case, they would manufacture new ones. Thus, after Dr. Calmbacher communicated his negative findings to the RICO Defendants and their co-conspirators, he was "terminated without warning or explanation" and Donziger ordered him to return to the United States. At the time, Donziger believed that "[Dr. Calmbacher] will still sign the perito [expert] reports, but we might have to write them in Quito."

106.   Dr. Calmbacher, however, was adamant that he would still be the one to "write the Perito reports," despite his differences with Donziger, because he needed "to comply with [his] obligation to the court and to maintain [his] professional integrity with the Ecuadorian court." In an email to Donziger, Dr. Calmbacher made clear that the RICO Defendants were not to alter any of the conclusions in his report:

> It also has been stressed to me that it is highly unusual for a perito [expert] to al-
> low others to contribute to the writing of a report. Comments or review is accept-
> able, but the perito's opinion and findings are final. I therefore have and feel no
> obligation to allow your team of textile engineers and associated cron[i]es to re-
> view or edit my reports. I am assured, as perito of the court, that I am completely
> within my rights to write and submit my report independent of those who have
> nominated me for appointment as perito. My sole obligation is to tell the truth, as
> I see it, to the court, no matter the consequences for either party.

107.   After Dr. Calmbacher's rebuke, Donziger threatened to withhold payment from him in order to pressure Dr. Calmbacher to draft the reports in a manner that would back up the Lago Agrio Plaintiffs' assertions. Donziger described this strategy to Wray, Kohn and Bonifaz, but also noted that, if the problem was not resolved, "we are developing a Plan B that will be ex-plained in person."

108.   Plan B put into play Donziger's view that "[s]cience has to serve the law prac-tice; the law practice doesn't serve science." The RICO Defendants and their co-conspirators cast aside Dr. Calmbacher's actual conclusions and set about manufacturing reports to be filed under Dr. Calmbacher's name, a fact that Chevron only learned for the first time at Dr. Calmbacher's March 2010 deposition that Chevron subpoenaed pursuant to 28 U.S.C. § 1782.

109.    The difficulty for the RICO Defendants was how to obtain Dr. Calmbacher's signature on the false conclusions they wanted to submit as "expert" findings. Their solution was to send Dr. Calmbacher initial drafts of the report, which correctly characterized his conclusions, for his review. Because the drafts appeared to accurately reflect his opinions, Dr. Calmbacher authorized the reports to be filed.

110.    Next, the conspirators prevailed upon Dr. Calmbacher to provide signature pages, along with several blank pages bearing his initials, which he did, based on the lie that these extra pages would be used to file the reports he had already authorized to be filed. At the conspirators' request, Dr. Calmbacher sent by overnight delivery service one set of these signed and initialed pages to Ecuador and the second set directly to Donziger in New York.

111.    The reports that the RICO Defendants and their co-conspirators filed under Dr. Calmbacher's name, however, are not the same as the reports that he authorized to be filed. Instead, as part of their Plan B, the RICO Defendants and their co-conspirators prepared different, fraudulent reports that misstated the evidence and concluded that the inspected sites presented a danger to the environment and required additional remediation. The conspirators printed their fraudulent reports on the pages that Dr. Calmbacher had initialed, used the signature pages that he had provided, and filed the forged reports with the court in Lago Agrio.

112.    Although Chevron has since informed the Lago Agrio court about the falsified Calmbacher reports, to date the court has refused to remove his reports from the record or take any corrective measures.

### c.    Arranging Cabrera's Appointment as Global Assessment Expert and Secretly Writing His Supposedly "Independent" Report

113.    When Dr. Calmbacher refused to cooperate in the scheme to defraud and extort Chevron and when the Lago Agrio court's settling experts began to confirm the RICO Defendants' and their co-conspirators' lack of evidence, the conspirators changed tactics. Realizing that neutral settling experts would not accept their fraudulent claims, the RICO Defendants and their co-conspirators requested that the Lago Agrio court abandon the judicial inspection process

that had been agreed to by the parties. In its place, the conspirators arranged for the Lago Agrio court to create a new "global assessment" process and secured the appointment of a co-conspirator to the position of the purportedly neutral "global assessment expert" with whom they would work in secret to ghostwrite his report. Until Chevron uncovered the RICO Defendants' and their co-conspirators' underlying fraudulent behavior, their plan seemed to be working.

114.    To the Lago Agrio court, the conspirators proposed that a single expert be appointed, and that he and his team conduct a global assessment of the former concession area.

115.    To execute their scheme, the RICO Defendants assembled a team handpicked by the conspirators of U.S. scientists, Ecuadorians, engineers, and other experts, who would do the actual work charged to Cabrera. And after the report was filed, some of individuals were disclosed as members of Cabrera's fictional team.

116.    In December 2006, more than two months before Cabrera was appointed by the court, Donziger discussed the RICO Defendants' and their co-conspirators' plan to ghostwrite the "independent" report with co-conspirator Soltani: "The judge is going to appoint a guy in Ecuador, um, to be the expert, but really, you know, we'll be supporting him with the work—our people, E-Tech, whoever we choose to use." As Donziger saw it, the expert would "ha[ve] to totally play ball with us and let us take the lead while projecting the image that he is working for the court." Indeed, the driving question for the plaintiffs during this period, was, as Donziger mused, "how can we control this perito?"

**(i)    Weeks Before the Court Appointed Cabrera, the RICO Defendants Meet With Him to Plan His "Independent" Expert Report**

117.    The RICO Defendants and their co-conspirators put their expanded scheme to defraud and extort Chevron in motion in early 2007. The first order of business was to ensure that the court adopt the new "global assessment" process proposed by the RICO Defendants and their co-conspirators and appoint Cabrera as the global assessment expert.

118.    On January 16, 2007, Fajardo reported that he had been in contact with the Lago Agrio judge in person and had sent him an email message regarding who to appoint as the global

47

assessment expert. Fajardo then set about persuading Cabrera to join them in their extortionate scheme in a series of secret meetings during February 2007. The RICO Defendants and their co-conspirators first appealed to Cabrera emotionally, impressing upon him "the importance of the case, what it means for history, how we can do something that we will always be remembered for, what this would mean for the country and world, etc." They also made it clear that he would be rewarded financially. Not only would Cabrera be paid a substantial sum for his "work," an amount that eventually totaled at least $263,000, but Donziger or one of his co-conspirators likely told Cabrera what Donziger had told another potential expert: "if he served as the global court expert and the plaintiffs won the case that he would have a job the rest of his life being involved in the remediation."

119.    Having convinced Cabrera to join their conspiracy and secure in the knowledge that the court would select Cabrera, the conspirators set to work with him to plan the writing of the report by the covert U.S. team the RICO Defendants and their co-conspirators had assembled. This report would develop into an essentially fictional description of the region that alleged massive harms with little or no valid data or analysis in support. And Cabrera would act as the RICO Defendants' and their co-conspirators' puppet.

120.    On March 3, 2007—two weeks *before* the court appointed Cabrera—Donziger, Fajardo and Yanza met with Cabrera to plan the report. Also present at this meeting were members of the U.S. team working with the conspirators to ghostwrite the Cabrera Report, including Defendant Ann Maest, Richard Kamp of E-Tech International and Charles Champ of Champ Science and Engineering.

121.    In the morning session of the March 3rd meeting, Fajardo gave a PowerPoint presentation outlining the plan for Cabrera's Global Expert Assessment. As part of that plan, Fajardo stated: "Our legal theory is that Texaco is liable for all of the existing damage, even that caused by Petroecuador." Fajardo then outlined a plan for dealing with Chevron: "Chevron's main problem right now is that it doesn't know what the hell is going to happen in the global expert examination. In other words, they don't know that. I hope none of you tell them, please.

[laughter] . . . . [I]t's Chevron's problem." Next, Fajardo identified six steps that the RICO De-
fendants must take, specifically:  (1) the team must "[k]eep up the pressure and constant over-
sight in the court"; (2) the team must "[m]ake certain that the expert constantly coordinates with
the [Lago Agrio] plaintiffs' technical and legal team"; (3) "[t]he [Lago Agrio] plaintiffs' techni-
cal coordinator must be [involved] in the process fulltime" and "[a]ccompany the expert in the
field"; (4) "an attorney . . . will always be in the field to also protect the activity being per-
formed"; (5) the team must "provide the facilities and necessary support to the field team"; and
(6) the team must "support the expert in writing the report."

122.   Fajardo made clear that they were the ones who would actually be writing
Cabrera's report, explaining:  "And here is where we do want the support of our entire technical
team . . . of experts, scientists, attorneys, political scientists, so that all of us will contribute to
that report—in other words—you see . . . *the work isn't going to be the expert's.  All of us bear
the burden.*"  Someone asked whether the final report was going to be prepared only by the ex-
pert Cabrera.  Fajardo responded that the expert will "sign the report and review it.  But all of us
. . . have to contribute to that report."  Ann Maest of Stratus asked, "Together?" and Fajardo con-
firmed.  Maest then stated, "But not Chevron," and everyone laughed.

123.   Later that day, the conspirators discussed the "work plan," a document that was
prepared by the conspirators and subsequently submitted to the Ecuadorian court by Cabrera as
the independent court expert.  Donziger proposed that he and the U.S.-based consultants form a
"work committee" to present a "draft plan," with a goal of being "more or less eighty percent,
ninety percent from achieving a plan" in a few days.  Looking at Cabrera, Donziger then said,
"and Richard, of course you really have to be comfortable with all that.  And we'll also def—
define the support the expert needs."  The recording of the meeting ended with Donziger com-
menting, they could "jack this thing up to thirty billion in one day."  Donziger went on to say
that he was exaggerating—it would really take 90 days.  And in the end, the RICO Defendants
and their co-conspirators "jacked up" the damages estimate in Cabrera's Report to $27 billion.
Their plan of submitting their liability and damages theories under the guise of an "independent"

expert report whose content was dictated by the very persons who stood to profit from an extorted payment from Chevron was thus well under way.

124.     The next day, March 4th, Donziger explained how he would accomplish the conspiracy's goal, despite the absence of supporting evidence.  When Defendant Maest and the other consultants hired by the RICO Defendants and their co-conspirators to write Cabrera's report told Donziger that there was no evidence that contamination from the pits had spread into the surrounding groundwater, Donziger responded:  "Hold on a second, you know, this is Ecuador, okay, . . .   You can say whatever you want and at the end of the day, there's a thousand people around the courthouse, you're going to get what you want" and "[t]herefore, if we take our existing evidence on groundwater contamination, which admittedly is right below the source . . . [a]nd wanted to extrapolate based on nothing other than our, um, theory," then "[w]e can do it. And we can get money for it."  He continued:  "*Because at the end of the day, this is all for the Court just a bunch of smoke and mirrors and bullshit.*"  And when Champ argued that "there is not enough information on that groundwater" and that "the one hole in the remediation, is the water," Donziger instructed the camera crew capturing his conversation to stop filming, stating, "[T]here's another point.  I got to make . . . to these guys, but I can't get this on camera."

125.     The RICO Defendants' and their co-conspirators' strategy all along, as first evidenced in Donziger's discussion with Fajardo about whether to request an even higher amount than Russell's disavowed $6 billion damages estimate to make it appear as though a judgment of a lower amount was reasonable or even somehow favorable to Chevron (*see* ¶ 98, *supra*), was to provide an absurd damages number to convince the judge to award a lower but still outrageous amount.  Donziger described the goal to his consultants:  "If we have a legitimate fifty billion dollar damages claim, and they end up—the judge says, well, I can't give them less than five billion."  He explained that an inflated damages number would allow the judge to say that "Tex had a huge victory.  They knocked out ninety percent of the damages claim."

126.     Donziger brushed off other comments from consultants Champ and Kamp expressing concern about meeting with Cabrera.  First, Champ told Donziger, "I know we have to

be totally transparent with Chevron in showing them what we're doing." Donziger responded, "No, no," and stated, "because they will find out everything we do." He continued: "Our goal is that they don't know shit . . . and that's why they're so panicked." Then, Kamp expressed un-ease about the process and commented to Donziger that "[h]aving the perito [Cabrera] there yes-terday in retrospect . . . That was bizarre." In response, Donziger instructed Kamp: "Don't talk about it," and, "that's the way it works." Donziger told the camera crew, "[T]hat is off the re-cord."

