removed, the better off shareholders will be'" and that "Barclay's called the Ecuador case a 'drag' on Chevron's stock value."

240.    And on August 24, 2010, FOXBusiness reported that, "the oil company has lost much of its gains over the past few weeks as it continues to fight a lawsuit in Ecuador that alleges Texaco, acquired by Chevron in 2001, wrecked portions of a jungle while drilling for oil in the 1970s and 1980s." The conspirators published this article in its entirety the next day at the chevronpit.blogspot.com.

241.    Above all, however, the RICO Defendants' and their co-conspirators' false statements, harassing conduct, and lobbying efforts with media, government, shareholders and private individuals are all aimed at one ultimate objective—forcing Chevron to pay the RICO Defendants and their co-conspirators billions of dollars to make them stop.

> **e.    The RICO Defendants Falsely Accuse Chevron of Murder to Generate Outrage and Force Chevron to Pay**

242.    The conspirators have made numerous public statements stating or implying that Chevron is guilty of murder. This claim is false and has been made intentionally and without any basis whatsoever. The RICO Defendants and their co-conspirators' intent in spreading this lie is to generate great outrage and disgust among the public and activists and in the media, all in furtherance of their extortionate conspiracy.

243.    Defendant Fajardo and his co-conspirators have attempted to capitalize on the violent murder of Fajardo's brother, Wilson Fajardo. They have repeatedly implied that Chevron was responsible and claimed that there has been no police investigation into the crime. Yet Fajardo knows this to be false. In a written statement made to the District Prosecutor as part of the extensive investigation into his brother's murder, Fajardo himself provided the names and addresses of the men he believed to be his brother's murderers, details concerning the place and circumstances of the murder, and, most importantly, a detailed account of the prior bad blood between the alleged murderers and Wilson Fajardo, including prior threats and an attempt by one

of the men to stab his brother a few days earlier.  There is no mention in this statement of Chevron or Texaco or any connection to the Lago Agrio Litigation.

244.     Despite this statement concerning the details of Wilson Fajardo's death and his knowledge that Chevron had nothing to do with it, Fajardo has falsely and intentionally implied that Chevron was responsible.  For example, on April 22, 2008, Fajardo made the following statement on Ecuadorian TV: "I can't say that it was Texaco that did it, but I can't say the contrary.  This sort of thing was never investigated.  In other words, there've been many things, a lot of pressure, a lot of persecution in this case, which leaves a lot to be seen."  And on August 24, 2009, Fajardo said to *Publico*, "I have been threatened many times and one of my brothers was killed by hit men, but I don't have evidence that Chevron was behind his killing."

245.     Fajardo's co-conspirator Hinton has perpetuated these falsehoods in comments she posted on Politico.com on November 16, 2009, in which she stated that "no one knows who murdered [Fajardo's] brother," and the death happened when Fajardo "and other members of the [Lago Agrio] plaintiffs' legal team had received a number of anonymous death threats connected to the work on the case."  These statements are false and Fajardo and Hinton knew at the time that they were false.  Fajardo knew that his brother's death had been investigated and he knew that Texaco and Chevron had nothing to do with it.  Yet he lied about it on television, and Hinton spread that lie.

246.     Even though he identified suspects in his brother's murder and the murderers' motives for killing his brother, Fajardo has falsely implied that the killers mistook Wilson Fajardo for Defendant Fajardo himself to create the impression that Chevron had attempted to "assassinate" Fajardo.  For example, in a May 2007 article in *Vanity Fair* magazine concerning the case against Chevron, Fajardo claimed that he was being followed and that "the killers had made a mistake."  Donziger has taken this outrageous claim all the way to the United States Congress. In a statement before the Tom Lantos Human Rights Commission, Donziger asserted that the "team of lawyers and advocates fighting Chevron in Ecuador's courts over clean-up responsibility have suffered harm in retaliation for exercising their legal rights[.]"  And the first "[e]xample

of this retaliation" he offered the committee was: "The lead lawyer for the rainforest communi-
ties, Pablo Fajardo, has been subjected to death threats.  A brother of Mr. Fajardo was murdered
in 2004, about a year after the trial began, under mysterious circumstances that some think was a
case of mistaken identity."  Similarly, in a particularly offensive scene in *Crude* set at Wilson
Fajardo's grave, Defendant Fajardo linked his brother's "assassination" to the "first judicial in-
spection of the Texaco case" and falsely said that the killers "were looking for me."  In another
scene, he "joked" that he kept a gun in his house "[f]or when Texaco comes."  These knowingly
false statements are intended to leave the false impression that Chevron is not only responsible
for the murder of Wilson Fajardo, but seeks to kill Pablo Fajardo as well.

247.     The outrageous attacks on Chevron linking it to murder are just more of the
RICO Defendants' thinly veiled threats to Chevron:  Pay up, or we will continue our campaign
of lies, fraud, and corruption.

## C.     The Conspirators' Campaign of Lies and Obstruction in U.S. Courts

248.     Determined to prevent their conspiracy to defraud and extort Chevron from be-
ing exposed in the discovery and other proceedings Chevron commenced in U.S. federal courts,
the RICO Defendants embarked on a campaign of obstruction and lies, attempting to conceal the
true authorship of the Cabrera Report and the RICO Defendants' and their co-conspirators' rela-
tionship with the supposedly "independent" Cabrera.  Defendants went as far as misrepresenting
Cabrera's independence in a complaint they filed in this Court in related litigation seeking to stay
an arbitration proceeding.  And Donziger, the ringleader of the enterprise, has personally inter-
fered with discovery proceedings in this Court and elsewhere, including repeated and sustained
violations of multiple court orders issued from this Court.  In this and other lies and misconduct
before various U.S. courts, the RICO Defendants and their co-conspirators, including law firms
Patton Boggs, Emery Celli and Motley Rice, have brought their pervasive fraud into the courts of
this country and have attempted to hide their criminal scheme from Chevron and the courts.

1. **Attempting to Obstruct Chevron's Discovery Proceedings by Making False and Misleading Statements Before U.S. District Courts and Courts of Appeals**

249.     Faced with denials from the conspirators in Ecuador about the authorship of Cabrera's report, Chevron turned to the United States to pursue discovery from the largely U.S.-based enterprise directly through proceedings under 28 U.S.C. § 1782, which authorizes "[t]he district court of the district in which a person resides or is found [to] order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal." Several courts have granted Chevron's applications for discovery, resulting in the production of more evidence of fraud, collusion, and criminal misconduct, and evidence establishing the RICO Defendants' and their co-conspirators' knowing obstruction of Chevron's Section 1782 applications. This evidence, and the condemnation by numerous U.S. courts of the conduct it reveals, is detailed below. But co-conspirator Julio Prieto perhaps captured the RICO Defendants' and their co-conspirators clear knowledge of the wrongfulness of their own conduct in an email to Donziger and Fajardo after Fajardo told him that the RICO Defendants' correspondence with Stratus was likely to be disclosed in a Section 1782 proceeding in Colorado: "[T]he effects are potentially devastating in Ecuador (apart from destroying the proceeding, all of us, your attorneys, might go to jail)[.]"

250.     Accordingly, the RICO Defendants adopted a strategy of obstruction and delay in furtherance of their criminal scheme, seeking to hold off U.S. discovery until they could obtain a judgment in Ecuador and begin their plan to use it to harass and attack Chevron and its subsidiaries around the world. As co-conspirator Ilann Maazel of Emery Celli wrote to Donziger and other co-conspirators, including attorneys at Patton Boggs and Motley Rice, "Unless we want the Stratus/Cabrera revelation to come out in CO [Colorado], which seems like the worst possible place, we need to make our submission in Ecuador and fast. . . . We've bought over a month in CO and everywhere else but time is almost certainly about to run out."

251.     Throughout these Section 1782 proceedings, the first of which Chevron initiated on December 18, 2009, the RICO Defendants have sought to impede Chevron's discovery

through lies, procedural abuses, and obstructionist delaying tactics. These efforts notwithstanding, Chevron has obtained additional evidence demonstrating that the conspirators wrote the Cabrera Report and sought to use the so-called "independent" report to their advantage. As this evidence has come to light, the RICO Defendants and their co-conspirators have continued to make statements that are not only false, but inconsistent with their own prior representations, despite the fact that that this strategy made them look, "coy at best and silly or untrustworthy at worst," as Jonathan Abady of Emery Celli put it in an email to Donziger and other Emery Celli and Patton Boggs attorneys.

> **a.** **The RICO Defendants' Initial False Representations to U.S. Courts That They Had No Relationship With Cabrera and No Role in Preparing the "Cabrera Report"**

252.   In opposing Chevron's discovery efforts, the RICO Defendants' first tactic was denial of any misconduct whatsoever. They apparently hoped that by stonewalling the federal court, they could avoid the discovery of their extraordinary misconduct. In multiple filings in Section 1782 proceedings, the conspirators have falsely asserted their lack of relation to Cabrera: "Mr. Cabrera is not even an expert for one party, but a Court-appointed neutral . . . ." Additionally, in declarations filed throughout the country, the RICO Defendants and their co-conspirators have perpetuated their false version of events, hiding their relationship with Cabrera and claiming that he was "independent."

253.   The RICO Defendants continued to spread their false version of events in depositions. On April 23, 2010, for example, Chapman falsely testified that he had no reason to think that Stratus had provided work product to Cabrera. The RICO Defendants and their co-conspirators were proud of Chapman's performance, but realized that the truth was bound to come out. As co-conspirator Andrew Wilson of Emery Celli wrote to Donziger, "Chapman did an excellent job of not remembering anything—but Chevron will be able to do side-by-side comparisons of Stratus work product and [Cabrera's] report to a judge that will smell bad." In fact, as Stratus's own documents makes clear, Chapman, who is the head of Stratus' natural resource economics group, was personally involved in and knowledgeable of Stratus's secret au-

thorship of Cabrera's report. Indeed, it was Chapman who provided Donziger with the initial outline and plan for Stratus to write the "damage estimate," and asked Donziger "when a final report would have to be delivered to the Judge" so that Stratus could plan its resources accordingly. Chapman's deposition misconduct, however, is not surprising given that Beltman held meetings for Stratus staff after Chevron filed for discovery from Stratus in an attempt to mislead the employees and influence their potential testimony regarding Stratus's authorship of the Cabrera Report. At these meetings, Beltman repeatedly misstated that Cabrera was an independent expert and misrepresented the role of Stratus in ghostwriting the Cabrera Report. Beltman consistently omitted any discussion of Stratus's true involvement.

254.     In another blanket denial, Stratus represented through counsel to the District of Colorado on April 27, 2010 that Stratus was "astonish[ed]" to see "similarit[ies]" between their own work product and the Cabrera Report. It assured the court that Stratus did not have "an opportunity to review Cabrera's report in draft form," and that what they provided their co-conspirators was, "intended to assist them in their analysis of data," and in the "mediation," not "to assist Cabrera." These were outright lies; Stratus *ensured* that its work product appeared in the Cabrera Report. In a "Status Report" filed three weeks later, counsel for Stratus informed the court that "continued inquiry suggests that there were communications between Mr. Cabrera and two representatives of Stratus."

255.     Allegedly before a subpoena issued under the authority of the Southern District of California, co-conspirator and Stratus subcontractor Powers threw out a computer hard drive containing responsive documents and deleted responsive emails. Evidence obtained by Chevron in other Section 1782 proceedings demonstrated that Powers had been a key participant in the RICO Defendants' scheme. Indeed, one of the RICO Defendants' *own attorneys* had written, that "we are getting an indication from these documents how important a player Bill Powers was in this whole thing. He has substantial knowledge and involvement in the Cabrera Report drafting." Ultimately, Powers confirmed in his deposition that he had drafted the annexes to the initial Cabrera Report and substantial portions of the supplemental Cabrera Report.

