UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CHEVRON CORPORATION,

                Plaintiff,

    v.

STEVEN DONZIGER, THE LAW OFFICES OF
STEVEN R. DONZIGER, PABLO FAJARDO
MENDOZA, LUIS YANZA, FRENTE DE
DEFENSA DE LA AMAZONIA A/K/A AMAZON
DEFENSE FRONT, SELVA VIVA SELVIVA
CIA, LTDA., STRATUS CONSULTING, INC.,
DOUGLAS BELTMAN, ANN MAEST, MARIA
AGUINDA SALAZAR, CARLOS GREFA
HUATATOCA, CATALINA ANTONIA
AGUINDA SALAZAR, LIDIA ALEXANDRA
AGUINDA AGUINDA, PATRICIO ALBERTO
CHIMBO YUMBO, CLIDE RAMIRO AGUINDA
AGUINDA, LUIS ARMANDO CHIMBO
YUMBO, BEATRIZ MERCEDES GREFA
TANGUILA, LUCIO ENRIQUE GREFA
TANGUILA, PATRICIO WILSON AGUINDA
AGUINDA, CELIA IRENE VIVEROS
CUSANGUA, FRANCISCO MATIAS
ALVARADO YUMBO, FRANCISCO
ALVARADO YUMBO, OLGA GLORIA GREFA
CERDA, LORENZO JOSÉ ALVARADO
YUMBO, NARCISA AIDA TANGUILA
NARVÁEZ, BERTHA ANTONIA YUMBO
TANGUILA, GLORIA LUCRECIA TANGUILA
GREFA, FRANCISCO VICTOR TANGUILLA
GREFA, ROSA TERESA CHIMBO TANGUILA,
JOSÉ GABRIEL REVELO LLORE, MARÍA
CLELIA REASCOS REVELO, MARÍA
MAGDALENA RODRÍGUEZ BARCENES,
HUGO GERARDO CAMACHO NARANJO, JOSÉ
MIGUEL IPIALES CHICAIZA, HELEODORO
PATARON GUARACA, LUISA DELIA
TANGUILA NARVÁEZ, LOURDES BEATRIZ
CHIMBO TANGUILA, MARÍA HORTENCIA

Case No. 11-CV-0691

**CHEVRON'S MEMORANDUM
OF LAW IN SUPPORT OF ITS
APPLICATION BY ORDER TO
SHOW CAUSE FOR A
TEMPORARY RESTRAINING
ORDER AND PRELIMINARY
INJUNCTION**

VIVEROS CUSANGUA, SEGUNDO ÁNGEL          :
AMANTA MILÁN, OCTAVIO ISMAEL             :
CÓRDOVA HUANCA, ELIAS ROBERTO            :
PIYAHUAJE PAYAHUAJE, JAVIER PIAGUAJE     :
PAYAGUAJE, DANIEL CARLOS LUSITANDE       :
YAIGUAJE, BENANCIO FREDY CHIMBO          :
GREFA, GUILLERMO VICENTE PAYAGUAJE       :
LUSITANTE, DELFÍN LEONIDAS PAYAGUAJE     :
PAYAGUAJE, ALFREDO DONALDO               :
PAYAGUAJE PAYAGUAJE, TEODORO             :
GONZALO PIAGUAJE PAYAGUAJE, MIGUEL       :
MARIO PAYAGUAJE PAYAGUAJE, FERMIN        :
PIAGUAJE PAYAGUAJE, REINALDO             :
LUSITANDE YAIGUAJE, LUIS AGUSTÍN         :
PAYAGUAJE PIAGUAJE, EMILIO MARTÍN        :
LUSITANDE YAIGUAJE, SIMON LUSITANDE      :
YAIGUAJE, ARMANDO WILFRIDO PIAGUAJE      :
PAYAGUAJE, and ÁNGEL JUSTINO             :
PIAGUAGE LUCITANTE,                      :
                                        :
          Defendants.                   :
                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :
                                        :
                                        x

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................ 1

FACTUAL BACKGROUND ................................................................................ 8

I.    The Origins of the Scheme .............................................................. 8

II.    The Scheme to Defraud and Extort Chevron ..................................... 10

      A.    *"[N]o judge can rule against us":* Influencing the Ecuadorian Court Through Violent Threats of Violence and Political Pressure ................. 11

          1.    Defendants Employ Intimidation and Scare Tactics to Send a Clear Message to the Court That It Must Rule Against Chevron 11

          2.    Defendants Collude with Ecuador to Manufacture Criminal Charges, Undermine the 1998 Final Release, and Influence the Court ................................................................................ 13

      B.    *"Facts don't exist, facts are created":* Corrupting the Judicial-Inspection Process by Falsifying and Manufacturing Evidence ............. 15

          1.    Defendants Falsify Their Judicial-Inspection Expert's Reports .. 15

          2.    The Conspirators Tout a $6 Billion Remediation Cost Estimate Denounced by Its Author as "Too High by a Substantial Margin" ................................................................................ 16

      C.    *"[T]he work isn't going to be the expert's":* Hijacking the Judicial Process and Staging a Sham "Global Damages Assessment" ................. 17

          1.    Defendants Conspire To Arrange the Judicial Appointment of Their Inside Person, Cabrera, as an "Independent" Court Expert 17

          2.    Defendants Plan Out the Report With Cabrera Before He Is Appointed ................................................................................ 19

          3.    Defendants Ghostwrite a Report for Cabrera to Sign and Pass Off as His Independent Conclusions .......................................... 20

          4.    Defendants Issue a Fraudulent Endorsement of Their "Cabrera" Report and Seek to Procure Other Endorsements Through Misrepresentations ..................................................................... 23

          5.    Defendants Attempt to Whitewash Their Fraud With Yet Another Fraud .............................................................................. 24

i

D.      Inflicting *"damage to [Chevron's] reputation":* Defendants Launch Public Attacks on Chevron Based on Lies to Force Chevron to Pay Up. 26

III.  The Cover-Up:  Defendants Attempt to Hide and Complete the Ongoing Fraud .... 29

ARGUMENT ................................................................................................. 31

I.      Chevron Is Likely to Succeed on the Merits and Obtain a Permanent Injunction 31

A.      Chevron Is Likely to Secure Permanent Injunctive Relief Under RICO. 31

1.      Private Entities May Seek Injunctive Relief Under RICO ......... 32

2.      Defendants Are Engaged in a Long-Running Racketeering Scheme .................................................................................. 34

a.      Defendants' Affiliation Constitutes an "Enterprise" Under § 1962(c) ................................................................ 34

b.      Defendants Have "Conducted" the Affairs of the RICO Enterprise .................................................................. 34

c.      Defendants Have Engaged in Multiple Acts of Racketeering Activity ................................................... 37

d.      Defendants' Racketeering Acts Constitute a "Pattern" ... 46

e.      Defendants' Conduct Has Proximately Caused Injury to Chevron .................................................................. 47

3.  Defendants Are Engaged in a Conspiracy to Violate RICO .............. 47

B.      Chevron Is Likely to Succeed in Its Request for Permanent Injunctive Relief Against Defendants' Tortious Acts Under State Law ................. 48

1.      Chevron Is Likely to Succeed in Enjoining Defendants' Ongoing Fraud .......................................................................... 48

2.      Chevron Is Likely to Succeed on Its Claim for Unjust Enrichment ................................................................................ 50

3.      Chevron is Likely to Succeed in Obtaining an Injunction Against Defendants' Tortious Interference with Contract ........... 51

4.      Chevron Is Likely to Succeed on Its Claim for Trespass to Chattels ...................................................................................... 52

C.  Chevron Is Likely to Succeed on Its Claim for Declaratory and Injunctive Relief Against Attempts to Recognize or Enforce the Lago Agrio Judgment ................................................................................. 52

1.  Declaratory and Injunctive Relief at This Stage Is Authorized and Proper ..................................................................... 53

a.  Declaratory and Injunctive Relief Against Recognition Is Appropriate ................................................................. 53

b.  The Declaratory Relief Action Presents a Ripe Controversy ................................................................. 53

c.  The Second Circuit Declaratory Judgment Factors Compel a Declaration of Non-Recognition and Unenforceability ......................................................... 56

2.  It Is Already Clear That the Lago Agrio Judgment Is Unrecognizable and Unenforceable ................................... 58

a.  The Lago Agrio Proceeding and Any Judgment  Arising Therefrom Is the Product of an Fraud ............................ 58

b.  The Ecuadorian Judicial System Does Not Provide Impartial Tribunals and Violates Due Process ................ 59

D.  Chevron Has Met the Standard for an Anti-Suit Injunction ................... 62

E.  At the Very Least, Chevron Has Shown Sufficiently Serious Questions Going to the Merits to Make Them a Fair Ground for Litigation ........... 63

II.  Absent Injunctive Relief, Chevron Will Suffer Irreparable Harm ...................... 64

III.  The Balance of Hardships Favors Chevron ....................................................... 66

IV.  The Public Interest Counsels in Favor of an Injunction ................................... 67

V.  The Court Should Authorize Alternative Methods of Service .......................... 67

CONCLUSION ................................................................................................................. 70

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Abbott Labs. v. Gardner*,
387 U.S. 136 (1967)...................................................................56

*Aguinda v. Texaco, Inc.*,
142 F. Supp. 2d 534 (S.D.N.Y. 2001) ..........................................9

*AMA v. United Healthcare Corp.*,
588 F. Supp. 2d 432 (S.D.N.Y. 2008) ........................................34

*America Online v. IMS*,
24 F. Supp. 2d 548 (E.D. Va. 1998) ...........................................54

*Aoude v. Mobil Oil Corp.*,
892 F.2d 1115 (1st Cir. 1989)....................................................62

*Banco Nacional de Cuba v. Sabbatino*,
376 U.S. 398, 421 (1964) ...........................................................60

*Beacon Constr. Co. v. Matco Elec. Co.*,
521 F.2d 392 (2d Cir. 1975) .......................................................61

*Boyle v. United States*,
129 S. Ct. 2237 (2009)................................................................35

*Brenntag Int'l Chems., Inc. v. Bank of India*,
175 F.3d 245 (2d Cir. 1999) .......................................................67

*Bridge v. Phoenix Bond & Indem. Co.*,
553 U.S. 639 (2008)....................................................................49

*Bridgeway Corp. v. Citibank*,
201 F.3d 134 (2d Cir. 2000) .......................................................63

*Bridgeway Corp. v. Citibank*,
45 F. Supp. 2d 276 (S.D.N.Y. 1999) ....................................61, 62, 63, 64

*Buxton Mfg. Co. v. Valiant Moving & Storage, Inc.*,
657 N.Y.S.2d 450 (N.Y. App. Div. 1997) ..................................51

*Caperton v. A. T. Massey Coal Co., Inc.*,
129 S. Ct. 2252 (2009)................................................................64

*Carpenter v. United States*,
484 U.S. 19 (1987)......................................................................42

*Cedeño v. Intech Group, Inc.*,
No. 09 Civ. 9716 (JSR), 2010 WL 3359468 (S.D.N.Y. Aug. 25, 2010) ..................................39

*Cement & Concrete Workers Dist. Council Welfare Fund, Pension Fun, Legal Servs.
Fund & Annuity Fund v. Lollo*,
148 F.3d 194 (2d Cir. 1998) .......................................................52

*Chicago Title & Trust Co. v. Fox Theatres Corp.*,
182 F. Supp. 18 (S.D.N.Y. 1960) ...............................................51

*China Trade & Dev't Corp. v. M.V. Choong Yong*,
837 F.2d 33 (2d Cir. 1987) ...................................................65, 66

*Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
598 F.3d 30 (2d Cir. 2010) .........................................................66

*City of New York v. Smokes-Spirits.com, Inc.,*
  541 F.3d 425 (2d Cir. 2008) ............................................................ 51

*Compuserve Inc. v. Cyber Promotions, Inc.,*
  962 F. Supp. 1015 (S.D. Ohio 1997) ................................................ 54

*Cont'l Air Lines, Inc. v. Civil Aeronautics Bd.,*
  522 F.2d 107 (D.C. Cir. 1975) ......................................................... 57

*Continental Cas. Co. v. Coastal Sav. Bank,*
  977 F.2d 734, 737 (2d Cir. 1992).………………………………………56

*Cooper v. Weissblatt,*
  277 N.Y.S. 709 (N.Y. App. Term 1935) .......................................... 51

*Cunard S.S. Co. v. Salen Reefer Servs.,*
  773 F.2d 452 (2d Cir. 1985) ............................................................ 64

*De Falco v. Bernas,*
  244 F.3d 286 (2d Cir. 2001) ............................................................ 35

*Desser v. Schatz,*
  581 N.Y.S.2d 796 (N.Y. App. Div. 1992) ....................................... 51

*Doninger v. Niehoff,*
  527 F.3d 41 (2d Cir. 2008) ................................................................ 3

*Dow Jones & Co. v. Harrods, Ltd.,*
  237 F. Supp. 2d 394 (S.D.N.Y. 2002), *aff'd* 346 F.3d 357 (2d Cir. 2003) ...................... 58, 59

*Drobbin v. Nicolet Instrument Corp.,*
  631 F. Supp. 860 (S.D.N.Y. 1986) .................................................. 69

*Duane Reade Inc. v. St. Paul Fire & Marine Ins. Co.,*
  411 F.3d 384 (2d Cir. 2005) ............................................................ 59

*eBay, Inc. v. Bidder's Edge,*
  100 F. Supp. 2d 1058 (N.D. Cal. 2000) ........................................... 55

*Farrell Lines Inc. v. Columbus Cello-Poly Corp.,*
  32 F. Supp. 2d 118 (S.D.N.Y. 1997) ............................................... 56

*Foster v. Churchill,*
  665 N.E.2d 153 (N.Y. 1996)............................................................. 53

*Garcia v. Berkshire Life Ins. Co. of Am.,*
  569 F.3d 1174 (10th Cir. 2009) .................................................. 51, 61

*Georgia v. Pa. R.R. Co.,*
  324 U.S. 439 (1945)......................................................................... 56

*Griffin v. Griffin,*
  327 U.S. 220 (U.S. 1946) ................................................................ 64

*H.J. Inc. v. Nw. Bell Tel. Co.,*
  492 U.S. 229 (1989)......................................................................... 48

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.,*
  322 U.S. 238 (1944)..................................................................... 50, 70

*Hemi Group, LLC v. City of New York,*
  130 S. Ct. 983 (2010) ...................................................................... 51

*Hilton v. Guyot,*
  159 U.S. 113 (1895) .................................................................... 61, 62

*Hyosung Am., Inc. v. Sumagh Textile Co.,*
  25 F. Supp. 2d 376 (S.D.N.Y. 1998) ............................................... 52

*In re Application of Chevron Corp.*,
    --- F. Supp. 2d ----, 2010 WL 3489341 (S.D.N.Y. Nov. 30, 2010) ........................................ 11

*In re Application of Chevron Corp.*,
    709 F. Supp. 2d 283 (S.D.N.Y. 2010) ......................................................................... 11, 44

*In re Application of Chevron Corp.*,
    No. 10 MC 00002 (LAK), 2010 WL 4861351 ...................................................... 67

*In re Application of Chevron Corp.*,
    No. 10 MC 00002 (LAK), 2010 WL 4910248 (S.D.N.Y. Nov. 10, 2010)...................... passim

*In re Application of Chevron Corp.*,
    No. 10 MC 00002 (LAK), 2010 WL 4922312 (S.D.N.Y. Nov. 30, 2010)............................. 69

*In re Bridgestone/Firestone, Inc. Tires Prod. Liab. Litig.*,
    470 F. Supp. 2d 917 (S.D. Ind. 2006), *rev'd on other grounds*, 533 F.3d 578 (7th Cir.
    2008) ............................................................................................................... 62

*In re Managed Care Litig.*,
    298 F. Supp. 2d 1259 (S.D. Fla. 2003) .......................................................... 34

*In re Murchison*,
    349 U.S. 133 (1955)........................................................................................ 64

*In re Perry H Koplik & Sons, Inc.*,
    357 B.R. 231 (Bankr. S.D.N.Y. 2006)............................................................ 63

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    685 F. Supp. 2d 186 (D. Mass. 2010) ............................................................ 52

*Int'l Minerals & Resources, Inc. v. Pappas*,
    761 F. Supp. 1068 (S.D.N.Y. 1991) .............................................................. 53

*Israel v. Wood Dolson Co.*,
    134 N.E.2d 97 (N.Y. 1956)............................................................................ 53

*Italverde Trading, Inc. v. Four Bills of Lading*,
    485 F. Supp. 2d 187 (E.D.N.Y. 2007) .......................................................... 56

*Japan Gas Lighter Ass'n v. Ronson Corp.*,
    257 F. Supp. 219 (D.N.J. 1966) .................................................................... 59

*Karaha Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*,
    500 F.3d 111 (2d Cir. 2007) ................................................................... 65, 66

*Lama Holding Co. v. Smith Barney Inc.*,
    668 N.E.2d 1370 (N.Y. 1996) ...................................................................... 50

*Motorola Credit Corp. v. Uzan*,
    202 F. Supp. 2d 239 (S.D.N.Y. 2002) ..................................................... 34, 35

*Motorola Credit Corp. v. Uzan*,
    No. 02 Civ. 666 (JSR), 2003 U.S. Dist. LEXIS 111 (S.D.N.Y. Jan. 7, 2003)........................ 65

*N.B. Garments (PVT.), Ltd. v. Kids Int'l Corp.*,
    No. 03-08041, 2004 WL 444555 (S.D.N.Y. Mar. 10, 2004)................................. 52

*N.Y. Times Co. v. Gonzales*,
    459 F.3d 160 (2d Cir. 2006) ................................................................... 59, 60

*Nat'l Park Hospitality Ass'n v. Dep't of the Interior*,
    538 U.S. 803 (2003)...................................................................................... 56

*Neder v. United States*,
    527 U.S. 1 (1999).......................................................................................... 41

*Norex Petroleum Ltd. v. Access Indus., Inc.,*
--- F.3d ----, 2010 WL 4968691 (2d Cir. Dec. 8, 2010) .................................... 39

*NOW, Inc. v. Scheidler,*
267 F.3d 687, 697 (7th Cir. 2001) ................................................ 33, 34, 35

*Osorio v. Dole Food Co.,*
665 F. Supp. 2d 1307 (S.D. Fla. 2009) ................................................ 57

*Oxxford Clothes XX, Inc. v. Expeditors Int'l of Washington, Inc.,*
127 F.3d 574 (7th Cir. 1997) ................................................ 51

*Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.,*
369 F.3d 645 (2d Cir. 2004) ................................................ 55, 65, 66

*Paramount Film Distrib. Corp. v. State,*
285 N.E.2d 695 (N.Y. 1972) ................................................ 53

*Polito v. Polito,*
503 N.Y.S.2d 867 (N.Y. App. Div. 1986) ................................................ 53

*Register.com, Inc. v. Verio, Inc.,*
356 F.3d 393 (2d Cir. 2004) ................................................ 54, 55

*Religious Tech. Ctr. v. Wollersheim,*
796 F.2d 1076 (9th Cir. 1986) ................................................ 34

*Republic of Ecuador v. ChevronTexaco Corp.,*
376 F. Supp. 2d 334 (S.D.N.Y. 2005) ................................................ 8, 9, 53

*Reves v. Ernst & Young,*
507 U.S. 170 (1993) ................................................ 34, 36

*Rice v. Manley,*
66 N.Y. 82 (1876) ................................................ 51

*Rockwell Int'l Sys., Inc. v. Citibank, N.A.,*
719 F.2d 583 (2d Cir. 1983) ................................................ 69

*Rotella v. Wood,*
528 U.S. 549 (2000) ................................................ 34

*Salinas v. United States,*
522 U.S. 52 (1997) ................................................ 50

*Salinger v. Colting,*
607 F.3d 68 (2d Cir. 2010) ................................................ 2, 69, 70

*Securitron Magnalock Corp. v. Schnabolk,*
65 F.3d 256 (2d Cir. 1995) ................................................ 49

*Sedima, S.P.R.L. v. Imrex Co.,*
473 U.S. 479 (2d Circuit 1984) ................................................ 34, 35

*Soc'y of Lloyd's v. Ashenden,*
233 F.3d 473 (7th Cir. 2000) ................................................ 63

*Spencer Trask Software & Info. Servs., LLC v. RPost Int'l, Ltd.,* 190 F.Supp.2d 577
(S.D.N.Y. 2002) ................................................ 2

*Sperry v. Crompton Corp.,*
863 N.E.2d 1012 (N.Y. 2007) ................................................ 53

*SR Int'l Bus. Ins. Co. v. Allianz Ins. Co.,*
343 Fed. App'x 629 (2d Cir. 2009) ................................................ 58

*Stochastic Decisions, Inc. v. DiDomenico,*
995 F.2d 1158 (2d Cir. 1993) ................................................ 49

*Streck v. Peters,*
   855 F. Supp. 1156 (D. Haw. 1994) ................................................................ 41
*Tamimi v. Tamimi,*
   328 N.Y.S.2d 477 (N.Y. App. Div. 1972) ...................................................... 61
*Telerate Sys., Inc. v. Caro,*
   689 F. Supp. 221 (S.D.N.Y. 1988) ................................................................. 54
*Terminate Control Corp. v. Horowitz,*
   28 F.3d 1335 (2d Cir. 1994) .................................................................... 40, 49
*Thomas v. Union Carbide Agric. Prods. Co.,*
   473 U.S. 568 (1985) ................................................................................ 56, 58
*Trane Co. v. O'Connor Secs.,*
   718 F.2d 26 (2d Cir. 1983) ............................................................................ 34
*Transportes Aereos Pegaso, S.A. de C.V. v. Bell Helicopter Textron, Inc.,*
   623 F. Supp. 2d 518 (D. Del. 2009) .............................................................. 62
*United States v. Basciano,*
   599 F.3d 184 (2d Cir. 2010) .................................................................... 48, 49
*United States v. Buffalano,*
   727 F.2d 50 (2d Cir. 1984) ............................................................................ 45
*United States v. Burden,*
   600 F.3d 204 (2d Cir. 2010) .......................................................................... 48
*United States v. Caplinger,*
   339 F. 3d 226 (4th Cir. 2003) ........................................................................ 46
*United States v. Capo,*
   791 F.2d 1054 (2d Cir. 1986) ........................................................................ 45
*United States v. Davis,*
   380 F.3d 183 (4th Cir. 2004) ......................................................................... 46
*United States v. Diaz,*
   176 F.3d 52 (2d Cir. 1999) ............................................................................ 36
*United States v. Enmons,*
   410 U.S. 396 (1973) ...................................................................................... 40
*United States v. Gelb,*
   700 F.2d 875 (2d Cir. 1983) .......................................................................... 42
*United States v. Holmes,*
   44 F.3d 1150 (2d Cir. 1995) .......................................................................... 47
*United States v. Indelicato,*
   865 F.2d 1370 (2d Cir. 1989) ........................................................................ 48
*United States v. Kanovsky,*
   618 F.2d 229 (2d Cir. 1980) .......................................................................... 43
*United States v. LaFontaine,*
   210 F.3d 125 (2d Cir. 2000) .......................................................................... 46
*United States v. Middlemiss,*
   217 F.3d 112 (2d Cir. 2000) .................................................................... 38, 40
*United States v. Philip Morris USA, Inc.,*
   566 F.3d 1095 (D.C. Cir. 2009) .................................................................... 33
*United States v. Piervinanzi,*
   23 F.3d 670 (2d Cir. 1994) ............................................................................ 46

*United States v. Pizzonia,*
  577 F.3d 455 (2d Cir. 2009) ............................................................. 48, 49
*United States v. Private Sanitation Indus. Ass'n,*
  995 F.2d 375 (2d Cir. 1993) ................................................................. 33
*United States v. Quattrone,*
  441 F.3d 153 (2d Cir. 2006) ................................................................. 42
*United States v. Rodolitz,*
  786 F.2d 77 (2d Cir. 1986) ................................................................... 46
*United States v. Schwarz,*
  283 F.3d 76 (2d Cir. 2002) ................................................................... 45
*United States v. Throckmorton,*
  98 U.S. 61 (1878)................................................................................. 61
*United States v. Turkette,*
  452 U.S. 576 (1981).............................................................................. 35
*United States v. Viola,*
  35 F.3d 37 (2d Cir. 1994) ..................................................................... 50
*United States v. William Savran & Assocs., Inc.,*
  755 F. Supp. 1165 (E.D.N.Y. 1991) ...................................................... 53
*Wilton v. Seven Falls Co.,*
  515 U.S. 277 (1995).............................................................................. 56

