# KOHN, SWIFT & GRAF, P.C.

ONE SOUTH BROAD STREET, SUITE 2100

PHILADELPHIA, PENNSYLVANIA 19107-3304

JOSEPH C. KOHN
ROBERT A. SWIFT
GEORGE W. CRONER
ROBERT J. LAROCCA
DENIS F. SHEILS *◊
DOUGLAS A. ABRAHAMS *
WILLIAM E. HOESE
STEVEN M. STEINGARD *
STEPHEN H. SCHWARTZ †
CRAIG W. HILLWIG
ELKAN M. KATZ
CHRISTINA D. SALER *
NEIL L. GLAZER †
JARED G. SOLOMON

(215) 238-1700
TELECOPIER (215) 238-1968
FIRM E-MAIL: info@kohnswift.com
WEB SITE: www.kohnswift.com

E-MAIL: JKOHN@KOHNSWIFT.COM

HAROLD E. KOHN
1914-1999

OF COUNSEL
MERLE A. WOLFSON
LISA PALFY KOHN

† ALSO ADMITTED IN NEW YORK
◊ ALSO ADMITTED IN NEVADA
* ALSO ADMITTED IN NEW JERSEY

August 9, 2010

Pablo Fajardo
Luis Yanza
Humberto Piaguaje

Ermel Chavez
Hugo Payaguaje
Emergildo Criollo

Dear Sirs:

I received your letter on July 29, 2010 in which you state you are terminating our agreement with you as your attorneys. I must say that I am personally saddened and professionally disappointed by what has happened to our attorney-client relationship and to the case. I believe your decision to remove our firm, which is the culmination of several years of actions and decisions on your part and, primarily, on Mr. Steven Donziger's ("Donziger") part, has already damaged the case severely and will continue to damage it in the future, perhaps irreparably. I am also shocked by recent disclosures concerning potentially improper and unethical, if not illegal, contacts with the court-appointed expert, Mr. Cabrera, which are coming out in the U.S. discovery proceedings being initiated by Chevron. Not only did we not know of any of this conduct, it is contrary to assurances that Donziger and you made to us on numerous occasions.

I believe that Donziger's influence and positions have interfered with and ultimately damaged our relationship beyond repair. His actions, in turn, have been driven by what appear to us to be his efforts to control all matters in the case, make all decisions, keep our firm in the dark, withhold documents and information from us, interfere with and block our efforts to meet and discuss issues in the case in a meaningful way, keep secrets from us, prevent questioning of any of his actions or decisions, and prevent discussion between and among the professionals working for you. We do not know the extent of your awareness of or involvement in any of this, but it is now clear that at least he intentionally misled us, and simply used this firm as a source of funds for himself, for others, and for other expenses he unilaterally deemed appropriate. Increasingly, I have come to realize that my firm and I were deceived, in part apparently driven by a combination of Donziger's conceit and naivete, a dangerous combination which is leading the case rapidly towards disaster.

66886

KOHN, SWIFT & GRAF, P.C.          CONTINUATION SHEET NO. 2          MR. PABLO FAJARDO
                                                                    MR. LUIS YANZA
                                                        MR. HUMBERTO PIAGUAJE
                                                                MR. ERMEL CHAVEZ
                                                            MR. HUGO PAYAGUAJE
                                                        MR. ERMERGILDO CRIOLLO

AUGUST 9, 2010

Your most recent letter repeats some of the same themes and untruths which Donziger has been promoting for some time. I do not intend to set forth an exhaustive discussion here but do need to respond with the true facts to the false and incomplete points in your letter. I also attach my prior letter of November 19, 2009, which addressed our overall relationship, which I request you share with your communities, along with this letter.

First, this firm has not breached any agreements with you or failed to meet our obligations under any agreements. Please be advised that while we still would like to engage in amicable dialogue with you, we assert and reserve all of our rights to recover our expenditures and attorneys' fees under our agreement, and if necessary we will do so through all appropriate legal actions. There is no agreement which requires, as Donziger and now you suggest, that this firm must pay whatever sums to Donziger and others that he demands, for his own account and otherwise, while our firm is excluded from participation in the decision making and budgeting process, lied to about the status of the case and your actions, and information is otherwise withheld from us. Furthermore, I have reiterated in writing (email dated December 11, 2009) and in our meeting in April, 2010, that we were prepared to continue to pay necessary and appropriate litigation expenses. In addition, I proposed to you involving several other prominent law firms in the case who were willing to discuss joining the case and making substantial contributions of both expenses and lawyer time. These proposals were completely ignored by you. You never asked to meet with these firms, or even have a phone call with them, even though, as I said, they were willing to pay expenses and not seek fees for themselves until the end of the case. From the materials I gave you about two of these firms in April, you can see that these firms have 30 years of experience in environmental, human rights, and other major cases, a far better record than any of the firms that Donziger has obtained who have appeared in the matters in the United States. I can only assume that you ignored these opportunities at Donziger's insistence because he thought that he could not exercise complete control over matters if firms of this type were involved, and that because I was recommending them, they would not acquiesce in his plans and efforts to remove us from the case.

