UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CHEVRON CORPORATION,

                Plaintiff,

      v.

STEVEN DONZIGER, et al.,

                Defendants.

---

Case No. 11-CV-0691

---

**MEMORANDUM OF LAW OF DEFENDANTS HUGO GERADO CAMACHO NARANJO AND JAVIER PIAGUAJE PAYAGUAJE IN OPPOSITION TO PLAINTIFF CHEVRON CORPORATION'S APPLICATION BY ORDER TO SHOW CAUSE FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTIVE RELIEF**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BACKGROUND ................................................................................. 3

    Chevron and Ecuador ................................................................................. 3

        A.    Chevron's Destruction of the Amazonian Rainforest ................................ 3

        B.    Chevron Fights to Get to Ecuador's Courts ................................................ 5

                1.    The Ecuadorian Plaintiffs File in the Southern District, but – Touting Ecuador's Courts – Chevron Seeks to Evade American Jurisdiction ................................................................ 5

                        (a)    Chevron's First FNC Motion Fails Because Chevron Fails to Consent to Ecuadorian Jurisdiction ........ 6

                        (b)    On Remand, Chevron Promises to Consent to Ecuadorian Jurisdiction and Satisfy Any Ecuadorian Judgment Subject Only to a CPLR 5304 Defense ............. 7

                        (c)    Chevron Knew What It Was Doing ................................... 9

                2.    Based on Chevron's Representations, the District Court and the Second Circuit Grant the FNC Motion ................................... 10

        C.    The Lago Agrio Litigation ................................................................ 12

                 1.    Relying on Chevron's Promises, for Seven Years Plaintiffs Litigate One of the Largest Cases in Ecuadorian History, Revealing Overwhelming Evidence of Chevron's Illegal Conduct ................................................................ 12

                2.    Chevron Attacks the Forum of Its Own Choosing ...................... 12

                          (a)    Chevron Files a Private Arbitration to Avoid Ecuador Courts ................................................................ 12

                          (b)    Chevron Uses § 1782 Applications In a Continuing Effort to Undermine the Proceedings in Ecuador ............. 15

        D.    The Tactics of Chevron and its Counsel ................................... 19

                1.    Repressive Litigation as a Weapon ................................... 19

                          (a)    Intimidation Efforts Via Section 1782 Proceedings ......... 20

(b) Intimidation Via Media..................................................... 20

(c) Intimidation Via Ethics Threats........................................ 20

(d) Chevron's Counsel's Prior (Failed) Attempts at
Repressive Litigation ...................................................... 21

(e) This Court's Predetermination of Issues........................... 22

ARGUMENT ............................................................................................... 25

I. THE COURT HAS NO PERSONAL JURISDICTION OVER THE
ECUADORIAN PLAINTIFFS......................................................... 25

A. The Court Ordered Method for Service of Process on the
Indigenous Farmers and Laborers Does Not Comport with Due
Process ............................................................................... 25

B. This Court Otherwise Has No Jurisdiction Over the Ecuadorian
Plaintiffs............................................................................. 32

II. PRINCIPLES OF INTERNATIONAL COMITY AND ESTOPPEL
PRECLUDE THE COURT FROM GRANTING THE
EXTRAORDINARY RELIEF CHEVRON SEEKS ........................... 35

A. This Court Must Abstain from Deciding Issues that are Currently
Before the Lago Agrio Court ................................................ 35

1. International Comity ................................................. 36

2. Uniform Foreign-Money Judgments Recognition Act ........ 41

B. Chevron is Estopped from Seeking to Invoke this Court's
Jurisdiction Over Allegations Before the Lago Agrio Court........ 43

III. PLAINTIFF HAS NOT CARRIED ITS BURDEN TO ESTABLISH IT IS
ENTITLED TO INJUNCTIVE RELIEF ............................................ 47

A. Standard for Interim Injunctive Relief.................................... 47

B. Chevron Has Not Shown it Will Suffer Immediate and Irreparable
Harm .................................................................................. 48

C. Chevron Is Not Likely to Succeed on the Merits or Its Request for
Injunctive Relief.................................................................. 51

1. A Private Entity, Such as Chevron, Cannot Obtain
Injunctive Relief in a RICO Action ............................. 51

2. There Has Been No Showing that any of the Defendants
Engaged in Extortion ................................................................ 55

3. Chevron is Not Entitled to Relief Under the Declaratory
Judgment Act, 28 U.S.C. § 2201 ................................................ 59

4. There is No Showing that New York Law Applies to the
Common Law Claims Asserted in the Complaint ........................ 62

D. The Balance of Hardships Does Not Favor Chevron............................... 65

CONCLUSION............................................................................................................. 67

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aetna Life Ins. Co. v. Haworth,*
  300 U.S. 227 (1937)..................................................................................................59

*Aguinda v. Texaco, Inc.,*
  142 F. Supp. 2d 534 (S.D.N.Y. 2001)........................................................... passim

*Aguinda v. Texaco, Inc.,*
  303 F.3d 470 (2d Cir. 2002)......................................................................... passim

*Aguinda v. Texaco, Inc.,*
  945 F. Supp. 625 (S.D.N.Y. 1996) .................................................................6

*AIM Intern. Trading LLC v. Valcucine SpA.,*
  188 F.Supp.2d 384 (S.D.N.Y. 2002)...........................................................48

*Alexander v. Sandoval,*
  532 U.S. 275 (2001)......................................................................................53

*American Medical Ass'n v. United Healthcare Corp.,*
  588 F. Supp.2d 432 (2008) ...........................................................51, 52, 53, 54

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,*
  171 F.3d 779 (2d Cir.1999).........................................................................32

*Best Cellars Inc., v. Grape Finds at Dupont, Inc.,*
  90 F. Supp. 2d 431 (S.D.N.Y. 2000)...........................................................32

*Best Van Lines, Inc. v. Walker,*
  490 F.3d 239 (2d Cir. 2007).........................................................................34

*Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of N.J.,*
  448 F.3d 573 (2d Cir. 2006)..........................................................................65

*Biosafe-One, Inc. v. Hawks,*
  639 F. Supp. 2d 358 (S.D.N.Y. 2009).........................................................65

*Bowoto v. Chevron Corp.,*
  481 F. Supp. 2d 1010 (N.D. Cal. 2007) ................................................57, 58

*Brenntag Int'l Chems., Inc. v. Bank of India,*
  175 F.3d 245 (2d Cir. 1999)..........................................................................50

*Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.*,
    601 F.2d 48 (2d Cir. 1979)...................................................................................................65

*Buffalo Forge Co. v. Ampco-Pittsburgh Corp.*,
    638 F.2d 568 (2d Cir. 1981)................................................................................................65

*Cedeño v. Intech Group, Inc.*,
    -- F. Supp. 2d --, 2010 WL 3359468 (S.D.N.Y. Aug. 25, 2010) .....................................55, 56

*Center Cadillac, Inc. v. Bank Leumi Trust Co. of N.Y.*,
    808 F. Supp. 213 (S.D.N.Y. 1992) ....................................................................................57

*Chamberlain v. Peak*,
    155 A.D.2d 768, 547 N.Y.S.2d 706 (N.Y. App. Div. 1989) ................................................35

*Consolidated Brands, Inc. v. Mondi*,
    638 F. Supp. 152 (E.D.N.Y. 1986) ....................................................................................49

*Corporacion Venezolana de Fomento v. Vintero Sales Corp.*,
    629 F.2d 786 (2d Cir. 1980)..............................................................................................62

*Cromer Finance Ltd. V. Berger*,
    137 F. Supp. 2d 452 (S.D.N.Y. 2001)...............................................................................62

*Dole Food Co. Inc. v. Gertten*,
    No. BC417435 (Cal. Super. Ct. Nov. 17, 2010) ...................................................................22

*Dow Jones & Co., Inc. v. Harrods, Ltd.*,
    237 F. Supp. 2d 394 (S.D.N.Y. 2002), *aff'd*, 346 F.3d 357 (2d Cir. 2003) ..................... passim

*Drobbin v. Nicolet Instrument Corp.*,
    631 F. Supp. 860 (S.D.N.Y. 1986) ....................................................................................50

*Ehrenfeld v. Mahfouz*,
    No. 04 Civ. 9641 (RCC), 2005 WL 696769 (S.D.N.Y. March 23, 2005)........................27, 28

*Farrell Lines Inc. v. Columbus Cello-Poly Corp.*,
    32 F. Supp. 2d 118 (S.D.N.Y. 1997)..................................................................................61

*Finance One Pub. Co. Ltd. v. Lehman Bros. Special Fin.*,
    414 F.3d 325 (2d Cir. 2005)..............................................................................................63

*Finanz AG Zurich v. Banco Economico S.A.*,
    192 F.3d 240 (2d Cir. 1999)..............................................................................................36

