indicate previous methods of service attempted and made bald assertions that service by letter rogatory was futile); *see also Ehrenfeld v. Mahfouz*, No. 04 Civ. 9641 (RCC), 2005 WL 696769, at *2 (S.D.N.Y. March 23, 2005) (referring to Rule 4(f)(3) alternate service stated that in order to obtain permission to effect service by alternate means, the plaintiff "must show that the facts and circumstances of the . . . case necessitate[ ] . . . district court [ ] intervention.") (internal quotations and citations omitted); *Ryan v. Brunswick Corp.*, No. 02-CV-0133E(F), 2002 WL 1628933, at *2 (W.D.N.Y. May 31, 2002) (imposing threshold requirement on plaintiff to demonstrate "that they have reasonably attempted to effectuate service on the defendant(s) and that the circumstances are such that the district court's intervention is necessary . . . .").

In the Order to Show Cause it submitted to the Court, Chevron proposed to effectuate (and the Court ordered) service of process upon 47 indigenous farmers and laborers in remote areas of Ecuador by sending an e-mail not to any of them but to Pablo Fajardo, an individual who Chevron "represented to the Court possesses a power of attorney" on behalf of all of them.[19] Chevron and the Court ignore that the powers of attorney do not bestow Fajardo with the authority to accept service of process.  Indeed, Chevron claims that some of these powers of attorney are forgeries, bestowing no authority at all upon Fajardo. [20]

---

[19]  Amazingly, Chevron seizes on these powers of attorney to imbue Fajardo with blanket authority to be elected by the Court to accept service of process for the indigenous Ecuadorians, while out of the other side of Chevron's mouth it claims that the very same powers of attorney are forgeries and invalid. *See* Compl.¶ 62.

[20] In *Forum Financial Group, LLC v. President, Fellows of Harvard College*, 199 F.R.D. 22 (D. Me. 2001), the Court allowed service on defendant's attorney, even though the attorney was not authorized to accept service. *Id.* at 24-25.  However, this case is inapposite here, as the Court stated "service of process via Spiegel is appropriate given Hay's efforts to evade service in Russia and Spiegel's recent acceptance of service on Hay's behalf in a case also involving Hay's business dealings in Russia." *Id.*  Clearly, the Court there conditioned its authorization of service on a set of very discrete and factually distinct set of circumstances.

While it is true that district courts have permitted service by e-mail under Rule 4(f)(3), the instant matter is not the "proper circumstance[]" which one could conclude that service by e-mail is "an appropriate means under Rule 4." *See Philip Morris*, 2007 WL 725412, at *2 ("What constitutes appropriate service will vary depending upon the particular circumstances of the case"). Chevron's proposal in this regard, and the Court's blind acceptance of it, cries out as a due process violation. Chevron has not made a sufficient showing that other methods of service are inadequate under the circumstances, that there is any likelihood that the 47 indigenous Ecuadorians will be properly notified of the present action, or provided any facts demonstrating that previous attempts to serve them by other means have failed. *See, e.g., Philip Morris*, 2007 WL 725412, at *2 (in granting e-mail as alternative means found that the plaintiff demonstrated the inadequacies of other means of service, that service by e-mail was likely to succeed due to defendants' exclusive use of the internet to conduct business and regularly corresponded with customers over e-mail, and that defendants refused to disclose their physical location or location of incorporation); *see also Ehrenfeld*, 2005 WL 696769, at *3 (declining to permit e-mail service as alternate means finding that circumstances did not comport to cases where "courts have upheld service via e-mail" which "involved e-mail addresses undisputedly connected to the defendants and that the defendants used for business purposes."); *Ryan v. Brunswick Corp.*, 2002 WL 1628933, at *2 (granting use of e-mail as alternate method where defendant maintained website that directed communication via e-mail finding that "[i]nasmuch as [defendant] conducts its business through these means of communication, such are reasonably calculated . . . ."); *Williams v. Advertising Sex, LLC*, 231 F.R.D. 483, 487-88 (N.D.W.Va. 2005) (permitting use of e-mail as means of service under Rule 4(f)(3) upon sufficient evidence by plaintiff demonstrating defendants were "sophisticated participants in e-commerce," that e-mail linked to an established

website used for business was a reliable channel of communication, and that prior attempts to serve defendants resulted in defendants attempt to evade formal service).

In a recent case analyzing alternative service, *Prediction Co. LLC v. Rajgarhia*, Judge Scheindlin stated that the plaintiff "must show that it has made a reasonable effort to effectuate service and that the facts and circumstances justify the Court's intervention." *Prediction*, No. 09-cv-7459, 2010 WL 1050307, at *2 (S.D.N.Y. Mar. 22, 2010). Chevron, however, pointedly avoids this requirement and merely requests the Court's intervention through Rule 4(f)(3), rather than using the more applicable Rule 4(f)(2)(A). The latter provision requires that a party seeking to effectuate service on a foreign defendant should attempt service "as prescribed by the foreign country's law for service in that country in an action in its courts of general jurisdiction." Fed. R. Civ. P. 4(f)(2)(A). Therefore, under the clear language of Rule 4(f) and the case law of this Court, if there are applicable service laws in Ecuador, Chevron should at least attempt to follow them before resorting to the last ditch "alternate means" it seeks under Rule 4(f)(3).

Ecuador has very clear laws regarding the service of process upon Ecuadorian citizens. Even more to the point, Ecuadorian law provides for service of process upon indigenous people.

> If a community of those termed "indigenous" is sued, the summons shall be served personally to at least five of the community members, each of which will be given a copy of the claim and court order, and record of evidence of reception shall be filed in the service proceedings.

> Furthermore, the clerk or process server shall read the claim and the respective court order on a public holiday in the courtyard of the parish to which the community belongs, at the busiest hour of the day; all of which shall be recorded in the respective minutes.

> If the community belongs to two or more parishes, the provisions of the preceding paragraph shall be applied in each of them.

(*See* Elsen Cert., Ex. XX.)

29

As previously stated, "what constitutes appropriate service will vary depending upon the particulars of the case." *Philip Morris*, 2007 WL 725412, at *2. Contrary to the clear Ecuadorian law on service of process to indigenous people, the Court has blessed Chevron's improper attempt to effectuate service on Ecuadorian Plaintiffs and many other indigenous farmers and laborers in the Ecuadorian Amazon region by emailing another foreigner who purports to hold powers of attorney for some of them. Ecuadorian law, however, provides that indigenous people must be *personally* served. According to Article 86, a process server (or other authorized person) must go to the village of the indigenous person and serve at least five members of the community OR read the notice out loud in the plaza of the parish on a holiday. (*See* Elsen Cert., Ex. XX.)

Notwithstanding the above, Chevron seeks to validate its proposed alternative service by pointing out that email service to parties residing in foreign countries has been allowed by various courts in the United States. Chevron further asserts that this service is valid because Mr. Fajardo has power of attorney over the other Ecuadorian plaintiffs in this litigation. However, as explained below, this is faulty logic and reasoning.

Chevron relies heavily on *Rio Properties, Inc. v. Rio International Interlink*, 284 F.3d 1007 (9th Cir. 2002) as support for its contention that email service in a foreign country is appropriate. However, that case is inapposite to this situation. In *Rio*, the Ninth Circuit allowed email service because the plaintiff was "[u]nable to serve [defendant] by conventional means." *Id.* at 1013. Indeed, the defendant in that action was a Costa Rican company with no listed Costa Rican address. *See id.* In *Rio* (unlike Chevron here) the plaintiff sought to serve defendant through various traditional means, but was thwarted in each attempt, as defendant successfully avoided service. *See id.* Therefore, the court held that plaintiff "needed only to demonstrate that

the facts and circumstances of the present case necessitated the district court's intervention" due to its "inability to serve an elusive international defendant." *Id.* at 1016. Moreover, the Ninth Circuit stressed that even if "facially permitted by Rule 4(f)(3), a method of service of process must also comport with constitutional notions of due process." *Id.*

Further, the Ninth Circuit recognized that the defendant in *Rio* was clearly attempting to avoid service through deception and duplicity. *Id.* at 1013-19; *see also U.S. Aviation Underwriters, Inc, v. Nabtesco Corp.*, No. C07-1221RSL, 2007 WL 3012612, at *2 (W.D.Wash. Oct. 11, 2007) (citing *Rio Prop. Inc.*, for the proposition that service by e-mail was not appropriate "unlike *Rio Properties* where the defendant was elusive and striving to evade service of process.") (internal quotations and citations omitted); *Williams*, 231 F.R.D. at 487 (stating that "the Ninth Circuit became the only court of appeals to recognize the propriety of service of process by e-mail under Rule 4(f)(3), when it held that the district could had not abused its discretion when authorizing e-mail service *after traditional attempts at service had failed*.") (emphasis added). Here, Chevron has made *no showing* that the Ecuadorian Plaintiffs have purposefully evaded service. Chevron never even attempted personal service.

Rather, it appears that Chevron seeks to bypass the longstanding notion of due process and hastily call upon this Court to order a method of service that, under both the laws of Ecuador and this District, are not "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Madu, Edozie & Madu, P.C.*, 265 F.R.D. at 115. As the Western District of Washington found in denying service by e-mail as an alternative means, "the requirements for due process and respect for international law outweigh plaintiff's desire to proceed expeditiously." *U.S. Aviation Underwriters, Inc,* 2007 WL 3012612, at *2. This Court should reach the same conclusion.

