UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHEVRON CORPORATION,<br><br>               Plaintiff,<br><br>          v.<br><br>STEVEN DONZIGER, et al.,<br><br>               Defendants. | Case No. 11-CV-0691 |

---

# MEMORANDUM OF LAW OF DEFENDANTS HUGO GERADO CAMACHO NARANJO AND JAVIER PIAGUAJE PAYAGUAJE IN OPPOSITION TO PRELIMINARY INJUNCTION

---

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................................. 1

ARGUMENT .................................................................................................................................. 3

    I.    THE COURT SHOULD ABSTAIN FROM ENTERTAINING THIS APPLICATION TO STAY EXECUTION OF THE ECUADORIAN JUDGMENT UNDER THE PRINCIPLES OF *PENNZOIL V. TEXACO, INC.*, 481 U.S. 1 ............................................................................................. 3

    II.    A PRIVATE INJUNCTION IS NOT AVAILABLE UNDER RICO, AND A RICO CLAIM PREMISED UPON THE OVERWHELMINGLY FOREIGN CONDUCT ALLEGED IN THE COMPLAINT IS NOT COGNIZABLE ..................................................................................................... 6

    III.    CHEVRON CANNOT ESTABLISH THAT IT HAS SUFFERED OR WILL SUFFER IRREPARABLE HARM ........................................................................ 9

    IV.    THIS COURT DOES NOT HAVE JURISDICTION OVER THE ECUADORIAN PLAINTIFFS ................................................................................... 14

CONCLUSION ............................................................................................................................. 17

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*American Medical Ass'n v. United Healthcare Corp.*,
    588 F. Supp. 2d 432 (S.D.N.Y. 2008)......................................................................................6

*Berkshire Capital Group v. Palmet Venture*,
    307 Fed. App'x 479 (2d Cir. 2008)....................................................................................15, 16

*Cedeño v. Intech Group, Inc.*,
    -- F. Supp. 2d --, 2010 WL 3359468 (S.D.N.Y. Aug. 25, 2010) ...........................................7

*Consolidated Brands, Inc. v. Mondi*,
    638 F. Supp. 152 (E.D.N.Y. 1986) .......................................................................................13

*Fischbarg v. Doucet*,
    9 N.Y.3d 375 (2007) .............................................................................................................16

*In re Fredeman Litigation*,
    843 F.2d 821 (5th Cir. 1988) ..................................................................................................7

*Morrison v. National Australia Bank Ltd.*,
    130 S.Ct. 2869, 177 L.Ed.2d 535 (2010) ............................................................................7, 8

*Norex Petroleum Ltd. v. Access Indus., Inc.*,
    -- F.3d --, 2010 WL 4968691 (2d Cir. Dec. 8, 2010).....................................................7, 8, 9

*Pennzoil v. Texaco, Inc.*,
    481 U.S. 1 (1987)............................................................................................................passim

*Sunward Elecs., Inc. v. McDonald*,
    362 F.3d 17 (2d Cir. 2004) ....................................................................................................15

**STATUTES**

18 U.S.C. §§ 1961 *et seq.*.................................................................................................................2

28 U.S.C. § 1782...........................................................................................................................13

C.P.L.R. § 302(a)(1) ................................................................................................................3, 14

Pursuant to the Court's Order on Plaintiff's Motion for a Temporary Restraining Order, dated February 8, 2011, Hugo Gerado Camacho Naranjo and Javier Piaguaje Payaguaje (the "Ecuadorian Plaintiffs") respectfully submit this Memorandum of Law in Opposition to Preliminary Injunction. The Ecuadorian Plaintiffs incorporate herein by reference the Preliminary Statement, Factual Background and Argument set forth in their previously submitted Memorandum of Law in Opposition to Chevron Corporation's ("Chevron") Application by Order to Show Cause for a Temporary Restraining Order and Preliminary Injunctive Relief ("Initial Opposition"). They offer this Memorandum in further opposition to a preliminary injunction and respond to various arguments offered at the hearing before the Court on February 8, 2011 (the "February 8, 2011 Hearing").

