UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                  :

CHEVRON CORPORATION,                :

             Plaintiff,          :

                  :

       v.                  :     CASE NO. 11-CV-0691 (LAK)

                  :

STEVEN DONZIGER, et al.,            :

             Defendant.       :

                  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# CHEVRON'S REPLY IN SUPPORT OF
# MOTION FOR PRELIMINARY INJUNCTION


GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue, 47th Floor
New York, New York 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

*Attorneys for Chevron Corporation*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................. 1

THE ECUADORIAN JUDGMENT ..................................................................... 5

FACTUAL BACKGROUND .............................................................................. 6

I.    Defendants' False Claims of Contamination ............................................ 7

II.   Defendants' Mischaracterization of the Dismissal of the *Aguinda* Litigation ................... 8

III.  Defendants' Continued Misrepresentations About the Lago Agrio Litigation ................. 9

ARGUMENT .................................................................................................. 10

I.    This Court Has Jurisdiction Over All Defendants and Service Was Proper ................... 10

      A.    This Court Has Jurisdiction Defendants Pursuant to the Jurisdictional
            Provisions of the RICO Statute and Under New York's Long-Arm
            Statute ........................................................................................ 10

      B.    Chevron Has Properly Effected Service on All Defendants ................................ 14

II.   Chevron Is Likely to Succeed on the Merits of Its Claims .............................. 18

      A.    Chevron Is Entitled to an Injunction Under RICO ............................................. 18

            1.    Chevron Has Shown a Pattern of Racketeering Activity,
                  Including, But Not Limited to, Extortion ........................................ 18

            2.    Federal Courts Have the Statutory and Inherent Authority to
                  Protect a Private Plaintiff from Irreparable Racketeering
                  Injuries .................................................................................. 20

            3.    Chevron Does Not Seek Extraterritorial Application of RICO ............... 22

      B.    Chevron Is Entitled to a Declaration of Non-Recognition and
            Supporting Injunctive Relief ................................................................ 25

      C.    Defendants Do Nothing to Challenge Chevron's Likely Success on the
            Merits of Its State-Law Claims, Which Independently Entitle It to
            Injunctive Relief ................................................................................ 26

III.  International Comity Does Not Prevent This Court From Enjoining the
      Extortionate Scheme Targeted at New York ............................................. 27

i

**TABLE OF CONTENTS**
**[Continued]**

Page

  A. Comity and International Abstention Support Injunctive Relief ......................... 27

  B. Defendants' Estoppel Arguments Are Predicated on Baseless Fiction ............... 30

IV. Absent Injunctive Relief, Chevron Will Suffer Irreparable Injury ................................. 31

V. The Balance of Hardships and Public Interest Favor Chevron ......................................... 35

CONCLUSION ........................................................................................................................ 35

# TABLE OF AUTHORITIES

Page(s)

## Cases

*'J. Doe No. 1' v. CBS Broad., Inc.,*
    806 N.Y.S.2d 38 (App. Div. 2005) ................................................................. 27

*Aetna Cas. & Sur. Co. v. Liebowitz,*
    570 F. Supp. 908 (E.D.N.Y. 1983),
    *judgment aff'd*, 730 F.2d 905 (2d Cir. 1984) ........................................ 20, 22

*Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.,*
    98 F.3d 25 (2d Cir. 1996) .............................................................................. 14

*Aguinda v. Texaco, Inc.,*
    303 F.3d 470 (2d Cir. 2002) ................................................................. 4, 8, 31

*Aguinda v. Texaco, Inc.,*
    No. 93 Civ. 7527 (S.D.N.Y. filed Nov. 3, 1993) ....................................... 11

*Alexander v. Sandoval,*
    532 U.S. 275 (2001) ....................................................................................... 21

*Alfadda v. Fenn,*
    935 F.2d 475 (2d Cir. 1991) ......................................................................... 24

*Ali v. Mid-Atl. Settlement Servs., Inc.,*
    233 F.R.D. 32 (D.D.C. 2006) ........................................................................ 16

*Am. Med. Ass'n v. United Healthcare Corp.,*
    588 F. Supp. 2d 432 (S.D.N.Y. 2008) ................................................... 20, 21

*Am. Online v. IMS,*
    24 F. Supp. 2d 548 (E.D. Va. 1998) ............................................................ 27

*Baker v. Latham Sparrowbush Assocs.,*
    72 F.3d 246 (2d Cir. 1995) ........................................................................... 17

*Baldree v. Cargill, Inc.,*
    758 F. Supp. 704 (M.D. Fla. 1990),
    *aff'd without opinion*, 925 F.2d 1474 (11th Cir. 1991) ............................ 20

*Banco Nacional de Cuba v. Sabbatino,*
    376 U.S. 398 (1964) ....................................................................................... 29

*Berkshire Capital Grp., LLC v. Palmet Ventures, LLC,*
    307 F. App'x 479 (2d Cir. 2008) .................................................................. 13

*Berwick v. New World Network Int'l., Ltd.,*
    No. 06 Civ. 2641(JGK), 2007 WL 949767 (S.D.N.Y. Mar. 28, 2007) ................... 27

*Best Van Lines, Inc. v. Walker,*
    490 F.3d 239 (2d Cir. 2007) ......................................................................... 12

## TABLE OF AUTHORITIES
### [Continued]

Page(s)

*Blazevska v. Raytheon Aircraft Co.*,
522 F.3d 948 (9th Cir. 2008) ............................................................. 22, 23

*Bowoto v. Chevron Corp.*,
481 F. Supp. 2d 1010 (N.D. Cal. 2007) ................................................. 18

*Boyle v. United States*,
129 S. Ct. 2237 (2009) ............................................................................ 24

*Brenntag Int'l Chems., Inc. v. Bank of India*,
175 F.3d 245 (2d Cir. 1999) ............................................................. 34, 35

*Cedeño v. Intech Group, Inc.*,
733 F. Supp. 2d 471 (S.D.N.Y. 2010) ............................................... 23, 24

*Chevron Corp. v. Bonifaz*,
No. CV-09-05371-CW (N.D. Cal. Oct. 8, 2010) .................................... 10

*China Trade & Dev. Corp. v. M.V. Choong Yong*,
837 F.2d 33 (2d Cir. 1987) ..................................................................... 32

*Compuserve Inc. v. Cyber Promotions, Inc.*,
962 F. Supp. 1015 (S.D. Ohio 1997) ...................................................... 27

*Conboy v. AT&T Corp.*,
241 F.3d 242 (2d Cir. 2001) ................................................................... 22

*Conkling v. Turner*,
18 F.3d 1285 (5th Cir. 1994) .................................................................. 20

*Culpepper v. Reynolds*,
421 F.2d 888 (5th Cir. 1970) .................................................................. 22

*Cunard S.S. Co. Ltd. v. Saleen Reefer Servs.*,
773 F.2d 452 (2d Cir. 1985) ................................................................... 28

*DeFalco v. Bernas*,
244 F.3d 286 (2d Cir. 2001) ................................................................... 18

*Dixon v. Mack*,
507 F. Supp. 345 (S.D.N.Y. 1980) ......................................................... 12

*Dole Food Co. v. Gertten*,
No. BC417435 (L.A. Super. Ct. filed July 8, 2009) .............................. 10

*Dow Jones & Co., Inc. v. Harrods, Ltd.*,
237 F. Supp. 2d 394 (S.D.N.Y. 2002) .................................................... 29

*Ehrenfeld v. Mahfouz*,
No. 04 Civ. 9641(RCC), 2005 WL 696769 (S.D.N.Y. Mar. 23, 2005)............... 15, 16

**TABLE OF AUTHORITIES**
**[Continued]**

Page(s)

*Envtl. Def. Fund, Inc. v. Massey,*
   986 F.2d 528 (D.C. Cir. 1993) .................................................................. 22, 23

*Farrell Lines Inc. v. Columbus Cello-Poly Corp.,*
   32 F. Supp. 2d 118 (S.D.N.Y. 1997),
   *aff'd sub nom., Farrell Lines Inc. v. Ceres Terminals Inc.,*
   161 F.3d 115 (2d Cir. 1998) ........................................................................ 4

*Fischbarg v. Doucet,*
   880 N.E.2d 22 (N.Y. 2007) ............................................................. 12, 13, 14

*Forum Fin. Grp., LLC v. President, Fellows of Harvard Coll.,*
   199 F.R.D. 22 (D. Me. 2001) ...................................................................... 16

*Franklin v. Gwinnett Cnty. Pub. Schs.,*
   503 U.S. 60 (1992) ...................................................................................... 21

*Galgay v. Bulletin Co.,*
   504 F.2d 1062 (2d Cir. 1974) ..................................................................... 12

*Gonzalez v. Texaco, Inc.,*
   No. CV-06-02820-WHA, 2007 U.S. Dist. LEXIS 56622
   (N.D. Cal. Aug. 3, 2007)............................................................................. 10

*Gonzalez v. Texaco, Inc.,*
   No. CV-06-02820-WHA, 2007 U.S. Dist. LEXIS 81222
   (N.D. Cal. Oct. 16, 2007)............................................................................ 10

*Grand River Enters. Six Nations Ltd. v. Pryor,*
   425 F.3d 158 (2d Cir. 2005) ....................................................................... 12

*Guilbert v. Gardner,*
   480 F.3d 140 (2d Cir. 2007) ....................................................................... 27

*Hawkins v. Steingut,*
   829 F.2d 317 (2d Cir. 1987) ....................................................................... 20

*House of Diamonds v. Borgioni, LLC,*
   -- F. Supp. 2d --, 2010 WL 3398534 (S.D.N.Y. 2010) ............................. 12

*In re Applic. of Chevron Corp.,*
   No. 10 MC 00001(LAK), 2010 WL 3489341 (S.D.N.Y. Sept. 7, 2010)................. 13

*In re Applic. of Chevron Corp.,*
   No. 10 MC 00002 (LAK), 2010 WL 4910248 (S.D.N.Y. Nov. 10, 2010)............ 26

*In re Bd. of Dirs. of Telecom Arg., S.A.,*
   528 F.3d 162 (2d Cir. 2008) ....................................................................... 28

**TABLE OF AUTHORITIES**
**[Continued]**

Page(s)

*In re Fredeman Litig.*,
 843 F.2d 821 (5th Cir. 1988) ................................................................ 20

*In re Managed Care Litig.*,
 298 F. Supp. 2d 1259 (S.D. Fla. 2003) ................................................. 20

*In re Payroll Express Corp.*,
 186 F.3d 196 (2d Cir. 1999) .................................................................... 7

*In re Union Carbide*,
 809 F.2d 195 (2d Cir. 1987) .................................................................. 31

*Jolly v. Coughlin*,
 76 F.3d 468 (2d Cir. 1996) .................................................................... 34

*JP Morgan Chase Bank v. Altos Hornos de Mex.*,
 412 F.3d 418 (2d Cir. 2005) .................................................................. 29

*Kazlow & Kazlow v. A. Goodman & Co.*,
 402 N.Y.S.2d 98 (N.Y. App. Term 1977) ............................................. 12

*Knieriemen v. Bache Halsey Stuart Shields Inc.*,
 427 N.Y.S.2d 10 (N.Y. App. Div. 1980) .............................................. 26

*LaForest v. Former Clean Air Holding Co.*,
 376 F.3d 48 (2d Cir. 2004) .................................................................... 33

*Laker Airways Ltd. v. Sabena Belgian World Airlines*,
 731 F.2d 909 (D.C. Cir. 1984) .............................................................. 29

*Lefkowitz v. Bank of N.Y.*,
 676 F. Supp. 2d 229 (S.D.N.Y. 2009) ................................................... 29

*Lemmon v. People*,
 20 N.Y. 562 (N.Y. 1860) ...................................................................... 28

*Link v. Wabash R.R. Co.*,
 370 U.S. 626 (1962) ................................................................................ 7

*Madu, Edozie & Madu, P.C. v. Socketworks Ltd. Nig.*,
 265 F.R.D. 106 (S.D.N.Y. 2010) .......................................................... 15

*Marra v. Bushee*,
 447 F.2d 1282 (2d Cir. 1971) ............................................................... 27

*Md. Cas. Co. v. Pac. Coal & Oil Co.*,
 312 U.S. 270 (1941) .............................................................................. 25

*Mitchell v. Robert DeMario Jewelry, Inc.*,
 361 U.S. 288 (1960) .............................................................................. 22

**TABLE OF AUTHORITIES**
**[Continued]**

Page(s)

*Morrison v. Nat'l Austl. Bank Ltd.*,
   130 S. Ct. 2869 (2010) ............................................................................. 22, 23, 24

*Motorola Credit Corp. v. Uzan*,
   202 F. Supp. 2d 239 (S.D.N.Y. 2002) ...................................................... 20, 22

*Mut. Life Ins. Co. v. Hill*,
   193 U.S. 551 (1904) ................................................................................... 29

*Nat'l Union Fire Ins. Co. v. BP Amoco P.L.C.*,
   319 F. Supp. 2d 352 (S.D.N.Y. 2004) ...................................................... 12, 13

*Norex Petroleum, Ltd. v. Access Indus. Inc.*,
   No. 07-4553-cv, -- F.3d --, 2010 WL 4968691 (2d Cir. Dec. 8, 2010) ................... 24

*NOW, Inc. v. Scheidler*,
   267 F.3d 687 (7th Cir. 2001) .................................................................... 20, 21

*Osorio v. Dole Food Co.*,
   665 F. Supp. 2d 1307 (S.D. Fla. 2009) ..................................................... 31

*Pappas v. Middle Earth Condo. Ass'n*,
   963 F.2d 534 (2d Cir. 1992) ..................................................................... 6

*Park S. Assocs.  v. Fischbein*,
   626 F. Supp. 1108 (S.D.N.Y. 1986) .......................................................... 19

*Pennzoil v. Texaco, Inc.*,
   481 U.S. 1 (1987) ..................................................................... 4, 28, 29, 30

*People of the State of New York by Abrams v. Seneci*,
   817 F.2d 1015 (2d Cir. 1987) .................................................................... 20

