UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHEVRON CORPORATION, | CASE NO. 11 CV 0691 (LAK) |
| Plaintiff, | |
| vs. | |
| STEVEN DONZIGER, et al., | |
| Defendants. | |

**MEMORANDUM OF LAW INCLUDING OFFER OF PROOF IN OPPOSITION TO CHEVRON'S MOTION FOR A PRELIMINARY INJUNCTION AND OBJECTION TO THE COURT'S CLOSURE OF THE RECORD**

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF LAW INCLUDING OFFER OF PROOF IN OPPOSITION
TO CHEVRON'S MOTION FOR A PRELIMINARY INJUNCTION AND
OBJECTION TO THE COURT'S CLOSURE OF THE RECORD ...................................1

I.      PRELIMINARY STATEMENT .........................................................................................1

II.     PROCEDURAL BACKGROUND.......................................................................................2

ARGUMENT .............................................................................................................................5

        A.      Absent further opportunity for Donziger to marshal and present
                evidence in opposition to Chevron's Application, any preliminary
                injunction would violate Rule 65(a) of the Federal Rules of Civil
                Procedure. ...............................................................................................5

        B.      Under binding Second Circuit precedent, this Court cannot enjoin
                Donziger's pursuit of a possible, but uninitiated foreign suit in an
                unknown location...................................................................................8

        C.      Chevron has not demonstrated that it is likely to suffer irreparable
                harm absent preliminary injunctive relief. .............................................12

        D.      Chevron should be estopped from raising claims and arguments that
                contradict its prior positions in the *Aguinda* litigation...........................17

        E.      The Court should not exercise its jurisdiction under the Declaratory
                Judgment Act, ........................................................................................20

                1.      Chevron's Ninth Claim for Relief does not satisfy the factors
                        supporting a declaratory judgment action..................................20

                2.      Chevron's Ninth Claim for Relief does not state a sufficient
                        case or controversy to support a declaratory judgment action..................22

        F.      Even if the Court concludes that Chevron has shown a likelihood of
                success on its RICO claim (which it shouldn't), injunctive relief is not
                available to private plaintiffs under RICO............................................25

        G.      Chevron's common law claims (third through seventh claims for
                relief) are barred by the litigation privilege under New York law and,
                therefore, cannot support any preliminary injunctive relief....................27

        H.      Chevron's unclean hands preclude it from receiving a preliminary
                injunction or other equitable relief.........................................................29

                1.      Chevron's use of Diego Borja...................................................30

                2.      Criminal prosecution of Chevron employees. ...........................31

                3.      Work with experts....................................................................31

## TABLE OF CONTENTS
### (cont'd)

Page

4. Chevron's improper use of the Ecuadoran military............................31

5. Chevron's change of position regarding the forum. ................................32

I. Chevron's requested preliminary injunction is unconstitutionally vague and overbroad..........................................................................................33

J. Donziger joins in the other arguments presented by defendants Hugo Gerado Camacho Naranjo, and Javier Piaguaje Payaguaje in opposition to Chevron's application. .....................................................34

K. Any Bond Should be Commensurate with the Judgment. ....................35

III. CONCLUSION.............................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Aequitron Med., Inc. v. Dyro*
  999 F. Supp. 294 (E.D.N.Y. 1998) ...................................................................27, 29

*Aguinda v. Texaco, Inc.*
  142 F. Supp. 2d 534 (S.D.N.Y. 2001) ................................................................. *passim*

*Bakhshandeh v. American Cyanamid Co.*
  211 F.Supp. 803 (S.D.N.Y. 1962) ........................................................................28

*Basic v. Fitzroy Eng'g, Ltd.*
  949 F. Supp. 1333 (N.D. Ill. 1996) ......................................................................22

*Bates v. Long Island R.R. Co.*
  997 F.2d 1028 (2d Cir. 1993) ...............................................................................17

*Buffalo Forge Co. v. Ampco-Pittsburgh Corp.*
  638 F.2d 568 (2d Cir. 1981) ............................................................................1, 12

*China Trade & Dev. Corp. v. MV Choong Yong*
  837 F.2d 33 (2d Cir. 1987) ...............................................................1, 8, 9, 10, 12

*Commodity Futures Trading Comm'n v. Vartuli*
  228 F.3d 94 (2nd Cir. 2000) .................................................................................34

*CRP/Extell Parcel I, L.P. v. Cuomo*
  394 Fed. Appx. 779 (2nd Cir. 2010)................................................................15, 17

*Dan River, Inc. v. Icahn*
  701 F.2d 278 (4th Cir. 1983) ...............................................................................26

*Denney v. Deutsche Bank AG*
  443 F.3d 253 (2d Cir. 2006) ................................................................................25

*Dornberger v. Metro. Life Ins. Co.*
  961 F. Supp. 506 (S.D.N.Y. 1997) ......................................................................25

*Dow Jones & Co., Inc. v. Harrods Ltd.*
  346 F.3d 357 (2d Cir. 2003) ........................................................................ *passim*

*Eastman Kodak Co. v. Kavlin*
  978 F. Supp. 1078 (S.D. Fla. 1997) .....................................................................22

*Farrell Lines Inc. v. Ceres Terminals Inc.*
  161 F.3d 115 (2d Cir. 1998) ................................................................................22

*Finnie v. Walker*
  257 F. 698 (2d Cir. 1919) ....................................................................................29

*Forts v. Ward*
  566 F.2d 849 (2d Cir. 1977) ..................................................................................7

*Garcia v. Yonkers Sch. Dist.*
  561 F.3d 97 (2d Cir. 2009) ........................................................................5, 6, 33

*Gau Shan Co., Ltd. v. Bankers Trust Co.*
  956 F.2d 1349 (6th Cir. 1992) ...............................................................................9

*Gen. Elec. Co. v. Deutz AG*
  270 F.3d 144 (3d Cir. 2001) ..................................................................................9

# TABLE OF AUTHORITIES
## (cont'd)

**Page(s)**

*Goss Int'l Corp. v. Man Roland Druckmaschinen Aktiengesellschaft*
491 F.3d 355 (8th Cir. 2007) ........................................................................9

*Granny Goose Foods, Inc. v. Bhd. of Teamsters*
415 U.S. 423 (1974) ....................................................................................5

*In re Air Crash Near Nantucket Island*
392 F. Supp. 2d 461 (E.D.N.Y. 2005) .......................................20, 21, 22

*In re Fredeman Litig.*
843 F.2d 821 (5th Cir. 1988) .....................................................................26

*In re United Pan-Europe Commc'ns N.V.*
No. 02-16020, 2003 WL 221819 (S.D.N.Y. Jan. 30, 2003) .....................16

*In re Worldcom, Inc. Sec. Litig.*
No. 02 Civ. 3288 (DLC) 2007 WL 2994395 (S.D.N.Y. Oct. 16, 2007).....33

*Indus. Ltd. v. M/T Beffen*
475 F.3d 56 (2d Cir. 2007) .....................................................................8, 9

*Jessup v. Am. Kennel Club, Inc.*
862 F. Supp. 1122 (S.D.N.Y. 1994) ...................................................13, 15

*JSG Trading Corp. v. Tray-Wrap, Inc.*
917 F.2d 75 (2d Cir. 1990) .......................................................................13

*Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas*
*Bumi Negara*
500 F.3d 111 (2d Cir. 2007) ........................................................................9

*Kern v. Clark*
331 F.3d 9 (2d Cir. 2003) ......................................................................7, 25

*Laker Airways Ltd. v. Sabena, Belgian World Airlines*
731 F.2d 909 (D.C. Cir. 1984) .....................................................................9

*Marcy Playground, Inc. v. Capitol Records, Inc.*
6 F. Supp. 2d 277 (S.D.N.Y. 1998) ...........................................................16

*Marshall Durbin Farms, Inc. v. Nat'l Farmers Org., Inc.*
446 F.2d 353 (5th Cir. 1971) .......................................................................6

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Callahan*
265 F. Supp. 2d 440 (D. Vt. 2003) .............................................................29

*Metro. Opera Ass'n, Inc. v. Local 100, Hotel Emps. and Rest. Emps.*
239 F.3d 172 (2nd Cir. 2001) .....................................................................34

*Mitchell v. Washingtonville Cent. Sch. Dist.*
190 F.3d 1 (2d Cir. 1999) ...........................................................................17

*Motorola Credit Corp. v. Uzan*
202 F. Supp. 2d 239 (S.D.N.Y. 2002) ........................................................25

*Motorola Credit Corp. v. Uzan*
322 F.3d 130 (2d Cir. 2003) ........................................................................25

*New Hampshire v. Maine*
532 U.S. 742 (2001).....................................................................................19

# TABLE OF AUTHORITIES
## (cont'd)

**Page(s)**

*Nikkal Indus., Ltd. v. Salton, Inc.*
  735 F. Supp. 1227 (S.D.N.Y. 1990) ..............................................................30

*No Spray Coal., Inc. v. City of New York*
  252 F.3d 148 (2d Cir. 2001) .........................................................................12

*NOW, Inc. v. Scheidler*
  267 F.3d 687 (2001)......................................................................................25

*O'Brien v. Alexander*
  898 F. Supp. 162 (S.D.N.Y. 1995) ...............................................................27

*Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris Inc.*
  185 F.3d 957 (9th Cir. 1999) ........................................................................26

*Paramedics Electromedicina Comercial, Ltda v. GE Medical Systems Info. Techs., Inc.*
  369 F.3d 645 (2nd Cir. 2004).....................................................................8, 9

*Patton v. Dole*
  806 F.2d 24 (2d Cir. 1986) ........................................................................1, 12

*Peregrine Myanmar Ltd. v. Segal*
  89 F.3d 41 (2nd Cir. 1996) ......................................................................33, 34

*Random House, Inc. v. Rosetta Books LLC*
  283 F.3d 490 (2d Cir. 2002) .........................................................................12

*Rodriguez v. DeBuono*
  175 F.3d 227 (2d Cir. 1999) .............................................................12, 13, 16

*Rosen v. Siegel*
  106 F.3d 28 (2d Cir. 1997) ..............................................................................5

*Scheidler v. National Organization for Women, Inc.*
  537 U.S. 393 (2003)......................................................................................25

*Shapiro v. Cadman Towers, Inc.*
  51 F.3d 328 (2d Cir. 1995) ...........................................................................13

*Stokely-Van Camp, Inc. v. Coca-Cola Co.*
  646 F. Supp. 2d 510 (S.D.N.Y. 2009) ..........................................................29

*Texaco, Inc. v. Pennzoil Co.*
  626 F. Supp. 250 (S.D.N.Y. 1986) ...............................................................15

*Trane Co. v. O'Connor Secs.*
  718 F.2d 26 (2d Cir. 1983) ...........................................................................27

*USA Network v. Jones Intercable, Inc.*
  704 F. Supp. 488 (S.D.N.Y. 1989) .....................................................13, 14, 15

*Vera, Inc. v. Tug "Dakota"*
  769 F. Supp. 451 (E.D.N.Y. 1991) ...............................................................14

### State Cases

*Andrews v. Steinberg*
  471 N.Y.S.2d 764 (1983)...............................................................................29

# TABLE OF AUTHORITIES
## (cont'd)

**Page(s)**

*Beroiz v. Wahl*
   84 Cal. App. 4th 485 (2000) ...................................................................28

