UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CHEVRON CORPORATION,

                Plaintiff,

        -against-                                 11 Civ. 0691 (LAK)

STEVEN DONZIGER et al.,

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**OPINION**

Appearances:

Randy M. Mastro
Andrea E. Neuman
Scott A. Edelman
Kristen L. Hendricks
William E. Thompson
GIBSON, DUNN & CRUTCHER, LLP
*Attorneys for Plaintiff*

Steven R. Donziger
*Defendant* Pro Se

John W. Keker (*pro hac vice* pending)
Elliot R. Peters
KEKER & VAN NEST, LLP
*Attorneys for Defendant Donziger*

Julio C. Gomez
JULIO C. GOMEZ, ATTORNEY AT LAW LLC
*Attorney for Defendants Hugo Gerardo
Camacho Naranjo and Javier Piaguaje
Payaguaje*

Gordon Mehler
LAW OFFICES OF GORDON MEHLER, P.L.L.C.
*Attorneys for Defendants Stratus Consulting,
Inc., Douglas Beltman, and Ann Maest*

Table of Contents

I    The Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
     Texaco's Former Operations in Ecuador. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
     The Beginning – the Aguinda Class Action in this Court. . . . . . . . . . . . . . . . . . . . 7
          Texaco Settles All Pollution Claims With Ecuador.. . . . . . . . . . . . . . . . . . . . . 9
          The Aguinda Plaintiffs and Lawyers Make A Deal With Ecuador. . . . . . . . . . 10
          Ecuador's Environmental Management Act of 1999.. . . . . . . . . . . . . . . . . . . 10
     The Lago Agrio Litigation – 2003–2008. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
          The Complaint. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
          Donziger's Role. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
          Early Stages. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
               The Initial Criminal Investigation – An Attempt to Defeat the Settlement
                    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
               The Early Expert Inspections. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
               Donziger Solicits Berlinger to Make Crude.. . . . . . . . . . . . . . . . . . . . . . 18
               The Global Assessment – The Cabrera Report. . . . . . . . . . . . . . . . . . . . . 18
     The Release of Crude Leads to U.S. Discovery Revealing Misconduct. . . . . . . . . . . . 20
          The Release of Crude. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
          Dr. Calmbacher Disavows Report the LAPs Filed Over His Name. . . . . . . . . . 22
          The Cabrera Report Exposed. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
               Cabrera's Appointment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
               The LAPs Ghost-Wrote All or Much of Cabrera's  Report. . . . . . . . . . . . 26
               The "Cleansing" Operation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
     The LAPs' Use of Pressure Tactics and Political Influence in this Case. . . . . . . . . . . . 35
          Intimidation of the Ecuadorian Judges. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
          The Plan to Pressure the Court With an "Army". . . . . . . . . . . . . . . . . . . . . . . . 37
          Killing the Judge?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
          Political Influence to Use the Criminal Process Against Former TexPet Lawyers
               to Extort a Settlement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
     The Legal and Political Climate in Ecuador – Fair Trial Becomes Impossible and the
          ROE, at the LAPs, Urgings, Seeks to Prosecute Chevron Lawyers for Tactical
          Reasons. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
          The Ecuadorian Judiciary.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
               The 2004 Purge of the Supreme Court.. . . . . . . . . . . . . . . . . . . . . . . . . . . 46
               President Correa's Influence Over the Judiciary. . . . . . . . . . . . . . . . . . . . 47
               Donziger Admits Corrupt Nature of the Ecuadorian Judiciary. . . . . . . . . 52
     The Lago Agrio Judgment and the LAPs' Enforcement Plan. . . . . . . . . . . . . . . . . . . . 52
          The Judgment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
          Appellate Remedies in Ecuador. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
          The LAPs' Enforcement Plan. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
     The UNCITRAL Arbitration. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
     This Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
          The Complaint. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
               Parties.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

        Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62
        Proceedings to Date. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

II  Legal Analysis and Additional Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
    A.   Chevron Is Threatened With Immediate and Irreparable Injury. . . . . . . . . . . . . 65
        1.   The Threatened Harm Would Be Irreparable.. . . . . . . . . . . . . . . . . . 66
        2.   The Threatened Harm Is Imminent. . . . . . . . . . . . . . . . . . . . . . . . . 69
        3.   The Availability of Appellate Remedies and a Possible Stay in Ecuador
            Do Not Preclude a Finding of Threatened Irreparable Injury. . . . . . . . . 72
    B.   The Balance of Hardships Tips Decidedly Toward Chevron. . . . . . . . . . . . . . 73
    C.   Likelihood of Success on the Merits – The Substantive Claims
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
        1.   The Claim for a Declaration that the Judgment is Not Entitled to
            Recognition or Enforcement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
           a.   Standards Governing Recognition and Enforcement.. . . . . . . . . 75
           b.   Chevron Has Shown the Requisite Likelihood of Success on its
               Claim that Ecuador Does Not Provide Impartial Tribunals and Due
               Process
               . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77
           c.   There Are At Least Serious Questions Going to the Merits of the
               Claim that the Judgment Was Procured By Fraud.. . . . . . . . . . . 82
           d.   This Is an Appropriate Case for Declaratory Relief.. . . . . . . . . . 84
        2.   The Other Claims.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87
    D.   Likelihood of Success on the Merits – Procedural Issues. . . . . . . . . . . . . . . . 87
        1.   Chevron Is Likely to Establish Personal Jurisdiction As to the Two
            Foreign Defendants Who Have Not Waived the Defense.. . . . . . . . . . . 87
           a.   Service of Process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88
           b.   The Exercise of Jurisdiction over the LAP Representatives. . . . . 89
              (1)   Amenability to Service.. . . . . . . . . . . . . . . . . . . . . . . 90
                 (a)   N.Y. CPLR § 301. . . . . . . . . . . . . . . . . . . . . . 90
                 (b)   N.Y. CPLR § 302.. . . . . . . . . . . . . . . . . . . . . 94
              (2)   Due Process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96
                 (a)   Minimum Contacts. . . . . . . . . . . . . . . . . . . . . 96
                 (b)   Reasonableness. . . . . . . . . . . . . . . . . . . . . . . 97
           c.   The Other Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99
        2.   Comity and Abstention. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100
        3.   Donziger's Judicial Estoppel Argument Lacks Merit. . . . . . . . . . . . . 105
        4.   Donziger Was Afforded an Adequate Opportunity to Respond. . . . . . . 106
           a.   The Argument and Scheduling of the Motion. . . . . . . . . . . . . . 107
           b.   The Denial of the Adjournment and the Briefing Schedule Were
               Consistent With Rule 65(a) and Due Process. . . . . . . . . . . . . 109
        5.   No Evidentiary Hearing Was Required. . . . . . . . . . . . . . . . . . . . . . 115
    E.   The Bond. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

III  The Record on this Motion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

iii

    A.    The Filings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>121</u>

    B.    Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>121</u>

IV    Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>125</u>

LEWIS A. KAPLAN, *District Judge.*

A provincial court in Ecuador has entered a multibillion dollar judgment against Chevron Corporation ("Chevron") in an action brought by indigenous peoples in the Amazonian rain forest (the "Lago Agrio Plaintiffs" or "LAPs").[1]   The gravamen of their case is alleged pollution of the rain forest in years *ending in 1992* by Texaco, Inc. ("Texaco"), the stock of which Chevron acquired at the end of 2001.[2]

This claim originated in the United States.   Three American lawyers began the original litigation in this Court many years ago.[3]   After the New York suit was dismissed in 2000 on *forum non conveniens* grounds, they brought a successor lawsuit on a different legal theory (the "Lago Agrio" case) in Ecuador.   The judgment at issue here was entered in that case.

The LAPs' attorneys and other representatives have stated that they intend to seek to collect on that judgment in multiple jurisdictions around the world, including by *ex parte* attachments, asset seizures, and other means, as promptly as possible, starting before completion of the Ecuadorian appellate process.[4]   The purpose of such multiplicitous and burdensome proceedings against a company like Chevron, which would be good for the money if the judgment ultimately

---

[1]
      The LAPs are forty-seven individuals, who are named also as defendants in this action.

[2]
      Chevron acquired Texaco in 2001, after Texaco discontinued operations in Ecuador and settled environmental claims with its government.   As of December 31, 2010, Texaco remained a wholly-owned subsidiary of Chevron.  Chevron Corp., Annual Report (Form 10-K), Ex. 21.1 (Feb. 24, 2011).

[3]
      Hendricks Decl. [DI 14, No. 10-MC-00002 (LAK)] (hereinafter "Hendricks Decl. I") Ex. B, at 9.

[4]
      For example, one of their principal lawyers stated that: "[W]e're coming back immediately, as soon as we can, to get that judgment enforced. We are not waiting for the appeals process, as is our right."  Hendricks Decl. [DI 60-54, 104-111] (hereinafter "Hendricks Decl. II") Ex. 1, CRS-482-00-CLIP-01.

stands up, is plain.  By their own admissions, it is to exert pressure on Chevron by means of this litigation strategy to force a quick and richer settlement.

Chevron contends that the judgment is not enforceable outside Ecuador because (1) the Ecuadorian legal system does not provide impartial tribunals or procedures compatible with the requirements of due process of law, and (2) it was obtained by fraud led in major degree by a New York City lawyer, Steven Donziger, substantial parts of which were conducted in the United States. It brought this case for, among other relief, a declaration that the judgment is not entitled to recognition or enforcement. It now seeks a preliminary injunction principally to bar the enforcement of the judgment outside Ecuador pending the resolution of this case on the merits or, at least, the resolution of its prayer for a declaratory judgment.

This is an extraordinary case.  The amount involved is large.  Chevron challenges the fairness and integrity of the judicial system of Ecuador and thus implicates considerations of international comity.  There are issues concerning the reach of U.S. law and questions pertaining to the conduct of the New York lawyer and others.  There are other concerns.

The Court is mindful of the seriousness of each of them[5] and does not act lightly.  In the midst of the many "trees" in this vast record, however, sight should not be lost of the forest. Several points must be borne clearly in mind from the outset.

First, a great deal of the evidence of possible misconduct by Mr. Donziger and others, as well as important evidence regarding the unfairness and inadequacies of the Ecuadorian system and proceedings, consists of video recordings of the words of Donziger and others made by a New

---

[5] This led the Court to solicit the views of the U.S. Department of State on this motion on February 9, 2011.  *See* DI 79.  The Department politely declined to express any view.  *See* DI 114.

York documentary film maker, Joseph Berlinger, whom Donziger invited to film activities in relation to the Ecuadorian case and who ultimately released a documentary film about it called *Crude*.  Still more comes from e-mails and other documents between and among Donziger and others working with him that were produced in related cases.  Yet neither Donziger nor any of the other key actors has denied Chevron's allegations or attempted here to explain or justify under oath their recorded statements and written admissions.  Thus, the record includes uncontradicted and unexplained statements by Donziger and some of his alleged co-conspirators including such highly pertinent comments as this:

> "They're all [i.e., the Ecuadorian judges] corrupt!  It's – it's their birthright to be corrupt."[6]

Nor was this an offhand remark or a new sentiment on Donziger's part.  In a brief filed in this Court in 2000 in an effort to avoid a *forum non conveniens* dismissal of his earlier case, Donziger stated that Ecuador could not provide an adequate forum and that its judiciary was corrupt.[7]

Second, the submissions made by Donziger and the two LAPs who have appeared by counsel (the "LAP Representatives") – the rest have defaulted –  are replete with complaints that there is no hurry here, that the judgment cannot now be enforced under Ecuadorian law, that Donziger should have been given more time to respond to the motion, that the argument of the motion should have been delayed, and the like.  As will appear, none of these contentions has merit even considered in isolation.  But the details of each of these points should not obscure this overriding fact.

---

[6]

Hendricks Decl. II Ex. 1, CRS-053-02-03.

[7]

*E.g.,* Plaintiffs' reply memorandum of law *passim, Aguinda v. Texaco, Inc.,* No. 93 Civ. 7527 (JSR) (S.D.N.Y. filed Apr. 24, 2000) (DI 151).

4

When it heard the preliminary injunction motion, this Court noted that any urgency could be eliminated if the defendants agreed to a temporary order that they maintain the *status quo* – that is, that no effort would be made to enforce the judgment – for a period sufficient to permit submission of additional papers and deliberation by the Court.[8]  The LAP Representatives refused.[9] And while Donziger offered an extension of the temporary restraining order ("TRO") as to himself alone, that offer was essentially illusory because the lack of comparable relief as to the LAPs and some of the other defendants would have left Chevron without the protection that it sought – the LAPs simply could have used lawyers other than Donziger to seek enforcement.[10]  Moreover, when Chevron sought a severance and an expedited trial of its claim for a declaration that the judgment is not entitled to recognition or enforcement, the LAP Representatives, after first agreeing, back-pedaled and objected.[11]

Third, it must be borne in mind that this is a preliminary injunction motion.  As the Supreme Court has said:

> "The purpose of a preliminary injunction is merely to preserve the relative position of the parties until a trial on the merits can be held.  Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures

---

[8]

Tr., Feb. 18, 2011, at 44:10-18.

[9]

*Id.*, at 50:7-21.

[10]

To be sure, an injunction against Donziger would bind persons in active concert and participation with him who have actual notice of the order.  FED. R. CIV. P. 65(d)(2).  The LAPs or other defendants, however, would be free to seek to enforce the judgment independently of Donziger or, at least, to claim that they had acted independently.

[11]

Tr., Feb. 18, 2011, at 30:19-22, 74:15-76:19; letter, Steven Hyman, Feb. 23, 2011 [DI 169].

5

that are less formal and evidence that is less complete than in a trial on the merits."[12] Moreover, where, as here, the district court concludes that the risk of harm warrants a TRO to maintain the *status quo* to permit appropriate consideration of whether to issue a preliminary injunction, "Rule 65," in the eloquent words of the late Judge Friendly, "demands such but only such thoroughness as a burdened federal judiciary can reasonably be expected to attain within" the limited period during which the TRO may remain in effect.[13]

Fourth, there has been a great deal of posturing on both sides. Chevron, for example, complains of the Ecuadorian legal system and judiciary while the LAPs attempt to make much of the fact that Texaco, years ago, successfully obtained a *forum non conveniens* dismissal of the first of these cases, arguing among other things that the courts of Ecuador would be an adequate forum. Fair enough. But before rising to the bait on either side, however, it is well to bear in mind that the positions of both sides have changed 180 degrees since the predecessor litigation in New York. Chevron then touted the adequacy of the Ecuadorian judiciary, while the plaintiffs – in briefs bearing Donziger's name as counsel – argued that Ecuador could not provide an adequate forum and that its judiciary was corrupt. Similarly, the LAP Representatives argue that the LAPs are poor, indigenous people of the rain forest who cannot properly be sued in New York. In doing so, however, they utterly ignore the fact that they previously have sued both Texaco and Chevron here, voluntarily participated in still other cases in this Court, are voluntarily litigating in other federal courts around the country, and for years used Donziger and his New York office to mount public relations, political and fund raising efforts in support of their Ecuadorian efforts. So a good deal of

---

[12]       *Univ. of Texas v. Camenish,* 451 U.S. 390, 395 (1981).

[13]       *SEC v. Frank,* 388 F.2d 486, 490 (2d Cir. 1968).

the rhetoric and argument in this case on these and other issues must be viewed with a critical eye.

The parties here have submitted a large evidentiary record.  The facts are essentially undisputed although the same perhaps cannot be said of each of the inferences to be drawn from certain of them.  The Court has considered the matter carefully.  This is its decision on the motion together with its findings of fact and conclusions of law.


*I     The Background*

*Texaco's Former Operations in Ecuador*

In 1964, Texaco Petroleum Company ("TexPet"), a fourth-tier subsidiary of Texaco, began oil exploration and drilling in the Oriente region of eastern Ecuador. In the following year, TexPet started operating a petroleum concession for a consortium owned in equal shares by TexPet and Gulf Oil Corporation (the "Consortium").[14]  In 1974, the Republic of Ecuador ("ROE") acquired Gulf's interest through its state-owned oil company, Petroecuador.[15]  Petroecuador and the ROE became the majority owner of the Consortium in 1976.[16]

TexPet operated a trans-Ecuadorian oil pipeline and the Consortium's drilling activities until 1990, when Petroecuador assumed those functions.  Two years later, TexPet relinquished all of its interests in the Consortium, leaving it owned entirely by Petroecuador.[17]

---

[14]

   *See* Hendricks Decl. II Ex. 15.

[15]

   *Id.* Ex. 16.

[16]

   *Id.* Ex. 17.

[17]

   *Id.* Ex. 19; *Aguinda v. Texaco, Inc.*, 303 F.3d 470, 473 (2d Cir. 2002).

Thus, while the point is only parenthetical, it is interesting that any pollution that may have been released in the past eighteen or more years occurred after Texaco ceased operations in Ecuador.[18]

*The Beginning – the Aguinda Class Action in this Court*

Donziger explained the genesis of what ultimately became the Lago Agrio case during the filming for *Crude:*

> "I got involved in this lawsuit because I went to law school with a young man back in the early nineteen nineties, whose father is from Ecuador, and found out about this.  And his father is a sole practitioner, a lawyer in western Massachusetts, his name is Cristobal Bonifaz, and he started the case, along with his son, myself and the law firm – the Kohn law firm that's funding the case."[19]

The case they started[20] was *Aguinda v. Texaco, Inc.,* a Southern District of New York purported class action on behalf of inhabitants of the Ecuadorian rain forest – including as plaintiffs, it appears, all or most of the LAPs in the suit – that sought billions in damages for alleged personal injuries and property damage as a result of oil operations that allegedly "polluted the rain forests and rivers in

---

[18]

Others have commented on this fact.  According to an Ecuadorian media source, Petroecuador has been responsible for 1,415 environmental accidents in the Oriente region from approximately 2001-2009.  Hendricks Decl. II Ex. 21.  The president of Ecuador has stated publicly that "Petroecuador continues to contaminate" and has "dreadful environmental management practices." *Id.* Ex. 22, at 3.  Defendant Fajardo, one of the LAPs Ecuadorian lawyers, has stated that after Texaco discontinued operations, Petroecuador "has inflicted more damage and many more disasters than Texaco itself." *Id.* Ex. 23, at 2.  As will appear, the LAPs have not sued Petroecuador.

[19]

Hendricks Decl. I Ex. B, at 9.

[20]

Donziger, then two years out of law school, was one of the lawyers who represented the plaintiffs. *Aguinda* Cpt. at 38.

8

Ecuador."[21]  The plaintiffs asked for billions of dollars also to "redress contamination of the water supplies and environment."[22]  In addition, they sought "equitable relief to remedy the contamination and spoliation [*sic*] of [plaintiffs'] properties, water supplies and environment."[23] In other words, the complaint asked this Court to require Texaco to perform remediation work within Ecuador, another sovereign state.

Texaco promptly sought dismissal of the *Aguinda* action on the grounds, among others, of *forum non conveniens* and the failure to join the Republic of Ecuador and Petroecuador, which it argued were indispensable because (1) the requested equitable relief within Ecuador could not otherwise be ordered, and (2) Petroecuador's own actions would be at issue in the case.[24]  It argued, among other things, that Ecuador was an adequate and appropriate alternative forum.

As will appear, this Court ultimately dismissed the case on *forum non conveniens* grounds in 2001,[25] and the Second Circuit affirmed.[26]  Nevertheless, important events took place while the case was pending.

_____

[21]

    *Aguinda v. Texaco, Inc.*, 303 F.3d 470, 473 (2d Cir. 2002).

[22]

    *See Republic of Ecuador*, 376 F. Supp. 2d at 341.

[23]

    *Aguinda* Cpt. ¶ 90.

[24]

    Motion to dismiss, *Aguinda* DI 10, at 3.

[25]

    *See Aguinda*, 142 F. Supp. 2d 534.

[26]

    *See Aguinda*, 303 F.3d 470.

*Texaco Settles All Pollution Claims With Ecuador*

While the *Aguinda* litigation was pending in New York, TexPet in 1994 entered into a Memorandum of Understanding[27] and, in 1995, signed a settlement agreement with the ROE and Petroecuador (the "Settlement"). TexPet agreed to perform specified remedial environmental work in exchange for a release of claims by the ROE. The release, which covered TexPet, Texaco, and related companies, encompassed "all the Government's and Petroecuador's claims against the Releases for Environmental Impact arising from the Operations of the Consortium, except for those related to the obligations contracted" under the Settlement, which were to be "released as the Environmental Remedial Work is performed to the satisfaction of the Government and Petroecuador."[28] Moreover, the GOE represented that all of the claims asserted in the *Aguinda* action "belong[ed] to the government of the Republic of Ecuador under the Constitution and laws of Ecuador and under international law."[29] Thus, the release by Ecuador seems to have been intended to put an end to any claims or litigation concerning Texaco's alleged pollution.

Three years later, the ROE entered into an agreement with TexPet (the "Final Release") in which the ROE agreed that the Settlement had been "fully performed and concluded" and "proceede[ed] to release, absolve, and discharge" TexPet and related companies, including its successors, "from any liability and claims . . . for items related to the obligations assumed by

---

[27]

Hendricks Decl. II Ex. 32.

[28]

*Republic of Ecuador*, 376 F. Supp.2d at 341-42; Hendricks Decl. II Ex. 47.

[29]

Hendricks Decl. II Ex. 81.

10

TexPet" in the Settlement.[30]

*The Aguinda Plaintiffs and Lawyers Make A Deal With Ecuador*

The *Aguinda* plaintiffs were not idle in Ecuador while their case was pending in New York.  For one thing, they evidently were concerned about Texaco's claim that Ecuador was an indispensable party in view of the prayer for an equitable decree requiring environmental remediation in Ecuadorian territory.  They obtained Ecuador's agreement to advise this Court that it consented to the "execution in its territory of any environmental cleanup measures that the [Southern District] Court may order [Texaco] to perform."[31]  But there was a *quid pro quo*.

As spelled out in the formal agreement, dated November 20, 1996, between the plaintiffs and the Ecuadorian government, of the *Aguinda* plaintiffs and their lawyers waived any rights to (1) make any claims against Ecuador, Petroecuador, and affiliates thereof, and (2) to collect from Texaco any amount arising from an award by this Court to Texaco of contribution against Ecuador, Petroecuador or affiliates.[32]  In other words, they effectively agreed to reduce the amount of any judgment they might obtain against Texaco by the amount of any award of contribution Texaco might obtain against Ecuador, Petroecuador or affiliates.

*Ecuador's Environmental Management Act of 1999*

That was not the end of the collaboration among Ecuador, Donziger and his

---

[30]

    *Republic of Ecuador*, 376 F. Supp. 2d at 342; Hendricks Decl. II Ex. 46.

[31]

    Hendricks Decl. II Ex. 81.

[32]

    *Id.*

colleagues, and the *Aguinda* plaintiffs against Texaco.

In 1999, Ecuador enacted the Environmental Management Act of 1999 (the "EMA"), which among other things created a new private right of action for damages for the cost of remediation of environmental harms generally, as distinct from personal injuries or property damages to specific plaintiffs.[33] The EMA became the basis upon which the Lago Agrio case was brought.[34] And it is relevant to focus on the context in which the EMA was adopted.

By 1999, the *Aguinda* plaintiffs were litigating Texaco's motion to dismiss that case on the ground of *forum non conveniens*. They evidently understood, moreover, that Ecuador did not permit class actions or pretrial discovery and feared that class-wide tort claims such as those asserted in New York would not be entertained.[35]

When the Lago Agrio case was commenced in 2003, Cristobal Bonifaz – one of the lawyers with whom Donziger brought the *Aguinda* suit and in whose law office he worked at the time[36] – held a press conference in Ecuador. According to the Associated Press, Bonifaz indicated that "his team" had "worked with Ecuadorian lawyers to draft [the EMA] similar to the U.S.

---

[33]

Act 99-37, Registro Oficial No. 245, July 30, 1999.

[34]

The EMA (the Ley de Gestión Amiental in Spanish) is cited in the Lago Agrio complaint as creating a right on the part of natural persons and others to sue "for damage and loss and for health and environmental deterioration, including biodiversity." Hendricks Decl. II Ex. 86, at 13, 15.

[35]

*See* Defendant's reply memorandum of law at 5-12, *Aguinda v. Texaco, Inc.*, No. 93 Civ. 7527 (JSR) (S.D.N.Y. filed Jan. 25, 1999) [DI 142].

[36]

*See* Plaintiffs' reply memorandum of law at 14, *Aguinda v. Texaco, Inc.*, No. 93 Civ. 7527 (JSR) (S.D.N.Y. filed Apr. 24, 2000) [DI 151].

12

superfund law" and that those efforts were in preparation "for a possible move from U.S. courts."[37]

Accordingly, recognizing that this like all findings at this stage is provisional, the Court infers that the EMA was substantially drafted and its enactment procured by Bonifaz, Donziger and other American attorneys for the *Aguinda* plaintiffs. They did so because they feared losing the *forum non conveniens* motion in New York and being remitted to Ecuador, which had no class actions and thus no vehicle for the sort of giant toxic tort and other litigations common in the United States. They intended the EMA to provide a basis for suing in Ecuador to recover billions in damages in the absence of any other vehicle for doing so.

*The Lago Agrio Litigation – 2003–2008*

    *The Complaint*

As noted, the Court of Appeals affirmed the dismissal of the *Aguinda* case in 2001. In 2003, a group of Ecuadorians, including many of the *Aguinda* plaintiffs, sued Chevron and Texaco in Lago Agrio, Ecuador.[38] The complaint, brought on behalf of the LAPs, alleges environmental contamination by TexPet, Texaco's subsidiary, and Texaco in the years up to 1992. It states that Texaco was responsible for the activities of TexPet because it directed and controlled TexPet's operations and capitalized it in a manner designed to limit liability for any complaint

---

[37]     Hendricks Decl. II Ex. 83, at 2.

    The questions whether the EMA applies retroactively and, if so, breached Ecuador's obligations under the Texaco Settlement remain disputed.

[38]     *See id.* Ex. 86.

derived from its activities.[39]  The complaint went on to allege in conclusory terms that Texaco and

Chevron on October 9, 2001 merged into a "new company . . . replacing the previously mentioned

[Texaco and Chevron] with regard to all obligations and rights" and maintains that Chevron

therefore is subject to Texaco and TexPet liabilities.[40]  Consistent with the EMA, the complaint

sought remediation of alleged pollution said to remain in the region inhabited by the plaintiffs,

demanded judgment requiring that the necessary work be done, and sought health improvement and

medical monitoring of the inhabitants be done, at the expense of "the defendant."[41]

---

[39]

    *Id.* at § IV.

[40]

    *Id.* at § I, ¶12, § IV, ¶ 9.

