UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

CHEVRON CORPORATION,

                    Plaintiff,

vs.

STEVEN DONZIGER, THE LAW OFFICES
OF STEVEN R. DONZIGER, et al.,

                    Defendants.

CASE NO. 11-CV-0691-LAK

---

**MEMORANDUM OF LAW OF DEFENDANTS STEVEN DONZIGER AND THE LAW
OFFICES OF STEVEN R. DONZIGER IN OPPOSITION TO PLAINTIFF CHEVRON
CORPORATION'S MOTION TO BIFURCATE ITS NINTH CLAIM FOR RELIEF, IN
WHOLE OR IN PART, FOR EXPEDITED TRIAL, AND IN RESPONSE TO
MARCH 11, 2011 ORDER TO SHOW CAUSE**

## I.    PRELIMINARY STATEMENT

To misquote Jack Nicholson in "A Few Good Men," *Chevron can't handle the truth*.

After conducting over a year's worth of pre-litigation discovery by means of 28 U.S.C. § 1782 proceedings in courts across the United States, Chevron launched a full-scale attack on Steven Donziger and the Law Offices of Steven R. Donziger (collectively, "Donziger") and dozens of others involved in the *Aguinda* case, accusing them of criminal and intentionally tortious conduct, and alleging that Donziger's life work for the last 17 years is a fraud and akin to organized crime.  Having gotten as much bang for its buck out of making these false and malicious allegations as it could possibly get, Chevron now wants to avoid actually having to prove any of its claims and to duck any discovery into its own pervasive wrongdoing. Chevron instead wants to put the Republic of Ecuador on trial, because one of its courts had the temerity to issue a detailed, carefully-reason judgment condemning both Chevron's environmental violations and its years of litigation misconduct undertaken to avoid liability for its environmental damage.  Chevron's procedural legerdemain should not be rewarded.

Following its commencement of this litigation on February 1, Chevron requested, and on March 7th obtained—without an evidentiary hearing and without Donziger having been heard—a sweeping preliminary injunction prohibiting him and virtually anyone else from taking any action to enforce any judgment issued in Ecuador in the *Aguinda* case.  No one has sought enforcement of that judgment in New York or elsewhere, nor could anyone.  The appellate process in Ecuador, which automatically stays the judgment,[1] is proceeding, with Chevron having just filed a massive brief (raising many of the same issues it has asserted in this Court). As the Second Circuit has recognized, "[t]he Ecuadorian courts have not issued—and may never issue—a final judgment against Chevron."  *Republic of Ecuador, et al. v. Chevron Corp., et. al.,* Nos. 10-1020-cv (L) 10-1026 (Con), – F.3d – , 2011 WL 905118, at * 11 (2d Cir. Mar. 17, 2011).  In short, there currently is no urgent need to adjudicate Chevron's declaratory judgment

---

[1] *See* Mar. 7, 2011 Prelim. Inj. Order, at 54.

claim, if there ever was any or ever will be any.

Yet, despite there being no final judgment to enforce, and having secured a preliminary injunction prohibiting enforcement, Chevron wants to make a mockery of due process and proceed to trial on a sliver of its declaratory judgment claim (its Ninth Claim for Relief) in as little as three months, and without the participation of Donziger or his counsel. To do so, Chevron must run from the facts that (i) it asserted its declaratory judgment claim against Donziger; (ii) its declaratory judgment claim is based upon and expressly incorporates all of Chevron's malicious and false factual allegations relating to Donziger's purported wrongdoing; and (iii) its declaratory judgment claim forms the sole basis for the Court's existing preliminary injunction against Donziger and everyone else.

Chevron has presented the Court with two alternatives for bifurcation of its declaratory judgment claim: (1) a trial on the entirety of the claim within approximately six months; or (2) a trial on certain issues ("the non-fraud statutory bases [for non-recognition] under C.P.L.R. 5304[.]") within approximately three months.[2] Chevron Mem., at 2. Chevron proposes to exclude Donziger from either trial, yet does not propose to dismiss him. In other words, Chevron wants to try Donziger *in absentia*. *See id.* at 11-12.

Neither version of Chevron's bifurcation proposal can be squared with due process, fairness, or Donziger's constitutional right to a jury trial. The declaratory relief claim cannot "be neatly bifurcated,"[3] because it cannot be tried in a vacuum without reference to what actually happened in the *Aguinda* case. Any trial on Chevron's declaratory relief claim will require adjudication of facts and issues that Donziger and the other defendants have a constitutional right to have resolved by a jury. Moreover, any effort to have a bowdlerized trial, free of any reference to Chevron's scurrilous allegations about what happened in the *Aguinda* case and how it was decided in Ecuador, will result, at best, in nothing more than what Chevron already has by its preliminary injunction—a non-final judgment by a District Court Judge in Manhattan that

---

[2] The Court expressed particular interest in Chevron's second alternative at the March 15, 2011 conference. *See* Mar. 15, 2011 RT, at 16:22-17:3.

[3] Chevron Mem., at 4.

purports to tell the world that Ecuador's judicial decisions must be ignored outside Ecuador.

If this Court nonetheless were to order some form of separate trial on the declaratory judgment claim, Donziger must be entitled to participate to refute Chevron's false accusations, to ensure that the Court's preliminary injunction against him does not mature into a permanent injunction, and to protect his direct financial interest in the recognition and enforcement of the *Aguinda* judgment. And the Court should sever Chevron's declaratory judgment claim, rather than bifurcate it, so that whatever trial is held will result in a final, appealable judgment on the issue of the enforceability and recognizability of *Aguinda* judgment. Bifurcation, which would not result in a final judgment, would not expedite final resolution of this action and, therefore, would serve neither Chevron's claimed interest, defendants' interests, nor the interests of justice. Finally, Donziger, and all other defendants, must be accorded a reasonable opportunity to conduct fact and expert discovery, to pursue dispositive motions, and to prepare their defense prior to any trial. The three to six month timeframe proposed by Chevron does not provide defendants with nearly enough time, especially given that Chevron has had a fifteen-month head start on discovery and there already is a preliminary injunction in place protecting Chevron in the interim.

For all of these reasons, as discussed in detail below, the Court should decline Chevron's request to perpetuate the break-neck pace that has characterized these proceedings to date, and should instead set a schedule that allows for Chevron's sweeping claims to be resolved in a properly-ordered manner. This litigation should proceed with Donziger's participation, with adequate time for all parties to develop the factual record and address the myriad legal issues raised by Chevron's overreaching Complaint, and with those issues that must be tried to a jury tried first, as the Constitution requires.

## II.    ARGUMENT

### A.    Chevron's proposed bifurcation of the entirety of its declaratory relief claim would violate Donziger's right to a jury trial and would not promote judicial efficiency.

#### 1.    This Court cannot try Chevron's declaratory relief claim before a jury trial on Chevron's RICO and other claims.

"Maintenance of the jury as a fact-finding body is of such importance and occupies so

firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care." *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 501 (1959); *see also* Fed. R. Civ. Pro. 42(b) ("When ordering a separate trial, the court must preserve any federal right to a jury trial."). To preserve that right, when an issue is common to both legal and equitable claims in the same proceeding, the legal claim must be tried first to a jury. *Id.* at 510-11; *see also Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 472-73 (1962); *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 432 (2d Cir. 1995) ("[I]n order to safeguard the parties' Seventh Amendment rights with respect to claims triable to the jury, the general rule is that the jury must be allowed to decide the legal claims prior to the court's determination of the equitable claims"). "This is because, once the right to a jury trial attaches to a claim, it extends to all factual issues necessary to resolving that claim." *Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 170 (2d Cir. 2001). "[T]rial of the equitable claim first to a judge would foreclose the later presentation of the common issue to a jury, and thereby violate the trial-by-jury guarantee." *Robinson*, 267 F.3d at 170 (citing *Beacon Theatres*, 359 U.S. at 510-11).

