# EXHIBIT 35

CALLEJAS R. ADOLFO                                    BOOK No. 63

Case No. 2003-0002

**PRESIDING JUDGE: AB. NICOLAS ZAMBRANO LOZADA**

**PROVINCIAL COURT OF SUCUMBIOS. – ONLY COURT ROOM OF THE PROVINCIAL COURT OF JUSTICE OF SUCUMBIOS.** Nueva Loja, Monday February 14, 2011 at 8:37 a.m. **WHEREAS.-** In regard to case No. 002-2003 that María Aguinda et al., are pursuing for environmental damages against the Company Chevron Corporation, assisting their proceeding stages, it is established.-

1).- Having incorporated the attachments and briefs submitted at 4:24 p.m. of February 03, 2011 by Doctor Adolfo Callejas Ribadeneira, Legal Counsel of Chevron Corporation, and considering them, it is stipulated to deny its motion of reversal, dated February 02, 2011 at 5:14 p.m., by virtue of not impairing their right to submit motions protected by law.- 2).- Basically, María Aguinda, Ángel Piaguaje, et al. protected by the content of Articles 2241 and 2256 of the prior code of the Civil Code (hereinafter referred to as CC), currently Articles 2214 and 2229 respectively, pursuant to the new Code published in the Official Registry of June 24, 2005, to base the obligation of repairing the damage; in Article 169 of OIT to ground the right of compensation for indigenous; and in regard to the right to claim damages resulting from an environmental effect, in number 6 of Article 23 and Article 86 of the Constitution of 1998, as well as in Article 2260 of the prior code of the Civil Code, currently Article 2236, which indicates that "In general, popular action is granted in all cases of contingent damage due to recklessness or negligence of menace to indeterminate persons. But if the damage threatens only determinate persons, only one of them may attempt the action", and in Article 41 of the Environmental Law – hereinafter referred to as LGA (folios 78 and 79), are on folios 73 to 80 claiming the elimination or removal of contaminated elements and the repairing of environmental damages, against CHEVRON TEXACO CORPORATION, which changed its name to CHEVRON CORPORATION, in accordance with what it is indicated and showed by the document submitted by its Common Lawyer, attached to the submitted brief of August 23, 2005, at 8:05 a.m.; this lawsuit, in its clauses First to Sixth, summarizes the background (where it alleges that the detail of the work made by Chevron is contained in Attachment A of the lawsuit), contaminated methods employed by Texaco, damages and the affected population, liability of Texaco, grounds of rights

previously described and it states the following plans: "Based on the mentioned legal provisions, as members of the affected communities and protecting the rights jointly acknowledged, the appearing parties are claiming from CHEVRON TEXACO CORPORATION, previously identified in the background, as follows: 1.- The elimination or removal of the contaminated elements that are still threatening the environment and health of the inhabitants. Therefore, the sentence should determine: a) The removal and the appropriate treatment and disposal of waste and contaminant material existent in the pools or pits opened by TEXACO and that have been simply covered, blocked or inappropriately treated; b) The treatment of rivers, streams, lakes, swamps and natural and artificial water resources and the appropriate disposition of all waste material; c) The removal of all elements of structure and machinery sticking out from the ground in the closed or abandoned station and substation wells, as well as oil ducts, pipes, and other similar elements related to said wells; and, d) In general, the cleaning of lands, plantations, contaminant residuals produced or generated as a consequence of the operations managed by TEXACO, including the deposits for contaminant wastes built as part of the bad executed cleaning environmental tasks; 2. The repairs of the caused environmental damages, in accordance with what it is established in Article 43 of the Environmental Law. Therefore, in sentence, it should be ordered: a) The execution in the open pools by TEXACO of the needed tasks to recover the natural characteristics and conditions that the ground and the circulating environment had before suffering damages; b) The hiring of specialized persons or institutions, at the expense of the lawsuit, to design and run a recovery plan of the native flora and fauna, whatever possible; c) The hiring of specialized persons or institutions, at the expense of the lawsuit, to design and run a plan for the regeneration of the aquatic life; d) The hiring of specialized persons or institutions, at the expense of the lawsuit, to design and run a plan of improvement and monitoring health of the inhabitants of the population affected by the contamination. The necessary resources to cover the cost of the activities, which are claimed, the amount determined by experts, in accordance with what it is provided in the last but one division of Article 43 of the Environmental Law, should be submitted to the Front of Defense of Amazonía, to be applied exclusively for the purpose

of the sentence, with the advice of specialized international institutions; 3) The payment of ten percent of the value representing the amount of the repairs, mentioned in the second division of Article 43 of the Environmental Law; as well as the payment of legal costs of the action and the value of time and proceedings used, in accordance with what it is provided by Article 2261 of the Civil Code. The amount of money ordered to be paid for these concepts should be also delivered, by express request of the Plaintiffs, to the Front of Defense of the Amazonía." The mentioned Plaintiff, in accordance with the actions, appeared at the Conciliation Hearing (folios 243 to 267), Dr. Adolfo Callejas, in the capacity of Plaintiff's Legal Counsel, with his defense attorneys, Dr. Arturo Carvajal Salas, Enrique Carvajal Salas and Alberto Racines Enríquez, who broadly and elaborated answered the lawsuit, and proposed the following exceptions, in this order: "Exceptions.- By virtue of the above mentioned reasons, I raise the following exceptions: IV.1.- Main Exception.- As the main exception I allege the lack of jurisdiction of the Ecuadorian Judges and therefore, the lack of competency and jurisdiction, that Mr. President of the H. Superior Court of Justice of Nueva Loja has, to hear and to resolve the lawsuit submitted by María Aguinda S. et al. against Chevron Texaco Corporation, because the Judge does not have them over the company I represent.-   IV.2 First Subsidiary Exceptions.- As first subsidiary exceptions I allege in order, as follows: IV.2.1.- Lack of a legitimate contradictor; IV.2.2.- I deny Chevron Texaco Corporation to be a legitimate contradictor; IV.2.3.- I deny that Chevron Texaco Corporation is a successor of Texaco Inc. or that it had acquired any right or obligation from Texaco Inc. IV.3.- Second Subsidiary Exceptions.- Likewise, in order, I allege the following second subsidiary exceptions: IV.3.1.- Unlawful accrual of actions, because in the verbal process, actions requiring a different stage have been stated, and the hearing is not competent to you, Mr. President.- IV.3.2.- I expressly allege the inapplicability of the Environmental Law, because I expressly allege the nonretroactive of said law.- IV.3.3.- I formulate the same statement in regard to Article 15 of the Agreement 169 of the International Organization of Work.- IV.3.4.- I expressly allege the statute of limitation of the action, in accordance with what it is established in Article 2259 of the Civil Code.- IV.4.- Third Subsidiary Exceptions.- Subsiding all the above mentioned exceptions and for the non consented and non admitted event that the above mentioned exceptions are not sufficient, I allege: IV.4.1.- Lack of rights of the Plaintiffs to plan this action herein, due to the lack of linking with

Chevron Texaco Corporation and because the assumed ecological damages of the Amazonia region, in the area where Petroecuador Consortium was – Texaco, unjustifiably attributed only to Texaco Petroleum Company, were the object of settlements was legally celebrated and issued. As we elaborated before.- IV.4.2.- I expressly allege inadmissibility of the lawsuit filed with the protection of Article 2260 of the Civil Code.- IV.4.3.- I allege the end of all the obligation that Texpet may had have, since said company was released of the environmental damages claimed.- IV.5.- Fourth Subsidiary Exceptions.- Finally, adding to what I expressed, I formulate the following additional exceptions, also subsidiary: IV.5.1.- I deny that my represented party had caused any damage to the Plaintiffs.- IV.5.2.- I deny that my represented party has to be liable for actions of third parties.- IV.5.3.- I deny that my represented party has any obligation to repair any damages.- IV.5.5.- I deny that my represented party Chevron Texaco Corporation, had executed any action of the ones described in the lawsuit.- IV.5.6.- I deny that my represented party had caused any damage.- IV.5.7.- In other words, I deny all grounds of fact and law of the lawsuit.- IV.5.8.- I deny that Chevron Texaco Corporation had committed a civil crime or a quasi delict causing damage to the Plaintiffs.- IV.5.9. I deny that Chevron Texaco is guilty of malice or negligence that had caused damages to the plaintiffs in the past or in the present.".- Upon existing facts to be justified, a legal evidence term of six days was granted, which had expired, and because the process is in the stage of resolution, it is considered**: ONE**.- Lack of competence. As the old Supreme Court indicated, in sentence of third instance, "The competence is one of the substantial unavoidable proceedings that the Law requests to be met for the Judge or Court to be able to validly and legally resolve the grounds of the action. In other words, the Judge or Court before hearing the aspects of the dispute, should incontrovertibly establish his competence, under penalty of his infringement generates the legal nullity, with a serious violation of the law" (Legal Gazette. Year LXXXI. Serial XIII. No. 11. Folio 2406; Quito, February 26, 1981), therefore this is the first point to be solved in this ruling. In regard to the jurisdiction and competence, it is considered that in accordance with the Constitution and the Organic Code of the Legal Function (hereinafter referred to as COFJ), the jurisdiction corresponds to the entities of this function of the State, in other words, the power of administering justice lays in the Judicial

Function, which means, in civil issues, to declare the right and to make it effective, even against the resistance of the obligated party. The Code of Civil Procedure, in its first Article, indicated: "The jurisdiction, this is, the power of administrating justice, consist in the public power of judging and executing the ruling about a certain issue, power corresponding to the Courts and Judges established by the laws [...]" Similarly, Article 7 of the Organic Code of the Judicial Function indicated: "The jurisdiction and competence rise from the Constitution and law. Only judges appointed in accordance with their precepts [...] may execute the legal power". The jurisdiction of the Presidency to hear this case, this is, the power of administering justice understood as "the Public Power of ruling and executing what it was ruled" (Art. 150 COFJ), is given by the Constitution (Art. 167) and by COFJ (number a) of the tenth transitory disposition, all their members, including the undersigned persons, legally and duly performing their tasks in their positions, it is established their jurisdiction, the one that should be executed in accordance with the rules of competency, understood as the "the measure within the mentioned power is distributed among the several Courts, for the purpose of territory, matter, of the persons and grades" (Art. 1 of the Code of Civil Procedure, hereinafter referred to as Code of Civil Procedure). This case is suing the repairs of environmental damages and damages caused by the environmental effects, this is, at the beginning we were in the territory in the alleged number 5 of Article 29 of the Code of Civil Procedure, which the competent Judge is the one "where the damages were caused, in the lawsuits on damage compensation or repair", however, there are special rules for the competence of the matter when it is about environmental damages, which it is this case. In accordance with what it is determined by the second division of Article 42 of LGA (RO 245 of July 30, 1999) the undersigned Alternate President of the Province Court of Sucumbíos is competent, to hear and resolve in first instance, the civil action for damages of María Aguinda et al. against Chevron Corporation, before the excuse of Dr. Juan Evangelista Núñez Sanabria, former President of this Court and because of the recusal due to the lack of enforcement of this case, from Dr. Leonardo Isaac Ordoñez Piña, current President of the Court. The lack of competence alleged by the Plaintiff has being argued indicating that the Company Chevron Corporation says not to be a successor of Texaco Inc., which even though is being true, it does not affect the jurisdiction or competency of this Court,

that as it has been established in this case, given by the Constitution, the new COFJ, the Code of Civil Procedure, and the LGA. This Presidency considers that the alleged fact that Chevron Corporation is not a successor of TEXACO INC. does not stop the competence of this Court, if not eventually, if being true the alleged fact it would be understood as lack of legitimate contradictor, which is an exception that has been alleged as the first subsidiary exception in the answer to the Plaintiff and that it will be analyzed later on. **TWO.-** The dispute is stuck with the pretentions of the Plaintiff and the exceptions proposed by the Defendant in the conciliation hearing; as it could be expected, the previous aspects, dealt with in the answers, were first analyzed. These referred to the lack of competence of this Court, which has been supported in the light of several facts that are also concerned with the other exceptions previously dealt with in the answers and that will be conveniently ruled in this ruling. The settled exceptions, in an orderly manner, are ruled as follows.- **THREE.-** The Defendant has alleged the following exceptions, which will be analyzed in the order that have been submitted because in the answers they are not differentiated whether they are dilatory or peremptory defense. 3.1.- Lack of legitimate contradictor. The Plaintiff claims that Chevron is the successor of Texaco whereas the Defendant denies this claim, and thus by having to pronounce on it, as written on the file, it is observed that the strict judicial sense, that is, by understanding the succession as a way of acquiring the domain for which the rights and obligations of the originator to its successors (according to the Roman tradition), the claim that Chevron is not the successor of Texaco Inc. is correct, as it has the documentary evidence duly certified that evidences that Texaco Inc. holds legal status and therefore legal existence (on folios 222 and 223 the original document can be found in English, translated on folios 224 and 225), therefore, it is evident that no succession is possible mortis causa without a cause. This Presidency starts the analysis considering the exposition on the Defendant's part in the conciliation hearing, referring that no merger existed between Texaco and Chevron, contrarily, as shown with the certificate that lies on folios 230 and 231 (translation on folio 225), the merger actually occurred between Texaco Inc. and Keepep Inc. However, this proven-with-documents reality can be analyzed in the light of all the evidence, for which several aspects are considered, among which it is convenient to firstly refer to that on folio 4103 a reason can be found from October 29, 2003, at 11:18 a.m., registered by the Administration Secretariat, in which it is proven that the Defense Party did not appear for the production of several

documents precisely related to this issue, which had been timely requested by the Plaintiffs by the brief received on October 23, 2003 at 3:25 p.m. and ordered for ruling on October 23, 2003 at 3:30 p.m. The documents that the Defendant should produce included: 1) Complete and certified copy of the "Merging Plan and Agreement", which indicates the relation with the "Merging Certificate between Keepep Inc. and Texaco Inc.", document which its issuance date is October 9, 2001; 2) Complete and certified copy of the document certifying the authorization of Chevron Corporation, for its subsidiary Keepep Inc. to intervene in the Merger; 3) Complete and certified copy of the authorization of the competent corporative entity to proceed with the change of name from Chevron Corporation to Chevron Texaco Corporation; 4) Complete and certified copy of the authorization of the competent corporative entity issued in order for Chevron to be able to incorporate the word Texaco to its new name. These documents not exhibited by the Defense, in spite of being timely requested by the Plaintiff and ordered by the Presidency of this Court were not submitted by the Defense. In accordance with what the file is certifying, the Defense expressed the reasons grounding an alleged impossibility of producing said documents, by brief of October 27, 2003 at 4:50 p.m., taken care by order of October 27, 2003 at 5:20 p.m., ordering to comply with what it was ordered or to submit the excuse on the set date. As it was noted, the reason indicated by the Clerk clearly stated that the Defense did not appear on the date and time scheduled, therefore it did not submit a valid excuse for this failure to comply. Considering Art. 826 of the Code of Civil Procedure in regard to the compliance of the requested production as evidence, and having this Presidency to consider only the elements being part of this proceeding, I consider that the negative to comply with the ordered production may not favor the Defense, but otherwise, the Code of Civil Procedure has established a sanction for these cases, in Art. 827, indicates: "If the production is ordered and it is not complied within the set term, the reluctant party will have imposed a fee from ten to forty United States Dollars for each day of delay, depending on the amount of the issue. This fee may not exceed the equivalent value of ninety days", therefore in this case, because of the time passed, the maximum fee should apply, equivalent to 40 dollars daily multiplied by 90 days, for each document that has not been produced in accordance with what was ordered. Likewise, the same happens with the production of documents requested by the brief

on October 24, 2003, at 4:59 p.m., which is referred to as "Chevron Texaco Notice of the 2002 Annual Meeting and the 2002 Proxy Statement" and "Chevron Texaco Notice of the 2003 Annual Meeting and the 2003 Proxy Statement", and also through the written notice on October 24, 2003, at 5:00 p.m., on which it is requested to point out date and time so that the company being sued displays the following documents: "a.- complete and certified copy of the "Agreement and Plan of Merger" between Chevron Corporation and Texaco Inc., b.- Complete and certified copy of the minutes of the competent organism, on which it is recorded the authorization for the organization called "merger" to proceed, within the legislation of the State of Delaware, from the United States of America, between the companies Chevron Corporation and Texaco Inc.; c.- Certificate of Merger between Texaco Inc. and Chevron Corporation.; d.- Authorization of the competent entity, allowing Chevron Texaco Corporation to establish, on the legal documents "Chevron Texaco Notice of the 2002 Annual Meeting and the 2002 Proxy Statement and Chevron Texaco Notice of the 2003 Annual Meeting and the 2003 Proxy Statement", which has been the figure called "Merger", between the companies Texaco Inc. and Chevron Corporation", written notices that were attended to through the ruling of October 27, 2003 at 08:40 a.m., by which the requested production was settled for November 4, 2003 without any records in the process of the fulfillment of such order. This situation has also been considered together with the rest of the evidence of the file, which indicate that both Chevron and Texaco representatives made several public statements in different media and with different spokespersons, announcing a financial operation that would combine the strength of both companies to form a new one that would be benefited from this union. In the file, from folios 140700, there is an important evidence, in the authentication given on June 6, 2008 of the real copy of the following documents: 1. Chevron Document: Power Point Slides "Calling to Meeting Analysis"; Transcription of analysts meeting from Chevron and Texaco, October 16, 2000; 3. Chevron and Texaco agree on a merger of $100 billion in an Integrated Energy Company (Top-Tier); 4. Chevron and Texaco announce a leadership team and an organization structure for the proposed Company after merger; 5. Proposed merger of Chevron Texaco clarifies regulating obstacle in Europe; 6. Texaco actionists approve the merger Chevron Texaco; 7. The U.S. Federal Commission of Commerce approves the Chevron and Texaco merger; 8. Chevron Texaco Merger announces complementation of the merger; 9. Chevron Texaco begin first full day of global operations; 10. Chevron Texaco announces its plans to promote the retailing gasoline brand in the

U.S.; 11. Consent Agreement of the Federal Commerce Commission giving to the merger of Chevron S.A. and Texaco Corp. protection of competition in the market; 12. Analysis of the merge order proposed from the merge as an assistance for the public comment; and, 13. Agreement containing consent orders, with their respective translation, and more documents. In view that these documents were publicly available, exactly the official folio of Chevron, the sued corporation (www.chevron.com), it is proceeded to analyze its content as follows: In general, all these documents are referring to or announcing a financial operation called a "merger", in the English language, which is the language of these documents. Bearing in mind the translation from the English-Spanish Law Dictionary, by Henry Saint Dahl, Publisher McGrraw-Hill's [sic], and additionally the translations in the file, we come to the unmistakable conclusion that the English term "merger" is translated into Spanish as "fusión". Likewise, the translation submitted to the Presidency of the Court within the same protocol, made by Mr. Mauricio Javier Rodríguez Sandoval, from folios 140746, is invariably translating the English term "merger", from the Spanish word "fusión". In regard to what a merger is, the Company Law has a complete section developing the concept of a merger, indicating that this one is happening: a) when two or more companies joint to constitute a new one, followed by its rights and obligations; and, b) when one or more companies are absorbed by another one that continues to exist (Art. 337), therefore it is convenient to analyze the legal business occurred between Chevron and Texaco Inc., to determine if Art. 337 from the Company Law is applicable to them. Under this legal perspective, all the documentation related to the transcription of the meeting of Analysts held on October 16, 2000 of the merger between Chevron and Texaco have been analyzed, in which David O'Reilly, General Manager of Chevron, declares as follows: "First of all, we will talk about the strategic reasons of combining Chevron and Texaco to constitute this new company: Chevron Texaco Corporation" (folio 140747) and then he continues saying: "the capacity of the new company will be strengthened by the combination of skills and talents of both organizations", and that "We will have a greater and more solid portfolio allowing Chevron and Texaco a better management and absorption of risks" (folio 140748). The Presidency carefully observes the fact that the General Manager of Chevron highlights the idea of "combining" Chevron and Texaco so the new company may benefit from this combination

of the skills and talents of both, for which it is evident that the new company acquired benefits from the combined companies. It is remarkable that although no explicit mention of obligations, the advantage of a "better management and risk absorption" is analyzed. The Presidency cannot overlook that on slide 13 of the presentation (folio 140750) the benefits of the merger are discussed around Latin America, describing how the new company will benefit from the rights that combined companies have in South American countries; although no mention was made on the obligations of these companies on these countries, by fundamental law principle we understand that the wealth is merged as a whole, formed by assets and liabilities, and in accordance with the law, it is understood that whichever the bottom legal financial business is, or however the companies would like to call it or cover it, the one that causes legal effects is the real business. This Presidency is convinced that the wealth must be combined as a whole and not only its rights, that is, the obligations are also combined. We understand that the Managers of both companies publicly announced a merger, and that the legal effects of such operation necessarily imply that the new "combined" company succeeds in rights and obligations its creators, in accordance with what is ruled on it in Art. 337 of the Company Law, and in Art. 338 that rules that the respective social wealth will be trespassed "in block", that is, that the whole wealth is transferred, assets and liabilities, rights and obligations, with no inventory benefit or limit, as it is clearly explained in the second subsection of Art. 341 where it is ruled that "the absorbing company will be in charge of paying the assets of the absorbed one and will assume, because of this right, the responsibilities of a liquidator with reference to the creditors of the latter"; therefore, the claim of the defendant has no legal merit whatsoever that "there is no legal uphold of the expected automatic transfer of the obligations that may have had TEXACO INC.. to Chevron Texaco Corporation" (folio 244), because the transfer is not "automatic", but this one has its cause in the legal business that has been called "merger" in English, and that combined the wealth of both companies. Additionally, different press bulletins published by Chevron Corporation have been analyzed which are legalized in the file with their translations within the Registration that we hereby analyzed, on which several statements are held from Chevron's CEO, claiming expressly that "this merger positions Chevron Texaco as a much stronger global energy producer,

and that it will create a bigger value for the shareholders of both companies" (back of folio 140759). The General Manager of ChevronTexaco on October 10, 2001 also announced that with the new company "we have a broader combination of high quality assets, business, skills and technology thanks to the merger" (folio 140768), which proves that the new company, ChevronTexaco Corporation, now only called Chevron Corporation, acquired benefits (assets, business, skills and technology) out of the combination of the two companies, Texaco and Chevron. That it is coincident with what was said by the President and General Manager of Texaco, Glenn F. Tilton, who claimed that "the new ChevronTexaco will unite two great companies", thus he is expecting "to complete the merger and creating a new great energy company" (folio 140766). Due to the good faith principle, any citizen, Ecuadorian or North American, that heard the public statements given by the companies Chevron and Texaco would inevitably have reached to the conviction of a merger between them. This same conviction seems to be the one that motivated the Plaintiffs initiating legal actions against the new company resulting from the combination of the other two, because this conclusion is the result of trusting the information both companies publicly disclosed through their legal representatives and their official channels. In the official website of the company Chevron, www.chevron.com, on October 9, 2001 the sued company said the following public announcement: "Chevron Texaco Corporation announces the consummation of the merger" (back of folio 140767). Such clear and express announcement does not leave room for confusion, and it is presumed to be true because of the good faith principle, but if the public statements given by Managers and Presidents of both companies were done with the sole objective of creating a false impression of reality, then we may describe these statements as malicious, and because of the fundamental law principle, their author or authors cannot take benefit from such malice, in accordance with what it is established in number 2 of Art. 17 of the Company Law, which establishes that "because of fraud, abuse, or non-legal recourses that are committed in the name of the companies and other natural or legal entities, will be personally and severally liable for it; 1. Whoever ordered or executed them, without prejudice to the responsibility to which those people may affect. 2. The ones who took advantage of their value. 3. The holders of assets with the purpose of their restitution", therefore in this case, in which the facts and announcement of the spokespeople and representatives of both companies created a false expectation of the reality, the companies who participated in this financial operation and expect to benefit from the false information disclosed are jointly liable.

Additionally, to issue this ruling I consider Dr Ricardo Reis Veiga's statements, who gave his version of the facts (folio 103,460) during the legal inspection of the well Guanta 7, in which he stated: "I am the Vice-President of Texaco Petroleum Company, I am a lawyer of profession, I am responsible of all legal matters of the company in Latin America", and he also added that "I do have a connection with Chevron, of course I have one, but I did not have any connection with Chevron at that time because the truth is that it had not merged […]", clarifying the position he holds in the company Texaco, and also clarifying that he holds "connections" with Chevron, but those connections are after the merger, which is united when he claimed that "because the truth is that it had not merged", disclosing the true fact that the author of such testimony had the internal conviction of the existence of the merger as a consumed fact, occurred and objective. It is also considered that there are several checks in the proceeding (folios 103221, 104241, 101884, 69483, among others) that have been signed by Dr Rodrigo Pérez Pallarez, legal representative of the company Texaco in Ecuador, to meet the obligations of the Defendant, Chevron Corporation, has had to cancel as part of the expenses generated by this trial. This subrogation of Texaco, which is not a procedural part in this trial, to meet the obligations contracted by Chevron Corporation, necessarily denotes, at least, a patrimonial relationship between both companies, because between different and independent companies it would not exist a legal cause so that one company assumes legal expenses of the other. All these public statements and proceeding actions conducted by spokespeople and representatives of both companies (Chevron Corp. and Texaco Inc.) lead to the unequivocal conclusion that the combination of their patrimony and personalities are a legal reality, apart from being public and evident. In accordance with what it is settled in the principle of procedural truth established in Art. 27 of the COFJ, this Presidency, as a competent Judge, does not require further evidence of the merger between Chevron and Texaco, given the fact that its notoriety has been proved based on the evidence provided in the stages of the proceedings. It cannot be overlooked the manifest reality, that neither Chevron Corp. nor Texaco Inc., neither their spokespeople nor their representatives, in neither of their frequent press releases, have publicly denied the existence of the merger (as they do have publicly denied, debated and denounced other facts, by means of paid announcements in the media), but on the contrary, being this lawsuit the only familiar place in which Chevron Corp. debates the existence of the merger with Texaco Inc., therefore it is convenient to remember that in our legal system prevails the principle that nobody

may benefit from its bad faith, as it would be the case of having several false public advertisements to broadcast a deformed idea of the reality and to benefit from the induced mistake, as for example if said maneuver is starting with the purpose of avoiding the legal obligations with third parties. The fact that the shareholders of the predecessor companies are the same that lead the new company, resulting from said merger that the shareholders of Chevron are owners of "approximately 61% of the new merged company, while the shareholders of Texaco would be holders of approximately 39% of this" (folio 140770); and additionally that the executives in charge of the new company are the same ones who managed the combined companies, (140759, 140761, 140768), as it occurs in this case, leading us to think that there is no sufficient separation between the property and the control of the new company and its predecessors. It is considered if the shareholders of Texaco Inc., become shareholders of Chevron, and consequently were benefited from the new company (same as its executives), the obligations they had as shareholders of Texaco Inc. would also passed to the new company, Chevron Corp. The right serves the justice, and it may not allow to manipulate legal institutions with unlawful purposes, as to favor a fraud or to promote injustice, as it would be the case of transferring assets to a Corporation "free of liability" while the liability is kept in a company "free of assets", such as the Defense intents us to understand from the transaction occurred between Chevron and Texaco, in which the new company is benefiting from the combined companies, but it is omitted to mention its obligations. As the First Civil and Business Court of the Old Supreme Court tells us, "in the foreign doctrine and jurisprudence, the need of the lifting of the veil of the legal entities is gaining space, every time more, specifically of corporations. The unveiling consists in disregarding the external way of the legal entity, and as of there, to enter in the interior of such and to examine the real interests in its interior". (Legal Gazette. Year CV. Serial XVIII. No. 1, Folio 79, Quito, July 23, 2004 published in the file 172, Official Registration 553, March 29, 2005). In cases like this, in which the alleged new corporate structure is met, may cause fraud to third parties or a similar injustice, the North American jurisprudence teaches us to impose the doctrine of the corporate lifting of the veil in a special way. Likewise, it is occurring in the Ecuadorian jurisprudence, in which the development had been such that it had achieved to summarize a series of basic allegations containing, in turn, a definition as well as an identification of the action scope of the institution of the lifting of the veil in Ecuador.

First of all, it is of vital importance highlighting that the lifting of the veil institution is of a strictly exceptional character, since it is undeniable the important social role that a clear separation of the patrimonies of the legal entities and their owners plays (as it is provided in the Sentence of the First Civil and Commercial Court of the Supreme Court of Justice. File Number 393, ruled on July 8, 1999 at 9:00 a.m.. Official Registry No. 273 on September 9, 1999). Secondly, there is the evident reality that the existence of the society figure has been ground for several abuses, being used not only for the objectives provided by Law, but also to affect the rights of third parties by means of constituting in practice as a fraud tool. It is before this assumption on which the Judges must lift the veil of legal entities, to observe and analyze the reality of things beyond appearances (see Sentence of the First Civil and Commercial Court of the Supreme Court of Justice. File Number 120, ruled on March 21, 2001 at 11:15 a.m. Official Registry Number 350 on June 19, 2001). Thirdly, when analyzing abuses of the society figure, it is not relevant if this one was constituted with the clear intention of conducting a fraud or damage. It is enough with the fact that such fraud or damage exists to justify a lifting of the veil (see the Sentence of the First Civil and Commercial Court of the Supreme Court of Justice. File Number 393, ruled on July 8, 1999 at 9:00 a.m. Official Registry Number 273 on September 9, 1999). Finally, it is essential to highlight that lifting the corporate veil of a company does not simply constitute a power of the judge when finding abuses of the corporate figure. Contrarily, the application of this institution represents a real obligation of the judge because it is the only, or at least the most effective, remedy to unveil such abuses of the legal entity (see the Sentence of the First Civil and Commercial Court of the Supreme Court of Justice. File Number 20, ruled on January 28, 2003 at 11:00 a.m. Official Registry Number 58 on April 9, 2003). Due to these reasons, the fact that the procedural process shows the legal existence of Texaco and the merger of this latter with Keepep does not contradict the proven fact, public and evident, that the new company, Chevron Corporation, benefited from all of the assets and liabilities of Texaco and of Chevron, in the same way that the triangular inverse merger may be useful as a legal mechanism to allege that Chevron was only benefited from rights and assets, leaving at the Texaco company the pending litigations and other obligations.

It is estimated that if the financial operation between Chevron and Texaco gave as a result that the shareholders from Texaco received 0.77 regular shares from Chevron and the shareholders started to own 61% of the combined entity, valued in 100,000 millions (folio 140759) is because this operation implied the transfer of assets and/or rights from which the new company and the shareholders of the combined companies would take benefit; however, we have to insist on the fact that is contrary to the law principles and good faith intending that only assets and rights have been transferred, whereas not the obligations. If we consider the Company Law and the procedural truth principle, together with the given and referred evidence in this ruling that show that Chevron (and its shareholders) were benefited from the merger with Texaco, plus the universal right principles, we have more than enough legal grounds for the transfer of the obligations of Texaco to the sued company, Chevron Corp., and thus the obligation to commit to the Ecuadorian justice pending on Texaco Inc. was also transferred to the new company Chevron Texaco Corporation, because of which Chevron Corp., consequently, cannot allege that it has never worked in Ecuador to fundament lack of a legitimate contradictor. It is recorded in the file that Texaco –which did operate—was obligated to be subject to this jurisdiction, according to the ruling of the New York Court, on folio 152883, that states: "after the devolution of the actions, Texaco assumed the remaining commitment; that is, being subject to the Courts of Ecuador (and also of Peru)", falling after the filing of the lawsuit, because of territory matters, under the competence of the Presidency of this Court. Additionally to the notorious and justified facts and the invoked law, this Presidency has studied and considered the precedents of the legislation of the U.S., as it recognizes that in cases where the merger was conducted in bad faith or to defraud third parties, it has to be assumed as a de facto merger. The precedents in Delaware establish that "the corporations will not be able to avoid their responsibilities by means of a merger". Accordingly to what it is said in the procedural truth principle, the courts of the U.S. pay more attention to the substance than to the form of this type of transactions. It has been made clear that the simple fact of calling a merger to a transaction does not make it into such and that the Courts have to observe the substance of the transfer instead of what is alleged by the parties. It is considered of utmost importance that the general principle according to which in the mergers "those who take benefits from them also assume their obligations", established in several Codes.

Doctrinally it is appreciated that the imposition of liability to the new company is appropriate in those cases in which it previously knew the liability of its predecessor so that, without evident argument in the process showing that Chevron Corp. did not know about the obligations of Texaco Inc., it is assumed that the existence of the order from the Law Courts in New York was not hidden by Texaco Inc. to Chevron Corp. It is appropriate to the ends of justice, to impose to Chevron Corp., who benefited from the "merger", the obligations of Texaco Inc. On the other hand, allowing the right of the victims to compensation to disappear because of mere formalities within the merger would be considered by the U.S. Courts as "manifest injustice", always considering that under certain circumstances allowing evading or avoiding liabilities through corporate formalities can be unfair for the victims that would remain defenseless. All this leads us to seriously doubt of the good faith with which the defendant acted in this trial in particular, because this is the only known scenario in which CHEVRON CORP. appears contesting the merger with Texaco. Liability of Texaco Inc., by Texpet. The defense states that "The use of a subsidiary company, in this case TEXPET, created to develop operations in Ecuador as a different company, with minute capital and assets, infinitely inferior to the actual volume of its operations, corresponds to a scheme designed to limit the impact of any claim derived from its activities in the country. In fact, TEXPET was nothing but an instrument through which TEXACO INC. acted, owner by itself, or through its affiliates, from the whole of its capital." It states as well that TEXACO INC. directed, supervised and controlled the operations of its subsidiary company TEXPET in Ecuador and established the operative procedures and the techniques to be employed in the activities of exploration and exploitation of hydrocarbons, however as the defendant pointed out during the conciliation hearing in the Federal Courts of New York, declaring that neither TEXACO INC.. nor CHEVRON CORP.. "conceived nor approved" the "decisions related to the methods, procedures, etc. applied by Texpet in Ecuador" (folio 253), so that in the first place it is convenient to analyze that judicial decision which in the event of constituting a collateral estoppel will preclude this Court to re-examine this issue. Thus, the first thing to note is the fact that if such failure would constitute a collateral estoppel, that is how it should have been alleged, as an exception, during the conciliation hearing, which was the moment of the timely proceeding in accordance with the Ecuadorian Procedure Law.

This exception has not been submitted, which shows that the defendant did not have the conviction or the intention for that foreign court ruling to be taken into consideration as an ultimate material decision. Second, it is noticed that although the file states the foreign court ruling of the United States District Court, Southern District of New York, dated May 30, 2001 (translation of expert witness Zambrano dated November 14, 2008, at 2.30 p.m. from folio 152840 in volume 1430) that states that "after taking several statements and obtaining answers to no less than 81 document requests and 14 questionings, the plaintiffs were not capable of submitting substantial evidence about the significant participation of Texaco [U.S.] in the wrong execution of the activities subject matter to this lawsuit" (folio 152882). This decision refers mainly to the Court's jurisdiction and was based on several aspects that need to be reconsidered. After reading this court order in context, it is obvious that what the ruling in question is analyzing is the link between the evidence and the U.S. or Ecuador as another parameter to establish the most convenient venue, arriving at the conclusion that the greatest amount of evidence is in Ecuador. The ruling reads: "the background information overwhelmingly indicates that these cases are totally related to Ecuador and have nothing to do with the United States" (folio 152880), which is not a decision of merit that determines that Texaco Inc. did not manage or make decisions on the operations in Ecuador, but that the lack of evidence in this aspect is considered as another ground to prove *forum non conveniens*. The rationale expressed by the New York Court that, by logic, most of the evidence should be in Ecuador is considered correct, which also implies that the New York Court acknowledged that new evidence could be provided. Then, if we consider the text transcribed from the sentence, we understand that it refers to the fact that the file has been analyzed in terms of "evidence admissible" in the United States. However, in Ecuador, the rules applied to determine what is considered admissible evidence are not necessarily the same and this Presidency has the duty to adjust to what our laws establish regarding the evidence, its practice and valuation. Finally, the new evidence submitted needs to be considered, which is part of this file pursuant to the above-mentioned laws and must be considered to establish the procedural truth. Thus, the fact that only admissible evidence obtained in the U.S. has been analyzed, together with the fact that new evidence has been submitted,

leads us to consider the facts of merit discussed considering all the evidence. We also consider that this decision refers to this issue only as an additional argument that proves the lack of link between the case and the United States to prove, precisely, that there was no discretionality in the decision of the lower court when deciding that in this case the evidence was in Ecuador, but that the balance of public and private interests tilt the scale towards an Ecuadorian venue; therefore, what this ruling does is confirm the formal decision of the lower court that dismisses the lawsuit based on *Forum non Conveniens*, but changes this decision by conditioning it to Texaco's commitment to accept the interruption of the statute of limitations on actions, so it becomes evident that we cannot talk about a material *res judicata* because the merits of the case have not been resolved; on the contrary, the lawsuit has been dismissed taking as a basis the existence of a more appropriate venue: this one. Thus, jurisdiction was established in this Presidency of the Provincial Court of Justice of Sucumbíos, where we also need to give merit to evidence that has been brought to this proceeding and that was not considered either by the New York Federal Court or by the Court of Appeals when they issued their rulings. Thus, we conclude that the judicial decision of the Federal Court of New York has not been final on the merits of the matter, nor has it caused status, that is why a material *res judicata* cannot be admitted nor is it admissible as a decision on merits binding for this Presidency, which has full jurisdiction to reach a solution on this aspect it has become aware of. Therefore, what we need to analyze are the documents obtained and submitted by Texaco Inc. through the Discovery process, whose existence has been accepted by the defendant as a true fact during a conciliatory hearing as well as other documents that have been brought legally to these proceedings. We also need to analyze the law applicable to the specific circumstances of this case to determine if it is appropriate to apply the doctrine of piercing the corporate veil, which in our court system is developed through case law, not legislation. Thus, we start again by reminding you that the origin of this institution was the need judges and courts had to solve the severe crisis the concept of legal person entered into because many exploited the benefits provided by the recognition of the corporate legal status. This is recognized by our case law, in sentence No. 135- 2003, issued within the ordinary trial for payment of sales commission No. 36-2003 pursued by José Miguel Massuh Buraye against Roberto Dumani,

published in R.O. No. 128 on July 18, 2003 stating that "[…] there are cases where there is abuse of the legal status to elude compliance with legal duties, particularly tax duties, or to be used as a screen to get around third party rights. That is why the doctrine that allows judges to pierce the veil of the legal person and take measures regarding human beings and the undercover relations behind it has become stronger", so that limits are established on the benefits granted by the legal system in order to favor the general economic development, not only of honest businesspeople, but of society as a whole; however, by taking advantage of the net worth division or separation and of the responsibility, the corporate veil has been used for evil purposes that are not related to their purpose. Likewise, it has been expressed to the Supreme Court of Justice in sentence No. 120-2001 of appeal for annulment within the oral summary proceeding No.242-99 which states that "actions of legal persons have shown over the last years a notorious and damaging diversion, because it is used as a sidelong and diverted way to get around the law or damage third parties." (Published in the R.O. No. 350 dated Tuesday, June 19, 2001, Judicial Bulletin No. 5 Year CII. Series XVII. P. 1262. Quito, March 21, 2001.) In view of this possibility, claimed by the plaintiff, we need to start to analyze it by considering that this trial was brought to court for the repair of environmental damages allegedly caused by TEXPET while it was running the Napo Concession; this is why it is convenient for us to determine if conditions that allow us to pierce the corporate veil are met or not in order to make Texaco Inc. assume responsibility for the behavior or actions of Texpet, to which the defendant has expressly opposed, pointing out that they are different and independent companies. Therefore, to solve this aspect, we will analyze the different factors that reflect, beyond formal questions, the level of dependence between subsidiary and headquarter so as to determine if it can be considered that the corporate veil has been used to hide the real interested parties and beneficiaries of the subsidiary's businesses and if it has been legitimate. 1.-Bearing this in mind, we first observed if the capital of the subsidiary matched the amount of the business conducted and of the obligations that needed to be met, because it is understood that businesspeople, in good faith, risk in their business a capital that is reasonably adequate to face their potential responsibilities. It can be considered that the capital of the subsidiary is insufficient if the subsidiary needs constant authorizations and fund transfers to proceed with its normal course of business, since in that case the ones who really make the decisions and exercise control over

activities are the people who provide authorizations and funds, who are usually bound through the mask of a legal status, which in some cases causes the formal structure of the corporation to be dismissed to avoid fraud against third parties. In the file, volume 65, folios 6827, 6828, 6830, 6831, 6826, 6833 there are translations of several requests of authorization from Shields to Palmar, where Mr. Shields makes requests on behalf of the "Ecuadorian division" of Texaco Inc. to his superiors of Texaco Inc. requesting approval for different matters typical of the operations in Eastern Ecuador. The file shows authorizations for day-to-day matters, of regular administration, such as tenders for catering or cleaning services for the consortium's operating sites in Quito and the East (translation of document PET 029369 on folio 6827 and PET 028910 on folio 6830), or the hiring of movie training services in the East facilities (PET 029086 on folio 6831). We also found an authorization for hiring equipment and personnel for the maintenance of oil pipes (PET 019212 on folio 6828) and bridge construction in Aguarico and Coca (PET 016879 on folio 6833). Finally, Shields requests Palmer's authorization to start the exploration of well Sacha-84 in October 1976 (PET 012134). The file also shows several documents from the Texpet archives, with authorization requests from Bischoff to Palmer in volume 65, folios 6839, 6840, 6843, 6844, 6848 which shows that just as Shields, Palmer refers to Texpet operations in the East as "the Ecuadorian division". Among the authorization requests, there is record of an urgent request to approve the tender of two workover towers (support and maintenance) for exploitation in the East (PET 030919 on folio 6839) and the tender for a road between wells Yuca and Culebra (PET 016947 on folio 6843), key aspects for the development of operations of Texpet. There is also a request of authorization to extend a ferry service agreement in the area (PET 032775 on folio 6844), and what is more important, there is a request for approval of the approval documents for well Vista-1. There is also a memorandum of special importance that reveals the existence of a linear chain of authorization existing among these executives, since Bischoff requests Palmer that, if he approved the document, he should sign it and forward it to McKinley, a higher executive in Texaco Inc. (PET 022857 on folio 6848), denoting the existence of a chain of command, which caused the decisions on every aspect related to the operation of Texpet in Ecuador be made by executives in Texaco Inc. in the US. The file also shows requests of authorization from Palmer

to Granville, in volume 66, folios 6930, 6938, 6943, which show that the chain of authorizations goes above Palmer, as echoing a request from Shields (see PET 019212, on folio 6828), Palmer requests Granville authorization to hire equipment and personnel for the maintenance of oil pipes (PET 029976, on folio 69309) and according to Bischoff´s requirement (see PET 030919, folio 6839) he approves one of the offers for the construction of workover towers, submitting that approval to the okay of Granville (PET 029991 on folio 6943). There are also in the file letters and memorandums from Shields and Palmer to John McKinley from the files of Texaco Inc. and Texpet. In book 66, folios 6957, 6958, 6964, 6959, 6960, 6974.That demonstrate that both Shields and Palmer maintained a constant exchange of letters and memos with McKinley requesting his authorization and informing him about events related to the Napo concession. Similarly, letters of lower ranked officers sent to Shields in book 65, folios 6855, 6856, 6860, 6861, 6875, 6882, 6885 where reference is made to letters addressed to Shields originating in Quito in the hands of lower management that requested authorization, such as William Saville who was an executive with Texpet operating in Quito and sent many and regular communications to Shields (In New York) requesting authorizations. For example, he sends Shields the estimated costs for the drilling of wells Sacha 36 to 41 (doc s/n) and requests his approval to start the tender for transportation of fuel in the East (PET 031387, folio 6856). J.E.F. Caston, another executive of the oil company located in Quito requests Shield's authorization to call a tender for various services (PET 020758 on folio 6860) and to approve the estimated costs to submergible pumps in five wells in the field of Lago Agrio. Finally, we have Max Crawford, another officer located in Quito who also requested approval on a regular basis from Shields for various purposes (PET 035974, folio 6882, and doc. s/r folio 6885). On the other hand consideration must be given to the proven fact that the decisions of the "Executive Committee" of Texpet had to be approved by the board of Texaco Inc. As we see in the board of directors memorandum no. 478 (Book 25, folio 2427) where it approved the decision by Texpet to enter into negotiations with Ecuador to oppose the increase of a tax on income for the oil company, and additional payments in the same manner that the board of Texaco approved the purchase of an aircraft for USD 850,000, Memorandum 456 (Book 24, folio 2351) demonstrating the authority of decision by Texaco on purchases made by Texpet. In my opinion these acts demonstrate the constant scrutiny of Texaco over every operation and news related to

Texpet in Ecuador. If we analyze this fact independently perhaps it can be confused with the normal control the board has over its subsidiaries. However, we must analyze this control of the parent on its subsidiary within its context considering also that the board of Texaco Inc. also delivered assignments of money with which Texpet operated which implies that Texpet lacked not only administrative autonomy but also financial since it was Texaco Inc. that controlled not only decisions but also authorized funds that Texpet needed for the normal development of its operations. Based on the admitted fact that Texpet is a subsidiary at fourth level belonging one hundred percent by a sole owner Texaco Inc. and that Texpet operated with funds coming from Texaco Inc. it has been demonstrated that there is no real separation of assets. We understand that the legal forms necessarily imply different assets, according to the regulations of the legal form, but in this case the confusion of assets is evident, confusing also the legal forms. Among the proof that leads us to this assertion we mention in addition the memorandum of the board of Texaco Inc. No. 380, dated January 22, 1965 (Book 22, folio 2166) that established funds in favor of Cia. Texaco Petroleos del Ecuador in an amount of USD 30,312.00. The memorandum of the board of Texaco Inc. No. 387, dated September 17 1965 (Book 22, folio 2176) established funds in favor of Texaco Petroleum Company (Texpet) in an amount of USD 27,625. The memorandum of the board of Texaco Inc. No. 393, dated April 19, 1966 (Book 22, folio 2182) established funds in favor of Texaco Petroleum Company (Texpet) in an amount of USD 331,272.00 and in favor of Cia. Texaco Petroleos del Ecuador for USD 13,631 thus establishing the conviction that this Presidency insofar as Texaco Inc. was concerned controlled the funds both for the company over which it had rights of concession (Texaco Petroleos del Ecuador) as the one that was contracted to obtain the concession of the fields, thus it is evident that TEXPET was a company without capital; or sufficient autonomy to meet the normal business activities which in turn amounts to another piece of evidence of the lack of independence of the subsidiary from the parent, leading us to the conviction that TEXPET was an undercapitalized company that depended both economically as administratively on the parent. The amount of the contracts that require authorizations presumes the absence of own capital which is an indication of their incapacity to meet eventual liabilities

That can arise in an oil operation. Cabanellas explains in his work "Legal Law: General Part, the Legal Format", that "the legal format is based on a set of regulations that determine which conduct is related to the company insofar as its legal form is concerned. The general effects of these regulations can be modified as a function of certain standards that alter their attributions going from conduct that can be attributed normally to the company as a legal entity to others as physical persons or ideal existence, as can be their members or other persons who exercise control over the company". (See Vol. 3. Buenos Aires, Editorial; Heliasta, 1993, P. 65). It has been demonstrated in the file that the authorizations and investments required by Texpet led to control being in the hands of the parent which constitutes an important fact to be considered. As is properly affirmed by López Mesa and José Cesano, in their work "The Abuse of legal form in commercial companies: Contributions to their study from the point of view of mercantile and penal aspects (Buenos Aires, Depalma, 2000) when they say: "The system of legal form cannot be used against the higher interests of a company or the rights of third parties. The techniques manipulated to coerce the use merely instrumental in the form of the company vary and adopt various names but all postulate in substance the reality of the economic and social aspect and the supremacy of objective law". In accordance with the Superior Court in sentence 120.2001 mentioned previously it has been said that "faced with these abuses one has to react ignoring the legal form that is to say, removing the veil that separates third parties from the final subjects of the results of a legal business in order to prevent that the legal form of the company be used deviously as a mechanism to damage third parties be they creditors who would be impeded to collect or legitimate owners of a property or right whose entitlement is impeded. These are extreme situations that must be analyzed very carefully as the legal form cannot be affected, but likewise cannot be used as a pretext to protect and commit fraud. 2. Now well, if we consider the formal issues such as the fact that the same persons exercise positions of executive directors and other executive positions in both companies, added to the admittance that Texaco Inc. is owner in 100% of Texpet, it is obvious the need to apply the doctrine of company lifting.

For example, Mr. Robert C. Shields performed duties as vice president of Texaco Inc. between 1971 and 1977 and also as Head of the Board of Directors of Texpet, as can be seen in his sworn statement (Book 63, folio 6595). In reviewing the file is appears that Shields signs his letters in the name of Texpet when in his own testimony between 1971 and 1977 he occupied the position of Vice President of Texaco Inc. This fact is coherent with what Bischoff stated regarding that Texpet was a division of Texaco Inc. that operated in Latin America and not a mere subsidiary as sustained by the defense of the party demanded. Similarly, Mr. Robert M. Bischoff during his career held positions at Texaco Inc. both in the United States as in Latin America. Between 1962 and 1968 he worked as vice president in the production division for Latin America which he himself calls Texaco Petroleum Company (Texpet) as can be seen in his sworn statement in book 63, folio 6621. This demonstrates how inclusively the same executives of Texaco Inc. thought of Texpet as a division, and not as a separate entity. As Shields, it is clear from the file that Bischoff participated actively in the complex chain and processes of decision making involving Texaco Inc. and Texpet. In his sworn statement Bischoff explains how the contracts of Texpet located in Florida that exceeded USD 500,000 had to be approved by a lawyer in the name of Wissel, head of attorneys for Texaco Inc. In this case, we see the relationship between Texpet and Texaco was not limited to who was majority owner's or shares but that they were intimately linked, with Texaco making all the decisions whilst Texpet only executed them. It is true that in general a company can have subsidiaries with completely different legal form. However, when the subsidiaries share the same informal name, same staff, and are directly linked to the parent company in an uninterrupted chain of decision making the separation between people and assets is diluted and even disappears. In this case, it has been proven that in reality Texpet and Texaco Inc. operates in Ecuador as a single operation and inseparable. Both important decisions as the trivial ones went through various executive levels and decision making bodies at Texaco Inc. To such a point that the subsidiary depended on the parent to contract a simple catering service. In this sense, it is completely normal that the board of a subsidiary company be made up of some parent officers and it is also normal that the parent receives periodic reports on it state of affairs,

and decision be taken that due to their importance are above normal administration processes. However, in the case of Texaco Inc. and its subsidiary Texaco Petroleum Company (Texpet) the role of the directors go beyond the roles that can be considered normal as they received information and made decisions on most events and acts of Texpet on daily matters of the operations of the concession of Napo responding to a chain of commands that was well established as has been demonstrated in the file. 3. Finally, consideration is given to the doctrine of lifting the company veil which is especially applicable facing the abuses committed to the detriment of public order or the rights of third parties to avoid fraud and injustice, that is to say, the corporate veil must be lifted as long as not doing so favors fraud or promotes injustice as would be the case in which we find schemes internationally created to leave benefits for the parent company whilst the obligations remain with the subsidiary who in general terms is incapable of satisfying them. As is said by López Mesa and José Cesano, "Even when one may admit under a hypothesis that two companies are subject to a single unit of decisions or constitute an economic unit or group of companies, these are not sufficient data to absolve the legal autonomy of each insofar as there is no allegation and proof that legal forms have been instrumented in violation of the legal regulations" (folios 145 and 146). In this respect it should be noted that that acting party has alleged expressly that Texpet was a company instrumented to maintain responsibilities over a company without sufficient capital whilst the parent was left with no responsibility in order to precisely avoid the pretentions of potential liability towards third parties whilst in the file there is plenty of evidence of the lack of independence of the subsidiary vis a vis the parent, which in reality took all the decisions and benefited for the acts of the subsidiary who in addition was incapable of facing any potential liabilities. Finally consideration is given to what was said by the Supreme Court

In its sentence No. 393 dictated under ordinary procedure No. 1152-95 in which for moral damages Ruben Moran Buenano filed against Ricardo Antonio Onofre Gonzalez and Leopolodo Moran Intriago published in R.O. No. 273 on September 9 1999, regarding lifting the veil on companies warns that "the use of the instrument is not open or indiscriminate but to be applied in those hypothesis in which the interpreter of the law concludes that the legal person has been constituted with the intention of committing fraud against the law or against third parties or when its uses leads to the same intention of committing fraud". An aspect that coincides with what was mentioned by said authors in as much as this doctrine "cannot be used but with great prudence caring not to use it indiscriminately, lightly and not measured for it can lead to leaving aside the formal structure of companies or inappropriately with serious damages to the law, certainty, and safety in legal relationships' so that considering the previous analysis it is established that exceptionally but justified it is necessary to lift the corporate veil that separates Texaco Inc. from its fourth level subsidiary Texpet as it has been proven that it was a company with a capital that was very inferior to the volume of its operations that required constant authorizations and investments from the parent to conduct normal activities and that the executives in both companies were the same and therefore not to lift the corporate veil would imply a manifest injustice. 3.2 Undue accumulations of shares – The defendant alleges that the verbal summary of actions that require substantiation that is different whose recognition is beyond this presidency so that to resolve this issue there is undue accumulation which occurs when two actions necessarily have different procedures. The defendant has argued that the actions derived from Civil Code (2241, 2256, 2260) "must be processed under ordinary procedures with the competent civil judge" however, after reading Articles 2241, 2256 and 2260 above mentioned, (currently Articles 2214, 2229 and 2236) no reference is found as to the procedure to be followed or the competent judge therefore there is no legal basis to affirm that these actions must be processed under "ordinary procedure" with the competent judge in Civil Matters. On the contrary, the Article No 59 of the Code of Civil Procedure establishes with total clarity that "Any judicial controversy that, according to law, does not have an special procedure, an ordinary ruling will apply",

therefore disposing that the ordinary procedure would be the one foreseen in a general way and residual for those cases in which a law exists that establishes a special procedure. In this case the last item of Article 43 of the LGA clearly establishes that "the damage and detriment demands originated due to an environmental impact will be performed in a verbal summary", while the second item of Article 42 indicates that the President of the local Justice State Court will be responsible where the environment impact were to take place, so that, considering the legal fundamentals and the petitions stated in the demand, that have been reproduced in this verdict, does not apply this exception to the mentioned standards, henceforth there is not an improper accumulation of shares, but the application of a legal mandate that results from the execution of the specialty principle, since it is a special and later Law that orders in procedural legislation the procedure to follow, imposing over a previous Law, that does not explicitly establish any type of procedure, but un a general way disposes an ordinary ruling as a residual procedure to follow in any case that does not have an special procedure according to the Law; and in this case, there is no law neither has it been claimed, that supports the "necessity" or legal mandate to apply an ordinary procedure to the damage actions established in the Civil Code, while there is a Law that establishes an special procedure. 3.3.- LGA non-retroactivity. The non-retroactivity in the application of the Law is a legal right valid in our procedure system as a general rule, however, rule 20 of Article 7 of the Civil Code, mentioned on several occasions by the procedure parts, established that the rules related to the substantiation and ritualism of the processes prevail over the previous ones from the moment in which they should start to apply, that is, an exception to the general rule is established, under which the adjectival rules should be retroactively apply, and as it was previously established in this verdict, the LGA established the verbal summary procedure and places the responsibility on the President of the local State Court where the facts took place. The second item of Article 42 states: "The President of the local State Court in which the environmental impact took place will be responsible for learning about the proposed actions as a consequence of it. If the impact compromises several jurisdictions, the responsibility will correspond to any of the presidents of the state courts of these jurisdictions"; while the 5th item of Article 43 clearly establishes that "The damage and detriment demands originated due to an environmental impact will be performed in a verbal summary". These rules refer to two essential aspects of the process' rituality: the

responsibility and the procedure, that is, they are clearly procedural rules, so that when the mentioned rule is applied, the general non-retroactivity principles is not applied to those LGA disposition since the demand is based on this lay in the matters related to the procedure rituality. On the contrary, the right to request a repair of the damages is guaranteed by the Civil Code, according to what appear in the demand declaration, in Articles 2241 and 2256, which will be analyzed afterwards in this verdict. Additionally, and in a concordant way the COFJ disposition is considered, in the second item of number 2 of the Article 163, where it is established the same exception to the general principle of non-retroactivity of the law, by stating that "However, the laws regarding the substantiation and rituality of the rulings, prevail over the previous ones from the moment in which they should start to apply". Under the above we find that legally the adjective rules contained in the LGA are entirely applicable to this cause, even when they were passed after the facts being judged, so this exception is not admitted. 3.4.- Non-retroactivity of 169 OIT.- The agreement No 169 of OIT is part of the international legal rules valid in Ecuador, however the date in which it started to be applied is newer than to the one if the facts that originate the demand, so in the application of the principle of non-retroactivity in this case the exception to the non-retroactivity stated against the OIT agreement No 169 proceeds, so since the exception is admitted in this legal case, it cannot be applied to this cause. 3.5.- Prescription, according to 2259. According to the file (folio 263), in the conciliation audience, Dr. Adolfo Callejas stated that "according to the published resolutions of the New York Court the commitment to accept the existence of a civil interruption to the prescription caused by the presentation on November 1993 of a demand against TEXACO INC. in New York also for the supposed environmental impact due to the operations of the Consortium many times mentioned, the commitment is written down in the 08/16/2002 decision issued by the 2nd District Appellations Federal Court of the United States of America [which translation was delivered on 11/14/2008, at 02:30 p.m. by the expert translator Carmita Zambrano Guzmán], is only and exclusively applied to the TEXACO INC. company, without being the same applicable also to the defendant, CHEVROTEXACO CORPORATION, which is a juridical entity different of TEXACO INC., that is no successor neither acquired any right or obligation that TEXACO INC. would have had", form which is understood that the defendant's Judicial Attorney

acknowledges in the name of his represented that there is a judicial order, issued by the 2nd District Appellations Federal Court of the United States of America, which obligates TEXACO INC. to accept the existence of a civil interruption to the prescription originated by the presentation in November 1993 of a demand against it. It is clear to this Court that the defendant had never adduced the inexistence of this judicial order, but adduces that the mentioned order is directed to Texaco Inc. and therefore it is not applicable to the defendant, Chevron Corp. Before this argument we have to consider that despite the fact that the order was directed to TEXACO INC., and despite that this company maintains a legal life, the operation known publicly by "merger", has the juridical effect that CHEVRON CORP. substitutes TEXACO INC. in its rights and obligations, so the defendant, CHEVRON CORP., is linked due to the obligation of the company TEXACO INC., so there is no place for the prescription adduced since there is an existing a pending obligation over the defendant to accept the existence of an civil interruption to the prescription originated in the presentation in November 1993 of a demand of TEXACO INC. in New York, as it was admitted by the defendant throughout its attorney, Dr. Adolfo Callejas Rivadeneira. 3.6.- Lack of Plaintiff's right. The defendant claims that there is no link between them and the plaintiffs; and that the eventual damages have already being subject of settlements. As regards the eventual lack of link between the defendant and the plaintiff, it is noted that for having the plaintiff the right to set an action it is not a requirement a link between them and the defendant, since rights and/or obligations could had being transferred to third parties, throughout different obligation transmittal businesses, in which a third party subrogates the obligations, no matter the original link of the obligation's creditor. Despite this, here it is convenient to remember some of the facts already considered, such as the fact that the defendant had publicly merged with Texaco Inc., which is owns a 100% of Texpet, a 4 level subsidiary company in charge of the Consortium's operations, those that the plaintiff claim to cause damages to the environment and impacted over the area inhabitants. The existence of a link, although it is not direct, is to the Court's criteria reasonably established. In the same way, the facts that base it are demonstrated, pending to check the existence of the damages claimed in the demand, an aspect to be analyzed later in this

verdict. On the other hand, as regards the claimed lack of plaintiff's rights since the damages had been subject of settlements, the President notes that those settlements took effect as mentioned in the file, so the Ecuador Government liberate Texpet and its head, Texaco Inc., from all responsibility for the environmental damages that could had been originated in the Concession. There is not even one procedural piece in the file that indicate that the Ecuador Government could had filed this demand or any other against Texaco Inc. in relation to environmental damages in the Napo Concession, neither that it could have acted as a procedural part in this ruling. There is either no legal base to support that the existence of this settlement could disable the plaintiffs´ right to claim actions and petitions, and avoid those to be resolved. This right was established in the second codification of the Political Constitution of the Republic of Ecuador, (R.O. No.183, on 05/05/1993), in the number 10 of Article 19, and also in the Article 8.1 American Human Rights Convention, which text is published and valid since 1984 (R.O.No. 801, 08/06). Also we could find the right to claim in the courts established in the American Declaration of Human rights and Obligations of 1948 (Art. XVIII), in the Universal Declaration of the Human rights (Art. 10), and in the Human Rights Universal Agreement (Art. 10), and in the Civil and Political Rights International Agreement (Art. 14, paragraph 1). Seen from this point of view, the exercise of the action and/or claim right is guaranteed by the State, and it could not establish a limit to this right throughout an administrative contract, since "The empowering force of the Constitution cannot be eluded in any circumstance since its rules prevail over the others, being then regarding the public and private right" (see Resolution No. 0008-03-AA on 10/28/2003 if the Constitutional Court). The theory that the Government acts are always performed in the name of the people and that constitute their will's expression cannot be used with such exaggeration because this would make impossible to oppose to such acts, and on the contrary, the general rule is that every act could be opposed. On the other hand, we must consider that not every act in which the Government or any of its institutions intervene is a Government act. The Resolution No. 0036-2001-TC, 0042-2001.TC and 0044-2001-TC, issued by the entire Constitutional Court in the cumulated cases 0036-2001-TC, 0042-2001.TC and 0044-2001-TC, states that: "The letter b) of Article 2 of the resolution excludes the government acts from the refutation through the protection action, restricting this concept to those that comply with the three conditions that limit it: that imply "the direct exercise of a Constitutional attribution"; that they are issued "in the exercise of an activity impossible to delegate"; that they have a general "reach or effect".

In this respect it must be taken into consideration that there are certain acts which the Political Constitution establishes as being fundamental powers of the organs of State, furthermore, in current doctrine, these are translated as legal norms and not as inter parties acts. Given that the Contract from 1995 does not show the unilateral will of the State, but that it is a participatory partner according to the wishes of a individual company, Texpet, it is clear that said contract cannot be classified as an act of government, making the theory that said contract is an act of government inadmissible, even more so that it had been signed by the government on behalf of all Ecuadorians as the defendant has repeatedly argued, saying in the judicial inspection of Yulebra and the judicial inspections of Estación Yuca, Guanta and Auca Sur that "The plaintiffs illegally claim to be unaware of the legal nature of the representation as set out in the Political Constitution, the Civil Code, and applicable laws and question the Ecuadorian government and the officials who at the time were legal representatives of Petroecuador and the Ministry of Energy and Mines for releasing TEXPET from any liability for environmental conditions in the area of the Concession of 1973, arguing that the release does not extend to their clients; accepting that plaintiff's theory would mean that each one of the officials acted of their own accord and not for the bodies they represented, including the legal involvement of the Ecuadorean state which is in itself responsible for all the citizens of our country". We should make clear that although it might be true that the officials who subscribed to said release were not acting of their own accord or for their own rights, it is nevertheless true that their actions and representation are limited and bound to the Constitution and applicable laws. The Presidency is not unaware of the nature of the representation but the representation by the officials who conceded the release is limited to the entities they represented and does not apply to the entire Government of Ecuador which has no part in this suit and cannot benefit from it, for which there is no legal reason to extend such representation to all citizens and deprive them of rights that are in themselves inviolate. As far as the law is concerned, the defendant alleges that the plaintiffs have no right to

sue because the damages were settled which would imply that such settlements had the power to restrict fundamental rights, however a reading of all the different settlements mentioned shows clearly that none attempts possess – as the law requires – the legal power of a suit or petition presented by a person in Ecuador, but to the contrary; the literal wording established in the Contract of 1995 clearly sets out the legal reach of said document. Article 1.7 entitles "Extent of the Work", says: "The purview of this group of works and actions for compensation agreed between the parties and established in annex A required to absolve and free Texpet before the Government and Petroecuador of all legal and contractual obligations and responsibility for Environmental Impact resulting from the Consortium's Operations", in which it highlights that this freedom from obligation applies to the Government and Petroecuador. Article 1.12 entitled "Release" also discusses freedom from the Government and Petroecuador, making clear that this includes "any suit that the Government or Petroecuador can or does make against Texpet, as a result of the agreement with the Consortium", in accordance with Article V which clearly indicates that "the government and Petroecuador will free, absolve and discharge Texpet (its organization, employees and others) in perpetuity of any other demand the Government and Petroecuador might make against the Exonerated for the Environmental Impact resulting from the Consortium's Operations". To be completely clear we also believe that what is set out in clause IV of the Final Act signed on the 30th September 1998 by the Government represented by the Ministry of Energy and Mines, Petroecuador and the Texas Petroleum Company in which the former proceed to free, absolve and discharge the Exonerated of any suit or claim "the Government of the Republic of Ecuador, Petroecuador or affiliates might make for concepts related to the obligations taken on by Texpet in said contract" making it clear that the extent of the freedom from responsibility and claims is limited to those acting on behalf of the government, Petroecuador or their affiliates. Additionally I believe that jurisdictional legal authority is determined by the Constitution and that the Government cannot renounce this in an administrative contract as in this case said contract would be contrary to public law, as it is always obliged to administer justice. Certainly, the plaintiffs who do not appear as having signed the alleged settlements in the defendants' defense, have the right to take legal action and make petitions, as guaranteed by the Constitution because this right is inviolate and also

because the settlements are clear in their expression of who are the active and passive parties in the absolution, and this kind of legal transaction cannot be extended to third parties and is not applicable to inviolate rights. The terms of Article 42 of the LGA should also be taken into account: "Every legal individual or human group may be heard in penal, civil or administrative proceedings that are initiated for violations of an environmental character, even if their own rights have not been impinged", together with the fact that the suit has been presented by 42 citizens, the plaintiffs, who have not requested personal compensation for any damage, but are demanding the protection of a collective right, according to the regulations set out by the LGA, the compensation for environmental damage which, as has been alleged at this trial, affects more than 30,000 people, these clearly not having been specifically identified. This Presidency has noted that those potentially affected by the activities of the Consortium are divided into diverse human groups which find common ground for the fact that they have suffered environmental damage, even though they do not share a single nationality or hail from a single area. A census or list does not exist, unless it is revealed in the file, precisely because these are diverse human groups linked by a single cause of suffering and a common interest in resolving it. The legal basis for the collective right of the plaintiffs to present this action is thus established to the satisfaction of the court and lies in the substantial fundamental, un-renounceable and inviolate right to present suits and petitions, and secondly in the regulations of the Civil Code that provide a basis for compensation for damage and thirdly in the active legalization of the plaintiffs to be heard in this proceeding in defense of collective rights. 3.7 Inadmissibility of the demand for protection under 2260. During the answer to the accusation, the defendant argued that Article 2236 (previously 2260) "confers a right that can only be exercised via an ordinary proceeding before a Civil Judge" (folio 264 reverse), however the text of this rule states "By general rule a popular action occurs in cases of a sizable amount of damage that for imprudence or negligence threatens indeterminate persons. But if the damage only threatens identified persons only one of them may carry out the action", in which it can be appreciated that nowhere in the rule is the procedure or proceeding that must be followed to make this law effective established, neither does it make any reference to the judge who should preside over this action. The Civil Judge is the judge to whom jurisdiction is given if another judge is not specified as having

jurisdiction, but taking precedence over this rule are express dispositions such as Article 42 of the LGA. In the same way, an ordinary trial is the procedure determined for all cases where a special procedure has been determined, but again in this case the LGA has changed the procedures for claiming this right, and has established very clearly that in cases involving claims for environmental damage the procedure for verbal summary should be followed (Art.43). The defendant in its answer has affirmed that Article 2260 "Can only be invoked against the present operator and proprietor of the areas which used to belong to the Consortium", however, attending to the characteristics of the environmental year, the presence of contaminating elements in the environment can represent a threat or risk against unidentified people and as the claim is precisely for the removal of these elements, arguing that damage has been caused and that they represent danger, the legal basis in the cited regulation is appropriate. 3.8- Expiry of obligations through the release of Texpet. It has been established that the expiry of obligations in favor of the defendant Chevron Corp., is due to the release of liability bequeathed by the Government of Ecuador to the name TEXPET, TEXACO INC., etc., but the defendant is not contesting the passive subject of the release but the active subject, i.e. the body bequeathing the release. Chevron alleges that this release of liability on the part of the Government of Ecuador was carried out as an Act of Government in the name of all its citizens, removing their rights for which reason we must once again concentrate on this instrument. The text of the Contract of 1995, when referring to the extent of the release of liability states: "The extent of the group of works and actions for compensation agreed between the parties and established in annex A which requires the discharge and release of TEXPET by the Government and Petroecuador, of all legal and contractual obligations and from liability for environmental impact resulting from the consortium's operations" which reveals that the release was issued by the Government and Petroecuador in their name exclusively given that it states "before the Government, Petroecuador", a wording which makes no reference to third parties nor does it permit expansive interpretations. It does not in the process provide any proof at all that the plaintiffs have signed any document exempting any liability that the defendant may owe them for which reason it has not been relinquished. Thus, although the suit has rightly opposed the exception, it has failed to demonstrate that said relinquishment of obligations is also applicable to obligations to third parties as the contract of 1995 and he Final Act signed on the 30th September 1998 clearly demonstrate otherwise. 3.9 The

remaining exceptions put forward by the defendant constitute pure denials to the allegations made in the lawsuit for which reason it is convenient to juxtapose them with the facts as proved by the file, which will be done later on.

**FOUR.-** There are several petitions presented by the parties during the proceeding which must be resolved by this act, as this is the right procedural moment to do so; this is in accordance with the terms of Article 273 of the Code of Civil Procedure: "The sentence should only decide the fundamental point of the litigation and the incidents which, having arisen during the trial, could be reserved without prejudice to the parties and later resolved." Thus, there being no evidence that the parties have been irreparably prejudiced, they having exercised a passionate and extensive defense of their positions limited only by the Law and the rights of the opposing party, with respect to the actions which arose as the writs were presented by both parties that still have to be resolved, those that relate to the parties' disagreement with some part of the procedural process as well as those presented before the execution of the order for sentence to be passed but were included in this procedure after indicating that they would be addressed during the sentencing in the following order: 4.1 Writs containing unresolved requests relating to the procedure of "justly requested proof" the defendant having repeatedly complained about the manner in which this Court has conducted the verbal summary procedure, supposedly for having incorrectly applied the principal of speed, impeding the defendant from properly exercising their defense All this is not in accordance with the procedural tables of this proceeding which has lasted almost 8 years and accumulated more than two hundred thousand folios of files. However, the delay in processing this case is not the fault of the judge but the procedural parties who have debated and complicated even the most common aspects of the procedural process. So from the beginning of the proceedings for this case we can begin by referring to : 1) The evidence requested by Chevron in points 30, 31, 38, 62, 63, and 73 of their writ dated October 27, 2003 at 5:00 p.m. (3295 folios), as examining the file it is clear that the Court has officiated on two occasions on the institution required in the defendant's request, in official answer No. 1890-DNH-EEC90692, presented on the May 18, 2009 at 10:49 a.m., consisting of 156,548 folios, which Chevron received and indicated that it was necessary to designate two persons to revise the documentation, after which Chevron expressed

no interest at all in the reply and nor did it designate or insinuate that it would designate any further staff to assist in the revision which was in their interest, in spite of the evidence being requested in its defense, allowing time to pass and the stage in the ruling process to change and finally, at the end of the evidentiary process, trying to reopen the subject with an extemporaneous request. The Presidency considers this conduct of the defense by the defendant to be proof of procedural bad faith. 2) Moving on to the judicial scrutiny phase we find that challenges were raised against each of the experts and the way they carried out their work, the way they were named and put forward, and the Court was even asked to designate deciding experts to resolve the presumed contradiction between experts, making it appropriate to refer to these themes whose debate and positions have threatened to impede the normal advance of the evidence gathering process, or even prolong it indefinitely. The file shows that between both procedural stages more than one hundred judicial examinations were requested, this being an unprecedented burden on this Court which nevertheless accepted them and ordered them to be carried out in spite of the evident necessity of coordination between the Court and the parties for an improved execution of the tasks. For this reason, the Court accepted the document named "Terms of reference for judicial inspections, plan of analysis and plan for sampling" proposed by both parties in the proceeding to guide the work of the experts. However, the defendant has alleged on repeated occasions that the document constitutes a genuine contract in spite of being titled "Terms of reference for judicial inspections, plan of analysis and plan for sampling" and thus sustains in its order of 7th November 2008 at 17:02 that "once classified and approved by the judge, a protocol was created which was freely agreed by both parties resulting in a "procedural contract" whose parameters are to be applied obligatorily; and, the same regulations that apply to contracts should be applied[ ... ]", founding their assertions in the words of the treatise of Enrique Vescovi, who effectively, in his General Theory of Process recognizes that the theory of the procedural contract is not widely accepted in modern law and having revised the case law neither is there any mention of a procedural contract and even less so of one that is mandatory for a Judge, with the exception of the agreement reached by the parties to designate the expert or more than one expert (Art. 252 Code of Civil Procedure). To the contrary, there is no procedural regulation sustaining the existence of a "procedural contract", and even less one that is mandatory for such a figure in the doctrine or the revised case law, so that neither the doctrine nor the Law nor Ecuadorian procedural practice recognize such an institution, except in cases clearly established by in the Law. In fact, if we

observe the actions for the defense of the defendant in this case, we see that neither were they convinced of the mandatory nature of the agreement as a reading of the act of the Judicial Inspection of the Palanda Station, and the judicial inspection of the Shushufindi refinery, in which the defendant expressly resolved to process the designation of a single expert, recognizing that no agreement between the parties existed and withholding application of said agreement. With said legal basis this Presidency is convinced that the said agreement did not constitute a procedural contract in the terms established by Chevron in their writs of the 7th November of 2008 at 17:02 and 17:05, for which reason their arguments are rejected and, to the contrary, the literal wording of the same agreement clearly indicates that they are "guides", "terms of reference" and in no way constitute a regulation or a contract, and certainly do not have the power to limit the actions of the experts in their task as this could reduce the judge's ability to perceive the truth. In fact, once the judicial inspection has been ordered it is up to the judge to designate an expert "only if necessary" (Art. 243 of the Code of Civil Procedure), and the judge is only obliged to nominate more than one expert by agreement with the two parties (Art. 252 of the Code of Civil Procedure) and furthermore is not obliged to conform to their criteria (Art. 249 of the Code of Civil Procedure), and the second paragraph of Article 262 of the Code of Civil Procedure, so that procedural law is clear in designating the powers of the judge and the limit of the agreements that can be reached by the conflicting parties as they cannot impose themselves above the powers of the judge in the conduction of the proceeding. The very purpose of the expert, to assist the judge, and the expert pronouncement, as a sub-statement in the file, is that of offering greater qualities of ruling in the field of science or art with which the judge is unfamiliar, to aid the resolution and thus can be of help at the moment of sentencing, the Judge is not obliged to conform to their pronouncement against his own ruling, that is to say what an expert does or does not say does not bind the Judge's hands, as he has the powers to appreciate the evidence according to the rules of sound ruling Thus, not fulfilling the terms of reference cannot be considered a fault in duty *per se* – and as shall be shown later on, neither is it a crucial error – as it is up to the judge to appreciate the content of the information provided according to the rules of sound ruling and to assign it the value it deserves. For this reason all writs referring to the previously mentioned document containing terms of reference to experts in judicial inspections, whose arguments have been considered but not necessarily included in

this ruling, are considered to have been dispatched. On the same subject we enter into the analysis of the existence of supposedly contradictory expert reports carried out by different experts participating in the different evidence gathering tasks, the consideration of these reports has been a complicated task, for the technical nature of their content as well as the variety of criteria expressed by each expert, which apparently can even be contradictory, according to the defendant, who has requested on several occasions that other experts be named to decide on these discrepancies, invoking Art. 259 of the Code of Civil Procedure which states: "In the case of discord between expert reports, the Judge, if he considers it necessary to make a ruling, will name another expert." in which case, examining the same regulation we note that before another expert is named it is necessary for the Judge to consider said naming necessary to make a ruling, however, the file contains abundant information from which to make a ruling and any person could see that the evidence provided from both parties (56 judicial inspections with their respective expert reports, 6 independent experts, testimony, documents and statements), even given the apparent contradictions – and the consequent debates they have begun – have all served to better illustrate the truth in the eyes of the judge for which reason it was not considered necessary to name a third expert, who rather then clarity could actually being new complications to the process. Article 249 of the Code of Civil Procedure states that "The Judge can dismiss the report of the expert or experts if it is contrary to what his own ruling and senses tell him and order a new inspection with another expert or more". Making the Judge's presence in the process extremely important and emphasizing the importance of the Judge's discretion in considering the different reports, naming a third expert in the case they are contradictory and/or ordering that a new expert examine the evidence when a discord exists or when it is contrary to what the judge has perceived, whichever is applicable. In the Ecuadorian procedural process, the judge is not obliged to conform to a report against their convictions or to name a third expert to resolve alleged discord so that, according to established regulations it has been decided not to order that a deciding expert be called,

considering that enough data exists in the different reports to shine light on the facts and allow the judge to apply proper reasoning and sound criteria; It is also considered that although the Judge is not obliged to name a third expert to resolve apparent discords between the reports, he is obliged to apply principals of procedural economy and speed and to prevent the practice of unnecessary procedures, for which reason Art. 259 states that a third expert should only be named "if it is necessary to better form ruling", whilst if this condition is not fulfilled because the judge believes that a third expert will not help to better form his ruling this third expert will be inappropriate. However, apart from the alleged contradictions the parties have had the opportunity to declare on each of the more than one hundred expert reports presented during this trial, to request clarification and extensions, and to express their disagreement and challenges to them, all of which have been considered by this judge in coming to this sentence, so no inexplicable contradictions can affect the ruling of this judge. For this reason, all the writs relating to the apparent contradictions in the different reports for the judicial inspections, whose arguments have been considered but are not necessarily reflected in this ruling, are considered to have been dispatched. In fact, the challenges to the different reports have been taken to extremes by the defendant, who has alleged the existence of crucial errors in practically all the expert reports not presented by themselves, showing a lack of objectivity in their arguments which when examined by the judge have failed to convince of the existence of errors that might affect the integrity of the reports. Thus we have 26 cases of alleged crucial errors whose need to be processed and consequent denials were expressed by Chevron on the May 12, 2010 at 8:50 a.m. (folios 177499 to 177514) relating to the 13 refused summary processes and alleging that their right to defense has been inhibited due to only 13 open challenges being subjected to documentary evidence as Chevron wished to request the carrying out of several evidentiary procedures which it announced continuously as though in an ordinary trial. In the writ of the December 22, 2010, at 5:48 p.m., the defendant committed itself to summarizing the state of the procedures for its requests for declaration of crucial error, although we should note that it erred in affirming that the challenges were not considered in the proper manner, for which reason the judge ordered that "they be added to the orders for the

evidentiary writs and if unavailable, as the law requires, that they conform to the different requests for evidence", as the conduction of the proceeding corresponds to the judge and given that Article 258 Code of Civil Procedure states literally that crucial errors must be "conclusively proved" relative to Article 844 Code of Civil Procedure impeding the opening of actions that might detain the procedure of a proceeding, we have no doubt about the impossibility of opening a new evidentiary stage as the defendant wishes, within a verbal summary trial, to prove the existence of an alleged crucial error which the law states must be proved conclusively and not quickly, for which reason it has been ordered that the evidence be limited to documents so that they can be incorporated into the process without unnecessary delay and allow the plaintiff to express its arguments as it has, convincing the judge that there is not enough evidence to prove crucial errors, as is shown by the following. As regards the report on the judicial inspection of the Sacha Central Production Station by the expert José Robalino, about which a request for declaration of a crucial error was presented in the writ of February 14, 2006, at 9:25 a.m. (folio 93270) and the writ of May 18, 2006 at 8:55 a.m. (folio 108853) the challenges refer on the one hand to improper sampling or improper sampling methods, as according to Chevron  the expert should have referred to the document "Terms of reference" and on the other Chevron alleges the anachronistic use of legislation. Something very similar occurs with the report by the same expert on the inspections of the Shushufindi 13 well, as, if we examine Chevron's writ of April 17, 2006 at 2:50 p.m. (folio 103678) which requests declaration of a crucial error in the report we see that it alleges practically the same thing in relation to the use of the "Terms of Reference" for the taking of samples and also the retroactive use of a law, when citing "examples" of the errors in the text of their petition although they add an argument that the expert "disregards the basic principle of the solemnity of contracts", which is a legal term that should undoubtedly be applied by the judge of the case and not the experts, and finally Chevron asserts that the expert "makes affirmations of a legal nature" which were evident on examination of the reports but shall not be considered in this sentence, precisely because they are outside the area of his expertise. Chevron also alleges the crucial error committed by this expert in his report for the judicial inspection of the Lago Agrio 2 well in its writ of May 11, 2006 at 3:45 p.m. (folio 107691), literally repeating the request for declaration of an essential error on referring to "having incorrectly used the wrong legal and technical parameters with the express intention of deceiving the judge". Also repeating the arguments about the solemnity of contracts and alluding to the release given by the Government of Ecuador and rejecting the legal affirmations of the expert to which the same reasoning shall be applied in this case as well.

In order to conclude the analysis of the erroneous essential orders against the expert reports of José Robalino, we must refer to his views on the Sacha Norte 1 well, and to the Chevron order from December 13, 2006 at 4:30 p.m. (folio 124036), in which we again find the repetition of the same arguments, which as we clarified, are up to the judge to analyze. We also find two separate erroneous essential orders that contradict the expert Luis Villacreces with respect to his expert opinions regarding the judicial inspections of the Shushufindi 18 wells, by order of May 30, 2006 at 3:20 p.m. (folio 110536) Auca 1, by order of July 12, 2007 at 3:10 p.m. (folio 131347); Yuca 2B, by Chevron order of June 14, 2007 at 8:35 a.m. (folio 130207); Cononaco 6, by order of July 3, 2007 at 5:50 p.m. (folio 130729); and Shushufindi 27, Chevron order of May 30, 2006 at 4:10 p.m. (folio 111063), in which we also find similar accusations ant the same bases for the essential errors, like the fact of affirming that the legal norms used by the expert are anachronous, characterizing this as an "obvious essential error" (folio 110541 for Shushufindi 18, folio 131358 for Auca 1; 130235 and 130243 for Yuca 2B), or which ignores the force of environmental remediation and the principles of law that can be applied to the contracts (folio 131347 for Auca 1; 130730 for Conocaco 6; 111073 for Shushufindi 27; 130235 for Yuca 2B); or that it does not use the sampling methods agreed to by the parties and approved by the Court (folio 130730 for Cononaco 6) or established in the RAP (see folios 111074 for Shushufindi 27), all of these previously considered aspects that are far from being considered as errors in the essence of the reports. Following the case of the expert report of the judicial investigation into the Shushufindi 7 well, presented by the expert Francisco Viteri in accordance with the Chevron order written on March 13, 2006 at 4:30 p.m. (folio 100294), the expert does not know about the existence of the RAP, violates the basic, solemn principle of the contracts, issues judicial opinions and applies laws retroactively. The same occurs in the expert report on the judicial inspection of the Estacion Sacha Sur, prepared by the expert Orlando Felicita, in accordance with Chevron order of October 23, 2006 at 8:30 a.m. (folio 121836), whom is also accused of using "anachronistic legal norms", of "not knowing the

legal instruments regarding remediation"; and also in the expert report on the judicial investigation of the Aguarico 2 well, made by the expert Pilamunga on October 6, 2008, (folio 151247), in which we find exactly the same arguments, adapted to this report. In the case of the expert report on the Shushufindi 25 well, prepared by Fabian Mora Orozco, and which was initiated by Chevron order of March 13, 2007 at 5:15 p.m. (folio 126743), includes the record that has not been cited to the expert, but it warns that the purpose of such a citation was to permit him to exercise his defense, being of the case that in which it is not necessary for him to exercise any defense since there exists no valid accusation against him as can be seen upon revising the arguments of this order in such a way that the citation is a mere formality that has not impeded the proper development of this transaction nor has denied the expert of exercising his defense. With respect to the orders with essential mistakes that have not been opened, this is the order against the report on the judicial inspection of Sacha 57 by the expert Robalino, presented by Chevron on April 25, 2006, (folio 89347); the order against the report on the judicial inspection of the Lago Agrio 6 well by the same expert, Robalino, presented on May 23, 2006 at 5:45 p.m. (folio 109534); the order against the report on the judicial inspection of the Shushufindi 21 well by the expert Francisco Viteri, presented by Chevron on March 13, 2006 at 4:26 p.m. (folio 99982); the order against the report of the judicial inspection of the Estacion Aguarico by the expert Villacreces, presented on September 12, 2006 at 3:35 p.m. (folio 119317); and the order of the judicial inspection of the Shushufindi 4 well by the expert Robalino, presented by Chevron on January 19, 2006 at 3:05 p.m. (folio 91289), observes that in all the cases of accused reports there is another expert report presented by the expert that the very Chevron implied, there are also statements by Chevron in response to such reports and the clarification orders, and finally, the statements about the expansions and clarifications, in such a way that it is virtually impossible for an essential error to escape the eyes of the Judge, and furthermore, being that these denied cases are identical to those mentioned in the previous lines, for which a special conditions for the trial were set, the judge has become convinced that the alleged essential errors do not exist, since the ineffective arguments are redundant. With respect to the orders of essential error against the reports presented by the expert Marcelo Muñoz, expert named by the Court without being implied by any party, in relation to the judicial inspections of well called Auca 17, presented by Chevron on July 16, 2009 at 3:30 p.m. (folio 157637; of the well called Auca 19, presented on the same date,

July 16, 2009 at 3:32 p.m. (folio 157664; of the Estacion Auca Central, of the same date at 3:34 p.m. (folio 158555); of Estacion Auca Sur, also on the same date at 3:36 p.m. (157730); also on the same day, at 3:38 p.m., against the report of the Estacion Culebra (folio 157759); of the Estacion Yulebra, also from July 16, 2009 at 3:40 p.m. (folio 157777); of the Estacion Yuca Central at 3:42 p.m. (folio 157801); and finally the same July 16, 2009 at 3:50 p.m., of the Estacion Guanta Central (folio 157820), observing that it is noted in the file that Chevron requested the attendance of the expert in Court in order to be examined, accordingly it can be seen in the public record that it rests from folios 159786. According to what is read in the record, the expert responded to all of the questions that Chevron's lawyers asked, the only topic left unanswered was the anachronistic application of the law. Folios 158789 and 158790 show that little before the examination of Muñoz, the expert, by the Chevron team, the judge intervened in the following way: "Mr. President, addressing Dr. Campuzano, asks him: What question, what interrogation has Dr. Muñoz not satisfied for you? Dr. Campuzano responds: basically the part about the extreme application of decree 1215 for work done by Texaco in the field of environmental remediation from 95 to 98, so, Dr. Muñoz has used decrees currently in force as a reference, but he is forgetting that the remediation performed by Texaco from 95 to 98, and therefore could never have been used by later laws, this is, legislation, a law that is only effective five years later, which is legally inadmissible, that is the request of the company being sued", so that later the judge, through providence of July 27, 2010, which denied the opening of essential error transaction and the basis upon which the expert has already appeared to answer all of the questions of the defendant's party. Even though the provisions in this providence are found to be enforceable, what is also observed is that the anachronistic application of the legislation as a basis for suing the existing essential errors does not have precedence for however many experts have proceeded to comply with the judge's orders and of the parties to apply the various criteria. It remains the responsibility of the judge to assess results of the reports jointly with the accusations of anachronism, which have been abundantly alleged by the defense. As such, considering that which has been presented and in order to resolve this matter, consideration of the fact that the record notes that the defendant sought to open 26 summary law suits for alleged essential errors against just about every one of the experts that have acted in this law suit, be it thorough implication by the defendant party or chosen by the Presidency of the Court, but no law suit has been called for against the foreign experts who participated through implication by the very Chevron, which makes us think that such accusations lack objectivity, and that the defendant has used these essential error law suits as a way, in fact, to challenge the proof of the adversary, and not as a means to amend the record and correct the true essential errors that could affect the decision of the cause, which is of the essence of this institution.

Secondly, it is considered that Chevron had two opportunities to summarily prove through interviews and / or documents submitted to the Court on the existence of each one of the essential errors that it alleged, leaving the bases and their supporting evidence to be assessed, however, there is no proof that the alleged errors cannot be characterized as essential because they do not affect the very essence of the experts questioned nor can they affect the judge's opinion. Finally, consider that each of the reports that supposedly have essential errors should be assessed jointly with the rest of the expert reports, including the ones presented by the experts implied by Chevron, in a way that a truly essential error would become apparent, impeding the judge from issuing a failure of influence by any essential error in any report. In relation to the merits of these arguments, it is observed that they refer more to disagreements over the interpretation of data or the application of the Law by the experts, so that the alleged shall be taken into consideration when assessing the expert reports and shall not consider nor be take into account the legal criteria used or issued by any expert, thus definitively discarding any pretense that the expert reports questioned by the defendant and tainted by errors that could be characterized as essential nor can induce errors upon this Presidency. With these issues resolved, all the writings by the parties related to the complaints of essential errors in the reports of various experts, whose arguments have been considered but are not necessarily reflected in the positive form of this failure, shall be considered released. On the other hand, the parties have also mutually challenged the experts for use of the laboratories of Havoc and Severn Trent by the various experts implicated by the parties, based on mutual allegations that supposedly these laboratories are not qualified for performing their jobs, which they allege disqualifies the samples. On this topic the work of Dr. Blanca Viera, Director of National Accreditation of July 12, 2006 at 5:50 p.m. (folios 114413 and 114414), the OEA- 06-151 is considered and in relation to the same, that which was stated by the acting party through the letter dated August 16, 2006 at 5:05 p.m. (117232), in the sense that it provides consistency in her statement and acceptance because they consider that the Ecuadorian Accreditation agency has abolished the legitimacy of the work or tests that the HAVOC laboratory performed, which is the laboratory used by the experts implied by the acting party. However, the party being sued,

by means of a letter dated October 29, 2007 at 5:22 p.m. (folio 133394 to 133399), has disputed these facts, affirming that HAVOC was not empowered to perform the tests for this trial because it did not meet the accreditation when the analyses on the samples were performed during the judicial inspections and that opposite of what is affirmed by the acting party, said work does not abolish that which was performed by Havoc, so in response to the text of the work in question, it is held that this one indicates that the Ecuadorian Accreditation Agency does not have the jurisdiction to empower, but rather to accredit, and that in this case it cannot certify the laboratory because it has not been evaluated, but that it cannot stop it from performing the work that is does, particularly that it could not be considered as an inherent defect of the reports. On this same topic, previously, the defendant's party, by a letter written by Dr. Adolfo Callejas on December 5, 2007 at 5:38 p.m. (133810), asked that he believes that there is any reason why there is any type of accreditation regarding the Havoc Cia Ltda., laboratories, to which the actors invoked the principle of equality of the different sides so that the same reasoning can be applied with respect to the Severn Trent laboratories used by the implicated experts by the law suit, making it evident that upon revising the record that the latter lack any certification issued by the OAE, but rather have similar one obtained abroad (see folios 117500 and forward, and other similar ones), which has also been the reason for the challenge by the stakeholders. However, despite the mutual accusations that pretend to detract from the findings obtained by the experts who are implied by the counterpart, it is considered that justice cannot be served if the validity of the samples at the base of these formal challenges are discarded, thus the results from the samples of the experts implicated by both parties will be partially met, but they will proceed to assess the results of the analysis jointly and considering the allegations in their respective challenges. As laid out by the work of the OAE 06-151, which in accordance with the Law, the lack of accreditation would not be an impediment to performing tests, much less to present them in a trial, but rather, that the lack of accreditation simply constitutes the absence of a formal recognition of the technical capacity of the laboratories used by the experts implicated by both parties in the case, particularly, as has been said, it will be considered carefully. With this resolved all the letters and wrings of the parties related to the laboratories and their respective accreditations, whose argument have been considered but are not necessarily reflected positively in this failure, are considered released.

Finally, in relation to the judiciary inspections, as mentioned before, the parties discussed even the daily issues of the case proceeding, getting to the conclusion that a judge should lead the process, giving priority to the service of justice. 3) Thereby, although the defendant has alleged that it has been caused an irreparable burden by not allowing 64 proceedings requested by the petitioner, for which party a Letter of Waiver for the 64 judicial inspections was accepted by the leading judge of this Court, through an order dated August 22, 2006, at 11:00 a.m. (folio 117589), and that has been ratified several times and the ruling has become final. However, some criteria brought in by the defendant have been left without ruling, as mention by Chevron's writing on August 25, 2006, at 5:00 p.m. (folio 118518), when it expressed opposition to the judge that "by you accepting, Mr. President, the petitioner's intention of resigning to the judiciary inspections…it could be considered that , either the judge has been influenced to deceit, or otherwise in being its order a ruling that not only arranges for the process development, but also …the judge has expressed his criteria in advance by benefiting the petitioner…", a conclusion reached because these criteria are based upon a false premise that the waiver to the inspections leads to a recognition by the judge that the petitioner's claims are proven, which is not true, nor have them been said either expressed or implied by any of the judges that have taken jurisdiction in this case. By accepting the waiver, from the record it is clear that the judge simply accepted the waiver, without any 'modifications', nor an implicit recognition of any kind in relation to the petitioner's claims. According to Article 144 of the Code of Civil Procedure, each party is responsible for proving the alleged facts, while the judge shall conclude upon a warrant, in such a way that no implicit recognition shall apply at the trial stage, except that the expressed recognition of proven facts must be explained and considered in final ruling, so that if the petitioner had failed in bringing in the evidence before the judge, the latter will pass ruling by alleging this and waiving, totally or partially, the petitioner's pretense. It has been noticed that during this waive proceeding, the writing of July 24, 2006, at 2:35 p.m., had a request in which the defendant "duly asked to set new dates and times to take on each of the proceeding for the judicial inspections aforesaid", making reference to the judicial inspections exclusively requested by the defendants, and that, although these were not timely

asked by Chevron at the procedural stage. This new request was based upon the portions of the texts the petitioners brought in, and was heard and denied by a proceeding dated August 22, 2006, at 11:00 a.m., and that the defendant has requested persistently a revocatory action of such proceeding, the same which has been denied, ratifying it by final ruling. Nevertheless, the statements expressed in the writing dated June 13, 2006, at 5:55 p.m., submitted by the petitioner in relation to the unity principle of the proof and its application to a judicial trial, and based on the party's right to request it be put in practice or drop it, clearly stating that the defendant, Chevron, has been allowed to take all the actions that it requested for its defense, so that the terms defenselessness, irreparable burden, favorable treatment to any of the parties, dissonant words that do not match the procedure reality, and, on the contrary, show that the actions taken by the judge in relation to this dispute, have only avoided that Chevron claims ownership of proof requests that were not timely sought, and to which the party show no real interest and illegitimately based upon a misunderstanding of the unity principle of the proof.

In this regard the President agrees with the master Manuel Devis Echandía, who describes the community principle of the proof as a consequence of the principle of unity, by making it clear that the proof "does not belong to whom furnishes the evidence and that is improper pretend it only benefits to whom provided it, once it was legally introduced to the process, it must be considered to determine the existence or nonexistence of the fact it refers to, whether it is beneficial to the party that provided it or the contrary, who in turn, can request for it. (See the Procedural Law Book, Volume II, on judicial proofs), so that wrongly we could limit the effects of the proof that was introduced to the record to the only benefit of the party that requested for such proof, but we are sure that it does not implies that the proceeding party could claim this principle of unity to make the other party's request of a proof its own request, because the community principle applies to a proof "once lawfully furnished in the process", thus being obvious that a proof request is not equivalent to a "proof lawfully furnished", so it does not belongs to the process, but to the party that timely furnished it. On the contrary, a statement included in the record that the petitioners filed on December 15, 2006 (folios 124894 to 124908), in which the petitioners, by means of a deed ratify the waive to the inspections made by their attorneys, so that the said deed was definitely accepted by a

proceeding dated January 22, 2007 (folio 1256579). Additionally, the defendant considers that the writing of July 3, 2006, at 5:30 p.m. to which the writing date December 22, 2010, at 5:48 p.m., makes reference, has no claim to solve, from which I infer that having included it in the list of matters to be treated "before passing ruling" is an involuntary mistake of the defendant. Upon resolution, all the writings are submitted to the parties in relation to the waiver of the judicial inspections, their arguments having been considered, but are not necessarily reflected in this ruling. Thus, to conclude the analysis of the pending issues relating to the proof stage, we must refer to: 4.2. Other Writings containing pending requests related to mutual accusations of fraud, manipulation, and alleged intentions to mislead the judge in several ways. Thus, analyzing the charges relating to counterfeit or forged expert reports, misconduct allegations from collaborators to the litigant parties, and evident misconduct evident. In this order, we begin by denouncing a) Falsification of Charles Calmbacher expert reports submitted by Chevron. An analysis of these facts could be made by noting that the reports provided by the expert Charles Calmbacher were duly delivered to the Court, were attached to the record (folio 52205 onwards to the Shushufindi's 48 report, folios 46241 onwards, to Sacha 94's report) and the litigants made aware of the procedural parties, who issued their statements (see folio 73145 for Chevron's statements to Shushufindi 48, and see folio 68452 for Chevron for Chevron's statements to Sacha 94). However, according to recent testimony before the expert Calmbacher before foreign courts, which have been submitted by Chevron to this Court by writing dated April 14, 2010, at 3:42 p.m. (folio 168601 onwards), which states that the reports submitted to the Court on behalf of the expert Calmbacher were not written by him, and that such reports turn out to be made up and delivered without the expert's authorization. In relation to this issue, public statements have also been included in the record given by the expert to the press (see the petitioner's writing on July 7, 2010, at 5:15 p.m., folios 185930 onwards), in which it is claimed that notice was published in The Universe, a newspaper from the of Guayaquil, on August 17, 2004, "The American Charles Calmbacher, industrial hygienist and toxicologist, said that, though Texaco ceased operations in the Amazon in the mid-nineties, several health effects are evident at present because many diseases have time-delayed effects of up to

twenty years" (folio 185945), so in response to Chevron's request of deleting the expert's report from Sacha 94 and Shushufindi 48 records, and in relation to the seriousness of the complaint, since it is evident that Dr. Calmbacher has personal issues with the plaintiffs' team due to labor and money issues, and since he has not been able to be questioned about this or his contradictory public statements, so to avoid any nullification or prejudice regarding a topic that has not been able to be clarified, and so that it will not affect the cumulative evidence, Dr. Calmbacher's comments and conclusions will not be considered in this ruling, without prejudice to other legal actions that the parties could begin. B) As to the involvement of expert Richard Cabrera in this trial, exaggerated numbers of orders requesting to declare null his designation or of a report based on the most varied argumentations, as it is discussed below. For example, that is the case of Cabrera's participation in the company named CAMPET, which was considered as an argument to support an alleged conflict of interests, because this company is dully registered as a contractor to Petroecuador, according to Chevron's complaint in the writing dated February 9, 2010, at 9:07 a.m. (folios 167039 to 167055). The defendant argued that there is a conflict of interest that would prevent the participation of Cabrera as the Court's expert, by the sole fact of his participation in a company registered as a contractor to Petroecuador, but it has failed to indicate how this would affect or benefit Cabrera's participation as expert in this trial, and this does not appear to cause any conflict of interest, because Petroecuador is not part of this litigation indeed, nor does Petroecuador's contractor record have any link to this process and, in no way is bound to pass judgment. Similarly, the defendants, though a statement dated May 21, 2010, at 4:35 p.m. (folio 178982) have denounced Cabrera's involvement in a U.S. trial Arias vs. DYNCORP attributing to the expert certain statements that contradict what they have alleged in this trial and preclude his participation as an expert. However, upon a revision of the attached documents furnished in the complaint, it is concluded that Cabral was part of the U.S. trial, but he cannot be attributed the conclusions reached thereto. In the same

litigation against DYNCORP, a lawyer who took part, this same lawyer was the petitioner's attorney in the U.S., but he has not been a procedural party to the proceedings in relation to this case. These kinds of relationships do not pose any conflict in relation to the participation of the Eng. Cabrera as an expert in this trial because he was designated by this Court without suggestion made by any of the parties, but by the President of this Court, chosen from among a list of well-known experts, so that an event like the one mentioned above cannot be considered an obstacle to his participation. In relation to the nullity of his appointment, and Cabrera's expert report, throughout the record the defendant has furnished a huge number of writings in which it requests expert Richard Cabrera's appointment nullity, and therefore the removal of his expert report. The arguments for this alleged nullity have diverged throughout the record, as it is the case of the alleged irregularities in the expert appointment, or the accusation of having used reports allegedly forged by the defendants, or of having acted in collusion with the defendants and their representatives. In relation to the first issue, from the record revision, it is clear that there were no irregularities in Cabrera designation, nor in his report, so there are no legal grounds to make his appointment or his report null, highlighting that this issue has been settled on many previous occasions, without having furnished any new evidence suggesting the existence of any grounds for declaring his appointment and/or record nullity. In relation to the alleged use of forged reports and a supposed collusion with the defendants, Chevron's writing submitted by Chevron on July 12, 2010, at 2:39 p.m., in which Chevron attached a significant amount of documentation, e-mail contacts, dozens of videos which it claims to be their transcripts (bodies from 2011 to 2017, and others), is under scrutiny. The petitioner has challenged the validity of these videos and their transcripts to be "obviously manipulated evidence", by stating that they are selected paragraphs, edited and taken out of context, and of longer films this Court has failed to appreciate. However, due to the seriousness of the complaint, and although the evidences do not constitute proof, we must satisfy the constant petition at the end of this writing, that in addition to making reference to the nullity for which we have not found legal grounds, it requests that this Court shall decline considering expert Cabrera's report, and goes further by requesting the Court refrains considering "warrants to abstain from passing judgment at least until December 1, 2010, and until you, Mr. President have investigated all the evidence in relation to Cabrera's forged expert report".

This petition would imply this Court suspended the proceedings of this case based on the requests of one of the litigants who had some expectations for that time lapse, which contravenes to public law by mandating that no incident may suspend the oral summary trial, which is why this petition was previously rejected. However, given that the defendant's petition on Cabrera's report is not being considered, and not wanting leave them defenseless due to the fact that that this type of trial cannot provide them the time to furnish evidence to prove their charges against Cabrera and his expert report, the petition for the report not to be considered when passing ruling is accepted. C) As to the mutual complaints of misconduct by collaborators to the counterparty, what Chevron has claimed in relation to Mr. Steven Donziger's actions has been analyzed, taking into account the writing by the defendant dated December 20, 2010, at 4:30 p.m., in which it attached proof obtained from the "defendant's legal counselor", the same as in the writing of December 22, 2010 at 5:45 p.m., and others related to this topic, from which derives that there is no procedural element in the record indicating Mr. Steven Donziger's participation in the case, either as a legal counselor, as a plaintiff, or as a procedure party, nevertheless his involvement in the legal team for the petitioner's is clear enough due to his multiple public actions as spokesman for the petitioner. However, according to our law a "Petitioner is the one who proposes a claim, and a defendant, is the one against whom the claim is proposed" (Code of Civil Procedures, Art. 32), so that neither the experts, their assistants, or any other support staff, are to be considered as parties to this action, therefore, Mr. Donziger shall not be considered as a procedure party, nor Mr. Donziger's actions are binding for the petitioners or it could be pretended that these take responsibility for its consequences. Although Mr. Donziger is a practicing lawyer, holding the law as a profession and he is linked to the petitioners to some extent there is no evidence of any power of attorney signed by the petitioners, allowing him to take part as the defense in this case, since his statements are rejected, particularly those in which any value of that Mr. Donziger could say or do when on camera or in any other situation is ignored. No pressure has been effectively exerted on this Court. Additionally, notice that although this Court had the power to judge Mr. Donziger due to his disrespectful

statements, it could not be done on the basis of such small and limited portions of selected and edited hours of filming, without giving the defendant the right to defend himself or explain the context of such statements, and is concluded that without any detriment to the case or prejudice of the parties' rights to take legal actions in separate proceedings they consider appropriate, the complaint is disregarded, for it is not likened to any procedure party. Similarly, we apply the provisions in Art. 32 of the CCP, to the complaint filed by the petitioners against Mr. Diego Borja, who is the author of the clandestine films that were used by Chevron's defense to denounce alleged irregular proceedings of the former Chairman of the Judiciary, according to folios 158420-158427 in the writing, which was enlarged in the writing dated July 13, 2010: at 8:48 a.m., which denied the involvement of the defendant's court attorney in the planning of the filming, but recognizing that "in fact, Diego Borja was Chevron's independent contractor for a specific role". Consequently, because of this complaint, the Judge, Dr. Juan Nuñez, excused himself from continuing the case and a process against him was started in the Judicial Council. In relation to this issue, we notice the record contains dozens of different types of documents signed by Diego Borja, all related to the samples collected and analyzed in laboratories by all the experts suggested by the defendant, which undoubtedly linked him to the 'team' defending the defendant, but as in the case of Mr. Donziger, his performance is not enough to consider it a separate trial. If we consider the statements allegedly made by Diego Borja while in conversations with Mr. Santiago Escobar, secretly recorded by the latter, and which appear in the transcripts delivered by the petitioners, we must understand that most of the samples collected by the experts suggested by the defendant have been manipulated (see writing dated April 20, 2010, at 3:27 p.m. and its annexes), and they would lose their value as evidence. However, these recordings cannot be considered valid proofs since they were collected in secret, in the same way that Mr. Borja made them, but which were effective after all for the Ecuadorian function to be in the center of a media scandal and to delay the process. Moreover, the petitioner party, by means of a statement dated April 20, 2010, at 3:27 p.m. (folio 170980), has settled down and requested not to leave the probative value of these proofs aside, for they argue that even though the manipulation, it is a proof of what has been said in the complaint. This behavior, the same as that of Mr. Donziger's, is considered misconduct, however, according to Art. 32 of the Code of Civil Procedure, Mr. Borja is not a party to the actions, neither his acts nor statements can

be attributed to the defendant's company; consequently no sanctions against Chevron are to be taken, without prejudice to the parties' rights to initiate separate actions for the ones that are considered legitimately represented. e) To conclude we must refer to the events occurred during the scheduled judicial inspection at Guanta Station that was called off upon Chevron's request, which has raised the most vigorous protests from the petitioner party. On folio 81410, an official letter from Major Arturo Velasco, Chief of Intelligence of the GFE-IV-'RAYO' (a Special Task Force), was found which reads that 'by comments made by the staff of the Intelligence Agency of Sucumbíos, it was learned that problems and incidents with the staff of settlers and natives of the area of the El Guanta station were expected on October 19, 2005. According to information obtained by military intelligence it was known that the intention is to retain CHEVRON TEXACO officers and other people attending the judicial inspection by blocking the entrance and exit roads in the premises to force the signing of commitment documents for the submittal and performance of a number of requests', in virtue of which it suggests totally limiting the activities in that sector due to lack of security guarantees. This official letter 'was filed at the Secretary of the Court on October 18, 2005, at 5:00 p.m., followed by a statement by Chevron at 5:57 p.m. (folio, 81426), in which making reference to the such official letter alleges that "As it is known, currently there is not in the area or at the on-site judicial inspection any necessary guarantees for the fulfillment of the same [...] I have been instructed by the party I represent not to appear at the inspection above referred to [...] very politely requested to call off the inspection [...]", a request that was accepted by the President of the Court, and has subsequently caused solid claims from the petitioner party, in relation to the manipulation and fraud carried out by the defendant to use a bogus military report, prepared at the request of the defendant itself. The Presidency noticed that from folios 93037 to 93031 there is an official letter by the Brigade General Fabián Varela Moncayo, Undersecretary of National Defense, which sends 6 folios of notary paper bearing the official seals of the respective departments related to the report mentioned by Major Arturo Velasco, in which we read that Major Velasco says: "From the time I remained in this unit, the relationships with Texaco officials have been good, mutual respect and cooperation in various activities. On Tuesday, October 18, at about 1:00 p.m., an official of Texaco, a worker in a service company, together with a former teammate of the department, Mr. Capt. Manuel Bravo (R),

said they had to attend a court hearing at El Guanta [...] who had confirmed information, which in return they would block the roads to demand a list of requests and their integrity was at risk. Upon this, I clearly refused to provide any military personnel for their protection, indicating that that is the function of the National Police. They told me that it was not their request that the purpose was to call off the court hearing [...] and claimed that a member of the military intelligence group could tell the judge, to what I replied I was going to do it so. The judge came and told them that the military intelligence group heard that a closure of roads was planned [...], fact to which I agreed because he is my friend and I know my Capt.'s seriousness [Bravo]. The judge accepted the proposal and told me he a document from the department with the same orders [...] I told him that the same as him, I had already provided for the police department, the agency that is in charge of it, to do so and that it would be desirable that he asked them [later to Capt. Bravo] to comes to the office to help with him the document, at least to make the officers see they would be in trouble, and after their insistence, I agreed and I suggested that the document is not supported by the department but instead I was held responsible for it, and that I would do it for him to take the necessary precautions [...] But only until the Police report arrived; I also told him I could not hand in the said document by any reason [...] I gave my Capt. the document and warned him the document had no validity for it lacked the department's logo, and that it was just to take the necessary precautionary measures for the safety of his officers, moreover, that under no circumstances it could be released." On the same subject we can also read from the report introduced by the EMC Colonel Miguel Ruiz Fuertes, that refers to the judge's decision of calling off the judicial inspection based "in a report submitted by Major Arturo Velasco, Intelligence Officer (P-2) of GFE-VI-DE-RAYO", in which it order that due to AISU's information it was known that during the said inspection problems and incidents were foreseen among the settlers and natives of the area. Major Arturo Velasco would have provided this information at the request of Capt. Manuel Bravo (R.), a former partner in Major Velasco's military life, the same one who used to work at the company that provides security services for Texaco [...].It should be mentioned that no written notice or verbal communication was provided by AISU as regards problems or incidents that would happen among the inhabitants of the "El Guanta" area during the judicial inspection". Therefore, it is clear by the document author's statements and his superiors, that the contents

of the Major Velasco's report is false when asserting that "by comments made by the staff of the Intelligence Agency of Sucumbíos, it was learned that problems and incidents with the staff of settlers and natives of the area of the El Guanta station were expected on October 19, 2005. According to the information gathered from military intelligence [...]", when, in fact no written notice or verbal communication was provided by AISU on problems or incidents that would happen to the inhabitants of the area of the "El Guanta" during the judicial inspection, from which it appears that the true and only source of information was the brief military intelligence report by Capt. Major Velasco Bravo (R), private security officer who renders services for the defendant. On this grounds, the judge has enough evidence to verify that indeed 'was misled by the Chevron Corp.'s Prosecutor, Dr. Adolfo Callejas, when requesting the Court to call off the judicial proceeding based on false information, or at least manipulated and that was not checked by any official source, but pretended to be real and official, even without the support of the military force, and moreover being a document that could not be released as it was its author's request, and undoubtedly was issued under his sole responsibility and drove by their friendship, but not due to data provided as military intelligence. However, the defendant's conduct, although it has influenced and hindered the prosecution of the case by motivating an order dated October 18, 2005, at 5:59 p.m. (folio 81531) the cancelation of the proceeding, has not affected the final ruling, so it shall be considered as an example of procedural conduct in passing this ruling, without prejudice to the rights and actions that the parties and/or third parties may be represented and or could take action, or are taking action in relation to this fact. Therefore, we conclude by analyzing the petitions made by each party in relation to the case proceeding, by declaring that have been properly satisfied, in terms of law, and we go on to analyze: 4.3 New preliminaries. Without being dilatory exceptions set in the dispute, it means dilatory defenses that must be addressed by the judge, since they have been raised by the defendant, despite being in a more advanced procedural stage in the process. Thus, the complaint that many of the defendant's signatures seem to be counterfeit, the lack of the defendant's power of attorney, and even the lack of competence of the court due to the change of the Constitution in 2008, which it may derogate

previous exceptions, these did not exist or were not found when the demand should be contested, therefore they are considered as follows: Forged signatures. "As for Chevron's writings of December 20, 2010, at 08:50 and December 22, 2010, at 3:45 p.m., concerning a well-known foreign expert's graphological report, who has not been at the judge's or the counterpart's order accordingly as it is the case, previous to assessing his observations, it was observed that the defendants have ratified in more than one occasion their participation in this process, with no graphological dissent that can be used as an argument for a forgery the own author of the signature denies. It is worth mentioning that no one of the alleged affected by their signatures' forgery has supported Chevron's complaint for this is reckless and disloyal to the Court and its counterpart. The same applies to the defendant's allegations as to the lack of "fingerprints", as it argues in its writing dated December 22, 2010, at 3:49 p.m., for the lack of solemnity as to this detail was cured  with the defendants subsequent acts, since a solemnity of this kind cannot obstruct in any way the administration of justice. Upon this, we are lead to dismiss the charges of false enforcement against the lawyers who have acted representing the defendants, Dr. Alberto Wray and Att. Pablo Fajardo, who have appeared duly authorized by the defendants and under the Law, according to Art. 40 of the CCP. B. Lack of the Judge jurisdiction due to a change of the Constitution. In the order dated October 29, 2008, at 5:00 p.m., the Judge responded to a brief filed by the defendant on October 28, 2008, at 9:30 a.m., which challenges this Court jurisdiction and requests it be inhibited from continuing the present case. The Judge denied this petition based on Articles 11, clauses 3, 75, 168 clauses 4, 172 and 426 of the Constitution. Additionally, it is observed that on folios 151523 there is a resolution of the Committees of Financial Management and Human Resources of the National Judicial Council, dated October 21, 2006, with an Article that provides that "upon the promulgation of the law regulating the formation and operation of the Judicial Council and the latter is under the Provincial Courts of Justice, and Criminal District Courts, it is provided that the Superior Courts, District Courts and other Criminal Courts within courts continue to function in accordance with the provisions of the Organic Law of the judiciary, the National Judicial Council and other applicable laws in relation to all that does not contravene the Constitution", and it also

considers that on folio 151525 the very same institution clarifies the name Superior Court shall comply with the constitutional provision, based on the fact that on Thursdays, those who were acknowledging cases extended their jurisdiction and did not lose them in the cases they were working on, so these defenses do not fit hereto as long as it refers to the applicable law. 4.4- Chevron's challenge to the experts hired by the petitioners to expressed their criteria to financially assess the petitioner party. We must consider the fact that these experts have not performed as assistants to the Court, nor their views have been considered as expert opinions, but it is about third parties who have been hired by the petitioner party, without the intervention of the Court, so even if it was true that the petitioner has committed fraud by using Dr. Barnthouse's work, as Chevron complaint in its writing of December 21, 2010, at 11:00 a.m.. In the same line of argument, they refer a responsibility Annex by Dr. Allen, Dr. Picone, as indicated in Chevron's writing dated December 22, 2010, at 5:40 p.m., in which the petitioners are accused of ideologically falsifying the contents of the Annex, which would be a very serious offense committed by a party to the action in a trial. The basis of (this accusation is that Dr. Barnthouse has testified that he revised expert Cabrera's report but he did not made his own report on the damages, which is consistent with the reading of the writing by the petitioner party on September 21, 2010, whereby the Annex made by Dr. Picone, Dr. Barnthouse and other further annexes were delivered, the initial part of which reads that the purpose of it is to cooperate with the President of this Court by providing him our position as to the economic criteria applied to the remediation of environmental damage. We hope that this document and its annexes will allow the judge to have a clear and updated vision as to the real economic expenses that the remedial of the damages caused by Texpet operations in the Amazonian provinces of Orellana and Sucumbíos could cost. "To conclude, we would like to clarify that the introduction of these economic criteria is simply a reference to the values involved in the environmental damage remediation as may occur in this trial; moreover, this document is not the realization of our claims, nor our ultimate aim in this trial", from where it is inferred that the petitioners could not have wanted to "deceit" the Court with false reports of damage, as claimed by the defendant, as the petitioners clearly announced their intention

to deliver the documents and annexes, with applicable economic criteria for the remediation -not a report of damage, to allow the judge to have a clear and updated vision of the economic expenses; all in compliance with the judge's order of August 2, 2010, at 9:00 a.m., this also been met by the defendant within the respective term, so the ideological forgery charge being reckless, without merit and is dismissed without further proceedings. This decision applies to the challenge the defendant made against the expert authors of the annexes, which are not experts or assistants, but independent professionals, who have been hired, and if they are considered affected by a distortion or misuse of his statements they may take the necessary actions in relation to it, without prejudice of the rights of the parties and of third parties that may believe they are rightful to take legal actions over this issue. 4.5. Lawyers penalties for alleged libel, slander and defamation. From the process, it is clear there are countless process petitions, from both parties in the case, to punish the opposing party legal counselor upon allegedly present offensive writings, the record containing two separate calls for attention to several lawyers from both parties to the action, by engaging in excesses or lack of courtesy to their counterpart, so according to the provisions of Article 500 of the Penal Code, and taking into account that this case has received a passionate defense of both parties to the action, because what is said in this process sets jurisdiction, because the alleged libel have been mutually expressed, they call to the fact that an injury cures another injury, or that a libel against another is a "tie", therefore, none of the lawyers shall be punished by their opinions against the counterparty to the defense of this case, without prejudice to its right to exercise a separate action, if deemed appropriate. However, this Court has also had to draw attention repeatedly to the defense lawyers of the defendant by the charges and terms that have been used against this presidency, in the various staff we have dealt with, as when they assured and did not prove that the President of the Court supported the petitioner's lawyers in their 'maneuvers', by saying "This irregular appointment of the expert for the "expert examination" has been full of vices explainable only through a undeniable and reprehensible conflict of interests" (see writing dated December 13, 2007, at 9:10 a.m.), when from the record, it is clear that no irregularities were committed in the appointment of such expert, to the point that even the Human Resources Committee of the National Judicial Council at that time had ruled by order dated February 20, 2008, at 10:44 a.m., under

record No. 240-2007 SG, begun pursuant to a complaint by Dr. Adolfo Callejas, acting as Chevron's Prosecutor, with the same arguments it used to accuse the Court of improper conduct and has been solved by indicating where pertinent that "The offense attributed to Dr. Germán Yánez Ruiz, President of Superior Court of Justice in Nueva Loja, is the lack of integrity or competence in the designation of an expert, by wrongly applying Article 252 of the Code of Civil Procedure which states: "The judge will appoint a single expert on the person he chooses, from the writings in the respective superior courts. However, the parties may by mutual agreement choose the expert or seek to appoint more than one for the proceeding, agreement which is binding on the judge."; in this case, each party suggested an expert, but such suggestions were challenged and no agreement was reached to choose one, so the judge, on executing a statute, decided to appoint a single expert, so its performance is within the constitutional right of independence of judges and courts have in the exercise of its jurisdiction, under Article 199 of the Political Constitution of the Republic, thus not incurring in any administrative offense, showing that the unfounded and gratuitous accusation made against the President of this Court, that had not been the only one, but is has repeatedly been made reference to a "judicial lynching", supported by the Court, to the point that in a ruling dated May 30, 2008, at 10:30 a.m., we found that the judge rejected and left out the record improper utterances in various documents filed by the defendant: "Attach to the process the writing introduced by Dr. Adolfo Callejas Ribadeneira on April 18, 2008, at 4:48 p.m., as to its content, as President of the Court the term denial of justice used by the CHEVRON CORPORATION's attorney is rejected, since many writings have been released on the sole subject-matter introduced, expert report" [...], and "Attach to the process the writing presented by Dr. Adolfo Callejas Ribadeneira on April 18, 2008, at 4:12 p.m., its content to be added to the record and take into account the timely procedural moment, except for the phrase "legal lynching", this being dismissed because it does not correspond to the truth", and the judge had to admonish Dr. Adolfo Callejas on: "Attach to the process the writing furnished by Dr. Adolfo Calleja Ribadeneria on April 18, 2008, at 4:42 p.m., its content: draw attention to the lawyer signing the writing for

him to refrain from making comments on the performance of the Judge, because the misconduct is repeated and once more is fair [...]". This is not about isolated events, but references to a possible lack of impartiality of behalf of the Judge which have been constant throughout the process and have even been publicly repeated by the spokespersons of the defendant company, reaching the ears of the Judge both offences against his judicial competence, which shall be also considered when passing ruling. 4.6. Finally, with regard to the petitions concerning the invalidity of previous orders that are already executed, and whose revocatory action has been requested more than once, it meets the provisions of Art. 291 of the CCP, while "The Revocatory being granted or denied, no clarification, amendment or addition shall be asked twice", which applies to the writing dated December 21, 2010, at 10:50 a.m. referring to a case that has already been settled, so it must comply with the resolution in Dr. Yanes's orders mentioned hereto, and similarly, to the other cases pending revocation, additions or clarifications that remain outstanding and that have been filed more than once. **FIVE.-** As stated in the recitals preceding this ruling, there is no evidence of any substantial lack of solemnity, or violation of the guarantees of due process, or procedure that may influence upon this decision, the oral summary procedure given for damages caused by an environmental impact, it is therefore declared the validity of the process.- **SIX.-** Considering the force of Law at the time this President has reviewed the Ecuadorian environmental legislation in force at the time Texpet developed Consortium operations, highlighting the following rules: In RO No.378, of December 17, 1921, the Hydrocarbons Act or the Act on mineral deposit, in which they referred to the rights of the tenant of paying a fee when the mineral deposit was on wasteland, and specifies: "The payment of this fee shall entitle the tenant the right to use, for farm purposes and only in sufficient quantity, land, water, wood and other building materials found in the area of the contract, without depriving the towns and villages of the flow of water that will be indispensable to their domestic chores and irrigation, without interfering in the smaller navigation, and without depriving the waters of its qualities of purity and potability and without exhausting fish". This Act did not become effective during Texpet operations, because it was expressly derogated by the Petroleum Act, which was issued in RO No.

560, August 9, 1937. However, should be taken into account in its wording, as it is repeated, with variations in subsequent legislation and concession contracts. The Petroleum Law would be effective until 1971, that is to say, the year previous to the one when the first Petroleum barrel was extracted from the concession., which means that several wells had been already perforated while it was still effective, reason why these had to fulfill its dispositions, which ordered that the execution of the works would have to be in accordance with the Technical Rules of Petroliferous Works, which apparently has never been dictated as this Court knows, which means that from the beginning of the operations of Texpet until 1971, that is to say, during the initial period when a great part of the facilities of the Partnership was constructed, there was no effective law that established specific technical obligations that the operator had to fulfill from the point of view of the hydro carbon technique, because it was only in 1974 that the Regulation of the Exploration and Hydrocarbon Operation was published, in the Supreme decree 1185, published in Official Registry 530 of April 9, 1974 where it was indicated that it was obligation of the operator "to take all the measures and precautions in fulfilling his activities in order to avoid damages or dangers to people, properties, natural resources and to sites of archaeological, religious or touristic interest" (Art. 41). Nevertheless, for this period of time we must consider that in R.O. No. 186, of February 21, 1964, appears the authorization for the Ministry of Public Works that, in the name and representation of the government of Ecuador, to grant to Texas Petroleum Company a Hydro carbon concession. This concession was granted by the Military Meeting of the government having considered "That the applicant company has the technical and economical means necessary for carrying out an efficient hydro carbon exploration". In addition among the antecedents appears that "Texas Petroleum Company has also expressed, that will be responsible with the two Ecuadorian companies for all the obligations, that these acquire with the Government of Ecuador, as a result of the concession transference required by Texas Petroleum Company". This means that one of the reasons why the Government of Ecuador authorized such concession was the economic and technological capacity of the company Texas Petroleum Company that accepted to share the responsibility with the Ecuadorian companies. It is also taken into account the fact that the government guarantees to the Concessionary a calm and peaceful possession of the lands which are national goods, but making an exception regarding the rights of third parties, according to the Sixth clause, that provides: "Possession of

the granted zone A) the government, leaving out of danger the rights of third parties, will let the concessionaire in calm and pacific possession of the lands that, being national goods were included in this concession". On the other hand, in the clause Tenth there is an important condition imposed to the advantage right of the Concessionaire for using waters in its operations: "The concessionaire has the right according to this contract, to use the lands that are in the areas mentioned in the first and second clause, as well as the wood waters and another construction equipments that are meant for the exploration, operation and development of their concession, without depriving the towns of the water volume that is indispensable for them for their domestic and irrigable necessities, neither making difficult the navigation, nor taking the drinkable and purity qualities of the waters, nor preventing fishing." What implies that the use of waters within the operations of the Partnership was allowed whenever it didn't deprive of their qualities of drinkable and purity, which make us take into consideration also the clause Thirty second, that at letter G) stipulates that the concessionaire is forced "To manage the concession by using suitable and efficient machineries for the object", which has been constantly put forward by the prosecution part in its defense, as it can be seen later on. In the same way it is considered that in the R.O. No. 158, of February 8, 1971, appears published the Health Code that contains the following norms of obligatory application, which were effective for "all the matter or public or private action" through all the national territory: "Art. 1. - The health is the complete state of physical mental and social well-being, and not only the absence of disease or disability. Art. 2. - All matter or public or private action, will be regulated by the dispositions contained in the present code, special laws and regulations. Art. 3. - The Health Code governs in a specific and prevalent way the rights, obligations and norms regarding the protection and rehabilitation of and collective individual health." These dispositions would be applicable for the case when we find affected the rights of the collective or individual public health, or obligations or norms that were not fulfilled as regards the protection of these rights. Thus, with respect to which it must be understood as "health", this Court takes care of the concepts invoked, in the same way that with respect to environmental cleaning that is presented in Article 6 that says: "Art. 6. - Environmental Cleaning is the set of activities dedicated to cleaning and controlling the atmosphere where the man lives, in order to protect his health." With respect to the prohibitions and obligations regarding the protection of health, we find that Article 12 and Article 25 contain similar dispositions that provide prohibitions for

unloading substances in the ambient, if these have not been treated before until turning them into inoffensive for the health. "Art. 12. No person will be allowed to eliminate towards the air, ground, or waters, the solid, liquid or gaseous residues, without previous treatment that turned them into inoffensive for the health. Art. 25 The residues, used waters, industrial residues will not be unloaded, directly or indirectly in streams, rivers, lakes, drains, or in any other water of domestic, agricultural, industrial or of recreation use unless they have been treated by methods that made them inoffensive for health." These norms are obligatory for all the people, natural and legal, as it is clarified by Article 16: "Every person has to protect the hydrographic sources or river basins that are used for the water supply, being subjected to the dispositions of this code, special laws and its regulations". Equally is considered "Art. 17 Nobody will be allowed to unload directly, or indirectly, noxious or undesirable substances in a way that can contaminate or affect the sanitary quality of the water and to obstruct, total or partially, the routes of supply", insofar as the substances spilled in the atmosphere can be considered as noxious, whereas if they are considered as toxic, irritating corrosive, inflammable, explosive or radioactive, it will be taken into consideration the provisions of "Art. 29.- the possession, production, import, consumption, transport, distribution, use and elimination of toxic substances and products of corrosive irritating, inflammable character, radioactive or explosives, that constitute a danger for the health, must be undertaken in sanitary conditions which they eliminate such risk and subject to the control and exigencies of the suitable Regulation." It is underlined that although such regulations for the hydro carbon industry did not exist, this doesn't exclude the obligation of handling such substances in sanitary conditions that eliminate such risk, so that we must evaluate if the practices used by Texpet during the Partnership, as the direct elimination in the atmosphere of waters of formation after a decantation process, are able to eliminate the risks that we have written down regarding the formation water. Of a concordant way is being observed the Hydrocarbon Law published in the Official Registry no. 322 of October 1, 1971, which contains an express disposition that imposes the obligation of "adopting the necessary measures for the protection of flora and fauna and other natural resources", and "avoiding the contamination of waters,

atmosphere and lands" (see Article 29, letter s) and t), dispositions that are similar, to the ones found in the later codification of the Hydrocarbon Law, published in Official Registry no. 616 of August 14, 1974 (Article 30, letter s) and t), and in the Official Registry no. 711, of November 15, 1978, in Article 31, letters s) and t), being a constant in the effective hydro carbon legislation of Ecuador. There are being considered in a special way all these norms referred to because they were effective before the first petroleum barrel of the Ecuadorian Amazonia was operated in 1972, that until then was known as a free zone of all industry and human contamination, excepting the ancestral arts of the towns that lived there, so that we can have the certainty to reasonably affirm that there is no doubt regarding the purity of waters until that year, being that purity of the water a characteristic or condition that everyone is forced to fulfill since 1971.

Then, together with the beginning of the drilling of petroleum in Ecuadorian Amazonia it was promulgated the Water Law, published in the Registry no. 69, of May 30, 1972, that in its Article 22 says "There should be forbidden all contamination of the waters that affects the human health or the development of the flora or fauna", reason why considering as supporting the provisions established in the first Article, the dispositions of the Water Law regulated from that date the use of marine, superficial, underground and atmospheric waters of the national territory, in all physical states and forms (Article 1), it was from that date prohibited all contamination of the water sources, in addition establishing that "By usage right there will be understood the administrative, non transferable authorization, for the use of waters with the requirements prescribed in this Law" (Art. 5), reason why, the right of using the waters granted to the operator in the clause Tenth of the contract of Concession of 1964, that established the right of the Concessionaire to use the waters without depriving them of their drinkable quality and purity, was also subjected to the provisions of this law. If we analyze the Water Regulation, published by means of the Official Registry No. 233 of January 26, 1973, we can find a definition for the water contaminated in Article 89, that says: "it is considered contaminated Water all the current one or not that presents deterioration of its physical, chemical or biological characteristics, due to the influence of any element… and that give as result the total or partial limitation of them for the domestic, industrial, agricultural, fishing, recreational use and others" ; and another one considers the "noxious change", in Article 90, that says: "it is considered 'noxious change' the one that takes place through the influence of polluting agents or any other action susceptible to cause or to increase the degree

of deterioration of the water, by modifying its physical, chemical or biological qualities, and, in addition, by the damages caused for a short or long term, to the uses mentioned in the previous Article", definitions that will be taken into consideration when evaluating the examination elements presented by the parts. With respect to the Contract of August 6, 1973, at folio 3292, body 33, there is a note of Dr. Adolfo Callejas, Judicial Solicitor of Chevron displayed on October 27, 2003, at 5:00 p.m., in which invoking the mentioned contract the demanded part stands out: clause 46.1. - that textually says: "The Contractors will adopt the advisable measures for the protection of the flora, fauna and other natural resources, and they will avoid the contamination of waters, atmosphere and land, under the control of the pertinent organisms of the State" (emphasis was added by the demanded one in his writing). Where two elements deserve the analysis of this Court: 1) that was an obligation to use, suitable means for protecting the environment, and 2) that the State had the supervising and controlling power. The obligation to use the suitable means for the protection of the flora and fauna will be taken into consideration further on, when referring to the operational practices used by the demanded one and their results, in order to evaluate this way the effectiveness of the measures used by the demanded one for avoiding damages to the environment, having to advance that the public interest of an industry does not contradict the obligation of using all the means available for avoiding the damage, as well as either releases the industry of its obligation to repair the damages caused to third parties. On the other hand, as regards the control of the pertinent organisms of the State, it should be written down that the control faculty and/or obligation of the State does not imply that a possible and reproachable inactivity of the public organizations, releases of responsibility the controlled subject. The same way, we have not found a legal foundation that sustains the theory that the responsibility of the controlled subject goes the controller in case this one has failed in his obligation of control. This is concordant with the theory that the administrative authorization of the activity does not impose to the harmed ones the legal obligation of supporting them, especially when there was the technical and economically reasonable possibility to diminish the occasional impacts (see sentence No.589/2007 of May 31st, of the Room of the Civilian of the Supreme Court of Spain RJ/2007/3431). It is understood one thing is the permission or administrative authorization of an industry with the indication to avoid the environmental damages, as it happens in the present case; and another different think is the existence of this authorization that implies that its holder can use it harmfully, and

avoiding assuming responsibility for damages against third parties. Not even the observance of the regulations of the industry and other administrative norms exempt the industry to repair the damages that causes, because there are cases where the objective responsibility rules. With respect to the rest of norms of this Contract, referring to the obligations of the Government of inspecting and controlling, as well as to its power to approve the production rates and other related aspects, there will not be analyzed its fulfillment or violation, because it does not correspond to us the duty to pronounce on the contractual relation between the Government and the demanded one, but on the damages supposedly caused by the way in which this last one managed the Partnership, independently of the actions or omissions of the State, that has left specifically out of danger the rights of third parties, in the clause Sixth of the previously referred Contract of 1964. Finally, by the specialty of the matter, the Regulation of the Hydro carbon Operations, published in the Official Registry 681 of May 8, 1987 is being considered, which indicated that "The operating company as well as the subcontractor companies dedicated to the hydro carbon activities, according to the laws and regulations regarding the protection of the environment and according to the international practices in the matter of preservation of the ichthyologic wealth and the farming industry, will have to avoid any type of environmental contamination coming from their operations that can cause damages to the human life and health, flora and fauna". The tenor of all these mentioned norms allows us to understand the effective legal frame of the time, and therefore we can conclude that under the protection of the effective legal dispositions of the time when Texpet handled the Partnership, any form or way of contamination was a legal violation, in such a way that the smaller or accidental incidents of contamination, related to hydro carbon operations, would create liabilities to compensate smaller ones, of a proportional way to the caused damage, whereas the majors incidents or the application of continuous polluting practices throughout the time would generate obligations corresponding to the magnitude of the damage. Under this mechanism the majority of smaller damages would happen unseen in the practice and would not require remediation, nor in the practice would be started any action for persecuting a compensation, for example, of a person who has contaminated waters with the soap that washes the clothes with. These mentioned legal norms created a reasonable legal regime for environmental liabilities, because it established related potential responsibilities related to the caused damage, stimulating the caution as a measure for reducing the own potential liabilities and thus avoiding responsibilities, and in addition establishing the positive legal mandate for adopting the

advisable measures for protecting the flora and fauna. This way any person, natural or legal, would have to face and be responsible for significant liabilities when that same person has created them, which is completely rational and right under any legal system. This Court doesn't consider a legal support the fact that the demanded part has alleged that the laws of time when the Partnership operated were inapplicable and impassable, because such indifference from the part of the demanded for effective legal mandates in Ecuador contravenes to the provisions of the norms of the Civil Code that in its first Article clarifies that the Law is a declaration of the sovereign will that, declared in the form prescribed by the Constitution, orders, prohibits or allows, and in this case the mandate of the mentioned laws was to take the adapted measures in order to protect the flora and fauna, and the general prohibition to contaminate waters or take away their drinkable and purity qualities.

According to the norms that govern the interpretation and application of the Law, that in its Preliminary Title, Paragraph 4 on the Judicial interpretation, stipulates that "The words of the Law will be understood in their natural and obvious sense, according to the general use of the same words" (second rule of Article 18), in accordance with the first rule, that tells us that: "When the sense of the Law is clear, its literal tenor will not be neglected, with the pretext to consult its spirit". This first rule it also indicates that "in order to interpret a dark expression of the law can appeal to its intention or spirit clearly indicated in itself, or in the trustworthy history of its establishing", reason why supposing that the dark can be found in the Mandate of the mentioned laws, we can affirm that the intention or spirit of the legislation invoked in this failure is evidently to prevent the contamination, not to authorize it. Being the spirit of these legal norms so evident for the judge and considering that Article 13 stipulates that "The law forces all the inhabitants of the Republic including the foreigners: and its ignorance does not excuse any person", we can affirm as regards the demanded one that it had to fulfill the exhibited legal mandates. With reference to the use of determined practical operational and to the fulfillment of the effective legislation at the time of the partnership, it can be observed the participation of the Dr. Alberto Racines in representation of Chevron, during the judicial inspection of the Station Yuca Sur who showed that "The reason why I repeat this, is that Texaco, in the time when this station functioned and all the stations of the ex- partnership

and that are now the exclusive property of Petroecuador, installed a similar system, a system of swimming pools where there were separated in each one, the hydrocarbon from the water and then a process of decanting of the elements contained by the water, that were heavier elements that decanted and the water flowed until fulfilling certain standards, which if I am right at that time did not exist, at least in Ecuador. But to fulfilling certain permissive levels in order to be able to be evacuated in the environment; that was the practice, because the problem here is that when speaking of the form in which Texaco used the production water, it is always mentioned how from the Wash Tank went directly to the environment, which was never true. In all the historical occasions and on this matter I ask that Mr. Perito to make an investigation on the subject, which will not be very difficult, because it is easy to see the construction plane; after all the National Hydrocarbon Direction and the Ministry of Energy were those that always approved, all the constructions of the stations and the works that were made in the stations; there was an established procedure for evacuating water to the surroundings, it was not evacuated directly to the tanks, as it is always mentioned, it was evacuated after a treatment, that included a process of oxygenation and ventilation that was the best form to naturally separate the elements that were there. Unfortunately seventeen or eighteen years later since Texaco stopped operating here we know the standards neither the form, nor the level of elements contained in the water evacuated by Texaco, how got off from those swimming pools and we will never know it, but we can know that contains the water of here, which was the process that was provoked, so that the water fulfills certain parameters that now are established." It is being observed that the professional has mentioned to the Court that after the process described by him, "the water flows until fulfilling certain standards and if I am right at that time did not exist at least in Ecuador", and repeats the idea that Texaco fulfilled the parameters even before these exist, when sustaining that all this process was handled "so that the water fulfills certain parameters that now are established" but which consequently did not existed before. Although indeed the mentioned professional is right when affirming that at the time of the Partnership did not exist "standards" that he mentions, and although is certain that nowadays we cannot know "the level of elements that contained the water evacuated by Texaco", is not permissible the argument that this absence of "parameters", to the state supervision exempted Texaco of its obligation to fulfill the effective legislation which asked the petroleum company to operate by using mechanisms for avoiding damages to the flora and fauna, and to abstain from depriving waters of their qualities, because the fulfillment of a clear and express mandate it does not need a regulation nor parameter some, but it had take make use of the knowledge that had the demanded one regarding the potential damages that can cause the formation water after the treatment used

by Texaco in the Partnership, since it is evident that this knowledge had to be necessarily considered as an integral component of an established procedure in order to be able to evacuate water within the surroundings if it tried to fulfill the invoked legal norm. This way, the solution of this debate cannot be ignoring the Law, as suggests the defense of Chevron, because the lack of regulations cannot be understood as an implicit authorization for taking the purity of the waters or using practices that have put in danger the health of the people. In addition, the judge is prohibited to protect himself from a possible lack or darkness of norms for managing justice since as it our jurisprudence says: brought a civil suit, the Judge must solve it; he cannot suspend or deny the administration of justice nor by darkness or lack of Law like stipulated in Art. 18 of the Civil Code (see judicial newspaper, Year XXXV. Series. no. 127. Folio 3025, March 21, 1936) according to what the constitution stipulated in Article 28, that says that "the judges in the exercise of their functions will limit themselves to judge and handle that rulings in the courts, in accordance with the constitution, the international instruments of human rights and the laws of the Republic. They will not be able to excuse themselves from exerting their authority or failing in subjects of their competition for lack of norm or darkness of the same, and will have to do it in accordance with the legal frame, according to the matter. The general principles of right as well as the doctrine and the jurisprudence, will serve to interpret, integrate and delimit the field of application of the legal frame, as well as to undergo the absence or insufficiency of the dispositions that regulate one field". Understood like this the obligation that the judge has to apply the effective legislation at the time the partnership functioned to the acts of the defendant, by virtue of the literal tenor of the invoked norms, all pouring that will deprive the waters of their qualities, or that will damage the flora and fauna, causing damages or threatening doing so undetermined people, would be an act in opposition to the Law, even though Texaco has thought that the legislation was inapplicable to it then since its supervising was obligatory, and there is no legal foundation that admits that the possible lack of regulations is a sufficient

justification for denying the application of the effective laws at the time the partnership operated. In addition it should also be mentioned another aspects debated in this ruling, since several of the different experts who have participated in this ruling have prepared the reports considering the effective parameters of environmental quality, which motivated the misfortune and reclamations of the demanded part that has alleged in its defense the principle of non retroactive character of the law, that would prevent judging the acts of its defendant under protection of the provisions of the laws that were not effective then. Indeed it is agreed that would attempt against the principle of the most elementary justice judging the acts of Texpet under the protection of the provisions of the effective laws, reason why considering the retroactive application of the law, it should be clarified that these parameters have not been used in order to judge the acts of the demanded one. It is evident that the effective legislation does not contain the parameters that the operator of the partnership had to fulfill at the time of operation because they were nonexistent. As can be seen the effective Legislation at the time when Texaco operated by means of Texpet in Ecuador did not establish tolerable parameters, standards or maximum limits, but in environmental matter asked using the pertinent measures in order to protect the flora and fauna, prohibiting the contamination of waters (Art. 12 and 17 of the water Law); additionally to the dispositions of the CC that establish the sources of obligations as we will see further on. The effective laws then established obligations in accordance with the Law of Hydrocarbons of 1971 that in its Art. 71 imposed the obligation of "adopting the necessary measures for the protection of the flora and fauna and other natural resources", and "avoiding the contamination of waters, atmosphere and lands" (see Article 29, letters s) and t); Article 41 of the Regulation of Exploration and Hydrocarbon Operation, in the Supreme Decree of 1185, published in R.O. 530 of April 9, 1974, that established that it is obligation of the operator "To take all the measures and precautions of the case when undertaking its activities in order to avoid damages or dangers to people, properties, natural resources and to archaeological, religious or touristic interest sites"; Article 16 of the Water Law that establishes that "All person has to protect the hydrographic sources or river basins that are used for the water supply subjected to the dispositions as this Code, special laws and its regulations" the contract concluded in 1964, in its Thirty second clause letter g stipulates that the concessionaire is forced to operate the concession by using suitable and efficient machinery for the object". Seen like this, although this Presidency is conscious and agrees with the experts insinuated by the demanded part that there are no numerical laws, as it has been explained in the previous lines it is considered that this absence of regulations or numerical landlords, does not exonerate him to obey the other laws promulgated that period of time, reason why all the obligations of transcribing

in previous lines were effective and were indispensable to the operators of the Partnership for knowing "the level of elements that contained the water evacuated by Texaco", is not permissible as an the argument that the absence of "parameters", or the state supervision, has exempted Texaco of its obligation to fulfill the effective legislation, that required the oil company to operate using mechanisms in order to avoid damages to the flora and fauna, and to abstain from depriving waters of their qualities of potability and purity. In fact the control organisms imposed several penalties to Texpet as a result of the fact that its operations failed to fulfill the legal mandates. Thus, for example in the document 006047, sent by the Eng. Rodrigo Cisneros Hydrocarbon Chief, on September 10, 1975, to the Manager of Texaco, in which in relation to a spill it is mentioned: "That such negligence caused the petroleum spill and has taken place the contamination of the Earth with petroleum, in agreement to the stipulations of letter t) of Art. 30 of the hydrocarbon Law, infringing of this way of law [...](folio 155543), which contradicts the alleged thing by the defense of Chevron in this ruling regarding the fact that its defendant always fulfilled the effective legislation in Ecuador. The same way happens with document 01905, sent to the same Manager of Texaco, Michael Martinez, on March 15, 1976 by the Hydrocarbon Chief of a main directorate, imposing a fine to Texaco for "not adopting the measures necessary for avoiding the contamination of waters, in the Shushufindi field of the Oriental Region" (folio 155546). It is also taken into consideration the document no. 004335 DGHOCR, sent by Eng. Guillermo Bixby on July 25, 1974, therefore Mr. M.A. Martinez, Manager of Texaco, in which he addresses with "the intention of distributing the instructions corresponding to the Company, so that they avoid the contamination of waters in the Eastern region in the zones in which there are being carried out different works [...]; "(folio 155526), indicating the existence of a legal violation in progress, besides an order for this violation to stop. The mere existence of all these penalties imposed by the Government of Ecuador against Texpet and Texaco Petroleum Company, by means of administrative acts, aside from being prove of legal violations, demonstrates us that sanctioning the breach of a legal mandate, clear and express, like the one invoked in the administrative act in mention, it is not necessary a regulation nor any parameter. It is why when we

analyze the fault, beyond the existence of a legal obligation to act avoiding the damages to the environment, it will be necessary to take care of the predictability that had the demand of the potential damages that could be caused with the operational practices used during the Partnership (discharge in the atmosphere of the water of formation after the treatment used by Texpet, or the use of open swimming pools and without coverings), since it is evident that this knowledge had to be necessarily considered as an integral component of any established procedure in order to be able to evacuate to the surroundings, if this one tried to fulfill the effective legal norm. This way, the solution of this debate cannot be ignoring the effectiveness of the Law, as suggests the defense of Chevron, because the lack of regulation cannot be understand as an implicit authorization to prevail waters of their purity, or to use practices that have put into danger the health of the people. In addition, the judge is not allowed to support himself on a possible lack or darkness of norm in order to administer justice, since as our jurisprudence says: "Once initiated a civil suit, the Judge must solve it; he cannot suspend or deny the administration of justice nor by the darkness or lack of law, as stipulated in Art. 18 of the Civil Code" (see the Judicial Newspaper. Year XXXV.Series V. No. 127 folio 3025. Quito, March 21, 1936). Concordant way it has had In accordance with the Constitution, in its Article 28, that stipulates that "The judges, in the exercise of their functions, will limit themselves to judge and fulfill the judging process, in accordance with the Constitution, the international instruments of human rights and the laws regarding the norm or darkness of the same, and they will have to do it in accordance with the legal frame, according to the matter. The general principles of the right, as well as the doctrine and the jurisprudence, will serve to interpret, integrate and delimit the field of application of the legal frame, as well as to replace the absence or insufficiency of the dispositions that regulate one field". Understood like this the obligation that the judge has to apply the effective legislation at the time the partnership functioned to the acts of the defendant, by virtue of the literal tenor of the invoked norms, all pouring that will deprive the waters of their qualities, or that will damage the flora and fauna, causing damages or threatening doing so undetermined people, would be an act in opposition to the Law, even though Texaco has thought that the legislation was inapplicable to it then since its supervising was obligatory, and there is no legal foundation that admits that the possible lack of regulations is a sufficient justification for denying the application of the effective laws at the time the partnership operated. In addition it should also be mentioned another aspects debated in this ruling, since several of the different experts who have participated in this ruling have prepared the reports considering the effective parameters of

environmental quality, which motivated the misfortune and reclamations of the demanded part that has alleged in its defense the principle of non retroactive character of the law, which would prevent judging the acts of its defendant under protection of the provisions of the laws that were not effective then. Indeed it is agreed that would attempt against the principle of the most elementary justice judging the acts of Texpet under the protection of the provisions of the effective laws, reason why considering the retroactive application of the law, it should be clarified that these parameters have not been used in order to judge the acts of the demanded one. It is evident that the effective legislation does not contain the parameters that the operator of the partnership had to fulfill at the time of operation because they were nonexistent. As can be seen the effective Legislation at the time when Texaco operated by means of Texpet in Ecuador did not establish tolerable parameters, standards or maximum limits, but in environmental matter asked using the pertinent measures in order to protect the flora and fauna, prohibiting the contamination of waters (Art. 12 and 17 of the Water Law); additionally to the dispositions of the CC that establish the sources of obligations as we will see further on. The effective laws then established obligations in accordance with the Law of Hydrocarbons of 1971 that in its Art. 71 imposed the obligation of "adopting the necessary measures for the protection of the flora and fauna and other natural resources", and "avoiding the contamination of waters, atmosphere and lands" (see Article 29, letters s) and t); Article 41 of the Regulation of Exploration and Hydrocarbon Operation, in the Supreme Decree of 1185, published in R.O. 530 of April 9, 1974, that established that it is obligation of the operator "To take all the measures and precautions of the case when undertaking its activities in order to avoid damages or dangers to people, properties, natural resources and to archaeological, religious or touristic interest sites"; Article 16 of the Water Law that establishes that "All person has to protect the hydrographic sources or river basins that are used for the water supply subjected to the dispositions as this Code, special laws and its regulations" the contract concluded in 1964, in its thirty second clause letter G) stipulates that the

concessionaire is forced to operate the concession by using suitable and efficient machinery for the object". Seen like this, although this Presidency is conscious and agrees with the experts insinuated by the demanded part that there are no numerical laws, as it has been explained in the previous lines it is considered that this absence of regulations or numerical landlords, does not exonerate him to obey the other laws promulgated that period of time, reason why all the obligations of transcribing in previous lines were effective and were indispensable to the operators of the Partnership. Beyond this, as a parenthesis, there should be mentioned as it will be explained further on, this Presidency has not used the legal references made by the different experts insinuated by the parts to establish a toxicity threshold. Finally, when studying the applicable legislation in time for this case, it is considered that the application of effective parameters of environmental quality cannot be considered as an essential error in the report of any expert, since in this failure these parameters have not been considered for establishing infractions nor responsibilities, but have served for the judge to have another parameter of reference regarding the state in which the environment is, according to our own measurement of the reality. Without these instruments the judge could not have had any local reference of the pollution level or in the worst case he would have limited himself to talk about the norm of some other country with a reality different from ours. It should be underlined that the application of the effective instruments of environmental management doesn't even responds to the levels that must be reached by the remedy, since this Court takes care of the pretension of the demanding, requests the removal and the suitable treatment and disposition of the discharges and polluting materials that still exist in the swimming pools of Texaco, and the cleaning of the rivers, natural and artificial matting, lakes, marshes and waters, and understands that such does not imply using the effective norm as reference parameters in order to fulfill the remedy, so that the Court could use it as another parameter of reference, among all the others displayed by the parts , in order to determine the possible existence and magnitude of an environmental damage.- **SEVEN.-** The CIVIL RESPONSIBILITY, the FOUNDATION OF the OBLIGATION. In accordance with Article 1480 of the Civil Code, the obligations rise, among others sources, as a result of a fact that has inferred insult or damages to the person or his goods, as in crimes and offense; that is to say, by illicit facts, that are regulated by Title XXXIII, book 4 of the Civil Code (Articles 2241 to 2261). From the application of these Articles it is established that a fact that inferred insult or damage to another one is source of obligations, but there should be mentioned one of the most studied sentences in the Ecuadorian right, as it was the one dictated by the First Room of the Mercantile and Civil and of the Supreme Court of Justice, in the sentence dictated on October 29, 2002, published in R.O. 43, of March 19, 2003, which clarifies that "The Civil Code, which has followed the classical doctrine, deems illicit facts not

only the personal actions and omissions of the person in charge that intentionally or guiltily have caused damage to a third party, (Articles 2241, 2242, 2242, 2244 and 2245) but also to the damages caused by the people who are his responsibility, care or dependency (Articles 2246, 2247, 2248, 2248 and 2252), or the things that are in his property or which he uses (Articles 2250, 2251, 2253, 2254 and 2255)" out of which it seems that not for all case is required the direct fault of the person in charge, but in several cases the fault is assumed by acts of third parties or damages caused by things he uses. Thus, the sentence follows: "Article 2256 of the Civil Code contemplates, as we will analyze further on, the extra-contractual civil responsibility for risky or dangerous activities, in that the fault is presumed, which requires the victim to display means of proof of the negligence, negligence or inexperience; having to demonstrate then that the fact happened by major force, act of God, or by intervention of a strange element or by exclusive fault of the victim". It should be to remembered that Article 2256 of the previous codification of the Civil Code, corresponds at the moment to Article 2229, referred to in first lines of this sentence as a foundation in fact of this demand, that requires the recovery of the damages caused by the oil operations lead by Texpet in the Concession, in such a way that being invoked the extra-contractual civil responsibility by dangerous activities, we have to analyze if in the present case the requirements are fulfilled for applying it. For the analysis of such a delicate and complex subject we will take into consideration once again the analysis made by the First Room of Civilian and Mercantile in the mentioned sentence, because this one analyzes carefully and sets out with brilliance each one of the aspects that must be considered in the Ecuadorian procedural system, of the following way: "For the extra-contractual civil responsibility there should be gathered three assumptions or elements: 1. A damage or prejudice, material or moral; 2. A demonstrated or preexisting fault; and 3. A Bond, of casualty between one and the other". Therefore we will go to the analysis of each of these elements, as it is exposed next. 1. - The damage: the sentence of the First Room says that "The damage as a factual phenomenon is different from the legal damage. This one occurs only when certain indispensable characteristics are fulfilled, that must concur in the damage of the victim. The damage is legal and, like this, it will be repairable when it is certain. The certainty of its existence is an indispensable assumption, because the damage for the purposes of the responsibility is that one whose existence has been proved. Those that are hypothetical or possible are not repayable. In the matter of

damages it is insufficient to allege damage in abstract or a mere possibility; it is necessary the proof of the real damage suffered indeed; the damages that have not been demonstrated procedurally, with conviction elements that express an effective damage, do not exist from the legal point of view." Reason why we must take care of the fact that it is not enough alleging damage, but with the object of the responsibility it is necessary to prove it exactly, because this one will be repairable when certain. This Court observes that a great amount of different damages has been alleged and that there are several hundreds of bodies with evidence that must be evaluated before emitting a criterion properly based with respect to the existence of a real final damage suffered indeed. For this reason, the analysis of the existence of legal damages will be presented further on, when the test is evaluated as a whole, without forgetting that this is a requirement for the extra-contractual civil responsibility, that to form itself would come to complete this analysis. Nevertheless, beyond the configuration of the legal damage, this Court will consider that the damages can be present or future, as indicated in the First Room that clarifies us that "the first one is the one that has already happened, the one that has been completed. The future one is the one that hasn't take place, but appears as the foreseeable prolongation or aggravation of a present damage, according to the circumstances of the case and the experiences of life. The future damage is only formed in the measure in which appears as a consequence at least probable, of the antecedent fact, when it is known with objectivity that it would happen within the natural and ordinary course of things." This is the reason why this Court will have to study carefully, when evaluating the test and the reasonable possibility that there could appear new damages as a result of the antecedent fact. 2. - The fault: With respect to the second element, we considered that the extra-contractual responsibility can be subjective or objective, fraudulent or guilty reason why with respect to the fault there should be made an analysis regarding the will and consciousness of the demanded part in relation to the damages that are required, taking into account the sentence that serves us as foundation for this analysis, that tells us that "the extra-contractual civil responsibility, in our legislation, is subjective in its essence; that is to say, it requires the presence of the culpability as an element indispensable for its configuration. The culpability investigates the existing relation between the will of the subject and his act. This will is described as fraudulent when the subject wishes the act. And its consequences that normally is foreseeable, and is guilty when the agent causes the damage without the intention of doing it, but acting with imprudence, negligence or

inexperience, and can be added with infraction of legal or prescribed norms. It is a concept opposed to the fraud, because while the fault talks about the action or omission that causes damage without intention of doing it, in the fraud the infraction falls on the same damage that is caused. Meaning that fault consists in the omission of the indispensable conduct of the actor. It is the opposite conduct to the duty of preventing the foreseeable consequences; in this scope it is being observed that the prosecution part has alleged repeatedly that the demanded one was legally forced to avoid the damages that have been caused, apart from having affirmed that the demanded part knew and was conscious of the consequences of its conduct. These two aspects, once confirmed, would affect the level of the fault, being able inclusively form a fraudulent conduct. Beginning with the alleged obligation that the demanded one had to avoid the damages to the ecosystem and to the health of the people, when reviewing the effective legislation at the time of works of Texpet in Ecuador, we find out that this obligation existed indeed and was binding for Texpet, turning it into an indispensable conduct, that is to say, a legal obligation to fulfill. Nevertheless, the demanded part has alleged in its defense that "It is not legally acceptable, as regard the expressed things by those who try to question in this demand the TEXPET action, as an operator of the partnership, without properly basing the reasons of such attack, as requires the Ecuadorian procedural law. The public documents of settlement that I have been talking about, as well as the audits of diverse nature practiced during the Contract of concession of 1973 and after its completion, allows us to affirm that TEXPET acted as an Operator of the Partnership in the form that was allowed and authorized by the governmental organizations in charged by the law of the direction and execution of the hydro carbon policy formulated by the Ecuadorian Government that fulfilled the terms of the mandate that were granted by the titular companies of rights in the Partnership, that subjected strictly to the provisions of the contract of concession from 1973, to the effective laws of that time and to what was constituted by the operational practices within the industry in the years of the decades 1960, 1970 and 1980" (see the hearing of conciliation and answer of the demand at folio 259), reason why this Court has noticed that the defense of Chevron affirms not only having fulfilled all the effective legal and contractual norms, but also that operated with permission and under monitoring of the Government of Ecuador, reason why to abound in

this analysis there should be made not only an analysis of the effective legal norm during the years when Texpet operated, but later will be necessary to analyze also the effect of a possible monitoring or state supervision regarding the obligation of the defendant or the rights of third people. This way, in relation to the first subject, we must remember that we have already seen the legal norms that were effective in Ecuador; reason why further on, when valuing the test as a whole, there will be evaluated the fulfillment of these norms, since it is about the application of the historical legislation to facts confirmed in the file. In case of confirming that any norm has been infringed, it would be enough to form another pillar of the responsibility, the fault, because it is understood that it is about the omission of an indispensable conduct of the demanded part. Secondly, with respect to the monitoring or control of the Government of Ecuador on certain activities, it is clarified that after reviewing the file it has been possible to state that there isn't nor has been alleged by the demanded part any legal norm that maintains the hypothesis that the monitoring or the state control frees Texpet of its legal obligations. There doesn't exist, as far as this Court knows, doctrine or known cases in which the state control has released of responsibility the controlled subject, because this one is formed generally as an administrative responsibility that is exerted notwithstanding the rights of third parties. In fact, there is no legal foundation nor jurisprudence that maintains the theory that a mere administrative authorization imposes to third people the legal duty to support the damages that they cause, or worse, to deprive them of their right to request the repair of the same. On the contrary, we find out that the Spanish jurisprudence, that has developed this subject, set out by the Dr. Francisco Marin Castán, in the Sentence of the Room of the Civil (1st Section) of the Supreme Court of Spain, in sentence no. 589/2007 of May 31st (RJ/2007/3431), in which the sentence of December 12, 1980 is mentioned as well (RJ/1980/4747), that it indicates us that: "the legal ordering cannot allow a concrete form of economic activity, for the only purpose of representing a social interest, enjoy such a singular regime that is authorizing to suppress or reduce, without the right counter value, the rights of the individuals, on the contrary the public interest of an industry does not contradict the obligation of appealing to all the precise facilities for avoiding the damages, taking the measures that the technique imposes in order eliminate the emissions as it does not exclude the right exigency of repaying the patrimonial damage caused the proprietors of the neighboring estates, indemnification lacking any idea of fault for being a responsibility with objective note". They consider right the understanding of this sentence regarding the subject that worries us, that is to say, if the

administrative authorization of the activity would exclude the knowledge of the matter by the civil order, reason why Marin Castán concludes by mentioning another sentence, from February 19, 1971, where it is explained that "one thing is the permission of installation of an industry with the indication of the elements that must be taken into consideration in order to avoid damages and dangers, own mission of the administration, and another different one that when not fulfilling the requirements ordered or because the used elements are deficient or suffer from insufficiency, a damage in the property of third party takes place and a conflict is followed, its knowledge completes the organs of the civil jurisdiction". This criterion is welcomed by this Court, because it is understood that not even the observance and fulfillment of the applicable norm release the forced one of his responsibilities, or either of the civil actions that third party can initiate. This way, if we deepen more in the analysis of the file we find several administrative penalties imposed to Texaco by the acts of Texpet, but leaving out of danger the rights of third parties. Thus for example, it is demonstrates in the file folio 155551, that contains the notification of a penalty imposed to Texaco Petroleum Company, in which "there are left out of danger the rights of third parties so that they initiate the civil and penal actions", or also document 07557, of December 13, 1976, sent to the General Manager of Texaco Petroleum Company, Michael Martinez, by the Secretary of the Main directorate of hydro carbon, Ernesto Corral Bueno, where it is expressed with all clarity that "there are left out of danger the rights of third parties so that they initiate the civil and penal actions" (folio 155554).

The case of Resolution no. 3-77 of the Ministry of Natural Resources, of July 19, 1977 is identical (folio 1555555). The same way happens with the constant documents in sheet 155558 and 155562 further on. The presence of these documents in the file demonstrates that the demanded one knew before that it was not safe from claims of third parties, but on the contrary, the rights of those third parties were those that were out of danger. This Court recognizes that the penalties imposed by the Government of Ecuador to Texpet at the time of the Partnership do not imply a repair of the caused damage, but a mere administrative sanction that reflects a legal breach, without any damage being repaired. As for the will of the author of the damage, it is considered that the file does not demonstrate in any of its parts that the Texpet company has acted with the will of causing damage, reason why in principle there would not exist a fraudulent intention, nevertheless, we cannot stop observing other probatory elements displayed by the

prosecution part with the intention of demonstrating that the demanded one had knowledge of the potential damages that it would be caused by the form it achieved its activities, and in addition that had the knowledge and the technical capability to prevent them with a reasonable cost, which, in case of being true would cause that such damages wouldn't be only foreseeable, but avoidable, reason why, being legally indispensable to it should have avoided such damages under the protection of the effective historical legislation of the time, would be evidently a serious guilty conduct, that in civil matter is resembled to fraud. For example, from the file, sheet 155522 sent on March 21, 1983, by the Governor of the Ñapo, Ney Estupiñan Recalde, to the eng. Rene Bucaram, General Manager of Texaco, in which he says that "it is citizen clamor [or] Mr. General Manager of Texaco the serious damage that is being caused in the sector of Shushufindi by the contamination of the waters, rivers, matting, because of the split of hydro carbon remainders that is being the object on the part of workers of the CEPE-TEXACO Partnership". These words constitute a clear warning of the harmful situation in progress, and that needed to be corrected, reason why the man continues: "For the exposed situation I allow asking you to take the right measures for avoiding to be continued these damages, because there will be incalculable repercussions for the ecological system and mainly for the farming sector", denoting a warning and a very clear and precise order, to stop fulfilling activities that were causing damage, under the forecast that these damages could get to have "incalculable repercussions". This warning and order made to the defendant are difficult to ignore for this Court. We cannot either ignore that the actors have alleged that Texaco Inc. had the knowledge and the technical capability to prevent such damages with a reasonable cost, which in case of being true, would made the damages not only foreseeable, but also avoidable. Being thus, and legally indispensable to Texpet the duty of avoiding such damages under the protection of the effective historical legislation at the time the Partnership operated, it would be evidently a serious guilty conduct. However, before analyzing the probatory elements, let's see what the doctrine says regarding the criteria for the appreciation of the fault, as it has been gathered in the sentence of the First Room previously mentioned, that says that: "In the field of the doctrine, there have been recognized two criteria for guiding its appreciation. Basically the difference depends on the subject, at the time of achieving such examination of predictability: a model

abstract or concrete, the agent. In the first model, also called objective, the general predictability is taken into consideration from the example subject or prototype. It is a calculation of an anticipated vision of the probable results according to the average attitude of the people; for example, the good father, the wise man, etc. The concrete model or subjective model accepts guilt in relation with the agent. It does not present itself with any ideal or abstract comparison, paying attention only to the particular conditions that surround the bad effect. In this case, according to the objective criteria, we need to calculate the predictability according to the average attitude of a "good oil company" of the time, according to the subjective criteria we will only pay attention to the knowledge that Texpet had and the particular conditions surrounding the bad effect, as we did in the previous lines when we referred to the current legislation and the bad surrounding. Following the objective criteria, this court finds that to form a proper idea in time with respect to the predictability of the damages in conformity with the average attitude of a good oil company, we can't pay attention to what was said by the different experts of the court that have served insinuate by the parts, they contradict each other, each one shows different perspectives of the same historical moment. The presidency observes that the "First book of Oil and Gas production" (original folios 140620 to 140698, legal translation 158756-158834), it does not correspond to any legal part in this lawsuit, which has been written in 1962, this is before the start of operation Texpet in Ecuador, which gives us certainty that It is an objective and impartial text, which reflects closely what can be expected from a "good oil company", it is considered with care the fact that warnings had been written about the formation of waters, alongside recommendations that "Extreme care should be employed to handle and disposition of the produced water not only because of the possible damage to agriculture, but also because of the possibility of contaminating lakes and rivers that hold drinking water as well as water for irrigation" (original folios 158811). In the case of proving that the demanding part has not taken the extreme care for handling of the formation water it could be inferred that the warnings were ignored and the recommendations were not carried out as would be done by a "good oil company" being responsible of the blame according to the objective criteria.

We have also considered the subjective criteria, of which is influenced by the fact in the "Special Problems" chapter of this book which has been written by T.C. Brink, of Texaco Inc. it consists of an express appreciation in the beginning of the book, and it is this precisely this part of the text which contains the warnings which have been summoned by this court, we reach the conclusion not only that Texaco Inc. had previous knowledge of the damages that could be caused because a decade earlier their own officials wrote books warning of the situation, this was the state of the technique according to the American Oil institute. Many declarations are taken into account of which the defendant has made with their defending attorneys, denying that is was not done in bad faith, not even because of lack of skill, it is evident that this argument it not enough to free the defendant of juridical responsibilities. "The defendant can always allege that he/she did not mean to cause harm, as in the alleged misconduct, the important part is the negative result from the subjective for not having been careful enough to adopt the necessary measures to prevent it". Due to this, beyond the classification of the act as misconduct or guilty, the important part is the negative result obtained as a consequence of misconduct. In this sense we declare that "the guilt" and "misconduct" are not opposed concepts, but rather different in the manner of acting but definitely both attitudes cause harm", leaving an objective jurisprudence approach to the extracontractual responsibility, in which the way of acting is not relevant, but rather the consequences of the act. In the sentence of the First Room which as served as support to refer to civil responsibility in this decision we find a masterly exposition with respect to this new type of responsibility, which considers the new social phenomena, the principles of our civil right and the legislation of other countries, of which we eco due to their lucidity. The modern world and the one that is close with its extraordinary and progressive accumulation of risks demands a better defense of human values, created by a technique that facilitates everything, on the other hands attempts against it. The multiplicity of real dangerous contingencies and risks that are warned are hazy due to dissatisfaction and are at the edge of compensatory idea, this took a slow evolution of elements and knowledge facilitates the most advanced juridical systems by entering into socialization regimes conducts the risk victim so that he/she is not unprotected.

This gave rise to the theory of risk, according to which who uses, and makes the most out of any class of media which provides benefits, generates thru it social risks, and due to the circumstance it should assume the responsibility of the damages that they caused, the benefit that comes from that activity has as a counterpart the reparation of damages caused to the individuals or the stockholders. It is the risk benefit, which has its origin in the Roman maxim *ubi emolumentum ibi llus* [where there is a benefit comes a responsibility]. The risk of the thing is a lawful danger and socially accepted as a counterpart of the social or economic benefits that imports the operation or use of the dangerous things. For the recognition of the civil extracontractual responsibility it is not necessary there to be guilt or misconduct, it is enough to see the damages caused by the direct consequence of the event that originated it. It is the objective responsibility. The theory of pure objective responsibility has had little acceptance in the legislation of most countries and in the jurisprudence of foreign tribunals. The need for guilt is considered a major demand of justice with respect to the responsible person. But the load of guilt results in most cases almost impossible or very difficult for the victim, the need to revert the load of guilt was considered, in the sense of who uses it and, it makes the most out of the risk to who ever it corresponds to show that the misconduct was produced by higher power or a case of chance, by a third guilty party or by exclusive guilt of the proper victim. In other words, the guilt was established of the person that uses and makes the most out of risk because the harm was done. This theory has been imposed increasingly particularly in jurisprudence, as what has happened in the sentences dictated in the supreme courts of France, Argentina & Colombia. I totally agree with those positions, and this is the reason why we adopt the sustenance of this decision, in view that the production, industry and operation of hydrocarbon substances constitute with no doubt, activities of high risk and danger. Regarding this subject, the author Arturo Valencia Zea, comments the dispositions of the Colombian Civil Code on out-of-contract liability which are similar to those expressed on Title XXXIII of the Ecuadorian Civil Code, he expresses "The main source of harm was found in the act itself, people that found themselves under the care of another, and other things, such as animals and ruins of buildings. But the nowadays, especially in the XX century, it created a new and form of harm:

Those caused by activities or dangerous explorations, they have origin in the use of all kinds of vehicles, machines and new energies as what happens with automobiles, trains, aircrafts, transportation by sea and rivers, electricity, constructions, etc. To decree the compensation of this class of harm the criteria of guilt was insufficient, because the cause most accidents are unknown, it has been said that modern man "uses powers in which he himself doesn't know the power or nature of it". The criteria of simple presumption of guilt, as what happens with harms caused by a third party, it results impotent, because the owner of the exploration (train company, automobile company or factory, etc.) can show that is has taken the measures to avoid accidents and these have been fulfilled in spite of taking all the previsions. The need to establish a new type of responsibility for this class of harm, eliminating the criteria of guilt by means of a responsibility of full right or establishing an absolute presumption . The owner of the exploration or industry should respond directly to the damages that are caused by the mentioned industry or exploration, it can only be exonerated of guilt if it is shown that the cause was not because of the exploration, but rather a strange act (unforeseeable events , third party guilt or the victim). The owner of the exploration is not exonerated of guilt accrediting the absence of guilt, as occurs with the responsibility of a third party what is referred by Art. 2347 and 2349" (Civil Right, Number III, of obligations, Bogota, Temis, 8th edition, 1990, pages 230 and 231). The Articles mentioned equal the Articles 2247 and 2249 of Ecuadorian Civil Code. "These are currently equal to Articles 2220 and 2222. The sentence continues to explain how a special responsibility was configured due to damages done by risk industries, based on the thesis by Zuleta, giving a new interpretation to the equivalent of our Articles 2229 from 2 criteria, the first one: "I. The placing of the Articles 2341 to 2356 [2214 to 2229 of the Ecuadorian Civil Code]", as follows: 1. The Article 2341 [2214 of the Ecuadorian Civil Code] refers to the damages caused through proper acts which in general have the same sense or spirit as human conduct which constitutes the sense of criminal liability. It is the common law. 2. Articles 2347 to 2349 [2220 to 2222 of the Ecuadorian Civil Code] refer to damages caused by third parties and parents should respond for minors, tutors or sitters, masters or patrons, school principals, etc.

3. Articles 2353 & 2354 [2224 to 2226 of the Ecuadorian Civil Code] state norms about the damages caused by animals, of which their owners should respond to holders. 4. Articles 2350 & 2355 [2221 & 2227 of the Ecuadorian Civil Code] comprise of the damages caused by the ruins of the buildings and things that fall from the top, of which the owners are responsible of the constructions or building. 5. It is natural to think that the Article 2356 [2229 of the Ecuadorian Civil Code] refers to a different class of harm; and these are caused by dangerous activities and explorations". The second one: "II. The same examples as Articles 2356 [2229 of the Ecuadorian Civil Code]. We will examine the last two examples of this legal text, according to which respond to damages caused: a) whoever removes the slaps from a draining ditch or pipeline, or covers it in the street or path, without the necessary precautions so that it doesn't fall on any pedestrian, b) faulty construction or reparation of an aqueduct or fountain that flows thru the path "it is in a state that can cause damaged to a pedestrian", these are dangerous activities at the time that the code was written; the doctrine and jurisprudence resolved to extend the applications to other exploration industries or activities that are specially dangerous in these times" (folio 233). Likewise, we transcribe the pertinent parts of a decision dictated by the supreme court of Colombia, related with the theory of guilt due to dangerous activities: "…the sentence will not be annulled, the result is that the harmful elements and link to the cause, are already established by the Tribunal and are not disapproved for annulment, it will be integrated with the guilt to the society in demand based on the pretension of the severance pay to the actors in a dangerous activity of which is applicable the Article 2356 of the Civil Code [2229 of the Ecuadorian Civil Code]… this Article is for the Colombian jurisprudence the same as Article 1384 which is for France, a reason for studies found, a special attention should be placed on trying to find the dispositions of all the problems with legal characters that are presented by industries and modern times with the appearance of machines and inventions that carries inevitable and unknown dangers. It is a resumption of Article 2341 ib. (2214 of the Ecuadorian Civil Code] that marks the obligation of a severance pay, due to the repetition of the substance part that holds both dispositions. Nevertheless, the court has sustained several times the distinction between both norms; because one refers to the fact of the man that

has determined guilt proved by the victim, instead, the second refers essentially to "a damage" attributed or malevolence or negligence of the person that caused it. The use of the word "impute" means a presumption of malevolence or guilt against themselves, for of exercising a dangerous activity or the handling of an object that carries danger, that can only be distorted by means of proving e of some causal absolving responsibility, such as unforeseeable circumstances, fortuitous, the fact or the fact exclusively to the victim. System which is favorable to the victim because only has to prove the damage and the resultant link of causality in order to progress the compensating action (Dario Preciado Agudelo, Damages Recompense. Contractual Civil Responsibility, extracontractual and criminal, volume II, Bogota, Library of Professional Editions, 1988, pages 805 and 806). The defendant has manifested the activities of the hydrocarbons that caused the damages, they were legit activities. Authorized by the law, nevertheless this courts considers that the fact that it was a legit activity simply implies that the "risk of the thing is a legit danger and socially accepted as a counterpart of social and economic benefits" and it does not mean that the activity by being legit it is not exempt of the responsibility of who does it, all the contrary, the development of the right has been established "the guilt of the person that uses, and makes use of the benefit of the harmful act for which the harm was done". Considering that "production, industry, transport and operation of hydrocarbon substances constitute without a doubt, activities of high risk and dangerous" the necessity is imposed to establish a new type of responsibility because "the criteria of simple presumption of guilt, as happens with the damages due to an external fact, become powerless, because the owner of an exploitation (railroad, automobiles, factories, etc.) can well demonstrate that has been careful to avoid accidents and that these are made in despite of the previsions taken" and for that reason the defendant "only can be exonerated of responsibility demonstrating that the damage was not caused by the exploitation but rather for an odd circumstance (unforeseeable event, third party fault or of the victim itself), because the absence of guilt does not exonerate of responsibility to the owner of the exploitation, for as it was already explained, the system works in favor of the victim of the damage for only has to prove the damage and the following link of causality in order to thrive a compensatory action. For the aforementioned, it is truly convenient to analyze the causality. The causality: The First Courtroom indicates that "The principle that has to be a cause and effect relationship between the offense

and the damage are clear and indisputable", for we understand that the causality relation between the offense and the damage is one of the presumptions that should concur to the extracontractual civil responsibility, for it deserves for us to study the reach of the causality relation in this case. The Sentence in the Fist Courtroom notes that "the difficulties arise, many times in the practice to determine to which point an offense can be caused by other. In the majority of the cases the facts are not presented pure or simple but rather mixed or combined with other events; with advantage or limited by other concurrent, underlying or preexistent facts". Likewise in this case, the events are not presented alone but rather mixed or influenced by a series of facts that have been pleaded in their defense by prosecutorial parts. It has been pleaded in one hand that the environmental damages are not simply those impacts suffered by the ecosystem, but also are part of the same damage all the consequences that the same cause, while in the other hand it has been pleaded the possible impacts in the ecosystem are not capable of causing more damage, proving two opposite perspectives on a same subject, for before the complexity of this discussion we are lead again to look at the jurisprudential development that this matter has had. "The problem has been discussed at lengths by the doctrine, and has originated numerous different theories. The main ones are: 1. - Theory of equivalence of conditions, or *conditione sine qua non*. According to this theory a fact can be considered a cause of a subsequent one when the lack of the previous fact would avoid the subsequent one. Any antecedents that respond to these conditions should be considered cause of the damage. If there are several prior facts, there is no reason to prefer some and exclude others; for that reason it is also called the equivalent conditions theory. This theory has been criticized because extends the causal relation to the infinite, including the so called preconditions or cause of the causes. 2. - Theory of the next cause. The indefinite propagation of the causality, typical of the previous theory lead to other: only the closer cause is relevant. This theory has been dismissed for the simple reason that the latter condition is the cause of the damage, but not always the same carry all the damaging power. 3. - Theory of the efficient cause. The aforementioned difficulties have been tried to be solved maintaining that a cause should be considered to the one with greater efficiency to provoke damage. But the gain is not that

much with this theory because it only translates the difficulty: What will be the base to consider one cause more efficient than the other? 4. - Theory of the adequate causality. This theory, which we agreed with, is the one that the majority of the doctrinarian authors and the jurisprudence of foreign courts prefer. It consists in leaving in the hands of a judge the analysis of the subject when the damaging fact has an aptitude to generate responsibility in the author, from which results in omitting all general rules and the confidence in the discretional authority of the judge. After all, according to this theory it should be obtained as criteria to establish responsibility, first of all, in an objective analysis related to the external character that connect to the causal link. Starting from the obvious fact that there is not a positive rule that indicates the judge which theory of causality should be applied, it is imposed the discretional authority as indicated by jurisprudence, but without releasing the Judge from backing up his decision, for what this Presidency before exercising such discretional authority, will consider the theoretical development of the matter, because as recognized by the aforementioned sentence: "As a matter of fact, the theoretical development of the matter has not concluded. So much so that new explanatory and coadjuvant theories have emerged in France according to necessities and demands that the present world conceives. From these theories we mention the following: the so called "Of the guilty creation of the unjustified risk of the dangerous condition", in which context is accredited the causal link when the causal result preceded the configuration of an unjustified risk, as well as the guilty creation of a condition that certainly included danger; the theory of "Follow up or the continuous mark of the harmful demonstration". This theory maintains that the march of the evil should be followed without discontinuity and starting with the final damage is necessary to go back to the chain of causes explaining each offense by the defectiveness of the prior offense to the possible appearance of a breach in the causal chain". We believe that we are in fact before one of these demands and necessities that the present world conceives, and for what the Administration of justice should find a solution with the available sources of the law, for which it cannot be spared the study and consideration of these theories, since the judge has the discretion to apply them when he/she considers that could better be adopted to the circumstances of this trial. The theory "Of guilty creation of unjustified risk of a dangerous condition" indicates that when is created a condition that includes danger, any harm that happens would be understood as a causal result of this risk, i.e., in this case, the creation of a dangerous condition, such as an industrial zone of the oil industry with the impact

that generates to its surroundings, the only existence of harm would be enough to accredit a causal link between this and the created danger. Considering that in the book we are referring to in prior lines (folio 158811), "Primer of Oil and Gas Production", written in 1962 in some degree by one of the executives of the defendant company, acknowledged the dangers and problems in handling the formation water, in application of this theory would be correct to say that the defendant has ample knowledge of the risky situation that was creating, for what any damage inflected to the sources of water as consequence of spilling the formation water would be considered having its cause in the situation of danger consciously created. In the other hand, the theory of "Follow-up or of continuous mark of the harmful manifestation", tells us to start with the damage and to go back tiding the facts for the defectiveness of the prior one, thus in this case we should study every damage that has been proved, and at all possible to go back to the facts that provoke them, establishing whether or not they can be attributed to the defendant, for in this case we should start from each independent legal damage analyzing the facts that provoke them and to determine if the defendant is responsible for them. Finally we refer to two theories that have been developed by Anglo-Saxon jurisprudence referring to causality of damages to people's health: theory of substantial factor and of the most probably cause, which are legal theories of causality developed in U.S., Australia and England, given the necessity of emphasize the difference between legal causality and scientific causality. So, the theory of substantial fact does not require a simple scientific causality but rather the reasonable medical probability that the defendants conduct has been a factor that substantially contributed to increase the dose of damaging substances and therefore the risk of develop illness. Among the required elements for the application of this theory we count two: 1. the reasonable medical probability, which means that should more than a mere possibility, which is measured starting from 50% of possibilities, for which it is evident that in applying this theory should be rather probable than improbable that the conduct of the defendant contributed to the generation of the damage; 2. The substantial factor, which implied that the damaging element cannot be neither merely theoretical nor play a secondary role generating the damage. According to this theory these elements should be considered without the necessity of proving which one has been precisely the one causing the damage, due to the irreducible lack

of scientific certainty regarding to which of the elements used by the defendant provoked the damage, in regards to the theory of the most probable cause, the Australian jurisprudence indicates that causality can be establish by a inference process, which combine concrete facts even when to none of these can be attributed the causality by itself, which means that not necessarily this single pollutant agent that causes the damage, but rather it was enough contributing factor, which means that the defendant participation would be minimum, trivial or insignificant factor. After this analysis that barely resume the different theories that can be applied, it becomes evident that due to a complexity of the case, to the nature of the damages and the diversity of theories, it is imperative that in considering the causality of the damages we do it studying separately each kind of damages, because none of them are equal nor have the same causality, so within this theoretical frame, this aspect also will be revised later on, to analyze the proof as a whole searching for signs of the causality.- **EIGHT**.- The claim brought on the lawsuit allows us to restrict the discussion strictly to those aspects that the plaintiffs require leaving out any possible damage which reparation was not claimed. Thus, we answer the claims transcribed at the beginning of this ruling, but observing that the claim brought in the lawsuit cannot contravene the Law, observation that is done in relation to the claim that "The necessary resources to cover the costs of activities which execution is claimed, in the amount partially determined according to the penultimate paragraph of Article 43 of the Law of Environmental Management, should be delivered to Front of Defense of the Amazon, for that, with the help and advice of specialized international institutions, be applied exclusively to determined purposes in the sentence". Because the Law of Environmental Management on the same Article 43 give the judge the faculty of determine the natural or legal person who should receive the payment and make the repairs, indicating that "the Judge will order that the payment, for which the civil repair applies, be made to the institution which would perform the repairs according to this law", without being mandatory for the judge to abide to the claim of the lawsuit, but rather to comply with the Law. In this point it is also considered that the Government of Ecuador has proceeded to release Chevron of all responsibility through the contract of environmental remediation signed with Texaco Inc. in 1995, likewise with the contracts subscribed between the municipality of Shushufindi, Joya de los Sachas and Coca, and the Naval Command of Sucumbíos and Texaco, as stated in body 70,

that is why "the company that should perform the cleaning activities" could not be a public entity because the Government had declared as satisfactory the remedy activities according to the terms established in the contract but not likewise the plaintiffs who are demanding for a through cleaning that restores the natural characteristics and conditions of the area affected by the petrol company started by the company TexPet as operating company from the group. From whence two fundamental elements arise: 1.- The payment which eventually be ordered can not be done to any public not government entity because in the file it is stated that the Estate had freed Texaco and thus Chevron of all their responsibility related to the environmental damage subject of this suit, so the profit or advantage by the Estate resulting on a condemn against the suit in this trial would result in the failure of the dispositions contained in such contract, antijuridic situation that this court is not willing to provoke and 2. The jobs of cleaning or remediation performed by Estate institutions, as any other Estate activity, should be circumscribed to what the Law permits, limiting its action path to where Laws allow as it is happening in the case of remediated pools as part of the different projects of remediation performed in pools by the company Petroecuador (CEREPS, PEPDA), according to the experts report handed to this court by the expert Gerardo Barros. In addition, it is noticeable that these projects are centered in the remediation of the polluted soil in the pools areas not considering other aspects that need to be considered by this court in attention to that requested in the suit. In the case of the repair of damages requested by the plaintiffs we find that they are not after an environmental repair that only comply with the environmental parameters established in the norm in force but they have asked specifically: "the elimination or remotion of the polluting elements that are still a threat to the environment and to the inhabitants health" for which they demand the remotion and the adequate treatment and disposition of the waists and polluting materials still existent in the pools or open ditch by Texaco and the sanitation of the rivers, lakes, swamps or any natural or artificial course of water. Exactly, the demand asks that in the sentence it is ordered "The execution in the pools opened by Texaco the jobs necessary to recuperate the characteristics and natural conditions that the soil and the environment had before being damaged", for which based on the

proof rendered by the parts related to the works performed by Petroecuador remediating the different fields, we can see that all cases are consistent with that established in the related laws without the objective being to recuperate the characteristics and natural conditions that the soil and the environment had before being damaged. Thus the institution or entity that should get the payment should be an entity independent from the Estate but dedicated precisely to those jobs needed to repair the damage in the required terms. **NINE**.- Valued the proof as a total and according to the healthy critic we are convinced of the existence of the following facts: 9.1 TEXACO PETROLEUM COMPANY WAS THE OPERATOR DESIGNED BY THE CONSORTIUM FOR ALL THE OPERATIONS OF THE NAPO CONCESSION. Both parties coincide in pointing dates, limits and main parts of the concession, which in historical order are stated in the different Official Records as the Official Record 186 of February 21, 1964 by which the Ecuadorian Government made a concession of over 1 million hectares to Texas Petroleum Company which ceded in the same act its rights to Texaco Petróleos del Ecuador and Gulf Ecuatoriana de Petróleos; the OR. 209 of June 26, 1969 which reduced to 561,661 hectares; then OR 362 and 370 of 3 and 16 of August 1973 accordingly when new contracts were signed and an area of 497,301 hectares was set which is the area that has been known as the Napo Concession (In this sentence referred only as "the concession"), that in the first instance belonged to a group formed by Texaco Petróleos del Ecuador and Gulf Ecuatoriana de Petróleos, and then by the previous and CEPE and finally this last would absorb GULF turning into the major partner of the consortium. In this same way this court pays special attention in the fact that is has been proven, by the Napo Agreement, between Texaco and Gulf in October 22, 1965 in its clauses 6.1; 6.2 and 6.4 [see translation in the body 93, folios 10154-10194] that the concessionaries agreed since the beginning in delegating all the operations to the company TexPet subsidiary in fourth level and absolute property of Texaco Inc., which was the one that performed all the operations of the consortium under the surveillance and State control from the beginning and to the end of its operations as it is recognized by Dr. Adolfo Callejas in the conciliation audience when answering the suit, saying "I think it is necessary to mention to you, Mr. President, that for the operation of a consortium it is international practice commonly used in the oil industry that one of the parts are designated

as operator of the same, subject to all mandates of the co-owners which in all cases maintain the full responsibility for those operations performed in its name […] from the Joint Operations Napo Agreement it is detached that the operator was "…the agent and exclusive contractor of both parties" and it was ordered by their commanders "..to carry on the obligations of work of the parties…", in consequence the action of Texaco Petroleum Company" as technical responsible and executor of the operations for the consortium" and as in charge of "the design, construction, installation and operation of the infrastructure and needed equipment for the exploration and exploitation of oil" it acted as Agent of the co-owners or commanders and with the previous consent and approval of Corporación Estatal Petrolera Ecuatoriana, CEPE, after from Petroecuador in its capacity of co-participant of the above mentioned consortium" [folio 247]. Thus it is judicially proven that the operation of the concession was in charge of Texpet which has been corroborated by the experts that worked in the different judicial inspections and in which reports they coincided   in pointing that Texpet was the responsible to execute the operations of the Consortium until June 1990. This fact has not been controverted by the parties but it is clear that the defendant party even they are recognizing to be the operations for the Consortium has argued indistinctively that acted as a commander and under surveillance of the partners, as in folio 244, when they say that "Petroecuador was a major participant and as such beneficiary of the Contract of Concession of 1973, that legally was operated by Texaco Petroleum Company (TEXPET) until June 30, 1990 and after by Petroecuador until June 6, 1992 date the Contract of Concession of 1973 ended by compliance of its term of enforcement". With respect to the surveillance and control from the State we had referred in lines before but as its acts as commander or Agent, we refer to clause 46.1 of the Contract 1973 quoted by same Dr. Calleja in folio 247 recognizing that such obligation says "The contractors should adopt the convenient measures for the protection of the flora, fauna and other natural resources and they should avoid polluting the water, the atmosphere and the soil under the control of the pertinent State entities", reminding that all agent or commander is obligated to act according to the mandate and to the laws enforced, being personally responsible when its acts exceed or contravene the limits of the command according to what is stated in Articles 2020 and 2035 of the Civil Code that foresees "that the Commander will adhere rigorously to the terms of the command unless it is authorized

differently by law". If the volunteer of the committee stated also in the abovementioned clause 46.1 of the contract that should prevailed. 9.2.- EXISTENCE OF ENVIRONMENTAL DAMAGES. Having reviewed the different reports handled to this court by different experts hired by both parties and appointed by the court, and also those designated by the court without an appointment by the parties, it have been proven the existence of environmental damages that have their origin in the activities of the oil exploitation performed during the operation of the concession as will be explained later when the results of the lab analysis of the taken samples by the experts are evaluated. Before we must make clear that this court has not considered the conclusions presented by the experts in the report because they are contradictory one to the other, even though they refer to the same reality, reason why we have omitted the appreciations and personal opinions of each expert and we have taken the technical content of the reports, specially the results abovementioned, thus the judge has been capable of arriving to his/her own criteria according to the rules of healthy criticism. Under this perspective and before evaluating the existence of damages according to the proof rendered to the file we should define what environment is and what can be understood as damage to it. According to the "1999 Ecuador Human Development report" in folio 3208 which is documentary proof added to the file by demand of the defendant party we can understand from a holistic perspective that environment is not only the flora, fauna and scenery in which these develop, but the environment is also constituted for the institutions, the economical, political and social relations, the culture, amongst other values that act between the individuals and inhabitants of the human species. Based on this definition it would be accurate to define environmental damage in general terms as total loss, decrease, detriment, perjury, inferred cost, to the environment or to any of its natural or cultural components. In this trial, it has been demanded the elimination or remotion of the polluting elements that still threatens the environment and the health of the inhabitants (see the sue claims VI.1. and VI.2 accordingly in folio 79 and 80). As the repair of environmental damages according to that stated in Article 43 of the LGA in its first part reads: "The natural juridical persons or natural persons or human groups attached by a common interest and affected directly by the action or mean omission may submit

before the appropriate judge actions for harm and damage and for the detriment cost to the health or to the environment including the biodiversity with its constitutive elements", all of which is fully in agreement with the holistic perspective of the environmental damage definition proposed in previous lines, and also according to that established in the Constitution in force at that time (numeral 2 of Article 19 warranties the right to leave in an environment free of pollution of the Political Constitution of Republic of Ecuador of 1984). This leads us to understand that the environmental damage should be considered in all its complexity including the different forms and derivatives this might have in its environmental components because we understand that this cannot be considered isolated but in linkage with other rights as the right to health. This criteria is in accordance with the Constitutional Court Resolution #1457, of 18-08-2009 that reads "According to the regulations to apply the mechanisms of social participation established in the environmental administration law, the collective environmental rights are those rights shared by the community to enjoy a healthy and pollution-free environment and involves aesthetic, scenic, recreational, cultural, physical and mental integrity and in general, quality of life. And defines the ENVIRONMENTAL IMPACT as any positive or negative alteration of the environment provoked directly or indirectly by a project or activity in a determined area, meaning the environmental impact is any human action that produces alterations over the physical and human environment". Thus, and considering also that the obligations emerge from the real concourse of volunteers or two or more persons as the contracts or conventions, and as a results of a fact that had harmed or damaged another person as in the felonies or quasi-felonies (Art. 1453 of the Civil Code), we reach the conclusion that in case of prove of judicial damage in different components of the environment and also proof that it is done by the actions performed by the defendant company, it will be funded according to law, the obligation to repair the damage on such components. For the complex task of evaluating the presence of environmental damage, it is considered firstly the existence of over 100 expert reports in the file that are an important part of documented evidence given by experts proposed by both parties and also by experts appointed by the court so in a jointly fashion their data is trustful and allows the judge to reach the conviction that there are different levels of polluting elements from the oil industry an the area of the Concession.

The presence of these polluting elements shows us the existence of damages in the soil, which are integral part of the ecosystem and thus it potentially translate as damage in various components of the environment, depending on the level dangerousness on these elements and of the level of exposition of the person's and the ecosystem to those may result also lessening in the human health or the local flora or fauna. For these reasons the court considers that the sites that show a direct impact (like the soil surrounding the pools) and other hydric resources had not been the only juridic asset damaged, but the damage frequently reached other aspects of the ecosystem as the flora and the fauna and eventually different aspects of the society that depend on it. Thus, we proceeded to the analysis of the different expert reports considering that the environmental damages object of this trial are not only those caused by a direct impact to the ecosystem but those that for its nature this kind of damages cover also all those that are direct consequence of the environmental impact. To this respect we appreciate that this is a technical topic for which we review the different expert reports presented throughout this trial. Starting with the presence of pollution in soil this court observes the findings of the different experts that had participated on the judicial inspections performed within this trial and had presented the results of their experiences. We observe that in the reports presented by those experts proposed by both the plaintiff and the defendant parties they report the presence of different concentrations of hydrocarbon and or the products utilized during the perforation or conditioning of the oil rigs. Before starting the revision of the results presented in the reports it is convenient to remember that this presidency uses distinct maximum limits allowed established in the Ecuadorian current legislation only as a reference to meet the real condition of the area of the Napo Concession, and not for perform the compliance of such norm by the defendant party since by retroactivity principle, these norms cannot be applied to facts prior to their promulgation. Nevertheless and in virtue that they were legal dispositions in force and applicable *herga homes* in the operational period of Texpet it is considered that it was prohibited to eliminate towards the air, the soil, the water, the solid liquid or gas residues without previous treatment that turn them in innocuous for the health (Art. 12 The Health Code O.R. number 158 of February 8, 1971). Regarding petrol,

The hydrocarbons law published in the official register number 322 from October 1, 1971 was in force that clearly imposing obligation of "legation of adopt the needed measures to protect the flora fauna and other natural resources", and "avoid the pollution in water, atmosphere and soil" [see Art. 29, letters S) and T)] dispositions that are similar to those found in the coding after the hydrocarbons law published on the official register number 616 of August 14, 1974 [see Art. 30 letters S) and T)] and the official register number 711 of November 15, 1978 in its Article 31 letters S) and T) being a constant in the hydrocarbons enforced in Ecuador. By rule there where also established norms to be considered in oil matters where it was the obligation of the defendant "take all the providences and precautions while performing their activities to avoid damages and dangers to people, property, natural resources, and archeological religious or touristic sites." (see Art. 41 of the ruling on exploration and exploitation of hydrocarbons) in supreme decree 1185 published in official register 530 of April 9, 1974), while by contract where linked by clause 46.1 which read "the contractors will adopt the convenient measures to protect the flora fauna and other natural resources as well as avoid the pollution of waters, atmosphere and soil under the control of the appropriate State entities". Finally it is considered by the limits of the rights of the defendant where limited according to the established in the O.R. number 186 of February 21, 1964 in clause tenth reads: the concessionary have the right to the effects of this contract to use the land located in the areas subject to clauses first and second as well as the waters, woods and other construction materials found there to use them in the exploration, exploitation and development of its concession without limiting the towns of the waterfalls indispensable for their domestic errands, irrigations, nor making the navigation difficult nor take the qualities of potability and purity to the waters and do not obstruct the fishing activity". Thus it is established that the sue had the obligation of foreseeing and avoid the presence of dangerous products for the health and/or the ecosystem used during the oil exploitation in sites operated by Texpet so the presence of these types of substances that might put in danger the life and/or the health and/or affect the development of the flora and fauna more than revealing the existence of infractions to the mentioned norms constitute proof of a juridic damage that as such carries the obligation to be repaired. Even though it is correct to confirm that

many of these components (barium, cadmium, lead, chrome, etc.) are in a natural form in the environment and they are in fact necessary for the development of the biological life if they surpass certain limits might be dangerous, for example, the hexavalent chromium is object of very strict limits around the world, because it is a very corrosive for the tissues and a known carcinogenic. It is also important to recognize that the hexavalent chromium as a carcinogenic that the defendant has mentioned through its attorney Dr. Diego Larrea, during the judicial inspection of the ditch Cononaco 6 (see folio 123108) previously to evaluate the concentration of these and other chemical substances present in the soil we consider the specific criteria contained in the document named "evaluation of international norms applicable for the closing of pools in the oil camps 1994-1998" presented as annex or appendix by the expert appointed by Chevron, even the content doesn't show any value of reference for chrome VI. In the same way that we accept the impugnation of such document because it was written by the interested party in the result of this trial, as it is stated in the file King and Spalding had sponsored the defendant in various legal actions in the U.S. that had direct relation to these costs (see folio 4729). Its also interesting that each document has served as a base to the different experts that acted by appointment of the defendant. In the case of the chrome VI the criteria of this court is any amount bigger than the one found in any natural form in the environment should be removed because of the dangerousness that it presents, even its disposal was not regulated by the laws enforced in that time nor had chrome VI been considered by the "Evaluation of the international norms applicable for the closing of the pools in the old camps 1994-1998 by basic criteria of justice, legality, decency and respect for the human life, it is understood that since this is a known carcinogenic it is a dangerous substance which handling the defendant should had taken care of according to the legal dispositions in force, so any disposal of this substance that might put in danger the people or the ecosystem produced an obligation to repair this situation, independently that the product that cost such risk is or is not regulated for the norm in force at that time. We take into consideration the defense of the defendant in charge of Dr. Alfonso Callejas, who during the judicial inspection in Sacha Sur (folio 97523) declared: "[…] those norms that for example

contained in the hydrocarbons law in 71 that said that in the oil operation the flora and the fauna would be taken care of that, in order to have an execution, should develop in laws regulations and parameters [...]" , but it has no value because it is contrary to the law because the laws are to be complied being the principle of legality a pillar where the administration of justice rests further than any irreverent argumentation of any attorney that pretends to take value of the legislation for conviction or for convenience. In this way, the lack of rules or parameters that rules the disposal of chrome VI to the environment did not mean in any way an implicit authorization to dispose this dangerous substance to the environment. It should have been done an exhaustive and complicated analysis of the results of the lab analysis presented as valid proof within this trial noting the magnitude of this work in relation to the experts appointed by Chevron had given 50939 results of 2371 samples, the experts appointed by the plaintiff had given the process a total of 6239 results of 466 valid samples, while the experts appointed by the court had given 178 samples and 2166 results (not considering the sampling performed by the expert Cabrera); totaling 2311 samples. To this we should add 608 results presented by expert Jorge Bermeo, and 939 results presented in 109 samples collected by the expert Gerardo Barros that had been also taken in account but with the considerations noted for each case. This references the magnitude of the figures and the amount of work that had been done by the justice administrator to investigate the truth in this cause, it is done with the intention to save any error, minimal or involuntary that might happen while performing the evaluation of the samples, because this is not a simple mathematical process, but a valuation of what the process file tells us, that it is not produced in black and white but in a series of shades, that a simple calculation error would not change the criteria form in the judge by all the evidence. In addition, it is considered that it is not an accounting evaluation, but a statistic one, so the result depends on what the sample represents, even with a certain degree of error, because what it is really of the interest of this type of studies is that all the elements of the sampled universe are known, and that all these elements have the real possibility of being included in a sample. Considering the facts that the file show, such as, the existence of certain amount of ditches, stations and pools that were designed, built and operated by Texpet, in conjunction with the amount or sample of sites inspected and the results of these inspections,

it is considered that the valid samples of the file are representative of the state of the area of concession. Thus, with the noted considerations we start the analysis of the results of the samples taken in the field by the different experts that had acted in this trial, making a general appreciation of the results presented for total petrol hydrocarbons (TPHs). It is taken in consideration that the defendant has alleged that the TPH is not a good indicator of risk by saying that "over that same topic Mr. President, I will make a "fuss" that I made a few days ago and a few judicial inspections ago, relative to that the content of hydrocarbons, TPHs, do not quantify the toxicity nor the risk to health because the hydrocarbons are found in nature, for example, in the grass 14 mg/Kg, the dry leafs of oak tree of 18.00mg/kg in the asiculas of pine 16,000mg/kg; and many non toxic products derived from petroleum, and used by men; we have the baby oil surely used by many people, it has 865,680 mg/kg of TPH; the vaseline, not the song, but the one implemented for certain uses, has 749,000 mg/kg" (see folio 155,068). Never the less, in the file we also find notes regarding the potential negative effects of the TPHs for the health of the people, as the ones of expert Bermeo, that in the conclusions of his report indicates that "the analysis performed in the tissue of fish determined the presence of total hydrocarbons in the fish in values way above allowed in the water, which as in our country there is no reference or norm that indicates or determine the maximum amount that can be present before causing problems to the fish and, at long, to the health of those who eat it, we take as reference the permissible values for the water, and from this point we can state that there is contamination existent by hydrocarbons, which can turn in a food problem should it continue. The Agency for the Toxic Substances and the Register of Diseases, ATSDR of the U.S., show that these products are highly harmful for the health and are a result of a mix of different products derived from the petrol, such as (gasoline, lubricant oils, greases, tar, etc.) so the presence of total hydrocarbons in the fish are the result of the petrol activities that take place in the area" (see folios 159,373 to 159,376) also the expert appointed by the plaintiff, Edison Camino, said in his report of Sacha 10 that "some of the components of the TPHs may affect the nervous system", and that "a component TPH (benzene) is carcinogenic in human beings" (see report in folios 52,474 to

52780). In this way, standing by the aforementioned by the expert suggested by the defendant, Gino Bianchi, in his defense of the judicial inspection of well lake Agrio 2, in respect to that "The TPH is not used to evaluate the potential health risks since it only shows the quantity of petroleum in the sample, and not its characteristics of toxicity" but also that "the Toxicological properties of crude petroleum can be characterized over the base of the following toxic compounds: Volatile aromatic hydrocarbons: benzene, toluene, ethylbenzene and xylenes Polycyclic Aromatic Hydrocarbons [...]; Heavy metals: barium, cadmium, copper, chromium, hexavalent chromium, mercury, nickel, lead, vanadium and zinc" (see text, folio 95701, which is identical to what expert Jorge Salcedo said in his opinion on the judicial inspection of well Shushufindi 18 and Shushufindi 25, and reiterated by Gino Bianchi in his opinion of the judicial inspection of well Guanta 7), this Court has decided that the most adequate thing is that the TPHs be considered jointly with the rest of the evidence, because even though it is not a precise indicator of the health risk, it is a good indicator of the state of the environment in general insofar as impacts due to Hydrogarbons, even though we must recognize that in order to identify possible health threats the presence of other elements must be monitored. In this aspect, in consistent manner with what expert Gino Bianchi said in regards with certain toxic compounds, the aforementioned Yanacuri report is addressed in that it expresses a particular preoccupation expressed by the exposure to benzene, toluene and xilene (BTEX), that due to its water solubility, increased permanency in clay soil, health hazard pose must be eliminated up to the level where the presence is natural in soil. In the same manner this study is addressed, when is says "numerous epidemiological studies made on workers of different professions show the carcinogenic effects of HAPs" (see folio 3352 and back), known as Polycyclic Aromatic Hydrocarbons, are contained typically in formation water, and even though they are not as water soluble, they can remain attached to solids in suspension and migrate large distances, without degrading; but the perforation mud used for a variety of purposes including controlling subterraneous pressure and handling the perforation cuts to the surface, even though they may vary in composition, is considered to generally contain heavy metal, as well as mercury, lead, cadmium, zinc, chromium VI, and barium. In this order we will begin referring to the presence of TPHs in the results found in the samples taken in the ground by the experts that participated in the judicial inspections, noting that 10% of the total of the results present ranges

of over 5000 ppm of TPHs, 10.3% present ranges from 1000ppm of TPHs to 5000ppm of TPHs, while 79.7% of the results from the samples show results under 1000 ppm of TPs, but it is observed with attention that from all these results for TPHs, 80.4% was provided by the experts suggested by the defendant (1984 results), of which 88.2% (1750 results) are those that are beneath 1000 ppm. The expert suggested by the plaintiff have presented a total of 420 results, that constitute barely 17 of the sample, and this of the 38% (160) barely beneath the 1000 ppm, meaning that 62% of the samples are contaminated over this level. This means that, at first sight after a statistical analysis, it appears that most of the facts provided by the laboratory results, seen jointly suggest a presence beneath 1000 ppm of TPHs (70.9% of the total of the sample, meaning that they provide over 88.95% of this 79.7% of the total of the results that are beneath 1000 ppm of TPH), in this way it is evidenced that when quadruplicating the sample size with this data which is influenced improperly and inevitably in the appreciation of the general table. According to the lawyers of the defendant, this is due to a process of the "Sample Homogenization", as the procedural parties discussed during the judicial inspection of well Lake Agrio 15, where the lawyer Pablo Fajardo manifested that "it has been the practice during the judicial diligences of the defendant of its technicians, of taking samples out of context, out of the pool - with what objective? To say that there is no contamination. Logically, if I take a sample from the top of that hill, no evidence of contamination will ever be found. The sample must be taken from the site where the pools are so that it can be informed if evidence of hidrocarburates actually existed. The compound samples what do they do? Take perhaps a sample in the pool site and two other samples out of the pool after during the homogenization of the samples, and in the end they are diluted or considerably diminished in that type of evidence. These are small tricks that are being implemented in the technical part to detract, diminish, and make believe in front of the court that there exist no contaminating elements, when this is not true Mr. President", to what Dr. Callejas was able to explain that

"what […] had been solicited was a representative sample of the site, and the site is composed by a considerable area, this area should be represented in the sample. As the name indicates sample is an indicative of what lies there. So this is not a trick. It is a system, first it lies in the plans to be sampled and analyzed that both parties agreed to, and second, it is used daily in our country and everywhere in the world because is a scientific way to do it. The other is just an expedition to fish what is wrongly called here contamination, and is the mere presence of hydrocarbon residue. In regards to the way the expert technicians suggested by us go about their sample work, I reject the affirmations that they are a trick to the Court. It is the adequate way to do it and what is aimed with its execution is prove that what is said so lightly is true, that this petroleum has migrated, that this petroleum has moved, that these materials are spread all over the area, converting this in an environmental disaster zone" (see act in folios 101119 to 101145). Then, during the judicial inspection of pond Cononaco 6, lawyer Pablo Fajardo gave the following explanation in regards to what was done by the experts suggested by Chevron: "Take a sample from the pool perhaps, but if you find hydrocarbon then take two more sample out of the pool, and here I have a sample if you may allow me please. Mr. President I want to show you that this is what the technicians cooperating with the defendant are doing; if there is evidence of mud or contaminated product they take this evidence and mix it with two larger portions of noncontaminated products, going through the whole process called homogenization. To what end? Only to dilute the contamination that exists there. If there existed there in that sample thousands of grams of hydrocarbons, in the end they put double and if there were three only one will appear, and they claim there is no contamination. What a trick Mr. President, what a mockery they make of the Judicial Function. This is what the experts are doing and the technicians that are cooperating with the defendants, and that is why in the end they report that there are no hydrocarbons." This affirmation will have its due response afterwards by Chevron's Judicial Procurator, Dr. Adolfo Callejas: "It is called obtaining a representative and compound sample, otherwise, what is done by the technicians of the acting party, is called fishing. They throw a hook and see where there is a piece of crude, and they make that out to be representative of the entire area. This is deceit, Mr. President, this is a lie, this is a farce. In all practice of sampling there must be a sample that represents the entire site, in its surface, in its width, in its length, in its depth, lawyer Pablo Fajardo. That is why the representation, the

homogenization of the samples is done, not to fool anybody, because if you do what your technicians do, meaning, analyzing that piece of the obscure material that you brought with you today, that is not representative of the site." (See act, folios 123088 to 123123) The expositions of the parties are taken into account and it is considered that the sample are representative of the site where they were taken, meaning, that if they were taken from a pool it is considered that that pool is contaminated and not the whole extension of the area. Nevertheless, further on the possibility of filtrations from within the pool will be discussed, which is why the presence of contaminated ground around the sources of contamination should be prevented, constituting the pools that were constructed and used by Texpet as operator of the Consortium. Nevertheless, to conclude with the analysis in the presence of TPHs, in the area ground of the Concession, it is considered that the experts suggested by the plaintiffs presented sample results with amounts reaching the 900000 mg/kg of TPHs; therefore, it should be highlighted, by contrast, that the experts suggested by defendant did not analyze Total Hydrocarbons of Petroleum in a direct and complete way, but analyzed DRO and GRO, which is the equivalent of TPH to diesel and TPH to gasoline, respectively, which complicates the comparison of the results obtained by the experts suggested by the different parties, because while some presented Total Hydrocarbons, the others presented Hydrocarbons divided into gasoline and diesel, so these must be added in order to obtain a relative equivalence comparable with TPHs. Besides with the TPH results we can see that all the fields of Consortium present similar situations, as evidenced by the samples taken during different inspections of the sites belonging to each field. For the Sancha field, in Station Sacha North 2, besides the referred to previously, samples ESN2-PIT3-SE2_sv and ESN2-PIT2-SE1_sv taken by expert Francisco Viteri are considered, and reach 849238 an 528686mg/Kg. respectively; while sample SA14-AS_sv presented by the expert Oscar Davila in inspection Sacha 14, reaches 575187 mg/kg for the Shushufindi field we consider exemplary the sample presented in the opinion of expert José Robalino, of the sample SSF4-P1T1-SD1-SU1-R (1.3-1.6)_sv and SSF4-P1T3-SD1-SU1-R (0.0 TO 0.4)_sv collected during the judicial inspection of Shushufindi 4, that provide results of 900,000 mg/kg. For the Lake Agrio field we found that the results presented by expert José Robalino for samples LA02-P1T1-SD1-SU1-R (0.4-0.8m)_sv and LA06-P1T1-SD1-R(1.4-1.9M)-

R(1.4-1.9m)_sv, collected in the judicial inspections of Lake Agrio 2 and Lake Agrio 6, respectively, reach 324771 and 299431 mg/Kg., while expert Luis Villacreces reports that sample LAC-P1T1-SD1-SU1-R (1.6-2.4M)_sv, collected in the judicial inspection of Lake Agrio Central station, that reach 317375 mg/Kg. For the Aguarico, sample EAG-A2-SE1_sv, taken by expert Luis Villecreces in Aguarico Station, reaches 333262 mg/Kg ,while in the Guanta field the same expert presents sample GTA07-P1T2-SE1_sv collected in Guanta 7, and reaches 235764 mg/kg. For the Auca and Yuca fields, sample AU01-P1T1-SD2-SU2-R (220-240 cm)_sv and sample YU2B-A1-SE1_sv, presented by expert Villacreces in his report on the inspection of well Auca 1 and Yuca 2B, show a presence of 22842.4 and 18127.8 mg/kg of TPHs respectively. With these results we can also note that these quantities repeat themselves equally in the results of our samples taken during inspections of the sites remedied according do the RAP and that continued production after Texpet's exit from the Consortium (mix operation), as the results obtained in Shushufindi 13 and in Sacha 6 (see samples SSF13-PYO-SD1-SU1-R(2.1-2.3)_sv, SSF13-P1T3-SD2-SU1-R(0.2-1.0)_sv, obtained by expert José Robalino suggested by the plaintiff, due to their TPHs results and seeing samples SA-6-JI-SB6-1.6M, taken by expert John Connor, that show results 1110 mg/kg of barium, or of samples SA-6-JI-P1T1A-SB1-2.40M,SA-6-J1-SB3-0.7M and SA-6-J1-SB3-2.1M that show results between 0.13 and 0.15 mg/Kg of toluene, to the RAP and were abandoned, without having been operated afterwards (exclusive operation of Texpet), according to what is reported in sample M2, taken by expert Pilamunga, assigned by the Court without suggestion by the processing parties for the judicial inspection of well Aguarico 2, and also well Shushufindi 18 of the results of TPHs for the samples SSF18-A1-SU1-R(0.0m)_sv and SSF18-A1-SU2-R (0.0M)-sv. As is evidenced by the file, these results for TPHs are also presented in sites that were not remedied by Texpet,, such as wells Shushufindi 4 and well Lake Agrio 15 (see samples SSF4-P1T1-SD1-SU1-R(1.3-1.6)_sv; SSF4-P1T3-SD1-SU1-R  (0.0-0.4)_sv;  LA15-P1T1-SD2-SU1-R(1.8-2.2M)_sv;  LA15-P1T1-SD1-SU1-R(1.8-2.2m)\_sv  and LA15-P1T2-SD2-SU1-R(1.4-1.8m)_sv, which gives us the certainty that the environmental conditions are similar in all sites even though in these the aforementioned remediation labors have take place even though these have been

abandoned since then or in operation. In this way, in consideration to the presence of impacts due to hydrocarbons mentioned previously, we must analyze the reach or the extension of said contamination in grounds within the area of concession, warned that it cannot be understood that all the ground in the concession area is contaminated, but that the samples are representative of the places where they have been taken, however it is considered that according to the quantity and consistency of the data thrown in the 54 judicial inspections done in sites operated by Texpet, it is adequate to analyze the possibility of extrapolating these data so that the rest of the installations operated by Texpet but that has not been inspected in this trial, meaning, we will not base ourselves on the premise that the results of the samples of the analyzed sites in the judicial inspections are direct proof of the site not inspected, but that the quantity of the sites inspected leads to consider them a representative sample of the universe of sites operated by Texpet, so that the results of the sites inspected can be extrapolated, idea that is strengthened in great measure by the similitude of the results in the practiced inspections. Also, this decision is made considering that the defendant has recognized the extrapolation as a valid system to reach the conclusions based on the sample. Written in October 27, 2003, at 5:00 p.m., the Chevron's defense says "Do you allow Mr. President, that the expert collect official information of the National Directorate of Hydrocarbons, about the reconditioned boreholes within this period by PETROPRODUCCION and select a representative number for your report, which will include the number of pools used in each case and the objective or destination for which they were used" (folio 3330), demonstrating your suggestion to use a representative number for your report, which is consistent with the nature of this same exploitation. Following the criteria of this one to court, the 97 expert reports presented by the experts that have acted in the judicial inspections in sites operated by Texpet, constitute a reasonably representative sample of the universe of sites operated by Texpet when in charge of the concession, being a sample from which results can be extrapolated. In this manner this Court does not need to have inspected each hectare in the Concession or every site that has been operated by the defendant, but based on the results obtained in a representative number of all the sites operated by Texpet, it is capable of deducing the foreseeable results in the rest of the sites not considered in the sample. However,

as we had warned, beyond the presence of the TPHs, that even though they are an indicator of the presence of hydrocarbons in the described area, they could or couldn't be good health risk demonstrators, we will pass the analysis of the dangerous elements that must be monitored and eventually eliminated, such as benzene, toluene, the HAPs and heavy metals and or/ anticorrosive agents that have been used in the perforation of wells, such as chrome VI, el barium, or mercury, which are elements that pose health concern. The danger these elements pose is evidenced mainly in the reports by the experts suggested by the defendants, such as expert Edison Camino, that refers to this subject in his report of the judicial inspection of well Sacha 10, in chapter "Health Impacts", from folio 52529 onwards, and that repeats in folios 59798 in the expert report of well Sacha 51, after doing a revision of many elements that he considers dangerous, but only some of them have been chosen by this Court, depending on their hazard, permanence and water solubility in water. In these opinions frequent references to the Department of Health and Human Services (from now on DHHs because of its acronym in English), to the International Agency for Cancer Investigation (from now on IARC, because of its acronym in English), and the Environmental Protection Agency of the United States, (from now on USEPA, because of its acronym in English) and the World Health Organization (OMS). On the other hand, the experts suggested by the defendant have coincided in pointing out the same USEPA, to the OMS and the American Society of Proofs and Materials (from now on ASTM because of its acronym in English), as indicated by Gino Bianchi, in his assessment on toxicity on pages 60496 onwards, in the opinion of the same well Sacha 51, and on many occasions the experts have made reference to the classification of the Agency for Toxic Substances and Disease Registry (hereinafter ATSDR, for its acronym in English), which is why all these international sources will be addressed to establish in this trial the danger in the reported elements in the judicial inspections. That having been said and addressing the danger of certain contaminating elements we begin the reference through the results of the samples that present results for benzene, noting that Benzene is water soluble, and that even though it can be found in a natural manner in the environment, it is the most powerful carcinogenic agent of those evaluated in this verdict, known as such by the IARC, the EPA, and the Department of Health and Human Services of the United States, which is why the presence of at least 14 result that reflect the presence of benzene in the grounds of the concession between 0.056 and 18mg/kg draws our attention; the

results of the samples taken by the experts suggested by the defendant, Bjorn, Bjorkman and Gino Bianchi, during the judicial inspections of Sacha North 2 and Sacha 13, respectively, present an alarming 18 and 17 mg/kg (see samples RB-ESN2-P1T3-SE1 and SA_13_JI_AM1_0.1M, respectively). Also, the expert suggested by Chevron, John Connor, presented results that presented quantities of 9.9 and 2.3 mg/Kg. (see samples JL-LAC-P1T1-SD2-SU1.R (1.30-1.90) M and JI-LAC-P1T1-SD1-SU1-R (1.6-2.4) M in the judicial inspection of Central Lago Agrio, whereas 0.22mg/kg in samples JL-LAC-PIT1-SD2-SU2-R (2.0 –2.5) M in the same inspection; as far as the samples of the experts suggested by the defendants we find one in Southeast Shushufindi and another one in Sacha 51, with 5 and 1mg/kg., respectively (see our samples SSF-SW-PNT-SCIIIb_sv and SA51-NE2(1.25-1.77m)_sv), that show an unusual presence of this dangerous health agent, which must be extracted from the ground. Toluene is found in a natural manner in crude petroleum and is water-soluble. This element is associated with reproductive problems and other development defects, which is why the presence of at least 10 results that show that the ground is contaminated with quantities between 0.12 and 97 mg/Kg reflects the impact suffered by this ground and a potential health risk. Many samples are the experts suggested by the defendant, for instance, the samples JI-SSFN-PIS3-(SS) - 3, OM and JI-SH48-SW3-SB1 (3), taken by the experts suggested by Chevron John Connor and Gino Bianchi respectively, present results of 0.3 and 0.28 mg/kg; while we find 1 and even 5 mg/kg. In the results of 0.3 and 0.28 mg/kg, while we find 1 and even 5 mg/kg in the results of samples SSF-SW-PNT-SCIIIb_sv and SA51-NE2 (1.25-1.77m)_sv taken by experts Oscar Dávila and Edison Camino in the judicial inspection of North Shushufindi and Shushufindi 51 respectively. We should also consider that samples SA-6JI-PIT1A-SB12.40M, SA-6-JI-SB3-07M and SA-6-JI-SB3-2.M, taken by the expert John Connor, show results between 0.13 and 0.15 mg/kg of toluene in well Sacha 6, which is a well that has been declared remedied according to the RAP, which shows us the dangerous presence of this contaminating agent and the imminent necessity of removing this agent from the grounds of the are of Concession. The Haps, which are also a potential carcinogen, can penetrate deeply into the ground, specially If there is prolonged contact such as in resting pools, putting the nearby ground and subterraneous water in danger of becoming contaminated, highlighting the presence of 54 resulting between 1.1

and 3142 mg/kg, in the samples taken from the experts suggested by the defendant, since the experts suggested by the defendant did not analyze this compound. Instead expert Luis Villacreces, in samples taken during the inspections of well Auca 1, Cononaco 6, and well Sacha 51, and wells 18.4, and 7 of the Shushufindi field has presented results that go beyond any criteria of reasonable tolerance, with results like 3142 and 466 in Auca 1 and AU01-P1T1-SD2-SU2-R(220-240 CM)_sv and AU01-A1-SD1-SU1-R (60-100cm)_sv; 2450 and 876 in Cononaco 6 in CON6-A2-SE1_sv and CON6-P1T1-SD1-DU1-R(160-260cm)_sv; 154.152,73.6325,70.4021 in Shushufindi 18, in SSF18-A1-SU2-R(0.0 m)_sv, SSF18-PIT2-SD1-SU1-R (1.5-2.0m)_sv and SSF18-A1-SU1-R (0.0m)_sv expert José Robalino reports results up to 42.47 in Shushufindi 4, whereas expert Francisco Viteri reported 34.13 in Sushifindi 7 in SSF07-A2-SD1-SU1-R(1.3-1.9)_sv; all which contributes to form the criteria of this Presidency. Mercury has been considered as a possible human carcinogen by the EPA, and there are multiples studies that show the effects to its exposure, being the most worrisome permanent damages to the brain and kidneys, which is why this Court is being alerted that such alarmingly high mercury levels were found in the Sacha and Shushufindi fields, and Lake Agrio, where we found various samples that reach 7mg/Kg., taken by experts José Robalino in the judicial inspection of Central Sacha (see samples SAC-EST-S1_sv and SAC-PIT1-S1-1_sv); and SAC-PIT-1-S1-2_sv) and Xavier Grades in Shushufindi 8 and Lake Agrio North (see samples SSF08-P1T1-S1_sv, SSF08-P1T1-S2_sv, SSF08-P1T1-S3_sv,   SSF08-P1T2-S11_sv,   SSF08_P1T2-S3_SV,   SSF08-P1T2-S4-1_sv,   SSF08-P1T2-S5_sv, SSF08_PIT2-S6_sv, and also LAN-ESTA-B_sv, LAN-ESTA-B1_sv, LAN-ESTA-B2_sv, LAN-ESTA-C_sv, LAN-ESTB-ASUE1_sv, LAN-ESTB-ASUE2_sv, LAN-ESTB-D1_sv, LAN-ESTB-D2_sv, LAN-ESTB-E1_sv). In the face of these results, that show the presence of mercury in elevated levels in ground samples collected during the judicial inspections, an alarming presence of this element is evidenced in the grounds of the ecosystem within the concession. Lead is also found in a natural manner in earth but it has a well earned fame as hazardous to health reflected for instance in the growing restrictions for the use of gasoline containing lead all over the world, based on the preoccupations regarding health, mainly in diminished cognitive capacity, besides it is considered as reasonably presumably as a carcinogenic human agent. The samples of the ground and water taken during judicial inspections have indicated excessive levels of lead that can pose health risks for the local

population. Levels of lead in the ground are much more elevated than normal, which contributes to corroborate that lead poisoning is a real risk. In spite of that it is observed that the results that reach 294 mg/kg, like in sample J1-SSF-25-P1T2-SD1-(0.0M) taken by the expert suggested by Chevron, Jorge Salcedo, in the inspection of well Shushufindi 25, it has not sufficed for these professionals to find a risk for the health of these people. Two other samples stand out J1-CO-06-SB4-0.0M and SSF-13-JI-SB1-1.6M_tx, taken by the expert suggested by the defendant, Ernesto Baca, in the judicial inspections of wells Cononaco 6 and Shushufindi 13, reporting 98.8 and 98.6 mg/kg., respectively. In an agreeable manner the expert suggested by the plaintiffs, José Robalino, has reported results similar in samples SA18-SE3_sv and SA18-NE1-1_sv, taken during the judicial inspection of well Sacha 18, and that reach 99.89 and 69.93 mg/kg, respectively. In regards to the cadmium, it is addressed that it can irritate the stomach and respiratory track gravely , and that there is a scientific consensus about cadmium is in fact a human carcinogen, which is why the 151 results between 1.003 and 315.79 mg/kgare so dangerous, of which we highlight sample JI-SA18-NE1-(SS), collected in the inspection of well Sacha 18 by expert Fernando Morales, expert suggested by Chevron, where we found 4.1mg/kg of Cadmium; samples JI-SSF-07-SB1 1.2m (DUP), J1-SSF-07-SB2 1.40M, JI-SSF-07-SB1 1.2M, JI-SSF-07-PIT2-SBC 1.7M, JI-SSF-07-SB1 0M, J1-SSF-07-SB2 0M taken during the judicial inspection of well Shushufindi 07, by expert suggested by the defendant, Gino Bianchi, that represents results that range between 2.6 mg/kg to 3.3mg/kg; in the same manner samples obtained by experts John Connor, Ernesto Baca in the judicial inspections of Sacha 6 and Sacha 14, respectively, in which we find results superior to 2mg/kg of Cadmium. The experts suggested by the plaintiff report results that reach 315.79 mg/kg. (See sample SSF45A-A1-SE2_sv, taken in Shushufindi 45 A by expert Amaury Suarez); or the 16mg/kg and 5 mg/kg reported by expert Oscar Davila in the samples collected SSF-SUR-C1-TW(0.60-0.80m)_sv and SA14-P3 (0.10-0.80m)_sv, in the judicial inspections of Shushufindi South and Sacha 14, respectively; and the 7.9 mg/kg found in sample LAN-ESTB-H2_sv, taken by expert Xavier Grandes in the judicial inspection of Lake Agrio North. Regarding the chrome VI we found 108 results between 0.42 and 87 mg/kg. While the World Health Organization, the International Agency for Cancer Research (IARC) and the

Environmental Protection Agency (EPA) of the United States has determined that chrome (VI) is a known carcinogenic agent for human beings, which makes the results obtained in samples SA13-SE1(1.0-1.5m)_sv and SA13-SW3(1.0-A1.4m)_sv specially grave, presented with their respective custody chains within the expert report of Dr. Luis Villacreces regarding the judicial inspection of well Sasha 13, contains alarming levels of Chrome VI: 32.18 AND 13.44 Mg/kg respectively. The same expert has also reported a sample containing 87 mg/kg, collected during the judicial inspection of Cononaco 6 well. Like the samples SSF4-PIT1-SD1-SU1-R (1.3-1.6)_sv, SSF4-PIT5-SD1-SU1-R (1.2-1.6)_sv and SSF4-PIT5-SD2-SU2-R (1.6-3.3)_sv presented by expert José Robalino in his report concerning the judicial inspection of well Shushufindi 4 (8.31 the first two and 8.23 mg/kg the last one). Further, in Aguarico field, the sample RB-EAG-A1-SE4 taken by the expert indicated by defendant, Fernando Morales, evidences the presence of Chromium VI at levels which are dangerous for the human health (1.11 mg/kg). In the field Lago Agrio we also found the presence of Chromium VI in samples LA06-PIT2-SD1-SU1-R (1.8-2.8m)_sv, a constant feature in the judicial inspection report carried out in Lago Agrio 6 conducted by expert Robalino (3.62 mg/kg). To finish with, sample GTA07-A1-SD1-SU1-R(20-60cm)_sv shows the presence of Chromium VI also in field Guanta (1.9 mg/kg), as evidenced in the report submitted by expert Villacreces to the judicial inspection of Guanta 7 well. Lastly, many barium compounds are insoluble in water and may have harmful effects on health and may also cause cancer, even though barium is not specifically classified for its carcinogenicity neither by the International Agency for Research on Cancer (IARC) nor by the US Department of Health and Human Services; however, this lack of classification does not entail its classification as a material harmless for health; therefore, in view of the potential harm it may cause and the lack of studies carried out, we think it appropriate to consider dangerous the great number of results exceeding 751 mg/kg and reaching 10100 mg/kg, this being one of the most reported elements present in all fields by the experts indicated by the plaintiff and the experts indicated by Chevron. From the results which are worth highlighting we can mention samples JI-SSF-25-PIT2-SD1-(0.0M), SSF-SUR-JI-SB5, SSF-SUR-JI-SB3 and JI-GTA06-PIT1-SD2 which exceed 5000 mg/kg, all obtained by experts suggested by defendant (Jorge Salcedo the first one, John Connor the second and third referred samples and Gino Bianchi the fourth), in

different judicial inspections (Shushufindi 25 the first one, Shushufindi South the second and third ones and Guanta 6 the fourth one). Further, plaintiff's expert, Mr. José Robalino, reported elevated results in Sacha 18 and Central Sacha soils (see samples SA18-NW6-A2_sv, SAC-PIT1-S1-2_sv and SAC-PIT2-S1_sv). Samples with barium content were found in samples SA6-JI-SB6-1.6M, taken by expert John Connor in Sacha 6 judicial inspection, well repaired according to RAP, which shows results of 1110 mg/kg barium, and the judicial inspection of Sacha 57 well, a place repaired according to RAP, exclusively operated by defendant, where sample SA-57-JI-NEA-TW was taken by defendant's expert Gino Bianchi, presents 1290mg/kg barium. On the other hand, if the results of the samples obtained in water are observed, in relation to the prohibition of water contamination in a manner that affects human health or the development of the flora and fauna (Art. 22 Water Act, published by Official Registry N° 69, May 30, 1972) and in connection to the Health Code, which imposed defendant the legal obligation to protect fountains or hydrographic basins used for water supply, in accordance with the provisions of this Code, special laws and regulations" (Art. 16), it is found that, in a majority of cases, the files show worrying results of THP and other elements in the samples taken by plaintiff's experts and in those of Court appointed experts, but Chevron's experts show relatively lower results for many elements and in certain cases with no results for others, as in the cases of Chromium VI and TPHs, which were not studied by defendant's experts. For this reason, the information available in this trial related to hydrocarbon pollution in surface waters shall be carefully analyzed. It is a bit untrustworthy the fact that on the one hand, the results obtained by defendant present relatively low levels of hydrocarbon pollution; whereas on the other, various studies, including the one conducted by expert Jorge Bermeo, Court appointed expert, reports the presence of hydrocarbon elements in water. The judge is not compelled to stick to the experts' reports against his own criteria since the levels of pollution found in surface waters may vary according to the place where the samples are taken and the methods employed, we warn the parties to the trial that what cannot vary is the irrefutable fact that the legal

representative of Texaco Petroleum Company, Rodrigo Pérez Pallarez, through a letter addressed to Mr. Xavier Alvarado Roca, President of *Vistazo* Magazine, published in many newspapers of the country, within which is evidenced in this proceeding the publication in *El comercio* newspapers, dated March 16, 2007 in folio 6 volume 1, declares and acknowledges that "in Ecuador 15,834 million gallons were dumped between 1972 and 1990 during the entire operation of Texaco Consortium" (folio 140601). After the public declaration of Texaco Petroleum Company's legal representative in Ecuador, the existence of a considerable dumping of formation waters to the ecosystem on the area of the Concession becomes real. Therefore, it results not only reasonable but also inevitable an impact on surface waters as a consequence of such dumping. Further, if we consider the amounts of formation waters in relation to the dangerousness of the dumped substance; that is, the hazards of dumping formation waters into surface waters of human consumption; it is evident that the people who used those sources of water were exposed to the pollutants spilled on it. Considering that formation waters have hydrocarbon solvents such as BTex (benzene, toluene, ethyl benzene and xylene), HAPs (polycyclic hydrocarbons) and TPHs (total petroleum hydrocarbons) referred to above about the hazard they represent to human health, the harm and the risk are evident. The defense of defendant during the judicial inspection at Lago Agrio Central station read as follows: "Much has been said during trial of the famous production waters, of the formation waters, figures are invented and astronomical quantities are mentioned without any supporting document. We have never accepted as it was mistakenly said, that TEXACO Company has dumped to the environment any petroleum, such figures will have to be evidenced by who claims them. But, what is the production water or formation water? It is the water that exists in geological formations that contain petroleum in the soil. Upon the perforation of the well, it comes out together with the petroleum and must be separated because it would be uneconomic and not technical to transport production water through long distances as it is done with petroleum for its trading or for its refining. Production water is basically characterized by having variable percentages or contents of salt. There are production waters which are much more salty than sea water in certain fields across the world and there are others which are less salty; for example: in the case of Consortium, the Lago Agrio field, pursuant to existing and published studies,

production water has five or six times less salt than sea water, this does not mean that they do not have salt, they do have, but production water also has small amounts of petroleum in the tank, it is separated, by gravity differences and by chemical products those small amounts of petroleum, which generally are around 20 and 40 parts per million, insignificant, which is why in the Consortium case, after the production water was separated in the cleaning tank, it was sent to one or more reservoirs built in series to be treated and achieve a better separation of this hydrocarbon. It also has certain metals, we are not denying this, these are metals found naturally in petroleum, in variable amounts also, the production water that is produced in the eastern region of Ecuador, contains metals in amounts that do not represent a risk to human health. This was demonstrated by the laboratory tests that we have conducted in all Stations, that we have inspected to date and that I hereby request as well as I will timely ratify it is done". However, the results of the samples (see samples JI-LA-CENTRAL-PW, taken by expert John Connor, Chevron's expert, with a content of 1.31 mg/kg of barium) contradict the allegations defending Chevron, supporting the plaintiff's allegations by saying that "We know for example that formation water contains 30% salt and that obviously such salt in excess generates sodium chlorides, which produces another pollution chain that may affect even vegetation and impedes the normal development of plant roots" (see file on folios 102251 to 102308). We further recall what has been revised by analyzing what could be expected from a "good petroleum company", thus, it is carefully considered the fact that in 1962 important warnings about the hazards of formation waters were already written and in fact, it was recommended that "extreme care should be exercised in the management and disposal of production water not only due to its possible harm to agriculture but also to the possibility of lake and river pollution which have drinking water or water for irrigation purposes" (folio 158811). Therefore, it is evident that we are not making reference to a harmless element as confirmed by the attorneys for the defendant. On the contrary, as confirmed by Chevron's experts, "Despite the fact that production waters do not have significant concentrations of toxic components, it can represent a potential harm to recipients and

vegetation due to high concentrations of salt (dissolved natural minerals coming from production oilfields)" (see folio 70018). Therefore, it is appropriate for this Court to conclude that the formation water constitutes an industrial waste inevitably produced upon petroleum extraction and due to its dangerousness it should be treated with extreme diligence, which did not occur in the operation conducted by TEXPET. Another piece of evidence which will be specially considered, are the interviews received during the judicial inspections, which will be analyzed afterwards in connection to the individual conception of human health, in the sense that they agree in pointing out water pollution as the source of their health problems. With respect to the pollution of surface waters it also observed in expert Bermeo's report, that he found water pollutants that are probably not coming from hydrocarbon sources, such as fecal coliforms or other elements that the expert confirms may exist due to farm activities or even mining, even though he did not submit evidence of the existence of such industries in the area. Considering that the presence of coliforms or pollutants not related to the petroleum industry cannot be attributed to the activities performed by defendant, proved harm will not be deemed as reparable in this trial but the parties will have the right to start the legal actions they may deem appropriate. As regards hydrocarbon pollution, the experts state that "The presence of heavy metals in the water, especially Mercury (Hg) may result in a reduction of water resources due to its toxicity. On the other hand, most of these metals are easily absorbed and are bio accumulative; this permits a better fixation on the fish tissue, thus becoming part of the trophic chain". Moreover, in his conclusions he indicated that "The analysis performed in fish tissue determined the presence of total hydrocarbons in fish with values exceeding the maximum permitted in water; thus, since in our country there is no reference or rule that indicates the maximum amount permitted before causing trouble to fish and therefore to the health of the individuals who consume it, we take as a reference the values permitted for water and from that perspective we can state that there exists hydrocarbon pollution, which could become a feed problem if it continues. The United States Agency for Toxic Substances and Disease Registry, ATSDR indicates that these products are highly hazardous for the health and are the result of a mixture of different products derived from petroleum elements and from petroleum itself (gasoline, lubricating oil, fat, pitch, etc.), thus, the presence of total hydrocarbons in

fish is the result of petroleum related activities performed in the area". All this information will be considered upon assessing the possible impacts on human health; however, to this Court, the findings of expert Bermeo are enough to confirm the presence of different types of contaminants in water sources used by the inhabitants of the area. As regards the pollution of other hydric sources, the studies on ground water carried out during this trial by the experts of the parties to the lawsuit for the judicial inspections, present different conclusions. The Judge has carefully reviewed their findings to reach his own conclusions. It is observed that the different experts have alleged the possibility of ground water contamination, indicating for example that "given the non-soluble nature of the degraded petroleum present in the subsoil and the low permeability of clayey soil found in the area, the soil leachates cannot impact on underground water quality exceeding the limits for consumption water of the United States Environmental Protection Agency USEPA or the World Health Organization (WHO)" (see Sacha 21 report by defendant's expert, John Connor, on folio 24475), or that "the layer of the soil and the remediated soils are made up of clay which prevent significant filtration of rain water and the subsequent production of leachates from the soil in the area of the remediated reservoir. Given the low solubility of hydrocarbons and the low permeability of soil, there is no potential impact on ground waters in this area". (see Sacha 10 report by defendant's expert, Gino Bianchi on folio 29,792); in fact, certain experts have not taken samples arguing that "No samples were taken from the river's water since the degraded petroleum found in the remediated area and in the north-east region of the platform does not have the migration potential necessary to reach the river" (see Sacha 10 report submitted by defendants' expert, Gino Bianchi on folio 29,748). On the other hand, the plaintiffs' experts stated that "the toxic contents in this area are dangerous because they can easily reach the inhabitants of these areas since the plot surrounding the well is used for the cattle and the crops. Underground water used by the families to prepare their food has toxics

coming from these polluted sources […]" (see Sacha 14 report by expert Oscar Dávila on folio 72.239) and that "It is proved that the petroleum crossed the bottom of the polluted areas, which demonstrates that the soil is not made up of an impermeable layer and notwithstanding this situation it was not waterproofed to prevent petroleum migration to deeper layers. From the descriptions above it is understood that ground waters are contaminated with hydrocarbon wastes that prevent its use given the severe consequences of the use of this resource to human health" (see Sacha 57 report by expert José Robalino on folio 80,985; and see samples SA-57-JI-SW1, SA-57-JI-SW2 of plaintiff's expert, Gino Bianchi taken in Sacha 57, even though no TPHs are analyzed, 0.022 and 0.031 mg/L results are presented respectively), coincides with the results demonstrated by water samples containing TPHs, which can be observed in other cases where the experts took water samples looking for TPHs (see LAC-PIT1-SD1-GW-NF (2.0m) and SSF13-PIT1-SO1-GW1-NF (0.7), taken under the reservoirs and presenting 61mg/l TPH and 5.2 mg/l TPH respectively. This provides a good hint that the reservoirs are a potential source of hydrocarbon pollution for groundwater and contributes as a proof that the presence of hydrocarbons buried in the reservoirs suppose a risk for the environment and eventually a risk for the flora and fauna and the human health since groundwater may become polluted becoming a risk to the individuals who are in contact with said waters. For the above expressed reasons and based on this Presidency's criteria to find the truth regarding groundwater pollution, not only the presence of pollution in samples should be addressed to but also the possibility of filtrations from the reservoirs to the environment. With respect to the possibility of finding migrations or filtrations, this Court has been extremely careful or stated through the parties in the judicial inspection of Lago Agrio 15 well, where Dr. Adolfo Callejas, after requesting a lateral perforation in a slope where supposedly there was a reservoir, in the name of Chevron expressed that "the reasons why there will not be petroleum flow in this area are that the material that may be found there is in a high degradation status for the passage of time, one of the characteristics of degraded petroleum in its solid status, the natural soil of the area is of clay, as observed, with low permeability, the degraded petroleum does not liberate as the dissolved petroleum" (folio 101128); whereas the plaintiff

represented by Attorney Pablo Fajardo, sustained that "even though no large amounts migrate, the substance is permanently there diluting and going out. And it does not degrade, when the soil is mixed with those hydrocarbon elements there is no such degradation […]. This degradation does not exist, volatile elements spread when crude is in surface, but in this case it is buried and given the high amount of petroleum, heavy elements cannot be eliminated and migrate progressively […]" . After the perforation carried out at the request of Dr. Adolfo Callejas, the right to speak was given to the defendant's expert, Ernesto Baca, who said: "As it can be observed, the soil here is clayey, the smell of petroleum is found in horizontal distances, profound, away from the slope where there is a mixture, since the slope went down gradually and there are samples which are cleaner than others, but when going deeper there is more petroleum smell and can be smelled in any sample" (folio 101133), denoting the presence of pollution originated by petroleum. From the above, it is understood that there are certain technical aspects showing different criteria from the experts of the parties and the parties themselves. Therefore, is appropriate to provide full probative value to the official letter dated November 24, 1976 (folio 101106), sent to Michael Martinez, President of Texaco Petroleum Company, and signed by Eng. Granja, Deputy Technical Director, stating that on October 7, 1976, "Filtrations of crude oil took place in Lago Agrio 15 well, as a consequence a nearby estuary where a spring rises became polluted, the water was polluted in its course until Aguarico, causing harm in a farm of a tenant" evidencing that at least at that time there were filtrations which called the attention of the authorities. The challenge made by the defendant against this document, in charge of Dr. Alberto Racines on folio 101130, is not accepted on the grounds of being against the law to pretend to be unaware of the content for the mere fact of being addressed to the agent and not to the principal, pretending to allege mistake, stating that the Manager of Texaco Petroleum Company, in his capacity as agent, was not the person to whom the official letter should be addressed to; on the contrary, the date on which the official letter was sent and the sender and addressee confirm the reliability of the document to prove the plaintiff's case. On the other hand, the fact that both expert Gino Bianchi as well as expert Ernesto Baca, both defendant's experts, repeated part of their

conclusions, word for word, when on folios 60,529 and 66,129 (on reports Sacha 51 and Sacha 65 respectively) they exactly coincided by stating that "upon the evaluation of exposure by leaching to ground waters and superficial runoffs, it was found that the BTEX values calculated in the most conservative manner, are not sufficient to cause health risks. This degradation rapidly eliminated the most movable and toxic parts of petroleum", makes the judge doubt about the impartiality of the experts of Chevron, since it is very difficult to understand how two independent experts can present exactly the same conclusions. For this reason, repeats and recalls that only the results of the sample analysis taken in the field by the different experts, duly analyzed in the laboratory and the results of which are recorded in the file will be taken into account, but no expert conclusion will be considered, since the Presidency does not share their criteria and is able to reach its own conclusions based on the results and its ruling. These results evidently constitute a sign of environmental damage; hazardous elements are introduced in dangerous amounts into the ecosystems, a consequence of hydrocarbon practices used in the Concession by TEXPET. It has to be determined the level in which these contaminants have altered the ecosystem and caused negative impact on the environment and/ or its components, besides the direct impact on the soil and water referred to above. First of all, it is worth considering other environmental damages proved in the file, the reason why the pollution and the hydrocarbon damage may be attributable to third parties not demanded in this lawsuit. The plaintiff's defense could prove by means of documentation, the existence of environmental damages caused by third parties, as in the speech of Dr. Patricio Campuzano during the judicial inspection of Yuca Station (see entry on folios 155678 to 155714, and related documents) when he says "As you may see, there is a monthly detail in '99, the stations where formation water was registered and the number of barrels evacuated to the vicinity. All matters related to Yuca Station were highlighted to be applied to this specific case. Despite the fact that Executive Order 1215, which contains the Regulations for Hydrocarbon Operations, sets forth that the formation water does not constitute a dangerous element per se, and it is so specified in the same executive order as stated. Anyway, I request, Your Honor, to consider the case I will present so that the expert herein

appointed, be the one to grade the level of conductivity that the water released to the environment finally has, based on the reports of the Attorney General. I will refer specifically to January '99 when 107,012 barrels of formation water were produced; 62,733 barrels were reinjected and 44,279 were released to the environment. In February 1999, 97,328 barrels of production water were produced, 52,437 were reinjected and 44,891 were released to the environment. The report is large and the Yuca Station is highlighted, I repeat, there are in January, April, July, October, etc. At the end of this General Attorney's document there is a summary that states as follows: "Production Water Management at Yuca Station, Year 1999" with a statistics graphic in which the water production colored in purple by the year 1999 reflects 1,174,108 of production water; colored in red is the reinjected water which amounts to 729,986 barrels by the year 1999 and colored in green is the water released to the environment which amounts to 444,122 barrels; equivalent to 38% Mr. President. During the same year a Statistics Chart was made covering the whole Eastern District in 1999; that is, for all the Amazonia fields managed by the ATTORNEY GENERAL. The water produced, as shown in this Chart, amounted to 65 million in round figures. Reinjected production water: 50 million barrels, Water released to the environment: 14 million barrels; equivalent to 22% Mr. President. The same situation was registered in the year 2000 and it goes on in the future. "Additionally, Mr. President, I put the matter for your consideration and I will submit a copy to the Expert. Another report of the GENERAL ATTORNEY entitled "Environmental Protection Amazonic District", "Disaster Control Crude Oil Spillage and/or Spillage" in which the spillages occurred in the year 2000 are highlighted, in this case, specifically in the Central Yuca Station, this facility is also known simply as "Yuca". On May 5th, 2000 an accident occurs in the ACT (in capital letters) Platform; the Expert should explain what is understood by the acronym "ACT". The description explains that there is a breakage in the ACT unit of measurement and a possible failure of a Check valve and in black letters there is a caption that reads "equipment failure"; "the damages caused", they refer to the well's platform; contaminated surface: 60 square meters, estimated spilled volume: 1.3 barrels; Third party affectation: No; Percentage growth: 100%, remedied. The Expert will have to be informed on this and pronounce himself.

This must be known by the expert and vote on so as to acknowledge the fact that there have been spills not only in this facility but also in Yulebra Station, in the well Yuca 06, in Pindo Station, well Auca Este, well Yuca 04, and Auca Sur Station. On April 1, 2000 there is a spill in Auca Sur Station. On April 2 there is a problem in the injector well 05 of Auca Field, etc. Mr. President, this corresponds to year 2000. In 2001 there is another form similar to Petroecuador in which it is indeed mentioned highlighting this Yuca Central Station, in which is stated that on February 9, 2001 in "Yuca Central" Station there has been a problem in the separators sump due to malfunctioning of Check valve, or equipment. This has caused a spill on half oil barrel in the before mentioned sump. This has occurred throughout 2001 and continues the same up until December 2001 when a problem has taken place in Cononaco due to oil spills. In 2002, another form similar to Environmental Protection of Amazonian District, called "Disaster Control, Spills of Crude and/or Oil products of "Region of Auca" because this entire field is inside that area. Additionally, it has been pointed for 2002 the spills directly having an impact on this Station. There is a similar form for the year 2003 with the same characteristics. An identical report for 2004, with the exact same characteristics, but emphasizing basically that the report belongs to the current owner of this facility. Additionally, I should now refer, Mr. President, to a memorandum from Orellana Local Government of the Department of Environment that reads: Attention: Superintendent Amazonian District, Subject: Report on contamination control due to emissions from the camp. I do not intend to weary Your Honor but this is in relation to an environment contamination due to spill of crude from the pipeline in well Yuca 12, handled by state enterprise Petroproducción on March 23, 2005 when the affected fields were controlled and Mr. Adelmo Garrido, who probably owns the place, was also interviewed. And, it is stated that on that date a problem of importance has taken place, at least, in the area next to this office, Orellana Local Government through the Department of Environment provides the pictures accounting for the broken tube system of the spill, the vegetation affected for the spilled oil, the pool affected by the spilled oil and, finally, the water slope used for human consumption – today affected by the spill. This is the claim issued by Orellana Local Government. - Department of Environment in well Yuca 12. Alternatively to the previous point, there is another form issued also by Petroecuador, in which other spills are presented; the form is entitled: "CLEANING AND REMEDIATION OF CRUDE AND/OR OIL PRODUCTS IMPLEMENTED BY DIRECT ADMINISTRATION" in which it is stated, Mr. President, chronologically

since January 1995 up until January 18, 2003 the different spills occurred in Amazonia and I have pointed those occurring in particular in Yuca Central, one in January 15, 1995 in the cleaning area which surface reaches 150 m$^2$. On January 17, there is another one of 150 meters; on June 12, 1995 there is another one affecting 6000 m$^2$. In February 1997 there is another one affecting 350 m$^2$. In November 1998 there is another one affecting 1700 m$^2$. In February 9, 2001, it affects 250 m. In January 2002 it affects 3030 m. There is another one affecting additionally 900 m$^2$ on the same date". In the same way, the content of the report made handed by expert Gerardo Barros has been taken into consideration; this shows the existence of contaminating practices as well and effects on the operations carried out by Petroecuador. However, this possible liability of a third party for environmental damages cannot be subject to ruling given the fact that it has not been included in litigation, which has been entrenched according to the stated in the present document. Pursuant to Article 833 of Code of Civil Procedure "the consolidation hearing will start with the statement of defense which will contain the exceptions, delaying and peremptory, which the defendant considers assisted. Thus, litigation being entrenched, the judge will seek conciliation and, in succeeding, the trial will be over". In the present case litigation was entrenched without the presence or participation of third parties other than the applicant and the defendant and, due to the fact that Article 492 of Code of Civil Procedure states "At any trial a third party can be heard to whom judicial court orders cause direct perjury. The claim of the third party will be adjudicated as incident, subject to derogation from the following paragraphs in relation to third parties"; and, since Article 493 of Code of Civil Procedure states "The third party in any case, either it is intended in the regular or executive ruling, it is always an incident" and, taking into consideration that these do not fit this type of proceedings, it is applied what stated in Article 486, which is "third parties that, for any circumstance, consider themselves impaired by any order dictated in the summary ruling, must present their claim separately", protecting in this way their rights. This is in line with what is demonstrated in the records, in so far as, in July 27, 2004 (see folios 8398-8401, section 79) Petroproducción appear in the present proceeding. It is to be acknowledged that Petroproducción Vice Presidency hands over power to Dr. César Abad, to which the trial judge in his order dated on August 26, 2004 at 9 AM (folios 9051-9053 front and back) in its concerning section claims: "Add to the files and

inform the parties the special power that Mr. Engineer Fausto Jara Martínez, Vice President of State Enterprise Petroproducción, grants to Mr. César Abad López, in the same way add to the files the submission made by the above mentioned Dr. César Abad López", to which Chevron, through submission dated on September 13, 2004 at 11:40 AM (folio 9445) requests Petroproducción to clarify its intention about its role in the trial. In the order issued in September 21, 2004 (folio 9450) the judge states: "Add to the files the submission made by Dr. Adolfo Callejas on September 13, 2004 at 11:40 AM regarding its content; even when Petroproducción is not part of this trial, transfer to Dr. César Abad, attorney of the Vice President of that entity, so as to clarify on scope, implications and intentions of the submission to which the representative of the defendant refers". Finally, in folio 9458 (section 87) it is the submission made by Petroproducción in which it is stated that Petroproducción, Petroecuador subsidiary, is not a party in these proceedings. To pass a final ruling, this Court considers this trial has been initiated against Chevron for the procedures made by Texpet (fourth level subsidiary of absolute property of Texaco Inc., with which it partnered in 2002) in the concession started under the Contract of 1964, mentioned above, and in which clause 3.7 states that "It will be left to Texaco only the ways, the means to carry out procedures corresponding following the current agreement, in a way that it will be able to explore and exploit oil, gas and other similar hydrocarbon types in the area […]", which is why these actions carried out by Texaco, under its sole and only decision, and its consequences in the environment, which concern this ruling. In this Presidency's criterion there are three sound reasons to exclude the liability damages of Petroecuador in the scope of the present ruling: 1) only the applicant and the defendant appear in this trial, while the third party which is presumably liable for new damages (Petroecuador) has not been able to exercise their defense on this cause; 2) damages caused by third party (Petroecuador) have not been requested, reason why these are not included in the litigation that has been entrenched with the statements of claims and defense, making clear that these damages are not to be considered as compensated through this ruling and, the applicant rights to request reparation are protected and, 3) the obligation to make reparation imposed on the author of a damage does not extinguish because of new damages attributable to third parties. The destruction of the item to be repaired or handed in has been

recognized by the doctrine as a way of extinguish the obligations; however, it has not been alleged and it has not occurred in this case since the item to be repaired is not destroyed but has been subjected to several damages of different types and origin, making clear once again that those damages not included in the claim – referring to the damages caused by the defendant – have not been considered as reparable by this ruling. For this purpose what is relevant is to determine the existence of those damages whose reparation is required (see folio 79), as it in effect has been done prior in the text in relation to the contamination of hydrocarbon source; nonetheless, just as it was noticed before, there are other sources of contamination potentially damaging that have been registered in the file which especially pointed out by expert Jorge Bermeo, who in his conclusion n°2 refers to the Contamination of Water by Human activities, indicating that "Another contaminating spot is that originated by direct discharge of water without any prior treatment to the rivers in the region, which can be observed in the number of colonies of fecal coliforms found by PROTAL-ESPOL Laboratories in most rivers of the area"; and, in the report made by expert Herrera referring to the environmental impact produced by the soil mismanagement, to which is convenient to refer to Article 116 of the Civil Procedure Code which clearly establishes that "Evidence should be defined to the issue under litigation and the facts being judged". In this trial, neither municipalities nor any other potential contaminating entity (plantations, crops, haciendas or farmers) have been taken to court and, even when it has been proved that there is a possibility that any of these contaminating agents (coliforms or fertilizers) may also be a potential cause of any of the damages proved, this possibility does not alter the actual fact proved in the file that several agents used and/or produced during hydrocarbon exploitation can be found in the environment and are potentially capable of causing them as well. In accordance with the precautionary principle, all agents potentially damaging must be harmful for health and the environment, but in this trial the parts liable for contamination through coliforms and/or fertilizers have not been sued, reason why the reparation of those damages on the defendant does not take place, protecting in this way the rights that can assist the parts to take action in their own defense. In this way, to conclude the analysis of dangerous elements proceeding from the procedures of Texpet in Consortium and, considering the results in most of the experts' reports are similar we

can conclude that 1. The procedures of all the oil fields operated by Texpet visited during inspections have responded to identical operating systems, which allows us to assume that operation practices did not vary from place to place and results have been the same; 2. The contamination of the licensing area reaches 7,392,000 m$^3$, figure obtained considering we have 880 pools (proved by aerial photographs certified by the Military Geographic Institute included in the file, analyzed together with the official documents from Petroecuador provided by the parties and especially by the expert Gerardo Barros, and aggravated by the fact that the defendant has not provided the historical archives informing the number of pool, its construction criterion, use or abandonment) of 60 x 40 meters, given the possibility of leaks and spills, at least 5 meters around the pools must be repaired and, the pools are 2.40 meters deep (which is a reasonable estimate, since pools are of different measures and, as we stated before, the defendant has not provided a file or historical archive informing the quantity or size of the pools); 3. The surface drinking water has suffered an important impact from the dumping of at least 16 thousand million gallons of formation water during Texpet operations and; 4. There are risks of leaking from the pool that could affect groundwater. 9.3. - OTHER TYPE OF DAMAGES. However, you cannot fail to observe the fact that the environmental damages described above and which are attributable to the defendant's activities (on soil and water) can have consequences especially serious in those cases affecting the ecosystems where the living groups whose cultural entirety is firmly associated with the region's health, since environmental degradation may jeopardize the group existence (see Orellana, Criminal Punishment for Environmental Damage: Individual and State Responsibility at a Crossroads, Georgetown International). In this case the applicants have alleged at least two types of impact suffered by human beings: 1. adverse effects for health, including high rates of cancer, miscarriages, high child mortality rates, and genetic malformations and, 2. Impacts on indigenous communities, including displacement from ancestral territories and loss of identity and cultural integrity. We shall begin with the issue of human health which is the most complex and urgent of all the aspect presented before this Court.

According to the United Nations Committee on Economic, Social and Cultural Rights, health is about "a human right mainly and absolutely for the exercising of the other human rights. Every human being is entitled to the enjoyment of the highest attainable standard of health allowing life with dignity" (General Comment 14, General Assembly 2000, for this we understand that this is necessary component of the right to live, in a way that proceeding against people's health is like proceeding against their own lives. The length of this fundamental human right goes beyond any argument that may set the parties involved, since this right has a wide development in the different international instruments. Thus, in the International Covenant on Economic, Social and Cultural Rights, paragraph 1 of Article 12, we find it is about the "right of everyone to the enjoyment of the highest attainable standard of physical and mental health". In paragraph 1 of Article 25 in the Universal Declaration of Human Rights it is stated that "everyone has the right to a standard of living adequate for the health and well-being of himself and of his family, specifically food, clothing, housing and medical care and necessary social services". Furthermore, the right for health is recognized in a special way in the subsection IV of paragraph e) of Article 5 of the International Convention on the Elimination of All Forms of Racial Discrimination of 1965; and identically in section f) of paragraph 1 of Article 11 and Article 12 of the Convention on the Elimination of all Forms of Discrimination against Women, in 1979; also, as in the Article 24 of the Convention on the Rights of the Child, of 1989. In regional issues it can be observed in Article 10 of the Additional Protocol to the American Convention on Human Rights in the Area of Economic, Social and Cultural Rights, in 1988. Consequently with the invoked regulations, this Presidency recognizes that the right to health is associated in a special way with the right to human dignity, to non-discrimination and equality, since all these are integral components of the same. To assess the possible adverse effects for human health caused by the contamination reported in the granted area, the following evidence is taken into consideration: the copies of the folios 41 to 45 of the file "Situation of Mothers and Children in the Ecuadorian Amazonia. Nutrition Health and Physical Growth in the Ecuadorian Amazonia", prepared by UNICEF. According to the defendant, this document points to the causes of infant death which in theory demonstrates the difference of that asserted by the applicants, since these alleges the situation to be similar in the rest of Ecuador. These information are presented from folio 3201 and, after

checking these we noticed the different provinces in Amazonia report a determined number of deaths related to tumors that may be associated with cancer alleged by applicants, but for the Sucumbíos province there is no even a typology related to cancer as cause for death, reason why there is a considerable bias in this information that prevents comparison or appreciation of the exposed reality. As will be seen below, this bias repeats itself in most official statistics due, mainly, to the lack of presence of the State in the area. Regarding certified copies of folios 81 and 82, "Environment Sanitation Coverage in the country and the Amazonian provinces during 1989 and 1990", a chapter of the previously mentioned document, it is taken into account as statistic indication of those categories involving environmental sanitation, as if Sucumbíos province has the lowest total of all Amazonian provinces in home connection of drinking water and in access to open tap, which does not mean that people living in these regions do not make use of water instead it necessarily implies that inhabitants of these provinces are most dependent on natural water sources. It is considered that the document "Situation of Health in Ecuador, Core Indicators per Region and per Province" 2000 and 2001 Edition. As the defendants allege, in this document it is revealed that, opposite to the applicant's affirmation, the state of all cantons and provinces in Ecuador is very similar; however, it is a known fact that does not require evidence but to leave a record, as the information presented in "Environment Sanitation Coverage in the country and the Amazonian provinces during 1989 and 1990", and on folio 14 of the document "Endemain III" Report on the Amazonia, chapter "Housing Characteristics for Study Domain" Chart 3.1, Orellana and Sucumbíos provinces have suffered during decades from the State abandonment (access to health services is inferior and, is also inferior to the access to drinking water), presenting a gap regarding presence of the State and unsatisfied needs in human health, which has reflected almost complete lack of state health services, preventing people from receiving prevention, diagnosis or treatment whatsoever, in a way that is difficult to be part of official statistics which represents an important bias to be considered. It is considered as evidence folios 61-74 of the document "Report on Human Development, Ecuador 1999", published by UNICEF in which information on environmental policies and Ecuador sustainability in the 1990s is provided.

It is considered that the defendant alleged that even though this information registers Ecuador environmental issues, oil exploitation techniques do not constitute an environmental issue; however, after checking the document the court has found under the title: "Some Facts and Number of the Ecologic-Environmental Issues of Ecuador", in the literal e), the following text: "Disorganized and irrational exploitation of non-renewal natural resources. These activities are made at national level, being the most remarkable and conflictive cases those related to oil and mining. Mining and oil exploitation are both carried out without a particular planning determining the cost-benefit of these activities that are authorized before the sole presence of fields without an assessment as to whether or not these are comparatively profitable with the collateral impacts that may bring to society and the environment. In practice, most places where mining and oil related activities are carried out, which in many cases are protected areas, have suffered high ecological impacts either due to contamination or destruction of the different renewable natural resource." The defendant has also alleged that en folios 63 and 64 of the same report it is pointed out the lack of environmental policies in the country in the 1980s, when it is the beginning of an incipient policy of environmental protection; however, it does not behold this legal analysis made by UNICEF, and instead will support its decision in its own analysis of the environmental protection regulation and its development, as it has been shown above. Regarding deforestation, it is taken into account what has been mentioned in folio 66 in relation to "the process of deforestation is strictly related to agriculture borders expansion and spontaneous colonization of tropical regions with some exceptions". The certified copies of folios 160-166 of the report About Human Development, chapter "Health Indicators in Ecuador according to Regions, Provinces, Cantons and Area of Residence" where according to the defendant it is shown that all cantons in Ecuador present the same information, which after being analyzed it can be noticed are not quite right. The defendant has not considered the bias previously mentioned, caused mainly by lack of information due to absence of the State in this provinces, which has provoked the lack of influence of the information presented, being incomplete reflection of reality for the court. It is considered the certified copy of folio 14 of the document "Endemain III" Report on Amazonia, chapter "Housing Characteristic for Study Domain", Chart no. 3.1 published by CEPAR, in which it is reflected a high percentage of 19% of

inhabitants of Amazonia using as water supply resource a River, Lake or Ditch, in comparison to a 5.7% in the other regions (1.3% for the Island Region) proving beyond any bias, the dependence of the applicants to the Amazonia towards the sources of natural water. In relation to charts 1, General Rates on the State of Health in the Ecuadorian Amazonia, corresponding years to 1967, 1970, 1974, 1978, 1982, 1986, 1989; 2, life expectancy in the Amazonian Region, corresponding to years 1962, 1977, 1980, 1985, 1980-1985, 1985-1990; 3, "Neonatal and Infant Mortality" 1989; 4, Infant Mortality Rate 1980-1989 are taken into account to issue this ruling with the notated considerations. It is taken into consideration as evidence the publication made by CEPAR "The weight of disease in Ecuador provinces – Years of Healthy Life lost by premature death and disability – Avisa" – Published in Quito, September 10, 2000, where the information on the number of physicians available per 10,000 inhabitants calls the attention, since it is noticeable the significant disparity between the different provinces, such as Pichincha, with 20.9 physicians per 10,000 inhabitants and 633 Health Centers and, Sucumbíos, with 6.8 physicians per 10,000 inhabitants and 38 Health Centers. Secondly, it is considered that the publication point out that "the grouping of diseases was determined in the study in Mexico, thus there is no adjustment required for the study of the provinces", which calls the attention because there is a possibility that the reality in the entire Mexican territory is not comparable to that in the provinces of Orellana and Sucumbíos, which is not discussed enough in the publication and may represent an important bias in the presented information. It is considered that out of the 3 groups of diseases including 133 diseases, the first group refers to communicable diseases, nutrition and reproduction would not be associated with the object of this litigation. The second group includes non-communicable and chronic diseases and, the third one refers to deaths caused by violence, accidental or intentional injuries; so that we are interested in the second which includes cancer, contributing to the 42.2% of the disease in the country (903,561 AVISA), which means a loss of 63 years of healthy life per inhabitant. According to what this publication states, "Diseases grouped as non-communicable are product of urbanization and new lifestyles among the population, also new diets and lack of exercise." This contributes to prove that this type of diseases is common to modern

scenarios, in accordance with the statements provided by Mr. Silvio Albarracín when examined during inspection in Yuca 2B, Miguel Zumba in Sacha 13 and, Amada Armijos in Cononaco 6 whose interviews will be discussed below. Finally, with respect to this publication it is considered that: "Certainly, the weight of disease is higher in provinces located in layers of extreme backwardness, in this province of high mortality rate we find the 17% of the weight of disease in the country, even though they have the 9% of the national population"; chart 1 in folio 28 shows that Amazonian provinces have the highest percentages of poverty and destitution and, also in AVISA rates per 1000 inhabitants, which seems to have a relation between these indicators; however, after analyzing all information presented, not only in this study but also in the rest that have been mentioned, we can conclude that is not poverty which directly causes mortality, instead it is common denominator; in other provinces with similar poverty rates we could not find the same problem which undoubtedly reflects the existence of other factors that may have an influence in such mortality, since poverty by itself cannot cause problems, instead poverty is the problem and it may derived in other problems from inability and/or impossibility of accessing health services because of extreme poverty or lack of such services. In fact, it seems to be quite the opposite, being contamination another factor contributing to worsen poverty conditions; it can be observed that people living in places affected by contamination have more issues developing economic activities in these conditions. Likewise, we must necessarily remember and consider that expert Jorge Bermeo in his conclusions indicates that "Analysis made on fish tissue determined presence of total hydrocarbon types in fish rated highly over the allowed number in water, which not existing in our country of reference or regulation indicating or determining maximum allowed quantity present before causing problems to fish and therefore to the health of those using it, we take as reference the values allowed for water and, from this point we can manifest the existing contamination by hydrocarbon; which could become a nutritious problem if continued. The Agency for Toxic Substances and the Disease Registry, the ATSDR of the U.S., indicates that these products are highly harmful for health and are the result of a mixture of different products

derived from oil and oil as such (gas, lubricating oils, grease, tar, etc.), which is why the presence of total hydrocarbon in fish is the result of oil activities carried out in the region" (see folios 159373 to 159376). Afterwards, in accordance to the evidence request number 84 submitted by the [sic] on October 27, 2003, at 5:00 p.m., expert Gerardo Barros had to present a report on "the current use of the so called reservoirs in the perforation and reconditioning or maintenance jobs in oil wells of the different oilfields that belonged to the consortium Pertroecuador – Texaco, through a sample that the Expert will select from diverse wells in which the State Company Petroproducción has conducted either directly or by means of specialized contractors, such perforation, maintenance or reconditioning jobs in the fields called Lago Agrio, Sacha, Shushufindi, Auca and Cononaco since July 1, 1992 to the date of the report. Your Honor, I hereby request you to order the Expert to collect official information from the National Hydrocarbons Agency on the wells drilled and reconditioned during the above mentioned period by Petroproducción and select thereof a representative number for his report, which will include the number of reservoirs used in each case and the purpose or destination of its use. However, upon the experts written opinion, it was noticed that the job carried out by said expert did not strictly comply with was what ordered but extended the report to oilfields that were not requested as evidence, he took many field samples and made observations related to health, which are not considered for having easily exceeded the purpose of the above described expert's written opinion. It does not take into account that all the above mentioned documents presented by plaintiff help precisely to contradict what was confirmed by plaintiffs; however, they complement the complex scenario that must be appreciated as a whole; for that reason, the evidence presented by plaintiff will be considered, who in supporting the case, presented the studies that confirm their opinion; thus, the Judge should also take them into consideration. In the Yana Curi report, on file 34, it was surprising the fact that the report had been prepared by the Health Department of the Vicar of Aguarico in collaboration with the Medicine and Tropical Hygene School of London, as a response to an alleged challenge of oil companies and the government, to prove the adverse effects on health. As regards the scientific evidence of the impact of petroleum on health, the report starts mentioning the studies carried out on the impact of petroleum on animals and afterwards it refers to its impact on the different phases of hydrocarbon activities on human health. The effects of crude oil on animals are properly registered,

pursuant to the information disclosed, which refers for example to skin tumors on rats after the application of crude oil on them (folio 3157), weight loss and size of rat fetus who ate crude, significant differences in weight and blood hemoglobin levels of otters who lived in polluted areas of the Prince William Strait (folio 3158), thus proving that "crude oil exposure can cause injuries on certain organs, cancer, reproduction defects and even death", both in domestic and wild animals. As regards the impact on human health, the analysis makes a difference between the impacts that may be suffered during the different stages of the cycle of petroleum activity and presents at least 3 roots by which petroleum can reach individuals: skin absorption, ingestion and inhalation. It specifies that exposure is not necessarily limited to the area of contamination; there are different mechanisms by which contamination may move from one place to another. The impacts referred to the exploration phase have not been documented and respond to simple observations of the author; therefore, they are not taken into account. On the contrary, in the perforation/production phase, even though we were informed that a few studies were carried out, and even some of said studies do not evidence any relation or excessed diseases; however, the information about oilfield and gas workers of the U.S. and the relation between their jobs and acute myelogen leukemia will be timely considered, as well as the effect of leukemia among oilfield workers in China. It is taken into consideration what the report indicates: "The effects on individuals upon an acute exposure to crude oil are mainly temporary and have a short duration unless the concentration of components is unusually high". The particular concern about benzene, toluene and xylene exposure is also considered. Likewise, when it says "numerous epidemiologic studies performed on workers of different occupations have demonstrated the carcinogenic effects of HAPs". As regards mercury, a heavy metal concerning human health, it may be present in perforation wastes. In this way, the studies which were carried out on animals demonstrate the potential risk that supposes the exposure to

different petroleum components and/or chemicals used for its production, whereas the studies carried out on human beings, referred to in this report, have demonstrated, in its majority, that the exposed population face a high risk of severe an irreversible effects on their health, which, if so, it could be a potential problem concerning public health. The purpose of the study is to "determine whether the contamination of the environment by petroleum related activities in the East of Ecuador has affected the health of the population that lives nearby wells and oilfields". The conclusions of this study will be applied to the contamination originated by petroleum related activities, whoever its operator may be. In general terms, the health of populations living near wells and oilfields was compared to other populations living far away from such facilities and if contamination originates in such areas, it will be an important factor to support the difference found. This report includes an "environmental assessment" based on water sample collection, as stated in the report. The samples collected for this report were not obtained within the proceedings or upon the request of a competent authority; therefore, they will not be considered to enter ruling; they will only be considered for the purposes of the report. For the purpose of sentence enforcement, the definition stated in the report on "polluted communities" will be taken into account "Polluted communities" shall mean "those communities found within an area of 5 km, surrounding a well or oilfield, following the river in the direction of the current". This study is taken into consideration (together with the possible interpretations) because the steps taken follow a methodology that this Court deems appropriate for an epidemiologic study having the proposed objective, since the purpose of epidemiology is the assessment of the frequency and distribution of diseases among individuals and the investigation among certain exposures the occurrence of a disease; even though the field study was conducted in November 1998 and April 1999, before the commencement of this trial and therefore, without Court intervention. Among the conclusions, the author confirms that it is difficult to establish a relationship between petroleum contamination and its impact because the effects vary and because there was not much information available about past contaminations; however, the author can confirm that "women that live near wells or oilfields have a worse general health condition than the women who live far from such wells and oilfields" pointing out that "there are a number of reasons that suggest that the

contamination of wells and oilfields is responsible for the adverse effects on health, as stated above". The first reason that supports the idea of a connection between contamination exposure and a worse health condition is the fact that both an exposed and a non-exposed population were compared, both under similar social and economic conditions. The second reason is determined by the statistical importance of the results found. The third reason is supported by the studies conducted on animals and human beings which alert us in a similar way about the risk that exposure implies for health. Finally, the fourth reason is supported by the fact that the results coincide with the effects known for petroleum exposure. As regards the study on "Cancer in Ecuadorian Amazonia", in volume 35, it recognizes that "the information about the incidence of cancer on the region is scarce", that "In the Amazonian region there are no health care centers were cancer can be diagnosed or treated and the suspicious cases are sent to Quito" and that "hospitals do not have histopathology services or access to cancer treatment", which was already warned before in this opinion and has not been contradicted or distorted by any other evidence in the file, that is why it the data of the National Tumor Registry is so revealing, even though it contains the cases diagnosed in Quito, it collects 985 cases from the Amazonian provinces between 1985 and 1989. Despite this fact, it is recognized that "even though the registration of tumors in Quito is high (95%), given the geographic and socio- economic difficulties to have access to an adequate health care service for the inhabitants of this region, the cancer rates are highly underestimated". In this study, as in Yana Curi, populations exposed to petroleum related activities and non-exposed populations were compared, but in this last case the areas exposed were defined, for example those were there was petroleum exploitation during the last 20 years. The results indicate a standardized impact rate of 39.49 by 100,000 men and 68.25 for women. The Relative Risk (Men RR: 1.40, Trust Interval 95%; 1.15-1.71; and women RR: 1.63; Trust Interval 95%; 1.39-1.91) set forth in this report, a very important statistical particular to issue this opinion since it can be used as a measure to assess the medical probability that a disease is caused by certain agent; therefore, this information will be used to determine a cause-effect relationship. This Court agrees with the conclusion of the report that states that all this particulars suggest a connection between the risk of having cancer and living in an area having petroleum exploitation history because it is inevitable to notice what these signs indicate. Even though this information may not be enough in itself to prove a cause-

effect relationship, this evidence will be analyzed together with the rest of the evidence to reach the appropriate criteria of the Judge, considering that these studies reflect group characteristics and exposures, not individual ones. In general, different epidemiologic studies have proved how the different types of cancer found in the Amazonia are associated with the exposure of chemical compounds of petroleum, but in particular, the results of this study suggest a relationship between cancer impact and the fact of living in areas of petroleum related activities, suggesting a cause-effect relationship for the intensity of the association between exposure and certain types of cancer; by the evidence of biological mechanisms that certain crude oil components may increase cancer risk; and for the firm arguments of other investigations that associate chemical compounds of petroleum and cancer. In relation to these two last documents, it is observed that the defendant presented the transcription of the interview conducted by Dr. Patricio Campuzano, attorney for the defendant, to Dr. Mishael Keish, made by Luis Velasteguí Galarza, expert designated for this purpose, submitted to the Court on February 17, 2010, at 5:00 p.m., where, as far as it is understood because of language limitations, Dr. Keish affirms that Dr. San Sebastian could not establish cause-effect relationships with the information he had at that moment; therefore this Court warns that upon reading the works of Dr. San Sebastian it is clearly noted that he has not done so because he expressly explained that the limitations of his job do not allow him to establish a cause-effect relationship. Thus, the Judge understood that such information suggested an association between petroleum related activities and health damage on individuals. Similarly, in Dr. Patricio Campuzano's statement, who in the judicial inspection of South Sacha Station (see file on folios 97512 to 97585) on the defendant's behalf, expressed among other things, the following: "in Epidemiology there are several methods to arrive at valid and representative conclusions; one of those methods is determined by surveys to the group of potentially harmed individuals. These surveys are based on various questions to reach conclusions. Among the questions asked is one related to the possibilities of having access to healthcare centers to obtain a medial diagnose and treatment", which coincides with the statements of the above mentioned reports, thus, becoming a strong criteria that is aligned with this Court's reasoning through

this opinion, understanding that there are interpretations that affect statistics, being one of the most important the lack of access to health care centers. Once again it is noted that the defendant has alleged that "Dr. San Sebastian's studies do not show a cause-effect relationship Your Honor. You have the sacred duty to enter ruling on this matter as you may deem appropriate and to that end you have to be absolutely sure that petroleum causes diseases; that is, that there is a causal nexus, for the effects from the epidemiologic point of view that we have analyzed and we have questioned the scope of the studies carried out by Dr. Miguel San Sebastian", as stated in judicial inspection file. In the same judicial inspection, on behalf of plaintiff, participated Dr. Jaime Breilh, who submitted a document signed by several scientists of the different continents (folio 97434 to 97438), in which according to Dr. Breilh himself, "this group of 50 scientists in the world agrees on the fact that there is no science or no perfect studies are accepted, there is no perfect study from the methodology perspective. I say so after 25 years of investigation in this country, after many pieces of work published in different languages across the world. However, there are studies, of course, as the case of San Sebastian, subject to strict revisions to be published in magazines and such revisions include revisions of a methodology nature. What does the reviewer do? I have been reviewer of Articles of Egypt. What is done? It does not say, methodology is perfect or imperfect, what one says is, methodology allows me a certain level of suspicion to assume the beginning of precaution", thus, we repeat that the works of Dr. San Sebastian clearly indicate that such reports do not prove a cause-effect relationship, they rather suggest an association and that is how this Court will consider it, a causal nexus will be determined reviewing the evidence as a whole. The words of Dr. Campuzano when analyzing the charts prepared by the National Institute of Statistics and Census, which contain mortality rates based on the population in 1998, will be considered also together with the rest of the evidence presented and also taking into account the interpretations that may affect the statistical data presented. As regards the field investigation report entitled "The Texaco Legacy: wells and stations" carried out in 2000 by experts Manuel Pallares and Pablo Yépez, included in the file by order issued on October 22, 2003 at 3:00 p.m. One of the authors, Pablo Yépez, says in his statement that it was financed by

Proteus foundation (folio 2147) but this Court received a letters rogatory with information of said foundation denying the statement (see folio 156033), which results inconsistent since its origin was not clear enough. With this appreciation it is considered that in the survey there are several testimonies were health affections have been reported from folios 272, until folio 611, however, the appreciation from the defendant is correct in its impugnation to such Report, in the sense that in order for a witness to be taken as such he would provide his testimony before a competent administrative, judicial or consular official, after providing his legal oath. However, it is informed that the information collected in this report, even thought it has been incorrectly called "testimony", it is not such, as testimony is what witnesses offer before a competent authority, so that it is evident that it is not about witnesses providing a declaration, but simply surveys, in which the same dispositions are not applied for a testimony and there is no need to give legal oath to the surveyors. This mentioned, it is evident that such testimonies do not have the value as if they were given by a witness who gives legal oath, before a competent authority, but maintain its value as statistic information source, whenever the information was collected in a technical manner by qualified persons. Also, it is considered that the study of the field called "Study to know the reach of the contamination effects in the wells and stations perforated before 1990 in the fields of Lago Agrio, Dureno, Atacapi, Guanta, Shushufindi, Sacha, yucca, Auca and Cononaco", performed by Roberto Bejarano and Monserrat Bejarano, added to the process by a providence on 10/22/2003, at 5:00 p.m. , and stated in the file since section 7, folio 614, in which 1017 families, from which 957 were considered to be greatly affected;- From the affected families, 42, 42%, that is, 4006, started actions to remedy their situation and only 17, 24%, that is, 70 obtained some result. The report does literally say the following: "Based in observations from different fields, wells, pools and the direct conversations with families from the involved persons and affected by the Ecuadorian hydrocarbon contamination", "The field owners or those who know the area where the wells and their respective pools are always accompanied the technical team and were the main source of information as they are the only ones who know the place history". It also says: "The direct contamination towards the rivers, essential water sources for the majority of the families, is one of the worst existing problems, as it is used to cook, drink, shower, wash clothes and for animals.

For these reasons the presence of illnesses produced by the exposure and use of river water includes dermal affections, intestinal and vaginal infections, and in several cases cancer, in women basically of the uterus, ovaries and breasts; in general of the throat, stomach, kidney, skin and brain". One of this report's authors says in his testimony "The Frente contracted me. I imagine that there is an inter-institutional partnership between Petroecuador and the Frente that is why for sure it was printed in Petro sheets". This witness assures tat the samples where taken randomly, however the impugnation on the defendant's behalf against the proof claims a lack of impartiality from the authors side, which seems to be proven with the same testimony, where the author admits to having been contracted by the Frente de Defensa from the Amazonian, which fact could have affected its objectivity. Because of this, this Court does not consider this report effective proof of the facts within it, but they constitute evidence to be considered along with the other. Finally, in regards to the persons' health damage, it is noticed that no harm or affections to human health have been proven in a casuistry manner, that is, the existence of harm over the health of particular persons has not been specifically identified, but it has been proven epidemiologically is the existence of harm to public health. In relation to the lack of proof about health harm to any individual in particular, this Presidency notices the appreciation of the defendant in the sense that no medical certificates have been presented to demonstrate the existence of any harm or pain to the health of any specific person, so in order to resolve it is consider in the first place that it has not been a demand on the reparation of particular harm, but that the demand party request in the health subject is "The contract on the defendant's behalf of specialized institutions to decide and implement an enhancement and monitoring plan of the health of the inhabitants of the affected populations by the contamination" (folio 80), so the given proof does not need to refer to particular damages, but to an impact of the public health, so the fact that there is no proof of particular harm or damage is not relevant; and in the second place that the mentioned request is coherent with the purpose of the demand that is the reparation of environmental damages, as it has been seen are those caused in the environment or in any of its components, so the existence of harm to the public health is what needs to be analyzed and if these harm have a direct relation to the reported environmental impacts and for which reparation is demanded.

In this point we think it is appropriate to consider the conception that the inhabitant have about their own health, so that their reported declarations before this Court are taken into account, in which in general, the interviewed inhabitants during the judicial inspections appear to have a very poor conception about their own health, and consider themselves to be affected by the Texpet operations, This is taken into account to the protection of Article 245 of the Civil Procedure Code that enables the Judge to "examine the key persons that know the place of the house", during the judicial inspection diligences, having to highlight the procedural truth that all of the received declarations are identical, without the existence of a single declaration that indicates the contrary. In this manner, during the different judicial inspections there were received several declarations from persons that described their knowledge of the facts pertaining to this ruling. In this manner, in relation to the health impact the following declarations were considered, which in a coherent way describe similar situations, in most cases related to the use of contaminated water by hydrocarbon-c. Therefore, Mr. Silvio Albarracin said during the inspection to Yuca 2B that "The Court presidency asks, are you sick with cancer? And the witness responds: no, my wife passed away from cancer three years ago. The Court president asks how much time did your wife live in this place, and the witness responds: she lived here for 18 years. The Court presidency asks if there is more that you could tell us about this subject that worries us, and the witness says: this is a contamination generated by Texaco, that has contaminated the main waters, because of that, when I took my wife to the hospital, she was detected cancer was SOLCA, when they asked us where we were from we told them that from the east, after what they asked if that area was a petroleum zone, I responded yes, and "of course" he told me, nothing else" (see act on folio 122533). Mr. Miguel Zumba, who declared during the judicial inspection from Sacha 13 (see act on folio 11722), explain before the Court that "From the water contamination when drinking, I have experienced stomachache and headache, all the family suffers from headaches and stomachaches, we even have asked Petroecuador and we have reported the fact and they have told us that we have to go to Quito to have some exams done and even they have given us a card to go there to have the exams done, we have gone to that place and we have not met the doctors because they are on vacation, or that we have to return tomorrow and due to the distance, we have not have time to wait, and we have not have the opportunity to be assisted by them."

This also comes to confirm the above analyzed in regards to the difficult access the affected have to the appropriate health services and the state absence that implies an important bias in the official statistics. During the interview to Mr. Zumba he also said that "we were told that they could not find any type illness and said that could be a very particular illness, because no uric acid or diabetes is detected, neither cholesterol, they did not find any type of illness, and that it could be another type of illness, maybe from some contamination. They asked where we came from and we told them that from the east, and they told us that we could be contaminated from the petroleum". An identical manner appears in the declaration of Amada Francisca Armijos Ajila, taken in the judicial inspection of well Cononaco 6 (see act in folios 123088 to 123123), that was perforated in 1984 and that tells us that "the river was not contaminated when we came in 1982, after a few years, as we did not know and we continued using the water until my husband got ill and died in 2002, he suffered from cancer, he passed away, he has been dead since 03/22/2002 when he died from cancer", clarifying also that "since last year we have been drinking potable water, we were not to collect water from the river, to wash, cook, from this river that is contaminating, from here we call it the Andina river. The oldest of my girls is also ill, she suffers a lot, learning", insinuating a possible connection between the death of her husband, who suffered from cancer and the use of contaminated water with certain carcinogenic elements. In an identical manner there is a water reference in the declaration of Mr. Gustavo Ledesma Riera, provided in the judicial inspection of well Shushufindi 4 (see act on folios 74879 to 74904), who clarifies that "Since I purchased this field, because there was no water to drink, because the water from the marshes could not be used, I followed my custom that it has been to make a cube; I thought carefully about making a cube to obtain good water that could be used", clarifying that the well has a depth of 11 meters according to the judicial inspection act, where the citizen also declared and answered to the questions in the following terms: "When the water started to come out, we left it for a day to see how much it rose, then when there was a quantity of water something appeared on the water's surface, a kind of oil. Due to our water necessity we started to clean that and we started to use it, more or less until ten months ago, when we stopped using that water, because every worker that came here with their family had their children sick, and even the workers got sick and we did not know why and now I find out this very serious problem that no worker wants to come because this matter has become well-known, that there is no water to drink here, I have water here that I bring from outside, I have to bring it by car because this water is useless, neither the water from the marshes that are all around, so no one wants to drink that water, because it became well-known due to the case of 8 to 10 workers, who have come here with family and all became sick, so it is public that no one should work in Mr. Ledesma's field, because there is no water to drink.

Question: Have technical, laboratory scientific analysis about what does the water contain not been performed? Answer: No, the doctor was able to tell the worker that there was contamination when he asked a worker where he was taking the water and worker told him from that well." Lilia Perpetua Mora Verdesoto, who -during the judiciary inspection of Sacha Norte- (See minute in folios 1043921 to 104461) said that she arrived at the area in 1985, has spoken in identical words and indicates us in reference to her own water well that "it's been several years since we opened the well in order to be able to extract water for human consumption, my husband dug it, but a contaminated dirty water comes out, the smell and a layer of oil on top of it, I have not been able to prepare juice since then, that's why we brought the water for cooking from the river, but even that contaminated water leaked onto the river. Onto the estuary from where we brought our drinking water." In a similar way, Mr. José Segundo Córdova Encalada, who says to have arrived at the area in 1980, during the judiciary inspection of Sacha Sur (See minute in folios 97512 to 97585), declared that "Now, why did my family get sick? Because we used to walk, since we are not rich, around noon time, local nature and climate made that smoke go up in the highway, which caused many men in these communities to suffer from the lower half of their body and it gave women cancer in their genitals. They breathed and that was due to the pure pollution. I am not knowledgeable about petroleum but I believe that they were affected by that burning fluid that caught the body", apart from that, in the minutes in folio 97539 state that "the witness manifests that his uncle - his father's brother - came from the province of El Oro, he was healthy and used to drink water from here, I told him I already know a little - do not drink that water - but he wouldn't stop drinking it, and after more or less one-year he became sick with heartburn, he was taken to Quito then came here back home several months and finally died, he was diagnosed with cancer, my mother used to regularly bring us lunch, she was good and healthy and got a stomach swelling, she is not dead but the expenses have cost us a lot." In the same judiciary inspection Mrs. Maria del Carmen Villota was examined by the Court Presidency, as stated in the minute 97548, where the lady declares that as she used to

walk over the crude oil spread on the roads and as the waters sometimes mixed with something that the witness calls "crude", that she "washed and continued the same as if water remained normally liquid", who asserted before the court that she has been diagnosed with cancer a few months ago. Also in this judiciary inspection Mr. José Holger García Vargas, who said to have his wife immobilized in bed and blamed the river pollution for his and his wife suffering, he asserted also that he used the river's water "since at that time there was nowhere to get drinking water from, river that we used and bathed and washed in, and that's why she has contracted some fungus that she has not been able to get rid of with any medicine until today", declaration that is particularly illustrative for this Court about these people's dependence on the natural water resources that have been impacted by Texaco's contaminations. Then, Gerardo Plutarco Gaibor, during the judiciary inspection of Estacion Aguarico (folio 82595-82642) claims to have been in the area since 1979, said that in the same inspection that: "we had arrived at that time, plenty dirty, dark water ran through the estuary and it was quite salty, I have a small house, downhill from here on the left, in which I established myself with my wife and the two daughters that I had back then. So the girls would go down to bathe in and drink from the water and used to get sick from typhus, fungus, and we did too, since we didn't know that it was polluted water and we bathed in it", declaration that contributed to prove that they were waters of human use and that the pourings done by Texpet subjected the persons using it to an improper exposure. Mr. Gaibor also said and proved to the Court President his illness sequels, as it can be seen in the minute that says "I have illnesses, as you can appreciate in these pictures Mr. President, here is fungus on my wife's skin, here is some on my backside, this is my belly, it's been years since then and until today that has continued polluting our skin and I even have it here in the shin, I have healed but I am still affected. This is from approximately 20 years ago. I continue with those infections to the skin Mr. President. I am not lying, it's proven. Therefore this water, as you can see there, is from the tube is being inspected, and plenty of salty water fell from it." Concurrently, in the judiciary inspection of Shushufindi 13 (please see minute on folios 74973-75013), Mrs. Aura Fanny Melo Melo, claimed that "water has always been like that, it pours out more when it rains, the grass that leads to the estuary remains stained, stained with crude, even my daughter, who went looking for fish one time, stepped into the estuary and her foot began itching and I was not able

to cure her. In Quito, a biopsy was performed on her, they healed her knee but they couldn't heal her feet from underneath, look, a biopsy was performed in her Quito and she bears the scar here but it can't be healed by anything". Also the declaration of Mr. Pedro Chamba Paucar, who says to have lived there since 1973, and asserted during the judiciary inspection of Shushufindi Sur Oeste (see minute in folios 10057 on), that "during those times I had a daughter that got sick and Cepe's engineer told me that he begged me not to bathe in that water, especially my wife who was pregnant to please not use the water and that they would come to fix it in a few days". All of these declarations made before the Court President, show a profound conviction that all the citizens interviewed about the water's pollution, and this last one, as the reason for their health problems. However, there are many other declarations that do not refer specifically to the water pollution but to the products deposited in pools and other oil installations, and that seven times became in contact with the people, as shown by Mr. Manuel Antonio Caba Caba's declaration, who during judiciary inspection of Sacha Norte 1 (see minute in folios 104391-104461) pointed out that he arrived in the area in 1986, and that his "wife used to shepherd cows around the pool edge, and they have an affection of the feet, I would like you Messrs. attorneys, Mr. President to verify. Here is my wife, and here are the affections to their feet, that for now we were able to heal and until now I could have…on both feet". Further into the file, we will find and interview to Romelia Mendua, performed through her interpreter Mr. Emergildo Criollo, giving the judiciary inspection of Guanta 7 (minute in folios 103431-103478): tells us that "with the arrival of the Texaco company, there was environment, big and small rivers pollution, that's why we suffered a lot during the time of Chevron company. They also killed animals that we used to eat. That's why we currently do not have enough food, children also remain small, we also suffer unknown illnesses, with the arrival of the Texaco Company". Then, the testimony of Mr. José Guamán Romero during the judiciary inspection of Aguarico 2, on June 12, 2008, who gives his version of how his wife, Mrs. Maria Transito Romero Carannqui died and what he says to have been told, blaming the oil in which his wife fell by accident and for the cancer that she contracted. There also is the declaration of Mrs. Rosa Ofelia Guamán Guamán, during the judiciary inspection at well Yuca 2B (see minute in folios 122533), said "I've been suffering for one year, I was told to seek treatment, I was very fat and now I'm getting thin, and from the exams that

have been performed on me, they told me that I have leukemia due to the pollution, given that we live beside a well", and finally it is also considered that during the judiciary inspection to Estacion Sacha Sur (see minute in folios 97512-97585), Mr. Hugo Ureña was examined, as stated in folio 97537, where the minute says that the witness has been living there for 34 years and that "the witness manifested that his father died from cancer, as well as one aunt and finally one nephew with leukemia, less than one year ago at age 17. He states that his father's illness left them very poor, since it was necessary to sell 73 cattle heads seeking health, as well as a car belonging to the witness's brother, despite that, the witness father could not be healed, who died, as well as his aunt a few months later from stomach cancer". This Court recognizes that all these above declarations are not reliable and incontrovertible proof that affection to these citizens health really exists, however they can't be denied value since we can observe an impressive coincidence between the facts described by all of these declarations, without existing any testimony or declaration against it. The experts that have participated in this trial closely know the historic reality better than those who have lived there, issuing their opinions before this court within their areas of expertise; however they have not experienced what it is to leave in that environment, and do not historically know it beyond what some documents prove. None of the experts that have participated in this trial does closely know the historical reality better than those who have lived there, therefore this declarations would be considered, giving them the deserved value and in accordance to the rules of the healthy criticism, and together with the other evidences presented by the parties. This court also understands that the citizens that have been examined during the judiciary inspections are neither doctors nor technicians in the health area, as clearly stated by Chevron's Attorney, Dr. Adolfo Callejas, who at the time of examining Mr. Carlos Cruz Calderón during this judiciary inspection of Yuca 2B asked him "how do you know that they are toxic wastes, what analysis have been performed to define that they are toxic?", therefore, in recognition of this sagacious argument of the attorney aiming to disqualify a farmer, it is repeated that in the subject this Court will appreciate such declarations in accordance to the healthy criticism, and together with all explanation of scientific evidence that has been submitted by the parts. However, this Court is inclined to think that all these coincidences in the received declarations corroborate sayings, which makes us think that the hardships narrated by said testimonies are real. With respects to the means submitted to prove the existence of damage to the public health and

it's origin, say the surveys and the epidemiologic studies, we must recognize that by law, it is normally required and reliable proof of the existence of damage, but that the law evolution has permitted the use of other evidentiary means. This is recognized by the Counsel of the defendant, Dr. Adolfo Callejas who during the judicial inspection to the Sacha 6 well on August 18, 2004, said: "There are two main ways to assess the validity of claims relating to human health: (1) The conduction of an epidemiological study; and (2) Performing a risk assessment; the two are based on a fundamental submission: "There must be personal exposure to an harmful agent that may be result in illness." In fact, the existence of an environmental risk is determined by the following three (3) essential components: 1. A source of contamination; 2. A way in which the pollution reaches the receiver; and 3. A recipient of the pollution. If one or more of these three components is not present, then there is no risk. In case there is risk and the three components complete the chain, there is still the possibility that the contamination is at such a low level that it will not cause any damage. Examples of sources of contamination may be oil pits and spills. The pollution existing there could be transported by air, surface or underground water or by direct contact. The receivers can be people, animals, plants or their water sources (streams or wells)". This important statement supports not only the evidence that can be provided to assess the validity of claims relating to human health, but also recognizes the possibility that under certain conditions, it can cause damage to human health. In a consistent manner one of the experts suggested by the defendant also acknowledged this possibility, saying that "Although the water does not contain significant concentrations of toxic components, this may present a potential harm to the receiving bodies and vegetation due to the high concentrations of salt (dissolved natural minerals from the production site)" (folio 70018). Having said this, it is necessary to proceed and analyze the possible ways of exposure of individuals to the environmental pollution reported, noting that ingestion, inhalation, and direct contact have been repeatedly mentioned in the proceedings and in this ruling, as their primary forms of exposure. In first place, this Court notes that all these mechanisms of exposure have been described both by the experts and citizens of the area, and is corroborated by analyzing the statements made during the judicial inspections

in which the residents of the zone have agreed to narrate these same forms of contact, as an example we have the statement of Amada Francisca Armijos Ajila in Conocaco 6 (see minutes in folios 123088 to 123123), on "since we did not know were continued using the water until my husband became ill and died in 2002", similarly Mr. José Segundo Córdova Encalada in Sacha Sur South (see minutes in folios 97512 to 97585), stated that "Now, why did my family became ill? Because we walked on foot, as we are not rich, at about noon, the nature here and the weather makes the highway smoke, that caused many men in these communities to suffer from the waist down and women to have cancer in the reproductive organs, they were inhaling and that was pure pollution I don't know much about oil, but I think that fire like fluid that they got in their body, affected them"; besides this, as we had mentioned, in folios 97539 it has been recorded that "The witness said that an uncle, a brother of his father came healthy from del Oro province and only drank water here, uncle, I told him, I already know a little and you shouldn't drink that water, but he kept drinking it and in about a year or so he started feeling bad with burning sensations in the stomach" Gerardo Plutarco (folios 82595-82642) he also said "very turbid, dark, salted water was running through this stream, I had a little house down from here to the left, and I lived there with my wife and my two daughters who I had at that time. Then the girls came down to bathe, drink water and were taken ill, they had typhoid fever, fungi, and we did too because we did not know it was contaminated water and we bathed there", just like Mr. José Holger García Vargas, at the Aguarico Station (see minutes in folios 82595-82642), who said he used the river's water "because at that time there wasn't any place to take the water from, just the river, and we used to bathe and wash", all of which gives an account of various forms of exposure, to which we add the statement of the expert Jorge Bermeo, mentioned above, in relation to the risk of these elements entering into the food chain. Having stated this, as regards to the health impacts suffered by the people as a result of the water pollution, we consider what was said by the field survey entitled "Study to determine the extent of the effects of pollution in the stations and wells drilled before 1990 in the fields of Lago Agrio, Dureno, Atacapi, Guanta, Shushufindi, Sacha, Yuca, Auca and Cononaco", prepared by Roberto Bejarano and Montserrat Bejarano, added to the process by means of an order dated October 22, 2003, at 3:00 p.m., and included in the files from section 7, folio 614, which reads:

"The direct pollution of rivers, an essential source of water for most families is one of the worst problems, since it is used for cooking, drinking, bathing, washing clothes and animals. For these reasons the presence of diseases caused by exposure and consumption of water from the rivers, causes them dermal diseases, intestinal and vaginal infections, and in many cases cancer in women basically in the uterus, ovaries and breasts; and in general in the throat, stomach, kidneys, skin and brain," this corroborates what was expected, in the sense that the Concession's natural water sources have been contaminated by the defendant's oil and gas activities and that due to the hazard of the substances discharged and all the possible means of exposure, this pollution threatens the health and lives of people in general and the ecosystem. However, this case is more complex, as we had previously noted, because the environmental damages described above, which are attributable to the defendant's activities (in soil and water) may have particularly severe consequences in cases that affect the ecosystem where groups whose cultural integrity is strongly associated with the health of the territory live, as the environmental degradation can potentially threaten the very existence of the group. Thus, in terms of impacts on indigenous communities, because these human groups depended on hunting and fishing, the impacts on the ecosystem directly affected them, however, the Court considers that the decrease in the hunting and fishing that the indigenous communities were dependent on, although it affects their food supply and thus their right to health and life itself is the result of impacts suffered by the flora and fauna, so we must undertake to repair the environmental damage caused to the flora and fauna to restore their livelihood resources and recover their traditional food supply, and seek to compensation for this impact. In contrast, in terms of loss of domestic animals and crops suffered by citizens who have declared during the judicial inspections, we must clarify that no specific claims have been filed to repair such damage, i.e. no compensation is being sought, however, since all the statements received during the judicial inspection are consistent, they will help to strengthen the criteria of the judge as to the reality of the situation described. All this no doubt may have also affected his right to food supply and consequently his right to life since "The right to food supply is a human right protected by international law. It is the right to have access, on a regular,

permanent and free basis, either directly or by purchase in cash or a quantitatively and qualitatively, proper and sufficient food supply, corresponding to the cultural traditions of the population to which the consumer belongs, and which ensures a physical and mental, individual and collective, free from anxieties, fulfilling and dignified life". (Ziegler, J., Report of the Special Rapporteur of the Commission on Human Rights of the U.N. on the right to food, Committee on Social and Economic Rights, Geneva, March 2004). Within this framework, we consider the following statements received during the judicial inspections: the statement made by José Guamán Romero in Aguarico 2, on June 12, 2008, who gives his versions on folios 141,008, 141,009, of how "I first cultivated coffee, then I had pastures, but it happened that grass was always dying because of the problem with the crude oil, everything was pure crude oil, my pigs died here, they were coming rooting the ground and all of the sudden they fell here". Accordingly, the statement made by Telmo Ramírez during the judicial inspection of Conocaco 6, on November 16, 2006, folio 123100, says, "The same goes for the cattle, I lost about ten head of cattle, and it drank water here. When that happened, I didn't even know what contamination was, we lost about ten head of cattle. I could not heal them with any medicine". We consider to be identical the statement made by Daniel Barre, issued on November 15, 2006, in the judicial inspection to Auca 1 (folio 122971-123007), which according to the minutes, says: "asked if he had any animals he replied, "of course, here the cattle miscarry and I die from the contaminated it drinks. The chemicals here which little by little go inside them are for this". The declaration of Manuel Antonio Caba Caba, who in the judicial inspection to Sacha Norte 1 (folio 104391-104461) indicates that arrived to the area in 1986, and has "first, I worked with coffee, I lost the coffee, then I sowed grass and I lost part of the grass, was breeding cattle, but the best cow got sick, miscarried". Similarly, the declaration of Mr. Gustavo Ledesma Riera, given during the judicial inspection to the Shushufindi 4 well, on July 25, 2005 (folio 74879-74904), who tells us that "in view that I had many losses, in other words, the cattle, the pigs had died and almost lost my daughter in law, because while she was trying to save the pigs that had fallen into the oil pit, she fell, but the workers that luckily were nearby, heard her cries for help and came and rescued my daughter in law, I have evidence, from the doctors that took care of her". Mr. Hugo Ureña was interviewed during the judicial inspection at the Sacha Sur Station, as recorded on folio 97537, which states that

he said "he has a forty acre property, most of which is covered with grass, and although he no longer has animals because they have died and miscarried, he requested from the company an assessment for compensation for his animals, an investigation was conducted by some experts from the Ministry of Agriculture, who found oil in the livers, kidneys and intestines of the animals, but he still has not found an authority for justice to be had, they never honored their offers". In the judicial inspection of Sacha Norte (folio 104391-104461), Mr. Carlos Quevedo Quevedo, who declared that he lives in the area since 1970, also declared that his crops did not harvest in an appropriate manner: "A dirty liquid with a little oil was running and that fell on the marshes, the plants were damaged, the fruit contaminated, let me give an example, a papaya, the papaya blossomed and began to harvest, and you ate it, it had a bad smell and then the person had had headaches and stomachaches", he added that "we did not use the water from the lagoon because it is not good, I have a small stream or spring and we take the water from there, but it is not favorable because it always turns out bad". Consequent with this, is the statement made by Mr. Briceño Castilo José Antonio during the judicial inspection at Lago Agrio 2 (folios 87923-87965), who declared before the President of the Court "then that is what I can attest that here in this area, I had cattle, then here's evidence I had the cattle and I lost it because the cattle sucked the water, it did not die but it never reproduced, it became thin, it produced no milk all that". We also found the statement made by Celestina Piaguaje Payaguaje, who says he has lived in the area since 1973, and during the judicial inspection at the Aguarico Station (folio 82595-82642) declared that "Yes, during the years from 1960 to 1969 he lived in the town of Secoya and Siona in a more dignified manner. There was no pollution and everything was normal, like the life we people from the jungle live. We lived well off from hunting and fishing and the environment was healthy. Then, from the year 70 onwards, everything changed abruptly". He also refers to this when he says that "it seems like our life changed completely, we were forced to seek an alternative to our livelihood, because there was no hunting or fishing, we had to breed cattle and live well so that we wouldn't have to search for another way different to the traditional hunting and fishing", explaining that "we had to eat fish, but sometimes the catfish, for example, had their stomachs swamped with oil and they had a different taste. This means

that they were contaminated. That happened with the small catfish and big catfish, too". During that same inspection, Gerardo Plutarco Gaibor, who claims to have been in the area since 1979, said: "And then we come forward with the same thing, we had a few head of cattle that drank the water and miscarried, became thin and died, the cattle died, all the animals died because they ingested that water, Mr. President". Also considered, is the statement made by Anselmo Abad Vasquez, on folio 79715, provided during the judicial inspection at Shushufindi 21, in which he states that "Yes, I had cattle , all of these were pastures, there is still some grass leftover, my cattle got sick, had sores which were not the so called Tupe, and all of that, as much as I tried they would not heal, we suffer from lack of veterinarians, but asked the one and the other and there was no possible cure, they became thin and died, then we realized it was because of contamination of the water, I chose to look for springs and make wells so that the cattle could drink water from there instead of the rivers, and until now, no one can drink water from the rivers". This is also consistent also with what Maximo Celso said in his statement, on folio 41659 during the judicial inspection at Lago Agrio Norte, he stated that "I had a pig pen here, I lost all my pigs, one hundred and twenty pigs, of which there were thirty sows that produced, since Texaco began to divert the water to this sector" and that "At the time I grew coffee. Among the coffee, I had a banana plantation that had a pig pen, and I lost all my animals, because at that time the formation water was continuous. The part that crossed over to discharge the formation water was around this place. They told us that it was healthy, even good to drink. And I was so trusting that I did not take my animals out because I was sure of that. When the animals, when the sows gave birth, the uterus remained on the outside, I consulted the doctor and he said it was an extremely serious contamination problem". Mr. Simón José Rogel Robles, was also questioned during the judicial inspection at Lago Agrio Norte (folio 41632-41693), and he stated that "My family and I were engaged in agriculture and cattle breeding because there was a pasture from where we are walking now up to there, then the cattle drank that water and it was no longer good for us, it became rachitic, we practically lost it, or they fell there and were bathed in oil, and we had to bathe them and sell them". During the judicial inspection at Shushufindi 13 (folio 74973-75013), Mrs. Aura Fanny Melo Melo, said, "I have cattle here, but the cattle dies, always, always, I gave some photos to Mr. Padilla who was the President, I have one here, I couldn't find the others, some die like that,

thin, a goat that died peeling, a piece of horn fell off, but I did not take pictures, because I did not know anything, and the fish do not grow", and Mr. Pedro Chamba Paucar, who says he has lived there since 1973, asserted during judicial inspection at Shushufindi South West (folio 10057), that "five animals died and the rest became rachitic and I had to sell them for half the price because I was losing them". Similarly, during the judicial inspection at Shushufindi 48 (folio 9407), Mr. Carlos Manuel Ajila Samaniego, stated that "What I have planted is an oil palm plantation, the palms near the oil well are dying, the one that is far from the well, does not die, just the one around the oil well dies. Furthermore, your Honor, there is a pit with waste, oil contaminated water and is clearly visible, may be about fifteen to thirty centimeters from here". Mrs. Rosa Ramos, who says she arrived in 1985, also stated during the judicial inspection at Sacha 53 (folio 9142-9171) that "it was about eight years ago, that they filled the part that was an oil well where they animals fell and died when you were not watching them". Mr. Carlos Cruz Calderón, during the judicial inspection at Yuca 2B (folio 1,225,333), stated that "There was an oil pit in this place, where a great number of barrels of oils were stored, head of cattle, pigs, chickens fell there because it was actually a well that had a lot of oil"; while Luis Vicente Alban, who said he had arrived in the area in 1980, during the same inspection at Yuca "B, stated that "At that time, I came here with my cattle, I settled and started working in the pastures as can be seen, and I knew nothing about the oil being bad, then they started to get sick and sicker and a lot of my cattle has died, the contamination is there and it stretches down to the village, about 30 head of cattle have died". Mr. Miguel Zumba, who stated during the judicial inspection at Sacha 13 (folio 11722), stated that, "When I bought the farm here I made excavations to get water, what we call buckets of water, and the water was contaminated with oil, throughout this sector, I even dug a deep well at about 6 or 7 feet from the house, and of more or less 3 meters, and we found crude contamination with a rotten smelling mud, but it had oil. There was oil and water below, in the well that we dug with a depth of more or less 12 meters, we found oil contamination and so on, so we stopped that, to date the well is open, but it is already being filled with trash and we dug another well further and also found contamination, the contamination was at about 5 meters, later we dug another well at 60 meters, the tracks are still there and we also found oil

contamination, so we had to carry water from the neighbors and the river, that we had to boil to drink, I brought water from neighbor, until I began to dig a well on the banks of the river, at 1.50 or 2 meters, more or less at river level, so that when the river dries up the water dries up too. When you first throw the bucket in, the water has oil but there is no noticeable contamination, we boiled the water that we used, of course it did not look clear and in time because we cleansed it with bleach and some other things that you add to the water, the color from the water would disappear, but it had a smell, a different smell, and indeed that water was used at that time while living here, fetching water and collecting rain. The channels are generally what we use here, in this area, we have collected rainwater, which we have always used many times after boiling it, but there has been many times when we have been unable to do so, and we have drunk it like that". Despite that Dr. Adolfo Callejas during the judicial inspection at the Shushufindi 48 well (see minutes from folio 9407), while exercising his right to question the citizen who gave a statement, expressed that "The result of agriculture is always random, as it is defined by the climate conditions, soil conditions," this Court does not agree that these statements of those interviewed are describing a random event, but the overwhelming coincidence of all statements, with no statement on the contrary, supports the thesis of constant damage caused by pollution, and not of a "random result". All these statements quoted invite us to conclude that the exposure of wild and domestic animals, and crops to substances from the oil industry adversely affects them in detriment of the ability to provide quality food for the people, which is a right necessary for the comprehensive development of an individual as well as for the preservation of their physical and mental faculties. On the other hand, it is considered the "loss of lands" claimed by the plaintiffs cannot be pigeonholed as environmental damage, as it is not an impact suffered by the environment or any of its components, but if there were to be damage, it would be in a strict sense patrimonial detriment. Thus to analyze this point, the Court considers, first, that no prior ownership of the land has been demonstrated, which should have existed in order for them to have it or otherwise have it taken away from them. The recognition of ancestral property of the land is subsequent to the events giving rise to this trial, consequently,

as of the date they were forced off their land, they had no acknowledged right of ownership over these lands, so legally they were unable to lose them. However, for this Court the records have shown the displacement to which the indigenous communities inhabiting the Concession area have been forced to, which is another element that influenced the cultural impact, especially because it was a group of human beings whose existence was closely tied to their natural environment. The main reasons for this displacement were the impact suffered by land and rivers, noise and pollution, because these change the configuration of the ecosystem that their cultural institutions depended on, inevitably forcing them to move, to change and/or adapt to the new-situation, as shown in the interview with Celestino Piaguaje, during the Judicial Inspection at the Aguarico Station (see folio 82595-82642), in which he states that "Yes, during the years from 1960 to 1969 he lived in the town of Secoya and Siona in a more dignified manner. There was no pollution and everything was normal, like the life we people from the jungle live. We lived well off from hunting and fishing and the environment was healthy. Then, from the year 1970 onwards, everything changed abruptly. First you could see how the Companies came, opening paths in the communities and also the helicopters, building heliports and we saw them coming to our communities in the Amazon basin. It seemed like if it was temporary work, but later the oil drilling and production work started. Hence I say, it seems like life changed completely, we were forced to seek an alternative for our livelihood, because there was no hunting or fishing, we had to breed cattle and live well so that we wouldn't have to search for another way different to the traditional hunting and fishing", Well, as usual, it was inevitable for us not to hunt or fish because there is no other custom. That is why we had to eat fish, but sometimes the catfish, for example, had their stomachs swamped with oil and they had a different taste. This means that they were contaminated. That happened with the small catfish and big catfish, too. That's what we seen. - Do they still continue to fish and hunt today? Well, these days, now, not much. Our hunting and fishing is limited". "This statement confirms the impact suffered by the cultures of peoples who depended on the jungle for their "good life", because the oil operations discharged their wastes into the same river where they fished, destroying their culture and customs. In addition the

plaintiffs have mentioned another element that had a cultural impact on indigenous people, and they claim it was a result of the very cultural interaction between oil workers and the communities. This Court, however, believes that such interaction, despite the impact it may have had on the culture of those indigenous peoples, cannot be considered an environmental impact, since it is not a case of human action causing damage to the environment or any of its components, but people directly influencing other people. For the above reasons, it is concluded that the only impact suffered by the indigenous peoples that may be considered an environmental damage is the cultural damage caused by forced displacement, mainly resulting from the impact on lands and rivers and from a decline in the species traditionally sought after for hunting and fishing, what forced them to modify their habits. On the other hand, the parties are hereby reminded that, under section 2216 of the Civil Code, both the causer of the damage and the causer's heirs are obliged to redress the damage. Therefore, even though the grounds for liability in this action (objective, no-fault) by the defendant and the legal damages proved in this case have already been ruled upon, it is relevant to review the causality of the various kinds of damages heretofore described. **TEN.-** Causality. At this point in this ruling, it is appropriate to consider applying the different causality theories explained above to the damages recently described, because such damages must be a consequence of the defendant's actions if the obligation to redress damages is to be deemed well founded. With this consideration, we begin this review by taking each kind of damage separately because, as we will see below, different causality theories apply depending on the type of damage and always with regard to the appropriate causality theory, preferred in our legal practice, as shown by the quotations from the ruling by the First Chamber (Civil and Commercial) of the Supreme Court of Justice, passed on October 29, 2002, published in the Official Registry No 43, on March 19, 2003. 10.1. Causality of damage to soil and water. Thus, we begin our review to determine the causality of the damage found in the soil of the Concession area by considering first the nature of the activity that allegedly led to the soil damage, i.e. the business performed by the defendant as operator of the Consortium. Therefore, this Court finds it appropriate to apply the "Wrongful creation of unreasonable risk from a dangerous condition" theory, which

deems the causal link proved when the causal result preceded the configuration of unreasonable risk, or the wrongful creation of a condition which certainly involved danger. Hence, it is appropriate to consider: 1. Whether Texpet's practices configured a risk, i.e. whether the hydrocarbon industry is in fact a dangerous industry (this characteristic has been established above by case law, therefore now we will perform a factual analysis of this dangerousness); in other words, whether the practices used by Texpet in performing its business necessarily involved the generation of hazardous waste; then 2. Whether this created risk was unnecessary, i.e. whether the risk posed by such waste could have been prevented or at least reduced by its creator; 3. whether failure to prevent or diminish the risk, even if able to do so, has in fact resulted in the occurrence of predictable damage; and 4. Lastly, we will evaluate statements by citizens who claim to have known these facts first hand. Such statements have been received during court inspections and will be evaluated in order to ratify or disprove the findings of this analysis. In this order, with the purpose of determining whether the operations conducted by Texpet created a risk, let us see how 1. THE PRACTICES USED BY TEXPET FOR PERFORMING ITS BUSINESS NECESSARILY INVOLVED THE GENERATION OF WASTE INTO THE ECOSYSTEM. In order to become convinced that the design and operation of the Concession by Texpet would necessarily generate waste, we have considered the statement given at the defendant's request by engineer Alfredo Guerrero, who during the court inspection at Guanta station, on folio 155965, provided an explanation of how the station worked, and was questioned by engineer Olga Lucía Gómez at the plaintiff's request. This statement appears on record as follows: "We are now at Guanta station, located in Sucumbíos province. As you can see, the manifolds are outside the station. This is a traditional production station; after the drilling is completed, the stream lines from all the wells come here to the station, where the fluid from every well is directed straight to the station, after passing through the manifolds, which are three-way valves, because we need to know what the output is per well, and it can be directed either toward the bigger separators, which are production separators, or toward the smaller one, which has a gauge for checking well by well, so you can measure the output of that well in order to make any corrections necessary and perform repair work on the separators, which are basically

horizontal cylinders with baffles and plates, this is so they can change the flow so that the gas can rise to the upper part of the separator and, through the yellow lines, vent off 95% of the gas that comes with the oil; as we know, an oil well consists of three elements, namely gas, oil and water. After the separators, the output comes to the black tank, called a wash tank; chemicals are injected when it leaves the separators because the fast flow of oil and gas forms too strong an emulsion and two kinds of treatment--mechanical and chemical--are needed to remove the water from the oil. Mechanical methods are plates which change the flow to allow the water, which is heavier, to decant; and the chemical treatment gets between the water and oil tensional space, reduces the tension, and breaks and separates the water. The first wash tank is for decanting water; before it enters the tank, there are some vertical cylinders which carry the remaining gas from the separators for its removal. It is done this way because they are atmospheric tanks—they cannot take more than six-ounce increase because the top would crack. The black tank was painted black to take advantage of ambient temperature; higher temperature makes it easier to break up the water-oil emulsion. Then it goes to the lead tank, which is a surge tank and where the station output will be gauged. From that surge tank, it goes to the pipeline pumps, which make the noise we can hear now, to send the output to Lago Agrio. The water in the wash tank goes to the water tank, to be reused for well re-injection. Here ends my description." The President of the court asks Ms. Olga Lucía Gómez Cerón whether the separation system is a two- or three-phase system; she answers it is two-phase, and Mr. Alfredo Guerrero comments, "I am the one who built the station, I sent a requisition to the United States and all the equipment installed is three-phase, but here, due to the turbulent liquid flow, to the water-oil emulsion, they cannot be separated, because the flow coming out the lower section of the separator is minimal; those separators are API tanks and meet all requirements, they are all three-phase separators but they are working 99.9% as two-phase because of the emulsion; the surface tension of water molecules with oil is too strong, that is why two methods are needed, mechanical and chemical, to break up the emulsion and get the water to decant in the wash tank." Then the President gives the floor to Ms. Olga Lucía Gómez, who says: "I would just like to point out that, if the

pumping system historically used by Texaco had not been used in the fields, which is an electro submersible system existing in most fields, it is a system which, as I explained yesterday, is too aggressive because crude generation, although it should be high, also pulls a great deal of water and, of course, when this emulsion comes in with so much water that sometimes it even exceeds the amount of crude production, as the emulsion depends on how the crude is removed from the production field, then a separator working on a two-phase level is not enough. Although the Engineer is right when he says that this type of separators can also work as three-phase systems, they have not done so historically, they just break up the emulsion, remove the gas in a way which is not complete; the separator is built to be 95% to 98% efficient, but it is not, because of the type of emulsion, then the gas still comes out with liquid particles, and the crude and the water still come out with gas particles, that is why they have problems with the tanks, they need to have this gas boot to remove the gas that is still left in the emulsion coming in here, oil and water, there are still gas particles left, just as the process is not complete for the gas coming out of the separator, it still has some liquid particles, so the industry is losing, crude is being lost through gas, too much water is produced with many corrosive levels, this may have helped cause so much cracking of the stream lines coming from the wells—the high corrosiveness levels coming in this crude, water and gas emulsion." The President of the Court gives the floor again to Mr. Alfredo Guerrero, who says: "I don't know if I can check records; we had three types of lift—gas at Shushufindi, because of the existing gas-oil ratio; in Sacha Auca, hydraulic pumping, that is, injecting petroleum to draw more petroleum--a dual system; and the third, very simple one, very handy in case of shutdown or something, was the electro submersible system, that is, electric pumps. It is not true that there were more of these; maybe there are now, but when Texaco was here, when I was working here, we had mostly Gas lift in Shushufindi, and Poweroil in Sacha and Auca." The President of the Court lets Ms. Olga Gómez make one last comment, and Ms. Gómez says: "Back in the 80's gas started to be reused, although historically burning gas was most usual in an oil field; gas can be reused as fuel for generating the very requirements of the station, such as in a refinery or in the case of Shushufindi, where the gas produced is reused." Valuable technical information has thus been

made available to the Court, which takes it as a whole, as a technical description of the process used in production stations, explaining that the emulsion drawn from the wells contains different products in variable quantities, which must be separated; this process results in crude, gas and formation water, the very elements with which, according to the plaintiffs, the environment has been contaminated. Therefore, the case should be further analyzed in search of an explanation on the final destination of each of these emulsion components referred to by the experts. 2. Now, in order to determine whether this created risk or danger has been unnecessary, or if it could have been prevented or at least reduced by its creator, we will first look into the defendant's actions, that is, the way its facilities were built and its operations carried on, so as to determine its competence in handling the produced waste. Thus, we see that the different experts have given a detailed explanation of the procedure and methods used by Texpet to build the facilities it would use to treat the waste derived from its operation of the Consortium. We will consider expert reports by Gino Bianchi, John Connor and Bjorn Bjorkman, foreign experts who have been approved by Chevron's counsel and appointed experts by the President of this Court. Gino Bianchi's expert report on the court inspection of Sacha 13 well deals with the construction of these pits, and says that "Most of the earth pits (including the ones built in Eastern Ecuador) are built by digging in the ground to a depth of 1.5 to 1.8m below the surface; the removed earth was dumped around the perimeter to form 1.2- to 1.5-meter-high berms. Pit size was based on the estimated volume of material they would hold." (folio 76309). These figures are consistent with those used to calculate pit size, and they confirm what has been said about the pits being mere excavations, with no lining whatsoever, and they are also consistent with other experts' statements that THE PITS BUILT BY TEXPET WERE EXCAVATIONS IN THE GROUND, WITH NO LINING OF ANY KIND. Although the experts approved by Chevron have all stated that the Concession soils do not allow migration or filtrations because they are waterproof, it has been established above that migrations and filtrations were not only a possibility but also a reality which was documented and even witnessed by the Court during the above-mentioned inspection of Lago Agrio

15 well. Then, based on reports by John Connor, we see that these pits are used in production stations to decant production water before discharging it into the environment. He says so, for example, in his expert report on Shushufindi Sur station, where he explains that "Consistently with practices used in oil fields around the world, decanting pits were used in production stations during the period when Texpet was the operator of the former Petroecuador-Texpet Concession, to remove solids and oil from production water before its discharge into the environment" (folio 70018), and he stresses that the use of decanting pits prior to pouring their content into the environment was the state-of-practice in oil fields around the world and, he made clear to this Court, in that station as well. "The 3 decanting pits were used for treating production water before its discharge, specifically for removing sediments and traces of oil" (see folio 70011). It is noted that this process mentioned in the statement was the only process used for treating production water prior to its discharge into the environment. This was ratified by Chevron-approved expert Bjorn Bjorkman in his report on Sacha Norte 2 (see report in file 958 and exhibits up to file 967), where he states that: "In the decades of Texaco's operation, it was common practice all over the world to treat waters in decanting pits and discharge them into the environment" (folio 105072). This idea that pouring substances into the environment was "common practice" in all oil fields around the world has also been repeated by the defendant-approved expert John Connor, who stated that: "managing production water through its treatment in decanting pits and subsequent discharge into the environment was common practice around the world in the 1960s through the 1990s". In the same report, he repeats that "While Texpet was the operator of the Shushufindi Norte production station (that is, from 1975 to 1990), the use of earth pits was standard practice in the oil industry around the world, including the U.S." (folio 70020). For the purposes of this ruling, it is noted that, in addition to stressing the certainty that the pits were mere excavations in the ground, used to decant production water prior to its discharge into the environment, the Chevron-approved experts insist that this was the standard practice around the world, which is at odds with the plaintiffs' claims in the complaint; therefore, it is up to the Court to pass ruling, always based upon the elements

in the case files, but under no obligation to abide by the opinions of the different experts, who are auxiliaries to the Court whose role it is to inform the Court on technical matters to the best of their knowledge. This is why this Court will not consider any conclusions of a legal nature drawn by the experts, because when they state that "In Ecuador, while Texpet was the operator, there were no numeric criteria for production water discharge or reinjection requirements", or that "in those days (during the Texpet operation period) there were no technical standards in Ecuador for the design or construction of decanting pits" (folio 70020), the Court is presented with a highly biased and limited legal analysis; such an analysis by a technical expert exceeds his expertise and contains important flaws because it considers only some technical regulations in the oil industry, while failing to consider the rest of Ecuadorian law which was effective at the time when the Consortium was in operation and which has been dealt with above. For this reason, as far as all these "state-of-the-tech" statements are concerned, this Court will consider the sayings of experts approved by the defendant but only jointly with the other evidence in the files. This Court finds that, in order to get a proper idea of the state of the technology at said time, we cannot consider only the statements of the different experts approved by the parties to act before this Court, because they do not only contradict one another, but each of them also shows different perspectives of the same moment in history. Because we believe it is important to settle the apparent contradiction between the plaintiffs regarding the use of this type of pits and their discharge into the environment as a common practice for managing formation water, we must strive particularly to find out if there are more unbiased and objective documents, dating from the time in question and not prepared recently or at the request of either party; even if the experts have tried to respect historical perspective, any recent documents may be biased by some subjectivity because they were prepared to create an impact on the result of this case. This Court finds that, for the purpose of this ruling, it is appropriate to consider documents which have not been produced by experts approved and paid by either party, and which have not even been produced with this lawsuit in mind, because such documents would provide a much more objective and unbiased reflection of the actual state of the technology at the time of Consortium operations. This Court notes that the book "Primer of Oil and

Gas Production" (original on folios 140620 to 140698, translation on folios 158756-158834), prepared by the American Petroleum Institute, in special collaboration with T.C. Brink., from Texaco Inc., does not answer to the interest of any party in this trial, nor to partial historical perspectives, but it is a book that describes the technical principles of this industry for the same period in which the events of this trial occur. This document, which has been written in 1962, that is, before the beginning of Texpet operations in Ecuador, gives us the certainty that it is an objective and unbiased text, which gives us a historical view of what the technical status was during the period of the Consortium operations. Hence, its warnings as regards the handling and the risks of formation waters are carefully considered: "Extreme care should be exercised in the handling and disposal of produced water, not only due to a possible damage to agriculture, but also due to the possible contamination of lakes and rivers that are the source of drinking water and are used for irrigation purposes" (folio 158811), which constitutes a warning and an acknowledgment of the danger and possible damages, which have apparently been ignored by Texpet and that in fact go against the practices implemented by Texpet in the Concession described by the expert John Connor as "the handling of production water through the treatment in decanting pits and the subsequent discharge in the environment," and justified based on what allegedly "was a common practice around the world between the 1960's and 1990's," something we have just seen is false or, at least, contrary to the only historical document that we found in the file. Even though these recommendations were not part of any law, it is understood that due to its authors and the period in which they were written, they clearly and objectively establish the state of the Technique. Therefore, it is fair and appropriate to use these words, written before the occurrence of the events that cause these trials to define the state of the Technique that Texpet was capable of and committed to fulfill, in contrast to the implemented practices that consisted in the decanting of formation waters in pits drilled in the soil before being discharged in the ecosystem. A contribution to this is the Document 276-80 of June 25, 1980 (see original on folios 3118 and 3892, and its translation on folios 4731 and 4732), which was sent to Eng. Rene Bucaram in relation to the removal of pits, or its lining and enclosing to avoid contamination, in which the District Superintendent D. W. Archer, from Texaco Inc., states that the possibility of pollution is minimal and he suggests not to cover, enclose or line the bottom of the pits. In this document, it is clearly stated that "the current pits

are necessary for an efficient and profitable production in our drilling and reconditioning programs, and for our production operations. The alternative to using our current pits is to use steel pits with a prohibitive cost," continuing with the explanation about the costs that this would imply and minimizing the problems or damages this pits would cause. This proves that there was an alternative to the pits dug in the soil, but this alternative was not taken into account mainly for economic reasons. The use of steel sheets or tanks was an alternative more expensive in economic terms, but something that would have avoided the overflow of the pits content or its migration through the soil, polluting it as the file showed. This Court thinks that it would be appropriate to state that these decisions motivated by merely economic reasons that minimize the potential damage to the environment and to third parties were precisely the cause of the damages proved by this trial, since this managerial decisions based on costs result in practices that have consequences for the people who are part of this management and who are the one that often have to pay the real costs of such decisions. Likewise, as regards the treatment of formation water, there is a document of the process issued by the United States Patent and Trademark Office, of the United States Department of Commerce, on June 18, 1974, from patent No. 3,817.859, in which Texaco Inc. is the owner of an invention called Contaminated Water Treatment Method, whose original appears on folios 153722 to 153725, and its translations and other certificates on folios 156092 onwards. As regards this test, it is considered that the plaintiff, through Dr. Alejandro Ponce, during a judicial inspection of Sacha Norte 1 (see Record on folios 104391 to 1044619), by submitting a simple copy of this document, which is identical to the one that appears on such folios, said: "[...] when in 1972 the company Texaco asks the Patent Office of the United States to issue an invention patent about the treatment method of waste water that I read about is a way of making use of certain flows of the process waste streams through its injection in the underground geological formations that links and levels the formation of solid precipitates that block the underground formation. Moreover, the inventors justify that certain affluent flows of industries are waste, and they do not have an apparent one. These flows should be used, but doing it in or near the ground surface could cause severe contamination problems.

This is what Texaco says when it submits the invention patent application in 1972." In relation to this document, Dr. Adolfo Callejas also mentioned this same inspection saying: "Dr. Ponce said just a minute ago that Texaco knew that discharging formation water would derive in pollution since it has submitted this patent, which is also a method discovered by Mr. Jack F. Tate, who gave it to Texaco Inc. on March 29, 1972 according to this document. But there does not appear what Dr. Ponce said, since it states the following: "In the invention background, certain affluent flows of the industry are waste and do not have an apparent use. These flows should be used, but doing it in or near the ground surface could cause considerable problems. It could, it does not state a cause, as he has just mentioned lying and trying to deceive the Court, it says that it could, what he read before, thank God I still have good memory; what he has just read before said it could and now he changed. He did not say that it could, but that it causes." After analyzing the statements of the two attorneys it is clear that both agree in that said document states that using certain flows or streams of the oil industry in the surface or near it "may" cause considerable problems, which is considered as a premise that shows the acknowledgment of a possibility, from which this Court will go on with its analysis. Now, if we consider that the execution of the operational practices described in the expert reports resulted in the discharge of these streams on the surface, which Dr. Rodrigo Pérez Pallarez, acting as the Legal Representative of Texaco Petroleum Company, has publicly admitted that "in Ecuador 15,834 millions of gallons have been discharged between 1972 and 1990 during the operation period of the Consortium by Texaco" (folio 140601), and finally considering that these discharges "can cause considerable problems," it would be reasonable to assume that the environmental problems reported could be caused by the discharges admitted by Dr. Rodrigo Pérez Pallarez. Moreover, in the judicial inspection of the Yuca Station (see record on folios 155678 to 155714), after obtaining said patent through the corresponding request as it was mentioned before, the parties referred to this document again. Dr. Diego Larrea, defending the respondent said: Mr. President, one thing is to have a patent that they may have probably had, another thing is to implement that, and another thing is to have the equipment and make the investments. What attorney Prieto did not say is that in Texas, where this regulation originated, there are thousands of pits that they say that do not have the same technology that Texaco Petroleum Company applied here, since this is the

third world, but in fact in the first world the number of pits is not the exaggerated figure that my dear colleague Fajardo mentions, which yesterday was 900 and today is 1,000. Over there are 20,000, 30,000, 100,000, 200,000 in that state, in Louisiana there are more, in Colombia there are more, in Argentina there are more pits with and without lining. Mr. President, I am not going to use my arguments, I will use the arguments of my colleagues working for the other party, because maybe I am not worthy of belief. They got upset, they got tired, they got bothered, we have talked about the same issue 50 times, we have showed how in Texas and Louisiana, I do not want you to get bored, I will not list each and every pit, but there are pits. Where does the logic of my colleague fail? There is a patent, that is a fact and no one denies it. Another thing is to apply that patent. Texaco Petroleum Company has pits in Texas, in California and in other places where it carries out its oil exploitation." The Court observes that the appreciation of the defense attorney is correct, since being the owner of a patent does not necessarily imply the use of it. However, we also note that said patent refers to improvements in reinjection equipment, while Dr. Larrea in his argument is referring to the use of unlined open pits. The understanding of this Court on the matter of this trial allows it to observe the eventual use of the technology described in the patent would have replaced the goosenecks, not the pits, thus the argument related to the pits in other countries is irrelevant as regards this test. The plaintiff, through its attorney Julio Prieto, replied what Dr. Diego Larrea argued as follows: "Dr. Larrea said that one thing is to own a patent and another is to apply it. That is clear. But if in 1962 it is planned and in 1972 there is an improvement patent, just the same year in which they produce the first barrel of oil in Ecuador, we show that they had the ability, but that the defendant lacked the willingness to do it. In this particular point the Court will stop to analyze the fact that the availability at that time of effective technological measures to avoid dumping formation waters into the surface was certainly proved, as well as the abovementioned fact that the Concession was handed over by the Military Junta of Ecuador to Texaco Inc. considering "That the applicant company has the appropriate technical and economical resources to carry out an effective oil exploration" (see O.G. 186, February 21, 1964, a fundamental acknowledgment that turns out into an obligation also stated in Clause 32, letter G), authorizing the Minister of

Development to give to Texas Petroleum Company, on behalf of the Government of Ecuador, an oil concession that states that the Concessionaire must "exploit the concession using appropriate and efficient machinery," showing the express obligation of the defendant to use the best technological resources available. Moreover, after that, by the Supreme Decree 1185 The Oil Exploration and Exploitation Regulation was published in the Official Gazette 530 on April 9, 1974 establishing that the operator must "take all the necessary measures and precautions when carrying out its activities to avoid damages or risks to the people, properties, natural resources and archeological, religious or tourist sites" (Art. 41), making it clear that the operator, even though it was legally bound to exercise due care, was far from taking all the necessary measures and precautions justifying with economic reasons the lack of technological resources available to precisely avoid such damages. "To have" a patent, that is, the ownership of a patent implies rights to its owner, such as the legal capacity to use the protected technological development, while the implementation of that protected technology in the field requires the willingness to do it. The mere granting of a patent necessarily implies a technological development, since the novelty and the industrial use are some of the requirements that an invention must have to be protected by a patent, thus, the content of a patent should be "modern" or "innovative," as opposed to something known or existent. The patent in question claims improvements in reinjection equipment, which implies the previous existence of that technology, which purpose has been clearly stated in the same patent: re-injecting the streams of the oil industry since its flows could cause serious problems, which means that Texaco Inc. should have looked for, invented, improved and registered technological solutions, which were undoubtedly appropriate and efficient technology for that time, but that was not used by Texpet when it operated the Consortium in Ecuador. All the above-mentioned information leads us to the understanding that the system implemented by Texpet for waste treatment did not get rid of nor handle the risks in an appropriate or sufficient way, but in a cost-effective way. As it was designed, after a decanting process, the pit system dumped its waste to the environment, that is, THE SYSTEM WAS designed TO DISCHARGE ITS WASTE TO THE ENVIRONMENT, in a

cost-effective way, but did not address correctly the risks of damages. It is foreseeable that this conduct has generated a negative impact in the recipient of these unloading, in which case we would be speaking about a dangerous situation that was created when it could have been avoided. -3.- Thus, following the analysis of the causality of the environmental damages, we analyze whether the potential damages have really occurred, that is to say, whether THE SYSTEM ACTUALLY UNLOADED THE WASTE INTO THE ENVIRONMENT, FOR WHICH WE TAKE INTO ACCOUNT THE ASSERTIONS OF THE legal representative of the Texaco Petroleum Company. Rodrigo Pérez Pallarez, by means of a letter addressed to Mr. Xavier Alvarado Roca, President of the Vistazo magazine, which was published in several newspapers in the country, among which this publication process is included in El Comercio newspaper, on March 16, 2007, on folio 6 of book 1, he states that "in Ecuador, 15.834 billion gallons were spilled between 1972 and 1990 during the whole operation period of the Texaco Consortium" (folio 140601). This confirms what the result or effect of the practices used was: after decantation and passing through the goosenecks, the formation water was unloaded into the environment, contaminating inevitably the natural water sources of the area which the inhabitants of the area depended on, quite a large amount and filled with dangerous substances, even when the law stipulated specific prohibitions in this sense, like the ones contained in the Health Code published in the O.G. No. 158 of February 8, 1971 stating that no one shall dump into the air, soil or water the solid, liquid and gas waste without prior treatment which makes them harmless to health, (Art. 12). This dumping of formation water, after a simple and free process of decantation, directly into the system, constitutes, without a doubt, a real damage, legally proven and publicly acknowledged by the legal representative of Texaco Petroleum Company, and its cause lies in the acts attributable to the defendant, which, as we have seen, was the only technical responsible for the consortium operations. -4.- As final element of conviction regarding the cause of these damages, the statements provided by the citizens are considered with special attention, which have been examined by the President of the Court during the judicial inspections, under the legal authority envisaged by Article 245 of the Code of Civil Procedure, as all these are the same in their descriptions, accounting for a generalized perception of the contaminating practices during the Consortium period. The stories of how the water sources were contaminated are frequent, like the statement of José Guamán Romero in the judicial inspection of

Aguarico 2 pit (see minutes in sheets 140787-140814), on June 12, 2008, who gives his version of how "when it rains, all the oil comes down to the estuary and it gets contaminated" and that "here there are two oil tanks, they were big tanks and security guards would walk by here, but they would fall asleep and the tanks would spill until they wanted, and the oil would fall towards this side, that is why I said that the grass was useless", or the statement provided in the judicial inspection of Cononaco 6 pit by Telmo Ramírez, on November 16, 2006, on sheets 123100, saying that "all the mud would come out and the pit would spill oil towards the estuary. There was no water wall, there wasn't anything; they did not put a membrane, anything. The mud would go clear. Everything would go there. There are trails up to down there, which is where when it goes down, it disappears, not any more, eh. I worked for Texaco for two years; I worked on this pit 6, as a production assistant; I was with generation back then. When the wells were cleaned, Chivo would come, the water was dumped in the tanks, and it would be emptied here. Everything was dumped in the estuary". It is considered that statements like these cannot be taken as technical proof, since the citizens providing statements are not oil technicians or experts in the field or the subject; however, the fact that these citizens remember and are in agreement when telling the same facts, it is useful for the Court to reach an understanding that even though their statements can be inaccurate from the point of view of the oil technique, they are true in the sense that they describe facts which are unconscious in the memory of all the examined people. Thus, the statement of Mr. Juan Zambrano, during the judicial inspection of Lago Agrio 11 A, was telling us that "here in the pit, a big pit of approximately forty meters, the carriages would come, I recall, there were called vacuum, really loaded, they go inside backwards and would dump all the crude, that is why it became so contaminated downstream"; coincidently with the statement of Mr. José Segundo Córdova Encalada, who claimed to have arrived at the area in 1980, during the judicial inspection of Sacha Sur, he noted that "The contaminated water was put by Texaco in an earthen pit which they had here, where tee vacuum carrying crude from the other pits would come, from other wells which were accumulated here, in the front, and when they needed some for a road, the vacuum would come again and they would take crude passing through my farm, where it would leave smoke in such a way that the poor people from the country could not walk, also the products, such as corn, which are produced every three months would also get contaminated with the crude". The statement of Daniel Barre in the judicial inspection of Auca 1 on November 15, 2006 was also considered, who claimed that he arrived in the area in 1971 and that "they put a piping here, through which this would come out

downstream, since there was what they would call parapet gooseneck, which contaminated that other area, as it would come out towards that direction, from here, everything it was the same"; the statement of Ms. Cruz América Castillo Lamar, who lives in the area since 1973, and during the judicial inspection of the Sacha Norte claimed: "What I have seen is that there has been a constant contamination, like here, in our town, when they would burn the oil here, all that smoke would come out like oil sparks and that would contaminate all the environment, up to the water that we took for drinking from the little tanks, that like making butter out of it, with little pieces of oil, that was in one part; and what a person absorbs as well, since it contaminates that. Another thing, when they would spray the oil here, the pits would be overflowed or they would just spray it, I do not know, but the fact was that it was sprayed downwards, and it reached the estuary and it went into the big river, as it was for a very long time that this was contaminated, that we could not even bathe properly, or wash the clothes, because the water was contaminated". (Folio 88991) Coincidently, the statement by Máximo Celso, on folio 41659, during the judicial inspection of Lago Agrio Norte, when he was examined by the Presidency, he replied that "on that pit, they would burn oil, it was hell, because the heat was unbearable, and the smoke was deadly, after two or three hour, oil would come down from the sky. Back then, in the pit, so that water would not come out towards the other side, they changed the direction so that it would all go to the estuary located at the back of the station. They created a pit that it now buried, and we complained, because they were contaminating the part which was cultivated. Question: And what happened when Texaco was here? Answer: When Texaco was here, I recall the names of the people operating here as well.- Question: Did Texaco redirected towards here the water coming out with the oil? Answer: They redirected the water with oil. From there, there was a very big spillage; from here towards there, and the oil went that way and they burnt it. They would put fire. That was a normal practice for them to clean; that was a pestilence, after five days, because of the animals that had died; we saw dead deer, well, animals". Likewise, the statement of Mr. Simón José Robles, during the judicial inspection of Lago Agrio Norte, he said "when Texaco built the pits, those were enormous wells that they would fill with crude, and at night, we could not hang our clothes, because those clothes would be black the next morning", and also, to the questions of the President of the Court, on folio 41669, they would reply like this: In which year did the estuary contamination occur? Answer: the oil spray took place when they

changed the pit, because behind the incinerator, there was a pit there, where they would burn oil; they moved the pit towards here, and the oil spray began. Question: Who changed the pit? Answer: Texaco itself did that, Texaco built the pit. Where were the pits they would put the formation water in?". Another coincident statement that this Court considers to state a ruling, is that from Mr. William Powers, an expert who was interviewed by request of the plaintiffs, who during the judicial inspection of Sacha Sur, stated that "both Chevron and Texaco are American companies since before Second World War, dumping formation water with high salinity if prohibited, because the problem is the high salinity, more dangerous than the other compounds, into the surface water and underground water; they always reinject that water since a long time ago, it is a good thing that Petroecuador does that. However, the U.S. Law aimed at preventing the contamination of fresh water by production water, when Texaco started to operate in Ecuador, the unloading of that water in the estuaries and rivers should have never happened". The Presidency agrees with this, not because it is an American company complying with other standards in their countries, but because as reviewed as the historical legislation applicable to the Consortium operations has been, it is clear that, under the Health Code, no person could throw into the environment waste without a treatment that would make them harmless, prohibiting the unloading of industrial waste in any water course of household or agricultural use (arts. 12 and 25); according to disposition of the Water Law, all water contamination affecting human health of the development of the wildlife was prohibited" (art 22); by contractual clause, the operating company had to "exploit the concession using proper and efficient machinery for that purpose", while according to the Hydrocarbon Law from 1971, TexPet had the obligation to "Adopt the necessary measures for the protection of the wildlife and other natural resources" and to "prevent contamination of the water, of the atmosphere and the lands" (see Articles 29, literal s and t) provisions which are similar to the ones found in the later codification of the Hydrocarbon Law, published in the Official Records No. 616 from August 14, 1974 (Articles 30, literals s and t) and in the Official Record No. 711 from November 15, 1978, in Article 31, literals s and t), being always the same in the hydrocarbon legislation in force in Ecuador. 10.2. Health damage causality. Just like we have warned in previous lines, when the people's health damage causality wants to be proven it is necessary to apply theories of causality that

differentiate between the legal and the scientific one, like the substantial factor theory and the most probable cause theory, since as we have seen in this case, it is not a claim for compensation for health injuries of individuals, but a claim for the "hiring of people or specialized institutions to design and put in practice an improvement and monitoring plan for the health of the inhabitants in the populations affected by contamination", meaning that what should be analyzed is the presence of a public health problem and the causality of these damages applying the theories mentioned. Under this view, the substantial factor theory indicates that we should analyze two elements: the reasonable medical probability and the substantial factor. The criterion of this Court, considering the dependence of the area inhabitants on the natural water sources and the unloading performed by Texpet, it is appropriate to state that it is more improbable that the exposure of the effluents unloaded by Texpet into the environment could have produced an adverse impact to their health, therefore, there is a possibility of at least 50% that the conduct of Texpet was the cause of the health impacts, that is to say, there is a reasonable medical probability. Secondly, the presence of unloaded substances by Texpet into the environment has been a substantial factor, and not merely theoretical, but which turns out to be foreseeable that it had a mayor role, since the health impacts were unforeseeable, because there were substances that have a known harmful potential and because it is utterly consistent with the diseases found in the population of the area. The Court believes that the existence of public health conditions has been reasonably and sufficiently proven, like the fact that the condition has a reasonable medical probability of having being caused by the exposure of people living in the Concession area to the substances unloaded by Texpet into the ecosystem. As we have seen, the file shows that hundreds of human beings certainly have been exposed to a risk by soil and water contamination, whose presence into the environment constitutes a substantial factor that is caused mainly by the Texpet activities as operator of the Petroecuador-Texaco Consortium. Turning to the most probable cause theory, if we combine the facts proven by the file, in an inference process, we will observe that the facts point to the contributing factors, and even though none of these factors can be pointed out as the direct causality nor the exclusive responsibility, on the other hand, the coincidence of the results among the different epidemiological studies scientifically supported, as well as the risk assessment for

human health, and the testimonies received during the judicial inspections have successfully showed that there is scientific basis to reasonably link the health claims of the region inhabitants with the oil pollution that derives from the activities of Texpet as the Consortium operator, which is a sufficient causal relationship for this Court to order the remediation of the damages caused. 10.3 Causal relationship of cultural impacts. Considering that an environmental impact is a human action that causes changes in the human and physical environment, and that in this trial there is a claim to remove or eliminate the pollutant elements that still threaten the environment and the health of the inhabitants (see the claims defendant, VI. 1 and VI.2 respectively, on folios 79 and 80), as well as to remediate environmental damages in accordance with Article 43 of the LGA, which in its first subsection states that: "Natural persons, legal entities or human groups linked by a common interest and directly affected by a harmful action or omission shall be entitled to pursue an action for damages and impairment caused to the health and environment, including the biodiversity with its elements, before the competent Judge," and according to the comprehensive definition of environmental damage suggested before, and taking into account what the Constitution applicable at that time stated (in its point 2, Article 19, the 1984 Political Constitution Codification of the Republic of Ecuador guarantees the right to live in a pollution free environment), we understand the environmental damage in all its complexity, considering the nature and consequences this could have in the environmental components. Therefore, taking into account the link between environmental damages and human rights, we have discussed the relationship between environmental damages and health impacts, but this Court also notes a relationship of the environmental impacts as a direct agent responsible for certain forced alterations in the indigenous cultures that based their social system, culture and existence on a close bond with nature, causing a cultural impact suffered by this indigenous people. The indigenous communities usually depended on hunting and fishing for subsistence, but these were affected by the environmental impacts caused by the activities of the Consortium operator. This situation was expressed by Celestino Piaguaje, who was interviewed by the Presidency of the Court during the judicial inspection of Aguarico Station (see record on folios 82595-82642), and he said: "From 1960 to 1969 the Secoya and the Siona people

lived with dignity. There was no contamination and everything was normal, like our lives, rainforest people. We have very well subsisted on hunting and fishing, and the environment was really healthy. Then, after the year 1970, everything changed completely and sharply. First, we could see how the companies arrived blazing trails in the communities, and the helicopters, building heliports, and we could also see their arrival to our communities in the prairies of the Amazonia. At the beginning it was seen as a temporary work, but then the drilling and oil exploitation activities started. Since then, it seems to me that life changed completely, something that forced us to look for another way of life, so as to have another alternative to lead a good life, since we could not fish nor hunt any more. Therefore, we had to breed cattle so as not to look for another means of subsistence different from our traditional hunting and fishing. That is all I can say as regards the difference that has been made." Likewise, Mendua Omenda Romelia, who was interviewed during the judicial inspection of Guanta 7 pit (see folios 103431-103478), expresses her views about how she feels that their diet was affected by the defendant's activities, saying that: "With the arrival of Texaco, animals we always ate were killed, that is why now we do not have enough food. Children are too small, and we are suffering unknown illnesses." At this point we should make a digression and note that not all the culturization process experienced by the indigenous people has been caused by the activities of the respondent; in many cases, it was a social phenomenon, like migration and/or colonization. However, in other cases, the impacts are caused by environmental damages that can even affect the survival and food habits of a culture, inevitably changing it. Therefore, this Court thinks that the impacts suffered in their cultures by the indigenous people have been partially caused by the defendant's activities, but they have also been caused by external agents, being the activity of the defendant an important contributing factor due to the dependence and close relationship between the damaged ecosystem and the customs of the affected people. So far, this is the causal relationship analysis of the damages, which let us formulate our conclusions. Thus, as regards the damages mentioned here, and following a criteria repeated several times by the Supreme Court, in the sense that "The causal relationship between the tort and damage considered shall be assessed by the judges with reasonable criteria in each particular case.

This Court understands that the different theories on the qualification of the causal link which have been stated by the doctrine are an important guide for the Court; but they do not limit its faculty to evaluate the relevant facts taking into account the specific circumstances in the matters considered" (see Resolution 168-2007, from April 11, 2007, case number 62-2005, Andrade c. CONELEC and other, and in the resolutions number 414-2007 from October 2, 2007, case 19-2005, Hermida Moreira and *et al.* v. Municipality of Cuenca M and 457-2007 from November 16, 2007, case 71-2005, López Yánez v. President of the Republic), this Court, under the analysis and facts stated so far, considers that all these factors lead to conclude that the way in which the Concession facilities were designed and built, as well as the way in which they were subsequently operated by the Consortium operator, are the direct and foreseeable cause of the presence of contaminating agents that harm the ecosystem and people's health. For this Court, it is clear that since 1962 there are texts written by experts from Texaco Inc., in the United States, which recommended extreme care in the handling of production water to avoid potential damages, which shows that this was a known problem and therefore, it was foreseeable, for which Texaco Inc. had known technological solutions at disposal, whose use certainly would have contributed to avoiding potential soil and water damages, but they were not applied in the Concession operation for economic reasons, that is to say, during the operation of the Concession, Texpet avoided the use of available technology (reinjection equipment, steel tanks) and recommended practices (reinjection of formation water) to avoid the foreseeable damages. The admitted dumping of 15,834 million gallons of formation water into the Amazonia environment is a direct consequence of this omission. In much the same way, the construction of open pits without coating cannot be considered as a recommended practice for the environments where near water sources are in danger. It is not necessary to have proof of a notorious and public fact, generally known, that the Concession area, like all the Amazonia, is a highly humid and rainy area, therefore, it is logical to believe that the construction of this type of pits would not be a recommendable practice for the foreseeable risk of overflowing, which would cause damages to the near water sources. Moreover, as a direct consequence of the technology and operational practices used by Texpet which contaminated the environment; thousands of citizens living in the area

have been affected, because they have been forced to modify their culture and way of life, due to the impacts in the ecosystem with which they are intimately linked, and also because a generalized problem has been generated, which affects people's health living in the impacted areas due to the activities described. Thus, after analyzing the different evidence provided in the clarification of the issue in question, for this Court it is clear that 1. There is a contamination attributable to the operational oil scheme of the Concession, since due to the way in which it was designed, it caused the dumping of effluents into the environment, in spite of the existence of technological alternatives at disposal. 2. The reported contamination can be considered as dangerous, because there is an admission of the possibility that the dumping of fluids like the ones Texaco admits to have dumped, on behalf of Texpet, caused the damages to the agriculture and people's health. This possibility of suffering from a damage, which in this case threatens undetermined people, should not be suffered by the threatened people due to the contingent damage, because the legislator has wisely foreseen (Art. 2236 of the Civil Code) the class action you are exercising, by means of which you have demanded, among other things, the removal and the adequate treatment and disposal of the contaminating waste and materials still present, the reparation of the rivers, estuaries and lakes, and in general, the cleaning of the soils, plantations and crops and so on, where there are contaminating waste produced or generated as a consequence of the operations directed by Texaco, which are precisely those contaminants mentioned in the previous lines, which were included in the reports of the different experts who have submitted their reports, and that pose a threat with the possibility, admitted by the defendants, of damaging undetermined people, like the ones represented by the plaintiffs. 3. The dumping of the described contaminants could have been prevented by the defendant using the other technology available at that time, something that was ignored in the operational structure of the Concession, that was under the sole responsibility of Texpet, operating as a fourth level subsidiary of Texaco Inc., which, in turn, was publicly acquired by Chevron, creating Chevron Texaco, the defendant company in this trial, subsequently named Chevron Corp. **ELEVEN.-** Negligence. Even though it is not necessary to go into an analysis of negligence, given that this is patently a case of strict liability, in the opinion of this Presidency it is advisable to analyze the degree of diligence with which the party in question has acted in relation to the harmful effects emanating from its conduct, and the degree of diligence that was demandable as an operator of the Consortium. As it

was well stated in Decision 168-2007, of April 11, 2007, Case Number 62-2005. Andrade v. CONELEC *et al.*, and in Decisions No. 414-2007 of October 2, 2007, Case 19-2005, Hermida Moreira *et al.* v. Municipality of Cuenca and No. 457- 2007 of November 16, 2007, Case 71-2005, López Yánez v. President of the Republic, in what constitutes a principle whose application is mandatory "liability is strict if it depends exclusively on the justice or lawfulness of the result of the conduct of the party in question. Thus, it matters little whether the party in question has acted with wrongful intent or negligence." Accordingly, the harmful results of the conduct of the defendant, as described above are sufficient foundation for the liability of the defendant, while "In the case of what are called hazardous activities, negligence is presumed; thus it corresponds to the party in question to demonstrate that its conduct has been in keeping with the degree of diligence that the law [demands of it] in its activity." Thus, deepening this analysis, and going beyond this presumption of negligence, an analysis had been conducted of whether the defendant's conduct has been in keeping with the degree of diligence that the law requires of all industries and persons, for example when it prohibits the discharge of industrial waste into natural watercourses (Health Code, Articles 12 and 15), and prohibits all contamination that affects human health or the development of the flora and fauna (Waters Act, Article 22). It is clear throughout the file that there has been a continual violation of these provisions by the defendant. As noted above, if it is confirmed that the acts of the defendant in the Consortium have violated legal norms, that would be legally sufficient to establish another pillar of liability, which is negligence, since it is understood that negligence consists of the omission of a conduct demandable from the defendant. Thus, based on the analysis conducted regarding the presence of damage and of its causality in relation to the legal and contractual obligations that weighed on the Consortium's operator, the foundation has been established for the negligence of the defendant from the perspective of a lack of due diligence in a hazardous activity. The plaintiffs have alleged that Texaco Inc. had the know-how and the technical capacity to prevent such damage, which it has demonstrated to be true. This means that the damage was not only foreseeable, but also avoidable. Thus being the case, and since the duty is legally demandable from Texpet to prevent such damage under the historic legislation in effect in the era in which it operated the Consortium, in the opinion of this Presidency the acts of the defendant are clearly a conduct amounting to gross negligence. **TWELVE.-** THE CONTRACT FOR REMEDIATION AND RELEASE FROM LIABILITY. Very careful consideration has been given to the fact demonstrated through documentation that there is a

Contract for Implementing of Environmental Remediation Work And Release From Obligations, Liability and Claims, between Texpet and the Minister of Energy and Mines and the CEO of Petroecuador, signed on May 4, 1995, in connection with which the case also has on the record (several times) the respective certificates that certify that various sites operated by Texaco have been remediated as ordered by the contract, to the satisfaction of the parties to the contract. Nonetheless, in the case at hand the plaintiffs, who were not parties to the above-mentioned, argue that whether or not the contract was performs, there is contamination at these sites that pose a risk for their health and their lives. It is our opinion that these citizens cannot be deprived of their fundamental rights, and in the exercise thereof they have brought an action before the public body in charge of administering justice, lodging their case with this Presidency of the Court as the competent jurisdiction to pronounce ruling on their pursued remedy of the remediation of various environmental damage that allegedly occur in several of the same [sites] that are the subject matter of the Contract. As we have reviewed above, during the litigation it has been possible to confirm that many sites included in the RAP, which after the execution of the works we accepted as remediated by the Government, today still have contamination at dangerous levels, which ought to be eliminated in order to protect the health of persons. We have not taken this particularity into account to qualify the validity of the contract, since that is not at issue in this litigation. In said regard it is clarified that it is not our task to pronounce a finding regarding the contractual relationship between the parties that signed said contract, nor on whether or not it was performed, since we are not litigating with respect to the contract, nor are we casting doubt on its validity. This means that the performance or nonperformance of the contract shall not be analyzed since it is not at issue in the litigation. Nonetheless, considering that many of the sites that were the subject matter of the remediation Contract have also been the subject matter of the lawsuit, and considering that said contract does not affect third parties, if the defendant were to take responsibility for the remediation of the environmental damage that might remain at those sites that were remediated according to the 1995 contract, that would not undermine the validity of that contract between its signing parties. This same line of reasoning also applies to the releases signed with municipalities and provincial Counsels, as explained above, which shall not be able to benefit from or administer funds generated by the execution of this ruling. **THIRTEEN.-** MEASURES FOR REMEDIATION OF THE DAMAGE. Evaluating the various expert reports in keeping with the rules of good ruling, and considering the unanimous perception of the persons

interviewed throughout the course of this litigation during the court-ordered inspections, the conviction is reached that there are several types of environmental and other additional damages that are a direct consequence of thereof. The results of the court-ordered inspections have demonstrated the presence of contaminating substances generated by the techniques employed for the oil exploitation, and likewise, sufficient elements of proof have been submitted to demonstrate a reasonable probability that these contaminants could be the cause of the damages reported to the ecosystem and to the health of persons. Thus, in order to protect the health and life of human beings, they must be remedied until any risk they pose is eliminated. We are reminded that the complaint called for the removal and proper treatment and disposal of the waste and contaminating materials still existing, without any reference whatsoever to a reference parameter with respect to the level of clean-up to be attained. Thus, it is understood that the requested removal of this waste and these contaminating materials should be complete to the extent technically possible. Therefore the highest possible level of remediation should be applied, until things return to their natural state. In the opinion of this Court the remediation of the damage environmental shall be effective to the degree that the contaminating elements are removed and eliminated from the ecosystem until returning the ecosystem to its natural state, but on the other hand, those damages for which there is a reasonable probability of having been caused by the presence of these contaminants will not be remedied by themselves upon removing their cause, as is the case of the impacts to the flora, fauna, aquatic life, and the health of the inhabitants of the zone. Seen from this perspective, the environmental damage in the area in which the concession operated is very extensive and it is technically impossible to return things to their original state, to the point where in many of the cases it is not possible to remedy the damage; rather it will be necessary to establish mitigation or compensation measures where applicable, for example, where there is serious damage to public health. For this reason this Court finds it helpful to divide the various REMEDIATION MEASURES that could be applied to the damages proven, considering that they could be of three types: (1) principal measures, focused on returning the natural resources to their basic state to the extent possible and in the shortest possible amount of time; (2) supplementary measures, created recognizing that the principal measures could take time or might not be completely effective; their objective is to offset the fact that the primary remediation might not obtain the full restoration of the natural resources and to compensate for the time that is passing without remediation; and (3) mitigation measures, aimed at decreasing and mitigating the effect of damage whose remediation is impossible.

Each of these measures merits an independent analysis to identify which is the most appropriate, depending upon the type of damage. That analysis should be made considering that for the award ordering remediation of damages the only thing taken into account is the damage whose remediation was requested in the complaint and that also have been proven as required by law. Thus, in this matter, once again we shall be guided by what was requested in the complaint, based on which the case was brought and which must be proven by the plaintiffs. As stated above, the complaint requested "1. The elimination or removal of the contaminating elements that still threaten the environment and the health of the inhabitants. As a consequence, the ruling must order: a)The removal and the proper treatment and disposal of the waste and contaminating materials still existing in the pits or ditches opened by TEXACO and that have been simply plugged, covered or inadequately treated; b) The clean-up of the rivers, estuaries, lakes, wetlands and natural and artificial watercourses and the proper disposal of all the waste materials; c) The removal of all structural and machinery elements that extend above ground at the wells, stations and substations that have been closed, shut down or abandoned, as well as the ducts, piping, inlets and other similar elements related to those wells; and, d) In general, the clean-up of the lands, fields, crops, streets, roads and buildings where there was contaminating residue produced by or generated as a consequence of the operations directed by TEXACO, including the deposits for contaminating waste constructed as part of the poorly executed environmental clean-up tasks. 2. Remediation of the environmental damage caused, pursuant to Article 43 of the Environmental Management Act. As a consequence the ruling shall order: a) execution at the pits opened by TEXACO of the works necessary to restore the characteristics and natural conditions of the soil and the flowing bodies prior to incurring the damage; b) the contracting, at the defendant's cost, of specialized persons or institutions to design and implement a restoration plan for the native flora and fauna, where possible; c) the contracting, at the defendant's cost, of specialized persons or institutions to design and implement a plan for the regeneration of the aquatic life; d) the contracting, at the defendant's cost, of specialized persons or institutions to design and implement a plan for improvement and monitoring of the health of the inhabitants of the population centers affected by the contamination. The funds necessary to cover the cost of the activities whose

execution is demanded, in the quantity expertly determine pursuant to the second to the last paragraph of Article 43 of the Environmental Management Act shall be delivered to the Frente de Defensa de la Amazonía [Amazon Defense Front], so that, with the participation and advice of specialized international institutions, it shall apply them exclusively for the purposes determined in the ruling." Thus, considering that it has been requested that the costs be delivered demanded by these activities, we shall analyze each of the remediation measures independently in order to identify the most appropriate one, depending upon the type of damage. Accordingly, with respect to the principal measures, we find that they are necessary to satisfy the pursued remedy of the plaintiffs of eliminating or removing of the contaminating elements that still threaten the environment and the health of the inhabitants. This pursued remedy is admitted. Thus, the defendant is ordered to completely remove the contaminating elements referred to in this ruling, since that are considered to threaten the environment and the health of the inhabitants. The following is thus ordered: a) "The removal and proper treatment and disposal of the waste and contaminating materials still existing in the pits or ditches opened by TEXACO," as described in greater detail below. With respect to the "clean-up of the rivers, estuaries, lakes, wetlands and natural and artificial watercourses and the proper disposal of all the waste materials," we have already reviewed how it has been proven in the file that billions of gallons of contaminants were discharged into natural water sources. Thus, it is ordered that such waters must be cleaned up to the extent possible, at the defendant's cost, for which all traces of the hazardous elements referred to in this ruling shall be eliminated from the sediments of the rivers, estuaries and wetlands that have received the discharges produced by Texpet or the filtrations from the pits constructed when it operated the Concession. Thus, the defendant is ordered to pay SIX HUNDRED MILLION DOLLARS (USD$600,000,000.00) for the clean-up of groundwater, a figure that is lower than average according to the economic criterion that estimated by Douglas C. Allen, the expert contracted by the plaintiffs to provide his valuation criteria for their economic valuation criteria, which is not in any way obligatory or binding for this Court, but a simple reference that is not accepted; nonetheless, the figure indicated shall be sufficient for the contracting of persons with the necessary expertise to carry out this principal remediation measure; while in relation to the pursued remedy of "The removal of all structural and machinery elements that extend above ground at the wells, stations and substations that have been closed, shut down and abandoned,

as well as the ducts, piping, inlets and other similar elements related to such wells," this Court notes that the removal of infrastructure abandoned was demanded, but the pursued remedy is not warranted, because it has not been demonstrated in the file that said abandoned infrastructure caused or could cause damage in any event. The same applies to item 1.d, which says "In general, the clean-up of the lands, fields, crops, streets, roads and buildings in which there was contaminating residue produced by or generated as a consequence of the operations directed by TEXACO, including the deposits for contaminating waste constructed as part of the poorly executed environmental clean-up tasks," given that it is considered that neither the presence of damage nor the need to clean-up of private lands, crops, streets or buildings has not been demonstrated in the file, as required by law. In second place, the complaint requests "2. Remediation of the environmental damage caused, pursuant to Article 43 of the Environmental Management Act." For the enforcement of this pursued remedy the complaint requests an order for "execution at the pits opened by TEXACO of the works necessary to restore the characteristics and natural conditions of the soil and the flowing bodies prior to incurring the damage," which is related to item 1.a) of the pursued remedies, which refers, instead, to the soil inside the pits, while now what is being requested extends to the remediation of environmental damage in the pits and in the surrounding environment. Thus, once again we refer to what was stated by expert Barros for the clean-up of soils, but with the considerations noted, ordering the defendant to also remediate the soil around the pits. As we can see, the plaintiffs have requested the removal of the waste and contaminating materials existing in and around the pits. Thus, with respect to the clean-up of soils, note is taken of the valuation made in the Expert Report of the Court-appointed expert, Mr. Gerardo Barros, with respect to the fact that it contains a specific reference regarding soil remediation costs, which can be adjusted to the degree of environmental remediation necessary in this case, through mathematical calculations, considering differences such as the number of cubic meters to be cleaned and the level of clean-up to be attained, and applied to the volume of contaminated soil that this Court has calculated that exists in part nine of the findings of this ruling, in which we state that the contamination in the concession area amounted to 7,392,000 cubic meters ($m^3$). Accordingly, if we consider that the sums invested for the projects referred to by expert Barros in his report range between 183 and 547 dollars per cubic meter,

taking an average value of 365 dollars per cubic meter, the figure amounts to 2,698,080,000 dollars. Nonetheless one considers the levels of clean-up obtained by the above-referenced projects, we see that they attain a level of clean-up obtained in the projects in question [sic], we see that they attain a level of clean-up of up to 1000 mg/Kg. of TPHs, while the plaintiffs have requested the removal of all the elements that could affect their health and their lives. Thus, the level of clean-up should aim to leave things in the state they had prior to the consortium's operations, and not be limited to evaluating and eliminating TPHs, which would increase the cost per cubic meter estimated based on the information provided by expert Barros. This is consistent with what was estimated by the plaintiffs in their pleading of September 16, 2010, containing economic valuation criteria requested by this Court, in which they state that Douglas C. Allen, a specialized consultant "estimates that the potential soil remediation costs at 356 wells and 22 production stations would range between $487 million (for clean-up to 1000 ppm of TPH) and $949 million (for clean-up of 100 ppm of TPH), depending upon the objective sought with respect to ppm of TPH," demonstrating that the costs practically double when the level is increased to 100 mg/Kg. Under this assumption, the quantity that this Presidency estimates as necessary for a clean-up of soils, should not exceed FIVE BILLION THREE HUNDRED AND NINETY-SIX MILLION, ONE HUNDRED AND SIXTY THOUSAND DOLLARS (USD$5,396,160,000.00) and shall be aimed at restoring the natural conditions of the soil impacted by Texpet's activities. We now go onto the measures that are supplementary to the remediation of damages, and that are necessary given that the primary measures will not, in-and-of themselves resolve all the damages in question. Thus, continuing with the pursued remedies, we note that the plaintiffs have requested b) the contracting, at the defendant's cost, of specialized persons or institutions to design and implement a restoration plan for the native fauna and flora, where possible, and likewise c) the contracting, at the defendant's cost, of specialized persons or institutions to design and implement a plan for the regeneration of the aquatic life, all these aspects referring to the lives of the animals and plants in the Concession area that have been adversely impacted by the hydrocarbons activities engaged in by Texpet, but that will [sic] be automatically remedied by the removal of the contaminating elements. Thus, is considered proper to order, as is hereby done, precisely the implementation of a restoration program for flora and fauna and aquatic life, with a supplementary measure

to the principal measures ordered above, since it is obvious that the original flora and fauna will not be restored on their own when the environmental damage has been removed. Thus, a supplementary measure will be required that remediates this problem. According to the plaintiffs, based on what was stated by Dr. Lawrence W. Barnthouse, the figure to offset the loss of habitat and environmental services for 60 years ranges between 874 and 1700 million dollars; nonetheless this figure includes compensation for past services lost, which what this supplementary measure pursues is to restore the native flora, fauna and aquatic life of the zone. Thus, considering the differences, it is estimated that at least TWO HUNDRED MILLION DOLLARS (USD$ 200,000,000.00) are needed divided into 10 million dollars per year, which shall be sufficient to invest in restoration programs for the native species, for at least 20 years or until their presence is no longer necessary, for which specialized entities recognized in the subject matter shall work jointly with the inhabitants of the area impacted by the Consortium's activities. This remediation measure, to the extent that it is successful in restoring the conditions of the flora and fauna to their natural state, will also help remedy the impact suffered in the nutrition of the indigenous peoples on account of the damage to its sources of subsistence. Likewise, with respect to water pollution, it is considered that despite the clean-up ordered above, the people who depend on these sources will need an alternative for their most basic needs. Thus, as a supplementary measure, the implementation is ordered of a potable water system or systems, which shall be constructed at the defendant's cost and benefit the persons who inhabit the area that was operated by the defendant. For this item, consideration is given to what was stated by expert Gerardo Barros in his report, and the difference sources contained in his annexes and other documents that reflect the costs of programs by the European Reference Centre for First Aid Education, UNICEF, and USAID (see documents in corpuses 1501, 1539, 1557-1560, 1573 and 1576) regarding the cost of a water supply to the area affected, regarding the fact that the various water supply systems using a local source would range between average values of 100 and 119 dollars per person, and stating that a connection to the rest of the population (35% not serviced) would cost 7 million dollars. Expert Barros stated that "regional aqueduct systems are not only unnecessary, but that the alleged cost 430 million is enormously exaggerated in comparison to the actual cost for systems in the region," with which this Presidency is partially in agreement, since even though in our opinion [the] cost of 430 million is

high, we do not agree that regional systems can be considered unnecessary, since the contamination of local waters is precisely the problem that makes it impossible to the use local water, which must be transported from other parts of the region through aqueducts, and which would notably increase the cost of this project. Considering the differences between the projects that result in the cost differences, such as the fact that of whether it is planned for a 100 or 35% of the population and whether it uses water from a local source or transported through an aqueduct, we find that it is appropriate to cover the 35% not covered by the projects mentioned with transported water. Thus, making the adjustments needed that ought to be done considering the differences noted, the Presidency estimates that this compensation measure we need ONE HUNDRED and FIFTY MILLION DOLLARS (USD$ 150,000,000.00) We now pass onto the measures for mitigation of damage, contemplated for damage whose remediation is impossible and whose suffering cannot be avoided, such as damage to the health of persons and to their cultures. It is considered that the complaint requested "the contracting, at the defendant's cost, of specialized persons or institutions to design and implement a plan for improvement and monitoring of the health of the inhabitants of the population centers affected by the contamination." This aspect merits meticulous analysis, considering that a serious adverse impact to public health has been demonstrated, provoked by the presence in the environment of contaminants generated by the hydrocarbons practices as implemented by Texpet. Thus, it is not possible to order the individualized remediation of the health of the persons affected, which are undetermined, but measures can indeed be ordered that equally address the problem in general, such as a health improvement plan, as was requested as part of the plaintiffs' pursued remedies. Thus, the defendant is ordered to defray the costs for the implementation of a health system. This health system, to cover the health needs created by the public health problem that was occasioned by the acts of the defendant would need at least ONE BILLION FOUR HUNDRED MILLION DOLLARS (USD$1,400,000,000.00) to function in an ongoing, sufficient manner. Also, among the mitigation measures damage cultural is addressed, since the occurrence described of the impacts to the indigenous peoples is a consequence of the conduct of the defendant; therefore, implementation is ordered of a community rebuilding and ethnic reaffirmation program, whose costs shall also be covered by the defendant, in the amount of ONE HUNDRED MILLION DOLLARS

(USD$100,000,000.00) which amount was obtained based on the costs for four years of nine and a half million dollars of the CAIMAN project referred to by expert Gerardo Barros in his expert report (see corpus 1576 and 1577), and which can share its objectives with the mitigation measures ordered here, but that should also replicate efforts to restore community organization and community values and reaffirm the ethnic identity of the different peoples, for a time period of at least 20 years, which proportionally increases the costs. Finally, this Presidency considers that there is also sufficient evidence to demonstrate the existence of an excessive number of cancer deaths in the Concession area, and many of the people interviewed during the court-ordered inspections even stated that they suffered from cancer or someone close to them had some type of cancer. Nonetheless, we should note that the remediation of particular cases of cancer has not been demanded, nor are such cases identified. Thus, they are not subject to damages; rather, to the contrary, it is found that this evidence together with the statistics reflects an aggravating factor to the public health problem referred to above. Considering that the lack of individualization of the victims does not provide a release from liability to remedy such damage, what is appropriate to analyze is who the beneficiary of said remediation would be. Thus, considering the fact that the existence has [sic] been proven of a serious public health problem, whose causes are reasonably attributable to the hydrocarbons exploitation, it is necessary that the mitigation measures ordered to cover the public health problem originated by Texpet's misconduct, also be aimed at mitigating this public health problem. Thus, the award for the provision of funds for a plan of health shall by increased by EIGHT HUNDRED MILLION DOLLARS (USD$800,000,000.00) which shall necessarily include treatment for the people who have cancer that can be attributed to Texpet's operation in the Concession. **FOURTEEN.-** We find that the following constitutes a display of procedural bad faith on the defendant's part: failure to appear at the exhibition of documents ordered coupled with a failure to submit an excuse on the date indicated; attempting to abuse the merger between Chevron Corp. and Texaco Inc. as a mechanism to evade liability; abuse of the rights granted under procedural law, such as the right to submit the motions that the law allows for, such as the case of the right to take the case up to an appeal, repeated motions on issues already ruled upon, and motions that by operation of law are inadmissible within summary verbal proceedings, and that have all warranted admonishments and fines against defense counsel defendant from the various

Judges who have presided over this Court; delays provoked through conduct that in principle is legitimate, but whose use has unfair consequences for the proceedings themselves, such as refusing and creating obstacles for payment of the experts who took office, thus preventing them from being able to commence their work, or drafting checks for the payment of experts made out to the Court of Justice, or the well documented case of the videos that were illegally recorded by persons close to the defendant. Nonetheless, beyond this procedural misconduct and without prejudice to costs, considering the severity of the effects of the Texaco's misconduct, the bad faith with which the defendant has acted in [this] litigation and the failure to publically acknowledge the dignity and suffering of the victims of the defendant's conduct, the punitive damages requested by the plaintiffs are considered, and it is noted that the same were not requested in the complaint. Yet despite not being expressly requested, this Court observes that a legal foundation has been presented, found in jurisprudence (see Pizarro, "Derechos de daños," ["Rights to Damages"] La Rocca, Buenos Aires, 1996) based on a series of factors to be considered by the judge at the time of establishing these types of damages, prominent among which are: the severity of the offense, understanding in this case the damage caused even despite the fact that it should have and could have been avoided; the particular situation of the party that caused the damage, especially with respect to their wealth, in which the positioning of the defendant stand out; the benefits obtained by the wrong, such as increased profits obtained due to a reduced cost for oil production; the antisocial nature of the misconduct, given to the legal assets protected; the aim of dissuasion for such future conduct; the defendant's attitude during the case, displaying its fairness in the litigation towards the other party and towards the Court; and the emotional distress to the victims, which in this case was not even recognized; all that has been considered by this Presidency in keeping with the universal principles of law that reign in our country and support such a request. Thus, the acts of the defendant while it operated the Concession, the economic benefit it obtained, the acts of its representatives, and their way of proceeding in these proceedings make it appropriate to apply this sanction, but not in the sum sought by the plaintiffs or in the pursued form of unjust enrichment. Rather, this presidency, in accordance with good ruling, imposes punitive damages equivalent to an additional 100% of the aggregate amounts of the remediation measures, which is proper in keeping with the punitive and dissuasive purposes of this type of damages, which have a dual purpose of setting an example and dissuading such conduct, in an effort to recognize the victims and ensure that similar misconduct will not repeat. Nonetheless,

considering that the defendant has already been ordered remediate the damage, and insofar as it serves the same exemplary and dissuasive purposes, this civil penalty may be replaced, at the defendant's option, by a public apology on behalf of Chevron Corp., offered to those affected by Texpet's operations in Ecuador. This public recognition of the damage caused must be published no later than within 15 days, in the leading print media in Ecuador and in the country of the defendant's domicile, on three different days, which, if done, shall be considered a symbolic measure of moral redress and of recognition of the effects of their misconduct, as well as a guarantee that it shall not repeat, which has been recognized by the Inter-American Court of Human Rights with the aim of "Court, [and ...] transmission of a message of official reproof of the human rights violations involved, as well as avoiding repetition of violations such as those in the instant case." (See case of Hermanos Gómez Paquiyauri vs. Peru. Merits, Reparations and Costs. Ruling of July 8, 2004. Series C No. 110, Paragraph 223). **FIFTEEN.-** Finally, considering that is necessary to establish a suitable mechanism for execution of the award, that makes it possible to ensure that the criterion of Justice employed in this ruling becomes a reality, thus ensuring the effective protection by the Courts, and bearing in mind [that] the applicability of a trust as the way to perform the obligations has been recognized in Supreme Court Decisions Number 16-2007 of April 11, 2007, Case No. 62-2005, entitled Andrade v. CONELEC; and No. 229- 2002, Official Gazette 43 of March 19, 2003 and seeking to protect the rights of the plaintiffs and of the affected persons through the application of the same criterion that has served to set the damages, the following means of execution is imposed for the award of damages contemplated in Section Thirteen of the Findings: a) Within sixty days of the date of service with this ruling, the plaintiffs shall constitute a commercial trust, to be administered by one of the funds and trusts administrative companies with residence in Ecuador in keeping with the terms of the Securities Market Act and other applicable law. b) The autonomous endowment shall be comprised by the total amount of the damages that the defendant has been ordered to pay in Section Thirteen of the Findings. c) The beneficiary of the trust shall be the Frente de Defensa de la Amazonía [Amazon Defense Front] or such person or persons as the Frente of Defense of the Amazonía may designate, considering that "the persons affected" by the environmental damages, are undetermined, but determinable persons, brought together by a collective right, and that the remediation measures are

the manner of benefitting them. d) The instructions for the funds and trusts administrator contained in the trust agreement, shall include but not be limited to, and must not contradict the following provisions: i. The entire endowment shall be earmarked to cover the costs needed for contracting the persons in charge of carrying out the remediation measures contemplated in Section Thirteen of the Findings, and the legal and administrative expenses of the trust; ii. The representatives of the Frente de Defensa or such persons as they may designate on behalf of the affected persons, shall comprise the board of trust, which shall be the decision-making and control body, and they shall establish a remediation plan within the parameters established in Section Thirteen of the Findings of this ruling. iii. The Junta is empowered to selection of the contractors, who shall be persons with mastery in the arts and techniques applicable to each remediation measures; for which, prior to the selection of the persons contracted by the Trust to carry out the remediation measures, the Board shall receive technical advice and express the reasons for its vote, which shall be transcribed and submitted to the trustee; iv. The administrator, apart from exercising the legal representation of the trust, shall supervise the remediation plan to ensure that it is in keeping with the remediation measures set forth in Section Thirteen of the Findings, and shall also verify in advance that the contracts that are going to be signed are in keeping with the purpose of the trust; v. The administrator and the Board of the trust have the power to supervise the correct execution of the works by the companies contracted, directly or through external overseers and/or auditors; The trial court, in the execution stage, shall verify the exact performance of the obligation to constitute the trust within the term granted for that purpose; and subsequently, once they are applied, shall also ascertain the effectiveness of the remediation measures, and the proper management of the funds shall be the responsibility of the trustee. For the reasons set forth above, **ADMINISTERING JUSTICE IN THE NAME OF THE SOVEREIGN PEOPLE OF ECUADOR AND BY AUTHORITY OF THE CONSTITUTION AND THE LAWS OF THE REPUBLIC,** this Court partially accepts the complaint filed by María Aguinda, Ángel Piaguage *et al.* against Chevron Corp., and orders the defendant to pay the costs of the remediation measures for the damage as set forth in Section Thirteen of the Findings, which it shall contribute to a trust as established in Section Fifteen of the Findings of this ruling. Additionally, by operation of law, the defendant must pay 10% in addition to the amount of the ruling as damages on behalf of the Frente de Defensa de la Amazonía. With

costs. Given the resignation the regular Rulings Clerk, acting as such is Gloria Cabadiana Guanulema, Esq. SERVICE HEREOF IS ORDERED. f) the Honorable Nicolás Zambrano, President of the Division One-of-One of the Provincial Court of Justice of Sucumbíos, which is communicated to you for appropriate legal purposes.

[signature]                          [seal:]
GLORIA CABADIANA, ESQ.               PROVINCIAL COURT
                                     OF JUSTICE
RULINGS CLERK (Acting)               DIVISION ONE-OF-ONE
                                     SUCUMBÍOS