# EXHIBIT 36

10-1020-cv (L)
Republic of Ecuador v. Chevron

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

---

August Term, 2010

(Argued: August 5, 2010       Decided: March 17, 2011)

Docket Nos. 10-1020-cv (L) 10-1026 (Con)

---

REPUBLIC OF ECUADOR,

*Petitioner-Appellant,*

DANIEL CARLOS LUSITAND YAIGUAJE, VENANCIO FREDDY CHIMBO CHEFA, MIGUEL
MARIO PAYAGUAJE PAYAGUAJE, TEODORO GONZALO PIAGUAJE PAYAGUAJE, SIMON
LUSITANDE YAIGUAJE, ARMANDO WILMER PIAGUAJE PAYAGUAJE, JAVIER PIAGUAJE
PAYAGUAJE, FERMIN PIAGUAJE, LUIS AGUSTIN PAYAGUA PIAGUAJE, EMILIO MARTIN
LUSITAND YAIGUAJE, REINALDO LUSITANDE YAIGUAJE, MARIA VICTORIA AGUIND
SALAZAR, CARLOS GREGA HUATATOCA, CATALINA ANTONIA AGUINDA SALAZAR, LIDIA
ALEXANDRIA AGUI AGUINDA, CLIDE RAMIRO AGUINDA AGUINDA, LUIS ARMANDO
CHIMBO YUMBO, BEATRIZ MERCEDES GREFA TANGUILA, LUCIO ENRIQUE GREFA
TANGUILA, PATRICIO WILSON AGUINDA AGUINDA, PATRICIO ALBERTO CHIMBO YUMBO,
SEGUNDO ANGEL AMANTA MILAN, FRANCISCO MATIAS ALVARADO YUMBO, OLGA
GLORIA GREFA CERDA, NARCISA TANGUILA NARVAEZ, BERTHA YUMBO TANGUILA,
LUCRECIA TANGUILA GREFA, FRANCISCO VICTOR TANGUILA GREFA, ROSA TERESA
CHIMBO TANGUILA, MARIA CLELIA REASCOS REVELO, HELEODORO PATARON GUARACA,
CELIA IRENE VIVEROS CUSANGUA, LORENZO JOSE ALVARADO YUMBO, FRANCISCO
ALVARADO YUMBO, JOSE GABRIEL REVELO LLORE, LUIZA DELIA TANGUILA NARVAEZ,
JOSE MIGUEL IPIALES CHICAIZA, HUGO GERARDO CAMACHO NARANJO, MARIA
MAGDALENA RODRIGUEZ, ELIAS PIYAHUAJE PIYAHUAJE, LOURDES BEATRIS CHIMBO
TANGUILA, OCTAVIO CORDOVA HUANCA, CELIA IRENE VIVEROS CUSANGUA, GUILLERMO
PAYAGUAJE LUCITANDE, ALFREDO PAYAGUAJE, DELFIN PAYAGUAJE,

*Plaintiffs-Appellants,*

— v.—

CHEVRON CORPORATION, TEXACO PETROLEUM COMPANY,

*Defendants-Appellees.*

---

1  B e f o r e:
2
3          JACOBS,[*] *Chief Judge*, POOLER and LYNCH, *Circuit Judges*.
4
5                    _____

6          The Republic of Ecuador and a group of Ecuadorian citizens appeal from the district
7  court's (Leonard B. Sand, *Judge*) denial of their motions to stay an arbitration between
8  Chevron Corporation and Ecuador.  On appeal, Ecuador argues that Chevron waived its right
9  to arbitrate and is otherwise estopped from arbitrating the claims now pending before the
10 arbitral panel, while the Ecuadorian citizens, who are not parties to the arbitration, argue for
11 a stay on various estoppel theories.  We hold that Ecuador's waiver and estoppel claims
12 should be determined by the arbitral panel, and that the Ecuadorian citizens are not entitled
13 to a stay of the arbitration based on equitable, collateral, or judicial estoppel.

14         AFFIRMED.

15                    _____
16
17         GENE C. SCHAERR (Eric W. Bloom, Lauren M. Butcher, Gregory L. Ewing, C.
18              MacNeil Mitchell, *on the brief*), Winston & Strawn LLP, Washington,
19              DC and New York, New York, *for Petitioner-Appellant*.
20
21         JONATHAN S. ABADY (Ilann M. Maazel, O. Andrew F. Wilson, *on the brief*),
22              Emery Celli Brinckerhoff & Abady LLP, New York, New York,  *for
23              Plaintiffs-Appellants*.
24
25         RANDY M. MASTRO (Edward G. Kehoe, Daniel J. King, King & Spalding,
26              New York, New York, Scott A. Edelman, Thomas G. Hungar, *on the
27              brief*), Gibson, Dunn, & Crutcher LLP, New York, New York, Los
28              Angeles, California, and Washington, DC, *for Defendants-Appellees*.
29

---

[*] Chief Judge Dennis Jacobs was designated as the third member of the panel pursuant to Internal Operating Procedure E(b), replacing Judge Reena Raggi, who recused herself earlier in these proceedings.

1         Daniel A. Cohen, Kornstein Veisz Wexler & Pollard, LLP, New York, New
2              York, *for Amici Curiae Emergency Committee for American Trade and*
3              *National Association of Manufacturers in support of Defendants-*
4              *Appellees.*
5
6         Carter G. Phillips, Kathleen M. Mueller, Sidley Austin LLP, Washington, DC,
7              Robin S. Conrad, Amar D. Sarwal, National Chamber Litigation
8              Center, Inc., Washington, DC, *for Amicus Curiae Chamber of*
9              *Commerce of the United States of America in support of Defendants-*
10             *Appellees.*
11
12 ———————————
13 GERARD E. LYNCH, *Circuit Judge*:

14      For nearly seventeen years, in litigation spanning two continents and numerous

15 courtrooms, a group of Ecuadorian citizens ("Plaintiffs") have sought relief for

16 environmental devastation allegedly caused by defendant-appellee Texaco Petroleum

17 Company's ("TexPet") oil exploration and drilling operations in the Ecuadorian

18 rainforest.  In 2001, the district court (Jed S. Rakoff, *Judge*) dismissed Plaintiffs' initial

19 action on Chevron's forum non conveniens motion, and Plaintiffs refiled their claims in

20 Lago Agrio, Ecuador, where they are currently being litigated.

21      Recently, Chevron Corporation[1] and TexPet (collectively, "Chevron") invoked the

22 arbitration clause in Ecuador's Bilateral Investment Treaty ("BIT") with the United

23 States, and initiated arbitration against Ecuador.  See Treaty Between The United States

24 of America and The Republic of Ecuador Concerning the Encouragement and Reciprocal

25 Protection of Investments, U.S.-Ecuador, Aug. 27, 1993, S. Treaty Doc. No. 103-15

26 [hereinafter Bilateral Investment Treaty].  Chevron's notice of arbitration asserted that

---

1    [1] Chevron Corporation merged with TexPet's parent company, Texaco, in 2001 to
2 form ChevronTexaco, Inc.  In 2005, ChevronTexaco changed its name back to Chevron
3 Corporation.

