UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CHEVRON CORPORATION,

                Plaintiff,

        -against-                                        11 Civ. 0691 (LAK)

STEVEN DONZIGER, et al.,

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

Appearances:

<table>
<tr><td>Randy M. Mastro</td><td>Julio C. Gomez</td></tr>
<tr><td>Andrea E. Neuman</td><td>JULIO C. GOMEZ, ATTORNEY AT LAW LLC</td></tr>
<tr><td>Scott A. Edelman</td><td></td></tr>
<tr><td>Kristen L. Hendricks</td><td>Carlos A. Zalaya, II</td></tr>
<tr><td>William E. Thomson</td><td>F. GERALD MAPLES, PA</td></tr>
<tr><td>GIBSON, DUNN & CRUTCHER, LLP</td><td></td></tr>
<tr><td><em>Attorneys for Plaintiff</em></td><td><em>Attorneys for Defendants Hugo Gerardo Camacho Naranjo and Javier Piaguaje Payaguaje</em></td></tr>
</table>

LEWIS A. KAPLAN, *District Judge.*

      The so-called Lago Agrio plaintiffs[1] (the "LAPs") recently obtained a multibillion

dollar judgment (the "Judgment") against Chevron Corporation ("Chevron") from a provincial court

in Ecuador for alleged environmental pollution by Texaco, Inc. ("Texaco"), the shares of which now

---

[1]    The Lago Agrio plaintiffs are forty-eight individuals, one of whom now is deceased.

are owned, directly or indirectly, by Chevron.  Steven Donziger, a New York attorney, has been a lead lawyer for them for many years.  The Judgment came after about 18 years of litigation in this Court, in Ecuador, and in other *fora,* among them a number of U.S. district courts in which Chevron sought discovery pursuant to 28 U.S.C. § 1782 in relation to the Ecuadorian litigation and an international arbitration between Chevron and Ecuador.

At the time this case began, the undersigned had been presiding for months over and had decided the central issues in two of the Section 1782 proceedings.  In the first, Chevron sought discovery from a documentary film maker, Joseph Berlinger, who had produced a film about the Ecuadorian litigation. The second sought discovery from Donziger.  This Court's rulings granting discovery and denying a motion to quash by Donziger have been affirmed by the Court of Appeals.[2]

Chevron brought this action against the LAPs, Donziger and others on February 1, 2011.  The amended complaint asserts, among other things, that the Ecuadorian judicial system "does not provide impartial tribunals or procedures compatible with the requirements of due process of law"[3] and that the Judgment was obtained by fraud by Donziger and others.  Chevron seeks, in addition to other relief, a declaration that the Judgment is not entitled to enforcement or recognition and an injunction barring its enforcement outside Ecuador.

Two days later, Chevron sought a temporary restraining order ("TRO") and a preliminary injunction barring enforcement of the Judgment.  After hearing both sides, the Court granted the TRO on February 8, 2011, and the preliminary injunction on March 7, 2011.  Since then, the two LAPs who have appeared in this action, subsequently referred to as the LAP

---

[2]    Certain aspects of those proceedings remain pending.

[3]    N.Y. C.P.L.R. § 5304(a)(1).

Representatives,[4] and Donziger have appealed from the preliminary injunction, this Court denied a stay pending appeal, and the Court granted Chevron's request to bifurcate for expedited discovery and trial Count 9 of the complaint, which seeks a declaration that the Ecuadorian judgment is unenforceable and unrecognizable.

After participating in the Section 1782 proceedings before the undersigned for many months and unsuccessfully litigating the preliminary injunction motion and the motion for a separate and expedited trial of the declaratory judgment claim in this case, all without seeking recusal, the LAP Representatives now move to disqualify the undersigned, arguing that his impartiality in this case reasonably might be questioned. The motion rests entirely on rulings and events that occurred in the two previous Section 1782 proceedings and on this Court's rulings in this action. There is no claim of any extrajudicial source of bias.

*Facts*

The background of the litigation is set forth in the Court's prior opinions in the Section 1782 proceedings[5] and in this action,[6] familiarity with which is assumed. It therefore will

---

[4]

    The remaining LAPs and other Ecuadorian defendants have defaulted. A certificate of default has been entered.

[5]

    *In re Chevron Corp.*, 709 F. Supp.2d 283 (S.D.N.Y.) (*"Berlinger § 1782 I"*), *aff'd sub nom.*, *Chevron Corp. v. Berlinger*, 629 F.3d 297 (2d Cir. 2010); *In re Chevron Corp.*, 736 F. Supp.2d 773 (S.D.N.Y. 2010) (*"Berlinger § 1782 II"*); *In re Chevron Corp.*, 749 F. Supp.2d 135 (S.D.N.Y.) (*"Donziger §1782 I"*, fuller opinion, *In re Chevron Corp.*, 749 F. Supp.2d 141 (S.D.N.Y.) (*"Donziger §1782 II"*), *on reconsideration*, 749 F. Supp.2d 170 (S.D.N.Y.) (*"Donziger § 1782 III"*), *aff'd sub nom.*, *Lago Agrio Plaintiffs v. Chevron Corp.*, Nos. 10-4341-cv, 10-4405-cv (CON), 2010 WL 5151325 (2d Cir. Dec. 15, 2010).

[6]

    *Chevron Corp. v. Donziger*, ___ F. Supp.2d ____, 2011 WL 778052 (S.D.N.Y. Mar. 7, 2011) (*"Donziger I"*); *Chevron Corp. v. Donziger*, No. 11 Civ. 0691 (LAK), 2011 WL

suffice to summarize the circumstances in which this case and motion arise.

## I.      The Aguinda and Lago Agrio Cases

The litigation that led to the Ecuadorian judgment arose out of the activities of a fourth-tier subsidiary of Texaco, Texaco Petroleum Company ("TexPet"), which operated and partly owned a petroleum concession in the Oriente region of eastern Ecuador from 1965 until the early 1990s. In 1990, TexPet turned operations of the concession over to the Republic of Ecuador ("ROE") which, through the state-owned oil company Petroecuador, had owned a 50 percent interest in the concession since 1976. In 1992, TexPet relinquished all of its interests in the concession, leaving it owned and operated entirely by Petroecuador from that point forward.

Donziger and certain other American lawyers took an interest in these events. In 1993, they filed *Aguinda v. Texaco*,[7] a Southern District of New York purported class action on behalf of indigenous Ecuadorian plaintiffs including, it appears, all or most of the LAPs. The *Aguinda* plaintiffs sought billions of dollars in damages for alleged personal injuries and property damage as well as remediation of alleged environmental harm said to have been caused by the operation of the petroleum concession.

While the *Aguinda* litigation was pending, the ROE released TexPet from any claims arising out of those operations in exchange for TexPet performing certain remedial environmental

---

979609 (S.D.N.Y. Mar. 7, 2011) ("*Donziger II*"); *Chevron Corp. v. Donziger*, No. 11 Civ. 0691 (LAK), 2011 WL 1408386 (S.D.N.Y. Apr. 6, 2011) ("*Donziger III*"); *Chevron Corp. v. Donziger*, No. 11 Civ. 0691 (LAK), 2011 WL 1465679 (S.D.N.Y. Apr. 15, 2011) ("*Donziger IV*"); *Chevron Corp. v. Donziger*, No. 11 Civ. 0691 (LAK), 2011 WL 1560926 (S.D.N.Y. Apr. 18, 2011) ("*Donziger V*").

[7]      No. 93 Civ. 7527 (JSR) (S.D.N.Y. filed Nov. 3, 1993).

work, which the ROE deemed completed in 1998.  As the ROE represented at the time that all of the claims asserted in the *Aguinda* action belonged to it, the release seems to have been intended to put an end to any claims or litigation concerning TexPet's alleged pollution.  In 2001, the *Aguinda* action was dismissed on the ground of *forum non conveniens*.[8]  The Second Circuit affirmed the dismissal in 2002.[9]

After the ROE released TexPet from liability, however, Ecuador enacted the Environmental Management Act of 1999.  That statute, among other things, created a new private right of action for damages for the cost of remediation of environmental harms generally, as distinct from personal injuries or property damages to specific plaintiffs.  In 2003, after *Aguinda* was dismissed, the LAPs commenced the Lago Agrio litigation against Chevron, a subsidiary of which had acquired all of Texaco's outstanding shares in 2001.  That same year, the Comptroller General of the ROE filed a *denuncia*, apparently a criminal accusation, against two Chevron (formerly TexPet) lawyers, as well as former ROE and Petroecuador officials, alleging that they had falsified documents and violated Ecuadorian law in connection with the ROE's release of TexPet.  Those charges were dropped in 2006 for insufficient evidence but were reactivated in 2008 – apparently at the urging of Donziger (who remained central to the LAPs' Lago Agrio litigation effort) and his colleagues by the new Ecuadorian administration led by then-recently elected President Correa.  Those criminal charges, as far as the Court understands, remain pending.  The Lago Agrio litigation ultimately led to the Judgment.

