# EXHIBIT 1120

## ADVISORY AGREEMENT

THIS ADVISORY AGREEMENT (as from time to time may be amended in accordance with the terms hereof, this "Agreement"), dated as of February ___, 2011, is made between and among (i) each of the individual plaintiffs in the matter *Maria Aguinda y Otros v. Chevron Corporation* (as listed on the attached Exhibit A, and together with their respective successors and assigns, the "Plaintiffs"), by Pablo Estenio Fajardo Mendoza, Esq., as lead counsel for and Ecuadorian legal representative of the Plaintiffs, (ii) FRENTE DE DEFENSA DE LA AMAZONIA (as listed on the attached Exhibit A, and together with its successors and assigns, the "Amazon Defense Front"), (iii) ASAMBLEA DE AFECTADOS POR TEXACO (as listed on the attached Exhibit A, and together with its successors and assigns, the "Assembly of Communities Affected by Texaco" and, collectively with the Amazon Defense Front, the "Plaintiffs' Coordinators") by Luis Yanza under that certain Special Power of Attorney dated March 1, 2010 (the "POA") granted by Ermel Gabriel Chávez Parra, Ernesto Germán Maniguaje Piaguaje, Ángel Justino Piaguage Lucitante, Toribio Aguinda Lucitante and Pedro Bienvenido Galarza Bravo, and (iv) CSL STRATEGIES LLC, a California limited liability company ("CSL"), and MARK FABIANI LLC, a California limited liability company ("Fabiani" and collectively with CSL, the "Advisors"). The Plaintiffs, the Plaintiffs' Coordinators and the Advisors are hereinafter sometimes referred to individually as a "Party" and collectively as the "Parties".

## RECITALS

A.    The case *Maria Aguinda y Otros v. Chevron Corporation* [No. 002-2003] is pending in the Provincial Court of Justice of Sucumbios, Ecuador to recover clean-up costs and other damages from defendant Chevron Corporation (a/k/a Texaco; ChevronTexaco; Chevron) for Texaco's role as drilling operator in Ecuador and/or consortium partner.

B.    A number of actions pursuant to 28 U.S.C. § 1782 have been filed by Chevron and Chevron lawyers in various United States District Courts against various of the Plaintiffs' advisors (including, without limitation, several of their former and current lawyers).

C.    Additional related litigation and associated activities are occurring and anticipated (including, without limitation, (i) initiating affirmative actions pursuant to 28 U.S.C. §1782, (ii) initiating actions as necessary to enforce a judgment against Chevron or its subsidiaries in Ecuador, the United States and/or other countries, (iii) pursuing and/or defending any appeals therefrom and (iv) conducting possible settlement negotiations with Chevron and its representatives) (all of the above, collectively, the "Litigation").

D.    The Plaintiffs are represented by Pablo Fajardo Mendoza, Esq. and Steven R. Donziger, Esq. ("Plaintiffs' U.S Representative") (the foregoing, collectively with any successors thereto, the "Plaintiffs' Representatives"), as well as other Ecuadorian and United States lawyers and law firms.

WOODS00045036

E.    The Plaintiffs desire to engage the Advisors to provide Services (defined below) under the terms set forth in this Agreement, and the Advisor desires to accept such engagement and provide the Services.

F.    The Parties acknowledge that Chevron is vigorously contesting the Litigation, and that the likelihood of success of the Litigation is uncertain.

G.    Following careful and extended consideration, the Plaintiffs and the Advisors desire to enter into this Agreement on terms that each Party considers commercially reasonable (taking into account, among other things, all relevant facts and circumstances related to the Litigation).

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Plaintiffs and the Advisor, intending to be legally bound, hereby agree as follows:

1.    Engagement.  Subject to each of the terms, covenants and conditions set forth in this Agreement, (a) the Plaintiffs hereby engage the Advisors to provide the services set forth on the attached Schedule 1 (collectively, the "Services"), and (b) each Advisor hereby accepts such engagement and agrees to provide the Services as and when required by this Agreement.  The Advisors shall report directly to the Plaintiffs' U.S. Representative and/or such other person(s) as the Plaintiffs from time to time may instruct.  Each Advisor shall be jointly and severally liable for the provision of the Services hereunder.

2.    Term.  The term of this Agreement (the "Term") shall commence on the date hereof, and shall continue until the date on which this Agreement is terminated in accordance with Section 7 below.

3.    Devotion of Time  Each Advisor shall devote such of his professional and business time and attention as is necessary to provide the Services as and when required by this Agreement.

4.    Fees and Permitted Expenses.

(a)    As compensation for providing the Services to the Plaintiffs in accordance with this Agreement, each Advisor shall be entitled to (a) payment of one half (1/2) of the contingent fee set forth on the attached Schedule 2 (the "Fee") and (b) payment of or reimbursement for any third-party expenses actually incurred by such Advisor as set forth on, and to the extent permitted by, the attached Schedule 2 (the "Permitted Expenses").  Except for Permitted Expenses set forth on the attached Schedule 2, each Advisor shall bear all costs in connection with providing the Services.

(b)    The Advisor and the Plaintiffs hereby acknowledge and agree as follows:

- 2 -

CONFIDENTIAL - ACCESS LIMITED BY PROTECTIVE ORDER    WOODS00045037

(i)      If, from time to time, the Plaintiffs reasonably determine that (i) one or more additional lawyers and/or law firms should be retained by the Plaintiffs in order to assist with the pursuit or defense of the Litigation ("Additional Lawyers") and/or (ii) there are insufficient funds currently available to the Plaintiffs to pay the reasonably anticipated costs and expenses of the Litigation as shown on the then current Budget and, as a result, the Plaintiffs should seek additional funding for the Litigation from one or more additional funders ("Additional Funders"), then the Plaintiffs shall deliver notice of that fact to the chairman of the management committee appointed by the lawyers for the Plaintiffs (the "Chairman") and the Plaintiffs' U.S. Representative setting forth such determination and requesting that the Chairman and the Plaintiffs' U.S. Representative agree to reduce the percentage of the Total Contingency Fee Payment (defined on Schedule 2) payable to the Plaintiff's lawyers and other advisors who are to be paid on a contingent basis  on a pro rata basis (based upon their then existing entitlement to a percentage of the Total Contingency Fee Payment) in order to allow for the Plaintiffs to engage such Additional Lawyers or enter into a funding arrangement with such Additional Funders, as applicable (such notice, a "Request Notice"). Each Request Notice shall describe the proposed economic terms and conditions for any agreement with Additional Lawyers and/or Additional Funders, including, without limitation, as applicable, the percentage of Plaintiff Collection Monies (defined on Schedule 2) proposed to be paid to any Additional Lawyers (the "Additional Lawyer Percentage") and the percentage of Plaintiff Collection Monies proposed to be paid to any Additional Funder (the "Additional Funder Percentage"). Immediately upon receipt of any Request Notice, the Chairman and the Plaintiffs' U.S. Representative shall deliver a copy thereof to the Advisor, for notification purposes only.

(ii)      No later than 10 days after the delivery of a Request Notice by the Plaintiffs, the Chairman and the Plaintiffs' U.S. Representative shall discuss and decide jointly to either approve or reject the requested actions set forth in such Request Notice. If both the Chairman and the Plaintiffs' U.S. Representative agree to approve the requested actions set forth in such Request Notice, then the requested actions set forth in such Request Notice shall be deemed approved, and the Plaintiffs thereafter may engage the Additional Lawyers or enter into a funding agreement with Additional Funders, as applicable, upon economic terms no more favorable to the Additional Lawyers or Additional Funders, as applicable, than as set forth in the approved Request Notice.

(iii)      Immediately upon the engagement of any Additional Lawyers or the entry into a funding agreement with any Additional Funders which, in each case, has been approved in accordance with this Section 4(b), the percentage of the Total Contingency Fee Payment payable to the Advisor shall be reduced by the Advisor's pro rata share (based upon the Advisor's then existing percentage of the Total Contingency Fee Payment, without regard to any portion of the Total Contingency Fee Payment which has been set aside to fund a bonus pool for the Plaintiffs' lawyers or other advisors) of the amount required to enable the Plaintiffs to grant, as applicable, (a) the Additional Lawyer Percentage to such Additional Lawyer or (b) the Additional Funder Percentage to such Additional Funder. For avoidance of doubt, the Plaintiffs agree and acknowledge that none of the Plaintiffs' lawyers of other advisors (including the Advisor) shall bear any

- 3 -

CONFIDENTIAL - ACCESS LIMITED BY PROTECTIVE ORDER                    WOODS00045038

more or any less than its respective pro rata share of the reductions referred to in this Section 4(b).

5.      Acknowledgement of Payment Terms; Intercreditor Agreement.   Each Advisor acknowledges and agrees that (a) there will be no payment of the Fee in the event no award is actually paid to the Plaintiffs in respect of the Litigation and (b) the terms of the engagement set forth in this Agreement (including the payment of the Fee) are subject to the priorities, terms and provisions set forth in the Intercreditor Agreement dated as of October 31, 2010 by and among the Plaintiffs, the Plaintiffs' Coordinators, certain parties providing funding for the Litigation and the Plaintiffs' lawyers and other advisors (the "Intercreditor Agreement"), a copy of which has previously been provided to the Advisors.  Each Advisor shall, as a condition to the engagement and to the rights of the Advisors to the payment of the Fee and any other amounts payable hereunder, execute and deliver the Intercreditor Agreement and comply with each of the terms thereof.

6.      Termination of Agreement.

(a)      The Plaintiffs have the right to terminate this Agreement for Cause (defined below) upon 1 days' prior written notice of such termination to the Advisors.  If the Plaintiffs terminate this Agreement for Cause, then (i) neither Advisor shall be entitled to payment of the Fee or payment of or reimbursement for any Permitted Expenses and (ii) the Plaintiffs shall have no obligation to pay the Fee to the Advisors or to pay or reimburse the Advisors for any Permitted Expenses.

(b)      The Plaintiffs have the right to terminate this Agreement for any reason other than Cause upon not less than 30 days' prior written notice of such termination to the Advisors.  If the Plaintiffs terminate this Agreement for any reason other than Cause, then (i) each Advisor shall continue to be entitled to (1) payment of the Fee if and as the same would otherwise be due and payable to such Advisor in accordance with this Agreement and (2) payment of or reimbursement for any Permitted Expenses, but only if and to the extent that such Permitted Expenses are incurred as of the effective date of such termination, and (ii) the Plaintiffs shall remain obligated to (1) pay the Fee to each Advisor if and as the same would otherwise be due and payable to such Advisor in accordance with this Agreement and (2) pay to or reimburse each Advisor for any Permitted Expenses, but only if and to the extent that such Permitted Expenses are incurred as of the effective date of such termination.

(c)      The Advisors have the right to terminate this Agreement for Good Reason (defined below) upon not less than 30 days' prior written notice of such termination to the Plaintiffs from each Advisor.  If the Advisors terminate this Agreement for Good Reason, then (i) each Advisor shall continue to be entitled to (1) payment of the Fee if and as the same would otherwise be due and payable to such Advisor in accordance with this Agreement and (2) payment of or reimbursement for any Permitted Expenses, but only if and to the extent that such Permitted Expenses are incurred as of the effective date of such termination, and (ii) the Plaintiffs shall remain obligated to (1) pay the Fee to each Advisor if and as the same would otherwise be due and payable to such Advisor in accordance with this Agreement and (2) pay to or reimburse each Advisor for any Permitted Expenses, but only if and to the extent that such

CONFIDENTIAL - ACCESS LIMITED BY PROTECTIVE ORDER      WOODS00045039

Permitted Expenses are incurred as of the effective date of such termination.

(d)     The Advisors have the right to terminate this Agreement for any reason other than Good Reason upon not less than 30 days' prior written notice of such termination to the Plaintiffs. If the Advisors terminate this Agreement for any reason other than Good Reason, then (i) neither Advisor shall be entitled to payment of the Fee or payment of or reimbursement for any Permitted Expenses and (ii) the Plaintiffs shall have no obligation to pay the Fee to the Advisors or to pay or reimburse the Advisors for any Permitted Expenses.

(e)     This Agreement shall automatically terminate upon the death or disability of Christopher S. Lehane or Mark Fabiani, or upon the bankruptcy, insolvency or dissolution of either Advisor. In such event, (i) the Plaintiffs, acting reasonably and in good faith, may reduce the amount of the Fee to a liquidated amount that reflects, on an equitable basis, all of the Services theretofore performed by the Advisors and any other relevant circumstances deemed equitable by the Plaintiffs, (ii) the Plaintiffs shall remain obligated to pay the Fee (reduced as noted above) to each Advisor if and as the same would otherwise be due and payable to such Advisor in accordance with this Agreement, and (iii) the Plaintiffs shall remain obligated to pay to or reimburse each Advisor for any Permitted Expenses, but only to the extent that such Permitted Expenses are incurred by such Advisor as of the date of such death, disability, bankruptcy, insolvency or dissolution. Any disagreement concerning any reduction of the Fee pursuant to Section 6(e)(i) above shall be addressed by means of arbitration pursuant to Section 9 below.

(f)     The term "Cause" means, with respect to the Advisors, any one or more of the following: (i) the gross negligence, fraud or willful misconduct on the part of an Advisor in connection with the performance of his duties under this Agreement; (ii) the suffering by Christopher S. Lehane or Mark Fabiani of an habitual drug addiction or intoxication at any point during the Term that renders an Advisor unable to perform the Services as and when required under this Agreement; (iii) any Advisor, Christopher S. Lehane or Mark Fabiani being finally convicted by a court of competent jurisdiction of any felony that, in the good faith, reasonable judgment of the Plaintiffs, has or may have a material adverse effect on the Litigation or either Advisors' ability to perform the Services as and when required by this Agreement; or (iv) a repeated and continuing failure or refusal on the part of an Advisor to perform its material duties and responsibilities under this Agreement but only if such failure or refusal has not been cured within 15 days following the delivery by the Plaintiffs of written notice to the Advisors setting forth their intention to terminate the Advisors for Cause.

(g)     The term "Good Reason" means, with respect to the Advisors, any one or more of the following: (i) a failure on the part of the Plaintiffs to pay or reimburse the Advisors for any Permitted Expenses within 60 days after the same are due and payable as set forth on the attached Schedule 2; provided, that in any case, such failure shall not constitute Good Reason unless (x) the Advisors have given written notice to the Plaintiffs stating that such failure constitutes Good Reason under this Agreement and (y) the Plaintiffs thereafter fail to make such payment within 30 days after receipt of such notice; or (ii) the conditions of the Advisors' engagement by the Plaintiffs has become so intolerable that a reasonable person in his position would feel compelled to resign.

- 5 -

CONFIDENTIAL - ACCESS LIMITED BY PROTECTIVE ORDER          WOODS00045040

(h)    Notwithstanding anything to the contrary in this Agreement, the provisions of <u>Sections 6</u> through <u>13</u> of this Agreement shall survive any termination of this Agreement.

7.    <u>Confidentiality</u>.  Neither Advisor shall disclose or use any non-public information regarding the Plaintiffs or the Litigation (including, without limitation, the terms of this Agreement) except as (a) specifically authorized in writing by the Plaintiffs or a Plaintiffs' Representative or (b) required to comply with any applicable law, rule or regulation or the valid order of any governmental agency or any court of competent jurisdiction; <u>provided</u>, that if any such disclosure is required pursuant to <u>Section 7(b)</u>, the applicable Advisor shall give prompt notice to the Plaintiffs' Representatives of such requirement, disclose no more information than is so required, and cooperate with any attempts by the Plaintiffs to obtain a protective order or similar treatment for the confidential information.

8.    <u>Indemnification and Exculpation</u>.  The Plaintiffs hereby agree to indemnify and hold each Advisor and each of their respective successors and assigns and anyone claiming through or under any of the foregoing (each, an "<u>Indemnified Party</u>") harmless from and against any and all losses, costs, liabilities, damages, awards and expenses (including, without limitation, legal fees and expenses and costs of suit, and out-of-pocket expenses, such as travel) (collectively, "<u>Covered Expenses</u>") actually incurred by such Indemnified Party pursuant to this Agreement in connection with the Litigation (including, without limitation, the defense and/or pursuit, as applicable, of appealing any judgments or decisions or other appellate proceedings) and/or arising out of the performance by such Advisor of the Services as and when required by this Agreement (collectively, "<u>Claims</u>"), to the fullest extent provided by law.

9.    <u>Arbitration; Governing Law</u>.

(a)    This Agreement shall be governed by and construed and interpreted in accordance with the laws of New York (without reference to principles of conflicts of laws)

(b)    Any controversy or claim arising out of or relating to this Agreement, the relationship among the Plaintiffs' Representatives, the Plaintiffs, the Plaintiffs' Coordinators, other attorneys or advisors involved in the Litigation or any of their affiliates or successors (the "<u>Arbitration Parties</u>") and either Advisor, its attorneys and staff or any of their successors (the "<u>Advisor Arbitration Parties</u>") or the services provided by the Advisor Arbitration Parties pursuant to this Agreement or otherwise shall be submitted to binding arbitration, in accordance with this <u>Section 9</u>, if the Parties have been unable to resolve the dispute through negotiation, mediation or otherwise within thirty (30) days after one Party has provided written notice of a dispute to the other Party.  The Advisors shall send any such notice to all three of the Plaintiffs' Representatives by registered overnight delivery service such as Federal Express or DHL at the last-known address of such persons in the Advisors' records.  By agreeing to arbitrate, the Parties are agreeing to waive any right to a jury trial.   The arbitration shall be conducted and administered by the International Centre for Dispute Resolution in accordance with its International Arbitration Rules (the "<u>ICDR Rules</u>"), this Agreement and the Federal Arbitration Act.  In the event of a conflict, the provisions of the ICDR Rules shall control, except where the

- 6 -

    WOODS00045041

ICDR Rules conflict with this Agreement, in which case this Agreement shall control. The arbitration shall be conducted before a panel of three arbitrators (all of whom shall be former state or federal judges, with at least five years judicial experience and each of whom shall be fluent speakers and readers of both Spanish and English), regardless of the size of the dispute, to be selected as provided in the ICDR Rules. The arbitration shall be commenced and held in Miami, Florida, unless otherwise required by a person or entity who or which has provided funding to the Plaintiffs in respect of the Litigation. Any issue concerning the location of the arbitration, the extent to which any dispute is subject to arbitration, the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, and any discovery disputes, shall be resolved by all of the arbitrators. No potential arbitrator may serve on the panel unless he or she has agreed in writing to be bound by these procedures. To the extent state law is applicable, the arbitrators shall apply the substantive law of the State of New York. Each Party shall, upon the written request of the other Party, promptly provide the other with copies of all documents on which the producing Party may rely in support of or in opposition to any claim or defense and a report of any expert whom the producing Party may call as a witness in the arbitration hearing. At the request of a Party, and upon the showing of good cause, the arbitrators shall have the discretion to order production by the other Party or by a third party of other documents relevant to any claim or defense. Each Party shall be entitled to depose a maximum of three witnesses (which number may not be increased by the arbitral tribunal), plus all experts designated to be witnesses at the arbitration. The depositions shall be held within thirty (30) days of the making of a request and shall be limited to a maximum of six hours per deposition. All objections are reserved for the arbitration hearing, except for objections based on privilege and proprietary or confidential information.

(c)     All aspects of the arbitration shall be treated as confidential and neither the Parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a Party shall give written notice to all other Parties and shall afford such Parties a reasonable opportunity to protect their interests. The result of the arbitration shall be binding on the Parties and judgment on the arbitrators' award may be entered in any court having jurisdiction. In no event shall the arbitrators have any authority to award punitive damages.

(d)     The Parties acknowledge that the Plaintiffs intend to enter into agreements with other attorneys and non-legal advisors on or after the date of this Agreement and that all such agreements will contain provisions obligating the Parties thereto to submit any disputes to binding arbitration substantially similar to the provisions of this Section 9. In the event of any dispute between the Plaintiffs and an attorney (whether active or inactive) or any other person or entity with a legitimate or alleged claim to Plaintiff Collection Monies (any such person, a "Claimant"), the Plaintiffs desire to resolve such dispute in a single arbitration proceeding involving all such Claimants. In view of the foregoing, in the event of an arbitration proceeding involving the Plaintiffs and a Claimant, the Advisor agrees to participate in such proceeding if it is joined by Plaintiffs or any Claimant and agrees not to oppose joinder of other attorneys or Claimants if sought by Plaintiffs or a Claimant who is a party to the arbitration proceedings. Furthermore, the Advisor agrees that under no circumstances shall it demand, claim or seek to obtain a greater amount or increased percentage of Plaintiff Collection Monies than it has agreed

- 7 -

CONFIDENTIAL - ACCESS LIMITED BY PROTECTIVE ORDER                    WOODS00045042

to in this Agreement and hereby unconditionally and irrevocably waives any right to make such a demand or claim in any arbitral, judicial or other proceeding anywhere in the world.

        (e)     In the event of any dispute between a Party and any provider of funding or financing for the Litigation, the Parties agree to be bound by and comply with any arbitration provisions in the definitive documentation with such provider of funding or financing.

     10.    <u>Independent Contractor Status</u>.   Each Advisor shall for all purposes be an independent contractor and not an agent or employee of the Plaintiffs, and neither Advisor shall have any authority to act for, represent, bind or obligate the Plaintiffs except as specifically provided herein or in a separate writing executed by Plaintiffs' U.S. Representative.   This Agreement shall not be construed for any purposes to create any joint venture or partnership among the Parties.

     11.    <u>Privilege</u>.   In the course of providing the Services, the Parties understand that there will be a need for the Advisors to communicate with the Plaintiffs' Representatives and the Plaintiffs and counsel retained by the Plaintiffs.  The Parties agree that all such communications are to be treated as confidential and protected to the maximum extent permitted under applicable law by the attorney/client, work product, joint defense, common interest, and all other applicable privileges and doctrines.

     12.    <u>Notices</u>.  All notices or other communications given pursuant to this Agreement must be in writing and must be delivered personally or by an internationally recognized courier service or by facsimile.  All notices must be sent to the Parties at their respective addresses set forth below (or any other address that any Party may designate by written notice to the other Parties):

        <u>If to any Plaintiff</u>:

        c/o Steven R. Donziger, Esq.



        <u>If to the Advisors</u>:

        CSL Strategies LLC
        115 Presidio Avenue
        San Francisco, CA 94115
        Fax: 415/928-9200

and to:

        Mark Fabiani LLC
        939 Coast Boulevard, Suite 4D
        La Jolla, CA 92037

- 8 -

WOODS00045043

Fax: 858/551-1734

13.    Miscellaneous

(a)    Amendments; Waivers.    This Agreement may only be modified or amended in writing signed by all of the Parties.  No waiver or release of any provision of this Agreement or of any right, obligation, claim or course of action arising hereunder shall be valid or binding for any purpose unless in writing and duly executed by the Party against whom the same is asserted.

(b)    Entire Agreement.    This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof and supersedes all other agreements, representations, understandings and the like, written or oral, relating thereto.  For avoidance each Advisor agrees and acknowledges that its respective rights under that certain letter agreement regarding Aguinda v. ChevronTexaco dated October 6, 2005 between and among each Advisor, the Law Offices of Kohn, Swift & Graf, P.C. and the Law Offices of Steven R. Donziger, P.C. (the "Consultation Agreement") are terminated.  In exchange for the Plaintiffs' agreement to enter into this Agreement, each Advisor hereby waives any and all rights that such Advisor may have in respect of the Consultation Agreement (including any rights to payment in respect thereof), and agrees that this Agreement is the sole agreement relating to compensation that the Advisors may receive in respect of the Litigation.

(c)    Severability.    If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws effective during the term of this Agreement, such provision shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part of this Agreement; and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Agreement.  Furthermore, in lieu of each such illegal, invalid or unenforceable provision, there shall be added automatically as a part of this Agreement a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and be legal, valid and enforceable.

(d)    Assignment.    The Advisors shall have no rights to assign any of their rights or obligations under this Agreement and the Advisors may not delegate any of their duties or obligations hereunder.  The Plaintiffs and the Plaintiffs' Coordinators may establish a trust for the purpose of, among other things, more efficiently carrying out the Litigation (such trust, the "Litigation Trust").  In the event that the Litigation Trust is established, the Plaintiffs have the right to and shall promptly (a) assign all of their respective rights and obligations under this Agreement to the Litigation Trust and (b) provide notice thereof to the Advisors in accordance with Section 12 hereof.

(e)    Counterparts; Electronic or Facsimile Signatures.    This Agreement (i) may be executed in any number of counterparts, all of which together shall constitute a single instrument, and (ii) may be executed and/or delivered by means of electronic transmission (email) or facsimile.

- 9 -

CONFIDENTIAL - ACCESS LIMITED BY PROTECTIVE ORDER
WOODS00045044

        (f)     <u>Language</u>.  This Agreement has been drafted in English and translated into Spanish, and the parties hereto will execute both versions.  In the event of a conflict between the English version of this Agreement and the Spanish translation thereof, the Spanish translation thereof shall control.

<div align="center">[signatures on following page]</div>

CONFIDENTIAL - ACCESS LIMITED BY PROTECTIVE ORDER

WOODS00045045

IN WITNESS WHEREOF, the Plaintiffs, through their duly authorized representatives, and the Advisor have executed this Agreement as of the date first written above.

<u>PLAINTIFFS</u>

On behalf of each of the plaintiffs in the matter *Maria Aguinda y Otros v. Chevron Corporation*

By: _____

            Pablo Estenio Fajardo Mendoza, Esq., as Lead Counsel For and Ecuadorian Legal Representative of the Plaintiffs

El Frente de Defensa de la Amazonia

By: _____

            Ermel Gabriel Chávez Parra, its President

On behalf of the Asamblea de Afectados por Texaco

By: _____

            Luis Yanza, as Coordinator under the POA

- 11 -

CONFIDENTIAL - ACCESS LIMITED BY PROTECTIVE ORDER

WOODS00045046

<u>ADVISORS</u>

CSL STRATEGIES LLC


By:          _____
             Name: Christopher S. Lehane
             Title:


MARK FABIANI LLC


By:          _____
             Name: Mark Fabiani
             Title:

CONFIDENTIAL - ACCESS LIMITED BY PROTECTIVE ORDER                    WOODS00045047

# EXHIBIT A

Plaintiffs:

Maria Victoria Aguinda Salazar;
Carlos Grega Huatatoca;
Catalina Antonia Aguinda Salazar;
Lidia Alexandra Aguinda Aguinda;
Patricio Alberto Chimbo Yumbo;
Clide Ramiro Aguinda Aguinda;
Luis Armando Chimbo Yumbo;
Beatriz Mercedes Grefa Tanguila;
Lucio Enrique Grefa Tanguila;
Patricio Wilson Aguinda Aguinda;
Celia Irene Viveros Cusangua;
Fransisco Matias Alvarado Yumbo;
Fransisco Alvardo Yumbo;
Olga Gloria Grefa Creda;
Lorenzo Jose Alvardo Yumbo;
Narcisa Aida Tanguila Narvaez;
Berta Antonia Yumbo Tanguila;
Gloria Lucrecia Tanquila Grefa;
Fransisco Victor Tanguila Grefa;
Rosa Teresa Chimbo Tanguila;
Jose Gabriel Revelo Llore;
Maria Clelia Reascos Revelo;
Maria Magdalena Rodriguez Barcenes;
Hugo Gerardo Camacho Naranjo;
Jose Miguel Ipiales Chicaiza;
Heleodoro Pataron Guaraca;
Luiza Delia Tanguila Narvaez;
Lourdes Beatriz Chimbo Tanguila,
Maria Hortencia Viveros Cusangua;
Segundo Angel Amanta Milan;
Octavio Ismael Cordova Huanca;
Elias Roberto Piyahuaje Payahuaje;
Javier Piaguaje Payaguaje;
Daniel Carlos Lusitande Yaiguaje;
Benacio Fredy Cimbo Grefa;
Guillermo Vincentepayaguaje Lusitante;

Delfin Leonidas Payaguaje Payaguaje;
Alfredo Donaldo Payaguaje Payaguaje;
Teodoro Gonzalo Piaguaje Payaguaje;
Miguel Mario Payaguaje Payaguaje;
Fermin Piaguaje Payaguaje;
Reinaldo Lusitande Yaiguaje;
Luis Agustin Payaguaje Piaguaje;
Emilio Martin Lusitande Yaiguaje;
Simon Lusitande Yaiguaje;
Armando Wilfrido Piaguaje Payaguaje; and
Angel Justino Piaguaje Lucitante.

Plaintiffs' Coordinators:

The Asamblea de Afectados por Texaco
(Assembly of Communities Affected by
Texaco) comprising the Frente de Defensa de
la Amazonia; Organization of the Indigenous
Nationality Siona of Ecuador (ONISE); the
Organization of the Indigenous Nationality
Secoya of Ecuador; the Indigenous Federation
of the Cofan Nationality of Ecuador
(FEINCE); Los Kichwas Firmantes de la
Demanda; and Los Colonos Afectados

El Frente de Defensa de la Amazonia

CONFIDENTIAL - ACCESS LIMITED BY PROTECTIVE ORDER

## SCHEDULE 1

Services

Public affairs and other services in respect of the Litigation as the Plaintiffs and/or any Plaintiffs' Representative may request from time to time.

