# EXHIBIT A

# ANNOTATED AMENDED COMPLAINT AND APPENDICES

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CHEVRON CORPORATION,

               Plaintiff,

     v.

STEVEN DONZIGER, THE LAW OFFICES OF
STEVEN R. DONZIGER, DONZIGER &
ASSOCIATES, PLLC, PABLO FAJARDO
MENDOZA, LUIS YANZA, FRENTE DE
DEFENSA DE LA AMAZONIA A/K/A AMAZON
DEFENSE FRONT, SELVA VIVA SELVIVA
CIA, LTDA., STRATUS CONSULTING, INC.,
DOUGLAS BELTMAN, ANN MAEST, MARIA
AGUINDA SALAZAR, CARLOS GREFA
HUATATOCA, CATALINA ANTONIA
AGUINDA SALAZAR, LIDIA ALEXANDRA
AGUINDA AGUINDA, PATRICIO ALBERTO
CHIMBO YUMBO, CLIDE RAMIRO AGUINDA
AGUINDA, LUIS ARMANDO CHIMBO
YUMBO, BEATRIZ MERCEDES GREFA
TANGUILA, LUCIO ENRIQUE GREFA
TANGUILA, PATRICIO WILSON AGUINDA
AGUINDA, CELIA IRENE VIVEROS
CUSANGUA, FRANCISCO MATIAS
ALVARADO YUMBO, FRANCISCO
ALVARADO YUMBO, OLGA GLORIA GREFA
CERDA, LORENZO JOSÉ ALVARADO
YUMBO, NARCISA AIDA TANGUILA
NARVÁEZ, BERTHA ANTONIA YUMBO
TANGUILA, GLORIA LUCRECIA TANGUILA
GREFA, FRANCISCO VICTOR TANGUILA
GREFA, ROSA TERESA CHIMBO TANGUILA,
JOSÉ GABRIEL REVELO LLORE, MARÍA
CLELIA REASCOS REVELO, MARÍA
MAGDALENA RODRÍGUEZ BARCENES,
HUGO GERARDO CAMACHO NARANJO, JOSÉ
MIGUEL IPIALES CHICAIZA, HELEODORO
PATARON GUARACA, LUISA DELIA
TANGUILA NARVÁEZ, LOURDES BEATRIZ
CHIMBO TANGUILA, MARÍA HORTENCIA

11 Civ. 0691 (LAK)


AMENDED COMPLAINT

JURY TRIAL DEMANDED

VIVEROS CUSANGUA, SEGUNDO ÁNGEL          :
AMANTA MILÁN, OCTAVIO ISMAEL             :
CÓRDOVA HUANCA, ELIAS ROBERTO            :
PIYAHUAJE PAYAHUAJE, JAVIER PIAGUAJE     :
PAYAGUAJE, DANIEL CARLOS LUSITANDE       :
YAIGUAJE, BENANCIO FREDY CHIMBO          :
GREFA, GUILLERMO VICENTE PAYAGUAJE       :
LUSITANTE, DELFÍN LEONIDAS PAYAGUAJE     :
PAYAGUAJE, ALFREDO DONALDO               :
PAYAGUAJE PAYAGUAJE, TEODORO             :
GONZALO PIAGUAJE PAYAGUAJE, MIGUEL       :
MARIO PAYAGUAJE PAYAGUAJE, FERMIN        :
PIAGUAJE PAYAGUAJE, REINALDO             :
LUSITANDE YAIGUAJE, LUIS AGUSTÍN         :
PAYAGUAJE PIAGUAJE, EMILIO MARTÍN        :
LUSITANDE YAIGUAJE, SIMON LUSITANDE      :
YAIGUAJE, ARMANDO WILFRIDO PIAGUAJE      :
PAYAGUAJE, and ÁNGEL JUSTINO             :
PIAGUAGE LUCITANTE,                      :
                                         :
                 Defendants.             :
                                         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**TABLE OF CONTENTS**

Page

INTRODUCTION ..................................................................................................... 1

PARTIES AND RELEVANT NON-PARTIES .......................................................... 4

    Plaintiff ................................................................................................................. 4

    RICO Defendants ................................................................................................. 5

    Non-Party Co-Conspirators ................................................................................ 7

    Remaining Defendants ...................................................................................... 12

SUBJECT MATTER JURISDICTION AND VENUE ............................................ 14

PERSONAL JURISDICTION ................................................................................. 15

FACTUAL BASIS FOR CLAIMS ......................................................................... 20

A.    Background ....................................................................................................... 20

    1.    TexPet Participates in Ecuador's State Oil Consortium and Negotiates Release From Liability in Return for Specified Remediation ............................. 21

    2.    U.S. Plaintiffs' Lawyers Devise Baseless Litigation Against Chevron in Ecuador .................................................................................................. 35

B.    The Conspirators Are Corrupting the Judicial Process to Extort a Payment From Chevron ................................................................................................... 40

    1.    Pressuring the Lago Agrio Court and Manufacturing Evidence .......................... 42

        a.    Implementing Pressure Tactics and Colluding With Ecuadorian Government Officials .................................................................................. 42

        b.    Taking Advantage of a Weakened and Increasingly Corrupt Ecuadorian Judiciary ................................................................................ 54

        c.    Manipulating and Falsifying Their Own Experts' Findings to Corrupt the Judicial Inspection Process .................................................. 57

            (i)    Inducing an Expert to Report Biased and False Results ............... 60

            (ii)    Filing Falsified Expert Reports .................................................... 65

i

d.   Arranging Cabrera's Appointment as Global Assessment Expert and Secretly Writing His Supposedly "Independent" Report...................................................................................... 70

(i)   Weeks Before the Court Appointed Cabrera, the RICO Defendants Meet With Him to Plan His "Independent" Expert Report ............................................. 72

(ii)   The Court Appointed Cabrera as Its "Independent" "Global Assessment Expert"....................................... 78

(iii)   While Cabrera Staged Mock Inspections, the RICO Defendants and Their Co-Conspirators Secretly Ghostwrote His Report ............................................ 80

(iv)   The "Cabrera Report":  The RICO Defendants' Repeated Fraud ......................................................... 96

(v)   The RICO Defendants' Fraudulent Endorsements of Their "Cabrera Report" and Procurement of Other Endorsements Through Misrepresentations................... 102

(vi)   The RICO Defendants' Payments to Cabrera for Work He Did Not Perform............................................... 107

(vii)   The RICO Defendants' Attempt to Launder the "Cabrera Report" ...................................................... 110

2.   Colluding With the Republic of Ecuador to Bring Sham Charges Against Chevron's Attorneys.................................................... 115

3.   Launching Public Attacks on Chevron Based on Misleading Statements and Lies to Force Chevron to Pay Up .............................. 125

a.   The Fraudulent Media Blitz................................... 126

b.   Misrepresenting the "Independent" and "Neutral" Cabrera Report.................................................................. 135

c.   The RICO Defendants Make False Statements to U.S. State and Federal Government Officials............................. 140

d.   The Conspirators Attempt to Manipulate Chevron's Stock Price to Coerce a Favorable Settlement ................. 146

e.   The RICO Defendants Falsely Accuse Chevron of Murder to Generate Outrage and Force Chevron to Pay ......... 154

Page

C.    The Conspirators' Campaign of Lies and Obstruction in U.S. Courts ........................ 156

    1.    Attempting to Obstruct Chevron's Discovery Proceedings by Making
          False and Misleading Statements Before U.S. District Courts and
          Courts of Appeals ................................................................................. 158

          a.    The RICO Defendants' Initial False Representations to U.S.
                Courts That They Had No Relationship With Cabrera and No
                Role in Preparing the "Cabrera Report" .................................... 159

          b.    The RICO Defendants' Subsequent False and Misleading
                Statements in an Attempt to Justify and Excuse Their
                Emerging Misconduct.......................................................... 168

    2.    Making False Statements to Deceive New York Courts in Connection
          With Chevron's Section 1782 Applications and Other Actions ...................... 179

    3.    Obstructing Judicial Proceedings by Tampering With Witnesses,
          Withholding Documents, and Making False Statements to This Court.............. 183

D.    Chevron Has Suffered Substantial Damages as a Result of the RICO
      Defendants' Conspiracy, and Enforcement of the Corrupt Judgment in the
      Lago Agrio Litigation Would Deepen the Harm ................................................ 188

CLAIMS FOR RELIEF ........................................................................................ 200

    FIRST CLAIM FOR RELIEF
    (Violations of RICO, 18 U.S.C. § 1962(c)) ...................................................... 200

    SECOND CLAIM FOR RELIEF
    (Conspiracy to Violate RICO, Violation of 18 U.S.C. § 1962(d)) .................... 216

    THIRD CLAIM FOR RELIEF
    (Fraud)......................................................................................................... 218

    FOURTH CLAIM FOR RELIEF
    (Tortious Interference With Contract) ............................................................ 219

    FIFTH CLAIM FOR RELIEF
    (Trespass to Chattels)...................................................................................... 221

    SIXTH CLAIM FOR RELIEF
    (Unjust Enrichment)........................................................................................ 223

    SEVENTH CLAIM FOR RELIEF
    (Civil Conspiracy)........................................................................................... 224

Page

EIGHTH CLAIM FOR RELIEF
        (Violations of New York Judiciary Law § 487) ................................................. 225

NINTH CLAIM FOR RELIEF
        (Request for Declaratory Judgment That the Judgment by the Lago
        Agrio Court Against Chevron is Unenforceable and Non-
        Recognizable) ................................................................................................. 226

PRAYER FOR RELIEF ......................................................................................... 228

Plaintiff Chevron Corporation ("Chevron") for its Amended Complaint against the Defendants listed below alleges as follows:

## INTRODUCTION

1.      Over the course of several years, defendant Steven Donziger and his co-defendants and co-conspirators have sought to extort, defraud, and otherwise tortiously injure plaintiff Chevron by means of a plan they conceived and substantially executed in the United States.  It has been carried out by a U.S.-based enterprise comprised of, among others, U.S. plaintiffs' lawyers led by Donziger; U.S. environmental consultants, led by Stratus Consulting, Inc., Ann Maest, and Doug Beltman; their Ecuadorian colleagues, led by Pablo Fajardo and Luis Yanza; and their front organizations, the Amazon Defense Front and Selva Viva.  These conspirators are collectively referred to herein as the "RICO Defendants."[1]  Their co-conspirators in the enterprise include, among others, U.S. law firms and attorneys, such as Joseph Kohn of Kohn Swift & Graf, P.C., Emery Celli Brinckerhoff & Abady LLP, Motley Rice LLC and Patton Boggs LLP; U.S. environmental "activists," such as Atossa Soltani, Amazon Watch, and Rainforest Action Network; U.S. public relations consultants, such as Karen Hinton; and additional financiers, such as Russell DeLeon and the Burford Group.

2.      The enterprise's ultimate aim is to create enough pressure on Chevron in the United States to extort it into paying to stop the campaign against it.  The RICO Defendants have sought to inflict maximum "damage to [Chevron's] reputation," to put "personal psychological

---

[1]   Forty-seven of the 48 Ecuadorian individuals who are named in the caption of the Lago Agrio complaint are also named as defendants here (the exception being one who is now deceased).  Whether or not these 47 individuals were actively involved with the corrupt acts described in this Amended Complaint, or knew or should have known about them, the Lago Agrio Litigation and multiple acts in United States courts have been undertaken in their names, as well as in the name of the Amazon Defense Front, by the other defendants or those acting in concert with them on their behalves.  Thus, they are vicariously liable for the torts of their agents undertaken on their behalves, can in no way benefit from a corruptly obtained judgment, and any relief Chevron procures by means of this action or other legal avenues applies equally to these 47 Ecuadorian individuals, who necessarily would thereby be acting in concert with their corrupt agents.

pressure [on] their top executives," to disrupt Chevron's relations with its shareholders and investors, to provoke U.S. federal and state governmental investigations, and thereby force the company into making a payoff.[2]

3.       To effect this plan, the RICO Defendants and their co-conspirators initiated a sham litigation in Lago Agrio, Ecuador (the "Lago Agrio Litigation"), claiming to seek money damages for "collective environmental rights" of the "affected" "communities" to remediate alleged petroleum contamination in Ecuador's Oriente region.  The Lago Agrio Litigation was directed and funded in significant part from the United States by United States residents, such as Donziger and Kohn.  In prosecuting the Lago Agrio Litigation, the RICO Defendants and their co-conspirators have engaged in a series of corrupt acts.  For example, they have submitted in the Lago Agrio Litigation fabricated evidence in the form of expert reports in the name of a U.S. environmental consultant, Dr. Charles Calmbacher, that he did not draft or approve.  They also pressured U.S. environmental consultant David Russell to generate an inflated $6 billion damages figure, which they never filed in Lago Agrio but instead touted in the press and, via co-conspirator Amazon Watch, submitted to the U.S. Securities and Exchange Commission in an attempt to trigger a Sarbanes-Oxley investigation.  And they arranged the appointment of Richard Stalin Cabrera Vega ("Cabrera") as the Ecuadorian court's sole expert to conduct a "global damages assessment."  They then secretly met with Cabrera to plan his report and—in

_____

[2]   Declaration of Kristen L. Hendricks In Support of Chevron Corporation's Motion to Compel Production of Documents From Joseph C. Kohn and Kohn, Swift & Graf, P.C. ("Hendricks Decl."), Exhibit 1, CRS-104-01-CLIP-01 (2006.07.24 *Crude* outtake video clip of S. Donziger discussing strategy with Cush and others); Exhibit 2 (certified transcript) at 41-42; Exhibit BU (2009.10.16 Email from A. Woods to S. Donziger re "New Partners Plan in Email – since you're travelling") (WOODS-HDD-0349678).

All exhibit references herein are to the concurrently filed Hendricks Declaration.  For the convenience of the Court, only Exhibits A through EZ have been submitted therewith.  Exhibits 1-384 were previously submitted with the February 3 Declaration of Kristen L. Hendricks In Support of Chevron Corporation's Motion for Preliminary Injunction, Dkts. 6-55 (Case No. 11 Civ. 0691 (LAK)).

the United States—ghostwrote the report and its annexes that Cabrera adopted "pretty much verbatim."[3]  The U.S.-based consultant RICO Defendants drafted "comments" purporting to criticize "the Expert's work and conclusions," even though they had written his initial report themselves, and then ghostwrote "Cabrera's" responses to their own "comments," increasing his fake damage assessment to more than $27 billion.[4]  In addition, the RICO Defendants have adopted a strategy to intimidate Ecuadorian judges, whom they have described as "mak[ing] decisions based on who they fear the most, not based on what the laws should dictate,"[5] and they have colluded with the Republic of Ecuador to procure sham criminal charges against Chevron's attorneys.

4.      To pressure Chevron in the United States, the RICO Defendants have cited this fabricated evidence, Cabrera's supposedly "independent" report and these trumped-up criminal charges in false statements to the U.S. Congress, the U.S. Department of Justice, state and federal regulatory agencies, including the Securities and Exchange Commission, the U.S. media, and Chevron shareholders, among others.  They have also made false statements to U.S. courts in an attempt to cover up their wrongdoing and to obstruct Chevron's discovery efforts.  In fact, when U.S. discovery proceedings were poised last March to require disclosure of the RICO Defendants' collusion with Ecuadorian court expert Cabrera, the RICO Defendants sought to delay the truth from coming out.  As one of the Ecuadorian lawyers told Defendant Donziger at the time, "the effects" of disclosure "are potentially devastating in Ecuador (apart from

---

[3]   Exhibit 6 (2011.01.08 Deposition of Steven Donziger, *In re Application of Chevron Corp.*, 10-MC-00002 (LAK) (S.D.N.Y.) ("Donziger Dep.")) at 2433:8-14.

[4]   Exhibit 7 (2008.09.16 Plaintiffs' Comments on Cabrera Report); Exhibit 8 (2008.11.17 Cabrera Supplemental Report); Exhibit 9 (2008.10.27 Email chain among D. Beltman, J. Peers, and A. Maest re "Ecuador. Doug – you should read this") (STRATUS-NATIVE051388) at 1; Exhibit 10 (2008.08.01 Email from D. Beltman to A. Maest and others re "Cabrera report comments") (STRATUS-NATIVE058697) at 1.

[5]   Exhibit 1, CRS-350-04-CLIP-01 (2007.06.06 *Crude* outtake video clip of meeting between S. Donziger, L. Yanza, and A. Soltani); Exhibit 2 (certified transcript) at 419.

destroying the proceeding, all of us, your attorneys, might go to jail)."[6]  U.S. counsel agreed, admitting in a remarkable series of internal emails that "it appears not only that Cabrera and plaintiffs can be charged with a 'fraud' respecting the former's report, but that Stratus was an active conspirator."[7]  Undeterred, however, Donziger and other U.S. counsel then conspired to "cleanse"[8] the Cabrera scandal by submitting to the Lago Agrio court last September new expert reports which largely relied on the tainted "Cabrera" report, but hiked the damages sought to $113 billion.

5.      The RICO Defendants' conduct violates the Racketeer Influenced and Corrupt Organizations Act, 28 U.S.C. § 1961 *et seq.*, with predicate acts of extortion, mail and wire fraud, money laundering, obstruction of justice, and witness tampering, among others.  In addition, Defendants' conduct constitutes common law fraud, unjust enrichment, intentional interference with contract, trespass to chattels, and civil conspiracy, among others.  As a result, Defendants' misconduct entitles Chevron to injunctive relief precluding Defendants from attempting to enforce the judgment emanating from the proceedings in Lago Agrio, Ecuador, a declaratory judgment that the Lago Agrio judgment is unenforceable, damages, and other relief.

## PARTIES AND RELEVANT NON-PARTIES

**Plaintiff**

6.      Plaintiff Chevron Corporation ("Chevron") is a Delaware corporation with its principal place of business located at 6001 Bollinger Canyon Road, San Ramon, California 94583.  Chevron is therefore a citizen of Delaware and California.

---

[6]   Exhibit 11 (2010.03.30 Email from J. Prieto to S. Donziger, P. Fajardo, L. Yanza, and J. Saenz re "Protection Action") (DONZ00055225).

[7]   Exhibit 12 (2010.05.16 Email chain among J. Horowitz, A. Wilson, S. Donziger, and others re "Rule60(b) And Stratus Materials") (DONZ00056679) at 1.

[8]   Exhibit 13 (2010.05.20 Email chain among S. Donziger, E. Westenberger, J. Abady and others re "Draft Outline of Possible Ecuadorian Court Filing") (DONZ00067932) at 1.

**RICO Defendants**

7.      The defendants listed in paragraphs 8 through 17 are the individuals who have conspired to engage in a pattern of racketeering activity, have each committed numerous criminal acts as part of their scheme to defraud and extort Chevron, and have each participated in the operation or management of the criminal enterprise.  These defendants shall be referred to herein as the "RICO Defendants."

8.      Defendant Steven Donziger ("Donziger") is currently a "consulting" attorney for the Amazon Defense Front in the Lago Agrio Litigation and, as he described himself, "the person primarily responsible for putting [the Lago Agrio] team together and supervising it."[9] Donziger is an individual residing in New York, New York, with an intention to reside there indefinitely, and is therefore a citizen of the State of New York.  Exercise of jurisdiction over Donziger is reasonable and proper in this District for the reasons set forth in paragraph 25, *infra*.

9.      Defendant the Law Offices of Steven R. Donziger is a sole proprietorship located at 245 W. 104th Street, #7D, New York, New York 10025, and is therefore a citizen of the State of New York.  Exercise of jurisdiction over the Law Offices of Steven R. Donziger is reasonable and proper in this District for the reasons set forth in paragraph 26, *infra*.

10.      Defendant Donziger & Associates, PLLC is a professional limited liability corporation located at 245 W. 104th Street, #7D, New York, New York 10025, and is therefore a citizen of the State of New York.  Exercise of jurisdiction over Donziger & Associates, PLLC is reasonable and proper in this District for the reasons set forth in paragraph 26, *infra*.

11.      Defendant Pablo Fajardo Mendoza ("Fajardo") is counsel of record for the Amazon Defense Front as well as purportedly counsel of record for the named plaintiffs in the Lago Agrio Litigation.  Fajardo is an individual residing in Ecuador, with an intention to reside there indefinitely, and is therefore a citizen of Ecuador.  Exercise of jurisdiction over Fajardo is reasonable and proper in this District for the reasons set forth in paragraph 28, *infra*.

---

[9]   Exhibit 14 (2006.11.03 S. Donziger Book Proposal) (DONZ00006707) at 2.

12.     Defendant Luis Yanza ("Yanza") is the co-founder of the Amazon Defense Front and is or has been the General Manager for Defendant Selva Viva. Yanza is an individual residing in Ecuador, with an intention to reside there indefinitely, and is therefore a citizen of Ecuador. Exercise of jurisdiction over Yanza is reasonable and proper in this District for the reasons set forth in paragraph 29, *infra*.

13.     Defendant Frente de Defensa de la Amazonia, a/k/a the Amazon Defense Front or Amazon Defense Coalition (the "Frente" or the "Front"), is a "non-profit" organization purporting to represent the "plaintiffs" in the Lago Agrio Litigation. The Front is the designated "beneficiary" and "trustee" of a trust ordered by the judgment in the Lago Agrio Litigation (the "Judgment Trust"), and intends to administer the proceeds from the judgment entered against Chevron. The Front is a non-profit organization registered under the laws of Ecuador with offices located in the town of Nueva Loja (Lago Agrio) in the province of Sucumbíos, Ecuador. The Front is therefore a citizen of Ecuador. Exercise of jurisdiction over the Front is reasonable and proper in this District for the reasons set forth in paragraph 30, *infra*.

14.     Defendant Selva Viva, a/k/a Selva Viva Selviva CIA, Ltda. ("Selva Viva") is or was an Ecuadorian limited liability company with an office located at 1240 Shirys Street, Tumbaco, Ecuador. Selva Viva is therefore a citizen of Ecuador. Defendant the Front created Selva Viva to administer funds for the litigation. Defendant the Front controls Selva Viva, Defendant Donziger is or has been the President of Selva Viva, and Defendant Yanza is or has been the General Manager of Selva Viva. Exercise of jurisdiction over Selva Viva is reasonable and proper in this District for the reasons set forth in paragraph 31, *infra*.

15.     Defendant Stratus Consulting, Inc. ("Stratus") provided various environmental consulting services to the RICO Defendants, and was involved in producing the purportedly "independent" expert report filed in the Lago Agrio Litigation. Stratus is a private corporation incorporated in Colorado with its main office at 1881 Ninth Street, Suite 201, Boulder, Colorado 80302, and is therefore a citizen of Colorado. Exercise of jurisdiction over Stratus is reasonable and proper in this District for the reasons set forth in paragraph 27, *infra*.

6

16.     Defendant Douglas Beltman ("Beltman") is an Executive Vice President of Stratus.  Beltman is an individual residing in Colorado, with an intention to reside there indefinitely, and is therefore a citizen of Colorado.  Exercise of jurisdiction over Beltman is reasonable and proper in this District for the reasons set forth in paragraph 27, *infra*.

17.     Defendant Ann Maest ("Maest") is a Managing Scientist at Stratus.  Maest is an individual residing in Colorado, with an intention to reside there indefinitely, and is therefore a citizen of Colorado.  Exercise of jurisdiction over Maest is reasonable and proper in this District for the reasons set forth in paragraph 27, *infra*.

**Non-Party Co-Conspirators**

18.     Certain other non-party individuals and business entities played roles, direct or indirect, in the scheme to defraud and extort Chevron.  Foremost among these individuals and business entities are the following:

      a.  Joseph Kohn ("Kohn") of the law firm Kohn Swift & Graf P.C. is an attorney who was a "consulting" attorney for the Amazon Defense Front in the Lago Agrio Litigation, and a primary source of funds for that litigation and for many of the illegal activities described in this Amended Complaint.  Kohn is a resident of Pennsylvania.

      b.  Kohn Swift & Graf P.C. ("Kohn Swift") is a professional corporation located at One South Broad Street, Suite 2100, Philadelphia, Pennsylvania 19107.  Kohn Swift has bankrolled the Lago Agrio Litigation as one of its "flagship cases" and funded the co-conspirators' other illegal activities.

      c.  Joshua Lipton ("Lipton") is the President of Stratus and is a resident of Colorado.  Together with the RICO Defendants, Lipton coordinated and oversaw the use of Stratus and other resources by the RICO Defendants to ghostwrite the Cabrera Report and publicize its findings.  To these ends, Lipton met with Donziger to discuss the RICO Defendants' plan to draft portions of the Cabrera Report and

was included in various correspondence concerning Stratus's work in ghostwriting the Cabrera Report.

d.  David Chapman ("Chapman") is a Principal at Stratus and is a resident of Colorado.  Chapman proposed drafting the Cabrera Report to Donziger, worked with Lipton and the RICO Defendants to coordinate the use of Stratus resources in the ghostwriting of the Cabrera Report, and participated in the subsequent obstruction of Chevron's efforts to uncover evidence of the fraud in U.S. court proceedings.  He met with Donziger to discuss the RICO Defendants' plan to ghostwrite the Cabrera Report, signed Stratus's report endorsing the Cabrera Report, and perjured himself in a deposition when he testified that he had no reason to believe that Stratus had provided work product to Cabrera.

e.  William Powers ("Powers") is a subcontractor for Stratus and is a resident of California.  Powers had responsibility for components of the fraudulent scheme to ghostwrite the Cabrera Report; he worked on two annexes of the Cabrera Report and drafted portions of Cabrera's supplemental report.

f.  Amazon Watch is a "non-profit" organization with its main office at 221 Pine Street, San Francisco, California 94104.  Amazon Watch undertakes various projects ostensibly on behalf of environmental and human rights causes in the Amazon basin.  In connection with the Lago Agrio Litigation, Amazon Watch applied its experience and resources in public, media and government relations to use the Cabrera Report and other false and fraudulent claims as the basis for the RICO Defendants' public pressure campaign against Chevron.  With the Amazon Defense Front, Amazon Watch maintains at least one of the RICO Defendants' websites, chevrontoxico.com, and through that and other means, distributes false and misleading statements as part of the RICO Defendants' extortionate scheme. Kohn and Kohn Swift are significant financial supporters of Amazon Watch.

g.  Atossa Soltani ("Soltani") is the founder and executive director of Amazon Watch and, in that capacity, Soltani repeatedly distributed false and misleading statements about Chevron and the Lago Agrio Litigation as part of the RICO Defendants' extortionate scheme.  She has also worked with Donziger, Yanza and other RICO Defendants to coordinate the public pressure campaign against Chevron, and to develop the RICO Defendants' strategy of manipulating the Lago Agrio court through intimidation and collusion with the Republic of Ecuador. Soltani is a resident of California.

h.  Rainforest Action Network ("RAN") is a "non-profit" organization with its main office at 221 Pine Street, San Francisco, California 94104.  The organization specializes in boycotts, demonstrations, and other high-profile means of exerting pressure on corporations that it perceives threaten the world's rainforests.  In close concert with Amazon Watch (with which it shares a headquarters location), RAN has organized demonstrations and boycotts against Chevron and distributed false and misleading statements about Chevron and the Lago Agrio Litigation. RAN also maintains at least one of the websites, changechevron.org, through which the RICO Defendants distribute false and misleading statements.

i.  Richard Stalin Cabrera Vega ("Cabrera") is a mining engineer and court expert in the Lago Agrio Litigation and a resident of Ecuador.  The RICO Defendants secured his appointment as a purportedly independent court expert in the Lago Agrio Litigation.  He was paid by the RICO Defendants and their co-conspirators for his cooperation in signing a fraudulent report ghostwritten by the RICO Defendants and their co-conspirators and he has repeatedly misrepresented his independence.

j.  Alberto Wray ("Wray") is the former counsel of record for the plaintiffs in the Lago Agrio Litigation and is a resident of Washington, D.C.  Wray previously served on Ecuador's Supreme Court and has significant political connections in

9

Ecuador.  The RICO Defendants have used Wray's connections to procure the sham criminal investigations of Chevron's attorneys.

k.  Cristóbal Bonifaz ("Bonifaz") of the Law Offices of Cristóbal Bonifaz was counsel of record for plaintiffs in two actions that were filed in the Southern District of New York, *Aguinda v. Texaco, Inc.*, No. 93 Civ. 7527 (S.D.N.Y. Nov. 3, 1993), and *Jota v. Texaco, Inc*., No. 94 Civ. 9266 (S.D.N.Y. Dec. 28, 1994). Bonifaz is a resident of Massachusetts.  Until in or about 2006, Bonifaz was also a consulting attorney for the Front, and purportedly the named plaintiffs, in the Lago Agrio Litigation.

l.  Juan Pablo Saenz ("Saenz") is an Ecuadorian attorney who claims to represent the plaintiffs in the Lago Agrio Litigation and is a key intermediary between the RICO Defendants and the Republic of Ecuador.  He has also signed false and misleading declarations filed in U.S. courts, including in the Southern District of New York.

m.  Julio Prieto ("Prieto") is an Ecuadorian attorney who claims to represent the plaintiffs in the Lago Agrio Litigation.  Prieto was a key participant in the RICO Defendants' obstruction of justice in U.S. courts and he proposed litigation and public relations activities in the United States that the RICO Defendants undertook in order to obscure the evidence of their fraudulent scheme.

n.  Karen Hinton ("Hinton") is a spokeswoman for the Front in the United States and is a resident of Virginia.  Hinton assisted the RICO Defendants in the development of their public pressure campaign and, often in concert with Amazon Watch, has authored false and misleading press releases and media statements about the Lago Agrio Litigation in furtherance of the RICO Defendants' extortionate scheme.

o.  E-Tech International ("E-Tech") is an environmental consulting firm located at 231 Las Mananitas, Santa Fe, New Mexico 87501.  E-Tech provided various

environmental consulting services to the RICO Defendants and helped the RICO
Defendants secretly draft Cabrera's work plan and otherwise colluded with
Cabrera.

p.   Burford Capital Limited, Burford Group Limited, Burford Group LLC, Burford
Advisors LLC, and Treca Financial Solutions (collectively, "Burford") are
associated entities in the business of litigation finance.  Burford Capital Limited is
registered in the Bailiwick of Guernsey and is publicly traded on the London
Stock Exchange's AIM Market.  Burford Group Limited is also a Guernsey
corporation, and it operates in the United States through its subsidiary Burford
Group LLC, which has its principal office at 1185 Avenue of the Americas, New
York, New York 10036.  Burford Advisors also has its principal office at 1185
Avenue of the Americas, New York, New York 10036.  Treca Financial Solutions
is registered in the Cayman Islands, and is a funding vehicle established by
Burford to funnel financial support to the RICO Defendants.  Burford began
working with the RICO Defendants in 2009 and began funding the Lago Agrio
Litigation in 2010.

q.   Russell DeLeon ("DeLeon") is a law school friend of Donziger's and
entrepreneur whose businesses include PartyGaming Plc, an online gambling
company headquartered in Gibraltar.  DeLeon has funded the RICO Defendants'
activities for several years, providing over $1 million in support, and has made
payments directly to Ecuadorians, including Fajardo and others.  DeLeon has
funneled some or all of this funding through Torvia Limited, a company
incorporated under the laws of Gibraltar.

r.   Emery Celli Brinckerhoff & Abady LLP ("Emery Celli") is a law firm located at
75 Rockefeller Plaza, 20th Floor, New York, New York 10019.  Emery Celli has
spearheaded the RICO Defendants' obstruction and cover-up efforts in the United
States, making numerous meritless filings in opposition to Chevron's discovery

11

proceedings in U.S. courts in an express effort to delay those proceedings and "buy time" for the RICO Defendants' criminal scheme.

s. Patton Boggs LLP ("Patton Boggs") is a law firm with its principal office at 2550 M Street, NW, Washington, D.C. 20037.  Patton Boggs has developed the RICO Defendants' strategy for pursuing the assets of Chevron and its subsidiaries around the world on the basis of the fraudulent judgment in Ecuador, and has also been instrumental in the cover-up and obstruction of Chevron's U.S. discovery proceedings.

t. Motley Rice LLC ("Motley Rice") is a law firm with an office located at One Corporate Center, 20 Church St., Hartford, Connecticut 06103.  Motley Rice has participated in the obstruction of Chevron's U.S. discovery efforts.

u. H5 is a California corporation with its principal office at 71 Stevenson St., San Francisco, California 94105.  H5 has participated in planning and implementing the RICO Defendants' scheme, including the "cleansing" of the Cabrera Report and the obstruction of Chevron's U.S. discovery efforts.

19.    At all relevant times, each and every non-party named in paragraph 18 was acting in concert with, or as an agent for, one or more of the RICO Defendants and, further, as described in more detail below, conspired with one or more of the other RICO Defendants to perform the acts averred herein.

**Remaining Defendants**

20.    The Lago Agrio Litigation was ostensibly brought on behalf of forty-eight named individual Ecuadorians,[10] referred to herein as the Lago Agrio Plaintiffs.  At all relevant times, the Lago Agrio Plaintiffs have been individuals residing in the Republic of Ecuador.  The

---

[10] One of these individuals, Esteban Lusitante Yaiguaje, is now deceased and thus is not named as a defendant in this case.

Lago Agrio Plaintiffs are those individuals identified in Appendix A to this Amended Complaint, which is incorporated by reference as if set forth herein in its entirety.

21.     The Lago Agrio Plaintiffs' Complaint seeks no individual damages in the Lago Agrio Litigation, and the signatures for twenty of the Lago Agrio Plaintiffs on the power of attorney form submitted along with the complaint in the Lago Agrio Litigation are the product of forgery.  Defendant Fajardo, in a sworn declaration submitted to this Court in January 2011, has affirmed that he represents the Lago Agrio Plaintiffs as their attorney in the Lago Agrio Litigation and is authorized to pursue and defend their interests in other domestic and foreign courts.  According to Fajardo, the Lago Agrio Plaintiffs gave him "the power to represent them" in the Lago Agrio Litigation in 2006.[11]  At that time, they purportedly signed documents appointing him as their "Common Attorney,"[12] which required him "to undertake all appropriate legal action to defend the[ir] rights" and authorized him "to appear on their behalf in connection with the Lago Agrio Litigation and if necessary to delegate this power to others."[13] Subsequently, in November 2010, "at least forty-one (41)" of the Lago Agrio Plaintiffs allegedly signed notarized powers of attorney "affirming" Fajardo's "powers to represent them in pursuit and defense of their interests before the courts in Ecuador and in all other countries, including the United States."[14]  Moreover, in these powers of attorney, the Lago Agrio Plaintiffs purportedly "ratified and approved each and every action to date performed by [Fajardo] or by any other persons authorized by [Fajardo] to act in defense of the [Lago Agrio] Plaintiffs'

---

[11]  Exhibit EJ (certified translation of 2011.01.19 Declaration of P. Fajardo, *In re Application of Chevron Corp.*, 10-mc-00002 (LAK) Dkt 167-1 (S.D.N.Y.)), ¶ 3.

[12]  Exhibit EJ (certified translation of 2011.01.19 Declaration of P. Fajardo, *In re Application of Chevron Corp.*, 10-mc-00002 (LAK) (S.D.N.Y.), Dkt. 167-1), ¶ 3.

[13]  Exhibit EJ (certified translation of 2011.01.19 Declaration of P. Fajardo, *In re Application of Chevron Corp.*, 10-mc-00002 (LAK) (S.D.N.Y.), Dkt. 167-1), ¶ 4.

[14]  Exhibit EJ (certified translation of 2011.01.19 Declaration of P. Fajardo, *In re Application of Chevron Corp.*, 10-mc-00002 (LAK) (S.D.N.Y.), Dkt. 167-1), ¶ 6.

interests in the Lago Agrio Litigation and in all other related actions."[15]  In his declaration, Fajardo represented that the Lago Agrio Plaintiffs who signed the powers of attorney in November 2010 "affirmed that as lead counsel I have the authority to make and sign contracts, hire and retain legal consultants, and designate to others all or part of my power to represent the [Lago Agrio] Plaintiffs."[16]  He also stated that he retained several U.S. law firms to assist with the representation of the Lago Agrio Plaintiffs, including Patton Boggs, Emery Celli, and Motley Rice.[17]

22.     Whether or not the individual Lago Agrio Plaintiffs were or are aware of the fraud that has been perpetrated by the RICO Defendants and their co-conspirators in their names, the Lago Agrio Plaintiffs cannot benefit from the fraud and corrupt acts perpetrated ostensibly on their behalf.

## SUBJECT MATTER JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction over Chevron's claims under 28 U.S.C. §§ 1331 and 1332, and under 18 U.S.C. § 1964(c).  Chevron's first claim for relief arises under 18 U.S.C. § 1961 *et seq.*, as hereinafter more fully appears.  There is also complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.  Chevron's state law claims arise out of the same case or controversy as its federal law claims, as all claims in this action arise out of a common nucleus of operative facts.  Thus, this Court also has supplemental jurisdiction over Chevron's state law claims under 28 U.S.C. § 1367.

---

[15]  Exhibit EJ (certified translation of 2011.01.19 Declaration of P. Fajardo, *In re Application of Chevron Corp.*, 10-mc-00002 (LAK) (S.D.N.Y.), Dkt. 167-1), ¶ 9.

[16]  Exhibit EJ (certified translation of 2011.01.19 Declaration of P. Fajardo, *In re Application of Chevron Corp.*, 10-mc-00002 (LAK) (S.D.N.Y.), Dkt. 167-1), ¶ 8.

[17]  Exhibit EJ (certified translation of 2011.01.19 Declaration of P. Fajardo, *In re Application of Chevron Corp.*, 10-mc-00002 (LAK) (S.D.N.Y.), Dkt. 167-1), ¶ 10.

24.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2), as a substantial number of the events giving rise to this action occurred in this District, and also under 18 U.S.C. § 1965.

## PERSONAL JURISDICTION

25.     Exercise of jurisdiction over Defendant Donziger is reasonable and proper in this District because Donziger is a citizen of the State of New York and because he conducts extensive business activities within the State.  Donziger is the sole proprietor of the Law Offices of Steven R. Donziger, which is located and does business in New York.  Through his activities in New York, Donziger has served as the ringleader in the enterprise to defraud and extort Chevron, working closely with the other RICO Defendants in this action.  For Chevron's claims for violations of 18 U.S.C. § 1962 and New York state law, exercise of jurisdiction over Donziger is proper pursuant to 18 U.S.C. § 1965(a) and N.Y. C.P.L.R. 301.

26.     Exercise of jurisdiction over the Law Offices of Steven R. Donziger and Donziger & Associates, PLLC is reasonable and proper in this District because the Law Offices of Steven R. Donziger and Donziger & Associates, PLLC are citizens of New York, and because they conduct extensive business activities in the State.  Further, by and through the activities of Donziger described above, the Law Offices of Steven R. Donziger and Donziger & Associates PLLC have served as key players in the conspiracy against Chevron.  For Chevron's claims for violations of 18 U.S.C. § 1962 and New York state law, exercise of jurisdiction over the Law Offices of Steven R. Donziger and Donziger & Associates, PLLC is proper pursuant to 18 U.S.C. § 1965(a) and N.Y. C.P.L.R. 301.

27.     Defendants Stratus, Beltman, and Maest are all residents of the United States. For Chevron's claims for violations of 18 U.S.C. § 1962, the exercise of jurisdiction over each of these defendants is proper in this District pursuant to 18 U.S.C. § 1965(b).  The ends of justice require application of the nationwide service provisions of 18 U.S.C. § 1965(b) because there is no district in which all of the RICO Defendants could otherwise be tried together.  For Chevron's claims under New York state law, exercise of jurisdiction over Defendants Stratus, Beltman, and

Maest is proper pursuant to N.Y. C.P.L.R. 301 and 302.  Through their agents and co-conspirators, Defendants Stratus, Beltman, and Maest have transacted and continue to transact business in the State of New York, and there is a substantial nexus between Defendants Stratus, Beltman, and Maest's purposeful availment of the New York forum and Chevron's claims.

28.     Exercise of jurisdiction over Fajardo is proper pursuant to 18 U.S.C. § 1965(b) and N.Y. C.P.L.R. 301 and 302.  Fajardo has transacted business and engaged in tortious conduct in the United States and New York which gives rise in part to Chevron's claims.  Among other things, Fajardo (i) met with his co-conspirators in the United States multiple times to plan the ghostwriting of the Cabrera Report, including trips to New York to meet with Donziger and to Boulder, Colorado; (ii) acted in the United States and New York to conceal the conspiracy and fraud, including falsely testifying in *In re Application of Chevron*, Case No. 10 MC 00002 (S.D.N.Y. Aug. 6, 2010) that Cabrera was "independent" while knowing the RICO Defendants' role in Cabrera's appointment and reports (*see id.*, Dkt 31 at Ex. 46); (iii) solicited and obtained funds for the Lago Agrio Litigation while in the United States and, on information and belief, in New York; and (iv) caused to be filed in the Southern District of New York an action on behalf of the Lago Agrio Plaintiffs to stay the international arbitration that Chevron initiated pursuant to the United States-Ecuador Bilateral Investment Treaty (the "Treaty Arbitration"), *Yaiguaje et al. v. Chevron Corp. and Texaco Petroleum Co.*, No. 10 CV 316 (LBS) (S.D.N.Y. Jan. 14, 2010) ("*Yaiguaje*").  Fajardo has also engaged in intentional, wrongful, illegal, and/or tortious acts the effects of which Fajardo knew and intended would be felt in the United States and New York. For example, Fajardo has (i) directed a multitude of phone calls, emails, and other forms of communication to his co-conspirators in the United States and New York for the purpose of planning and carrying out their conspiracy and fraud; and (ii) participated in and orchestrated campaigns in the United States and New York to influence United States federal officials, State of New York officials, financial analysts, investors, and stockholders for the purpose of extorting money from Chevron.  Also, as set forth more fully herein, Fajardo's co-conspirators and agents have engaged in intentional, wrongful, illegal, and/or tortious acts in the United States and New

16

York.  Fajardo was aware of the effects in the United States and New York of those acts, the activities of Fajardo's co-conspirators and agents were to the benefit of Fajardo, and his co-conspirators and agents were working at the direction, under the control, at the request, and/or on behalf of Fajardo in committing those acts.

29.     Exercise of jurisdiction over Yanza is proper pursuant to 18 U.S.C. § 1965(b) and N.Y. C.P.L.R. 301 and 302.  Yanza has transacted business and engaged in tortious conduct in the United States and New York which give rise in part to Chevron's claims.  Among other things, Yanza (i) met with his co-conspirators in the United States multiple times to plan the ghostwriting of the Cabrera Report, including trips to New York to meet with Donziger and to Boulder, Colorado; (ii) caused funds to be transferred within the United States and from the United States to Ecuador in furtherance of the RICO Defendants' wrongful activities; (iii) attended Chevron shareholder meetings to attempt to pressure Chevron's stockholders and board of directors in furtherance of the conspiracy; (iv) solicited and received funds for the Lago Agrio Litigation while in the United States and, on information and belief, in New York and from persons in the United States and New York directly and through agents by other means for the purpose of carrying out the conspiracy and fraud; (v) attempted to conceal the conspiracy and fraud by making false and misleading statements in the United States and elsewhere; and (vi) caused to be filed in the Southern District of New York the *Yaiguaje* action on behalf of the Lago Agrio Plaintiffs to stay the Treaty Arbitration initiated by Chevron.  Yanza has also engaged in intentional, wrongful, illegal, and/or tortious acts the effects of which Yanza knew and intended would be felt in the United States and New York.  For example, Yanza has (i) directed multitudes of phone calls, emails, and other forms of communication to his co-conspirators in the United States and New York for the purpose of planning and carrying out their conspiracy and fraud; and (ii) participated in and orchestrated campaigns in the United States and New York to influence United States federal officials, State of New York officials, financial analysts, investors, and stockholders for the purpose of extorting money from Chevron.  Also, as set forth more fully herein, Yanza's co-conspirators and agents have engaged in intentional, wrongful,

illegal, and/or tortious acts in the United States and New York.  Yanza was aware of the effects in the United States and New York of those acts, the activities of Yanza's co-conspirators and agents were to the benefit of Yanza, and his co-conspirators and agents were working at the direction, under the control, at the request, and/or on behalf of Yanza in committing those acts.

30.     Exercise of jurisdiction over the Front is proper pursuant to 18 U.S.C. § 1965(b) and N.Y. C.P.L.R. 301 and 302.  The Front has been designated beneficiary and trustee in the Lago Agrio Litigation and stands to benefit from the fraudulent judgment entered against Chevron.  Yanza is the Front's co-founder, Fajardo is a leader within the organization, and at all times relevant herein Yanza and Fajardo were acting as the Front's co-conspirators, agents and/or alter egos in perpetrating the conspiracy and fraud against Chevron.  By and through its co-conspirators, agents and/or alter egos Yanza and Fajardo, the Front has transacted business and engaged in tortious conduct in the United States and New York which give rise in part to Chevron's claims, as set forth more fully above.  The Front has also engaged in intentional, wrongful, illegal, and/or tortious acts the effects of which the Front knew and intended would be felt in the United States and New York.  Among other things, the Front: (i) directed multitudes of phone calls, emails, and other forms of communication to its co-conspirators in the United States and New York for the purpose of planning and carrying out their conspiracy and fraud; (ii) maintains or causes to be maintained a website intentionally directed towards a U.S.-based audience called www.texacotoxico.org through which the Front has attempted to conceal the conspiracy and fraud by making false and misleading statements and, on information and belief, raised funds from the United States and New York for the purpose of carrying out the conspiracy and fraud; (iii) solicited and received funds from persons in the United States and New York directly and through agents by other means for the purpose of carrying out the conspiracy and fraud; (iv) used Amazon Watch as its public relations firm in the United States to publish false and misleading statements to conceal the conspiracy and fraud; and (v) hired a Washington, D.C.-based lobbyist to pursue its and its co-conspirators' interests before the U.S. Congress. Also, as set forth more fully herein, the Front's co-conspirators and agents have engaged in

18

intentional, wrongful, illegal, and/or tortious acts in the United States and New York.  The Front was aware of the effects in the United States and New York of those acts, the activities of the Front's co-conspirators and agents were to the benefit of the Front, and its co-conspirators and agents were working at the direction, under the control, at the request, and/or on behalf of the Front in committing those acts.

31.     Exercise of jurisdiction over Selva Viva is proper pursuant to 18 U.S.C. § 1965(b) and N.Y. C.P.L.R. 301 and 302.  Donziger is or has been the President of Selva Viva, Yanza is or was the General Manager of Selva Viva, and at all times relevant herein Donziger, Yanza and Fajardo were acting as Selva Viva's co-conspirators, agents and/or alter egos in perpetrating the conspiracy and fraud against Chevron.  By and through its co-conspirators, agents and/or alter egos Donziger, Yanza and Fajardo, Selva Viva has transacted business and engaged in tortious conduct in the United States and New York which give rise in part to Chevron's claims, as set forth more fully above.  Selva Viva has also directly transacted business and engaged in tortious conduct in the United States which give rise in part to Chevron's claims. The RICO Defendants use or have used Selva Viva as a conduit for funding their wrongful activities in Ecuador.  Selva Viva has solicited and received several payments from Kohn Swift in the United States in order to fund the Lago Agrio Litigation, and some of those payments were subsequently channeled to Cabrera from a Selva Viva bank account.  Also, as set forth more fully herein, Selva Viva's co-conspirators and agents have engaged in intentional, wrongful, illegal, and/or tortious acts in the United States and New York.  Selva Viva was aware of the effects in the United States and New York of those acts, the activities of Selva Viva's co-conspirators and agents were to the benefit of Selva Viva, and its co-conspirators and agents were working at the direction, under the control, at the request, and/or on behalf of Selva Viva in committing those acts.

32.     Exercise of jurisdiction over the Lago Agrio Plaintiffs is proper pursuant to N.Y. C.P.L.R. 301 and 302 because the Lago Agrio Plaintiffs have purposefully availed themselves of the New York forum by purportedly engaging New York attorneys and instituting and otherwise

participating in related litigation in this District.  The Lago Agrio Plaintiffs have reportedly hired Defendant Donziger, a New York attorney, to represent their interests in the Lago Agrio Litigation.  Additionally, they have reportedly hired co-conspirator Emery Celli, a New York law firm, to represent them in litigation pending in this Court and elsewhere in the United States.  On January 14, 2010, the Lago Agrio Plaintiffs were the named plaintiffs in an action filed in this Court against Chevron to stay the Treaty Arbitration that Chevron initiated to obtain relief for the Republic of Ecuador's violations of its obligations under the United States-Ecuador Bilateral Investment Treaty, investment agreements, and international law, including Ecuador's failure to abide by the negotiated settlement and releases relating to the remediation of the former concession area.  *See Yaiguaje*, No. 10 CV 316 (LBS) (S.D.N.Y. Jan. 14, 2010), Transcript of Hearing, Mar. 10-11, 2010.  The Lago Agrio Plaintiffs have also intervened in Chevron's 28 U.S.C. § 1782 proceedings in this Court (and in other federal district courts) by filing various motions and briefs as "interested parties."  The Lago Agrio Plaintiffs' involvement in the 1782 proceedings in this Court caused Judge Kaplan to specifically find that "they [have] subjected themselves to the personal jurisdiction of this Court."  *In re Application of Chevron*, 10 MC 00001 (LAK) (S.D.N.Y. July 22, 2010), 9/7/2010 Order at 23.  There is a substantial nexus between the Lago Agrio Plaintiffs' purposeful availment of the New York forum and Chevron's claims under New York state law.  For such claims, exercise of jurisdiction over the Lago Agrio Plaintiffs is therefore proper pursuant to N.Y. C.P.L.R. 301-02.

## FACTUAL BASIS FOR CLAIMS

### A.      Background

33.     This Amended Complaint details how a group of U.S. plaintiffs' lawyers, together with U.S. and Ecuadorian co-conspirators, set about fraudulently exploiting images of environmental degradation in rural Ecuador to extort money from a U.S. company in a criminal scheme.  Many of the quotations included in this Amended Complaint were captured in video footage in the making of *Crude: The Real Price of Oil*, a film commissioned by the RICO

Defendants and their co-conspirators in furtherance of their criminal scheme.  Others come directly from the RICO Defendants' own emails, letters and other documents.

     **1.**      **TexPet Participates in Ecuador's State Oil Consortium and Negotiates Release From Liability in Return for Specified Remediation**

     34.     In 1964, Ecuador granted oil exploration and production rights (known as a "concession") in a designated part of the Oriente region of Ecuador to Texaco Petroleum Company ("TexPet") and the Ecuadorian Gulf Oil Company ("Gulf"),[18] which then formed what came to be known as the consortium.  Ecuador's state-owned oil company, Petroecuador (formerly known as Corporación Estatal Petrolera Ecuatoriana or CEPE), became a stakeholder in the consortium in 1974 and, on December 31, 1976, it became the 62.5% majority stakeholder.[19]

     35.     When the consortium began its exploration activities, TexPet and Gulf agreed that TexPet would serve as the operator on behalf of both companies.[20]  As operator, and per the terms of the 1965 Napo Joint Operating Agreement that governed the internal workings of the consortium, TexPet was "in direct charge of carrying out the [p]arties' work obligations and performing other duties" with their prior consent and approval.[21]  Each party was obligated to provide operating expenses and investment funds according to its ownership interest in the consortium.[22]  TexPet was required to render its services as operator at cost and, in consideration

---

[18]  Exhibit 15 (1964.02.21 Superior Decree, No. 205-A, published in Official Record No. 186).

[19]  Exhibit 16 (1973.08.06 Agreement between the Government of Ecuador, Ecuadorian Gulf Oil Company, and Texaco Petroleum Company) ("1973 Agreement"); Exhibit 17 (1977.05.27 Agreement among the Government of Ecuador, CEPE and Ecuadorian Gulf Oil Company).

[20]  Exhibit 18 (1965 Napo Joint Operating Agreement).

[21]  Exhibit 18 (1965 Napo Joint Operating Agreement), ¶ 6.2.

[22]  Exhibit 18 (1965 Napo Joint Operating Agreement), ¶ 6.3.

therefor, was to be indemnified and held harmless by the parties for any claims brought by third parties arising out of or related to its performance as operator.[23]

36.     Once Petroecuador entered the consortium and after it became the majority owner, TexPet continued to serve as operator.  As majority owner, however, Petroecuador contributed 62.5% of the consortium's investments and operating costs and approved all annual work programs and budgets.[24]  Petroecuador retained oversight of TexPet's activities as operator beyond the annual budgeting cycles by approving projects as they were implemented and answering monthly "cash calls" with the funds necessary for each month's operating expenses.[25]

37.     TexPet continued in the role of operator until 1990 when Petroecuador assumed operations.[26]  In 1992 when the concession contract expired, Petroecuador took over 100% ownership of the former consortium fields and facilities.[27]  TexPet has not operated any oilfields in Ecuador since 1990, and has had no ownership interest in any oilfield operations in Ecuador since 1992.[28]  From 1992 to the present, Petroecuador has been the sole owner and operator of the former concession area.[29]

---

[23]  Exhibit 18 (1965 Napo Joint Operating Agreement), ¶¶ 6.3, 6.4.

[24]  Exhibit 18 (1965 Napo Joint Operating Agreement), ¶¶ 8.7, 8.2.

[25]  Exhibit 18 (1965 Napo Joint Operating Agreement), ¶¶ 7.4, 8.2, 8.8.

[26]  *Republic of Ecuador v. ChevronTexaco Corp.*, 376 F. Supp. 2d 334, 340 (S.D.N.Y. 2005).

[27]  Exhibit 19 (1990.06.30 Agreement for the Change of Operator of the Consortium Petroecuador-Texaco); *see also* Exhibit 16 (1973 Agreement), §§ 4, 28; *In re Application of Chevron Corp.*, No. 10 MC 00002 (LAK), 2010 WL 4910248, at *5 (S.D.N.Y. Nov. 10, 2010).

[28]  Exhibit 19 (1990.06.30 Agreement for the Change of Operator of the Consortium Petroecuador-Texaco).

[29]  Exhibit 19 (1990.06.30 Agreement for the Change of Operator of the Consortium Petroecuador-Texaco); *see also* Exhibit 16 (1973 Agreement), §§ 4, 28.

38.     Before its termination, the consortium's activities generated over US$23 billion. The Republic of Ecuador retained 97.3% of this amount, however, through an array of income taxes, royalties, contributions for domestic consumption, and gross profit on Petroecuador's share.  The money generated by the consortium represented more than 50% of Ecuador's gross national product during that period.[30]

39.     TexPet's total profits over the life of the consortium were a small fraction of those realized by Ecuador—less than US$500 million.

40.     Since Petroecuador took over operational control in 1990, it has drilled 414 new wells—almost 30% more than were drilled during TexPet's 25 years as the operator—and, according to Ecuadorian public media sources, was responsible for more than 1,400 disclosed spills from 2000 to 2008 alone.[31]  Petroecuador's environmental record has prompted Ecuador's current President, Rafael Correa to comment that Petroecuador "has dreadful environmental management practices."[32]

41.     Defendant Fajardo—before he realized that such candor might undercut the conspiracy's attempts to extort Chevron—also spoke out against Petroecuador's environmental record:

> [Petroecuador is] unreliable because what Petro[ecuador] says is one thing and what it does is the complete opposite.  Since Texaco left here, Petro[ecuador] has inflicted more damage and many more disasters than Texaco itself.  But they'd never, ever say that.  So there's one spill after another; there's broken pipes, there's contamination of wetlands, of rivers, of streams in great magnitude.  But

---

[30]  Exhibit 20 (2000 Article by Kristi Jacques, "Environmental Justice Case Study: Texaco's Oil Production in the Ecuadorian Rainforest").

[31]  Exhibit 21 (2009.02.28 Article, "Petroecuador diagnostica los daños ambientales por crudo" ["Petroecuador diagnosed environmental damage from Oil"], EL UNIVERSO).

[32]  Exhibit 22 (certified translation of 2007.04.27 Press Conference held by R. Correa during visit to the Oriente) at 3.

since it's a state-owned company, since it's the same people involved in the laws
and all, no one says a thing.[33]

42.     When Petroecuador took over as operator of the consortium in 1990, TexPet

consented to Ecuador's request that it collaborate with Petroecuador to conduct an environmental

audit of the consortium's oil fields.[34]  TexPet insisted, however, that Petroecuador, as majority

owner of the consortium, share responsibility for any necessary remediation that the audit

identified in the same manner as the parties had shared all operating costs.[35]  Ecuador

acknowledged that TexPet was responsible for only its 37.5% share of the costs of remediating

the environmental impact of the consortium's operations, and the parties recognized that TexPet

could not be held responsible for the environmental impact of oil field operations conducted after

its concession rights expired in 1992.[36]

43.     In 1994, Ecuador publicly rejected the preliminary findings of the independent,

joint audit[37] and threatened to bring suit against TexPet for injuries to Ecuador's environment.[38]

Ecuador further informed TexPet that Petroecuador would not participate with TexPet in

conducting environmental remediation because it lacked the necessary money to fund its share of

---

[33]  Exhibit 23 (2003.11 Final Report FLACSO-Petroecuador Project Phase Two:  Study on
      Socio-Environmental Conflicts in the Sacha and Shushufindi Fields (1994-2002) by Dr.
      Guillaume Fontaine) at 77.

[34]  Exhibit 24 (2006.11.14 Deposition of Diego Tamariz, *Republic of Ecuador v.
      Chevrontexaco Corp.*, 04CV8378LBS (S.D.N.Y.)) at 140:1-142:19; 147:14-148:9; Exhibit
      25 (1990.05.10 Letter from D. Tamariz to L. Román) (ROEPROD_00020141); Exhibit 26
      (1990.05.11 Letter from D. Tamariz to W. Gillies).

[35]  Exhibit 27 (1990.06.01 Letter from W. Gillies to D. Tamariz).

[36]  Exhibit 28 (1992.06.01 Letter from Nat. Hydrocarbons Dir. to R. Almeida).

[37]  Exhibit 29 (2006.10.19 Deposition of Giovanni Elicio Mario Rosania Schiavone, *Republic
      of Ecuador v. Chevrontexaco Corp.*, 04CV8378LBS (S.D.N.Y.) ("Rosania Dep.")) at 48:2-
      51:6.

[38]  Exhibit 30 (1994.07.08 Letter from P. Lynch to A. Dahik).

the work.[39]  Thus, instead of identifying remediation work to be funded jointly, Ecuador insisted that the parties identify a set of remediation obligations corresponding to TexPet's share of responsibility.

44.     On or about December 14, 1994, Ecuador, Petroecuador, and TexPet entered into a Memorandum of Understanding ("MOU") in which they agreed to define TexPet's "Scope of the Work of Environmental Reparation" with respect to the "biotic" and "abiotic" environment,[40] and also secured from TexPet a commitment to "carry out socio-economic compensation projects in order to address problems . . . stemming from the oil operations. . . ."[41] This compensatory effort would accrue to the benefit not of the government in a narrow sense, but rather of the larger population.  In fact, elsewhere, the document expressly underscores that these projects had to "tak[e] into consideration the inhabitants of the Oriente Region."[42]  In exchange, the MOU obligated Ecuador to "negotiate the full and complete release of TexPet's obligations for environmental impact arising from the operations of the Consortium."[43]

45.     The MOU furthered Ecuador's own constitutional duties toward its citizens. Under Article 19(2) of the extant Constitution, the authority to vindicate any environmental

---

[39]  Exhibit 31 (2006.08.09 Opinion of the Deputy Prosecutor General) at 2.4.

[40]  Exhibit 32 (1994 Memorandum of Understanding Between Ecuador, Petroecuador and TexPet ("1994 MOU")) at 1 (I(d)) ("impactos en el medio ambiente").  *See also id*. at 2 (IV) & 3 (IV(b)) ("impactos ambientales").

[41]  Exhibit 32 (1994 MOU) at 3 (V) ("Texpet se comprometerá a realizar o ejecutar los proyectos de compensaciones socioeconomicas, tendientes a solucionar los problemas de esta naturaleza causados por las operaciones petroleras.").

[42]  Exhibit 32 (1994 MOU) at 3 (V) ("La ejecución de los proyectos deberá desarrollarse tomando en cuenta a los habitantes de la Región Oriental.").

[43]  Exhibit 32 (1994 MOU) at 2.

rights on behalf of the Ecuadorian people was held exclusively by the government of Ecuador.[44] According to the Ecuadorian Ambassador to the United States, "It is the Republic's *obligation* to become involved in matters that directly impact the welfare of Ecuadorian citizens, territory and natural resources, and the very sovereignty of the Republic of Ecuador.  The recent agreement between the Republic, Petroecuador and Texaco Petroleum Company, which was reviewed and supported by the Ecuadorian Congress, . . . demonstrates the Republic's determination to fulfill this obligation."[45]

      46.      Thus, as TexPet was winding down its operations, an Environmental Committee of the Ecuadorian Congress insisted that any settlement agreement between TexPet and Ecuador "indemnify or alleviate the negative environmental effects caused . . . to the Ecuadorian population living in [the] Amazonian region," and stressed, to that end, that TexPet had to provide compensation in the "biotic, abiotic and socio-economic areas," and, with an "atmosphere of consensus[,] . . . tak[e] into consideration the inhabitants and authorities in the region."[46]  TexPet and the representatives of Ecuador and Petroecuador "t[ook] into consideration" the comments and suggestions from the Ecuadorian Congress.[47]  Local politicians from the Oriente region also played what they saw as a "leading role as the interested party" in

---

[44]  Exhibit 33 (1978 Constitution of the Republic of Ecuador, art. 19(2)) (imposing "duty [on] the State" to "oversee the preservation of nature" and guarantee all Ecuadorians "[t]he right to live in a pollution-free environment").

[45]  Exhibit 34 (1996.01.03 Affidavit of Ambassador Edgar Teran, *Aguinda v. Texaco Inc.*, No. 93-CV-7527 (S.D.N.Y.)), ¶ 11; *see also* Exhibit 35 (1996.01.11 Supplemental Brief *Amicus Curiae* of the Republic of Ecuador, *Aguinda v. Texaco Inc.*, No. 93-CV-7527 (S.D.N.Y.)).

[46]  Exhibit 36 (1994.11.09 Report of the Special Permanent Environmental Comm'n of the National Congress) at 3, 5; *see also* Exhibit 37 (1994.10.20 Letter from Environmental Advisers to the Vice President to A. Dahik, Vice President of the Republic of Ecuador) at 1 (heralding the settlement as a "pragmatic solution serving the interests of the country").

[47]  Exhibit 38 (1994.11.10 Letter from D. LeCorgne to A. Dahik) at 1.

the "negotiations to reach an understanding between Texaco and the Ecuadorian Government regarding environmental remediation in the Amazon."

47.     Defendant the Front also openly and actively participated in the negotiation of this settlement between TexPet and Ecuador.  Defendant Yanza, President of the Front, sought an "audience" with the President of Ecuador "to explain directly the situation" of the people of the Oriente whom he purported to represent, so that their situation "may be taken into consideration when signing the agreements with [TexPet]."[48]  Yanza later submitted his group's "proposal" for defining the scope of work, which he claimed represented "far-reaching and vigorous work to reach consensus" among the population.[49]  Reflecting this cooperation with groups like the Front, Ecuadorian officials recently repeated, under oath, that the negotiations leading to these settlements were "open for all those who wanted to attend," and members of many environmental organizations, including the Front, did attend.[50]  These governmental officials saw themselves as the "facilitator[s]" of an open dialogue between the communities and TexPet,[51] and followed orders from the "National Congress to take into account the problems that Amazonian groups were having."[52]  As a result of this dialogue, the environmental groups were "behind everything that was being done,"[53] leading to a final instrument that considered

---

[48]  Exhibit 39 (1994.10.05 Letter from L. Yanza to D. Ballen); *see also* Exhibit 40 (1994.10.20 Letter from T. Bustamante to G. Rosania) at 1.

[49]  Exhibit 41 (1995.02.22 Letter from L. Yanza to G. Abril).

[50]  Exhibit 29 (Rosania Dep.) at 73:3-14, 93:22-94:12, 95:9-15, 102:20-103:10, 2006.10.10; Exhibit 42 (Deposition of Galo Abril Ojeda, *Rep. of Ecuador v. ChevronTexaco Corp.*, No. 04cv8378 (LBS) (S.D.N.Y.) ("Abril Dep.")) at 70:6-22.

[51]  Exhibit 29 (Rosania Dep.) at 78:4-79:3.

[52]  Exhibit 42 (Abril Dep.) at 76:2-77:7.

[53]  Exhibit 42 (Abril Dep.) at 94:13-95:3.

and accounted for the interests of individuals and communities in the concession areas.[54]  When the MOU was opened to public scrutiny, and while the Scope of Work was being defined, the Front was one of the groups that wrote to the Ministry of Energy and Mines to express their "agree[ment] that the process of understanding [between Ecuador and TexPet] and the immediate performance of the environmental remediation work should continue."[55]

48.     Pursuant to the terms of the MOU, on or about March 23, 1995, Ecuador, Petroecuador, and TexPet executed a precise "Scope of Work" identifying the particular sites and projects that would constitute TexPet's remediation obligations, consistent with TexPet's former one-third ownership share of the consortium.[56]  The "Scope of Work" required the performance of not only a vast remediation effort by TexPet, but also a number of socioeconomic projects, including the payment of $1 million to a redress fund to "be used for the rehabilitation of the areas affected, establishing, together with the population, viable systems for the use of renewable natural resources, and . . . to improve the quality of life."[57]  The Ministry of Energy and Mines received that money, and was entrusted to administer the fund "for the benefit of the Indigenous Communities of the Amazonian region."[58]  TexPet also financed the establishment of education and medical centers in the Oriente, together with "logistical support" for those centers such as ambulances and aircraft.[59]

---

[54]  Exhibit 29 (Rosania Dep.) at 86:6-87:5, 88:21-89:21, 112:5-113:10.

[55]  Exhibit 43 (1995.02.22 Work Session Record, TexPet Remediation Agreement) at 1.

[56]  Exhibit 44 (1995.03.23 Annex A to 1995 Settlement Agreement, Scope of the Environmental Remedial Work), pts. I-VII.

[57]  Exhibit 44 (1995.03.23 Annex A to 1995 Settlement Agreement, Scope of the Environmental Remedial Work) at 4 (pt. VII.A).

[58]  Exhibit 45 (1995.11.15 Delivery-Acceptance of Meeting Minutes); *see also* Exhibit 46 (1998.09.30 Final Release), art. II.2.

[59]  Exhibit 46 (1998.09.30 Final Release), art. II.2.

49.     Following the execution of the Scope of Work, on or about May 4, 1995, Ecuador, Petroecuador, and TexPet executed a settlement agreement (the "1995 Settlement Agreement").  In consideration for its release from any future responsibility for environmental impacts, TexPet agreed to perform the defined "Environmental Remedial and Mitigation Work"[60] and provide "socio-economic compensation" for the affected areas.[61]  The 1995 Settlement Agreement immediately "release[d], acquit[ted] and forever discharge[d]" TexPet from all claims based on "Environmental Impact" from the consortium's activities at sites not included in the Scope of Work and provided that TexPet would be released from any "Environmental Impact" associated with the sites covered by the Scope of Work upon completion of the prescribed remediation at each site.[62]  In other words, because Petroecuador continued to operate the oil fields, it assumed any residual or future responsibility, recognizing both its share of the past, as the former consortium's majority owner, and its control over the future, as sole owner and operator going forward.

50.     The settlement was purposefully broad.  "Environmental Impact" was defined as "[a]ny solid, liquid or gaseous substance present or released into the environment in such concentration or condition, the presence or release of which causes, or has the potential to cause harm to human health or the environment."[63]  Reflecting this breadth of coverage, the release "includ[ed] but [was] not limited to consequences of all types of injury that the Government or Petroecuador may allege concerning persons, properties, business, reputations, and all other types of injuries that may be measured in money, including but not limited to, trespass, nuisance,

---

60   Exhibit 44 (1995.03.23 Annex A to 1995 Settlement Agreement, Scope of the Environmental Remedial Work), pts. I-VI.

61   Exhibit 44 (1995.03.23 Annex A to 1995 Settlement Agreement, Scope of the Environmental Remedial Work), pt. VII.

62   Exhibit 47 (1995.05.04 Contract for Implementing of Environmental Remedial Work and Release from Obligations, Liability and Claims) ("1995 Settlement Agreement"), art. 5.1.

63   Exhibit 47 (1995 Settlement Agreement), art. 1.3.

negligence, strict liability, breach of warranty, or any other theory or potential theory of recovery."[64]  The claims expressly released also included all "causes of action under Article 19-2 of the [1978] Political Constitution of the Republic of Ecuador,"[65] which, as discussed in paragraph 45, *supra*, placed the "duty [on] the State" to "oversee the preservation of nature" and guarantee all Ecuadorians "[t]he right to live in a pollution-free environment."[66]  The 1995 Settlement Agreement was signed by Abril Ojeda, Ecuador's Minister of Energy and Mines; Federico Vintimilla Salcedo, Executive President of Petroecuador; Ricardo Reis Veiga, Vice President of TexPet; and Rodrigo Pérez Pallares, legal representative of TexPet.[67]

51.     The 1995 Settlement Agreement also obligated TexPet "to continue negotiations" with certain municipalities in eastern Ecuador that had also brought suit against the company.[68]  Filing materially identical complaints, the municipalities of Joya De Los Sachas, Orellana, Shushufindi, and Lago Agrio had each sued TexPet in 1994 in order to protect "the health of [their] citizens, the rivers of [their] communities."[69]  These municipalities purported to fulfill their quasi-sovereign duties to assist the Republic in meeting its environmental obligations

---

64   Exhibit 47 (1995 Settlement Agreement), art. V, ¶ 5.2.

65   Exhibit 47 (1995 Settlement Agreement), art. V, ¶ 5.2.

66   Exhibit 33 (1978 Constitution of the Republic of Ecuador, art. 19(2)).

67   Exhibit 47 (1995 Settlement Agreement).

68   Exhibit 44 (1995.03.23 Annex A to 1995 Settlement Agreement, Scope of the Environmental Remedial Work), pt. VII.C.

69   Exhibit 48 (1994.07.25 Complaint, *Municipality of Lago Agrio v. Texaco Petroleum Co.*), ¶ 2; *see also* Exhibit 49 (1994.05.12 Complaint, *Municipality of La Joya de los Sachas v. Texaco Petroleum Co.*), ¶ 4 (seeking to vindicate "the health of all citizens, animals, species, flora, fauna, rivers, water sources and soil"); Exhibit 50 (1994.08.23 Complaint, *Municipality of Orellana (Coca) v. Texaco Petroleum Co.*), ¶ 4 (same); Exhibit 51 (1994.07.20 Complaint, *Municipality of Shushufindi v. Texaco Petroleum Co.*), ¶ 2 (seeking to vindicate "the rights of the community at large" with respect to environmental pollution).

to all citizens, and to exercise their own capacity to "carry out legal actions" necessary to protect the "collective needs of [their] community" of inhabitants, specifically those needs concerning health and the environment.

52.      In consideration for TexPet financing specified "social interest works,"[70] each municipality suit was settled in 1996, similarly "exempt[ing], releas[ing], exonerat[ing] and reliev[ing] forever" Texaco and TexPet "from any responsibility, claim, request, demand or complaint, be it past, current or future, for any and all reasons related to" the consortium's operations, "especially concerning damages possibly caused to the environment in said cantonal jurisdiction of the Municipality."[71]   The parties also expressly agreed that "pursuant to Article 2386 [current Article 2362] of the Civil Code, this settlement shall have for the parties the effect of *res judicata* before the highest court."[72]   Each settlement agreement represented that the municipal government had consulted "with the entities and organizations representing the community of its inhabitants" in order to choose an appropriate reparation project.[73]   According to sworn statements of the relevant government officials, each agreement met "the interests of The Community and of its citizens as to any claims they may have against TEXPET."   All of these settlements were "approve[d] . . . in full" by Ecuadorian courts because they "d[id] not

---

[70]  Exhibit 52 (1996.05.02 Lago Agrio (Nueva Loja) Municipality Settlement & Release) at 5 (§ 3.2).

[71]  Exhibit 52 (1996.05.02 Lago Agrio (Nueva Loja) Municipality Settlement & Release) at 7 (§ 4.2).  Each municipality settlement contained identical terms.  *See also* Exhibit 53 (1996.05.02 La Joya de los Sachas Municipality Settlement & Release) at 7 (§ 4.2); Exhibit 54 (1996.05.02 Francisco de Orellana (Coca) Municipality Settlement & Release) at 7 (§ 4.2); Exhibit 55 (1996.05.02 Shushufindi Municipality Settlement & Release) at 7 (§ 4.2).

[72]  Exhibit 52 (1996.05.02 Lago Agrio (Nueva Loja) Municipality Settlement & Release) at 5-6 (§ 7).

[73]  Exhibit 52 (1996.05.02 Lago Agrio (Nueva Loja) Municipality Settlement & Release) at 5 (§ 2.4).

violate any legal provision" and "cover[ed] all issues described in the [municipality] complaint[s]."[74]

53.     In addition to the national and municipal governments, two Provinces also settled their potential claims against TexPet in the name of their residents and of the ecosystems within their respective territories.  In 1996, the provincial government of Sucumbíos conferred "with entities and organizations representing the community of its inhabitants" in order to select an acceptable reparation project and avoid a potential lawsuit with TexPet.  It ultimately demanded, "according to the interests of the community," that TexPet fund "social interest works," *viz*., "provincial eco-production projects."[75]  A Consortium of Municipal Mayors in the Napo Province also endorsed a settlement contract that identified their potential disputes with TexPet relating to "the oil concession," and, especially, to "the impact or damages possibly caused to the environment."[76]  Like its counterparts in Sucumbíos and at the national level, it negotiated and settled with TexPet in order to safeguard environmental and communal entitlements.  These agreements with the municipalities and provinces shall be referred to herein collectively as the "1996 Municipality Releases."

54.     Pursuant to the terms of the 1995 Settlement Agreement with Ecuador, TexPet selected Woodward-Clyde, one of the largest environmental engineering firms in the world at the time, from a list provided by Ecuador of acceptable contractors to perform the remediation.[77]

---

[74]  Exhibit 56 (1996.06.12 Judgment Approving the Settlement, Civil Court of Napo, Los Joya de los Sachas); Exhibit 57 (1996.05.08 Judgment Approving the Settlement, Second Court in Civil Matters of Sucumbios, Shushufindi); Exhibit 58 (1996.06.25 Judgment Approving the Settlement, Civil Court of Orellana); Exhibit 59 (1996.09.19 Judgment Approving the Settlement, First Civil Court Sucumbíos, Lago Agrio).

[75]  Exhibit 60 (1996.05.02 Province of Sucumbios & TexPet, Settlement Agreement) at 5 (§ 3.2).

[76]  Exhibit 61 (1996.04.26 Consortium of the Municipalities of Napo "Comuna," Instrument of Settlement and Release from Obligations, Responsibilities and Claims) at 1 (§ 2).

[77]  Exhibit 47 (1995 Settlement Agreement), art. I, 1.9, art. III, 3.1, 3.2.

Woodward-Clyde conducted additional investigations of the well sites listed in the Scope of Work and developed a Remedial Action Plan, which identified the specific pits at each well site requiring remediation under the criteria set out in the 1995 Settlement Agreement and specified the remedial action to be taken at each site.[78]  Ecuador reviewed Woodward-Clyde's Remedial Action Plan and conducted its own investigation of the sites to confirm that it was consistent with the MOU and the 1995 Settlement Agreement.[79]  In September 1995, Ecuador, Petroecuador, TexPet, and Woodward-Clyde each approved and signed off on the Remedial Action Plan.[80]

55.     Between October 1995 and September 1998, Woodward-Clyde conducted all of the remediation required by the 1995 Settlement Agreement and the Remedial Action Plan on behalf of TexPet and at TexPet's expense.[81]  The remediation work was monitored and supervised by Petroecuador, the Ministries of Energy and Environment, and outside auditors.[82] Ecuador issued a series of official records called "*Actas*" during this time certifying the adequacy of the remediation work that it had supervised and evaluated on an ongoing basis.[83]  In all, TexPet spent approximately $40 million (unadjusted dollars) on environmental remediation and

---

[78]  Exhibit 62 (1995.09.08 Remedial Action Plan for the Former Petroecuador-TexPet Consortium), pt. 3.0.

[79]  Exhibit 63 (2000.05.04 Woodward-Clyde Final Report) at 1-4.

[80]  Exhibit 62 (1995.09.08 Remedial Action Plan for the Former Petroecuador-TexPet Consortium) at Signature Page.

[81]  Exhibit 63 (2000.05.04 Woodward-Clyde Final Report) at 1-4.

[82]  Exhibit 46 (1998.09.30 Final Release) at Introduction; Exhibit 63 (2000.05.04 Woodward-Clyde Final Report) at 9-1.

[83]  Exhibits 64-72 (1996.02.26 Approval Acta 1; 1996.03.14 Approval Acta 2; 1996.04.11 Approval Acta 3; 1996.07.24 Approval Acta 4; 1996.07.24 Approval Acta 5; 1996.11.22 Approval Acta 6; 1997.03.20 Approval Acta 7; 1997.05.14 Approval Acta 8; 1997.10.16 Approval Acta 9).

community development in Ecuador pursuant to the 1995 Settlement Agreement in exchange for the releases granted by Ecuador.

56.     On September 30, 1998, Ecuador, Petroecuador, and TexPet executed the *Acta Final* (the "1998 Final Release"), certifying that TexPet had performed all of its obligations under the 1995 Settlement Agreement, and thus fully releasing TexPet from any and all environmental liability arising from the consortium's activities except for individual personal injury claims, such as to specific persons or property, which the parties understood as not being covered by the release.[84]   The 1998 Final Release was signed on behalf of Ecuador by Patricio Ribadeneira, the Minister of Energy and Mines; on behalf of Petroecuador by Ramiro Gordillo, Executive Chairman, and by Luis Alban Granizo, Manager of Petroproducción; and on behalf of TexPet by Rodrigo Pérez Pallares and Ricardo Reis Veiga.[85]

57.     The validity of these agreements has been publicly acknowledged by the Republic of Ecuador,[86] and—recently—by the Lago Agrio Plaintiffs as well.[87]  As noted above,

---

[84]   Exhibit 46 (1998.09.30 Final Release).

[85]   Exhibit 46 (1998.09.30 Final Release).

[86]   Exhibit 34 (1996.01.03 Affidavit of Ambassador Edgar Teran, *Aguinda v. Texaco Inc.*, No. 93-CV-7527 (S.D.N.Y.)), ¶ 7 ("an agreement has been reached between the Republic, Petroecuador and Texaco Petroleum Company for remediation of certain affected areas. Pursuant to this agreement, Texaco Petroleum Company also has agreed to create two funds, one of which is administered by the Ministry of Energy and Mines, for various health, education and social projects for the people of Ecuador's eastern region.  This agreement has achieved settlement of all claims between the Republic, Petroecuador and Texaco Petroleum Company"); *see also* Exhibit 73 (1995.04.21 Memorandum from M. Peñaherrera to Undersecretary of the Environment) (internal ROE counsel acknowledging that the settlement was "legally appropriate and can be legalized by the Minister [of Energy and Mines], after having been legalized by the Executive President of PETROECUADOR and by the legal representatives of TEXACO PETROLEUM COMPANY") at 4.

[87]   Exhibit 74 (2010.12.06 Plaintiffs' Filing, Lago Agrio, Ecuador).  *See also* Exhibit BV (English and Spanish versions of 1997.09.18 Letter from H. Camacho to P. Bijur, then-CEO of Texaco Petroleum Company); Exhibit DK (2008.08.01 Email from D. Beltman to P. Fajardo and S. Donziger re "Plan de Trabajo – Texpet cleanup") (STRATUS-NATIVE063668).

*supra* paragraphs 45 and 50, at the time the 1995 Settlement Agreement and the 1998 Final Release were executed, the Republic of Ecuador was the only legal person or entity with standing to represent and assert legal claims for environmental damage.[88]  Ecuador, and only Ecuador, could demand environmental remediation; individuals could assert only individual property damage or personal injury claims.  Accordingly, TexPet's settlement with Ecuador and the affected municipalities and provinces fully discharged TexPet from any responsibility or liability that may have existed for environmental impact as a result of the consortium's activities, except individual personal injury claims.

### 2.    U.S. Plaintiffs' Lawyers Devise Baseless Litigation Against Chevron in Ecuador

58.     Certain plaintiffs' attorneys in the United States sought to exploit any environmental harm in the Oriente region by turning it into a financial windfall for themselves. These U.S. plaintiffs' attorneys (including Defendant Donziger, and co-conspirators Kohn and Bonifaz), devised a plan to use TexPet's former participation in the consortium as the basis for extracting large sums of money from TexPet's parent, Texaco, Inc. ("Texaco").  As Kohn described his motivation, "[A]t the end of the day . . . , it [would] be a lucrative case for the firm."[89]  As Donziger described it, "I sit back and dream . . . .  Billions of dollars on the table.  A movie, a possible book."[90]  In other words, a financial windfall of unprecedented proportion, and

---

[88]  Exhibit 35 (1996.01.11 Supplemental Brief *Amicus Curiae* of the Republic of Ecuador, *Aguinda v. Texaco, Inc.*, No. 93-CV-7527 (S.D.N.Y.)) at 1 ("The claims asserted in this action would inevitably involve this Court in issues concerning the validity of Ecuadorian laws, regulations and social policies affecting property and persons located in Ecuador. These are matters over which Ecuador has exclusive jurisdiction."); Exhibit 75 (1996.06.10 Letter from Ambassador Edgar Teran to Judge Rakoff re "Maria Aguinda, et al. v. Texaco Inc."); Exhibit 33 (Constitution of the Republic of Ecuador, art. 19(2), Official Registry No. 183).

[89]  Exhibit 1, CRS-170-00-CLIP-04 (2007.01.31 *Crude* outtake video clip of meeting between J. Kohn and unidentified male); Exhibit 2 (certified transcript) at 162.

[90]  Exhibit 76 (2007.04.04 Entry in Composite of S. Donziger Personal Notes) (DONZ00027256) at 5 of 109.

one that would make Donziger "quite wealthy."[91]  According to Donziger's estimates, he thought his "own fee right now would be around 200m[illion]."[92]

59.     In 1993 and 1994, these U.S. plaintiffs' attorneys filed two lawsuits against Texaco in federal district court in New York, purportedly on behalf of classes of "30,000 residents" of the Oriente and "25,000 residents" of Peru.  *See Aguinda v. Texaco, Inc*., No. 93 Civ. 7527 (S.D.N.Y. Nov. 3, 1993) ("*Aguinda*") and *Jota v. Texaco, Inc*., No. 94 Civ. 9266 (S.D.N.Y. Dec. 28, 1994) ("*Jota*").  Those actions were dismissed on grounds including *forum non conveniens*, international comity, and failure to join indispensable parties Petroecuador and the Republic of Ecuador.

60.     Because Ecuador and Petroecuador had released TexPet from liability following its remediation efforts and because Ecuadorian law does not allow class actions, the U.S. plaintiffs' attorneys required the government's cooperation to bring a potentially lucrative lawsuit in Ecuador.  The U.S. plaintiffs' attorneys had no desire to sue Petroecuador or Ecuador for the harms that had occurred—despite their actual culpability—because, as Defendant Donziger explained, "[T]he government here will never pay for any judgment.  In contrast, Texaco can pay."[93]  In order to get the "juicy check" that, as Fajardo put it, was the ultimate goal,[94] the U.S. plaintiffs' attorneys struck a deal with the Ecuadorian government to enable those attorneys to bring an action against a convenient U.S. target.

---

[91]  Exhibit 77 (2010.12.02 Deposition of Michael Bonfiglio, *In re Application of Chevron*, 10-MC-00001 (LAK) (S.D.N.Y.) ("Bonfiglio Dep.")) at 676:7-10.

[92]  Exhibit 78 (Undated Letter from S. Donziger to R. DeLeon) (DONZ00081966) at 1.

[93]  Exhibit 1, CRS-116-01-CLIP-01 (2007.11.16-2007.11.17 *Crude* outtake video clip of meeting between S. Donziger and L. Yanza); Exhibit 2 (certified transcript) at 65.

[94]  Exhibit 79 (2008.01.02 Email from P. Fajardo to A. Ponce, L. Yanza, S. Donziger, and others re "TASKS") (DONZ00025653).

61.     The U.S. plaintiffs' attorneys agreed not to sue Petroecuador and assured the Republic of Ecuador that it would benefit from any judgment entered against Chevron in exchange for public and private governmental support for the U.S. plaintiffs' attorneys' case.

62.     The U.S. plaintiffs' attorneys presented Ecuador's Attorney General with written promises not to pursue legal action against the Republic of Ecuador or Petroecuador or to collect a judgment against Ecuador if one were awarded to them. Bonifaz stated, "[I]f the U.S. court [in the *Aguinda* or *Jota* actions] finds both Petroecuador and Texaco guilty, we will not accept the percentage of the claim assigned to [Petroecuador]."[95] And he admitted that the Lago Agrio Plaintiffs had "committed in legal documents not to sue Ecuador."[96]

63.     With reported legislative assistance from the U.S. plaintiffs' attorneys, Ecuador enacted the Environmental Management Act of 1999 (the "EMA").[97] For the first time, the EMA enabled private individuals to bring generalized environmental injury claims previously held exclusively by the state. It also extended standing for the first time to private citizens to enforce "collective environmental rights" for environmental harm. These actions are private in name only, however, because the EMA provides that any monetary judgment be awarded to the "community."

64.     With a new and highly advantageous legal framework thus in place, the U.S. plaintiffs' attorneys, joined and assisted by other RICO Defendants and their co-conspirators, filed the Lago Agrio Litigation, *Maria Aguinda et al. v. Chevron-Texaco*, in May 2003 in the

---

[95]  Exhibit 80 (1997.04.22 Interview with C. Bonifaz, "Petroecuador will not be damaged," EL COMERCIO); *see also* Exhibit 81 (1996.11.20 Waiver of Rights, *Aguinda v. Texaco*, No. 93-CV-7527 (S.D.N.Y.)) (CH-0000233).

[96]  Exhibit 82 (Judith Kimerling, Indigenous Peoples and the Oil Frontier in Amazonia: The Case of Ecuador, ChevronTexaco and Aguinda v. Texaco, 38 N.Y.U. J. Int'l L. & Pol. 413, 519 & n.290 (2006)).

[97]  Exhibit 83 (2003.05.06 Article by Gonzalo Solano, "US lawyers take $1 billion lawsuit against ChevronTexaco to Ecuador," ASSOCIATED PRESS); Exhibit 84 (1999 Environmental Management Act), art. 41.

Superior Court of Nueva Loja, Ecuador.  As a result of the EMA, and the RICO Defendants'
attempt to apply it retroactively, the Lago Agrio Litigation is unusual in structure.  The
ostensible plaintiffs in the Lago Agrio Litigation are forty-eight named individuals, but it is
unknown whether these individuals consented to have the litigation brought in their names, as
twenty of their signatures were forged in the very document that purported to provide authority
to Ecuadorian counsel to file the complaint.[98]

65.     The Lago Agrio Litigation does not seek damages based on personal injuries to
the named Plaintiffs, which, along with claims for individual property damage, is the only type
of claim individuals could bring (see paragraph 57, supra).  Rather, relying on the EMA, the
complaint seeks the costs of remediating broadly defined "environmental damages,"[99] the
proceeds of which will not directly benefit the Lago Agrio Plaintiffs.  Defendants Donziger,
Fajardo and the other U.S. and Ecuadorian lawyers and investors reportedly expect up to 30% of
the judgment.[100]  The Republic of Ecuador reportedly expects 90% of the benefit,[101] although
the RICO Defendants with assistance from Patton Boggs, H5 and other co-conspirators have
already laid out plans to "keep the proceeds out of Ecuador,"[102] by placing the funds in a "trust"
outside of the country,[103] under the exclusive control of a trustee they approve.[104]  The RICO

---

[98]  Exhibit 85 (2010.11.19 Declaration of Gus R. Lesnevich), ¶ 12.1.

[99]  Exhibit 86 (2003.05.07 Lago Agrio Complaint), §§ V.3, VI.2.

[100] Exhibit 6 (2010.12.23 Donziger Dep.) at 1902:12-1904:8.

[101] In re Application of Chevron Corp., No. 10 MC 00002 (LAK), 2010 WL 4910248, at *6
      (S.D.N.Y. Nov. 10, 2010); Exhibit 87 (2009.09.04 Press Conference for Prosecutor
      Washington Pesántez) at 2.

[102] Exhibit 88 (2010.10.12 Email chain among N. Purrington, E. Beime and others, re
      "Ecuador – Security") (DONZ000106262) at 1.

[103] Exhibit 6 (2011.01.08 Donziger Dep.) at 2708:6-7.

[104] Exhibit B (Executed Funding Agreement) at 11 (§ 8.1).

Defendants requested that the Front receive an additional amount equal to 10% of the judgment (a fact that Donziger thought "best if Chevron did not know" out of concern that it "could harm the image" of the litigation),[105] and the trial court granted that request in its judgment.[106]  The individual Lago Agrio Plaintiffs, on the other hand, will not receive any portion of the judgment, and thus are at most only nominal plaintiffs.[107]

66.     In effect, the RICO Defendants are planning to control nearly all of the proceeds from the judgment, shutting out the Lago Agrio Plaintiffs, the Republic of Ecuador, and Petroecuador and setting themselves up as a source of patronage through billions of dollars in remediation contracts that will be issued following an adverse judgment against Chevron, in a country whose entire annual Gross Domestic Product is just over $64 billion.  In an email exchange with Fajardo and Donziger, for example, co-conspirator Julio Prieto noted that "Petroecuador is NOT the one who must contract the remediation companies . . . .  That's our job."  And when the RICO Defendants heard that the Republic of Ecuador might be considering negotiating with Chevron directly, they pushed to have those conversations shut down, urging that no "representative of the Ecuadorian government . . . meet face to face with a representative of Chevron at this juncture[.]"[108]

67.     The Lago Agrio complaint does not name the entity that has been responsible for environmental harm in the Oriente region since at least 1992:  Petroecuador.  Pursuant to their agreement not to bring any claims against Petroecuador or the Republic of Ecuador itself, the Lago Agrio Plaintiffs' U.S. representatives caused Chevron to be named as the only defendant in

---

[105] Exhibit 89 (2008.09.09 Email from S. Donziger to L. Yanza re "important question/CONFIDENTIAL") (DONZ0030370) at 1.

[106] Exhibit C (certified translation of 2011.02.14 Judgment, Lago Agrio Court) at 187.

[107] Exhibit 6 (2011.01.08 Donziger Dep.) at 2700:10-13.

[108] Exhibit 90 (2009.07.13 Email from S. Donziger to J. Prieto, P. Fajardo, L. Yanza and others, re "Our perspective/confidential") (DONZ00066538) at 1.

the Lago Agrio Litigation, despite the fact that Chevron has never operated in Ecuador.  (Years after TexPet ceased operations in Ecuador, one of Chevron's subsidiaries merged with Texaco, TexPet's ultimate parent company.  Chevron thereby became an indirect shareholder of TexPet.)

**B.    The Conspirators Are Corrupting the Judicial Process to Extort a Payment From Chevron**

68.    The support of the Republic of Ecuador, the manipulation of the EMA, and the filing of the Lago Agrio Litigation provided the U.S. lawyers with the foundation for their criminal scheme.  Through the conduct of their criminal enterprise, the conspirators set about to manufacture false evidence and a fake "history" that they would repeat in every media outlet, before Congress, in front of state and federal investigative and administrative agencies, and with which they would seek to scare and mislead Chevron shareholders and investors.  All of this was done in furtherance of their scheme to coerce Chevron into making a massive payoff to the criminal enterprise.  As part of this scheme, the conspirators keep "jack[ing] up," in Donziger's words,[109] their demand.  In 2003, they thought $6 billion was an aggressive number.  In 2008, they raised the stakes to $16 billion, then to $27 billion, and finally, to an outrageous $113 billion, before ultimately obtaining an $18.2 billion judgment in Lago Agrio.

69.    The RICO Defendants' criminal scheme has three main lines of attack:  One, intimidate or corrupt the Lago Agrio court and obtain a fraudulent judgment against Chevron based on manufactured evidence of liability.  Two, collude with the Republic of Ecuador to procure sham criminal charges against Chevron's attorneys.  Three, conduct a massive public pressure campaign designed to spread false and misleading information about Chevron and the Lago Agrio Litigation.  These lines of attack are related but nonetheless distinct attempts to pressure Chevron into paying the RICO Defendants.  Donziger has even admitted that the criminal charges and the pressure campaign were *not* simply means of supporting the Lago Agrio

---

[109] Exhibit 1, CRS-193-00-CLIP-01 (2007.03.03 *Crude* outtake video clip of meeting between S. Donziger, A. Maest, and unidentified male); Exhibit 2 (certified transcript) at 252.

Litigation, but "other things in play outside of the legal case."[110]  The ultimate objective, in Donziger's words, is to cause "damage to [Chevron's] reputation," to put "personal psychological pressure [on] their top executives" through threats and attacks through the media and force Chevron into a payoff.[111]

70.     Donziger has explained how the conspirators work to increase costs for Chevron on all fronts until it gives in to their extortionate demands:

> The work doesn't let up just because I'm in the U.S., at all.  I mean, it's still really intense, you know, so it's always looking for ways to increase the leverage and increase the cost to Chevron for not doing anything.  So, what's the cost?  The cost is, right now, it's the cost of the risk of getting a huge multi-billion dollar judgment at trial, . . . it's the cost of all the hassle they have to put up with from the environmental groups, . . . it's the cost of their sullied reputation, you know, in the media.[112]

71.     The RICO Defendants and their co-conspirators have shown no signs of stopping their attack.  Indeed, Donziger has threatened to try to enforce the fraudulent judgment obtained in the Lago Agrio Litigation in the United States and in other foreign jurisdictions, observing that "Chevron operates in more than 100 countries and has numerous oil tankers that troll the world's waterways and dock in any number of ports . . . ."[113]  In a recent speech, Donziger asserted that the conspirators are assembling a legal team to "seize assets, seize boats," wherever Chevron's subsidiaries operate around the world[114]—even though the Lago Agrio

---

[110] Exhibit D (2011.03.23 Donziger Dep.) at 4249-4250.

[111] Exhibit 1, CRS-104-01-CLIP-01 (2006.07.24 *Crude* outtake video clip of S. Donziger discussing strategy with Cush and others); Exhibit 2 (certified transcript) at 41-42.

[112] Exhibit 91 (Transcript of J. Berlinger film *Crude*) (MB-NONWAIVER00092726) at 52; Exhibit 4 (*Crude* DVD).

[113] Exhibit 92 (2009.09.29 Amazon Watch Press Release, "Ecuador Rising-Hatarinchej: Chevron's Recent Setbacks in U.S. Courts Forced Its Hand on Arbitration Claim, Lawyers Say") at 1.

[114] Exhibit 93 (2010.11.15 S. Donziger speech re litigation strategy) at 7.

Plaintiffs previously told this Court that Chevron's defense against any Lago Agrio judgment should be restricted to New York's recognition act.[115]  Fajardo has likewise warned that the RICO Defendants plan to confiscate Chevron's assets in the United States in order to enforce the judgment.[116]  And Donziger has also stated that the conspirators' plan is to move on from Chevron and Ecuador and reprise their criminal scheme again and again:  "take legal fees we can earn from this case and do more cases like this in different places.  With, you know, the same team, if possible."[117]

### 1.    Pressuring the Lago Agrio Court and Manufacturing Evidence

#### a.    Implementing Pressure Tactics and Colluding With Ecuadorian Government Officials

72.    Central to the RICO Defendants' and their co-conspirators' scheme to defraud and extort Chevron is the fact that Ecuador's judiciary has developed systemic weakness and corruption, in addition to other significant flaws and shortcomings.  The conspirators are aware of this fact, and have sought to exploit it.  According to Donziger, "[T]he court is now in play, up for grabs, and accessible."[118]  Donziger has boasted that, unlike in the United States, the "game" is "dirty" and there are "almost no rules" in Ecuador.[119]  Donziger and his co-conspirators have

---

[115] Exhibit 94 (2010.01.14 Lago Agrio Plaintiffs' Complaint to Stay Arbitration, *Yaiguaje v. Chevron Corp.*, No. 10-CV-0316 (LBS) (S.D.N.Y.)), ¶¶ 2, 41.

[116] Exhibit 95 (2009.09.04 Radio Interview of P. Fajardo on the "Informativo Ecuadoradio," RADIO QUITO).

[117] Exhibit 1, CRS-200-02-03 (2007.03.03-2007.03.04 *Crude* outtake video clip of S. Donziger and an unidentified male speaker); Exhibit 2 (certified transcript) at 319.  *See also* Exhibit 76 (2007.04.04 Entry in Composite of S. Donziger Personal Notes) (DONZ00027256) at 5 of 109.

[118] Exhibit 76 (2006.03.11 Entry in Composite of S. Donziger Personal Notes) (DONZ00036235).

[119] Exhibit 1, CRS-052-00-CLIP-05 (2006.03.30 *Crude* outtake video clip of S. Donziger discussing upcoming meeting with the judge); Exhibit 2 (certified transcript) at 16.

sought repeatedly to capitalize on the Ecuadorian judiciary's weakness, threatening violence, bullying judges, and using political connections to obtain rulings in their favor based on the judges' fear of repercussions rather than the facts or law.  Indeed, Donziger instructed one of his co-conspirators to "prepare a detailed plan with the necessary steps to attack the judge through legal, institutional channels and through any other channel you can think of."[120]  Attacking the judge was necessary, because, as Donziger put it:  "[T]he only way the court will respect us is if they fear us—and . . . the only way they will fear us is if they think we have [s]ome control over their careers, their jobs, their reputations—that is to say, their ability to earn a livelihood."[121]  This fear and "constant pressure on the judge and the court" is essential to the RICO Defendants' and their co-conspirators' plan to obtain "a fast decision."[122]  With assistance from the highest levels of the Ecuadorian government, the RICO Defendants and their co-conspirators ensured that the Lago Agrio court would rule against Chevron, as it ultimately did.

73.     The RICO Defendants and their co-conspirators do not view the enterprise in which they are engaged as a lawsuit.  As Donziger has explained, the litigation "is not a legal case," but a "political battle that's being played out through a legal case."[123]  In other words, Donziger and his co-conspirators knew that what "we need to do is to get the politics in order . . . [because] the only way we're going to succeed, in my opinion, is [i]f the country gets excited about getting this kind of money out of Texaco . . . .  So you have to play to those . . . themes,

---

[120] Exhibit 96 (2006.06.14 Email from S. Donziger to A. Villacis re "Need plan") (DONZ00086533).

[121] Exhibit 96 (2006.06.14 Email from S. Donziger to A. Villacis re "Need plan") (DONZ00086533).

[122] Exhibit 97 (2009.05.01 Selva Viva Action Plan) (DONZ00036220).

[123] Exhibit 1, CRS-060-00-CLIP-04 (2006.04.13 *Crude* outtake video clip of S. Donziger discussing strategy with Benjamin and unidentified female), Exhibit 2 (certified transcript) at 33.

[with] those feelings these people have."[124]  Consistent with this strategy, Donziger and the other RICO Defendants know that their "success" will have nothing to do with pursuing the Lago Agrio Litigation on the merits, but rather will depend on using that "litigation" as a vehicle or pretense with which to attack Chevron in the media and before U.S. governmental bodies and shareholders and force it into paying them off.  In Donziger's own words, the conspirators have conducted the Lago Agrio Litigation as a "flat-out street brawl, extreme fighting through litigation" in which he and his co-conspirators are seemingly "only a short step away from smashing the faces of our counterparts with a closed fist, or taking out guns[.]"[125]

74.     Donziger has acknowledged the RICO Defendants' and their co-conspirators' use of "pressure tactics" to influence and intimidate the Ecuadorian judiciary.[126]  Donziger admitted that such tactics are "something you would never do in the United States. . . .  But Ecuador, you know . . . this is how the game is played, it's dirty."[127]  Donziger further declared that "there's almost no rules here" and that "the only language that I believe, this judge is gonna understand is one of pressure, intimidation and humiliation.  And that's what we're doin' today. We're gonna let him know what time it is . . . .  We're going to scare the judge, I think today."[128] These fear tactics are effective, according to Donziger, because Ecuadorian judges "are really not

---

[124] Exhibit 1, CRS-060-00-CLIP-04 (2006.04.13 *Crude* outtake video clip of meeting among S. Donziger, Benjamin, and unidentified female speaker); Exhibit 2 (certified transcript) at 34-35.

[125] Exhibit 14 (2006.11.03 S. Donziger Book Proposal) (DONZ00006707) at 24.

[126] Exhibit 1, CRS-052-00-CLIP-05 (2006.03.30 *Crude* outtake video clip of S. Donziger discussing upcoming meeting with the judge); Exhibit 2 (certified transcript) at 16.

[127] Exhibit 1, CRS-052-00-CLIP-05 (2006.03.30 *Crude* outtake video clip of S. Donziger discussing upcoming meeting with the judge); Exhibit 2 (certified transcript) at 16.

[128] Exhibit 1, CRS-052-00-CLIP-06 (*Crude* outtake video clips of S. Donziger); Exhibit 2 (certified transcript) at 16, 18.

very bright"[129] and "make decisions based on who they fear the most, not based on what the laws should dictate."[130]  In fact, when an associate suggested to Donziger that no judge would rule against them because "[h]e'll be killed," Donziger replied that, although the judge might not actually be killed if he ruled against them, "he thinks he will be . . . .  Which is just as good."[131] As a colleague told Donziger, "The only way we will win this case is if the judge thinks he will be doused with gasoline and burned if he rules against us."[132]  Donziger stated that this comment did not shock him.[133]  Donziger further asserted:  "[The judges] don't have to be intelligent enough to understand the law, just as long as they understand the politics."[134]  And according to Donziger, "no judge can rule against us and feel like he can get away with it in terms of his career."[135]  These threats are made all the more real given the prevalence of violence in the Oriente region of Ecuador[136].  Indeed, Fajardo has acknowledged that paid assassins in the

---

[129] Exhibit 76 (2006.07.26 Entry in Composite of S. Donziger Personal Notes) (DONZ00027256) at 55 of 109.

[130] Exhibit 1, CRS-350-04-CLIP-01 (2007.06.06 *Crude* outtake video clip of meeting among S. Donziger, L. Yanza, and A. Soltani); Exhibit 2 (certified transcript) at 419.

[131] Exhibit 1, CRS-129-00-CLIP-02 (Undated *Crude* outtake video clip of meeting among S. Donziger, A. Ponce and others); Exhibit 2 (certified transcript) at 70.

[132] Exhibit 76 (2006.03.11 Entry in Composite of S. Donziger Personal Notes) (DONZ00036235).

[133] Exhibit 76 (2006.03.11 Entry in Composite of S. Donziger Personal Notes) (DONZ00036235).

[134] Exhibit 1, CRS-129-00-CLIP-02 (Undated *Crude* outtake video clip of meeting among S. Donziger, A. Ponce, and others); Exhibit 2 (certified transcript) at 71.

[135] Exhibit 1, CRS-032-00-CLIP-01 (2006.03.09 *Crude* outtake video clip of meeting between S. Donziger and unidentified male); Exhibit 2 (certified transcript) at 11.  *See also* Exhibit BW (2003.12.17 Memorandum from S. Donziger to J. Kohn re "Ecuador trip/General Update") (DONZ00084015).

[136] Exhibit 14 (2006.11.03 S. Donziger Book Proposal) (DONZ00006707); Exhibit 98 (2010.12.02 Article, "FACTBOX-Key political risks to watch in Ecuador").

Oriente will kill someone for as little as $60,[137] and the region is known to harbor elements of the terrorist group FARC.[138]

75.    As part of their strategy to intimidate and coerce the Lago Agrio court, the RICO Defendants and their co-conspirators plotted to raise what they called their own "private army," a "specialized group" detailed "to watch over the court," for which, "if we need weapons, we can provide weapons."[139]  According to Fajardo, it was "necessary" for the RICO Defendants and their co-conspirators to "organize pressure demonstrations at the court" that will be a "little bit aggressive" in order to "teach the court a lesson."[140]  During one meeting in which the "private army" was discussed, Defendants Donziger and Yanza along with Amazon Watch founder Soltani and Kevin Koenig, Amazon Watch's Northern Amazon Program Coordinator, discussed their plans to organize and finance attempts "to control the court, to pressure the court."[141]  Donziger elaborated that the conspirators "want to send a message to the court that, 'don't f[**]k with us anymore—not now, and not—not later, and never.'"[142]  He observed that, "no one fears us right now.  And, until they fear us, we're not gonna win this case.  I'm convinced."[143]

---

[137] Exhibit 14 (2006.11.03 S. Donziger Book Proposal) (DONZ00006707).

[138] Exhibit 1, CRS-189-01-CLIP-01 (2007.03.03 *Crude* outtake video clip of meeting with Cabrera in which P. Fajardo, S. Donziger, L. Yanza, and others discuss the presence of the FARC in the area); Exhibit 2 (certified transcript) at 238.

[139] Exhibit 1, CRS-350-04-CLIP-02 (2007.06.06 *Crude* outtake video clip of meeting among A. Soltani, S. Donziger, L. Yanza, and others); Exhibit 2 (certified transcript) at 422-24.

[140] Exhibit 1, CRS-346-00-CLIP-02 (2007.06.04 *Crude* outtake video clip of meeting between S. Donziger and P. Fajardo); Exhibit 2 (certified transcript) at 402-03.

[141] Exhibit 1, CRS-350-04-CLIP-01 (2007.06.06 *Crude* outtake video clip of meeting among S. Donziger, L. Yanza, and A. Soltani); Exhibit 2 (certified transcript) at 419, 422.

[142] Exhibit 1, CRS-350-04-CLIP-01 (2007.06.06 *Crude* outtake video clip of meeting among S. Donziger, L. Yanza, and A. Soltani); Exhibit 2 (certified transcript) at 420.

[143] Exhibit 1, CRS-350-04-CLIP-01 (2007.06.06 *Crude* outtake video clip of meeting among S. Donziger, L. Yanza, and A. Soltani); Exhibit 2 (certified transcript) at 420.

Accordingly, the conspirators planned to "take over the court with a massive protest," with the goal of "shut[ting] the court down for a day."[144]  According to Donziger, "[O]nly after that should we talk to the judge about what he needs to do.  The judge needs to fear us for this to move how it needs to move, and right now there is no fear, no price to pay for not making these key decisions."[145]  Realizing the ramifications of this plan, Soltani asked if the videotapes of the discussion could be subpoenaed, advising:  "I just want you to know that it's—it's illegal to conspire to break the law."[146]

76.      Ignoring these qualms, the RICO Defendants and their co-conspirators put their plan into effect, organizing their "army" in demonstrations at inspection sites and at the courthouse itself, intending to confront and instill fear into the court.  Donziger described one action to Joe Berlinger, the director of the film *Crude*:  "[O]ur private 'army' . . . has been very effective.  Yesterday they followed a Texaco lawyer into the judge's chambers and had a confrontation.  This is a critical part of our strategy that is allowing the case to go forward."[147]  Over the ensuing months, the conspirators' private army would make numerous appearances at judicial inspections of environmental sites, at the courthouse, and in the streets of Lago Agrio, always seeking to remind the judiciary that this was not litigation, but a "flat-out street brawl."[148]  At one such protest at a judicial inspection of the Sacha Sur Station, the RICO Defendants and their co-conspirators amassed their "army" of protesters who the judge would

---

[144] Exhibit 1, CRS-350-04-CLIP-01 (2007.06.06 *Crude* outtake video clip of meeting among S. Donziger, L. Yanza, and A. Soltani); Exhibit 2 (certified transcript) at 419-20.

[145] Exhibit 76 (2006.06.02 Entry in Composite of S. Donziger Personal Notes) (DONZ00036276).

[146] Exhibit 1, CRS-350-04-CLIP-02 (2007.06.06 *Crude* outtake video clip of meeting among A. Soltani, S. Donziger, L. Yanza, and others), Exhibit 2 (certified transcript) at 423.

[147] Exhibit 99 (2007.06.28 Email chain between M. Bonfiglio and J. Berlinger re "update") (JB-NONWAIVER00061808).

[148] Exhibit 14 (2006.11.03 S. Donziger Book Proposal) (DONZ00006707) at 24.

47

not permit to enter the Station due to the risk that such a large mob would pose to the Station's operation.[149]  When Donziger saw that what he described as his "army" would not be able to enter, he demanded that the "f[**]kin' judge" come to the gate to deal with the mob himself and warned that "they're provoking a violent incident."[150]  Although the RICO Defendants' and their co-conspirators' "army" was rebuffed at this inspection, the RICO Defendants and their co-conspirators achieved their purpose of letting the judiciary know that it was being watched by a potentially violent group.[151]  In another incident, the conspirators organized a protest at the judge's office after a canceled judicial inspection.  The intimidation was successful, causing the judge to "sweat" and "promis[e] to make a decision" on a new date by the following day.[152]

77.     The RICO Defendants also employed extortion to get what they wanted.  For example, the RICO Defendants "wrote up a complaint against [Judge] Yanez, but never filed it, while letting him know [they] might file it if he does not adhere to the law and what [they] need."[153]  And on a task list he prepared in February 2006, Donziger wrote: "accuse [Judge] of being involved in corruption with Chevron; ask for recusal."[154]

---

[149] Exhibit 1, CRS-028-01 (2006.03.08 *Crude* outtake video clip of protest of judicial inspection); Exhibit 2 (certified transcript) at 2-9.

[150] Exhibit 1, CRS-028-01 (2006.03.08 *Crude* outtake video clip of protest of judicial inspection); Exhibit 2 (certified transcript) at 3-4.

[151] Exhibit 1, CRS-069-02-CLIP-03 (Undated *Crude* outtake video clip of S. Donziger strategy of interfering with judicial inspections); Exhibit 2 (certified transcript) at 37.

[152] Exhibit 76 (2006.11.09 Entry in Composite of S. Donziger Personal Notes) (DONZ00036263).

[153] Exhibit 76 (2006.09.13 Entry in Composite of S. Donziger Personal Notes) (DONZ00027256) at 54 of 109.

[154] Exhibit 104 (2006.02.20 Document entitled, "Strategy Plan") (DONZ00084801).  *See* Exhibit D (2010.12.13 Donziger Dep.) at 1288-89; Exhibit D (2010.12.23 Donziger Dep.) at 1840:18-1843:12; 1964:11-14; 1968:17-1970:12.

78.      The RICO Defendants' and their co-conspirators' plan to instill fear in the judiciary was only one approach to illegally obtaining a favorable ruling.  Another approach involved numerous attempts to personally influence, intimidate or negotiate with the judge in the Lago Agrio Litigation, often through *ex parte* meetings.  Donziger described such actions as "lobbying."[155]  Donziger, for example, has held numerous meetings with presiding judges, often over lunch at the judges' homes, during which he has "t[aken] advantage of the situation to explain [the RICO Defendants'] theory of the case."[156]  During one such meeting, Donziger pressed upon the judge the false assertion that "Texaco's sampling is full of s[**]t."[157]  Donziger has also asked his co-conspirators to meet with the judge in secret and press their case.[158]  And indeed, Fajardo and the Front—the organization that stands to receive a windfall from the judgment—have met directly with the judge, pressing the conspirators' interests and obtaining promises of cooperation from the judge.[159]

79.      The RICO Defendants did all this because they believed that it worked.  On one occasion, one of Donziger's co-conspirators suggested that in order to get the court to rule in their favor on an important legal point, "Maybe Pablo [Fajardo] can have one of his backroom conversations."[160]  In August 2006, co-conspirator Joseph Mutti updated Donziger that, "Luis

---

[155] Exhibit 76 (2006.03.11 Entry in Composite of S. Donziger Personal Notes) (DONZ00036235).

[156] Exhibit 76 (2006.03.11 Entry in Composite of S. Donziger Personal Notes) (DONZ00036235).

[157] Exhibit 76 (2006.11.20 Entry in Composite of S. Donziger Personal Notes) (DONZ00027256) at 36 of 109.

[158] Exhibit 100 (2006.02.10 Email among S. Donziger, A. Ponce, and others re "idea") (DONZ00040410).

[159] Exhibit 102 (2006.10.12 Email from J. Prieto to S. Donziger and L. Yanza re "winston's money") (DONZ00023523) at 1-2.

[160] Exhibit 101 (2006.09.05 Email from S. Donziger to A. Marr re "one other thing") (DONZ00106774).

[Yanza] reported that the judge appears to be backing down from his position regarding the cancellation of the inspections and that pressure must be brought to bear on him.  Thus, it was resolved that two members of the coalition will be traveling to Lago next week to meet with the judge.  Esperanza already met with him twice this week—once with an accompanying declaration—so he's already feeling the pressure."[161]  The RICO Defendants are not the only observers to note the impact that these tactics have had.  *The Economist*, for example, observed: "The judge in Lago Agrio, Juan Núñez, . . . has made no secret of his sympathy for the plaintiffs."[162]

80.     Not content merely to apply pressure themselves, and as part of their previous arrangement with the Ecuadorian government (*see* paragraphs 60-63, *supra*), the RICO Defendants and their co-conspirators have also enlisted Ecuadorian officials to pressure and intimidate the judiciary to rule against Chevron.  As Donziger has explained the strategy, "We can have the best proof in the world, and if we don't have a political plan we will surely *lose*. On the other hand, we can [have] mediocre proof and a good political plan and stand a good chance of winning."[163]  Donziger understood that to get what the co-conspirators wanted, he had to do "political work at the highest level to make things happen, like get the government, for example, to take a position in a case that affects your clients."[164]  This was facilitated by the fact that, according to Donziger, the conspirators had "close ties" to "high-ranking Ecuadorian

---

[161] Exhibit 103 (2006.08.18 Email chain among J. Mutti, S. Donziger, and others re "Temas" ["Topics"]) (DONZ00041397).

[162] Exhibit E (2009.05.21 Article, "Ecuador, Chevron and pollution: Justice or extortion?" THE ECONOMIST).

[163] Exhibit 76 (2006.05.31 Entry in S. Donziger Personal Notes) (DONZ00036277) (emphasis added).

[164] Exhibit 1, CRS-104-01-CLIP-01 (2006.07.24 *Crude* outtake video clip of S. Donziger discussing strategy with Cush and others); Exhibit 2 (certified transcript) at 46.

government officials" in addition to the Front's "wide influence in Ecuador" and "ab[ility] to command meetings with government ministers and even the President."[165]

81.     The collaboration between the RICO Defendants and Republic of Ecuador is so close that one U.S. District Court has concluded that it was "an established fact" that the Republic of Ecuador was supporting the Lago Agrio Plaintiffs.[166]  The Republic of Ecuador recently asserted in court filings that it has had a formal "*common interest agreement*" with representatives of the Lago Agrio Plaintiffs since 2006.[167]  In pursuit of that alleged common interest, the RICO Defendants and the Republic of Ecuador have coordinated their legal and public relations strategies, both directly and through Ecuador's U.S. legal counsel.  As part of this cooperation, the RICO Defendants have received assistance from the highest levels of government in Ecuador, from "allies [who were] firmly entrenched at the top."[168]  For example, Donziger himself ghostwrote a letter from Ecuador's ambassador to the United States, Dr. Luis Gallegos, to *The Wall Street Journal*.[169]

82.     The RICO Defendants have also worked with Winston & Strawn LLP ("Winston & Strawn"), the U.S. law firm hired by Ecuador to represent it against Chevron in proceedings in

---

[165] Exhibit 14 (2006.11.03 S. Donziger Book Proposal) (DONZ00006707) at 4, 22.

[166] Exhibit 105 (2007.04.19 Hr'g Tr., *Republic of Ecuador v. ChevronTexaco*, No. 04-CV-8378 (LBS) (S.D.N.Y.)) at 6.

[167] Exhibit 106 (2010.12.01 Republic of Ecuador's Limited Opposition to 1782 (Kohn), *In re Application of Chevron Corp.*, No. 10-MC-00208 (JD) (E.D. Pa.)) at 6.

[168] Exhibit 76 (2006.10.25 Entry in Composite of S. Donziger Personal Notes) (DONZ00027256) at 43 of 109.

[169] Exhibit 107 (2007.10.31 Email from R. Herrera to S. Donziger re "WSJ idea") (DONZ00021209); Exhibit 108 (2007.10.31 Email from R. Herrera to S. Donziger re "try this") (DONZ00021212); Exhibit 109 (2007.11.01 Email from R. Herrera to S. Donziger re "carta") (DONZ00021214-15).

the United States.[170]  The RICO Defendants have provided information and other assistance to

Winston & Strawn, including having Stratus provide scientific analysis[171] and Donziger help

with the drafting of legal documents.[172]  Donziger, aware that this level of cooperation crossed

the line, was concerned it might lead Chevron to believe the RICO Defendants and the

Ecuadorian government were "in bed" together.[173]  Thus, upon realizing he had been

photographed alongside a Winston & Strawn attorney for a newspaper article, Donziger vowed

to deny that the man in the photograph was him.[174]  However, Donziger recognizes that the

RICO Defendants and the Republic of Ecuador have been "really helping each other."[175]

83.     The RICO Defendants have also turned to the government to *shut down*

Petroecuador's remediation, because of the negative impact it would have on their scheme.  For

example, in 2009, in an email to Donziger and other conspirators with the subject line

"WORRISOME," Fajardo warned them that a newspaper was reporting that the government was

assuming responsibility for remediation, and, worse, that it believed it would cost an "extremely

low" $96 million.  Fearful that Chevron would "say that the State finally assumed its duty and is

---

[170] Exhibit BX (2006.08.25 Email from S. Donziger to R. Herrera, C. Mitchell, and E. Bloom re "quick thought") (DONZ00129953).

[171] Exhibit 110 (2009.09.30 Email from S. Donziger to D. Beltman re "can u be available tomorrow afternoon for a phone call?") (STRATUS-NATIVE050326).

[172] Exhibit 1, CRS-169-05-CLIP-09 (2007.01.31 *Crude* outtake video clip of meeting between S. Donziger and J. Kohn); Exhibit 2 (certified transcript) at 152.  *See also* Exhibit BY (2006.09.25 Email from J. Kohn to S. Donziger re "RE: in quito for two days") (DONZ-HDD-0085706).

[173] Exhibit 1, CRS-109-00-CLIP-02 (*Crude* outtake video clip of meeting among S. Donziger, L. Schrero, J. Saenz, and others); Exhibit 2 (certified transcript) at 55.

[174] Exhibit 1, CRS-148-01-CLIP-01 (2007.01.17 *Crude* outtake video clip of meeting among S. Donziger, L. Yanza, and others); Exhibit 2 (certified transcript) at 90.

[175] Exhibit 1, CRS-163-02-CLIP-02 (2007.01.18 *Crude* outtake video clip of S. Donziger explaining the relationship between the Lago Agrio Plaintiffs and the Ecuadorian government); Exhibit 2 (certified transcript) at 143.

going to clean up what it ought to," Fajardo called on his co-conspirators to act.  Donziger responded in an email to Juan Saenz, "You have to go to Correa to put an end to this s[**]t once and for all."[176]

84.     Other members of the Ecuadorian government have also signaled to the Lago Agrio court the government's demand that Chevron be found liable.  As the Ecuadorian Attorney General Diego García Carrión told a reporter in August 2008, the Correa administration's position in this case is clear:  "The pollution is [the] result of Chevron's actions and not of Petroecuador."[177]  Again, in May 2010, Attorney General García "dismissed any responsibility on the part of the Ecuadorian State for the environmental damage caused in the Amazon region by the U.S.-based oil company Chevron-Texaco."[178]  And in September 2009, Ombudsman Fernando Gutiérrez announced:  (i) the Lago Agrio Litigation "has absolute priority and the judgment must be rendered as soon as possible";[179] (ii) the case concerns "an assault on the entire country";[180] and (iii) in a direct signal to the Lago Agrio court, Chevron, rather than the State, bears full responsibility for any harm.

85.     This support was not arrived at independently, but through collusion between the RICO Defendants and the Republic of Ecuador.  Ana Alban, then Ecuador's Minister of the Environment, communicated with Donziger directly, assuring him that the government was

---

[176] Exhibit 112 (2009.06.22 Email chain among S. Donziger, J. Sáenz, P. Fajardo, L. Yanza, and others re "PREOCUPANTE" ["WORRISOME"] (DONZ00066371) at 1.

[177] Exhibit 113 (2008.08.07 Article by Isabel Ordóñez, "Amazon Oil Row: US-Ecuador Ties Influence Chevron Amazon Dispute," DOW JONES) at 3.

[178] Exhibit 114 (2010.05.05 Transcript of Attorney General Diego García: The Ecuadorian Government Is Not Responsible for the Environmental Damage Caused by Chevron).

[179] Exhibit 115 (2009.09.15 Article, "Defensor del Pueblo pide prioridad al caso Texaco" ["Ombudsman Requests Priority for Texaco Case"], HOY).

[180] Exhibit 116 (2009.09.10 Article by Cristhian Reyes H., "Defensor del Pueblo dice que caso Chevron ya se debería sentenciar" ["Ombudsman says that the decision in Chevron case should already have been issued"], EFE).

"giving the support that we can do" to the Lago Agrio Plaintiffs, reminding him that "we brought the President to the zone," and assuring him that she had a "very close" "friend of the Frente de Amazonia working with me doing all this."[181]

86.     The fact that President Correa and other members of the government have sided with the Defendants and against Chevron sends a clear message to the Ecuadorian judiciary that it must find Chevron liable.  And it sends a message to Chevron that it must pay money to the conspirators in the form of a "settlement" or face the fraudulent, politically influenced judgment that the RICO Defendants intend to try to enforce in U.S. courts or elsewhere.

> **b.     Taking Advantage of a Weakened and Increasingly Corrupt Ecuadorian Judiciary**

87.     The RICO Defendants have been able to influence the proceedings because the independence and integrity of the Ecuadorian judiciary has eroded to where it is now greatly susceptible to these tactics, and to pressure from outside and through the executive branch. Indeed, the Ecuadorian presidency now wields de facto control and near-autocratic power over all Ecuadorian institutions.

88.     Various sources confirm the political branches' domination over Ecuador's judiciary in recent years and the judiciary's system-wide corruption.  For example, the World Bank's Worldwide Governance Indicators for 2009, compiled from 21 independent sources, ranked Ecuador below the 10th percentile of all countries surveyed with respect to the "rule of law"—down from the 31st percentile in 2003[182].  Ecuador's negative score is -1.28, which places it below North Korea (-1.25)[183].

---

[181] Exhibit 1, CRS-421-00-CLIP-03 (2007.07.24 *Crude* outtake video clip of meeting among S. Donziger, A. Alban, and T. Styler); Exhibit 2 (certified transcript) at 446.

[182] Exhibit 117 (Excerpts from 2009 World Bank Worldwide Governance Indicators).

[183] Exhibit 117 (Excerpts from 2009 World Bank Worldwide Governance Indicators).

89.     The U.S. Department of State's annual Human Rights Report published in March 2010 also noted that "there continued to be serious problems" in Ecuador with respect to "corruption and denial of due process within the judicial system" and that the judiciary was "susceptible to outside pressure and corruption."[184]  Similarly, as recently as July 15, 2010, the UN Special Rapporteur on extrajudicial executions described Ecuador's judicial system as "almost universally condemned for its inefficiency and mismanagement."[185]

90.     Among the means by which President Correa has established his control over the judiciary is a policy whereby he has caused the issuance of a memorandum instructing all of his ministers that should any Ecuadorian court enjoin their ministry, and if the ministry is able to overturn the injunction on appeal, the ministry is to immediately sue the judge who entered the injunction *personally* for damages.[186]

91.     There are numerous examples of this corruption and undue influence on display in the Lago Agrio Litigation.  While he was presiding over the trial, Judge Núñez publicly stated that the Lago Agrio Litigation had "taken too long" immediately after a two-hour luncheon with President Correa, at which the President complained about delays and demanded "expedited treatment of cases that are of interest to Ecuador."[187]  Judge Núñez was ultimately forced to excuse himself from the case, not because of his apparent bias, but because of a bribery

---

[184] Exhibit 118 (U.S. Department of State Human Rights Reports, Ecuador, 2007-2009) at 32, 35.

[185] Exhibit 119 (2010.07.15 Press Release by United Nations Special Rapporteur, "UN independent expert finds 'astonishingly high rates for impunity for killings in Ecuador'").

[186] Exhibit EK (2010.11.18 Official Circular No. T1.C1-SNJ-10-1689).

[187] Exhibit F (Joffre Campaña Mora, *Injerencia en la administración de justicia* [*Interference in the Administration of Justice*], EL UNIVERSO, Mar. 5, 2009); Exhibit G (Juan Forero, *In Ecuador, High Stakes in Case Against Chevron*, WASH. POST, Apr. 28, 2009, at A12).

solicitation scandal where he was caught on video expressing his prejudgment against Chevron.[188]

92.     Just after this bribery solicitation story broke and the videos become public, on September 2, 2009, co-conspirator Juan Pablo Saenz wrote to Donziger and assured him that the Front's "sources at the government tell us they're actively looking for [Ecuadorians involved in the scandal], to cut their heads off.  We should focu[s] on [the Americans involved], since they're the Chevron stooges.  Correa and his cronies will take care of the rest."[189]

93.     On the following day, September 3, 2009, Judge Núñez filed a motion to excuse himself from the Lago Agrio Litigation.[190]  The next day, Prosecutor General Pesántez publicly declared that he had asked Judge Núñez to excuse himself "to prevent any delay of the trial." Pesántez then added that Chevron had "probably caused serious environmental damages for decades and also caused illnesses" and confirmed that the government of Ecuador expected to receive 90% of the prospective judgment against Chevron.[191]

94.     Although Chevron filed a petition to annul all of Judge Núñez's biased and politically influenced rulings in the Lago Agrio Litigation, that petition was denied by Judge Núñez's replacement.[192]  Thus, Judge Núñez's improper and bad-faith judicial decisions continued to taint the Lago Agrio Litigation and undermine Chevron's rights, just as the RICO Defendants hoped they would.  After all, the conspirators' underlying strategy has been that the

---

[188] Exhibit BZ (Simon Romero and Clifford Krauss, *Chevron Offers Evidence of Bribery Scheme in Ecuador Lawsuit*, N.Y. TIMES, Aug. 31, 2009).

[189] Exhibit 111 (2009.09.02 Email chain between J. Saenz and S. Donziger re "Chevron Charged With Dirty Tricks in Ecuador") (DONZ00052196) at 1.

[190] Exhibit H (certified translation of 2009.09.03 recusal motion of Judge Núñez, Lago Agrio Court).

[191] Exhibit 87 (2009.09.04 Press Conference for Prosecutor Washington Pesántez).

[192] Exhibit I (certified translation of 2009.11.30 Lago Agrio court order denying Chevron's appeal of court's refusal to nullify prior rulings) at 3-4.

more Chevron fears an unfair ruling in the sham Lago Agrio Litigation, the better target for an extorted payment it becomes.

95.     Against this backdrop of collusion and corruption, the RICO Defendants have obtained a judgment in their favor and against Chevron by playing the "game" "dirty"[193] and currying favor from the Ecuadorian government.  And this is all part of the conspirators' scheme to convince Chevron to pay up—or else.[194]  Chevron has initiated international arbitration under the Bilateral Investment Treaty, seeking relief from the Republic of Ecuador's violations of international law and treaty obligations in connection with its failure to honor its contractual agreements.  The Lago Agrio Plaintiffs and other parties named in this Amended Complaint are not and cannot be parties to the Treaty Arbitration, and Ecuador has asserted sovereign immunity against claims filed in courts of the United States.

> c.     **Manipulating and Falsifying Their Own Experts' Findings to Corrupt the Judicial Inspection Process**

96.     At the outset of the litigation, the Lago Agrio court ordered a process known as a judicial inspection to assess the 122 former consortium oil production sites. [195]  In a process agreed to by both parties and the court, experts were nominated by each side and appointed by

---

[193] Exhibit 1, CRS-052-00-CLIP-05 (2006.03.30 *Crude* outtake video clip of S. Donziger discussing upcoming meeting with the judge); Exhibit 2 (certified transcript) at 16.

[194] Exhibit 1, CRS-052-00-CLIP-05 (2006.03.30 *Crude* outtake video clip of S. Donziger discussing upcoming meeting with the judge); Exhibit 2 (certified transcript) at 16.

[195] Exhibit 120 (2003.10.29 Order regarding evidence and appointment of experts, Lago Agrio Litigation).

the court to investigate and report on conditions at the sites.[196]  The court nominated a third set of "settling experts" to resolve any differences between the experts nominated by the parties.[197]

97.     The RICO Defendants and their co-conspirators believed they could use and corrupt the judicial inspection process to their advantage.  To this end, they designed a strategy to "choreograp[h]"[198] the judicial inspections and to "create conflict, invit[ing] the press" to "entrap [Chevron] in the conflict."[199]  As Donziger put it, "The goal of the inspections [was] to win the legal case, not to produce an independent scientific report."[200]  From his perspective, the judicial inspection process was "all about politics and arguing and bulls[**]t and show."[201]  Part of that show was to organize a number of demonstrations at the judicial inspection sites—some threatened to become violent (see paragraph 76, supra)—to showcase the strength and will of the RICO Defendants' and their co-conspirators' "army" and to send a message to the judiciary that it was being watched.

98.     The RICO Defendants and their co-conspirators have also sought and obtained a court order prohibiting Petroecuador from conducting any remediation of the former consortium

---

[196] Exhibit 121 (2004.08.07 Summary Oral Hearing No. 002-2003, Terms of reference for the experts carrying out judicial inspections, Lago Agrio Litigation); Exhibit 122A (2004.08.26 Order adopting Procedural Agreement for experts, Lago Agrio Litigation).

[197] Exhibit 121 (2004.08.07 Summary Oral Hearing No. 002-2003, Terms of reference for the experts carrying out judicial inspections, Lago Agrio Litigation) at 2; see Exhibit 122 (certified translation of Ecuadorian Code of Civil Procedure, art. 259).

[198] Exhibit 1, CRS-069-02-CLIP-03 (Crude outtake video clip of S. Donziger strategy of interfering with judicial inspections); Exhibit 2 (certified transcript) at 37.

[199] Exhibit 1, CRS-053-01 (2006.03.30 Crude outtake video clip of meeting among S. Donziger, Benjamin, A. Ponce, L. Yanza, and others); Exhibit 2 (certified transcript) at 22.

[200] Exhibit 123 (2004.09.09 Memorandum from S. Donziger to Ecuador v. Texaco Case Team) (DONZ00022695) at 1 of 3.  See also Exhibit CA (2005.01.01 Email from M. Pareja to S. Donziger (DONZ-HDD-0052901).

[201] Exhibit 1, CRS-069-02-CLIP-03 (Crude outtake video clip of S. Donziger strategy of interfering with judicial inspections); Exhibit 2 (certified transcript) at 37.

area.[202]  Fajardo spelled out to his colleagues, "[Petroecuador is] altering the evidence and it is possible that when our technicians go to the PG to take samples that they will find most of the waste has been removed.  This could complicate things for us a bit."[203]  Fajardo explained that it was "urgent" that the RICO Defendants "coordinate" with Petroecuador "so they will desist [remediating] until we've had a chance to extract the evidence we need."[204]  In response, Donziger cautioned Fajardo to "[b]e careful with written letters—informal and oral meetings are better[.]  [W]e don't want Texaco to use some letter to say we are obstructing remediation."[205]  In another email to Donziger and other conspirators, Fajardo expressed concern that the government was assuming responsibility for remediation, and that it would cost an "extremely low" $96 million.  The RICO Defendants then turned to the government for assistance in shutting down the remediation.

99.  Ultimately, the judicial inspection process was short-lived.  The first and only time settling experts issued a report for one of the judicial inspection sites was in February 2006, at which point they agreed with Chevron's expert's findings and concluded that TexPet's remediation met the standards agreed to with Ecuador.  They further agreed that there was no evidence of contamination posing a risk to either human health or the environment.[206]

---

[202] Exhibit 124 (2007.07.12 Letter from R. Cabrera to Lago Agrio court requesting that Petroecuador cease remediation of former oil production sites that are subject to judicial inspection, Lago Agrio Litigation); Exhibit 125 (2007.10.29 Letter from P. Fajardo to Lago Agrio court endorsing Cabrera's request that Petroecuador's remediations efforts cease, Lago Agrio Litigation).

[203] Exhibit 126 (2006.12.21 Email chain among P. Fajardo, S. Donziger, L. Yanza, and others re "URGENT PROPOSAL") (DONZ00020233).

[204] Exhibit 126 (2006.12.21 Email chain among P. Fajardo, S. Donziger, L. Yanza, and others re "URGENT PROPOSAL") (DONZ00020233).

[205] Exhibit 126 (2006.12.21 Email chain among P. Fajardo, S. Donziger, L. Yanza, and others re "URGENT PROPOSAL") (DONZ00020233).

[206] Exhibit 127 (2006.02.01 "Report of the Settling Experts on the Judicial Inspection of the Sacha 53 Well").

100.    When it became apparent to the conspirators that the judicial inspection process was not going to provide them with the record they needed to extort a payment from Chevron, they abandoned that process and set about developing their own false history and factual record, entirely under their control.  Using a series of paid experts whom they pressured, misled or recruited to their scheme, the conspirators created an increasingly extreme and distorted record, and then manipulated the Lago Agrio court into accepting that false history as the product of independent analysis.

(i)    **Inducing an Expert to Report Biased and False Results**

101.    To create their first false data point, the RICO Defendants pressured their U.S. expert David Russell to develop an exaggerated damages estimate and continued to "use it to put out a figure that will scare Chevron and investors,"[207] long after Russell sent Donziger a cease-and-desist letter demanding that he stop using the estimate.

102.    In 2003, Russell, who was retained by the RICO Defendants to oversee the judicial inspection process for the Lago Agrio Plaintiffs and prepare a damages analysis, initially estimated the cost of remediation to be approximately $6 billion.[208]  In Russell's own words, that estimate was prepared in "a very short time, with only a week of review time in the jungle, and heavily influenced by [Donziger] in the writing."[209]  At Donziger's insistence, and as evidence of his heavy influence on Russell's initial calculation, Russell used the most expensive remedial option available, because Donziger wanted a "large" damages estimate.[210]  Even so,

---

[207] Exhibit 128 (2006.12.22 Email from L. Lopez to S. Donziger re "Makarik Nihua/Judith's concerns….") (DONZ00088074).

[208] Exhibit 129 (2006.02.14 Letter from D. Russell to S. Donziger re "Cease and Desist") (POWERS-NATIVE09594); Exhibit 6 (2010.12.23 Donziger Dep.) at 1858:9-19.

[209] Exhibit 129 (2006.02.14 Letter from D. Russell to S. Donziger re "Cease and Desist") (POWERS-NATIVE09594) at 1.

[210] Exhibit 129 (2006.02.14 Letter from D. Russell to S. Donziger re "Cease and Desist") (POWERS-NATIVE09594) at 1.

Russell made clear to Donziger and others that the quantitative data "ha[d] not [been] reliably established" and that he and his team were "still at the guessing stage."[211]

103.     As Russell continued his work, he realized that the evidence on the ground did not support his damages estimate.  By December 2004, he told Donziger "that Texaco may be right when they indicate that the remediation is performing as designed, and degrading the petroleum."[212]  Two months later he provided an update to Donziger in which he explained, "From the data I have seen so far, we are not finding any of the highly carcinogenic compounds one would hope to see when investigating the oil pits."[213]

104.     After Russell prepared his estimate, he learned that the remediation work he considered appropriate could be completed at a substantially lower cost and wrote Donziger in February 2006 to demand that he stop using the unsupported and exaggerated $6 billion estimate.[214]  In his letter, Russell informed Donziger that the information he had since learned "would cause me to state that the 2003 cost estimate is too high by a substantial margin, perhaps by a factor of ten, or more."[215]  (Emphasis in original.)  And indeed, a year later, another of the co-conspirators, Charles Champ, estimated that a remediation and related social and development projects could be done for $1 billion, an estimate that itself is wildly exaggerated

---

[211] Exhibit 130 (2004.12.12 Email from D. Russell to S. Donziger, C. Bonifaz, and A. Wray re "I disagree!") (DONZ00036208) at 1, 5.  *See also* Exhibit DL (2004.05.15 Memorandum from D. Russell to Lawyers on the Ecuador Case re "Ecuador - next steps & Costs") (DONZ00084048).

[212] Exhibit 131 (2004.12.27 Memorandum from D. Russell to S. Donziger re "Mid Course Corrections and the Scope of the Global Inspection") (DONZ00038519) at 1.

[213] Exhibit 132 (2005.02.11 Email from S. Donziger to D. Russell and E. Camino re "Needed: A different analysis") (DONZ00038567).

[214] Exhibit 129 (2006.02.14 Letter from D. Russell to S. Donziger re "Cease and Desist") (POWERS-NATIVE09594).

[215] Exhibit 129 (2006.02.14 Letter from D. Russell to S. Donziger re "Cease and Desist") (POWERS-NATIVE09594) at 1.

and calculated using fictional cost assumptions.  Nonetheless, the RICO Defendants have never publicly disclosed this exaggerated figure because it is too low for their illicit purposes.[216]

105.     In that same cease-and-desist letter, Russell objected to Donziger's and Amazon Watch's use of the $6 billion estimate in their request to the U.S. Securities and Exchange Commission ("SEC") for the SEC to "investigate Chevron under Sarbanes-Oxley" for allegedly "underreporting their liabilities."[217]  Russell made clear that the "estimate is no longer valid and if subpoenaed to testify, I will state that the costs are much lower based upon the knowledge available to me at the time I was released from the project."[218]

106.     Russell also emphasized in the letter that he wanted nothing more to do with Donziger and the RICO Defendants' and their co-conspirators' pursuit of the litigation against Chevron:

> I do not want to get into the courts in the US, and do not want to be involved in your case against Texaco/Chevron!
>
> I have not prepared any other cost estimate, nor do I intend to do so.  It is no longer any of my concern, except to see that the name of my company and my reputation are not abused by continued association with the Aguinda vs. Texaco lawsuit.  If subpoenaed, I will tell the truth about what I know about the existing costs, how the cost estimate was prepared, and what the differences in unit costs might be to cleanup contamination in Ecuador.
>
> I am trying to stay out of your way and out of your case, but by using and abusing the outdated cost estimate to flail Chevron, you keep dragging me back in to [sic] it!  The Ecuador project has been a sorry chapter in my life and I do not want to get re-involved with you or it on any basis.

---

[216] Exhibit 133 (2007.01.09 Email from C. Champ to S. Donziger re "epiphany") (DONZ00048774) at 1.  *See also* Exhibit CB (2009.11.10 Email from A. Woods to S. Donziger re "letter to luis and pablo") (WOODS-HDD-0223243).

[217] Exhibit 129 (2006.02.14 Letter from D. Russell to S. Donziger re "Cease and Desist") (POWERS-NATIVE09594) at 1.

[218] Exhibit 129 (2006.02.14 Letter from D. Russell to S. Donziger re "Cease and Desist") (POWERS-NATIVE09594) at 2.

Several recent press releases using the 2003 cost estimate plus the most recent demand by Amazon Watch abuses me and my company.

Get a new cost estimate generated in Ecuador.  You will have to do that under the terms of the Global Inspection as required by the Court in Ecuador.  That 2003 cost estimate is a ticking time bomb which will come back to bite you, and very badly if anyone attempts due diligence on it.

(Emphasis in original.)[219]

107.    Donziger did not mince words in response:  "I don't care what the f[**]k that guy says."[220]  In a conversation with co-conspirator Soltani of Amazon Watch, Donziger acknowledged that the "[p]rice tag" for remediation "would only be a guess" and that Russell's $6 billion "very rough estimate" significantly overstated the true costs of remediation:  "[The] six billion dollar thing is out there.  The reality is, based on what this guy is telling me, [it] would cost less than that.  Significantly less than that . . . ."[221]  And in an email to his co-conspirators, Donziger recognized that the "fact [Russell] sent this letter has a certain amt of danger for us."[222]  Nonetheless, in a subsequent conversation with Defendants Fajardo and Yanza and others, Donziger discussed requesting a higher amount than $6 billion so a judgment of a lower amount could be portrayed as favorable to Chevron:  "But as a concept, I ask, do we ask for

---

[219] Exhibit 129 (2006.02.14 Letter from D. Russell to S. Donziger re "Cease and Desist") (POWERS-NATIVE09594) at 2.

[220] Exhibit 1 CRS-138-02-CLIP-02 (2006.12.06 *Crude* outtake video clip of meeting with S. Donziger and unidentified male); Exhibit 2 (certified transcript) at 78.

[221] Exhibit 1 CRS-138-02-CLIP-02 (2006.12.06 *Crude* outtake video clip of meeting with S. Donziger and unidentified male); Exhibit 2 (certified transcript) at 78-79.

[222] Exhibit 134 (2006.02.14 Email from S. Donziger to W. Powers, A. Maest, and B. Epdick re "Russell backing off cost estimate – important") (DONZ00038651).

much more than we really want as a strategy?  Do we ask for eight and expect three, so that [the judge] says, 'Look, Texaco, I cut down the largest part.'"[223]

108.    And despite Russell telling Donziger that his estimate was inaccurate and that he did "not want to be involved in" the Lago Agrio Litigation and despite Donziger's assurance to Russell that he would stop using Russell's work, the RICO Defendants and their co-conspirators continued to use the exaggerated and disavowed $6 billion estimate.[224]  As Donziger explained it, "[G]iven that [the RICO Defendants] ha[d] worked with Russell's number all of these years," not continuing to use the $6 billion number "would make [them] look like fools."[225]  For example, Amazon Watch, exhibiting the same disregard of the facts as Donziger, continued to tout the $6 billion figure well after Russell sent Donziger his cease-and-desist letter.  Amazon Watch's press releases asserted that Russell's company, Global Environmental Operations, endorsed the $6 billion damages estimate even though Russell implored Donziger to stop "abusing" the "name of [Russell's] company" by associating it with the Lago Agrio Litigation.[226]  For example, a March 20, 2007 press release entitled "Ecuador Court Speeds Up Chevron's $6 Billion Amazon Trial Over Rainforest Contamination" issued by Amazon Watch states:  "The only independent damage assessment, by the U.S. firm Global Environmental Operations, puts clean-up costs at $6.14 billion, exclusive of personal damages to thousands of

---

[223] Exhibit 1, CRS-159-00-CLIP-06 (2007.01.16 *Crude* outtake video clip of meeting among S. Donziger, P. Fajardo, L. Yanza, J. Saenz, A. Ponce, J. Prieto, and others); Exhibit 2 (certified transcript) at 125.

[224] Exhibit 129 (2006.02.14 Letter from D. Russell to S. Donziger re "Cease and Desist") (POWERS-NATIVE09594) at 2.

[225] Exhibit 76 (2006.04.06 Entry in Composite of S. Donziger Personal Notes), (DONZ00027256) at 16 of 109.

[226] Exhibit 129 (2006.02.14 Letter from D. Russell to S. Donziger re "Cease and Desist") (POWERS-NATIVE09594) at 2.

residents of the area."[227]  In issuing this press release, the conspirators lied about having an expert estimate of $6 billion when they knew that Russell repudiated the $6 billion figure as "no longer valid" and "a ticking time bomb" well over a year earlier.[228]  Donziger has subsequently admitted that he had no other basis for the $6 billion figure when that press release was issued.[229]

### (ii)    Filing Falsified Expert Reports

109.    Not only did the RICO Defendants and their co-conspirators pressure Russell to come up with a large, unsupported damages assessment, but they also submitted falsified expert reports under the name of another of their U.S. experts, Dr. Charles Calmbacher, that contradicted his conclusions that he had found no evidence of harm.

110.    In 2004, the conspirators selected Dr. Calmbacher to be the expert in charge of their inspection and to act as the Lago Agrio Plaintiffs' testifying expert for four of the sites that were being inspected.[230]

111.    Shortly after Dr. Calmbacher began his work in the field, Donziger informed him and the other members of the technical team that "[t]he goal is to win the legal case, not to produce an independent scientific report."[231]  Much to the RICO Defendants' dismay, Dr. Calmbacher did not abide by this admonition when he informed the RICO Defendants and

---

[227] Exhibit 135 (2007.03.20 Amazon Watch Press Release, "Ecuador Court Speeds up Chevron's $6 Billion Amazon Trial over Rainforest Contamination").

[228] Exhibit 129 (2006.02.14 Letter from D. Russell to S. Donziger re "Cease and Desist") (POWERS-NATIVE09594) at 2.

[229] Exhibit D (2011.01.18 Donziger Dep.) at 3190:8-3191:3.

[230] Exhibit 136 (2010.03.29 Deposition of Charles W. Calmbacher, *In re Application of Chevron Corp.*, No. 10-MI-0076 (TWT) (GGB) (N.D. Ga.) ("Calmbacher Dep.")) at 115:15-24, 118:15-21.

[231] Exhibit 123 (2004.09.09 Memorandum from S. Donziger to Ecuador v. Texaco case team) (DONZ0022694-95).

their co-conspirators that, in his professional opinion, the sites he inspected did not require further remediation and did not pose a risk to human health or the environment.[232]  This, of course, was not what the RICO Defendants and their co-conspirators wanted to hear.  Indeed, Donziger had instructed Dr. Calmbacher to find contamination during his site inspections.[233]

112.    Dr. Calmbacher was uneasy with Donziger's instructions and the level of control the RICO Defendants tried to exert over his work.  He was concerned regarding the methods and scope of analysis that the RICO Defendants and their co-conspirators planned to perform on the samples they collected.[234]  In his opinion, the analysis was insufficient to test all the aspects of the oil that he felt should be tested.[235]  When Dr. Calmbacher informed Donziger of his concerns, however, Donziger brushed them aside and decided to proceed with the limited and inadequate analysis he already had planned.[236]

113.    When it became clear that Dr. Calmbacher's conclusions were unsatisfactory to the RICO Defendants and their co-conspirators, they submitted to the Lago Agrio Court judicial inspection samples bearing the name "Selva Viva Laboratory" on the chain of custody forms.[237]  But there is no Selva Viva Laboratory; rather, the "analysis" was performed—if it was performed at all—in the RICO Defendants' and their co-conspirators' team hotel room, and they borrowed the name "Selva Viva"—the same name as the RICO Defendant who was "created"

---

[232] Exhibit 136 (Calmbacher Dep.) at 115:15-24, 118:15-21.

[233] Exhibit 136 (Calmbacher Dep.) at 52:13-18.

[234] Exhibit 136 (Calmbacher Dep.) at 88:6-91:6.

[235] Exhibit 136 (Calmbacher Dep.) at 88:6-91:6.

[236] Exhibit 136 (Calmbacher Dep.) at 88:6-91:6.  *See also* Exhibit DM (certified translation of 2006.10.02 Email from J. Prieto to S. Donziger, A. Page, and L. Schrero re "RE: regarding settling experts – FOLLOW-UP IDEAS / OUTLINE") (DONZ00041662).

[237] Exhibit 136 (Calmbacher Dep.) at 99:2-100:21.

"simply as a pass thru mechanism to administer funds for the litigation" in Ecuador[238]—to lend false authenticity to their sham inspection.[239]  The conspirators knew such activity was not without risk, and they worried that Dr. Calmbacher would "inform the court that the Selva Viva project is a fraud."[240]

114.    Ultimately, the RICO Defendants and their co-conspirators decided that they did not need Dr. Calmbacher to agree with their position, and that if the facts did not support their case, they would manufacture new ones.  Thus, after Dr. Calmbacher communicated his negative findings to the RICO Defendants and their co-conspirators, he was "terminated without warning or explanation" and Donziger ordered him to return to the United States.[241]  At the time, Donziger believed that "[Dr. Calmbacher] will still sign the perito [expert] reports, but we might have to write them in Quito."[242]

115.    Dr. Calmbacher, however, was adamant that he would still be the one to "write the Perito reports," despite his differences with Donziger, because he needed "to comply with [his] obligation to the court and to maintain [his] professional integrity with the Ecuadorian

---

[238] Exhibit 137 (2007.08.14 Email chain among S. Donziger to K. Wilson, J. Kohn, and K. Kenny re "Critical money transfer") (DONZ00024887) at 1.  *See also* Exhibit CC (2005.06.14 Email from C. Kusner to S. Donziger re "RE: new bank wire information for Ecuador") (DONZ-HDD-0069892).

[239] Exhibit 136 (Calmbacher Dep.) at 133:15-19.

[240] Exhibit 138 (2005.07.25 Email from S. Donziger to P. Fajardo, L. Yanza, and A. Villacis re "important – Chuck Calmbacher") (DONZ00027787) at 1.

[241] Exhibit 139 (2004.10.26 Email from C. Calmbacher to S. Donziger re "Apologies") (DONZ00022792).

[242] Exhibit 140 (2004.10.20 Email from S. Donziger to A. Wray re "Latest Information") (DONZ00027447).

court."[243]  In an email to Donziger, Dr. Calmbacher made clear that the RICO Defendants were
not to alter any of the conclusions in his report:

> It also has been stressed to me that it is highly unusual for a perito [expert] to
> allow others to contribute to the writing of a report.  Comments or review is
> acceptable, but the perito's opinion and findings are final.  I therefore have and
> feel no obligation to allow your team of textile engineers and associated cron[i]es
> to review or edit my reports.  I am assured, as perito of the court, that I am
> completely within my rights to write and submit my report independent of those
> who have nominated me for appointment as perito.  My sole obligation is to tell
> the truth, as I see it, to the court, no matter the consequences for either party.[244]

116.    After Dr. Calmbacher's rebuke, Donziger threatened to withhold payment from
him in order to pressure Dr. Calmbacher to draft the reports in a manner that would back up the
Lago Agrio Plaintiffs' assertions.  Donziger described this strategy to Wray, Kohn and Bonifaz,
but also noted that, if the problem was not resolved, "we are developing a Plan B that will be
explained in person."[245]

117.    Plan B put into play Donziger's view that "[s]cience has to serve the law
practice; the law practice doesn't serve science."[246]  The RICO Defendants and their co-
conspirators cast aside Dr. Calmbacher's actual conclusions and set about manufacturing
reports to be filed under Dr. Calmbacher's name, a fact that Chevron only learned for the first

---

[243] Exhibit 141 (2004.10.24 Email from C. Calmbacher to S. Donziger re "Perito's
Responsibilities") (DONZ00022790).

[244] Exhibit 141 (2004.10.24 Email from C. Calmbacher to S. Donziger re "Perito's
Responsibilities") (DONZ00022790).

[245] Exhibit 142 (2004.10.24 Email from S. Donziger to M. Pallares, A. Wray, J. Kohn, C.
Bonifaz, and J. Bonifaz re "Update On Case From Ecuador") (DONZ00027304) at 2.

[246] Exhibit 1, CRS-158-02-CLIP-09 (2007.01.16 *Crude* outtake video clip of meeting among
S. Donziger, A. Ponce, P. Fajardo, J. Sáenz, J. Prieto and others); Exhibit 2 (certified
transcript) at 99; Exhibit 136 (Calmbacher Dep.) at 60:22-63:16.

time at Dr. Calmbacher's March 2010 deposition that Chevron subpoenaed pursuant to 28 U.S.C. § 1782.[247]

118.     The difficulty for the RICO Defendants was how to obtain Dr. Calmbacher's signature on the false conclusions they wanted to submit as "expert" findings.  Their solution was to send Dr. Calmbacher initial drafts of the report, which correctly characterized his conclusions, for his review.[248]  Because the drafts appeared to accurately reflect his opinions, Dr. Calmbacher authorized the reports to be filed.[249]

119.     Next, the conspirators prevailed upon Dr. Calmbacher to provide signature pages, along with several blank pages bearing his initials, which he did, based on the lie that these extra pages would be used to file the reports he had already authorized to be filed.[250]  At the conspirators' request, Dr. Calmbacher sent by overnight delivery service one set of these signed and initialed pages to Ecuador and the second set directly to Donziger in New York.[251]

120.     The reports that the RICO Defendants and their co-conspirators filed under Dr. Calmbacher's name, however, are not the same as the reports that he authorized to be filed.[252]  Instead, as part of their Plan B, the RICO Defendants and their co-conspirators prepared different, fraudulent reports that misstated the evidence and concluded that the inspected sites presented a danger to the environment and required additional remediation.[253]  The conspirators printed their fraudulent reports on the pages that Dr. Calmbacher had initialed,

---

[247] Exhibit 136 (Calmbacher Dep.) at 112:1-12, 117:2-5, 118:22-119:1.

[248] Exhibit 136 (Calmbacher Dep.) at 62:5-63:16.

[249] Exhibit 136 (Calmbacher Dep.) at 62:5-63:16.

[250] Exhibit 136 (Calmbacher Dep.) at 62:5-63:16.

[251] Exhibit 136 (Calmbacher Dep.) at 62:5-63:16.

[252] Exhibit 136 (Calmbacher Dep.) at 62:5-63:16.

[253] Exhibit 136 (Calmbacher Dep.) at 62:5-63:16.

used the signature pages that he had provided, and filed the forged reports with the court in Lago Agrio.[254]

121.     Although Chevron has since informed the Lago Agrio court about the falsified Calmbacher reports, to date the court has refused to remove his reports from the record or take any corrective measures.[255]

> ### d.     Arranging Cabrera's Appointment as Global Assessment Expert and Secretly Writing His Supposedly "Independent" Report

122.     When Dr. Calmbacher refused to cooperate in the scheme to defraud and extort Chevron and when the Lago Agrio court's settling experts began to confirm the RICO Defendants' and their co-conspirators' lack of evidence, the conspirators changed tactics. Realizing that neutral settling experts would not accept their fraudulent claims, the RICO Defendants and their co-conspirators requested that the Lago Agrio court abandon the judicial inspection process that had been agreed to by the parties.[256]   In its place, the conspirators arranged for the Lago Agrio court to create a new "global assessment" process and secured the appointment of a co-conspirator to the position of the purportedly neutral "global assessment expert" with whom they would work in secret to ghostwrite his report.   Until Chevron uncovered the RICO Defendants' and their co-conspirators' underlying fraudulent behavior, their plan seemed to be working.

---

[254] Exhibit 136 (Calmbacher Dep.) at 62:5-63:16.

[255] Exhibit 143 (2010.08.06 Chevron's Motion for Terminating Sanctions, Lago Agrio Litigation).

[256] Exhibit 144 (2006.01.27 Plaintiffs' Motion to Withdraw from Specific Judicial Inspections, Lago Agrio Litigation); Exhibit 145 (2006.07.21 Plaintiffs' Motion to Relinquish Judicial Inspections, Lago Agrio Litigation).

123.    To the Lago Agrio court, the conspirators proposed that a single expert be appointed, and that he and his team conduct a global assessment of the former concession area.[257]

124.    To execute their scheme, the RICO Defendants assembled a team handpicked by the conspirators[258] of U.S. scientists, Ecuadorians, engineers, and other experts, who would do the actual work charged to Cabrera.[259]  And after the report was filed, some of these individuals were disclosed as members of Cabrera's fictional team.[260]

125.    In December 2006, more than two months before Cabrera was appointed by the court, Donziger discussed the RICO Defendants' and their co-conspirators' plan to ghostwrite the "independent" report with co-conspirator Soltani:  "The judge is going to appoint a guy in Ecuador, um, to be the expert, but really, you know, we'll be supporting him with the work—our people, E-Tech, whoever we choose to use."[261]  As Donziger saw it, the expert would "ha[ve] to totally play ball with us and let us take the lead while projecting the image that he is working for

---

[257] Exhibit 146 (2006.12.04 Plaintiffs' Motion, Lago Agrio Litigation).

[258] Exhibit 6 (2010.12.29 Donziger Dep.) at 2177:8-23, 2178:11-15.

[259] Exhibit 1, CRS-187-01-02 (2007.03.03 *Crude* outtake video clip of meeting at Selva Viva headquarters among S. Donziger, P. Fajardo, L. Yanza, A. Maest, R. Kamp, C. Champ, R. Cabrera, and others); Exhibit 2 (certified transcript) at 169-214.

[260] Exhibit 147 (2008.03.11 Email from D. Beltman to S. Donziger re "one other thing" attaching "Draft – Outline for PG Report") (STRATUS-NATIVE067410) at 9.

[261] Exhibit 1, CRS-138-02-CLIP-01 (2006.12.06 *Crude* outtake video clip of meeting between S. Donziger and A. Soltani); Exhibit 2 (certified transcript) at 76.

the court."[262]  Indeed, the driving question for the plaintiffs during this period, was, as Donziger mused, "how can we control this perito?"[263]

> **(i)** **Weeks Before the Court Appointed Cabrera, the RICO Defendants Meet With Him to Plan His "Independent" Expert Report**

126.    The RICO Defendants and their co-conspirators put their expanded scheme to defraud and extort Chevron in motion in early 2007.  The first order of business was to ensure that the court adopt the new "global assessment" process proposed by the RICO Defendants and their co-conspirators and appoint Cabrera as the global assessment expert.

127.    On January 16, 2007, Fajardo reported that he had been in contact with the Lago Agrio judge in person and had sent him an email message regarding who to appoint as the global assessment expert.[264]  Fajardo then set about persuading Cabrera to join them in their extortionate scheme in a series of secret meetings during February 2007.  The RICO Defendants and their co-conspirators first appealed to Cabrera emotionally, impressing upon him "the importance of the case, what it means for history, how we can do something that we will always be remembered for, what this would mean for the country and world, etc."[265]  They also made it clear that he would be rewarded financially.  Not only would Cabrera be paid a substantial sum for his "work," an amount that eventually totaled at least $263,000, but Donziger or one of his co-conspirators likely told Cabrera what Donziger had told another potential expert:  "if he

---

[262] Exhibit 76 (2006.12.16 Entry in Composite of S. Donziger Personal Notes) (DONZ00027256) at 30 of 109.

[263] Exhibit 76 (2006.07.25 Entry in Composite of S. Donziger Personal Notes) (DONZ00027256) at 56 of 109.

[264] Exhibit 1, CRS-158-02-CLIP-06 (2007.01.16 *Crude* outtake video clip of conversation between P. Fajardo and J. Prieto); Exhibit 2 (certified transcript) at 94-95.

[265] Exhibit 76 (2007.02.27 Entry in Composite of S. Donziger Personal Notes) (DONZ00027256) at 12 of 109.

served as the global court expert and the plaintiffs won the case that he would have a job the rest of his life being involved in the remediation."[266]

128.     Having convinced Cabrera to join their conspiracy and secure in the knowledge that the court would select Cabrera, the conspirators set to work with him to plan the writing of the report by the covert U.S. team the RICO Defendants and their co-conspirators had assembled.  This report would develop into an essentially fictional description of the region that alleged massive harms with little or no valid data or analysis in support.  And Cabrera would act as the RICO Defendants' and their co-conspirators' puppet.

129.     On March 3, 2007—two weeks *before* the court appointed Cabrera—Donziger, Fajardo and Yanza met with Cabrera to plan the report.[267]  Also present at this meeting were members of the U.S. team working with the conspirators to ghostwrite the Cabrera Report, including Defendant Ann Maest, Richard Kamp of E-Tech International and Charles Champ of Champ Science and Engineering.[268]

130.     In the morning session of the March 3rd meeting, Fajardo gave a PowerPoint presentation outlining the plan for Cabrera's Global Expert Assessment.  As part of that plan, Fajardo stated:  "Our legal theory is that Texaco is liable for all of the existing damage, even that caused by Petroecuador."[269]  Fajardo then outlined a plan for dealing with Chevron:  "Chevron's main problem right now is that it doesn't know what the hell is going to happen in the global

---

[266] Exhibit 6 (2010.12.08 Donziger Dep.) at 993:12-19.

[267] Exhibit 1, CRS-187-01-02 (2007.03.03 *Crude* outtake video clip of meeting at Selva Viva headquarters among S. Donziger, P. Fajardo, L. Yanza, A. Maest, R. Kamp, C. Champ, R. Cabrera, and others); Exhibit 2 (certified transcript) at 169-214.

[268] Exhibit 1, CRS-187-01-02 (2007.03.03 *Crude* outtake video clip of meeting at Selva Viva headquarters among S. Donziger, P. Fajardo, L. Yanza, A. Maest, R. Kamp, C. Champ, R. Cabrera, and others); Exhibit 2 (certified transcript) at 169-214.

[269] Exhibit 1, CRS-187-01-02 (2007.03.03 *Crude* outtake video clip of meeting at Selva Viva headquarters among S. Donziger, P. Fajardo, L. Yanza, A. Maest, R. Kamp, C. Champ, R. Cabrera, and others); Exhibit 2 (certified transcript) at 179.

expert examination.  In other words, they don't know that.  I hope none of you tell them, please.  [laughter] . . . .  [I]t's Chevron's problem."[270]  Next, Fajardo identified six steps that the RICO Defendants must take, specifically:  (1) the team must "[k]eep up the pressure and constant oversight in the court"; (2) the team must "[m]ake certain that the expert constantly coordinates with the [Lago Agrio] plaintiffs' technical and legal team"; (3) "[t]he [Lago Agrio] plaintiffs' technical coordinator must be [involved] in the process fulltime" and "[a]ccompany the expert in the field"; (4) "an attorney . . . will always be in the field to also protect the activity being performed"; (5) the team must "provide the facilities and necessary support to the field team"; and (6) the team must "support the expert in writing the report."[271]

131.    Fajardo made clear that they were the ones who would actually be writing Cabrera's report, explaining:  "And here is where we do want the support of our entire technical team . . . of experts, scientists, attorneys, political scientists, so that all of us will contribute to that report—in other words—you see . . . *the work isn't going to be the expert's.  All of us bear the burden*."  Someone asked whether the final report was going to be prepared only by the expert Cabrera.  Fajardo responded that the expert will "sign the report and review it.  But all of us . . . have to contribute to that report."  Then Defendant Ann Maest of Stratus added, with a smile, "But not Chevron," and everyone laughed.[272]

132.    Later that day, the conspirators discussed the "work plan," a document that was prepared by the conspirators[273] and subsequently submitted to the Ecuadorian court by Cabrera

---

[270] Exhibit 1, CRS-191-00-CLIP-03 (2007.03.03 *Crude* outtake video clip of meeting among P. Fajardo, A. Maest, and others); Exhibit 2 (certified transcript) at 244.

[271] Exhibit 1, CRS-191-00-CLIP-03 (2007.03.03 *Crude* outtake video clip of meeting among P. Fajardo, A. Maest, and others); Exhibit 2 (certified transcript) at 245.

[272] Exhibit 1, CRS-191-00-CLIP-03 (2007.03.03 *Crude* outtake video clip of meeting among P. Fajardo, A. Maest, and others); Exhibit 2 (certified transcript) at 245-46 (emphasis added).

[273] Exhibit 6 (2010.12.29 Donziger Dep.) at 2165:4-6, 2203:4-6.

as the independent court expert.[274]  Donziger proposed that he and the U.S.-based consultants form a "work committee" to present a "draft plan," with a goal of being "more or less eighty percent, ninety percent from achieving a plan" in a few days.  Looking at Cabrera, Donziger then said, "and Richard, of course you really have to be comfortable with all that.  And we'll also def—define the support the expert needs."[275]  Donziger has admitted under oath that this work plan was drafted by his co-conspirators and that Cabrera did not disclose its true authors.[276]

133.     The recording of the March 3rd meeting ended with Donziger commenting, they could "jack this thing up to thirty billion in one day."[277]  Donziger went on to say that he was exaggerating—it would really take 90 days.[278]  And in the end, the RICO Defendants and their co-conspirators "jacked up" the damages estimate in Cabrera's Report to $27 billion.  Their plan of submitting their liability and damages theories under the guise of an "independent" expert report whose content was dictated by the very persons who stood to profit from an extorted payment from Chevron was thus well under way.

134.     The next day, March 4th, Donziger explained how he would accomplish the conspiracy's goal, despite the absence of supporting evidence.  When Defendant Maest and the other consultants hired by the RICO Defendants and their co-conspirators to write Cabrera's report told Donziger that there was no evidence that contamination from the pits had spread into the surrounding groundwater, Donziger responded:  "Hold on a second, you know, this is

---

[274] Exhibit 6 (2011.01.08 Donziger Dep.) at 2406:7-11.

[275] Exhibit 1, CRS-189-00-CLIP-05 (2007.03.03 *Crude* outtake video clip of meeting among S. Donziger, P. Fajardo, F. Reyes, A. Villacreces, and others); Exhibit 2 (certified transcript) at 225-27.

[276] Exhibit D (2010.12.29 Donziger Dep.) at 2165:1-8, 2166:18-22.

[277] Exhibit 1, CRS-193-00-CLIP-01 (2007.03.03 *Crude* outtake video clip of meeting between S. Donziger, A. Maest, and unidentified male); Exhibit 2 (certified transcript) at 252-53.

[278] Exhibit 1, CRS-193-00-CLIP-01 (2007.03.03 *Crude* outtake video clip of meeting among S. Donziger, A. Maest, and others); Exhibit 2 (certified transcript) at 253.

Ecuador, okay, . . .  You can say whatever you want and at the end of the day, there's a thousand people around the courthouse, you're going to get what you want"[279] and "[t]herefore, if we take our existing evidence on groundwater contamination, which admittedly is right below the source . . . [a]nd wanted to extrapolate based on nothing other than our, um, theory," then "[w]e can do it.  And we can get money for it."[280]  He continued:  "*Because at the end of the day, this is all for the Court just a bunch of smoke and mirrors and bullshit.*"[281]  And when Champ argued that "there is not enough information on that groundwater" and that "the one hole in the remediation, is the water," Donziger instructed the camera crew capturing his conversation to stop filming, stating, "[T]here's another point.  I got to make . . . to these guys, but I can't get this on camera."[282]

135.    The RICO Defendants' and their co-conspirators' strategy all along, as first evidenced in Donziger's discussion with Fajardo about whether to request an even higher amount than Russell's disavowed $6 billion damages estimate to make it appear as though a judgment of a lower amount was reasonable or even somehow favorable to Chevron (*see* paragraph 107, *supra*), was to provide an absurd damages number to convince the judge to award a lower but still outrageous amount.  Donziger described the goal to his consultants:  "If we have a legitimate fifty billion dollar damages claim, and they end up—the judge says, well, I can't give them less than five billion."  He explained that an inflated damages number would allow the

---

[279] Exhibit 1, CRS-195-05-CLIP-01 (2007.03.04 *Crude* outtake video clip of meeting between S. Donziger, A. Maest, R. Kamp, and C. Champ); Exhibit 2 (certified transcript) at 259.

[280] Exhibit 1, CRS-195-05-CLIP-01 (2007.03.04 *Crude* outtake video clip of meeting among S. Donziger, R. Kamp, A. Maest, and C. Champ); Exhibit 2 (certified transcript) at 259.

[281] Exhibit 1, CRS-195-05-CLIP-01 (2007.03.04 *Crude* outtake video clip of meeting among S. Donziger, A. Maest, R. Kamp, and C. Champ); Exhibit 2 (certified transcript) at 260 (emphasis added).

[282] Exhibit 1, CRS-195-05-CLIP-01 (2007.03.04 *Crude* outtake video clip of meeting among S. Donziger, A. Maest, R. Kamp, and C. Champ); Exhibit 2 (certified transcript) at 260, 261, 263.

judge to say that "Tex had a huge victory.  They knocked out ninety percent of the damages claim."[283]

136.    Donziger brushed off other comments from consultants Champ and Kamp expressing concern about meeting with Cabrera.  First, Champ told Donziger, "I know we have to be totally transparent with Chevron in showing them what we're doing."  Donziger responded, "No, no," and stated, "because they will find out everything we do."  He continued:  "Our goal is that they don't know shit . . . and that's why they're so panicked."  Then, Kamp expressed unease about the process and commented to Donziger that "[h]aving the perito [Cabrera] there yesterday in retrospect . . . That was bizarre."  In response, Donziger instructed Kamp:  "Don't talk about it," and, "that's the way it works."  Donziger told the camera crew, "[T]hat is off the record."[284]

137.    The RICO Defendants' and their co-conspirators' close relationship with Cabrera also raised questions in the minds of the *Crude* filmmakers, who became "confused about why Chevron is saying that the Court Appointed expert is biased."[285]  The filmmakers asked Fajardo why he was paying Cabrera, "[w]hy is Chevron not also paying for the expert and why do they not have their own expert[?]"[286]  Even to sympathetic individuals untrained in legal matters, something about the RICO Defendants' and their co-conspirators relationship with Cabrera seemed wrong.

---

[283] Exhibit 1, CRS-196-01-CLIP-01 (2007.03.04 *Crude* outtake video clip of meeting among S. Donziger, A. Maest, and R. Kamp discussing groundwater evidence); Exhibit 2 (certified transcript) at 453-54.

[284] Exhibit 1, CRS-196-00-CLIP-01 (2007.03.04 *Crude* outtake video clip of meeting among S. Donziger, A. Maest, R. Kamp, and C. Champ discussing groundwater evidence); Exhibit 2 (certified transcript) at 265-67.

[285] Exhibit 148 (2008.05.07 Email from J. Berlinger to M. Bonfiglio re "Ask Pablo") (JB-NONWAIVER00092520).

[286] Exhibit 148 (2008.05.07 Email from J. Berlinger to M. Bonfiglio re "Ask Pablo") (JB-NONWAIVER00092520).

(ii)    The Court Appointed Cabrera as Its "Independent"
        "Global Assessment Expert"

138.    In late February, to cover up the fact that the judge planned to appoint the

"global assessment expert" championed by the RICO Defendants, the judge called Cabrera and

purported to ask him for a recommendation for the expert.[287]  But by this point Cabrera's

appointment had already been secretly secured by the RICO Defendants.  Indeed, in their internal

correspondence they discussed the steps they had taken to make "100% sure the judge would

appt Richard," including threatening the judge with a complaint against him that they showed

him, but never filed.[288]  Thus, when Donziger feared the judge's call to Cabrera meant the

appointment of the RICO Defendants' handpicked "expert" was in jeopardy, Fajardo reassured

him that the call was just "part of the judge's complicated plan to protect himself."[289]  On March

19, 2007, the Lago Agrio court did indeed appoint Cabrera as its global assessment expert,[290]

ordering that Cabrera would be "responsible for the entire report, the methodology used, for the

work done by his assistants, etc."[291]

139.    Cabrera, the RICO Defendants, and their co-conspirators had violated the terms

of Cabrera's appointment before he had been appointed, and they would continue to do so

throughout his service.  They did this even though the RICO Defendants knew, as Donziger has

---

[287] Exhibit 76 (2007.03.01 Entry in Composite of S. Donziger Personal Notes)
(DONZ00027256) at 10 of 109.

[288] Exhibit 76 (2007.02.27 Entry in Composite of S. Donziger Personal Notes)
(DONZ00027256) at 12, 54 of 109; Exhibit 149 (2006.07.26 Email chain between J. Mutti,
S. Donziger, and J. Kohn re "Potentially huge") (DONZ00023182).

[289] Exhibit 76 (2007.03.01 Entry in Composite of S. Donziger Personal Notes)
(DONZ00027256) at 10 of 109.

[290] Exhibit 150 (2007.03.19 Order declaring the relinquishment valid and appointing Engineer
Richard Stalin Cabrera Vega, Lago Agrio Litigation) at 2.

[291] Exhibit 151 (2007.10.03 Order requiring Cabrera to maintain independence with respect to
the parties, Lago Agrio Litigation) at 10.

since admitted, that the Lago Agrio court ordered Cabrera to "act with absolute objectivity and independence" and to "act independent of the parties."[292]  The RICO Defendants, however, knew that they had to maintain a façade of independence.  To do so, shortly after Cabrera was appointed, they plotted "something that Richard [Cabrera] could do AGAINST us in order to prove his independence."[293]

140.    When the Lago Agrio court officially swore in Cabrera as the global assessment expert on June 13, 2007, Donziger exclaimed that "the perito just got sworn in . . . this is a huge victory!!!!!!!!"[294]  He further elaborated that the development was good for the Lago Agrio Plaintiffs' case:  "We have to keep pushing on all fronts at all times. . . .  [A]ll this bullshit about the law and facts . . . but in the end of the day it is about brute force . . . . [Cabrera's appointment] took five months . . . five months of delay . . . and [the judge] never would have done [it] had we not really pushed him."[295]  And he noted, "that visit to the judge last week was a huge help."[296]

141.    Consistent with Cabrera's unique and central status as the court's sole expert for damages issues, including liability, the Lago Agrio court repeatedly issued orders that Cabrera was required to be independent from the parties.  For example, when the court administered the oath to Cabrera in June 2007, Cabrera had to promise that he would perform his duties "with

---

[292] Exhibit 6 (2010.12.29 Donziger Dep.) at 2136:19-2137:3, 2266:17-25.

[293] Exhibit 152 (2007.05.10 Email chain between S. Donziger and P. Fajardo re "PREOCUPACION CONFIDENCIAL") (DONZ00108564) at 1.

[294] Exhibit 153 (2007.06.13 Email from S. Donziger to J. Berlinger and M. Bonfiglio re "emergency") (JB-NONWAIVER00062204).

[295] Exhibit 1, CRS-361-11-CLIP-01 (2007.06.13 *Crude* outtake video clip of S. Donziger discussing R. Cabrera's appointment); Exhibit 2 (certified transcript) at 431, 434.

[296] Exhibit J (2007.06.13 Email from S. Donziger to A. Soltani, S. Tegel, K. Koenig, and J. DeLury Ciplet re "HUGE VICTORY") (DONZ-HDD-0113389).

complete *impartiality* and *independence* vis-à-vis the parties."[297]  And on October 3, 2007, the Lago Agrio court ordered Cabrera to "work in an impartial manner and independently with respect to the parties."[298]  The court further explained that "the role of the expert is one of complete impartiality and transparency with respect to the parties and their attorneys" and required Cabrera to "observe and ensure . . . the impartiality of his work, and the transparency of his activities."[299]  By then, the conspirators were already well into planning the drafting of Cabrera's purportedly independent report, and indeed the court itself may have been participating in the scheme by this point, and merely issuing these orders for the sake of appearances.

142.    In November 2007, the Lago Agrio court ordered that "all the documents that serve as support or a source of information for the work performed by the Expert must be presented together with the report. . . .  [I]n his report the Expert is required to cite all of the scientific sources, and analytical and legal documents that he uses to perform his work."[300]

### (iii)    While Cabrera Staged Mock Inspections, the RICO Defendants and Their Co-Conspirators Secretly Ghostwrote His Report

143.    In public, the RICO Defendants and their co-conspirators and Cabrera worked to maintain the illusion that Cabrera was an independent expert.  At one inspection, in an exchange included in the film *Crude*, Cabrera and Fajardo made a show of rejecting a suggestion from

---

[297] Exhibit 154 (2007.06.13 Swearing in of R. Cabrera as court-appointed expert, Lago Agrio Litigation) at 3 (emphasis added).

[298] Exhibit 151 (2007.10.03 Order instructing Cabrera to maintain independence with respect to the parties, Lago Agrio Litigation) at 6.

[299] Exhibit 151 (2007.10.03 Order instructing Cabrera to maintain independence with respect to the parties, Lago Agrio Litigation) at 10, 12.

[300] Exhibit 155 (2007.11.29 Order regarding supporting documents to expert report, Lago Agrio Litigation) at 1.

Chevron's lawyer Diego Larrea that counsel for the parties be permitted to make suggestions to Cabrera as to what samples he might take on his inspections (translations are taken from *Crude*):

> Cabrera:   (Addressing the public)  I have been named the expert for the global assessment report.  At this juncture, I am the highest authority at this examination.  The samples taken and the analyses done today will be the only ones valid for this report.
>
>                    ***
>
> Larrea:     (To Cabrera)  We would like you to consider the possibility of letting us know what kind of sample will be taken at each location so that eventually we can suggest that other samples be taken—
>
> Fajardo:    (Raising his hands in protest) Wait, wait, wait. . . .
>
> Larrea:     In the same terms that Pablo says —
>
> Fajardo:    You can't do that.
>
> Larrea:     The expert can check the equipment to verify if it's visible. (To Fajardo) It's a request.  He can deny it or accept it.
>
> Fajardo:    What we agreed on was that the expert has the authority to say what is and what isn't going to be.  We can't say "take samples here and there."  Excuse me, but that is something he has to decide.
>
>                    ***
>
> Cabrera:   (To Larrea) You can make a suggestion, but I can't work under your criteria.  I decide where to take samples, and that's it, counselor.[301]

144.     Of course, while Fajardo's duet with Cabrera at the inspection site was featured in the theatrical release of *Crude*, the outtakes show that Fajardo was doing far more than merely inspecting Cabrera's equipment.  At their all-day session weeks earlier, Fajardo told Cabrera exactly what "criteria" he would be working under, and how Fajardo's associates would secretly

---

[301] Exhibit 91 (Transcript of J. Berlinger film *Crude*) (MB-NONWAIVER00092726) at 51-53; Exhibit 4 (*Crude* DVD) at 2:21-2:25.

write Cabrera's report for him.[302]  And when Cabrera did go into the field to conduct testing, Donziger laid down further "criteria" under which he expected Cabrera to work in an email to Yanza and Fajardo:  "When I get there, we'll re analyze the work and the budget with Richard. And we'll adjust with a much smaller team.  My tendency is to stop Richard from working much more in the field . . .  or, if he continues doing it, he should continue under the most strict control with an extremely limited number of samples.  And we'll change the focus of the data at our offices."[303]  The RICO Defendants have also admitted that they selected the sites that Cabrera would sample.  Indeed, as Donziger has admitted, Fajardo was in "regular contact" with Cabrera—unbeknownst to Chevron—while Cabrera was supposedly serving as the "independent" court expert.[304]

145.    Back in the United States, preparations were well underway for drafting Cabrera's Report.  Just after the March meeting with Cabrera, David Chapman, a principal at Stratus, emailed Donziger, proposing that "the way this would work best is that if Stratus did much of the work, putting the pieces together and writing the report."[305]  Shortly thereafter, on April 27, 2007, the conspirators assembled at Stratus's offices in Boulder, Colorado[306],[307] to

---

[302] Exhibit 1, CRS-187-01-02 (2007.03.03 *Crude* outtake video clip of meeting at Selva Viva headquarters among S. Donziger, P. Fajardo, L. Yanza, A. Maest, R. Kamp, C. Champ, R. Cabrera, and others); Exhibit 2 (certified transcript) at 181.

[303] Exhibit 156 (2007.07.17 Email from S. Donziger to L. Yanza and P. Fajardo re "Ideas para reunion con Richard" ["Ideas for meeting with Richard"]) (DONZ00062680) at 1.

[304] Exhibit D (2011.01.08 Donziger Dep.) at 2582:24-2583:6.

[305] Exhibit 157 (2007.04.03 Email chain among S. Donziger, D. Chapman, A. Maest, and others re "Approach for assessment") (DONZ00061973) at 1.

[306] Exhibit 1, CRS-269-01-04 (2007.04.26 *Crude* outtake video clip of Stratus meeting among S. Donziger, D. Chapman, J. Lipton, P. Sowell and D. Beltman); Exhibit 2 (certified transcript) at 355-62.

[307] Exhibit 1, CRS-193-00-CLIP-01 (2007.03.03 *Crude* outtake video clip of meeting among S. Donziger, A. Maest, and others); Exhibit 2 (certified transcript) at 252.

discuss how they were going to "jack this thing up to thirty billion," as Donziger had put it.

Present at the meeting from Stratus were President Joshua Lipton, David Chapman, Preston

Sowell, and Defendants Beltman and Maest.[308]  The conspirators ultimately went with

Chapman's suggested approach, permitting Stratus to take the lead on the drafting of the report.

As Donziger later admitted, Beltman, the Stratus project leader, had "a fair amount of

discretion," including the authority to eliminate sections of the report if Stratus could not

complete them on time.[309]

      146.     The participants in this meeting also discussed how they could leverage the

Cabrera Report, once it was filed in the Lago Agrio court, as a supposedly independent

endorsement of their position.[310]  Donziger talked up how important and far-reaching he thought

the report should be:  "We also see this case as having a larger meaning. . . .  [W]e think that,

Uhm, this is the kind of thing people will be interested in reading.  You know, like this damages

report[—]academics, people in your field, other lawyers."[311]  Lipton responded, "we loved the

whole package."[312]  As a result, Stratus entered into a contract with Kohn Swift to provide

---

[308] Exhibit 1, CRS-269-01-04 (*Crude* outtake video clip of Stratus meeting); Exhibit 2 (certified transcript) at 355-62; *see also* Exhibit 158 (2010.04.23 Deposition of David Chapman, *Chevron Corp. v. Stratus Consulting, Inc.*, No. 1:10-cv-00047 (MSK) (MEH) (D. Colo.) ("Chapman Dep.")) at 197:6-199:3.

[309] Exhibit D (2011.01.08 Donziger Dep.) at 2496.

[310] Exhibit 1, CRS-269-01-04 (2007.04.26 *Crude* outtake video clip of Stratus meeting among S. Donziger, D. Chapman, J. Lipton, P. Sowell and D. Beltman); Exhibit 2 (certified transcript) at 358-59; Exhibit 159 (2008.06.04 – 2008.06.05 Notes from "Ecuador Meeting in Boulder") (STRATUS-NATIVE096796).

[311] Exhibit 1, CRS-269-01-04 (2007.04.26 *Crude* outtake video clip of Stratus meeting among S. Donziger, D. Chapman, J. Lipton, P. Sowell, and D. Beltman); Exhibit 2 (certified transcript) at 359.

[312] Exhibit 1, CRS-269-01-08 (2007.04.26 *Crude* outtake video clip of meeting among S. Donziger, A. Maest, J. Lipton, D. Beltman, and others); Exhibit 2 (certified transcript) at 369.

technical assistance, including the production of reports and support in discussions with the media, in furtherance of the conspiracy.[313]  The initial contract for $125,000 was modified multiple times to accommodate Stratus's increasing involvement and fees.[314]  Indeed, by the fall of 2009, Stratus received at least $1.1 million in payment for their role in the criminal scheme.[315]  Donziger also offered Stratus a piece of the action, suggesting that it could obtain contracts to oversee the actual remediation work once the RICO Defendants obtained a fraudulent judgment against Chevron.[316]

147.    Meetings and communications continued between the conspirators as they prepared Cabrera's report.  Leading up to the April 2008 filing of Cabrera's first report, Stratus, Donziger, Kohn, and environmental consultants exchanged hundreds of emails regarding draft outlines of the Cabrera report and proposed annexes, schedules for completion of various annexes, and discussing review, analysis, and translation of the annexes including "[e]nvironmental standards," "[e]co impacts from contamination," "[p]it (plus) cleanup costs," "[v]alue of human life losses," "[h]abitat losses at wells and stations," "TexPet [r]emediation summary," "[h]istorical data summary," "[d]ata extrapolation" and "[t]oxicity of site chemicals to humans." (Additional details concerning the emails exchanged in furtherance of the

---

[313] Exhibit 160 (2007.08.20 Contract between Stratus and Kohn, Swift & Graf P.C.) (STRATUS-NATIVE043270).

[314] Exhibit 160 (2007.08.20 Contract between Stratus and Kohn, Swift & Graf P.C.) (STRATUS-NATIVE043270); Exhibit 161 (2008.07.07 Email from J. Kohn to D. Beltman re "approval for upcoming work") (STRATUS-NATIVE066482).

[315] Exhibit 162 (2009.11.19 Letter from J. Kohn to L. Yanza and P. Fajardo re "Ecuador-Texaco Case") (DONZ00026949) at 16.

[316] Exhibit K (2007.10.23 Email from S. Donziger to D. Beltman re "update – let's talk again") (DONZ00025289) at 2.

conspiracy's scheme to defraud Chevron are included in Appendix B, which is incorporated by reference as if set forth herein in its entirety.)[317]

148.    During this period, Donziger continued to press for higher and higher damages numbers, explaining at one point that an estimate for unjust enrichment "sound[ed] awfully low"[318] and implored that the Stratus consultants not "say or even suggest anything that backs away from the [Lago Agrio plaintiffs'] figures."[319]  And as another means of getting the high numbers he wanted—and getting the most impact from the "independent" expert—Donziger during this period suggested to Stratus that they "define the norms of clean-up" and then "propose these norms to the Ministry of Energy which governs these norms[,] and whose Minister is a good friend of ours, so that the Ministry issues them as an official decree before the trial ends."[320]

149.    The numerous emails among the Stratus team and between Stratus and Donziger were necessary because, as Beltman explained in a February 22, 2008 email urging his Stratus colleagues' support:  "We have to write, over the next 2 to 3 weeks, probably the single most important technical document for the case.  The document will pull together all of the work over the last 15 or so years on the case and make recommendations for the court to consider in making

---

[317] Exhibit 163 (2008.02.08 Email from D. Beltman to S. Donziger) (STRATUS-NATIVE070483); Exhibit 164 (2008.02.26 Email from D. Beltman to Stratus team re "Ecuador annex schedule") (STRATUS-NATIVE043849); Exhibit 165 (2008.03.10 Email from D. Beltman to A. Maest and Stratus team re "Annex translation update") (STRATUS-NATIVE040664).

[318] Exhibit 166 (2007.11.16 Email chain between S. Donziger and D. Beltman re "Unjust Enrichment") (DONZ00025512) at 3.

[319] Exhibit 166 (2007.11.17 Email from S. Donziger to D. Beltman re "Unjust Enrichment") (DONZ00025512).

[320] Exhibit 167 (2007.09.19 Email from S. Donziger to D. Beltman, A. Maest, J. Lipton, and P. Sowell, copying J. Kohn, re "Important idea") (DONZ00025160).

its judgment."[321]   And that "single most important technical document for the case" was the Cabrera Report itself.  As Donziger has now admitted, "[T]he general idea" was "that Stratus would draft the report in a form that it could be submitted directly to the Ecuadorian court by Mr. Cabrera."[322]   The RICO Defendants and their co-conspirators took care to make it appear that Cabrera had actually prepared the report.  For example, Kohn corrected Beltman at one point, telling him to use "1,000ppm instead of 100" because "Cabrera exclusively uses 1000."[323]

150.    As Beltman, Donziger and others made decisions about the contents of appendices to the report and which appendices to include, Beltman also turned his focus to completing the draft of the report itself, writing to Maest and other colleagues on March 10, 2008:  "Now that the annexes are out of the way, there's the little problem of the report itself. Unfortunately, I've been too busy on annex stuff to work much on it, and it has to go to the court in [two] weeks and get translated.  It's a problem."[324]   Indeed, Beltman himself was responsible for drafting the majority of the report, while the various annexes were parceled out among the various Stratus employees and contractors and others hired by the RICO Defendants.[325]   When he had an initial draft of the Cabrera Report written, Beltman sent it to Donziger, asking whether he was "on track in terms of tone, language level, and content."[326]

---

[321] Exhibit 168 (2008.02.22 Email from D. Beltman to Science Group, D. Chapman, and others re "CONFIDENTIAL – Ecuador Project Update") (STRATUS-NATIVE043232).

[322] Exhibit 6 (2010.12.29 Donziger Dep.) at 2253:5-11.

[323] Exhibit L (2008.08.05 Email from J. Kohn to D. Beltman and S. Donziger re "RE: CONFIDENTIAL – CLEANUP COMPLETENESS VS. COSTS") (DONZ00026662).

[324] Exhibit 169 (2008.03.11 Email from D. Beltman to A. Maest and J. Peers re "Report help") (STRATUS-NATIVE053742).

[325] Exhibit 169 (2008.03.10 Email from D. Beltman to A. Maest and J. Peers re "Report help") (STRATUS-NATIVE053742); Exhibit 170 (2008.02.27 Email chain between S. Donziger and D. Beltman re "Start on report text; human tox annex") (DONZ00025833).

[326] Exhibit 170 (2008.02.27 Email chain between S. Donziger and D. Beltman re "Start on report text; human tox annex") (DONZ00025833).

151.     While Stratus was the primary coordinator of the work that went into the Cabrera Report, other members of the U.S.-based team of experts the conspirators assembled, including E-Tech, Uhl, Baron, Rana & Associates, Inc., and 3TM Consulting, also contributed to the report without attribution in the report or disclosure to Chevron.[327]  Annex S of the Cabrera Report, for example, was drafted by co-conspirator William Powers, who worked for E-Tech and was a subcontractor for Stratus, and his calculations were used in Annex T.[328]  And Richard Clapp, another consultant hired by Donziger and his co-conspirators, drafted one of the annexes to the Cabrera Report.[329]  And Stratus retained contractors to prepare a large database of sampling data, known to the RICO Defendants as the "Selva Viva Database," which was reviewed and further revised by the RICO Defendants and their co-conspirators in Ecuador.[330]

152.     As the various consultants finished their portions of the Cabrera Report, Beltman took on the delicate task of translating the report, written in English by U.S. consultants, into Spanish.  As Beltman would later put it, they would treat "our original English version as if it's a translated version" of Cabrera's work.[331]  In March 2008, Beltman corresponded with several

---

[327] Exhibit 171 (2010.09.10 Deposition of Bill Powers, *In re Application of Chevron Corp.*, 10-cv-01146 (IEG-WMC) (S.D. Cal.) ("Powers Dep.")) at 240:16-243:13; Exhibit 172 (2010.10.27 Deposition of Randy Horsak, *Chevron Corp. v. 3TM Consulting, LLC*, No. 04:10-mc-134 (S.D. Tex.)) at 16:24-18:8, 45:21-47:7, 49:14-25; Exhibit 173 (2008.03.06 Email from D. Beltman to S. Donziger re "we have spanish translation of Uhl report already") (STRATUS-NATIVE069116).

[328] Exhibit 171 (Powers Dep.) at 251:4-252:23.

[329] Exhibit 174 (2008.05.14 Email from D. Beltman to S. Donziger re "Urgent issue") (STRATUS-NATIVE068772).

[330] Exhibit M (2010.11.30 Deposition of Laura Belanger, *Chevron Corp. v. Stratus Consulting, Inc.*, No. 1:10-cv-00047-MSK-MEH (D. Colo.)) at 47:5-50:17, 54:22-56:12.

[331] Exhibit 175 (2008.07.28 Email from D. Beltman to B. Lazar and D. Mills re "english translations") (STRATUS-NATIVE044716).

translation firms, ultimately working mainly with Translating Spanish, Inc.[332]  On March 12, 2008, Beltman sent, via email with a copy to Maest, the actual Cabrera Report—which contained an introduction falsely stating that "[t]his report was written by Richard Cabrera, ING to provide expert technical assistance to the Court"[333]—to be translated into Spanish for filing with the Lago Agrio court.[334]  And as Beltman and other Stratus Consultants revised their work, they forwarded new annexes of the report for translation as well.[335]  In addition, the critical annexes to the Cabrera Report covering alleged remediation costs, excess cancer deaths, and other building blocks of what would ultimately be a $27 billion fraud were also translated into Spanish at Beltman's direction days before they were fraudulently submitted to the Lago Agrio court as the work of Cabrera and the other Spanish-speaking personnel to whom the report would be attributed.[336]  In order to facilitate the final preparations, the RICO Defendants discussed renting office space in Ecuador as well, but Donziger stressed that it had to be "isolated," and could not be space shared with those known to be affiliated with the RICO Defendants.[337]

---

[332] Exhibit 176 (2008.03.12 Email from D. Beltman to info@translatingspanish.com re "Big Report") (STRATUS-NATIVE058388); Exhibit 177 (2008.03.13 Email from Enlaso Enterprise Language Solutions to D. Beltman re "Confidentiality agreements") (STRATUS-NATIVE065206).

[333] Exhibit 178 (2008.04.01 Cabrera Report) at 1.

[334] Exhibit 176 (2008.03.12 Email from D. Beltman to info@translatingspanish.com re "Big Report") (STRATUS-NATIVE058388) at 1.

[335] Exhibit 179 (2008.03.13 Email from Beltman to info@translatingspanish.com re "Last Annex: Unjust enrichment") (STRATUS-NATIVE062935).

[336] Exhibit 176 (2008.03.12 Email from D. Beltman to info@translatingspanish.com re "Big Report") (STRATUS-NATIVE058388); Exhibit 180 (2008.03.07 Email from D. Beltman to info@translatingspanish.com re "Two more annexes for translation") (STRATUS-NATIVE070414).

[337] Exhibit 181 (2007.05.07 Email chain between S. Donziger and L. Francisco re "JK") (DONZ00108534) at 1.

153.     Prior to the Cabrera Report's submission, Beltman followed up to ensure that those consultants who had actually written certain annexes had their "name[s] taken off" the documents that Cabrera would actually submit to the court.[338]  The RICO Defendants and their co-conspirators determined "to whom Richard [Cabrera would] attribute each of the annexes," and it was not to their actual authors.[339]  All of these contributions were orchestrated by the conspirators, who maintained a master schedule identifying each portion of the report, which of their team members would do the actual work, and to whom they could publicly and fraudulently "attribute[e] each in the filed Cabrera Report."[340]

154.     The conspirators did not entirely ignore Cabrera during this period of heavy drafting.  In January 2008, Donziger, Beltman, Maest, Fajardo and others met with Cabrera as the conspirators were in the homestretch of drafting his report.[341]  Notably, this meeting was held at a private home, and not at the conspirators' offices in Quito, in order to keep the meeting a secret.[342]  The RICO Defendants also delegated various aspects of the report to nominal authors who had not been publicly identified as working with the Lago Agrio Plaintiffs, but who in fact were close associates of the RICO Defendants.  The RICO Defendants kept a close eye and a firm hand on their work.[343]  For example, Luis Miguel Garcia Aragon, who was later

---

[338] Exhibit 182 (2008.03.23 Email from D. Beltman to S. Donziger re "Powers Report") (STRATUS-NATIVE063676).

[339] Exhibit 147 (2008.03.11 Email from D. Beltman to S. Donziger re "one other thing" attaching "Draft – Outline for PG Report") (STRATUS-NATIVE067410) at 9.

[340] Exhibit 147 (2008.03.11 Email from D. Beltman to S. Donziger re "one other thing" attaching "Draft – Outline for PG Report") (STRATUS-NATIVE067410) at 6-9.

[341] Exhibit 6 (2010.12.29 Donziger Dep.) at 2243:7-10, 2245:2-10.

[342] Exhibit N (2011.01.19 Deposition of Ann S. Maest, *Chevron Corp. v. Stratus Consulting, Inc.*, No. 1:10-cv-00047-MSK-MEH (D.Colo.) ("2011.01.19 Maest Dep.")) at 115:14-24.

[343] Exhibit 164 (2008.02.26 Email from D. Beltman to Stratus team re "Ecuador annex schedule") (STRATUS-NATIVE043849).

disclosed to be a member of Cabrera's team, engaged in ongoing email communication with Beltman and Maest regarding the drafting of extensive portions of the Cabrera Report. On January 22, 2008, Aragon emailed Beltman, "We're moving forward with our model thanks to your help. Now I'm maling [sic] you after the documents [sic] you told me about. Do you remember, about the discount rate and so? I'd appreciate you sending me those."[344] The RICO Defendants and their co-conspirators also retained and worked with another consultant, Juan Cristobal Villao Yepez, who was also later identified in the filed Cabrera Report as a member of Cabrera's "independent" team, and the technical reports on water issues that he wrote as a paid consultant for the RICO Defendants ultimately appeared in the Cabrera Report.[345] Another supposed member of Cabrera's "independent" team is Ximena Echeverria who has since been revealed to be an employee of Defendant Selva Viva and who was actively working with Stratus, a fact never disclosed to Chevron or the Lago Agrio court until it was revealed in Chevron's U.S. discovery efforts.[346] Accordingly, the RICO Defendants and their co-conspirators and "Cabrera's team" were one and the same.

155.    And it was the RICO Defendants and their agents who finalized the Cabrera Report, down to the last comma. At most, Cabrera had a few hours to skim the report and the 4,000 pages of supporting material, but he made no changes, and could not have given it a substantive review—that is, if he reviewed it at all. The bulk of the report was drafted in English—a language Cabrera does not speak—and was not complete until the middle of March.[347] After the translation was finished on or around March 18, 2008, the RICO

---

[344] Exhibit 183 (2008.01.22 Email from L. Aragon to D. Beltman re "reestablishing communication") (STRATUS07302010-000003).

[345] Exhibit 6 (2010.12.29 Donziger Dep.) at 2324:9-2326:2.

[346] Exhibit 184 (2010.12.10 Deposition of Jennifer M. H. Peers) at 40:8-46:1.

[347] Exhibit 176 (2008.03.12 Email from D. Beltman to info@translatingspanish.com re "Big Report") (STRATUS-NATIVE058388).

Defendants still had work to do on the Cabrera Report, prompting Beltman to complain that they were in a "tight bind" with so little time left.[348]  The RICO Defendants and their co-conspirators continued to maintain control of the document during this time, revising the Spanish text directly, until the morning of March 31, the day before it was filed.[349]  On that morning, they printed the report and its voluminous supporting material, which were then to be submitted to the Lago Agrio court the next day by Cabrera—its author in name only.

156.    Nonetheless, Cabrera, the RICO Defendants, and their co-conspirators intended to spread the lie that the report was Cabrera's own.  To this end, they made every effort to conceal the huge amount of work performed by Stratus and others, despite the Lago Agrio court's order that Cabrera present "all the documents that serve as support or a source of information" and "cite all of the scientific sources, and analytical and legal documents that he use[d]."[350]  Donziger has admitted that "there was a general feeling on our team that we wanted to "ke[ep] confidential" the "fact that plaintiffs had written" "[p]ortions of what became the Cabrera report."[351]  Concealing this fact was partly driven by the concern of some of the RICO Defendants and their co-conspirators about being criminally charged in Ecuador if they had admitted that they had ghostwritten portions of the report filed under Cabrera's name.[352]

157.    The RICO Defendants and their co-conspirators have never disclosed, and have still not admitted, the relationship between Cabrera and the Lago Agrio Plaintiffs to the Lago

---

[348] Exhibit 168 (2008.02.22 Email from D. Beltman to Science Group, D. Chapman, and others re "CONFIDENTIAL – Ecuador Project Update") (STRATUS-NATIVE043232).

[349] Exhibit 365 (2008.03.27 Email from J. Peers to P. Fajardo re "Figuras corregidas – Annexo IMPACTOS ECOLOGICOS") (STRATUS-NATIVE052259).

[350] Exhibit 155 (2007.11.29 Order regarding supporting documents to expert report, Lago Agrio Litigation) at 1.

[351] Exhibit 6 (2011.01.08 Donziger Dep.) at 2554:6-2555:11.

[352] Exhibit 6 (2011.01.08 Donziger Dep.) at 2634:8-15.

Agrio court.  Indeed, they have failed to disclose this fact even though as early as May 2010, one of the conspirators, Ilann Maazel of Emery Celli, conceded in internal correspondence that "neither Cabrera nor plaintiffs disclosed a submission from plaintiffs that contained drafts of part of the expert report written by Stratus" and another, Jonathan Abady of the same firm, described the relationship as the "wholesale adoption of Stratus work product w/o attribution."[353]  And Donziger himself has now conceded that he "do[es]n't think" the Cabrera Report's statement of authorship—"[t]his report was written by expert engineer Richard Stalin Cabrera Vega"—"is accurate"[354] and that Stratus ultimately gave Cabrera "a substantial amount of material,"[355] including "an actual report with annexes in Cabrera's name."[356]  Yet the RICO Defendants still have not acknowledged the truth.  As recently as January 2011, the RICO Defendants filed a brief in the Third Circuit stating that "[t]he Ecuadorian court was and is well aware of the Ecuadorian Plaintiffs' *ex parte* contacts with Cabrera and submission of materials to him—and indeed, *invited* such contacts and submission."[357]

158.    The RICO Defendants and their co-conspirators, in attempting to conceal the true authorship of the Cabrera Report and its annexes, encountered some close calls.  On May 14, 2008, for example, Beltman wrote to Defendant Donziger regarding an "[u]rgent issue" that arose when Karen Hinton, spokeswoman for the Amazon Defense Front, wanted to give Richard Clapp's report—the same report the RICO Defendants submitted as an annex to the

---

[353] Exhibit 185 (2010.05.16 Email chain among S. Donziger, J. Abady, I. Maazel, and others re "Motion Under Rule60(B)(3)") (DONZ00056668) at 1.

[354] Exhibit 6 (2011.01.08 Donziger Dep.) at 2490:12-18.

[355] Exhibit 6 (2010.12.29 Donziger Dep.) at 2267:24-2268:2.

[356] Exhibit 6 (2010.12.29 Donziger Dep.) at 2267:24-2268:2, 2378:6-9.

[357] Exhibit 186 (2011.01.19 Brief of Ecuadorian Plaintiffs, *In re Application of Chevron Corp.*, Nos. 10-4699, 11-1099 (3d Cir.)) at 13.

Cabrera Report—to a reporter.[358]  To have done so would have exposed the truth that the RICO Defendants and their co-conspirators and their consultants actually wrote the Cabrera Report. And so, Beltman told Hinton not to use the Clapp report, giving the false reason that he was "not sure of its pedigree" instead of telling her the real reason it could not be made public:  that it was used "as an Annex" to the Cabrera Report.[359]  Concerned about covering their tracks, Beltman warned Donziger that they "need to be careful about this."[360]  And later, when the RICO Defendants and their co-conspirators feared that Clapp himself would inadvertently disclose the true authorship of the Cabrera Report during a congressional hearing, Donziger explained the steps necessary to prevent exposure:  "We have to talk to Clapp about that 5-pager, and how we have to limit its distribution.  It CANNOT go into the Congressional Record as being authored by [Clapp]."[361]

159.    In their rush to finish the Cabrera Report and then the supplemental report, the RICO Defendants and their co-conspirators were not careful enough.  After the Cabrera Report had already been submitted, Beltman realized that an annex to the Cabrera Report may have cited a report written by Clapp.  The problem, according to Beltman, was that the cited report had then *itself* been used verbatim in Cabrera's report.  Beltman lamented in an email to a

---

[358] Exhibit 174 (2008.05.14 Email from D. Beltman to S. Donziger re "Urgent issue") (STRATUS-NATIVE068772).

[359] Exhibit 187 (2008.05.14 Email chain between D. Beltman and K. Hinton re "A few additional comments") (STRATUS-NATIVE049270) at 1.

[360] Exhibit 174 (2008.05.14 Email from D. Beltman to S. Donziger re "Urgent issue") (STRATUS-NATIVE068772).

[361] Exhibit 188 (2008.11.18 Email from D. Beltman to S. Donziger re "Ecuador trip report and health summary") (STRATUS-NATIVE061311).

colleague, "[o]h what a tangled web . . ."[362] omitting the rest of the quotation, "when first we practice to deceive."

160.      In another effort to prevent Stratus's role in drafting the Cabrera Report from coming to light, Beltman attempted to influence the testimony of Stratus employees who might be called to testify in United States court.[363]  After Chevron filed an action pursuant to 28 U.S.C. § 1782 seeking discovery from Stratus, Stratus held staff meetings attended by all staff available at that time, including some personnel who had been subpoenaed to testify.[364]  The staff members were provided with information about Chevron's subpoenas and the Cabrera Report, and Beltman, taking the opportunity to create a consistent but misleading story, misrepresented to the meeting attendees that Cabrera was an "independent expert who submitted his own report to the court."[365]  During this and other staff meetings, Beltman also misrepresented Stratus's role to Stratus staff.  He explained that Stratus had "prepared a series of technical analyses" that were given to Cabrera "to help in his preparation of his report" and failed to disclose the fact that Beltman and other Stratus consultants had authored the report that Cabrera submitted as his own.[366]

161.      Fajardo and Donziger also discussed how they would respond to any accusations that "Cabrera used exactly, or almost exactly, the same words we put in our motions."[367]

---

[362] Exhibit 189 (2008.07.28 Email from D. Beltman to D. Mills re "another annex for Clapp") (STRATUS-NATIVE057803).

[363] Exhibit 190 (2010.10.20 Deposition of David Mills, *Chevron Corp. v. Stratus Consulting, Inc.*, No. 1:10-cv-00047 (D. Colo.) ("Mills Dep.")) at 31:3-31:5.

[364] Exhibit 190 (Mills Dep.) at 27:15-31:5.

[365] Exhibit 190 (Mills Dep.) at 31:3-31:5.

[366] Exhibit 190 (Mills Dep.) at 32:19-33:6.

[367] Exhibit 191 (2009.03.18 Email from S. Donziger to P. Fajardo re "I need a response") (DONZ00050214) at 1.

Fajardo offered the "[s]imple" solution of concocting a story that the RICO Defendants submitted material to Cabrera after they noticed some errors in the calculations and figures in the report and that Cabrera then adopted their submission.[368]  As Fajardo put it, "There is no substantive problem, we just have to explain it."[369]

162.    Fajardo and Donziger also devised ways to hide their misconduct by creating special email addresses and code names to be used in planning and discussing their scheme. Fajardo, for instance, instructed Donziger not to use his own email account to send comments about the report that Stratus was ghostwriting, and not to send the comments to Fajardo's regular email address but to direct them to a new, specially created email address.  Fajardo instructed Donziger, "do not insert any names in the document," and told him to use code names; Fajardo went by Lagarto 2, and Donziger by Lagarto 3.[370]  ("Lagarto" is Spanish for "lizard.")  This was done, as Donziger has admitted, because they did not want others to know that Stratus had drafted the final report for Cabrera to submit to the court.[371]

163.    In addition, the conspirators sought otherwise to cover their tracks in the United States.  E-Tech, for example, failed to report income received for doing its work to the Internal Revenue Service, characterizing payments to consultants as charitable contributions, and routed payments, inside the United States and abroad, in order to hide the fact that these payments were being used to fund unlawful activity.[372]  E-Tech has also subsequently failed to file required

---

[368] Exhibit 191 (2009.03.18 Email from S. Donziger to P. Fajardo re "I need a response") (DONZ00050214) at 1.

[369] Exhibit 191 (2009.03.18 Email from S. Donziger to P. Fajardo re "I need a response") (DONZ00050214) at 1.

[370] Exhibit O (certified translation of 2007.06.22 Email from P. Fajardo to S. Donziger re "ACCOUNT") (DONZ00043514).

[371] Exhibit D (2011.01.18 Donziger Dep.) at 3087:20-3089:18.

[372] Exhibit 192 (E-Tech IRS-Form 990 from 2006, 2007, and 2008).

reports in its home state of New Mexico, resulting in the cancellation of its Certificate of Incorporation.[373]  And as the RICO Defendants and their co-conspirators continue to obstruct Chevron's investigation into their conduct in front of many U.S. federal courts, they have kept up a constant public pressure campaign attacking every suggestion that the Cabrera Report was not neutral and independent.  *See* paragraphs 229-39, *infra*.  This defense of the Cabrera Report is necessary because, among other things, without it the RICO Defendants would be left with no evidence of either liability or damages.

**(iv)    The "Cabrera Report":  The RICO Defendants'
Repeated Fraud**

164.    On April 1, 2008, accompanied by armed guards, Cabrera filed his first report with the Lago Agrio court.[374]  Despite the fact that Cabrera still had more time to file his report and had not made any public statement that he would be filing it early, the RICO Defendants knew when he would file the report, and had prepared detailed press releases and alerted the *Crude* team to be on hand to film the event.[375]  Relying on misstatements, conclusions not supported by evidence, and bad science, the "Cabrera" Report—the culmination of the clandestine work that the conspirators had begun more than a year earlier—concluded that Chevron was liable for more than $16 billion.[376]  The RICO Defendants knew that the Cabrera Report falsely attributed liability to Chevron, and that it would be accepted only if it appeared to have come from an "independent" court expert.  This was why they prepared the document in

---

[373] Exhibit 193 (2010.05.21 Certificate of Cancellation of Certificate of Incorporation of E-Tech International and 2003.09.10 Certificate of Incorporation of E-Tech International from the New Mexico Office of the Public Regulation Commission).

[374] Exhibit 194 (2008.04.02 Amazon Watch Press Release, "Court Expert Smacks Chevron With Up to $16 Billion in Damages") at 1.

[375] Exhibit 195 (2008.04.01 Email from S. Donziger to J. Kohn re "DRAFT ONLY – DO NOT SHOW TO ANYBODY") (DONZ00025894).

[376] Exhibit 178 (2008.04.01 Cabrera Report).

96

secret, and actively sought to keep Chevron from knowing who had really written it.  And the conspirators were not done ghostwriting material for Cabrera to falsely present as his own.

165.     In September 2008, the parties submitted to the Lago Agrio court questions and comments on the Cabrera Report.  The RICO Defendants' and their co-conspirators' submission filed on behalf of the Lago Agrio Plaintiffs was in all respects intended to perpetuate the false appearance that Cabrera was neutral and independent and that the RICO Defendants and their co-conspirators were not the report's true authors.  This submission purported to urge Cabrera to consider various documents and third-party reports, criticized his legal analysis of liability, and gave suggestions as to how he might support his existing findings and introduce new ones.[377] But it had been the RICO Defendants and their co-conspirators themselves who had decided which documents to review, how to present the legal case, and what findings and support to put forward in Cabrera's report.  Thus, the RICO Defendants and their co-conspirators wrote their "questions" to further the false appearance of independence from Cabrera.

166.     Cabrera filed a response to the Lago Agrio Plaintiffs' comments on November 17, 2008 in a supplemental report.[378]  Ignoring Chevron's objections, the comments put forward by the Lago Agrio Plaintiffs are reflected (at times word for word, including errors) in Cabrera's supplemental report, which increased the damage recommendation to $27 billion, with little explanation and no legally or scientifically valid support.[379]  As Donziger had planned, the RICO Defendants and their co-conspirators were indeed able to "jack this thing up to thirty billion."[380]

---

[377] Exhibit 7 (2008.09.16 Plaintiffs' Comments on Cabrera Report).

[378] Exhibit 8 (2008.11.17 Cabrera Supplemental Report).

[379] Exhibit 8 (2008.11.17 Cabrera Supplemental Report).

[380] Exhibit 1, CRS-193-00-CLIP-01 (2007.03.03 *Crude* outtake video clip of meeting among S. Donziger, A. Maest, and others); Exhibit 2 (certified transcript) at 252.

167.    The RICO Defendants and their co-conspirators also dictated other portions of Cabrera's response by secretly drafting his "answers" to their own comments and questions. Some of the "questions to the Perito [Cabrera]," according to an internal Stratus email, were "assigned to us."[381]  In an email dated August 1, 2008, Beltman outlined for his colleagues what "we need to do for the comments on the Cabrera report."  His email listed the various answers that needed to be prepared, and what they should say.  Beltman repeatedly referred to the Lago Agrio Plaintiffs' questions in the first person and to their own work as that of "Mr. Cabrera." For example, he says that "[w]e comment on the lack of consideration given to cleanup of rivers and streams," and "[w]e comment that Cabrera does not consider metal contamination in his cleanup costs."[382]  He then suggests possible responses to those comments.  Beltman likewise expressed his desire that work performed by U.S. consultant 3TM "be in a form that someone in Ecuador could have written,"[383] and another Stratus employee noted that Stratus needed to revise their work to "clean up the language so it [would] sound[] more like [Cabrera] and less like a comment."[384]

168.    The RICO Defendants accomplished their ruse in part by asking Powers, the same Stratus contractor who ghostwrote portions of Cabrera's initial report (*see* paragraph 151, *supra*), to respond to questions that had been raised in connection with the Cabrera Report. Defendant Maest provided Powers the questions to be answered—questions that were the very

---

[381] Exhibit 9 (2008.10.27 Email chain among D. Beltman, J. Peers, and A. Maest re "Ecuador. Doug – you should read this") (STRATUS-NATIVE051388) at 1.

[382] Exhibit 10 (2008.08.01 Email from D. Beltman to A. Maest and others re "Cabrera report comments") (STRATUS-NATIVE058697) at 1.

[383] Exhibit 196 (2008.10.29 Email chain among D. Beltman, J. Peers, and A. Maest re "Plan for rough estimate of groundwater damages") (STRATUS-NATIVE053480).

[384] Exhibit 9 (2008.10.27 Email chain among D. Beltman, J. Peers, and A. Maest re "Ecuador. Doug – you should read this") (STRATUS-NATIVE051388) at 2.

same ones posed by the Lago Agrio Plaintiffs in their September 2008 filing.[385]  Powers then supplied Maest with the answers that are the same as those that are included in Cabrera's November 2008 report.[386]

169.     In addition, the RICO Defendants and their co-conspirators incorporated into Cabrera's response a second report written by Richard Clapp, another one of their hired consultants.[387]  Just as the RICO Defendants and their co-conspirators had been concerned that Hinton or Clapp himself would inadvertently disclose the fact that Clapp's first report had been incorporated "as is" in the form of an annex to the Cabrera Report,[388] they likewise became concerned that the use of Clapp's second report in Cabrera's response would accidentally be made public.  Beltman warned Donziger, "I don't think we should hand out either [report] as Clapp's, thereby distributing proof."[389]

170.     Beyond the misrepresentations concerning Cabrera's independence and the authorship of "his" report, the Cabrera Report—without which the RICO Defendants cannot demonstrate liability or damages—suffers from substantial flaws and fundamental problems.[390] Determined to "jack up" the damages estimate to $27 billion, the conspirators, among other egregious defects, attributed *all* alleged environmental impact from oil operations in the former

---

[385] Exhibit 171 (Powers Dep.) at 156:7-159:20; Exhibit 197 (2008.10.31 Email from A. Maest to W. Powers re "Reinjection and gas capture questions") (CA000816-17).

[386] Exhibit 171 (Powers Dep.) at 156:7-159:20; Exhibit 197 (2008.10.31 Email from A. Maest to W. Powers re "Reinjection and gas capture questions") (CA000816-17).

[387] Exhibit 174 (2008.05.14 Email from D. Beltman to S. Donziger re "Urgent issue") (STRATUS-NATIVE068772).

[388] Exhibit 198 (2008.11.06 Email chain between D. Beltman and S. Donziger re "clapp") (STRATUS-NATIVE065062).

[389] Exhibit 198 (2008.11.06 Email chain between D. Beltman and S. Donziger re "clapp") (STRATUS-NATIVE065062).

[390] Exhibit DN (certified translation of 2008.05.19 Email from S. Donziger to D. Beltman re "Fwd: COMMENTS") (STRATUS-NATIVE062132).

consortium area to TexPet and none to Petroecuador, the sole owner of operations in the former consortium area for the past nearly 20 years and the one responsible for well over 1,400 oil spills during that time.[391]  The report includes millions of dollars of damages for remediation of disposal pits that do not exist and are, in fact, shadows and other dark objects on aerial photographs.[392]  In addition, the report relies on U.S.-derived cost baselines, standards, and methodologies which do not reflect substantial differences in costs between the U.S. and Ecuador, and are often meaningless outside the larger U.S. regulatory context.  For example, the report asserts that the cost of remediating the pits—including the imaginary ones—would be $2.2 million per pit.  This is *25 times* greater than Petroecuador's average actual cost of ongoing pit remediation at $85,000 per pit.

171.    Other intentional errors abound.  Even though Cabrera did not take a *single* sample of drinking water and despite the existence of literally dozens of public drinking water systems in the concession area, the report assesses $428 million in damages for potable water systems.[393]  The conspirators also included $8.4 billion in damages for "unfair profits" TexPet allegedly earned, a penal levy that the Lago Agrio Plaintiffs never requested in their complaint, and included allocations such as millions of dollars to create a husbandry farm to produce hunting game for local residents.[394]

---

[391] Exhibit 1, CRS-193-00-CLIP-01 (2007.03.03 *Crude* outtake video clip of meeting among S. Donziger, A. Maest, and others); Exhibit 2 (certified transcript) at 252; Exhibit 21 (2009.02.28 Article, "Petroecuador diagnostica los daños ambientales por crudo" ["Petroecuador diagnosed environmental damage from oil"], EL UNIVERSO); Exhibit 8 (2008.11.17 Cabrera Supplemental Report).

[392] Exhibit 199 (2010.12.16 Deposition of Douglas Allen, *In re Application of Chevron Corp.*, No. 2:10-mc-00091 (WKS) (D. Vt.) ("Allen Dep.")) at 237-241.

[393] Exhibit 8 (2008.11.17 Cabrera Supplemental Report) at 53.

[394] Exhibit 8 (2008.11.17 Cabrera Supplemental Report) at 29, 54.

172.     Finally, the RICO Defendants relied on unreliable, manipulated sampling data that they selected in order to maximize their damages claims.  While claiming to use independent laboratories, the RICO Defendants actually processed much of the material themselves, often at a makeshift lab in a hotel room, which they referred to as "Selva Viva Labs."[395]  This work was so shoddy, however, that they sometimes had to simply "lose" reports that would not stand up to any review.[396]  They would also change their analysis when the results were not coming out the way they wanted.  For example, in 2004 they stopped analyzing for certain contaminants because they realized that the presence of those contaminants in the samples would "show that the contamination is much more recent than we would desire," thus indicating that the source was Petroecuador activity after TexPet ceased operations.[397]

173.     The Cabrera Report also unilaterally expanded the scope of Cabrera's mandate and went far beyond the expertise of his publicly disclosed team by addressing additional issues unrelated to the Lago Agrio Plaintiffs' claims for environmental remediation and medical monitoring.[398]  Despite the failure to identify a single individual with cancer or produce a single medical report, the report initially assessed $2.9 billion for "excessive cancer deaths" and then increased that to $9.5 billion in the November 2008 filing, ostensibly based on just over a page of additional discussion.[399]  The report did not use any scientifically accepted method to link

---

[395] Exhibit CD (Calmbacher Dep.) at 132:11-133:19.

[396] Exhibit CE (certified translation of 2005.05.19 Email from L. Yanza to S. Donziger re "Re: Fwd: SALARIES FOR ENGINEERS") (DONZ-HDD-0063057).

[397] Exhibit P (2004.11.01 Email from D. Russell to S. Donziger and E. Camino re "Re: two important issues") (DONZ-HDD-0056423).  *See also* Exhibit DO (2007.12.04 Email from A. Maest to S. Donziger and D. Beltman re "RE: can we talk briefly today?") (STRATUS-NATIVE050355).

[398] Exhibit 178 (2008.04.01 Cabrera Report); Exhibit 8 (2008.11.17 Cabrera Supplemental Report) at 53-54.

[399] Exhibit 178 (2008.04.01 Cabrera Report) at 5-6; Exhibit 8 (2008.11.17 Cabrera Supplemental Report) at 53.

cancer to the consortium's operations; instead of using official data, the "excessive" cancer deaths were "assessed" on the basis of self-reporting at group meetings with undisclosed members of the local population conducted by purported member of the Cabrera team Carlos Beristain, who was in fact working at the direction of the RICO Defendants and their co-conspirators.[400]

174.    The Cabrera Report and its subsequent supplement were not the only documents filed under Cabrera's name which were secretly written by the RICO Defendants.  On November 5, 2007, Cabrera filed a statement with the Lago Agrio court alleging that he had been subjected to threats and harassment, and that he was constantly under surveillance by unknown parties. But while this notice was signed by Cabrera, it was prepared for him by the RICO Defendants.[401]  Donziger has admitted, however, that he had no concrete evidence for the allegations in the notice that Cabrera was in "serious danger."[402]

> **(v)    The RICO Defendants' Fraudulent Endorsements of Their "Cabrera Report" and Procurement of Other Endorsements Through Misrepresentations**

175.    The RICO Defendants and their co-conspirators sought almost immediately after filing the Cabrera Report to bolster it through the publication of endorsements of the report by Stratus itself—the report's secret author—and by third-party experts.

176.    After the conspirators filed their report under the name of court expert Cabrera, Donziger, Beltman, Maest, Fajardo, Yanza, and Hinton assembled again in Boulder, Colorado to discuss and manage the "[s]cientific and public relation response to [the] Cabrera report."[403]

---

[400] Exhibit 178 (2008.04.01 Cabrera Report) at 28-31.

[401] Exhibit Q (certified translation of 2007.12.14 Email from P. Fajardo to S. Donziger re "Re: one more time") (DONZ00045245).

[402] Exhibit D (2011.01.18 Donziger Dep.) at 3125:3-8.

[403] Exhibit 159 (Notes from 2008.06.04 Ecuador meeting in Boulder) (STRATUS-NATIVE096796) at 1.

During this meeting, they developed their plan to obtain multiple levels of endorsement of the report for use in the Lago Agrio court and the U.S. media.[404]  They also strategized about how to increase the already unfounded damages number contained in the Cabrera Report, developed a plan for responding to Chevron's criticisms of the report, and outlined a plan of attack on the media front.[405]  As Beltman later acknowledged in an email to Amazon Watch about the progress of their plan to procure fraudulent endorsements, "a big part of this will be for media."[406]

177.    The first level of endorsement the RICO Defendants and their co-conspirators put into play was the promotion of the Cabrera Report and the trumpeting of its "independence" by Stratus, the report's secret author.  On December 1, 2008, Stratus released a fifteen-page document purporting to analyze and defend the Cabrera Report.[407]  In this document, which bears on its front page the signatures of Beltman and Maest, as well as other Stratus employees, Stratus claimed, "Mr. Cabrera is thus acting in the capacity of a neutral 'expert' to the Court, and his role is to assist the Court in evaluating the scientific and technical information that was collected and compiled for the case.  In the U.S. Court system, Mr. Cabrera would be called a Technical Special Master."[408]

---

[404] Exhibit 159 (Notes from 2008.06.04 Ecuador meeting in Boulder) (STRATUS-NATIVE096796) at 3-4.

[405] Exhibit 159 (Notes from 2008.06.04 Ecuador meeting in Boulder) (STRATUS-NATIVE096796) at 2-4.

[406] Exhibit 200 (2008.06.26 Email from D. Beltman to Amazon Watch re "Greetings, and . . . .") (STRATUS07162010 000001).

[407] Exhibit 201 (2008.12.01 Comments on the Report of the Court-Appointed Expert Richard Cabrera Vega in the Case of *Maria Aguinda y Otros v. Chevron Corp.*, Stratus Consulting).

[408] Exhibit 201 (2008.12.01 Comments on the Report of the Court-Appointed Expert Richard Cabrera Vega in the Case of *Maria Aguinda y Otros v. Chevron Corp.*, Stratus Consulting) at 1.

178.     Stratus's December 2008 review of the Cabrera Report is written to give the impression that its authors had no connection to the Cabrera Report or the supplement to his report, and were providing a neutral, third-party review.  For example, the RICO Defendants and their co-conspirators described the writing of the report as follows:  "After reviewing the extensive record of environmental data and information that was collected during the trial, and collecting some of his own data, Mr. Cabrera has concluded that Texpet's operations severely contaminated a large area of the Ecuadorian Amazon, and that the contamination has caused extensive damages to the environment and its inhabitants."[409]  Once completed, Stratus's "review" of the Cabrera Report was knowingly distributed by the conspirators using physical and electronic mail and remains available on a co-conspirator's website at http://amazonwatch.org. Yet Maest, who signed the review, has admitted that she did not know if Cabrera or any disclosed member of his team actually wrote any portion of the report, and that she has never seen anything suggesting that Cabrera actually considered or even read the report she and her colleagues wrote for him.[410]

179.     Stratus's "review" was intended to deceive, as one of the lawyers retained by the RICO Defendants who reviewed the submission in 2010 recognized.  Responding to an ongoing discussion about the RICO Defendants' plan to accuse Chevron of fraud on the theory that it knew Stratus had written the Cabrera report all along, the lawyer wrote the following to Donziger and other conspirators:

> This document might end the discussion.  *These "comments" are written in a manner to give the impression that Cabrera was entirely independent and conducted his own research and came up with his own findings. There is no indication in this document that Stratus, ostensibly the company of experts independent from Cabrera, was itself involved in "ghosting" the Cabrera report.* This might not be dispositive if there were other evidence showing that Chevron

---

[409] Exhibit 201 (2008.12.01 Comments on the Report of the Court-Appointed Expert Richard Cabrera Vega in the Case of *Maria Aguinda y Otros v. Chevron Corp.*, Stratus Consulting) at 2.

[410] Exhibit N (2011.01.19 Maest Dep.) at 52:21-56:17.

had actual or constructive knowledge that Stratus had been involved in the
creation of the Cabrera report.  In such a case Stratus's "comments" may have
been a rather crude and awkward  spin by a biased expert - but it would not have
been a "fraud" upon Chevron. But, in the absence of such evidence, *then it
appears not only that Cabrera and [the Lago Agrio] plaintiffs can be charged
with a "fraud" respecting the former's report, but that Stratus was an active
conspirator.*[411]

This statement admitting that Stratus was involved in "ghosting" the Cabrera Report and

expressing concerns regarding Stratus's "endorsement" of the report was from one of the Lago

Agrio Plaintiffs' attorneys purportedly retained by Donziger.

180.    The second level of endorsement envisioned by the RICO Defendants and their

co-conspirators and discussed during their June 2008 meeting in Boulder involved soliciting the

endorsement of credible experts by deceiving them about the Cabrera Report's authors and the

collusion between the RICO Defendants and their co-conspirators and Cabrera.[412]  During the

meeting, the RICO Defendants and their co-conspirators discussed the fact that experts who had

already been approached for endorsement had questioned their "relationship to Cabrera," and the

RICO Defendants and their co-conspirators acknowledged that they "need[ed] to be able to give

them answers."[413]  What they ended up doing, in fact, was concealing that relationship entirely.

181.    In seeking the sham "endorsements" of the Cabrera Report, Stratus falsely

represented to numerous third parties that the report was written by Cabrera.  For example, on

June 12, 2008, David Mills of Stratus emailed a representative of California's Office of Spill

Prevention and Response, describing the Cabrera Report as follows:  "As part of the trial, the

Ecuadorian judge currently directing the case appointed a technical expert to summarize[] and

---

[411] Exhibit 12 (2010.05.16 Email chain among J. Horowitz, A. Wilson, S. Donziger, and others
re "Rule60(b) And Stratus Materials") (DONZ00056679) at 1.

[412] Exhibit 159 (Notes from 2008.06.04 Ecuador meeting in Boulder) (STRATUS-
NATIVE096796) at 3-4.

[413] Exhibit 159 (Notes from 2008.06.04 Ecuador meeting in Boulder) (STRATUS-
NATIVE096796) at 3.

analyze the technical data and information about the case and draw conclusions about the environmental and human impacts of the oil exploration and production activities.  This expert report was recently submitted to the court."[414]  Stratus asked the representative to review the Cabrera Report for a fee and provide comments via telephone conversation—comments that, if favorable, could later be submitted by the RICO Defendants and their co-conspirators to the court.[415]

182.     Similarly, on June 26, 2009, Beltman emailed a representative of Brazil's Aggeu Magalhães (Haggai Magellan) Research Center seeking an endorsement of the Cabrera Report. In that communication, Beltman referred to "the Court Expert report in which [Cabrera] presents the results of his studies and makes recommendations to the judge about the damages caused by Texaco and what needs to be done as reparation for those damages."[416]  Beltman asked the Haggai Magellan Research Center to "please review the Court Expert report and read our evaluation of it, and think about how you could provide support.  Our first choice is for you to sign the evaluation that we drafted (I can provide you with a blank signature page for you to sign and return)."[417]

183.     The RICO Defendants' and their co-conspirators' goal of obtaining fifteen or twenty endorsements from academics in addition to consultants, however, proved difficult given what Beltman called the "weaknesses" of the Cabrera Report.  As Beltman explained to Donziger in an email:  "Our original concerns about this have come to pass . . . .  [Academics]

---

[414] Exhibit 202 (2008.06.12 Email from D. Mills to California Office of Spill Prevention and Response re "Assistance with report review") (STRATUS-NATIVE042209).

[415] Exhibit 202 (2008.06.12 Email from D. Mills to California Office of Spill Prevention and Response re "Assistance with report review") (STRATUS-NATIVE042209).

[416] Exhibit 203 (2009.06.26 Email from D. Beltman to representative of Haggai Magellan Research Center re "support on the Chevron case") (STRATUS07022010 000334).

[417] Exhibit 203 (2009.06.26 Email from D. Beltman to representative of Haggai Magellan Research Center re "support on Chevron case") (STRATUS07022010 000334).

are trained and they function to be critical, not accepting.  [Additionally], they know that signing their names onto some kind of endorsement of the Cabrera report is setting them up for public attack from Chevron (and perhaps attack within their academic circles as well) . . . .  And finally, some of the underlying work in the Cabrera report has weaknesses that an academic would probably have a hard time defending."[418]  Beltman explained, "[w]e're having better success with consultants being willing to sign endorsements than academics (something I am not proud of)."[419]

184.    The RICO Defendants and their co-conspirators did, however, ultimately succeed in convincing third parties to review the Cabrera Report that Stratus held out as having been drafted by a "Technical Special Master."[420]  For example, on July 15, 2008, Stratus executed a contract with Dr. Peter N. Jones of Bauu Institute whereby he agreed to review the Cabrera Report and provide comments in a conversation with Stratus.[421]  Such fraudulently obtained endorsements, along with Stratus's own evaluation—falsely touted as "independent"—served to further enhance the value of the Cabrera Report in the RICO Defendants' and their co-conspirators' media pressure campaign targeted at forcing Chevron to pay them off.

### (vi)    The RICO Defendants' Payments to Cabrera for Work He Did Not Perform

185.    The perceived independence of the Cabrera Report was essential to the RICO Defendants' plan.  Independence was the key to its credibility with the press, the public, and the

---

[418] Exhibit 204 (2008.07.29 Email from D. Beltman to S. Donziger re "Cabrera document review") (STRATUS-NATIVE042610).

[419] Exhibit 204 (2008.07.29 Email from D. Beltman to S. Donziger re obtaining endorsements for Cabrera report) (STRATUS-NATIVE042610) at 1.

[420] Exhibit 205 (2008.07.15 "Honorarium Agreement S063-8H-1303" between Stratus and P. Jones) (STRATUS-NATIVE043281).

[421] Exhibit 205 (2008.07.15 "Honorarium Agreement S063-8H-1303" between Stratus and P. Jones) (STRATUS-NATIVE043281) at 3.

other parties whose endorsements the RICO Defendants and their co-conspirators needed.  Of

course, the perception of independence would be lost if it was known that the RICO Defendants

and their co-conspirators wrote the report themselves, and keeping this secret required Cabrera's

cooperation.  And if the Cabrera Report were perceived as untrustworthy, the RICO Defendants

would be at a loss to demonstrate Chevron's liability, not to mention the "damages" they hoped

to recover.  Accordingly, when the RICO Defendants arranged for the court to abandon the

judicial inspection process and appoint Cabrera as a "global" expert, they also insisted that the

parties should pay for this process, and directly paid Cabrera over $263,000, despite the fact that

Chevron objected throughout to the improper new process and refused to fund it.[422]  These

payments began immediately.  Just weeks after Cabrera's appointment had been publicly

announced, but before he was officially sworn in to commence his work, Yanza wrote to

Donziger and told him, "We have met with Richard and everything is under control. We gave

him some money in advance."[423]  Some payments were made through a "secret account,"

through which Kohn funneled tens of thousands of dollars to Cabrera, apparently in excess of the

$263,000 paid to Cabrera through Selva Viva.[424]  As it is now clear that Cabrera did not write

the report, the only purpose for these payments, which were made by Defendant Selva Viva and

funded by Kohn or Kohn Swift, must have been to buy Cabrera's cooperation and silence

regarding the true authorship of the report.

       186.     Cabrera earned his money by repeatedly perjuring himself in the Lago Agrio

court.  For example, on July 23, 2007, four months after an all-day PowerPoint session with

---

[422] Exhibit 206 (Checks to R. Cabrera accompanied by letters from P. Fajardo to Lago Agrio
court noting payments); Exhibit 207 (2008.10.06 Chevron's Motion to Revoke Order
Regarding Payment of Fees to Expert Cabrera, Lago Agrio Litigation).

[423] Exhibit R (certified translation of 2007.04.17 Email from L. Yanza to S. Donziger re "A
couple of things") (DONZ00042961).

[424] Exhibit S (certified translation of 2007.09.12 Email from L. Yanza to S. Donziger re "We
should not give Texaco the pleasure of stopping the Global Assessment") (DONZ-HDD-
0125080).

Donziger and Fajardo, Cabrera declared to the court: "I should clarify that I do not have any relation or agreements with the plaintiff, and it seems to me to be an insult against me that I should be linked with the attorneys of the plaintiffs."[425]

187.     When Chevron raised questions with the Lago Agrio court as to the authorship of the Cabrera Report and Cabrera's relationship with the Lago Agrio Plaintiffs, Cabrera represented in multiple filings with the Lago Agrio court that he had worked independently and transparently despite evidence to the contrary.  On October 7, 2008, for example, Cabrera declared in a filing that he is an "honest man with nothing to hide, and [his] conduct as an expert in this case has been as professional, impartial and objective as possible, as can be seen from [his] expert report."[426]  In that same filing, Cabrera asserted that he does "not take orders from either of the parties to the lawsuit" and that he is "not, nor will [he] be, subject to the views or whims of either of the parties."[427]  In a subsequent February 5, 2009 filing, Cabrera claimed that the "entire expert investigation procedure was completed by [him] personally."[428]  He later declared that "[a]ll the work was planned, directed, and approved by [him], as the person responsible for the expert examination."[429]

188.     The RICO Defendants have also denied a relationship with Cabrera in filings with the Lago Agrio court.  For example, in an April 4, 2008 filing, Fajardo asserted that the notion that there was a "common interest relationship between the expert Mr. Cabrera and the

---

[425] Exhibit 208 (2007.07.23 R. Cabrera Filing, Lago Agrio Litigation).

[426] Exhibit 209 (2008.10.07 R. Cabrera Filing, Lago Agrio Litigation) at 151322.

[427] Exhibit 209 (2008.10.07 R. Cabrera Filing, Lago Agrio Litigation) at 151322.

[428] Exhibit 210 (2009.02.05 R. Cabrera Filing, Lago Agrio Litigation) at 154175.

[429] Exhibit 211 (2009.03.04 R. Cabrera Filing, Lago Agrio Litigation) at 154585.

plaintiff" and that Cabrera "works for us" was "simply ridiculous."[430]  Then on April 25, 2008,

the RICO Defendants and their co-conspirators characterized Chevron's claim that a close

relationship existed between them and Cabrera as "[a]nother infamy," "childish and absurd."[431]

189.    Despite these protestations of Cabrera's independence to the Lago Agrio court,

Donziger himself has now admitted that Cabrera's statements were "not accurate" because

"certainly the [Lago Agrio] plaintiffs provided materials for his consideration."[432]

### (vii)   The RICO Defendants' Attempt to Launder the "Cabrera Report"

190.    Despite the RICO Defendants' concerted efforts to conceal the true authorship of

the Cabrera Report, Chevron has uncovered significant elements of the nature and extent of their

pervasive fraud, through discovery in U.S. courts pursuant to 28 U.S.C. § 1782.  *See* paragraphs

270-323 *infra*.  This partial picture of the truth coming to light, however, has not stopped the

RICO Defendants from seeking and obtaining a massive judgment based on "Cabrera's" report.

Instead, they have sought to whitewash the Cabrera Report by, for all intents and purposes,

submitting it—again—to the Lago Agrio court, only this time with *new* names attached.[433]  On

September 16, 2010, the RICO Defendants filed seven new "expert" reports with the Lago Agrio

court, through which they now demanded $113 billion in damages.

191.    These seven new expert reports purport to be independent.  In reality, however,

they are a repackaging of Cabrera's flawed and fraudulent report.  Donziger discussed this plan

with his co-conspirators at Patton Boggs, expressing his concern that they were not moving

---

[430] Exhibit 212 (2008.04.04 Plaintiffs' Filing responding to Chevron's position on Cabrera, Lago Agrio Litigation) at 140166-140167.

[431] Exhibit 213 (2008.04.25 Plaintiffs' Filing responding to Chevron's position on Cabrera neutrality, Lago Agrio Litigation) at 140266.

[432] Exhibit 6 (2010.12.29 Donziger Dep.) at 2291:10-25.

[433] Exhibit 13 (2010.05.20 Email chain among S. Donziger, E. Westenberger, J. Abady, and others re "Draft Outline of Possible Ecuadorian Court Filing") (DONZ00067932) at 1.

quickly enough to file the new expert reports.  As Donziger reported, "The Ecuador team is getting nervous that there is an increasing risk that our 'cleansing' process is going to be outrun by the judge and we will end up with a decision based entirely on Cabrera.  Absent our intervention ASAP, they believe the judge could issue autos para sentencia in about 3-4 weeks, which would in effect bar our remedy to the Cabrera problem."[434]  In another conversation, one of the co-conspirators at Patton Boggs, Adlai Small, told Donziger, "One overarching theme to think about throughout this process is how we want the new expert to address the Cabrera report and its conclusion.  While our new expert will most likely rely on some of the same data as Cabrera (and come to the same conclusions as Cabrera), [d]o we think the expert should make specific mention of such consistencies?"[435]  Small went on to explain to Donziger that he thought they should attempt to structure the new expert reports in such a way that they might rehabilitate the tainted Cabrera Report to some degree, so that someone presented with the new reports "might feel comfortable concluding that certain parts of Cabrera are a valid basis for damages."[436]  Donziger has also admitted that the new expert reports were intended to give the RICO Defendants "an argument" allowing them to "attempt to shut down Chevron's 1782 efforts in the U.S."[437]

192.    The link between the fraudulent Cabrera Report and the work of the "new" experts is made explicit in the retention agreement signed by the Weinberg Group, a consulting firm, which, in turn, retained the "new" experts.  The Weinberg Group's retention agreement provides that it was retained for the purpose of "conduct[ing] a comprehensive review of selected

---

[434] Exhibit T (2010.06.14 Email from S. Donziger to N. Economou re "FYI") (DONZ00068050).

[435] Exhibit 214 (2010.08.18 Email from S. Donziger to A. Small re "Brainstorming on Expert Issues") (DONZ00031475) at 1.

[436] Exhibit 214 (2010.08.18 Email from S. Donziger to A. Small re "Brainstorming on Expert Issues") (DONZ00031475) at 1.

[437] Exhibit 6 (2010.12.29 Donziger Dep.) at 2331:15-19, 2337:20-21.

sections of an expert report prepared by Richard Stalin Cabrera Vega,"—not to produce a new, independent scientific report.[438]  As one co-conspirator has described it, the role of the Weinberg Group is merely to "provid[e] a submission with their name on it."[439]

193.    The Weinberg Group provided copies of the Cabrera Report to the experts it retained for use in their own reports.[440]  According to Donziger and his co-conspirators, all the "new expert[s]" needed was the "Cabrera report in and of itself" along with the data that Cabrera relied upon.[441]  As the RICO Defendants and their co-conspirators intended, these "new" experts then relied heavily on the Cabrera Report.  According to Donziger, none of these "new" experts had "go[ne] to Ecuador," "did any kind of new site inspection," "did any kind of new sampling," or indeed, did "environmental testing of any kind."[442]

194.    One of the "new" experts, Douglas Allen, for example, made no independent evaluation of the evidence, instead relying on the unsubstantiated findings contained in the Cabrera Report.  Indeed, the conspirators instructed Allen to use the Cabrera Report as his "starting point."[443]  He relied entirely on the Cabrera Report for, among other items, the number of pits requiring remediation.[444]  Despite the fact that he "[did]n't know if there are in fact 917

---

[438] Exhibit 215 (2010.8.18 Letter from H. Dunkelberger to J. Abady re independent analysis of Cabrera Rpt.) (DONZ00031477) at 1.

[439] Exhibit 216 (2010.08.20 Email chain among S. Donziger, J. Brickell, and others re "Call to discuss expert report.") (DONZ00031480) at 1.

[440] Exhibit 199 (2010.12.16 Allen Dep.) at 122:2-5; Exhibit 217 (2010.12.10 Deposition of Lawrence Barnthouse, *Chevron Corp. v. Barnthouse*, 1:10-mc-53 (S.D. Ohio) ("Barnthouse Dep.")) at 62:2-5.

[441] Exhibit 218 (2010.07.13 Email chain between S. Donziger and E. Westenberger re "Expert") (DONZ00057942) at 1.

[442] Exhibit 6 (2010.12.22 Donziger Dep.) at 1652:17-1653:17.

[443] Exhibit 199 (Allen Dep.) at 140:25-141:11.

[444] Exhibit 199 (Allen Dep.) at 171:18-172:3, 225:6-25.

pits that require remediation," he relied on that number anyway—drawn from the fraudulent Cabrera Report—in developing his own estimate.[445]  He relied on the Cabrera Report despite his opinion that the conclusions in the Cabrera Report are unreliable and that that the report lacked appropriate citations and references.[446]  Allen has admitted, however, that had he known that the RICO Defendants and their co-conspirators actually wrote the Cabrera Report, that would have "bother[ed]" him and affected his expert opinions.[447]

195.     Similarly, another "new" expert, Dr. Lawrence Barnthouse, relied on the standards contained in the Cabrera Report, and "assume[d] [Cabrera] was correctly characterizing what they were."[448]  Indeed, he has admitted that he was not retained to create a new, independent report,[449] and further acknowledged that he "couldn't be completely independent" and he had not "independently performed all the [necessary] calculations" in his own report[450] because most of the information he needed was "only available from the Cabrera Report."[451]  Like Allen, Barnthouse has admitted that he relied on the Cabrera Report despite the fact that he had reached the conclusion that Cabrera's numbers were "uncertain" and that methodology he adopted from Cabrera was an "an unreliable indicator" and was "[s]uboptimal, [and] inadequate."[452]

---

[445] Exhibit 199 (Allen Dep.) at 229:19-22.

[446] Exhibit 199 (Allen Dep.) at 163:14-17.

[447] Exhibit U (2010.12.16 Deposition of Douglas Allen, *In re Application of Chevron Corp.*, No. 2:10-mc-00091 (WKS) (D. Vt.)) at 205-206.

[448] Exhibit 217 (Barnthouse Dep.) at 115:10-15, 130:3-15.

[449] Exhibit 217 (Barnthouse Dep.) at 248:11-17.

[450] Exhibit V (2010.12.10 Deposition of Lawrence Barnthouse, *Chevron Corp. v. Barnthouse*, No. 1:10-mc-53 (S.D. Ohio)) at 123.

[451] Exhibit 217 (Barnthouse Dep.) at 52:2-10.

[452] Exhibit 217 (Barnthouse Dep.) at 78:23-79:8, 203:22-204:4, 205:2-3.

196.     Jonathan Shefftz, another of these experts, did no independent work and repackaged portions of the fraudulent Cabrera Report.  For example, Shefftz assumed without doing any independent research or analysis that TexPet was required to incur costs and to remediate pits based solely on the Cabrera Report's assertion that these costs were necessary.[453] Shefftz admitted that his report as a whole depends upon "data and cost figures from the Cabrera Report" and that he had "simply taken [Cabrera's] volume figures and . . . cost figures and used those as inputs to [his] calculations."[454]  He explained that he "was not engaging in any exercise to verify [Cabrera's] data series or his cost figures.  [Shefftz] was just using them in [his] report."[455]  Shefftz also conceded that his reliance on the Cabrera Report and its flawed numbers could "lend an upward bias" to his own results.[456]  Furthermore, an annex of Shefftz's draft report relies heavily on annex T to the Cabrera report[457]—an annex that was drafted by Stratus, the consultants who ghostwrote the Cabrera Report.[458]

197.     The reports of other experts, such as Carlos Picone, Robert Paolo Scardina, and Daniel Rourke were written "in collaboration with the Weinberg Group,"[459] the group that had

---

[453] Exhibit 219 (2010.12.16 Deposition of Jonathan C. Shefftz, *Chevron Corp. v. Shefftz*, No. 1:10-mc-10352-JLT (D. Mass.) ("Shefftz Dep.")) at 120:18-121:12, 200:12-201:2.

[454] Exhibit 219 (Shefftz Dep.) at 59:24-60:2, 62:13-17, 82:17-83:6, 165:10-13.

[455] Exhibit 219 (Shefftz Dep.) at 69:2-3.

[456] Exhibit 219 (Shefftz Dep.) at 63:16-18.

[457] Exhibit 219 (Shefftz Dep.) at 83:2-6, 83:25-84:10, 128:7-129:3.

[458] Exhibit 198 (2008.11.16 Email from D. Beltman to S. Donziger re "clapp") (STRATUS-NATIVE065062).

[459] Exhibit 220 (2010.12.16 Deposition of Dr. Carlos E. Picone, *Chevron Corp. v. Picone*, No. 8:10-cv-02990-AW (D. Md.) ("Picone Dep.")) at 67:13-14.

been hired not to create new reports but rather to repackage the Cabrera Report.[460]  Sections of Picone's report were written entirely by the Weinberg Group, with only "minimal" editing by Picone.[461]  Scardina's report was written largely by a person at the Weinberg Group whose identity and qualifications are unknown to Scardina himself.[462]  Scardina, like the other experts, also relied exclusively on the Cabrera Report and the Weinberg Group for information central to his report.[463]

198.     In summary, the "new" expert reports submitted by the RICO Defendants are new only in two aspects.  First, they bear new names, despite being nothing more than another repackaging of the Stratus report that was originally submitted as the Cabrera Report.  And second, they purport to support a new damages figure, a remarkable $113 billion,[464] which is a nearly $90 billion increase over Stratus's figure, despite offering no new analysis or evidence.

### 2.     Colluding With the Republic of Ecuador to Bring Sham Charges Against Chevron's Attorneys

199.     As part of their scheme to defraud and extort Chevron, the RICO Defendants and their co-conspirators conspired with officials from the Republic of Ecuador to advance baseless criminal prosecutions against Ricardo Reis Veiga and Rodrigo Pérez Pallares, lawyers responsible for executing the 1998 Final Release that precludes Defendants' claims against Chevron in the Lago Agrio Litigation.  As co-conspirator Bonifaz explained the strategy to Donziger and Kohn in 2005:

---

[460] Exhibit 221 (2010.12.16 Deposition of Dr. Robert Paolo Scardina, *In re Application of Chevron Corp.*, No. 7:10-mc-00067 (W.D. Va.) ("Scardina Dep.")) at 87:9-14, 297:1-17; Exhibit 215 (2010.8.18 Letter from H. Dunkelberger to J. Abady re independent analysis of Cabrera Rpt.) (DONZ00031477) at 1.

[461] Exhibit 220 (Picone Dep.) at 54:13-20, 140:21.

[462] Exhibit 221 (Scardina Dep.) at 87:9-14, 297:1-17.

[463] Exhibit 221 (Scardina Dep.) at 225:5-20, 267:11-270:16.

[464]  Exhibit W (2010.09.24 Article "Shakedown in the Rain Forest," WALL ST. J.).

The day ChevronTexaco's management becomes convinced that Reiss Veiga [sic] sold them a bill of goods with his promises that got [rid] of our case, that is the day on which ChevronTexaco will want to talk.  That is also the day that will see the end of Reiss Veiga's [sic] corporate career. . . .  Thus we have to destroy his reputation with ChevronTexaco as an incompetent any way we can to see our case settled.[465]

200.     With criminal convictions in hand, the RICO Defendants and their co-conspirators and Ecuador could then seek to nullify the release, and "fully leverage the criminal investigation"—in the media and otherwise—to force Chevron to "settle" the Lago Agrio Litigation or face a massive judgment.[466]  According to Donziger, "[I]f this penal case is brought, this will be on the wires all over the world and it will really raise the cost to [Chevron]."[467]  Indeed, footage from *Crude* shows the conspirators admitting that the criminal prosecutions are a means to exert "personal psychological pressure [on Chevron's] top executives,"[468] and Donziger's own personal notes make clear that the criminal prosecutions were meant "to keep the hammer over [Chevron's] head"[469] and "force [Chevron] to the table for a possible settlement."[470]

---

[465] Exhibit X (2005.03.03 Email from C. Bonifaz to J. Kohn, S. Donziger, and A. Wray re "Texaco") (DONZ-HDD-0046401).

[466] Exhibit 222 (2005.10.01 Memorandum by C. Lehane, attached to email from S. Donziger to J. Kohn re "Lehane's first press plan") (DONZ00027919) at 1; Exhibit 6 (2010.12.01 Donziger Dep.) at 551:6-19, 552:14-554:7.

[467] Exhibit 223 (2005.05.30 Email chain among S. Donziger, A. Wray, C. Bonifaz, and J. Kohn re conference call to discuss criminal charges against those who signed remediation agreements) (DONZ00026843).

[468] Exhibit 1, CRS-104-01-CLIP-01 (2006.07.24 *Crude* outtake video clip of S. Donziger discussing strategy with Cush and others); Exhibit 2 (certified transcript) at 41-42.

[469] Exhibit 76 (2006.09.27 Entry in Composite of S. Donziger Personal Notes) (DONZ00027256) at 53 of 109.

[470] Exhibit 76 (2006.10.06 Entry in Composite of S. Donziger Personal Notes) (DONZ00036266).

201.     The RICO Defendants' and their co-conspirators' collusion with the Republic of Ecuador to procure the criminal indictments has been long in the works.[471]  In an email exchange in August 2005 (which appears to be an excerpt from an ongoing correspondence) among conspirators Alberto Wray, Bonifaz, Fajardo, Yanza, the Front, and Ecuador's Attorney General's office, Wray wrote, "if at some point we want the Government and the Attorney General to play for our side, we must give them some ability to maneuver."[472]  Martha Escobar, a deputy of the Attorney General, responded that both the office and "all of us working on the State's defense were searching for a way to nullify or undermine the value of the remediation contract and the final acta [*i.e.*, the 1998 Final Release] . . . ."[473]

202.     In that same email exchange, Escobar confirmed that the Attorney General was still determined to prosecute "those who executed" the 1995 Settlement Agreement and the 1998 Final Release, despite the absence of evidence of any wrongdoing:  "The Attorney General remains resolved to have the Comptroller's Office conduct another audit (that also seems unlikely to me given the time); he wants to criminally try those who executed the contract (that also seems unlikely to me, since the evidence of criminal liability established by the Comptroller's Office was rejected by the prosecutor . . . ."[474]  The Attorney General later

---

[471] Exhibit CF (2004.12.07 Email from C. Bonifaz to S. Donziger and E. Camino re "Re: Supuesto Fraude") (DONZ-HDD-0053565); Exhibit CG (2005.05.30 Email from S. Donziger to C. Bonifaz, A. Wray, J. Kohn, and J. Bonifaz re "Re: sked conference call Monday at 10 a.m." (DONZ-HDD-0075501); Exhibit CH (2005.06.14 Email from J. Kohn to C. Bonifaz, S. Donziger, and A. Wray re "RE: more proof in case") (DONZ-HDD-0069896).

[472] Exhibit 224A (2005.08.10 Email chain among M. Escobar, A. Wray, C. Bonifaz, and others re criminally charging those who signed remediation agreements).

[473] Exhibit 224A (2005.08.10 Email chain among M. Escobar, A. Wray, C. Bonifaz, and others re criminally charging those who signed remediation agreements).

[474] Exhibit 224A (2005.08.10 Email chain among M. Escobar, A. Wray, C. Bonifaz, and others re criminally charging those who signed remediation agreements).

informed one of the RICO Defendants' colleagues that "he want[ed] [them] to work together on this matter" and that, at least initially, "he [did] not want [their] meetings to be made public."[475]

203.     After working together for some time, the RICO Defendants were successful in getting the Republic of Ecuador to pursue fraud charges related to the remediation against Chevron in litigation in the United States.  When Donziger learned of this, he reveled in their success:  "The Attorney General of Ecuador is now suing Chevron for fraud on the remediation!! We have been pushing this for over a year, we finally did it !!! This is huge, huge."[476]

204.     The RICO Defendants and their co-conspirators went to great lengths to hide their collusion with the Republic of Ecuador, despite the existence of, as the co-conspirators themselves described it, "pretty much irrefutable evidence of us collaborating with the [government] to get Reis Veiga and Perez convicted."[477]  In an email to Donziger and others, one of the conspirators reminded them that they "had to resort to very sophisticated methods to disassociate ourselves from the case (Amicus Curiae submitted by third parties etc)," and urged Donziger and others not to undo this work by associating themselves publicly with the prosecutions.[478]  In an email to the Republic of Ecuador's U.S. counsel discussing the potential prosecution, Donziger assured him that an Ecuadorian colleague working on the matter, "understands the need to keep his contacts with your client's office totally confidential and non-

---

[475] Exhibit 225A (2006.01.31 Email between S. Donziger and J. Prieto re "Remediation Agreement Nullification!!") (DONZ00028129).

[476] Exhibit 226A (2006.07.21 Email from S. Donziger to W. Powers, A. Maest, M. Quarles, and R. Kamp re "restructuring E-Tech in light of government lawsuit") (DONZ00023146) at 1.

[477] Exhibit Y (certified translation of 2009.02.04 E-mail exchange between S. Donziger and J. Saenz re "RE: New Press Release/important") (DONZ00028909) at 2.

[478] Exhibit 227A (2009.02.04 Email from J. Saenz to S. Donziger re "Nuevo Boletin/importante") (DONZ00049867).

public."[479]  Martha Escobar—the deputy Attorney General with whom Wray exchanged emails—even perjured herself in a deposition taken in an action pending in the Southern District of New York on November 21, 2006 and denied that she ever had *any communications* with the conspirators concerning the Lago Agrio Litigation.[480]  But when confronted with her own 2005 email with Wray proving otherwise, she confirmed that she had been acting in that correspondence at the direction of the Attorney General.[481]

205.    The collusion with the Republic of Ecuador to obtain sham criminal charges, and the extortionate purpose of that collusion, is documented in the film *Crude* and its outtakes.  In a January 2007 meeting between Donziger and Kohn captured in the *Crude* outtakes, in which they are reviewing materials the RICO Defendants provided to the Ecuadorian Attorney General in support of criminal prosecutions, Kohn discussed the RICO Defendants' extortion plan:  "So, again, that may be something that we could facilitate going away at the right time . . . . if they wanted it to go away."  Donziger replied, "Precisely."[482]  Donziger told Kohn that Chevron is alleging a "conspiracy" between them and the Ecuadorian government, to which Kohn responded, "If only they knew."[483]

---

[479] Exhibit 228A (2006.02.15 Email from S. Donziger to R. Herrera re "Important – Chevron/Ecuador") (DONZ00086287) at 1.

[480] Exhibit 229A (2006.11.21 Deposition of Dr. Martha Escobar, *Republic of Ecuador v. Chevron-Texaco Corp.*, No. 04-CV-8378 (S.D.N.Y.) ("Escobar Dep.")) at 17:15-19:12, 133:10-135:5.

[481] Exhibit 229A (Escobar Dep.) at 157:15-158:21.

[482] Exhibit 1, CRS-170-00-00 (2007.01.31 *Crude* outtake video clip of meeting between S. Donziger and J. Kohn); Exhibit 2 (certified transcript) at 159.

[483] Exhibit 1, CRS-169-05-09 (2007.01.31 *Crude* outtake video clip of meeting between S. Donziger and J. Kohn); Exhibit 2 (certified transcript) at 150.

206.     On April 26, 2007, President Correa toured the Lago Agrio oil fields with the RICO Defendants and their co-conspirators.[484]  That same day, he issued a press release demanding the criminal prosecution of the Ecuadorian officials who had signed the 1998 Final Release.[485]  On the following day after hearing this news, Donziger mused as to whether the time might be right to "ask for the head of [Chevron's lawyer Rodrigo] Pérez Pallares—given what the President said."  Donziger explained:  "[H]e's totally with us."[486]  The next day, on April 28, 2007, in a national radio address, President Correa echoed the RICO Defendants' rhetoric, calling Chevron's Ecuadorian lawyers traitors and demanding that they, along with the Petroecuador officials who signed the 1998 Final Release, be criminally prosecuted.[487]  In the movie *Crude*, Donziger is shown stating that "Correa just said that anyone in the Ecuadorian Government who approved the so-called remediation is now going to be subject to litigation in Ecuador," and adding that those persons who signed the 1998 Final Release "are shittin' in their pants right now."[488]

207.     The fact that President Correa called for the criminal indictment of those who signed the Final Release did not come as a surprise to the RICO Defendants and their co-conspirators.  A month prior to President Correa's tour of the Oriente, Fajardo met with

[484] Exhibit 230A (2007.04.25 Press Release, Office of President Rafael Correa, "El Presidente de la Replúbica vistará las provincias de Orellana y Sucumbíos" ["The President will visit the Province of Orellana and Sucumbíos"]) at 1.

[485] Exhibit 231A (2007.04.26 Press Release, Office of President Rafael Correa, "Que el mundo entero vea la barbaridad que hizo Texaco" ["The whole world should see the barbarity displayed by Texaco"]) at 1.

[486] Exhibit 1, CRS-268-00-CLIP-01 (2006.04.13 *Crude* outtake video clip of meeting between S. Donziger and unidentified male); Exhibit 2 (certified transcript) at 353.

[487] Exhibit 232A (2007.04.28 Article, "Correa se declara 'indignado' por daños en la Amazonía causados por Texaco" ["Correa Says He is 'Furious' About the Damage Texaco caused in the Amazonian Region"], EFE) at 1.

[488] Exhibit 91 (Transcript of J. Berlinger film *Crude*) (MB-NONWAIVER00092726) at 43; Exhibit 4 (*Crude* DVD) at 1:02:51.

Ecuadorian government officials, including Alexis Mera, a Judicial Secretary and chief legal advisor to President Correa, in which Fajardo asked for Mera's assistance in providing the President with a "basis" for "reopen[ing]" the "investigation for . . . the responsible parties."  The conspirators explained to Mera that, while they could mobilize the public in an effort to overturn the 1995 Settlement Agreement and the 1998 Final Release, "the official nature of the President could do much more in this case . . . [and] interest by the Executive Branch[] and pressure on the Public Prosecutor's Office . . .  could do a lot on this subject."[489]  Mera, in response, proceeded to outline various ways of nullifying the settlement and release.  Remarkably, the RICO Defendants managed to procure Mera's assistance, and thus collude with the government, despite Mera's admission that there was no "sustainable" path to nullification.[490]

208.    The RICO Defendants and their co-conspirators made significant efforts to enlist the support of President Correa and other Ecuadorian governmental officials, holding private lunch meetings and conferences.[491]  Donziger personally met with President Correa on more than one occasion, and Fajardo and Yanza also met with Correa repeatedly without Donziger in attendance.[492]  After one such meeting with the President, Fajardo reported:  "So, the President thinks that if we put in a little effort, before getting the public involved, the Prosecutor will yield, and will re-open that investigation into the fraud of, of the contract between Texaco and the

---

[489] Exhibit 1, CRS-221-02-CLIP-01 (2007.03.29 *Crude* outtake video clip of meeting among P. Fajardo, A. Ponce, J. Prieto, L. Yanza, and others with A. Mera, Ecuador's Secretary of Judicial Affairs); Exhibit 2 (certified transcript) at 333.

[490] Exhibit 1, CRS-221-02-CLIP-01 (2007.03.29 *Crude* outtake video clip of meeting among P. Fajardo, A. Ponce, J. Prieto, L. Yanza, and others with A. Mera, Ecuador's Secretary of Judicial Affairs); Exhibit 2 (certified transcript) at 344.

[491] Exhibit 1, CRS-221-02-CLIP-01 (2007.03.29 *Crude* outtake video clip of meeting among P. Fajardo, A. Ponce, J. Prieto, L. Yanza, and others with A. Mera, Ecuador's Secretary of Judicial Affairs); Exhibit 2 (certified transcript) at 330-44.

[492] Exhibit D (2011.01.19 Donziger Dep.) at 3566:2-4.

Ecuadorian Government."[493]  By seeking assistance from Ecuadorian government representatives, this is precisely the "strategic development"[494] the RICO Defendants ultimately achieved.

209.    The plan to procure the criminal prosecution of Chevron's attorneys included more than obtaining President Correa's support.  The RICO Defendants and their co-conspirators also aimed, as called by one of their associates, their "troops [and] artillery" against Chevron's attorneys through a series of demonstrations, and they publicly pressured Ecuadorian officials.[495]  As Defendant Yanza proclaimed during a July 31, 2008 press conference, in order to ensure prosecution, the RICO Defendants and their co-conspirators would "have to take legal actions against these officials . . . make public denunciations . . . put pressure through the people, all these mechanisms . . . ."  Yanza warned that "nothing is ruled out."[496]  According to Donziger, this was part of the conspirators' strategy of conducting a "guerrilla campaign" against Veiga and Pallares.[497]

[493] Exhibit 1, CRS-376-03-CLIP-01 (2007.06.08 *Crude* outtake video clip of P. Fajardo and unidentified individuals discussing re-opening the prosecutor's investigation of fraud related to the Final Release); Exhibit 2 (certified transcript) at 439.

[494] Exhibit 233A (2007.02.27 Email from S. Tegel to S. Donziger, A. Tossa, J. Ciplet, and K. Koenig re "edited release" and attachment "cvx release 2_28_07ST.doc") (DONZ00006833).

[495] Exhibit 1, CRS-105-00-CLIP-02 (2006.07.24 *Crude* outtake video clip of a press conference speech by a representative of the Coalición Nacional, formed to support the Amazon Defense Front); Exhibit 2 (certified transcript) at 52.

[496] Exhibit 224 (2008.07.31 Transcript of Plaintiffs' Press Conference).

[497] Exhibit 225 (2006.02.08 Email from S. Donziger to "toxico" re "ideas") (DONZ00028217).

210.    And this campaign was successful.  As Donziger boasted, "[W]e are kicking some ass, and it feels awfully good."[498]  Donziger was elated not only because criminal charges would be useful to the RICO Defendants' and their co-conspirators' extortionate scheme, but also because it would satisfy a personal vendetta.  As Donziger described his feelings toward Mr. Veiga, "Some days, I fantasize about putting my strong hands around Reis Veiga's neck and squeezing until he begs for mercy.  I want him to know how it feels to suffer . . . ."[499]

211.    The RICO Defendants' and their co-conspirators' objective was finally achieved on August 26, 2008 when the Ecuadorian government announced criminal charges for fraud against Ricardo Reis Veiga and Rodrigo Pérez Pallares, the two Chevron attorneys who signed the 1995 Settlement Agreement and the 1998 Final Release.[500]  The charges were issued after two previous Prosecutors General had determined that there was no evidence of fraud and had requested that the case be closed.[501]  But that was before the RICO Defendants manufactured the allegedly "independent" Cabrera Report upon which the Prosecutor General expressly relied when he filed the charges against Veiga and Pallares.

212.    After the sham criminal charges were procured, the RICO Defendants reprised their "private army" and engaged in direct threats against Veiga and Pérez.  On October 5, 2009, Defendant Yanza, among others, enlisted the help of local citizens in parading crude effigies of Veiga, Pérez, and other Chevron executives in front of the courthouse in Ecuador.  At the concluding rally, Yanza and others gave speeches and threatened to "kick [Pérez's] ass" and "bury [Chevron's lawyers] in the . . . pit."  The protestors announced the "crimes" of each

---

[498] Exhibit 226 (2007.03.06 Email chain among S. Donziger, R. Kamp, A. Maest, M. Quarles, and W. Powers re "meeting on remediation draft") (DONZ00006860) at 1.

[499] Exhibit 14 (2006.11.03 S. Donziger Book Proposal) (DONZ00006707) at 19.

[500] Exhibit 227 (2008.08.26 Order from Prosecutor General Washington Pésantez ordering investigation to begin).

[501] Exhibit 228 (2008.07.31 Preliminary Criminal Investigation of Falsehood in a Public Instrument: A Serious Crime that Is about to Be Time-Barred).

Chevron executive and a man dressed as the Grim Reaper mimed beheading each of the effigies with his scythe before placing the "bodies" in a coffin. The protesters then carried the coffin into the jungle, dug a shallow grave, and buried the Chevron executives in effigy.[502]

213.     The criminal charges against two of Chevron's attorneys are a direct result of the collusion between the RICO Defendants and their co-conspirators and the Republic of Ecuador. The issuance of these baseless charges and the threats of violence against Chevron's attorneys were firm but also a thinly veiled extortionate threat to Chevron: If you do not settle the Lago Agrio Litigation on our terms we will have your employees imprisoned—or worse. Indeed, as Judge Kaplan of the Southern District of New York noted, evidence shows that Donziger and his colleagues have "attempt[ed] to procure criminal prosecutions for the purpose of extracting a settlement [from Chevron],"[503] and that the prosecutions "appear[] to have been instigated by Donziger and others working with him for the base purposes of coercing Chevron to settle and undermining a significant element of its defense in Ecuador, the release it obtained from the [Republic of Ecuador]."[504] Likewise, in 2010, the U.S. State Department reported that "[c]riminal complaints and arrest warrants against foreign company officials" are used in Ecuador "to pressure companies involved in commercial disputes."[505] That is exactly what has occurred here.

---

[502] Exhibit 229 (certified transcript of video clip of "Marcha demandantes Lago Agrio") at 10.

[503] *In re Application of Chevron Corp.*, No. 10 MC 00002 (LAK), 2010 WL 4910248, at *12 (S.D.N.Y. Nov. 10, 2010).

[504] *In re Application of Chevron Corp.*, No. 10 MC 00002 (LAK), 2010 WL 4910248, at *17 (S.D.N.Y. Nov. 10, 2010).

[505] Exhibit 230 (2010.03 U.S. State Department 2010 Investment Climate Statement – Ecuador).

### 3.     Launching Public Attacks on Chevron Based on Misleading Statements and Lies to Force Chevron to Pay Up

214.    Through their own efforts and those of their collaborators, the RICO Defendants have conspired to manufacture a wave of public criticism of Chevron based on deliberate falsehoods and misleading statements.  Since at least 2006, but with increased intensity since manufacturing the fraudulent Cabrera Report, they have saturated the public domain with their false propaganda—using the Internet, radio, television, and film, as well as print media, including books, newspapers, and magazines.  And they have taken this pressure campaign to U.S. state and federal agencies, seeking their falsely induced assistance in this racketeering scheme.  As conspirator Amazon Watch has explained, the strategy is to "turn up the heat on Chevron through various means, shareholder resolutions, major media coverage and major investigations through, for example, the Securities and Exchange Commission."[506]  And Donziger has proposed that the conspirators use the slogan "Always attacking."[507]  According to Donziger, the "strategy" is to "increase the cost to Chevron" including the "cost of their sullied reputation, you know, in the media."[508]  As he explained to one of his associates in preparing for a mediation with Chevron, "[w]e need to get more press and increase the pressure b/w now and then, to get the price up."[509]  As one federal judge put it, the "object of the whole game,

---

[506] Exhibit 1, CRS-137-03-CLIP-01 (2006.12.06 *Crude* outtake video clip of conversation among S. Donziger, L. Salazar, and A. Soltani); Exhibit 2 (certified transcript) at 74.  *See also* Exhibit CI (2005.09.26 Email from B. Powers to S. Donziger re "research and response FW: need help responding to Chevron's letter") (WOODS-HDD-0082160); Exhibit CJ (2005.10.12 Email from S. Donziger to A. Page re "urgent research project – Sarbanes Oxley") (DONZ00027938).

[507] Exhibit 231 (2006.02.10 Email from S. Donziger to P. Fajardo, L. Yanza, and A. Ponce re "Always on the offensive/Ricardito") (DONZ00028233) at 1.

[508] Exhibit 91 (Transcript of J. Berlinger film *Crude*) (MB-NONWAIVER00092726) at 52; Exhibit 4 (*Crude* DVD) at 122:50.

[509] Exhibit 232 (2007.10.29 Email from S. Donziger to C. Lehane re "let's talk") (DONZ00021158).  *See also* Exhibit CK (2006.08.08 Email from R. Bistrong to S. Donziger re "RE: Hello") (DONZ-HDD-0083063).

according to Donziger, is to make this so uncomfortable and so unpleasant for Chevron that they'll write a check and be done with it."[510]

a.    **The Fraudulent Media Blitz**

215.    Donziger outlined the RICO Defendants' and their co-conspirators' "strategy" of increasing costs to Chevron by "sull[ying] their reputation" to reporter Peter Maass.[511]  In an article published in *Outside* magazine, Maass called Donziger's strategy "attrition warfare: death by lawsuit."  Donziger told Maass, "This case has to be won both in and out of the courtroom . . . .  If you had the case without the pressure, you would never get a result."  Maass observed, "Donziger wants to keep the public pressure on, to make the company so miserable that it throws in the towel and settles."  This is "guerrilla PR," and "[r]abble rousing is a vintage Donziger tactic."[512]  Increasing the pressure involves maximizing publicity, and Donziger always "does his best to arrange a good show."[513]

216.    To that end, Donziger recruited Karen Hinton, a public relations specialist, to create and manage the RICO Defendants' and their co-conspirators' campaign of false and misleading public statements, and to coordinate the efforts to co-opt the media and well-meaning private citizens in the conspirators' pressure campaign.  Stratus contributed to the effort as well, developing what Stratus referred to as a "comprehensive press kit."[514]  And political and communications consultant Chris Lehane was brought on board to help the RICO Defendants

---

[510] Exhibit 233 (2010.09.23 Hr'g Tr., *In re Application of Chevron Corp.*, No. 10 MC 00002 (LAK) (S.D.N.Y.)) at 24:6-8.

[511] Exhibit 91 (Transcript of J. Berlinger film *Crude*) (MB-NONWAIVER00092726) at 52; Exhibit 4 (*Crude* DVD) at 122:50.

[512] Exhibit 234 (2007.03 Article by Peter Maass, "Slick") at 7-8.

[513] Exhibit 234 (2007.03 Article by Peter Maass, "Slick") at 4.

[514] Exhibit 235 (2008.10.06 Email from D. Beltman to S. Donziger, J. Kohn, A. Maest, and others re "Current Work List Update") (STRATUS-NATIVE043297).

"leverage the criminal investigation of the Chevron executives" through extensive public relations efforts.[515]  In addition to recruiting reporters to cover the story, Lehane and the conspirators planned to "[b]uild[] off the initial activity, we will want to consider several targeted specific mini-campaigns all designed to create pressure points on Chevron's economics."[516]  These "mini-campaigns" included filing a shareholder lawsuit against Chevron "for failure to disclose information," contacting the New York Attorney General "to see whether we can get Spitzer into the game," and manipulating students at a "major university that is invested in Chevron for a divestment campaign."[517]  In an email about hiring a new team member in Ecuador, Donziger described the ideal candidate as someone who would "raise some hell in Ecuador," and that the "job entails f[**]king up every machine you see that has ChevronTexaco's name on it. . . .  Being able to manufacture reality a plus."[518]

217.    The conspirators also maintain relationships, in part through the provision of financial support, with various organizations that distribute false and misleading public statements to increase the public pressure on Chevron.  Some of these organizations are dedicated to the fraud while others have broader functions, but all are knowing or unknowing accomplices of the RICO Defendants and their co-conspirators.  Foremost among these are Amazon Watch, RAN, and Defendant the Front, organizations that knowingly operate and control significant aspects of the pressure campaign and overarching conspiracy to extort a payment from Chevron.

---

[515] Exhibit 222 (2005.10.01 Memorandum by C. Lehane, attached to email from S. Donziger to J. Kohn re "Lehane's first press plan") (DONZ00027919) at 1 of 3.

[516] Exhibit 222 (2005.10.01 Memorandum by C. Lehane, attached to email from S. Donziger to J. Kohn re "Lehane's first press plan") (DONZ00027919) at 3 of 3.

[517] Exhibit 222 (2005.10.01 Memorandum by C. Lehane, attached to email from S. Donziger to J. Kohn re "Lehane's first press plan") (DONZ00027919) at 3 of 3.

[518] Exhibit Z (2004.10.05 Email from Z. Hurwitz to S. Donziger re "Re: job description") (DONZ-HDD-0057683).

218.     The RICO Defendants and their co-conspirators funnel a substantial portion of their public attacks on Chevron through Amazon Watch, which presents itself to the public as an independent organization.  Donziger has explained the crucial role of this element of the pressure campaign:

> [They have] played an absolutely critical role in this . . .  [I]f it weren't for them, we would just be a legal case, but because of the work of people who care, you know, especially Amazon Watch, we're a campaign that has a legal case.  And I think . . . that, um, the pain Amazon Watch can cause Chevron in many respects is greater than the pain we can cause . . . .[519]

The RICO Defendants coordinate their efforts with Rainforest Action Network, whose "direct action" campaigns Donziger describes as "[b]rutally personal."[520]

219.     Amazon Watch dutifully plays its role, fully understanding that "the target of many of the . . . campaign releases is Chevron itself rather than the media" and working to "get under Chevron management's skin" as much as possible.[521]  In a proposal seeking $1 million in funding from the RICO Defendants and their co-conspirators, Amazon Watch described the Lago Agrio Litigation as nothing less than a chance to "change how the oil industry operates," and offered to join what it saw as "an existing and well-developed campaign structure based in the U.S."  Amazon Watch described its goal as putting Chevron's management and board, "in a position where, to survive intact in American society as a reputable company with a competitive edge, they will be forced to settle the lawsuit."  It then set forth how they would "threaten" the "personal comfort levels" of Chevron management, who currently "live in the Bay Area with impunity," how Chevron's directors "are particularly vulnerable to direct pressure and pressure

---

[519] Exhibit 1, CRS-261-00-CLIP-01 (2007.04.24 *Crude* outtake video clip of S. Donziger discussing role of Amazon Watch); Exhibit 2 (certified transcript) at 350.

[520] Exhibit AA (2009.09.25 Memorandum from S. Donziger to Rainforest Action Network re "Chevron Campaign Ideas") (DONZ-HDD-0007634).

[521] Exhibit 236 (2006.08.09 Email from S. Tegel to S. Donziger and J. Ciplet re "Posting release" and attachment, "ChevronCancelConference-shortST.doc") (DONZ00006626).

via secondary targets," and how Amazon Watch would create a "task force" that will be "a constant and daily source of friction for Chevron[.]"[522]  Amazon Watch also prepared a visual representation of their strategy, a chart describing various pressure tactics, including the use of government agencies, all in a circle surrounding "Chevron."[523]

220.    Amazon Watch's proposal is in line with Donziger's strategy to "keep attacking, keep pressure on, etc."[524]  Donziger has further explained his "cost-benefit" calculation of the pressure campaign: "I also think that if you run . . . the costs in terms of the hassle, the management time, reputational . . . [h]arm, dealing with the board, looking bad, having your kids . . . in school, have friends who say, hey, what'd your daddy do in Ecuador? . . . . I think all of that factors into it in an af—extremely significant way, much more than th—the hard-core costs, . . . out-of-pocket expenses and stuff—I think that's where they're most vulnerable."[525]

221.    The RICO Defendants rely on Amazon Watch to carry out many of the public attacks against Chevron, and the RICO Defendants closely monitor, frequently revise, and sometimes entirely ghostwrite, the press releases and letters that Amazon Watch issues.  When an Amazon Watch representative complained to Donziger that Amazon Watch was "not here to simply rubber-stamp press releases," and dared to tell him that prior experience showed that Amazon Watch "needs to carefully fact-check your press releases in order to safeguard our own credibility," Donziger replied sharply.  He stated that he and the other lawyers were "the final

---

[522] Exhibit AB (2009.06.04 proposal re "Amazon Watch Ecuador Campaign") (WOODS-HDD-0353023).

[523] Exhibit AC (2009.02.04 "Chevron Pressure Chart") (DONZ-HDD-0201477).

[524] Exhibit 76 (2005.11.15 Entry in Composite of S. Donziger Personal Notes) (DONZ00036262).

[525] Exhibit 1, CRS-170-00-CLIP-06 (2007.01.31 *Crude* outtake video clip of S. Donziger and J. Kohn discussing campaign against Chevron executives); Exhibit 2 (certified transcript) at 155.

authority," and that, "We can be collaborators, but we are not equal partners."[526]  The issue that set off Donziger's tirade is particularly telling:  Amazon Watch had wanted to provide Cabrera's educational credentials in a press release about him.  Donziger's response:  "The issue about Cabrera's qualifications is a good example.  He doesn't have a doctorate.  I don't want to highlight that.  So I don't mention what degree he has in the press release.  Obviously if he had a doctorate it would be in there, don't u think?"[527]  In response, the Amazon Watch representative called Donziger's tactic an "unsubtle and unnecessary obfuscation" and "[b]ombast and hoodwink."[528]

222.    By using Amazon Watch as their proxy, the RICO Defendants and their co-conspirators can also deliver their extortionate threats to Chevron using more direct language than they are willing to use themselves—at least publicly.  In "turn[ing] up the heat on Chevron,"[529] the RICO Defendants and their co-conspirators have made their extortionate demands explicit in direct communications with Chevron.  For example, on December 17, 2009, Soltani wrote a letter "on behalf of Amazon Watch" to then-incoming Chief Executive Officer John Watson in which she cited the fraudulent $27 billion damages assessment from the Cabrera Report, and threatened, "Until Chevron takes meaningful steps to resolve this case, it will continue to play out in the courts of Ecuador, as well as in the global court of opinion."  She went on to state, "We don't make these suggestions lightly or symbolically."[530]

---

[526] Exhibit 237 (2007.08.24 Email chain among P. Fajardo, S. Donziger, and S. Tegel re "follow up on press releases") (DONZ00044114) at 1-2.

[527] Exhibit 237 (2007.08.24 Email chain among P. Fajardo, S. Donziger, and S. Tegel re "follow up on press releases") (DONZ00044114) at 1.

[528] Exhibit 238 (2010.01.26 Email chain between S. Donziger and S. Tegel re "another thought") (DONZ00048985) at 2.

[529] Exhibit 1, CRS-137-03-CLIP-01 (2006.12.06 *Crude* outtake video clip of conversation among S. Donziger, L. Salazar, and A. Soltani); Exhibit 2 (certified transcript) at 74.

[530] Exhibit 239 (2009.12.17 Letter from A. Soltani to Chevron CEO J. Watson).

223.     The RICO Defendants and their co-conspirators use all available means to publish their lies and half-truths in the "global court of opinion." They regularly disseminate press releases over the Internet, through electronic mail, and on newswires. They appear on television and radio broadcasts. Through various organizations they fund, the conspirators operate or cause to be operated websites that attack Chevron at www.chevrontoxico.com, www.texacotoxico.org, www.amazonwatch.org, www.chevroninecuador.com, truecostofchevron.com, thechevronpit.blogspot.com, and www.changechevron.org. The conspirators also promote their scheme through social media tools, sending messages to supporters through Twitter (@changechevron) and Facebook, and by posting defamatory comments and false statements (frequently using pseudonyms) in response to articles written on the websites of newspapers, blogs and other commentators. They have helped fund at least one book of photography and a documentary film, promoting misleading images of environmental impact and poverty.[531]  And the conspirators' attacks on Chevron have not been limited to words and pictures: They have arranged or threatened marches and demonstrations at Chevron shareholder meetings, places of business, and in front of the homes of individual Chevron employees and board members.[532]

---

[531] Exhibit AD (2008.01.11 Email from L. Dematteis to S. Donziger re "Re: Vacation; Book Costs") (DONZ-HDD-0151684).

[532] Exhibit AE (2010.03.02 Blog post "Emergildo Criollo Delivers Letter and Petition to Chevron Headquarters," *available at* changechevron.org/blog/page/6/, last accessed May 9, 2011); Exhibit CL (2010.05.28 Email from S. Donziger to R. DeLeon re "Re: Fw: Chevron update – from Houston") (DONZ00127260); Exhibit CM (2009.01.24 Email from S. Donziger to A. Woods re "quick assignment") (WOODS-HDD-0354358); Exhibit CN (2009.09.27 Memorandum re "Chevron's Board of Directors") (WOODS-HDD-0128174); Exhibit CO (2007.02.09 Email from L. Salazar-Lopez to S. Donziger re "Checking in today?") (DONZ00022312) at 7; Exhibit AA (2009.09.25 Memorandum from S. Donziger to Rainforest Action Network re "Chevron Campaign Ideas") (DONZ-HDD-0007634); Exhibit CP (2010.06.04 memorandum prepared by M. Ramos re "Team Workplan 2010-2011") (DONZ00104202); Exhibit CQ (2010.03.08 Email from B. Cayo-Cotter to M. Anderson re "Great Alternet piece up about last week's Chevron extravaganza!") (DONZ00054689).

224.    The RICO Defendants' false statements are made in support of appeals for funding, including through a link to make payments directly on their websites, at http://chevrontoxico.com/take-action/donate.html and at https://www.gifttool.com/donations/Donate?ID=38&VER=1& LNG=EN (via a link from http://www.amazonwatch.org).  Again, however, the RICO Defendants are careful to use the supposedly independent Amazon Watch as a front for their efforts.  At chevrontoxico.com, the statements soliciting donations by mail request that they be sent to Amazon Watch at its address in San Francisco, California.[533]  Kohn and Kohn Swift have made substantial donations to Amazon Watch.[534]  In 2009, for example, Kohn reported that Kohn Swift had contributed over $184,000 to Amazon Watch and that sum did not include the donations he had personally made to Amazon Watch.  On information and belief, the conspirators use funds received in this manner to continue to prosecute their unlawful scheme to defraud Chevron.  In fact, Amazon Watch's tax returns reveal that it has directed at least $90,000 in donations to the Front since 2002.[535]

225.    The RICO Defendants and their co-conspirators use other proxies besides Amazon Watch to peddle their propoganda.[536]  For example, when one documentary filmmaker came to Ecuador to shoot a movie about Lago Agrio, Donziger made sure that the RICO Defendants had a say in how it was made and how it was marketed, telling the filmmaker, "It is critically important I be brought into the strategy because it could affect the legal case."  The

---

[533] Exhibit 240 (Screenshot of website "ChevronToxico – Donate, http://chevrontoxico.com/take-action/donate.html).

[534] Exhibit 241 (2009.07.01 Email chain among J. Kohn, R. DeLeon, and S. Donziger re "Fee Breakdown Chart through 5-31-09 (00053725-2)") (DONZ00039127) at 1-2.

[535] Exhibit 242 (2002-2008 Amazon Watch Tax Returns).

[536] Exhibit EN (2010.4.13 Email from A. Woods to S. Donziger re "RE: budget for jumail" with attachment) (WOODS-HDD-0208416); Exhibit EO (2010.2.26 Chase Bank Statement) (DONZ00132910) at 5; Exhibit ER (2009.07.13 Email from K. Hinton to A. Woods re "FW: opeds") (WOODS-HDD-0099390); Exhibit ES (2010.02.16 Email from S. Donziger to A. Woods re "follow up") (WOODS-HDD-0257795).

filmmaker subsequently gave Donziger access to the production plans.[537]  The RICO Defendants recruited another filmmaker, Joseph Berlinger, to make *Crude*, a purported documentary about the Lago Agrio Litigation that was released in 2009.  The film, according to Donziger, shows how he "manipulate[d] the trial."[538]  While Berlinger has claimed that he intended his film to be "fair," he and his team worked closely with Donziger and others in the planning, shooting, editing and distribution of the film, and assured Donziger that he would be favorably presented in the final product, stating, "We will live up to our end of the bargain."[539]

226.      Berlinger altered the film before release, at the RICO Defendants' and their co-conspirators' request, to hide the relationship between the conspirators and Carlos Beristain, who was publicly disclosed as the author of a major portion of the Cabrera Report, as discussed in paragraph 305, *infra*.[540]  This was a critical change, because public disclosure of the prior relationship between the RICO Defendants and Beristain could have been the visible tip that would alert Chevron and the public to the mammoth iceberg of collusion between the RICO Defendants and Cabrera.  Well aware of this risk, Fajardo told the filmmakers that disclosure of that relationship was, "so serious that we could lose everything,"[541] and that "the way it is, the

---

[537] Exhibit AF (2007.11.02 Email from M. O'Brien to S. Donziger re "Re: your ecuador film") (DONZ-HDD-0134986).

[538] Exhibit 243 (2009.03.19 Email from S. Donziger to J. Berlinger and M. Bonfiglio re "did you know that. . . .") (JB-NONWAIVER00011487).

[539] Exhibit AG (2006.05.02 Email from M. Bonfiglio to S. Donziger re "Re: cvx footage") (WOODS-HDD-0087195).

[540] Exhibit 244 (2010.11.05 Deposition of Joseph Berlinger, *In re Application of Chevron*, 10 MC 00001 (LAK) (S.D.N.Y.)) at 264-92.

[541] Exhibit 245 (2010.08.03 Email chain between J. Berlinger and S. Donziger re "GRACIAS") (JB-NONWAIVER91320).

entire case will simply fall apart on us."[542]  He thus had the changes made even though they were "costly."[543]

227.    A few months later, when Fajardo visited the University of Oregon, he expressed alarm at his discovery that students there had obtained copies of the version showing Beristain, and told Donziger that they had a "serious problem," although he assured Donziger that nobody at Oregon knew that there was a "conflict."[544]  And when the RICO Defendants learned that CNN intended to show clips from *Crude*, they and the filmmaker engaged in a scramble to ensure that the Beristain scenes were not shown, obliquely instructing CNN, "Please do NOT include any footage during Trudie's visit to the Cofan community that features a man wearing a white t-shirt."[545]  Berlinger has also stated that he expected—as did the RICO Defendants—that the documentary *Crude* could "have some real-life impact on a decision or a potential settlement."[546]  Through Section 1782 discovery proceedings authorized by this Court, Chevron has obtained a substantial volume of outtakes from *Crude*, outtakes that make clear the scope of the RICO Defendants' lies and stonewalling, and from which many of the direct quotations in this Amended  Complaint are taken.

228.    Although Donziger and his conspirators were involved in the making of the film *Crude*, they knew that the film would be far more useful to their cause if it appeared independent.  Donziger emphasized to Berlinger during filming, "I do not want to been seen as

---

[542] Exhibit 77 (Bonfiglio Dep.) at 369:9-370:23.

[543] Exhibit 245 (2010.08.03 Email chain between J. Berlinger and S. Donziger re "GRACIAS") (JB-NONWAIVER91320).

[544] Exhibit 246 (2009.02.25 Email chain among P. Fajardo, S. Donziger, and L. Yanza re "ME PREOCUPA") (DONZ00050021).

[545] Exhibit 247 (2009.04.06 Email from A. Pflaum to E. Vaughn) (JB-NONWAIVER00012940).

[546] Exhibit 248 (2009.06.25 Email from M. Bonfiglio to J. Berlinger re "E-mail to MM") (JB-NONWAIVER00018410).

helping [you] . . . in front of the Chevron lawyers."[547]  But behind the scenes, one of *Crude*'s major financial backers was Russell Deleon, a law school friend of Donziger who has also been a major financial supporter of the Lago Agrio Litigation.[548]  Upon *Crude*'s completion, the conspirators promoted and relied upon the released version of the film in their pressure campaign against Chevron, and to raise money for that campaign.[549]  At http://chevrontoxico.com/take-action/crude-house-party.html, they urge readers to hold *Crude* "screening parties" and to ask for donations (for the RICO Defendants) at those events.  On that web page, the RICO Defendants assert, "[i]n order to change Chevron, one of the largest and dirtiest oil companies on the planet, we need to build a movement a million times more powerful than them.  *Crude* will educate and inspire thousands of people to commit to changing Chevron in the coming weeks and months."

> ### b.    Misrepresenting the "Independent" and "Neutral" Cabrera Report

229.    In all of these communications media, the conspirators have repeated their false claims that Cabrera offers an "independent" and scientific perspective which "proves" Chevron's liability.  And in doing so, the conspirators have sought to increase pressure on Chevron and thereby extort a payment from it.  For instance, there is a lengthy summary of the Cabrera Report on chevrontoxico.com, which never discloses the RICO Defendants' role in writing the report, and concludes with the following:  "A final decision on Chevron's liability and damages will be

---

[547] Exhibit 249 (2007.02.09 Email chain among S. Donziger, J. Berlinger, and M. Bonfiglio re "important update") (MB-STIP00065338).

[548] Exhibit 6 (2010.11.29, 2010.12.01 Donziger Dep.) at 78:23-81:3, 101:20-102:14, 617:9-4; *see also* Exhibit ET (2009.07.30 Email from J. Berlinger to H. Shan re "Re: Checking in") (JB-STIP00173593).

[549] Exhibit 250 (Amazon Watch Promotional Website, "Crude: The Film Chevron Doesn't Want You To See," http://chevrontoxico.com/Crude).

made by the trial judge.  However, courts in Ecuador generally give wide deference to reports prepared by independent experts."[550]

230.    When challenged, the RICO Defendants have repeated their claim that Cabrera is independent.  For example, on April 3, 2008, Fajardo stated, in a press release issued by Amazon Watch, "Chevron's claim that Professor Cabrera is cooperating with the plaintiffs is completely false," and "Chevron is frightened by Cabrera precisely because he is an independent and credible expert."[551]   The RICO Defendants' guiding principle, as Donziger wrote to Fajardo, is: "If you repeat a lie a thousand times it becomes the truth."[552]

231.    On or about May 31, 2008, shortly after the RICO Defendants caused their own secretly written report to be filed as Cabrera's, Kohn appeared on Fox News, touting Cabrera's independence.[553]  He not only claimed that Cabrera was an "independent expert appointed by the judge," but then falsely stated that Cabrera "analyzed all of the evidence from all of the parties from both sides," to come up with the damages estimate of "between eight and sixteen billion."[554]  Kohn did not reveal that his co-conspirators ghostwrote Cabrera's report.

232.    After the conspirators drafted the update to the Cabrera Report in November 2008, increasing the total damages assessed to $27 billion, the Front issued a press release on December 1, 2008, falsely extolling the Cabrera Report as an "independent" assessment by the "Special Master" based on the review of the "trial evidence—the vast majority of it provided by

---

[550] Exhibit 251 (ChevronToxico Webpage, "$27 Billion Damages Assessment," http://chevrontoxico.com/about/historic-trial/27-billion-damages-assessment.html) at 1.

[551] Exhibit 252 (2008.04.03 Frente de Defensa de la Amazonia Press Release, "Chevron Accused of Lying To Shareholders Over $16 Billion Damages Claim In Ecuador Rainforest Case By Amazon Defense Coalition").

[552] Exhibit 253 (2008.08.14 Email from P. Fajardo to S. Donziger re "interesante") (DONZ00047412).

[553] Exhibit 254 (Certified transcript of 2008.05.31 J. Kohn Interview, Fox News).

[554] Exhibit 254 (Certified transcript of 2008.05.31 J. Kohn Interview, Fox News).

Chevron."[555]  Once again, no mention was made of the fact that Cabrera's report and its update had actually been written by the RICO Defendants, or that the majority of materials upon which it was based were not "trial evidence" at all, but that enterprise's files.

233.     The RICO Defendants and their co-conspirators, in addition to portraying Cabrera's report as independent to the media, also used the fraudulent "evaluation" drafted by Stratus to enhance the credibility of the Cabrera Report in the media.  For instance, on December 1, 2008, Hinton and Amazon Watch issued a press release about the Stratus report entitled "Chevron's $27 Billion Liability in Ecuador's Amazon Confirmed by Team of Independent Scientists."[556]  That press release states that "[t]he independent expert report was prepared by Richard Cabrera, an Ecuadorian environmental scientist appointed by the court as a Special Master who has worked mostly for oil companies in preparing environmental damage assessments," and quotes an endorsement from Defendant "Douglas Beltman, a scientist at Stratus Consulting who, along with a team of scientists, reviewed the expert's report on behalf of the [Lago Agrio] plaintiffs."[557]  It is unsurprising that Stratus employees "endorsed" the report, given that they wrote it.

234.     Stratus's involvement in the media campaign was envisioned as early as the initial August 2007 contract between Kohn Swift and Stratus contemplating that Stratus would engage in "discussions with the media" in addition to performing other tasks to further the conspiracy.[558]  As an example, Defendants Beltman and Stratus were involved in orchestrating

---

[555] Exhibit 255 (2008.12.01 Frente de Defensa de la Amazonia Press Release, "Chevron's $27 Billion Liability in Ecuador's Amazon Confirmed by Team of Independent Scientists").

[556] Exhibit 255 (2008.12.01 Frente de Defensa de la Amazonia Press Release, "Chevron's $27 Billion Liability in Ecuador's Amazon Confirmed by Team of Independent Scientists").

[557] Exhibit 255 (2008.12.01 Frente de Defensa de la Amazonia Press Release, "Chevron's $27 Billion Liability in Ecuador's Amazon Confirmed by Team of Independent Scientists").

[558] Exhibit 160 (2007.08.20 Contract between J. Kohn and Stratus) (STRATUS-NATIVE043270) at 7.

the RICO Defendants' response to Chevron's allegations that Cabrera's supplemental report showed evidence of collusion between Cabrera and the Lago Agrio Plaintiffs.  Indeed, Beltman sent Donziger draft language denying that the Lago Agrio Plaintiffs were in collusion with Cabrera and claiming that "Cabrera's November response to the plaintiffs is clearly his own."[559] This response became part of the RICO Defendants' overall efforts to portray the Cabrera Report as independent.

235.    Now, despite the unequivocal evidence that the RICO Defendants' and their co-conspirators' own team of experts ghostwrote Cabrera's report and its update, the conspirators continue to spread the lie that Cabrera is independent.[560]  In May 2010, in response to a court filing by Chevron alleging collusion between the RICO Defendants and Cabrera, Fajardo again denied any wrongdoing, claiming that Cabrera had worked independently.[561]  When asked about the involvement of Stratus, Fajardo told the media, "They are our technical advisers in the United States, and they have worked with us for some years, but they have never interfered in the trial."[562]  Yet the *day before* he made that statement, he had written a review of Chevron's filing for his co-conspirators in which he conceded that it was "true" that "plaintiffs (that is, us) have worked in collusion with expert Cabrera."[563]  The RICO Defendants and their co-conspirators

---

[559] Exhibit 256 (2009.03.18 Email between D. Beltman and S. Donziger re "draft text to address Chevron ad re: language in Cabrera response") (STRATUS-NATIVE069215).

[560] Exhibit 257 (2010.05.24 Article by Mercedes Alvaro, "Chevron Seeks to Dismiss Ecuador Court Appointment," DOW JONES NEWSWIRES).

[561] Exhibit 257 (2010.05.24 Article by Mercedes Alvaro, "Chevron Seeks to Dismiss Ecuador Court Appointment," DOW JONES NEWSWIRES).

[562] Exhibit 257 (2010.05.24 Article by Mercedes Alvaro, "Chevron Seeks to Dismiss Ecuador Court Appointment," DOW JONES NEWSWIRES).

[563] Exhibit 258 (2010.5.25 Email from P. Fajardo to J. Saenz et al., re "REGARDING CHEVRON'S ANNULMENT REQUEST") (DONZ00057014).

still continue to use the Cabrera Report as a jumping off point for their most recent claim for $113 billion in damages.[564]

236.     The RICO Defendants' and their co-conspirators' far-reaching campaign to portray the fraudulent Cabrera Report as that of an independent court expert has been largely successful, and numerous unsuspecting media outlets have repeated uncritically the RICO Defendants' false refrain about Cabrera's independence.  An April 3, 2008 Reuters article, for example, stated:  "An independent environmental expert told a court in Ecuador that the oil company Chevron should pay $7 billion to $16 billion in compensation for environmental damage in the country."[565]  And in a May 2009 broadcast, the television show *60 Minutes* reported on the Lago Agrio Litigation, discussing the Cabrera report in detail, but never suggesting that the RICO Defendants had actually secured Cabrera's appointment and written his report.[566]  This was undoubtedly because the RICO Defendants had never disclosed this to *60 Minutes*.  To this day, the RICO Defendants and their co-conspirators maintain a link to the *60 Minutes* broadcast of this misleading report on one of their websites.  As the conspirators had hoped, then, the mainstream media has bought the propaganda and played the role the conspirators hoped and intended in the scheme to extort a payment from Chevron.  And in fact, their hoodwinking of the mainstream press benefits the conspirators doubly in that it allows them to republish—without correction—the media outlet's false statements about the Cabrera Report, as they did with the Reuters story described above.[567]

---

[564] Exhibit 215 (2010.8.18 Letter from H. Dunkelberger to J. Abady re independent analysis of Cabrera Rpt.) (DONZ00031477) at 1.

[565] Exhibit 259 (2008.04.03 Article by Reuters, "Report Says Chevron Owes Billions for Ecuadorean Pollution," NEW YORK TIMES) at 1.

[566] Exhibit 260 (Transcript of 2009.05.03 episode of CBS News: 60 Minutes).

[567] Exhibit 261 (2010.09.17 Frente de Defensa de la Amazonia Press Release entitled, "Chevron Faces Tens of Billions in Clean-up Costs; Potential Death Toll Put at 10,000 in Ecuador Rainforest").

237.    The RICO Defendants' and their co-conspirators' deception of the national and international media has gone beyond prompting the republication of lies about Cabrera's independence.  For example, Defendants Fajardo and Yanza were awarded the Goldman Environmental Prize, "the world's largest prize program for grassroots environmental activists,"[568] and Fajardo was awarded the CNN "Heroes" award.[569]  The press release announcing the Goldman Prize echoed the RICO Defendants' misstatements and half-truths, including those regarding Cabrera's independence.[570]

### c.    The RICO Defendants Make False Statements to U.S. State and Federal Government Officials

238.    The conspirators have sought to open as many fronts as possible in their offensive against Chevron, pursuant to their strategy to generate maximum pressure on Chevron to drive it into a coerced settlement.  The RICO Defendants and their collaborators have made false and misleading statements in the United States to state and federal officials, seeking to enlist their (unknowing) aid in the fraudulent scheme through investigations and other official acts.  Since 2008, the RICO Defendants have continuously touted the findings in the so-called "independent" Cabrera Report as evidence in support of their demands for official action.

239.    The conspirators have engaged in a long-running campaign to convince the SEC to investigate Chevron for allegedly violating disclosure obligations.[571]  They have attempted to

---

[568] Exhibit 262 (Screenshot of website "Goldman Prize – Founders," http://www.goldmanprize.org/aboutus/founders).

[569] Exhibit 263 (2007.12.07 Amazon Watch Press Release, "Pablo Fajardo Wins CNN Hero Award").

[570] Exhibit 264 (Screenshot of website "Goldman Prize – Pablo Fajardo Mendoze & Luiz Yanza," http://www.goldmanprize.org/2008/centralsouthamerica).

[571] Exhibit DP (2005.09.26 Email from S. Donziger to C. Lehane re "Re: SEC strategy/Ecuador") (DONZ00027901); Exhibit DQ (2005.11.01 Email from S. Donziger to C. Lehane re "list of analysts that cover chevron" (DONZ00086023); Exhibit DR (2006.01.31 Email from S. Donziger to A. Soltani re "Plan for SEC follow up" (DONZ00028135).

obscure their role in this campaign by using Amazon Watch as their front, but Donziger has admitted that he wrote several of the letters which purportedly came from Amazon Watch.[572] On January 30, 2006, at the RICO Defendants' behest, Amazon Watch wrote Christopher Cox, then Chairman of the SEC, requesting that he "open an investigation into the Chevron Corporation (CVX) for violating SEC regulations governing disclosure obligations to shareholders in reference to litigation against the company over an oil-related environmental catastrophe in Ecuador."  Relying on David Russell's $6 billion damages assessment (which he had already disavowed), Amazon Watch accused Chevron of failing to inform its shareholders of its "staggering potential liability."  The letter went on to mischaracterize the lawsuit as a "class action," and falsely claimed that Chevron had "been forced to admit at trial that Texaco . . . dumped over 18 billion gallons of toxic water into the rainforest . . . ."[573]  Although Donziger personally informed Amazon Watch Executive Director Soltani that the Russell report was grossly excessive (*see* paragraph 107, *supra*), Amazon Watch never corrected its false statements to the SEC or Chevron shareholders.  In fact, the next month, Soltani and Amazon Watch sent a follow-up letter, accusing Chevron of distorting the report of the "settlement experts" from the then-ongoing "judicial inspection" process—the same proceeding in which the conspirators submitted the false expert report with Dr. Calmbacher's fraudulently obtained signature.[574] Shortly thereafter, Donziger reported to Lehane that, "The SEC is actively investigating

---

[572] Exhibit 6 (2011.01.18 Donziger Dep.) at 3178:10-13.

[573] Exhibit 265 (2006.01.30 Letter from A. Soltani and S. Aird, on behalf of Amazon Watch, to Chairman of the U.S. Securities and Exchange Commission, C. Cox).  *See also* Exhibit DS (2006.01.31 Email from S. Donziger to C. Lehane re "SEC complaint") (DONZ00006069).

[574] Exhibit 266 (2006.02.28 Letter from A. Soltani and S. Aird, on behalf of Amazon Watch, to Chairman of the U.S. Securities and Exchange Commission, C. Cox).

[Chevron's] failure to disclose this liability in its public filings—I know this for a fact, because I was just interviewed by an SEC investigator last week[.]"[575]

240.    On March 18, 2008, Amazon Watch reprised this effort, writing another letter signed by Soltani to the SEC.[576]  In this letter, written weeks *before* the fraudulent Cabrera Report was filed but obviously well-aware of its secret contents, Soltani emphasized the forthcoming report, and the independence of its purported author, "an independent special master" that had prepared his report "mak[ing] use of all evidence collected" with "a large team of technical experts under [his] supervision."  The letter demanded an investigation and "the imposition of a penalty on Chevron for failing to comply with its obligations."  Soltani argued "that Cabrera is being attacked by Chevron precisely because he *is qualified* to conduct a credible damages assessment."  Soltani and Amazon Watch made these statements knowing that Cabrera's report was being ghostwritten by Stratus and the RICO Defendants' other consultants.  Indeed, despite knowing that the Cabrera Report was a fraud, Soltani accused Chevron of "contriv[ing] claims of procedural unfairness" and called Chevron's position that the process had been unfair "ludicrous."[577]

241.    When Donziger heard that the SEC might actually be investigating Chevron, he wrote that this was a "huge victory for AW [Amazon Watch]."  He instructed his team to "keep feeding them [the SEC] stuff," even though, he wrote, "I sort of feel this is bogus."[578]

---

[575] Exhibit AH (2006.07.12 Memorandum from S. Donziger to C. Lehane re "Developments in Ecuador Litigation") (DONZ00106488).

[576] Exhibit CR (2007.07.18 Email from D. Firger to A. Soltani re "prepping for another SEC letter") (DONZ-HDD-0117053).

[577] Exhibit 267 (2008.03.18 Letter from A. Soltani to Chairman of the U.S. Securities and Exchange Commission, C. Cox) at 6.

[578] Exhibit AI (2006.07.12 Email from D. Fisher to S. Donziger re "RE: SEC investigation/Chevron") (DONZ-HDD-0081432).

242.     The RICO Defendants and their co-conspirators have made these same false statements to other federal agencies.  In a letter dated April 29, 2008, to the U.S. Trade Representative, Defendants Yanza and Fajardo called Cabrera "an independent court-appointed special master," and misstated that "the bulk of the evidence relied on by the special master, Professor Richard Cabrera, was provided by Chevron itself via its own sampling evidence."[579]

243.     And in April 2009, Donziger made false statements concerning Cabrera's purported "independence" in a statement before the U.S. House of Representatives.  Donziger falsely stated that "[t]he best and most recent *independent* estimate available of the human health impact of this contamination is provided by the expert appointed by the court, Richard Cabrera." (emphasis added).  Donziger also testified that "[n]umerous qualified scientists have reviewed this report and found its conclusions reasonable and the damages assessment consistent with the costs of other large environmental cleanups."[580]  At no time did Donziger disclose the fact that the "qualified scientists" were his co-conspirators Stratus, Beltman, Maest, and Chapman, who planned and secretly wrote the "Cabrera" Report.

244.     The RICO Defendants have also made false statements to individual members of Congress.  On December 19, 2008, Defendant Beltman provided United States Congressman Jim McGovern's office "some talking points" for an interview with the Los Angeles Times, falsely telling the Congressman's staff that "[t]he Court Expert reviewed available scientific data and concluded that people in the area suffer from many illnesses caused by the contamination, including cancer."[581]  On January 31, 2009, Beltman forwarded Cabrera's reports, stating "[t]he

---

[579] Exhibit 268 (2008.05.06 Letter from S. Donziger to United States Trade Representative, S. Schwab, and attachment of a facsimile dated 2008.04.29) at 2.

[580] Exhibit 269 (2009.04.28 Statement by S. Donziger to Tom Lantos Human Rights Commission) at 5.  *See also* Exhibit CS (2009.04.28 Congressional Hearing Transcript) (available at www.loe.org/images/content/090529/hearing_transcript.doc) at 6:123-129.

[581] Exhibit 270A (2008.12.19 Email chain among D. Beltman, S. Donziger, congressional staff member C. Buhl, and M. Mershon re "LA Times going to do editorials on Ecuador/oil contamination/Texaco-chevron") (STRATUS06182010 000078).

Court Expert's March 2008 report summary is attached," and that "[a]lso attached is the November 2008 response to the [Lago Agrio] Plaintiff's questions that was written by the Court Expert."[582]  Beltman failed to disclose that Stratus and the other RICO Defendants actually ghostwrote the responses to the Lago Agrio Plaintiffs along with Cabrera's initial report.

245.   In addition, the RICO Defendants have extended their campaign to state officials.[583]  In 2009, the RICO Defendants made fraudulent allegations about Chevron to the New York Attorney General, and provided that office with false information that Cabrera was a neutral "court-appointed expert" and that the RICO Defendants had played no part in creating the exorbitant $27 billion figure.[584]  Their intention was to generate an official inquiry or investigation, which would itself bring direct pressure on Chevron, and which the RICO Defendants could use to reinforce their own pressure campaign.[585]  On May 4, 2009, in reliance

---

[582] Exhibit 270 (2009.01.31 Email chain among D. Beltman, S. Donziger, and C. Buhl, congressional staff member re "I'm sure you sent this to me before but. . . .") (STRATUS06182010 000082).

[583] Exhibit CT (2009.03.03 Email from M. Anderson to S. Donziger and A. Woods re "Re: Maryland Letter to Chevron & Recap") (DONZ00097083-85); Exhibit DT (2009.02.13 Email from S. Donziger to B. Barnes, J. Sharp, S. Moorhead, K. Caperton, W. Wiedeman, and S. Martin re "draft letter for Jerry Brown" (WOODS-HDD-0092867); Exhibit DU (2009.03.01 Memorandum re "Increase Pressure") (DONZ00081621).

[584] Exhibit CU (2009.03.27 Email from S. Donziger to R. DeLeon re "check this out") (DONZS00002852); Exhibit CV (2009.03.29 Email from S. Donziger to J. Kohn re "latest memo for Cuomo") (DONZ00086585-86); Exhibit CW (2009.04.23 Email from Google Calendar to S. Donziger re "Daily Agenda for Steven Donziger as of 5:26am") (DONZ00097985); Exhibit CX (2009.04.24 Email from S. Donziger to J. Kohn re "update") (DONZ00130390); Exhibit EU (undated Memorandum re "Three-month plan") (WOODS-HDD-0101567).

[585] Exhibit D (2010.12.08 Donziger Dep.) at 719:2-723:14.  *See* Exhibit DV (2009.02.13 Email from S. Donziger to B. Barnes, S. Moorhead, and P. Thomasson re "DeNapoli info/instructions for Ben") (WOODS-HDD-0364941); Exhibit EV (2009.01.25 Email from K. Hinton to S. Donziger re "Questions for Cuomo to ask") (WOODS-HDD-0101564); Exhibit EW (2009.06.22 Email from S. Donziger to K. Hinton re "Re: Opeds") (WOODS-HDD-0091355).

upon the RICO Defendants' false statements, the New York Attorney General did just that, sending Chevron a letter inquiring about Chevron's disclosures related to the Lago Agrio Litigation and requesting a "written response" to several questions within a week.[586]  In the letter's first paragraph, the New York Attorney General stated, "As I understand the allegations, a technical expert has estimated that if the plaintiffs prevail in the litigation, damages assessed against Chevron may be as high as $27 billion."[587]  The RICO Defendants seized on this outcome, referring to the letter in multiple press releases as an "investigation."  In a May 25, 2009 letter to Chevron shareholders ostensibly from Atossa Soltani and other members of Amazon Watch, the conspirators claimed that "New York State Attorney General Andrew Cuomo has opened a probe of the company," and "Chevron is now the target of an official fraud investigation by the New York State Attorney General."[588]  And, precisely as the RICO Defendants had intended, the New York Attorney General's letter was noted in the press, and it generated media coverage suggesting that Chevron had "mishandled" the matter.  Industry publication Oilgram news stated that the campaign was having the intended effect, reporting, in reference to the May 4 letter: "Analysts seem mixed on what the Ecuador fallout ultimately may

---

[586] Exhibit CY (2009.04.02 Email from S. Donziger to S. Martin, S. Moorhead, and K. Caperton re "draft ltr for Cuomo") (DONZ00030864–66); Exhibit DW (2009.04.03 Email from S. Donziger to M. Anderson and A. Woods re "Re: Spoke with Amnesty…") (DONZ00030870); Exhibit CZ (2009.04.13 Email from K. Hinton to M. Anderson, S. Donziger, and A. Woods re "Re: Amnesty Letter to Cuomo") (WOODS-HDD-0101539); Exhibit DA (2009.05.05 Email from G. Fine to S. Donziger re "Re: urgent/possible change of plans") (DONZ00129154).

[587] Exhibit 271 (2009.05.04 Letter from New York Attorney General A. Cuomo to Chevron CEO D. O'Reilly) at 1; Exhibit DX (2009.05.04 Letter from New York Attorney General A. Cuomo to Chevron CEO D. O'Reilly) (DONZ00017788) at 1.

[588] Exhibit 276 (2009.05.25 Letter from A. Soltani, K. Koenig, and M. Anderson, on behalf of Amazon Watch, to Chevron shareholders); Exhibit EY (2009.05.05 Email from S. Donziger to K. Hinton re "Re: Cuomo letter") (DONZ00030903); Exhibit EZ (2009.05.05 Email from K. Hinton to S. Donziger re "Re: Bob McCarthy") (WOODS-HDD-0099491).

mean to Chevron but appear to agree there will be at least a short-term knock to the stock price." It quoted an analyst with OppenheimerFunds, Inc. stating, "I would settle and cut my losses."[589]

> **d.   The Conspirators Attempt to Manipulate Chevron's Stock Price to Coerce a Favorable Settlement**

246.     To increase financial and public pressure on Chevron to pay off the RICO Defendants through an extorted settlement of the Lago Agrio Litigation, the conspirators have sought to manipulate and depress Chevron's stock price by targeting Chevron's shareholders, potential investors, and stock analysts with their lies and half-truths.  The objective, as expressed by Donziger, was to cause a "mass sell-off of billions in [Chevron] stock."[590]  In furtherance of their scheme, the conspirators have staged protests at Chevron's shareholder meetings and at the homes of members of Chevron's Board of Directors, and have issued false and misleading propaganda to Chevron's shareholders about its liability in the Lago Agrio Litigation.  In each instance, they have argued that the $27 billion damages assessment is independent and legitimate, and thus represents a major risk to Chevron's share value.  Donziger described these pressure tactics on shareholders as one of the "key cards we can play."[591]

247.     The RICO Defendants' strategy of targeting Chevron's shareholders is stated in their public comments and on the websites they operate, which contain material aimed directly at investors.  At the website changechevron.org/for-investors, operated by co-conspirator RAN, the conspirators claim "Chevron's current brand of operations exposes the company (and its investors) to great financial, reputational, and environmental risks."  In reference to the damages assessed in Cabrera's report, the conspirators refer to "staggering liabilities," and suggest that

---

[589] Exhibit 272 (2009.05.26 Article, "Concerns Grow in Chevron Ecuador Suit," OILGRAM NEWS).

[590] Exhibit AJ (2003.11.19 Memorandum from S. Donziger to Team re "Strategic Planning Memo/Ecuador Case") (DONZ00084014) at 3.

[591] Exhibit 76 (2006.03.11 Entry in Composite of S. Donziger Personal Notes) (DONZ00036234).

Chevron has not "adequately warned shareholders about the financial risks the company faces in the Ecuador lawsuit."  The conspirators describe these activities on their website:  "To pressure Chevron to do the right thing in Ecuador, we engage in a variety of tactics.  In the past few years we have. . . [a]lerted Chevron's shareholders to the company's lies and omissions regarding the case in Ecuador, a case in which a ruling against Chevron would dramatically threaten the value of those shareholders' investments."[592]  And in August 2008, Donziger commissioned a detailed analysis of "various options for a more proactive and engaged strategy to put pressure on Chevron via public markets."[593]

248.    For example, shortly after Cabrera filed his initial report, on or about May 31, 2008, Kohn appeared on a Fox News segment touting the "independent" Cabrera Report as a reason for Chevron shareholders to be concerned.  In that interview, Kohn insinuated that Chevron was hiding information regarding Cabrera's "independent" damage assessment, stating "shareholders were [recently] informed for the first time of even the existence of the case although the original case was filed in the U.S. in the 90s."  He then warned that "shareholders should be concerned about the image of Chevron."[594]  At no point did Kohn explain that his co-conspirators had actually ghostwritten Cabrera's supposedly independent report.

249.    In the face of allegations that the RICO Defendants colluded with Cabrera, in a press release issued by the Front on February 13, 2009, Fajardo is quoted as saying that such allegations were "'false and defamatory'" and claimed that it would "'expose Chevron

---

[592] Exhibit 273 (Frente de Defensa de la Amazonia Press Release, Amazon Watch Campaign, *available at* http://chevrontoxico.com/about/amazon-watch-campaign/) at 1.

[593] Exhibit AK (2008.08.13 Memorandum from G. Erion and A. Taylor to S. Donziger re "Future Securities Strategy Against Chevron Corporation ('Chevron')" (WOODS-HDD-0147956).  *See also* Exhibit DY (2008.08.20 Email from G. Erion to S. Donziger and A. Taylor re "Securities Law Strategy – UPDATE") (DONZ00047467).

[594] Exhibit 254 (Certified transcript of 2008.05.31 J. Kohn Interview, Fox News).

shareholders to additional liability.'"[595]  And in an April 2008 press release issued by the Amazon Defense Front, Fajardo accused Chevron of failing to disclose to shareholders that Ecuador's Attorney General had filed a formal complaint to the U.S. Department of Justice, and that "[t]his is part of [a] conscious strategy to try to discredit a trial process that Chevron knows it is losing because of the evidence."[596]  And as recently as December 21, 2010, the Front issued a press release quoting Fajardo as saying, "Chevron's Board of Directors cannot continue to ignore the mounting evidence of illegal activity and fraud on the part of the company's legal team in the United States and in Ecuador. . . .  We intend to seek full redress of the harm that has been done in the name of Chevron's shareholders and to hold accountable all individuals in Chevron who have participated in this unlawful scheme."[597]

250.     The conspirators have also communicated directly with Chevron shareholders and influential analysts on numerous occasions.  On May 25, 2009, Amazon Watch sent a letter signed by Soltani to Chevron shareholders, asserting that Chevron had made "false, misleading, or incomplete" filings with the SEC, and quoted analysts from Barclays and Potomac Research stating that the litigation was hurting Chevron's stock price.  As with most of the conspirators' public statements since April 2008, the letter relied upon an "independent court damages

---

[595] Exhibit 274 (2009.02.13 Amazon Defense Coalition Press Release, "Chevron Blasted For Misconduct and Corruption in Ecuador Trial").

[596] Exhibit 252 (2008.04.03 Frente de Defensa de la Amazonia Press Release, "Chevron Accused of Lying To Shareholders Over $16 Billion Damages Claim In Ecuador Rainforest Case By Amazon Defense Coalition").

[597] Exhibit 275 (2010.12.21 Press Release, "Chevron's Desperation, Evidence Tampering, and Insults to Indigenous Culture Growing In Ecuador Trial").  *See* Exhibit D (2010.12.13 Donziger Dep.) at 1288-89; Exhibit D (2010.12.23 Donziger Dep.) at 1840:18-1843:12; 1964:11-14; 1968:17-1970:12.

assessment," but did not disclose that the RICO Defendants and their co-conspirators themselves had secretly written that "assessment."[598]

251.     Donziger and his co-conspirators have also personally lobbied analysts, including in personal meetings, and made fraudulent misrepresentations with the intent that their misrepresentations would be reported as fact by these analysts, and that these reports would decrease Chevron's stock price.[599]  On May 11, 2009, for example, Donziger and his co-conspirators met in New York with the Managing Director of Oil & Gas Equity research at UBS, and provided him with copies of the Cuomo letter, the Cabrera report and supplemental report, and the fraudulent "review" of that report by Stratus, all intended to convey the impression that Cabrera's report was independent and valid.[600]  Also involved in this effort was co-conspirator Daniel Orlow, described by the RICO Defendants as "an investment advisor who works with the legal team that represents the Amazonian communities," who made repeated public statements shortly after the UBS meeting on behalf of the RICO Defendants such as:  "The pressure is increasing on Chevron's management over the uncertainty surrounding a very significant potential environmental liability in Ecuador," and "Our team is being contacted repeatedly by shareholders and analysts who are concerned that Chevron management is not fully and honestly disclosing the company's exposure in Ecuador . . . .  There is a real concern that Chevron is not playing it straight and that it might have overpaid for Texaco."[601]

---

[598] Exhibit 276 (2009.05.25 Letter from A. Soltani, K. Koenig, and M. Anderson, on behalf of Amazon Watch, to Chevron shareholders) at 2.

[599] Exhibit DB (2009.05.12 Email from W. Featherston to A. Woods re "RE: Available times next week") (WOODS-HDD-0233066); Exhibit DC (2009.05.27 Email from S. Donziger to D. Orlow re "Fwd: FW") (DONZ00086715); Exhibit DD (2009.07.24 Email from K. Hinton to S. Donziger and A. Woods re "Analysts") (DONZ00029195).

[600] Exhibit 277 (2009.05.12 Email chain among A. Woods, S. Donziger, and D. Orlow re "Available times next week") (DONZ00017797) at 1.

[601] Exhibit 278 (2009.05.26 Frente de Defensa de la Amazonia Press Release, "Chevron Falls Short On Disclosure Obligations Relating to $27 Billion Ecuador Liability, Says Investor

[Footnote continued on next page]

252.    In another effort to influence Chevron's share price, the conspirators have instituted a "Buy Freeze" campaign in which they have contacted investors directly and, relying on false and misleading statements about the results of the site inspections and the criminal prosecutions and government inquiries that the conspirators have instigated, urged the investors not to buy Chevron stock.  Amazon Watch describes the campaign as follows:

> Amazon Watch is contacting institutional and individual shareholders – in particular, socially responsible investment community (SRIs) and public employees, teachers and university pension funds to urge them to join the buy freeze.  The trial court in Lago Agrio, Ecuador, has found shocking levels of life-threatening toxins at dozens of former Chevron production sites in Ecuador . . . .

> Now Chevron is being accused of fraud in Ecuador for lying about the results of a limited remediation it did in the mid-1990s . . . .

> As a result, Ecuador's Attorney General has asked the U.S. Department of Justice to investigate Chevron's alleged fraud.  The Securities and Exchange Commission already is probing the company for failing to disclose the potential liability to shareholders.[602]

Amazon Watch concealed the fact that it was the RICO Defendants and their co-conspirators who actually wrote the Ecuadorian Attorney General's report.[603]

253.    The conspirators have also staged protests at several of Chevron's annual shareholder meetings.[604]  As shown in the film *Crude*, these protests, while designed to appear

---

[Footnote continued from previous page]
Advisory Group"); Exhibit 279 (2009.05.21 Frente de Defensa de la Amazonia Press Release, "Chevron Management Dealt Major Blow with CalPERS Announcement on Ecuador").  *See also* Exhibit DE (2009.05.08 Email from S. Donziger to D. Orlow re "Re: E&O and D&O") (WOODS-HDD-0352789).

[602] Exhibit 280 (2007.10.24 Amazon Watch Press Release, "Chevron Investors Urged To Freeze Purchase of Company Stock Because of Ecuador Disaster").

[603] Exhibit DF (2006.07.21 Email from S. Donziger to C. Lehane re "Re: FCPA") (DONZ00129921).  *See also* Exhibit DG (2007.04.11 Letter from Amazon Watch to Chevron shareholders) (DONZ00007151) at 2.

[604] Exhibit 281 (2010.05.27 Amazon Defense Coalition Press Release, "New Questions About Chevron CEO in Wake of Arrests, Shareholder Defiance, at Annual Meeting"); Exhibit CL
[Footnote continued on next page]

to be grassroots, community events, are actually carefully planned and literally scripted by Donziger and his co-conspirators.[605]

254.    In addition, the conspirators have lobbied large institutional investors to support Chevron shareholder resolutions designed to bring support for the conspirators' lies and to add additional pressure on Chevron.[606]  For example, Stratus and Amazon Watch were involved in drafting a 2009 shareholder resolution, offered by the Office of the Comptroller of New York City as the custodian and trustee of certain pension funds.  On December 1, 2008, Mitchell Anderson of Amazon Watch emailed Beltman of Stratus with the subject line "2009 Shareholder Resolution – Urgent Update" and stated that "[w]e need to make some changes quickly to the

---

[Footnote continued from previous page]
(2010.05.28 Email from S. Donziger to R. DeLeon re "Re: Fw: Chevron update – from Houston") (DONZ00127260).

[605] Exhibit 91 (Transcript of J. Berlinger film *Crude*) (MB-NONWAIVER00092726) at 9-12; Exhibit 4 (*Crude* DVD) at 1:12-1:19; Exhibit DH (2007.04.24 Email from M. Brune to S. Tegel re "RE: Weds media") (DONZ00088856); Exhibit DZ (undated document re "Internal Schedule of Events for 2005 Shareholders Meeting and Mobilization CVX: Clean Up Ecuador Campaign") (DONZ00079766).

[606] Exhibit 280 (2007.10.24 Amazon Watch Press Release, "Chevron Investors Urged To Freeze Purchase of Company Stock Because of Ecuador Disaster"); Exhibit EA (2004.09.28 Email from L. Salazar-Lopez to S. Donziger re "Travel to Ecuador…") (DONZ-HDD-0057406); Exhibit EB (2006.02.21 Email from S. Donziger to S. Alpern re "Re: Letter to SEC") (DONZ00017215); Exhibit EC (2009.01.08 Email from S. Donziger to A. Woods re "issue w checks") (WOODS-HDD-0353906); Exhibit ED (NYS Board of Elections Financial Disclosure Report for DiNapoli 2014, January 2009 Period); Exhibit EE (NYS Board of Elections Financial Disclosure Report for DiNapoli 2014, July 2009 Period); Exhibit EF (2010.03.30 Email from S. Alpern to S. Donziger re "Investor statement to-do items") (DONZ00103094); Exhibit EG (2010.04.18 Email from M. Anderson to S. Donziger re "Fwd: latest version of investor statement") (DONZ00103271); Exhibit EX (2007.02.07 Email from J. DeLury Ciplet to S. Donziger re "Re: N.Y. Assembly Democrats Settle on Comptroller") (DONZ-HDD-0099646); Exhibit EP (2008.12.01 Email from S. Donziger to B. Barnes, K. Caperton, J. Sharp, S. Moorhead, K. Hinton, A. Woods, S. Martin, and W. Wiedeman re "state treasurers - important") (WOODS-HDD-0266992); Exhibit EQ (2009.01.05 Email from S. Martin to S. Donziger re "DiNapoli Contribution") (DONZ00095954).

below paragraph, given the new figures released by the court appointed expert."[607]  Beltman provided the higher numbers from Cabrera's revised report, which were then included verbatim in the shareholder resolution proposed by the funds the next day.[608]  That resolution provides that a "court-appointed expert in the Ecuadorian litigation has recommended that Chevron be held liable for up to $27.3 billion in damages," but fails to explain that Stratus and the other RICO Defendants and their co-conspirators secretly drafted the "court-appointed expert's" report finding Chevron liable.[609]

255.    The conspirators have promoted their involvement in drafting shareholder resolutions that seek to draw attention to Cabrera's finding of liability, but, again, without disclosing the RICO Defendants' and their co-conspirators' roles in drafting his report.  For example, on April 8, 2009, after the SEC declined to issue a no-action letter to Chevron regarding one of the conspirators' shareholder resolutions, Hinton and Amazon Watch issued a press release describing the resolution as, "a high-profile resolution that threatens to focus attention on the company's record-breaking $27 billion environmental liability in Ecuador."[610]

256.    The Wall Street Journal has reported that the RICO Defendants' statements about the Lago Agrio Litigation, and, specifically, Cabrera's assessment of $27 billion in damages has had its desired effect on Chevron's share price:  "The possibility that a judge may

---

[607] Exhibit 282 (2008.12.01 Email chain among M. Anderson, D. Beltman, S. Donziger, and others re "2009 Shareholder Resolution – Urgent Update") (STRATUS07092010) at 1.

[608] Exhibit 282 (2008.12.01 Email chain among M. Anderson, D. Beltman, S. Donziger, and others re "2009 Shareholder Resolution – Urgent Update") (STRATUS07092010) at 1.

[609] Exhibit 283 (2008.12.02 Fax from P. Doherty, Office of the Comptroller of New York City, to L. Beebe, Chevron Corporate Secretary) at 2.

[610] Exhibit 284 (2009.04.08 Frente de Defensa de La Amazonia Press Release, "SEC Rejects Chevron Attempt to Block Shareholder Resolution on Ecuador Environment Case").

later this year demand damages as high as $27.5 billion, roughly one-fifth of Chevron's market capitalization, appears to have spooked some investors."[611]

257.    The Front and Hinton have touted negative analyst reports regarding Chevron on the website, chevrontoxico.com.  For example, on May 26, 2009, the conspirators published an article stating that "Oppenheimer, in a report dated May 4th [2009], said the $27 billion claim from Ecuador 'could depress the stock until a settlement is reached . . . the sooner [the case] is removed, the better off shareholders will be'" and that "Barclay's called the Ecuador case a 'drag' on Chevron's stock value."[612]

258.    And on August 24, 2010, FOXBusiness reported that, "the oil company has lost much of its gains over the past few weeks as it continues to fight a lawsuit in Ecuador that alleges Texaco, acquired by Chevron in 2001, wrecked portions of a jungle while drilling for oil in the 1970s and 1980s."  The conspirators published this article in its entirety the next day at the chevronpit.blogspot.com.[613]

259.    Above all, however, the RICO Defendants' and their co-conspirators' false statements, harassing conduct, and lobbying efforts with media, government, shareholders and private individuals are all aimed at one ultimate objective—forcing Chevron to pay the RICO Defendants and their co-conspirators billions of dollars to make them stop.

---

[611] Exhibit 285 (2009.07.24 Article by Liam Denning, "Chevron Ecuador Woes Mask Potential," WALL ST. J.) at 1.

[612] Exhibit 278 (2009.05.26 Frente de Defensa de la Amazonia Press Release, "Chevron Falls Short On Disclosure Obligations Relating to $27 Billion Ecuador Liability, Says Investor Advisory Group").  *See* Exhibit DI (2009.05.04 Email from K. Hinton to S. Donziger and A. Woods re "FW: 60 Minutes Exposes Chevron's Destruction of Amazon Rainforest") (WOODS-HDD-0100639).

[613] Exhibit 286 (2010.08.24 Article by Jennifer Booton, "Chevron Down As It Continues to Fight $27B Environmental Lawsuit in Ecuador," FOX BUSINESS).

e.     **The RICO Defendants Falsely Accuse Chevron of Murder to Generate Outrage and Force Chevron to Pay**

260.     The conspirators have made numerous public statements stating or implying that Chevron is guilty of murder.  This claim is false and has been made intentionally and without any basis whatsoever.  The RICO Defendants and their co-conspirators' intent in spreading this lie is to generate great outrage and disgust among the public and activists and in the media, all in furtherance of their extortionate conspiracy.

261.     Defendant Fajardo and his co-conspirators have attempted to capitalize on the violent murder of Fajardo's brother, Wilson Fajardo.  They have repeatedly implied that Chevron was responsible and claimed that there has been no police investigation into the crime.  Yet Fajardo knows this to be false.  In a written statement made to the District Prosecutor as part of the extensive investigation into his brother's murder, Fajardo himself provided the names and addresses of the men he believed to be his brother's murderers, details concerning the place and circumstances of the murder, and, most importantly, a detailed account of the prior bad blood between the alleged murderers and Wilson Fajardo, including prior threats and an attempt by one of the men to stab his brother a few days earlier.  There is no mention in this statement of Chevron or Texaco or any connection to the Lago Agrio Litigation.[614]

262.     Despite this statement concerning the details of Wilson Fajardo's death and his knowledge that Chevron had nothing to do with it, Fajardo has falsely and intentionally implied that Chevron was responsible.  For example, on April 22, 2008, Fajardo made the following statement on Ecuadorian TV:  "I can't say that it was Texaco that did it, but I can't say the contrary.  This sort of thing was never investigated.  In other words, there've been many things, a lot of pressure, a lot of persecution in this case, which leaves a lot to be seen."[615]  And on

---

[614] Exhibit 287 (2004.11.08 Statement by P. Fajardo to District Attorney for Canton of Shushufindi).

[615] Exhibit 288 (2008.04.22 Discussion with Xavier Lasso, ECUADOR TV) at 19.

August 24, 2009, Fajardo said to *Publico*, "I have been threatened many times and one of my brothers was killed by hit men, but I don't have evidence that Chevron was behind his killing."[616]

263.     Fajardo's co-conspirator Hinton has perpetuated these falsehoods in comments she posted on Politico.com on November 16, 2009, in which she stated that "no one knows who murdered [Fajardo's] brother," and the death happened when Fajardo "and other members of the [Lago Agrio] plaintiffs' legal team had received a number of anonymous death threats connected to the work on the case."[617]   These statements are false and Fajardo and Hinton knew at the time that they were false.  Fajardo knew that his brother's death had been investigated and he knew that Texaco and Chevron had nothing to do with it.  Yet he lied about it on television, and Hinton spread that lie.

264.     Even though he identified suspects in his brother's murder and the murderers' motives for killing his brother, Fajardo has falsely implied that the killers mistook Wilson Fajardo for Defendant Fajardo himself to create the impression that Chevron had attempted to "assassinate" Fajardo.  For example, in a May 2007 article in *Vanity Fair* magazine concerning the case against Chevron, Fajardo claimed that he was being followed and that "the killers had made a mistake."[618]   Donziger has taken this outrageous claim all the way to the United States Congress.  In a statement before the Tom Lantos Human Rights Commission, Donziger asserted that the "team of lawyers and advocates fighting Chevron in Ecuador's courts over clean-up responsibility have suffered harm in retaliation for exercising their legal rights[.]"  And the first "[e]xample of this retaliation" he offered the committee was:  "The lead lawyer for the rainforest

---

[616] Exhibit 289 (2009.08.24 Article by P. Rusiñol, "Chevron's Fate to Be Decided in Ecuador", PUBLICO) at 2.

[617] Exhibit 290 (2009.11.16 Article by Kenneth P. Vogel, "Chevron's Lobbying Campaign Backfires," Politico.com).

[618] Exhibit 291 (2007.05 Article by William Langewiesche, "Jungle Law," VANITY FAIR).

communities, Pablo Fajardo, has been subjected to death threats.  A brother of Mr. Fajardo was murdered in 2004, about a year after the trial began, under mysterious circumstances that some think was a case of mistaken identity."[619]  Similarly, in a particularly offensive scene in *Crude* set at Wilson Fajardo's grave, Defendant Fajardo linked his brother's "assassination" to the "first judicial inspection of the Texaco case" and falsely said that the killers "were looking for me."[620] In another scene, he "joked" that he kept a gun in his house "[f]or when Texaco comes."[621] These knowingly false statements are intended to leave the false impression that Chevron is not only responsible for the murder of Wilson Fajardo, but seeks to kill Pablo Fajardo as well.

265.    The outrageous attacks on Chevron linking it to murder are just more of the RICO Defendants' thinly veiled threats to Chevron:  Pay up, or we will continue our campaign of lies, fraud, and corruption.

## C.    The Conspirators' Campaign of Lies and Obstruction in U.S. Courts

266.    Determined to prevent their conspiracy to defraud and extort Chevron from being exposed in the discovery and other proceedings Chevron commenced in U.S. federal courts, the RICO Defendants embarked on a campaign of obstruction and lies, attempting to conceal the true authorship of the Cabrera Report and the RICO Defendants' and their co-conspirators' relationship with the supposedly "independent" Cabrera.  Defendants went as far as misrepresenting Cabrera's independence in a complaint they filed in this Court in related litigation seeking to stay an arbitration proceeding.[622]

---

[619] Exhibit 269 (2009.04.28 Statement by S. Donziger to Tom Lantos Human Rights Commission) at 9.

[620] Exhibit 4 (*Crude* DVD) at 48:07.

[621] Exhibit 4 (*Crude* DVD) at 54:04.

[622] Exhibit 94 (2010.01.14 Lago Agrio Plaintiffs' Complaint to Stay Arbitration, *Yaiguaje v. Chevron Corp.*, No. 10-CV-0316 (LBS) (S.D.N.Y.)), ¶¶ 29-30.

267.     These obstruction efforts have been managed by Patton Boggs, among others.  In 2010, when it appeared to the RICO Defendants that Chevron was going to uncover clear evidence of their collusion with Cabrera, attorneys from Patton Boggs participated in a series of meetings with RICO Defendants and co-conspirators in the United States and in Ecuador, to apprise themselves of the nature of that relationship.  They also asserted control over the defense against Chevron's discovery actions behind the scenes, ghostwriting court papers and managing lawyers at other firms.  While their investigation was ongoing, and while by their own admission they did not know "what there was to admit," they drafted and caused to be filed briefs and declarations containing false and misleading statements denying the extensive collusion with Cabrera.[623]

268.     Once it was clear that the RICO Defendants' earlier statements to U.S. courts had been false and misleading, Patton Boggs doubled down, and not only repeated and reasserted false statements about Cabrera, but also negotiated for itself a stake in the outcome of the Lago Agrio Litigation in an agreement which gave it substantial influence over the future course of the litigation.[624]

269.     Furthermore, Donziger, the ringleader of the enterprise, has himself personally interfered with discovery proceedings in this Court and elsewhere, including repeated and sustained violations of multiple orders issued by this Court.  In this and other lies and misconduct before various U.S. courts, the RICO Defendants and their co-conspirators, including Patton Boggs and other law firms such as Emery Celli and Motley Rice, have brought their pervasive fraud into the courts of this country and have attempted to hide their criminal scheme from Chevron and the courts.

---

[623] Exhibit 293 (2010.06.15 Email chain among S. Donziger, J. Abady, and others re "Final Proposed Draft") (DONZ00031368) at 2.

[624] Exhibit B (Executed Funding Agreement) at 31-32 (Schedule 1, §§ 2-3).

1.     **Attempting to Obstruct Chevron's Discovery Proceedings by Making False and Misleading Statements Before U.S. District Courts and Courts of Appeals**

270.     Faced with denials from the conspirators in Ecuador about the authorship of Cabrera's report, Chevron turned to the United States to pursue discovery from the largely U.S.-based enterprise directly through proceedings under 28 U.S.C. § 1782, which authorizes "[t]he district court of the district in which a person resides or is found [to] order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal."[625]  Several courts have granted Chevron's applications for discovery, resulting in the production of more evidence of fraud, collusion, and criminal misconduct, and evidence establishing the RICO Defendants' and their co-conspirators' knowing obstruction of Chevron's Section 1782 applications.  This evidence, and the condemnation by numerous U.S. courts of the conduct it reveals, is detailed below.  But co-conspirator Julio Prieto perhaps captured the RICO Defendants' and their co-conspirators clear knowledge of the wrongfulness of their own conduct in an email to Donziger and Fajardo after Fajardo told him that the RICO Defendants' correspondence with Stratus was likely to be disclosed in a Section 1782 proceeding in Colorado: "[T]he effects are potentially devastating in Ecuador (apart from destroying the proceeding, all of us, your attorneys, might go to jail)[.]"[626]

271.     Accordingly, the RICO Defendants adopted a strategy of obstruction and delay in furtherance of their criminal scheme, seeking to hold off U.S. discovery until they could obtain a judgment in Ecuador and begin their plan to use it to harass and attack Chevron and its subsidiaries around the world.  As co-conspirator Ilann Maazel of Emery Celli wrote to Donziger and other co-conspirators, including attorneys at Patton Boggs and Motley Rice, "Unless we want the Stratus/Cabrera revelation to come out in CO [Colorado], which seems like the worst

---

[625] 28 U.S.C. § 1782.

[626] Exhibit 11 (2010.03.30 Email from J. Prieto to S. Donziger, P. Fajardo, L. Yanza and J. Saenz re "Protection Action") (DONZ00055225).

possible place, we need to make our submission in Ecuador and fast. . . .  We've bought over a month in CO and everywhere else but time is almost certainly about to run out."[627]

272.     Throughout these Section 1782 proceedings, the first of which Chevron initiated on December 18, 2009, the RICO Defendants have sought to impede Chevron's discovery through lies, procedural abuses, and obstructionist delaying tactics.  These efforts notwithstanding, Chevron has obtained additional evidence demonstrating that the conspirators wrote the Cabrera Report and sought to use the so-called "independent" report to their advantage.  As this evidence has come to light, the RICO Defendants and their co-conspirators have continued to make statements that are not only false, but inconsistent with their own prior representations, despite the fact that that this strategy made them look, "coy at best and silly or untrustworthy at worst,"[628] as Jonathan Abady of Emery Celli put it in an email to Donziger and other Emery Celli and Patton Boggs attorneys.

> a.     **The RICO Defendants' Initial False Representations to U.S. Courts That They Had No Relationship With Cabrera and No Role in Preparing the "Cabrera Report"**

273.     In opposing Chevron's discovery efforts, the RICO Defendants' first tactic was denial of any misconduct whatsoever, despite Prieto's email making clear that what the RICO Defendants did, if discovered, would "destroy" their case in Ecuador and that, "all of us, your attorneys, might go to jail."  Indeed, as Donziger has recently admitted, even after he received Prieto's email, the substance of which he discussed with Patton Boggs and Emery Celli lawyers, Emery Celli filed briefs in which it claimed that Cabrera was independent and, in Donziger's words, "[s]ought to prevent Stratus' role relative to the Cabrera report from coming out."[629]

---

[627] Exhibit 292 (2010.05.27 Email chain among S. Donziger, E. Westenberger, and others re "Mini-revelation") (DONZ00031337) at 2.

[628] Exhibit 293 (2010.06.15 Email chain among S. Donziger, J. Abady, and others re "Final Proposed Draft") (DONZ00031368) at 3.

[629] Exhibit D (2011.01.19 Donziger Dep.) at 3362:07-3363:20; 3386:22-3388:4.

And as early as January 2010, Donziger was preparing scripts about the relationship with Cabrera for Stratus and others to rely on in depositions using a consistent, but false, story.[630]  By taking these and other actions that served to stonewall the federal court, they hoped to avoid the discovery of their extraordinary misconduct.  In multiple filings in Section 1782 proceedings, the conspirators have falsely asserted their lack of relation to Cabrera:  "Mr. Cabrera is not even an expert for one party, but a Court-appointed neutral . . . ."[631]  Additionally, in declarations filed throughout the country, the RICO Defendants and their co-conspirators have perpetuated their false version of events, hiding their relationship with Cabrera and claiming that he was "independent."

274.    The RICO Defendants continued to spread their false version of events in depositions.  On April 23, 2010, for example, Chapman falsely testified that he had no reason to think that Stratus had provided work product to Cabrera.[632]  The RICO Defendants and their co-conspirators were proud of Chapman's performance, but realized that the truth was bound to come out.  As co-conspirator Andrew Wilson of Emery Celli wrote to Donziger, "Chapman did an excellent job of not remembering anything—but Chevron will be able to do side-by-side comparisons of Stratus work product and [Cabrera's] report to a judge that will smell bad."[633]  In fact, as Stratus's own documents make clear, Chapman, who is the head of Stratus's natural

---

[630] Exhibit AL (2010.01.29 S. Donziger document "Respuestas.Depositions" ["Deposition Answers"]) (DONZ-HDD-0008987).

[631] Exhibit 294 (2010.06.07 Lago Agrio Plaintiffs' Response to Order to Show Cause, *In re Application of Chevron Corp.*, No. 2:10-cv-02675 (SRC) (MAS) (D.N.J.)) at 20; Exhibit 295 (2010.07.09 Plaintiffs' Response in Opposition to Chevron's Fed. R. Civ. P. 72(a) Objections, *Chevron Corp. v. Stratus Consulting, Inc.*, No. 1:10-cv-00047 (MSK) (MEH) (D. Colo.)) at 27.

[632] Exhibit 158 (Chapman Dep.) at 137:4-8.

[633] Exhibit 296 (2010.04.23 Email chain among S. Donziger, A. Wilson of Emery Celli, and others re "Colorado Update") (DONZ00031206) at 1.

resource economics group,[634] was personally involved in and knowledgeable of Stratus's secret authorship of Cabrera's report.[635]  Indeed, it was Chapman who provided Donziger with the initial outline and plan for Stratus to write the "damage estimate," and asked Donziger "when a final report would have to be delivered to the Judge" so that Stratus could plan its resources accordingly.[636]  Chapman's deposition misconduct, however, is not surprising given that Stratus has remained actively involved in the conspiracy even after the evidence of wrongdoing was made public.[637]  For example, Beltman held meetings for Stratus staff after Chevron filed for discovery from Stratus in an attempt to mislead the employees and influence their potential testimony regarding Stratus's authorship of the Cabrera Report.  At these meetings, Beltman repeatedly misstated that Cabrera was an independent expert and misrepresented the role of Stratus in ghostwriting the Cabrera Report.  Beltman consistently omitted any discussion of Stratus's true involvement.[638]

275.    In another blanket denial, Stratus represented through counsel to the District of Colorado on April 27, 2010 that Stratus was "astonish[ed]" to see "similarit[ies]" between their

---

[634] Exhibit 158 (Chapman Dep.) at 16:12-19:1.

[635] Exhibit 297 (2008.05.14 Email from D. Beltman to E. English, D. Mills, D. Chapman, and others re "Ecuador project meetings here on May 29-30") (STRATUS-NATIVE044489) (asking for Chapman's availability for meetings "to talk about the Cabrera Peritaje Global (aka the court expert report)"); Exhibit 298 (2007.09.27 Email chain between D. Beltman and S. Donziger re "SOW and budget") (STRATUS-NATIVE043259) at 2; Exhibit 299 (2008.01.29 Email chain among D. Beltman, D. Chapman, E. English, and others re "Rainforest Literature") (STRATUS-NATIVE053671) (Chapman asks, "Doug, has there been any indication from Stephen [Donziger] if we should move ahead on either reviewing or augmenting/supplementing the current report?").

[636] Exhibit 157 (2007.04.03 Email from S. Donziger to D. Chapman re "Approach for assessment") (DONZ00061973) at 1.

[637] Exhibit AM (2010.12.02 Deposition of Douglas Beltman, *In re Application of Pallares*, 10-cv-02528-PAB-MEH (D. Colo.) ("2010.12.02 Beltman Dep.")) at 18:3-19:20.

[638] Exhibit 190 (Mills Dep.) at 27-37.

own work product and the Cabrera Report.[639]  It assured the court that Stratus did not have "an opportunity to review Cabrera's report in draft form," and that what they provided their co-conspirators was, "intended to assist them in their analysis of data," and in the "mediation," not "to assist Cabrera."  These were outright lies; Stratus *ensured* that its work product appeared in the Cabrera Report,[640] and Maest and Beltman both subsequently admitted that neither of them were surprised by the presence of their work in the Cabrera Report, and that nobody at Stratus would have been surprised by it.[641]  In a "Status Report" filed three weeks later, counsel for Stratus informed the court that "continued inquiry suggests that there were communications between Mr. Cabrera and two representatives of Stratus."[642]

276.    Allegedly before a subpoena issued under the authority of the Southern District of California, co-conspirator and Stratus subcontractor Powers threw out a computer hard drive containing responsive documents and deleted responsive emails.[643]  Evidence obtained by Chevron in other Section 1782 proceedings demonstrated that Powers had been a key participant in the RICO Defendants' scheme.  Indeed, one of the RICO Defendants' *own attorneys* had written, that "we are getting an indication from these documents how important a player Bill Powers was in this whole thing.  He has substantial knowledge and involvement in the Cabrera

---

[639] Exhibit 300 (2010.04.27 Hr'g Tr., *Chevron Corp. v. Stratus Consulting, Inc.*, No. 10-cv-00047 (MSK) (MEH) (D. Colo.)) at 69:12-13.

[640] Exhibit 176 (2008.03.12 Email from D. Beltman to info@translatingspanish.com re "Big Report") (STRATUS-NATIVE058388).

[641] Exhibit N (2011.01.19 Maest Dep.) at 141; Exhibit AN (2010.10.06 Deposition of Douglas Beltman, *Chevron Corp. v. Stratus Consulting, Inc.*, 1:10-cv-00047-MSK-MEH (D. Colo.) ("2010.10.06 Beltman Dep.")) at 296-297.

[642] Exhibit 301 (2010.05.18 Stratus Status Report, *Chevron Corp. v. Stratus Consulting, Inc.*, No. 10-cv-00047 (MSK) (MEH) (D. Colo.)) at 3.

[643] Exhibit 302 (2010.11.10 Email from M. Severson to J. Sabovich re "Draft Protocol"); Exhibit 171 (Powers Dep.) at 160:8-161:9.

Report drafting."[644] Ultimately, Powers confirmed in his deposition that he had drafted the annexes to the initial Cabrera Report and substantial portions of the supplemental Cabrera Report.[645]

277.    The RICO Defendants also falsely denied contact with other Cabrera team members.  The District of New Jersey granted Chevron's application for discovery from another of the conspirators, UBR, on the basis that while that firm was a paid consultant to the RICO Defendants, one of its employees, Juan Cristobal Villao Yepez, was disclosed as one of the authors of the Cabrera Report.[646]  On appeal, the RICO Defendants told the Third Circuit Court of Appeals that it should reverse, because there was no evidence supporting Chevron's claim that Villao had any connection to Cabrera, or that he had worked for UBR when he was supposed to have been working with Cabrera.[647]  But several months later, when this District ordered Defendant Donziger to produce his own files, they revealed that Donziger and other RICO Defendants had had direct communications with Villao regarding his contribution to the Cabrera Report.[648]  And Donziger himself has now admitted that Villao worked for both Cabrera and the RICO Defendants.[649]  Nonetheless, the RICO Defendants have taken no action to remedy their misrepresentations to the Third Circuit.  In internal correspondence, they have, however,

---

[644] Exhibit 303 (2010.09.08 Email chain among S. Donziger, E. Westenberger, and E. Daleo re "California – Powers") (DONZ00031586) at 1.

[645] Exhibit 171 (Powers Dep.) at 250:23-256:11.

[646] Exhibit 304 (2010.06.15 Order Granting Application for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in Foreign Proceedings, *In re Application of Chevron Corp.*, 2:10-cv-02675 (SRC) (D.N.J.)).

[647] Exhibit 305 (2010.07.30 Brief for Appellants UBR and Ecuadorian Plaintiffs, *In re Application of Chevron Corp.*, No. 10-2815 (3d Cir.)) at 44.

[648] Exhibit 306 (2007.10.23 Email chain between S. Donziger and C. Villao re "Re:") (DONZ00021063).

[649] Exhibit 6 (2010.12.29 Donziger Dep.) at 2324:9-22.

discussed the situation regarding Villao and whether to publicly acknowledge that the Cabrera Report was ghostwritten by the RICO Defendants and their co-conspirators, commenting on their concern at being accused of "perpetuation of the fraud."[650]  Andrew Wilson of Emery Celli, for example, warned Donziger to be "[c]areful" because it is "not clear our relationship with Villao was disclosed."[651]

278.  In their internal communications, the RICO Defendants and their co-conspirators have recognized that their denials did not square with the facts.  In May 2010, one of the Lago Agrio Plaintiffs' U.S. lawyers wrote that their characterization that Cabrera had "considered" Stratus's work "seems like way too much of a stretch considering that Cabrera's report, or substantial annexes to it, are in fact the consultant's work.  This is far more than 'circumstantial evidence'; this is, indeed, a '"hand in glove" showing.'"[652]  Co-conspirator Jonathan Abady of Emery Celli described the relationship between the RICO Defendants and Cabrera as "wholesale adoption of Stratus work product w/o attribution."[653]  Co-conspirator Wilson admitted in an internal email that "[t]he more we emphasisze [sic] [Cabrera's] neutrality the less sense it makes that we were talking to him outside of school."[654]  And in an April 2010 letter from Donziger to his co-conspirators, Donziger referred to the "Colorado 1782 action" as a "major contingency" and warned that "if Chevron succeeds in obtaining discovery from Stratus and deposing the

---

[650] Exhibit 293 (2010.06.15 Email chain among S. Donziger, J. Abady, and others re "Final Proposed Draft") (DONZ00031368) at 4.

[651] Exhibit 307 (2010.07.19 Email chain among S. Donziger, A. Wilson, and others re "urgent – does this pass muster for a journalist about New Jersey case?") (DONZ00031398) at 1.

[652] Exhibit 308 (2010.05.05 Email chain among S. Donziger, A. Wilson, J. Abady, and others re "aguinda litigation") (DONZ00031278) at 7.

[653] Exhibit 185 (2010.05.16 Email chain among S. Donziger, J. Abady, I. Maazel, and others re "Motion Under Rule60(B)(3)") (DONZ00056668) at 1.

[654] Exhibit 309 (2010.05.04 Email chain among S. Donziger, A. Wilson of Emery Celli, and others re "Fajardo Declaration") (DONZ00031261) at 2.

Stratus principals . . . , they will find that Stratus wrote the bulk of the report adopted by Cabrera and submitted to the court."[655]   Donziger also admitted that there was "significant back and forth collaboration between local counsel and Cabrera, and separately, via local counsel and Stratus," and discussed the sorts of emails that would be produced, including "numerous emails between Stratus and local counsel documenting how this work was done," "some emails between Stratus and U.S. counsel that show U.S. counsel (relying on guidance of local counsel) approved of this process, encouraged it, and was involved in it from a supervisory perspective," and emails that will "show some effort to keep the extent of this ex parte collaboration between our local counsel and Cabrera from being disclosed."[656]

279.    Additionally, in extensive correspondence in June 2010, among Donziger, Motley Rice, Patton Boggs, Emery Celli, and other co-conspirators, Jason Rockwell at Patton Boggs acknowledged that, "the Ann Maest notes suggest more coordination with Cabrera than counsel simply dropping off two sets of documents," and Jonathan Abady of Emery Celli conceded that, "By refusing to admit this now obvious fact, we look coy at best and silly or untrustworthy at worst."[657]

280.    Because their position in these proceedings has been so divergent from the facts, the RICO Defendants have had trouble retaining counsel willing to go along with this scheme of falsehoods and obstruction.  Donziger has admitted that when first one and then another of the U.S. law firms that the RICO Defendants retained to represent their interests in opposing

---

[655] Exhibit AO (2010.04.17 Letter from S. Donziger to fellow counsel) (DONZ-HDD-0004621).

[656] Exhibit AO (2010.04.17 Letter from S. Donziger to fellow counsel) (DONZ-HDD-0004621).

[657] Exhibit 293 (2010.06.15 Email chain among S. Donziger, J. Abady, and others re "Final Proposed Draft") (DONZ00031368) at 3.

Chevron's Section 1782 applications learned of the full scope of the RICO Defendants' relationship with Cabrera, the firms withdrew from the representation.[658]

281.    In response to Chevron's initial Section 1782 filings, the RICO Defendants retained a respected New York firm to represent their interests.  But when a senior partner with that firm interviewed Stratus employees in Boulder, it was apparent to him that the RICO Defendants' relationship with Cabrera was improper and contrary to the representations made to him by Donziger.  His law firm withdrew the next day.[659]

282.    Around this time, Donziger prepared a memorandum which he addressed to lawyers from a Colorado firm also retained by the RICO Defendants to block Chevron's discovery from Defendant Stratus.  In that memorandum, Donziger misled those attorneys on numerous material facts.  For example, in a section of the memo titled "Role of Stratus Consulting," he listed such innocuous activities as "helping Ecuadorian counsel respond to scientific questions," and "giving media interviews," but failed to inform the attorneys that Stratus had in fact written the Cabrera Report, the central allegation of the pending court proceeding.[660]  And he listed "Opinions in Cabrera's report were taken directly from Stratus materials," as one of Chevron's "inaccurate" factual assertions.[661]

283.    When this second firm was unable to obtain confirmation of any of Donziger's false representations, and after learning from its predecessor about the results of the interviews he had conducted with Stratus, that firm also withdrew.  Simultaneously with its withdrawal, it

---

[658] Exhibit 6 (2010.12.29 and 2011.01.08 Donziger Dep.) at 2353:2-2357:23, 2381:19-2387:4, 2385:20-2387:4.

[659] Exhibit 310 (2010.05.24 Memorandum re "Steven Donziger" from J. McDermott to S. Donziger) (DONZ00056918).

[660] Exhibit 311 (2010.02.21 Memorandum from S. Donziger to J. McDermott and others re "Response to Chevron 1782 Motion") (DONZ00048987) at 3-4.

[661] Exhibit 311 (2010.02.21 Memorandum from S. Donziger to J. McDermott and others re "Response to Chevron 1782 Motion") (DONZ00048987) at 3-4.

sent Donziger an email citing the "troubling information" that it had learned regarding Stratus's role in preparing the Cabrera Report, and that "we are concerned about our ability to satisfy our obligations to Judge Kane and to the court if we continue in our representation of the Lago Agrio plaintiffs in this case."  The attorney concluded, "I'm sorry it has come to this, but I feel if we proceed I may be compromising this firm's reputation and ethical stature and I cannot do that."[662]

284.     The conspirators then turned to counsel that they thought "appear[ed] willing to sign anything,"[663] but their relationship with that counsel lasted only a month before that firm withdrew.  And when the *fourth* firm retained by the RICO Defendants in the *same* Section 1782 proceeding reviewed the record, and not merely Donziger's materially misleading memorandum, it concluded that, "it appears not only that Cabrera and plaintiffs can be charged with a 'fraud' respecting the former's report, but that Stratus was an active conspirator."[664] At this fourth counsel's request, the second firm retained by the RICO Defendants, who had previously informed Donziger that the RICO Defendants' position was "untenable," prepared a brief memorandum summarizing its bases for withdrawal.  In that memorandum, that firm stated that "we did not feel that we had a Rule 11 basis to file an opposition to Chevron's subpoena."[665] Rule 11 of the Federal Rules of Civil Procedure requires that every filing submitted to a federal court must be signed by an attorney who represents that the filing is not for "any improper

---

[662] Exhibit 6 (2010.12.29 and 2011.01.08 Donziger Dep.) at 2353:2-2357:23, 2381:19-2387:4, 2385:20-2387:4; Exhibit 312 (2010.03.21 Email chain among S. Donziger, J. McDermott, and others re "Chevron v. Stratus") (DONZ00031129) at 1.

[663] Exhibit 313 (2010.03.29 Email chain among S. Donziger, A. Page, and others re "latest drafts of motion and affidavit") (DONZ00067627) at 1.

[664] Exhibit 12 (2010.05.16 Email chain among J. Horowitz, A. Wilson, S. Donziger, and others re "Rule60(b) And Stratus Materials") (DONZ00056679) at 1.

[665] Exhibit 310 (2010.05.24 Memorandum re "Steven Donziger" from J. McDermott to S. Donziger) (DONZ00056918).

purpose," that the "claims, defenses, and other legal contentions are warranted by existing law," and that "the factual contentions have evidentiary support."

285.     When another lawyer, Andrew Woods, who worked for Donziger, grew alarmed that Donziger was using him to make possibly false claims in a declaration filed in federal court, and asked to make a clarifying submission if any of his previous statements were false, Donziger and his co-conspirators talked him into remaining silent.[666]  Despite their own recognition of their misconduct, the RICO Defendants continue to deny this evidence and dissemble in sworn statements, in court filings, and in deposition testimony.

> **b.     The RICO Defendants' Subsequent False and Misleading Statements in an Attempt to Justify and Excuse Their Emerging Misconduct**

286.     As their strategy of stonewalling and total denial became increasingly impossible to square with the emerging factual record, including the video outtakes from *Crude*, the RICO Defendants and their co-conspirators made a last-ditch effort to cover up their misconduct by attempting to confuse and mislead federal courts regarding the Lago Agrio court orders governing their association with Cabrera.  The RICO Defendants distorted the record in several ways as part of their attempt to impede federal court review of Chevron's discovery applications and thereby allow the Lago Agrio court to march towards judgment.

287.     In response to an inquiry from the District of Colorado seeking information about the full relationship between Cabrera and Stratus, Wilson of Emery Celli, appearing as counsel for the Lago Agrio Plaintiffs, assured the court that they would provide the "full picture" in an upcoming filing.  Indeed, Wilson assured the court *nine* times at the hearing that the

---

[666] Exhibit 314 (2010.04.01 Email from A. Woods to S. Donziger re "Rick's latest email") (DONZ00055241); Exhibit 315 (2010.04.05 Email chain between A. Woods and S. Donziger re "motion and affidavits") (DONZ00055339).

upcoming report would provide the "full picture."[667]  When the conspirators caused that

promised "full picture" to be filed, however, it was incomplete and misleading.  In a sworn

declaration, Defendant Fajardo provided a lengthy description of the relationship between the

RICO Defendants and Cabrera, but falsely attested that Cabrera was "independent" and omitted

from his declaration the substantial role he and other conspirators had played in securing

Cabrera's appointment, his numerous personal meetings with Cabrera—including the March

2007 meeting captured in the *Crude* outtakes—and the massive, U.S. project to write, translate

and submit the fraudulent Cabrera Report.[668]  Rather, Fajardo claimed that the RICO

Defendants' contact with Cabrera was pursuant to orders issued by the Lago Agrio court in

January and April 2008, requesting that the parties make various submissions to Cabrera.  The

RICO Defendants and their co-conspirators filed Fajardo's false declaration not only in the

District of Colorado, but also in proceedings before this Court and at least six others courts

throughout the country.[669]

---

[667] Exhibit 300 (2010.04.27 Hr'g Tr., *Chevron Corp. v. Stratus Consulting, Inc.*, No. 10-cv-00047 (MSK) (MEH) (D. Colo.)) at 31:23-25, 33:20-25, 34:20-35:3, 41:5-9, 42:1-8, 57:20-58:4, 63:3-63:22, 77:1-7, 88:17-20.

[668] Exhibit 316 (2010.05.05 Declaration of P. Fajardo in Support of Lago Agrio Plaintiffs' Motion for Protective Order, *Chevron Corp. v. Stratus Consulting, Inc.*, No. 10-cv-00047 (MSK) (MEH) (D. Colo.)), ¶ 11.

[669] Exhibit 374 (Exhibit 2 to 2010.05.07 Ecuadorian Plaintiffs' Brief In Support of Motion to Quash, *In re Application of Chevron Corp.*, No. 4:10-mc-134 (S.D. Tex.), Dkt. 38-16); Exhibit 375 (Exhibit O to 2010.06.07 Certification of James T. Hunt, Jr., *In re Application of Chevron Corp.*, No. 2:10-cv-02675 (SRC) (MAS) (D.N.J.), Dkt. 5-15); Exhibit 379 (Exhibit O to 2010.06.26 Declaration of Maria C. Severson, *In re Application of Chevron Corp.*, No. 10-cv-1146-IEG-WMC (S.D. Cal.), Dkt. 16-4); Exhibit 381 (Exhibit I to 2010.08.11 Declaration of W. David Bridgers, *In re Application of Chevron Corp.*, No. 3:10-cv-00686 (M.D. Tenn.), Dkt. 44-9); Exhibit 382 (Exhibit I to 2010.08.24 Declaration of Wyatt S. Stevens, *In re Application of Chevron Corp.*, No. 1:10-mc-00027-GCM-DLH (W.D.N.C.), Dkt. 20-10); Exhibit 383 (Exhibit 7 to 2010.08.26 Declaration of John W. Boyd, *In re Application of Chevron Corp.*, No. 1:10-mc-00021-JCH-LFG (D.N.M.), Dkt. 63-2); Exhibit 384 (Exhibit 46 to 2010.08.28 Declaration of O. Andrew F. Wilson, *In re Application of Chevron Corp.*, No. 10-mc-00002 (LAK) (S.D.N.Y.), Dkt. 31-6).

288.    The RICO Defendants have repeatedly invoked these 2008 Lago Agrio orders, even though much of their extensive recruitment, meeting, and collusion with Cabrera occurred in 2007.  They have also sought to explain Cabrera's various fraudulent statements to the court that he was independent from them, by asserting, in a federal court filing signed by Wilson of Emery Celli, that those statements were "made before the [Lago Agrio] court order authorizing him to get material from the parties," and argued that "[w]hen the [Lago Agrio] Court ordered Mr. Cabrera to consider whatever submissions were provided by the parties, the landscape changed considerably.  Nevertheless, Chevron conflates Mr. Cabrera's 2007 statements with conduct that occurred *after* Court authorization was given in 2008 . . . ."[670]

289.    The RICO Defendants' and their co-conspirators' attempt to excuse their conduct based on these orders is unavailing on its face.  These orders were issued a year after their close relationship with Cabrera began, and they do not authorize anything like what transpired.  Indeed, when confronted with the evidence of the RICO Defendants' prior relationship with Cabrera, Donziger himself admitted that he and his co-conspirators "met with and interacted with Mr. Cabrera both before and after" the Lago Agrio court issued its January 2008 order.[671]  Their defense is also incompatible with their statements to the Lago Agrio court *after* those orders were issued.  On April 25, 2008, Defendant Fajardo asserted in a filing in the Lago Agro court that it was "[a]nother infamy" that the plaintiffs were "accused of having a close relationship with Independent Expert Richard Cabrera."  "It is disappointing, your honor, that professionals with such experience have fallen into such childish and absurd arguments."[672]  And this defense ignores the fact that the one submission the RICO Defendants made to Cabrera

---

[670] Exhibit 317 (2010.05.17 Plaintiffs' Reply in Support of Motion for a Protective Order, *Chevron Corp. v. Stratus Consulting, Inc.*, No. 10-cv-00047 (MSK) (MEH) (D. Colo.)) at 2.

[671] Exhibit 6 (2010.12.29 Donziger Dep.) at 2280:9-17.

[672] Exhibit 213 (2008.04.25 Plaintiffs' Filing responding to Chevron's position on Cabrera neutrality, Lago Agrio Litigation) at 140266.

pursuant to court order was expressly limited to documents from "public institutions in the country," which does not include the work of their own consultants—an inconsistency they have conceded in private correspondence.[673]

290.    The RICO Defendants' constant refrain, that "materials" were "submitted" to Cabrera, who "reviewed" them, is contradicted by the RICO Defendants' own records.  As detailed previously, Stratus was finalizing what would be adopted "whole cloth" by Cabrera just before he filed it, and it is simply impossible that he gave it any meaningful review in the few hours he could have had to do so.  Nor is it credible that any revisions he might have made in that brief period were material.  The RICO Defendants knew exactly what he would file because it was what they wrote.  Indeed, the day *before* Cabrera filed the report, Donziger had in his possession a table of damages amount that matched those in the Cabrera report to the penny for numerous categories, including cancer deaths, ecosystem losses, unjust enrichment, and remediation.  In their total estimates, Donziger's table and the Cabrera report differed by less than one tenth of a percent.[674]

291.    Nonetheless, the RICO Defendants continue to assert in U.S. federal court that their relationship with Cabrera was pursuant to those orders and fully disclosed to the Lago Agrio court.[675]  Before the Third Circuit, for example, the RICO Defendants recently asserted that, "The Ecuadorian court was and is well aware of the Ecuadorian Plaintiffs' *ex parte* contacts with Cabrera and submission of materials to him—and indeed, *invited* such contacts and

[673] Exhibit 318 (2010.04.24 Email chain among S. Donziger, A. Wilson, and others re "Fajardo Letter.pdf") (DONZ00055883) at 1.

[674] Exhibit AP (certified translation of 2008.03.31 Email from S. Donziger re: "table") (DONZ-HDD-0032998).

[675] Exhibit 319 (2010.12.08 Ecuadorian Plaintiffs' Opposition to the Chevron Applicants' Application for Discovery Under 28 U.S.C. § 1782, *In re Application of Chevron Corp.*, No. 10-MC-209 (JD) (E.D. Pa.)) at 5-6.

submissions."[676]  Of course, if the court was aware of the RICO Defendants' collusion with Cabrera, which was roundly denied by the RICO Defendants and Cabrera for years, that merely implicates the court in the fraud.  It does not excuse or justify it.

292.     In depositions ordered by U.S. courts, the RICO Defendants have continued to obstruct Chevron's investigation, and maintained untenable positions in the face of overwhelming evidence.  For example, Defendant Ann Maest, despite her appearance in the *Crude* outtakes participating in a *meeting* with Cabrera at which the Cabrera Report was planned, denied under oath that she had "any contact with Mr. Cabrera in conjunction with [her] work[.]" When asked about the meeting, she simply asserted, "I don't recall that," ignoring the fact that, as she would admit just a few minutes later, she had watched the video of the meeting within the past two weeks.  Then, when the video was shown to her, and she was asked about Fajardo's statement that "the work isn't going to be the expert's," she testified that she "didn't know what he meant," and she denied understanding that Chevron would be excluded from that work, despite clearly being shown commenting and laughing about that very subject on the video, and the fact that her own handwritten notes from the meeting contain the following phrase, marked by a large star: "Only plaintiffs are doing Peritaje Global, not Chevron."[677]  Throughout her deposition testimony, nearly every time she was shown evidence—often her own work product—that Stratus had knowingly prepared the Cabrera Report and intended it to be misperceived as independent, she claimed she did not remember, or did not understand, the evidence.[678]  When confronted with Cabrera's repeated denials of assistance from the RICO Defendants, Maest testified that she had discussed this with Beltman, and that their conclusion

---

[676] Exhibit 186 (2011.01.19 Brief of Ecuadorian Plaintiffs, *In re Application of Chevron Corp.*, Nos. 10-4699, 11-1099 (3d Cir.)) at 13.

[677] Exhibit AQ (2010.12.08 Deposition of Ann S. Maest, *In re Application of Pallares*, 10-cv-02528-PAB-MEH (D. Colo.) ("2010.12.08 Maest Dep.")) at 114, 120, 175-77, 184, 295.

[678] Exhibit AQ (2010.12.08 Maest Dep.) at 219-20, 230, 233-34, 236, 240, 311-13.

was simply that "in Latin culture, for men it's not something that you want to admit, that you are getting help[.]"[679]  Among the few things she would admit in her testimony was that the conspirators understood that their meetings with Cabrera had to be kept secret.[680]

293.    The RICO Defendants have also made the false claim, first before the District of Colorado and then before other courts, that Cabrera disclosed his contacts with the conspirators in his report.  In support of this new position, they specifically referred to a citation in the Cabrera Report which they quoted as, "*Excerpts from . . . Selva Viva 2002-2006*" (emphasis and alteration in original).[681]  But the full citation, without the conspirators' carefully placed ellipses, plainly referred to a specific set of documents related to the judicial inspections, and does not disclose anything resembling the wholesale ghostwriting that actually occurred.

294.    The RICO Defendants and their co-conspirators also claimed that their submissions to Cabrera were "privileged," and that Ecuadorian law permitted parties secretly to submit materials to court officials without disclosing those materials to other parties.[682]  In support of this claim, the RICO Defendants and their co-conspirators submitted a declaration that cited no legal authority whatsoever.[683]

---

[679] Exhibit N (2011.01.19 Maest Dep.) at 119-20.

[680] Exhibit N (2011.01.19 Maest Dep.) at 111:20-24.

[681] Exhibit 320 (2010.05.05 Lago Agrio Plaintiffs' Brief in Support of Motion for Protective Order, *Chevron Corp. v. Stratus Consulting, Inc.*, No. 10-cv-00047 (MSK) (MEH) (D. Colo.)) at 4-5; Exhibit 316 (2010.05.05 Declaration of P. Fajardo in Support of Lago Agrio Plaintiffs' Motion for Protective Order, *Chevron Corp. v. Stratus Consulting, Inc.*, No. 10-cv-00047 (MSK) (MEH) (D. Colo.)), ¶ 5.

[682] Exhibit 320 (2010.05.05 Lago Agrio Plaintiffs' Brief in Support of Motion for Protective Order, *Chevron Corp. v. Stratus Consulting, Inc.*, No. 10-cv-00047 (MSK) (MEH) (D. Colo.)) at 13, 21-22.

[683] Exhibit 321 (2010.05.05 Declaration of A. Neidl in Support of Lago Agrio Plaintiffs' Motion for Protective Order, *Chevron Corp. v. Stratus Consulting, Inc.*, No. 10-cv-00047 (MSK) (MEH) (D. Colo.)).

295.    In another attempt to excuse their conduct, the RICO Defendants and their co-conspirators have falsely asserted that their conduct was no different from Chevron's relationship with other court experts.  But the RICO Defendants know that there is no "real comparison" to be made and that any such comparison would not be "legitimate," as Eric Westenberger, an attorney at Patton Boggs, wrote to Donziger and others back in July 2010.[684]

296.    Indeed, the RICO Defendants' internal correspondence is replete with admissions that they were relying on unsupportable theories and distinctions to avoid disclosure. In March 2010, Andrew Woods learned from Donziger of the circumstances surrounding the first of several withdrawals by counsel representing the RICO Defendant in the Stratus Section 1782 proceedings.  He immediately advised Donziger to seek outside counsel regarding his potential personal liability for the manufacturing of the Cabrera Report.[685]  Donziger did so, and immediately thereafter began creating a false record that tried to put the blame for the misconduct on his Ecuadorian colleagues, writing a memo to "file" asserting that he had been misled.[686]

297.    But then in an April 2010 letter to his co-conspirators, Donziger bluntly acknowledged that their relationship with Cabrera was "a violation of local court rules," and "improper" under a "traditional Ecuadorian law perspective.  By working so closely with our local counsel and Stratus, Cabrera violated his duties to the court."[687]  And on May 16, 2010,

---

[684] Exhibit AR (2010.07.22 Email from E. Westenberger to S. Donziger re "Ecuador Filing") (DONZ00058111).

[685] Exhibit AS (2010.03.18 A. Woods Memorandum to File re "Conversation with Steven Donziger regarding Constantine Cannon's decision to not participate in case") (WOODS-HDD-0210541).

[686] Exhibit AT (2010.03.22 S. Donziger Memorandum to File re "Denver action/ethical issues") (DONZ-HDD-0008520).

[687] Exhibit AO (2010.04.17 Letter from S. Donziger to fellow counsel) (DONZ-HDD-0004621).

attorney Ilann Maazel of Emery Celli, conceded in an email to co-counsel that, "the core basis for the 1782 is nevertheless apparently correct: neither Cabrera nor plaintiffs disclosed a submission from plaintiffs that contained drafts of part of the expert report written by Stratus."[688]  Yet the very next day, the RICO Defendants caused to be filed in federal court a brief containing the claim that all contact between Cabrera and the RICO Defendants was disclosed.[689]

298.    In response to another suggested defense, in which the conspirators would argue that the only fraud shown by the record was Donziger's and not the "clients'" thus supposedly protecting privilege, Donziger complained that, "you're throwing me under the bus," and noted that there was substantial evidence that Yanza was involved in any fraud.  Co-conspirator Ilann Maazel of Emery Celli assured him that Yanza was not his client, but Donziger pointed out that Yanza was associated with the Front, which stood to receive 10% of any judgment.  These concerns notwithstanding, the RICO Defendants and their co-conspirators have pressed this argument in numerous U.S. courts.[690]

299.    The RICO Defendants' and their co-conspirators' attempt to whitewash their conduct was insupportable on its face, and Chevron's subsequent discovery of their true conduct has demonstrated how baseless these attempts were.  The RICO Defendants and their co-conspirators did not submit materials to Cabrera so that he could independently review them; rather, they submitted materials for him to sign and submit to the court under his name.  Nor did they ever intend to disclose this to Chevron, or to anyone.  As Donziger put it, their specific

---

[688] Exhibit 185 (2010.05.16 Email chain among S. Donziger, J. Abady, I. Maazel, and others re "Motion Under Rule60(B)(3)") (DONZ00056668) at 1.

[689] Exhibit 317 (2010.05.17 Plaintiffs' Reply in Support of Motion for a Protective Order, *Chevron Corp. v. Stratus Consulting, Inc.*, No. 10-cv-00047 (MSK) (MEH) (D. Colo.)) at 2.

[690] Exhibit 322 (2010.09.22 Email from S. Donziger to I. Maazel re "Re: crime fraud legal point") (DONZ00031628).

intent with respect to Chevron's knowledge of the RICO Defendants' relationship with Cabrera was to make sure "that they don't know shit."[691]

300.     The RICO Defendants offered these false statements in part because they hoped to avoid discovery of their misconduct, but also in an effort to at least forestall disclosure as long as possible through factual misrepresentations and the obstructive filing of meritless court papers.  Through this strategy, they would buy themselves time to allow the Lago Agrio court to issue its judgment against Chevron under which the only basis for liability would be the fraudulent Cabrera Report.  In May 2010, as the conspirators realized that the truth of their relationship would start to come out, Donziger described their strategy: "I think we should appeal on the theory that we gain a greater advantage by fighting them on everything, and tying them up, than in conceding any one thing even if we expect to ultimately lose that one thing down the road."[692]   And another conspirator, Eric Westenberger of Patton Boggs, spelled it out in more specific terms in an email to Donziger and co-conspirators at Emery Celli, Motley Rice, and H5: "What about the following?  Appeal; move for stay; if we win with [the District Court Judge] great; if we lose, we produce whatever we want (narrow read); [Gibson Dunn] complains and then we move for clarification.  If we lose again, we think about another appeal."[693]

301.     The RICO Defendants have also tried to distract attention from Chevron's discovery by concocting false allegations against Chevron as a diversionary tactic.  For example, they have sought to try to blame the Judge Núñez bribery solicitation scandal on Chevron, even though their own special counsel on the issue concluded that "Chevron is telling the truth" when

---

[691] Exhibit 1, CRS-196-00-01 (2007.03.04 *Crude* outtake video clip of meeting among S. Donziger, A. Maest, C. Champ, and R. Kamp discussing groundwater evidence); Exhibit 2 (certified transcript) at 266.

[692] Exhibit 323 (2010.05.27 Email from S. Donziger to A. Wilson re "Ecuador/Texas Foundational Dep. Ordered") (DONZ00031335).

[693] Exhibit 292 (2010.05.27 Email chain  among S. Donziger, E. Westenberger, and others re "Mini-revelation") (DONZ00031337) at 1.

it claimed not to have "even known about these conversations" at the time they first occurred.[694] When news of the RICO Defendants' improper relationship with court experts began to become public in 2010, co-conspirator Prieto suggested that they use the bribery solicitation as an excuse for "starting a new action on our own to mitigate and counteract the effects of what might happen in Denver?" He also suggested that this could be a means of getting broader discovery for their pressure campaign: "Chevron must have some skeletons in the closet. Let's search."[695] The RICO Defendants eventually followed Prieto's suggestion, bringing just such an action in federal court in California.

302.    The evidence that Chevron has uncovered in the Section 1782 proceedings, in spite of the RICO Defendants' and their co-conspirators' obstructive tactics, has inspired strong language from several federal courts. For example, the District Court in the District of New Jersey held that the conduct in furtherance of the conspiracy could not constitute "anything but a fraud on the judicial proceeding."[696]   And, regarding videotaped evidence of the criminal enterprise that Chevron has obtained, Judge Kaplan of the Southern District of New York found that "the outtakes contain substantial evidence of misconduct in and relating to the Ecuadorian litigation."[697]   Specifically, Judge Kaplan noted that the outtakes "contain substantial evidence that Donziger and others (1) were involved in ex parte contacts with the court to obtain appointment of the expert, (2) met secretly with the supposedly neutral and impartial expert prior to his appointment and outlined a detailed work plan for the plaintiffs' own consultants, and

---

[694] Exhibit AU (2009.12.23 Email from G. Fine to S. Donziger re "Re: read this and let's talk tomorrow") (DONZ00129504) at 2.

[695] Exhibit AV (certified translation of 2010.04.05 Email from S. Donziger to J. Prieto, P. Fajardo, J. Saenz, and L. Yanza re "Re: Suggestion") (DONZ00031148).

[696] Exhibit 324 (2010.06.17 Hr'g Tr., *In re Application of Chevron*, No. 10-2675 (SRC) (D.N.J.)) at 23:19-20.

[697] *In re Application of Chevron Corp.*, No. 10 MC 00001 (LAK), 2010 WL 3489341, at *1 (S.D.N.Y. Sept. 7, 2010).

(3) wrote some or all of the expert's final report that was submitted to the Lago Agrio court and the Prosecutor General's Office, supposedly as the neutral and independent product of the expert."[698]  The Western District of North Carolina court also found that "what has blatantly occurred in this matter would in fact be considered fraud by any court,"[699] while the District of New Mexico court concluded, "[t]he release of many hours of the outtakes has sent shockwaves through the nation's legal communities, primarily because the footage shows, with unflattering frankness, inappropriate, unethical and perhaps illegal conduct."[700]  The District of New Mexico court also found that the RICO Defendants have engaged in "corruption of the judicial process, fraud, attorney collusion with the Special Master, inappropriate *ex parte* communications with the court, and fabrication of reports and evidence."[701]

303.    Numerous courts have also found that the crime-fraud exception to the attorney-client privilege applied and thus did not shield the RICO Defendants' and their co-conspirators' pervasive fraud from discovery.  The District Court for the Southern District of California, for example, reasoned that there "is ample evidence in the record that the Ecuadorian Plaintiffs secretly provided information to Mr. Cabrera, who was supposedly a neutral court-appointed expert, and colluded with Mr. Cabrera to make it look like the opinions were his own."[702]  That

---

[698] *In re Application of Chevron Corp.*, No. 10 MC 00002 (LAK), 2010 WL 4118093, at *2 (S.D.N.Y. Oct. 20, 2010).

[699] Exhibit 325 (2010.08.30 Order, *In re Application of Chevron Corp.*, Nos. 1:10 mc 27, 1:10 mc 28 (GCM) (DLH) (W.D.N.C.)) at 12.

[700] Exhibit 326 (2010.09.02 Amended Memorandum Opinion and Order authorizing discovery, *In re Application of Chevron Corp.*, Nos. 10-MC-21, 10-MC-22 JH/LFG (D.N.M.)) at 3-4.

[701] Exhibit 326 (2010.09.02 Amended Memorandum Opinion and Order authorizing discovery, *In re Application of Chevron Corp.*, Nos. 10-MC-21, 10-MC-22 JH/LFG (D.N.M.)) at 3.

[702] Exhibit 327 (2010.09.10 Order denying Respondent E-Tech's appeal, *In re Application of Chevron*, No. 10-CV-1146 (IEG) (S.D. Cal.)) at 9.

court subsequently found that the crime-fraud exception applied to discovery of co-conspirator William Powers, finding that he was "deeply involved [in the fraud] in that his work product was apparently adopted whole cloth by the allegedly neutral expert Cabrera."[703]  Similarly, the District Court of New Mexico noted that "exchanges" among the RICO Defendants "trigger the crime-fraud exception, because they relate to corruption of the judicial process, the preparation of fraudulent reports," and "the fabrication of evidence."[704]  And the Southern District of New York noted that "there is more than a little evidence" that the activities of the RICO Defendants "come within the crime-fraud exception."[705]

### 2.   Making False Statements to Deceive New York Courts in Connection With Chevron's Section 1782 Applications and Other Actions

304.     The RICO Defendants' and their co-conspirators' deliberate misrepresentations to federal courts have not been limited to lies about their relationship with Cabrera and the authorship of the Cabrera Report.  Rather, the RICO Defendants and their co-conspirators have made, or caused to be made, a number of false statements before federal courts in New York in connection with their attempt to prevent the discovery of certain *Crude* outtakes in a Section 1782 proceeding and in the case the Lago Agrio Plaintiffs filed, through co-conspirator Emery Celli, to stop Chevron's arbitration with Ecuador in a bilateral investment treaty proceeding.

305.     Before the Southern District of New York, the RICO Defendants and their co-conspirators made a series of false statements regarding *Crude* and the contents of the outtakes from filming sought by Chevron pursuant to Section 1782.  When Chevron discovered evidence

---

[703] Exhibit AW (2011.02.11 Order Re: Discovery Relating To Emails and Metadata, *In re Application of Chevron Corp.*, 3:10-cv-01146-IEG-WMC (S.D. Cal.)) at 3-4.

[704] Exhibit 328 (2010.09.13 Memorandum Opinion and Order rejecting claims of attorney-client privilege and ordering production of documents, *In re Chevron Corp.*, Nos. 1:10-mc-00021-22 (LFG) (D.N.M.)) at 11.

[705] *In re Application of Chevron Corp.*, No. 10 MC 00002 (LAK), 2010 WL 4910248, at *21 (S.D.N.Y. Nov. 10, 2010).

that a scene in *Crude* had been modified at the RICO Defendants' request in order to suppress evidence of meetings between the RICO Defendants and Cabrera team member Carlos Beristain, the RICO Defendants told the court that the meeting was "innocuous" and "of no relevance to anything."[706]  Similarly, on appeal of the district court's order requiring production of the *Crude* outtakes, the RICO Defendants and their co-conspirators claimed that they had requested Berlinger to delete the scene from the DVD version of the film only to "avoid the misimpression, cynically fostered by Chevron below, that [the Lago Agrio] plaintiffs participated in one of Dr. Beristain's focus groups *after* he was a court expert" (emphasis in original).[707]  In fact, however, the meeting from which Beristain was carefully edited out of the picture was a meeting arranged and funded by the RICO Defendants and their co-conspirators as part of their scheme to control the content of the Cabrera Report.[708]  Nor was that the only evidence of wrongdoing that disclosure of the video would record.  And the attorney who signed the brief in the Second Circuit, Ilann Maazel of Emery Celli, knew that the Beristain footage would turn out to be much less damaging than what he knew the outtakes would contain:  "a meeting with Steve, Pablo, Stratus, and Cabrera," as he informed his co-counsel when the Second Circuit's order compelling production was announced.[709]

---

[706] Exhibit 329 (2010.04.23 Lago Agrio Plaintiffs' Memorandum in Opposition to Application, *In re Application of Chevron*, No. M-19-111 (S.D.N.Y.)) at 8.

[707] Exhibit 330 (2010.06.14 Brief and Special Appendix for Respondent-Appellant Lago Agrio Plaintiffs, *Chevron Corp. v. Berlinger*, No. 10-1918-cv(L) (2d Cir.)) at 23.

[708] Exhibit 1, CRS-161-01-01-CLIP-01 (*Crude* outtake video clip of meeting among S. Donziger, P. Fajardo, and L. Yanza re C. Beristain's role in expert report); Exhibit 2 at 128-135; Exhibit 91 (Transcript of J. Berlinger film *Crude*) (MB-NONWAIVER00092726) at 48-49; Exhibit 4 (*Crude* DVD) at 2:14-2:16; Exhibit 331 (2007.05.07 Email from P. Fajardo to C. Beristain re "CALENDARIO DE REUNIONES" ["MEETINGS PLAN WITH C"]) (DONZ00043170) at 1.

[709] Exhibit 332 (2010.07.15 email from I. Maazel to E. Westenberger and others re "2d Cir. order") (DONZ00057972) at 3.

306.     Judge Kaplan noted that Berlinger's representations regarding the contents of those outtakes, which were adopted by the RICO Defendants through their agent and co-conspirator Emery Celli have "proved inaccurate."  Judge Kaplan observed that "[t]hese and similar instances are worrisome in considering their present claims."[710]

307.     In addition to the false statements concerning *Crude*, the conspirators have made misrepresentations in two other cases before the Southern District of New York.  One of those cases was brought by the Republic of Ecuador and Petroecuador and the other was filed by the RICO Defendants (ostensibly on behalf of the Lago Agrio Plaintiffs), through their agent and co-conspirator Emery Celli, in an attempt to stay the Treaty Arbitration Chevron had commenced as a result of Ecuador's failure to abide by the terms of the 1998 Final Release.[711]  In making false statements about Cabrera in both proceedings in related actions before this Court, the RICO Defendants have attempted to deceive the Court.

308.     On January 14, 2010, co-conspirator Emery Celli filed an action ostensibly on behalf of the Lago Agrio Plaintiffs in the United States District Court for the Southern District of New York, seeking a court order compelling Chevron to stay the bilateral investment treaty proceeding.  The complaint alleged that "[t]he best and most recent *independent* estimate available of the human health impact of this contamination is provided by the *neutral Special Master* [Cabrera] appointed by the [Lago Agrio] court to provide advice on damages."[712]

---

[710] *In re Application of Chevron Corp.*, No. 10 MC 00001 (LAK), 2010 WL 3489341, at *2 (S.D.N.Y. Sept. 7, 2010).

[711] Exhibit 94 (2010.01.14 Lago Agrio Plaintiffs' Complaint to Stay Arbitration, *Yaiguaje v. Chevron Corp.*, No. 10-CV-0316 (LBS) (S.D.N.Y.)), ¶ 31; *see Republic of Ecuador v. ChevronTexaco Corp.*, No. 04-CV-8378 (LBS) (S.D.N.Y.).

[712] Exhibit 94 (2010.01.14 Lago Agrio Plaintiffs' Complaint to Stay Arbitration, *Yaiguaje v. Chevron Corp.*, No. 10-CV-0316 (LBS) (S.D.N.Y.)), ¶ 29.

(emphasis added).  It further stated that "Dr. Cabrera appointed a team of 14 technical officials," and that "the final report [was] *produced by the Cabrera team . . . .*" (emphasis added).[713]

309.   This complaint also alleged that "[e]nvironmental remediation experts from the United States have reviewed the Cabrera report and found its conclusions reasonable and its damages assessment consistent with the costs of other large environmental clean-ups around the world."[714]  The "environmental remediation experts from the United States" were the RICO Defendants themselves, a fact which was not disclosed by the RICO Defendants to this Court.

310.   In previous litigation between Chevron and the Republic of Ecuador, the RICO Defendants prevailed upon counsel for the Republic of Ecuador, Winston & Strawn, to amend the Republic of Ecuador's pleadings to include allegations that TexPet's 1998 Release was obtained through fraudulent misrepresentations.[715]  Defendant Donziger described the allegation as a "hammer" that he could use in the Lago Agrio Litigation.[716]  Donziger was then called upon by senior Ecuadorian officials to coach witness testimony in support of the allegation.[717]  But this allegation was made in bad faith and without sufficient evidence, for the improper purpose of gaining "leverage" over Chevron outside of the litigation in which it was asserted, and ultimately could not be sustained.  And two months later, the Republic of Ecuador insisted that the allegation be withdrawn because no witness could be found to support a necessary element of

---

[713] Exhibit 94 (2010.01.14 Lago Agrio Plaintiffs' Complaint to Stay Arbitration, *Yaiguaje v. Chevron Corp.*, No. 10-CV-0316 (LBS) (S.D.N.Y.)), ¶ 30.

[714] Exhibit 94 (2010.01.14 Lago Agrio Plaintiffs' Complaint to Stay Arbitration, *Yaiguaje v. Chevron Corp.*, No. 10-CV-0316 (LBS) (S.D.N.Y.)), ¶ 31.

[715] Exhibit D (2011.01.19 Donziger Dep.) at 3474-3517; Exhibit AX (2006.06.21 Plaintiffs' Notice of Motion to Amend Reply, *Republic of Ecuador v. ChevronTexaco*, 04-cv-8378 (LBS) (S.D.N.Y.)).

[716] Exhibit 76 (2006.09.27 Entry in Composite of S. Donziger Personal Notes) (DONZ00027256) at 53 of 109.

[717] Exhibit AY (certified translation of 2006.09.04 Email from G. De Heredia to S. Donziger re "Witness waits for instructions") (DONZ-HDD-0086482).

the fraud claim and sanctions could therefore be imposed.  Donziger nevertheless convinced the

Republic of Ecuador to falsely state to the court that "it was being withdrawn not because it was

not valid, but for reasons of stringent scheduling set by [the Court]."[718]  With the lack of

evidence obscured, Donziger continued to represent to Chevron that "we will have a special

witness from the government who will testify about fraud during the examination," a ruse

intended to keep a "hammer" over Chevron's head, which he referred to as "misdirection."[719]

As Donziger wrote, "this backs up my litigation strategy of filing losing motions to create

leverage."[720]

### 3.   Obstructing Judicial Proceedings by Tampering With Witnesses, Withholding Documents, and Making False Statements to This Court

311.    Donziger, the mastermind of the RICO Defendants' fraudulent scheme, has also

been a leading actor in the attempted cover-up of the criminal scheme in U.S. courts.  He has

tampered with the testimony and sworn submissions of at least two other witnesses, Mark

Quarles and Dr. Charles Calmbacher, and he has defied multiple discovery orders from this

Court commanding him to produce his own documents, and lied to the Court repeatedly about

his noncompliance.

312.    Donziger has been working to prevent Chevron's discovery of the RICO

Defendants' scheme for years.  On or before September 17, 2007, the RICO Defendants and their

co-conspirators induced one of their consultants, Mark Quarles, to sign a declaration, which was

submitted in an action pending in the Southern District of New York, stating that "Mr. Cabrera

---

[718] Exhibit 76 (2006.10.02 Entry in Composite of S. Donziger Personal Notes) (DONZ00027256) at 49 of 109.

[719] Exhibit 76 (2006.10.25 Entry in Composite of S. Donziger Personal Notes) (DONZ00027256) at 43 of 109; *see also* Exhibit 6 (2011.01.19 Donziger Dep.) at 3506:1-3507:7.

[720] Exhibit 76 (2006.11.07 Entry in Composite of S. Donziger Personal Notes) (DONZ00027256) at 38 of 109.

and his team have acted independently from both the [Lago Agrio] plaintiffs and the defendant . . . ."[721]  During Quarles's recent deposition in a Section 1782 proceeding, Quarles testified that the statement concerning Cabrera's independence in his declaration was based on several days of observation of the global assessment process in 2007, and also on specific false representations by Donziger that Cabrera had written the work plan upon which the Cabrera Report was based. He further testified that Donziger paid him to conduct his observations and sign the declaration. Quarles testified that had he known that Cabrera was working directly with the lawyers for the Lago Agrio Plaintiffs (i.e., the RICO Defendants), he would not have signed the declaration.[722]

313.    Recent document productions from Donziger have further revealed that not only did Donziger push Quarles to swear to Cabrera's independence, he pressed for stronger language, and asked Quarles to remove language that would have hurt the RICO Defendants if the true facts were known.  On September 16, 2007, Donziger sent Quarles an email attaching Quarles's draft declaration.  Where Quarles had written a paragraph discussing the qualifications of Cabrera's team, Donziger requested that he replace that language with statements that Donziger knew to be utterly false: "Mr. Cabrera has at all times acted independently from both the plaintiffs and the defendant.  At no time has Mr. Cabrera entertained suggestions or even met with plaintiffs or their representatives regarding his current work plan."  Donziger then told Quarles to delete language suggesting that if any such contacts had taken place, "a degree of biasness would have been introduced into the sampling plan."[723]   Quarles accepted Donziger's request to delete the "biasness" passage, and ultimately signed a version containing the core of the false claim of independence.

---

[721] Exhibit 333 (2007.09.17 Declaration of M. Quarles, *Republic of Ecuador v. ChevronTexaco*, No. 04CV8378LBS (S.D.N.Y.)) at 3.

[722] Exhibit 334 (2010.09.01 Deposition of Mark Quarles, *In re Application of Chevron Corp.*, No. 3:10-cv-00686 (M.D. Tenn.)) at 115-16, 118-19, 121-22.

[723] Exhibit 335 (2007.09.16 Email with attachment from S. Donziger to M. Quarles re "your affidavit edited") (DONZ00063081) at 5.

314.    More recently, when the conspirators learned that Chevron would be taking Dr. Calmbacher's deposition in a Section 1782 proceeding, the RICO Defendants attempted to stop Calmbacher from exposing the truth about the falsified reports that Defendants and their co-conspirators filed in his name.

315.    Under the guise of seeking to move to quash the subpoena, Donziger contacted Dr. Calmbacher and attempted to convince him not to testify at his deposition, telling him that testifying could pose "real problems" for him and could result in a "potential law case against" him because "they're going to go after [him] for unprofessional behavior."[724]   Donziger had no factual basis upon which to make these statements, which were false and misleading.  When asked at his deposition whether "Donziger [was] trying to convince [him] not to come and testify," Calmbacher testified:  "Very much so.  Very much so."[725]

316.    Dr. Calmbacher disregarded Donziger's threats and outrageous claims, and testified pursuant to the court-authorized subpoena.  Shown copies of the reports filed by Defendants in the Lago Agrio court under his name, Dr. Calmbacher testified, "I did not reach these conclusions and I did not write this report."[726]   Dr. Calmbacher proceeded to explain how the conspirators sent him a version of his expert report that correctly stated his views and blank pages for him to initial so that they could obtain his signature for the falsified reports filed with the Lago Agrio court, as described in paragraphs 117-20, *supra*.[727]

317.    In the Section 1782 proceeding directed at Donziger himself, he has disregarded the Federal Rules of Civil Procedure and this Court's multiple express orders to produce all of his responsive documents.  With the approval of the Court, Chevron served a subpoena on

---

[724] Exhibit 136 (Calmbacher Dep.) at 144:24-145:7.

[725] Exhibit 136 (Calmbacher Dep.) at 145:8-10.

[726] Exhibit 136 (Calmbacher Dep.) at 116:9-10.

[727] Exhibit 136 (Calmbacher Dep.) at 60:22-63:11.

Donziger on August 9, 2010, seeking documents and testimony regarding many of the matters described in this Amended Complaint.  Donziger moved to quash the subpoena, and this Court denied that motion on October 20, 2010 and ordered Donziger to comply with the subpoena "forthwith."[728]  Further, because Donziger had failed to produce a privilege log, the Court held that any privilege claims over Donziger's documents were waived.  Nonetheless, the Court noted that it would "relieve [Donziger] of the waiver," if he "file[d] a complete privilege log on or before October 29, 2010."

318.    Donziger did not comply.  Instead he produced a fraction of his documents, filed meritless and conflicting papers with the Court, and then, nearly a month later, submitted a facially defective "privilege log."  On November 29, the Court *once again* ordered Donziger to produce his responsive documents, finding that Donziger's conduct "was a deliberate attempt to structure the response to the subpoenas in a way that would create the maximum possibility for delay."[729]  And Donziger once again failed to comply.

319.    At Donziger's deposition, his conduct was so improper that it prompted the Special Master, appointed by this Court to oversee the deposition, to write to the Court:  "From virtually the first day of his deposition, Mr. Donziger gave many unresponsive, self serving answers to questions that should have been answered directly, with no embellishment."[730]  The Special Master went on to describe how he had repeatedly cautioned Donziger and his counsel, but that this "seemed to have little effect."[731]

---

[728] *In re Application of Chevron Corp.*, No. 10 MC 00002 (LAK), 2010 WL 4118093, at *4 (S.D.N.Y. Oct. 20, 2010).

[729] *In re Application of Chevron Corp.*, 10 MC 00002 (LAK), 2010 WL 4922312, at *11 (S.D.N.Y. Nov. 30, 2010).

[730] Exhibit 336 (2010.12.27 Order, *In re Application of Chevron Corp.*, No. 10 MC 00002 (LAK) (S.D.N.Y.)) at 1.

[731] Exhibit 336 (2010.12.27 Order, *In re Application of Chevron Corp.*, 10 MC 00002 (LAK) (S.D.N.Y.)) at 1.

320.    On January 13, 2011, the Court *yet again*, in response to a motion to compel filed by Chevron, ordered Donziger to produce the documents he had been under orders to produce since October, and held in reserve the possibility of holding Donziger in contempt. Over the next several days, Donziger, without explanation for his prior failure to do so, produced over 87,000 documents, four times as many as he had produced before, the vast majority of which were responsive to Chevron's requests, and included many of the probative documents that form the basis for this Amended Complaint.  Yet, in deposition testimony immediately following this production, Donziger admitted that he had yet *more* responsive documents, such as those in email accounts that the RICO Defendants set up specifically to hide sensitive communications about, among other topics, their authorship of the Cabrera Report.[732]

321.    Accordingly, on January 21, the Court ordered Donziger to turn over the computer hard drives in his possession, so that Chevron could test the sufficiency of his production.  On these hard drives were *thousands* more documents that were responsive to Chevron's requests and highly relevant to Chevron's defense of the Lago Agrio Litigation and its prosecution of the BIT Arbitration but that Donziger had failed to produce.  Many of the documents Donziger had withheld were highly probative and damning materials that revealed the RICO Defendants' scheme in even greater detail, including emails about meetings with the judge in Lago Agrio and with President Correa, memos regarding the obstruction of Chevron's discovery efforts in the United States, and other documents revealing further falsehoods made by the RICO Defendants to the press and to government agencies.

322.    This hidden cache of documents is not the end of the story.  Donziger produced seven hard drive images in response to the Court's order, and assured Chevron, through counsel, that those were all that he had, and that he was "not aware of any use by him or others

---

[732] Exhibit 6 (2011.01.18 Donziger Dep.) at 3012:14-3013:12, 3017:5-21, 3057:17-3059:19, 3086:23-3089:18.

of thumb drives or similar devices and, accordingly, does not have any."[733]  But analysis of the hard drive images provided by Donziger revealed that at least 79 unique external storage devices, including 7 external hard drives, 1 zip drive, and 59 flash drives had been connected to those hard drives at various times.[734]  The analysis also revealed that on August 4, 2010, two different external storage devices were attached to Donziger's computers—that was the day after Chevron made its first public filing containing the outtakes from *Crude* that showed Donziger's March 3, 2007 meeting with Cabrera.[735]

323.    Confronted with this analysis, Donziger admitted that he "might have" used a flash drive "once or twice," and that he might have used one in the last six to eight weeks in connection with the Lago Agrio Litigation, but that he does not have it anymore, and does not know where it is or why he does not have it.[736]

**D.    Chevron Has Suffered Substantial Damages as a Result of the RICO Defendants' Conspiracy, and Enforcement of the Corrupt Judgment in the Lago Agrio Litigation Would Deepen the Harm**

324.    The RICO Defendants and their co-conspirators have used the corruption and politicization endemic to the Ecuadorian judicial system to their advantage and by colluding with the Ecuadorian government and corrupting the court and its "neutral" expert.  Indeed, as Judge Kaplan explained, "there is evidence to support Chevron's claim that the 'global assessment' is a fraud . . . .  There is evidence too that other expert evidence submitted to the Ecuadorian courts on behalf of those plaintiffs also was fraudulent.  Chevron thus stands in jeopardy of a huge

---

[733] Exhibit AZ (2011.01.28 Email from T. Haggerty to K. Hendricks re "Re: Hard Drives").

[734] Exhibit BA (2011.02.01 Second Supplemental Declaration of Michael F. McGowan ("McGowan Decl.")) ¶¶ 5-6, 10, 23-24.

[735] Exhibit BA (McGowan Decl.) ¶¶ 26-27.

[736] Exhibit D (2011.01.29 Donziger Dep.) at 3671:8-11; 3671:20-21; 3673:2-9; 3673:19-24; 3671:18-3676:13; 3685:21-3686:23.

judgment that, if ultimately rendered, could be the result of a fraud practiced by the Lago Agrio plaintiffs."[737]

325.    On February 14, 2011, the Lago Agrio court did just that when it announced its judgment, awarding $8.65 billion in supposed damages, another $865 million on top of the damages to the Front as the Lago Agrio plaintiffs' representative, and $8.65 billion in punitive damages, all of which are unsupported by law or evidence.  In accordance with the conspirators' longstanding strategy, the award is lower than the amounts the RICO Defendants claimed, so as to allow the RICO Defendants to argue that the judgment was supposedly fair because the court "cut down the largest part."[738]  On its face, the judgment confirms that it was not the product of anything resembling a fair process and instead purports to impose record-breaking liability on Chevron without even the pretense of a finding that Chevron actually caused any harm.  While disclaiming reliance on Cabrera, the judgment necessarily relied on Cabrera's fraudulent report (the only "evidence" of causation in the case) and on the reports of the RICO Defendants' other "new" experts, such as Allen, Shefftz and Barnthouse, whose reports were designed by the RICO Defendants and their co-conspirators to "whitewash" the Cabrera Report and who themselves have admitted to relying on the Cabrera Report, rather than conducting their own independent analyses.[739]  The judgment further imposed another $8.65 billion as "punitive" damages,

_____

[737] *In re Application of Chevron Corp.*, No. 10 MC 00002 (LAK), 2010 WL 4910248, at *2 (S.D.N.Y. Nov. 10, 2010).

[738] Exhibit 1, CRS-159-00-CLIP-06 (2007.01.16 *Crude* outtake video clip of meeting among S. Donziger, P. Fajardo, L. Yanza, J. Saenz, A. Ponce, J. Prieto, and others); Exhibit 2 (certified transcript) at 125.

[739] *See* Exhibit EL (English translation of *Estimated Cost of Delivering Health Care to the Affected Population of the Concession Area of Ecuador* by Carlos E. Picone, M.D., F.C.C.P., Appendix C to the September 16, 2010 filing in the Lago Agrio Litigation by Plaintiffs, as provided at http://chevrontoxico.com/news-and-multimedia/2010/0917-summary-of-analysis-of-damages-to-ecuadors-amazon-basin.html) at 6; Exhibit EM (English translation of *Environmental Damages Valuation* by Douglas C. Allen, P.A., Appendix A to the September 16, 2010 filing in the Lago Agrio Litigation by Plaintiffs, as provided at

[Footnote continued on next page]

although Ecuadorian law does not allow for punitive damages and the Lago Agrio Plaintiffs did not even seek such damages in their complaint.[740]  The Lago Agrio court stated that it would relieve Chevron of this "punitive penalty" only if Chevron issued a public "apology" in both the Ecuadorian and United States press, effectively admitting liability, within fifteen days of the judgment.[741]  The apparent purpose of this penalty was to coerce an unjustified admission of liability from Chevron by making the cost of an appeal equal to $8.65 billion so that Chevron could not possibly successfully appeal or challenge enforcement later.  In addition, the judgment all but ignored Chevron's undisputed evidence of the RICO Defendants' misconduct, including the Calmbacher and Cabrera frauds.

326.    The RICO Defendants and/or their co-conspirators were also closely involved in either the actual drafting of portions of the 188-page judgment or providing to Judge Zambrano—or whoever actually wrote the judgment—on an ex parte basis material that is not part of the public record in the Lago Agrio Litigation.  For example, portions of the judgment rely on information that was obtained from and exclusive to the "Selva Viva Database"—the same database controlled by the RICO Defendants and their co-conspirators and the source of at least two annexes of the Cabrera Report.[742]  The Selva Viva Database, however, is not part of the Lago Agrio Litigation public record.[743]  The judgment, for instance, uses an irregular naming

---

[Footnote continued from previous page]
    http://chevrontoxico.com/news-and-multimedia/2010/0917-summary-of-analysis-of-damages-to-ecuadors-amazon-basin.html) at 15-17.

[740] Exhibit BB (certified translation of 2011.02.15 Declaration of Dr. César Coronel Jones, *Chevron Corp. v. Donziger*, No. 1:11-cv-00691 (LAK) (S.D.N.Y.), Dkt. 95), ¶¶ 12-15.  *See also* Exhibit DJ (2007.04.22 Memorandum from S. Donziger to J. Kohn re "Ecuador Work Plan") (DONZ00085215) at 2.

[741] Exhibit C (certified translation of 2011.02.14 Judgment, Lago Agrio Court) at 184-86.

[742] Exhibit BC (Declaration of Michael L. Younger, *Chevron Corp. v. Donziger*, No. 1:11-cv-00691 (LAK) (S.D.N.Y.), Dkt. 300 ("Younger Decl.")), ¶¶ 9-17.

[743] Exhibit BC (Younger Decl.), ¶ 10.

convention for samples that is otherwise unique to the Selva Viva Database.[744]  The judgment also repeats data errors and other irregularities that are unique to the secret Selva Viva Database. For example, the judgment treats samples that show that no mercury was detected as having detected "alarming levels of mercury" at 7 mg/kg.[745]  The reason for this unambiguous error is the fact that the "<" symbol indicating that there was "<7 mg/kg" detected—which was the detection limit for the laboratory's testing equipment—appears in a separate column in the Selva Viva Database.  And whoever wrote the judgment simply transposed the detection limit without the "<" symbol.[746]  Another error is that the judgment claims that results for certain samples are in milligrams per kilogram (mg/kg) when they are really in *micrograms* per kilograms (μg/kg) to arrive at contaminant levels a thousand times higher than the samples actually showed.  Again, the source of this error is mistakes in the Selva Viva Database in which the results were mislabeled.[747]  The judgment contains some the same errors contained in the Cabrera Report, but it also contains additional errors of the same types that are not included in the Cabrera Report but that are included in the secret Selva Viva Database—proving that whoever wrote the judgment relied on the secret Selva Viva database itself, and not the Cabrera Report.[748]  In addition, the judgment relies on other internal, non-public documents prepared by the RICO Defendants and their co-conspirators and repeats the exact same errors found in those documents, including citations to the wrong page in the *Lago Agrio* record, grammatical errors,

---

[744] Exhibit BC (Younger Decl.), ¶¶ 14-15.

[745] Exhibit C (certified translation of 2011.02.14 Judgment, Lago Agrio Court) at 109; Exhibit BC (Younger Decl.), ¶ 16.

[746] Exhibit BC (Younger Decl.), ¶ 16.

[747] Exhibit BC (Younger Decl.), ¶ 16.

[748] Exhibit BC (Younger Decl.), ¶ 17; Exhibit BD (2011.04.15 Supplemental Declaration of Michael L. Younger), ¶¶ 8-17.

and errors in the description of documents.[749]  There is no explanation as to how Judge

Zambrano or whoever wrote the judgment would have had access to this non-public information

without the clandestine assistance from the RICO Defendants and their co-conspirators.

327.    While both Chevron and the Lago Agrio Plaintiffs have appealed the fraudulent

judgment in Ecuador, the systemic weakness of the Ecuadorian judiciary, institutional failings,

and the manipulation of the appellate process in this case demonstrate that Judge Zambrano's

ruling will not receive an independent and fair review.  Instead, there is evidence that the very

judge who issued the decision—Judge Zambrano, along with Benjamín Cevallos, the President

of the Judicial Council—which has sole power to appoint and remove judges in Ecuador—

manipulated the selection process to hand select the three judges who will hear the appeal.

Cevallos appeared at a press conference with Judge Zambrano to announce the issuance of the

judgment in the Lago Agrio case, praising Zambrano as a "shining star,"[750] and in the months

leading up to the constitution of the panel engaged in several unusual actions.  The three judges

initially assigned to the appeal consisted of Judge Zambrano, Judge Núñez, and Judge Marco

Yaguache.  Then, weeks before the panel was officially constituted, Judge Yaguache was

removed from the panel by Cevallos and replaced by Judge Luis Legña with no justification,

except to state that Judge Yaguache's removal was "for the benefit of institutional interests."[751]

Then Judge Zambrano, as the Judicial Council's provincial delegate, allegedly conducted a

"lottery" to replace himself and Judge Núñez on the panel.  Contrary to Ecuadorian law, this

alleged lottery was conducted in secret and with no notice to the parties.[752]  As a result, the

panel consisted of Judge Legña, whose presence on the panel was engineered by Cevallos;

---

[749] Exhibit BE (Declaration of Seth A. Leone, *Chevron Corp. v. Donziger*, No. 1:11-cv-00691
(LAK) (S.D.N.Y.), Dkt. 299), ¶¶ 6-19.

[750] Exhibit BF (certified translation of 2011.02.15 Teleamazonas broadcast).

[751] Exhibit BG (certified translation of 2011.03.03 Dismissal of Judge Yaguache).

[752] Exhibit BH (certified translation of 2011.03.30 Chevron filing, Lago Agrio Court).

Judge Toral, who was nominated by Judge Zambrano;[753] and Judge Orellana, who was appointed as a substitute judge by the Judicial Council, which is controlled by Cevallos as President, just six weeks before Judge Zambrano issued the judgment against Chevron.[754]  The Lago Agrio Plaintiffs themselves noted the procedural irregularities in the constitution of the appellate panel in a brief filed last month with the Lago Agrio Court, requesting that the panel make clear that appropriate procedures were followed "to avoid defects nullifying the proceedings."[755]  Even setting aside the role of the Judicial Council, and specifically Cevallos, in the constitution of this panel, there are other indications of bias and prejudice against Chevron.  For example, Judge Orellana is a part-time judge who also acts as a lawyer and currently represents an individual who recently filed a complaint against Chevron for alleged personal injuries supposedly caused by TexPet's prior operations in Ecuador.[756]

328.    The jeopardy that Chevron faces as a result of this fraudulent judgment is compounded by the fact that the RICO Defendants continue to have access to significant funds to carry out their criminal scheme.  Until 2010, Kohn had been the primary source of funds for the criminal scheme, supporting it with over $7 million in less than seven years—"the largest single component" of which, according to Kohn, was over $1 million provided to Donziger personally.[757]  This money was made available by Kohn upon specific requests from Defendants Donziger and Yanza, who worked with Kohn to prepare budgets for the case, and would contact

---

[753] Exhibit BI (certified translation of 2009.03.04 Appointment of Judge Toral).

[754] Exhibit BJ (certified translation of 2011.01.06 Appointment of Judge Orellana).

[755] Exhibit BK (certified translation of 2011.03.30 Filing by P. Fajardo, Lago Agrio Court).

[756] Exhibit BL (certified translation of 2011.02.21 Complaint of Celso Parra).

[757] Exhibit 162 (2009.11.19 Letter from J. Kohn to L. Yanza and P. Fajardo, re "Ecuador-Texaco Case") (DONZ00026949) at 18.

him as often as monthly to request amounts ranging from $40,000 to $100,000 each time.[758]
These funds were distributed to U.S. consultants, including Defendant Stratus, and to Ecuador,
mainly through Selva Viva and the Front, to fund the RICO Defendants' activities in that
country.[759]

329.   After Donziger, Yanza, and Fajardo had a falling out with Kohn, they secured
additional ongoing funding from Burford.[760] The RICO Defendants' relationship with Burford
began in October 2009, and by June 2010, Burford had spent hundreds of hours working on
issues related to the RICO Defendants' scheme, and had been active in developing strategy.[761]
In the summer and fall of 2010, the RICO Defendants, along with co-conspirators H5, Emery
Celli, Motley Rice and Patton Boggs discussed a $15 million investment from Burford,[762] and
by December, $4 million had already been provided to further the RICO Defendants criminal
scheme.[763] The relationship with Burford was largely orchestrated by Patton Boggs, which acts
as Burford's outside counsel and even shares space in its New York offices with Burford.  In
exchange, Burford received not only an interest in any money obtained from Chevron, but also

---

[758] Exhibit 162 (2009.11.19 Letter from J. Kohn to L. Yanza and P. Fajardo re "Ecuador-Texaco Case") (DONZ00026949).

[759] Exhibit 162 (2009.11.19 Letter from J. Kohn to L. Yanza and P. Fajardo re "Ecuador-Texaco Case") (DONZ00026949); Exhibit 241 (2009.07.01 Email chain among R. DeLeon, S. Donziger, and J. Kohn re "Fee Breakdown Chart through 5/31/09 (00053725-2)") (DONZ00039127).

[760] Exhibit 6 (2010.12.01 Donziger Dep.) at 619:8-622:24.

[761] Exhibit BM (2010.06.22 document "Burford Capital Aguinda Presentation June 22, 2010") (DONZ00129831) at 7.

[762] Exhibit B (Executed Funding Agreement) at 3 (§ 2.1); Exhibit 337 (2008.08.28 Email chain among S. Donziger, C. Bogart, J. Molot, and S. Seidel re "Burford proposal") (DONZ00036728).

[763] Exhibit B (Executed Funding Agreement) at 3 (§ 2.1).

approval authority over the use of its funds,[764] which authority is exercised by James Tyrell, a senior Patton Boggs partner.[765]  Another substantial source of funds has been Russell DeLeon, an online gambling entrepreneur who was a major source of funding for *Crude*.[766]

330.    The RICO Defendants, acting in concert with Burford and Patton Boggs, have further ensured their control over the future of the Lago Agrio Litigation, and secured their own claims on any proceeds, and those of Burford and Patton Boggs, by apparently requiring a number (but not all) of the Lago Agrio Plaintiffs to assign their rights in the litigation to a trust (the "Burford Trust").  The trustee of the Burford Trust, who must be approved by Burford, will be "the sole and only Person entitled to, among other things . . . have the authority and obligation to apply and distribute any proceeds of the Award" held in the Burford Trust, and that distribution apparently is now governed by a contractual agreement between Donziger, Burford, DeLeon, the Front, Patton Boggs, H5 and other U.S. parties.[767]  This contractual agreement incorporates a complex "waterfall" that, for any funds placed in the Burford Trust, secures the claims of the RICO Defendants, Burford, Patton Boggs and others, and relegates any actual distribution in Ecuador to the residual.  Furthermore, Donziger, Fajardo and Yanza purportedly retain authority over the Burford Trust trustee's further pursuit of the Lago Agrio Litigation.[768]

331.    Defendants already are planning to seek immediate enforcement of the Ecuadorian judgment in U.S. and foreign courts, and to extort a payment from Chevron by using the Ecuadorian judgment to threaten seizure of Chevron's assets and those of its subsidiaries. The RICO Defendants' internal blueprint for global enforcement, a memo by co-conspirator

---

[764] Exhibit 337 (2008.08.28 Email chain among S. Donziger, C. Bogart, J. Molot, and S. Seidel re "Burford proposal") (DONZ00036728).

[765] Exhibit B (Executed Funding Agreement) at 31-32 (Schedule 1, §§ 2-3).

[766] Exhibit 6 (2010.11.29 Donziger Dep.) at 79:25-81:3, 102:9-14.

[767] Exhibit B (Executed Funding Agreement) at 11 (§ 8.1).

[768] Exhibit B (Executed Funding Agreement) at 11 (§ 8.1).

Patton Boggs titled "Invictus," asserts that, "If and when an enforceable judgment is entered in Ecuador, Plaintiffs' Team expects to be engaged quickly, if not immediately, on multiple enforcement fronts—in the United States and abroad."[769]  They have said as much expressly on multiple occasions, and, in fact, have represented to the Southern District of New York that Chevron's defense against any Lago Agrio judgment should be restricted to New York's Recognition Act.[770]

332.     Co-conspirator Amazon Watch has reported that the Lago Agrio Plaintiffs' representatives will quickly "move to collect the judgment by any means necessary in whatever country the company has assets" and that they "will seek to enforce any judgment against the oil giant immediately in U.S. courts."[771]  Co-conspirator Hinton said that "If the [Ecuadorian] courts were to agree to [force Chevron to post a bond in order to appeal the Lago Agrio judgment], then we would try to start seizing assets in other countries."[772]  According to Donziger, "If we get a judgment out of the trial court, we're coming back immediately, — soon as we can, —to get that judgment enforced.  We are not waiting for the appeals process."[773] And Donziger has threatened that "Chevron operates in more than 100 countries and has numerous oil tankers that troll the world's waterways and dock in any number of ports . . . .

---

[769] Exhibit 341 (Undated Memorandum, "Invictus.  Path Forward: Securing and Enforcing Judgment and Reaching Settlement") ("Invictus Memorandum") (DONZ00032520) at 12.

[770] Exhibit 94 (2010.01.14 Lago Agrio Plaintiffs' Complaint to Stay Arbitration, *Yaiguaje v. Chevron Corp.*, No. 10-CV-0316 (LBS) (S.D.N.Y.)), ¶¶ 2, 41.

[771] Exhibit 342 (2007.07.04 Amazon Watch Press Release, "Chevron Launches 'Dirty War' on Ecuador Court"); Exhibit 343 (2009.06.24 Frente de Defensa de la Amazonia Press Release, "New Evidence of Chevron Fraud from Final Judicial Inspections in $27 Billion Environmental Case") at 1.

[772] Exhibit 344 (2010.04.22 Article by Fiona Smith, "Chevron Case Comes to a Head", LOS ANGELES DAILY JOURNAL) at 2.

[773] Exhibit 1, CRS-482-00-CLIP-01 (2008.04.14 *Crude* outtake video clip of S. Donziger discussing the strategy to enforce the Ecuadorian judgment); Exhibit 2 (certified transcript) at 450.

This could end up being one of the biggest forced asset seizures in history and it could have a significant disruptive impact on the company's operations."[774]  In an interview broadcast as part of a *60 Minutes* segment on the Lago Agrio Litigation, Donziger, in response to the observation that Chevron has no assets in Ecuador, stated, "At the end of the day, it might be a situation where a U.S. court enforces the judgment and the marshals have to go to Chevron and seize their assets."[775]  These threats continue unabated.  Just months before this Amended Complaint was filed, Donziger, in a speech to law students, told them that he was assembling a legal team "to execute whatever judgment comes out of Ecuador effectively, in whatever forum might—forum might be appropriate, including multiple places that, you know, you could file suits, you could seize assets, seize boats."[776]

333.    Through statements made to this Court, Defendants have also made clear their intent to enforce the judgment immediately.  When asked by Judge Sand of the Southern District of New York whether the Lago Agrio Plaintiffs in their action to stay the Treaty Arbitration were "willing to stipulate that [they would] take no efforts to enforce the judgment until . . . the arbitration is completed," their counsel refused to agree to stay enforcement:  "No, your honor. We would not and cannot do that."[777]

334.    Indeed, since the issuance of the Lago Agrio judgment, Defendants have only accelerated their plan to pressure Chevron by using the fraudulent judgment to institute

---

[774] Exhibit 92 (2009.09.29 Amazon Watch Press Release, "Ecuador Rising-Hatarinchej: Chevron's Recent Setbacks in U.S. Courts Forced Its Hand on Arbitration Claim, Lawyers Say") at 1.

[775] Exhibit 260 (2009.05.03 Transcript of episode of CBS News: 60 Minutes) at 7.

[776] Exhibit 93 (2010.11.15 S. Donziger speech re litigation strategy) at 7.  *See also* Exhibit EH (2009.11.13 Memorandum re enforcement of foreign judgments) (DONZ-HDD-0009297); Exhibit EI (Draft memorandum re enforcement of judgment) (DONZ-HDD-0006549).

[777] Exhibit 345 (2010.03.11 Hr'g Tr., *Republic of Ecuador v. Chevron Corp. and Texaco Petroleum Co.*, No. 09-CV-9958 (LBS) (S.D.N.Y.), *Yaiguaje et al. v. Chevron Corp. and Texaco Petroleum Co.*, No. 10-CV-316 (LBS) (S.D.N.Y.)) at 84:8-12.

attachment proceedings and other enforcement actions, in defiance of a temporary restraining order issued by this Court.  On February 14, 2011, Fajardo stated that "we're going to immediately ask any country where Chevron has assets . . . that Chevron's assets be attached."[778]  And a day later, referring to this Court's issuance of a temporary restraining order, Fajardo stated that the order would not prevent Defendants' attempts to enforce and recognize the judgment outside of the United States:  "The judge cannot order and require something that is outside of United States territory, as such.  *Therefore, that injunction is completely, uh, it's unenforceable, inapplicable for countries other than the United States.*"[779]

335.    The judgment of the Lago Agrio court, procured by the RICO Defendants' and their co-conspirators' fraud—in addition to related attachment and enforcement efforts and the specter of billions of dollars in liability—threatens to disrupt Chevron's business operations, sully its reputation, and otherwise cause Chevron to suffer irreparable harm.  In the RICO Defendants' "Invictus" memorandum, outlining their plans to use the Lago Agrio judgment to extract payments from Chevron, Patton Boggs also proposes initiating a shareholder derivative action against Chevron in the United States, "as a point of leverage with respect to settlement [and] as a fruitful basis for discovery into the machinations of Chevron management vis à vis the Ecuadorian litigation."[780]  And that memo also reveals that the RICO Defendants do not intend to wait for judgments in their proposed enforcement proceedings: "Consistent with their aggressive approach, Plaintiffs' Team will look for ways to proceed against Chevron on a pre-judgment basis, largely as a means of attaining a favorable settlement at an early stage.  Various

---

[778] Exhibit BN (certified translation of 2011.02.14 Amazon Defense Front press conference) at 7.

[779] Exhibit BO (certified translation of 2011.02.15 P. Fajardo interview with Ecuadorian media Agencia Efe).

[780] Exhibit 341 (Invictus Memorandum) at 12.

laws and procedures within and outside the United States may permit attachment of Chevron's assets prior to successful recognition of the Ecuadorian judgment."[781]

336.    Nor are the RICO Defendants limiting their operations to the Lago Agrio Litigation.  Donziger has stated that their intention is to "take legal fees we can earn from this case and, do more cases like this in different places with, you know, the same team, if possible."[782]

337.    The RICO Defendants' extensive and wide-ranging scheme to defraud and extort Chevron, as described in this Amended Complaint, has already had a lasting and irreparable effect on Chevron.  The RICO Defendants' false and misleading statements have been relied on by the U.S. courts, U.S. state and federal government agencies, Chevron's shareholders, investors, analysts, the media, and by the Lago Agrio court by means of its acceptance of Defendants' and Cabrera's misrepresentations and omissions and its failure to take meaningful corrective action.  Further, the RICO Defendants' false and misleading statements have caused Chevron substantial damages.  Chevron has had to expend millions of dollars in attorneys' fees and costs defending itself in the sham litigation the RICO Defendants and their co-conspirators have prosecuted in Ecuador, and exposing the conspirators' pervasive fraud in the Section 1782 proceedings.  On top of the attorneys' fees and expenses, Chevron's interest in executed contracts, including the 1995 Settlement Agreement and 1998 Final Release, has also been impaired as a result of the RICO Defendants' and their co-conspirators' collusion with the Republic of Ecuador.  In addition, many of the RICO Defendants' extortionate acts have presented unfair and false representations of Chevron's business practices, harming Chevron's reputation and goodwill.  As alleged throughout, these harms represent the precise result

---

[781] Exhibit 341 (Invictus Memorandum) at 14.

[782] Exhibit 1, CRS-200-02-03 (2007.03.03-2007.03.04 *Crude* outtake video clip of S. Donziger and an unidentified male speaker); Exhibit 2 (certified transcript) at 319.  *See also* Exhibit 76 (2007.04.04 Entry in Composite of S. Donziger Personal Notes) (DONZ00027256) at 5 of 109.

intended by the RICO Defendants' misconduct.  And worse, it is clear from the RICO Defendants' actions and words that they have no intention of stopping until Chevron surrenders to their extortionate demands.  Without the Court's intervention, Chevron will continue to suffer significant harm at the hands of the RICO Defendants and their unlawful scheme.

338.     The facts and evidence presented in this Amended Complaint are the result of many thousands of hours of work by Chevron, its attorneys, and its investigators, and have been assembled at extraordinary cost.  As this Amended Complaint was being prepared for filing, however, new evidence continued to emerge, and the true nature of the RICO Defendants' criminal conduct becomes clearer and clearer.  Just a few months ago, considering Chevron's request to obtain discovery directly from the ringleader of this enterprise, Donziger, the United States District Court for the Southern District of New York summarized the case as follows: "[T]he name of the game is, arguably, to put a lot of pressure on the courts to feed them a record in part false for the purpose of getting a big judgment or threatening a big judgment, which conceivably might be enforceable in the U.S. or in Britain or some other such place, in order to persuade Chevron to come up with some money.  Now, do the phrases Hobbs Act, extortion, RICO, have any bearing here?"[783]

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
#### (Violations of RICO, 18 U.S.C. § 1962(c))
#### (Against All RICO Defendants)

339.     Chevron realleges and incorporates herein by reference each and every foregoing paragraph of this Amended Complaint as if set forth in full.

340.     At all relevant times, Chevron is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

---

[783] Exhibit 233 (2010.09.23 Hr'g Tr., *In re Application of Chevron*, No. 10 MC 00002 (LAK) (S.D.N.Y.)) at 24:14-20.

341.    At all relevant times, each RICO Defendant is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

*The RICO Enterprise*

342.    The RICO Defendants and their co-conspirators are a group of persons associated together in fact for the common purpose of carrying out an ongoing criminal enterprise, as described in the foregoing paragraphs of this Amended Complaint; namely, through a multi-faceted campaign of lies, fraud, threats and official corruption, to coerce Chevron into paying billions of dollars to the RICO Defendants and their co-conspirators.  These RICO Defendants and their co-conspirators have organized their operation into a cohesive group with specific and assigned responsibilities and a command structure, operating in the United States and Ecuador, funded primarily from the United States, and directed mainly from the United States.  Over the years they have adapted their scheme to changing circumstances, recruiting new members to their operation, and expanding the scope and nature of their activities.  While the organization of the criminal enterprise has changed over time, and its members may have held different roles at different times, the criminal enterprise has generally been structured to operate as a unit in order to accomplish the goals of their criminal scheme:

      a.    Defendants Donziger, the Law Offices of Steven R. Donziger, and Donziger & Associates, PLLC have been responsible for oversight of the scheme to defraud and extort Chevron, and have directed other conspirators to take actions necessary to accomplish the overall aims of the criminal enterprise—namely, manufacturing evidence of Chevron's liability, procuring sham criminal charges against Chevron's attorneys, conducting a massive public pressure campaign designed to spread false and misleading information about Chevron and the Lago Agrio Litigation, and obstructing Chevron's efforts at uncovering the truth in various U.S. court proceedings.

      b.        Defendant Fajardo has been primarily responsible for prosecuting the sham litigation in the Ecuadorian courts, has served as one of the heads of the criminal enterprise in the U.S. and Ecuadorian media, and has planned and coordinated the ghostwriting of the Cabrera Report.

      c.        Defendants Yanza and the Front have been primarily responsible for managing the RICO Defendants' "private army," exerting influence over and colluding with Ecuadorian government and court officials, and serving as media representatives for the criminal enterprise in which they have made false statements to Chevron stockholders, financial analysts, investors, and/or state and federal agencies.  Yanza arranged for funding from Kohn and/or Kohn Swift for the RICO Defendants' activities in Ecuador, and frequently caused money to be transferred out of the United States for this purpose.

      d.        Defendant Selva Viva has served as a conduit for funding and otherwise furthering the RICO Defendants' criminal enterprise.

      e.        Defendants Stratus, Beltman, and Maest have been responsible for coordinating the drafting of and actually ghostwriting the Cabrera Report and other submissions to the Lago Agrio court, and for the false promotion of the Cabrera Report as independent in the media and to U.S. courts.

343.   The RICO Defendants and their co-conspirators constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), referred to hereinafter as the "Enterprise."  Each of the RICO Defendants participated in the operation or management of the Enterprise.

344.   At all relevant times, the Enterprise was engaged in, and its activities affected interstate and foreign commerce within the meaning of 18 U.S.C. § 1962(c).

*Pattern of Racketeering Activity*

345.    The RICO Defendants conducted or participated, directly or indirectly, in the conduct, management, or operation of the Enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c), to wit:

### Pattern of Racketeering Activity:  Extortion in Violation of Hobbs Act, 18 U.S.C. § 1951

346.    At all times material to this Amended Complaint, Chevron was engaged in interstate and foreign commerce and in an industry that affects interstate and foreign commerce.

347.    As described herein, the RICO Defendants have engineered a wide-ranging campaign of public attacks based on false and misleading statements, trumped up criminal charges, a threatened and actual fraudulent civil judgment, investigations by government agencies, and ongoing harassment and disruptions of business operations, and have demanded the payment of billions of dollars before these activities will cease, all with the intent and effect of causing a reasonable fear of economic loss on the part of Chevron.

348.    As described herein, the RICO Defendants manufactured false evidence against Chevron and are relying on that false evidence in the sham Lago Agrio Litigation with the intent and effect of causing a reasonable fear of economic loss on the part of Chevron.

349.    As described herein, the RICO Defendants conspired with the Republic of Ecuador to advance baseless criminal charges against two Chevron lawyers responsible for executing the 1998 Final Release in order to extort a payment from Chevron.

350.    The RICO Defendants' actions are intended to induce fear in Chevron that the RICO Defendants will, among other things:  (1) continue to pursue a scheme of misrepresentation to the great harm and public denigration of Chevron, unless and until Chevron "settles" the Lago Agrio Litigation; (2) continue to conspire with Ecuadorian officials to have Chevron's attorneys criminally prosecuted on trumped up charges; and (3) secure a fraudulent multi-billion dollar judgment against Chevron and file lawsuits in the United States and in other foreign jurisdictions seeking recognition and enforcement of the judgment.  These actions, as

described herein, have created a reasonable fear of harm on the part of Chevron, including fear of economic loss.

351.     Accordingly, the RICO Defendants have unlawfully obstructed, delayed, and affected—and attempted to obstruct, delay, and affect—commerce as that term is defined in 18 U.S.C. § 1951, and the movement of articles and commodities in such commerce, by extortion, as that term is defined in § 1951, in that the RICO Defendants attempted to induce Chevron to consent to relinquish property through the wrongful use of actual and threatened force, violence, and fear—including fear of economic harm.

*Pattern of Racketeering Activity:  Extortion in Violation of New York Penal Law §§ 110.00, 155.05(2)(e), 155.42*

352.     Similarly, the RICO Defendants' wrongful attempts to appropriate Chevron's property by instilling fear that if the property is not delivered the RICO Defendants would perform an act calculated to harm Chevron materially with respect to its business, financial condition, and reputation violates New York Penal Law §§ 110.00, 155.05(2)(e), 155.42.

*Pattern of Racketeering Activity:  Multiple Instances of Mail Fraud and Wire Fraud in Violation of 18 U.S.C. §§ 1341, 1343*

353.     As described herein, the RICO Defendants engaged in a wide-ranging scheme or artifice to defraud Chevron, various courts of law, and the greater public concerning Chevron's purported liability for environmental harm in Ecuador by manufacturing evidence, colluding with the court expert Cabrera to submit the RICO Defendants' manufactured evidence, and then holding out the Cabrera Report as independent and neutral when it decidedly was not. The ultimate objective of the RICO Defendants' scheme or artifice to defraud is to coerce Chevron into making a multi-billion dollar payment that will directly benefit the individual and organizational RICO Defendants.

354.     In furtherance of their scheme, and as described herein, the RICO Defendants transmitted, or caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, and also caused

matters and things to be placed in any post office or authorized depository, or deposited or
caused to be deposited matters or things to be sent or delivered by a private or commercial
interstate carrier, including, but not limited to, the following:

a.      emails and website postings incorporating false and misleading
statements regarding the Cabrera Report;

b.      wirings and/or mailings between and among the RICO Defendants
concerning the preparation of the report in the United States that
was submitted to the Lago Agrio court by Cabrera;

c.      communications directed toward U.S. state and federal government
officials and regulators incorporating false and misleading
statements regarding Chevron's liability in the Lago Agrio
Litigation;

d.      funds transferred by Kohn and/or Kohn Swift to the RICO
Defendants, with the intent that those funds be used to promote the
carrying on of the RICO Defendants' criminal activities; and,

e.      electronic filing and service of court papers containing false and
misleading statements intended to impede the operation of those
courts.

355.    Chevron incorporates by reference the attached Appendix B, which sets
forth particular uses of wire and mail communications in furtherance of the RICO Defendants'
scheme or artifice to defraud that constitute violations of 18 U.S.C. §§ 1341 and 1443, including
which individual defendant caused the communication to be mailed or wired, when the
communication was made, and how it furthered the fraudulent scheme.

356.    The RICO Defendants participated in the scheme or artifice knowingly,
willfully, and with the specific intent to deceive and/or defraud Chevron into paying the RICO
Defendants and their co-conspirators.  The RICO Defendants knowingly and intentionally
prepared a self-serving analysis of Chevron's alleged liability in Lago Agrio, and then knowingly

and with the intent to deceive the Lago Agrio court, Chevron, and the general public, caused that analysis to be filed under the pretense that it was a report prepared by an independent court expert.  The RICO Defendants colluded with the Republic of Ecuador to initiate criminal prosecution of Chevron's attorneys on the basis of this report and other statements the RICO Defendants knew to be false or misleading.  The RICO Defendants further caused statements regarding this report, these criminal charges and other matters, which statements the RICO Defendants knew to be false or misleading, to be disseminated to the general public, to the media, and to multiple state and federal agencies and federal courts, with the intent that those statements be believed and that they form the basis for further public attacks on Chevron, investigations of Chevron, and reduction in the value of Chevron's corporate assets.  The RICO Defendants knowingly engaged in the aforementioned conduct with the intent to generate fear in Chevron such that Chevron would ultimately pay the RICO Defendants to cease their conduct, under the guise of a settlement of the Lago Agrio Litigation, through satisfaction of a judgment in the Lago Agrio Litigation, or in a subsequent proceeding to recognize and enforce such a judgment.

357.    The RICO Defendants' false and misleading statements have been relied on by U.S. courts, U.S. state and federal government agencies, Chevron's shareholders, investors, analysts, the media, and by the Lago Agrio court by means of its acceptance of Defendants' and Cabrera's misrepresentations and omissions and its failure to take meaningful corrective action.  Further, the RICO Defendants' false and misleading statements have caused Chevron substantial damages.

*Pattern of Racketeering Activity:  Money Laundering in Violation of 18 U.S.C.
§ 1956(a)(2)(A)*

358.    Defendants Yanza, Donziger, the Law Offices of Steven R. Donziger, and Donziger & Associates, PLLC, have on multiple occasions, acting in their individual capacities and as agents for Selva Viva and/or the Front have knowingly caused the transportation, transmission, and/or transfer of funds to or from the United States to themselves and to

Defendants Selva Viva, the Front, and other entities with the intent that those funds be used to promote the carrying on of unlawful activity, including but not limited to violations of 18 U.S.C. §§ 1341, 1343 and 1951, such as the secret preparation of the Cabrera Report, payment to Cabrera for his complicity and silence as to the report's authorship, the funding of the RICO Defendants' pressure campaigns against the Lago Agrio court and against Chevron, and collusion with the Republic of Ecuador.

*Pattern of Racketeering Activity:  Obstruction of Justice in Violation of 18 U.S.C. § 1503*

359.    Faced with implacable denials in Ecuador from Cabrera and the RICO Defendants about the authorship of the Cabrera Report, Chevron turned to U.S. courts to pursue discovery directly from the Enterprise through proceedings under 28 U.S.C. § 1782, which authorizes "[t]he district court of the district in which a person resides or is found [to] order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal."

360.    In a concerted effort to thwart Chevron's attempts to uncover the truth and avoid discovery, the RICO Defendants, and their counsel, have habitually filed or caused to be filed documents, including declarations sworn to under penalty of perjury, that falsely represent that Cabrera was an independent expert and that otherwise misrepresent the RICO Defendants' interactions with Cabrera.  They have done so with the full knowledge that these statements were false, as evidenced by their own internal correspondence.  By making these deliberate and strategic false representations in various pending federal judicial proceedings, with full awareness of their consequence and with the specific intent to corruptly endeavor to influence, obstruct, and impede the due administration of justice, the RICO Defendants have committed multiple instances of obstruction of justice in violation of 18 U.S.C. § 1503.

*Pattern of Racketeering Activity:  Witness Tampering in Violation of 18 U.S.C. § 1512*

361.     Pursuant to a March 2, 2010 order issued by the United States District Court for the Northern District of Georgia granting Chevron's Section 1782 application, Chevron noticed the deposition of Defendants' expert, Charles W. Calmbacher, Ph.D.

362.     Fearing that Dr. Calmbacher would expose the truth about the falsified reports filed in his name by the RICO Defendants, Donziger knowingly engaged in intimidation, threats, misleading conduct, and corrupt persuasion toward Dr. Calmbacher, with the specific intent to influence, delay, and prevent Dr. Calmbacher's testimony or cause Dr. Calmbacher to withhold records, objects, documents, and testimony from an official proceeding.

363.     As Dr. Calmbacher testified pursuant to the court-authorized subpoena at his March 29, 2010 deposition, Donziger contacted Dr. Calmbacher and emphatically attempted to convince Dr. Calmbacher not to testify at his deposition, warning him that testifying could pose "real problems" for him and could result in a "potential law case against" him because "they're going to go after [him] for unprofessional behavior."  When asked at his deposition whether "Donziger [was] trying to convince [him] not to come and testify," Calmbacher testified:  "Very much so.  Very much so."  Donziger tampered with Dr. Calmbacher's testimony in violation of 18 U.S.C. § 1512 in furtherance of the Enterprise's scheme.

364.     The RICO Defendants also tampered with the testimony of environmental consultant Mark Quarles in furtherance of the Enterprise's scheme.  In 2007, Ecuador submitted a declaration by Quarles regarding the "independence" of the Cabrera Report in a proceeding pending in the Southern District of New York, using that declaration to support the government's contention that the Lago Agrio Litigation "has proceeded in accordance with rules of procedure under Ecuador law."  Quarles has recently admitted in sworn testimony that Donziger paid him for this affidavit, and that he would not have signed the affidavit if he had known about the RICO Defendants' involvement with Cabrera.  By not disclosing the truth about Donziger's improper contact with Cabrera and instead deliberately misleading Quarles, Donziger knowingly engaged in misleading conduct and corrupt persuasion toward Quarles with the intent to influence his testimony in an official proceeding.

365.     The RICO Defendants and their co-conspirators also tampered with the potential testimony of numerous Stratus employees in furtherance of the Enterprise's scheme. After Chevron instituted a Section 1782 application in December 2009 seeking discovery from Stratus, Beltman, undoubtedly concerned about potentially damaging future testimony from Stratus employees, knowingly engaged in misleading conduct and corrupt persuasion toward numerous Stratus employees, with the specific intent to influence, delay, and prevent those employees' truthful testimony or cause the employees to withhold records, objects, documents, and testimony from an official proceeding.  Beltman repeatedly misrepresented to Stratus staff members that Cabrera was independent and had authored his own report.  Beltman likewise repeatedly misled Stratus employees and omitted the true facts when he misrepresented that Stratus had played a limited role of technical advisor to the Lago Agrio Plaintiffs.  Thus, Beltman tampered with the Stratus employees' potential or expected testimony in violation of 18 U.S.C. § 1512, in furtherance of the Enterprise's scheme.

### *Summary of the Pattern of Racketeering Activity Alleged Against Each RICO Defendant*

366.     Defendant Donziger has committed numerous mail and wire fraud violations, including those identified in Appendix B in which Donziger used or caused to be used the mail or wires in furtherance of the RICO Defendants' scheme to defraud.  Donziger has also engaged in extortion of Chevron and fraudulent conduct through numerous acts, including by participating in a campaign of public attacks based on false and misleading statements about Chevron and the Lago Agrio Litigation (including making false statements to the U.S. House of Representatives), manufacturing false evidence in the form of the Cabrera Report, procuring baseless criminal charges against Chevron's attorneys in Ecuador, colluding with Ecuadorian officials and pressuring the Lago Agrio court to ensure a negative outcome for Chevron in the Lago Agrio Litigation, and threatening and causing threats to be made to Chevron directly and through its shareholders.  In addition, Donziger has engaged in obstruction of justice by filing and/or causing to be filed in multiple U.S. courts documents, including declarations sworn under

penalty of perjury, falsely representing that Cabrera was an independent expert and otherwise misrepresenting the RICO Defendants' interactions with Cabrera. Donziger has committed wire fraud and engaged in money laundering by knowingly causing funds to be transported, transmitted, or transferred from the United States to Selva Viva, Yanza, the Front, and other parties with the intent that such payments would fund the RICO Defendants' criminal activity. Donziger has also engaged in witness tampering by knowingly engaging in intimidation, threats, misleading conduct, and corrupt persuasion toward Dr. Calmbacher with the specific intent to influence, delay, and prevent Dr. Calmbacher's testimony in the Northern District of Georgia. Donziger also tampered with the testimony of Mark Quarles by paying him for his affidavit and by concealing the RICO Defendants' involvement with Cabrera and the Cabrera Report.

367.     Defendants the Law Offices of Steven R. Donziger and Donziger & Associates, PLLC, through the actions of their agent Defendant Donziger, have committed numerous predicate acts, including mail and wire fraud, extortion, obstruction of justice, money laundering, and witness tampering. The mail and wire fraud violations include those identified in Appendix B in which the Law Offices of Steven R. Donziger or Donziger & Associates, PLLC used or caused to be used the mail or wires in furtherance of the RICO Defendants' scheme to defraud. The Law Offices of Steven R. Donziger and Donziger & Associates, PLLC have also engaged in extortion of Chevron and fraudulent conduct through numerous acts, including by participating in a campaign of public attacks based on false and misleading statements about Chevron and the Lago Agrio Litigation (including making false statements to the U.S. House of Representatives), manufacturing false evidence in the form of the Cabrera Report, procuring baseless criminal charges against Chevron's attorneys in Ecuador, colluding with Ecuadorian officials and pressuring the Lago Agrio court to ensure a negative outcome for Chevron in the Lago Agrio Litigation, and threatening and causing threats to be made to Chevron directly and through its shareholders. In addition, the Law Offices of Steven R. Donziger and Donziger & Associates, PLLC have engaged in obstruction of justice by filing and/or causing to be filed in multiple U.S. courts documents, including declarations sworn under penalty of

perjury, falsely representing that Cabrera was an independent expert and otherwise misrepresenting the RICO Defendants' interactions with Cabrera.  Also, the Law Offices of Steven R. Donziger and Donziger & Associates, PLLC have committed wire fraud and engaged in money laundering by knowingly causing funds to be transported, transmitted, or transferred from the United States to Selva Viva, Yanza, the Front, and other parties with the intent that such payments would fund the RICO Defendants' criminal activity.  The Law Offices of Steven R. Donziger has also engaged in witness tampering through Donziger's knowing intimidation, threats, misleading conduct, and corrupt persuasion toward Dr. Calmbacher with the specific intent to influence, delay, and prevent Dr. Calmbacher's testimony in the Northern District of Georgia.  In addition, the Law Offices of Steven R. Donziger also tampered with the testimony of Mark Quarles by paying him for his affidavit and by concealing the RICO Defendants' involvement with Cabrera and the Cabrera Report.

368.     Defendant Fajardo has committed numerous mail and wire fraud violations, including those identified in Appendix B in which Fajardo used or caused to be used the mail or wires in furtherance of the RICO Defendants' scheme to defraud.  Fajardo has also engaged in extortion of Chevron and fraudulent conduct by participating in a campaign of public attacks based on false and misleading statements about Chevron and the Lago Agrio Litigation (including in a letter to the U.S. Trade Representative), by manufacturing and causing to be manufactured false evidence, and by applying pressure to Ecuadorian government officials to procure baseless criminal charges against Chevron's attorneys.  In addition, Fajardo has engaged in obstruction of justice by filing or causing to be filed in numerous U.S. courts documents, including a declaration sworn under penalty of perjury, that falsely represent that Cabrera was an independent expert and that otherwise misrepresent the relationship between Cabrera and the RICO Defendants.

369.     Defendant Yanza has committed numerous mail and wire fraud violations, including those identified in Appendix B in which Yanza used or caused to be used the mail or wires in furtherance of the RICO Defendants' scheme to defraud.  Yanza has committed wire

fraud and engaged in money laundering by knowingly causing funds to be transported, transmitted, or transferred from the United States to Selva Viva, the Front, and other parties with the intent that such payments would fund the RICO Defendants' criminal activity.  Yanza has also engaged in extortion of Chevron and fraudulent conduct by participating in a campaign of public attacks based on false and misleading statements about Chevron and the Lago Agrio Litigation (including in a letter to the U.S. Trade Representative), by manufacturing and causing to be manufactured false evidence, and by applying pressure to Ecuadorian government officials to procure baseless criminal charges against Chevron's attorneys.  In addition, Yanza has engaged in obstruction of justice by filing or causing to be filed in multiple U.S. courts documents, including declarations sworn to under penalty of perjury, that falsely represent that Cabrera was an independent expert and that otherwise misrepresent the RICO Defendants' interactions with Cabrera.

370.    Defendant the Front, through the actions of its agents Defendants Fajardo and Yanza, among others, has committed numerous predicate acts, including mail and wire fraud, money laundering, and extortion.  The mail and wire fraud violations include those identified in Appendix B in which the Front used or caused to be used the mail or wires in furtherance of the RICO Defendants' scheme to defraud.  The Front has also committed several wire fraud violations and multiple acts of money laundering by causing funds to be transferred by Kohn and/or Kohn Swift from the United States to Ecuador, acting as a conduit of those funds, and then distributing those funds to finance the RICO Defendants' illegal scheme.  In addition, the Front has engaged in numerous acts of extortion of Chevron and fraudulent conduct by participating in a campaign of public attacks based on false and misleading statements about Chevron and the Lago Agrio Litigation through a website the Front maintains as well as numerous press releases and by manufacturing and causing to be manufactured false evidence.

371.    Defendant Selva Viva, through the actions of its agents Defendants Yanza and Donziger, among others, has committed several wire fraud violations and multiple acts of money laundering by causing funds to be transferred by Kohn and/or Kohn Swift from the

United States to Ecuador, acting as a conduit of those funds, and then distributing those funds to finance the RICO Defendants' illegal scheme. Through the actions of its agents Defendants Yanza and Donziger, among others, Selva Viva has also engaged in numerous acts of extortion of Chevron and fraudulent conduct by manufacturing and causing to be manufactured false evidence.

372.    Defendant Stratus, through the actions of its agents Defendants Beltman, Maest, and other individuals, has committed numerous predicate acts, including mail and wire fraud, extortion, obstruction of justice, and witness tampering. The mail and wire fraud violations include those identified in Appendix B in which Stratus used or caused to be used the mail or wires in furtherance of the RICO Defendants' scheme to defraud. Stratus also has engaged in extortion of Chevron and fraudulent conduct by manufacturing false evidence, in the form of the Cabrera Report and its annexes, used extensively by the RICO Defendants in the Lago Agrio Litigation and more generally in furtherance of their illegal scheme. In addition, Stratus has engaged in extortion and fraudulent conduct by disseminating false statements about Chevron through its authorship of the Cabrera Report and through its later "evaluation" of that report. Stratus also has engaged in extortion and fraudulent conduct by participating in a campaign of public attacks based on false and misleading statements about Chevron and the Lago Agrio Litigation. Finally, Stratus has engaged in obstruction of justice by misrepresenting to the United States District Court for the District of Colorado that Cabrera was an independent expert, that it was "astonished" to see "similarities" between its own work product and the Cabrera Report when Stratus actually drafted the majority of the Cabrera Report, and otherwise misrepresenting the relationship between Cabrera and the RICO Defendants. Finally, Stratus has engaged in witness tampering by repeatedly and intentionally misleading numerous of its employees regarding Cabrera's independence, and omitting facts about its true role in drafting the Cabrera Report, with the intent that its employees would then fail to testify truthfully if called to testify as to these subjects.

373.     Defendant Beltman has committed numerous mail and wire fraud violations, including those identified in Appendix B in which Beltman used or caused to be used the mail or wires in furtherance of the RICO Defendants' scheme to defraud.  Beltman also has engaged in extortion of Chevron and fraudulent conduct by manufacturing false evidence, in the form of the Cabrera Report and its annexes, used extensively by the RICO Defendants in the Lago Agrio Litigation and more generally in furtherance of their illegal scheme.  In addition, Beltman has engaged in extortion and fraudulent conduct by disseminating false statements about Chevron through his role in drafting both the Cabrera Report and his later "evaluation" of that report.  Beltman also has engaged in extortion of Chevron and fraudulent conduct by disseminating and causing to be disseminated false statements to the public and to a member of Congress regarding Chevron, the Lago Agrio Litigation, and Cabrera's independence.  Beltman also engaged in obstruction of justice by causing misrepresentations to be made to the United States District Court for the District of Colorado that Cabrera was an independent expert, that Stratus was "astonished" to see "similarities" between its own work product and the Cabrera Report when it actually drafted the majority of the Cabrera Report, and otherwise misrepresenting the relationship between Cabrera and the RICO Defendants.  Finally, Beltman has engaged in witness tampering by repeatedly and intentionally misleading numerous Stratus employees regarding Cabrera's independence, and omitting facts about Stratus's true role in drafting the Cabrera Report, with the intent that its employees would then fail to testify truthfully if called to testify as to these subjects.

374.     Defendant Maest has committed numerous mail and wire fraud violations, including those identified in Appendix B in which Maest used or caused to be used the mail or wires in furtherance of the RICO Defendants' scheme to defraud.  Maest also has engaged in extortion of Chevron and fraudulent conduct by manufacturing false evidence, in the form of the Cabrera Report and its annexes, used extensively by the RICO Defendants in the Lago Agrio Litigation and more generally in furtherance of their illegal scheme.  In addition, Maest has engaged in extortion and fraudulent conduct by disseminating false statements about Chevron

through her role in drafting both the Cabrera Report and Cabrera's later "evaluation" of that report.  Maest also has engaged in extortion of Chevron and fraudulent conduct by disseminating and causing to be disseminated false statements to the public regarding Chevron, the Lago Agrio Litigation, and Cabrera's independence.  Finally, Maest has engaged in obstruction of justice by causing misrepresentations to be made to the United States District Court for the District of Colorado that Cabrera was an independent expert, that Stratus was "astonished" to see "similarities" between its own work product and the Cabrera Report when it actually drafted the majority of the Cabrera Report, and otherwise misrepresenting the relationship between Cabrera and the RICO Defendants.

375.   Each of the RICO Defendants has engaged in multiple predicate acts, as described in paragraphs 366-74, *supra*.  The conduct of each of the RICO Defendants described in paragraphs 345-74, *supra*, constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

376.   Chevron was injured in its business and property by reason of the RICO Defendants' violations of 18 U.S.C. § 1962(c).  The injuries to Chevron caused by reason of the violations of 18 U.S.C. § 1962(c) include but are not limited to damage to Chevron's reputation and goodwill; the impairment of Chevron's interest in executed contracts, including the 1995 Settlement Agreement and 1998 Final Release; and the attorneys' fees and costs to defend itself in objectively baseless, improperly motivated sham litigation in Ecuador and in related litigation in the U.S., including the attorneys' fees and costs associated with exposing the RICO Defendants' pervasive fraud in the Section 1782 proceedings.

377.   Further, these injuries to Chevron were a direct, proximate, and reasonably foreseeable result of the violation of 18 U.S.C. § 1962.  Chevron is the ultimate victim of the RICO Defendants' unlawful Enterprise.  Chevron has been and will continue to be injured in its business and property in an amount to be determined at trial.

378.   Pursuant to 18 U.S.C. § 1964(c), Chevron is entitled to recover treble damages plus costs and attorneys' fees from the RICO Defendants.

379.     Chevron is further entitled to, and should be awarded, a preliminary and permanent injunction that enjoins Defendants, their assignees, and anyone else acting in concert with them—including the law firms of Emery Celli, Motley Rice and Patton Boggs, and H5 and financial backers such as Burford and Russell DeLeon—from commencing, prosecuting, or advancing in any way—directly or indirectly—any attempt to recognize or enforce the Lago Agrio judgment in any court, tribunal, or administrative agency in any jurisdiction, in the United States or abroad, including any attempt to attach or seize any Chevron or Chevron subsidiary's or co-venturer's assets, whether pre-judgment or otherwise, until this Court determines the merits and enters judgment on Chevron's claims against the Defendants in this action.

WHEREFORE, Chevron prays for judgment as set forth below.

## SECOND CLAIM FOR RELIEF
### (Conspiracy to Violate RICO, Violation of 18 U.S.C. § 1962(d))
### (Against All RICO Defendants)

380.     Chevron realleges and incorporates herein by reference each and every foregoing paragraph of this Amended Complaint as if set forth in full.

381.     The RICO Defendants have unlawfully, knowingly and willfully combined, conspired, confederated and agreed together and with others to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

382.     Upon information and belief, the RICO Defendants knew that they were engaged in a conspiracy to commit the predicate acts, and they knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity.  This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

383.     Upon information and belief, the RICO Defendants agreed to conduct or participate, directly or indirectly, in the conduct, management, or operation of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

384.     Each RICO Defendant knew about and agreed to facilitate the Enterprise's scheme to obtain property from Chevron.  It was part of the conspiracy that the RICO

Defendants and their co-conspirators would commit a pattern of racketeering activity in the conduct of the affairs of the Enterprise, including the acts of racketeering set forth in paragraphs 345-74, *supra*.

385.    As a direct and proximate result of the RICO Defendants' conspiracy, the acts of racketeering activity of the Enterprise, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Chevron has been injured in its business and property, including damage to Chevron's reputation and goodwill; the impairment of Chevron's interest in executed contracts, including the 1995 Settlement Agreement and 1998 Final Release; and the attorneys' fees and costs to defend itself in objectively baseless, improperly motivated sham litigation in Ecuador and in related litigation in the U.S., including the attorneys' fees and costs associated with exposing the RICO Defendants' pervasive fraud in the Section 1782 proceedings.

386.    Pursuant to 18 U.S.C. § 1964(c), Chevron is entitled to recover treble damages plus costs and attorneys' fees from the RICO Defendants.

387.    Chevron is further entitled to, and should be awarded, a preliminary and permanent injunction that enjoins Defendants, their assignees and anyone else acting in concert with them—including the law firms of Emery Celli, Motley Rice and Patton Boggs, and H5 and financial backers such as Burford and Russell DeLeon—from commencing, prosecuting, or advancing in any way—directly or indirectly—any attempt to recognize or enforce the Lago Agrio judgment in any court, tribunal, or administrative agency in any jurisdiction, in the United States or abroad, including any attempt to attach or seize any Chevron or Chevron subsidiary's or co-venturer's assets, whether pre-judgment or otherwise, until this Court determines the merits and enters judgment on Chevron's claims against the Defendants in this action.

WHEREFORE, Chevron prays for judgment as set forth below.

### THIRD CLAIM FOR RELIEF
#### (Fraud)
#### (Against All Defendants)

388.     Chevron realleges and incorporates herein by reference each and every foregoing paragraph of this Amended Complaint as if set forth in full.

389.     Defendants and their agents have knowingly misrepresented, omitted, and/or concealed material facts in their pleadings and representations before U.S. courts and before the Lago Agrio court, in their communications to federal and state government agencies and officials, and in their communications to Chevron, Chevron's shareholders, investors, analysts, and the media.  Each and every Defendant has personally engaged in this conduct, or knew or should have known that other Defendants were engaged in it on his or her behalf.  These false representations are detailed throughout this Amended Complaint and include the falsified Calmbacher reports, the true authorship of the Cabrera Report, the denial of any improper contact with Cabrera, the supposed independence and neutrality of Cabrera and his liability and damages assessment, the submission of new "expert" reports based on the fraudulent Cabrera Report, and the fraudulent endorsements of the Cabrera Report.

390.     Defendants made these false representations while knowing that their misrepresentations were materially false and/or that their omissions were material.

391.     Defendants further made these misrepresentations and/or omissions with the intent of obtaining favorable rulings from the U.S. and Lago Agrio courts, pressuring U.S. state and federal agencies to pursue investigations of Chevron, and propagating false information about Chevron to shareholders, investors, analysts, and the media.

392.     These material misrepresentations and/or omissions have been reasonably and justifiably relied upon by Chevron, the U.S. courts, state and federal government agencies and officials, and Chevron's shareholders, investors, analysts, and the media, and by the Lago Agrio court by means of its acceptance of Defendants' and Cabrera's misrepresentations and omissions and its failure to take meaningful corrective action.

393.     As a direct, proximate, and foreseeable result of Defendants' fraud, Chevron has been harmed, including significant pecuniary, reputational, and other damages.  These injuries include significant damage to Chevron's reputation and goodwill, and the attorneys' fees and costs to defend itself in objectively baseless, improperly motivated sham litigation in Ecuador and in related litigation in the U.S., including the attorneys' fees and costs associated with exposing the Defendants' pervasive fraud in the Section 1782 proceedings.

394.     Defendants have engaged in the malicious, willful, and fraudulent commission of wrongful acts and, because of the reprehensible and outrageous nature of these acts, Chevron is entitled to, and should be awarded, punitive damages against each of the Defendants.

395.     Chevron is further entitled to, and should be awarded, a preliminary and permanent injunction that enjoins Defendants, their assignees and anyone else acting in concert with them—including the law firms of Emery Celli, Motley Rice and Patton Boggs, and H5 and financial backers such as Burford and Russell DeLeon—from commencing, prosecuting, or advancing in any way—directly or indirectly—from any attempt to recognize or enforce the Lago Agrio judgment in any court, tribunal, or administrative agency in any jurisdiction, in the United States or abroad, including any attempt to attach or seize any Chevron or Chevron subsidiary's or co-venturer's assets, whether pre-judgment or otherwise, until this Court determines the merits and enters judgment on Chevron's claims against the Defendants in this action.

WHEREFORE, Chevron prays for judgment as set forth below.

## FOURTH CLAIM FOR RELIEF
### (Tortious Interference With Contract)
### (Against All Defendants)

396.     Chevron realleges and incorporates herein by reference each and every foregoing paragraph of this Amended Complaint as if set forth in full.

397.     Defendants are and have been aware of valid and enforceable contracts between TexPet and the Republic of Ecuador, including the 1995 Settlement Agreement and the 1998 Final Release.  These contracts, in exchange for TexPet's remedial actions, released TexPet,

Texaco, and their employees, successors, principals and subsidiaries from liability relating to environmental damage in Ecuador.

398.     Defendants have intentionally caused and continued to cause the Republic of Ecuador to repeatedly breach the 1995 Settlement Agreement and the 1998 Final Release. Defendants have, through improper influence and the fabricated Cabrera Report, persuaded the Republic of Ecuador to refuse to defend Chevron's rights and those of its subsidiaries under the contracts, to improperly dictate to the judiciary that Chevron be held liable in the Lago Agrio Litigation, and to bring criminal charges against Chevron's employees.

399.     The judgment from the Lago Agrio court also constitutes a severe and qualitatively different breach of the 1995 Settlement Agreement and the 1998 Final Release. Defendants have intentionally caused the Republic of Ecuador to take actions necessary to secure this fraudulent judgment.

400.     As a direct, proximate, and foreseeable result of Ecuador's breaches of the 1995 Settlement Agreement and the 1998 Final Release, Chevron has been forced to defend itself against claims for which TexPet had already secured a release, which has caused significant pecuniary, reputational, and other damages.  These injuries include significant damage to Chevron's reputation, and attorneys' fees and costs to defend itself and its subsidiaries against previously released claims in Ecuador, in related litigation to attempt to enforce these contracts in international arbitration, and in recognition and enforcement efforts around the world.

401.     Defendants have engaged in the malicious, willful, and fraudulent commission of wrongful acts and, because of the reprehensible and outrageous nature of these acts, Chevron is entitled to, and should be awarded, punitive damages against each of the Defendants.

402.     Chevron is further entitled to, and should be awarded, a preliminary and permanent injunction that enjoins Defendants, their assignees, and anyone else acting in concert with them—including the law firms of Emery Celli, Motley Rice and Patton Boggs, and H5 and financial backers such as Burford and Russell DeLeon—from commencing, prosecuting, or advancing in any way—directly or indirectly—any attempt to recognize or enforce the Lago

Agrio judgment in any court, tribunal, or administrative agency in any jurisdiction, in the United

States or abroad, including any attempt to attach or seize any Chevron or Chevron subsidiary's or

co-venturer's assets, whether pre-judgment or otherwise, until this Court determines the merits

and enters judgment on Chevron's claims against the Defendants in this action.

WHEREFORE, Chevron prays for judgment as set forth below.

### FIFTH CLAIM FOR RELIEF
**(Trespass to Chattels)**
**(Against All Defendants)**

403.     Chevron realleges and incorporates herein by reference each and every foregoing

paragraph of this Amended Complaint as if set forth in full.

404.     As set forth above, the RICO Defendants have engaged in a pattern of extortion,

collusion, wrongdoing, and deceit with an intent to interfere with Chevron's property, and the

Lago Agrio Plaintiffs have benefited and will continue to benefit from the RICO Defendants'

criminal scheme through a fraudulent judgment.  Through these actions, and by prosecuting a

fraudulent lawsuit, manufacturing false evidence, tampering with testimony, disseminating

misleading statements to courts, the public, and U.S. government officials, and otherwise

engaging in the pressure campaign described in the foregoing paragraphs of this Amended

Complaint, Defendants have intentionally, and without justification or consent, interfered and

intermeddled with Chevron's use and enjoyment of its funds that were intended for Chevron's

business purposes and of its business reputation and goodwill.

405.     Chevron has been harmed and the use of its property has been interfered with

and disturbed when its property, resources, and funds were necessarily redirected from their

intended uses to defend against Defendants' fraudulent litigation and misleading media

campaign.  For example, Chevron has been forced by the RICO Defendants' intentional and

wrongful conduct to expend funds and resources defending against fraudulent submissions in the

Lago Agrio Litigation, pursuing relief in the Treaty Arbitration, uncovering the RICO

Defendants' fraud through discovery in the United States (discovery with which the RICO

Defendants have continually interfered and which they have unduly extended, as described

herein), responding to false and misleading reports in major media publications and broadcasts which have been induced by the RICO Defendants, and maintaining an ongoing effort to provide accurate information about the Cabrera Report and other aspects of the RICO Defendants' fraud to the media and directly to the public.

406.    Chevron also has been harmed in that Defendants' conduct has damaged Chevron's reputation, thus interfering with Chevron's interest in the public goodwill toward it. Public awareness of and positive associations with the Chevron and Texaco brand names, and Chevron's other brand assets are among Chevron's most valuable assets, and Chevron has invested substantial resources into those brand names.  The RICO Defendants have intentionally sought to reduce the value of those assets as part of their extortionate scheme.  As Donziger has expressly stated, a key element of the RICO Defendants' strategy is to impose upon Chevron, "the cost of their sullied reputation, you know, in the media."[784]

407.    The harms suffered by Chevron are the direct, proximate, and reasonably foreseeable results of the Defendants' acts of intentional interference with Chevron's funds and goodwill.

408.    Defendants have engaged in the malicious, willful, and fraudulent commission of wrongful acts and, because of the reprehensible and outrageous nature of these acts, Chevron is entitled to, and should be awarded, punitive damages against each of the Defendants.

409.    Chevron is further entitled to, and should be awarded, a preliminary and permanent injunction that enjoins Defendants, their assignees, and anyone else acting in concert with them—including the law firms of Emery Celli, Motley Rice and Patton Boggs, and H5 and financial backers such as Burford and Russell DeLeon—from commencing, prosecuting, or advancing in any way—directly or indirectly—any attempt to recognize or enforce the Lago Agrio judgment in any court, tribunal, or administrative agency in any jurisdiction, in the United States or abroad, including any attempt to attach or seize any Chevron or Chevron subsidiary's or

---

[784] Exhibit 91 (Transcript of J. Berlinger film *Crude*) (MB-NONWAIVER00092726) at 52.

co-venturer's assets, whether pre-judgment or otherwise, until this Court determines the merits and enters judgment on Chevron's claims against the Defendants in this action.

WHEREFORE, Chevron prays for judgment as set forth below.

### SIXTH CLAIM FOR RELIEF
#### (Unjust Enrichment)
#### (Against All Defendants)

410.    Chevron realleges and incorporates herein by reference each and every foregoing paragraph of this Amended Complaint as if set forth in full.

411.    Defendants seek to obtain billions of dollars from Chevron through a fraudulent judgment in the Lago Agrio Litigation.  Defendants have been and will continue to be unjustly enriched by benefits obtained due to the judgment itself.

412.    Any property that Defendants obtain from Chevron will be acquired as a result of Defendants' tortious, illegal, and fraudulent conduct, as set forth herein, including the prosecution of the Lago Agrio Litigation itself.

413.    Principles of equity and good conscience mandate that this Court prevent Defendants from reaping a multi-billion dollar windfall and any benefits arising out of the fraudulent litigation by, among other things, issuing a preliminary and permanent injunction against Defendants that enjoins Defendants, their assignees, and anyone else acting in concert with them—including the law firms of Emery Celli, Motley Rice and Patton Boggs, and H5 and financial backers such as Burford and Russell DeLeon—from commencing, prosecuting, or advancing in any way—directly or indirectly—any attempt to recognize or enforce the Lago Agrio judgment in any court, tribunal, or administrative agency in any jurisdiction, in the United States or abroad, including any attempt to attach or seize any Chevron or Chevron subsidiary's co-venturer's assets, whether pre-judgment or otherwise, until this Court determines the merits and enters judgment on Chevron's claims against the Defendants in this action.

WHEREFORE, Chevron prays for judgment as set forth below.

## SEVENTH CLAIM FOR RELIEF
### (Civil Conspiracy)
### (Against All Defendants)

414.    Chevron realleges and incorporates herein by reference each and every foregoing paragraph of this Amended Complaint as if set forth in full.

415.    As set forth above, Defendants have committed torts against Chevron, including acts of racketeering giving rise to violations of RICO, fraud, tortious interference with contract, trespass to chattels, and unjust enrichment.

416.    Defendants agreed to participate in a common scheme against Chevron. Defendants intentionally participated in the furtherance of a plan or purpose to obtain property from Chevron.  In furtherance of this plan or purpose, Defendants committed overt and unlawful acts, including acts of racketeering as alleged herein.

417.    As a direct and proximate result of Defendants' conspiracy, the overt acts committed in furtherance of that conspiracy, and the torts committed against Chevron, Chevron has been damaged in its business and property, and further damage to Chevron's business and property is threatened and imminent.

418.    Defendants have engaged in the malicious, willful, and fraudulent commission of wrongful acts and, because of the reprehensible and outrageous nature of these acts, Chevron is entitled to, and should be awarded, punitive damages against each of the Defendants.

419.    Chevron is further entitled to, and should be awarded, a preliminary and permanent injunction that enjoins Defendants, their assignees, and anyone else acting in concert with them—including the law firms of Emery Celli, Motley Rice and Patton Boggs, and H5 and financial backers such as Burford and Russell DeLeon—from commencing, prosecuting, or advancing in any way—directly or indirectly—any attempt to recognize or enforce the Lago Agrio judgment in any court, tribunal, or administrative agency in any jurisdiction, in the United States or abroad, including any attempt to attach or seize any Chevron or Chevron subsidiary's or co-venturer's assets, whether pre-judgment or otherwise, until this Court determines the merits and enters judgment on Chevron's claims against the Defendants in this action.

WHEREFORE, Chevron prays for judgment as set forth below.

## EIGHTH CLAIM FOR RELIEF
### (Violations of New York Judiciary Law § 487)
### (Against Defendants Donziger, the Law Offices of Steven R. Donziger and Donziger & Associates, PLLC)

420.    Chevron realleges and incorporates herein by reference each and every foregoing paragraph of this Amended Complaint as if set forth in full.

421.    New York Judiciary Law § 487 provides, in pertinent part, as follows:  "An attorney or counselor who . . . [i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party . . . [i]s guilty of a misdemeanor, and in addition to the punishment prescribed therefore by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action."

422.    As set forth above, Donziger, the Law Offices of Steven R. Donziger, and Donziger & Associates, PLLC engaged in an intentional pattern of collusion, wrongdoing, and deceit with the intent to deceive both Chevron and multiple federal courts, including the United States District Court for the Southern District of New York and the United States Court of Appeals for the Second Circuit.

423.    Donziger, the Law Offices of Steven R. Donziger, and Donziger & Associates, PLLC actively participated in the preparation and filing of multiple court submissions to the United States District Court for the Southern District of New York, which included false and misleading statements about the Lago Agrio Litigation and the Cabrera Report.  Defendants Donziger and the Law Offices of Steven R. Donziger knowingly caused these misstatements to be filed with the intent of deceiving this Court and Chevron.  As described in paragraphs 304-10, *supra*, these misstatements were filed in opposition to Chevron's requests for discovery under 28 U.S.C. § 1782 and in support of the Lago Agrio Plaintiffs' and the Republic of Ecuador's actions against Chevron seeking to terminate arbitration proceedings.

424.    Donziger and the Law Offices of Steven R. Donziger tampered with the testimony of environmental consultant Mark Quarles in furtherance of the Enterprise's scheme.

In 2007, Ecuador submitted a declaration by Quarles regarding the "independence" of the Cabrera Report in a proceeding pending in the Southern District of New York, using that declaration to support Ecuador's contention that the Lago Agrio Litigation "has proceeded in accordance with rules of procedure under Ecuador law."  Quarles has recently admitted in sworn testimony that Donziger paid him for this affidavit, and that he would not have signed the affidavit if Donziger had told him the truth about the RICO Defendants' involvement with Cabrera.  By not disclosing the truth about the RICO Defendants' improper contact with Cabrera and instead deliberately misleading Quarles, Donziger knowingly engaged in deceit with the intent to deceive Quarles, this Court, and Chevron.

425.    As a result of the deceitful and fraudulent conduct of Donziger, the Law Offices of Steven R. Donziger, and Donziger & Associates, PLLC as described herein, Chevron has been injured in an amount to be established at trial.

426.    By reason of the foregoing, Chevron is entitled to monetary damages against Donziger, the Law Offices of Steven R. Donziger, and Donziger & Associates, PLLC, treble damages, and reasonable attorneys' fees pursuant to Judiciary Law § 487.

WHEREFORE, Chevron prays for judgment as set forth below.

## NINTH CLAIM FOR RELIEF
**(Request for Declaratory Judgment That the Judgment by the Lago Agrio Court Against Chevron is Unenforceable and Non-Recognizable)**
**(Against the Front and the "Lago Agrio Plaintiffs")**

427.    Chevron realleges and incorporates herein by reference each and every foregoing paragraph of this Amended Complaint as if set forth in full.

428.    Chevron is entitled to a declaratory judgment that the judgment from the Lago Agrio court is unenforceable and non-recognizable pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201(a).

429.    A declaratory judgment will not improperly increase friction between sovereign legal systems or encroach on the proper domain of a foreign court because no court has a right to impose fraudulent judgments such as the judgment of the Lago Agrio court.  And an injunction

against the Defendants named in this claim and all those acting in concert with them would not bind or affect the Ecuadorian courts in any way, and necessarily does not interfere with any proceedings in any other foreign courts because, *inter alia*, no recognition or enforcement proceedings are currently pending in any such courts.

430.      By this claim, Chevron seeks a declaratory judgment that the Lago Agrio judgment is unenforceable and non-recognizable, including but not limited to under the United States Constitution, federal common law, New York common law principles of comity, and/or New York's Recognition of Foreign Country Money Judgments Act (New York C.PL.R. 5301, *et seq.*,), on, among others, grounds of fraud, failure to afford procedures compatible with due process, lack of impartial tribunals, lack of personal jurisdiction, contravention of public policy, that the judgment conflicts with another final and conclusive judgment, that the proceeding in the foreign court was contrary to an agreement between the parties under which the dispute in question was to be settled otherwise than by proceedings in that court, and that the judgment is an unenforceable penalty.

431.      By reason of the fraudulent acts and fundamentally unfair proceedings described in this Amended Complaint that have given rise to the Lago Agrio judgment, an actual and justiciable controversy has arisen and now exists between Chevron and the Lago Agrio Plaintiffs and the Front as to whether the judgment is unenforceable and non-recognizable in the United States and establishing that Chevron's assets are safe from the Defendants' fraudulent actions and racketeering activity.  The actions of the RICO Defendants on behalf of the Lago Agrio Plaintiffs whom they purport to represent have damaged and are threatening to continue damaging Chevron.  Unless the controversy between the parties is resolved, the Lago Agrio Plaintiffs and the Front will continue to harm Chevron and will seek recognition and enforcement of the fraudulent judgment that the RICO Defendants have obtained on the Lago Agrio Plaintiffs' behalf.

432.      Chevron has no adequate remedy at law.  A declaratory action is necessary and useful in resolving and disposing of the question of whether the fraudulent Lago Agrio judgment

227

is enforceable and recognizable, and is the best and most effective remedy for finalizing the controversy between the parties as to this issue and for relieving Chevron from the expensive and damaging uncertainty surrounding the pending enforcement and recognition of the fraudulent judgment.  Chevron is entitled to have the question of whether the Lago Agrio judgment is enforceable and recognizable settled promptly so that it may continue conducting its business without the threat of attachment, asset seizures, or other enforcement actions arising from the massive fraudulent judgment.

433.    Chevron is further entitled to, and should be awarded, a preliminary and permanent injunction against the Front and the Lago Agrio Plaintiffs, their assignees and anyone else acting in concert with them from commencing, prosecuting, or advancing in any way—directly or indirectly—any attempt to recognize or enforce the Lago Agrio judgment in any court, tribunal, or administrative agency in any jurisdiction, in the United States or abroad, including any attempt to attach or seize any Chevron or Chevron subsidiary's or co-venturer's assets, whether pre-judgment or otherwise, until this Court determines the merits and enters judgment on Chevron's claims against the Defendants in this action.  Thus, even though they are not named defendants in this Declaratory Judgment claim, the other RICO Defendants and their co-conspirators, including the law firms of Emery Celli, Motley Rice and Patton Boggs, and H5 and financial backers such as Burford and Russell DeLeon, make themselves subject to any injunction issued by this Court to the extent they act in concert with the defendants named in this claim—the Lago Agrio Plaintiffs and the Front.

WHEREFORE, Chevron prays for judgment as set forth below.

## PRAYER FOR RELIEF

### On the First and Second Claims for Relief:

1.    For general damages according to proof at trial, trebled according to statute, 18 U.S.C. § 1964(c);

2.    For pre-judgment interest according to statute; and

3.      For Chevron's reasonable attorneys' fees and costs according to statute, 18 U.S.C. § 1964(c).

**On the First through Seventh Claims for Relief:**

4.      For general damages according to proof at trial;

5.      For equitable relief as appropriate pursuant to applicable law, including but not limited to issuing a temporary restraining order, a preliminary injunction and a permanent injunction that bars Defendants, their assignees and anyone else acting in concert with them— including potentially the law firms of Emery Celli, Motley Rice and Patton Boggs, and H5 and financial backers such as Burford and Russell DeLeon—from commencing, prosecuting, or advancing in any way—directly or indirectly—any attempt to recognize or enforce the Lago Agrio judgment in any court, tribunal, or administrative agency in any jurisdiction, in the United States or abroad, including any attempt to attach or seize any Chevron or Chevron subsidiary's or co-venturer's assets, whether pre-judgment or otherwise, until this Court determines the merits and enters judgment on Chevron's claims against the Defendants in this action; and

6.      Only for the third, fourth, fifth, and seventh claims for relief, punitive damages in an amount to be proven at trial.

**On the Eighth Claim for Relief:**

7.      For general damages according to proof at trial, trebled according to statute, Judiciary Law § 487; and

8.      For Chevron's reasonable attorneys' fees and costs according to statute, Judiciary Law § 487.

**On the Ninth Claim for Relief:**

9.      For a declaration that the judgment against Chevron in the Lago Agrio Litigation is non-recognizable and unenforceable for each and every one of the reasons set forth herein; and

10.     For equitable relief as appropriate pursuant to applicable law, including but not limited to issuing a temporary restraining order, a preliminary injunction and a permanent injunction that bars the Front, the Lago Agrio Plaintiffs, their assignees and anyone else acting in

concert with them—including the other RICO Defendants, the law firms of Emery Celli, Motley Rice and Patton Boggs, and H5 and financial backers such as Burford and Russell DeLeon—from commencing, prosecuting, or advancing in any way—directly or indirectly—any attempt to recognize or enforce the Lago Agrio judgment in any court, tribunal, or administrative agency in any jurisdiction, in the United States or abroad, including any attempt to attach or seize any Chevron or Chevron subsidiary's or co-venturer's assets, whether pre-judgment or otherwise, until this Court determines the merits and enters judgment on Chevron's claims against the Defendants in this action, or until such time as this Court deems appropriate.

**As to All Causes of Action:**

11.     For such other legal and equitable relief as the Court may deem Chevron is entitled to receive.

DATED: April 20, 2011

                                    GIBSON, DUNN & CRUTCHER LLP


                                    By:_____
                                           Randy M. Mastro

                                    200 Park Avenue
                                    New York, New York  10166-0193
                                    Telephone:  212.351.4000

                                    Scott A. Edelman
                                    2029 Century Park East
                                    Los Angeles, California  90067
                                    Telephone:  310.552.8500

                                    Andrea E. Neuman
                                    3161 Michelson Drive
                                    Irvine, California  92612
                                    Telephone:  949.451.3800

                                    William E. Thomson
                                    333 South Grand Avenue
                                    Los Angeles, California  90071
                                    Telephone:  213.229.7000

                                    Attorneys for Plaintiff Chevron Corporation

# APPENDIX A

*Chevron Corp. v. Donziger et al.:* Amended Complaint Appendix A
"The Lago Agrio Plaintiffs" (Defendants )

|  | Defendant | Province of Citizenship | Country of Citizenship |
|---|---|---|---|
| 1. | Alfredo Donaldo Payaguaje Payaguaje | Sucumbios | Republic of Ecuador |
| 2. | Angel Justino Piaguaje Lucitante | Unknown | Republic of Ecuador |
| 3. | Armando Wilfrido Piaguaje Payaguaje | Sucumbios | Republic of Ecuador |
| 4. | Beatriz Mercedes Grefa Tanguila | Orellana | Republic of Ecuador |
| 5. | Benancio Freddy Chimbo Grefa | Sucumbios | Republic of Ecuador |
| 6. | Bertha Antonia Yumbo Tanguila | Orellana | Republic of Ecuador |
| 7. | Carlos Grega Huatatoca | Orellana | Republic of Ecuador |
| 8. | Catalina Antonia Aguinda Salazar | Orellana | Republic of Ecuador |
| 9. | Celia Irene Viveros Cusangua | Orellana | Republic of Ecuador |
| 10. | Clide Ramiro Aguinda Aguinda | Orellana | Republic of Ecuador |
| 11. | Daniel Carlos Lusitande Yaiguaje | Sucumbios | Republic of Ecuador |
| 12. | Delfin Leonidas Payaguaje Payaguaje | Sucumbios | Republic of Ecuador |
| 13. | Elias Roberto Piyahuaje Payahuaje | Sucumbios | Republic of Ecuador |
| 14. | Emilio Martin Lusitande Yaiguaje | Sucumbios | Republic of Ecuador |
| 15. | Fermin Piaguaje Payaguaje | Sucumbios | Republic of Ecuador |
| 16. | Francisco Alvarado Yumbo | Orellana | Republic of Ecuador |
| 17. | Francisco Matias Alvarado Yumbo | Orellana | Republic of Ecuador |
| 18. | Francisco Victor Tanguila Grefa | Orellana | Republic of Ecuador |
| 19. | Gloria Lucrecia Tanguila Grefa | Orellana | Republic of Ecuador |
| 20. | Guillermo Vicente Payaguaje Lusitante | Sucumbios | Republic of Ecuador |
| 21. | Heleodoro Pataron Guaraca | Orellana | Republic of Ecuador |
| 22. | Hugo Gerardo Camacho Naranjo | Orellana | Republic of Ecuador |
| 23. | Javier Piaguaje Payaguaje | Sucumbios | Republic of Ecuador |
| 24. | Jose Gabriel Revelo Llore | Orellana | Republic of Ecuador |
| 25. | Jose Miguel Ipiales Chicaiza | Orellana | Republic of Ecuador |
| 26. | Lidia Alexandra Aguinda Aguinda | Orellana | Republic of Ecuador |

*Chevron Corp. v. Donziger et al.:* Amended Complaint Appendix A

1

| | Defendant | Province of Citizenship | Country of Citizenship |
|---|---|---|---|
| 27. | Lorenzo Jose Alvarado Yumbo | Orellana | Republic of Ecuador |
| 28. | Lourdes Beatriz Chimbo Tanguila | Orellana | Republic of Ecuador |
| 29. | Lucio Enrique Grefa Tanguila | Orellana | Republic of Ecuador |
| 30. | Luis Agustin Payaguaje Piaguaje | Sucumbios | Republic of Ecuador |
| 31. | Luis Armando Chimbo Yumbo | Orellana | Republic of Ecuador |
| 32. | Luisa Delia Tanguila Narvaez | Orellana | Republic of Ecuador |
| 33. | Maria Victoria Aguinda Salazar | Orellana | Republic of Ecuador |
| 34. | Maria Clelia Reascos Revelo | Orellana | Republic of Ecuador |
| 35. | Maria Hortencia Viveros Cusangua | Orellana | Republic of Ecuador |
| 36. | Maria Magdalena Rodriguez Barcenes | Orellana | Republic of Ecuador |
| 37. | Miguel Mario Payaguaje Payaguaje | Sucumbios | Republic of Ecuador |
| 38. | Narcisa Aida Tanguila Narvaez | Orellana | Republic of Ecuador |
| 39. | Octavio Ismael Cordova Huanca | Sucumbios | Republic of Ecuador |
| 40. | Olga Gloria Grefa Cerda | Orellana | Republic of Ecuador |
| 41. | Patricio Alberto Chimbo Yumbo | Orellana | Republic of Ecuador |
| 42. | Patricio Wuilson Aguinda Aguinda | Orellana | Republic of Ecuador |
| 43. | Reinaldo Lusitande Yaiguaje | Sucumbios | Republic of Ecuador |
| 44. | Rosa Teresa Chimbo Tanguila | Orellana | Republic of Ecuador |
| 45. | Segundo Angel Amanta Milan | Orellana | Republic of Ecuador |
| 46. | Simon Lusitande Yaiguaje | Sucumbios | Republic of Ecuador |
| 47. | Teodoro Gonzalo Piaguaje Payaguaje | Sucumbios | Republic of Ecuador |

*Chevron Corp. v. Donziger et al.: Amended Complaint Appendix A*

# APPENDIX B

*Chevron Corp. v. Donziger et al.: Amended Complaint Appendix B*
Selected Violations of 18 U.S.C. §§ 1341, 1343 (Mail and Wire Fraud)

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 1. | Steven Donziger | Dr. Charles Calmbacher | September 9, 2004 | Email | Manufacture false evidence. | Donziger sent a memorandum by email to Calmbacher and other members of the technical team reminding the team that "the goal is to win the legal case, not to produce an independent scientific report." Amended Complaint ("Am. Compl.") ¶ 111. |
| 2. | Donziger | Alberto Wray | October 20, 2004 | Email | Manufacture false evidence. | Donziger sent an email to Wray explaining Calmbacher had been removed from the field, and "will still sign the perito reports, but we might have to write them in Quito." Am. Compl. ¶ 114. |
| 3. | Dave Russell | Donziger | November 1, 2004 | Email | Manufacture false evidence. | Russell sent an email to Donziger and other team members stating they needed to stop analyzing for BTEX and GRO because the "data is self defeating except to show the contamination is much more recent that [sic] we would desire, and that would lead to an arguement [sic] that the contamination is by PetroEcuador rather than Texaco." Am. Compl. ¶ 172. |

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 4. | Donziger | Calmbacher | January 27, 2005 | Email | Manufacture false evidence. | Donziger sent an email to Calmbacher asking Calmbacher to send signature pages via DHL which Donziger had said would be used to file an expert report correctly stating Calmbacher's views. The RICO Defendants and their co-conspirators then used Calmbacher's signature to submit falsified reports to the Lago Agrio court under Calmbacher's name. Am. Compl. ¶¶ 118-20. |
| 5. | Calmbacher | Donziger | On or around January 27, 2005 | Overnight Courier | Manufacture false evidence. | In response to Donziger's request, Calmbacher signed several blank pages which Donziger told him would be used to file an expert report correctly stating Calmbacher's views, and sent the signed pages to the RICO Defendants and their co-conspirators by overnight courier. The RICO Defendants and their co-conspirators then used Calmbacher's signature to submit falsified reports to the Lago Agrio court under Calmbacher's name. Am. Compl. ¶¶ 118-20. |

*Chevron Corp. v. Donziger et al.: Amended Complaint Appendix B*

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 6. | Donziger | Calmbacher | March 3, 2005 | Email | Manufacture false evidence. | Donziger sent an email to Calmbacher asking for a "repeat of the [signature] papers [he] sent last time" to be sent via FedEx overnight. The RICO Defendants and their co-conspirators then used Calmbacher's signature to submit a falsified report to the Lago Agrio court under Calmbacher's name. Am. Compl. ¶¶ 118-20. |
| 7. | Calmbacher | Donziger | March 3, 2005 | Overnight Courier | Manufacture false evidence. | In response to Donziger's request, Calmbacher signed several blank pages which Donziger told him would be used to file an expert report correctly stating Calmbacher's views, and sent the signed pages to the RICO Defendants and their co-conspirators by overnight courier. The RICO Defendants and their co-conspirators then used Calmbacher's signature to submit a falsified report to the Lago Agrio court under Calmbacher's name. Am. Compl. ¶¶ 118-20. |
| 8. | Cristobal Bonifaz | Joseph Kohn, Donziger | March 3, 2005 | Email | Threaten Chevron with economic harm through scheme to procure criminal prosecutions of Chevron's attorneys. | Bonifaz sent an email to Kohn, Donziger, and others, discussing a strategy to focus their energies on "destroy[ing] [Reiss Veiga's] reputation" in order to force Chevron to settle the case. Am. Compl. ¶ 199. |

*Chevron Corp. v. Donziger et al.*: Amended Complaint Appendix B

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 9. | Donziger | Alejandro Ponce | July 25, 2005 | Email | Prevent Disclosure of Fraudulent Scheme. | Donziger sent an email to Ponce asking for advice regarding how to deal with Calmbacher, expressing concern that Calmbacher would "inform the court that the Selva Viva project is a fraud." Am. Compl. ¶ 113. |
| 10. | Donziger | Ponce | February 10, 2006 | Email | Collude with the Government of Ecuador and manipulate and collude with Ecuadorian judicial system. | Donziger sent an email to Ponce asking him to meet with the judge one-on-one to explain their theory of the case and all of the issues from the plaintiffs' perspective. Am. Compl. ¶ 78. |
| 11. | Donziger | Ponce | June 14, 2006 | Email | Manipulate and collude with Ecuadorian judicial system. | Donziger sent an email to Ponce instructing him to "prepare a detailed plan with the necessary steps to attack the judge through legal, institutional channels and through any other channel you can think of." Am. Compl. ¶ 72. |
| 12. | Donziger | Daria Fisher | July 12, 2006 | Email | Threaten Chevron with economic harm through government investigations based on fraudulent, manufactured evidence. | Donziger and Fisher exchanged emails regarding their ongoing efforts to cause an SEC investigation of Chevron. Donziger noted, "I sort of feel this is bogus, but as long as they want to look at it we should keep feeding them stuff." Am. Compl. ¶ 241. |

*Chevron Corp. v. Donziger et al.: Amended Complaint Appendix B*

4

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 13. | Amazon Watch | Donziger | August 9, 2006 | Email | Threaten Chevron with economic harm through campaign of public pressure based on false and misleading statements. | The Director of Communications at Amazon Watch sent an email to Donziger attaching a press release that was posted on amazonwatch.org and chevrontoxico.org, in which he had "only changed one word" from what Donziger sent. The email acknowledges the target of the releases is Chevron, not the media, with the goal to "get under Chevron management's skin" as much as possible. The attached press release asserts the disavowed $6 billion damages figure. Am. Compl. ¶ 219. |
| 14. | Kohn, Swift & Graf, P.C. | Selva Viva CIA LTDA, Ecuador | January 22, 2007 | Payment via Wire Transfer | Fund extortionate scheme to defraud Chevron. | Disbursement of $12,000.00. Am. Compl. ¶¶ 31, 185, 328. |
| 15. | Donziger | Joseph Berlinger | February 9, 2007 | Email | Threaten Chevron with economic harm through campaign of public pressure based on false and misleading statements. | Donziger emails Berlinger to give him instructions regarding filming a hearing and notes that he did "not want to [be] seen as helping [Berlinger] . . . in front of the Chevron lawyers." Am. Compl. ¶ 228. |
| 16. | Kohn, Swift & Graf, P.C. | Selva Viva | February 5, 2007 | Payment via Wire Transfer | Fund extortionate scheme to defraud Chevron. | Disbursement of $75,000.00. Am. Compl. ¶¶ 31, 185, 328. |

*Chevron Corp. v. Donziger et al.*: Amended Complaint Appendix B

5

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 17. | Donziger | Kamp | March 6, 2007 | Email | Promote false evidence. | Donziger forwarded a press release to Kamp touting the disavowed $6 billion damages figure and discussing a letter signed by leaders of indigenous groups seeking criminal prosecution of Pallares and Viega. Donziger noted, "we are kicking some ass and it feels awfully good." Am. Compl. ¶ 210. |
| 18. | Kohn, Swift & Graf, P.C. | Selva Viva | March 20, 2007 | Payment via Wire Transfer | Fund extortionate scheme to defraud Chevron. | Disbursement of $40,000.00. Am. Compl. ¶¶ 31, 185, 328. |
| 19. 6 | Amazon Watch, Donziger | n/a | March 20, 2007 | Wire (Press Release) | Promote false evidence. | Amazon Watch released a press release touting Russell's $6 billion figure, knowing that the figure was exaggerated and had been disavowed by Russell. Am. Compl. ¶ 108. |
| 20. | Luis Yanza | Donziger | April 2007 | Telephone | Collude with the Government of Ecuador. | Yanza and Donziger spoke on the telephone regarding Yanza's meeting with President Correa and setting up the April 26, 2007 tour of the consortium area by Correa. Am. Compl. ¶¶ 206, 208. |
| 21. | Kohn, Swift & Graf, P.C. | Selva Viva | April 13, 2007 | Payment via Wire Transfer | Fund extortionate scheme to defraud Chevron. | Disbursement of $30,000.00. Am. Compl. ¶¶ 31, 185, 328. |

*Chevron Corp. v. Donziger et al.:* Amended Complaint Appendix B

6

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 22. | Yanza | Donziger | April 17, 2007 | Email | Execute extortionate scheme by manipulating and colluding with members of the Ecuadorian judicial system and court appointed expert. | Yanza sent Donziger an email noting that himself, "Pablo, Alejandro," and "some other manager" were meeting with the judges the next day regarding the case, and that they had "met with Richard [Cabrera] and everything is under control. We gave him some money in advance." Am. Compl. ¶ 185. |
| 23. | Donziger | Fajardo | May 10, 2007 | Email | Manufacture false evidence and collude with court-appointed expert. | Donziger sent an email to Fajardo stating that they should have Cabrera find against Plaintiffs on some issues to create the illusion that Cabrera was independent, and look for ways to make sure Texaco did not know anything about Cabrera's work or plan. Am. Compl. ¶ 139. |
| 24. | Kohn, Swift & Graf, P.C. | Selva Viva | May 11, 2007 | Payment via Wire Transfer | Fund extortionate scheme to defraud Chevron. | Disbursement of $40,000.00. Am. Compl. ¶¶ 31, 185, 328. |
| 25. | Donziger | Berlinger | June 13, 2007 | Email | Execute extortionate scheme by colluding with the Government of Ecuador and court-appointed expert | Donziger sent an email to Berlinger asking him to "get someone to the office to shoot" because "the perito just got sworn in . . . this is a huge victory!!!!!!" Am. Compl. ¶ 140. |
| 26. | Kohn, Swift & Graf, P.C. | Selva Viva | June 14, 2007 | Payment via Wire Transfer | Fund extortionate scheme to defraud Chevron. | Disbursement of $100,000.00. Am. Compl. ¶¶ 31, 185, 328. |

*Chevron Corp. v. Donziger et al.:* Amended Complaint Appendix B

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 27. | Fajardo | Donziger | June 22, 2007 | Email | Execute and prevent disclosure of extortionate scheme | Fajardo sent an email to Donziger, referring to him as "Lagarto 3," containing account details to log into a private email account regarding "expert examination" to "learn about the plan." He instructs Donziger not to email a copy of the plan to anyone, and only to indentify himself as Lagarto 3. Am. Compl. ¶ 162. |
| 28. | Donziger | Berlinger | June 27, 2007 | Email | Threaten Chevron with economic harm through campaign of public pressure. | Donziger sent an email to Berlinger urging him to bring camera crews down to capture a march of their "private 'army' which has been very effective." He notes this was a "critical part of [their] strategy that is allowing the case to go forward." Am. Compl. ¶ 76. |
| 29. | Kohn, Swift & Graf, P.C. | Selva Viva | July 20, 2007 | Payment via Wire Transfer | Fund extortionate scheme to defraud Chevron. | Disbursement of $100,000.00. Am. Compl. ¶¶ 31, 185, 328. |
| 30. | Yanza | Donziger | August 8, 2007 | Email | Facilitate transfer of funds for fraudulent scheme. | Yanza sent an email to Donziger saying he is going to the office "to take care of . . . the money for the Huao," and asks "[d]o you know if JK was able to transfer something to the new account for which I gave him the details?" Am. Compl. ¶¶ 29, 185, 328-29. |

*Chevron Corp. v. Donziger et al.:* Amended Complaint Appendix B

8

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 31. | Donziger | Karen Wilson | August 14, 2007 | Email | Facilitate transfer of funds for fraudulent scheme. | Donziger sent an email requesting that Kohn Swift transfer $50,000.00 to an account for the Frente in Ecuador. Donziger explained that Yanza ran the Selva Viva account, which was created "simply as a pass thru mechanism to administer funds for the litigation" in Ecuador, and that the Frente controlled Selva Viva. Am. Compl. ¶ 113. |
| 32. | Kohn, Swift & Graf, P.C. | Selva Viva | September 4, 2007 | Payment via Wire Transfer | Fund extortionate scheme to defraud Chevron. | Disbursement of $50,000.00. Am. Compl. ¶¶ 31, 185, 328. |
| 33. | Yanza | Donziger | September 12, 2007 | Email | Fund extortionate scheme to defraud Chevron. | Yanza sent an email to Donziger asking him to get Kohn to wire $30,000 to a "secret account" and $20,000 to Selva Viva's account in order to pay Cabrera. Am. Compl. ¶ 185. |
| 34. | Donziger | Douglas Beltman, Ann Maest | September 19, 2007 | Email | Collude with Government of Ecuador. | Donziger sent an email to Stratus asking for help defining the "norms" of clean-up so they could "propose these norms to the Ministry of Energy which governs these norms[,] and whose Minister is a good friend of ours, so that the Ministry issues them as an official decree before the trial ends." Am. Compl. ¶ 148. |
| 35. | Kohn, Swift & Graf, P.C. | Selva Viva | October 17, 2007 | Payment via Wire Transfer | Fund extortionate scheme to defraud Chevron. | Disbursement of $50,000.00. Am. Compl. ¶¶ 31, 185, 328. |

*Chevron Corp. v. Donziger et al.: Amended Complaint Appendix B*

9

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 36. | Donziger | Chris Lehane | October 29, 2007 | Email | Threaten Chevron with economic harm through campaign of public pressure based on false and misleading statements. | Donziger sent an email to Chris Lehane, a political consultant known for attack strategies, stating they need to get more press to increase pressure on Chevron leading to upcoming mediation in order to increase the settlement price. Am. Compl. ¶ 216. |
| 37. | Donziger | Raul Herrera | October 31, 2007 | Email | Fraudulently misrepresent proceedings in Ecuador and threaten Chevron with economic harm through campaign of public pressure based on false and misleading statements. | Donziger ghostwrote a letter to the editor of the Wall Street Journal in the name of Ecuador's ambassador to the United States, and sent it to a Wall Street Journal reporter via email. The letter was a response to a column about Chevron's responsibility for contamination in Ecuador and claimed that Chevron was "afforded ample due process." Am. Compl. ¶ 81. |
| 38. | Beltman | Donziger | November 6, 2007 | Email | Manufacture false evidence and collude with court-appointed expert. | Beltman sent an email to Donziger attaching a report on the cost estimate to clean up the contaminated pits. Am. Compl. ¶ 147. |
| 39. | Kohn, Swift & Graf, P.C. | Selva Viva | November 13, 2007 | Payment via Wire Transfer | Fund extortionate scheme to defraud Chevron. | Disbursement of $70,000.00. Am. Compl. ¶¶ 31, 185, 328. |

*Chevron Corp. v. Donziger et al.: Amended Complaint Appendix B*

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 40. | Beltman | Donziger | November 16, 2007 | Email | Manufacture false evidence and collude with court-appointed expert. | Beltman sent an email to Donziger regarding "avoided costs" analysis and "amount of additional money/equity that Chevron has now because they did not build and maintain proper pits and reinject water from 1967-1991." Am. Compl. ¶ 148. |
| 41. | Donziger | Beltman | November 16, 2007 | Email | Manufacture false evidence and collude with court-appointed expert. | Donziger responded to Beltman email regarding "avoided costs" saying that "we need to get somebody else to look at the model" because it "sounds awfully low." Am. Compl. ¶ 148. |
| 42. | Beltman | Donziger | November 17, 2007 | Email | Manufacture false evidence and collude with court-appointed expert. | Beltman responded to Donziger regarding "avoided costs" issue, explaining the "unjust enrichment calculation." Am. Compl. ¶ 148. |
| 43. | Donziger | Beltman | November 17, 2007 | Email | Manufacture false evidence and collude with court-appointed expert. | Donziger responded to Beltman's explanation of "avoided costs" and unjust enrichment issues, directing him to not "say or even suggest anything that backs away from the [unjust enrichment] figures" in the plaintiffs' submission. Am. Compl. ¶ 148. |
| 44. | Kohn, Swift & Graf, P.C. | Selva Viva | December 17, 2007 | Payment via Wire Transfer | Fund extortionate scheme to defraud Chevron. | Disbursement of $50,000.00. Am. Compl. ¶¶ 31, 185, 328. |

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 45. | Fajardo | Donziger, Yanza | January 2, 2008 | Email | Manufacture false evidence and collude with court-appointed expert; defraud Chevron; manipulate and collude with Ecuadorian judicial system. | Fajardo emailed a list of "'necessary tasks" for 2008, including to "knock out" Chevron but to first "cash the juicy checks," to "stir up the cases" in the Supreme Court of Justice and Prosecutor's Office by "tak[ing] advantage of the new Prosecutor," to "watch over" the Havoc case, "[c]oordinate with the President of the Republic for defense on the accusation of denial of justice," "watch over the process of naming new Superior Court Justices," "[c]omplete all preparation work for the inspection we need to conduct," including "Annexes: genocide, health . . .," to "Prepare the legal scenario for the defense of the expert report," "[w]rite the answer to the expert report," "[c]oordinate with the Communications team on the scheduled announcement of the expert report results," and to "exert the maximum possible pressure, so that the judge or the Court, so that the case, does not become paralyzed." Am. Compl. ¶ 60. |
| 46. | Kohn, Swift & Graf, P.C. | Selva Viva | January 17, 2008 | Payment via Wire Transfer | Fund extortionate scheme to defraud Chevron. | Disbursement of $50,000.00. Am. Compl. ¶¶ 31, 185, 328. |

*Chevron Corp. v. Donziger et al.: Amended Complaint Appendix B*

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 47. | Luis Miguel Garcia Aragón | Beltman | January 22, 2008 | Email | Manufacture false evidence, and collude with court-appointed expert. | Cabrera team member Aragón sent an email to Beltman "reestablishing communication" and stating "we're moving forward with our model thanks to your help." Am. Compl. ¶ 154. |
| 48. | Aragón | Beltman, Maest | January 23, 2008 | Email | Manufacture false evidence, and collude with court-appointed expert. | Email exchange between Beltman, Maest and Cabrera team member Aragón discussing "incorporating uncertainty into the calculus" and asking whether it was ok to use the U.S. treasury rate for discounting restoration costs. Am. Compl. ¶ 154. |
| 49. | Yanza | Donziger | January 29, 2008 | Email | Facilitate transfer of funds for fraudulent scheme; manufacture false evidence and collude with court-appointed expert. | Yanza asks Donziger to "[b]efore you travel please confirm that our friend JK makes the deposit in the other account. I already sent him the bank information." He also reports that "[t]he expert did not appear to answer questions before the court" and that the judge therefore cancelled the hearing, but that "he'll certainly set another date" and "[w]e're on top of this issue." Am. Compl. ¶¶ 29, 185, 328-29. |
| 50. | Beltman | Donziger, Maest, Fajardo | February 8, 2008 | Email | Manufacture false evidence, and collude with court-appointed expert. | Beltman sent an email to Donziger, et al. attaching a draft outline of proposed annexes to the Cabrera Report. Am. Compl. ¶ 147. |
| 51. | Kohn, Swift & Graf, P.C. | Selva Viva | February 11, 2008 | Payment via Wire Transfer | Fund extortionate scheme to defraud Chevron. | Disbursement of $20,000.00. Am. Compl. ¶¶ 31, 185, 328. |

*Chevron Corp. v. Donziger et al.: Amended Complaint Appendix B*

13

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 52. | Beltman | "Stratus Science Group," David Chapman | February 22, 2008 | Email | Manufacture false evidence, and collude with court-appointed expert. | Beltman sent an email to other Stratus consultants seeking to motivate the Stratus team as they must "write, over the next 2 to 3 weeks, probably the single most important technical document for the case [which] will pull together all of the work over the last 15 or so years on the case and make recommendations for the court to consider in making its judgment" while knowing that the technical document was the Cabrera Report itself.  Am. Compl. ¶ 149. |
| 53. | Beltman | Maest | February 26, 2008 | Email | Manufacture false evidence, and collude with court-appointed expert. | Beltman sent an email to Stratus team, including Maest, regarding schedule for completion of work on the Cabrera Report, and attaching an outline of the report listing true authors of each portion and who the portions would be attributed to (generally Cabrera). Am. Compl. ¶ 147. |
| 54. | Beltman | Donziger | February 27, 2008 | Email | Manufacture false evidence and collude with court-appointed expert. | Beltman sent an email to Donziger stating "[a]ttached is my rough start of the Peritaje Global report," and asks whether it is "on track in terms of tone, language level, and content?" Am. Compl. ¶ 150. |

*Chevron Corp. v. Donziger et al.*: Amended Complaint Appendix B

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 55. | Donziger | Beltman | February 27, 2008 | Email | Manufacture false evidence and collude with court-appointed expert. | Donziger responded to Beltman's email attaching "rough start of the Peritaje Global report" saying "I think it's working. Keep going." Am. Compl. ¶ 150. |
| 56. | Beltman | Maest | February 29, 2008 | Email | Manufacture false evidence, and collude with court-appointed expert. | Beltman sent an email to Maest and another Stratus consultant listing annexes to cut from the final report in order to have it complete in time "given the turnaround time for translation and review." Am. Compl. ¶ 147. |
| 57. | Beltman | Michael Carney | March 1, 2008 | Email | Manufacture false evidence, and collude with court-appointed expert. | Beltman sent an email to another Stratus consultant with comments concerning drafting of an ecorisk annex and considerations surrounding translations. He notes that it will be translated in Spanish and that the "main audience for this is the judge." Am. Compl. ¶ 147. |
| 58. | Kohn, Swift & Graf, P.C. | Selva Viva | March 5, 2008 | Payment via Wire Transfer | Fund extortionate scheme to defraud Chevron. | Disbursement of $40,000.00.  Am. Compl. ¶¶ 31, 185, 328. |
| 59. | Beltman | Brian Lazar | March 5, 2008 | Email | Manufacture false evidence, and collude with court-appointed expert. | Beltman sent an email to another Stratus consultant discussing edits to an annex concerning soil clean up costs. Am. Compl. ¶ 147. |

*Chevron Corp. v. Donziger et al.*: Amended Complaint Appendix B

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 60. | Beltman | Translating Spanish, Inc. | March 7, 2008 | Email | Manufacture false evidence, and collude with court-appointed expert. | Beltman sent an email to Translating Spanish, Inc. concerning translation of attached "ecosystem value" annex from English to Spanish, and discussing progress of translation of other annexes such as "Environmental standards, Pit (plus) cleanup costs, [and] value of human life losses." Am. Compl. ¶ 152. |
| 61. | Beltman | Translating Spanish, Inc. | March 7, 2008 | Email | Manufacture false evidence, and collude with court-appointed expert. | Beltman sent an email to Translating Spanish, Inc. concerning translation of attached annexes concerning environmental standards and soil remediation. Am. Compl. ¶ 152. |
| 62. | Beltman | Maest | March 10, 2008 | Email | Manufacture false evidence, and collude with court-appointed expert. | Beltman sent an email to Maest and other Stratus consultants concerning review, analysis, and translation of annexes to Cabrera Report including "environmental standards, eco impacts from contamination, pit cleanup costs, value of human life losses, habitat losses, [and] TexPet remediation." Am. Compl. ¶ 147. |
| 63. | Beltman | Maest | March 10, 2008 | Email | Manufacture false evidence, and collude with court-appointed expert. | Beltman sent an email to Maest asking for help with drafting the main Cabrera Report "now that the annexes [were] out of the way." Am. Compl. ¶ 150. |

*Chevron Corp. v. Donziger et al.: Amended Complaint Appendix B*

16

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 64. | Beltman | Donziger | March 10, 2008 | Email | Manufacture false evidence, and collude with court-appointed expert. | Beltman sent an email to Donziger discussing status of translations of annexes, asking Donziger to make any changes in redline, and stating that with the annexes mostly out of the way, he would now "get back to the [Cabrera] report." Am. Compl. ¶ 150. |
| 65. | Beltman | Donziger | March 11, 2008 | Email | Manufacture false evidence, and collude with court-appointed expert. | Beltman sent an email to Donziger attaching an outline of the Cabrera report which included a listing of who would write each section of the report, and who each section would be attributed to, which was not the actual authors. Am. Compl. ¶ 153. |
| 66. | Maest | Beltman | March 11, 2008 | Email | Manufacture false evidence, and collude with court-appointed expert. | Maest sent an email to Beltman stating she could help Beltman draft the main Cabrera Report. Am. Compl. ¶ 147. |
| 67. | Translating Spanish, Inc. | Beltman | March 11, 2008 | Email | Manufacture false evidence, and collude with court-appointed expert. | "Translating Spanish, Inc." sent an email to Beltman attaching a translated VSL annex. Am. Compl. ¶ 152. |

*Chevron Corp. v. Donziger et al.: Amended Complaint Appendix B*

17

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 68. | Beltman | Translating Spanish, Inc. | March 12, 2008 | Email | Manufacture false evidence, and collude with court-appointed expert. | Beltman sent an email to Translating Spanish, Inc. attaching "the main report," written in English, and stating it was a high priority to be translated into Spanish because it needed to be filed soon with the court in Ecuador. The attached report stated that it was written by Richard Cabrera, although it was actually prepared by Beltman and other Stratus consultants. Am. Compl. ¶ 152. |
| 69. | Beltman | Donziger | March 13, 2008 | Email | Manufacture false evidence, and collude with court-appointed expert. | Beltman sent an email to Donziger listing what he had sent so far including the "main report" and "annexes." He notes that the main report still needs to be translated, and "a native Spanish speaker" will need to read the translations "to make sure they make sense." Am. Compl. ¶ 147. |
| 70. | Enlaso Enterprise Language Solutions | Stratus | March 13, 2008 | Email | Manufacture false evidence, and collude with court-appointed expert. | Enlaso Enterprise Language Solutions sent an email to Stratus regarding an estimate for translation services for annexes to the Cabrera Report. Am. Compl. ¶ 152. |

*Chevron Corp. v. Donziger et al.*: Amended Complaint Appendix B

|  | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 71. | Beltman | Stratus | March 18, 2008 | Email | Manufacture false evidence, and collude with court-appointed expert. | Beltman sent an email to other Stratus consultants regarding the "unjust enrichment annex" and attaching copies in Spanish and English. He asks the consultants to fill in the tables in both versions and send back to him as soon as possible. Am. Compl. ¶ 147. |
| 72. | Amazon Watch, Donziger | Chairman of the United States Securities and Exchange Commission | March 18, 2008 | Mail | Threaten Chevron with economic harm through government investigations based on fraudulent, manufactured evidence. | Amazon Watch sent a letter to the SEC seeking investigation and sanction of Chevron for alleged failure to comply with securities regulations, emphasizing the forthcoming Cabrera Report, and the independence of its purported author, "an independent special master" that had prepared his report "mak[ing] use of all evidence collected" with "a large team of technical experts under [his] supervision." Am. Compl. ¶ 240. |
| 73. | Beltman | William Powers | March 20, 2008 | Email | Manufacture false evidence, and collude with court-appointed expert. | Beltman sent an email to Powers asking for "the status of the report" and noting that "we need to submit everything to the court on Monday (!!!)" Am. Compl. ¶ 147. |
| 74. | Maest | Beltman | March 20, 2008 | Email | Manufacture false evidence, and collude with court-appointed expert. | Maest sent an email to Beltman, attaching annex regarding soil remediation with her comments. Am. Compl. ¶ 147. |

*Chevron Corp. v. Donziger et al.*: Amended Complaint Appendix B

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 75. | Beltman | Lazar | March 21, 2008 | Email | Manufacture false evidence, and collude with court-appointed expert. | Beltman sent an email to another Stratus consultant concerning an annex regarding soil remediation. Am. Compl. ¶ 147. |
| 76. | Powers | Beltman | March 22, 2008 | Email | Manufacture false evidence, and collude with court-appointed expert. | Powers drafted Annex S to the Cabrera Report and emailed it to Beltman for incorporation into the report. Am. Compl. ¶ 147. |
| 77. | Beltman | Donziger | March 23, 2008 | Email | Manufacture false evidence, and collude with court-appointed expert. | Beltman sent an email to Donziger regarding whether Fajardo and Yanza received Powers' report. He notes that they need to format it and take Powers name off, "but they can figure that out." Am. Compl. ¶ 153. |
| 78. | Beltman | Chapman | March 24, 2008 | Email | Manufacture false evidence, and collude with court-appointed expert. | Beltman sent an email to other Stratus consultants discussing the validity of survey collected data used for the Cabrera Report. Am. Compl. ¶ 147. |
| 79. | Jennifer Peers | Fajardo | March 27, 2008 | Email | Manufacture false evidence, and collude with court-appointed expert. | A Stratus consultant, Peers, sent an email to Fajardo regarding updated language for annex regarding ecological impacts of contamination. Am. Compl. ¶ 147. |
| 80. | Fajardo | Peers | March 27, 2008 | Email | Manufacture false evidence, and collude with court-appointed expert. | Fajardo responded to Peers' email regarding updated language, stating that it was too late to make changes. Am. Compl. ¶ 147. |

*Chevron Corp. v. Donziger et al.*: Amended Complaint Appendix B

20

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 81. | Amazon Watch, Amazon Defense Front, Fajardo | n/a | April 3, 2008 | Wire (Press release) | Falsely promote Cabrera Report as independent and/or neutral. | In a press release issued by Amazon Watch and the Front, Fajardo made knowingly false statements about Cabrera's independence. He stated, "Chevron's claim that Professor Cabrera is cooperating with the plaintiffs is completely false," and that "Chevron is frightened by Cabrera precisely because he is an independent and credible expert." Am. Compl. ¶ 230. |
| 82. | Kohn, Swift & Graf, P.C. | Selva Viva | April 11, 2008 | Payment via Wire Transfer | Fund extortionate scheme to defraud Chevron. | Disbursement of $70,000.00. Am. Compl. ¶¶ 31, 185, 328. |
| 83. | Yanza and Fajardo | United States Trade Representative Susan Schwab | April 29, 2008 | Mail | Falsely promote Cabrera Report as independent and/or neutral. | Yanza and Fajardo sent a letter to a United States Trade Representative misstating that Cabrera was "an independent court-appointed special master" and misstating that "the bulk of the evidence relied on [by Cabrera] was provided by Chevron itself via its own sampling evidence." Am. Compl. ¶ 242. |
| 84. | Kohn, Swift & Graf, P.C. | Selva Viva | May 5, 2008 | Payment via Wire Transfer | Fund extortionate scheme to defraud Chevron. | Disbursement of $35,000.00. Am. Compl. ¶¶ 31, 185, 328. |

*Chevron Corp. v. Donziger et al.: Amended Complaint Appendix B*

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 85. | Beltman | Donziger | May 14, 2008 | Email | Prevent disclosure of fraudulent scheme. | Beltman sent an email to Donziger stating that "Karen [Hinton] wants to give the Clapp report to a reporter, but we can't do that since it's an Annex. I'll tell her not to because I'm not sure of the report pedigree, but we need to be careful about this." Am. Compl. ¶ 158. |
| 86. | Beltman | Karen Hinton | May 14, 2008 | Email | Prevent disclosure of fraudulent scheme. | Beltman sent an email to Hinton explaining that she could not give out copies of a report by Clapp to reporters, falsely claiming he was "not sure of its pedigree" and failing to disclose that the true reason was that the report was used as an annex to the Cabrera Report. Am. Compl. ¶ 158. |
| 87. | Amazon Watch, The Front | n/a | May 21, 2008 | Wire (Press release) | Falsely promote Cabrera Report as independent and/or neutral. | Amazon Watch and the Front authored a press release falsely stating that Cabrera was independent and misleadingly omitting the RICO Defendants' and their co-conspirators' role in writing his report: "A recent court-ordered report, written by an independent expert, has proposed that Chevron pay a minimum of $7 billion and up to $16 billion to compensate for environmental contamination." Am. Compl. ¶ 214. |
| 88. | Kohn, Swift & Graf, P.C. | Selva Viva | June 9, 2008 | Payment via Wire Transfer | Fund extortionate scheme to defraud Chevron. | Disbursement of $30,000.00. Am. Compl. ¶¶ 31, 185, 328. |

*Chevron Corp. v. Donziger et al.*: Amended Complaint Appendix B

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 89. | David Mills, Beltman, Chapman | Steve Hampton, California Department of Fish and Game, Office of Spill Prevention and Response | June 12, 2008 | Email | Falsely promote Cabrera Report as independent and/or neutral. | A Stratus consultant sent an email on behalf of himself, Beltman, Chapman, and others at Stratus, asking Hampton to consider reviewing and endorsing the Cabrera Report. The email fails to disclose Stratus and the other the RICO Defendants' and their co-conspirators' role in ghostwriting the report. Am. Compl. ¶ 181. |
| 90. | Beltman | Amazon Watch | June 26, 2008 | Email | Falsely promote Cabrera Report as independent and/or neutral. | Beltman sent an email to Amazon Watch stating that Stratus was working on assembling a team of "well-credentialed experts" to review Cabrera's report and provide support to be shared with the Lago Agrio court and the media. Am. Compl. ¶ 176. |
| 91. | Donziger | Fajardo, Yanza | June 26, 2008 | Email | Execute scheme to extort and defraud Chevron. | Donziger sent an email urging people to "think again and think outside the box of the law if necessary. Think politics, law, or a combination . . . . If the law is in the way, then tell me how to change the law. If an executive order can help, then tell me how. If the new Constitution can help, tell me how." Am. Compl. ¶ 147. |
| 92. | Kohn, Swift & Graf, P.C. | Selva Viva | July 2, 2008 | Payment via Wire Transfer | Fund extortionate scheme to defraud Chevron. | Disbursement of $30,000.00. Am. Compl. ¶¶ 31, 185, 328. |

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 93. | Kohn | Beltman | July 7, 2008 | Email | Manufacture false evidence, collude with court-appointed expert, and falsely promote Cabrera Report as independent and/or neutral. | Kohn sent an email to Beltman approving Stratus upcoming work which included executing peer reviews of the Cabrera Report, working on comments on the Cabrera Report, and working on Cabrera response due in November. Am. Compl. ¶ 147. |
| 94. | Beltman | Lazar | July 28, 2008 | Email | Manufacture false evidence, collude with court-appointed expert, and falsely promote Cabrera Report as independent and/or neutral. | Beltman sent an email to another Stratus consultant asking for help editing Stratus's original English versions of annexes to the Cabrera report so that they appear to be translations of the Spanish version of the Cabrera report. Am. Compl. ¶ 152. |
| 95. | Beltman | Donziger | July 29, 2008 | Email | Falsely promote Cabrera Report as independent and/or neutral. | Beltman sent an email to Donziger detailing Stratus's attempts to obtain endorsements for the Cabrera Report, stating they were having difficulty finding academics who were willing to endorse the Cabrera Report, and suggesting they should turn to consultants and/or their internal team for endorsements instead. Am. Compl. ¶ 183. |

*Chevron Corp. v. Donziger et al.*: Amended Complaint Appendix B

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 96. | Fajardo | Maest, Beltman | July 31, 2008 | Email | Manufacture false evidence, and collude with court-appointed expert. | Fajardo sent an email to Maest and Beltman asking about the progress of comments, which they had agreed to draft by the end of July according to the plan they set out during their meeting in Boulder in June. Am. Compl. ¶ 147. |
| 97. | Beltman | Maest | August 1, 2008 | Email | Manufacture false evidence, and collude with court-appointed expert. | Beltman sent Maest and other Stratus consultants an email detailing "what [they] need[ed] to do for the comments on the Cabrera report." Am. Compl. ¶ 167. |
| 98. | Kohn | Beltman, Donziger | August 5, 2008 | Emails | Manufacture false evidence and collude with court-appointed expert. | In emails exchanged between Kohn, Donziger, and Beltman, Kohn instructed Beltman to conduct analysis "of the type in your section 2 of cleanup to 1,000 ppm instead of 100" because apparently "Cabrera exclusively uses 1000." Am. Compl. ¶ 147. |
| 99. | Kohn, Swift & Graf, P.C. | Selva Viva | August 11, 2008 | Payment via Wire Transfer | Fund extortionate scheme to defraud Chevron. | Disbursement of $38,000.00. Am. Compl. ¶¶ 31, 185, 328. |
| 100. | Kohn, Swift & Graf, P.C. | Selva Viva | September 11, 2008 | Payment via Wire Transfer | Fund extortionate scheme to defraud Chevron. | Disbursement of $28,000.00. Am. Compl. ¶¶ 31, 185, 328. |
| 101. | Kohn, Swift & Graf, P.C. | Selva Viva | October 3, 2008 | Payment via Wire Transfer | Fund extortionate scheme to defraud Chevron. | Disbursement of $32,000.00. Am. Compl. ¶¶ 31, 185, 328. |

*Chevron Corp. v. Donziger et al.: Amended Complaint Appendix B*

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 102. | Beltman | Donziger | October 6, 2008 | Email | Manufacture false evidence, and collude with court-appointed expert. | Beltman sent an email to Donziger listing current work including revising and reevaluating portions of the Cabrera Report, and working with Donziger on how to prepare responses to Chevron's comments on the report. Am. Compl. ¶ 167. |
| 103. | Beltman | Peers | October 27, 2008 | Email | Manufacture false evidence, and collude with court-appointed expert. | Beltman and Stratus consultant Jennifer Peers exchanged emails regarding work of U.S. consultant 3TM in which Peers noted that they needed to revise 3TM's work to "clean up the language so it [would] sound[] more like [Cabrera] and less like a comment." Am. Compl. ¶ 167. |
| 104. | Beltman | Stratus | October 29, 2008 | Email | Manufacture false evidence, and collude with court-appointed expert. | Beltman sent an email to another Stratus consultant noting his desire that work performed by U.S. consultant 3TM "be in a form that someone in Ecuador could have written." Am. Compl. ¶ 167. |
| 105. | Maest | Powers | October 31, 2008 | Email | Manufacture false evidence, and collude with court-appointed expert. | Maest sent an email to Powers asking him to respond to questions to the Cabrera Report posed by the Lago Agrio Plaintiffs. Am. Compl. ¶ 168. |

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 106. | Powers | Maest | November 4, 2008 | Email | Manufacture false evidence, and collude with court-appointed expert. | Powers drafted answers to the questions posed in response to the Cabrera Report and sent them to Maest. The answers were later filed with the Lago Agrio court as Cabrera's answers to questions posed by the Lago Agrio Plaintiffs. Am. Compl. ¶ 168. |
| 107. | Donziger | Beltman | November 4, 2008 | Email | Prevent disclosure of fraudulent scheme. | Donziger sent an email to Beltman regarding the need to prevent expert Richard Clapp from "go[ing] off the reservation" and "talk[ing] to the congressman in a way that damns the Cabrera report with faint praise if you know what I mean." Am. Compl. ¶ 158. |
| 108. | Beltman | Donziger | November 6, 2008 | Email | Prevent disclosure of fraudulent scheme. | Beltman sent an email to Donziger stating they should not distribute copies of either of two reports written by Clapp because one of them would "probably appear in the expert's response to comments. I don't think we should hand out either one as Clapp's, thereby distributing proof." Am. Compl. ¶ 169. |
| 109. | Kohn, Swift & Graf, P.C. | Selva Viva | November 14, 2008 | Payment via Wire Transfer | Fund extortionate scheme to defraud Chevron. | Disbursement of $40,000.00. Am. Compl. ¶¶ 31, 185, 328. |

*Chevron Corp. v. Donziger et al.: Amended Complaint Appendix B*

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 110. | Beltman | Donziger | November 18, 2008 | Email | Prevent disclosure of fraudulent scheme. | Beltman sent an email to Donziger stating they must limit distribution of a 5-page report written by Clapp regarding his Ecuador trip. Beltman states the report "CANNOT go into the Congressional Record as being authored by him." Am. Compl. ¶158. |
| 111. | Amazon Watch, The Front | n/a | December 1, 2008 | Wire (Press release) | Falsely promote Cabrera Report as independent and/or neutral. | Amazon Watch and the Front distributed a press release about the Stratus review of the Cabrera Report, entitled, "Chevron's $27 Billion Liability in Ecuador's Amazon Confirmed by Team of Independent Scientists." The press release stated that Cabrera was independent and that his report had been confirmed by a "team of independent scientists" and failed to disclose the relationship between Stratus and Cabrera. Am. Compl. ¶233. |
| 112. | Stratus, Beltman, Maest | n/a | December 1, 2008 | Email/Mail/ Internet | Falsely promote Cabrera Report as independent and/or neutral. | Stratus released a fifteen page document, signed by Beltman, Maest, and other Stratus consultants, distributed by physical and electronic mail and posted online, "analyzing" and defending Cabrera's report as the work of a court appointed neutral expert, and failing to disclose that Stratus and the other RICO Defendants and their co-conspirators actually drafted the report. Am. Compl. ¶177. |

*Chevron Corp. v. Donziger et al.: Amended Complaint Appendix B*

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 113. | Amazon Watch | Beltman | December 1, 2008 | Email | Threaten Chevron with economic harm through campaign of public pressure based on false and misleading statements. | Email exchange with the subject line "2009 Shareholder Resolution – Urgent Update" regarding proposed shareholder resolution providing that a "court-appointed expert in the Ecuadorian litigation has recommended that Chevron be held liable for up to $27.3 billion in damages," but failing to disclose that Stratus and the other RICO Defendants and their co-conspirators actually drafted the expert's report finding Chevron liable. Am. Compl. ¶ 254. |
| 114. | Kohn, Swift & Graf, P.C. | Selva Viva | December 18, 2008 | Payment via Wire Transfer | Fund extortionate scheme to defraud Chevron. | Disbursement of $30,000.00. Am. Compl. ¶¶ 31, 185, 328. |
| 115. | Beltman | Cindy Buhl, Office of United States Congressman Jim McGovern | December 19, 2008 | Email | Falsely promote Cabrera Report as independent and/or neutral and threaten Chevron with economic harm through campaign of public pressure based on false and misleading statements. | Beltman provided United States Congressman Jim McGovern's office "some talking points" for an interview with the Los Angeles Times, falsely telling the Congressman's staff that "[t]he Court Expert reviewed available scientific data and concluded that people in the area suffer from many illnesses caused by the contamination, including cancer." Am. Compl. ¶ 244. |

*Chevron Corp. v. Donziger et al.*: Amended Complaint Appendix B

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 116. | Fajardo | Berlinger | January 22, 2009 | Email | Falsely promote Cabrera Report as independent and/or neutral and prevent disclosure of fraudulent scheme. | Fajardo sent an email to Bonfiglio and Berlinger reiterating the need to delete the images they had discussed from the Crude documentary, noting the issue was "so serious that we can lose every-thing." Am. Compl. ¶226. |
| 117. | Beltman | Cindy Buhl, Office of United States Congressman Jim McGovern | January 31, 2009 | Email | Falsely promote Cabrera Report as independent and/or neutral. | Beltman forwarded Cabrera's reports, stating "[t]he Court Expert's March 2008 report summary is attached," and that "[a]lso attached is the November 2008 response to the [Lago Agrio] Plaintiff's questions that was written by the Court Expert." Beltman failed to disclose that he and the Lago Agrio Plaintiffs' other U.S. consultants ghostwrote the report as well as the re-sponse. Am. Compl. ¶244. |
| 118. | Kohn, Swift & Graf, P.C. | Selva Viva | February 4, 2009 | Payment via Wire Transfer | Fund extortionate scheme to defraud Chevron. | Disbursement of $30,000.00. Am. Compl. ¶¶31, 185, 328. |

*Chevron Corp. v. Donziger et al.: Amended Complaint Appendix B*

30

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 119. | Amazon Watch, The Front, Fajardo | n/a | February 13, 2009 | Wire (Press Release) | Falsely promote Cabrera Report as independent and/or neutral. | Amazon Watch and the Front issued a press release in which Fajardo made knowingly false statements about Cabrera's independence, stating that the comments made by Chevron General Counsel Charles James "alleging without proof that an independent court expert was cooperating with the plaintiffs were 'false and defamatory' and could expose Chevron shareholders to additional liability." Am. Compl. ¶ 249. |
| 120. | Kohn, Swift & Graf, P.C. | Selva Viva | March 9, 2009 | Payment via Wire Transfer | Fund extortionate scheme to defraud Chevron. | Disbursement of $30,000.00. Am. Compl. ¶¶ 31, 185, 328. |
| 121. | Beltman | Donziger | March 18, 2009 | Email | Falsely promote Cabrera Report as independent and/or neutral. | Beltman sent Donziger an email containing draft language denying that the Lago Agrio Plaintiffs were in collusion with Cabrera and claiming that "Cabrera's November response to the plaintiffs is clearly his own." However, Beltman knew that he and the Lago Agrio Plaintiffs' other U.S. consultants had drafted the response. Am. Compl. ¶ 234. |

*Chevron Corp. v. Donziger et al.: Amended Complaint Appendix B*

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 122. | Ali Pflaum | Emma Vaughn | April 6, 2009 | Email | Prevent disclosure of fraudulent scheme and falsely promote Cabrera Report as independent and/or neutral. | At the request of the RICO defendants, who were attempting to cover up Carlos Beristain's presence in some Crude footage, Pflaum sent an email to Emma Vaugn at CNN, asking her to "NOT include any footage from Trudie's visit to the Cofan community that features a man in a white t-shirt." Am. Compl. ¶227. |
| 123. | Kohn, Swift & Graf, P.C. | Selva Viva | April 21, 2009 | Payment via Wire Transfer | Fund extortionate scheme to defraud Chevron. | Disbursement of $10,000.00. Am. Compl. ¶¶ 31, 185, 328. |
| 124. | Kohn, Swift & Graf, P.C. | Selva Viva | May 7, 2009 | Payment via Wire Transfer | Fund extortionate scheme to defraud Chevron. | Disbursement of $20,000.00. Am. Compl. ¶¶ 31, 185, 328. |
| 125. | Amazon Watch, Donziger | Chevron Shareholders | May 25, 2009 | Mail | Threaten Chevron with economic harm through campaign of public pressure based on false and misleading statements. | Amazon Watch sent a letter to Chevron shareholders asserting Chevron had made "false, misleading, or incomplete filings with the SEC," quoting two analysts stating the litigation was hurting Chevron's stock price, and relying on the "independent court damages assessment" without disclosing that the RICO Defendants and their co-conspirators had written that "assessment." Am. Compl. ¶250. |
| 126. | Kohn, Swift & Graf, P.C | Selva Viva | May 28, 2009 | Payment via Wire Transfer | Fund extortionate scheme to defraud Chevron. | Disbursement of $22,000.00. Am. Compl. ¶¶ 31, 185, 328. |

*Chevron Corp. v. Donziger et al.: Amended Complaint Appendix B*

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 127. | Beltman | Representative of Brazil's Aggue Magalhães (Haggai Magellan) Research Center | June 26, 2009 | Email | Falsely promote Cabrera Report as independent and/or neutral. | Beltman sent an email to the Center seeking an endorsement of the Cabrera Report, providing a copy of the report and Stratus's analysis of it, and recommending the Center sign an evaluation that Stratus drafted. Stratus failed to disclose its own consultants ghost-wrote the report. Am. Compl. ¶ 182. |
| 128. | Kohn, Swift & Graf, P.C. | Selva Viva | June 29, 2009 | Payment via Wire Transfer | Fund extortionate scheme to defraud Chevron. | Disbursement of $20,000.00.  Am. Compl. ¶¶ 31, 185, 328. |
| 129. | Kohn, Swift & Graf, P.C. | Selva Viva | July 16, 2009 | Payment via Wire Transfer | Fund extortionate scheme to defraud Chevron. | Disbursement of $70,000.00.  Am. Compl. ¶¶ 31, 185, 328. |
| 130. | Kohn, Swift & Graf, P.C. | Selva Viva | August 26, 2009 | Payment via Wire Transfer | Fund extortionate scheme to defraud Chevron. | Disbursement of $20,000.00.  Am. Compl. ¶¶ 31, 185, 328. |
| 131. | Andrew Wilson | Donziger, Beltman | August 29, 2009 | Email | Manipulate and collude with Ecuadorian judicial system. | Wilson sent an email to Donziger, and Beltman, attaching transcripts from two meetings with Judge Nuñez, noting one transcript "seems to show Nuñez was aware that his actions were helping further that something that was improper to be part of as a judge." Am. Compl. ¶ 91. |

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 132. | Yanza | Donziger | September 17, 2007 | Email | Fund extortionate scheme to defraud Chevron. | Yanza sent an email to Donziger with the subject line "transfer" and containing details for a bank account for the Frente in Lago Agrio. Yanza notes, "I hope you make a deposit right away because I offered to give the Wao [Cabrera] another advance tomorrow and I don't want to look bad." Am. Compl. ¶¶ 29, 185, 328-29. |
| 133. | Kohn, Swift & Graf, P.C. | Selva Viva | September 23, 2009 | Payment via Wire Transfer | Fund extortionate scheme to defraud Chevron. | Disbursement of $20,000.00. Am. Compl. ¶¶ 31, 185, 328. |
| 134. | Donziger | Beltman | September 30, 2009 | Email | Execute extortionate scheme by colluding with the Government of Ecuador. | Donziger sent an email to Beltman noting he was meeting with the Republic of Ecuador's attorneys in DC and needed Beltman to provide scientific analysis. Am. Compl. ¶ 82. |
| 135. | Beltman | Donziger | September 30, 2009 | Email | Execute extortionate scheme by colluding with the Government of Ecuador. | Beltman agreed to be available for a call to discuss scientific evidence to be provided to the Republic of Ecuador's attorneys. Am. Compl. ¶ 82. |
| 136. | Kohn, Swift & Graf, P.C. | Selva Viva | October 20, 2009 | Payment via Wire Transfer | Fund extortionate scheme to defraud Chevron. | Disbursement of $27,000.00. Am. Compl. ¶¶ 31, 185, 328. |

*Chevron Corp. v. Donziger et al.: Amended Complaint Appendix B*

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 137. | Amazon Watch, Donziger | Chevron Chief Executive Officer John Watson | December 17, 2009 | Mail | Threaten Chevron with economic harm through campaign of public pressure based on false and misleading statements. | Amazon Watch sent a letter to Chevron's then Chief Executive Officer citing the fraudulent damages assessment from the Cabrera Report and threatening "until Chevron takes meaningful steps to resolve this case, it will continue to play out in the courts of Ecuador, as well as the global court of opinion" and warning "we don't make these suggestions lightly or symbolically." Am. Compl. ¶ 222. |
| 138. | RICO Defendants, Donziger | United States District Court, Southern District of New York | January 14, 2010 | Electronic Case Filing and Service | Prevent disclosure of fraudulent scheme and falsely promote Cabrera Report as independent and/or neutral. | Complaint caused to be filed by the RICO Defendants and their co-conspirators on behalf of the Lago Agrio Plaintiffs in a U.S. court made false and misleading statements about Cabrera's independence with the intent of securing a court order compelling Chevron to stay the treaty arbitration. Am. Compl. ¶ 308. |
| 139. | Donziger | Calmbacher | March 2010 | Telephone | Prevent disclosure of fraudulent scheme. | Donziger telephoned Calmbacher in an attempt to prevent him from exposing the truth about the falsified reports filed in his name by the RICO Defendants and their co-conspirators. Am. Compl. ¶ 315. |

*Chevron Corp. v. Donziger et al.*: Amended Complaint Appendix B

35

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 140. | Julio Prieto | Donziger, Yanza, Fajardo | March 30, 2010 | Email | Prevent disclosure of fraudulent scheme. | Prieto sent an email to Donziger, Yanza, and Fajardo noting that "the effects" of disclosure were "potentially devastating in Ecuador (apart from destroying the proceeding, all of us, your attorneys, might go to jail)." Am. Compl. ¶ 270. |
| 141. | RICO Defendants, Donziger | United States District Court, Southern District of New York | April 23, 2010 | Electronic Case Filing and Service | Prevent disclosure of fraudulent scheme and falsely promote Cabrera Report as independent and/or neutral. | Filing in U.S. court by the RICO Defendants and their co-conspirators making false and misleading statements regarding the relevance of *Crude* footage with the intent of deceiving the court. The RICO Defendants and their co-conspirators asserted the footage had "no relevance to anything" but the subsequently obtained footage showed evidence of the RICO Defendants' and their co-conspirators' collusion and scheme to defraud Chevron. Am. Compl. ¶ 305. |

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 142. | Andrew Wilson | Donziger | April 23, 2010 | Email | Prevent disclosure of fraudulent scheme. | Wilson sent an email regarding "next steps," and, regarding the Chapman deposition, stated that "Chapman did an excellent job of not remembering anything – but Chevron will be able to do a side-by-side comparisons [*sic*] of Stratus work product and his report to a judge that will smell bad . . . we need a way to explain how he got access to our docs. Because it seems that he did incorporate Stratus work product and the longer we do not let the real story come out the worse it will be when it does." Am. Compl. ¶ 274. |
| 143. | Donziger | Wilson | April 23, 2010 | Email | Prevent disclosure of fraudulent scheme. | Donziger responded to April 23, 2010 Wilson email re "explaining" collusion with expert, saying "We need a face to face asap. When is beltman depo?" Am. Compl. ¶ 274. |
| 144. | Wilson | Donziger | May 4, 2010 | Email | Prevent disclosure of fraudulent scheme. | Wilson wrote in email exchange that "[t]he more we emphasize [*sic*] [Cabrera's] neutrality the less sense it makes that we were talking to him outside of school." Am. Compl. ¶ 278. |

*Chevron Corp. v. Donziger et al.*: Amended Complaint Appendix B

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 145. | Jay Horowitz | Donziger | May 5, 2010 | Email | Prevent disclosure of fraudulent scheme. | Co-conspirator Horowitz sent an email to co-conspirator Westenberger and Donziger, discussing strategies for preventing discovery and noting that arguing Cabrera "considered" Stratus's work would be "way too much of a stretch" given that substantial portions of the Cabrera report were written by Stratus consultants. Am. Compl. ¶ 278. |
| 146. | RICO Defendants, Stratus, Donziger | United States District Court, District of Colorado | May 5, 2010 | Electronic Case Filing and Service | Prevent disclosure of fraudulent scheme and falsely promote Cabrera Report as independent and/or neutral. | Filing in U.S. court by the RICO Defendants and their co-conspirators making false and misleading statements regarding Cabrera's independence with the intent of deceiving the court. In a Motion for Protective Order, the RICO Defendants and their co-conspirators misrepresented that Cabrera was independent. Am. Compl. ¶ 273. |
| 147. | Fajardo, RICO Defendants | United States District Court, District of Colorado | May 5, 2010 | Electronic Case Filing and Service | Prevent disclosure of fraudulent scheme and falsely promote Cabrera Report as independent and/or neutral. | Declaration of Fajardo filed in a U.S. court making false and misleading statements about Cabrera's independence with the intent of deceiving the court. Fajardo falsely claimed Cabrera's work was independent, and grossly misstated the level of disclosure provided to Chevron and the court regarding the RICO Defendants' and their co-conspirators' work with Cabrera. Am. Compl. ¶ 287. |

*Chevron Corp. v. Donziger et al.:* Amended Complaint Appendix B

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 148. | RICO Defendants, Donziger | United States District Court, Southern District of Texas | May 7, 2010 | Electronic Case Filing and Service | Prevent disclosure of fraudulent scheme and falsely promote Cabrera Report as independent and/or neutral. | Filing in U.S. court by the RICO Defendants and their co-conspirators making false and misleading statements regarding Cabrera's independence with the intent of deceiving the court. The RICO Defendants and their co-conspirators misrepresented that Cabrera was independent. Am. Compl. ¶ 273. |
| 149. | Fajardo; RICO Defendants | United States District Court, Southern District of Texas | May 7, 2010 | Electronic Case Filing and Service | Prevent disclosure of fraudulent scheme and falsely promote Cabrera Report as independent and/or neutral. | Declaration of Fajardo filed in a U.S. Court making false and misleading claims regarding Cabrera's independence with intent of deceiving the court. Fajardo falsely claimed Cabrera's work was independent, and grossly misstated the level of disclosure provided to Chevron and the court regarding the RICO Defendants' and their co-conspirators' work with Cabrera. Am. Compl. ¶ 287. |
| 150. | Jonathan Abady | Donziger | May 16, 2010 | Email | Prevent disclosure of fraudulent scheme and falsely promote Cabrera Report as independent and/or neutral. | Abady, responding to Maazel's email expressing concern about Stratus' relationship with Cabrera, acknowledged that one problem they had was "Cabrera's wholesale adoption of Stratus' work product w/o attribution," but despite that he still thought there was a basis for asserting that "all aspects of our relationship w Cabrera were ok." Am. Compl. ¶ 278. |

*Chevron Corp. v. Donziger et al.: Amended Complaint Appendix B*

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 151. | Horowitz | Donziger | May 16, 2010 | Email | Prevent disclosure of fraudulent scheme and falsely promote Cabrera Report as independent and/or neutral. | In an email chain among RICO co-conspirators regarding representations regarding the Lago Agrio Plaintiffs' relationship with Cabrera in a planned court filing, Horowitz concluded that "it appears not only that Cabrera and plaintiffs can be charged with a 'fraud'" due to Cabrera's report, "but that Stratus was an active conspirator." Am. Compl. ¶ 284. |
| 152. | RICO Defendants, Stratus, Donziger | United States District Court, District of Colorado | May 17, 2010 | Electronic Case Filing and Service | Prevent disclosure of fraudulent scheme and falsely promote Cabrera Report as independent and/or neutral. | Filing in U.S. court by the RICO Defendants and their co-conspirators making false and misleading statements regarding Cabrera's independence with the intent of deceiving the court. The RICO Defendants and their co-conspirators claimed Cabrera's statements that he was independent occurred before a Lago Agrio court order authorizing submissions from the parties. However, the RICO Defendants and their co-conspirators maintained an ongoing relationship with Cabrera for nearly a year prior to that order. Am. Compl. ¶ 288-89. |

*Chevron Corp. v. Donziger et al.: Amended Complaint Appendix B*

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 153. | Fajardo | n/a | May 24, 2010 | Wire (Press Release) | Falsely promote Cabrera Report as independent and/or neutral. | When asked about the involvement of Stratus, Fajardo told the media, "They are our technical advisers in the United States, and they have worked with us for some years, but they have never interfered in the trial." Am. Compl. ¶ 235. |
| 154. | Maazel | Donziger | May 27, 2010 | Email | Prevent disclosure of fraudulent scheme. | Co-conspirator Maazel sent an email to Donziger discussing strategies to avoid the "Stratus/Cabrera revelation" from coming out in court in Colorado. Am. Compl. ¶ 271. |
| 155. | Westenberger | Donziger | May 27, 2010 | Email | Prevent disclosure of fraudulent scheme. | Co-conspirator Westenberger, in discussing strategies for limiting discovery of the Cabrera fraud via email, wrote "What about the following? Appeal; move for stay; if we win with kane great; if we lose, we produce whatever we want (narrow read); gd complains and then we move for clarification. If we lose again, we think about another appeal." Am. Compl. ¶ 300. |

*Chevron Corp. v. Donziger et al.: Amended Complaint Appendix B*

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 156. | Donziger | Wilson | May 27, 2010 | Email | Prevent disclosure of fraudulent scheme. | Donziger sent an email to Wilson stating, "I think we should appeal on the theory that we gain a greater advantage by fighting them on everything, and tying them up, than in conceding any-one thing even if we expect to ulti-mately lose that one thing down the road." Am. Compl. ¶ 300. |
| 157. | Fajardo, RICO Defen-dants | United States District Court, Dis-trict of New Jersey | June 7, 2010 | Electronic Case Filing and Service | Prevent disclosure of fraudulent scheme and falsely promote Cabrera Report as inde-pendent and/or neu-tral. | Declaration of Fajardo filed in U.S. Court making false and misleading claims regarding Cabrera's independ-ence with intent of deceiving the court. Fajardo falsely claimed Cabrera's work was independent, and grossly misstated the level of disclosure provided to Chevron and the court regarding the RICO Defendants' and their co-conspirators' work with Cabrera.  Am. Compl. ¶ 287. |
| 158. | RICO Defen-dants, Donziger | United States District Court, Dis-trict of New Jersey | June 7, 2010 | Electronic Case Filing and Service | Prevent disclosure of fraudulent scheme and falsely promote Cabrera Report as inde-pendent and/or neu-tral. | Filing in U.S. court by the RICO De-fendants and their co-conspirators mak-ing false and misleading statements regarding Cabrera's independence with the intent of deceiving the court.  The RICO Defendants and their co-conspirators misrepresented that Cabrera was independent.  Am. Compl. ¶ 273. |

*Chevron Corp. v. Donziger et al.*: Amended Complaint Appendix B

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 159. | Amazon Watch, The Front | n/a | June 8, 2010 | Wire (Press release) | Falsely promote Cabrera Report as independent and/or neutral. | In a press release, the RICO Defendants and their co-conspirators claimed the $27 billion figure in the Cabrera Report was "starting to look like a glaring underestimate compared to the astronomical damages facing BP in the gulf oil spill, according to an analysis in *The New York Times* published today." Am. Compl. ¶ 214. |
| 160. | Donziger | James Tyrell, Eric Westenberger, Eric Daleo | June 14, 2010 | Email | Prevent disclosure of fraudulent scheme and falsely promote Cabrera Report as independent and/or neutral. | Donziger sent an email to co-conspirators at Patton Boggs discussing their plan to repackage the fraudulent Cabrera Report. He explained: "The Ecuador team is getting nervous that there is an increasing risk that our 'cleansing' process is going to be outrun by the judge and we will end up with a decision based entirely on Cabrera. Absent our intervention ASAP, they believe the judge could issue autos para sentencia in about 3-4 weeks, which would in effect bar our remedy to the Cabrera problem." Am. Compl. ¶ 191. |

*Chevron Corp. v. Donziger et al.*: Amended Complaint Appendix B

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 161. | RICO Defendants, Donziger | United States Court of Appeals, Second Circuit | June 14, 2010 | Electronic Case Filing and Service | Prevent disclosure of fraudulent scheme and falsely promote Cabrera Report as independent and/or neutral. | Filing in U.S. court by the RICO Defendants and their co-conspirators making false and misleading statements with the intent of deceiving the court. The RICO Defendants and their co-conspirators made knowingly false statements about the content of *Crude* footage, and with knowing falsity claimed Chevron had never made the arguments regarding wrongdoing before the Ecuadorian court. Am. Compl. ¶ 304. |
| 162. | Abady, Wilson | Donziger | June 15, 2010 | Email | Prevent disclosure of fraudulent scheme and falsely promote Cabrera Report as independent and/or neutral. | Abady sent an email to Donziger and other co-conspirators suggesting they admit that they submitted findings to Cabrera which were properly adopted by Cabrera, and by failing to admit such, they looked "coy at best and silly and untrustworthy at worst." Wilson responded wondering "whether we do better by explaining that we authored the report – rather than letting Chevron tell that story like Nancy Drew." Am. Compl. ¶ 272. |

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 163. | RICO Defendants, Donziger | United States District Court, District of Colorado | June 21, 2010 | Electronic Case Filing and Service | Prevent disclosure of fraudulent scheme and falsely promote Cabrera Report as independent and/or neutral. | Filing in U.S. court by the RICO Defendants and their co-conspirators making false and misleading statements with the intent of deceiving the court. In a "Second Response to 'Update on Lago Agrio Proceeding,'" the RICO Defendants and their co-conspirators falsely claimed that any of their materials which had ultimately been included in Cabrera's report were submitted to Cabrera pursuant to a Lago Agrio court order. Am. Compl. ¶ 273. |
| 164. | Fajardo, RICO Defendants | United States District Court, District of Colorado | June 21, 2010 | Electronic Case Filing and Service | Prevent disclosure of fraudulent scheme and falsely promote Cabrera Report as independent and/or neutral. | Filing in U.S. court by the RICO Defendants and their co-conspirators attaching as an exhibit a filing Fajardo submitted to the Lago Agrio court, which makes false and misleading statements regarding Cabrera's independence, with the intent of deceiving the court. Am. Compl. ¶ 273. |

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 165. | Fajardo, RICO Defendants | United States District Court, Southern District of California | June 26, 2010 | Electronic Case Filing and Service | Prevent disclosure of fraudulent scheme and falsely promote Cabrera Report as independent and/or neutral. | Declaration of Fajardo filed in U.S. Court making false and misleading claims regarding Cabrera's independence with intent of deceiving the court. Fajardo falsely claimed Cabrera's work was independent, and grossly misstated the level of disclosure provided to Chevron and the court regarding the RICO Defendants' and their co-conspirators' work with Cabrera.  Am. Compl. ¶ 287. |
| 166. | Donziger, RICO Defendants | United States District Court, Southern District of California | June 26, 2010 | Electronic Case Filing and Service | Prevent disclosure of fraudulent scheme and falsely promote Cabrera Report as independent and/or neutral. | Filing in U.S. court by the RICO Defendants and their co-conspirators making false and misleading statements regarding Cabrera's independence with the intent of deceiving the court. The RICO Defendants and their co-conspirators misrepresented that Cabrera was independent.  Am. Compl. ¶ 273. |

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 167. | Donziger, RICO Defendants | United States District Court, District of Colorado | July 9, 2010 | Electronic Case Filing and Service | Prevent disclosure of fraudulent scheme and falsely promote Cabrera Report as independent and/or neutral. | Filing in U.S. court by the RICO Defendants and their co-conspirators making false and misleading statements regarding Cabrera's independence with the intent of deceiving the court. The RICO Defendants and their co-conspirators falsely contended Cabrera was not an expert for one party, but a court-appointed neutral, despite the facts that they met with Cabrera prior to his appointment to plan his expert report and that the RICO Defendants' U.S. team actually wrote the report. Am. Compl. ¶273. |
| 168. | Donziger | Daleo | July 2, 2010 | Email | Prevent disclosure of fraudulent scheme. | Daleo sent an email to Westenberger stating that "tomorrow's production to Chevron will be the leanest to date at 37 documents," and that unfortunately, they "are coming to what appears to be the end the road in terms of 'publicly available' material to produce." Daleo then notes that "[if] you think this is unacceptably low, we can produce some documents we were trying to hold off producing that are nonprivileged but potentially damaging." Donziger responds, "excellent." Am. Compl. ¶ 271-72. |

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 169. | Wilson | Donziger | July 19, 2010 | Email | Prevent disclosure of fraudulent scheme and falsely promote Cabrera Report as independent and/or neutral. | Donziger and RICO co-conspirators discussed what to say regarding the Lago Agrio Plaintiffs' relationship with Villao, a Cabrera team member who also worked for the Lago Agrio Plaintiffs. Wilson warned they needed to be careful because it was "not clear our relationship with Villao was disclosed." Am. Compl. ¶ 277. |
| 170. | Donziger | Wilson | July 19, 2010 | Email | Prevent disclosure of fraudulent scheme and falsely promote Cabrera Report as independent and/or neutral. | Donziger responded, "we say not concealed. Is that good enough? We could also not respond." Am. Compl. ¶ 277. |
| 171. | Wilson | Donziger | July 19, 2010 | Email | Prevent disclosure of fraudulent scheme and falsely promote Cabrera Report as independent and/or neutral. | Wilson responded to Donziger's email about Villao disclosure, noting that if Villao worked for UBR at the same time he was on Cabrera's team, it was not on his CV which "seems a bit like concealment." Wilson then recommended not making a specific comment about Villao. Am. Compl. ¶ 277. |

*Chevron Corp. v. Donziger et al.*: Amended Complaint Appendix B

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 172. | Westenberger | Donziger | July 22, 2010 | Email | Prevent disclosure of fraudulent scheme | Westenberger sent an email to Donziger pointing out problems with Fajardo's "attempt to compare what Chevron supposedly did vis a vis certain experts what allegedly happened with plaintiffs and Cabrera." Nonetheless, in multiple briefs subsequently filed in various actions, RICO Defendants argued that what they did vis-à-vis Cabrera was akin to what Chevron allegedly did vis-à-vis Barros. Am. Compl. ¶ 295. |

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 173. | RICO Defendants, Donziger | United States Court of Appeals, Third Circuit | July 30, 2010 | Electronic Case Filing and Service | Prevent disclosure of fraudulent scheme and falsely promote Cabrera Report as independent and/or neutral. | Filing in U.S. court by the RICO Defendants and their co-conspirators making false and misleading statements regarding Cabrera's independence with the intent of deceiving the court. The RICO Defendants and their co-conspirators claimed that Cabrera's statements that he was independent all occurred before a Lago Agrio court order authorizing submissions from the parties. However, the RICO Defendants and their co-conspirators maintained an ongoing relationship with Cabrera for nearly a year prior to that order. The RICO Defendants and their co-conspirators also argued in the filing that there was no evidence supporting Chevron's claim that Villao had any connection to Chevron, or that he had even worked for UBR when he was a member of Cabrera's disclosed team. But several months later, when this District ordered Defendant Donziger to produce his own files, they revealed that Donziger and the other RICO Defendants and their co-conspirators had had direct communications with Villao regarding his contribution to the Cabrera Report. Am. Compl. ¶ 277. |

*Chevron Corp. v. Donziger et al.*: Amended Complaint Appendix B

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 174. | RICO Defendants, Donziger | United States Court of Appeals, Fifth Circuit | August 2, 2010 | Electronic Case Filing and Service | Prevent disclosure of fraudulent scheme and falsely promote Cabrera Report as independent and/or neutral. | Filing in U.S. court by the RICO Defendants and their co-conspirators making false and misleading statements regarding Cabrera's independence with the intent of deceiving the court. The RICO Defendants and their co-conspirators claimed that Cabrera's statements that he was independent all occurred before a Lago Agrio court order authorizing submissions from the parties. However, the RICO Defendants and their co-conspirators maintained an ongoing relationship with Cabrera for nearly a year prior to that order. Am. Compl. ¶ 288-89. |
| 175. | Fajardo, RICO Defendants | United States District Court, Middle District of Tennessee | August 11, 2010 | Electronic Case Filing and Service | Prevent disclosure of fraudulent scheme and falsely promote Cabrera Report as independent and/or neutral. | Declaration of Fajardo filed in U.S. Court making false and misleading statements regarding Cabrera's independence with intent of deceiving the court. Fajardo falsely claimed Cabrera's work was independent, and grossly misstated the level of disclosure provided to Chevron and the court regarding the RICO Defendants' and their co-conspirators' work with Cabrera. Am. Compl. ¶ 287. |

*Chevron Corp. v. Donziger et al.*: Amended Complaint Appendix B

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 176. | Adlai Small | Donziger | August 18, 2010 | Email | Prevent disclosure of fraudulent scheme. | Small sent an email to Donziger discussing expert report issues, and stated, "One overarching theme to think about throughout this process is how we want the new expert to address the Cabrera report and its conclusion. While our new expert will most likely rely on some of the same data as Cabrera (and come to the same conclusions as Cabrera), do we think the expert should make specific mention of such consistencies?" Small went on to explain to Donziger that he thought they should attempt to structure the new expert reports in such a way that they might rehabilitate the tainted Cabrera report to some degree, so that someone presented with the new reports "might feel comfortable concluding that certain parts of Cabrera are a valid basis for damages. Am. Compl. ¶ 191. |
| 177. | Abady | Donziger | August 19, 2010 | Email | Prevent disclosure of fraudulent scheme. | Abady sent an email to Donziger and others noting that the Weinberg Group's purpose was to "provid[e] a submission with their name on it." Am. Compl. ¶ 192. |

*Chevron Corp. v. Donziger et al.: Amended Complaint Appendix B*

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 178. | Fajardo, RICO Defendants | United States District Court, Western District of North Carolina | August 24, 2010 | Electronic Case Filing and Service | Prevent disclosure of fraudulent scheme and falsely promote Cabrera Report as independent and/or neutral. | Declaration of Fajardo filed in U.S. Court making false and misleading claims regarding Cabrera's independence with intent of deceiving the court. Fajardo falsely claimed Cabrera's work was independent, and grossly misstated the level of disclosure provided to Chevron and the court regarding the RICO Defendants' and their co-conspirators' work with Cabrera. Am. Compl. ¶ 287. |
| 179. | Fajardo, RICO Defendants | United States District Court, District of New Mexico | August 25, 2010 | Electronic Case Filing and Service | Prevent disclosure of fraudulent scheme and falsely promote Cabrera Report as independent and/or neutral. | Declaration of Fajardo filed in U.S. Court making false and misleading claims regarding Cabrera's independence with intent of deceiving the court. Fajardo falsely claimed Cabrera's work was independent, and grossly misstated the level of disclosure provided to Chevron and the court regarding the RICO Defendants' and their co-conspirators' work with Cabrera. Am. Compl. ¶ 287. |

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 180. | Fajardo, RICO Defendants | United States District Court, Southern District of New York | August 28, 2010 | Electronic Case Filing and Service | Prevent disclosure of fraudulent scheme and falsely promote Cabrera Report as independent and/or neutral. | Declaration of Fajardo filed in U.S. Court making false and misleading claims regarding Cabrera's independence with intent of deceiving the court. Fajardo falsely claimed Cabrera's work was independent, and grossly misstated the level of disclosure provided to Chevron and the court regarding the RICO Defendants' and their co-conspirators' work with Cabrera. Am. Compl. ¶ 287. |
| 181. | Daleo | Donziger | September 8, 2010 | Email | Prevent disclosure of fraudulent scheme. | Donziger and co-conspirators from Patton Boggs discussed via email the importance of having someone defend the Powers deposition, given "[h]e has substantial knowledge and involvement in the Cabrera Report drafting." Am. Compl. ¶ 276. |
| 182. | Maazel | Donziger | September 22, 2010 | Email | Prevent disclosure of fraudulent scheme. | Co-conspirator Maazel and Donziger discussed a strategy for preventing disclosure of Donziger's emails by claiming the only fraud was Donziger's and not the Lago Agrio Plaintiffs'. Am. Compl. ¶ 298. |

*Chevron Corp. v. Donziger et al.*: Amended Complaint Appendix B

| | From | To | Date | Format | Purpose | Description and Complaint Reference |
|---|---|---|---|---|---|---|
| 183. | Donziger, Donziger & Associates, PLLC | Michael Goldhaber | October 20, 2010 | Email | Threaten Chevron with economic harm through campaign of public pressure based on false and misleading statements. | Donziger sent an email to Goldhaber discussing "off the record" details regarding Diego Borja for potential inclusion in a press release. Am. Compl. ¶ 214. |
| 184. | Donziger, Donziger & Associates, PLLC | Westenberger | November 10, 2010 | Email | Threaten Chevron with economic harm through campaign of public pressure based on false and misleading statements. | Donziger sent an email to co-conspirator Westenberger asking if it would be okay with Karen Hinton sitting in on their meeting and talk about press strategy. Am. Compl. ¶ 214. |

*Chevron Corp. v. Donziger et al.*: Amended Complaint Appendix B

55