# EXHIBIT 1232

LEXIS S.A. - Silec, Sistema Integrado de Legislación Ecuatoriana

# REGISTRO OFICIAL™

## Administración del Sr. Ec. Rafael Correa Delgado
### Presidente Constitucional de la República

Año II -- Quito, Sábado 17 de Mayo del 2008 -- N° 339

"Registro Oficial"
es marca registrada del
Tribunal Constitucional
de la República del Ecuador.



SUMARIO:

Págs.

FUNCION EJECUTIVA

ACUERDO:

MINISTERIO DE DESARROLLO URBANO Y VIVIENDA:

0031  Deléganse a los subsecretarios de Vivienda y de Desarrollo Organizacional para que dentro de sus áreas de competencia autoricen los trámites administrativos, técnicos y financieros, que la Unidad de Asesoría Técnica (UAT) requiera y solicite para el cabal desempeño de sus funciones ... 3

FUNCION JUDICIAL

CORTE SUPREMA DE JUSTICIA SALA DE LO CONTENCIOSO ADMINISTRATIVO:

Recursos de casación en los juicios seguidos por las siguientes personas e instituciones:

156-07  Miguel Angel Alquinga Morales en contra del Ministerio de Energía y Minas y otros ... 4

Págs.

157-2007  Enrique Oswaldo Rivera Rivera en contra del Alcalde de la Municipalidad del Cantón Centinela del Cóndor y otro ... 6

158-07  Compañía Ingeniería Andina Bromco INABROMCO Cía. Ltda., en contra de la Empresa Metropolitana de Alcantarillado y Agua Potable de Quito ... 6

159-07  Yolanda Sevillano Andrade en contra del Director General del Instituto Ecuatoriano de Seguridad Social ... 8

160-07  Maria Isabel Trujillo Torres en contra del Director General del Instituto Ecuatoriano de Seguridad Social ... 9

161-07  David Fernando Mogrovejo Zapata en contra del Instituto Ecuatoriano de Seguridad Social ... 11

162-07  Sonia Cecilia González Medina en contra del Instituto Ecuatoriano de Seguridad Social ... 13

163-07  Fanny Palmira Marcillo Panta en contra del Rector del Colegio Nacional "Abdón Calderón Muñoz" ... 16

Lexis S.A.
AtencionClientes@lexis.com.ec - Suscripciones@lexis.com.ec
www.lexis.com.ec - www.lexis.ec

LEXIS S.A. - Silec, Sistema Integrado de Legislación Ecuatoriana

2  —  Suplemento  —  Registro Oficial N° 339  —  Sábado 17 de Mayo del 2008

Págs.

164-07 Ingeniero Carlos Cueva Ordóñez en contra del Ministerio de Bienestar Social .. 17

167-07 Víctor Hugo Moreno Torres en contra de la Ilustre Municipalidad de Pucará ......... 19

168-07 Florencio Antonio Andrade Medina en contra de la Empresa Eléctrica Manabí S.A., EMELMANABI y otros .............. 21

169-07 Jorge Washington García Chávez en contra del Instituto Ecuatoriano de Seguridad Social ................................. 31

170-07 Janeth Fabiola Castanier López en contra del Instituto Ecuatoriano de Seguridad Social ........................................... 33

173-07 Ab. Galo Guido Vera Alcívar en contra del Director Ejecutivo del Consejo Nacional de la Judicatura ..................... 36

174-07 Ing. Néstor Aurelio Pauta Astudillo en contra del Instituto Ecuatoriano de Seguridad Social ................................. 37

175-07 Hipatia de la Nube López Vintimilla en contra del Instituto Ecuatoriano de Seguridad Social ................................. 39

176-07 Samuel Daniel Castro Palma en contra del Gerente General del Banco Central del Ecuador y otro.............................. 42

177-07 Franklin Peñaranda Corrales y otros en contra del Ministerio de Energía y Minas y otro ......................................... 46

178-07 María del Cielo Matamoros Vélez en contra del Instituto Ecuatoriano de Seguridad Social ................................. 48

179-07 Lauro Raúl López Bustamante en contra del Instituto Ecuatoriano de Seguridad Social ........................................... 50

180-07 José Octavio Zambrano Vera en contra del Instituto Forestal de Areas Naturales y Vida Silvestre –INEFAN– ............... 52

181-07 Juan Bosco Copiano Rodríguez en contra de la Contraloría General del Estado ...... 53

182-07 Doctor Freddy Sánchez Cajas en contra del Instituto Ecuatoriano de Seguridad Social ........................................... 54

183-07 Gregorio Neptalí Amador Contreras en contra del Instituto Ecuatoriano de Seguridad Social ................................. 55

184-07 Víctor Manuel Suárez Guevara en contra del Ministro de Economía y Finanzas y otros ........................................... 57

Págs.

185-07 Víctor Atocha Cedillo en contra del Instituto Ecuatoriano de Seguridad Social 59

186-07 Francisco Eduardo León Cáceres en contra del Instituto Ecuatoriano de Seguridad Social ................................. 61

191-07 Silvia Margarita Córdova Vásconez en contra del Instituto Ecuatoriano de Seguridad Social ................................. 63

192-07 Jorge Alberto Hidalgo Piedra en contra de la Municipalidad del Distrito Metropolitano de Quito ...................... 65

TERCERA SALA DE LO PENAL:

Recursos de casación, revisión y apelación en los juicios penales seguidos en contra de las siguientes personas:

196-2005 Patricia del Carmen Lucas Sautana por el delito tipificado en el Art. 494 del Código Penal .......................................... 69

302-2005 Silvio Ricardo Farías Zambrano por el delito culposo que tipifica y reprime el Art. 76 de la Ley de Tránsito ................ 70

480-2005 Gilberto Manuel Barre Zambrano por el delito de violación en perjuicio de Angela Narcisa Barre González ...................... 71

568-2005 Marisol del Rocío Naranjo Moposita por el delito de tenencia y posesión ilícita de droga ......................................... 72

670-2005 Juan Chulca Chiliquinga por el delito de enriquecimiento ilícito ........................ 73

58-2006 Juan Evangelista Vera Montiel por el delito de homicidio simple ....................... 78

130-2006 Jorge Enrique León Rea por el delito de violación en perjuicio de Viviana Noemí Huilca Rea ...................................... 79

140-2006 Marcelo Ojeda Moreno por el delito de lesiones en perjuicio de Jorge Washington Pilataxi Guano y otra ........................ 80

191-2006 Mario Islao Medina Guaillas por el delito que tipifica y sanciona el Art. 61 de la Ley de Sustancias Estupefacientes y Psicotrópicas ................................. 81

275-2006 Dr. Luis Remigio Serrano Serrano por el delito de lesiones inintencionales a Mariángel Calvache Torres ............... 83

320-2006 Adán Isidro Arias Espín por el delito previsto en el Art. 61 de la Ley de Sustancias Estupefacientes y Psicotrópicas 86

323-2006 Luis Armando Cevallos Guamanzara y otro por el delito de robo agravado ...... 88

Lexis S.A.
AtencionClientes@lexis.com.ec - Suscripciones@lexis.com.ec
www.lexis.com.ec - www.lexis.ec

LEXIS S.A. - Silec, Sistema Integrado de Legislación Ecuatoriana

| Suplemento | — | Registro Oficial N° 339 | — | Sábado 17 de Mayo del 2008 | — | 21 |

Municipal de Pucará en la que hizo una larga exposición de sus puntos de vista y de defensa de sus derechos, ni que el actor ejercitara sus opciones de solicitar reconsideración de las resoluciones del Concejo de Pucará, ni que recurriera de ellas ante el Consejo Provincial, por lo cual no es procedente su alegación de que en la sentencia del Tribunal *a quo* que es objeto del recurso se hubieran infringido las normas constantes en los artículos 1 y 5 de la Ley de la Jurisdicción Contencioso Administrativa, como él pretende.- En cambio, consta del proceso, que, según la libre decisión del actor y recurrente señor Víctor Hugo Moreno Torres, al amparo de lo previsto en la Ley de Modernización, él planteó su acción directamente ante el Tribunal de lo Contencioso Administrativo de Cuenca, como se menciona en el considerando séptimo.- DECIMO SEGUNDO. En modo adicional a las consideraciones de tipo jurídico que se han enunciado en las consideraciones precedentes, puede ser útil también reparar en que por las graves y comprobadas acusaciones de las que fuera objeto el actor y recurrente, en relación con el modo y la forma en que cumplía sus obligaciones de funcionario de muy alta jerarquía como *Director* en el área financiera (lo que no había ocurrido en casos similares) admitir su actuación en la Municipalidad, después de que fuera removido por resolución unánime del Concejo Municipal de Pucará, determinaría graves problemas operativos en dicha Municipalidad.- Con estos antecedentes expuestos y sin necesidad de otras consideraciones, ADMINISTRANDO JUSTICIA EN NOMBRE DE LA REPUBLICA Y POR AUTORIDAD DE LA LEY, se casa la sentencia y, de conformidad con el artículo 16 de la Ley de Casación, se rechaza la demanda, en el juicio seguido por el recurrente señor Víctor Hugo Moreno Torres, contra la Municipalidad de Pucará.- Notifíquese, publíquese y devuélvase.

f.) Dr. Marco Antonio Guzmán Carrasco, Ministro Juez.

f.) Dr. Hernán Salgado Pesantes, Ministro Juez.

f.) Dr. Jorge Endara Moncayo, Ministro Juez.

Certifico.

f.) Secretaria Relatora.

En Quito, hoy día martes diez de abril de dos mil siete, a partir de las dieciséis horas, notifiqué, mediante boletas, la nota en relación y sentencia que anteceden, al actor, señor Víctor Hugo Moreno Torres, por sus derechos, en el casillero judicial No. 2364 y al demandado, por los derechos que representan, señor Director Regional de la Procuraduría General del Estado en Cuenca, en el casillero judicial No. 1200. No se notifica a los demandados, señores Alcalde y Procurador Síndico del Municipio del cantón Pucará, provincia del Azuay, por cuanto de autos no consta que hayan señalado domicilio para efectos de este recurso.

Certifico.

f.) Secretaria Relatora.

RAZON: Siento como tal, que las fotocopias de la sentencia que en cinco fojas útiles anteceden, son iguales a su original.- Certifico.- Quito, 18 de abril de 2007.

f.) Secretaria Relatora.

No. 168-07

**CORTE SUPREMA DE JUSTICIA**
**SALA DE LO CONTENCIOSO ADMINISTRATIVO**

Quito, a 11 de diciembre del 2007; las 08h30.

VISTOS (62-2005): Los recursos de casación que constan: el primero, a fojas 279 a 281 del proceso, interpuesto por el ingeniero Jorge Daniel Arteaga Santana, en su calidad de Presidente Ejecutivo, y representante legal de la Empresa Eléctrica Manabí S.A., EMELMANABI (en adelante simplemente "EMELMANABI"); el segundo, a fojas 283 a 286 del proceso, planteado por Javier Astudillo Farah, en su calidad de Director Ejecutivo del Consejo Nacional de Electricidad (en adelante simplemente "CONELEC"); y, el tercero, a fojas 290 a 292 del proceso, interpuesto por el doctor Demetrio Intriago Vélez, Director Distrital de la Procuraduría General del Estado en Manabí; recursos todos ellos propuestos respecto de la sentencia de mayoría expedida por el Tribunal de lo Contencioso Administrativo No. 4, de 20 de septiembre de 2004, a las 11h50, dentro del proceso signado con el número 40-2003, promovido por el señor Florencio Antonio Andrade Medina, por sus propios y personales derechos y por los que representa del menor de edad Juan Pablo Andrade Bailón.- En la sentencia objeto del presente recurso, el Tribunal *a quo* resolvió: "*Declarar con lugar la demanda e ilegal y atentatorio a la Constitución el acto administrativo impugnado, disponiéndose que los demandados CONSEJO NACIONAL DE ELECTRIFICACION (CONELEC) y EMPRESA ELECTRICA DE MANABI (EMELMANABI) de manera conjunta y en porcentajes iguales, en cumplimiento de lo dispuesto en el artículo 20 de la Constitución Política del Estado, paguen al actor la suma de un millón de dólares americanos, por concepto de indemnización por los daños físicos, morales y síquicos sufridos por el menor Juan Pablo Andrade Bailón como consecuencia de haber recibido descarga eléctrica a la que no estaba obligado jurídicamente a recibir, que le ha ocasionado quemaduras, amputación de miembros superior e inferior e incapacidad de 80%, considerándose como factor para determinar el monto de indemnización la edad del niño, el tiempo transcurrido desde la fecha en que se produjo el hecho lesivo, los gastos realizados en el tratamiento inmediato de las lesiones, los gastos para todo la vida, incluyéndose también en este monto indemnizatorio las disposiciones pertinentes del Código de Procedimiento Civil relacionado al daño emergente, lucro cesante e intereses a percibirse desde el inicio de la obligación indemnizatoria*".- EMELMANABI fundamentó su recurso en las causales primera y tercera de la Ley de Casación, y considera infringidos en la sentencia objeto de este recurso los artículos: 1 y 10 de la Ley de la Jurisdicción Contencioso Administrativa (indebida aplicación); 38 de la Ley de Modernización (indebida aplicación); y, 119, 121 y 278 del Código de Procedimiento Civil (falta de aplicación). CONELEC fundamentó su recurso en las causales primera, tercera, cuarta y quinta del artículo 3 de la Ley de Casación, por considerar erróneamente interpretados los artículos 38 de la Ley de Modernización y 133 del Estatuto del Régimen Jurídico Administrativo de la Función Ejecutiva; indebidamente aplicados, los artículos 130, 131 y 132 del Estatuto del Régimen Jurídico Administrativo de la Función Ejecutiva; 47 y 48 del Código de Menores; así también considera infringidos los artículos 121, 273 y 277 del

Lexis S.A.
AtencionClientes@lexis.com.ec - Suscripciones@lexis.com.ec
www.lexis.com.ec - www.lexis.ec

Código de Procedimiento Civil. Finalmente, la Procuraduría General del Estado, por medio de su Director Distrital, alegó las causales primera y tercera del artículo 3 de la Ley de Casación, y señaló como normas infringidas, por aplicación indebida, los artículos 38 de la Ley de Modernización, 42 de la Ley de la Jurisdicción Contencioso Administrativa, y 355, numeral 2, y 277 del Código de Procedimiento Civil. Todas las normas del Código de Procedimiento Civil se han invocado según su numeración anterior a la codificación vigente a la fecha de expedición de este fallo.- Al haberse concedido el recurso y sometido el caso a resolución de la Sala, ésta, con su actual conformación, para resolver considera: PRIMERO: La Sala de lo Contencioso Administrativo de la Corte Suprema de Justicia es competente para conocer y resolver los recursos de casación que se interponen contra las sentencias o autos de los tribunales distritales de lo Contencioso Administrativo, de acuerdo con el artículo 200 de la Constitución Política de la República y la Ley de Casación en vigencia.- SEGUNDO: Se ha agotado el trámite establecido por la ley para esta clase de recursos, sin que exista nulidad alguna que declarar.- TERCERO: En función de los efectos que podrían derivarse de los diversos vicios que los recurrentes acusan se habrían registrado en la sentencia objeto del recurso, esta Sala ha de pronunciarse, en primer lugar, sobre las alegaciones referidas a la causal quinta, para luego, de ser necesario, continuar con las causales cuarta, tercera y primera, siguiendo el orden de enunciación. En relación con la causal quinta, el CONELEC afirma, en su recurso (fs. 784): *"En el considerando noveno la sentencia mantiene contradictoriamente lo siguiente: dice que el actor 'impugna en sede jurisdiccional el acto administrativo que se circunscribe en la negativa de CONELEC a aceptar el reclamo administrativo indemnizatorio', lo cual no es verdad ya que la demanda no se dirigió en contra el acto administrativo de denegación de la reclamación administrativa, tanto qué en el considerando séptimo expresan que el accionante había propuesto su demanda en contra de un hecho administrativo. La sentencia declara en la parte resolutiva 'con lugar la demanda e ilegal y atentatorio a la Constitución el acto administrativo impugnado'..."*.- La causal quinta está referida a vicios intrínsecos del fallo materia del recurso que, por tanto, deben desprenderse del análisis del mismo y de ningún otro elemento externo. No se trata de reproches de congruencia del fallo en relación con la materia de la litis (que corresponde a la causal cuarta), mucho menos, con la valoración que hace el Tribunal Distrital de la prueba actuada.- En la sentencia objeto del recurso, esta Sala aprecia, entre otras cuestiones (que serán objeto de examen subsiguiente) lo que se menciona enseguida: a) El Tribunal a quo justificó el rechazo de la excepción de incompetencia planteada por los demandados, por medio de una oscura calificación de la materia de la litis, y un argumento condicional y subsidiario. Así, señala que, por efecto del artículo 38 de la Ley de Modernización, en caso de falta del acto administrativo impugnado en el caso, la competencia del Tribunal a quo se aseguraría por tratarse de un hecho administrativo (considerando séptimo). b) Al mismo tiempo, el Tribunal de instancia entiende que la demanda se dirige a impugnar el acto administrativo con el que CONELEC (fs. 3 y 4) negó su reclamo administrativo (considerando noveno y décimo cuarto). Nótese que los condenados en la sentencia son el CONELEC y EMELMANABI. c) Por otro lado, definió la naturaleza de la acción efectivamente propuesta por el actor, según el

régimen de responsabilidad patrimonial pública prevista en los artículos 20 y siguientes de la Constitución Política (considerando octavo). d) La falta de claridad conceptual sobre la materia respecto de la cual el Tribunal a quo debía pronunciarse ha tenido efecto, también, en la parte resolutiva de la sentencia, en la que se adopta el referido régimen de responsabilidad patrimonial pública, bajo la tesis del deber del Estado de reparar los daños ocasionados en los derechos de los administrados, cuando éste no tiene el deber jurídico de soportar consecuencias de la actividad pública, sin siquiera explicar su pertinencia en la parte considerativa. e) Tampoco se puede apreciar en la resolución los argumentos fácticos o jurídicos para determinar qué corresponde a la indemnización por daños materiales, qué corresponde a la compensación por los perjuicios morales y cuál es la importancia de cada uno de los criterios de cuantificación enunciados en el valor de la condena. f) Pese a que la demanda se presentó por los propios derechos del compareciente y por los que representa de su hijo menor de edad -lo que presupone dos partes actoras- según consta en las primeras líneas de la sentencia analizada, en la parte dispositiva no se define si la condena beneficia al compareciente por una afectación a sus derechos o beneficia al menor a quien representa el compareciente. g) No se establece de modo alguno la base jurídica para la distribución de las cargas económicas que supone la condena, de la manera en que se ha fijado en la sentencia: *"de manera conjunta y en partes iguales"*.- Todos estos vicios afectan la motivación de la sentencia materia del presente recurso y, por tanto, son objeto de la causal quinta del artículo 3 de la Ley de Casación en lo que respecta al cumplimiento de los requisitos exigidos por la ley para una sentencia.- El CONELEC, sin embargo, en un recurso técnicamente defectuoso, confundió la calificación de los casos de la causal quinta del artículo 3 de la Ley de Casación al invocarla; pero, de las afirmaciones contenidas en el escrito de interposición del recurso, se desprende que lo que esta Entidad acusó, en la sentencia materia del presente recurso, se constituye a la contradicción señalada entre los distintos considerandos, y entre éstos y la resolución adoptada respecto a la materia de la litis y la naturaleza de la acción propuesta; esto es, un vicio de motivación.- En alguna otra ocasión esta Sala ha manifestado (Resolución No. 90-2007 de 27 de febrero de 2007 en el caso 125-2004 Procurador General del Estado c. Germán Venegas) *"A este respecto, esta Sala estima que no es posible en una sentencia, adecuadamente motivada, de conformidad con el artículo 24, numeral 13 de la Constitución Política, que se empleen argumentos condicionales y subsidiarios; es decir, ningún Tribunal podrá considerar que su tarea de hacer efectiva la tutela judicial se ha cumplido, con las exigencias de seguridad jurídica en su vertiente de la predecibilidad en la aplicación del ordenamiento jurídico, si para resolver emplea una fórmula similar a: 'Si este argumento no es válido y verdadero (condición), entonces este otro sí lo será (en subsidio del primero)'. Este tipo de vicio deberá ser acusado invocando la causal quinta del artículo 3 de la Ley de Casación"*.- Cuando el Tribunal a quo no pudo precisar la naturaleza jurídica de la acción propuesta y el contenido de la materia de la litis en la fundamentación de su sentencia, prefirió acudir al mecanismo de emplear respuestas contradictorias entre sí, para atender cada planteamiento de las partes, como si cada respuesta fuese independiente en el caso: se trata de una exposición de argumentos condicionales y subsidiarios. Como se desprende de lo dicho, el fallo materia del recurso no está

