**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CHEVRON CORPORATION,

                 Plaintiff,

      v.

STEVEN DONZIGER, *et al.*,

            Defendants.

11 Civ. 0691 (LAK)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## CHEVRON CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS RENEWED MOTION BY ORDER TO SHOW CAUSE FOR AN ORDER OF ATTACHMENT AND OTHER RELIEF

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

*Attorneys for Plaintiff Chevron Corporation*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT ........................................................................................................................... 5

I.     Chevron Meets the Statutory and Legal Requirements for Attachment ............................ 5

     A.     A Renewed Motion for Attachment Is Appropriate ............................................... 7

     B.     Chevron Has Demonstrated a Likelihood of Success on the Merits of Its
           Claims ................................................................................................................... 7

II.     Chevron Is Entitled to an Attachment in the Amount of Defendants' Unjust Gain .......... 8

III.     Chevron Is Entitled to an Attachment on Its RICO Damages ......................................... 12

     A.     Chevron Is Entitled to Attach the Value of the Judgment to Restore it to
           the Position It Would Have Occupied Absent Defendants' Illegal
           Conduct ............................................................................................................... 12

     B.     Chevron Has Also Incurred Millions of Dollars in Attorneys' Fees for
           Which It Is Entitled to Attachment ...................................................................... 15

IV.     Chevron Renews Its Request That This Court Enter a TRO to Prevent Defendants
     From Dissipating Their Interest in the Judgment ............................................................ 17

CONCLUSION ...................................................................................................................... 19

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Agnew v. Alicanto, S.A.,*
125 F.R.D. 355 (E.D.N.Y. 1989) ................................................................................. 17

*Bank of China v. NMB L.L.C.,*
192 F. Supp. 2d 183 (S.D.N.Y. 2002) ................................................................. 6, 14

*Bankers Trust Co. v. Rhoades,* 859 F.2d 1096 (2d Cir. 1988) ..................................... 12

*Banyai v. Mazur,*
No. 00 Civ. 9806(SHS), 2007 WL 959066 (S.D.N.Y. Mar. 29, 2007) .................... 9

*Bay Ridge Air Rights v. State,*
44 N.Y.2d 49, 375 N.E.2d 29 (1978) ................................................................. 14, 15

*Bingham v. Zolt,* 66 F.3d 553, 560 (2d Cir. 1995) ..................................................... 12

*Breakaway Solutions, Inc. v. Morgan Stanley & Co., Inc.,* No. Civ. A. 19522,
2004 WL 1949300 (Del Ch. Aug. 27, 2004) ....................................................... 10

*Bridge v. Phoenix Bond & Indem. Co.,* 553 U.S. 639  (2008) .................................... 16

*Chase Manhattan Bank (Nat'l Ass'n) v. Banque Intra, S.A.,*
274 F. Supp. 496 (S.D.N.Y. 1967) ........................................................................ 8

*Concord Asset Management, Inc. v. Intercredit Corp.,*
No. 92 Civ 7756 (JFK), 1992 WL 373477 (S.D.N.Y. Dec. 3, 1992) .................... 17

*Corcoran & Kostelanetz v. Dupuy,*
6 A.D.2d 776, 175 N.Y.S.2d 153 (1st Dep't 1958) .............................................. 7

*Davila Pena v. Morgan,* 149 F. Supp. 2d 91 (S.D.N.Y. 2001) ..................................... 16

*Deutsche Anlagen-Leasing GMBH v. Kuehl,*
111 A.D.2d 69, 489 N.Y.S.2d 195 (1st Dep't 1985) .............................................. 11

*Dreieck Finanz AG v. Sun,*
No. 89 CIV. 4347(MBM), 1989 WL 96626 (S.D.N.Y. Aug. 14, 1989) ............... 7, 8

*EBC I, Inc. v. Goldman Sachs & Co.,*
7 A.D.3d 418, 777 N.Y.S.2d 440 (1st Dep't 2004),
*aff'd in part, rev'd in part on other grounds by* 5 N.Y.3d 11, 832 N.E.2d 26
(N.Y. 2005) ......................................................................................................... 9, 10

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*FCA Assocs. v. Texaco, Inc.*,
  No. 03-CV-6083T, 2005 WL 735959 (W.D.N.Y. Mar. 31, 2005) ........................................... 14

*First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.*, 218 F. Supp.2d 369
  (S.D.N.Y. 2002) ....................................................................................................... 16

*FTC v. Bronson Partners, LLC*,
  654 F.3d 359 (2d Cir. 2011) .................................................................................... 9

*FTC v. Verity Int'l, Ltd.*,
  443 F.3d 48 (2d Cir. 2006) ...................................................................................... 9

*Henegan v. Merchants Mut. Ins. Co.*, 31 A.D.2d 12, 294 N.Y.S.2d 547  (1st Dep't
  1968) .......................................................................................................................... 13

*Higgins v. New York Stock Exchange, Inc.*, 942 F.2d 829 (2d Cir. 1991) ................................... 13

*Hotel 71 Mezzo Lender v. Favor*,
  14 N.Y.3d 303, 900 N.Y.S.2d 698 (2010) ............................................................... 3, 11

*ITC Entm't., Ltd. v. Nelson Film Partners*,
  714 F.2d 217 (2d Cir. 1983) .................................................................................... 6

*Johnson v. Nyack Hosp.*, 954 F. Supp. 717 (S.D.N.Y. 1997) ....................................................... 13

*Kayser-Roth Corp. v. Berger*,
  427 F. Supp. 452 (S.D.N.Y. 1976) ........................................................................... 11

*Kessenich v. Raynor*, 120 F. Supp. 2d 242 (E.D.N.Y. 2000) ......................................................... 9

*Ladenburg v. Commercial Bank of Newfoundland*,
  5 A.D. 219, 39 N.Y.S. 119 (1st Dep't 1896) ............................................................ 7

*Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 123 (2d Cir. 2003) ...................................................... 16

*Libancell S.A.L. v. The Rep. of Leb.*,
  No. 06 Civ. 2765 (HB), 2006 WL 1321328 (S.D.N.Y. May 16, 2006) ..................................... 17

*Mfrs. Hanover Trust Co. v. Chemical Bank*,
  160 A.D.2d 113, 559 N.Y.S.2d 704 (1st Dep't 1990) ............................................... 10

