UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CHEVRON CORPORATION,

                Plaintiff,


       -against-                                11 Civ. 0691 (LAK)


STEVEN DONZIGER, et al.,

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## OPINION ON MOTION TO DISMISS AMENDED COMPLAINT

Appearances:


                Randy M. Mastro
                Andrea E. Neuman
                Kristen L. Hendricks
                Scott A. Edelman
                William E. Thompson
                GIBSON, DUNN & CRUTCHER, LLP
                *Attorneys for Plaintiff*

                John W. Keker
                Elliot R. Peters
                Christopher J. Young
                Jan Nielsen Little
                Matthew M. Werdeger
                Nikki H. Vo
                Paula L. Blizzard
                William S. Hicks
                KEKER & VAN NEST, LLP
                *Attorneys for Donziger Defendants*

TABLE OF CONTENTS

Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
  The Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
  Proceedings to Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
  I.    Legal Standard for Rule 12(b)(6) Motion . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
  II.   RICO – Section 1962(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
        A.    Alleged Extraterritorial Application . . . . . . . . . . . . . . . . . . . . . . . . . . 8
              1.    Chevron's Allegations and the *Norex* Decision . . . . . . . . . . . . 10
              2.    Answering the Extraterritoriality Question . . . . . . . . . . . . . . . . 12
                    a.    Emphasis on the Enterprise . . . . . . . . . . . . . . . . . . 13
                    b.    Emphasis on the Alleged Racketeering Activity . . . . . . . 17
              3.    Application to this Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
        B.    Sufficiency of Pattern Allegation – The Single Scheme Argument . . . . . 21
        C.    Sufficiency of Predicate Act Allegations . . . . . . . . . . . . . . . . . . . . . . . 23
              1.    Extortion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
              2.    Mail and Wire Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
              3.    Money Laundering . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
              4.    Obstruction of Justice and Witness Tampering . . . . . . . . . . . . 31
        E.    Causation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
  III.  RICO Conspiracy – Section 1962(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
  IV.   Common Law Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
        A.    Chevron's Allegations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
        B.    Reliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
              1.    First-Party Reliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
              2.    Third-Party Reliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
  V.    Tortious Interference with Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
  VI.   Trespass to Chattels . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
  VII.  Unjust Enrichment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
  VII.  New York Judiciary Law § 487 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
  VIII. Civil Conspiracy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

LEWIS A. KAPLAN, *District Judge.*

Last year, an Ecuadorian trial court entered a multibillion dollar judgment ("the Judgment")[1] against Chevron Corporation ("Chevron") in an action brought by 47 individual Ecuadorian residents (the "Lago Agrio Plaintiffs" or "LAPs").  In anticipation of the Judgment, Chevron filed this action against (1) the LAPs, (2) their New York lawyer Steven Donziger, the Law Offices of Steven Donziger, Donziger & Associates, PLLC (collectively, the "Donziger Defendants"), (3) Stratus Consulting, Inc. and two of its personnel (collectively, the "Stratus Defendants"), and (4) a few other defendants.[2]  Two of the LAPs (the "LAP Representatives") and the Donziger and Stratus Defendants have appeared.  The remainder have defaulted.[3]

The matter is now before the Court on the Donziger Defendants' motion to dismiss the amended complaint for failure to state a claim upon which relief can be granted.[4]  The Court assumes familiarity with the extensive history of this controversy in this Court and the Court of Appeals, which is fully set out in numerous published decisions.[5]

---

[1]

An appellate court in Ecuador affirmed the Judgment in all material respects in January 2012.  DI 384.

[2]

These other individuals and entities included are: Pablo Fajardo Mendoza ("Fajardo"), Luis Yanza ("Yanza"), Selva Viva Selviva CIA, Ltda ("Selva Viva"), and the Amazon Defense Front ("ADF").  Chevron alleges also that various "co-conspirators" were part of the RICO enterprise, but they are not named as defendants.

[3]

DI 206, Ex. 16.

[4]

As these motions to dismiss were filed before the Court severed Count 9, they include arguments related to that cause of action. The Court, however, considers only those arguments related to the other eight counts because they are all that remain pending in this action.

[5]

These include the following:

Decisions in proceedings brought under 28 U.S.C. § 1782:  *In re Chevron Corp.*, 709 F. Supp. 2d 283 (S.D.N.Y.), *aff'd sub nom.*, *Chevron Corp. v. Berlinger*, 629 F.3d 297 (2d Cir.

*Facts*

*The Complaint*

The amended complaint in this case contains more than 432 paragraphs of allegations, supplemented by a 56-page, single-spaced appendix that sets forth specific details amplifying assertions in the body of the pleading.  For purposes of this motion to dismiss, they all are assumed to be true, and the plaintiff is entitled to the benefit of all inferences reasonably drawn from them.

In most instances, a decision ruling on a motion to dismiss would begin with a summary of the allegations of the complaint.  In this case, however, that is unnecessary to the disposition of this motion, as most of Chevron's factual allegations are set forth in the Court's findings with respect to an earlier motion for a preliminary injunction.[6]  Where more detailed consideration of specific allegations is required, it is reserved to those portions of this opinion as deal with the substantive issues to which those allegations are pertinent.  The Court emphasizes, however, that it decides this Rule 12(b)(6) motion based strictly upon the allegations of the amended complaint and matters incorporated therein by reference and that it has not relied upon evidence that has been before it on other motions.  For present purposes it suffices to summarize most briefly the

---

2010); *In re Chevron Corp.*, 736 F. Supp. 2d 773 (S.D.N.Y. 2010); *In re Chevron Corp.*, 749 F. Supp. 2d 135, *fuller opinion*, *In re Chevron Corp.*, 749 F. Supp. 2d 141, *on reconsideration*, 749 F. Supp. 2d 170 (S.D.N.Y., *aff'd sub nom.*, *Lago Agrio Plaintiffs v. Chevron Corp.*, 409 Fed. Appx. 393 (2d Cir. 2010).

Other decisions:  *Chevron Corp. v. Donziger*, 768 F. Supp. 2d 581 (S.D.N.Y. 2011) ("*Donziger I*") (granting preliminary injunction), *rev'd*, *Chevron Corp. v. Naranjo*, 667 F.3d 232 (2d Cir. 2012); *Chevron Corp. v. Donziger*, 800 F. Supp. 2d 484 (S.D.N.Y. 2011) ("*Donziger II*") (granting separate trial and expedited discovery on claim for declaratory judgment).

[6]

*Donziger I*, 768 F. Supp. 2d at 594-626.

fundamental core of its claims and to outline the causes of action included in the amended complaint.

Although there is more to the case, Chevron's claims include assertions that Steven Donziger, a New York lawyer, and others based in the United States, here conceived, substantially executed, largely funded, and significantly directed a scheme to extort and defraud Chevron, a U.S. company, by, among other things, (1) bringing a baseless lawsuit in Ecuador; (2) fabricating (principally in the United States) evidence for use in that lawsuit in order to obtain an unwarranted judgment there; (3) exerting pressure on Chevron to coerce it to pay money not only by means of the Ecuadorian litigation and Judgment, but also by subjecting Chevron to public attacks in the United States and elsewhere based on false and misleading statements, (4) inducing U.S. public officials to investigate Chevron on the basis of false claims, and (5) making false statements to U.S. courts and intimidating and tampering with witnesses in U.S. court proceedings to prevent Chevron from obtaining evidence of the fraud.

The amended complaint contains nine causes of action:

Counts 1 and 2 assert substantive and conspiracy claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). The details of their allegations are described extensively below. Broadly speaking, however, they allege that the Donziger Defendants, the Stratus Defendants, some of the other defendants (but not the LAPs),[7] and a number of non-parties conducted and conspired to conduct the affairs of an enterprise through a pattern of racketeering activity in order, among other things, "to coerce Chevron into paying billions of dollars" to "stop

---

[7]     *See supra* note 2.

4

[an allegedly extortionate] campaign against it."[8]  The alleged predicate acts include extortion, mail and wire fraud, money laundering, witness tampering, and obstruction of justice.

Counts 3 through 5 assert claims against all defendants for fraud, tortious interference with contract, and trespass to chattels relating to the allegedly unlawful scheme described above.[9]

Count 6 asserts claims against all defendants for unjust enrichment on the ground that defendants have been and will be enriched as a result of the Judgment.[10]

Count 7 asserts a state law claim for civil conspiracy against all defendants, alleging that they conspired to commit the substantive state law violations.[11]

Count 8 asserts that the Donziger Defendants violated Section 487 of the New York Judiciary Law.[12]

Count 9 sought a declaration that the Judgment was unenforceable and unrecognizable "on, among others, grounds of fraud, failure [by Ecuador] to afford procedures compatible with due process, lack of impartial [Ecuadorian] tribunals, lack of personal jurisdiction, [and] contravention of public policy."[13]  As detailed below, Count 9 has been disposed of previously.

---

[8]

Amended Complaint [DI 283] ("Cpt.") ¶¶ 1-2, 342; *see id.* ¶¶ 339-87.

[9]

*Id.* ¶¶ 388-409.

[10]

*Id.* ¶¶ 410-13.

[11]

*Id.* ¶¶ 414-19.

[12]

*Id.* ¶¶ 420-26.

[13]

*Id.* ¶ 430.

*Proceedings to Date*

        In March 2011, this Court preliminarily enjoined the LAPs and others from, among other things, seeking enforcement or recognition of the Judgment outside Ecuador.[14] That injunction rested on findings that (1) Chevron was threatened with immediate and irreparable injury, (2) it was likely to prevail on its claim the Judgment was not entitled to recognition or enforcement because Ecuador did not provide impartial tribunals and due process, (3) the record showed serious questions as to whether the Judgment had been procured by fraud, and (4) the balance of hardships weighed in favor of preliminary injunctive relief.[15]   The Court subsequently bifurcated, and later severed Count 9, which sought a declaration that the Judgment was not entitled to recognition or enforcement and a permanent injunction against enforcement efforts, set a trial date on that Count, and stayed proceedings on Counts 1 through 8 pending resolution of Count 9.[16]

        In September 2011, the Second Circuit vacated the preliminary injunction and stated that an opinion would follow.  The subsequent opinion did not pass, one way or the other, on this Court's findings with respect to the nature of the Ecuadorian tribunals or the evidence of fraud in the procurement of the Judgment.  Rather, it explained that the panel had vacated the preliminary injunction on the ground that:

> "the procedural device [Chevron] has chosen to present those claims is simply unavailable: The [New York Recognition of Foreign Country Money Judgments Act ("Recognition Act")] nowhere authorizes a court to declare a foreign judgment

---

[14]     *Donziger I*, 768 F. Supp. 2d at 581.

[15]     *Id*.

[16]     DI 279.

unenforceable on the preemptive suit of a putative judgment-debtor."[17] The prayer for declaratory relief, the Circuit held, was of no avail because, in its view, a declaration of the enforceability or recognizability of the Judgment could not be had because the Recognition Act (1) "does not authorize a court to declare a foreign judgment null and void for all purposes in all countries,"[18] and (2) could not justify a declaration with respect to recognizability and enforcement in New York alone because there was no indication that the LAPs ever would seek to enforce the Judgment here.[19]   The Circuit remanded Count 9 to this Court with instructions to dismiss it in its entirety.[20]

Accordingly, Counts 1 through 8 remain and were unaffected by the appellate decision.  They are the only claims relevant to the Donziger Defendants' motion to dismiss.

## Discussion

### I.     *Legal Standard for Rule 12(b)(6) Motion*

In resolving a Rule 12(b)(6) motion, the Court accepts as true the factual allegations set forth in the complaint and draws all reasonable inferences in the plaintiff's favor.[21]  In order to understand such a motion, "the plaintiff must provide the grounds upon which [its] claim[s] rest[]

---

[17]

*Naranjo*, 667 F.3d at 240.

[18]

*Id.* at 245.

[19]

*Id.* at 246.

[20]

*Id.* at 234.

