UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                 :

CHEVRON CORPORATION,             :

                 Plaintiff,       :

          -against-          :   Case No. 11 Civ. 0691 (LAK)

                                   :

STEVEN R. DONZIGER, et al.,      :

                Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**CHEVRON CORPORATION'S MEMORANDUM OF LAW IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY
JUDGMENT ON THE STRATUS DEFENDANTS' AFFIRMATIVE
DEFENSES OF RES JUDICATA AND COLLATERAL ESTOPPEL**

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

*Attorneys for Plaintiff Chevron Corporation*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................... iii

TABLE OF ABBREVIATIONS AND DEFINED TERMS ........................... viii

PRELIMINARY STATEMENT ..................................................................... 1

FACTUAL BACKGROUND .......................................................................... 4

I.    When Defendants' Lawsuit Against Chevron Proved Unfounded, They
      Leveraged Judicial Corruption to Obtain a Judgment by Fraud ....................... 4

      A.    After Producing Oil in Partnership With Ecuador, TexPet Remediated
            Its Share of Impacts and Was Released From Further Liability ........................ 5

      B.    Defendants' Own Analysis Revealed the Remediation Was Proper ................... 5

      C.    Defendants Subverted the Ecuadorian Trial, Colluding With the Court ............... 8

            1.    Defendants Effected the Choice of a Co-Conspirator as Court
                  Expert ........................................................................................... 8

            2.    Defendants Secretly Authored the "Independent" Expert's
                  Report ......................................................................................... 10

            3.    When Chevron Uncovered This Scheme, Defendants
                  Repackaged the Report Using "Cleansing" Experts ............................... 11

      D.    Defendants' Scheme Took Advantage of a Weak and Politicized
            Judiciary ........................................................................................... 12

II.   Defendants Ghostwrote the Judgment, Awarding Themselves an Enormous
      Windfall With No Basis in Law or Fact ..................................................... 14

      A.    The Judgment Was Not Written by the Presiding Judge ............................... 14

      B.    The Judgment Is Replete With Text and Data Lifted From Defendants'
            Confidential Files, Including Numerous Common Errors and
            Idiosyncrasies .................................................................................... 15

            The Fusion Memo .............................................................................. 15

            The "Index Summaries" ........................................................................ 16

            The Selva Viva Data Compilation ........................................................... 16

            June 18, 2009 Fajardo emails regarding trust law ...................................... 16

## TABLE OF CONTENTS
### (Continued)

Page

C.    The Judgment Awards Outlandish Damages, Including an $8.65 Billion Punitive Damages Award Contrary to Ecuadorian Law ........................... 17

III.    Both the Trial and Appellate Courts Avoided the Evidence of Defendants' Fraud .............................................................................................................. 18

A.    The Trial Court Refused to Adjudicate the Fraud, Falsely Claiming to Moot the Question by Excluding the Cabrera Report ........................................... 18

B.    The Appellate Court Refused to Adjudicate the Fraud ......................................... 19

C.    Defendants Attempt to Employ Their Fraudulent Judgment ................................ 21

SUMMARY JUDGMENT STANDARD ........................................................................... 21

ARGUMENT ....................................................................................................................... 22

I.    Defendants' Fraudulent Judgment Cannot Be Recognized on Multiple Grounds ...................................................................................................................... 23

A.    The Court May Not Recognize a Judgment Defendants Secretly Wrote ............. 24

B.    The Judgment Cannot Be Recognized Because Defendants' Ongoing Fraud Infected the Proceedings ............................................................................ 27

C.    The Judgment Constitutes an Unenforceable Penalty ......................................... 30

D.    The Ecuadorian Court Lacked Personal Jurisdiction Over Chevron .................. 31

II.    The Judgment Does Not Preclude Litigation of Any *Issue* in This Action ...................... 32

A.    The Judgment Cannot Have Preclusive Effect Because Chevron Did Not Receive a "Full and Fair Opportunity to Litigate" in the Lago Agrio Litigation ................................................................................................... 32

B.    The Judgment Has No Preclusive Effect as to Defendants' Fraud Because the Ecuadorian Courts Did Not Adjudicate It and Disclaimed Preclusive Effect ................................................................................................... 33

III.    The Judgment Does Not Preclude the Litigation of Any *Claims* in This Action ............. 35

CONCLUSION .................................................................................................................... 35

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Ackermann v. Levine,*
    788 F.2d 830 (2d Cir. 1986) ........................................................................ 23, 29

*Alfadda v. Fenn,*
    966 F. Supp. 1317 (S.D.N.Y. 1997) ...................................................... 21, 23, 32

*Allstate Life Ins. Co. v. Linter Group Ltd.,*
    994 F.2d 996 (2d Cir. 1993) .............................................................................. 23

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)............................................................................................ 22

*Aoude v. Mobil Oil Corp.,*
    892 F.2d 1115 (1st Cir. 1989) ........................................................................... 29

*Bridgeway Corp. v. Citibank,*
    201 F.3d 134 (2d. Cir. 2000) ............................................................................. 25

*Caperton v. A. T. Massey Coal Co.,*
    129 S. Ct. 2252 (2009).................................................................................... 3, 24

*Central Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.,*
    56 F.3d 359 (2d Cir. 1995) ................................................................................ 32

*Chevron Corp. v. Donziger,*
    768 F. Supp. 2d 581 (S.D.N.Y. 2011) ......................................................... 25, 28

*Chevron Corp. v. Salazar,*
    2011 U.S. Dist. LEXIS 87463 (S.D.N.Y. Aug. 8, 2011).................................. 30

*CIBC Mellon Trust Co. v. Mora Hotel Corp.,*
    100 N.Y.2d 215 (2003)...................................................................................... 32

*Computer Assocs. Int'l v. Altai, Inc.,*
    126 F.3d 365 (2d Cir. 1997) .............................................................................. 35

*Diorinou v. Mezitis,*
    237 F.3d 133 (2d Cir. 2001) .............................................................................. 27

*DiRusso v. DiRusso,*
    287 N.Y.S.2d 171 (Sup. Ct. 1968)..................................................................... 30

# TABLE OF AUTHORITIES
## (Continued)

Page(s)

*Drexel Burnham Lambert Group Inc. v. Galadari,*
   777 F.2d 877 (2d Cir. 1985) ........................................................................ 23, 25

*Evans v. Ottimo,*
   469 F.3d 278 (2d Cir. 2006) ................................................................................. 33

*F.D.I.C. v. Great Am. Ins. Co.,*
   607 F.3d 288 (2d Cir. 2010) ................................................................................. 22

*Fairchild, Arabatzis & Smith, Inc. v. Prometco (Produce & Metals) Co.,*
   470 F. Supp. 610 (S.D.N.Y. 1979) ....................................................................... 29

*Fuchsberg & Fuchsberg v. Galizia,*
   300 F.3d 105 (2d Cir. 2002) ................................................................................. 33

*Griffin v. Griffin,*
   327 U.S. 220 (1946).............................................................................................. 23

*Guidi v. Inter-Continental Hotels Corp.,*
   2002 U.S. Dist. LEXIS 14833 (S.D.N.Y. Aug. 12, 2002)..................................... 34

*Harkness v. Hyde,*
   98 U.S. 476 (1878)................................................................................................ 32

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.,*
   322 U.S. 238 (1944)......................................................................................... 27, 29

*Herrera v. ADD Mktg. & Consolidation, Inc.,*
   No. CV 09-0174-TUC-JM, 2011 WL 4014348 (D. Ariz. May 11, 2011)................ 3

*Hilton v. Guyot,*
   159 U.S. 113 (1895)............................................................ 3, 23, 24, 25, 27, 28, 30

*Huntington v. Attrill,*
   146 U.S. 657 (1892).............................................................................................. 31

*In re Application of Chevron Corp.,*
   Case No. 11-24599-cv (S.D. Fla., June 12, 2012) ........................................... 2, 16

*In re Parmalat Sec. Litig.,*
   493 F. Supp. 2d 723 (S.D.N.Y. 2007) .................................................................. 32

*Int'l Cablevision, Inc. v. Sykes,*
   172 F.R.D. 63 (W.D.N.Y. 1997)........................................................................... 31

iv

# TABLE OF AUTHORITIES
## (Continued)

Page(s)

*Interoceanica Corp. v. Sound Pilots,*
    107 F.3d 86 (2d Cir. 1997) .................................................................................... 35

*Jacobowitz v. Metselaar,*
    268 N.Y. 130 (1935) ............................................................................................. 30

*Jeffreys v. City of New York,*
    426 F.3d 549 (2d Cir. 2005) ........................................................................... 22, 26

*Khandhar v. Elfenbein,*
    943 F.2d 244 (2d Cir. 1991) .................................................................................. 33

*Kulak v. City of New York,*
    88 F.3d 63 (2d Cir. 1996) ................................................................................ 22, 25

*Maersk, Inc. v. Neewra, Inc.,*
    2010 WL 2836134 (S.D.N.Y. July 9, 2010) ............................................... 29, 33, 34

*Manez Lopez v. Ford Motor Co.,*
    470 F. Supp. 2d 926 (S.D. Ind. 2006) .................................................................... 29

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986) .............................................................................................. 22

*Morgan v. United States,*
    304 U.S. 1 (1938) ............................................................................................... 3, 24

*Naranjo v. Chevron Corp.,*
    Case No. 11-1150 (2d Cir. Jan. 26, 2012) ............................................................. 32

*Osorio v. Dole Food Co.,*
    665 F. Supp. 2d 1307 (S.D. Fla. 2009), *aff'd*, 635 F.3d 1277 (11th Cir. 2011) ...... 27

*Overmyer v. Eliot Realty,*
    371 N.Y.S.2d 246 (N.Y. Sup. Ct. 1975) ................................................................ 31

*Parklane Hosiery v. Shore,*
    439 U.S. 322 (1979) .............................................................................................. 21

*Republic of Ecuador v. Chevron Corp.,*
    638 F.3d 384 (2d Cir. 2011) .................................................................................. 32

*Smith v. Alleghany Corp.,*
    394 F.2d 381 (2d Cir. 1968) .................................................................................. 29

**TABLE OF AUTHORITIES**
(Continued)

Page(s)

*Tamimi v. Tamimi,*
    328 N.Y.S.2d 477 (N.Y. App. Div. 1972) ............................................................. 30

*Taylor v. List,*
    880 F.2d 1040 (9th Cir. 1989) ........................................................................... 22

*Toledo Scale Co. v. Computing Scale Co.,*
    261 U.S. 399 (U.S. 1923) .................................................................................. 29

*United States v. Throckmorton,*
    98 U.S. 61 (U.S. 1878) ................................................................................ 29, 30

*W. Gillette v. Ariz. Corp. Comm'n,*
    121 Ariz. 541 (Ariz. Ct. App. 1979) .................................................................... 27