127.     The RICO Defendants' and their co-conspirators' close relationship with Cabrera also raised questions in the minds of the *Crude* filmmakers, who became "confused about why Chevron is saying that the Court Appointed expert is biased." The filmmakers asked Fajardo why he was paying Cabrera, "[w]hy is Chevron not also paying for the expert and why do they not have their own expert[?]" Even to sympathetic individuals untrained in legal mat-ters, something about the RICO Defendants' and their co-conspirators relationship with Cabrera seemed wrong.

**(ii)     The Court Appointed Cabrera as Its "Independent" "Global Assessment Expert"**

128.     In late February, to cover up the fact that the judge planned to appoint the "global assessment expert" championed by the RICO Defendants, the judge called Cabrera and purported to ask him for a recommendation for the expert. But by this point Cabrera's appoint-ment had already been secretly secured by the RICO Defendants. Indeed, in their internal corre-spondence they discussed the steps they had taken to make "100% sure the judge would appt Richard," including threatening the judge with a complaint against him that they showed him, but never filed. Thus, when Donziger feared the judge's call to Cabrera meant the appointment of the RICO Defendants' hand-picked "expert" was in jeopardy, Fajardo reassured him that the call was just "part of the judge's complicated plan to protect himself." On March 19, 2007, the Lago Agrio court did indeed appoint Cabrera as its global assessment expert, ordering that

51

Cabrera would be "responsible for the entire report, the methodology used, for the work done by his assistants, etc."

129.    Cabrera, the RICO Defendants, and their co-conspirators had violated the terms of Cabrera's appointment before he had been appointed, and they would continue to do so throughout his service. They did this even though the RICO Defendants knew, as Donziger has since admitted, that the Lago Agrio court ordered Cabrera to "act with absolute objectivity and independence" and to "act independent of the parties." The RICO Defendants, however, knew that they had to maintain a façade of independence. To do so, shortly after Cabrera was appointed, they plotted "something that Richard [Cabrera] could do AGAINST us in order to prove his independence."

130.    When the Lago Agrio court officially swore in Cabrera as the global assessment expert on June 13, 2007, Donziger exclaimed that "the perito just got sworn in . . . this is a huge victory!!!!!!!!" He further elaborated that the development was good for the Lago Agrio Plaintiffs' case: "We have to keep pushing on all fronts at all times. . . . [A]ll this bullshit about the law and facts . . . but in the end of the day it is about brute force . . . . [Cabrera's appointment] took five months . . . five months of delay . . . and [the judge] never would have done [it] had we not really pushed him."

131.    Consistent with Cabrera's unique and central status as the court's sole expert for damages issues, including liability, the Lago Agrio court repeatedly issued orders that Cabrera was required to be independent from the parties. For example, when the court administered the oath to Cabrera in June 2007, Cabrera had to promise that he would perform his duties "with complete *impartiality* and *independence* vis-à-vis the parties." And on October 3, 2007, the Lago Agrio court ordered Cabrera to "work in an impartial manner and independently with respect to the parties." The court further explained that "the role of the expert is one of complete impartiality and transparency with respect to the parties and their attorneys" and required Cabrera to "observe and ensure . . . the impartiality of his work, and the transparency of his activities." By then, the conspirators were already well into planning the drafting of Cabrera's

purportedly independent report, and indeed the court itself may have been participating in the scheme by this point, and merely issuing these orders for the sake of appearances.

132.    In November 2007, the Lago Agrio court ordered that "all the documents that serve as support or a source of information for the work performed by the Expert must be presented together with the report. . . . [I]n his report the Expert is required to cite all of the scientific sources, and analytical and legal documents that he uses to perform his work."

### (iii)    While Cabrera Staged Mock Inspections, the RICO Defendants and Their Co-Conspirators Secretly Ghostwrote His Report.

133.    In public, the RICO Defendants and their co-conspirators and Cabrera worked to maintain the illusion that Cabrera was an independent expert. At one inspection, in an exchange included in the film *Crude*, Cabrera and Fajardo made a show of rejecting a suggestion from Chevron's lawyer Diego Larrea that counsel for the parties be permitted to make suggestions to Cabrera as to what samples he might take on his inspections (translations are taken from *Crude*):

Cabrera:    (Addressing the public)  I have been named the expert for the global assessment report.  At this juncture, I am the highest authority at this examination.  The samples taken and the analyses done today will be the only ones valid for this report.

\*\*\*

Larrea:    (To Cabrera)  We would like you to consider the possibility of letting us know what kind of sample will be taken at each location so that eventually we can suggest that other samples be taken—

Fajardo:    (Raising his hands in protest) Wait, wait, wait. . . .

Larrea:    In the same terms that Pablo says —

Fajardo:    You can't do that.

Larrea:    The expert can check the equipment to verify if it's visible. (To Fajardo) It's a request.  He can deny it or accept it.

Fajardo:    What we agreed on was that the expert has the authority to say what is and what isn't going to be.  We can't say "take samples here and there."  Excuse me, but that is something he has to decide.

*** 

Cabrera:   (To Larrea) You can make a suggestion, but I can't work under your
           criteria. I decide where to take samples, and that's it, counselor.

134.   Of course, while Fajardo's duet with Cabrera at the inspection site was featured
in the theatrical release of *Crude*, the outtakes show that Fajardo was doing far more than merely
inspecting Cabrera's equipment. At their all-day session weeks earlier, Fajardo told Cabrera ex-
actly what "criteria" he would be working under, and how Fajardo's associates would secretly
write Cabrera's report for him. And when Cabrera did go into the field to conduct testing,
Donziger laid down further "criteria" under which he expected Cabrera to work in an email to
Yanza and Fajardo: "When I get there, we'll re analyze the work and the budget with Richard.
And we'll adjust with a much smaller team. My tendency is to stop Richard from working much
more in the field . . . or, if he continues doing it, he should continue under the most strict control
with an extremely limited number of samples. And we'll change the focus of the data at our of-
fices." The RICO Defendants have also admitted that they selected the sites that Cabrera would
sample.

135.   Back in the United States, preparations were well underway for drafting
Cabrera's Report. Just after the March meeting with Cabrera, David Chapman, a Principal at
Stratus, emailed Donziger, proposing that "the way this would work best is that if Stratus did
much of the work, putting the pieces together and writing the report." Shortly thereafter, on
April 27, 2007, the conspirators assembled at Stratus's offices in Boulder, Colorado to discuss
how they were going to "jack this thing up to thirty billion," as Donziger had put it. Present at
the meeting from Stratus were President Joshua Lipton, David Chapman, Preston Sowell, and
Defendants Beltman and Maest.

136.   The participants in this meeting also discussed how they could leverage the
Cabrera Report, once it was filed in the Lago Agrio court, as a supposedly independent endorse-
ment of their position. Donziger talked up how important and far-reaching he thought the report
should be: "We also see this case as having a larger meaning. . . . [W]e think that, Uhm, this is

54

the kind of thing people will be interested in reading.  You know, like this damages report[—]academics, people in your field, other lawyers."  Lipton responded, "we loved the whole package."  As a result, Stratus entered into a contract with Kohn Swift to provide technical assistance, including the production of reports and support in discussions with the media, in furtherance of the conspiracy.  The initial contract for $125,000 was modified multiple times to accommodate Stratus's increasing involvement and fees.  Indeed, by the fall of 2009, Stratus received at least $1.1 million in payment for their role in the criminal scheme.

137.    Meetings and communications continued between the conspirators as they prepared Cabrera's report.  Leading up to the April 2008 filing of Cabrera's first report, Stratus, Donziger, Kohn, and environmental consultants exchanged hundreds of emails regarding draft outlines of the Cabrera report and proposed annexes, schedules for completion of various annexes, and discussing review, analysis, and translation of the annexes including "[e]nvironmental standards," "[e]co impacts from contamination," "[p]it (plus) cleanup costs," "[v]alue of human life losses," "[h]abitat losses at wells and stations," "TexPet [r]emediation summary," "[h]istorical data summary," "[d]ata extrapolation" and "[t]oxicity of site chemicals to humans." (Additional details concerning the emails exchanged in furtherance of the conspiracy's scheme to defraud Chevron are included in Appendix B, which is incorporated by reference as if set forth herein in its entirety.)  During this period, Donziger continued to press for higher and higher damages numbers, explaining at one point that an estimate for unjust enrichment "sound[ed] awfully low" and implored that the Stratus consultants not "say or even suggest anything that backs away from the [Lago Agrio plaintiffs'] figures."  And as another means of getting the high numbers he wanted—and getting the most impact from the "independent" expert—Donziger during this period suggested to Stratus that they "define the norms of clean-up" and then "propose these norms to the Ministry of Energy which governs these norms[,] and whose Minister is a good friend of ours, so that the Ministry issues them as an official decree before the trial ends."

138.    The numerous emails among the Stratus team and between Stratus and Donziger were necessary because, as Beltman explained in a February 22, 2008 email urging his Stratus

colleagues' support: "We have to write, over the next 2 to 3 weeks, probably the single most important technical document for the case. The document will pull together all of the work over the last 15 or so years on the case and make recommendations for the court to consider in making its judgment." And that "single most important technical document for the case" was the Cabrera Report itself. As Donziger has now admitted, "[T]he general idea" was "that Stratus would draft the report in a form that it could be submitted directly to the Ecuadorian court by Mr. Cabrera."

139.    As Beltman, Donziger and others made decisions about the contents of appendices to the report and which appendices to include, Beltman also turned his focus to completing the draft of the report itself, writing to colleagues on March 10, 2008: "Now that the annexes are out of the way, there's the little problem of the report itself. Unfortunately, I've been too busy on annex stuff to work much on it, and it has to go to the court in [two] weeks and get translated. It's a problem." Indeed, Beltman himself was responsible for drafting the majority of the report, while the various annexes were parceled out among the various Stratus employees and contractors and others hired by the RICO Defendants. When he had an initial draft of the Cabrera Report written, Beltman sent it to Donziger, asking whether he was "on track in terms of tone, language level, and content."

140.    While Stratus was the primary coordinator of the work that went into the Cabrera Report, other members of the U.S.-based team of experts the conspirators assembled, including E-Tech International, Uhl, Baron, Rana & Associates, Inc., and 3TM Consulting, also contributed to the report without attribution in the report or disclosure to Chevron. Annex S of the Cabrera Report, for example, was drafted by co-conspirator William Powers, who worked for E-Tech and was a subcontractor for Stratus, and his calculations were used in Annex T. And Richard Clapp, another consultant hired by Donziger and his co-conspirators, drafted one of the annexes to the Cabrera Report.

141.    As the various consultants finished their portions of the Cabrera Report, Beltman took on the delicate task of translating the report, written in English by U.S. consultants, into

Spanish. As Beltman would later put it, they would treat "our original English version as if it's a translated version" of Cabrera's work. In March 2008, Beltman corresponded with several translation firms, ultimately working mainly with Translating Spanish, Inc. On March 12, 2008, Beltman sent the actual Cabrera Report—which contained an introduction falsely stating that "[t]his report was written by Richard Cabrera, ING to provide expert technical assistance to the Court"—to be translated into Spanish for filing with the Lago Agrio court. And as Beltman and other Stratus Consultants revised their work, they forwarded new annexes of the report for translation as well. In addition, the critical annexes to the Cabrera Report covering alleged remediation costs, excess cancer deaths, and other building blocks of what would ultimately be a $27 billion fraud were also translated into Spanish at Beltman's direction days before they were fraudulently submitted to the Lago Agrio court as the work of Cabrera and the other Spanish-speaking personnel to whom the report would be attributed. In order to facilitate the final preparations, the RICO Defendants discussed renting office space in Ecuador as well, but Donziger stressed that it had to be "isolated," and could not be space shared with those known to be affiliated with the RICO Defendants.