256.     The RICO Defendants also falsely denied contact with other Cabrera team members.  The District of New Jersey granted Chevron's application for discovery from another of the conspirators, UBR, on the basis that while that firm was a paid consultant to the RICO Defendants, one of its employees, Juan Cristobal Villao Yepez, was disclosed as one of the authors of the Cabrera Report.  On appeal, the RICO Defendants told the Third Circuit Court of Appeals that it should reverse, because there was no evidence supporting Chevron's claim that Villao had any connection to Cabrera, or that he had worked for UBR when he was supposed to have been working with Cabrera.  But several months later, when this District ordered Defendant Donziger to produce his own files, they revealed that Donizger and other RICO Defendants had had *direct* communications with Villao regarding his contribution to the Cabrera Report.  And Donizger himself has now admitted that Villao worked for both Cabrera and the RICO Defendants.  Nonetheless, the RICO Defendants have taken no action to remedy their misrepresentations to the Third Circuit.  In internal correspondence, they have, however, discussed the situation regarding Villao and whether to publicly acknowledge that the Cabrera Report was ghostwritten by the RICO Defendants and their co-conspirators, commenting on their concern at being accused of "perpetuation of the fraud."  Andrew Wilson of Emery Celli, for example, warned Donziger to be "[c]areful" because it is "not clear our relationship with Villao was disclosed."

257.     In their internal communications, the RICO Defendants and their co-conspirators have recognized that their denials did not square with the facts.  In May 2010, one of the Lago Agrio Plaintiffs' U.S. lawyers wrote that their characterization that Cabrera had "considered" Stratus's work "seems like way too much of a stretch considering that Cabrera's report, or substantial annexes to it, are in fact the consultant's work.  This is far more than 'circumstantial evidence'; this is, indeed, a '"hand in glove" showing.'"  Co-conspirator Jonathan Abady of Emery Celli described the relationship between the RICO Defendants and Cabrera as "wholesale adoption of Stratus work product w/o attribution."  Co-conspirator Wilson admitted in an internal email that "[t]he more we emphasisze [sic] [Cabrera's] neutrality the less sense it makes that we were talking to him outside of school."  And in extensive correspondence in June 2010, among

Donziger, Motley Rice, Patton Boggs, Emery Celli, and other co-conspirators, Jason Rockwell at Patton Boggs acknowledged that, "the Ann Maest notes suggest more coordination with Cabrera than counsel simply dropping off two sets of documents," and Jonathan Abady of Emery Celli conceded that, "By refusing to admit this now obvious fact, we look coy at best and silly or un-trustworthy at worst."

258.    Because their position in these proceedings has been so divergent from the facts, the RICO Defendants have had trouble retaining counsel willing to go along with this scheme of falsehoods and obstruction.  Donziger has admitted that when first one and then another of the U.S. law firms that the RICO Defendants retained to represent their interests in opposing Chevron's Section 1782 applications learned of the full scope of the RICO Defendants' relationship with Cabrera, the firms withdrew from the representation.

259.    In response to Chevron's initial Section 1782 filings, the RICO Defendants re-tained a respected New York firm to represent their interests.  But when a senior partner with that firm interviewed Stratus employees in Boulder, it was apparent to him that the RICO Defen-dants' relationship with Cabrera was improper and contrary to the representations made to him by Donziger.  His law firm withdrew the next day.

260.    Around this time, Donziger prepared a memorandum which he addressed to lawyers from a Colorado firm also retained by the RICO Defendants to block Chevron's discov-ery from Defendant Stratus.  In that memorandum, Donziger misled those attorneys on numerous material facts.  For example, in a section of the memo titled "Role of Stratus Consulting," he listed such innocuous activities as "helping Ecuadorian counsel respond to scientific questions," and "giving media interviews," but failed to inform the attorneys that Stratus had in fact written the Cabrera Report, the central allegation of the pending court proceeding.  And he listed "Opin-ions in Cabrera's report were taken directly from Stratus materials," as one of Chevron's "inac-curate" factual assertions.

261.    When this second firm was unable to obtain confirmation of any of Donziger's false representations, and after learning from its predecessor about the results of the interviews

he had conducted with Stratus, that firm also withdrew. Simultaneously with its withdrawal, it sent Donziger an email citing the "troubling information" that it had learned regarding Stratus' role in preparing the Cabrera report, and that "we are concerned about our ability to satisfy our obligations to Judge Kane and to the court if we continue in our representation of the Lago Agrio plaintiffs in this case." The attorney concluded, "I'm sorry it has come to this, but I feel if we proceed I may be compromising this firm's reputation and ethical stature and I cannot do that."

262.     The conspirators then turned to counsel that they thought "appear[ed] willing to sign anything," but that their relationship with that counsel lasted only a month before that firm withdrew. And when the *fourth* firm retained by the RICO Defendants in the *same* Section 1782 proceeding reviewed the record, and not merely Donziger's materially misleading memorandum, it concluded that, "it appears not only that Cabrera and plaintiffs can be charged with a 'fraud' respecting the former's report, but that Stratus was an active conspirator." At this fourth counsel's request, the second firm retained by the RICO Defendants, who had previously informed Donziger that the RICO Defendants' position was "untenable," prepared a brief memorandum summarizing its bases for withdrawal. In that memorandum, that firm stated that "we did not feel that we had a Rule 11 basis to file an opposition to Chevron's subpoena." Rule 11 of the Federal Rules of Civil Procedure requires that every filing submitted to a federal court must be signed by an attorney who represents that the filing is not "any improper purpose," that the "claims, defenses, and other legal contentions are warranted by existing law," and that "the factual contentions have evidentiary support."

263.     When another lawyer, Andrew Woods, who worked for Donziger, grew alarmed that Donziger was using him to make possibly false claims in a declaration filed in federal court, and asked to make a clarifying submission if any of his previous statements were false, Donziger and his co-conspirators talked him into remaining silent. Despite their own recognition of their misconduct, the RICO Defendants continue to deny this evidence and dissemble in sworn statements, in court filings, and in deposition testimony.

**b.**     **The RICO Defendants' Subsequent False and Misleading Statements in an Attempt to Justify and Excuse Their Emerging Misconduct**

264.     As their strategy of stonewalling and total denial became increasingly impossible to square with the emerging factual record, including the video outtakes from *Crude*, the RICO Defendants and their co-conspirators made a last-ditch effort to cover up their misconduct by attempting to confuse and mislead federal courts regarding the Lago Agrio court orders governing their association with Cabrera. The RICO Defendants distorted the record in several ways as part of their attempt to impede federal court review of Chevron's discovery applications and thereby allow the Lago Agrio court to continue its march towards judgment.

265.     In response to an inquiry from the District of Colorado seeking information about the full relationship between Cabrera and Stratus, Wilson of Emery Celli, appearing as counsel for the Lago Agrio plaintiffs, assured the court that they would provide the "full picture" in an upcoming filing. Indeed, Wilson assured the court *nine* times at the hearing that the upcoming report would provide the "full picture." When the conspirators caused that promised "full picture" to be filed, however, it was incomplete and misleading. In a sworn declaration, Defendant Fajardo provided a lengthy description of the relationship between the RICO Defendants and Cabrera, but falsely attested that Cabrera was "independent" and omitted from his declaration the substantial role he and other conspirators had played in securing Cabrera's appointment, his numerous personal meetings with Cabrera—including the March 2007 meeting captured in the *Crude* outtakes—and the massive, U.S. project to write, translate and submit the fraudulent Cabrera Report. Rather, Fajardo claimed that the RICO Defendants' contact with Cabrera was pursuant to orders issued by the Lago Agrio court in January and April 2008, requesting that the parties make various submissions to Cabrera.

266.     The RICO Defendants have repeatedly invoked these 2008 Lago Agrio orders, even though much of their extensive recruitment, meeting, and collusion with Cabrera occurred in 2007. They have also sought to explain Cabrera's various fraudulent statements to the court that he was independent from them, by asserting, in a federal court filing signed by Wilson of

Emery Celli, that those statements were "made before the [Lago Agrio] court order authorizing him to get material from the parties," and argued that "[w]hen the [Lago Agrio] Court ordered Mr. Cabrera to consider whatever submissions were provided by the parties, the landscape changed considerably. Nevertheless, Chevron conflates Mr. Cabrera's 2007 statements with conduct that occurred *after* Court authorization was given in 2008 . . . ."

267.    The RICO Defendants' and their co-conspirators' attempt to excuse their conduct based on these orders is unavailing on its face. These orders were issued a year after their close relationship with Cabrera began, and they do not authorize anything like what transpired. Indeed, when confronted with the evidence of the RICO Defendants' prior relationship with Cabrera, Donziger himself admitted that he and his co-conspirators "met with and interacted with Mr. Cabrera both before and after" the Lago Agrio court issued its January 2008 order. Their defense is also incompatible with their statements to the Lago Agrio court *after* those orders were issued. On April 25, 2008, Defendant Fajardo asserted in a filing in the Lago Agrio court that it was "[a]nother infamy" that the plaintiffs were "accused of having a close relationship with Independent Expert Richard Cabrera." "It is disappointing, your honor, that professionals with such experience have fallen into such childish and absurd arguments." And this defense ignores the fact that the one submission the RICO Defendants made to Cabrera pursuant to court order was expressly limited to documents from "public institutions in the country," which does not include the work of their own consultants—an inconsistency they have conceded in private correspondence.

268.    Nonetheless, the RICO Defendants continue to assert in U.S. federal court that their relationship with Cabrera was pursuant to those orders and fully disclosed to the Lago Agrio court. Before the Third Circuit, for example, the RICO Defendants recently asserted that, "The Ecuadorian court was and is well aware of the Ecuadorian Plaintiffs' *ex parte* contacts with Cabrera and submission of materials to him—and indeed, *invited* such contacts and submissions." Of course, if the court was aware of the RICO Defendants' collusion with Cabrera,

which was roundly denied by the RICO Defendants and Cabrera for years, that merely implicates the court in the fraud. It does not excuse or justify it.

269.    The RICO Defendants have also made the false claim, first before the District of Colorado and then before other courts, that Cabrera disclosed his contacts with the conspirators in his report. In support of this new position, they specifically referred to a citation in the Cabrera Report which they quoted as, "*Excerpts from . . . Selva Viva 2002-2006*" (emphasis and alteration in original). But the full citation, without the conspirators' carefully placed ellipses, plainly referred to a specific set of documents related to the judicial inspections, and does not disclose anything resembling the wholesale ghostwriting that actually occurred.

270.    The RICO Defendants and their co-conspirators also claimed that their submissions to Cabrera were "privileged," and that Ecuadorian law permitted parties secretly to submit materials to court officials without disclosing those materials to other parties. In support of this claim, the RICO Defendants and their co-conspirators submitted a declaration that cited no legal authority whatsoever.

271.    In their internal correspondence, RICO Defendants and their co-conspirators admitted that they were relying on unsupportable distinctions to avoid disclosure. As early as May 16, 2010, attorney Ilaan Maazel of Emery Celli, conceded in an email to co-counsel that, "the core basis for the 1782 is nevertheless apparently correct: neither Cabrera nor plaintiffs disclosed a submission from plaintiffs that contained drafts of part of the expert report written by Stratus." Yet the very next day, the RICO Defendants caused to be filed in federal court a brief containing the claim that all contact between Cabrera and the RICO Defendants was disclosed.

272.    In response to another suggested defense, in which the conspirators would argue that the only fraud shown by the record was Donziger's and not the "clients'" thus supposedly protecting privilege, Donziger complained that, "you're throwing me under the bus," and noted that there was substantial evidence that Yanza was involved in any fraud. Co-conspirator Ilann Maazel of Emery Celli assured him that Yanza was not his client, but Donziger pointed out that Yanza was associated with the Front, which stood to receive 10% of any judgment. These con-

cerns notwithstanding, the RICO Defendants and their co-conspirators have pressed this argument in numerous U.S. courts.

273.    The RICO Defendants' and their co-conspirators' attempt to whitewash their conduct was insupportable on its face, and Chevron's subsequent discovery of their true conduct has demonstrated how baseless these attempts were. The RICO Defendants and their co-conspirators did not submit materials to Cabrera so that he could independently review them; rather, they submitted materials for him to sign and submit to the court under his name. Nor did they ever intend to disclose this to Chevron, or to anyone. As Donziger put it, their specific intent with respect to Chevron's knowledge of the RICO Defendants' relationship with Cabrera was to make sure "that they don't know shit."