## Statutes

§ 1956(a)(2) ............................................................................................ 46
18 U.S.C. § 1341 ..................................................................................... 41
18 U.S.C. § 1343 ..................................................................................... 41
18 U.S.C. § 1503 ..................................................................................... 42
18 U.S.C. § 1512(b) ................................................................................. 45
18 U.S.C. § 1951(a) ............................................................................ 39, 40
18 U.S.C. § 1951(b)(2) ............................................................................ 39
18 U.S.C. § 1956(a)(2)............................................................................. 39
18 U.S.C. § 1956(c) ............................................................................ 46, 47
18 U.S.C. § 1961 ..................................................................................... 46
18 U.S.C. § 1961(1) ................................................................................. 39
18 U.S.C. § 1961(4) ................................................................................. 35
18 U.S.C. § 1962 ....................................................................................... 3
18 U.S.C. § 1962(c) ................................................................................. 36
18 U.S.C. § 1962(d) ................................................................................. 49
18 U.S.C. § 1964(a) ................................................................................. 33
28 U.S.C. § 2201(a) ............................................................................ 55, 56
New York Penal Law § 155.05(2)(e)......................................................... 41
New York Penal Law § 155.05(2)(e) \s ..................................................... 41
New York Penal Law § 155.42 ................................................................. 41

## Other Authorities

BLACK'S LAW DICTIONARY 1701 (9th ed. 2009) ......................................... 64
Blakey & Gettings, *Racketeer Influenced & Corrupt Organizations (RICO); Basic
  Concepts – Criminal and Civil Remedies,* 53 Temple L. Q. 1009(1980)................................. 33

Wexler, *Civil RICO Comes of Age:  Some Maturational Problems and Proposals for Reform*, 35 Rutgers L. Rev. 285 (1983) .................................................................. 33

## Rules

N.Y. C.P.L.R. § 5301 ................................................................................................ 3
N.Y. C.P.L.R. § 5304(a)(1) ............................................................................... 62, 64
N.Y. C.P.L.R. § 5304(a)(1-2) ................................................................................ 61
N.Y. C.P.L.R. § 5304(a)(2) ..................................................................................... 57
N.Y. C.P.L.R. § 5304(b)(3) ..................................................................................... 61

## Restatement

R<small>ESTATEMENT</small> (S<small>ECOND</small>) <small>OF</small> T<small>ORTS</small> § 217(b) (1965) ...................................................... 54
R<small>ESTATEMENT</small> (S<small>ECOND</small>) <small>OF</small> T<small>ORTS</small> § 936 ................................................................. 52

## PRELIMINARY STATEMENT

"If you repeat a lie a thousand times," says New York lawyer Steven Donziger, "it becomes the truth."  Ex. 253.[1]  Guided by this credo, Donziger and his U.S. and Ecuadorian co-conspirators have pursued a scheme to corruptly and fraudulently obtain a sham judgment in Ecuador in the name of the Lago Agrio Plaintiffs.  From that false backdrop, they have engaged in an ongoing scheme to damage and extort billions of dollars from Chevron Corporation ("Chevron") by making the same misrepresentations, over and over again, to U.S. federal and state governmental agencies, the U.S. Congress, U.S. courts, and Chevron shareholders, among others.  The evidence of this fraudulent scheme is overwhelming, and much of it comes straight out of Defendants' own mouths, captured on video by a filmmaker they solicited to promote their extortionate cause.  As this Court has observed, "Donziger's own words raise substantial questions as to his possible criminal liability," *In re Application of Chevron Corp.*, No. 10 MC 00002 (LAK), 2010 WL 4910248, at *4 (S.D.N.Y. Nov. 10, 2010) ("*Donziger*"), and "[t]he object of the whole game, according to Donziger, is to make this so uncomfortable and so unpleasant for Chevron that they'll write a check and be done with it."  Ex. 233 at 24:6-8.  Defendants' own words and efforts to conceal their conduct also confirm their recognition of its wrongfulness.  Defendant Douglas Beltman lamented the difficulty of obscuring evidence of their malfeasance: "Oh what a tangled web, . . . ."  Ex. 189.  Donziger's Ecuadorian co-counsel was more direct in describing the anticipated effects that court-ordered discovery of their misconduct would have: "[T]he effects are potentially devastating in Ecuador (apart from destroying the proceeding, all of us, your attorneys, might go to jail)."  Ex. 11.

Based on the compelling evidence of Defendants' wide-ranging scheme to extort and defraud Chevron, this Court should enter a temporary restraining order and preliminary injunction restraining Defendants, their agents, and all those acting in concert with them from taking any

---

[1]  Unless otherwise noted, all exhibit references are to the Declaration of Kristen L. Hendricks.

action seeking to have an anticipated Ecuadorian judgment against Chevron recognized or enforced in any jurisdiction, pending the determination of this action. Such an injunction is necessary to maintain the status quo, which Defendants plan to alter to Chevron's detriment as soon as the Ecuadorian court renders its judgment by mounting a "multiple front[]" assault of "prejudgment attachments" and enforcement proceedings abroad to "compound the pressure" on Chevron to pay them off. Ex. 341 at 12, 14. In furtherance of their extortionate strategy, Defendants plan to avoid jurisdictions that "permit[] a court to consider whether 'the judgment was rendered in circumstances that raise substantial doubt about the integrity of the rendering court,'" *id.* at 13, and instead, to pursue enforcement in foreign jurisdictions subject to their political influence, *id.* at 19-20. Thus, unless restrained, Defendants threaten to disrupt, irreparably harm, and wreak havoc on the operations and reputations of Chevron and its subsidiaries around the world, as an integral means of furthering their scheme to make Chevron cut them a "juicy check[]." Ex. 79, DONZ00025654 at 1. An injunction, therefore, is necessary not only to maintain the status quo, but to prevent Defendants' further attempts to consummate their *ongoing* wrongful scheme.

A temporary restraining order and preliminary injunction are proper where, as here, the movant shows by a preponderance that (1) there is "either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in [the movant's] favor"; (2) the movant "is likely to suffer irreparable injury in the absence of an injunction"; (3) "the balance of hardships tips in [its] favor"; and (4) "the public interest would not be disserved by the issuance of a preliminary injunction." *Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010); *see Spencer Trask Software & Info. Servs., LLC v. RPost Int'l, Ltd.*, 190 F. Supp. 2d 577, 580 (S.D.N.Y. 2002) (standard for temporary restraining order is the same as for a preliminary injunction). The overwhelming evidence of racketeering activity that Chevron already has amassed, and Defendants' stated plans to inflict irreparable injury on Chevron with immediate prejudgment seizures of assets and other harms to its business and reputation, easily satisfy these elements.

**1. Chevron is exceedingly likely to prevail on the merits.** Chevron's Complaint

pleads claims under the Racketeer Influenced And Corrupt Organizations Act, 18 U.S.C. § 1962 *et seq.* ("RICO"), as well as for fraud, unjust enrichment, and other common law torts.  Chevron also seeks declaratory and injunctive relief, pursuant to New York's Foreign Country Money-Judgments Recognition Act (the "Recognition Act"), N.Y. C.P.L.R. § 5301 *et seq.*—the very statute that the Lago Agrio Plaintiffs and their representatives repeatedly have asserted would govern any enforcement proceedings.  Because Chevron seeks only to maintain the status quo, it need not even show a "clear" or "substantial" likelihood of success, *see Doninger v. Niehoff*, 527 F.3d 41, 47 (2d Cir. 2008).  Chevron meets this standard for each of its claims.

  **a.** **RICO.**  Defendants' claims against Chevron in the Lago Agrio Litigation and the "[p]rice tag" they have placed on them, measured in billions of dollars, are admitted inventions, concocted to create public pressure on Chevron to force it to pay up.  Ex. 1, CRS-138-02-CLIP-02; Ex. 2 at 78.  Virtually confessing their claims' lack of substantive merits, Defendants have submitted knowingly false evidence to the Lago Agrio court—including expert reports from a U.S. environmental consultant, Dr. Charles Calmbacher, that he did not draft or approve.  Ex. 136 at 116:9-117:20.  Faced with insurmountable legal and factual barriers to any legitimate judgment—such as contemporaneous releases of liability granted by the Ecuadorian government in exchange for approved remediation of agreed-upon sites by the entity that actually operated in the region two decades ago and an absence of scientific evidence of harm in the remediated sites—Defendants turned to corrupt, extralegal means to get their way.  As Donziger has explained, the Lago Agrio Litigation is "not a legal case," but a "political battle that's being played out through a legal case," and "this is all for the Court just a bunch of smoke and mirrors and bullshit. It really is. We have enough, to get money, to win."  Ex. 1, CRS-060-00-CLIP-04, 195-05-CLIP-01; Ex. 2 at 33, 260.  To make sure that the Lago Agrio court ruled in their favor, Defendants persuaded the Ecuadorian government to manufacture false criminal charges against two Chevron attorneys for alleged fraud relating to the remediation, and they manipulated the court into appointing Richard Stalin Cabrera Vega ("Cabrera") as its supposedly "neutral" and "independent" expert for a "global" assessment of the harms Defendants alleged.  The criminal

charges against Chevron's attorneys are a sham based in part upon Cabrera's official report, a document secretly orchestrated and ghostwritten by the Defendants that purported to assess $27.3 billion in damages against Chevron.  To help obscure their corrupt dealings with Cabrera, Defendants even plotted something that [Cabrera] "could do AGAINST us in order to prove his independence."  Ex. 152 at 1.

At each stage of the litigation, Defendants have arbitrarily increased by several orders of magnitude their earlier "estimates" of damages.  After initially claiming grossly inflated reme-diation costs of one billion dollars, Exs. 448, 449, Donziger procured and publicly touted a six billion dollar estimate while admitting privately that remediation would cost "[s]ignificantly less than that."  Ex. 1, CRS-138-02-CLIP-02, Ex. 2 at 79.  Moreover, the expert he pressured into providing the $6 billion estimate later expressly disavowed it as "too high by a substantial mar-gin, perhaps by a factor of ten, or more."  Ex. 129 at 1 (emphasis in original).  Defendants have now upped their bogus claims far beyond even the $27.3 billion they presented in Cabrera's name, inducing new experts to rely on and try to "cleanse" the fraudulent Cabrera Report—while, ironically, relying heavily on an assumption of its validity—and to endorse new, lawyer-influenced damages claims of *$113 billion*.  Ex. 13.  In a testament to the effectiveness of Defen-dants' intimidation campaign and the systemic failures of the current Ecuadorian judicial system, the Lago Agrio court has turned a blind eye to the overwhelming evidence of Defendants' fraud.

The prospect of a fraudulently procured judgment in the Lago Agrio Litigation is being wielded as a club in ongoing attempts to force U.S.-based Chevron to pay Defendants to elimi-nate reputational harm and un-quantifiable business risk associated with having to defend itself against harassing enforcement actions across the globe.  That Defendants' ultimate focus is on extorting a payment in the United States is clear from the continuous activities they have under-taken here to leverage their fraudulent Ecuadorian litigation into money.  They arranged for a sympathetic U.S. filmmaker to tell a sanitized version of their tale in a "documentary" called *Crude*.  When *Crude* debuted in 2009, they arranged screenings of the film—with the evidence of their illicit activities largely edited out—and invited members of the U.S. Congress and Cabi-

4

net, among others.  Ex. 386 at JB-NonWaiver00010377.  And after ghostwriting the $27.3 billion Cabrera Report and surreptitiously arranging for its submission to the Lago Agrio court, they deceptively promoted it to the public as a vindication of their claims, and falsely touted it to U.S. government officials as an "independent" assessment to try to instigate baseless U.S. investigations of Chevron.  Defendants' public-relations arm has long waged a campaign of misinformation in the United States, through press releases, television appearances, websites, and even letters directly to Chevron's shareholders, falsely accusing Chevron of massive environmental harm and even murder based on this fabricated "evidence."

Defendants made these same false statements to this Court in an attempt to preclude Chevron from seeking relief against the government of Ecuador under the U.S.-Ecuador Bilateral Investment Treaty.  Ex. 94, ¶¶ 29-31.  And once Chevron began to seek discovery pursuant to 28 U.S.C. § 1782, Defendants, instead of abandoning their corrupt scheme, doubled down and conspired to cover up the fraud in numerous U.S. courtrooms.  Defendants committed or suborned perjury, and coached witnesses to do "an excellent job of not remembering anything."  Ex. 296 at 1; *see* Ex. 387; Ex. 292 at 1.  Rather than fulfill their duties of candor to U.S. courts, Defendants adopted a plan for "perpetuation of the fraud," Ex. 293 at 4, and implemented an obstruct-and-delay strategy of "not admitting everything—only what we have to," *id.* 293 at 2, seeking to "buy time" to manipulate the Ecuadorian proceedings to their fateful conclusion, Ex. 388 at 1.

Defendants have engaged in extortion, attempted extortion, mail and wire fraud, obstruction of justice, witness tampering, and money laundering, among other racketeering acts, and it is clear that they will continue in their racketeering scheme unless enjoined.

**b.  Fraud and other torts.**  Defendants' attorney-orchestrated deceptions, evidence falsifications, and misrepresentations also give rise to a variety of tort claims.  Chevron is likely to prove its entitlement to injunctive relief preventing the perpetuation and consummation of Defendants' tortious acts.  Chevron is also likely to succeed in showing that, absent emergency injunctive relief, Defendants will be unjustly enriched and will interfere with Ecuador's settlement and release of the very claims on which the Lago Agrio judgment will be based.

5

    **c.  New York's Recognition Act.**  Moreover, any judgment in favor of the Lago Agrio Plaintiffs resulting from the highly corrupt process in Ecuador will necessarily be unenforceable under the Recognition Act.  Defendants have represented to this Court that any Ecuadorian judgment will be "subject . . . to CPLR 5301 *et seq.*," Ex. 389 at 1, which precludes recognition "if the judgment was rendered under a system which does not provide impartial tribunals or procedures compatible with the requirements of due process of law'" or procured "by fraud."  Ex. 390 at 9 N.Y. C.P.L.R. § 5304.  Numerous outtakes from *Crude*—made available to Chevron under authority of this Court and the Second Circuit—show Defendants admitting and scheming to exploit the fact that the Ecuadorian "judicial system is so utterly weak."  *Donziger*, 2010 WL 4910248, at *4.  In Donziger's words, "[t]hey're all corrupt!  It's—it's their birthright to be corrupt."  *Id.*; *see* Ex. 1, CRS-053-02-CLIP-03; Ex. 2 at 26.  Under the Recognition Act, and the U.S. Constitution's guarantees of due process, neither this nor any other court in the United States may enforce a judgment from the Lago Agrio court, where Chevron was deprived of an impartial tribunal and, instead, withstood a process indelibly stained by corruption and fraud.

    **2.  Unless enjoined, Defendants will inflict irreparable injury on Chevron.**  Defendants stand on the verge of what they have long sought:  a multi-billion-dollar Ecuadorian judgment that they will use to multiply their public and political attacks as they embark on a campaign in the United States and elsewhere to disrupt the commercial operations of Chevron and its subsidiaries in order to force Chevron to write that "juicy check."  As Donziger has boasted, "Chevron operates in more than 100 countries and has numerous oil tankers that troll the world's waterways and dock in any number of ports . . . . This could end up being one of the biggest forced asset seizures in history and *it could have a significant disruptive impact on the company's operations*."  Ex. 92 at 1-2 (emphasis added).

    Defendants' internal documents set out in even greater detail their strategy to use the Ecuadorian judgment as leverage in "an international enforcement campaign"—pursuing an "aggressive approach . . . against Chevron . . . as a means of attaining a favorable settlement at an early stage."  Ex. 341 at 14.  The documents reveal a plan to attack Chevron especially in the

foreign jurisdictions where Defendants and their U.S. agents believe that they have "political connections" that may grease the skids.  *Id.* at 12, 19.[2]

3. **The balance of hardships tips decisively in Chevron's favor.**  In contrast to the severe irreparable harm Chevron will suffer if it is forced to wait for an injunction until after Defendants have initiated enforcement actions around the world and commenced their planned disruption of Chevron's business, Defendants will suffer no harm.  In the unlikely event the Lago Agrio Plaintiffs (or more accurately, the contingency-fee lawyers and "non-profit" organizations who purport to represent them, along with their U.S. and European investors and the Ecuadorian government, all of whom appear to be the real intended beneficiaries) are ever entitled to recover on a judgment awarded in Ecuador, this Court's grant of a preliminary injunction would only temporarily delay collection.  And because Chevron has invoked New York's Recognition Act, an injunction would simply require Defendants to litigate their enforcement action in the Southern District of New York—just as they insisted that, in a complaint they filed in this Court last year, Chevron was required.  *See* Ex. 94, ¶¶ 37-42.  Defendants can therefore hardly complain about having to litigate the enforceability of any judgment in this Court.

4. **The public interest strongly supports an injunction here.**  It is clearly in the public interest to preclude criminal, fraudulent enterprises from reaping the benefits of their wrongful acts.  An injunction here would merely maintain the status quo until the Court may consider the

---

[2]  Recent statements by Lago Agrio Judge Zambrano in a letter sent to the Treaty Arbitration Tribunal late yesterday and in an interview published by Reuters on Monday reinforce the urgency of injunctive relief against Defendants here, as well as the urgency of interim measures against Ecuador in the arbitral proceedings.  *See* Ex. 444.  After ignoring for nearly two months the Treaty Arbitration Tribunal's request that he advise it when he expected to rule in the Lago Agrio Litigation, *see* Ex. 455, Judge Zambrano finally responded by merely reciting the Code of Civil Procedure provisions that fix the outer limits of when he is required to rule (in this case, about six years) while making it clear that he has the authority to rule at any moment.  *See* Ex. 459.  Judge Zambrano was quoted by Reuters in a January 31, 2011 article as stating that he had gone through 1,500 volumes of the case record since issuing his *autos para sentencia* order on December 17, 2010 and had "about 500" volumes to go.  Ex. 455.  His February 1 letter to the Treaty Arbitration Tribunal was sent on the eve of a recently set hearing on Chevron's request for interim measures ordering the Republic of Ecuador to take steps to preserve the status quo, Ex. 455, and just after the Tribunal denied Ecuador's February 1, 2011 request to "immediately order the cancellation of the hearing currently scheduled for February 6, 2011 <u>and dismiss Claimants' Second Application for Interim Measures</u>" in light of the filing of Chevron's complaint in this matter.

full evidentiary record at trial.

*          *          *

In view of Chevron's strong likelihood of success in this suit, the irreparable and far greater harm it will suffer absent emergency injunctive relief here, and the public interest against fraud and in favor of due process, this Court should now grant emergency injunctive relief.  The injunction should bar Defendants, their assignees and anyone else acting in concert with them—including the law firms of Emery Celli, Motley Rice and Patton Boggs, and financial backers such as the Burford Group and Russell DeLeon—from commencing, prosecuting, advancing in any way, or receiving any benefit from—directly or indirectly—any attempt to recognize or enforce any Lago Agrio judgment in any court, tribunal, or administrative agency in any jurisdiction, in the United States or abroad, including any attempt to attach or seize any Chevron or Chevron subsidiary's or co-venturer's assets, whether pre-judgment or otherwise, until this Court determines the merits and enters judgment on Chevron's claims in this action.[3]

## FACTUAL BACKGROUND

To avoid unnecessary repetition, Chevron refers the Court to, and incorporates in full, the facts set forth in Exhibit A, the Annotated Complaint and its supporting exhibits.  Chevron here only summarizes Defendants' criminal and tortious acts necessitating an injunction.

## I.   The Origins of the Scheme

In 1964, Ecuador granted oil exploration and production rights in the Oriente region of the country to a consortium, in which TexPet, a subsidiary of Texaco, participated.  *Donziger*, 2010 WL 4910248, at *5.  Ecuador, through its state-owned oil company, Petroecuador, became the majority stakeholder of the consortium in 1976.  *Id*.  In 1990, Petroecuador took over as the sole operator of the consortium.  *Republic of Ecuador v. ChevronTexaco Corp. ("ROE")*, 376 F. Supp. 2d 334, 340 (S.D.N.Y. 2005).  In 1992, TexPet relinquished its remaining interest, leaving

---

[3]  Because of the ample evidence amassed and the many legal issues addressed here, Chevron respectfully requests this Court's permission to file an oversized brief of 70 pages in support of this application.

all operations entirely owned by Petroecuador.  *Donziger*, 2010 WL 4910248, at *5.

In 1994, Ecuador, Petroecuador, and TexPet agreed in a Memorandum of Understanding to "negotiate the full and complete release of Texpet's obligations for environmental impact arising from the operations of the Consortium."  Ex. 32 at 2.  In 1995, they executed a settlement agreement ("1995 Settlement Agreement"), which provided that TexPet would be fully released from all claims of environmental impact upon completion of the remediation prescribed in the agreed-upon Scope of Work.  Ex. 47 at 3, ¶¶ 5.1, 5.2; *ROE*, 376 F. Supp. 2d at 341-42; *see* Ex. 44.  From 1995 through 1998, TexPet performed the agreed-upon environmental remediation and community development.  Ecuador contemporaneously issued nine *actas* (decrees) certifying the adequacy of the remediation work, which it, along with outside auditors, supervised.  Exs. 64-72.

In 1998, Ecuador, Petroecuador, and TexPet executed the *Acta Final* ("1998 Final Release"), certifying that TexPet had performed all of its obligations under the 1995 Settlement Agreement, and fully "release[d], absolve[d] and discharge[d] TEXPET."  Ex. 46, pt. IV; *see ROE*, 376 F. Supp. 2d at 342.  At the time the 1995 Settlement Agreement and the 1998 Final Release were executed, Ecuador exclusively held all legal claims of environmental damage in the country.  Ecuador was, as its Ambassador told Judge Rakoff of this District, the sole "legal owner of the rivers, streams and natural resources and all public lands where the [consortium's] oil producing operations" took place.  Ex. 75.

Hoping for a "lucrative case" against Texaco, Ex. 1, CRS-170-00-CLIP-04, Ex. 2 at 162; Ex. 6 at 604:11-19, a group of U.S. plaintiffs' attorneys, including Donziger and Joseph Kohn, filed a putative class action in this District in 1993, seeking damages for "'property damage, personal injuries, and increased risk of disease'" allegedly caused by the consortium's operations. *Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534, 537 (S.D.N.Y. 2001).  The case was dismissed on grounds of *forum non conveniens*, requiring the plaintiffs' lawyers to pursue any cognizable claims in Ecuador.  *Id.*, *aff'd*, 303 F.3d 470 (2d Cir. 2002).

The conspirators had a problem:  They had their sights set on a huge payday, but Ecuador had no class action procedure and any claims for harm to the environment generally belonged

exclusively to Ecuador.  So the conspirators cut a deal with Ecuador:  They presented Ecuador with written promises that they would not sue or collect any judgment against Petroecuador, even if one were awarded to them.  Ex. 81.  In turn, Ecuador, with legislative assistance from the U.S. plaintiffs' attorneys, enacted the 1999 Environmental Management Act ("EMA"), creating a new private cause of action to enforce "collective environmental rights."  Exs. 83, 84.

## II.  The Scheme to Defraud and Extort Chevron

In May 2003, based on an unconstitutional retroactive application of the EMA, Donziger and his co-conspirators filed the Lago Agrio Litigation asserting claims, not for damages for individual injury as alleged in *Aguinda*, but for remediation of public lands—the very claims that were released by Ecuador.  Ex. 86, §§ V.3.a, VI.  Thus, this was *not* a re-filing of *Aguinda*, but an entirely new case premised on distinct legal theories, seeking different relief from a different defendant.  The conspirators brought the new action not against Texaco or TexPet, but against Chevron, which acquired Texaco as a subsidiary in late 2001, after the 1998 Final Release and after the dismissal of *Aguinda*.  *See Donziger*, 2010 WL 4910248, at *1 n.3.  As agreed, the conspirators sued neither Petroecuador nor Ecuador.  Indeed, although the complaint proposed that the Amazon Defense Front (the "Front") be the sole recipient of all funds recovered, Ex. 86, § VI.2, Ecuador's Prosecutor General later announced that the government would receive 90 percent of any judgment against Chevron.  Ex. 87 at 2; *see Donziger*, 2010 WL 4910248, at *6.  Ninety percent of even Defendants' earlier assessment of a $27 billion claim is "twice what the general State budget for one year would be."  *Id.*; *see Donziger*, 2010 WL 4910248, at *6.