Second, you state that I unilaterally sent letters to certain consultants and that has impacted the case. I believe you are referring to letters I sent last November informing Ms. Hinton and Mr. Beltman that, without our firm's prior approval, they should not expect to be paid by this firm for efforts requested by others. Ms. Hinton spoke to me shortly after that, said she perfectly understood my position, and that she wished to continue working on the case and I understand she has. Mr. Beltman also sent me a cordial confirmation. Also, Donziger told me during a meeting in March, 2010 that his friend Mr. DeLeon has advanced additional funds pursuant to an agreement directly with you, and he obtained a "loan" from a friend of Mr. Barnes.

Third, you state that we have attempted to force you to propose a settlement negotiation. That is completely untrue and devoid of facts, and sounds like another of Donziger's fantasies. On November 10, 2009 I sent you a detailed letter setting forth my views, as a lawyer, of the possible benefits of pursuing a settlement negotiation at that time. You wrote

66886

KOHN, SWIFT & GRAF, P.C.                CONTINUATION SHEET NO. 3                MR. PABLO FAJARDO
                                                                                 MR. LUIS YANZA
                                                                                 MR. HUMBERTO PIAGUAJE
                                                                                 MR. ERMEL CHAVEZ
                                                                                 MR. HUGO PAYAGUAJE
                                                                                 MR. ERMERGILDO CRIOLLO

                                                                                 AUGUST 9, 2010

back shortly after that, summarily rejecting the ideas set forth in my letter. You never sought to discuss the matter with me or exchange ideas and strategies. I attach another copy of that letter and request that you discuss it with your communities, as the points raised in it are as important now as they were then, perhaps even more so. Indeed, the developments of the last year under Donziger's control have only hurt the case, and the chances for a settlement, dramatically.

       Fourth, you say there needed to be dialog between the legal team. I agree. As we explained in prior letters and in detail at our meeting in April we had been trying for well over a year to have a meeting of the entire legal team to discuss all issues and all pending motions, etc., including offers during 2009 to meet with the team in Ecuador, but Donziger repeatedly interfered with and ultimately blocked any such meeting, saying that it would not be "helpful" or "efficient.". He told us we could not meet with Juan Pablo when he was in the United States to meet with the Winston firm last summer. Throughout 2009 we asked for information on numerous issues, including any drafts of the final submission. I have requested in writing in January, 2010 and again at our April meeting the drafts of the final submission and you have never forwarded anything to us in response. We put substantial time into trying to analyze, among other things, what requirements would need to be met to enforce a judgment against Chevron in the United States (or under general international standards), and we made clear to Donziger on numerous occasions that this analysis had to inform final submissions to the Lago Agrio court, or at the very least that the lawyers in Ecuador needed to be fully briefed on it. All of this was to be in preparation for anticipated litigation against Chevron in the United States following entry of a judgment in the plaintiffs' favor, but we were stonewalled constantly on our requests for information, documents, records, etcetera. How can you expect our work on something when you never sent us any of the documents we requested?

       Fifth, you state that Pablo, Luis and Humberto did not spend much time with us when we met in April and that I maintained a hostile attitude. You, not us, determined the scheduled time for the meeting. I had said we would spend as much time as you wanted to spend. You left after several hours to attend a party in New York and meet with Donziger and law firms he was trying to involve in the case. At our meeting Luis and Pablo stated several times that the points I raised were "important" and "necessary to be discussed." They stated it was right to put everything on the table, and you acknowledged that "mistakes had been made" and there should not be one person in "control" of all aspects of the case. I stated we were willing to (a) fund necessary and appropriate litigation expenses, (b) provide the efforts of myself and the three additional lawyers who had worked on the case as well as other experienced lawyers as needed, (c) take the lead in addressing the United States litigation including possible discovery from Chevron (which no one has yet begun), and (d) approach other leading United States firms to join the team, and gave you voluminous resumes of two such firms. As I mentioned above, you, presumably under Donziger's direction, ignored these proposals and never made any further inquiries concerning involving these firms.

       After the meeting you informed me that a Mr. Ecouomou was working on a new "financing" arrangement and agreements among the legal team and that I should meet with him.

66886

KOHN, SWIFT & GRAF, P.C.          CONTINUATION SHEET NO. 4          MR. PABLO FAJARDO
MR. LUIS YANZA
MR. HUMBERTO PIAGUAJE
MR. ERMEL CHAVEZ
MR. HUGO PAYAGUAJE
MR. ERMERGILDO CRIOLLO

AUGUST 9, 2010

At your request, I did.  Mr. Ecouomou is a non-lawyer who was acting as a sort of broker to obtain funding for the case for a fee.  After our meeting I sent him a short list of questions.  He responded shortly thereafter saying I had a right to get answers to those questions, but since that time I have heard nothing further from him.

Aside from your termination of the attorney-client relationship, there are important points which I must restate, and request that you share with the communities.