*Ford v. Reynolds*,
    316 F.3d 351 (2d Cir. 2003)..............................................................................................48

*Forum Financial Group, LLC v. President, Fellows of Harvard College,*
    199 F.R.D. 22 (D. Me. 2001) .................................................................................................. 27

*Gilbert v. Seton Hall University,*
    332 F.3d 105 (2d Cir. 2003) .................................................................................................. 63

*Grand River Enter. Six Nations v. Pryor,*
    481 F.3d 60 (2d Cir. 2007) .................................................................................................... 47

*Green Party of New York State v. New York State Bd. of Elections,*
    389 F.3d 411 (2d. Cir. 2004) ................................................................................................. 48

*Groden v. Random House, Inc.,*
    61 F.3d 1045 (2d Cir. 1995) .................................................................................................. 44

*Hanson Trust PLC v. SCM Corp.,*
    774 F.2d 47 (2d Cir. 1985) .................................................................................................... 47

*Hilton v. Guyot,*
    159 U.S. 113 (1895) ............................................................................................................... 42

*In re Bd. of Directors of Telecom Argentina, S.A.,*
    528 F.3d 162 (2d Cir. 2008) .................................................................................................. 36

*In re Commodore Int'l, Ltd.,*
    *242 B.R.* 243 (Bankr. S.D.N.Y. 1999) ................................................................................... 34

*In re Fredeman Litigation,*
    843 F.2d 821 (5th Cir. 1988) ........................................................................................... 53, 55

*In re Merck & Co.,*
    197 F.R.D. 267 (M.D.N.C. 2000) .......................................................................................... 17

*Italverde Trading, Inc. v. Four Bills of Lading,*
    485 F. Supp. 2d 187 (E.D.N.Y. 2007) ................................................................................... 61

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,*
    596 F.2d 70 (2d Cir. 1979) .................................................................................................... 49

*Jota v. Texaco, Inc.,*
    157 F.3d 153 (2d Cir. 1998) ................................................................................................ 6, 7

*JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.,*
    412 F.3d 418 (2d Cir. 2005) .................................................................................................. 37

*JSG Trading Corp. v. Tray-Wrap, Inc.,*
    917 F.2d 75 (2d Cir. 1990) .................................................................................................... 48

*Kerr v. Compagnie De Ultramar*,
   250 F.2d 860 (2d Cir. 1958)...................................................................................25

*Kosakow v. New Rochelle Radiology Assocs.*,
   274 F.3d 706 (2d Cir. 2001)...................................................................................44

*Landoil Res. Corp. v. Alexander & Alexander Servs., Inc.*,
   918 F.2d 1039 (2d Cir.1990)...................................................................................32

*Lauritzen v. Larsen*,
   345 U.S. 571 (1953)...............................................................................................40

*Loveridge v. Pendleton Woolen Mills, Inc.*,
   788 F.2d 914 (2d Cir. 1986)...................................................................................49

*Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*,
   265 F.R.D. 106 (S.D.N.Y. 2010) ........................................................................26, 31

*Matter of Allstate Ins. Co.*,
   81 N.Y.2d 219, 597 N.Y.S. 2d 904 (1993) ..............................................................63

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997)...............................................................................................47

*Metro. Life Ins. v. Robertson-Ceco Corp.*,
   84 F.3d 560 (2d Cir.1996).......................................................................................32

*Mitchell v. Washingtonville Cent. Sch. Dist.*,
   190 F.3d 1 (2d Cir. 1999).......................................................................................44

*Morrison v. Nat'l Australia Bank Ltd.*,
   130 S. Ct. 2869 (2010).......................................................................................35, 56

*Motorola Credit Corp. v. Uzan*,
   202 F.Supp.2d 239 (S.D.N.Y. 2002) (Rakoff, J.), *rev'd. on other grounds*, 322 F.3d
   130 (2d Cir. 2003).............................................................................................52, 54

*Norex Petroleum Ltd. v. Access Indus., Inc.*,
   -- F.3d --, 2010 WL 4968691 (2d Cir. Dec. 8, 2010)...............................................56

*Noto v. Cia Secula di Armanento*,
   310 F. Supp. 639 (S.D.N.Y. 1970 ...........................................................................25

*NOW, Inc. v. Scheidler*,
   267 F.3d 687(7th Cir. 2001), *rev'd. on other grounds*, 537 U.S. 393, 123 S.Ct. 1057,
   154 L.Ed.2d 991 (2003) .....................................................................................52, 54

*Park South Assocs. v. Fischbein,*
  626 F. Supp. 1108 (S.D.N.Y. 1986)............................................................57, 58

*Philip Morris USA, Inc. v. Veles, Ltd.,*
  No. 06 CV 2988(GBD), 2007 WL 725412 (S.D.N.Y. March 12, 2007)..............26, 28, 30, 55

*Prediction Co. LLC v. Rajgarhia,*
  No. 09-cv-7459, 2010 WL 1050307, *2 (S.D.N.Y. Mar. 22, 2010).......................29

*Pub. Serv. Comm'n of Utah v. Wycoff Co.,*
  344 U.S. 237 (1952)...........................................................................59

*Religious Tech Ctr. v. Wollersheim,*
  796 F.2d 1076 (9th Cir. 1986) ................................................................54

*Republic of Ecuador v. ChevronTexaco Corp.,*
  376 F. Supp. 2d 334 (S.D.N.Y. 2005).........................................................14

*Reuters Ltd. v. United Press Int'l, Inc.,*
  903 F.2d 904 (2d Cir. 1990)..................................................................48

*Rio Properties, Inc. v. Rio International Interlink,*
  284 F.3d 1007 (9th Cir. 2002) .............................................................30, 31

*Rockwell Int'l Sys., Inc. v. Citibank, N.A.,*
  719 F.2d 583 (2d Cir. 1983)..................................................................50

*Royal & Sun Alliance Ins. Co. of Canada v. Century Int'l Arms, Inc.,*
  466 F.3d 88 (2d Cir. 2006)................................................................36, 37

*Ryan v. Brunswick Corp.,*
  No. 02-CV-0133E(F), 2002 WL 1628933 (W.D.N.Y. May 31, 2002) ..................27, 28

*School of Visual Arts v. Kuprewicz,*
  3 Misc. 3d 278, 771 N.Y.S.2d 804 (N.Y.Sup. 2003)..........................................65

*Sedima, S.P.R.L. v. Imrex Co., Inc.,*
  741 F.2d 482 (2d Cir. 1984), *rev'd. on other grounds,* 473 U.S. 479 (1985).........................51

*Sewell v. 1199 Nat'l Benefit Fund for Health & Human Services,*
  187 F. App'x 36 (2d Cir. 2006) .............................................................44

*Simon v. Safelite Glass Corp.,*
  128 F.3d 68 (2d Cir. 1997)...............................................................44, 46

*Stichting Ter Behartiging Van De Belangen Van Oudaandeelhouders In Het Kapitall Van
  Saybolt Int'l B.V. v. Schrieber,*
  407 F.3d 34 (2d Cir. 2005)..................................................................63

*Thornburgh v. American College of Obstetricians and Gynecologists*,
476 U.S. 747 (1986)..................................................................................................48

*Tradescape.com v. Shivaram*,
77 F. Supp. 2d 408 (S.D.N.Y. 1999)....................................................................65

*Trane Co. v. O'Connor Secs.*,
718 F.2d 26 (2d Cir. 1983)....................................................................................52

*Transamerica Mortgage Advisors, Inc. v. Lewis*,
444 U.S. 11 (1979)..................................................................................................53

*Tucker Anthony Realty Corp. v. Schlesinger*,
888 F.2d 969 (2d Cir. 1989)..................................................................................48

*U.S. Aviation Underwriters, Inc, v. Nabtesco Corp.*,
No. C07-1221RSL, 2007 WL 3012612 (W.D.Wash. Oct. 11, 2007)....................31

*United States v. Enmons*,
410 U.S. 396 (1973)................................................................................................57

*United States v. Phillip Morris*,
566 F.3d 1095 (D.C. Cir. 2009)............................................................................55

*Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*,
751 F.2d 117 (2d Cir.1984)....................................................................................32

*Williams v. Advertising Sex, LLC*,
231 F.R.D. 483 (N.D.W.Va. 2005)..................................................................28, 31

## RULES

Fed. R. Civ. P. 4 ........................................................................................... passim

Fed. R. Civ. P. 12 ....................................................................................25, 53

Fed. R. Civ. P. 65 ..............................................................................................48

L. Civ. R. 1.6......................................................................................................44

## STATUTES

18 U.S.C. § 1952................................................................................................57

18 U.S.C. § 1964................................................................................... passim

28 U.S.C. § 1782 ................................................................................................... passim

28 U.S.C. § 2201 ....................................................................................................39, 59