**B.      This Court Otherwise Has No Jurisdiction Over the Ecuadorian Plaintiffs**

The individuals whom Chevron has identified in its Complaint as the "Lago Agrio Plaintiffs" are 47 indigenous Ecuadorian farmers and laborers (among them the Ecuadorian Plaintiffs), most of whom have never set foot in the United States. Chevron alleges that this Court has personal jurisdiction over them "pursuant to N.Y.C.P.L.R §§ 301-02," but the "facts" which Chevron alleges to support such purported jurisdiction show that no such jurisdiction exists here.

As best can be determined, Chevron relies on diversity jurisdiction in bringing its claims against the Lago Agrio Plaintiffs. In a diversity case, personal jurisdiction is established pursuant to the law of the state in which the court sits. *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft* Corp., 751 F.2d 117, 120 (2d Cir.1984). Even if jurisdiction is established pursuant to the state's long arm statute, the court must assess whether the assertion of jurisdiction comports with the due process clause. *Metro. Life Ins. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir.1996); *Best Cellars Inc., v. Grape Finds at Dupont, Inc.*, 90 F. Supp. 2d 431, 444-45 (S.D.N.Y. 2000) (citing *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir.1999).

Without any level of specificity, Chevron purports to rely on "the provisions of N.Y. C.P.L.R. §§ 301-02"[21] to support personal jurisdiction over the Lago Agrio Plaintiffs. Under § 301, understood to be a "general jurisdiction" provision, a court may "exercise such jurisdiction over persons, property, or status as might have been exercised heretofore." N.Y. C.P.L.R. § 301. What § 301 requires is "continuous, permanent, and substantial activity in New York." *Landoil Res. Corp. v. Alexander & Alexander Servs., Inc.,* 918 F.2d 1039, 1043 (2d Cir.1990) (internal

---

[21] N.Y. C.P.L.R. § 302 has several subsections, but Chevron's Complaint leaves unanswered the question of which subsection(s) of § 302 it believes should apply here.

quotation marks and citation omitted).  Even assuming, without admitting, the accuracy of Chevron's jurisdictional allegations against the Lago Agrio Plaintiffs, they fall well short of demonstrating any continuous, permanent and substantial activity in New York to sustain jurisdiction over them under § 301.  The best Chevron can muster is to say that the Lago Agrio Plaintiffs have "purportedly engage[ed] New York attorneys and otherwise participated in related litigation in this District."  *See* Compl. ¶30.  The isolated engagement of a New York lawyer, and the isolated participation in a New York litigation, cannot seriously be considered the type of "continuous, permanent and substantial activity" in New York to confer general jurisdiction.  As such, § 301 is unavailing to Chevron.[22]

The other basis upon which Chevron asserts that the Court has personal jurisdiction over the Lago Agrio Plaintiffs is N.Y.C.P.LR. § 302, a "specific jurisdiction" statute.  As noted above, Chevron fails to specify which provisions of § 302 apply, but a careful analysis of their jurisdictional allegations demonstrates that no provisions of § 302 support jurisdiction over the Lago Agrio Plaintiffs.  Section 302(a)[23] provides, in pertinent part, as follows:

> As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent:
>
> 1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or
>
> 2. commits a tortious act within the state . . .; or

---

[22]  Chevron also seeks to turn this Court's comments in a prior action into a premise for permanent general jurisdiction over these 47 indigenous Ecuadorians.  *See* Compl. ¶30.  Of course, the Court's comments pertained to that action and that action only, as there is no basis for finding a party's participation in a New York litigation to be the kind of "continuous, permanent and substantial activity" to render that party forever subject to that court's jurisdiction.

[23]  Subsections (b), (c) and (d) of § 302 are non-applicable on their face and need not be addressed.

> 3. commits a tortious act without the state causing injury to person or property within the state, . . . if he
>
> (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or
>
> (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce . . . .

N.Y. C.P.L.R. § 302(a).

There is little question that subsections (2) and (3) cannot apply to the Lago Agrio Plaintiffs here. They have not committed, and are not alleged to have committed, any tortious act within New York State, so subsection (2) is unavailing. Nor are they alleged to derive substantial revenue from New York or from interstate or international commerce, or persistently or regularly engage in business or other conduct in New York, to permit the application to them of subsection (3). Thus, the only remaining jurisdictional provision which arguably may apply is § 302(a)(1).

Section 302(a)(1) itself has two components: A defendant may subject himself to personal jurisdiction by either by transacting business within the state or by contracting to supply goods or services within the state. N.Y. C.P.L.R § 302(a)(1). It is evident that the Lago Agrio Plaintiffs have never contracted to supply goods or services within the state. Whether they have transacted business in New York sufficient to confer personal jurisdiction under § 302(a)(1) is answered by "examining the totality of the circumstances . . . [, but] [t]he quality, rather than the quantity, of contacts with New York is the most important consideration." *In re Commodore Int'l, Ltd.*, 242 B.R. 243, 254 (Bankr. S.D.N.Y. 1999) (citations omitted). "A connection that is 'merely coincidental' is insufficient to support jurisdiction under N.Y. C.P.L.R. § 302(a)(1)." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 249 (2d Cir. 2007).

Chevron's allegations of the Lago Agrio Plaintiffs' participation in a prior New York litigation, and their engagement of New York counsel for that limited purpose and to represent and assist them in Ecuador, fall short of what is necessary to transact business in New York under subsection (a)(1). The section "requires an articulable nexus, a substantial relationship, between the New York activity, business or transaction and the asserted claim and injury," in order for the Court to obtain jurisdiction. *Chamberlain v. Peak,* 155 A.D.2d 768, 769, 547 N.Y.S.2d 706, 707 (N.Y. App. Div. 1989). Chevron does not allege that the Lago Agrio Plaintiffs' participation in the New York litigations has anything to do with Chevron's asserted claim and injury here. It does not. Nor does Chevron contend that the Lago Agrio Plaintiffs' engagement of Steven Donziger many years ago to represent their interests even occurred in New York. Thus, there is no "New York activity" of these Ecuadorian nationals which has the requisite nexus with Chevron's claims here to support jurisdiction under § 302 (a)(1).

Literally, and likely dispositive of the issues here, the law of the United States would not apply extraterritorially to the Ecuadorian Plaintiffs. As recently recognized by the Supreme Court of the United States, "it is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Morrison v. Nat'l Australia Bank Ltd.,* 130 S. Ct. 2869, 2877, 177 L.Ed. 3d 535 (2010) (internal citations omitted). This longstanding and recently espoused principle extends to many of the claims at issue here, and the Court lacks jurisdiction over the Ecuadorian Plaintiffs.

## II.   PRINCIPLES OF INTERNATIONAL COMITY AND ESTOPPEL PRECLUDE THE COURT FROM GRANTING THE EXTRAORDINARY RELIEF CHEVRON SEEKS

### A.   This Court Must Abstain from Deciding Issues that are Currently Before the Lago Agrio Court

1.     *International Comity*

Chevron requests this Court adjudicate claims of fraud that Chevron has been furiously litigating for years in the Lago Agrio Litigation.  Apparently, unhappy with its lack of success regarding these allegations in Ecuador, Chevron now seeks relief from this Court on these same issues that are currently before the Lago Agrio Court – ironically, the foreign court Chevron held in such high esteem nine years ago when it sought and successfully obtained from this Court a dismissal of the *Aguinda* action, the precursor to the Lago Agrio Litigation.  In a similar attempt to hedge, Chevron has brought these same claims before the UNCITRAL Bilateral Investment Treaty arbitration panel in the Hague (the "BIT Arbitration").  Because Chevron's allegations have been presented to and are pending before the Lago Agrio Court and the BIT Arbitration, this Court must abstain from entertaining Chevron's latest litigation tactic designed to interfere with the foreign proceedings.

In determining whether to abstain from exercising jurisdiction when litigation is pending in a foreign jurisdiction, federal courts "should be guided by the principles upon which international comity is based: the proper respect for litigation in and the courts of a sovereign nation, fairness to litigants, and judicial efficiency." *Royal & Sun Alliance Ins. Co. of Canada v. Century Int'l Arms, Inc.*, 466 F.3d 88, 94 (2d Cir. 2006).  As a general matter, comity is an equitable principle whereby federal courts afford respect and extend recognition to the judicial acts of a foreign sovereign for persons subject to the foreign nation's jurisdiction and laws. *Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240, 246 (2d Cir. 1999).  Courts apply comity where "foreign proceedings do not violate the laws or public policy of the United States and if the foreign court abides by fundamental standards of procedural fairness." *In re Bd. of Directors of Telecom Argentina, S.A.*, 528 F.3d 162, 171-72 (2d Cir. 2008).  The principles of abstention and comity require a consideration of numerous factors, including "the similarity of

the parties, the similarity of the issues, the order in which the actions were filed, the adequacy of the alternate forum, the potential prejudice to either party, the convenience of the parties, the connection between the litigation and the United States, and the connection between the litigation and the foreign jurisdiction." *Royal & Sun Alliance Ins. Co*, 466 F.3d at 94.