## PRELIMINARY STATEMENT

Chevron preemptively seeks the extraordinary remedy of a preliminary injunction to prevent plaintiffs who have endured nearly a decade of litigation in a foreign court from pursuing the lawful execution of an anticipated judgment. To avoid having to fend off lawful execution efforts which may be taken around the world, Chevron has come to this Court, alleging claims which are either not cognizable or which have no likelihood of success in this Court, and crafted a "sky is falling" presentation to convince the Court to impose equitable relief where none is permitted.

As set forth in the Initial Opposition and in more depth below, principles of comity dictate that this Court should refrain from entertaining an injunction application whose purpose is to restrain the execution of a judgment of another court. The United States Supreme Court has seen this same entity (via its predecessor, Texaco) attempt virtually the same maneuver in this very Court 24 years ago, and unanimously determined that this Court should have abstained from entertaining a proceeding designed to stay enforcement of another court's judgment. *See*

1

*Pennzoil v. Texaco, Inc.*, 481 U.S. 1 (1987). That rationale applies even more strongly here, where Chevron fought to have the underlying litigation fought in the court whose anticipated judgment it now seeks to avoid.

Chevron's claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*, does not permit a private plaintiff like Chevron to obtain injunctive relief. RICO does not provide for injunctive relief to private litigants (though it does allow such relief to the government), and the express exclusion of such relief has led this Court and others to conclude that private litigants may not obtain injunctive relief under RICO. In addition, serious questions also go to the heart of whether that RICO claim is even cognizable in the first instance, as Supreme Court and Second Circuit precedent call into question the Court's ability to entertain a RICO claim premised, as here, on overwhelmingly predominant overseas conduct.

Even assuming that the Court could entertain an injunction application under the current circumstances, Chevron's failure to meet any of the injunction standards precludes such relief. Despite Chevron's counsel's argument that carefully thought-out and lawful enforcement efforts would be designed to "disrupt Chevron's operations," business disruption is not and cannot be tantamount to irreparable harm. The Ecuadorian Plaintiffs are entitled to execute on any judgment they may obtain. No one doubts that answering for a judgment is unpleasant, perhaps even "disruptive," but having to do so is not irreparable harm.

Finally, the Ecuadorian Plaintiffs cannot be subject to this Court's personal jurisdiction.[1] A careful analysis of the precise causes of action alleged against the Ecuadorian Plaintiffs, and

---

[1] For the sake of clarity, the Ecuadorian Plaintiffs expressly reiterate herein all of their prior objections to service of process and personal jurisdiction, and make this submission without waiver of, and expressly intending to reserve, all such objections. The Ecuadorian Plaintiffs also reserve their right to submit evidence on this application

2

the facts which underpin them, show that the exercise of long-arm jurisdiction over them under N.Y. C.P.L.R. § 302(a)(1) would be inappropriate. Without proper jurisdiction over them, this Court is without constitutional power to enjoin them.

## ARGUMENT

**I.   THE COURT SHOULD ABSTAIN FROM ENTERTAINING THIS APPLICATION TO STAY EXECUTION OF THE ECUADORIAN JUDGMENT UNDER THE PRINCIPLES OF *PENNZOIL V. TEXACO, INC.*, 481 U.S. 1**

Chevron's argument that it will be irreparably harmed if an injunction is not entered because the Ecuadorian Plaintiffs will seek immediately to enforce any judgment that may issue ignores the fact that Ecuadorian law provides for appellate review of trial level judgments *and* a procedure for the posting of a bond pending appeal. Chevron has come to this Court without waiting for entry of any Ecuadorian judgment and has eschewed any effort under Ecuadorian law to obtain the stay of enforcement that it now seeks from this Court, without having explained why the appellate and stay procedures available to it under Ecuadorian law are insufficient. This Court must not allow Chevron to do a preemptive end-run around the appellate process that will be available to it in the Ecuadorian courts should a judgment ultimately issue there. Accordingly, the Court should abstain from entertaining the injunction application for reasons set forth in *Pennzoil v. Texaco, Inc.*, 481 U.S. 1 (1987).