*Philip Morris USA Inc. v. Scott*,
   131 S. Ct. 1 (2010) .................................................................................... 34

*Pioneer Inv. Serv. Co. v. Brunswick Assocs.*,
   507 U.S. 380 (1993) .................................................................................. 6

*Pizzabioche v. Vinelli*,
   772 F. Supp. 1245 (M.D. Fla. 1991) ......................................................... 17

*Porter v. Warner Holding Co.*,
   328 U.S. 395 (1946) .................................................................................. 22

*PT United Can Co. v. Crown Cork & Seal Co.*,
   138 F.3d 65 (2d Cir. 1998) ....................................................................... 11

*Register.com, Inc. v. Verio, Inc.*,
   356 F.3d 393 (2d Cir. 2004) ..................................................................... 33

vii

**TABLE OF AUTHORITIES**
**[Continued]**

Page(s)

*Reich v. Cambridgeport Air Sys., Inc.,*
 26 F.3d 1187 (1st Cir. 1994)............................................................................. 21

*Religious Tech. Ctr. v. Wollersheim,*
 796 F.2d 1076 (9th Cir. 1986) ................................................................... 20, 21

*Republic of Ecuador v. Chevrontexaco Corp.,*
 426 F. Supp. 2d 159 (S.D.N.Y. 2006) ............................................................ 26

*Riggs v. Palmer,*
 115 N.Y. 506 (1889)......................................................................................... 29

*Rio Props., Inc. v. Rio Int'l Interlink,*
 284 F.3d 1007 (9th Cir. 2002) ............................................................ 14, 15, 16

*Rockwell Int'l Sys., Inc. v. Citibank, N.A.,*
 719 F.2d 583 (2d Cir. 1983) ............................................................................ 34

*Royal & Sun Alliance Ins. Co. of Can. v. Century Int'l Arms, Inc.,*
 466 F.3d 88 (2d Cir. 2006) .............................................................................. 29

*RSM Prod. Corp. v. Fridman,*
 No. 06 Civ. 11512 (DLC), 2007 WL 1515068 (S.D.N.Y. May 24, 2007)............................. 16

*Salinger v. Colting,*
 607 F.3d 68 (2d Cir. 2010) .............................................................................. 35

*Sedima, S.P.R.L. v. Imrex Co.,*
 473 U.S. 479 (1985)................................................................................... 20, 24

*Sheehan v. Purolator Courier Corp.,*
 676 F.2d 877 (2d Cir. 1982) ............................................................................ 22

*Shekoyan v. Sibley Int'l Corp.,*
 217 F. Supp. 2d 59 (D.D.C. 2002) .................................................................. 23

*Simon v. Philip Morris, Inc.,*
 124 F. Supp. 2d 46 (E.D.N.Y. 2000) ............................................................. 27

*Solid Waste Agency v. U.S. Army Corps of Eng'rs,*
 531 U.S. 159 (2001)......................................................................................... 20

*Sovereign Camp W.O.W. v. O'Neil,*
 266 U.S. 292 (1924)......................................................................................... 32

*Sumar v. Fox,*
 2010 N.Y. Misc. LEXIS 2307 (N.Y. Sup. Ct. May 18, 2010)....................... 14

*Tellez v. Dole Food Co.,*
 No. BC312852 (L.A. Super. Ct. July 15, 2010) ............................................ 10

**TABLE OF AUTHORITIES**
**[Continued]**

Page(s)

*Tom Doherty Assocs. v. Saban Entm't, Inc.*,
   60 F.3d 27 (2d Cir. 1995) ................................................................. 34

*Trane Co. v. O'Connor Secs.*,
   718 F.2d 26 (2d Cir. 1983) ............................................................... 20

*Transamerica Mortg. Advisors, Inc. v. Lewis*,
   444 U.S. 11 (1979) ........................................................................... 21

*United States v. Eisen*,
   974 F.2d 246 (2d Cir. 1992) ............................................................. 19

*United States v. Gotti*,
   459 F.3d 296 (2d Cir. 2006) ............................................................. 19

*United States v. Middlemiss*,
   217 F.3d 112 (2d Cir. 2000) ............................................................. 18

*United States v. Pizzonia*,
   577 F.3d 455 (2d Cir. 2009) ............................................................. 18

*United States v. Sasso*,
   215 F.3d 283 (2d Cir. 2000) ............................................................. 21

*United States v. Teitler*,
   802 F.2d 606 (2d Cir. 1986) ............................................................. 19

*Watts v. Swiss Bank Corp.*,
   27 N.Y.2d 270 (1970) ....................................................................... 26

*Yaiguaje v. Chevron Corp.*,
   No. 10 CV 316 (S.D.N.Y. filed Jan. 14, 2010) ............................... 11

**Statutes**

18 U.S.C. § 1961 ................................................................................. 24

18 U.S.C. § 1962 ................................................................................. 21

18 U.S.C. § 1964 ............................................................... 4, 20, 21, 22

18 U.S.C. § 1965 ......................................................................... 11, 12

28 U.S.C. § 1651 ................................................................................. 22

Hobbs Act, 18 U.S.C. § 1951 ...................................................... 18, 19

N.Y. C.P.L.R. § 3016 .......................................................................... 26

N.Y. C.P.L.R. § 302 ............................................................................ 12

N.Y. C.P.L.R. § 308 ............................................................................ 14

## TABLE OF AUTHORITIES
### [Continued]

Page(s)

N.Y. C.P.L.R. § 5304 .................................................................................. 25

Pub. L. 91-452, § 904, 84 Stat. 947 (1970) ................................................. 22

Recognition of Foreign Country Money Judgments Act,
    N.Y. C.P.L.R. §§ 5301–5309 ........................................................... 4, 31

### Rules

Fed. R. Civ. P. 11 ....................................................................................... 10

Fed. R. Civ. P. 4 ..................................................................... 3, 14, 15, 16, 17

Fed. R. Evid. 801 ........................................................................................ 6

### Other Authorities

1 SPENCER W. SYMONS, POMEROY'S EQUITY JURISPRUDENCE § 261j
    (5th ed. 1941) .................................................................................. 32

19A N.Y. Jur. Conflict of Laws § 2 ............................................................ 26

Bee Tan, Singapore, *in* ENFORCEMENT OF FOREIGN JUDGMENTS 352
    (Dennis Campbell ed., 1997) ............................................................ 33

G. Robert Blakey & Scott Cessar, *Equitable Relief Under Civil RICO: Reflections
    on* Religious Technology Center v. Wollersheim*: Will Civil RICO Be Effective
    Only Against White-Collar Crime?*, 62 NOTRE DAME L. REV. 526 (1987) ............ 21

Restatement (Second) of Torts § 936 ........................................................... 27

Rules of Court, O. 29, r. 2 (Sing.) .............................................................. 33

United Nations Comm'n on Int'l Trade Law (UNCITRAL) Arbitration Rules,
    art. 26 ............................................................................................. 30

## PRELIMINARY STATEMENT

Injustice is swift in Ecuador.  On the heels of this Court's temporary restraining order and the Treaty Arbitration Tribunal's interim measure order against the Republic of Ecuador, Exs. 514, 516, 550, 562, the Lago Agrio court responded yesterday by rushing out a punitive $8.6 billion judgment against Chevron, with $868 million on top for the Front.  It further ordered a doubling of that amount as a "penalty" unless Chevron "apologizes" within the next fifteen days. The audacity and swiftness of this response provide stunning confirmation of the systemic corruption in Ecuador, the effectiveness of these Defendants' criminal scheme, and the ripeness of Chevron's emergency application.  Moreover, the wisdom of this Court's temporary restraining order has now been affirmed, and the need for a preliminary injunction is more urgent than ever.

Defendants' opposition to Chevron's preliminary injunction application is strikingly silent in the face of the damning evidence of their own misconduct.  In fact, most of the Defendants—including Fajardo, Yanza, Selva Viva, and the Front—have chosen to completely disregard this Court's orders, filing no briefs and making only disparaging statements in the press. Exs. 514, 516, 550.  As for Donziger, following a week in which a criminal defense attorney (Gerald Lefcourt) claiming to represent him made statements to the press, Donziger appeared pro se at the February 8 hearing, declined to speak because he did not "feel comfortable responding . . . without counsel," then failed to submit any opposition.  Ex. 546 at 19:19-21; *e.g.*, Exs. 507, 510-512.  All of the Defendants have been properly served pursuant to this Court's Order to Show Cause—their public denunciations confirm their actual notice—and they have now had ample opportunity to respond to Chevron's motion.  The failure of nearly every Defendant to appear or oppose Chevron's motion is itself sufficient ground for this Court to enjoin them.

Rather than contest issuance of the injunction, these Defendants have apparently chosen to hide behind the guise of two individuals who have lent their names to the effort to secure a corrupt judgment in Ecuador.  As in the Lago Agrio Litigation, these two individuals serve merely as nominal "stalking horses" for the real interests behind this extortionate scheme to defraud Chevron.  Their representation here has obviously been arranged, and their briefs ghost-

1

written, by those real interests, including the same U.S. lawyers at Patton Boggs now pulling the strings behind the scenes and implementing the judgment procurement and enforcement strategy that is expressly designed to "compound the pressure" on Chevron to succumb to Defendants' extortionate demands.  *See* Ex. 341 at 14.  On the record, Mr. Elsen admitted that Patton Boggs ghostwrote the brief he signed, and the latest brief filed on behalf of Defendants Camacho Naranjo and Piaguaje reads much the same, parroting arguments Patton Boggs made in earlier "Lago Agrio plaintiff" briefs, defending that "good law firm" for authoring the "Invictus" memorandum, and repeating the same language used by Patton Boggs' lawyers in "on the record" appearances in other courts.  Decl. of Randy M. Mastro.

The purpose behind this elaborate subterfuge is not hard to discern.  The "Invictus" authors apparently think that, by working through surrogates, they can put forth more sympathetic spokespeople than the Defendants caught on film plotting this extortionate scheme and threatening judges to effectuate it—conduct that Mr. Elsen admitted was "indefensible" and that Patton Boggs, Emery Celli, Motley Rice, and their surrogates do not even attempt to address.

Defendants Camacho Naranjo and Piaguaje have been chosen to appear here in order to try to change the conversation.  Defendants cannot credibly deny the crimes they have committed.  Instead, they prefer to repeat the same lies they have long advanced about the purported "merits" of the Ecuadorian litigation.  Of course, parties who have merits on their side do not fabricate documents, ghostwrite court expert reports, or threaten judges.  The charges these Defendants repeat—which lack any record support or factual basis—are also irrelevant to any issue before this Court in determining Chevron's request for a preliminary injunction.  It brings to mind Donziger's mantra:  "If you repeat a lie a thousand times it becomes the truth."  Ex. 253.

Indeed, whoever selected *these* exemplar Defendants obviously did not conduct a reasonable inquiry into their allegations.  For example, Camacho Naranjo, when he was President of the small community of Pimampiro, "present[ed] a testimony of real gratefulness to Texaco Petroleum Company for the environmental remediation work performed on the creek which has its origin near Well SA-89."  Ex. 520 at 2.  Directly contrary to the current assertions made in his

name, Camacho Naranjo's contemporaneous testimonial praised the results of the cleanup:

> Cleaning-up the creek in a length of about 1,300 feet along our town has produced such a positive outcome for the local population that it has become a beautiful family visiting place; but mainly, the water currently clean will let us start economic projects like fish breeding, both at a personal and corporative levels, in a cooperative effort of Pimampiro citizens to convert such an activity in a commercial production.

*Id.* Those were Mr. Camacho Naranjo's words in 1997, in his official capacity, "[s]peaking in the name of the population of Pimampiro." *Id.* At that time, fresh from witnessing TexPet's remediation, he pronounced that work "fully and satisfactorily completed." *Id.*

**Service**. Though Defendants challenge the manner in which they were served, they never contested that service on them comported with this Court's Order to Show Cause, or that Federal Rule 4(f) authorized this Court to prescribe the chosen manners of service. The record confirms that all Defendants have been properly served.

**Personal jurisdiction**. In arguing that this Court lacks jurisdiction over them under New York's long-arm statute, Defendants ignore their extensive contacts with and purposeful availment of the forum by means of the extensive litigation conducted in their names. Defendant Fajardo recently attested to the authorized nature of this representation in a sworn declaration, and after no fewer than three U.S. law firms asserted their authority to represent the Defendants in various pleadings, they cannot possibly deny it now. And Donziger, a New York lawyer, has held himself out to be their authorized attorney and agent here for more than a decade. Under well-settled caselaw, these contacts clearly are sufficient to give this Court personal jurisdiction over them. Nor is there any contention that this Court lacks personal jurisdiction over other Defendants, such as Fajardo, Yanza, the Front, or Stratus, under RICO's jurisdictional provisions. As such, their recent public statements that they feel free to flout this Court's order by commencing enforcement actions overseas are gravely mistaken. *See, e.g.*, Ex. 514 (Fajardo stating that while this Court's TRO will prevent enforcement in the United States, it "does not protect Chevron in other countries where [it] operates").

**Likelihood of Success.** On the merits, Defendants' contentions are easily dispatched.

1.      **RICO.**  Defendants make no effort to dispute the mountains of evidence demonstrating that Chevron will likely prevail on the merits of its RICO claims.  Indeed, they ignore entirely every predicate act alleged except for Hobbs Act extortion.  But Chevron also alleged—and supported with evidence—numerous acts of wire and mail fraud, witness tampering, money laundering, and obstruction of justice—all of which, like the extortionate scheme itself, took place largely or entirely within the United States.  This court has power to enjoin this racketeering scheme pursuant to 18 U.S.C. § 1964(a) and the judiciary's traditional equitable powers.  As such, Defendants cannot possibly show that Chevron is unlikely to succeed on the merits of its RICO claim, much less that it has failed to raise "serious questions."