*Grasso v. Mathew*
   564 N.Y.S.2d 576 (1991) ......................................................................29

*Herzfeld & Stern, Inc. v. Beck*
   572 N.Y.S.2d 683 (1991) ......................................................................27

*Lincoln Life and Annuity Co. of New York v. Caswell*
   813 N.Y.S.2d 385 (2006) ......................................................................29

*Park Knoll Assocs. v. Schmidt*
   59 N.Y.2d 205 (1983) .....................................................................27, 29

*Simon v. Potts*
   225 N.Y.S.2d 690 (1962) ......................................................................29

### Federal Statutes

18 U.S.C. § 1962(c) ................................................................................3

18 U.S.C. § 1964(a)-(c) .........................................................................26

### State Statutes

C.P.L.R. § 5304 ....................................................................................18

New York Judiciary Law § 487 ...........................................................3, 28

### Federal Rules

Fed. R. Civ. P. 65(a) .............................................................................1, 5

Fed. R. Civ. P. 65(d)(1) .........................................................................33

### State Rules

Rules of Professional Conduct, Preamble ¶ 9, Rule 1.4 ...........................34

### Constitutional Provisions

First Amendment ...................................................................................34

### Other Authorities

Albert A. Ehrenzweig, *A Treatise on the Conflict of Laws*, §§ 51, 59, at 52
   (1962) ...................................................................................................11

## I.   PRELIMINARY STATEMENT

Steven Donziger and the Law Offices of Steven R. Donziger (collectively "Donziger") respectfully submit this Memorandum of Law Including Offer of Proof in Opposition to Chevron's Motion for a Preliminary Injunction and Objection to the Court's Closure of the Record.  Donziger recognizes that the Court asserted that "it's over" on the preliminary injunction application on Friday, February 18, 2011, RT 2/18/11 at p. 79:14-80:5, but Donziger respectfully submits that under the circumstances, as described and discussed more fully below, this Memorandum is timely, proper and should be considered by the Court pursuant to Fed. R. Civ. P. 65(a).  Substantial legal and factual reasons mandate that Chevron's motion for a preliminary injunction be denied.

According to Chevron, everything that Donziger and the other defendants have ever done in connection with the *Aguinda* litigation is fraudulent and extortionate, including even organizing public relations and media campaigns regarding the litigation and Chevron's environmental record.  But Chevron's allegations—which, notably, do not include any denial that its predecessor-in-interest Texaco caused massive pollution in the Ecuadorian Amazon— cannot simply be taken at face value.  *See* Declaration of Elliot R. Peters ("Peters Decl."), Ex. 12 (12/17/10 submission to Prov. Ct. of Justice).  Rather, to be entitled to the "extraordinary remedy" of a preliminary injunction, *Patton v. Dole*, 806 F.2d 24, 28 (2d Cir. 1986), Chevron must demonstrate that it is likely to suffer irreparable harm and that its claims are factually and legal meritorious.  Despite its banker's boxes of pleadings, Chevron has not made this required showing.  To the contrary, Chevron's motion is legally flawed on numerous grounds.

Under Second Circuit authority, including *China Trade & Dev. Corp. v. MV Choong Yong*, 837 F.2d 33 (2d Cir. 1987), this Court lacks jurisdiction to enjoin foreign legal proceedings under these circumstances.  Moreover, Chevron has not submitted any evidence establishing a likelihood of irreparable harm absent a preliminary injunction, which is the "*sine qua non* for the grant of such equitable relief."  *Buffalo Forge Co. v. Ampco-Pittsburgh Corp.*, 638 F.2d 568, 569 (2d Cir. 1981).  Nor could Chevron, as the *Aguinda* Judgment is not yet final and enforceable, Chevron has multiple appellate remedies still available to it in Ecuador, no

enforcement actions have been filed against Chevron in New York or anywhere else in the world, and Chevron has ample resources and ability to defend its interests in any enforcement actions that might eventually be instituted.

Chevron also is judicially estopped from challenging any judgment in the *Aguinda* case in this Court based upon the representations and promises it made in order to remove this litigation from the Southern District of New York to Ecuador more than a decade ago.  Chevron litigated the *Aguinda* case in the precise forum of its choosing, and promised this Court and the Second Circuit that it would honor a judgment of the Ecuadorian Court, if one were rendered. Having originally fought hard to move this case *out* of this Courthouse, Chevron is precluded from playing musical courts once again.

Additionally, Chevron has not shown that it is likely to prevail on the merits of any of its claims.  Chevron's declaratory judgment action attacking the *Aguinda* litigation proceedings and the integrity of the Ecuadorian judicial system is not ripe, as no final judgment has yet been issued in Ecuador.  Chevron also lacks standing to assert its RICO claim because its damages are speculative and uncertain, and private plaintiffs, such as Chevron, have no right to injunctive relief under RICO in any event.  Furthermore, Chevron's state-law claims, to the extent that they even apply to the conduct alleged in Chevron's complaint and are not barred by the statute of limitations, are based upon conduct that falls within the scope of New York's litigation privilege.

The balance of the equities do not tip in Chevron's favor.  To the contrary, Chevron's own unclean hands with respect to the *Aguinda* litigation tip the equities decidedly against it and preclude Chevron from obtaining a preliminary injunction or any other equitable relief.  And even if Chevron had satisfied the requirements for preliminary injunctive relief, its requested preliminary injunction is unconstitutionally vague and overbroad.

## II.    PROCEDURAL BACKGROUND

On February 1, 2011, Chevron filed its Complaint in this action.  On February 3, 2011, Chevron submitted an application to the Court for an Order to Show Cause why a Temporary Restraining Order ("TRO") and Preliminary Injunction Should Not Be Entered.  Chevron's Complaint is 148 pages long and consists of 397 paragraphs.  In support of its TRO application,

Chevron submitted two affidavits with a total of 589 exhibits.  By signing the Order to Show Cause on February 3, 2011, the Court set a hearing on Chevron's TRO application for February 8, 2011.  Donziger was served on February 3, 2011.

The Complaint alleges, *inter alia*, that Donziger's participation on behalf of plaintiffs suing Chevron in Ecuador for environmental contamination constituted criminal conduct, in violation of the Racketeer Influenced Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1962(c), various common law theories, and New York Judiciary Law § 487.  The Complaint alleges that Donziger's co-counsel in Ecuador, several American law firms that had represented the *Aguinda* plaintiffs in the United States or provided legal assistance to Donziger, as well as environmental and public relations consultants for the *Aguinda* plaintiffs, were all also racketeers.  Needless to say, these accusations, along with the breadth, and the apparent cost and complexity of the litigation being brought by one of the largest corporations in the world, made it difficult for Donziger, a civil rights lawyer who practices law out of his home on West 104th Street in Manhattan, immediately to locate and retain defense counsel who were available and willing to appear on his behalf in the matter.

Prior to the February 8, 2011 hearing, Donziger sent a *pro se* letter to the Court.  *See* Peters Decl., Ex. 11.  The hearing proceeded on February 8.  By Order dated February 8, 2011 at 5:00 p.m. (Doc. No. 77; filed on February 9, 2011), the Court entered a TRO enjoining Donziger from:

> . . . commencing, prosecuting, advancing in any way, or receiving benefit from, directly or indirectly, any action or proceeding for recognition or enforcement of any judgment entered against Chevron in [the Aguinda action].

At that time, the Court's Order set argument on Chevron's application for a preliminary injunction on February 18, 2011, and ordered the parties to block open the period beginning February 22, 2011, for an evidentiary hearing.  By Order dated February 14, 2011, the Court Ordered that the TRO would remain in effect through 11:59 p.m. on March 8, 2011.

In advance of the February 18 hearing, on February 17, 2011, Donziger retained the undersigned law firm Keker & Van Nest, LLP ("KVN") to appear on his behalf and defend the RICO and other claims brought by Chevron.  By letter dated February 17, 2011, KVN informed

the Court that it had been retained by Donziger, sought a sixty-day continuance of the preliminary injunction hearing, offered to stipulate to a continuation of the TRO during that period, and explained why the case raised substantial legal and factual issues that Donziger wanted to brief to the Court.  *See* Peters Decl., Ex. 1.  On the following day, February 18, 2011, KVN appeared at a hearing before the Court, at which time the Court ruled that it would not agree to any continuance for Donziger, cancelled the evidentiary hearing which it had ordered the parties to be available for during the following week, and then "closed" the proceedings, expressly foreclosing Donziger from presenting evidence or further written legal arguments to the Court in opposition to Chevron's motion for preliminary injunction.  At that time, none of the parties, nor the Court, had yet been able to read, much less analyze or brief, the judgment of the Ecuadorian court in the *Aguinda* litigation, which had been entered in Ecuador on February 14, 2011.  That Order consisted of 188 pages written in the Spanish language.  At that time, the TRO was not set to expire for 18 days.

On February 24, 2011, at the Court's request, Donziger submitted the Declaration of Professor Alejandro Miguel Garro of Columbia University Law School and Columbia University's Parker School of Foreign and Comparative Law ("Garro Decl.").  In his declaration, Professor Garro confirms that Chevron has the right to appeal the February 14, 2011, judgment in the *Aguinda* case, that the intermediate court of appeal in Ecuador will review the findings of fact and conclusions of law in the judgment *de novo*, and that the judgment is not enforceable until Chevron's appeal is finally decided.  *See* Garro Decl. ¶¶ 15-17, 22, 25, 26, and 30.

On February 24, 2011, at the close of business, Donziger received from Chevron for the first time a translation of the *Aguinda* judgment.  Peters Decl., Ex. 32.

Today, nine days after we met our client for the first time and eight days after we were retained, undersigned counsel respectfully submits this brief and offer of proof in opposition to Chevron's Application for Preliminary Injunction.

## ARGUMENT

**A.** **Absent further opportunity for Donziger to marshal and present evidence in opposition to Chevron's Application, any preliminary injunction would violate Rule 65(a) of the Federal Rules of Civil Procedure.**

Rule 65(a)(1) of the Federal Rules of Civil Procedure expressly provides that "a court may issue a preliminary injunction only on notice to the adverse party." "*The purpose of this requirement is to give the opposing party a fair opportunity to oppose the motion for a preliminary injunction, and the court must allow that party sufficient time to marshal his evidence and present his arguments against the issuance of the injunction.*" *Rosen v. Siegel*, 106 F.3d 28, 31-32 (2d Cir. 1997) (internal quotations and citations omitted) (emphasis added); *accord Garcia v. Yonkers Sch. Dist.*, 561 F.3d 97, 105 (2d Cir. 2009); *see also Granny Goose Foods, Inc. v. Bhd. of Teamsters*, 415 U.S. 423, 432 n.7 (1974) ("The notice required by Rule 65(a) before a preliminary injunction can issue implies a hearing in which the defendant is given a fair opportunity to oppose the application and to prepare for such opposition.") "Compliance with rule 65(a)(1) is mandatory." *Rosen*, 106 F.3d at 32 (internal quotation and citation omitted).