    As a matter of U.S. law, the assertion that Chevron succeeded to Texaco's liabilities by merger is incorrect.  As appears in official public documents, a remote subsidiary of Chevron named Keepep Inc. merged with and into Texaco.  Texaco was the surviving corporation.  All of the pre-merger shares of Texaco were cancelled and those of Keepep, which had been owned directly or indirectly by Chevron, were converted into new shares of Texaco, making Chevron the direct or indirect holder of 100 percent of Texaco's shares.  Thus, Chevron did not succeed to any liabilities of Texaco by virtue of the merger itself.  *See* William J. Rands, *Corporate Tax: The Agony and the Ecstasy*, 83 Neb. L. Rev. 39, 51 n.76 (2004) ("[T]he reverse triangular merger prevents inchoate liabilities from flowing into an acquiring corporation"; because "the target is kept alive," "it is responsible for its own liabilities.").  Texaco, indeed, today is a Delaware corporation, as it has been since 1926.  Delaware Department of State: Division of Corporations, https://delecorp.delaware.gov/tin/controller (last visited Mar. 2, 2011).

    There are circumstances in which an acquiring company in a transaction structured like this one could be held liable for obligations of a subsidiary.  *E.g.*, *Saginaw Prop., LLC v. Value City Dept. Stores, LLC*, 08-13782, 2009 WL 3536616, *8-9 (E.D. Mich. Oct. 30, 2009) (acquirer in reverse triangular merger may be liable if "the transaction amount[ed] to a de facto merger" or the acquirer is a "mere continuation" of the target).  For present purposes, the Court expresses no view as to whether any of those circumstances is present here.  The only point, for the moment, is that Chevron did not succeed to obligations of Texaco by merger.

[41]

    Hendricks Decl. II Ex. 86, § VI.

The Lago Agrio litigation, though it was brought on behalf of similar and, in many cases, the same individuals, was a fundamentally different lawsuit than *Aguinda. Aguinda* sought predominantly damages for the plaintiffs and class members for injuries to person or property that each allegedly had suffered. The LAPs, however, sued in something akin to a *parens patriae* capacity to require the defendants to perform, or to pay the cost of performing, environmental and other remediation methods.

*Donziger's Role*

When the Lago Agrio case commenced in Ecuador, Ecuadorian lawyers naturally became involved. But Donziger too remained very much involved. In fact, his role was enormous. He became the fulcrum of the entire effort to use the Lago Agrio litigation to obtain a very large payment from Chevron. He has described himself as the "link to all of the work in the United States and all of the institutional history of the case."[42] In a 2006 book proposal, he described his role as follows:

> "I have been at the epicenter of the legal, political, and media activity surrounding the case both in Ecuador and in the U.S. I have close ties with almost all of the important characters in the story, including Amazon indigenous leaders, high-ranking Ecuadorian government officials, the world's leading scientists who deal with oil remediation, environmental activists, and many of Chevron's key players."[43]

He has confirmed that his role in the litigation was not confined to time he spent in Ecuador. His "work doesn't let up just because [he is] in the U.S., at all."[44] While he is in the United States, the

---

[42]

   Hendricks Decl. I Ex. A, CRS-027-16-05.

[43]

   Hendricks Decl. II Ex. 14, at 4.

[44]

   *Id*. Ex. 91 at 52; Ex. 4.

work continues to be "intense" as he finds "ways to increase the leverage and . . . cost to Chevron."[45]

In a telephone conversation about the same book deal, he assured the person with whom he spoke

that he, Donziger, is "so much a part of the story that it would be hard for someone to do a book

without [his] cooperation."[46]

> These descriptions are understatements. As this Court previously found, Donziger:
>
> "attempted to (1) intimidate the Ecuadorian judges, (2) obtain political support for the Ecuadorian lawsuit, (3) persuade the [Government of Ecuador] to promote the interests of the Lago Agrio plaintiffs, (4) obtain favorable media coverage, (5) solicit the support of celebrities (including Daryl Hannah and Trudie Styler) and environmental groups, (6) procure and package 'expert' testimony for use in Ecuador, (7) pressure Chevron to pay a large settlement, and (8) obtain a book deal."[47]

He was involved intimately in obtaining and formulating expert reports for submission in the Lago

Agrio case; seeking political support of the president of Ecuador, among others; procuring favorable

media coverage in the United States and elsewhere; and promoting critical attention to Chevron by

U.S. and New York State public officials, all for the purpose of pressuring Chevron to pay a

settlement. And while some of his activities occurred in Ecuador, many took place right here in

Manhattan.

> To be sure, some Ecuadorians were importantly involved in the Lago Agrio case as

well, most notably Pablo Fajardo and Luis Yanza. Fajardo is the lead attorney in the Ecuadorian

---

[45]     *Id.*

[46]     Hendricks Decl. I Ex. A, CRS-151-03-02.

[47]     *In re Chevron Corp.,* __ F. Supp.2d __, No. 10 Civ. 00002 (LAK), 2010 WL 4910248, at *3 (S.D.N.Y. Nov. 10, 2010), *aff'd sub nom. Lago Agrio Plaintiffs v. Chevron Corp.,* Nos. 10-4341-CV, 10-4405-CV, 2010 WL 5151325 (2d Cir. Dec. 15, 2010) (hereinafter "*Chevron II*").

16

courts on behalf of the LAPs.  Yanza is the co-founder of the Amazon Defense Front (the "ADF"), a supposedly non-profit organization that purports to represent the LAPs and that seeks to be charged with administering any part of the judgment recovered against Chevron that does not go to the ROE or other defendants (i.e., the lawyers).[48]  The evidence establishes that Donziger, Fajardo, Yanza and the ADF have worked closely together at all relevant times.

*Early Stages*

*The Initial Criminal Investigation – An Attempt to Defeat the Settlement*

In 2003, the same year in which the Lago Agrio litigation was filed, the Comptroller General of the ROE filed a *denuncia* against TexPet lawyers, Rodrigo Pérez Pallares ("Pérez") and Ricardo Reis Veiga ("Veiga"), and former ROE and Petroecuador officials.  It alleged that they had falsified public documents in connection with the Settlement and Final Release and had violated Ecuador's environmental laws.  At least one purpose of doing so quickly became clear.

In 2004, the Ecuadorian Prosecutor General began an investigation of the criminal charges.  The Ecuadorian Deputy Attorney General explained in an email to one of the LAPs' counsel in the Lago Agrio litigation that the criminal prosecutions were potentially a "way to nullify or undermine the value of the" Settlement and Final Release [of Texaco], though "evidence of criminal liability established by the Comptroller [General's] Office was rejected by the prosecutor."[49]

---

[48]

See Judgment (English translation), Provincial Court of Justice, Feb. 14, 2011 [DI 168], at 187 (hereinafter "Judgment").

[49]

Hendricks Decl. II Ex. 224A, at 1-2.

During this period, Donziger, Bonifaz, and others worked to encourage the ROE to bring criminal fraud charges against Pérez and Veiga.[50]  Two years later, however, the District Prosecutor found that "there [was] not sufficient evidence to pursue the case against . . . Mr. Ricardo Reis Veiga and Mr. Rodrigo Pérez Pallares, representatives of TEXPET."[51] As we shall see, the same District Prosecutor in his subsequent capacity as national Prosecutor General and after the political winds in Ecuador had changed, later decided to reopen the criminal investigation and charge Pérez and Veiga with the same allegations that he previously had dismissed for lack of evidence.

### The Early Expert Inspections

In the early stages of the Lago Agrio litigation, the court directed the parties to investigate and report jointly on conditions at a number of former consortium production sites.[52]

The LAPs selected Dr. Charles Calmbacher to act as their expert in charge of the inspections and to report on some of the sites.  In early 2005, they filed reports in his name for two of those sites, each purporting to show extensive environmental damage.[53]  Although it appears to have been unknown either to Chevron or the court at the time, it later became clear, as discussed below,  that the reports the LAPs filed over Calmbacher's name were entirely false and fraudulent.

---

[50]

*See id.* Exs. 223, 228A.

[51]

*Id.* Ex. 11, at 10.

[52]

Hendricks Decl. I Ex. EE, ¶ 44.

[53]

*In re Chevron Corp.,* No. 1:10-MI-0076-TWT-GGB, Order, at 2 (N.D. Ga. Mar. 2, 2010).

18

In any case, however, events began to move in additional and important directions.

### Donziger Solicits Berlinger to Make Crude

As this Court wrote previously:

"In 2005, Steven Donziger, one of the lead counsel for the plaintiffs in the Lago Agrio Litigation, solicited award-winning producer and filmmaker Joseph Berlinger to create a documentary depicting the Lago Agrio Litigation from the perspective of his clients. Berlinger recounted that:

"During the summer of 2005, a charismatic American environmental lawyer named Steven Donziger knocked on my Manhattan office door. He was running a class-action lawsuit on behalf of 30,000 Ecuadorian inhabitants of the Amazon rainforest and was looking for a filmmaker to tell his clients' story."[54]

Principal photography begin in November 2005. "For the next three years, Berlinger shadowed the plaintiffs' lawyers and filmed 'the events and people surrounding the trial,' compiling six hundred hours of raw footage."[55] As will appear, Berlinger's appearance on the scene eventually had a huge impact on the Lago Agrio litigation and related matters.

### The Global Assessment – The Cabrera Report

In 2006, just after Berlinger began filming, the LAPs asked the Lago Agrio court to end the judicial inspection process in which Dr. Calmbacher had participated.[56] They later petitioned for the appointment of an expert for a "global assessment" of the alleged environmental

---

[54]

*In re Chevron Corp.*, 709 F. Supp.2d 283, 287 (S.D.N.Y.), *aff'd sub nom.*, *Chevron Corp. v. Berlinger*, ___ F.3d ___, 2011 WL 102671 (2d Cir. 2010) (hereinafter "*Chevron I*").

[55]

*Id.*

[56]

Hendricks Decl. II Exs. 144, 145.

effects,[57] which was intended to complete the "final evidentiary phase" of the litigation.

On March 19, 2007, the Ecuadorian court appointed a supposedly neutral and independent Ecuadorian expert, Richard Stalin Cabrera Vega ("Cabrera"), to make the global assessment.[58] Cabrera was sworn on June 13, 2007, with "responsibil[ity] for the entire report, the methodology used, for the work done by his assistants, etc. He understood that he was obliged to "perform his duties faithfully and in accordance with science, technology, and the law, with complete impartiality and independence vis-à-vis the parties."[59]

On March 28, 2008, Cabrera set the amount of damages at $16 billion and filed his report several days later.[60] Chevron questioned his independence. Fajardo and others on the LAP side defended it in public statements. For example, in an April 3, 2008 press release issued by the ADF and Amazon Watch, Fajardo stated, "Chevron's claim that Professor Cabrera is cooperating with the [Lago Agrio] plaintiffs is completely false" and "Chevron is frightened by Cabrera precisely because he is an independent and credible expert."[61] Kohn made the same claim regarding Cabrera's independence in an interview on Fox News during the following month.[62] Chevrontoxico.com, a website sponsored by the LAPs regarding the litigation, described Cabrera

---

[57]
    *Id.* Ex. 146.

[58]
    *Id.* Ex. 150, at 2.

[59]
    *Id.* Ex. 154, at 3.

[60]
    In November 2008, he raised the figure to $27 billion. *Id.* Ex. 251.

[61]
    *Id.* Ex. 252, at 2.

[62]
    *Id.* Ex. 253.

as an "independent" expert,[63] along with issuing other press releases and public statements made on behalf of the LAPs.[64]  As will appear, these statements were false.

At that point, the parties had the opportunity to comment on the Cabrera report.  The LAPs hired Stratus Consulting, Inc. ("Stratus") to prepare comments on the Cabrera report, which were submitted to the Lago Agrio court on December 1, 2008.[65]  Amazon Watch and the ADF issued a press release describing Stratus's endorsement of the Cabrera report.[66]

As will appear, Cabrera was anything but independent and Stratus, in purporting to comment on Cabrera's work, in fact was commenting on its own – it actually had written all or most of the Cabrera report.

*The Release of Crude Leads to U.S. Discovery Revealing Misconduct*

*The Release of Crude*

*Crude* was released in early 2009.  According to its press package, it "'captures the evidentiary phase of the Lago Agrio trial, including field inspections and the appointment of independent expert Richard Cabrera to assess the region.'  The film depicts also the environmental damage allegedly caused by TexPet and interviews with Ecuadorians dying of diseases perhaps

---

[63]

*Id*. Ex. 251.

[64]

*See id*. Exs. 255, 257, 274.

[65]

*See id*. Ex. 201.

[66]

*See id*. Ex. 255.

caused by oil spills."[67]   The Court has described a few key scenes elsewhere and incorporates that description here:

> "A.      Plaintiffs' Counsel Meets with Expert Witness
>
> "Crude contains footage of a number of meetings that took place in the Dureno community of the indigenous Cofan people.  A version of Crude 'streamed' over Netflix depicts one such meeting, at which Dr. Beristain, an expert who contributed to Cabrera's neutral damages assessment, is shown working directly with both the Cofan people and plaintiffs' counsel.  Berlinger, however, altered the scene at the direction of plaintiffs' counsel to conceal all images of Dr. Beristain before Crude was released on DVD.  The interaction between plaintiffs' counsel and Dr. Beristain therefore does not appear in the final version of Crude sold on DVD in the United States.
>
> "B.      Plaintiff's Counsel Interferes with Judicial Inspection
>
> "In another scene of Crude, Donziger, one of plaintiffs' lead counsel, persuades an Ecuadorian judge, apparently in the presence of Chevron's lawyers and news media, to block the judicial inspection of a laboratory allegedly being used by the Lago Agrio plaintiffs to test for environmental contamination.  Donziger describes his use of 'pressure tactics' to influence the judge and concedes that '[t]his is something you would never do in the United States, but Ecuador, you know, this is how the game is played, it's dirty.'
>
> "C.      Plaintiffs' Representatives Meet with the Ecuadorian Government
>
> "In another scene, a representative of the plaintiffs informs Donziger that he had left the office of President Correa 'after coordinating everything.'  Donziger declares, 'Congratulations.  We've achieved something very important in this case . . . . Now we are friends with the President.'  The film then offers a glimpse of a meeting between President Correa and plaintiffs' counsel that takes place on a helicopter.  Later on, President Correa embraces Donziger and says, 'Wonderful, keep it up!'
>
> "Donziger explains also that President Correa had called for criminal prosecutions to proceed against those who engineered the Settlement and Final Release.  'Correa just said that anyone in the Ecuador government who approved the

---

[67]   Chevron I, 709 F. Supp.2d at 289.

22

so-called remediation is now going to be subject to litigation in Ecuador.  Those guys are shittin' in their pants right now.'"[68]

While all of these sequences shed light on events in Ecuador, the revelation that Dr. Beristain, a contributor to Cabrera's supposedly independent global assessment, had been  at a meeting with plaintiffs and plaintiffs' counsel – a matter raising a question about Cabrera's independence – was of particular concern.  That was especially so in light of the fact that the images of Dr. Beristain at that meeting that were in a Netflix version had been edited out of the version released on DVD.

These and perhaps other circumstances caused Chevron during the first quarter of 2010 to begin seeking discovery under 28 U.S.C. § 1782 from American witnesses thought to have knowledge of pertinent facts.  In a series of proceedings around the country, Chevron obtained, among other things, the outtakes from *Crude* – the video segments that did not make it into the film as released – as well as documents and testimony from Donziger, Stratus, and others.  The information gained in the Section 1782 proceedings is remarkably informative about the Lago Agrio litigation and related matters bearing heavily on this motion and it provides a significant part of the evidentiary record.

*Dr. Calmbacher Disavows Report the LAPs Filed Over His Name*

As previously noted, Dr. Charles Calmbacher had been selected by the LAPs to act as their expert in charge of the inspections and to report on some of the sites.  In early 2005, they filed reports in his name for two of those sites, each purporting to show extensive environmental

---

[68]      *Id.*

damage.   In early 2010, in one of Chevron's first Section 1782 proceedings, Dr. Calmbacher

testified as follows:

> "Q . . . To the extent that someone took this signature page that is currently attached
> at the last page of Exhibit 12 and attached it to this report and represented to the
> Court in Lago Agrio that you had written this report and reached these conclusions,
> that would be false, correct?   A. That's correct. I did not reach these conclusions and
> I did not write this report."[69]

> "Q. So the conclusions in the expert report for Shushufindi 48, Exhibit 13, to the
> extent they're presented to the Court as conclusions you reached, that presentation
> would be false, correct? A. Correct."[70]

> "Q. Did you ever find that any of the sites that you inspected required any further
> remediation? A. No."[71]

> "Q. While you were working as a judicial inspection expert for the plaintiffs, did you
> ever conclude that TexPet had failed to adequately remediate one of the sites?  A. I
> didn't no."[72]

Dr. Calmbacher made clear that he had "discussed what [his] findings were on this site and others"

with Donziger and believes that Donziger would have known that the reports submitted over

Calmbacher's name had not been authorized by Calmbacher.[73]  Donziger even told another member

of the legal team via e-mail that Dr. Calmbacher "will still sign the [expert] reports," but the LAPs

---

[69]
　　　Hendricks Decl. II Ex. 136, at 116:9-10.

[70]
　　　*Id.* at 117:16-20.

[71]
　　　*Id.* at 113:23-25.

[72]
　　　*Id.* at 115:15-19.

[73]
　　　*Id.* at 118:15-119:1.

team "might have to write [the reports] in Quito."[74]  Dr. Calmbacher testified as well that Donziger told him that "he wanted the answer to be that there was contamination and people were injured . . . [b]ecause it makes money.  That's what wins his case."[75]

The LAPs terminated Dr. Calmbacher.  There perhaps is bad feeling between them.  Nevertheless, his testimony is evidence that persons acting on behalf of the LAPs prepared reports expressing views contrary to Calmbacher's and submitted those fictitious reports to the Lago Agrio court over his name.   Perhaps there is a different explanation.  But neither Donziger nor any other knowledgeable person on the LAP side has submitted an affidavit or other sworn proof – timely or not – denying Calmbacher's assertions or offering any explanation.

*The Cabrera Report Exposed*

The outtakes and other Section 1782 discovery yielded a great deal of evidence about Cabrera's appointment and the preparation of his purported report..

*Cabrera's Appointment*

There is substantial evidence of irregularity relating to the appointment and independence of Cabrera.

At about the time of the petitions to terminate the inspections and obtain a global assessment by an "independent" court appointee, the Ecuadorian judge, according to an e-mail from

---

[74]

*Id.* Ex. 140.

[75]

*Id.* Ex. 136, at 92:2-11.

Donziger to Yanza, was "on his heels from . . . charges of trading jobs for sex in the court."[76] Donziger and the LAPs lawyers drafted a complaint against the judge. Before the complaint was filed, Fajardo, in consultation with Donziger, met *ex parte* with the judge concerning the pending request to terminate the previously ordered inspections in favor of the proposed "global assessment."[77] Fajardo left the meeting with the belief that the judge wanted "to forestall the filing of a complaint against him by the" LAPs and the view that the LAPs' prospects with respect to obtaining the global assessment were "looking better."[78]

Fajardo had other *ex parte* meetings with the judge concerning the appointment. The *Crude* outtakes reveal Fajardo talking about the global assessment before Cabrera was appointed and stating that he had a pretty good idea of who would be appointed.[79] Donziger boasted in the outtakes that Cabrera "never would have [been appointed] had we not really pushed him."[80] The outtakes confirm also that the LAPs knew in advance that Cabrera would be the appointee.[81] Then, not long after Cabrera was appointed and sworn in, Yanza e-mailed Donziger that he had met with

---

[76]

Hendricks Decl. II Ex. 149.

[77]

In the course of the conversation, the judge mentioned that Texaco lawyers had seen him previously on this point, presumably also *ex parte.*

[78]

*Id.*

[79]

*Id.* Ex. 1, CRS-158-02-06.

[80]

*Id.* Ex. 1, CRS-361-11-01.

[81]

As is discussed in greater detail below, Donziger and Fajardo held a meeting on March 3, 2007, more than two weeks before Cabrera's appointment, with Cabrera and LAP environmental consultants to plan the report that Cabrera would issue.

Cabrera and that "everything [wa]s under control.  We gave him some money in advance."[82]

Further, Donziger testified in a Section 1782 deposition in this Court:

> "Q     Did you tell Mr. Cabrera that if he served as the global court expert and the plaintiffs won the case that he would have a job the rest of his life being involved in the remediation; did you tell him that?
>
> "A     I might have.  I don't remember."[83]

While the evidence is not conclusive and certainly would be open to further examination at trial, the foregoing suggests at least the possibilities that (1) the judge agreed to the global assessment in general and to appoint Cabrera in particular in exchange for the LAPs' agreement not to file a complaint against the judge, and (2) Cabrera, the supposedly independent court appointee, was paid money up front and promised future consideration by the LAPs in the event they prevailed.  In the absence of any affidavit or other evidence from Donziger or Fajardo pointing to a different conclusion on these points, the Court concludes, solely for purposes of this motion, that Chevron has demonstrated at least serious questions as to the accuracy of each of the foregoing propositions.

### The LAPs Ghost-Wrote All or Much of Cabrera's  Report

On March 3, 2007, Donziger and Fajardo held a meeting with Cabrera and LAP environmental experts, including Stratus, for the purpose of planning the report to which Cabrera eventually would attach his name.

The *Crude* outtakes reveal that Fajardo on that occasion informed the group that the

---

[82]

    *Id.* Ex. 463.

[83]

    *Id.* Ex. 6, at 993:12-19.

goal of the meeting was to "define the general structure of [the] global expert assessment."[84] Donziger later clarified that the plaintiffs' work plan would involve not only evidence and remediation, but also writing the expert's opinion.[85]

At the meeting, Fajardo made a PowerPoint presentation that outlined the *Plan Para Examen Pericial Global,* or Plan for the Global Expert Assessment.[86]  He emphasized to those present that everyone would contribute to the report, explaining:  "And here is where we do want the support of our [i.e., the LAPs'] entire technical team . . . of experts, scientists, attorneys, political scientists, so that all will contribute to that report – in other words – you see . . . *the work isn't going to be the expert's.  All of us bear the burden*."[87]  Someone asked whether the final report would be prepared only by the expert.  Fajardo responded that the expert would "sign the report and  review it. But all of us . . . have to contribute to that report."[88]  Defendant Ann Maest of Stratus said, "Together?," which Fajardo confirmed.  Maest then stated, "But not Chevron," a comment met with widespread laughter.[89]

In the afternoon session, the group discussed the "work plan," the first document that

---

[84]
    *Id.* Ex. 2, at 175.

[85]
    *Id.* Ex. 1, CRS-189-00-02.

[86]
    *Id.*, CRS-187-01-02.

[87]
    *Id.*, CRS-191-00-03 (emphasis added).

[88]
    *Id.*

[89]
    *Id.*

Cabrera would be required to sign and file with the Ecuadorian court.[90]  Donziger proposed that he

and the U.S.-based consultants form a "work committee" to present a "draft plan" in a few days.[91]

Looking at Cabrera, Donziger then said, "and Richard, of course you really have to be comfortable

with all that. And we'll also define the support the expert needs."[92]  The recording of the meeting

ended with Donziger commenting, "We could jack this thing up to $30 billion in one day."[93]

Donziger later confirmed at his deposition that the LAPs' own experts provided Cabrera with a work

plan that he later submitted to the court, ostensibly as a product of his own work.[94]

Outtakes recorded on the following day reveal that Donziger made clear to one of the

Stratus consultants that everything the plaintiffs were doing was to be concealed from Chevron, his

"goal [being] that they don't know shit."[95]  During the same lunch, the Stratus consultants told

Donziger that there was no evidence that contamination from the pits had spread into the

surrounding groundwater.  Donziger responded in quite memorable fashion:

> "*You can say whatever you want and at the end of the day, there's a thousand people around the courthouse, you're going to get what you want,*" and "[t]herefore, if we take our existing evidence on groundwater contamination, which admittedly is right

---

[90]

    *Id.*, CRS-189-00-02.

[91]

    *Id.*

[92]

    *Id.*

    It is interesting, and possibly significant, that Donziger and Cabrera, soon to be appointed the neutral and impartial expert, already were on a first-name basis.

[93]

    *Id.*, CRS-193-00-01.

[94]

    *Id.* Ex. 6, at 2165:2-8, 2203:4-6, 2406:7-11.

[95]

    *Id.* Ex. 1, CRS-196-00-01.

below the source . . . [a]nd wanted to extrapolate based on nothing other than our . . . theory," then "[w]e can do it.  And we can get money for it."[96]

He went on:

"*[T]his is all for the Court just a bunch of smoke and mirrors and bullshit.*"[97]

And when one consultant argued that "there [wa]s not enough information on that groundwater" and that "the one hole in the remediation, [wa]s the water," Donziger broke off the discussion, stating, "There's another point I got to make to these guys, but I can't get this on camera."[98]  The recording then ended.

This was not the only occasion during that lunch on which Donziger went "off the record."  When one expert commented that it had been "bizarre" to have had Cabrera present at the meeting the day before, Donziger instructed the expert not to talk about that fact and told the camera operator that those comments were off the record.[99]  The expert elaborated that he was surprised that there had been a meeting during which "everything" had been laid out while the expert was present.[100]

Donziger and his team continued to "lay everything out" for Cabrera.  But before they

---

[96]      *Id.*, CRS-195-05-01 (emphasis added).

[97]      *Id.* (emphasis added).

[98]      *Id.*

[99]      *Id.*, CRS-196-00-01.

[100]      *Id.*

did that, they discussed planning what Cabrera could do "to prove his independence."[101]   In the meantime, Donziger worked with David Chapman of Stratus, among others, to determine how Stratus would do "much of the work, putting the pieces together and writing the report."[102]

Evidence indicates that Doug Beltman, other Stratus consultants, and subcontractors outlined[103] and drafted substantial portions of the Cabrera report and many of its annexes[104] and supervised their translation into Spanish[105] until the document eventually was signed by Cabrera and submitted to the court.  In January 2008, Donziger, Yanza, Fajardo, Beltman, and Maest met secretly with Cabrera, likely to discuss the report that was being prepared for him to sign.[106]   In March 2008, Ecuadorian counsel for the LAPs "conveyed a substantial amount of information prepared by Stratus to Cabrera and may not have contemporaneously advised Chevron (or the Court) of that submission."[107]   E-mail exchanges among Donziger, Beltman, and other Stratus consultants confirm

---

[101]

*Id.* Ex. 152, at 1.

[102]

*Id.* Ex. 157, at 1.

[103]

*See e.g.*, *id.* Exs. 163-164.

[104]

*See e.g.*, *id.* Exs. 165-166, 168-170, 179, 182.

[105]

*See e.g.*, *id.* Exs. 173, 175-177, 180, 355-357.

[106]

*Id.* Ex. 6, at 2243:7-10, 2245:2-10.

[107]

*Id.* Ex. 12, at 3.