As this Court appeared to recognize at the March 15 conference,[4] Donziger unquestionably has a right to a jury trial of all factual issues bearing on Chevron's RICO, fraud, conspiracy, and tortious interference claims. *See Maersk, Inc. v. Neewra, Inc.*, 687 F. Supp. 2d 300, 341 (S.D.N.Y. 2009) (finding that Seventh Amendment jury right attaches to civil RICO claims and common-law fraud claims); *Germain v. Connecticut Nat. Bank*, 988 F.2d 1323, 1328-29 (2d Cir. 1993) (holding that defendant was entitled to jury trial on tortious interference claim). And both Chevron and Donziger have demanded a jury trial on all issues triable as of right by a jury. *See* Complaint, at 149; Donziger Jury Demand [Doc. No. 212]. Because the Court cannot decide whether the *Aguinda* judgment was procured by fraud for purposes of resolving the declaratory judgment claim without adjudicating many, if not all, of the overlapping allegations of fraud and misconduct that also underlie Chevron's other claims, Chevron's proposal to bifurcate its declaratory judgment claim in its entirety clearly would run afoul of *Beacon*

---

[4] *See* Mar. 15, 2011 RT, at 16:17-19.

*Theatres* and its progeny. *See, e.g., Brown v. Sandimo Materials*, 250 F.3d 120, 127-28 (2d Cir. 2001) (reversing district court's order striking defendant's jury demand for legal (LMRA) claim and directing the court, on remand, to allow a jury to determine all issues bearing on that claim before resolving entitlement to equitable relief). Indeed, although it avoids any mention of *Beacon Theaters* or Rule 42(b), Chevron all but concedes the point when it proposes, in the alternative, that the Court "bifurcate only those portions of Chevron's Declaratory Judgment claim that do not overlap in any way with the RICO and other claims going to fraud." Chevron's Mem., at 11.

> **2.    Trying Chevron's declaratory judgment claim separately would not promote judicial efficiency and economy and would prejudice Donziger.**

Separate and apart from the insurmountable constitutional problems posed by Chevron's motion to bifurcate and try first its declaratory relief claim, none of the factors courts are required to consider supports bifurcation here. "The factors a court is to consider when determining whether to grant separate trials include whether: (1) the issues sought to be tried are significantly different from one another; (2) the severable issues require testimony from different witnesses and/or different documentary proof; (3) the extent to which the party opposing severance would be prejudiced if it were granted; and (4) the extent to which the party requesting severance would be prejudiced if it were not granted[.]" *Gaffney v. Department of Info. Tech. and Telecomm.*, 579 F. Supp. 2d 455, 459 (S.D.N.Y. 2008). Bifurcation is the exception rather than the rule, and "the party moving for a separate trial has the burden of showing that [separate trials are] necessary to prevent prejudice or confusion, and to serve the ends of justice." *Id.* (internal quotations and citations omitted; brackets in original).

A trial on the entirety of Chevron's declaratory judgment claim, including its fraud-based grounds for non-recognition of the *Aguinda* judgment, will involve adjudication of issues that are not "significantly different" from Chevron's RICO and state law claims, but rather are largely overlapping, as Chevron itself admits. *See* Chevron's Mem., at 2; *see also id.*, at 11; Mar. 15, 2011 RT, at 4:20-24. A trial on those overlapping issues also will require testimony from the same witnesses, including Donziger and the other RICO defendants, Chevron's representatives

and agents, including Diego Borja and Wayne Hansen, and the many experts and consultants on both sides of the case. It also will require much of the same documentary proof, including many of the documents, emails, and *Crude* outtakes submitted by Chevron in connection with its preliminary injunction motion, and Donziger's and the other defendants' documentary evidence in opposition to Chevron's claims of fraud and criminal wrongdoing, including the many additional *Crude* outtakes that put the lie to Chevron's editing. *Cf. Gaffney*, 579 F. Supp. 2d at 459 (denying bifurcation where "the testimony and documentary evidence that will form the bases of Plaintiffs' claims against the Individual Defendants [which Plaintiffs seek to bifurcate] substantially overlap and are inextricably related to Plaintiffs' [other] claims").

Furthermore, Donziger will be severely prejudiced if a trial in which his allegedly fraudulent and criminal conduct is at issue is held without his participation, as Chevron has requested, and without a jury first resolving all of the factual issues pertaining to Donziger's alleged misconduct. In contrast, Chevron will suffer no appreciable prejudice if its declaratory relief claim is not bifurcated in light of the Court's March 7, 2011 Preliminary Injunction Order prohibiting enforcement of the *Aguinda* judgment. Chevron contends that it will be prejudiced without bifurcation because "representatives of the Lago Agrio Plaintiffs and the Front have [allegedly] made clear that they will not abide by this Court's preliminary injunction[.]" Chevron's Mem., at 1. But even if this claim were true, Chevron does not explain how an early trial (especially one that does not result in a final judgment) would make the Lago Agrio plaintiffs and the Front any more likely to comply with this Court's directives.[5]

---

[5] It bears repeating that the Ecuadorian courts have not finished adjudicating the *Aguinda* case. *See Republic of Ecuador*, 2011 WL 905118, at *11; Mar. 7, 2011 Prelim. Inj. Order, at 54-55. No one knows when the Ecuadorian judicial process will be completed. Chevron's claims that it will happen quickly are entirely speculative. And if its past behavior is any guide, Chevron will do whatever it can to stall and derail the appellate process. What is more, no one is currently seeking enforcement in New York or anywhere else. The so-called "Invictus" memorandum and the other evidence cited by Chevron in its Preliminary Injunction Motion regarding defendants' purported strategy to seek immediate enforcement of the *Aguinda* judgment around the world is months, if not years, old, and of course, pre-dates this Court's March 7, 2011 Order. But, if someone does attempt to enforce the judgment or to seek pre-judgment attachment of Chevron's assets, that person will have to do so through the judicial systems of the countries where Chevron has chosen to do business. Chevron is more than capable of defending itself in any such enforcement action, and there is no reason to believe that courts outside the Southern District of New York are not capable of fairly and competently evaluating the merits of Chevron's N.Y.

**B.**    **Chevron's proposed bifurcation of the supposed non-fraud issues in its declaratory relief claim would have serious adverse consequences and would inevitably infringe Donziger's right to a jury trial.**

As discussed above, Chevron does not cite *Beacon Theaters* in its motion or address how its bifurcation request can be squared with Donziger's (and all other defendants') right to a jury trial. But Chevron does acknowledge, as it must, that the issues raised by its declaratory relief claim "overlap with the RICO and state-law claims." Chevron's Mem., at 2; *see also id.*, at 11; Mar. 15, 2011 RT, at 4:20-24. To address this "overlap," and the fact that it requires a jury trial on Chevron's fraud and tort claims before any bench trial on the entirety of its declaratory relief claim, Chevron argues that it would be appropriate for the Court to bifurcate and adjudicate only those components of its declaratory judgment claim challenging enforcement of the *Aguinda* judgment on grounds other than fraud. In particular, Chevron argues that the Court could separately adjudicate (1) whether or not Ecuador provides impartial tribunals and due process, (2) whether the Lago Agrio court had personal jurisdiction over Chevron, and (3) whether some portion or all of the *Aguinda* judgment contravenes public policy and an unenforceable penalty. Chevron's Mem., at 2; *see also id.* at 11; *cf.* RT, at 16:17-17:3 (Court identifying these same questions as possible subject matter for a bifurcated trial). This alternative proposal, however, is just as prejudicial and problematic as Chevron's primary proposal, as there is no feasible way to isolate these issues from Chevron's overarching claims of fraud and wrongdoing.