3

1    Ecuador had improperly interfered in the Lago Agrio litigation and requested, among

2    other things, a declaration that Chevron has no liability for environmental damage arising

3    out of TexPet's drilling operations in Ecuador.

4         Plaintiffs, who are not parties to the arbitration, responded by commencing this

5    proceeding in the district court for a stay of the BIT arbitration, arguing that Chevron's

6    initiation of arbitration against Ecuador breached the promises that Texaco made to the

7    district court in order to secure dismissal of Plaintiffs' original action.  Shortly thereafter,

8    Ecuador also moved for a stay.  The district court (Leonard B. Sand, *Judge*) assumed,

9    without deciding, that it had the power to stay BIT arbitration, but declined to exercise

10   that authority in this case.  See Republic of Ecuador v. Chevron Corp., Nos. 09 Civ. 9958,

11   10 Civ. 316, 2010 WL 1028349 (S.D.N.Y. Mar. 16, 2010).  Ecuador and Plaintiffs

12   appealed.  We conclude that the initiation of BIT arbitration did not breach Chevron's

13   promises to the district court and that the BIT arbitration and the Lago Agrio litigation

14   can coexist without undermining the district court's forum non conveniens dismissal.  We

15   therefore affirm the district court's refusal to stay the arbitration.

16                                    **BACKGROUND**

17        Prior decisions of both this Court and the district court have thoroughly detailed

18   the factual background and procedural history of this case.  See Aguinda v. Texaco, Inc.,

19   303 F.3d 470 (2d Cir. 2002); Jota v. Texaco, Inc., 157 F.3d 153 (2d Cir. 1998); Republic

20   of Ecuador v. ChevronTexaco Corp., 376 F. Supp. 2d 334 (S.D.N.Y. 2005); Aguinda v.

21   Texaco, Inc., 142 F. Supp. 2d 534 (S.D.N.Y. 2001); Aguinda v. Texaco, Inc., 945 F.

22   Supp. 625 (S.D.N.Y. 1996).  We repeat only those facts necessary to resolve the narrow

1    issue raised in this appeal.[2]

2            In 1993, residents of Ecuador's Oriente region sued Texaco in the Southern

3    District of New York "seeking extensive relief for vast devastation to that region caused

4    by . . . decades of oil exploration and extraction activities." Aguinda, 945 F. Supp. at

5    626.  Plaintiffs alleged that TexPet "improperly dumped . . . toxic by-products of the

6    drilling process into the local rivers" and constructed a pipeline that "leaked large

7    quantities of petroleum into the environment," causing both personal injuries and

8    catastrophic environmental damage.  Jota, 157 F.3d at 155.  At the time, both Texaco and

9    the Ecuadorian government vigorously opposed having Plaintiffs' claims litigated in the

10   United States, and Texaco moved for dismissal on forum non conveniens and

11   international comity grounds.  Id. at 156.  The district court (Jed S. Rakoff, *Judge*)

12   granted Texaco's motion and dismissed Plaintiffs' action.  Aguinda, 945 F. Supp. at 627.

13           Shortly after that dismissal order, a new government came to power in Ecuador.

14   Political change brought with it a shift in Ecuador's view of this litigation, and the

15   Ecuadorian government attempted to intervene in the lawsuit on Plaintiffs' behalf.

16   However, the district court denied Plaintiffs' then-pending motion for reconsideration and

---

1    [2] Chevron has twice moved to supplement the record with thousands of pages of
2    documents and numerous compact discs containing material irrelevant to the specific issue
3    currently before us.  Both motions were denied.  After the initial denial, Chevron began
4    submitting similar materials under the guise of Federal Rule of Appellate Procedure 28(j).
5    But, as Chevron's experienced appellate counsel is certainly well aware, that rule only
6    permits parties to submit "*pertinent* and *significant* authorities."  See Fed. R. App. P. 28(j)
7    (emphasis added).  It is not to be used as a vehicle to bombard this Court with distracting and
8    irrelevant documents.  Cf. United States v. Bortnovsky, 820 F.2d 572, 575 (2d Cir. 1987)
9    ("In making any such submission, a party is strictly forbidden from making additional
10   arguments . . . .").

1 Ecuador's motion to intervene. <u>Jota</u>, 157 F.3d at 155, 158. On appeal, we held that the

2 district court erred by dismissing Plaintiffs' complaint without first securing "a

3 commitment by Texaco to submit to the jurisdiction of the Ecuadoran courts" and

4 remanded for further proceedings. <u>Id</u>. at 159-61, 163.

5 On remand, Texaco provided that commitment by "unambiguously agree[ing] in

6 writing to be[] sued . . . in Ecuador, to accept service of process in Ecuador, and to waive

7 . . . any statute of limitations-based defenses that may have matured since the filing of the

8 [complaint]." <u>Aguinda</u>, 142 F. Supp. 2d at 539. Texaco also offered to satisfy any

9 judgments in Plaintiffs' favor, reserving its right to contest their validity only in the

10 limited circumstances permitted by New York's Recognition of Foreign Country Money

11 Judgments Act.[3] <u>See</u> N.Y. C.P.L.R. 5301 <u>et seq</u>. With those concessions in mind,[4] the

---

1 [3] Chevron Corporation claims, without citation to relevant case law, that it is not
2 bound by the promises made by its predecessors in interest Texaco and ChevronTexaco, Inc.
3 However, in seeking affirmance of the district court's forum non conveniens dismissal,
4 lawyers from ChevronTexaco appeared in this Court and reaffirmed the concessions that
5 Texaco had made in order to secure dismissal of Plaintiffs' complaint. In so doing,
6 ChevronTexaco bound itself to those concessions. In 2005, ChevronTexaco dropped the
7 name "Texaco" and reverted to its original name, Chevron Corporation. There is no
8 indication in the record before us that shortening its name had any effect on
9 ChevronTexaco's legal obligations. Chevron Corporation therefore remains accountable for
10 the promises upon which we and the district court relied in dismissing Plaintiffs' action.
11 Throughout this Opinion, we use the various corporate names that Chevron
12 Corporation has employed during the course of this litigation only for purposes of clarity.
13 In so doing, we do not attribute any legal significance to the nomenclature used.