---

[8]     *Aguinda v. Texaco, Inc.*, 142 F. Supp.2d 534 (S.D.N.Y.2001).

[9]     *Aguinda v. Texaco, Inc.*, 303 F.3d 470 (2d Cir. 2002).

II.     *The Section 1782 Proceedings*

        In recent years, Chevron brought more than a dozen Section 1782 proceedings in U.S. courts to obtain evidence for use in the Ecuadorian litigation and an international arbitration it has brought against Ecuador in relation to these events.  As noted, two of those cases were brought in the Southern District of New York and are before the undersigned.

     A.     *The Berlinger Section 1782 Proceeding*

        The first related to the film *Crude*, the making of which Donziger had solicited and in which Donziger appeared on camera at great length.  The film portrayed some of Donziger's activities in and statements about the Lago Agrio litigation.  Among other things, the film, as released to the public, depicted:

(1)     Donziger pressuring an Ecuadorian judge "to block the judicial inspection of a laboratory allegedly being used by the Lago Agrio plaintiffs to test for environmental contamination.  Donziger describe[d] his use of 'pressure tactics' to influence the judge and concede[d] that '[t]his [wa]s something you would never do in the United States, but Ecuador, you know, this is how the game is played, it's dirty,'"[10] and

(2)     A representative of the LAPs reporting to Donziger that he had "coordinat[ed] everything" with the president of Ecuador, Donziger being embraced and lauded by the president, and Donziger explaining that "President Correa had called for criminal prosecutions to proceed against those who engineered the

---

[10]     *Berlinger § 1782 I*, 709 F. Supp.2d at 289.

Settlement and Final Release."  Donziger added that "'Correa just said that anyone in the Ecuador government who approved the so-called remediation is now going to be subject to litigation in Ecuador.  Those guys are shittin' in their pants right now.'"[11]

In addition, one version of the film – in a part edited out of the version released generally at the LAPs' request – depicted  an *ex parte* meeting involving Donziger, some of the LAPs, and others with an expert who contributed to a supposedly neutral damages assessment by a court-appointed expert.[12]

This and other evidence led to *Berlinger § 1782 I*, which was affirmed on appeal and ultimately required the film maker to turn over the outtakes that did not make their way into *Crude*.[13]

B.      *The Donziger Section 1782 Proceeding*

The outtakes included, among other things, scenes in which Donziger and others spoke of pressuring the Ecuadorian judiciary to rule in the LAPs' favor, described the Ecuadorian judicial system as "corrupt," traveled to meet *ex parte* with an Ecuadorian judge, and appeared to be driving the criminal prosecutions of the two Chevron Ecuadorian lawyers.  Chevron therefore obtained a Section 1782 subpoena requiring Donziger to produce documents and submit to a deposition.  Donziger and the LAPs, separately represented, moved to quash.

At the heart of the motion to quash were Donziger's and the LAPs' arguments that

---

[11]     *Id.*

[12]     *Id.*

[13]     *Berlinger § 1782 I*, 709 F. Supp.2d 283, *aff'd sub nom. Chevron Corp.*, 629 F.3d 297.

discovery from Donziger would be inappropriate because he was among the LAPs' lawyers and that the attorney-client privilege and work product doctrine in any case precluded production.  Chevron rejoined, among other things, that the circumstances warranted discovery notwithstanding that Donziger is a lawyer and that any claim of privilege or work product was overcome by the crime-fraud exception.  Donziger responded that nothing in the *Crude* outtakes revealed anything unlawful and that the crime-fraud exception to the privileges therefore did not apply.

　　　　As Donziger and the LAPs refused to cooperate in seeking a stay of proceedings in Ecuador to facilitate consideration of issues raised in this Court, the litigation of the motion to quash occurred under extreme time pressure. Chevron was faced with the imminent prospect of an enormous judgment in the Ecuadorian litigation, and the two Chevron attorneys were facing criminal prosecution there with a critical preliminary hearing just a short time away.  All sought the evidence for use in defending themselves in Ecuador.  Thus, it was apparent that Chevron and the two accused lawyers were in a race against time – delay served the interests of Donziger and the Ecuadorian plaintiffs because delay of discovery in the Section 1782 proceeding threatened to preclude its use either in the preliminary hearing in the Ecuadorian criminal case or before entry of judgment in the civil litigation.

　　　　The Court denied the motion to quash and ordered that Donziger comply with Chevron's subpoena.[14]  That decision was affirmed on appeal.[15]  At no point during either of the Section 1782 proceedings did Donziger, the LAPs, or any other party move to recuse the

---

[14]

　　　　*Donziger §1782 I*, 749 F. Supp.2d 135, *fuller opinion*, *Donziger §1782 II*, 749 F. Supp.2d 141, *on reconsideration*, *Donziger § 1782 III*, 749 F. Supp.2d 170.

[15]

　　　　*Chevron Corp.*, 2010 WL 5151325.

undersigned.

## III.    *This Action*

As noted, Chevron filed this action on February 1, 2011.  Its core is Chevron's claim that the Judgment is not recognizable or enforceable.  The complaint asserts also claims under the Racketeer Influenced and Corrupt Organizations Act, several state law tort claims, and claims against Donziger for violating legal ethics standards.  On February 3, Chevron moved for a TRO and a preliminary injunction barring enforcement of the Judgment.[16]  The Court scheduled argument on the TRO for February 8, 2011.   As will be seen, Donziger and, to an extent, the LAP Representatives, began questioning the impartiality of the undersigned at the outset, entirely on the basis of events in the Section 1782 proceedings.

### A.    *Donziger's Letter of February 8, 2011*

On February 8 – the date on which the Court had scheduled the TRO argument – Donziger requested an adjournment, claiming that he needed more time to obtain counsel.[17]  The

---

[16]     DI 4.

[17]     DI 158 ("Donziger Letter") at 1.

The accuracy of that claim was quite debatable.  Donziger at the time was represented by the Kaplan, Friedman firm  in the Section 1782 proceeding.  Even before the order to show cause was filed, several media outlets quoted a statement by attorney Gerald Lefcourt, who claimed to represent Donziger.  *See, e.g.*, Alison Frankel, *Chevron Files RICO Suit Against Steven Donziger, Ecuadorian Plaintiffs, and Expert Consultants* (Feb. 3, 2011, 8:30 AM), http://amlawdaily.typepad.com/amlawdaily/2011/02/chevronrico.html;  Barbara  Leonard, *Chevron Levels RICO Charges Over $113 Billion Trial in Ecuador* (Feb. 1, 2011 4:17 PM), http://www.courthousenews.com/2011/02/01/33808.htm;  Erin  Fuchs,  *Chevron  Accuses  E c u a d o r e a n s '  A t t y  O f  E x t o r t i o n  ( F e b .  1 ,  2 0 1 1 )*, http://www.law360.com/topnews/articles/223261/chevron-accuses-ecuadoreans-atty-of-e

Court denied the request, noting that TROs, which may be granted without notice, are of limited duration.[18]  Most of the letter, however, was devoted to Donziger's further assertion that an "overwhelming appearance of impropriety . . . would attach to this Court accepting this case."[19]  The letter made essentially four arguments, all or most of which have resurfaced in the present motion.

First, it alleged that "the Court has shown antagonism towards [Donziger] and the *Aguinda* litigation."[20]  This assertion rested on misleading and out-of-context quotations from the transcripts of arguments in the Section 1782 proceedings.

Second, it asserted that the Court had "urged" Chevron to bring this action, a contention based on the Court's question during the argument of the motion to quash in the Donziger Section 1782 proceeding whether "the phrases Hobbs Act, extortion, RICO, have any bearing here?"[21]  As will appear, the suggestion that the Court urged Chevron to bring this action is entirely unsupportable.