CONFIDENTIAL - ACCESS LIMITED BY PROTECTIVE ORDER

WOODS00045049

SCHEDULE 2

Fees; Permitted Expenses

A.    Fees.

As compensation for providing the Services to the Plaintiffs in accordance with the terms of the Agreement, the Advisors shall be entitled to a fee in the amount equal to one and one-quarter percent (1.25%) of the Total Contingency Fee Payment. The term "Total Contingency Fee Payment" means an amount equal to twenty percent (20%) of all Plaintiff Collection Monies, as such amount may be reduced as a result of a successful claim for a contingency fee payment made against the Plaintiffs by a lawyer or lawyers who no longer represent the Plaintiffs. The term "Plaintiff Collection Monies" means any amounts paid, whether in lump sum or installments, whether from defendant Chevron Corporation (a/k/a Texaco; ChevronTexaco; Chevron), any other party listed as a defendant in respect of the Litigation (including, without limitation, his or its respective affiliates and successors in interest), or any other party added or joined to the Litigation from time to time as a defendant or indemnitor or against whom proceedings are asserted or threatened. Funds are considered "paid" when the monies are disbursed to the Plaintiffs or are available to be so disbursed. For the avoidance of doubt, Plaintiff Collection Monies shall be reduced for taxes and similar assessments required to be paid in the United States or Ecuador and by the amount of any counterclaims or similar judgments which may be made against the Plaintiffs but not the application of the 100/10 Law. If it is determined that the 100/10 Law prevents the Plaintiffs from paying the entire amount of their contingency fee obligations from the Plaintiff Collection Monies, the term "Total Contingency Fee Payment" means an amount equal to one hundred percent (100%) of all portions of the Plaintiff Collection Monies that may be paid by the Plaintiffs in satisfaction of their contingency fee obligations. The term "100/10 Law" means Article 43 of Ecuador's Environmental Management Act, Law No. 37, RO/245 of July 30, 1999.

B.    Permitted Expenses.

The Plaintiffs will reimburse each Advisor for reasonable third-party expenses actually incurred by such Advisor in connection with the performance of the Services; provided, that such expenses shall have been approved by the Plaintiffs' U.S. Representative in writing prior to the incurrence thereof.

CONFIDENTIAL - ACCESS LIMITED BY PROTECTIVE ORDER

# EXHIBIT 1121

# NEIDL & ASOCIADOS
### ABOGADOS

**Steven R. Donziger**
**Law Offices of Steven R. Donziger, P.C.**

███████████████████████████

| | | | |
|---|---|---|---|
| MATTER: | 130 | INVOICE #: | 1120 |
| Y. REF: | n/d | CLIENT: | 0006 |
| O.REF.: | n/d | AGENT: | 5002 |
| COUNTRY: | ECUADOR | COUNTRY: | USA |

Dear Sirs,

**According to your instructions we have proceeded with the matters described herein below:**

| MATTER | DESCRIPTION OF SERVICE/CONCEPT | AMOUNT |
|---|---|---|
| 130 | Legal Services rendered in Ecuador<br>Case: Ecuador vs. Chevron – Texaco<br>Trust for Funding Agreement between<br>FDA and Third Parties<br><br>Hours: 310<br>Rate: $240.- per our | |
| | Fees subtotal.................................. $74.400.- | |
| | **TOTAL AMOUNT DUE  USD$74.400.-** | |

TOTAL AMOUNT DUE:
SEVENTY FOUR THOUSAND FOUR HUNDRED DOLLARS and 00/100

If you are paying by check, please send it via overnight courier service to:
NEIDL & ASOCIADOS
República 396, 6ᵗʰ floor
Quito-Ecuador
If payment is made by bank transfer, please wire it to the following account:
HELM BANK
999 Brickell Avenue
Miami, Florida 33131
ABA ████1456
SWIFT: ███████
For further deposit to account No ████0769
Beneficiary: Andrew Neidl

INSTRUCTIONS:
1. When making a transfer, please indicate invoice date and number.
2. Make sure the wire transfer is made in the full amount.
3. Please notify us with the transfer number when possible.

May 16th, 2011

CONFIDENTIAL - ACCESS LIMITED BY PROTECTIVE ORDER

WOODS00044882

# EXHIBIT 1122

## RETAINER AGREEMENT

THIS RETAINER AGREEMENT (as from time to time may be amended in accordance with the terms hereof, this "Agreement"), dated as of January ⊆, 2011, is made between and among (i) each of the individual plaintiffs in the matter *Maria Aguinda y Otros v. Chevron Corporation* (as listed on the attached Exhibit A, and together with their respective successors and assigns, the "Plaintiffs"), by Pablo Estenio Fajardo Mendoza, Esq., as lead counsel for and Ecuadorian legal representative of the Plaintiffs, (ii) EL FRENTE DE DEFENSA DE LA AMAZONIA (as listed on the attached Exhibit A, and together with its successors and assigns, the "Amazon Defense Front"), duly represented by Ermel Gabriel Chávez Parra, who is authorized by the Board of Directors and as beneficiary of any judicial or settlement award granted to the Plaintiffs, (iii) ASAMBLEA DE AFECTADOS POR TEXACO (as listed on the attached Exhibit A, and together with its successors and assigns, the "Assembly of Communities Affected by Texaco" and, collectively with the Amazon Defense Front, the "Plaintiffs' Coordinators") by Luis Yanza under that certain Special Power of Attorney dated March 1, 2010 (the "POA") granted by Ermel Gabriel Chávez Parra, Ernesto Germán Maniguaje Piaguaje, Ángel Justino Piaguage Lucitante, Toribio Aguinda Lucitante and Pedro Bienvenido Galarza Bravo, and (iv) DONZIGER & ASSOCIATES, PLLC, a New York professional limited liability company having offices at ███████████ New York, New York ████ (the "Firm").

### WITNESSETH:

WHEREAS, the case *MariaAguinda y Otros v. Chevron Corporation* [No. 002-2003] is pending in the Provincial Court of Justice of Sucumbios to recover clean-up costs and other damages and relief from defendant Chevron Corporation (a/k/a Texaco; ChevronTexaco; Chevron) for Texaco's role as drilling operator in Ecuador and/or consortium partner; and

WHEREAS, a number of actions pursuant to 28 U.S.C. § 1782 have been filed by Chevron and Chevron lawyers Rodrigo Perez Pallares and Ricardo Reis Veiga in various United States District Courts against various of the Plaintiffs' advisors, including two of their former and current lawyers; and

WHEREAS, additional related litigation and associated activities are occurring and anticipated, including, without limitation,initiating actions pursuant to 28 U.S.C. § 1782 and as necessary to enforce a judgment against Chevron or its subsidiaries in Ecuador, the United States and/or other countries and pursue or defend any appeals therefromand conducting possible settlement negotiationswith Chevron and its representatives (all of the above, collectively, the "Litigation"); and

WHEREAS, the Plaintiffs previously engaged the Firm to provide legal services to pursue and defend, as the case may be, the Litigation to its conclusion, and desire to more particularly set forth the terms of the attorney-client relationship between the Plaintiffs and the Firm, and to document and define the economic compensation to which the Firm is entitled to receive for its representation of the Plaintiffs in connection with the Litigation; and

WHEREAS, by virtue of having acted as the primary United States attorney on behalf of

CONFIDENTIAL - ACCESS LIMITED BY PROTECTIVE ORDER

the Plaintiffs to date, the Plaintiffs desire to appoint Steven R. Donziger, Esq. to act as Plaintiffs' U.S. Representative (defined below) with such responsibilities as are set forth below, and to cooperate in such capacity with Pablo Fajardo Mendoza, Esq. and Luis Yanza (the foregoing, collectively with any successors thereto, the "Other Plaintiffs' Representatives"); and

WHEREAS, the Plaintiffs and the Firm desire to enter into this Agreement after careful and extended consideration on terms that each party considers commercially reasonable (taking into account, among other things, all relevant facts and circumstances related to the Litigation).

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, the Plaintiffs and the Firm, intending to be legally bound, hereby agree as follows:

(1)    Scope of Representation.

The Plaintiffs previously engaged the services of the Firm to serve as legal counsel to the Plaintiffs in connection with the Litigation, which such engagement is hereby continued as set forth herein, with Steven R. Donziger, Esq. as the Firm's lead partner on the engagement. The Firm will cooperate and coordinate its efforts as requested by the Plaintiffs with any other lawyers or law firms retained by the Plaintiffs in connection with the Litigation (whether such efforts are to occur in the United States, Ecuador or elsewhere).

(2)    Devotion of Resources.

(a)    The Firm agrees that it shall zealously represent the Plaintiffs in connection with the Litigation and shall commit substantial resources to the Litigation as may be required in order to zealously prosecute and defend the Litigation whether foreseen or unforeseen. The Firm shall devote significant and sufficient time, attention and effort to the Litigation as may be necessary or desirable to advance and significantly further the interests of the Plaintiffs in the Litigation (including, without limitation, in developing and executing defensive and offensive litigation strategy, including actions under 28 USC § 1782 and all related Litigation now occurring or which may arise in the future, including, without limitation, claims Chevron may assert against active or inactive lawyers, experts, advisors, consultants or others, litigation relating to the Chevron's claims under the Bilateral Investment Treaty between the United States and Ecuador, claims asserted by the Plaintiffs and/or Chevron related to the underlying environmental case in Lago Agrio, Ecuador and enforcement of any judgment in favor of the Plaintiffs in the Litigation).

(b)    In addition, the Plaintiffs hereby appoint Steven R. Donziger, Esq. to act as their United States representative ("Plaintiffs' U.S. Representative") to exercise overall responsibility for the strategic direction of the Litigation and the day-to-day management of the Litigation. Without limiting the generality of the foregoing, the Plaintiffs' U.S. Representative shall have primary responsibility for the following:

(i)    coordinating the overall legal strategy of the Plaintiffs to pursue and defend all aspects of the Litigation, as applicable, in such a manner as to advance and

2

CONFIDENTIAL - ACCESS LIMITED BY PROTECTIVE ORDER                    WOODS00045391

further the interests of the Plaintiffs in the Litigation to the maximum extent (including, without limitation, coordinating the United States legal strategy with the Ecuadoran legal strategy);

   (ii) assembling and organizing the various United States lawyers and law firms who or which from time to time will represent the Plaintiffs in connection with the Litigation (including, without limitation, preparing and negotiating engagement agreements with such lawyers and law firms on behalf of the Plaintiffs; and coordinating the efforts and undertakings of such lawyers and law firms);

   (iii) coordinating the efforts to procure funding or financing for the Litigation from one or more third parties (including, without limitation, from time to time obtaining and evaluating bids from third parties in respect of such funding or financing, making recommendations to the Plaintiffs in respect of such bids and preparing and negotiating on behalf of the Plaintiffs the definitive transactional documents and agreements with each funder or financer selected by the Plaintiffs to provide any such funding or financing);

   (iv) assembling and organizing the various non-legal advisors, experts, service providers and others who or which from time to time will assist the Plaintiffs in pursuing and/or defending various aspects of the Litigation, and coordinating the efforts and undertakings of such advisors, experts, service providers and others; and

   (v) coordinating the media, public affairs and public relations activities on behalf of the Plaintiffs (including, without limitation, retaining lobbyists, public affairs advisors and public relations advisors on behalf of the Plaintiffs).

The Plaintiffs' U.S. Representative hereby acknowledges that, in carrying out the foregoing responsibilities, he will be required to provide his efforts in the United States, Ecuador and elsewhere. The Plaintiffs' U.S. Representative may not enter into agreements, settlements or negotiations with representatives, agents, lobbyists or any other person associated with Chevron without authorization and direction from the Plaintiffs. This authorization and direction may be given by the Other Plaintiffs' Representative in the Republic of Ecuador.

  (3) <u>Fees and Expenses; Budget and Billing.</u>

   (a) <u>Contingent Fee.</u>As compensation for its services hereunder, the Firm shall be entitled to an Active Lawyer Percentage of thirty one and one-half percent (31.5%)of the Total Contingency Fee Payment. The "<u>Total Contingency Fee Payment</u>" means an amount equal to twenty percent (20%) of all Plaintiff Collection Monies. "<u>Plaintiff Collection Monies</u>" means any amounts paid, whether in lump sum or installments, whether from Chevron Corporation (a/k/a Texaco; ChevronTexaco; Chevron), any other party listed as a defendant in respect of the Litigation (including, without limitation, his or its respective affiliates and successors in interest), or any other party added or joined to the Litigation from time to time as a defendant or indemnitor or against whom proceedings are asserted or threatened. Funds are considered "paid" when the monies are disbursed to the Plaintiffs or are available to be so disbursed. For the

<div align="center">3</div>

avoidance of doubt, the Plaintiff Collection Monies shall be reduced for taxes and similar assessments required to be paid in the United States or Ecuador but not the application of the 100/10 Law. If it is determined that the 100/10 Law prevents the Plaintiffs from paying the entire amount of their contingency fee obligations from the Plaintiff Collection Monies, the term "Total Contingency Fee Payment" means an amount equal to one hundred percent (100%) of all portions of the Plaintiff Collection Monies that may be paid by the Plaintiffs in satisfaction of their contingency fee obligations. The "100/10 Law" means Article 43 of Ecuador's Environmental Management Act, Law No. 37, RO/245 of July 30, 1999.

(b)    Monthly Retainer.As further compensation for its services hereunder,for each month during the term of this Agreement, the Plaintiffs shall pay to the Firm a monthly retainer in accordance with a budget to be provided by the Firm to the Chairman from time to time (the "Monthly Retainer"). The Monthly Retainer that is due and payable for each month during the term of this Agreement shall be paid by the Plaintiffs on or before the 10th day of the calendar month to whichthe Monthly Retainer applies.

(c)    Other Amounts. The parties acknowledge that, from time to time,the Plaintiffs or one of the Other Plaintiffs' Representativeswill submit requests to the Plaintiffs' U.S. Representative for funds to pay or reimburse, as applicable, certain case expenses and fees and expenses of Ecuadoran counsel, advisorsand/or service providers who or which have provided legal or other services to the Plaintiffs in connection with the Litigation. In such event, the Plaintiffs' U.S. Representative shall promptly present such requests (in the form of an invoice) to the Chairman (defined below) for approval and payment in accordance with Clause 3(f) below.

(d)    Expenses. In addition to payment of the Monthly Retainer, the Firm shall, subject to Clause 3(e) and Clause 3(f)below, be entitled to reimbursement for anyreasonable out-of-pocket expenses or other costs incurred by the Firm in connection with its representation of the Plaintiffs in the Litigation (the "Expenses").

(e)    Budget. The Plaintiffs, the Firm and the other attorneys actively involved in the Litigation are preparing a preliminary budget (to be broken down on a monthly basis) of fees, costs and expenses of the Litigation and related activities that may be billed to the Plaintiffs by the Firm and others, which such budget will be attached to the Master Agreement (defined below) as an exhibit thereto (the "Budget"). The parties (i) acknowledge that the preliminary budget is not yet final, and is still being finalized by the Plaintiffs, the Firm and such other attorneys and (ii) agree that the monthly allocation for the Firm that will be included in the Budget, when finalized, shall be an amount equal to the Monthly Retainer Fee. The parties hereto acknowledge that the Budget may change from time to time as may be set forth in the Master Agreement.

(f)    Billing and Payment. As soon as practicable after the end of a calendar month, the Firm shall submit a bill to the Plaintiffs for reimbursement of its Expenses for such month setting forth in reasonable detail the Expenses that it incurred during the preceding month in connection with its representation of the Plaintiffs in the Litigation.If requested by the Plaintiffs, the Firm will also provide a written description to the Plaintiffs setting forth in

4

    WOODS00045393

reasonable detail the legal services that the Firm provided during the preceding month in connection with its representation of the Plaintiffs in the Litigation and time spent by the Firm's attorneys and other professionals during the preceding month on the Litigation; provided, that, and for the avoidance of doubt, any such written description of legal services and time provided by the Firm upon any such request shall not affect the obligation of the Plaintiffs to pay the Monthly Retainer to the Firm in accordance with Section 3(b) above. Billsfor Expenses shall be sent for approval to (i) the Plaintiffs'U.S. Representative and (ii) once designated, the chairman of the management committee (to be discussed in the Master Agreement) (the "Chairman").No amount will be paid with respect to a bill for Expenses absent the approval of each of the Chairman and the Plaintiffs' U.S. Representative.

(g)    Payments to Other Attorneys.   The Firm acknowledges that other law firms, advisors and service providers retained by the Plaintiffs in connection with the Litigation and related activities have been instructed to submit their respective monthly invoices to (x) the Chairman and (y) the Plaintiffs' U.S. Representative. The Firm further acknowledges that the Chairman's law firm is not authorized to make any payment in respect of any such invoice unless and until it has received the written authorization to pay such invoice from (i) the Chairman and (ii) the Plaintiffs' U.S. Representative. The Plaintiffs' U.S. Representative shall coordinate with the Chairman for the review and approval or disapproval (in whole or in part) of each such invoice in accordance with the terms of the underlying engagement agreement, the Budget, the Master Agreement and this Agreement. So long as the fees and expenses on such invoice do not exceed the applicable monthly allocation for the presenting law firm, advisor or service provider set forth in the Budget, and are approved by the Chairman and the Plaintiffs' U.S. Representative, the Plaintiffs' U.S. Representative shall sign whatever written authorization(s) may be reasonably required in order to release the funds necessary to pay such invoice from the Trust Accounts(as defined below) or accounts in which the Plaintiffs' funds are then being held.

(h)    Trust Accounts.   If requested by the Plaintiffs or one of the Other Plaintiffs' Representatives, the Firm agrees to maintain one or more segregated trust accounts (the "Trust Accounts"), and to hold and maintain in such Trust Accounts the proceeds of one or more third party fundings or financings pending the disbursement and payment of such proceeds in accordance with the provisions of this Agreement, the Budget and the Master Agreement. In such event, the Firm shall maintain accurate records of all deposits and withdrawals from each Trust Account, and provide true and correct copies of those records to the Other Plaintiffs' Representatives promptly upon a written request for the same.

(i)    Acknowledgement of Payment Terms; Intercreditor Agreement.   The Firm acknowledges and agrees that (a) there will be no payment of the contingent fee described in Section 3(a) in the event no award is granted and/or actually paid to the Plaintiffs in respect of the Litigation and (b) the terms of the engagement set forth in this Agreement (including the payment of the success fee described in Section 3(a)) are subject to the priorities, terms and provisions set forth in the Intercreditor Agreement dated as of October 31, 2010 by and among the Plaintiffs, the Plaintiffs' Coordinators, certain parties providing funding for the Litigation and the Plaintiffs' lawyers and other advisors (the "Intercreditor Agreement"). The Firm shall, as a condition to the engagement, execute and deliver the Intercreditor Agreement and agrees to comply with the terms thereof.

5

(j)     The Firm hereby acknowledges and agrees as follows:

(i)     If, from time to time, the Plaintiffs reasonably determine that (i) one or more additional lawyers and/or law firms should be retained by the Plaintiffs in order to assist with the pursuit or defense of the Litigation ("Additional Lawyers") and/or (ii) there are insufficient funds currently available to the Plaintiffs to pay the reasonably anticipated costs and expenses of the Litigation as shown on the then current Budget and, as a result, the Plaintiffs should seek additional funding for the Litigation from one or more additional funders ("Additional Funders"), then the Plaintiffs shall deliver notice of that fact to the Chairman and the Plaintiffs' U.S. Representative setting forth such determination and requesting that the Chairman and the Plaintiffs' U.S. Representative agree to reduce the Active Lawyer Percentages of each lawyer engaged by the Plaintiffs on a contingency fee basis in respect of the Litigation (each, an "Active Lawyer") on a pro rata basis (based upon their then existing Active Lawyer Percentages under each Active Lawyer's respective retainer agreement with the Plaintiffs) in order to allow for the Plaintiffs to engage such Additional Lawyers or enter into a funding arrangement with such Additional Funders, as applicable (such notice, a "Request Notice"). Each Request Notice shall describe the proposed economic terms and conditions for any agreement with Additional Lawyers and/or Additional Funders, including, without limitation, as applicable, the Active Lawyer Percentage proposed to be allocated to any Additional Lawyers (the "Additional Lawyer Percentage") and the percentage of Plaintiff Collection Monies proposed to be paid to any Additional Funder (the "Additional Funder Percentage"). Immediately upon receipt of any Request Notice, the Chairman and the Plaintiffs' U.S. Representative shall deliver a copy thereof to the Firm and each other Active Lawyer, for notification purposes only.

(ii)    No later than 10 days after the delivery of a Request Notice by the Plaintiffs, the Chairman and the Plaintiffs' U.S. Representative shall discuss and decide jointly to either approve or reject the requested actions set forth in such Request Notice. If both the Chairman and the Plaintiffs' U.S. Representative agree to approve the requested actions set forth in such Request Notice, then the requested actions set forth in such Request Notice shall be deemed approved, and the Plaintiffs thereafter may engage the Additional Lawyers or enter into a funding agreement with Additional Funders, as applicable, upon economic terms no more favorable to the Additional Lawyers or Additional Funders, as applicable, than as set forth in the approved Request Notice.

(iii)   Immediately upon the engagement of any Additional Lawyers or the entry into a funding agreement with any Additional Funders which, in each case, has been approved in accordance with this Section 3(j), the Active Lawyer Percentage of the Firm shall be reduced by the Firm's pro rata share (based upon the Firm's then existing Active Lawyer Percentage) of the amount required to enable the Plaintiffs to grant, as applicable, (a) the Additional Lawyer Percentage to such Additional Lawyer or (b) the Additional Funder Percentage to such Additional Funder, in each case, taking into account any reductions made to the portion of the Plaintiff Collection Moines which are or may be paid to any non-lawyer advisors to the Plaintiffs in accordance with the terms

6

                                    WOODS00045395

of the agreement then in place between the Plaintiffs and such non-lawyer advisor. For avoidance of doubt, no Active Lawyer shall bear any more or any less than its pro rata share of the reductions referred to in this Section 3(j).

(4)    Reporting Obligations.

The Firm shall provide timely updates to the Other Plaintiffs' Representatives on the status of its legal efforts on behalf of the Plaintiffs, and shall promptly respond to any reasonable request for information received from any of the Other Plaintiffs' Representative.

(5)    Other Attorneys.

The Plaintiffs have entered into, and expect to enter into, agreements with other attorneys to work on the Litigation. These agreements are expected to differ from this Agreement in various ways. For example, some of those attorneys will be compensated through a combination of hourly or monthly fees (with various degrees of discount or no discount) and contingent fee payments, or exclusively on a contingent basis. Other attorneys may be retained to work without any contingent fees. Any attorneys who the Plaintiffs agree to compensate, in whole or part, on a contingent basis shall be required to become parties to a master agreement to be agreed to by all firms representing the Plaintiffs on a contingency basis (the "Master Agreement").

(6)    Confidentiality of Client Information.

The Firm shall not disclose anyconfidential information of the Plaintiffs to any third parties, including otherclients, unless (a) specifically authorized by the Plaintiffsor theOther Plaintiffs' Representativesto do so or (b)legally required to do so.

(7)    Client Files.

In the course of the representation of the Plaintiffs, the Firm shallmaintain and safeguard the Plaintiffs' files to the same extent and in the same manner as the Firmmaintains its client files generally. The Plaintiffs' files shall consist of all correspondence, pleadings,deposition transcripts, exhibits, physical evidence, experts' reports, attorney work product and other items related to the Firm's representation of the Plaintiffs. The Plaintiffs' filesshall be and remain the property of the Plaintiffs.The Firm will provide the Other Plaintiffs' Representativeswith access to the Plaintiffs'files at such reasonable times as may be requested by the Other Plaintiffs' Representatives. The Firm will dispose of the Plaintiffs' files after the conclusion of the Litigation in accordance with the Firm's document retention policies.

(8)    Conflicts of Interest.

The Firm confirms that it has performed a conflicts check on the known parties and is unaware of any conflict (either waivable or non-waivable) that would prevent or preclude the Firm's representation of the Plaintiffs. Furthermore, the Firm represents that it has no preexisting attorney-client relationship with any party in the Litigation (other than the Plaintiffs).

7

CONFIDENTIAL - ACCESS LIMITED BY PROTECTIVE ORDER

(9)     Individual Actions.

In the event that any person or entity (whether a party to the Litigation or otherwise), other than any Plaintiff, brings a legal action against the Firm or any attorney thereof relating to the Firm's or such attorney's representation of the Plaintiffs in connection with the Litigation(whether in Ecuador, the United States or elsewhere) (including, for avoidance of doubt, actions brought pursuant to pursuant to 28 U.S.C. § 1782) (each, an "Individual Action"), the Plaintiffs shall make available to the Firm and/or each such attorney the funds necessary to pay the reasonable costs of defending against such Individual Action (the "Defense Funds"). The Defense Fundsshall be paid out of and to the extent of the monies then available to fund the general expenses of the case. Following a final, non-appealable order of a court of competent jurisdiction in respect of such Individual Action that the Firm or such attorney has committed actual fraud, professional malpractice or willful misconduct (or following the entry of a guilty plea or settlement agreement admitting the same), then the Plaintiffs may require that the Firm or such attorney pay to the Plaintiffs the amount of the Defense Funds actually paid by the Plaintiffs to or for the benefit of the Firm or such attorney, as applicable.

(10)    Arbitration of Disputes.

(a)     Any controversy or claim arising out of or relating to this Agreement, the relationship among the Plaintiffs' Representatives, the Plaintiffs, other attorneys involved in the Litigation or any of their affiliates or successors (the "Arbitration Parties") and the Firm,its attorneys and staff or any of their successors (the "Firm Arbitration Parties") or theservices provided by the Firm Arbitration Parties pursuant to this Agreement orotherwise shall be submitted to binding arbitration, in accordance with this Section 10, if the parties have been unable to resolve the dispute through negotiation, mediation or otherwise within thirty (30) days after one party has provided written notice of a dispute to the other party.  The Firm shall send any such notice to all three of the Plaintiffs' Representatives by registered overnight delivery service such as Federal Express or DHL at the last-known address of each such person in the Firm's records.By agreeing to arbitrate, the parties are agreeing to waive any right to a jury trial.The arbitration shall be conducted and administered by the International Centre for Dispute Resolution in accordance with its International Arbitration Rules (the "ICDR Rules"), this Agreement and the Federal Arbitration Act. In the event of a conflict, the provisions of the ICDR Rules shall control, except wherethe ICDR Rules conflict with this Agreement, in which case this Agreement shall control. Thearbitration shall be conducted before a panel of three arbitrators (all of whom shall be formerstate or federal judges, with at least five years judicial experience and each of whom shall be fluent speakers and readers of both English and Spanish), regardless of the size of thedispute, to be selected as provided in the ICDR Rules. The arbitration shall be commenced andheld in Miami, Florida, unless otherwise required by a person or entity who or which has provided funding to the Plaintiffs in respect of the Litigation. Any issue concerning the location of the arbitration, the extent towhich any dispute is subject to arbitration, the applicability, interpretation, or enforceability ofthese procedures, including any contention that all or part of these procedures are invalid orunenforceable, and any discovery disputes, shall be resolved by all of the arbitrators. No potential arbitrator may serve on the panel unless he or she has agreed in writing to be bound by these procedures.  To the extent state law is applicable, the arbitrators shall apply the substantivelaw of the State of New York. Each party shall, upon the

8

CONFIDENTIAL - ACCESS LIMITED BY PROTECTIVE ORDER

WOODS00045397

written request of the other party, promptly provide the other with copies of all documents on which the producing party may rely in support of or in opposition to any claim or defense and a report of any expert whom the producing party may call as a witness in the arbitration hearing. At the request of a party, and upon the showing of good cause, the arbitrators shall have the discretion to order production by the other party or by a third party of other documents relevant to any claim or defense. Each party shall be entitled to depose a maximum of three witnesses (which number may not be increased by the arbitral tribunal), plus all experts designated to be witnesses at the arbitration. The depositions shall be held within thirty (30) days of the making of a request and shall be limited to a maximum of six hours per deposition. All objections are reserved for the arbitration hearing, except for objections based on privilege and proprietary or confidential information.

(b)     All aspects of the arbitration shall be treated as confidential and neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests. The result of the arbitration shall be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction. In no event shall the arbitrators have any authority to award punitive damages.

(c)     The parties acknowledge that the Plaintiffs intend to enter into agreements with other attorneys on or after the date of this Agreement and that all such agreements will contain provisions obligating the parties thereto to submit any disputes to binding arbitration substantially similar to the provisions of this Section 10. In the event of any dispute between the Plaintiffs and an attorney (whether active or inactive) or any other person or entity with a legitimate or alleged claim to Plaintiff Collection Monies (any such person, a "Claimant"), the Plaintiffs desire to resolve such dispute in a single arbitration proceeding involving all such Claimants. In view of the foregoing, in the event of an arbitration proceeding involving the Plaintiffs and a Claimant, the Firm agrees to participate in such proceeding if it is joined by the Plaintiffs or any Claimant and agrees not to oppose joinder of other attorneys or the Claimants if sought by the Plaintiffs or a Claimant who or which is a party to the arbitration proceedings. Furthermore, the Firm agrees that under no circumstances shall it demand, claim or seek to obtain a greater amount or increased percentage of Plaintiff Collection Monies than it has agreed to in this Agreement and in the Master Agreement, and hereby unconditionally and irrevocably waives any right to make such a demand or claim in any arbitral, judicial or other proceeding anywhere in the world.