Lexis S.A.
AtencionClientes@lexis.com.ec - Suscripciones@lexis.com.ec
www.lexis.com.ec - www.lexis.ec

LEXIS S.A. - Silec, Sistema Integrado de Legislación Ecuatoriana

adecuadamente motivado, y la resolución no guarda coherencia con las razones de derecho y de hecho que se exponen en los considerandos del fallo, por lo que cabe admitir la acusación formulada sobre la base de la causal quinta del artículo 3 de la Ley de Casación y, en tal virtud, casar la sentencia y dictar, de conformidad con el artículo 16 ibidem, la que corresponda.- CUARTO: El señor Florencio Antonio Andrade Medina, por sus propios derechos y por los que representa de su hijo, Juan Pablo Andrade Bailón, presentó el 30 de abril del 2003, una demanda (fs. 35 a 44) por la que pretende *un resarcimiento compensatorio por los daños y perjuicios materiales y morales* ocasionados por las fatales descargas eléctricas que tuvieron su causa directa en la patente *deficiencia prestacional del servicio de fluido eléctrico, indemnización que solicito con la legitimación suficiente por ser el padre del menor incapacitado permanentemente* (el subrayado es de la Sala).- Fundamenta su demanda, principalmente, en los artículos: 1, 18, 20 y 249, inciso segundo, de la Constitución Política del Estado; 12, 13 y 14 de la Ley de Régimen del Sector Eléctrico; 2, letra ch, 209 y 212 del Estatuto del Régimen Jurídico Administrativo de la Función Ejecutiva (según su reforma publicada en el Registro Oficial 7333, de 27 de diciembre de 2002); y, 38 de la Ley de Modernización del Estado. El compareciente señala, en su demanda, los siguientes hechos relevantes: a) El día 11 de mayo de 2002, al menor de edad Juan Pablo Andrade Bailón recibió una fuerte descarga eléctrica, proveniente de un cable de alta tensión, localizado frente al balcón del tercer piso de la vivienda de su familia, ubicada en Bahía de Caráquez; b) El menor de edad recibió la descarga en razón del auxilio prestado a otro menor de edad, ahora fallecido, Fernando Quispe Cedeño. Este menor alcanzó el cable con una varilla metálica; c) El cable del que provino la descarga se encuentra a menos de metro y medio y no tiene protección alguna; d) El menor *fue lesionado con quemaduras de tercer grado en un 16.5% SQC* (fs. 38), y *ha sido "incapacitado permanentemente"* (fs. 43); e) La peligrosidad de los cables eléctricos que se hallan tendidos en las proximidades del lugar del suceso ha sido de conocimiento del personal de EMELMANABI.- De otra parte, EMELMANABI propuso las siguientes defensas y excepciones (fs. 65 a 67): a) Negativa pura y simple de los fundamentos de hecho y de derecho de la demanda; b) Falta de derecho del demandante; c) Incompetencia del Tribunal *por falta de acto administrativo*, *por falta de jurisdicción* y *por no ser el juez del domicilio del demandado principal*.- La Procuraduría General del Estado (fs. 84 y 85) negó los fundamentos de hecho y de derecho de la demanda, argumentó ilegitimidad de personería y, en general, planteó la nulidad procesal, sin que conste en su escrito de contestación fundamentación alguna (*causa petendi*) sobre sus defensas y excepciones. En esta materia, se insiste en que, de conformidad con el artículo 102 del Código de Procedimiento Civil, el demandado no podrá cumplir su propósito de oponerse de manera específica a las pretensiones del actor, con una contestación a la demanda en la que no determine lo que admite o niega de la demanda, o sin que establezca con precisión las razones jurídicas y fácticas por las que propone una determinada defensa o excepción. Las deficiencias en una contestación a la demanda, en la que simplemente se enlistan defensas y excepciones sin fundamentación de ningún tipo, no pueden ser subsanadas por el Juez, a través de la presunción de una *causa petendi* que no consta en la contestación a la demanda, pues, en este caso y en virtud del principio de lealtad procesal y el debido proceso, las partes

sólo podrán ejercer su derecho de contradicción durante el proceso, si conocen con claridad lo que alega cada una de ellas en defensa de sus intereses.- Finalmente, el CONELEC interpuso las siguientes defensas y excepciones: a) Negativa pura y simple de los fundamentos de hecho y de derecho de la demanda; b) Incompetencia del Tribunal; c) Improcedencia de la acción, porque *los perjuicios sufridos por el administrado fueron causados por su propia negligencia, impericia, culpa... no hubo una deficiente prestación del servicio; hubo una descarga debida al accionar de dos menores, cuya culpa en la generación del siniestro no puede originar indemnización*; *...porque si supusiese que no hubo ese agente externo catalizador de todos estos eventos, la descarga se debió producir por caso fortuito o fuerza mayor*; *la demanda no reúne los requisitos previstos en el artículo 71 del Código de Procedimiento Civil, en lo que respecta a la cosa, cantidad o hecho que se exige*; y, que *EMELMANABI es la única responsable por los efectos dañosos de su actividad, en su calidad de concesionario, por lo que no procede demandar a CONELEC*.- En estos términos, ha quedado fijada la materia de la litis. Se aclara, por lo tanto, que la acción propuesta no se endereza a impugnar la legalidad del acto administrativo contenido en el Oficio No. DE-03 0154 de 4 de febrero de 2003, suscrito por el Director Ejecutivo del CONELEC (fs. 3), con el que se niega la reclamación administrativa que, por la misma causa que originó este proceso, cursó Florencio Antonio Andrade Medina, el 9 de enero de 2003 (fs. 98 a 103).- QUINTO: El *thema decidendum*, en el caso puesto a la consideración de la Sala, se refiere a la responsabilidad extracontractual del Estado, prevista en el artículo 20 de la Constitución Política, norma que establece lo siguiente: *Las instituciones del Estado, sus delegatarios y concesionarios, estarán obligados a indemnizar a los particulares por los perjuicios que les irroguen como consecuencia de la prestación deficiente de los servicios públicos o de los actos de sus funcionarios y empleados, en el desempeño de sus cargos* (el subrayado es de la Sala). Evidentemente, la responsabilidad extracontractual del Estado hace parte, pese a la especialidad derivada del desarrollo normativo, jurisprudencial y doctrinal en el Derecho Administrativo, de la construcción de una teoría general de la responsabilidad. Los elementos fundamentales de esta teoría, trazados desde la perspectiva del Derecho Privado, han sido ya definidos por la Corte Suprema de Justicia, en múltiples ocasiones.- De manera sintética, esta concepción puede ser expuesta en los siguientes términos: a) Las obligaciones civiles nacen, entre otras fuentes, *a consecuencia de un hecho que ha inferido injuria o daño a otra persona, como en los delitos y cuasidelito* (artículo 1453 Código Civil); b) La responsabilidad civil extracontractual es directa cuando se deriva de acciones u omisiones, dolosas o culposas, propias del sujeto obligado; c) La responsabilidad civil extracontractual es indirecta cuando los daños son causados por personas que están a cargo, cuidado o dependencia del obligado, o, se derivan de los bienes que son de su propiedad o de los que se sirve; d) Son presupuestos materiales para la procedencia de la responsabilidad civil extracontractual, la existencia de un daño material o moral, la culpabilidad del sujeto y una relación de causa-efecto entre el hecho ilícito y el daño producido; e) Es jurídicamente relevante el daño cierto, sea este actual o futuro: se entiende por daño cierto, la afectación probada a un interés jurídicamente protegido; es actual, el daño que ya se ha producido, v. gr., el daño emergente; y, es futuro, el daño que objetivamente se espera, v. gr., el lucro cesante; f)

Lexis S.A.
AtencionClientes@lexis.com.ec - Suscripciones@lexis.com.ec
www.lexis.com.ec - www.lexis.ec

24   —   **Suplemento**   —   **Registro Oficial Nº 339**   —   **Sábado 17 de Mayo del 2008**

Si se afecta el patrimonio de las personas, se considera que el daño es material; en tanto que si la afectación se refiere a cualquier aspecto extrapatrimonial de la persona, el daño es moral; g) El grado de culpabilidad define la intencionalidad con la que el sujeto actúa en relación con los efectos dañosos que se desprenden de su conducta: se dice que existe dolo cuando el sujeto busca, a través de su conducta, producir la afectación; hay culpa, cuando el sujeto, sin intención de provocar un daño, lo produce en razón de su imprudencia, negligencia o impericia al obrar; la culpa es grave, leve o levísima, según lo previsto en el 29 del Código Civil; h) La responsabilidad es subjetiva, cuando se la hace depender de la culpabilidad del sujeto de cuya conducta se deriva el daño. En el caso de las denominadas actividades riesgosas, la culpa se presume, de tal forma, que le corresponde al sujeto demostrar que su conducta se ha ajustado al nivel de diligencia que la ley le exige en su actividad. De otra parte, la responsabilidad es objetiva, si ella depende exclusivamente de la justicia o licitud del resultado de la conducta del sujeto, por lo que, poco importa si el sujeto ha actuado con dolo o culpa; i) La relación causal entre el hecho ilícito y el daño considerados, se ha de calificar con criterios de razonabilidad por parte de los juzgadores, en cada caso concreto; esta Sala entiende que las distintas teorías sobre la calificación del nexo causal, que han sido provedas por la doctrina, son para el juzgador una guía importante, pero no limitan su facultad de calificar los hechos relevantes sobre las circunstancias específicas de los asuntos puestos a su consideración Ahora bien, desde la perspectiva del Derecho Público, la doctrina más calificada recomienda, y así lo asume esta Sala, que existen ciertos aspectos de la teoría de la responsabilidad que deben ser adecuados al ámbito de la responsabilidad extracontractual del Estado. Se examinarán con detalle el tema en los literales que se enuncian luego, en párrafos específicos: a) El origen de la responsabilidad extracontractual del Estado no se encuentra en ilicitud de sus actos o hechos, sino en la injusticia o ilicitud de los efectos de su actividad en las personas, sus bienes o el ambiente. Así, es principio fundamental en la organización del Estado, la solidaridad y, en virtud de ella, los administrados se encuentran sujetos a una serie de deberes y responsabilidades generales (entre otros, ver el artículo 97 de la Constitución Política) que permiten hacer efectivo el conjunto de los correlativos derechos de los que somos titulares. En este sentido, el preámbulo de la Constitución Política señala: *"El Pueblo de Ecuador ... fiel a los ideales de libertad, igualdad, justicia, progreso, solidaridad, equidad y paz que han guiado sus pasos desde los albores de la vida republicana ... establece en esta Constitución las normas fundamentales que amparan los derechos y libertades, organiza el Estado y las instituciones democráticas e impulsan el desarrollo económico y social"* (El subrayado es de la Sala). La aplicación del principio de solidaridad, sin embargo, no significa que los restantes principios previstos en la misma Constitución Política no deban ser también efectivos, lo que es posible a través de una adecuada ponderación de los bienes jurídicos que, en apariencia, se encuentran en conflicto. De tal forma que, en la búsqueda de atender a los intereses colectivos, aunque se entiende que el interés individual debe ceder ante ellos, la distribución de las cargas públicas individuales está sometida a un criterio general de igualdad material o sustancial, lo que evita toda forma de sacrificio individual injusto o ilícita, por ser contrario a este principio de igualdad en el reparto de las cargas públicas. Por ello, cuando el Estado y sus instituciones, en el ejercicio de sus

potestades, provocan un desequilibrio en la distribución de las cargas públicas, que implique un sacrificio individual intolerable, está llamado a reparar los perjuicios provocados, a reestablecer el balance afectado. Por esta razón, el artículo 20 de la Constitución Política no hace referencia al obrar lícito o ilícito de los funcionarios o empleados públicos, cuando asigna la responsabilidad al Estado en el evento de que se cause un perjuicio a los administrados, originada en su comportamiento. En efecto, esta norma, en su parte pertinente, establece: *"Las instituciones del Estado, sus delegatarios y concesionarios, estarán obligadas a indemnizar a los particulares por los perjuicios que les irroguen como consecuencia... de los actos de sus funcionarios y empleados, en el desempeño de sus cargos"*. De la misma manera, cuando el referido artículo 20 *ibídem* hace referencia a la *"prestación deficiente de servicios públicos"* no califica la licitud de los actos o hechos conducentes a la prestación correspondiente sino al defecto funcional del servicio.- b) Consecuencia del enunciado precedente es que el régimen de responsabilidad patrimonial pública, establecido en nuestro ordenamiento jurídico, no pueda ser considerado subjetivo, en el sentido de que no se encuentra fundado en el clásico criterio de culpabilidad, cuya asignación implica un reproche a la conducta del sujeto que provoca el daño. En materia de responsabilidad pública por la deficiente prestación de servicios públicos o por los actos de los funcionarios y empleados públicos, de los que se desprende un perjuicio para los administrados, sería irrelevante, en lo que respecta a la obligación del Estado de reparar el daño sufrido por el administrado, la intencionalidad con la que los sujetos se comportan en el ejercicio de sus funciones. Ello no significa que esta intencionalidad no sea importante en el sistema de responsabilidad, pues, como lo establece el inciso segundo de la norma analizada (artículo 20 de la Constitución Política) la calificación de la culpabilidad de los funcionarios y empleados públicos determina la posibilidad de que el Estado pueda repetir en su contra los perjuicios económicos que tuvo que asumir frente a los administrados.- En este punto, es importante aclarar que la responsabilidad del Estado, tal como ha sido perfilada, no se adecua, tampoco, a la idea de la culpa presunta, propia por ejemplo, de la realización de actividades de riesgo o de la responsabilidad por actos de terceros. Esto se debe a que, según la tesis de la culpa presunta, bastaría probar -presuponiendo la reversión de la carga de la prueba- que el efecto dañoso no se deriva de la negligencia, imprudencia o impericia de los sujetos a cargo de la actividad pública o, con más exactitud, que el comportamiento de estos sujetos se ha ajustado a las reglas jurídicas y técnicas previstas para el ejercicio de la actividad pública de la que se trate. Sostener esta posición significaría considerar que los efectos de la actividad pública, socialmente intolerables por su injusticia o ilicitud, son irrelevantes, porque la conducta de los agentes públicos se ha arreglado a las formas determinadas por otros agentes públicos; y que, las instituciones del Estado, con competencias normativas, son irresponsables frente a la deficiencia de la regulación y sus efectos dañosos. c) La responsabilidad patrimonial del Estado es, en todos los casos, directa. En tal virtud, el Estado no responde por los perjuicios que su actividad pueda provocar en las personas, los bienes o el ambiente, como lo hace toda persona por el hecho de los que estuvieran bajo su cuidado o dependencia, según el régimen previsto en los artículos 2220 y siguientes del Código Civil. Esto se debe a que la responsabilidad de los funcionarios y

Lexis S.A.
AtencionClientes@lexis.com.ec - Suscripciones@lexis.com.ec
www.lexis.com.ec - www.lexis.ec

LEXIS S.A. - Silec, Sistema Integrado de Legislación Ecuatoriana

empleados públicos, en cuanto sujetos de imputación jurídica, es distinta e independiente a la responsabilidad pública que se deriva del ejercicio de las atribuciones y el cumplimiento de sus deberes como sujetos de la actividad pública. El comportamiento de un funcionario o empleado público es, a efectos del régimen de responsabilidad analizado, atribuible al Estado mismo, cuando se analizan sus relaciones con el administrado. Cosa distinta es la revisión de este comportamiento, personal e individual, para determinar la responsabilidad del funcionario o empleado frente al Estado, por el inadecuado ejercicio de sus competencias. d) Se ha insistido que la responsabilidad extracontractual del Estado tiene origen en la injusticia o ilicitud de la afectación en las personas, bienes o el ambiente, originada en la actividad pública; por ello, es necesario clarificar el sentido que se adopta al referirnos a la injusticia o ilicitud de la afectación, es decir, delimitar lo que ha de entenderse por daño indemnizable. En principio, el daño indemnizable ha de ser cierto, actual o futuro, material o moral, como ha quedado expuesto por la teoría general de la responsabilidad. Ahora bien, la calificación de un hecho como "*afectación injusta*" es una materia sujeta al criterio judicial, según las reglas de la sana crítica, que puede ser objeto de control en base a la razonabilidad de dicho criterio, esto es, su motivación. Sin embargo, parece conveniente señalar que la injusticia en la afectación se desprende ordinariamente de la vulneración del referido principio de igualdad material en la distribución de las cargas públicas. Se trata, entonces, de una afectación anormal, esto es, un efecto dañoso que excede manifiestamente las consecuencias generales que objetivamente se pueden esperar de la actividad pública en relación con el conjunto de los administrados. En lo que se refiere a una "*afectación ilícita*", el criterio de calificación está ligado a los deberes constitucionales de los administrados, en el sentido de que nadie puede ser obligado a asumir un sacrificio individual si no media un deber constitucional que se lo haya impuesto. En este caso, el deber jurídico de soportar la carga pública no podría provenir únicamente de normas de rango inferior; pues, de otro modo, se haría impracticable la responsabilidad del Estado que ejerce potestades normativas. Así, por ejemplo, es evidente que no se puede esperar que el administrado deba soportar la expropiación de sus bienes sin el pago del justo precio, aunque legal o reglamentariamente se hubiese admitido esta posibilidad. En este caso ejemplificativo, la expropiación practicada de la manera en que se ha regulado, supone una afectación ilícita en el patrimonio del administrado que debe ser reparada en razón de la responsabilidad extracontractual del Estado como legislador. e) Definido el carácter de la responsabilidad extracontractual del Estado, como una responsabilidad por la injusticia o ilicitud de los efectos de la actividad pública en las personas, bienes o el ambiente, es evidente que, demostrado el daño indemnizable, resta únicamente determinar la vinculación, en una relación de causa-efecto, de la actividad pública de la que se trate con el referido daño. Se trata, pues, de atribuir los efectos dañosos a la realización de una actividad pública específica. En este sentido, las instituciones del Estado únicamente podrán oponerse a las pretensiones resarcitorias del administrado que hubiese sufrido un daño demostrado e indemnizable, si prueban que los efectos dañosos se derivan de fuerza mayor o caso fortuito, por el hecho de un tercero o por culpa de la víctima. Se hace notar, sin embargo, que la responsabilidad extracontractual del Estado no se enerva si la afectación a las personas, sus bienes o al ambiente, no son atribuibles de

manera exclusiva a las circunstancias eximentes de responsabilidad enunciadas.- SEXTO: EMELMANABI y CONELEC han planteado como excepción la incompetencia del juzgador para conocer del caso. A este respecto, es necesario señalar que toda actividad pública se verifica a través de actos, hechos y contratos; de tal forma que la prestación de cualquier servicio público, en tanto actividad pública, presupone la existencia de una serie de actos, hechos y contratos de los que resulta la prestación del servicio. Cuando se alega que el Estado ha incurrido en responsabilidad extracontractual por deficiencia en la prestación de servicios públicos, no se está atacando únicamente un específico acto, hecho o contrato administrativos, sino el efecto que, en conjunto, todos ellos, los necesarios para la prestación del servicio, han producido. Se evalúa un defecto sistémico, funcional, de la actividad pública (que, se insiste, se efectúa a través de actos, hechos y contratos), en este caso, para la prestación del servicio público que ha dado origen a un daño indemnizable. Ahora bien, a la fecha de presentación de la demanda, esto es, el 30 de abril de 2003 (fs. 44), se encontraba vigente el artículo 38 de la Ley de Modernización del Estado, Privatizaciones y Prestación de Servicios Públicos por parte de la Iniciativa Privada, con la redacción dada por el artículo 1 de la Ley 2001-56, publicada en el Registro Oficial No. 483, de 28 de diciembre de 2001. Esta norma señala que: "*Los Tribunales Distritales de lo Contencioso Administrativo y de lo Fiscal, dentro de la esfera de su competencia, conocerán y resolverán de todas las demandas y recursos derivados de actos, contratos, hechos administrativos, y reglamentos expedidos, suscritos o producidos por las entidades del sector público. El administrado afectado presentará su demanda o recurso ante el tribunal que ejerce jurisdicción en el lugar de su domicilio. El procedimiento será el previsto en la Ley de la Jurisdicción Contencioso Administrativa o Código Tributario. No se exigirá como requisito previo para iniciar cualquier acción judicial contra las entidades del sector público la proposición del reclamo y agotamiento en la vía administrativa*". Empero de iniciarse cualquier acción judicial contra alguna institución del sector público, quedará insubsistente todo reclamo que sobre el mismo asunto se haya propuesto por la vía administrativa" (el subrayado es de la Sala).- De tal forma que, de conformidad con el artículo 38 de la Ley de Modernización del Estado, Privatizaciones y Prestación de Servicios Públicos por parte de la Iniciativa Privada, cuando el administrado acude a la Función Judicial para hacer valer su derecho a ser indemnizado por la responsabilidad extracontractual del Estado prevista en el artículo 20 de la Constitución Política del Estado, debe hacerlo ante el Tribunal Distrital de su domicilio, que es competente para conocer "toda demanda que se derive" de actos, hechos y contratos administrativos que, como queda indicado, son considerados en conjunto, sin determinación de ninguna clase, porque se presupone para toda prestación de un servicio público como actividad pública, cuya deficiencia funcional se sostiene ha causado un daño indemnizable. Esta Sala, de otra parte, funda su competencia en el artículo 200 de la Constitución Política y la Ley de Casación vigente, particularmente en el artículo 16, en lo que respecta a la competencia para dictar la sentencia correspondiente en el caso, luego de haber sido casada aquella que fue materia de un recurso de casación.- Por estas consideraciones no son admisibles las excepciones de incompetencia en razón de la materia o el territorio propuestas por CONELEC y EMELMANABI.- SEPTIMO: La Procuraduría General del