*Mueller v. Rayon Consultants, Inc.*,
  193 F. Supp. 650 (S.D.N.Y. 1961) ........................................................................... 7, 15

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Musket Corp. v. PDVSA Petroleo, S.A.,*
  512 F. Supp. 2d 155 (S.D.N.Y. 2007) ........................................................................... 7

*NML Capital, Ltd. v. Banco Central de la República Argentina,*
  652 F.3d 172 (2d Cir. 2011) .......................................................................................... 7

*Pinto v. Allstate Ins. Co.,* 221 F.3d 394 (2d Cir. 2000) ................................................. 13

*Prentiss v. Greene,*
  193 A.D. 672, 184 N.Y.S. 558 (1st Dep't 1920) ......................................................... 15

*Provisional Protective Comm. v Williams,*
  121 A.D.2d 271, 503 N.Y.S.2d 47 (1st Dep't 1986) ................................................... 17

*Reeder v. Mastercraft Elecs. Corp.,* 297 F. Supp. 815 (S.D.N.Y. 1969)........................ 16

*Shipman v. Kruck,* 267 Va. 495 (Va. 2004) ................................................................... 13

*Stanley v. Trinchard,* 500 F.3d 411 (5th Cir. 2007)....................................................... 13

*State v. Daicel Chem. Indus., Ltd.,*
  No. 403878/2002, 2004 WL 5487822 (Sup. Ct. N.Y. County 2004) ......................... 10

*U.S. Football League v. Nat'l Football League,* 842 F.2d 1335 (2d Cir. 1988)........... 13

*United States v. Gabelli,*
  No. 03 CIV 8762 (PAC), 2005 WL 2978921 (S.D.N.Y. Nov. 4, 2005)........................ 9

*Usdan v. Dunn Paper Co.,*
  392 F. Supp. 953 (E.D.N.Y. 1975) ............................................................................... 15

*Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 339 (1971)................ 13

**Statutes**

18 U.S.C. § 1964(c) .................................................................................................. 12, 17

**Other Authorities**

6 Am. Jur. 2d Attachment and Garnishment § 46 (2011) ................................................ 8

Restatement (First) of Restitution § 1 (1937) .................................................................. 8

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

**Rules**

N.Y. CPLR 6210 .................................................................................................. 17, 19

N.Y. CPLR 6212(a) ................................................................................................. 6

**Treatises**

Dan B. Dobbs, *Law of Remedies*, (2d ed. 1993) ............................................................ 9

## PRELIMINARY STATEMENT

On January 6, 2012, this Court denied Plaintiff Chevron Corporation's initial attachment motion on the ground that "Chevron ha[d] not demonstrated a likelihood of recovering any specific amount of damages." Dkt. 377 at 6. The Court explained that its decision was "to say only that an order of attachment is not available on the present showing because Chevron has not established a likelihood of recovery in any specific amount." Dkt. 377 at 6. The Court left open the prospect that Chevron could make "a sufficient case for some order of attachment, now or in the future," if supplemented by a specific damages showing. *Id.* Chevron now makes that showing and hereby respectfully renews its motion for prejudgment attachment of Defendants' assets, presenting evidence establishing a specific amount that Chevron will likely be entitled to recover on its legal and equitable claims. *See* Fed. R. Civ. P. 64 and N.Y. CPLR 6201, *et seq.*

Chevron's need for security over Defendants' assets has only increased since its initial motion was filed. In January 2012, the Ecuadorian appellate court affirmed the fraudulent $18.2 billion judgment issued in Lago Agrio, and then issued "clarifications" requested by the Lago Agrio Plaintiffs ("LAPs") despite being the prevailing party. Dkts. 383-1; 384-1. The Tribunal hearing Chevron's arbitration pursuant to the U.S.-Ecuador Bilateral Investment Treaty ("BIT") then issued two interim measures awards directing the Republic of Ecuador ("ROE"), including its judicial branch, to "take all measures necessary to suspend or cause to be suspended" enforcement and recognition of the judgment. Declaration of Anne Champion ("Champion Decl."), Ex. 1241 at 3; Ex. 1240 at 16.[1] Instead of complying with its obligations under the Treaty Arbitration Tribunal's awards, the Ecuadorian appellate court denounced them, denying Chev-

---

[1] On February 27, the Treaty Arbitration Tribunal issued a Third Interim Award rejecting the ROE's jurisdictional objections, paving the way for it to determine the merits of Chevron's liability claim against the ROE over the travesty of justice to which Ecuador has subjected Chevron. *See* Ex. 1274.

ron's request to stay judgment enforcement pending its further appeal, and following the LAPs'
public script by stating that a "simple arbitration award, although it may bind Ecuador, cannot
obligate Ecuador's judges to violate the human rights of our citizens." Ex. 1242 at 3; *see also*
Exs. 1243–46; 1239, 1263. The LAPs' lead Ecuadorian counsel, Pablo Fajardo, then sought an
order from the Ecuadorian court declaring the judgment "enforceable" within the meaning of Ar-
ticle 3 of the Inter-American Convention on the Extraterritorial Effect of Judgments. Ex. 1253;
Ex. 1270. On Friday, March 1, 2012, the Ecuadorian appellate court granted the LAPs' request.
*See* Champion Decl. ¶ 45. As a result, the LAPs are now in a position to effectuate their scheme,
as they have publicly vowed, to employ "'attachments, seizure of assets, intervention or freezing
of Chevron accounts, and even the seizure of refineries' in foreign countries." Ex. 1255. On
March 2, Fajardo announced at a press conference that the LAPs plan to commence various en-
forcement actions, specifically threatening to seek seizure of Chevron-affiliated tankers passing
through the Panama Canal and assets in Venezuela. Ex. 1272.

   That Defendants intend to harm Chevron irreparably through a vexatious foreign en-
forcement campaign is clear. Indeed, if Defendants believed that the Lago Agrio judgment was
lawfully enforceable, they would seek enforcement here where Chevron is subject to jurisdiction
and the judgment could be satisfied in its entirety. Instead, the LAPs have stated their intention
to launch multiple actions to disrupt Chevron's operations and pursue the limited assets of sepa-
rate Chevron affiliates around the world—entities that were not parties to the Ecuadorian litiga-
tion and from which the LAPs will not be able to collect the entirety of the judgment—for the
purpose of pressuring Chevron into paying them off. Further, any amounts that Defendants col-
lect on the Lago Agrio judgment will be dissipated and funneled to off-shore safe havens beyond
the reach of U.S. courts. *See* Dkt. 45-9. Attachment is therefore necessary to ensure that any

2

judgment issued by this Court can be enforced and to preserve Chevron's right to a recovery against Defendants on the claims asserted here.  Furthermore, the principal asset Chevron seeks to attach—the fraudulent Lago Agrio judgment against it—is located here because Chevron is subject to this Court's jurisdiction. *See Hotel 71 Mezz Lender v. Falor*, 14 N.Y.3d 303, 314–16, 900 N.Y.S.2d 698 (2010) (holding that the "situs of the debt is wherever the debtor is present") (citing *Harris v. Balk*, 198 U.S. 215, 222–23 (1905)).