[21]

*See, e.g.*, *Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001) (citing *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994)), *cert. denied*, 535 U.S. 1054 (2002).

through factual allegations sufficient 'to raise a right to relief above the speculative level.'"[22]

Although a Rule 12(b)(6) motion is addressed to the face of the pleading, the court may consider

documents attached to or incorporated by reference in the complaint.[23]   Moreover, as previously

noted, the Court in deciding this Rule 12(b)(6) motion has confined itself to the allegations of the

amended complaint and the handful of other documents properly considered on such a motion, most

notably the Ecuadorian court decisions and other decisions of U.S. courts that are proper subjects

of judicial notice.[24]

II.      *RICO – Section 1962(c)*

        Chevron brings its substantive RICO claim under 18 U.S.C. § 1962(c), which makes

it unlawful "for any person employed by or associated with any enterprise engaged in . . . interstate

or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such

enterprise's affairs through a pattern of racketeering activity."[25]   The statute thus requires Chevron

to allege (1) an enterprise, (2) the conduct of the affairs of the enterprise through (3) a pattern of

racketeering activity, and (4) injury to [its] business or property . . . caused by the violation of

---

[22]

      *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 677-68 (2009).

[23]

      *E.g.*,  *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007); *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000).

[24]

      *See, e.g.*, *Lefkowitz v. Bank of N.Y.*, 676 F. Supp. 2d 229, 249 (S.D.N.Y. 2009).

[25]

      18 U.S.C. § 1962(c).

Section 1962."[26]

      The Donziger Defendants assert that the RICO claim should be dismissed because (1) it would require an impermissible attempt to apply the statute extraterritorially, and Chevron (2) fails to allege a pattern of racketeering activity, (3) does not sufficiently plead predicate acts, and (4) fails to allege that its injuries were caused by the predicate acts.[27]

### A.    *Alleged Extraterritorial Application*

      The extraterritoriality argument stems from *Morrison v. National Australia Bank Ltd.*,[28] the so-called "foreign cubed" case, in which the Supreme Court considered whether foreign plaintiffs had a cause of action under Section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act")[29] for an alleged securities fraud perpetrated against foreign plaintiffs by both foreign and domestic defendants with respect to transactions in foreign securities that took place on a foreign stock exchange.[30]  It approached the question in two steps.

      It first referred to the principle that U.S. legislation presumptively has no extraterritorial application in the absence of Congressional intent that it be so applied, and concluded

---

[26]

      *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 184 (2d Cir. 2008) (citing *DeFalco v. Bernas*, 244 F.3d 286, 305 (2d Cir. 2001) (internal quotation marks omitted)); *see* 18 U.S.C. § 1964(c).

[27]

      *See* DI 303, at 2-16.

[28]

      130 S. Ct. 2869 (2010).

[29]

      15 U.S.C. § 78j(b).

[30]

      130 S. Ct. at 2875.

that the presumption against extraterritorial effect had not been rebutted because the Exchange Act is silent as to extraterritorial effect.[31]

It then passed to the issue whether the plaintiffs' proposed application of the statute on the facts before it would have been extraterritorial.  It reasoned that the "focus" of Section 10(b) was to afford a remedy for deceptive conduct "in connection with the sale of any security registered on a [U.S.] national securities exchange or any security not so registered" and ultimately held that "only transactions in securities listed on domestic exchanges, and domestic transactions in other securities" are actionable under the statute.[32]  As the transactions of which the foreign plaintiffs complained had occurred on an Australian exchange and involved shares of an Australian bank, it affirmed the dismissal of the complaint.

*Morrison* thus requires consideration of two questions:  whether the presumption against extraterritorial application applies to RICO and, if it does, whether applying RICO to all or part of Chevron's claim in fact would be extraterritorial.

The first requires no extensive analysis.  The Second Circuit has held that RICO, like the Exchange Act, is silent as to extraterritorial application and, in consequence, that the presumption against extraterritorial application governs in RICO cases.[33]  The more difficult

---

[31]   *Id.* at 2881-83.

[32]   *Id.* at 2884.

[33]   *Norex Petroleum Ltd. v. Access Indus., Inc.*, 631 F.3d 29, 32-33 (2d Cir. 2010) ("Our Court's precedent holds that 'RICO is silent as to any extraterritorial application.'  While Norex urges us to consider this statement dicta, we cannot do so.") (quoting *N.S. Fin. Corp. v. Al-Turki*, 100 F.3d 1046, 1051 (2d Cir. 1996)); *accord, Cedeño v. Intech Grp., Inc.*, 733 F. Supp. 2d 471, 473 (S.D.N.Y. 2010), *aff'd sub nom. without consideration of the point, Cedeño v. Castillo*, 457 Fed. Appx. 35 (2d Cir. 2012).

question is whether all or part of Chevron's claims would involve extraterritorial application of the statute. As always, the starting point must be the facts – the allegations of the amended complaint, the truth of which must be assumed for purposes of this motion.

### 1.    *Chevron's Allegations and the* Norex *Decision*

This of course is not a "foreign cubed" case. The RICO claims at issue here rest on allegations that Steven Donziger, a New York lawyer, and others based in the United States, here conceived, substantially executed, largely funded, and significantly directed[34] a scheme to extort and defraud Chevron, a U.S. company, by, among other things, (1) bringing a lawsuit in Ecuador;[35] (2) fabricating (principally in the United States) evidence for use in that lawsuit in order to obtain an unwarranted judgment there;[36] (3) exerting pressure on Chevron to coerce it to pay money not only by means of the Ecuadorian litigation and judgment, but also by subjecting Chevron to public attacks in the United States and elsewhere based on false and misleading statements;[37] (4) inducing

---

[34]

  Cpt. ¶ 1 (alleging that defendants "sought to extort defraud, and otherwise tortiously injure plaintiff Chevron by means of a plan they conceived and substantially executed in the United States."); *id.* ¶ 2 ("The enterprise's ultimate aim is to create enough pressure on Chevron in the United States to extort it into paying to stop the campaign against it.").

[35]

  *Id.* ¶ 3.

[36]

  *E.g.*, *id.* ¶ 145 ("Back in the United States, preparations were well underway for drafting Cabrera's report."); *id.* ¶ 151 ("While Stratus was the primary coordinator of the . . . Cabrera Report, other members of the U.S.-based team of experts . . . also contributed to the report without attribution in the report or disclosure to Chevron."); *id.* ¶¶ 353-56.

[37]

  *Id.* ¶ 214.

U.S. public officials to investigate Chevron;[38] and (5) making false statements to U.S. courts and intimidating and tampering with witnesses in U.S. court proceedings to cover up their improper activities.[39]  In other words, the RICO claims include the allegation that the RICO Defendants – a term defined in the amended complaint and consisting predominantly of Americans[40] – formulated a scheme to extort and otherwise wrongfully to obtain money from Chevron, a U.S. company, by conducting and conspiring to conduct the affairs of an enterprise – which also consists predominantly of Americans[41] – through a pattern of racketeering activity that included acts in the United States by Americans as well as acts in Ecuador by both Americans and Ecuadorians.

The Donziger Defendants contend that the extraterritorial question is answered, favorably to them, by *Norex Petroleum Ltd. v. Access Industries, Inc.*[42]  But they are mistaken.

In *Norex*, a Canadian plaintiff alleged that the defendants had engaged in a racketeering scheme, using Russian companies, to take over control of another Russian company in which the plaintiff was a minority shareholder, leaving the Canadian plaintiff as "a powerless minority shareholder."[43]  The district court dismissed the complaint under the pre-*Morrison* conduct-and-effects test.  The Second Circuit affirmed.  Insofar as the brief opinion addressed the question

---

38

        *Id.* ("And they have taken this pressure campaign to U.S. state and federal agencies, seeking their falsely induced assistance in this racketeering scheme."); *id.* ¶ 216.

39

        *Id.* ¶¶ 273-77, 291-300, 311-16.

40

        *Id.* ¶¶ 1, 7-17.

41

        *Id.* ¶ 18.

42

        *See* DI 303, at 2-6.

43

        631 F.3d at 31.

now before this Court, it said only that "simply alleging that some domestic conduct occurred cannot support a claim of domestic application.  '[I]t is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States.'  [*Morrison*, 130 S. Ct] at 2884 (emphasis in original).  The slim contacts with the United States alleged by Norex are insufficient to support extraterritorial application of the RICO statute."[44]

The allegations of the amended complaint here are entirely different.  Unlike the *Norex* complaint, the scheme alleged here was conceived and orchestrated in the United States to injure a U.S. plaintiff, involved a predominately U.S. enterprise, and was carried out in material respects, though by no means entirely, here.  *Norex* therefore does not control.  Indeed, as the Circuit in *Norex* found it unnecessary to articulate an approach to deciding whether application of RICO in a given situation is extraterritorial, beyond drawing a conclusion with respect to the particular complaint before it, that case sheds no light on the pivotal question before this Court.[45]

2.    *Answering the Extraterritoriality Question*

The few other cases that, since *Morrison*, have addressed the question whether given applications of RICO would be extraterritorial have taken different approaches.

---

[44]

   *Id.* at 33.

[45]

   *See* Note, *Life After Morrison: Extraterritoriality and RICO*, 44 VAND. J. TRANSNAT'L L. 1385, 1402 (2011) (*Norex* did not "offer[] much guidance as to what might constitute domestic application.").

>  a.  *Emphasis on the Enterprise*

*Cedeño*[46] was a RICO claim by a Venezuelan plaintiff against defendants, most of whom allegedly were associated with the Venezuelan government.  The alleged racketeering scheme included unjustified imprisonment of the plaintiff in Venezuela and damage to his British Virgin Islands company.  The district court dismissed, in part on the ground that "RICO evidences no concern with foreign enterprises, [and] . . . does not apply where . . . the alleged enterprise and the impact of the predicate activity upon it are entirely foreign."[47] Quite apart from the fact that neither the alleged enterprise nor the impact of the alleged predicate activity in this case is "entirely" or even substantially foreign, this Court, respectively, does not find *Cedeño*'s emphasis on the domestic or foreign character of the alleged RICO enterprise persuasive or helpful.[48]

>  As an initial matter, the suggestion that "RICO evidences no concern with foreign enterprises" seems overly broad, whether viewed in analytical or practical terms.  Viewed from an analytical perspective, the RICO statute prohibits various activities in relation to an "enterprise" – (1) investment or use of income derived from a pattern of racketeering activity in an enterprise, (2) acquisition or maintenance of an interest in or control of an enterprise through a pattern of

---

46

>  *Cedeño*, 733 F. Supp. 2d at 471.

47

>  *Id.* at 473-74.

>  While the Court of Appeals affirmed the dismissal by non-precedential summary order, it declined to decide whether the district court's focus on the location or character of the enterprise had been correct.  *Cedeño*, 457 Fed. Appx. at 37-38.