*Weiss v. Glemp,*
    792 F. Supp. 215 (S.D.N.Y. 1992) ...................................................................... 31

*Weiss v. La Suisse,*
    161 F. Supp. 2d 305 (S.D.N.Y. 2001) .................................................................. 34

*Wimmer Can. v. Abele Tractor & Equip. Co.,*
    299 A.D.2d 47 (N.Y. App. Div. 3d Dep't 2002) ..................................................... 24

**Statutes**

N.Y. C.P.L.R. § 5301(b) .......................................................................................... 31

N.Y. C.P.L.R. § 5302 .............................................................................................. 31

N.Y. C.P.L.R. § 5304(a) ............................................................................... 23, 24, 25

N.Y. C.P.L.R. § 5304(a)(2) ...................................................................................... 32

N.Y. C.P.L.R. § 5304(b) .......................................................................................... 23

N.Y. C.P.L.R. § 5304(b)(3) ................................................................................ 23, 28

**Other Authorities**

11-5304 New York Civil Practice .............................................................................. 30

Arthur Nussbaum, Jurisdiction and Foreign Judgments, 41 Colum. L. Rev. 221,
    221 (1941) ..................................................................................................... 20

## TABLE OF AUTHORITIES
### (Continued)

Page(s)

Black's Law Dictionary (9th 2009) ............................................................ 20

J. Story, Conflict of Laws 2d ed. § 607 (1841) .......................................... 3

### Rules

Fed. R. Civ. P. 56(a) ................................................................................. 22

## TABLE OF ABBREVIATIONS AND DEFINED TERMS

The following abbreviations and defined terms will be used in Chevron Corporation's Motion for Summary Judgment:

| | |
|---|---|
| Lago Agrio Litigation | *Maria Aguinda et al. v. Chevron-Texaco*, the litigation brought by the LAPs in Lago Agrio, Ecuador. |
| LAPs | The plaintiffs in the Lago Agrio Litigation, including appearing defendants Hugo Gerardo Camacho Naranjo and Javier Piaguaje Payaguaje. |
| Donziger | Defendants Steven Donziger, The Law Offices of Steven R. Donziger, and Donziger & Associates PLLC. |
| Stratus | Defendants Stratus Consulting, Inc., Douglas Beltman, and Ann Maest. |
| Defendants | All Defendants to this action generally. |
| TexPet | Texaco Petroleum Corporation, a fourth-tier subsidiary of Texaco, Inc. |
| ROE | The Republic of Ecuador |
| Consortium | The oil exploration and production consortium between the Ecuadorian state-owned company Petroecuador and TexPet, operating from 1962 to 1992. |
| St. __ | Chevron's Local Rule 56.1 Statement of Material Facts on Motion for Summary Judgment (all citations are by paragraph number). |
| Decl. __ | Exhibits to the March 1, 2012 Declaration of Anne Champion in Support of Chevron Corporation's Motion for Summary Judgment or Partial Summary Judgment on Defendants' Affirmative Defenses of Res Judicata and Collateral Estoppel, Dkt. 400. |

## PRELIMINARY STATEMENT

The Stratus Defendants unequivocally plead that the Ecuadorian judgment precludes Chevron's claims.  *See* Dkt. 474 at 88-90 (Affirmative Defenses 10, 16, & 23).  But the judgment that Stratus's co-defendants are now attempting to enforce in Canada (and soon elsewhere) is a fraud, and precludes nothing.  Stratus is wrong to claim that this Court has an "obligation to afford deference to, international comity to and/or to presume the regularity of the judicial proceedings and validity of the judgment[.]"  *Id.* at 90.  Before Stratus can purport to rely on the Ecuadorian judgment for any preclusive effect here, the law requires Stratus to demonstrate that the judgment is entitled to recognition under applicable U.S. law.  Stratus cannot possibly do so.  Indeed, its co-defendants, in responding to the identical motion, did not even attempt to rebut the evidence of fraud precluding such recognition, and Stratus cannot either.  Accordingly, Chevron brings this motion for summary judgment, which is substantively the same as the pending motion for summary judgment on the identical affirmative defenses raised by the other defendants, and urges this Court to resolve that core question now.

As the U.S. District Court for the Western District of North Carolina recognized, "[W]hat has blatantly occurred in this matter would in fact be considered fraud by any court."  Dkt 48-23 at 12.  No reasonable trier of fact could conclude that the fraudulent $18.2 billion Ecuadorian judgment may be recognized or given preclusive effect under U.S. law.  To take only the most glaring examples, Stratus secretly ghostwrote the purportedly "neutral" and "independent" report that Defendants caused to be filed under false pretenses as the official work of "Special Master" Richard Stalin Cabrera Vega.  Internally acknowledging the insufficiency of their own scientific evidence, Defendants went to great lengths to arrange Cabrera's appointment, including blackmailing the sitting judge with a civil complaint (St. 106), and went to even greater lengths to ensure that the global expert would "totally play ball with us and let us take the lead while project-

ing the image that he is working for the court" (St. 113).  This included bribing Cabrera with tens of thousands of dollars, including making illicit payments from what Defendants themselves described as "our secret account."  St. 134.  Defendants took great pains to hide their Cabrera ghostwriting, including using code words such as "the cook," "restaurant," "waiter," and the "Wao" to disguise their interactions with the Ecuadorian court and Cabrera (St. 175), and imploring the *Crude* filmmakers to "remove the images we discussed" of Dr. Beristain working with plaintiffs' attorneys because "[t]his is so serious that we could lose everything."  St. 176.  In court, Defendants and Cabrera denied in the strongest terms that they were working together—a charge they called "unthinkable," "offensive," and an "insult."  St. 127.  But privately, Stratus called the Cabrera Report "probably the single most important technical document for the case" (Dkt. 33-2), and worried, "Oh what a tangled web . . ." (Dkt. 34-14).  Lawyers conspiring with Defendants agonized that disclosure of Stratus's records confirming the Cabrera collusion would "destroy" their case in Ecuador, and that "all of us, your attorneys, might go to jail."  St. 177.  One of the LAPs' U.S. lawyers even privately observed that it appeared the Defendants "can be charged with a 'fraud'" and "Stratus was an active conspirator."  St. 177, 173.

Furthermore, as the Southern District of Florida has recently held, "Chevron has obtained mounds of evidence . . . that suggests that the judgment itself was also ghostwritten."  *In re Application of Chevron Corp.*, Case No. 11-24599-cv (S.D. Fla., June 12, 2012) ("*Banco*") at 4. Despite their many opportunities in various U.S. federal courts to dispute this evidence, Defendants have never done so.[1]  To the contrary, they have conceded that their secret internal materials appear in the judgment, and Donziger testified he could not explain it.  St. 39.  Nor has anyone

---

[1]   In fact, Defendants' sole attempt to explain any of Chevron's judgment fraud evidence—the discussion of the Fajardo email regarding trusts that contained an error-laden transcription of an Ecuadorian supreme court decision that appeared (with the identical errors) in the judgment—constituted a factual misrepresentation to this Court and the Second Circuit that they cannot defend, yet have failed to correct.  *See* Argument Section I.A, *infra*.

else.  It is Stratus's burden to offer admissible evidence sufficient to support every element of its purported defense.  And even if it were Chevron's burden, Stratus cannot defeat Chevron's showing without proffering *evidence* from which a reasonable trier of fact could find that the judgment is, for example, the product of a fair and unbiased proceeding.  *See Kulak v. City of N.Y.*, 88 F.3d 63, 71 (2d Cir. 1996).  But it cannot do so.  "[M]erely saying it is disputed does not make it so."  *Herrera v. ADD Mktg. & Consolid., Inc.*, No. CV 09-0174-TUC-JM, 2011 WL 4014348, at *3 (D. Ariz. May 11, 2011).

Such a tainted foreign judgment cannot be recognized under U.S. law.  As the Supreme Court has long recognized, "[I]f a special master or the trial judge permitted the plaintiff's attorney to formulate the findings upon the evidence, conferred *ex parte* with the plaintiff's attorney regarding them, and then adopted his proposals without affording an opportunity to his opponent to know their contents and present objections, there would be no hesitation in setting aside the report or decree as having been made without a fair hearing."  *Morgan v. United States*, 304 U.S. 1, 19–20 (1938).  This conclusion rests on constitutional and historical bedrock.  Just three years ago, the Supreme Court reaffirmed that a fair hearing before an impartial tribunal is a constitutional requirement, observing:  "It is axiomatic that a fair trial in a fair tribunal is a basic requirement of due process."  *Caperton v. A. T. Massey Coal Co.*, 129 S. Ct. 2252, 2259 (2009) (quotations and alterations omitted).  And nearly two centuries ago, Justice Story observed:  "It is easy to understand that the defendant may be at liberty to impeach the original justice of the judgment by showing . . . that it was procured by fraud."  J. Story, Conflict of Laws 2d ed. § 607 (1841) (*quoted with approval in Hilton v. Guyot*, 159 U.S. 113, 190 (1895)).

Even if Stratus could show a genuine issue of material fact regarding whether the Ecuadorian judgment may be recognized under U.S. law, it still would not be entitled to preclusive

effect on the fraud issue, as the Ecuadorian appellate court disclaimed any such ruling:

> Mention is also made of fraud and corruption of plaintiffs, counsel and repre-
> sentatives, *a matter to which this Division should not refer at all*, except to let it
> be emphasized that the same accusations are pending resolution before authorities
> of the United States of America due to a complaint that has been filed by the very
> defendant here, Chevron, under what is known as the RICO act, and *this Division
> has no competence to rule on the conduct of counsel, experts or other officials* or
> administrators and auxiliaries of justice, if that were the case.

St. 198 (emphases added).  Following the LAPs motion for "clarification" of this ruling, the Ec-

uadorian appellate court attempted to provide Defendants with a *post hoc* fig leaf stating that it

really had reviewed the fraud evidence, but nonetheless reiterated that it "stays out of these accu-

sations, preserving the parties' rights to . . . continue the course of the actions that have been

filed in the United States of America."  St. 201.

In sum, Stratus's res judicata and collateral estoppel defenses require as a necessary pre-

condition, and thereby put at issue, the recognizability of the Ecuadorian judgment.  But Stratus

cannot meet its burden to show a genuine issue of material fact precluding this Court from ruling

that the Ecuadorian judgment cannot be recognized under U.S. law, both on account of Defend-

ants' fraud, and on account of the judgment's other inherent flaws described below.  According-

ly, Chevron is entitled to summary judgment (or, at a minimum, partial summary judgment) on

Stratus's defenses of res judicata and collateral estoppel.