142.     Prior to the Cabrera Report's submission, Beltman followed up to ensure that those consultants who had actually written certain annexes had their "name[s] taken off" prior to submission. The RICO Defendants and their co-conspirators determined "to whom Richard [Cabrera would] attribute each of the annexes," and it was not to their actual authors. All of these contributions were orchestrated by the conspirators, who maintained a master schedule identifying each portion of the report, which of their team members would do the actual work, and to whom they could publicly and fraudulently "attribute[e]" each in the filed Cabrera Report."

143.     The conspirators did not entirely ignore Cabrera during this period of heavy drafting. In January 2008, Donziger, Beltman, Maest, Fajardo and others met privately with Cabrera as the conspirators were in the home-stretch of drafting his report. The RICO Defendants also delegated various aspects of the report to nominal authors who had not been publicly

identified as working with the Lago Agrio Plaintiffs, but who in fact were close associates of the RICO Defendants. The RICO Defendants kept a close eye and a firm hand on their work. For example, Luis Miguel Garcia Aragon, who was later disclosed to be a member of Cabrera's team, engaged in ongoing email communication with Beltman and Maest regarding the drafting of extensive portions of the Cabrera Report. On January 22, 2008, Aragon emailed Beltman, "We're moving forward with our model thanks to your help. Now I'm maling [sic] you after the doccuments [sic] you told me about. Do you remember, about the discount rate and so? I'd appreciate you sending me those." The RICO Defendants and their co-conspirators also retained and worked with another consultant Juan Cristobal Villao Yepez, who was also later identified in the filed Cabrera Report as a member of Cabrera's "independent" team, and the technical reports on water issues that he wrote as a paid consultant for the RICO Defendants ultimately appeared in the Cabrera Report. Another supposed member of Cabrera's "independent" team is Ximena Echeverria who has since been revealed to be an employee of Defendant Selva Viva and who was actively working with Stratus, a fact never disclosed to Chevron or the Lago Agrio court until it was revealed in Chevron's U.S. discovery efforts. Accordingly, the RICO Defendants and their co-conspirators and "Cabrera's team" were one and the same.

  144. The short time table between Stratus's drafting of the report, its translation, and submission of the report to the court meant that Cabrera's review was necessarily limited, if he reviewed the report at all. As Beltman put it, the conspirators were "stuck with [a] very tight timeline" to get the report translated and reviewed. In fact, the report itself was scheduled to be translated into Spanish by March 18, 2008, giving Cabrera mere days to review the report— along with the 4,000 pages of accompanying material—before submitting it to the Lago Agrio court in his name. Such a schedule, and the resulting preclusion of any real review of the Stratus-drafted report by its purported author who, according to Donziger, ultimately "adopted pretty much verbatim what had been provided to him," put the RICO Defendants and their co-conspirators in what Beltman called a "tight bind."

145.    In fact, Cabrera himself received the translated report so late as to render any substantive review impossible.  Nonetheless, Cabrera, the RICO Defendants, and their co-conspirators intended to spread the lie that the report was Cabrera's own.  To this end, they made every effort to conceal the huge amount of work performed by Stratus and others, despite the Lago Agrio court's order that Cabrera present "all the documents that serve as support or a source of information" and "cite all of the scientific sources, and analytical and legal documents that he use[d]."  Donziger has admitted that "there was a general feeling on our team that we wanted" to "ke[ep] confidential" the "fact that plaintiffs had written" "[p]ortions of what became the Cabrera report."  Concealing this fact was partly driven by the concern of some of the RICO Defendants and their co-conspirators about being criminally charged in Ecuador if they had ad-mitted that they had ghostwritten portions of the report filed under Cabrera's name.

146.    The RICO Defendants and their co-conspirators have never disclosed, and have still not admitted, the relationship between Cabrera and the Lago Agrio Plaintiffs to the Lago Agrio court.  Indeed, they have failed to disclose this fact even though as early as May, 2010, one of the conspirators, Ilaan Maazel of Emery Celli, conceded in internal correspondence that "neither Cabrera nor plaintiffs disclosed a submission from plaintiffs that contained drafts of part of the expert report written by Stratus" and another, Jonathan Abady of the same firm, described the relationship as the "wholesale adoption of Stratus work product w/o attribution."  And Donziger himself has now conceded that he "do[es]n't think" the Cabrera Report's statement of authorship—"[t]his report was written by expert engineer Richard Stalin Cabrera Vega"—"is accurate" and that Stratus ultimately gave Cabrera "a substantial amount of material," including "an actual report with annexes in Cabrera's name."  Yet the RICO Defendants still have not ac-knowledged the truth.  As recently as January 2011, the RICO Defendants filed a brief in the Third Circuit stating that "[t]he Ecuadorian court was and is well aware of the Ecuadorian Plain-tiffs' *ex parte* contacts with Cabrera and submission of materials to him—and indeed, *invited* such contacts and submission."

147.     The RICO Defendants and their co-conspirators, in attempting to conceal the true authorship of the Cabrera Report and its annexes, encountered some close calls. On May 14, 2008, for example, Beltman wrote to Defendant Donziger regarding an "[u]rgent issue" that arose when Karen Hinton, spokeswoman for the Amazon Defense Front, wanted to give Richard Clapp's report—the same report the RICO Defendants submitted as an annex to the Cabrera Report—to a reporter. To have done so would have exposed the truth that the RICO Defendants and their co-conspirators and their consultants actually wrote the Cabrera Report. And so, Beltman told Hinton not to use the Clapp report, giving the false reason that he was "not sure of its pedigree" instead of telling her the real reason it could not be made public: that it was used "as an Annex" to the Cabrera Report. Concerned about covering their tracks, Beltman warned Donziger that they "need to be careful about this." And later, when the RICO Defendants and their co-conspirators feared that Clapp himself would inadvertently disclose the true authorship of the Cabrera Report during a congressional hearing, Donziger explained the steps necessary to prevent exposure: "We have to talk to Clapp about that 5-pager, and how we have to limit its distribution. It CANNOT go into the Congressional Record as being authored by [Clapp]."

148.     In their rush to finish the Cabrera Report and then the supplemental report, the RICO Defendants and their co-conspirators were not careful enough. After the Cabrera Report had already been submitted, Beltman realized that an annex to the Cabrera Report may have cited a report written by Clapp. The problem, according to Beltman, was that the cited report had then *itself* been used verbatim in Cabrera's report. Beltman lamented in an email to a colleague, "[o]h what a tangled web . . ." omitting the rest of the quotation, "when first we practice to deceive."

149.     In another effort to prevent Stratus's role in drafting the Cabrera Report from coming to light, Beltman attempted to influence the testimony of Stratus employees who might be called to testify in United States court. After Chevron filed an action pursuant to 28 U.S.C. § 1782 seeking discovery from Stratus, Stratus held staff meetings attended by all staff available at that time, including some personnel who had been subpoenaed to testify. The staff members

60

were provided with information about Chevron's subpoenas and the Cabrera Report, and Beltman, taking the opportunity to create a consistent but misleading story, misrepresented to the meeting attendees that Cabrera was an "independent expert who submitted his own report to the court." During this and other staff meetings, Beltman also misrepresented Stratus's role to Stratus staff. He explained that Stratus had "prepared a series of technical analyses" that were given to Cabrera "to help in his preparation of his report" and failed to disclose the fact that Beltman and other Stratus consultants had authored the report that Cabrera submitted as his own.

150.    Fajardo and Donziger also discussed how they would respond to any accusations that "Cabrera used exactly, or almost exactly, the same words we put in our motions." Fajardo offered the "[s]imple" solution of concocting a story that the RICO Defendants submitted material to Cabrera after they noticed some errors in the calculations and figures in the report and that Cabrera then adopted their submission. As Fajardo put it, "There is no substantive problem, we just have to explain it."

151.    In addition, the conspirators sought otherwise to cover their tracks in the United States. E-Tech, for example, failed to report income received for doing its work to the Internal Revenue Service, characterizing payments to consultants as charitable contributions, and routed payments, inside the United States and abroad, in order to hide the fact that these payments were being used to fund unlawful activity. E-Tech has also subsequently failed to file required reports in its home state of New Mexico, resulting in the cancellation of its Certificate of Incorporation. And as the RICO Defendants and their co-conspirators continue to obstruct Chevron's investigation into their conduct in front of many U.S. federal courts, they have kept up a constant public pressure campaign attacking every suggestion that the Cabrera Report was not neutral and independent. *See* Section B.3., *infra*. This defense of the Cabrera Report is necessary because, among other things, without it the RICO Defendants would be left with no evidence of either liability or damages.

(iv)   The "Cabrera" Report:  The RICO Defendants' Re-
          peated Fraud

152.   On April 1, 2008, accompanied by armed guards, Cabrera filed his first report with the Lago Agrio court.  Despite the fact that Cabrera still had more time to file his report and had not made any public statement that he would be filing it early, the RICO Defendants knew when he would file the report, and had prepared detailed press releases and alerted the *Crude* team to be on hand to film the event.  Relying on misstatements, conclusions not supported by evidence, and bad science, the "Cabrera" Report—the culmination of the clandestine work that the conspirators had begun more than a year earlier—concluded that Chevron was liable for more than $16 billion.  But the conspirators were not done ghostwriting material for Cabrera to falsely present as his own.

153.   In September 2008, the parties submitted to the Lago Agrio court questions and comments on the Cabrera Report.  The RICO Defendants' and their co-conspirators' submission filed on behalf of the Lago Agrio Plaintiffs was in all respects intended to perpetuate the false appearance that Cabrera was neutral and independent and that the RICO Defendants and their co-conspirators were not the report's true authors.  This submission purported to urge Cabrera to consider various documents and third-party reports, criticized his legal analysis of liability, and gave suggestions as to how he might support his existing findings and introduce new ones.  But it had been the RICO Defendants and their co-conspirators themselves who had decided which documents to review, how to present the legal case, and what findings and support to put forward in Cabrera's report.  Thus, the RICO Defendants and their co-conspirators wrote their "questions" to further the false appearance of independence from Cabrera.

154.   Cabrera filed a response to the Lago Agrio Plaintiffs' comments on November 17, 2008 in a supplemental report.  Ignoring Chevron's objections, the comments put forward by the Lago Agrio Plaintiffs are reflected (at times word for word, including errors) in Cabrera's supplemental report, which increased the damage recommendation to $27 billion, with little ex-

planation and no legally or scientifically valid support.  As Donziger had planned, the RICO De-
fendants and their co-conspirators were indeed able to "jack this thing up to thirty billion."

155.    The RICO Defendants and their co-conspirators also dictated other portions of
Cabrera's response by secretly drafting his "answers" to their own comments and questions.
Some of the "questions to the Perito [Cabrera]," according to an internal Stratus email, were "as-
signed to us."  In an email dated August 1, 2008, Beltman outlined for his colleagues what "we
need to do for the comments on the Cabrera report."  His email listed the various answers that
needed to be prepared, and what they should say.  Beltman repeatedly referred to the Lago Agrio
Plaintiffs' questions in the first-person and to their own work as that of "Mr. Cabrera."  For ex-
ample, he says that "[w]e comment on the lack of consideration given to cleanup of rivers and
streams," and "[w]e comment that Cabrera does not consider metal contamination in his cleanup
costs."  He then suggests possible responses to those comments.  Beltman likewise expressed his
desire that work performed by U.S. consultant 3TM "be in a form that someone in Ecuador could
have written," and another Stratus employee noted that Stratus needed to revise their work to
"clean up the language so it [would] sound[] more like [Cabrera] and less like a comment."

156.    The RICO Defendants accomplished their ruse in part by asking Powers, the
same Stratus contractor who ghostwrote portions of Cabrera's initial report (*see* ¶ 140, *supra*), to
respond to questions that had been raised in connection with the Cabrera Report.  Defendant
Maest provided Powers the questions to be answered—questions that were the very same ones
posed by the Lago Agrio Plaintiffs in their September 2008 filing.  Powers then supplied Maest
with the answers that are the same as those that are included in Cabrera's November 2008 report.

157.    In addition, the RICO Defendants and their co-conspirators incorporated into
Cabrera's response a second report written by Richard Clapp, another one of their hired consult-
ants.  Just as the RICO Defendants and their co-conspirators had been concerned that Hinton or
Clapp himself would inadvertently disclose the fact that Clapp's first report had been incorpo-
rated "as is" in the form of an annex to the Cabrera Report, they likewise became concerned that
the use of Clapp's second report in Cabrera's response would accidentally be made public.