274.    The RICO Defendants offered these false statements in part because they hoped to avoid discovery of their misconduct, but also in an effort to at least forestall disclosure as long as possible through factual misrepresentations and the obstructive filing of meritless court papers. Through this strategy, they would buy themselves time to allow the Lago Agrio court to issue its judgment against Chevron under which the only basis for liability would be the fraudulent Cabrera Report. In May 2010, as the conspirators realized that the truth of their relationship would start to come out, Donziger described their strategy: "I think we should appeal on the theory that we gain a greater advantage by fighting them on everything, and tying them up, than in conceding any one thing even if we expect to ultimately lose that one thing down the road." And another conspirator, Eric Westenberger of Patton Boggs, lawyers spelled it out in more specific terms: "What about the following? Appeal; move for stay; if we win with [the District Court Judge] great; if we lose, we produce whatever we want (narrow read); [Gibson Dunn] complains and then we move for clarification. If we lose again, we think about another appeal."

275.    The evidence that Chevron has uncovered in the Section 1782 proceedings, in spite of the RICO Defendants' and their co-conspirators' obstructive tactics, has inspired strong language from several federal courts. For example, the District Court in the District of New Jersey held that the conduct in furtherance of the conspiracy could not constitute "anything but a

107

fraud on the judicial proceeding." And, regarding videotaped evidence of the criminal enterprise that Chevron has obtained, Judge Kaplan of the Southern District of New York found that "the outtakes contain substantial evidence of misconduct in and relating to the Ecuadorian litigation." Specifically, Judge Kaplan noted that the outtakes "contain substantial evidence that Donziger and others (1) were involved in ex parte contacts with the court to obtain appointment of the expert, (2) met secretly with the supposedly neutral and impartial expert prior to his appointment and outlined a detailed work plan for the plaintiffs' own consultants, and (3) wrote some or all of the expert's final report that was submitted to the Lago Agrio court and the Prosecutor General's Office, supposedly as the neutral and independent product of the expert." The Western District of North Carolina court also found that "what has blatantly occurred in this matter would in fact be considered fraud by any court," while the District of New Mexico court concluded, "[t]he release of many hours of the outtakes has sent shockwaves through the nation's legal communities, primarily because the footage shows, with unflattering frankness, inappropriate, unethical and perhaps illegal conduct." The District of New Mexico court also found that the RICO Defendants have engaged in "corruption of the judicial process, fraud, attorney collusion with the Special Master, inappropriate *ex parte* communications with the court, and fabrication of reports and evidence."

276.    Numerous courts have also found that the crime-fraud exception to the attorney-client privilege applied and thus did not shield the RICO Defendants' and their co-conspirators' pervasive fraud from discovery. The District Court for the Southern District of California, for example, reasoned that there "is ample evidence in the record that the Ecuadorian Plaintiffs secretly provided information to Mr. Cabrera, who was supposedly a neutral court-appointed expert, and colluded with Mr. Cabrera to make it look like the opinions were his own." Similarly, the District Court of New Mexico noted that "exchanges" among the RICO Defendants "trigger the crime-fraud exception, because they relate to corruption of the judicial process, the preparation of fraudulent reports," and "the fabrication of evidence." And the Southern District of New

York noted that "there is more than a little evidence" that the activities of the RICO Defendants "come within the crime-fraud exception."

### 2.   Making False Statements to Deceive New York Courts in Connection With Chevron's Section 1782 Applications and Other Actions

277.   The RICO Defendants' and their co-conspirators' deliberate misrepresentations to federal courts have not been limited to lies about their relationship with Cabrera and the authorship of the Cabrera Report.  Rather, the RICO Defendants and their co-conspirators have made, or caused to be made, a number of false statements before federal courts in New York in connection with their attempt to prevent the discovery of certain *Crude* outtakes in a Section 1782 proceeding and in the case the Lago Agrio Plaintiffs filed, through co-conspirator Emery Celli, to stop Chevron's arbitration with Ecuador in a bilateral investment treaty proceeding.

278.   Before the Southern District of New York, the RICO Defendants and their co-conspirators made a series of false statements regarding *Crude* and the contents of the outtakes from filming sought by Chevron pursuant to Section 1782.  When Chevron discovered evidence that a scene in *Crude* had been modified at the RICO Defendants' request in order to suppress evidence of meetings between the RICO Defendants and Cabrera team member Carlos Beristain, the RICO Defendants told the court that the meeting was "innocuous" and "of no relevance to anything."  Similarly, on appeal of the district court's order requiring production of the *Crude* outtakes, the RICO Defendants and their co-conspirators claimed that they had requested Berlinger to delete the scene from the DVD version of the film only to "avoid the misimpression, cynically fostered by Chevron below, that [the Lago Agrio] plaintiffs participated in one of Dr. Beristain's focus groups *after* he was a court expert" (emphasis in original).  In fact, however, the meeting from which Beristain was carefully edited out of the picture was a meeting arranged and funded by the RICO Defendants and their co-conspirators as part of their scheme to control the content of the Cabrera Report.  Nor was that the only evidence of wrongdoing that disclosure of the video would record.  And the attorney who signed the brief in the Second Circuit, Ilann Maazel of Emery Celli, knew that the Beristain footage would turn out to be much less damaging

than what he knew the outtakes would contain, "a meeting with Steve, Pablo, Stratus, and Cabrera," as he informed his co-counsel when the Second Circuit's order compelling production was announced.

279.    Judge Kaplan noted that Berlinger's representations regarding the contents of those outtakes, which were adopted by the RICO Defendants through their agent and co-conspirator Emery Celli have "proved inaccurate." Judge Kaplan observed that "[t]hese and similar instances are worrisome in considering their present claims."

280.    In addition to the false statements concerning *Crude*, the conspirators have made misrepresentations in two other cases before the Southern District of New York.  One of those cases was brought by the Republic of Ecuador and Petroecuador and the other was filed by the RICO Defendants (ostensibly on behalf of the Lago Agrio Plaintiffs), through their agent and co-conspirator Emery Celli, in an attempt to stay the Treaty Arbitration Chevron had commenced as a result of Ecuador's failure to abide by the terms of the 1998 Final Release.  In making false statements about Cabrera in both proceedings in related actions before this Court, the RICO Defendants have attempted to deceive the Court.

281.    Finally, on January 14, 2010, co-conspirator Emery Celli filed an action ostensibly on behalf of the Lago Agrio Plaintiffs in the United States District Court for the Southern District of New York, seeking a court order compelling Chevron to stay the bilateral investment treaty proceeding.  The complaint alleged that "[t]he best and most recent *independent* estimate available of the human health impact of this contamination is provided by the *neutral Special Master* [Cabrera] appointed by the [Lago Agrio] court to provide advice on damages." (emphasis added).  It further stated that "Dr. Cabrera appointed a team of 14 technical officials," and that "the final report [was] *produced by the Cabrera team . . . .*" (emphasis added).

282.    This complaint also alleged that "[e]nvironmental remediation experts from the United States have reviewed the Cabrera report and found its conclusions reasonable and its damages assessment consistent with the costs of other large environmental clean-ups around the

world." The "environmental remediation experts from the United States" were the RICO Defendants themselves, a fact which was not disclosed by the RICO Defendants to this Court.

### 3. Obstructing Judicial Proceedings by Tampering With Witnesses, Withholding Documents, and Making False Statements to This Court

283.    Donziger, the mastermind of the RICO Defendants' fraudulent scheme, has also been a leading actor in the attempted cover up of the criminal scheme in U.S. courts. He has tampered with the testimony and sworn submissions of at least two other witnesses, Mark Quarles and Dr. Charles Calmbacher, and he has defied multiple discovery orders from this Court commanding him to produce his own documents, and lied to the Court repeatedly about his non-compliance.

284.    Donziger has been working to prevent Chevron's discovery of the RICO Defendants' scheme for years. On or before September 17, 2007, the RICO Defendants and their co-conspirators induced one of their consultants, Mark Quarles, to sign a declaration, which was submitted in an action pending in the Southern District of New York, stating that "Mr. Cabrera and his team have acted independently from both the [Lago Agrio] plaintiffs and the defendant . . . ." During Quarles's recent deposition in a Section 1782 proceeding, Quarles testified that the statement concerning Cabrera's independence in his declaration was based on several days of observation of the global assessment process in 2007, and also on specific false representations by Donziger that Cabrera had written the work plan upon which the Cabrera Report was based. He further testified that Donziger paid him to conduct his observations and sign the declaration. Quarles testified that had he known that Cabrera was working directly with the lawyers for the Lago Agrio Plaintiffs (i.e., the RICO Defendants), he would not have signed the declaration.

285.    Recent document productions from Donziger have further revealed that not only did Donziger push Quarles to swear to Cabrera's independence, he pressed for stronger language, and asked Quarles remove language that would have hurt the RICO Defendants if the true facts were known. On September 16, 2007, Donziger sent Quarles an email attaching Quarles' draft declaration. Where Quarles had written a paragraph discussing the qualifications of

Cabrera's team, Donziger requested that he replace that language with statements that Donziger knew to be utterly false: "Mr. Cabrera has at all times acted independently from both the plaintiffs and the defendant. At no time has Mr. Cabrera entertained suggestions or even met with plaintiffs or their representatives regarding his current work plan." Donziger then told Quarles to delete language suggesting that if any such contacts had taken place, "a degree of biasness would have been introduced into the sampling plan." Quarles accepted Donziger's request to delete the "biasness" passage, and ultimately signed a version containing the core of the false claim of independence.

286.   More recently, when the conspirators learned that Chevron would be taking Dr. Calmbacher's deposition in a Section 1782 proceeding, the RICO Defendants attempted to stop Calmbacher from exposing the truth about the falsified reports that Defendants and their co-conspirators filed in his name.

287.   Under the guise of seeking to move to quash the subpoena, Donziger contacted Dr. Calmbacher and attempted to convince him not to testify at his deposition, telling him that testifying could pose "real problems" for him and could result in a "potential law case against" him because "they're going to go after [him] for unprofessional behavior." Donziger had no factual basis upon which to make these statements, which were false and misleading. When asked at his deposition whether "Donziger [was] trying to convince [him] not to come and testify," Calmbacher testified: "Very much so. Very much so."

288.   Dr. Calmbacher disregarded Donziger's threats and outrageous claims, and testified pursuant to the court-authorized subpoena. Shown copies of the reports filed by Defendants in the Lago Agrio court under his name, Dr. Calmbacher testified, "I did not reach these conclusions and I did not write this report." Dr. Calmbacher proceeded to explain how the conspirators sent him a version of his expert report that correctly stated his views and blank pages for him to initial so that they could obtain his signature for the falsified reports filed with the Lago Agrio court, as described in paragraphs 108 to 111, *supra*.

289.    In the Section 1782 proceeding directed at Donziger himself, he has disregarded the Federal Rules of Civil Procedure and this Court's multiple express orders to produce all of his responsive documents.  With the approval of the Court, Chevron served a subpoena on Donziger on August 9, 2010, seeking documents and testimony regarding many of the matters described in this Complaint.  Donziger moved to quash the subpoena, and this Court denied that motion on October 20, 2010 and ordered Donziger to comply with the subpoena "forthwith."  Further, because Donziger had failed to produce a privilege log, the Court held that any privilege claims over Donziger's documents were waived.  Nonetheless, the Court noted that it would "relieve [Donziger] of the waiver," if he "file[d] a complete privilege log on or before October 29, 2010."

290.    Donziger did not comply.  Instead he produced a fraction of his documents, filed meritless and conflicting papers with the Court, and then, nearly a month later, submitted a facially defective "privilege log."  On November 29, the Court *once again* ordered Donziger to produce his responsive documents, finding that Donziger's conduct "was a deliberate attempt to structure the response to the subpoenas in a way that would create the maximum possibility for delay."  And Donziger once again failed to comply.

291.    At Donziger's deposition, his conduct was so improper that it prompted the Special Master, appointed by this Court to oversee the deposition, to write to the Court:  "From virtually the first day of his deposition, Mr. Donziger gave many unresponsive, self serving answers to questions that should have been answered directly, with no embellishment."  The Special Master went on to describe how he had repeatedly cautioned Donziger and his counsel, but that this "seemed to have little effect."