Defendants recognized that legally, the EMA could not be retroactively applied to their claims.  Co-conspirator Cristóbal Bonifaz acknowledged that "the same three judges hearing the Lago Agrio case, primarily on the basis of the Law of Environmental Management, decided in 2001 that this law can not be applied to cases based on contamination which occurred before 1999."  Ex. 423 at 2.  But Defendants did not let the law get in their way.  Donziger assured Kohn that they were "getting" three Supreme Court justices "to sign an affidavit for the Winston lawyers," counsel for Ecuador, that the EMA could be retroactively applied.  *Id.* at 1.

The Lago Agrio Litigation therefore commenced with, and was premised on, a fraud. But it did not stop there.  To ensure a massive judgment, Defendants engaged in many more fraudulent and criminal acts, including pressure tactics to intimidate an institutionally weak judiciary, the repeated manufacture of evidence, and ultimately, the hijacking of the judicial process by arranging for the appointment of an "independent" court expert whose reports they secretly wrote themselves.  Defendants also colluded with the Ecuadorian government to have sham criminal charges brought against the former TexPet attorneys who negotiated the 1995 Settlement Agreement and 1998 Final Release, and to falsely declare TexPet's remediation a fraud, so as to reinforce the message to the Lago Agrio court that it must rule against Chevron.

### A. *"[N]o judge can rule against us"*:  Influencing the Ecuadorian Court Through Violent Threats of Violence and Political Pressure

#### 1. Defendants Employ Intimidation and Scare Tactics to Send a Clear Message to the Court That It Must Rule Against Chevron

Throughout the Lago Agrio Litigation, Defendants have exploited the Ecuadorian judiciary's weakness, bullying judges and using political connections to obtain favorable rulings based on judges' fears rather than on the facts or the law.  The strategy, in Donziger's words, was to "mobiliz[e] the country, politically, so that no judge can rule against us and feel like he can get away with it in terms of his career."  Ex. 1, CRS-032-00-CLIP-01; Ex. 2 at 11.

Although Defendants planned these underhanded tactics behind closed doors, they allowed a film crew to record some of those discussions.  Donziger solicited U.S. filmmaker Joseph Berlinger to make a movie about the litigation and granted his team "extraordinary access," *In re Application of Chevron Corp.*, 709 F. Supp. 2d 283, 297 (S.D.N.Y. 2010) *("Berlinger")*, thinking that a movie would "completely change the dynamic" in Ecuador and in the United States.  Ex. 1, CRS-350-04-CLIP-02; Ex. 2 at 427.  And "in the (mistaken) belief that Berlinger could not be subpoenaed to tell what he knew or to produce his outtakes," *In re Application of Chevron Corp.*, --- F. Supp. 2d ----, 2010 WL 3489341, at *2 (S.D.N.Y. Nov. 30, 2010), Defendants even allowed Berlinger's crew to film them as they planned their self-described "pressure tactics" to intimidate the court, *Berlinger*, 709 F. Supp. 2d at 289.

This Court, however, held that Berlinger could be subpoenaed and ordered him to produce hundreds of hours of unreleased footage from the *Crude* film—an order that the Second Circuit in July 2010 directed the filmmaker to comply with forthwith.  *Id.* at 299; Ex. 391.  The release of those outtakes, as one U.S. court has observed, "sent shockwaves through the nation's legal communities, primarily because the footage shows, with unflattering frankness, inappropriate, unethical and perhaps illegal conduct."  Ex. 326 at 3-4.

The outtakes reveal that Defendants purposefully and routinely sought to capitalize on, in Donziger's words, the "institutional weakness in the [Ecuadorian] judiciary, generally, and of this court, in particular," employing a variety of scare and pressure tactics.  Ex. 1, CRS-350-04-CLIP-01; Ex. 2 at 419; *see Donziger*, 2010 WL 4910248, at *4.  Luis Yanza, President of the Front, along with Donziger and their co-conspirators at Amazon Watch, even schemed to raise their "own army," a "specialized group" detailed "to watch over the court," for which, "if we need weapons, we can provide weapons."  Ex. 1, CRS-350-04-CLIP-02; Ex. 2 at 422-24.  Concerned about the discussion being caught on tape, Atossa Soltani of Amazon Watch asked whether "anybody can, uh, subpoena these videos," advising, "I just want you to know that it's—it's illegal to conspire to break the law."  Ex. 1, CRS-350-04-CLIP-02; Ex. 2 at 423.  Donziger assured her that "[w]e don't have the power of subpoena in Ecuador."  *Id.*

Believing that the outtakes could not be subpoenaed, Donziger spoke openly, saying that they needed an army to "send a message to the court that, 'don't fuck with us anymore-- not now, and not-- not later, and never.'"  Ex. 1, CRS-350-04-CLIP-01; Ex. 2 at 420.  As Pablo Fajardo put it, "the idea is to teach a lesson to this judge."  *Id.*, Ex. 1, CRS-346-00-CLIP-02; Ex. 2 at 403.  "[O]nly after that should we talk to the judge about what he needs to do," Donziger wrote.  "The judge needs to fear us for this to move how it needs to move, and right now there is no fear, no price to pay for not making these key decisions."  Ex. 76 at DONZ00036276.

Video evidence shows Defendants executing their scheme.  Indeed, Donziger emailed Berlinger, urging him to send the crew to capture a "huge" planned march on the courthouse, featuring "our private 'army' which has been very effective.  Yesterday they followed a Texaco

lawyer into the judge's chambers and had a confrontation.  This is a critical part of our strategy that is allowing the case to go forward." Ex. 135 at 1.  These scare tactics were critical because, according to Donziger himself, Ecuadorian judges "make decisions based on who they fear the most, not based on what laws should dictate." Ex. 1, CRS-350-04-CLIP-01; Ex. 2 at 419.  As a colleague told Donziger, "[T]he only way we will win this case is if the judge thinks he will be doused with gasoline and burned if he rules against us." Ex. 76 at DONZ00036235.

### 2. Defendants Collude with Ecuador to Manufacture Criminal Charges, Undermine the 1998 Final Release, and Influence the Court

To put further force behind their message to the Lago Agrio court as to how it must rule against Chevron, Defendants enlisted the aid of Ecuadorian officials, all the way to President Correa himself. *See, e.g.*, Exs. 231A, 232A.  Ecuador's Minister of the Environment assured Donziger directly that the government was "giving the support that we can do," and that she had a "very close of, friend of the Frente de Amazonia working with me doing all this." Ex. 1, CRS-421-00-CLIP-03; Ex. 2 at 446.

Political pressure was key because, as Donziger has explained, to keep their positions, Ecuadorian judges "don't have to be intelligent enough to understand the law, just as long as they understand the politics." Ex. 1, CRS-129-00-CLIP-02; Ex. 2 at 71.  President Correa, having neutralized meaningful opposition in Congress and in the courts, has himself admitted that "Ecuador is not currently living under in a State of law." Ex. 393; *see* Expert Decl. of Vladimiro Álvarez Grau ("Álvarez Decl."), ¶¶ 23-87.  And so when Defendants decided that the Lago Agrio court was not fully cooperating, they did not write a brief.  They schemed to make the court cooperate by "do[ing] the things the judge is gonna really feel.  Like the President of the country calling him out . . . ." Ex. 1, CRS-376-04-CLIP-01; Ex 2 at 442.  As one federal court has described, "the Lago Agrio attorneys . . . place[d] pressure on the new Ecuadorian government to push for a specific outcome in the litigation, and . . . the Ecuadorian government intervened in ongoing litigation." Ex. 326 at 4.

Defendants also colluded with Ecuador to try to "extinguish" the legal problem that the

1998 Final Release wholly precluded their claims against Chevron.  Ex. 6 at 248:16-250:15.
Their "solution" was to have Ecuador's Prosecutor falsely accuse Ricardo Reis Veiga and Rod-
rigo Pérez Pallares, the former TexPet lawyers who negotiated the release with Ecuador, of
fraud, even though Ecuador and outside auditors had supervised and certified the adequacy of the
remediation.  Defendants planned to "fully leverage the criminal investigation" in the litigation
and in the press to extract a hefty settlement out of Chevron.  Ex. 222, DONZ00027919 at 1; *see*
Ex. 6 at 454:19-455:4, 455:17-24, 716:19-717:5.

Donziger knew that any prosecution would be baseless, admitting that his colleagues had
"scour[ed] the penal code to find any provision that could be used against Reis Veiga and really
could find none . . . ."  Ex. 76 at DONZ00036259.  And in 2006 and 2007, Ecuador's Prosecutor
General, and then-District Prosecutor Washington Pesántez, both "found that 'there [was] not
sufficient evidence to pursue the case against . . . Mr. Ricardo Reis Veiga and Mr. Rodrigo Pérez
Pallares.'"  *Donziger*, 2010 WL 4910248, at *9; *see* Ex. 31; Ex. 394 at 9-10.

But Defendants were undeterred.  President Correa's ascent to power marked a "turning
point for the prospects of a criminal prosecution" of Chevron's attorneys.  *Donziger*, 2010 WL
4910248, at *9.  In January 2007, Donziger and Kohn discussed efforts to have Ecuador's Attor-
ney General declare TexPet's remediation a fraud.  Kohn spelled out the extortionate character of
the plan to prompt criminal charges:  "So, again, that may be something that we could facilitate
going away at the right time . . . . if they wanted it to go away."  Donziger replied, "Precisely."
Ex. 1, CRS-170-00-CLIP-00; Ex. 2 at 159.  Shortly thereafter, Fajardo reported that President
Correa had advised him that "the commercial-national political forces have changed, that is, [the
Prosecutor General] is afraid of being removed," and so "if we put in a little effort, before getting
the public involved, the Prosecutor will yield . . . ."  Ex. 1, CRS-376-03-CLIP-01; Ex. 2 at 439.

Defendants' pressure tactics worked.  In August 2008, Prosecutor General Pesántez re-
versed his earlier finding that "there was no evidence of civil, administrative, or criminal nature
liability" by TexPet's representatives, Ex. 394 at 9-10, and criminally charged Messrs. Veiga and
Perez.  Ex. 227.  As a co-conspirator later remarked, the evidence of Defendants "collaborating

with the fiscalia [Public Prosecutor] to get Reis Veiga and Perez convicted" is "pretty much ir-refutable." Ex. 395 at 2. Following the issuance of the charges, Defendants organized a march on the courthouse, during which their "private army," led by Yanza, enacted the beheading of Chevron's executives and placed the effigies in a coffin that was buried in a shallow grave in the jungle. Ex. 229. The message to Chevron was clear: Give in to our extortionate demands or we will have your executives imprisoned, or worse. The message to the court was just as clear: Rule against Chevron, or else. As Donziger has boasted, no judge would rule against Defendants because, though he might not actually be killed, "he thinks he will be . . . . Which is just as good." Ex. 1, CRS-129-00-CLIP-02; Ex. 2 at 70.

B. **"*Facts don't exist, facts are created*": Corrupting the Judicial-Inspection Process by Falsifying and Manufacturing Evidence**

Although Donziger has admitted that the Lago Agrio Litigation is a "political battle," De-fendants have tried to create the veneer of a proper "legal case," so they may enforce a judgment in the United States and elsewhere. Ex. 1, CRS-060-00-CLIP-04; Ex. 2 at 33. Because the facts did not support their claims, Defendants manufactured and falsified "evidence." As Donziger put it: "Facts don't exist, facts are created." Ex. 1, CRS-198-00-CLIP-06; Ex. 2 at 307.

1. **Defendants Falsify Their Judicial-Inspection Expert's Reports**

At the outset of the litigation, the parties agreed and the Ecuadorian court ordered a "ju-dicial inspection" process, whereby experts nominated by each party investigated and reported on the environmental conditions at the former oil production sites, with disputes to be resolved by a panel of neutral "settling experts." Exs. 120-122. Defendants selected Dr. Charles Calm-bacher to conduct inspections and to act as their testifying expert for four of the sites. Ex. 396 at 2. The Lago Agrio Plaintiffs submitted two reports in Dr. Calmbacher's name, purporting to show extensive environmental damage requiring millions of dollars to remediate. Exs. 397, 398.

Defendants fabricated those reports. Dr. Calmbacher testified that, after inspecting the first two sites, he "concluded that I did not see significant contamination that posed immediate threat to the environment or to humans or wildlife around it." Ex. 136 at 114:25-115:2. *See also*

15

*id.* at 113:19-115:24, 118:15-119:1.  This was not what Defendants wanted to hear.  *Id.* at 91:25-92:11.  Following Donziger's view that "[s]cience has to serve the law practice; the law practice doesn't serve science," Ex. 1, CRS-158-02-CLIP-09, Ex. 2 at 99, Defendants resorted to fraud. They prepared a report containing Dr. Calmbacher's real conclusions and sent it to him in the United States.  As the report appeared to accurately reflect his opinions, Dr. Calmbacher signed it and, based on another misrepresentation, initialed pages for the report to be printed on, and mailed them to Ecuador.  Ex. 16 at 62:5-63:6.  Defendants then prepared replacement reports misstating that the inspected sites presented a danger to the environment and required additional remediation, used Dr. Calmbacher's signature page, and filed the forged reports with the court. Shown copies of the reports filed under his name, Dr. Calmbacher testified, "I did not reach these conclusions and I did not write this report."  *Id.* at 116:9-10; *see id.* at 116:11-117:20.

### 2.  The Conspirators Tout a $6 Billion Remediation Cost Estimate Denounced by Its Author as "Too High by a Substantial Margin"

For years after abandoning their initial claim for "only" $1 billion, Defendants widely touted a $6 billion figure from their retained expert, David Russell, of the U.S. firm Global Environmental Operations.  That estimate, in Russell's words, "was prepared in a very short time, with only a week of review time in the jungle, and heavily influenced by [Donziger] in the writing."  Ex. 129 at 1.  Russell made clear to Donziger that the quantitative data "ha[d] not [been] reliably established," and that he and his team were "still at the guessing stage."  Ex. 130 at DONZ00036208, DONZ00036212.

Defendants sought to characterize that unreliable estimate as fact and to exploit it as widely as possible.  Via co-conspirator Amazon Watch, they cited the estimate to the Securities and Exchange Commission in an attempt to trigger a bogus Sarbanes-Oxley investigation.  Ex. 265.  Seeing his estimate being abused, in February 2006, Russell sent Donziger a "Cease and Desist" letter, demanding that Donziger "stop using" the $6 billion remediation cost estimate because it "is too high by a substantial margin, perhaps by a factor of ten, or more."  Ex. 129 at 1 (emphasis in original).

16

Donziger's response was blunt:  "I don't care what the fuck that guy says."  Ex. 1, CRS-138-02-CLIP-02; Ex. 2 at 78.  Donziger acknowledged to Soltani of Amazon Watch that Russell's "very rough estimate" overstated the true cost, and that the reality was that "[it] would cost less than that.  Significantly less than that . . . ."  *Id.*; Ex. 2 at 79.  But Donziger wanted to demand a high number, asking, "Do we ask for eight [billion] and expect three so that [the judge] says, 'Look, Texaco, I cut down the largest part.'"  Ex. 1, CRS-159-00-CLIP-06; Ex. 2 at 125.  And despite Russell explicitly telling Donziger that the estimate was wildly inaccurate, Defendants continued to promote the $6 billion figure.  For example, Amazon Watch issued a press release in March 2007 asserting that "[t]he only independent damage assessment, by the U.S. firm Global Environmental Operations, puts clean-up costs at $6.14 billion . . . ."  Ex. 135.

The Defendants protected their inflated estimate and their baseless theory that Chevron should bear all responsibility for environmental damage by responding forcefully to alternative, lower estimates.  When an expert proposed a lower estimate, Donziger wrote him:  "GUARD THAT NUMBER WITH YOUR LIFE PLEASE. DO NOT TELL ANYBODY."  *Donziger*, 2010 WL 4910248, at *8 n.63; Ex. 399.  And in 2009, in an email to Donziger and other conspirators with the subject line "WORRISOME," Fajardo warned of a newspaper report that the Ecuadorian government was assuming responsibility for *all* remediation, and that this was "bad" in part because the total "financial cost is extremely low"—$96 million.  Ex. 112 at 2.  Fearful that Chevron would "say that the State finally assumed its duty and is going to clean up what it ought to," Fajardo called on his co-conspirators to act.  "[I]f we don't act, Chevron will take advantage of this and really screw us."  *Id.*  Donziger responded in an email to Juan Saenz: "You have to go to Correa to put an end to this shit once and for all."  *Id.* at 1.

**C.  *"[T]he work isn't going to be the expert's"*:  Hijacking the Judicial Process and Staging a Sham "Global Damages Assessment"**

**1.  Defendants Conspire To Arrange the Judicial Appointment of Their Inside Person, Cabrera, as an "Independent" Court Expert**

The only time the panel of settling experts issued a report, it concluded that there was no evidence of contamination posing a risk to human health or to the environment.  Ex. 127 at 67.

Recognizing that the panel's repeated rejection of their claims would likely end their case, Defendants moved to abandon the judicial-inspection process. Ex. 146. In January 2007, the court reversed its earlier rulings ordering that process, and granted Defendants' request. Ex. 400. On March 19, 2007, the court appointed mining engineer Richard Cabrera as the sole expert to conduct an independent "global" assessment of environmental conditions and their origins. Ex. 150.

But this was "not even remotely the whole story." *Donziger*, 2010 WL 4910248, at *6. In actuality, Cabrera's appointment was the result of a covert pressure campaign that Defendants mounted against the court. Donziger "was sure that we had lost the court with the perito demento [*sic*] [settling expert] report," but boasted that "due to some good strateging [*sic*] and some counter-pressure, the court is now in play, up for grabs, and accessible." Ex. 76 at DONZ00036235. Defendants repeatedly pressured the judge, and Donziger bragged, "I love it – this lobbying. I am good at it." *Id.* But when the judge lagged, Defendants escalated to threats. In July 2006, Donziger emailed Kohn: "The judge, who is on his heels from the charges of trading jobs for sex in the court, said he is going to accept our request to withdraw the rest of the inspections . . . . The judge also I believe wants to forestall the filing of a complaint against him by us, which we have prepared but not yet filed." Ex. 149 at 1.[4]

In November 2006, Donziger wrote Kohn, asking for financing to "begin the peritaje

---

[4] In fact, before Defendants implemented their scheme to have Cabrera appointed as the single, global expert they would control, they devised a plan to manipulate and take over the work of the Lago Agrio court's so-called "settling" experts. The settling experts were jointly conducting inspections and making recommendations on a site-by-site basis. In late 2005 and early 2006, however, Donziger arranged for two respected Ecuadorian engineers, Gustavo Pinto and Fernando Reyes, to work secretly for and be paid by the Lago Agrio Plaintiffs' team and to meet privately with the judge under the pretense that they were independent experts sharing their views on the joint inspections. Ex. 6 at 3845:24-3847:25. Indeed, Donziger confessed to a "vague recollection" that Pinto and Reyes in fact met with Judge Yañez. Ex. 405 at 3849:15-21. The ultimate goal was for Pinto and Reyes to take over the site inspections as the court's appointees, while still secretly working for the plaintiffs. *Id.* at 3851:20-3852:13. In his contemporaneous notes, Donziger called this scheme "going over to the dark side" and his "bargain with the devil." Ex. 76 at DONZ00036258, DONZ00023089 at 22, Ex. 405 at 3848:2-11. He even developed a code name in his notes for his two collaborators—"GF"—to hide their identities. *See* Ex. 6 at 3845:17-3846:20; Ex. 76, DONZ00036255, DONZ00036258, DONZ00036243, DONZ00023089. But by mid-2006, as the joint inspections started to produce results in Chevron's favor anyway, Donziger abandoned his "bargain with the devil" to pursue the appointment of a single global damages expert whom he and the plaintiffs could control. *See* DONZ00036281; Ex. 6 at 1809:3-1812:11, 2128:13-2130:17. That "global expert," of course, turned out to be Cabrera.

global [global expert report]." Ex. 401, DONZ00023859 at 1. A couple of months later, in a meeting in Philadelphia, Donziger told Kohn that the court would soon appoint the global expert, but that "[i]t would be our team . . . that we would pay . . . ." Ex. 1, CRS-169-05-CLIP-01; Ex. 2 at 147. In February 2007, a month before the court made the appointment public, Donziger, Fajardo, and Yanza met with Cabrera and "[e]xplained everything." Ex. 76, DONZ00027256 at 11; Ex. 6 at 985:4-8. For acting as Defendants' puppet, Cabrera would receive a substantial sum, an amount that eventually totaled at least $263,000. Ex. 206.

### 2. Defendants Plan Out the Report With Cabrera Before He Is Appointed

With their hand-picked candidate primed to assume the position of global damages expert, Defendants turned their efforts to making sure that Cabrera knew what he was supposed to find. On March 3, 2007, two weeks before Cabrera's public appointment, Donziger, Fajardo, Yanza, and Maest, and their co-conspirators met with Cabrera to lay out their plan for the official duties the court would later appoint Cabrera to perform. Ex. 1, CRS-187-01-02, 188-00-CLIP-02, 188-01-CLIP-01, 189-00-CLIP-02, 189-00-CLIP-03, 189-00-CLIP-05, 191-00-CLIP-02, 191-00-CLIP-03, 192-00-CLIP-01, 193-00-CLIP-01; Ex. 2 at 169-235, 241-53; Ex. 6 at 1120:23-1121:5. As Donziger wrote in his personal notes, they "spend [*sic*] the whole day making comments and mostly directing them to Richard [Cabrera]. We laid out our entire case and legal theory - what a benefit! We need to do the same with the judge." Ex. 76, DONZ00027256 at 6.

Fajardo made clear that "the work isn't going to be the expert's"; the expert would just "sign the report and review it." Ex. 1, CRS-191-00-CLIP-03; Ex. 2 at 245. Fajardo underscored to the group, and to Cabrera, that their theory was "that Texaco is responsible for all of the existing damage, even that caused by Petroecuado[r]." Ex. 1, CRS-187-01-02; Ex. 2 at 179. Donziger discussed ways to make Chevron pay more, commenting that they could "jack this thing up to thirty billion . . . in one day." Ex. 1, CRS-193-00-CLIP-01; Ex. 2 at 252-53. Critical to Defendants' ability to "jack this thing up" was keeping Chevron in the dark about their collusion with Cabrera. As Fajardo told the group: "Chevron's main problem right now is that it doesn't know what the hell is going to happen in the global expert examination." Ex. 1, CRS-

191-00-CLIP-03; Ex. 2 at 244.  He added that "all of us . . . have to contribute to that report," to which Defendant Anne Maest responded, to uproarious laughter, "But not Chevron."  *Id.*

After preparing for Cabrera to be installed as the court's "independent" expert, Defendants continued their modus operandi of simply making up facts.  At a meeting the following day, the very consultants whom Donziger had hired to ghostwrite the report informed him that there was no evidence of groundwater contamination and that "nothing has spread anywhere at all."  Ex. 1, CRS-195-05-CLIP-01; Ex. 2 at 258.  The lack of evidence did not pose a problem, Donziger told them, because "this is Ecuador. . . . You can say whatever you want and at the end of the day, there's a thousand people around the courthouse, you're going to get what you want."  *Id.*  Donziger explained, "[T]his is all for the Court just a bunch of smoke and mirrors and bullshit."  *Id.*  As Maest wrote in her notes:  "prove damages – preferred but not necessary."  Ex. 402 at STRATUS-NATIVE128132.[5]

### 3. Defendants Ghostwrite a Report for Cabrera to Sign and Pass Off as His Independent Conclusions

Consistent with Cabrera's unique and central role as the court's sole expert on damages and liability, the Lago Agrio court repeatedly and publicly ordered Cabrera to be independent from the parties, and to conduct his activities with "complete impartiality and transparency with respect to the parties and their attorneys."  Ex. 269 at 10, 12; *see also* Ex. 154.  Cabrera repeatedly affirmed his compliance with these orders, telling the Lago Agrio court, "The defendant's

---

[5]  Throughout this period, most of the plaintiffs' testing went through a laboratory named HAVOC.  The laboratory was not properly accredited, *see* Ex. 6 at 3743:14–3744:3, and it did not even have the proper equipment to conduct the tests it purported to conduct, Ex. 446 at 175:17–24.  Given the importance of HAVOC's work to the Lago Agrio Plaintiffs' case, Donziger was obsessed with stopping inspections of HAVOC.  In one e-mail, he says it would be a "DISASTER" if HAVOC were inspected.  Ex. 456.  In another, he inquires about whether "the accreditation process" for HAVOC, which Donziger emphasized was "VITAL," had begun.  Ex. 440.  One reason it was "VITAL" was that HAVOC had already been doing work for which the accreditation was required.  *See* Ex. 6 at 3743:14-3744:3.  Indeed, the very first time Donziger interacted with the Ecuadorian judiciary, in a moment captured in the *Crude* outtakes, he burst into the judge's chambers, *ex parte*, and insist that HAVOC not be inspected.  Ex. 6 at 3737:22-3739:17.  He admitted in the outtakes that he "could never do this in the United States but Ecuador, you know, this is how the game is played, it's dirty.  We have to occasionally use pressure tactics . . . ."  The taint on the HAVOC lab continues to infect all of the Lago Agrio Plaintiffs' case.

attorneys allege that the plaintiff is in 'close contact' with me, and the plaintiff has provided me with technical information and support staff to assist with the expert examination.  This is untrue . . . . [T]he idea that the plaintiffs would be helping me with that is unthinkable."  Ex. 403.