1.   Donziger's egotistical "control" over the litigation has been a disaster.  As I said in April, the Calmbacher deposition proceeded without any representation from the plaintiffs'; deadlines were missed in the Denver case which set the tone for all the other proceedings; the attorney-client privilege has been effectively destroyed due to Donziger's egotistical and naïve behavior in allowing filming of what should have been confidential meetings and his obsession with public relations, and now, the courts are accepting Chevron's argument that a "crime/fraud" exception applies to attorney-client communications.  Meanwhile, it does not appear that Donziger has taken any steps to affirmatively take discovery from Chevron, or any of the persons who may have acted on Chevron's behalf.

2.   Finally, and most disturbing and shocking to our firm are recent revelations in Chevron's discovery of the extent of contacts with Cabrera, which our firm had no knowledge of and never would have approved.  Indeed, it appears to me that the outright refusal to provide us with any information about Cabrera's report were intended to hide from us what may have been outrageously improper conduct.  We had several times over the course of last year indicated that one matter that needed to be fully discussed and explored was the expert's reports and recommendations, in the context of discussing strategically how to frame a final submission to the court that might result in a defensible judgment.  As with everything else, we were frustrated in our efforts to have those conversations, but at the time we simply assumed that Cabrera's work was sloppy and overly ambitious, but had been done independently.

When Chevron first started making these accusations, Donziger assured me repeatedly that there were no improper contacts of any kind, and I had no reason to believe things to be to the contrary.  Pablo and Luis made similar assurances during our meeting in April.  It is now clear in hindsight that those statements were blatant lies, intended to induce our firm into paying more money for litigation expenses.  Last Summer, after the news about the videotaped meeting with Judge Nunez broke, I proposed that as the plaintiffs lawyers, we should hire another independent lawyer to conduct interviews of our team to ascertain all that could relate to Chevron's charges of misconduct, so we would know the extent of any conduct which Chevron might rely upon to attack the case.  I spoke with a lawyer in Philadelphia, fluent in Spanish, who worked as a prosecutor for the United States government and now as part of his practice, regularly conducts internal investigations for private clients, businesses and governments, including in South America.  I arranged a conference call with him and Donziger. Donziger steadfastly refused to agree to any such investigation, all the while assuring me that there was no improper contact of any kind.

66886

KOHN, SWIFT & GRAF, P.C.          CONTINUATION SHEET NO. 5          MR. PABLO FAJARDO
                                                                    MR. LUIS YANZA
                                                            MR. HUMBERTO PIAGUAJE
                                                                   MR. ERMEL CHAVEZ
                                                               MR. HUGO PAYAGUAJE
                                                           MR. ERMERGILDO CRIOLLO

AUGUST 9, 2010

     We now find out that there may have been extensive, systematic contacts, orchestrated by Donziger, and with your participation and agreement, which have threatened the entire case. And, of course, we find out about it in part as a result of the utter stupidity, arrogance and conceit of inviting a film to be made documenting this improper conduct.

     Luis, at our meeting in April, you described the case as a "train" which needs to reach its destination. Unfortunately you, under Donziger's control, and by excluding our firm, are driving the train over a cliff.

     In light of this behavior which makes it highly unlikely that any court in the United States or elsewhere would ever enforce any judgment you might obtain, it is ironic that you write about our firm's "moral" obligation. Donziger hid this activity from us because he knew that we would never have agreed to or supported this strategy. It has undermined the entire case and the credibility of the entire plaintiffs' team. Donziger refused us access to his files last year, I now believe in part to hide these contacts from us, and to otherwise assert his exclusive control over matters. He refused my suggestion of an internal investigation, because it would have revealed these facts. And, as I state in my November 2009 letter and at our April 2010 meeting, I have insisted on ethical agreements among the consultants and others that do not amount to unethical fee sharing.

     I therefore recommend that the plaintiffs representatives take the following actions:

     Replace all legal counsel and client leaders who have participated in the tainting of the case through the contact and communications with Cabrera (and others), have new counsel set forth all facts to the Lago Agrio Court, and agree that the Cabrera report be stricken and that a new expert be engaged by the Court to conduct the independent study.

     We will, as you request, send to Luis the detailed schedules of all of our expenditures and attorney time expended on the case.

     We reserve all of our legal rights in the matter under both the attorney-client agreement and our agreement with Donziger.

     We request that you promptly send us any agreements which would purport to affect, alter or impair our firm's rights in any way.

Very truly yours,

Joseph C. Kohn

JCK/kw

66886

DONZ00026949 Page 5 of 22

NOVEMBER 10, 2009 LETTER

DONZ00026949 Page 6 of 22

KOHN, SWIFT & GRAF, P.C.