28 U.S.C. § 2283 .........................................................................................................39

Ecuador Civil Code, Article 86 ...................................................................................30

N.Y. C.P.L.R. § 214 .....................................................................................................65

N.Y. C.P.L.R. § 301 ................................................................................................32, 33

N.Y. C.P.L.R § 302 .................................................................................32, 33, 34, 35

N.Y. C.P.L.R. § 5301 ..........................................................................7, 41, 42, 49

N.Y. C.P.L.R. § 5304 ........................................................................................... passim

## OTHER AUTHORITIES

11A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2948 (2d ed. 1995) ........................................................................................................................47

Hans Smit, *American Assistance to Litigation in Foreign and International Tribunals*: *Section 1782 of Title 28 of the U.S.C. Revisited*, 25 Syracuse J. Int'l L. & Com. 1 (1998) ...................................................................................................................17

John Otis, *Chevron vs. Ecuadorean activists*, The Global Post, May 3, 2009 ............................12

*Restatement (Third) of Foreign Relations Law of the United States: Jurisdiction to Adjudicate* § 421(2)(i)(1987) ...................................................................................39

Satisfying *Forum Non Coveniens* ...............................................................................45

The Global Lawyer: The Mystery of the Ghostwritten Report, *Michael Goldhaber,* The AmLaw Litigation Daily (Jan. 28, 2011) .................................................................20

## **PRELIMINARY STATEMENT**

Chevron Corporation ("Chevron") gives a new meaning to "scorched earth" warfare.  It has engaged in an unprecedented litigation, public relations and outright intimidation campaign around the world to avoid the day of reckoning that may rapidly be approaching in the very court of its choosing.  This all results from the fact that Chevron's predecessor contaminated one of the most delicate ecosystems on this planet and, as a result, destroyed the way of life for thousands of indigenous and other people who inhabit that area.  Unsatisfied with its combat measures to date, Chevron has decided that it is time to up the ante; it's time to destroy the enemies at any cost.  Chevron now looks to this Court to carry out its endgame.  Chevron asks this Court to enter sweeping restraints on parties and lawyers over whom this Court has no jurisdiction to prevent enforcement of a non-existent judgment that indeed may never be entered simply because it fears that it may finally be held responsible for its decades-long environmental devastation.

Chevron's counsel now bring unjustified, unfair and specious attacks on the efforts of Ecuadorian citizens Hugo Gerado Camacho Naranjo and Javier Piaguaje Payaguaje (the "Ecuadorian Plaintiffs"), as well as many others (including at least one counsel for those indigenous Ecuadorians), to seek justice in Ecuadorian courts.  Chevron claims that its allegations of fraud, conspiracy, trespass and other baseless complaints are enough to deny the Ecuadorian Plaintiffs their legal rights to the aid and assistance of their counsel.  Such assertions hardly are new to Chevron's counsel, who appear to be building their own "cottage industry" of repressive litigation tactics to be deployed against any individual or lawyer who dares to present an independent view.  Those efforts have been denied and punished in other cases, and justice demands they should be denied and punished here.

1

Put simply, the behavior of Chevron and its counsel in this Court, courts across this country, in Ecuador and in The Hague is an outrage. Justice demands that this Court stop such conduct. Now.

This Court cannot and should not grant the extraordinary relief sought by Chevron. Under long-standing precedent, this Court does not have – indeed, no court of the United States has – the authority to dictate to or undermine the proceedings of the judicial system of another sovereign nation. Furthermore, having fought in this very district court for years to require the Ecuadorian Plaintiffs to bring and prosecute their claims in Ecuador's courts, Chevron cannot now be permitted to ask this Court for relief regarding the proceedings pending in Ecuador. It is undeniable that a judgment has not yet been entered in the Ecuadorian court. Only when and if a favorable judgment is rendered for the Ecuadorian Plaintiffs, and only when and if such a judgment is sought to be enforced in the United States, will it be legally permissible and appropriate for Chevron to raise its complaints regarding the adequacy of the Ecuadorian court proceedings before whichever United States court is considering the issue of enforcement.

Finally, Chevron has not made anything even close to the necessary showing required to demonstrate that it is entitled to any form of temporary restraints or preliminary injunctive relief. It is well-settled that a private entity such as Chevron cannot obtain the type of injunctive relief sought here. Moreover, Chevron has failed to demonstrate any immediate and irreparable harm it will suffer without the requested injunctive relief. Nor is Chevron likely to succeed on the merits of any of its claims or in obtaining permanent injunctive relief. And notwithstanding Chevron's lengthy and protracted protestations, there has been no showing whatsoever either that any defendant engaged in the "extortion" alleged or that the balance of hardships favors Chevron (and it does not). It is all too clear that Chevron is following the Court's statements made on the

record in an earlier proceeding which suggested that Chevron bring the causes of action it now asserts.  Chevron is now endeavoring to gain a tactical advantage over the Ecuadorian Plaintiffs and their agents by using to its benefit the apparent animosity directed toward the Ecuadorian Plaintiffs and their lawsuit that first began in this Court over 20 years ago.

In William Shakespeare's "Henry the Sixth", Dick the butcher (a murderous henchman to Jack Cade, a traitor and pretender to the throne) utters the oft-quoted line, "The first thing we do, let's kill all the lawyers."  ("Henry the Sixth", Part Two, Act Four, Scene Two).  Chevron apparently seeks to channel Dick's dream and to intimidate, repudiate and stifle the Ecuadorian Plaintiffs through innumerable legal actions, restraining orders and other principles, among them a full fraud attack on their lawyers.  But just as the villainous characters in Shakespeare's play ultimately were defeated, so too must be the improper efforts of Chevron and its counsel here.

## FACTUAL BACKGROUND

Chevron's seventeen year effort to forum shop and avoid an accounting for its despoiling of the Amazon rainforest in Ecuador is a complex, lengthy and detailed story that is difficult to recount concisely.  Nonetheless, an understanding of these facts is critical to appreciate the improper and unfounded nature of Chevron's instant application and the reasons why it must be denied.

### Chevron and Ecuador

### A.    Chevron's Destruction of the Amazonian Rainforest

From 1964 to 1992, Chevron owned an interest in an approximately 1,500 square-mile concession in Ecuador that contained numerous oil fields and more than 350 well sites.  (*See* Certification of Sheldon Elsen ("Elsen Cert."), Ex. A at ¶ 13.[1]  Beginning in 1964 and continuing

---

[1] Plaintiffs' Complaint to Stay Arbitration dated January 14, 2010, ¶ 13.

at least until June 30, 1990 -- when it ceased being operator of the concession area – Chevron engineered and presided over what some experts believe is the worst oil-related environmental disaster in the world.  It deliberately dumped many billions of gallons of waste byproduct from oil drilling directly into the rivers and streams of the rainforest covering an area roughly the size of Rhode Island.  It gouged more than 900 unlined waste pits out of the jungle floor – pits which to this day leach toxic waste into soils and groundwater.  It burned hundreds of millions of cubic feet of gas and waste oil into the atmosphere, poisoning the air and creating "black rain" which inundated the area during tropical thunderstorms.  (*See* Elsen Cert., Ex. A at pp. 6-7.)

To put Chevron's villainous acts in proper perspective, Chevron deliberately dumped into Ecuador's Amazon rainforest many more times the amount of oil spilled by the Exxon Valdez.  In the impacted area of Ecuador today, due to the legacy created by Chevron, the natural environment of the Amazon rainforest on which thousands of people depend for their daily sustenance is for the most part poisoned.  (*See* Elsen Cert., Ex. A at p. 7.)  To minimize production costs, Chevron built an oil extraction system that was designed to pollute.  First, it discharged billions of gallons of "production water" (the contaminated waste water that is mixed with crude oil as it comes out of the ground) into streams and rivers – four million gallons *per day* at the height of the operation.  At Chevron's oil production facilities, the "formation water" was separated from the crude and discharged onto the ground and into the surface waters on a continuous basis, 24 hours per day, seven days per week, over a period of decades.  (*See id.* ¶ 14.)

Second, Chevron built over 900 open-air toxic waste pits in and around its well sites.  Chevron cut these pits directly into the floor of the jungle, and those pits had no lining to prevent their contents from migrating into the soil and groundwater.  To the contrary, Chevron designed

the waste pits to flow into neighboring streams and rivers. Chevron filled the waste pits with "drilling muds" and waste crude oil and then used them for permanent storage in violation of established industry standards. Chevron built many of its pits with piping systems used to drain these oil byproducts into nearby streams and rivers. Chevron would also set the pits on fire. In addition, the Company regularly dumped the oil sludge from the waste pits along dirt roads in the region. (*See* Elsen Cert., Ex. A at ¶ 16.)