Here, the various factors all militate in favor of this Court abstaining from exercising jurisdiction. Chevron and the Ecuadorian Plaintiffs are both parties to the Lago Agrio Litigation.[24] Not only are the parties the same, but Chevron's allegations in this proceeding – allegations that the Lago Agrio Litigation is the product of fraud – are identical to those Chevron has repeatedly made before both the Lago Agrio Court and the BIT Tribunal.[25] Moreover, Chevron has never once argued the Lago Agrio Court lacks jurisdiction to resolve Chevron's claims of fraud – a fact buttressed by Chevron's bombardment of the Lago Agrio Court with voluminous submissions detailing the same allegations made here. *See JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 427 (2d Cir. 2005) (abstention warranted where, in part, claims at issue were properly before a Mexican court).

Furthermore, there can be no doubt that the Lago Agrio Court is both an adequate and convenient forum for resolution of Chevron's claims. Indeed, for nine years Chevron contended the Lago Agrio Litigation, previously pending in this Court, belonged in the Ecuadorian judicial system. (*See* Elsen Cert., Ex. G at 18.) ("Ecuador's judicial system provides a fair and adequate alternative forum").) Chevron got its wish in 2002 when the Second Circuit affirmed this

---

[24] The fact that some of Defendants are not named parties in the Lago Agrio Litigation is of no consequence in the comity analysis, as all Defendants have been the target of Chevron fraud allegations in the Lago Agrio Litigation. *See Royal & Sun Alliance Ins. Co.*, 466 F.3d at 94 (noting abstention does not require the parties to the foreign proceeding be exactly the same).

[25] The Ecuadorian Plaintiffs are not party to the BIT Arbitration and do not concede that the BIT Tribunal has any authority over the proceedings currently pending in Ecuador.

Court's decision to dismiss the *Aguinda* action to permit re-filing in Ecuador.  *Aguinda v. Texaco, Inc.*, 303 F.3d 470, 480 (2d Cir. 2002).

Were this Court to not abstain, the Ecuadorian Plaintiffs would suffer extreme prejudice. Chevron's legal gamesmanship is all too clear – a strategy predicated on delaying and undermining the Lago Agrio Litigation at all costs.  To that end, Chevron has proffered the same claims of fraud first before the Lago Agrio Court, second before the BIT Tribunal, and now before countless federal courts throughout the United States.  Try as Chevron might, it cannot escape the reality that the Lago Agrio Court retains jurisdiction over the underlying litigation, including jurisdiction over Chevron's assertions of fraud.  The Ecuadorian Plaintiffs have awaited resolution of their human rights and environmental damages claims since 1993 and should be entitled to pursue their claims in Ecuador, free of Chevron's stall tactics and free from the onslaught of collateral maneuvers in countless other tribunals.  In addition, abstention would not result in any prejudice to Chevron, as it is Chevron who sought and obtained the Ecuadorian court's jurisdiction over the Lago Agrio Litigation in the first place.  Chevron can hardly claim prejudice from having to suffer the results of litigation in a foreign jurisdiction of its choice. Indeed, interference with proceedings in a foreign jurisdiction is exactly what abstention and principles of comity prohibit, especially when it is Chevron who fought so hard to bring the Lago Agrio Litigation to Ecuador.  This Court must defer to the Ecuadorian judicial system and avoid adjudicating the claims which Chevron presents here.

In *Dow Jones & Co., Inc. v. Harrods, Ltd.*, 237 F. Supp. 2d 394 (S.D.N.Y. 2002), *aff'd*, 346 F.3d 357 (2d Cir. 2003), the plaintiff (also represented by Chevron's attorneys, Gibson Dunn & Crutcher) argued that the Court should exercise its power under the Declaratory Judgment

Act, 28 U.S.C. § 2201(a) (discussed *infra*), and in effect nullify any judgment that would result from a defamation proceeding pending in the United Kingdom. The Court refused:

> Dow Jones asks this Court, in aid of declaratory relief, to enjoin [the defendant] from pursuing its litigation in the London Action and every other possible forum. The Court cannot endorse such a far-reaching request. The constitutional strictures of the Full Faith and Credit Clause do not extend to international assertion of jurisdiction, especially those that the forum may consider extravagant.

*Id.* at 411 (citing *Restatement (Third) of Foreign Relations Law of the United States: Jurisdiction to Adjudicate* § 421(2)(i), at 304-05 (1987). This Court should take the modest approach adopted in *Dow Jones*, which as affirmed by the Second Circuit is binding precedent, and decline to interfere with the proceeding pending in Ecuador.[26]

In fact, the Court in *Dow Jones* found that tactics such as Chevron's should not be permitted to disrupt foreign proceedings. The Court was acutely aware of the public policy implications of a federal court issuing injunctive relief prohibiting parties from pursuing pending litigation in foreign proceedings. Fundamentally, the Court noted the founding principles of a functioning international arena reflect the "immutable concept of even sovereignty and the co-equality of states." *Dow Jones & Co., Inc.*, 237 F. Supp. 2d at 429. Restraints on pursuing foreign litigation, the Court recognized, could "invite a duel of injunction and counterinjunction" whereby the foreign court attempts to prevent further interference from American courts and preserve its legitimacy. *Id.* The Court cautioned that such acrimonious international judicial relations might have "significant bearing on the treatment American litigants receive when their disputes reach the tribunals of foreign countries for resolution." *Id.* at 430. As a result, the Court

---

[26] Indeed, other statutes generally bar federal injunctions on state suits already pending. *See* 28 U.S.C. § 2283 ("A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."

in *Dow* Jones stated such undesirable consequences must be considered when injunctive relief would interfere with proceedings in a foreign sovereign nation. *Id.* at 429.

Here, Chevron's central allegations of fraud in this case, largely surrounding the Cabrera report, have been fully presented to the court in Ecuador, and that court will consider those issues in rendering any judgment that may be forthcoming.   In recent months, Chevron has submitted to the Ecuadorian Court numerous motions attacking the Cabrera report and the integrity of the proceedings there.  In connection with those motions, Chevron has appended thousands of pages of deposition transcripts, emails and other documentary "evidence" obtained through its various § 1782  proceedings, most if not all of which it has now submitted or paraphrased to this Court in its TRO application.   As such, the Ecuadorian Court already has before it the very same evidence which Chevron asks this Court to consider now in the Southern District action.   The Ecuadorian Court certainly is equipped to analyze the impact, if any, of such evidence and fashion its final judgment to account for such evidence.  Thus, this Court should, at the very least, abstain from taking up the same matter and rule that Chevron's application is in affront to the sovereignty principles addressed in great detail by the *Dow Jones* Court and later affirmed by the Second Circuit.  As the *Dow Jones* court recognized,

> [i]n dealing with international commerce we cannot be unmindful of the necessity for mutual forbearance if retaliations are to be avoided; nor should we forget that any contact which we hold sufficient to warrant application of our law to a foreign transaction will logically be as strong a warrant for a foreign country to apply its law to an American transaction.

*Id.* (quoting *Lauritzen v. Larsen*, 345 U.S. 571, 582 (1953)).

Moreover, the Court in *Dow Jones* reasoned that the Declaratory Judgment Act ought not to be "misused to precipitous means to obtain access to court ahead of an opponent in an alternate action and thereby attempt to defeat an anticipated defense that may be interposed [in]

the other forum." *Id.* at 443.  Similarly, where, as here, injunctive relief is asserted to bar a litigant from pursuing a foreign litigation (such as any enforcement proceeding that may stem for a judgment in Ecuador), there is "no justifiable basis for issuing a restraining order for this purpose." *Id.* at 444.

> Grounds for particular circumspection derive in large part from the reality that ***no practical difference exists between an injunction restraining the parties and one addressed to the foreign court itself,*** thus highlighting the potential for deleterious conflicts with the orderly administration of justice of another sovereign state and for undue hindrance of the conduct of the foreign litigants.

*Id.* at 445 (emphasis added).  Under this reasoning, restraining Defendants from pursuing the fruits of the pending Ecuadorian proceeding is necessarily a restraint on the Ecuadorian Court itself – a consequence that threatens the legitimacy of the Ecuadorian Court and violates the basic principles of dignity afforded to the courts of sovereign nations.  Chevron's crafty assertion that it seeks only to enjoin Defendants and their agents from taking any action as a result of an Ecuadorian judgment that might issue, and not the court in Ecuador itself, is unavailing.  Cutting off Defendants rights' to pursue any judgment that may be entered in Ecuador would result in a serious miscarriage of justice, especially when Chevron has represented to this Court that it would agree to seek relief only by way of N.Y. C.P.L.R. § 5301, et seq.

### 2. *Uniform Foreign-Money Judgments Recognition Act*

But more importantly, there is an appropriate vehicle through which Chevron can raise its claims as to the validity of any Ecuadorian judgment.  Like the plaintiff in *Dow Jones*, once a judgment is entered in Ecuador, Chevron "will then accrue a justifiably ripe occasion to challenge in a United States jurisdiction any effort to enforce the judgment on the substantive grounds it prematurely interposes here." *Id.* at 446.  To support its claim for injunctive relief, Chevron argues, in essence, that it will suffer irreparable harm if an injunction is not entered

because the Ecuadorian Plaintiffs will move swiftly to enforce any judgment that the Ecuadorian court may issue, and that the cost of any seizure of Chevron's assets in the course of that enforcement will not be remediable. However, Chevron intentionally ignores the procedures of the anticipated enforcement proceedings, and it fails to recognize that many of the arguments it raises here (baseless as they are) are more properly asserted in subsequent enforcement proceedings.