Chevron's actions in this litigation are strikingly similar to the actions taken by Texaco, Chevron's predecessor-in-interest, when it was faced with the prospect of paying a similarly large money judgment in the 1980s in the *Pennzoil* case. Texaco lost a jury trial on a competitor's claims of tortious interference and a Texas state court was poised to enter a judgment against Texaco in the amount of $11.12 billion. *See id.* at 4. After the adverse jury

---

in response to what was offered by Chevron both at the February 8, 2011 Hearing and subsequent thereto, the latest of which was filed on February 10, 2011, just one day before the due date of this submission.

verdict—and before the judgment was entered—Texaco filed an action in the Southern District of New York and, in connection therewith, sought to enjoin enforcement of the Texas judgment. *Id.* at 6. Among other things, Texaco argued that the judgment was the product of fundamental unfairness in violation of the Due Process Clause and that the provision of Texas state law requiring it to post a supersedeas bond "in at least the amount of judgment, interest and costs" as a condition precedent of obtaining a stay of the judgment pending appeal effectively prevented it from seeking appellate review of the judgment. *See id.* at 6 n.6.

The district court enjoined enforcement of the judgment, but conditioned the injunction on the posting of a $1 billion bond. The Second Circuit affirmed, but the Supreme Court reversed, holding that the district court should have abstained from exercising jurisdiction over the case in the first instance. *Id.* at 10. In concluding that abstention was appropriate under the circumstances, the Supreme Court cited the trial forum's strong interest in "enforcing the orders and judgments of [its] courts" and noted that Texaco "apparently made no effort under Texas law to secure the relief sought in [its federal] case" (*i.e.*, a modification of the requirement of posting a bond in the full amount of the judgment as a condition of obtaining a stay pending appeal). *Id.* at 15. The Supreme Court stated that "because Texaco [could not] demonstrate that the Texas courts were not then open to adjudicate its claims, there is no basis for concluding that the Texas law and procedures were so deficient that . . . abstention is inappropriate." *Id.* at 17. Concurring in the judgment, Justice Marshall made a statement that is equally, if not more, applicable in this case:

> The history of this lawsuit demonstrates that great sums of money, like great cases, make bad law. Because a wealthy business corporation has been ordered to pay damages in an amount hitherto unprecedented, and finds its continued survival in doubt, we and the courts below have been presented with arguments of great sophistication and complexity, all concerned with a case which

4

> under clearly applicable principles should never have been in the federal courts at all. The Court's opinion, which addresses in sweeping terms one of these questions, is the result of what Justice Holmes called "a kind of hydraulic pressure which makes what previously was clear seem doubtful, and before which even well settled principles will bend."
>
> Had the sole proprietor of a small Texas grocery sued in the Southern District of New York to enjoin the enforcement of the Texas bonding provision in order to facilitate appeal in Texas from a state-court judgment in the amount of $10,000, the result below would surely have been different, even if inability to meet the bonding requirement and to stay execution of judgment meant dissolution of the business and displacement of employees. The principles which would have governed with $10,000 at stake should also govern when thousands have become billions. ***That is the essence of equal justice under law***.

*Id.* at 26 (Marshall, J., concurring) (emphasis added). In a separate concurrence, Justice Marshall joined with Justice Stevens in another comment appropriate to the current case, especially in light of the Court's concern here about the "importance" of Chevron to its employees and to the world at large:

> Admittedly, Texaco makes a sympathetic argument, particularly when it describes the potential adverse impact of this litigation on its employees, its suppliers, and the community at large. But the exceptional magnitude of those consequences is the product of the vast size of Texaco itself—it is described as the fifth largest corporation in the United States—and the immensity of the transaction that gave rise to this unusual litigation. The character of harm that may flow from this litigation is not different from that suffered by other defeated litigants, their families, their employees, and their customers. The price of evenhanded administration of justice is especially high in some cases, but our duty to deal equally with the rich and the poor does not admit of a special exemption for multibillion-dollar corporations or transactions.

*Id.* at 34 (Stevens, J., concurring).