2.      **Declaratory relief.**  Defendants' suggestion that the Declaratory Judgment Act imposes a per se rule requiring issuance of a corrupt foreign judgment before a court may intervene is contrary to governing law and also moot given the issuance of the Lago Agrio judgment. *See, e.g., Farrell Lines Inc. v. Columbus Cello-Poly Corp.*, 32 F. Supp. 2d 118, *aff'd*, 161 F.3d 115 (2d Cir. 1998).  Defendants' assertion that comity mandates this Court to stay its hand incorrectly suggests that Chevron is asking this Court to enjoin the Lago Agrio Litigation, misinterprets binding case law, and ignores the extensive evidence that the Ecuadorian courts and government are complicit in the fraud.  And *Pennzoil v. Texaco, Inc.* is about *Younger* abstention as a matter of U.S. federalism—and thus entirely irrelevant.  Finally, Defendants' estoppel argument is utterly unpersuasive, given that Defendants insist that dismissal of *Aguinda* was conditioned on Texaco challenging any subsequent judgment under New York's Recognition Act. That is exactly what Chevron seeks to do here.

3.      **Choice of law.**  Though Defendants assert that New York law should not be applied, they have not even attempted to satisfy the threshold requirement of demonstrating an actual *conflict* between the laws of New York and some other relevant jurisdiction.  This failure alone defeats Defendants' argument, even if this were not a New York-based conspiracy orchestrated by a New Yorker (Donziger).

4.      **Irreparable injury and balance of hardships.**  Defendants now claim that their

avowed strategy of instituting a multiplicity of actions seeking attachments would not cause Chevron any injury.  Their assertions are belied by their own words, touting this strategy precisely *because* it will "disrupt[]" Chevron's operations and prompt a payoff.  Ex. 92; *see* Ex. 341.

In sum, the Court should enter the requested preliminary injunction and maintain the status quo by prohibiting these Defendants and anyone acting in concert with them from funding, commencing, prosecuting, advancing in any way, or receiving any benefit from, directly or indirectly, any action of proceeding for recognition or enforcement of the Lago Agrio court's judgment, or for prejudgment seizure or attachment based on any such judgment.

### THE ECUADORIAN JUDGMENT

On February 14, 2011, the Ecuadorian court announced its judgment, awarding over $8.6 billion in supposed damages.  These figures are entirely unsupported by law or evidence. While disclaiming Cabrera, it necessarily relies on his fraudulent report (the only "evidence" of causation in the case), on Defendants' supposed "cleansing" experts who themselves relied on Cabrera, and on unabashed *ipse dixit*.  In accordance with Donziger's longstanding strategy, the award is far lower than the amounts Defendants claimed, so as to allow Defendants to argue that the judgment was supposedly fair because the court "cut down the largest part."  Ex. 1, CRS-159-00-CLIP-06; Ex. 2 at 125.  But the award is far *greater* than the amounts that the government of Ecuador has estimated are required for remediation of the entire area—including the impacts caused by Petroecuador over the past two decades—or even the amounts that Defendants' scientific experts privately admitted would be sufficient for remediation (regardless of who is legally responsible).  *E.g.*, Ex. 129.  The Ecuadorian court further imposed another $8.6 billion as "punitive" damages, although Ecuadorian law does not allow for punitive damages.  Coronel Decl., ¶¶ 12-15.  The court stated that it would relieve Chevron of this "penalty" only if Chevron issues a public "apology" within the next fifteen days.  Fajardo announced today that the Lago Agrio Plaintiffs would appeal the judgment—yet another familiar maneuver from Defendants' playbook, whereby they assume a public pose of dissatisfaction with the results of their corrupt acts, in order to try to bolster their credibility and increase the amount recovered.  Exs. 555, 557.

The decision promptly followed this Court's TRO and the Treaty Arbitration Tribunal's order requiring Ecuador to take "all measures at its disposal to suspend or cause to be suspended the enforcement or recognition within and without Ecuador of any judgment against [Chevron]." Ex. 486 at 3. The Ecuadorian court's quick response to these orders—after eight years of refusing to rule on case dispositive motions—is all the more striking given that less than two weeks ago, Judge Zambrano responded to the Tribunal's request to notify it of when the decision might issue by vaguely stating only that the judgment "will be issued within the period of time provided for by the law in question," Ex. 459 at 1, and made statements to the press that he had reviewed only three quarters of the approximately 200,000-page docket. Ex. 455.[1]

Though much of Defendants' misconduct is undisputed—indeed, captured in high-definition video—the Ecuadorian court gave it little attention, dismissing the Calmbacher and Cabrera frauds and instead chastising Chevron's lawyers. Among other things, the court also ignored Chevron's argument that Ecuador is liable, and dismissed the retroactive application of an entirely new law as a mere procedural rule not subject to prohibitions on retroactivity.

## FACTUAL BACKGROUND

Despite their 22 pages of "Factual Background," Defendants do not dispute *any* of Chevron's extensive evidence proving that they engaged in a multi-pronged criminal scheme to defraud and extort Chevron. *See* Mot. at 11-31. Indeed, much of the damning evidence supporting Chevron's claims comes straight out of the mouths and emails of Defendants and their co-conspirators, and these admissions are chargeable to all the Lago Agrio plaintiffs. *See Pioneer Inv. Serv. Co. v. Brunswick Assocs.*, 507 U.S. 380, 386 (1993) ("clients must be held accountable for the acts and omission of their attorneys"); Fed. R. Evid. 801(d); *Pappas v. Middle Earth Condominium Ass'n*, 963 F.2d 534, 537-38 (2d Cir. 1992). Although the Lago Agrio plaintiffs— or at least the two who have appeared—now claim ignorance, Patton Boggs wrote their initial opposition brief but did not put the firm's name on it, and likely wrote the latest one as well. Ex.

---

[1] Given this public record and indications in the Judgment itself, Chevron suspects that Judge Zambrano received secret "assistance" drafting the judgment and anticipates requesting discovery on this issue shortly.

546 at 21:4-20; *see* Mastro Decl.

Further, Defendants' opposition relies throughout on the unsupported and misleading Complaint filed in this District to enjoin the Treaty Arbitration—which Donziger and Emery Celli prepared, soliciting feedback from Winston & Strawn, counsel for Ecuador.  Ex. 94; *see* Exs. 487-490.  Defendants cannot have it both ways.  Even accepting the claim that they were not actively involved in the fraud, they cannot now benefit from that fraud, and the "sins of [their] lawyers" should not be visited upon Chevron.  *Link v. Wabash R.R. Co.*, 370 U.S. 626, 634 n.10 (1962); *see also In re Payroll Express Corp.*, 186 F.3d 196, 208 (2d Cir. 1999) (principal may not disclaim knowledge of agent's fraud and yet retain benefit obtained by the fraud).

In short, Defendants' arguments are both beside the point and wrong and Chevron will address only a few of the more egregious misrepresentations here.

## I.     Defendants' False Claims of Contamination

Contrary to Defendants' assertions, Chevron neither owned an interest in the consortium nor operated in Ecuador—TexPet did.  *See* Exs. 16, 18.  Defendants also repeat the misrepresentations that Donziger made to the Tom Lantos Human Rights Commission, including that TexPet "gouged more than 900 unlined waste pits out of the jungle floor – pits which to this day leach toxic waste into soils and groundwater," citing only their own Complaint in their action to enjoin the Treaty Arbitration as "evidence."  TRO Opp. at 4; *see* Ex. 269 at 6-7.  These claims are baseless.  The claim of 900 pits was based on the purported aerial photo analysis done by supposedly "independent" court expert, Richard Cabrera.  But the photographs were of such low quality that Douglas Allen, one of Defendants' new "experts," conceded after review of a higher resolution photograph of a "pit" that "this appears to be a tree."  Ex. 560 at 250:11-20.  Moreover, Defendants have privately admitted they have *no* evidence of any leaching into the soil or groundwater.  *See* Ex. 1, CRS-195-05-CLIP-01; Ex. 2 at 258-59.  For example, in March 2008, Beltman admitted, "I do not think that contamination sufficient to impact the ecology extends very far beyond the pads, pits, and spills at the wells – there simply isn't a migration pathway."  Ex. 513 at 1-2.

Defendants also repeat the falsehood that "Chevron deliberately dumped into Ecuador's

Amazon rainforest many more times the amount of oil spilled by the Exxon Valdez," again citing only their own Complaint.  TRO Opp. at 4.  But Defendants' own consultant informed them more than three years ago that the claim was scientifically unsupportable.  Exs. 522, 523; *see* Ex. 553 at 4003:20-4019:13 [Donziger Dep.].

## II.    Defendants' Mischaracterization of the Dismissal of the *Aguinda* Litigation

Defendants falsely claim that the 1993 *Aguinda* litigation was against Chevron, which was never a defendant in that case.  *See Aguinda v. Texaco, Inc.*, 303 F.3d 470 (2d Cir. 2002). Defendants also fail to mention that the actual defendant, Texaco, expressly reserved "all claims and defenses that it may have or be entitled to assert if this action were to proceed in this Court or in a court in Ecuador other than the in personam and limitations defenses specifically waived." Ex. 484 at 4.  And Defendants wholly ignore the language of Judge Rakoff's dismissal order list-ing "the conditions upon which the claims set forth in the Complaints in these actions may be refiled in the civil courts of Ecuador."  Ex. 482 at 1.  Those conditions did *not* include satisfying any judgment rendered by the Ecuadorian court, and certainly not one procured by fraud.

And while Defendants harp on Texaco's statements that the Ecuadorian courts would provide a fair and adequate forum, *see* TRO Opp. at 6, no one could have anticipated that Defen-dants would join forces with the Ecuadorian government to actively corrupt the judiciary.  As soon as Defendants found out which judge was assigned to the case, for example, they planned "to start lobbying him, working with him."  Ex. 76, DONZ00027256 at 26; Ex. 1, CRS-052-00-CLIP-06; Ex. 2 at 18.  There is also substantial evidence, cited in the Annotated Complaint, in which Donziger openly acknowledges pressuring the court to get the results he wanted because they probably "cannot win the case" on the merits.  Ex. 76, DONZ00027256 at 1; *see* Ann. Compl., §§ B.1, B.2.  Defendants relied on the Ecuadorian government to suppress news report-ing a dramatically lower cost of remediation, with Donziger explaining, "You have to go to Correa to put an end to this shit once and for all."  Ex. 112 at 1.  As Donziger happily admitted, "Texaco is right.  We run Ecuador."  Ex. 540; *see also* Ex. 493.  These actions leave no doubt that the Ecuadorian judicial system is rife with corruption and undue pressure from the govern-

ment.  *See* Álvarez Decl., Ex. A; *see also* Exs. 496, 497, 508, 509, 533-536.

## III.   Defendants' Continued Misrepresentations About the Lago Agrio Litigation

Defendants' brief is also replete with blatant misrepresentations about the Lago Agrio Litigation.  They assert that "Cabrera performed no fewer than forty-eight separate site inspections on his own, in constant communication with the court."  TRO Opp. at 16.  In fact, Cabrera did *not* conduct inspections on his own; Defendants wrote Cabrera's work plan and selected the "specific sites that we thought would be helpful for him to inspect," Ex. 405 at 2167:19-25; *see* Ex. 6 at 2165:2-6, 2406:7-11.  Defendants also claim, again, that Chevron has not identified any order or law prohibiting *ex parte* contact in the Lago Agrio Litigation.  TRO Opp. at 18.  Not only has Chevron submitted expert declarations showing that Defendants' conduct—which went far beyond "*ex parte* contact"— violated Ecuadorian law, *see, e.g.*, Ex. 506, but *Defendants' Ecuadorian lawyers have admitted* that their actions were illegal, and that "all of us, your attorneys, might go to jail" if evidence of their conduct was divulged.  Ex. 11.

Defendants also mischaracterize their motion to the Lago Agrio court for additional submissions on damages as a gracious gesture on their part to give Chevron an undeserved second opportunity.  TRO Opp. at 18.  In fact, Defendants made that motion in an attempt to repackage the Cabrera Report so that a court "might feel comfortable concluding that certain parts of Cabrera are a valid basis for damages."  Ex. 214 at 1; Ex. 411.  Chevron's depositions of Defendants' new "experts" have confirmed that their reports are factually baseless.  For example, Daniel Rourke, who wrote Defendants' $69 billion submission on "excess" cancer risk, testified, "It's an assumption of the calculations.  There is no scientific basis."  Ex. 559 at 118:14-19.  Rourke also conceded he was offering no opinion on whether Chevron or Texaco took any action that actually caused anybody to get cancer.  *Id.* at 61:11-22, 268:2-20.  Likewise, Jonathan Shefftz, who assessed up to $37.86 billion in unjust enrichment, testified that he was "not making any sort of analysis" of alleged unjust enrichment.  Ex. 561 at 59:10-11.

Defendants suggest that Chevron somehow abused the § 1782 actions to try to "bully" them.  TRO Opp. at 20.  But *every* court has *granted every one* of Chevron's § 1782 applications,

and all of Chevron's allegations about what the discovery would show have been proven true. As Chevron's Annotated Complaint sets out in detail, it is Defendants who have sought to mislead U.S. courts in an effort to block discovery of their fraud.  Ann. Compl., § C.  Defendants cannot and do not dispute that they engaged in this obstructionist behavior in their attempt to cover up their misconduct.  Defendants' contentions that Chevron's litigation tactics have somehow been abusive are a baseless smokescreen for their own misconduct.[2]

## ARGUMENT

### I.     This Court Has Jurisdiction Over All Defendants and Service Was Proper

The vast majority of Defendants have not opposed Chevron's motion for preliminary injunction.  They have instead sent Defendants Camacho Naranjo and Piaguaje—whose former counsel admitted that their opposition was ghostwritten by Patton Boggs (Ex. 546 at 21:9-20)—to mouth their objections.  Despite these Defendants' arguments, this Court's authority to exercise *in personam* jurisdiction not only over these two Defendants, but over all Defendants cannot seriously be questioned, and each named Defendant has been properly served.