To date, Donziger has not had *any* substantive opportunity, much less an "adequate opportunity" to "marshal his evidence" against the sweeping preliminary injunction requested by Chevron. Chevron filed its massive, 148-page, 397-paragraph complaint in this action (which it undoubtedly spent months preparing) less than four weeks ago, and Chevron filed its 71-page application for a TRO and preliminary injunction, supported by 589 exhibits (which it also undoubtedly spent months preparing) less than three weeks ago.[1] The Court only provided Donziger with nine-days notice of the February 18, 2011 hearing on Chevron's preliminary injunction application, and only three days notice of the due date for any opposition to Chevron's preliminary injunction request. Under the circumstances, Donziger only was able to retain counsel to represent him in this action on February 17th—one day before the preliminary injunction hearing. Donziger and his counsel were not accorded the time necessary to read all of Chevron's pleadings, much less to prepare a response to them. And Donziger has had no

---

[1] Chevron submitted an additional 14 affidavits, with 121 exhibits, in connection with its 36-page reply.

opportunity to test the evidence submitted by Chevron or to obtain additional relevant evidence through discovery.

Yet, despite this procedural history, and despite a myriad of complex factual and legal issues raised by Chevron's application, the Court has denied Donziger's requests for additional time to oppose Chevron's application. Peters Decl., Exs. 1 and 11. The Court has done so notwithstanding (1) Donziger's offer to stipulate to a sixty-day extension of the Court's February 8, 2011 TRO to permit Donziger to submit—and the Court to consider—a substantive opposition, *id.*, Ex. 1; and (2) the undisputed fact that the judgment issued by the Ecuadorian court on February 14, 2011 is not final and enforceable, but rather is subject to an appeal of right, which both Chevron and the Ecuadorian plaintiffs have stated publicly that they intend to pursue and are in fact pursuing. Garro Decl. ¶¶ 15-17, 22, 25, 26, and 30; Peters Decl., Ex. 20, 21. In short, the Court has denied Donziger a reasonable opportunity to defend himself, even though Chevron faces no imminent danger of any enforcement action against it in United States or elsewhere (*see* Section C, *infra*).

The Court's rush to judgment—if it results in the issuance of a preliminary injunction, as requested by Chevron—constitutes a violation of Donziger's right to procedural due process. Indeed, Donziger's situation is analogous to that described and condemned in *Marshall Durbin Farms, Inc. v. Nat'l Farmers Org., Inc.*, 446 F.2d 353 (5th Cir. 1971):

> Plaintiffs thrust the defendants into an impossible position insofar as both preparing and presenting an effective response to the motion for preliminary injunction. Prior to the hearing the defendants were obliged, within a few days, to undertake a task which was at least difficult and at most almost insurmountable. They were under the necessity of retaining counsel, locating the numerous persons and investigating the multitude of occurrences alleged in the complaint and separate affidavits, determining if there was evidence to controvert what was said to have occurred, and either procuring affidavits or arranging for live testimony from witnesses.

*Id.* at 356-57 (holding that one week notice of preliminary injunction proceedings was insufficient) (cited with approval by the Second Circuit in *Garcia*, 561 F.3d at 105). Like the defendants in *Marshall Durbin Farms*, Donziger found himself prior to the February 18, 2011 preliminary injunction hearing in the "impossible position" of retaining counsel, researching and briefing complicated issues of procedural and substantive law, determining the relevance and

veracity of Chevron's proffered evidence, and arranging for affidavits and other evidence to rebut that evidence, all within nine days.

Additionally, where, as in this case, the issues presented by a motion for preliminary injunction implicate disputed issues of fact, this Court is required to hold an evidentiary hearing before issuing any injunction. "It is settled law in this Circuit that motions for preliminary injunctions should not be decided on the basis of affidavits when disputed issues of fact exist." *Kern v. Clark*, 331 F.3d 9, 12 (2d Cir. 2003) (quoting *Commodity Futures Trading Comm'n v. Incomco, Inc*., 649 F.2d 128, 131 (2d Cir. 1981)). "The existence of factual disputes necessitates an evidentiary hearing ... before a motion for a preliminary injunction may be decided." *Id.* The reasoning of *Forts v. Ward*, 566 F.2d 849 (2d Cir. 1977), the leading Second Circuit case on the issue, is directly applicable to this case:

> Generally, of course, a judge should not resolve a factual dispute on affidavits or depositions, for then he is merely showing a preference for "one piece of paper to another." *This is particularly so when the judge without holding an evidentiary hearing, resolves the bitterly disputed facts in favor of the party who has the burden of establishing his right to preliminary relief.* This caveat is most compelling "where everything turns on what happened and that is in sharp dispute; in such instances, the inappropriateness of proceeding on affidavits attains its maximum . . . ."

*Id.* at 851-852 (internal citations omitted) (emphasis added).

Here, most of the "facts" upon which Chevron's application is based—including its claims regarding defendants' supposed efforts to "defraud and extort Chevron," Chevron's own (mis)conduct in connection with the *Aguinda* litigation, the integrity of the Ecuadoran judicial system, and the imminency and irreparability of any supposed harm—are hotly contested. And, as discussed herein, including in Section H, *supra*, Donziger, if given the opportunity, would offer substantial evidence rebutting Chevron's claims. Consequently, the Court's decision to cancel its previously-scheduled evidentiary hearing on Chevron's application is contrary to law and is another means by which the Court has denied Donziger an adequate opportunity to oppose the application.

In sum, the proceedings before this Court to date have not complied with the notice requirements of Rule 65(a)(1), basic standards of procedural due process, or established Second

Circuit law governing preliminary injunctions.  Donziger must be accorded an adequate

opportunity to marshal and present evidence in opposition to Chevron's application before this

Court properly may issue any preliminary injunction against him.

**B.    Under binding Second Circuit precedent, this Court cannot enjoin Donziger's pursuit of a possible, but uninitiated foreign suit in an unknown location.**

Chevron seeks to enjoin Donziger and anyone acting in concert with him from

"commencing, prosecuting, advancing in any way, or receiving benefit from, directly or

indirectly, any action or proceeding for recognition or enforcement of any judgment entered

against Chevron in [the *Aguinda* action]."  Feb. 9, 2011 TRO (Doc. No. 77).  It is undisputed that

no such enforcement action has been initiated in New York, or in any other location worldwide.

Rather, Chevron states that it *fears* such an action might occur, based on the "Invictus" strategy

document drafted by counsel for the *Aguinda* plaintiffs.

Chevron's fear of possible future enforcement actions is insufficient as a matter of law to

entitle it to a foreign anti-suit injunction under the binding Second Circuit standard laid out in

*China Trade & Dev. Corp v. MV Choong Yong*, 837 F.2d 33 (2nd Cir. 1987).  Under the *China*

*Trade* test, an anti-suit injunction against foreign litigation may be imposed only if two threshold

requirements are met:  "(A) the parties are the same in both matters, and (B) resolution of the

case before the enjoining court is dispositive of the action to be enjoined."  *Paramedics*

*Electromedicina Comercial, Ltda v. GE Medical Systems Info. Techs., Inc.*, 369 F.3d 645, 652

(2nd Cir. 2004) (citing *China Trade*, 837 F. 2d at 35).

If these two threshold requirements are satisfied, "courts are directed to consider a

number of additional factors," *id.*, including whether the foreign, parallel litigation would:

> (1) frustrat[e] ... a policy in the enjoining forum; (2) ... be vexatious; (3) ...
> threat[en] ... the issuing court's in rem or quasi in rem jurisdiction; (4) ...
> prejudice other equitable considerations; or (5) ... result in delay, inconvenience,
> expense, inconsistency, or a race to judgment.

*Ibeto* Petrochemical *Indus. Ltd. v. M/T Beffen*, 475 F.3d 56, 64 (2d Cir. 2007) (quoting *China*

*Trade*, 837 F. 2d at 35).  Perhaps most importantly for this matter, *China Trade* also states that

"principles of comity counsel that injunctions restraining foreign litigation be 'used sparingly'

and 'granted only with care and great restraint.'"  *Paramedics*, 369 F.3d at 652 (quoting *China*

*Trade*, 837 F.2d at 36).

The *China Trade* test has been consistently upheld and affirmed by the Second Circuit. *See Paramedics Electromedicina Comercial, Ltda v. GE Medical Systems Info. Techs., Inc.*, 369 F.3d 645, 652 (2nd Cir. 2004) (applying *China Trade* test and granting anti-suit injunction); *Ibeto Petrochemical Industries Ltd. v. M/T Beffen*, 475 F.3d 56, 64 (2d Cir. 2007) (same); *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,* 500 F.3d 111 (2d Cir. 2007) (same).

In addition, numerous other circuits have adopted similar or identical tests.  The Eight Circuit, in adopting a similar test, described the "conservative approach" of the First, Second, Third, Sixth, and District of Columbia Circuits under which "a foreign antisuit injunction will issue only if the movant demonstrates (1) an action in a foreign jurisdiction would prevent United States jurisdiction or threaten a vital United States policy, and (2) the domestic interests outweigh concerns of international comity." *Goss Int'l Corp. v. Man Roland Druckmaschinen Aktiengesellschaft*, 491 F.3d 355, 359-60 (8th Cir. 2007) (citing *Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren,* 361 F.3d 11, 17 (1st Cir. 2004) (adopting the "conservative approach," which questions "whether the foreign action either imperils the jurisdiction of the forum court or threatens some strong national policy" and "accords appreciably greater weight to considerations of international comity")); *see also Gen. Elec. Co. v. Deutz AG,* 270 F.3d 144, 161 (3d Cir. 2001) (same); *Gau Shan Co., Ltd. v. Bankers Trust Co.,* 956 F.2d 1349, 1355 (6th Cir. 1992) (same); *China Trade,* 837 F.2d at 35-37 (same); *Laker Airways Ltd. v. Sabena, Belgian World Airlines,* 731 F.2d 909, 926-34 (D.C. Cir. 1984) at 926-34 (same).

Under the conservative approach, issues of international comity are given more weight, and "[c]omity dictates that foreign anti-suit injunctions be issued sparingly and only in the rarest of cases." *Gau Shan Co.,* 956 F.2d at 1354 (citing *Laker Airways,* 731 F.2d at 927).  As the Sixth Circuit has explained, an anti-suit injunction "conveys the message … that the issuing court has so little confidence in the foreign court's ability to adjudicate a given dispute fairly and efficiently that it is unwilling even to allow the possibility." *Gau Shan Co.* 956 F.2d at 1355 (6th

Cir. 1992).

The Second *Circuit's China Trade* test, by definition, requires comparison between the case brought domestically and the case brought in a foreign jurisdiction. If the foreign suit does not yet exist, the court cannot satisfy the threshold requirements, because it cannot compare the parties in the two actions nor evaluate the effect of resolution. Nor can the court evaluate the additional factors, because they also require knowledge about the foreign suit and such matters as how an injunction would affect the domestic court's jurisdiction and whether an injunction would result in delay or inconsistency.

Here, *Chevron* cannot hope to succeed in satisfying the *China Trade* factors. No foreign actions to enforce any judgment have been initiated. Nor is the Ecuadorian judgment even final. Moreover, should there be an action in the future in some unknown location, Donziger is unlikely to be a party to any such action since he is not a party to the *Aguinda* case.

Nor would *the* second threshold requirement be satisfied. Any disposition of the current action in the Southern District of New York (the "enjoining court") would *not* be dispositive of all possible future foreign actions. With all due respect to this Court, it can only be dispositive on this issue if it has jurisdiction over *all* parties that could enforce the *Aguinda* judgment and if *all* foreign jurisdictions where enforcement proceedings might be brought decide to give effect to this Court's decision under their own principles of international comity. Such worldwide harmony is unlikely, and demonstrates one of the problems with applying the *China Trade* factors in the abstract. Unless a concrete, foreign suit is identified and can be evaluated, the Court is left looking at every *possible* foreign jurisdiction.