In discussing this exchange of information, one U.S. lawyer stated:

"Stratus did put out a statement about its views on the Cabrera report which never disclosed its substantial role and, indeed, went to great lengths to praise the report at arms length. Cabrera, for his part, never mentions Stratus by name.  I think these facts are bad for us . . ."  *Id.*

that Stratus drafted substantial portions of the Cabrera report and its annexes.[108]  An outline of the

expert report includes a table that assigns each annex to a member of the Stratus team.  There is a

note below the table which reads: "need to figure out to whom Richard [Cabrera] will attribute each

of the annexes,"[109] thus implying that the annexes would be supplied to Cabrera, but not attributed

to the people who actually wrote them.  A few weeks before the Cabrera report was submitted,

Beltman sent Donziger a draft of the report for Donziger's feedback.[110]  And it appears to have been

Beltman, copying Maest, who sent a complete draft of the report with Cabrera's name, in English,

to a translation service less than three weeks before the report was filed.[111]

        If there were any doubt as to the implication of this evidence, it was removed at

Donziger's deposition where he admitted that Cabrera had "adopted pretty much verbatim what had

been provided to him by Stratus.[112]  Indeed, he testified:

> "Q     Was it agreed that Stratus would draft the report in a form that could
> be submitted directly to the Ecuadorian court by Mr. Cabrera?
>
> "A     I don't have a specific recollection, but I think that was the general
> idea."[113]

---

[108]

    *See id.* Exs. 147, 352-354, 356, 358-359, 361-364.

[109]

    *Id.* Ex. 147, at 9.

[110]

    *Id.* Ex. 170.

[111]

    *Id.* Ex. 176.

[112]

    *Id.* Ex. 6, at 2433:9-14.

[113]

    *Id.* at 2253:5-11.

    Fajardo, for his part, admitted in an e-mail to Donziger and others that the LAPs "worked
in collusion with expert Cabrera."  *Id.* Ex. 258.

As the facts concerning the ghost writing of the Cabrera report first threatened to come and then came out in the Section 1782 proceedings, at least some on the Lago Agrio side became deeply concerned. One of the LAPs' Ecuadorian lawyers wrote to Donziger that the "effects" of disclosure could be "potentially devastating in Ecuador (apart from destroying the proceeding, all of us, your attorneys, might go to jail)[.]"[114]  Moreover, although time does not permit detailed discussion of the evidence, there is extensive evidence that counsel for the LAPs and Donziger made Herculean and perhaps questionable efforts in the Section 1782 proceedings to prevent or delay the disclosure of material proving the roles of Stratus and other U.S. consultants in the Cabrera report.[115]

### *The "Cleansing" Operation*

The disclosures concerning Stratus' ghost writing of all or much of the Cabrera report created a substantial problem for the LAPs and their lawyers. This led Donziger and lawyers from Patton Boggs and Emery Celli, which also represent the LAPs in United States Section 1782 proceedings, to brainstorm about submitting to the Ecuadorian court a new expert report that would appear to be independent but that would be premised on the data and conclusions purportedly

---

[114]
　　*Id.* Ex. 11.

[115]
　　*See e.g., id.* Exs. 292 ("What about the following? Appeal; move for stay; if we win with [district judge] great; if we lose, we produce whatever we want (narrow read); gd complains and then we move for clarification.  If we lose again, we think about another appeal."), 323 ("I think we should appeal on the theory that we gain a greater advantage by fighting [Chevron] on everything, and tying them up, than in conceding any one thing even if we expect to ultimately lose that one thing down the road. I could be convinced otherwise but I think it important we adhere to that fundamental principle of our strategy as outlined by Jim at the meeting a few weeks ago."); 388 (discussion of ways to "buy time"); 527 ("Yes, we will admit [the submission of Stratus documents to Cabrera], but the timing is critical and it must come out after the Ecuador filing and not before for several reasons").

reached by Cabrera.  This effort to "cleanse" the Cabrera report is detailed in an August 2010 e-mail, approximately one month before the new report was submitted to the Lago Agrio court:

> "[O]ur new expert will most likely rely on some of the same data as Cabrera (and come to the same conclusions as Cabrera) . . . We probably wouldn't want to draw that much attention to Cabrera, but we should think about whether our expert might address Cabrera's findings in such a subtle way that someone reading the new expert report (the Court in Lago or an enforcement court elsewhere) might feel comfortable concluding that certain parts of Cabrera are a valid basis for damages."[116]

> "With Cabrera as a starting point, identify the data/evidence he used to support his numbers – Have our expert review this analaysis and hopefully agree with some of his conclusions.  More importantly however, we need to help the expert identify other sources in the record – ultimate conclusion could be higher or lower than Cabrera, and potentially based on a mixture of sources from Cabrera and the other record evidence we identify[.]"[117]

Although the e-mail states that the attorneys would attempt to "find support from other evidence not relied upon by Cabrera, . . . independent credible evidence," it identified a plan to involve Beltman of Stratus – the U.S. environmental consultant who was instrumental in outlining and ghostwriting the Cabrera report.[118]

New reports were obtained and submitted.[119]  Nevertheless, the new consultants largely reviewed certain sections of the Cabrera report rather than conduct their own independent

---

[116]
    *Id.* Ex. 214, at 1.

    Although the LAP representatives contemplated hiring one new expert they hired the Weinberg Group, another scientific consulting firm, and subcontracted with several new experts.

[117]
    *Id.* at 3.

[118]
    *Id.* at 2.

[119]
    *Id.* Exs. 215, 262.

34

fact finding.[120]  Nearly all of the new experts completed their reports in less than a month without (1) visiting Ecuador, (2) conducting any new site inspections, (3) taking any new samples, (4) conducting any other form of environmental testing, or (5) taking steps independently to verify the data in the Cabrera report or other findings upon which they relied.[121]

* * *

While the evidence necessarily is incomplete, the record before the Court indicates the likelihood that (1) the concept of a global assessment by a court appointed expert and the selection in particular of Cabrera was accepted by the Ecuadorian court in order to forestall the filing by the LAPs of a complaint against the judge relating to a "sex for jobs" scandal, (2) Cabrera was not at all independent of the LAPs, as he had been selected, paid some money, and promised future compensation by them if they won, (3) the Cabrera report in fact was planned by Fajardo and other LAP representatives and, at least in substantial part, written by Stratus, (4) at the LAPs' request, Stratus submitted to the court comments on the purported Cabrera report without disclosing that Cabrera in at least major respects was not the author and that much of the report on which they purported to comment had been written by Stratus itself, (5) Cabrera, Fajardo, and the ADF, and others on the LAP side falsely represented to the Lago Agrio court and to the world at large that

---

[120]

     *Id.* Ex. 215.

     Donziger later testified that the Lago Agrio plaintiffs requested permission to submit new export findings as an "argument" that could be used to end U.S. discovery proceedings related to the Cabrera report.  *Id.* Ex. 6, at 2331:15-19, 2337:16-21.

[121]

     *See id.* Exs. 199 (Allen Dep.) 164:7-25, 166:3-13, 171:18-172:3, 225:1-5, 229:14-22; 217 (Barnthouse Dep.) 52:2-10, 130:3-19, 164:25-165:25; 219 (Shefftz Dep.) 60:6-17, 129:21-129:7; 220 (Picone Dep.) 224:17-225:2; 221 (Scardina Dep.) 225:5-20, 263:1-264:2, 264:8-20, 267: 17-268:19, 269:16-270:16, 276:14-20. *See also id.* Ex. 6 (Donziger Dep.), 1652:17-1653:17.

Cabrera was completely independent, and (6) when the provenance of the Cabrera report came out

in the Section 1782 proceedings, the LAPs procured and submitted as new and independent analyses

reports from still other consultants who had not visited Ecuador, conducted any site inspections, nor

obtained any samples for this purpose, and had relied upon data in the discredited Cabrera report.

For purposes of this motion, the Court so finds.

*The LAPs' Use of Pressure Tactics and Political Influence in this Case*

Given what has been said already, it is not surprising that the LAPs, through their

lawyers and others, resorted to pressure tactics directed at the Ecuadorian courts as well as political

influence to achieve their objectives.

*Intimidation of the Ecuadorian Judges*

We have seen already that the LAPs, through Fajardo, brought pressure to bear on

the Lago Agrio judge to secure adoption of their proposal for a global assessment and the selection

of Cabrera as the court-appointed expert.  But they did not stop there.

Donziger has served as the field general in what he describes in the *Crude* outtakes

as a "political battle . . . being played out through a legal case,"[122] a view that dovetails with his

assessment of the Ecuadorian court system as corrupt and driven by politics.  Donziger's activities

in the United States and Ecuador have gone far beyond the rendition of professional legal services.

Donziger, Fajardo, Yanza and the ADF have orchestrated a campaign to intimidate the Ecuadorian

judiciary.  According to Donziger, it has been important to mobilize the country politically "[s]o that

---

[122]
     *Id*. Ex. 1, CRS-060-00-04.

no judge can rule against [the plaintiffs] and feel like he can get away with it in terms of his career."[123]  Donziger directed a member of the Ecuadorian legal team to "prepare a detailed plan with the necessary steps to attack the judge through legal, institutional channels and through any other channel [he could] think of."[124]

One example depicted in part in *Crude* shows Donziger and other LAP representatives traveling to an *ex parte* meeting with a judge on March 30, 2006.  Prior to the meeting, Donziger described his plan to "intimidate," "pressure," and "humiliate" the judge:

> "The only language that I believe this judge is going to understand is one of pressure, intimidation and humiliation.  And that's what we're doing today.  We're going to let him know what time it is. . . . As a lawyer, I never do this.  You don't have to do this in the United States.  It's dirty. . . . It's necessary.  I'm not letting them get away with this stuff."[125]

Donziger repeatedly referred to the Ecuadorian judicial system as "weak," "corrupt," and lacking integrity. He further explained to the camera on multiple occasions:

> "The judicial system is so utterly weak. The only way that you can secure a fair trial is if you do things like that.  Like go in and confront the judge with media around and fight and yell and scream and make a scene.  That would never happen in the United States or in any judicial system that had integrity."[126]

> "They're all [i.e., the Ecuadorian judges] corrupt!  It's – it's their birthright to be corrupt."

---

[123]

    *Id.*, CRS-032-00-01.

[124]

    *Id.* Ex. 96.

[125]

    *Id.* Ex. 1, CRS-052-00-06.  This is not the first time that Donziger deployed such a strategy. When an Ecuadorian judge would not allow Donziger to appear in court because he did not have his passport.  Donziger instructed an Ecuadorian attorney to lie and say that the judge called Donziger a "gringo." Hendricks Decl.I Ex. A., CRS-046-02-01.

[126]

    Hendricks Decl. I Ex. A, CRS-053-02-01.

"You can solve anything with politics as long as the judges are intelligent enough to understand the politics . . . .  [T]hey don't have to be intelligent enough to understand the law, just as long as they understand the politics."[127]

"[I]t's a problem of institutional weakness in the judiciary, generally, and of this court, in particular . . .We believe they make decisions based on who they fear the most, not based on what the law should dictate."[128]

### The Plan to Pressure the Court With an "Army"

Among the events filmed by the *Crude* crew was a conversation between Donziger and Fajardo in which Donziger and Fajardo discussed the need to "be more and more aggressive" and to "organize pressure demonstrations at the court."  In the same clip, Donziger referred to the litigation as a "matter of combat" that requires "actually . . . put[ting] an army together."[129]

The outtakes captured a June 6, 2007 meeting in which Donziger outlined a strategy to pressure the Ecuadorian court.  Donziger told those present that the LAPs needed to "do more politically, to control the court, to pressure the court" because Ecuadorian courts "make decisions based on who they fear most, not based on what the laws should dictate."[130]  Donziger expressed concern that no one feared the plaintiffs, and he stated that the plaintiffs would not win unless the courts began to fear them.[131]  He described also his desire to take over the court with a massive

---

[127]    Hendricks Decl. II Ex. 1, CRS-129-00-02.

[128]    *Id.*, CRS-350-04-01.

[129]    *Id.*, CRS-346-00-02.

[130]    *Id.*, CRS-350-04-01.

[131]    *Id.*

protest as a way to send a message to the court of "don't fuck with us anymore – not now, and not – not later, and never."[132]   He then proposed raising "our own army" to which Yanza interjected "a specialized group . . . for immediate action."[133]   During this exchange, Atossa Soltani of Amazon Watch said, "I just want you to know that it's . . . illegal to conspire to break the law" to which Donziger said, "No law's been conspired to be broken."[134]   The conversation about raising an army to pressure the court then continued, with Yanza waving the camera away as he told Donziger that the "army"could be supplied with weapons.[135]

       Two days later, speaking directly to the camera, Donziger continued to emphasize the importance of pressuring the judge in the Lago Agrio litigation.   According to Donziger, the plaintiffs' "biggest problem" had been their inability to pressure the judge.   He explained that suing Chevron for moral damages or pressuring the Prosecutor General to open criminal investigations was not sufficient to make the judge feel pressure.[136]   Donziger asserted that the plaintiffs needed to do things that the judge would "really feel" such as being "called out" by the president of the country or the supreme court, implying that Donziger and others could develop strategies that would result in such actions.[137]

---

132

     *Id.*

133

     *Id.*, CRS-350-04-02.

134

     *Id.*

135

     *Id.*

136

     *Id.*, CRS-376-04-01.

137

     *Id.*

Later that month, Donziger asked Berlinger and his crew to film the LAPs' "private 'army,'" which he characterized as being "very effective" because "it followed a Texaco lawyer into the judge's chambers and had a confrontation"– "a critical part of [the] strategy . . . allowing the case to go forward . . ."[138]

*Killing the Judge?*

Finally, Donziger participated in a dinner conversation about what might  happen to a judge who ruled against the LAPs.  One or more other participants in the conversation suggested that a judge would be "killed" for such a ruling.  Donziger replied that the judge "might not be [killed], but he'll think – he thinks he will be . . . which is just as good."[139]  The comment reveals at least Donziger's desire to benefit from fear engendered in the Ecuadorian judges.

*Political Influence to Use the Criminal Process Against Former TexPet Lawyers to Extort a Settlement*

We have referred previously to the consideration and abandonment in 2006, for lack of evidence, of criminal charges against two of Texaco's (and now Chevron's) attorneys, Pérez and Veiga, who negotiated and signed the Settlement and Final Release.

The *Crude* outtakes include a brief interview with Donziger on his way to President Correa's January 2007 inauguration, a subject discussed below as it relates to its consequences for the Ecuadorian judiciary.  For present purposes, however, it is relevant that Donziger boasted that

---

[138]

*Id*. Ex. 99, at 1.

[139]

*Id*. Ex. 1, CRS-129-00-02.

President Correa's inauguration was a potentially "critical event" for the outcome of the Lago Agrio litigation.  Soon thereafter, Donziger explained that the LAPs and the ROE had "been really helping each other"[140] and discussed the importance of working his contacts in the new government.[141]

On January 31, 2007, Donziger met with Joseph C. Kohn of Kohn Swift & Graf, P.C., a U.S. law firm providing financial support for the Lago Agrio litigation.  He explained to Kohn that the plaintiffs had been working with the Prosecutor General's office and that, although the criminal proceedings were closed, there is "no finality" in Ecuador.[142]  Approximately a week later, the LAPs,  in a radio segment,  asked President Correa to bring criminal charges against Chevron's attorneys, specifically mentioning Pérez.[143]

This campaign continued.  The outtakes show Donziger and others planning a press conference to pressure the Prosecutor General to bring criminal charges.[144]  On the following day, Donziger asked that posters be made of "Texaco's four accomplices,"[145] including Pérez and Veiga – posters that later were displayed at a press conference and a demonstration.

---

[140]

Hendricks Decl. I Ex. 1, CRS-163-02-02.

[141]

*Id.*

[142]

Dans Decl. [DI 40, No. 10-MC-00002 (LAK)] (hereinafter "Dans Decl.") Ex. 2, CRS-170-00-03.

[143]

*Id.* Ex. 17.

[144]

*Id.* Ex. 2, CRS-198-00-04.

[145]

Hendricks Decl. I Ex. A, CRS-204-01-02.

In March 2007, President Correa pledged his full support for the LAPs.[146]  He followed that pledge with a meeting with Yanza.  In a telephone conversation on or about April 23, 2007, Yanza reported to Donziger and Fajardo on a conversation he had had with President Correa. To the extent that his report may be gleaned from the outtakes, Yanza told Donziger that President Correa had an interest in learning more about the alleged environmental harm and "fraud in the field."[147]  He added to Donziger that President Correa "insist[ed]" that he continued to "[think] about doing something in the Prosecutor's Office."[148]  A day or two later, Yanza again reported to Donziger and Fajardo, asserting on that occasion  that Yanza had "coordinat[ed] everything" with President Correa.[149]

Within a few days, President Correa, Yanza, Fajardo, and others boarded a government helicopter together to tour the Oriente region.[150]  In a voiceover in *Crude*, Donziger bragged:  "We have achieved something very important in the case. We are now friends with the President."  That "friendship" immediately became apparent.  On the same day as his visit to the Oriente region, President Correa issued a press release "urg[ing] the Office of the Prosecutor to permit the Prosecution of the Petroecuador officials who accepted the remediation carried out by

---

[146]

Dans Decl. Ex. 12.

[147]

*Id.* Ex. 2, CRS-248-03-01.

[148]

*Id.*

[149]

Hendricks Decl. II Ex. 4 (*Crude*), 1:03:03.

[150]

Portions of President Correa's visit are depicted in *Crude* and the outtakes. *See also id.* Ex. 230A.

Texaco."[151]

The fact that there was no mention of the TexPet lawyers apparently bothered Donziger.  In a telephone conversation the next day that was captured by Berlinger's cameras, Donziger said that "perhaps it is time to ask for the head of Pérez Pallares – given what the President said."[152]  On the following day, President Correa broadcast a call for the criminal prosecution of "Chevron-Texaco . . . homeland-selling lawyers" in addition to the prosecution of Petroecuador officials.[153]

Finally, in one of the outtakes, Fajardo reported: "So, the President thinks that if we put in a little effort, before getting the public involved, the Prosecutor will yield, and will re-open that investigation into the fraud of, of the contract between Texaco and the Ecuadorian Government."[154]

On November 30, 2007, Ecuador's new Constituent Assembly, which by then was controlled by President Correa,[155] removed the Prosecutor General, who had found no basis to support criminal charges against the Individual Petitioners and former ROE officials, and replaced him with Dr. Washington Pesántez Muñoz.  Dr. Pesántez had been the District Prosecutor who had decided in March 2007 that "the report on the special audit conducted by the Comptroller General

---

[151]

   Dans Decl. Ex. 14.

[152]

   Hendricks Decl. II Ex. 1, CRS-268-00-01.

[153]

   Dans Decl. Ex. 13.

[154]

   Hendricks Decl. II Ex. 1, CRS-376-03-01.

[155]

   *Infra* at 47 - 49.

of Ecuador . . . showed that there was no evidence of civil, administrative or criminal nature liability

on the part of . . . representatives of the TEXACO company, with respect to environmental damage

that had allegedly been caused in the Amazon region."[156]  Several months later, however, Dr.

Pesántez decided that the criminal case should be reopened.[157]

On March 31, 2008, less than a week after Cabrera reported a damages finding of $16

billion and a day before he filed his report with the court, Pérez and Veiga received notice that the

new Prosecutor General had reactivated the criminal charges based on "new" evidence.[158]

On July 31, 2008, representatives of the LAPs, including Donziger, held a press

conference during which Yanza commented that the plaintiffs had presented evidence to the

Prosecutor General's office to encourage an investigation.[159]  President Correa, in a radio address

less than two weeks later, offered his support for the criminal prosecutions:

> "But previous governments supported Texaco Chevron and betrayed our people:
> they signed agreements saying that everything was resolved, which has been one of
> the principal arguments by Texaco Chevron in its defense, when in fact nothing was
> resolved.  Now, the Prosecutor General (Washington Pesántez), has, very properly,
> opened an investigation to punish those people, because it was a lie:  there was
> nothing, nothing resolved, nothing cleaned up, all of the pollution."[160]

In June 2009, the Prosecutor General's office ordered Cabrera, in his capacity as the

expert who conducted the environmental analysis regarding Texaco's presence in Ecuador, to give

---

[156]     Hendricks Decl. II Ex. 394, at 9.

[157]     *See id.* Dans Decl. Ex. 15.

[158]     *Id.*

[159]     Hendricks Decl. II Ex. 224, at 5-6.

[160]     Dans Decl. Ex. 23.

testimony.[161]  A month later, it issued a statement describing Cabrera's testimony.  The account included a description of the  global assessment process and the fact that Cabrera had referred the Prosecutor General to his report.[162]

Pérez and Veiga now face criminal charges in Ecuador.  On April 29, 2010, the Prosecutor General issued official accusations to them. They await a preliminary hearing to determine whether the prosecution will proceed.  It is reasonable to conclude that the Prosecutor General has revived the prosecution at least in part on the basis of the ostensibly independent Cabrera report, which was covertly written by the LAPs' consultants, at the urging of the LAPs with the support of President Correa.

*The Legal and Political Climate in Ecuador – Fair Trial Becomes Impossible and the ROE, at the LAPs, Urgings, Seeks to Prosecute Chevron Lawyers for Tactical Reasons*

The Court has drawn attention already to the fact that *Aguinda* plaintiffs and Texaco expressed sharply differing views to Judge Rakoff in 1999 and 2000 concerning the Ecuadorian courts and legal system.  Donziger, representing the former, asserted that the Ecuadorian system was inadequate and the judiciary corrupt.  Texaco disputed this.  But the issue here is whether the judgment rendered in 2011 at the conclusion of a lawsuit begun in 2003 is foreclosed from recognition and enforcement by virtue of the conditions during that period, not during 1999-2000. It therefore is necessary to review the situation in Ecuador during the relevant time period.

---

161

*Id*. Ex. 19.

162

*Id*. Ex. 20.

*The Ecuadorian Judiciary*

The Court has noted already the inauguration of President Correa, Donziger's comment that prediction that it would be a "critical event" for the Lago Agrio litigation, and President Correa's pledge of full support for the Lago Agrio plaintiffs. It is important as well to consider the already troubled state of the Ecuadorian court system and the impact of President Correa's rise to power upon it.

The Ecuadorian judiciary has been in a state of severe institutional crisis for some time. Matters have deteriorated recently.[163]

From 1979 to 1998, judges of the Supreme Court of Justice, the highest court in Ecuador at that time, were appointed by the National Congress for six-year terms and therefore were highly susceptible to political influence.[164] Ecuador's Nineteenth Constitution, in effect from 1998 until October 2008, overhauled the appointment system, providing that Supreme Court justices would serve life terms and that the Supreme Court *en banc* would appoint new justices.[165] A brief period of stability and judicial independence followed these reforms.[166]

---

[163]

Some, but by no means all, of the evidence on this point comes from the report of Vladimiro Alvarez Grau (the "Alvarez Report"), prepared in September 2010. Alvarez Decl. [DI 56]. Alvarez is an impressively credentialed expert who has practiced law in Ecuador for nearly 40 years and has held numerous elected and appointed public offices and legal academic positions in that country. *Id.* ¶¶ 1-21. In addition, he has been a weekly columnist for over 17 years, covering legal and political issues for two major newspapers in Ecuador.

[164]

*Id.* ¶ 26.

[165]

*Id.* ¶¶ 27-28.

[166]

*Id.* ¶ 29.

*The 2004 Purge of the Supreme Court*

This changed dramatically when the Ecuadorian Congress in 2004 and 2005, just after the Lago Agrio litigation was filed,[167] purged the three highest judicial tribunals in Ecuador. In December 2004, the Congress, at the instigation of then-President Gutierrez, unconstitutionally replaced 27 of the 31 justices of the Supreme Court with new justices elected by Congress.[168]  Just five months later, President Gutierrez declared a state of emergency and removed all of the Supreme Court justices, including those recently elected.  As a result, Ecuador was left without a Supreme Court for most of a year during which the Lago Agrio case was pending.

Ecuador's judiciary appears never to have recovered from these events.  In November 2005, following President Gutierrez's downfall, new justices selected by a new qualification committee established by Congess were appointed.[169]   In May 2006, this new Supreme Court purported to limit lower-court judges to four-year terms and arrogated to itself the power to appoint and re-appoint lower court judges.  "This circumstance made stability and continuity of the appointments of lower-court judges dependent on whether their rulings demonstrated their loyalty to the positions held by the higher-court judges who appointed them."[170]  In consequence, Supreme Court justices serve at the will of Congress and lower court judges have short terms of offices and futures dependent on reappointment by the Supreme Court.

---

[167]  *See id.* ¶¶ 30-33.

[168]  *Id.* ¶ 30.

[169]  *Id.* ¶ 33.

[170]  *Id.*

*President Correa's Influence Over the Judiciary*

President Correa was elected president of Ecuador in 2006.  He has condemned Ecuador's oil contracts as "true entrapment for the country."[171]   Moreover, the state of the Ecuadorian judiciary only worsened with the election of President Rafael Correa in November 2006.[172]

Shortly after assuming office, President Correa commanded the Supreme Electoral Tribunal, with threats of violence, to set a date for a plebiscite to create a Constituent Assembly to draft a new Constitution.[173]  When the Tribunal obeyed, 57 of the 100 congressional representatives challenged the constitutionality of the Tribunal's proceedings and voted to remove the President.[174] The Tribunal, by then subservient to the President, dismissed these 57 representatives and called on 57 alternate representatives loyal to the President to fill their seats.[175]  The representatives who had been dismissed brought suit in the Constitutional Tribunal, which ruled in their favor and ordered that they be reinstated.  President Correa immediately condemned that decision.  That very day, the newly appointed congressional majority unconstitutionally removed all of the judges of the

---

[171]   *Rafael Correa Biography*, GUERRILLERO, June 29, 2009, http://www.guerrillero.cu/english/index.php?option=com_content&view=article&id=577 :rafael-correa-biography&catid=41:varieties&Itemid=61 (last visited Oct. 8, 2010).

[172]   Alvarez Decl. ¶ 34-35 ("Since his election, President Correa views himself as embodying the will of the people, and he rejects anything–including the rule of law–that constrains the exercise of that will.").

[173]   *Id.* ¶ 37.

[174]   *Id.* ¶¶ 38-39.

[175]   *Id.*

Constitutional Tribunal and appointed new judges.[176]  The new Constitutional Tribunal reversed its previous decision with respect to the 57 original representatives and from that day forward consistently has backed the administration's decisions.

In April 2007, Ecuador voted to draft a new constitution, and a Constituent Assembly was formed.  It issued "Mandate No. 1," which, among other things, eliminated Congress, the duties of which were assumed by the Constituent Assembly, and declared the Constituent Assembly's supremacy over the judiciary.[177]  When this was challenged before the Constitutional Tribunal, that body ruled that no judge could countervene the Constituent Assembly.

The new October 2008 constitution has further concentrated power in the hands of President Correa.  It subjects certain decisions of the Supreme Court (renamed the National Court of Justice) to review by the Constitutional Tribunal (renamed the Constitutional Court).[178]  In addition, it terminated the appointments of 31 Supreme Court justices and subjected them to a lottery from which 21 randomly would be selected to serve on the National Court of Justice.  Most of the 31 justices refused to submit to the lottery and resigned in protest, causing a gap of several

---

[176]

        *Id.* ¶ 40 ("In addition, threats of criminal prosecution were made against both the members of the Constitutional Tribunal and the original 57 representatives").