**1.**    **This Court should not—and, as a practical matter, cannot—adjudicate the impartiality and due process of the Ecuadorian judicial system in the abstract.**

American courts have been extremely reluctant to pass judgment on another country's entire judicial system, given the impact any such sweeping determination could have on international comity and the act of state doctrine. As The Honorable Vincent L. Broderick

---

C.P.L.R. 5304 defenses. Indeed, although the Court preliminarily concluded that Chevron's declaratory relief claim was ripe for adjudication, *see* Mar. 7, 2011 Prelim. Inj. Order, at 85, Donziger submits that the Court should reconsider its determination, especially given the Second Circuit's opinion in *Republic of Ecuador*, wherein the court concluded that it would be improper "to forestall or resolve any entirely hypothetical conflicts between as-yet-nonexistent rulings" through injunctive relief, 2011 WL 905118, at *11, and made clear that "the Ecuadorian courts, applying Ecuadorian law" should first be allowed to address the merits of Chevron's and the plaintiffs' claims. *Id.* at *10-11.

explained in the original *Aguinda* case in this District in response to claims that the Ecuadorian court system was incapable of fairly adjudicating the matter:  "Although lack of impartiality in adjudication is a potential problem in all jurisdictions including those in the United States …, the courts of the United States are properly reluctant to assume that the courts of a sister democracy are unable to dispense justice[.]"  *Aguinda v. Texaco*, *Inc.*, No. 93 Civ. 7527, 1994 WL 142006, at \*2 (S.D.N.Y. April 11, 1994); *accord Aguinda v. Texaco, Inc.,* 142 F. Supp. 2d 534, 544 (S.D.N.Y. 2001); *see also Corporacion Tim, S.A. v. Schumacher*, 418 F. Supp. 2d 529, 532-533 (S.D.N.Y. 2006) ("American courts should be wary of branding other nations' judicial forums as deficient in the substance or procedures that their laws contain….  Such denunciations not only run counter to principles of international comity and could retard efforts to reform foreign tribunals, but also risk imposing on our judicial system the burden of serving as courtroom to the world for the adjudication of essentially foreign disputes with only nominal connections with the United States.").

In keeping with this reluctance to put the judicial systems of other sovereign nations on trial, "[t]here are few cases in which recognition of a judgment is denied for lack of due process under the C.P.L.R. 5304(a)(1)[.]"  *CIBC Mellon Trust Co. v. Mora Hotel Corp. N.V.*, 743 N.Y.S.2d 408, 414-415 (2002).  And the few "cases that have denied recognition on this ground have done so when the rendering nations' judicial systems are in an obvious state of disarray." *S.A.R.L. Aquatonic-Laboratoires PBE v. Marie Katelle, Inc.*, No. CV 06-640, 2007 WL 1589562, at \*5 (D. Ariz.  June 1, 2007).  Indeed, the only case identified in either the *CIBC Mellon* or *S.A.R.L.* decisions where a court passed judgment on a country's entire judicial system during a particular time period is *Bridgeway Corp. v. Citibank*, 45 F. Supp. 2d 276 (S.D.NY. 1999), wherein the court concluded that the Liberian legal system, during that country's vicious, long-running civil war, was essentially non-existent and therefore could not provide impartial tribunals or due process.  *See id.* at 287-288.

The only other case that comes close is *Bank Melli Iran v. Pahlavi*, 58 F.3d 1406 (9th Cir. 1995).  But in that case, the court's decision not to enforce an Iranian judgment was grounded in evidence that the judicial system in post-revolution Iran was systemically biased

against relatives of the deposed Shah, including the defendant who was the Shah's sister. *See id.* at 1411-1413. In other words, the *Bank Melli Iran* court examined whether a particular defendant received a fair trial under the particular circumstances of the underlying case. In contrast, courts have upheld foreign judgments even when presented with generalized evidence of judicial corruption. *See S.C. Chimexim S.A. v. Velco Enter.*, No. 98 Civ. 0142, 1999 WL 223513, at *8-9 (S.D.N.Y. Mar. 17, 1999) (holding that minimum requirements of due process were satisfied by Romanian judicial system in 1992, despite evidence indicating that due process guarantees are not always accorded and that "corruption remains a concern").

The Ecuadorian judicial system, which Texaco/Chevron so fervently sought as the forum for the *Aguinda* case,[6] has trial courts, appellate courts, substantive laws, procedural rules for adjudication, appeals (ongoing now in *Aguinda*), and all the other indicia of a civil legal system. To compare it to Liberia in the midst of civil war is absurd. This Court should not put Ecuador's entire judicial system on trial *in absentia*. Doing so would violate the principles of international comity and the act of state doctrine,[7] and would have serious adverse consequences. Should Chevron prevail in such a trial, this Court would be determining, in effect, that Ecuador's current court system cannot provide impartial tribunals or due process to any litigant in any case involving any issue and, therefore, that no Ecuadorian judgment should be recognized or enforced in the United States or elsewhere. Such a sweeping condemnation of Ecuador, a democracy, a United States ally in the war on drugs and other endeavors, a major recipient of

---

[6] It should not be forgotten that the *Aguinda* case was adjudicated in Ecuador only because Texaco/Chevron fought for years to keep it out of the Southern District of New York. *See Republic of Ecuador*, 2011 WL 905118, at *1-2. Nor should it be forgotten that Texaco/Chevron did so with full knowledge of the frequent political changes that mark the history of Ecuador.

[7] "The act of state doctrine precludes the courts of this country 'from inquiring into the validity of the public acts a recognized foreign power committed within its own territory.'" *Galu v. Swissair: Swiss Air Transport Co., Ltd.*, 873 F.2d 650, 653 (2d Cir. 1989) (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964)). "Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves." *Bigio v. Coca-Cola Co.*, 239 F.3d 440, 451 (2d Cir. 2000) (quoting *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897)).

United States foreign aid, and a major trading partner of the United States,[8] could damage the countries' bilateral relations and United States foreign policy initiatives towards Ecuador.[9]  *Cf. Bigio*, 239 F.3d at 453 ("[T]he applicability of the [act of state] doctrine depends on the likely impact on international relations that would result from judicial consideration of the foreign sovereign's act.  If adjudication would embarrass or hinder the executive in the realm of foreign relations, the court should refrain from inquiring into the validity of the foreign state's act." (quoting *Allied Bank Int'l v. Banco Credito Agricola de Cartago*, 757 F.2d 516, 520-21 (2d Cir. 1985)).  It also could prevent American citizens and corporations that may be pursuing judgments in Ecuador now, or in the future, from ever collecting on those judgments internationally (according to the U.S. Department of State, more than 100 American companies currently do business in Ecuador).[10]  And it could impact American litigants who obtain judgments against Ecuadorians in the United States from enforcing those judgments in Ecuador.

Moreover, any trial addressing the impartiality and due process of the Ecuadorian judicial system that strays beyond the substance of Ecuador's laws and procedures and the structure of its judicial institutions in the abstract, and examines how those laws, procedures, and institutions operate in practice, under Ecuador's current government, will inevitably have to address the hotly-contested facts and circumstances surrounding the *Aguinda* litigation.  Chevron consistently has argued—and this Court so far has agreed—that these facts and circumstances bear on an assessment of the Ecuadorian judiciary.  *Cf.* Mar. 7, 2011 Prelim. Inj. Order, at 77 (noting that "there is abundant evidence before the Court that Ecuador has not provided impartial

---

[8] *See* Peters Decl., Ex. 1 (U.S. Dept. of State Background Note: Ecuador, available at http://www.state.gov/r/pa/ei/bgn/35761.htm), at 3-4 & 6-7.

[9] Indeed, the government of Ecuador already has felt compelled to respond to this Court's rulings.  According to the *New York Times*, Ecuador's ambassador to the United States released a statement on March 9 defending Ecuador's judiciary and expressing "consternation that a U.S. court has elected to pass judgment on Ecuador's courts."  *See* Peters Decl., Ex. 2 (Lawrence Hurley, *Ecuador's U.S. Ambassador Speaks Out on Chevron Case*, N.Y. Times, Mar. 10, 2011, available at http://www.nytimes.com/gwire/2011/03/10/10greenwire-ecuadors-us-ambassador-speaks-out-on-chevron-c-86771.html?pagewanted=print), at 1 of 4.

[10] *See* Peters Decl., Ex. 1, at 6.  Chevron itself has litigated successfully in Ecuador in at least three other civil cases (a fact which Chevron's spokesman interviewed by the *New York Times* did not dispute).  *See id.*, Ex. 2, at 2 of 4.

tribunals or procedures compatible with due process of law … **especially in cases such as this**."
(emphasis added)); *see also id.* at 79 ("**In these circumstances**, it is reasonable to infer, at least
at this preliminary stage, that **this is the type of highly politicized case** that has not received,
and will not receive, fair and impartial treatment in the Ecuadorian courts." (emphasis added)).
Any exploration of these issues, however, inevitably will intrude upon Donziger's Seventh
Amendment rights.