1 [4] While the district court did not include Texaco's promise to satisfy any Ecuadorian
2 judgment in its stipulation and order, an express adoption of the prior inconsistent position
3 is not required. The court need only adopt the position "in some manner, such as by
4 rendering a favorable judgment." <u>Mitchell v. Washingtonville Cent. Sch. Dist.</u>, 190 F.3d 1,

1    district court again dismissed Plaintiffs' complaint. <u>Aguinda</u>, 142 F. Supp. 2d at 554. On

2    August 16, 2002, we affirmed. <u>Aguinda</u>, 303 F.3d at 480. Plaintiffs responded by

3    refiling their claims in Lago Agrio, Ecuador, and the resulting Ecuadorian litigation

4    continues to this day.[5]

5         In September 2009, Chevron initiated BIT arbitration against Ecuador. Chevron's

6    notice of arbitration asserted two claims related to the Lago Agrio litigation. First,

7    Chevron argued that any judgment issued against it would violate the terms of TexPet's

8    previous settlement agreement with Ecuador under which TexPet funded certain

9    environmental remediation projects in exchange for what Chevron now characterizes as a

1    6 (2d Cir. 1999) (internal citation omitted); <u>see also</u> <u>Maharaj v. Bankamerica Corp.</u>, 128 F.3d
2    94, 98 (2d Cir. 1997). Here, Texaco had been trying to convince the district court that
3    Ecuador would serve as an adequate alternative forum for resolution of its dispute with
4    Plaintiffs. As part of those efforts, Texaco assured the district court that it would recognize
5    the binding nature of any judgment issued in Ecuador. Doing so displayed Texaco's well-
6    founded belief that such a promise would make the district court more likely to grant its
7    motion to dismiss. Had Texaco taken a different approach and agreed to participate in the
8    Ecuadorian litigation, but announced an intention to disregard any judgment the Ecuadorian
9    courts might issue, dismissal would have been (to say the least) less likely. We therefore
10   conclude that the district court adopted Texaco's promise to satisfy any judgment issued by
11   the Ecuadorian courts, subject to its rights under New York's Recognition of Foreign
12   Country Money Judgments Act, in awarding Texaco the relief it sought in its motion to
13   dismiss. As a result, that promise, along with Texaco's more general promises to submit to
14   Ecuadorian jurisdiction, is enforceable against Chevron in this action and any future
15   proceedings between the parties, including enforcement actions, contempt proceedings, and
16   attempts to confirm arbitral awards.

1         [5] Chevron's contention that the Lago Agrio litigation is not the refiled <u>Aguinda</u> action
2    is without merit. The Lago Agrio plaintiffs are substantially the same as those who brought
3    suit in the Southern District of New York, and the claims now being asserted in Lago Agrio
4    are the Ecuadorian equivalent of those dismissed on forum non conveniens grounds.

1    release from liability for environmental impact falling outside the scope of that

2    settlement.  Second, Chevron argued that the Ecuadorian government improperly

3    interfered with the Lago Agrio proceedings.  In particular, Chevron claimed that

4    "Ecuador's executive branch has publicly announced its support for the plaintiffs, and it

5    has sought . . . to interfere with Chevron's defense," and that "Ecuador's judicial branch

6    has conducted the Lago Agrio Litigation in total disregard of Ecuadorian law,

7    international standards of fairness, and Chevron's basic due process and natural justice

8    rights . . . ."

9         In the BIT arbitration, Chevron Corporation and TexPet seek (1) a declaration that

10    they "have no liability or responsibility for environmental impact . . . or for performing

11    further environmental remediation"; (2) a declaration that Ecuador has breached both the

12    BIT and the terms of its release agreement with TexPet; (3) an order requiring Ecuador to

13    inform the Lago Agrio court that Chevron has "been released from all environmental

14    impact . . . and that Ecuador and Petroecuador [Ecuador's state-owned oil company] are

15    responsible for any remaining and future remediation work"; (4) a "declaration that

16    Ecuador or Petroecuador is exclusively liable for any judgment that may be issued in the

17    Lago Agrio Litigation"; (5) an order "requiring Ecuador to indemnify, protect and defend

18    [Chevron] in connection with the Lago Agrio Litigation, including payment . . . of all

19    damages that may be awarded against Chevron"; and (6) attorneys' fees, litigation costs,

20    arbitration costs, "moral damages," and interest.

21         In December 2009, Ecuador petitioned the district court to stay the BIT arbitration,

1   arguing that Chevron's initiation of arbitration and pursuit of such broad relief violated

2   the promises that Texaco previously made in order to secure a forum non conveniens

3   dismissal of Plaintiffs' action in the United States courts.  Shortly thereafter, Plaintiffs

4   moved to stay the arbitration "to the extent it would seek dismissal, nullification or

5   avoidance of any judgment" in the Lago Agrio litigation.  The district court (Leonard B.

6   Sand, *Judge*) refused to stay the arbitration and granted Chevron's motion to dismiss both

7   actions.  Republic of Ecuador, 2010 WL 1028349, at *2.  Ecuador and Plaintiffs

8   appealed.

9          During the pendency of this appeal, the parties called our attention to two events

10  that occurred after this case was briefed.  First, the arbitral panel issued an interim order

11  directing Ecuador to "take all measures at its disposal to suspend or cause to be

12  suspended the enforcement . . . of any judgment against [Chevron Corporation] in the

13  Lago Agrio Case."  Chevron Corporation v. The Republic of Ecuador, PCA Case No.

14  2009-23 (Feb. 9, 2011).  A few days later, the Lago Agrio court entered an $8.6 billion

15  judgment against Chevron, from which both parties intend to appeal.  While we recognize

16  the potential importance of those events, they do not alter the basic question on appeal:

17  whether the district court erred by refusing to stay the BIT arbitration based on the record

18  before it.

19                              **DISCUSSION**

20  I.  Power to Stay Arbitration

21          The parties agree that BIT arbitration falls under the United Nations Convention

1    on the Recognition and Enforcement of Foreign Arbitral Awards ("New York

2    Convention"), which governs agreements that are "commercial and . . . not entirely

3    between citizens of the United States." Motorola Credit Corp. v. Uzan, 388 F.3d 39, 49

4    (2d Cir. 2004) (internal quotation marks omitted).[6] The New York Convention

5    "promote[s] the enforcement of arbitral agreements in contracts involving international

6    commerce so as to facilitate international business transactions . . . ." Smith/Enron

7    Cogeneration Ltd. v. Smith Cogeneration Int'l, Inc., 198 F.3d 88, 92 (2d Cir. 1999)

8    (internal quotation marks omitted). The Federal Arbitration Act ("FAA") implements the

9    New York Convention, Motorola Credit Corp., 388 F.3d at 49, and brings with it "a

10    national policy favoring arbitration of claims that parties contract to settle in that

11    manner," Vaden v. Discover Bank, 129 S. Ct. 1262, 1271 (2009) (internal quotation

12    marks omitted).