Third, Donziger claimed that this Court should not preside because Chevron contemplates the undersigned being a witness in this case.  Not surprisingly, there is no suggestion either in the letter or elsewhere that the undersigned has any personal knowledge of any facts

---

xtortion.  There is evidence also that Donziger retained Mr. Lefcourt as early as December 2010 to represent him in response to any civil complaint or criminal investigation.  *See* DI 298 Exs. 15, 16; *Donziger I,* 2011 WL 778052, at *45 & n. 405.  In addition, he is a lawyer himself and, according to his letterhead, employs two associates.

[18]     Tr., Feb. 8, 2011 at 2:2-13.

[19]     *Id.*

[20]     Donziger Letter at 3.

[21]     Donziger Letter at 2 (quoting *In re Chevron Corp.*, 10-MC-00002 (LAK), Tr., Sept. 23, 2010).

relevant to this action beyond whatever it has learned by presiding as a judge and certainly no suggestion that Chevron (or anyone else) intends to attempt to call him as a witness.

Fourth, the letter alleged that the Court had made a number of remarks about Donziger's conduct during proceedings in the Section 1782 proceedings that indicated that it had "reached conclusions as to numerous of the ultimate issues in this case."[22]  As will be seen, this allegation is without merit.

B.   *Donziger's Motion to Reassign the Case*

Approximately three weeks after the February 8 letter and approximately four weeks after Chevron filed this action, Donziger, joined by the LAP Representatives,[23] moved to transfer this case from the undersigned to the Honorable Jed S. Rakoff – who had presided over the *Aguinda* action – under the related case provision of the Southern District's Rules for the Division of Business Among District Judges (the "RDB").[24]  That application was entirely baseless for reasons set out in the Court's decision denying it.[25]  But it was notable also for two additional reasons.

First, in seeking reassignment to Judge Rakoff, neither the LAP Representatives nor Donziger disclosed that the LAPs in 2000 had moved unsuccessfully to recuse Judge Rakoff in the

---

[22]

Donziger Letter at 1-2.

[23]

DI 167.

[24]

DI 160 ("Transfer Motion").

[25]

*Donziger II,* 2011 WL 979609.

*Aguinda* case[26] or that the *Crude* outtakes contained footage of Donziger calling Judge Rakoff "corrupt," "totally biased against us," and "a dishonest judge."[27]

Second, although the subject had no proper bearing on whether the RDB had been abused by Chevron, as Donziger and the LAP Representatives claimed, much of the transfer motion repeated and expanded upon the assertions that the undersigned had demonstrated bias in favor of Chevron. Those contentions now form a substantial part of the basis for the present motion.[28]

C.    *This Motion*

Notwithstanding the allegations contained in Donziger's letter and the transfer motion, this is the first application by any party to this case or the Section 1782 proceedings to recuse the undersigned. It was made nearly two months after the transfer motion, more than two and a half months after Donziger's letter, nearly three months after Chevron filed this action, and more than one year after this Court began presiding over the related Section 1782 proceedings.

The motion largely echoes the arguments and allegations of Donziger's letter and the transfer motion. The LAP Representatives repeat the arguments that the undersigned (1) encouraged Chevron to bring this suit, (2) views the Lago Agrio litigation effort as a "game," (3) has prejudged

---

[26]

*Aguinda v. Texaco, Inc.*, 139 F. Supp.2d 438 (S.D.N.Y. 2000), *aff'd*, *In re Aguinda*, 241 F.3d 194 (2d Cir. 2001).

[27]

DI 179 Ex. 2.

The Court notes a recent article by a respected commentator taking the view that "[t]he effort to force or shame off a case a judge . . . is becoming the latest weapon in a litigator's arsenal – litigation by other means." Linda Greenhouse, *Recuse Me*, N.Y. TIMES (May 4, 2011), http://opinionator.blogs.nytimes.com/2011/05/04/recuse-me/?partner=rss&emc=rss.

[28]

Transfer Motion, *passim*.

the merits of this case, (4) has questioned the LAPs' existence by calling them the "so-called Lago Agrio Plaintiffs," (5) is antagonistic towards the government and courts of Ecuador, and (6) may be called as a witness in this action.  To this they have added complaints about the substance of the Court's rulings on and in connection with the preliminary injunction and bifurcation motion and its denial of a stay pending appeal.  In the last analysis, however, the motion rests almost entirely on criticism of and disagreement with the Court's rulings and reasoning in this case and in the Section 1782 proceedings.

## *Discussion*

### I.    *Recusal Under Section 455(a)*

The LAP Representatives argue only that the undersigned should be recused because his impartiality might reasonably be questioned.[29]  The relevant statute therefore is Section 455(a) of the Judicial Code,[30] which provides that "[a]ny . . . judge . . . shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."  That statute makes disqualification a matter addressed to the district judge's discretion,[31] subject to review only for

---

[29]
    They have not asserted that there is any extrajudicial source of bias.  And while they nominally repeat Donziger's previous assertion that the undersigned is disqualified because he is a possible witness, they have relegated that argument to a footnote on the last page of their memorandum.  LAP Representatives Mem. at 35 n.17.  In any case, there is no basis for it.  There is no suggestion that the undersigned has personal knowledge of any facts or otherwise could be a material witness in this case.  *See* 28 U.S.C. § 455(b)(5)(iv).

[30]
    28 U.S.C. § 455(a).

[31]
    *In re Basciano*, 542 F.3d 950, 956 (2d Cir. 2008) ("[t]he district judge has discretion 'in the first instance to determine whether to disqualify himself.'") (quoting *In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1312 (2d Cir. 1988)), *cert. denied*, 129 S. Ct. 1401 (2009).

abuse.[32]  Moreover, it has both procedural and substantive components.


      *A.*      *Timeliness*

      A motion for recusal under Section 455(a) must be made "as soon as the facts on

which it is premised are known to the parties."[33]  The LAP Representatives protest in large part the

Court's remarks and rulings from the Section 1782 proceedings, which occurred months and, in

some instances, approximately one year before this motion.  Yet the LAP Representatives never

moved to recuse the undersigned in those cases.  Nor did they do so for nearly three months of

litigation in this action.  Instead, they waited until after this Court had ruled on the preliminary

injunction and bifurcation motions in this case.  In all the circumstances, this motion is untimely

and, quite possibly, so untimely that the LAP Representatives impliedly have waived their right to

seek recusal.[34]  At a minimum, it is untimely insofar as it relies upon anything that transpired in the

Section 1782 proceedings and through the argument of the preliminary injunction motion in this

case.


      *B.*      *The Substantive Standard*

      The substantive standard that governs this motion is plain:

          "It is axiomatic that a judge may not preside over a case when his impartiality

---

[32]

    *In re Basciano*, 542 F.3d at 956.

[33]

    *United States v. Bayless*, 201 F.3d 116, 127 (2d Cir.), *cert. denied*, 529 U.S. 1061 (2000); *see also Apple v. Jewish Hosp. & Medial Center*, 829 F.2d 326, 333 (2d Cir. 1987).

[34]

    *Bayless*, 201 F.3d at 127 ("[U]ntimeliness in making a motion for recusal can sometimes constitute the basis for finding an implied waiver.").

might reasonably be questioned. In deciding the sensitive question of whether to recuse a judge, the test of impartiality is what a reasonable person, *knowing and understanding all the facts and circumstances,* would believe.

*     *     *

"[T]he test to be applied is an objective one *which assumes that a reasonable person knows and understands all the relevant facts. See Pepsico, Inc. v. McMillen,* 764 F.2d 458, 460 (7th Cir.1985); *United States v. Ferguson,* 550 F. Supp. 1256, 1260 (S.D.N.Y.1982). *   *   * Like all legal issues, judges determine appearance of impropriety – not by considering what a straw poll of the only partly informed man-in-the-street would show – but by examining the record facts and the law, and then deciding whether a reasonable person knowing and understanding all the relevant facts would recuse the judge.*"[35]

Moreover, recusal under Section 455(a) typically is appropriate only in cases of bias or prejudice stemming from an extrajudicial source.[36] Here, however, no one has contended that the Court harbors a bias or prejudice stemming from such a source. Rather, the argument is based on colloquy between the Court and counsel during arguments and substantive rulings.

The Court's comments from the bench on various occasions, all or most in the Section 1782 proceedings, upon which the LAP Representatives rely – which, as discussed below, are wholly innocuous when read in context – were germane to the issues presented, based on the evidence, and made on the record in proceedings over which the Court was presiding. As the Supreme Court made clear in *Liteky v. United States*, comments based on evidence adduced before a judge are not a basis for recusal even where they reflect a disposition with respect to a litigant:

"The judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person. But the judge is not thereby recusable for bias or

---

[35]

*In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1308, 1313 (first and third emphases added).