(d)     In the event of any dispute between a party hereto and any provider of funding or financing for the Litigation, the parties hereto agree to be bound by and comply with any arbitration provisions in the definitive documentation with such provider of funding or financing.

(11)   Controlling Law.

This Agreement shall be governed by and construed and interpreted in accordance with the laws of New York without reference to principles of conflict of laws.

9

CONFIDENTIAL - ACCESS LIMITED BY PROTECTIVE ORDER

(12)   <u>Privilege</u>.

In the course of representing the Plaintiffs, the parties understand that therewill be a need for the Firm to communicate with the Other Plaintiffs' Representatives and the Plaintiffs and other counsel retained by the Plaintiffs. The partiesagree that all such communications are to be treated as confidential and protected to themaximum extent permitted under applicable law by the attorney/client, work product, jointprosecution, common interest, and all other applicable privileges and doctrines.

(13)   <u>Modification in Writing</u>.

No modification, amendment, waiver or release of any provisions of this Agreement or ofany right, obligation, claim or course of action arising hereunder shall be valid or binding for anypurpose unless in writing and duly executed by the party against whom same is asserted.

(14)   <u>Entire Agreement</u>.

This Agreement contains all the agreements between the parties hereto regarding thesubject matter of this Agreement and all prior and contemporaneous agreements and understandings between the parties with respect to the subject matter hereof are deemed mergedherein, including, without limitation, the letter agreements dated as of January 2, 2006 and April 27, 2006.  In the event of a conflict between the terms of this Agreement and the Master Agreement (once executed), the terms of the Master Agreement will prevail.

(15)   <u>Termination of Agreement</u>.

Either party may terminate this Agreement upon thirty (30) days notice in writing to theother party. The provisions of <u>Clauses6,7,9-12,</u> and<u>14-19</u> shall survive the termination of thisAgreement.Upon the termination of this Agreement, the Firm shall no longer be a party to, or have any rights under, the Master Agreement or the Intercreditor Agreement.  If either party terminates this Agreement prior to the recovery by the Plaintiffs of amounts otherwise payable to the Firm under the Master Agreement(if applicable) or the Intercreditor Agreement, then in the event of a recoveryby Plaintiffs of any amounts otherwise so payable, the parties will negotiate in good faith a payment to the Firm on an equitable basis taking into account all relevant circumstances.

(16)   <u>Confidentiality of Agreement</u>.

The partieshereby acknowledge and agree that the information contained in thisAgreement is not known to thepublic, is confidential and proprietary, and is not to be disclosed by either party to any otherperson without the prior written approval of the other party except (a) to the extent necessary to comply with any applicable law, rule or regulation or thevalid order of any governmental agency or any court of competent jurisdiction and (b) as necessary to enforce its rights under, and perform its agreements and obligationsunder, this Agreement.

10

CONFIDENTIAL - ACCESS LIMITED BY PROTECTIVE ORDER

WOODS00045399

(17)   <u>Severability</u>.

If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws effective during the term of this Agreement, such provision shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part of this Agreement; and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Agreement. Furthermore, in lieu of each such illegal, invalid or unenforceable provision, there shall be added automatically as a part of this Agreement a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and be legal, valid and enforceable.

(18)   <u>Language</u>.

This Agreement has been drafted in English and Spanish, and the Parties will execute both versions.  In the event of a conflict between the English version of this Agreement and the Spanish version, the English version shall control.

(19)   <u>Assignment by Plaintiffs</u>.

It is understood and agreed that the Plaintiffs and the Plaintiffs' Coordinators may establish a trust for the purpose of, among other things, more efficiently carrying out the Litigation (such trust, the "<u>Litigation Trust</u>").  In the event that the Litigation Trust is established, the Plaintiffs covenant and agree that they will (a) assign all of their respective rights and obligations under this Agreement to the Litigation Trust and (b) within ten (10) days of such assignment, one of the Other Plaintiffs' Representatives will provide notice thereof to the Firm at the address listed in the forepart to this Agreement

[Remainder of page intentionally left blank]

11

CONFIDENTIAL - ACCESS LIMITED BY PROTECTIVE ORDER

WOODS00045400

IN WITNESS WHEREOF, the Plaintiffs, through their duly authorized representatives, and the Firm have executed this Agreement as of the date first written above.

PLAINTIFFS:

On behalf of each of the plaintiffs in the matter *Maria Aguinda y Otros v. Chevron Corporation*

By: _____ 06-01-11
    Pablo Estenio Fajardo Mendoza, Esq., as
    Lead Counsel For and Ecuadorian Legal
    Representative of the Plaintiffs

Witness: _____

El Frente de Defensa de la Amazonía

By: _____ 05/01/2011
    Ermel Gabriel Chávez Parra, President

Witness: _____

On behalf of the Asamblea de Afectados por Texaco

By: _____ 05-01-2011
    Luis Yanza, as Coordinator under the POA

Witness: _____

FIRM:

Donziger & Associates, PLLC

By: _____
    Steven R. Donziger, Partner

Witness: _____

12

CONFIDENTIAL - ACCESS LIMITED BY PROTECTIVE ORDER

EXHIBIT A

| | |
|---|---|
| Plaintiffs' Coordinators: | Maria Clelia Reascos Revelo; |
| | Maria Magdalena Rodriguez Barcenes; |
| Asamblea de Afectados por Texaco (Assembly | Hugo Gerardo Camacho Naranjo; |
| of Communities Affected by Texaco) | Jose Miguel Ipiales Chicaiza; |
| comprising the Frente de Defensa de la | Heleodoro Pataron Guaraca; |
| Amazonia; Organization of the Indigenous | Luiza Delia Tanguila Narvaez; |
| Nationality Siona of Ecuador (ONISE); the | Lourdes Beatriz Chimbo Tanguila; |
| Organization of the Indigenous Nationality | Maria Hortencia Viveros Cusangua; |
| Secoya of Ecuador; the Indigenous Federation | Segundo Angel Amanta Milan; |
| of the Cofan Nationality of Ecuador | Octavio Ismael Cordova Huanca; |
| (FEINCE); Los Kichwas Firmantes de la | Elias Roberto Piyahuaje Payahuaje; |
| Demanda; and Los Colonos Afectados | Javier Piaguaje Payaguaje; |
| | Daniel Carlos Lusitande Yaiguaje; |
| El Frente de Defensa de la Amazonia | Benacio Fredy Cimbo Grefa; |
| | Guillermo Vincentepayaguaje Lusitante; |
| Plaintiffs: | Delfin Leonidas Payaguaje Payaguaje; |
| | Alfredo Donaldo Payaguaje Payaguaje; |
| Maria Victoria Aguinda Salazar; | Teodoro Gonzalo Piaguaje Payaguaje; |
| Carlos Grega Huatatoca; | Miguel Mario Payaguaje Payaguaje; |
| Catalina Antonia Aguinda Salazar; | Fermin Piaguaje Payaguaje; |
| Lidia Alexandra Aguinda Aguinda; | Reinaldo Lusitande Yaiguaje; |
| Patricio Alberto Chimbo Yumbo; | Luis Agustin Payaguaje Piaguaje; |
| Clide Ramiro Aguinda Aguinda; | Emilio Martin Lusitande Yaiguaje; |
| Luis Armando Chimbo Yumbo; | Simon Lusitande Yaiguaje; |
| Beatriz Mercedes Grefa Tanguila; | Armando Wilfrido Piaguaje Payaguaje; and |
| Lucio Enrique Grefa Tanguila; | Angel Justino Piaguaje Lucitante. |
| Patricio Wilson Aguinda Aguinda; | |
| Celia Irene Viveros Cusangua; | |
| Fransisco Matias Alvarado Yumbo; | |
| Fransisco Alvardo Yumbo; | |
| Olga Gloria Grefa Creda; | |
| Lorenzo Jose Alvardo Yumbo; | |
| Narcisa Aida Tanguila Narvaez; | |
| Berta Antonia Yumbo Tanguila; | |
| Gloria Lucrecia Tanquila Grefa; | |
| Fransisco Victor Tanguila Grefa; | |
| Rosa Teresa Chimbo Tanguila; | |
| Jose Gabriel Revelo Llore; | |

CONFIDENTIAL - ACCESS LIMITED BY PROTECTIVE ORDER

# EXHIBIT 1123

—

| | |
|---|---|
| **From:** | Neil L.Glazer [nglazer@kohnswift.com] |
| **Sent:** | Thursday, July 30, 2009 9:20 AM |
| **To:** | Andrew Woods |
| **Subject:** | RE: MOU |

I will continue to dig. It's even more essential we find the draft where Texaco proposed that Ecuador release all claims including those of third-parties, because Clause VIII of the MOU was not incorporated into the 1995 Agreement, and that fact is not helpful to us absent some other subsequent documentation on the issue. It is parol evidence with respect to construction of the 1995 Agreement, but because of the nature of the dispute, the stakes involved, the breadth of the release language in the 1995 Agreement, and the fact that the Republic is a party to it, I think it's very possible (maybe likely) that a US court in an enforcement action would look beyond the 1995 release language in order to construe it. Maybe not, but we need to nail this down because that is one of the principal questions being asked on the Hill in offices where Chevron's lobbyists have been.

Anyway, Joe wants me to put all this together for something he's doing, and we also think if we can do this with real clarity, Karen can shop a story re: Chevron's voluntary dismissal of the SDNY action, even though it did not reach the merits of that issue.

If I can't locate it soon, I'll call Eric Bloom. I need to speak to him about a couple other things anyway.

***Privilege and Confidentiality Notice***

The information contained in this e-mail message is attorney-client privileged and/or confidential information intended for the use of the named recipient only. You are hereby notified that any dissemination, distribution, or copying of this communication is prohibited. If you have received this communication in error, please immediately notify the sender by replying to this electronic e-mail or call us at 215-238-1700. Thank you.

**From:** Andrew Woods [mailto:awoods@donzigerandassociates.com]
**Sent:** Thursday, July 30, 2009 8:46 AM
**To:** Neil L.Glazer
**Subject:** RE: MOU

Yes, I've heard it mentioned as well, and I've read the brief where it describes the drafts up to the final, but I can't remember where and I've never seen the original.

**From:** Neil L.Glazer [mailto:nglazer@kohnswift.com]
**Sent:** Thursday, July 30, 2009 5:18 AM
**To:** awoods@donzigerandassociates.com
**Subject:** Re: MOU

Thanks, Andrew. I'll comb the records of the other cases - I know it was mentioned somewhere.
Sent from my BlackBerry® Wireless Handheld

***Privilege and Confidentiality Notice***

The information contained in this e-mail message is attorney-client privileged and/or confidential information intended for the use of the named recipient only. You are hereby notified that any dissemination, distribution, or copying of this communication is prohibited. If you have received this communication in error, please immediately notify the sender by replying to this electronic e-mail or call us at 215-238-1700. Thank you.

-----Original Message-----

From: Andrew Woods <awoods@donzigerandassociates.com>

7/30/2009

WOODS-HDD-0149347

To: Neil L.Glazer
Sent: Wed Jul 29 19:59:02 2009
Subject: RE: MOU

I have the MOU (attached) but I don't have any of the drafts.


From: Neil L.Glazer [mailto:nglazer@kohnswift.com]
Sent: Wednesday, July 29, 2009 5:52 PM
To: awoods@donzigerandassociates.com
Subject: MOU


Andrew -- do you have the December 1994 MOU between Texaco and the Republic/Petroecuador?  Do you have any of the drafts proposed by Texaco leading to the 1995 remediation agreement?

I'm trying to put together a complete set of docs related to the release, so I can do a 1-2 page bullet point summary.

Thanks,
Neil


Neil L. Glazer
KOHN, SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107
215-238-1700
215-238-1968 (fax)
nglazer@kohnswift.com

7/30/2009

WOODS-HDD-0149348

# EXHIBIT 1124

# INFORME SUMARIO DEL EXAMEN PERICIAL

## Por: Ing. Richard Stalin Cabrera Vega
## PERITO DE LA CORTE DE JUSTICIA DE NUEVA LOJA
## DICTAMEN PERICIAL

## 24 de marzo de 2008

# 1  DECLARACIÓN DE RESULTADOS

Yo, perito Richard Cabrera Vega, declaro que las siguientes son los hallazgos de las evaluaciones requeridas a mi por la Presidencia de la Corte Superior de Justicia Nueva Loja:

1. Las primeras fuentes de contaminación en el área de la concesión son el petróleo crudo, lodos de perforación y otros aditivos, y aguas de producción que fueron arrojadas en el ambiente desde inicios de 1967. Los contaminantes de estas fuentes están presentes en suelos, agua de subterránea, sedimentos y agua superficial en el área de la concesión y persisten en el ambiente hasta la actualidad.

2. Texpet es la primera responsable por la contaminación. Texpet operó en el área de la concesión con pocas o ningún control ambiental y causó mucha de la contaminación en el área. Texpet inició operaciones en el área concesionada en 1967 y fue el exclusivo operador hasta Junio de 1990. Texpet manejó incorrectamente desechos de pozos de producción, descargó el cien por ciento del agua de producción en los arroyos y ríos, quemó gases en la atmósfera. Las deficientes infraestructuras y prácticas establecidas por Texpet fueron heredadas por Petroecuador. Auditorías conducidas por Texaco confirman ampliamente la contaminación existente en desde esa época. La contaminación continúa hasta estos días como fue confirmado por las muestras tomadas por mí mismo y por los Peritos propuestos por ambas partes en litigio.

3. Hay suficientes información con datos ambientales de irrefutable validez para determinar sobre la contaminación ambiental en el área de la Concesión. Como

STRATUS-NATIVE106635

parte del litigio, miles de análisis ambientales fueron realizados por mí mismo, los Peritos de los demandantes y por los Peritos de Chevron Corporation. Los métodos usados para recolectar y analizar las muestras produjeron datos fiables que apoyan la conclusión de que la tierra y el agua están contaminadas por actividades relacionadas con la producción petrolera.

4. Los niveles de fondo de contaminantes son bajos en tierra y agua. Las áreas en la concesión que no han sido impactadas por actividades relativas a la producción petrolera tienen concentraciones bajas o no detectables de hidrocarburos petroleros y metales en suelos y agua.

5. El medioambiente de la concesión están contaminados con hidrocarburos de petróleo y otros contaminantes relacionados con operaciones petroleras. Los suelos en estaciones y pozos de producción petrolera contienen hidrocarburos de petróleo y metales en concentraciones que son muchas veces más altas que los estándares para limpieza ambiental en Ecuador " e internacionalmente". El agua subterránea bajo los pozos de desechos está contaminada por encima de los estándares ecuatorianos. Cuando el agua de producción era arrojada directamente desde las estaciones durante las operaciones de Texpet a ríos, arroyos, pantanos y suelos fueron altamente contaminados con petróleo, metales y sales en concentraciones que fueron mucho veces más altas que los estándares ecuatorianos. La contaminación ambiental está documentada en los datos recolectados por todas las partes (yo mismo, los peritos insinuados por los demandantes y los peritos insinuados por Chevron Corporation) y ampliamente corroboradas por muestreos históricos que tuvieron lugar en años anteriores al inicio de la demanda.

6. La contaminación ambiental ha causado daños a la población humana. La población humana que habita en el área de la concesión sufre de efectos adversos en su salud como resultado de la exposición a contaminantes de los campos petroleros, estos efectos incluyen cáncer, muerte por cáncer, abortos espontáneos, tal como consta en los anexos L y P.

7. La contaminación ambiental ha causado daños al sistema ecológico en el área de la concesión. Las concentraciones de contaminantes relacionadas con el petróleo son muchas veces más alta en suelos y agua que aquellos que causan toxicidad a plantas, animales, aves y otros recursos bióticos. Observaciones directas en el campo confirman que la vida de plantas y animales fue y continúa siendo impactada por la contaminación.

8. Remediaciones previas y actuales no han limpiado la contaminación adecuadamente. La remediación conducida por Texaco entre 1995 y 1998 estaba dirigida a solamente a solamente a reducir la contaminación en determinados sitios, y seusaron métodos que dejaron detrás gran cantidad de contaminación. Muestreo de sitios remediados por Texaco confirman la presencia de hidrocarburos de petróleo por sobre los estándares vigentes e incluso sobre los establecidos en el contrato de remediación. Los métodos usados actualmente por Petroecuador a través del Proyecto de Eliminación de Piscinas del Distrito Amazónico (PEPDA) para la remediación también dejan detrás enormes cantidades de contaminación.

STRATUS-NATIVE106636

9. Una remediación adicional y mejorada es necesaria para limpiar la contaminación existente en el medio ambiente. Los suelos contaminados deben ser remediados a niveles menos de 1.000 ppm HTP's y a un costo aproximado de un mil setecientos millones de dólares ($ 1.700 millones). La remediación propuesta solo está dirigida a la contaminación existente en suelos. Acciones de limpieza adicionales son necesarias para remediar el agua de superficie contaminada, sedimentos, agua subterránea, flora y fauna. Sin embargo hay insuficiente información disponible para determinar que tan extensas deben ser estas acciones de remediación adicional, razón por la cual no están incluidas en este análisis.

10. Otras acciones son necesarias para limpiar el perjudicial entorno, que no están cubiertas por remediación propuesta. Hay 4 acciones recomendadas que repararán parcialmente los daños existentes causados por las operaciones de Texaco en el área de la concesión:
    - Proveer de agua potable a la gente que vive dentro y en el área de influencia de la concesión. El costo aproximado es $ 468 millones.
    - Proveer de sistemas de atención de salud para la gente de la región. El costo aproximado suma $ 480 millones.
    - Implementar un plan de recuperación territorial, alimenticia y cultural para grupos indígenas ancestrales que han sido afectados por las operaciones de Texaco. El costo aproximado es $XXX
    - Implementar mejoramiento de la infraestructura de producción petrolera para reducir la contaminación actual al ecosistema. El costo aproximado es $XXX

El costo total para estas acciones es $ XXX, proveyendo una fuente de suministros de agua potable y un sistema de atención de salud, reparará daños que no han sido causados solamente por las operaciones de Texpet. De todas formas estas acciones son apropiadas porque la remediación propuesta solamente está dirigida a la contaminación existente en suelos y no incluye la reparación de contaminación en otras fuentes naturales. Dotar para mejorar la infraestructura petrolera es apropiado porque las operaciones de los campos continúan plagadas de una pobre infraestructura y dementes prácticas ambientales dejadas por Texpet.

11. Pasados y futuros impactos en la gente y el ambiente por la contaminación deben ser compensados.
    a. La apropiada compensación por el exceso de muertes de cáncer sufridas por la gente en la concesión es $ 2.910 millones
    b. La apropiada compensación por la pérdida del ecosistema de la selva causado por el impacto de los pozos petroleros, las estaciones y los caminos construidos durante el tiempo que Texpet operó en la Amazonia ecuatoriana está entre $ 875 millones y $1.697 millones.

12. Las acciones y costos identificados para reparar el daño y compensar las pérdidas son conservadoras y no están dirigidas a todos los impactos. La limpieza es para remediación, pero no alcanzará una restauración total para recuperar las condiciones previas a la exploración y producción petrolera. No todas las pérdidas sufridas por las personas y el ambiente han sido incluidas.

STRATUS-NATIVE106637

Texaco alcanzó ganancias aproximadas de $ 8.310 millones por operar la concesión de una manera irresponsable con el medio ambiente. Texaco ahorró enormes cantidades de dinero al no manejar apropiadamente los desechos petroleros, al no reinyectar el agua de formación, por construir piscinas en forma defectuosa y por quemar los gases en lugar de capturarlos. El costo ahorrado compounded durante el tiempo. Esta suma es completamente separada del valor que estipularía el costo dentro de un contexto de reparación de daños y compensaciones por pérdidas. De todas formas la Corte puede imponer esta suma a Chevron Corporation como un perjuicio por daños punitivos si escoge o considera esta figura que ayudará a cubrir la brecha entre la remediación y la restauración, si la Corte decide que la restauración es el remedio más apropiado.

# 2 INTRODUCCIÓN

Este informe fue elaborado por el Perito Ingeniero Richard Stalin Cabrera Vega, para proporcionar asistencia técnica profesional a la Corte Superior de Justicia de Nueva Loja en el Juicio No. 002-2003, que siguen María Aguinda y Otros (en adelante *los demandantes)* en contra de Chevron Corporation (en adelante *la compañía*, o la *demandada)*. El propósito de este informe es asistir a la Corte con cuestiones técnicas que son importantes en este caso. La Presidencia de la Corte de Nueva Loja, mediante Providencia del día 19 de marzo del 2007, 08H30 me designó como Perito, designación que fue ratificada en Providencia del día 17 de Mayo de 2007, a las 08H30 Una vez designado, el día 13 de Junio de 2007, yo Richard Stalin Cabrera Vega, me posesioné como Perito y me comprometí a realizar un estudio en toda el área que fue operada por Texaco dentro de la Concesión que inicialmente estuvieron intereses el Consorcio Texaco Gulf y Luego CEPE (Petroecuador) Texaco; y entregar mi dictamen de acuerdo a lo ordenado por la Corte, que básicamente comprende los siguientes puntos:

   a. Evaluar, de existir alguno, el daño ambiental sufrido por los recursos primarios: el suelo, los recursos hídricos, la cobertura vegetal, la fauna y los demás elementos del entorno y detallarán sus características;
   b. Especificar, de ser posible, el origen de tales daños, tanto causal como cronológico;
   c. Constatar la eventual existencia actual de sustancias que afecten el ambiente y constituyan o puedan constituir un peligro para los seres vivos o una amenaza para su subsistencia y modo de vida;
   d. Especificar las obras, actividades y medidas de orden técnico que deberían llevarse a la practica para sanear el ambiente, en primer lugar, y restaurarlo, en la medida de lo técnicamente posible, al estado que tuvo antes de sufrir el daño;
   e. Determinar los parámetros metodológicos de la restauración y los estándares o metas ambientales a conseguirse, en función de las características de cada ambiente.

Adicionalmente a lo ordenado por el Juez, debo observar y cumplir con las disposiciones y facultades de ley que rigen en nuestro país y que tienen relación con el peritazgo y dictamen pericial.

Para esta tarea se ha considerado que el presente Examen Pericial se había pedido de manera complementaria a las Inspecciones Judiciales, como parte del proceso judicial, por lo que, tras haberlo ordenado la Presidencia de la Corte, he procedido a analizar la

STRATUS-NATIVE106638

información presentada previamente en el juicio por los peritos insinuados por ambas partes para las Inspecciones Judiciales.

Hubo mucha información presentada en el juicio por ambas partes procesales y por los peritos insinuados por éstas, la cual he considerado cuidadosa y detalladamente, y a pesar de que ambas partes han escrito y hablado mucho en los medios sobre este caso, anticipando criterios sobre mi trabajo, me he basado en los datos y en la información del juicio y no en lo que se ha dicho y escrito fuera de éste. Me concentré en la contaminación del suelo, de las aguas subterráneas, del agua superficial y del aire provocada por la operación de Texpet y en los efectos de la contaminación sobre la salud de las personas, sus bienes, las afectaciones a los pueblos indígenas y al ecosistema. De esta manera, creo que mi análisis es justo y proporciona mis mejores recomendaciones a la Corte.

Al final de este informe se encuentra una serie de anexos, cada uno de los cuales cubre un tema específico relacionado con este informe. Los anexos contienen el análisis técnico-científico, y este informe presenta una compilación y resumen de esos análisis, lo que significa que gran parte de los detalles técnicos referidas en este reporte se encuentra también contenida en estos anexos.

Este Dictamen Pericial requirió mucho trabajo para poder cubrir todos los requerimientos de la Presidencia de la Corte. Según se dispuso en las providencias inicialmente mencionada, me basé en la ayuda que me proporcionaron otros expertos para realizar algunos de los análisis técnicos; estos expertos han venido a formar parte de mi equipo técnico, el cual está formado por profesionales imparciales y de intachables credenciales, como se puede ver en el Anexo V.

Las secciones que se presentan en este informe son las siguientes:

- Sección 3.- contiene una descripción de la contaminación ambiental causada por las actividades de producción petrolera de Texpet en la Concesión [1].
- Sección 4.- presenta información sobre los daños causados por la contaminación a las personas que viven en el área.
- Sección 5.- es una evaluación de los daños causados por la contaminación en el ambiente.
- Sección 6.- describe las medidas que se deben tomar para mejorar y recuperar el ambiente dañado.
- Sección 7.- presenta información sobre los valores en dólares de algunas de las pérdidas provocadas a personas y al ambiente.

Yo, Richard Cabrera, ... [sus credenciales]
Es cuanto puedo decir en honor a la verdad. Salvo Error u Omisión.

---

[1] La Concesión petrolera de la que Texpet era operadora será conocida en este informe como *la Concesión*, aún a pesar de que se reconoce que Gulf también formó parte de la Concesión en sus inicios, y también de que Cepe haya cambiado su nombre a Petroecuador.

STRATUS-NATIVE106639

# 3 CONTAMINACIÓN AMBIENTAL CAUSADA POR LAS OPERACIONES DE TEXPET COMO PARTE DEL CONSORCIO

## 3.1 Método

He estudiado la contaminación ambiental y luego he evaluado los daños causados por esta contaminación a las personas y al ambiente en dos pasos. En el primer paso, evalué la contaminación ambiental causada por Texpet en el área de la Concesión, lo cual constituye el tema de esta sección. En el segundo paso, evalué los daños que ha provocado la contaminación en las personas (tanto colonas como indígenas), y en el ecosistema en la Concesión. En la sección 4 se describen los daños causados a la salud de las personas y en la sección 5, los daños causados al ecosistema.

Esta sección es la evaluación de la contaminación ambiental causada por Texpet, operadora del consorcio. Primero describo, en términos generales, las fuentes, migración y destino de los químicos emitidos hacia el ambiente por parte de Texpet. Luego identifico las normas ambientales a utilizar para evaluar si las concentraciones de químicos en el ambiente son mayores a las normales o lo suficientemente altas como para causar daño a las personas o ecosistemas. Cuidadosamente revisé la información ambiental de contaminantes de la Concesión que fue recolectada por mi persona o mi equipo técnico; y en otras fases del litigio para asegurarme de que fuera confiable. Luego, comparé la información confiable, recolectada durante el juicio, con las normas ambientales para evaluar el grado de contaminación causada por las actividades de Texpet.

Finalmente analicé el proceso de remediación ambiental realizado por Texpet entre los años 1995 y 1998, comparando ese proceso en base a la abundante documentación existente con los resultados del muestreo por mi realizado y los otros estudios, realizados tanto por los técnicos insinuados por ambas partes para las inspecciones judiciales, como por la Contraloría General del Estado.

## 3.2 Fuentes contaminantes, transporte y receptores

La información presentada en el presente Dictamen fue recopilada de numerosos documentos presentados ante la Corte y proporciona una idea general de las fuentes y el transporte de los contaminantes. También describe cómo pueden las personas, sus bienes y el ambiente o ecosistema estar expuestos a los contaminantes. Las siguientes secciones presentan información más detallada basada en los datos ambientales que han sido recolectados durante el juicio.

### 3.2.1 Emisiones químicas en el ambiente

En base a mi revisión de los informes técnicos preparados por los peritos insinuados por ambas partes para las Inspecciones Judiciales, existen muchas maneras en las que los químicos en el petróleo crudo, el lodo de excavación y los demás aditivos, y en las aguas

STRATUS-NATIVE106640

de producción pueden haber sido liberados por Texpet hacia el ambiente. La contaminación comienza en los pozos de petróleo.

Texpet perforó y operó 356 pozos de petróleo en la Concesión, y cada pozo de petróleo tiene piscinas de desechos que fueron construidas durante la excavación, mantenimiento y operación del pozo[2]. Los pozos en la Concesión generalmente tienen dos o tres piscinas cada uno, aunque algunos pozos tienen mas piscinas. Los residuos que se colocaron en las piscinas fueron principalmente petróleo crudo, lodos de perforación con otros aditivos, y agua de producción. Las piscinas fueron construidas como hoyos o zanjas en el suelo y no estaban revestidas. Inicialmente, todas las piscinas de desechos también estaban a cielo abierto, aunque con el tiempo, algunas de ellas fueron cubiertas con tierra (VER ANEXO H). Algunas veces, las piscinas de desechos se desbordaban, especialmente en épocas de lluvias abundantes. Algunas piscinas de desechos fueron construidas con tuberías en sus laterales, que permitían que el petróleo crudo u otros desechos fluyeran hacia los bosques adyacentes. Además, debido a que las piscinas de desechos no están revestidas, en forma constante existían filtraciones o derrumbes de los bordes de las piscinas, por lo consiguiente los químicos se trasladaron a través del suelo y contaminaron el agua subterránea que pasa por debajo de las piscinas, así se puede apreciar en múltiples documentos o cartas (VER ANEXO H). Algunas piscinas también fueron quemadas intencionalmente, lo que liberó químicos del petróleo crudo al aire.