AtencionClientes@lexis.com.ec - Suscripciones@lexis.com.ec
www.lexis.com.ec - www.lexis.ec

LEXIS S.A. - Silec, Sistema Integrado de Legislación Ecuatoriana

26 — Suplemento — Registro Oficial N° 339 — Sábado 17 de Mayo del 2008

Estado y CONELEC han propuesto como excepción la falta de personería. Únicamente en el caso de CONELEC se fundamentó la excepción en el sentido de que el señor Florencio Antonio Andrade Medina no estaría legitimado para comparecer en el proceso a nombre de su hijo, menor de edad, Juan Pablo Andrade Bailón, porque, según lo previsto en los artículos 47 y 48 del Código de Menores, el ejercicio de la patria potestad les correspondería de manera conjunta al padre y la madre. Se hace notar, a este respecto, que el régimen jurídico invocado se encontraba ya derogado por el Código de la Niñez y la Adolescencia, publicado en el Registro Oficial 737, de 3 de enero de 2003. El artículo 104 del Código de la Niñez y la Adolescencia, vigente a la fecha de presentación de la demanda (30 de abril de 2003), establece que: *"Respecta a la patria potestad se estará a lo dispuesto en el Código Civil sin perjuicio de lo establecido en los artículos siguientes."*- Un artículo 28 del Código Civil establece que: *"Son representantes legales de una persona, el padre o la madre, bajo cuya patria potestad vive; su tutor o curador; y lo son de las personas jurídicas, los designados en el Art. 570"* (el subrayado es de la Sala). El inciso primero del artículo 300 del Código Civil señala que: *"El hijo de familia no puede comparecer en juicio, como actor contra un tercero, sino representado por el padre o la madre que ejerza la patria potestad"* (el subrayado es de la Sala). Finalmente, el artículo 34 del Código de Procedimiento Civil prevé: *"Los que se hallen bajo patria potestad serán representados por el padre o la madre que la ejerza; y los demás incapaces que no estuvieren bajo patria potestad, tutela o curaduría, por el curador que se les dé para el pleito"* (el subrayado es de la Sala). En tal virtud, la alegación de que la defensa de los intereses del menor en un juicio (que han de primar, en cualquier caso) requiere la intervención del padre y la madre, según el régimen vigente a la fecha de presentación de la demanda, no tiene sustento, por lo que se niega la excepción.- OCTAVO: En lo que respecta a la oportunidad con la que se ha presentado de la demanda (30 de abril de 2003) en relación con el tiempo de caducidad del derecho de acción en la vía contencioso administrativa, se hace notar que el artículo 2 de la Ley 2001-56, publicada en el Registro Oficial 483, de 28 de diciembre de 2001, con el que se reforma el artículo 65 de la Ley de la Jurisdicción Contencioso Administrativa, estableció que: *"El término para deducir la demanda en la vía contencioso administrativa será de noventa días en los asuntos que constituyen materia del recurso contencioso de plena jurisdicción, contados desde el día siguiente al de la notificación de la resolución administrativa que se impugna.- En los casos que sean materia del recurso contencioso de anulación u objetivo se podrá proponer la demanda hasta en el plazo de tres años, a fin de garantizar la seguridad jurídica. En los casos que sean de materia contractual y otras de competencia de los Tribunales Distritales de lo Contencioso Administrativo, se podrá proponer la demanda hasta en el plazo de cinco años"*. El caso concreto está sujeto al último supuesto. En esta materia, es importante definir el momento desde el que se debe computar el plazo de cinco años para que opere la caducidad del derecho de acción. De manera general, este plazo debe ser contado desde el momento en que es posible el ejercicio de la acción, salvo que el procedimiento administrativo iniciado no haya concluido, o se trate de hechos continuados. En el presente caso, el suceso aconteció 11 de mayo de 2002, el procedimiento administrativo inició el 9 de enero del 2003 (fs. 98) y concluyó el 4 de febrero de 2003 con la resolución del CONELEC No. 0154, que

consta a fojas 3. Desde el 4 de febrero del 2003 hasta el 30 de abril del mismo año, fecha en la que se interpuso la demanda, no ha trascurrido el plazo previsto en el artículo 65 de la Ley de la Jurisdicción Contencioso Administrativa.- NOVENO: No existe ninguna otra razón por la que deba ser declarada la nulidad del proceso, por lo que se rechaza la excepción de nulidad planteada por la Procuraduría General del Estado, más allá de que aquélla no se encuentra debidamente fundamentada. DÉCIMO: En lo que respecta al fondo de la controversia, los daños morales y materiales que han sufrido Florencio Antonio Andrade Medina y su hijo menor de edad Juan Pablo Andrade Bailón, se encuentran probados en el proceso: a) Consta de: la historia clínica No. 127564 del Hospital de Niños "Dr. Roberto Gilbert Elizalde", de la ciudad de Guayaquil (fs. 125 a 134); del resumen clínico de la Unidad de Quemados del Hospital de Niños "Dr. Roberto Gilbert Elizalde", de la ciudad de Guayaquil, suscrito por la Dra. Margot Orellana (fs. 135 a 137); del informe pericial suscrito por los doctores Gabriel Díaz Loor y Walter Roca Baida (fs. 225 y 226), y de los certificados médicos que figuran a fojas 139 y 140, que Juan Pablo Andrade Bailón tuvo que ser sometido al procedimiento de amputación de sus miembros superior izquierdo e inferior derecho, a causa de las quemaduras en su cuerpo, que son de III grado 16.5 SCQ; b) Del informe pericial que consta a fs. 225 y 226, se desprende, también, que Juan Pablo Andrade Bailón, luego del suceso, tiene un porcentaje de incapacidad del 80%. c) De los mismos certificados incluidos a fojas 139 y 140, se deriva que el menor de edad estuvo sometido a tratamiento médico en la ciudad de Guayaquil del 12 de mayo al 28 de junio de 2002, de lo que se infiere un detrimento patrimonial para atender los gastos médicos, manutención y alojamiento. d) De la incapacidad física demostrada, se desprende que el menor de edad no podrá proveerse de los medios necesarios para sustentar su existencia, por sí mismo, como cualquier otro trabajador. e) De los efectos del suceso en el cuerpo del menor de edad, según queda señalado, se puede inferir razonablemente que Florencio Antonio Andrade Medina, como padre, y Juan Pablo Andrade Bailón como el sujeto directamente afectado, han sufrido un daño moral vinculado con el cambio trascendental en su forma de vida. Aunque los efectos sicológicos y anímicos, actuales, que el suceso ha provocado en los actores no constan acreditados a través de la práctica de ninguna diligencia probatoria, son fácilmente deducibles de los hechos probados.- Los daños materiales y morales constatados son indemnizables, según lo señalado en el considerando quinto de esta sentencia, porque son ciertos, esto es, probados; actuales, en lo que respecta a los gastos efectuados para obtener la atención médica del menor y los daños morales; en el caso de cada uno de los actores en la presente causa; objetivamente esperables (futuros) en lo que concierne a la imposibilidad que el menor tiene de proveerse los medios para su subsistencia por sí mismo como cualquier otro trabajador, una vez que tenga edad suficiente para ello; son injustos e ilícitos, porque se trata de efectos anormales en la prestación del servicio de distribución de energía eléctrica, y porque no existe norma alguna que obligue a Florencio Antonio Andrade Medina y Juan Pablo Andrade Bailón al sacrificio individual que han debido soportar con ocasión de la prestación del referido servicio de distribución de electricidad.- DÉCIMO PRIMERO: En lo que respecta al nexo causal entre la actividad pública y los daños indemnizables, de las piezas procesales se desprende: a) El CONELEC ha afirmado en su contestación a la demanda: *"En el presente caso los hechos son los siguientes: un niño*

Lexis S.A.
AtencionClientes@lexis.com.ec - Suscripciones@lexis.com.ec
www.lexis.com.ec - www.lexis.ec

Case 1:11-cv-00691-LAK-RWL   Document 370-10   Filed 12/20/11   Page 10 of 99

*de ocho años juega con otro en un balcón; este último toma una varilla metálica con la cual intencionalmente toma contacto con un cable de alta tensión. En estas circunstancias se produce la descarga que mata al menor, y que difícilmente habría habido si no hubiese habido un sujeto externo provocador; en suma, los menores provocaron el siniestro*" (fs. 88, vuelta). b) La confirmación de los hechos relatados consta en los enunciados que el CONELEC realiza en el pliego de preguntas para la confesión judicial del señor Antonio Andrade Medina, particularmente, en las preguntas 3, 5 y 7 (fs. 228). c) En el escrito de interposición del recurso de casación, el CONELEC manifiesta (fs. 286): "*... en el Ecuador y en el mundo, casi el ciento por ciento de la distribución eléctrica se hace a través de cables a la intemperie y sin aislantes; en el Ecuador hay cinco mil kilómetros de cables de esta naturaleza. Ni siquiera ustedes que aceptan incondicionalmente un dato informativo de manera peyorativa podrían indicar en qué sectores de esta ciudad o de esa provincia hay tendido eléctrico con aislantes. Ponerlos significaría un costo tan alto, que la electricidad costaría tanto que las poblaciones carecerían de esa fuente energética...*" (el subrayado es de la Sala). Esta afirmación respecto al hecho de que los tendidos eléctricos a través de los cuales se distribuye la energía eléctrica no tienen aislantes, confirma lo que el actor ha señalado en su demanda y, tampoco, ha sido puesto en discusión en el proceso.- Es verdad que las diligencias judiciales en las que no participa la parte contraria para ejercer su derecho de contradicción, por iniciativa del peticionario o defecto procesal, no tienen valor alguno dentro del proceso, por lo que, pese a que el informe pericial que consta a fojas 123 del proceso confirma el hecho de que los cables del tendido eléctrico se encuentran a la intemperie y sin aislante, no tiene valor alguno en el proceso.- Sin embargo, de cuanto se ha señalado, esta Sala ha llegado a la convicción de que los daños probados e indemnizables tienen como causa adecuada los siguientes factores concurrentes: a) La conducta del menor Fernando Quispe Cedeño; b) El hecho de que el titular del tendido eléctrico, por razones de costo-beneficio, mantenga cables sin aislantes; y, c) La tolerancia de la autoridad administrativa a cargo de la regulación y control de la actividad que realiza el titular del tendido eléctrico. En cuanto al primer factor, es evidente que a un menor (Fernando Quispe Cedeño), no se le puede exigir una conducta distinta a la que es propia de su edad, como lo ha afirmado el actor. En lo que respecta a EMELMANABI y el CONELEC, la actividad de distribución de energía eléctrica, a cargo de la primera, y que está sujeta al control y regulación del segundo, en virtud de los artículos 12 y 13, letras: a y e de la Ley del Régimen del Sector Eléctrico, lo que les vuelve solidariamente responsables, es una actividad de riesgo y, como tal, presupone eventuales afectaciones a los administrados, que exceden lo que les es exigible individualmente, por la ventaja colectiva que significa realizar la actividad en tales condiciones. El hecho de que el tendido eléctrico, en el Ecuador y -según lo plantea CONELEC- en la mayor parte del mundo, se encuentre sin aislantes, confirma la apreciación de que la deficiencia en la actividad de distribución y las eventuales afectaciones a las personas, bienes o ambiente es objetiva; es decir, los riesgos de la actividad son asumidos a priori, tanto por el prestador efectivo del servicio como por el órgano de control y regulación que lo tolera, en razón de que el costo de proveer mayores seguridades a los administrados, y, por tanto, precaver los perjuicios eventuales, es superior al beneficio de sostener un sistema que permita un costo del servicio

eléctrico menor. Dicho de otra manera, la deficiencia en la prestación del servicio de distribución de energía eléctrica es, en este caso, un dato objetivo y plenamente admitido por el titular de la red eléctrica y el órgano de control y regulación, frente a las limitaciones económicas y prácticas que, en el Ecuador, existen para sostener, al mismo tiempo, altos niveles de seguridad para las personas, los bienes y el ambiente, y bajos costos para la provisión del servicio. Este hecho objetivo -la deficiente prestación del servicio de distribución de energía eléctrica- es un dato permanente en la realidad ecuatoriana, según los criterios señalados; por ello, se justifican mecanismos de aseguramiento como el contenido en el Reglamento de concesiones, permisos y licencias para la prestación del servicio de energía eléctrica, publicado en el Registro Oficial No. 290, de 3 de abril de 1998, que tantas veces han invocado los demandados. La existencia del aseguramiento no modifica la responsabilidad de los sujetos que participan en la actividad que genera el daño indemnizable. Cosa distinta es que los daños puedan ser reparados sin la intervención de la Administración de Justicia, que, por supuesto, no lo deseable. Esta reparación puede efectuarse espontáneamente, empleando para el efecto los seguros de responsabilidad contratados, o bien, atendiendo los requerimientos de los administrados efectuados en sede administrativa. Este último aspecto requiere algunas precisiones: a) El Estatuto del Régimen Jurídico Administrativo establece un procedimiento específico para que la administración atienda los reclamos de indemnización de los perjuicios materiales o morales que se deriven de la actividad de la Administración Central o Institucional. A este respecto, véanse los artículos 209 y siguientes del Estatuto del Régimen Jurídico Administrativo de la Función Ejecutiva, actualmente vigente; b) Las normas del Estatuto del Régimen Jurídico Administrativo deben ser interpretadas de conformidad con el segundo inciso del artículo 272 de la Constitución Política, en el sentido de que no pueden modificar las mismas prescripciones constitucionales en la materia, como aquéllas previstas en normas con rango de ley; c) Siguiendo el criterio previamente señalado, el artículo 209 del Estatuto del Régimen Jurídico Administrativo de la Función Ejecutiva no modifica en nada el derecho de los administrados de acudir directamente a la Función Judicial para hacer valer sus derechos sin agotar la vía administrativa, de conformidad con el artículo 38 de la Ley de Modernización; d) El plazo de prescripción contemplado en el artículo 211 *ibídem* no tiene aplicación alguna, en la medida en que es incompatible con el plazo de caducidad de cinco años previsto en el artículo 65 de la Ley de la Jurisdicción Contencioso Administrativa, reformado por el artículo 2 de la Ley 2001-56, publicada en el Registro Oficial número 483, de 28 de diciembre de 2001; e) El artículo 212 del Estatuto del Régimen Jurídico Administrativo de la Función Ejecutiva es también incompatible con los artículos 38 y 28 de la Ley de Modernización, en el sentido de que el administrado no está obligado a esperar la negativa de la administración para proponer su acción ante la jurisdicción contencioso administrativa, y el término que tiene la administración para atender todo tipo de reclamación, salvo que se hubiese previsto uno distinto en una norma de rango legal, es el de quince días según lo previsto en el artículo 28 de la Ley de Modernización, de tal forma que, si la administración no hubiese contestado oportunamente el reclamo correspondiente, se ha de aplicar, en todo caso, el régimen jurídico de los actos administrativos regulares presuntos y los procedimientos de ejecución, sobre los que esta Sala ha tenido la oportunidad de pronunciarse

Lexis S.A.
AtencionClientes@lexis.com.ec - Suscripciones@lexis.com.ec
www.lexis.com.ec - www.lexis.ec