This Court has already found "ample evidence of fraud," virtually all of which is "undisputed," and "no meaningful prospect that Chevron ever could collect any damages" or "recover any amounts paid in satisfaction of the Lago Agrio judgment in the event it ultimately prevailed here." *Chevron Corp. v. Donziger, et al.*, 768 F. Supp. 2d 581, 628, 636, 655 (S.D.N.Y. 2011). These findings satisfy the principal statutory elements entitling Chevron to attachment—a likelihood of success on the merits of its claims and a risk that Chevron will be unable to enforce any future judgment in its favor due to the dissipation of assets. *See* CPLR 6201, 6212(a); Dkt. 354; *infra*, Section I.[2]  Chevron therefore respectfully renews its motion for prejudgment attachment of Defendants' assets.

Through this renewed motion, Chevron now submits substantial evidence establishing specific amounts that it is likely to recover as a money judgment here.

---

[2]  Moreover, in permitting Chevron's RICO and state law claims (Counts 1-8) to proceed before Your Honor, the Second Circuit did not question in any way this Court's fraud and other factual findings. *See Chevron v. Naranjo*, No. 11-1150, Dkt. 644-1 at 11 n.8 (2d Cir. Jan. 26, 2012) (deciding "only those issues that relate to the severed declaratory judgment claim and the district court's rulings thereon"), 29 n.17 (inviting the parties to address the "various charges and counter-charges regarding the Ecuadorian legal system and their adversaries' conduct of this litigation" "before the district court or elsewhere"), 7 n.5 (highlighting that "the district court credited Chevron's allegation that Donziger threatened to blackmail the Ecuadorian judge" (citing *Donziger*, 768 F. Supp. 2d at 606)).

First, Chevron presents expert testimony quantifying the minimum amount Chevron is likely entitled to recover on its unjust enrichment claim. Professors Steven Shavell and Steven Grenadier each calculate the current value of the judgment that Defendants have unjustly obtained at Chevron's expense by analyzing the prices already paid or promised in exchange for interests in the judgment. Crediting those prices and using independent methodologies, each of them has concluded that the value of the entire Lago Agrio judgment in Defendants' hands today is at least $200 million. *See* Affidavit of Harvard Law and Economics Professor Steven Shavell ("Shavell Aff.") at ¶¶ 7–8, 9–16; Affidavit of Stanford Financial Economics Professor Steven Grenadier ("Grenadier Aff.") at ¶¶ 6–7, 10–12, 21–24. Professor Shavell notes alternatively that Defendants have, at a minimum, unjustly enriched themselves by the more than $10 million they have already collected from funders in exchange for interests in the judgment. *See* Shavell Aff. at ¶¶ 8, 16; Champion Decl. at ¶ 41.

Second, Chevron presents evidence of the amount it is likely entitled to recover on its RICO claims. The amount these experts place on the value of the fraudulent judgment today in Defendants' hands—$200 million—would also be recoverable and trebled on Chevron's RICO claim. Because Defendants' RICO conspiracy included the procurement of the fraudulent Lago Agrio judgment, this Court should order attachment of the judgment, at least to the extent of its present value of $200 million trebled, as necessary to restore Chevron to the position it would have occupied absent their illegal conduct.

Third, Chevron now submits evidence of a portion of the attorneys' fees that it has incurred as a consequence of the Defendants' racketeering activity, including the defense of the fraudulent Lago Agrio litigation and the pursuit of evidence through Section 1782 proceedings. Those attorneys' fees are specific damages recoverable and trebled on Chevron's RICO and oth-

er claims. Chevron's actual recoverable fees far exceed that amount, but for the purposes of this attachment application, Chevron seeks an attachment for $60 million in attorneys' fees trebled.[3] *See* Declaration of Veronica Jones ("Jones Decl.") and Declaration of Louise Heckert ("Heckert Decl.").

Due to RICO's treble damages provision, Chevron is entitled to an attachment of at least $780 million (consisting of the judgment value of $200 million, and attorney's fees of $60 million, trebled). That attachment will permit Chevron to attach the Lago Agrio judgment itself as that is the only significant asset that can be used to satisfy any judgment entered by this Court.

In light of Chevron's likelihood of success on the merits of its claims, Chevron's immediate need for security over Defendants' assets, and the evidentiary showing Chevron now makes of specific quantifiable damages, Chevron respectfully requests that this Court order Defendants to show cause why the Court should not order the United States Marshal to attach Defendants' assets (including their interest in the judgment) to satisfy Chevron's claims.[4] Chevron also requests a temporary restraining order to prevent Defendants from frustrating the purposes of this attachment by transferring or attempting to transfer their assets in the interim. The TRO would expire upon entry of an order of attachment.

## ARGUMENT

### I.     Chevron Meets the Statutory and Legal Requirements for Attachment

As set forth in more detail in Chevron's prior motion (Dkt. 354), prejudgment attachment is appropriate when a plaintiff demonstrates: (1) a cause of action; (2) likelihood of success on the merits of its claims; (3) one or more of the grounds for attachment provided for by Section

---

[3]  Chevron reserves its right to seek and recover its full attorneys' fees, among other damages, at trial or in any future application to expand the scope of this Court's attachment order.

[4]  Chevron has filed and served this application electronically in conformity with this Court's June 7, 2011 Order regarding proposed orders to show cause. *See* Dkt. 335.