48

>  The same may be said of the cases in other districts that have taken a similar approach.  *See Sorota v. Sosa*, ___ F. Supp. 2d ___, No. 11-808897-Civ., 2012 WL 313530, at *4 (S.D. Fla. Jan. 31, 2012); *In re Le-Nature's Inc.*, No. 09-MC-162, 2011 WL 2112533, at *3 (W.D. Pa. May 26, 2011); *In re Toyota Motor Corp.*, 785 F. Supp. 2d 883, 914-15 (C.D. Cal. 2011); *European Cmty. v. RJR Nabisco, Inc.*, No. 02-CV-5771, 2011 WL 843957, at *5 (E.D.N.Y. Mar. 8, 2011).

racketeering activity, or (3) conduct of the affairs of an enterprise through a pattern of racketeering activity.[49]  One may assume, without deciding, that Congress was not concerned about investment or use of racketeering proceeds in or the acquisition or maintenance of control of foreign enterprises through patterns of racketeering activity.  But it is very unlikely that Congress had "no concern" with the conduct of the affairs of foreign enterprises through patterns of racketeering activity, at least if the prohibited activities injured Americans in this country and occurred here, either entirely or in significant part.[50]

From a practical perspective, it is well to bear in mind that foreign enterprises have been at the heart of precisely the sort of activities – committed in the United States – that were exactly what Congress enacted RICO to eradicate.  Many will recall, for example, that a RICO count in perhaps the largest criminal conspiracy case ever tried in this district, the so-called "Pizza Connection" case, rested on a decision by members of the Sicilian Mafia to begin shipping narcotics to the United States and their development of a distribution network in this country.[51]  The RICO

---

[49]

18 U.S.C. §§ 1962(a)-(c).

[50]

To the extent that the district court in *Cedeño* sought to justify its approach on the theory that RICO prohibits the use of a pattern "as a conduit for committing a pattern of predicate acts" and thus makes the enterprise its focus, 733 F. Supp. 2d at 473-74, this Court respectfully disagrees.  While a § 1962(c) violation necessarily involves the conduct of the affairs of an enterprise through a pattern of racketeering activity, and in that sense involves the enterprise as a "conduit," § 1962(c)'s focus unmistakably is on the racketeering activity or, at least, on the racketeering activity in relation to the enterprise.  *See, e.g.*, Organized Crime Control Act of 1970, Pub. L. No. 91-452, § 1, 84 Stat. 922-23 ("It is the purpose of this act to seek the eradication of organized crime in the United States . . . by providing enhanced sanctions *and new remedies to deal with the unlawful activities* of those engaged in organized crime.") (emphasis added).  Thus, a determination of the extraterritorial versus domestic character of the application of the statute to a § 1962(c) claim that concentrates on the enterprise to the exclusion of the pattern of racketeering activity would be inappropriate.

[51]

*See generally United States v. Casamento*, 887 F.2d 1141, 1148-49 (2d Cir. 1989).

enterprise in that case "consisted of 'made members' . . . and associates of such members, of a secret criminal organization, which operated in Sicily, the United States and elsewhere, known as 'La Cosa Nostra,' or 'the Mafia.'"[52]  No enterprise could have been closer to the core of the Congressional concerns that resulted in the enactment of RICO.  To say that Congress did not intend RICO to apply unless the enterprise in question was purely domestic would be unsupportable.  So courts should be cautious before construing the statute in civil cases in ways that would be most undesirable, not to mention inconsistent with Congressional intent, if applied in criminal cases.

Second, the emphasis on whether the RICO enterprise is domestic or foreign simply begs the question of how to determine the enterprise's character.  Citizenship or legal status is not a viable approach, as it would produce absurd results.  The term "enterprise" is defined to include, among other things, any individual, corporation or other legal entity.[53]  If the citizenship or legal auspices under which an enterprise exists were controlling or entitled to substantial weight, the applicability of the statute in a given case would depend upon a factor unrelated to the statutory purpose.  For example, suppose that officials of two corporations – one incorporated in Delaware and the other in Bermuda, but both doing substantial business in the United States – conducted the respective affairs of those entities, each entity independent of the other, through patterns of mail and wire fraud or other predicate acts in the United States to the great injury of members of the American public.  The idea that the officials of the Delaware corporation could be prosecuted criminally and sued civilly under RICO because their enterprise was a domestic corporation while their counterparts with the Bermudan corporation would be immune solely because the Bermudan

---

[52]    Indictment, Count 16, ¶ 1, *United States v. Badalamenti*, SS 84 Crim. 236 (PNL).

[53]    18 U.S.C. § 1961(4).

corporation was foreign would be risible.  Moreover, citizenship or legal characteristics would afford no reliable or principled basis for characterizing association-in-fact enterprises consisting of citizens or entities organized under the laws of different countries.

To be sure, the domestic or foreign character of an enterprise might be determined differently, as for example by focusing on where the enterprise operates, where it makes decisions, where its assets (if it has any) are located and so on.  Indeed, one court that focused on the RICO enterprise in determining whether application of RICO in the case before it would have been extraterritorial employed a "nerve center" test, considering "where [its] decisions [we]re made."[54] That is a perfectly sensible and well-established approach to determining where a company has its principal place of business for jurisdictional purposes.[55]  Its relevance in this context, however, is questionable.  One must bear in mind that the RICO enterprise in a Section 1962(c) case, like this one, is not and may not be a defendant[56] and need not be charged with wrongdoing.  "This requirement [of distinctness as between enterprise and defendant] 'focuses the section on the culpable party and recognizes that the enterprise itself is often a passive instrument or victim of the racketeering activity.'"[57]  Thus, there is no necessary or, in many cases, even probable connection

---

[54]

     *RJR Nabisco, Inc.*, 2011 WL 843957, at *5-6.

[55]

     *See, e.g.*, *Hertz Corp. v. Friend*, 130 S. Ct. 1181, 1191-94 (discussing well-established nature of nerve-center test and adopting it to determine a corporation's principal place of business for the purposes of establishing diversity jurisdiction); *Kubin v. Miller*, 801 F. Supp. 1101 (S.D.N.Y. 1992).

[56]

     *See, e.g.*, *DeFalco v. Bernas*, 244 F.3d 286, 307 (2d Cir. 2001); *Bennett v. U.S. Trust Co. of N.Y.*, 770 F.2d 308, 314-15 (2d Cir. 1985).

[57]

     *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir. 1994).

between where the RICO enterprise makes its decisions and whether the application of RICO to the racketeering activity at issue in a given case was the sort of activity with which Congress would have been concerned.

All of this is not to say that the location of the enterprise never might be relevant to the question whether the application of the statute, given the allegations of a given complaint, would be extraterritorial in whole or in part.  But its relevance, if any, would depend upon the facts.

### b.    Emphasis on the Alleged Racketeering Activity

Another court that has dealt with the question of whether a proposed application of RICO was extraterritorial has concentrated on the alleged pattern of racketeering activity – in other words, on the conduct that the statute is intended to eradicate.  In *CGC Holding Co. v. Hutchens*,[58] the plaintiffs alleged a RICO claim based on their having been induced to advance substantial loan processing fees to the defendants in consequence of a racketeering conspiracy.   Two foreign defendants moved to dismiss the RICO claim under *Morrison*, *Norex*, *Cedeño*, and *United States v. Philip Morris USA, Inc.*,[59] arguing that the application of the statute in *CGC* would be extraterritorial and that the enterprise allegedly included some foreign persons.  But the district court denied the motion, writing:

> "These cases do not indicate that RICO is inapplicable merely because some of the participants in the enterprise reside outside the United States. As relevant to the allegations in the present case, RICO makes it unlawful for 'any person' associated with 'any enterprise' engaged in interstate commerce to participate in the conduct of the enterprise's affairs through pattern of racketeering activity. *See* 18

---

[58]    824 F. Supp. 2d 1193 (D. Colo. 2011).

[59]    783 F. Supp. 2d 23 (D.D.C. 2011).

U.S.C. § 1962(c). *The focus of the statute is the racketeering activity*, i.e., to render unlawful a pattern of domestic racketeering activity perpetrated by an enterprise. *See U.S. v. Philip Morris*, 783 F.Supp.2d at 29."

"In the present case most of the participants in the activities that are the subject of the RICO claim, including the Meisels defendants, reside in Canada. However, the racketeering activity of the enterprise with which the Meisels defendants allegedly were associated, was directed at and largely occurred within the United States. The goal of the enterprise, according to plaintiffs' allegations, was to extract money from CGC and the other plaintiffs through a phony loan scheme. Defendants, including the Meisels defendants, allegedly used telephone, mail, and email communications directed to potential borrowers in the United States. An agent of the Hutchens and participant in the alleged scheme, Mr. Luistermans, was dispatched to Colorado to inspect property that was to be used as collateral for the loans. A Colorado lawyer was engaged to assist with the loan process. Similar conduct was directed at plaintiffs in Florida and Illinois."

"These facts are a far cry from those of *Norex* and *Cedeno*, where the actors, victims and conduct were foreign, and the connection to the United States was essentially incidental. *Philip Morris* is a closer case, but again, the court found that the English company's conduct in the U.S. was not the basis for the alleged RICO liability. In the present case, the conduct of the enterprise within the United States was a key to its success."

"Accordingly, while I agree that RICO does not apply extraterritorially, I do not agree that this case, as alleged, involves an extraterritorial application of the statute."[60]

This approach has much appeal, as it would afford a remedy to a U.S. plaintiff who claims injury caused by domestic acts of racketeering activity without regard to the nationality or foreign character of the defendants or the enterprise whose affairs the defendants wrongfully conducted.  It would be consistent with the Supreme Court's and our Circuit's repeated recognition

---

[60] *CGC Holding Co.*, 824 F. Supp. 2d at 1209-10; *see also Philip Morris USA*, 783 F. Supp.2d at 29 (declining to sustain RICO claim on theory that foreign defendant liability could be premised on its domestic conduct notwithstanding *Morrison* on the ground that the theory never previously had been advanced rather than on ground that the theory would have been insufficient).

that "the heart of any RICO complaint is the allegation of a *pattern* of racketeering."[61]  And it almost certainly would be consistent with Congressional intent, which included protecting American victims at least against injury caused by the conduct of the affairs of enterprises through patterns of racketeering activity that occur in this country.[62]  Accordingly, this Court finds the general approach taken in *CGC*[63] to be persuasive and an appropriate means for determining when a proposed application Section 1962(c) of RICO is domestic or foreign – the focus properly is on the pattern of racketeering activity and its consequences.  If there is a domestic pattern of racketeering activity aimed at or causing injury to a domestic plaintiff, the application of Section 1962(c) to afford a remedy would not an extraterritorial application of the statute.

> 3.     *Application to this Case*

As noted previously, the RICO violation alleged in this case consisted of the conduct

---

[61]

> *Rotelle v. Wood*, 528 U.S. 549, 556 (2000) (quoting *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 154 (1987) (emphasis in original) (internal quotation marks omitted); *Alfadda v. Fenn*, 935 F.2d 475, 479 (2d Cir. 1991).

[62]

> *See supra* note 50.

[63]

> This is not to say that the *CGC* court's formulation perhaps should not be refined.  For example, by upholding the sufficiency of the complaint on the ground that the victims were domestic and the alleged racketeering activity "was directed at and *largely* occurred within the United States," the test would introduce a perhaps unnecessary element of subjectivity – what "largely" occurred in the United States to one person nevertheless also may "largely," "significantly," or "materially" have occurred abroad.  Moreover, what *Morrison* prohibits is the extraterritorial application of the statute.  The application of the statute to patterns of racketeering activity therefore perhaps must be limited to patterns that are entirely domestic in nature, a qualification not addressed in *CGC*.  *But see Tianrui Grp. Co. v. ITC*, 661 F.3d 1322, 1329-30 (Fed. Cir. 2011) (*Morrison* permits reliance upon foreign conduct "to establish an element of a claim alleging a domestic injury and seeking a wholly domestic remedy.").  But it is unnecessary to address these details for purposes of this motion.

of the affairs of the enterprise through a pattern of racketeering activity.  The scheme (1) allegedly was conceived and orchestrated in and from the United States (2) in order wrongfully to obtain money from a company organized under the laws of and headquartered in the United States, and to cover up unlawful and improper activities, and (3) acts in its furtherance were committed here by Americans and in Ecuador by both Americans and Ecuadorians.  Assuming that the amended complaint alleges a domestic pattern of racketeering activity,[64] applying the statute to that pattern would not be extraterritorial.  Moreover, even if the nationality, citizenship, or location of the enterprise were pertinent in such circumstances, the enterprise alleged in this case, an association in fact including both Americans and Ecuadorians, with the Americans predominant in number[65] and charged with conceiving and supervising the scheme, would cut in favor of application of the RICO statute here.