## FACTUAL BACKGROUND

## I.      When Defendants' Lawsuit Against Chevron Proved Unfounded, They Leveraged Judicial Corruption to Obtain a Judgment by Fraud

On May 7, 2003, Defendants caused to be filed a complaint against Chevron in Lago

Agrio, Ecuador, alleging that TexPet, a fourth-tier subsidiary of Texaco Inc., caused supposed

environmental damage for which Chevron was allegedly responsible as a result of a merger be-

tween a Chevron subsidiary and Texaco, Inc. in 2001.  St. 94.  But Defendants' own experts de-

termined that evidence did not support Defendants' claims, so they resorted to fraud, colluding with the court to manufacture the fabricated Cabrera Report and then the fraudulent judgment.

**A.      After Producing Oil in Partnership With Ecuador, TexPet Remediated Its Share of Impacts and Was Released From Further Liability**

The Lago Agrio Litigation arose out of TexPet's participation in an oil exploration and production consortium between 1964 and 1992, operating pursuant to a concession granted by Ecuador.  Beginning in 1973, Ecuador's state-owned oil company, Petroecuador, took an increasing ownership stake and operational role in the Consortium, culminating with the 1992 termination of the Consortium, at which point Petroecuador became the sole owner and operator.  Dkt. 10-2 to 20-3.  The Consortium generated more than $23 billion, of which the ROE retained 97%.  Dkt. 355-1 at 86.[2]

When, in 1990, Ecuador refused to renew the concession, Ecuador and TexPet entered into settlement and release agreements, including the 1998 Final Release, fully releasing TexPet from all claims of environmental impact after it completed specified remediation and community development projects to the satisfaction of both Ecuador and outside auditors.  Dkt. 21-17 to 22-11.  The remediation was highly regarded—indeed, defendant Camacho, now a plaintiff in the Lago Agrio Litigation, sent a letter on behalf of his town to Texaco's CEO praising the remediation as "fully and satisfactorily completed."  Dkt. 356-12 at 234.  Petroecuador still has not completed its share of the remediation.  Dkt. 355-1 at 3.  Nonetheless, in 2003, the LAPs sued only Chevron in Lago Agrio.  St. 243.

**B.      Defendants' Own Analysis Revealed the Remediation Was Proper**

At the outset of the Ecuadorian case, the parties agreed to a series of 122 "judicial inspec-

---

2      In order to avoid repetition, Chevron incorporates by reference previously filed documents cited by docket entry herein and in its Statement of Material Facts.

tions" of various oil drilling and production sites, where experts for the parties would each exam-

ine the sites and submit their findings to a panel of settling experts to reconcile the reports and

issue final determinations regarding the presence or absence of harmful contamination.  St. 98-

99.  When the settling experts issued their first and only report, they agreed with Chevron that

the site in question, Sacha 53, did not pose a threat to human health or the environment and that

the remediation had been properly done.  St. 103.  Thereafter, Defendants ensured that this was

the last impartial factual finding that would be made in the Lago Agrio Litigation.

The Sacha 53 report could not have surprised Defendants—their own experts had repeat-

edly told them that the evidence did not support Defendants' allegations.  These contrary find-

ings notwithstanding, Defendants continued, and continue to this day, to make allegations they

know to be without evidentiary support.

***Defendants Have No Evidence of Poisoned Water.***  Defendants repeatedly assert that

"[t]oxic and in many cases carcinogenic, chemicals continue to lace the waters that thousands of

indigenous persons and farmers depend on for every facet of their lives."  Decl. 2003 at 9.  But

when Defendants' experts found no evidence of harmful contamination from oil production, they

stopped testing groundwater and drinking water.  Dkt. 6-2 at CRS 195-05-01; Dkt. 7-6 at 254-63;

St. 100, 150-51.

***Defendants Have No Evidence of Agricultural Soil Contamination.***  Defendants claim

that "tens of thousands of men, women, and children . . . are still waiting for . . . unpoisoned soil

in which to grow their crops."  Decl. 2002 at 4.  They decry a "Rainforest Chernobyl" with "con-

tamination . . . covering an area of rainforest the size of Rhode Island."  Dkt 355-17 at 28; Dkt.

47-30 at 3.  But Defendant Beltman conceded that "I do not think that contamination sufficient to

impact the ecology extends very far beyond the pads, pits, and spills at the wells."  Dkt. 108-13.

Even the Cabrera Report, secretly written by Defendants, estimates the area requiring remediation as only 0.37 square miles.  Dkt. 33-12 at 43.  And former LAPs' expert David Russell, who coined the phrase "Rainforest Chernobyl," has renounced his findings and his association with the LAPs.  Decl. 2277; Dkt. 31-14.

**Defendants Have No Evidence of an Elevated Cancer Rate.**  Defendants label the concession area a "death zone" and a "cancer zone," claim "increased rates of cancer, leukemia, birth defects, and a multiplicity of other health ailments," and assert that oil contamination has caused "1,401 excess cancer deaths."  Dkt. 355-25 at 23, 25, 28.  But Defendants' own experts admit that the 1,401 number has "little validity" and that "no one has studied" the causality between oil production prior to 1992 and any illnesses in Ecuador.  St. 169; Dkt. 355-22 at 2.

**Defendants Have No Evidence That TexPet's Remediation Was "Fraudulent."**  Defendants persuaded the ROE to bring baseless criminal charges against Chevron attorneys involved in the TexPet remediation, and to assert a "fraud" counterclaim against Chevron in litigation in this District—which Donziger described as a "hammer" to leverage a payoff.  Dkt. 28-7 at 53 of 109.  But Defendant Beltman himself found no "clear instances where Texpet did not meet the conditions required in the cleanup."  St. 168.  Former LAP experts Russell and Calmbacher said the same thing.  Decl. 2156 at 115, Dkt. 31-14.  The ROE ultimately withdrew the fraud counterclaim it had asserted because it lacked evidence.  Dkt. 28-7 at 49 of 109.

Defendants' own experts have repeatedly challenged these unsupported allegations. When former expert Russell sent Donziger a "cease-and-desist" letter demanding that he stop using Russell's remediation estimate of $6 billion (which Russell described as "too high by a substantial margin, perhaps by a factor of ten, or more") (Dkt. 31-14), Donziger's response was blunt:  "I don't care what the fuck that guy says."  Dkt. 6-8 at 77–79.  When Defendants' experts,

including Defendant Maest, told Donziger they had no evidence of contaminants migrating into the groundwater, he replied:

> Hold on a second, you know, this is Ecuador, okay, . . . You can say whatever you want and at the end of the day, there's a thousand people around the court-house, you're going to get what you want. . . . Therefore, if we take our existing evidence on groundwater contamination, which admittedly is right below the source . . . [a]nd wanted to extrapolate based on nothing other than our, um, theo-ry . . . [w]e can do it. And we can get money for it. . . . *Because at the end of the day, this is all for the Court just a bunch of smoke and mirrors and bullshit.*

Dkt. 7-6 at 254–63. When one expert pushed back, explaining that "there is not enough infor-mation on that groundwater," Donziger instructed the camera crew to stop filming, stating, "[T]here's another point I got to make . . . to these guys, but I can't get this on camera." *Id.*

### C.   Defendants Subverted the Ecuadorian Trial, Colluding With the Court

#### 1.   Defendants Effected the Choice of a Co-Conspirator as Court Expert

As it became increasingly clear that further impartial testing would only undermine their position, Defendants engaged in lobbying efforts to convince the court to cancel the remaining judicial inspections, including a string of *ex parte* meetings with presiding Judge Yánez, and the drafting and private brandishing of a civil complaint against him. St. 105-06. Donziger wrote in his diary that "the only way the court will respect us is if they fear us. . . . Our issues first and foremost are whether the judge will accept the renuncia [waiver] . . . of the inspections . . . . If it doesn't happen, then we are in an all-out war with the judge to get him removed." *Id.*

In January 2007, the Lago Agrio court acceded to Defendants' threats and announced that it would appoint a global assessment expert. St. 110. In secret, Defendants were further lobby-ing the judge to appoint someone under their control. St. 114. Donziger wrote, "I asked Pablo if he was 100 percent sure the judge would appoint Richard [Cabrera] and not Echeverria, and he said yes. But given that this is the most important decision of the case thus far, there is simply no margin for error." *Id.* As another lawyer working for Donziger put it, "Pablo's a clever char-

acter and in pretty with the judge, right, so I'm sure some solution will come up."  *Id*.  After Cabrera was appointed, Donziger characterized it as a "HUGE VICTORY" stating that "[the judge] never would have done [it] had we not really pushed him."  *Id*.

By the time the court officially appointed Cabrera as the global expert, Defendants had convinced him "to totally play ball with us and let us take the lead while projecting the image that he is working for the court."  St. 113.  To ensure Cabrera's cooperation, Defendants formally paid Cabrera over $263,000 for work he never performed, and they made tens of thousands of dollars in *secret* payments to him through what they described as "our secret account."  St. 134. Regarding these payments, they would subsequently write:  "[Cabrera] is also very uncomfortable (and this is dangerous)," so it was "urgent for the money to arrive next week."  *Id*.

On March 3, 2007—two weeks before the court appointed Cabrera—Defendants Donziger, Fajardo, and Yanza, along with the U.S. consultants that they had hired to ghostwrite Cabrera's report, met with Cabrera in Quito.  At that meeting, Fajardo presented the plan for Cabrera's Global Expert Assessment, stating, "Chevron . . . doesn't know what the hell is going to happen in the global expert examination. . . .  I hope none of you tell them, please. [laughter] . . . . [I]t's Chevron's problem."  St. 129.  Fajardo continued:  "[T]he work isn't going to be the expert's.  All of us bear the burden."  *Id*.  When Fajardo stated that Cabrera would "sign the report and review it.  But all of us . . . have to contribute to that report," Defendant Maest added, smiling, "[b]ut not Chevron"—and everyone laughed.  *Id*.

During these planning sessions, several of Defendants' co-conspirators expressed concern about the secrecy and their close relationship with Cabrera.  When consultant Champ told Donziger, "I know we have to be totally transparent with Chevron in showing them what we're doing," Donziger responded, "No, no," and stated, "because they will find out everything we

do."  He continued: "Our goal is that they don't know shit . . . and that's why they're so pan-icked."  Then, consultant Kamp expressed unease about the process and commented to Donziger that "[h]aving the perito [Cabrera] there yesterday in retrospect. . . .  That was bizarre."  In re-sponse, Donziger instructed Kamp:  "Don't talk about it" and "that's the way it works."  Donziger told the *Crude* camera crew filming the discussion, "[T]hat is off the record."  St. 130.

Publicly, Defendants denied their relationship with Cabrera, repeatedly describing him as "independent."  St. 125.  They praised his appointment "primarily due to the issue of impartiali-ty . . . because, having not been named by either of the parties, he will be even more objective in his analysis and conclusions."  *Id*.  And Cabrera himself, in filings secretly written by Fajardo (St. 128), proclaimed his independence in the strongest terms, declaring it "unthinkable" and an "insult" to suggest that he might "have any relation or agreement with the plaintiff."  St. 127.