Beltman warned Donziger, "I don't think we should hand out either [report] as Clapp's, thereby distributing proof."

158.    Beyond the misrepresentations concerning Cabrera's independence and the authorship of "his" report, the Cabrera Report—without which the RICO Defendants cannot demonstrate liability or damages—suffers from substantial flaws and fundamental problems.  Determined to "jack up" the damages estimate to $27 billion, the conspirators, among other egregious defects, attributed *all* alleged environmental impact from oil operations in the former consortium area to TexPet and none to Petroecuador, the sole owner of operations in the former consortium area for the past nearly 20 years and the one responsible for well over 1,400 oil spills during that time.  The report includes millions of dollars of damages for remediation of disposal pits that do not exist and are, in fact, shadows and other dark objects on aerial photographs.  In addition, the report relies on U.S.-derived cost baselines, standards, and methodologies which do not reflect substantial differences in costs between the U.S. and Ecuador, and are often meaningless outside the larger U.S. regulatory context.  For example, the report asserts that the cost of remediating the pits—including the imaginary ones—would be $2.2 million per pit.  This is *25 times* greater than Petroecuador's average actual cost of ongoing pit remediation at $85,000 per pit.

159.    Other intentional errors abound.  Even though Cabrera did not take a *single* sample of drinking water and despite the existence of literally dozens of public drinking water systems in the concession area, the report assesses $428 million in damages for potable water systems.  The conspirators also included $8.4 billion in damages for "unfair profits" TexPet allegedly earned, a penal levy that the Lago Agrio Plaintiffs never requested in their complaint, and included allocations such as millions of dollars to create a husbandry farm to produce hunting game for local residents.

160.    The Cabrera Report also unilaterally expanded the scope of Cabrera's mandate and went far beyond the expertise of his publicly disclosed team by addressing additional issues unrelated to the Lago Agrio Plaintiffs' claims for environmental remediation and medical monitoring.  Despite the failure to identify a single individual with cancer or produce a single medical

report, the report initially assessed $2.9 billion for "excessive cancer deaths" and then increased

that to $9.5 billion in the November 2008 filing, ostensibly based on just over a page of addi-

tional discussion. The report did not use any scientifically accepted method to link cancer to the

consortium's operations; instead of using official data, the "excessive" cancer deaths were "as-

sessed" on the basis of self-reporting at group meetings with undisclosed members of the local

population conducted by purported member of the Cabrera team Carlos Beristain, who was in

fact working at the direction of the RICO Defendants and their co-conspirators.

(v)    **The RICO Defendants' Fraudulent Endorsements of
Their "Cabrera Report" and Procurement of Other
Endorsements Through Misrepresentations**

161.    The RICO Defendants and their co-conspirators sought almost immediately after

filing the Cabrera Report to bolster it through the publication of endorsements of the report by

Stratus itself—the report's secret author—and by third-party experts.

162.    After the conspirators filed their report under the name of court expert Cabrera,

Donziger, Beltman, Maest, Fajardo, Yanza, and Hinton assembled again in Boulder, Colorado to

discuss and manage the "[s]cientific and public relation response to [the] Cabrera report." Dur-

ing this meeting, they developed their plan to obtain multiple levels of endorsement of the report

for use in the Lago Agrio court and the U.S. media. They also strategized about how to increase

the already unfounded damages number contained in the Cabrera Report, developed a plan for

responding to Chevron's criticisms of the report, and outlined a plan of attack on the media front.

As Beltman later acknowledged in an email to Amazon Watch about the progress of their plan to

procure fraudulent endorsements, "a big part of this will be for media."

163.    The first level of endorsement the RICO Defendants and their co-conspirators

put into play was the promotion of the Cabrera Report and the trumpeting of its "independence"

by Stratus, the report's secret author. On December 1, 2008, Stratus released a fifteen-page

document purporting to analyze and defend the Cabrera Report. In this document, which bears

on its front page the signatures of Beltman and Maest, as well as other Stratus employees, Stratus

claimed, "Mr. Cabrera is thus acting in the capacity of a neutral 'expert' to the Court, and his

65

role is to assist the Court in evaluating the scientific and technical information that was collected and compiled for the case.  In the U.S. Court system, Mr. Cabrera would be called a Technical Special Master."

164.     Stratus's December 2008 review of the Cabrera Report is written to give the impression that its authors had no connection to the Cabrera Report or the supplement to his report, and were providing a neutral, third-party review.  For example, the RICO Defendants and their co-conspirators described the writing of the report as follows:  "After reviewing the extensive record of environmental data and information that was collected during the trial, and collecting some of his own data, Mr. Cabrera has concluded that Texpet's operations severely contaminated a large area of the Ecuadorian Amazon, and that the contamination has caused extensive damages to the environment and its inhabitants."  Once completed, Stratus's "review" of the Cabrera Report was knowingly distributed by the conspirators using physical and electronic mail and remains available on a co-conspirator's website at http://amazonwatch.org.

165.     Stratus' "review" was intended to deceive, as one of the lawyers retained by the RICO Defendants who reviewed the submission in 2010 recognized.  Responding to an ongoing discussion about the RICO Defendants' plan to accuse Chevron of fraud on the theory that it knew Stratus had written the Cabrera report all along, the lawyer wrote the following to Donziger and other conspirators:

> This document might end the discussion. *These "comments" are written in a manner to give the impression that Cabrera was entirely independent and conducted his own research and came up with his own findings. There is no indication in this document that Stratus, ostensibly the company of experts independent from Cabrera, was itself involved in "ghosting" the Cabrera report.* This might not be dispositive if there were other evidence showing that Chevron had actual or constructive knowledge that Stratus had been involved in the creation of the Cabrera report. In such a case Stratus's "comments" may have been a rather crude and awkward  spin by a biased expert - but it would not have been a "fraud" upon Chevron. But, in the absence of such evidence, *then it appears not only that Cabrera and [the Lago Agrio] plaintiffs can be charged with a "fraud" respecting the former's report, but that Stratus was an active conspirator.*

This statement admitting that Stratus was involved in "ghosting" the Cabrera Report and expressing concerns regarding Stratus's "endorsement" of the report was from one of the Lago Agrio Plaintiffs' attorneys purportedly retained by Donziger.

166.     The second level of endorsement envisioned by the RICO Defendants and their co-conspirators and discussed during their June 2008 meeting in Boulder involved soliciting the endorsement of credible experts by deceiving them about the Cabrera Report's authors and the collusion between the RICO Defendants and their co-conspirators and Cabrera. During the meeting, the RICO Defendants and their co-conspirators discussed the fact that experts who had already been approached for endorsement had questioned their "relationship to Cabrera," and the RICO Defendants and their co-conspirators acknowledged that they "need[ed] to be able to give them answers." What they ended up doing, in fact, was concealing that relationship entirely.

167.     In seeking the sham "endorsements" of the Cabrera Report, Stratus falsely represented to numerous third parties that the report was written by Cabrera. For example, on June 12, 2008, David Mills of Stratus emailed a representative of California's Office of Spill Prevention and Response, describing the Cabrera Report as follows: "As part of the trial, the Ecuadorian judge currently directing the case appointed a technical expert to summarize[] and analyze the technical data and information about the case and draw conclusions about the environmental and human impacts of the oil exploration and production activities. This expert report was recently submitted to the court." Stratus asked the representative to review the Cabrera Report for a fee and provide comments via telephone conversation—comments that, if favorable, could later be submitted by the RICO Defendants and their co-conspirators to the court.

168.     Similarly, on June 26, 2009, Beltman emailed a representative of Brazil's Aggeu Magalhães (Haggai Magellan) Research Center seeking an endorsement of the Cabrera Report. In that communication, Beltman referred to "the Court Expert report in which [Cabrera] presents the results of his studies and makes recommendations to the judge about the damages caused by Texaco and what needs to be done as reparation for those damages." Beltman asked the Haggai Magellan Research Center to "please review the Court Expert report and read our evaluation of

it, and think about how you could provide support.  Our first choice is for you to sign the evaluation that we drafted (I can provide you with a blank signature page for you to sign and return)."

169.    The RICO Defendants' and their co-conspirators' goal of obtaining fifteen or twenty endorsements from academics in addition to consultants, however, proved difficult given what Beltman called the "weaknesses" of the Cabrera Report.  As Beltman explained to Donziger in an email:  "Our original concerns about this have come to pass . . . .  [Academics] are trained and they function to be critical, not accepting.  [Additionally], they know that signing their names onto some kind of endorsement of the Cabrera report is setting them up for public attack from Chevron (and perhaps attack within their academic circles as well) . . . .  And finally, some of the underlying work in the Cabrera report has weaknesses that an academic would probably have a hard time defending."  Beltman explained, "[w]e're having better success with consultants being willing to sign endorsements than academics (something I am not proud of)."

170.    The RICO Defendants and their co-conspirators did, however, ultimately succeed in convincing third parties to review the Cabrera Report that Stratus held out as having been drafted by a "Technical Special Master."  For example, on July 15, 2008, Stratus executed a contract with Dr. Peter N. Jones of Bauu Institute whereby he agreed to review the Cabrera Report and provide comments in a conversation with Stratus.  Such fraudulently obtained endorsements, along with Stratus's own evaluation—falsely touted as "independent"—served to further enhance the value of the Cabrera Report in the RICO Defendants' and their co-conspirators' media pressure campaign targeted at forcing Chevron to pay them off.

### (vi)    The RICO Defendants' Payments to Cabrera for Work He Did Not Perform

171.    The perceived independence of the Cabrera Report was essential to the RICO Defendants' plan.  Independence was the key to its credibility with the press, the public, and the other parties whose endorsements the RICO Defendants and their co-conspirators needed.  Of course, the perception of independence would be lost if it was known that the RICO Defendants and their co-conspirators wrote the report themselves, and keeping this secret required Cabrera's

cooperation. And if the Cabrera Report were perceived as untrustworthy, the RICO Defendants would be at a loss to demonstrate Chevron's liability, not to mention the "damages" they hoped to recover. Accordingly, when the RICO Defendants arranged for the court to abandon the judicial inspection process and appoint Cabrera as a "global" expert, they also insisted that the parties should pay for this process, and directly paid Cabrera over $263,000, despite the fact that Chevron objected throughout to the improper new process and refused to fund it. As it is now clear that Cabrera did not write the report, the only purpose for these payments, which were made by Defendant Selva Viva and funded by Kohn or Kohn Swift, must have been to buy Cabrera's cooperation and silence regarding the true authorship of the report.

172.    Cabrera earned his money by repeatedly perjuring himself in the Lago Agrio court. For example, on July 23, 2007, four months after an all-day PowerPoint session with Donziger and Fajardo, Cabrera declared to the court: "I should clarify that I do not have any relation or agreements with the plaintiff, and it seems to me to be an insult against me that I should be linked with the attorneys of the plaintiffs."

173.    When Chevron raised questions with the Lago Agrio court as to the authorship of the Cabrera Report and Cabrera's relationship with the Lago Agrio Plaintiffs, Cabrera Represented in multiple filings with the Lago Agrio court that he had worked independently and transparently despite evidence to the contrary. On October 7, 2008, for example, Cabrera declared in a filing that he is an "honest man with nothing to hide, and [his] conduct as an expert in this case has been as professional, impartial and objective as possible, as can be seen from [his] expert report." In that same filing, Cabrera asserted that he does "not take orders from either of the parties to the lawsuit" and that he is "not, nor will [he] be, subject to the views or whims of either of the parties." In a subsequent February 5, 2009 filing, Cabrera claimed that the "entire expert investigation procedure was completed by [him] personally." He later declared that "[a]ll the work was planned, directed, and approved by [him], as the person responsible for the expert examination."

174.     The RICO Defendants have also denied a relationship with Cabrera in filings with the Lago Agrio court.  For example, in an April 4, 2008 filing, Fajardo asserted that the notion that there was a "common interest relationship between the expert Mr. Cabrera and the plaintiff" and that Cabrera "works for us" was "simply ridiculous."  Then on April 25, 2008, the RICO Defendants and their co-conspirators characterized Chevron's claim that a close relationship existed between them and Cabrera as "[a]nother infamy," "childish and absurd."