292.    On January 13, 2011, the Court *yet again*, in response to a motion to compel filed by Chevron, ordered Donziger to produce the documents he had been under orders to produce since October, and held in reserve the possibility of holding Donziger in contempt.  Over the next several days, Donziger, without explanation for his prior failure to do so, produced over 87,000 documents, four times as many as he had produced before, the vast majority of

which were responsive to Chevron's requests, and included many of the probative documents that form the basis for this complaint. Yet, in deposition testimony immediately following this production, Donziger admitted that he had yet *more* responsive documents, such as those in email accounts that the RICO Defendants set up specifically to hide communications sensitive communications about, among other topics, their authorship of the Cabrera Report.

**D.   Chevron Has Suffered Substantial Damages as a Result of the RICO Defendants' Conspiracy, and Enforcement of a Corrupt Judgment in the Lago Agrio Litigation Would Deepen the Harm**

293.   The RICO Defendants and their co-conspirators have used the corruption and politicization endemic to the Ecuadorian judicial system to their advantage and by colluding with the Ecuadorian government and corrupting the court and its "neutral" expert. It is therefore likely that the Lago Agrio court will do as the RICO Defendants and their co-conspirators have desired and enter a massive, fraudulent judgment against Chevron even though there is no legitimate evidence to establish liability or damages. *See* ¶¶ 87-184, *supra*. Indeed, as Judge Kaplan explained, "there is evidence to support Chevron's claim that the 'global assessment' is a fraud . . . . There is evidence too that other expert evidence submitted to the Ecuadorian courts on behalf of those plaintiffs also was fraudulent. Chevron thus stands in jeopardy of a huge judgment that, if ultimately rendered, could be the result of a fraud practiced by the Lago Agrio plaintiffs."

294.   The jeopardy that Chevron faces is compounded by the fact that the RICO Defendants continue to have access to significant funds to carry out their criminal scheme. Until 2010, Kohn had been the primary source of funds for the criminal scheme, supporting it with over $7 million in less than seven years—"the largest single component" of which, according to Kohn, was over $1 million to Donziger personally. This money was made available by Kohn upon specific requests from Defendants Donziger and Yanza, who worked with Kohn to prepare budgets for the case, and would contact him as often as monthly to request amounts ranging from $40,000 to $100,000 each time. These funds were distributed to U.S. consultants, including Defendant Stratus, and to Ecuador, mainly through Selva Viva and the Front, to fund the RICO De-

114

fendants' activities in that country. After Donziger, Yanza, and Fajardo had a falling out with Kohn, they secured additional ongoing funding from Burford, a firm that specializes in funding large lawsuits. In the summer and fall of 2010, the RICO Defendants discussed a $15 million investment from the Burford Group, and by December, the initial funds had already been provided to support their criminal activities. In exchange, Burford received not only an interest in any money obtained from Chevron, but also approval authority over the use of their funds. Another substantial source of funds has been Russell DeLeon, an online gambling entrepreneur who was a major source of funding for *Crude*.

295.   Moreover, a judgment that finds Chevron liable and awards damages appears to be imminent, as indicated by the Lago Agrio court itself. On December 17, 2010 at 9:57 a.m., only two days after counsel for the Lago Agrio Plaintiffs' Ecuadorian counsel demanded "a final declaration by the Courts: a judgment, a declaration by the court that will put an end to this long litigation" and disregard the evidence of fraud and corruption, the Lago Agrio court issued an order known as *autos para sentencia*. This order purports to formally close the evidence and vest the court with authority to enter a judgment at any time and without any further act or notice to the parties. Indeed, the Lago Agrio Plaintiffs themselves have acknowledged that judgment is imminent. In a recent filing before U.S. court, the Lago Agrio Plaintiffs asserted that a final judgment could be issued as early as February 2011. And, on January 17, 2011, the RICO Defendants and their co-conspirators caused the Lago Agrio Plaintiffs to file their *alegato* or closing arguments with the Lago Agrio court.

296.   Defendants already are planning to seek immediate enforcement of the impending Ecuadorian judgment in U.S. and foreign courts, and to extort a payment from Chevron by using the Ecuadorian judgment to threaten seizure of Chevron's assets and those of its subsidiaries. The RICO Defendants internal blueprint for global enforcement, a memo by co-conspirator Patton Boggs titled "Invictus," asserts that, "If and when an enforceable judgment is entered in Ecuador, Plaintiffs' Team expects to be engaged quickly, if not immediately, on multiple enforcement fronts—in the United States and abroad." They have said as much expressly on multiple

occasions, and, in fact, have represented to the Southern District of New York that Chevron's defense against any Lago Agrio judgment should be restricted to New York's Recognition Act.

297. Co-conspirator Amazon Watch has reported that the Lago Agrio Plaintiffs' representatives will quickly "move to collect the judgment by any means necessary in whatever country the company has assets" and that they "will seek to enforce any judgment against the oil giant immediately in U.S. courts." Co-conspirator Hinton said that "[i]f the [Ecuadorian] courts were to agree to [force Chevron to post a bond in order to appeal the Lago Agrio judgment], then we would try to start seizing assets in other countries." According to Donziger, "If we get a judgment out of the trial court, we're coming back immediately, — soon as we can, —to get that judgment enforced. We are not waiting for the appeals process." And Donziger has threatened that "Chevron operates in more than 100 countries and has numerous oil tankers that troll the world's waterways and dock in any number of ports . . . . This could end up being one of the biggest forced asset seizures in history and it could have a significant disruptive impact on the company's operations." In an interview broadcast as part of a 60 Minutes segment on the Lago Agrio Litigation, Donziger, in response to the observation that Chevron has no assets in Ecuador, stated, "At the end of the day, it might be a situation where a U.S. court enforces the judgment and the marshals have to go to Chevron and seize their assets." These threats continue unabated. Just months before this Complaint was filed, Donziger, in a speech to law students, told them that he was assembling a legal team "to execute whatever judgment comes out of Ecuador effectively, in whatever forum might—forum might be appropriate, including multiple places that, you know, you could file suits, you could seize assets, seize boats."

298. Through statements made to this Court, Defendants have also made clear their intent to enforce immediately the imminent judgment. When asked by Judge Sand of the Southern District of New York whether the Lago Agrio Plaintiffs in their action to stay the Treaty Arbitration were "willing to stipulate that [they would] take no efforts to enforce the judgment until . . . the arbitration is completed," their counsel refused to agree to stay enforcement: "No, your honor. We would not and cannot do that."

116

299.    The impending judgment of the Lago Agrio court, procured by the RICO Defen-
dants' and their co-conspirators' fraud—in addition to related attachment and enforcement ef-
forts and the specter of immediate liability, which according to the RICO Defendants and their
co-conspirators, may be as high as $113.5 billion—threatens to disrupt Chevron's business op-
erations, sully its reputation, and otherwise cause Chevron to suffer irreparable harm.  In the
RICO Defendants' "Invictus" memorandum, outlining their plans to use the Lago Agrio judg-
ment to extract payments from Chevron, Patton Boggs also proposes initiating a shareholder de-
rivative action against Chevron in the United States, "as a point of leverage with respect to set-
tlement [and] as a fruitful basis for discovery into the machinations of Chevron management vis
à vis the Ecuadorian litigation."  And that memo also reveals that the RICO Defendants do not
intend to wait for judgments in their proposed enforcement proceedings: "Consistent with their
aggressive approach, Plaintiffs' Team will look for ways to proceed against Chevron on a pre-
judgment basis, largely as a means of attaining a favorable settlement at an early stage.  Various
laws and procedures within and outside the United States may permit attachment of Chevron's
assets prior to successful recognition of the Ecuadorian judgment."

300.    Nor are the RICO Defendants limiting their operations to the Lago Agrio Litiga-
tion.  Donziger has stated that their intention is to "take legal fees we can earn from this case
and, do more cases like this in different places with, you know, the same team, if possible."

301.    The RICO Defendants' extensive and wide-ranging scheme to defraud and extort
Chevron, as described in this Complaint, has already had a lasting and irreparable effect on
Chevron.  The RICO Defendants' false and misleading statements have been relied on by the
U.S. courts, U.S. state and federal government agencies, Chevron's shareholders, investors, ana-
lysts, the media, and by the Lago Agrio court by means of its acceptance of Defendants' and
Cabrera's misrepresentations and omissions and its failure to take meaningful corrective action.
Further, the RICO Defendants' false and misleading statements have caused Chevron substantial
damages.  Chevron has had to expend millions of dollars in attorneys' fees and costs defending
itself in the sham litigation the RICO Defendants and their co-conspirators have prosecuted in

Ecuador, and exposing the conspirators' pervasive fraud in the Section 1782 proceedings. On top of the attorneys' fees and expenses, Chevron's interest in executed contracts, including the 1995 Settlement Agreement and 1998 Final Release, has also been impaired as a result of the RICO Defendants' and their co-conspirators' collusion with the Republic of Ecuador. In addition, many of the RICO Defendants' extortionate acts have presented unfair and false representations of Chevron's business practices, harming Chevron's reputation and goodwill. As alleged throughout, these harms represent the precise result intended by the RICO Defendants' misconduct. And worse, it is clear from the RICO Defendants' actions and words that they have no intention of stopping until Chevron surrenders to their extortionate demands. Without the Court's intervention, Chevron will continue to suffer significant harm at the hands of the RICO Defendants and their unlawful scheme.

302.   The facts and evidence presented in this Complaint are the result of many thousands of hours of work by Chevron, its attorneys, and its investigators, and have been assembled at extraordinary cost. As this Complaint was being prepared for filing, however, new evidence continued to emerge, and the true nature of the RICO Defendants' criminal conduct becomes clearer and clearer. Just a few months ago, considering Chevron's request to obtain discovery directly from the ringleader of this enterprise, Donziger, the United States District Court for the Southern District of New York summarized the case as follows: "[T]he name of the game is, arguably, to put a lot of pressure on the courts to feed them a record in part false for the purpose of getting a big judgment or threatening a big judgment, which conceivably might be enforceable in the U.S. or in Britain or some other such place, in order to persuade Chevron to come up with some money. Now, do the phrases Hobbs Act, extortion, RICO, have any bearing here?"

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF
### (Violations of RICO, 18 U.S.C. § 1962(c))
### (Against All RICO Defendants)

303.    Chevron realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

304.    At all relevant times, Chevron is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

305.    At all relevant times, each RICO Defendant is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

*The RICO Enterprise*

306.    The RICO Defendants and their co-conspirators are a group of persons associated together in fact for the common purpose of carrying out an ongoing criminal enterprise, as described in the foregoing paragraphs of this Complaint; namely, through a multi-faceted campaign of lies, fraud, threats and official corruption, to coerce Chevron into paying billions of dollars to the RICO Defendants and their co-conspirators.  These RICO Defendants and their co-conspirators have organized their operation into a cohesive group with specific and assigned responsibilities and a command structure, operating in the United States and Ecuador, funded primarily from the United States, and directed mainly from the United States.  Over the years they have adapted their scheme to changing circumstances, recruiting new members to their operation, and expanding the scope and nature of their activities.  While the organization of the criminal enterprise has changed over time, and its members may have held different roles at different times, the criminal enterprise has generally been structured to operate as a unit in order to accomplish the goals of their criminal scheme:

     a.    Defendants Donziger and the Law Offices of Steven R. Donziger have been responsible for oversight of the scheme to defraud and extort Chevron, and have directed other conspirators to take actions necessary to accomplish the overall aims of the criminal enterprise—namely, manufactur-

119

ing evidence of Chevron's liability, procuring sham criminal charges against Chevron's attorneys, conducting a massive public pressure campaign designed to spread false and misleading information about Chevron and the Lago Agrio Litigation, and obstructing Chevron's efforts at uncovering the truth in various U.S. court proceedings.

b.    Defendant Fajardo has been primarily responsible for prosecuting the sham litigation in the Ecuadorian courts, has served as one of the heads of the criminal enterprise in the U.S. and Ecuadorian media, and has planned and coordinated the ghostwriting of the Cabrera Report.

c.    Defendants Yanza and the Front have been primarily responsible for managing the RICO Defendants' "private army," exerting influence over and colluding with Ecuadorian government and court officials, and serving as media representatives for the criminal enterprise in which they have made false statements to Chevron stockholders, financial analysts, investors, and/or state and federal agencies.  Yanza arranged for funding from Kohn and/or Kohn Swift for the RICO Defendants' activities in Ecuador, and frequently caused money to be transferred out of the United States for this purpose.

d.    Defendant Selva Viva has served as a conduit for funding and otherwise furthering the RICO Defendants' criminal enterprise.

e.    Defendants Stratus, Beltman, and Maest have been responsible for coordinating the drafting of and actually ghostwriting the Cabrera Report and other submissions to the Lago Agrio court, and for the false promotion of the Cabrera Report as independent in the media and to U.S. courts.