In reality, Defendants controlled every aspect of Cabrera's work.  Members of their team ghostwrote Cabrera's work plan, selected his technical team for him, selected the cites for his inspection, found him office space, paid him in advance, selected his personal assistant—the girl-friend of one of the Lago Agrio plaintiffs' lawyers—and even purchased his insurance.  Ex. 404 at 2; Ex. 152; *see* Ex. 405 at 2167:19-25, 3833:20-3834:6.  They even entered into a secret con-tract with Cabrera, Ex. 404, a contract that Cabrera vehemently denied to the Lago Agrio court: "I do not have any relation or agreements with the plaintiff, and it seems to me to be an insult against me that I should be linked with the attorneys of the plaintiffs."  Ex. 208.  In April 2007—even before Cabrera had been sworn in—Donziger met with Beltman, Maest, and other Stratus representatives in Colorado to decide which damages categories to include in the report, without consulting or even informing Cabrera.  Ex. 1, CRS-269-01-04, 269-01-08; Ex. 2 at 354-62; Ex. 6 at 2421:25-2423:8.  Defendants communicated frequently as they prepared the "Cabrera" Report. *See* Ann. Compl., Appx. B.  All the while, Donziger pressed for ever-higher numbers, imploring Stratus not to "even suggest anything that backs away from the [original] figures."  Ex. 166 at 1.

In February 2008, Beltman told his team they had to "write, over the next 2 to 3 weeks, probably the single most important technical document for the case"—the Cabrera Report.  Ex. 168 at STRATUS-NATIVE043232.  Beltman and Maest would write the "summary Peritaje Global report."  Ex. 314 at 1; *see* Exs. 169, 176.  Beltman tasked other Stratus consultants or subcontractors, including Bill Powers and Richard Clapp, with drafting the annexes.  *See* Ex. 164 at 1-2; Ex. 71 at 95:14-22, 109:2-7, 251:4-253:1, 255:5-256:13; Ex. 174.  Defendants planned how to "attribute" these annexes to "Richard" Cabrera or his supposedly independent team members.  Ex. 147 at STRATUS-NATIVE067415-18.  On at least one occasion, Beltman veri-fied that the annexes' true author's "name [was] taken off" prior to submission.  Ex. 182.

The conspirators' scheme was intentionally and elaborately deceptive.  First, they wrote

Cabrera's March 24, 2008 initial $16 billion report, delivering its 4,000 pages to him just days before he filed it "pretty much verbatim" on April 1, 2008.  *See* Ex. 6 at 2433:8-14; *see id.* at 2378:6-9; Ex. 176; Ex. 406 (providing inserts for the Cabrera Report on March 25); Ex. 407 (providing input on damages table for the Cabrera Report on March 30); Ex. 408 (translating Cabrera's declaration of findings on April 1).  Next, in September 2008, Defendants filed "comments" purporting to criticize "the Expert's work and conclusions" as "unjustly favorable to the defendant."  Ex. 7 at 40, 60.  Then, Defendants wrote *Cabrera's* supplemental report purporting to provide "[a]nswers by the Expert Richard Cabrera, with the Support of His Technical Team."  Ex. 8.  Beltman and Maest tasked Powers "to respond to questions that had been raised about the report that Stratus had submitted that [his] work fed into," Ex. 171 at 93:9-12, 164:4-7, 165:14-20; *see also id.* at 93:24-94:1, 158:5-8, 288:20-290:20, and worked with other subcontractors to prepare additional inserts.  *E.g.*, Ex. 196; Ex. 198.  Stratus made sure to "clean up the language so it sounds like the Perito and less like a comment."  Ex. 9 at STRATUS-NATIVE051389; *see also* Ex. 353.  The result of this subterfuge was to "jack . . . up" the "assessment" by more than another $10 billion, to $27.3 billion.[6]

Consistent with Donziger's direction to the consultants that "this is all for the [Lago Agrio] Court just a bunch of smoke and mirrors and bullshit," Defendants concocted damages figures for "harm" they privately admitted did not exist.  Ex. 1, CRS-195-05-CLIP-01; Ex. 2 at 258-60.  For example, Defendants included $3.2 billion for groundwater remediation, even though they acknowledged that there was "[n]o groundwater number – not enough data."  Ex. 159 at 1; *see* Ex. 196.  Defendants assessed $9.5 billion for alleged "excess" cancer deaths, de-

---

[6] Further evidence that Donziger and his Ecuadorian legal team were aware of their own wrongdoing is the fact that they developed cryptic code names for use in their e-mails.  In an e-mail discussing their plan to purchase insurance for Cabrera, for example, Julio Prieto reported to Donziger and Fajardo a "life insurance quote for the Wao."  Ex. 442; Ex. 6 at 3805:8-18, 3807:19-3808:17.  Donziger testified that "the Wao" is Cabrera, and that they used that term "so it wouldn't be clear on the face of the document that [they were] referring to Cabrera."  Ex. 6 at 3805:8-19; 3807:19-3808:2.  In another e-mail, Fajardo reports that he "met with the boss," who "will ratify Richard and everything that's been ordered," and that he and "the boss" "parted as good friends."  Ex. 152.  The "boss," Donziger has confirmed, is the judge, Ex. 6 at 3835:7-10, with whom Fajardo met "many times," Ex. 405 at 3835:21-3836:3.

spite being informed by their health expert that the questionnaire on which the calculations were based, "from an epidemiological point of view . . . has little validity," and that "[t]he calculation of the excess of cases is incorrect" and uses a number that "has no sense." Ex. 409 at STRATUS-NATIVE052295-96; *see also* Ex. 1, CRS-159-00-CLIP-10, Ex. 2 at 102-106 (Defendants discussing the lack of evidence of any causal link between oil contamination and cancer). Defendants claimed another $8.4 billion for alleged unjust enrichment—more than *15 times* the $530 million calculation Beltman sent to Donziger and Kohn. Ex. 166 at 3.

### 4. Defendants Issue a Fraudulent Endorsement of Their "Cabrera" Report and Seek to Procure Other Endorsements Through Misrepresentations

Not content simply to ghostwrite a bogus report and pass it off as the work of an "independent" court expert, Defendants and their co-conspirators sought almost immediately after filing the Cabrera Report to bolster its usefulness through the publication of endorsements of the report by Stratus itself—the report's secret author—and by third-party experts. In July 2008, Donziger, Beltman, Maest, Fajardo, Yanza, and Karen Hinton convened in Colorado to discuss the "scientific and public response to [the] Cabrera report." Ex. 159, STRATUS-NATIVE096796 at 1. There, they crafted a plan to obtain multiple levels of endorsement of the report for use in the Lago Agrio court and, more importantly, in the U.S. media. *Id.*

The first level of endorsement Defendants put into play involved one of the most brazen aspects of their racketeering campaign: the trumpeting of the Cabrera Report's "independence" by none other than Stratus, its secret author. In December 2008, Stratus released "Comments" purporting to independently validate the Cabrera Report, falsely representing that "Mr. Cabrera is thus acting in the capacity of a neutral 'expert' to the Court . . . . In the U.S. Court system, Mr. Cabrera would be called a Technical Special Master." Ex. 201 at 1.

The second level of endorsement Defendants and their co-conspirators solicited involved those of other experts, who they pursued by actively deceiving them about the Cabrera Report's authorship. *See* Ex. 159, STRATUS-NATIVE096798 at 3. For instance, Beltman solicited California's Office of Spill Prevention and Response, by misleadingly suggesting that the "technical

expert" appointed "to summarize[] and analyze the technical data and information about the case and draw conclusions about the environmental and human impacts" had actually prepared the report. Ex. 202 at STRATUS-NATIVE042209. Defendants' goal of obtaining fifteen or twenty endorsements from academics in addition to paid consultants, however, proved difficult. As Beltman emailed Donziger: "[Academics] are trained and they function to be critical, not accepting," and "some of the underlying work in the Cabrera report has weaknesses that an academic would probably have a hard time defending." Ex. 204 at STRATUS-NATIVE042610.

### 5.   Defendants Attempt to Whitewash Their Fraud With Yet Another Fraud

When Defendants began to fear that pending § 1782 proceedings against Stratus in Colorado would expose the Cabrera fraud, they actively sought to distance themselves from the Cabrera Report. In June 2010, Defendants requested that the Lago Agrio court order the parties to file additional submissions on damages and then move swiftly to judgment. Ex. 377. As Patton Boggs' Eric Westenberger explained, this was "an effort to 'cleanse' any perceived impropriety related to the Cabrera Report." Ex. 13; Ex. 405 at 3707:7-12. Defendants viewed this maneuver as critical. In fact, when the drafting process dragged on, Donziger told his co-conspirators at Patton Boggs and Emery Celli that "[t]he Ecuador team is getting nervous that there is an increasing risk that our 'cleansing' process is going to be outrun by the judge and we will end up with a decision based entirely on Cabrera. Absent our intervention ASAP, they believe the judge could issue autos para sentencia in about 3-4 weeks, which would in effect bar our remedy to the Cabrera problem." Ex. 411. Donziger testified that he and the Ecuadorian legal team feared that a judgment from the Lago Agrio court that relied upon the Cabrera report would be "harder to enforce." Ex. 6 at 3712:6-11; 3712:22-3713:4.

Donziger has admitted that the new submission also was intended to give Defendants "an argument" to "attempt to shut down Chevron's 1782 efforts in the U.S." Ex. 6 at 2331:15-19, 2337:20-21. While Defendants' motion was pending, however, the Second Circuit ordered the production of the *Crude* outtakes, Ex. 391, key clips of which Chevron presented to the Lago Agrio court, Ex. 143. But rather than investigating Defendants' corruption, and ignoring the fact

that Cabrera had been appointed as "the sole expert" on damages, Ex. 151 at 17, the court granted Defendants' request for an additional damages submission.  Ex. 412.

On September 16, 2010, Defendants filed their new "expert" reports, which merely re-package the flawed and fraudulent Cabrera Report.  *See* Ex. 413.  As one Patton Boggs lawyer wrote to Donziger in August 2010:  "We probably wouldn't want to draw that much attention to Cabrera, but we should think about whether our expert might address Cabrera's findings in such a subtle way that someone reading the new expert report (the Court in Lago or an enforcement court elsewhere) might feel comfortable concluding that certain parts of Cabrera are a valid basis for damages."  Ex. 214 at 1.  The proposed agreement with the Weinberg Group, which supplied the new "experts," explicitly stated that its role was to "conduct a comprehensive review of se-lected sections of an expert report prepared by Engineer Richard Stalin Cabrera Vega as an inde-pendent expert for the court."  Ex. 215 at 1.  One co-conspirator has noted that the Weinberg Group's function was merely to "provid[e] a submission with their name on it."  Ex. 216 at 1.

Rather than put its own name on the re-packaged Cabrera Report, however, the Weinberg Group instead reprised the role of Stratus, controlling and even ghostwriting reports submitted under the names of others.[7]  The nominal authors rely on the Cabrera Report, even though they have admitted that they did not verify the Cabrera Report's data or standards , and had no view about whether they were accurate.[8]  As Donziger has admitted, none of the new experts went "to

---

[7]  At least two of the new experts testified that the Weinberg Group drafted substantial portions of their reports. New expert Picone, whose report offers a $1.4 billion damage assessment for health care costs, testified that much of his report was written by the Weinberg Group, Ex. 220 at 51:5-18, 54:13-20, 75:11-21, 88:16-89:3, 115:1-11, 118:12-22, 152:19-153:4 (Picone and the Weinberg Group "were working on the draft and the various iterations of the same draft"), 224:4-225:2, 234:19-235:15 (the report was a "collaborative product . . . it was a team effort"), including a unique comparative analysis in which the health care costs incurred in the aftermath of the terrorist at-tack on the World Trade Center in Manhattan on September 11, 2001, are used as a model for health care costs in the Amazon.  *Id.* at 140:9-21, 132:4-15, 157:20-158:17 (referring Chevron's counsel to the Weinberg Group to an-swer questions about the WTC comparative analysis since it was they, not him, who authored that analysis).  And new expert Scardina, whose report assesses $541.5 million in damages against Chevron for a new potable water system in Ecuador testified that at least half of his report was written by the Weinberg Group.  Ex. 221 at 87:9-88:2.

[8]  *See* Ex. 199 at 140:21-141:11, 152:10-21, 162:25-164:13, 166:8-13, 171:18-172:3, 225:6-25, 270:18-271:24; Ex. 219 at 59:12-60:2, 62:18:63:9, 68:21-69:4; Ex. 221 at 114:14-19, 224:20-225:20, 262:21-264:2, 269:8-270:16, 276:8-20; Ex. 217 at 52:2-10, 79:24-80:19, 115:10-21, 130:3-15, 188:7-20.

Ecuador," "did any kind of new site inspection," "did any kind of new sampling," or indeed, did "environmental testing of any kind." Ex. 6 at 1652:17-1653:17.

Thus, the new expert reports are devoid of any real basis for their findings. As one of the new experts admitted, their reports would not be admissible as expert testimony in any U.S. Court, because, "for American courts, you truly need to have more data to support whatever you're indicating." Ex. 220 at 94:20-95:7. Yet, the new reports "jack . . . up" the damages for the same claims to $113 billion—more than quadruple the Cabrera Report's total, and 19 times Russell's $6 billion estimate of, which Russell disavowed. Ex. 129 at 1.[9]

### D. Inflicting *"damage to [Chevron's] reputation"*: Defendants Launch Public Attacks on Chevron Based on Lies to Force Chevron to Pay Up

While "litigating" the case in Ecuador, Defendants have worked to manufacture a wave of public criticism of Chevron in the United States, based on their fabricated "evidence." And Defendants have taken this pressure campaign to U.S. federal and state governmental bodies, seeking their falsely induced official actions to further their racketeering scheme. These actions were crucial because, as Donziger has explained, the ultimate objective is to do "damage to [Chevron's] reputation," put "personal psychological pressure [on] . . . their top executives," and thereby force Chevron into a massive payoff. Ex. 1, CRS-104-01-CLIP-01; Ex. 2 at 41-42.

The centerpiece of Defendants' U.S. media attack has been their false claim that Cabrera offered an "independent" and scientific perspective which "proves" Chevron's liability. For example, after the conspirators ghostwrote the supplement to the Cabrera Report filed in November 2008, Amazon Watch and the Front issued a press release falsely extolling the $27.3 billion report as the "independent" assessment by the "Special Master." Ex. 255. The press release even quoted an endorsement from "Douglas Beltman, a scientist at Stratus Consulting who, along with a team of scientists, reviewed the expert's report . . . ." *Id.*

---

[9]  The dramatic increase in damages was based in part on a recommendation made by financial backer the Burford Group. "[T]here should be interest added to the amount that Chevron unjustly earned during the contamination period. . . . Interest would significantly increase any awards granted." Ex. 414. *See also* Ex. 6 at 3887:21-3888:13.

To generate maximum pressure on Chevron to coerce it into a payoff, the conspirators have long campaigned to persuade the SEC to investigate Chevron for allegedly violating disclosure obligations.  For instance, in a January 2006, Amazon Watch sent a letter to the SEC in which it asserted, relying on Russell's $6 billion estimate, that Chevron had failed to disclose "potential liability [that] appears to exceed 10% of Chevron's asset base."  Ex. 265.  The next month, the conspirators upped their price tag to $20 billion.  In private, co-conspirator Soltani relayed to Donziger her "concern . . . that with each [press] release the amount of liability keeps climbing (first we said $2 billion, then $6 billion, then 10 billion and now 20 billion)."  Ex. 415 at 1.  Donziger told her that "[t]hese are only estimates, but they are sound estimates based first on the Russell report"—despite Russell labeling his $6 billion figure a "guesstimate" "based upon a week of looking at the sites, without any scientific data."  Ex. 130 at DONZ00036210-11.

Since 2008, Defendants have continuously touted the findings in the so-called "independent" Cabrera Report in their demands for official action.  For instance, Yanza, Fajardo, and Donziger sent a letter to the U.S. Trade Representative, in which they falsely described the Cabrera Report as the work of the "impartial court-appointed special master," who had "evaluated" the case and determined "damages of between $7 billion and $16 billion."  Ex. 268 at 4.  In April 2009, Donziger falsely stated to the U.S. House of Representatives that "[t]he best and most recent *independent* estimate available of the human health impact of this contamination is provided by the expert appointed by the court, Richard Cabrera."  Ex. 269 at 7 (emphasis added).  Fearing that Stratus subcontractor Richard Clapp might distribute his report with his own name on it to a Congressman, Beltman urgently emailed Donziger:  "We have to talk to Clapp about that 5-pager, and how we have to limit its distribution.  It CANNOT go into the Congressional Record as being authored by [Clapp]."  Ex. 188 at STRATUS-NATIVE061311.

Defendants also perpetuated these falsehoods in U.S. courts.  In September 2007, Donziger and his co-conspirators induced a consultant, Mark Quarles, to sign a declaration attesting to Cabrera's independence, which Ecuador filed in its action against Chevron in this District.  Ex. 333.  Quarles recently testified that his declaration was based on Donziger's specific

misrepresentations that Cabrera had written his work plan, Ex. 334 at 115:20-116:4, 118:3-25—which Donziger, Maest, and their collaborators actually drafted.  Ex. 6 at 2163:17-21, 2165:4-6, 2406:7-11; *see* Ex. 1, CRS-189-00-CLIP-02; Ex. 2 at 223-27.  When the lawyers realized that they would only be compounding their fraud by continuing to tout Cabrera as independent, they brought on new lawyers to make the same points.  Ex. 6 at 2325:3-2326:25, 2331:2-2337:21, 2353:2357:23, 2385:24-2387:25.  And in January 2010, the Lago Agrio Plaintiffs filed a com-plaint in this District to stop Chevron's Bilateral Investment Treaty arbitration, which alleged that "[e]nvironmental remediation experts from the United States have reviewed the Cabrera re-port and found its conclusions reasonable . . . ."  Ex. 94, ¶ 31.  The conspirators did not disclose that those same experts—Stratus and its subcontractors—wrote the Cabrera Report.

The conspirators also sought to increase pressure on Chevron by targeting its sharehold-ers, potential investors, and stock analysts with lies and distortions.  In a May 2008 appearance on Fox News, Kohn insinuated that Chevron had concealed information from shareholders, stat-ing that "[t]here was, for the very first time, a disclosure of even the existence of this case al-though it was originally filed in the United States in the nineties."  Ex. 254.  He also falsely de-scribed "eight and sixteen billion" as "the number that the judge's independent expert has come up with" and warned that "shareholders should be concerned about the image of Chevron."  *Id.*

In May 2009, in apparent response to a communication from Defendants, New York's Attorney General sent Chevron a letter inquiring about Chevron's disclosures related to the Lago Agrio Litigation: "As I understand the allegations, a technical expert has admitted that if the plaintiffs prevail in the litigation, damages assessed against Chevron may be as high as $27 bil-lion."  Ex. 271 at 1.  Amazon Watch sent Chevron shareholders a letter accusing Chevron of "omit[ting] critical facts about its liability in Ecuador" and noting that "New York State Attorney General Andrew Cuomo has opened a probe of the company . . . on precisely this issue."  Ex. 276 at 1.  Among the "facts" Amazon Watch claimed Chevron was hiding was that "a team of independent experts appointed by the court to assess damages" had supposedly found contamina-tion caused more than 1,400 cancer deaths, and that "100% of Texaco's former production sites

are highly contaminated, according to the independent court damages assessment." *Id.*

### III.  The Cover-Up:  Defendants Attempt to Hide and Complete the Ongoing Fraud

When Chevron commenced 28 U.S.C. § 1782 discovery proceedings in U.S. courts, Defendants embarked on a campaign of witness tampering and obstruction to prevent their ongoing conspiracy to defraud and extort Chevron from being discovered and foiled.

For instance, when the Northern District of Georgia court issued a subpoena ordering Dr. Calmbacher to appear for a deposition, Donziger contacted Calmbacher to try to stop him from testifying.  Ex. 136 at 144:14-146:3.  Donziger threatened that testifying could pose "real problems" for Dr. Calmbacher and could result in a "potential law case against" him because "they're going to go after [him] for unprofessional behavior." *Id.* at 144:24-145:7.  When asked at his deposition whether "Donziger [was] trying to convince [him] not to come and testify," Dr. Calmbacher testified:  "Very much so.  Very much so." *Id.* at 145:8-10.

And when Chevron sought discovery from Stratus, the Lago Agrio Plaintiffs intervened and told the District of Colorado that their only contacts with Cabrera were through document submissions via the Ecuadorian court in 2008.  Ex. 300 at 32:21-33:7.  In support of this lie, they filed a sworn declaration from Fajardo, who falsely attested that Cabrera was "independent" and that Defendants' contact with him was pursuant to court orders issued in 2008.  Ex. 316.  Doing their part, Stratus principals told their counsel, who relayed to the U.S. court, that they were "astonish[ed]" to see "similarity" between their work and the Cabrera Report, and that Stratus did not have "an opportunity to review Cabrera's report in draft form."  Ex. 300 at 40:10-12, 69:8-14.  Meanwhile at Stratus, Beltman held staff meetings in an attempt to influence employees' potential testimony, misrepresenting Stratus's role in ghostwriting the Cabrera Report.  Ex. 190 at 28:11-31:13.  David Chapman, who attended the April 2007 meeting with Donziger about which damages categories to include in the Cabrera Report, falsely testified that he had no reason to believe that Stratus had provided work product to Cabrera.  Ex. 158 at 137:4-8.  Chapman acted pursuant to Defendants' plan.  As Emery Celli lawyer Andrew Wilson crowed, "Chapman did an excellent job of not remembering anything . . . ."  Ex. 296 at 1.

Amongst themselves, the co-conspirators could not deny what became increasingly obvious:  "[T]he core basis for [Chevron's] 1782 is nevertheless apparently correct: neither Cabrera nor plaintiffs disclosed a submission from plaintiffs that contained drafts of part of the expert report written by Stratus," as Jay Horowitz (then Stratus's local counsel in Colorado), wrote to Jonathan Abady, Ilann Maazel, and Andrew Wilson of Emery Celli Brinckerhoff & Abady LLP ("Emery Celli"), and Donziger in an e-mail exchange dated May 12-16, 2010.  Ex. 185 at 1.  To this, Abady responded: "As far as I can tell, the possible 'problem' with our Cabrera relationship is twofold – wholesale adoption of Stratus work product w/o attribution (11 of 17 annexes) and the meetings he may have had w local counsel (see potential disclosure of *Crude* footage)."  *Id.* Thus, by the date of this e-mail the lawyers on this e-mail exchange knew that "the *Crude* footage would disclose that Cabrera had met with local Ecuadorian counsel for the Lago Agrio plaintiffs."  Ex. 6 at 3864:21-3865:6.