ONE SOUTH BROAD STREET, SUITE 2100

PHILADELPHIA, PENNSYLVANIA 19107-3304

JOSEPH C. KOHN
ROBERT A. SWIFT
GEORGE W. CRONER
ROBERT J. LAROCCA
DENIS F. SHEILS †◊
DOUGLAS A. ABRAHAMS •
WILLIAM E. HOESE
STEVEN M. STEINGARD •
STEPHEN H. SCHWARTZ †
CRAIG W. HILLWIG
ELKAN M. KATZ
CHRISTINA D. SALER •
NEIL L. GLAZER †
JARED G. SOLOMON

(215) 238-1700
TELECOPIER (215) 238-1968
FIRM E-MAIL: info@kohnswift.com
WEB SITE: www.kohnswift.com
E-MAIL: JKOHN@KOHNSWIFT.COM

HAROLD E. KOHN
1914-1999

OF COUNSEL
MERLE A. WOLFSON
LISA PALFY KOHN

November 10, 2009

† ALSO ADMITTED IN NEW YORK
◊ ALSO ADMITTED IN NEVADA
• ALSO ADMITTED IN NEW JERSEY

## CONFIDENTIAL – ATTORNEY/CLIENT COMMUNICATION

Luis Yanza                                    Pablo Fajardo

      *Re:* ***Ecuador- Texaco Case***

Dear Luis and Pablo:

      I hope you are both well.

      I am writing this letter to raise with you the important issue that I have been discussing from time-to-time with Steven and that I am sure we all think about, namely, if and when to approach Chevron regarding further settlement negotiations and, what an appropriate and achievable range for a settlement would be.  I suggested to Steven that I would put down my thoughts in a letter which can form the basis for further thought and discussions.

      The possible settlement of this case is obviously a difficult and complicated question.  Negotiations would be complex and subtle.  These are questions which I believe need to be discussed in some detail.  This letter does not attempt to address all of the complexities of the settlement process, but instead to raise some basic points for consideration and further thought.

57557_1

## CONFIDENTIAL – ATTORNEY/CLIENT COMMUNICATION

<u>My Proposal:  We Should Approach Chevron To See If A Settlement Can Be Reached Before The End Of The Year</u>.  Let me get right to the point.  I believe for several reasons that now may be an opportune time to approach Chevron's counsel to see if an agreement could be reached before the end of the year on a total dollar amount of a settlement payment from Chevron and the broad outlines of the remediation and other programs that would be part of the settlement.  The reasons include the resignation of O'Reilly as President of Chevron at years end and the recent events in the case.  In the past, Mr. Cullen has expressed to me that the O'Reilly regime did not want this case to be "passed down to the next generation of leadership" at the company.  In addition, I believe that the new president and his team will not be interested in dealing with a settlement of this case in the first year or two of their tenure.

<u>The Amount of the Settlement That Can Be Achieved</u>.  I believe that we should set a goal in negotiations to obtain a settlement amount "around $1 billion."  That is a range that would provide sufficient funds for major remediation, pit clean up, health care, water treatment and other remedies.  It is an amount that will not be available if the litigation takes a turn against us.  It is an amount which, after 5 or 10 or more years of litigation, might still be the best possible settlement, and it is a range that <u>may</u> hold some interest for Chevron to pay.  More specifically, I believe a final settlement which is in the range from $1 billion to $1.2 billion on the high side, to $700 million to $850 million on the low side, is within the realm of possibility now, and would be an outstanding result given the enormous risks of this case.  Such a settlement would provide the certainty of tremendous benefits to the thousands of people suffering from Chevron's conduct now, as opposed to the uncertain result of further litigation

57557_1

## CONFIDENTIAL – ATTORNEY/CLIENT COMMUNICATION

many years from now.  I believe Chevron will fight for the next 10 or 20 years, if necessary, before paying a settlement in the multi-billion dollar range.  Therefore, if we signal a willingness to negotiate in the range of $1 billion we may be able to get serious negotiations started, negotiating between $500 million and $1 billion in the next months.

Some of the factors which lead me to this conclusion are summarized here.  Again, this is not meant to be exhaustive or address all of the issues that we should consider before embarking on this proposed path.

1.     There Is No Guarantee We Will "Win" The Case.  Indeed, It Could Be Lost Entirely and The Plaintiffs Could Get Nothing In The End.  As we all know, this case has tremendous risks and the ultimate outcome is completely uncertain.  The events of the past months highlight the unpredictable nature of the case.  If the case is litigated to finality in Ecuador and in collection proceedings in the United States and other countries, the process could easily take another 10 years or more. At any step along the way, Chevron could obtain a victory on any one, technical issue, of jurisdiction or liability of the corporate parent entity, or any other one of the host of defenses it has and will assert.  In that event, the case would be lost and there would be no recovery of any kind.  No amount of public pressure or press coverage will convince Chevron to pay a settlement if it gets a favorable legal decision on a dispositive issue.  I believe litigating this case to conclusion holds a 25% to 50% possibility that the case would be lost and there would be no recovery at all.  When considering the range of a possible settlement you should consider it against the possibility of losing the case entirely and receiving nothing, as

## CONFIDENTIAL – ATTORNEY/CLIENT COMMUNICATION

well as against the possibility of obtaining a larger settlement or recoveries through years of additional litigation.