Chevron's operation was grossly substandard by any measure: it violated, *inter alia*, then-current U.S. industry standards, Ecuadorian environmental law, the Company's contract with Ecuador's government – which prohibited Chevron from using production methods that contaminated the environment – and international law. Even Chevron's own internal audits of its environmental impacts, conducted in the early 1990s by independent outside consultants and placed in evidence in the Lago Agrio trial, found extensive contamination at Chevron's oil production facilities. Consistent with its willful neglect of Ecuador's Amazon rainforest and the people who lived there, Chevron also engaged in deliberate malfeasance: a 1972 memo from R.C. Shields, then head of Latin American production for Chevron, issued a blunt directive to Chevron's acting manager in Ecuador to destroy previous reports of oil spills and to forego documenting future spills in writing unless they were already known to the press or regulatory authorities. (*See* Elsen Cert., Ex. A at ¶¶ 15-17.)

## B.   Chevron Fights to Get to Ecuador's Courts

### *1.   The Ecuadorian Plaintiffs File in the Southern District, but – Touting Ecuador's Courts – Chevron Seeks to Evade American Jurisdiction*

In 1993, Ecuadorian indigenous people filed a federal class-action lawsuit against Chevron in the Southern District of New York, then the site of the global headquarters of Texaco, Chevron's predecessor in interest. The plaintiffs in that action "sought money damages

under theories of negligence, public and private nuisance, strict liability, medical monitoring, trespass, civil conspiracy, and violations of the Alien Tort Claims Act," as well as "extensive equitable relief to redress contamination of the water supplies and environment." *Aguinda v. Texaco, Inc.,* 303 F.3d 470, 473 (2d Cir. 2002).

From the lawsuit's inception, and for nine years, Chevron did everything it could to transfer the case away from the Southern District to the courts of Ecuador.[2] Chevron's motion on *forum non conveniens* and international comity grounds rested heavily on its argument that the Ecuadorian courts provided an adequate, fair, and neutral forum.

For nine years, Chevron touted the Ecuadorian judicial system, submitting numerous affidavits from experts and its own counsel, and repeating these assertions in extensive briefing. (*See, e.g.,* Elsen Cert., Ex. B at p. 34 ("Ecuadorian legal norms are similar to those in many European nations."); Ex. C at ¶ 2 ("the courts in Ecuador provide a totally adequate forum"); Ex. D at ¶ 6-7 ("the Ecuadorian courts provide an adequate forum for claims such as those asserted by the plaintiffs"); Ex. E at p. 1-5; Ex. F; Ex. G at p. 18 ("Ecuador's judicial system provides a fair and adequate alternative forum"); Ex. G at p. 1-21; Ex. H at p.3.)

     (a)    Chevron's First FNC Motion Fails Because Chevron Fails to Consent to Ecuadorian Jurisdiction

The district court granted Chevron's motion to dismiss on *forum non conveniens* and international comity grounds. *Aguinda v. Texaco, Inc.,* 945 F. Supp. 625, 627 (S.D.N.Y. 1996). The United States Court of Appeals for the Second Circuit, however, vacated and remanded, holding that a *forum non conveniens* dismissal would be inappropriate *unless* Chevron (then

---

[2] *See Aguinda v. Texaco, Inc.,* 945 F. Supp. 625 (S.D.N.Y. 1996), *vacated by Jota v. Texaco, Inc.,* 157 F.3d 153 (2d Cir. 1998); *Aguinda v. Texaco, Inc.,* 142 F. Supp. 2d 534 (S.D.N.Y. 2001), *aff'd Aguinda v. Texaco,* 303 F.3d 470, 476 (2d Cir. 2002).

Texaco) first consented to Ecuadorian jurisdiction.  *Jota v. Texaco, Inc.,* 157 F.3d 153, 155, 159

(2d Cir. 1998).  The court held:

> '[I]n order to grant a motion to dismiss for forum non conveniens,
> a court must satisfy itself [among other things] that the litigation
> may be conducted elsewhere against all defendants.'  . . .
> Accordingly, dismissal for *forum non conveniens* is not
> appropriate, at least absent a commitment by Texaco to submit to
> the jurisdiction of the Ecuadoran courts for purposes of this action.

*Id.* (citation omitted).

> (b)     On Remand, Chevron Promises to Consent to Ecuadorian
>         Jurisdiction and Satisfy Any Ecuadorian Judgment Subject Only to
>         a CPLR 5304 Defense

On remand, Chevron made a series of promises designed to ensure that the case would be

transferred to Ecuador.  On multiple occasions, Chevron promised to satisfy any Ecuadorian

final judgment, subject only to a single, defined defense (N.Y. C.P.L.R. § 5304) in an

enforcement action.

**Promise #1:**

The Ecuadorian plaintiffs submitted interrogatories to Chevron concerning its alleged

willingness to try the *Aguinda* case in Ecuador.  Those plaintiffs asked: "Will [Chevron] fully

satisfy any judgment entered against it . . . by an Ecuadorian court if the claims made herein by

Maria Aguinda and other members of the putative class are dismissed without prejudice and re-

filed in Ecuador?"  In a verified response, Chevron stated: "[Chevron] . . . *will* satisfy a final

judgment . . . in the event th[e] [*Aguinda*] action[ is] dismissed by this Court on grounds of

*forum non conveniens* or international comity and if plaintiffs refile claims in Ecuador.

[Chevron] reserves its right to contest any such judgments under [N.Y. C.P.L.R. § 5301 *et seq.*]."

7

(*See* Elsen Cert., Ex. I at ¶ 2.) (emphasis added)[3]   In a number of interrogatory responses, Chevron also referred the Ecuadorian plaintiffs to its moving *FNC* brief to be filed on January 11, 1999, wherein it promised to explicate further its willingness to satisfy a judgment in Ecuador.

**Promise #2:**

In that January 11, 1999 moving brief to the district court, Chevron explicated further and, in an attempt to induce the court to transfer the case to Ecuador, Chevron flatly represented:

> *If this Court dismisses* these cases on forum non conveniens or comity grounds, Texaco *will agree* as follows: . . . fourth, Texaco *will satisfy* judgments that might be entered in plaintiffs' favor, subject to Texaco's rights under New York's Recognition of Foreign Country Money Judgments Act [N.Y. C.P.L.R. § 5304].

(Emphasis added.)[4]

**Promise #3:**

Bolstering this unambiguous representation, Chevron's moving brief also cited its written "Agreements Regarding Conditions of Dismissal" ("Texaco Agreement") which it stated was "to be signed and filed with the Court in *Aguinda*" if the Court conditionally dismissed the case. (*See* Elsen Cert., Ex. G at p. 17 n. 7.)   The Texaco Agreement once again represented that it "agrees to satisfy a final judgment . . . in favor of a named plaintiff in Aguinda, subject to Texaco Inc.'s reservation of its right to contest any such judgment under New York's Recognition of Foreign Country Money Judgments Act." (*See* Elsen Cert., Ex. K at ¶ 5.)   Both

---

[3] Texaco's Objections and Resps. to Pls.' Interrogs. Regarding Proposed Alternative Fora (Dec. 28, 1998) (*See* Elsen Cert., Ex. I.)

[4] Texaco's Mem. Of Law Supp. Renew. Mots. To Dismiss (Jan. 11, 1999) (emphasis added). (*See* Elsen Cert., Ex. G at P. 16-17.)

Chevron and the district court in *Aguinda* repeatedly relied upon the Texaco Agreements.  (*See* Elsen Cert., Ex. H); *Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534, 539, 550 n.5 (S.D.N.Y. 2001).

**Promise #4:**

The Ecuadorian plaintiffs nevertheless remained suspicious that Chevron was not telling the truth, *i.e.*, that it was secretly planning to attack an Ecuadorian judgment after the *FNC* motion was granted and the case was safely out of the hands of a United States district judge. (*See* Elsen Cert., Ex. H, at p. 21.)  In response to these concerns, Chevron made a *fourth* unambiguous representation to the court in its reply brief, stating: Chevron "has agreed to satisfy *any* judgment in plaintiffs' favor, reserving its right to contest their validity *only* in the limited circumstances permitted by New York's Recognition of Foreign Country Money Judgments Act." (*See id.*) (emphasis added).

(c)      Chevron Knew What It Was Doing

Chevron's repeated representations and promises to the Ecuadorian plaintiffs and to the district court were not idle comments, but a considered and deliberate strategy by a sophisticated litigant and its counsel designed to escape federal court jurisdiction and send the case to what they believed was a more favorable venue, Ecuador.