Absent any preemptive treaty, state law governs the enforceability of foreign judgments. As articulated by the Supreme Court in 1895, foreign judgments are subject to enforcement in the United States through principles of comity as long as a "full and fair" trial was conducted in the foreign nation. *Hilton v. Guyot*, 159 U.S. 113, 202–03 (1895). That standard was later codified as the Uniform Foreign Money-Judgments Recognition Act (the "Act"). Currently, over half the states have adopted the Act in some form, including California and New York. *See* N.Y. C.P.L.R. § 5301 et seq.

Under the Act, there are three mandatory grounds for non-recognition of foreign judgments: "(1) the judgment was rendered under a system which does not provide impartial tribunals or procedures compatible with the requirements of due process of law; (2) the foreign court did not have personal jurisdiction over the defendant; or (3) the foreign court did not have jurisdiction over the subject matter." In the absence of one of these factors, the court also has the discretion to decline recognition if any of the following six factors are present: (1) the defendant did not receive sufficient notice to defend the proceedings; (2) the judgment was obtained due to fraud; (3) the cause of action at issue is repugnant to the enforcing state's public policy; (4) the judgment is in conflict with another final judgment that was rendered; (5) the foreign country's

proceedings were contrary to an agreement between the parties; or (6) the foreign court was a "seriously inconvenient forum" in the case of jurisdiction based solely on personal service.

Here, Chevron's claims of fraud, corruption, extortion, and the like are more properly reserved for collateral attack during the execution phase, after any judgment is entered. The law is clear: *Dow Jones* prohibits Chevron's pre-emptive efforts in this court.

**B.    Chevron is Estopped from Seeking to Invoke this Court's Jurisdiction Over Allegations Before the Lago Agrio Court**

Having previously argued in this very Court that the Lago Agrio Litigation must proceed in Ecuador, an argument this Court adopted (*see Aguinda, et al. v. Texaco, Inc.*, 142 F. Supp. 2d 534 (S.D.N.Y. 2001), Chevron now returns, arguing this time that this Court is in fact a proper forum. Such an invocation of this Court's jurisdiction is entirely inconsistent with Chevron's previous representations that the Lago Agrio Litigation belongs in Ecuador and Chevron's commitment to satisfy any judgment entered in Ecuador. In fact, the impetus for this entire case appears to have been off-hand comments this Court (Kaplan, J.) made on the record in an earlier § 1782 proceeding. As evidenced by the conclusion to the factual narrative set forth in Complaint in this case, Chevron has adopted the guidance provided by this Court:

> [T]he name of the game is, arguably, to put a lot of pressure on the courts to feed them a record in part false for the purpose of getting a big judgment or threatening a big judgment . . . . ***Now do the phrases Hobbs Act, extortion, RICO, have any bearing here?***

Compl. ¶ 302 (emphasis added). Using those ostensibly inviting comments as a springboard, Chevron now brings this case, alleging those very claims suggested by Judge Kaplan, in order to gain a tactical advantage over proceedings in a foreign country by capitalizing on the evidenced

antagonism toward the litigation strategy that the Ecuadorian Plaintiffs have pursued.[27]  *See Groden v. Random House, Inc.*, 61 F.3d 1045, 1053 (2d Cir. 1995).

Chevron should be estopped from doing so.  Judicial estoppel is an equitable doctrine that "prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken by [that party] in a prior legal proceeding."  *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2d Cir. 1999).  The doctrine is designed to remedy the risk of inconsistent results that threaten the integrity of the judicial system.  *Simon v. Safelite Glass Corp.*, 128 F.3d 68, 72 (2d Cir. 1997).  Judicial estoppel is invoked where "(1) a party's later position is 'clearly inconsistent' with its earlier position, and (2) the party has succeeded in persuading a court to accept its earlier position.  *Sewell v. 1199 Nat'l Benefit Fund for Health & Human Services*, 187 F. App'x 36, 40 (2d Cir. 2006).

Similarly, under the doctrine of equitable estoppel "a party may be estopped from pursuing a claim or defense where: (1) the party to be estopped makes a misrepresentation of fact to the other party with reason to believe that the other party will rely on it; (2) and the other party reasonably relies upon it; (3) to her detriment."  *Kosakow v. New Rochelle Radiology Assocs.*, 274 F.3d 706, 725 (2d Cir. 2001).

---

[27] Chevron's tactics in this regard are evidenced by its unusually lengthy Local Rule 1.6 "Related Case Explanation" designed to get this case assigned to Judge Kaplan, by whom the comments about RICO, extortion and the Hobbs Act were made.  In the Related Case Explanation, Chevron recounts the § 1782 collateral discovery proceedings before Judge Kaplan, one of which is the proceeding in which Judge Kaplan appeared to invite Chevron to bring the very claims alleged in this separate action.  Chevron made no effort to apprise the Clerk of other cases that may have been more related to (and other Judges perhaps more familiar with) the substance of the claims here, such as *Yaiguaje v. Chevron Corp.*, 10-cv-316 (Sand, J.) and *Aguinda, et al. v. Texaco, Inc.*, 142 F. Supp. 2d 534 (S.D.N.Y. 2001) (Rakoff, J.).  By virtue of this Court's invitation to Chevron to assert the claims in this newly filed action, it would appear advisable that this Court (Kaplan, J.) should recuse itself, as a reasonable person could conclude that this Court's impartiality to fairly decide the very claims it suggested Chevron assert is called seriously into question.

Chevron ignores the undeniably contradictory nature of its request that this Court enjoin the Ecuadorian Plaintiffs from taking any action to enforce any judgment that may be entered in the Lago Agrio Litigation. Over the course of nine years, Chevron fervently sought the dismissal of the initial *Aguinda* class action filed in this Court in 1993, premised on the legitimacy of Ecuadorian courts to resolve the claims brought against Chevron. *Aguinda v. Texaco, Inc.*, 303 F.3d 470, 473–76 (2d Cir. 2002). Indeed, Chevron submitted numerous affidavits from experts and its own counsel lauding the appropriateness of the Ecuadorian judicial system. (*See* Elsen Cert., Ex. C at ¶ 2 ("the courts in Ecuador provide a totally adequate forum"); ("the Ecuadorian courts provide an adequate forum for claims such as those asserted by the plaintiffs"). Chevron argued no differently in its briefing to this Court. (*See* Elsen Cert., Ex. G at p. 18.)

In further support of its motion to dismiss the *Aguinda* litigation, Chevron committed to submit to the jurisdiction of Ecuador. *Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534, 538 (S.D.N.Y. 2001). Chevron also agreed to "satisfy a final judgment (i.e. a judgment with respect to which all appeals have been exhausted), if any, entered against it in a Foreign Lawsuit in favor of a named plaintiff in *Aguinda*, subject to Texaco Inc.'s reservation of its right to contest any such judgment under New York's Recognition of Foreign Country Money Judgments Act." (*See* Elsen Cert., Ex. K at ¶ 5.)

This Court ultimately accepted Chevron's assertions and dismissed the *Aguinda* case on *forum non conveniens* grounds to permit re-filing the action in Ecuador. *Aguinda*, 303 F.3d at 476. On appeal to the Second Circuit, Chevron continued to tout the suitability of the Ecuadorian judicial system. (*See* Elsen Cert., Ex. B at p. 23.) Following the Second Circuit's decision to affirm this Court's dismissal of *Aguinda*, Chevron issued a press release, confirming

its "long-standing position" to this Court and the international community at large that "[t]he appropriate forum for this litigation is Ecuador." (*See* Elsen Cert., Ex. P.)

Now almost ten years later, Chevron decries the purported "systemic failures of the current Ecuadorian judicial system [that] has turned a blind eye to the overwhelming evidence of Defendants' fraud." (Pl's. Br. at 4.) Chevron's claim is as ironic as it is false. After previously arguing in this Court and in the Second Circuit that the Ecuadorian judicial system constitutes a noble body capable of fairly resolving the legal issues present in the Lago Agrio Litigation, Chevron now reverses course and argues in this Court that the Ecuadorian judicial system is a sham, inept, and unwilling to address Chevron's allegations of fraud.

In light of the foregoing, Chevron should be estopped from seeking its requested relief at this time and in this Court. First, Chevron's current vitriolic attacks on the Lago Agrio Court are inconsistent with its prior representations to this Court that the Lago Agrio Court is a virtuous judicial body. Chevron's attempt to preliminarily enjoin the Ecuadorian Plaintiffs from executing any judgment that may issue in Ecuador also contradicts its prior commitment to satisfy any judgment issued in Ecuador subject only to New York's Recognition of Foreign Country Money Judgments Act. Second, both this Court and the Second Circuit adopted Chevron's representations and commitments by dismissing the *Aguinda* action. A judicial estoppel is necessary to preserve the integrity of the judicial system both domestic and abroad. *Simon*, 128 F.3d at 72. Chevron seeks to flout the sensibility of this Court by flatly contradicting its prior representations before this Court that the Ecuadorian judicial system is best-suited to address the claims in the Lago Agrio Litigation – an unsurprising fact given Chevron's intent on doing whatever it takes to subvert and shut down the Lago Agrio Litigation. At the same time, Chevron degrades the Lago Agrio Court it previously held in seemingly high regard. Judicial

estoppel prohibits Chevron from now seeking to invoke this Court's jurisdiction to adjudicate matters in the Lago Agrio Litigation.