When the Supreme Court issued the *Pennzoil* decision 24 years ago, one would not have expected to see the same company, now calling itself Chevron, try virtually the identical maneuver, in the identical district court, to avoid what would be, for its time, another identically

5

unprecedented judgment. For all the same reasons that the Supreme Court found that abstention was appropriate in *Pennzoil*, abstention is also appropriate here. Ecuador—as a sovereign nation—has a strong interest in, and a procedure for, resolving disputes concerning the validity and enforceability of judgments issued by Ecuadorian courts pursuant to Ecuadorian law.[2] Any order issued by this Court enjoining enforcement of a judgment that may issue from the Ecuadorian court will be a serious affront to the sovereignty of the Republic of Ecuador and would violate the principles the Supreme Court espoused in *Pennzoil*.

## II. A PRIVATE INJUNCTION IS NOT AVAILABLE UNDER RICO, AND A RICO CLAIM PREMISED UPON THE OVERWHELMINGLY FOREIGN CONDUCT ALLEGED IN THE COMPLAINT IS NOT COGNIZABLE

Despite the controlling law of this circuit, Chevron nevertheless asserted at the February 8, 2011 Hearing that it is entitled to an injunction in light of, and in advance of resolving, the claims asserted under RICO. To obtain the TRO, Chevron's counsel argued: "The fact of the matter is that this ultimately comes down to a U.S. based scheme involving a U.S. pattern of racketeering, and while it has an extraterritorial component, it's U.S. parties trying to extort a U.S. Company. That clearly falls within RICO." (T38:8-12). The Ecuadorian Plaintiffs remind the Court that a private litigant such as Chevron cannot obtain an injunction under RICO. *American Medical Ass'n v. United Healthcare Corp.*, 588 F. Supp. 2d 432 (S.D.N.Y. 2008) ("if Congress expressly granted private litigants a right to seek damages under the statute, while remaining taciturn about a private litigant's ability to seek injunctive relief, this Court can neither infer a meaning that is unexpressed, nor ignore Congress's seemingly willful silence on the

---

[2] Chevron has not proffered any evidence suggesting that the appellate procedures available to it under Ecuadorian law are somehow insufficient. It should not be able to sidestep the appellate process under Ecuadorian law, including the process that it post a bond in accordance with Ecuadorian law in order to obtain a stay of enforcement of the judgment pending appeal.

6

matter"); *see also In re Fredeman Litigation*, 843 F.2d 821, 830 (5th Cir. 1988) (holding that private injunctive actions under RICO are not cognizable because "Congress indeed had several opportunities to give express authorization to private injunctive actions but chose not to do so, apparently because it hesitated in the face of the ramifications of that remedy."). Neither the Court nor Chevron addressed this fatal defect to its claim for injunctive relief under RICO. Such relief is simply unavailable to a private litigant like Chevron.

Even if RICO could be a private plaintiff's premise for interim injunctive relief, it cannot support injunctive relief against the Ecuadorian Plaintiffs here. They are not defendants on the RICO claim, nor can they be, as law of this circuit is that RICO does not apply extraterritorially. *See Cedeño v. Intech Group, Inc.*, -- F. Supp. 2d --, 2010 WL 3359468 (S.D.N.Y. Aug. 25, 2010); *see also Norex Petroleum Ltd. v. Access Indus., Inc.*, -- F.3d --, 2010 WL 4968691 (2d Cir. Dec. 8, 2010) (holding that RICO does not apply extraterritorially to actions involving foreign claims and foreign acts). Thus, insofar as a likelihood of success on the RICO claim appears to have been Chevron and the Court's premise for injunctive relief, the injunction cannot stand.[3]

In fact, *Norex Petroleum*, and the Supreme Court case upon which its holding is premised, *Morrison v. National Australia Bank Ltd.*, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010), call the viability of Chevron's RICO claim into doubt. In *Norex,* the Court of Appeals considered the question of whether a United States federal court could properly hear a claim under RICO arising from allegations which primarily involved foreign actors and foreign acts. The plaintiff in *Norex* alleged that the defendants, which included U.S.-based entities and U.S.