### A.     This Court Has Jurisdiction Defendants Pursuant to the Jurisdictional Provisions of the RICO Statute and Under New York's Long-Arm Statute

Donziger and his co-conspirators planned and orchestrated a scheme to defraud Chevron from New York, and thus this Court has personal jurisdiction over all Defendants pursuant to

---

[2] Defendants' reference to litigation in the Northern District of California is misleading and irrelevant.  Shortly after his dismissal as counsel for the Lago Agrio Plaintiffs, Cristóbal Bonifaz brought personal injury claims, including cancer claims, against Chevron on behalf of certain other Ecuadorians.  Judge Alsup dismissed the claims with prejudice and sanctioned Bonifaz in the amount of $45,000 under Rule 11 for bringing cancer claims on behalf of individuals who did not have cancer and for hiding that fact from Chevron during discovery, *Gonzalez v. Texaco, Inc.*, No. CV-06-02820-WHA, 2007 U.S. Dist. LEXIS 81222, at *35-*40 (N.D. Cal. Oct. 16, 2007), and noted that the action was likely part of a "larger scheme" against Chevron, *id.*, 2007 U.S. Dist. LEXIS 56622, at *9 (N.D. Cal. Aug. 3, 2007).  Chevron's later action for malicious prosecution was dismissed after only limited discovery, when the court refused to consider Judge Alsup's factual findings in opposition to Bonifaz's anti-SLAPP motion.  *See Chevron Corp. v. Bonifaz*, No. CV-09-05371-CW (N.D. Cal. Oct. 8, 2010).  In fact, even Donziger called Bonifaz's lawsuit "bogus," stating that "an American attorney sanctioned this week by a U.S. court for filing bogus claims has no connection to [the Lago Agrio Litigation]."  Ex. 483 at 1.  Defendants' attack against Gibson Dunn is likewise baseless.  The *Dole* defamation action was brought after a documentary filmmaker repeated patently false statements about Dole in the film *Bananas!* (not unlike those about Chevron in *Crude*, although Dole never recovered the *Bananas!* outtakes).  Although the plaintiffs featured as victims in *Bananas!* later had the judgment in their favor dismissed with prejudice upon the clear and convincing evidence of a "massive fraud perpetrated on [the] court" and "witness tampering" by plaintiffs' and their attorneys (Ex. 549 at 27:27-28:28, 30:12-20), the court ruled against Dole in its defamation action because it found placards about the fraud findings placed at the end of the hour-and-a-half-long film (added only after Dole sent several cease-and-desist letters) were sufficient to convince viewers that the preceding allegations about Dole in *Tellez* were not actually true.

RICO's jurisdictional provisions and New York's long-arm statute.  The connections to the State of New York, and the significance of those contacts to the Defendants' scheme, are extraordinary, indeed overwhelming.  For example:

- Each and every named Defendant has conspired with Steven Donziger to carry out this massive scheme of global extortion aimed at importing a fraudulent multi-billion dollar judgment into New York's courts.  *E.g.*, Ann. Compl. ¶¶ 60-63, 66-69.

- Donziger, the ringleader of the conspiracy, is a New York resident and has orchestrated the entire conspiracy from New York.  Ex. 14 at 2.

- The initial *Aguinda* lawsuit, as well as the subsequent *Yaiguaje* suit, were filed in New York.  *See Yaiguaje v. Chevron Corp.*, No. 10 CV 316 (S.D.N.Y.); *Aguinda v. Texaco, Inc.*, No. 93 Civ. 7527 (S.D.N.Y. Nov. 3, 1993).

- Donziger, Yanza, and Fajardo met in New York to plan actions relating to the conspiracy.  Ann. Compl. ¶¶ 26, 27.

- Donziger solicited Berlinger to make *Crude* in New York.  Ann. Compl. ¶ 209.

- The conspirators retained Donziger and Emery Celli, a New York law firm, to represent the Lago Agrio plaintiffs in the § 1782 and various other proceedings.  Ex. 94.

- Calmbacher sent one set of signed and initialed pages to Donziger in New York, who then used those pages to falsify Calmbacher's report.  Ann. Compl. ¶¶ 108-111, 288; Ex. 136 at 62:5-63:16.

- The conspirators met with representatives of New York Attorney General Cuomo to try to prompt an investigation of Chevron.  Ex. 6 at 719:2-723:14.

- The conspirators met with stock analysts in New York in an attempt to drive down Chevron's share price.  Ex. 277.

- The conspirators made numerous false statements in front of New York courts in an attempt to conceal the conspiracy.  *See, e.g.*, Ex. 94, ¶¶ 29-31.

- The conspirators have sought and obtained funding from the Burford Group, which has a presence in New York.  *See* Ex. 6 at 619:8-622:24.

For the RICO claims, personal jurisdiction exists in "any district in which [a defendant] resides, is found, has an agent, or transacts his affairs," and defendants outside of the district are subject to personal jurisdiction when "the ends of justice require."  18 U.S.C. § 1965(a)-(b).  Critically, a court has personal jurisdiction over all of the co-conspirators in a RICO scheme when it has personal jurisdiction "as to at least one defendant," and the out-of-state defendants have minimum contacts with the U.S. as a whole.  *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 71 (2d Cir. 1998).  Here, the ringleader of the conspiracy—Donziger—resides in New York, transacts his business from New York, and most importantly, has orchestrated the criminal scheme with Fajardo, Yanza, the Front, Selva Viva, the Stratus Defendants, and others,

*in New York*.  Because this Court has personal jurisdiction over Donziger, it may also assert personal jurisdiction against the out-of-state RICO Defendants pursuant to § 1965(b).

As for the state law claims, Donziger and his co-conspirators are subject to personal jurisdiction under New York's long-arm statute, because, as detailed in the Annotated Complaint, they have transacted extensive business in New York and this suit "arises from" those contacts. Under C.P.L.R. § 302(a)(1), an out-of-state party transacts business in New York through contacts—even a single contact—that constitute "purposeful activity" in New York.  *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007); *see Grand River Enters. Six Nations Ltd. v. Pryor*, 425 F.3d 158, 166 (2d Cir. 2005) (same).  Such contacts may occur "through an agent." N.Y. C.P.L.R. § 302(a); *see Nat'l Union Fire Ins. Co. v. BP Amoco P.L.C.*, 319 F. Supp. 2d 352, 360 (S.D.N.Y. 2004).  Defendants' tortious conduct also subjects them to personal jurisdiction here under § 302(a)(2).  *See, e.g.*, Ann. Compl. ¶¶ 110, 201, 227, 233, 236, 259, 277-82.  The Second Circuit has recognized personal jurisdiction over non-domiciliary co-conspirators for the acts of a co-conspirator in New York, even when a formal agency relationship is lacking.  *See Galgay v. Bulletin Co.*, 504 F.2d 1062, 1065 (2d Cir. 1974); *Dixon v. Mack*, 507 F. Supp. 345, 349-50 (S.D.N.Y. 1980).

Defendants Camacho Naranjo and Piaguaje claim that the 47 individual Defendants' "engagement of New York counsel" for a "limited purpose" does not constitute the transaction of business.  TRO Opp. at 35.  But under New York law, purposeful contacts occur when an out-of-state party retains, communicates with, and transacts business through New York counsel. *Fischbarg v. Doucet*, 880 N.E.2d 22, 26-27 (N.Y. 2007).  *See House of Diamonds v. Borgioni, LLC*, -- F. Supp. 2d --, 2010 WL 3398534, at *2 (S.D.N.Y. 2010).  Moreover, New York courts have held that a party's "affirmative and deliberate use of the courts of this state . . . through its attorneys render it amenable to our long-arm jurisdiction." *Kazlow & Kazlow v. A. Goodman & Co.*, 402 N.Y.S.2d 98, 99 (N.Y. App. Term 1977).  The 47 individual Defendants have purportedly retained New York counsel—Steven Donziger and Emery Celli, among others—to represent their interests and carry out *multiple* proceedings in New York, including a lawsuit seeking

12

to stay the ongoing Treaty Arbitration, Ann. Compl. ¶¶ 30, 281; Ex. 94, and intervention in re-lated § 1782 proceedings.  As this Court found, this intervention is sufficient to subject them to personal jurisdiction in New York.  *See In re Applic. of Chevron Corp.*, No. 10 MC 00001(LAK), 2010 WL 3489341, at \*10 (S.D.N.Y. Sept. 7, 2010).

Defendants cite no contrary authority, instead attempting to limit *Fischbarg* to its facts. PI Opp. at 16.  But as *Fischbarg* held, "[i]t is the nature and quality of th[e] contacts through which defendants established a substantial ongoing professional commitment between them-selves and [New York counsel], governed by the laws of our state, which support long-arm juris-diction."  *Fischbarg*, 9 N.Y.3d at 382-83.  When looking at the close and extended connection between the 47 individual Defendants and their New York counsel, it is evident that the individ-ual Defendants established such an ongoing commitment.[3]

Although Chevron has questioned whether Emery Celli—the firm who, apparently au-thorized by Fajardo on behalf of the 47 individual Defendants, filed a New York action and has made several appearances before this Court (Exs. 94, 491)—properly represents the 47 individ-ual Defendants, those questions do not impact this Court's personal jurisdiction.  *See Nat'l Union Fire Ins. Co. v. BP Amoco P.L.C.*, 319 F. Supp. 2d 352, 360 (S.D.N.Y. 2004).  A proper focus on the "realities of the relationship in question," *id.*, demonstrates that the 47 individual Defendants have allowed New York counsel to participate in the scheme to defraud Chevron in their name—a scheme that has been perpetuated by contacts into and out of New York.  Defendants Camacho Naranjo and Piaguaje signed Fajardo's broad power of attorney in 2010 that purportedly "ratifies and approves each and every one of the actions performed by the attorney Pablo Fajardo Men-doza," Ex. 481 at 3:19-20, and which, according to Fajardo's sworn declaration to this Court, included his ability to hire additional counsel, such as Emery Celli, Ex. 480, ¶ 5.

---

[3] Defendants also argue that the specific facts in *Berkshire Capital Group, LLC v. Palmet Ventures, LLC*, 307 Fed. App'x 479 (2d Cir. 2008), differ from this case.  PI Opp'n at 15-16.  While the Court should examine the "totality of circumstances," as suggested in *Berkshire*, the Court is not bound by the non-exhaustive factors or specific factual circumstances discussed in *Berkshire*, which cited *Fischbarg* with approval.  *Id.* at 480-81.  Based on the totality of the circumstances and the overwhelming authority in the Second Circuit, personal jurisdiction over the 47 individual Defendants is proper because they have engaged in a long-term attorney-client relationship in New York.

Finally, Defendants falsely assert that "the Lago Agrio Plaintiffs' participation in the New York litigation has [nothing] to do with Chevron's asserted claim and injury here." TRO Opp. at 35. The Second Circuit has made clear that a claim "arises out of" a defendant's contacts in New York "when there exists 'a substantial nexus' between the [contacts] and the cause of action sued upon." *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 31 (2d Cir. 1996). When the contacts in New York are not "merely coincidental occurrences that have a tangential relationship to the present case," the present case will "arise from" the contacts. *Fischbarg*, 880 N.E.2d at 29-30. Here, there is no question that this case arises from the 47 individual Defendants' contacts with New York. Indeed, as explained above, the scheme that Donziger has orchestrated from New York, and that the 47 individual Defendants have participated in through their agents, Donziger, Emery Celli, and others, lies at the heart of the instant action.

### B.      Chevron Has Properly Effected Service on All Defendants

Nor is there any doubt that each of the Defendants has been properly served pursuant to Federal Rule of Civil Procedure 4 and this Court's February 3, 2011 Order. Defendants have not and cannot offer any evidence or arguments to the contrary.

Specifically, Stratus, Beltman, and Maest were personally served with the Complaint. Dkts. 69-71. Donziger and his law offices were served by email pursuant to this Court's order and delivery to Donziger's doorman followed by mailing, as permitted by C.P.L.R. § 308(2) and Rule 4(e)(1). Dkts. 68, 75; *see also Sumar v. Fox*, 2010 N.Y. Misc. LEXIS 2307, at *4 (N.Y. Sup. Ct. May 18, 2010). And Donziger's attorney, Gerald Lefcourt, has provided countless statements to the press regarding the Complaint (Exs. 507, 510-512), even though Donziger represented to this Court that he is unable to secure counsel. Ex. 546 at 2:2-4, 19:19-21.

The Ecuadorian Defendants have also been properly served. Dkt. 75. Because Chevron's request for a TRO required swift action by this Court to avoid irreparable harm, alternative means of service of the complaint under Rule 4(f)(3) were necessary and justified. As Defendants acknowledge, Rule 4 does not create a "hierarchal preference" of means of service. TRO Opp. at 26; *see also Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1015 (9th Cir. 2002).

This Court has recognized that "service of process under Rule 4(f)(3) is neither a 'last resort' nor 'extraordinary relief'" but rather "is merely one means among several which enables service of process on an international defendant." *Ehrenfeld v. Mahfouz*, No. 04 Civ. 9641(RCC), 2005 WL 696769, *2 (S.D.N.Y. Mar. 23, 2005) (quoting *Rio Props., Inc.*, 284 F.3d at 1015).