In essence, this Court is being asked to determine that it has so little confidence *in every other jurisdiction in the world* that none can be allowed to even take up an enforcement action, let alone evaluate the merits under their own laws. For instance, this Court has previously remarked that "[b]elieve me, if this were the High Court in London, you can be sure I'd wait." Peters Decl., Ex. 33, 04/30/2010 Hr'g Tr. 36:9-10. Yet the requested preliminary injunction effectively denounces that view, because it attempts to enjoin any proceeding in the High Court in London just as surely as it enjoins every other court worldwide. Such a decision does not

comport with international comity.  The essence of comity is that "each sovereign, including the State of New York, can decide for itself which foreign country judgments it will recognize and which it won't."  David D. Siegel, New York Practice § 472 (4th ed. 2010).  It is inappropriate for this Court to make that determination for every jurisdiction in the world before any such proceedings are even initiated.

Judge Marrero of this Court evaluated a similar request for an injunction prohibiting worldwide enforcement of a prospective judgment in a foreign court.  *See Dow Jones* 237 F. Supp .2d 394 (S.D.N.Y. 2002).  The Court found that it could not "endorse such a far-reaching request.  The constitutional strictures of the Full Faith and Credit Clause do not extend to international assertions of jurisdiction, especially those that the forum state may consider extravagant or exorbitant."  *Dow Jones*, 237 F. Supp. 2d at 411 (citing *Restatement (Third) of the Foreign Relations Law of the United States: Jurisdiction to Adjudicate* § 421(2)(i), at 304-05 (1987), at § 431 and Comment at 321-22 (noting that under international law, a state may not exercise authority to enforce a law that it has no jurisdiction to prescribe, whether the assertion of jurisdiction is carried out through the courts or by nonjudicial means)); *see generally* Albert A. Ehrenzweig, *A Treatise on the Conflict of Laws,* §§ 51, 59, at 52 (1962)).

The Court rejected Dow Jones' request for a worldwide injunction, finding that the Declaratory Judgment Act (DJA) did not "confer upon an American court a preemptive style of global jurisdiction branching worldwide and able to strike down offending litigation anywhere on Earth."  *Dow Jones,* 237 F. Supp. 2d at 411.  The Court noted that  "[i]ntriguing as such universal power might appear to any judge, this Court must take a more modest view of the limits of its jurisdiction, and offers a more humble response to the invitation and temptation to overreach."  *Id*.  The Court found "nothing in the United States Constitution, nor in the DJA or in customary practice of international law, that comports with such a robust, Olympian perspective of federal judicial power."  *Id.* at 411.

Moreover, the Court recognized that even if it did succumb to temptation and believe it did have such "universal power," it is unclear that other courts around the world "would unquestioningly recognize a declaratory ruling of this Court as dispositive."  *Id.* at 412.  The

Court found it a "doubtful premise" that "every other plausible sovereign jurisdiction in this world would … honor the higher authority of American law that this Court would have proclaimed dispositive and binding, and, in an equally pliant and agreeable display of deference, likewise would bow to this Court's presumed superior judgment." *Id*. at 412.

Under the binding *China Trade* test, and under the sensible admonition of Judge Marrero to resist the temptation to believe this Court has universal power over all foreign jurisdictions, the Court must refrain from entering Chevron's requested preliminary injunction.

**C.     Chevron has not demonstrated that it is likely to suffer irreparable harm absent preliminary injunctive relief.**

"[P]reliminary injunctive relief is an extraordinary remedy and should not be routinely granted." *Patton v. Dole*, 806 F.2d at 28; *accord No Spray Coal., Inc. v. City of New York*, 252 F.3d 148, 150 (2d Cir. 2001). "A party seeking a preliminary injunction in this Circuit must show:  (1) irreparable harm in the absence of the injunction *and* (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." *Random House, Inc. v. Rosetta Books LLC*, 283 F.3d 490, 491 (2d Cir. 2002) (emphasis added). Additionally, where an injunction "will alter rather than maintain the status quo," movant must show "clear" or "substantial" likelihood of success.  *Rodriguez v. DeBuono*, 175 F.3d 227, 233 (2d Cir. 1999) (internal citation omitted).

Although Chevron is obligated to satisfy each element of this test, irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." *Rodriguez*, 175 F.3d at 233-234 (quoting *Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir. 1983)).  Accordingly, Chevron "must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered."  *Id.* (quoting *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990)); *see also Buffalo Forge*, 638 F.2d at 569 ("'serious questions going to the merits, standing alone, do not justify injunctive relief.  There must also be a showing of irreparable harm, the absence of an adequate remedy at law, which is the *sine qua non* for the grant of such equitable relief." (internal citation omitted)).

Specifically, Chevron "*must demonstrate an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages*."  *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir. 1995) (internal quotation marks and citation omitted) (emphasis added).  In the absence of a showing of irreparable harm, a motion for a preliminary injunction must be denied.  *Rodriguez*, 175 F.3d at 234; *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 80 (2d Cir. 1990).  Chevron has not made—and cannot make—its required showing of irreparable harm.

Chevron devoted only three pages of its 71-page preliminary injunction opening brief to discussing the irreparable harm that it purportedly will suffer if the Court does not grant its sweeping preliminary injunction request.  And those three pages are devoid of *any* evidence of actual, imminent harm, irreparable or otherwise.  Instead, Chevron merely rehashes its (mis)characterization of the "Invictus" memorandum and various out-of-context quotations of Donziger and others regarding possible strategies for enforcing a final judgment against Chevron.  But Chevron's characterization of this evidence, even if taken as accurate, only shows that the plaintiffs in the *Aguinda* case—like successful plaintiffs in any litigation anywhere— intend, when the time comes, to seek to enforce any final judgment that they may receive in their favor, and that they intend to do so in countries where (unlike Ecuador) Chevron has assets.  It does not demonstrate that Chevron presently faces "an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages."  *Shapiro,* 51 F.3d at 332.  Chevron's failure to make this required showing necessitates the denial of its motion, as "[i]njunctive relief 'will not be granted against something merely feared as liable to occur at some indefinite time[.]'"  *USA Network v. Jones Intercable, Inc.*, 704 F. Supp. 488, 493 (S.D.N.Y. 1989) (quoting *Connecticut v. Massachusetts*, 282 U.S. 660, 674 (1931)).

Additionally, Chevron has not provided any evidence that any harm it might suffer as a result of some theoretical, future enforcement action would be irreparable.  *See Jessup v. Am. Kennel Club, Inc.*, 862 F. Supp. 1122, 1127 (S.D.N.Y. 1994) ("The law in this Circuit requires Plaintiffs to show a *likelihood* of irreparable injury, not a *possibility* of irreparable injury, and

'likelihood sets, of course, a higher standard than "possibility."'" (quoting *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990) (emphasis in original)).  For example, while Chevron asserts in its opening memorandum that "[t]he costs of even a temporary seizure of Chevron's assets or those of its subsidiaries could be substantial, and unlikely to be remediable after the fact," Chevron Br., at 65, Chevron does not cite to any sworn affidavit or any other evidence to support this sweeping claim.  Nor does Chevron provide any explanation, much less evidentiary support, as to how any particular enforcement action or actions would irreparably disrupt its operations and business relationships.

Chevron attempted to correct its complete failure to submit evidence of irreparable harm by submitting with its reply brief the Declaration of Rex J. Mitchell, its Deputy Comptroller. But all Mitchell states—in the most conclusory of terms—is that seizure of Chevron assets in the countries where it does business "would disrupt its supply chain and operations" and "would cause Chevron to miss critical deliveries to business partners."  Mitchell Decl. ¶ 7.  This is far from enough.  A preliminary injunction "should issue not upon a plaintiff's imaginative, worst case scenario of the consequences flowing from the defendant's alleged wrong but upon a concrete showing of imminent irreparable injury."  *USA Network*, 704 F. Supp. at 491.  Mitchell does not identify any specific disruptions or missed deliveries that are likely to occur, or provide any explanation as to why such harm would result from any specific enforcement action or combination of actions.  Mitchell also fails to address whether or not there are reasonable steps Chevron could take to mitigate or eliminate such harm (such as, for example, posting a bond in the jurisdiction of the enforcement action)[2].

Moreover, even if the Court were to accept Mitchell's conclusory predictions, disruptions to Chevron's business operations and relationships, unless they threaten to destroy Chevron's business as a whole, do not constitute irreparable harm.  "[I]f the wrongful activity threatens only the disruption as opposed to the destruction of an ongoing business there is no irreparable injury."  *Vera, Inc. v. Tug "Dakota"*, 769 F. Supp. 451, 454 (E.D.N.Y. 1991); *accord Ass'n of*

---

[2] Notably, Chevron admits in its reply brief that countries in which enforcement actions might take place might permit Chevron to post a bond.  Chevron Reply Br., at 33 n.18

*Legal Aid Attorneys v. City of New York*, No. 96 Civ. 8137 (SHS), WL 620831, at *6 (S.D.N.Y. Oct. 8, 1997) ("[P]laintiffs' allegations … at most support a claim for business disruption which is insufficient by itself to establish irreparable harm."); *Jessup*, 862 F. Supp. at 1127 ("disruption in business does not constitute irreparable harm." (internal quotation and citation omitted)); *USA Network*, 704 F. Supp. at 491 ("[M]ere disruptions in business ... though perhaps substantial, do not [constitute irreparable harm].").

Chevron does not even attempt to argue that any potential enforcement actions against it would threaten to destroy its business or force it into bankruptcy.  Nor could it.  Chevron had *net income* in 2009 of $10,483,000,000—far more than the total amount of the *Aguinda* Judgment— and net income in 2008 of $23,931,000,000.  Peters Decl., Ex. 22 at 5.  Moreover, Chevron had assets totaling $164,621,000,000 at the end of 2009.  *Id.*  And, as of February 23, 2011, Chevron's market capitalization was $205,810,000,000—more than twenty times the amount of the Judgment.  *Id.*, Ex. 23 at 1.  In short, Chevron is more than capable financially of paying the *Aguinda* Judgment in full.  *Cf. Texaco, Inc. v. Pennzoil Co.*, 626 F. Supp. 250, 253 (S.D.N.Y. 1986) (enjoining enforcement of judgment where judgment greatly exceeded Texaco's stock market capitalization and where there was "no way in the world that Texaco could pay the Judgment without reorganizing or liquidating").