[177]

        *Id.* ¶ 44 ("The third sub-paragraph of Article 2 of Mandate No. 1 advised and ordered that 'judges or tribunals that process any action contrary to the decisions of the Constituent Assembly shall be dismissed from their post and subject to prosecution.'"); *see also id.* ("Article 9 of Mandate No. 1 provided as follows: 'Unless otherwise ordered by the Constituent Assembly, the justices of the Supreme Court, members of the Judicial Council, the Constitutional Tribunal, and the Supreme Electoral Tribunal shall continue to perform their duties.'").

[178]

        *Id.* ¶ 51.

months before the government was able to appoint interim justices.[179]

Since his re-election in November 2008, President Correa has continued to interfere in judicial matters of interest to the Ecuadorian government.[180]  In a number of recent cases, judges have been threatened with violence, removed, and/or prosecuted when they ruled against the government's interests.[181]  "In addition to direct government intervention in specific cases . . . the Judiciary is also frequently pressured by threats and criticism from key officials in the Correa Administration."[182]  The Justice Minister has called for the removal of an entire list of criminal judges, leading the President of the Court of Guayaquil to state that "this is only part of the government's plan to take over the country's courts of justice."[183]  In 2009, the President of the Civil and Criminal Commission of the National Assembly stated that "[o]ur system of justice has completely collapsed."[184]  And in June 2010, the Judicial Council publicly declared that currently "the Judicial Branch is not independent."[185]  "The absence of an independent Judiciary has in many

---

[179]

    *Id.* ¶ 51.

[180]

    *Id.* ¶¶ 53-60.

[181]

    *Id.* ¶¶ 56-59.

[182]

    *Id.* ¶ 60; *see also id.* ¶ 62 ("In 2009, at a public meeting, numerous judges reported that Government officials had been exerting pressure with threats and penalties if judges did not rule in accordance with the Government's wishes.").

[183]

    *Id.* ¶ 61.

[184]

    *Id.* ¶ 62.

[185]

    *Id.* ¶ 63 ("The body expressed 'its concerns over serious risks to the Judicial Branch" . . . [and] specifically identified as 'risks' 'the threat of impeachment [by the Assembly]' of members of the Council; the lack of 'economic and financial autonomy' of the judiciary; and the presence of elements outside of the Judiciary that are trying to 'wield influence in matters

cases allowed the Government to breach contractual relationships and stipulations with impunity . . . . Such breaches occur especially when there is interest on the part of the Government or strong political pressures."[186]  The Correa administration has targeted large foreign companies in particular for such treatment.[187]  In 2009, Ecuador withdrew from the International Centre for Settlement of Investment Disputes, and President Correa soon thereafter requested that Congress terminate 13 bilateral investment treaties that prescribed fair treatment toward foreign companies.[188]

All this has lead numerous independent commentators, identified in the Alvarez Report, to conclude that the rule of law is not respected in Ecuador in cases that have become politicized.[189]  Alvarez himself concludes that "[t]he cumulative effect of the political pressure on

---

that are the exclusive domain of the purveyors of justice.'").

[186]

*Id.* ¶ 70.

[187]

*Id.* ¶¶ 70-75; *see also id.* ¶ 74 ("President Correa has stated that 'I really, really hate the big transnational companies . . . .'").

[188]

*Id.* ¶ 74.

[189]

*See, e.g., id.* ¶ 69 (a former President of the Supreme Court said in January 2010 that "[j]udges are obeying certain government influences . . . . There are judges who have been instructed, who because of their position or for other reasons, do certain improper things, and that is the way justice is administered in general, and that's why the country is not progressing, nor will it make much progress as long as it has no independent judiciary system"); *id.* (another former Supreme Court justice wrote that "[s]ince 2008, the administration of justice has entered an institutional crisis. . . . [T]here is a marked trend whereby the Executive Branch is taking over all sorts of duties, and the Judiciary has been unable to escape this trend"); *id.* (the Chairman of the special committe that selected the justices of the Supreme Court in 2005 declared recently that "[t]he great disgrace of the court system is tha tpolitical interests can't resign themselves to not interfere with the courts. . . . The current constitution has minimized the power of the Court; that is evident in its rulings. Political influences have turned out to be ruinous"); *id.* (an attorney and academic wrote in June 2009 that "what we are experience on a daily basis, those of us who are involved in judicial activity, cannot be worse.  With few exceptions, we find corruption at every step, delays all around; alarming incompetence, undue pressure and influences, and on and on, to the point that at this time justice in Ecuador is just one more item up for sale").

the Judiciary cannot be overstated . . . . The situation has become so dire that, in those cases where President Correa or others in his administration express a view, the judge must either rule accordingly or face the high likelihood of public condemnation, removal from office, and even criminal prosecution."[190]   "It is not possible to rely on the independence of the Judicial Branch, because it no longer acts impartially, with integrity and firmness in applying the law and administering justice.  Rather, on the contrary, members of the Judiciary are subject to constant pressure, temptations and threats that influence their decisions."[191]

Reports by the World Bank and the U.S. State Department are to similar effect.[192] The World Bank's Worldwide Governance Indicators show that in 2009 Ecuador was ranked in the lowest eight percent of the 213 economies studied with respect to "Rule of Law," lower than both Liberia and North Korea.[193]   Likewise, the State Department's three most recent Human Rights Reports for Ecuador have recognized that Ecuadorian judges sometimes decide cases as a result of substantial outside pressures, particularly in cases of interest to the government.[194]

---

[190]

  *Id.* ¶ 82.

[191]

  *Id.* ¶ 87.

[192]

  *See* Hendricks Decl. II Ex. 117 (World Bank, Worldwide Governance Indicators for Ecuador, *available at* http://info.worldbank.org/governance/wgi/sc_country.asp); *Id.* Ex. 118 (U.S. Dep't of State, Country Reports on Human Rights Practices, 2007, 2008, and 2009, *available at* http://www.state.gov/g/drl/rls/hrrpt/2009/wha/136111.htm).

  As stated above, the U.S. Department of State has chosen not  to submit its views with respect to the matter currently before me.

[193]

  *See id.* Ex. 117.

[194]

  *See id.* Ex. 118 (2009 Report) ("While the constitution provides for an independent judiciary, in practice the judiciary was at times susceptible to outside pressure and corruption.  The media reported on the susceptibility of the judiciary to bribes for favorable decisions and

*Donziger Admits Corrupt Nature of the Ecuadorian Judiciary*

Alvarez's conclusions are very much in-line with Donziger's oft stated opinions regarding the Ecuadorian judiciary.  In the *Crude* outtakes, Donziger stated:

> "They're all [i.e., the Ecuadorian judges] corrupt!  It's – it's their birthright to be corrupt."[195]

> "The judicial system is so utterly weak. The only way that you can secure a fair trial is if you do things like that.  Like go in and confront the judge with media around and fight and yell and scream and make a scene.  That would never happen in the United States or in any judicial system that had integrity."[196]

> "You can solve anything with politics as long as the judges are intelligent enough to understand the politics . . . .  [T]hey don't have to be intelligent enough to understand the law, just as long as they understand the politics."[197]

*The Lago Agrio Judgment and the LAPs' Enforcement Plan*

*The Judgment*

On February 14, 2011, the Lago Agrio court issued a multi-billion dollar judgment

---

resolution of lega cases . . . . Judges occasionally reached decisions based on media influence or political and economic pressures."); *see also id.* Ex. 230 (U.S. Dep't of State, 2010 Investment Climate Statement for Ecuador, *available at* http://www.state.gov/e/eeb/rls/othr/ics/2010/138060.htm) ("Systemic weakness in the judicial system and its susceptibility to political and economic pressures constitute important problems faced by U.S. companies investing in or trading with Ecuador. . . . Concerns have been raised in the media and by the private sector that Ecuadorian courts may be susceptible to outside pressure and are perceived as corrupt, ineffective, and protective of those in power.").

[195]

*Id.* Ex. 1, CRS-053-02-03.

[196]

Hendricks Decl. I Ex. A, CRS-053-02-01.

[197]

Hendricks Decl. II Ex. 1, CRS-129-00-02.

against Chevron.  The court held that Texaco had caused extensive damage to the environment, peoples, and indigenous cultures in Ecuador in violation of Ecuadorian law at the time that Texaco had operated there, and it found that Chevron properly could be held liable by merger with Texaco and on a veil-piercing theory for any remediation owed by Texaco.[198]  In the course of deciding the LAPs' claims, the Lago Agrio court concluded also, *inter alia*, that (1) it was competent to hear the complaint,[199] (2) the settlement between the ROE and Texpet and Texaco did not bind the LAPs,[200] (3) it would not consider the Calmbacher and Cabrera reports in issuing the judgment,[201] and (4) it would consider other expert assessments to which Chevron objected, presumably including the "cleansing" reports based on the excluded Cabrera report.[202]

The judgment awards: (1) $600 million for groundwater remediation, (2) $5.396 billion for soil remediation, (3) $200 million for damages to the native flora and fauna, (4) $150 million for drinking water remediation, (5) $1.4 billion for the delivery of health care, (6) $100 million for indigenous cultural damages, and (7) $800 million for excess cancer deaths,[203] a total of $8.646 billion.  This sum is to be administered by a commercial trust in Ecuador over which

---

[198]
     *See* Judgment, at 6-26.

[199]
     *Id.* at 4-6.

[200]
     *Id.* at 29-34.

[201]
     *Id.* at 48-51.

[202]
     *Id.* at 57-58 (identifying Dr. Barnthouse, Dr. Allen, and Dr. Picone – authors of three of the "cleansing reports" – as some of the authors at issue in this motion by Chevron in the Ecuadorian court).

[203]
     *Id.* at 169-84.

defendant ADF, headed by defendant Yanza, will exercise control.[204]   The judgment awarded also

an additional 10 percent of the total directly to the ADF.[205]   Finally, the judgement granted punitive

damages, equaling 100 percent of the $8.646 billion, unless Chevron issued a "public apology" to

the LAPs within 15 days of the issuance of the judgment.[206]   To the Court's knowledge, Chevron

has not issued such an apology, and the time set by the Ecuadorian court within which to do so has

expired.  This leaves the current value of the judgment at more than $18 billion.


*Appellate Remedies in Ecuador*

As the matter bears importantly on the urgency of this ruling and the issue of

threatened irreparable injury, it is necessary to consider avenues open to Chevron in Ecuador.

Under Ecuadorian law, a lower court's judgment is stayed during the pendency of

an initial appeal.[207]   The first appeal is heard by an intermediate appellate court, which reviews the

facts and law *de novo*.[208]   Once that appeal is decided, either party may appeal that decision to the

---

204

     *Id.* at 186-87.

205

     *Id.* at 187.

206

     *Id.* at 184-86.

207

     *See, e.g.*, Garro Decl. [DI 132] ¶ 16.

     On February 24, 2011, the parties submitted at this Court's request supplementary declarations with respect to the appeals process and the finality of judgments in Ecuador. The three declarations are in substantial agreement except where otherwise indicated.

208

     *See id.* ¶ 17.

Supreme Court of Ecuador by filing a writ of cassation.[209]  Nevertheless, if the judgment is upheld

or modified by the intermediate appeals court, it is enforceable while the writ of cassation is pending

before the Supreme Court.[210]   The petitioner for the writ of cassation, however,  may ask the

intermediate court  to stay enforcement upon the petitioner's posting a sufficient bond, the amount

of which is decided by the intermediate court.[211]  As is discussed below, however, a stay in Ecuador

would not necessarily stay proceedings outside Ecuador.

On February 17, 2011, the LAPs appealed the judgment, seeking, *inter alia*, to

increase the damage award.[212]   On the same day, Chevron filed a motion with the lower court

seeking clarification of certain aspects of its decision.[213]   Courts usually issue such clarifications

within a few days of their filing.[214]   Once any clarification is issued, Chevron will have three days

within which to appeal.[215]  To the Court's knowledge, no such clarification yet has been issued.

---

[209]

      *See id.* ¶ 18.

[210]

      *See id.* ¶ 19.

[211]

      It is unclear whether a stay is available as a matter of right upon posting a bond.

[212]

      *See* Jones Decl. [DI 134] ¶ 16.

      Under Ecuadorian law, either side may appeal a lower-court judgment within three days following notification of the decision.  In the alternative, a party may ask the lower court, within the same three-day window, for clarification of certain aspects of its decision.  *See id.* ¶ 14; Simon Decl. [DI 133] ¶ 6.

[213]

      *See* Jones Decl. ¶ 14.

[214]

      Only the Jones Declaration addresses the timing of this aspect of the process.  *See id.*

[215]

      *See id.* ¶ 15.

Once Chevron appeals, the appellate court  may rule at any time, and there is good reason to believe that it will do so quickly in this case.  In cases tried by what in Ecuador are known as summary verbal proceedings, as was the case here,[216] the appellate court, as is customary in the United States,   rules based on the existing record, which generally allows for more prompt disposition of these cases.[217]  Moreover, "[a]s a practical matter, the time it takes for the appellate court to rule will largely depend on how important the case is, *how much pressure is placed on the appellate court by the parties or other forces* to render its decision, and how loaded the dockers are of the judges appointed by the appellate panel."[218]  Here, all of these factors strongly indicate that the appellate court is likely to issue a decision quickly, at which point the judgment will become enforceable in Ecuador.[219]  Indeed, that court necessarily will understand that the LAPs have the full support of President Correa.

---

[216]

The EMA, which created the claim sued upon, provides that such cases shall be heard by "summary verbal proceedings."  *See* Judgment, at 27.  The decision of the Lago Agrio court acknowledges that it was so tried.  *See id.* at 26-27, 184.

[217]

*See id.* ¶ 28.

Dr. Simon declares that the law prescribes that the initial appeal be decided within 12 days plus an additional day for each 100 pages of proceedings beyond the first 100, but that in his experience most appeals of this type take even longer than prescribed by law.  Simon Decl. ¶ 9.  This ignores, however, the unusually politicized nature of this case and the accordant pressures brought to bear on those deciding it.

[218]

*See* Jones Decl. ¶ 30 (emphasis added).

[219]

*See id.* ¶ 31. ("As I will explain more fully below, because this case allows only a limited appeal, has national significance for Ecuador, and the Lago Agrio plaintiff's counsel and supporters are very actively and publicly pursuing the advancement of the case, it would not surprise me at all if, even with the size of the record in this case, a decision is issued very soon.  I also think that the composition of the appellate panel in this case – assistant judges without the case volume normally associated with permanent judges – is likely to shorten the time it will take for the court to rule.").

*The LAPs' Enforcement Plan*

Now that a judgment against Chevron has been rendered, there is good reason to believe the defendants quickly will move to enforce that judgment and seize assets simultaneously in multiple jurisdictions.

From at least September 2009 until the present, Donziger and other defendants have indicated their intent to pursue an aggressive world-wide enforcement strategy in order to obtain settlement leverage over Chevron without "waiting for the appeals process."[220]  According to an ADF press release, "[i]f the plaintiffs win a judgment against Chevron in Ecuador's courts, they plan to move 'expeditiously' to seize Chevron's assets in the U.S. and other countries . . . ."[221]  The press release quotes Donziger as saying that "Chevron operates in more than 100 countries and has numerous oil tankers that troll the world's waterways and dock in any number of ports[.] This could end up being one of the biggest forced asset seizures in history and it could have a significant disruptive impact on the company's operations."[222]  Donziger described the defendants' enforcement strategy in similar terms a year later while speaking at Duke University Law School:

> "[O]ne of Chevron's vulnerabilities is they have assets in over a hundred countries, and you could enforce a judgment out of Ecuador in any of many countries where they have enormous assets. . . . [S]o we're gonna be able to execute whatever judgment comes out of Ecuador . . . in whatever forum might . . . be appropriate, including multiple places that . . . you could file suits, you could seize assets, seize

---

[220]

Hendricks Decl. II Ex. 1, CRS-482-00-CLIP-01.

[221]

*Id.* Ex. 92, at 1-2 (press release issued by Amazon Watch and Frente de la Amazonia, dated September 24, 2009).

[222]

*Id.*

boats . . . ."[223]

The intent of this enforcement strategy is even more apparent in the undated "Invictus" memorandum,[224] prepared by Patton Boggs, which outlines the LAPs' strategy. The plan is to seek to enforce the judgment "*quickly, if not immediately, on multiple enforcement fronts – in the United States and abroad.*"[225] The LAPs "will look for ways to proceed against Chevron on a pre-judgment basis, *largely as a means of attaining a favorable settlement at any early stage.*"[226] "[A]ssets may be attached by way of an *ex parte* proceeding . . ., *making [that] an extremely attractive option for obtaining leverage early in a case.*"[227]

The memorandum recognizes that the defendants may have trouble enforcing an Ecuadorian judgment in the United States,[228] where several Section 1782 courts have rebuked the defendants for fraudulent conduct in connection with the Ecuadorian suit.[229] As a result, the

---

[223]

     *Id.* Ex. 93 (transcript of November 15, 2010 speech).

[224]

     *Id.* Ex. 341 (hereinafter "Invictus Memo").

[225]

     *Id.* at 12 (emphasis added).

[226]

     *Id.* at 14 (emphasis added).

[227]

     *Id.* at 15 (second emphasis added).

[228]

     *Id.* at 17 ("[O]ur experience with U.S. courts in the context of Chevron's domestic collateral discovery actions filed under 28 U.S.C. § 1782 suggests that they may view proceedings in a Latin American nation with more of a jaundiced eye than most other tribunals would. . . . [N]on-U.S. jurisdictions may, for a variety of reasons, offer the prospect of a more expedient resolution than could be obtained in the U.S.").

[229]

     *In re Chevron Corp.*, No. 10-MC-21 (J/LFG) (D.N.M. Sept. 13, 2010) (finding "that . . . discussions trigger the crime-fraud exception, because they relate to corruption of the judicial process, the preparation of fraudulent reports, the fabrication of evidence, and the

memorandum lays out a global plan of attack, identifying more than twenty countries as potentially desirable jurisdictions for asset seizure and enforcement efforts:  "Particularly critical is avoiding – to the extent possible – relitigation of the merits of the case."[230]

Speed is central to the defendants' strategy: "Upon entry of judgment, Plaintiffs' team will move quickly to bring Chevron to the table . . . and negotiate a favorable settlement before Chevron becomes entrenched in fighting enforcement. . . . Chevron's discomfort with having an enforceable judgment on the books, and with the uncertainty surrounding the manner in which Plaintiffs will seek to enforce that judgment, will create a window of opportunity for settlement."[231]

In the days since the Ecuadorian judgment issued, the LAPs have reiterated their intention to mount a multi-country full-court press to enforce the award against Chevron.

---

preparation of the purported expert reports by the attorneys and their consultants."); *In re Application of Chevron Corp.*, No. 10-cv-1146-IEG (Wmc) (S.D. Cal. Sept. 10, 2010) (crime-fraud exception applies because "[t]here is ample evidence in the record that the Ecuadorian Plaintiffs secretly provided information to Mr. Cabrera, who was supposedly a neutral court-appointed expert, and colluded with Mr. Cabrera to make it look like the opinions were his own."); *Chevron Corp. v. Champ*, No. 1:10-mc-0027 (GCM-DLH) (W.D.N.C. Aug. 30, 2010) ("While this court is unfamiliar with the practices of the Ecuadorian judicial system, the court must believe that the concept of fraud is universal, and that what has blatantly occurred in this matter would in fact be considered fraud by any court. If such conduct does not amount to fraud in a particular country, then that country has larger problems than an oil spill.").

[230]    *Id.* at 12.

The Memo highlights more than twenty countries as being of "particular interest" for enforcement purposes, due in many cases to Patton Boggs' relationships with governments and important individuals in those jurisdictions.  *Id.* at 19-20.

[231]    *Id.* at 28.

*The UNCITRAL Arbitration*

It remains only to consider that this case is not the only game in town.   An international arbitration tribunal already has ordered Ecuador to put a halt to the LAPs' enforcement efforts.

The United States and Ecuador are parties to a bilateral investment treaty (the "BIT").[232]  The BIT, broadly speaking, provides that private parties having investment disputes with Ecuador may pursue their claims in accordance with the Arbitration Rules of the United Nations Commission on International Trade Law.[233]

In 2009, Chevron commenced a BIT arbitration against Ecuador.  It there alleges that the ROE improperly colluded with the LAPs in relation to the Lago Agrio litigation, abused the criminal justice system and engaged in other coercive tactics, and breached its investment agreements and treaty obligations.[234]  It seeks, among other things, declarations that Chevron and its affiliates have no liability with respect to the alleged environmental pollution and that Ecuador has breached the BIT and its treaty obligations in various respects and indemnification from Ecuador for any liability Chevron may have in the Lago Agrio litigation.[235]

On February 9, 2011, the day after this Court issued the TRO, the arbitration tribunal entered an Order for Interim Measures.  It found that Chevron "[had] made out a sufficient case"

---

[232]

Investment Treaty With the Republic of Ecuador, Aug. 27, 1993, S. Treaty Doc. No. 103-15.

[233]

*Id.* Art. VI(3)(A), VI(4).

[234]

Hendricks Decl. I Ex. EE, *passim*.

[235]

*Id.* at 17-18.

for the tribunal to take discretionary interim measures.[236]  It directed the ROE "to take all measures at its disposal to suspend or cause to be suspended the enforcement or recognition within and without Ecuador of any judgment against [Chevron] in the Lago Agrio case."[237]  It ordered also that the ROE inform the tribunal of its efforts to implement the order.[238]  That order, however, does not bind the LAPs or their counsel.

*This Case*

    *The Complaint*

        *Parties*

        Chevron filed this action on February 1.  The complaint asserts claims against 56 defendants who fall into four groups.

        The first group is Donziger and his firm, the Law Offices of Steven R. Donziger.[239]

        Second are Stratus and two of its employees – Beltman, an executive vice president, and Maest, a managing scientist.[240]

        The third group comprises four Ecuadorian individuals and entities who, in various overlapping ways, have participated in the LAPs' representation in the Lago Agrio litigation.

---

[236]
      Hendricks Decl. II Ex. 486, at 3

[237]
      *Id.*

[238]
      *Id.* at 4.

[239]
      Cpt. ¶¶ 8-9.

[240]
      *Id.* ¶¶ 14-16.

Fajardo is their counsel of record in that matter.[241]  The ADF is a non-profit organization headed by Yanza, and Fajardo is also its counsel.[242]  Selva Viva is an entity created by the ADF to administer litigation funds.  It is managed by Yanza,[243] and its president is or was Donziger.[244]

The fourth group of defendants is the LAPs.[245]

Additionally, the complaint alleges culpable conduct on the part of a number of non-parties including, *inter alia*, Joe Kohn, who in large part financed the Lago Agrio litigation, the Amazon Watch League, and certain American lawyers and law firms who have represented the LAPs in various U.S. proceedings.[246]

*Claims*

The complaint asserts nine claims seeking, under a number of theories, damages and an injunction against enforcement of the Lago Agrio judgment.

Counts 1 and 2 assert substantive and conspiracy claims under the Racketeering

---

[241]

     *Id.* ¶ 10; *see also infra* note 328.

[242]

     Cpt. ¶¶ 10, 12.

[243]

     *Id.* ¶ 13; *see also* Hendricks Decl. II Ex. 137.

[244]

     Cpt. ¶ 13; Hendricks Decl. II Ex. 439.

[245]

     *Id.* ¶ 19.

[246]

     *Id.* ¶¶ 17-18.

Influenced and Corrupt Organizations Act ("RICO")[247] against all defendants except the LAPs.[248] These claims allege that the pertinent defendants and a number of non-party co-conspirators engaged in a criminal enterprise to obtain a settlement from or judgment against Chevron through unlawful means including fraud and extortion.

Counts 3 through 5 assert against all defendants state tort claims relating to the allegedly unlawful scheme described above: fraud, tortious interference with contract, and trespass to chattels.[249]

Count 6 asserts against all defendants a claim for unjust enrichment on the ground that any recovery on the Lago Agrio judgment would be inequitable.[250]

Count 7 asserts a state claim for civil conspiracy against all defendants, alleging that they conspired to commit the substantive violations described above.[251]

Count 8 asserts against Donziger and his law firm violations of the New York Judiciary Law[252] governing the conduct of lawyers.[253]

Count 9 seeks a declaratory judgment, pursuant to the federal Declaratory Judgment

---

[247]

18 U.S.C. § 1962(c), (d).

[248]

Cpt. ¶¶ 303-51.

[249]

*Id.* ¶¶ 352-73.

[250]

*Id.* ¶¶ 374-77.

[251]

*Id.* ¶¶ 378-83.

[252]

N.Y. JUD. § 487.

[253]

Cpt. ¶¶ 384-90.

64

Act,[254] that the Lago Agrio judgment is not entitled to recognition or enforcement in the United States or anywhere else.[255]

### Proceedings to Date

This action was commenced on February 1, 2011. Chevron moved by order to show cause for a temporary restraining order ("TRO") and a preliminary injunction restraining enforcement of the Ecuadorian judgment outside Ecuador on February 3, 2011. The Court issued the TRO after argument on February 8, 2011[256] and heard argument on the preliminary injunction motion on February 18, 2011. It then closed the record subject to the limited submissions on two specific questions of pertaining to appellate practice in Ecuador.

Further discussion of the procedural course of this case is deferred to points in the analysis to which it is relevant.

### II    Legal Analysis and Additional Facts

"A party seeking a preliminary injunction must establish irreparable harm and either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in its favor."[257]

---

[254]

28 U.S.C. § 2201.

[255]

Cpt. ¶¶ 391-97.

[256]

The TRO was extended until March 8, 2011.

[257]

*Kamerling v. Massanari,* 295 F.3d 206, 214 (2d Cir. 2002).

A.    *Chevron Is Threatened With Immediate and Irreparable Injury*

        The purpose of a preliminary injunction is "'to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits,' 'to keep the parties, while the suit goes on, as far as possible in the respective positions they occupied when the suit began.'"[258] The irreparable injury requirement is satisfied if there is a "substantial chance" that Chevron, in the absence of a preliminary injunction, would suffer injury that could not be undone if Chevron prevails on its declaratory judgment claim.[259]

        The evidence establishes that the LAPs and their allies intend quickly to pursue multiple enforcement actions and asset seizures, including *ex parte* remedies where possible, around the globe. Absent a preliminary injunction, Chevron would be forced to defend itself and litigate the enforceability of the Ecuadorian judgment in multiple proceedings. There is a significant risk that assets would be seized or attached, thus disrupting Chevron's supply chain, causing it to miss critical deliveries to business partners, damaging "Chevron's business reputation as a reliable supplier and harm the valuable customer goodwill Chevron has developed over the past 130 years," and causing injury to Chevron's "business reputation and business relationships."[260] The Court finds also that the motive for this strategy is not only to collect on the judgment, which the LAPs of course have a right to try to do in an appropriate manner, but to attempt to coerce Chevron to settle the case quickly to avoid this harm. These threatened injuries would be irreparable, and they are sufficiently

---

[258]

        *WarnerVision Entm't Inc. v. Empire of Carolina, Inc.*, 101 F.3d 259, 261 -262 (2d Cir. 1996) (internal citations omitted).