Much of the evidence cited by Chevron in support of its claims that the Ecuadorian
judiciary is corrupt—and relied upon by this Court in its Preliminary Injunction Order—consists
of isolated statements by Donziger and others culled out-of-context from the thousands of pages
of documents and emails and hundreds of hours of film footage obtained by Chevron through its
28 U.S.C. § 1782 discovery efforts.  For example, Chevron repeatedly cited—and the Court
repeatedly references—Donziger's comments that "it is the 'birthright' of Ecuadorian judges to
be corrupt" and that "the only way to secure a fair trial in Ecuador is by causing disruption
because the judicial system is 'utterly weak' and lacks 'integrity'" in support of its determination
that Chevron is likely to succeed on the merits of its declaratory judgment claim.  Mar. 7, 2011
Prelim. Inj. Order, at 3, 36, 79-80*; see also id.* at 35-44 Chevron Mem. ISO Prelim. Inj. [Doc.
No. 5], at 11-15, 60-62; Complaint ¶¶ 70-86, 395.  Chevron also cited—and the Court also relies
upon—Donziger's and the other defendants alleged conduct, including alleged pressure and
scare tactics and inappropriate *ex parte* meetings and communications with Ecuadorian judges,
as evidence that the Ecuadorian judicial system is corrupt and subject to outside influence.  *See*
Mar. 7, 2011, Prelim. Inj. Order, at 21, 80; *see also id.* at 21, 35-39; Chevron Mem. ISO Prelim
Inj., at 61-62; Complaint ¶¶ 70-86.

These comments and this alleged conduct, placed in their proper context (including
Chevron's own vexatious and unlawful tactics and maneuvers during the *Aguinda* litigation), and
without Chevron's selective and self-serving editing, may show that Donziger is emotional about
his work and is a zealous, if perhaps un-diplomatic, advocate who was frustrated by the
Chevron's persistent efforts to avoid a decision on the merits of Lago Agrio plaintiffs' claims.
They do not establish that Donziger is guilty of any wrongdoing.  Donziger looks forward to the

opportunity (which he has not yet been accorded, and which Chevron is presently seeking to prevent him from having) to prove the falsity of Chevron's scurrilous and malevolent allegations. Donziger's statements also do not and cannot establish any overarching truth about the Ecuadorian judicial system any more than an attorney in the United States criticizing the integrity of our federal courts can establish that they are unfair or lack due process. Nonetheless, Chevron has consistently argued—and this Court so far has agreed—that these and other statements attributed to Donziger are relevant to the determination of whether the Ecuadorian justice system affords litigants—particularly litigants in a case that involves issues that are politically charged—due process.[11]  Yet, critically and fatally for Chevron's motion, these same allegations also form a key part of Chevron's fraud and RICO claims, which must be tried to a jury in the first instance. *See, e.g.,* Complaint ¶¶ 303, 306, 311, 320, 330.  Indeed, in its Preliminary Injunction Order, the Court expressly recognized the apparent evidentiary overlap between Chevron's allegations of misconduct by Donziger and its claims that the Ecuadorian judiciary is biased and weak:

> **[A] great deal of the evidence of possible misconduct by Mr. Donziger and others, as well as important evidence regarding the unfairness and inadequacies of the Ecuadorian system and proceedings**, consists of video recordings of the words of Donziger and others made by a New York documentary film maker, Joseph Berlinger, whom Donziger invited to film activities in relation to the Ecuadorian case and who ultimately released a documentary film about it called *Crude*.  Still more comes from e-mails and other documents between and among Donziger and others working with him that were produced in related cases.

March 7, 2011 Prelim. Inj. Order, at 2-3 (emphasis added).

Similarly, Chevron relies upon the 2009 judicial bribery scandal involving Chevron operatives Diego Borja and Wayne Hansen, and the alleged attempt by the Ecuadorian government to cover up that scandal, as evidence of the endemic corruption of the Ecuadorian judiciary.  *See* Complaint ¶ 79; Chevron Mem. ISO Prelim. Inj., at 61.  Indeed, in its bifurcation motion Chevron argues that the recordings prepared by Borja and Hansen in the course of their purported sting operation "**are remarkably revealing about the corruption and lack of due**

---

[11] Indeed, the section of the Court's Preliminary Injunction Order addressing the impartiality of the Ecuadorian judicial system includes the following subheading:  "Donziger Admits Corrupt

**process in Ecuador in general and in this case in particular**."  Chevron Mem., at 8 n.3 (emphasis added).  Thus, the facts and circumstances surrounding Borja's and Hansen's failed effort to induce the judge into accepting a bribe as part of a potentially unlawful scheme to undermine the trial, Chevron's and its counsel involvement in that operation and its aftermath, and how Ecuador responded once Chevron made Borja's and Hansen's recordings public, all are directly relevant to the impartiality and due process of Ecuadorian courts.

        Additionally, it would not be possible for this Court to determine whether Ecuador's courts are so subject to political interference as not to be impartial—"especially in cases such as this"—without litigating the alleged "collusion" between Donziger and the other defendants and President Correa's government, and the alleged results of that collusion.  These results include, according to Chevron's Complaint, the passage of the 1999 Environmental Management Act, the criminal charges that Ecuador has brought against Chevron executives and agents, and the public statements of President Correa and other Ecuadorian government officials regarding the *Aguinda* case.  *See, e.g.,* Complaint ¶¶ 58-64, 70-83, 185-198; *see also* Mar. 7, 2011 Prelim. Inj. Order, at 10-13, 21-22.  Chevron itself asserts that "[t]he fact that President Correa and other members of the Government have sided with the Defendants and against Chevron sends a clear message to the Ecuadorian judiciary they must find Chevron liable."  Complaint ¶ 83.  And Chevron claims that "**[t]his support was not arrived at independently, but through collusion between the RICO Defendants and the Republic of Ecuador.**"  *Id.* ¶ 82 (emphasis added).  Consequently, any trial addressing the alleged politicization of the Ecuadorian judiciary under President Correa will implicate and require findings of fact regarding Donziger's and the other defendants' alleged efforts to promote and capitalize upon that politicization, which efforts also form a key part of Chevron's RICO and other claims.  *See, e.g.,* Complaint ¶¶ 303, 306, 311, 313, 330.  Any such trial also will implicate Chevron's own efforts to use Ecuador's government and military to forestall a plaintiffs' judgment in the *Aguinda* case.

        In sum, passing judgment on the entire Ecuadorian judicial system would violate principles of international comity and the act of state doctrine and could have a serious adverse

_____

Nature of the Ecuadorian Judiciary."  Mar. 7, 2011 Prelim. Inj. Order, at 52.

impact on U.S.-Ecuadorian relations and on other American litigants.  Moreover, the focus of any trial on Chevron's declaratory judgment action will inevitably include the facts and circumstances of the *Aguinda* litigation, and will not be limited to Ecuador's laws and institutions in the abstract.  Under *Beacon Theaters* and its progeny, a trial on those issues either must itself be a jury trial or must follow a jury trial on Chevron's other claims.

> **2.  A trial evaluating whether the *Aguinda* judgment is contrary to public policy is premature at this point and necessarily will implicate the underlying facts and circumstances of the *Aguinda* litigation.**

Any trial addressing whether the *Aguinda* judgment is contrary to public policy or is an unenforceable penalty would be premature at this point because the *Aguinda* judgment is not yet final, and could well be reversed or modified on appeal.  As the Second Circuit noted in its decision in *Republic of Ecuador*:  **"The Ecuadorian Courts have not issued—and may never issue—a final judgment against Chevron[.]"**  2011 WL 905118, at *11 (emphasis added); *accord* Mar. 7, 2011 Prelim. Inj. Order, at 54-55.  Therefore, rushing ahead with a trial now— despite this Court's Preliminary Injunction Order and the fact that the *Aguinda* judgment is stayed on appeal by operation of Ecuadorian law—runs the very real risk that its outcome will be mooted by subsequent events in the courts of Ecuador or the that issues to be tried will change on the eve or in the middle of trial.  For example, the Ecuadorian appellate court, which conducts a *de novo* review of both the facts and the law,[12] could reverse the judgment, or it could modify the judgment in significant respects, including the damage award.  Furthermore, even if it made sense to proceed to trial on this issue now, the question of whether the *Aguinda* judgment is unenforceable as contrary to public policy—just like the question of whether it was rendered by an impartial tribunal in accordance with due process—will require an examination of the facts and circumstances leading to and supporting the judgment.