13        Given that strong policy in favor of arbitration, and the lack of express

14    authorization to stay arbitrations under the New York Convention, the FAA, or the BIT,

15    Chevron asserts that courts lack the power to stay BIT arbitration. That is an open

16    question in our Circuit. See Westmoreland Capital Corp. v. Findlay, 100 F.3d 263, 266

---

1        [6] Although dicta in International Shipping Co. v. Hydra Offshore, Inc. suggests that
2    the New York Convention is enforceable only where the party invoking its provisions seeks
3    "either to compel arbitration or to enforce an arbitral award," 875 F.2d 388, 391 n.5 (2d Cir.
4    1989), in light of the principle that the Convention should be interpreted "broadly to
5    effectuate its recognition and enforcement purposes," Bergesen v. Joseph Muller Corp., 710
6    F.2d 928, 933 (2d Cir. 1983), we conclude that the case law applying the New York
7    Convention and the federal policy favoring arbitration apply where a court acts to protect its
8    prior judgments by staying incompatible arbitral proceedings otherwise governed by that
9    Convention.

1   n.3 (2d Cir. 1996) ("Because we find that subject matter jurisdiction is lacking, we do not

2   need to decide whether the FAA gives federal courts the power to stay arbitration

3   proceedings."), <u>abrogated on other grounds</u>, <u>Vaden</u>, 129 S. Ct. 1262.  Because we

4   conclude that a stay is unnecessary in this case, we need not resolve the question of

5   whether federal courts have the power to stay arbitration under the FAA (or any other

6   authority) in an appropriate case.

7   II.  <u>Analysis</u>

8          A.  <u>Ecuador's Waiver and Estoppel Claims</u>

9          Ecuador argues that Chevron, having previously agreed to litigate against Plaintiffs

10  in Lago Agrio, is now "estopped from accepting, ha[s] waived [its] right to accept, or

11  ha[s] otherwise rejected [its] right" to arbitration under the BIT.  If Ecuador is correct,

12  then Chevron's initiation of arbitration was invalid and the arbitral panel lacks

13  jurisdiction over the claims now before it.  Chevron, in addition to challenging the merits

14  of Ecuador's waiver and estoppel claims, argues that those claims should be decided by

15  the arbitral panel.  Because the parties have agreed to arbitrate threshold issues like

16  estoppel and waiver, our precedent prevents us from addressing the merits of Ecuador's

17  claims; instead, we leave them to the arbitral panel in the first instance.

18         Ecuador moved to stay the BIT arbitration under the FAA.  Section Two of the

19  FAA states that "an agreement in writing to submit to arbitration an existing

20  controversy . . . shall be valid, irrevocable, and enforceable, save upon such grounds as

21  exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  That provision

11

1  constitutes "a congressional declaration of a liberal federal policy favoring arbitration

2  agreements . . . . The effect . . . is to create a body of federal substantive law of

3  arbitrability, applicable to any arbitration agreement within the coverage of the Act."

4  Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983).  The

5  application of state law, especially in a case like this "where there is little connection to

6  the forum[,] . . . would introduce a degree of parochialism and uncertainty into

7  international arbitration that would subvert the goal of simplifying and unifying

8  international arbitration law."  Smith/Enron Cogeneration Ltd., 198 F.3d at 96.  We

9  therefore apply federal law to determine the arbitrability of Ecuador's waiver and

10  estoppel claims.

11        Under federal law, "arbitration is a matter of contract and a party cannot be

12  required to submit to arbitration any dispute which he has not agreed so to submit."

13  AT & T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 648 (1986) (internal

14  quotation marks omitted).  Therefore, we must first "resolve[] the question of the very

15  existence of the contract embodying the arbitration clause."  Specht v. Netscape

16  Commc'ns Corp., 306 F.3d 17, 26 (2d Cir. 2002) (internal quotation marks omitted).

17  Only after ensuring that a valid arbitration agreement exists may we proceed to determine

18  whether that agreement requires the arbitration of Ecuador's claims.

19        At the outset, we note that Chevron is not a party to the BIT.  Unlike the more

20  typical scenario where the agreement to arbitrate is contained in an agreement between

21  the parties to the arbitration, here the BIT merely creates a framework through which

1    foreign investors, such as Chevron, can initiate arbitration against parties to the Treaty.

2    In the end, however, this proves to be a distinction without a difference, since Ecuador,

3    by signing the BIT, and Chevron, by consenting to arbitration, have created a separate

4    binding agreement to arbitrate.

5         The BIT provides that "an 'agreement in writing' for purposes of Article II of the

6    . . . New York Convention" is created when a foreign company gives notice in writing to

7    a BIT signatory and submits an investment dispute between the parties to binding

8    arbitration in accordance with Article VI of the Treaty.  <u>See</u> Bilateral Investment Treaty,

9    art. VI § 4(b).  All that is necessary to form an agreement to arbitrate is for one party to be

10   a BIT signatory and the other to consent to arbitration of an investment dispute in

11   accordance with the Treaty's terms.  In effect, Ecuador's accession to the Treaty

12   constitutes a standing offer to arbitrate disputes covered by the Treaty; a foreign

13   investor's written demand for arbitration completes the "agreement in writing" to submit

14   the dispute to arbitration.

15        Here, Chevron complied with the requirements of Article VI by notifying Ecuador

16   in writing and submitting the dispute to an arbitral panel "in accordance with the

17   Arbitration Rules of the United Nations Commission on International Trade Law

18   (UNCITRAL)."  <u>Id</u>. art. VI § 3(a)(iii).  Therefore, the parties formed an "agreement in

19   writing" within the meaning of the New York Convention.  Article II of the New York

20   Convention, enforced in the United States through 9 U.S.C. § 201, requires the

21   recognition of "an agreement in writing under which the parties undertake to submit to

1    arbitration all or any differences which have arisen or which may arise between them."

2    Convention on the Recognition and Enforcement of Foreign Arbitral Awards art. II(1),

3    June 10, 1958, 21 U.S.T. 2517.  Applying that provision to this case requires us to enforce

4    the parties' agreement according to its terms.

5         With the existence of a valid arbitration agreement established, we turn to the

6    arbitrability of Ecuador's waiver and estoppel claims.  We must determine whether the

7    parties intended for the arbitral panel or the courts to resolve those threshold issues.  We

8    will reach the merits of Ecuador's claims only if they are fit for judicial determination.

9         We address the arbitrability of Ecuador's waiver and estoppel claims "with a

10   healthy regard for the federal policy favoring arbitration."  Moses H. Cone, 460 U.S. at

11   24.  That policy "is even stronger in the context of international business transactions"

12   where "arbitral agreements promote[] the smooth flow of international transactions by

13   removing the threats and uncertainty of time-consuming and expensive litigation."  David

14   L. Threlkeld & Co. v. Metallgesellschaft Ltd., 923 F.2d 245, 248 (2d Cir. 1991); see also

15   Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 631 (1985)

16   (federal policy favoring arbitration applies with "special force in the field of international

17   commerce").  As a result, we resolve "any doubts concerning the scope of arbitrable

18   issues . . . in favor of arbitration, whether the problem at hand is the construction of the

19   contract language itself or an allegation of waiver, delay, or a like defense to

20   arbitrability."  Moses H. Cone, 460 U.S. at 24-25.