[36]

*Liteky v. United States*, 510 U.S. 540, 550-51 (1994).

prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and are indeed sometimes (as in a bench trial) necessary to completion of the judge's task.  As Judge Jerome Frank pithily put it: 'Impartiality is not gullibility.  Disinterestedness does not mean child-like innocence.  If the judge did not form judgments of the actors in those court-house dramas called trials, he could never render decisions.'  [citation omitted].  Also not subject to deprecatory characterization as 'bias' or 'prejudice' are opinions held by judges as a result of what they learned in earlier proceedings.  It has long been regarded as normal and proper for a judge to sit in the same case upon its remand, and to sit in successive trials involving the same defendant."[37]

The Court continued:

"[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. . . . *Not* establishing bias or partiality . . . are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display.  A judge's ordinary efforts at courtroom administration – even a stern and short-tempered judge's ordinary efforts at courtroom administration – remain immune."[38]

To be sure, there may be cases in which "[a] favorable or unfavorable predisposition can also deserve to be characterized as 'bias' or 'prejudice' because, even though it springs from the facts adduced or the events occurring at trial, it is so extreme as to display clear inability to render fair judgment."[39]  But this quite clearly is not such a case.  Not only do the Court's comments and questions, taken in context and in full, fail to support any claim of bias, prejudice or inappropriate prejudgment, but this Court – unlike several others that have decided related Section 1782

---

[37]     *Id.* at 550-51.

[38]     *Id.* at 555-56.

[39]     *Id.* at 551.

proceedings[40] – has declined to rule on Chevron's contention that Donziger's activities come within the crime-fraud exception to the attorney-client privilege.[41]  It has taken cognizance of the fact that the rules governing conduct in Ecuador may be different than those familiar to American lawyers.[42] And it repeatedly made clear the provisional nature of its findings and views in ruling on the preliminary injunction motion.[43]

> The LAPs' contention that the Court's rulings give rise to an appearance of partiality

---

[40]

*In re Chevron Corp.*, No. 10-MC-21 (J/LFG) (D.N.M. Sept. 13, 2010) (finding "that . . . discussions trigger the crime-fraud exception, because they relate to corruption of the judicial process, the preparation of fraudulent reports, the fabrication of evidence, and the preparation of the purported expert reports by the attorneys and their consultants."); *In re Application of Chevron Corp.*, No. 10-cv-1146-IEG (WMC) (S.D. Cal. Sept. 10, 2010) (crime-fraud exception applies because "[t]here is ample evidence in the record that the Ecuadorian Plaintiffs secretly provided information to Mr. Cabrera, who was supposedly a neutral court-appointed expert, and colluded with Mr. Cabrera to make it look like the opinions were his own."); *Chevron Corp. v. Champ*, No. 1:10-mc-0027 (GCM-DLH) (W.D.N.C. Aug. 30, 2010) ("While this court is unfamiliar with the practices of the Ecuadorian judicial system, the court must believe that the concept of fraud is universal, and that what has blatantly occurred in this matter would in fact be considered fraud by any court. If such conduct does not amount to fraud in a particular country, then that country has larger problems than an oil spill.").

[41]

*Donziger § 1782 I*, 2010 WL 4118093, at *4.

The LAP Representatives' contention that the undersigned's rulings "went much further than any court ever has," DI 305 at 1-2, is remarkable in light of the Court's restraint on this crucial issue – one on which multiple other judges have ruled against their position.

[42]

Tr., Feb. 8, 2011, at 47:17-19.

[43]

*E.g., Donziger I*, 2011 WL 778052, at *6 ("recognizing that this like all findings at this stage is provisional, the Court infers that the EMA was substantially drafted and its enactment procured by Bonifaz, Donziger and other American attorneys for the *Aguinda* plaintiffs"), *11 (recognizing possible bias against the LAPs of witness relied upon by Chevron), *12 (recognizing that evidence that Ecuadorian judge appointed the ostensibly neutral expert  in exchange for the LAPs' agreement not to file complaint against him and that the LAPs paid the neutral expert up front and promised him future consideration if they prevailed was not conclusive and open to further examination at trial).

is baseless as well.  The Supreme Court has been abundantly clear:

> "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion.  [citation omitted].  In and of themselves (i.e., apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required . . . when no extrajudicial source is involved."[44]

Here, there is no allegation of extrajudicial source.  And the rulings complained of, which in some cases are rather different than the LAP Representatives' distorted and misleading accounts of them, plainly do not fall within "the rarest circumstances" in which they could evidence the requisite bias or appearance of partiality.  They therefore "are proper grounds for appeal, not for recusal."[45]  The Court's decisions, where appealed, uniformly have been affirmed.  Disagreement or dissatisfaction with the Court's rulings is not enough to succeed on this motion.[46]  An adversary system inherently has one side that wins and another that loses.[47]  "If losses compromised the appearance of justice, this system would grind to a halt."[48]

Indeed, Donziger previously made to the Second Circuit much the argument that the LAP Representatives make now.  In *Lago Agrio Plaintiffs v. Chevron Corp.*,[49] in which many of the

---

[44]

*Liteky*, 510 U.S. at 555.

[45]

*Id.*

[46]

*See*, *e.g.*, *Truong v. Charles Schwab & Co.*, No. 07 Civ. 8085 (SHS), 2009 WL 464452, *1 (S.D.N.Y. Feb. 24, 2009).

[47]

*United States v. Awadallah*, 436 F.3d 125, 137 (2d Cir. 2006).

[48]

*Id.*

[49]

2010 WL 5151325.

19

statements and rulings complained of were made, Donziger's appellate brief was sharply critical of

this Court, complaining among other things that:

> "the District Court formed a jaundiced view of Donziger and his role in the Lago
> Agrio case.  Having done so, the Court swept aside the considerations that have led
> the courts to strongly disfavor discovery from active litigation counsel, and when
> they permit such discovery, to limit it to the essential.  In permitting the broadest
> possible discovery of the Lago Agrio plaintiffs' lead lawyer, the District Court
> abused its discretion."[50]

In affirming this Court's decision in that matter, however, the Court of Appeals wrote:

> "[I]n light of the complexity of this case and the urgency of its adjudication, we wish
> to note the exemplary manner in which the able District Judge has discharged his
> duties. There is no question but that all concerned, not least this Court, are well
> served by the careful and comprehensive analysis which is evident repeatedly
> throughout the many memoranda and orders of the District Court, many of which
> were produced with rapidity in the context of the District Court's daunting schedule
> in this and other important cases."[51]

These principles alone suffice to dispose of this motion.  But the motion fails for an

additional reason.  "In deciding the sensitive question of whether to recuse a judge, the test of

impartiality is what a reasonable person, *knowing and understanding all the facts and

circumstances*, would believe."[52]  When considered in context,[53] the remarks and rulings that the

LAP Representatives protest are perfectly banal.

---

[50]
       Brief on behalf of Steven Donziger, *Lago Agrio Plaintiffs v. Chevron Corp.*, at 6.

[51]
       *Lago Agrio Plaintiffs*, 2010 WL 5151325, at *2.

[52]
       *In re Drexel Burnham Lambert, Inc.*, 861 F.2d 1307, 1309 (2d Cir.1988) (emphasis added),
*reh'g denied*, 869 F.2d 116 (2d Cir.), *cert. denied*, 490 U.S. 1102 (1989); *see also Hoatson
v. N.Y. Archdiocese*, 280 Fed. Appx. 88, 91 (2d Cir. 2008) (quoting *Bayless*, 201 F.3d at
127).

[53]
       The Court does not attempt to enumerate or clarify each of the LAP Representatives'
claimed grievances, many of which merit no attention whatsoever.

II.     The Comments and Questions Relied Upon

    A.     The Allegation that the Court "Urged" Chevron to Bring this Action

        The LAP Representatives and Donziger repeatedly have contended that the Court urged Chevron to bring this action by asking, during the September 23, 2010 argument of the motion to quash in the Section 1782 proceeding against Donziger, whether "the phrases Hobbs Act, extortion, RICO, have any bearing."  The Court certainly did include those words in a much longer question on that occasion.  But they were certainly not a suggestion that Chevron bring this case, as the record makes abundantly clear.  So the LAP Representatives' assertion is flatly contradicted by the record.  The facts are these.