Texpet también operó 22 estaciones de procesamiento donde se separaban las mezclas de petróleo crudo, aguas de producción y gases que emanaban de los pozos de producción. Durante muchos años, el petróleo crudo y las aguas de producción fueron separados en piscinas similares a las que Texpet construyó en los pozos de producción, aunque, por lo general, las piscinas en las estaciones eran más grandes. Estas piscinas tampoco estaban revestidas, por lo que la contaminación del petróleo crudo y las aguas de producción se trasladó a través del suelo. No existe ningún documento que muestre que Texpet reinyectó el agua de formación al subsuelo, por lo que puedo afirmar que Texpet, durante todos los años que mantuvo su operación en el área, vertió las aguas de formación, que eran separadas del petróleo crudo, directamente en los arroyos, ríos o pantanos cercanos, sin realizar un adecuado tratamiento. Durante las operaciones de Texpet en el área de la Concesión, vertió más de (20.858.535.500) veinte mil millones de galones de aguas de producción a los arroyos, ríos y pantanos del área de la Concesión (ver Anexo F). Además, extrajo 230.464.948 pies cúbicos de gas, los mismos que fueron quemados en los mecheros instalados en las estaciones, o a su vez vertido en la atmósfera a través del sistema de venteo en las mismas estaciones.

Las principales fuentes de químicos emitidos por Texpet en el área de la Concesión son petróleo crudo, agua de producción y químicos o soluciones químicas utilizadas en la perforación y mantenimiento de pozos de petróleo (como por ejemplo, lodo de perforación y fluidos de perforación). Como se profundizará más adelante en este estudio, estos químicos pueden ser tóxicos para la gente y el medio ambiente.

El petróleo crudo contiene miles de químicos separados, de los cuales la mayoría son hidrocarburos, lo que significa que contienen sólo átomos de carbono e hidrógeno. Los hidrocarburos en el petróleo crudo incluyen químicos tales como el benceno, el tolueno y

---

[2] El Anexo PISCINAS tiene detalles en la historia de las operaciones de Texpet en la Concesión

STRATUS-NATIVE106641

los hidrocarburos aromáticos policíclicos, que son tóxicos para las personas y la vida silvestre. El petróleo crudo también contiene metales como el níquel, el vanadio y el zinc. Las muestras de petróleo crudo de la Concesión, que fueron recolectadas y analizadas durante las Inspecciones Judiciales, confirman que el petróleo crudo en la Concesión contiene estos químicos.

El lodo de perforación, que facilita la perforación de los pozos de petróleo, contiene altas concentraciones de bario, el cual se agrega al lodo de perforación (Health and Safety Executive, 2000). Otros químicos que se agregan al lodo de perforación incluyen cloruro de potasio y cromo (Health and Safety Executive, 2000). Otros aditivos utilizados en la perforación o reacondicionamiento de pozos de petróleo pueden incluir cromo, bario, formaldehidos y ácido clorhídrico (Health and Safety Executive, 2000).

Las aguas de producción son aguas que se encuentran en el subsuelo con el petróleo crudo y que emergen de los pozos de petróleo junto con el petróleo crudo. El análisis químico de las aguas de producción de la Concesión indica que contienen altas concentraciones de sal (en algunos casos el agua de producción es más salada que el agua de mar), hidrocarburos tales como el benceno y el tolueno, y metales (Fugro-McClelland West, 1992).

## 3.2.2 Derrames de Crudo en el área de la concesión.

Las operaciones petroleras de Texpet en el área de la concesión generaron un elevado número de derrames de hidrocarburos a lo largo de los años. Estos derrames se describen en una serie de comunicaciones, memorandos, cartas, oficios y reportes enviadas y recibidas por Texpet, los cuales fueron analizados y sistematizados (ver anexo I)

Debido al largo tiempo de operación de la empresa, el número preciso de documentos nos es desconocido. Los documentos revisados parecen abarcar tan solo una porción de las décadas de operación, por lo cual el número de derrames encontrados no refleja la realidad, ya que seguramente se trata de un número más elevado. Sin embargo los datos arrojados por este análisis permiten construir un modelo que, si bien no es estadísticamente representativo de la totalidad de derrames ocurridos en los años de operación, refleja claramente la realidad operativa de dicha operación.

En total, los documentos analizados reportaron 276 derrames de hidrocarburos, los cuales ascienden a aproximadamente 26.400 barriles derramados.

Los derrames fueron catalogados en función de sus causas (fuerza mayor, fallas de operación, intervención de terceras personas) y sus efectos (contaminación, sanciones, incendios y otros daños). En cuanto a las causas, el mayor número de derrames respondió a fallas operacionales (casi 80%). Esta causa incluye tanto fallas normales de operación, como instancias donde los derrames fueron producto de manifiesta negligencia. No se dispone de datos porcentuales sobre las consecuencias de los derrames, ya que en la mayoría de los casos éstos generaron más de una.

Es importante aclarar que una gran parte de los documentos provienen de los archivos de Texpet, y son sus mismos funcionarios quienes aceptan que los derrames fueron causados por los actos y omisiones de personas vinculadas con la empresa. (ver anexo I)

STRATUS-NATIVE106642

**Derrames de Petroecuador.-**

Durante mi recorrido de campo fui testigo de la existencia de varios derrames de crudo en éstos últimos meses y años. Por ende existen múltiples documentos en los cuales se comprueba que dichos derrames también han existido y existen durante los años que la empresa Petroamazonas hoy Petroproducción, han estado operando la misma área de la concesión, tal como lo ha expuesto la empresa demandada en varios escritos y que se hace referencia en algunos informes periciales de los Peritos que fueron insinuados por la empresa demandada.

El número total de derrames y barriles de hidrocarburos derramados corresponde únicamente a la muestra que se tenía disponible para el análisis, la cual refleja únicamente una porción de los años de operación de Texpet en la Amazonía ecuatoriana. Es razonable pensar que la cantidad de derrames y barriles derramados es mayor.

El hecho que la gran mayoría de derrames hayan estado vinculados con las operaciones de Texpet, sugiere que existían serios problemas con sus políticas y prácticas de operación de los pozos y estaciones de la concesión.

## 3.2.3 Regado de crudo en las vías

Otra fuente de contaminación en el área de la Concesión fue la práctica de Texpet de rociar petróleo crudo en las carreteras para mantener el polvo asentado, según consta en varios documentos y en testimonio de pobladores era una práctica de Texpet el regar crudo en todas las vías o accesos a los pozos y de interconexión entre campos petroleros. Por ser la Amazonía Ecuatoriana un área de alta lluviosa el crudo regado en las carreteras iba a parar en los ríos o esteros circundantes o aledaños a las vías. (Ver anexo i página 4).

## 3.2.4 Movimiento y degradación de los químicos

Los químicos del petróleo crudo, de las aguas de producción y de los aditivos de los pozos pueden trasladarse del lugar donde fueron emitidos originariamente. Los químicos en las aguas de producción y en el petróleo crudo pueden ser transportados río abajo por ríos y arroyos. Los químicos que se pueden disolver en aguas subterráneas pueden trasladarse con la misma agua a medida que fluye por debajo del suelo. Los químicos de las llamas de antorchas o mecheros que se liberan en el aire pueden trasladarse con el viento. De estas maneras, los químicos se dispersan en áreas mucho más grandes que las áreas originarias en donde fueron liberados al medio ambiente.

Algunos de los hidrocarburos en el petróleo crudo pueden descomponerse en el ambiente, y los estudios realizados por los expertos insinuados por la demandada para las inspecciones judiciales, documentan que ha habido una degradación de cierta cantidad de petróleo crudo en el área de la Concesión. La degradación microbiana puede transformar a ciertos hidrocarburos en otros compuestos menos tóxicos. La degradación microbiana tiende a ser más rápida en áreas con más oxígeno y agua. En áreas sin oxígeno, tales como las subterráneas, la degradación microbiana es mucho más lenta. Además, la degradación microbiana tiende a actuar sólo en ciertos tipos de compuestos de hidrocarburo en el petróleo crudo, mientras que otros tipos de compuestos no se ven afectados. Asimismo,

STRATUS-NATIVE106643

ciertos hidrocarburos del petróleo crudo pueden evaporarse de los derrames o de las piscinas no cubiertas, pero otros no. Los metales del petróleo crudo o el lodo de perforación no se descomponen en el ambiente.

## 3.2.5 Exposición química de las personas y el ambiente

Las personas que viven en el área de la Concesión han estado expuestas a los químicos del petróleo crudo, a las aguas de producción, de la quema incompleta de gas y a los aditivos de pozos de numerosas formas. Una de esas formas es a través de la inhalación de vapores que provienen, ya sea de la evaporación de petróleo crudo como de las llamas de antorchas o mecheros. Por ejemplo, cuando se riega petróleo crudo sobre las carreteras, las personas que viven a lo largo de éstas respiran los compuestos más volátiles que se evaporan, incluyendo compuestos como benceno, que pueden producir cáncer. Las personas que viven cerca de las piscinas también pueden respirar los vapores de compuestos que se evaporan de las piscinas. Las llamas de las antorchas producen diferentes compuestos de hidrocarburo, porque la combustión dentro de las llamas no es completa (Strosher, 1996), por lo tanto, las personas que viven cerca de donde hay petróleo crudo a cielo abierto, o cerca de las llamas de los mecheros, pueden estar expuestas a contaminantes al respirarlos y llevarlos a sus pulmones.

Las personas también pueden estar expuestas a los químicos al beber agua contaminada o ingerir alimentos contaminados. Las personas que viven en el área utilizan agua subterránea y agua de la superficie como fuentes para beber, y ambos tipos de agua están contaminados (detalles proporcionados más adelante en este informe). Además, las cosechas y demás plantas, al igual que los peces y animales que las personas ingieren, pueden acumular contaminantes. Las personas también pueden estar expuestas al petróleo crudo y metales contaminantes mediante la exposición directa de la piel.

El ecosistema en el área de la Concesión está expuesto a contaminantes en el suelo, en los ríos y los arroyos, en el agua subterránea y en el aire. Por ejemplo, las plantas pueden estar expuestas a contaminantes en el suelo donde crecen, en el agua subterránea hasta donde llegan sus raíces, y en el aire. Al igual que para los humanos, los animales también pueden estar expuestos a los contaminantes al respirarlos, ingerirlos y beberlos, y por exposición directa con la piel. Los animales también pueden quedar atrapados en las piscinas de petróleo crudo y el petróleo crudo en las plumas de los pájaros imposibilita su vuelo, por lo tanto, les produce la muerte.

## 3.2.6 Información sobre contaminantes que se tuvo en cuenta

Para sacar conclusiones específicas sobre la contaminación ambiental en el área de la Concesión, me basé principalmente en la información recopilada por mi persona con mi equipo técnico bajo las instrucciones de esta Corte (VER ANEXO A); así como también en la información recopilada por los expertos o peritos insinuados por los *demandantes* y por *la compañía* durante las Inspecciones Judiciales.

Durante el juicio, las partes presentaron sus inquietudes con respecto a la confiabilidad de la información analítica recopilada. El Anexo B es una evaluación de la calidad y la

STRATUS-NATIVE106644

confiabilidad de la información analítica de la *compañía*, de los *demandantes* y de la que yo recopilé durante el segundo semestre del año 2007. Como se describe en el anexo, hay suficiente documentación sobre control de seguridad/calidad de laboratorio para concluir que la información generada por todos los laboratorios analíticos es válida y confiable. No obstante, pongo menos énfasis en alguna información sobre aguas subterráneas recolectada por los *demandantes* debido a que los métodos que utilizaron fueron los que probablemente causaron que las muestras de agua subterránea tengan altos contenidos de tierra suspendida en ellas, y este material puede tergiversar los resultados de las muestras.

Además consideré la información de la contaminación ambiental que fue recolectada por varios grupos antes de las Inspecciones Judiciales. Esta información incluye datos recopilados por contratistas para Texaco como parte de las auditorías de operación (Fugro-McClelland West, 1992; HBT Agra Limited, 1993), información recopilada por contratistas de TexPet como parte de la reparación realizada en la década de 1990 (Woodward-Clyde International, 2000), y la información recopilada por investigadores y publicada en literatura científica (Jochnick et al., 1994; San Sebastian et al., 2001, 2002) (ver Anexo C). No le otorgué demasiado peso a estos datos ya que no fueron recolectados en el marco del litigio, sin embargo sí los consideré por la concordancia con la información del litigio y por aclarar cualquier información sobre la contaminación ambiental que no esté incluida en la información de la Inspección Judicial ni en mis datos.

### 3.2.7 Normas ambientales

Algunos de los químicos emitidos por Texpet, como por ejemplo los metales, se encuentran naturalmente en el ambiente. Otros químicos, tales como los químicos en el petróleo crudo, no se presentan de manera natural, pero si están presentes en muy bajas concentraciones, es posible que no causen daño a las personas ni al ambiente. Por lo tanto, he evaluado el daño causado por la contaminación de las operaciones de Texpet mediante la comparación de información ambiental sobre la contaminación con las normas o lineamientos establecidos por el gobierno ecuatoriano para proteger a las personas y al ambiente. (Ver anexo D)

La tabla 3.1 enumera las normas ambientales ecuatorianas más importantes. Estas normas han sido establecidas por la ley ecuatoriana y se pueden utilizar para evaluar cuándo el suelo, el agua de la superficie o el agua subterránea están contaminados de manera que puedan presentar un riesgo o dañar a las personas y al ambiente. Según se describe en el Anexo D, cuando hay más de una norma disponible en la ley ecuatoriana para un contaminante en especial, utilizo la norma más baja disponible. El Anexo D, denominado Revisión de las Normas de Calidad Ambiental del Ecuador también compara las normas ecuatorianas con las normas de otros países o grupos internacionales y la comparación muestra que las normas ecuatorianas para la protección de las personas y el ambiente son similares a las normas de protección en otros países. Esta similitud le otorga una credibilidad agregada a las normas ecuatorianas. Por lo tanto, he comparado la información de contaminación ambiental con estas normas ecuatorianas para determinar dónde está presente la contaminación pero, probablemente, no presente un riesgo o daño, y dónde la contaminación sí presenta un riesgo o daño.

STRATUS-NATIVE106645

No aplicar estas normas, o no aplicar ninguna norma, haría imposible la determinación de la existencia de riesgos o daños, por lo que sin su aplicación esta pericia sería imposible realizar.

**Tabla 3.1: Normas ecuatorianas relevantes de calidad ambiental para el agua superficial y el suelo. Ver el Anexo D como referencia.**

| Parámetro | Agua superficial (ppm) | Suelo (ppm) |
|---|---|---|
| Cadmio | 0,001 | < 1 |
| Cromo VI | 0,05 | 0,4 |
| Cromo | 0,016 | 65 |
| Níquel | 0,025 | < 40 |
| Zinc | 0,18 | 200 |
| TPH | 0,325 | 1.000 |
| Benceno | 0,01 | 0,05 |
| Benzo(a)Pireno | 0,00001 | 0,1 |
| Naftaleno | 0,035 | 0,1 |
| HAP | 0,0003 | < 1 |

Las normas del Decreto No. 1215 son de particular importancia para el total de hidrocarburos de petróleo (TPH) en el suelo. Estas normas son los "límites permisibles para la identificación y recuperación de suelos contaminados en todas las fases de la industria hidrocarburífera". Por lo tanto, estas normas son directamente aplicables para identificar los suelos en el área de la Concesión que exceden los límites permitidos para TPH, y para identificar la necesidad de recuperación de dichos suelos. El Decreto No. 1215 especifica tres concentraciones permitidas de TPH en el suelo: 1.000 mg/kg (o partes por millón, ppm) para ecosistemas sensibles; 2.500 mg/kg para suelos de uso agrícola y 4.000 mg/kg para suelos de uso industrial. El área de la Concesión está en el bosque tropical Amazónico, el cual es un ecosistema sensible. Además, los hogares de muchos campesinos que viven en el área están muy cerca de los pozos o estaciones de producción de petróleo, o de áreas donde se ha derramado petróleo crudo y, por lo tanto, las personas en la región pueden estar fácilmente expuestas a la contaminación de petróleo.

La información contenida en el Anexo D indica que la norma ecuatoriana de 1.000 mg/kg de TPH es más alta que muchas otras normas o lineamientos. Por ejemplo, en los Estados Unidos la contaminación de suelos por petróleo es regulada por los Estados. De entre los estados que recientemente obtuvieron estándares para TPH, diez pusieron estándares más bajos que 1.000 mg/kg TPH (Anexo D). Por lo tanto, en Ecuador el objetivo de limpieza de 1.000 mg/kg de TPH es más alto que el estándar en algunos estados de los Estados Unidos, y esto puede ser demasiado alto. Es ciertamente más alto que los niveles de fondo para hidrocarburos de petróleo en suelo, que están muy cerca del cero.[3] No obstante, el valor de 1.000 mg/kg de TPH se utiliza debido a que es la norma ecuatoriana.

---

[3] El valor medido de fondo de TPH en suelos depende del método analítico utilizado. Con algunos métodos, el TPH de fondo puede llegar a ser tan alto como 100 mg/kg debido a material orgánico de presencia natural en suelos.

STRATUS-NATIVE106646

Adicionalmente, PEPDA[4] ha establecido concentraciones de TPH y ciertos metales que reflejan distintos niveles de calidad ambiental. Estos valores son utilizados para medir la eficacia de sus labores de remediación en piscinas contaminadas de la región oriental. La Tabla xx es la valoración porcentual de los indicadores de descontaminación. Los valores de TPH y metales al 70% de valoración porcentual de calidad ambiental son los establecidos por el Decreto 1215 para ecosistemas sensibles. Valores de calidad ambiental por debajo del 70% no son admitidos por PEPDA (CITE). PEPDA utiliza un valor de <100 mg/kg de TPH como un indicador de una mejora del 100% en las condiciones ambientales como resultado de su remediación. La mayoría de las piscinas remediadas por PEPDA de ls que he revisado información demuestran un índice de calidad ambiental post remediación del 90 al 100%.

Basado en los estándares ecuatorianos relevantes y las consideraciones resaltadas en esta sección, hay un rango de estándares de TPH que pueden ser utilizados para determinar los valores de limpieza para suelos impactados, y compra las concentraciones medidas de TPH en muestras ambientales de la Concesión. Para los propósitos de este reporte utilizaré un estándar de 1.000 mg/mk como el estándar relevante. Vale recalcar que valores más bajos de remediación son alcanzables y serían más beneficiosos para la salud de las personas y el ecosistema.

### TABLA N° 12. VALORACIÓN PORCENTUAL DE LOS INDICADORES DE DESCONTAMINACIÓN

| Parámetro | | TPH | CADMIO | NÍQUEL | PLOMO | Valoración Porcentual de Calidad Ambiental |
|---|---|---|---|---|---|---|
| Valor Analítico | | >5500 | >5 | >200 | >360 | 0 |
| | | 5500 | 5 | 200 | 350 | 10 |
| | | 5000 | 4,5 | 175 | 300 | 20 |
| | | 4500 | 4 | 150 | 250 | 30 |
| | | 4000 | 3,5 | 125 | 200 | 40 |
| | | 3500 | 3 | 100 | 150 | 50 |
| | | 3000 | 2,5 | 75 | 125 | 60 |
| | | 2500* | 2 | 50 | 100 | 70** |
| | | 1500 | 1,5 | 25 | 70 | 80 |
| | | 500 | 1 | 20 | 40 | 90 |
| | | <100 | <0,6 | <10 | <12,5 | 100 |
| Unidad de medida | | mg/l | mg/l | mg/l | mg/l | % |

*RAOH Decreto 1215: Límites permisibles para la identificación y remediación de suelos contaminados en todas las fases de la industria hidrocarburíferas, incluidas las estaciones de servicio)
**Los valores analíticos que corresponden a un valor porcentual menor que 70, se consideran como no permisibles.

Elaborado por: Equipo Técnico Ambiental- PEPDA

Fuente: Petroproducción y PEPDA, 2006. Eliminación de la Piscina SA-14-1. Informe Final. Proyecto Eliminación de Piscinas Contaminadas y Limpieza de Derrames en el Distrito Amazonico. PEPDA. Pg. 22. Nota: las unidades deben estar en mg/kg.

[4] Proyecto de Eliminación de Piscinas del Distrito Amazónico (PEPDA)

STRATUS-NATIVE106647

Los estándares ambientales de Ecuador fueron establecidos después de que cesaron las operaciones de Texpet dentro de la Concesión. Sin embargo, durante las operaciones de Texpet existían guías y prácticas aceptadas para el manejo y disposición de desechos de la exploración y explotación petrolera que no fueron seguidas por Texpet (ej. API, 1962). Más allá de esto, los estándares ambientales se aplican a daños ambientales sin importar cuando la contaminación ha ocurrido. Aún si la contaminación ha sucedido muchos años antes, los estándares son aplicables como estándares de limpieza para remediación. Esto es consistente con las leyes de reparación ambiental alrededor del mundo, así como el CERCLA en EEUU. Estas leyes establecen los estándares y requerimientos para una limpieza de contaminación existente, y se aplican sin importar cuando ha ocurrido la contaminación. Por consiguiente, el hecho de que los estándares ambientales del Ecuador hayan sido establecidos luego de finalizadas las operaciones de Texpet es irrelevante, y los estándares deben utilizarse para determinar los niveles adecuados de remediación.

## 3.2.8 Concentraciones de contaminación de fondo

Cuando se comparan concentraciones de contaminantes en muestras ambientales de la Concesión con los estándares, las concentraciones de fondo también deben ser consideradas. Metales y ciertos químicos orgánicos pueden estar presentes de forma natural en el suelo y en el agua. Esta sección se refiere a las concentraciones de fondo consideradas por PEPDA como representativas de condiciones sin impactos en suelos remediados.

3.5.1 Concentraciones de fondo de metales para suelos

Hay presencia de determinados metales en las fuentes contaminantes de la Concesión, como el petróleo, el lodo de perforación y el agua de producción. Como los metales tienen una presencia natural, se deben considerar las concentraciones de metales de fondo cuando se evalúan los datos de los contaminantes.

Los peritos insinuados por ambas partes y el perito Cabrera analizaron las muestras de suelo recolectadas en la Concesión como parte de las inspecciones judiciales y el Examen Pericial para determinar el contenido de metales. Se seleccionaron los datos de los peritos insinuados por la *compañía* para evaluar las concentraciones de metales de fondo porque ellos recolectaron más muestras fuera de las piscinas y lejos de las fuentes potenciales de contaminación que las demás partes y, además, porque se consideró que los resultados de vanadio en suelo de los *demandantes* eran demasiado bajos (consultar el Anexo B). Se usaron los siguientes procedimientos para identificar las concentraciones de metales de fondo de los datos de suelo de los peritos insinuados por la *compañía*:

- Uso sólo de las muestras recolectadas fuera de las piscinas.
- Uso sólo de las muestras recolectadas fuera de las estaciones (en las estaciones fuera de las piscinas hay impactos generalizados debido a los derrames y a las antorchas).
- Uso sólo de muestras sin presencia evidente de TPH, BTEX ni PAH.

Hay alrededor de 50 a 60 muestras que satisfacen estos criterios (según el metal). Sin embargo, como estas muestras no se recolectaron específicamente para determinar el fondo y como se recolectaron en los pozos o cerca de éstos, algunas probablemente contengan metales que se originan en las actividades de producción del petróleo. Por lo tanto, usé el

STRATUS-NATIVE106648

75% de las concentraciones para representar el límite superior de las concentraciones de fondo. Los valores se muestran en la Tabla X y se comparan con los valores ecuatorianos de suelos que se establecen en el Decreto 1215 y el Decreto 3516. Como los niveles de fondo seleccionados son más bajos que los valores ecuatorianos, esto significa que los suelos con concentraciones de metales superiores a los valores ecuatorianos probablemente estén contaminados debido a las operaciones petrolíferas en la Concesión.

STRATUS-NATIVE106649

Tabla X. Distribución de fondo[a] de concentraciones de metales (mg/kg) en suelos recolectadas por los expertos insinuados por Chevron para las inspecciones judiciales.

| Parámetro | n | Mínimo | Medio | 75% | Decreto 1215 | Decreto 3516 |
|---|---|---|---|---|---|---|
| Bario | 72 | 30.1 | 196 | 399 | | 750 |
| Cadmio | 72 | 0 | 0.10 | 0.49 | 1 | 2 |
| Cobre | 72 | 0 | 31.7 | 49.5 | | 63 |
| Cromo | 61 | 0 | 17.3 | 26.6 | | 65 |
| Cromo VI | 59 | 0 | 0.00 | 0.00 | | 0.4 |
| Mercurio | 59 | 0 | 0.06 | 0.09 | | 0.8 |
| Niquel | 72 | 0 | 14.5 | 26.5 | 40 | 50 |
| Plomo | 61 | 0 | 9.00 | 12.0 | 80 | 100 |
| Vanadio | 61 | 0 | 71.8 | 108 | | 130 |
| Zinc | 72 | 0 | 47.1 | 71.2 | | 200 |

a. Definidos como ejemplos recolectados en pozos fuera de piscinas con bajas concentraciones de hidrocarburos de petróleo.

### 3.2.9 Indicadores de descontaminación de PEPDA

Los indicadores de descontaminación de PEPDA fueron discutidos en la sección 3.4. Concentraciones de cadmio, níkel, y plomo que representan una mejora del 100% en la calidad del ambiente son de 0.6, 10, y 12.5 mg/kg, respectivamente. (ver tabla xx). Estos valores son similares al valor de la media de 75% para línea de base en la tabla YY. Cualquiera de estos parámetros pudiera ser utilizado para medir la línea de base de concentraciones en suelos, y puede ser comparada para medir concentraciones de contaminantes para el caso.

### 3.2.10     Descripción de la contaminación ambiental

**Descripción de las Inspecciones Judiciales y estudios de muestreo de mi investigación durante el segundo semestre del 2007**

Durante las Inspecciones Judiciales, los peritos insinuados por la *compañía* y los *demandantes* recolectaron muestras de 34 sitios de pozos de producción y de 10 estaciones. Además, los peritos insinuados por la *compañía* recolectaron muestras de tres sitios de pozos de donde los *demandantes* no recolectaron muestras, y los peritos insinuados por *demandantes* recolectaron muestras de otros tres sitios de pozos donde no lo hicieron los peritos insinuados por la *compañía*. Los peritos insinuados por la *compañía* también recolectaron muestras de una estación donde los Demandantes no lo hicieron. En el 2007, yo recolecté muestras de 44 sitios de pozos de producción y de una estación (ver Anexos A y E). Los *demandantes*, la *compañía* y yo recolectamos muestras de suelo y, donde era posible, muestras de agua subterránea y superficial, e hicimos analizar sus concentraciones

STRATUS-NATIVE106650

químicas en laboratorios analíticos. La tabla 3.2 enumera los sitios de pozos de producción y estaciones muestreadas por los *demandantes* y la *compañía* durante las Inspecciones Judiciales y por mí en el 2007. Dichos sitios se pueden ver en la Figura 3.1.

**Tabla 3.2: Cantidades de muestras recolectadas por las diferentes partes para el litigio**

|  | Muestras de suelo | Muestras de agua subterránea | Otras muestras[5] |
|---|---|---|---|
| Expertos insinuados por la *compañía* (Inspección Judicial) | 948 | 335 | 29 |
| Expertos insinuados por los *demandantes* (Inspección Judicial) | 355 | 105 | 3 |
| Richard Cabrera (2007) | 211 | 119 | 46 |

---

[5] Incluyen crudo, agua de producción, sedimento y asfalto.

STRATUS-NATIVE106651

**Figura 3.1: Ubicación de los sitios de pozos y estaciones en la Concesión, con sitios muestreados resaltados en anaranjado y amarillo.**



STRATUS-NATIVE106652

Una de las más importantes medidas químicas para este caso es la cantidad de TPH en una muestra. El TPH es la cantidad total de todos los hidrocarburos de petróleo en una muestra. El Anexo B describe los diferentes métodos utilizados por los expertos insinuados por los *demandantes* y la *compañía* para medir el TPH y cómo dichos métodos pueden afectar los resultados. Los expertos insinuados por los *demandantes* y yo utilizamos un método analítico para TPH (método 418.1) que mide todos los hidrocarburos de petróleo, pero que tiende a sobreestimar la cantidad de TPH en las muestras de suelo cuando las concentraciones de TPH son bajas (aproximadamente 100 a 200 ppm de TPH). No obstante, debido a que la norma para TPH en suelos es de 1.000 ppm, esta tendencia a sobrestimar concentraciones cuando hay poco o nada de TPH presente no presenta un problema. Los expertos insinuados por la *compañía* utilizaron métodos analíticos para TPH que usan mediciones separadas para distintos tipos de hidrocarburos de petróleo y luego, las mediciones separadas se suman para obtener un resultado de TPH. No obstante, el método que utilizaron no mide todos los tipos de hidrocarburos de petróleo, por lo tanto, las mediciones de TPH realizadas por los expertos insinuados por la *compañía* son, generalmente (ver Anexo B), distorsionadamente bajas. Independientemente de esto, la información de ambas partes es consistente en cuanto a que ambas muestran claramente los altos niveles de contaminación de petróleo en el suelo de la Concesión.