**28 — Suplemento — Registro Oficial N° 339 — Sábado 17 de Mayo del 2008**

repetidamente, y constituyen un precedente jurisprudencial de obligatorio cumplimiento; f) Del mismo modo, la acción de repetición prevista en el segundo inciso del artículo 20 de la Constitución Política depende únicamente de que la conducta del funcionario o empleado sea dolosa o gravemente culpable, de tal forma que las condiciones previstas en el 213 del Estatuto del Régimen Jurídico Administrativo son inconciliables con el ordenamiento constitucional. Sobre la responsabilidad de los funcionarios y empleados públicos por los perjuicios que se irroguen al Estado por su conducta, es necesario subrayar que cuando un administrado acude ante la autoridad con un reclamo administrativo tendiente a obtener el resarcimiento de los perjuicios materiales y morales producidos por la actividad pública y la administración, por medio del funcionario competente, no atiende la petición, aceptándola o negándola, en el término previsto en el artículo 28 de la Ley de Modernización, incurre, en caso de dolo o de culpa grave, en la responsabilidad prevista en el inciso segundo del artículo 20 de la Constitución Política, y deberá asumir los perjuicios económicos ocasionados al Estado, y así tendrá que ser declarado en el proceso de ejecución del acto administrativo presunto derivado del silencio administrativo positivo.- DECIMO SEGUNDO: Del criterio vertido en el considerando precedente es posible sostener que los daños indemnizables, que se derivan de una actividad que se organiza asumiendo las deficiencias propias del sistema, deben ser reparados, salvo que exista una causa eximente, debidamente probada por los demandados.- Como ha quedado señalado las causas eximentes, que modifican la atribución del efecto dañoso a la actividad pública, en la relación causal anotada, son la fuerza mayor o el caso fortuito, el hecho de un tercero o la culpa de la víctima, siempre que se justifique su exclusividad, como factor generador del daño. El CONELEC ha afirmado que: *"Debe señalarse que la casa fue construida cuando la red de distribución de la energía eléctrica ya existía, y que aún hoy la casa no está terminada ya que no existen los mínimos elementos de seguridad tanto en los balcones como en las ventanas. Además, si a esto se añade que si hubiese habido un peligro evidente por la cercanía de la red eléctrica, ya para los constructores ya para los residentes, la autorización municipal correspondiente habría observado ese peligro para que EMELMANABI hiciese las rectificaciones del caso"* (fs. 88; vuelta); *"...habiendo un imprevisto imposible de precaver, no hay culpa o negligencia de la cual derive indemnización (fs. 89)"* En esta línea, los demandados han podido probar exclusivamente la culpa de Florencio Antonio Andrade Medina, como corresponsable de los efectos dañosos provocados al menor y a sí mismo. En efecto, de la confesión judicial que ha rendido Florencio Antonio Andrade Medina se desprende, específicamente de la respuesta a la pregunta 4 (fs. 228 y 229), que construyó la vivienda en la que se produjo el suceso materia de esta acción sin las autorizaciones administrativas necesarias, a su juicio, de manera emergente por el terremoto de Bahía de Caráquez. Esto tiene un efecto trascendente en relación con los efectos dañosos que el señor Florencio Antonio Andrade Medina pretendía sean resarcidos por los demandados, por sus propios y personales derechos. De conformidad con el artículo 2217 del Código Civil, cuando dos o más personas intervienen en el hecho que provoca el daño, son solidariamente responsables de todo el perjuicio. Al ser Florencio Antonio Andrade Medina corresponsable de los perjuicios que son materia del presente caso, no puede beneficiarse de su propia falta y, en tal virtud, las

pretensiones que ha presentado por sus propios y personales derechos deberán ser desechadas. Esta circunstancia, de otra parte, no modifica en nada la responsabilidad de CONELEC y EMELMANABI respecto de los perjuicios ocasionados al menor Juan Pablo Andrade Bailón, ni la capacidad del padre para reclamar, en nombre de su hijo, estos perjuicios a los corresponsables, por su obligación solidaria.- Es necesario aclarar que tampoco se han considerado como pruebas válidas en este caso, la diligencia de inspección judicial y el informe pericial, así como los documentos agregados a dicho informe, que constan a fojas 171 a 198, porque, aunque la diligencia fue ordenada por el Tribunal *a quo* mediante providencia de 12 de noviembre de 2003 debidamente notificada a las partes, la fecha en que debía practicarse y la designación del perito no fue notificada a la parte actora por el Juez Octavo de lo Civil de Manabí, encargado, según consta a fojas 171, vuelta. En cualquier caso, la diligencia tuvo como propósito definir la situación del inmueble igual que del lugar en el que se produjo el suceso en relación con el tendido eléctrico, así como el cumplimiento de las normas técnicas, exclusivamente en lo que respecta a las distancias, en el referido tendido eléctrico. El resultado no modifica de manera alguna las convicciones a las que ha llegado esta Sala en relación con el daño indemnizable, el nexo causal y los eximentes de responsabilidad.- DECIMO TERCERO: De cuanto se ha señalado, esta Sala encuentra que EMELMANABI y CONELEC son responsables solidarios de los daños materiales y morales producidos al menor Juan Pablo Andrade Bailón, según el régimen previsto en el artículo 20 de la Constitución Política.- Al emitir en materia de indemnizaciones, esta Sala invoca la Convención Americana sobre Derechos Humanos que, en su artículo 63.1, dispone la obligación del Estado, cuya responsabilidad ha sido establecida, de reparar el daño ocasionado y sus consecuencias, y la de determinar el pago de una justa indemnización. La jurisprudencia de la Corte Interamericana de Derechos Humanos orienta la forma en la que se debe proceder para reparar e indemnizar tanto el daño material como los daños morales. *"Su naturaleza y monto, dice la referida Corte, dependen del daño ocasionado en los planos tanto material como inmaterial. Las reparaciones no pueden implicar ni enriquecimiento ni empobrecimiento para la víctima o sus sucesores"*. (Caso Cantoral Benavides, Reparaciones, sentencia de 3 de diciembre de 2001, entre otras).- Esta Sala procede, entonces, a cuantificar la indemnización que estarán obligados a pagar los demandados a favor de Juan Pablo Andrade Bailón y, por las circunstancias del caso, la manera en que se deberá cumplir la condena. En efecto, de conformidad con el artículo 279 del Código de Procedimiento Civil: *"Si se condenare a una de las partes al pago de frutos, intereses, daños y perjuicios, en la misma sentencia se determinará la cantidad que se ha de pagar, y si esto no fuere posible, se fijarán las bases para la liquidación y el modo de verificarla"* (el subrayado es de la Sala). En lo que respecta a los daños materiales sufridos por Juan Pablo Andrade Bailón se considera exclusivamente el valor que dejará de percibir en razón de su incapacidad para proveerse de los medios de subsistencia, como cualquier otro trabajador. Para tal efecto esta Sala entiende que es razonable fijar como valor de la indemnización por los perjuicios materiales causados, un monto equivalente al valor de la canasta familiar vital, por cada mes y por el tiempo de esperanza de vida de un ecuatoriano varón. Se emplea, en este caso, el valor de la canasta familiar vital, porque esta Sala no podría concebir al

Lexis S.A.
AtencionClientes@lexis.com.ec - Suscripciones@lexis.com.ec
www.lexis.com.ec - www.lexis.ec

LEXIS S.A. – Silec, Sistema Integrado de Legislación Ecuatoriana

menor de edad afectado fuera de un núcleo familiar, que el Estado garantiza y protege según lo previsto en el artículo 37 y 48 de la Constitución Política. De conformidad con el Instituto Nacional de Estadísticas y Censos, a razón del año 2007, el valor de la canasta familiar vital es de TRESCIENTOS DIECISEIS 28/100 dólares de los Estados Unidos de América; en tanto que, la esperanza de vida de un ecuatoriano, varón, según la Organización Mundial de la Salud, es de setenta años de edad. En tal virtud, dado que el hecho acaeció cuando Juan Pablo Andrade Bailón tenía ocho años de edad, (fs. 116) el valor que percibirá por concepto de indemnización por daños materiales asciende a la suma de DOSCIENTOS TREINTA Y CINCO MIL TRESCIENTOS DOCE 32/100 dólares de los Estados Unidos de América. De conformidad con el artículo 2232 del Código Civil, *"la reparación por daños morales puede ser demandada si tales daños son el resultado próximo de la acción u omisión ilícita del demandado, quedando a la prudencia del juez la determinación del valor de la indemnización atentas las circunstancias, previstas en el inciso primero de este artículo"* (el subrayado es de la Sala); y, como se ha dicho, la Corte Interamericana de Derechos Humanos señaló que las indemnizaciones no tienen como propósito enriquecer a la víctima. Esta Sala entiende que no es posible cuantificar las pérdidas extrapatrimoniales que ha sufrido Juan Pablo Andrade Bailón, por lo que, aclarando que el valor que ahora se fija como reparación de los perjuicios morales sólo busca atenuar el efecto anímico y sicológico, basándose en equidad, condena solidariamente a EMELMANABI y CONELEC al pago de OCHENTA MIL 00/100 dólares de los Estados Unidos de América, por este concepto. En total, la indemnización compensatoria suma el valor de TRESCIENTOS QUINCE MIL TRESCIENTOS DOCE 32/100 dólares de los Estados Unidos de América.- DECIMO CUARTO: Finalmente, es necesario establecer un mecanismo adecuado de ejecución de la sentencia, que permita asegurar que el criterio de Justicia empleado en el presente caso se haga realidad, asegurando la tutela judicial efectiva garantizada en el artículo 24, numeral 17, de la Constitución Política y procurando precautelar los intereses de Juan Pablo Andrade Bailón con la aplicación del mismo criterio que ha servido para fijar las indemnizaciones por daños materiales. Con estos fundamentos, EMELMANABI y CONELEC son condenados, adicionalmente, a la siguiente obligación de hacer, que constituye un modo de ejecución de la condena principal prevista en el considerando precedente: a) En el plazo de quince días desde la fecha de notificación con la presente sentencia, EMELMANABI y CONELEC, a su costa, deberán constituir un fideicomiso mercantil, en cualquiera de las instituciones habilitadas en el Ecuador como fiduciarias; b) El patrimonio autónomo estará conformado por el valor total de las indemnizaciones a las que han sido condenados los demandados; c) El único beneficiario del fideicomiso será Juan Pablo Andrade Bailón; d) EMELMANABI y CONELEC se asegurarán que las únicas instrucciones a la entidad fiduciaria, que contenga el contrato de fideicomiso, sean las siguientes: 1. Desembolsar mensualmente, desde la fecha de constitución del fideicomiso, la suma de TRESCIENTOS DIECISEIS 28/100 dólares de los Estados Unidos de América (valor de una canasta familiar), a favor de quienes ejerzan la patria potestad del menor de edad para su cuidado, hasta que Juan Pablo Andrade Bailón cumpla la mayoría de edad; 2. Juan Pablo Andrade Bailón, una vez que cumpla la mayoría de edad, podrá disponer libremente del patrimonio autónomo constituido a su favor; 3. Los

derechos fiduciarios, cuyos certificados serían emitidos a favor de Juan Pablo Andrade Bailón, no podrán ser transferidos hasta que su titular cumpla la mayoría de edad; e) EMELMANABI y CONELEC y sus sucesores si se produjere cambio de estas entidades o de su nombre, estarán en la obligación de cubrir todos los costos y gastos que supongan el sostenimiento del fideicomiso mercantil, en los términos establecidos en esta sentencia, hasta que Juan Pablo Andrade Bailón cumpla la mayoría de edad.- El Tribunal de instancia, en la etapa de ejecución, verificará el cumplimiento exacto de esta obligación de hacer a la que se condena a EMELMANABI y CONELEC, en el plazo otorgado para el efecto.- Por las consideraciones vertidas, ADMINISTRANDO JUSTICIA EN NOMBRE DE LA REPUBLICA Y POR AUTORIDAD DE LA LEY, se casa la sentencia y, aceptando parcialmente la demanda, se condena solidariamente a la Empresa Eléctrica Manabí S.A., EMELMANABI y al Consejo Nacional de Electricidad, CONELEC, al pago, a favor de Juan Pablo Andrade Bailón, de las indemnizaciones establecidas en el considerando décimo tercero de esta sentencia, por los daños materiales y morales que ha sufrido el referido menor, por la deficiente prestación del servicio público de distribución de la energía eléctrica, daños y responsabilidad extracontractual que también se declaran. Se condena, así también, a EMELMANABI y CONELEC al cumplimiento de la obligación de hacer prevista en el considerando décimo cuarto de esta sentencia, como modalidad de cumplimiento de la condena principal. Se desecha la demanda en lo que respecta a las pretensiones que el señor Florencio Antonio Andrade Medina ha efectuado, por sus propios y personales derechos.- Sin costas.- Notifíquese, publíquese y devuélvase.

f.) Dr. Marco Antonio Guzmán Carrasco, Ministro Juez.

f.) Dr. Hernán Salgado Pesantes, Ministro Juez.

f.) Dr. Jorge Endara Moncayo, Ministro Juez.

Certifico.

f.) Secretaria Relatora.

En Quito, el día de hoy miércoles once de abril del dos mil siete, a partir de las dieciséis horas, notifiqué mediante boletas la providencia que antecede, al actor señor Florencio Andrade Medina, en el casillero judicial No. 1096 y 1328 y a los demandados, por los derechos que representan, CONELEC, EMELMANABI, al Dr. Jorge Cevallos Parra, y al Procurador General del Estado, en los casilleros judiciales Nos. 540, 811, A-57 y 1200, respectivamente.- Certifico.

f.) Secretaria Relatora.

## AUTO DE ACLARACION

### CORTE SUPREMA DE JUSTICIA
### SALA DE LO CONTENCIOSO ADMINISTRATIVO

Quito, a 30 de abril del 2007; las 08h30.

VISTOS (62-2005): El escrito que antecede (fs. 81), en el que el CONELEC, por medio de su abogado patrocinar, ha solicitado la ampliación de la sentencia dictada en la causa

Lexis S.A.
AtencionClientes@lexis.com.ec – Suscripciones@lexis.com.ec
www.lexis.com.ec - www.lexis.ec

30 — Suplemento — **Registro Oficial N° 339** — Sábado 17 de Mayo del 2008

seguida por Florencio Antonio Andrade Medina contra CONELEC.- De conformidad con el artículo 281 del Código de Procedimiento Civil: "*El Juez que dictó sentencia, no puede revocarla ni alterar su sentido en ningún caso; pero podrá aclararla o ampliarla, si alguna de las partes lo solicitare dentro de tres días*" De conformidad con el artículo 282 ibídem, procede la ampliación "(...) cuando no se hubiere resuelto alguno de los puntos controvertidos, o se hubiere omitido decidir sobre frutos, intereses o costas. La negativa será debidamente fundamentada.- Para la aclaración o la ampliación se oirá previamente a la otra parte".- El peticionario ha solicitado la ampliación en el término previsto en la ley, y se ha corrido traslado a la otra parte, conforme lo ordenan las normas antes citadas.- El peticionario entiende que esta Sala no se ha pronunciado sobre la acusación que ha planteado respecto de la sentencia dictada por el Tribunal *a quo* con relación a la falta de cumplimiento de los requisitos de la demanda en lo que concierne a la determinación de la "*cosa, cantidad o hechos que se exige*"; sin embargo, el peticionario no se ha percatado de que, al existir razón suficiente para admitir la acusación vertida en relación con la causal quinta del artículo 3 de la Ley de Casación, esta Sala, con suficiente fundamento (Ver considerando tercero de la sentencia cuya ampliación se solicita) y pese a las diferencias técnicas en la interposición del recurso, admitió la referida causal por los defectos en la motivación de la sentencia, en lo que atañe a sus requisitos.- La admisión de la causal invocada por la entidad recurrente tendría por efecto que la sentencia materia del recurso de casación, debía ser extinguida, esto es "casada", sin que sea necesaria ulterior consideración. Una vez una sentencia, de conformidad con el artículo 16 de la Ley de Casación, la Sala constituye en Tribunal de instancia y dicta la sentencia que corresponde a la materia de la litis. La materia de la litis consta expuesta en el considerando cuarto de la sentencia.- En tal virtud, la ampliación solicitada, en lo que respecta a las demás razones invocadas por el recurrente en su escrito de interposición del recurso, no tiene sustento.- De otra parte, el peticionario de la ampliación señala que esta Sala no se ha referido a la alegación planteada por la parte demandada en lo relacionado con la competencia de los tribunales distritales y de esta Sala para conocer las demandas por responsabilidad extracontractual del Estado. En esta materia baste remitir al solicitante al considerando sexto de la sentencia cuya ampliación se solicita, y que se reproduce a continuación, para su lectura: "*SEXTO: EMELMANABI Y CONELEC han planteado como excepción la incompetencia del juzgador para conocer el caso. A este respecto es necesario señalar que toda actividad pública se verifica a través de actos, hechos y contratos; de tal forma que, la prestación de cualquier servicio público, en tanto actividad, presupone la existencia de una serie de actos, hechos y contratos de los que resulta la prestación del servicio. Cuando se alega que el Estado ha incurrido en responsabilidad extracontractual por deficiencia en la prestación de servicios públicos, no se está atocando únicamente un específico acto, hecho o contrato administrativo, sino el efecto que, en conjunto, todos ellos, los necesarios para la prestación del servicio, han producido. Se evalúa un defecto sistémico, funcional, de la actividad pública (que, se insiste, se verifica a través de actos, hechos y contratos), en este caso, para la prestación del servicio público que ha dado origen a un daño indemnizable. Ahora bien, a la fecha de presentación de la demanda, esto es, el 30 de abril de 2003 (fs.44), se*

encontraba vigente el artículo 38 de la Ley de Modernización del Estado, Privatizaciones y Prestación de Servicios Públicos por parte de la Iniciativa Privada, en la redacción dada por el artículo s de la Ley 2001-56, publicada en el Registro Oficial No.483 de 28 de diciembre de 200. Esta norma señala que: «*Los Tribunales Distritales de lo Contencioso Administrativo y de lo Fiscal, dentro de la esfera de su competencia, conocerán y resolverán de <u>todas las demandas y recursos derivados de actos, contratos, hechos administrativos, y reglamentos expedidos, suscritos o producidos por las entidades del sector público. El administrado afectado presentará su demanda o recurso ante el tribunal que ejerce jurisdicción en el lugar de su domicilio. El procedimiento será el previsto en la Ley de la Jurisdicción Contencioso Administrativo o Código Tributario. No se exigirá como requisito previo para iniciar cualquier acción judicial contra las entidades del sector público la proposición del reclamo y agotamiento de la vía administrativa. Empero, de iniciarse cualquier acción judicial contra alguna institución del sector público, quedará insubsistente todo reclamo que sobre el mismo asunto se haya propuesto por la vía administrativa</u>* (el subrayado es de la Sala).- De tal forma que, de conformidad con el artículo 38 de la Ley de Modernización del Estado, Privatizaciones y Prestaciones de Servicios Públicos por parte de la Iniciativa Privada, cuando el administrado acude a la Función Judicial para hacer valer su derecho a ser indemnizado por la responsabilidad extracontractual del Estado prevista en el artículo 20 de la Constitución Política del Estado, debe hacerlo ante el Tribunal Distrital de su domicilio, que es competente para conocer «*toda demanda que se derive de actos, hechos y contratos administrativos que, como queda indicado, son considerados en conjunto, sin determinación de ninguna clase, porque se le presupone para toda prestación de un servicio público como actividad, cuya deficiencia funcional se sostiene ha causado un daño indemnizable. Esta Sala, de otra parte, funda su competencia en el artículo 200 de la Constitución Política y la Ley de Casación vigente, particularmente en el artículo 16, en lo que respecta a la competencia para dictar la sentencia correspondiente en el caso, luego de haber sido casada aquella, materia de un recurso de casación.- Por estas consideraciones no son admisibles las excepciones de incompetencia en razón de la materia o el territorio propuestas por CONELEC y EMELMANABI*".- El asunto sobre el que el peticionario pretende que esta Sala se pronuncie afirmativa o negativamente, esto es, si una descarga eléctrica es un acto o un contrato, es impertinente en la causa y luce realmente absurdo.- Pese a la abundante fundamentación que contiene la sentencia cuya ampliación se solicita, el solicitante parece no discernir que el problema jurídico para determinar la competencia de los tribunales distritales de lo Contencioso Administrativo y de esta Sala, en su caso, no está en determinar si una descarga eléctrica es un acto o un contrato (lo que constituye un falso problema), sino en el hecho de que la prestación de un servicio público presupone la existencia de una serie de actos administrativos, actos de simple administración, hechos e incluso contratos; y, cuando se analiza la falla de un servicio de la que se desprende la responsabilidad extracontractual del Estado se atiende el defecto funcional y sistemático. Por todas estas razones, esta Sala considera que la solicitud de ampliación es improcedente, por la que se la desecha.- Notifíquese.

f.) Dr. Marco Antonio Guzmán Carrasco, Ministro Juez.

Lexis S.A.
AtencionClientes@lexis.com.ec - Suscripciones@lexis.com.ec
www.lexis.com.ec - www.lexis.ec

**Suplemento   —   Registro Oficial N° 339   —   Sábado 17 de Mayo del 2008   —   31**

f.) Dr. Hernán Salgado Pesantes, Ministro Juez.

f.) Dr. Jorge Endara Moncayo, Ministro Juez.

Certifico.

f. ) Secretaria Relatora.

En Quito, el día de hoy lunes treinta de abril del dos mil siete, a partir de las dieciséis horas, notifiqué mediante boletas la providencia que antecede, al actor Florencio Andrade Medina, en el casillero judicial No. 1096 y 1328 y a los demandados, por los derechos que representan, CONELEC, EMBLMANABI y al Procurador General del Estado, en los casilleros judiciales Nos. 540, 811 y 1200.- Certifico.

f. ) Secretaria Relatora.