6201; and (4) that the amount demanded by the attachment exceeds defendants' known counterclaims. *See* CPLR 6212(a); 6201(1); 6201(3).  Courts have also required that plaintiff show "'something, whether it is a defendant's financial position or past and present conduct [that] poses a real risk of the enforcement of a future judgment.'" *Bank of China v. NMB L.L.C.*, 192 F. Supp. 2d 183, 188 (S.D.N.Y. 2002) (quoting *Meridien Int'l Bank Ltd. v. Gov't of Rep. of Liber.*, No. 92 Civ. 7039, 1996 WL 22338, at *3 (S.D.N.Y. Jan. 22, 1996)); *see also, e.g.*, *ITC Entm't., Ltd. v. Nelson Film Partners*, 714 F.2d 217, 221–22 (2d Cir. 1983) (granting order of attachment in aid of security where the defendant had insufficient assets in New York).

In its prior briefing, which Chevron incorporates by reference and does not repeat, Chevron demonstrated that it meets the statutory and legal requirements for attachment.  Chevron has stated RICO claims against the RICO Defendants and state law claims against all Defendants; shown that the amount demanded exceeds all known counterclaims (which Defendants do not dispute); and shown that there remains an immediate and pressing need for this provisional remedy to secure a possible future judgment in Chevron's favor for which Chevron has shown a likelihood of success.  *See* Dkts. 354, 369; *see also* Champion Decl. at ¶ 48 (listing the seven separate federal district courts that have made crime-fraud findings over Defendants' conduct vitiating their privilege claims); Dkts. 397 at 8–18; 398 at ¶¶ 1–45, 87–223.  Chevron's need for security has only become more compelling since its previous filings because the Lago Agrio judgment has been upheld and declared enforceable by the Ecuadorian appellate court in defiance of the Treaty Arbitration Tribunal's First and Second Interim Measures Award, Defendants have admitted their intention to assign away their interest in the fraudulent Lago Agrio judgment in exchange for money (Dkt. 365 at 6–8), and Defendants' recent statements in the press and to the Lago Agrio court demonstrate that enforcement efforts are imminent (Champion Decl. at ¶ 25

(collecting exhibits)); Ex. 1270; 1272.

### A.     A Renewed Motion for Attachment Is Appropriate

Given Chevron's continued need for security over Defendants' assets, a renewed motion

addressing the shortcoming the Court identified in Chevron's initial motion is appropriate and

non-controversial.  *See Ladenburg v. Comm'l Bank of Newfoundland*, 5 A.D. 219, 222, 39

N.Y.S. 119 (1st Dep't 1896) ("Where an attachment is defective or fails for any reason, there is

nothing which prohibits an application for a new one.").  "Indeed, it is well-settled that judgment

creditors can file successive attachment motions before final judgment has been entered in the

underlying suit."  *NML Capital, Ltd. v. Banco Central de la República Argentina*, 652 F.3d 172,

185 (2d Cir. 2011) (citations omitted).  And courts have consistently permitted the submission of

later supplemental affidavits in support of attachment to show "with reason and probability the

amount of [plaintiff's] damages."  *Mueller v. Rayon Consultants, Inc.*, 193 F. Supp. 650, 651–52

(S.D.N.Y. 1961); *Corcoran & Kostelanetz v. Dupuy*, 6 A.D.2d 776, 776, 175 N.Y.S.2d 153 (1st

Dep't 1958) (requiring "facts from which it may be ascertained with reasonable certainty that the

plaintiffs are entitled to recover a stated sum"); *see also* Dkt. 377 at 5 n.8 (collecting cases).

### B.     Chevron Has Demonstrated a Likelihood of Success on the Merits of Its Claims

To be entitled to a prejudgment attachment, Chevron need show only that it is likely to

obtain a money judgment on a single one of its legal or equitable claims.  *See Musket Corp. v.*

*PDVSA Petroleo, S.A.*, 512 F. Supp. 2d 155, 160–61 (S.D.N.Y. 2007) (noting that to obtain an

attachment plaintiff need only demonstrate that he was "likely to succeed on the merits with re-

spect to either" his breach of contract or unjust enrichment claim, but finding plaintiff failed to

prove his likelihood of success on the merits for both claims); *Dreieck Finanz AG v. Sun*, No. 89

CIV. 4347(MBM), 1989 WL 96626, at *4–5 (S.D.N.Y. Aug. 14, 1989) (finding attachment war-

ranted where likelihood of success on unjust enrichment claim alone was shown). Moreover, at-

tachment may be granted on the basis of a legal or an equitable claim as long as "plaintiff has

demanded and would be entitled, in whole or in part, or in the alternative, to a money judgment

against one or more defendants." CPLR 6201; *see also Dreieck Finanz AG*, 1989 WL 96626, at

*1; *Chase Manhattan Bank (Nat'l Ass'n) v. Banque Intra, S.A.*, 274 F. Supp. 496, 500 (S.D.N.Y.

1967) (denying motion to vacate attachment on claim for unjust enrichment); 6 Am. Jur. 2d At-

tachment and Garnishment § 46 (2011) ("Prejudgment garnishment and attachment are permissi-

ble on a claim for unjust enrichment, so long as the amounts claimed are ascertainable by simple

computation or reference to market price.").

**II.   Chevron Is Entitled to an Attachment in the Amount of Defendants' Unjust Gain**

Chevron's prior briefing addresses the legal standard and likelihood of success on its un-

just enrichment claim, and is incorporated by reference here. *See* Dkt. 354 at 38–39. In order to

demonstrate that it is entitled to an attachment on its unjust enrichment claim, Chevron must

show "that it is against equity and good conscience to permit the defendant to retain what is

sought to be recovered." *Dreieck Finanz AG*, 1989 WL 96626, at *4–5 (granting confirmation of

attachment on unjust enrichment claim) (citation omitted). Here, Defendants have been unjustly

enriched by their receipt of the fraudulent Lago Agrio judgment itself—a judgment that has a de-

terminable market value even now, before Defendants have sought to enforce it. Shavell Aff. at

¶¶ 7–8, 9–16; Grenadier Aff. at ¶¶ 6–7, 10–12, 18–24. It would be unjust to permit them to re-

tain the judgment.

Chevron should be able to obtain a money judgment on this claim as equitable restitution

in an amount equal to the value of the Defendants' ill-gotten gain, which they must disgorge.

*See* Restatement (First) of Restitution § 1 (1937) ("A person who has been unjustly enriched at

the expense of another is required to make restitution to the other."); *see also* Dan B. Dobbs, *Law*

8

*of Remedies* § 3.1 (2d ed. 1993) ("restitution is measured by the defendant's unjust gain").