---

[64]

The Donziger Defendants do not argue that Chevron has failed to allege the existence of a *domestic* pattern of racketeering activity save insofar as such an argument is subsumed in their broader contention that Chevron has alleged no pattern at all because all acts in furtherance of the alleged attempted extortion constituted "only a single predicate act."  DI 303, at 5.  That argument is rejected below.  Accordingly, the question whether Chevron sufficiently has alleged a domestic pattern of racketeering activity for other reasons is not before the Court.

[65]

The alleged RICO enterprise is an association in fact consisting of both Americans and foreigners.  The Americans include the Donziger Defendants; the U.S. environmental consultants led by Stratus Consulting, Inc., Ann Maest and Douglas Beltman as well as Joshua Lipton, David Chapman and William Powers of Stratus and the E-Tech International and H5 firms; U.S. law firms and attorneys including Joseph Kohn and the firms of Kohn Swift & Graf P.C., Emery Celli Brinckerhoff & Abady LLP, Motley Rice LLC, and Patton Boggs LLP; U.S. environmental "activists" such as Atossa Soltani, Amazon Watch, and Rainforest Action Network; and U.S. public relations consultants including Karen Hinton.  Cpt. ¶¶ 1, 15-18, 342.  The Ecuadorians are Fajardo, Yanza, the ADF, Richard Stalin Cabrera Vega ("Cabrera"), Juan Pablo Saenz, Julio Prieto and Selva Viva.  *Id.* ¶¶ 1, 11-14, 18.  The nationality of two other individuals is not mentioned.  *Id.* ¶ 1.  Two alleged members of the enterprise are alleged to be U.S. residents but their citizenship is not mentioned.  *Id.* ¶¶ 18i, 18j.  Finally, the enterprise is said to include certain entities, organized in the Channel or Cayman Islands but operating in the United States, that are involved in financing the litigation for the LAPs.  *Id.* ¶ 18p.

This conclusion is entirely consistent with *Morrison*, *Norex*, and the statute itself. Accordingly, insofar as the Donziger Defendants' motion seeks dismissal of the RICO claims under *Morrison*, their motion must be denied.[66]

B.      *Sufficiency of Pattern Allegation – The Single Scheme Argument*

Among the elements of a legally sufficient RICO claim is that the defendant have (1) committed two or more acts, (2) constituting a "pattern" (3) of "racketeering activity."[67]  The Donziger Defendants challenge the sufficiency of the RICO claim on the single, narrow ground, *viz.* that "[m]ultiple acts in furtherance of a single extortion episode constitute only a single predicate act of attempted extortion, not a pattern of two or more predicate acts,"[68] and that "all of the wrongful acts [alleged by Chevron] . . . relate to – and were in furtherance of – a single, even if wide-ranging, effort to extort Chevron into paying a sizeable settlement."[69]  There are at least two flaws fatal to this argument.

---

[66]

As this resolves this aspect of the motion before the Court, there is no need to speculate about whether the result would be the same if the character of the alleged enterprise were different, if the alleged acts of racketeering activity would amount to a pattern only if foreign acts were aggregated with domestic, if Chevron alleged no injury consequent to a domestic pattern of racketeering activity, or if various other circumstances existed.  Nor need the Court address the questions whether and to what extent that Chevron, if it prevails, would be entitled to relief with respect to alleged injuries caused only by foreign acts.  Such matters must await further factual development.

[67]

*Town of West Hartford v. Operation Rescue*, 915 F.2d 92, 100 (2d Cir. 1990) (quoting *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir. 1983)).

[68]

DI 303, at 5 (quoting *Linens of Europe, Inc. v. Best Mfg. Inc.*, No. 03 Civ. 9612 (GEL), 2004 WL 2071689, at *16 (S.D.N.Y. Sept. 16, 2004) (internal quotation marks omitted)).

[69]

*Id.*

First, the amended complaint alleges far more than extortion.  It alleges (1) multiple acts of mail and wire fraud for the purpose of deceiving "Chevron, various courts of law, and the greater public" with respect to Chevron's liability and responsibility for the alleged degradation of the environment in Ecuador,[70] (2) money laundering for the purpose of promoting unlawful activity including the alleged mail and wire fraud violations,[71] and (3) obstruction of justice and witness tampering in an effort to cover up wrongful activities.[72]  Hence, even if the Donziger Defendants were correct that all alleged acts in furtherance of a single extortion or extortion attempt are a single act of racketeering activity for RICO purposes, an issue that need not be decided here, their argument would fail.  Unlike the cases upon which they rely, this is not a complaint that seeks to take repeated threats in service of a single extortionate demand, call each threat an attempted extortion, and thus proliferate the number of predicate acts for RICO purposes – all in the absence of other predicate acts.  Indeed, the case principally relied upon by the movants, while treating repeated threats in a single extortion attempt as a single predicate act, ultimately dismissed the RICO claim in light of its failure to allege other predicate acts sufficient to make out a pattern.[73]

Second, our Circuit long has "interpreted [pattern of racketeering activity] to mean 'multiple racketeering predicates – which can be part of a single 'scheme' – that are related and that

---

[70] Cpt. ¶¶ 353-57.

[71] *Id.* ¶ 358.

[72] *Id.* ¶¶ 359-65.

[73] *Linens of Europe, Inc.*, 2004 WL 2071689, at *18.

amount to, or threaten the likelihood of continued criminal activity.'"[74]  Indeed, in an *en banc*

decision later adopted in this respect by the Supreme Court,[75] it has emphasized that it sees no

> "basis in RICO or its legislative history for the proposition that a RICO violation cannot be established without proof of more than one scheme, episode, or transaction . . .  The statute defines racketeering activity in terms of criminal 'acts,' *see* §§ 1961(1)(A), (B), (C), and (E), or 'offenses,' *see* § 1961(1)(D); it similarly defines pattern in terms of 'acts' of racketeering activity, *see* § 1961(5).  There is no mention of schemes, episodes, or transactions.  We doubt that Congress meant to exclude from the reach of RICO multiple acts of racketeering simply because they . . . further but a single scheme."[76]

The Donziger Defendants effort to sweep the myriad alleged offenses in violation of several federal

statutes into nothing more than attempts in the service of a single extortion and thus to amalgamate

what the RICO statute quite plainly treats as separate acts of racketeering activity is without merit.[77]

C.    *Sufficiency of Predicate Act Allegations*

1.    *Extortion*

Chevron alleges that the Donziger Defendants and others have committed acts of

---

[74]

> *United States v. Reifler*, 446 F.3d 65, 91 (2d Cir. 2006) (quoting *United States v. Coiro*, 922 F.2d 1008, 1016 (2d Cir. 1991)); *see also United States v. Daidone*, 471 F.3d 371, 374-75 (2d Cir. 2006).

[75]

> *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240-41 (1989) (declining to require pleading or proof of multiple schemes to establish RICO pattern.

[76]

> *United States v. Indelicato*, 865 F.2d 1370, 1383 (2d Cir. 1989) (*en banc*).

[77]

> To be sure, the Court is entirely mindful that the presence of two or more acts of racketeering activity, *simpliciter*, does not suffice to make out a pattern.  There are other requirements.  *See, e.g.*, *H.J., Inc.*, 492 U.S. at 240-43.  But the Donziger Defendants have not argued that these other requirements are not satisfied by the amended complaint.  *See* DI 303, at 6-8.

extortion in violation of the Hobbs Act.[78]  It asserts that "the RICO defendants have engineered a wide-ranging campaign of public attacks based on false and misleading statements, trumped up criminal charges, a threatened and actual fraudulent civil judgment, investigations by government agencies, and ongoing harassment and disruptions of business operations, and have demanded the payment of billions of dollars before these activities will cease, all with the intent and effect of causing a reasonable fear of economic loss on the part of Chevron."[79]  Chevron alleges also that the Donziger Defendants, among other things, made false statements to the U.S. House of Representatives and drafted public attacks distributed by Amazon Watch in added efforts to induce Chevron to pay them off.[80]

The Donziger Defendants contend that these allegations are insufficient because: (1) "Chevron has failed to allege that the RICO Defendants have actually obtained any money or property from Chevron,"[81] (2) Chevron fails to allege that the RICO defendants "ever actually threatened Chevron or demanded a payment of money or property to 'stop the campaign against it,'"[82] and (3) claims of vexatious litigation and defamation cannot constitute extortion.[83]  These arguments lack merit.

---

[78]    18 U.S.C. § 1951.

[79]    Cpt. ¶ 347; *see id.* ¶¶ 348-51.

[80]    *Id.* ¶¶ 239, 243.

[81]    DI 303, at 11.

[82]    *Id.* at 8 (quoting Cpt. ¶ 2).

[83]    *Id.* at 9-11.

First, as previously noted, the Hobbs Act proscribes attempted extortion. The amended complaint adequately alleges that the Donziger Defendants have attempted to extort money from Chevron by seeking to instill fear of consequences more unpalatable than making the desired payments. The fact that the RICO Defendants have not succeeded in obtaining the desired payoff is immaterial to the question whether Chevron sufficiently has alleged Hobbs Act extortion as a RICO predicate act.[84]

The second argument also is unpersuasive. The Second Circuit has stated that the Hobbs Act "does not limit the definition of extortion to those circumstances in which property is obtained through the wrongful use of fear created by implicit or explicit threats, but instead leaves open the cause of the fear."[85] Therefore, as long as Chevron has alleged that the RICO Defendants "knowingly and willfully create[d] or instill[ed] fear [of economic harm], or use[d] or exploit[ed] existing fear [of economic harm] with the specific purpose of inducing [Chevron to] part with [its] property," then it adequately has alleged the wrongful use of fear.[86] Chevron has satisfied that standard. Among other things, Chevron alleges that "[t]he RICO Defendants have sought to inflict maximum 'damage to [Chevron's] reputation, to put 'personal psychological pressure [on] their [*sic*] top executives,' to disrupt Chevron's relations with its shareholders and investors, to provoke U.S.

---

[84]

    *See, e.g.*, *United States v. Salerno*, 868 F.2d 54, 530-31 (2d Cir. 1989) (evidence sufficient to warrant conviction of predicate Hobbs Act offense in RICO prosecution despite lack of evidence that payments made or fear actually instilled where evidence supported finding that attempt was made to obtain payments by instilling fear).

[85]

    *United States v. Abelis*, 146 F.3d 73, 83 (2d Cir. 1998).

[86]

    *Id.*; *see also United States v. Gotti*, 459 F.3d 296, 332-33 (2d Cir. 2006); *United States v. Capo*, 817 F.2d 947, 951 (2d Cir. 1987) (*en banc*) (fear of economic loss is sufficient to sufficient basis for extortion charge).

federal and state governmental investigations, and thereby force the company into making a payoff."[87]  It further asserts that Donziger stated specifically that the defendants' strategy was to "increase the cost to Chevron" including the "cost of their [*sic*] sullied reputation . . . in the media . . . . to get the price up."[88]

The Donziger Defendants' third argument fares no better.[89]  The cases the Donziger Defendants rely upon hold only that frivolous litigation and defamatory statements are not alone sufficient to constitute extortion.[90]  But Chevron's amended complaint goes far beyond that.

Chevron does not allege a scheme that consisted of the allegedly baseless Lago Agrio litigation, either in and of itself or in combination with allegedly false and defamatory statements. Rather, it alleges that the RICO Defendants are executing a multi-faceted, extortionate scheme that has included not only bringing the Lago Agrio litigation, but also intimidating of Ecuadorian judges, fabricating evidence, making false statements to U.S. courts, Congress, the SEC, and the media, and bringing false criminal charges, all for the purpose of coercing Chevron "into paying to stop the

---

[87]

    Cpt. ¶ 2; *see also id.* ¶¶ 68-70, 200, 213-15, 220, 246.

[88]

    *Id.* ¶ 214.

[89]

    DI 303, at 9-11.