## 2.  Defendants Secretly Authored the "Independent" Expert's Report

According to Donziger, "the general idea" was "that Stratus would draft the report in a form that it could be submitted directly to the Ecuadorian court by Mr. Cabrera."  St. 155.  So while Cabrera posed as the independent court expert for the *Crude* cameras, Defendants ghost-wrote Cabrera's official work plan, were secretly involved in site selection, determined his sam-pling protocols and ultimately drafted his report.  St. 136, 140, 155.  As Donziger explained to the team, Cabrera was to work "under the most strict control with an extremely limited number of samples. And we'll change the focus of the data at our offices."  St. 140.

While Stratus and its contractors prepared the report in the United States, in English, De-fendants planned how to "attribute" each section to Cabrera or members of his public team, mak-ing sure the true author's "name [was] taken off" each section prior to submission to the court.  St. 145, 155.  Donziger has admitted that Cabrera filed Defendants' report "pretty much verba-tim," and he does not know if Cabrera drafted *or even read* any part of "his" report.  St. 155.

After filing the initial report, Defendants submitted sham objections to the report they had just written, criticizing it as "unjustly favorable to" Chevron.  St. 164.  They then ghostwrote "Cabrera's" responses to their fake objections, the language of which Stratus "clean[ed] up" so it would "sound[] more like [Cabrera.]"  St. 166.  Stratus published a purportedly independent peer review, which one of the LAPs' U.S. lawyers later described as "written in a manner to give the impression that Cabrera was entirely independent and conducted his own research and came up with his own findings," such that it "appears not only that Cabrera and plaintiffs can be charged with a 'fraud' respecting the former's report, but that Stratus was an active conspirator."  St. 173.

  **3.**  **When Chevron Uncovered This Scheme, Defendants Repackaged the Report Using "Cleansing" Experts**

Through discovery in various U.S. federal courts, including this Court, Chevron obtained evidence showing that Defendants had secretly written Cabrera's report.  In response, Defendants attempted to whitewash their misconduct by putting the report's conclusions into the mouths of new experts.  As one LAPs' attorney explained in a May 2010 email, this was "an effort to 'cleanse' any perceived impropriety related to the Cabrera Report."  St. 184.  To effectuate this plan, Defendants requested in June 2010 that the Ecuadorian court order the parties to file additional submissions on damages and then move swiftly to judgment.  St. 185.

To prepare these filings, Defendants retained a U.S. consulting firm, the Weinberg Group, to "conduct a comprehensive review of selected sections of an expert report prepared by Engineer Richard Stalin Cabrera Vega as an independent expert for the court."  St. 184.  One expert who worked on this "new" report testified that he was instructed to use the Cabrera Report as a "starting point" and, accordingly, took as given the data and remediation standards in the Cabrera Report, even though he doubted their accuracy.  St. 188.  Another testified that he relied upon "data and cost figures from the Cabrera report" and "used those as inputs." *Id.*  None of

these "cleansing" experts had "go[ne] to Ecuador," "did any kind of new site inspection," "did any kind of new sampling," or indeed, did "environmental testing of any kind." *Id*. On September 16, 2010, Defendants filed these "new" damages reports in the Ecuadorian court. St. 186.

### D.   Defendants' Scheme Took Advantage of a Weak and Politicized Judiciary

The LAPs were able to exert their will over the Lago Agrio court in part because of the collapse of judicial independence in Ecuador. Ecuadorian President Correa has declared that "the Executive Branch [can] exert pressure on the Judicial Branch to get the courts to 'respond to the needs of the country.'" St. 69. And his Government exerted that pressure through various means, announcing that any judge who ruled against the government's interests and was reversed on appeal would be sued personally for damages, and establishing a new body under his control vested with full authority to appoint and remove all judges. St. 70; Decl. 2082.

The Correa Administration has deployed the judiciary as a powerful weapon. In July 2011, President Correa obtained a $40 million verdict against *El Universo*, a leading Ecuadorian paper, along with a three-year prison sentence for a columnist and three of the paper's owners, after the columnist referred to Correa as a "dictator" in a column about a recent aborted coup attempt. St. 46. The 156-page judgment was issued fewer than 33 hours after a new, temporary judge was assigned to the case, prompting questions whether Correa supporters had ghostwritten the judgment. *Id*. And on the eve of the paper's final appeal, those questions were conclusively answered, when the prior judge who had been recused came forward with a sworn statement testifying to political pressure and announced that she had been offered nearly $1 million to issue a judgment pre-written by Correa's attorney—the same judgment that her replacement issued days later. St. 50. Less than two hours of deliberation after the hearing, without addressing the evidence of ghostwriting and bribery, the Ecuadorian high court affirmed the ghostwritten verdict in its entirety. Correa attended the hearing and crowds of his supporters rallied in force outside the

courthouse, burning copies of *El Universo* and threatening journalists.  Decl. 2098.  The court system was thus complicit with the Government's demands, demonstrating that it cannot be trusted in politicized cases, and that the only constraint on Correa came from outside Ecuador: After an international outcry, Correa ultimately pardoned the defendants in the case.  St. 54.

Correa has aligned himself publicly and privately with the LAPs.  St. 80-82.  Defendants have held numerous private meetings with him, reporting internally that he was providing "fabulous support," and "even said that he would call the Judge."  St. 82.  Correa has publicly called the LAPs' attorneys "real heroes" and offered them "all the support of the National Government."  St. 80.  And the ROE, after long denying its relationship with the LAPs, is pursuing U.S. discovery targeted at Chevron's Lago Agrio expert witnesses, and has intervened in Chevron's discovery actions to assert a "common interest privilege" with the LAPs.  Dkt. 30-17.

Independent international organizations have noted the dramatic decline in the capability of the Ecuadorian judiciary to administer impartial justice.  Since Correa's election, the U.S. State Department has reported on "the susceptibility of the judiciary to bribes for favorable judicial decisions and resolution of legal cases and on judges parceling out cases to outside lawyers who wrote judicial sentences on cases before the court and sent them back to the presiding judge for signature."  St. 56.  Other organizations have reached similar conclusions, finding that Ecuador ranks near the bottom of all nations for "rule of law" and similar measures.  St. 60-67.

Defendants have made clear that they knew the weakness of the Ecuadorian judiciary— and exploited it.  Donziger has stated that he "believe[s] the [judges in Ecuador] make decisions based on who they fear the most, not based on what the laws should dictate."  St. 72.  In Donziger's view, "there are almost no rules here," and the courts are "so utterly weak" that conduct takes place in Ecuador that "would never happen in a judicial system that had integrity."  St.

73.  "They're all corrupt!" he has proclaimed, "It's—it's their birthright to be corrupt."  St. 74.

Accordingly, Donziger has explained Defendants' strategy:  "[W]e can [have] mediocre proof

and a good political plan and stand a good chance of winning."  St. 78.

## II.  Defendants Ghostwrote the Judgment, Awarding Themselves an Enormous Windfall With No Basis in Law or Fact

The record shows that Defendants' judgment is in fact exactly the type of fraudulent

judgment reported on by the U.S. State Department, "parcel[ed] out" to be secretly ghostwritten

by Defendants, just as they had ghostwritten the Cabrera Report.  St. 56.  And the judgment it-

self, on its face, departs from settled Ecuadorian law and is unsupported by the evidence.

### A.  The Judgment Was Not Written by the Presiding Judge

In an interview published on January 31, 2011, Judge Zambrano told Reuters that he was

personally reading the entire trial record, and that he still had approximately 50,000 pages re-

maining.  St. 3.  Two weeks later, and less than one week after this Court issued a temporary re-

straining order against Defendants, Judge Zambrano issued the 188-page, single-spaced judg-

ment.  St. 4.  He could not have read and comprehended the remaining 50,000 pages in that brief

time, nor could he have read the entire 215,000-page record and drafted the judgment in the eight

weeks between the closing of the record and the issuance of the judgment.[3]  St. 43.

The only reasonable explanation for this discrepancy is that Judge Zambrano did not

write the judgment, or at least that he received substantial assistance in doing so.  And the evi-

dence further shows that it was Defendants, or others working on their behalf, who provided this

assistance—just as Defendants ghostwrote the Cabrera Report.

---

[3]    Assuming the record averages 300 words per page, a two-week review of the final 50,000 pages would have
required reading over 2,230 words per minute—more than seven times the average reading speed, reading every
day, eight hours a day, for 14 days—with no time for actually writing the 188-page, single-spaced judgment.  St. 43.

**B.    The Judgment Is Replete With Text and Data Lifted From Defendants' Confidential Files, Including Numerous Common Errors and Idiosyncrasies**

In December 2008, Fajardo called a meeting with "all the teams" to develop a plan to "obtain a trial judgment in 2009" that would be "favorable and significant." St. 40. Work on the judgment began thereafter. In June 2009, Defendants instructed an intern to do research for their "legal alegato and the judgment *but without him knowing what he is doing. . ." Id.* (emphasis added). Two weeks later, Defendants began circulating materials they would use to draft the judgment. On June 18, 2009, Fajardo circulated research regarding the use of a trust instrument to disburse judgment proceeds; strings of text from this email appear word-for-word in the judgment. St. 23. Other emails refer to a "key" meeting on "the outcome of the case and what to do, how much money to put in, how to distribute the items and everything," a meeting with minutes reporting "Creation of Final Order" as a discussion topic. St. 40. Finally, in a December 29, 2009 internal memo, after Judge Zambrano became the presiding judge, Fajardo declared that he was "99.99 percent sure" that "the plan for the judgment w[ould] be fulfilled." St. 42.

Forensic analysis demonstrates that whoever wrote the judgment copied directly from the Defendants' internal, unfiled legal memoranda and record summaries, importing telltale errors and idiosyncrasies from those documents into the judgment. In fact, Fajardo has *admitted* that Defendants' non-public work product appears in the judgment. St. 37. The judgment contains portions of several memos and draft briefs, including: (1) the "Fusion Memo"—an internal memo discussing the relationship between Chevron, Texaco, and TexPet (St. 12); (2) a draft alegato the LAPs never filed (St. 20); (3) a memo regarding environmental legislation from several different countries (St. 23); and (4) the "Index Summaries," a collection of spreadsheets listing documents in the record (St. 16).