175.     Despite these protestations of Cabrera's independence to the Lago Agrio court, Donziger himself has now admitted that Cabrera's statements were "not accurate" because "certainly the [Lago Agrio] plaintiffs provided materials for his consideration."

### (vii)   The RICO Defendants' Attempt to Launder the "Cabrera Report"

176.     Despite the RICO Defendants' concerted efforts to conceal the true authorship of the Cabrera Report, Chevron has uncovered significant elements of the nature and extent of their pervasive fraud, through discovery in U.S. courts pursuant to 28 U.S.C. § 1782.  *See* ¶¶ 249-292 *infra*.  This partial picture of the truth coming to light, however, has not stopped the RICO Defendants from seeking a massive judgment based on "Cabrera's" report.  Instead, they have sought to whitewash the Cabrera Report by, for all intents and purposes, submitting it—again— to the Lago Agrio court, only this time with *new* names attached.  On September 16, 2010, the RICO Defendants filed seven new "expert" reports with the Lago Agrio court, through which they now demanded $113 billion in damages.

177.     These seven new expert reports purport to be independent.  In reality, however, they are a repackaging of Cabrera's flawed and fraudulent report.  Donziger discussed this plan with one of his colleagues, Adlai Small of Patton Boggs, who told him, "One overarching theme to think about throughout this process is how we want the new expert to address the Cabrera report and its conclusion.  While our new expert will most likely rely on some of the same data as Cabrera (and come to the same conclusions as Cabrera), [d]o we think the expert should make specific mention of such consistencies?"  Small went on to explain to Donziger that he thought

70

they should attempt to structure the new expert reports in such a way that they might rehabilitate the tainted Cabrera Report to some degree, so that someone presented with the new reports "might feel comfortable concluding that certain parts of Cabrera are a valid basis for damages." Donziger has also admitted that the new expert reports were intended to give the RICO Defendants "an argument" allowing them to "attempt to shut down Chevron's 1782 efforts in the U.S."

178.    The link between the fraudulent Cabrera Report and the work of the "new" experts is made explicit in the retention agreement signed by the Weinberg Group, a consulting firm, which, in turn, retained the "new" experts. The Weinberg Group's retention agreement provides that it was retained for the purpose of "conduct[ing] a comprehensive review of selected sections of an expert report prepared by Richard Stalin Cabrera Vega,"—not to produce a new, independent scientific report. As one co-conspirator has described it, the role of the Weinberg Group is merely to "provid[e] a submission with their name on it."

179.    The Weinberg Group provided copies of the Cabrera Report to the experts it retained for use in their own reports. According to Donziger and his co-conspirators, all the "new expert[s]" needed was the "Cabrera report in and of itself" along with the data that Cabrera relied upon. As the RICO Defendants and their co-conspirators intended, these "new" experts then relied heavily on the Cabrera Report. According to Donziger, none of these "new" experts had "go[ne] to Ecuador," "did any kind of new site inspection," "did any kind of new sampling," or indeed, did "environmental testing of any kind."

180.    One of the "new" experts, Douglas Allen, for example, made no independent evaluation of the evidence, instead relying on the unsubstantiated findings contained in the Cabrera Report. Indeed, the conspirators instructed Allen to use the Cabrera Report as his "starting point." He relied entirely on the Cabrera Report for, among other items, the number of pits requiring remediation. Despite the fact that he "[did]n't know if there are in fact 917 pits that require remediation," he relied on that number anyway—drawn from the fraudulent Cabrera Report—in developing his own estimate. He relied on the Cabrera Report despite his opinion that

the conclusions in the Cabrera Report are unreliable and that that the report lacked appropriate citations and references.

181.     Similarly, another "new" expert, Dr. Lawrence Barnthouse, relied on the standards contained in the Cabrera Report, and "assume[d] [Cabrera] was correctly characterizing what they were." Indeed, he has admitted that he was not retained to create a new, independent report, and has further acknowledged that he "couldn't be completely independent" because most of the information he needed was "only available from the Cabrera Report." Like Allen, Barnthouse has admitted that he relied on the Cabrera Report despite the fact that he had reached the conclusion that Cabrera's numbers were "uncertain" and that methodology he adopted from Cabrera was an "an unreliable indicator" and was "[s]uboptimal, [and] inadequate."

182.     Jonathan Shefftz, another of these experts, did no independent work and repackaged portions of the fraudulent Cabrera Report. For example, Shefftz assumed without doing any independent research or analysis that TexPet was required to incur costs and to remediate pits based solely on the Cabrera Report's assertion that these costs were necessary. Shefftz admitted that his report as a whole depends upon "data and cost figures from the Cabrera Report" and that he had "simply taken [Cabrera's] volume figures and . . . cost figures and used those as inputs to [his] calculations." He explained that he "was not engaging in any exercise to verify [Cabrera's] data series or his cost figures. [Shefftz] was just using them in [his] report." Shefftz also conceded that his reliance on the Cabrera Report and its flawed numbers could "lend an upward bias" to his own results. Furthermore, an annex of Shefftz's draft report relies heavily on annex T to the Cabrera report—an annex that was drafted by Stratus, the consultants who ghostwrote the Cabrera Report.

183.     The reports of other experts, such as Carlos Picone, Robert Paolo Scardina, and Daniel Rourke were written "in collaboration with the Weinberg Group," the group that had been hired not to create new reports but rather to repackage the Cabrera Report. Sections of Picone's report were written entirely by the Weinberg Group, with only "minimal" editing by Picone. Scardina's report was written largely by a person at the Weinberg Group whose identity and

qualifications are unknown to Scardina himself. Scardina, like the other experts, also relied exclusively on the Cabrera Report and the Weinberg Group for information central to his report.

184.    In summary, the "new" expert reports submitted by the RICO Defendants are new only in two aspects. First, they bear new names, despite being nothing more than another repackaging of the Stratus report that was originally submitted as the Cabrera Report. And second, they purport to support a new damages figure, a remarkable $113 billion, which is a nearly $90 billion increase over Stratus' figure, despite offering no new analysis or evidence.

### 2.    Colluding With the Republic of Ecuador to Bring Sham Charges Against Chevron's Attorneys

185.    As part of their scheme to defraud and extort Chevron, the RICO Defendants and their co-conspirators conspired with officials from the Republic of Ecuador to advance baseless criminal prosecutions against Ricardo Reis Veiga and Rodrigo Pérez Pallares, lawyers responsible for executing the 1998 Final Release that precludes Defendants' claims against Chevron in the Lago Agrio Litigation. With criminal convictions in hand, the RICO Defendants and their co-conspirators and Ecuador could then seek to nullify the release, and "fully leverage the criminal investigation"—in the media and otherwise—to force Chevron to "settle" the Lago Agrio Litigation or face a massive judgment. According to Donziger, "[I]f this penal case is brought, this will be on the wires all over the world and it will really raise the cost to [Chevron]." Indeed, footage from *Crude* shows the conspirators admitting that the criminal prosecutions are a means to exert "personal psychological pressure [on Chevron's] top executives," and Donziger's own personal notes make clear that the criminal prosecutions were meant "to keep the hammer over [Chevron's] head" and "force [Chevron] to the table for a possible settlement."

186.    The RICO Defendants' and their co-conspirators' collusion with the Republic of Ecuador to procure the criminal indictments has been long in the works. In an email exchange in August 2005 (which appears to be an excerpt from an ongoing correspondence) among conspirators Alberto Wray, Bonifaz, Fajardo, Yanza, the Front, and Ecuador's Attorney General's office, Wray wrote, "if at some point we want the Government and the Attorney General to play for our

side, we must give them some ability to maneuver." Martha Escobar, a deputy of the Attorney General, responded that both the office and "all of us working on the State's defense were searching for a way to nullify or undermine the value of the remediation contract and the final acta [*i.e.*, the 1998 Final Release] . . . ."

187.    In that same email exchange, Escobar confirmed that the Attorney General was still determined to prosecute "those who executed" the 1995 Settlement Agreement and the 1998 Final Release, despite the absence of evidence of any wrongdoing:  "The Attorney General remains resolved to have the Comptroller's Office conduct another audit (that also seems unlikely to me given the time); he wants to criminally try those who executed the contract (that also seems unlikely to me, since the evidence of criminal liability established by the Comptroller's Office was rejected by the prosecutor . . . ." The Attorney General later informed one of the RICO Defendants' colleagues that "he want[ed] [them] to work together on this matter" and that, at least initially, "he [did] not want [their] meetings to be made public."

188.    After working together for some time, the RICO Defendants were successful in getting the Republic of Ecuador to pursue fraud charges related to the remediation against Chevron in litigation in the United States.  When Donziger learned of this, he reveled in their success: "The Attorney General of Ecuador is now suing Chevron for fraud on the remediation!! We have been pushing this for over a year, we finally did it !!! This is huge, huge."

189.    The RICO Defendants and their co-conspirators went to great lengths to hide their collusion with the Republic of Ecuador.  In an email to Donziger and others, one of the conspirators reminded them that they "had to resort to very sophisticated methods to disassociate ourselves from the case (Amicus Curiae submitted by third parties etc)," and urged Donziger and others not to undo this work by associating themselves publicly with the prosecutions.  In an email to the Republic of Ecuador's U.S. counsel discussing the potential prosecution, Donziger assured him that an Ecuadorian colleague working on the matter, "understands the need to keep his contacts with your client's office totally confidential and non-public." Martha Escobar—the deputy Attorney General with whom Wray exchanged emails—even perjured herself in a deposi-

tion taken in an action pending in the Southern District of New York on November 21, 2006 and denied that she ever had *any communications* with the conspirators concerning the Lago Agrio Litigation. But when confronted with her own 2005 email with Wray proving otherwise, she confirmed that she had been acting in that correspondence at the direction of the Attorney General.

190.    The collusion with the Republic of Ecuador to obtain sham criminal charges, and the extortionate purpose of that collusion, is documented in the film *Crude* and its outtakes. In a January 2007 meeting between Donziger and Kohn captured in the *Crude* outtakes, in which they are reviewing materials the RICO Defendants provided to the Ecuadorian Attorney General in support of criminal prosecutions, Kohn discussed the RICO Defendants' extortion plan: "So, again, that may be something that we could facilitate going away at the right time . . . . if they wanted it to go away." Donziger replied, "Precisely." Donziger told Kohn that Chevron is alleging a "conspiracy" between them and the Ecuadorian government, to which Kohn responded, "If only they knew."

191.    On April 26, 2007, President Correa toured the Lago Agrio oil fields with the RICO Defendants and their co-conspirators. That same day, he issued a press release demanding the criminal prosecution of the Ecuadorian officials who had signed the 1998 Final Release. On the following day after hearing this news, Donziger mused as to whether the time might be right to "ask for the head of [Chevron's lawyer Rodrigo] Pérez Pallares—given what the President said." Donziger explained: "[H]e's totally with us." The next day, on April 28, 2007, in a national radio address, President Correa echoed the RICO Defendants' rhetoric, calling Chevron's Ecuadorian lawyers traitors and demanding that they, along with the Petroecuador officials who signed the 1998 Final Release, be criminally prosecuted. In the movie *Crude*, Donziger is shown stating that "Correa just said that anyone in the Ecuadorian Government who approved the so-called remediation is now going to be subject to litigation in Ecuador," and adding that those persons who signed the 1998 Final Release "are shittin' in their pants right now."

192.     The fact that President Correa called for the criminal indictment of those who signed the Final Release did not come as a surprise to the RICO Defendants and their co-conspirators.  A month prior to President Correa's tour of the Oriente, Fajardo met with Ecuadorian government officials, including Alexis Mera, a Judicial Secretary and chief legal advisor to President Correa, in which Fajardo asked for Mera's assistance in providing the President with a "basis" for "reopen[ing]" the "investigation for . . . the responsible parties."  The conspirators explained to Mera that, while they could mobilize the public in an effort to overturn the 1995 Settlement Agreement and the 1998 Final Release, "the official nature of the President could do much more in this case . . . [and] interest by the Executive Branch[] and pressure on the Public Prosecutor's Office . . .  could do a lot on this subject."  Mera, in response, proceeded to outline various ways of nullifying the settlement and release.  Remarkably, the RICO Defendants managed to procure Mera's assistance, and thus collude with the government, despite Mera's admission that there was no "sustainable" path to nullification.