307.    The RICO Defendants and their co-conspirators constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), referred to hereinafter as the

"Enterprise." Each of the RICO Defendants participated in the operation or management of the Enterprise.

308.   At all relevant times, the Enterprise was engaged in, and its activities affected interstate and foreign commerce within the meaning of 18 U.S.C. § 1962(c).

*Pattern of Racketeering Activity*

309.   The RICO Defendants conducted or participated, directly or indirectly, in the conduct, management, or operation of the Enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c), to wit:

### *Pattern of Racketeering Activity:  Extortion in Violation of Hobbs Act, 18 U.S.C. § 1951*

310.   At all times material to this Complaint, Chevron was engaged in interstate and foreign commerce and in an industry that affects interstate and foreign commerce.

311.   As described herein, the RICO Defendants have engineered a wide-ranging campaign of public attacks based on false and misleading statements, trumped up criminal charges, threatened fraudulent civil judgments, investigations by government agencies, and ongoing harassment and disruptions of business operations, and have demanded the payment of billions of dollars before these activities will cease, all with the intent and effect of causing a reasonable fear of economic loss on the part of Chevron.

312.   As described herein, the RICO Defendants manufactured false evidence against Chevron and are relying on that false evidence in the sham Lago Agrio Litigation with the intent and effect of causing a reasonable fear of economic loss on the part of Chevron.

313.   As described herein, the RICO Defendants conspired with the Republic of Ecuador to advance baseless criminal charges against two Chevron lawyers responsible for executing the 1998 Final Release in order to extort a payment from Chevron.

314.   The RICO Defendants' actions are intended to induce fear in Chevron that the RICO Defendants will, among other things:  (1) continue to pursue a scheme of misrepresentation to the great harm and public denigration of Chevron, unless and until Chevron "settles" the

Lago Agrio Litigation; (2) continue to conspire with Ecuadorian officials to have Chevron's at-torneys criminally prosecuted on trumped up charges; and (3) secure a fraudulent multi-billion dollar judgment against Chevron and file lawsuits in the United States and in other foreign juris-dictions seeking recognition and enforcement of the judgment. These actions, as described herein, have created a reasonable fear of harm on the part of Chevron, including fear of eco-nomic loss.

315.   Accordingly, the RICO Defendants have unlawfully obstructed, delayed, and affected—and attempted to obstruct, delay, and affect—commerce as that term is defined in 18 U.S.C. § 1951, and the movement of articles and commodities in such commerce, by extor-tion, as that term is defined in § 1951, in that the RICO Defendants attempted to induce Chevron to consent to relinquish property through the wrongful use of actual and threatened force, vio-lence, and fear—including fear of economic harm.

### *Pattern of Racketeering Activity: Extortion in Violation of New York Penal Law §§ 110.00, 155.05(2)(e), 155.42*

316.   Similarly, the RICO Defendants' wrongful attempts to appropriate Chev-ron's property by instilling fear that if the property is not delivered the RICO Defendants would perform an act calculated to harm Chevron materially with respect to its business, financial con-dition, and reputation violates New York Penal Law §§ 110.00, 155.05(2)(e), 155.42.

### *Pattern of Racketeering Activity: Multiple Instances of Mail Fraud and Wire Fraud in Violation of 18 U.S.C. §§ 1341, 1343*

317.   As described herein, the RICO Defendants engaged in a wide-ranging scheme or artifice to defraud Chevron, various courts of law, and the greater public concerning Chevron's purported liability for environmental harm in Ecuador by manufacturing evidence, colluding with the court expert Cabrera to submit the RICO Defendants' manufactured evidence, and then holding out the Cabrera Report as independent and neutral when it decidedly was not. The ultimate objective of the RICO Defendants' scheme or artifice to defraud is to coerce Chev-ron into making a multi-billion dollar payment that will directly benefit the individual and organ-izational RICO Defendants.

318.    In furtherance of their scheme, and as described herein, the RICO Defendants transmitted, or caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, and also caused matters and things to be placed in any post office or authorized depository, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier, including, but not limited to, the following:

      a.     emails and website postings incorporating false and misleading statements regarding the Cabrera Report;

      b.     wirings and/or mailings between and among the RICO Defendants concerning the preparation of the report in the United States that was submitted to the Lago Agrio court by Cabrera;

      c.     communications directed toward U.S. state and federal government officials and regulators incorporating false and misleading statements regarding Chevron's liability in the Lago Agrio Litigation;

      d.     funds transferred by Kohn and/or Kohn Swift to the RICO Defendants, with the intent that those funds be used to promote the carrying on of the RICO Defendants' criminal activities; and,

      e.     electronic filing and service of court papers containing false and misleading statements intended to impede the operation of those courts.

319.    Chevron incorporates by reference the attached Appendix B, which sets forth particular uses of wire and mail communications in furtherance of the RICO Defendants' scheme or artifice to defraud that constitute violations of 18 U.S.C. §§ 1341 and 1443, including which individual defendant caused the communication to be mailed or wired, when the communication was made, and how it furthered the fraudulent scheme.

320.    The RICO Defendants participated in the scheme or artifice knowingly, willfully, and with the specific intent to deceive and/or defraud Chevron into paying the RICO

Defendants and their co-conspirators. The RICO Defendants knowingly and intentionally pre-pared a self-serving analysis of Chevron's alleged liability in Lago Agrio, and then knowingly and with the intent to deceive the Lago Agrio court, Chevron, and the general public, caused that analysis to be filed under the pretense that it was a report prepared by an independent court ex-pert. The RICO Defendants colluded with the Republic of Ecuador to initiate criminal prosecu-tion of Chevron's attorneys on the basis of this report and other statements the RICO Defendants knew to be false or misleading. The RICO Defendants further caused statements regarding this report, these criminal charges and other matters, which statements the RICO Defendants knew to be false or misleading, to be disseminated to the general public, to the media, and to multiple state and federal agencies and federal courts, with the intent that those statements be believed and that they form the basis for further public attacks on Chevron, investigations of Chevron, and reduction in the value of Chevron's corporate assets. The RICO Defendants knowingly engaged in the aforementioned conduct with the intent to generate fear in Chevron such that Chevron would ultimately pay the RICO Defendants to cease their conduct, under the guise of a settle-ment of the Lago Agrio Litigation, through satisfaction of a judgment in the Lago Agrio Litiga-tion, or in a subsequent proceeding to recognize and enforce such a judgment.

321.    The RICO Defendants' false and misleading statements have been relied on by U.S. courts, U.S. state and federal government agencies, Chevron's shareholders, inves-tors, analysts , the media, and by the Lago Agrio court by means of its acceptance of Defendants' and Cabrera's misrepresentations and omissions and its failure to take meaningful corrective ac-tion. Further, RICO Defendants' false and misleading statements have caused Chevron substan-tial damages.

### *Pattern of Racketeering Activity:  Money Laundering in Violation of 18 U.S.C. § 1956(a)(2)(A)*

322.    Defendants Yanza and Donziger have on multiple occasions, acting in their individual capacities and as agents for Selva Viva and/or the Front have knowingly caused the transportation, transmission, and/or transfer of funds to or from the United States to them-

selves and to Defendants Selva Viva, the Front, and other entities with the intent that those funds be used to promote the carrying on of unlawful activity in violation of 18 U.S.C. §§ 1341, 1343 and 1951, including the secret preparation of the Cabrera Report, payment to Cabrera for his complicity and silence as to the report's authorship, the funding of the RICO Defendants' pressure campaigns against the Lago Agrio court and against Chevron, and collusion with the Republic of Ecuador.

*Pattern of Racketeering Activity:  Obstruction of Justice in Violation of 18 U.S.C. § 1503*

323.    Faced with implacable denials in Ecuador from Cabrera and the RICO Defendants about the authorship of the Cabrera Report, Chevron turned to U.S. courts to pursue discovery directly from the Enterprise through proceedings under 28 U.S.C. § 1782, which authorizes "[t]he district court of the district in which a person resides or is found [to] order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal."

324.    In a concerted effort to thwart Chevron's attempts to uncover the truth and avoid discovery, the RICO Defendants, and their counsel, have habitually filed or caused to be filed documents, including declarations sworn to under penalty of perjury, that falsely represent that Cabrera was an independent expert and that otherwise misrepresent the RICO Defendants' interactions with Cabrera.  By making these deliberate and strategic false representations in various pending federal judicial proceedings, with full awareness of their consequence and with the specific intent to corruptly endeavor to influence, obstruct, and impede the due administration of justice, the RICO Defendants have committed multiple instances of obstruction of justice in violation of 18 U.S.C. § 1503.

*Pattern of Racketeering Activity:  Witness Tampering in Violation of 18 U.S.C. § 1512*

325.    Pursuant to a March 2, 2010 order issued by the United States District Court for the Northern District of Georgia granting Chevron's Section 1782 application, Chevron noticed the deposition of Defendants' expert, Charles W. Calmbacher, Ph.D.

326.    Fearing that Dr. Calmbacher would expose the truth about the falsified reports filed in his name by the RICO Defendants, Donziger knowingly engaged in intimidation, threats, misleading conduct, and corrupt persuasion toward Dr. Calmbacher, with the specific intent to influence, delay, and prevent Dr. Calmbacher's testimony or cause Dr. Calmbacher to withhold records, objects, documents, and testimony from an official proceeding.

327.    As Dr. Calmbacher testified pursuant to the court-authorized subpoena at his March 29, 2010 deposition, Donziger contacted Dr. Calmbacher and emphatically attempted to convince Dr. Calmbacher not to testify at his deposition, warning him that testifying could pose "real problems" for him and could result in a "potential law case against" him because "they're going to go after [him] for unprofessional behavior." When asked at his deposition whether "Donziger [was] trying to convince [him] not to come and testify," Calmbacher testified: "Very much so. Very much so." Donziger tampered with Dr. Calmbacher's testimony in violation of 18 U.S.C. § 1512 in furtherance of the Enterprise's scheme.

328.    The RICO Defendants also tampered with the testimony of environmental consultant Mark Quarles in furtherance of the Enterprise's scheme. In 2007, Ecuador submitted a declaration by Quarles regarding the "independence" of the Cabrera Report in a proceeding pending in the Southern District of New York, using that declaration to support the Government's contention that the Lago Agrio Litigation "has proceeded in accordance with rules of procedure under Ecuador law." Quarles has recently admitted in sworn testimony that Donziger paid him for this affidavit, and that he would not have signed the affidavit if he had known about the RICO Defendants' involvement with Cabrera. By not disclosing the truth about Donziger's improper contact with Cabrera and instead deliberately misleading Quarles, Donziger knowingly engaged in misleading conduct and corrupt persuasion toward Quarles with the intent to influence his testimony in an official proceeding.

329.    The RICO Defendants and their co-conspirators also tampered with the potential testimony of numerous Stratus employees in furtherance of the Enterprise's scheme. After Chevron instituted a Section 1782 application in December 2009 seeking discovery from

Stratus, Beltman, undoubtedly concerned about potentially damaging future testimony from Stratus employees, knowingly engaged in misleading conduct and corrupt persuasion toward numerous Stratus employees, with the specific intent to influence, delay, and prevent those employees' truthful testimony or cause the employees to withhold records, objects, documents, and testimony from an official proceeding.  Beltman repeatedly misrepresented to Stratus staff members that Cabrera was independent and had authored his own report.  Beltman likewise repeatedly misled Stratus employees and omitted the true facts when he misrepresented that Stratus had played a limited role of technical advisor to the Lago Agrio Plaintiffs.  Thus, Beltman tampered with the Stratus employees' potential or expected testimony in violation of 18 U.S.C. § 1512, in furtherance of the Enterprise's scheme.