At one point, Defendants planned to try to block Chevron's Section 1782 application to Stratus by asserting that Chevron's application was a fraud, on the theory that Chevron knew all along that Stratus had written the Cabrera Report.  Exs. 12, 185.  Aside from the troubling fact that this would have required Defendants to "come clean" on their relations with Cabrera, it eventually became clear to Stratus's lawyer that this "theory" was false.  As he informed Donziger and other conspirators, after reviewing the "Comments" on the Cabrera Report that Stratus published after Cabrera's two reports were released:

> These *"comments"* are written in a manner to give the impression that Cabrera was entirely independent and conducted his own research and came up with his own findings. There is no indication in this document that Stratus, ostensibly the company of experts independent from Cabrera, was itself involved in "ghosting" the Cabrera report.  This might not be dispositive if there were other evidence showing that Chevron had actual or constructive knowledge that Stratus had been involved in the creation of the Cabrera report.  In such a case Stratus's "comments" may have been a rather crude and awkward  spin by a biased expert - but it would not have been a "fraud" upon Chevron.  But, in the absence of such evidence, *then it appears not only that Cabrera and [the Lago Agrio] plaintiffs can be charged with a "fraud" respecting the former's report, but that Stratus was an active conspirator.*

Ex. 12 at 1 (emphases added).  This statement expressly acknowledges Defendants' ongoing

30

fraud, and Stratus's active part in it.

As might be expected, when faced with these facts of deception and subterfuge, more than one set of counsel withdrew.  On May 24, 2010, John V. McDermott of Brownstein Hyatt Farber Schreck, LLP—who had been Stratus's counsel—explained the reasons for withdrawing:

> On March 24, 2010, when BHFS withdrew, we did not feel that we had a Rule 11 basis to file an opposition to Chevron's subpoenas.  Notably, despite our repeated requests to you, we had not received the pertinent documents and information that were necessary to support the arguments we had discussed as being the main reasons to oppose the subpoenas . . . .  We were concerned by Jeff Shinder's abrupt decision to no longer be involved in the case—which he advised us of the day after he met with numerous witnesses in Boulder. . . .  Shinder told us that after meeting with the witnesses, he was concerned that despite your representations to us that Stratus' work with the Ecuadorian expert complied with Ecuadorian procedure and was proper, he understood the opposite to be true.

Ex. 310 at 1.

There can be no doubt that Defendants have recognized that their denials of collusion with Cabrera did not square with the facts.  In May 2010, one of the Lago Agrio Plaintiffs' U.S. lawyers wrote that their claim that Cabrera "considered" Stratus's work "seems like way too much of a stretch considering that Cabrera's report, or substantial annexes to it, are in fact the consultant's work.  This is far more than 'circumstantial evidence'; this is, indeed, a '"hand in glove" showing'. . . ."  Ex. 308 at 7.  Fajardo admitted it was a "Truth" that "the plaintiffs (that is, us) have worked in collusion with expert Cabrera."  Ex. 258.  Yet Defendants continued to try to block and stall discovery, while they worked on the Ecuadorian court to quickly enter the predetermined judgment.  On December 17, 2010, that court issued the *autos para sentencia*, closing the evidentiary phase and signaling the end of the litigation.  Ex. 338.  Thus, Defendants are now on the cusp of obtaining the fraudulent judgment that have long sought.

## ARGUMENT

## I.  Chevron Is Likely to Succeed on the Merits and Obtain a Permanent Injunction

### A.  Chevron Is Likely to Secure Permanent Injunctive Relief Under RICO

Injunctive relief is proper where a defendant has committed or intends to commit a RICO

violation, and "exhibits a reasonable likelihood of committing future violations." *United States v. Philip Morris USA, Inc.*, 566 F.3d 1095, 1131 (D.C. Cir. 2009).  Defendants have engaged in a multi-year, many-pronged conspiracy to extort a multi-billion dollar payment from Chevron through sham litigation, fraud, money laundering, obstruction, witness tampering, and a massive campaign of false publicity.  They have sustained this conspiracy despite significant setbacks, including exposure of their fraudulent conduct, and have responded by merely upping the ante of claimed damages.  Defendants' persistence shows that it is not merely a likelihood, but a virtual certainty, that, if not enjoined, they will continue to engage in racketeering activity.

### 1. Private Entities May Seek Injunctive Relief Under RICO

This Court "ha[s] jurisdiction to prevent and restrain violations of [18 U.S.C.] section 1962 . . . by issuing appropriate orders, including, but not limited to . . . imposing reasonable restrictions on the future activities . . . of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in . . ."  18 U.S.C. § 1964(a).  Section 1964(a) "both confers jurisdiction on the district courts and specifies certain remedial powers that the courts will have in cases brought before them."  *NOW, Inc. v. Scheidler*, 267 F.3d 687, 697 (7th Cir. 2001), *rev'd on other grounds*, 537 U.S. 393 (2003).[10]  Though §§ 1964(b) and (c) specifically authorize further relief for certain types of plaintiffs, nothing in those sections undermines the more general authorization of injunctive relief in § 1964(a).  *See NOW*, 267 F.3d at 697 ("Given that the government's authority to seek injunctions comes from the combination of the grant of a right of action to the Attorney General in § 1964(b) and the grant of district court authority to enter injunctions in § 1964(a), we see no reason not to conclude, by parity of reasoning, that private parties can also seek injunctions under the combination of grants in §§ 1964(a) and (c).").

---

[10]  The Second Circuit has relied on § 1964(a) as support for the government's right to seek a permanent injunction under RICO, finding that such an injunction "did not exceed the scope" of the "broad discretion and latitude" held by the district courts pursuant to § 1964(a) "in enjoining violators from activities that might lead to future violations"  *United States v. Private Sanitation Indus. Ass'n*, 995 F.2d 375, 377 (2d Cir. 1993).

This reading is confirmed by the Supreme Court's recognition that Congress intended RICO to be liberally construed.  *See Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993) (quoting Pub. L. 91-452, 84 Stat. 947, § 904(a)); *see also Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 498 (1985).  As Judge Rakoff explained in *Motorola Credit Corp. v. Uzan*, 202 F. Supp. 2d 239 (S.D.N.Y. 2002), federal courts possess a "right to grant injunctive relief in private civil actions in accordance with traditional principles of equity jurisdiction." *Id.* at 243.  "It would be extraordinary indeed if Congress, in enacting a statute that Congress expressly specified was to be 'liberally construed to effectuate its remedial purposes,' intended, without expressly so stating, to deprive the district courts of utilizing this classic remedial power in private civil actions brought under the act." *Id.*  This particular remedial power is fundamental to Congress' intent in enacting civil RICO, which was "not merely to compensate victims but to turn them into prosecutors, 'private attorneys general,' dedicated to eliminating racketeering activity." *NOW*, 267 F.3d at 698 (quoting *Rotella v. Wood*, 528 U.S. 549, 557 (2000)).  As the Seventh Circuit held, "Recognizing that the statute gives private citizens the ability to seek injunctive relief as well as damages is fully consistent with this role for civil RICO litigation." *Id.  See also In re Managed Care Litig.*, 298 F. Supp. 2d 1259, 1282-83 (S.D. Fla. 2003) (following *NOW*).[11]

---

[11]   In *AMA v. United Healthcare Corp.*, the court declined to follow Judge Rakoff's reasoning in *Motorola*, instead holding that injunctive relief is not available under RICO.  588 F. Supp. 2d 432, 445 (S.D.N.Y. 2008).  The court relied on outdated Second Circuit dicta, suggesting "doubts as to the propriety" of such relief.  *Id.* (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 741 F.2d 482, 489 n.20 (2d Cir. 1984), *rev'd on other grounds*, 473 U.S. 479 (1985), and *Trane Co. v. O'Connor Secs.*, 718 F.2d 26, 28-29 (2d Cir. 1983)).  The *AMA* court also relied heavily on an outdated Ninth Circuit opinion, which invoked "snippets of legislative history," *Scheidler*, 267 F.3d at 699, to conclude that Congress did not intend to confer a private right to seek injunctive relief.  *Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076 (9th Cir. 1986).  Commentators widely agree that the Ninth Circuit's reading of legislative history is wrong.  *See, e.g.*, Wexler, *Civil RICO Comes of Age:  Some Maturational Problems and Proposals for Reform*, 35 Rutgers L. Rev. 285 (1983) (noting that, "[i]n fact, the legislative history simply does not reflect any clear legislative intention on this issue"); Blakey & Gettings, *Racketeer Influenced & Corrupt Organizations (RICO); Basic Concepts – Criminal and Civil Remedies*, 53 Temple L. Q. 1009, 1020 n.67 (1980).  *See also Motorola Credit Corp. v. Uzan*, 202 F. Supp. 2d 239, 244 (S.D.N.Y. 2002) ("Furthermore, the Ninth Circuit's reading in *Wollersheim* of RICO's legislative history is far too narrow and wooden.").  Moreover, *AMA* court's narrow reading of RICO, like the Second Circuit's dicta, is unsupportable in light of intervening Supreme Court precedent criticizing the Ninth Circuit's method of interpreting legislative history and the unduly narrow scope that several courts of appeals gave RICO.  *See, e.g.*, *Scheidler*, 267 F.3d at 699 (noting that post-*Wollersheim* Supreme Court precedent made clear that "Congress's refusal to enact amendments to the statute . . . is a particularly thin reed on which to rest the interpretation of a statute") (citations omitted); *Sedima*, 473 U.S. at 490 (not addressing the propriety of private injunctive relief, but disapproving of the Second Circuit's "narrow construction of the statute").

### 2.   Defendants Are Engaged in a Long-Running Racketeering Scheme

To prove a violation of RICO, a plaintiff must prove that the defendants are conducting the affairs of an enterprise through a pattern of racketeering activity, and that the activities of the enterprise affect interstate commerce and injured plaintiff's business or property.  *De Falco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001).  Chevron has easily met this standard here.[12]

### a.   Defendants' Affiliation Constitutes an "Enterprise" Under § 1962(c)

The term "enterprise" includes, as relevant here, "any . . . group of individuals associated in fact although not a legal entity." § 1961(4).  "[T]he very concept of an association in fact is expansive," *Boyle v. United States*, 129 S. Ct. 2237, 2243 (2009), reaching "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981).  The only "structure" that an "association-in-fact" must have is "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*, 129 S. Ct. at 2244.  Here, Defendants worked together for years towards the common purpose of extorting money from Chevron to distribute amongst themselves and their allies.  As such, the association among Defendants constitutes an "enterprise."

### b.   Defendants Have "Conducted" the Affairs of the RICO Enterprise

RICO makes it unlawful to "conduct or participate, directly or indirectly, in the conduct of [an] enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).  "RICO liability is not limited to those with primary responsibility for the enterprise's affairs," nor to "those with a formal position in the enterprise." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).  All that is required is "*some* part in directing the enterprise's affairs." *Id.*  Indeed, a defendant is liable so long as he or she has "discretionary authority in carrying out the instruc-

---

[12]   Because RICO requires only "a minimal effect on interstate commerce," *De Falco v. Bernas*, 244 F.3d 286, 309 (2d Cir. 2001), and there can be no dispute that Defendants' activities affected interstate and foreign commerce (*see* Facts, § II.D, *supra*; Ann. Compl., § B.3), that requirement need not be further discussed.

tions of [the conspiracy's] principals." *United States v. Diaz*, 176 F.3d 52, 92-93 (2d Cir. 1999).

Defendants are all major participants in the enterprise. They planned, directed, and executed the attempted extortion. In addition to the numerous mail or wire fraud violations detailed in Appendix B to the Annotated Complaint, each Defendant also personally acted as follows:

<u>Donziger</u>, an American lawyer, is the ringleader of the scheme, and, in his own words, is "the person primarily responsible for putting [the Lago Agrio] team together and supervising it." Ex. 14 at 2. He has, personally and through the <u>Law Offices of Steven R. Donziger</u>, structured a campaign of public attacks against Chevron based on false and misleading statements, manufactured false evidence (including the reports submitted in the names of Dr. Calmbacher and Cabrera), procured baseless charges against Chevron's attorneys, colluded with Ecuadorian officials, pressured the Lago Agrio court to rule against Chevron, and caused threats to be made to Chevron directly and through its shareholders. *See* Facts, § II, *supra*; Ann. Compl., § B.

Donziger has also obstructed justice by causing documents to be filed in multiple U.S. courts falsely representing that Cabrera was an independent expert and otherwise misrepresenting Defendants' interactions with Cabrera. *See* Facts, § III, *supra*; Ann. Compl., § C. Donziger has engaged in money laundering by causing Kohn, Kohn Swift, and other U.S. investors to transfer funds to Selva Viva and the Frente in Ecuador with the intent that those funds be used to promote Defendants' criminal activity. *E.g.*, Exs. 162, 241. Donziger tampered with the testimony of Dr. Calmbacher by attempting to corruptly persuade him to refuse to testify about Defendants' scheme. *See* Facts, § III, *supra*; Ann. Compl., ¶¶ 268-88. Donziger also tampered with the testimony of Mark Quarles by concealing Defendants' involvement with Cabrera and the Cabrera Report, in order to induce Quarles to present false testimony to this Court. *See* Facts, § II.D, *supra*; Ann. Compl., ¶¶ 283-85.

Through its Executive Vice President <u>Douglas Beltman</u>, Managing Scientist <u>Ann Maest</u>, and other agents, <u>Stratus Consulting, Inc.</u> spearheaded the scheme to fraudulently ghostwrite the Cabrera Report and Cabrera's subsequent responses to Defendants' comments on that report, filling both documents with false statements about the existence of harm and Chevron's purported

responsibility for it.  *See* Facts, § II.C, *supra*; Ann. Compl., Appx. B at 32, 34-37, 39, 41-42,44, 46-51, 53-65, 75-74, 87-92, 96-100; *see also* Ex. 6 at 2253:5-11.  Beltman and Maest engaged in extortion and mail and wire fraud by publicly promoting the Cabrera Report and their answers to it as both independent and correct, despite their awareness that the Cabrera Report was neither of those things.  *E.g.*, Exs. 201, 255.  They also obstructed justice by causing their counsel to mis-represent to the U.S. District Court for the District of Colorado that Stratus was "astonish[ed]" to see the "similarity of product" between its own work product and the Cabrera Report, when Stra-tus knowingly drafted the report itself and was responsible for providing most of the Annexes to the Cabrera Report, and otherwise misrepresenting or causing to be misrepresented the relation-ship between Cabrera and Defendants.  Ex. 300 at 69:13; *see also id.* at 40:10-16.

Pablo Fajardo Mendoza has also acted to attempt to extort Chevron by participating in a campaign of public attacks based on false and misleading statements about Chevron and the Lago Agrio Litigation (including writing a letter to the U.S. Trade Representative), by manufac-turing and causing to be manufactured false evidence in both U.S. and Ecuadorian court, and by colluding with Ecuadorian governmental officials to procure baseless criminal charges against Chevron attorneys.  *E.g.*, Ex. 268 Ex. 316; Ex. 1, CRS-221-02-CLIP-01; Ex. 2 at 330-44; *see* Ann. Compl., ¶¶ 118, 120-22, 128, 186, 192-93, 224, 265, 267.  Fajardo coordinated with De-fendants Donziger, Beltman, Maest, and Stratus in ghostwriting the Cabrera Report.  *E.g.*, Ex. 1, CRS-191-00-CLIP-03, Ex. 2 at 244-246; Ex. 79 at 2.

Fajardo also traveled to the United States to plan Defendants' obstruction strategy in or-der to cover-up Defendants' wrongdoing long enough for Defendants to consummate their cor-rupt scheme.  Exs. 159, 79.  He has also engaged in obstruction of justice by causing false and misleading documents to be filed in numerous U.S. courts, including his sworn declaration, that falsely represented that Cabrera was an independent expert and that otherwise misrepresented the relationship between Cabrera and Defendants.  *E.g.*, Exs. 316, 374, 375, 378, 381, 382, 383, 384.

Luis Yanza traveled to the United States to plan how to increase the already unfounded damages number contained in the Cabrera Report, orchestrated Defendants' response to Chev-

ron's criticisms of the report, including a media strategy. Ex. 159. Yanza has managed Defendants' "private army," exerting influence over and colluding with Ecuadorian government and court officials. *See, e.g.*, Ex. 1, CRS-350-04-CLIP-02; Ex. 2 at 422-24; Ex. 229; Ann. Compl., ¶¶ 73-75, 194, 197. Yanza also attempted to extort Chevron through a campaign of public attacks based on false and misleading statements (including in a letter to the U.S. Trade Representative), by manufacturing false evidence, and by pressuring Ecuadorian governmental officials to procure baseless criminal charges against Chevron's attorneys. *E.g.*, Ex. 268; Ex. 6 at 862:15-863:10, 865:21-866:22; Ex. 1, CRS-221-02-CLIP-01; Ex. 2 at 330-44.

Through the actions of its agents Fajardo and Yanza, among others, the <u>Amazon Defense Front</u> has engaged in numerous acts of extortion by manufacturing and causing to be manufactured false evidence, participating in a campaign of public attacks through its website and numerous press releases, spreading false and misleading statements about Chevron and the Lago Agrio Litigation. *See* Facts, § II, *supra*; Ann. Compl., §§ B.1, B.3.

<u>Selva Viva</u> has committed multiple acts of money laundering by causing funds to be transferred from the United States to Ecuador and acting as a conduit and then distributing agent for those funds to finance Defendants' illegal scheme. Ex. 137; *see* Ann. Compl., Appx. B at 11, 13, 15, 18, 20, 22, 24-27, 29, 33, 38, 40, 43, 45, 52, 76, 78, 82, 86, 93-95, 103, 108, 112, 114, 117-18, 120, 122-25, 128. Selva Viva has also furthered the extortionate scheme by causing the manufacture of false evidence. *E.g.*, Ex. 136 at 99:2-100:21; Ex. 138; Ex. 184 at 40:8-46:1.

### c.  Defendants Have Engaged in Multiple Acts of Racketeering Activity

Under RICO, "racketeering activity" includes: (1) "any act which is indictable under . . . section 1951 [18 USCS § 1951 (Hobbs Act)] (relating to interference with commerce, robbery, or extortion)"; (2) "any act or threat involving . . . extortion . . . which is chargeable under State law and punishable by imprisonment for more than one year"; (3) "any act which is indictable under . . . section 1341 [18 USCS § 1341] (relating to mail fraud), section 1343 [18 USCS § 1343] (relating to wire fraud)"; (3) "any act which is indictable under . . . section 1503 [18 USCS § 1503] (relating to obstruction of justice); and (4) "any act which is indictable under . . .

section 1512 [18 USCS § 1512] (relating to tampering with a witness, victim, or an informant)";
or (5) "any act which is indictable under . . . section 1956 [18 USCS § 1956] (relating to the
laundering of monetary instruments)."  18 U.S.C. § 1961(1).  Defendants have engaged in con-
duct that is indictable under each of these statutes.[13]

### (i)  Defendants Have Violated the Hobbs Act

The Hobbs Act prohibits "obstruct[ing], delay[ing], or affect[ing] commerce . . . by rob-
bery or extortion or attempt[ing] or conspir[ing] so to do."  18 U.S.C. § 1951(a).  "Extortion" is
"the obtaining of property from another, with his consent, induced by wrongful use of actual or
threatened force, violence, or fear, or under color of official right."  *Id.* § 1951(b)(2); *see United
States v. Middlemiss*, 217 F.3d 112, 118 (2d Cir. 2000) (instilling reasonable fear of economic
loss is extortionate).  Attempted extortion is also a predicate act of racketeering.  18 U.S.C.
§ 1951(a); *see also Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1346 (2d Cir. 1994).

Defendants have been and are engaged in illegal extortion under § 1951.  They have re-
peatedly stated—on film no less—that they intend to secure a judgment, not by proving any law-
ful claim to it, but by fabricating evidence, intimidating the Ecuadorian court, and colluding with
Ecuadorian officials.  *See, e.g.*, Ex. 1, CRS-195-05-CLIP-01, 350-04-CLIP-01; Ex. 2 at 260, 420.
*Cf. United States v. Enmons*, 410 U.S. 396, 400 (1973) (Hobbs Act applies where "the alleged
extortionist has no lawful claim to th[e] property").  Most recently, Defendants have sought to
increase the pressure on Chevron to pay them off by arbitrarily upping the claimed damages to
$113 billion, based on reports from new "experts" who rely heavily on the fraudulent Cabrera

---

[13]   RICO need not have extraterritorial application to reach Defendants' enterprise, which was conceived, directed,
and funded from the United States, and their predicate activities, many of which were conceived and conducted from
or within the United States, including the inducement of Dr. Calmbacher to provide a signature that would be used
on a falsified report, Stratus's ghostwriting of the Cabrera Report, numerous meetings to plan Defendants' campaign
of lies in the U.S. media, attempts to instigate U.S. governmental investigations of Chevron, and obstruction of jus-
tice and witness tampering in connection with U.S. judicial proceedings.  And all of Defendants' acts have been
aimed, ultimately, at threatening enforcement of a multi-billion-dollar judgment in the United States, in order to
extort a payment from U.S.-based Chevron.  Thus, this not a case where the "enterprise and the impact of the predi-
cate activity upon it are entirely foreign," *Cedeño v. Intech Group, Inc.*, No. 09 Civ. 9716 (JSR), 2010 WL 3359468,
at *2 (S.D.N.Y. Aug. 25, 2010), nor is it one where the enterprise had only "slim contacts with the United States,"
*Norex Petroleum Ltd. v. Access Indus., Inc.*, --- F.3d ----, 2010 WL 4968691, at *3 (2d Cir. Dec. 8, 2010).

Report and never attempted to verify the underlying data.  *See* Facts, § II.C.5, *supra*; Ann. Compl., § B.1.c.vii.  Moreover, at Defendants' urging, the Attorney General's Office of the Republic of Ecuador issued baseless charges against two former TexPet attorneys involved in the negotiation and execution of the Settlement and Release.  *See* Facts, § II.A.2, *supra*; Ann. Compl., § B.2.  The charges were filed despite two previous Prosecutors General determining that there was no evidence of fraud, Exs. 31, 441, and after Defendants purposefully increased their efforts to influence the Ecuadorian officials responsible for those charges.  *See* Ann. Compl., ¶¶ 186-196.  Co-conspirator Kohn made the "leverage" purpose of the criminal charges explicit when he noted to Donziger that the charges "may be something that we could facilitate going away at the right time . . . . if they wanted it to go away"—a statement that Donziger confirmed.  Ex. 1, CRS-170-00-CLIP-00; Ex. 2 at 159.

### (ii) Defendants' Attempted Extortion Violates New York State Law

Defendants' wrongful attempts to compel Chevron to pay a  "settlement" to stop their ongoing fraud also constitute extortion under New York law.[14]  *Streck v. Peters*, 855 F. Supp. 1156, 1163 (D. Haw. 1994) ("extortion or attempted extortion under state law" is a racketeering act).  In addition to the general extortionate scheme pursued by Defendants, New York law enumerates specific conduct that, if threatened by a defendant, supports a claim for extortion.

*First*, Defendants have threatened Chevron that, if it does not pay, they will subject it to further fraudulent and extortionate conduct.  New York Penal Law § 155.05(2)(e).

*Second*, Defendants have worked with Ecuador to "cause criminal charges to be instituted" against Ricardo Reis Veiga and Rodrigo Pérez Pallares, the two attorneys who signed the 1995 Settlement Agreement and the 1998 Final Release.  *Id*. § 155.05(2)(e).

*Third*, Defendants have manufactured a smear campaign against Chevron, which has in-

---

[14]   Extortion and attempted extortion of greater than $1 million are each felonies under New York law and constitute racketeering acts under § 1961(1).  *See* New York Penal Law § 155.42 (grand larceny in the first degree); *id.* § 110.00 (attempt to commit a crime is itself a crime); *id.* § 155.05(2)(e) (defining larceny to include extortion).

cluded false statements to U.S. governmental bodies and officials, Chevron's shareholders, and the public at large. *See* Facts, § II D, *supra*; Ann. Compl., § B.3. New York Penal Law § 155.05(2)(e) (extortion occurs by a defendant's "public[ation of] an asserted fact . . . tending to subject [it] to hatred, contempt or ridicule"). Among other things, Defendants have falsely accused Chevron of murder. *See* Ann. Compl., § B.3.e.