2.      Achieving a larger settlement would take many more years.  Even if a settlement in excess of this range could be achieved, it will take years of additional litigation. During that time, the people in the Orient will continue to suffer and die from the pollution, drink contaminated water, and lack basic medical care.  Any remediation program will take many years to implement.  There is a tremendous benefit to beginning that process now, rather than 5 or 10 years from now, even if there is a larger amount of money in the future.  A win at the trial level will only be the beginning, not the end.  The Exxon Valdez case, for example, has continued for 13 years after the trial verdict in the U.S.  It is not inconceivable that this case could last as long, or longer.

3.      A "Victory" At Trial Poses It's Own Risks, Including Losing Control Over Implementing The Recovery.  Even a victory at the trial court level poses many risks and potential problems for ultimately recovering from Chevron.  First, the result at the trial level is still months, if not years away.  Second the complexity of the evidence and claims and any remedy that the court may structure will provide Chevron and its lawyers with dozens of appellate issues to raise in Ecuador and in subsequent enforcement actions in the U.S. and elsewhere.  Chevron will hire teams of lawyers to review the verdict, and the larger it is, the more issues and arguments they will raise, and the harder and longer they will fight.  Third, a decision in our favor may result in losing control over the implementation of any potential

57557_1

## CONFIDENTIAL – ATTORNEY/CLIENT COMMUNICATION

remedies.  In a settlement, we can agree to structure the relief in areas we deem most vital; we can administer the remedies in a way we want, without outside interference.  A court verdict may take control over any such relief from us, and give it to the court or government officials and agencies.  Moreover, a verdict in our favor will draw the government, NGOs and other entities to the case, who will seek to control the remediation process.

        4.      A Settlement Of $700 Million Or More Would Provide Vast Amounts Of Relief.  A settlement in the range I mentioned above, would provide tremendous relief to the affected individuals and communities.  Assuming a settlement even in the $700 million to $800 million range, and our ability to control and direct expenditures, such a settlement could provide for virtually 100% clean-up of all of the oil pits; $100 million or more towards clean water programs; $100 million or more towards establishing healthcare facilities and treatments, and still leave tens of millions of dollars for other important programs and remedies that could be developed.  Indeed, such a settlement at this figure would be one of the most outstanding humanitarian achievements ever obtained in a court of law.  A settlement in that range would be the largest or among the largest, in an environmental case on behalf of individuals ever (as opposed to government prosecutions or "Superfund" type cases), and among the largest legal settlements of any kind, anywhere in the world.  We should not pass up an opportunity of this type on the hope or belief that "we will get more later."  Frequently cases are not successful "later".  They are lost.

DONZ00026949 Page 11 of 22

Kohn, Swift & Graf, P.C.                    CONTINUATION SHEET NO. 6                    Luis Yanza
                                                                                      Pablo Fajardo
                                                                                  November 10, 2009

## CONFIDENTIAL – ATTORNEY/CLIENT COMMUNICATION

5.      <u>A Settlement Fund Can Lead To The Possibility of Obtaining Additional Funds and Relief</u>.  A settlement would not necessarily be the limit of the relief which could be obtained.  A settlement could spur more effective clean up programs from the government, by establishing a protocol we approve.  Hospitals and Universities could support the healthcare initiatives we begin.  NGOs and foundations could be solicited to support other programs and activities as part of an overall remediation.

6.      <u>We Should Not Gamble A Certain Achievable Benefit Against A Hope Of Getting More In The Future</u>.  Given the results that could be obtained from such a settlement, it is not in the clients' interest to take the gamble that we would in fact obtain more, or substantially more, by continuing the litigation.  I simply would not gamble $700 million or $800 million today against the possibility of receiving twice that or $2 billion or more at some unknown point in the future.  Indeed, it could be the case where the litigation continues for 5 or 10 or more years and a settlement in the same range we could achieve now is obtained, only we have delayed for 5 or 10 years implementing any relief.

Reasonable people can have differences of opinion about what the possible outcome of the case is and what a fair settlement would be.

All of us can agree, however, that we cannot guarantee a successful outcome, or predict the future.  Governments have changed to be more favorable to our position and they can change back to what they were, or worse.  We do not know who the judges are who will ultimately decide the fate of the plaintiffs, or what arguments they will find persuasive, or what

57557_1

## <u>CONFIDENTIAL – ATTORNEY/CLIENT COMMUNICATION</u>

biases they may have. I believe that if we can agree with Chevron upon a number where we can provide real clean-up of the pits, clean water, healthcare and other programs now, rather than 5, 10 or 15 years from now, that it is our duty to the clients to attempt to do so, rather than gamble that outcome on a belief and a hope that we could "win" something greater in the future.

For these reasons, I believe we have nothing to lose and everything to gain by approaching Chevron on this basis to see if a reasonable result can be obtained in connection with O'Reilly's departure this year. If Chevron has no interest, then we will continue to press the case as vigorously as we have been.

I am available to meet and discuss these issues and others with you at your earliest convenience and believe we should do so promptly if we hope to begin the process before the end of the year.

With my best regards,

Sincerely,

Joseph C. Kohn

JCK/kw

DONZ00026949 Page 13 of 22

NOVEMBER 19, 2009 LETTER

KOHN, SWIFT & GRAF, P.C.