At the time Chevron was touting the Ecuadorian legal system in the Southern District, it was fully aware that Ecuador did not have a perfect legal system.[5]  Chevron went to Ecuador with its eyes open, but its promises to the district court, to the Second Circuit and to plaintiffs were not ill-considered.   For Chevron still reserved for itself an escape hatch in case of

---

[5] *See, e.g.,* U.S. Dep't of State.  Ecuador: Country Reports on Human Rights Practices, Bureau of Democracy, Human Rights, and Labor, 2000.    February 23, 2001, available at http://www.state.gov/g/drl/rls/hrrpt/2000/wha/766.htm ("The Constitution provides for an independent judiciary; however, in practice the judiciary is susceptible to outside pressure and corruption."). (*See* Elsen Cert., Ex. J.)

misconduct, fraud, or other problems that could affect the Ecuadorian litigation in the future. That escape hatch was "New York's Recognition of Foreign Country Money Judgments Act," *i.e.*, N.Y. C.P.L.R. § 5304. (*See* Elsen Cert., Ex. H at p. 21 n.13.)

N.Y. C.P.L.R. § 5304 provides that, in an enforcement action, "A foreign country judgment is not conclusive if," *inter alia*:

> (a)(1) the judgment was rendered under a system which does not provide impartial tribunals or procedures compatible with the requirements of due process of law;
>
> . . . .
>
> (b)(3) the judgment was obtained by fraud;
>
> (b)(4) the cause of action on which the judgment is based is repugnant to the public policy of this state; [or]
>
> . . . .
>
> (b)(6) the proceeding in the foreign court was contrary to an agreement between the parties under which the dispute in question was to be settled otherwise than by proceedings in that court.

N.Y. C.P.L.R. § 5304. Thus, if and when plaintiffs secured a judgment in Ecuador, Chevron still reserved the ability in an enforcement action to defend itself on the grounds that due process was not followed (N.Y. C.P.L.R. § 5304(a)(1)), or that "the judgment was obtained by fraud" (N.Y. C.P.L.R. § 5304(b)(3)) or was against New York "public policy" (N.Y. C.P.L.R. § 5304(b)(4)). Whatever horribles that could occur in the future in an Ecuadorian case, Chevron, represented by sophisticated counsel, *prospectively* reserved to itself this particular, defined avenue to defend itself on due process and other specified grounds.

An enforcement action subject to a N.Y. C.P.L.R. § 5304 defense, of course, would be brought by the Ecuadorian Plaintiffs and those individuals would have an opportunity to rebut Chevron's allegations. By its very nature, an enforcement action would also be brought *after*, not before, judgment was entered.

> 2. *Based on Chevron's Representations, the District Court and the Second Circuit Grant the FNC Motion*

10

Relying on Chevron's representations, the district court then dismissed the case on *forum non conveniens* grounds.  *Aguinda*, 142 F.Supp.2d at 538-39.  The district court expressly cited the filed "Texaco Agreements" (*see* Elsen Cert. Ex. K), which contained Chevron's commitment to satisfy any final Ecuadorian judgment subject only to a N.Y. C.P.L.R. § 5304 defense.  *Id.* At 539.[6]

The *Aguinda* plaintiffs appealed again.  In its appellate brief, "ChevronTexaco," as it now called itself[7] — again repeated its consent to jurisdiction in Ecuador, and to the "other dismissal conditions in order to facilitate litigation in plaintiffs' home courts." (*See* Elsen Cert., Ex. B.)  In so doing, ChevronTexaco specifically cited the pages of the district court record that contained the Texaco Agreement, including its waiver of other defenses to enforcement of any Ecuadorian judgment.  *Id.* At p. 15 (citing, *inter alia*, JA4991-5002, which contains the Texaco Agreement).[8]

On this record, the Second Circuit affirmed the district court's second *forum non conveniens* dismissal.  *Aguinda v. Texaco, Inc.*, 303 F.3d 470 (2d Cir. 2002).  ChevronTexaco lauded the decision, stating in a press release that it was "pleased with the ruling of the U.S. Court of Appeals affirming the lower court's dismissal," which "vindicate[d] ChevronTexaco's long-standing position and the arguments we have made to the court:  The appropriate forum for this litigation is Ecuador." (*See* Elsen Cert., Ex. P.)

---

[6] *Aguinda*, 142 F. Supp. 2d at 539; (*See* Elsen Cert., Exs. K.; L at p. 5.).  After the dismissal, Chevron also signed a stipulation promising to submit to the jurisdiction of the Ecuadorian court. (*See* Elsen Cert., Ex. M.)

[7] Texaco merged with Chevron Corp. on October 9, 2001, and the merged entity initially changed its name to ChevronTexaco Corp. (*See* Elsen Cert., Ex. N.)  In 2005, ChevronTexaco Corp. changed its name back to "Chevron Corp." (*See* Elsen Cert., Ex. O.)

[8] After the district court dismissed *Aguinda* on FNC grounds, Chevron stipulated (once again) that it would agree to jurisdiction in Ecuador if plaintiffs re-filed their case there. (*See* Elsen Cert., Ex. M.)

C.     **The Lago Agrio Litigation**

1.     *Relying on Chevron's Promises, for Seven Years Plaintiffs Litigate One of the Largest Cases in Ecuadorian History, Revealing Overwhelming Evidence of Chevron's Illegal Conduct*

After final dismissal of the *Aguinda* action in 2002, the Ecuadorian plaintiffs re-filed the case in Lago Agrio, Ecuador.   The case began in 2003.   It has been highly contested and vigorously defended by Chevron.   The record contains more than *200,000* pages of evidence, roughly 63,000 chemical sampling results produced by laboratories contracted by both parties and the court expert, testimony from dozens of witnesses, and 102 judicial field inspections of former Chevron well and production sites conducted over a five-year period under the auspices of the court.   Soil samples from the production wells and separation stations inspected reveal extensive contamination in violation of Ecuadorian law.   (*See* Elsen Cert., Ex. A at ¶ 28.)

Notwithstanding the overwhelming evidence against it, Chevron remained committed to fight the litigation for as long as possible, by whatever means necessary.   In a 2007 press release, Chevron promised plaintiffs a "lifetime" of appellate and collateral litigation if they persisted in pursuing their claims.   (*See* Elsen Cert., Ex. Q.)   Or, as a Chevron spokesperson put it succinctly in stating company policy:   the Company would "fight" the *Aguinda* case "until hell freezes over" and then "fight it out on the ice."[9]

2.     *Chevron Attacks the Forum of Its Own Choosing*

(a)     Chevron Files a Private Arbitration to Avoid Ecuador Courts

Chevron is attempting to make good on its threat to fight until hell freezes over and thereafter.   Recognizing the enormity of the evidence, and the possibility that it may lose the

---

[9]   John Otis, *Chevron vs. Ecuadorean activists*, The Global Post, May 3, 2009, http://www.globalpost.com/dispatch/the-americas/090429/chevron-ecuador?page=0,2     (*See* Elsen Cert., Ex. T.)

Lago Agrio trial, Chevron hired new lawyers in 2009 and adopted a new litigation strategy: to defeat Ecuadorian jurisdiction, attack the Lago Agrio Court, and pre-empt any Ecuadorian judgment.

On September 23, 2009, Chevron filed a "notice of arbitration," allegedly pursuant to the U.S.-Ecuador Bilateral Investment Treaty. (*See* Elsen Cert., Ex. S.) Chevron has asked this private arbitration panel to order the government of Ecuador simply to tell the judge to dismiss the Lago Agrio litigation. (*See* Elsen Cert., Ex. S at ¶ 76(3).) Chevron's prayer for relief seeks, *inter alia*,

- a "declaration" that Chevron and its affiliates "have no liability or responsibility for environmental impact";
- a "declaration" that Chevron and its affiliates "have . . . no responsibility . . . for performing any . . . environmental remediation";
- "[a]n order and award requiring Ecuador to inform the court in the Lago Agrio Litigation" that Chevron and its affiliates "have been released from all environmental impact" arising out of their activities in Ecuador;
- a "declaration" that Ecuador "is exclusively liable for any judgment that may be issued in the Lago Agrio Litigation";
- "[a]n award for all damages caused to" Chevron and its affiliates, "including attorneys' fees incurred by" Chevron and its affiliates "in defending the Lago Agrio Litigation"; and
- "An award of moral damages to compensate" Chevron and its affiliates "for the non-pecuniary harm that they have suffered."

(*See* Elsen Cert., Ex. S at ¶¶ 76(1), 76(3), 76(4), 76(5), 76(6), 76(7).)  In short, Chevron is seeking an order through the arbitration panel requiring the Republic's President to violate Ecuador's Constitution, interfere with the country's independent judiciary, and quash a trial brought by Ecuadorian citizens against Chevron in the very court in which Chevron sought to have the claims heard.