These facts equally support a claim for equitable estoppel. Upon the dismissal of the *Aguinda* suit by this Court for re-filing in Ecuador, which was premised on Chevron's consent to jurisdiction in Ecuador and commitment to satisfy any Ecuadorian judgment subject to New York law, a decision affirmed by the Second Circuit, the Ecuadorian Plaintiffs relied on Chevron's promises and re-filed their claims against Chevron in Ecuador in 2003. The Ecuadorian Plaintiffs have since expended significant time and resources litigating their claims in the forum of Chevron's choice and would suffer the enormous prejudice of wasting nearly eight years of Ecuadorian litigation only to have this Court adjudicate claims presently before the Lago Agrio Court.

Therefore, Chevron should be found to be judicially and equitably estopped from seeking a preliminary injunction or any other relief from this Court.

## III.   PLAINTIFF HAS NOT CARRIED ITS BURDEN TO ESTABLISH IT IS ENTITLED TO INJUNCTIVE RELIEF

### A.   Standard for Interim Injunctive Relief

Interim injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (internal quotation marks omitted) (quoting 11A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2948 at 129-30 (2d ed. 1995)) (emphasis omitted); *see also, e.g., Grand River Enter. Six Nations v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007); *Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir. 1985) (stating that the preliminary injunction "is one of the most drastic tools in the arsenal of judicial remedies").

47

Under the federal rules, the standard for granting a temporary restraining order and a preliminary injunction are identical. *AIM Intern. Trading LLC v. Valcucine SpA.*, 188 F.Supp.2d 384, 386 (S.D.N.Y. 2002). In order to obtain interim injunctive relief, a movant must clearly establish: "first, irreparable injury, and, second, either (a) likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships decidedly tipped in the movant's favor. *Green Party of New York State v. New York State Bd. of Elections*, 389 F.3d 411 (2d. Cir. 2004). Whether injunctive relief should issue or not "rests in the sound discretion of the district court which, absent abuse of discretion, will not be disturbed on appeal." *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990) (quoting *Thornburgh v. American College of Obstetricians and Gynecologists*, 476 U.S. 747, 755 (1986)).

The Second Circuit has deemed the threshold showing of "irreparable harm" to be of particular significance under Rule 65. *See, e.g., Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990). The movant is required to establish not a mere ***possibility*** of irreparable harm, but that it is "***likely*** to suffer irreparable harm if equitable relief is denied." *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990) (emphasis in original). "Likelihood sets, of course, a higher standard than 'possibility.'" *Id.*

**B.    Chevron Has Not Shown it Will Suffer Immediate and Irreparable Harm**

As set forth above, "a showing of irreparable harm is required for the imposition of any injunctive relief, preliminary or permanent." *Ford v. Reynolds*, 316 F.3d 351, 355 (2d Cir. 2003) (internal citations omitted). To make this showing, the movant (here, Chevron) must establish that the injury alleged is more than mere money damages." *Id.* (quoting *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989)). "Irreparable harm is established not only where the injury is actual and imminent but where no adequate legal remedy exists which would redress the harm, therefore mandating the exercise of the Court's equity powers."

48

*Consolidated Brands, Inc. v. Mondi*, 638 F. Supp. 152, 155 (E.D.N.Y. 1986).  The sound precept that 'equity should not intervene where there is an adequate remedy at law,' is well known and honored in this Circuit."  *Id.* (quoting *Loveridge v. Pendleton Woolen Mills, Inc.*, 788 F.2d 914, 918 (2d Cir. 1986); *see also Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979) ("irreparable injury means injury for which a monetary award cannot be adequate compensation").

The present case is about money, nothing else.  Therefore, there is no "irreparable harm" that Chevron will suffer in the event the Ecuadorian Plaintiffs are permitted to exercise their legal rights and enforce any judgment that the Court in Ecuador may issue.  In its brief, Chevron glosses over the critical requirement of irreparable harm and cites the stated intent of the Ecuadorian Plaintiffs' counsel to immediately enforce the judgment in Ecuador.  (*See* Pl's. Br. at 64).   Of course, that judgment is about money.  To the extent Chevron contends that those damages flow from a judgment that was otherwise procured by fraud, it has an adequate remedy at law (and via N.Y. C.P.L.R. § 5301 et seq.), rendering injunctive relief in this case improper.

Chevron's unsupported passing references to loss of goodwill, business relationship, and other intangible assets are similarly unavailing.  In making this argument, Chevron offers no sworn statement or uncontroverted evidence that enforcement proceedings related to a judgment in Ecuador will result in loss of good will or bankruptcy.  Of course, loss of business is not enough to be entitled to the extraordinary relief of an injunction. *Cf. Mondi*, 638 F. Supp. at 155 ("Loss of business, if it is not remote or speculative but actual, is a quantifiable injury.").  In fact, Chevron amazingly fails to offer <u>any</u> sworn evidence about the injury it asks this Court to believe will occur.

The cases Chevron offers do not support its contention that money damages is enough to meet the irreparable harm requirement. First, citing dicta from *Drobbin v. Nicolet Instrument Corp.*, 631 F. Supp. 860, 912 (S.D.N.Y. 1986), Chevron claims that money damages may satisfy the irreparable harm element if the defendants would not otherwise be able to compensate the plaintiff. But at this juncture, there is no proof as to the amount of damages at issue here. That is because, in part, no judgment has been entered in Ecuador, and Chevron cites to no proofs of the amount of damage it is facing.[28]   Second, Chevron's reliance on *Rockwell Int'l Sys., Inc. v. Citibank, N.A.*, 719 F.2d 583, 586 (2d Cir. 1983) is unavailing. There the Court recognized that "a remedy at law may be considered inadequate when the amount of damages would be difficult to prove . . . ." *Id.* at 586. The Court in that case also questioned whether the Republic of Iran was an adequate forum. *Id.* Here, on the other hand, if and when judgment is entered and execution is begun, the amount of damages will easily be established in that very judgment. Finally, *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 250 (2d Cir. 1999) is inapposite. In that case, the court recognized that the threat of insolvency may satisfy the irreparable harm element. *See id.* ("[C]ourts have excepted from the general rule regarding monetary injury situations involving obligations owed by insolvents."). Chevron concedes later in its papers, however, that "there is no reasonable basis on which to contend that Chevron would become insolvent or unreachable by U.S. courts . . . ." (Pl's. Br. at 67.)

In sum, Chevron can point to no "harm" other than having to face the consequences of a money judgment being entered against it in Ecuador. Such "harm" is not "irreparable," and is patently insufficient for interim injunctive relief.

---

[28] Other than to the Cabrera Report, which Chevron maintains is fraudulent and has attacked in the Lago Agrio Court.

**C.     Chevron Is Not Likely to Succeed on the Merits or Its Request for Injunctive Relief**

*1.     A Private Entity, Such as Chevron, Cannot Obtain Injunctive Relief in a RICO Action*

Whether or not Chevron is likely to succeed on the merits of its RICO claim is beside the point.  No court in this District has granted preliminary injunctive relief to a private citizen in a RICO case and not been overturned.   Recently, a court in this District dismissed a private plaintiff's RICO claims seeking preliminary injunctive relief, holding that RICO does not permit courts to provide such relief.  *See American Medical Ass'n v. United Healthcare Corp.*, 588 F. Supp.2d 432 (2008).  With this well-reasoned analysis and dispositive law in mind, this Court should reject Chevron's twisted mischaracterization of the applicable legal principles, and hold that RICO actions do not confer a right to injunctive relief to private citizens like Chevron.

Section 1964 of RICO has three subsections.  Subsection (a) provides:

> The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to:  ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons.

18 U.S.C. § 1964(a).  Subsection (b) permits the Attorney General to seek injunctive relief under the statute, and subsection (c) grants private litigants the right to seek treble damages under the statute.  *Id.*  While the question of whether a private citizen may seek injunctive relief under RICO has never been decided squarely by the Second Circuit, it has stated on multiple occasions that were it to ever decide the issue, it would likely find that no injunctive relief exists for private litigants under § 1964.  *See Sedima, S.P.R.L. v. Imrex Co., Inc.*, 741 F.2d 482, 490 (2d Cir.

1984), *rev'd. on other grounds*, 473 U.S. 479 (1985) ("While post-enactment legislative history is not by any means conclusive, it cannot merely be ignored. It thus seems altogether likely that § 1964(c) as it now stands was not intended to provide private parties injunctive relief.") (citations omitted); *Trane Co. v. O'Connor Secs.*, 718 F.2d 26, 28–29 (2d Cir. 1983) ("[I]t should be noted that courts which have confronted the issue have expressed serious doubt concerning the propriety of granting injunctive relief under any circumstances to private parties. . . . We have the same doubts as to the propriety of private party injunctive relief. . . .") (citations omitted).