---

[3] The Ecuadorean Plaintiffs also refer the Court to footnote 33 of their Initial Opposition to point out for the Court the unlikelihood that Chevron will succeed on *any* of its common law claims, which fail under New York law and may in fact be governed, if cognizable at all, by Ecuadorian law.

citizens, participated in a widespread scheme to seize control over the Russian oil industry and committed numerous acts in the United States in furtherance of the scheme. The Court of Appeals held that RICO does not apply extraterritorially and stated that "simply alleging that some domestic conduct occurred cannot support a claim of domestic application." *Id.* at *3. Citing *Morrison*, the Court of Appeals found that the slim contacts with the United States alleged by the plaintiff were insufficient to support extraterritorial application of RICO, noting that "it is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States." *Id.* at *3 (citing *Morrison*, 130 S.Ct. at 2884) (emphasis in original). The Second Circuit framed the issue as whether the complaint stated a claim for which the court could provide relief rather than as a jurisdictional question, and held that it did not.

Not even Chevron can seriously dispute that the heart of its claims in this case concerns conduct in Ecuador. Thus, while Chevron argues that its RICO claim is premised on certain acts taken in the United States, that does not enable this Court to hear its claim. As stated by the Second Circuit in *Norex*, merely alleging that some conduct occurred in the United States is insufficient to support a claim. Chevron's argument that discovery and certain minor meetings occurred here, in the context of a lengthy foreign litigation, are nothing more than the "slim contacts" that the Court of Appeals has expressly rejected as a basis for stating a claim. Chevron attempts to stretch any connection between this forum and its cause of action, but the fact remains that all of the alleged actions underlying its claim were made in connection with litigation in Ecuador regarding an environmental tort committed in Ecuador against Ecuadorian citizens. Any actions that may have occurred in the United States were minor events which were ultimately in furtherance of the Ecuadorian litigation. Therefore, Chevron is unlikely to succeed

8

on the merits of its RICO claim under *Norex*, and cannot meet its burden on its application for a preliminary injunction.

### III. CHEVRON CANNOT ESTABLISH THAT IT HAS SUFFERED OR WILL SUFFER IRREPARABLE HARM

Chevron has failed to make the requisite showing of irreparable injury, which is necessary for granting a preliminary injunction. Chevron's counsel, and apparently now the Court, misconstrue the memorandum entitled "Invictus." (*See* Dkt. 49-5.) Chevron's counsel has inaccurately described that memo as "how they [the Ecuadorian Plaintiffs and counsel] intend to use that like a club to cause disruption to Chevron, to cause harm to Chevron." T5:11-13. The Court apparently adopted that reasoning:

> What seems to be going on, of course, this is only a provisional interim view, is that an effort is threatened to use this worldwide, full-court press, which seems to have very little legitimate basis to it apart from the harassment it will cause, to exert pressure.
> . . . .
>
> Obviously there is a major threat of irreparable injury for all the reasons that have been discussed. To force Chevron to respond to five, fifteen, twenty-five, a hundred countries around the world and have shiploads of oil or gasoline attached all over the place clearly does render irreparable injury, particularly when we are not dealing here with anybody who is about to flee the country with all their cash in a satchel.

T46:2-6; 18-25.

It is initially regrettable that the Court considered a strategy suggesting the employment of lawful efforts toward execution on a judgment "to have little legitimate basis to it." Far from evidencing a willingness to disrupt Chevron's operations for the sake of disruption, this internal, privileged memorandum reflects a careful, thoughtful and efficient strategy that may be executed to ensure satisfaction of a judgment that may be rendered in favor of the Ecuadorian Plaintiffs

9

after seventeen years of litigation. That the memorandum has fallen into Chevron's and its counsel's hands makes clear the undue prejudice a litigant faces when its privileges are stripped because of a technical violation (*i.e.*, failure of a client's attorney to timely provide a privilege log under a court's local rule). Counsel explores in this memorandum the ability to enforce any favorable judgment in the United States and/or other countries where Chevron may have assets. Indeed, Chevron is now in a position to use this privileged information to move assets from countries where it believes the Ecuadorian Plaintiffs may intend to enforce the judgment. The need for a strategy to enforce a favorable judgment arises from Chevron's continued efforts to frustrate the Lago Agrio Litigation since the outset – first seeking to move the case to Ecuador in 1993, interfering with the trial process once there, and now dragging the case back to the United States in an effort to cut off any chance of the Ecuadorian Plaintiffs from collecting on a favorable judgment.