Disregarding this clear authority, Defendants assert that "Chevron should at least attempt to follow [methods provided under Ecuadorian law for service] before resorting to the last ditch 'alternate means' it seeks under Rule 4(f)(3)." TRO Opp. at 29. Yet this squarely contradicts Rule 4 itself. "The *only* limitations on Rule 4(f)(3) are that the means of service must be directed by the court and must not be prohibited by international agreement." *Ehrenfeld*, 2005 WL 696769, at *2 (S.D.N.Y. Mar. 23, 2005) (emphasis added). Moreover, Chevron "need not have attempted every permissible means of service of process before petitioning the court for alternative relief. Instead, [Chevron] needed only to demonstrate that the facts and circumstances of the present case necessitated the district court's intervention."[4] *Rio Props., Inc.*, 284 F.3d at 1016; *see also Ehrenfeld*, 2005 WL 696769 at *2. Given the urgent need for resolution of Chevron's motion, the court properly exercised its discretion to authorize alternate means of service under Rule 4(f)(3). *See Rio Props., Inc.*, 284 F.3d. at 1015 ("in cases of 'urgency,' Rule 4(f)(3) may allow the district court to order a 'special method of service,' even if other methods of service remain incomplete or unattempted").[5]

Though Defendants now purport to question Fajardo's relationship with the 47 individual Defendants, they do not challenge the Court's authority to direct the Complaint to be served on

---

[4] Defendants cite *Madu, Edozie & Madu, P.C. v. Socketworks Ltd. Nig.*, 265 F.R.D. 106, 115-16 (S.D.N.Y. 2010), for the proposition that "this Court requires: 'The parties to show that they have reasonably attempted to effectuate service on the defendants(s) . . . .'" TRO Opp. at 26. But *Madu* instructs that a court "*may* require" such a showing, not that it is required to do so. *Madu*, 265 F.R.D. at 115 (emphasis added). "The decision whether to allow alternative methods of serving process under Rule 4(f)(3) is committed to the sound discretion of the district court." *Id.*

[5] In sharp contrast, the service demanded by Defendants is not only inapplicable, but also time consuming and likely ineffective. Defendants would have Chevron attempt service under Rule 4(f)(2)(A) by following Ecuadorian procedure for serving process when indigenous communities have been sued. This procedure—which is not even applicable here because Chevron has sued individuals as opposed to "indigenous communities" (*see* Decl. of Dr. César Coronel Jones, ¶¶ 18, 19)—would require Chevron to wait for the next Ecuadorian "public holiday" to read aloud Chevron's moving papers during the so-called "busiest hour of the day." TRO Opp. at 29. Even if Chevron were required to effect service in this manner—which it is not—the window of opportunity to provide Chevron its requested relief would very likely have slammed shut by the time service was effected.

Defendants by service on him under Rule 4(f)(3).  Nor could they, as Fajardo has recently provided this Court with sworn testimony that the individual Defendants have "affirmed" his actions as their counsel, Ex. 480, ¶¶ 8, 9, indicating that he is "in communication with" and "know[s] how to locate" the individual Defendants.  *Ehrenfeld,* 2005 WL 696769, at \*3.  Both Camacho Naranjo and Piaguaje reportedly signed a power of attorney for Fajardo as recently as November 2010, purportedly affirming his "powers to represent them in pursuit and defense of their interests before the courts in Ecuador and in all other countries, including the United States."  Ex. 480, ¶ 6.  This broad power of attorney reinforces the propriety of the service.  *See Forum Fin. Group, LLC v. President, Fellows of Harvard College*, 199 F.R.D. 22, 24 n.2, 25 (D. Me. 2001).

Given the exigencies underlying Chevron's request for a temporary restraining order and preliminary injunction, service by email and mail were necessary.[6]  Fajardo and Yanza regularly correspond by email and Selva Viva and the Front use email for business activities and have public mailing addresses.  Thus, despite Defendants' conclusory arguments to the contrary, the email and mail service authorized in this case satisfied due process requirements that service be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *RSM Prod. Corp. v. Fridman*, No. 06 Civ. 11512 (DLC), 2007 WL 1515068, at \*1 (S.D.N.Y. May 24, 2007).

Finally, there is no question that the service on the Ecuadorian Defendants was effective.  As provided in Chevron's Declarations of Service, emails addressed to Fajardo, Yanza, and the Front went through and Selva Viva has accepted delivery of the Complaint and Summons.  Dkt. 75; Decl. of Kirsten Galler, ¶ 4.  Additionally, on February 15, 2011, Chevron personally served Fajardo and Yanza with the Complaint and Summons.  Decl. of Pablo Salvador Defina Bu-

---

[6] Service by email or mail was likely the only method of service capable to quickly reach Defendants given their recent attempts to evade personal service in Ecuador.  *See Rio Props., Inc.*, 284 F.3d at 1016.  Though Defendants attempt to distinguish *Rio Props* as involving an "elusive international defendant," Fajardo and Yanza have been equally evasive.  TRO Opp. at 30-31.  On February 11, 2011, Chevron attempted personal service on Fajardo and Yanza at their last known addresses, and Fajardo attempted to deliberately evade service.  Decl. of Rene Enrique Recalde Mera; Decl. of Ivan Alberto Racines Enriquez; *see also* Decl. of Dr. César Coronel Jones, ¶¶ 1, 12-17.  Service of process "is not a game of hide and seek."  *Ali v. Mid-Atl. Settlement Servs., Inc.*, 233 F.R.D. 32, 36 (D.D.C. 2006).  "Where the defendant receives actual notice and the plaintiff makes a good faith effort to serve the defendant pursuant to the federal rule, service of process has been effective."  *Id.* at 36.

caram.[7]  Such service is permitted under Rule 4(f)(2)(c)(i), as personal delivery is not prohibited

under Ecuadorian law.  Decl. of Dr. César Coronel Jones, ¶¶ 1, 12-17; *Pizzabioche v. Vinelli*, 772

F. Supp. 1245, 1247-49 (M.D. Fla. 1991).  The Front was also hand delivered these documents.

Davila Decl.; Decl. of Enrique Carvajal Salas, at 2 (personal delivery to the Front's offices).

Furthermore, Defendants launched an elaborate media campaign after Chevron's papers

were served, which demonstrates that the methods of service authorized under Rule 4(f)(3) were

successful.  Defendants have *actual* notice.  The Front has issued multiple press releases in re-

sponse to the filing of the Complaint in which Fajardo is quoted and expressly acknowledges the

lawsuit.  Exs. 457, 516, 517.  In radio and television interviews, Fajardo is described as the

Front's lawyer and discusses the lawsuit and admits that he is also named as a defendant.  *E.g.*,

Ex. 550.  He has also commented on the scope of this Court's TRO.  Ex. 514.  Yanza, accompa-

nied by numerous other members of the 47 individual Defendants announced to the press that he

was not "surprise[d]" by the filing of the Complaint.  Ex. 537 at 2.

Several of the 47 individual Defendants have also been captured on videos acknowledg-

ing receipt of the Complaint.  Exs. 472, 473.  In one video, Defendants are told that a "document

has come from the United States" with their names on it regarding the "lawsuit made against

[them]" and that they are "[being] sued by Texaco."  *Id*.  After their names are read aloud, eight

Defendants raise their hand to acknowledge their identity.  *Id*.  A ninth Defendant acknowledged

the lawsuit against her in a different video.  Ex. 518.

Where "a party receives actual notice that apprises it of the pendency of the action and af-

fords an opportunity to respond, the due process clause is not offended."  *See Baker v. Latham*

*Sparrowbush Assocs.*, 72 F.3d 246, 254 (2d Cir. 1995) (citations omitted).  The responses from

Defendants after they were served confirm that they not only had "actual knowledge" affording

them "an opportunity to respond," but also that they have afforded themselves of that opportu-

---

[7] Because of the timing of this filing, English translations of the Defina Declaration and the Declaration of Maria
Gabriela Davila Cueva are not available.  Chevron will supplement the record with an English translation of this
Declaration as soon as it is available.

nity through their statements to the press and on video.  Nothing more is required.

## II.     Chevron Is Likely to Succeed on the Merits of Its Claims

### A.     Chevron Is Entitled to an Injunction Under RICO

#### 1.     Chevron Has Shown a Pattern of Racketeering Activity, Including, But Not Limited to, Extortion

Defendants dispute only a single aspect of the extensive factual allegations underlying the RICO claim:  whether Chevron has stated a claim for Hobbs Act extortion.  TRO Opp. at 56.  But Defendants cannot defeat Chevron's RICO claim by challenging only "one of the RICO predicates," *id.,* because Chevron alleged and proved numerous other racketeering acts.  Ann. Compl. ¶¶ 317-29.  Plainly, Chevron need not prove every alleged predicate act to prevail; it need only show that the RICO Defendants operated their association "through a pattern of rack-eteering activity."  *See United States v. Pizzonia*, 577 F.3d 455, 460 (2d Cir. 2009).  Because no Defendant contests Chevron's proof that the RICO Defendants engaged in the other predicate acts alleged, Chevron is indisputably likely to succeed on the merits of its RICO claim.

In any event, Defendants' challenges to Chevron's extortion claim fail.  Defendants assert that they have not *actually* "demanded money or any other property," or made an "actual threat to obtain money from Chevron."  TRO Opp. at 57.  But Chevron has proffered substantial evi-dence that the RICO Defendants have made multiple public demands that Chevron pay them bil-lions of dollars, or else they will continue their campaign to disrupt Chevron's operations and harm its reputation.  *See, e.g.*, Ann. Compl. ¶¶ 58, 66, 81-83, 216-20, 237-47, 296-99.  This proof suffices to demonstrate extortion, as even "suggestions" constitute extortion where, as here, the defendant's conduct is accompanied by a threat of harm.  *DeFalco v. Bernas*, 244 F.3d 286 (2d Cir. 2001); *United States v. Middlemiss*, 217 F.3d 112, 118 (2d Cir. 2000) ("the element of fear that [the Hobbs Act] requires is satisfied where a victim reasonably fears economic loss").

Relying on *Bowoto v. Chevron Corp.*, 481 F. Supp. 2d 1010, 1016 (N.D. Cal. 2007), De-fendants also contend that the RICO Defendants' failure—so far—to actually obtain any prop-erty from Chevron somehow undermines their attempted extortion claim.  TRO Opp. at 57.  But this simply misses the mark.  Unlike *Bowoto*, a case about proving *completed* extortion, Chev-

ron's allegation—backed by overwhelming evidence—is that the RICO Defendants are actively ***attempting*** to extort Chevron.  *See* Ann. Compl. ¶ 315.  Attempted extortion, no less than the completed act, violates the Hobbs Act.  *See, e.g.*, *United States v. Gotti*, 459 F.3d 296, 324 (2d Cir. 2006).  Indeed, the fact that Defendants have yet to realize the fruits of their extortionate scheme is the very reason that a preliminary injunction against enforcement has meaning.

Defendants next mischaracterize the RICO Defendants' extensive wrongful conduct as mere "zealous representation" that cannot give rise to a RICO claim.  TRO Opp. at 57-58.  But "[i]t is one thing to challenge the perception, memory, or bias of an opponent's witnesses; it is quite another for a party's lawyer and witness to concoct testimony that they know has been wholly fabricated."  *United States v. Eisen*, 974 F.2d 246, 253 (2d Cir. 1992) (upholding RICO conviction based on fraudulent conduct in the course of civil litigation).  The RICO Defendants, like the lawyers in *Eisen*, crossed this line by presenting fabricated evidence and pressuring witnesses to testify falsely in U.S. court proceedings to try to fraudulently induce a settlement.  *Id.* at 251-53.  They employed these same impermissible tactics in the Lago Agrio Litigation when they, among other things, conspired with Cabrera, a supposedly independent expert witness, to submit fabricated evidence to the Lago Agrio court.[8]

Chevron's RICO claim is not based exclusively on litigation conduct anyway.  Instead, Chevron has alleged (and offered supporting evidence) that the RICO Defendants have operated a multi-pronged scheme designed to pressure Chevron to make a large payment, regardless of the underlying merits of the Lago Agrio claims.  The RICO Defendants have conspired with Ecuadorian officials to have Chevron's attorneys prosecuted on trumped-up charges that they "could facilitate going away at the right time," Ex. 1, CRS-170-00-CLIP-00; Ex. 2 at 158-60, publicly attacked Chevron with false and misleading statements, and plotted means to "compound the

---

[8] In support of their zealous representation argument, Defendants rely almost exclusively on *Park South Associates v. Fischbein*, 626 F. Supp. 1108, 1114 (S.D.N.Y. 1986), implying that it holds that litigation conduct is never actionable under RICO.  This is simply a misstatement of the case, and contrary to Second Circuit law.  *See Eisen*, 974 F.2d at 246; *United States v. Teitler*, 802 F.2d 606 (2d Cir. 1986).  Indeed, *Park South* rejected a RICO claim for basic pleading deficiencies unrelated to the sufficiency of allegations arising out of litigation conduct.  *Id.* at 1115.  Here, unlike the plaintiff in *Park South*, Chevron has filed a detailed complaint, along with supporting evidence, that fully explains Defendants' fraudulent conduct and their wrongful acts designed to exert pressure on Chevron.

pressure" on Chevron and disrupt Chevron's operations to force a "settlement."

2.     **Federal Courts Have the Statutory and Inherent Authority to Protect a Private Plaintiff from Irreparable Racketeering Injuries**

Defendants "remind the Court" that it is purportedly "well-settled" that 18 U.S.C. § 1964 precludes courts from granting a private party an injunction against a RICO violation.  TRO Opp. at 2; PI Opp. at 6.  But Defendants offer only *two* cases reaching that holding,[9] and cannot point to a single *binding* decision on point.  Defendants highlight dicta in two 25-year-old Second Circuit decisions—one of which was later reversed on other grounds for its "narrow construction" of RICO, *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 490 (1985)—suggesting that, under then-extant case law, the court had "doubts" about permitting private equitable relief. TRO Opp. at 52 (quoting *Trane Co. v. O'Connor Secs.*, 718 F.2d 26, 28-29 (2d Cir. 1983)).  But that court's view of its "likely" resolution of an issue it recognized it was not deciding has little bearing here, coming as it did *before* the Supreme Court clarified that "if Congress' liberal-construction mandate [with respect to RICO] is to be applied anywhere, it is in § 1964, where RICO's remedial purposes are most evident," and *before* the Supreme Court labeled "failed legislative proposals," *Wollersheim*'s preferred evidence of legislative intent, "a particularly dangerous ground on which to rest an interpretation of a prior statute."  *Sedima*, 473 U.S. at 491 n.10; Mot. at 33 n.11; *Solid Waste Ag. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 169-70 (2001).  Indeed, the Second Circuit has since specifically clarified that it has *not* decided the issue.  *People of the State of New York by Abrams v. Seneci*, 817 F.2d 1015, 1017 (2d Cir. 1987).