Chevron also argues that any financial harm that it might suffer as a result of enforcement actions could be irreparable because it might not be able to get its money back in the event that it prevails in this litigation.  But even assuming that this argument has legal merit, Chevron's claims are pure speculation.  *See, e.g.,* Chevron Br., at 65 (claiming that the costs of an enforcement action "*could be* substantial" and "*unlikely* to remediable"); *id.* at 66 ("Defendants … *may not* retain the overwhelming majority of the award, but rather 90 percent *may* go to the Ecuadorian government….  Ecuador is *unlikely* to return the money. (emphasis added)).  The Second Circuit and courts in this District repeatedly have held that speculative claims of irreparable harm cannot support a preliminary injunction.  *See, e.g., CRP/Extell Parcel I, L.P. v. Cuomo*, 394 Fed. Appx. 779, 782 (2nd Cir. 2010) ("Here, plaintiff-appellant has failed to make the required showing because it has adduced nothing more than conclusory assertions in support

of its claim that one or more defendant-appellees might 'spend' the escrow monies and later become insolvent."); *In re United Pan-Europe Commc'ns N.V.*, No. 02-16020, 2003 WL 221819, at \*4 (S.D.N.Y. Jan. 30, 2003) (holding that "[i]n light of [its] conclusory allegations, Movieco has failed to show irreparable harm"); *Marcy Playground, Inc. v. Capitol Records, Inc.*, 6 F. Supp. 2d 277, 282 (S.D.N.Y. 1998) ("[T]he movant for a preliminary injunction must show not only that irreparable injury is possible, but that it is likely.  Plaintiffs' showing certainly does not rise to that level.  The most that can be said is that they have advanced a speculative theory.").

Looking beyond Chevron's hypothetical doomsday scenarios, the fact of the matter is that the Judgment issued by the Ecuadorian court is not yet a final, enforceable judgment under Ecuadoran law.  Indeed, Chevron has asked the Ecuadorian court to expound on 27 points and to clarify 22 other points in the Judgment.  Peters Decl., Exs. 20 and 21; *see also* Affidavit of Dr. Cesar Coronel Jones ("Jones Aff.") ¶ 14.  And once that procedure is complete, Chevron has a right to appeal the Judgment, which it has stated it intends to exercise.  Garro Decl. ¶¶ 15, 18, 22-29, 25**;** Peters Decl., Ex. 3 (Eguiguren Statement of Foreign Law), at ¶ 42; Exs. 20 & 21.  Not until that appeal is resolved—and then, only if the *Aguinda* plaintiffs prevail on appeal—would the Judgment become final and enforceable against Chevron.  Garro Decl. ¶¶ 16-17, 30-33**;** Peters Decl., Ex. 2 (2/11/11 press release by Ecuador A.G.'s Office); *cf. Rodriguez*, 175 F.3d at 235 ("Where a movant is found to be able to wait for the outcome of an appeal before obtaining preliminary injunctive relief, the irreparable harm he or she faces may not ordinarily be deemed 'imminent' as required to sustain a preliminary injunction.").  Furthermore, while Chevron harps repeatedly on the unsurprising fact that the *Aguinda* plaintiffs and their counsel have considered strategies for enforcing any final judgment that they might ultimately obtain in a variety of countries, the *Aguinda* plaintiffs have not in fact initiated any actions in any court to seize oil tankers or other assets or to otherwise disrupt Chevron's operations.

In short, the *Aguinda* litigation is far from over, and any *actual* harm to Chevron from any *actual* efforts by Donziger or any other defendant in this case to enforce an *actual* final judgment in that litigation is still far over the horizon.  Accordingly, Chevron's claims of

imminent, irreparable harm are both premature and speculative, and cannot lawfully support a preliminary injunction. Rather, "[t]o award relief based upon [Chevron's] purely speculative allegations would push the standard for injunctive relief beyond its reasonable limit." *CPR/Extell Parcel I*, 394 Fed. Appx. at 782.

**D.     Chevron should be estopped from raising claims and arguments that contradict its prior positions in the *Aguinda* litigation.**

Judicial estoppel protects "the integrity of the judicial process" by preventing a party from taking a position contrary to a position that it has taken in an earlier proceeding. *Bates v. Long Island R.R. Co.*, 997 F.2d 1028, 1037-38 (2d Cir. 1993). A party invoking judicial estoppel must show two elements: (1) that the party against whom the estoppel is asserted took an inconsistent position in a prior proceeding and (2) that position was adopted by the first tribunal in some manner. *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2d Cir. 1999).

Judicial estoppel applies here because Chevron has taken factual positions in the prior *Aguinda* litigation in this District calculated to secure dismissal for *forum non conveniens*, and then contradicted those positions in this case because its interests have changed. *See Bates*, 997 F.2d at 1038 (holding that plaintiff who previously claimed permanent disability in FELA action was judicially estopped from later claiming wrongful termination on the basis of those disabilities).

For nearly a decade, Chevron's predecessor-in-interest relentlessly pursued dismissal of the initial *Aguinda* class action (filed in this Court) on the ground that Ecuador was the proper forum. To support its (ultimately successful) *forum non conveniens* argument, Chevron consistently took the position—first before this Court, then on appeal to the Second Circuit, then on remand to this Court—that Ecuador provides a fair and adequate alternative forum. *See, e.g.*, Peters Decl., Ex. 28 (Texaco's 1/11/1999 Mem. i/s/o Renew. Mot. to Dismiss), at 19 ("Ecuador's Constitution guarantees due process and equal protection, and its courts provide important substantive and procedural rights."); *id.* Ex. 27 (12/20/01 Brief before Second Circuit), at 34 ("Ecuadorian legal norms are the similar to those in many European nations."); *id.* Ex. 24 (Ponce Aff.) at ¶2 ("the courts in Ecuador provide a totally adequate forum").

To bolster its renewed motion to dismiss (after remand from the Second Circuit),
Chevron also promised the Court that it would "satisfy any judgments [in Ecuador] that might be
entered in plaintiffs' favor," reserving only the right to contest _enforcement_ of the judgment
under the specific provisions of N.Y. C.P.L.R. § 5304 (New York's Recognition of Foreign
Country Money Judgments Act) (the "New York Act").  *See id.*, Ex. 28 (1/11/1999 Renew. Mot.
to Dismiss), at 16-17.  Consistent with this representation, Chevron included with its moving
papers a written "Notice of Agreements in Satisfying Forum Non Conveniens and International
Comity Conditions" (the "Texaco Agreement").  This Agreement unambiguously manifested
Chevron's intent "to satisfy a final judgment (*i.e.*, a judgment with respect to which all appeals
have been exhausted), if any, in favor of a named plaintiff in *Aguinda*, subject to Texaco, Inc.'s
reservation of its rights to contest any such judgment under [the New York Act]."  *Id.*, Ex. 29
(Texaco Agreement), at ¶5.  Chevron made similar promises in its *forum non conveniens* reply
brief and in verified interrogatory responses.  *Id.*, *Ex.* 26 (1/25/99 Reply), at 21 & Ex. 25
(12/28/98 Responses to Interrogatories), at 3.

In granting Chevron's renewed motion to dismiss for *forum non conveniens*, the Court
expressly adopted Chevron's view that Ecuador provides an adequate alternative forum.
*Aguinda v. Texaco, Inc*., 142 F. Supp. 2d 534, 544 (S.D.N.Y. 2001) (citing affidavits submitted
by Texaco).  The Court also cited the Texaco Agreement as evidence of the company's
"commitments."  *Id*. at 539 (citing Texaco App., Ex. 18).

After failing to prevail in its chosen forum, Chevron's interests have changed, and so
have its theories and factual representations to the Court.  Despite its earlier promise to satisfy
any judgment in Ecuador (subject to the _defenses_ set forth in N.Y. C.P.L.R. § 5304), Chevron
has filed an _offensive_ action to enjoin a first instance judgment in Ecuador that is not yet final
and that no one has sought to enforce in this Court (or any other).  Eight of the nine claims have
nothing to do with the New York Act.  And while the ninth claim purports to seek declaratory
relief under N.Y. C.P.L.R. § 5304, the defenses in section 5304 only provide a means to resist
enforcement in New York courts; the New York Act plainly does not authorize the Court simply
to proclaim that a foreign judgment is invalid and unenforceable everywhere (even in the country

in which it was issued). *Dow Jones & Co., Inc.*, 237 F. Supp. at 411 (American courts do not have a "preemptive style of global jurisdiction branching worldwide and able to strike down offending litigation anywhere on Earth"). In short, in this action Chevron breaches the promises and representations it made to secure dismissal of the earlier U.S. complaint.

Moreover, the primary relief that Chevron purports to seek in this case (an injunction against enforcement of the Ecuador judgment) is predicated on allegations that directly contradict its earlier affirmations regarding the integrity of the Ecuadorian legal system. *See, e.g.*, Chevron Br., at 58. (arguing that the "Ecuadorian judicial system fails to provide fair and impartial tribunals or basic guarantees of due process"). Chevron may attempt to defend the inconsistency between its two positions by arguing that shortcomings within Ecuadorian judicial institutions only emerged *after* the Court's dismissal of the U.S. action. But publications by the U.S. State Department and Transparency International suggest that the levels of corruption in Ecuador did not change materially (and certainly not for the worse) from the late 1990s and early 2000s to the present.[3] There is also evidence that judicial reform efforts in Ecuador have actually improved the integrity and independence of the judiciary. *See* Peters Decl., Exs. 4-9 (Eguiguren, Arias, and Albuja Martinez expert statements).

Chevron's expedient flip-flopping on this issue is the very sort of gamesmanship that judicial estoppel is intended to prevent. *See New Hampshire v. Maine*, 532 U.S. 742, 751 (2001) (judicial estoppel is appropriately applied if "the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped"). Indeed, in *Pavlov v. Bank of N.Y. Co.*, this Court specifically recognized that a party who prevailed in securing dismissal for *forum non conveniens* after lauding the integrity of a foreign judicial system "quite likely would be estopped" from later arguing in an enforcement action that the foreign jurisdiction "does not provide impartial tribunals or procedures compatible

---

[3] For instance, in Transparency International's 2001 Corruption Perceptions Index, Ecuador was given a raw score of 2.3 out of a possible 10, and ranked 79 out of 93 countries (the 14th percentile). Peters Decl., Ex. 30. In its 2010 report, Transparency International assigned Ecuador a raw score of 2.5 and ranked it 127 out of 178 countries (the 28th percentile). *Id.*, Ex. 31.

with due process." 135 F. Supp. 2d 426, 435 (S.D.N.Y. 2001) (Kaplan, J.), *rev'd in part on other grounds*, 25 Fed. App'x 70 (2d Cir. 2002).  In choosing to try this case in Ecuador rather than the Southern District, Chevron made an informed decision, cognizant of the risk that the political winds in Ecuador might shift.  It assumed that risk and ise estopped now from taking a contrary position.

By application of judicial estoppel, Chevron is barred from seeking any injunction or declaration against enforcement of a judgment in Ecuador, except as a *defense* to enforcement of a final judgment pursuant to the New York Act.

**E.     The Court should not exercise its jurisdiction under the Declaratory Judgment Act,**

This Court should not exercise jurisdiction under the Declaratory Judgment Act ("DJA") as to Chevron's Ninth Claim for Relief.  Numerous courts have declined to permit DJA actions in situations analogous to this case, where there was a parallel proceeding in a foreign jurisdiction.  Those courts declined jurisdiction on two main grounds:  because the action failed to satisfy the factors courts are required to consider for DJA matters; and because no case or controversy existed sufficient to bring the matter within federal jurisdiction.  Both grounds for declining jurisdiction exist here.

**1.     Chevron's Ninth Claim for Relief does not satisfy the factors supporting a declaratory judgment action**

In order to support a declaratory judgment action in the context of a parallel foreign court proceeding, courts in this Circuit have used a five factor test:

(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved;

(2) whether a judgment would finalize the controversy and offer relief from uncertainty; ...