[259]

        *See Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999).

[260]

        Mitchell Decl. [DI 97] ¶¶ 8, 10.

imminent to warrant relief.

### 1.    The Threatened Harm Would Be Irreparable

The LAPs' enforcement plans threaten Chevron with at least four distinct types of injury.  First, it would be subjected to the coercive effect of multiple proceedings and the risk of asset seizures and attachments that might be occur, some without even advance notice.  Second, even apart from the coercive effect, Chevron would be put to the cost, distractions and other burdens of defending itself in multiple *fora,* probably simultaneously. Third, asset seizures and attachments, whether *ex parte* or after notice, would disrupt Chevron's business and harm its reputation and its goodwill."[261]  Finally, to whatever extent that the LAPs collect on the judgment before its validity ultimately is determined, Chevron would be unable to recover the money if it ultimately prevailed. These all are traditional and well established bases for equitable relief.

As an initial matter, "injunctions to restrain a multiplicity of suits [in cases of vexatious litigation] . . . are not only permitted, but favored, by the courts."[262]  This is so largely because a multiplicity of suits has *in terrorem* value – it forces its target needlessly to defend itself in many *fora* and thus creates settlement pressures above and beyond anything warranted by the merits.[263]  As the Seventh Circuit has written, "a conspiracy to prosecute, by concert of action,

---

[261]   Mitchell Decl. ¶¶ 8, 10.

[262]   1 SPENCER W. SYMONS, POMEROY'S EQUITY JURISPRUDENCE § 261j (5th ed. 1941).  *See also, e.g., Thorogood v. Sears, Roebuck and Co.*, 624 F.3d 842, 852 (7th Cir. 2010). ("Abuse of litigation is a conventional ground for the issuance of an injunction under the All Writs Act").

[263]   *Id.*

numerous baseless claims against the same person for the wrongful purpose of harassing and ruining him, partakes of the nature of a fraudulent conspiracy, and the bringing of such suits will be enjoined to prevent a multiplicity of suits which would subject the plaintiff to enormous expense and inconvenience."[264]  In addition, forcing a defendant to attempt to ward off proceedings "in a myriad of jurisdictions . . . would [leave it] helpless against settlement extortion if a valid . . . defense were mistakenly rejected by a trial [or other] court."[265]

There would be no adequate remedy at law for this coercive effect.  If Chevron were to yield to the coercion, the damage would have been done.  Chevron would have paid a price for peace.  Some portion of that price would have gone to eliminate the risk of the judgment ultimately being upheld on the merits, which is fair enough.  But the balance would have been attributable to the added risk and burdens of the multiple proceedings and remedies.  That increment to the price would be the product of the coercive effect of the multiplicitous litigation and the disruption and potential disruption it would entail.  Indeed, the LAPs quite plainly recognized this in their Invictus memorandum, which spoke of using multiple proceedings, attachments and *ex parte* proceedings "largely as a means of attaining a favorable settlement at an early stage."[266]  And there would be no remedy for it.

There would be no adequate remedy even if Chevron did not yield.  While its attorneys' fees and other out-of-pocket expenses no doubt could be tallied, no such accounting could be had for the other burdens and effects of defendants' tactics.  The costs to its reputation as a

---

[264]      *Id.*

[265]      *Id.*

[266]      Invictus Memo, at 12, 14, 15.

reliable supplier and its good will could not be quantified.  And equitable relief long has been appropriate where, as here, "damages are difficult to establish and measure" and there would be a loss of reputation, good will, and business opportunities.[267]

There is a further and even more basic difficulty in the circumstances of this case.  The LAPs are indigenous people in the rain forest.  The judgment creditors here all are Ecuadorian.[268] There is no meaningful prospect that Chevron ever could collect any damages for the expense, burden, disruption and harm that would be caused by multiple enforcement proceedings and asset seizures and attachments even if such losses could be quantified.  Nor could it recover any amounts paid in satisfaction of the Ecuadorian judgment in the event it ultimately prevailed here.

This too is a recognized basis for equitable relief.  As Justice Scalia recently wrote, while economic injury usually "is not considered irreparable, . . . that is because money can usually be recovered from the person to whom it is paid.  If the expenditures cannot be recouped, the

---

[267]

      *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004); *see also id.* ("We have found, for example, that injunctive relief is appropriate where it would be 'very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come.'" (quoting *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999))); *CRP/Extell,* 394 Fed. Appx. at 781 ("[W]e have upheld an award of injunctive relief where a movant claimed money damages that were hard to measure *plus* irreparable harm, including loss of reputation, goodwill and business opportunities.").

[268]

      Pursuant to the judgment, the bulk of any recovery would go to a commercial trust in Ecuador, to be administered by an Ecuadorian trust administrator company, for the purpose of implementing remediation programs there.  Judgment, at 186-87 ("Within a period of sixty days of the date of service of this judgment, the plaintiffs shall establish a commercial trust, to be administered by one of the fund and trust administrator companies located in Ecuador . . . . The autonomous endowment shall be comprised by the total value of the compensation that the defendant has been ordered to pay per part Thirtenth of the Findings [remediation and compensation].  The beneficiary of the trust shall be the Amazon Defense Front or the person or persons that it designates . . . .").

69

resulting loss may be irreparable."[269]

In sum, this Court finds that the injuries with which Chevron is threatened absent an injunction would be irreparable. Nor is there any reason to inflict that risk upon it. Chevron is not a fly-by-night operation about to flee the country. It is a major enterprise based in the United States, unalterably subject to legal process here, and quite able to pay the entire judgment if it turns out to be entitled to recognition and enforcement – an issue that could be resolved in a single action. The LAPs' interest in using a myriad of enforcement proceedings and methods around the world in order to gain leverage in the hope of forcing a quick settlement, or a settlement richer than would be warranted by the inherent value of the judgment itself, does not overcome these common sense considerations.

2.    *The Threatened Harm Is Imminent*

Chevron has established also that the threatened harm is sufficiently imminent in light of the interplay of Ecuadorian, United States and other pertinent law.

The Ecuadorian trial court's decision was issued on February 14, 2011. A Chevron application for clarification is pending. Even assuming that no enforcement efforts could succeed anywhere until that occurs, that ruling may come at any time. Chevron's legal exposure would begin

---

[269]

> *Philip Morris USA, Inc. v. Scott*, 131 S. Ct. 1, 4 (2010) (Scalia, J., in chambers). *See also CRP/Extell Parcel I, L.P. v. Cuomo*, 394 Fed. Appx. 779, 781 (2d Cir. 2010) ("We have long held that an injury compensable by money damages is insufficient to establish irreparable harm. This does not mean that a party at risk of suffering a monetary loss may never receive injunctive relief, but it does mean that, notwithstanding any compensable losses, a movant must provide evidence that it is likely to suffer damage that cannot be rectified by financial compensation . . . ." (internal citations omitted)).

at or before that moment.[270]

> Ecuador is a party to treaties pursuant to which the LAPs are able to seek, and perhaps to obtain, preventive measures orders in other Latin American countries, including Colombia, that would freeze or attach Chevron assets.[271]

> Once the clarification ruling is made, Chevron will have three days within which to appeal to the Provincial Court. Unless overturned, the judgment would become enforceable in Ecuador once that initial appeal is decided.[272] While the Court cannot know exactly when that would occur, it could happen any time from the moment Chevron files its appeals notice until several months later.[273] Given the history and circumstances of this case, there is substantial reason to believe that the process will move quickly.[274] And while the LAPs argue that the Provincial Court may not

---

[270]

Further, the LAPs, but for the TRO, even now could begin multiple proceedings even if they could not yet bring them to conclusion.

[271]

Jones Decl. ¶¶ 21-26.

[272]

*See* Garro Decl. [DI 132], at ¶ 30; Simon Aff. [DI 133], at ¶ 14; Jones Decl., at ¶¶ 3, 55.

As described earlier, *see supra* note 210 and accompanying text, certain contingencies might result in a stay of enforcement beyond the initial appeal, but this is by no means certain.

[273]

There is a statutory time limit of something over 200 days within which the Provincial Court would be obliged to act. Simon Aff. ¶ 9.

[274]

Jones Decl. ¶¶ 3, 28-31(stating, among other things, that "As I will explain more fully below, because this case allows only a limited appeal, has national significance for Ecuador, and the Lago Agrio plaintiffs' counsel and supporters are very actively and publicly pursuing the advancement of this case, it would not surprise me at all if, even with the size of the record in this case, a decision is issued very soon. I also think that the composition of the appellate panel in this case – assistant judges without the case volume normally associated with permanent judges – is likely to shorten the time it will take for the court to rule."), 55 (noting that Chevron, in the circumstances of this case, may not have the opportunity to file a brief on appeal because the LAPs already have appealed and the Provincial Court therefore

rule for some months, the LAPs' enforcement counsel themselves have stated that they do not expect the appeals process significantly to delay enforcement.[275]  In consequence, there is a "substantial chance" that the judgment will become enforceable in Ecuador quite soon.

At that point, the game would change dramatically.  Section 2 of the Uniform Recognition of Foreign Country Money Judgments Act (the "Recognition Act" or the "Act"),[276] provides that the Act applies "to any foreign country judgment which is final, conclusive and enforceable where rendered even though an appeal therefrom is pending or it is subject to appeal." The pendency of a further appeal in Ecuador therefore would not preclude recognition and enforcement proceedings here[277] unless the judgment remained unenforceable in Ecuador.  That

--- 

could rule as soon as Chevron's appeal is filed).

[275]

Invictus Memo, at 7 ("Our understanding of the Ecuadorian appellate process suggests that Chevron's anticipated appeal of an adverse ruling would not substantially delay enforcement."); *id.* at 8 ("[T]he initial appeal is not a lengthy process . . . . during the pendency of that appeal, the judgment is not deemed enforceable under Ecuadorian law, and thus, would not appear to be enforceable anywhere else.").

[276]

Codified in New York at CPLR § 5302.

The Recognition Act was promulgated in 1962 and updated in 2005.  The 1962 version has been adopted by 31 states.  *See* 13, Pt. II UNIFORM LAWS ANNOTATED: CIVIL PROCEDURAL AND REMEDIAL LAWS 43 (West Master ed., 2002).  The 2005 update has been adopted by 12, although 11 previously had adopted the 1962 version.  *See id.* at 7 (Supp. 2010).  Both versions provide in identical language that recognition and enforcement may not be accorded to a judgment rendered under a judicial system that does not provide impartial tribunals or procedures compatible with due process of law and need not do recognize or enforce a judgment procured by fraud.  *See* 13, Pt. II UNIFORM LAWS ANNOTATED 58-59; *id.* at 15.

[277]

N.Y. C.P.L.R. § 5302; *see also S.C. Chimexim S.A. v. Velco Enters. Ltd.*, 36 F. Supp. 2d. 206, 213 (S.D.N.Y. 1999) (Romanian judgment found to be final and presumptively valid for purposes of § 5302, notwithstanding that an appeal had been taken in Romania).

Under CPLR § 5306, a New York court may choose to stay the enforcement action where an appeal has been taken in the rendering country, but such a stay is discretionary.

would occur if, and only if, the Provincial Court were to grant a stay, which may be discretionary and in any case would be available only upon posting a bond in an amount fixed by that court.  Hence, the judgment may become enforceable in New York and at least most of the United States soon.  And since, in the absence of satisfactory information concerning conflicting foreign law, the Court applies the law of the forum,[278] the Court accepts for present purposes that the same would be true in all or much of the rest of the world.

      In sum, then, it seems clear that the LAPs even now may seek "preventive measures" freezing or attaching Chevron assets in certain Latin American countries.  They are likely to be in a position to seek enforcement and other remedies here and in other countries as soon as the Provincial Court rules, which is likely to be soon.  This view is supported by the LAPs' unwillingness to commit to a stay of enforcement of sufficient duration to permit a more deliberate consideration of this motion.  Hence, there is a "substantial chance" of irreparable injury in the absence of a preliminary injunction.

3.    *The Availability of Appellate Remedies and a Possible Stay in Ecuador Do Not Preclude a Finding of Threatened Irreparable Injury*

      One more point should be made.  It probably will be argued that Chevron's appellate

---

[278]

     *E.g., Vishipco Line v. Chase Manhattan Bank, N.A.*, 660 F.2d 854, 859-60 (2d Cir. 1981); *Torah Soft Ltd. v. Drosnin,* 224 F. Supp.2d 704, 712 (S.D.N.Y. 2002); *In re Bennett Funding Group , Inc. Secur. Litig.,* 270 B.R. 126, 129 n.4  (S.D.N.Y. 2001) (applying New York law despite suggestion that Bermuda law would apply where none of the parties had proved foreign law); RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 136, cmt. h (1972) ("[W]here either no information, or else insufficient information, has been obtained about the foreign law, the forum will usually decide the case in accordance with its own local law . . . .  The forum will usually apply its own local law for the reason that in this way it can best do justice to the parties . . . .  When both parties have failed to prove the foreign law, the forum may say that the parties have acquiesced in the application of the local law of the forum.").

remedies in Ecuador are an adequate remedy at law and that it therefore has not shown sufficiently imminent irreparable injury, at least not yet. Although superficially appealing, the argument does not withstand analysis.

Chevron maintains that Ecuador does not "provide impartial tribunals [and] procedures compatible with due process of law." As will appear, it has established a likelihood of succeeding on that contention or, at least, the existence of serious questions on that point to be fair ground for litigation. In consequence, the assumption that Chevron will get a fair and proper hearing and result in Ecuador cannot properly be made here. More generally, any proceeding with respect to recognition and enforcement of a judgment rendered in a country other than the nation in which enforcement is sought may involve an attack on the judicial system of the rendering country. Where a judgment debtor in such a proceeding demonstrates the required likelihood of success in such a challenge, the risk of enforcement of the foreign judgment before a final decision may be reached in the rendering country may, and here does, threaten the judgment debtor with immediate and irreparable harm. The showing of likely success forecloses the propriety of assuming that the judgment debtor will receive due process in the appellate process in the rendering nation.

B.    *The Balance of Hardships Tips Decidedly Toward Chevron*

In considering the equities, "I must . . . determine if 'the harm which [Chevron] would suffer from the denial of [its] motion is "decidedly" greater than the harm [the defendants] would suffer if the motion is granted.' "[279]  Moreover, it is helpful to consider the harm that would befall

---

[279]    *Holford USA Ltd. v. Cherokee, Inc.*, 864 F.Supp. 364, 374 (S.D.N.Y.1994) (quoting *Buffalo Forge Co.*, 638 F.2d 568, 569 (2d Cir. 1981) (second alteration in original).

74

each of the parties were the ruling on this motion, whichever way it goes, ultimately to prove incorrect or inequitable. In other words, "the balance of hardships inquiry asks which of the two parties would suffer most grievously if the preliminary injunction motion were wrongly decided."[280] In this case, that is not a close question.

　　　　　If the Court mistakenly were to deny a preliminary injunction, the LAPs and their representatives immediately would seek to enforce the Ecuadorian judgment, resulting in the serious and quite likely irreparable injury just described. The possible availability of a stay pending review by Ecuador's National Court of Justice does not alter this conclusion for two reasons.

　　　　　First, for the reasons just explained, Chevron's demonstration of a likelihood of success on its contention that this "judgment was rendered in a system that does not provide impartial tribunals or procedures compatible with the requirements of due process of law" means that it has demonstrated a likelihood that it will not receive fair and appropriate consideration in the Ecuadorian appellate process.

　　　　　Second, if a stay were available at all, it would be available only upon posting of a bond, the amount of which would be fixed by the Provincial Court. It reasonably may be inferred that a bond in the billions of dollars would be required.[281] Such a bond doubtless would not be provided unless the surety had a commitment, unquestionably enforceable in the United States, that

---

[280]

　　　　　*Tradescape.com v. Shivaram*, 77 F.Supp.2d 408, 411 (S.D.N.Y.1999); *accord Foulke by Foulke v. Foulke*, 896 F.Supp. 158, 162 (S.D.N.Y.1995); *Holford USA Ltd.*, 864 F.Supp. at 374.

[281]

　　　　　The Court does not here suggest that such an amount would be appropriate, as the purpose of the bond ostensibly would be only to secure against damages for delay in collection, not to secure payment of the judgment. *See* Jones Decl. ¶ 52; *see also infra* notes 415 - 419 and accompanying text.

Chevron would indemnify it if it were obliged to pay in Ecuador.  Thus, the practical effect of such a bond would be to place billions of dollars of Chevron's assets under the control of the Ecuadorian courts, there to be applied as they saw fit regardless of whether Chevron prevailed on its claim here that the Ecuadorian judgment is not entitled to recognition or enforcement in the United States or elsewhere outside Ecuador.

The LAPs would face no comparable risk if an injunction were erroneously granted. Chevron clearly is able to pay the judgment in the event it ultimately proves to be enforceable.  It is reachable through U.S. and other courts if the judgment stands the test.  Hence, the worst that could befall the LAPs if a preliminary injunction were entered here mistakenly  would be a delay in the enforcement of the judgment, outside Ecuador, for a period sufficient to litigate this case to conclusion.

When the possibility of delay in enforcement is balanced against the potential harm to Chevron, there is no contest.

C.      *Likelihood of Success on the Merits – The Substantive Claims*

1.      *The Claim for a Declaration that the Judgment is Not Entitled to Recognition or Enforcement*

a.      *Standards Governing Recognition and Enforcement*

In *Hilton v. Guyot*,[282] the Supreme Court made plain that our receptivity toward the recognition and enforcement of foreign country money judgments is not without limit.  Recognition and enforcement may be denied where the party resisting enforcement shows that there was:

---

[282]
    159 U.S. 113 (1895).

"prejudice in the [rendering] court, or in the system of laws under which it was sitting, or fraud in procuring the judgment, or any other special reason why the comity of this nation should not allow it full effect."[283]

More recently, the Ninth Circuit restated one element of this principle:

"It has long been the law of the United States that a foreign judgment cannot be enforced if it was obtained in a manner that did not accord with the basics of due process. See Hilton, 159 U.S. at 205-06, 16 S.Ct. at 159. As the Restatement of the Foreign Relations Law of the United States succinctly puts it: 'A court in the United States may not recognize a judgment of a court of a foreign state if: (a) the judgment was rendered under a judicial system that does not provide impartial tribunals or procedures compatible with due process of law....' § 482(1)(a) (1987).

"We are aware of no deviation from that principle."[284]

Even if the rendering state provides impartial tribunals and due process, recognition and enforcement may be denied if, among other things, "the judgment was obtained by fraud."[285]

Precisely these rules govern as well under the Uniform Foreign Country Money Judgments Recognition Act, a version of which applies in most states, including New York where it is codified in Article 53 of the Civil Practice Law and Rules.[286]  As previously discussed, the Court here applies New York law in the absence of satisfactory reason to believe that the law governing recognition or enforcement of the Ecuadorian judgment anywhere else would be different.[287]  This

---

[283]

    *Id.* at 123.

[284]

    *Bank Melli Iran v. Pahlavi,* 58 F.3d 1406, 1410 (9th Cir.), *cert. denied,* 516 U.S. 989 (1995) (declining to recognize or enforce Iranian judgment).

[285]

    RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 482(2)(c) (2011).

[286]

    N.Y. CPLR §§ 5304(a), 5304(b), subd. 1; Recognition Act §§ 4(a), 4(b).

[287]

    *See supra* note 278.

is especially appropriate in the context of this preliminary injunction motion given the urgency of the matter.  There will be time enough to consider the applicability and content of the law of other jurisdictions in subsequent proceedings.

> b.    *Chevron Has Shown the Requisite Likelihood of Success on its Claim that Ecuador Does Not Provide Impartial Tribunals and Due Process*

In determining whether a foreign legal system "provide[s] impartial tribunals [and] procedures compatible with due process of law," a court considers not only the structure and design of the judicial system at issue, but also "its practice during the period in question."[288]  And while the Court is far from eager to pass even a provisional judgment as to the fairness of the judicial system of another country, it of course is obliged to do so.  Moreover, it must do so here on a record less complete than it would have on a motion for summary judgment or at trial.  That said, there is abundant evidence before the Court that Ecuador has not provided impartial tribunals or procedures compatible with due process of law, at least in the time period relevant here, especially in cases such as this.

The Alvarez Report, discussed above, concludes that the Ecuadorian judicial system

---

[288]   *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 142 (2d Cir. 2000) (affirming district court's refusal to recognize a 1993 Liberian judgment because at that time the Liberian judicial system did not provide impartial tribunals or procedures compatible with the requirements of due process); *see also* Paulsson Decl., Feb. 14, 2011 [DI 102] ¶ 21 ("Classically stated, proceedings leading to judgments that are 'evidently unjust and impartial' will constitute a denial of justice.  There are no particular rules of procedure that need to be followed in order to comply with the international concept of due process.  International law simply requires that litigants are afforded 'ordinary justice.'").

Of course, it is well known that some of the most repressive countries in the world, such as the Soviet Union under Stalin, had constitutions and legal forms that, on their face, were very enlightened.  The practice was quite otherwise.

"no longer acts impartially, with integrity and firmness in applying the law and administering justice."[289]  It has been plagued by corruption and political interference for decades, and the situation has worsened since President Correa's election.  The President has consolidated his control over the Constitutional and Electoral Courts, and he continues to threaten and pressure judges at all levels, particularly those hearing suits that implicate government interests.  In a number of recent cases, judges have been threatened with violence, removed, and/or prosecuted for ruling against the ROE.[290]  For example, after a lower-court ruled against the government in a dispute with the City of Guayaquil, President Correa "called for violent protests in the streets and demanded that the National Court of Justice correct his 'atrocity.'"[291]  A month later, the appellate court reversed, ruling in favor of the ROE.[292]  In another case involving a contractual dispute between the GOE and a Brazilian engineering company, the GOE ordered that criminal charges be brought against several of the company's officials.[293]  When the criminal court dismissed the indictment, the Prosecutor General announced a criminal investigation of the members of the criminal court.[294]

Against this backdrop of chronic political interference with the Ecuadorian courts, President Correa consistently has expressed strong feelings about, and demonstrated great interest

---

[289]    Alvarez Decl. ¶ 87.

[290]    *See id.* ¶¶ 55-69.

[291]    *Id.* ¶ 56.

[292]    *Id.*

[293]    *Id.* ¶ 59.

[294]    *Id.*

in, the LAPs' suit against Chevron.  In 2007, he pledged his support to the LAPs and toured the Oriente region with Yanza, Fajardo, and others.  In the days that followed, President Correa publicly called for the Office of the Prosecutor to prosecute "Chevron-Texaco . . . homeland-selling lawyers" who had negotiated and signed the ROE-Texaco settlement.[295]  In July 2008, President Correa again publicly threw his support behind the newly re-opened prosecution, declaring in a radio broadcast that "previous governments supported Texaco Chevron and betrayed our people."[296]  Moreover, the ROE stands to benefit greatly from the billions of dollars that would flow into Ecuador for remediation and other programs were the judgment enforced.  In these circumstances, it is reasonable to infer, at least at this preliminary stage, that this is the type of highly politicized case that has not received, and will not receive, fair and impartial treatment in the Ecuadorian courts.[297]

The Alvarez report is not the only basis for concluding that the Lago Agrio judgment may not be recognized or enforced.  As we have seen, Donziger, in his role as counsel for the LAPs, repeatedly has described the Ecuadorian legal system and its judges as corrupt and highly susceptible to political and other pressure.  He declared before Joe Berlinger's video cameras that it is the "birthright" of Ecuadorian judges to be corrupt.[298]  According to Donziger, the only way to secure a fair trial in Ecuador is by causing disruption because the judicial system is "utterly weak" and lacks

---

[295]

Dans Decl. [DI 40, No. 10-MC-00002 (LAK)] Ex. 13.

[296]

*Id.* Ex. 23.

[297]

*See also* Paulsson Decl. ¶ 28 ("The alleged facts set forth in the previous section would, if true, mean that the way that the Lago Agrio trial was conducted did not comply with the international concept of due process.").

[298]

Hendricks Decl II Ex. 1, CRS-053-02-03.

80

"integrity."[299]  He has stated that it is more important for an Ecuadorian judge to know the politics related to a particular case than to know the law.[300]  And he and his colleagues repeatedly have pressured the Ecuadorian judges "to let [them] know what time it is," to send a message that they cannot "fuck with us anymore – not now, and not – not later, and never," and to obtain their desired result from judges who "make decisions based on who they fear most, not based on what the laws should dictate."

While stated more conservatively, numerous independent commentators – quoted in Alvarez's report – have concluded that the Ecuadorian legal system is highly politicized and has little respect for the rule of law.[301]  The World Bank's Worldwide Governance Indicators show that Ecuador ranks in the bottom eight percent of countries with respect to the rule of law, lower than Liberia and North Korea.[302]  The State Department's three most recent Human Rights Reports indicate that Ecuadorian judges sometimes decide cases based on substantial outside pressures, especially in cases of interest to the government.[303]

The defendants' only response to this evidence has been the belated filing by Donziger of several expert statements and reports regarding the Ecuadorian judiciary, prepared and signed in

---

[299]

Hendricks Decl. I Ex. A, CRS-053-02-01.

[300]

Hendricks Decl II Ex. 1, CRS-129-00-02.

[301]

See supra notes 189 - 191 and accompanying text.

[302]

See Hendricks Decl. II Ex. 117.

[303]

See id. Exs. 118, 230.

2008 and 2009 for submission in the arbitration proceedings.[304]  As explained below, those materials are not part of the record on this motion because they were filed in violation of the scheduling order and too late for an effective response.  Nonetheless, the Court has reviewed them and concluded that they would not alter the result even if they were properly considered on this motion.

The materials belatedly submitted by Donziger all were written at least a year and a half before the Alvarez Report.  They do not purport to address any of the statements or events – including several of his examples of governmental interference in specific cases – that post-dated their drafting.  They do not directly contest the facts asserted in the Alvarez Report even with respect to pre-2009 events.  They tell essentially the same factual story as Alvarez with respect to how Ecuadorian judicial institutions had changed in the years up to and including 2008.  They differ materially from Alvarez only with respect to the inferences they draw as to how those changes affected the judiciary's independence and impartiality prior to 2009.[305]

Chevron thus is likely to prevail on its contention that the Ecuadorian judgment in this case "was rendered under a system which does not provide impartial tribunals or procedures

_____

[304]

    *See* Peters Decl., Feb. 25, 2011[DI 138], Ex. 4 (Eguigeren Decl., May 9, 2008); Ex. 5 (Arias Decl., Sept. 22, 2008); Ex. 6 (Arias Decl., Jan. 26, 2009); Ex. 7 (Albuja Decl., Jan. 30, 2008); Ex. 8 (Albuja Decl., May 9, 2008); Ex. 9 (Albuja, Jan. 26, 2009).