Under Second Circuit law, "[t]o avoid recognition of a foreign judgment on public-policy grounds, the defendant must satisfy a very challenging standard."  *Thomas and Agnes Carvel Foundation v. Carvel*, 736 F. Supp. 2d 730, 749 (S.D.N.Y. 2010).  In the words of the Second

---

[12] *See* Prelim. Inj. Order, at 54-55.

Circuit:  A judgment is unenforceable as against public policy to the extent that it is repugnant to fundamental notions of what is decent and just in the State where enforcement is sought.... The standard is high, and infrequently met.  As one court wrote, "[o]nly in clear-cut cases ought it to avail defendant…."  *Ackermann v. Levine*, 788 F.2d 830, 841 (2d Cir. 1986) (internal quotations and citations omitted).  Similarly, under New York law, to justify a refusal to recognize a foreign judgment on public-policy grounds, Chevron "must establish that such recognition would be 'inherently vicious, wicked or immoral, and shocking to the prevailing moral sense.'"  *Thomas and Agnes Carvel*, 736 F. Supp. 2d at 749 (quoting *Sung Hwan Co. v. Rite Aid Corp.*, 7 N.Y.3d 78, 82 (2006)).

Chevron claims in its Complaint that any judgment rendered against it in Ecuador would violate public policy.  *See* Complaint ¶ 394.  Chevron, however, does not support this claim with anything other than its allegations that the judgment is the result of fraud and corruption due in large part to the allegedly wrongful conduct of Donziger and the other defendants.[13]  In other words, Chevron's public policy argument is "simply [its] lack of due process argument dressed in different clothing."  *Shell Oil Co. v. Franco*, No. CV 03-8846, 2004 WL 5615657, at *4-5 (C.D. Cal. Nov. 22, 2004).  Chevron does not appear to contend that any Ecuadorian judgment awarding damages for past environmental wrongs—obtained without fraud and rendered by an impartial tribunal following adequate due process—would contravene New York State public policy.  Indeed, such an argument would fly in the face of the large body of New York State and federal law permitting the recovery of just this sort of damages under a variety of statutory and common law legal theories, as well as the Second Circuit's conclusion that "the claims now being asserted in Lago Agrio are the Ecuadorian equivalent of those dismissed on forum no conveniens grounds."  *Republic of Ecuador*, 2011 WL 905118, at *2 n.5.  Therefore, evaluating whether the *Aguinda* judgment is "inherently vicious, wicked or immoral, and shocking to the prevailing moral sense" will require an inquiry into what actually happened during the *Aguinda*

---

[13] Notably, Chevron's Preliminary Injunction Motion does not raise this ground for non-recognition and non-enforcement.  *See* Chevron's Mem. ISO Prelim. Inj., at 58-62 (citing only fraud and lack of impartial tribunals and due process, but not public policy).

litigation, and the impact, if any, of Donziger's and the other defendants' alleged wrongful conduct on the judgment.

As for whether some portion or all of the judgment constitutes an unenforceable penalty, there is no reason that the Ecuadorian appellate court should not have the right to decide that question in the first instance. Chevron's attempt to attack the substance of the *Aguinda* judgment collaterally, before it is reviewed and affirmed according to Ecuadorian law and procedure, is improper and premature. But, even if the Court were to accept Chevron's invitation to consider this issue ahead of, and without the benefit of the reasoning of, the Ecuadorian appellate courts, doing so will require the Court to consider all the facts and circumstances, spanning the entire course of the *Aguinda* litigation, leading up to the Ecuadorian judgment and its imposition of punitive damages.[14] As explained by the Lago Agrio court in the *Aguinda* judgment, punitive damages were assessed against Chevron not only based upon the egregious nature of its underlying environmental violations, but also on Chevron's years of persistent litigation misconduct. *See* Doc. No. 168, at 34-44, 184-186. This same misconduct will be a key issue in any trial on Chevron's RICO and other claims, and cannot be resolved in a bifurcated bench proceeding. Also, if Chevron intends to argue (as it has to date) that punitive damages were awarded against as a result of defendant's allegedly improper litigation conduct and/or their alleged collusion with the government of Ecuador, factual issues regarding Donziger's and the other defendant's conduct will again be directly at issue.

### 3. Any question of the Lago Agrio court's personal jurisdiction over Chevron has been fully adjudicated and, therefore, is not a proper issue for trial.

Chevron also wants an early trial on its claims that the *Aguinda* judgment should not be recognized and is unenforceable because the Lago Agrio court lacks personal jurisdiction over

---

[14] There is nothing inherently wrong with a foreign court imposing punitive damages in a civil case, and judgments including such damages are enforceable in the United States. *See* Restatement of the Law (Third) of Foreign Relations Law of the United States § 483 cmt b. (2010) *see also id.* § 483, reporter's note 4. ("Courts in the United States do not distinguish, for purposes of enforcement, between judgments awarding compensatory judgments only and judgments awarding multiple or punitive (exemplary damages), such as treble damages for violation of the antitrust laws."). Indeed, Chevron itself is seeking punitive damages in this case, and it has expressed no intention not to seek worldwide enforcement of any judgment it might obtain.

Chevron.  But, on this issue, Chevron's wish already has been granted.  The issue of personal

jurisdiction—along with several related issues—has now been resolved by the Second Circuit

and, therefore, is no longer a proper issue for any trial, bifurcated or otherwise.  In its March 17,

2011 decision in *Republic of Ecuador*, the Second Circuit held:

> **Texaco provided "<u>a commitment … to submit to the jurisdiction of the
> Ecuadorian courts</u>" … by "unambiguously agree[ing] in writing to be[] sued
> in Ecuador, to accept service of process in Ecuador, and to waive … any
> statute of limitations-based defenses that may have matured since the filing
> of the [complaint]."**

2011 WL 905118 , at *2 (internal quotations omitted; first and second ellipses added; other

alterations in original).  The Second Circuit further held that:

> **<u>Chevron Corporation … remains accountable</u> for the promises [made by its
> predecessors in interest Texaco and ChevronTexaco, Inc.] upon which we
> and the district court relied in dismissing Plaintiffs' action.**

*Id.*, at *2 n.3 (emphasis added).  The Second Circuit also concluded that:

> **Texaco's promise to satisfy any judgment issued by the Ecuadorian courts,
> subject to its rights under New York's Recognition of Foreign Country
> Money Judgments Act, … <u>along with Texaco's more general promises to
> submit to Ecuadorian jurisdiction, is enforceable against Chevron</u> in this
> action and any future proceedings between the parties, including
> enforcement actions."**

*Id.*, at *2 n.4 (emphasis added).  Additionally, the Second Circuit rejected Chevron's arguments

that the *Aguinda* case in Ecuador is not a continuation of the lawsuit originally filed against

Texaco in this District:

> **<u>Chevron's contention that the Lago Agrio litigation is not the refiled *Aguinda*
> action is without merit</u>.  The Lago Agrio plaintiffs are substantially the same
> as those who brought suit in the Southern District of New York, and the
> claims now being asserted in Lago Agrio are the Ecuadorian equivalent of
> those dismissed on forum non conveniens grounds.**

*Id.*, at *2 n.5 (emphasis added).

The Second Circuit's determination of these issues is conclusive and binding on Chevron.