21        The Supreme Court has "distinguished between 'questions of arbitrability,' which

14

1     are to be resolved by the courts unless the parties have clearly agreed otherwise, and other

2     'gateway matters,' which are presumptively reserved for the arbitrator's resolution."

3     <u>Mulvaney Mech., Inc. v. Sheet Metal Workers Int'l Ass'n, Local 38</u>, 351 F.3d 43, 45 (2d

4     Cir. 2003), quoting <u>Howsam v. Dean Witter Reynolds, Inc.</u>, 537 U.S. 79, 83-85 (2002).

5     "Questions of arbitrability" is a term of art covering "dispute[s] about whether the parties

6     are bound by a given arbitration clause" as well as "disagreement[s] about whether an

7     arbitration clause in a concededly binding contract applies to a particular type of

8     controversy." <u>Howsam</u>, 537 U.S. at 84. Those issues should be decided by the courts

9     unless "there is *clear and unmistakable evidence* from the arbitration agreement . . . that

10     the parties intended that [they] be decided by the arbitrator." <u>Bell v. Cendant Corp.</u>, 293

11     F.3d 563, 566 (2d Cir. 2002) (internal quotation marks omitted). On the other hand, "the

12     phrase 'question of arbitrability' [is] *not* applicable . . . where parties would likely expect

13     that an arbitrator would decide the gateway matter. Thus procedural questions which

14     grow out of the dispute and bear on its final disposition are presumptively *not* for the

15     judge, but for an arbitrator, to decide." <u>Howsam</u>, 537 U.S. at 84 (internal quotation marks

16     omitted).

17        Both waiver and estoppel generally fall into that latter group of issues

18     presumptively for the arbitrator. The Supreme Court has stated, in dicta, that "the

19     presumption is that the arbitrator should decide 'allegation[s] of waiver.'" <u>Id</u>. at 84,

20     quoting <u>Moses H. Cone</u>, 460 U.S. at 24-25. Similarly, <u>Howsam</u> favorably quoted the

21     comments to the Revised Uniform Arbitration Act of 2000 for the proposition that, "in the

1    absence of an agreement to the contrary, . . . prerequisites such as . . . estoppel[] and other

2    conditions precedent to an obligation to arbitrate . . . are for the arbitrators to decide."  Id.

3    at 85 (internal quotation marks omitted).  Furthermore, we have noted that "defenses to

4    arbitrability such as waiver, estoppel, or delay" are "questions properly decided by

5    arbitrators."  See Mulvaney Mech., 351 F.3d at 46.

6          In this case, however, Ecuador characterizes its waiver and estoppel arguments as

7    undermining the agreement itself, not merely as preventing Chevron from taking

8    advantage of an admittedly binding arbitration clause.  Ecuador claims that, under such

9    circumstances, waiver and estoppel are presumptively for the courts.  We need not reach

10   that issue here because, even assuming Ecuador's waiver and estoppel claims go to

11   Chevron's ability to initiate arbitration, and thus are fairly characterized as "questions of

12   arbitrability," there is "clear and unmistakable evidence" that the parties intended these

13   issues to be decided by the arbitral panel in the first instance.  Bell, 293 F.3d at 566

14   (emphasis removed).

15         By signing the BIT, Ecuador agreed to resolve investment disputes through

16   arbitration under the UNCITRAL rules.  Article 21 of those rules states that the arbitrator

17   "shall have the power to rule on objections that it has no jurisdiction, including any

18   objections with respect to the existence or validity of the . . . arbitration agreement."

19   UNCITRAL Arbitration Rules art. 21, para. 1, G.A. Res. 31/98, U.N. Doc. A/RES/31/98

1    (Dec. 15, 1976).[7]  Therefore, Ecuador consented to sending challenges to the "validity" of

2    the arbitration agreement to the arbitral panel.  In this case, Ecuador's estoppel and

3    waiver claims challenge the "validity" of the arbitration agreement because Ecuador

4    argues that Chevron either waived its right to or is estopped from entering into a binding

5    agreement to arbitrate.  Because Ecuador's waiver and estoppel claims go to the validity

6    of the arbitration agreement, Article 21 requires that they be decided by the arbitral panel

7    in the first instance.

8          That conclusion is supported by this Court's interpretation of similar language in

9    other arbitration agreements.  Our decision in Contec Corp. v. Remote Solution Co., 398

10   F.3d 205 (2d Cir. 2005), provides an example.  There, Contec Corporation initiated

11   arbitration against Remote Solution.  Remote Solution insisted that it had never entered

12   into a binding arbitration agreement with Contec Corporation; instead, it claimed to have

13   contracted only with Contec L.P., Contec Corporation's predecessor.  Id. at 207.

14   Although Remote Solution's claim went to the validity of the arbitration agreement, we

15   looked to that agreement for evidence that the parties intended for the arbitrator to decide

16   questions of arbitrability.  Such evidence came from the agreement's incorporation of

17   Rule 7 of the American Arbitration Association ("AAA"), which states that "[t]he

18   arbitrator shall have the power to rule on his or her own jurisdiction, including any

---

1    [7] The UNCITRAL rules were revised in 2010, and jurisdictional issues are now
2    governed by Article 23.  However, this dispute arises under the rules in place prior to the
3    2010 revision.  See UNCITRAL Arbitration Rules art. 1, G.A. Res. 65/22, U.N. Doc.
4    A/RES/65/22 (Jan. 10, 2011).

17

1    objections with respect to the existence, scope or validity of the arbitration agreement."

2    Id. at 208 (internal quotation marks omitted).  We concluded that Rule 7's language

3    "empower[ed] an arbitrator to decide issues of arbitrability," such as the validity of the

4    arbitration agreement itself, and "serve[d] as clear and unmistakable evidence of the

5    parties' intent to delegate such issues to an arbitrator."  Id.

6          We then determined that the parties had a "sufficient relationship to each other and

7    to the rights created under the agreement . . . to permit Contec Corporation to compel

8    arbitration even if, in the end, an arbitrator were to determine that the dispute itself [was]

9    not arbitrable because Contec Corporation [could not] claim rights under the

10   [agreement]."  Id. at 209.  Importantly, Remote Solution, the party seeking to avoid

11   arbitration, had signed the agreement, which broadly covered the business relationship at

12   issue and delegated questions of arbitrability to the arbitrator.  Id. at 209-11.  That

13   "indicator of Remote Solution's expectation and intent" enabled us to "conclude that as a

14   signatory to a contract containing an arbitration clause and incorporating by reference the

15   AAA Rules, Remote Solution [could] not . . . disown its agreed-to obligation to arbitrate

16   all disputes, including the question of arbitrability."  Id. at 211.