        Chevron moved for a Section 1782 subpoena for discovery from Donziger on August 18, 2010.[54]  Recognizing that Donziger probably would raise privilege objections to any subpoena, its memorandum argued that any such argument would fail under the crime-fraud exception because "Donziger [had] orchestrated a scheme to tamper with expert testimony, to obstruct inquiry into that tampering, and to procure a fraudulent official report with the stated intent of extorting a settlement or enforcing a judgment based on that report in U.S. courts." It argued also that the District of New Jersey already had overruled related claims of privilege under the crime-fraud exception.[55]

        Donziger moved to quash the subpoena on August 27, 2010,[56] in part on the ground of alleged attorney-client privilege.  Chevron's September 1 opposition to that motion argued that any privilege had been vitiated by the crime-fraud exception.  Specifically, it accused Donziger of

---

[54]     *In re Chevron Corp.*, 10-MC-00002 (LAK), DI 11.

[55]     *Id.* DI 11, at 23.

[56]     *Id..* DI 23.

engaging in racketeering activity, extortion, and Hobbs Act violations:

> "The evidentiary record Chevron has put before this Court amply supports a finding of at least 'probable cause' that numerous U.S. criminal statutes have been violated. For example, under the Hobbs Act, 18 U.S.C. § 1951, a conspiracy to commit extortion – *i.e.*, the 'obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right'—is a felony punishable by twenty years' imprisonment. The broad scheme to threaten or obtain a false judgment based on faked evidence and corrupted court experts positing wildly excessive damages 'assessments,' from a tribunal subjected to intense political and physical pressure, topped off with a campaign of public vilification against Chevron and its employees based on knowing falsehoods, represents a literal extortion racket. [citation omitted]. This scheme also involves multiple acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343, and 1346. And Donziger's attempts to intimidate or mislead Calmbacher in connection with his deposition is probable cause for obstruction of justice in violation of 18 U.S.C. § 1503 or witness tampering in violation of 18 U.S.C. § 1512(b)." . . . .

> "All of these acts and the conspiracy to commit them, if committed in furtherance of a racketeering enterprise, constitute predicate acts under RICO, 18 U.S.C. §§ 1961-1964."[57]

Thus, Chevron had laid out its RICO, Hobbs Act and extortion claims well before the motion to quash was argued and well before the Court even posed its question. In short, the chronology is flatly inconsistent with the LAP Representatives' contention. But that is not all.

When the motion to quash came on for argument on September 23, Donziger's counsel asserted that the crime-fraud exception did not apply because "there's no Ecuadorian statue or case saying that the principal conduct that's being attacked was unlawful."[58] At that point, the Court interposed a question – which contains the language on which the LAP Representatives rely but which they quote quite selectively (the underscored portions below having been elided in the

---

[57]

 *In re Chevron Corp.*, 10-MC-00002 (LAK), DI 38 at 23-24.

[58]

 *Id.*, Tr. Sept. 23, 2010, 23:18-23.

LAP Representatives' motion[59]).  It said:

> "But then, wait a minute.  There's all kinds of reference in Donziger's own
> statement[s] to pressuring and humiliating the judges.  Got to put pressure on the
> judges because otherwise they're not going our way.  There's certainly a certain
> amount of evidence which if credited suggests that phony expert reports have been
> submitted, come back [i.e., Calmbach], and then depending on one's view of the
> business with Cabrera maybe that's true. The object of the whole game, according
> to Donziger, is to make this so uncomfortable and so unpleasant for Chevron that
> they'll write a check and be done with it.  I believe I also saw a clip in the course of
> preparing for this argument in which reference is made to the criminal case and
> Donziger or one of his Ecuadorian colleagues makes the comment that the whole
> criminal problem in Ecuador could be made by the plaintiffs to go away if somehow
> this whole thing could be wrapped up in a nice big settlement.  So the name of the
> game is, arguably, to put a lot of pressure on the courts[,] to feed them a record in
> part false for the purpose of getting a big judgment or threatening a big judgment,
> which conceivably might be enforceable in the U.S. or in Britain or some other such
> place, in order to persuade Chevron to come up with some money.  Now, do the
> phrases Hobbs Act, extortion, RICO, have any bearing here?"[60]

The quoted words to which the LAP Representatives now object – that is, the non-underscored

portion of the full text quoted above – thus adverted to an argument that Chevron already had made,

were based on evidence before the Court, and came in response to Donziger's counsel's assertion

that there was no evidence of illegality.

Given this record, the suggestion that this Court suggested that Chevron bring this

action is entirely unsupportable.

### B. The Court's Description of the Genesis of the Lago Agrio Litigation

The LAP Representatives and Donziger complain of the Court's description of the

genesis of the Lago Agrio litigation.   For example, the letter, transfer motion, and recusal motion

---

[59]    See LAP Representatives Mem. at 4-5.

[60]    In re Chevron Corp., 10-MC-00002 (LAK), Tr. Sept. 23, 2010, at 24:6-22.

all point to the Court's statement during the argument of the motion to quash last September in the

Donziger Section 1782 proceeding that:

> "Look, we all understand what the basic facts are, right?  The basic facts are that this lawsuit is put together and financed by Donziger and the Kohn firm, American class action lawyers.  They start out in the U.S. to hit Chevron as big as they can."[61]

Once again, however, they ignore the very next words of out of the undersigned's mouth, which

were these:  "Maybe their case is meritorious, maybe it isn't.  I haven't got a clue."[62]  Perhaps

equally egregious, they ignore the context in which the statement was made[63] and disregard the fact

that the Court acknowledged that Chevron too might have engaged in questionable actions in

Ecuador, stating "for all I know, both sides are behaving corruptly there.  I don't know, but maybe

they all are.  Beats me."[64]

---

[61]

*In re Chevron Corp.*, 10-MC-00002 (LAK), Tr., Sept. 23, 2010, at 15:25-16:4.

[62]

*Id.* at 16:4-5.

[63]

The quoted sentences were part of a much longer response by the Court to Donziger's argument that no discovery against him should be permitted because he was litigation counsel to the LAPs and his contention that Chevron was wrong in questioning that he functioned in that role.  *Id.* at 14:20-15:23.  The Court responded in substance that (1) the *Aguinda* case had its genesis with Donziger and a firm of class action lawyers who sought a large recovery, (2) the Court had no view as to whether the case was meritorious, (3) Chevron had succeeded in obtaining dismissal of *Aguinda* in favor of litigation in Ecuador, (4) Donziger had made "it clear that anybody giving anybody the least respect, at least in his opinion, to the Ecuadorian courts is out of his mind," a reference to Donziger's statement, among others, that the Ecuadorian judiciary is weak and its judges corrupt, (5) both the LAPs and Chevron may have behaved corruptly in Ecuador although the Court did not know whether that was the case, (6) "at the end of the day, [the Court had] two or three questions to decide here," which it then proceeded to state, and (7) "the rhetoric about, well, he's a lawyer, there's a lawsuit and he's related to the lawsuit . . . basically begs every one of those questions." *Id.* at 15:25-17:19.

[64]

*Id.* at 16:17-19.  *See also* Tr., Apr. 30, 2010, at 33:4-7 ("THE COURT: . . . I don't for a minute assume a priori that anyone's hands in this matter are clean.").

C.      *The Court's References to "Games"*

The LAP Representatives protest certain statements in which the Court used the word "game" or the phrase "name of the game."  These statements alluded primarily to Donziger's and the LAPs' delaying tactics, to wit, prolonging the Section 1782 proceedings in the apparent hope that the Ecuadorian court would render a judgment before Chevron and its Ecuadorian lawyers could obtain or make use of any discovery obtained through this Court.  One such statement was "I know the game here."[65]

The context of the statement was this: While arguing the motion to quash, Donziger requested that the Court grant him time to comply with the subpoena if the motion were denied. Mindful of the urgency of completing the discovery, the Court asked Donziger whether he would be willing to have the Ecuadorian litigation stayed pending his compliance.  Donziger refused.  In the ensuing exchange the Court remarked:

> "I will look at the question of time very differently if the activity stops in Ecuador than otherwise.  And you know that's my view from the last case.  You know it's the Court of Appeals' view from the last case.  Don't tell me about how long Mr. Donziger needs.  I know the game here."[66]

The Court did no more than recognize the obvious – that Donziger's request for more time, if granted and if no stay of the Ecuadorian case were in place, would have benefitted Donziger and the LAPs at the expense of Chevron and its attorneys facing prosecution in Ecuador.  Moreover, there is strong evidence that delay was not merely the effect of various procedural moves and requests by

---

[65]

       *In re Chevron Corp.*, 10-MC-00002 (LAK), Tr., Sept. 23, 2010, at 35:19.