Yo, Richard Cabrera, también llevé a cabo un estudio en el 2007 como parte de mi papel como perito de la Corte en el litigio. Recolecté muestras de 44 sitios de pozos de producción y de una estación. Mi intención fue llevar a cabo un estudio de manera similar a la de los estudios de las Inspecciones Judiciales. Recolecté muestras de suelo, agua superficial y agua subterránea en estos sitios (ver Anexo A). Una diferencia entre mi estudio y el de las Inspecciones Judiciales fue la manera en la que recolecté las muestras del agua subterránea. Luego de construir pozos de agua subterránea temporarios, dejé que el agua en los pozos se asentara por aproximadamente 24 horas. Esto redujo la cantidad de tierra suspendida en el agua cuando la recolecté, y eliminé el problema que ocurrió en algunas muestras de agua subterránea recolectadas por los *demandantes*. (ver Anexo B)

Un último comentario sobre las Inspecciones Judiciales y la investigación realizada en el campo durante el segundo semestre del 2007 es que los estudios no recolectaron muestras de cada uno de los pozos de producción por considerarlo innecesario e inadecuado para esta clase de estudio. El Anexo G indica que los sitios muestreados son representativo, ya que en total se tomaron muestras de 81 pozos, que representan el 22,8% de los 356 pozos perforados por Texpet en la Concesión; y del 54% (12) de las 22 estaciones de producción), de todos los sitios de pozos y de las estaciones de producción y que, por lo tanto, las conclusiones del subgrupo de sitios que fue muestreado son válidas para todos los pozos y estaciones de producción en la Concesión. En total, entre mi propia investigación y las inspecciones judiciales se han muestreado en 81 pozos y 12 estaciones, que representan. Es decir que se ha muestreado el ___% de los Pozos y el ___ de las estaciones. (Ver anexo G)

Igualmente con base a la información que diferentes instituciones me proporcionaron he tratado de reconstruir la historia de la operación de Texaco en la Amazonia Ecuatoriana. (ver anexo F). Con el análisis realizado en el anexo f, se puede concluir que la empresa Texaco no varió su sistema de operación de un campo a otro. Es decir que el mismo método de operación los puso en práctica en todos los campos y durante todos los años que estuvo la operación del área de la concesión bajo su responsabilidad.

**Contaminación ambiental**

STRATUS-NATIVE106653

Durante mi trabajo de campo en el 2007 y en el proceso de las inspecciones judiciales se recolectaron miles de muestras de los pozos de petróleo y estaciones en la Concesión. En el anexo A, consta el detalle, la descripción, muestreos y análisis de cada uno de los sitios por mí muestreados. Igualmente los peritos insinuados por ambas partes presentaron informes detallados de cada sitio muestreado durante las Inspecciones Judiciales, y dichos informes contienen información y datos de gran valor. En este documento resumo los datos que fueron recolectados durante el litigio, con especial énfasis en si las concentraciones medidas de contaminantes son mayores a las normas ecuatorianas o no.

Por otra parte en el anexo E, existe información de la concentración química de cada sitio está resumida en una sola página. Las concentraciones de TPH están resumidas en el anverso de cada página y la información de otros contaminantes se resume en el reverso. Se debe revisar el Anexo para obtener una descripción resumida más completa de la contaminación ambiental en los sitios individuales que han sido muestreados.

## 3.2.11    Hidrocarburos de petróleo en suelos

En cada pozo de producción y estación muestreada, por lo menos una muestra de suelo contenía concentraciones de TPH que sobrepasaban los 1.000 ppm. Este hecho indica que se ha derramado o vertido petróleo crudo en cada uno de los sitios, y que las concentraciones de TPH exceden las normas ecuatorianas en, por lo menos, una muestra en cada sitio.

Una inspección más detallada de la información del TPH del suelo indica que, de todas las piscinas de desechos muestreados, el 88% (173 de 196) tiene TPH que sobrepasa las 1.000 ppm en al menos una muestra. Muchas de las piscinas tienen varias muestras que exceden las 1.000 ppm, como se puede ver en el Anexo E. Debido a que vemos las altas concentraciones de TPH en casi todos los pozos muestreados, esto significa que casi todas las piscinas de desechos en toda la Concesión están contaminadas con hidrocarburos de petróleo por encima de la norma ecuatoriana. Las tablas 3.3 son un resumen de la información de TPH en todas las muestras de suelo recolectadas para el litigio, separadas por muestras tomadas de las piscinas y de afuera de ellas. La tabla 3.3.A contiene datos de mi estudio, y la tabla 3.3.B contiene datos aportados por los peritos insinuados por las partes procesales.

**Tabla 3.3 A: Resumen de la información de TPH en muestras de suelo recolectadas para el litigio por Richard Cabrera**

|  | Cantidad de muestras | Cantidad de muestras (%) > 1.000 ppm TPH | TPH promedio (ppm) | TPH máximo (ppm) |
|---|---|---|---|---|
| Muestras de piscinas | 131 | 109 (83%) | 22.219 | 414.414 |
| Muestras de afuera de las piscinas | 82 | 23 (28%) | 7.500 | 175.095 |

**Tabla 3.3 B: Resumen de la información de TPH en muestras de suelo recolectadas para el litigio por los peritos insinuados por las partes procesales**

|  | Cantidad de Cantidad de TPH | | | TPH máximo |
|---|---|---|---|---|

STRATUS-NATIVE106654

| | muestras | muestras (%) > 1.000 ppm TPH | promedio (ppm) | (ppm) |
|---|---|---|---|---|
| Muestras de piscinas | 640 | 344 (54%) | 19.586 | > 900.000 |
| Muestras de afuera de las piscinas | 844 | 234 (28%) | 5.028 | 333.262 |

Un porcentaje más alto de piscinas (54% según la información entregada por los peritos insinuados por las partes, y 83% según mis propios estudios) tenían concentraciones de TPH más alto que 1000 ppm que muestras de fuera de las piscinas (28% según la información entregada por los peritos insinuados por las partes, y 28% según mis propios estudios). Las muestras de piscinas también tenían promedios más altos de concentración (~191.000 ppm comparado a ~51.000 ppm según la información entregada por los peritos insinuados por las partes, y 22.219 ppm según mis propios estudios). Estos datos muestran que las piscinas están severamente contaminadas con hidrocarburos de petróleo. La información en la tabla también indica que la contaminación por petróleo no se limita sólo a los pozos. La información de muestreo indica que las concentraciones de TPH en muchas muestras de suelo tomadas afuera de las piscinas también excedían los 1.000 ppm de TPH. La contaminación afuera de los pozos es causada por los derrames (ver ANEXO I), fugas o filtraciones de los mismos (ver Anexo H).

En el Anexo H y en el Anexo N se encuentran detalles adicionales sobre la contaminación de TPH en suelos.

## 3.2.12    Metales en el suelo

Las tablas 3.4 resumen la información de metales en los suelos. La tabla 3.4.A contiene datos de mi estudio, y la tabla 3.4.B contiene datos aportados por los peritos insinuados por las partes procesales. En mis estudios el vanadio, bario y cadmio sobrepasan la norma legal con una frecuencia de 36%, 29% y 14% respectivamente. El cobre, el bario, el vanadio y el cromo VI tienen la mayor frecuencia de excedencias a las normas (14% a 24% de todas las muestras aportadas por los peritos insinuados por las partes para las inspecciones judiciales). El cobre y el vanadio están presentes en el petróleo crudo y el bario se utilizaba en el lodo de perforación. El cromo VI fue utilizado como un aditivo de excavación. Esta información indica que los suelos en los sitios contienen concentraciones de metales relacionadas con la producción de petróleo que exceden las normas ecuatorianas.

**Tabla 3.4, A: Resumen de la información de metales en muestras de suelo recolectadas para el litigio por Richard Cabrera**

| Metal (norma, ppm) | Cantidad de muestras | Cantidad de muestras (%) > límite | Promedio (ppm) | Máximo (ppm) |
|---|---|---|---|---|
| Bario (750) | 28 | 8 (29%) | 595 | 1.736 |
| Cadmio (1) | 7 | 1 (14%) | 0,54 | 1,4 |
| Cobre (63) | 0 | | | |
| Cromo (65) | 12 | 0 | 6,9 | 9,2 |
| Cromo VI (0,4) | 0 | | | |
| Mercurio (0,8) | 0 | | | |
| Níquel (40) | 30 | 0 | 7,8 | 11,9 |

21 de 61

STRATUS-NATIVE106655

| | | | | |
|---|---|---|---|---|
| Plomo (80) | 8 | 0 | 4,4 | 7,3 |
| Vanadio (130) | 22 | 8 (36%) | 99 | 290 |
| Zinc (200) | 0 | | | |

**Tabla 3.4, B: Resumen de la información de metales en muestras de suelo recolectadas para el litigio por los peritos insinuados por las partes procesales**

| Metal (norma, ppm) | Cantidad de muestras | Cantidad de muestras (%) > límite | Promedio (ppm) | Máximo (ppm) |
|---|---|---|---|---|
| Bario (750) | 1.276 | 212 (17%) | 490 | 10.100 |
| Cadmio (1) | 1.248 | 147 (12%) | 0,69 | 316 |
| Cobre (63) | 1.000 | 239 (24%) | 44 | 130 |
| Cromo (65) | 487 | 31 (6%) | 26 | 233 |
| Cromo VI (0,4) | 745 | 107 (14%) | 0,52 | 87 |
| Mercurio (0,8) | 457 | 2 (0,4%) | 0,079 | 1,1 |
| Níquel (40) | 1.274 | 51 (4%) | 18 | 199 |
| Plomo (80) | 558 | 4 (1%) | 12 | 294 |
| Vanadio (130) | 445 | 95 (21%) | 92 | 290 |
| Zinc (200) | 1.214 | 16 (1%) | 67 | 1.181 |

### 3.2.13   Hidrocarburos de petróleo en el agua subterránea

Los datos sobre agua subterránea recolectados por los peritos insinuados por los *demandantes*, por los peritos insinuados por la *compañía* y por mi persona, muestran una gran diferencia en el porcentaje de muestras que exceden la norma de Ecuador de 0,325 mg/L de TPH (Tabla 3.5). De las 192 muestras recolectadas por la *compañía*, sólo 2 (o el 1%) de las muestras contenían un TPH superior a la norma, y la mayoría de las muestras no presentaban un TPH detectable. Por el contrario, el 59% de las muestras de agua subterránea recolectada por expertos insinuados por los *demandantes* presentaba niveles de TPH que superaban la norma de agua subterránea. La diferencia entre los datos de las dos partes probablemente se deba a las diferencias de lugares donde se recolectaron las muestras, el campo y los métodos analíticos utilizados. Como se analiza en el Anexo B, algunas de las muestras de agua subterránea de los expertos insinuados por los *demandantes* pueden tender a ser más altas en TPH debido a las cantidades relativamente altas de suelo en las muestras. Por otro lado, es posible que los métodos analítico utilizados por la *compañía* no midan todos los hidrocarburos de petróleo en las muestras (ver detalles en Anexo B).

**Tabla 3.5: Resumen de los resultados de TPH en muestras de agua subterránea recolectadas para el litigio**

| Investigador | Cantidad de muestras de agua subterránea analizadas para determinar el TPH | Cantidad de muestras que exceden el estándar de TPH de 0,325 mg/L | Porcentaje de muestras que exceden el estándar de TPH |
|---|---|---|---|
| *Peritos insinuados por los demandantes* | 39 | 23 | 59% |
| *Peritos insinuados* | 192 | 2 | 1% |

STRATUS-NATIVE106656

| *por la compañía* | | | |
|---|---|---|---|
| Cabrera (2007) | 104 | 33 | 32% |

Los datos sobre agua subterránea que se recolectaron bajo mi dirección en el 2007 se encuentran entre los resultados de las dos partes. El 32% de las muestras contenían un TPH superior al 0,325 mg/L de la norma. Esto resulta casi idéntico al promedio general del porcentaje de las violaciones de los datos de los *demandantes* y de la *compañía* del 30%, lo que sugiere que mi estudio dio resultados neutrales.

Las Tablas 3.6 resumen las concentraciones de TPH reales medidas en las aguas subterráneas separadas de acuerdo a si las muestras se recolectaron de debajo de las piscinas o no. La tabla 3.6.A contiene datos de mi estudio, y la tabla 3.6.B contiene datos aportados por los peritos insinuados por las partes procesales. Como se esperaba, un porcentaje más alto de las muestras recolectadas de debajo de las piscinas excedió la norma de aguas subterráneas, y la concentración de TPH promedio es superior debajo de las piscinas. Esto coincide con que las piscinas son una fuente de contaminación de TPH para el agua subterránea subyacente.

**Tabla 3.6.A: Resumen de la información de TPH en muestras de agua subterránea recolectadas para el litigio por Richard Cabrera**

| | Cantidad de muestras | Cantidad de muestras (%) > 0,325 ppm TPH | TPH promedio (ppm) | TPH máximo (ppm) |
|---|---|---|---|---|
| Muestras de piscinas | 64 | 18 (45%) | 6,2 | 68 |
| Muestras de afuera de las piscinas | 40 | 15 (23%) | 2,5 | 94 |

**Tabla 3.6.B: Resumen de la información de TPH en muestras de agua subterránea recolectadas para el litigio por los peritos insinuados por las partes procesales**

| | Cantidad de muestras | Cantidad de muestras (%) > 0,325 ppm TPH | TPH promedio (ppm) | TPH máximo (ppm) |
|---|---|---|---|---|
| Muestras de piscinas | 94 | 30 (32%) | 3,4 | 68 |
| Muestras de afuera de las piscinas | 241 | 28 (12%) | 1,03 | 94 |

Por lo tanto, los datos sobre agua subterránea muestran que el agua subterránea en el pozo y los sitios de estación está contaminada con TPH. Mis estudios demuestran que el 45% de las muestras en piscinas sobrepasan la norma ecuatoriana, mientras que aproximadamente el 30% de las muestras de las inspecciones judiciales contienen un TPH que la supera. El agua subterránea debajo de las piscinas tiende a estar más contaminada con TPH que el agua subterránea fuera de las piscinas. Entre los tres estudios, se tomaron muestras de agua subterránea en aproximadamente 73 sitios diferentes y las concentraciones de TPH en el agua subterránea excedían la norma de TPH en 32 (el 44%) de los sitios.

## 3.2.14    Metales en agua subterránea

STRATUS-NATIVE106657

Para todos los metales presentes en el agua subterránea, las concentraciones exceden las normas ecuatorianas en menos del 10% de las muestras. Este resultado indica que los metales representan un problema menor en el agua subterránea en comparación con los hidrocarburos de petróleo. Los metales con los porcentajes de violación más altos son el bario y el cadmio, ya que ambos exceden las normas en un 9% de las muestras del agua subterránea.

### 3.2.15    Contaminantes en el agua superficial

En algunos de los sitios visitados durante las Inspecciones Judiciales, los peritos insinuados por la *compañía* recolectaron muestras de agua de arroyos, ríos, o pantanos cercanos. En general, estas muestras no presentan niveles de contaminación superiores a las normas.

Sin embargo, la mayoría de estas muestras de agua se recolectaron cerca de pozos de producción, y las posibles vías desde las fuentes de contaminación hacia los lugares donde se tomaron las muestras no siempre están claras. Otros estudios han demostrado que hay contaminación en arroyos y ríos de la Concesión. Dichos estudios se describen en la siguiente sección. Por lo tanto, a pesar de que la mayoría de las muestras de agua superficial tomadas por los peritos insinuados por la *compañía* muestra que la contaminación en muchos lugares específicos dentro de la Concesión es poca o nula, los datos no muestran que toda el agua de la Concesión está libre de contaminación.

Otros investigadores han recolectado y analizado muestras de ríos y arroyos dentro de la Concesión. Estos incluyen estudios de TPH en ríos que la población utiliza para obtener agua potable, agua para bañarse o lavar ropa, tales como Jochnick et al. (1994) y estudios realizados por los contratistas de Texaco sobre la contaminación de arroyos debido al desecho de agua de producción de estaciones (Fugro-McClelland West, 1992). Estos estudios documentan que los hidrocarburos de petróleo (TPH), metales y otros contaminantes generados por el agua de producción han contaminado los ríos y arroyos. Por ejemplo, el TPH se midió en concentraciones muchas veces superior a la norma ecuatoriana en el agua de producción que se desechaba en los ríos; casi todas las muestras de agua de río también contenían TPH por encima de la norma. Las concentraciones de cloruro obtenidas de los desechos de agua de producción también fueron muy altas en los ríos que se encontraban corriente abajo de las estaciones.

Utilizando información de concentraciones de cloro en esteros sin impactos y agua de producción en cada estación de producción durante el tiempo que Texpet operó la Concesión, el impacto de la contaminación por agua de producción puede ser cuantificado. La descarga de agua de producción desde las estaciones desde 1972 a 1990 contaminó cerca de 2.8 trillones de litros de agua superficial por encima de los estándares de calidad de agua de la EPA de EEUU de 230 mg/L, esta cantidad de agua es equivalente a la cantidad de agua utilizada por todos los residentes de Quito en 12 años[6]. Visto desde otro punto de vista, la cantidad de agua contaminada por las descargas de las estaciones desde 1972 hasta 1990 es igual al 80% del agua usada por los residentes de Quito anualmente.

---

[6] EMMAP Quito, marzo 2006, Empresa metropolitana de alcantarillado y agua potable.

STRATUS-NATIVE106658

### 3.2.16    Línea de tiempo de las operaciones de Texpet que provocaron la contaminación

Texpet operó en el área de la Concesión hasta junio de 1990, época en la que PetroEcuador a través de Petroamazonas, hoy Petroproducción, se hizo cargo de las operaciones. Desde entonces Petroecuador ha instalado pozos adicionales, pero esos pozos no se encuentran incluidos en este informe. Durante el tiempo que Texpet se encargó de las operaciones de la Concesión, instaló y operó aproximadamente 356 pozos de producción de petróleo y 22 estaciones de procesamiento de petróleo. Después de que PetroEcuador se hiciera cargo de las operaciones, continúo operando la mayoría de los pozos y todas las estaciones que Texpet había instalado. Desde junio de 1990, algunos de los pozos de producción de Texpet han quedado abandonados, y PetroEcuador ha instalado algunos pozos y estaciones de producción nuevos. Una pregunta para considerar es qué porcentaje de la contaminación provocó Texpet y qué porcentaje provocó PetroEcuador después de que se hiciera cargo de las operaciones.

Se realizaron dos auditorias ambientales por separado a principios de la década de 1990, después de que Texpet dejará de operar la Concesión, acerca de sus operaciones. Estas auditorias fueron realizadas por contratistas de Texaco, y ambas incluyeron muestras ambientales de piscinas de desechos, suelos y agua. Pese a las críticas que hicieron varias instituciones de control, entre ellas el Congreso Nacional, las auditorias mostraron que Texpet funcionó con pocos controles ambientales, o ninguno (ver Anexo C y Anexos F e I). Las piscinas de desechos se construyeron sin revestimientos, y muchas de ellas no eran lo suficientemente grandes como para abarcar todos los residuos que se colocaron en ellas. Durante la mayoría de los años de las operaciones de Texpet, toda el agua de producción se desechó directamente en los ríos y arroyos, y todos los gases se lanzaron a la atmósfera. Sin embargo, en los últimos años de su operación, Texpet instaló algunas estaciones de captura de gas, aún a pesar de lo cual la mayoría del gas se seguía quemando. La práctica de esparcir petróleo crudo en las rutas se practicó principalmente durante los años de operación de Texpet. Además, durante la época en que Texpet operó la Concesión, se informaron cientos de derrames de petróleo que sumaron muchos miles de barriles. La información ambiental recolectada durante las auditorias de los contratistas de Texpet confirma que hubo una contaminación masiva en la Concesión en esa época. Por lo tanto, hay evidencias contundentes de que una gran parte de la contaminación en la Concesión fue provocada por Texpet durante sus operaciones.

PetroEcuador también contribuyó con la contaminación ambiental. Petroecuador continuó arrojando residuos en las piscinas sin revestimiento en los pozos de petróleo. Durante algunos años, Petroecuador continuó arrojando agua de producción en ríos y arroyos, a pesar de que realizó esfuerzos para reinyectar el agua de producción nuevamente en el suelo. Recién para 2005, casi el 100% del agua de producción se había reinyectado. PetroEcuador continúa emitiendo gases, a pesar de que han construido instalaciones para capturar más gases y no arrojarlos a la atmósfera. También se han producido más derrames de petróleo crudo después de que PetroEcuador se hiciera cargo de las operaciones en 1990.

Está claro que la totalidad de los contaminantes que fueron liberados en el ambiente antes de junio de 1990 todavía son de responsabilidad exclusiva de Texpet. Información de las Inspecciones Judiciales demuestra que los sitios operados exclusivamente por Texpet

STRATUS-NATIVE106659

todavía están contaminados, de manera que contaminantes de Texpet permanecen en el ambiente de todos los sitios operados por Texpet. Asimismo, la totalidad de la contaminación que se produjo en sitios construidos por PetroEcuador después de junio de 1990 es responsabilidad exclusiva de PetroEcuador; dichos sitios no se incluyen en este informe. La pregunta se sigue planteando para la contaminación que ocurrió después de junio de 1990 en los sitios operados primeramente por Texpet y luego por PetroEcuador.

Hay dos formas posibles de considerar la responsabilidad por la contaminación que ocurrió después de junio de 1990. Una forma es determinar que Texpet todavía es responsable en gran parte, ya que fue quien estableció los métodos de operación en estos sitios que provocaron la contaminación que aún sigue sucediendo. Por ejemplo, Texpet construyó las piscinas de desechos que se utilizan en esos sitios. Texpet también estableció los procedimientos normales de operación sobre cómo manejar los desechos, tales como arrojar agua de producción y liberar gases a la atmósfera. Texpet también estableció los procedimientos para asuntos como el mantenimiento y control de las tuberías de petróleo. Resulta poco realista esperar que PetroEcuador cambie inmediatamente todas las operaciones en la Concesión para hacerlas más seguras. En vez de eso, PetroEcuador tuvo que operar toda la infraestructura existente en el área de la Concesión tal como la recibió de parte de Texpet y, por ende, la contaminación que continuó después de junio de 1990 en los sitios operados por Texpet todavía sigue siendo responsabilidad en gran parte de Texpet. Considero que lo Texpet debió haber dejado instalado un sistema que disminuya considerablemente el impacto ecológico a su sucesora en la operación. Es por esto necesario que se implementen avances en la técnica para lograr una adecuada y completa reinyección del agua de formación (ver anexo S y T), con el fin de prevenir mayor contaminación ambiental.
[DO WE HAVE DATA ON OIL PRODUCTION AFTER JUNE 1990?]

Una segunda forma de considerar la contaminación que ocurrió después de junio de 1990 es utilizar la cantidad relativa de petróleo crudo que se produjo en esos sitios después de junio de 1990 como representación de la responsabilidad total. La Tabla CRUDO DESPUÉS DE 1990 muestra la cantidad de petróleo crudo que se produjo antes y después de junio de 1990 en todos los pozos de la Concesión que fueron operados primeramente por ChevronTexaco. La tabla muestra que el XX% del petróleo crudo de estos pozos se extrajo antes de junio de 1990 por ChevronTexaco. Sin embargo, esta cantidad probablemente subestima la contribución relativa de ChevronTexaco con la contaminación total de estos sitios, ya que PetroEcuador ha realizado mejoras en sus operaciones que han reducido la cantidad de contaminación ambiental, como por ejemplo, reinyecta casi el 100% del agua de producción en pozos subterráneos. Por lo tanto, esta segunda manera de calcular la contribución probablemente le atribuye un porcentaje muy bajo a ChevronTexaco. NO REVISADO

## 3.2.17    Reparación de piscinas de TexPet

Sobre éste aspecto juntamente con mi equipo técnico hemos realizado una profunda investigación. Se realizó un análisis de las diferentes fotografías aéreas que reposan en el Instituto Geográfico Militar (IGM), de la información procesada sobre piscinas que me fue entregada en el Ministerio del Ambiente, sobre los diferentes estudios que se han realizado tanto en las auditorías y en otros estudios que forman parte del expediente. Una vez

STRATUS-NATIVE106660

analizada toda la información recopilada he llegado a la conclusión que Texpet, abrió o construyó 916 piscinas en el área de la Concesión, tal como se explica en el anexo H. Sin embargo debido a que muchas de esas piscinas fueron cubiertas por vegetación o tierra, no constan en ninguno de los estudios anteriores, ni en el anexo A de la demanda propuesta por los actores. (Ver anexo h).

El día 4 de Mayo de 1995, Texpet, suscribió un contrato para la remediación de las piscinas en el área de la Concesión. Texpet afirmó que esa limpieza cubrió toda su responsabilidad por la contaminación en la Concesión. Texpet afirmó que la limpieza cubrió el 37,5% de los sitios de pozos de petróleo contaminados en el área de la Concesión, lo que ellos afirman que es su parte de la responsabilidad, por esta razón el Gobierno del Ecuador y Petroecuador el día 30 de septiembre de 1998 suscribieron un acta en la cual liberaron de toda responsabilidad a Texaco y a todas las personas o empresas vinculadas. Por otro lado los *demandantes* afirman que toda la responsabilidad debe recaer sobre la compañía operadora del 100% Consorcio, por haber sido la autora material de los daños mientras incumplía la ley. También afirman que sin importar lo que Texaco hizo en su limpieza, el área todavía permanece altamente contaminada, inclusive los sitios en los que Texpet realizó su limpieza. El objetivo de TPH para suelos de Texpet fue de menos de 5.000 ppm en las piscinas[7].

Según la información que yo he recopilado sobre éste hecho, puedo afirmar que Texpet de las 916 piscinas halladas en el presente estudio, 215 pertenecieron al RAP, sin incluir las piscinas remediadas de las estaciones. De las piscinas escogidas para remediar, 70 fueron denominadas como NFA en las cuales no se realizó ninguna acción; 27 fueron incluidas en el RAP, teniendo así que en 156 piscinas se realizó una "Remediación Completa". Se deduce entonces que el 77% de las piscinas abiertas por la petrolera TEXACO no fueron consideradas para hacer remediación, el 16% fueron intervenidas, denominándolas como remediadas completamente y el 7% fueron consideradas para realizar remediación pero no se concretó debido a que se encontraban taponadas previamente o, estaban siendo utilizadas por la comunidad local o, había cultivos sobre ellas.

En cuanto a considerar las afirmaciones acerca de la cantidad de sitios que se limpiaron o si las acciones de limpieza fueron las apropiadas, consideraremos los datos sobre la contaminación que continúa en los sitios donde TexPet realizó la limpieza. El Anexo H presenta un análisis de los datos de contaminación recolectados durante las Inspecciones Judiciales o que yo recolecté durante el segundo semestre del 2007 de los sitios que la *compañía* afirma que se limpiaron correctamente. Durante mi trabajo de campo recolecté muestras de varias piscinas que fueron reportadas como de remediación completa en el RAP, y durante el proceso de inspecciones judiciales los Peritos insinuados por las partes recolectaron muestras de otras piscinas reportadas en el RAP como de remediación completa; es decir que de las 156 piscinas que Texpet reportó en el RAP como de remediación completa, se han muestreado a un total de 54 piscinas, que equivalen al 34.6 %. En el análisis en el anexo muestra que las piscinas de desechos que la *compañía* afirma que están limpias, en realidad contiene niveles de hidrocarburos de petróleo superiores a lo establecido en la norma ecuatoriana de 1.000 ppm de TPH, y muchos otros sobrepasan inclusive el límite de 5.000 ppm, llegando a cantidades casi de 325.000 ppm (Lago Agrio 2). De hecho, la cantidad de contaminación causada por hidrocarburos de petróleo en las piscinas en las que TexPet realizó la limpieza parece ser nada menos que la contaminación

---

[7] También había un estándar ara la cantidad de TPH que filtraba desde el suelo de menos de ¿? Mg/L.

STRATUS-NATIVE106661

en las piscinas que TexPet no limpió. Por lo tanto, independientemente de los reclamos de ambas partes, los datos muestran que la reparación de TexPet no logró una limpieza que cumpla con las normas ecuatorianas y, por ende, la contaminación sigue presente. Además, baso mis recomendaciones sobre la necesidad de realizar una limpieza en los datos reales que recolectamos durante las Inspecciones Judiciales y que recolecté durante el 2007. Los datos alcanzan para determinar la necesidad de limpieza, sin importar las afirmaciones anteriores de la reparación de TexPet que se realizó anteriormente.

Cabe resaltar que los resultados del análisis técnico científico, son plenamente concordantes con los criterios de los pobladores que habitan junto a las piscinas o áreas afectadas que han sido remediadas.

Según se desprende del "Estudio Psicosocial de Impacto de la Explotación Petrolera de Texaco en las Comunidades Amazónicas del Ecuador". (Ver anexo L). En dicho estudio respecto a la remediación de los derrames de crudo o a la limpieza de las piscinas dicen:

Un 86,9% señalaron que no hubo limpieza y un 13,1% si durante el tiempo de operar Texaco. Cuando existió limpieza la mayor parte de las veces consistió en tapar piscinas, una limpieza superficial del crudo, o quema de desechos. La población afectada apenas contó con información sobre las tareas que se estaban llevando a cabo, ni contaron con medidas de protección.

Respecto a las experiencias de remediación llevadas a cabo por la compañía Texaco entre 1995 y 1998, según el 67,6% de los encuestados la compañía no realizó tareas de limpieza en sus comunidades, mientras que en un 31,8% si se llevaron a cabo. La valoración de la remediación llevada a cabo solo fue buena en el 5,04% (17casos).

A pesar del impacto que ha sido descrito tanto en forma de contaminación como de otro tipo de abusos, solo un 20,2%, hicieron quejas o demandas por los daños ocasionados. Las razones fundamentales para no demandar fueron la falta de información y la indefensión.