RAZON: Siento como tal que las fotocopias que en veinte y dos (22) fojas útiles anteceden, debidamente selladas, foliadas y rubricadas son iguales a sus originales que constan en la Resolución No. 168/07 dentro del juicio contencioso administrativo que sigue Florencio Antonio Andrade Medina por sus derechos y por los que representa de su hijo Juan Pablo Andrade Bailón contra la Empresa Eléctrica de Manabí, EMELMANABI y otros, al que me remito en caso necesario.- Certifico.- Quito, a 11 de mayo de 2007.

f.) Dra. María del Carmen Jácome O., Secretaria Relatora de la Sala de lo Contencioso Administrativo de la Corte Suprema de Justicia.

No. 169-07

**CORTE SUPREMA DE JUSTICIA**
**SALA DE LO CONTENCIOSO ADMINISTRATIVO**

Quito, a 11 de abril del 2007; las 09h00.

VISTOS (32-2004): El recurso de casación que consta a fojas 225 a 235 del proceso, interpuesto por el ingeniero Jorge Madera Castillo, Director General y representante legal del Instituto Ecuatoriano de Seguridad Social, en contra de la sentencia expedida por el Tribunal de lo Contencioso Administrativo No. 2, de 29 de agosto de 2003, a las 15h30, dentro del proceso signado con el número 8456-ML, propuesto por el señor Jorge Washington García Chávez contra la entidad representada por el recurrente; sentencia en la que *"declara nulo el acto administrativo de supresión del cargo de Jefe de la División de Riesgo de Trabajo Regional 2 del IESS contenido en el oficio 2000121.6854 del 23 de febrero del 2001 suscrito y firmado por el Eco. Patricio Llerena Torres, Director General del Instituto Ecuatoriano de Seguridad Social (E) y notificado en la ciudad de Guayaquil al accionante el 28 de febrero del 2001 y, naturalmente lo que en este sentido disponen la resolución No. C.I 114 del 22 de febrero del 2001 de la Comisión Interventora del IESS que expresa que*

*se suprime el puesto según lo previsto en el literal d) del Art. 109 de la Ley de Servicio Civil y Carrera Administrativa. Ordenándose en consecuencia que la institución demandada a través de su representante legal proceda a restituir al Abogado Washington García Chávez al cargo de Jefe de la División de Riesgo de Trabajo Regional 2 del IESS. Como consecuencia de la nulidad declarada el Tribunal ordena que se le pague al accionante todos los sueldos y remuneraciones que debió percibir y no lo hizo, como consecuencia del acto administrativo de que se trata...".-* El recurrente fundamentó su recurso en la causal primera del artículo 3 de la Ley de Casación por: falta de aplicación del artículo 65 de la Ley de la Jurisdicción Contencioso Administrativa; falta de aplicación del artículo 101, numeral 2, del Código de Procedimiento Civil; aplicación indebida del Reglamento para Supresión de Puestos y su correspondiente indemnización, expedido mediante Decreto Ejecutivo No. 928, publicado en el Registro Oficial No. 236, de 20 de julio de 1993; aplicación indebida del artículo 59, letra b, de la Ley de la Jurisdicción Contencioso Administrativa; aplicación indebida del artículo 112 de la Ley de Servicio Civil y Carrera Administrativa; falta de aplicación de los artículos 58 y 272 de la Constitución Política; errónea interpretación de la Disposición Transitoria Segunda de la Constitución Política; falta de aplicación de los artículos 1, 3 y 11 de la Ley de Seguro Social Obligatorio; falta de aplicación de la Resolución No. C. I. 106 de la Comisión Interventora del IESS, de 25 de octubre de 2000; y, falta de aplicación de la Resolución del Tribunal Constitucional No. 071-2001-TP, de 9 de mayo de 2001.- Al haberse concedido el recurso y sometido el caso a resolución de la Sala, ésta, con su actual conformación, avoca conocimiento de aquel y para resolver considera: PRIMERO: La Sala de lo Contencioso Administrativo de la Corte Suprema de Justicia es competente para conocer y resolver los recursos de casación que se interponen contra las sentencias o autos de los tribunales distritales de lo Contencioso Administrativo, de acuerdo con el artículo 200 de la Constitución Política de la República y la Ley de Casación en vigencia.- SEGUNDO: Se ha agotado el trámite establecido por la ley para esta clase de recursos, sin que exista nulidad alguna que declarar.- TERCERO: Esta Sala estima necesario, previamente y para mejor entendimiento del análisis que se presenta, describir sucintamente el asunto controvertido en la causa, de la que se ha derivado la sentencia materia del presente recurso. El actor se ha presentado ante el Tribunal de instancia con la pretensión de que se declare la ilegalidad *"(...) del acto administrativo impugnado, esto es, la supresión del puesto que venía desempeñando en la Dirección Regional 2 del IESS, mediante el oficio 2000121-6854, Quito, 23 de febrero del 2001, notificado en Guayaquil el 28 de los mismos mes y año, (...) por ilegal al violarse: El Art. 109 literal d) de la Ley de Servicio Civil y Carrera Administrativa en concordancia con los Arts. 1, 2, 4, 5 del Reglamento para la Supresión de Puestos publicado en el R.O. 236 de 20 de junio de 1993, así como por infringirse el inciso segundo de la Disposición Transitoria Segunda de la Constitución Política de la República y numeral 6 del Art. Innumerado de la Sección Tercera, Parágrafo 1 de la normativa institucional reformada publicada en el R.O. No. 194 del 30 de octubre del 2000 (...) así como el Art. 16 de la Resolución No. C.I. 106 del 25 de octubre del 2000."* En subsidio, se solicitó que se declare la nulidad del referido acto, en aplicación del literal b) del artículo 59 de la Ley de la Jurisdicción Contencioso Administrativa. Como consecuencia de la*

Lexis S.A.
AtencionClientes@lexis.com.ec - Suscripciones@lexis.com.ec
www.lexis.com - www.lexis.ec

# EXHIBIT 1233

I, Marino Fernandez, declare that the following is true and correct:

1.     I am over the age of 18 and competent to testify.  I have personal knowledge of all of the matters set forth in this declaration and if called upon, could testify truthfully to each of them.

2.     I am the owner and operator of International Analytical Group, Inc. ("IAG"). IAG has been providing environmental consulting services, including establishing and auditing laboratories and coordinating testing for U.S. companies in Latin America and the Caribbean for more than 12 years.

3.     I have a B.S. from the University of Havana, with a major in analytical chemistry.

4.     In 2005, IAG was hired by Severn Trent Laboratories ("STL") to undertake two projects relating to *Aguinda v. Chevron Corporation,* a case pending against Chevron Corporation in Lago Agrio, Ecuador.  The first project was to set up a laboratory in Lago Agrio to analyze and process samples that were to be gathered as part of the judicial inspection process in the litigation.  The second was to set up a sample management program to facilitate U.S. laboratory testing of the samples.

5.     In connection with this work, I reported to Al Verstuyft of Chevron and Jack Tuschall of STL.  STL had the contract to run the laboratory in Lago Agrio and to perform the U.S.-based laboratory testing.

6.     In connection with the sample management program I set up in Lago Agrio, there was a need to hire someone to take care of the transportation of the samples from the Lago Agrio laboratory to the United States.  Diego Borja applied for that position and I hired him for it.

7.     I supervised Diego Borja in that position for approximately 2 years, until my association with the project ended.

8.     While I supervised Diego Borja, there were only two job responsibilities that he had.  First, samples from the field came into the STL Laboratory that was operating at a military base in Lago Agrio.  It was his job to ensure that those samples, once received by STL, were transported to STL in the U.S. for testing and to complete the related chain-of-custody

paperwork. Second, the technical team taking the samples in the field required containers and related equipment to take the samples. The technical team would tell Diego Borja what they needed, such as coolers, containers, plastic bags and the like. Diego Borja would make sure that those items were available to them before they left the Lago Agrio military base to go to the field.

9. It was not part of Diego Borja's job to go into the field where the samples were taken. I never saw him do that, I never became aware that he had done it, and no one ever reported to me that he had gone into the field.

10. For the sample management component of his job, I trained Diego Borja directly and carefully. Diego Borja was trained to follow a Standard Operating Procedure that I have frequently used for sample management, a true and correct copy of which is attached hereto as Exhibit 1. I carefully oversaw Diego Borja's work to ensure that he was complying with the SOP.

11. STL laboratories in the U.S. comply with specific regulatory requirements about the time that can elapse between when a sample it taken and when they receive it for testing. They also comply with requirements about the temperature range in which the sample must be maintained prior to their receipt. They also comply with requirements about the documentation, including the chain-of-custody record that must be maintained with the sample. I am personally familiar will these requirements and taught them to Diego Borja so that he would follow them.

12. The STL laboratories in the U.S. completed forms called "sample receipt forms." If there were problems with the samples they received relating to the Lago Agrio litigation, they reported those problems to me. I do not recall any problems with Diego Borja's sample management work. In fact, I was pleased because his performance and compliance with the requirements for sample management were better than average and exceeded my expectations.

13. Based on my experience in sample management, the close oversight I provided to Diego Borja, and the amount of quality control that I know the STL laboratories in the U.S. perform when receiving samples, Diego Borja would not have been able to tamper with the

sample without the tampering being detected.  Diego Borja did not have the scientific training to know how to tamper with the samples and, even if done by someone scientifically trained, the tampering likely would have been detected.

14.  I was never involved in sample tampering, including sample switching designed to mislead to the Lago Agrio court about the level of contamination.  I am not aware of anyone who engaged in such sample tampering.

I declare under the penalty of perjury under the laws of the United States, Florida and Ecuador that the foregoing is true and correct.  Executed this 30th day of July 2010 in Hollywood, Florida.

_____

Marino Fernandez

7-30-2010

SIGNED BEFORE ME THIS 30TH DAY OF JULY, 2010
BY MARINO FERNANDEZ.

NORINE D'AURIA
MY COMMISSION # DD 790130
EXPIRES: June 27, 2012
Bonded Thru Budget Notary Services

-3-

# EXHIBIT 1234

I, Louis Manzano, declare that the following is true and correct:

I am over the age of 18 and competent to testify. I have personal knowledge of all of the matters set forth in this declaration and if called upon, could testify truthfully to each of them.

1.      I work for TestAmerica Inc., formerly known as Severn Trent Laboratories ("STL"). I have BS in chemistry from Governors State University. I have been employed at this facility since 1989. I have experience in Metals Digestion, GFAA Metals analysis, GC VOA (FID/PID/ELCD), GC MS (Mass Spectroscopy), GC SemiVoa (ECD) and as a Project Manager.

2.      In 2005, I was assigned to work at an STL laboratory located on a military base in Lago Agrio. I was the Technical Director, working on the analytical bench. My duties included: supervising lab personnel, writing and reviewing Q.A. SOP's for the facility, training the employees on methods and procedures, ensuring proper SOP implementation, performing sample analysis and final data review, and maintaining/troubleshooting laboratory instruments.

3.      The STL laboratory in Lago Agrio was responsible for the analyzing and processing of samples that were taken as part of the judicial inspection process in *Aguinda v. Chevron Corporation*. Some tests had to be performed on the samples within a very short time after the samples were taken, such as the test for fecal coliform. Those tests were performed at the STL laboratory in Lago Agrio. For other testing, that was not subject to such tight time constraints, the samples were sent from the STL laboratory in Lago Agrio to STL laboratories in the U.S. for further testing.

4.      In connection with this work, I knew who Diego Borja was because I was aware that he was responsible for arranging transportation of the samples to the STL laboratories in the U.S. I did not work directly with Diego Borja.

5.      At no time was I aware of Diego Borja going to the field to participate in sample collection. I never learned directly or indirectly that he had done so. As I understood it, that was not part of Diego Borja's job.

6.      The STL laboratories in the U.S. adhere to specific requirements about the time that can elapse between when a sample is taken and when they receive it for testing. They also

adhere to requirements about the temperature range in which the samples must be maintained prior to the laboratory's receipt of the samples.  They also adhere to requirements about the documentation, including the chain-of-custody record, that must be maintained with each sample.  I am personally familiar will all of these requirements.

7.      The STL laboratories in the U.S. completed forms called "sample receipt forms." If there were problems with the samples they received relating to the Lago Agrio litigation, they reported those problems back to people in the STL laboratory in Lago Agrio and I would have learned of them.  I do not recall learning directly or indirectly of any significant problems with Diego Borja's sample management work.

8.      I was never involved in sample tampering, including sample switching designed to mislead to the Lago Agrio court about the level of contamination.  I am not aware of anyone who engaged in such sample tampering.

I declare under the penalty of perjury under the laws of the United States, Illinois and Ecuador that the foregoing is true and correct.  Executed this _11_ day of August 2010 in University Park, Illinois.


_____
Louis Manzano

SFI-646742v1

# EXHIBIT 1235

I, Bosco Ramirez, declare that the following is true and correct:

  1.  I am over the age of 18 and competent to testify.  I have personal knowledge of all of the matters set forth in this declaration and if called up, could testify truthfully to each of them.

  2.  I am Corporate Operations Director for TestAmerica Inc., formally known as Severn Trent Laboratories ("STL").

  3.  I hold a Master of Science Degree in Analytical Chemistry from Governor's State University in Illinois and a Bachelors of Science Degree in Chemistry from San Jose State University in California.

  4.  In 2004, STL obtained the contract to set up and provide support for a laboratory in Ecuador that was to analyze and process samples taken as part of the judicial inspection process in *Aguinda v. Chevron Corporation*, a case pending in Lago Agrio, Ecuador.  Most of the testing of the samples was to be conducted at STL laboratories in the U.S., but the Ecuador laboratory did certain types of testing that had to be conducted within tight time parameters after the samples were taken.  It was not logistically possible for these tests to be performed in the U.S..

  5.  I was the Laboratory Director for the STL laboratory in Ecuador beginning in April 2005.  As the Laboratory Director, I worked in the lab on a rotational basis for two weeks at a time.  My primary focus was quality assurance and making sure the lab was set up and operating consistent with U.S. standards.

  6.  Diego Borja was an independent contractor hired by STL in Ecuador.  His direct supervisor was Marino Fernandez of International Analytical Group, Inc. ("IAG").

  7.  Diego Borja's principal responsibilities were: (1) to arrange for transport of the samples to STL laboratories in the U.S., accompanied by the required paperwork, including chain of custody documentation; and (2) to ensure that the technical team had the necessary collection containers and related supplies to collect samples in the field.

8.      Diego Borja did not have any job responsibilities that called on him to go into the field and participate in sample collection in any way.  I never saw him do that, I never became aware that he had done it, and no one ever reported to me that he had gone into the field.

9.      Diego Borja's role was referred to as "sample management."  Marino Fernandez trained Diego Borja to perform this job consistent with IAG's standard operating procedure ("SOP"), a true and correct copy of which is attached as Exhibit 1.  Based on my experience, this SOP is consistent with industry practice in the U.S.

10.      The STL laboratory in Ecuador generated records for each sample that it received.  The records include details about the sample, including chain of custody information.  When Diego Borja took custody of a sample for purposes of shipping it to an STL laboratory in the U.S., it was his job to add that information to the chain of custody to ensure that the correct instructions and paper work accompanied the samples when shipped.  The records that were generated by STL traced chain of custody information when any action was taken relating to a sample.

11.      The STL laboratories in the U.S. have a detailed Sample Receipt procedure.  They complete "sample receipt forms."  As part of this process, they identify whether there has been any perceived problem in the handling of the sample, such as failing to pack it properly or to maintain it at the right temperature.  If there were problems with the samples arriving from the STL Ecuador laboratory, they would have reported to the Sample Management group.  No serious problems were ever reported to me and I believe the sample management protocol worked well.

12.      I was never involved in sample tampering, including sample switching designed to mislead the Ecuador court about the level of contamination.  I am not aware of anyone who engaged in such sample tampering, including Diego Borja.

I declare under penalty of perjury under the laws of the United States, California and Ecuador that the foregoing is true and correct.  Executed this 27th day of July 2010 in Atwater, California.

Bosco M. Ramirez

-3-

# EXHIBIT 1236

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF NEW YORK

3    ----------------------------x

4    CHEVRON CORPORATION,           )

5                    Plaintiff,     )

6        v.                         )

7    MARIA AGUINDA SALAZAR,         )

8    et al.,                        )   Case No.

9                    Defendants.    )   11-CV-3718 (LAK)

10       and                        )

11   STEVEN DONZIGER, et al.,       )

12                    Intervenors.  )

13   ----------------------------x

14

15      Videotaped Deposition of CHEVRON CORPORATION,

16         By and through its Corporate Designee,

17                  BLAKE W. LARKIN

18                  Washington, DC

19            Wednesday, September 14, 2011

20                    9:04 a.m.

21

22   Reported by: Leslie Anne Todd

Page 2

1        Videotaped deposition of BLAKE W. LARKIN, held

2    at the offices of:

3

4

5              Gibson, Dunn & Crutcher, LLP

6              1050 Connecticut Avenue, NW

7              Suite 200

8              Washington, DC 20036

9              (202) 955-8500

10

11

12

13

14        Pursuant to Notice, before Leslie Anne Todd,

15    Court Reporter and Notary Public in and for the

16    District of Columbia, who officiated in administering

17    the oath to the witness.

18

19

20

21

22

```
 1            A P P E A R A N C E S

 2       ON BEHALF OF PLAINTIFF:

 3            ROBERT C. BLUME, ESQUIRE

 4            SAMANTHA PJESKY, ESQUIRE

 5            Gibson, Dunn & Crutcher, LLP

 6            1801 California Street

 7            Suite 4200

 8            Denver, Colorado 80202

 9            (303) 298-5700

10

11       ON BEHALF OF DEFENDANTS JAVIER PIAGUAJE PAYAGUAJE

12       and HUGO GERARDO CAMACHO NARANJO:

13            LARRY R. VESELKA, ESQUIRE

14            Smyser Kaplan & Veselka, LLP

15            700 Louisiana

16            Suite 2300

17            Houston, Texas 77002

18            (713) 221-2300

19       ALSO PRESENT:

20            WILLIAM ENGIBOUS

21            DAVID MOYER, ESQUIRE

22            DANA CAMPBELL, Videographer
```

1      believed it's incalculable as to what would be the

2      impact of any disruption, and my question following

3      up on that is, because you believe it's incalculable,

4      you've not tried to calculate it, correct?

5           A    That is correct.  Because every

6      disruption would have a different impact.

7           Q    The next component I believe you

8      mentioned in your testimony was the ability to

9      capture new business.

10          A    Right.

11          Q    Can you explain what -- how you -- more

12     about what --

13          A    Sure.

14          Q    -- that impact would be.

15          A    Sure.  For example, I think of goodwill

16     in terms of existing businesses.  We supply -- and my

17     colleague Bill will talk much more about this -- but

18     we supply United Airlines, for example, with jet

19     fuel.  We're an extremely reliable, safe,

20     environmentally responsible supplier.  We've got a

21     great relationship with them.  Can we build from that

22     relationship with United to capture business with,

1    say, Southwest or Delta, if we don't already have it?

2    That's the sort of impact on potential new business.

3         Q    And, again, there's been no -- you don't

4    know of an attempt to identify particular new

5    business that would be at risk?

6              MR. BLUME:  Objection to form.

7    BY MR. VESELKA:

8         Q    A particular target customer.

9         A    I mean it would just be -- to me it would

10   just be a meaningless exercise.

11        Q    And with regard to organizational

12   capability, I think was the next component you

13   testified about.

14        A    Right.  Right.  What is the value --

15   what's the question?  I'm sorry.

16        Q    You testified that Chevron believes that

17   there would be irreparable harm if there were not a

18   permanent injunction issued because of the impact on

19   its organizational capability.

20        A    Right.

21        Q    And I understand the words, but I want to

22   understand what -- what component -- what are you

                                                    Page 120

1    are you intending to prepare any type of specific

2    kind of report for your testimony at trial?