"[R]estitution is a restoration required to prevent unjust enrichment." Dobbs, § 4.1(2). Because

the restitution awarded on an unjust enrichment claim "is measured by defendant's unjust gain,

rather than by plaintiffs' loss," Chevron is already entitled to restitution equal to the value of the

fraudulently obtained judgment and payments received from investors for a percentage of their

recoveries. *Banyai v. Mazur*, No. 00 Civ. 9806 (SHS), 2007 WL 959066 *4 (S.D.N.Y. Mar. 29,

2007) (citing *Pereira v. Farce*, 413 F.3d 330, 340 (2d Cir. 2005)) (internal quotation marks omit-

ted); *see also United States v. Gabelli*, No. 03 CIV 8762 (PAC), 2005 WL 2978921, at *3–4

(S.D.N.Y. Nov. 4, 2005) ("Damages typically focus on the plaintiff and provide 'make-whole,'

compensatory, monetary relief; restitution, by contrast, concentrates on the defendant—

preventing unjust enrichment, disgorging wrongfully held gains, and restoring them to the plain-

tiff."); *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 368–69 (2d Cir. 2011); *FTC v. Verity Int'l,

Ltd.*, 443 F.3d 48, 67 (2d Cir. 2006). In other words, Defendants must disgorge their ill-gotten

gains.[5]

It does not matter that some of Defendants' ill-gotten gains have come from third party

investors. Even where a defendant's unjust enrichment comes from a third party, rather than di-

rectly from the plaintiff, "[t]he reach of equity is not so short" as to preclude recovery on a theo-

ry of unjust enrichment. *EBC I, Inc. v. Goldman Sachs & Co.*, 7 A.D.3d 418, 420, 777 N.Y.S.2d

440 (1st Dep't 2004) (upholding unjust enrichment claim), *aff'd in part, rev'd in part on other

grounds by* 5 N.Y.3d 11, 832 N.E.2d 26 (N.Y. 2005) (dismissing unjust enrichment claim on

---

[5]   Among the relief to which Chevron may be entitled on its unjust enrichment claim is a con-
structive trust over any judgment proceeds. *See Kessenich v. Raynor*, 120 F. Supp. 2d 242,
251-52 (E.D.N.Y. 2000) (citing *Golden Budha Corp. v. Canadian Land Co. of Am., N.V.*, 931
F.2d 196, 202 (2d Cir. 1991)). Thus, attachment resulting from Chevron's likelihood of suc-
cess on its unjust enrichment claim could be considered the equivalent of a constructive trust
over these judgment proceeds.

other grounds, finding it precluded by parties' contract).  In such circumstances, "[i]t suffices that defendant received benefits to which it was not entitled that were effectively conferred by plaintiff."  *Id.* (holding unjust enrichment claim available where defendant received kickbacks from third parties after underpricing shares of plaintiff's company); *see also State v. Daicel Chem. Indus., Ltd.*, No. 403878/2002, 2004 WL 5487822 (N.Y. Sup. Ct. 2004) (quoting *EBC I* with approval and finding that pleading "a direct benefit or enrichment as a direct result of plain-tiffs conferring a benefit" is not required to maintain an unjust enrichment claim); *Mfrs. Hanover Trust Co. v. Chemical Bank*, 160 A.D.2d 113, 117, 559 N.Y.S.2d 704, 708 (1st Dep't 1990) ("It does not matter whether the benefit is directly or indirectly conveyed" in order to sustain claim for unjust enrichment); *Breakaway Solutions, Inc. v. Morgan Stanley & Co., Inc.*, No. Civ. A. 19522, 2004 WL 1949300, at *15 n.106 (Del. Ch. Aug. 27, 2004) (citing *EBC I* for the proposi-tion that New York law "apparently does not necessarily require that the [unjust] enrichment be *at the expense* of the plaintiff") (emphasis in original).

Thus, Chevron will be entitled to obtain equitable restitution or disgorgement of Defend-ants' unjust gain—which equals the current value of the fraudulent $18 billion judgment—even though Chevron has not paid any money to satisfy that fraudulent judgment.  Defendants possess a fraudulent judgment against Chevron that they unjustly obtained at Chevron's expense.  In-deed, Defendants have already monetized a portion of the judgment by selling shares in it, en-riching themselves by, at a minimum, more than $10 million in third-party investment funds, ac-cording to discovery received by Chevron to date.  *See* Shavell Aff. at ¶ 16; Champion Decl. at ¶ 41.  Defendants also admit their intention to continue selling off pieces of the judgment.  *See* Dkt. 365 at 13–15.  Chevron is therefore entitled to an order of prejudgment attachment in an amount equal to the current value of the judgment—which Chevron can enforce against the

judgment itself, Defendants' only significant asset, which is sited in New York as this Court has jurisdiction over Chevron. *See Hotel 71 Mezz Lender*, 14 N.Y.3d at 314–16 (holding that the "situs of the debt is wherever the debtor is present") (citing *Harris v. Balk*, 198 U.S. 215, 222–23 (1905)).

Further, the current market value of the judgment in Defendants' hands is measurable. Professor Shavell calculates the present "market value" of the judgment by looking at the prices that the Defendants have received for pieces of it. According to his analysis and that of Professor Grenadier, the present value of the judgment is at least $200 million (Shavell Aff. at ¶¶ 7–8, 9–16; *see also* Grenadier Aff. at ¶¶ 6–7, 10–12, 18–24), and Chevron is therefore entitled to an order of attachment in at least that amount.

Should Defendants attempt to enforce the fraudulently obtained judgment against Chevron's assets or those of its affiliates, the value of the judgment in Defendants' hands might increase. In that case, the amount by which Defendants are unjustly enriched would also increase, and Chevron would be entitled to an increase in the amount of its attachment, and potentially other remedial relief as well. An attachment would prevent Defendants from collecting judgment proceeds only to disburse them, alienating their only significant asset that is capable of providing security for a judgment in favor of Chevron in this case.[6]

---

[6] Though attachment is proper where likelihood of success is found on a single claim (*Musket Corp.*, 512 F. Supp. 2d at 160–61), Chevron's fraud claim is also based in part on damages arising from the fraudulent Lago Agrio judgment and offers another ground for attachment. *See Kayser-Roth Corp. v. Berger*, 427 F. Supp. 452, 454 (S.D.N.Y. 1976) (granting attachment based on New York state law fraud claim); *Deutsche Anlagen-Leasing GMBH v. Kuehl*, 111 A.D.2d 69, 70–71, 489 N.Y.S.2d 195 (1st Dep't 1985) (same). Specifically, Chevron pleaded that Defendants' knowing material misrepresentations relating to "the falsified Calmbacher reports, the true authorship of the Cabrera Report, the denial of any improper contact with Cabrera, the supposed independence and neutrality of Cabrera and his liability and damages assessment, the submission of new "[cleansing] expert" reports based on the fraudulent Cabrera Report, and the fraudulent endorsements of the Cabrera Report," were

### III.    Chevron Is Entitled to an Attachment on Its RICO Damages

RICO damages are intended to restore the plaintiff to the position he would have occu-

pied, absent the illegal conduct.  *See Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1106 (2d Cir.