[90]

    *E.g.*, *von Bulow v. von Bulow*, 657 F. Supp. 1134, 1145 (S.D.N.Y 1987) ("In concluding that a RICO claim may not be maintained . . . the Court need not address the situation where allegedly unjustified suits form a part of some more extensive scheme of racketeering activity, such as extortion."); *see also United States v. Pendergraft*, 297 F.3d 1198, 1205-08 (11th Cir. 2002); *Conte v. Newsday, Inc.*, 703 F. Supp. 2d 126, 137-38 (E.D.N.Y. 2010).

campaign against it."[91]   Chevron's extortion allegations are more than sufficient.[92]   Accordingly, Chevron adequately has alleged at least one predicate act of extortion even assuming that multiple threats in pursuit of a single payoff always are but a single predicate act.

### 2.    Mail and Wire Fraud

The elements of mail and wire fraud are three:  (1) the formation of a scheme to defraud victims (2) of money or other property (as the object of the scheme), and (3) the use of the mails or interstate or foreign wire communications in furtherance of the scheme.[93]   "Scheme to defraud" has been construed liberally to include "any plan consummated by the use of the mails, in which artifice or deceit is employed to obtain something of value with the intention of depriving the

---

91

*E.g.*, Cpt. ¶¶ 3-4, 74, 200-37, 246-59, 260-65, 347.

92

*See, e.g.*, *Calabrese v. CSC Holdings, Inc.*, 283 F. Supp. 2d 797, 809-10 (E.D.N.Y. 2003) (holding that extortion allegations that included an "agreement involv[ing] the use of misrepresentations, threats and lawsuits in order to obtain the monies" were sufficient to survive a motion to dismiss); *Motorola Credit Corp. v. Uzan*, 202 F. Supp. 2d 239, 247 n.3, *rev'd on other grounds*, 322 F.2d 130 (2d Cir. 2003) ("While some lower courts have held that the threat of civil litigation or even the initiation of unjustified civil lawsuits does not constitute a Hobbs Act predicate act under RICO . . . none of these cases . . . involved, as here, the perjurious obtaining of a criminal charge in order to induce physical fear immediately used to try to extort economic concessions."); *cf. United States v. Kattar*, 840 F.2d 118, 122-24 (1st Cir. 1988) (holding that extortion was properly pleaded where defendant threatened defamation if not paid money).

93

*City of New York v. Smokes-Spirits.com, Inc.*, 541 F.3d 425, 4455 (2d Cir. 2008), *rev'd on other grounds sub nom. Hemi Group LLC v. City of New York*, 130 S. Ct. 983 (2010); *see also Fountain v. United States*, 357 F.3d 250, 255 (2d Cir. 2004) (quoting *United States v. Dinome*, 86 F.3d 277, 283 (2d Cir. 1996)).

For ease of expression, references to the mails in the balance of this paragraph applies equally to use of wires.

owner of his property."[94]  The scheme need not have succeeded to complete the offense.[95]  It need not otherwise be prohibited by state or federal law, nor need it fit traditional common law concepts of fraud.[96]  There is no requirement that the defendant him- or herself use the mails.  It suffices if the defendant caused them to be used by an agent, or set in motion events which foreseeably would involve their use.[97]  For the prohibited use of the mails to be "in furtherance" of the scheme, it is not necessary that fraudulent representations be transmitted by mail, nor need the mails be essential to the conduct of the scheme.  It is enough that the use be "for the purpose of executing" the scheme.[98]  Each prohibited use of the mails, moreover, is a separate indictable offense even if all are made pursuant to a single corrupt scheme.[99]

The amended complaint asserts that the RICO Defendants engaged in a scheme or

---

[94]

*United States v. Kreimer*, 609 F.2d 126, 128 (5th Cir. 1980); *see United States v. Schwartz*, 924 F.2d 410, 420 (2d Cir. 1991) ("[I]t is enough to show defendants contemplated doing actual harm, that is, something more than merely deceiving the victim.").

[95]

*See United States v. Pierce*, 224 F.3d 158, 166 (2d Cir. 2000) ("[T]he prosecution need not show that the scheme in fact resulted . . . in a loss to the person who is the target of the plan.").

[96]

*Durland v. United States*, 161 U.S. 306, 312-14 (1896).

[97]

*E.g.*, *United States v. Bornovsky*, 879 F.2d 30, 39 (2d Cir. 1989) ("defendant need not actually intend, agree to or even know of a specific mailing to 'cause' mail to be sent as long as he or she 'does an act with knowledge that the use of mails will follow in the ordinary course of business, or where such can reasonably be foreseen'") (internal quotation marks and citation omitted); *United States v. Carpenter*, 791 F.2d 1024, 1035 (2d Cir. 1986) ("sufficient that appellants knew that the use of interstate mail and wire services was a reasonably foreseeable consequence of the scheme").

[98]

*United States v. Maze*, 414 U.S. 395, 400 (1974).

[99]

*E.g.*, *United States v. Weatherspoon*, 581 F.2d 595 (7th Cir. 1978); *United States v. Eskow*, 422 F.2d 1060, 1064 (2d Cir.), *cert. denied*, 398 U.S. 959 (1970).

artifice to defraud Chevron and others "by manufacturing evidence, colluding with . . . Cabrera to submit . . . manufactured evidence, and then holding out the Cabrera Report as independent and neutral when it decidedly was not," all for the purpose of coercing Chevron to make a multi-billion dollar payment.[100]   In furtherance of that scheme, it asserts also that the RICO Defendants "transmitted, or caused to be transmitted" such false and misleading statements through the mails and wires to U.S. and Ecuadorian courts, U.S. state and federal agencies, and the general public.[101]

The Donziger Defendants argue that the alleged mail and wire fraud predicate acts are insufficient because Chevron fails to allege that: (1) anyone relied on them to Chevron detriment,[102] or (2) they proximately caused Chevron's alleged injury.[103]

The first of these arguments is patently incorrect as a matter of law.  Although our Circuit and others previously had held that reliance was a necessary element of mail or wire fraud, the Supreme Court more recently has held in *Bridge v. Phoenix Bond & Indemnity Co.*[104] that "no showing of reliance is required to establish that a person has violated § 1962(c) by conducting affairs of an enterprise through a pattern of racketeering activity consisting of acts of mail [or wire]

---

[100]

Cpt. ¶ 353.

[101]

*Id.* ¶¶ 354-56.

Chevron attached to its amended complaint a list of almost two-hundred alleged acts of mail and wire fraud by the RICO Defendants. *Id.*, Ex. B.

[102]

DI 303, at 11-15.

[103]

*Id.* at 12-15.

[104]

553 U.S. 639 (2008).

fraud."[105]

      The Donziger Defendants' second argument – *viz.* that Chevron has not adequately pleaded injury as a proximate consequence of the alleged acts of mail and wire fraud – is not pertinent to the question whether Chevron has sufficiently alleged acts of mail and wire fraud or a pattern of racketeering activity.  The argument conflates two quite different questions – whether the amended complaint adequately alleges a pattern of racketeering activity and, if it does, whether it adequately alleges a claim for damages caused by that pattern.  While the issue of causation, which is dealt with below, is pertinent on the latter question, it does not bear on whether Chevron has sufficiently pled predicate mail and wire fraud acts.

### 3.  *Money Laundering*

      Section 1956(a)(2)(A) of the Criminal Code,[106] one of the money laundering statutes, defines another category of racketeering activity.[107]  It makes unlawful the "transport[], transmitt[al], or transfer[], or attempt[] to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States . . . with the intent to promote the carrying on of specified unlawful activity."[108]  Broadly speaking, "specified unlawful activity" includes,

---

[105]

      *Id.* at 649.

[106]

      18 U.S.C. § 1956(a)(2)(A).

[107]

      *Id.* § 1961(1)(B).

[108]

      *Id.* § 1956(a)(2)(A).

among others, any offense listed in the definition of "racketeering activity" in the RICO statute,[109] which includes Hobbs Act and state law extortion, mail and wire fraud, money laundering, witness tampering, and obstruction of justice.

Chevron alleges that the RICO Defendants "knowingly caused the transportation, transmission, and/or transfer of funds to and from the United States . . . with the intent that those funds be used to promote the carrying on of unlawful activity" including acts of extortion and mail and wire fraud.[110]  The Donziger Defendants contend only that the money laundering predicate acts cannot be sustained because they are based on inadequately pleaded acts of extortion and mail and wire fraud.[111]

As the Court has concluded that the extortion and mail and wire fraud predicate acts are pleaded sufficiently, the Donziger Defendants' argument is without merit.

### 4.     *Obstruction of Justice and Witness Tampering*

The last two categories of alleged predicate acts are obstruction of justice and witness tampering.  Chevron alleges that the RICO Defendants obstructed justice in violation of Section 1503 of the Criminal Code[112] by filing or causing to be filed before U.S. courts in Section 1782

---

[109]

     *Id.* § 1956(c)(7)(A).

[110]

     Cpt. ¶ 358.

[111]

     DI 303, at 16-17.

[112]

     18 U.S.C. § 1503.

proceedings[113] allegedly false documents that misrepresented Cabrera's status as an independent expert.[114]  It asserts also that the they violated Section 1512 of the Criminal Code[115] by tampering with (1) the testimony of Dr. Charles Calmbacher in a deposition taken in the Northern District of Georgia, (2) a declaration submitted by Mark Quarles to this Court in 2007, and (3) the potential testimony of several Stratus employees.[116]  All of this, it contends, was designed to conceal the RICO Defendants' fraud in Ecuador and the falsity of its misrepresentations in this country concerning Chevron.[117]

The Donziger Defendants argue that these predicate acts are pleaded insufficiently because they allege no more than efforts to cover up the alleged conspiracy to extort money from Chevron.[118]  In other words, they assert that a RICO claim cannot be based on acts that "[a]ttempt[] to hide one's involvement in a [RICO] scheme after it has been exposed in order to limit liability . . . ."[119]

But Chevron does not allege that the RICO Defendants' submissions to U.S. courts regarding the independence and *bona fides* of the Cabrera Report or their alleged witness tampering

---

[113]
See 28 U.S.C. § 1782.

[114]
Cpt. ¶¶ 361-65.

[115]
18 U.S.C. § 1512.

[116]
Cpt. ¶¶ 361-65.

[117]
*Id.* ¶¶ 360, 362.

[118]
DI 303, at 15-16.

[119]
*Id.* at 16 (quoting *Phila. Reserve Supply Co v. Norwalk & Assocs., Inc.*, Civ. A. No. 91-0449, 1992 WL 210590, at *6 (E.D. Pa. Aug. 25, 1992)).

were designed only to "hide [their] involvement in a [RICO] scheme."  Rather, it alleges that the instances of obstruction of justice and of witness tampering were designed to (1) dissuade U.S. courts from ordering Section 1782 disclosure in connection with the Ecuadorian litigation, (2) persuade Dr. Charles Calmbacher to decline to testify at a U.S. deposition, and (3) suborn a false affidavit by Mark Quarles[120] concerning the RICO Defendants' involvement with Cabrera, all for the purpose of "impeding the due administration of justice."[121]  The amended complaint thus sufficiently alleges that the purposes of the alleged obstruction and witness tampering were to keep evidence of the RICO Defendants' misconduct from being brought to the attention of the Ecuadorian courts and other tribunals in service of the alleged overall goal of obtaining a baseless Ecuadorian judgment for use in obtaining money from Chevron.

### E.    Causation

The amended complaint alleges essentially two types of injuries in consequence of the alleged RICO violations.

First, it asserts that "Chevron [has been] injured in its business and property by reason of" those violations and that the injuries include,

> "but are not limited to damage to Chevron's reputation and goodwill; the impairment of Chevron's interest in executed contracts . . . ; and the attorneys' fees and costs to defend itself [a] in objectively baseless, improperly motivated sham litigation in Ecuador and [b] in related litigation in the U.S., including the attorneys' fees and costs associated with exposing the RICO Defendants' pervasive fraud in the Section

---

[120]

The affidavit allegedly was submitted to this Court.

[121]

Cpt. ¶ 360; *see id.* ¶¶ 311-23, 362-65.