**The Fusion Memo** is an internal draft memorandum regarding the alleged "merger" be-

tween Chevron and Texaco.  St. 7.  It does not appear in the trial record (St. 9), yet there are at least 15 examples where "identical or nearly identical strings of more than 90 words, idiosyncratic numerical ordering, and identical series of orthographic errors" from the Fusion Memo appear in the judgment.  St. 10-12.  One court commented that "[a] line by line comparison clearly reveals significant overlapping."  *Banco* at 4 n.7.  Multiple experts have concluded that that author of the judgment must have had access to the Fusion Memo.  St. 10-12.

**The "Index Summaries"** refers to an excel spreadsheet maintained by the LAPs which indexed and summarized documents in the trial record.  St. 13.  It was never submitted to the Lago Agrio court or made public (St. 15), yet there are multiple examples of identical orthographic errors, identical or nearly identical word strings, and incorrect citations from the Index Summaries which appear in the judgment.  St. 16.  Multiple experts have concluded that the author of the judgment must have had access to the Index Summaries.  *Id*.

**The Selva Viva Data Compilation** is an internal and unfiled series of spreadsheets the LAPs prepared during the period 2008–2010 containing sampling data generated during the Lago Agrio Litigation.  St. 25.  It does not appear in the trial record (St. 27), yet there are more than 100 data irregularities in the judgment that also appear in the Data Compilation.  St. 28.  Further, many sampling results in the Data Compilation use idiosyncratic naming conventions and labels that do not appear in the trial record, but do appear in the judgment.  *Id*.  And the Data Compilation erroneously reports sampling data showing measurable amounts of mercury, benzene, and toluene, and these same errors appear in the judgment.  St. 30.  Again, expert analysis has concluded that the author of the judgment had access to the Data Compilation.  St. 29.

**June 18, 2009 Fajardo emails regarding trust law** sent to co-conspirators quote at length from several Ecuadorian legal opinions.  St. 21.  In one, he noted that the decision's ar-

guments "serve us well for our alegato and . . . Worth reading." *Id.* (ellipsis in original).[4]  Fajardo's emails were never made part of the publicly available trial record (St. 22), but the judgment contains text from both of Fajardo's emails and his case quotations—including errors in transcription found in Fajardo's email, but not in the original published cases.  St. 23.

### C.   The Judgment Awards Outlandish Damages, Including an $8.65 Billion Punitive Damages Award Contrary to Ecuadorian Law

The judgment shows other signs of impropriety, including a "punitive penalty" award of $8.65 *billion* in the absence of a public apology by Chevron, even though the complaint does not request punitive damages and *Ecuadorian law does not permit punitive damages*—as even Defendants themselves have admitted.  St. 232.  Other examples abound.  The judgment awards $1.4 billion for a new "health system" without any citation to or explanation of where that cost came from.  St. 190.  That award, however, matches exactly the cost asserted in the Defendants' cleansing expert report on health care.  St. 222.  And the judgment awards $150 million for "a potable water system or systems" to "benefit the persons who inhabit the area that was operated by the defendant," without citing any evidence (and there is none) that drinking water in the region is contaminated by compounds associated with petroleum production.  St. 191.  The judgment claims the $150 million cost is derived from an expert report by Gerardo Barros, but Barros is actually referring to *Cabrera's* cost estimate—which he describes as "enormously exaggerated" and "fraudulent."  St. 210.  The judgment also awards soil remediation costs of $5.4 billion, or more than $6 million of soil cleanup for each pit it claims must be remediated.  St. 192.  But Petroecuador is currently conducting remediation of the exact same pits, in the exact same area, to the standards set by Ecuadorian law and with the approval of the Ecuadorian Ministry of the

---

4    In addition to direct references to the judgment (discussed *infra*), Fajardo refers on several occasions to writing "the alegato and . . ." where the ellipsis appears to be a reference to the judgment.  St. 40.  *See also id.* ("organizing the office's legal information for the alegato and the other project").

Environment, and is spending less than $85,000 per pit for soil remediation.  Decl. 2346.  *See also* St. 193 ($600 million for groundwater remediation based solely on the "possibility" of contamination); c*ompare id.* at 181 (requiring soil remediation to a TPH level of 100 ppm) *with* Decl. 2129 at 57 (Ecuadorian law permits from 1,000 to 4,000 ppm).

## III.    Both the Trial and Appellate Courts Avoided the Evidence of Defendants' Fraud

### A.    The Trial Court Refused to Adjudicate the Fraud, Falsely Claiming to Moot the Question by Excluding the Cabrera Report

Chevron presented substantial evidence of fraud to the Lago Agrio trial court in at least nine separate filings between May and December 2010, repeatedly requesting that the court investigate Defendants' fraud.  St. 183.  But the trial court deferred these requests, and while the judgment acknowledged that Chevron had submitted "a significant number of documents, e-mail contacts, several dozen videos and what it claims are their transcripts," it said that the court could not conduct a "hearing" on Chevron's defense because of a "lack of time."  St. 195.

The judgment did not adjudicate the question of fraud, or discuss the evidence thereof with any specificity.  It merely characterized Chevron's evidence as "circumstantial," which it is not, and dismissed the allegations against Donziger because there supposedly was "no indication in any part of the file that Mr. Donziger participated in this case."  *Id*.  The judgment did not mention the documented acts of the LAPs' counsel—Fajardo, Ponce, Prieto, and Saenz—or of LAPs' representative Luis Yanza, all of whom are prominent in the videos and emails.  Furthermore, the judgment stated that with regard to Donziger, it was "without . . . prejudice to the parties' right to separately initiate the legal actions to which they believe themselves entitled[.]"  St. 196.  As for the "cleansing" experts, the judgment stated that "the parties and third parties retain the rights to which they believe they are entitled to take legal action over this issue."  St. 197.

Having refused to allow any investigation of plaintiffs' interactions with Cabrera, the

presiding judges, and governmental officials, the judgment purported to resolve all the various

acts of fraud by disclaiming reliance upon just the Calmbacher or Cabrera reports.  St. 203.  But

even this inadequate response was untrue, as the judgment drew heavily on Cabrera:

- The judgment assesses $5.396 billion in soil remediation damages based in part on the conclusion that Chevron is responsible for remediating 880 pits in the former Concession area, a number that was derived from Annex H to the Cabrera Report and has no other record source.  St. 208.[5]
- The judgment relies on the Cabrera Report's cost figure in assessing $150 million in damages for a potable water system, as well as the Cabrera Report's assignment of $200 million in costs to "recover the native flora, fauna, and the aquatic life of the zone."  St. 211.
- The judgment awards damages in eight of the categories originally identified in the Cabrera Report, and for which the Cabrera Report is the sole expert opinion.  St. 222.

### B.        The Appellate Court Refused to Adjudicate the Fraud

On January 3, 2012 the appellate court issued its opinion affirming the trial court.  Just as

with the trial court judgment, which was released before the trial judge could possibly have re-

viewed the record and immediately following Chevron's motion in this Court for a preliminary

injunction, the appellate judgment was, despite a voluminous record, released just one month af-

ter the appellate panel was finalized,[6] and just weeks after Chevron filed its motion in this Court

seeking to attach Defendants' interest in the judgment.  St. 235.

The Ecuadorian appellate court expressly refused to reach the fraud issue:

Mention is also made of fraud and corruption of plaintiffs, counsel and repre-
sentatives, *a matter to which this Division should not refer at all*, except to let it
be emphasized that the same accusations are pending resolution before authorities

---

[5]   The court's clarification order stated that this number was obtained when "the Court analyzed the various aerial photographs that form a part of the record and that were certified by the military Geographic Institute."  St. 205.  But this cannot be true.  The record does not contain aerial photographs of 880 pits.  St. 206-07.

[6]   The constitution of the appellate panel was unusual.  The panel was not drawn from a separate court, distant from the trial proceedings—rather, it was comprised of judges drawn from a chamber of the same court that oversaw the Lago Agrio trial itself.  *Compare* Decl. 2113 and Decl. 2207 *with* Dkt. 168.  And Judge Zambrano, the purported author of the trial court judgment, was the Provincial Director of the Judicial Council of that court and was involved in the constitution of the panel.  Decl. 2113.  Under Ecuadorian law, the selection of an appellate panel is supposed to occur by public lottery, but in this case, panel selection involved multiple secret lotteries (in several instances conducted before Judge Zambrano himself), direct intervention by Ecuadorian judicial authorities, and numerous changes of personnel.  Dkt. 356-12 at 94-145; Decl. 2113; Decl. 2207.

of the United States of America due to a complaint that has been filed by the very
defendant here, Chevron, under what is known as the RICO act, and *this Division
has no competence to rule on the conduct of counsel, experts or other officials* or
administrators and auxiliaries of justice, if that were the case.

St. 198 (emphases added).[7]  The appellate court did address a few isolated pieces of the evidence
showing that Defendants had a role in authoring the judgment, but its discussion avoids the actu-
al issues raised by that evidence.  In response to the evidence that the judgment shared common
errors and idiosyncratic features with the Defendants' internal Selva Viva Data Compilation, the
court claimed that it had "been able to confirm first hand that the record includes the information
to which the judgment refers"—but it did not try to explain the irregular *presentation* of that in-
formation in the judgment, which does not appear in the record.  St. 32.  Similarly, it acknowl-
edged the presence of some of the data errors identified by Chevron as common to the judgment
and the Defendants' secret files (St. 34), but asserted simply that the errors themselves did not
affect the judgment.  St. 199.  In each case, the court did not address the larger implication—that
these commonalities showed Defendants had a hand in writing the judgment.

In response to the court's statement that it had "no competence" to address Defendants'
fraud, Defendants asked the court to "clarify" that it had, in fact, had competence and had re-
viewed that evidence.  Decl. 2146.  Just hours after Chevron submitted its objections to this re-
quest, the court issued its "clarification" order, stating:

> [W]ith respect to irregularities in the preparation of the trial court judgment . . . it
> is clarified that yes such allegations have been considered, but no reliable evi-
> dence of any crime ha[s] been found.  The Division concluded that the evidence
> provided by Chevron Corporation, does not lead anywhere without a good dose of
> imaginative representation, therefore it has not been given any merit, nor has
> more space been dedicated to it.

---

[7]   "Competence" in civil law systems is akin to subject matter jurisdiction.  Arthur Nussbaum, *Jurisdiction and Foreign Judgments*, 41 Colum. L. Rev. 221, 221 (1941).  Black's defines "competence" as "[t]he capacity of an of-ficial body to do something" and offers as an example "the court's competence to enter a valid judgment."  Black's Law Dictionary (9th 2009).