193.     The RICO Defendants and their co-conspirators made significant efforts to enlist the support of President Correa and other Ecuadorian governmental officials, holding private lunch meetings and conferences.  After one such meeting with the President, Fajardo reported: "So, the President thinks that if we put in a little effort, before getting the public involved, the Prosecutor will yield, and will re-open that investigation into the fraud of, of the contract between Texaco and the Ecuadorian Government."  By seeking assistance from Ecuadorian government representatives, this is precisely the "strategic development" the RICO Defendants ultimately achieved.

194.     The plan to procure the criminal prosecution of Chevron's attorneys included more than obtaining President Correa's support.  The RICO Defendants and their co-conspirators also aimed, as called by one of their associates, their "troops [and] artillery" against Chevron's attorneys through a series of demonstrations, and they publicly pressured Ecuadorian officials. As Defendant Yanza proclaimed during a July 31, 2008 press conference, in order to ensure prosecution, the RICO Defendants and their co-conspirators would "have to take legal actions

against these officials . . . make public denunciations . . . put pressure through the people, all these mechanisms . . . ." Yanza warned that "nothing is ruled out." According to Donziger, this was part of the conspirators' strategy of conducting a "guerrilla campaign" against Veiga and Pallares.

195.     And this campaign was successful. As Donziger boasted, "[W]e are kicking some ass, and it feels awfully good." Donziger was elated not only because criminal charges would be useful to the RICO Defendants' and their co-conspirators' extortionate scheme, but also because it would satisfy a personal vendetta. As Donziger described his feelings toward Mr. Veiga, "Some days, I fantasize about putting my strong hands around Reis Veiga's neck and squeezing until he begs for mercy. I want him to know how it feels to suffer . . . ."

196.     The RICO Defendants' and their co-conspirators' objective was finally achieved on August 26, 2008 when the Ecuadorian government announced criminal charges for fraud against Ricardo Reis Veiga and Rodrigo Pérez Pallares, the two Chevron attorneys who signed the 1995 Settlement Agreement and the 1998 Final Release. The charges were issued after two previous Prosecutors General had determined that there was no evidence of fraud and had requested that the case be closed. But that was before the RICO Defendants manufactured the allegedly "independent" Cabrera Report upon which the Prosecutor General expressly relied when he filed the charges against Veiga and Pallares.

197.     After the sham criminal charges were procured, the RICO Defendants reprised their "private army" and engaged in direct threats against Veiga and Pérez. On October 5, 2009, Defendant Yanza, among others, enlisted the help of local citizens in parading crude effigies of Veiga, Pérez, and other Chevron executives in front of the courthouse in Ecuador. At the concluding rally, Yanza and others gave speeches and threatened to "kick [Pérez's] ass" and "bury [Chevron's lawyers] in the . . . pit." The protestors announced the "crimes" of each Chevron executive and a man dressed as the Grim Reaper mimed beheading each of the effigies with his scythe before placing the "bodies" in a coffin. The protesters then carried the coffin into the jungle, dug a shallow grave, and buried the Chevron executives in effigy.

198.    The criminal charges against two of Chevron's attorneys are a direct result of the collusion between the RICO Defendants and their co-conspirators and the Republic of Ecuador. The issuance of these baseless charges and the threats of violence against Chevron's attorneys were firm but also a thinly veiled extortionate threat to Chevron:  If you do not settle the Lago Agrio Litigation on our terms we will have your employees imprisoned—or worse.  Indeed, as Judge Kaplan of the Southern District of New York noted, evidence shows that Donziger and his colleagues have "attempt[ed] to procure criminal prosecutions for the purpose of extracting a settlement [from Chevron]," and that the prosecutions "appear[] to have been instigated by Donziger and others working with him for the base purposes of coercing Chevron to settle and undermining a significant element of its defense in Ecuador, the release it obtained from the [Republic of Ecuador]."  Likewise, in 2010, the U.S. State Department reported that "[c]riminal complaints and arrest warrants against foreign company officials" are used in Ecuador "to pressure companies involved in commercial disputes."  That is exactly what has occurred here.

### 3.    Launching Public Attacks on Chevron Based on Misleading Statements and Lies to Force Chevron to Pay Up

199.    Through their own efforts and those of their collaborators, the RICO Defendants have conspired to manufacture a wave of public criticism of Chevron based on deliberate falsehoods and misleading statements.  Since at least 2006, but with increased intensity since manufacturing the fraudulent Cabrera Report, they have saturated the public domain with their false propaganda—using the Internet, radio, television, and film, as well as print media, including books, newspapers, and magazines.  And they have taken this pressure campaign to U.S. state and federal agencies, seeking their falsely induced assistance in this racketeering scheme.  As conspirator Amazon Watch has explained, the strategy is to "turn up the heat on Chevron through various means, shareholder resolutions, major media coverage and major investigations through, for example, the Securities and Exchange Commission."  And Donziger has proposed that the conspirators use the slogan "Always attacking."  According to Donziger, the "strategy" is to "increase the cost to Chevron" including the "cost of their sullied reputation, you know, in

the media." As he explained to one of his associates in preparing for a mediation with Chevron, "[w]e need to get more press and increase the pressure b/w now and then, to get the price up." As one federal judge put it, the "object of the whole game, according to Donziger, is to make this so uncomfortable and so unpleasant for Chevron that they'll write a check and be done with it."

### a.    The Fraudulent Media Blitz

200.    Donziger outlined the RICO Defendants' and their co-conspirators' "strategy" of increasing costs to Chevron by "sull[ying] their reputation" to reporter Peter Maass. In an article published in *Outside* magazine, Maass called Donziger's strategy "attrition warfare: death by lawsuit." Donziger told Maass, "This case has to be won both in and out of the courtroom . . . . If you had the case without the pressure, you would never get a result." Maass observed, "Donziger wants to keep the public pressure on, to make the company so miserable that it throws in the towel and settles." This is "guerrilla PR," and "[r]abble rousing is a vintage Donziger tactic." Increasing the pressure involves maximizing publicity, and Donziger always "does his best to arrange a good show."

201.    To that end, Donziger recruited Karen Hinton, a public relations specialist, to create and manage the RICO Defendants' and their co-conspirators' campaign of false and misleading public statements, and to coordinate the efforts to co-opt the media and well-meaning private citizens in the conspirators' pressure campaign. Stratus contributed to the effort as well, developing what Stratus referred to as a "comprehensive press kit." And political and communications consultant Chris Lehane was brought on board to help the RICO Defendants "leverage the criminal investigation of the Chevron executives" through extensive public relations efforts. In addition to recruiting reporters to cover the story, Lehane and the conspirators planned to "[b]uild[] off the initial activity, we will want to consider several targeted specific mini-campaigns all designed to create pressure points on Chevron's economics." These "mini-campaigns" included filing a shareholder lawsuit against Chevron "for failure to disclose information," contacting the New York Attorney General "to see whether we can get Spitzer into the

game," and manipulating students at a "major university that is invested in Chevron for a divestment campaign."

202.    The conspirators also maintain relationships, in part through the provision of financial support, with various organizations that distribute false and misleading public statements to increase the public pressure on Chevron.  Some of these organizations are dedicated to the fraud while others have broader functions, but all are knowing or unknowing accomplices of the RICO Defendants and their co-conspirators.  Foremost among these are Amazon Watch, RAN, and Defendant the Front, organizations that knowingly operate and control significant aspects of the pressure campaign and overarching conspiracy to extort a payment from Chevron.

203.    The RICO Defendants and their co-conspirators funnel a substantial portion of their public attacks on Chevron through Amazon Watch, which presents itself to the public as an independent organization.  Donziger has explained the crucial role of this element of the pressure campaign:

> [They have] played an absolutely critical role in this . . . [I]f it weren't for them, we would just be a legal case, but because of the work of people who care, you know, especially Amazon Watch, we're a campaign that has a legal case.  And I think . . . that, um, the pain Amazon Watch can cause Chevron in many respects is greater than the pain we can cause . . . .

204.    Amazon Watch plays its role effectively, fully understanding that "the target of many of the . . . campaign releases is Chevron itself rather than the media," Amazon Watch works to "get under Chevron management's skin" as much as possible.  The idea, according to Donziger, is to "keep attacking, keep pressure on, etc."  He further explained his "cost-benefit" calculation of the pressure campaign: "I also think that if you run . . . the costs in terms of the hassle, the management time, reputational . . . [h]arm, dealing with the board, looking bad, having your kids . . . in school, have friends who say, hey, what'd your daddy do in Ecuador?   . . . . I think all of that factors into it in an af—extremely significant way, much more than th—the hard-core costs, . . . out-ofpocket expenses and stuff—I think that's where they're most vulnerable."

205.    The RICO Defendants rely on Amazon Watch to carry out much of the public at-
tacks against Chevron, and the RICO Defendants closely monitor the press releases Amazon
Watch issues to make sure it remains on message.  When an Amazon Watch representative com-
plained to Donziger that Amazon Watch was "not here to simply rubber-stamp press releases,"
and dared to tell him that prior experience showed that Amazon Watch "needs to carefully fact-
check your press releases in order to safeguard our own credibility," Donziger replied sharply.
He stated that he and the other lawyers were "the final authority," and that, "We can be collabo-
rators, but we are not equal partners."  The issue that set off Donziger's tirade is particularly tell-
ing: Amazon Watch had wanted to provide Cabrera's educational credentials in a press release
about him.  Donziger's response:  "The issue about Cabrera's qualifications is a good example.
He doesn't have a doctorate.  I don't want to highlight that.  So I don't mention what degree he
has in the press release.  Obviously if he had a doctorate it would be in there, don't u think?"  In
response, the Amazon Watch representative called Donziger's tactic an "unsubtle and unneces-
sary obfuscation" and "[b]ombast and hoodwink."

206.    By using Amazon Watch as their proxy, the RICO Defendants and their co-
conspirators can also deliver their extortionate threats to Chevron using more direct language
than they are willing to use themselves—at least publicly.  In "turn[ing] up the heat on Chevron,"
the RICO Defendants and their co-conspirators have made their extortionate demands explicit in
direct communications with Chevron.  For example, on December 17, 2009, Soltani wrote a let-
ter "on behalf of Amazon Watch" to then-incoming Chief Executive Officer John Watson in
which she cited the fraudulent $27 billion damages assessment from the Cabrera Report, and
threatened, "Until Chevron takes meaningful steps to resolve this case, it will continue to play
out in the courts of Ecuador, as well as in the global court of opinion."  She went on to state,
"We don't make these suggestions lightly or symbolically."

207.    The RICO Defendants and their co-conspirators use all available means to pub-
lish their lies and half-truths in the "global court of opinion."  They regularly disseminate press
releases over the Internet, through electronic mail, and on newswires.  They appear on television

and radio broadcasts.  Through various organizations they fund, the conspirators operate or cause to be operated websites that attack Chevron at www.chevrontoxico.com, www.texacotoxico.org, www.amazonwatch.org, www.chevroninecuador.com, truecostofchevron.com, thechevron-pit.blogspot.com, and www.changechevron.org.  The conspirators also promote their scheme through social media tools, sending messages to supporters through Twitter (@changechevron) and Facebook, and by posting defamatory comments and false statements (frequently using pseudonyms) in response to articles written on the websites of newspapers, blogs and other commentators.  And the conspirators' attacks on Chevron have not been limited to words, or to statements to third parties:  They have arranged or threatened marches and demonstrations in front of the homes of individual Chevron employees and board members.