### *Summary of the Pattern of Racketeering Activity Alleged Against Each RICO Defendant*

330.    Defendant Donziger has committed numerous mail and wire fraud violations, including those identified in Appendix B in which Donziger used or caused to be used the mail or wires in furtherance of the RICO Defendants' scheme to defraud.  Donziger has also engaged in extortion of Chevron and fraudulent conduct through numerous acts, including by participating in a campaign of public attacks based on false and misleading statements about Chevron and the Lago Agrio Litigation (including making false statements to the U.S. House of Representatives), manufacturing false evidence in the form of the Cabrera Report, procuring baseless criminal charges against Chevron's attorneys in Ecuador, colluding with Ecuadorian officials and pressuring the Lago Agrio court to ensure a negative outcome for Chevron in the Lago Agrio Litigation, and threatening and causing threats to be made to Chevron directly and through its shareholders.  In addition, Donziger has engaged in obstruction of justice by filing and/or causing to be filed in multiple U.S. courts documents, including declarations sworn under penalty of perjury, falsely representing that Cabrera was an independent expert and otherwise misrepresenting the RICO Defendants' interactions with Cabrera.  Donziger has committed wire fraud and engaged in money laundering by knowingly causing funds to be transported, transmitted, or transferred from the United States to Selva Viva, Yanza, the Front, and other parties with the in-

tent that such payments would fund the RICO Defendants' criminal activity.  Donziger has also engaged in witness tampering by knowingly engaging in intimidation, threats, misleading conduct, and corrupt persuasion toward Dr. Calmbacher with the specific intent to influence, delay, and prevent Dr. Calmbacher's testimony in the Northern District of Georgia.  Donziger also tampered with the testimony of Mark Quarles by paying him for his affidavit and by concealing the RICO Defendants' involvement with Cabrera and the Cabrera Report.

331.    Defendant the Law Offices of Steven R. Donziger, through the actions of its agent Defendant Donziger, has committed numerous mail and wire fraud violations, including those identified in Appendix B in which the Law Offices of Steven R. Donziger used or caused to be used the mail or wires in furtherance of the RICO Defendants' scheme to defraud.  Through the actions of Donziger, the Law Offices of Steven R. Donziger has also engaged in extortion of Chevron and fraudulent conduct through numerous acts, including by participating in a campaign of public attacks based on false and misleading statements about Chevron and the Lago Agrio Litigation (including making false statements to the U.S. House of Representatives), manufacturing false evidence in the form of the Cabrera Report, procuring baseless criminal charges against Chevron's attorneys in Ecuador, colluding with Ecuadorian officials and pressuring the Lago Agrio court to ensure a negative outcome for Chevron in the Lago Agrio Litigation, and threatening and causing threats to be made to Chevron directly and through its shareholders.  In addition, the Law Offices of Steven R. Donziger, through Donziger, has engaged in obstruction of justice by filing and/or causing to be filed in multiple U.S. courts documents, including declarations sworn under penalty of perjury, falsely representing that Cabrera was an independent expert and otherwise misrepresenting the RICO Defendants' interactions with Cabrera.  The Law Offices of Steven R. Donziger has also engaged in witness tampering through Donziger's knowing intimidation, threats, misleading conduct, and corrupt persuasion toward Dr. Calmbacher with the specific intent to influence, delay, and prevent Dr. Calmbacher's testimony in the Northern District of Georgia.  In addition, the Law Offices of Steven R. Donziger, again through Donziger, also

tampered with the testimony of Mark Quarles by paying him for his affidavit and by concealing the RICO Defendants' involvement with Cabrera and the Cabrera Report.

332.   Defendant Fajardo has committed numerous mail and wire fraud violations, including those identified in Appendix B in which Fajardo used or caused to be used the mail or wires in furtherance of the RICO Defendants' scheme to defraud.  Fajardo has also engaged in extortion of Chevron and fraudulent conduct by participating in a campaign of public attacks based on false and misleading statements about Chevron and the Lago Agrio Litigation (including in a letter to the U.S. Trade Representative), by manufacturing and causing to be manufactured false evidence, and by applying pressure to Ecuadorian government officials to procure baseless criminal charges against Chevron's attorneys.  In addition, Fajardo has engaged in obstruction of justice by filing or causing to be filed in numerous U.S. courts documents, including a declaration sworn under penalty of perjury, that falsely represent that Cabrera was an independent expert and that otherwise misrepresent the relationship between Cabrera and the RICO Defendants.

333.   Defendant Yanza has committed numerous mail and wire fraud violations, including those identified in Appendix B in which Yanza used or caused to be used the mail or wires in furtherance of the RICO Defendants' scheme to defraud.  Yanza has committed wire fraud and engaged in money laundering by knowingly causing funds to be transported, transmitted, or transferred from the United States to Selva Viva, the Front, and other parties with the intent that such payments would fund the RICO Defendants' criminal activity.  Yanza has also engaged in extortion of Chevron and fraudulent conduct by participating in a campaign of public attacks based on false and misleading statements about Chevron and the Lago Agrio Litigation (including in a letter to the U.S. Trade Representative), by manufacturing and causing to be manufactured false evidence, and by applying pressure to Ecuadorian government officials to procure baseless criminal charges against Chevron's attorneys.  In addition, Yanza has engaged in obstruction of justice by filing or causing to be filed in multiple U.S. courts documents, including declarations sworn to under penalty of perjury, that falsely represent that Cabrera was an

independent expert and that otherwise misrepresent the RICO Defendants' interactions with Cabrera.

334.    Defendant the Front, through the actions of its agents Defendants Fajardo and Yanza, among others, has committed numerous mail and wire fraud violations, including those identified in Appendix B in which the Front used or caused to be used the mail or wires in furtherance of the RICO Defendants' scheme to defraud.  In addition, the Front has engaged in numerous acts of extortion of Chevron and fraudulent conduct by participating in a campaign of public attacks based on false and misleading statements about Chevron and the Lago Agrio Litigation through a website the Front maintains as well as numerous press releases and by manufacturing and causing to be manufactured false evidence.

335.    Defendant Selva Viva, through the actions of its agents Defendants Yanza and Donziger, has committed several wire fraud violations and multiple acts of money laundering by causing funds to be transferred by Kohn and/or Kohn Swift from the United States to Ecuador, acting as a conduit of those funds, and then distributing those funds to finance the RICO Defendants' illegal scheme.  Selva Viva has also engaged in numerous acts of extortion of Chevron and fraudulent conduct by manufacturing and causing to be manufactured false evidence.

336.    Defendant Stratus, through the actions of its agents Defendants Beltman, Maest, and other individuals, has committed numerous mail and wire fraud violations, including those identified in Appendix B in which Stratus used or caused to be used the mail or wires in furtherance of the RICO Defendants' scheme to defraud.  Stratus also has engaged in extortion of Chevron and fraudulent conduct by manufacturing false evidence, in the form of the Cabrera Report and its annexes, used extensively by the RICO Defendants in the Lago Agrio Litigation and more generally in furtherance of their illegal scheme.  In addition, Stratus has engaged in extortion and fraudulent conduct by disseminating false statements about Chevron through its authorship of the Cabrera Report and through its later "evaluation" of that report.  Stratus also has engaged in extortion and fraudulent conduct by participating in a campaign of public attacks based on false and misleading statements about Chevron and the Lago Agrio Litigation.  Finally, Stra-

tus has engaged in obstruction of justice by misrepresenting to the United States District Court
for the District of Colorado that Cabrera was an independent expert, that it was "astonished" to
see "similarities" between its own work product and the Cabrera Report when Stratus actually
drafted the majority of the Cabrera Report, and otherwise misrepresenting the relationship be-
tween Cabrera and the RICO Defendants.

      337.    Defendant Beltman has committed numerous mail and wire fraud viola-
tions, including those identified in Appendix B in which Beltman used or caused to be used the
mail or wires in furtherance of the RICO Defendants' scheme to defraud.  Beltman also has en-
gaged in extortion of Chevron and fraudulent conduct by manufacturing false evidence, in the
form of the Cabrera Report and its annexes, used extensively by the RICO Defendants in the
Lago Agrio Litigation and more generally in furtherance of their illegal scheme.  In addition,
Beltman has engaged in extortion and fraudulent conduct by disseminating false statements
about Chevron through his role in drafting both the Cabrera Report and his later "evaluation" of
that report.  Beltman also has engaged in extortion of Chevron and fraudulent conduct by dis-
seminating and causing to be disseminated false statements to the public and to a member of
Congress regarding Chevron, the Lago Agrio Litigation, and Cabrera's independence.  Beltman
also engaged in obstruction of justice by causing misrepresentations to be made to the United
States District Court for the District of Colorado that Cabrera was an independent expert, that
Stratus was "astonished" to see "similarities" between its own work product and the Cabrera Re-
port when it actually drafted the majority of the Cabrera Report, and otherwise misrepresenting
the relationship between Cabrera and the RICO Defendants.  Finally, Beltman has engaged in
witness tampering by repeatedly and intentionally misleading numerous Stratus employees re-
garding Cabrera's independence, and omitting facts about Stratus's true role in drafting the
Cabrera Report, with the intent that the employees would then fail to testify truthfully if called to
testify as to these subjects.

      338.    Defendant Maest has committed numerous mail and wire fraud violations,
including those identified in Appendix B in which Maest used or caused to be used the mail or

wires in furtherance of the RICO Defendants' scheme to defraud. Maest also has engaged in extortion of Chevron and fraudulent conduct by manufacturing false evidence, in the form of the Cabrera Report and its annexes, used extensively by the RICO Defendants in the Lago Agrio Litigation and more generally in furtherance of their illegal scheme. In addition, Maest has engaged in extortion and fraudulent conduct by disseminating false statements about Chevron through her role in drafting both the Cabrera Report and Cabrera's later "evaluation" of that report. Maest also has engaged in extortion of Chevron and fraudulent conduct by disseminating and causing to be disseminated false statements to the public regarding Chevron, the Lago Agrio Litigation, and Cabrera's independence. Finally, Maest has engaged in obstruction of justice by causing misrepresentations to be made to the United States District Court for the District of Colorado that Cabrera was an independent expert, that Stratus was "astonished" to see "similarities" between its own work product and the Cabrera Report when it actually drafted the majority of the Cabrera Report, and otherwise misrepresenting the relationship between Cabrera and the RICO Defendants.

339.   Each of the RICO Defendants has engaged in multiple predicate acts, as described in paragraphs 330 to 338, *supra*. The conduct of each of the RICO Defendants described in paragraphs 309 to 338, *supra*, constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

340.   Chevron was injured in its business and property by reason of the RICO Defendants' violations of 18 U.S.C. § 1962(c). The injuries to Chevron caused by reason of the violations of 18 U.S.C. § 1962(c) include but are not limited to damage to Chevron's reputation and goodwill; the impairment of Chevron's interest in executed contracts, including the 1995 Settlement Agreement and 1998 Final Release; and the attorneys' fees and costs to defend itself in objectively baseless, improperly motivated sham litigation in Ecuador and in related litigation in the U.S., including the attorneys' fees and costs associated with exposing the RICO Defendants' pervasive fraud in the Section 1782 proceedings.

341.   Further, these injuries to Chevron were a direct, proximate, and reasonably fore-seeable result of the violation of 18 U.S.C. § 1962.  Chevron is the ultimate victim of the RICO Defendants' unlawful Enterprise.  Chevron has been and will continue to be injured in its business and property in an amount to be determined at trial.

342.   Pursuant to 18 U.S.C. § 1964(c), Chevron is entitled to recover treble damages plus costs and attorneys' fees from the RICO Defendants.

343.   Chevron is further entitled to, and should be awarded, a preliminary and permanent injunction that enjoins Defendants, their assignees, and anyone else acting in concert with them—including the law firms of Emery Celli, Motley Rice and Patton Boggs, and financial backers such as Burford Group and its related entities and Russell DeLeon—from commencing, prosecuting, or advancing in any way—directly or indirectly—any attempt to recognize or enforce any Lago Agrio judgment in any court, tribunal, or administrative agency in any jurisdiction, in the United States or abroad, including any attempt to attach or seize any Chevron or Chevron subsidiary's or co-venturer's assets, whether pre-judgment or otherwise, until this Court determines the merits and enters judgment on Chevron's claims against the Defendants in this action.

WHEREFORE, Chevron prays for judgment as set forth below.