### (iii)  Defendants Have Engaged in Mail and Wire Fraud

Wire and mail fraud require proof that the defendants:  (1) formed a scheme or artifice to defraud, (2) used the mails, private commercial carriers, and/or wires in furtherance of that scheme, (3) with the specific intent to deceive or defraud, and (4) the scheme resulted or, if successful, would have resulted in the loss of money or property. 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud); *see also Neder v. United States*, 527 U.S. 1, 20 (1999).

Defendants' scheme to compel an unwarranted settlement for fraudulently ascribed damages constitutes a scheme to defraud. 18 U.S.C. §§ 1341, 1343; *Carpenter v. United States*, 484 U.S. 19, 27 (1987). This scheme has been undertaken with the specific intent to deceive the recipients of Defendants' fraudulent statements, *United States v. Gelb*, 700 F.2d 875, 880 (2d Cir. 1983), and has already damaged Chevron by causing it to incur substantial attorneys' fees. Defendants have also sought, through their fraud, to artificially depress Chevron's stock price. Amazon Watch has publicly claimed that as a result of the Cabrera Report, "analysts at both Barclay's and Oppenheimer are now warning Chevron investors about the Ecuador liability" and that "Barclay's called the Ecuador case a 'drag' on Chevron's stock value." Ex. 278; *see also, e.g.*, Ex. 285 ("The possibility that a judge may later this year demand damages as high as $27.5 billion, roughly one-fifth of Chevron's market capitalization, appears to have spooked some investors"). Moreover, if successful, the scheme would saddle Chevron with a massive wrongfully obtained judgment that Defendants admit intending to enforce against Chevron around the world.

Appendix B to the Annotated Complaint details numerous specific predicate acts of mail and wire fraud. Key examples include (1) Defendants' circulation of numerous emails in the course of devising and crafting the Cabrera Report and its cover-up; (2) Defendants' inducement

of Dr. Calmbacher to mail them signed and initialed pages, which Defendants used to file forged reports, *see* Facts, § II.B.1, *supra*; (3) Donziger's phone call to Dr. Calmbacher pressuring him not to testify, *see* Facts, § III, *supra*; and (4) Fajardo's and Lago Agrio Plaintiffs' filing of declarations and papers, via the federal courts' electronic filing system, that contained false and misleading statements intended to impede the operation of those courts.

### (iv)  Defendants Have Obstructed Justice

Obstruction of justice requires that (1) a federal judicial proceeding was pending, (2) of which defendants were aware, and (3) the defendants corruptly endeavored to influence, obstruct, or impede the due administration of justice therein (whether or not defendants succeeded in doing so).  18 U.S.C. § 1503; *United States v. Quattrone*, 441 F.3d 153, 170 (2d Cir. 2006).  Perjury constitutes obstruction of justice, as does  "giving false and evasive answers to questions."  *United States v. Kanovsky*, 618 F.2d 229, 230 (2d Cir. 1980).

Defendants have committed perjury before numerous federal courts to shield evidence of their extortionate scheme.  When Chevron filed a § 1782 application seeking discovery from Stratus, Defendants realized that production of their documents could subject them to criminal prosecutions and coordinated their activities in efforts to avoid those consequences.  As a co-conspirator wrote to Donziger, "Today Pablo [Fajardo] and Luis [Yanza] were kind enough to tell us what was going on in Denver . . . [T]he problem, my friend, is that the effects are potentially devastating in Ecuador (apart from destroying the proceeding, all of us, your attorneys, might go to jail). . . ."  Ex. 11.  That court-ordered discovery was "NOT acceptable."  *Id.*  Indeed, Donziger has testified that his Ecuadorian counterparts "were worried about being criminally charged if they admitted that the plaintiffs' team, including counsel, had written portions of the report that Cabrera filed under his name."  Ex. 6 at 2634:8-15.

So, in response to an inquiry from the District of Colorado seeking information about the full relationship between Cabrera and Stratus, counsel for the Lago Agrio Plaintiffs assured the court, no fewer than 14 times, that they would provide the "full picture" or "full context" in an upcoming filing.  Ex. 300 at 32:23-25, 33:20-25, 34:20-35:3, 41:5-9, 41:18-25, 42:1-5, 42:5-8,

41

63:3-6, 63:6-9, 63:11-16, 63:17-20, 67:20-21, 72:1-7, 77:1-10.  Plaintiffs' counsel told the court: "[J]ust to give you a sense, Mr. Cabrera is -- he's the author of a damages report in the Ecuadorian case."  *Id.* at 31:25-32:3.

The conspirators' subsequent presentation of the promised "full picture" further bolstered the false story they were intent on telling.  In a sworn declaration, Fajardo falsely stated that Cabrera was an independent expert whom the Lago Agrio court (not Defendants) selected: "[T]he court concluded that the global damages assessment expert would be selected from the pool of seven independent experts it previously appointed in the case.  Of the seven, the court appointed Richard Cabrera Vega . . . ."  Ex. 316 at ¶ 11.  Fajardo mischaracterized the interactions between Cabrera and Defendants by implying that Plaintiffs "delivered materials to Mr. Cabrera" only in response to two "official requests" from Cabrera (through the Ecuadorian court) for such materials.  *Id.* ¶¶ 17-18.  Fajardo further stated, falsely, that "[t]hroughout the process, by virtue of Cabrera's status as a court-appointed expert, Chevron enjoyed the same opportunity as Plaintiffs to provide materials to Cabrera supportive of its position in the litigation."  *Id.* ¶ 21.  Defendants filed Fajardo's declaration not only in Colorado and in this Court, but in at least six other courts throughout the country.[15]  Emery Celli attorney Andrew Wilson pointed out that this strategy could backfire, as "[t]he more we emphasisze [sic] [Cabrera's] neutrality the less sense it makes that we were talking to him outside of school."  Ex. 309 at 2.

Defendants used Fajardo's declaration to falsely represent to the District of Colorado that they merely delivered materials to Cabrera "*[i]n response to [Cabrera's] requests*," in support of a motion for a protective order barring any discovery from their Stratus "Consulting Experts." Ex. 320 at 13, 28 (emphasis added).  Defendants did not disclose that Stratus had written the Cabrera Report, even while recognizing that submitting a declaration without that critical information would be "misleading at best."  Ex. 410 at 1.  Emery Celli partner Illann Maazel recog-

---

[15]  Ex. 384 (S.D.N.Y.); Ex. 374 (S.D. Tex.); Ex. 375 (D.N.J.); Ex. 379 (S.D. Cal.); Ex. 281 (M.D. Tenn.); Ex. 382 (W.D.N.C.); Ex. 383 (D.N.M.).

nized the obvious deception in Defendants' filings when he wrote to Donziger and others, "I just don't see how [Fajardo] can sign an aff. that documents his submissions to Cabrera without mentioning that he sent documents that originated from Stratus, which is the one thing the judge is going to want to know." *Id.* Stratus principal David Chapman did his part to block discovery of Stratus's documents by doing "an excellent job of not remembering anything" at his deposition, Ex. 296, and falsely testifying that he had no reason to think Stratus had provided work product to Cabrera, Ex. 158 at 137:4-8.

Similarly, in order to prevent discovery of the *Crude* outtakes, Defendants made repeated misrepresentations to this Court and the Second Circuit. The Netflix version of the film contains footage showing Dr. Carlos Beristain, a member of Cabrera's allegedly independent team, "working directly" with Donziger and his co-conspirators. *Berlinger*, 709 F. Supp. 2d at 289. Filmmaker Berlinger later admitted that he had "altered the scene at the direction of plaintiffs' counsel to conceal all images of Dr. Beristain before *Crude* was released on DVD." *Id.* Defendants told this Court and the Second Circuit that Beristain's excising was "innocuous," Ex. 329 at 8, and that the outtakes contained no "evidence of a crime . . . or anything close to it," Ex. 424 at 25. In fact, Donziger and Fajardo repeatedly requested the filmmakers to alter the Beristain scene or "the entire case will simply fall apart on us." Ex. 425; *see also* Ex. 245 at JB-NonWaiver00091320. Defendants' lies to the courts were motivated by their understanding that the outtakes unambiguously confirmed the coordinated, illegal schemes they had orchestrated in their attempts to extort Chevron with the threat of legal proceedings and a judgment in Ecuador.

Defendants plainly acted "corruptly," *i.e.* with the specific intent of obstructing justice, by shielding their criminal scheme. *United States v. Schwarz*, 283 F.3d 76, 82 (2d Cir. 2002). That their cover-up was not entirely successful does not make it less criminal. *United States v. Buffalano*, 727 F.2d 50, 54 (2d Cir. 1984).

### (v) Defendants Have Illegally Tampered with Witnesses

Under § 1512(b), a defendant engages in witness tampering where he (i) knowingly (ii) engaged in intimidation, threats, misleading conduct, or corrupt persuasion toward another per-

son (iii) with intent to influence, delay, or prevent testimony or cause any person to withhold a record, object, document, or testimony (iv) from an official proceeding.  18 U.S.C. § 1512(b). The witness's testimony need not be altered, so long as the threats had a tendency to intimidate. *United States v. Capo*, 791 F.2d 1054, 1069-70 (2d Cir. 1986), *rev'd on other grounds on reh'g*, 817 F.2d 947 (2d Cir. 1987).

Dr. Calmbacher testified that Donziger attempted to dissuade him from providing testimony in the § 1782 "official proceeding" pending in the Northern District of Georgia.  Specifically, Dr. Calmbacher testified that Donziger asserted that testifying "poses real problems for [Calmbacher] and it could be a potential law case against [him] and that it would pay or be in [Calmbacher's] best interest to go in with him on quashing the subpoena," because "they're going to go after [Calmbacher] for unprofessional behavior."  Ex. 136 at 144:17-145:6.  Donziger had no evidence on which to make these assertions, which were knowingly false and thus constitute "corrupt persuasion."  *United States v. Davis*, 380 F.3d 183, 196 (4th Cir. 2004); *United States v. LaFontaine*, 210 F.3d 125, 133 (2d Cir. 2000).

Beltman tampered with the testimony of Stratus employees who could be called to testify under § 1782.  Ex. 190 at 31:9-13.  At a staff meeting, he set out the Stratus party line for the staff to follow, falsely stating that Cabrera was an "independent expert who submitted his own report to the court" and Stratus had merely "prepared a series of technical analyses" that were given to Cabrera "to help in his preparation of his report."  *Id.* at 32:19-34:22.

Defendants also tampered with the testimony of consultant Mark Quarles, whose sworn declaration, filed by Ecuador in this District, falsely attested to Cabrera's "independence."  Ex. 333, ¶ 7.  Quarles has subsequently testified that Donziger solicited and paid for this declaration, misled Quarles as to the authorship of Cabrera's work plan, and probably edited Quarles' declaration.  Ex. 334 at 96:19-22, 105:2-12, 115:20-25, 118:6-119:24.  Quarles testified that he would not have signed the declaration had Donziger not misled him.  *Id.* at 116:1-4, 121:4-122:5.  By "deliberately l[ying]" and making "culpable omissions" to Quarles to obtain false testimony, Donziger violated the statute.  *United States v. Rodolitz*, 786 F.2d 77, 81-82 (2d Cir. 1986).

### (vi)  Defendants Have Illegally Laundered Money

The federal money laundering statute prohibits the transfer or attempted transfer of funds from the United States to a foreign country "with the intent to promote the carrying on of specified unlawful activity," including RICO predicate acts such as extortion, mail fraud, and wire fraud.  18 U.S.C. § 1956(a)(2), (c)(7)(A); 18 U.S.C. § 1961.  Section 1956 applies not only to the *transmitter* of such funds, but also to a recipient of transmitted money who "caused funds to be transferred 'from a place in the United States to or through a place outside . . . with the intent to promote the carrying on of specified unlawful activity.'"  *United States v. Caplinger*, 339 F. 3d 226, 232-33 (4th Cir. 2003).  *See also United States v. Piervinanzi*, 23 F.3d 670, 673, 679 (2d Cir. 1994) (affirming conviction for attempted money laundering where defendant caused a third party to transfer funds overseas).  Each "financial transaction" constitutes a separate offense. *United States v. Holmes*, 44 F.3d 1150, 1155-56 (2d Cir. 1995); 18 U.S.C. § 1956(c).

Donziger, Yanza, the Front, and Selva Viva have, on multiple occasions, violated § 1956 by causing funds to be transferred overseas to carry out their unlawful activity.  *See* Ann. Compl., Appx. B at 11, 13, 15, 18, 20, 22, 24, 25, 26, 27, 29, 33, 38, 40, 45, 52, 76, 78, 82, 86, 93-95, 103, 108, 114, 117-18, 122-25, 128.  For instance, at the behest of Donziger and Yanza, individually and as Selva Viva officers, Kohn transported, transmitted, and/or transferred $263,000 from the U.S. to Selva Viva in Ecuador to pay Cabrera for his signature and his silence on the Cabrera Report, acts that violate 18 U.S.C. §§ 1341, 1343, and 1951.  *See*, *e.g.*, Ex. 206; Ex. 348; Ex. 351.  By Donziger's admission, Defendants also sent $10,000 to Cabrera "to calm him down" after his report was issued.  Ex. 6 at 3814-16.  Selva Viva was an entity that "[t]he Frente created . . . simply as a pass thru mechanism to administer funds for the litigation," and which "the Frente controls" and which Yanza ran.  Ex. 137.

Defendants have also arranged unlawful overseas transfers of funds from Russ DeLeon since at least 2007, and more recently from the Burford Group.  *See* Ex. 426 at 1; Ex. 6 at 78:23-24, 102:7-14.  As of April 2009, DeLeon had "invested" $1.163 million in the case and paid $6.5 million in expenses.  Ex. 427.  In 2010, DeLeon agreed to invest another $500,000.  Ex. 428 at 6.

Part of these funds were earmarked for Ecuador to "support[] the team in Quito and Lago: Pablo Fajardo, Luis Yanza," and others. Ex. 429 at 1. In the summer and fall of 2010, Donziger, Fajardo, and Yanza approached Burford, a firm that specializes in funding large lawsuits, about a potential $15 million "investment." Ex. 6 at 621:2-623:6; *see* Exs. 337, 430, 431, 432. By December, the initial funds had already been provided to support Defendants' criminal activities. Ex. 6 at 619:16-620:4, 622:9-623:24.

### d. Defendants' Racketeering Acts Constitute a "Pattern"

The "'pattern' element . . . is a 'fairly flexible concept.'" *United States v. Basciano*, 599 F.3d 184, 202 (2d Cir. 2010) (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)). Predicate acts "must be related, both to each other (horizontal relatedness) and to the enterprise (vertical relatedness), and must threaten continuous criminal activity to constitute a pattern." *Id.* "RICO's pattern element thus serves to ensure that a defendant's criminal participation in an enterprise is not merely isolated or sporadic, but indicative of the sort of continuity of criminal activity – or the threat of continuity – that is the hallmark of racketeering." *United States v. Pizzonia*, 577 F.3d 455, 465 (2d Cir. 2009).

Defendants have engaged in a prohibited "pattern" of racketeering activity. The "relatedness" requirement is satisfied where the predicate acts have "the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.*, 492 U.S. at 240 (citation omitted). Here, each of Defendants' acts of extortion, mail and wire fraud, obstruction of justice, money laundering, and witness tampering was a part of a common plan, calculated to further the common goal of inducing Chevron into an unwarranted payoff. Defendants' acts thus are related "both to each other . . . and to the enterprise." *Basciano*, 599 F.3d at 202.

The other aspect of the pattern element—"continuity"—is likewise met. At a minimum, continuity exists where, as here, "the related predicates themselves involve a distinct *threat* of long-term racketeering activity, either implicit or explicit." *H. J. Inc.*, 492 U.S. at 242. (emphasis added). For Defendants, the predicate acts are a "regular way of doing business." *Id.*

46

"'Where the enterprise is an entity whose business is racketeering activity, an act performed in furtherance of that business automatically carries with it the threat of continued racketeering activity.'" *United States v. Burden*, 600 F.3d 204, 219 (2d Cir. 2010) (quoting *United States v. Indelicato*, 865 F.2d 1370, 1383-84 (2d Cir. 1989)).  Donziger has made this threat explicit, proposing that the enterprise should "take legal fees we can earn from this case and do more cases like this in different places.  With, you know, the same team if possible."  Ex.1, CRS-200-02-03; Ex. 2 at 319.  "Continuity" accordingly exists.

### e.  Defendants' Conduct Has Proximately Caused Injury to Chevron

Chevron has been injured in a variety of ways by Defendants' conduct, including attorneys' fees, public relations expenses, damages to goodwill, and impairment of contract rights.  Such damages are recoverable where proximately caused by Defendants.  *Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158, 1167 (2d Cir. 1993) (legal fees); *Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1343 (2d Cir. 1994) (lost profits); *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 262 (2d Cir. 1995) ("injury to reputation and/or loss of goodwill").

Proximate cause requires only that the harm to the plaintiff was a "direct result" and a "foreseeable and natural consequence of" the defendant's scheme.  *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658 (2008).  Here, Chevron was the only intended and foreseeable victim of Defendants' scheme.  As in *Bridge*, the Supreme Court's most recent discussion of proximate cause, "there are no independent factors that account for [Chevron's] injury, there is no risk of duplicative recoveries by plaintiffs removed at different levels of injury from the violation, and no more immediate victim is better situated to sue."  *Id*.  As such, Chevron's injury was proximately caused by Defendants' RICO violations.

### 3.  Defendants Are Engaged in a Conspiracy to Violate RICO

Defendants have also violated RICO by "conspir[ing] to violate" § 1962(a).  18 U.S.C. § 1962(d).  Such a conspiracy exists where the defendant "agreed with others (a) to conduct the affairs of an enterprise (b) through a pattern of racketeering."  *Basciano*, 599 F.3d at 199.  As outlined above, Defendants form an association-in-fact, which has conducted its affairs through a

pattern of racketeering.  Unlike § 1962(a), a defendant may violate § 1962(d) *without* proof that

the defendant "operat[ed] or manag[ed]" the enterprise.  *Pizzonia*, 577 F.3d at 462 n.4.  Instead,

the defendant need merely know "'the general nature of the conspiracy and that the conspiracy

extends beyond [his] individual role.'"  *Id.* (citation omitted) (alteration in original).  The exten-

sive evidence of each Defendant's knowing wrongdoing, *see supra* at I.A.2.b, more than suffices

to meet this burden.  *United States v. Viola*, 35 F.3d 37, 44 (2d Cir. 1994) ("it is axiomatic that

the proof required to show that a defendant knowingly associated with an existing conspiracy

'need not be overwhelming.'") (citation omitted).[16]

### B.   Chevron Is Likely to Succeed in Its Request for Permanent Injunctive Relief Against Defendants' Tortious Acts Under State Law

#### 1.   Chevron Is Likely to Succeed in Enjoining Defendants' Ongoing Fraud

New York common law fraud requires "a misrepresentation or a material omission of fact

which was false and known to be false by defendant, made for the purpose of inducing the other

party to rely upon it," causing "justifiable reliance of the other party on the misrepresentation or

material omission, and injury."  *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1373

(N.Y. 1996).  Chevron is the intended and actual victim of Defendants' repeated provision of

knowingly false evidence to courts in the United States and Ecuador, as well as misrepresenta-

tions to the United States Congress and state and federal regulatory bodies— all with the inten-

tion of inducing these governmental bodies to take official, adverse action against Chevron.  The

details of this fraudulent scheme are pleaded with particularity and supported by ample evidence

in the Annotated Complaint.  *See* Ann. Compl. at §§ B.3c, C.  The submission of these false-

hoods to these official bodies constitutes a fraud on those courts and agencies.  *See*, *e.g.*, *Hazel-*

---

16   Nor is it necessary to show that each Defendant committed, or agreed to commit, two predicate acts of racket-
eering.  Instead, each Defendant need only "intend to further an endeavor which, if completed, would satisfy all of
the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the
criminal endeavor.  He may do so in any number of ways short of agreeing to undertake all of the acts necessary for
the crime's completion." *Salinas v. United States*, 522 U.S. 52, 65 (1997).  Here, each Defendant participated in far
more than two predicate acts of racketeering, and each Defendant knew of, and attempted to further, the scheme.

*Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944) ("deceptive attribution of authorship," and attempts to "suppress[] the truth concerning the authorship" of writing relied on it constitutes a fraud); *Garcia v. Berkshire Life Ins. Co. of Am.*, 569 F.3d 1174, 1181 (10th Cir. 2009) ("when false evidence or testimony is provided under oath, knowingly and with intent to deceive, a party commits a fraud on the court"). Even if the Lago Agrio court is, as Chevron maintains, a witting participant rather than an innocent victim of Defendants' fraud, Defendants' acts nonetheless constitute a "fraud on that court" as well. *See, e.g., Chicago Title & Trust Co. v. Fox Theatres Corp.*, 182 F. Supp. 18, 37-38 (S.D.N.Y. 1960) (where judge was bribed, there was "no question that specific facts were alleged showing . . . a fraud upon the court"). Defendants' fraudulent misconduct has already caused Chevron to expend millions of dollars defending itself.

That Defendants induced or attempted to induce third parties to act on the basis of Defendants' misrepresentations does not shield Defendants from liability for their fraudulent acts. New York courts have long recognized that fraud may "exist where a false representation is made to a third party, resulting in injury to the plaintiff." *Buxton Mfg. Co. v. Valiant Moving & Storage, Inc.*, 657 N.Y.S.2d 450, 451 (N.Y. App. Div. 1997); *Desser v. Schatz*, 581 N.Y.S.2d 796, 797 (N.Y. App. Div. 1992) (when reliance by third party to the clear detriment of plaintiff exists, "it is of no moment, in this context, that the false representation was not made directly to plaintiff"); *Cooper v. Weissblatt*, 277 N.Y.S. 709, 714 (N.Y. App. Term 1935) (similar). Indeed, the Supreme Court recently noted the "long line of cases in which courts have permitted a plaintiff directly injured by a fraudulent misrepresentation to recover even though it was a third party, and not the plaintiff, who relied on the defendant's misrepresentation," citing New York law in support. Bridge, 553 U.S. at 656 & n.7 (citing *Rice v. Manley*, 66 N.Y. 82 (1876)).

The Second Circuit has suggested that "allegations of third-party reliance . . . are insufficient to make out a common law fraud claim under New York law." *City of New York v. Smokes-Spirits.com, Inc.*, 541 F.3d 425, 454 (2d Cir. 2008), *rev'd on other grounds by Hemi Group, LLC v. City of New York*, 130 S. Ct. 983 (2010); *Cement & Concrete Workers Dist. Council Welfare Fund, Pension Fun, Legal Servs. Fund & Annuity Fund v. Lollo*, 148 F.3d 194,

196-97 (2d Cir. 1998). But, as several courts have recognized, the Second Circuit's summary treatment of the issue is contrary to New York law. For example, Judge Baer has insightfully noted the conflict between the above Second Circuit holdings and decisions from the New York Court of Appeals, and it is the latter that "represent the law of New York." *N.B. Garments (PVT.), Ltd. v. Kids Int'l Corp.*, No. 03-08041, 2004 WL 444555, at *3 (S.D.N.Y. Mar. 10, 2004). Recognizing the court's obligation to follow the state's highest court on an issue of state law, Judge Baer held that a claim based on third-party reliance is cognizable. *Id.*; *see also Hyo-sung Am., Inc. v. Sumagh Textile Co.*, 25 F. Supp. 2d 376, 383-84 (S.D.N.Y. 1998); *In re Pharm. Indus. Ave. Wholesale Price Litig.*, 685 F. Supp. 2d 186, 209 (D. Mass. 2010) (similar).[17]

Moreover, even if the Second Circuit decisions in *Smokes-Spirits.com* and *Cement & Concrete Workers* articulated a generally applicable principle of New York law regarding third-party reliance as the basis for a claim for damages, those decisions did not hold that a court is powerless to enjoin ongoing fraudulent conduct simply because the injured party did not itself "rely" on (or was forever "deceived by") the false statements. Where the other elements of fraud are met, and third-party reliance has caused or will cause the plaintiff foreseeable harm, there is no reason to allow the fraud to continue. *Cf.* RESTATEMENT (SECOND) OF TORTS § 936.