ONE SOUTH BROAD STREET, SUITE 2100

PHILADELPHIA, PENNSYLVANIA 19107-3304

JOSEPH C. KOHN
ROBERT A. SWIFT
GEORGE W. CRONER
ROBERT J. LAROCCA
DENIS F. SHEILS †◊
DOUGLAS A. ABRAHAMS •
WILLIAM E. HOESE
STEVEN M. STEINGARD •
STEPHEN H. SCHWARTZ †
CRAIG W. HILLWIG
ELKAN M. KATZ
CHRISTINA D. SALER •
HADLEY P. ROELTGEN •
NEIL L. GLAZER †
JARED G. SOLOMON

(215) 238-1700
TELECOPIER (215) 238-1968
FIRM E-MAIL: info@kohnswift.com
WEB SITE: www.kohnswift.com
E-MAIL: JKOHN@KOHNSWIFT.COM

HAROLD E. KOHN
1914-1999

OF COUNSEL
MERLE A. WOLFSON
LISA PALFY KOHN

† ALSO ADMITTED IN NEW YORK
◊ ALSO ADMITTED IN NEVADA
• ALSO ADMITTED IN NEW JERSEY

November 19, 2009

## CONFIDENTIAL – ATTORNEY/CLIENT COMMUNICATION

Luis Yanza                                Pablo Fajardo

Re:  *Ecuador- Texaco Case*

Dear Luis and Pablo:

I write in response to your letter dated November 13, 2009 which I received on November 16th. You address my letter regarding settlement strategy and raise serious issues regarding the attorney-client agreement and the management of the case. These are important issues which we believe call for careful thought and an in person meeting. I encourage you to meet with our firm as your decisions concerning our involvement may place the plaintiffs' interests in jeopardy. This letter sets forth our position on these fundamental issues and hopefully you will better understand our perspective.

I.

First, let me summarize the key points from our position.

1.  We have the utmost respect for both of you, and for everything you have done to advance the case.

2.  All of us want the case to be successful. We have worked together on this matter for many years and are prepared to continue.

3.  This is a critical time, and the result of the positions taken in your letter will have a profound effect on the future of the case. We therefore hope you will consider the facts set forth in this letter and our perspective – and agree to meet with us as we propose – before you make a final decision.

57950_1

## CONFIDENTIAL – ATTORNEY/CLIENT COMMUNICATION

4.       Our firm's support of the case has been extraordinary.  In addition to the attorney time we have expended, we have spent approximately $7 million, of which $1.1 million has been paid to Doug Beltman's company, $1 million to Steven for fees and expenses and $700,000 on public relations firms.  We provide more facts of the payments to Selva below.

5.       The working relationship between me and our firm and Steven has steadily deteriorated over the past years.  I have raised issues with Steven many times, yet the deterioration has continued.  I am not sure why, but give some of my perspective below.  It is not done to attack Steven, but to respond to positions and arguments he has made to us in the past which appear in your letter.

6.       We do not agree with the conclusions or directives of your letter, or many of the assertions contained in it.  We do not agree with your assertions concerning the relevant agreement, and believe that your position is a material departure from the agreement and we do not and will not agree to it.

7.       We invite you to come to our office and spend as much time as is needed to address all issues; to see if agreement can be reached, get agreements which are legal and ethical with the other professionals, develop a budget and the sources of funding for it, determine if other law firms and which firms should be approached to participate in the case, and, to get a working relationship among the lawyers on track.  If your decisions as set forth in your letter are final and you do not want to hear more, then there is no need to waste time or to meet.  Our conclusions regarding the effect of your decision, if it is final, are set forth at the end of this letter.  It is our sincere hope that you will meet and have not reached a final decision.

8.       Even if you do not meet with us, I urge you to get proper written agreements in place with the various lobbyists and professionals Steven has approached so that all such arrangements are ethical and legal, and you will not be faced with disputes later.

The reasons for our conclusions, and responses to various statements in your letter, are set forth below.

II.

A.       <u>Settlement</u>.  I find the decision to not raise settlement before you "win" the trial to be naïve and impractical.  I can only give you my best advice based on 25 years of litigating against major corporations and their law firms and settling dozens of such cases.  If you wish to take the advice of Steven Donziger on this issue, even though he has practically no civil litigation experience outside of this case and who has never settled a single case, not even a simple car accident, I believe you are making a grave mistake.  You say you will wait for Chevron to propose a settlement to you.  I am afraid you will wait a very, very long time before that happens.  I don't know how many of the community leaders or plaintiffs you have been able to consult in the short time since you received my letter but I urge you to continue to consult and deliberate on this issue for all the reasons set forth in my letter.