At no point, however, either in its verified interrogatory response in the original 1993 case, (*see* Elsen Cert., Ex. I); its moving brief to the district court, (*see* Elsen Cert., Ex. G at p. 16-17); the Texaco Agreement, (*see* Elsen Cert., Ex. K. at ¶ 5); its reply brief to the district court,

(see Elsen Cert., Ex. II at p. 21); or its brief to the Second Circuit, (see Elsen Cert., Ex. R); did Chevron state, suggest, or in any way imply that it had reserved *any* right to attack or prevent an Ecuadorian judgment before a BIT tribunal.  (*See* Elsen Cert., Ex. W.)  To the contrary, Chevron repeatedly agreed to consent to Ecuadorian jurisdiction, and to satisfy any Ecuadorian judgment subject only to a N.Y. C.P.L.R. § 5304 defense in an enforcement proceeding.  (*See id.*)

Chevron's dubious basis for this extraordinary application is (1) that because the Republic of Ecuador released Chevron from environmental claims because of Chevron's purported remediation (a release, incidentally, that had nothing to do with third-party claims),[10] Chevron was also released *sub silentio* by plaintiffs, (see Elsen Cert., Ex. S at ¶¶ 14-21), and (2) Chevron's due process rights were violated in Ecuador in a number of respects, requiring dismissal of the Lago Agrio case. (*See* Elsen Cert., Ex. S at ¶¶ 35-65.)  Of course, before this court (the Southern District of New York), Chevron had reserved a different place (an enforcement court) and time (post-judgment) to address both its claims of release (N.Y. C.P.L.R. § 5304(b)(6)) and of due process (N.Y. C.P.L.R. § 5304(a)(1)).

Only companies and countries with investment disputes may appear before the BIT panel.  U.S.-Ecuador BIT Art. VI(1).[11]  The Ecuadorian Plaintiffs in this case may not.  Notwithstanding its promises to this Court, Chevron is therefore attempting to have a private

---

[10] See Elsen Cert., Ex. V; *see also Republic of Ecuador v. ChevronTexaco Corp.*, 376 F. Supp. 2d 334, 374 (S.D.N.Y. 2005) ("it is highly unlikely that a settlement entered into while *Aguinda* was pending would have neglected to mention the third-party claims being contemporaneously made in *Aguinda* if it had been intended to release those claims or to create an obligation to indemnify against them").  It is also notable that the Prosecutor General in Ecuador later determined that the certification of the alleged remediation by two Chevron lawyers (Messrs. Pallares and Veiga) and ten Ecuadorian officials was fraudulent, and brought criminal charges against those twelve individuals. (*See* Elsen Cert., Ex. AA.)

[11] http://www.state.gov/documents/organization/43558.pdf  (*See* Elsen Cert., Ex. W.)

arbitration panel order the dismissal of a seventeen-year litigation by 30,000 plaintiffs involving an oil disaster 10 times the size of the Exxon-Valdez, in a forum where plaintiffs cannot appear.

(b)   Chevron Uses § 1782 Applications In a Continuing Effort to Undermine the Proceedings in Ecuador

Faced with damning scientific evidence and the likelihood that the trial court in Ecuador will enter judgment assessing billions of dollars in damages, Chevron now seeks refuge and assistance from the American courts it eschewed previously in favor of the Ecuadorian court system.   Chevron is engaged in an unprecedented use of collateral proceedings in the American courts to portray itself as the victim, gain an unfair litigation advantage and divert the Ecuadorian plaintiffs' limited resources.  Clearly, these proceedings were not used to aid a foreign litigation.  Rather, they were improperly initiated to help devise this current action.

Over the course of the past year, Chevron has brought *twenty-five* 28 U.S.C. § 1782 lawsuits against dozens of non-parties (including counsel, documentary filmmakers, consultants, experts and others) throughout the country, in a national spectacle that one federal judge noted is "quickly spiraling out of control."[12]  The Chevron playbook in these actions is familiar.  It seeks massively overbroad and burdensome discovery on an expedited basis.  Chevron's discovery demands raise complicated legal and factual issues that would be difficult to resolve even under normal circumstances.   But it never seeks discovery under normal circumstances—Chevron always claims it needs the discovery immediately.  In orchestrating these scenarios, Chevron attempts to prevent the considered and deliberate analysis that these issues require.[13]   And

---

[12] *See* Elsen Cert., Ex. Y.

[13] A district court considering a recent § 1782 application specifically acknowledged that Chevron's late filing of the applications "created a situation" in which it would be very difficult to conduct a proper review and analysis of the parties' submissions by Chevron's deadline. (*See* Elsen Cert., Ex. AA at 170:10–25.)

sometimes these tactics have succeeded, forcing good judges to work under intense time pressures and rush to judgment—making mistakes in the process.

> *The Initial Wave: Chevron Obtains Discovery From Several U.S. Courts Concerning Contacts Between Plaintiffs and an Ecuadorian Court-Appointed Expert and Concerning the Involvement of Plaintiffs' Consulting Experts in the Preparation of That Expert's Report*

Between December 2009 and August 2010, Chevron filed applications for discovery pursuant to § 1782 against several of the Ecuadorian plaintiffs' U.S.-based environmental consultants, on the theory that these consultants had some involvement in the preparation of an expert report submitted by a court-appointed expert in the Lago Agrio litigation. This expert, Engineer Richard Cabrera Vega, was appointed by the Lago Agrio Court in March 2007 to serve as the "global damages assessment" expert – charged with submitting to the court a comprehensive submission that would assist the court in arriving at an appropriate valuation for each category of damages at issue in the case. (*See* Elsen Cert., Ex. BB at ¶¶ 8-13.) Mr. Cabrera performed no fewer than forty-eight separate site inspections on his own, in constant communication with the court. (*Id.* ¶ 13.) At the inspections and otherwise, Chevron attempted to impede Mr. Cabrera and delay the proceedings at every turn.[14] (*Id.*) Throughout the process, Chevron filed multiple motions attacking Mr. Cabrera's qualifications, credibility, processes, and findings.[15] (*Id.*)

---

[14] Contrary to court orders, Chevron disturbed the areas where Cabrera was scheduled to perform testing, *e.g.*, rolling in with machines that would compromise the ground to be sampled, interfering with Mr. Cabrera's ability to sample there. (*Id.*)

[15] Chevron's attacks on Cabrera were not limited to court proceedings. On November 6, 2007, Mr. Cabrera filed an official complaint with the Lago Agrio Court claiming that members of Chevron's legal team in Ecuador subjected him to threats and insults when he would conduct his field work. (*See* Elsen Cert., Ex. BB at ¶ 15.) In the complaint, Mr. Cabrera asserted that unknown persons were following him and members of his technical team in Lago Agrio, the town that he used as a base for his work in inspecting sites in nearby oil fields. (*Id.*) As a result

Mr. Cabrera submitted the global damages assessment (the "Cabrera Report") to the Lago Agrio Court on approximately April 1, 2008. However, it was not until December 2009 that Chevron filed its initial *ex parte* § 1782 petition seeking discovery from a consulting expert that Chevron had reason to believe played a role in preparing the Cabrera Report.[16]  *See In re: Application of Chevron Corporation*, 1:10-cv-00047-MSK-MEH, Dkt. 1 (D. Colo.)  Over the next few months, Chevron filed additional § 1782 applications in district courts around the country, most targeted at various sub-consultants who had contributed to the Cabrera Report in some way, arguing fraud and collusion by those actors in the drafting of the report that purportedly took place in Ecuador.  Chevron incorporated the video evidence, hours of deposition testimony, and hundreds of thousand of pages of documentary evidence that it obtained from these proceedings into numerous filings with the Lago Agrio Court, each of which laid out in great detail Chevron's theory that involvement of several of the Defendants in this action with the Cabrera Report required not only that the report be stricken, but that the entire case be dismissed. (*See* Elsen Cert., Ex. CC.)  Thus, the Ecuadorian court was and is well aware

---

of this complaint, the Lago Agrio Court mandated that Mr. Cabrera and members of his technical sampling team would be given law enforcement protection when conducting field work. (*Id.*)

[16] At that time, Chevron had at least a plausible justification for filing its application *ex parte*. But the fact that Chevron continues this practice after litigating against the Ecuadorian plaintiffs' U.S. counsel for approximately one year in district courts throughout the country – most applications are filed *ex parte* – is an egregious abuse of process and reflects a desire by Chevron to deny the Ecuadorian plaintiffs due process of law. *See In re Merck & Co.*, 197 F.R.D. 267, 270-71 (M.D.N.C. 2000) ("Nothing in Section 1782 states that the application is to be made *ex parte*, much less that the Court must entertain the application *ex parte*. Moreover, such a reading would seem to be contrary to the purpose of the statute, which is to help promote evenhanded justice and a sense of fair treatment."); *see also* Hans Smit, *American Assistance to Litigation in Foreign and International Tribunals: Section 1782 of Title 28 of the U.S.C. Revisited*, 25 Syracuse J. Int'l L. & Com. 1 (1998) ("[I]t is an elementary precept of due process that . . . *ex parte* applications are improper, and adequate notice of the [Section 1782] application should be given both to the person who is to produce the evidence and to adverse parties. . . . At the least, the court should consider assessing costs and attorney's fees against the party that made the original application.").

of the Ecuadorian plaintiffs' *ex parte* contacts with Cabrera and submission of materials to him—and, indeed, *invited* such contacts and submissions.  (*See* Elsen Cert., Ex. DD.)   When Chevron made the very same complaints about Cabrera to the Ecuadorian court that it has made to the various district courts hearing their § 1782 applications, citing hundreds of pages from discovery in their § 1782 actions, the Ecuadorian court ruled only that "the judge is *not* required to agree with the opinion of the experts" and instead (as described below) ordered the parties to submit their own supplemental submissions on damages.  (*See* Elsen Cert., Ex. EE.)   While perhaps foreign to the American system, Chevron has never identified a single order, a single rule, a single regulation, or a single law prohibiting *ex parte* contact between either party and court experts in the Lago Agrio Litigation.  Although the Lago Agrio Court has not to this point adopted Chevron's advocated Draconian position, the fact remains that the supposed Cabrera "fraud" is now before the Lago Agrio Court.