Two Southern District cases, *Motorola Credit Corp. v. Uzan*, 202 F. Supp. 2d 239 (2002), and *American Medical Ass'n v. United Healthcare Corp.*, 588 F. Supp. 2d 432 (2008), have reached different conclusions on the question, and only one remains good law. *Motorola Credit Corp. v. Uzan* is cited by Chevron in its brief to support its contention that private RICO claims may support an injunction (Pl.'s Br. 33.) However, the injunctive relief granted by the Motorola court was overturned on appeal. *See Motorola Credit Corp. v. Uzan*, 322 F.3d 130 (2d Cir. 2003). Unsurprisingly, Chevron merely makes passing reference to the fact that its primary legal support for its argument is no longer good law. Moreover, in reaching the conclusion that § 1964 permits private RICO actions for injunctive relief, the *Motorola* court heavily relied on the non-controlling Seventh Circuit decision in *NOW, Inc. v. Scheidler*, 267 F.3d 687 (2001). That decision also was overturned. *See Scheidler v. National Organization for Women, Inc.*, 537 U.S. 393 (2003).

Apart from the bad law Chevron cites, the controlling law here is clear—private RICO plaintiffs cannot seek injunctive relief. The district court in *American Medical Ass'n v. United Healthcare Corp.*, 588 F. Supp. 2d 432 (S.D.N.Y. 2008), considered the express language of

RICO and concluded that a private party was not authorized to seek injunctive relief under the statute, and dismissed plaintiff's RICO claims seeking declaratory and injunctive relief under Federal Rule of Civil Procedure 12(b)(6). *Id.* at 446.

In reaching that conclusion, the *American Medical* court looked to the express statutory language of § 1964 to determine whether it supported the plaintiff's claim that RICO provides injunctive remedies to private citizens, before ultimately noting that it "contains nothing explicit to that effect." *Id.* at 445. *American Medical* next posited that Supreme Court precedent has "long held that 'it is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it.'" *Id.* (quoting *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 19 (1979)). This ideology, the court reasoned, "works congruently with another long-standing rule, cautioning that '[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others.'" *Id.* (quoting *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001)). The court determined that "if Congress expressly granted private litigants a right to seek damages under the statute, while remaining taciturn about a private litigant's ability to seek injunctive relief, this Court can neither infer a meaning that is unexpressed, nor ignore Congress's seemingly willful silence on the matter." *Id.* at 445–46; *accord In re Fredeman Litigation*, 843 F.2d 821, 830 (5th Cir. 1988) (holding that private injunctive actions under RICO are not cognizable because "Congress indeed had several opportunities to give express authorization to private injunctive actions but chose not to do so, apparently because it hesitated in the face of the ramifications of that remedy.")

Moreover, and crucial to this Court's decision, the *American Medical* court highlighted that *Uzan* and *NOW*, the two cases upon which Chevron most heavily relies in its brief to support its position on this issue, have been reversed and are no longer good law.  It observed:

> As it now stands, no Court controlling within this jurisdiction has recognized a right to injunctive relief for private litigants under Section 1964(a) of RICO–with one exception: *Motorola Credit Corp. v. Uzan*, 202 F.Supp.2d 239, 242 (S.D.N.Y. 2002) (Rakoff, J.), *rev'd. on other grounds*, 322 F.3d 130 (2d Cir. 2003). Significantly, however, this case (as well as, *NOW, Inc. v. Scheidler*, 267 F.3d 687(7th Cir. 2001), *rev'd on other grounds*, 537 U.S. 393, 123 S.Ct. 1057, 154 L.Ed.2d 991 (2003), the 7th Circuit precedent upon which it was based) was reversed on other grounds and is no longer considered good law.

*Id.* at 445.   Nevertheless, in footnote 11 of its brief, Chevron incredulously contends that *American Medical*, which has not been overturned and was decided well after *Uzan*, relied upon "outdated Second Circuit dicta."  Also, Chevron explicitly, and incorrectly, states in its brief that *American Medical* "relied heavily on an outdated Ninth Circuit opinion, which invoked snippets of legislative history to conclude that Congress did not intend to confer a private right to seek injunctive relief" (Pl.'s Br. 33, n.11 (internal citations and quotations omitted)), ostensibly referring to *Religious Tech Ctr. v. Wollersheim*, 796 F.2d 1076 (9th Cir. 1986).  However, *American Medical* never referenced *Wollersheim* in its written decision.  Rather, instead of relying on non-controlling case law from other circuits, as *Uzan* did, *American Medical* fashioned its decision in light of existing Second Circuit and Supreme Court case law in conjunction with its interpretation of the plain statutory language of § 1964.[29]

---

[29] These are not the only legal misrepresentations in Chevron's brief on this issue.   In one peculiar citation of authority, Chevron continues to discredit the holding in *Wollersheim* by stating that "[c]ommentators widely agree that the Ninth Circuit's reading of the legislative history is wrong." (Pl.'s Br. 33, n.11.)  To support this broad statement it cites to secondary sources, which were written in 1980 and 1983, respectively—years before *Wollersheim* was decided in 1986 and many years after *American Medical*.   Clearly, despite Chevron's

Chevron's principal argument that RICO must be "liberally construed to effectuate its remedial purposes" and that to proscribe interim injunctive relief would thwart those purposes is specious. (*See* Pl.'s Br. 33.) The Fifth Circuit considered and rejected a similar argument in succinct fashion. *In re Fredeman Litigation*, 843 F.2d 821, 830 (5th Cir. 1988). It reasoned:

> The Supreme Court has emphasized that all of [RICO's] provisions, especially § 1964(c), should be read in a liberal spirit. The 'liberal construction' directive, however, neither compels nor authorizes us to disregard convincing evidence from the legislative history that Congress believed it had not approved private injunctive remedies and balked at doing so.

*Id.*

At bottom, the law of this District does not recognize the injunctive relief Chevron seeks under RICO.

> 2.   *There Has Been No Showing that any of the Defendants Engaged in Extortion*

Nor is Chevron likely to succeed on its claims that RICO would apply to this case, or that any of the Defendants (including the Ecuadorian Plaintiffs) engaged in actions that amount to "extortion" under the Hobbs Act. As an initial matter, recent law of this District holds that RICO has no applicability to foreign acts, undertaken by foreign actors, in foreign jurisdictions. In *Cedeño v. Intech Group, Inc.*, -- F. Supp. 2d --, 2010 WL 3359468 (S.D.N.Y. Aug. 25, 2010), Judge Rakoff concluded that, in cases such as the one at bar where the alleged RICO enterprise

---

insinuations, those legal articles were not, and indeed could not be, criticizing the Ninth Circuit's decision to prohibit private RICO actions for injunctive relief, as it was written years later. Finally, *United States v. Phillip Morris*, 566 F.3d 1095 (D.C. Cir. 2009), the initial case cited by Chevron in its brief to support the proposition that "[i]njunctive relief is proper where a defendant has committed or intends to commit a RICO violation, and 'exhibits a reasonable likelihood of committing future violations'" actually provides no support for its theory. (Pl.'s Br. 31–32.) In *Philip Morris*, the RICO action seeking injunctive relief was initiated by the United States *government*, not by a private citizen. Under the express language of RICO's § 1964(b), it is undisputed that the Attorney General may seek injunctive relief. Accordingly, like each of its other cited sources, *Philip Morris* gives Chevron no support.

involves foreign acts and actors, RICO has no applicability.  Citing the recent United States Supreme Court decision *Morrison v. Nat'l Australia Bank Ltd.*, 130 S. Ct. 2869 (2010), which held that section 10(b) of the Securities Exchange Act had no extraterritorial applicability, Judge Rakoff in *Cedeño* concluded that "nowhere does [RICO] evidence any concern with foreign enterprises, let alone a concern sufficiently clear to overcome the presumption against extraterritoriality."  *Cedeño*, 2010 WL 3359468, at *2.  Indeed, RICO is silent as to any extraterritorial application.  *Id.*; *see also Norex Petroleum Ltd. v. Access Indus., Inc.*, -- F.3d --, 2010 WL 4968691 (2d Cir. Dec. 8, 2010) (holding that RICO does not apply extraterritorially to actions involving foreign claims and foreign acts).

In this case, the vast canvas of the alleged fraud perpetrated by certain of the Defendants is focused mainly in Ecuador.  Although there are certainly contacts between the matter in Ecuador and the presence of certain alleged actors in the United States, that fact alone is not dispositive.  *See Norex Petroleum*, 2010 WL 4968691, at *3 ("[I]t is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States.") (quoting *Morrison*, 130 S. Ct. at 2884).  Here, the thrust of Chevron's claim in the Court in Ecuador, the BIT arbitration, and now in this Court, is that the Cabrera Report was the product of collusion with Defendants' counsel in Ecuador and the result of essentially "rigging the system" in Ecuador to obtain a large judgment.  The locus of that activity is Ecuador, not the United States.  Thus, Chevron is not likely to succeed on the merits of its RICO claim under *Morrison* and its progeny.

Even assuming RICO applied beyond U.S. borders, Chevron has failed to state a claim of "extortion" under the Hobbs Act, which is one of the RICO predicates Chevron alleges.  The Hobbs Act defines extortion as "the obtaining of property from another, with his consent,

induced by wrongful use or actual or threatened force, violence or fear, or under color of official right." 18 U.S.C. § 1952(b)(2).  Extortion is the use of wrongful means to achieve a wrongful objective. *United States v. Enmons*, 410 U.S. 396 (1973).  "For a conviction under the Hobbs Act to stand, the statutorily identified means—actual or threatened force, violence or fear—must have been employed to obtain money or property to which the alleged extortionist had no lawful claim." *Center Cadillac, Inc. v. Bank Leumi Trust Co. of N.Y.*, 808 F. Supp. 213, 231 (S.D.N.Y. 1992).