      Indeed, it is the ultimate irony that the Ecuadorian Plaintiffs are labeled mischievous and disruptive in their efforts to plan to enforce a potential favorable judgment entered by the court of a foreign sovereign. It is Chevron that has stripped all its assets from Ecuador, perhaps to avoid payment of any ultimate judgment, forcing the Ecuadorian Plaintiffs to look to the United States or other foreign jurisdictions to enforce a favorable judgment. It is Chevron that has vowed to avoid paying on the judgment "until hell freezes over," and beyond. It is Chevron and its counsel that have instituted multiple collateral proceedings – proceedings in sixteen United States federal judicial districts, a bilateral international arbitration, and this very proceeding – aimed at undermining any ultimate judgment in Ecuador before a judgment on the merits can even be rendered and before the foreign court itself is permitted, in final judgment, to be able to consider Chevron's allegations of "fraud" and other alleged misconduct.

Should a multi-billion dollar judgment be entered in this case, the Ecuadorian Plaintiffs likely will have no choice but to seek enforcement in multiple proceedings simultaneously and/or in succession to fulfill any judgment. To do so otherwise would jeopardize their ability to collect on their judgment. There is unlikely any single jurisdiction in which the Ecuadorian Plaintiffs could seek enforcement where enough assets would be available to satisfy such a judgment. Far from calculating an enforcement strategy for the sake of being vexatious or disruptive, the Ecuadorian Plaintiffs' enforcement actions will need to be brought in multiple jurisdictions and as soon as possible.

The Invictus memorandum, in summary, is nothing more than a good law firm's thorough analysis of potential collection strategies. The memorandum is an encapsulation and overview of, at the time it was authored, how the Ecuadorian Plaintiffs may choose to enforce their legal rights in the event a favorable judgment they have pursued for nearly twenty years is finally achieved. It is not, as Chevron contends (and the Court accepts) a war plan whose aim is the destruction of Chevron.[4] The Invictus memorandum itself, by its very terms, states under the heading: "Enforcing the Anticipated Judgment on Multiple Fronts," that "[t]he Plaintiffs will be judgment creditors. ***They seek no more than enforcement of their legitimate rights to the damages awarded to them after many years of complex litigation***." (*See* Declaration of Kristen L. Hendricks, Ex. 341 ("Invictus Memo") p. 12 (emphasis added).) That is the impetus for quick and immediate enforcement of the judgment, which the Court acknowledged in its remarks on the record: "They [the Ecuadorian Plaintiffs] are entitled to [relief] in the fullness of time, by which I mean not indefinite delay but prompt proceedings to examine the bona fides of any

---

[4] *See* Compl., ¶¶ 296, 299.

judgment." T49:17-20. It is not motivated by any ill motive to destroy Chevron or its business interests in a manner that would support the "irreparable harm" necessary for injunctive relief.

The Court nevertheless reached the erroneous conclusion that the Ecuadorian Plaintiffs' ultimate goal is to significantly interrupt Chevron's business. In doing so, the Court also extolled Chevron's importance as justification to avoid the consequences of an Ecuadorian judgment. "[W]e are dealing here with a company of considerable importance to our economy that employs thousands all over the world, that supplies a group of commodities, gasoline, heating oil, other fuels and lubricants on which every one of us depends every single day." T49:21-25. This "importance," according to the Court, apparently merits special treatment that other judgment debtors do not enjoy. But lacking from Chevron's evidence and the Court's analysis is precisely (or even generally) how efforts to enforce the judgment will cause Chevron irreparable damage. If Chevron is, as the Court ruminated, "good for the money here one way or the other," (T45:25-46:1), then it certainly can absorb isolated asset attachments in a number of jurisdictions. Chevron has coyly avoided telling the Court how any particular enforcement effort (or combination thereof) will irreparably disrupt its business. It has not put in a single piece of sworn evidence from any of its executives which satisfies its burden of proving that efforts to enforce the judgment will "irreparably damage" Chevron. All Chevron does is offer its counsel's argument that the enforcement efforts will "disrupt Chevron's operations." (T:3:25; T5:17). The Court cannot simply assume that irreparable harm will ensue.[5]

---

[5] The Court commented that "hav[ing] shiploads of oil or gasoline attached all over the place clearly does render irreparable injury." (T46:21-23). The Court offers no support for that illogical conclusion, and none exists. For example, if such attachments were to occur, Chevron could avoid the phantom "irreparable" injury by posting a bond or other security for the release of the cargo, and its business operations will suffer minimal disruptions as a result.