Contrary to Defendants' assertion, the *AMA* decision is itself not "controlling," coming as it does from another district court.  *See, e.g., Hawkins v. Steingut*, 829 F.2d 317, 321 (2d Cir.

---

[9] *Compare* TRO Opp. at 51-54 (citing *Am. Medical Ass'n v. United Healthcare Corp.*, 588 F. Supp. 2d 432 (S.D.N.Y. 2008) and *Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076 (9th Cir. 1986)) *with* Mot. at 32-33 (citing *Motorola Credit Corp. v. Uzan*, 202 F. Supp. 2d 239 (S.D.N.Y. 2002) and *NOW, Inc. v. Scheidler*, 267 F.3d 687 (7th Cir. 2001)).  Although Defendants claim *In re Fredeman Litig.*, 843 F.2d 821 (5th Cir. 1988), reached a similar "holding," that court "specifically reserved ruling on 'whether all forms of injunctive relief and other equitable relief are foreclosed to private plaintiffs under RICO.'"  *Conkling v. Turner*, 18 F.3d 1285, 1296 n.7 (5th Cir. 1994) (quoting *In re Fredeman Litig.*, 843 F.2d at 830).  In addition to *Motorola* and *Scheidler*, numerous courts have concluded that a private right to injunctive relief exists. *See, e.g., In re Managed Care Litigation*, 298 F. Supp. 2d 1259, 1282-83 (S.D. Fla. 2003); *Baldree v. Cargill, Inc.*, 758 F. Supp. 704, 706-07 (M.D. Fla. 1990), *aff'd without opinion*, 925 F.2d 1474 (11th Cir. 1991); *Aetna Casualty & Surety Co. v. Liebowitz*, 570 F. Supp. 908, 909-11 (E.D.N.Y. 1983), *judgment aff'd*, 730 F.2d 905 (2d Cir. 1984).

1987).  Thus, this Court is free to follow the better-reasoned view, adopted by a variety of RICO experts, that § 1964 either confers a right to private injunctive relief or, at a minimum, does not deprive this Court of its inherent equitable power to enter such an injunction.[10]  The soundness of this position is clear: Section 1964(a) expressly authorizes courts to "prevent and restrain violations of section 1962" and nothing in the remainder of the statute limits that authorization.

Like *AMA*, Defendants argue that by including an additional provision authorizing treble damages for private plaintiffs, Congress implicitly limited private plaintiffs to the treble damages remedy.  TRO Opp. at 53; *AMA*, 588 F. Supp. 2d at 445 ("'it is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it'") (quoting *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 19 (1979)).  But this analysis makes little sense; given that Congress had *already granted* courts power to enter injunctions in § 1964(a), it is hardly notable that it did not *repeat* that authorization in § 1964(c).  *See Scheidler*, 267 F.3d at 698.  Indeed, although Section 1964(b) authorizes the Attorney General to receive only *preliminary* injunctions, no one disputes that permanent injunctions may be properly granted to the government.  *Id.* at 697; *United States v. Sasso*, 215 F.3d 283, 290 (2d Cir. 2000) ("Congress intended [§ 1964(a)] to constitute broad authorization for entry of remedial orders").[11]

---

[10] Defendants dispute Chevron's observation that commentators largely disagree with *Wollersheim*'s holding only by noting that Chevron's authority predates *Wollersheim* itself.  TRO Opp. at 54-55 & n.29.  Though nothing in this timing undermines these commentators' reading of the legislative history to authorize private injunctive relief, the same view has prevailed since *Wollersheim*. *E.g.*, G. Robert Blakey & Scott Cessar, *Equitable Relief Under Civil RICO: Reflections on* Religious Technology Center v. Wollersheim*: Will Civil RICO Be Effective Only Against White-Collar Crime?*, 62 NOTRE DAME L. REV. 526, 528 (1987) ("*Wollersheim*'s reasoning is fatally flawed, since it is inconsistent with the text, legislative history, and purpose of RICO, and it cannot be easily squared with the teaching of the Supreme Court on how to read statutes in general or RICO in particular.").

[11] In concluding that *Transamerica* nonetheless precludes the entry of an injunction, Defendants and the *AMA* Court misread that case.  *Transamerica* addressed whether to imply a private right of action where the statute specified other remedies, not what remedies are available to a proper plaintiff.  *Id.* at 13, 20.  The Supreme Court has often recognized that these are "analytically distinct" questions.  *Franklin*, 503 U.S. at 65-66.  "The general rule . . . is that absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute."  *Id.* at 70-71.  And "[t]he mere naming of certain included remedies neither suggests nor is a 'clear direction' that other remedies are precluded."  *Reich v. Cambridgeport Air Sys., Inc.*, 26 F.3d 1187, 1191 (1st Cir. 1994) (quoting *Franklin*, 503 U.S. at 70).  *AMA* also relies on *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001), for the proposition that the "'express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others.'"  *AMA*, 588 F. Supp. 2d at 445 (quoting *Alexander*, 532 U.S. at 290).  *Alexander*, like *Transamerica*, considered whether to imply a private right of action in light of a different statutory means of enforcement (*i.e.,* agency termination of funding).  *Alexander*, 532 U.S. at 289.  Like *Transamerica*, it is thus inapposite.

Separate and apart from § 1964(a)'s explicit authorization of private injunctive relief, such a remedy is permitted by the courts' inherent authority to enter injunctions in a civil action within their jurisdiction, 28 U.S.C. § 1651; *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 291 (1960).  Nowhere does RICO "in so many words, or by a necessary and inescapable inference," *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946), *strip* the federal courts of such authority, and "'[a]bsent an expressed prohibition the inherent power remains.'"  *Sheehan v. Purolator Courier Corp.*, 676 F.2d 877, 884 n.11 (2d Cir. 1982) (quoting *Culpepper v. Reynolds*, 421 F.2d 888, 894 (5th Cir. 1970)).  "Congress must speak clearly' of its intent to interfere with the historic equitable powers of the courts; otherwise, no diminution in the courts' remedial powers may be inferred."  *Conboy v. AT&T Corp.*, 241 F.3d 242, 254 (2d Cir. 2001).

As Judge Rakoff noted in *Motorola Credit Corp.*, "It would be extraordinary indeed if Congress, in enacting a statute that Congress expressly specified was to be 'liberally construed to effectuate its remedial purposes,' intended, without expressly so stating, to deprive the district courts of this utilizing this classic remedial power in private civil actions brought under [civil RICO]."  202 F. Supp. 2d at 244 (quoting Pub. L. 91-452, § 904(a), 84 Stat. 947 (1970)); *see also Aetna Cas. & Sur. Co. v. Liebowitz*, 570 F. Supp. 908, 910 (E.D.N.Y. 1973).  Congress even specifically *preserved* equitable remedies, providing: "[n]othing in this title shall supersede any provision of Federal, State, or other law . . . affording civil remedies in addition to those provided for in this title."  Pub. L. 91-452, § 904(b).  This court's inherent power is thus clear.

### 3.     Chevron Does Not Seek Extraterritorial Application of RICO

Defendants invoke *Morrison v. Nat'l Australia Bank Ltd.*, 130 S. Ct. 2869 (2010), to argue that Chevron's RICO claim is barred because RICO lacks extraterritorial reach.  But as *Morrison* itself recognized, conduct is not outside the reach of a statute "[s]imply because a case's factual background involves some conduct occurring abroad"; instead, "a court must first inquire into whether applying a statute implicates any issue of extraterritoriality."  *Blazevska v. Raytheon Aircraft Co.*, 522 F.3d 948, 952 (9th Cir. 2008).  *See also Envtl. Def. Fund, Inc. v. Massey*, 986 F.2d 528, 532 (D.C. Cir. 1993) (Mikva, J.) (court cannot "bypass[] the threshold

question of whether the application [of a statute] presents an extraterritoriality problem at all"). *This* analysis—a topic Defendants barely address—makes clear that RICO fully applies to the U.S.-based enterprise through which Defendants have conducted their racketeering activity.

Under long-standing jurisprudence reaffirmed in *Morrison*, the extraterritoriality analysis identifies the "conduct the statute seeks to regulate" and asks whether that conduct is domestic or foreign. *Blazevska*, 522 F.3d at 952; *Morrison*, 130 S. Ct. at 2884. "Even where the significant effects of the regulated conduct are felt outside U.S. borders, the statute itself does not present a problem of extraterritoriality, so long as the conduct which Congress seeks to regulate occurs *largely within the United States*." *Envtl. Def. Fund*, 986 F.2d at 531 (emphasis added). As Judge Rakoff recently concluded, RICO is focused on "how a pattern of racketeering affects an enterprise," and the statute evidences no "concern with foreign enterprises." *Cedeño v. Intech Group, Inc.*, 733 F. Supp. 2d 471, 473 (S.D.N.Y. 2010).

Where the enterprise's ringleader is a U.S. citizen, who conspired with foreign and domestic allies to concoct a scheme, both domestic and foreign, to pressure a U.S. company into a massive payment, "the crux of the inappropriate conduct occurred within the United States." *Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 72 (D.D.C. 2002). Defendants' description of the enterprise's connections with the United States as including only "minor meetings" (PI Opp. at 8) is staggering given that the enterprise was directed by Donziger in the United States; was originally funded by Kohn in the United States; fraudulently drafted the Cabrera Report in the United States; made and publicized fraudulent statements as a means of extorting money from Chevron in the United States; developed its enforcement strategy in the United States; and concealed its ongoing fraud in the United States and in United States courts. When Defendants assert that the U.S. events were "ultimately in furtherance of the Ecuadorian litigation," they have matters precisely backwards. PI Opp. at 8. Occurrences in *Ecuador*, including the Lago Agrio Litigation, were "ultimately in furtherance" of "[t]he enterprise's ultimate aim . . . [of] creat[ing] enough pressure on Chevron in the United States to extort it into paying to stop the campaign against it." Ann. Compl. ¶ 2. As the very definition of an enterprise emphasizes the

significance of a "common purpose," an enterprise that has as its purpose causing an effect in the U.S.—*i.e.*, a coerced payment from Chevron—is domestic.  *See Boyle v. United States*, 129 S. Ct. 2237, 2244 (2009).[12]  In contrast, the *Norex* enterprise, -- F.3d --, 2010 WL 4968691, at *1 (2d Cir. Dec. 8, 2010), "primarily involve[d] foreign actors and foreign acts," operated primarily in Russia, and the point of it was to "take over a substantial portion of the Russian oil industry."

Defendants' characterization of *Cedeño*, 733 F. Supp. 2d 471, similarly misses the mark. Defendants interpret *Cedeño* as broadly holding that "where the alleged RICO enterprise involves foreign acts and actors, RICO has no applicability."  TRO Opp. at 55-56.  But *Cedeño* is much less extreme, holding merely that "RICO does not apply where . . . the alleged enterprise and the impact of the predicate activity upon it are entirely foreign."  *Cedeño*, 733 F. Supp. 2d at 474.  Defendants fail to dispute that such a circumstance is not present here.  PI Opp. at 8.[13]

Congress has "express[ly] admoni[shed] that RICO is to 'be liberally construed to effectuate its remedial purposes,'" and "RICO is to be read broadly."  *Sedima*, 473 U.S. at 497-98.  It has also clearly recognized that an enterprise might include foreign members and engage in overseas activities, yet still be within the scope of the statute as a domestic enterprise.  *See* 18 U.S.C. § 1961(1) (including such predicate acts as money laundering and falsifying immigration documents to gain entry into the United States).

Defendants' theory of extraterritoriality would leave this Court unable to remedy even the undisputedly domestic aspects of their RICO conspiracy, conduct that Congress clearly intended to prohibit.  Setting aside the racketeering acts with a foreign connection, the remaining allegations themselves describe a pattern of conducting an enterprise (an association-in-fact) through a pattern of racketeering activity intended to extort funds from Chevron.  For example, Appendix B to the Complaint outlines hundreds of acts of mail and wire fraud, many involving no foreign

---

[12] The Supreme Court's approach in *Morrison* to determining what applications of the Securities Exchange Act were domestic is instructive.  The Court limited the statute's reach to "only transactions in securities listed on domestic exchanges, and domestic transactions in other securities."  130 S. Ct. at 2884.  It did so based on a close reading of the statute itself, which indicated the "primacy of the domestic exchange" and, for securities not listed on a domestic exchange, "strongly confirmed" the "exclusive focus on *domestic* purchases and sales."  *Id.* at 2884-85.
[13] To the extent the focus of RICO is properly considered to be the "pattern of racketeering activity," *see Alfadda v. Fenn*, 935 F.2d 475, 479 (2d Cir. 1991), Defendants also fail to argue that such pattern is entirely foreign.

participation whatsoever.  *See, e.g.*, Appendix B, at 12, 14.  Moreover, Chevron's allegations of obstruction of justice and witness tampering are entirely domestic.  If Chevron had alleged these acts alone, there would be no colorable extraterritorial argument.  It defies logic and public policy to contend that Defendants may escape the reach of U.S. laws by *expanding* their unlawful scheme to extort money from Chevron by employing a foreign lawsuit to increase the pressure.

### B.   Chevron Is Entitled to a Declaration of Non-Recognition and Supporting Injunctive Relief

Defendants do not substantively respond to the merits of Chevron's claim that the judgment should not be enforced in the U.S. or elsewhere.  Rather, they simply claim Chevron is not eligible for declaratory relief.  TRO Opp. at 59.  This argument was always meritless—now it is also moot.  Yesterday, the Lago Agrio court, as expected, issued a multi-billion dollar judgment, rewarding Defendants' fraud with approximately $8 billion (with an additional $8 billion in punitive damages neither requested in plaintiffs' complaint nor permitted under Ecuadorian law).  Ex. 554; Decl. of Dr. Coronel, ¶¶ 10-25.  As such, there can no longer be any dispute that the Declaratory Judgment Act supports Chevron's requested relief, as "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties that have adverse legal interests, of sufficient immediacy and reality to warrant the issuances of a declaratory judgment."  *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941).