[3] whether the proposed remedy is being used merely for procedural fencing or a race to res judicata;

[4] whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; and

[5] whether there is a better or more effective remedy.

*In re Air Crash Near Nantucket Island*, 392 F. Supp. 2d 461, 472-3 (E.D.N.Y. 2005) (citing *Dow*

*Jones & Co., Inc. v. Harrods Ltd.,* 346 F.3d 357, 359 (2d Cir. 2003).

Applying these five factors to this case, the Court should reject any DJA claim at this time.  Looking at the first two factors, any judgment in New York will not settle the legal issues involved or finalize the controversy, as the process in Ecuador has not yet finished.  Any order from this Court would at best pertain to an intermediate judgment from Ecuador that will likely be further clarified and changed at the trial court or appellate level.  Nor is it clear that other courts worldwide would respect an order from this Court that essentially said no matter how the Ecuadorian court decides the issues, no judgment from it could ever be enforceable anywhere in the world.  Thus, this Court is unlikely to be able to finalize matters.

As to factor three, Chevron's proposed remedy in this Court is, indeed, inappropriately being used for procedural fencing.  Chevron is attempting to get a more favorable decision in this court than it believes it can get in Ecuador.  As the *Dow Jones* court noted, it is appropriate to review whether the competing foreign litigation "was specifically intended to evade the jurisdiction of the federal court."  *Dow Jones*, 237 F. Supp. 2d at 415.  The exact opposite is true here:  Chevron is instigating domestic litigation to evade the jurisdiction of the Ecuadorian court, jurisdiction it previously lauded and indeed selected.  This amounts to "strategic forum-shopping."  *Id.* at 440.  Chevron "seeks to establish venue here and away from another jurisdiction … and to haul foreign parties into this Court for an application of American law in support of a declaration of non-liability shielding [Chevron] from damages for prior conduct."  *Id.*  Such forum shopping did not support a DJA claim in *Dow Jones* and nor should it here.

Similarly, neither the fourth nor fifth factors support Chevron's DJA claim.  It is unambiguous that if this Court enters an injunction attempting to prohibit the enforcement of any Ecuadorian judgment worldwide, it will "increase friction between sovereign legal systems or improperly encroach on the domain of a … foreign court. "  *In re Crash*, 392 F. Supp. 2d at 473.  Moreover, there is clearly a "better or more effective remedy"—namely, to wait for the Ecuadorian process to finish, to wait for a judgment to be final, and if the judgment is against Chevron, to wait for the Ecuadorian plaintiffs to attempt to enforce any such judgment.  If the attempt to enforce is made in the United States, then this Court may take up again the issues

Chevron is demanding it take up now.

Finally, the *In re Crash* court reviewed in detail the four main cases that have evaluated a DJA claim in the context of parallel foreign proceedings:  *Basic v. Fitzroy Eng'g, Ltd.,* 949 F. Supp. 1333 (N.D. Ill. 1996); *Eastman Kodak Co. v. Kavlin,* 978 F. Supp. 1078 (S.D. Fla. 1997); *Dow Jones & Co. v. Harrods, Ltd.*, 237 F. Supp. 2d 237 (S.D.N.Y. 2002), *aff'd* 346 F.3d 357 (2d Cir. 2003) and *Farrell Lines Inc. v. Ceres Terminals Inc.*, 161 F.3d 115 (2d Cir. 1998). It determined that the unifying factor in those cases was whether the domestic forum "was the forum where the underlying dispute had its principal origins and the primary controlling legal issues were to be governed by the substantive law of that forum."  *In re Crash*, 392 F. Supp. 2d at 473.  If the foreign forum was the location of the dispute and foreign law was to be applied, as in *Basic, Dow Jones,* and *Eastman Kodak*, each court determined not to exercise its jurisdiction to support a DJA claim.  If the opposite was true, as it was in *Farrell* and in *In re Crash*, the courts did exercise their jurisdiction.  *Id.* at 473-478.

Applying this analysis to the facts of this case, the Court should not entertain a DJA claim.  As Chevron argued for years, the dispute *is* grounded in Ecuador, not New York. Moreover, the substantive law to be applied to the dispute, and indeed the substantive law requested by Chevron is that of Ecuador.  Chevron's *forum non conveniens* motion was in effect a forum selection clause, and it should be treated like such a clause in any contract, where the parties cannot try to escape it by filing lawsuits in other nations.  This Court should reject Chevron's attempt to evade its selected forum and decline to entertain jurisdiction over Chevron's Ninth Claim for Relief.

> **2.    Chevron's Ninth Claim for Relief does not state a sufficient case or controversy to support a declaratory judgment action**

Courts also reject DJA *claims* if they fail to satisfy the Article III requirement of a case or controversy.  In *Dow Jones*, Judge Marrero of this Court evaluated a declaratory judgment action brought by Dow Jones against a department store, Harrods, in the United Kingdom.[4]  Dow Jones

---

[4]  A related individual, Al Fayed, was also a defendant, but for simplicity, we will refer to both defendants as "Harrods."

sought a declaratory judgment that any potential libel claim by Harrods would be insufficient as a matter of law.  At the time Dow Jones brought its DJA action, Harrods had not yet initiated any lawsuit, but it subsequently did file suit in London for libel ("the London Action").  Dow Jones requested an injunction barring Harrods "from pursuing the London Action or related litigation against Dow Jones in any other forum in the world."  *Dow Jones*, 237 F. Supp. 2d. at 403.

Judge Marrero dismissed Dow Jones' DJ action on numerous grounds, including for lack of an actual case or controversy.  The Supreme Court "has reinforced that the DJA does not alter the essential predicates for the exercise of federal jurisdiction embodied in the prescription that "'[t]he judicial power does not extend to abstract questions" and that '[c]laims based merely upon "assumed potential invasions" of rights are not enough to warrant judicial intervention.'"  *Dow Jones*, 237 F. Supp. 2d at 406 (quoting *Public Service Comm'n of Utah v. Wycoff, Inc.*, 344 U.S. 237, 242 (1952) (quoting, in turn, *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 325 (1936)).  This requirement "circumscribes federal jurisdiction to real conflicts so as to preclude the courts from gratuitously rendering advisory opinions with regard to events in dispute that have not matured to a point sufficiently concrete to demand immediate adjudication and thus that may never materialize as actual controversies."  *Id*. at 406.

The *Dow Jones* court determined that there was not a sufficient case or controversy based on the "*mere prospect that such a [adverse] ruling may be rendered at some indefinite point in the future*."  *Dow Jones*, 237 F. Supp. 2d. at 408 (emphasis added).  The court found that a number of contingencies would have to occur before such a claim would be ripe, including "that Harrods may seek to enforce such judgment in the United States or elsewhere; [and] that if enforcement is sought, the judgment will be recognized somewhere."  *Id*.  But until those contingencies occurred, Dow Jones had "premature concerns about contingencies that may or may not come to pass."  *Id*.  The court noted that "[w]hat specific relief would be granted, whether monetary or injunctive, and whether a ruling against Dow Jones would be sustained on final appeal, are all speculative questions.  Whether or not Harrods would attempt to enforce a favorable judgment in the United States or elsewhere is also uncertain."  *Id*.  Based on these

uncertainties, the court determined that there was no actionable case or controversy.

Applying the *Dow Jones* reasoning to this case, it is clear that no current case or controversy cognizable under the DJA. While a judgment has been rendered in Ecuador, its terms are as yet uncertain. Chevron itself has asked for clarification of the ruling, submitting a 31-page request to the Ecuadorian court, asking it to expound on 27 points and to clarify 22 points. Peters Decl., Exs. 20 & 21; Jones Aff. ¶ 14. Chevron has stated that "our attorneys have found a number of legal and technical inconsistencies and ambiguities." Peters Decl., Exs. 20 & 21. Reportedly, Chevron has requested clarification of the formula used by the Ecuadorian court to come up with its damages assessment, and is also asking if the court viewed outtakes from the Crude documentary, among other requests. *Id.* Chevron has stated that the submission of the clarification request "has the same effect as an appeal in that it suspends the enforcement or execution of the verdict." Peters Decl., Ex. 20.

After the Ecuador court responds to Chevron's request for clarification, Chevron will be able to appeal. After the first level of appeal, another level of appeal is also available. Garro Decl., ¶¶ 18, 28, 29. The Ecuadorian court may change its order in response to Chevron's request for clarification, or it may be changed on appeal. There is at present no final judgment that can be enforced.

Chevron's "assumed potential invasions of rights" are not sufficiently concrete at this time to create a case or controversy under the DJA. As in *Dow Jones*, a number of contingencies must occur before the matter would be ripe: the Ecuadorian trial court must respond to Chevron's request for clarification, which may change its order in potentially material ways; Chevron must appeal; the first level appellate court must affirm the judgment in a way detrimental to Chevron; Chevron must appeal again, and lose again; and the Ecuadorian plaintiffs must then attempt to enforce the judgment in the United States—all before an actual case or controversy exists. As has been widely reported in the press: "Resolution of the case could be years away, and few analysts expect the company to pay anything soon, if at all." Peters Decl., Ex. 20. Until those contingencies come to pass, this Court should decline jurisdiction under the DJA.

**F.     Even if the Court concludes that Chevron has shown a likelihood of success on its RICO claim (which it shouldn't), injunctive relief is not available to private plaintiffs under RICO.**

Given that the great majority of the factual allegations underlying Chevron's RICO claim are contested, this Court should not, and properly cannot, determine that Chevron is likely to prevail on the merits based on the paper record currently before it.[5]  *See Kern v. Clark*, 331 F.3d 9, 12 (2d Cir. 2003).  But, even if the Court were nonetheless to make that determination, private plaintiffs such as Chevron do not have a right to injunctive relief under the RICO statute.  No court in this District has granted preliminary injunctive relief to a private plaintiff in a RICO case and not been overturned.  And in *American Medical Association  v. United Healthcare Corp.*, a court in this District held unequivocally that preliminary injunctive relief is not available under RICO to a private plaintiff.  588 F. Supp. 2d 432, 444-446 (S.D.N.Y. 2008).[6]  The decision in *American Medical Association* is carefully-reasoned, persuasive, and should be adopted by this Court.

Section 1964 of RICO has three subsections.  Subsection (a) provides courts with

---

[5] There are also serious questions regarding the legal basis for Chevron's RICO claim, including, in particular, whether Chevron currently has standing to pursue its RICO claim.  "RICO standing is a more rigorous matter than standing under Article III."  *Denney v. Deutsche Bank AG*, 443 F.3d 253, 266 (2d Cir. 2006).  Statutory standing under RICO incorporates an enhanced ripeness requirement: "*a cause of action does not accrue under RICO until the amount of damages becomes clear and definite*."  *Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135 (2d Cir. 2003) (emphasis added) (quoting *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir. 1994)).  Here, the extent of Chevron's purported damages are unknown.  Chevron alleges damage to its reputation, loss of goodwill, impairment of various unspecified contracts, and attorneys fees in an unstated amount resulting from ongoing litigation efforts.  *See* Complaint ¶ 340.  These vague allegations are not sufficient to accord Chevron standing under RICO.  *See, e.g., Denney,* 443 F.3d at 266 (no clear and definite injury where extent of damage unknown); *Harbinger Capital Partners Master Fund I, Ltd. v. Wachovia Capital Mkts.*, LLC, 07-CV-8139, 2008 WL 3925175, at *4 (S.D.N.Y. Aug. 26, 2008), *aff'd*, 347 Fed. Appx. 711 (2d Cir. 2009) ("Plaintiffs lack statutory standing to sue under RICO for their damages have yet to become 'clear and definite' and are thus unripe."); *Dornberger v. Metro. Life Ins. Co.*, 961 F. Supp. 506, 521 (S.D.N.Y. 1997) (stating that § 1964(c) "requires a showing of some actual, out-of-pocket financial loss").