[305]

    Aside from their ultimate conclusions, the most significant differences between Alvarez and the belated declarations relate to the ways in which they interpret different institutional changes to the judiciary.  To take one example, Alvarez asserts that the new 2008 Constitutional "created another period of uncertainty and chaos in the judiciary" by terminating the appointments of 31 Supreme Court justices and subjecting them to a lottery from which 21 randomly would be chosen to serve on the National Court of Justice.  *See* Alvarez Decl. ¶ 51.  In contrast, Dr. Marco Vinizio Albuja Martinez argues that this reduction in numbers was a necessary and beneficial means of improving judicial efficiency and that the National Court's functioning was interrupted for 2 weeks at most.  Ex. 9 (Albuja Decl., Jan. 26, 2009) ¶ 54.

compatible with the requirements of due process of law,"[306] at least in cases of this sort.  It assuredly has established serious questions going to the merits of that issue that are fair ground for litigation in later stages of this case.  That would be true even if the Court considered Donziger's untimely expert reports.

> c.  *There Are At Least Serious Questions Going to the Merits of the Claim that the Judgment Was Procured By Fraud*

A court has discretion not to recognize a foreign judgment procured by fraud.[307] Chevron at least has raised serious questions also as to whether the decision in the Lago Agrio litigation was so procured.

There is ample evidence of fraud in the Ecuadorian proceedings.  The LAPs, through their counsel, submitted forged expert reports in the name of Dr. Calmbacher.[308]  Their counsel orchestrated a scheme in which Stratus ghost-wrote much or all of Cabrera's supposedly independent damages assessment without, as far as the record discloses, notifying the Ecuadorian court of its involvement.[309]  They submitted comments of Stratus, bolstering the Cabrera report, but without

---

[306]

> *See, e.g., Bank Melli Iran v. Pahlaavi,* 58 F.3d 1406, 1411-12 (2d Cir.), *cert. denied,* 516 U.S. 989 (1995); *CIBC Mellon Trust Co. v. Mora Hotel Corp., N.V.,* 296 A.D.2d 81, 88, 743 N.Y.S.2d 408, 414-15 (1st Dept. 2002).

[307]

> *See Hilton*, 159 U.S. at 202 (addresses whether "fraud in procuring the [foreign] judgment or any other special reason why the comity of this nation should not allow its full effect"); RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 482(2)(c) (2011).

[308]

> Hendricks Decl. II Exs. 136, at 116:9-10, 117:16-20, 118:15-119:1; 140.

[309]

> *See id* Exs. 147, 165-166, 168-170, 179, 182, 352-354, 356, 358-359, 361-364.

83

disclosing Stratus's prior participation.[310]  Despite the apparent relationship between the LAPs and Cabrera, both parties repeatedly misrepresented to the Ecuadorian court that there was no relationship or any form of inappropriate contact that might prejudice Chevron in the proceedings.[311]

When it became evident that the LAPs' improper contacts with Cabrera, including the pre-appointment meetings, ghost-writing, and illicit payments, would be revealed through the Section 1782 proceedings, LAP representatives undertook a scheme to "cleanse" the Cabrera report.  They hired new consultants who, without visiting Ecuador or conducting new site inspections  and relying heavily on the initial Cabrera report, submitted opinions that increased the damages assessment from $27 billion to $113 billion.[312]

Although the Ecuadorian court claims to have disregarded the Calmbacher and Cabrera reports in determining the judgment, it does appear to have overruled Chevron's objections to the "cleansing" reports and considered at least some of those reports in rendering the judgment.[313] Almost all of cleansing reports explicitly relied upon Cabrera's findings.[314]  Thus, it likely is impossible to separate the tainted Cabrera process from the final judgment.  This is especially so in this case, as the Ecuadorian judiciary lacks independence, is highly susceptible to politics and

---

[310]

      *See id.* Ex. 201.

[311]

      *See e.g.*, *id.* Exs. 251-253, 255, 257, 274.

[312]

      *See id.* Ex. 261.

[313]

      *See* Judgment, at 57-58.

[314]

      *See* Exs. 199 (Allen Dep.) 171:18-20; 217 (Barnthouse Dep.) 80:13-19, 165:10-25; 219 (Shefftz Dep.) 62:11-63:9, 68:21-69:4, 128:10-20, 165:3-13; 221 (Scardina Dep.) 114:14-19, 225:5-20, 263:1-264:2, 276:14-20.

pressure, and was subject to pressure and intimidation by the LAPs. Indeed, it is at least arguable that such intimidation and pressure qualifies as duress on the court by the prevailing party, which is an independent ground for denying judgment recognition.[315]

In all the circumstances, Chevron has raised substantial questions that present a fair ground for litigation as to whether the Ecuadorian judgment is a result of fraud practiced on the Ecuadorian tribunal even if the Ecuadorian court did not consider the Calmbacher and Cabrera reports.

### d.    *This Is an Appropriate Case for Declaratory Relief*

Donziger, in a belated memorandum that is not properly before the Court for reasons stated below, argues that this is not an appropriate case for a declaratory judgment.[316]  He argues principally that this Court should decline to exercise jurisdiction under the Declaratory Judgment Act because (1) no controversy exists sufficient to bring the matter within federal jurisdiction, and (2) the action fails to satisfy the factors that courts must consider when deciding whether to exercise jurisdiction.[317]  Even if the Court were to consider these arguments, they would be unpersuasive.

---

[315]

The language of Section 483 of RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES, addressing the grounds for non-recognition of foreign judgments tracks the Recognition Act.  Comment *e* to that section cross references Sections 68 and 70 of the RESTATEMENT (SECOND) OF JUDGMENTS.  Section 70 provides that a judgment "may be avoided" if it "[r]esulted from corruption of or duress upon the court . . . or duress upon" the party "against whom the judgement was rendered.

[316]

DI 133, at 20-24.

[317]

Donziger Mem. [DI 137], at 20-24.

The Declaratory Judgment Act[318] empowers a district court to issue a declaratory judgment in "a case of actual controversy within its jurisdiction."[319]   The decision whether to exercise that power is within the discretion of the district court.[320]   Courts in this circuit generally have considered the following factors in exercising that discretion:

> "(i) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; (ii) whether a judgment would finalize the controversy and offer relief from uncertainty; (iii) whether the proposed remedy is being used merely for procedural fencing or a race to res judicata; (iv) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; and (v) whether there is a better or more effective remedy."[321]

As an initial matter, there clearly is an actual controversy here.[322]   The Ecuadorian court has rendered a multi-billion dollar judgment against Chevron.  Chevron has asked the court for clarification of certain aspects of its judgment, but those clarifications, even if granted, would not eliminate the controversy over the validity of the judgment.   Moreover, the LAPs explicitly have stated their intention to pursue enforcement in multiple jurisdictions worldwide as soon as possible and certainly no later than when the initial appeal is decided, which could occur in a matter of days once the court's clarifications issue.  This matter requires the Court's consideration now, not later.

---

318

       28 U.S.C. § 2201(a).

319

       *Id.*; *see also N.Y. Times v. Gonzales*, 459 F.3d 160, 165 (2d Cir. 2006).

320

       *See, e.g.*, *N.Y. Times*, 459 F.3d at 165-66.

321

       *See id.* at 167 (internal quotation marks omitted) (citing *Dow Jones & Co., Inc. v. Harrods Ltd.*, 346 F.3d 357, 359-60 (2d Cir. 2003)).

322

       This is unlike *Dow Jones & Co. Inc. v. Harrod's, Ltd.*, 237 F.Supp.2d 394 (S.D.N.Y. 2002), where the British court had not yet issued a judgment.

Donziger's arguments with respect to the factors pertinent to the exercise of jurisdiction similarly are unavailing.  A declaratory judgment by this Court as to the enforceability of the Ecuadorian judgment would finally determine the controversy over enforceability, at least for the United States and quite possibly more broadly.  Indeed, since equity acts *in personam*, the Court may issue an injunction barring all of the defendants from filing enforcement proceedings in other jurisdictions.  Hence, this Court's judgment should finally determine the controversy worldwide.

To be sure, Ecuador doubtless would rather not have the judgment or its legal system called into question.  To that extent, there is bound to be a certain amount of friction.[323]  But this is unavoidable.  When a sovereign country renders a judgment and parties attempt to enforce that judgment abroad, the fact that the judgment and the forum in which it was rendered are open to attack in the forum where enforcement is sought is inherent in the international scheme.  The only question here is whether that analysis will occur in one forum or in dozens or scores of *fora*, as the LAPs would have it.  In this circumstance, there is no better remedy because the alternative is litigation all over the world, deciding enforceability jurisdiction by jurisdiction.  Moreover, the record here raises very substantial doubts as to whether the appeals process in the Ecuadorian courts, controlled or heavily influenced as they are by President Correa, would resolve Chevron's claims fairly.

Of course, the Court recognizes that there is procedural fencing here as is often the case with threatened parallel proceedings.  The advantage Chevron seeks by filing in this Court is to have enforceability adjudicated in a single forum at one time, rather than in a multiplicity of jurisdictions all over the world, and it quite obviously sued in its preferred forum.  But, as is clear

---

[323]  It is worth noting in this respect that no one is attempting here to interfere with Ecuador's adjudication of the underlying dispute or the enforceability of the Ecuadorian judgment in the forum in Ecuador.

from the Invictus Memo, the LAPs are engaged in procedural fencing as well.  Unless enjoined, they intend to seek enforcement in their preferred *fora*.  But they seek more.  They hope to benefit from burdens imposed by a multiplicity of proceedings.  The question to be determined here is whether it is better, notwithstanding the fact that both parties are engaged in some degree of procedural fencing, to have one proceeding or many.  In all the circumstances, the Court finds that the factors favor exercise of jurisdiction.

2.     *The Other Claims*

Chevron makes a number of other claims on the merits, including RICO and state law tort claims.  In view of the Court's conclusion that it is sufficiently likely to prevail on its claim for a declaration that the Ecuadorian judgment is not entitled to recognition or enforcement and that efforts in that direction should be enjoined, it is not necessary to pass on those alternative theories at this time.

D.     *Likelihood of Success on the Merits – Procedural Issues*

1.     *Chevron Is Likely to Establish Personal Jurisdiction As to the Two Foreign Defendants Who Have Not Waived the Defense*

The LAP Representatives argue that the Court may not grant Chevron's motion, at least as to them, because it does not have personal jurisdiction over them.[324]  In the present posture of the case, the question is whether Chevron "has established at least a reasonable probability of

---

[324]   The LAP Representatives style their argument as an assertion that the Court does not have personal jurisdiction over any of the LAPs.  As the other LAPs have not appeared and have waived any personal jurisdiction defense, *infra* text accompanying notes 366 - 369, the point is not considered here.

88

ultimate success on the question of the court's in personam jurisdiction."[325]  Chevron must meet this burden with evidence,[326] not mere allegations.[327]

        a.     *Service of Process*

        The LAP Representatives, the two LAPs who have appeared here, first argue that they have not been served properly.  No other defendant makes that argument, and it is without merit.

        FED. R. CIV. P. 4(f)(3) authorizes service on aliens "by other means not prohibited by international agreement, as the court orders."  Pursuant to that rule, the Court on February 3, 2011, ordered that service upon the LAPs be effected by serving their lead Ecuadorian lawyer, Fajardo, by email.[328]  On February 8, 2011, Chevron filed proof of such service.[329]  Fajardo concededly received

---

[325]

        *Weitzman v. Stein,* 897 F.2d 653, 659 (2d Cir. 1990).

[326]

        *See Starlift Logistics, Inc. v. Stacey*, No. 05 Civ. 4162, 2006 WL 2689618 (E.D.N.Y. Sept. 19, 2006) (finding exercise of personal jurisdiction appropriate, but venue lacking, after holding an evidentiary hearing); *Do the Hustle, LLC v. Rogovich*, No. 03 Civ. 3870, 2003 WL 21436215 (S.D.N.Y. June 19, 2003) (declining to enjoin two defendants where plaintiffs had not submitted enough evidence to establish a reasonable probability of success on the issue of personal jurisdiction).

[327]

        *See Yurman Designs, Inc. v. A.R. Morris Jewelers*, 41 F. Supp.2d 453 (S.D.N.Y.), *denied on reconsideration*, 60 F. Supp.2d 241 (S.D.N.Y. 1999) (plaintiff's allegations as to personal jurisdiction did not suffice).

[328]

        DI 4 at 4-5 (internal footnotes omitted).

        During the Section 1782 proceedings, Fajardo submitted evidence of his authority as the LAPs' counsel.  *See In re Application of Chevron Corp.*, 10-mc-00002 (LAK), DI 165.  Specifically, he submitted a 2006 retainer agreement bearing the LAPs' names, *id.* Ex. 1 – including those of the LAP Representatives, *id.* at 2-4 11-13 – as well as a 2010 power of attorney, *id.* Ex. 2, in which 41 of the 47 LAPs – including the Individual LAPs, *id.* pt. 1 at 18-19, 25; *id.* pt. 3 at 26, 33 – affirmed his authority and ratified his actions to that point.

[329]

        DI 75 ¶¶ 5, 9, 10.

the papers,[330] and these two defendants appeared by New York counsel on February 8, 2011, and filed extensive papers in opposition to the TRO application.

The LAP Representatives nevertheless complain that service under Rule 4(f)(3) was improper because Chevron did not demonstrate an inability to serve them in person or in a manner conforming with Ecuadorian law.  But "'[s]ervice of process under Rule 4(f)(3) is neither a 'last resort' nor 'extraordinary relief.'  It is merely one means among several which enables service of process on an international defendant.'"[331]  Indeed, "[t]he only limitations on Rule 4(f)(3) are that the means of service must be directed by the court and must not be prohibited by international agreement."[332]  Their argument that the method of service violated due process therefore is frivolous.[333]  The objection on the ground of improper service fails.

b.    *The Exercise of Jurisdiction over the LAP Representatives*

The basis for subject matter jurisdiction over Chevron's claims against the LAP

---

330

Letter from Pablo Fajardo to Court, Feb. 24, 2011 [DI 128].

331

*Ehrenfeld v. Salim a Bin Mahfouz*, No. 04 Civ. 9641, 2005 WL 696769, at *2 (S.D.N.Y. Mar. 23, 2005) (quoting *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1015 (9th Cir. 2002)); *accord, Nuance Comm's, Inc. v. Abbyy Software House,* 626 F.3d 1222, 1239 (Fed. Cir. 2010).

332

*Ehrenfeld*, 2005 WL 696769, at *2 (citing *Rio Props., Inc.*, 284 F.3d at 1015).

333

"If a party receives actual notice that apprises it of the pendency of the action and affords an opportunity to respond, the due process clause is not offended."  *Baker v. Latham Sparrowbush Assocs.*, 72 F.3d 246, 254 (2d Cir. 1995) (citations omitted).

90

Representatives is alienage jurisdiction under 28 U.S.C. § 1332.[334]  Accordingly, the Court conducts

a two-part inquiry in determining its likely personal jurisdiction over them:  "First, it must determine

whether the plaintiff has shown that the defendant[s probably are] amenable to service of process

under the forum state's laws; and second, it must assess whether the court's assertion of jurisdiction

under these laws [probably] comports with the requirements of due process."[335]

(1)      <em>Amenability to Service</em>

(a)      <em>N.Y. CPLR § 301</em>

N.Y. CPLR § 301 confers general jurisdiction over parties "doing business" in the

State of New York.  A party "is 'doing business' and is therefore 'present' in New York and subject

to personal jurisdiction with respect to any cause of action, related to personal jurisdiction with

respect to any cause of action, related or unrelated to the New York contacts, if it does business in

New York 'not occasionally or casually, but with a fair measure of permanence and continuity."[336]

In *ABKCO Indus., Inc. v. Lennon*,[337] the First Department held that defendant Richard

Starkey – better known as Ringo Starr – was subject to general jurisdiction in New York on account

---

[334]
       The Declaratory Judgment Act does not confer federal question jurisdiction under 28 U.S.C. § 1331.  *See Starter Corp. v. Converse, Inc.*, 84 F.3d 592, 594 (2d Cir. 1996).

[335]
       *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 570 (2d Cir.), *cert denied*, 519 U.S. 1006 (1996) (quoted in *Ehrenfeld v. Mahfouz*, 489 F.3d 542, 547 (2d Cir. 2007)).

[336]
       *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 58 (2d Cir. 1985) (quoting *Tauza v. Susquehanna Coal Co.*, 220 N.Y. 259, 267, 115 N.E. 915 (1917)) (quoted in *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 95 (2d Cir. 2000)).

[337]
       52 A.D.2d 435, 384 N.Y.S.2d 781 (1st Dep't 1976).

of his "doing business" here.[338]  Both the New York Court of Appeals[339] and the Second Circuit[340] have assumed without deciding that CPLR § 301, as the First Department held in *ABKCO*, applies to natural persons as well as corporations.  This view, which finds further support in recent authority,[341] makes abundant sense.  Were the rule different, a corporation conducting sufficient business here would be amenable to suit under Section 301, but a natural person engaged in precisely the same activity as a sole proprietor could not.  Moreover, the concerns implicated by personal jurisdiction – such as foreseeability of suit, availing oneself of the privileges provided by a forum state, reasonableness, and the like – apply equally to corporations and natural persons.  This Court therefore adopts the view that Section 301 applies to natural persons as well as corporations.  Accordingly, it turns to the question whether these defendants probably are doing business here.

As an initial matter, the LAP Representatives repeatedly have brought or intervened in actions in this Court.  They appear to have been plaintiffs in *Aguinda*.[342]  They were plaintiffs in

---

338

     *Id.* at

339

     *Laufer v. Ostrow*, 55 N.Y.2d 305, 313, 434 N.E.2d 692 (1982) (evidence did not support that defendant was doing business in New York).

340

     *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 58 (2d Cir. 1985) (evidence did not support that defendant was doing business in New York).

341

     *MediaXposure Ltd. (Cayman) v. Omnireliant Holdings, Inc.*, No. 603325/09, 2010 WL 4225939 (Table) (Sup. N.Y. Cty. Oct. 25, 2010); *San Diego County Employees Retirement Ass'n v. Maounis*, ___ F. Supp.2d ___, No. 07 Civ. 2618 (DAB), 2010 WL 1010012, at *10-11 (S.DN.Y. Mar. 15, 2010); *Palmer v. Globalive Communications Corp.*, No. 07 Civ. 038 (MGC), 2008 WL 2971469, *3-4 (S.D.N.Y. Aug. 1, 2008).

342

     *Compare* Cpt. (listing "Hugo Gerardo Camacho Naranjo" and "Javier Piaguaje Payaguaje" as defendants) *with Aguinda* Cpt. (listing "Gerardo Camacho" and "Javier Piyaguaje" as plaintiffs).

the action before Judge Sand to enjoin Chevron's BIT arbitration.[343]  They have appeared voluntarily by counsel in both of the Section 1782 proceedings – although they were not named as parties – to oppose the discovery that Chevron therein sought, first from Berlinger and then from Donziger.  In doing so, they retained New York counsel.

　　　　　To this must be added the actions of Mr. Donziger, which are relevant because a defendant may be subject to general jurisdiction in New York based not only on the defendant's actions, but also on the actions of the defendant's agents:[344]  The question is whether the out-of-state defendant "affiliate[d] itself with a New York representative entity and that New York representative renders] services on behalf of the [out-of-state defendant] that go beyond mere solicitation and are sufficiently important to the foreign [defendant] that the [defendant] itself would perform equivalent services if no agent were available."[345]

　　　　　Donziger has been involved in this litigation – first in the *Aguinda* action in this Court and then in the Lago Agrio case – for almost 19 years.  The record of his activities in New York on behalf of the LAP Representatives is enormous, so much so that the Court infers that he has done little over the past eighteen years other than pursue the interests of the LAPs.  His firm has been the functional equivalent of the LAPs' New York office.  He has acted for them in a broad variety of ways – public relations, hiring and consulting with experts, political activity, fund raising and so on – many of which took place in or involved New York.  He persuaded Berlinger, another New York resident, to film and produce *Crude*.  He sought funding for the litigation from New York investors

---

[343]　　　　See *Yaiguaje et al v. Chevron Corp.*, 10 Civ. 316 (LBS).

[344]　　　　*Wiwa*, 226 F.3d at 95.

[345]　　　　*Id.*

– in one email, for instance, he informed Yanza of "two possible investors in New York who can help us quite a bit with money now through the upcoming years" with a potential investment of $10 million.[346]  He solicited funds from Burford Group's Christopher Bogart,[347] who appears to be based in New York.[348]  Donziger reached out also to financial and political bodies in New York to support and publicize the litigation and to exert pressure on Chevron to settle.  He met with UBS in New York to discuss Chevron's financial disclosures.[349]  He reached out to New York's then Attorney General,[350] who sent Chevron a letter requesting follow up about the veracity of Chevron's public disclosures respecting liability in Ecuador.[351]  Chevron received also similar correspondence from the New York City Comptroller.[352]  Given the likelihood that this would have happened without the LAPs reaching out, and Donziger's role as their primary agent in New York, it is reasonable to infer that Donziger provoked that letter as well.

Whether a defendant is doing business in New York "depends on the aggregate of the [defendant's] activities; the key question is whether the quality and nature of the defendant's contacts with New York make it reasonable and just according to traditional notions of fair play and

---

[346]
    *See* Hendricks Decl. II Ex. 89.

[347]
    *Id.* Ex. 337.

[348]
    Burford invested.  *Id.* Ex. 430.

[349]
    *Id.* Ex. 277.

[350]
    *Id.* Ex. 6 at 719:2-720:12.

[351]
    *Id.* Ex. 271.

[352]
    *Id.* Ex. 283.

substantial justice that it be required to defend the action in New York."[353]  On this record, Chevron

is likely to prevail on its contention that the LAP Representatives are doing business in New York

by virtue both of their repeated litigation in this Court and Donziger's activities on their behalf.[354]


       *(b)*     *N.Y. CPLR § 302*

       Even if the LAP Representatives do not satisfy Section 301, they would be subject to

specific jurisdiction in New York under Section 302(a), which provides:

> "Acts which are the basis of jurisdiction.  As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:
>
> "1.     transacts any business within the state or contracts anywhere to supply goods or services in the state."

      Chevron is likely to establish that the LAP Representatives' participation, usually as

plaintiffs, in litigation in this Court and the actions of Donziger in relation to the Lago Agrio

litigation and his associated public relations, fund raising, political and other activities on their behalf

constitute the transaction of business in New York "in person or through [one or more] agent[s]."

They therefore probably are subject to personal jurisdiction here on Chevron's claim for a declaratory

judgment and an injunction provided only that Chevron is likely also to establish this claim "aris[es]

---

[353]
> *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 937 F.2d 44, 51 (2d Cir. 1991) (internal quotation marks omitted) (citing *Laufer v. Ostrow*, 55 N.Y.2d 305, 311, 434 N.E.2d 692, 694 (1982) (citations omitted)).

[354]
> *See ABKCO*, 52 A.D.2d at 440, 384 N.Y.S.2d at 784 ("Starkey's composing activities, which he has exploited in the United States through attorneys and accountants whom he has retained in New York on a continuing basis, constitute doing business in New York.").

from" the transaction of that business.  This depends upon whether there is "an 'articulable nexus'

or a 'substantial relationship'" between the business the LAP Representatives transacted in New York

and Chevron's claims.[355]

> This determination "is not an exact science," but

> "involves a judgment as to whether the cause of action is sufficiently related to the business transacted that it would not be unfair to deem it to arise out of the transacted business.  To determine whether a sufficient nexus exists, a court must evaluate the totality of the circumstances surrounding defendants' activities in New York in connection with the matter giving rise to the lawsuit."[356]

> In this case, the LAP Representatives and the other LAPs began this litigation, in the

*Aguinda* case, in New York.  After fighting fiercely for years to keep the case here, they were

remitted to Ecuador.  But their contacts with New York, if anything, grew.  Donziger, as their agent,

was the field general of the Ecuadorian litigation, acting predominantly in New York.   He raised

money for it, gave interviews, solicited press coverage, appeared on television, hired experts,

reviewed their work product, and consulted with lawyers and others in Ecuador by e-mail and other

means of communication, all from New York.  The judgment in Ecuador is significantly a product

of his efforts.  In the totality of circumstances, Chevron is likely to establish a sufficient nexus

between the LAP Representatives' transaction of business here, both in person and through their

---

[355]

    *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 23-24 (2d Cir. 2004); *see also Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006) (quoting *McGowan v. Smith*, 52 N.Y.2d 268, 272, 437 N.Y.S.2d 643, 419 N.E.2d 321 (1981)); *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467, 527 N.Y.S.2d 195, 522 N.E.2d 40 (1988).

[356]

    *Antaeus Enters. Inc v. SD-Barn Real Estate, LLC*, 396 F. Supp.2d 408, 410 (S.D.N.Y. 2005) (citing *PDK Labs*, 103 F.3d 1105, 1109 (2d Cir. 1997)) (quoting *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 59 (2d Cir.1985)), and citing *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 31 (2d Cir.1996) (requiring a "substantial nexus" between the business transacted and plaintiff's cause of action) (internal quotation marks and footnotes omitted).

agents, to bring them within CPLR § 302(a), subd. 1.

#### (2)    Due Process

The question whether due process permits an exercise of jurisdiction requires "an analysis consisting of two components: the 'minimum contacts' test and the 'reasonableness' inquiry."[357]  The former looks to "whether the defendant has certain minimum contacts [with the forum] . . . such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."[358]  The latter "asks . . . whether it is reasonable under the circumstances of the particular case" to assert personal jurisdiction.[359]

#### (a)    Minimum Contacts

To satisfy due process, a defendant's minimum contacts with the forum state "must have a basis in 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws.'"[360]  "[T]he defendant's conduct and connection with the forum State [must be] such that he

---

357

    *Bank Brussels Lambert v. Fidler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002) (citing *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir.1996)).

358

    *Id.* at 127 (quoting *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 152 (2d Cir.2001) (in turn quoting *Calder v. Jones*, 465 U.S. 783, 788 (1984)) (internal quotation marks omitted).

359

    *Id.* at 129 (quoting *Metro. Life Ins.*, 84 F.3d at 568 (in turn quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)) (internal quotation marks omitted).

360

    *Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal., Solano County*, 480 U.S. 102, 109 (1987) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).

should reasonably anticipate being haled into court there."[361]   As with the analysis under CPLR Sections 301 and 302, the claim must arise out of the defendant's minimum contacts with the state if specific jurisdiction, but not general jurisdiction, is asserted .[362]

> For substantially the same reasons that the Court found that Chevron is likely to prevail on its contention that the LAP Representatives' New York contacts are sufficient under state law, their contacts with New York are likely to satisfy due process as well.[363]

> (b)      Reasonableness

> As the LAP Representatives probably have established the requisite minimum contacts with New York, the presumption is in favor of retaining jurisdiction over them.[364]   To rebut that

---

[361]

*World-Wide Volkswage Corp. v. Woodson*, 444 U.S. 286 (1980).