*Bank of New York v. First Millennium, Inc*., 607 F.3d 905, 918 (2d Cir. 2010) ("[I]ssue

preclusion, also known as collateral estoppel, bars a plaintiff from relitigating an issue that has

already been fully and fairly litigated in a prior proceeding.").  The Ecuadorian courts have

personal jurisdiction over Chevron in the *Aguinda* case, and Chevron is no longer permitted to

challenge the *Aguinda* judgment on jurisdictional grounds. [15]

**C.    Donziger has a right to participate in any trial of Chevron's declaratory relief claim.**

Chevron claims that the only proper parties to a bifurcated declaratory judgment trial are the actual judgment creditors of the *Aguinda* judgment and that the trial, therefore, should proceed without Donziger, who is not a judgment creditor.  Chevron Mem., at 10-11.  There are multiple problems with Chevron's attempt to eliminate Donziger as an adversary in its pursuit of a declaratory judgment.

*First,* Chevron's basic premise—that Donziger is not a judgment creditor—is incorrect under New York law, which applies to Chevron's declaratory relief claim.  Donziger—as well as other counsel to the Ecuadorian plaintiffs—is a judgment creditor because he owns a portion of the judgment pursuant to his contingent fee contract with the Ecuadorian plaintiffs.  Under New York law, a charging lien gives the attorney "an equitable ownership interest in the client's cause of action," rather than providing a mere "priority of payment" in favor of the attorney.  *LMWT Realty Corp. v. Davis Agency, Inc.*, 85 N.Y.2d 462, 467-68 (1995); *accord  Butler, Fitzgerald & Potter v. Sequa Corp.*, 250 F.3d 171, 178 (2d Cir. 2001) (New York precedent, which governs attorney's charging liens issued by federal courts in New York, defines a charging lien as giving an "equitable ownership interest in the client's cause of action") (internal citation omitted)); *cf. Gilbert v. Johnson*, 601 F.2d 761, 767 (5th Cir. 1979) (discharged lawyer with a contingent fee agreement has an "interest" in an action for purposes of intervention); *Gaines v. Dixie Carriers, Inc.*, 434 F.2d 52, 54 (5th Cir. 1970) (holding same).  Because Donziger owns a portion of the judgment, he is a judgment creditor and entitled to participate in any trial addressing the validity

---

[15] Even if it were not already conclusively adjudicated, Chevron's personal jurisdiction argument is without merit, given that Chevron has been litigating the merits of the *Aguinda* case in Ecuador for years, and has now availed itself of its appellate remedies there.  *See* N.Y. C.P.L.R. 5305(a)(2) ("The foreign country judgment shall not be refused recognition for lack of personal jurisdiction if … the defendant voluntarily appeared in the proceedings, other than for the purpose of protecting property seized or threatened with seizure in the proceedings or of contesting the jurisdiction of the court over him"); *see also CIBC Mellon Trust*, 100 N.Y.2d 215, 223-24 (2003) (noting that C.P.L.R. § 5305(a)(2) "foreclose[s] a defendant from contesting a foreign judgment for lack of personal jurisdiction once the defendant has done anything more than it had to do to preserve its jurisdictional objection," and finding that party's appeal to the High Court "abrogate[d] the reviewability of defendants' argument that the English judgments are unenforceable in New York because the English courts lacked jurisdiction over them.").

of the judgment, regardless of the scope of that trial.

  *Second*, even if Donziger were not formally a judgment creditor, he has a strong interest relating to the property or transaction (the *Aguinda* litigation and resulting judgment) that is the subject of Chevron's declaratory relief claim.  In this regard, the law governing intervention under Rule 24(a)(2) of the Federal Rules of Civil Procedure provides a relevant benchmark.  As the Second Circuit has explained:  "Rule 24(a)(2) does not require that the intervenor prove a property right, whether in the constitutional or any other sense."  *Brennan v. N.Y.C. Bd. of Educ.*, 260 F.3d 123, 130 (2d Cir. 2001).  Indeed, in *New York Public Interest Research Group, Inc. v. Regents of the University of the State of New York,* 516 F.2d 350, 351-52 (2d Cir. 1975) (per curiam), the Second Circuit held that the Pharmaceutical Society of the State of New York, Inc. and three individual pharmacists had standing to intervene as of right in an action challenging the legality of a regulation prohibiting advertising the price of prescription drugs, even though the interest asserted—the economic interest of pharmacists in sustaining the regulation—clearly did not constitute a property right.  Thus, "Rule 24(a)(2) requires not a property interest but, rather, 'an interest relating to the property or transaction which is the subject of the action.'"  *Brennan*, 260 F.3d at 130.

  It cannot plausibly be argued that Donziger does not have such an interest.  Donziger is named personally as a defendant in Chevron's declaratory relief claim, and not merely as an agent of the *Aguinda* plaintiffs.  Chevron also based its declaratory relief claim in significant part on allegations of criminal and intentionally tortious conduct by Donziger.  Moreover, on the basis of those allegations, Chevron sought and successfully obtained a preliminary injunction broadly prohibiting Donziger personally from "directly or indirectly funding, commencing, prosecuting, advancing in any way, or receiving benefit from any action or proceeding … for recognition or enforcement of the judgment" rendered in Ecuador.  Mar. 7, 2011 Prelim. Inj. Order, at 125.  Chevron has not offered to dismiss Donziger as a defendant to its declaratory relief claim or to relieve him from the Court's preliminary injunction.  To the contrary, Chevron argues in its bifurcation motion that Donziger is "bound by the preliminary injunction" "in any event" because he serves as an "agent" and is "in active concert" with the Ecuadorian plaintiffs.

Chevron Mem., at 12, n.5.  Based on this argument, Chevron will no doubt seek to include Donziger in any post-trial permanent injunction, regardless of whether he is permitted to participate in the trial.  *See* Complaint, Prayer for Relief ¶ 10.

Under these circumstances, Donziger has compelling personal, professional, economic, and constitutional interests in participating in any trial relating to the declaratory judgment claim that forms the foundation of the Court's preliminary injunction order.  Chevron has not cited— and Donziger's counsel has been unable to identify—any case where a named defendant (or even unnamed party seeking to intervene) was not permitted to participate in a trial under remotely similar circumstances.  Chevron cites *New York State Association for Retarded Children v. Carey*, 727 F.2d 240 (2d Cir. 1984), in support of its argument that the Court can proceed to trial without Donziger.  But that decision focuses on Eleventh Amendment immunity from suit, and the language that Chevron quotes, when put in context, has no bearing on the present situation.  *See id.* at 244 ("Thus, we agree with the district court that UCP's agency relationship with the State does not, of itself, bring its claim within the exception to the Eleventh Amendment allowing suits seeking state compliance with prospective decrees.").  Chevron also cites *Attorneys' Liability Protection Society  v. Klein*, 929 F. Supp. 1399, 1400 (D. Kan. 1996), but that case simply stands for the unsurprising, and irrelevant, proposition that once a party has been dismissed from a lawsuit—which Donziger most certainly has not—that party no longer has standing to petition the Court for removal.  *See id.* ("After the amended complaint was filed, the Youngbloods were no longer parties to the case, and accordingly, no longer had standing to petition the court for removal.").  Chevron's citation to *Baim v. Natto*, 316 F. Supp. 2d 113 (N.D.N.Y. 2003), is equally off base.  In *Baim*, the court simply observed that it is the plaintiff, and not his attorney, who is the proper party to apply for attorneys' fees pursuant to 42 U.S.C. § 1988.  *See id.* at 117.

Chevron's reliance on *Butler, Fitzgerald & Porter*, 250 F.3d 171, to support its argument also is misplaced.  There, although the Second Circuit affirmed the lower court's denial of a discharged law firm's motion to intervene in its former client's breach of contract case, the court decided not to address whether a charging lien *per se* constitutes sufficient interest to warrant

intervention. *See id.* at 176-177; *see also id.* at 178 (noting that under New York law a "charging lien may indeed constitute an interest in the underlying action itself"). Rather, the focus of the court's decision not to permit intervention was on "whether a discharged attorney's intervention into a former client's action fits within the language of [Rule 24(a)]." *Id.* at 177. Here, Donziger is not a discharged attorney seeking to intervene in a former client's action. Additionally, the *Butler* court questioned whether the interest of discharged counsel in their attorney's fees sufficiently related to the underlying contract dispute that was the subject of the action. *See id.* In this case, the subject of the action is the validity of the *Aguinda* judgment itself, in which Donziger has a direct financial interest, as well as Donziger's conduct leading to that judgment. Finally, the *Bulter* court expressed concern about the impact of permitting former counsel to intervene on the client's control of the litigation. *See id.* at 278-279. Donziger, of course, is neither counsel nor former counsel to any party in *this case*—he is a named defendant in every claim, including the declaratory judgment claim.