17          Ecuador is now in the same situation.  As a signatory to the BIT, Ecuador has

18   consented to arbitrating disputes arising out of investment projects like TexPet's drilling

19   operations in Ecuador.  That agreement also incorporated by reference the UNCITRAL

20   rule delegating questions of arbitrability to the arbitral panel through language nearly

21   identical to the AAA provision at issue in Contec.  Therefore, Ecuador cannot now

1  "disown its agreed-to obligation to arbitrate . . . the question[s] of arbitrability" it has

2  raised as defenses to arbitration in this Court.  Id.

3        Chevron, too, has consented to sending those threshold issues to the arbitrator.  It

4  invoked the UNCITRAL rules when filing its notice of arbitration and has argued that

5  questions of arbitrability are for the arbitral panel.  Because both parties have consented

6  to having questions of arbitrability, including Ecuador's waiver and estoppel claims,

7  determined by the arbitral panel in the first instance, we do not reach their merits here.

8  Nor can we stay arbitration on those grounds.

9        B.  Enforcing Previous Judgments

10        Plaintiffs argue that Chevron is using BIT arbitration to undermine the Lago Agrio

11  litigation and deprive them of a forum capable of resolving those claims previously

12  dismissed by the district court on forum non conveniens grounds.  According to Plaintiffs,

13  Chevron has breached the promises that Texaco made in order to secure that dismissal by

14  pursuing BIT arbitration, and a stay of the arbitral proceedings is necessary in order to

15  hold Chevron accountable to those promises.

16        Plaintiffs moved to stay the BIT arbitration on judicial estoppel, equitable

17  estoppel, and collateral estoppel grounds.  Although those doctrines have somewhat

18  different purposes and applications, in each case "the party who is to be estopped

19  . . . must have asserted a fact or claim, or made a promise, that another party relied on,

20  that a court relied on, or that a court adjudicated" and then later attempted to take a

21  contradictory stance in that or another proceeding.  Maitland v. Univ. of Minn., 43 F.3d

1    357, 364 (8th Cir. 1994).  Cf. Bank of N.Y. v. First Millennium, Inc., 607 F.3d 905, 918

2    (2d Cir. 2010); Kosakow v. New Rochelle Radiology Assocs., 274 F.3d 706, 725 (2d Cir.

3    2001); Maharaj v. Bankamerica Corp., 128 F.3d 94, 98 (2d Cir. 1997).  Generally

4    speaking, we employ estoppel to ensure the integrity of the judicial process, New

5    Hampshire v. Maine, 532 U.S. 742, 749-50 (2001), and to hold litigants accountable for

6    statements upon which courts and other parties reasonably rely, OSRecovery, Inc. v. One

7    Groupe Int'l, Inc., 462 F.3d 87, 93 n.3 (2d Cir. 2006).

8         Plaintiffs' estoppel claims rest on four statements that Texaco made to the district

9    court in order to secure dismissal of Plaintiffs' action.  The first three statements concern

10   Texaco's submission to Ecuadorian jurisdiction.  In Jota, we made clear that a forum non

11   conveniens dismissal would be appropriate only if Texaco were "to submit to the

12   jurisdiction of the Ecuadoran courts." 157 F.3d at 159.  To comply with that ruling,

13   Texaco agreed "to be[] sued . . . in Ecuador, to accept service of process in Ecuador, and

14   to waive . . . any statute of limitations-based defenses that may have matured since the

15   filing of [Plaintiffs' complaint]." Aguinda, 142 F. Supp. 2d at 539.  Those three promises

16   were embodied in the district court's stipulation and order, which both parties signed.

17   See Aguinda v. Texaco, Nos. 93 Civ. 7527, 94 Civ. 9266 (S.D.N.Y. June 21, 2001).

18   Texaco also promised that, if Plaintiffs' claims were dismissed on forum non conveniens

19   grounds, it would "satisfy judgments that might be entered in plaintiffs' favor [by the

20   Ecuadorian courts], subject to [its] rights under New York's Recognition of Foreign

21   Country Money Judgments Act." (Texaco's Mem. of Law in Supp. of Its Renewed Mot.

1    to Dismiss Based on Forum Non Conveniens and International Comity 16-17.)  The basic

2    question now before us is whether Chevron's actions in pursuing BIT arbitration

3    constitute a breach of those four promises.

4            Initially, we note that there is no inherent conflict between BIT arbitration and the

5    Lago Agrio litigation.  Those two proceedings involve different parties and distinct

6    claims.  BIT arbitration is designed to settle investment disputes between foreign

7    investors and the host government.  <u>See</u> Bilateral Investment Treaty, art. VI.  It is limited

8    to the resolution of disputes "between a Party [to the BIT] and a national or company of

9    the other Party arising out of or relating to . . . an investment agreement between that

10   Party and such national or company . . . [or] an alleged [breach] of any right conferred or

11   created by [the BIT] with respect to an investment."  <u>Id</u>.  Chevron's claims are now

12   pending in BIT arbitration precisely because they deal with allegations of Ecuador's

13   improper behavior with respect to Texaco's investment in the region.    However,

14   Plaintiffs are not parties to the BIT, and that treaty has no application to their claims; their

15   dispute with Chevron therefore cannot be settled through BIT arbitration.  Instead

16   Plaintiffs have exercised their right under the forum non conveniens dismissal to litigate

17   their claims against Chevron in Lago Agrio.  That litigation continues to this day.  The

18   existence of those parallel proceedings – one in which Chevron asserts wrongdoing on the

19   part of Ecuador and another in which Plaintiffs assert wrongdoing on the part of Chevron

20   – makes clear that the Lago Agrio litigation can coexist with BIT arbitration.