[66]

       *Id.* at 35:15-19.

Donziger and the LAPs, but the subjective purpose of at least some of them.[67]

D.    *Allegations that the Court has Prejudged the Merits of this Case*

The LAP Representatives contend that the Court has reached conclusions on a number of ultimate issues in this case.  The argument appears to take two or three forms.

First, the LAP Representatives protest certain conclusions that the Court reached in ruling on Chevron's request for a preliminary injunction.  The Court stated, for example, that "Chevron is likely to prevail on its claim that the judgment is neither recognizable nor enforceable."[68]  Such conclusions were neither improper nor gratuitous.  "A party seeking a preliminary injunction must establish irreparable harm and either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits and a balance of hardships decidedly in its favor."[69]  Consequently, a court ruling on a motion for a preliminary injunction not only can but must reach conclusions as to the likely outcome of the case before it.  A ruling that a party is or is not likely to succeed in certain respects is not, as the LAP Representatives suggest, grounds for recusal.  If it were, no court could rule on a preliminary injunction and continue to preside over the

---

[67]    In a May 27, 2010 email, Donziger approved the following litigation strategy with respect to a § 1782 proceeding pending in the District of Colorado that sought evidence that the supposedly neutral Ecuadorian expert's report had been ghostwritten by the LAPs: "Appeal; move for stay; if we win with kane [presumably Judge John L. Kane, Jr., of the U.S. District Court for the District of Colorado] great; if we lose, we produce whatever we want (narrow read); gd [presumably Chevron counsel Gibson Dunn] complains and then we move for clarification.  If we lose again, we think about another appeal."  *In re Chevron Corp.*, No. 10-MC-00002 (LAK), DI 150 Ex. 3.

[68]    *Donziger V*, 2011 WL 1560926, at *2.

[69]    *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir.2002).

case to which it pertained.

Second, the LAP Representatives complain about the Court's statements regarding certain "issues" that, in fact, are nothing more than the undisputed factual background of this case. For example, during the argument of the TRO application, counsel for the LAP Representatives asserted that "Chevron's game is to leave these peasants with their land ruined and this oil down there uncleaned up."[70]  The Court interjected that it understood "that emotions are high on both sides of this matter," but that it understood also "that Chevron never did business in Ecuador and . . . that Texaco was out of Ecuador for years before [Chevron] acquired Texaco and further that Texaco has been out of Ecuador for 19 years and that whatever has happened since 1992 has happened on the watch of the Ecuadorian-owned oil company," which was followed by a request to counsel to "try to keep some facts more or less in order."[71]  The accuracy of the Court's understanding is undisputed.

Third, the LAP Representatives take issue with certain "conclusions" that were not conclusions at all.  They allege, for example, that the Court has "conten[ded] that Chevron should not assume liability for Texaco."[72]  The Court has done no such thing.  While summarizing the complaint and, specifically, the LAPs' contention that "Chevron . . . is subject to Texaco and TexPet liabilities,"[73] the Court stated in a footnote the indisputable proposition that Chevron did not succeed

---

[70]     Tr., Feb. 8, 2011, at 39:2-4.

[71]     *Id.* at 39:6-12.

[72]     LAP Representatives Mot. at 5-6 n.3.

[73]     *Donziger I*, 2011 WL 778052, at *6.

to Texaco's liabilities *by merger*.[74]   Briefly stated, this is because Texaco was the surviving company in a reverse triangular merger with a wholly owned subsidiary of Chevron by which Chevron acquired the stock but, under American law, not the liabilities of Texaco.   But the Court took pains to point out that "[t]here are circumstances in which an acquiring company in a transaction structured like this one could be held liable for obligations of a subsidiary" and "expresse[d] no view as to whether any of those circumstances is present here."[75]

The issue of Chevron's status (or lack thereof) as Texaco's successor in interest bears also on the LAP Representatives' incorrect assertion or implication that the Court has determined that Chevron is not bound here by statements made by Texaco during the *Aguinda* litigation,[76] a matter pertinent to the LAP Representatives' contention that Chevron is judicially estopped to deny the adequacy and fairness of the Ecuadorian courts by Texaco's assertions during the *Aguinda* litigation that *forum non conveniens* dismissal would be appropriate because Ecuador would provide an adequate forum.   In ruling on the preliminary injunction motion, the Court merely rejected the contention that Chevron is unlikely to succeed in this action on account of the purported judicial estoppel.   It did so for two reasons.   First, it held that "there [wa]s no evidence in th[e preliminary injunction] record that, if accepted, could justify disregarding Texaco's separate corporate existence."[77]   Second, and more importantly, the Court held that even if Texaco's statements were

---

[74]
      *Id.* at *6 n.40.

[75]
      *Id.*

[76]
      *See* LAP Representatives Mem. at 5-6 & n.3.

[77]
      *Donziger I*, 2011 WL 778052, at *42.

28

attributable to Chevron (something that may or may not be demonstrated on a fuller record), the statements concerning the adequacy of an Ecuadorian forum were in 1998-2001 and thus spoke only as of that time.  Thus, even if Chevron were bound by Texaco's arguments regarding the adequacy of an Ecuadorian forum as of the time those arguments were made, it is entirely possible that changes in Ecuador since leave open the question whether the Judgment, rendered in 2011 in a case that did not even begin until 2003, is recognizable and enforceable.[78]

### E.    Alleged Antagonism

The LAP Representatives argue that the Court has called the LAPs' existence into question by calling them the "so-called Lago Agrio Plaintiffs."  This is groundless.  The use of "so-called" simply indicates, consistent with the primary definition for the phrase, that these indigenous Ecuadorians are "commonly named" the Lago Agrio Plaintiffs, or "popularly so termed."[79]  Indeed, both their own counsel and the Second Circuit have so referred to them.[80]

The LAP Representatives contend that certain other remarks by the Court evidence bias when in fact they stated conclusions, based on evidence, pertinent to the legal issues that were

---

[78]

   *Id.* at *43.

[79]

   Merriam-Webster   Dictionary:   So-called,   definition,   *available   at*
   http://www.merriam-webster.com/dictionary/so-called?show=0&t=1303930092.

   The Lago Agrio plaintiffs have been so termed long before this Court came to preside over
   the pertinent proceedings.  *See, e.g.*, *Republic of Ecuador v. Chevrontexaco Corp.*, 426 F.
   Supp.2d 159, 161, 163 (S.D.N.Y. 2006).  Indeed, their own counsel has used the phrase from
   the outset of this Court's involvement.  *See* Tr., Apr. 30, 2010, at 3:19-20.

[80]

   *See In re Chevron*, 10-MC-00001, Tr., Apr. 30, 2010, at 3:19-20; *Lago Agrio Plaintiffs v.
   Chevron Corp.,* Nos. 10-4341-cv, 10-4405-cv (CON), 2010 WL 5151325 (2d Cir. Dec. 15,
   2010).

before the Court.  For instance, the LAP Representatives argue that this Court's alleged bias in favor of Chevron is revealed by its statement, made during the TRO hearing, that Chevron is "a company of considerable importance to our economy that employs thousands all over the world."[81]  The Court did so, however, only after noting that the "[p]ublic interest warrant[ed] some consideration" in determining whether a TRO was appropriate.[82]  Courts routinely consider the public interest as a factor in deciding whether to grant TROs and other injunctive relief.[83]

### F.   Allegations Against the Special Master

The LAP Representatives argue that the Special Master, Max Gitter, Esq., whom the Court appointed to preside over Donziger's deposition in the Donziger Section 1782 proceeding exhibited bias against Donziger and in favor of Chevron.  For substantially the reasons discussed in Chevron's memorandum,[84] these allegations are unfounded and, in any case, immaterial to the motion before the Court.  Indeed, no party appealed any of his rulings to or sought his removal by this Court, as was their right.  The Special Master is not even appointed in this case.  Quite simply, there has been no demonstration that the allegations against him and his rulings have any bearing on the question whether the undersigned should be disqualified.

---

[81]   LAP Representatives Mem. at 7 (quoting Tr., Feb. 8, 2011, at 49:21-50:4).

[82]   Tr., Feb. 8, 2011, at 49:14.

[83]   See, e.g., *Clinical Insight, Inc. v. Louisville Cardiology Medical Group, PSC*, 2011 WL 1549478, at *3 (W.D.N.Y. Apr. 22, 2011) (citing *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979)).

[84]   DI 297 at 32-35.