La mayor parte de las quejas fueron por parte de los indígenas y tuvieron un carácter colectivo. Las quejas ocasionadas por enfermedad derivada de la contaminación también fueron más importantes en los indígenas. De quienes realizaron demandas, la mayoría de las veces lo hicieron a la compañía Texaco por ser la considerada responsable en 69,15%, y a los trabajadores de la compañía que era la referencia más cercana y los interlocutores en el campo en un 36%. Dichas quejas a los trabajadores y la empresa Texaco fueron más señaladas por los indígenas.

Según los datos aportados por los demandantes las quejas no fueron ocasionales, y por tanto quienes demandaron lo hicieron con cierta reiteración ya sea por la persistencia de los impactos en ausencia de respuesta o por la existencia en el periodo citado de nuevas formas de contaminación. La respuesta que obtuvieron estas demandas fue mayoritariamente negativa según los entrevistados, negando la responsabilidad, no respondiendo, prometiendo investigar o en algunos casos sufriendo amenazas. Solo en un 4,2% de los casos resolvieron el problema.

## 3.2.18    Percepciones sobre la reparación

**STRATUS-NATIVE106662**

Las diferentes medidas de reparación fueron valoradas como bastante y muy importantes entre el 94,5% y 99,6%. El análisis factorial mostró un primer factor que explicaba el 54% de la varianza que asociaba la limpieza de crudo, agua de calidad, remediación completa de piscinas, recuperación de espacios contaminados, recuperación de territorios y de las pérdidas de tierras y atención en salud básica. Un segundo factor que explica el 18% de la varianza agrupó las variables de atención especializada de salud, medidas de promoción de la educación, compensaciones económicas, reconocimiento público, construcción de infraestructuras y programas productivos. Es por tanto un componente de desarrollo social y humano.

En términos porcentuales en primer orden de preferencia aparecieron el agua de calidad suficiente en un 24,9%, la atención básica en salud con 23,2%, la limpieza del crudo en un 19,7% y la educación con 7%. Los porcentajes relativos a la segunda en orden de importancia fueron el agua en un 25%, la atención en salud básica en un 19,3%, la educación con 17,9% y la atención en salud especializada con 8,5%. Las respuestas relativas a la tercera en orden de importancia fueron la educación para el 17,8% de los encuestados, la salud básica para el 16,1%, la indemnización en un 15%, y el agua de calidad en un 12%. Por último las respuestas dadas a la cuarta prioridad fueron educación con 17,7%, salud básica 16%, indemnización en un 15,2% y agua de calidad el 12,2%.

Respecto al modo de hacer efectiva la reparación para el 71,1% de los encuestados el método para determinar la forma de hacer más efectiva la reparación sería la consulta a la población. Posteriormente aparece en orden de frecuencia la necesidad de ser todos más conscientes y preparar a las personas y comunidades para evitar problemas en un 59,4%, mientras que una minoría de encuestados señalaba que cada quien debería poder decidir sobre el destino de la reparación que le corresponda 19,2%, y un 50,3% considera que habría que establecer acuerdos entre las comunidades afectadas para evitar problemas en el reparto de la reparación. Respecto a las diferencias étnicas, los indígenas señalaron como más importante la necesidad de consulta a la población, así como establecer acuerdos entre comunidades. Los encuestados mestizos señalaron más importante una reparación en función del grado de afectación y la importancia de la conciencia para evitar posibles problemas con la reparación. Estas diferencias muestran un patrón más colectivista en el caso indígena y una perspectiva más centrada en la evaluación y en la conciencia de la reparación en los mestizos. Globalmente, las mujeres refieren como más importante llegar a acuerdos comunes para el reparto de la reparación llegado el caso.

Independientemente de los comentarios o respuestas de la población o del criterio vertido por cada una de las partes en litigio, recomiendo implementar un adecuado y eficaz plan de remediación de las piscinas, sedimentos de los ríos, o pantanos. En el anexo N, se determinan las técnicas y mecanismos con los cuales se debería realizar esa reparación (ver anexo N)

## 3.2.19    Comparación con los informes de las Inspecciones Judiciales.

Tanto los peritos insinuados por la *compañía* como por los *demandantes* han emitido largos informes como parte de los resultados de sus investigaciones en las inspecciones judiciales. Los informes son comprensivos y se refieren a muchos temas diferentes

STRATUS-NATIVE106663

relacionados a la contaminación existente en el área de la Concesión. En esencia, ambos partes alcanzaron conclusiones diferentes en sus informes:

- los peritos insinuados por la *compañía* concluyen que no hay problemas por la contaminación de la Concesión. Concluyen que la mayor parte de los datos de sus muestras muestran bajas concentraciones en el ambiente, y que los estándares relevantes no son excedidos con suficiente frecuencia como para considerarlos un problema. También sostienen que la limpieza que realizaron en los noventas resolvió cualquier contaminación que ellos causaron que fuera un problema.
- los peritos insinuados por los *demandantes* concluyen que existe contaminación de suelos, agua, y aguas subterráneas en la Concesión, y que toda el área ha sido severamente contaminada al extremo que la gente y el ambiente han sido severamente afectados a lo largo de la Concesión.

Mi análisis de la información concluye que de hecho existe seria contaminación proveniente de actividades de exploración y producción de Texpet, pero la contaminación no está en toda el área de la Concesión. La contaminación está focalizada en áreas alrededor de pozos, estaciones, y derrames. Cuando el agua de producción era descargada de las estaciones, grandes cantidades de ríos y esteros corriente abajo de las estaciones fueron severamente contaminados.

En mi opinión, los peritos insinuados por la *compañía* para llegar a sus conclusiones se basaron demasiado en muestras tomadas en áreas apartadas de la contaminación. También utilizaron estándares ambientales más altos que los requeridos por la ley ecuatoriana y que los niveles de seguridad utilizados por otros países. Por otro lado, los datos obtenidos por los peritos insinuados por los *demandantes* no reflejan toda la extensión  de la contaminación en el área de Concesión porque se concentraron principalmente en las fuentes de contaminación

Considero que es muy importante que haya una consistencia general entre las diferentes investigaciones que se han llevado a cabo en el área de la Concesión. Todos los estudios realizados en la Concesión, incluyendo los realizados durante el juicio y los hechos antes del juicio (Anexo C), demuestran que existe seria y dispersa (pero no está en todas partes) contaminación en el área de Concesión. Estas diversas investigaciones se corroboran entre ellas, haciendo que los datos de cada uno de estos estudios sean más confiables.

Es resaltable el hecho de la ocurrencia de esta coincidencia que demuestra lo confiable de los datos. Adicionalmente debo indicar que las conclusiones constantes en los informes emitidos por los expertos insinuados por la *compañía* no han sido tomadas en cuenta ya que ignoran la presencia de contaminantes al evitar hacer una comparación de sus resultados con los estándares aplicables en el Ecuador para definir los márgenes de seguridad ambiental.

## 3.3  Conclusiones

### Fuentes de contaminación

Las Fuentes principales de contaminación en la Concesión son el petróleo crudo, el lodo de perforación y otros aditivos, y el agua de producción que se arrojaron al medio ambiente. El petróleo crudo consta principalmente de hidrocarburos de petróleo. El lodo de

STRATUS-NATIVE106664

perforación contiene metales tales como el bario. El agua de producción, que se desecha principalmente de las estaciones, contiene hidrocarburos de petróleo, metales y sales. En concentraciones suficientes, estos químicos son dañinos para las personas y el medio ambiente.

**Datos de la contaminación**

Se recolectaron miles de muestras ambientales de la Concesión y se analizaron como parte del juicio. Aunque no se tomaron muestras de todos los sitios de pozos y estaciones, los resultados de las muestras pueden usarse de cualquier forma para extrapolar la contaminación existente en toda el área de Concesión, por el motivo principal de que se considera que la muestra es lo suficientemente representativa (54% de las Estaciones, y 22,8% de los pozos han sido muestreados). Revisé las muestras y los métodos analíticos, y llegue a la conclusión de que los datos son confiables y que se pueden utilizar para tomar decisiones sobre la contaminación ambiental y la limpieza.

**Contaminación ambiental**

Los datos muestran que el medio ambiente en el área de la Concesión está muy contaminado con hidrocarburos de petróleo y otros contaminantes liberados de las operaciones de petróleo. Cada piscina de desechos contiene petróleo en concentraciones superiores a las establecidas por la norma ecuatoriana de 1.000 ppm TPH. Los suelos en los pozos y las estaciones que se encuentran fuera de las piscinas también se encuentran muy contaminados con petróleo de derrames o de pérdidas de los pozos. El agua subterránea en el 44% de los sitios de donde se tomaron muestras contiene hidrocarburos que exceden las normas, y el agua subterránea que se encuentra debajo de las piscinas tiende a estar más contaminada con hidrocarburos que el agua subterránea que se encuentra fuera de las piscinas. Cuando el agua de producción se arrojaba a los ríos y los arroyos, los ríos y arroyos de la Concesión resultaron muy contaminados.

**Acciones de recuperación**

Cuando PetroEcuador se hizo cargo de las operaciones, no tuvieron más opción que continuar las operaciones tal como Texpet las había iniciado. Con el tiempo, PetroEcuador ha realizado mejoras, tales como reinyectar el agua de producción (aunque sus pozos de reinyección son inadecuados e inseguros). La limpieza que TexPet realizó en la década de 1990 no fue suficiente para solucionar la contaminación en las piscinas; todavía hay un nivel muy alto de contaminación en las piscinas que requiere una limpieza adicional.

# 4  IMPACTOS EN LA POBLACIÓN

La sección anterior describe la contaminación en la Concesión que se originó como resultado de las operaciones de Texpet. Esta sección describe los efectos nocivos que afectaron a las personas debido a sus actividades de producción y explotación de petróleo.

## 4.1  *Exposición a químicos tóxicos*

STRATUS-NATIVE106665

La población que vive en el área de Concesión está expuesta a químicos provenientes del petróleo crudo, el agua de producción, el lodo de perforación y los aditivos mediante varias formas (Figura 4.1). Las personas pueden ingerir químicos al comer alimentos contaminados, beber agua contaminada o, accidentalmente, ingerir suelo contaminado. Los contaminantes volátiles, tales como el benceno, el tolueno, el etil benceno y los xilenos (BTEX) pueden inhalarse e instalarse en los pulmones. Algunos de los hidrocarburos de petróleo también se pueden absorber por la piel.

Los químicos que se encuentran en el petróleo crudo, el agua de producción y los desechos de perforación en la Concesión son tóxicos para los humanos. En el anexo K se establece la toxicidad de los compuestos clave a los que se exponen las personas y proporciona más detalles acerca de las formas en la que la población puede exponerse a los químicos. La información en el anexo muestra que los químicos en la Concesión pueden causar una variedad de efectos nocivos para la salud, incluidos cáncer, daño a los pulmones, al hígado, al sistema nervioso central, y a otros órganos, bajo peso de nacimiento y otros efectos en los fetos, así como también efectos en el estómago y la piel.

**Figura 4.1: Exposición química de la población del área de la Concesión a través de los caminos**



## 4.2  Efectos causados a la población humana

### 4.2.1  Metodología

En el Anexo L, se expone un importante estudio sobre los efectos causados a la población humana.
La metodología utilizada en el Anexo L, consiste en dos estudios: uno cualitativo y otro cuantitativo.

El estudio cuantitativo se hizo a través de una encuesta a una muestra de 1064 personas (mayores de 24 años y todos de diferentes núcleos familiares) con objeto de recoger información sociodemográfica, el grado de afectación por la contaminación petrolera, el nivel de percepción de salud, los cambios en el modo de vida y experiencias significativas

STRATUS-NATIVE106666

en relación a la explotación petrolera de Texpet como modo de relación con las comunidades

No se realizó un grupo de control, ya que dentro del área no existen personas que no hayan estado expuestas a su influencia. Para poder hacer comparaciones en función del nivel de exposición se tomó el criterio de distancia a las explotaciones petroleras, estableciéndose grupos de mayor a menor distancia y un índice global de exposición para poder realizar comparaciones entre el conjunto de población afectada. Es importante mencionar que el estudio ha mostrado que existen diferencias de afectación según la distancia de los encuestado con los focos de contaminación. Esto significa que mientras más cerca, mayor el impacto en su salud.

El estudio cualitativo se realizó a través de seis grupos focales, seleccionados según el criterio de etnia (mestizo, indígena). Se tuvieron en cuenta los elementos de la cultura, y se priorizó la participación de personas ancianas especialmente en el caso de las comunidades indígenas dado que cumplen una función de memoria colectiva. También se cuidó la participación de las mujeres.

## 4.2.2  Resultados del Estudio

En este resumen se incluye una síntesis de los hallazgos más importantes del estudio realizado, teniendo en cuenta diferentes áreas como el impacto de la contaminación, la pérdida de territorio e impacto cultural en las comunidades indígenas, las consecuencias en la salud, el comportamiento y modo de actuación de la compañía Texaco respecto a la población, la evaluación de la remedición, así como las percepciones de reparación de la población encuestada. Se incluyen los datos apoyados tanto en los estudios cualitativos, como cuantitativos realizados.

### 4.2.2.1  Impacto de la contaminación petrolera de Texaco

Un 72,4% de los encuestados sufrieron las consecuencias de accidentes como derrames de piscinas, de oleoductos y en menor medida de sísmicas y mecheros. Estos accidentes conllevaron la contaminación frecuente de cursos de agua y tierra. Además las frecuentes prácticas de petrolear caminos produjeron contaminación por lixiviado y la práctica de incendiar piscinas de crudo generó una amplia difusión de contaminantes.

Entre un 81,4% y un 95,9% de la población encuestada señala una afectación grave a la naturaleza como consecuencia de la actividad petrolera de Texaco con la afectación de aguas, muertes de animales, rotura de piscinas, o quema de crudo.

Las explotaciones petroleras de la empresa Texaco así como los numerosos episodios de contaminación referidos afectaron la biodiversidad de la zona y de forma grave las actividades de caza y pesca que eran básicas en el modo de vida y la alimentación de las comunidades indígenas. El 31,2% de los encuestados, refirió haber consumido frecuente o muy frecuentemente animales muertos, especialmente peces muertos (13,6% y 17,6%) a consecuencia de la contaminación. Cuando la comunidad carecía de información sobre los

STRATUS-NATIVE106667

riesgos del consumo de los peces y animales muertos por la contaminación se incrementaba su consumo. Dicho consumo fue más frecuente en las comunidades indígenas.

Un 65,13% de los encuestados mostraron sufrimiento o duelo a causa de los accidentes. Este impacto no fue solo en el ámbito familiar sino especialmente colectivo y comunitario. Los efectos socioeconómicos de los accidentes fueron muy notables, en un 93% ocasionando pobreza y destrucción de chacras en 87,8%. La destrucción de las chacras conlleva la pérdida de cultivos, limitando los recursos alimenticios y las condiciones de vida.

Las pérdidas de animales domésticos, como vacas, caballos, gallinas o chanchos fueron referidas con una frecuencia entre el 23,8% y el 46,8% de los entrevistados según el tipo de animales. Solo un 31,1% refirió no haber tenido alguna de estas pérdidas. La media de pérdidas referida de 4,23 vacas, de caballos perdidos 0,74, la media de gallinas perdidas es de 28,75 y la chanchos de 4,66. La gran mayoría de estas pérdidas se dieron en comunidades de población mestiza.

El 74,1% de los entrevistados señalaron haber tenido pérdidas de tierra como consecuencia de la contaminación o la explotación petrolera, tanto por contaminación directa, pérdida de capacidad productiva y destrucción de chacras. La media de hectáreas dañadas referida en esos años es de 5,70. Las comunidades indígenas refieren mayor influencia de la pérdida de tierras. Los resultados muestran que a mayor cercanía a las instalaciones mayor referencia a destrucción de chacras y al nivel de afectación de las mismas.

Un 22,1% de los encuestados tuvieron que desplazarse a causa de la Texaco, por el impacto negativo en el agua o la tierra. El desplazamiento fue mayor entre la población indígena.

El 89,3% de las personas encuestadas no contaron con ninguna información proporcionada por la Texaco sobre los riesgos de la contaminación por petróleo. Esta ausencia generalizada de información aumentó la exposición al riesgo. Esta exposición se dio más en las comunidades indígenas debido al desconocimiento del castellano, el miedo a los *cucamas* (hombres blancos) de Texaco, y la distancia cultural.

Las actividades infantiles ligadas a los ríos y esteros, como la natación y la pesca se vieron afectadas en un grado muy alto. El contacto directo con el crudo como parte de sus juegos fue una experiencia relatada como muy frecuente en un 76,4%.

### 4.2.2.2   Impactos en la salud

Teniendo en cuenta los resultados de los análisis físico-químicos reportados en mi estudio, así como también por los señores peritos que fueron insinuados por cada una de las partes litigantes, y la toxicidad de esos producto encontrados (ver anexo k), es lógico concluir que la población humana que habita en el área de la Concesión está en un alto riesgo de ser afectada en su salud, principalmente con un alto riesgo de padecer y

STRATUS-NATIVE106668

morir por el cáncer, tal como se demuestra en varios estudios que se han realizado al respecto que consta en el apéndice 1 del anexo P de éste informe. (ver anexo P).

## 4.2.3 Cáncer

### 4.2.3.1   Distribución por tipo de cáncer, sexo y edad

En el estudio cuantitativo se realizaron varias preguntas sobre el cáncer. El 21,33% de las familias encuestadas, casi una de cada cuatro, conocen al menos de un caso de cáncer en su núcleo familiar. Este número total de casos se refiere a enfermos y personas fallecidas por cáncer. Esta frecuencia de casos de cáncer, en más de uno de cada cinco encuestados, es muy alta.

Los resultados de la distribución de casos de cáncer en Quito según el Registro Nacional de tumores presenta, para la población joven, una frecuencia menor que la encontrada en la distribución de la muestra del estudio de Maldonado. Las características de los estudios son diferentes, por lo que no se puede sacar resultados concluyentes de estos datos. Sin embargo, se refleja una tendencia que sugiere la posible existencia de factores específicos asociados a la proporción de tumores en relación a la edad en esta zona.

De los casos reportados en el estudio, una ligera mayoría corresponde a mujeres. El tipo de cáncer más frecuente entre éstas fue el de útero (37,34%), mientras que en los hombres fue el de estómago (25,7%).

### 4.2.3.2   Distribución en función de la distancia a los pozos

Se contrastaron los casos de cáncer referidos con la distancia a los pozos de la población encuestada. Las cifras se encuentran en la siguiente tabla:

**Fig 4.2. Distribución de casos de cáncer en función a la distancia a los pozos**

| Distancia a pozos | Número de entrevistas en % respecto total N=1064 | Número de casos de cáncer en la familia | X media |
|---|---|---|---|
| Menos 250 metros | 34,49% | 158 | 1,43 |
| 251-500 m | 17,57% | 43 | 1,23 |
| 501-2000 m | 29,22% | 76 | 1,24 |
| Más de 2km | 17,1% | 26 | 1,14 |
| Valores perdidos | 1,59% | 3 | |

Un 58,62% de los encuestados que describen más de un caso de cáncer viven a menos de 250 metros de un pozo, lo cual es estadísticamente relevante al considerar que solo el 34% de personas de la muestra habitan a esta distancia.

STRATUS-NATIVE106669

### 4.2.3.3  Distribución en función de la etnia

En los grupos focales se recogieron muchas descripciones de casos de cáncer asociados por la gente con la contaminación ambiental.  Los casos son más abundantes en los grupos de colonos, particularmente en el de mujeres colonas.

Un 89,65% de los encuestados que refieren más de un caso de cáncer en sus familias son mestizos, es decir prácticamente nueve de cada diez, siendo el resto indígenas. Estos datos son consistentes con las experiencias de estos dos grupos de población. Los mestizos estuvieron más expuestos a la contaminación petrolera que la población indígena en general, dado que vivieron más cerca de las instalaciones de la empresa Texaco.

## 4.2.4  Abortos espontáneos

Del total de encuestados un 71,71% refirieron embarazos en la época que operó la Texpet entre 1964 y 1990.  El número de abortos espontáneos referidos fue de un 11,88% de los embarazos totales, mientras el 88,1% de embarazos se llevaron a término. Del total de familias que refirieron abortos espontáneos, en un 65,9% de las familias entrevistadas hubo un aborto, dos en el 22,8% y tres o más abortos en el 11,3%. Si bien esta razón de abortos por número de embarazos es comparativamente similar a otras zonas en la actualidad, los datos reflejan que una mayor exposición a contaminación incide en un alza de la gravedad de los casos de aborto, con mayor número de casos en la familia.

## 4.2.5  Malformaciones infantiles

Se registraron 97 casos de niños nacidos con malformaciones en 79 familias. Es decir, un 10,35% de las familias que registraron embarazos señalaron malformaciones en alguno de los niños nacidos.  Si bien estos datos no nos permiten sacar conclusiones en términos cuantitativos, algunos estudios señalan la influencia de contaminantes de derivados del petróleo o químicos usados en la industria petrolera, tales como los HAPs (dependiendo de la dosis y nivel de exposición).

## 4.2.6  Mortalidad infantil

En este caso 97 encuestados, es decir el 12,71 % de los que tuvieron embarazos, refirieron haber tenido un total de 133 niños fallecidos en los primeros treinta días de vida. Esto supone un 3,73% de los embarazos llegados a término. Respecto a los niños muertos entre el primer mes y los doce meses de vida, 103 encuestados registraron un total de 125 niños muertos, lo que supone el 3,51% del total de embarazos llegados a término. Globalmente los muertos durante el primer año de vida suponen un 7,24%.

En el estudio 77 encuestados, es decir un 11,53% refirieron 88 niños fallecidos entre el primer y los cinco años de vida. Esto supone un 2,47% del total de embarazos llegados a término.  En este punto se verificó nuevamente la relación entre el impacto y la cercanía de éstos a los pozos (Fig. 4.6.)

**Fig. 4.3. Número de niños entre 1-5 años muertos**

STRATUS-NATIVE106670

**en relación a distancia a pozos**

| Distancia a pozo | Media de niños muertos menores de 5 años |
|---|---|
| Menos de 250 m | 2.29 (28 casos) |
| 250-500 m | 2.11 (18 casos) |
| 500m-2Km | 2.05 (21 casos) |
| Más de 2Km | 2.00 (6 casos) |

## 4.3 Percepción de salud

La percepción de salud se refiere a la concepción que las personas tienen de su propio estado de salud, y el de sus familias. Los resultados de los datos obtenidos llaman mucho la atención, ya que son dramáticamente diferentes de aquellos que se han obtenido en poblaciones muy diferentes. Del total de personas encuestadas cerca del 60% estima que su salud y la de su familia es mala o muy mala, mientras que estudios similares a nivel mundial han establecido que un 65% de personas estima que su salud es buena o muy buena.

Esta percepción de salud se complementó con una pregunta sobre el impacto percibido de la explotación petrolera, reflejando los datos obtenidos que una mayoría del 85,2% considera que se vio afectada "bastante" o "mucho". Los problemas de salud más frecuentemente atribuidos a la contaminación de Texpet fueron los problemas digestivos en un 84%, los problemas de piel en un 76,7% y los problemas respiratorios en un 84,8%.

Igualmente, en el Estudio Psicosocial que consta en el anexo L, la población residente por más de 18 años en el área, expresa su criterio frente a la salud humana.

Un 58,4% la considera mala o muy mala su salud. Una mayoría del 85,2% considera que se vio afectada bastante o mucho por las explotaciones de la Texaco. El impacto en las limitaciones funcionales fue también amplio pero en menor escala.

Para un 79,5% aumentó bastante o mucho los problemas de salud. Los problemas de salud más frecuentemente atribuidos a la contaminación de Texaco fueron los problemas digestivos en un 84%, los problemas de piel en un 76,7% y los problemas respiratorios en un 84,8%. La percepción de salud personal y familiar es más negativa cuanto más cerca se estuvo de las instalaciones de Texaco. Un 88,2% de los encuestados afirmaron sentirse más tristes, deprimidos o nerviosos por ello.

Durante la realización de los grupos focales se recogieron abundantes descripciones de casos de cáncer que la gente asoció a las consecuencias de la contaminación, especialmente en las comunidades mestizas. El 21,33% de las familias encuestadas han tenido al menos de un caso de cáncer en su núcleo familiar, y en una de cada cuatro familias en las que se han dado casos de cáncer se ha dado más de un caso. Un 89,65% de los encuestados que refieren más de un caso de cáncer en sus familias son mestizos, es decir prácticamente nueve de cada diez, siendo el resto indígenas.

STRATUS-NATIVE106671

A mayor cercanía a los pozos, más cáncer en familia, en el recinto comunitario y más muertos por cáncer. A menor distancia a piscina, mechero mayor número de casos de cáncer también en el caso de los desechos.

El índice de exposición global a contaminación mostró que el porcentaje de casos de cáncer en la unidad familiar muestra un perfil similar. A mayor exposición, más casos de cáncer.

El mayor número de casos de cáncer se da entre la población mestiza con una diferencia estadísticamente significativa. Estos datos son consistentes con que los mestizos estuvieron más expuestos a la contaminación petrolera.

## 4.4  Impactos a las nacionalidades indígenas

La operación petrolera en su conjunto ha causado y sigue causando graves impactos a los pueblos indígenas en la Región Amazónica Ecuatoriana. Sin embargo en el presente caso me he limitado a tratar de determinar los impactos que Texpet ocasionó a la población indígena, debido su a peculiar situación y realidad. Este impacto se puede resumir en una dramática alteración del modo de vida tradicional indígena, pero contiene e implica una serie de factores que se exploran a continuación.

En las comunidades indígenas se destaca una falta de información previa y una alteración total de su modo de vida. La realización de explosiones para las sísmicas, el sobrevuelo de helicópteros, la construcción de trochas y entrada en su territorio de maquinaria y trabajadores, etc. alteró su modo de vida tradicional. La falta de información, la ausencia de consulta previa, el desconocimiento del idioma y presencia sin respeto a la naturaleza, así como la presencia y actitud de los "blancos" generaron miedo y un repliegue de las comunidades como forma de protección.

La intervención de Texpet generó efectos adversos aún durante las labores previas al inicio de las actividades de extracción. Estas labores fueron: 1) realización de sísmicas a lo largo de franjas de muchos kilómetros en la selva; 2) deforestación en las zonas elegidas como lugares de extracción o asentamientos; 3) presencia de trabajadores acompañados en ocasiones de militares, instalaciones, maquinarias, etc. en su territorio. 3) fragmentación y alteración del territorio para la vida de las comunidades indígenas, pero también para los animales de la selva que se repliegan y alejan más adentro de la selva.

## 4.4.1  Caza y pesca

Para los grupos indígenas las actividades de caza y pesca, más allá de ser un simple medio de procurarse alimentos, se encuentra en el centro de su modo do vida y cultura. Un 94,2% de los encuestados refiere que se perdió la posibilidad de cazar porque disminuyeron los animales como consecuencia de la contaminación, mientras que un 96,1% afirma que la pesca también fue afectada. Estos datos demuestran no solo la pérdida de oportunidades para la manutención de la población, especialmente en la población indígena que dependía de estas fuentes de proteínas para su dieta, sino un impacto en la biodiversidad en términos de este tipo de especies.

STRATUS-NATIVE106672

Adicionalmente a estos impactos para la salud, la muerte de animales por causa de la contaminación presenta un riesgo para las personas que, por desconocimiento, los consumieron frecuentemente. Estas personas representan aproximadamente el 30% de los encuestados.

## 4.4.2 Pérdidas de tierra como consecuencia de la contaminación o explotación

Se evaluó el impacto de las explotaciones petroleras o la contaminación por la Texaco en la posible pérdida de tierras. Respecto las pérdidas de tierra, un 74,1% de los entrevistados señalaron haber perdido tierras como consecuencia de la contaminación o la explotación petrolera.

Las comunidades indígenas refirieron mayor afectación que los colonos en la pérdida de tierra asociada a la pérdida de territorio y contaminación de la misma especialmente debido a la contaminación del agua. Estas diferencias pueden deberse también a las diferencias culturales debido a que en las comunidades indígenas la relación con la tierra es mucho más valorada dado que no solo es un elemento de subsistencia individual sino también de supervivencia colectiva, y la relación con la tierra forma parte de la identidad colectiva.

## 4.4.3 Desplazamiento forzado

Más de una de cada cinco personas encuestadas, un 22,1%, refiere que tuvo que desplazarse a causa de la Texpet. Entre las razones que motivaron el desplazamiento de estas personas en orden de frecuencia están el impacto negativo en tierra o ríos, el ruido y la contaminación, la incompatibilidad de la agricultura con el petróleo, enfermedades graves, destrucción de propiedades, accidentes, violencia y problemas legales.   El desplazamiento fue mayor en indígenas que en colonos.

## 4.4.4 Impacto cultural y cohesión comunitaria

Las actividades de Texpet, y la sola presencia de sus operarios en el área, tuvieron varios impactos en la cultura de las comunidades indígenas.  Se verificó en primer lugar un verdadero proceso de aculturación que buscaba la implantación de referentes y prácticas culturales occidentales, tales como el dinero, el alcohol, y hasta el idioma español.

En muchos de estos casos la transferencia de usos y referentes culturales no fue fruto natural del proceso de contacto cultural, sino más bien parte de una práctica sistemática. El alcohol,  por ejemplo, causó la muerte de un shamán Cofán, y afectó gravemente la salud y la cohesión comunitaria.

Aproximadamente un 40% de los encuestados el accionar de Texpet influyó en la cohesión de las comunidades, entendiéndose por esta tanto la relación de la comunidad con la naturaleza, como la confianza interna, organización, toma de decisiones, etc.