3              MR. BLUME:  Objection to the extent the

4    answer would reveal conversations you may have had

5    about that topic with counsel.

6              THE WITNESS:  No.

7              MR. BLUME:  And if so, I'd instruct you

8    not to answer.

9              THE WITNESS:  No.

10   BY MR. VESELKA:

11        Q    Any aspect of Chevron's belief that it

12   would suffer irreparable harm if a permanent

13   injunction is not entered with regard to the shipping

14   company operations that you haven't described for us

15   today that you know of?

16        A    I didn't address, directly at least,

17   operation on joint ventures.  That would be an

18   additional one.

19        Q    And give examples of what kind of joint

20   ventures you are talking about.

21        A    Sure.  So we have, for example, a -- two

22   vessels in eastern Canada that we do not operate but

Page 121

1    we have an ownership share in.  And I don't know the

2    percentages, but some with Exxon, some with Shell, I

3    think.  And if a joint venture vessel was seized

4    through some sort of legal process, saying Chevron

5    owns a third of this ship, we'll -- we'll attach to

6    get an enforcement to that extent -- we don't know

7    where this will happen, you know, in the world --

8    that would have a severe impact on that joint

9    venture, and, of course, on Chevron's reputation as

10   to somebody you want to do business with.  No joint

11   venture partner will thank us for putting them in

12   that sort of peril.

13       Q    That would not be playing nice with the

14   other big guys.

15       A    And even with -- not even with other oil

16   majors but, you know, other people we do business

17   with.

18       Q    All right.  Anything else -- thank you

19   for clarifying that -- that you remember now?

20       A    No.  I think that's it.

21           MR. VESELKA:  All right.

22           Subject to and reserving the right to

Page 24

1    BY MR. VESELKA:

2         Q    I mean, for example, your team -- your

3    legal team wouldn't be reviewing the contracts for

4    that delivery?

5         A    No.

6         Q    As an experienced barrister and an

7    American legal practitioner, you're familiar with the

8    role you have here today being designated as a

9    30(b)(6) corporate representative of Chevron

10   Corporation?

11        A    Yes.

12             MR. BLUME:  Objection to form.

13   BY MR. VESELKA:

14        Q    What do you understand is your area of

15   designation -- substantive area of designation?

16        A    I'll be talking about the category -- the

17   first category in the deposition notice, shipping

18   aspects.

19        Q    And when did you first learn you would be

20   designated as a corporate representative?

21        A    I'd say that was about three weeks ago.

22   Maybe a little longer.

1          Q     Have you served in this capacity before?

2          A     No.

3          Q     Have you served in this capacity for

4     anyone other than Chevron before?

5          A     No.

6          Q     Who selected you?

7               MR. BLUME:  Objection to form.

8               If you know.

9               THE WITNESS:  No, I don't know.

10    BY MR. VESELKA:

11         Q     This isn't --

12         A     I don't know who to thank.

13         Q     This isn't a favor you owe to Mr. Moyer

14    here?

15         A     I don't know who made that decision to

16    invite me.

17         Q     Well, who did you learn about it from?

18         A     David Moyer.

19         Q     Since learning of your selection, what

20    have you done to prepare for your testimony today?

21         A     Well, let me see.  I read the deposition

22    notice.  Of course, I discussed it -- discussed the

Page 26

```
1      areas to be covered.
2              Q      With whom?
3              A      With counsel.
4              Q      Who?
5              A      David Moyer.
6                     I reviewed a number of pleadings and
7      opinions which were sent to me to give me background.
8                     And then in terms of actually learning
9      information within the shipping company, I -- I sit
10     on the shipping company's leadership team, which is a
11     small team that manages the company, so I see from a
12     management perspective, you know, our operations very
13     broadly.
14                    I also sit on the company's professional
15     development committee, so I see what roles people
16     play, what their skill sets are and so on, as part of
17     my day-to-day work.
18                    And I sit on some other management
19     committees, like operational audit committees and
20     operational excellence committees, so I have that --
21     that sort of broader knowledge of where we do
22     business and how we do business and so on.
```

Page 27

```
 1              I augmented that with discussions with
 2      several people who I thought could give me some
 3      helpful information.
 4          Q    Who were they?
 5          A    The first was Tom Olinger, O-L-I-N-G-E-R.
 6      He is the general manager of our -- of our commercial
 7      fleet.
 8              I spoke with Paul Rathkamp,
 9      R-A-T-H-K-A-M-P, who was our former manager of our
10      Houston office and has a good background in vessel
11      operations and chartering and so on.
12              I spoke with Tim Coombes, C-O-O-M-B-E-S,
13      who is our marine assurance manager, and who also has
14      a -- he's sort of a jack-of-all-trades within
15      shipping, he's done everything, so he had a very good
16      perspective of the operations.
17              I spoke to Ian Baird, B-A-I-R-D, who is a
18      fleet manning -- manager, I probably don't have that
19      title exactly right, but he's an HR person.
20          Q    HR?
21          A    HR.
22              I think that's it.
```

1          Q    Okay.  With Mr. Baird, tell me what you

2     asked him and what he -- what he told you.

3          A    I want -- I wanted some input on

4     staffing, how we staff our vessels, to give some

5     thought to the impact on the organizational

6     capability of losing a vessel.  And so I asked him

7     about that, and -- I mean I can summarize what he

8     told me if you'd like.

9          Q    Please.

10         A    I was particularly interested in

11    organizational capability because we're a very old

12    company, been around since 1980 -- 1895, but even,

13    you know, looking back more realistically over, say,

14    20 years we've developed some very sophisticated

15    organizational capabilities to do the various

16    shipping operations.

17             So I was concerned with if we lost an

18    asset, we would lose the people.  And if we lost the

19    people, how readily we would be able to replace those

20    people.  And that would be affected by how long

21    they've been with us, and how good they are at what

22    they do, and how well they fit into our general

Page 29

1   management.

2             And he told me -- he reaffirmed -- some

3   of the information was new, but essentially

4   reaffirmed that Chevron is an employer of choice for

5   mariners.  That we have an exceptionally strong

6   retention for ratings.  We have some ratings that

7   have been around for 40 years.  We have a very

8   good -- not as good but a very, very good retention

9   for officers.  I think it's something in the order of

10  3 to 5 percent attrition.

11            So, in short, Chevron mariners join the

12  company and tend to stay with the company for a very

13  long time and develop their skill sets and advance

14  within the organization, and that, of course, is

15  different from most shipping companies.  Mariners

16  tend to move around.  A ship is a ship to many

17  mariners.  But working with Chevron, they -- we

18  actually run our fleet in a quite different way than

19  a typical shipowner.

20      Q    You started this off by saying you were

21  concerned that if you lost a -- lost a vessel, that

22  you would lose the crew.  If a vessel is arrested or

Page 30

1    if it's executed upon in the -- in the legal terms of

2    execution of a judgment, it's not like it

3    vaporizes -- the crew is not going to vaporize with

4    them.

5              Why would you be concerned about how you

6    would lose the crew?

7              MR. BLUME:  And I will object to the

8    extent that the reasons -- to the extent that reasons

9    why you made inquiry or pursued certain facts came as

10   a result of conversations with counsel, I simply

11   instruct you not to reveal those conversations.  To

12   the extent they came from other reasons, then you can

13   answer over an objection to form.

14             MR. VESELKA:  Well, Rob, just to be clear

15   here -- Mr. Blume, excuse me -- he's been designated

16   as a 30(b)(6) witness here today, but based upon

17   representations made to us that he's going to be one

18   of your witnesses at trial, and as the designation

19   for him to answer on behalf of the corporation of --

20   of these issues, the facts learned or issues

21   addressed for purposes of his testimony as a

22   corporate representative, I don't think -- obviously,

Page 31

1   litigation strategy, anything dealing with

2   litigation, there is still a privilege with regard to

3   advising him as a witness that we would agree with.

4   But I'm just raising the issue that I think we're

5   entitled, if you are positing him as a corporate

6   representative, to learn the facts on which he is

7   basing his testimony.

8           MR. BLUME:  My -- my --

9           MR. VESELKA:  And I don't know that

10  that differs at all --

11          MR. BLUME:  My objection simply is the

12  question --

13          MR. VESELKA:  -- with what your

14  instructions are.

15          MR. BLUME:  Right.

16          My objection was not to the facts.  He is

17  free to talk about the facts.  My objection was a

18  question about why he made certain choices or pursued

19  certain lines.  To the extent that the reasons --

20          MR. VESELKA:  Okay.

21          MR. BLUME:  -- why he went about

22  collecting facts are a result of conversation with

Page 32

1      counsel, I simply instruct you not to reveal the

2      conversations with counsel.  You can discuss the

3      facts that you learned from these witnesses,

4      conversations you had -- not these witnesses, excuse

5      me -- facts that you learned from these people within

6      the organization or conversations you had with

7      people, but the -- the -- any reasons why you pursued

8      it that may come as a result of conversations or may

9      come as a result of a specific work product with

10     regard to litigation, I would instruct you not to go

11     into.

12            THE WITNESS:  Okay.  I think I -- I think

13     I've got your question down, which is why was I

14     worried about personnel --

15     BY MR. VESELKA:

16        Q    Right.

17        A    -- in relation to an execution against a

18     vessel and arrest of a vessel.

19            Well, because if Chevron lost the vessel,

20     they would have no work for the mariners, and it

21     wouldn't be able to keep the mariners on without any

22     ship to keep them employed, and we would lose them.

Page 33

1          Q    Well, ships can be replaced.  You're

2     talking about immediately, right?

3               MR. BLUME:  Objection.  Form.

4               THE WITNESS:  Well, no.  I think -- that

5     would -- that's not the way a sophisticated shipping

6     company operating within a global supply chain would

7     work.  A particular ship is there for a particular

8     need, constructed in a particular way, outfitted with

9     particular equipment, manned in a particular way for

10    a very specific trade.  And they are not fungible.  I

11    can't -- it's not like you sell your Toyota and buy

12    another Toyota.  We -- we couldn't replace -- we

13    certainly could not readily replace a -- a ship.  And

14    if we lost a ship, we would -- I'm not -- we would

15    have to review what work we had available for the

16    mariners.  They are to be assigned to a ship.  If we

17    lost a ship, we could not sustain those mariners, and

18    we could not sustain the shoreside -- the same level

19    of shoreside support for those ships.

20               So in addition to the people that work on

21    the ships, you've got all the shoreside support and

22    marine engineers, naval architects, project managers,

1    accountants, finance people, lawyers, payroll, all

2    those other support functions.

3    BY MR. VESELKA:

4        Q    But -- I apologize.  If I ever cut you

5    off, let me know so that you can complete your

6    answer.  I will let you complete it.  I may object

7    afterwards but I will let you complete it.

8                The -- but in the realm of what we're

9    talking about here, an arrest or an execution,

10   Chevron never has to actually lose the ship, does it?

11               MR. BLUME:  Objection.  Calls for a legal

12   conclusion.  Objection to form.

13               If you know.

14               THE WITNESS:  It -- I disagree.  You are

15   not -- if you are talking about an arrest under

16   supplemental admiralty rules -- is that what you're

17   talking about when you say "arrest"?

18   BY MR. VESELKA:

19       Q    Can't you normally post a bond --

20       A    That's a pre --

21       Q    -- and get the vehicle back -- the vessel

22   back?  Excuse me.

1           Q    Well, to the extent that you bring up a

2     topic and say, I discussed this topic with him, but I

3     also discussed it with him, and out of all of them I

4     got that --

5           A    Right.

6           Q    -- if that makes it easier to do, and so

7     you are not having to remember which part --

8           A    Right.

9           Q    -- you got from which one, feel free to

10     do that.

11           But I'm going to need to make sure I work

12     through all of them to ask, though -- if you cover a

13     topic now with regard to Mr. Coombes and say with all

14     other people, we won't have to repeat it on those

15     others.

16           A    Okay.  So I will try and -- try and

17     extract what particularly Mr. Coombes spoke about.

18           Q    All right.

19           A    He's a safety person.  The role, as I

20     mentioned, of Chevron Shipping within the

21     organization is to manage Chevron's marine risk, and

22     to do that, we carry their cargos.  So his safety

Page 50

1      organization is very distinct from the commercial

2      teams.  Now, they're actually sort of a firewall

3      between them so that in terms of safety, they are not

4      influenced by the commercial teams.

5                His -- one of his concerns was that if

6      you -- if you imperil the ability of our ships to --

7      to get access to suppliers, if it's -- if it's

8      executed on or even if it has to route around a

9      jurisdiction of execution where execution is

10     possible, then you will create some significant

11     safety risks.

12               For example, a vessel could very quickly

13     get out of class.  If she's out of class, of course

14     she can't trade.  If she's out of class, she will be

15     detained by -- under port state authority controls.

16     If she's out of class, she won't be able to trade

17     according to her flag state.  If repairs are not

18     available, then -- then that will have a potential

19     impact on safety.  He was very concerned with the

20     safety aspects.

21               He also was concerned with the human

22     factors that arise when morale is affected by, for

Page 51

1    example, something like having ships seized by a

2    creditor.  Because it's very important for our

3    mariners to really keep their eye on the ball and

4    really be totally focused on safety.  We are

5    probably, probably the world's safest shipping

6    company, but if we're not, we're certainly up in the

7    very top tier.

8              So if you have a mariner take his eye off

9    that and start thinking about, Should I look for

10   another job?  Is Chevron going to keep me on?  Am I

11   going to be able to pay college tuition for my

12   daughter?  Those things are a real distraction.

13        Q    Explain how if you have to avoid sailing

14   through the particular waters or stopping at a port

15   of call because of concern over the risk of execution

16   of one country leads to the kind of concerns you had

17   about losing your --

18        A    No.

19        Q    -- certification.

20        A    Sorry.  Those are two different -- two

21   different things he told me.

22        Q    Okay.  All right.

```
                                              Page 52

 1        A    But if I understand the question,

 2   obviously, if you can't call the port of call to have

 3   typical repair work done -- so I'll give you an

 4   example.

 5        Q    Please.

 6        A    So let's say we are steaming with the

 7   VLCC from the Arab Gulf where we bring oil through

 8   Asia, through the Malacca Strait, around Malaysia,

 9   past Singapore and on to the U.S. West Coast; assume

10   we have a relatively minor maintenance issue, say a

11   third redundant radar system or a second redundant

12   radio is out of operation, we would want to fix that.

13   They are there for a reason.

14        Q    Right.

15        A    We might call at Singapore, come in and

16   have a radio tech come on board and lose a day

17   steaming, but Singapore -- we could get into

18   Singapore safely, make sure that the vessel was fully

19   operational in all respects and get on with the

20   voyage.

21             If we couldn't call up Singapore, we

22   couldn't proceed with that -- with that -- with that
```

Page 53

1    repair.  Without that repair, obviously we're

2    operating in a suboptimal safety environment.  If

3    it's a more significant repair, say mode of engine

4    issue or a steering issue or something, we would be

5    in a position of saying, well, we've got a real

6    safety issue as to how we -- how we address this.

7    The damage is just -- I mean the risk to the vessel

8    is just incalculable how we -- how we would square

9    that -- you know, square that circle.

10              So he was concerned with the -- the

11   operation of our fleet depends on ready access to all

12   the marine superintendents, the repair

13   superintendents, the project managers, shipyards, the

14   whole ecosystem that supports the vessel.  If you

15   take some of that system away, you will affect the

16   ability of the vessel to trade and particularly

17   affect the ability of the vessel to trade safely.

18        Q    There were -- if you couldn't -- decided

19   that the risk of execution, hypothetically, were too

20   great for stopping at Singapore, there are other

21   ports of call where you could stop and get repair

22   work done.

1        A      Not necessarily.  This is a V we're

2     talking about.  These are big, big ships.  There's

3     not many places they can go in, and we would not --

4     we do not go into ports for the sake of going into

5     ports.

6        Q      Right.

7        A      I mean we have to have a good reason, and

8     we'd have to have a very careful safety analysis

9     done.  What are the tug services like?  What are

10    the -- what are the pilots like?  What's the security

11    situation?  Risk of piracy through the Malacca

12    Straits?  Risk of terrorism.

13               We would have to do an awful lot, and you

14    may find -- for example, Singapore was a good example

15    for me to choose, I suppose -- there's no repair

16    techs in Kuala Lumpur for that particular piece of

17    equipment, or there's no yard that can take a ship

18    that deep.  These are, you know, very, very large

19    ships.

20               So, no, it wouldn't be as easy as that.

21               We have established commercial

22    relationships with the yards and with the suppliers

```
                                              Page 55
```

 1     at these major ports of call.  Cut that off, cut off

 2     access to those suppliers, and you're going to affect

 3     vessel operations.

 4          Q     How many VLCCs do you have?

 5          A     I think there are about 15 out of our 20

 6     foreign flag vessels.

 7          Q     For purposes of the record, that is very

 8     large crude carriers?

 9          A     Yes.

10          Q     Just as an aside, we mentioned earlier --

11     early on the idea of LNG.  How many LNG vessels do

12     y'all have?

13          A     We have one that we operate.  That's it.

14               MR. BLUME:  When you get to a convenient

15     spot, we've been going about an hour.

16               MR. VESELKA:  Okay.  We can break, that's

17     fine.

18               THE VIDEOGRAPHER:  Going off record at

19     10:05:23.

20               (Recess.)

21               THE VIDEOGRAPHER:  We're back on record

22     at 10:24:52.

Page 56

```
 1    BY MR. VESELKA:
 2         Q    Anything else in particular you remember
 3    Mr. Coombes raising from his safety concerns or
 4    otherwise?
 5         A    I touched upon the class.
 6         Q    Right.
 7         A    He -- he -- the issue with port state
 8    control and flag state control, being on the marine
 9    assurance side, of course he sees that every day.  He
10    was very concerned about the disruptions to the
11    regulatory controls for port state and flag state
12    which would result from any disruption to
13    relationships with suppliers.  He touched upon
14    complications to in-charters, disruptions to
15    in-charters and disruptions to out-charters.
16         Q    And what did he say would be the concern
17    with regard to disruptions as to in-charters?
18    In-charters meaning where Chevron Shipping is
19    chartering someone else's vessel to use.
20         A    Right.
21              So -- well, the disruption to an
22    in-charter would be that if Chevron cargos were being
```

Page 57

1    seized, that that would have a disruptive impact on

2    the vessel operation, and that we would lose our

3    reputation as a -- as a safe, reliable, dependable

4    lifter.

5            You know, cargos are sold to us, let's

6    say -- for example, in Saudi Arabia, you get a very

7    narrow lifting window, typically about one day.  If

8    say a cargo is loaded and the vessel is then subject

9    to some sort of legal process, the person we charter

10   the vessel from is not going to be very happy with us

11   because they are planning on lifting, carrying,

12   delivering and getting on with the next contracted

13   lifting for somebody else.  So he was concerned about

14   our reputation in the market as being somebody you

15   could reliably charter to.

16       Q    And you mentioned disruption as to

17   out-charters.

18       A    Right.

19       Q    What do you mean by "out-charters"?

20       A    So we have, as I said, about 23 tankers,

21   and when we do not have system cargos to carry for

22   them or where they are not in the right position to

1        Q     Mr. Olinger, Tom Olinger, what did you

2     learn from him as part of your preparation for this

3     testimony today?

4        A     Well, he is the seniormost commercial

5     person within the shipping organization, and there

6     are really two things that I think stood out from

7     Tom's assessment.  One was the impact on enterprise

8     value.  And the second was more specifically the

9     impact on the Jones Act fleet and our organizational

10    capability there.

11       Q     Okay.  What was his concern about the

12    impact on enterprise value?

13       A     Well, the concern is that shipping within

14    the broader enterprise does not exist for the sake of

15    being a shipping company.  We're not in the shipping

16    business to make money out of operating ships.

17    Independent shipowners are in that business.  That's

18    what they do.