1988).  The fact of the fraudulent Ecuadorian judgment is itself a present damage to Chevron,

and attachment of that judgment, at least to the extent of its present value of $200 million, is nec-

essary to restore Chevron to the position it would have occupied absent Defendants' illegal con-

duct.  In addition, Chevron is entitled to an attachment to secure its recovery on the attorneys'

fees it has incurred to defend against the fraudulent Lago Agrio suit and to pursue Section 1782

discovery in the U.S. to uncover Defendants' fraud.  Thus, for attachment purposes, Chevron's

RICO damages are at least in part presently quantifiable.  And they should be trebled.  *See* 18

U.S.C. § 1964(c).

### A.    Chevron Is Entitled to Attach the Value of the Judgment to Restore it to the Position It Would Have Occupied Absent Defendants' Illegal Conduct

The only way to place Chevron in the same position it would have been in "absent the

[Defendants'] illegal conduct" is through an attachment protecting Chevron from the effects of

Defendants' use of their fraudulent judgment in a vexatious foreign enforcement campaign.

Well-established Second Circuit law holds that RICO allows for the recovery of "future damag-

es."  *See Bingham v. Zolt*, 66 F.3d 553, 560 (2d Cir. 1995); *Bankers Trust*, 859 F.2d at 1106 (ap-

plying to RICO the principles of antitrust law as articulated in *Zenith Radio Corp. v. Hazeltine*

---

made with the "intent of obtaining favorable rulings from the U.S. and Lago Agrio courts,"
and were "relied upon" "by the Lago Agrio court by means of its acceptance of Defendants'
and Cabrera's misrepresentations and omissions and its failure to take meaningful corrective
action," resulting in significant damage to Chevron.  Dkt. 356-1 at ¶¶ 389–93.  And given the
overwhelming and undisputed evidence that Defendants ghostwrote the Lago Agrio judg-
ment itself (*see* Dkts. 369 at 9 n.2; 370 at ¶¶ 2–16 & accompanying exhibits; Dkts. 397 at
14–18; 398 at ¶¶ 40–45 & accompanying exhibits; *see also* Champion Decl., Ex. 1267), the
appellate court's apparent "reliance on" the fraudulent representations therein further sup-
ports Chevron's claim of fraud.

*Research, Inc.*, 401 U.S. 321, 339 (1971)). Future damages "need not be calculated with mathe-matical precision" so long as this Court can "make a fair and reasonable estimate of plaintiffs' future damages." *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1378 n. 27 (2d Cir. 1988); *see also Higgins v. New York Stock Exchange, Inc.*, 942 F.2d 829, 832 (2d Cir. 1991) (when applying *Zenith*, courts will decline to estimate future damages only in a "rare case"); *Johnson v. Nyack Hosp.*, 954 F. Supp. 717, 720 (S.D.N.Y. 1997) (Kaplan, J.) (applying *Zenith* in civil rights context and holding that plaintiff could have alleged future economic damages in ear-lier action). The LAPs already have their judgment in hand. Professors Shavell and Grenadier have both calculated the present value of that judgment as $200 million. These calculations of the judgment's present value are an appropriate measure of Chevron's likely future damages.

Courts have recognized in a variety of contexts that a plaintiff can incur damages due to a wrongfully imposed judgment even before he pays the judgment. For example, "the majority of jurisdictions," including New York, allow an insured against whom an excess judgment is en-tered as a result of an insurance company's bad faith to sue for damages immediately upon entry of the judgment. *Henegan v. Merchants Mut. Ins. Co.*, 31 A.D.2d 12, 13, 294 N.Y.S.2d 547 (1st Dep't 1968) ("An insurer which has been guilty of bad faith, one which has deliberately shackled its insured with the crippling jeopardy of a large excess judgment, may not insist that the insured must sacrifice his assets and pay the judgment before suit."). This is because "the mere existence of an excess final judgment causes harm to the judgment debtor." *Id.*; *see also Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 402 (2d Cir. 2000) ("[E]xcess judgments are damages in themselves . . . and so properly the subject of awards in bad faith claims."). And many courts follow the same rule in the context of legal malpractice claims. *See, e.g.*, *Stanley v. Trinchard*, 500 F.3d 411, 422 n.35 (5th Cir. 2007) (collecting cases); *Shipman v. Kruck*, 267 Va. 495, 508 (Va. 2004) ("[A] cli-

13

ent who suffers the entry of a judgment against him indeed suffers a legal injury or damages. There is little remote, speculative, or contingent about a money judgment." (citation omitted)).

There is no reason to apply a different rule here. Defendants' illegal activity has led directly to the entry of a judgment that will cause real, concrete injury to Chevron. Indeed, Chevron will now have to incur the cost of defending itself against Defendants' vexatious foreign litigation seeking to enforce that judgment. Moreover, the cost of potentially avoiding that consequence, and the fact of damage to Chevron, is reflected in the present value of the judgment, as calculated by Professors Shavell and Grenadier. Such resulting damages are more than sufficient to justify issuance of the requested attachment order in the amount of the judgment, at least to the extent of its present value of $200 million, as calculated by these experts.