1782 proceedings."[122]

It therefore seeks to recover treble "damages according to proof at trial."[123]

Second it alleges that "these injuries . . . will continue" and that "Chevron . . . is entitled to . . . a preliminary and permanent injunction that enjoins Defendants [and others] acting in concert with them . . . from commencing, prosecuting, or advancing in any way . . . any attempt to recognize or enforce the [Judgment] . . . in the United States or abroad . . . ."[124]

The Donziger Defendants seek dismissal of the RICO claims because, they argue, (1) Chevron has not adequately alleged reliance by anyone on misrepresentations and omissions of defendants or Cabrera that are alleged as part of the mail and wire fraud predicate acts,[125] (2) "any theory of proximate cause that Chevron may seek to advance with respect to Donziger's alleged fraudulent statements would be so attenuated as to be nonexistent for purposes of RICO,"[126] (3) the Lago Agrio court's decision said that it did not rely on the Calmbacher or Cabrera reports and the defendants' alleged whitewashing of the latter,[127] and (4) any informed decision by the Lago Agrio court to rely on fraudulent evidence would have been an independent intervening factor breaking

---

[122]

     *Id.* ¶ 376.

[123]

     *Id.*, prayer for relief ¶ 1.

[124]

     *Id.* ¶¶ 377, 379, prayer for relief ¶ 5.

[125]

     DI 303, at 11-13.

[126]

     *Id.* at 14.

[127]

     *Id.* at 14-15.

any causal link between Donziger's actions and the Judgment.[128]  These arguments are insufficient to warrant dismissal of the RICO claims either to the extent that they seek damages or an injunction.

As an initial matter, the suggestion that the damages claim is wanting because Chevron supposedly has not adequately alleged reliance by anyone on any misrepresentations or omissions that have been part of the fraudulent scheme that underlies the mail and wire fraud predicate acts is misguided.  A RICO damages plaintiff need allege only that it has suffered "an injury directly resulting from some or all of the activities comprising the violation."[129]  As the Donziger Defendants do not challenge the sufficiency of Chevron's allegations of injury consequent to any predicate acts except those of mail and wire fraud, this argument necessarily would fail even if the Donziger Defendants were correct as to the mail and wire fraud predicates.  And they are not. Chevron more than sufficiently has alleged at least that it has sustained substantial attorneys' fees and professional costs in responding to defendants' allegedly fraudulent statements to U.S. courts of Section 1782 proceedings, the Lago Agrio court, and various government agencies.[130] Accordingly, the complaint adequately alleges causation of damages in consequence of the alleged RICO violations without regard to the Lago Agrio court's purported disclaimer of reliance on the

---

[128]

     *Id.* at 15.

[129]

     *Marshall & Isley Trust Co. v. Pate*, 819 F.2d 806, 809 (7th Cir. 1987); *see also Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1347 (2d Cir. 1994) (stating that *Marshall & Isley* "appears to be a correct reading of § 1964(c)," but not so holding).

[130]

     It is "well-settled that legal fees may constitute RICO damages when they are the proximate consequence of a RICO violation." *First Capital Asset Mgmt. v. Brickellbush, Inc.*, 218 F. Supp. 2d 369, 382 (S.D.N.Y. 2002), *aff'd*, 385 F.3d 159 (2d Cir. 2004).  Moreover, the amended complaint alleges that Donziger stated that the scheme was designed to "increase the cost to Chevron" in order "to get the price up" and to "increase the cost . . . of [Chevron's] sullied reputation."  Cpt. ¶ 214.

allegedly fraudulent Cabrera report.  The amended complaint alleges that the court relied upon the

RICO Defendants' "whitewashing" expert reports, which in turn relied upon Cabrera.[131]  Thus, it

adequately alleges a direct causal link between the Donziger Defendants' alleged predicate acts and

the Judgment, not to mention the ocean of legal fees and professional costs incurred in seeking to

prove Chevron's allegations that the Judgment is fraudulent.  Whether it will be able to prove its

allegations at trial, of course, is another matter.[132]  But the amended complaint is sufficient in this

respect to warrant going forward with the damages claim.

       The injunction claim is an even easier question.  The Court of course is aware that

the question whether a private plaintiff may obtain injunctive relief under RICO remains open in this

and most other circuits.[133]  But the Donziger Defendants have not argued that point on this motion

and, indeed, have not address the question whether, assuming injunctive relief is available in an

appropriate case, this amended complaint adequately alleges a basis for it.  Accordingly, there is no

basis for dismissing the injunction claim on the ground that it does not adequately plead causation.

       For these reasons, Chevron's allegations satisfy civil RICO's causation requirement.

Chevron therefore adequately alleges its substantive RICO claim.

---

[131]

    Cpt. ¶¶ 190-98, 325-26.

[132]

    Likewise, it remains to be seen whether critical acts upon which Chevron relies are
domestic or would be predicate acts only by virtue of impermissible extraterritorial
application of RICO.  *See supra* notes 63-66.

[133]

    *Compare, e.g.*, *Nat'l Org. For Women, Inc. v. Scheidler*, 267 F.3d 687 (7th Cir. 2001)
(injunction available to private RICO plaintiff), *rev'd on other grounds*, *Scheidler v. Nat'l
Org. For Women, Inc.*, 537 U.S. 393 (2003), and *Motorola Credit Corp*, 202 F. Supp. 2d
at 243, *with Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076 (9th Cir. 1986) (injunction
not available to private RICO plaintiff), *cert. denied*, 479 U.S. 1103 (1987), *Trane Co. v.
O'Connor Sec.*, 718 F.2d 26, 28-29 (2d Cir. 1983), and *Bernard v. Taub*, No. CV 90-0501
(ADS), 1990 WL 34680, at *3-4 (E.D.N.Y. Mar. 21, 1990).

III.    *RICO Conspiracy – Section 1962(d)*

   The Donziger Defendants argue only that the RICO conspiracy claim brought under 18 U.S.C. § 1962(d) should be dismissed because Chevron failed sufficiently to allege its substantive RICO claim.[134]  As the Court holds that Chevron adequately has alleged its substantive claim, this argument is without merit.[135] The RICO conspiracy claim thus survives the motion to dismiss.

IV.    *Common Law Fraud*

  A.    *Chevron's Allegations*

   Chevron alleges that the Donziger Defendants and others "knowingly misrepresented, omitted, and/or concealed material facts . . . in their representations" to it, U.S. courts, the Lago Agrio court, federal and state agencies and officials in the United States, Chevron's stockholders, investors, analysts, and the media, to obtain favorable rulings from U.S. and the Lago Agrio courts, pressure U.S. officials to investigate Chevron, and propagate false information to harm Chevron.[136] These alleged false representations include the "Calmbacher reports, the true authorship of the Cabrera Report, the denial of any improper contact [on behalf of the LAPs] with Cabrera, the supposed independence and neutrality of Cabrera and his liability and damages assessment, the submission of new 'expert' reports on the fraudulent Cabrera Report, and the fraudulent

---

[134]
   DI 303, at 17.

[135]
   *See, e.g.*, *Fuji Photo Film U.S.A., Inc. v. McNulty*, 640 F. Supp. 2d 300, 321 (S.D.N.Y. 2009).

[136]
   Cpt. ¶¶ 389-91.

endorsements of the Cabrera Report."[137]  Chevron alleges further that Chevron, U.S. courts, the Lago

Agrio court, federal and state agencies and officials in the United States, Chevron's stockholders,

investors, analysts, and members of the media reasonably relied on these false representations and

that Chevron suffered pecuniary and reputational harm as a direct, proximate, and foreseeable result

of defendants' fraud.[138]

B.    Reliance

The elements of a common law fraud claim are "'a material, false representation, an

intent to defraud thereby, and reasonable reliance on the representation, causing damage to the

plaintiff.'"[139]  The Donziger Defendants assert that Chevron's fraud claim, to the extent it rests on

alleged reliance by third parties on defendants' misrepresentations, is legally insufficient because

reliance by the plaintiff is an essential element of the tort.  Moreover, it contends that the claim is

insufficient also to the extent that it is based on first-party reliance by Chevron because Chevron has

not alleged that the alleged false representations were made to deceive Chevron, that it reasonably

---

[137]

    *Id.* ¶ 389.

[138]

    *Id.* ¶¶ 392-93.

[139]

    *Chanayil v. Gulati*, 169 F.3d 168, 171 (2d Cir. 1999) (quoting *Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970-71 (2d Cir. 1987)).

    The parties have briefed the questions relating to the sufficiency of Chevron's common law claims under New York law.  DI 303, at 17, 21, 24; DI 324, at 24, 29, 32.  They thus have accepted, at least for purposes of this motion, that New York law governs or that there is no conflict between the law of New York and that of any otherwise applicable jurisdiction. *See, e.g.*, *Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 137 (2d Cir. 1991) (noting that the parties consented to applying New York law by arguing on the bases of New York law in their respective filings); *Vishipco Line v. Chase Manhattan Bank. N.A.*, 660 F.2d 854, 860 (2d Cir. 1981) (in the absence of authority to the contrary, courts apply the law of the forum state).

relied on them, or that its reliance caused its injuries.[140]

### 1.    First-Party Reliance

Chevron asserts that its fraud claim is valid on the basis of first-party reliance because it relied on the defendants' alleged false representations to its detriment.[141]  Its argument, however, is not persuasive.

The amended complaint, to be sure, contains a single, conclusory allegation that Chevron relied on the alleged misrepresentations and material omissions.[142]  Several other allegations, however, contradict that general assertion and demonstrate that Chevron did not rely on these representations or omissions.[143]  Moreover, any pecuniary harm caused by the Judgment and any reputational harm caused by the alleged false statements required the reliance of third parties, such as the Ecuadorian courts, investors, and the media.  The only plausible injuries based on first-

---

[140]

DI 303, at 18-20.

The Donziger Defendants do not argue that Chevron fails to plead its fraud claim with the requisite amount of particularity.  Indeed, any attempt to do so would be futile.  *E.g.*, Cpt. ¶¶ 109-21, 185-88, 246-59, 304-10, 392.

[141]

Cpt. ¶¶ 392-93.

[142]

*Id.* ¶ 392.

Conclusory allegations of reliance are insufficient where contradicted by specific, inconsistent allegations.  *See, e.g.*, *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1095 (2d Cir. 1995) (upholding dismissal where "attenuated allegations" supporting the claim were "contradicted both by more specific allegations in the Complaint and by facts of which [the court] may take judicial notice").

[143]

Cpt. ¶ 3 (discussing the "sham litigation in Lago Agrio, Ecuador," "the fabricated evidence" including the Calmbacher and Cabrera reports, and the "fake damage assessment"); *id.* ¶¶ 4, 69, 101, 109, 128-29, 156, 325, 337 (demonstrating that Chevron believed that these alleged fraudulent and false statements were not true).

party reliance are the attorneys' fees and costs Chevron spent to defend itself against the allegedly false statements and material omissions.  But those injuries do not support Chevron's position because it would have incurred those costs regardless of whether it had believed the allegedly false statements.  Simply put, Chevron incurred no attorneys' fees or costs because it relied on any misrepresentations by the defendants. Chevron, to the extent its claim rests on its own alleged reliance on defendants' misstatements  therefore fails to state a legally sufficient claim for common law fraud.

### 2.      Third-Party Reliance

The Donziger Defendants do not argue that Chevron fails sufficiently to allege that third-parties relied on the allegedly false representations or that such reliance injured Chevron.[144] Rather, they contend only that fraud claims may not be predicated on reliance by third parties.[145] They rely principally on two Second Circuit decisions to that effect, *Smokes-Spirits.com* and *Cement & Concrete Workers District Council*.[146]  But it is important to bear in mind also the Circuit's instruction that this Court's obligation in any case resting on New York State law is to adhere to decisions of the New York Court of Appeals as the "final authority on state law"[147] and, in the

---

[144]

DI 303, at 17-20.