St. 202.  But Ecuadorian law does not permit this type of substantive change on a petition for clarification (St. 200), and even the conclusory, post hoc "finding" was expressly limited to only some of the judgment fraud evidence—with respect to the other misconduct by the LAPs, the court stated that it did "not find evidence of 'fraud' by the plaintiffs or their representatives, such that, as has been said, it stays out of these accusations[.]"  St. 201.  And it went on to confirm, as the judgment had, that it was "preserving the parties' rights . . . to continue the course of the actions that have been filed in the United States of America. . . .  [I]t is obvious that it was not its responsibility to hear and resolve proceedings that correspond to another jurisdiction."  *Id.*

### C.    Defendants Attempt to Employ Their Fraudulent Judgment

Despite this overwhelming evidence, which seven U.S. courts have found constitutes evidence of fraud (*see* June 13, 2012 Declaration of Anne Champion), Defendants—including the Stratus Defendants—seek to use their bogus judgment to preclude consideration by this Court, and others, of the very fraud that produced it.  In its answer to Chevron's amended complaint, Stratus asserts defenses of res judicata and collateral estoppel based on the "presume[d] . . . validity of the [Ecuadorian] judgment."[8]  *See* Dkt. 474 at 90; *see also id.* at 88-89.  These defenses fail, however, because there is no genuine dispute that the judgment is unrecognizable and cannot be given preclusive effect.

### SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule 56(a), "[t]he court shall grant summary judgment if the movant

---

[8]    In this brief, Chevron employs the modern terminology of "issue preclusion" and "claim preclusion," following the guidance of Judge McKenna of this Court:  "Issue preclusion, sometimes referred to as collateral estoppel, can be contrasted with claim preclusion, sometimes referred to by the more generic term of res judicata.  The Supreme Court explained the difference in *Parklane Hosiery*.  'Under the doctrine of res judicata, a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action.  Under the doctrine of collateral estoppel, on the other hand, the second action is upon a different cause of action and the judgment in the prior suit precludes relitigation of issues actually litigated and necessary to the outcome of the first action.'  *Parklane Hosiery v. Shore*, 439 U.S. 322, 326 n.5 (1979).  This Court will adhere to the more descriptive terms of issue and claim preclusion."  *Alfadda v. Fenn*, 966 F. Supp. 1317, 1325 n.8 (S.D.N.Y. 1997).

shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Although the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact, once that showing is made the nonmoving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010).  While the court must credit the evidence of the nonmoving party and "draw[] all *reasonable* inferences in his favor," "conclusory statements, conjecture, or speculation . . . will not defeat summary judgment." *Kulak*, 88 F.3d at 71 (emphasis added).  "A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  The nonmoving party cannot "simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), but rather, "must offer some hard evidence showing that its version of the events is not wholly fanciful." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (citations omitted).  Only a dispute over a "material" fact—a fact "that might affect the outcome of the suit under the governing law"—"will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The dispute must be "genuine," *i.e.*, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citations omitted).

## ARGUMENT

By asserting res judicata and collateral estoppel defenses, Stratus and the other Defendants seek to prevent this Court from conducting a substantive examination of Chevron's evidence that they committed racketeering and fraud against Chevron in collusion with, *inter alia*, the Ecuadorian court.  But the fraudulent judgment, procured by means of multiple fraudulent schemes and from a biased tribunal and without due process, cannot have preclusive effect in this Court.

22

"To resolve [the preclusive effect of a foreign judgment], the Court must determine (1) whether the [foreign] judgment is entitled to recognition by this Court; and (2) if so, the extent to which the Court should accord preclusive effect to the [foreign] judgment under the principles of issue preclusion." *Alfadda v. Fenn*, 966 F. Supp. 1317, 1325 (S.D.N.Y. 1997).  Federal and New York law provide substantially similar tests for these requirements.  *See Ackerman v. Levine*, 788 F.2d 830, 842 n.12 (2d Cir. 1986).  The overwhelming evidentiary record here allows for no "genuine dispute of material fact" on either recognition of the judgment or its preclusive effect.

## I.    Defendants' Fraudulent Judgment Cannot Be Recognized on Multiple Grounds

Comity "does not require, but rather forbids, [recognition] where such a recognition works a direct violation of the policy of our laws, and does violence to what we deem the rights of our citizens." *Hilton v. Guyot*, 159 U.S. 113, 193 (1895) (quotation omitted).  Likewise, "due process requires that no other jurisdiction shall give effect, even as a matter of comity, to a judgment elsewhere acquired without due process." *Griffin v. Griffin*, 327 U.S. 220, 229 (1946).  Accordingly, courts are not authorized to recognize judgments rendered by partial judicial systems or systems that do not provide due process. *Ackermann*, 788 F.2d at 842 n.12; N.Y. C.P.L.R. § 5304(a).  Further, a judgment should not be recognized where there was "fraud in procuring the judgment" (*Hilton*, 159 U.S. at 202; N.Y. C.P.L.R. § 5304(b)(3)), or where there is "any other special reason why the comity of this nation should not allow it full effect[.]" *Hilton*, 159 U.S. at 202; *see also* N.Y. C.P.L.R. § 5304(b) (codifying additional non-recognition bases).

Stratus and the other Defendants cannot simply point to the judgment and demand recognition—as the parties asserting the affirmative defense, they bear the burden of its proof. *Drexel Burnham Lambert Group Inc. v. Galadari*, 777 F.2d 877, 880 (2d Cir. 1985); *cf. Allstate Life Ins. Co. v. Linter Group Ltd.*, 994 F.2d 996, 999 (2d Cir. 1993) (party seeking recognition bears "the burden of proving that comity [is] appropriate"); *Wimmer Can. Inc. v. Abele Tractor & Equip.*

*Co.*, 299 A.D.2d 47, 49 (N.Y. App. Div. 2002).  But the judgment's infirmities and partiality are

apparent from its face, and the evidentiary record, consisting of Defendants' own statements and

writings, establishes beyond genuine dispute that, *inter alia*, the tribunal was not impartial, that

due process was not provided, and that Defendants obtained the judgment through fraud.

### A.    The Court May Not Recognize a Judgment Defendants Secretly Wrote

The Ecuadorian judgment was not the product of an impartial tribunal, and thus cannot be

recognized under federal or New York law.  *Hilton*, 159 U.S. at 202–203; N.Y. C.P.L.R.

§ 5304(a).  The unrebutted evidence shows that portions of the judgment—indeed, dispositive

legal conclusions—were secretly written by Defendants, and that other portions—material factu-

al findings—were, at a minimum, written by someone with access to Defendants' private files.

Further, unrebutted evidence shows that the presiding judge did not write the opinion, indeed

could not have written the opinion.  *See infra* pp. 14-17.  This judgment is the product of an ille-

gal, improper, and secret collaboration whereby Defendants arranged for the drafting and release

of their judgment by a collusive, cowed, or otherwise compliant court.[9]  Such a process is neither

impartial nor comports with due process.  *See Caperton*, 129 S. Ct. at 2259; *Morgan*, 304 U.S. at

19–20.  Accordingly, this Court need not consider the impartiality of the Ecuadorian judiciary as

a general matter,[10] because that judiciary it not the author, or at least not the sole author, of the

---

[9]    Outsourcing judicial opinions to parties violates Ecuadorian law.  "[I]t is only the Judge who rules on the dis-
pute and prepares and hands down the judgment."  Decl. 2136 at 21.  "[N]o provision [under Ecuadorian law], even
considers the possibility of a third party being able to contribute to its preparation."  *Id.*

[10]    The endemic corruption in the Ecuadorian judiciary has reached shocking levels, as the fraud here and in the *El
Universo* case demonstrate.  *See* St. 46-86.  At least in politicized cases like this one, where President Correa, who
controls the Ecuadorian judiciary, has made his interest in the outcome clear, Ecuadorian judgments do not merit
recognition in U.S. courts.  Defendants have offered no contrary evidence, instead relying on the false assertion that
Chevron may not present this argument—which Chevron has already refuted and this Court already rejected.
*Chevron Corp. v. Donzig*er, 768 F. Supp. 2d 581, 649 (S.D.N.Y. 2011).  But it is Defendants' burden to prove the
essential elements of their affirmative defense (*Drexel*, 777 F.2d at 880), and this Court should not recognize
Defendants' judgment absent a showing that the Ecuadorian judiciary provides impartial tribunals and due process
(N.Y. C.P.L.R. § 5304(a)); *Hilton*, 159 U.S. at 193).  Defendants cannot make this showing.  *See also Bridgeway*
[Footnote continued on next page]

judgment at all.  Stratus cannot carry its elementary burden of showing that the judgment was the product of a fair and impartial tribunal, because Defendants are its true authors.

Chevron has submitted this evidence in multiple courts and Defendants, despite ample opportunity, have never rebutted it.  To the contrary, they have *admitted* that their secret files appear in the judgment (St. 37) and they have *admitted* to ghostwriting the Cabrera Report (St. 155).  This reflects a systemic failing—since 2006 the U.S. State Department has reported on Ecuadorian examples of "judges parceling out cases to outside lawyers who wrote judicial sentences on cases before the court and sent them back to the presiding judge for signature."  St. 56.

Defendants have offered no alternative reasonable inference to be drawn from this evidence.  In a related proceeding, the LAPs first suggested that this evidence was not conclusive because of a purported dispute over what constitutes the trial record.  Decl. 2126.  But the LAPs offered no portion of any version of any trial record containing any of the material found in both the judgment and their secret files.  Then they suggested that the trial court "could have borrowed" the language from unspecified submissions not yet made part of the record, or from an unspecified "press packet" supposedly distributed at judicial inspections—which press packet the LAPs did not submit.  *Id* at 30–31.  This is a textbook example of a "conclusory statement[], conjecture, or speculation [that] will not defeat summary judgment."  *Kulak*, 88 F.3d at 71.

Defendants took the same speculative approach before this Court, offering, in the related "Count 9" proceeding, expert reports that claim the evidence "does not preclude the possibility that the unfiled documents . . . may not themselves have been filed, [and that] language from them may have influenced filed documents [Chevron's expert] has not yet examined."  Decl. 2039 at 5.  But Defendants offered no evidence that any such "unfiled documents" existed or ex-

---

[Footnote continued from previous page]
*Corp. v. Citibank*, 201 F.3d 134, 141–44 (2d. Cir. 2000) (refusing to recognize Liberian judgment).

plained how reliance on "unfiled documents" could be proper under Ecuadorian law—or in any system with due process.  This is the very absence of "hard evidence showing that [their] version of the events is not wholly fanciful."  *Jeffreys*, 426 F.3d at 554 (quotations omitted).

Before the Second Circuit (joined by Donziger) and before *this Court*, the LAPs offered another response to this evidence, this time relying not on speculation but on falsehood.  Addressing *only* the June 18 Fajardo email regarding trust law, portions of which appear verbatim in the judgment, the LAPs claimed the verbatim portions were "stock language" from published court opinions.  St. 24.  But the fact is that Fajardo's email did *not* reflect the case as published, but contained unique errors and alterations—errors and alterations that appear in the judgment— along with Fajardo's own analysis of the case.  *Id.*  This Stratus cannot dispute.