208.    The RICO Defendants' false statements are made in support of appeals for funding, including through a link to make payments directly on their websites, at http://chevrontoxico.com/take-action/donate.html and at https://www.gifttool.com/donations/Donate?ID=38&VER=1& LNG=EN (via a link from http://www.amazonwatch.org).  Again, however, the RICO Defendants are careful to use the supposedly independent Amazon Watch to front for their efforts.  At chevrontoxico.com, the statements soliciting donations by mail request that they be sent to Amazon Watch at its address in San Francisco, California.  Kohn and Kohn Swift have made substantial donations to Amazon Watch.  In 2009, for example, Kohn reported that Kohn Swift had contributed over $184,000 to Amazon Watch and that sum did not include the donations he had personally made to Amazon Watch.  On information and belief, the conspirators use funds received in this manner to continue to prosecute their unlawful scheme to defraud Chevron.  In fact, Amazon Watch's tax returns reveal that it has directed at least $90,000 in donations to the Front since 2002.

209.    Amazon Watch is not the RICO Defendants' and their co-conspirators' only proxy.  In what they no doubt believed at the time to be a coup, they recruited award-winning filmmaker Joseph Berlinger to make *Crude*, a purported documentary about the Lago Agrio Litigation that was released in 2009.  The film, according to Donziger, that shows how he "manipu-

late[d] the trial." While Berlinger has claimed that he intended his film to be "fair," he altered

the film before release, at the RICO Defendants' and their co-conspirators' request, to hide the

relationship between the conspirators and Carlos Beristain, who was publicly disclosed as the

author of a major portion of the Cabrera Report, as discussed in paragraph 278, *infra*. This was a

critical change, because public disclosure of the prior relationship between the RICO Defendants

and Beristain could have been the visible tip that would alert Chevron and the public to the

mammoth iceberg of collusion between the RICO Defendants and Cabrera. Well aware of this

risk, Fajardo told the filmmakers that disclosure of that relationship was, "so serious that we

could lose everything," and that "the way it is, the entire case will simply fall apart on us." He

thus had the changes made even though they were "costly."

210.    A few months later, when Fajardo visited the University of Oregon, he expressed

alarm at his discovery that students there had obtained copies of the version showing Beristain,

and told Donziger that they had a "serious problem," although he assured Donziger that nobody

at Oregon knew that there was a "conflict." And when the RICO Defendants learned that CNN

intended to show clips from *Crude*, they and the filmmaker engaged in a scramble to ensure that

the Beristain scenes were not shown, obliquely instructing CNN, "Please do NOT include any

footage during Trudie's visit to the Cofan community that features a man wearing a white t-

shirt." Berlinger has also stated that he expected—as did the RICO Defendants—that the docu-

mentary *Crude* could "have some real-life impact on a decision or a potential settlement."

Through Section 1782 discovery proceedings authorized by this Court, Chevron has obtained a

substantial volume of outtakes from *Crude*, outtakes that make clear the scope of the RICO De-

fendants' lies and stonewalling, and from which many of the direct quotations in this Complaint

are taken.

211.    Although Donziger and his conspirators were involved in the making of the film

*Crude*, they knew that the film would be far more useful to their cause if it appeared independ-

ent. Donziger emphasized to Berlinger during filming, "I do not want to been seen as helping

[you] . . . in front of the Chevron lawyers." But behind the scenes, one of *Crude*'s  major finan-

cial backers was Russell Deleon, a law school friend of Donziger who has also been a major financial support of the Lago Agrio litigation.  Upon *Crude*'s completion, the conspirators promoted and relied upon the released version of the film in their pressure campaign against Chevron, and to raise money for that campaign.  At http://chevrontoxico.com/take-action/crude-house-party.html, they urge readers to hold *Crude* "screening parties" and to ask for donations (for the RICO Defendants) at those events.  On that web page, the RICO Defendants assert, "[i]n order to change Chevron, one of the largest and dirtiest oil companies on the planet, we need to build a movement a million times more powerful than them.  *Crude* will educate and inspire thousands of people to commit to changing Chevron in the coming weeks and months."

### b.   Misrepresenting the "Independent" and "Neutral" Cabrera Report

212.    In all of these communications media, the conspirators have repeated their false claims that Cabrera offers an "independent" and scientific perspective which "proves" Chevron's liability.  And in doing so, the conspirators have sought to increase pressure on Chevron and thereby extort a payment from it.  For instance, there is a lengthy summary of the Cabrera Report on chevrontoxico.com, which never discloses the RICO Defendants' role in writing the report, and concludes with the following:  "A final decision on Chevron's liability and damages will be made by the trial judge.  However, courts in Ecuador generally give wide deference to reports prepared by independent experts."

213.    When challenged, the RICO Defendants have repeated their claim that Cabrera is independent.  For example, on April 3, 2008, Fajardo stated, in a press release issued by Amazon Watch, "Chevron's claim that Professor Cabrera is cooperating with the plaintiffs is completely false," and "Chevron is frightened by Cabrera precisely because he is an independent and credible expert."  The RICO Defendants' guiding principle, as Donziger wrote to Fajardo, is: "If you repeat a lie a thousand times it becomes the truth."

214.    On or about May 31, 2008, shortly after the RICO Defendants caused their own secretly written report to be filed as Cabrera's, Kohn appeared on Fox News, touting Cabrera's

independence.  He not only claimed that Cabrera was an "independent expert appointed by the judge," but then falsely stated that Cabrera "analyzed all of the evidence from all of the parties from both sides," to come up with the damages estimate of "between eight and sixteen billion." Kohn did not reveal that his co-conspirators ghostwrote Cabrera's report.

215.    After the conspirators drafted the update to the Cabrera Report in November 2008, increasing the total damages assessed to $27 billion, the Front issued a press release on December 1, 2008, falsely extolling the Cabrera Report as an "independent" assessment by the "Special Master" based on the review of the "trial evidence—the vast majority of it provided by Chevron."  Once again, no mention was made of the fact that Cabrera's report and its update had actually been written by the RICO Defendants, or that the majority of materials upon which it was based were not "trial evidence" at all, but that enterprise's files.

216.    The RICO Defendants and their co-conspirators, in addition to portraying Cabrera's report as independent to the media, also used the fraudulent "evaluation" drafted by Stratus to enhance the credibility of the Cabrera Report in the media.  For instance, on December 1, 2008, Hinton and Amazon Watch issued a press release about the Stratus report entitled "Chevron's $27 Billion Liability in Ecuador's Amazon Confirmed by Team of Independent Sci-entists."  That press release states that "[t]he independent expert report was prepared by Richard Cabrera, an Ecuadorian environmental scientist appointed by the court as a Special Master who has worked mostly for oil companies in preparing environmental damage assessments," and quotes an endorsement from Defendant "Douglas Beltman, a scientist at Stratus Consulting who, along with a team of scientists, reviewed the expert's report on behalf of the [Lago Agrio] plain-tiffs."  It is unsurprising that Stratus employees "endorsed" the report, given that they wrote it.

217.    Stratus's involvement in the media campaign was envisioned as early as the ini-tial August 2007 contract between Kohn Swift and Stratus contemplating that Stratus would en-gage in "discussions with the media" in addition to performing other tasks to further the conspir-acy.  As an example, Defendants Beltman and Stratus were involved in orchestrating the RICO Defendants' response to Chevron's allegations that Cabrera's supplemental report showed evi-

dence of collusion between Cabrera and the Lago Agrio Plaintiffs. Indeed, Beltman sent Donziger draft language denying that the Lago Agrio Plaintiffs were in collusion with Cabrera and claiming that "Cabrera's November response to the plaintiffs is clearly his own." This response became part of the RICO Defendants' overall efforts to portray the Cabrera Report as independent.

218. Now, despite the unequivocal evidence that the RICO Defendants' and their co-conspirators' own team of experts ghostwrote Cabrera's report and its update, the conspirators continue to spread the lie that Cabrera is independent. In May 2010, in response to a court filing by Chevron alleging collusion between the RICO Defendants and Cabrera, Fajardo again denied any wrongdoing, claiming that Cabrera had worked independently. When asked about the involvement of Stratus, Fajardo told the media, "They are our technical advisers in the United States, and they have worked with us for some years, but they have never interfered in the trial." Yet the *day before* he made that statement, he had written a review of Chevron's filing for his co-conspirators in which he conceded that it was "true" that "plaintiffs (that is, us) have worked in collusion with expert Cabrera." The RICO Defendants and their co-conspirators still continue to use the Cabrera Report as a jumping off point for their most recent claim for $113 billion in damages.

219. The RICO Defendants' and their co-conspirators' far-reaching campaign to portray the fraudulent Cabrera Report as that of an independent court expert has been largely successful, and numerous unsuspecting media outlets have repeated uncritically the RICO Defendants' false refrain about Cabrera's independence. An April 3, 2008 Reuters article, for example, stated: "An independent environmental expert told a court in Ecuador that the oil company Chevron should pay $7 billion to $16 billion in compensation for environmental damage in the country." And in a May 2009 broadcast, the television show 60 Minutes reported on the Lago Agrio Litigation, discussing the Cabrera report in detail, but never suggesting that the RICO Defendants had actually secured Cabrera's appointment and written his report. This was undoubtedly because the RICO Defendants had never disclosed this to 60 Minutes. To this day, the

RICO Defendants and their co-conspirators maintain a link to the 60 Minutes broadcast of this misleading report on one of their websites.  As the conspirators had hoped, then, the mainstream media has bought the propaganda and played the role the conspirators hoped and intended in the scheme to extort a payment from Chevron.  And in fact, their hoodwinking of the mainstream press benefits the conspirators doubly in that it allows them to republish—without correction— the media outlet's false statements about the Cabrera Report, as they did with the AP story described above.

220.     The RICO Defendants' and their co-conspirators' deception of the national and international media has gone beyond prompting the republication of lies about Cabrera's independence.  For example, Defendants Fajardo and Yanza were awarded the Goldman Environmental Prize, "the world's largest prize program for grassroots environmental activists," and Fajardo was awarded the CNN "Heroes" award.  The press release announcing the Goldman Prize echoed the RICO Defendants' misstatements and half-truths, including those regarding Cabrera's independence.

### c.     The RICO Defendants Make False Statements to U.S. State and Federal Government Officials

221.     The conspirators have sought to open as many fronts as possible in their offensive against Chevron, pursuant to their strategy to generate maximum pressure on Chevron to drive it into a coerced settlement.  The RICO Defendants and their collaborators have made false and misleading statements in the United States to state and federal officials, seeking to enlist their (unknowing) aid in the fraudulent scheme through investigations and other official acts. Since 2008, the RICO Defendants have continuously touted the findings in the so-called "independent" Cabrera Report as evidence in support of their demands for official action.

222.     The conspirators have engaged in a long-running campaign to convince the SEC to investigate Chevron for allegedly violating disclosure obligations.  They have attempted to obscure their role in this campaign by using Amazon Watch as their front, but Donziger has admitted that he wrote several of the letters which purportedly came from Amazon Watch.  On

January 30, 2006, at the RICO Defendants' behest, Amazon Watch wrote Christopher Cox, then Chairman of the SEC, requesting that he "open an investigation into the Chevron Corporation (CVX) for violating SEC regulations governing disclosure obligations to shareholders in reference to litigation against the company over an oil-related environmental catastrophe in Ecuador." Relying on David Russell's $6 billion damages assessment (which he had already disavowed), Amazon Watch accused Chevron of failing to inform its shareholders of its "staggering potential liability." The letter went on to mischaracterize the lawsuit as a "class action," and falsely claimed that Chevron had "been forced to admit at trial that Texaco . . . dumped over 18 billion gallons of toxic water into the rainforest . . . ." Although Donziger personally informed Amazon Watch Executive Director Soltani that the Russell report was grossly excessive (*see* ¶ 118, *supra*), Amazon Watch never corrected its false statements to the SEC or Chevron shareholders. In fact, the next month, Soltani and Amazon Watch sent a follow-up letter, accusing Chevron of distorting the report of the "settlement experts" from the then-ongoing "judicial inspection" process—the same proceeding in which the conspirators submitted the false expert report with Dr. Calmbacher's fraudulently obtained signature.