## SECOND CLAIM FOR RELIEF
### (Conspiracy to Violate RICO, Violation of 18 U.S.C. § 1962(d))
### (Against All RICO Defendants)

344.   Chevron realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

345.   The RICO Defendants have unlawfully, knowingly and willfully combined, conspired, confederated and agreed together and with others to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

346.   Upon information and belief, the RICO Defendants knew that they were engaged in a conspiracy to commit the predicate acts, and they knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to

allow the commission of this pattern of racketeering activity.  This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

347.    Upon information and belief, the RICO Defendants agreed to conduct or participate, directly or indirectly, in the conduct, management, or operation of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

348.    Each RICO Defendant knew about and agreed to facilitate the Enterprise's scheme to obtain property from Chevron.  It was part of the conspiracy that the RICO Defendants and their co-conspirators would commit a pattern of racketeering activity in the conduct of the affairs of the Enterprise, including the acts of racketeering set forth in paragraphs 309 to 338, *supra*.

349.    As a direct and proximate result of the RICO Defendants' conspiracy, the acts of racketeering activity of the Enterprise, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Chevron has been injured in its business and property, including damage to Chevron's reputation and goodwill; the impairment of Chevron's interest in executed contracts, including the 1995 Settlement Agreement and 1998 Final Release; and the attorneys' fees and costs to defend itself in objectively baseless, improperly motivated sham litigation in Ecuador and in related litigation in the U.S., including the attorneys' fees and costs associated with exposing the RICO Defendants' pervasive fraud in the Section 1782 proceedings.

350.    Pursuant to 18 U.S.C. § 1964(c), Chevron is entitled to recover treble damages plus costs and attorneys' fees from the RICO Defendants.

351.    Chevron is further entitled to, and should be awarded, a preliminary and permanent injunction that enjoins Defendants, their assignees and anyone else acting in concert with them—including the law firms of Emery Celli, Motley Rice and Patton Boggs, and financial backers such as Burford Group and its related entities and Russell DeLeon—from commencing, prosecuting, or advancing in any way—directly or indirectly—any attempt to recognize or enforce any Lago Agrio judgment in any court, tribunal, or administrative agency in any jurisdiction, in the United States or abroad, including any attempt to attach or seize any Chevron or

Chevron subsidiary's or co-venturer's assets, whether pre-judgment or otherwise, until this Court determines the merits and enters judgment on Chevron's claims against the Defendants in this action.

WHEREFORE, Chevron prays for judgment as set forth below.

### THIRD CLAIM FOR RELIEF
### (Fraud)
### (Against All Defendants)

352.    Chevron realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

353.    Defendants and their agents have knowingly misrepresented, omitted, and/or concealed material facts in their pleadings and representations before U.S. courts and before the Lago Agrio court, in their communications to federal and state government agencies and officials, and in their communications to Chevron's shareholders, investors, analysts, and the media. Each and every Defendant has personally engaged in this conduct, or knew or should have known that other Defendants were engaged in it on his or her behalf.  These false representations are detailed throughout this Complaint and include the falsified Calmbacher reports, the true authorship of the Cabrera Report, the denial of any improper contact with Cabrera, the supposed independence and neutrality of Cabrera and his liability and damages assessment, the submission of new "expert" reports based on the fraudulent Cabrera Report, and the fraudulent endorsements of the Cabrera Report.

354.    Defendants made these false representations while knowing that their misrepresentations were materially false and/or that their omissions were material.

355.    Defendants further made these misrepresentations and/or omissions with the intent of obtaining favorable rulings from the U.S. and Lago Agrio courts, pressuring U.S. state and federal agencies to pursue investigations of Chevron, and propagating false information about Chevron to shareholders, investors, analysts, and the media.

356.     These material misrepresentations and/or omissions have been reasonably and justifiably relied upon by Chevron, the U.S. courts, state and federal government agencies and officials, and Chevron's shareholders, investors, analysts, and the media, and by the Lago Agrio court by means of its acceptance of Defendants' and Cabrera's misrepresentations and omissions and its failure to take meaningful corrective action.

357.     As a direct, proximate, and foreseeable result of Defendants' fraud, Chevron has been harmed, including significant pecuniary, reputational, and other damages.  These injuries include significant damage to Chevron's reputation and goodwill, and the attorneys' fees and costs to defend itself in objectively baseless, improperly motivated sham litigation in Ecuador and in related litigation in the U.S., including the attorneys' fees and costs associated with exposing the Defendants' pervasive fraud in the Section 1782 proceedings.

358.     Defendants have engaged in the malicious, willful, and fraudulent commission of wrongful acts and, because of the reprehensible and outrageous nature of these acts, Chevron is entitled to, and should be awarded, punitive damages against each of the Defendants.

359.     Chevron is further entitled to, and should be awarded, a preliminary and permanent injunction that enjoins Defendants, their assignees and anyone else acting in concert with them—including the law firms of Emery Celli, Motley Rice and Patton Boggs, and financial backers such as Burford Group and its related entities and Russell DeLeon—from commencing, prosecuting, or advancing in any way—directly or indirectly—from any attempt to recognize or enforce any Lago Agrio judgment in any court, tribunal, or administrative agency in any jurisdiction, in the United States or abroad, including any attempt to attach or seize any Chevron or Chevron subsidiary's or co-venturer's assets, whether pre-judgment or otherwise, until this Court determines the merits and enters judgment on Chevron's claims against the Defendants in this action.

WHEREFORE, Chevron prays for judgment as set forth below.

## FOURTH CLAIM FOR RELIEF
### (Tortious Interference With Contract)
### (Against All Defendants)

360.    Chevron realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

361.    Defendants are and have been aware of valid and enforceable contracts between TexPet and the Republic of Ecuador, including the 1995 Settlement Agreement and the 1998 Final Release.  These contracts, in exchange for TexPet's remedial actions, released TexPet, Texaco, and their employees, successors, principals and subsidiaries from liability relating to environmental damage in Ecuador.

362.    Defendants have intentionally caused and continued to cause the Republic of Ecuador to repeatedly breach the 1995 Settlement and the 1998 Final Release.  Defendants have, through improper influence and the fabricated Cabrera Report, persuaded the Republic of Ecuador to refuse to defend Chevron's rights and those of its subsidiaries under the contracts, to improperly dictate to the judiciary that Chevron be held liable in the Lago Agrio Litigation, and to bring criminal charges against Chevron's employees.

363.    Any judgment from the Lago Agrio court that finds Chevron liable and awards damages will also constitute a severe breach of the 1995 Settlement and the 1998 Final Release.  Defendants have intentionally caused the Republic of Ecuador to take actions necessary to secure this fraudulent judgment.

364.    As a direct, proximate, and foreseeable result of Ecuador's breaches of the 1995 Settlement and the 1998 Final Release, Chevron has been forced to defend itself against claims for which TexPet had already secured a release, which has caused significant pecuniary, reputational, and other damages.  These injuries include significant attorneys' fees and costs to defend itself against previously-released claims in Ecuador and in related litigation to attempt to enforce these contracts in international arbitration.  The imminent and forthcoming breaches of the 1995 Settlement and the 1998 Final Release, which will likely occur when the Lago Agrio court issues

137

its judgment, will impose further direct, proximate and foreseeable costs upon Chevron, including significant damage to Chevron's reputation and Chevron's attorneys' fees and costs to defend itself and its subsidiaries in recognition and enforcement efforts around the world.

365.     Defendants have engaged in the malicious, willful, and fraudulent commission of wrongful acts and, because of the reprehensible and outrageous nature of these acts, Chevron is entitled to, and should be awarded, punitive damages against each of the Defendants.

366.     Chevron is further entitled to, and should be awarded, a preliminary and permanent injunction that enjoins Defendants, their assignees, and anyone else acting in concert with them—including the law firms of Emery Celli, Motley Rice and Patton Boggs, and financial backers such as Burford Group and its related entities and Russell DeLeon—from commencing, prosecuting, or advancing in any way—directly or indirectly—any attempt to recognize or enforce any Lago Agrio judgment in any court, tribunal, or administrative agency in any jurisdiction, in the United States or abroad, including any attempt to attach or seize any Chevron or Chevron subsidiary's or co-venturer's assets, whether pre-judgment or otherwise, until this Court determines the merits and enters judgment on Chevron's claims against the Defendants in this action.

WHEREFORE, Chevron prays for judgment as set forth below.

## FIFTH CLAIM FOR RELIEF
### (Trespass to Chattels)
### (Against All Defendants)

367.     Chevron realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

368.     As set forth above, the RICO Defendants have engaged in a pattern of extortion, collusion, wrongdoing, and deceit with an intent to interfere with Chevron's property, and the Lago Agrio Plaintiffs have benefited and will continue to benefit from the RICO Defendants' criminal scheme through a fraudulent judgment.  Through these actions, and by prosecuting a fraudulent lawsuit, manufacturing false evidence, tampering with testimony, disseminating misleading statements to courts, the public, and U.S. government officials, and otherwise engaging

in the pressure campaign described in the foregoing paragraphs of this Complaint, Defendants have intentionally, and without justification or consent, interfered and intermeddled with Chevron's use and enjoyment of its funds that were intended for Chevron's business purposes and of its business reputation and goodwill.

369.    Chevron has been harmed and the use of its property has been interfered with and disturbed when its property, resources, and funds were necessarily redirected from their intended uses to defend against Defendants' fraudulent litigation and misleading media campaign. For example, Chevron has been forced by the RICO Defendants' intentional and wrongful conduct to expend funds and resources defending against fraudulent submissions in the Lago Agrio Litigation, pursuing relief in the Treaty Arbitration, uncovering the RICO Defendants' fraud through discovery in the United States (discovery with which the RICO Defendants have continually interfered and which they have unduly extended, as described herein), responding to false and misleading reports in major media publications and broadcasts which have been induced by the RICO Defendants, and maintaining an ongoing effort to provide accurate information about the Cabrera Report and other aspects of the RICO Defendants' fraud to the media and directly to the public.

370.    Chevron also has been harmed in that Defendants' conduct has damaged Chevron's reputation, thus interfering with Chevron's interest in the public goodwill toward it.  Public awareness of and positive associations with the Chevron and Texaco brand names, and Chevron's other brand assets are among Chevron's most valuable assets, and Chevron has invested substantial resources into those brand names.  The RICO Defendants' have intentionally sought to reduce the value of those assets as part of their extortionate scheme.  As Donziger has expressly stated, a key element of the RICO Defendants' strategy is to impose upon Chevron, "the cost of their sullied reputation, you know, in the media."

371.    The harms suffered by Chevron are the direct, proximate, and reasonably foreseeable results of the Defendants' acts of intentional interference with Chevron's funds and goodwill.

372.    Defendants have engaged in the malicious, willful, and fraudulent commission of wrongful acts and, because of the reprehensible and outrageous nature of these acts, Chevron is entitled to, and should be awarded, punitive damages against each of the Defendants.

373.    Chevron is further entitled to, and should be awarded, a preliminary and permanent injunction that enjoins Defendants, their assignees, and anyone else acting in concert with them—including the law firms of Emery Celli, Motley Rice and Patton Boggs, and financial backers such as Burford Group and its related entities and Russell DeLeon—from commencing, prosecuting, or advancing in any way—directly or indirectly—any attempt to recognize or enforce any Lago Agrio judgment in any court, tribunal, or administrative agency in any jurisdiction, in the United States or abroad, including any attempt to attach or seize any Chevron or Chevron subsidiary's or co-venturer's assets, whether pre-judgment or otherwise, until this Court determines the merits and enters judgment on Chevron's claims against the Defendants in this action.

WHEREFORE, Chevron prays for judgment as set forth below.

### SIXTH CLAIM FOR RELIEF
#### (Unjust Enrichment)
#### (Against All Defendants)

374.    Chevron realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

375.    Defendants seek to obtain up to $113 billion from Chevron through a fraudulent judgment in the Lago Agrio Litigation. Defendants have been and will continue to be unjustly enriched by benefits obtained due to the expectation of an imminent judgment and the forthcoming judgment itself.

376.    Any property that Defendants obtain from Chevron will be acquired as a result of Defendants' tortious, illegal, and fraudulent conduct, as set forth herein, including the prosecution of the Lago Agrio Litigation itself.