## 2.   Chevron Is Likely to Succeed on Its Claim for Unjust Enrichment

Unjust enrichment occurs where "it is against equity and good conscience to permit the defendant to retain what is sought to be recovered." *Paramount Film Distrib. Corp. v. State*, 285 N.E.2d 695, 698 (N.Y. 1972); *see also Sperry v. Crompton Corp.*, 863 N.E.2d 1012, 1018 (N.Y. 2007) (same). "When a court is called upon to exercise its equitable powers, it is axiomatic that

---

[17]  New York state cases can be reconciled with the policy behind the Second Circuit's skepticism toward third-party reliance. In short, "Third party reliance on fraud is . . . cognizable under New York law where there is a suffi-cient causal connection between a defendant's fraud and a plaintiff's injury." *In re Pharm. Indus. Average Whole-sale Price Litig.*, 685 F. Supp. 2d at 210 (citation and quotation marks omitted). In contrast, decisions prohibiting such a claim generally "address situations presenting a risk of far-flung liability for inchoate or unintended injuries." *Hyosung Am.*, 25 F. Supp. 2d at 383 & n.8. There is nothing unintended about the injuries here. Limiting the class of prospective plaintiffs to those who directly relied on Defendants' statements would eliminate the only plaintiff with an incentive to sue, allowing a massive, complex fraud to go unremedied.

it may provide whatever relief is necessary and proper to do complete justice under the circumstances between the parties." *United States v. William Savran & Assocs., Inc.*, 755 F. Supp. 1165, 1182 (E.D.N.Y. 1991); *Mayer v. Bishop*, 551 N.Y.S.2d 673, 675-76 (N.Y. App. Div. 1990). *Cf. Polito v. Polito*, 503 N.Y.S.2d 867, 869 (N.Y. App. Div. 1986) (courts have discretion "to otherwise adjust the equities between the parties so as to avoid unjust enrichment"). Chevron is likely to successfully show that a permanent injunction is warranted to stop Defendants' attempts to enrich themselves with Chevron's money and property, because, as demonstrated above, *see* Section II, *supra*, *any* enforcement of *any* Ecuadorian judgment under the facts of this case would necessarily violate fundamental principles of due process and equity.

### 3. Chevron is Likely to Succeed in Obtaining an Injunction Against Defendants' Tortious Interference with Contract

Tortious interference with contract is established by proof of (1) the existence of a valid contract between plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional procuring of the breach; and (4) damages. *Foster v. Churchill*, 665 N.E.2d 153, 156 (N.Y. 1996). Defendants have interfered with the 1998 Final Release between Ecuador, Petroecuador and TexPet, which "release[d], absolve[d] and discharge[d] TEXPET" of environmental damage in Ecuador. Ex. 46, pt. IV; *see ROE*, 376 F. Supp. 2d at 342. Whether Chevron, a beneficiary of the releases obtained by TexPet, is characterized as a party to the contract or as a third-party beneficiary, it is entitled to bring suit. *Int'l Minerals & Resources, Inc. v. Pappas*, 761 F. Supp. 1068, 1074 (S.D.N.Y. 1991) (third-party beneficiary may sue).

Defendants were aware of the 1998 Final Release, as is evidenced by their communications with Ecuador's Attorney General's Office in August 2005, discussing how to nullify the contract, Ex. 224A at 1, as well as Chevron's assertion of the 1998 Final Release as a defense to liability for the alleged environmental damage in Ecuador, Ex. 433 at 245. Defendants intentionally influenced Ecuador to breach this contract by, *inter alia*, failing to perform its share of the remediation, refusing to defend TexPet's right to be free of environmental claims, and actively supporting the Defendants in a scheme to extort money for precisely the harms Ecuador

had agreed were conclusively resolved.  Moreover, Defendants are actively attempting to procure a further breach by obtaining a judgment against Chevron that is contrary to the terms of the 1998 Final Release.  As a result of Defendants' tortious conduct, Chevron has already suffered monetary damages in the form of litigation costs and loss of goodwill and injury to business reputation.  Moreover, Chevron is entitled to injunctive relief to prevent future impairment of the 1998 Final Release.  *Telerate Sys., Inc. v. Caro*, 689 F. Supp. 221, 233-34 (S.D.N.Y. 1988) (injunctive relief awarded to prevent the potential degradation of plaintiff's network).[18]

### 4.  Chevron Is Likely to Succeed on Its Claim for Trespass to Chattels

Under New York law, a "'trespass to a chattel may be committed by intentionally . . . using or intermeddling with a chattel in the possession of another,' where 'the chattel is impaired as to its condition, quality, or value.'"  *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (quoting RESTATEMENT (SECOND) OF TORTS § 217(b)).  Courts have recognized that harm to business reputation and goodwill is actionable on a trespass-to-chattels theory, as "recovery may be had for a trespass that causes harm to something in which the possessor has a legally protected interest."  *Compuserve Inc. v. Cyber Promotions, Inc.*, 962 F. Supp. 1015, 1022-23 (S.D. Ohio 1997); *see also America Online v. IMS*, 24 F. Supp. 2d 548, 550 (E.D. Va. 1998).  Defendants' widespread dissemination of false statements about Chevron's conduct in Ecuador has interfered with Chevron's reputation and goodwill, and with Chevron's use of its own resources, by diverting millions of dollars to defend against fraudulent accusations.  Injunctive relief is a proper remedy for such a trespass.  *See, e.g.*, *Register.com*, 356 F.3d at 404; *see also eBay, Inc. v. Bidder's Edge*, 100 F. Supp. 2d 1058, 1069, 1071-72 (N.D. Cal. 2000).

### C.  Chevron Is Likely to Succeed on Its Claim for Declaratory and Injunctive Relief Against Attempts to Recognize or Enforce the Lago Agrio Judgment

Given the evidence of fraud and corruption already adduced—including direct evidence

---

[18]   The scope and enforcement of the Settlement and Release Agreements as against the Ecuador is before the Treaty Arbitration Tribunal.  Here, Chevron seeks complementary relief to prevent these Defendants—none of whom can be a party to the Treaty Arbitration—from tortiously interfering with the Agreements.

of Defendants' strategy of manufacturing astronomical "damages" figures expressly so the Ecuadorian court can enter a lower number that Defendants will then try to trumpet as evidence of the court's impartiality (*see* Facts, § II.B.2, *supra*)—*any* Lago Agrio judgment will be unrecognizable under New York law and the U.S. Constitution.

### 1. Declaratory and Injunctive Relief at This Stage Is Authorized and Proper

#### a. Declaratory and Injunctive Relief Against Recognition Is Appropriate

"[W]here a party against whom a foreign judgment is entered is likely to suffer large and/or catastrophic losses as a result of another party's self-enforcement of the foreign judgment, the party facing the losses can initiate a declaratory judgment action and seek injunctive relief." *Italverde Trading, Inc. v. Four Bills of Lading*, 485 F. Supp. 2d 187, 213 (E.D.N.Y. 2007).[19] The Declaratory Judgment Act, 28 U.S.C. § 2201(a), empowers this Court to issue a declaration of nonrecognition/unenforceability. *See Wilton v. Seven Falls Co.*, 515 U.S. 277, 282-83 (1995). And this Court may issue a permanent injunction preventing Defendants and all those acting in concert with them from seeking to recognize or enforce the judgment, in order to protect its declaration of non-recognition. *Farrell Lines Inc. v. Columbus Cello-Poly Corp.*, 32 F. Supp. 2d 118, 124, 129-31 (S.D.N.Y. 1997) (issuing declaratory judgment and enjoining foreign litigation, noting "a federal court in the proper situation has the authority to enjoin a party from prosecuting a suit in a foreign jurisdiction even before the domestic action reaches judgment"), *aff'd*, 161 F.3d 115 (2d Cir. 1998).[20] *See also* § I.D, *infra* (discussing propriety of anti-suit injunction).

#### b. The Declaratory Relief Action Presents a Ripe Controversy

The Declaratory Judgment Act allows declaratory relief to issue in "a case of actual con-

---

[19]   Although the concepts of "recognition" and "enforcement" are legally distinct, because the judgment in this case will neither be recognizable nor enforceable reference to either concept is intended to capture both concepts.

[20]   The Burford Group, which is funding Defendants' litigation and would likely bankroll its enforcement efforts as well, is Defendants' co-conspirator, and thus this Court has the power to enjoin its financing of the fraudulent scheme. *Cf. Georgia v. Pa. R.R. Co.*, 324 U.S. 439, 463 (1945) ("In a suit to enjoin a conspiracy not all the conspirators are necessary parties defendant.").

troversy." 28 U.S.C. § 2201(a).  This requirement is practically indistinguishable from general Article III "ripeness."  *See Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985).  Thus, for the same reasons this case is "ripe," it presents an "actual controversy." Whether a case is ripe depends on (1) "the fitness of the issues for judicial decision" and (2) "the hardship to the parties of withholding court consideration."  *Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 808 (2003); *see also Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967).  Even though no Ecuadorian judgment has yet issued, both elements are met here.

*Fitness of Issues for Judicial Decision.*  A judgment in Lago Agrio is imminent and apparently inevitable.  On December 17, the court reissued the *autos para sentencia*, which formally closed the evidence and vested the court with authority to enter a judgment at any time. Ex. 338.  Defendants' own words make clear that a judgment for the Lago Agrio plaintiffs is a foregone conclusion.  Donziger has confirmed that no judge will rule against Defendants because, although he might not actually be killed, "he thinks he will be . . . . [w]hich is just as good."  Ex. 1, CRS-129-00-CLIP-02; Ex. 2 at 70; *see* Ex. 1, CRS-032-00-CLIP-01; Ex. 2 at 11. All that remains to be publicly revealed is the judgment's precise amount.  Despite their fraud, Defendants' internal documents make clear that Defendants intend to immediately initiate global recognition and enforcement efforts:  "Plaintiff's Team expects to be engaged quickly, if not immediately, on multiple enforcement fronts – in the United States and abroad. . . . Consistent with their aggressive approach, Plaintiffs' Team will look for ways to proceed against Chevron on a pre-judgment [attachment] basis, largely as a means of attaining a favorable settlement at an early stage."  Ex. 341 at 12, 14.  *See also* § II, *infra*.  Thus, there is a ripe legal controversy.

In addition, under the facts of this case, a number of key recognition issues are already well developed both factually and procedurally, and can be resolved even in the absence of the Ecuadorian court's specification of a precise dollar amount.  For example, the evidence of Ecuador's systemic lack of impartial tribunals is well-established (*see* § III.C.2.c, *supra*), and even if additional evidence of the fraud perpetrated in this case would be both relevant and likely to strengthen Chevron's argument in the future, it is more than sufficient to justify commencement

of a claim for declaratory relief and warrant preliminary injunctive relief at this time.  Similarly, the fact that the Ecuadorian court did not have proper personal jurisdiction over Chevron is presently fit for decision.  *See* N.Y. C.P.L.R. § 5304(a)(2); *Osorio v. Dole Food Co.*, 665 F. Supp. 2d 1307, 1324 (S.D. Fla. 2009) (recognition "requires that the rendering court possess . . . personal jurisdiction over the defendants.") (citation omitted).

Ripeness does not invariably require that a final foreign judgment be entered before the issues are fit for judicial decision.  To the contrary, "[w]hat is required is that the interest[] . . . in postponing review until the question arises in some more concrete and final form, be outweighed by the interest of those who seek relief from the challenged action's 'immediate and practical impact.'"  *Cont'l Air Lines, Inc. v. Civil Aeronautics Bd.*, 522 F.2d 107, 124-25 (D.C. Cir. 1975) (footnote and citation omitted); *see also Farrell*, 32 F. Supp. 2d at 122 (granting declaratory relief precluding Italian court's determination of liability and enjoining defendants from maintaining any foreign suit); *SR Int'l Bus. Ins. Co. v. Allianz Ins. Co.*, 343 Fed. App'x 629, 632 (2d Cir. 2009) (in spite of contingent underlying damages claims, declaratory action to determine whether the insured or the insurer stood to recover on those claims was ripe).[21]

*Hardship of Withholding Consideration*.  Although the consequences of a prospective judgment and enforcement action are difficult to predict and cannot be estimated with precision, as set forth in § II, *infra*, Defendants will have the opportunity to inflict severe hardship on Chevron if this Court declines to consider the declaratory relief issues until after judgment is entered.  Defendants will continue to publicly threaten a massive judgment in their attempt to extort

---

[21]  This case is distinguishable from *Dow Jones & Co. v. Harrods, Ltd.*, 237 F. Supp. 2d 394, 408-09 (S.D.N.Y. 2002), *aff'd* 346 F.3d 357 (2d Cir. 2003).  There, the request for declaratory relief in the United States preceded the filing of the foreign litigation by five days, *id*. at 401-02, and accordingly, the court did "not find enough immediacy and reality in Dow Jones' claim at this early stage of the London Action to warrant declaratory relief," *id*. at 408.  Chevron has compiled an extensive evidentiary record documenting the massive extent of the fraud that permeates every aspect of the Lago Agrio Litigation.  A judgment against Chevron for billions of dollars is a foregone conclusion, and Defendants have consistently professed their intent to immediately seek to enforce judgment.  Therefore, Chevron does not present a string of "premature concerns about contingencies that may or may not come to pass" to this Court, *id*., but rather asks the Court to find that Chevron "'does not have to await the consummation of threatened injury to obtain preventive relief.  If the injury is certainly impending, that is enough.'"  *Thomas v. Union Carbide Agric. Prods.*, 473 U.S. 568, 581-82 (1985).

a settlement, in order to attempt to harm Chevron's reputation.  And they may succeed in wrongfully seizing some of Chevron subsidiaries' assets abroad before this Court can grant relief.  Defendants plan to use this threat of disruption to "move quickly to bring Chevron to the table . . . and negotiate a favorable settlement before Chevron becomes entrenched in fighting enforcement."  Ex. 341 at 28.  By Defendants' own admission, they will seek to "seize assets, seize boats" if a judgment is entered, and their entire goal will be to cause "a significant disruptive impact on the company's operations."  Ex. 93 at 7; Ex. 92 at 1.

### c.  The Second Circuit Declaratory Judgment Factors Compel a Declaration of Non-Recognition and Unenforceability

Not only does a ripe controversy exist, but all five factors the Second Circuit applies to determine whether the court should exercise its discretion to issue declaratory relief also compel relief here.  *See N.Y. Times Co. v. Gonzales*, 459 F.3d 160, 167 (2d Cir. 2006).  When, as here, either of the first two factors are present, the Court *must* entertain the declaratory relief action.  *Continental Cas. Co. v. Coastal Sav. Bank*, 977 F.2d 734, 737 (2d Cir. 1992).

*First*, "the judgment will serve a useful purpose in clarifying or settling the legal issues involved."  *Gonzales*, 459 F.3d at 167.  Among other things, this court will be able to declare any judgment arising from Lago Agrio unrecognizable as a result of pervasive fraud and the absence of due process or fair and impartial tribunals.

*Second*, Chevron requires declaratory "relief from [the] uncertainty" and insecurity that now exists whereby at any moment a massive, fraudulent judgment could issue in Ecuador, triggering Defendants' plans to seek immediate disruption by launching multiple enforcement actions.  *Gonzales*, 459 F.3d at 167.  "The Declaratory Judgment Act was designed to relieve potential defendants from the Damoclean threat of impending litigation which a harassing adversary might brandish, while initiating suit at his leisure – or never."  *Japan Gas Lighter Ass'n v. Ronson Corp.*, 257 F. Supp. 219, 237 (D.N.J. 1966).  Here, "the adverse positions have crystallized and the conflict of interests is real and immediate," *id.*, making declaratory relief proper.

*Third*, Chevron is not attempting to use declaratory relief as a means of "'procedural

fencing' or race to res judicata," or as "strategic forum-shopping motivated by pursuit of a tactical advantage over an opponent." *Gonzales*, 459 F.3d at 167; *Dow Jones & Co., Inc. v. Harrods, Ltd.*, 237 F. Supp. 2d 394, 440 (S.D.N.Y. 2002).  Instead, Chevron is engaged in a good-faith attempt to seek protection from an imminent attempt to enforce a fraudulent judgment.

*Fourth*, as for whether a declaratory judgment "would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court," *Gonzales*, 459 F.3d at 167, the injunction Chevron requests does no more than maintain the status quo to ensure that the anticipated judgment may be reviewed in a thoughtful and orderly manner.  This result does not cause "friction" with Ecuador, *Gonzales*, 459 F.3d at 167, which has no legitimate interest in seeing its judgment rushed through in jurisdictions that are politically favorable to the Lago Agrio Plaintiffs.  Furthermore, a declaration that a judgment is not enforceable in the United States—or any other country outside Ecuador—does not encroach upon the domain of a Lago Agrio court, but rather is a proper exercise of this Court's discretion to prevent a corrupt and fraudulent foreign judgment from being enforced by persons within this Court's jurisdiction, and to give relief to a party within its jurisdiction that is a victim of a massive fraud.  *Cf. Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 421 (1964), *superseded by statute on other grounds* ("If a transaction takes place in one jurisdiction and the forum is in another, the forum does not by dismissing an action or by applying its own law purport to divest the first jurisdiction of its territorial sovereignty; it merely . . . makes applicable its own law to parties or property before it.").

*Finally*, Chevron has no "better or more effective remedy" against the continuing actions of the Defendants.  *Gonzales*, 459 F.3d at 167.  The Lago Agrio court has yielded to Defendants' pressure and denied Chevron a fair trial.  Now, with the evidence period closed and on the eve of judgment, declaratory relief that the judgment is unenforceable is essential to safeguard Chevron from further, irreparable harm by the Defendants.  Chevron has initiated international arbitration under the Bilateral Investment Treaty to obtain relief from the Republic of Ecuador's violations of international law and treaty obligations in connection with its failure to honor its contractual agreements.  The Lago Agrio Plaintiffs and other parties named in this complaint are not and

cannot be parties to the Treaty Arbitration, and Ecuador has asserted sovereign immunity against claims filed in courts of the United States.  Thus, to ensure complete relief, Chevron must pursue both, complementary legal avenues against the two sets of different defendants.  Granting declaratory relief here serves the purpose of the Declaratory Judgment Act, which is to "afford a speedy and inexpensive method . . . to settle legal rights and remove uncertainty and insecurity from legal relationships without awaiting a violation of the rights or a disturbance of the relationships."  *Beacon Constr. Co. v. Matco Elec. Co.*, 521 F.2d 392, 397 (2d Cir. 1975).  Likewise, these factors also support a permanent injunction in support of the declaration.  *See* § I.D, *infra* (addressing propriety of injunctive relief).

### 2.  It Is Already Clear That the Lago Agrio Judgment Is Unrecognizable and Unenforceable

There is an overwhelming likelihood of success in establishing the unenforceability of any Lago Agrio judgment against Chevron because Defendants have relied on fraud to obtain any such judgment and the Ecuadorian judicial system fails to provide a fair and impartial tribunal or basic guarantees of due process.  The Recognition Act and/or the U.S. Constitution bar recognition and enforcement in such circumstances.  N.Y. C.P.L.R. § 5304(a)(1-4); *Hilton v. Guyot*, 159 U.S. 113, 193, 202 (1895); *Bridgeway Corp. v. Citibank*, 45 F. Supp. 2d 276, 286 (S.D.N.Y. 1999), *aff'd*, 201 F.3d 134 (2d Cir. 2000).

### a.  The Lago Agrio Proceeding and Any Judgment Arising Therefrom Is the Product of an Fraud

The above-detailed scheme represents a highly compelling basis to deny recognition based on fraud, a longstanding statutory ground for non-recognition.  N.Y. C.P.L.R. § 5304(b)(3).  It goes virtually without saying that it constitutes a fraud when "the unsuccessful party has been prevented from exhibiting fully his case, by fraud or deception practiced upon him by his opponent"; when an officer of the court "connives at his defeat . . . [or] corruptly sells outs . . . to the other side"; or when "there has never been a real contest in the trial or hearing of the case."  *Tamimi v. Tamimi*, 328 N.Y.S.2d 477, 479-80 (N.Y. App. Div. 1972); *see also United States v. Throckmorton*, 98 U.S. 61, 65-66 (1878).

Over the seven-year history of the case, Defendants have presented multiple fabrications to the Lago Agrio court (including Dr. Calmbacher's supposed report), as well as to U.S. courts. *See*, *e.g.*, *Garcia*, 569 F.3d at 1174 ("when false evidence or testimony is provided under oath, knowingly and with intent to deceive, a party commits a fraud on the court"). Moreover, as detailed in the Complaint, Defendants installed Cabrera and the supposedly "neutral" expert, met with him to arrange his work, and ultimately wrote the report, *see* Ann. Compl., § B.1.c., including "figur[ing] out to whom [Cabrera] will attribute each of the annexes," carried out the orchestrated fraud. Ex. 47 at STRATUS-NATIVE043858. Defendants paid Cabrera over $263,000 for his participation in this fraud. Ex. 206; *cf. Transportes Aereos Pegaso, S.A. de C.V. v. Bell Helicopter Textron, Inc.*, 623 F. Supp. 2d 518, 538 (D. Del. 2009) (denying enforcement of a Mexican judgment on the basis of fraud where, among other things, a court-appointed expert had solicited a bribe from the defendant).

The new reports that Defendants have submitted do not cancel their fraud. Indeed, Defendants concocted those reports in an attempt to further conceal and consummate their fraud. *See Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1121 (1st Cir. 1989) ("Once a litigant chooses to practice fraud, that misconduct infects his cause of action, in whatever guises it may subsequently appear."). Defendants have long colluded with Ecuadorian officials to make sure that the Lago Agrio court enters the desired judgment. In light of this pattern of misconduct, it is clear that the Ecuadorian court's imminent judgment is the unenforceable product of fraud. Collusion between a party and a judicial officer constitutes fraud of the highest order. *See*, *e.g.*, *In re Bridgestone/Firestone, Inc. Tires Prod. Liab. Litig.*, 470 F. Supp. 2d 917, 925-26 (S.D. Ind. 2006), *rev'd on other grounds*, 533 F.3d 578, 593-94 (7th Cir. 2008) (refusing to recognize Mexican judgment where plaintiffs had colluded to obtain improper contacts with a judge).

### b.  The Ecuadorian Judicial System Does Not Provide Impartial Tribunals and Violates Due Process

To be recognizable and enforceable, any foreign judgment must be the product of a fair and impartial tribunal and a system which provides procedures compatible with due process.

*Hilton*, 159 U.S. at 202, 205; N.Y. C.P.L.R. § 5304(a)(1); *Bridgeway*, 45 F. Supp. 2d at 286

(party seeking enforcement bears burden of proving it derives from "regular proceedings con-

ducted under a system that provides impartial tribunals and procedures compatible with due

process."). Without question, the judgment Defendants will obtain will utterly fail.

   ***Fair and Impartial Tribunals.*** In order to determine whether a foreign system affords

fair and impartial tribunals, U.S. courts consider whether (i) "judicial officers were subject to

political and social influence," (ii) judges were "highly regarded for impartiality," and (iii) "cor-

ruption and incompetent handling of cases were prevalent." *Bridgeway*, 45 F. Supp. 2d at 287;

*see Soc'y of Lloyd's v. Ashenden*, 233 F.3d 473, 476 (7th Cir. 2000). In this analysis, courts of-

ten rely heavily on State Department and other objective reports. *E.g.*, *Bridgeway Corp. v. Citi-*

*bank*, 201 F.3d 134, 142-43 (2d Cir. 2000); *Bank Melli Iran*, 58 F.3d at 1411-12. Here, Defen-

dants' own words conclusively establish Ecuador's failure to provide impartial tribunals. *E.g.*,

Ex. 1, CRS-052-00-CLIP-05, 052-00-CLIP-06, 350-04-CLIP-01; Ex. 2 at 16, 18, 419; Ex. 14 at

24; *see Donziger*, 2010 WL 4910248, at *12 ("Donziger repeatedly referred to the Ecuadorian

judicial system as 'weak,' 'corrupt,' and lacking integrity.").