57950_1

## CONFIDENTIAL – ATTORNEY/CLIENT COMMUNICATION

      B.    <u>Costs and Attorney-Client Relationship</u>.  Your letter frames the fundamental problem which has infected our firm's relationship with Steven and which I have repeatedly raised with him:  namely, the position that budget decisions, and all strategy decisions in the case will be made by Steven, and our firm is obligated to pay any and all costs, whatever they might be, and whether they are set forth in any budget or not, and have no other involvement or say in the case.  This is not what our agreement is.  You state that we are under an obligation or agreement to pay a budget proposed by Steven, when there is no such agreement, nor would any law firm agree to this procedure.  What if Steven "decided" the budget should be $3 million per year, and he should receive $500,000 per year, and hire five additional lawyers, would we be obligated to pay that?  Of course not.  Steven repeatedly makes demands for funds from our firm which are undocumented, not pre-approved and outside any agreed upon budget.  I have told him we will no longer do that.

      1.    You used the word "breach" in reference to our obligations to pay expenses.  There has been no breach by our firm of any kind, of any agreement.  We have paid all necessary litigation expenses, as well as many wasteful and unnecessary expenses incurred due to Steven's extravagance and decisions.

      Let me set forth some of the facts as we see them.  First, with respect to the payments to Selva, I have attached a chart setting forth the dates and amounts of wire transfers to Selva since January 2007, which I sent to Juan Pablo on Monday.  You can see regular monthly transfers in various amounts including $40,000, $70,000, and $100,000.  These amounts were sent in response to the varying requests from Steven or Luis.  Payments this year have usually been $20,000 per month, an amount agreed to by Steven and me.  In July, a $70,000 payment was sent at Steven's request, supposedly to clear up all old or outstanding bills.  You say that you perceive I am not confident in your administrative responsibilities.  I do not know where you got that idea.  On the contrary, we sent payments for over a year at a time with no receipts or backup of any kind being sent to us.  We request such backup not because we do not trust your accounting, but because it is necessary for our own bookkeeping and because of 40 years of experience at our firm litigating contingency cases where ultimately costs must be justified to a court of law, or to a defendant in settlement or to address charges that a defendant could make about improper expenditures.  Indeed, Chevron has raised charges of improper contact with the court expert.

      Second, the one recent example you cite of the $37,000 request highlights my points and the misunderstandings.  I received an email from Luis on September 18, 2009 stating that monthly transfers would be "no greater than $25,000."  Then, on October 6th, I received another email from Luis requesting $27,000 due to the expenses of the recent march.  Despite the budget, we promptly sent the $27,000 requested.  Now you claim we "breached" some agreement.  I do not wish to belabor this one point, only to respond with facts to the example you raised.

57950_1

KOHN, SWIFT & GRAF, P.C.          CONTINUATION SHEET No. 4                    LUIS YANZA
                                                                          PABLO FAJARDO
                                                                       NOVEMBER 19, 2009

## CONFIDENTIAL – ATTORNEY/CLIENT COMMUNICATION

   2.  Over the many years of this case we have paid all appropriate litigation expenses. If you look at the budget you cite in your letter of $100,000 per month, or $1.2 million per year, the total amount spent on the case by our firm and the other funding source actually have <u>exceeded</u> that amount in 2007 and 2008 and is right at $1.2 million for 2009. For someone to charge that we have "breached" an obligation when the facts show we have paid <u>more</u> than the ideal budget you propose is, to me, offensive and ridiculous.

   3.  By far, the largest single component of the "budget" is Steven's demand for fees and expenses, and there, in my opinion, lies the root of the current problem, and the reason why this current crisis arises. A year or more ago I discussed with Steven that he needed to be self sustaining, and not look to our firm to continue to pay him for the life of the case. He sat in my office and acknowledged that we had no legal duty or obligation to ever pay him or to continue to pay him. I had also told him that even though I like Andrew, I had never agreed to pay him. Essentially, Steven hired Andrew without telling me he felt he needed to hire another lawyer or that he was doing so, and then he started sending me bills for Andrew. Steven's "budget" now includes $330,000 per year for himself and Andrew, unheard of in a contingency fee lawsuit, plus all their expenses which, despite my repeated requests to conserve resources includes excessive amounts of travel, stays at hotels and meals at expensive restaurants. There simply is no agreement which requires this firm to pay Steven or his "firm" members as part of the litigation expenses.

   4.  At the same time as we have spent enormous sums of money on the case, Steven has denied us access to documents, information and the legal team, despite our repeated requests. He has made it impossible for us to effectively discharge our duty as attorneys and has interfered with the attorney-client relationship. He purports to make all decisions on his own without any contact or input from our firm. Lawyers are told to not raise questions, speak up or disagree with Steven's suggestions. We have raised, and attempted to raise, many questions and issues relating to the effectiveness and enforceability of the judgment of the Lago court, among others. These questions have generally been ignored, and we would welcome the opportunity to discuss them with you. That is not what a co-counsel relationship or effective litigating is built upon. Our involvement with this case is as attorneys, not simply as an unlimited source of money to be spent at the discretion of another lawyer.