> *The Next Wave of § 1782 Applications:   Chevron Attempts to Justify its Continued Litigation of this Ecuadorian Case in the U.S. by Claiming that the Additional Expert Reports Submitted in September 2010 are Somehow Related to the Alleged "Fraudulent" Preparation of the Cabrera Report, Which Occurred Over Two Years Earlier.*

Chevron had the opportunity to ask the Lago Agrio Court to appoint a second expert (in addition to Mr. Cabrera) for purposes of the global damages assessment, but instead declined to do so, choosing the path of the obstructionist rather than using the damages assessment process as a means of constructively advocating its viewpoint on damages.  (*See* Elsen Cert., Ex. BB at ¶¶ 8, 9, 14, 15.)  Nonetheless, Chevron continued to assert that it had somehow been *frozen out* of the damages assessment process in the Lago Agrio Trial, and was being victimized.  Although the Ecuadorian plaintiffs believe that Chevron was not truly entitled to a second chance to make its case on damages to the Lago Agrio Court, they ultimately decided to attempt to put to rest any

further controversy on the matter by petitioning the Lago Agrio Court to allow both parties to put in an additional submission on damages. (*See* Elsen Cert., Ex. FF.) On August 2, 2010, recognizing the parties' heated disagreement on this issue and noting that the Court was not obligated to consider the findings set forth in the Cabrera Report, the Lago Agrio Court granted the Ecuadorian plaintiffs' request and invited the parties to file supplemental submissions justifying their respective positions on damages by September 16, 2010. (*See* Elsen Cert., Ex. GG.)

Both parties filed their damages submissions with the Lago Agrio Court on September 16 (the "September 16, 2010 supplemental damages submission" or "supplemental damages submission"). (*See* Elsen Cert., Exs. HH and II.) And, indeed, both parties appended to and relied on in their respective submissions numerous reports prepared by U.S.-based experts (*See* Elsen Cert., Ex. JJ.)

Chevron has since filed multiple § 1782 applications seeking discovery from experts who prepared reports appended to the Ecuadorian plaintiffs' supplemental damages submission. Chevron claimed that it "[was] entitled to the requested discovery to determine how Respondent fit[] into the known history of collusion and fraud in the Lago Agrio Litigation, and to support Chevron's claims against the Republic of Ecuador in the Treaty Arbitration." (*See, e.g.,* Elsen Cert., Ex. MM at p. 3.)

### D.    The Tactics of Chevron and its Counsel

#### *1.    Repressive Litigation as a Weapon*

The instant action is just the latest attack in a continuing campaign by Chevron and its counsel to intimidate all those who dare to challenge Chevron in the fight by the indigenous Ecuadorians for justice regarding the environmental destruction done by Chevron to the Amazon rainforest in Ecuador. And Chevron's counsel apparently is working to create a niche for itself

as "scorched earth" litigation counsel who will use any means to bully the opposition. Fortunately, other courts have seen fit to reject and punish such efforts.

(a)     Intimidation Efforts Via Section 1782 Proceedings

The practices of Chevron's counsel in depositions have been abusive – including opening the deposition of an environmental consultant by asking him if he is familiar with various criminal statutes – and have compelled defending counsel to seek relief from the district court in which the action is pending.  (*See generally* Elsen Cert., Ex. KK at p. 5.)

(b)     Intimidation Via Media

Even a review of just a few of the media statements made by Chevron's counsel on its behalf suffice to illustrate the efforts to frighten and squelch counsel for the Ecuadorian Plaintiffs:

- "Anyone jumping into bed with plaintiffs at this point needs to understand what they're signing on to," Chevron spokesman Kent Robertson said.  "They will be funding a fraudulent lawsuit." Judge Kaplan Lays Into Plaintiffs In Ecuador Suit Against Chevron, *Michael Goldhaber,* The AmLaw Litigation Daily (Nov. 8, 2010) (*See* Elsen Cert., Ex. LL.)

- ""It is surprising to me: the litigation tactics pursued on behalf of these plaintiffs to block, obstruct, and delay in the face of such damning and incontrovertible evidence in Ecuador," said Chevron outside counsel Randy Mastro of Gibson Dunn. "I think a lot of lawyers would have felt compelled to withdraw under such circumstances."" The Global Lawyer: The Mystery of the Ghostwritten Report, *Michael Goldhaber,* The AmLaw Litigation Daily (Jan. 28, 2011) (*See* Elsen Cert., Ex. NN.)

(c)     Intimidation Via Ethics Threats

Chevron's counsel has accused Patton Boggs LLP of professional ethics violations because of Patton Boggs' work in assisting the indigenous Ecuadorians with the submission of additional expert reports in the Ecuadorian litigation and has demanded that Patton Boggs immediately "withdraw" those additional expert reports.  Needless to say, the accusations are

without merit.  It is notable that it does not appear that either Chevron or its counsel have filed any complaint with any state ethics committee or other ethics authority.

In addition, before this very court in an action involving neither Patton Boggs LLP nor the indigenous Ecuadorian plaintiffs, Chevron sought sanctions against Patton Boggs LLP claiming that Patton Boggs did not have authority to represent the indigenous Ecuadorian plaintiffs.  As this court is aware, submissions have been made that clearly establish Patton Boggs LLP's authority and the total absence of merit to Chevron's claims.

(d)     Chevron's Counsel's Prior (Failed) Attempts at Repressive Litigation

Chevron's counsel is well acquainted with repressive litigation tactics.  On at least two prior occasions for different clients, Chevron's law firm, Gibson Dunn, has tried (and failed) to use such methods to achieve retribution or to squelch dissenting voices.

First, on behalf of its client Dole Food Company, Inc. ("Dole"), Chevron's counsel brought a defamation lawsuit against filmmakers who produced a documentary recounting Dole's use of pesticides in Nicaragua and litigation brought in the United States by banana plantation workers who claimed personal injuries resulting from exposure to those pesticides.  In response, the filmmakers filed a special motion pursuant to California's anti-Strategic Lawsuit against Public Participation ("SLAPP") statute to strike the complaint and for costs and attorneys fees.  Chevron's counsel dropped the defamation lawsuit but, pursuant to California's statute, the court continued the matter to consider the filmmakers' special motion and the issue of costs and attorneys fees.  The court determined that the filmmakers had proven their motion, that Chevron's counsel's lawsuit was a strategic lawsuit against public participation and that (had Chevron's counsel not dropped the suit) it was unlikely to have prevailed on the merits and so the lawsuit would have been struck, and therefore that costs and attorneys fees should be granted

against Dole in the amount of almost $200,000.   *See Dole Food Co. Inc. v. Gertten*, No. BC417435 (Cal. Super. Ct. Nov. 17, 2010).

Second, Chevron's counsel brought an action for malicious prosecution against Cristobal Bonifaz and his law office.   Mr. Bonifaz had brought an action against Chevron on behalf of several Ecuadorians claiming personal injuries from their alleged exposures to contaminants in the Amazon rainforest in Ecuador polluted by Chevron, an action which was later dismissed.   In response to the malicious prosecution claims, Mr. Bonifaz moved pursuant to California's anti-SLAPP statute to strike the complaint and for costs and attorneys fees.   The federal court found that Chevron had failed to show that it likely would have succeeded on the merits of its malicious prosecution claims, that evaluation of the evidence and discovery submitted indicated that Mr. Bonifaz' motion should be granted, struck Chevron's complaint and directed Mr. Bonifaz to recover his costs from Chevron.   *See Chevron Corp. v. Bonifaz*, No. 4:09-05371, Dkt. 71 (N.D. Cal. Oct. 8, 2010).