Here, Chevron has not alleged, nor can it allege, that any of the Defendants have demanded money or any other property through extortion.  At this juncture, their lengthy argument on extortion is premised on guesswork, a mere anticipation that a large judgment from the Court in Ecuador will be issued.  Absent an actual threat to obtain money from Chevron, the extortion claims in this case fail.  *See Bowoto v. Chevron Corp.*, 481 F. Supp. 2d 1010, 1016 (N.D. Cal. 2007) (holding that without obtaining any property, plaintiffs' extortion claims under the Hobbs Act fail).  Any "indirect theory of extortion does not fit the plain language of the Hobbs Act, and is unsupported by caselaw." *Id.*

The litigation tactics and purported maneuvering that Chevron outlines in its papers also fall short of stating a cognizable claim under the Hobbs Act, and certainly do not support relief under RICO.  In *Park South Assocs. v. Fischbein*, 626 F. Supp. 1108 (S.D.N.Y. 1986), the defendants were a law firm representing various tenants in fighting the purchase and conversion of property from apartments to condominiums.  In the course of their zealous representation, the defendants (1) initiated a number of legal proceedings to delay building plans, (2) filed complaints with the New York State Department of Housing and Community Renewal ("DHCR") for harassment and diminution of services, (3) filed actions in Landlord-Tenant Court

alleging a decrease in services, (4) advised clients to withhold paying rent because the premises were not habitable, and (5) caused New York City to institute litigation against the plaintiff. *Park South Assocs.*, 626 F. Supp. at 1110-11. The defendants also were alleged to have offered a bribe to an employee of the plaintiff to serve as a "spy," and they made statements to their adversary that the DHCR proceedings were "rigged" and that plaintiff should walk away from the property. *Id.* at 1111.

The court dismissed the RICO claims in that case, holding that the plaintiff could not include the Court system as part of the fraudulent enterprise without a government employee being alleged to be part of the fraud. *Id.* at 1112. But more to the point, the Court rejected the plaintiff's argument that the defendants had engaged in extortion under the Hobbs Act as none of the defendants were public officials acting under color of official right. Speaking directly to the litigation tactics employed, the court reasoned: "The tenants wanted to thwart [the plaintiff's] plans for the building. It appears they have been, in some measure, successful. It would be ludicrous to conclude that the acts complained of were not undertaken for the material benefit of the lawyers and the clients they were representing." *Id.* at 1114. That reasoning is applicable here.

First, if this Court were to accept Chevron's argument, then the flood gates would open and any zealous representation or prosecution of a case that involved substantial damages would potentially violate RICO. Even construing RICO broadly, principles of equity and common sense cannot support such a result. Moreover, much of Chevron's RICO woes stem not from any threats of violence or overt acts to extort money or property from Chevron, but instead they stem from the specter of large damages award obtained through counsel's zealous representation overseas. Indeed, no property has yet been obtained. *See Bowoto v. Chevron Corp.*, 481 F.

Supp. 2d at 1016.  Rather, Chevron is seeking to hold the Ecuadorian Plaintiffs and their counsel liable for zealous representation in seeking recovery for billions in environmental damages which Chevron caused.

>    3.    *Chevron is Not Entitled to Relief Under the Declaratory Judgment Act, 28 U.S.C. § 2201*

Pursuant to 28 U.S.C § 2201(a), Chevron seeks a declaration of non-enforceability on a judgment that does not exist.  Neither the law nor logic permits such relief.  28 U.S.C. § 2201(a), otherwise known as the Declaratory Judgment Act (the "Act"), provides, in pertinent part:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201 (a).  The Act "permits the court in one action to define the legal relationships and adjust the attendant rights and obligations at issue between the parties so as to avoid the dispute escalating into additional wrongful conduct."  *Dow Jones & Co., Inc. v. Harrods, Ltd.*, 237 F. Supp. 2d 394, 405 (S.D.N.Y. 2002).  But the Act only may be invoked in cases where there is an "actual controversy."  *Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237 (1952) (citing *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227 (1937).  Put another way, in order for a litigant to obtain relief under the Act, there must be a justiciable controversy, not a dispute premised on mere hypotheticals, such as the one at bar.  *Id.* at 242.  The long-held rule in this regard plainly states: "The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests.  It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts."  *Id.* at 242-43.

In *Dow Jones*, the Plaintiff (represented by Chevron's attorneys here, Gibson Dunn & Crutcher) engaged in the same sharp preemptive tactics that are now before this Court.[30]  The plaintiff in *Dow Jones* sought a declaration that any libel claim brought in an English court attributable to the plaintiff's statements that the defendant was the "Enron of Britain" would be insufficient as a matter of law. *Id.* at 403.

The Court disagreed because, among other things, no "actual controversy" existed that would warrant relief under the Declaratory Judgment Act.  The "actual controversy" requirement "circumscribes federal jurisdiction to real conflicts so as to preclude the courts from gratuitously rendering advisory opinions with regard to events in dispute that have not matured . . . ." *Id.* at 406.  Moreover, the controversy must not be nebulous or contingent.  *Id.* (internal citations omitted).  In finding that no actual controversy existed in *Dow Jones*, the Court described the plaintiff's theory as follows: "[U]nder Dow Jones' theory, an actual controversy exists by reason of the mere potential that Dow Jones may be exposed to liability in the London Action and that its being compelled to defend a lawsuit that would be found meritless in any court of the United States violates Dow Jones' First Amendment rights." *Id.* at 407.  The court rejected that theory: "[I]t does not follow that the mere prospect that such a ruling may be rendered at some indefinite point in the future raises a sufficient actual controversy within the meaning of the DJA." *Id.* at 408.

Chevron's attorneys (the same firm which represented Dow Jones) are asserting an argument here that is virtually the same, and this Court should reject it for the same reasons the

---

[30] Amazingly, Chevron contends that *Dow Jones* is not applicable here because "[a] judgment against Chevron for billions of dollars is a foregone conclusion, and Defendants have consistently professed their intent to immediately seek to enforce judgment." (Pl's. Br. at 55 n. 21.)  But the simple fact remains that no judgment has yet been rendered in the Ecuador proceedings.

court declined to grant relief under the Act in *Dow Jones*. Here, Chevron argues that a judgment is "imminent" and all that is left to publicly reveal is the "exact amount." (Pl's. Br. at 54). In other words, Chevron's "actual controversy" argument is premised on its own say-so. Cutting through the statements purportedly made by Defendants' counsel (in communications that were intended to be privileged), the Court in Ecuador has ***not entered any judgment.*** Chevron's contentions, therefore, are based purely on conjecture. There is no actual controversy that would trigger the Act or the Court's power thereunder. Indeed, Chevron admits that "the consequences of a prospective judgment and enforcement action are difficult to predict and cannot be estimated with precision . . . ." (Pl's. Br. at 55.)

Moreover, cases Chevron cites do not lend any support for its position in this regard. For example, Chevron opens its argument that it is likely to succeed on the merits of Declaratory Judgment Act claim with a quotation from *Italverde Trading, Inc. v. Four Bills of Lading*, 485 F. Supp. 2d 187, 213 (E.D.N.Y. 2007). But *Italverde* does not cite, much analyze the Act. Moreover, the court in *Farrell Lines Inc. v. Columbus Cello-Poly Corp.*, 32 F. Supp. 2d 118 (S.D.N.Y. 1997), while finding an "actual controversy," nonetheless recognized the general rule that "courts should be dubious of declaratory judgment actions when the plaintiff files suit to interfere with an action already filed or in anticipation of defendant filing suit in another forum."[31] *Id.* at 124.

At bottom, Chevron is unlikely to succeed on the merits of this claim. Chevron's fears of a prospective judgment and subsequent enforcement proceedings are not enough to satisfy the

---

[31] *Farrell*'s holding is inapposite as well. In that case, the Court found an actual controversy because it declared relations between the parties, as defined by contract (i.e., the bill of lading at issue). *See Farrell*, 32 F. Supp. 2d at 124. The circumstances of this case are vastly different. Here, Chevron seeks to enjoin Defendants from proceeding in litigation that is years old, citing the danger posed by a judgment that has not been issued and does not exist.

Act, especially in light of its claims of collusion and fraud allegedly exercised in obtaining that judgment. *See Dow Jones*, 237 F. Supp. 2d at 408 (holding that the plaintiff's "own express confidence that any judgment rendered against it in the [foreign court] would be summarily dismissed in any United States court works against its strenuous assertions that it faces a real, sufficiently direct immediate threat of injury").

      4.     *There is No Showing that New York Law Applies to the Common Law Claims Asserted in the Complaint*

With respect to the other causes of action set forth in the Complaint—fraud (Count Three), tortious interference with contract (Count Four), trespass to chattels (Count Five), unjust enrichment (Count Six), and civil conspiracy (Count Seven)—choice of law principles undercut Chevron's arguments that it is likely to succeed on the merits of those claims. Chevron has assumed, without providing any legal analysis, that New York law should govern the common law claims in this litigation. However, while this case was filed in the Southern District of New York, it remains far from settled which law from which jurisdiction will apply to the alleged common law claims. Indeed, the Court has the option of applying New York (forum), California or Delaware (plaintiff's domicile), or Ecuadorian law (location of alleged RICO scheme), among others.