12

Aside from the fact that any such business "disruption" could be adequately compensated with money damages (and therefore cannot be "irreparable harm"), *cf. Consolidated Brands, Inc. v. Mondi*, 638 F. Supp. 152, 155 (E.D.N.Y. 1986) ("Loss of business, if it is not remote or speculative but actual, is a quantifiable injury."), the Invictus Memo proves that the strategy for collecting a judgment the Ecuadorian Plaintiffs may obtain is not intended to cause Chevron's irreparable demise. Indeed, the settlement strategy set forth in the Memo—which Chevron failed to mention at argument—may actually benefit the company, further undercutting a finding of irreparable injury. The memo states, in pertinent part:

> **Invitation to Chevron to Resume Operations in Ecuador.** Plaintiffs' team will think creatively about ways to make settlement more palatable to Chevron. One idea that Plaintiffs' team will explore is the possibility that the Republic of Ecuador could be brought into the fold, ***and in the context of a settlement with Plaintiffs, Chevron might be permitted to re-enter Ecuador to resume operations to some extent*** – in a responsible fashion.

(Invictus Memo, p. 29. (emphasis added).)

Chevron argued (and the Court again accepted) that being forced to respond to multiple enforcement proceedings in various international forums is "irreparable harm" of the sort that supports injunctive relief. T5:15-21. The argument is not only flawed, it is exceptionally ironic, as Chevron itself is the party that has engaged in those tactics. It has initiated no less that 26 proceedings pursuant to 28 U.S.C. § 1782 in jurisdictions from California, to Texas, to here. It has commenced an arbitration proceeding in Hague. Now it has commenced the instant action. If a multiplicity of suits were the basis of injunctive relief, Chevron should be the party enjoined, not the Ecuadorian Plaintiffs.

13

## IV. THIS COURT DOES NOT HAVE JURISDICTION OVER THE ECUADORIAN PLAINTIFFS

As set forth in the Ecuadorian Plaintiffs' Initial Opposition, this Court lacks personal jurisdiction over them. The Court's comments at the February 8, 2011 Hearing, and the cases cited by Chevron's counsel, indicate their belief that personal jurisdiction is conferred by N.Y. C.P.L.R. § 302(a)(1). The Court appeared to conclude that personal jurisdiction existed simply by virtue of the fact that the Ecuadorian Plaintiffs were clients of Mr. Donziger, a New York attorney, and that he was their "agent" under N.Y. C.P.L.R. § 302(a)(1). (T31:1-5). However, the causes of action asserted against the Ecuadorian Plaintiffs in the instant lawsuit (the "non-RICO claims") arise not out of any conduct of Mr. Donziger in New York, but rather his conduct in and directed toward Ecuador and the proceedings there. As to the Fraud cause of action: "These false representations are detailed throughout this Complaint and include the falsified Calmbacher reports, the true authorship of the Cabrera Report, the denial of any improper contact with Cabrera, the supposed independence and neutrality of Cabrera and his liability and damages assessment, the submission of new 'expert' reports based on the fraudulent Cabrera Report, and the fraudulent endorsements of the Cabrera Report." (Compl., ¶ 353.) In support of its Tortious Interference with Contract claim, Chevron alleges: "Defendants have intentionally caused and continued to cause the Republic of Ecuador to repeatedly breach the 1995 Settlement and the 1998 Final Release." (Compl., ¶ 362.) Chevron does not allege that any of the Ecuador Plaintiffs engaged in contacts with this forum that would support its claim for Trespass to Chattels. Rather, it alleges that the Ecuadorian Plaintiffs merely "benefited and will continue to benefit" from the actions of the RICO Defendants. (*See* Compl., ¶ 368.)

Nor does Chevron allege any contacts that would have a substantial nexus with its Unjust Enrichment claim. Rather, it alleges that "Defendants have been and will continue to be unjustly

14

enriched by benefits obtained *due to the expectation* of an imminent judgment . . . ." (Compl., ¶ 375; *see also* Compl., ¶376 ("Any property that Defendants obtain from Chevron will be acquired as a result of Defendants' tortious, illegal, and fraudulent conduct, as set forth herein, including the prosecution of the Lago Agrio Litigation itself."))