Nor have Defendants disputed Chevron's overwhelming evidence that the judgment, and the Ecuadorian proceedings, are permeated by fraud, bias, and a complete absence of any semblance of due process, rendering the judgment unenforceable.  *See* Mot. at 58-61; N.Y. C.P.L.R. § 5304; *see also* Decl. of Jan Paulsson, ¶¶ 30-32.  Defendants ghost-wrote the 'neutral court-appointed' expert's report and ensured that no judge will rule against them because even if a judge might not actually be killed, "he thinks he will be . . . . [w]hich is just as good."  Ex. 1, CRS-129-00-CLIP-02; Ex. 2 at 70; CRS-032-00-CLIP-01; Ex. 2 at 11.  They submitted falsified evidence, including Calmbacher's purported reports, intentionally exerted illegitimate influence on the Ecuadorian court—which Donziger mocked as "weak," "corrupt," and lacking integrity— by colluding with the Ecuadorian government and manipulating the court to appoint a global ex-

pert and, later, to select Defendants' preferred candidate for that position.  *In re Applic. of Chevron Corp.*, No. 10 MC 00002 (LAK), 2010 WL 4910248, at *12 (S.D.N.Y. Nov. 10, 2010); Ex. 492 at 4-5; Ann. Compl., § B.  Under these facts, the judgment is indisputably unenforceable.

## C.   Defendants Do Nothing to Challenge Chevron's Likely Success on the Merits of Its State-Law Claims, Which Independently Entitle It to Injunctive Relief

Chevron has also demonstrated its likely success on the merits based on Defendants' New York state law torts, all of which compel an immediate injunction.  Far from challenging the merit of these common law claims or Chevron's entitlement to injunctive relief on that basis, Defendants attack Chevron's state law claims with an unsupported and erroneous assertion that Ecuadorian law—not New York law—governs.  Fatally absent, however, is: (1) any evidence of a conflict between Ecuadorian and New York law (a prerequisite to conflict of laws analysis); (2) any attempt by Defendants to meet their burden to show that there is any such conflict; and (3) a legitimate analysis of New York's interests—which, when analyzed, shows that even if there were a conflict—which is far from clear—that New York has the greatest interest in putting a stop to these New York-tethered torts.

Defendants must first show that there is a true conflict of laws, *see Knieriemen v. Bache Halsey Stuart Shields Inc*., 427 N.Y.S.2d 10, 15 (N.Y. App. Div. 1980), and New York deems parties to have "acquiesce[d] that forum law be applied" when "the parties by default in pleading or proof" fail to do so.  *Watts v. Swiss Bank Corp.*, 27 N.Y.2d 270, 276 (1970); 427 N.Y.S.2d at 15; N.Y. C.P.L.R. § 3016(e).  Because New York is the forum and Defendants have failed to show how, if at all, New York and Ecuadorian law are in conflict, the laws of New York apply to Chevron's state law claims.  *Id.*; *Republic of Ecuador v. Chevrontexaco Corp*., 426 F. Supp. 2d 159, 164 (S.D.N.Y. 2006) ("As no conflict between Ecuadorian law and the law of the forum has been shown, the Court will apply New York law"); 19A N.Y. Jur. Conflict of Laws § 2 ("Absent an actual conflict, the court will apply the law of the forum.").

Moreover, contrary to Defendants' suggestion that New York has insufficient interest in this litigation, New York has an overwhelming interest in having its law applied, as evidenced by its function as the hub of Donziger's fraud and the laundry list of tortious activity directed at

New York and set forth in clear detail in § I.A., *supra*, and has an overwhelmingly strong interest in imposing liability under its law on every Defendant and those who conspired with them.  *See, e.g.*, *Marra v. Bushee*, 447 F.2d 1282, 1283-84 & n.5 (2d Cir. 1971) ("Where the compensatory element dominant in negligent actions is supplanted by the punitive interest accompanying the state's attempt to control and deter injurious behavior, the defendant's conduct, and not the domicile . . . was considered determinative of the law to be employed."); *Simon v. Philip Morris, Inc.*, 124 F. Supp. 2d 46, 76 (E.D.N.Y. 2000) (while other interests may be involved, "New York has a paramount interest in punishing and deterring misconduct in New York").[14]

## III. International Comity Does Not Prevent This Court From Enjoining the Extortionate Scheme Targeted at New York

### A.     Comity and International Abstention Support Injunctive Relief

Relying on comity and *Younger* abstention, Defendants insist that "[t]his Court must not allow Chevron to do a preemptive end-run around the appellate process that will be available to it in the Ecuadorian courts should a judgment ultimately issue there" and urge this Court to "abstain from entertaining the injunction application."  PI Opp. at 3.  But the suggestion that Chevron has not tried to seek relief in Ecuador or that it would ever receive such relief is baseless, as evidenced by the legally and factually baseless, penal award entered in Ecuador yesterday, completely disregarding the overwhelming evidence of fraud and illegally imposing more than eight billion dollars in punitive damages against Chevron despite the fact that, among other things: (1)

---

[14] Defendants relegate their only challenge to the merits of Chevron's New York tort claims to a footnote.  By and large this entire footnote is predicated on the fundamental misunderstanding of common law conspiracy, which Defendants misleadingly suggest "should be dismissed in short order" because it is not an independent cause of action in New York.  Of course this totally misses the point of Chevron's conspiracy claim, which attaches to the underlying tort claims.  *See Berwick v. New World Network Intern., Ltd.*, No. 06 Civ. 2641(JGK), 2007 WL 949767 at *6 (S.D.N.Y. Mar. 28, 2007).  Defendants likewise argue that Chevron's unjust enrichment claim fails because there is no evidence that the Ecuadorian plaintiffs benefited at Chevron's expense—but it is precisely the imminent enrichment that Chevron seeks to enjoin.  Defendants' attack on Chevron's trespass to chattels claim is unpersuasive.  New York merely requires "harm to the condition, quantity or material value of the chattels at issue,"  *'J. Doe No. 1' v. CBS Broad., Inc.*, 806 N.Y.S.2d 38, 39 (App. Div. 2005), and many courts have recognized that harm to business reputation and goodwill is actionable on a trespass-to-chattels theory, as "a *legally protected interest.*"  *Compuserve Inc. v. Cyber Promotions, Inc.*, 962 F. Supp. 1015, 1022-23 (S.D. Ohio 1997) (emphasis added); *see also Am. Online v. IMS*, 24 F. Supp. 2d 548, 550 (E.D. Va. 1998).  Finally, Defendants' statute of limitations attack on the tortious interference claim fails—since it ignores that under New York law, a contract requiring continuing performance can be successively breached, resetting the statute of limitations.  *Guilbert v. Gardner*, 480 F.3d 140, 150 (2d Cir. 2007).  Furthermore, Defendants have conspired in pursuit of the ultimate breach—the fraudulent adverse judgment from the Lago Agrio court.  Injunctive relief is proper to remedy these torts.  *See* Restatement (Second) of Torts § 936.

the Lago Agrio plaintiffs never requested such relief; (2) punitive damages are not permitted under Ecuadorian law, Decl. of Dr. Coronel, ¶¶ 12-15; and (3) ) the alleged harms are unproven and Petroecuador is the party that failed to perform its remediation obligations.  Defendants' argument also depends on the false assertion that Chevron is asking this Court to enjoin the Ecuadorian proceedings, which is patently inaccurate and also moot in light of the judgment entered in Ecuador.  And finally, not even the most distorted notion of comity or *Younger* abstention set forth in *Pennzoil v. Texaco*, 481 U.S. 1 (1987) would permit—let alone compel—this Court to abstain from ruling on the present action or taking steps to preserve the status quo.

Rather, as Defendants concede, a fundamental prerequisite to any U.S. court abstaining based on principles of international comity is that the "foreign proceedings [] not violate the laws or public policy of the United States and [] the foreign court [must] abide[] by fundamental standards of procedural fairness."  TRO Opp. at 36 (quoting *In re Bd. of Directors of Telecom Argentina, S.A.*, 528 F.3d 162, 171-72 (2d Cir. 2008) (quotation marks omitted)).  "Comity will be granted to the decision or judgment of a foreign court if it is shown that the foreign court is a court of competent jurisdiction, and that the laws and public policy of the forum state and the rights of its residents will not be violated."  *Cunard S.S. Co. Ltd. v. Saleen Reefer Servs.*, 773 F.2d 452, 457 (2d Cir. 1985); *see also Lemmon v. People,* 20 N.Y. 562 (N.Y. 1860) (comity can "never be exercised in violation of our laws").  Defendants have offered no evidence challenging Chevron's overwhelming proof that the Ecuadorian court has failed to "abide[] by fundamental standards of procedural fairness."  *In re Bd. of Directors*, 528 F.3d at 171-72; *see also* Álvarez Decl., Ex. A, ¶ 87.  As such, the necessary prerequisites for this Court to defer to Ecuador's courts are not present.  *Id.*  Indeed, as Chevron's international due process expert and world renowned scholar has opined: "this was clearly a fundamentally unfair procedure judged against the standards of international law . . . it appears to have been 'a wilful disregard of due process of law' which 'shocks, or at least surprises, a sense of juridical propriety.'"  Paulsson Decl., ¶ 32.[15]

---

[15] Chevron submits herewith a declaration from Jan Paulsson, who opined on the procedures in the Ecuadorian litigation before judgment was entered yesterday.  Professor Paulsson is presently reviewing the judgment for addi-

[Footnote continued on next page]

Defendants' invocation of international abstention merely underscores the Court's obligation to act here. *See* TRO Opp. at 36-37. International abstention is a discretionary doctrine that rarely results in dismissal. *See JP Morgan Chase Bank v. Altos Hornos de Mexico*, 412 F.3d 418, 423 (2d Cir. 2005). In cases with related foreign proceedings, federal courts have a "'virtually unflagging obligation . . . to exercise the jurisdiction given them,'" and should abstain only in "exceptional circumstances." *Royal & Sun Alliance Ins. Co. of Can. v. Century Int'l Arms, Inc.*, 466 F.3d 88, 92-93 (2d Cir. 2006) (alteration in original; quotation omitted). Where, as here, Defendants cannot contend that "foreign proceedings are procedurally fair . . . and do not contravene the laws or public policy of the United States," such abstention is improper. *See JP Morgan Chase Bank*, 412 F.3d at 424; Paulsson Decl. ¶ 31. Having deprived Chevron of any meaningful opportunity to have its fraud claims heard in Ecuador, Defendants cannot now cite vague principles of comity to avoid answering for their actions. *See Mut. Life Ins. Co. v. Hill*, 193 U.S. 551, 561 (1904); *Riggs v. Palmer*, 115 N.Y. 506, 511-13 (1889).[16]

Finally, Defendants' lengthy, confused analogy to *Younger* abstention—via *Pennzoil*—likewise fails. *Younger* and *Pennzoil* address the relationship between U.S. federal and state courts—not international comity. *See Lefkowitz v. Bank of N.Y.*, 676 F. Supp. 2d 229, 273 (S.D.N.Y. 2009) (*Younger* abstention applies to "ongoing *state* proceeding . . . implicat[ing] an important *state* interest") (emphasis added; footnote omitted). The doctrine is premised on the "assum[ption] that state procedures will afford an adequate remedy." *See Pennzoil*, 481 U.S. at

---

[Footnote continued from previous page]

tional insights. Chevron may request this Court to permit it to submit a supplemental declaration from Professor Paulsson to permit him to provide his expert opinion on the Ecuadorian judgment.

[16] Defendants' reliance on *Dow Jones & Co., Inc. v. Harrods, Ltd.*, 237 F. Supp. 2d 394 (S.D.N.Y. 2002) is also misplaced. Unlike *Dow Jones*—where the declaratory plaintiff sought to enjoin incipient defamation litigation in the United Kingdom, Chevron merely seeks to enjoin ancillary enforcement efforts. And Defendants' attempt to minimize that distinction by claiming that their inability to enjoy "the fruits" of the judgment will work a restraint on the Ecuadorian court is unpersuasive. *See* TRO Opp. at 41. Chevron seeks interim protection from an on-going extortionate scheme organized and carried out by U.S. citizens in the United States, and it seeks only to maintain the status quo based on its claims that the Lago Agrio judgment is not entitled to recognition. Both issues are manifestly matters of U.S. law; they are not before the Ecuadorian court and deciding those issues does not impair Ecuador's sovereignty. *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 421 (1964); *Laker Airways, Ltd. v. Sabena*, 731 F.2d 909, 937 (D.C. Cir. 1984). The litany of cases Defendants cite involving international abstention in bankruptcy or debt restructuring cases are wholly inapposite. Unlike general abstention cases where abstention is appropriate only under "exceptional circumstances," international bankruptcy cases are "a discrete category of foreign litigation that generally requires dismissal." *Royal & Sun Alliance Ins. Co. of Can*, 466 F.3d at 92; *see also JP Morgan Chase Bank*, 412 F.3d at 424.

15.  That assumption is inappropriate in the international context, especially under the evidence adduced here. Moreover, *Younger* abstention requires an adequate remedy at law, *id.* at 10, and by definition there is no such remedy for a plaintiff who will suffer irreparable harm in the absence of equitable relief.[17]

### B.      Defendants' Estoppel Arguments Are Predicated on Baseless Fiction

Defendants repeatedly and misleadingly claim that Chevron "fought in this very district court for years to require the Ecuadorian plaintiffs to bring and prosecute their claims in Ecuador's courts [and] Chevron cannot now be permitted to ask this Court for relief regarding the proceedings pending in Ecuador."  *See*, *e.g.*, TRO Opp. at 2.  In short, Defendants argue that Chevron got what it asked for and now—as a matter of estoppel—it is powerless to defend itself. But Chevron never consented to be extorted, nor can it be estopped from challenging a remedy Defendants admit it expressly reserved in the *forum non conveniens* dismissal.  *See id.* at 10, 14.