[6] Chevron relies heavily on *Motorola Credit Corp. v. Uzan*, 202 F. Supp. 2d 239 (S.D.N.Y. 2002), in arguing that it should be entitled to injunctive relief on its RICO claim.  But that case is no longer good law.  Neither is the non-controlling Seventh Circuit decision in *NOW, Inc. v. Scheidler*, 267 F.3d 687 (2001), the case upon which the *Motorola* court heavily relied in reaching its conclusion that § 1964 permits private litigants to obtain injunctive relief under RICO.  *See Scheidler v. National Organization for Women, Inc.*, 537 U.S. 393 (2003) (overturning *NOW*).

"jurisdiction to prevent and restrain violations of section 1962 . . . ."; subsection (b) allows the Attorney General to institute proceedings and extends the right to seek injunctive relief; and, subsection (c) grants private litigants the right to sue under RICO and recover treble damages. 18 U.S.C. § 1964(a)-(c).  As noted in *American Medical Association*, none of these subsections expressly grant injunctive remedies to private plaintiffs.  And the fact that Congress explicitly granted to the Attorney General the right to seek injunctive relief, but did not do so with respect to private plaintiffs, strongly implies that Congress did not intend private plaintiffs to have such a right.  Specifically, as explained in *American Medical Association*:

> The Supreme Court has long held that 'it is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it.'  *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 19 (1979).  This ideology works congruently with another long-standing rule, cautioning that  '[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others.' *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001).  Taken together here, *if Congress expressly granted private litigants a right to seek damages under the statute, while remaining taciturn about a private litigant's ability to seek injunctive relief, this Court can neither infer a meaning that is unexpressed, nor ignore Congress's seemingly willful silence on the matter.*"

588 F. Supp. 2d at 445-46 (emphasis added).

The reasoning and holding of *American Medical Association* also is consistent with the great weight of authority on this issue.  *See, e.g., Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris Inc.*, 185 F.3d 957, 967 (9th Cir. 1999) ("[I]njunctive relief is not available to a private party in a civil RICO action." (citation omitted); *In re Fredeman Litig.*, 843 F.2d 821, 830 (5th Cir. 1988) (holding that RICO does not authorize a private party to seek injunctive relief since Congress "had several opportunities to give express authorization to private injunctive actions but chose not to do so, apparently because it hesitated in the face of the ramifications of that remedy."); *Dan River, Inc. v. Icahn,* 701 F.2d 278, 290 (4th Cir. 1983) (noting "substantial doubt whether RICO grants private parties ... a cause of action for equitable relief").

Moreover, although the Second Circuit has not yet ruled on this issue, it has on two separate occasions stated that it would likely find that section 1964 does not confer a right to private litigants to seek injunctive relief.  *See American Medical*, 588 F. Supp.2d at 445 (citing

*Sedima, S.P.R.L. v. Imrex Co., Inc.*, 741 F.2d 482, 489 n.20 (2d Cir. 1984)) *rev'd. on other grounds*, 473 U.S. 479 (1985) ("While post-enactment legislative history is not by any means conclusive, it cannot merely be ignored.  It thus seems altogether likely that § 1964(c) as it now stands was not intended to provide private parties injunctive relief." (citations omitted)) ; *Trane Co. v. O'Connor Secs.*, 718 F.2d 26, 28-9 (2d Cir. 1983) ("[I]t should be noted that courts which have confronted the issue have expressed serious doubt concerning the propriety of granting injunctive relief under any circumstances to private parties . . . We have the same doubts as to the propriety of private party injunctive relief . . ." (citations omitted))).

In light of *American Medical Association*, the decisions of both the Ninth and Fifth Circuits reaching the same conclusion, and the skepticism the Second Circuit has expressed regarding the availability of injunctive relief to private parties, this Court should not grant Chevron a preliminary injunction based upon RICO.

**G.    Chevron's common law claims (third through seventh claims for relief) are barred by the litigation privilege under New York law and, therefore, cannot support any preliminary injunctive relief.**

Chevron cannot prevail on its state-law claims because the great majority of conduct that Chevron has alleged in support of these claims is protected by New York's litigation privilege. Under New York law, statements made by parties and their attorneys during the course of litigation are "absolutely privileged" if they are in any way pertinent to the litigation.  *O'Brien v. Alexander*, 898 F. Supp. 162, 171 (S.D.N.Y. 1995).  "The test of 'pertinency' is extremely broad and embraces 'anything that may possibly or plausibly be relevant or pertinent with the barest rationality, divorced from any palpable or pragmatic degree of probability.'"  *Aequitron Med., Inc. v. Dyro*, 999 F. Supp. 294, 298 (E.D.N.Y. 1998) (quoting *O'Brien*, 895 F. Supp. at 171). Moreover, "the absolute privilege attaches not only at the hearing or trial phase, but to every step of the proceeding in question, even if it is preliminary and/or investigatory."  *Id.*; *see also Herzfeld & Stern, Inc. v. Beck*, 572 N.Y.S.2d 683, 685 (1991).  The litigation privilege "confers immunity from liability regardless of motive."  *Park Knoll Assocs. v. Schmidt*, 59 N.Y.2d 205,

209 (1983).[7]

Chevron's state-law claims are based almost exclusively upon alleged written and oral statements made by Donziger and others in connection with their prosecution of the underlying *Aguinda* litigation in Ecuador, as well as statements that were made to this Court and other United States courts regarding that litigation.  For example, Chevron alleges  that defendants are liable for fraud because, *inter alia*, they "knowingly misrepresented … material facts … in their pleadings and representations before U.S. courts and before the Lago Agrio court."  Complaint ¶¶ 353, 355.  Regarding its claim for interference with contract, Chevron alleges that defendants "persuaded the Republic of Ecuador to refuse to defend Chevron's rights … to improperly dictate to the judiciary that Chevron be held liable in the Lago Agrio litigation, and to bring criminal charges against Chevron employees."  *Id.* ¶ 362.  With respect to its claim for trespass to chattels, Chevron alleges that defendants "prosecut[ed] a fraudulent lawsuit, manufactur[ed] false evidence, tamper[ed] with testimony, [and] disseminat[ed] misleading statements to courts."  *Id.* ¶ 368.  And in support of its claim for violations of New York Judiciary Law § 487, Chevron alleges that Donziger prepared and filed "multiple court submissions" to this Court, "which included false and misleading statements about the Lago Agrio Litigation and the Cabrera Report."  *Id.*, ¶ 387.

As these allegations demonstrate, Chevron seeks to hold defendants liable for statements made in connection with the *Aguinda* litigation, as well as the collateral litigation in the United States.  Indeed, putting aside their vitriol, the section headings of Chevron's complaint could not be clearer on this point:  "Pressuring the Lago Agrio Court and Manufacturing Evidence," "Manipulating and Falsifying Their Own Experts' Findings to Corrupt the Judicial Inspection Process," "Colluding with the Republic of Ecuador to Bring Sham Charges Against Chevron's

---

[7] The litigation privilege applies to statements made in connection with foreign judicial proceedings, just as it applies to domestic proceedings.  *See Beroiz v. Wahl*, 84 Cal. App. 4th 485, 493-494 (2000) (holding that litigation privilege barred lawsuit based upon statements made in connection with Mexican judicial proceedings and noting "the cases that we have found have uniformly held that similar privileges apply to foreign proceedings and communications."); *Bakhshandeh v. American Cyanamid Co.*, 211 F.Supp. 803, 808-809 (S.D.N.Y. 1962) (applying New York law and holding that statements made by defendant's employee to an Iranian government official were subject to a qualified privilege).

Attorneys," "The Conspirators Campaign of Lies and Obstruction in U.S. Courts."  Complaint, at i-ii.  Besides court submissions, the alleged conduct underlying Chevron's claims also includes privileged communications between defendants and their clients in the underlying litigation; defendants' gathering of evidence and collaboration with their experts to conduct a damages analysis; and the defendants' communications with the public regarding the litigation.

These allegations cannot support any of Chevron's state-law claims.  *See Andrews v. Steinberg*, 471 N.Y.S.2d 764, 770 (1983) (litigation privilege applies "in any subsequent litigation arising from the questioned testimony, *whether based on defamation or on any other theory*." (emphasis added)).  Each category of alleged litigation-related conduct falls within the purview of the litigation privilege as construed by New York courts.  *Grasso v. Mathew*, 564 N.Y.S.2d 576 (1991).  To the extent that Chevron's claims are based on statements that took place outside of the courtroom and that did not directly involve the courts, those statements are also protected.  New York courts have held that statements between attorneys and witnesses, including expert witnesses, are protected.  *Aequitron*, 999 F. Supp. at 297-98; *Park Knoll Assocs.* 59 N.Y.2d at 209.  The same is true with respect to correspondence between attorneys and parties.  *Aequitron*, 999 F. Supp. at 297-98; *Simon v. Potts*, 225 N.Y.S.2d 690, 701 (1962).

Given how broadly New York courts have construed the litigation privilege, Chevron has not demonstrated that it is likely to prevail on the merits of its state law claims.

## H.    Chevron's unclean hands preclude it from receiving a preliminary injunction or other equitable relief.

A party that seeks equity must do equity, and may not come to the Court with unclean hands.  *See, e.g., Finnie v. Walker*, 257 F. 698, 702 (2d Cir. 1919); *Lincoln Life and Annuity Co. of New York v. Caswell*, 813 N.Y.S.2d 385 (2006) (McGuire, V., concurring).  In particular, a party seeking the extraordinary equitable remedy of a preliminary injunction must have "clean hands" and cannot have engaged in the same type of conduct that forms the basis for its request for injunctive relief.  *See, e.g., Stokely-Van Camp, Inc. v. Coca-Cola Co.*, 646 F. Supp. 2d 510, 533-534 (S.D.N.Y. 2009) (plaintiff's "own unclean hands … preclude the equitable relief of a preliminary injunction"); *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Callahan*, 265 F. Supp.

2d 440, 444-445 (D. Vt. 2003) ("Even if Merrill Lynch had demonstrated irreparable harm, the Court would deny its demand for preliminary injunctive relief under the doctrine of unclean hands."); *Nikkal Indus., Ltd. v. Salton, Inc.*, 735 F. Supp. 1227, 1238 (S.D.N.Y. 1990) (equitable relief inappropriate where plaintiff engaged in the same conduct it had challenged).

Here Chevron's hands with respect to the underlying litigation in Ecuador are anything but clean. Donziger makes the following offer of proof with respect to evidence that he would have presented to the Court in opposition to Chevron's application for the equitable relief of a preliminary injunction, had the Court accorded Donziger an adequate opportunity to marshal and present evidence, and had the Court held an evidentiary hearing on Chevron's application, as required by established Secord Circuit law.