[362]

*See Prime Mover Capital Partners L.P. v. Elixir Gaming Techs., Inc.*, ___ F. Supp.2d ___, 2011 WL 70144, at *2 (S.D.N.Y. Jan. 4, 2011).

[363]

*E.g.*, *McGlone v. Thermotex, Inc.*, ___ F. Supp.2d ___, 2010 WL 3749356, at *4 (E.D.N.Y. Sept. 21, 2010) (minimum contacts satisfied under due process for same reasons as under New York law).

An instructive case on constitutional minimum contacts is *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437 (1952).  There, the Supreme Court held that Ohio constitutionally could exercise general jurisdiction over a Filipino corporation based on the activities that its manager carried on in Ohio during the Japanese occupation of the Philippines.  *Id.* at 447-48.  Many of the activities in which he had engaged – running the business, corresponding, holding meetings, dispatching funds – are the same as those performed by Donziger in New York on behalf of the LAP Representatives.

[364]

*See Burger King*, 471 U.S. at 477 ("[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable."); *see also Simon*, 86 F. Supp.2d at 133 ("Those cases in which jurisdiction is so unreasonable as to defeat a showing of 'minimum contacts' are rare.").

98

presumption, they must present a compelling case that the exercise of such jurisdiction would be unreasonable.

The reasonableness of exercising jurisdiction over an alien defendant depends on four factors: (1) "the burden on the defendant," (2) "the interest of the forum state in obtaining convenient and effective relief," (3) "the interest of the plaintiff in obtaining convenient and effective relief," and (4) "the procedural and substantive policies of other nations whose interests are affected by the assertion of jurisdiction by the state court."[365]

The Court recognizes that the LAP Representatives apparently are indigenous persons living in the Amazonian rainforest and that, were this an ordinary litigation, litigation here would be burdensome for them. But this is no ordinary litigation, and there would be no burden. They brought the Lago Agrio case not to recover for personal injuries or property damage to them, but in a role more akin to private attorneys general, suing to remediate the region. There is no reason to think they have personal knowledge respecting the issues here, viz. the enforceability of the Lago Agrio judgment. Moreover, it appears that the LAP Representatives originally chose to bring the *Aguinda* action here and repeatedly have appeared here by counsel when it suited their purposes. They have been represented by innumerable prominent American lawyers for years, some of them in New York. In the circumstances, the Court's exercise of personal jurisdiction would not be burdensome.

The other factors bearing on reasonableness also probably support the exercise of jurisdiction.

New York has a material interest in adjudicating this dispute. The scheme that

---

[365] *Simon*, 86 F. Supp. at 128-29 (citing *Asahi*, 480 U.S. at 113; *Burger King*, 471 U.S. at 477; *World-Wide Volkswagen Corp.*, 444 U.S. at 292).

allegedly produced the judgment was formed or, at least, significantly advanced in New York. Donziger, a key figure, is a member of the New York Bar.

Chevron also has a substantial interest in obtaining convenient and effective relief, if indeed it is so entitled. It is perfectly reasonable and logical for Chevron to seek this relief in a United States forum, and specifically in the city in which such a large portion of the events leading to the Lago Agrio judgment took place. While no doubt other U.S. *fora* also would be reasonable, it cannot be said that New York is unreasonable.

Finally, one cannot say that other countries have significant interests that undermine this Court's exercise of jurisdiction. Naturally, Ecuador is interested. But the enforceability of the judgment outside Ecuador necessarily will be determined in a country or countries other than Ecuador. Ecuador's interest therefore does not alter the balance.

c.      *The Other Defendants*

Although none of the other LAPs, Fajardo, Yanza and the ADF, has appeared in this action, Chevron seeks a preliminary injunction against them as well. As a preliminary injunction should be entered only against defendants as to whom the plaintiff is likely to establish personal jurisdiction, the Court considers whether Chevron is likely to establish such jurisdiction as to them as well.

FED. R. CIV. P. 12 requires that defenses of insufficient service of process and lack of personal jurisdiction be asserted by motion or responsive pleading within 21 days after service of the summons and complaint. The Ecuadorian defendants were served with the summons and complaint,

pursuant to the order to show cause,[366] on February 4, 2011.[367]  They therefore had until February 25, extended by the Court until March 1,[368] to answer or move with respect to the complaint.  None but the LAP Representatives did either.  Under Rule 12(h), they therefore have waived the defenses of insufficiency of service and lack of personal jurisdiction as have the other Ecuadorian defendants.[369]

2.    *Comity and Abstention*

The defendants argue also that principles of *Younger* abstention and international comity counsel against issuing an injunction in this matter.

The abstention point with respect to other U.S. actions need not detain us long. *Younger* abstention applies only with respect to concurrent actions regarding the same matter filed in state courts of the United States and not with respect to foreign proceedings.[370]  There are none,

---

366

DI 4.

367

DI 75.

368

DI 127.

369

The Court extended the time until March 1, indicating that it would entertain "a timely motion for a further extension made on notice to all parties."  DI 127.  On March 2, Fajardo sent the Court a letter asserting on his and, purportedly, the LAPs' behalf "any and all other defenses available" and denying any waiver.  First, in light of the March 1 deadline, the March 2 letter was not timely.  Second, as the Court previously ruled [DI 127], Fajardo may not represent the LAPs in these proceedings, as he is not a member of the Bar.  *See id.*  Nor was his letter on notice to all parties.  For all of these reasons, the letter did not save Fajardo or any other defendants from their defaults and consequent waiver of jurisdictional objections to Chevron's motion.  The Court does not here address the question whether an appropriate future request for an extension within which to respond or move would be granted or whether any of these defendants then might be relieved of his or her waiver.

370

*See Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 17 (1987) (*Younger* abstention required district court to abstain from hearing constitutional claims where judgment debtor had not presented those claims to state court); *id.* at 11 ("[Comity] mandates application of *Younger* abstention

at least as far as the record discloses.

The propriety of enjoining potential enforcement actions in foreign courts is another matter, albeit one having nothing to do with *Younger*. "The power of federal courts to enjoin foreign suits by persons subject to their jurisdiction is well-established."[371]   "The fact that [such an] injunction operates only against the parties, and not directly against the foreign court," however, "does not eliminate the need for due regard to principles of international comity, because such an order effectively restricts the jurisdiction of the court of a foreign sovereign."[372]   As a result, anti-suit injunctions should be "used sparingly" and should be granted "only with care and great restraint."[373]

In this circuit, *China Trade & Development Corp. v. Choong Yong*[374] and its progeny provide the standard for determining when a court may enjoin parties before it from commencing or pursuing litigation in foreign jurisdictions.  There are two threshold requirements: (1) the parties in the two litigations must be the same, and (2) resolution of the case before the enjoining court should be dispositive of the actions to be enjoined in the foreign *fora*.[375]   If those conditions are met, then

---

not only when the pending state proceedings are criminal, but also when certain civil proceedings are pending, if the State's interests in the proceeding are so important that exercise of the federal judicial power would disregard the comity between the States and the National Government.").

[371]

*China Trade & Dev. Corp. V. M.V. Choong Yong*, 837 F.2d 33, 35 (2d Cir. 1987).

[372]

*Id.* at 35-36.

[373]

*Id.* (internal quotation marks and citations omitted).

[374]

*Id.*

[375]

*Id.* at 36; *see also Karaha Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 500 F.3d 111, 119 (2d Cir. 2007).

102

the court should consider five factors in determining whether to issue the injunction: "(1) frustration of a policy in the enjoining forum; (2) [whether] the foreign action would be vexatious; (3) [any] threat to the issuing court's in rem or quasi in rem jurisdiction; (4) [whether] the proceedings in the other forum prejudice other equitable considerations; or (5) [whether] adjudication of the same issues in separate actions would result in delay, inconvenience, expense, inconsistency, or a race to judgment."[376]

The first threshold requirement is met here because there is "substantial similarity and affiliation"[377] between the parties currently before this Court and the parties that necessarily would be involved in any enforcement actions in other jurisdictions. Courts generally have not applied the identity of parties prong literally, but instead found it to be satisfied where "even though not all parties to the two actions were identical, . . . 'the real parties in interest are the same in both matters.'"[378]

Here, the real parties in interest necessarily would be the same in any foreign enforcement actions that might be filed. Chevron obviously would be the defendant in any such action, and the LAPs and the ADF, who are defendants here, are the beneficiaries of the judgment and hence are the parties entitled to sue for enforcement. In addition, the other defendants on this complaint are closely affiliated with the LAPs and their lawsuit and are named in connection with

---

[376]

China Trade, 837 F.2d at 35 (quoting Am. Home Assur. Corp. v. The Insur. Corp. of Ireland, Ltd., 603 F. Supp. 636, 643 (S.D.N.Y. 1984) (internal quotation marks omitted)).

[377]

Paramedics Electromedicina Comercial, LTDA. v. GE Med. Sys. Info. Techs., Inc., 369 F.3d 645, 652 (2d Cir. 2004).

[378]

Id. at 652-53 (quoting Motorola Credit Corp. v. Uzan, 2003 WL 56998 (S.D.N.Y. Jan. 7, 2003)).

103

their advocacy of their interests.  Accordingly, the fact that the Stratus defendants likely would not be involved in any foreign enforcement action does not destroy the substantial similarity and affiliation among the parties currently before the Court and those that would be involved in any foreign enforcement suits.

> The second requirement is satisfied also.  A decision by this Court holding that the judgment is unenforceable and enjoining its enforcement would bind all of the parties that potentially could enforce the judgment and therefore should foreclose even the filing of foreign enforcement suits.[379]  Moreover, even if enforcement actions were to be filed abroad in violation of an injunction, a decision by this Court with respect to the enforceability of the Ecuadorian judgment likely would be recognized as sufficiently persuasive authority – if not binding on the parties – to dispose of the question of enforceability in the foreign *fora*.[380]  Under New York law, the question of enforceability turns on whether the Ecuadorian judgment was rendered by a system so fundamentally unfair and impartial that the judgment should not be recognized or a product of fraud.  This is a very common

---

[379]
> *See Paramedics*, 369 F.3d at 653-54 (affirming district court's conclusion that its holding that certain claims concurrently being asserted in a Brazilian action were arbitrable disposed also of that action for purposes of the second prong).

[380]
> This is very different from cases in which a U.S. decision applying U.S. substantive law would not dispose of a similar foreign action because the foreign action claims relief pursuant to foreign substantive law.  *See id.* at 653 n.3 ("Compare the cases in which the domestic court speaks to the merits of a controversy under domestic law while an analogous claim under foreign law is pending in a foreign forum, and in which resolution of one action may not dispose of the other.  *See Sperry Rand Corp. v. Sunbeam Corp.,* 285 F.2d 542, 545 (7th Cir.1960) (disposition of trademark action in Illinois would not necessarily resolve subsequently trademark suit filed in Germany under German law by plaintiff's German licensee, which "involv[ed] specific foreign rights arising under and enforceable only through the laws of" Germany); *Rauland Borg Corp. v. TCS Mgmt. Group, Inc.*, 1995 WL 31569 (N.D.Ill. Jan. 25, 1995), 1995 U.S. Dist. LEXIS 893, at *9-*12 (American trademark action implicated a different set of laws-and raised a potentially unique set of defenses-from a Canadian trademark action involving the same parties and issues).").

104

standard for determining whether to recognize foreign judgments.[381]  A careful factual and legal determination here that the Ecuadorian judgment is not entitled to enforcement on either ground ought to dispose also of any foreign enforcement actions that might be filed.

Having found the two threshold conditions to be present, the Court turns now to the remaining factors.  "*China Trade* instructed that two of these factors should be accorded 'greater significance': whether the foreign action threatens the enjoining forum's jurisdiction or its 'strong public policies.'  However, [the Second Circuit has] reiterated that *all* of the additional factors should be considered when determining whether an anti-suit injunction is warranted."[382]

Here the second, fourth, and fifth factors strongly counsel in favor of an injunction. The contemplated foreign actions would be vexatious, designed in part to harass and coerce Chevron into settling with defendants more quickly and at a higher price than otherwise might occur on the basis of the merits of the judgment alone.  Adjudication of enforceability of the judgment in multiple foreign actions likely would result in delay, inconvenience, expense, inconsistency, and a race to judgment.

Important public policies support injunctive relief as well.  "An anti-suit injunction may . . . be appropriate when a party seeks to evade important policies of the forum by litigating

---

[381]

*See, e.g.*, United Kingdom Foreign Judgments Reciprocal Enforcement Act of 1933, Part I.4(a), *available at* http://www.legislation.gov.uk/ukpga/Geo5/23-24/13/contents (foreign judgment shall be set aside if, *inter alia*, it was obtained by fraud or if enforcement would be contrary to public policy of the enforcing court); Singapore Academy of Laws, The Conflict of Laws, Chapter 6, § 4, *available at* http://www.singaporelaw.sg/content/Conflict.html (foreign judgment will not be enforced if it, *inter alia*, has been obtained "in breach of natural justice" (6.4.7), or would contravene public policy (6.4.9), and it may be impeached if it was obtained by fraud (6.4.11));

[382]

*Karaha Bodas*, 500 F.3d at 119 (internal citations omitted) (emphasis in original); *see also Ibeto Petrochemical Indus. Ltd. v. M/T Beffen*, 475 F.3d 56, 64 (2d Cir. 2007).

before a foreign court."[383]   Here, defendants intend to pursue multiple enforcement actions around the globe in an effort to pressure Chevron with respect to settlement and to enforce the judgment in *fora* that would not look closely at what occurred in Ecuador.  If the LAPs were allowed to enforce, or attempt to enforce, the judgment in this manner, they would be evading the U.S.'s strong interest in protecting its citizens from judgments entered in systems that do not accord their litigants the essentials of due process or as a result of fraud, particularly fraud organized and conducted in part within the United States.  In this respect, enforcement of the judgment appears also to threaten this Court's jurisdiction in that it would "undermine federal jurisdiction to determine whether [the judgment] should be invalidated on the bas[e]s" advanced by Chevron.[384]

In all the circumstances, the *China Trade* factors support the requested injunctive relief.

3.      *Donziger's Judicial Estoppel Argument Lacks Merit*

Donziger and the LAP Representatives argue that Chevron is unlikely to prevail because "Chevron's predecessor-in-interest relentlessly pursued dismissal of the initial *Aguinda* class action (filed in this Court) on the ground that Ecuador was the proper [and an entirely adequate] forum."[385]   The argument is riddled with flaws.

First, each and every statement upon which Donziger and the LAP Representatives rely was made by Texaco, not Chevron.  Chevron never was a party to the *Aguinda* case and, indeed,

---

[383]      *China Trade*, 837 F.2d at 37.

[384]      *Karaha Bodas*, 500 F.3d at 126.

[385]      Donziger Mem. [DI 137], at 17.  *See also* Lago Agrio Mem. [61-1], at 43.

did not even acquire the shares of Texaco – the alleged predecessor-in-interest to which Donziger refers – until October 2001.[386]   Texaco – the very same Texaco, Inc. that was a defendant in the *Aguinda* suit – remains a Delaware corporation, as it has been since 1926.  The blithe assumption that Chevron is bound or estopped by anything that Texaco said or did therefore assumes that Chevron became its successor-in-interest by virtue of its 2001 acquisition of Texaco's shares simply assumes that the LAPs are entitled to pierce Texaco's corporate veil or otherwise impute its previous positions to Chevron in these proceedings.  Yet there is no evidence in this record that, if accepted, could justify disregarding Texaco's separate corporate existence.  The LAPs simply have ignored that issue.

Second, even if the Texaco statements upon which Donziger and the LAP Representatives rely were attributable to Chevron, they would not get the LAP Representatives where they want to go.  Each of the statements relied upon, save one, was made in 1998 and 1999.  The exception was in 2001.  Even if they bound Chevron today, they spoke to the state of affairs in the 1998-2001 period.  But the conditions in Ecuador have changed dramatically in the past nine-plus years.[387]   Thus, there is no inconsistency between saying that Ecuador was an adequate forum in 1998-2001 and maintaining that it is not so today and has not been during the entire period since the Lago Agrio litigation began in 2003.

4.    *Donziger Was Afforded an Adequate Opportunity to Respond*

Donziger complains that he did not receive an adequate opportunity to respond.  That contention is best evaluated only in the full context in which it is made.

---

[386]

ChevronTexaco Corp., Annual Report (Form 10-K), Ex. 21.1 (Mar. 27, 2002).

[387]

*See supra* notes 163 - 197 and accompanying text.

     *a.     The Argument and Scheduling of the Motion*

This action was commenced on February 1, 2011. Donziger was aware of it immediately, as a lawyer representing him issued a statement on Donziger's behalf commenting on it that very day.[388]

On February 3, 2011, Chevron moved by order to show cause for a TRO and a preliminary injunction barring the LAPs, Donziger and others from, *inter alia,* commencing or prosecuting any proceeding to enforce any judgment that might be entered in the Lago Agrio case. The motion was supported, among other things, by evidence that the LAPs intended, promptly upon entry of such a judgment, to begin multiple enforcement proceedings around the world including, if possible, *ex parte* proceedings with the objective of disrupting Chevron's business and pressuring it to agree to a quick settlement.[389] Indeed, it presented evidence that Donziger himself had stated that "[W]e're coming back immediately, as soon as we can, to get that judgment enforced. We are not waiting for the appeals process, as is our right."[390] Moreover, there was substantial evidence that the entry of judgment in Ecuador was imminent. Citing statements by the Ecuadorian court, the LAPs had argued in a related proceeding that "a final judgment . . . can be entered, as early as February

---

[388]

     Barbara Leonard, *Chevron Levels RICO Charges Over $113 Billion Trial in Ecuador* (available at http://www.courthousenews.com/2011/02/01/33808.htm). The statement was reported also on the same day on another blog that reports on this case. *Amazon Defense Coalition on Chevron Fraud and RICO Case* (http://chevronecuadorlawsuitclearinghouse.wordpress.com/2011/02/01/amazon-defense-coalition-statement-on-chevron-fraud-and-rico-case/).

[389]

     Invictus Memo, at 14, 15, 17-29; Tr., Feb. 8, 2011, at 42:12-46:25.

[390]

     Hendricks Decl. II Ex. 1, CRS-482-00-CLIP-01.

108

2011."[391]

Rather than grant the TRO *ex parte,* the Court scheduled an argument on the TRO application for February 8, 2011, and indicated that a schedule for submission of papers in opposition to the preliminary injunction motion would be set subsequently.[392]  Donziger was served on February 3, 2011.

On February 8, 2011, the LAP Representatives filed a 78-page memorandum of law and a declaration and exhibits totaling 1,215 pages in opposition to the motion.[393]  Donziger, however, submitted only an unsworn letter in which he sought an adjournment and claimed that he had been unable to find counsel.  The Court denied the requested adjournment in light of the apparent imminence of the threatened harm and the need for prompt consideration at least of the TRO application, which properly could have been granted *ex parte.*  The Court then heard argument. Donziger appeared on his own behalf, but elected not to argue.  After hearing argument from the other parties, the Court granted the TRO and fixed February 11 as the date by which any opposing papers – that is, any papers in addition to the 78-page brief and 1,215 pages of evidence already submitted by the LAP Representatives – were to be filed.  On February 11, 2011, the LAP Representatives filed an additional memorandum of law.  Donziger filed nothing.

The Court heard argument on the preliminary injunction on February 18, 2011, at which time Donziger's present counsel appeared for the first time, unsuccessfully sought an adjournment, and argued the motion.

---

[391]     *Id.* Ex. 340, at 18.

[392]     DI 4.

[393]     DI 61-67.

     b.      *The Denial of the Adjournment and the Briefing Schedule Were Consistent With Rule 65(a) and Due Process*

As the Supreme Court has recognized:

> "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."[394]

Frequently, then, neither side to such an application will have as full an opportunity to marshal proof or brief law as it ideally would like before the motion is decided. Nevertheless, where the urgency warrants, such motions often are decided very quickly.[395] That of course is not to say that a party against whom such relief is sought is not entitled to a fair opportunity to respond. As the Second Circuit said in the *Rosen* case:

> "The Federal Rules of Civil Procedure prescribe a stylized ritual for the entry of a preliminary injunction. First, Rule 65 provides that '[n]o preliminary injunction shall be issued without notice to the adverse party.' FED.R.CIV.P. 65(a)(1).

---

[394]

     *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *see also Hsu By and Through Hsu v. Roslyn Union Free School Dist. No. 3*, 85 F.3d 839, 852 (2d Cir.) (even a provisional remedy that has the effect of disposing of the matter must be correct only "insofar as [is] possible on what may be an incomplete record"), *cert. denied*, 519 U.S. 1040 (1996); *Romer v. Green Point Sav. Bank*, 27 F.3d 12, 16 (2d Cir. 1994) (same); *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp.2d 1197, 1212 (C.D. Cal. 2007) ("Preliminary injunctions are typically requested when a lawsuit's factual development is limited and are designed to preserve the status quo pending trial."); *In re Johns-Manville Corp.*, No. 03 Civ. 7173, 2004 WL 385118, at *2 (S.D.N.Y. Mar. 2, 2004)(preliminary injunctions are decided on a "necessarily incomplete record").

[395]

     *E.g.*, *In re Marine Pollution Svc., Inc.*, 857 F.2d 91 (2d Cir. 1988) (reinstating bankruptcy court's preliminary injunction issued four days after grant of stay); *Williams v. Salerno*, 792 F.2d 323 (2d Cir. 1986) (affirming preliminary injunction issued two days after it was transferred to the issuing judge); *cf. Briley v. Blackford*, No. 89 Civ. 8365, 1990 WL 33727, at *6 n.7 (S.D.N.Y. Mar. 22, 1990) (denying motion for preliminary injunction without reaching "serious challenges" to subject matter and personal jurisdiction "because of the parties' need for urgent resolution of the motion").

110

> "'The purpose of this requirement is to give the opposing party a 'fair opportunity to oppose the motion for a preliminary injunction,' 7-Pt. 2 Moore's Federal Practice ¶ 65.04[3], at 65-81 (2d ed.1989), and the court must allow that party sufficient time to marshal his evidence and present his arguments against the issuance of the injunction, see 11 C. Wright & A. Miller, Federal Practice and Procedure § 2949, at 468 (1973).'"[396]

Hence, in that very case, it reversed the grant of a preliminary injunction because, among other things:

> "Siegel [the movant] made neither a written nor an oral motion for an injunction; the district court apparently entered the injunction in response to Siegel's letter request. The court never told Rosen [the non-moving party] that it was considering an injunction. Thus, Rosen had no notice that an injunction might be entered against him, and no fair opportunity to oppose it."[397]

But this case bears no resemblance to that.

The "stylized ritual" to which the Circuit referred in *Rosen* and elsewhere was followed here.  The complaint, of which Donziger was aware on the day of its filing, specifically sought a TRO and preliminary injunction.[398] An order to show cause bringing on the motion was issued and served on Donziger.  He then had five days notice before the TRO application – which could have been granted *ex parte* – was even heard.  He had ten days from the filing of the complaint and eight days from the issuance of the TRO within which to file opposing papers – a period during which the LAP Representatives, whose interest in resisting the preliminary injunction presumably is considerably greater than that of Donziger, who is one of their lawyers, filed 95 pages of memoranda and over 1,200 pages of declaration and exhibits.  So Donziger's argument comes down

---

[396]

    *Rosen v. Siegel,* 106 F.3d 28, 31 (2d Cir. 1997) (quoting *Weissman v. Stein,* 897 F.2d 653, 657 (2d Cir. 1990)).

[397]

    *Rosen,* 106 F.3d at 32.

[398]

    Cpt., prayer for relief ¶ 5.

to the proposition that the Court abused its discretion in fixing the briefing schedule.  And while the Court sympathizes with the plight in which Donziger's present counsel found themselves when they were retained on February 17, 2011, it is Donziger's position that is significant, not his belatedly hired lawyers.  In the circumstances of this case, there was no abuse of discretion in the briefing schedule.

As an initial matter, there appeared to be a need for very prompt action in light of the apparent imminence of the entry of a judgment in Ecuador – which of course occurred just days later – and the LAPs' stated determination to move promptly to seek to enforce that judgment in multiple jurisdictions around the world "without," in Donziger's words, "waiting for the appeals process." This was compounded by the facts that (a) a district court is obliged by Rule 52 to make findings of fact and conclusions of law in granting or denying a preliminary injunction,[399] (b) the TRO could not have been extended beyond March 8, 2011 by virtue of Rule 65(b), and (c) the record already submitted by Chevron and the LAP Representatives already including almost 200 pages of memoranda of law and thousands of pages of evidence.  The Court thus was obliged to absorb that material and prepare a decision on a complex matter in less than four weeks, a task that it feared could not properly be completed unless the record were closed promptly.  Another way of putting the same point is that "where interlocutory relief is truly needed, Rule 65 demands such but only such thoroughness as a burdened federal judiciary can reasonably be expected to attain within [the] twenty

---

[399] In exceptionally narrow circumstances, not present here, findings and conclusions may be dispensed with.  *E.g.*, *SEC v. Frank*, 388 F.2d 486, 490-91 (2d Cir.1968) (Friendly, J.) ("Congress is, of course, free, within the broad limits of due process, to dispense with the requirement of an evidentiary hearing when a federal agency seeks an interlocutory injunction.").

days" during which a TRO may run.[400]  These considerations alone justified the denial of any adjournment and the briefing schedule.  But other factors reinforced this conclusion.

First, a much more accommodating schedule could have been fixed had the LAP Representatives and Donziger been willing to agree to an extension of the TRO beyond 28 days in order to afford additional submissions and time for decision.[401]  While Donziger ostensibly was willing to extend the TRO *as to himself only,* the LAP Representatives were not.[402]  Donziger's offer therefore was illusory in the sense that it would have afforded Chevron no protection from enforcement activities on behalf of the LAP Representatives who, unlike Donziger, supposedly are real parties in interest with respect to the judgment.  It smacked also of gamesmanship, particularly in light of the fact that the explanation for the LAPs' position was risible.[403]  But whatever the

---

[400]

    *Id.* at 490-91.

[401]

    The refusal to extend the TRO as to all defendants to afford more time to all concerned was of a piece with repeated efforts by Donziger and the LAPs in related proceedings in the United States.  In the Section 1782 proceedings and the action to stay the arbitration,  this Court, Judge Sand and the Second Circuit all pressed the LAPs and Donziger – in response to earlier requests for postponements and delays – as to whether they would agree to stay matters in Ecuador in order to permit more deliberate consideration of proceedings here.  *In re Chevron Corp.,* No. 10 MC 00002 (LAK), 2010 WL 4922312, at *1 & n.6 (S.D.N.Y. Nov. 30, 2010); *Chevron II,* 2010 WL 4910248, at *3; *Chevron I,* 709 F. Supp.2d at 309; Hendricks Decl. II Ex. 345, at 84:8-12; Tr ., Nov. 22, 2010, at 79:24-82:15.  The LAPs and Donziger have rebuffed every such suggestion.  Moreover, there is abundant evidence in e-mails to which Donziger and attorneys for the LAPs suggesting that they were taking positions in the U.S. litigations which they knew were unlikely to prevail for the purpose of delay.  *See* Hendricks Decl. Exs. 292, 323, 387-88, 527.