In sum, the outcome of any trial on the declaratory relief claim will impair Donziger's direct economic interest in the *Aguinda* judgment, his direct interest in avoiding a permanent injunction that would severely restrict his ability to continue the work that has occupied a significant part of the last seventeen years of his life, and his interest in refuting Chevron's false accusations. These significant interests all mandate his participation in any trial on Chevron's declaratory relief claim.

**D.    The three to six month time period to trial proposed by Chevron is unworkable and unfair.**

Having already conducted fifteen months of discovery pursuant to 28 U.S.C. § 1782 targeting dozens of individuals in 15 different jurisdictions (supposedly for use in Ecuador, but already used extensively in this case), Chevron now asks the Court to set a trial schedule that will provide defendants with essentially no time to conduct their own discovery. Chevron's proposal that trial commence in three to six months ignores all of the discovery and motion practice that will be necessary to prepare even a small portion of its declaratory judgment claim for trial and is grossly unfair.

By Chevron's own admission, "[t]he case against … Steven Donziger and his numerous associates is necessarily lengthy, multifaceted, and complex."  Chevron Mem., at 2.  Although Chevron claims that the allegations underlying its declaratory judgment claim are narrower, this is belied by Chevron's own Complaint, which incorporates all of the preceding 390 paragraphs into its declaratory relief claim, and by its preliminary injunction motion, which focused on Donziger and his alleged racketeering enterprise.  It is also belied by the Court's Preliminary Injunction Order, which, although addressing only Chevron's declaratory relief claim, devotes 55-pages to the complex factual history of the *Aguinda* case.

To prepare for trial on Chevron's fraud allegations will require an enormous amount of fact discovery, including document discovery and deposition testimony from Chevron and numerous of its agents and employees, regarding Chevron's own conduct with respect to the *Aguinda* litigation, including its *ex parte* meetings with the judge, interactions with experts, and communications with the Ecuadorian government.  Defendants also will need document discovery and deposition testimony from many third-parties, including third-parties outside the United States.  By way of example only, defendants will need discovery from Petroecuador, Woodward-Clyde, UBS Corporation, Ricardo Reis Veiga, Rodrigo Perez Pallares, Diego Borja, Sara Portilla, Wayne Hansen, Severn Trent Laboratories, Interintelig, S.A., Sarah McMillen, Gene Randall, Adolfo Callejas Rivadencia, Diego Larrea Alarcon, James Craig, Kent Robertson, David Russell, Global Environmental Operations, Richard Cabrera, Charles Calmbacher, as well as John Connor and Chevron's other expert witnesses in the case.  Chevron, no doubt, also will want to take substantial additional discovery from defendants, various of the "co-conspirators" named its Complaint, and others.[16]  There is no way that all of this can be accomplished in six months, much less expert discovery and everything else that is required to prepare for trial.

A three month schedule to prepare for trial on Chevron's alternative, "narrow" trial proposal is equally absurd.  Even if such a trial were to be conducted without any consideration of the underlying events in the *Aguinda* case (which is neither desirable nor feasible), substantial

---

[16] Notably, Donziger's deposition, by itself, consumed 13 days.

discovery and pretrial preparation will be necessary.  *See, e.g.,* Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2444 (2010) ("Discovery is available to the parties in preparing themselves on issues of foreign law.  Oral and written examinations, interrogatories to parties, and requests for admission often are used to refine and sharpen disputed issues, to record expert testimony on foreign law, to determine the position taken by the opposing party's expert, and to gather information and foreign legal materials.").  In particular, experts on Ecuadorian law, procedure, and institutions will need to be retained and disclosed, and expert reports will need to be prepared, and likely translated, along with rebuttal reports.  And each of the experts will need to be deposed.  *See Silberman v. Innovation Luggage, Inc*., No. 01 CIV. 7109, 2002 WL 31175226, at *2 (S.D.N.Y. Sept. 30, 2002) ("a party is entitled to discovery regarding its adversary's foreign law expert, just as it is entitled to discovery regarding any other kind of expert."); *Base Metal Trading v. Russian Aluminum*, No. 00 Civ. 9627, 2002 WL 987257, at *4 (S.D.N.Y. May 14, 2002) (holding that where defendants submitted declarations from several foreign law experts in support of various motions, plaintiffs would be entitled to "investigate the bases for the opinions of the Defendants' foreign law experts through depositions"); *In re Bridgestone/Firestone, Inc*., 131 F. Supp. 2d 1027, 1031 (S.D. Ind. 2001) (holding that discovery on the basis of foreign law experts' conclusions and qualifications was appropriate).  This expert witness discovery, by itself, easily could consume several months.

There also must be time built into any pretrial schedule for dispositive motions, as there are serious unresolved legal questions regarding Chevron's declaratory relief claim.  The Court preliminarily addressed some of these issues, such as ripeness, in its Preliminary Injunction Order.  But, in light of the Second Circuit's decision in *Republic of Ecuador*, the ripeness issue should be revisited.  And other issues remain entirely unaddressed, such as whether this Court has the power under NY C.P.L.R. 5304, which is framed solely in terms of a "non-recognition" of a foreign judgment by a Court that is being called upon to enforce that judgment, and does not provide for either an affirmative cause of action to declare a judgment unenforceable or for any extraterritorial application.  Chevron asks the parties to brief fully, and the Court to consider and decide, these and any other dispositive issues, in only a few weeks.  Yet, there is no valid reason

for this Court to toss aside ordinary case management practices and continue to proceed at such a frantic pace that provides no time for careful consideration of the issues.

**E.      If the Court decides to hold a separate trial on Chevron's declaratory relief claim, it should sever, rather than bifurcate, that claim to permit entry of a final judgment.**

Chevron has requested that this Court bifurcate for early trial its declaratory relief claim pursuant to Rule 42(b) of the Federal Rules of Civil Procedure, rather than sever the claim pursuant to Rule 21.  Chevron acknowledges that the procedure it is seeking to invoke will result in separate trials on its declaratory relief claim and its other claims, but only one final judgment upon the completion of all trials, rather than an independent final judgment on its declaratory relief claim.  Chevron Mem., at 4; *see Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 556, 580 (E.D.N.Y. 1999).  Chevron offers no explanation as to why bifurcation, rather than severance, is the appropriate mechanism in this case.  Chevron merely argues that "[b]ifurcation and prompt resolution of the declaratory judgment claim are necessary because representatives of the Lago Agrio Plaintiffs and the Front have [allegedly] made clear that they will not abide by this Court's preliminary injunction[.]"  Chevron Mem., at 1.  Even assuming *arguendo* that Chevron is correct about the intensions of these "representatives", Chevron does not explain how does obtaining a non-final ruling on its declaratory judgment claim will further protect Chevron.

Therefore, if there is to be any separate trial on the declaratory judgment claim, Donziger requests that that claim be severed and tried as an independent action, resulting in an independent final judgment.  Whoever prevails can then immediately appeal, and the issues of recognizability and enforceability can be fully and finally adjudicated without waiting the additional months or years it may take to try Chevron's other claims and any counterclaims.[17]

---

[17] As requested at the March 15 conference, if the Court grants Chevron's motion and stays the balance of the case (Chevron's RICO and state law claims) pending the trial on all or part of Chevron's declaratory judgment claim, the Court should stay too the March 30 deadline for Donziger and the other defendants to respond to Chevron's Complaint on matters that are not going to be tried first.

### III.    CONCLUSION

For all the foregoing reasons, the Court should deny Chevron's motion to bifurcate in its entirety.  Granting any part of Chevron's motion would violate Donziger's constitutional right to a jury trial and would not serve the interests of justice.