21           There is also no conflict between Texaco's promises to the district court and

1    Chevron's initiation of a contemporaneous challenge to Ecuador's conduct with respect to

2    the Lago Agrio litigation.  Texaco expressly conditioned its promises on a reservation of

3    its rights under New York's Recognition of Foreign Country Money Judgments Act.  See

4    N.Y. C.P.L.R. 5304.[8]  Chevron has thus reserved its right to challenge any judgment

5    issued in Lago Agrio on the grounds that the Ecuadorian judicial system "does not

6    provide impartial tribunals or procedures compatible with the requirements of due process

7    of law," that the judgment itself "was obtained by fraud," or that "the proceeding in [Lago

8    Agrio] was contrary to an agreement between the parties."  Id.  Nothing in that

9    reservation of rights purports to restrict the kind of forum or type of proceeding in which

10   Chevron can raise those defenses.  Nor did Texaco promise to wait until after a judgment

11   was issued to challenge the fairness of the Lago Agrio litigation.  Having reserved the

12   rights conferred by N.Y. C.P.L.R. 5304, Chevron remains free to enforce them whenever

13   and wherever it chooses, limited only by the scope of the statute and the availability of a

---

1    [8] N.Y. C.P.L.R. 5304 provides, in pertinent part:
2            (a) . . . A foreign country judgment is not conclusive if . . . the
3            judgment was rendered under a system which does not provide
4            impartial tribunals or procedures compatible with the
5            requirements of due process of law . . . .
6            (b) . . . A foreign country judgment need not be recognized if
7            . . .
8            3.  the judgment was obtained by fraud . . . [or]
9            6.  the proceeding in the foreign court was contrary to an
10           agreement between the parties under which the dispute in
11           question was to be settled otherwise than by proceedings in that
12           court. . . .

1 forum prepared to address its claims. It is against that backdrop that we consider

2 Plaintiffs' estoppel claims.

3    1. Judicial Estoppel

4    The purpose of judicial estoppel "is to protect the integrity of the judicial process

5 by prohibiting parties from deliberately changing positions according to the exigencies of

6 the moment." New Hampshire, 532 U.S. at 749-50 (internal citations and quotation

7 marks omitted). It prevents a party from asserting a "factual position . . . clearly

8 inconsistent" with a position previously advanced by that party and "adopted by . . . the

9 court in some manner." Maharaj, 128 F.3d at 98. Because the doctrine is primarily

10 concerned with protecting the judicial process, relief is granted only when "the risk of

11 inconsistent results with its impact on judicial integrity is certain." Simon v. Safelite

12 Glass Corp., 128 F.3d 68, 71-72 (2d Cir. 1997); accord DeRosa v. Nat'l Envelope Corp.,

13 595 F.3d 99, 103 (2d Cir. 2010); Uzdavines v. Weeks Marine, Inc., 418 F.3d 138, 147-48

14 (2d Cir. 2005).

15    Chevron's notice of arbitration raised two claims that Plaintiffs assert are contrary

16 to the positions that Texaco took in order to secure the dismissal of Plaintiffs' action on

17 forum non conveniens grounds. Chevron's first claim is that "Ecuador has engaged in a

18 pattern of improper and fundamentally unfair conduct" with respect to the Lago Agrio

19 litigation that has undermined the impartiality of the Ecuadorian courts. Plaintiffs

20 properly characterize that claim as an assertion that "Chevron's due process rights [have

21 been] violated in Ecuador." Texaco, however, reserved its right to challenge any

1  judgment as "rendered under a system which does not provide impartial tribunals or

2  procedures compatible with the requirements of due process of law." N.Y. C.P.L.R.

3  5304(a)(1). Therefore, Chevron can raise its due process claims in BIT arbitration

4  without contravening Texaco's prior positions in the district court.

5       Chevron's second claim is that a prior agreement between TexPet and Ecuador

6  releases it "from any further liability for environmental impact." According to Chevron,

7  Ecuador has violated that agreement by refusing to "indemnify, protect and defend

8  [Chevron's rights] in connection with the Lago Agrio Litigation" and by failing to accept

9  responsibility for the environmental impact of TexPet's drilling operations. On that basis,

10  Chevron has requested that the arbitral panel issue an "order and award requiring Ecuador

11  to inform the court in the Lago Agrio Litigation that [Chevron] ha[s] been released from

12  all environmental impact" and a declaration that Ecuador "is exclusively liable for any

13  judgment that may be issued in [that] Litigation."

14       We conclude that Chevron may also raise its release claim in BIT arbitration. As

15  we have previously explained, there is a binding agreement between Chevron and

16  Ecuador to arbitrate investment disputes arising out of TexPet's drilling operations, and

17  Chevron's release claim is related to that activity. If Chevron believes that the terms of

18  the release agreement obligate Ecuador to take certain actions with respect to the Lago

19  Agrio litigation, nothing in Texaco's promises to the district court prevents Chevron from

20  using BIT arbitration to attempt to hold Ecuador accountable to those alleged

1    obligations.[9]  The very purpose of BIT arbitration is to provide an impartial venue for the

2    resolution of investment disputes like Chevron's release claim.

3          A promise to submit to the jurisdiction of the Ecuadorian courts and to pay a

4    resulting judgment is not incompatible with a request for an arbitral order requiring

5    Ecuador to intervene in the Lago Agrio litigation.  In dismissing Plaintiffs' action on

6    forum non conveniens grounds, the district court placed no conditions on Ecuador's right

7    to participate in any litigation instituted by Plaintiffs in Ecuador.  Nor could it have, since

8    Ecuador refused to waive its sovereign immunity in the district court and was not a party

9    to Plaintiffs' original action against Chevron.  See Aguinda, 142 F. Supp. 2d at 542.  As a

10   result, nothing that occurred in the United States action limits Ecuador's freedom to take

11   a position in the Lago Agrio litigation in support of either party.  Whether that

12   intervention is wholly voluntary or the result of an arbitral order enforcing an alleged

13   prior promise by Ecuador to Chevron to take a particular position in that litigation makes

14   no difference.  If such an order is issued, and Ecuador enters the Lago Agrio litigation in

15   support of Chevron, it will still be for the Ecuadorian courts to determine the effect (if

16   any) of such developments on the case pending before them.

17         Similarly, nothing in Texaco's promises to submit to Ecuadorian jurisdiction and

18   satisfy any Ecuadorian judgment prevents the arbitral panel from issuing a declaration

---

1          [9] We of course express no view on the merits of this, or any of the other claims that
2    Chevron has presented in the BIT arbitration.

25

1    regarding Chevron's liability for TexPet's drilling operations.[10]  If the arbitral panel

2    issues such a declaration before any Ecuadorian judgment becomes final, then the

3    Ecuadorian courts, applying Ecuadorian law, will determine what impact that declaration

4    has on Plaintiffs' case.  If the pending Lago Agrio judgment is overturned on appeal –

5    whether as a result of Ecuador's intervention or for any other reason – Chevron will have

6    complied with its obligation to litigate the matter in Ecuador and to pay any resulting

7    judgment; in that case, it would simply have won in the Ecuadorian courts, and there will

8    be no judgment to pay.

9        A conflict may arise if the Ecuadorian courts do issue a final judgment, and the

10   arbitrators subsequently enter an award that is inconsistent with that judgment.  Any such

11   conflict, should it arise, could be resolved in any resulting proceedings to enforce the

12   judgment.  In such a proceeding, Plaintiffs would be free to argue that Chevron is

13   estopped from refusing to pay that judgment based solely on the force of its release claim.