III.    *The Rulings Relied Upon*

   The LAP Representatives complain also that the Court's rulings in the Section 1782 proceedings and in this action are evidence of the Court's bias against them and the other defendants.  They offer a number of instances of this alleged "pattern of inequitable and overly harsh treatment."   Each example, however, is no more than a ruling by this Court based on fair legal reasoning.  Where appealed, they were affirmed.

  A.    *The Donziger Section 1782 Proceeding*

   1.    *Alleged Waiver of Privilege as to Three Documents Filed with the Court*

   The LAP Representatives protest the Court's ruling in the Donziger Section 1782 proceeding denying the LAPs' motion to file three documents under seal and holding that "the [public] filing of these documents with the Court waived whatever privileges otherwise might have attached to them."[85]  Their belated objections are without merit.

   The LAPs filed and sought to have sealed (1) a declaration of an attorney, (2) a document that appeared already to have been filed with the Ecuadorian court, and (3) an e-mail exchange between Donziger and a testifying expert.  As the party asserting privilege, the LAPs had the burden of establishing it.  They made no such showing.  The Court, moreover, found no basis for asserting privilege on the face of the documents.[86]  The LAPs did not object at the time that the ruling was made.  Thus, the Court's denial of the motion to seal was simply a judicial ruling that, under *Liteky*, is not grounds for recusal.

---

[85]   LAP Representatives Mem. at 23-24.

[86]   *In re Chevron Corp.*, 10-MC-00002, Order [DI 61] at 1.

### 2.      Rulings on Supplementing the Record

The LAP Representatives allege that the Court allowed Chevron, in the Donziger Section 1782 proceeding, to supplement the record on Donziger's motion to quash after briefing was completed but refused the LAPs' request to hold the record open for additional submissions.[87]  This description mischaracterizes what actually happened.

On September 20, 2010, Chevron moved for leave to supplement the record with testimony and documents from other Section 1782 proceedings outside of this District and one additional video segment from the *Crude* outtakes.[88]  The LAPs opposed the motion and, in the alternative, asked the Court to hold the record open for five days following oral argument on the motion to quash if the motion to supplement was granted.  The Court granted Chevron's motion and did not rule on the LAPs' alternative request,[89] which sought blank check authority for unspecified possible future filings.[90]  The Court later heard oral argument on the motion to quash on September 23.  On September 28, the fifth day following oral argument, the LAPs filed a motion to supplement to correct an allegedly erroneous and incomplete translation of one of the *Crude* outtakes.  That motion was given careful consideration in *Donziger § 1782 II*, where the Court concluded that the dispute as to the translation was immaterial.[91]  The LAPs made no other request to supplement the

---

[87]      LAP Representatives Mem. at 20.

[88]      *In re Chevron Corp.*, 10-MC-00002, DI 60.

[89]      *In re Chevron Corp.*, 10-MC-00002, DI 70 at 1.

[90]      *Id.*, DI 64 at 3.

[91]      *See Donziger § 1782 II*, 749 F.Supp.2d at 151 n.38.

record.  There was no disparity of treatment.

### 3.    *Donziger's Failure to Submit a Privilege Log*

The LAP Representatives complain also of the Court's holding in the Donziger 1782 proceeding that Donziger waived the attorney-client privilege and work product protection with respect to subpoenaed documents by failing to file a timely privilege log.[92] In addition, they claim that the manner in which the issue was adjudicated was misleading to the Court of Appeals.[93]

To begin with, the Second Circuit affirmed this Court's privilege ruling in *Lago Agrio Plaintiffs v. Chevron Corp.*  The merits of this Court's decision on that matter have been established conclusively.

The complaint about the manner in which the issue was adjudicated is difficult to understand, but it appears to rest on the fact that the Court, given the press of time, first issued its ruling in summary form on October 20, 2010,[94] then followed with a fuller opinion on November 10,[95] and still later, on November 30, 2010, granted Donziger's motion for reconsideration and reaffirmed its previous conclusions.[96]   The suggestion appears to be that the Second Circuit somehow was misled in the process.  But the fact of the matter is that all of this was before the Court

---

[92]    LAP Representatives Mem. at 23.

[93]    *Id.* at 29.

[94]    *Donziger § 1782 I,* 749 F.Supp.2d 135.

[95]    *Donziger § 1782 II*, 749 F.Supp.2d 141.

[96]    *Donziger § 1782 III*, 749 F. Supp.2d 170.

of Appeals in *Lago Agrio Plaintiffs*, which was not argued until December 9, 2010. Indeed, Donziger and the LAPs made to the Second Circuit substantially the same argument that the LAP Representatives make here.[97] There is no more merit to the argument now than there was then, when the Second Circuit affirmed notwithstanding this contention.

B.     *Proceedings in This Action*

1.     *Alleged Waiver of Donziger's Right to Oppose Preliminary Injunction*

The LAP Representatives claim that the Court ruled that Donziger waived his right to oppose entry of the preliminary injunction and that this is evidence of the Court's bias or impartiality.[98] The Court, however, made no such ruling.

Chevron moved for a TRO and a preliminary injunction on February 3, 2011. The Court scheduled argument on the TRO for February 8. On or before that date, the LAP representatives submitted a lengthy brief and over 1,200 pages of evidence. Donziger, an attorney who, moreover, was represented at the time by other counsel in the Donziger Section 1782 proceeding, submitted nothing.

When the TRO came on for argument, Donziger appeared but submitted no papers. The LAP Representatives, in contrast, filed another brief. As the motion for a preliminary injunction already had been pending for eight days, the Court set a deadline for opposition papers on the

---

97

Reply Brief for Respondent-Appellant Steven R. Donziger, *Lago Agrio Plaintiffs v. Chevron Corp.*, at 5-12; Brief for Respondent-Appellant Lago Agrio Plaintiffs, *Lago Agrio Plaintiffs v. Chevron Corp.*, at 4-8.

98

LAP Representatives Mem. at 25.

preliminary injunction motion of February 11.[99]

Donziger did not file opposition papers by the February 11 deadline.  He did, however, appear at oral argument on February 18, represented by counsel, who unsuccessfully sought an adjournment[100] and then argued in opposition of the motion.  On February 25, two weeks after opposition papers were due, Donziger's counsel, without seeking leave to do so, filed a memorandum styled as an "offer of proof in opposition to the preliminary injunction" and an "objection to the court's closure of the record," with accompanying exhibits.[101]

Relying on the Supreme Court's holding in *Lujan v. National Wildlife Federation*,[102] the Court ruled, in the exercise of discretion, that the subsequent filings were untimely and violated an express order of the Court and declined to consider them part of the record on the motion.[103]  In the alternative, however, the Court examined Donziger's belated filings and found that they would not have warranted a different result even if they had been considered part of the record.[104]

In sum, then, the Court never ruled that Donziger waived his right to oppose the preliminary injunction motion.  To the contrary, it considered the arguments his counsel made on

---

[99]

The LAP Representatives argue also that Donziger was unable to obtain counsel.  As noted previously, that is quite doubtful.  *Supra* note 17.

[100]

Tr., Feb. 18, 2011, at 2:20-3:8.

[101]

DI 137-142.

[102]

 497 U.S. 871 (1990).

[103]

*Donziger I*, 2011 WL 778052, *49-50.

[104]

*Id.* at 51.

February 18.  Beyond that, it merely required adherence to the briefing schedule it had set, bearing in mind the urgency of the situation and the need to issue a decision on a very large and complex record before the TRO expired.  Moreover, although it was not required to do so, it considered Donziger's belated filings in the alternative.

### 2.    Alleged Waiver of Unclean Hands Defense

The LAP Representatives protest the Court's alleged ruling that they had waived their unclean hands defense.[105]  The Court made no such ruling.

As of February 11, the deadline for submission of opposition papers, the LAP Representatives had timely filed 95 pages of briefing and over 1,200 pages of affidavits and exhibits, none of which asserted any unclean hands defense.

On February 28, the LAP Representatives moved to increase the amount of the TRO bond that the Court had required.[106]  The motion included a declaration by one of the LAPs' Ecuadorian lawyers which claimed to support, among other things, a defense of unclean hands.[107]  Still later, on March 4, four days before the TRO was set to expire, the LAP Representatives made a further submission without explanation for the late filing.[108]  The Court exercised its discretion to reject the late filings for purposes of the preliminary injunction motion for the same reasons that

---

[105]      LAP Representatives Mem. at 25-26.

[106]      DI 151.