STRATUS-NATIVE106673

Otros impactos atribuibles a la presencia de Texpet en la zona son el aumento de violencia y sensación de inseguridad de los indígenas, mal trato y discriminación por parte de los trabajadores de la empresa, y conducta hostil en general.

### 4.4.5 Otras violaciones de Derechos Humanos

............

**Violencia sexual**

El 10,1% de las personas entrevistadas refieren que en su familia existe al menos una mujer que fue víctima de abuso sexual por parte de trabajadores petroleros, sobre todo en los campos Dureno y Shushufindi, ya que en Dureno se encuentran los Cofanes y en Shushufindi residen los Sionas y Secoyas.

Uno de cada cinco entrevistados considera que la problemática de las violaciones sexuales a mujeres afectó bastante o mucho a la comunidad, mientras uno de cada veinte refiere conocimiento directo de que esos abusos fueron frecuentes tanto con mujeres adultas como menores de 18 años y uno de cada diez entrevistados sufrió violencia sexual en su propia familia por parte de operadores de la empresa Texpet. Estos elevados enormemente, unidos al hecho de que un porcentaje muy significativo de gente conozca en sus comunidades hijos de trabajadores o directivos de la Texpet que resultaron de esas formas de abuso, demuestran la gravedad de estos hechos.

Como conclusión puedo indicar que la actividad operacional de Texpet en el área de la Concesión, ha causado serios impactos a la vida de los pueblos indígenas ancestrales.

Entendiendo que el impacto ambiental no se lo puede analizar en forma aislada disciplinariamente, sino que hay que analizarlo en forma multidisciplinaria, igualmente la reparación del daño ambiental hay que hacerlo en forma integral. Como se establece en los párrafos anteriores los pueblos indígenas ancestrales han sido afectados en su territorio, en su cultura y en su alimentación básicamente. Es necesario implementar un plan de recuperación territorial, cultural y alimenticia de esos pueblos tradicionales, tal como se expone en el anexo M de éste informe.

## 4.5 Conclusiones

# 5  IMPACTOS EN EL ECOSISTEMA

## 5.1 Introducción

Esta sección resume los impactos ecológicos causados por la contaminación en la Concesión. Se consideran los posibles impactos en todos los componentes del ecosistema, incluidos plantas, animales, invertebrados y peces.

STRATUS-NATIVE106674

Los químicos que se encuentran en el petróleo crudo, el agua de producción, los lodos de perforación y otros aditivos son tóxicos para todo tipo de seres vivos. Sin embargo, para que se presente la toxicidad, un organismo debe estar expuesto a un químico, como por ejemplo a través de la ingestión, y esa dosis de exposición deberá ser lo suficientemente alta como para causar la toxicidad. Para ciertos químicos, la exposición debajo de ciertas dosis no provoca ningún efecto nocivo observable.

Existe una gran cantidad de literatura científica sobre las dosis de los químicos que causan toxicidad a los seres vivos. Hay otros factores, además de la dosis, que determinan si la exposición particular a un químico causará toxicidad en un organismo, tales como la duración de la exposición; la exposición del organismo a otros químicos al mismo tiempo; la salud general del organismo; la edad del organismo; y si el organismo es sensible al químico. Sin embargo, la dosis de la exposición a un químico es el factor principal para determinar si la contaminación ambiental causará toxicidad a un organismo expuesto.

Para evaluar si la contaminación en el área de Concesión provoca impactos ecológicos o no, se utilizaron los siguientes pasos:

> 1. Se desarrolló un modelo conceptual sobre cómo los organismos pueden exponerse a los químicos y se identificaron los químicos clave de preocupación.
> 2. Se investigó la toxicidad de los químicos clave de preocupación y se seleccionaron los niveles de umbrales de toxicidad.
> 3. Se compararon los datos de contaminación recolectados para el litigio con los umbrales de toxicidad.
> 4. Se recolectaron datos sobre el agua superficial previamente a que los estudios del litigio se utilizaran para evaluar la toxicidad en ríos donde se desechaba el agua de producción.
> 5. Se revisaron y compararon los estudios ecológicos de campo que se realizaron para la investigación con las conclusiones de la evaluación química.

Los detalles se encuentran en el Anexo J, sin embargo aquí se presentan un breve resumen y una descripción de las conclusiones.

## 5.2 La toxicidad del petróleo y el agua de producción de un pozo para el ecosistema

Los contaminantes en el petróleo crudo en los que se concentra nuestra preocupación son los hidrocarburos de petróleo. De los miles de químicos en el petróleo crudo, los más estudiados han sido la toxicidad ecológica del BTEX y los hidrocarburos aromáticos policíclicos. Estos compuestos son tóxicos para plantas, aves, mamíferos, invertebrados y peces. En dosis lo suficientemente altas, estos químicos pueden causar muerte aguda (es decir, inmediata). En dosis más bajas, pueden provocar efectos que conducen a la muerte, tales como cáncer, y efectos que pueden disminuir la capacidad de un organismo para sobrevivir, tales como una limitación del crecimiento o una disminución de la capacidad para resistir enfermedades. Otros químicos presentes en el petróleo crudo también son tóxicos, pero se los ha estudiado mucho menos.

STRATUS-NATIVE106675

El agua de producción también contiene BTEX e hidrocarburos de petróleo. También contiene grandes concentraciones de sal y, con frecuencia, el agua de producción es más salada que el agua de mar. Las concentraciones de metales también son altas en el agua de producción. Estos químicos pueden matar a los peces y a otros seres vivos acuáticos, o provocar cambios en la comunidad acuática, de manera que sólo podrán sobrevivir los organismos más resistentes a la contaminación.

Los organismos pueden estar expuestos a estos químicos en muchas formas diferentes, incluidas:

- Ingestión. Los animales pueden ingerir productos contaminados, o pueden ingerir los químicos adheridos al suelo o las partículas de sedimento. Muchos animales consumen, sin saberlo, grandes cantidades de suelo o sedimento mientras pastan.
- Contacto directo. Los compuestos de hidrocarburo en el petróleo se pueden acumular en toda la piel.
- Inhalación. Algunos de los compuestos de hidrocarburo son volátiles, tales como el BTEX.
- Las plantas pueden absorber los contaminantes a través de sus raíces (del suelo contaminado), hojas (contaminantes volatilizados o deposición de agua de lluvia u hollín contaminados), o a través de las membranas de las semillas.
- Los peces se encuentran expuestos a los químicos en el agua a través de la absorción por sus branquias.

Además, el petróleo crudo también puede dañar a los organismos a través de sus efectos físicos. El petróleo en las plumas de las aves puede afectar su capacidad de volar. El petróleo también puede hacer que la piel y las plumas pierdan efectividad para aislar o repeler el agua. Estos tipos de efectos ocurren cuando el petróleo se acumula en el suelo o sobre la superficie del agua después de un derrame, o en piscinas con petróleo flotante. (ver Anexo **J**)

## 5.3 Comparación de concentraciones de sustancias químicas y niveles de toxicidad en la Concesión

Las concentraciones de umbrales tóxicos en el suelo y en el agua superficial (arroyos y ríos) se seleccionaron después de una cuidadosa revisión de la literatura científica y de las reglamentaciones y normas gubernamentales. En varios casos, se utilizaron las normas ecuatorianas para la protección del ambiente, ya que el objetivo de estas normas es establecer máximos tolerables (considerados seguros) de contaminación, y teniendo en cuenta que estos valores coinciden con los datos de la literatura científica. Se identificaron umbrales de toxicidad para los siguientes químicos:

- TPH en el suelo y el agua
- Metales en el suelo y el agua
- BTEX e hidrocarburos aromáticos policíclicos en el agua
- Cloruro en el agua

STRATUS-NATIVE106676

La Tabla 5.1 enumera los umbrales de toxicidad seleccionados. En algunos casos, hay más de un umbral para representar el rango de exposición y toxicidad que puede haber para los diferentes tipos de organismos.

Los datos de contaminación ambiental de la Concesión se compararon con los umbrales que aparecen en la Tabla 5.1. Para los suelos, sólo se utilizaron datos de suelos que se encontraban en la superficie o cerca de ella (dentro de 1 metro de la superficie) para la comparación, ya que la exposición ecológica se limita a los contaminantes del suelo que se encuentran debajo (O QUERIA DECIR "SOBRE LA SUPERFICIE"? )de la superficie.

**Tabla 5.1: Umbrales tóxicos para contaminantes clave**

| Contaminante | Agua superficial (ug/L) | | | Suelo (mg/Kg) | | | | |
| | Estándar de Ecuador | Toxicidad aguda según U.S. EPA | Toxicidad crónica según U.S. EPA | Estándar de Ecuador | Plantas (EE. UU.) | Invertebrados (EE. UU.) | Aves (EE. UU.) | Mamíferos (EE. UU.) |
|---|---|---|---|---|---|---|---|---|
| Benceno | – | 5.300 | 262,0 | – | – | – | – | – |
| Tolueno | – | 17.500 | 110,3 | – | – | – | – | – |
| Etil benceno | – | 32.000 | 1.800 | – | – | – | – | – |
| Xileno | – | – | 2.600 | – | – | – | – | – |
| HAP | 0,3 | – | – | – | – | – | – | – |
| TPH | 500 | – | – | 1.000 | – | – | – | – |
| Bario | 1.000 | – | – | – | – | 330,0 | – | 2.000 |
| Cadmio | 1,0 | 2,0 | 0,25 | – | – | – | – | – |
| Cromo III | 50,0 | 570,0 | 74,0 | – | – | – | 26,0 | 34,0 |
| Cromo VI | – | 16,0 | 11,0 | – | – | – | – | – |
| Cobre | – | 13,0 | 9,0 | – | 70 | 80 | 28 | 49 |
| Plomo | – | 65,0 | 2,50 | – | – | – | – | – |
| Níquel | 25,0 | 470,0 | 52,0 | – | – | – | – | – |
| Zinc | 180,0 | 120,0 | 120,0 | – | 160,0 | 120,0 | 46,0 | 79,0 |
| Cloruro | – | 860.000 | 230.000 | – | – | – | – | – |

* = Toxicidad modificada en relación con la dureza del agua; criterios normalizados a una dureza de 100 mg/L
Referencias: Decreto No. 1215; CEPA, 1993; Rowe et al., 1997; U.S. **EPA, 1980a, 1980b, 1985, 1988, 1996,** 2005a, **2005b, 2005c,** 2007.

Los datos muestran que las concentraciones químicas en la Concesión exceden los umbrales de toxicidad. Por ejemplo, las figuras 5.1 y 5.2 comparan las concentraciones de TPH en los suelos superficiales en muestras tomadas por dentro y por fuera de las piscinas (respectivamente) con el umbral de 1.000 mg/kg. Las cifras aparecen con los datos en una escala logarítmica debido a la amplia variedad en la concentración de los datos. Cada línea horizontal en los grupos representa una diferencia de diez marcas en las concentraciones. La Figura 5.1 indica que muchas muestras tomadas de las superficies de las piscinas presentan concentraciones muy por encima de los 1.000 mg/kg. Las concentraciones son hasta 1.000 veces superiores al umbral (en los campos de Sacha y Lago Agrio), lo que

STRATUS-NATIVE106677

indica que el suelo es muy tóxico. Las superficies de las piscinas presentan estas elevadas concentraciones a pesar de que muchas de ellas han sido cubiertas con tierra. La Figura 5.2 demuestra que también se cree que el suelo que se encuentra fuera de las piscinas también es tóxico. Ambas figuras muestran que altas concentraciones de TPH se presentan en todos los campos de donde se tomaron las muestras.

**Figura 5.1: Concentraciones de TPH en los suelos superficiales del área de las piscinas, por campo. La línea roja representa el umbral de 1.000 mg/Kg. Tenga en cuenta que los datos se muestran en una escala logarítmica.**



**Figura 5.2: Concentraciones de TPH en los suelos superficiales afuera de las piscinas, por campo. La línea roja representa el umbral de 1.000 mg/Kg. Tenga en cuenta que los datos se muestran en una escala logarítmica.**



Las concentraciones de metales en los suelos superficiales también exceden los umbrales de toxicidad. En especial, las concentraciones de bario, cobre y zinc exceden los umbrales

STRATUS-NATIVE106678

en muchas muestras de suelo superficial recolectadas durante el litigio (consulte el Anexo O). La información sobre TPH y metales muestra que una gran parte del suelo superficial en los pozos y estaciones dentro de la Concesión presentan una contaminación lo suficientemente alta como para provocar toxicidad en los organismos terrestres.

El agua de producción que se vertió en ríos y arroyos los convirtió en no aptos para la vida acuática. Las aguas de producción contienen concentraciones de BTEX, HAP, TPH y cloruro muchas veces superiores a los umbrales de toxicidad. Los datos obtenidos corriente abajo de algunas estaciones muestran que las concentraciones siguen siendo tóxicas a 450 ó 700 metros corriente abajo de la estación de desecho. Los datos muestran claramente que los desechos de agua de producción convirtieron a los ríos y arroyos que se encuentran corriente abajo de las estaciones en tóxicos para la vida acuática.

Además, las medidas químicas en los peces que se tomaron de ríos de la Concesión muestran que contienen concentraciones de metales por encima de los niveles que son seguros para el consumo humano. En particular, las concentraciones de arsénico, cadmio, cromo, mercurio y zinc en los peces generalmente exceden los niveles seguros.

## 5.4 Observaciones de campo

La comparación entre las concentraciones de químicos en el área de la Concesión con los umbrales de toxicidad indica que la contaminación es lo suficientemente alta como para provocar toxicidad en plantas y animales. Además, hay observaciones de campo sobre los efectos de las actividades de producción y exploración de petróleo en el ecosistema de l área de la Concesión.

En primer lugar, hay condiciones visibles en todos los pozos. Es común ver en los pozos áreas donde hay menos plantas, o que las plantas son de diferentes tipos o más pequeñas que en las áreas no contaminadas. También es común que las plantas no crezcan con la misma fuerza en las piscinas cubiertas que en las áreas no contaminadas cercanas. En algunas áreas, todavía hay evidencias de viejos derrames de petróleo, ya que se puede observar petróleo erosionado y una capacidad reducida de crecimiento en las plantas. La Figura 5.3 muestra un ejemplo de un área como ésta cerca del pozo 56 de Sacha.

En segundo lugar, se han realizado estudios de la flora y la fauna en el área de Concesión y sobre cómo se comparan esta flora y fauna con las de áreas que no han sido afectadas por las actividades petroleras. Martinez (2007) comparó la diversidad de las comunidades de plantas de la Concesión con la diversidad de los bosques amazónicos en áreas que no sufrieron los impactos de las operaciones de los campos petroleros. Su estudio demostró que hay pocas especies naturales, o ninguna, presentes en las comunidades de plantas más cercanas a las plataformas de pozos. Fuera de estas áreas altamente afectadas, hay áreas de bosques fragmentados que carecen de biodiversidad para sustentar un ecosistema forestal saludable. El estudio concluye que la biodiversidad de flora y fauna en los bosques fragmentados es mucho menor que en áreas que no han sufrido el impacto de actividades petroleras.

Gallo (2007) investigó la diversidad de la fauna de la Concesión a través de extensas encuestas sobre mamíferos, aves, anfibios, reptiles e invertebrados acuáticos. El estudio

STRATUS-NATIVE106679

demuestra que la diversidad de mamíferos, aves, anfibios y reptiles es considerablemente inferior que la que habría naturalmente en áreas similares sin impactos. La fauna existente es aquella que tolera considerablemente las alteraciones del hábitat. Por ejemplo, las especies que se adaptan a la alimentación de cultivos, como la yuca y las frutas, eran comunes.

**Figura 5.3: Área de derrame de petróleo cerca del pozo 56 de Sacha. El petróleo se derramó de las tuberías hacia el fondo café que se ve detrás detrás. La fotografía muestra que las plantas en el área del derrame continúan teniendo problemas de crecimiento décadas después de que ocurrió el derrame.**



## 5.5 *Conclusiones*

El petróleo crudo, el agua de producción, el lodo de perforación y otros aditivos contienen sustancias químicas que son tóxicas para la vida ecológica. El interrogante sobre si la toxicidad realmente existe depende principalmente de cuán altas son las exposiciones ambientales en comparación con las concentraciones que causan dicha toxicidad.

La información recabada en el área de Concesión muestra que las concentraciones de petróleo crudo y metales en la superficie de los suelos en pozos y estaciones exceden los umbrales de toxicidad. Existe un exceso en los suelos superficiales dentro y fuera de las piscinas. Esta información demuestra que la contaminación ambiental es suficiente para causar toxicidad en la biota terrestre.

STRATUS-NATIVE106680

El agua de producción es altamente tóxica para la vida acuática. Las concentraciones de hidrocarburo de petróleo, metales, y cloruro sobrepasan ampliamente los umbrales de concentraciones tóxicas. Es poca la biota acuática que podría sobrevivir por un período extenso en la descarga del agua de producción. Cuando el agua de producción proveniente de las estaciones fue descargada en los ríos, las concentraciones de las sustancias químicas en éstos excedieron los umbrales de toxicidad por al menos cientos de metros río abajo de las estaciones.

Además de los efectos de las sustancias químicas, el ambiente también sufre la degradación del hábitat provocado por el desarrollo de los campos petroleros. Los caminos, las construcciones, las operaciones de campo y otras actividades han degradado el hábitat en el área de Concesión por lo que ahora existe una calidad de hábitat mucho más empobrecida que antes. La mayoría de las plantas y animales del bosque han desaparecido y sólo las plantas y animales que pueden resistir estas alteraciones pueden sobrevivir en el área.

# 6  ACCIONES PARA REPARAR EL DAÑO

Esta sección describe las acciones que deberían llevarse a cabo para reparar el daño ocasionado por Texpet al ambiente del área de Concesión. Primero, se resumen los daños causados por Texpet tal como se los ha descrito en secciones previas. Luego, se describe el enfoque para reparar el daño, así como también las acciones específicas que deberían llevarse a cabo. Por último, se describe cada una de las acciones en más detalles, y se incluye el costo estimado de cada acción propuesta.

## 6.1  Resumen de los daños causados por Texpet

Texpet causó contaminación generalizada al ambiente en el área de Concesión, la cual ha sido contaminada con petróleo crudo, agua de producción y químicos provenientes de las perforaciones de pozos. Las personas y el ecosistema en la Concesión han sido y son expuestos a las sustancias químicas en estos materiales, que incluyen BTEX, HAPs, metales y cloruro. También hubo una degradación generalizada del hábitat causada por el desarrollo de los campos petroleros a cargo de Texpet.

Los efectos que esto tiene en los seres humanos en el área son numerosos, siendo los más importantes los que tienen relación con la salud de las personas de la región. Las personas de la región sufren índices elevados de cáncer, muerte, abortos espontáneos y mortalidad infantil. (ver Anexo Q)

Otro efecto en los seres humanos es el desplazamiento de los grupos indígenas del área. JUAMPA MORE.

Asimismo, hay efectos en el ecosistema. Los suelos y ríos en el área son tóxicos para las plantas, los animales y otros organismos. La biodiversidad del área es mucho más baja que en ecosistemas forestales saludables, y las plantas y animales que viven en el área son

STRATUS-NATIVE106681

principalmente aquellos capaces de tolerar la degradación del hábitat y las alteraciones causadas por los seres humanos.

Estos impactos han estado sucediendo durante muchos años y continuarán en el futuro hasta que se limpie la contaminación y se repare el daño a las personas y al ambiente.

## 6.2 Enfoque para reparar el daño

Debe repararse el daño causado por Texpet a las personas y al ambiente del área de Concesión. El primer paso es limpiar la contaminación que se ha originado, por lo que se incluye una propuesta para remediar el problema de suelos contaminados en los pozos y estaciones. El enfoque para solucionar el problema se centra en limpiar el petróleo crudo y los hidrocarburos de petróleo de las piscinas y otros suelos contaminados en los pozos y estaciones. La limpieza de las piscinas contaminadas y otras áreas de suelos contaminados es una manera clara y directa de reparar los daños causados en el área de Concesión y que todavía continúan. Es necesario y urgente el implementar un verdadero plan de remediación de las áreas contaminadas con hidrocarburos por Texpet, (ver anexo n)

Sin embargo, la limpieza de las piscinas contaminadas y suelos asociados en los pozos y las estaciones no reparará el daño provocado a la salud humana. Para reparar el daño por completo, las personas en el área necesitan agua potable y un sistema de asistencia médica confiable. Muchas personas utilizan el agua que está contaminada a causa de las actividades de los campos petroleros o de las condiciones pobres de saneamiento, principalmente porque no tienen acceso a agua limpia para beber o realizar el lavado, lo cual es un factor significativo en la salud deficiente de las personas en el área. Además, la asistencia médica en la región es limitada. Un sistema de asistencia médica confiable mejoraría sustancialmente la salud de las personas, ya que les facilitaría un acceso inmediato al cuidado que necesitan. Estas dos acciones, brindar agua potable y establecer un buen sistema de asistencia médica, serán las acciones más efectivas para mejorar la salud y el bienestar de las personas en el área de Concesión que ha sido afectada por los efectos de las actividades de los campos petroleros.

Las operaciones de los campos petroleros no son directamente responsables de toda la contaminación del agua potable ni de todos los efectos adversos de salud que las personas sufren. Sin embargo, las personas en el área han sufrido los efectos adversos relacionados con las operaciones petroleras por un tiempo tan prolongado, y seguirán haciéndolo en el futuro, que brindarles agua potable y un sistema de asistencia médica viable sólo ayudará a frenar el daño actual provocado a su salud de las personas y ayudará a compensar los impactos sobre la salud sufridos en el pasado. Por lo tanto, el suministro de agua potable y un sistema de asistencia médico a las personas de la región es un enfoque razonable para abordar el daño ocasionado por las actividades de exploración y producción petrolera de Texpet. Con éstos hechos y como Perito independiente, cumpliendo con mi deber y ordenes de la Corte de Justicia, recomiendo implementar en forma urgente un sistema de agua (ver anexo r) y un sistema de salud (ver anexo p), para evitar que más personas continúen amenazadas por las causas antes descritas en mi dictamen.

Otra acción indispensable para reparar el daño es prevenir la contaminación futura del ambiente proveniente de las operaciones actuales de PetroEcuador. Cuando PetroEcuador

STRATUS-NATIVE106682

reemplazó a Texpet en las operaciones de la Concesión, heredó la infraestructura y las operaciones que habían sido establecidas por Texpet. A pesar de que PetroEcuador ha realizado algunas mejoras en las operaciones en la Concesión, tales como utilizar los pozos de petróleo antiguos para reinyectar agua de producción y capturar algo de gas antes de quemarlo todo, se necesitan mejoras adicionales. Específicamente, debería renovarse el sistema de reinyección del agua de producción para hacerla segura y deberían tomarse acciones para capturar todo el gas que actualmente se quema en las estaciones de la Concesión. Estas acciones son necesarias para evitar la contaminación futura que se originará como consecuencia de continuar con el legado de las operaciones de Texpet en la Concesión. Con las implementaciones nuevas, modernas y adecuadas tecnologías de reinyección del agua de formación y de un mejor aprovechamiento o disposición final del remanente del gas, considero que se estaría previniendo enormemente la contaminación ambiental dejada inicialmente por Texpet y hoy continuada por Petroecuador. (Ver Anexo S y T)

Finalmente, también es imprescindible realizar acciones para ayudar y apoyar a los grupos indígenas que han sido desplazados y afectados por las operaciones en la Concesión. Estos grupos ... WHAT WILL BE DONE – FROM INDIGENOUS REPORT (ver Anexo M)

Estas acciones, en conjunto, son indispensables para reparar el daño actual, ayudar a prevenir el daño futuro y (en parte) para compensar los perjuicios que han sido ocasionados por Texpet en el pasado. Para determinar si estas acciones son necesarias, el principio de precaución nos brinda un contexto ético y jurídico. Como se expuso en la Declaración de Río sobre el Medio Ambiente y el Desarrollo, el principio de precaución indica que:

Para proteger el medio ambiente, el enfoque cautelar deberá ser aplicado por cada uno de los estados en función de sus posibilidades. Cuando exista la amenaza de que se produzcan daños serios o irreversibles, no se podrá alegar falta de conocimientos científicos certeros como razón para aplazar la adopción de medidas rentables que impidan la degradación medioambiental. (United Nations Conference on Environment and Development, 1992).

Lo que el principio de precaución indica en este caso es que no necesitamos la certeza total de todos los aspectos del daño que se describe en secciones previas, ni la certeza total de que las acciones específicas propuestas sean lo mínimo exacto a realizar para reparar el daño. Necesitamos la certeza total de que cualquier daño que ha ocurrido y continuará ocurriendo sea abordado en su totalidad por estas acciones.

## 6.3  Acciones específicas para reparar el daño y sus costos

### 6.3.1  Restauración de las piscinas y el suelo contaminado

El nivel exigido de restauración de las piscinas y del suelo contaminado se basa en los estándares ecuatorianos para la contaminación de petróleo en suelos de ecosistemas sensibles de 1.000 ppm de TPH. El Anexo D muestra que este estándar concuerda con los estándares de otros países y organizaciones internacionales, aunque otros estándares son mucho menores a 1.000 ppm de TPH.  Esta concentración también es más alta que los

STRATUS-NATIVE106683

niveles de fondo de TPH en la Concesión[8]. No obstante, el estándar de 1.000 ppm de TPH se utiliza aquí para determinar cuánto suelo debe ser remediado. Asimismo, los suelos en la Concesión están contaminados por otras sustancias químicas además del petróleo crudo, pero se utiliza el TPH como objetivo de remediación debido a que la mayor cantidad de la contaminación del suelo proviene del petróleo crudo, y porque gran parte de la información del suelo disponible en la Concesión proviene del TPH.

La remediación de piscinas y suelos debería abordar el problema de las piscinas contaminadas y otros suelos contaminados, tales como los suelos en los pozos y estaciones contaminados debido a derrames. Existen aproximadamente 917 piscinas en los pozos y estaciones operadas por Texpet (Anexo H). Todas estas piscinas fueron construidas por Texpet; ninguna piscina en pozos instalados por Petroecuador ha sido incluida en este reporte. Basados en la información descrita en el Anexo H, alrededor del 80% de las piscinas en pozos y el 100% de las piscinas en estaciones requieren restauración. Además, se supone que el área de suelos adicionales fuera de las piscinas que deben remediarse es el 50% del área total de las piscinas en estas condiciones. Esta suposición se basa en información de las muestras que expresan niveles elevados de TPH fuera de las piscinas, en documentación de los numerosos derrames de petróleo crudo en pozos y estaciones y en el criterio profesional. La Tabla 6.1 muestra que existen [2] piscinas y suelos en la Concesión que requieren remediación. Se exponen detalles en el Anexo N.

**Tabla 6.1: Superficies de los suelos de la Concesión que requieren ser remediados (>1.000 ppm TPH)**

| Superficie del suelo | Pozos | Estaciones | Total |
|---|---|---|---|
| Superficie total de las piscinas | 691.000 m$^2$ | 77.500 m$^2$ | 769.000 m$^2$ |
| Superficie de piscinas que requieren ser remediadas | 553.000 m$^2$ (80% del suelo de las piscinas) | 77.500 m$^2$ (100% del suelo de las piscinas) | 631.000 m$^2$ |
| Superficies de los suelos fuera de las piscinas que requieren ser remediados (50% del suelo de las piscinas) | | | 316.000 m$^2$ |
| Superficie total de los suelos que requieren ser remediados. | | | 947.000 m$^2$ |

Para estimar el costo de la remediación, se debe tener conocimiento de la profundidad de la contaminación. El Anexo N analiza la profundidad de la contaminación y estima que es de 4 metros. Esto da como resultado un volumen total de xxxxx$^3$ de suelo que requiere ser remediado.

El Anexo N trata sobre varias formas viables para llevar a cabo la remediación. Asimismo, describe la remediación en curso realizada por PEPDA y la razón por la cual esta limpieza

---

[8] Los niveles de contaminación de fondo están en cero, o cerca de cero, pero algunos métodos para medir el TPH pueden resultar en valores tan altos como 100 a 200 ppm TPH debido a compuestos orgánicos de presencia natural en el suelo.

STRATUS-NATIVE106684

no es adecuada para eliminar la contaminación de las piscinas.  Una remediación más completa y rigurosa es necesaria para manejar completamente la contaminación que existe. Con el fin de remediar por completo la contaminación y reducirla a menos de 1.000 ppm de TPH, es indispensable extraer suelo de las piscinas y otras áreas contaminadas y utilizar la biorremediación para disminuir las concentraciones de petróleo. Luego, se rellenarán las piscinas con suelo saneado y de esa manera se logrará la remediación. El costo promedio en proyectos similares para abordar tipos similares de contaminación es de $448/m³ de suelo (Anexo N). Multiplicar este costo por el volumen total de suelo que debe ser remediado brinda un costo estimado total de $1,7 mil millones. Por lo tanto, remediar las piscinas y suelos contaminados de la Concesión costará aproximadamente $1,7 mil millones.

## 6.3.2 Suministro de agua potable

El Anexo R describe un sistema que sería instalado para brindar agua potable limpia a las personas en la Concesión. El sistema tomaría agua de los ríos que se encuentran más arriba de las áreas de exploración y producción y distribuiría el agua a los residentes de la región. Se instalarían tres sistemas regionales: uno para las comunidades y áreas al norte del río Aguarico; uno para las comunidades que limitan con el río Aguarico al norte, el río Coca al oeste, y el río Napo al sur; y uno para las comunidades en el Cantón Francisco de Orellana al sur del río Napo.