19             We're in the business to manage Chevron's

20    marine risks.  So the value to the enterprise is not

21    what income the shipping companies earn or what

22    losses they incur.  It's are we able to keep Chevron

Page 85

1    safe.  So safe environmentally, safe in terms of

2    people, and the -- so the role in -- and really the

3    existence of a shipping company is dependent on us

4    being exceptionally good at that.

5               The value that we add to the enterprise

6    in managing enterprise marine risk is incalculable.

7    For example, it is because we operate a fleet -- we

8    have master mariners and engineers and sailors and

9    all sorts of support teams -- that we can be good at

10   managing marine risks like tugs and pilots and

11   terminals all around the world, even where we don't

12   necessarily operate ships.  So shipping's nautical

13   maritime expertise is applied across the corporation.

14               Where, for example, we are going to be

15   having some production in a country that's going to

16   be shipped -- that's going to be carried by ships, we

17   don't start the process by arriving with a ship and

18   saying, We are ready to lift.  We start the process

19   with, What is your terminal going to look like?  What

20   are the security regulations around the terminal

21   going to look like?  What is the quality of the tugs

22   available?  What is the competency of the pilots

Page 86

1    available?  And on and on.  All that maritime

2    expertise is applied across the enterprise.

3              And I think the sort of example is, what

4    is -- what is the value of managing marine risks to

5    an outfit like BP after Macondo.  If they had got

6    that right, it would be very different.

7              So -- so the value with the shipping

8    organization within Chevron is not just that.  What's

9    the value of managing marine risks to Exxon, you

10   know, 20 years ago?

11             So he was very focused on the enterprise

12   value, and that disruptions to something like PAL or

13   something like the Jones Act fleet or something like

14   our lightering vessels or a particular class of

15   vessels, like MRs that we operate, product tankers

16   that we operate on the -- that impact on that

17   organizational capability will have knock-on impacts

18   across the organization, across the enterprise, and

19   those can't be -- there are just untold potential

20   impacts across the organization.

21        Q    And what was the particular concern he

22   had on the Jones Act?

Page 87

1    A    The Jones Act he was particularly

2    concerned with because it's a special sort of fleet

3    in a special industry, as you may have seen being in

4    Houston.

5            Jones Act are U.S.-flagged, U.S.-owned,

6    and U.S.-crewed, C-R-E-W-E-D, and there's not a lot

7    of depth in the market, there's not many available,

8    and as you know, there is a -- there is a coastwise

9    trade monopoly for U.S. flag vessel they are thin on

10   the ground, in short.

11           So that if we lost -- and we only operate

12   four.  If we lost one or two or -- or more of those

13   vessels, we would lose the ability to operate as a

14   shipping company that runs an American fleet.

15   There's differences on the way you run the American

16   fleet.  There is Coast Guard regulations on the port

17   state; flag state is also Coast Guard.  And there are

18   different operations that these ships do.

19           Particularly sensitive is the feed to our

20   El Segundo refinery -- I'm sorry -- the movement of

21   blending and feedstocks between our refineries, which

22   are regularly being balanced and rebalanced.  So if

1    El Segundo has too much of a particular feedstock or

2    blend stock, it will ship it up to Richmond, and vice

3    versa.

4              So these -- these Jones Act vessels are

5    used to carry product back and forth, up and down the

6    California coast, and --

7         Q    All four of them?

8         A    No.  Actually -- and to Hawaii just while

9    I think of it.

10             No, it's two or three typically on the

11   West Coast.  Of course, they are deployed where

12   customer demand is there.  We have one regularly

13   operating in the gulf -- U.S. gulf.

14        Q    And what's it -- going from where to

15   where, what is it doing?

16        A    It runs from -- I believe from our

17   refinery in Pascagoula into the South Florida market.

18        Q    So it is delivering the refined product?

19        A    Roger.

20        Q    Anything else from Mr. Olinger?

21        A    Yes.  He was -- as a part of that U.S.

22   fleet, he was concerned with disruptions to the

Page 89

1    Pacific Northwest.  We ship about every five days

2    refined product, mogas, gasoline, and so on, from

3    California up to the Pacific Northwest, about 300,000

4    barrels every five days or so.

5            If you take those Jones Act ships and

6    disrupt that, those deliveries to the Pacific

7    Northwest are going to impact our operations there,

8    our reputation there, the goodwill we've developed

9    with the communities there, and, of course, there

10   will be significant potential downstream impacts

11   right up to customers in the gas station and gas

12   lines and price spikes and so on.  It's a pretty

13   significant portion of the market that we service

14   there.

15           He was --

16       Q    He doesn't believe your competitors have

17   the capability of replacing that?

18       A    No.

19           And just similar sort of concerns in

20   Hawaii.  Even more so in Hawaii, because we have

21   about half of the islands' capacity.  And if shipping

22   is disrupted and you can't get crude into our

Page 90

1        Hawaiian refinery, the lights will go out in Hawaii.

2        We are literally responsible for fueling a lot of the

3        power grid.

4                    And, you know, of course, aircraft, not

5        just in Hawaii, on the West Coast, aircraft, trains

6        and so on.  So he was concerned with the impacts on

7        our customers -- and I don't mean retail customers, I

8        mean more broadly -- and the impacts that will have

9        on our reputation in the industry.

10           Q    And back to your discussion with

11       Mr. Moyer, any facts you learned in those discussions

12       to preparing your testimony?

13                    MR. BLUME:  To the extent Mr. Moyer

14       provided you with facts that are -- that would assist

15       you in your testimony as a 30(b)(6) representative

16       for topic No. 1, you certainly may reveal those

17       facts.  To the extent your discussions with Mr. Moyer

18       involved other discussions, I would instruct you not

19       to answer.

20                    THE WITNESS:  Mr. Moyer doesn't know much

21       about shipping.  And so I can't think of any facts he

22       gave me relevant to what we've been talking about.

Page 125

1      CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

2          I, Leslie Anne Todd, the officer before whom the

3   foregoing deposition was taken, do hereby certify

4   that the foregoing transcript is a true and correct

5   record of the testimony given; that said testimony

6   was taken by me stenographically and thereafter

7   reduced to typewriting under my direction; and that I

8   am neither counsel for, related to, nor employed by

9   any of the parties to this case and have no interest,

10  financial or otherwise, in its outcome.

11          IN WITNESS WHEREOF, I have hereunto set my

12  hand and affixed my notarial seal this 15th day of

13  September 2011.

14

15  My commission expires November 14, 2013.

16

17

18

19

20  _____

21  NOTARY PUBLIC IN AND FOR

22  THE DISTRICT OF COLUMBIA

# EXHIBIT 1237

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2             SOUTHERN DISTRICT OF NEW YORK

3    ----------------------------x

4    CHEVRON CORPORATION,          )

5                   Plaintiff,     )

6        v.                        )

7    MARIA AGUINDA SALAZAR,        )

8    et al.,                       )  Case No.

9                   Defendants.    )  11-CV-3718 (LAK)

10       and                       )

11   STEVEN DONZIGER, et al.,      )

12                   Intervenors.  )

13   ----------------------------x

14

15      Videotaped Deposition of CHEVRON CORPORATION,

16         By and through its Corporate Designee,

17               WILLIAM R. ENGIBOUS

18                  Washington, DC

19            Wednesday, September 14, 2011

20                    1:05 p.m.

21

22   Reported by: Leslie Anne Todd

Page 2

1          Videotaped deposition of WILLIAM R. ENGIBOUS,

2     held at the offices of:

3

4

5               Gibson, Dunn & Crutcher, LLP

6               1050 Connecticut Avenue, NW

7               Suite 200

8               Washington, DC 20036

9               (202) 955-8500

10

11

12

13

14          Pursuant to Notice, before Leslie Anne Todd,

15     Court Reporter and Notary Public in and for the

16     District of Columbia, who officiated in administering

17     the oath to the witness.

18

19

20

21

22

Page 3

1                    A P P E A R A N C E S

2          ON BEHALF OF PLAINTIFF:

3                  ROBERT C. BLUME, ESQUIRE

4                  SAMANTHA PJESKY, ESQUIRE

5                  Gibson, Dunn & Crutcher, LLP

6                  1801 California Street

7                  Suite 4200

8                  Denver, Colorado 80202

9                  (303) 298-5700

10

11         ON BEHALF OF DEFENDANTS JAVIER PIAGUAJE PAYAGUAJE

12         and HUGO GERARDO CAMACHO NARANJO:

13                 LARRY R. VESELKA, ESQUIRE

14                 Smyser Kaplan & Veselka, LLP

15                 700 Louisiana

16                 Suite 2300

17                 Houston, Texas 77002

18                 (713) 221-2300

19         ALSO PRESENT:

20                 BLAKE LARKIN

21                 DAVID MOYER, ESQUIRE

22                 DANA CAMPBELL, Videographer

1    safety and health issues.  There's mechanical

2    equipment that can break.  There's risk of all the

3    lost sales to customers.  There's risks associated

4    with -- with our reputation, goodwill, from impacts

5    on the -- on the withdrawal or the lack of -- of

6    supply in certain geographic areas associated with a

7    seizure of assets.

8              There may be some that don't come to me

9    right off the top of my head, but those are the --

10   the big ones that I can think of right offhand.

11        Q    Now, the first one was risk and

12   environment damage or safety or health risks

13   associated with the seizure.  What are -- what are

14   those risks?

15        A    I will describe a few examples.  So if --

16   if you were to come in and, in essence, pull the plug

17   on a refinery and kick the people out, there'd be

18   rather large environmental consequences associated

19   with that.  The refinery is not designed to just be

20   unplugged and walked away from.

21             The ensuing depressuring of all the gear

22   through the flare systems would probably overwhelm

Page 17

1    the flare systems, and you would have billowing

2    clouds of black smoke rolling through the communities

3    that we operate in.  So there is an environmental

4    example, but then also arguably some impact on -- on

5    your reputation.

6              Safety and health, an example might be in

7    that case shocking some of the process equipment with

8    that kind of an abrupt shutdown of equipment, things

9    are likely to break.  Things -- pipelines can -- can

10   open up and you'd have fires that would put people in

11   harm's way.

12        Q    You have fires in refineries even when

13   you just operate them regularly.  Things happen

14   and -- and there can be mistakes and breaks, correct?

15        A    Can you rephrase that question, please?

16        Q    Sure.  Operating a refinery is a very

17   sophisticated, complicated and potentially dangerous

18   operation.  Would you agree with that?

19        A    Yes.

20        Q    So, even when it's -- you're not -- when

21   somebody is not trying to, quote, unplug, as you say,

22   and just abruptly shut it down, there are things that

Page 18

1   can happen that lead to unintent- -- equipment

2   failures, manpower mistakes that lead to dangerous

3   and harmful fires and explosions in the operation of

4   refineries, correct?

5        A    I think it's very different in the

6   scenario that you just painted versus the scenario

7   that I walked through from an unplugging.  Let me

8   explain why.

9             Something like a refinery flare system is

10  not designed for somebody to walk in and pull the

11  plug and say, Get out; you no longer have this

12  refinery.  Because now all your equipment is trying

13  to overwhelm that flare system at once.  A flare

14  system would be designed for something like loss of

15  this electrical system.  The loss of a single

16  electrical system feeder into the refinery is

17  unlikely to cause that massive of a pressure dumping

18  to the flare system.

19             And so I think those two examples are

20  very -- while there are some similar natures to

21  them -- they are very, very different in their

22  construct.

1          Q     But in talking about what you see as the

2     potential irreparable harm coming from a seizure,

3     you're assuming that a seizure would involve somebody

4     abruptly shutting down and, quote, unplugging the

5     refinery.  Correct?

6                    MR. BLUME:  Objection.  Form.

7     BY MR. VESELKA:

8          Q     That's what you're positing as the

9     hypothetical risk, correct?

10                   MR. BLUME:  Objection to form.

11                   THE WITNESS:  I think in order to answer

12    your question of "what happens if," there's so many

13    variables that need to be defined for someone like me

14    to then be able to articulate what is likely to

15    happen.  There's so many variables that you have to

16    make so many simplifying assumptions to be able to

17    characterize a -- a what does "a seizure" mean?  I

18    took "a seizure" to mean it's no longer ours; all you

19    Chevron employees get off the premises.

20                   I'm not sure what else to assume.  If you

21    would like to propose a different scenario for me to

22    consider, I'd be happy to -- to walk through what

Page 20

1    that may look like.

2    BY MR. VESELKA:

3         Q    So you -- you've not done any analysis of

4    what the potential impacts would be if -- if whatever

5    authority was executing whatever form of levy or

6    execution upon the refinery that would come with

7    consultants and contractors who are knowledgeable and

8    aware of the requirements of operating such a

9    refinery?

10             MR. BLUME:  Objection.  That's not what

11   he said.  He asked you to posit another scenario and

12   he would be more than happy to walk you through what

13   that may look like.  If that's the scenario you want

14   to posit to him, I'm sure he would be willing to talk

15   about it.

16             THE WITNESS:  There are PSM, Process

17   Safety Management, regulations that define what level

18   of safety training is required for somebody to

19   operate a refinery.  You're not going to be able to

20   find a replacement organization that can safely

21   operate a refinery from off the street, regardless of

22   how much training you give them.  You won't know the

Page 21

1      specific details that are required to meet the

2      Process Safety Management requirements to operate

3      this type of equipment.  Just can't be done.

4      BY MR. VESELKA:

5           Q    You maintain manuals and procedures and

6      instructions all in writing, don't you?

7               MR. BLUME:  Objection to form.

8               THE WITNESS:  That is one element of it.

9      BY MR. VESELKA:

10          Q    I mean Chevron does maintain all of those

11     required safety procedures and operational procedures

12     in order to operate the refineries safely in written

13     form, don't they?

14              MR. BLUME:  Objection.  Form.

15              THE WITNESS:  Yeah.

16              THE REPORTER:  Did you say "yes"?

17              THE WITNESS:  Yes.

18     BY MR. VESELKA:

19          Q    So assuming people hired people with

20     proper certifications, proper experience of operating

21     refineries and gave them enough time to look over and

22     review those operating instructions and safety

Page 22

```
 1    requirements, do you agree that it's conceivable that
 2    a levying authority could have a team that could
 3    safely slow down if -- or if not, try to properly
 4    bring down a refinery?
 5                  MR. BLUME:  Objection.  Calls for
 6    speculation, and whether or not there's -- there's a
 7    levying authority with such a team in place goes
 8    beyond -- that's speculation; whether that's possible
 9    goes beyond the scope of the harm and the scope of
10    his designated expertise.
11                  But if you have -- if you want to
12    speculate and you have a thought on that, you may
13    answer.
14                  THE WITNESS:  I certainly do.  I wouldn't
15    recommend it.  I wouldn't want to be in the refinery
16    when you gave that kind of a hand-over.
17                  Part -- part of a prudent training
18    program would be some level of hands on.  I don't
19    know how somebody from outside the refinery gets that
20    kind of specific hands on, where is this valve
21    located?  To do any -- any job is going to be
22    interesting for somebody who's only read about it on
```

1    paper and not -- not seen it, lived it, touched it.

2    It's just inconceivable to me.

3            Whether or not there's some legal entity

4    that's willing to take that risk of, You guys get out

5    and we're bringing in the hired guns that know how to

6    operate this place safely, if they want to take on

7    that liability, so be it.  I wouldn't touch it.

8    BY MR. VESELKA:

9        Q    At that point it would be their

10   liability, not yours -- not Chevron's, right?

11           MR. BLUME:  Objection.  Calls for a legal

12   conclusion.  Calls for speculation.

13           THE WITNESS:  And if in the final

14   analysis it comes back to Chevron, how do you unwind

15   having spilled oil, having had black smoke throughout

16   a surrounding community that you work in?  They are

17   not going to remember the name of the judge that --

18   that caused that to happen.  They're going to

19   remember that it's a Chevron refinery, and therein

20   lies one of the major elements of irreparable harm.

21   BY MR. VESELKA:

22       Q    Which -- have you been posted for any,

```
                                            Page 32
 1          A     I -- I'm not sure.

 2                But with respect to are there any other

 3    risks related to environmental safety and health, I

 4    would say, yes, there are.  I mean I spoke of those

 5    that are of an immediate nature to a shutdown or of a

 6    pulling of the plug.

 7          Q     Right.

 8          A     There is still tremendous risks

 9    associated with -- even if the refinery were, quote,

10    shut down and abandoned, there's huge environmental

11    and safety risks associated with an abandoned

12    refinery.

13                For example, there -- there may be a -- a

14    small number of tanks in the tank field where the

15    roof drain is -- that system has -- has failed.  In

16    that -- in that case, that roof drain is closed.  And

17    if it rains, the water falls on top of the roof and

18    sinks the roof, and now you've got exposed

19    hydrocarbon, in that if that same rain storm is

20    electrical in nature, a lightning strike, and now

21    you've got a major tank fire that could easily spread

22    to multiple tanks if you don't have people that know
```

Page 33

1    what they're doing or know what tanks aren't in a

2    condition where they can be just walked away from

3    with -- with rain imminent.  That's just another

4    example.

5              Effluent systems that -- that take

6    refinery water and discharge to the Bay without

7    proper maintaining of -- of conditions can result in

8    inappropriate material going to Santa Monica Bay, for

9    example.  Not good if you're a surfer.

10        Q    Or a fish.

11        A    Or a fish.

12        Q    But any -- anyone with possession and

13   legal responsibility of the facility would be

14   responsible for complying with all of the appropriate

15   regulatory controls to prevent such discharge,

16   correct?

17              MR. BLUME:  Objection to form.  Calls for

18   a legal conclusion.

19              THE WITNESS:  I -- I suppose so.  What's

20   unclear to me is how you go from owner A to owner B

21   without a continuity plan in place.  That's -- that's

22   what I just don't understand.

```
                                        Page 40

 1          A     Okay.  So --

 2          Q     What is the irreparable harm that Chevron

 3     believes that it would suffer if a permanent

 4     injunction were not entered?

 5          A     So the highest risk profile that you put

 6     a refinery through is the shutdown and startup

 7     sequence of the refinery.  And that's due to a

 8     refinery being a series of processes that are

 9     designed to run at a constant temperature, at a

10     constant series of conditions in most cases, and the

11     startup/shutdown is a process that goes from ambient

12     to however many hundreds of degrees, in some cases,

13     up to into the thousand-plus degrees, you know, from

14     ambient pressure up to, in some cases, 3,000 pounds

15     or more pressure per square inch are -- put

16     significant stress on equipment.  The heating up of a

17     pipe, steam lines, et cetera, are things that -- the

18     worst thing you do to them, in most cases, is

19     starting them up and shutting them down.  Those

20     transient periods are stressful.  It's also where you

21     are most likely to have human error come in.  And so

22     what kind of mechanical stuff can break?  Well, it
```

1      can be as simple as a pump seal breaks, and now

2      you've got hydrocarbon coming out.  You may not

3      notice it coming down.  It may only be when you go to

4      restart that this pump isn't working like you

5      expected.  So while you had -- now we're in the

6      startup mode of this particular process plant, say a

7      crude unit, and your main feed pump has got a bad

8      seal, well, now you got to abandon your startup mode

9      and fix that seal, and come back.  And so the -- it's

10     the unknown, unknowable, unpredictable nature of if

11     you come in and pull the plug or if you come in and

12     shut down for an orderly transition, you don't know

13     what all you've done to the refinery in bringing it

14     down.

15              And what I do know is if you don't do it,

16     whatever you broke coming down, you wouldn't have to

17     fix.

18          Q    That's a risk a company runs any time it

19     needs to shutdown/startup for repairs, modifications,

20     due to accidents or other things.  I mean, that is

21     part of the risk of that process at any time.  It's

22     inherent in a shutdown/startup of any such operation,

Page 42

1      correct?

2                  MR. BLUME:  Objection to form.

3                  THE WITNESS:  I don't agree with that at

4      all.