Although Defendants failed to raise this issue in opposing Chevron's initial attachment motion, this Court expressed the concern that the judgment might have to be liquidated, in whole or part, in order to support an attachment.[7] Events since then have only exacerbated the situation

---

[7] This Court analogized Chevron's situation with respect to a judgment which has not yet been enforced to that of an indemnitee with an unaccrued claim. *See* Dkt. 377 at 6 n.9. But indemnification and attachment have distinct purposes. While an indemnitee typically seeks reimbursement for money that it has *already paid*, a party seeking attachment seeks security for an interest in a judgment potentially owed to it in the future. *Compare FCA Assocs. v. Texaco, Inc.*, No. 03-CV-6083T, 2005 WL 735959, at *6 (W.D.N.Y. Mar. 31, 2005) (noting that the "purpose of indemnification is to ensure that a party which has discharged a duty actually owed by another may be *reimbursed* for undertaking that duty" (citation omitted) (emphasis added)) *with Bank of China v. NBM L.L.C.*, 192 F. Supp. 2d 183, 187 (S.D.N.Y. 2002) ("New York's attachment statute is designed to serve twin functions:  obtaining jurisdiction over nondomiciliaries and *preventing defendants from frustrating judgments by transferring or secreting assets out of New York*." (emphasis added)). *Bay Ridge Air Rights v. State*, 44 N.Y.2d 49, 54, 375 N.E.2d 29 (1978), cited by the Court, involved an indemnification claim against the State of New York for a potential judgment in a case that had not yet been decided. *See* Dkt. 377 at 6, n.9. The court noted that "a party seeking indemnification or contribution ordinarily need not await the ripening of his claim to protect his right to proceed against a third party," but that the date of accrual in the specific facts of that case was significant because the indemnification claim was brought against the State of New York, requiring litiga-

and made all too clear the future damages Chevron faces here.  For the reasons explained here, an attachment in the amount of the judgment, at least to the extent of its present value, is appropriate and consistent with ample precedent.  *Cf. Mueller*, 193 F. Supp. at 652 (denying motion to vacate attachment in response to supplemental affidavit with "evidentiary matter from which a judge (at least in theory) can approximate the outside limit of damages a jury might find").[8]

Accordingly, on Chevron's RICO claims, this Court should enter an order attaching the judgment, at least to the extent of its present value of $200 million, trebled under the statute, in order to protect Chevron fully from Defendants' fraudulent scheme and prevent the Defendants from dissipating the judgment through vexatious foreign enforcement proceedings in the interim.

### B.   Chevron Has Also Incurred Millions of Dollars in Attorneys' Fees for Which It Is Entitled to Attachment

Chevron has incurred, and will continue to incur, substantial legal fees and expenses in defending against Defendants' campaign to extort billions of dollars from Chevron—including fees to defend itself in the fraudulent Lago Agrio litigation and fees spent on Section 1782 discovery in the U.S. to uncover Defendants' fraud, among others.  While Chevron is not attempting here to aggregate all of the attorneys' fees for which it may be entitled to a recovery as RICO damages, for purposes of this attachment motion it now presents unassailable evidence of a subset of its total fees, on which an attachment order can readily be predicated.

---

tion in the Court of Claims, whose rules do take into account the accrual date of a claim.  *Bay Ridge Air Rights*, 44 N.Y.2d at 54.

[8]  In the cases the Court cited in support of requiring a liquidated claim, the plaintiffs did not offer known damages.  For example, a known measure of damages was not present in *Prentiss v. Greene*, 193 A.D. 672, 679, 184 N.Y.S. 558 (1st Dep't 1920), where attachment was sought on a breach of contract claim but plaintiff failed to show that the stock at issue "would have had any market value" entitling plaintiff to more than nominal damages.  Similarly, *Usdan v. Dunn Paper Co.* involved a breach of contract action for payment of commissions.  392 F. Supp. 953, 956–57 (E.D.N.Y. 1975).  The court granted attachment on lost commissions but not on lost sales that it found were speculative.  *Id.*  Finally, in *Mueller*, 193 F. Supp. at 651–52, plaintiff sought attachment on per se libel claims for general damages of $250,000 per libel based solely on the assertion of damages in that amount in his complaint.

As this Court has explained, it is "well settled that legal fees may constitute RICO dam-ages when they are the proximate consequence of a RICO violation." *First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.*, 218 F. Supp. 2d 369, 382 (S.D.N.Y. 2002) (Kaplan, J.) (citing *Bankers Trust*, at 1099 & 1105 (holding that attorneys' fees incurred in defending against sham litigation or sham allegations are recoverable RICO damages)). Here, "the pattern of racketeering activi-ty" and Defendants' "individual predicate acts [have] impose[d] a direct injury" upon Chevron in the form of attorneys' fees. *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 123 (2d Cir. 2003). At-tachment may be sought to secure an award of attorneys' fees when those fees constitute damag-es. *See Reeder v. Mastercraft Elecs. Corp.*, 297 F. Supp. 815, 819 (S.D.N.Y. 1969) (finding that "an affidavit showing prima facie the reasonableness of the $15,000[] sought as attorneys' fees, costs and disbursements, should also have been submitted"); *see also Davila Pena v. Morgan*, 149 F. Supp. 2d 91, 95 (S.D.N.Y. 2001) (Kaplan, J.) (granting attachment to secure future judg-ment for attorney's lobbying fees).

Chevron's attorneys' fees expended in the Lago Agrio litigation in Ecuador have been proximately caused by Defendants' pattern of racketeering activity and underlying predicate acts. But for the scheme to extort Chevron, in part through sham litigation, Chevron would not have been required to expend attorneys' fees in the Lago Agrio litigation. Such expenditures were a "foreseeable and natural consequence" of Defendants' scheme. *Bridge v. Phoenix Bond & In-dem. Co.*, 553 U.S. 639, 658 (2008). Similarly, Chevron has also been required to expend sub-stantial attorneys' fees to uncover Defendants' scheme through Section 1782 discovery in the U.S. *See* Jones Decl. & Heckert Decl. Indeed, Chevron has had to initiate more than twenty Section 1782 proceedings throughout the country to expose Defendants' fraud. Champion Decl. at ¶¶ 47–48.

16

Here, Chevron seeks attachment on only this subset of its fees and provides affidavits verifying more than $68 million in such fees. *See* Jones Decl. & Heckert Decl. But again, being conservative, it now seeks an attachment in this regard on only $60 million in recoverable fees, trebled under the statute. *See* 18 U.S.C. § 1964(c).

\*\*\*

Accordingly, Chevron is entitled to an attachment on its RICO claims in the amount of at least $780 million (consisting of $200 million as the present value of the fraudulently-procured judgment, and $60 million in attorneys' fees, trebled under the statute).