[145]

*Id.*

[146]

*Smokes-Spirits.com, Inc.*, 541 F.3d at 454; *Cement & Concrete Workers Dist. Council Welfare Fund v. Lollo*, 148 F.3d 194, 196 (2d Cir. 1998) ("[A] plaintiff does not establish the reliance element of fraud . . . by showing only that a third party relied on defendant's false statements . . . .").

[147]

*Field v. Fidelity Union Trust Co.*, 311 U.S. 169, 177 (1940).

absence of such authority, decisions by the Appellate Divisions unless there is "persuasive evidence that the New York Court of Appeals . . . would reach a different conclusion."[148]  The Court therefore begins by examining *Smokes-Spirits.com* and *Cement & Concrete* and then turns to the New York authorities.

Both *Smokes-Spirits.com* and *Cement & Concrete* held that injury as a result of reliance by third parties is not actionable in New York.  As *Smokes-Spirits.com* merely relied upon *Cement & Concrete* for that proposition,[149] it is the latter case that is of principal significance.  And while *Cement & Concrete* accurately cited two Appellate Division decisions to that effect,[150] the two decisions upon which it relied are inconsistent with a series of New York Court of Appeals decisions that appear still to be authoritative as well as a significant number of Appellate Division decisions both before an after those relied upon in *Cement & Concrete*.  It therefore is appropriate to examine the New York authorities in considerably more detail.

As an initial matter, as another judge of this Court has pointed out, the New York Court of Appeals has held not once, but three times, that a claim for common law fraud may rest on third-party reliance.[151]  While these cases were decided in the last century, they have not been

---

[148]

   *Pahuta v. Massey-Ferguson, Inc.*, 170 F.3d 125, 134 (2d Cir. 1999).

[149]

   541 F.3d at 454.

[150]

   *Garelick v. Carmel*, 141 A.D.2d 501, 529 N.Y.S.2d 126, 128 (2d Dep't 1988); *Escoett & Co. v. Alexander & Alexander, Inc.*, 31 A.D.2d 791, 296 N.Y.S.2d 929 (1st Dep't 1969).

[151]

   *N.B. Garments (Pvt.) Ltd. v. Kids Int'l Corp.*, No. 03 Civ. 8041 (HB), 2004 WL 444555, at *3 (S.D.N.Y. Mar. 10, 2004) (citing *Eaton, Cole & Burnham Co. v. Avery*, 83 N.Y. 31, 33-34 (1880) (third party reliance is sufficient to sustain a cause of action for common law fraud), *Rice v. Manley*, 66 N.Y. 82, 87 (1876) (same), and *Bruff v. Mali*, 36 N.Y. 200, 205-206 (1867) (same)).

overruled, and this Court is bound to "defer to the voice of th[e] state's highest court – however antiquated its view of the law may seem."[152]

It is true, of course, that some "lower New York state courts [later] began to hold that common law fraud was not cognizable when based on the reliance of a third-party."[153]   But Appellate Division decisions in which the issue has arisen are have split on the issue even in some cases within the same department and without citing contrary decisions.[154] But the Circuit in *Cement & Concrete* neither cited nor discussed any of the Appellate Division holdings contrary to its holding.  Moreover, the Second and Fourth Departments both have allowed common law fraud claims based on third-party reliance since the Circuit's decision in *Cement & Concrete*,[155] thus casting its view of New York law in further doubt.

We thus are faced with old but square holdings by the New York Court of Appeals supporting fraud claims based on third-party reliance and a division of more modern authority at the intermediate appellate level albeit with the balance favoring the same position.  In addition, New

---

[152]

*Levesque v. Kelly Commc'ns, Inc.*, No. 91 Civ. 7045 (CSH), 1993 WL 22113, at *6 (S.D.N.Y. Jan. 25, 1993).

[153]

*N.B. Garments*, 2004 WL 444555, at *3.

[154]

*Compare Litvinov v. Hodson*, 74 A.D.3d 1884, 1885, 905 N.Y.S.2d 400, 401 (4th Dep't 2010) ("fraud may be found where a false representation is made to a third party, resulting in injury to the plaintiff") (internal quotation marks and citation omitted); *Ruffing v. Union Carbide Corp.*, 308 A.D.2d 526, 528, 764 N.Y.S.2d 462, 465 (2d Dep't 2003) (same); *Buxton Mfg. Co. v. Valiant Moving & Stor., Inc.*, 239 A.D.2d 452, 657 N.Y.S.2d 450 (2d Dep't 1997) (same); *Desser v. Schatz*, 182 A.D.2d 478, 581 N.Y.S.2d 796 (1st Dep't 1992) (same), *with Garelick,* 141 A.D.2d at 502, 529 N.Y.S.2d at 128 ("complaint must set forth all of the elements of fraud including the making of material representations by the defendant to the plaintiff"); *Escoett*, 31 A.D.2d at 791, 296 N.Y.S.2d at 929.

[155]

*Litvinov*, 74 A.D.3d at 1885, 905 N.Y.S.2d at 401; *Ruffing*, 308 A.D.2d at 528, 764 N.Y.S.2d at 465.

York unquestionably permits recovery based on reliance by third parties on false and deceptive statements in areas including tortious interference with contract.[156]

There is little doubt that this Court is in the undesirable position "of choosing between dueling pronouncements of New York law made by two Courts to whom [it is] obliged to defer."[157]  Nor, unlike the Circuit, may this Court certify this issue of state law to the New York Court of Appeals.  It therefore must decide the issue as best it can.  With the greatest respect for my Circuit brethren, this Court concludes that the New York Court of Appeals' previous decisions allowing recovery for common law fraud based on third party reliance remain authoritative and, in any case, that that Court, were it faced with the question anew, would adhere to that position.  Accordingly, Chevron's fraud claim cannot properly be entirely dismissed on the present motion for want of sufficient allegations of first-party reliance.

## V.     Tortious Interference with Contract

The elements of a claim for tortious interference with contract are: "(1) the existence of a valid contract between the plaintiff and a third party, (2) the defendant's knowledge of that contract, (3) the defendant's intentional procurement of the third party's breach of that contract, and (4) damages."[158]  The statute of limitations for tortious interference claims is three years, and it

---

[156]

      *See, e.g.*, *Cohen v. Davis*, 926 F. Supp. 399, 403-04 (S.D.N.Y. 1996) (denying motion to dismiss tortious interference with contract claim where plaintiff alleged that she was terminated because others relied on false statements about her).

[157]

      *N.B. Garments*, 2004 WL 444555, at *3.

[158]

      *See, e.g.*, *Chung v. Wang*, 79 A.D.3d 693, 694, 912 N.Y.S.2d 647, 648 (2d Dep't 2010).

"begins to run when the defendant performs . . . the alleged interference."[159]

The contracts at issue are the 1995 Settlement Agreement and the 1998 Final Release, which "released TexPet, Texaco, and their employees, successors, principals and subsidiaries from liability relating to environmental damage in Ecuador."[160]  Chevron alleges that the Donziger Defendants and others "improper[ly] influence[d] and . . . persuaded the Republic of Ecuador to refuse to defend Chevron's rights, causing Ecuador to renege on its alleged release of TexPet from all liability associated with the company's Ecuadorian operations."[161]

The Donziger Defendants argue that this claim is time-barred because any alleged interference began in 1999 (when Ecuador enacted the Environmental Management Act of 1999 ("EMA"), which allowed a private right of action to sue for environmental damages)[162] or in 2003 (when the LAPs, relying on the EMA, commenced the Lago Agrio litigation in Ecuador).[163] Chevron does not dispute that the statute of limitations began to run at one of these junctures. Rather, it describes the tortious conduct as persisting and characterizes the Judgment and the

---

[159]

> *Thome v. Alexander & Louisa Calder Found.*, 70 A.D.3d 88, 108, 890 N.Y.S.2d 16, 30 (1st Dep't 2009), *leave to appeal denied*, 2010 WL 2572017 (N.Y. 2010).

[160]

> Cpt. ¶ 397; *see id.* ¶¶ 396-402.

[161]

> *Id.* ¶ 398.

[162]

> DI 303, at 21.

> The amended complaint alleges that Ecuador enacted the EMA with help from the Donziger Defendants and other alleged co-conspirators.  *See id.* ¶¶ 58, 63.

[163]

> DI 303, at 21.

Cabrera Report as a new breaches of the contracts.[164]

      Chevron's attempt to avoid the bar of the statute of limitations by asserting that any tortious interference is ongoing fails because "tortious interference with contract is not a continuing tort."[165]  Moreover, the Court is persuaded that the alleged tortious interference began no later than 2003 when the Lago Agrio litigation was filed and, as alleged in the amended complaint, the Donziger Defendants and others "persuaded the Republic of Ecuador to refuse to defend Chevron's rights."[166]  As more than three years have elapsed since the start of the Lago Agrio litigation, the claim is untimely and must be dismissed as to the Donziger Defendants.[167]

## VI.    *Trespass to Chattels*

      In substance, Chevron alleges that the Donziger Defendants' "fraudulent litigation" and the corresponding "misleading media campaign"[168] has interfered with, disturbed, and damaged its "funds and goodwill"[169] and that they therefore have committed trespass to chattels.

      The essential elements of trespass to chattels are "(1) intent, (2) physical interference

---

[164]

    DI 324, at 29.

[165]

    *Spinap Corp., Inc. v. Cafagno*, 302 A.D.2d 588, 588, 756 N.Y.S.2d 86, 87 (2d Dep't 2003); *see also Bloomfield Bldg. Wreckers v. City of Troy*, 41 N.Y.2d 1102, 1103 (1977).

[166]

    Cpt. ¶ 398; *see id.* ¶¶ 58-67.

[167]

    As the Court holds that this claim is untimely, it does not consider the Donziger Defendants' other argument in favor of dismissing the tortious interference claim.

[168]

    Cpt. ¶ 405.

[169]

    *Id.* ¶ 407.

with (3) possession (4) resulting in harm."[170]  Chevron's claim is without merit for two reasons.

First, Chevron does not allege that the Donziger Defendants interfered with a chattel. The only interference alleged involved Chevron's funds and goodwill.  "Chattel" is defined as "[m]ovable or transferable property [such as] personal property."[171]  Money is fungible and not properly characterized as a "chattel."[172]  The same is true of goodwill.[173]

Second, Chevron does not allege that the Donziger Defendants *physically* interfered with possession of its property.[174]  Chevron's claim is essentially one for vexatious litigation – a tort that does not exist in New York[175] – and one that cannot be fit into the narrow doctrine of trespass to chattels.

---

170

> *Sweeney v. Bruckner Plaza Assocs. LP*, No. 23941/00, 2004 WL 5644706, at *4 (Sup. Ct. Bronx Co. July 12, 2004); *Sch. of Visual Arts v. Kuprewicz*, 3 Misc. 3d 278, 281-82, 771 N.Y.S.2d 804, 807-08 (Sup. Ct. N.Y. Co. 2003).

171

> BLACK'S LAW DICTIONARY 229 (7th ed. 1999) (defining "chattel").

172

> *Id.* ("Money is not to be accounted Goods or *Chattels*, because it is not of it self valuable . . . .") (quoting Thomas Blount, *Nomo-Lexicon: A Law-Dictionary* (1670)); *see also Meisels v. Schon Family Found.*, No. 22024/09, 2010 WL 2674049, at *2 (Sup. Ct. Kings Co. June 28, 2010) ("Money can be the subject of conversion when it can be described, identified, or segregated in the manner that a specific chattel can be and when it is subject to an obligation to be returned.").

173

> *Doe ex rel. Doe v. Fed. Express Corp.*, 571 F. Supp. 2d 330, 333 (D. Conn. 2008) (noting that forms of intangible property, such as goodwill and reputation, do not fit within the definition of a chattel); *see also Scenic Aviation, Inc. v. Blick*, No. 02-CV-01201, 2003 WL 26060445, at *10 (D. Utah Aug. 4, 2003) ("Scenic has not established the loss of chattel, it only alleges the loss of goodwill, employees and customers, which is insufficient to prove this claim.").