The Ecuadorian appellate court fared no better.  In its isolated attempts to address snippets of the evidence that Defendants ghostwrote the judgment, it failed to engage with the implications of the evidence, and instead offered irrelevancies.  Where Chevron pointed to common errors between the LAPs' secret files and the judgment, the appellate court pretended that the issue was the errors themselves, and held that they were not material.  Decl. 2144 at 11.  Where Chevron pointed to common text between the LAPs' "Fusion Memo" and the judgment, the court concluded that this was not "evidence," and thus not material.  Decl. 2147 at 3.  But it ignored the un-rebutted implication that the judgment's true author must have had access to secret LAPs documents.  And it pretended not even to know what the Selva Viva Database was.  St.32.

The irrelevant and speculative responses of Defendants and the Ecuadorian appellate court do not satisfy Stratus's (or the other Defendants') burden to prove the elements of their affirmative defense, nor do they show a genuine issue of material fact sufficient to defeat this motion.  The record shows beyond reasonable dispute that the judgment was not the true product of

the Ecuadorian judiciary alone, and that its manufacture did not comport with the laws of Ecuador, or the basic, constitutional or international law notions of impartiality and due process that every foreign judgment must satisfy before being recognized in a U.S. court.  *Hilton*, 159 U.S. at 205–206 (recognition is permitted only where the judgment is "rendered by a competent court . . . and its proceedings are according to the course of a civilized jurisprudence, and are stated in a clear and formal record"); *see also Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944) (vacating judgment because injecting ghostwritten submission into court proceedings was "tampering with the administration of justice," implicating "far more than an injury to a single litigant," and "a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society"); *W. Gillette v. Ariz. Corp. Comm'n*, 582 P.2d 375, 376 (Ariz. Ct. App. 1979) ("The participation in the actual decision making process by only one party to a controversy is inimical to the notions of fairness which underlie the due process of law."); *see also Osorio v. Dole Food Co.*, 665 F. Supp. 2d 1307 (S.D. Fla. 2009), *aff'd*, 635 F.3d 1277 (11th Cir. 2011); *Diorinou v. Mezitis*, 237 F.3d 133, 143 (2d Cir. 2001) ("[A] case-specific inquiry is sometimes appropriate" when considering whether a foreign judgment was issued by an impartial tribunal.).

**B.    The Judgment Cannot Be Recognized Because Defendants' Ongoing Fraud Infected the Proceedings**

Even if Judge Zambrano were the true author of Defendants' judgment, and even had he prepared it without secret assistance from Defendants, it would not be a recognizable judgment under U.S. law because the undisputed facts show that it was procured by fraud.[11]  *See* N.Y. C.P.L.R. § 5304(b)(3); *Hilton*, 159 U.S. at 202.  As this Court has previously found:

---

[11]   Of course, the undisputed evidence that Defendants did have a substantial hand in authoring the judgment itself establishes that the judgment was procured by fraud and is thus not recognizable under U.S. law.

> There is ample evidence of fraud in the Ecuadorian proceedings.  The LAPs, through their counsel, submitted forged expert reports in the name of Dr. Calmbacher.  Their counsel orchestrated a scheme in which Stratus ghost-wrote much or all of Cabrera's supposedly independent damages assessment without, as far as the record discloses, notifying the Ecuadorian court of its involvement. . . . When it became evident that the LAPs' improper contacts with Cabrera, including the pre-appointment meetings, ghost-writing, and illicit payments, would be revealed through the Section 1782 proceedings, LAP representatives undertook a scheme to "cleanse" the Cabrera report.  They hired new consultants who, without visiting Ecuador or conducting new site inspections and relying heavily on the initial Cabrera report, submitted opinions that increased the damages assessment from $27 billion to $113 billion.

*Donziger*, 768 F. Supp. 2d at 636.  Six other U.S. federal courts have made similar findings. June 13, 2012 Declaration of Anne Champion.  Moreover, evidence to which Defendants have offered no response shows that when Chevron repeatedly asked the Lago Agrio court to investigate Cabrera, Defendant Fajardo ghostwrote filings under Cabrera's name denying any relationship between Cabrera and the LAPs.  St. 128.  Subsequent appellate review in Ecuador did not remedy this fraud—the appellate court simply refused to consider the issue, stating first that it had no "competence," then confirming in its "clarification" order that "it stays out of these accusations."  Decl. 2147 at 4.

Nor was Defendants' fraud limited to hiding their authorship of the Cabrera Report and other filings.  Defendants knowingly put numerous falsehoods into that Report, from the number of sites at issue, to the sampling results obtained at them, to the impact on human health.  *See supra* pp. 6-8.  And they have carried the misrepresentations beyond the courthouse, relying on the fraudulently procured imprimatur of the Lago Agrio court to give false weight to their false claims in Ecuadorian and U.S. media, before U.S. government officials, and before the U.S. Congress.  St. 125; Dkt. 47-15, 47-29.

Corruption on this scale precludes recognition of any judgments issuing from the affected proceeding.  "Once a litigant chooses to practice fraud, that misconduct infects his cause of ac-

tion, in whatever guises it may subsequently appear." *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1121 (1st Cir. 1989); *see also Smith v. Alleghany Corp.*, 394 F.2d 381, 391 (2d Cir. 1968) (if the special master in state-court action had colluded with the opposing parties and had a hidden interest in that judgment, that "would permit a collateral attack at this time on both the [state-court] judgment and on [his] fee award"); *Maersk, Inc. v. Neewra, Inc.*, No. 05 Civ. 4356(CM), 2010 WL 2836134, at *14 (S.D.N.Y. July 9, 2010) ("The Court will not accord comity to proceedings marred by fraud."); *see also Hazel-Atlas Glass Co.*, 322 U.S. at 246; *Manez Lopez v. Ford Motor Co.*, 470 F. Supp. 2d 917, 926–27 (S.D. Ind. 2006) (Mexican judgment not recognizable where, *inter alia*, the plaintiffs' lawyers colluded with a clerk charged with recommending a resolution to the judge to provide the order that ultimately issued); *Ackermann*, 788 F.2d at 841 (judgment cannot be recognized where it is "repugnant to fundamental notions of what is decent and just").

Because Defendants' fraud prevented Chevron from obtaining a fair trial on the merits, it is precisely the sort of fraud that prohibits recognition. *Toledo Scale Co. v. Computing Scale Co.*, 261 U.S. 399, 421 (1923). Historically, some courts, especially when considering recognition under state law, distinguish between "intrinsic" and "extrinsic" fraud. *See Fairchild, Arabatzis & Smith, Inc. v. Prometco (Produce & Metals) Co.*, 470 F. Supp. 610, 615 (S.D.N.Y. 1979); *United States v. Throckmorton*, 98 U.S. 61, 68 (1878). The Supreme Court long ago rejected this distinction for recognition under federal law. *Toledo Scale Co.*, 261 U.S. at 421 (holding that "[w]e do not find ourselves obliged to enter upon a consideration of the sometimes nice distinctions made between intrinsic and extrinsic frauds in the application of the rule, because in any case to justify setting aside a decree for fraud whether extrinsic or intrinsic, it must appear that the fraud charged really prevented the party complaining from making a full and fair defense"); *Hilton,* 159 U.S. at 207 (acknowledging the distinction in *Throckmorton*, but finding

that "it is now established in England, by well-considered and strongly reasoned decisions of the court of appeal, that foreign judgments may be impeached, if procured by false and fraudulent representations and testimony of the plaintiff, even if the same question of fraud was presented to and decided by the foreign court").  As this Court has noted, "the distinction has been abandoned broadly and may well have no bearing in many other jurisdictions, the law of which may govern in at least some respects."  *Chevron Corp. v. Salazar*, No. 11 Civ. 3718, 2011 U.S. Dist. LEXIS 87463, at *6 n.2 (S.D.N.Y. Aug. 8, 2011); *see also* 11-5304 New York Civil Practice ("The distinction between extrinsic and intrinsic fraud . . . has been omitted from C.P.L.R. § 5304(b)(3), and both types of fraud serve as a basis of relief.").

Regardless, even Defendants concede fraud is "extrinsic" when, as here, it "prevents the losing party from having an adversary trial of the issue" or "deprives the opposing party of an opportunity adequately to present his claim or defense."  Dkt. 150 at 24–25 (quoting *Jacobowitz v. Metselaar*, 268 N.Y. 130, 134 (1935); *DiRusso v. DiRusso*, 287 N.Y.S.2d 171, 177–78 (Sup. Ct. 1968); *see also Tamimi v. Tamimi*, 328 N.Y.S.2d 477, 479 (N.Y. App. Div. 1972) (explaining that a judgment is obtained by extrinsic fraud "*[w]here the unsuccessful party has been prevented from exhibiting fully his case, by fraud or deception practiced upon him by his opponent . . . and similar cases which show that there has never been a real contest in the trial or hearing of the case.*") (quoting *Throckmorton*, 98 U.S. at 65) (emphasis in original)).

## C.    The Judgment Constitutes an Unenforceable Penalty

The judgment also does not merit recognition in this Court because it violates recognition principles on its face.  For example, "the courts of no country enforce the penal laws of another." *The Antelope*, 23 U.S. (10 Wheat.) 66, 123 (1825); *see* N.Y. C.P.L.R. § 5301(b) & 5302.  A judgment is penal, and thus unenforceable, where "the wrong sought to be redressed is a wrong to the public."  *Overmyer v. Eliot Realty*, 371 N.Y.S.2d 246, 256 n.8 (N.Y. Sup. Ct. 1975); *Hun-*

tington v. Attrill, 146 U.S. 657, 673–74 (1892); *Int'l Cablevision, Inc. v. Sykes*, 172 F.R.D. 63, 69 (W.D.N.Y. 1997).  By its own terms, this judgment is just such a penalty.

The judgment expressly "imposes a punitive penalty" that doubles the remediation award "for the punitive and dissuasive purposes of this type of compensation."  Dkt. 168 at 185.  The judgment offered to excuse this "punitive penalty" only if Chevron offered a public apology that would have required it to testify about liability and thereby effectively prevented it from seriously appealing or defending against enforcement.  *Id.*  As an expressly punitive measure, the judgment cannot be recognized.  But even those parts of the judgment that are not expressly punitive are unrecognizable, because the judgment is based on collective rights, acknowledging that "the plaintiffs . . .have not requested personal compensation for any harm, but rather have demanded the protection of a collective right[.]"  Dkt. 168 at 33.  An unenforceable penalty "awards a penalty to the state, or to a public officer in its behalf, *or to a member of the public, suing in the interest of the whole community to redress a public wrong.*"  *Loucks v. Standard Oil Co.*, 224 N.Y. 99, 102 (1918) (Cardozo, J.) (emphasis added); *Weiss v. Glemp*, 792 F. Supp. 215, 227 (S.D.N.Y. 1992) (same under New York's Recognition Act).  The judgment holds it to be "irrelevant" that "proof has not been presented of the existence of harm to the health of specific persons" because the issue in the case is "harm to public health[.]"  *Id.* at 138.  And the judgment *does not award any damages to the plaintiffs*.  Instead, because "'those affected' by the environmental harm, are undetermined, but determinable, persons united by a collective right," the judgment orders the creation of a trust to hold the judgment funds.  *Id.* at 186.