223.    On March 18, 2008, Amazon Watch reprised this effort, writing another letter signed by Soltani to the SEC. In this letter, written weeks *before* the fraudulent Cabrera Report was filed but obviously well-aware of its secret contents, Soltani emphasized the forthcoming report, and the independence of its purported author, "an independent special master" that had prepared his report "mak[ing] use of all evidence collected" with "a large team of technical experts under [his] supervision." The letter demanded an investigation and "the imposition of a penalty on Chevron for failing to comply with its obligations." Soltani argued "that Cabrera is being attacked by Chevron precisely because he *is qualified* to conduct a credible damages assessment." Soltani and Amazon Watch made these statements knowing that Cabrera's report was being ghostwritten by Stratus and the RICO Defendants' other consultants. Indeed, despite knowing that the Cabrera Report was a fraud, Soltani accused Chevron of "contriv[ing] claims of

procedural unfairness" and called Chevron's position that the process had been unfair "ludi-crous."

224.     The RICO Defendants and their co-conspirators have made these same false statements to other federal agencies.  In a letter dated April 29, 2008, to the U.S. Trade Repre-sentative, Defendants Yanza and Fajardo called Cabrera "an independent court-appointed special master," and misstated that "the bulk of the evidence relied on by the special master, Professor Richard Cabrera, was provided by Chevron itself via its own sampling evidence."

225.     And in April 2009, Donziger made false statements concerning Cabrera's pur-ported "independence" in a statement before the U.S. House of Representatives.  Donziger falsely stated that "[t]he best and most recent *independent* estimate available of the human health impact of this contamination is provided by the expert appointed by the court, Richard Cabrera." (emphasis added).  Donziger also testified that "[n]umerous qualified scientists have reviewed this report and found its conclusions reasonable and the damages assessment consistent with the costs of other large environmental cleanups."  At no time did Donziger disclose the fact that the "qualified scientists" were his co-conspirators Stratus, Beltman, Maest, and Chapman, who planned and secretly wrote the "Cabrera" Report.

226.     The RICO Defendants have also made false statements to individual members of Congress.  On December 19, 2008, Defendant Beltman provided United States Congressman Jim McGovern's office "some talking points" for an interview with the Los Angeles Times, falsely telling the Congressman's staff that "[t]he Court Expert reviewed available scientific data and concluded that people in the area suffer from many illnesses caused by the contamination, in-cluding cancer."  On January 31, 2009, Beltman forwarded Cabrera's reports, stating "[t]he Court Expert's March 2008 report summary is attached," and that "[a]lso attached is the Novem-ber 2008 response to the [Lago Agrio] Plaintiff's questions that was written by the Court Ex-pert."  Beltman failed to disclose that Stratus and the other RICO Defendants actually ghostwrote the responses to the Lago Agrio Plaintiffs along with Cabrera's initial report.

227.    In addition, the RICO Defendants have extended their campaign to state officials. On May 4, 2009, in response to a communication provided by Donziger, Kohn, Karen Hinton, and others, the New York Attorney General sent Chevron a letter inquiring about Chevron's disclosures related to the Lago Agrio Litigation.  In the letter's first paragraph, the New York Attorney General stated, "As I understand the allegations, a technical expert has admitted that if the plaintiffs prevail in the litigation, assessed against Chevron may be as high as $27 billion."  The RICO Defendants had provided the Attorney General with the false information that Cabrera was a neutral "court-appointed expert" and that the RICO Defendants had played no part in creating the exorbitant $27 billion figure.  The goal was to prompt the New York Attorney General to commence an investigation that would create additional pressure on, and expense for, Chevron. And according to plan, the New York Attorney General's letter was noted in the press, and it generated media coverage suggesting that Chevron had "mishandled" the matter.  For example, in reference to the New York Attorney General's letter, industry publication Oilgram news noted, "Analysts seem mixed on what the Ecuador fallout ultimately may mean to Chevron but appear to agree there will be at least a short-term knock to the stock price."  It quoted an analyst with OppenheimerFunds, Inc. stating, "I would settle and cut my losses."

### d.    The Conspirators Attempt to Manipulate Chevron's Stock Price to Coerce a Favorable Settlement

228.    To increase financial and public pressure on Chevron to pay off the RICO Defendants through an extorted settlement of the Lago Agrio Litigation, the conspirators have sought to manipulate and depress Chevron's stock price by targeting Chevron's shareholders, potential investors, and stock analysts with their lies and half-truths.  In furtherance of their scheme, the conspirators have staged protests at Chevron's shareholder meetings and at the homes of members of Chevron's Board of Directors, and have issued false and misleading propaganda to Chevron's shareholders about its liability in the Lago Agrio Litigation.  In each instance, they have argued that the $27 billion damages assessment is independent and legiti-

mate, and thus represents a major risk to Chevron's share value. Donziger described these pressure tactics on shareholders as one of the "key cards we can play."

229.    The RICO Defendants' strategy of targeting Chevron's shareholders is stated in their public comments and on the websites they operate, which contain material aimed directly at investors. At the website changechevron.org/for-investors, operated by co-conspirator RAN, the conspirators claim "Chevron's current brand of operations exposes the company (and its investors) to great financial, reputational, and environmental risks." In reference to the damages assessed in Cabrera's report, the conspirators refer to "staggering liabilities," and suggest that Chevron has not "adequately warned shareholders about the financial risks the company faces in the Ecuador lawsuit." The conspirators describe these activities on their website: "To pressure Chevron to do the right thing in Ecuador, we engage in a variety of tactics. In the past few years we have. . . [a]lerted Chevron's shareholders to the company's lies and omissions regarding the case in Ecuador, a case in which a ruling against Chevron would dramatically threaten the value of those shareholders' investments."

230.    For example, shortly after Cabrera filed his initial report, on or about May 31, 2008, Kohn appeared on a Fox News segment touting the "independent" Cabrera Report as a reason for Chevron shareholders to be concerned. In that interview, Kohn insinuated that Chevron was hiding information regarding Cabrera's "independent" damage assessment, stating "shareholders were [recently] informed for the first time of even the existence of the case although the original case was filed in the U.S. in the 90s." He then warned that "shareholders should be concerned about the image of Chevron." At no point did Kohn explain that his co-conspirators had actually ghostwritten Cabrera's supposedly independent report.

231.    In the face of allegations that the RICO Defendants colluded with Cabrera, in a press release issued by the Front on February 13, 2009, Fajardo is quoted as saying that such allegations were "'false and defamatory'" and claimed that it would "expose Chevron shareholders to additional liability." And in an April 2008 press release issued by the Amazon Defense Front, Fajardo accused Chevron of failing to disclose to shareholders that Ecuador's Attorney General

had filed a formal complaint to the U.S. Department of Justice, and that "[t]his is part of [a] conscious strategy to try to discredit a trial process that Chevron knows it is losing because of the evidence." And as recently as December 21, 2010, the Front issued a press release quoting Fajardo as saying, "Chevron's Board of Directors cannot continue to ignore the mounting evidence of illegal activity and fraud on the part of the company's legal team in the United States and in Ecuador. . . . We intend to seek full redress of the harm that has been done in the name of Chevron's shareholders and to hold accountable all individuals in Chevron who have participated in this unlawful scheme."

232.     The conspirators have also communicated directly with Chevron shareholders and influential analysts on numerous occasions. On May 25, 2009, Amazon Watch sent a letter signed by Soltani to Chevron shareholders, asserting that Chevron had made "false, misleading, or incomplete" filings with the SEC, and quoted analysts from Barclays and Potomac Research stating that the litigation was hurting Chevron's stock price. As with most of the conspirators' public statements since April 2008, the letter relied upon an "independent court damages assessment," but did not disclose that the RICO Defendants and their co-conspirators themselves had secretly written that "assessment."

233.     Donziger and his co-conspirators have also personally lobbied analysts, including in personal meetings, and made fraudulent misrepresentations with the intent that their misrepresentations would be reported as fact by these analysts, and that these reports would decrease Chevron's stock price. On May 11, 2009, for example, Donziger and his co-conspirators met in New York with the Managing Director of Oil & Gas Equity research at UBS, and provided him with copies of the Cuomo letter, the Cabrera report and supplemental report, and the fraudulent "review" of that report by Stratus, all intended to convey the impression that Cabrera's report was independent and valid. Also involved in this effort was co-conspirator Daniel Orlow, described by the RICO Defendants as "an investment advisor who works with the legal team that represents the Amazonian communities," who made repeated public statements shortly after the UBS meeting on behalf of the RICO Defendants such as: "The pressure is increasing on Chev-

ron's management over the uncertainty surrounding a very significant potential environmental liability in Ecuador," and "Our team is being contacted repeatedly by shareholders and analysts who are concerned that Chevron management is not fully and honestly disclosing the company's exposure in Ecuador . . . . There is a real concern that Chevron is not playing it straight and that it might have overpaid for Texaco."

234.    In another effort to influence Chevron's share price, the conspirators have instituted a "Buy Freeze" campaign in which they have contacted investors directly and, relying on false and misleading statements about the results of the site inspections and the criminal prosecutions and government inquiries that the conspirators have instigated, urged the investors not to buy Chevron stock.  Amazon Watch describes the campaign as follows:

> Amazon Watch is contacting institutional and individual shareholders – in particular, socially responsible investment community (SRIs) and public employees, teachers and university pension funds to urge them to join the buy freeze.  The trial court in Lago Agrio, Ecuador, has found shocking levels of life-threatening toxins at dozens of former Chevron production sites in Ecuador . . . .

> Now Chevron is being accused of fraud in Ecuador for lying about the results of a limited remediation it did in the mid-1990s . . . .

> As a result, Ecuador's Attorney General has asked the U.S. Department of Justice to investigate Chevron's alleged fraud.  The Securities and Exchange Commission already is probing the company for failing to disclose the potential liability to shareholders.

Amazon Watch concealed the fact that it was the RICO Defendants and their co-conspirators who actually wrote the Ecuadorian Attorney General's report.

235.    The conspirators have also staged protests at several of Chevron's annual shareholder meetings.  As shown in the film *Crude*, these protests, while designed to appear to be grassroots, community events, are actually carefully planned and literally scripted by Donziger and his co-conspirators.

236.    In addition, the conspirators have lobbied large institutional investors to support Chevron shareholder resolutions designed to bring support for the conspirators' lies and to add additional pressure on Chevron.  For example, Stratus and Amazon Watch were involved in

drafting a 2009 shareholder resolution, offered by the Office of the Comptroller of New York City as the custodian and trustee of certain pension funds. On December 1, 2008, Mitchell Anderson of Amazon Watch emailed Beltman of Stratus with the subject line "2009 Shareholder Resolution – Urgent Update" and stated that "[w]e need to make some changes quickly to the below paragraph, given the new figures released by the court appointed expert." Beltman pro-vided the higher numbers from Cabrera's revised report, which were then included verbatim in the shareholder resolution proposed by the funds the next day. That resolution provides that a "court-appointed expert in the Ecuadorian litigation has recommended that Chevron be held li-able for up to $27.3 billion in damages," but fails to explain that Stratus and the other RICO De-fendants and their co-conspirators secretly drafted the "court-appointed expert's" report finding Chevron liable.

237.    The conspirators have promoted their involvement in drafting shareholder reso-lutions that seek to draw attention to Cabrera's finding of liability, but, again, without disclosing the RICO Defendants' and their co-conspirators' role in drafting his report. For example, on April 8, 2009, after the SEC declined to issue a no-action letter to Chevron regarding one of the conspirators' shareholder resolutions, Hinton and Amazon Watch issued a press release describ-ing the resolution as, "a high-profile resolution that threatens to focus attention on the company's record-breaking $27 billion environmental liability in Ecuador."

238.    The Wall Street Journal has reported that the RICO Defendants' statements about the Lago Agrio Litigation, and, specifically, Cabrera's assessment of $27 billion in dam-ages has had its desired effect on Chevron's share price: "The possibility that a judge may later this year demand damages as high as $27.5 billion, roughly one-fifth of Chevron's market capi-talization, appears to have spooked some investors."

239.    The Front and Hinton have touted negative analyst reports regarding Chevron on the website, chevrontoxico.com. For example, on May 26, 2009, the conspirators published an article stating that "Oppenheimer, in a report dated May 4th [2009], said the $27 billion claim from Ecuador 'could depress the stock until a settlement is reached . . . the sooner [the case] is