377.    Principles of equity and good conscience mandate that this Court prevent Defendants from reaping a multi-billion dollar windfall and any benefits arising out of the fraudulent

litigation by, among other things, issuing a preliminary and permanent injunction against Defendants that enjoins Defendants, their assignees, and anyone else acting in concert with them— including the law firms of Emery Celli, Motley Rice and Patton Boggs, and financial backers such as Burford Group and its related entities and Russell DeLeon—from commencing, prosecuting, or advancing in any way—directly or indirectly—any attempt to recognize or enforce any Lago Agrio judgment in any court, tribunal, or administrative agency in any jurisdiction, in the United States or abroad, including any attempt to attach or seize any Chevron or Chevron subsidiary's or co-venturer's assets, whether pre-judgment or otherwise, until this Court determines the merits and enters judgment on Chevron's claims against the Defendants in this action.

WHEREFORE, Chevron prays for judgment as set forth below.

### SEVENTH CLAIM FOR RELIEF
### (Civil Conspiracy)
### (Against All Defendants)

378.    Chevron realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

379.    As set forth above, Defendants have committed torts against Chevron, including acts of racketeering giving rise to violations of RICO, fraud, tortious interference with contract, trespass to chattels, and unjust enrichment.

380.    Defendants agreed to participate in a common scheme against Chevron. Defendants intentionally participated in the furtherance of a plan or purpose to obtain property from Chevron. In furtherance of this plan or purpose, Defendants committed overt and unlawful acts, including acts of racketeering as alleged herein.

381.    As a direct and proximate result of Defendants' conspiracy, the overt acts committed in furtherance of that conspiracy, and the torts committed against Chevron, Chevron has been damaged in its business and property, and further damage to Chevron's business and property is threatened and imminent.

382.    Defendants have engaged in the malicious, willful, and fraudulent commission of wrongful acts and, because of the reprehensible and outrageous nature of these acts, Chevron is entitled to, and should be awarded, punitive damages against each of the Defendants.

383.    Chevron is further entitled to, and should be awarded, a preliminary and permanent injunction that enjoins Defendants, their assignees, and anyone else acting in concert with them—including the law firms of Emery Celli, Motley Rice and Patton Boggs, and financial backers such as Burford Group and its related entities and Russell DeLeon—from commencing, prosecuting, or advancing in any way—directly or indirectly—any attempt to recognize or enforce any Lago Agrio judgment in any court, tribunal, or administrative agency in any jurisdiction, in the United States or abroad, including any attempt to attach or seize any Chevron or Chevron subsidiary's or co-venturer's assets, whether pre-judgment or otherwise, until this Court determines the merits and enters judgment on Chevron's claims against the Defendants in this action.

WHEREFORE, Chevron prays for judgment as set forth below.

## EIGHTH CLAIM FOR RELIEF
### (Violations of New York Judiciary Law § 487)
### (Against Defendants Donziger and the Law Offices of Steven R. Donziger)

384.    Chevron realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

385.    New York Judiciary Law § 487 provides, in pertinent part, as follows: "An attorney or counselor who . . . [i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party . . . [i]s guilty of a misdemeanor, and in addition to the punishment prescribed therefore by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action."

386.    As set forth above, Donziger and the Law Offices of Steven R. Donziger engaged in an intentional pattern of collusion, wrongdoing, and deceit with the intent to deceive

both Chevron and multiple federal courts, including the United States District Court for the Southern District of New York and the United States Court of Appeals for the Second Circuit.

387.   Donziger and the Law Offices of Steven R. Donziger actively participated in the preparation and filing of multiple court submissions to the United States District Court for the Southern District on New York, which included false and misleading statements about the Lago Agrio Litigation and the Cabrera Report. Defendants Donziger and the Law Offices of Steven R. Donziger knowingly caused these misstatements to be filed with the intent of deceiving this Court and Chevron. As described in paragraphs 277 to 282, *supra*, these misstatements were filed in opposition to Chevron's requests for discovery under 28 U.S.C. § 1782 and in support of the Lago Agrio Plaintiffs' and the Republic of Ecuador's actions against Chevron seeking to terminate arbitration proceedings.

388.   Donziger and the Law Offices of Steven R. Donziger tampered with the testimony of environmental consultant Mark Quarles in furtherance of the enterprise's scheme. In 2007, Ecuador submitted a declaration by Quarles regarding the "independence" of the Cabrera Report in a proceeding pending in the Southern District of New York, using that declaration to support Ecuador's contention that the Lago Agrio Litigation "has proceeded in accordance with rules of procedure under Ecuador law." Quarles has recently admitted in sworn testimony that Donziger paid him for this affidavit, and that he would not have signed the affidavit if Donziger had told him the truth about the RICO Defendants' involvement with Cabrera. By not disclosing the truth about the RICO Defendants' improper contact with Cabrera and instead deliberately misleading Quarles, Donziger knowingly engaged in deceit with the intent to deceive Quarles, the court, and Chevron.

389.   As a result of the deceitful and fraudulent conduct of Donziger and the Law Offices of Steven R. Donziger as described herein, Chevron has been injured in an amount to be established at trial.

390.     By reason of the foregoing, Chevron is entitled to monetary damages against Donziger and the Law Offices of Steven R. Donziger, treble damages, and reasonable attorneys' fees pursuant to Judiciary Law § 487.

WHEREFORE, Chevron prays for judgment as set forth below.

## NINTH CLAIM FOR RELIEF
### (Request for Declaratory Judgment That the Judgment by the Lago Agrio Court Against Chevron is Unenforceable and Non-Recognizable)
### (Against All Defendants)

391.     Chevron realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

392.     Chevron is entitled to a declaratory judgment that the imminent judgment from the Lago Agrio court is unenforceable and non-recognizable pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201(a).

393.     A declaratory judgment will not improperly increase friction between sovereign legal systems or encroach on the proper domain of a foreign court because no court has a right to impose fraudulent judgments such as the imminent judgment of the Lago Agrio court.

394.     By this claim, Chevron seeks a declaratory judgment that any Lago Agrio judgment is unenforceable and non-recognizable, including but not limited to under the United States Constitution, federal common law, New York common law principles of comity, and/or New York's Recognition of Foreign Country Money Judgments Act (New York Civil Practice Law and Rules § 5301, *et seq.*, the "New York Act"), on, among others, grounds of fraud, failure to afford procedures compatible with due process, lack of impartial tribunals, and contravention of public policy.

395.     By reason of the fraudulent acts and fundamentally unfair proceedings described in this Complaint that have given rise to the imminent Lago Agrio judgment, an actual and justiciable controversy has arisen and now exists between Chevron and the Lago Agrio Plaintiffs as to whether the judgment is unenforceable and non-recognizable in the United States and establishing that Chevron's assets are safe from the RICO Defendants' fraudulent actions and racket-

eering activity. The actions of the RICO Defendants on behalf of the Lago Agrio Plaintiffs whom they purport to represent have damaged and are threatening to continue damaging Chevron. Unless the controversy between the parties is resolved, the Lago Agrio Plaintiffs will continue to harm Chevron and will seek recognition and enforcement of the fraudulent judgment that the RICO Defendants will have obtained on the Lago Agrio Plaintiffs' behalf.

396.    Chevron has no adequate remedy at law. A declaratory action is necessary and useful in resolving and disposing of the question of whether the fraudulent Lago Agrio judgment is enforceable and recognizable, and is the best and most effective remedy for finalizing the controversy between the parties as to this issue and for relieving Chevron from the expensive and damaging uncertainty surrounding the pending enforcement and recognition of the fraudulent judgment. Chevron is entitled to have the question of whether any Lago Agrio judgment is enforceable and recognizable settled promptly so that it may continue conducting its business without the threat of a massive fraudulent judgment.

397.    Chevron is further entitled to, and should be awarded, a preliminary and permanent injunction against Defendants, their assignees and anyone else acting in concert with them—including the law firms of Emery Celli, Motley Rice and Patton Boggs, and financial backers such as Burford Group and its related entities and Russell DeLeon—from commencing, prosecuting, or advancing in any way—directly or indirectly—any attempt to recognize or enforce any Lago Agrio judgment in any court, tribunal, or administrative agency in any jurisdiction, in the United States or abroad, including any attempt to attach or seize any Chevron or Chevron subsidiary's or co-venturer's assets, whether pre-judgment or otherwise, until this Court determines the merits and enters judgment on Chevron's claims against the Defendants in this action.

WHEREFORE, Chevron prays for judgment as set forth below.

## PRAYER FOR RELIEF

**On the First and Second Claims for Relief:**

1. For general damages according to proof at trial, trebled according to statute, 18 U.S.C. § 1964(c);

2. For prejudgment interest according to statute; and

3. For Chevron's reasonable attorneys' fees and costs according to statute, 18 U.S.C. § 1964(c).

**On the First through Seventh Claims for Relief:**

4. For general damages according to proof at trial;

5. For equitable relief as appropriate pursuant to applicable law, including but not limited to issuing a temporary restraining order, a preliminary injunction and a permanent injunction that bars Defendants, their assignees and anyone else acting in concert with them—including the law firms of Emery Celli, Motley Rice and Patton Boggs, and financial backers such as Burford Group and its related entities and Russell DeLeon—from commencing, prosecuting, or advancing in any way—directly or indirectly—any attempt to recognize or enforce any Lago Agrio judgment in any court, tribunal, or administrative agency in any jurisdiction, in the United States or abroad, including any attempt to attach or seize any Chevron or Chevron subsidiary's or co-venturer's assets, whether pre-judgment or otherwise, until this Court determines the merits and enters judgment on Chevron's claims against the Defendants in this action; and

6. Only for the third, fourth, fifth, and seventh claims for relief, punitive damages in an amount to be proven at trial.

**On the Eighth Claim for Relief:**

7. For general damages according to proof at trial, trebled according to statute, Judiciary Law § 487; and

8. For Chevron's reasonable attorneys' fees and costs according to statute, Judiciary Law § 487.

**On the Ninth Claim for Relief:**

9.     For a declaration that any judgment against Chevron in the Lago Agrio Litigation is non-recognizable and unenforceable for each and every one of the reasons set forth herein; and

10.     For equitable relief as appropriate pursuant to applicable law, including but not limited to issuing a temporary restraining order, a preliminary injunction and a permanent injunction that bars Defendants, their assignees and anyone else acting in concert with them—including the law firms of Emery Celli, Motley Rice and Patton Boggs, and financial backers such as Burford Group and its related entities and Russell DeLeon—from commencing, prosecuting, or advancing in any way—directly or indirectly—any attempt to recognize or enforce any Lago Agrio judgment in any court, tribunal, or administrative agency in any jurisdiction, in the United States or abroad, including any attempt to attach or seize any Chevron or Chevron subsidiary's or co-venturer's assets, whether pre-judgment or otherwise, until this Court determines the merits and enters judgment on Chevron's claims against the Defendants in this action, or until such time as this Court deems appropriate.

**As to All Causes of Action:**

11.     For such other legal and equitable relief as the Court may deem Chevron entitled to receive.

DATED: February 1, 2011

GIBSON, DUNN & CRUTCHER LLP


By: _____
                Randy M. Mastro

200 Park Avenue
New York, New York  10166-0193
Telephone:  212.351.4000


Scott A. Edelman
2029 Century Park East
Los Angeles, California  90067
Telephone:  310.552.8500

Andrea E. Neuman
3161 Michelson Drive
Irvine, California  92612
Telephone:  949.451.3800

William E. Thomson
333 South Grand Avenue
Los Angeles, California  90071
Telephone:  213.229.7000

*Attorneys for Plaintiff Chevron Corporation*

## DEMAND FOR JURY TRIAL

Plaintiff Chevron Corporation hereby demands a jury trial of all issues in this action triable as of right by a jury.

DATED: February 1, 2011

GIBSON, DUNN & CRUTCHER LLP

By: _____
        Randy M. Mastro

200 Park Avenue
New York, New York  10166-0193
Telephone:  212.351.4000

Scott A. Edelman
2029 Century Park East
Los Angeles, California  90067
Telephone:  310.552.8500

Andrea E. Neuman
3161 Michelson Drive
Irvine, California  92612
Telephone:  949.451.3800

William E. Thomson
333 South Grand Avenue
Los Angeles, California  90071
Telephone:  213.229.7000

*Attorneys for Plaintiff Chevron Corporation*