   Overwhelming evidence confirms Defendants' statements. The U.S. Department of

State's most recent Human Rights Report details Ecuador's "corruption and denial of due proc-

ess within the judicial system" and concluded that the judiciary was "susceptible to outside pres-

sure and corruption." Ex. 118 at 1, 4; *see also* Ex. 230. The World Bank's Worldwide Govern-

ance Indicators from 2009 ranked Ecuador below the 10th percentile of all countries surveyed

with respect to the "rule of law," a substantial drop from the 24th percentile in 2004. Ex. 117.

   In late 2004, then-President of Ecuador, Lucio Gutiérrez, and his congressional allies re-

placed *almost all members* of Ecuador's top three judicial tribunals. Álvarez Decl., ¶ 30. In

2005, Gutierrez dismissed all the Supreme Court justice, leaving the country without a Supreme

Court for much of the year. Álvarez Decl., ¶ 31. President Correa compounded the problems,

threatening to purge one of Ecuador's top tribunals (and in fact purging another) when those tri-

bunals opposed his manipulation of the legislature and drafting of a new Constitution. Álvarez

Decl., ¶ 37.  As the Pichincha Bar Association in Ecuador noted in March 2010, judges are, as a result of "insults and accusations, oftentimes unfounded," "weaker, more submissive, and true to the political interest of the [current administration]."  Ex. 434.  In June, Ecuador's National Judicial Council issued a resolution that "the Judicial Branch is not independent."  Ex. 435 at 1.

This politicization and corruption of the Ecuadorian judiciary are exemplified by the improprieties in the present case, including bribery, improper *ex parte* meetings, and lack of a fair hearing for Chevron.  *See, e.g.*, *Bridgeway*, 45 F. Supp. 2d at 287 (refusing to recognize Liberian judgment where "a reasonable factfinder could only conclude that, at the time the judgment at issue here was rendered, the Liberian judicial system was not fair and impartial and did not comport with the requirements of due process").  Indeed, Defendants have admitted that the Ecuadorian courts are corrupt and not impartial.  *See, e.g.*, Ex. 1, CRS-052-00-CLIP-05, CRS-052-00-CLIP-06, CRS-053-02-CLIP-03; Ex. 2 at 16, 18, 26; *see Donziger*, 2010 WL 4910248, at *12. Chevron is thus highly likely to prevail on this ground.

***Failure to Afford Procedures Compatible With Due Process.***  "It has long been the law of the United States that a foreign judgment cannot be enforced if it was obtained in a manner that did not accord with the basics of due process."  *Bank Melli Iran*, 58 F.3d at 1410; N.Y. C.P.L.R. § 5304(a)(1); *Griffin v. Griffin*, 327 U.S. 220, 228-29 (U.S. 1946) ("due process requires that no other jurisdiction shall give effect, even as a matter of comity, to a judgment elsewhere acquired without due process").  Although a foreign legal system need not share every aspect of U.S. jurisprudence, it "must abide by fundamental standards of procedural fairness," *Cunard S.S. Co. v. Salen Reefer Servs.*, 773 F.2d 452, 457 (2d Cir. 1985).  "It is axiomatic that '[a] fair trial in a fair tribunal is a basic requirement of due process.'"  *Caperton v. A. T. Massey Coal Co., Inc.*, 129 S. Ct. 2252, 2259 (2009) (quotation omitted) .

The Lago Agrio proceedings illustrate that the Ecuadorian judicial system ignores five of the most basic and fundamental components of due process:  (i) that any adjudication take place before a neutral and unbiased decisionmaker, free of external influence; (ii) that basic principles of corporate organization be recognized in determining jurisdiction and liability; (iii) that univer-

sal principles of *res judicata* and nonretroactivity be respected; (iv) that property be taken only after sufficient notice and a meaningful opportunity to respond; and (v) that liability and damages be assessed only upon proof of causation.  *See* Ann Compl. at 58-67, 72-93, 408-416.  Indeed, as Judge Kaplan has observed, the *Crude* outtakes "contain statements by Donziger that the Ecuadorian court system is corrupt, that the Lago Agrio plaintiffs can prevail only by pressuring and intimidating the courts, and that the facts have to be twisted to support the plaintiffs' theories." *Donziger*, 2010 WL 4910248, at *4.

### D.  Chevron Has Met the Standard for an Anti-Suit Injunction

Chevron seeks an injunction precluding Defendants and all those acting in concert with them from taking any action to recognize or enforce any Lago Agrio judgment in any other court, domestic or foreign.  Chevron does not seek to prevent entry of the Lago Agrio judgment itself.  "The power of federal courts to enjoin foreign suits by persons subject to their jurisdiction is well-established." *China Trade & Dev't Corp. v. M.V. Choong Yong*, 837 F.2d 33, 35 (2d Cir. 1987).  The factors guiding decisions to prohibit a defendant from commencing or continuing a foreign suit are clearly satisfied in this case.  *See id.* at 36-37.

First, the parties must be sufficiently "similar."  *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 652 (2d Cir. 2004).  This requirement is satisfied where, as here, a defendant is "named in the [foreign] action chiefly on the basis of its aspects of identity with" the defendant in the U.S. action.  *Id.*  Defendants are all affiliated with the Lago Agrio Plaintiffs and their lawsuit, and are named in connection with their purported advocacy of their interests.  *See also Motorola Credit Corp. v. Uzan*, No. 02 Civ. 666 (JSR), 2003 U.S. Dist. LEXIS 111, at *6 (S.D.N.Y. Jan. 7, 2003) (finding first requirement met where "the real parties in interest are the same in both matters").

Second, the resolution of the case before this Court would be dispositive of Defendants' foreign suits.  *Karaha Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 500 F.3d 111, 121 (2d Cir. 2007).  If this Court resolves that Defendants have engaged in criminal acts fundamentally tainting the judgment and should be enjoined from enforcing the

judgment, that holding would resolve any future suits seeking to enforce that same judgment. *See Paramedics Electromedicina*, 369 F.3d at 653-54.

The Lago Agrio Litigation also "threatens the jurisdiction of the enjoining forum," *i.e.*, this Court. *China Trade*, 837 F.2d at 36. This Court has jurisdiction over Defendants, who have availed themselves of the protection of this forum, and authority to resolve whether Defendants engaged in a pattern of racketeering activity. If Defendants are permitted to simultaneously pursue the fraudulent Ecuadorian judgment in foreign courts, that would "undermine federal jurisdiction to determine whether [those judgments] should be invalidated on the basis of the fraud." *Karaha Bodas*, 500 F.3d at 126. Furthermore, Defendants impermissibly seek "to evade important policies of the forum by litigating before a foreign court." *China Trade*, 837 F.2d at 37. The very reason Defendants would *not* seek to enforce their judgment here, and instead seek a foreign forum, would be to evade the strong public policies *against* a judgment obtained through fraud, corruption of the judicial system, and collusion with foreign government officials.[22]

### E. At the Very Least, Chevron Has Shown Sufficiently Serious Questions Going to the Merits to Make Them a Fair Ground for Litigation

As set forth above, Chevron is likely to succeed on the merits of its claim for injunctive relief under RICO and pursuant to a declaration of unenforceability. At the very least, even if at this preliminary stage the Court could not conclude that Chevron is *likely* to succeed, Chevron has raised serious questions concerning Defendants' conduct and its entitlement to relief. Because, as outlined below, "the costs outweigh the benefits of not granting the injunction," the likelihood of success standard is also met for this reason. *Citigroup Global Mkts., Inc. v. VCG*

---

[22] The remaining *China Trade* factors also support an anti-suit injunction here. 837 F.2d at 35. The judgment Defendants will seek to enforce via multiple enforcement actions around the world is invalid under any reasonable system of justice, as it is based on fraud. Moreover, the enforcement actions would be part of Defendants' scheme to extort a massive payment from Chevron. These actions are the prototype of "vexatious" litigation, *i.e.*, "instituted maliciously and without good grounds, meant to create trouble and expense for the party being sued." Black's Law Dictionary 1701 (9th ed. 2009). Further, allowing Defendants to proliferate their fraudulent scheme would be contrary to the core dictates of equity. And Defendants' stated purpose in launching these actions is to inflict "inconvenience" and "expense" on Chevron, to pressure it to pay up. *China Trade*, 837 F.2d at 35.

*Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).

## II.    Absent Injunctive Relief, Chevron Will Suffer Irreparable Harm

An injunction is necessary because, "but for the grant of equitable relief, there is a sub-stantial chance that upon final resolution of the action the parties cannot be returned to the posi-tions they previously occupied." *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999).  Defendants have repeatedly rejected requests from U.S. courts that they ask the Ecuadorian court to await the resolution of U.S. discovery proceedings, and that they not seek to accelerate the Ecuadorian judgment.  *See, e.g.*, *In re Application of Chevron Corp.*, No. 10 MC 00002(LAK), 2010 WL 4861351, at *3 (S.D.N.Y. Nov. 30, 2010).  Indeed, Defendants have done the exact opposite, actively pressing the Ecuadorian court to swiftly enter judgment so as to preclude presentation of Chevron's fraud evidence "to both the Ecuadorian court and the arbitra-tion before an ultimate decision with regard to the underlying litigation is reached."  Ex. 324 at 23:24-24:5; *see also* Ex. 436 at 28:14-17 (counsel "[a]bsolutely" admits "urging the Ecuadorian court to issue an opinion and a decision as quickly as possible"); Ex. 437 at 14:7-12 (Judge Kap-lan observing, "What I see here is a race, and at the moment, the petitioners are in imminent jeopardy, and [the Plaintiffs] have not offered to stop the race.  What they want to do is they want to tie the legs of the competing horse in the race.").  That judgment is now imminent.

Defendants have also made it very clear, in public statements, recorded private conversa-tions, and internal memoranda, that they will move to immediately enforce the fraudulent Ecua-dorian judgment.  When Judge Sand asked Defendants, in their suit to stay Chevron's BIT arbi-tration, whether they were "willing to stipulate that [they] will take no efforts to enforce the judgment until . . . the arbitration is completed," counsel categorically stated, "We would not and cannot do that."  Ex. 345 at 84:11-12.  Donziger has vowed:  "[W]e're coming back *immediately, as soon as we can*, to get that judgment enforced.  *We are not waiting for the appeals process*, as is our right."  Ex. 1, CRS-482-00-CLIP-01; Ex. 2 at 450 (emphases added).

From the start, Defendants' plan has been to seek to enforce the Ecuadorian judgment in the United States, not only because "[i]t clearly is the locus of a high concentration of Chevron

assets," but because a favorable U.S. judgment "should significantly grease the wheels of en-

forcement elsewhere." Ex. 341 at 12-13.  As Defendants have laid out in an internal memoran-

dum entitled, "Invictus – Path Forward: Securing and Enforcing Judgment and Reaching Settle-

ment," they will—"[c]onsistent with their aggressive approach"—"look for ways to proceed

against Chevron on a pre-judgment basis, largely as a means of attaining a favorable settlement

at an early stage." *Id.* at 14.

Defendants have also prepared to launch multiple enforcement actions and asset seizures

around the world, and are assembling a team to "seize assets, seize boats," wherever Chevron

subsidiaries operate.  Ex. 93 at 7.  Given the string of U.S. court orders condemning Defendants'

fraud, Defendants recognize that they may be unable to enforce the Ecuadorian judgment in the

United States.  *See* Ex. 341 at 17.  So they plan to expand their attack globally, starting in "juris-

dictions that offer the path of least resistance to enforcement." *Id.* at 12; *see id.* at 19 ("Patton

Boggs' current and former representation of numerous, geographically diverse foreign govern-

ments means that barriers to judgment recognition in a given country may not necessarily pre-

clude enforcement there."); Ex. 344 (co-conspirator Hinton outlined strategy of "seizing assets in

other countries").  In fact, Defendants may not even wait for the judgment to be entered and have

discussed "ask[ing] the judge to immediately rule to attach <u>Chevron</u>'s property or accounts, for

the amount indicated in the <u>Cabrera</u> report, just as a precautionary measure."  Ex. 443 at 1.

The costs of even a temporary seizure of Chevron's assets or those of its subsidiaries

could be substantial, and unlikely to be remediable after the fact.  Those costs would include not

only direct economic harms for which Defendants will be unable to compensate Chevron, but

also harms to business relationships, goodwill, and other intangible assets.  Defendants concede

as much, acknowledging the "significant disruptive effect on the company's operations" that

their immediate enforcement will have.  Ex. 92 at 1.  But as the "Invictus" memo demonstrates,

although Defendants recognize that Chevron will describe the Ecuadorian judgment as  "illegiti-

mate and the product of corruption," they hope their enforcement attempts will pressure Chevron

into a payment because of "Chevron's discomfort with having an enforceable judgment on the

books, and with the uncertainty surrounding the manner in which Plaintiffs will seek to enforce that judgment, will create a window of opportunity for settlement." Ex. 341 at 28.

And even purely monetary injuries can constitute irreparable harm justifying preliminary injunctive relief where, though "theoretically compensable," "as a practical matter, the defendant would not or could not respond fully for those damages . . . ." *Drobbin v. Nicolet Instrument Corp.*, 631 F. Supp. 860, 912 (S.D.N.Y. 1986); *Rockwell Int'l Sys., Inc. v. Citibank, N.A.*, 719 F.2d 583, 586-88 (2d Cir. 1983); *Brenntag*, 175 F.3d at 249-50. Chevron's injury would be irremediable in this sense, since none of the Defendants has substantial assets which Chevron or the subsidiaries that Defendants are likely to target could hope to recover the losses from seizures of oil tankers or other disruptions of their operations.

Moreover, should Defendants successfully enforce any portion of the judgment, they may not retain the overwhelming majority of the award, but rather 90 percent may go to the Ecuadorian government. *Donziger*, 2010 WL 4910248, at *6; *see In re Application of Chevron Corp.*, No. 10 MC 00002 (LAK), 2010 WL 4922312, at *11 (S.D.N.Y. Nov. 30, 2010). Even if this Court finds at the conclusion of trial that Chevron is entitled to recover any improperly enforced award, that ruling would be hollow since Ecuador is unlikely to return the money. Indeed, *Defendants* recognize the difficulty of retrieving funds from Ecuador, and for this reason have been "arranging for receipt of any funds recovered against the judgment through payment agents in the United States and thereafter dividing those funds outside the Republic of Ecuador," which "would have the practical effect of keeping the funds outside the immediate reach of Ecuadorian law upon recovery and would permit any adjudication of fee-splitting to take place in a carefully considered forum." Ex. 341 at 28; *see also* Ex. 6 at 2706:5-2709:4.

## III. The Balance of Hardships Favors Chevron

In weighing the harms affecting Chevron and Defendants, "[t]he relevant harm is the harm that (a) occurs to the parties' legal interests and (b) cannot be remedied after a final adjudication, whether by damages or a permanent injunction." *Salinger*, 607 F.3d at 81. As outlined above, Chevron will suffer irreparable monetary and non-monetary injury if Defendants are not

enjoined from enforcing the Ecuadorian judgment.  In contrast, Defendants would suffer only a slight, potential delay in enforcement.  Because there is no reasonable basis on which to contend that Chevron would become insolvent or unreachable by U.S. courts, any monetary award necessary to remedy any harm Defendants suffered from a delay could easily be assessed against, and collected from, Chevron.  Moreover, the only effect of such an injunction would be to require Defendants to litigate judgment recognition in this District—precisely what they urged Judge Sand and the Second Circuit to require of Chevron.  Mem. of Law in Support of Motion for Preliminary Injunction at 17, *Republic of Ecuador v. Chevron Corp.*, No. 09 Civ. 9958 (LBS), 2010 U.S. Dist. LEXIS 25487 (S.D.N.Y. Mar. 16, 2010); *see also* Brief for Plaintiffs-Appellants at 15, *Republic of Ecuador v. Chevron Corp.*, No. 10-1020-cv (L), 10-1026-cv (CON) (2d Cir. May 17, 2010).  The balance of harms favors Chevron "decidedly." *Salinger*, 607 F.3d at 79.

## IV.    The Public Interest Counsels in Favor of an Injunction

As described above, U.S. public policy favors the rule of law and the rendering of judicial decisions by impartial tribunals, not influenced by fraud.  As the Supreme Court recognized in a similar, but far less egregious case involving a ghostwritten article represented in litigation as the neutral position of an independent expert:  "[T]ampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant.  It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society." *Hazel-Atlas Glass Co.*, 322 U.S. at 246.  Defendants' repeated fabrication of evidence, scare tactics against the Ecuadorian court, tampering with witness testimony, and obstruction in U.S. legal proceedings undermine the administration of justice.  Denying recognition where a fraudulent scheme secures a favorable foreign judgment discourages such schemes in the future.  The public interest strongly weighs in favor of an injunction.

## V.    The Court Should Authorize Alternative Methods of Service

This Court should order service by alternate means under Federal Rule of Civil Procedure 4(f)(3).  Specifically, the Court should authorize (1) e-mail service on Fajardo and Yanza; (2)

service upon the 47 individual Defendants (the Lago Agrio Plaintiffs) by means of e-mail service on Fajardo, who has represented to this Court that he is their attorney with a broad power of attorney; (3) service upon Selva Viva by means of email and/or mail; and (4) service upon the Front by means of email and/or mail..

Rule 4(f)(3) permits a court to direct service on a defendant in a foreign country by any "means not prohibited by international agreement." "The decision whether to allow alternate methods of serving process under Rule 4(f)(3) is committed to the sound discretion of the district court." *RSM Prod. Corp. v. Fridman*, No. 06 Civ. 11512 (DLC), 2007 WL 1515068, at *1 (S.D.N.Y. May 24, 2007) (citation and internal quotation marks omitted). Such service must comport with due process, which requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* at * 1.[23]

Fajardo, Yanza, the 47 individual Defendants, Selva Viva, and the Front all reside or are located in Ecuador. The only treaty between the United States and Ecuador touching on service issues, the Inter-American Convention on Letters Rogatory ("IACLR"), contemplates the possibility of service of U.S. process in Ecuador by means of letters rogatory. But that method is not reasonably feasible in the circumstances of this case, and it is not required by the treaty. The U.S. State Department warns that "[l]etters rogatory are a time consuming, cumbersome process and should not be utilized unless there are no other options available." *See* U.S. Dep't of State, Service of Legal Documents Abroad—Service by Letter Rogatory, available at http://travel.state.gov/law/judicial/-judicial_680.html#rogatory (noting "habitual time delays of up to a year or more in execution of the requests"). And the IACLR does not require service of

---

[23] Chevron also requests that the Court authorize it to serve the papers in support of its application by order to show cause for a temporary restraining order and preliminary injunction in the same manner that it seeks to serve the summons and complaint. *Cf. SEC v. Int'l. Fiduciary Corp.*, No. 06 CV 1354, 2007 WL 7212109, *2–5 (E.D. Va. Mar. 29, 2007) (holding sufficient the service, at the same time and in the same manner as the complaint, of papers supporting a motion for temporary restraining order by any means permitted by Rule 5.).

process by this cumbersome method.  *See Mayatextil, S.A. v. Liztex U.S.A.*, No. 92 CIV.

4528(SS), 1994 WL 198696, at *5 (S.D.N.Y. May 19, 1994) (Sotomayor, J.) (stating that "[t]he

Convention merely provides one possible method of service" and "is neither mandatory nor ex-

clusive").  Chevron's risk of imminent harm underscores how poorly suited letter-rogatory are to

the exigent circumstances here.

    Courts have authorized email service pursuant to Rule 4(f)(3).  *See, e.g.*, *Rio Props., Inc.

v. Rio Int'l. Interlink*, 284 F.3d 1007, 1017 (9th Cir. 2002) (upholding order for service of proc-

ess on Costa Rican defendant by e-mail as not only proper, but "the method of service most

likely to reach [the defendant]"); *Prediction Co. LLC v. Rajgarhia*, No. 09 Civ. 7459(SAS), 2010

WL 1050307, at *2 (S.D.N.Y. Mar. 22, 2010) (granting motion to serve Indian defendant by cer-

tified mail upon defendant's U.S. attorney and by e-mail to e-mail address he previously used to

communicate with plaintiff).  The evidence before the Court shows that the Fajardo and Yanza

send and receive messages from e-mail accounts, *see e.g.*, Exs. 454; 245; 351; 79; 156; and 348.

and thus service through those accounts is "reasonably calculated . . . to apprise [them] of the

pendency of the action and afford them an opportunity to present their objections."  *RSM Prod.

Corp.*, 2007 WL1515068, at * 1.  In addition, Fajardo has acknowledged "the pendency of the

action" in the press.  *See* Ex. 451.

    With respect to the 47 individual Defendants, Chevron seeks to serve them through their

agent Fajardo.  Courts have permitted service upon a party's agent or attorney pursuant to Rule

4(f).  *See, e.g.*, *Ehrenfeld v. Mahfouz*, No. 04 Civ. 9641(RCC), 2005 WL 696769, *3 (S.D.N.Y.

Mar. 23, 2005); *Forum Fin. Group, LLC v. President, Fellows of Harvard College*, 199 F.R.D.

22, 25 (D. Me. 2001).  Pursuant to a power of attorney executed that Fajardo has sworn to this

Court that 41 of the 47 individual Defendants executed in 2010, Fajardo "may appear before

judges or courts of justice, arbitration or mediation, both in Ecuador and the United States of

America or any other country on the planet, defend the interests of the PRINCIPAL in all legal

actions brought by or against the PRINCIPAL . . . ."  *In re Applic. of Chevron*, No. 10 MC

00002, Dkt. 165-2, at 2 (LAK).  He is thus "in communication with" and "know[s] how to lo-

cate" those individuals, and so service upon him is reasonably calculated to apprise them of this action. *See Ehrenfeld*, 2005 WL 696769, *3.

Additionally, this Court should authorize service of Selva Viva and the Front by email and/or mail. *See Ryan v. Brunswick Corp.*, No. 02-CV-0133E(F), 2002 WL 1628933, *2 (W.D.N.Y. May 31, 2002) (authorizing service of Taiwanese company by mail, fax and/or by email listed on defendants' website); *Philip Morris USA Inc. v. Veles Ltd.*, 2007 WL 725412, *3 (S.D.N.Y. March 12, 2007) ("[T]he alternative means of service by email and fax in this case was reasonably calculated to apprise defendants of the pendency of this action."). The Front's website provides its contact information, including the email address of casotexaco@-gmail.com, an email that Yanza and others associated with the Front use.[24] *E.g.*, Exs. 445, 458. Additionally, Selva Viva also uses email for its business activities and has a mailing address. *E.g.*, Ex. 451, 453. Because Selva Viva and the Front "conduc[t] [their] business[es] through these means of communication, such are reasonably calculated to apprize [Selva Viva and the Front] of the pendency of this action and afford it an opportunity to respond." *Ryan*, 2002 WL 1628933, *2.

## CONCLUSION

Given the overwhelming evidence of Defendants' racketeering scheme and corruption of the Lago Agrio Litigation, and the irreparable harm that Chevron would suffer absent equitable relief to maintain the status quo, the Court should enter the requested preliminary injunction.

Dated: February 3, 2011
    New York, New York

                    Respectfully submitted,
                    GIBSON, DUNN & CRUTCHER LLP

                    By: *Randy M Mastro*
                        Randy M. Mastro
                    200 Park Avenue, 47th Floor
                    New York, New York 10166-0193
                    Telephone: 212.351.4000

---

[24] Moreover, the Front already has notice of the pendency of this action, as its English-language organ, the Amazon Defense Coalition, has put out a press release commenting on it. *See* Ex. 457.

Facsimile:  212.351.4035

Scott A. Edelman
2029 Century Park East
Los Angeles, California 90067
Telephone: 310.552.8500
Facsimile:  310.551.8741

Andrea E. Neuman
3161 Michelson Drive
Irvine, California 92612
Telephone: 949.451.3800
Facsimile:  949.451.4220

William E. Thomson
333 South Grand Avenue
Los Angeles, California 90071
Telephone: 213.229.7891
Facsimile:  213.229.6891

Attorneys for Chevron Corporation

101002225_12.DOC