   5.  I can only assume from this conduct that Steven has another law firm or firms that he believes will now fund or work on the matter and that he has precipitated this conflict to force us out of the case. He has spoken to a number of firms which he has told me of after the fact. I have told Steven repeatedly that I am willing to have additional lawyers join and contribute expenses to the case and in that regard introduced him to a top flight firm in Philadelphia with over 60 lawyers which was part of the <u>Exxon Valdez</u> case. They are willing to discuss sharing expenses and the workload and are willing to meet you. Steven has refused to follow up with me concerning their involvement. I would simply caution you to be careful in selecting additional counsel and in obtaining proper agreements from them. We have contacts

57950_1

KOHN, SWIFT & GRAF, P.C.           CONTINUATION SHEET NO. 5                    LUIS YANZA
                                                                            PABLO FAJARDO
                                                                         NOVEMBER 19, 2009

<u>**CONFIDENTIAL – ATTORNEY/CLIENT COMMUNICATION**</u>

with many of the leading firms in the U.S., have worked as co-counsel with many, and would be happy to advise.

6.      In my recent conversations with Steven I have told him that we remain committed to the case and would continue to fund litigation expenses including the Selva costs and necessary experts and other expenses (<u>provided</u> we have a clear budget, appropriate and legal agreements to compensate the non-lawyers Steven worked with and a proper attorney working relationship in the case). In addition to Steven finding his own means of support, I suggested that the public relations expenses which we have paid could perhaps be paid by the lobbyists and other professionals Steven has hired and who will seek their own fees from any recovery obtained by the plaintiffs. We are prepared to discuss feasible and proper arrangements with you at a meeting.

III.

C.      <u>Conclusion</u>. In summary, the directives set forth in your letter are contrary to our agreement and we do not accept them. We, therefore, see two possible outcomes:

One, we meet promptly in Philadelphia and agree upon a budget and reach appropriate attorney-client agreements understood by all, including agreements concerning procedures for the payment of other professionals that are ethical and legal, and for the handling of the case going forward.

Two, unless or until such agreements are reached, this firm considers that due to Steven's influence and interference, there is no longer an attorney-client relationship with our firm and we will withdraw from any further representation related to the case and notify the vendors and other appropriate entities of that fact.

Because I am a gentleman and am concerned with the outcome of the case, I will pay the November payment to Selva that I confirmed in my email to Juan Pablo on Monday I would. After that, we will not make further payments.

We reserve all of our rights, as do you.

Good luck and God speed.

Very truly yours,

Joseph C. Kohn

JCK/kw
cc:   Steven R. Donziger, Esquire

57950_1

# ATTACHMENT

**PAYMENTS TO SELVA VIVA CIA LTDA.**
**IN RE TEXACO/CHEVRON**
**YEARS 2007 – 2008 - 2009**

| DATE DISBURSED | SOURCE OF PAYMENT | AMOUNT DISBURSED |
|---|---|---|
| 01/22/2007 | Wired | $ 12,000.00 |
| 02/05/2007 | Wired | $ 75,000.00 |
| 03/20/2007 | Wired | $ 40,000.00 |
| 04/13/2007 | Wired | $ 30,000.00 |
| 05/11/2007 | Wired | $ 40,000.00 |
| 06/14/2007 | Wired | $100,000.00 |
| 07/20/2007 | Wired | $100,000.00 |
| 09/04/2007 | Wired | $ 50,000.00 |
| 10/17/2007 | Wired | $ 50,000.00 |
| 11/13/2007 | Wired | $ 70,000.00 |
| 12/17/2007 | Wired | $ 50,000.00 |
| 01/17/2008 | Wired | $ 50,000.00 |
| 02/11/2008 | Wired | $ 20,000.00 |
| 03/05/2008 | Wired | $ 40,000.00 |
| 04/11/2008 | Wired | $ 70,000.00 |
| 05/06/2008 | Wired | $ 35,000.00 |
| 06/09/2008 | Wired | $ 30,000.00 |
| 07/02/2008 | Wired | $ 30,000.00 |
| 08/11/2008 | Wired | $ 38,000.00 |
| 09/11/2008 | Wired | $ 28,000.00 |
| 10/03/2008 | Wired | $ 32,000.00 |
| 11/14/2008 | Wired | $ 40,000.00 |
| 12/18/2008 | Wired | $ 30,000.00 |
| 02/04/2009 | Wired | $ 30,000.00 |

56187_1

1 of 2

| DATE DISBURSED | SOURCE OF PAYMENT | AMOUNT DISBURSED |
|---|---|---|
| 03/09/2009 | Wired | $ 30,000.00 |
| 04/21/2009 | Wired | $ 10,000.00 |
| 05/07/2009 | Wired | $ 20,000.00 |
| 05/28/2009 | Wired | $ 22,000.00 |
| 06/29/2009 | Wired | $ 20,000.00 |
| 07/16/2009 | Wired | $ 70,000.00 |
| 08/26/2009 | Wired | $ 20,000.00 |
| 09/23/2009 | Wired | $ 20,000.00 |
| 10/20/2009 | Wired | $ 27,000.00 |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  | **TOTAL DISBURSED:** | **$1,329,000.00** |

56187_1

2 of 2

DONZ00026949 Page 22 of 22