(e)   This Court's Predetermination of Issues

As the Court is well aware, various issues regarding one of the counsel for the indigenous Ecuadorians (Defendant Steven A. Donziger, Esq.) previously had been litigated before this Court.   And this Court has not been hesitant to express its views on a number of topics:

(i)   <b>This Court Grants Petitions Demanding 600 Hours of Outtakes from the Documentary <i>Crude</i></b>

In January 2009, *Crude*, a documentary about the Lago litigation, was premiered.   After a substantial and unexplained delay of over fifteen months, Chevron sued the filmmaker in April 2010, demanding all 600 hours of his outtakes from the film (the "Berlinger action").   This Court disregarded a pending motion before the Ecuadorian court concerning its receptivity to Chevron's § 1782 discovery.   (*See* Elsen Cert., Ex. OO at p. 35.) ("Believe me, if this were the

22

High Court in London, I'd wait [for the ruling from the foreign court].").)   Ultimately, notwithstanding the journalist's privilege, this Court granted the applications in their entirety.  *In re Application of Chevron Corp.*, 709 F. Supp.2d 283 (S.D.N.Y. 2010).  On appeal, the Second Circuit affirmed.  *Chevron Corp. v. Berlinger*, No. 10-1918-cv (L), 10-1966-CV (COW), 2011 WL 102671 (2d Cir. Jan. 13, 2011).

### (ii)      This Court Rules for Chevron, *Ex Parte*

Chevron then filed a § 1782 petition secretly and *ex parte* without any notice to Mr. Donziger or anyone else.  Rather than give Mr. Donziger or anyone an opportunity to contest the application, this court granted it, *ex parte*, without analysis.  (*See* Elsen Cert., Ex. QQ.)[17]

### (iii)     This Court Grants Chevron's Massive, Untimely Motion to Supplement, then Fails to Rule on the Indigenous Ecuadorians' Modest Motion to Correct a False Translation by Chevron in its Petition

Mr. Donziger and the indigenous Ecuadorians moved to quash the subpoenas Chevron issued out of the Section 1782 application that this Court granted *ex parte*.  After the completion of briefing, Chevron moved to supplement the record with hundreds of pages of material, including material in its possession *prior* to briefing.   Mr. Donziger and the indigenous Ecuadorians opposed the untimely motion, and at a minimum, requested that the court hold the record open to permit submission of responsive documents.  This Court granted Chevron's motion in its entirety, but refused to hold the record open for either Mr. Donziger or the indigenous Ecuadorians to submit responsive documents.  (*See* Elsen Cert., Ex. UU.)

Shortly thereafter, the indigenous Ecuadorians made a considerably more modest motion to supplement, to correct a single, false translation Chevron gave of a comment during a meeting

---

[17] In contrast, then-Part 1 Judge Koeltl in the prior *Berlinger* action permitted all parties to brief that § 1782 application.

with plaintiffs and Mr. Cabrera.  Chevron had claimed falsely that plaintiffs' Ecuadorian counsel, Pablo Fajardo, stated that Cabrera would simply "sign the report and review it."  (*See* Elsen Cert., Ex. VV at p. 8, 16; Ex. WW at ¶ 11.)  But the indigenous Ecuadorians' motion attached an accurate translation: "What the expert will do is **give his criteria . . . right . . . .his opinion**, and sign the report, and review it as well."  (*See* Elsen Cert., Ex. TT at p. 1.)  This Court has still not ruled on that motion to supplement.

> (iv)    **At Oral Argument, this Court Gives Its Unsupported View of the Merits of the Litigation in Ecuador**

At a prior oral argument before this Court, this Court let the parties know exactly what it thought of the merits of the litigation in Ecuador:

> [T]he truth of the matter is that Petroecuador was in this up to their eyeballs at the time Texaco made the deal to pull out 18 years ago and a deal was made between Ecuador and Texaco, and it was like all other settlements, presumably; nobody admits anything, but whatever, and here's the deal.  We're out, we're going to do this, you're going to do that and it's all over.  And then you come along with Mr. Donziger and the, I guess the Ecuadorian legislature amends the constitution to revive a claim or to create some new claim.  I understand all that.  Believe me I do.  The imagination of American lawyers is just without parallel in the world.  It is our one absolutely overwhelming comparative advantage against the rest of the world, apart from medicine.  You know, we used to do a lot of other things.  Now we cure people and we kill them with interrogatories.  It's a sad pass.  But that's where we are.  And Mr. Donziger is trying to become the next big thing in fixing the balance of payments deficit.  I got it from the beginning.

(*See* Elsen Cert., Ex. WW.)  Needless to say, this snap judgment was not made with the benefit of any of the Ecuadorian Court's seven-year, 200,000 page trial record which is replete with evidence of liability and damages – much of it coming from Chevron and its predecessor.

> (v)    **This Court's Comments At Oral Argument Reflect this Court's Prejudgment of The Issues and Invitation For The Commencement of This Action**

This Court's comments at oral argument in a proceeding before this Court on September

23, 2010, speak for themselves:

- "The object of ***the whole game***, according to Donziger, is to make this so uncomfortable and so unpleasant for Chevron that they'll write a check and be done with it. . . . So ***the name of the game*** is, arguably, to put a lot of pressure on the courts to feed them a record in part ***false*** for the purpose of getting a big judgment or threatening a big judgment, which conceivably might be enforceable in the U.S. or in Britain or some other such place, in order to persuade Chevron to come up with some money. ***Now, do the phrases Hobbs Act, extortion, RICO, have any bearing here?***" (*See* Elsen Cert., Ex. ZZ at 24:6-22.)

- THE COURT: "***I know the game here.***" (*Id.* at 35:19.)

- THE COURT: "***[I]t's a giant game here. It's a giant game.*** The name of the game is to string it out." (*See* Elsen Cert., Ex. AAA at 26:19-21.)

(all emphasis added).

## ARGUMENT

### I. THE COURT HAS NO PERSONAL JURISDICTION OVER THE ECUADORIAN PLAINTIFFS

#### A. The Court Ordered Method for Service of Process on the Indigenous Farmers and Laborers Does Not Comport with Due Process[18]

Service of process upon a foreign individual is governed by Federal Rule of Civil Procedure 4(f). That Rule permits process to be served upon a foreign individual "by any internationally agreed means of service that is reasonably calculated to give notice . . . ."; however, "if there is no internationally agreed means . . . by a method that is reasonably calculated to give notice," as required by the foreign country's law or directed by the foreign

---

[18] The objection to personal jurisdiction is not waived where a defendant raises such an objection along with other objections in its initial response. "No defense or objection is waived by joining it with one or more other defenses or objections in a responsive pleading or in a motion." Fed. R. Civ. P. 12(b)(7). In this Circuit, "'voluntary general appearance' does not constitute waiver of the defense of lack of jurisdiction over the person.'" *Noto v. Cia Secula di Armanento*, 310 F. Supp. 639, 643 n. 9 (S.D.N.Y. 1970 (quoting *Kerr v. Compagnie De Ultramar*, 250 F.2d 860, 864 (2d Cir. 1958)).

authority, or if not prohibited by the foreign country, either by personally serving the foreign individual or by use of mail, return receipt required. Fed. R. Civ. P. 4(f)(1) – (2)(C)(ii). A court may also order service "by other means not prohibited by international agreement." Fed. R. Civ. P. 4(f)(3).

While the provisions of Rule 4(f) are not predisposed to any hierarchical preference, a court granting alternative service under Rule 4(f)(3) may not abandon or ignore the strict and necessary requirements of due process. "Even if facially permitted by Rule 4(f)(3), the proposed means of service must also comport with constitutional notions of due process . . . which require notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*, 265 F.R.D. 106, 115 (S.D.N.Y. 2010) (internal quotations and citations omitted); *see also Philip Morris USA, Inc. v. Veles, Ltd.*, No. 06 CV 2988(GBD), 2007 WL 725412, at *2 (S.D.N.Y. March 12, 2007) (stating that "[w]hat constitutes appropriate will vary depending upon the particular circumstances of the case."). Notwithstanding the fact that a district court may permit alternative service under Rule 4(f)(3) in its sound discretion, this Court requires:

> The parties to show that they have reasonably attempted to effectuate service on the defendant(s) and that the circumstances are such that the district court's intervention is necessary. This requirement, although not expressly provided by Rule 4(f)(3), is necessary in order to prevent parties from whimsically seeking alternate means of service and thereby increasing the workload of the courts.

*Madu, Edozie & Madu, P.C.*, 265 F.R.D. at 115-16 (internal quotations and citations omitted) (plaintiffs failed to overcome threshold requirement that it reasonably attempted to effectuate service and that alternate means were necessary finding, *inter alia,* that plaintiffs failed to