In an action based on federal question jurisdiction, the court must apply federal common law choice of law rules to determine which jurisdiction's laws govern. *See, e.g., Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 629 F.2d 786, 795 (2d Cir. 1980); *Cromer Finance Ltd. V. Berger*, 137 F. Supp. 2d 452, 470 n.15 (S.D.N.Y. 2001). To determine this, the Second Circuit applies the law "of the jurisdiction with the greatest interest in the legal claim at hand." *See Cromer*, 137 F. Supp. 2d at 470 n.15 (citing to *Corporacion*, 629 F.2d at 795). In diversity cases, "federal courts apply the choice of law rules of the forum state, in this case, New

York." *Gilbert v. Seton Hall University*, 332 F.3d 105, 109 (2d Cir. 2003). The preliminary inquiry must be "whether there is actual conflict between the laws of the jurisdictions involved." *Stichting Ter Behartiging Van De Belangen Van Oudaandeelhouders In Het Kapitall Van Saybolt Int'l B.V. v. Schrieber*, 407 F.3d 34, 46 (2d Cir. 2005) (citing *Matter of Allstate Ins. Co.*, 81 N.Y.2d 219, 223, 597 N.Y.S. 2d 904 (1993)). For tort claims, "'the preferred analytical tool . . . is tool is to apply 'interest analysis,' where the policies underling the competing laws are considered." *Finance One Pub. Co. Ltd. v. Lehman Bros. Special Fin.*, 414 F.3d 325, 336 (2d Cir. 2005) (quoting *Allstate Ins. Co.*, 81 N.Y.2d at 225)). Therefore, the law of the jurisdiction with the greatest interest in the case will apply.

Based on the allegations set forth in Chevron's pleading (which spans approximately 150 pages), it unclear what, if any, interest New York has in the outcome of this litigation. Chevron is a citizen of Delaware and California, and the vast majority of Defendants are indigenous people from the Ecuadorian Amazon region. Only two Defendants, Steven Donziger and his self-titled law firm, are residents of New York. Moreover, the vast majority of the acts alleged in the RICO complaint are based on conduct in a litigation taking place in Ecuador.

In the Complaint, Chevron makes many conclusory allegations regarding a plot to extort Chevron that was allegedly "conceived and substantially executed in the United States." Compl. at ¶1. However, Chevron fails to point to any specific events that occurred in New York. Indeed, it seems that while Chevron alleges that "a substantial number of events giving rise in this action occurred in this district", Compl. at ¶22, New York is actually only mentioned in a

handful of allegations, and many times it is in reference to the § 1782 actions initiated by Chevron, or to minor events in the alleged scheme.[32]

Ecuador, however, is named in a multitude of paragraphs and appears to be the location of the majority of the Defendants' alleged acts. For example, whole sections of the Complaint are dedicated to acts which allegedly occurred in Ecuador, such as Section B1- "Pressuring the Lago Agrio Court and Manufacturing Evidence" and Section B2- "Colluding With the Republic of Ecuador to Bring Sham Charges Against Chevron's Attorneys". Those two sections are at the core of Chevron's Complaint, including a total of 67 pages of allegations. By contrast, the section entitled "The Conspirators' Campaign of Lies and Obstruction in U.S. Courts", which is not exclusive to New York, is only 18 pages long. The only section specific to New York, "Making False Statements to Deceive New York Courts in Connection With Chevron's Section 1782 Applications and Other Actions", makes up but a small fraction of the Chevron's allegations in this matter.

While there are several other states that may have a nominal interest in this litigation, it is unnecessary to discuss each one's interest in the outcome of this case. It is clear, from Chevron's own allegations, that Ecuador has the greatest interest in the outcome of this litigation. This RICO litigation will directly affect the outcome of the Lago Agrio litigation, and Chevron's own complaint is focused on alleged acts that occurred either in Ecuador or for the benefit of the Lago Agrio Litigation. Thus, Chevron's "New York law" analysis of the alleged merits of its

---

[32] For example, the Complaint mentions such New York acts as reaching out to the New York Attorney General (Compl. ¶ 227), meeting the Managing Director of Oil & Gas Equity at UBS (Compl. ¶ 233) and appearing before the Southern District to dispute Chevron's discovery of outtakes from the movie *Crude* (Compl. ¶ 277-282).

common law claims is of no guidance to the Court, and the Court is without any basis to determine the potential success of those claims under Ecuadorian law.[33]

### D.      The Balance of Hardships Does Not Favor Chevron

Unless the balance of hardships tips decidedly in favor of the movant, the Court need not determine whether serious questions presenting a fair ground for litigation exist. *Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.*, 601 F.2d 48, 58 (2d Cir. 1979).  To prove that the balance of hardships tips in its favor, a movant must show that the harm it would suffer without the relief sought is *decidedly* greater than the harm its opponent would suffer if injunctive relief was granted. *Buffalo Forge Co. v. Ampco-Pittsburgh Corp.*, 638 F.2d 568, 569 (2d Cir. 1981) (emphasis added).  "The balance of hardships inquiry asks which of the two parties would suffer most grievously if the preliminary injunction motion were wrongly decided." *Tradescape.com v. Shivaram*, 77 F. Supp. 2d 408, 411 (S.D.N.Y. 1999).

---

[33] Even assuming New York law were to apply to the common law claims, Chevron has no likelihood of success.  For example, Chevron's civil conspiracy claim should be dismissed in short order.  "Civil conspiracy is not an independent tort in New York, and this claim is therefore dismissed." *Biosafe-One, Inc. v. Hawks*, 639 F. Supp. 2d 358, 369 (S.D.N.Y. 2009).  Chevron's unjust enrichment claim fares no better.  To establish a claim for unjust enrichment, Chevron must plead: "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of N.J.*, 448 F.3d 573, 586 (2d Cir. 2006). Chevron points to no benefit that the Ecuadorian Plaintiffs have retained at Chevron's expense.  To state a claim for trespass to chattels under New York law, Chevron must establish the Ecuadorian Plaintiffs "intentionally, and without justification or consent, physically interfered with the use and enjoyment of personal *property* in [plaintiffs'] possession," and that Chevron was thereby harmed.  *School of Visual Arts v. Kuprewicz*, 3 Misc. 3d 278, 771 N.Y.S.2d 804, 807 (N.Y.Sup. 2003) (emphasis added). Chevron has not cited to, nor does there appear to exist, any cases in New York where alleged damage to a company's reputation or goodwill, or its own spending as part of a public relations campaign, operated as a trespass to chattels.  Chevron's tortious interference claim is barred by the three-year statute of limitations, N.Y. C.P.L.R. § 214(4), premised as it is on the Ecuadorian Plaintiffs pursuit of damages in the court in Ecuador, which began over seven years ago, and the alleged effort to enlist the Ecuadorian government to aid the Ecuadorian Plaintiffs in the Lago Agrio Litigation, about which Chevron began complaining as early as October 8, 2007, more than three years ago. (*See* Elsen Cert., Ex. Q.)

65

Here, Chevron cannot show that it would suffer *any harm* should the Court deny its motion for injunctive relief, much less meet its burden of establishing that it decidedly would suffer more than the non-movants. Assuming that this Court denies the extraordinary remedy sought by Chevron, which would effectively prohibit litigants from attempting to enforce their own sovereign nation's judicial decree, Chevron would still have numerous avenues to explore the legal theories upon which it relies. The more appropriate forum for Chevron to advance its claims regarding the validity of the Ecuadorian court's judgment would be during any future enforcement actions—most certainly not on an expedited end-run around established legal processes. On the other hand, were this Court to grant Chevron's application, the Ecuadorian Plaintiffs would be placed in an untenable position. They would have obtained a judgment in their home country after the culmination of a struggle nearly two decades long, yet they would be legally barred from even attempting to enforce it. Chevron, which years ago polluted the Ecuadorian landscape with impunity in measures theretofore unprecedented, would still not be required to satisfy its responsibility.

Chevron overlooks this undeniable hardship to the indigenous Ecuadorians and the windfall to itself and claims that the Ecuadorian Plaintiffs would suffer only a "slight, potential delay in enforcement." (Pl's. Br. at 67.) That contention ignores the gorilla in the room— namely, that Chevron has instituted proceedings all over the United States and internationally to obstruct the Ecuadorian Plaintiffs from exercising their rights with respect to the judgment that may come from the court in Ecuador. Balancing these hardships, Chevron has not met its burden.

## CONCLUSION

For all the foregoing reasons, the Ecuadorian Plaintiffs respectfully request that this Court deny Chevron's application for a temporary restraining order and preliminary injunction.

Dated: February 8, 2011                              Respectfully Submitted,

ORANS, ELSEN, LUPERT &
BROWN LLP


/s/Sheldon Elsen
Sheldon Elsen, Esq. (SE1243)
875 Third Avenue, 28th Floor
New York, New York 10022-7203
Tel: 212-586-2211
Fax: 212-765-3662
Email: selsen@oellaw.com