There are no facts pertinent to those non-RICO claims which implicate or evidence conduct by Mr. Donziger in New York. The Court would be far out of bounds to assume that because Mr. Donziger maintains a New York office, the conduct underpinning the causes of action against the Ecuadorian Plaintiffs occurred in New York. Not a single allegation in the Complaint suggests that to be the case.

At the February 8, 2011 Hearing, Chevron's counsel cited two cases to support the claim of jurisdiction over the Ecuadorian Plaintiffs. One case undercuts Chevron's argument, the other is inapposite. *Berkshire Capital Group v. Palmet Venture*, 307 Fed. App'x 479 (2d Cir. 2008), in which Chevron's counsel represented the appellee (T36:22), actually supports the Ecuadorian Plaintiffs' arguments against jurisdiction. There, the Second Circuit held that whether a foreign litigant transacts business in this jurisdiction should be determined based on the totality of the circumstances, including

> whether the defendant has an ongoing contractual relationship with a New York entity, whether the contract was negotiated or executed in New York, whether the defendant visited New York in connection with the contract, and whether the contract is to be governed by New York law under a choice of law clause.

*Berkshire Capital*, 307 Fed. App'x at 480 (citing *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 22-23 (2d Cir. 2004)). Applying those factors here, dismissal is appropriate. Chevron does not allege that any of the Ecuadorian Plaintiffs "visited New York in connection with the contract," that any agreement between the Ecuadorian Plaintiffs and their counsel was executed

in New York or that it is governed by New York law.[6] The Ecuadorian Plaintiffs agree with Chevron's counsel about the *Berkshire* case in one respect: "it's a very good Second Circuit decision . . . ." (T36:22-23).

*Fischbarg v. Doucet*, 9 N.Y.3d 375 (2007), also cited by Chevron, is inapposite to this case. *Fischbarg* was a fee dispute case between out of state defendants and a New York lawyer. The Court decided that jurisdiction was proper where out of state residents retained, and had regular and continuous communications with, the New York lawyer. *See id.* at 377. All work that the plaintiff performed in furtherance of the contract was in New York; he did not leave the State to interact with his clients. *See id.* at 378. The Court of Appeals based its jurisdiction on two theories: (1) that the defendants had "engaged in sustained and substantial transaction of business in New York" and (2) that there was a substantial relationship between the action and the contacts. *See id.* at 382; 384. The court did not premise jurisdiction on any theory of "agency." Jurisdiction was premised on the defendants' own affirmative conduct directed at New York. No such conduct exists here.

Quite simply, Chevron's pleading is devoid of any allegations that the Ecuadorian Plaintiffs engagement of Donziger, or their purported participation in other New York proceedings,[7] has anything to do with Chevron's non-RICO claims. Put another way, Chevron's allegations do not provide the requisite "substantial nexus" between the Ecuadorian Plaintiffs' contact with this forum and the causes of action alleged against them in this Court. Without the requisite jurisdiction, the Court is without power to enjoin the Ecuadorian Plaintiffs.

---

[6] The "ongoing contract" element is inapposite here as the Ecuadorian Plaintiffs are not being sued on any purported contract.

[7] As noted in the Initial Opposition, the Ecuadorian Plaintiffs' participation in a New York litigation in the past, which participation is not the premise for the current causes of action, cannot be the basis for personal jurisdiction in this or any other case in New York.

## CONCLUSION

For all the foregoing reasons, the Ecuadorian Plaintiffs respectfully request that this Court deny Chevron's application for a preliminary injunction.

Dated: February 11, 2011                              Respectfully Submitted,

s/ *Norman Siegel*

Norman Siegel
260 Madison Avenue – 18th Floor
New York, NY 10016
(212) 532-7586


s/ *Steven J. Hyman*

Steven J. Hyman
McLaughlin & Stern, LLP
260 Madison Avenue – 18th Floor
New York, NY 10016
(212) 448-1100

Attorneys for Defendants
Hugo Gerado Camacho Naranjo and
Javier Piaguaje Payaguaje