Defendants' suggestion that Texaco agreed "to satisfy any Ecuadorian final judgment" is equally unavailing.  *See* TRO Opp. at 7, 9, 14, 46.  There is no Texaco agreement or court order requiring Chevron to satisfy any Ecuadorian judgment.  Even if  Texaco's statements were chargeable to Chevron and the quotes Defendants selectively invoke were the operative commitments (which Chevron has disputed in the Treaty Arbitration and in opposition to Defendants' and Ecuador's efforts to enjoin the Treaty Arbitration (*see* Ex. 556 at 30-37)), the court did not order Texaco to satisfy any Ecuadorian judgment and Texaco expressly reserved defenses—such as the ability to resist enforcement of a judgment obtained by fraud—available against the enforcement of any foreign-country judgment.  TRO Opp. at 10.  Moreover, in the Second Circuit it is *reversible error* to condition *forum non conveniens* (FNC) dismissal on the

---

[17] Finally, to the extent Defendants suggest this Court should abstain from granting relief out of comity owed to the Treaty Arbitration Tribunal, their argument is inapposite.  The rules governing the arbitration expressly permit national courts to issue interim measures, like preliminary injunctions, *see* UNCITRAL Rules, art. 26(3).  Moreover, none of the Defendants are parties to the BIT proceeding; the tribunal has not been asked to and could not enjoin them.  Indeed, the tribunal recently ordered the Republic of Ecuador—but not the Defendants—to "take all measures . . . to suspend or cause to be suspended the enforcement or recognition . . . of any judgment against [Chevron]"— essentially the same remedy Chevron seeks against the Defendants here.  An injunction blocking Defendants' extortionate enforcement plans would support, not hinder, the BIT proceeding. Moreover, the Tribunal entered interim measures *after* this Court entered the Temporary Restraining Order in this case and with knowledge of the Temporary Restraining Order, which it indicated was no problem at all.  Exs. 485-486.

requirement that a party agree to "satisfy any judgment" and waive subsequent challenges under the Recognition Act.  *See In re Union Carbide*, 809 F.2d 195, 204-05 (2d Cir. 1987).  This Circuit disallows such stipulations precisely because, even if it does not appear the foreign judgment will be obtained by fraud, such facts "conceivably could occur" after dismissal.  *Id*.  And, in addition, Defendants cannot point to any language remotely suggesting that Texaco—much less Chevron—waived any claims it might have against attempted extortion.

Nor is there anything "clearly inconsistent" with Texaco's argument in the 1990s that Ecuador then constituted an adequate alternative forum for plaintiffs to assert personal or property damage claims, and Chevron's current argument that (1) it is the victim of a scheme to reassert previously released "community claims" and to fabricate a fraudulent judgment that could never be recognized in any legitimate legal system, and (2) Ecuador presently fails to afford fair and impartial tribunals or procedures compatible with due process of law.  As Dr. Álvarez's declaration carefully details, since *Aguinda* was dismissed, the Ecuadorian judiciary has been subject to continuing rounds of threats, purges, and removals, to the point where neutral observers have concluded that "the Judiciary can no longer act impartially and with integrity, and is instead subject to constant pressure and threats that influence its decisions."  Álvarez Decl., Ex. A, ¶ 23. The FNC dismissal does not preclude Chevron from raising these challenges.  *See e.g.*, *In re Union Carbide*, 809 F.2d at 204-05 (even after FNC dismissal, "due process can be raised . . . as a defense to the plaintiffs' later attempt to enforce a resulting [foreign] judgment . . . in this country"); *Osorio v. Dole Food Co.*, 665 F. Supp. 2d 1307, 1343-44 (S.D. Fla. 2009) ("Defendants were not estopped from challenging the Nicaraguan judgment based on their [prior] *forum non conveniens* position" because their "legal positions" were not inconsistent, and the "legal landscape in Nicaragua" was "fundamentally altered").  Moreover, because *Aguinda* was a distinct action, Chevron is not bound by any limitations Texaco accepted there.

## IV.    Absent Injunctive Relief, Chevron Will Suffer Irreparable Injury

Chevron has made a clear and uncontroverted evidentiary showing—based on Defendants' own statements—that it will suffer irreparable harm absent injunctive relief.  Defendants

have openly admitted that they will seek to seize oil tankers and assets of Chevron subsidiaries around the world, and threaten that their actions will cause "a significant disruptive impact on [Chevron's] operations." Ex. 92 at 2; *see also* Ex. 93 at 7. They have vowed that they "are not waiting for the appeals process" and will seek to "immediately" get that judgment enforced. Ex. 1, CRS-482-00-CLIP-01; Ex. 2 at 450. Rather than deny these plans, Defendants simply contend that this "case is about money, nothing else" and "[t]herefore, there is no 'irreparable harm.'" TRO Opp. at 49. This argument is belied by their own admissions and also contrary to the law.

Defendants do not dispute that they are planning a blitz attack of multiple enforcement actions and seizures around the globe. And "injunctions to restrain a multiplicity of suits in such cases are not only permitted, but favored, by the courts." 1 SPENCER W. SYMONS, POMEROY'S EQUITY JURISPRUDENCE § 261j (5th ed. 1941) (citing *Sovereign Camp W.O.W. v. O'Neil,* 266 U.S. 292 (1924)); *see also China Trade & Dev't Corp. v. M.V. Choong Yong*, 837 F.2d 33, 39 (2d Cir. 1987). Further, it is clear that the point of launching a multiplicity of actions would be to harass Chevron to pay Defendants off, rather than seek enforcement on the merits. In the words of the Invictus memo, Defendants' "ultimate goal" is to "effect[] a swift and favorable settlement," "before Chevron becomes entrenched in fighting enforcement." Ex. 341 at 28-29.

Defendants' attempt to characterize Patton Boggs' Invictus as just a "good law firm's" analysis of how to enforce the judgment rather than a plan for an "enforcement strategy for the sake of being vexatious or disruptive," not only appears to have been written by Patton Boggs itself, but also selectively ignores all of the above statements, taken directly from their memo. PI Opp. at 11; *see* Mastro Decl. For instance, the memo states that "*[c]onsistent with their aggressive approach*, Plaintiffs' Team will look for ways to proceed against Chevron on a pre-judgment basis, *largely as a means of attaining a favorable settlement at an early stage*," explaining that "[p]re-judgment attachment would *undoubtedly compound the pressure already placed on Chevron vis à vis an international campaign*, and force Chevron to focus its resources on the proceedings initiated by the Plaintiffs, rather than its own sideshows." Ex. 341 at 14 (emphases added). The memo details more ways Defendants can "turn up the heat on Chevron," for

example, by "attempt[ing] to establish that Texaco/Chevron mislead *[sic]* both the SEC and investors concerning its awareness of liability." *Id.* at 9, 12. Far from an innocuous legal analysis, it is indeed a "war plan" to threaten and cause significant irreparable injury to Chevron's business and reputation, aimed at forcing Chevron to pay up just to stop the pain.

Defendants complain that Chevron has not submitted a declaration detailing how the forced asset seizures would affect its operations, and argue that any losses of business resulting from those seizures would not be irreparable. These arguments ignore Defendants' own statements vowing that "[t]his could end up being one of the biggest forced asset seizures in history and it could have a significant disruptive impact on [Chevron's] operations." Ex. 92 at 1-2. No declaration is necessary given these outright threats. *See LaForest v. Former Clean Air Holding Co.*, 376 F.3d 48, 55-56 (2d Cir. 2004) (affirming entry of injunction based on defendant's threat to cause irreparable injury). Nonetheless, Chevron has submitted a declaration confirming what Defendants have calculated into their Invictus strategy—that forced seizures and enforcement actions around the world could cause a significant disruption of Chevron's operations and are likely to result in the loss of reputation, goodwill, and business. *See* Decl. of Rex. J. Mitchell.

Citing a single district court case, Defendants contend "[l]oss of business . . . is a quantifiable injury." PI Opp. at 13. But that case dealt only with the readily calculable loss of business from a former employee's direct competition, not with the type of multi-faceted and large-scale disruption at issue here.[18] And the Second Circuit has held, in several cases, that the loss of business, damage to reputation, and harm to goodwill constitute irreparable harm. *E.g.*, *Regis-*

---

[18] Defendants criticize this Court's statement that "hav[ing] shiploads of oil or gasoline attached all over the place clearly does render irreparable injury" as lacking support, and argue that their seizures of tankers would not result in irreparable injury because Chevron could just post a bond and go on with its business with "minimal disruptions." PI Opp. at 12 n.5. Defendants offer no evidentiary or legal authority for their claim. Nor do they explain why seizures would cause only "minimal disruptions." To the contrary, they have bragged that prejudgment attachments would "*undoubtedly compound the pressure*" on Chevron and serve as "a means of attaining a favorable settlement at an early stage." Ex. 341 at 14 (emphasis added). In fact, *ex parte* pre-recognition attachment proceedings are available in countries in which Chevron subsidiaries have assets, including Singapore, which the Invictus memo identifies as a target. *See* Ex. 494 (Singapore Rule of Court, Order 29 (authorizing an injunction "for the detention, custody or preservation of any property which is the subject-matter of the cause or matter")); *see* Ex. 495 (Bee Tan, Singapore, *in* ENFORCEMENT OF FOREIGN JUDGMENTS 352 (Dennis Campbell ed., 1997)) (Rule applicable in foreign enforcement). Given that this can occur *ex parte*, if its assets were attached and tankers seized, it would result in material disruptions in Chevron's operations—perhaps before it even had notice of the claim—even if some countries might permit Chevron to later post a bond.

*ter.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (business opportunities); *Tom Do-herty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27, 38 (2d Cir. 1995) (goodwill). Also at stake is due process: Defendants seek to deprive Chevron of an opportunity to litigate the enforceability of the Lago Agrio judgment—itself imposed without affording Chevron due process, yet another basis for a finding of irreparable injury. *See Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) ("it is the alleged violation of a constitutional right that triggers a finding of irreparable harm").

Defendants' argument that monetary harm cannot support an injunction is likewise un-availing, as monetary damages can constitute irreparable harm where the plaintiff will not be able to recover those damages. *See Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999); *Rockwell Int'l Sys., Inc. v. Citibank, N.A.*, 719 F.2d 583, 586-88 (2d Cir. 1983); *see also Philip Morris USA Inc. v. Scott*, 131 S. Ct. 1, 4 (2010) (Scalia, J., in chambers) ("If expenditures cannot be recouped, the resulting loss may be irreparable."). The individual Defendants describe themselves as "indigenous farmers and laborers in remote areas of Ecua-dor," TRO Opp. at 27, who would hardly be able to repay the enormous damages Chevron would face from Defendants' plan to "seize assets, seize boats." Ex. 93, at 7. As a result, enforcement of the judgment in their favor would cause irreparable harm.

Likewise, Ecuador has made its position clear: *it* should receive at least 90% of any mon-ies recovered from the judgment. Ex. 87 at 2. And Ecuador demonstrated no intention of com-plying with its international obligations or returning any funds or assets even if the BIT tribunal ultimately issues a final award in favor of Claimants. Rather, Correa has announced that Ecua-dor will not pay "one red cent" in favor of a foreign oil company, and Ecuador already has re-fused to comply with international arbitral awards rendered against it. Álvarez Decl., Ex. A, ¶¶ 68, 72-74; *see* Exs. 498-503. While the government's relationship to the February 14 judgment remains to be seen, the judgment calls for a "trust" to be administered by and for the benefit of the Front—the very organization that is at the heart of the corrupt and extortionate scheme. For all of these reasons, "but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occu-

pied," *Brenntag*, 175 F.3d at 249, and a preliminary injunction is necessary.

## V.    The Balance of Hardships and Public Interest Favor Chevron

In weighing the harms affecting Chevron and Defendants, "[t]he relevant harm is the harm that (a) occurs to the parties' legal interests and (b) cannot be remedied after a final adjudication, whether by damages or a permanent injunction." *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010). As this Court has already recognized, "on the existing record . . . the balance of hardships tips decidedly in favor of Chevron." Dkt. 77 at 1. On the one hand, if this Court does not issue a preliminary injunction, substantial irreparable injury to Chevron will ensue. *See* § IV, *supra*. On the other hand, if this Court issues the injunction, Defendants will "not be injured in any material way by a delay" in enforcing the Ecuadorian judgment. *See* Dkt. 77 at 1. After all, if Defendants were to somehow later succeed on the merits of their claim—which they can not— they will later be able to collect from Chevron any portion of a properly enforced judgment. Defendants would not, as they suggest, be "legally barred" from ever attempting to enforce the Ecuadorian judgment (TRO Opp. at 66); rather, they would at worst be temporarily delayed. Any monetary award necessary to remedy any harm Defendants suffered from a delay could easily be assessed against, and collected from, Chevron.[19] As the Court noted, Chevron is not going anywhere. Ex. 546 at 46:23-25. Thus, the potential hardship to Defendants caused by a preliminary injunction is comparatively negligible.

## CONCLUSION

For the foregoing reasons, the Court should enter the requested preliminary injunction.

---

[19] Moreover, to the extent that Defendants will suffer any harm—however slight—as a result of a delay in an eventual enforcement, Chevron has posted a bond, as ordered by this Court.

Dated: February 15, 2011
      New York, New York

Respectfully submitted,
GIBSON, DUNN & CRUTCHER LLP

By: _/s/ Randy M. Mastro
_____
Randy M. Mastro
200 Park Avenue, 47th Floor
New York, New York 10166-0193
Telephone: 212.351.4000
Facsimile:  212.351.4035

Scott A. Edelman
2029 Century Park East
Los Angeles, California 90067
Telephone: 310.552.8500
Facsimile:  310.551.8741

Andrea E. Neuman
3161 Michelson Drive
Irvine, California 92612
Telephone: 949.451.3800
Facsimile:  949.451.4220

William E. Thomson
333 South Grand Avenue
Los Angeles, California 90071
Telephone: 213.229.7891
Facsimile:  213.229.6891

Attorneys for Chevron Corporation

101022938_4.DOC