1. **Chevron's use of Diego Borja.**

While Chevron complains of alleged corruption of the Ecuadorean legal system in connection with the *Aguinda* litigation, it appears that in 2009 Chevron participated in an effort to corrupt the system for its own benefit. A Chevron employee named Diego Borja, along with an American felon named Wayne Hanson, participated in a "sting" operation directed at the Ecuadorian judge presiding over the *Aguinda* litigation. They met on four occasions with the Judge, secretly videotaping each meeting. Chevron took possession of the videotapes, and then posted edited versions of them on YouTube. Chevron also issued press releases and public statements regarding the alleged corruption of the Judge. Chevron's release of these videotapes resulted in the disqualification of the Judge, and considerable delay of the case. Shortly thereafter Borja and his family were "relocated" at Chevron's expense, and Chevron has since retained and paid for two well-known lawyers to represent him . *See* Peters Decl., Ex. 13 (Winston and Strawn Memorandum, filed Sept 10, 2010 in *In Re Application of Republic of Ecuador*, CV-10-80225 MISC (N.D. Cal.)), at pages 11-15. Donziger will promptly be pursuing discovery from Chevron regarding its involvement in the judicial sting, its financial relationship with Borja and Hanson, and its communications with Borja and Hanson regarding the *Aguinda* litigation, the videotapes, and the judicial sting.

## 2.      Criminal prosecution of Chevron employees.

A key defense of Chevron in the *Aguinda* litigation is that the claims were released by the Government of Ecuador.  Although this defense appears to make little sense—surely the release of a corporation by the United States in this country would not terminate litigation against it brought by private parties—Chevron still clings to it, and pleads it and the facts underlying it in its complaint here.  However, two of Chevron's senior officers, and eight Ecuadorians have been charged criminally in Ecuador for their role in procuring this release.  *See* Peters Decl., Exs. 14, 15 (Spanish and translated English copies of Indictment, and excerpts describing the criminal indictment filed by the Republic of Ecuador in the recent BIT action).  In the RICO claim, Chevron charges as racketeering activity efforts by Donziger and others to urge the Ecuadorian prosecutors to bring the criminal case, even though such conduct is plainly privileged. Chevron's reliance on a release procured through criminal conduct is further evidence of unclean hands.  Donziger will also presently be seeking discovery from Chevron and the individual defendants in that criminal case about the allegations underlying the Ecuadorian criminal case, Chevron's payments to the individual defendants in that case, and Chevron's communications with the individual defendants in that case regarding the *Aguinda* litigation and the Ecuadorean criminal case.

## 3.      Work with experts.

Chevron's RICO claim alleges misconduct pertaining to the *Aguinda* plaintiffs' interactions with court-appointed expert, Cabrera.  Donziger submits that the *Aguinde* plaintiffs' conduct with respect to Mr. Cabrera was not unlawful and was consistent with custom and practice in Ecuador regarding experts appointed by the courts.  *See* Peters Decl., Ex. 10 (Declaration of Pablo Fajardo Mendoza, filed in *Chevron v Stratus*, Civ Action 10-CV-00047-MSK (D. Colo)).  Chevron similarly hired and interacted with numerous experts in connection with the *Aguinda* litigation in Ecuador.  Donziger will promptly be seeking discovery from Chevron regarding its interactions with experts in Ecuador.

## 4.      Chevron's improper use of the Ecuadoran military.

Chevron has a close relationship with Ecuador's military.  Indeed, Chevron employees

working on the *Aguinda* trial built and occupied housing on an Ecuadorian army base, which they agreed to give to the Ecuadorian mility.  *See* Peters Decl., Ex. 16.  This "gift" likely violates the Foreign Corrupt Practices Act.  On one occasion, in October of 2005, Chevron worked with the Ecuadorean military to secure a "suspension" of a key judicial inspection of a contaminated site during the trial, under questionable circumstances.  *See* Peters Decl., Ex. 17.  Donziger will promptly be seeking evidence from Chevron about its payments to and relationship with Ecuador's military, and its communications with the military about using military pretexts to interfere with the administration of justice in Ecuador in the *Aguinda* case.

> **5.**    **Chevron's change of position regarding the forum.**

Chevron complains of the *Aguinda* plaintiffs developing a close relationship with the democratically elected government of Ecuador and its President Correa.  Of course, it was Chevron who, after nine years of litigation in this Court and the Second Circuit between 1993 and 2002, finally convinced the U.S. Court that the litigation the *Aguinda* plaintiffs had filed in the U.S. should be transferred on *forum non conveniens* grounds to Ecuador.  In support of that application, Chevron submitted 14 affidavits to this Court, attesting to the fairness and probity of the Ecuadorean justice systems.  Affiants included Chevron's lead Ecuadorean counsel in the *Aguinda* litigation, and its two senior legal officers who are now criminal defendants in Ecuador. *See* Peters Decl., Ex. 18.  Donziger will promptly be seeking discovery from Chevron about its communications with government officials in Ecuador concerning the *Aguinda* litigation, and any financial relationships with any government officials in Ecuador.  It will be relevant to know why Chevron was once so eager to have this case heard in Ecuador, and now why it claims that the system there is not capable of producing a fair result.

In this regard, the Court should reflect on what Chevron is really doing here.  When the lawsuit was filed in this Court, Chevron moved it to Ecuador.  As the trial progressed and the strength of the Ecuadoran plaintiffs' case grew, Chevron started experiencing "buyers remorse."  Now that it has lost the trial in Ecuador, Chevron comes back to this Court to seek to enjoin enforcement of the Ecuadorian judgment, and a declaration that the judgment is unenforceable.  Notably, Chevron does not suggest an alternative forum for actually resolving the *Aguinda*

plaintiffs' serious allegations of harm and damages.  As Chevron spokesperson Silvia Garrigo

stated on camera to a Sixty Minutes reporter in 2009, when asked why Chevron had first moved

the case from New York to Ecuador, but was now criticizing the Ecuadorian court,  "We don't

want to get sued, period…. We don't want to be in *any* court." *See* Peters Decl., Ex. 19.  This

statement suggests that Chevron's prior efforts to transfer this case to Ecuador and the

representations Chevron made to the Court to secure that transfer were at best disingenuous and

perhaps fraudulent, and calls into question all of Chevron's litigation tactics for the last eighteen

years as it seeks to avoid having to answer for its predecessor's having largely destroyed a

portion of Ecuador the size of the state of Rhode Island.

**I.     Chevron's requested preliminary injunction is unconstitutionally vague and overbroad.**

Should the Court decide to grant some form of preliminary injunctive relief,

notwithstanding Chevron's failure to establish its entitlement to such relief, Chevron's requested

form of preliminary injunction is impermissibly vague and overbroad.  Rule 65(d)(1) of the

Federal Rules of Civil Procedure mandates that injunctions state their terms with specificity and

describe in detail the precise acts to be restrained or required.  Fed. R. Civ. P. 65(d)(1)(B) and

(C); *see Garcia v. Yonkers School Dist.*, 561 F.3d 97, 104 (2d Cir. 2009).  Here, the preliminary

injunction sought by Chevron sweeps so broadly that it will force Donziger to guess at the

contours of his permissible conduct.  Complaint, Prayer for Relief ¶¶ 5-9; *see Peregrine*

*Myanmar Ltd. v. Segal*, 89 F.3d 41, 52 (2nd Cir. 1996) (striking "undefined," "catch-all" phrase

from injunction because defendant "risks contempt if she guesses wrong"); *In re Worldcom, Inc.*

*Sec. Litig.*, No. 02 Civ. 3288 (DLC) 2007 WL 2994395, at *4 (S.D.N.Y. Oct. 16, 2007) ("Rule

65 is concerned with vagueness insofar as a vague injunction poses 'the threat of a contempt

citation for violation of an order so vague that an enjoined party may unwittingly and

unintentionally transcend its bounds.'" (quoting *Sanders v. Air Line Pilots Ass'n, Int'l*, 473 F.2d

244, 247 (2d Cir. 1972))).  Indeed, Chevron's requested injunction, as proposed and as adopted

by the Court in its TRO, can reasonably be read as barring Donziger from defending himself

altogether against Chevron's claim for declaratory relief that the *Aguinda* Judgment was

procured by fraud and is therefore unenforceable and non-recognizable.  Complaint ¶¶ 391-397.

Further, Chevron's proposed injunction, if granted, will trammel Donziger's free speech rights and may impinge on his legal and ethical duties.  Prohibiting Donziger from "advancing in any way . . . directly or indirectly, any action or proceeding for recognition or enforcement of any judgment," as does the Court's February 9, 2011 TRO, burdens Donziger's First Amendment right of free speech by proscribing any communication on the part of Donziger as to the matters at hand.  *See Peregrine*, 89 F.3d at 51 (striking paragraph of injunction barring threats of spurious lawsuits as not narrowly tailored, overbroad, and violative of the First Amendment); *Metro. Opera Ass'n, Inc. v. Local 100, Hotel Emps. and Rest. Emps.*, 239 F.3d 172, 178 (2nd Cir. 2001) (reversing grant of injunction for vagueness and stating that "the First Amendment strongly disfavors injunctions that impose a prior restraint on speech"); *Commodity Futures Trading Comm'n v. Vartuli*, 228 F.3d 94, 110 (2nd Cir. 2000) (striking down portion of injunction requiring registration with the Commodities Futures Trading Commission and noting that, "Whereas past fraud may ordinarily be punished without provoking First Amendment concerns, . . . the same is not true of measures . . . that restrict speech in an attempt to guard against future misrepresentation or abuse.").  Such a blanket prohibition also conflicts with Donziger's duties to zealously advocate for, communicate with, and loyally represent his clients. *See* ABA Model Rules of Professional Conduct, Preamble ¶ 9, Rule 1.4.

Accordingly, Chevron's proposed injunction will run afoul of the detail and specificity required by Rule 65, and its overreaching scope will violate Donziger's constitutional rights and legal obligations.

**J.     Donziger joins in the other arguments presented by defendants Hugo Gerado Camacho Naranjo, and Javier Piaguaje Payaguaje in opposition to Chevron's application.**

Donziger hereby joins, to the extent applicable, in all other and additional arguments presented by defendants Hugo Gerado Camacho Naranjo and Javier Piaguaje Payaguaje in opposition to Chevron's application, including the arguments presented in their memoranda of law filed February 8, 2011 and February 11, 2011 (Docket Nos. 61 & 81), and in oral argument in these matters.

**K.      Any Bond Should be Commensurate with the Judgment.**

If there is a preliminary injunction, a $10,000 bond is inadequate.  The bond should be commensurate with the Judgment in Ecuador.

### III.      CONCLUSION

For all the foregoing reasons, Donziger respectfully requests that this Court deny Chevron's application for a preliminary injunction.

Respectfully submitted,

Dated:  February 25, 2011

By:  */s/ Elliot R. Peters*
    ELLIOT R. PETERS
    JOHN W. KEKER (*pro hac vice* pending)
    JAN NIELSEN LITTLE (*pro hac vice* pending)
    KEKER & VAN NEST LLP
    710 Sansome Street
    San Francisco, CA  94111-1704
    Telephone:      415.391.5400
    Facsimile:       415.397.7188
    Email:      epeters@kvn.com
    Email:      jkeker@kvn.com
    Email:      jlittle@kvn.com

    **Attorneys for** STEVEN DONZIGER, THE LAW OFFICES OF STEVEN R. DONZIGER