[402]

    Tr., Feb. 8, 2011, at 35:23-36:7; *see also* Tr., Feb. 18, 2011, at 50:12-21.

[403]

    The LAPs argued at the preliminary injunction hearing that they would not agree to extend the TRO because they contest this Court's jurisdiction over them.  *See* Tr., Feb. 18, 2011, at 50:12-21; *see also id.* at 39:23-40:10, 40:20-21 (counsel for Donziger making the same argument).  But they easily could have agreed to a temporary injunction without prejudice to their jurisdictional objection, if only by filing an answer preserving the defense.

motives, the need to resolve this motion on the expedited schedule adopted was attributable principally to the position of the LAP Representatives.[404]

Second, Donziger, is a lawyer intimately involved in all aspects of the Ecuadorian litigation with respect to Chevron  His letterhead reveals that he has two associates.  He has existing personal attorney-client relationships with respect to this or related matters with Mr. Lefcourt and the Friedman, Kaplan firm.  Surely he could have filed answering papers by February 11, 2011 had he wished to do so, even if he truly could not find other counsel.  Moreover, there is cause for skepticism regarding Donziger's claim that he had been unable to do so.[405] His decision not to do so did not transform this Court's routine fixing of a briefing schedule into a Rule 65(a) or due process violation.

The standard governing Donziger's contention is clear: The Second Circuit's

"precedent instructs us to be 'particularly solicitous of a district court's ruling on a motion to adjourn the scheduled start of a trial proceeding.' *Sequa Corp. v. GBJ Corp.,* 156 F.3d 136, 147-48 (2d Cir.1998). We will not disturb such a ruling absent

---

[404]

Donziger suggests that Chevron took its time preparing its motion.  No doubt it took a good deal of effort.  But it was not until January 18, 2011 that Donziger admitted at a deposition in the Section 1782 proceeding that a decision could be rendered in Ecuador at any time Hendricks Decl. II Ex 462, at 3255:19-25 and even later, February 2, 2011, when the Ecuadorian judge effectively refused the request of the arbitration tribunal for an estimate of when a decision might be rendered in Ecuador, Hendricks Ex. 459.

[405]

As noted, as early as February 1, 2011 – the very day this case was commenced – a prominent New York lawyer who had been present in a prior proceeding in the Section 1782 case against Donziger and later was present with him at the TRO argument, issued a public statement with respect to this case as Donziger's attorney.  While that lawyer has not filed an appearance, Donziger concedes that the lawyer in question has an attorney-client relationship with Donziger with respect to this matter.   Thus, Donziger perhaps meant to convey only that he had not by February 8, 2011 assembled a legal team entirely to his satisfaction for this proceeding, not that he had been unable to find counsel.  Moreover, throughout the period relevant here, he has been represented in *Chevron Corp. v. Donziger,* No. 10 MC 0002 (LAK), by the firm of Friedman, Kaplan, Seiler & Adelman.   No explanation has been offered as to why that firm could not have represented him on this motion.

> a showing of 'clear abuse.' *Id.* '[T]o make that showing, the complaining party must establish both that the denial of the adjournment was arbitrary, and that it substantially impaired the presentation of his case.' *Id.; accord Farias v. Instructional Sys., Inc.,* 259 F.3d 91, 99-100 (2d Cir.2001) (identifying no abuse where, on first day of trial, court denied continuance to obtain absent witness and noting that decisions regarding trial adjournments 'rest within the sound discretion of the trial court and will be overturned only' where 'there is showing both of arbitrariness and of prejudice to the defendant'); *cf. Ungar v. Sarafite,* 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964) ('The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process *even if the party fails to offer evidence or is compelled to defend without counsel.*').'"[406]

As this standard governs with respect to trial adjournments in criminal cases, where the moving party may be deprived of his liberty, district judges necessarily have at least as much latitude with respect to adjournments of and briefing schedules on motions for preliminary injunctions in civil cases, where the remedy in question is provisional only and the stakes are far less weighty.

      The Court's scheduling decisions ruling fell comfortably within the appropriate degree of latitude, as they were reasoned determinations based on the facts and circumstances of this case and therefore not arbitrary.

      Nor did the Court's actions substantially impair the presentation of Donziger's case, even putting aside his election not to respond when required.   His present counsel on February 25, 2011 – 22 days after the order to show cause was served and 11 days after the expiration of the time for filing answering papers on the motion – filed what they characterized as an offer of proof.   It includes 1,538 pages of declarations and exhibits and a 35-page memorandum.   As appears elsewhere in this opinion, even if the Court were to consider the offer of proof, it would not alter the result here. Thus, even with the benefit of the two week extension that Donziger and his new counsel have attempted to grant themselves, the outcome would be the same.

---

[406]

      *Lewis v. Rawson,* 564 F.3d 569, 577 (2d Cir. 2009) (emphasis added).

5.      *No Evidentiary Hearing Was Required*

No party – including Donziger – requested an evidentiary hearing when the preliminary injunction motion was argued on February 18.  In the papers belatedly filed on February 25, however, Donziger's counsel asserted that the Court had "cancelled the evidentiary hearing," asserted that most of the facts upon which the motion is based "are hotly contested," and contended that "the issues presented by a motion for a preliminary injunction implicate disputed issues of fact" and that such a motion "'should not be decided on the basis of affidavits.'"[407] This is a considerable distortion of both the facts and the law.[408]

"[T]here is no hard and fast rule . . . that oral testimony must be taken on a motion for a preliminary injunction." [409]  No hearing is required where the record is devoid of disputed material facts or where the paper record makes a complete resolution possible.[410]  Nor is an evidentiary

---

[407]

DI 137, at 4, 7 (quoting *Kern v. Clark,* 331 F.3d 9, 12 (2d Cir. 2003)).

[408]

The assertion that the Court "cancelled the evidentiary hearing" is particularly inaccurate, as no evidentiary hearing ever was scheduled.  On February 8, 2011, when the TRO was argued and before all of the answering papers were due, the Court told counsel "to hold the period beginning February 22 available against the possibility" of an evidentiary hearing "if [the Court] conclude[d] that there is sufficient reason to do so."  Tr., Feb. 8, 2011, at 51-52.  At the preliminary injunction argument on February 18, 2011, after all answering papers should have been filed, no one asked for an evidentiary hearing and, in any case, there was no need for one in light of the lack of material factual issues requiring the taking of testimony in order to resolve this motion.

[409]

*Maryland Cas. Co. v. Realty Advisory Bd. on Labor Relations.,* 107 F.3d 979, 985 (2d Cir.1997).  *See also See also Wall v. Construction & Gen. Laborers' Union,* 80 Fed.Appx. 714, 716 (2d Cir. 2003); *Consol. Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 256 (2d Cir. 1989); *Redac Project 6426, Inc. v. Allstate Ins. Co.,* 402 F.2d 789, 790-91 (2d Cir.1968); *SEC v. Frank,* 388 F.2d at 490-91.

[410]

*Moore v. Consol. Edison Co. of NY,* 409 F.3d 506, 512 (2d Cir. 2005); *Charette v. Town of Oyster Bay,* 159 F.3d 749, 755 (2d Cir.1998) ("An evidentiary hearing is not required when the relevant facts either are not in dispute ... or when the disputed facts are amenable to

116

hearing required when, in the words of the late Judge Friendly, it is "apparent that the magnitude of the inquiry would preclude any meaningful 'trial-type' hearing within twenty [business] days,"[411] which is probably the maximum permitted duration of a TRO. These considerations control here.

First, many, though not all, of the facts underlying Chevron's motion in fact are undisputed in every meaningful sense. The history of the litigation, statements by Donziger and others in *Crude* and the outtakes, and many other matters are what they are. To be sure, Donziger and others perhaps may dispute that they acted with culpable intent, that they knowingly made false statements, that they conspired to submit false reports to the Ecuadorian courts and so on. Donziger eventually may contend that statements he made to video cameras in connection with the making of *Crude* were exaggerations, jokes or whatever. In fact, however, neither Donziger nor anyone else with personal knowledge concerning the facts critical to the RICO and tort claims has submitted an affidavit or declaration. They have not denied Chevron's allegations under oath or under penalties of perjury. Donziger has not in this record attempted to explain away or justify any of his statements on video. He did not do so even in the papers belatedly filed by his present counsel more than three weeks after the start of the action and two weeks after opposing papers were due. Accordingly, to the extent the Court is asked to reach provisional conclusions as to those matters, the record before it is the evidence presented by Chevron and the LAP Representatives on or before February 4, 2011, and such inferences as the Court reasonably may draw. There are no material issues of fact in this regard for purposes of the present motion.[412]

_____

complete resolution on a paper record.").

[411]    *SEC v. Frank,* 388 F.2d at 490.

[412]

In order to raise an issue of fact warranting a hearing, one must submit an affidavit or comparable evidence placing in issue a material assertion of the other side. This is true in

In any case, even assuming that there were material issues of fact at the heart of this motion, which there are not, this would be precisely the sort of case that Judge Friendly referred to when he wrote that no evidentiary hearing is necessary where the "apparent that the magnitude of the inquiry . . . precludes any meaningful 'trial-type' hearing within" the limited period during which a TRO could maintain the *status quo.* This is evident from a reading of the complaint and confirmed by the fact that Donziger's present counsel sought a 60-day adjournment. After all, if Donziger seriously contended that he needed 60 days to answer Chevron's charges, and the Court assumes that the statement was made in good faith, then it manifestly would have been impossible to hold an evidentiary hearing within 28 days of filing the motion. It certainly would have been impossible to do so between February 25, when Donziger first suggested the need for such a hearing, and the expiration of the TRO on March 8. Indeed, the failure to ask for such a hearing earlier quite plainly waived the point.[413]

---

criminal cases. *E.g., United State v. Gillette,* 383 F.2d 843, 848 (2d Cir.1967); *United States v. Stone,* 510 F. Supp.2d 338, 342 n. 22 (S.D.N.Y.2007); *United States v. Stein,* No. S1 05 Crim. 0888(LAK), 2006 WL 3164781, at * 1 & n. 3 (S.D.N.Y. Oct. 31, 2006); *United States v. Stein,* 440 F. Supp.2d 315, 327 (S.D.N.Y.2006); *United States v. Ahmad,* 992 F. Supp. 682, 685 (S.D.N.Y.1998); *United States v. Richardson,* 837 F.Supp. 570, 572 (S.D.N .Y.1993); United States v. Gregory, 611 F. Supp. 1033, 1044 (S.D .N.Y.1985) (Weinfeld, J.). It is true in civil cases. *See, e.g., Forts v. Ward,* 566 F.2d 849, 851-52 (2d Cir. 1977); *Dopp v. Franklin Nat'l Bk,* 461 F.2d 873, 879 (2d Cir. 1972) (resolution of factual issues created by disputes in affidavits or depositions merely prefers one piece of paper to another).

As indicated above, there are some small points of disagreement among experts on Ecuadorian law. An evidentiary hearing would not be helpful or practical in the present circumstances on those issues.

That would be true also even if the Court considered the papers Donziger belatedly filed on February 25, 2011, as they would raise no disputed issue of material fact on which a hearing would be helpful.

413

*See, e.g., Consol. Gold Fields PLC v. Minorco,* 871 F.2d 252, 256 (2d Cir. 1989).

6.    *The LAP Representatives Waived Their Unclean Hands Defense for this Motion*

In more than 750 pages of papers filed without leave of court on February 28, 2011, the LAP Representatives, in addition to new argument on points raised before, asserted for the first time that relief should be denied because Chevron had acted improperly in the course of the Ecuadorian litigation – essentially a defense of unclean hands.[414]  These papers came 17 days after the last date by which answering papers were to have been filed, and just days before the TRO was to expire and thus before this motion had to be decided.  Not only were they filed without leave of court, but no explanation was offered for their belated filing.

For reasons discussed in Point III, the Court declines to consider these late filed papers.  The unclean hands defense, if that is what the LAP Representatives intended to assert, is not before the Court on this motion though it may of course be asserted by them in later proceedings.

E.    *The Bond*

Rule 65(c) provides that a  "court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."

"In fixing the amount of security required, a court is not required to order security in respect of claimed economic damages that are no more than speculative.  Moreover, the burden is on the party seeking security to establish a rational basis for the amount of the proposed bond."[415]

---

[414]    DI 152-54.

[415]    *Int'l Equity Invs., Inc. v. Opportunity Equity Partners Ltd.*, 441 F. Supp. 2d 552, 556 (S.D.N.Y. 2006) (footnotes and citations omitted).

The rational basis, moreover, must relate to the purpose of the bond requirement, which is to provide security for payment of "costs . . . and pecuniary injury that may accrue during the period in which a wrongfully issued equitable order remains in effect."[416]  In other words, the bond serves only to guarantee payment of any damages sustained "during the period [the enjoined party] is prohibited in engaging in certain activities."[417]

The LAP Representatives argue that the bond should be fixed in the billions of dollars, essentially on the theory that the Ecuadorian judgment is in that range.  But the purpose of the bond requirement is not to secure the collectability of that judgment, at least in the absence of a showing that the delay itself would render the judgment unenforceable.[418]  It is simply to protect the LAP Representatives against any injury they may suffer if they are enjoined for a period from seeking to enforce that judgment and the injunction ultimately proves to have been inappropriate – in other words, to ensure payment of any damages caused by the delay in enforcement.[419]

The LAP Representatives have not shown any basis for supposing that they would be

---

[416]  11A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2954, at 287 (1995).

[417]  *Id.* at 292.

[418]  This would be unlikely here given Chevron's reported consolidated equity of more than $105 billion as of December 31, 2010.  Chevron Corp., Annual Report on Form 10-K for fiscal year ended Dec. 31, 2010, at FS-29 (available at http://www.sec.gov/Archives/edgar/data/93410/000095012311017688/f56670e10vk.htm #F56670152.

[419]  *See, e.g., Int'l Equity Invests., Inc. v. Opportunity Equity Partners Ltd.,* 441 F. Supp.2d 552, 566 (S.D.N.Y. 2006) (bond for preliminary injunction in corporate control contest temporarily barring defendants from taking control of target company refused where the enjoined party sought bond in the amount of its investment in the target company but no basis for concluding that the investment would be rendered worthless by the delay in injunction).

harmed in any quantifiable amount by a delay in the enforceability of the judgment for the period necessary to resolve this case on the merits.  The only possible damage apparently would be a function of the time value of money – the loss of the use of any funds that ultimately may properly be collectable for the period during which the preliminary injunction is in effect.  Even this would occur only if the LAPs would not be entitled, under Ecuadorian law, to interest on the judgment.

According to the Federal Reserve, the most recent yield for 3-month nonfinancial commercial paper is 24 basis points per annum (0.24 percent).[420]  Accordingly, the Court, in its discretion, fixes the required security at an amount equal to the total amount of the judgment ($18.2 billion) multiplied by that rate for a period of six months, or $21,800,000.[421]  This security shall be provided in the form of a bond or, at Chevron's election, the deposit of that sum with the Clerk of the Court for deposit in the CRIS system, there to abide further order of the Court.

### III    The Record on this Motion

Finally, the parties have filed a veritable avalanche of papers in this case.  It therefore is important to be clear as to precisely which of them are part of the record on this motion.

---

[420]

Federal Reserve Statistical Release, *Selected Interest Rates,* Feb. 22, 2011 (available at http://www.federalreserve.gov/releases/h15/current/).

[421]

It declines to require security for the additional penalty that would be imposed unless Chevron apologizes.

*A.     The Filings*

As noted, all papers in opposition to the motion were due by February 11, 2011. Donziger submitted nothing by them; the LAP Representatives submitted extensive papers.[422]  On February 18, 2011, at the preliminary injunction argument, the Court noted that the record was closed subject to the submission of certain additional materials regarding Ecuadorian appellate procedure.

Subsequently, Donziger on February 25, 2011, without even seeking leave of court, submitted very extensive answering papers.[423]  On February 28, 2011, the LAP Representatives did the same, also without even seeking leave.[424]  Finally, on March 4, 2011, made yet another extensive submission, at least this time moving simultaneously for leave to do so.[425]

*B.     Analysis*

S.D.N.Y. Civ. R. 6.1 provides in substance part that the judge presiding may fix the time for filing opposition and reply papers on motions.  The Court did so when it directed that papers in opposition to this motion be filed by February 11.   The LAP Representatives never sought an extension of the February 11 date.  While Donziger sought an adjournment of the motion on February 18, that application came after the deadline for filing answering papers had expired.  Thus, the February 25 and subsequent filings by Donziger and the LAP Representatives in opposition to the

---

[422]   DI 61-67.

[423]   DI 137-42.

[424]   DI 152-55.

[425]   DI 172-174.

That motion is being denied today by separate order.

122

preliminary injunction motion were untimely and violated an express order of the Court.

The Supreme Court held in *Lujan v. National Wildlife Federation*[426] that district courts

have discretion whether to accept late filings.[427]  But that discretion need not result in acceptance of

late papers whenever it is invoked, it has limits.  The Court made clear that Rule 6(b):

> "provides the mechanism by which that discretion is to be invoked and exercised.
> First, any extension of a time limitation must be 'for cause shown.'  Second, although
> extensions before expiration of the time period may be 'with or without motion or
> notice,' and *post*-deadline extension must be 'upon motion made,' and is permissible
> only where the failure to meet the deadline 'was the result of excusable neglect.'"[428]

And it went on to uphold the district court's rejection of late-filed affidavits in opposition to a motion

for summary judgment, adding that:

> "[I]n order to receive the affidavits here, the District Court would have had to regard
> the very filing of the late document as the [Rule 6(b)-required] 'motion made' to file
> it; it would have had to interpret 'cause shown' [required by Rule 6(b)] to mean
> merely 'cause,' since respondent made no 'showing' of cause at all; and finally, it
> would have had to find that as a substantive matter there was indeed 'cause' for the
> late filing and that the failure to file on time 'was the result of excusable neglect [as
> required by Rule 6(b)].'"[429]

This analytical framework is dispositive in this case.

All of the February 25 and subsequent filings were made after expiration of the

February 11 deadline.  Neither the LAP Representatives nor Donziger sought an extension of that

date before it had expired.  All of their filings therefore come within Rule 6(b), just as those at issue

---

[426]

      497 U.S. 871 (1990).

[427]

      *Id.* at 894-97.

[428]

      *Id.* at 895-96.

[429]

      *Id.* at 896-97 (emphasis in original) (footnote omitted).

in *Lujan.*

The LAP Representatives made no motion to file their February 28 papers out of time. They made no showing of cause for doing so. They made no showing of excusable neglect.[430]  They did not satisfy Rule 6(b).

Donziger's position is slightly different.  While the Court accepts that the February 18 application by his present counsel for an adjournment of the preliminary injunction motion included a request for additional time within which to file opposing evidence, that on the ground that Donziger's present counsel had been retained only the day before the argument, that request came after the time already had expired.[431]  Moreover, even assuming that it had not been made earlier because Donziger was looking for additional counsel, there was no showing of excusable neglect. In any case, the denial of the adjournment of the motion was appropriate for reasons discussed in the preceding section of this opinion.

To be sure, district courts may and, on occasion, do consider late-filed papers even

---

[430]

Nor does it appear that the failure by the LAP Representatives to file all of their papers on time was attributable to their counsel lacking the personnel or other resources.  Although the appearances on behalf of the LAP Representatives in this case have been filed only by New York counsel who practice in small firms or, in one case, as a single practitioner, the LAPs are represented quite broadly by at least one large international law firm which has been quite involved in this case behind the scenes.  At least the first submission on behalf of the LAP Representatives in opposition to Chevron's motion was prepared by the firm of Patton Boggs, Tr., Feb. 8, 2011, at 24, 27, the firm that prepared the Invictus Memo, although it was signed only by local counsel..  Patton Boggs, moreover, appeared on behalf of the LAPs in the district courts in at least three of Chevron's § 1782 proceedings, appeared for the LAPs on appeal in at least two of them, *Lago Agrio Plaintiffs v. Chevron Corp.,* Nos. 10-4341-CV, 10-4405-CV, 2010 WL 5151325 (2d Cir. Dec. 15, 2010), and *In re Chevron Corp.,* No. 10-4699 (3d Cir. filed Jan. 12, 2011), and are their counsel in their own § 1782 proceeding in San Francisco, *In re Yaiguaje, et al.,* No. 10-MC-80324 (CRB).  According to its web site, Patton Boggs is a firm of over 600 lawyers with seven offices.

[431]

Letter, John W. Keker, Feb. 17, 2011 [DI 180].

124

when they are not "*compelled* to receive them."[432]  In this case, however, there are strong reasons for

declining to do so.  For the most part, these are canvassed in connection with the discussion of the

denial of Donziger's request for an adjournment, but they include (1) the urgency imposed by the

impending March 8 expiration of the TRO, the threat of irreparable harm if the preliminary injunction

motion is not decided by then, and the difficult of carefully considering such extensive materials

submitted so near the deadline; (2) the refusal of the LAPs to agree not to seek to enforce the

Ecuadorian judgment for a time, in order to permit a more extended schedule for consideration of the

motion; (3) the likely gamesmanship involved in the LAP Representatives' withholding the 2008 and

2009 expert reports and the May 2010 Fajardo declaration, the major part of their February 28 filing,

despite the fact that those materials were readily available to the LAP Representatives and Donziger

before February 11; and (4) the Court's concern that Donziger's failure to file earlier and his delay

in retaining his present counsel were a ploy to use the late appearance of counsel as an excuse to

delay this motion.

     Given all the circumstances, the Court excludes the belated filings[433] from

consideration on this motion.  The Court nevertheless has examined the belated filings on behalf of

Donziger.[434]  For reasons expressed here, nothing they contain would warrant a different result even

if they were considered part of the record on the motion.

---

[432]

     *See id.* at 898 (emphasis in original); *but see Shapiro v. Cantor,* 123 F.3d 717, 722 (2d Cir. 1997) ("district court could not consider the untimely affidavit without a proper motion"); *Gadsden v. Jones Lang Lasalle Americas, Inc.,* 210 F. Supp.2d 430, 436 (S.D.N.Y. 2002).

[433]

     DI 137-142, 145-148.

[434]

     DI 137-142.

*IV   Conclusion*

For the foregoing reasons, Chevron's motion [DI 4] for a preliminary injunction is granted as against all defendants other than Stratus Consulting, Inc. ("Stratus"), Douglas Beltman and Ann Maest, as there is no evidence that they have any intention of attempting to enforce, or interest in, the Ecuadorian judgment.  It is denied as to those three defendants.

All defendants other than Stratus Beltman and Maest (their names being listed for convenience on the attached Schedule) be and they hereby are enjoined and restrained, pending the final determination of this action, from directly or indirectly funding, commencing, prosecuting, advancing in any way, or receiving benefit from any action or proceeding, outside the Republic of Ecuador, for recognition or enforcement of the judgment previously rendered in *Maria Aguinda y Otros v. Chevron Corporation,* No. 002-2003, in the Provincial Court of Justice of Sucumbios, Ecuador (hereinafter the *"Lago Agrio Case"),* or any other judgment that hereafter may be rendered in the *Lago Agrio Case* by that court or by any other court in Ecuador in or by reason of the *Lago Agrio Case* (collectively, a "Judgment"), or for prejudgment seizure or attachment of assets, outside the Republic of Ecuador, based upon a Judgment.

This Preliminary Injunction takes effect immediately.  Its continuation beyond 4 p.m. on March 15, 2011, Eastern Standard Time, is conditioned upon the posting by then of security as required in the Court's opinion of even date.

The Court is mindful of the parties' interest in having the enforceability and recognizability of the judgment outside of Ecuador determined without unnecessary delay. Moreover, the Court is obliged under FED. R. CIV. P. 57 resolve declaratory judgment actions.  The parties therefore may move promptly to sever Count 9 of the complaint, the declaratory judgment

126

claim, and to establish an appropriate schedule for its prompt resolution

The parties' attention is drawn to FED. R. APP. P. 8(a)(1).  The Court, as always, will

entertain an order to show cause to bring on any motion for a stay of the preliminary injunction on

short notice.

SO ORDERED.

Dated:      March 7, 2011
Issued at:   5:30 p.m.

Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

## SCHEDULE TO PRELIMINARY INJUNCTION

The defendants enjoined and restrained by this Preliminary Injunction are:

Steven Donziger, the Law Offices of Steven R. Donziger, Pablo Fajardo Mendoza, Luis Yanza, Frente de Defensa de la Amazonia a/k/a Amazon Defense Front, Selva Viva Selviva CIA, Ltda., Maria Aguinda Salazar, Carlos Grefa Huatatoca, Catalina Antonia Aguinda Salazar, Lidia Alexandra Aguinda Aguinda, Patricio Alberto Chimbo Yumbo, Clide Ramiro Aguinda Aguinda, Luis Armando Chimbo Yumbo, Beatriz Mercedes Grefa Tanguila, Lucio Enrique Grefa Tanguila, Patricio Wilson Aguinda Aguinda, Celia Irene Viveros Cusangua, Francisco Matias Alvarado Yumbo, Francisco Alvarado Yumbo, Olga Gloria Grefa Cerda, Lorenzo Jose Alvarado Yumbo, Narcisa Aida Tanguila Narvaez, Bertha Antonia Yumbo Tanguila, Gloria Lucrecia Tanguila Grefa, Francisco Victor Tanguilla Grefa, Rosa Teresa Chimbo Tanguila, Jose Gabriel Revelo Llore, Maria Clelia Reascos Revelo, Maria Magdalena Rodriguez Barcenes, Hugo Gerardo Camacho Naranjo, Jose Miguel Ipiales Chicaiza, Heleodoro Pataron Guaraca, Luisa Delia Tanguila Narvaez, Lourdes Beatriz Chimbo Tanguila, Maria Hortencia Viveros Cusangua, Segundo Angel Amanta Milan, Octavio Ismael Cordova Huanca, Elias Roberto Piyahuaje Payahuaje, Javier Piaguaje Payaguaje, Daniel Carlos Lusitande Yaiguaje, Benancio Fredy Chimbo Grefa, Guillermo Vicente Payaguaje Lusitante, Delfin Leonidas Payaguaje Payaguaje, Alfredo Donaldo Payaguaje Payaguaje, Teodoro Gonzalo Piaguaje Payaguaje, Miguel Mario Payaguaje Payaguaje, Fermin Piaguaje Payaguaje, Reinaldo Lusitande Yaiguaje, Luis Agustin Payaguaje Piaguaje, Emilio Martin Lusitande Yaiguaje, Simon Lusitande Yaiguaje, Armando Wilfrido Piaguaje Payaguaje, and Angel Justino Piaguage Lucitante.