Respectfully submitted,

Dated:  March 21, 2011

By:    */s/ John W. Keker*
JOHN W. KEKER (*Pro Hac Vice*)
ELLIOT R. PETERS
JAN NIELSEN LITTLE (*Pro Hac Vice*)
KEKER & VAN NEST LLP
710 Sansome Street
San Francisco, CA  94111-1704
Telephone: 415.391.5400
Facsimile: 415.397.7188
Email:      jkeker@kvn.com
Email:      epeters@kvn.com
Email:      jlittle@kvn.com

**Attorneys for** STEVEN DONZIGER, THE LAW OFFICES OF STEVEN R. DONZIGER

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ........................................................................1

II.   ARGUMENT .............................................................................................3

   A.   Chevron's proposed bifurcation of the entirety of its declaratory relief
        claim would violate Donziger's right to a jury trial and would not
        promote judicial efficiency. ..................................................................3

        1.   This Court cannot try Chevron's declaratory relief claim before
             a jury trial on Chevron's RICO and other claims. ......................3

        2.   Trying Chevron's declaratory judgment claim separately would
             not promote judicial efficiency and economy and would
             prejudice Donziger. ...................................................................5

   B.   Chevron's proposed bifurcation of the supposed non-fraud issues in its
        declaratory relief claim would have serious adverse consequences and
        would inevitably infringe Donziger's right to a jury trial. .......................7

        1.   This Court should not—and, as a practical matter, cannot—
             adjudicate the impartiality and due process of the Ecuadorian
             judicial system in the abstract. ..................................................7

        2.   A trial evaluating whether the *Aguinda* judgment is contrary to
             public policy is premature at this point and necessarily will
             implicate the underlying facts and circumstances of the
             *Aguinda* litigation. ..................................................................14

        3.   Any question of the Lago Agrio court's personal jurisdiction
             over Chevron has been fully adjudicated and, therefore, is not a
             proper issue for trial. ...............................................................16

   C.   Donziger has a right to participate in any trial of Chevron's declaratory
        relief claim. ........................................................................................18

   D.   The three to six month time period to trial proposed by Chevron is
        unworkable and unfair. ........................................................................21

   E.   If the Court decides to hold a separate trial on Chevron's declaratory
        relief claim, it should sever, rather than bifurcate, that claim to permit
        entry of a final judgment. .....................................................................24

III.  CONCLUSION .........................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Ackermann v. Levine*
   788 F.2d 830 (2d Cir. 1986) ...................................................................................15

*Aguinda v. Texaco, Inc.*
   142 F. Supp. 2d 534 (S.D.N.Y. 2001) ........................................................................8

*Aguinda v. Texaco, Inc.*
   No. 93 Civ. 7527, 1994 WL 142006 (S.D.N.Y. April 11, 1994)...............................8

*Attorneys' Liability Protection Society v. Klein*
   929 F. Supp. 1399 (D. Kan. 1996) ...........................................................................20

*Baim v. Natto*
   316 F. Supp. 2d 113 (N.D.N.Y. 2003) ......................................................................20

*Bank Melli Iran v. Pahlavi*
   58 F.3d 1406 (9th Cir. 1995) .................................................................................8, 9

*Bank of New York v. First Millennium, Inc.*
   607 F.3d 905 (2d Cir. 2010) .....................................................................................17

*Base Metal Trading v. Russian Aluminum*
   No. 00 Civ. 9627, 2002 WL 987257 (S.D.N.Y. May 14, 2002)...............................23

*Beacon Theatres, Inc. v. Westover*
   359 U.S. 500 (1959)....................................................................................................4

*Bigio v. Coca-Cola Co.*
   239 F.3d 440 (2d Cir. 2000) .................................................................................9, 10

*Brennan v. N.Y.C. Bd. of Educ.*
   260 F.3d 123 (2d Cir. 2001) .....................................................................................19

*Bridgeway Corp. v. Citibank*
   45 F. Supp. 2d 276 (S.D.NY. 1999) ...........................................................................8

*Brown v. Sandimo Materials*
   250 F.3d 120 (2d Cir. 2001) .......................................................................................5

*Butler, Fitzgerald & Potter v. Sequa Corp.*
   250 F.3d 171 (2d Cir. 2001) .........................................................................18, 20, 21

*Corporacion Tim, S.A. v. Schumacher*
   418 F. Supp. 2d 529 (S.D.N.Y. 2006) ........................................................................8

*Dairy Queen, Inc. v. Wood*
   369 U.S. 469 (1962)....................................................................................................4

*Gaffney v. Department of Info. Tech. and Telecomm.*
   579 F. Supp. 2d 455 (S.D.N.Y. 2008) .....................................................................5, 6

*Gaines v. Dixie Carriers, Inc.*
   434 F.2d 52 (5th Cir. 1970) ......................................................................................18

*Galu v. Swissair: Swiss Air Transport Co., Ltd.*
   873 F.2d 650 (2d Cir. 1989) .......................................................................................9

## TABLE OF AUTHORITIES
### (cont'd)

**Page(s)**

*Germain v. Connecticut Nat. Bank*
  988 F.2d 1323 (2d Cir. 1993) ...................................................................4

*Gilbert v. Johnson*
  601 F.2d 761 (5th Cir. 1979) ..................................................................18

*In re Bridgestone/Firestone, Inc.*
  131 F. Supp. 2d 1027 (S.D. Ind. 2001) ..................................................23

*LeBlanc-Sternberg v. Fletcher*
  67 F.3d 412 (2d Cir. 1995) ......................................................................4

*Maersk, Inc. v. Neewra, Inc.*
  687 F. Supp. 2d 300 (S.D.N.Y. 2009) .....................................................4

*Morris v. Northrop Grumman Corp.*
  37 F. Supp. 2d 556 (E.D.N.Y. 1999) .....................................................24

*New York Public Interest Research Group, Inc. v. Regents of the
University of the State of New York*
  516 F.2d 350 (2d Cir. 1975) ...................................................................19

*New York State Association for Retarded Children v. Carey*
  727 F.2d 240 (2d Cir. 1984) ...................................................................20

*Republic of Ecuador, et al. v. Chevron Corp., et. al.*, Nos. 10-1020-cv (L)
  10-1026 (Con), – F.3d – , 2011 WL 905118 (2d Cir. Mar. 17, 2011) ............................ *passim*

*Robinson v. Metro-N. Commuter R.R. Co.*
  267 F.3d 147 (2d Cir. 2001) .....................................................................4

*S.A.R.L. Aquatonic-Laboratoires PBE v. Marie Katelle, Inc.*
  No. CV 06-640, 2007 WL 1589562 (D. Ariz. June 1, 2007) .....................8

*S.C. Chimexim S.A. v. Velco Enter.*
  No. 98 Civ. 0142, 1999 WL 223513 (S.D.N.Y. Mar. 17, 1999) ................9

*Shell Oil Co. v. Franco*
  No. CV 03-8846, 2004 WL 5615657 (C.D. Cal. Nov. 22, 2004) ..............15

*Silberman v. Innovation Luggage, Inc.*
  No. 01 CIV. 7109, 2002 WL 31175226 (S.D.N.Y. Sept. 30, 2002) ..........23

*Thomas and Agnes Carvel Foundation v. Carvel*
  736 F. Supp. 2d 730 (S.D.N.Y. 2010) ...............................................14, 15

### State Cases

*CIBC Mellon Trust Co. v. Mora Hotel Corp. N.V.*
  743 N.Y.S.2d 408 (2002) ......................................................................8, 18

*LMWT Realty Corp. v. Davis Agency, Inc.*
  85 N.Y.2d 462 (1995) ..............................................................................18

### Federal Statutes

28 U.S.C. § 1782 .....................................................................................1, 11, 21

42 U.S.C. § 1988 ...........................................................................................20

# TABLE OF AUTHORITIES
## (cont'd)

<u>**Page(s)**</u>

### Federal Rules

Fed. R. Civ. Pro. 24(a)(2) ...................................................................................19

Fed. R. Civ. Pro. 42(b)..................................................................................4, 5, 24

### State Statute

C.P.L.R. 5304................................................................................................... *passim*

### Other Authorities

Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*
    § 2444 (2010)...........................................................................................23

Restatement of the Law (Third) of Foreign Relations Law of the United
    States § 483 (2010) ................................................................................16