14   New York's Recognition of Foreign Country Money Judgments Act, which is the sole

15   reserved route for Chevron to challenge any final judgment resulting from the Lago Agrio

16   litigation, provides only limited ways to attack a judgment based on a prior agreement.

17   Under that Act, a judgment "need not be recognized" if "the proceeding in the foreign

18   court was contrary to an agreement *between the parties* under which the dispute in

---

1        [10] Again, we express no view on whether such an award would be appropriate.  We
2    consider this scenario only to examine whether the potential effect of any arbitral award
3    supports Plaintiffs' claims of estoppel.  Of course, if the arbitral panel rules in favor of
4    Ecuador, the arbitration would have no effect at all on Plaintiffs' Ecuadorian litigation.

1    question was to be settled otherwise than by proceedings in that court." N.Y. C.P.L.R.

2    5304(b)(6) (emphasis added).  But that provision appears only to apply when the parties

3    to the foreign litigation act contrary to a prior agreement – usually a forum selection

4    clause – *between those same parties*.  See Attorney Gen. of Barb. v. Fitzpatrick Constr.

5    Ltd., No. 87 Civ. 4714, 1988 WL 18871, at *4 (S.D.N.Y. Feb. 22, 1988) (Walker, *J*.)

6    (limiting application of that provision to situations where parties had previously agreed to

7    litigate the issue in a forum other than the foreign court); see also N.Y. C.P.L.R. 5304

8    Practice Commentaries (McKinney's 1978) (same).  In this case, the prior agreement at

9    issue is the release agreement between Ecuador and TexPet; Plaintiffs were not a party to

10   that agreement.

11        At this point, however, we need not address the merits of any such argument.  Any

12   conflict between the outcomes of the BIT arbitration and the Lago Agrio litigation

13   remains purely hypothetical.[11]  The Ecuadorian courts have not issued – and may never

---

1    [11] Given the extent and fluidity of this dispute, we do not suggest that the possibilities
2    discussed above are the only moves that the parties can or will make, nor do we express any
3    views on how a court should respond to these potential arguments.  Recently, indeed, a
4    district court overseeing a related matter issued a preliminary injunction restraining any
5    attempt by Plaintiffs' lawyers to enforce the Lago Agrio judgment outside of Ecuador.  See
6    Chevron Corp. v. Donziger, No. 11 Civ. 0691, __ F. Supp. 2d __, 2011 WL 778052
7    (S.D.N.Y. Mar. 7, 2011).  We of course express no view about the merits of that decision,
8    but reference it only to show that the possible avenues for the parties to seek relief are many
9    and that allowing the BIT arbitration to proceed does not render Texaco's promises
10   meaningless or preclude the possibility that the final chapter in this dispute will be played
11   out in American courts that will be better able to evaluate the factual record than we are
12   today.  The only issue before us is whether the district court properly declined to enjoin that
13   arbitration, not whether the Lago Agrio judgment will become final, or prove enforceable in
14   the courts of the United States.

1    issue – a final judgment against Chevron, and the arbitral panel has yet to rule on the

2    merits of Chevron's claims, or even on whether it should reach the merits in light of

3    Ecuador's waiver and estoppel arguments.  Under these circumstances, there is no reason

4    for us to forestall or resolve any entirely hypothetical conflicts between as-yet-

5    nonexistent rulings by enjoining Chevron from commencing arbitration.[12]

6                    2. Equitable Estoppel

7           Equitable estoppel is properly invoked "where the enforcement of the rights of one

8    party would work an injustice upon the other party due to the latter's justifiable reliance

9    upon the former's words or conduct."  Kosakow, 274 F.3d at 725.  "An essential element

10   of [equitable] estoppel is detrimental reliance on the adverse party's misrepresentations."

11   Lyng v. Payne, 476 U.S. 926, 935 (1986).  Plaintiffs claim to meet that burden because, in

12   reliance on Texaco's promises to the district court, they "re-fil[ed] their action in

13   Ecuador[] and expend[ed] enormous time and resources prosecuting the case [there] for

14   over seven years."  According to Plaintiffs, Chevron has undermined those efforts by

15   pursuing BIT arbitration.

16          Assuming arguendo that Plaintiffs can show this reliance, they have failed to

17   demonstrate any misrepresentation by Chevron that would justify applying equitable

18   estoppel in this case.  As we previously explained, Chevron has thus far honored

_____

1        [12] Insofar as Ecuador argues that the district court erred by not staying the BIT
2    arbitration through its inherent power to protect its previous judgments, that argument fails
3    for the same reason we reject Plaintiffs' judicial estoppel claim: Chevron has not violated the
4    conditions of the forum non conveniens dismissal.

1    Texaco's promises to the district court.  As long as Chevron's actions remain consistent

2    with those promises, Plaintiffs' equitable estoppel claims should be denied.  See Towers

3    Charter & Marine Corp. v. Cadillac Ins. Co., 894 F.2d 516, 522 (2d Cir. 1990) (denying

4    equitable estoppel claim where conduct was "consistent with the agreements as written").

5    If Chevron loses in the arbitration, or prevails based on arguments that it reserved the

6    right to advance, or succeeds in a manner that leads to a final judgment in its favor in the

7    Ecuadorian courts, its initiation of arbitration is consistent with its promises to the district

8    court.  To the extent it seeks to use any arbitral award obtained on grounds other than

9    those reserved in its pledge to the district court to block enforcement of any final

10   judgment Plaintiffs may obtain in the Ecuadorian courts, Plaintiffs' claims of equitable

11   estoppel, like their claims of judicial estoppel, can be raised and resolved at that time.

12                    3.  Collateral Estoppel

13        Collateral estoppel bars relitigation of "an issue that has already been fully and

14   fairly litigated in a prior proceeding."  Bank of N.Y., 607 F.3d at 918 (emphasis

15   removed).  It "applies when (1) the identical issue was raised in a previous proceeding;

16   (2) the issue was actually litigated and decided in the previous proceeding; (3) the party

17   had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was

18   necessary to support a valid and final judgment on the merits."  Id. (internal quotation

19   marks omitted).  "If the issues [are] not identical, there is no collateral estoppel."  NLRB

20   v. Thalbo Corp., 171 F.3d 102, 109 (2d Cir. 1999).

21        The application of the collateral estoppel doctrine is improper here because there is

1    no identity of issue between the BIT arbitration and the previous litigation in the district

2    court.  While Ecuador would be collaterally estopped from relitigating issues already

3    decided by the district court in granting Texaco's motion to dismiss, nothing in the record

4    demonstrates that Chevron has asked the arbitral panel to decide any issues identical to

5    those previously decided by the district court.  Accordingly, collateral estoppel does not

6    apply.

7    **CONCLUSION**

8       We have considered all of the parties' arguments and have found in them no basis

9    for reversal.  For the foregoing reasons, the judgment of the district court is AFFIRMED.