[107]      DI 152-155.

[108]      DI 172.

it declined to consider Donziger's belated submissions.[109]

Thus, the Court never ruled that the unclean hands defense had been waived. To the contrary, it expressly stated that the unclean hands defense "may of course be asserted by [the LAPs] in later proceedings."[110] It simply held that it would not consider an affirmative defense to the motion for a preliminary injunction that had not been raised in any of the timely briefing or argument and that was first raised at a very late date.

### 3.    *Alleged Waiver of Personal Jurisdiction Objections*

The LAP Representatives assert that "the Court ruled that the Ecuadorian plaintiffs waived their right to challenge personal jurisdiction."[111] If this is meant to suggest that the Court ruled that the LAP Representatives have waived that right, the suggestion is demonstrably wrong, as the Court did no such thing. If it is meant only to indicate that the Court so ruled as to the non-appearing LAPs, it is accurate, but the ruling was indisputably correct and in any case not evidence of partiality.

So far as the LAP Representatives are concerned, they argued that Chevron was unlikely to prevail on the merits, and that a preliminary injunction should be denied, because they

---

[109]

    *Donziger I,*2011 WL 778052, at *48.

[110]

    *Id.  See also* DI 183 at 2.

    If the LAP Representatives had wanted to give the Court more time to consider fully this new defense, they could have sought leave to file the papers and agreed to an extension of the TRO or a legally binding commitment regarding the initiation of enforcement proceedings. *See* Tr., Feb. 18, 2011, 43:18-45:10. No such proposals were made to the Court.

[111]

    LAP Representatives Mem. at 28.

were not subject to personal jurisdiction here.  The Court considered and rejected that argument on its merits.[112]

The non-appearing LAPs were and are in a very different position.  Consistent with the service provision in the February 3 order to show cause, Chevron served the LAPs on February 4, 2011.[113]  The LAPs had until February 25 to respond to the complaint.  Two days shy of that deadline, however, defendant Fajardo (LAPs' Ecuadorian counsel in the Lago Agrio litigation) sent the Court a letter requesting that the Court grant him and the LAPs an extension of time to respond.[114]  The letter stated also that Fajardo and the LAPs "vigorously dispute[d] Chevron's claim that this Court has any jurisdiction over" them.  Fajardo, however, is not admitted to practice in this Court.  He therefore may not represent anyone here except himself.[115]  The Court therefore could

---

[112]

*Donziger I*, 2011 WL 778052, at *36-40 (section titled "Chevron Is Likely to Establish Personal Jurisdiction As to the Two Foreign Defendants Who Have Not Waived the Defense").

[113]

DI 4, 75.

[114]

DI 128.

[115]

*See* Local Civil Rule 1.3(c).  This Court consistently has enforced Rule 1.3(c) in prior matters.  *Accord In re Parmalat Securities Litig.*, 04 MD 1653 (LAK), DI 190 (Sept. 6, 2005) (submissions by Italian lawyers who were not admitted to practice in the Southern District of New York were nullities); *In re Parmalat Securities Litig.*, 04 MD 1653 (LAK), DI 243 (Dec. 7, 2005) (same); *Trustees of I.G. Frben Aktionarsvereinigung e.V. v. United States*, No. 04 Civ. 0431 (LAK), 2004 WL 251205 (S.D.N.Y. Feb. 11, 2004).  Furthermore, the requirement is a strict one.  For example, it is "a well-established general rule in this Circuit that a parent not admitted to the bar cannot bring an action *pro se* in federal court on behalf of his or her child."  *Tindall v. Poultney High School Dist.*, 414 F.3d 281, 284-85 (2d Cir. 2005)(citations omitted); *Cf. Rodriguez v. Eastman Kodak Co.*, 88 Fed. Appx. 470, 471 (2d Cir. 2004) ("[I]t is well established that a *pro se* class representative cannot adequately represent the interests of other class members." (internal quotation marks and citations omitted)).

Contrary to the LAP Representative's implication, LAP Representatives Mem. at 28, Fajardo's inability to act as counsel for other defendants in this case did not make it improper

not consider the letter as a request for an extension by the LAPs.  Nonetheless, on its own motion, the Court granted the LAPs a modest extension, making clear that it would consider a request for a further extension if it were made on notice and by a member of the Bar or by an individual defendant *pro se*.[116]  In the event, the non-appearing LAPs neither sought a further extension nor answered, moved or otherwise responded to the complaint– in a word, they defaulted.[117]

In ruling on Chevron's motion for a preliminary injunction, the Court considered (as it was obliged to do) whether Chevron was reasonably likely to succeed in proving the Court's personal jurisdiction over the non-appearing LAPs.[118]  In view of the fact that Rule 12(h) provides that the defense of lack of personal jurisdiction is waived if it is not included in a timely answer or Rule 12(b) motion, it so ruled.  Nonetheless, the Court declined to "address the question whether an appropriate future request for an extension within which to respond or move would be granted or whether any of these defendants then might be relieved of his or her waiver."[119]  No such application has been made.

---

to provide for service on the LAPs by serving Fajardo, their Ecuadorian attorney.  While Rule 1.3(c) requires that lawyers appearing before this Court be admitted to the Southern District of New York, FED. R. CIV. P. 4(f)(3) permits service of foreign defendants by "other means not prohibited by international agreement."  *See Donziger I*, 2011 WL 778052, at *36.

[116]

DI 127 at 2.

[117]

All of the LAPs were represented by American counsel throughout the Section 1782 proceedings in this and other courts.  Indeed, they are represented by the Motley Rice and Emery Celli firms to this day in the Berlinger and Donziger Section 1782 proceedings, which remain pending in this Court.

[118]

*Donziger I*, 2011 WL 778052, at *40.

[119]

*Id.* n. 369.

Subsequently, the Clerk entered a certificate of default.

*4.     Recent Rulings*

The LAP Representatives complain also of the Court's rulings on subsequent motions in this action.  The Court sees no reason to address any of these arguments, all of which are baseless as readily appears from the Court's prior decisions.

*IV.     Alleged External Opinion*

Finally, the LAP Representatives' reply memorandum concludes with the claim that it does not matter what they, Chevron or the Court think about the Court's ability to provide impartial justice.  "What matters is that the public—and in this case, the 'public' includes the global judicial and diplomatic community—perceive this Court as offering a fair and impartial forum to adjudicate Chevron's grave and extraordinary claims."  And they end with the assertion that "[i]t has become abundantly clear . . . to any reasonably impartial observer" that this is an occasion when the Court has succumbed to prejudices and passions at the expense of reason and temperance."  This is evidenced, they claim, by two news clippings, one of which observed only that "Chevron has received the lion's share of rulings in Judge Kaplan's court" and the other of which expressed the view that "Steven Donziger seems to have drawn the distaste of Judge Kaplan"[120] – neither a conclusion, whether right or wrong, that supports the LAP Representatives' conclusion.  But that is not what matters here, as press reports have little if any bearing even where they support a litigant's position:

> "[W]e cannot adopt a *per se* rule holding that when someone claims to see smoke, we must find that there is fire.  That which is seen is sometimes merely a smokescreen.  Judicial inquiry may not therefore be defined by what appears in the

---

[120]     DI 305, at 8-10 & n.12.

press.  If such were the case, those litigants fortunate enough to have easy access to the media could make charges against a judge's impartiality that would effectively veto the assignment of judges.  Judge-shopping would then become an additional and potent tactical weapon in the skilled practitioner's arsenal.  Instead, the sensitive issue of whether a judge should be disqualified requires a careful examination of those relevant facts and circumstances to determine whether the charges reasonably bring into question a judge's impartiality."[121]

That is especially true here given the LAPs' ready access to the media as evidenced by their procurement of the making of the film *Crude* to tell their story and their conduct of a media campaign.[122]

*Conclusion*

This Court has considered this motion with the great care that it deserves.  Informed persons, knowing and understanding all of the myriad and complex facts of these extensive proceedings, and putting aside the rhetoric and other devices deployed here by the LAP Representatives, readily would see that the Court's rulings have been firmly grounded in the law and the evidence.  There is no objective reason to think that it has been anything less than entirely impartial.

The motion to recuse the undersigned [DI 284] is denied.

SO ORDERED.

Dated:        May 9, 2011

_____

Lewis A. Kaplan

United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

[121]

    *In re Drexel Burnham Lambert Inc.*, 861 F.2d at 1309.

[122]

    *E.g.*, *Donziger § 1782 II*, 749 F. Supp.2d 157-58.

41