Se preferiría utilizar el agua subterránea como fuente de agua potable si se tuviese la certeza de que las condiciones hidrogeológicas son favorables y la contaminación del agua subterránea en la región es limitada. Sin embargo, es necesario realizar un estudio exhaustivo del agua en la región y del grado total de contaminación en el agua subterránea antes de determinar que ésta es una fuente viable de agua potable para la región.

Los costos para suministrar agua potable a la región son descritos en el Anexo R. Se estima que el costo para el establecimiento de los tres sistemas regionales es de $428 millones. Además, se requieren aproximadamente entre $30 y $50 millones (promedio de $40 millones) para evaluar el sistema de agua subterránea regional y determinar el grado total de contaminación. La caracterización del agua subterránea es necesaria para determinar si el agua subterránea de la región puede ser utilizada como una fuente de agua potable, o si agua potable debe provenir de los ríos más arriba de cualquier actividad de exploración o producción. Por lo tanto, los costos totales son de $468 millones.

## 6.3.3 Sistema de asistencia médica: Propuesta de un programa integral de salud en respuesta a la actividad petrolera en Sucumbíos y Orellana

### 6.3.3.1 Antecedentes, y justificación

Teniendo en cuenta lo expuesto en los diferentes anexos, productos de investigaciones responsables imparciales y coherentes, es necesario que dentro de esta coyuntura, se implemente un plan de salud comprehensivo, sustentable, eficaz e integral, que solucione

STRATUS-NATIVE106685

todos los problemas de salud de los habitantes de Sucumbíos y Orellana. Este plan de deberá incluir no solamente la atención de las personas y familias afectadas, sino que debe abarcar en enfoque integral que camine sobre ejes de salud diversa, prevención, investigación/monitoreo básicamente del cáncer y que por tanto se abra a un conjunto de subprogramas que cubran distintas dimensiones de la problemática. El enfoque de estos programas sobrepasa el tratamiento de las condiciones y enfermedades directa y estrictamente causado por las operaciones de Texpet. Esto es justificable, sin embargo, debido a que existen una serie de daños no necesariamente relacionados con la salud que no podrán ser restaurados por la empresa, por lo cual los habitantes deben ser compensados.

### 6.3.3.2   Características del Programa Integral de Salud

El Programa Integral de Salud que consta en el Anexo P de este estudio está diseñado en base a una serie de órganos administrativos que se ocuparán de la aplicación, desarrollo y mantenimiento de cuatro componentes importantes. Los más importantes de éstos órganos serán parte de una "Red de Unidades de Monitoreo y Respuesta" que, organizados en un esquema de tres niveles de acción, serán responsables del monitoreo ambiental y de salud para problemas causados por la explotación petrolera, la sistematización y análisis de toda la información relevante recogida en todos los niveles operativos y componentes del sistema, la ejecución de acciones relativas a las vigilancia de la aplicación de normas ambientales, de seguridad industrial y de salud colectiva, y en general la garantía de que estarán disponibles para la población una atención inmediata y de calidad en cualquier unidad de salud parte del sistema.

En la actualidad existen una serie de hospitales, dispensarios, clínicas y centros de salud operados por diferentes entes públicos y privados. Las ideas centrales en cuanto la ejecución del Plan Integral de Salud propuesto son dos: 1) dotar a éstas instituciones de salud de los recursos técnicos y humanos necesarios para desarrollar las acciones y servicios propuestos, y cumplir el objetivo de mejorar el nivel de vida y bienestar de todos los habitantes de las dos provincias, y; 2) articular estas instituciones en una verdadera red integral de salud que actúe de una manera coordinada y coherente, para maximizar los efectos las acciones y recursos disponibles.
Es evidente que las políticas y recursos de salud disponibles para las personas afectadas por la explotación petrolera de Texpet resultan insuficientes, hecho que está afectando sus vidas de una manera radical. Es por esto que la implementación de un Plan Integral de Salud resulta esencial para mejorar la calidad de vida de los habitantes de las provincias de Sucumbíos y Orellana.
En el área existen ya hospitales y centros dedicados a aliviar y prevenir los problemas de salud de sus habitantes. El problema es que éstos no cuentan con los recursos técnicos ni humanos para alcanzar sus objetivos. La implementación del plan propuesto solucionará las carencias presentes en las instituciones del sistema, y permitirá que funcionen de manera coherente y articulada para alcanzar sus objetivos.

STRATUS-NATIVE106686

### 6.3.4 Mejora de la infraestructura existente para las operaciones petroleras

Dos acciones son imprescindibles para mejorar la infraestructura de las operaciones petroleras existentes para que haya contaminación limitada o nula del ambiente tanto actualmente como en el futuro: renovar el sistema existente de reinyección del agua de producción; y capturar todo el gas para que no sea quemado. Estos costos tienen su origen en la necesidad de eliminar prácticas operacionales que fueron legadas por Texpet a PetroEcuador y que son las causantes de la contaminación en el área.

El Anexo T describe las acciones específicas necesarias para mejorar la infraestructura de las operaciones actuales. Aunque toda o casi toda el agua de producción es reinyectada en el presente, el sistema de reinyección utiliza pozos antiguos de producción petrolera que han sido reacondicionados para este fin. Este sistema es propenso a fallar y no es un enfoque satisfactorio a largo plazo. Los pozos de producción petrolera no están diseñados para soportar la presión ni las condiciones de reinyección del agua de producción, y no están construidos con las salvaguardias necesarias para garantizar que el agua no contamine el agua superficial o subterránea en el área. Por ejemplo, grietas en el entubado del pozo Shushufindi 45A han ocasionado contaminación extensa del agua subterránea alrededor del pozo con agua de producción tóxica y a su vez, el agua de producción ha sido descargada a la superficie en algunas áreas. Otros pozos petroleros que han sido reacondicionados en el área de la Concesión también han experimentado problemas y es de esperarse que esto siga sucediendo, por lo tanto, es necesario un sistema para la reinyección de agua que esté propiamente diseñado y construido para frenar e impedir la contaminación en el futuro.

De manera similar, actualmente se quema la mayor parte del gas que se separa del petróleo crudo y del agua de producción en las estaciones de la Concesión. La quema de gas produce muchas sustancias químicas tóxicas de hidrocarburos que pueden transportarse en el aire por distancias bastante extensas. Estas sustancias químicas pueden ser inhaladas por personas o animales, o pueden ser depositados en las plantas o suelos debido a la lluvia. El manejo adecuado de los gases es capturarlos y utilizarlos como una fuente de energía para las operaciones petroleras. Este enfoque también reduciría la cantidad de diesel y otros combustibles que necesitan ser transportados en la Concesión para operar centrales eléctricas.

El Anexo T estima el costo de un sistema de reinyección de agua y de un sistema para capturar gases, diseñados y construidos apropiadamente. Se estima que el costo total para estas mejoras en la infraestructura es $XX.

### 6.3.5 Provisión para grupos indígenas afectados

JUAMPA

### 6.4 Resumen

STRATUS-NATIVE106687

Las acciones de Texpet como operadora de la Concesión han causado daños a las personas y al medio ambiente y necesitan ser remediados. La Tabla 6.2 brinda un resumen de las acciones que son necesarias para reparar los daños ocasionados por la operación de Texpet. Estas acciones, en conjunto, son indispensables para reparar el daño actual, ayudar a prevenir el daño futuro y (en parte) para compensar los perjuicios que han sido ocasionados por Texpet en el pasado. Se estima que el costo total para estas acciones es $XX.

**Tabla 6.2: Resumen de las acciones necesarias para reparar los daños ocasionados por Texpet.**

| Acción | Costo estimado |
|---|---|
| Remediación de piscinas y suelos contaminados en pozos y estaciones | $1,700 millones |
| Suministro de agua potable, que incluye determinación de factibilidad de utilizar el agua subterránea como fuente de agua potable | $468 millones |
| Establecimiento de un sistema de asistencia médica | $X |
| Mejora de la infraestructura existente | $X |
| Provisión para grupos indígenas desplazados y afectados | $X |
| **Total** | **$X** |

# 7  VALOR DE LAS PÉRDIDAS SUFRIDAS POR LAS PERSONAS Y EL ECOSISTEMA

La sección previa describe las acciones necesarias para reparar los perjuicios causados por las acciones de Texpet. Aquellas acciones remediarán la contaminación ambiental existente, impedirán la contaminación actual y futura y suministrarán agua potable, asistencia médica y apoyarán los grupos indígenas, y, por lo tanto, mejorarán la salud y el bienestar de las personas afectadas. Sin embargo, las pérdidas sufridas por las personas y el ambiente han ocurrido por muchos años y continuarán ocurriendo hasta que se completen las acciones para reparar el daño. Esta sección estima el valor de algunas de esas pérdidas. El valor de las pérdidas es distinto del costo de reparar los daños que se describe en la sección previa. Ambos deben ser incluidos en la estimación de daños: el daño debe ser reparado (sección 6), y debe haber compensación por las pérdidas que ocurren hasta que se complete la remediación (esta sección). (ME GUSTA ESTO, PERO CREO QUE ES UN ENFOQUE MUY LEGAL, Y NADA TECNICO. COMO LO JUSTIFICA EL PERITO?)

El enfoque de incluir los costos para reparar los perjuicios y el valor de las pérdidas hasta que se complete la reparación concuerda con las leyes y regulaciones ambientales y con los conceptos de justicia e imparcialidad. Según el enfoque internacional en la materia, si una parte causa daño a otra por muchos años, el hecho de detener que se siga produciendo el daño es simplemente insuficiente. Para que el proceso sea completo, también se deben compensar las pérdidas de la parte perjudicada que han ocurrido en ese tiempo.

STRATUS-NATIVE106688

Esta sección presenta cálculos aproximados de los valores de dos tipos de pérdidas: muertes excesivas debido a los elevados índices de cáncer entre las personas que viven en el área de la Concesión; y las pérdidas de los servicios del ecosistema provistos por el bosque tropical. Esta sección también incluye un cálculo del enriquecimiento injusto ganado por Texpet al no haber invertido el dinero suficiente para operar la Concesión de manera responsable desde el punto de vista ambiental. El cálculo aproximado del enriquecimiento injusto está incluido con el fin de compararlo con los valores de las pérdidas.

Existen muchas otras pérdidas que las personas en el área de la Concesión sufren además de las muertes excesivas debido a los índices elevados de cáncer. Estas pérdidas están descritas en los Anexos L y P y en el Anexo M. Estas pérdidas incluyen otros efectos adversos para la salud aparte de muertes por cáncer, violaciones de los derechos humanos, desplazamiento de grupos indígenas de sus tierras nativas y pérdida de recursos alimenticios. Sin embargo, es muy difícil estimar el valor de estas pérdidas aunque sean reales y hayan estado ocurriendo por muchos años. Por esta razón, algunas de las acciones descritas en la sección previa, como proveer agua potable, establecer un sistema de asistencia médica y apoyar a los grupos indígenas, tienen como objetivo compensar las pérdidas además de evitar el daño continuo.

## 7.1 Valor de muertes por cáncer

La sección 4 y el Anexo L presentan los resultados de un sondeo detallado realizado a las personas en el área de la Concesión que demuestra que las personas que viven cerca de los pozos petrolíferos tienen un índice mucho más elevado de cáncer que las personas que viven al menos a 2 Km. de un pozo. Otros estudios publicados acerca de la salud de las personas en el área de la Concesión arribaron a la misma conclusión, como se describe en el Anexo Q. Estos resultados coinciden con el hecho de que el petróleo crudo contiene sustancias químicas que causan cáncer, tales como el benceno e hidrocarburos aromáticos policíclicos.

Un índice más elevado de cáncer dentro del área de la Concesión significa que existe un número más elevado que el normal de casos de cáncer. El término *casos de cáncer excesivos* se refiere al número de casos dentro de la Concesión que están por encima de lo esperado o normal, si las personas en la Concesión no hubieran sido expuestas a la contaminación de las actividades de los campos petrolíferos. Basados en el estudio del Anexo L y los estudios de la referencia, el índice de cáncer en la Concesión es aproximadamente 1,7 veces más elevado que el normal. Dado el índice de cáncer observado en el área de la Concesión y comparado con el índice normal, esto representa un total de 638 casos excesivos de cáncer entre las 30.000 personas representadas por los *demandantes*. Los detalles de este cálculo se incluyen en el Anexo Q.

El Anexo L también informa que el índice de muertes por cáncer es aproximadamente de un 67% en el área de la Concesión. Esto implica que de los 638 casos excesivos de cáncer, hubo aproximadamente 428 muertes excesivas. En otras palabras, el índice elevado de cáncer en la Concesión ocasionó la muerte de 428 personas por encima de lo normal o esperado.

STRATUS-NATIVE106689

Existen enfoques y métodos establecidos en los Estados Unidos que conceden un valor en dólares a lo que es llamado "el valor estadístico de la vida". Éste es un concepto utilizado para evaluar los incrementos o las disminuciones de los riesgos de mortandad de la población cuando los individuos que experimentan los riesgos no son realmente identificados. El valor estadístico de la vida se utiliza usualmente para evaluar los beneficios (o costos) de las acciones que disminuyen (o incrementan) los riegos de muerte. Por ejemplo, el valor estadístico de la vida es utilizado por el gobierno de los Estados Unidos para comparar los beneficios de las regulaciones propuestas que salvarán vidas (tales como la reducción de la contaminación) con los costos de las regulaciones. Aunque este concepto puede parecer una forma rudimentaria de dar valor a la vida de las personas, se ha confiado en él en muchas circunstancias y brinda una de las pocas herramientas que tenemos para evaluar las pérdidas sufridas por las personas en el área de la Concesión.

El valor estadístico de una vida en los Estados Unidos es de 6.8 millones (Anexo Q). Es apropiado utilizar el valor estadístico de la vida de los Estados Unidos en este caso ya que por la manera en la que Texpet decidió conducir sus operaciones, eligió contaminar el ambiente de la Concesión. Las personas que viven allí perciben el costo de esta decisión en los efectos sobre su salud, mientras que Texpet recibe un apreciable beneficio económico. Debido a que estos beneficios fueron liquidados en los Estados Unidos, es justo y adecuado que los costos reales de las decisiones de Texpet de operar sin controles ambientales también sean en términos de valores norteamericanos, por lo que considero que es apropiado utilizar la medida del valor estadístico de una vida de Estados Unidos para valuar las muertes excesivas por cáncer. El Anexo Q brinda detalles adicionales.

Multiplicar las 428 muertes excesivas por cáncer por $6.8 millones da un valor por muertes excesivas de $2,9 mil millones. Esta cifra representa el valor de las vidas perdidas debido a los índices de cáncer más elevados en la Concesión. En otras palabras, es el costo de las muertes excesivas por cáncer sufridas por las personas en el área de la Concesión debido a la manera en que Texpet decidió conducir sus operaciones.

## 7.2  Valor de las pérdidas en el ecosistema

REDO WITH LORENA'S PIECE??

Las pérdidas en el ecosistema ocasionadas por Texpet incluyen pérdidas directas del hábitat del bosque tropical en los pozos petroleros y las estaciones (por ejemplo, piscinas, derrames, plataformas) y pérdidas indirectas del bosque tropical debido a las rutas y otros desarrollos que Texpet construyó como parte de sus operaciones.

Existen dos métodos diferentes que se utilizan aquí para determinar el valor económico de las pérdidas de bosque tropical. Un método consiste en determinar cuánto costaría restaurar la extensión de bosque tropical que compensaría, con el tiempo, las pérdidas del bosque tropical. Esta restauración representaría una adición a la remediación de las áreas contaminadas, tales como piscinas. Al restaurar áreas adicionales del bosque tropical, pueden compensarse los servicios del ecosistema que se perdieron con el tiempo.

El segundo método consiste en utilizar el valor en dólares que las personas les dan a los ecosistemas del bosque tropical. Hay estudios publicados en la bibliografía en los que los

STRATUS-NATIVE106690

investigadores determinaron la cantidad de dinero que las personas están dispuestas a pagar para proteger los bosques tropicales, lo cual representa la cantidad de dinero que los bosques tropicales valen para las personas. Este valor puede utilizarse para determinar el valor en dólares de las pérdidas de los bosques tropicales que se produjeron con el tiempo.

El Anexo O presenta detalles de estos cálculos. Sucintamente, se estima que la extensión de bosque tropical que se perdió en pozos y estaciones es de 627 hectáreas (Las pérdidas se integran en el tiempo, desde la instalación de los pozos y las estaciones hasta el momento en que la remediación se considere completa). Estas pérdidas no se compensan restaurando otros bosques tropicales degradados a un estado más natural. Debido a que las pérdidas han ocurrido en un período prolongado de tiempo, y debido a que los beneficios de la restauración ocurrirán en el futuro, es indispensable restaurar un total de 3.544 hectáreas de bosque tropical para compensar las pérdidas POR QUE??. El costo de restaurar una hectárea de bosque tropical se estima en $XX (consultar Anexo O). Por lo tanto, el costo para restaurar suficiente bosque tropical para compensar las pérdidas es $XX.

El Anexo O también describe el segundo enfoque, el cual consiste en utilizar el valor que las personas le dan a los bosques tropicales. Por medio de múltiples estudios de bibliografía, el valor que las personas le dan al bosque tropical se expresa en término de $/hectárea/año. Las pérdidas de bosque tropical se calculan cada año, y se continuará con el cálculo hasta que se remedie la situación, por lo que el resultado es que el valor de las pérdidas directas de bosque tropical en pozos y estaciones va desde $150 millones a $206 millones, con un promedio de $178 millones. El Anexo O incluye detalles del cálculo

## 7.3  Enriquecimiento injusto

El enriquecimiento injusto es el beneficio financiero ganado por Texpet al no haber invertido suficiente dinero en controles ambientales apropiados durante su operación en la Concesión. El cálculo del enriquecimiento injusto abarca dos componentes: (1) un estimado del costo de los "ahorros" ganados por Texpet por no utilizar controles ambientales adecuados; y (2) el valor actual de aquellos ahorros en base a las ganancias de la compañía en inversiones de capital. El Anexo T brinda detalles del cálculo de enriquecimiento injusto. En algunos casos alrededor del mundo, el enriquecimiento injusto se utiliza para determinar un monto punitivo de daños. Aunque la Corte puede decidir utilizar el cálculo del enriquecimiento injusto en esa forma, el cálculo en realidad se presenta aquí para compararlo con los valores de las pérdidas experimentadas por las personas en el área de la Concesión, para poner aquellas pérdidas en perspectiva.

La manera responsable y adecuada en términos ambientales de operar un campo petrolífero incluye tres acciones diferentes para gestionar los desechos que se producen: (1) reinyectar toda el agua de producción; (2) gestionar y disponer adecuadamente de los desechos generados en los pozos; y (3) capturar todo el gas para que no sea quemado en la atmósfera. Dado que Texpet no realizó ninguna de estas acciones, los costos para estas tres opciones son la cantidad de dinero que Texpet "ahorró" al no utilizar controles ambientales apropiados. El Anexo T describe estas acciones y sus costos en más detalle. Si Texpet hubiera implementado estas acciones durante el período en que operó en la Concesión, hubiera costado aproximadamente $XX (en dólares, año 2008). Utilizando los métodos

STRATUS-NATIVE106691

aceptados para convertir este costo evitado a un valor actual, se estima que el enriquecimiento injusto total ganado por Texpet es de $XX.

### 7.4 Conclusiones

Se puede calcular el valor de algunas de las pérdidas que las personas en el área de la Concesión han sufrido. Se estima el valor de las muertes excesivas por cáncer por encima de lo normal es de $2.9 mil millones; asimismo, se estima que el valor de las pérdidas del ecosistema del bosque tropical es de $xx a $xx (promedio estimado de $xx), dependiendo del método utilizado para calcular las pérdidas. Existen muchas otras pérdidas que las personas en el área de la Concesión han sufrido a las que no se les puede adjudicar un valor, tales como efectos adversos sobre la salud aparte de las muertes por cáncer, el desplazamiento de las personas indígenas de sus tierras ancestrales y una percepción y actitud diferentes hacia el ambiente en el que viven.

En comparación, se estima que el enriquecimiento injusto ganado por Texpet al no invertir suficiente dinero en los controles ambientales cuando operó en la Concesión es de $XX.

# 8 REFERENCIAS

American Petroleum Institute, 1962, Primer of Oil and Gas Production, 2nd ed.
Camino Castro, E. 2004. Informe del Perito de la Inspección Judicial en Sacha 53. Juicio 002-2003 de la Corte Superior de Nueva Loja. November.
Canadian Environmental Protection Act (CEPA). 1993. Priority Substances List Assessment Report: Benzene. Government of Canada.
Fugro-McClelland West. 1992. Environmental Field Audit for Practices 1964-1990, Petroecuador-Texaco Consortium, Oriente, Ecuador. Final.
Gallo. 2007. Diagnostico de la Fauna Terrestre y Macro Invertebrados en Pozos Operados por la. Texaco.
HBT AGRA Limited (Agra). 1993. Environmental Assessment of the Petroecuador-Texaco Consortium Oil Fields: Volume I – Environmental Audit Report. Draft.
Health and Safety Executive. 2000. Drilling fluids composition and use within the OK Offshort drilling industry. Health and Safety Laboratory. Offshore Technology Report – OTO 1999 089. Available: http://www.hse.gov.uk/research/otohtm/1999/oto99089.htm.
Jochnick, C., Normand, R., and Zaidi, S. 1994. Violaciones de Derechos en la AmazoniaEcuatoriana: Las Consecuencias Humanas del Desarrollo Petrolero.
Martinez, E.C. 2007. Estudio botanico en 10 pozos operados por la Texaco durante 1964 y 1990 en la amazonia ecuatoriana con miras a su restauracion. October.
Rowe, B.L., S.J. Landrigan, and T.J. Lopes. 1997. Summary of Published Aquatic Toxicity Information and Water-Quality Criteria for Selected Volatile Organic Compounds. U.S. Geological Survey Open-File Report 97-563.
San Sebastian, M., B. Armstrong, and C. Stephens. 2002. Outcomes of pregnancy among women living in the proximity of oil fields in the Amazon basin of Ecuador. Int J Occup Environ Health. 8: 312-319.



STRATUS-NATIVE106692

San Sebastian, M., B. Armstrong, J.A. Cordoba, and C. Stephens. 2001. Exposures and cancer incidence near oil fields in the Amazon basin of Ecuador. Occup Environ Med. 58: 517-522.

Strosher, M. 1996. Investigations of Flare Gas Emissions in Alberta. Alberta Research Council. Final Report to Environment Canada, Alberta Energy and Utilities Board, and the Canadian Association of Petroleum Producers.

United Nations Conference on Environment and Development, 1992. Rio Declaration on Environment and Development. http://www.unep.org/Documents.Multilingual/Default.asp?DocumentID = 78&ArticleID = 1163

U.S. Environmental Protection Agency (U.S. **EPA). 1980a. Ambient Water Quality Criteria for Benzene. EPA-440/5-80-018. October. Office of Water Regulations and Standards Division. Washington, DC.**

U.S. Environmental Protection Agency (U.S. **EPA). 1980b. Ambient Water Quality Criteria for Ethylbenzene. EPA-440/5-80-048. October. Office of Water Regulations and Standards Division. Washington, DC.**

U.S. Environmental Protection Agency (U.S. **EPA). 1985.** Ambient aquatic life water quality criteria for lead. EPA 440/5-84-027. January. **Office of Water Regulations and Standards Division. Washington, DC.**

U.S. Environmental Protection Agency (U.S. **EPA). 1988. Ambient Water Quality Criteria for Chloride. EPA-440/5-88-001. February. Office of Water Regulations and Standards Division. Washington, DC.**

U.S. Environmental Protection Agency (U.S. **EPA). 1996. 1995 Updates: Water Quality Criteria Documents for the Protection of Aquatic Life in Ambient Water, EPA-820-B-96-001, September.**

U.S. Environmental Protection Agency (U.S. **EPA).** 2005a. Ecological Soil Screening Levels for Barium.

U.S. Environmental Protection Agency (U.S. **EPA). 2005b.** Ecological Soil Screening Levels for Copper. Interim Final.

U.S. Environmental Protection Agency (U.S. **EPA). 2005c.** Ecological Soil Screening Levels for Chromium. Interim Final.

U.S. Environmental Protection Agency (U.S. **EPA).** 2007. Ecological Soil Screening Levels for Zinc. Interim Final.

Woodward-Clyde International, 2000. Remedial Action Project, Oriente Region ,Ecuador. Final Report – Volume I of II. Prepared for Texaco Petroleum Company, White Plains, NY, May.

STRATUS-NATIVE106693

1    DECLARACIÓN DE RESULTADOS ...................................................................1
2    INTRODUCCIÓN .................................................................................................4
3    CONTAMINACIÓN AMBIENTAL CAUSADA POR LAS OPERACIONES DE
TEXPET COMO PARTE DEL CONSORCIO.................................................................6
    3.1    Método.................................................................................................................6
    3.2    Fuentes contaminantes, transporte y receptores.................................................6
        3.2.1    Emisiones químicas en el ambiente.............................................................6
        3.2.2    Derrames de Crudo en el área de la concesión.............................................8
        3.2.3    Regado de crudo en las vías .......................................................................9
        3.2.4    Movimiento y degradación de los químicos ..............................................9
        3.2.5    Exposición química de las personas y el ambiente....................................10
        3.2.6    Información sobre contaminantes que se tuvo en cuenta...........................10
        3.2.7    Normas ambientales...................................................................................11
        3.2.8    Concentraciones de contaminación de fondo............................................14
        3.2.9    Descripción de la contaminación ambiental..............................................16
        3.2.10   Hidrocarburos de petróleo en suelos.........................................................20
        3.2.11   Metales en el suelo....................................................................................21
        3.2.12   Hidrocarburos de petróleo en el agua subterránea....................................22
        3.2.13   Metales en agua subterránea......................................................................23
        3.2.14   Contaminantes en el agua superficial .......................................................24
        3.2.15   Línea de tiempo de las operaciones de Texpet que provocaron la
        contaminación ........................................................................................................25
        3.2.16   Reparación de piscinas de TexPet .............................................................26
        3.2.17   Percepciones sobre la reparación...............................................................28
        3.2.18   Comparación con los informes de las Inspecciones Judiciales. ................29
    3.3    Conclusiones .....................................................................................................30
4    IMPACTOS EN LA POBLACIÓN ....................................................................31
    4.1    Exposición a químicos tóxicos.........................................................................31
    4.2    Efectos causados a la población humana...........................................................32
        4.2.1    Metodología...............................................................................................32
        4.2.2    Resultados del Estudio ..............................................................................33
        4.2.3    Cáncer .......................................................................................................35
        4.2.4    Abortos espontáneos ..................................................................................36
        4.2.5    Malformaciones infantiles.........................................................................36
        4.2.6    Mortalidad infantil ....................................................................................36
    4.3    Percepción de salud ..........................................................................................37
    4.4    Impactos a las nacionalidades indígenas ..........................................................38
        4.4.1    Caza y pesca...............................................................................................38
        4.4.2    Pérdidas de tierra como consecuencia de la contaminación o explotación..39
        4.4.3    Desplazamiento forzado.............................................................................39
        4.4.4    Impacto cultural y cohesión comunitaria...................................................39
        4.4.5    Otras violaciones de Derechos Humanos...................................................40
    4.5    Conclusiones .....................................................................................................40
5    IMPACTOS EN EL ECOSISTEMA ..................................................................40
    5.1    Introducción ......................................................................................................40
    5.2    La toxicidad del petróleo y el agua de producción de un pozo para el ecosistema
    41
    5.3    Comparación de concentraciones de sustancias químicas y niveles de toxicidad
    en la Concesión ..........................................................................................................42

STRATUS-NATIVE106694

| | 5.4 | Observaciones de campo | 45 |
| | 5.5 | Conclusiones | 46 |
| 6 | | ACCIONES PARA REPARAR EL DAÑO | 47 |
| | 6.1 | Resumen de los daños causados por Texpet | 47 |
| | 6.2 | Enfoque para reparar el daño | 48 |
| | 6.3 | Acciones específicas para reparar el daño y sus costos | 49 |
| | 6.3.1 | Restauración de las piscinas y el suelo contaminado | 49 |
| | 6.3.2 | Suministro de agua potable | 51 |
| | 6.3.3 | Sistema de asistencia médica: Propuesta de un programa integral de salud en respuesta a la actividad petrolera en Sucumbíos y Orellana | 51 |
| | 6.3.4 | Mejora de la infraestructura existente para las operaciones petroleras | 53 |
| | 6.3.5 | Provisión para grupos indígenas afectados | 53 |
| | 6.4 | Resumen | 53 |
| 7 | | VALOR DE LAS PÉRDIDAS SUFRIDAS POR LAS PERSONAS Y EL ECOSISTEMA | 54 |
| | 7.1 | Valor de muertes por cáncer | 55 |
| | 7.2 | Valor de las pérdidas en el ecosistema | 56 |
| | 7.3 | Enriquecimiento injusto | 57 |
| | 7.4 | Conclusiones | 58 |
| 8 | | REFERENCIAS | 58 |

STRATUS-NATIVE106695