5      BY MR. VESELKA:

6            Q    Okay.

7            A    The nature of shutting down a whole

8      refinery -- if you take the case of Pascagoula or

9      El Segundo and Richmond, the only time Pascagoula

10     shuts down as an entire refinery is to evacuate for

11     hurricane.

12                To my knowledge, I can't remember a time

13     that El Segundo and Richmond, we have shut down the

14     entire refinery.  Other pieces still keep working.

15     It's very different to try and take the whole thing

16     down.  The level -- the complexity associated with

17     all the things that can go wrong coming down and

18     going up are a significantly higher complexity than

19     taking a process plant like a crude unit down and

20     bringing it back on line a month later after

21     performing maintenance.  Very different scenarios.

22           Q    El Segundo and Richmond are not

Page 43

1    threatened by hurricanes as often as Pascagoula.  How

2    often has Pascagoula been evacuated in your tenure at

3    Chevron?

4         A    Well, I was there nine years.  During

5    that time, I believe there were two -- we didn't

6    actually evacuate.  We still had a skeleton crew on

7    site, a ride-out crew, if you will, to where if

8    something happened during the storm, we could at

9    the first opportunity try and deal with it.  But we

10   had one in my first year in 1979, when Hurricane

11   Frederic came through, and then in '87 with Elena.

12             Prior to that, I don't know how many

13   times -- I know we were late getting out of the

14   refinery with Camille, and what was that, '69 -- or

15   '8? -- '60 something.  That's when we developed our

16   hurricane procedures for Pascagoula; it was

17   subsequent to that storm.

18             After Elena in '87, I'd be guessing at

19   the number of times.  It's not every year, although

20   there have been occasions where it's been multiple

21   times in a year.  I think -- I just don't remember

22   the exact numbers.

1          Q     They shut down for Katrina, didn't they?

2          A     Oh, yeah.  Months.

3          Q     And they've shut down --

4          A     George.

5                Like I say, I don't remember all of them.

6          Q     Okay.  Next you cited the risk of lost

7     sales.  And to what are you referring there?

8          A     Well, in that case where you shut down

9     the refinery to turn it over, clearly that refinery

10    is not refining any product, and any refined product

11    that it would be making you're not selling.  Now, to

12    the extent you're able to secure some product on the

13    market where spot market tenders of gasoline, jet or

14    diesel are traded, you may be able to acquire that

15    and continue to meet some sales.  There you'd be

16    losing the refining margin component.  But very

17    clearly if a refinery is not operating, you're not

18    getting that refining margin, and arguably you are

19    going to have sales that you aren't able to make.

20         Q     Right.  But you can analyze what was the

21    market at the time and compare it to your historical

22    share of that market and what your historical

Page 45

1      refining margin has been; you can do a calculation to

2      estimate what that loss is?

3                    MR. BLUME:  Objection to form.

4                    MR. VESELKA:  Correct?

5                    MR. BLUME:  Objection to form.

6                    THE WITNESS:  There are a large number of

7      variables.  The more simplifying assumptions that you

8      make, you can get the number of variables down to a

9      point where -- with a ridiculous number of

10     simplifying assumptions, yes, you could make a

11     calculation.  But do you do the market of before you

12     shut it down or do you do the market after you took

13     20 percent of Los Angeles's refining capacity off the

14     table and everybody knows it, and now have to replace

15     that product?  So the prices are different on those

16     two days.  Okay.  Which one do you use?  You have to

17     make a simplifying assumption.

18                    So can you make a calculation?  Yes, you

19     can make simplifying assumptions and come up with a

20     number.  What does that number mean?  I don't know

21     legally what that number means, other than it's a

22     reflection of the assumptions that went into it.

```
                                              Page 46

 1              So without knowing what assumptions that

 2      you want to make, without defining the assumptions, I

 3      can't define -- I can't make a calculation.  Because

 4      somebody's got to make simplifying assumptions

 5      because the number of variables are just too -- too

 6      large.

 7          Q    Well, you're familiar -- you've been

 8      involved in litigation for Chevron before, correct?

 9              MR. BLUME:  Objection to form.

10              What do you mean involved with

11      litigation?

12              THE WITNESS:  Yes.

13      BY MR. VESELKA:

14          Q    Well, you've testified for Chevron

15      before.

16          A    Yes.

17          Q    In how many different matters?

18          A    I don't recall offhand.  A number.

19          Q    And you've testified at FTC proceedings;

20      you've testified in Alaska regulatory commission

21      proceedings.

22              Where else?
```

Page 47

```
 1        A     A number of different FTC ones.  Whether
 2    or not that's the extent of it, I don't know.
 3        Q     Have you ever been involved in any
 4    commercial litigation involving Chevron and seen how
 5    parties hired economists or economic consultants or
 6    evaluation experts in order to do these type of
 7    making assumptions, testing assumptions, and
 8    calculating damages that result from various claimed
 9    legal -- claimed activities that somebody says
10    somebody else is legally responsible for?
11              You are familiar with that kind of
12    process in litigation, correct?
13              MR. BLUME:  Objection to form.
14              THE WITNESS:  I've been involved in --
15    tangentially in some aspects of that.  In those types
16    of cases, there is a calculation made.  There are a
17    number of assumptions made.
18              At the end of the day, it's a negotiated
19    settlement; it's not an actual statement of damages.
20    It's an agreed-upon business transaction between two
21    parties that may or may not have anything to do with
22    the actual damages.
```

Page 48

1    BY MR. VESELKA:

2         Q    Well, sometimes in the American court

3    system, we actually have these people testify about

4    that, and we let the juries decide those things, but,

5    I mean,

6    the --

7         A    Well, you can pretty much get an expert

8    to say anything you want has been my experience in

9    witnessing some of these things.

10        Q    All I'm trying to see is if you agree

11   that this particular component, the risk of lost

12   sales, is one of the kind of components that is often

13   in litigation addressed through expert testimony as

14   to a matter of calculation, allowing the trier of

15   fact to decide the reasonableness of the assumptions.

16             MR. BLUME:  Objection to form.

17             I mean, are you really asking a 30(b)(6)

18   witness on irreparable harm about legal process and

19   witnesses and economics?  Really?

20             It's beyond the scope, it calls for

21   speculation, it calls for a legal conclusion.  It's

22   just generally inappropriate.

```
 1              But you can answer if you have any idea.
 2              THE WITNESS:  Well, in the case of where
 3    I was -- I was making calculations of what it cost
 4    Chevron in the case of the Unocal RFG patents, I made
 5    calculations based on assumptions that I made.
 6    Ultimately, different players came up with different
 7    ways of calculating that.  So which one reflects the
 8    actual price, I would say mine did in Chevron's case,
 9    because I know what assumptions went into it.
10    BY MR. VESELKA:
11         Q    The next item you listed on the
12    components of irreparable harm that Chevron is --
13    that you're testifying on behalf of Chevron that it
14    would suffer potentially if no permanent injunction
15    were entered was with regard to impact on Chevron's
16    reputation.
17              What is the impact you're referring to
18    there?
19         A    Well, I think examples are always
20    illustrative.  So take a case where the El Segundo
21    refinery shuts down, or take a case where our
22    pipeline system in Los Angeles is seized and shut
```

Page 50

1    down.  In the case of El Segundo, we've got about a

2    20 percent market share in the Southern California

3    region, roughly speaking.  80 to 90 percent of that

4    supply can only come from -- well, let's say 80

5    percent of that supply can only come from the El

6    Segundo refinery, through

7    El Segundo, through Chevron USA-owned pipeline

8    systems that go through our three proprietary

9    terminals associated with that pipeline system that

10   supplies the greater Los Angeles basin.  Loss of El

11   Segundo or the terminals or the pipeline, any one of

12   those, and now that flow of product stops.  We have

13   no other way to supply our company-owned-and-operated

14   stations.  Most of the other deliveries are we

15   deliver to dealers in that region.  They've got

16   nowhere to go.  They start -- stop getting supply.

17   They're going to find us in breach of our supply

18   contract, and are going to - - if they are smart,

19   they are going to try to get their supply from

20   somebody else.  Obviously, they would have to debrand

21   their station.  But now your reputation as a reliable

22   supplier that brings people into your fold is now at

Page 51

1    risk.  How do you undo those people that jumped ship

2    and are now selling a competitor's gasoline?

3              If they're not getting supply from us and

4    they jumped to someone else, they may have signed up

5    a ten-year supply deal to get supply from Tesoro.  So

6    from a reputation standpoint, your reputation amongst

7    the dealer community is pretty iffy, let alone your

8    reputation if your name's associated with taking 20

9    percent of the supply out of the Los Angeles market.

10   To think that that's not going to have some hindrance

11   in someone in that area not being able to get

12   gasoline I think is a bit of a stretch.  Whether it's

13   gasoline, jet fuel for airlines, diesel for

14   railroads, military fuel for the defense industry,

15   somebody is not going to get what they want in

16   Southern California.  And that person that doesn't

17   get what they want as a normal course of running

18   their business, going about their life, they're going

19   to associate that pain that's inflicted on them with

20   not the person that made the ruling, but the company

21   who's associated with it, with Chevron.  That's

22   pretty hard to undo after the fact.

Page 52

1          Q     Why do you say that?

2          A     So this dealer who signed up with Tesoro

3     has not got a ten-year deal.  Okay?  How do I undo

4     that?  A month after this shutdown where he's jumped

5     ship, now it's, Oh, never mind, this really didn't

6     happen, and now we want to make Chevron -- how do you

7     make us whole?  How do you unwind that which you've

8     caused to happen?

9                For that public that's run out of

10    gasoline and associate it with Chevron, how do you

11    unwind that -- that that?  How do you unwind a BP

12    Macondo incident for people that live in Louisiana on

13    the coast?  How do you unwind an Exxon Valdez

14    incident?  How do you -- just say it didn't happen.

15    You cause something to happen, there's consequences.

16         Q     You are speculating about what the state

17    of mind and market reaction would be to customers if

18    there is some disruption that led to a shutdown so

19    that you did not have sufficient supply at your

20    company service stations for three or four weeks, and

21    then when you get supply again, you are saying --

22    you're speculating they're not going to come back as

1    information from anybody else outside that circle?

2          A    So let's back up because when -- your

3    definition of "met with" and my definition of "met

4    with" are two different definitions.

5          Q    Phone and correspondence is fine.  I mean

6    you communicated to get information to assist you --

7          A    I talked with Mike over the phone.  I

8    talked to Jeanne in person; I also talked to her by

9    phone.  Mark Hepburn, I did not fly to Hawaii to see.

10   I talked to him by the phone.

11         Q    You missed an opportunity.  He said to

12   take as much time as you needed, right?

13         A    I also have a family.

14         Q    Okay.  Mine's forgotten me about now

15   thanks to this case.

16              Anything about what you learned from

17   Mr. Hepburn about Hawaii that you've not already

18   included in what you told us?

19         A    I don't believe I've said anything about

20   Hawaii.

21         Q    I don't think -- you are the one that

22   mentioned Hawaii, I think.

Page 62

 1             Excuse me.  I need to put on the record,
 2     I was pointing at Mr. Larkin rather than
 3     Mr. Engibous.
 4             Is there anything special about the
 5     potential types of harm that would come from a
 6     disruption of the service to Hawaii that would be
 7     different in character than the irreparable harm
 8     you've already described generically?
 9         A    Well, I think it's -- let me answer that
10     twofold.
11             One, generically, each refinery, each
12     geographic region, each asset seizure will have its
13     own unique irreparable harms.  They'll follow along
14     the lines of similar themes; whether it be Singapore,
15     Thailand, Korea, South Africa, or somewhere in North
16     America.  Those elements are the same; the degrees of
17     which are unique.
18             Part two, what's unique about Hawaii:
19     Hawaii is a very island supply; island in that there
20     are only two refineries that basically serve the vast
21     majority of the petroleum/hydrocarbon supply for
22     those islands.  Chevron operates a pipeline system

Page 63

1    that delivers fuel oil to the local utilities.

2              We're also -- because of our refinery

3    configuration, we are the biggest supplier to Hawaii

4    Electric.  How the Hawaii Electric Company, or HECO,

5    is able to maintain the lights on in Oahu, or the

6    other utilities throughout the area, taking out

7    roughly two-thirds of the fuel oil supply by taking

8    our refinery out of the picture, it's not clear to me

9    how -- how they'd keep the lights on.

10             That -- that to me becomes even more of a

11   black eye, more of a -- instead of goodwill, ill-will

12   for being associated with -- with the lights out is a

13   bigger deal than not being able to gas up your car,

14   in my mind.

15             I mean, after Hurricane Ike came through,

16   I minded not being able to drive, because I couldn't

17   get gasoline, but I really missed having power.

18             (Mr. Moyer joins the deposition.)

19   BY MR. VESELKA:

20        Q    Anything additional that you learned

21   from, was it, Jeanne Defelice that you haven't

22   already described about the nature of the

Page 64

1      relationship to either the airlines or the military?

2          A      One of my specific lines of inquiry with

3      Jeanne was to understand, okay, I know that in the

4      Salt Lake distributive area, we are a major supplier

5      to the military -- I won't say where the base is or

6      what -- its local supply from the Salt Lake refinery

7      to military -- with military jet.  We're the major

8      supplier.  It's my understanding that we've been the

9      major supplier for years.  And I was trying to

10     understand who else bids on that contract.  And if

11     we're not supplying it, where does the military get

12     the jet fuel from?

13             Because this is a product that requires

14     specific testing, has specific testing requirements,

15     specific additives added to the fuel to be suitable

16     for use in the military.  And if their supply doesn't

17     come from the Chevron refinery in Salt Lake, their

18     basically trucking it in is the next alternative.  So

19     you take Chevron out of the picture, whether or not

20     the next supplier has enough to meet their needs.  I

21     was just trying to generally understand what options

22     were -- were most likely available in the case of a

Page 65

1    Salt Lake refinery seizure.

2           Q    And what did she tell you?  What were the

3    options for that military customer?

4           A    I believe I stated that in my answer.

5           Q    To truck it in, right?

6           A    If there's something that's not clear,

7    let me know and I'll further elaborate.

8           Q    Right.  All right.

9                Mike O'Neal, what specific information

10   did you get from him, and how does it bear on which

11   part of the irreparable harm you've testified about?

12          A    So in my capacities over the last 15

13   years, generally I've been, in some way, responsible

14   for that integrated supply chain or value chain in

15   the west.  It was my sense that if you take an El

16   Segundo or an El Segundo enrichment off the picture

17   that the State of California would have a near

18   impossible time meeting its petroleum demand without

19   Chevron.

20               Mike's background is -- while the two of

21   us started in Pascagoula several years ago, he spent

22   more of his career in the marketing side of the

Page 66

1       business, now is responsible for pricing, but is also

2       somebody who's been familiar with our distributive

3       area in the west, and I just wanted to calibrate on

4       if there was anything that I was missing from my

5       understanding of the -- of the California and Los

6       Angeles markets; if I -- I just wanted to reconfirm

7       that there wasn't anything that's changed that would

8       alter my beliefs that without El Segundo and/or

9       Richmond, that state or those distributive areas

10      would have a near impossible time meeting the

11      demands.  Not that the state meets the demands, but

12      the -- any entity within that state, whether it be a

13      customer, a plane, whatever, somebody -- some

14      significant parts of the economy are not going to

15      operate -- be able to operate as planned.

16           Q    All right.  The demands -- the expected

17      normal demand would be hard to be met, is what you're

18      saying.

19           A    I believe that's correct.

20           Q    And Mr. Cosby, you already said he was

21      just talking about the nature of the relationship

22      with -- the contractual relationship.  You've already

Page 67

1    described that, haven't you?

2         A    Yeah, and I believe that I either -- with

3    that, in teeing him up, I described that and also in

4    my earlier testimony when talking about, you know,

5    potentially a dealer deciding to sign up with another

6    person for a long-term deal, which is -- a lot of the

7    business is done in L.A. and other regions, that that

8    becomes a customer lost that doesn't come back.  Yet

9    another shot may be in a decade, but gone essentially

10   for a long time.

11        Q    So your understanding is that that dealer

12   and/or next -- is the next level down jobbers?

13        A    That's two different business models.

14        Q    Yeah.

15             -- that dealers are on long-term

16   contracts predominantly?

17             MR. BLUME:  Objection to form.

18             THE WITNESS:  I have a general

19   understanding.  I'm not comfortable speaking on

20   behalf of the company in that regard definitively.

21   You asked my personal opinion, I have a general

22   understanding, but I'm not going to swear to it as a

Page 68

1    company spokesperson.

2    BY MR. VESELKA:

3         Q    Okay.  Have you been involved on behalf

4    of Chevron in any way with regard to any enforcement

5    actions of any kind of judgments?

6              MR. BLUME:  Objection to form.  Beyond

7    the scope of his 30(b)(6) designation.

8              THE WITNESS:  I'm not sure legally what

9    that means.  I was involved in a -- in a -- the

10   Unocal RFG patent case, where at one point in time

11   we -- the court determined that we owed $20 million,

12   roughly speaking, to Unocal, and I was involved in

13   making some preliminary estimates.

14   BY MR. VESELKA:

15        Q    By enforcement actions, I'm talking about

16   any litigation where someone, whether it was Chevron

17   or a Chevron subsidiary, or somebody on the other

18   side that had a judgment and was trying to actually

19   collect it by levying upon assets, have you been

20   involved on any matter at that stage of the

21   proceedings?

22             MR. BLUME:  Objection.  Form.  Beyond the

1           MR. BLUME:  Yeah, I was going to say by

2     "counsel," you mean inside counsel as well as outside

3     counsel?

4           MR. VESELKA:  Yeah, inside or outside

5     counsel.  Not just Mr. Blume; other counsel as well.

6     All right?

7           THE WITNESS:  Yes.

8     BY MR. VESELKA:

9      Q    Other than the -- what you have testified

10    so far today, is there any other irreparable harm as

11    to which you're testifying today that Chevron

12    believes it would suffer if a permanent injunction is

13    not granted?

14     A    I think one area that I may not have

15    covered adequately would be lost future business, so

16    -- I think I covered the case where an individual

17    dealer may decide to go ink a long-term contract.

18    But I think there's a whole area of "if you caused;

19    not that we caused"; if your name is associated with

20    a run-out of product in a region because of some

21    action, or the price increases for that commodity

22    because 20 to 30 percent of the supply has been taken

Page 77

1      off the market, that in and of itself airlines might

2      find very offensive, that we've directly impacted

3      their bottom line by the price of jet fuel going up

4      in L.A.

5              How that plays out from how does your

6      next round of negotiations goes with the myriad of

7      airlines that we have term contracts with.  It's one

8      thing if they've -- if they've seen a price increase

9      associated with an event; if -- if that loss of

10     supply results in them unable to execute their

11     business plan, they're probably at a significantly

12     higher agitation level and arguably maybe less

13     willing to give you a term contract or willing to

14     give you a term contract at a significantly different

15     price structure than you currently have, I don't know

16     how to calculate.  I don't think anybody could begin

17     to know what the impact of those kinds of events,

18     whether they be price increases or supply

19     disruptions, have on your ability to do future

20     business.

21             And so that was one area that I didn't

22     think we'd talked about.

Page 83

1      CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

2          I, Leslie Anne Todd, the officer before whom the

3      foregoing deposition was taken, do hereby certify

4      that the foregoing transcript is a true and correct

5      record of the testimony given; that said testimony

6      was taken by me stenographically and thereafter

7      reduced to typewriting under my direction; and that I

8      am neither counsel for, related to, nor employed by

9      any of the parties to this case and have no interest,

10     financial or otherwise, in its outcome.

11         IN WITNESS WHEREOF, I have hereunto set my

12     hand and affixed my notarial seal this 15th day of

13     September 2011.

14

15     My commission expires November 14, 2013.

16

17

18

19

20     _____

21     NOTARY PUBLIC IN AND FOR

22     THE DISTRICT OF COLUMBIA