## IV. Chevron Renews Its Request That This Court Enter a TRO to Prevent Defendants From Dissipating Their Interest in the Judgment

Pursuant to CPLR 6210 and Federal Rule of Civil Procedure 64, as previously explained, Chevron is entitled to a temporary restraining order "prohibiting the transfer of assets" by Defendants or their garnishees.[9] *See* Dkt. 354 at 42–43. Here, where Defendants' principal asset in

---

[9] Federal Rule of Civil Procedure 64 permits Chevron to request entry of a TRO under applicable state law, pending resolution of its Renewed Motion for Attachment. *See Libancell S.A.L. v. The Rep. of Leb.*, No. 06 Civ. 2765 (HB), 2006 WL 1321328, at \*5 (S.D.N.Y. May 16, 2006). CPLR 6210 provides that, "[u]pon a motion on notice for an order of attachment, the court may, without notice to the defendant, grant a temporary restraining order prohibiting the transfer of assets." Thus, New York state law permits a court to enter a temporary restraining order at the inception of a noticed attachment motion—ex parte and without holding any prior noticed hearing—to preserve the status quo, pending resolution of the attachment motion. *See Agnew v. Alicanto, S.A.*, 125 F.R.D. 355, 357 (E.D.N.Y. 1989) (finding that, in support of a motion for attachment on notice, "[t]he temporary restraining order was granted without notice because . . . the bulk of the property to be attached were liquid funds that easily could be transferred out of New York by wire upon receipt of notice."); *Provisional Protective Comm. v Williams*, 121 A.D.2d 271, 273, 503 N.Y.S.2d 47 (1st Dep't 1986) (describing section 6210 as allowing ex parte temporary restraining orders for motions for attachment on notice); *Concord Asset Mgmt., Inc. v. Intercredit Corp.*, No. 92 Civ. 7756 (JFK), 1992 WL 373477, at \*2 (S.D.N.Y. Dec. 3, 1992) (distinguishing CPLR 6210— TRO on notice in aid of attachment on notice—from CPLR 6210—ex parte attachment without notice). Having given prior notice of its attachment application, having renewed that application and given notice by e-filing, and having now made the requisite showing supporting all of the elements entitling it to an attachment, Chevron has satisfied the requirements of CPLR 6210 for immediate entry of a TRO. Alternatively, Chevron asks this Court to set a prompt hearing

New York is their interest in the Lago Agrio judgment, an effective TRO "prohibiting the transfer" of Defendants' assets would necessarily include barring Defendants, their agents, employees, and attorneys, from transferring or attempting to transfer any interest in the Lago Agrio judgment or seeking to convert it into proceeds during the pendency of the attachment motion.

Chevron requests expedited consideration from the Court given the LAPs' recent efforts to obtain a declaration of enforceability in defiance of the BIT Arbitration Tribunal's Interim Measures Awards and their threats to begin vexatious enforcement proceedings. *See, e.g.,* Champion Decl. ¶ 45; *see also* Exs. 1238, 1253-1257; 1259-62; 1264-66; 1270; 1272-73.[10]

At a minimum Chevron respectfully requests protection from any prejudice due to the time necessary to resolve this motion. Defendants' efforts to conceal and encumber the judgment proceeds through assignments to third parties and their repeated statements since the appel-

---

date and order the Defendants to show cause at that hearing why a TRO should not be entered, pending resolution of Chevron's Renewed Motion for Attachment.

[10]   *See* Champion Decl., Exs. 1266 (on February 3, 2012, Fajardo reiterated that the LAPs' will "'pursue the oil company's assets around the world until it pays every last cent that it owes today to the Ecuadorian Amazon.'"); 1265 (January 27, 2012, Fajardo stated, "with this [Second Circuit] ruling, we are at liberty to initiate enforcement actions anywhere in the world, including in the U.S."); 1264 (on January 5, 2012: "Plaintiffs are working on a strategy for legal action in 'several continents and countries the world over where Chevron has assets,' Pablo Fajardo, the plaintiffs' lead lawyer, said . . . ."); 1256 (on January 4, 2012, Fajardo threatened that "[w]e're going to start the necessary actions for the ruling to be enforced in several continents and countries where Chevron has assets" (even though Chevron Corporation has assets only in the United States)); 1259 (on January 4, 2012, Fajardo stated, "'This [Ecuadorian appellate] judgment gives us the ability to go ahead and enforce the ruling in any part of the world where we see fit'"); 1260 (on January 4, 2012, Fajardo stated that "the path is clear for the plaintiffs to execute the judgment when it is legally possible, 'on different continents and in the different parts of the world . . . where Chevron has assets'"); 1261 (on January 4, 2012, Fajardo stated "the appellate decision makes the judgment enforceable even before a higher court ruling" and "the plaintiffs are prepared to seize Chevron assets abroad if necessary"); 1262 (on January 4, 2012, Fajardo announced, after the issuance of the Ecuadorian appellate decision, that the LAPs are "going to initiate the necessary enforcement actions on the different continents and in the countries where Chevron has assets, and we're going to go to different courts around the world to demand that Chevron pay"); Dkt. 354 at 13 n.3 (citing Exs. 1000, 1002–03).

late decision was entered in Ecuador illustrate the need for a temporary restraining order to preserve Chevron's interests pending the entry of a final order of attachment. *See* Dkt. 365.

## CONCLUSION

For the foregoing reasons, and for those set forth in Chevron's original attachment motion, Chevron respectfully requests that the Court enter an order of attachment in Chevron's favor (i) attaching Defendants' assets in a sum certain to be determined by this Court and (ii) directing the United States Marshal to take any debts or property in which Defendants claim a right, including the $18.2 billion Lago Agrio Judgment, into the Marshal's constructive possession.

Chevron further respectfully requests that, if necessary, in the interim, the Court issue a Temporary Restraining Order barring Defendants, their agents, employees, and attorneys from transferring or attempting to transfer any interest in the Lago Agrio judgment or seeking to convert it into proceeds. *See* CPLR 6210 and Fed R. Civ. P. 64.

Dated:  March 5, 2012                  Respectfully submitted,

                                        Randy M. Mastro
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Telephone: 212.351.4000
Facsimile: 212.351.4035

Andrea E. Neuman
3161 Michelson Drive
Irvine, California 92612
Telephone: 949.451.3800
Facsimile: 949.451.4220

William E. Thomson
333 South Grand Avenue
Los Angeles, California 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

Attorneys for Chevron Corporation