174

> Cpt. ¶¶ 403-09; *see Sch. of Visual Arts*, 3 Misc. 3d at 281-82, 771 N.Y.S.2d at 807-08.

175

> *See Chord Assocs., LLC v. Protech 2003-D, LLC*, No. 07-CV-5138, 2010 WL 3780380, at *1 (E.D.N.Y. Sept. 21, 2010).

VII.     *Unjust Enrichment*

Chevron alleges that the Donziger Defendants and others have been and, unless enjoined, will be enriched unjustly by the Judgment and its proceeds.[176]

A plaintiff seeking damages on an unjust enrichment claim must allege that "(1) defendant was enriched; (2) the enrichment was at plaintiff's expense; and (3) the circumstances were such that equity and good conscience require defendants to make restitution."[177]

The Donziger Defendants argue that Chevron fails to allege that they have been enriched at its expense because they have yet to collect or receive benefits from the Judgment.[178] The argument thus is that this claim is unripe or that Chevron cannot show any enrichment at its expense.  Chevron rejoins that the Donziger Defendants have been enriched because they "expect[] to obtain substantial sums of money [from the Judgment]" and that any benefits will come at Chevron's expense "in the form of myriad harms to Chevron that were a necessary result of defendants' scheme."[179]

As the Donziger Defendants have not recovered on the Judgment to date, the unjust enrichment claim is premature at best.  "The essence of [an unjust enrichment] claim is that one party *has* received money or a benefit at the expense of another."[180]  It cannot be said at this point

---

[176]

Cpt. ¶¶ 410-13.

[177]

*CBS Broadcasting Inc. v. Jones*, 460 F. Supp. 2d 500, 506 (S.D.N.Y. 2006) (quoting *Kidz Cloz, Inc. v. Officially for Kids, Inc.*, 320 F. Supp. 2d 164, 177 (S.D.N.Y. 2004)).

[178]

*See, e.g.*, DI 303, at 24.

[179]

DI 324, at 32.

[180]

*Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (emphasis added).

that the Donziger Defendants have been enriched[181] – unjustly or otherwise – especially considering that none of Chevron's assets have been seized to satisfy the Judgment, and the Donziger Defendants have yet to receive any contingent fees.[182]  Indeed, "[w]here the party against whom a judgment has been rendered succeeds in postponing the execution or the effectiveness of the judgment pending review . . . [a claim in restitution as necessary to avoid unjust enrichment] will not arise because the judgment will not be paid."[183]

      Moreover, any enrichment received by the Donziger Defendants to date – allegedly from litigation funding agreements[184] – did not come at Chevron's expense.  Although an unjust enrichment claim in some circumstances can arise from the conferral on a defendant of a benefit by a third party,[185] the plaintiff must have an interest in or right to the benefit thus conferred in order

---

[181]

    *Compare Prudential Ins. Co. of Am. v. Dukoff*, 674 F. Supp.2d 401, 413 (E.D.N.Y. 2009) (finding an unjust enrichment claim on an unpaid insurance benefit was ripe because "courts have held that a party may hold a property interest in an insurance policy"), *with In re Calloway*, 423 B.R. 627, 629-30 (Bankr. W.D.N.Y. 2010) (statute that reduced judgment creditor's available recovery did not "take any vested property interest of the judgment creditor" because "under New York law, a judgment does not create any vested property interest").

[182]

    *See Axel Johnson, Inc. v. Arthur Andersen & Co.*, 830 F. Supp. 204, 211-12 (S.D.N.Y. 1993) ("[N]o cause of action for unjust enrichment lies for hypothetical future liabilities."); *Schwartzbaum v. Emigrant Mortg. Co.*, No. 09 Civ. 3848, 2010 WL 2484181 (S.D.N.Y. Apr. 22, 2010), *report and recommendation adopted in part rejected on other grounds*, 2010 WL 2484116 (S.D.N.Y. June 16, 2010); *see also Scaramuzza v. Sciolla*, No. Civ. A. 04-CV-1270, 2004 WL 2063062, at *5 (E.D. Pa. Sept. 14, 2004) (characterizing unjust enrichment as "a retroactive equitable remedy," and noting that "[i]t is well established that an unjust enrichment action will fail based on the allegations of future benefits").

[183]

    RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 18, at 246-47 (2011).

[184]

    Cpt. ¶¶ 328-30.

[185]

    RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT, §§ 47-48, at 129-69.

to recover for unjust enrichment.[186]  But Chevron has not alleged any right to the litigation funding received by the Donziger Defendants.  "A complaint does not state a cause of action in unjust enrichment if it fails to allege that defendant received something of value which belongs to the plaintiff."[187]

## VII.    New York Judiciary Law § 487

Section 487 of the New York Judiciary Law[188] provides for civil treble damages and criminal sanctions against "[a]n attorney or counselor who . . . [i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party."[189]  Chevron alleges that the Donziger Defendants violated this statute by "engaging in an intentional pattern of collusion, wrongdoing, and deceit with the intent to deceive both Chevron and multiple federal courts," including this one.[190]

The Donziger Defendants seek dismissal of this claim on two bases.  First, they contend that Chevron has failed to allege that Donziger's alleged misconduct was committed in his

---

[186]

  *See, e.g.*, *id.* § 48, at 144 ("If a third person makes a payment to the defendant to which (as between the claimant and defendant) the claimant has a better legal or equitable right, the claimant is entitled to restitution . . . as necessary to prevent unjust enrichment.").

[187]

  *Bazak Intern. Corp. v. Tarrant Apparel Grp.*, 347 F. Supp. 2d 1, 4 (S.D.N.Y. 2004) (quotation omitted).

[188]

  N.Y. JUD. LAW § 487.

[189]

  *Id.*

[190]

  Cpt. ¶ 422.

capacity as an attorney and that the statute therefore does not apply.[191]   Second, they maintain that even if Donziger had acted as an attorney, any Section 487 claim arising out of those cases had to have been brought in the actions in which he did so and does not properly lie here.[192]   These arguments are without merit.

The first fails for the simple reason that Chevron explicitly alleges that Donziger is an attorney and that he and his law offices and professional corporations violated Section 487 by engaging "in an intentional pattern of collusion, wrongdoing, and deceit with the intent to deceive . . . multiple federal courts" and "actively participated in the preparation and filing of multiple court submissions to" this and other courts "which included false and misleading statements."[193]   If the amended complaint does not allege in so many words that he thus acted in his capacity of an attorney, that surely is a permissible inference that the Court is obliged to draw for purposes of this motion.

The second argument is equally deficient.   As an initial matter, the statute itself provides that an attorney who violates it "forfeits to the party injured treble damages, to be recovered in a civil action."[194]   The fact that it does not restrict the recovery of treble damages to a claim in the action in which the violation occurs, even if the injured party then was aware of the misconduct, is significant, as the reading advanced by the Donziger Defendants would be inconsistent with the plain statutory language.

---

[191]   DI 303, at 25-26.

[192]   *Id.* at 26.

[193]   Cpt. ¶¶ 422-23.

[194]   N.Y. JUD. LAW § 487(1).

Next, the Donziger Defendants rely for this argument on a single district court decision,[195] which in turn cited to state court cases[196] for the proposition.  But the state court cases do not support the proposition for which they were cited.  Rather, to the extent that they are relevant here at all, they stand for the rather different principle that a losing party may not collaterally attack the adverse judgment in a subsequent action under Section 487 but must move under CPLR 5015 to vacate the previous judgment.[197]  But Chevron does not here collaterally attack any prior judgment under Section 487 and, on that claim for relief, seeks only damages for the Donziger Defendants' alleged violations of the statute.[198]  Indeed, one New York court has held specifically that a Section 487 claim may be raised in a subsequent civil action as long as its "essential purpose" is not to collaterally attack the judgment in the action in which the violation was committed.[199]

---

[195]

  *Seldon v. Bernstein*, No. 09 Civ. 6163 (AKH), 2010 WL 3632482, at *2  (S.D.N.Y. Sept. 16, 2010).

[196]

  *Hansen v. Werther*, 2 A.D.3d 923, 767 N.Y.S.2d 702 (3d Dep't 2003); *Yalkowsky v. Century Apts. Assocs.*, 215 A.D.2d 214, 626 N.Y.S.2d 181 (1st Dep't 1995).

[197]

  *Yalkowsky* was a suit against a landlord and the landlord's attorney that sought collateral relief with respect to a prior Civil Court judgment, in part on the ground that the lawyer had violated § 487 in the prior action.  In affirming dismissal of the claim as against the lawyer, the court noted that the relief sought – vacatur of the prior judgment – was available only "by moving pursuant to CPLR 5015 to vacate the civil judgment due to its fraudulent procurement, not [in] a second plenary action collaterally attacking the judgment in the original action."  626 N.Y.S.2d at 182-83.

  *Hansen* held that an independent action would not lie under § 487 where the plaintiff had made the same § 487 claim against the same attorney in a prior action, but the prior action had been dismissed, and the complaint in any event failed to state a violation fo the statute 767 N.Y.S.2d at 923, certainly not the situation here.  Any broader comments were *dicta*.

[198]

  Cpt., prayer for relief ¶¶ 7-8.

[199]

  *Dupree v. Voorhees*, 24 Misc. 3d 396, 402, 876 N.Y.S.2d 840, 845 (Sup. Ct. Suffolk Co. 2009).

Finally, even a collateral attack on a prior judgment may be made under Section 487 in "a separate lawsuit . . . where the alleged perjury or fraud in the underlying action was 'merely a means to the accomplishment of a larger fraudulent scheme.'"[200]  *A fortiori*, the same would be true even if claims under Section 487 that do not collateral attack prior judgments nevertheless generally should be made in the prior actions.  And Chevron certainly alleged that the misconduct in the prior actions was "merely a means to the accomplishment of a larger fraudulent scheme."

## VIII.   *Civil Conspiracy*

Chevron's seventh claim for relief charges all defendants with civil conspiracy to commit the various state law torts alleged in the complaint.  The Donziger Defendants seek its dismissal, contending that New York does not recognize an independent tort of civil conspiracy *vel non.*

New York in fact does not recognize an independent tort for civil conspiracy.[201]  But it does create vicarious liability for civil conspiracy on the part of defendants who conspire with tortfeasors to commit other actionable wrongs, including amount others fraud, tortious interference with contract, trespass to chattels, and arguably violations of Section 487 of New York's Judiciary Law.[202]  As Chevron has alleged causes of action for fraud and a violation of Section 487 of the

---

[200]

   *Specialized Indus. Servs. Corp. v. Carter*, 68 A.D.3d 750, 751-52, 890 N.Y.S.2d 90, 92 (2d Dep't 2009) (citation omitted).

[201]

   *See, e.g.*, *Ferguson v. Meridian Distrib. Servs., Inc.*, 155 A.D.2d 642, 642, 548 N.Y.S.2d 233, 234 (2d Dep't 1989).

[202]

   *See, e.g.*, *Alexander & Alexander of N.Y. v. Fritzen*, 68 N.Y.2d 546, 969 (1986) (allegations of conspiracy permitted to connect the actions of separate defendants with an otherwise actionable tort); *Ferguson*, 155 A.D.2d at 642, 548 N.Y.S.2d at 234; *Reo v. Shudt*, 144

Judiciary Law, the civil conspiracy claim is sufficient as against the Donziger Defendants.[203]

*Conclusion*

For the foregoing reasons, the Donziger Defendants' motion to dismiss the amended complaint [DI 302] is granted to the extent that so much of the third claim for relief as is premised on detrimental reliance by Chevron and the fourth through sixth claims for relief all are dismissed, provided, however, that the dismissal of the claim for damages asserted in the sixth claim for relief is dismissed only as premature. The motion is denied in all other respects.

SO ORDERED.

Dated:        May 14, 2012

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

A.D.2d 793, 794-95, 534 N.Y.S.2d 553, 554 (3d Dep't 1988).

[203]

*E.g.*, *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006).