### D.    The Ecuadorian Court Lacked Personal Jurisdiction Over Chevron

The judgment is unenforceable because the Lago Agrio court lacked personal jurisdiction over Chevron.  *See* N.Y. C.P.L.R. § 5304(a)(2).  Chevron has never operated or been domiciled in Ecuador, does not derive substantial revenue from Ecuador, and has no regular business con-

tacts with Ecuador.  *See* St. 241.  Even Donziger privately conceded that the LAPs sued "the

wrong party in the complaint."  St. 245.  Chevron therefore consistently objected to Ecuador's

assumption of personal jurisdiction in the Lago Agrio case (St. 243-44), an objection that sur-

vives the trial court's refusal to sustain it.  *See CIBC Mellon Trust Co. v. Mora Hotel Corp.*, 100

N.Y.2d 215, 224 (2003); *Harkness v. Hyde*, 98 U.S. 476, 479 (1878) ("[N]or is the objection

waived when being urged it is overruled, and the defendant is thereby compelled to answer.").[12]

## II.    The Judgment Does Not Preclude Litigation of Any *Issue* in This Action

### A.    The Judgment Cannot Have Preclusive Effect Because Chevron Did Not Receive a "Full and Fair Opportunity to Litigate" in the Lago Agrio Litigation

Under federal law, the judgment must meet four elements for issue preclusion to apply:

> (1) the issues of both proceedings must be identical, (2) the relevant issues were actually litigated and decided in the prior proceeding, (3) there must have been "full and fair opportunity" for the litigation of the issues in the prior proceeding, and (4) the issues were necessary to support a valid and final judgment on the merits.

*Alfadda*, 966 F. Supp. at 1330 (citing *Central Hudson Gas & Elec. Corp. v. Empresa Naviera

Santa S.A.*, 56 F.3d 359, 368 (2d Cir. 1995)).  The party asserting preclusion bears the burden of

demonstrating each of these elements.  *See In re Parmalat Sec. Litig.*, 493 F. Supp. 2d 723, 733

(S.D.N.Y. 2007).  Under New York law, issue preclusion "may be invoked to preclude a party

from raising an issue (1) identical to an issue already decided (2) in a previous proceeding in

which that party had a 'full and fair opportunity' to litigate."  *Fuchsberg & Fuchsberg v. Galizia*,

300 F.3d 105, 109 (2d Cir. 2002) (citations omitted).  The party seeking preclusion must estab-

lish identity of the issues, while the party arguing against it must establish the absence of a "full

---

[12]   In a 2011 opinion affirming the dismissal of an action by the ROE and the LAPs seeking to stay the BIT arbitration, the Second Circuit suggested that Chevron had "bound itself" to representations made by Texaco in connection with the forum non conveniens dismissal of the original U.S. litigation.  *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 389 n.3 (2d Cir. 2011) (Lynch, J.).  More recently, however, in its opinion dismissing Chevron's related declaratory relief claim, the court made clear that it had not resolved the question.  *Naranjo v. Chevron Corp.*, No. 11-1150, --- F.3d ----, 2012 WL 232965, at *1 n.2 (2d Cir. Jan. 26, 2012) (Lynch, J.).

and fair opportunity" to litigate the issue.  *Evans v. Ottimo*, 469 F.3d 278, 281–82 (2d Cir. 2006).

There is no genuine dispute that the judgment was authored in whole or in part by De-
fendants, Defendants manipulated the trial to avoid impartial review of the evidence, they fraud-
ulently caused to be submitted court filings under the name of a purportedly independent expert
that they had in fact written themselves, and they bribed that expert to ensure his cooperation.
*See supra* pp. 8-12.  Such a "proceeding" does not provide a "full and fair opportunity" to liti-
gate.  *See Maersk*, 2010 WL 2836134, at *13 (denying preclusive effect to foreign judgment
where "there was no discovery," "no testimony under oath by any witness," "the matter was not
tried before a jury" and "findings were made by a court-appointed 'legal expert.'").

The Ecuadorian appellate court exacerbated this defect.  If "significant new evidence" is
discovered subsequent to the prior proceeding, "it cannot be found that a party was afforded a
full and fair opportunity to present his case in the absence of that evidence."  *Khandhar v. Elfen-
bein*, 943 F.2d 244, 249 (2d Cir. 1991) (citations omitted).  But when Chevron brought evidence
of Defendants' role in writing the judgment to the attention of the appellate court—evidence
necessarily obtained after the judgment issued—that court ignored it.  St. 32-35.

Confronted with a similarly unengaged appellate court in *Maersk*, this Court held:

> Then, when Maersk/Behbehani submitted additional documents—which it
> claimed evidenced the fraud—to the Court of Appeal after losing in the Court of
> First Instance, the appellate court declined to consider the documents on proce-
> dural grounds.  *It affirmed the Court of First Instance without wrestling with the
> merits of Maersk's claim.*  Thus, the secondary action (like the original action) did
> not afford Maersk the opportunity to fully and fairly litigate the Neewra Fraud
> claim that it asserts here.  Maersk cannot be said to have had its "day in court" in
> the Kuwaiti proceedings; it is entitled to that day now.

*Maersk*, 2010 WL 2836134, at *15 (emphasis added).  The same conclusion is warranted here.

**B.     The Judgment Has No Preclusive Effect as to Defendants' Fraud Because the
Ecuadorian Courts Did Not Adjudicate It and Disclaimed Preclusive Effect**

Stratus, like the other Defendants, asserts that the Ecuadorian court adjudicated the ques-

tion of fraud, precluding "relitigation" of that issue here.  *See* Dkt. 474 at 90; Dkt. 461 at 1-2, 7-8; Dkt. 462-1, Ex. 2361; Decl. 2149 at 9-10.  But both the judgment itself and the Ecuador appellate court stated that the judgment had no bearing on other proceedings relating to Defendants' fraud both inside[13] and outside Ecuador.  The attempt to rely on the judgment to preclude any issue in this litigation is self-defeating—if the judgment were to be recognized and given preclusive effect, it would, by its own terms, preclude this preclusion defense.

After condemning Donziger's on-camera statements—but ignoring his active role in corrupting the trial process—the judgment rules "without . . . prejudice to the parties' right to separately initiate the legal actions to which they believe themselves entitled[.]"  Dkt. 168 at 52.  And as to the "cleansing experts," the judgment provides "the parties and third parties retain the rights to which they believe they are entitled to take legal action over this issue."  Dkt. 168 at 58.

The appellate court also held that Defendants' fraud was "a matter to which this Division should not refer at all, except to let it be emphasized that the same accusations are pending resolution before authorities of the United States of America due to a complaint that has been filed by the very defendant here, Chevron, under what is known as the RICO act, and this Division has no competence to rule on the conduct of counsel, experts or other officials or administrators and auxiliaries of justice, if that were the case."  St. 198.  Its "clarification" order confirms the court "stays out of these accusations, preserving the parties' rights to . . . continue the course of the actions that have been filed in the United States of America. . . .  [I]t was not its responsibility to hear and resolve proceedings that correspond to another jurisdiction."  St. 201.

Despite Chevron's presentation of the overwhelming proof of the LAPs' fraudulent con-

---

13   Some courts have held that foreign judgments cannot have greater preclusive effect in the U.S. than in the rendering jurisdiction.  *Guidi v. Inter-Cont.. Hotels Corp*., 2002 U.S. Dist. LEXIS 14833, at *11–*12 (S.D.N.Y. Aug. 12, 2002); *Weiss v. La Suisse, Societe D'Assurances Sur La Vie*, 161 F. Supp. 2d 305, 313 n.7 (S.D.N.Y. 2001).

duct, the Ecuadorian trial court refused to substantively address, much less decide, these issues. In response to Chevron's evidence of the Cabrera fraud, it cited "a lack of time that this type of trial cannot grant for submitting the evidence which would allow the defendant to prove its accusations[.]"  St. 168.  And the appellate court pretended to address small snippets of the evidence that the judgment had been ghostwritten, but declined to review the rest of the fraud evidence, describing it as "a matter to which this Division should not refer at all."  St. 198.  A judgment cannot have preclusive effect on issues it does not adjudicate.

## III.   The Judgment Does Not Preclude the Litigation of Any *Claims* in This Action

"Under the doctrine of *res judicata*, a final judgment on the merits in an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action. . . .  *Res judicata* therefore bars the subsequent litigation of any claims arising from the transaction or series of transactions which was the subject of the prior suit."  *Computer Assocs. Int'l v. Altai, Inc.*, 126 F.3d 365, 369 (2d Cir. 1997) (internal quotations omitted and citations omitted).  "It must first be determined that the second suit involves the same 'claim'—or 'nucleus of operative fact'—as the first suit."  *Interoceanica Corp. v. Sound Pilots*, 107 F.3d 86, 90 (2d Cir. 1997) (citation omitted).  The Lago Agrio Litigation arose out of alleged environmental harms caused by TexPet prior to 1992.  This lawsuit, by contrast, arises out of ongoing fraud, extortion, and other wrongdoing by U.S. and Ecuadorian nationals since that time, only in part in connection with their prosecution of the Lago Agrio Litigation.  Further, the court in the Lago Agrio Litigation expressly refused to adjudicate Chevron's allegations related to Defendants' misconduct.  *See supra* pp. 34-35.  Thus, claim preclusion is inapplicable.

## CONCLUSION

Accordingly, the Court should enter summary judgment or partial summary judgment in Chevron's favor on Stratus's affirmative defenses of res judicata and collateral estoppel.

Dated: June 13, 2012                Respectfully submitted,

      New York, NY

                                          /s/ Randy M. Mastro

                                  Randy M. Mastro
                                  GIBSON, DUNN & CRUTCHER LLP
                                  200 Park Avenue
                                  New York, New York 10166
                                  Telephone: 212.351.4000
                                  Facsimile:  212.351.4035

                                  Andrea E. Neuman
                                  3161 Michelson Dr.
                                  Irvine, CA 92612
                                  Telephone: 949.451.3800
                                  Facsimile:  949.451.4220

                                  William E. Thomson
                                  333 South Grand Avenue
                                  Los Angeles, California 90071
                                  Telephone: 213.229.7000
                                  Facsimile:  213.229.7520

                                  *Attorneys for Chevron Corporation*