UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CHEVRON CORPORATION,

                Plaintiff,


       -against-                              11 Civ. 0691 (LAK)


STEVEN DONZIGER, et al.,

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**OPINION ON PARTIAL SUMMARY JUDGMENT MOTION**


        Appearances:

Randy M. Mastro
Andrea E. Neuman
Kristen L. Hendricks
Scott A. Edelman
William E. Thompson
GIBSON, DUNN & CRUTCHER, LLP
*Attorneys for Plaintiff*

John W. Keker
Elliot R. Peters
Christopher J. Young
Jan Nielsen Little
Matthew M. Werdeger
Nikki H. Vo
Paula L. Blizzard
William S. Hicks
KEKER & VAN NEST, LLP
*Attorneys for Donziger Defendants*

Julio C. Gomez
JULIO C. GOMEZ, ATTORNEY AT LAW LLC

Tyler G. Doyle
Craig Smyser
Larry R. Veselka
Christina A. Bryan
Garland D. Murphy, IV
SMYSER KAPLAN & VESELKA, L.L.P.

*Attorneys for Defendants Hugo Gerardo,
Camacho Naranjo and Javier Piaguaje
Payaguaje*

TABLE OF CONTENTS

Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
   I.    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
       A.    Texaco's Activities in Ecuador (1964-1992) . . . . . . . . . . . . . . . . . . . . 4
       B.    The Aguinda Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
       C.    Important Developments During the Aguinda Litigation . . . . . . . . . . . . 6
           1.     The Settlement and Final Release . . . . . . . . . . . . . . . . . . . . 6
           2.     The Environmental Management Act of 1999 . . . . . . . . . . . . . . 7
           3.     Chevron Acquires Shares of Texaco . . . . . . . . . . . . . . . . . . . 7
   II.   The Lago Agrio Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
       A.    Filing the Lawsuit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
       B.    Summary of the Lago Agrio Proceedings . . . . . . . . . . . . . . . . . . . . . 9
       C.    Summary of the Lago Agrio Judgment . . . . . . . . . . . . . . . . . . . . . . 12
       D.    The Ecuadorian Appellate Court's Treatment of Chevron's Fraud Claim
             . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
       E.    Developments Since the Appellate Decision . . . . . . . . . . . . . . . . . . . 17
   III.   Prior Proceedings in this Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
       A.    The Pleadings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
           1.     The Amended Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . 19
           2.     The Answers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
       B.    Prior Proceedings in this Court . . . . . . . . . . . . . . . . . . . . . . . . . . 22
       C.    Proceedings in the Court of Appeals . . . . . . . . . . . . . . . . . . . . . . . 23
       D.    The Present Motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
   IV.   The Alleged Fraud in Ecuador . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
       A.    The Alleged Ghost-Writing of Portions of the Court's Judgment . . . . . . 27
       B.    Allegedly Fraudulent Evidence, the Termination of Judicial Inspections,
           and the Appointment of Cabrera . . . . . . . . . . . . . . . . . . . . . . . . . 30
           1.     Calmbacher Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
           2.     Ending of Judicial Inspections and Cabrera's Appointment . . . . 32
           3.     The Cabrera Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
                a.     Defendants Secretly Were Involved in Defining the Scope
                    of Cabrera's Report . . . . . . . . . . . . . . . . . . . . . . . . . 36
               b.     The LAP Team Wrote Much of the Cabrera Report . . . . 37
           4.     The "Cleansing" Reports . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
   I.    Summary Judgment Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
       A.    General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
       B.    S.D.N.Y. Civil Rule 56.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
   II.   The Res Judicata-Collateral Estoppel Defense Is Properly Before the Court and Is
     Not Moot . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
       A.    The Answers Are Sufficient to Assert the Judgment As Claim or Issue
           Preclusive and Were Intended to Do So . . . . . . . . . . . . . . . . . . . . . 48
           1.     The Answers Sufficiently Assert These Defenses Based on the
               Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
           2.     The Defendants' Intentions . . . . . . . . . . . . . . . . . . . . . . . . . 51
                a.     The SJ Defendants' Prior Communication With This Court

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

        b.    The Argument to the Second Circuit . . . . . . . . . . . . . . . 53

        c.    The Lack of Any Other Arguable Basis for the Defenses
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

        d.    The Finality Argument . . . . . . . . . . . . . . . . . . . . . . . . . 57

  B.    The Disclaimer of Intention to Seek Enforcement of the Judgment in New York Neither Moots the Defenses Nor Sufficed to Withdraw Them Without Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

    1.    The Representation Would Be Ineffective Even on Its Own Terms
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

        a.    The Donziger Defendants Are Not Foreclosed from Asserting the Judgment as Res Judicata or Collateral Estoppel on the Theory that They Are Not Judgment Creditors and Hold No Rule 24 "Interest" in the Judgment
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

        b.    The Representation Does Not Even Bind the LAP Representatives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

    2.    The Representation Did Not Moot the Defenses . . . . . . . . . . . 64

    3.    The Representation Was an Ineffective Unilateral Amendment to the SJ Defendants' Answers . . . . . . . . . . . . . . . . . . . . . . . . . 66

  C.    Nothing in Naranjo Forecloses Consideration of the Defenses . . . . . . . 70

III.    The Enforceability and Recognizability of the Judgment . . . . . . . . . . . . . . . . . . . 71

  A.    Burdens of Proof With Respect to Recognizability and Enforceability of the Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

  B.    Lack of Personal Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

  C.    Penal Character of the Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

  D.    Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

    1.    The Extrinsic-Intrinsic Fraud Distinction . . . . . . . . . . . . . . . . 77

        a.    United States v. Throckmorton . . . . . . . . . . . . . . . . . . 77

        b.    The Questionable Vitality of Throckmorton . . . . . . . . . 79

        c.    Does the Recognition Act Incorporate the Extrinsic-Intrinsic Distinction? . . . . . . . . . . . . . . . . . . . . . . . . . . 83

    2.    Other Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

    3.    Does Chevron's Evidence of Fraud Warrant Summary Judgment of Non-Recognition? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

        a.    The Alleged Ghost-Writing of the Judgment . . . . . . . . . 86

        b.    The Calmbacher Reports . . . . . . . . . . . . . . . . . . . . . . 88

        c.    The Termination of Judicial Inspections and Cabrera's Appointment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

        d.    The Cabrera and "Cleansing" Reports . . . . . . . . . . . . . 90

IV.    Chevron's Former Adjudication Arguments . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

LEWIS A. KAPLAN, *District Judge.*

An Ecuadorian court has entered an $18.2 billion judgment (the "Judgment") against Chevron Corporation ("Chevron")[1] in an action brought by 47 individuals referred to as the Lago Agrio Plaintiffs (the "LAPs"), two of whom, Hugo Gerardo Camacho Naranjo and Javier Piaguaje Payaguaje (the "LAP Representatives"), have appeared in this action.[2]  Chevron brought this action against the LAPs, their lead U.S. attorney, Steven Donziger and his law offices, and others involved in the Lago Agrio Litigation,[3] claiming among other things that the Judgment is the product of fraud and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO").

The answers to the amended complaint of Donziger and his law offices and of the LAP Representatives (collectively, the "SJ Defendants") assert affirmative defenses of *res judicata* and/or collateral estoppel.  It is common ground among the parties that the Judgment may not be afforded *res judicata* or collateral estoppel effect unless it is entitled to recognition and enforcement here.  So Chevron has moved for partial summary judgment dismissing these affirmative defenses to the extent that they are based on the Judgment on the theory that the Judgment is not entitled to recognition or enforcement and therefore would not be entitled to preclusive effect even if the other bases for preclusion were satisfied.  And while Chevron's objections to recognition and enforcement in this action are broader, it bases this motion on contentions that the Judgment is not entitled to recognition because it (1) was procured by fraud, (2) constitutes an unenforceable penalty, and (3) was rendered against Chevron despite the fact that the Ecuadorian courts lacked personal jurisdiction

---

[1]    DI 168 (Lago Agrio Judgment).

[2]    The other LAPs have defaulted and are not defending against this action.  Hendricks Decl. [DI 206] ¶ 15 & Ex. 16 (Clerk's certificate).

[3]    Chevron alleges also that various "co-conspirators" were part of the RICO enterprise, but they are not named as defendants.

over it.  In the alternative, Chevron argues that the *res judicata*-collateral estoppel defense is without merit under the law of former adjudication without regard to the recognizability and enforceability of the Judgment.

The SJ Defendants respond that the *res judicata*-collateral estoppel defense does not raise the Judgment as preclusive of this action or any issue here, that they do not seek recognition or enforcement of the Judgment in New York, and that Chevron's motion therefore is moot or without merit.  They have not responded to Chevron's motion on the merits.

The Court concludes that the SJ Defendants' position is incorrect and proceeds to the merits of Chevron's motion.  It further concludes that Chevron's motion must be denied insofar as it rests on the premise that the Judgment is not recognizable or enforceable and, regardless of recognizability or enforceability, insofar as it rests on the law of collateral estoppel.  The motion, however, is granted to the extent that it seeks dismissal of the *res judicata* defense.

4

*Facts*[4]

I.   *Background*[5]

    A.   *Texaco's Activities in Ecuador (1964-1992)*

        In 1964, a fourth-tier subsidiary of Texaco Inc. ("Texaco"), Texaco Petroleum Company ("TexPet"), began exploring and drilling for oil in the Oriente region of eastern Ecuador.[6] The following year, TexPet started operating a petroleum concession with Gulf Oil Corporation ("the Consortium") and, by 1976, the Republic of Ecuador (the "ROE") – through Petroecuador, its state-owned oil company – had acquired Gulf Oil Corporation's interest and held a controlling share

---

[4]    The Court assumes familiarity with previous opinions in this matter, which include among others the following:

    Decisions in proceedings brought under 28 U.S.C. § 1782:  *In re Chevron Corp.*, 709 F. Supp. 2d 283 (S.D.N.Y. 2010), *aff'd sub nom.*, *Chevron Corp. v. Berlinger*, 629 F.3d 297 (2d Cir. 2010); *In re Chevron Corp.*, 736 F. Supp. 2d 773 (S.D.N.Y. 2010); *In re Chevron Corp.*, 749 F. Supp. 2d 135 (S.D.N.Y. 2010), *fuller opinion*, *In re Chevron Corp.*, 749 F. Supp. 2d 141 (S.D.N.Y. 2010), *on reconsideration*, 749 F. Supp. 2d 170 (S.D.N.Y. 2010), *aff'd sub nom.*, *Lago Agrio Plaintiffs v. Chevron Corp.*, 409 F. App'x 393 (2d Cir. 2010).

    Other decisions:  *Chevron Corp. v. Donziger*, 768 F. Supp. 2d 581 (S.D.N.Y. 2011) ("*Donziger I*") (granting preliminary injunction), *rev'd*, *Chevron Corp. v. Naranjo*, 667 F.3d 232 (2d Cir. 2012); *Chevron Corp. v. Donziger*, 800 F. Supp. 2d 484 (S.D.N.Y. 2011) ("*Donziger II*") (granting separate trial and expedited discovery on claim for declaratory judgment); *Chevron Corp. v. Donziger*, — F. Supp. 2d —, 2012 WL 1711521 (S.D.N.Y. May 14, 2012) ("*Donziger III*") (granting in part, denying in part motion to dismiss).

[5]    This motion follows almost 19 years of litigation in the United States, Ecuador, and elsewhere.  While, strictly speaking, very little of that history is material to the disposition of this motion, an understanding of the context in which this case and motion exist is helpful.  Moreover, the essentials of a good deal of this long history are undisputed and proper subjects of judicial notice.  Accordingly, Part I of the Facts section of this opinion briefly summarizes some of that context, relating facts that are appropriately noticed by the Court. The balance of the Facts section, and all of it that is material to the disposition of the motion, rests on the evidence of record on this motion.

[6]    *Aguinda v. Texaco, Inc.*, 303 F.3d 470, 473 (2d Cir. 2002).

of the Consortium.[7]  From 1976 until 1990, TexPet operated the Consortium's drilling activities and the trans-Ecuadorian pipeline.[8]  In 1990, however, Petroecuador took control of the Consortium's operations and, in 1992, TexPet ceased all operations in Ecuador. At this time, Petroecuador acquired its interest in the Consortium.[9]   From 1992 to present, neither Texaco nor any of its subsidiaries has operated in Ecuador.[10]

B.      The Aguinda Litigation

        In 1993, a group of Ecuadorians brought a class action lawsuit against Texaco seeking billions of dollars in damages from Texaco to "redress contamination of the water supplies and environment" allegedly caused by TexPet during its operations in Ecuador from 1964 to 1992.[11] In 1996, Judge Rakoff dismissed the case on grounds of *forum non conveniens* and international comity and because indispensable parties Petroecuador and the ROE had not been joined.[12]   The Second Circuit reversed, holding *inter alia* that the dismissal had been inappropriate without Texaco consenting to Ecuador's jurisdiction.[13]   Texaco consented on remand, and the district court again

---

[7]     *In re Chevron Corp.*, 749 F. Supp. 2d at 148.

[8]     *Id.*

[9]     *Id.*

[10]    *Id.*

[11]    *Republic of Ecuador v. ChevronTexaco Corp.*, 376 F. Supp. 2d 334, 341 (S.D.N.Y. 2005).

[12]    *Aguinda v. Texaco, Inc.*, 945 F. Supp. 625, 625-28 (S.D.N.Y. 1996).

[13]    *Jota v. Texaco, Inc.*, 157 F.3d 153, 159, 163 (2d Cir. 1998).

6

dismissed the action on *forum non conveniens* grounds.[14]  The Second Circuit affirmed in 2002.[15]

C.     *Important Developments During the Aguinda Litigation*

Between 1993, when the *Aguinda* litigation began, and 2002, when the Second Circuit affirmed Judge Rakoff's dismissal of the action on *forum non conveniens* grounds, several relevant developments occurred.

1.     *The Settlement and Final Release*

In 1995, after TexPet had relinquished its interest in the Consortium,  TexPet entered into a settlement agreement with the ROE and Petroecuador (the "Settlement").[16]  Under its terms, TexPet agreed to undertake environmental remediation work in Ecuador in exchange for the ROE and Petroecuador releasing any and all claims against it, Texaco, and all related companies.  The Settlement released these entities from "all the [Ecuadorian] Government's and Petroecuador's claims against the Releases for Environmental Impact arising from the Operations of the Consortium, except for those related to the obligations contracted" under the Settlement.[17]  The release of these claims, however, was contingent upon TexPet performing "Environmental Remedial Work . . . to the satisfaction of the [Ecuadorian] Government and Petroecuador."[18]

14
      *Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534 (S.D.N.Y. 2001).

15
      *Aguinda*, 303 F.3d at 470.

16
      *In re Chevron Corp.*, 749 F. Supp. 2d at 149.

17
      *Id.*

18
      *Id.*

7

In 1998, after TexPet had performed the environmental remediation work, the ROE entered into a second agreement with it (the "Final Release"), wherein the ROE agreed that the TexPet had "fully performed" under the Settlement.[19]  In the Final Release, the ROE "proceed[ed] to release, absolve, and discharge" TexPet, Texaco, and all related companies "from any liability and claims . . . related to the obligations assumed by TexPet" in the Settlement.[20]

### 2.    The Environmental Management Act of 1999

In 1999, the ROE enacted the Environmental Management Act of 1999 (the "EMA"), which created a private right of action for Ecuadorians who have been individually affected to seek damages related to environmental harms to the community.[21]  As will appear, the EMA became the basis for the litigation brought by the LAPs in Lago Agrio (the "Lago Agrio Litigation"),[22] which began in 2003 shortly after *Aguinda* was dismissed.

### 3.    Chevron Acquires Shares of Texaco

On October 9, 2001, while the *Aguinda* action still was pending in the Southern District of New York, a wholly owned subsidiary of Chevron, Keepep Inc., merged with and into

---

[19]

  *Republic of Ecuador*, 376 F. Supp. 2d at 341-42.

[20]

  *Id.* at 342.

[21]

  *Donziger I*, 768 F. Supp. 2d at 599 (citing Act 99-37, Registro Oficial No. 245, July 30, 1999).

[22]

  The Court hereinafter refers to the trial court that issued the Judgment as the Lago Agrio court.  As detailed more extensively in the Rule 56.1 Statement, six different judges presided over the Lago Agrio Litigation at various times.  Pl. 56.1 St. [DI 398] ¶ 1.

8

Texaco.[23]   Texaco was the surviving entity of the merger.[24]   Under the terms of the Merger

Agreement, Chevron became the owner of all of Texaco's common stock but did not acquire any

of Texaco's assets or liabilities.[25]

## II.   *The Lago Agrio Litigation*

### A.   *Filing the Lawsuit*

The Lago Agrio Litigation began in 2003 when the LAPs, represented by Steven

---

[23]

Endries Decl. [DI 399] ¶¶ 8-9; *see* Pl. 56.1 St. [DI 398] ¶¶ 236-37.

[24]

Endries Decl. [DI 399] ¶¶ 8-9; *see also Chevron Corp. v. Salazar*, 807 F. Supp. 2d 189, 193 (S.D.N.Y. 2011); Pl. 56.1 St. [DI 398] ¶ 237.

The Court takes judicial notice of the merger agreement ("Merger Agreement"), which was filed with the Securities and Exchange Commission as part of Amendment No. 4 to Form S-4 Registration Statement of Chevron, filed Aug. 27, 2001. It is included in DI 43 in *Republic of Ecuador v. Chevron Corp.*, 99 Civ. 9958 (LBS) (S.D.N.Y. filed Feb. 26, 2010), and is reproduced at pages A1991-2059 of the appendix in *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384 (2d Cir. 2011). *Id.*

[25]

Merger Agreement § 1.2.  Texaco never merged into Chevron.  Endries Decl. [DI 399] ¶¶ 8-9; Pl. 56.1 St. [DI 398] ¶¶ 236-38.

To be sure, the law recognizes various bases for disregarding the existence of a corporate entity and imposing liability upon its stockholders.  *See, e.g.*, *Trust v. Kummerfeld*, 153 F. App'x 761, 763 (2d Cir. 2005); *Scarbrough v. Perez*, 870 F.2d 1079, 1083-84 (6th Cir. 1989); *Wallace ex rel. Cencon Cable Inc. Partners II, L.P. v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999).  But a litigant seeking to impose corporate obligations on a shareholder must allege facts that, if proven, would justify disregarding the corporate entity.  The SJ Defendants have neither alleged such facts nor offered any such evidence in this case.

It is interesting to note that Ecuador adheres to the familiar principle that shareholders of corporations are not responsible for corporate obligations.  Art. 143 of the Ecuadorian Ley de Compañías provides, in translation, "[t]he company is a corporation whose capital, divided into shares negotiable, is formed by the contribution of the shareholders that are accountable only by the amount of their shares."

Donziger[26] and other lawyers who had been involved in the *Aguinda* action, sued Chevron in Ecuador under the EMA.[27]  Neither TexPet nor Texaco was named as a defendant.[28]

Throughout the litigation, Chevron has argued that the Ecuadorian courts lacked personal jurisdiction over it[29] because it never had operated nor was qualified to do business in Ecuador and had not merged with Texaco.[30]  Donziger indeed has acknowledged that in naming Chevron as the sole defendant in the Lago Agrio Litigation, the LAPs sued "the wrong party in the complaint."[31]

B.    *Summary of the Lago Agrio Proceedings*

The Lago Agrio Litigation proceeded in what may be described as several stages.

In 2004, the Lago Agrio court ordered specific site inspections to assess "the approximately 122 wells and production installations in the former concession granted by the

---

26

      Although Donziger did not formally appear in the Lago Agrio Litigation, he was the "fulcrum" of the entire litigation effort.  *Donziger I*, 768 F. Supp. 2d at 601.  He described his involvement in a book proposal, in which he stated: "I have been at the epicenter of the legal, political, and media activity surrounding the case both in Ecuador and in the U.S.  I have close ties with almost all of the important characters in the story . . . ." Hendricks Decl. [DI 9] ¶ 86 & Ex. 14 (Donziger book proposal), at 4.

27

      *In re Chevron Corp.*, 749 F. Supp. 2d at 149.

28

      *Donziger I*, 783 F. Supp. 2d at 716; Pl. 56.1 St. [DI 398] ¶¶ 225-27.

29

      Pl. 56.1 St. [DI 398] ¶¶ 243-44; Champion Decl. [DI 402] ¶ 206 & Ex. 2202 (Settlement hearing transcript, *Aguinda et al. v. Chevron Texaco Corporation*), at 243; *id.* ¶ 204 & Ex. 2200 (Chevron's Final Alegato), at 24-33.

30

      Pl. 56.1 St. [DI 398] ¶¶ 236-41; Endries Decl. [DI 399] ¶ 18.

31

      Pl. 56.1 St. [DI 398] ¶ 245; Champion Decl. [DI 402] ¶ 290 & Ex. 2285 (Donziger diary).

Ecuadorian government to what was called the PETROECUADOR-TEXACO Consortium."[32] Each party selected experts "to be present during the judicial inspections and accompany the President of the Superior Court and the Attorneys for the parties in the examination of the site being inspected."[33]  The experts then were to submit their findings to a panel of "settling experts" that would "provide decisive opinions . . . [and] comment solely on the reports presented by the experts appointed by the parties."[34]

        Some of these inspections were completed including two sites in respect of which the LAPs submitted reports over the signature of one of their experts, Dr. Charles W. Calmbacher.[35] But by 2006, the LAPs sought to terminate the remaining judicial inspections and have a single expert appointed to prepare a "Peritaje Global" – a global expert examination report analyzing the alleged environmental harm in the relevant areas of Ecuador.[36]  In 2007, the Lago Agrio court selected Richard Stalin Cabrera Vega ("Cabrera") to serve as the independent global expert and cancelled most of the remaining judicial inspections.[37]

---

32

    Pl. 56.1 St. [DI 398] ¶ 98; Hendricks Decl. [DI 31] ¶ 198 & Ex. 121 pt. 1 (Aug. 7, 2004 oral hearing summary), at 1.

33

    Pl. 56.1 St. [DI 398] ¶ 99; Hendricks Decl. [DI 31] ¶ 198 & Ex. 121 pt. 1 (Aug. 7, 2004 oral hearing summary), at 2.

34

    Pl. 56.1 St. [DI 398] ¶ 99; Hendricks Decl. [DI 31] ¶ 198 & Ex. 121 pt. 1 (Aug. 7, 2004 oral hearing summary), at 2.

35

    Pl. 56.1 St. [DI 398] ¶ 101; Hendricks Decl. [DI 52] ¶ 489 & Ex. 397 (Sacha 94 report); Champion Decl. [DI 402] ¶ 330 & Ex. 2325 (Shushufindi 48 report).

36

    Pl. 56.1 St. [DI 398] ¶ 104; Hendricks Decl. [DI 31] ¶ 222 & Ex. 144 (Jan. 2006 motion), at 2-3; *id.* ¶ 223 & Ex. 145 (July 2006 motion), at 3-5.

37

    Pl. 56.1 St. [DI 398] ¶¶ 110-12, 119; Champion Decl. [DI 402] ¶ 338 & Ex. 2333 (Jan. 26, 2007 Lago Agrio court order), at 1-2; Hendricks Decl. [DI 32] ¶ 232 & Ex. 154 pt. 1

On April 1, 2008, Cabrera submitted what purported to be his report to the Lago Agrio court.[38]  It found $16.3 billion in damages.[39]  Chevron and the LAPs both filed objections.[40]  A supplement to the original report then increased the damage assessment to $27.3 billion.[41]

As part of a LAP public relations campaign surrounding the Lago Agrio proceedings, Donziger arranged for the making and release in 2009 of a documentary film called *Crude*.[42]  The film purported to "'capture[] the evidentiary phase of the Lago Agrio trial, including field inspections and the appointment of independent expert Richard Cabrera to assess the region.'"[43]  There were two versions of *Crude* – one released on DVD and one that streamed on Netflix.

The Netflix version included certain scenes not in the DVD version.  One showed Dr. Carlos Beristain, who supposedly was an impartial contributor to Cabrera's report, working directly with the LAPs' counsel.[44]  Following the discovery of this scene, among other things, Chevron sought discovery in the United States under 28 U.S.C. § 1782 relating to the Lago Agrio

---

(Cabrera's swearing-in certificate), at 2.

[38]

Pl. 56.1 St. [DI 398] ¶ 159; Hendricks Decl. [DI 33] ¶ 256 & Ex. 178 (Cabrera report), at 1.

[39]

Hendricks Decl. [DI 33] ¶ 256 & Ex. 178 (Cabrera report), at 6.

[40]

Pl. 56.1 St. [DI 398] ¶ 164; Hendricks Decl. [DI 8] ¶ 79 & Ex. 7 pt. 1 (LAPs' objections to the Cabrera report).

[41]

Pl. 56.1 St. [DI 398] ¶ 165; Champion Decl. [DI 400] ¶ 51 & Ex. 2048 (Cabrera's answers to LAPs' objections to the Cabrera report), at 1, 52.

[42]

*In re Application of Chevron Corp.*, No. M-19-111, Berlinger Decl. ¶ 18.

[43]

*Id.*, Mastro Decl. Ex. AA (*Crude* press package), at 9-11.

[44]

*Id.*, Mastro Decl. Ex. G, at 1.

Litigation and the Cabrera report.

Based on evidence gained through the Section 1782 proceedings, Chevron began to argue, *inter alia*, that the Calmbacher reports, Cabrera's appointment, and the Cabrera report all were fraudulent.  These arguments created concern among the LAPs' lawyers.  New experts were hired to "address Cabrera's findings in such a subtle way that someone reading the new expert report . . . might feel comfortable concluding that certain parts of Cabrera are a valid basis for damages."[45] Eventually, seven such reports were submitted to the Lago Agrio court on September 10, 2010.[46]

On February 14, 2011, the Lago Agrio court issued the Judgment against Chevron in the aggregate amount of $18.2 billion.[47]

C.    *Summary of the Lago Agrio Judgment*

The Judgment held, *inter alia*, that: (1) Texaco's and TexPet's operations in Ecuador from 1964 to 1992 had caused damage to the environment and the Ecuadorian people in violation of the EMA,[48] (2) Chevron was a proper defendant and liable for these damages and any remediation

---

[45]

        Pl. 56.1 St. [DI 398] ¶ 184; Hendricks Decl. [DI 36] ¶ 292 & Ex. 214 (Aug. 18, 2010 email between Donziger and attorneys from Emery Celli and Patton Boggs), at 1; Hendricks Decl. [DI 356] ¶ 330 & Ex. T (June 14, 2010 email from Donziger to Patton Boggs' counsel), at 1 (stating that the LAP team is "getting nervous that there is an increasing risk that our 'cleansing' process is going to be outrun by the judge and we will end up with a decision based entirely on Cabrera").

[46]

        Pl. 56.1 St. [DI 398] ¶ 186; Champion Decl. [DI 401] ¶¶ 66-71 & Exs. 2063-68 (Allen, Barnthouse, Picone, Rourke, Scardina, Shefftz reports); *id.* ¶ 72 & Ex. 2069 (Anonymous report titled "Cultural Damages Caused to Indigenous Communities in the Ecuadorian Amazonia").

[47]

        Pl. 56.1 St. [DI 398] ¶ 4; DI 168 (Lago Agrio Judgment).

[48]

        *See generally* DI 168 (Lago Agrio Judgment), at 92-188.

owed by Texaco because of its supposed "merger" with Texaco as well as under a corporate-veil-piercing theory,[49] (3) the Settlement and Final Release between the ROE and Texpet did not bind the LAPs or preclude the Lago Agrio Litigation,[50] (4) the EMA had retroactive effect and could serve as a basis for relief,[51] and (5) the prior *Aguinda* litigation did not have *res judicata* effect on the Lago Agrio Litigation.[52]

The Judgment addressed some of Chevron's arguments about the propriety of the Calmbacher reports, Cabrera's appointment, the Cabrera report, and the reports of the additional experts the LAPs hired after the Cabrera report had come under attack. It disclaimed any reliance on the Calmbacher and Cabrera reports[53] but noted that it had considered other expert assessments to which Chevron had objected, including some of the reports submitted by the newly hired

---

[49]

    *Id.* at 6-26.

[50]

    *Id.* at 29-34.

[51]

    *Id.* at 28.

[52]

    *Id.* at 16-18.

[53]

    *Id.* at 48-51.

    There is some evidence that the Lago Agrio court did rely on the Cabrera report for certain aspects of the Judgment. Pl. 56.1 St. [DI 398] ¶¶ 204-10; Champion Decl. [DI 401] ¶ 141 & Ex. 2138 (Di Paolo declaration), at 1-2 (stating that "it is impossible for the Ecuadorian court to accurately identify the number of pits or the number of pits requiring remediation using aerial photo interpretations"); *id.* ¶ 185 & Ex. 2182 (Younger report), Ex. A, at 17-18 (concluding that the pit count in the Judgment is based on Annex H-1 of the Cabrera report); *see also id.* ¶ 274 & Ex. 2269 (Annex R of the Cabrera report), at 13-16 (recommending a $428 million award for potable water system); *id.* ¶ 131 & Ex. 2128 (Barros report) (relying on Cabrera report for the alleged damage award of $430 million for a potable water system but noting that 65 percent of the affected area is connected to a public water system); DI 168 (Lago Agrio Judgment), at 182-83 (awarding $150 million in damages for a potable water system based on multiplying $430 million in damages by the 35 percent of the population in the affected area not serviced by the public water system).

14

experts.[54]  The Lago Agrio court stated also that there were "no defects in the appointment of expert Cabrera, or in the delivery of his report[55] and that it could not conduct a proceeding to investigate Chevron's evidence of fraud "due to a lack of time . . . for submitting the evidence which would allow the defendant to prove its accusations."[56]

The Judgment awarded $8.646 billion in remediation damages and another $8.646 billion to be paid unless Chevron issued a "public apology" within 15 days of the issuance of the Judgment.[57]  Chevron issued no such apology within the 15-day period and, as far as this Court is aware, has issued no apology to date.

### D.     The Ecuadorian Appellate Court's Treatment of Chevron's Fraud Claim

After the Lago Agrio court issued the Judgment and denied Chevron's subsequent motion for clarification and amplification,[58] both the LAPs and Chevron appealed to the Sole Division of the Provincial Court of Justice of Sucumbíos.[59]  The LAPs sought additional damages, and Chevron sought to have the Judgment reversed or declared a nullity on multiple grounds,

---

[54]       DI 168 (Lago Agrio Judgment), at 57-58.

[55]       *Id.* at 50.

[56]       *Id.* at 50-51.

[57]       *Id.* at 186-87.

[58]       DI 186 (March 4, 2011 Lago Agrio clarification decision).

[59]       DI 417, Ex. A (Jan. 3, 2012 Ecuadorian appellate court decision), at 2.

15

including fraud and lack of jurisdiction.[60]  While it is not clear exactly what Chevron argued and the

evidence it presented, it appears that it contended at least that the Lago Agrio court was provided

with and considered evidence outside of the trial court record.[61]

      The appellate court affirmed the Judgment in all material respects on January 3,

2012.[62]  It declined, however, to address many of Chevron's allegations of fraud, stating that:

> "[m]ention is also made of fraud and corruption of plaintiffs, counsel and
> representatives, a matter to which this Division should not refer at all, except to . . .
> emphasize[] that the same accusations are pending resolution before authorities of
> the United States of America . . . and [that] this Division has no competence to rule
> on the conduct of counsel, experts or other officials or administrators and auxiliaries
> of justice, if that were the case."[63]

The only discrepancy in the Judgment addressed by the appellate court was the fact that certain data

referred to in the Judgment included some minor errors.[64]  Although the appellate court

acknowledged these errors, it held that they "do[] not affect the merits of the judgment being

examined."[65]

      In affirming the damage award, the appellate court specified that two trusts were to

be set up and managed by defendant Amazon Defense Front ("ADF") – one for the $8.646 billion

---

[60]

    *Id.*

[61]

    *See id.* at 12 ("As for the assertion that in the trial court evidence that is not in the case
record was considered . . . .").

[62]

    *Id.* at 17.

[63]

    *Id.* at 11.

[64]

    *Id.* at 12-13.

[65]

    *Id.* at 12.

...

in remediation damages and the other for the $8.646 billion in "punitive damages."[66]  Both trusts are

to be overseen by the same board.[67]

Following the appellate court ruling, Chevron sought clarification on several aspects

of that decision, including whether the appellate court had considered what was described as

Chevron's "accusations" that "the [J]udgment ha[d] been based on information foreign to the

record" and that the Lago Agrio court "had received 'secret assistance' in drafting" it.[68]  The court

stated that Chevron's contention was rejected because it was unsupported by "legal evidence that

is in the record" and that

> "[t]he texts indicated by Chevron . . . are not considered or put forth as legal
> evidence, not even by the defendant itself in its claim, for which reason the Division
> understands that it is not alleging that the judgment has been sustained on evidence
> foreign to the record.  Therefore, by starting by considering that the only evidence
> legally produced is deemed authentic in the trial about the facts in dispute, and that
> which must be in the record, it is concluded that the appealed judgment is based on
> legally presented evidence . . . ."[69]

The court then wrote that Chevron had announced on the day following entry of the Judgment by

the Lago Agrio court that it "suspected" that the trial judge "had received 'secret assistance' in

drafting the judgment and that it "therefore now . . . is untimely to try to say this – before the

---

[66]

       *Id.* at 16-17.

[67]

       *Id.* at 17.

       The court did not require that the additional 10 percent of remediation damages granted
under the EMA be placed in a trust.  The court granted also a professional fee of 0.1 percent
"of the values that are derived from the decisional act of this judgment" to the LAPs'
counsel.

[68]

       DI 417, Ex. B (Jan. 13, 2012 Ecuadorian appellate court clarification decision), at 4.

[69]

       *Id.*

Division – and not before who ruled on the cause in the first instance so that he clarify them."[70]  It proceeded to "make an observation" that it was "difficult to conceive" that any secret assistance "would have allowed for the introduction of arguments that were decisive."[71]  It noted, moreover, that "all the valid evidence that has been considered . . . all of the samples, documents, reports, testimonies, interview, transcripts and minutes . . . are found in the record without the defendant identifying any that is not . . . ."[72]

Despite these "observation[s]," the court stated unequivocally that "*it stay[ed] out of these accusations, preserving the parties' rights to present [a] formal complaint to the Ecuadorian criminal authorities or to continue the course of the actions that have been filed in the United States of America*."[73]  It made clear also that "it was not its responsibility to hear and resolve proceedings that correspond to another jurisdiction" or to "make a pronouncement on the interminable and reciprocal accusations over misconduct of some of the parties' attorneys, experts, or contractors . . . [because these allegations of fraud] could not affect the final result of the lawsuit."[74]

E.    *Developments Since the Appellate Decision*

After the Ecuadorian appellate court's decision and clarification, Chevron filed a

---

[70]     *Id.*

[71]     *Id*.

[72]     *Id.*

[73]     *Id.* at 5 (emphasis added).

[74]     *Id.*

18

cassation petition on January 20, 2012, seeking review of the Judgment in Ecuador's National Court of Justice.[75]   On February 17, 2012, the Ecuadorian appellate court accepted Chevron's cassation petition and referred the matter to the National Court of Justice.[76]

Since 2009, an international arbitration panel has been considering Chevron's claims against the ROE under a bilateral investment treaty (the "BIT")[77] between the United States and the Ecuador.  During recent months, the BIT tribunal issued two interim awards that ordered the ROE "to take all measures at its disposal to suspend or cause to be suspended the enforcement or recognition within and without Ecuador" of any judgment against Chevron in the Lago Agrio case and to inform the tribunal of its efforts to implement the order.[78]

The Ecuadorian appellate court responded to the First Interim Award by stating in a February 17, 2012 order that it had no authority to suspend enforcement of the Judgment because Chevron had not requested that a bond be fixed.[79]  It responded to the Second Interim Award with a March 1, 2012 order noting that no determination by the BIT tribunal could overcome the court's obligation to enforce international human rights laws[80] and stating also that the Judgment was final

---

[75]
       DI 414 (SJ Defendants' status report), at 3.

[76]
       *Id.* at 3-4.

[77]
       Investment Treaty With the Republic of Ecuador, Aug. 27, 1993, S. TREATY DOC. NO. 103-15.

[78]
       Champion Decl. [DI 410] ¶ 9 & Ex. 1240 (First Interim Award), at 16; *id.* ¶ 10 & Ex. 1241 (Second Interim Award), at 3; *see also* Pl. 56.1 St. [DI 398] ¶ 85.

[79]
       DI 414 (SJ Defendants' status report), at 4; Pl. 56.1 St. [DI 398] ¶ 86.

[80]
       Champion Decl. [DI 411] ¶ 3 & Ex. 1275 (Mar. 1, 2012 Ecuadorian appellate court order), at 2.

and enforceable under Ecuadorian law.[81]

III.    *Prior Proceedings in this Litigation*

    A.    *The Pleadings*

        1.    *The Amended Complaint*

This action was filed on February 1, 2011 against the LAPs, the Donziger Defendants,[82] the Stratus Defendants,[83] and a number of other individuals and entities. The amended complaint contains nine causes of action.

Counts 1 and 2 assert substantive and conspiracy claims under RICO and are described extensively in the recent decision ruling on the Donziger Defendants' motion to dismiss.[84] Broadly speaking, however, they allege that the Donziger Defendants, the Stratus Defendants, some of the other defendants (but not the LAPs),[85] and a number of non-parties conducted and conspired to conduct the affairs of an enterprise through a pattern of racketeering activity in order, among

---

81

    *Id.* at 7.

82

    The Donziger Defendants are Steven Donziger and his law firm, variously referred to as the Law Offices of Steven Donziger and Donziger & Associates, PLLC.

83

    The Stratus Defendants are Stratus Consulting, Inc., the consulting firm that allegedly ghost-wrote all or most of the Cabrera report, and two of its personnel, Douglas Beltman and Ann Maest.

84

    *Donziger III*, 2012 WL 1711521, at *4-15.

85

    Other defendants include Pablo Fajardo Mendoza, Luis Yanza, Selva Viva Selviva CIA, Ltda. ("Selva Viva"), and the ADF. Fajardo is the LAPs' lead counsel in the Ecuadorian courts. Yanza is the co-founder of the ADF and is the general manager for Selva Viva. Selva Viva is an Ecuadorian limited liability company that administers funds for the Lago Agrio Litigation. The ADF is a non-profit organization purporting to represent the LAPs in the Lago Agrio Litigation and is the "trustee" of the trusts ordered by the Judgment.

other things, "to coerce Chevron into paying billions of dollars" to "stop [an allegedly extortionate] campaign against it."[86]   The alleged predicate acts include extortion, mail and wire fraud, money laundering, witness tampering, and obstruction of justice.

Counts 3 through 5 assert claims against all defendants for fraud, tortious interference with contract, and trespass to chattels relating to the allegedly unlawful scheme described above.[87]

Count 6 asserts claims against all defendants for unjust enrichment on the ground that defendants have been and will be enriched as a result of the Judgment.[88]

Count 7 asserts a state law claim for civil conspiracy against all defendants, alleging that they conspired to commit the substantive state law violations.[89]

Count 8 asserts that the Donziger Defendants violated Section 487 of the New York Judiciary Law.[90]

Count 9 sought a declaration that the Judgment was unenforceable and unrecognizable "on, among others, grounds of fraud, failure [by Ecuador] to afford procedures compatible with due process, lack of impartial [Ecuadorian] tribunals, lack of personal jurisdiction, [and] contravention of public policy."[91]

Part of Count 3 and Counts 4 through 6 have been dismissed as to the Donziger and

---

[86]

Amended Complaint [DI 283] ("Cpt.") ¶¶ 1-2, 342; *see id.* ¶¶ 339-87.

[87]

*Id.* ¶¶ 388-409.

[88]

*Id.* ¶¶ 410-13.

[89]

*Id.* ¶¶ 414-19.

[90]

*Id.* ¶¶ 420-26.

[91]

*Id.* ¶ 430.

Stratus Defendants.[92]  As discussed below, Count 9 has been disposed of as well.

### 2.    *The Answers*

The SJ Defendants filed answers to Chevron's amended complaint.[93]  Two aspects of those answers are relevant here.

First, the Donziger Defendants' seventh affirmative defense asserts that "Chevron's claims are barred, in whole or in part, by the doctrines of collateral estoppel and/or res judicata."[94] Likewise, the LAP Representatives' thirty-third affirmative defense asserts that "[t]he claims asserted in the Complaint and any relief sought thereunder are barred, in whole or in part, under the doctrines of res judicata and/or collateral estoppel."[95]

Second, both assert unclean hands and *in pari delicto* affirmative defenses.[96] Moreover, the LAP Representatives' pleading explicitly and significantly relies, in this respect, on findings by the Lago Agrio court of misconduct by Chevron in the defense of the Lago Agrio case.[97] Indeed, they allege that:

> "*As observed by the Ecuadorian Court in its final judgment*, Chevron also engaged in the following procedural misconduct: raising at the eleventh hour 'unresolved

---

[92]

    *Donziger III*, 2012 WL 1711521, at *21; DI 472 (May 24, 2012 decision on Stratus Defendants' motion to dismiss).

[93]

    DI 307 (Donziger Defendants' answer); DI 350 (LAP Representatives' answer).

[94]

    DI 307 (Donziger Defendants' answer), at 71.

[95]

    DI 350 (LAP Representatives' answer), at 106.

[96]

    *Id.* at 91-105; DI 307 (Donziger Defendants' answer), at 71.

[97]

    DI 350 (LAP Representatives' answer), at 101-04.

issues' previously abandoned by Chevron in an effort to delay resolution of the case; obstructing the evidence gathering process by launching frivolous attacks upon each and every expert report not submitted by a Chevron-affiliate, which the Court found to be designed to 'impede the normal advance of the evidence gathering process, or even prolong it indefinitely;' and frontally attacking the court in a display of shocking disrespect for the judicial process. Further, In [*sic*] summation of Chevron's behavior throughout the course of the litigation, *the Court observed that* 'the following constitutes a display of procedural bad faith on the defendant's part: failure to . . . [produce] . . . documents ordered coupled with a failure to submit an excuse on the date indicated; attempting to abuse the merger between Chevron Corp. and Texaco Inc. as a mechanism to evade liability; abuse of the rights granted under procedural law, such as the right to submit the motions that the law allows for [. . .]; repeated motions on issues already ruled upon, and motions that by operation of law are inadmissible within summary verbal proceedings, and that have all warranted admonishments and fines against defense counsel defendant from the various Judges who have presided over this Court; [and] delays provoked through conduct that in principle is legitimate, but . . . [which have] . . . unfair consequences for the proceedings . . . such as refusing and creating obstacles for payment of the experts who took office, thus preventing them from being able to commence their work . . . .'"[98]

### B.   *Prior Proceedings in this Court*

This Court issued a preliminary injunction barring enforcement of the Judgment *pendente lite* in early March 2011.  In April 2011, the Court bifurcated, and later severed, Chevron's declaratory judgment claim (Count 9) and stayed proceedings in the first eight counts pending its resolution.[99]  It then issued a scheduling order that required completion of all discovery on the Count 9 action by September 15, 2011, and set the trial of that Count for November 14, 2011.[100]

After months of discovery, on the eve of the discovery deadline, and just before the Second Circuit heard oral argument on the SJ Defendants' appeal from the preliminary injunction,

---

[98]      *Id.* at 103-04 (emphasis added).

[99]      *Donziger II*, 800 F. Supp. 2d at 484; DI 328 (May 31, 2011 order severing Count 9).

[100]     DI 279 (Apr. 15, 2011 scheduling order).

23

the LAP Representatives filed a so-called stipulation with this Court (the "Representation")[101] in

which the two LAP Representatives, through counsel, stated that they:

> "do not intend and specifically disclaim any intent to enforce . . . the Lago Agrio Judgment in the State of New York.  The Ecuadorian Plaintiffs [a term defined in the document to mean Messrs. Naranjo and Payaguaje alone] further agree and stipulate never to seek recognition of the Lago Agrio Judgment under New York law.  [They] agree and stipulate never to seek recognition of the Lago Agrio Judgment in the State of New York by any means or under any law.  [They] agree and stipulate never to seek to domesticate the Lago Agrio Judgment in the State of New York.  [They] agree and stipulate never to seek to enforce the Lago Agrio Judgment against assets held by Chevron Corporation in the State of New York.  The Lago Agrio Plaintiffs [not defined] do not hereby waive, and expressly reserve, their right to seek enforcement of the judgment in any jurisdiction other than New York under any applicable law."[102]

### C.   Proceedings in the Court of Appeals

In September 2011, the Second Circuit vacated the preliminary injunction and stated

that an opinion would follow.  The subsequent opinion did not pass, one way or the other, on this

---

[101]

The Court refers to the document as the Representation rather than as a stipulation because the word "stipulation" frequently implies an agreement among different parties.  The Representation was a unilateral declaration purportedly made on behalf of the LAP Representatives by their common counsel. A copy of the Representation is located at *Chevron Corp. v. Salazar*, No. 11 Civ. 3718 (LAK), DI 296, Ex. A, at 1.

[102]

Representation, at 1.

Pablo Fajardo, an Ecuadorian attorney for the LAPs, filed a virtually identical "representation" in Ecuador, which stated that "we, the representatives of the Plaintiffs, herewith wish to formally inform this Court that . . . we will refrain from ever filing any action of any type in the State of New York, for the purpose of enforcing any Ruling handed down within the scope of this legal action, whether at this point in time or at any time when any such Ruling may become enforceable. . . . The foregoing notwithstanding, we, the Plaintiffs, herewith expressly reserve the right to enforce any Ruling issued within the scope of this legal action, always provided that the same is enforceable in any jurisdiction of the United States of America other than the State of New York as well as in all other countries throughout the entire world."  Smyser Decl. [DI 451] ¶ 3 & Ex. B (Lago Agrio Representation).

Court's findings with respect to the nature of the Ecuadorian tribunals or the evidence of fraud in the procurement of the Judgment.  Rather, it explained that the panel had vacated the preliminary injunction on the ground that:

> "the procedural device [Chevron] has chosen to present those claims [in Count 9] is simply unavailable:  The [New York Recognition of Foreign Country Money Judgments Act ("Recognition Act")] nowhere authorizes a court to declare a foreign judgment unenforceable on the preemptive suit of a putative judgment-debtor."[103]

The prayer for declaratory relief, the Circuit held, was of no avail because, in its view, a declaration with respect to the alleged the unenforceability or non-recognizability of the Judgment could not be had because the Recognition Act (1) "does not authorize a court to declare a foreign judgment null and void for all purposes in all countries,"[104] and (2) could not justify a declaration with respect to recognizability and enforcement in New York alone because there was no indication that the LAPs ever would seek to enforce the Judgment here.[105]  The Circuit remanded Count 9 to this Court with instructions to dismiss it in its entirety.[106]

Chevron's petition for certiorari is pending in the Supreme Court.

D.    *The Present Motion*

Chevron now moves for partial summary judgment dismissing the SJ Defendants' affirmative defenses of *res judicata* and collateral estoppel on the grounds that (1) the Judgment may

---

[103]

*Naranjo*, 667 F.3d at 240.

[104]

*Id.* at 245.

[105]

*Id.* at 246.

[106]

*Id.* at 234.

not be afforded any preclusive effect unless it may be recognized and enforced here, and (2) recognition and enforcement would be impermissible or inappropriate because (a) the Ecuadorian courts lacked personal jurisdiction over it, (b) the Judgment is penal in whole or in part, and (c) there was fraud in the procurement of the Judgment.[107]   It argues also, on the basis of the law of former adjudication without regard to issues as to the recognizability of the Judgment, that the Judgment is not preclusive of any claim or defense here.

In response, the SJ Defendants argue principally that the motion is moot because they "are not asserting in this lawsuit the affirmative defenses of res judicata and/or collateral estoppel with respect to the Ecuadorian Judgment."[108]   Specifically, the LAP Representatives assert that they no longer are pursuing those defenses in this action because, in the Representation filed in September 2011, they said that they would "not . . . seek recognition of the Ecuadorian Judgment . . . in any New York court."[109]   While the Donziger Defendants have made no such representation, they assert that they are not judgment creditors of the Judgment and therefore never could seek its enforcement in New York.[110]

IV.    *The Alleged Fraud in Ecuador*

The Court turns to the factual underpinnings of Chevron's motion.   It here summarizes the evidence advanced in support of the fraud claim, reserving discussion of any

---

[107]    DI 397 (Chevron Mem.), at 23-32.

[108]    DI 450 (SJ Def. Mem.), at 1.

[109]    *Id.*; Representation, at 1.

[110]    DI 450 (SJ Def. Mem.), at 1 n.2.

evidence pertinent to the other grounds of the motion for the discussion below.

While Chevron has made broader arguments in support of its fraud contention in other proceedings in this case, it relies in this motion principally on the following contentions:

First, material parts of the Judgment were ghost-written by the LAPs rather than written by the judge over whose name the Judgment was issued. Specifically, portions of at least three internal LAP documents that are not in the Lago Agrio court record and that dealt with allegedly material matters appear *in haec verba* in the Judgment, leading to the conclusion either that the judge improperly was given the LAP internal documents *ex parte* and simply copied portions of them or that the LAP team wrote at least parts of the Judgment itself.

Second, the two site inspection reports submitted over the signatures of Dr. Charles Calmbacher were bogus. While the signatures were genuine, the conclusions of the reports did not reflect his views and were not written by him.

Third, the judicial site inspections were stopped, the LAPs' suggestion for use of a global assessment was adopted, and Cabrera was selected to make that assessment in consequence of improper coercion and pressure exerted on behalf of the LAPs on the Lago Agrio court.

Fourth, the LAP team secretly planned the Cabrera report, wrote most of it, and provided it to Cabrera, who signed and filed it under the false pretense that it was independent, fair, and impartial.

Fifth, the LAP team participated in an elaborate charade to bolster the Cabrera report. It first purported to object to the report, though it in fact had written at least most of it, thereby creating a false appearance of independence on the part of Cabrera. Then, after discovery proceedings in the United States had produced evidence showing that the LAP team secretly had written the Cabrera report, the LAPs submitted seven additional reports designed to "cleanse" any

perceived improprieties in the Cabrera report.[111]

The following facts, alleged by Chevron, all are supported by admissible evidence. The SJ Defendants have not objected to its admissibility, controverted it with admissible evidence, or responded to the corresponding paragraphs of Chevron's 56.1 Statement.   Hence, all are undisputed and deemed admitted for the purposes of this motion except to the extent otherwise stated, which is limited to certain evidence pertaining to the Calmbacher reports.

A.      *The Alleged Ghost-Writing of Portions of the Court's Judgment*

The contention that at least parts of the Lago Agrio court's Judgment improperly were written by the LAP team relates principally to three internal LAP documents, none of which is in the Lago Agrio court record.[112]

- A document entitled *The Merger of Chevron Inc. and Texaco Inc.* (the "Unfiled Fusion Memo") was written by one or more members of the LAP team and addresses (1) the relationship among Texpet, Texaco Inc., and the Consortium, (2) the structure of Chevron's acquisition of the shares of Texaco, and (3) legal arguments relating to whether Chevron could be held liable for obligations of Texaco.[113]

---

[111]

Chevron's Rule 56.1 statement outlines also evidence relating to political pressure that allegedly was brought to bear on the Ecuadorian courts and corruption in the Ecuadorian judiciary generally.  Pl. 56.1 St. [DI 398] ¶¶ 55-86.  The majority of the relevant facts in the 56.1 statement pertain to whether the Ecuadorian court system as a whole provides impartial tribunals.  *Id.*  The Court previously addressed that question in its preliminary injunction opinion.  *Donziger I*, 768 F. Supp. 2d at 581.  Chevron, however, does not seek relief on this motion on that basis.  Accordingly, while the evidence of political pressure is likely to be relevant at another juncture, the Court does not consider it further on this motion.

[112]

Pl. 56.1 St. [DI 398] ¶¶ 9, 15, 27; Champion Decl. [DI 400] ¶ 105 & Ex. 2102 (Dec. 20, 2010 Juola report), at 1, 5.

[113]

Champion Decl. [DI 400] ¶ 119 & Ex. 2116 (Unfiled Fusion Memo); *see* Pl. 56.1 St. [DI 398] ¶¶ 7-8.

- The Index Summaries are spreadsheets prepared by the LAP team that list and summarize documents filed in the Lago Agrio court.[114]

- The Selva Viva Data Compilation consists of spreadsheets containing environmental sampling data.

In each instance, Chevron's motion is supported by analyses by one or more experts that establish that one or more passages in these documents – and in the case of the Unfiled Fusion Memo, at least one quite extended passage – appears verbatim in the Judgment.[115]  (Attached as the Appendix is a side-by-side comparison of (1) the text of the Spanish language Judgment highlighting the word strings that are character-by-character duplications of corresponding text in the Unfiled Fusion Memo with (2) a certified English translation, which permits comprehension by English speakers of the meaning of the duplicate text.)  The experts opine – based on "matching or similar word strings," "numerous data points," other "irregularities," and the like – that whoever wrote the

---

[114]

    Pl. 56.1 St. [DI 398] ¶ 13; *see also* Champion Decl. [DI 400] ¶ 123 & Ex. 2120 (Email attaching Index Summary); *id.* ¶ 125 & Ex. 2122 (June Index Summary).

[115]

    Pl. 56.1 St. [DI 398] ¶¶ 10-12, 16, 28; *see* Champion Decl. [DI 400] ¶ 120 & Ex. 2117 (Leonard report), at 10-16 (setting forth several examples of text that "demonstrate[ ] a co-occurring identical or nearly identical word string of more than 90 words found in both the Sentencia and Fusion Memo"); *id.* ¶ 121 & Ex. 2118 (Leonard supplemental report), at 1, Ex. A, at 21-24, Ex. B, at 6-8 (highlighting examples of overlapping language in the Unfiled Fusion Memo and the Judgment); *id.* ¶ 122 & Ex. 2119 (Turell report), at 8, 23-39, 44 (finding one section of the Judgment to be "an almost verbatim reproduction" of the Unfiled Fusion Memo); *see also id.* ¶ 120 & Ex. 2117 (Leonard report), at 22-26, Ex. 4, at 8-18 (providing examples of such overlapping errors in the Judgment and Index Summaries); *id.* ¶ 121 & Ex. 2118 (Leonard supplemental report), at 1, Ex. A, at 6-7 (highlighting portions of the Judgment where "strings of text and symbols . . . were plagiaristically copied" from the Index Summaries); *see also id.* ¶ 122 & Ex. 2119 (Turell report), at 40-43 (noting many instances of errors in the Index Summaries that were copied into the Judgment); Hendricks Decl. [DI 356] ¶ 566 & Ex. BC (Mar. 1, 2011 Younger report), ¶ 17 (stating that "in excess of 100 specific repeated irregularities," were "copied, cut-and-pasted, or otherwise taken directly from the [Unfiled] Selva Viva Data Compilation").

29

Judgment had and used these LAP documents in doing so.[116]

Two other experts discuss the authorship of the Judgment more broadly. They compared documents known to have been written by Judge Zambrano, who issued the Judgment, with the Judgment itself. The Turell report concluded that the "[w]ritten style of Judgment . . . is quite different from the written style identified in four of the texts headed by Judge Zambrano . . . so that these two text sets cannot have been written by the same author."[117] Similarly, McMenamin

---

[116]

Champion Decl. [DI 400] ¶ 120 & Ex. 2117 (Leonard report), at 10-16; *id.* ¶ 122 & Ex. 2119 (Turell report), at 8, 23-39, 44; Hendricks Decl. [DI 356] ¶ 566 & Ex. BC (Mar. 1, 2011 Younger report), ¶ 17.

Chevron cites two additional documents as evidence of copying of internal LAP documents by the Lago Agrio court or of drafting of all or part of the Judgment by the LAPs: (1) a June 18, 2009 email sent by Fajardo to Donziger and others concerning Ecuadorian trust law and the *Andrade v. Conelec* case, and (2) the LAPs' Draft Alegato, which is a document that outlined several of the LAPs' positions on various issues in the litigation. *See* Champion Decl. [DI 401] ¶ 177 & Ex. 2174 (June 18, 2009 email from Fajardo to Donziger and others); Champion Decl. [DI 400] ¶ 127 & Ex. 2124 (Draft Alegato).

With regard to Fajardo's email, the four "misquoted" words that allegedly demonstrate the identity of part of the Judgment to this document in three instances are virtual synonyms for each other and the fourth is a gendered article that reflects a different word choice in Spanish. The English translation of the Judgment therefore does not clearly reflect which version, if either, of the *Andrade* case is being quoted. Additionally, Chevron has submitted no expert reports documenting alleged plagiarism in the Judgment from the Fajardo email, or indicating whether or not the Fajardo email was or was not a part of the Lago Agrio court record. Indeed, the LAPs have asserted elsewhere that Fajardo's version of *Andrade* was derived from "stock language" that readily could have been found independently by the Lago Agrio court. *See, e.g.*, Champion Decl. [DI 400] ¶ 130 & Ex. 2127 (Dec. 6, 2011 brief filed by LAPs in *Chevron v. Salazar*, No. 11-1150 (2d Cir. Dec. 6, 2011)), at 11 n.6.

The Draft Alegato contains several word strings identical in the Judgment and the Fusion Memo. Champion Decl. [DI 400] ¶ 120 & Ex. 2117 (Leonard report), at 17-20); *id.* ¶ 121 & Ex. 2118 (Leonard supplemental report), Ex. A, at 24 (language from the Draft Alegato identical to language from the Unfiled Fusion Memo). Because the similarities of the Draft Alegato to portions of the Judgment thus appear to be coextensive with some of the similarities of the Unfiled Fusion Memo to the Judgment, the Court considers only the Unfiled Fusion Memo.

[117]

Champion Decl. [DI 400] ¶ 122 & Ex. 2119 (Turell report), at 44.

stated that "[t]here is substantial linguistic evidence that the [Judgment] was written by multiple authors . . . [and] that Judge Zambrano is not the author of significant amounts of the [Judgment]."[118]

B.    *Allegedly Fraudulent Evidence, the Termination of Judicial Inspections, and the Appointment of Cabrera*

1.    *Calmbacher Reports*

The LAPs selected Dr. Charles Calmbacher to serve as their expert for some of the judicial inspections ordered by the Lago Agrio court early in that litigation.  On February 14, and March 8, 2005, respectively, "[t]he LAPs submitted reports for the judicial inspections of well sites Shushufindi 48 and Sacha 94 to the Ecuadorian court . . . purporting to have been authored by . . . Calmbacher and finding that 'highly toxic chemicals' contaminated the area, that TexPet's remediation was 'inadequate or insufficient,' and opining that Shushufindi 48 and Sacha 94 required 'US$26,033,400' and '15,520,000 dollars' of further remediation respectively."[119]

Although the signature pages bear Dr. Calmbacher's signature,[120] he testified at a deposition in a Section 1782 proceeding that he had not reached the conclusions the reports

---

[118]

 *Id.* ¶ 109 & Ex. 2106 (McMenamin report), at 2 (emphasis removed).

[119]

 Pl. 56.1 St. [DI 398] ¶ 101; Hendricks Decl. [DI 52] ¶ 489 & Ex. 397 (Sacha 94 report); Champion Decl. [DI 402] ¶ 330 & Ex. 2325 (Shushufindi 48 report).

 Dr. Calmbacher testified with respect to deposition exhibits 12 and 13.  Exhibit 12 is a copy of the Sacha 94 report filed with the Lago Agrio court, a copy of which is Hendricks Decl. [DI 52] ¶ 489 & Ex. 397. Exhibit 13 is a copy of the Shushufindi 48 report filed with the Lago Agrio court, a copy of which is Champion Decl. [DI 402] ¶ 330 & Ex. 2325.

[120]

 Champion Decl. [DI 402] ¶ 159 & Ex. 2156 (Calmbacher deposition transcript), at 114:1-8, 117:23-118:14.

contained.[121]  He never concluded that TexPet had failed to remediate any site[122] or that any site posed a health or environmental risk.[123]

According to Dr. Calmbacher, Donziger knew that at least some of the conclusions listed in the Sacha 94 report were not Dr. Calmbacher's because Calmbacher previously had discussed his findings with Donziger.[124]  Moreover, when Calmbacher was served with the deposition subpoena in the Section 1782 proceeding in which his testimony was taken, Donziger and one of his associates each telephoned Dr. Calmbacher.  Donziger told Calmbacher that "it could be a potential law case against" Calmbacher if he did not "go in with [Donziger] on quashing the subpoena" and that they were "going to go after Calmbacher for unprofessional behavior." When Calmbacher said that he saw no reason to "go in with [Donziger] on quashing the subpoena," Donziger "hung up."[125]

For the sake of completeness, the Court notes that Chevron on a prior motion submitted a copy of an email from Donziger to another LAP lawyer, the relevant portion of which read:

"I want you to know that I am focusing on two main things:

"1)      Get the reports done and and [*sic*] done well."

----

[121]

> *Id.* at 113:1-25, 114:22-116:18, 117:2-20.

[122]

> *Id.* at 115:15-19.

[123]

> *Id.* at 115:20-24.

[124]

> *Id.* at 118:15-21.

[125]

> Hendricks Decl. [DI 31] ¶ 214 & Ex. 136 (Calmbacher deposition transcript), at 144:14-146:23.

"Frankly, we have had problems with Chuck [Calmbacher] that are even more serious than I realized.  His reports appear to lack much substance, and he still has refused to send me copies.  I based this on what Monica told me – there are no analysis results in his drafts.  He is also trying to undermine Edison's authority and is coming back to the United States today.  He will still sign the perito reports, *but we might have to write them in Quito.*"

\*   \*   \*

"The official line if anybody asks is NOT that Chuck was fired, but that he is coming back home for rest and health reasons.  If people ask if he is coming back to Ecuador, say that depends on his health and our needs.  I do not want Texaco thinking we have internal problems."[126]

### 2.      *Ending of Judicial Inspections and Cabrera's Appointment*

In January and July of 2006, Pablo Fajardo, an Ecuadorian lawyer for the LAPs, filed motions with the Lago Agrio court to "waive" and "relinquish" the LAPs' right to conduct most of the further judicial inspections at specified sites.[127]  While those petitions were pending, the judge presiding over the case at that time, Germán Yánez Ricardo Ruiz, in the words of Donziger, was "on his heels from . . . charges of trading jobs for sex in the court."[128]

During this period, Donziger and others drafted a complaint against Judge Yánez.[129]

---

126

    *Id.* ¶ 218 & Ex. 140 (Oct. 24, 2004 email from Donziger to "awraye1") (emphasis added).

127

    Pl. 56.1 St. [DI 398] ¶ 104; Hendricks Decl. [DI 31] ¶ 222 & Ex. 144 (Jan. 2006 motion), at 2-3; *id.* ¶ 223 & Ex. 145 (July 2006 motion), at 3-5.

128

    Pl. 56.1 St. [DI 398] ¶¶ 105-06; Hendricks Decl. [DI 32] ¶ 227 & Ex. 149 (July 26, 2006 email from Donziger to Joseph Kohn), at 1.

129

    Pl. 56.1 St. [DI 398] ¶¶ 105-06; Hendricks Decl. [DI 28] ¶ 149 & Ex. 76 pt. 2 (June 25, 2006 entry in Donziger's personal notes), at 29.

Fajardo met with the judge *ex parte*[130] and told him that "if he d[id] not adhere to the law and [do] what [the LAPs] need[ed]," they "might file it [against him]."[131]   Shortly thereafter, on September 7, 2006, Judge Yánez permitted the LAPs to withdraw from 64 remaining judicial inspections.[132]

In December 2006, Fajardo requested that the Lago Agrio court appoint a global expert "to conduct the entire examination."[133]   Before and after he filed that motion, Fajardo and other agents of the LAPs had additional *ex parte* meetings with Judge Yánez.[134]   During at least

---

[130]

The relevance of this and other *ex parte* meetings with the Lago Agrio judges is not whether they were violations of Ecuadorian law or professional standards.   Nor does the Court assume that Chevron did not participate in similar *ex parte* meetings.   Rather, the question on this motion is whether the LAP team's actions – including these *ex parte* meetings and advocacy – prevented Chevron from fully and fairly presenting its case such that the Judgment is not entitled to recognition or enforcement under U.S. law. *See, e.g., Ackermann v. Levine*, 788 F.2d 830, 845 (2d Cir.1986) ("[I]nternationalization of commerce requires 'that American courts recognize and respect the judgments entered by foreign courts to the greatest extent consistent with *our own ideals of justice and fair play*.'" (quoting *Tahan v. Hodgson*, 662 F.2d 862, 868 (D.C. Cir. 1981) (emphasis added))); *Allstate Ins. Co. v. Administratia Asigurarilor de Stat*, 962 F. Supp. 420, 425 (S.D.N.Y.1997) ("[In New York,] "courts 'generally will accord recognition to the judgments rendered in a foreign country under the doctrine of comity absent a showing of fraud in the procurement of the foreign judgment or unless recognition of the [foreign] judgment would offend a strong policy of New York.'" (quoting *Lasry v. Lasry*, 180 A.D.2d 488, 579 N.Y.S.2d 393, 393-94 (1st Dep't 1992))).

[131]

Pl. 56.1 St. [DI 398] ¶¶ 105-06; Hendricks Decl. [DI 28] ¶ 149 & Ex. 76 pt. 2 (June 25, 2006 entry in Donziger's personal notes), at 29.

[132]

Pl. 56.1 St. [DI 398] ¶ 107; Champion Decl. [DI 402] ¶ 224 & Ex. 2220 (Sept. 7, 2006 Lago Agrio court order), at 2.

[133]

Pl. 56.1 St. [DI 398] ¶ 108; Hendricks Decl. [DI 31] ¶ 224 & Ex. 146 (Dec. 4, 2006 Lago Agrio filing by Fajardo), at 1 (requesting the Lago Agrio court to "appoint an expert to act as an expert witness to conduct the entire examination").

[134]

Pl. 56.1 St. [DI 398] ¶ 109; *e.g.*, Hendricks Decl. [DI 28] ¶ 149 & Ex. 76 pt. 2 (Nov. 20, 2006 entry in Donziger's personal notes), at 9-11 (noting that Donziger met with judge at Lupe's house); *id.* (Nov. 16, 2006 entry in Donziger's personal notes), at 13 (stating that Donziger met with judge in Hotel Auca); *id.*(Jan. 19, 2007 entry in Donziger's personal notes), at 9-11 (noting that Donziger met with judge at the judge's house); *id.* ¶ 149 & Ex. 76 pt. 1 (May 25, 2007 entry in Donziger's personal notes), at 5 (On May 21, 2007, Fajardo

some of those meetings, the LAPs' attorneys and agents entreated him to appoint a global expert.[135]

On January 29, 2007, Judge Yánez ordered the global assessment that the LAPs wanted.[136]

   *Ex parte* meetings with Judge Yánez continued with the object of persuading him to

appoint Cabrera as the global expert, which ultimately occurred on March 19, 2007.[137]  Donziger

acknowledged that Judge Yánez "never would have done [so] had we not really pushed him."[138]

Moreover, the outcome had not been in doubt, at least for some time.  The LAPs were confident at

least as of late February 2007 that Judge Yánez would appoint Cabrera.[139] Cabrera was sworn in

---

    asked Donziger to "call . . .  judge [Yánez] so we could go see him at his house."  When Donziger called, the judge "asked that we bring over some whiskey or some wine." Donziger and Fajardo met with the judge that night but did not bring any alcohol with them.); Champion Decl. [DI 402] ¶ 319 & Ex. 2314 (Dec. 21, 2006 email from Fajardo to Donziger), at 1 (Fajardo stating that "I met with the Judge today, and I can say that he will definitely not issue the order before the recess").

[135]    Pl. 56.1 St. [DI 398] ¶ 109; Champion Decl. [DI 402] ¶ 318 & Ex. 2313 (Nov. 28, 2006 email from Saenz to Donziger and others), at 1 (Saenz noting that at a meeting with the judge, "we were able to persuade the Judge that he must only order the global assessment strictly following what is in the existing order"); *id.* ¶ 317 & Ex. 2312 (Nov. 7, 2006 email from Fajardo to Donziger), at 1 (stating that at a meeting with the judge, "[w]e explained the actual scope of the Global Assessment to him, and he understood somewhat. I think we have to strengthen our position, the delivery of information and the objectives of the global assessment").

[136]    Pl. 56.1 St. [DI 398] ¶ 110; Champion Decl. [DI 402] ¶ 338 & Ex. 2333 (Jan. 26, 2007 Lago Agrio court order), at 1-2.

[137]    Pl. 56.1 St. [DI 398] ¶¶ 114-15; Hendricks Decl. [DI 32] ¶ 228 & Ex. 150 (Mar. 19, 2007 Lago Agrio court order).

[138]    Pl. 56.1 St. [DI 398] ¶ 116; Hendricks Decl. [DI 6] ¶¶ 2-5, 73 & Ex. 1 (June 13, 2007 *Crude* outtake clip), at CRS-361-11-CLIP-01; Hendricks Decl. [DI 8] ¶¶ 3-4, 73 & Ex. 2 pt. 21 (Certified translation of June 13, 2007 *Crude* outtake clip), at 434.

[139]    Hendricks Decl. [DI 28] ¶ 149 & Ex. 76 pt. 1 (Feb. 27, 2007 entry in Donziger's personal notes), at 11-12 (Donziger stating that "I asked Pablo if he was 100% sure the judge would appoint Richard [Cabrera] and not Echeverria, and he said yes").

officially on June 13, 2007.[140]


### 3.       *The Cabrera Report*

At the June 13, 2007 ceremony at which he was installed, Cabrera swore to execute his duties "faithfully and in accordance with science, technology and the law and with complete impartiality and independence vis-a-vis the parties."[141]   The Lago Agrio court ordered also that he "perform his work in an impartial manner and independently with respect to the parties."[142]   It ordered, moreover, that Cabrera be "responsible for the entire report, the methodology used . . . [and] the work done by his assistants"[143] and that he "cite all of his scientific sources, and analytical and legal documents that he use[d] to perform his work."[144]   But Cabrera had been working with the LAPs for some time, and he continued to do so.

---

[140]

    Pl. 56.1 St. [DI 398] ¶ 114; Hendricks Decl. [DI 356] ¶ 256 & Ex. J (June 13, 2007 email from Donziger to Atossa Soltani and others), at 1 (stating that "[t]he perito [Cabrera] got sworn into [*sic*] after all those visits to the Court" and noting that "that visit to the judge last week was a huge help"); Pl. 56.1 St. [DI 398] ¶ 119; Hendricks Decl. [DI 32] ¶ 232 & Ex. 154 pt. 1 (Cabrera's swearing-in certificate), at 2.

[141]

    Pl. 56.1 St. [DI 398] ¶ 121; Hendricks Decl. [DI 32] ¶ 232 & Ex. 154 pt. 1 (Cabrera's swearing-in certificate), at 3.

[142]

    Pl. 56.1 St. [DI 398] ¶ 122; Hendricks Decl. [DI 32] ¶ 229 & Ex. 151 (Oct. 3, 2007 Lago Agrio court order), at 3.

[143]

    Pl. 56.1 St. [DI 398] ¶ 123; Hendricks Decl. [DI 32] ¶ 229 & Ex. 151 (Oct. 3, 2007 Lago Agrio court order), at 10.

[144]

    Pl. 56.1 St. [DI 398] ¶ 124; Champion Decl. [DI 402] ¶ 327 & Ex. 2322 (Nov. 30, 2007 Lago Agrio court order), at 1.

> a.    *Defendants Secretly Were Involved in Defining the Scope of Cabrera's Report*

On March 3, 2007, shortly before his selection and more than three months before he was sworn in, Cabrera met *ex parte* with the LAPs and their agents, including Ann Maest of Stratus.[145]  The primary purpose of that meeting was for the LAPs to "lay out the entire case and legal theory for Mr. Cabrera and the other participants in the meeting."[146]  During that meeting, Fajardo made a presentation concerning the global assessment in which he discussed what eventually would become the Cabrera report and stated that "*[t]he work isn't going to be the expert[']s. All of us bear the burden.*"[147]  Someone at the meeting then asked whether the final report would be prepared only by the expert.  Fajardo responded that the expert would "sign . . . the report and review it. . . .  But all of us, all together, have to contribute to that report."  Ann Maest of Stratus commented, "But . . . not Chevron," which caused others to laugh.[148]

After the meeting, one of the LAPs' consulting experts stated that meeting with Cabrera was "bizarre."  Donziger replied "[d]on't talk about it," and he immediately told a camera crew that had been filming the meeting for the making of *Crude* that the discussion was "off the

---

145

      Pl. 56.1 St. [DI 398] ¶ 129; Hendricks Decl. [DI 6] ¶¶ 2-5, 44 & Ex. 1 (Mar. 3, 2007 video of meeting in Ecuador attended by Fajardo, Maest, Cabrera, and others), at CRS-187-01-02; Hendricks Decl. [DI 7] ¶¶ 3-4, 52 & Ex. 2 pt. 12 (Certified translation of Mar. 3, 2007 *Crude* outtake clip), at 244.

146

      Pl. 56.1 St. [DI 398] ¶ 129; Hendricks Decl. [DI 8] ¶ 78 & Ex. 6 (Donziger deposition transcript), at 1120:23-1121:5.

147

      Pl. 56.1 St. [DI 398] ¶ 129; Hendricks Decl. [DI 6] ¶¶ 2-5, 52 & Ex. 1 (Mar. 3, 2007 *Crude* outtake clip), at CRS-191-00-CLIP-03; Hendricks Decl. [DI 7] ¶¶ 3-4, 52 & Ex. 2 pt. 12 (Certified translation of Mar. 3, 2007 *Crude* outtake clip), at 245 (emphasis added).

148

      Hendricks Decl. [DI 6] ¶¶ 2-5, 52 & Ex. 1 (Mar. 3, 2007 *Crude* outtake clip), at CRS-191-00-CLIP-03; Hendricks Decl. [DI 7] ¶¶ 3-4, 52 & Ex. 2 pt. 12 (Certified translation of Mar. 3, 2007 *Crude* outtake clip), at 245-46.

record."[149]

Subsequently, lawyers and agents of the LAPs were involved in "putting together Cabrera's work team,"[150] "in his site selection,"[151] and "in [Cabrera's] sampling protocols."[152] Indeed, Cabrera's work plan was drafted by the LAP team and given to Cabrera for his adoption. When the work plan was filed with the Lago Agrio court, it was not disclosed that the LAP team had provided Cabrera with a draft of the work plan.[153]

### b.   The LAP Team Wrote Much of the Cabrera Report

In January 2008, the Stratus Defendants and others met with Cabrera and discussed that "Stratus individuals would draft materials that would be given to Mr. Cabrera for his hoped-for

---

[149]

Pl. 56.1 St. [DI 398] ¶ 130; Hendricks Decl. [DI 6] ¶¶ 2-5, 56 & Ex. 1 (Mar. 4, 2007 *Crude* outtake clip), at CRS-196-00-CLIP-01; Hendricks Decl. [DI 7] ¶¶ 3-4, 56 & Ex. 2 pt. 21 (Certified translation of Mar. 4, 2007 *Crude* outtake clip), at 451-55.

[150]

Pl. 56.1 St. [DI 398] ¶ 140; Champion Decl. [DI 400] ¶ 46 & Ex. 2043 (Mar. 21, 2007 email from Fajardo to Donziger), at 1 (attaching "the first draft of the plan and schedule of activities to be carried out in the expert examination").

[151]

Pl. 56.1 St. [DI 398] ¶ 140; Hendricks Decl. [DI 8] ¶ 78 & Ex. 6 (Donziger deposition transcript), at 2203:11-13 ("Q: Plaintiffs had been involved in Mr. Cabrera's site selection, correct? A: Yes.").

[152]

Pl. 56.1 St. [DI 398] ¶ 140; Hendricks Decl. [DI 8] ¶ 78 & Ex. 6 (Donziger deposition transcript), at 2203:14-17 ("I think [sampling] protocols were suggested to [Cabrera] by the plaintiffs.").

[153]

Pl. 56.1 St. [DI 398] ¶ 142; Champion Decl. [DI 400] ¶ 13 & Ex. 2010 (Donziger deposition transcript), at 3833:16-3834:6; *id.* ¶ 47 & Ex. 2044 (Cabrera's work plan submitted to Lago Agrio court on June 25, 2007), at 1-12.

adoption in his report."[154]  The following month, Douglas Beltman of Stratus stated that "[w]e have

to write . . . probably the single most important technical document for the case. The document will

pull together all of the work over the last 15 or so years on the case and make recommendations for

the court to consider in making its judgment.  We (the case attorneys, the case team in Quito, and

Stratus) have put together a very ambitious outline for this report."[155]

       Over the next several weeks, the Stratus Defendants and others drafted the "Summary

Report of Expert Examination" and the majority of the annexes that soon were filed as the Cabrera

report.[156]  They had the report translated into Spanish before submitting it to Cabrera.[157]  And there

is no genuine dispute as to exactly what happened.  As Donziger has admitted, "Stratus wrote the

---

[154]

      Pl. 56.1 St. [DI 398] ¶ 140; Champion Decl. [DI 400] ¶ 13 & Ex. 2010 (Donziger deposition transcript), at 2247:2-10.

[155]

      Pl. 56.1 St. [DI 398] ¶ 144; Hendricks Decl. [DI 33] ¶ 246 & Ex. 168 (Feb. 22, 2008 email from Beltman to Stratus "Science Group" and others), at 1.

[156]

      Pl. 56.1 St. [DI 398] ¶ 155; Champion Decl. [DI 400] ¶ 49 & Ex. 2046 (Mar. 22, 2010 internal memo titled "Summary of Colorado Action *Aguinda v. ChevronTexaco*") ("The Cabrera Report is a series of 17 annexes; in all, 11 of them were prepared by Stratus and adopted by Cabrera."); *id.* ¶ 13 & Ex. 2010 (Donziger deposition transcript), at 3400:7-9 (Donziger: "Stratus had drafted a substantial number of annexes that were adopted by [Cabrera] verbatim that were included in his report."); Hendricks Decl. [DI 356] ¶ 522 & Ex. AO (Apr. 17, 2010 letter from Donziger to "Fellow Counsel"), at 1 ("[I]f Chevron obtained discovery from Stratus . . . they will find that Stratus wrote the bulk of the report adopted by Cabrera and submitted to the court.").

[157]

      Pl. 56.1 St. [DI 398] ¶ 155; Hendricks Decl. [DI 33] ¶ 254 & Ex. 176 (Mar. 12, 2008 email from Beltman to "info@translatingspanish.com"), at 1 ("The documents (main report and annexes) have to go to the court on March 24, and there are other team members who have to review the report in Spanish early next week . . . ."); *id.* ¶ 247 & Ex. 169 (Mar. 11, 2008 email between Beltman, Maest, and Jennifer Peers), at 1 ("My goal is to have the entire report drafted by COB Tuesday.  Based on how things are going, our current translators will take more than a week to turn it around . . . .  And that's not much time before it has to go to the court on Monday."); Champion Decl. [DI 400] ¶ 13 & Ex. 2010 (Donziger deposition transcript), at 2377:3-2378:9; *id.* at 3400:3-9 ("Stratus had drafted a substantial number of annexes that were adopted by [Cabrera] verbatim that were included in his report.").

bulk of the report adopted by Cabrera and submitted to the court."[158]

The Cabrera report was filed with the Lago Agrio court on April 1, 2008. It falsely or, at least, deceptively stated that it had been "prepared by the Expert Richard Stalin Cabrera Vega" with the help of "*my* technical team, which consists of *impartial* professionals."[159] It estimated roughly $8 billion in total damages and $8.3 billion in unjust profits by Texpet.[160] But that was not the end.

Both parties objected to the report. The LAP team – despite having drafted the vast majority of the report – publicly asserted that it was "unjustly favorable to [Chevron]" and "too conservative" in its damage calculations.[161]

On November 17, 2008, Cabrera filed answers to these comments and objections and increased his damage assessment to more than $27 billion.[162] The responses stated that they had

---

158

    Hendricks Decl. [DI 356] ¶ 522 & Ex. AO (Apr. 17, 2010 letter from Donziger to "Fellow Counsel"), at 1 ("[I]f Chevron obtained discovery from Stratus . . . they will find that Stratus wrote the bulk of the report adopted by Cabrera and submitted to the court."); *see also* Champion Decl. [DI 400] ¶ 13 & Ex. 2010 (Donziger deposition transcript), at 3400:7-9 (Donziger: "Stratus had drafted a substantial number of annexes that were adopted by [Cabrera] verbatim that were included in his report.").

159

    Pl. 56.1 St. [DI 398] ¶¶ 159-60; Hendricks Decl. [DI 33] ¶ 256 & Ex. 178 (Cabrera report), at 1-2 (emphasis added).

160

    Hendricks Decl. [DI 33] ¶ 256 & Ex. 178 (Cabrera report), at 6, 50.

161

    Pl. 56.1 St. [DI 398] ¶ 164; Hendricks Decl. [DI 8] ¶ 79 & Ex. 7 pt. 1 (LAPs' objections to the Cabrera report), at 40.

162

    Pl. 56.1 St. [DI 398] ¶ 165; Champion Decl. [DI 400] ¶ 51 & Ex. 2048 (Cabrera's answers to LAPs' objections on the Cabrera report), at 1, 52.

been written "by the Expert Richard Cabrera, with the Support of *His* Technical Team."[163]  In fact, however, the Stratus Defendants and other members of the LAP team had drafted those responses and given them to Cabrera to adopt.[164]  Indeed, they had attempted to word them so that they would read as if Cabrera had written them.[165]

### 4.    The "Cleansing" Reports

After the Cabrera report and the subsequent responses had been submitted – and after some of the evidence described above had been discovered through Section 1782 actions in the United States – members of the LAP team acknowledged problems associated with Cabrera's lack of independence.  Two U.S. law firms representing the LAPs in Section 1782 proceedings withdrew after discovering the LAP team's involvement with Cabrera.[166]  Another of the LAP attorneys wrote that if the relationship with Cabrera were disclosed, it would "destroy" the Lago Agrio Litigation

---

[163]

Pl. 56.1 St. [DI 398] ¶ 165; Champion Decl. [DI 400] ¶ 51 & Ex. 2048 (Cabrera's answers to LAPs' objections on the Cabrera report), at 4 (emphasis added).

[164]

Pl. 56.1 St. [DI 398] ¶ 166; Champion Decl. [DI 400] ¶ 13 & Ex. 2010 (Donziger deposition transcript), at 2962:9-2963:23 ("I believe Stratus prepared the [November report] materials in the hope that [Cabrera] would adopt them, sort of how they did with the annexes and the executive summary.").

[165]

Hendricks Decl. [DI 9] ¶ 81 & Ex. 9 (Oct. 27, 2008 email from Beltman to Maest, and Jennifer Peers), at 2 ("I will ask Brian to clean up the language so it sounds more like the Perito [Cabrera] and less like a comment.").

[166]

Pl. 56.1 St. [DI 398] ¶ 174; Hendricks Decl. [DI 8] ¶ 78 & Ex. 6 (Donziger deposition transcript), at 2353:2-2357:23 ("Q. Mr. Donziger, is it accurate that certain firms have withdrawn from representing the Lago Agrio plaintiffs after learning the nature of the plaintiffs' interactions with Mr. Cabrera, U.S. firms, I mean, law firms? A. Yes. Q. Was one of those firms Constantine Cannon? A. Yes."); *id.* at 2381:19-2387:4 ("Q. The Brownstein firm, Mr. McDermott withdrew in March of 2010, correct? A. Yes . . . they were troubled by the allegations . . . about Stratus' role writing materials to be given to Cabrera.").

and "all of us, your attorneys, might go to jail."[167]

The LAP team responded by considering the hiring of a new expert to "address Cabrera's findings in such a subtle way that someone reading the new expert report . . . might feel comfortable concluding that certain parts of Cabrera are a valid basis for damages."[168]  The initial plan was to submit an additional expert report to the Lago Agrio court that would appear to be independent of but, in fact, would rely on the data and conclusions reached in the Cabrera report.[169]

In the end, seven new reports were filed with the Lago Agrio court on September 16, 2010.[170]  Six of the seven were by U.S. experts; one was anonymous.[171]  But the known experts that submitted reports later admitted that they never had traveled to Ecuador for the purpose of gathering

---

167

      Pl. 56.1 St. [DI 398] ¶ 177; Hendricks Decl. [DI 9] ¶ 83 & Ex. 11 (Mar. 30, 2010 email from Prieto to Donziger, Yanza, and Fajardo), at 1.

168

      Pl. 56.1 St. [DI 398] ¶ 184; Hendricks Decl. [DI 36] ¶ 292 & Ex. 214 (Aug. 18, 2010 email between Donziger and attorneys from Emery Celli and Patton Boggs), at 1; Hendricks Decl. [DI 356] ¶ 330 & Ex. T (June 14, 2010 email from Donziger to Patton Boggs' counsel), at 1 (stating that the LAP team is "getting nervous that there is an increasing risk that our 'cleansing' process is going to be outrun by the judge and we will end up with a decision based entirely on Cabrera").

169

      Pl. 56.1 St. [DI 398] ¶ 184; Hendricks Decl. [DI 36] ¶ 292 & Ex. 214 (Aug. 18, 2010 email between Donziger and attorneys from Emery Celli and Patton Boggs), at 1 ("One overarching theme to think about throughout the process is how we want the new expert to address the Cabrera report and its conclusions."); Champion Decl. [DI 401] ¶ 198 & Ex. 2195 (June 21, 2010 Lago Agrio motion), at 3 (requesting that the Lago Agrio court permit the parties "to make supplemental submissions to guide the Court in arriving at a global damage assessment").

170

      Pl. 56.1 St. [DI 398] ¶ 186; Champion Decl. [DI 401] ¶¶ 66-71 & Exs. 2063-68 (Allen, Barnthouse, Picone, Rourke, Scardina, and Shefftz reports); *id.* ¶ 72 & Ex. 2069 (Anonymous report titled "Cultural Damages Caused to Indigenous Communities in the Ecuadorian Amazonia").

171

      *See* sources cited *supra* note 170.

data to support their reports.[172]  At least four relied on the data and conclusions in the Cabrera

report.[173]  For example, the Allen report stated that it "relied on parts of the Cabrera report" and

"made no efforts to independently verify the underlying data."[174] The Shefftz report also expressly

relied on "data and cost figures from the Cabrera report" without "know[ing] one way or the other

whether they're correct or not."[175]

---

[172]

      Pl. 56.1 St. [DI 398] ¶ 186; Champion Decl. [DI 401] ¶ 74 & Ex. 2071 (Barnthouse deposition transcript), at 164:25-165:4; *id.* ¶ 75 & Ex. 2072 (Picone deposition transcript), at 195:10-21; *id.* ¶ 76 & Ex. 2073 (Allen deposition transcript), at 164:7-13; *id.* ¶ 77 & Ex. 2074 (Shefftz deposition transcript), at 51:6-7; *id.* ¶ 78 & Ex. 2075 (Rourke deposition transcript), at 46:1-11; *id.* ¶ 79 & Ex. 2076 (Scardina deposition transcript), at 192:9-14.

[173]

      Pl. 56.1 St. [DI 398] ¶ 188; Champion Decl. [DI 401] ¶ 74 & Ex. 2071 (Barnthouse deposition transcript), at 52:2-10; *id.* ¶ 76 & Ex. 2073 (Allen deposition transcript), at 171:18-172:3; *id.* ¶ 77 & Ex. 2074 (Shefftz deposition transcript), at 59:20-60:2, 165:8-13; *id.* ¶ 79 & Ex. 2076 (Scardina deposition transcript), at 224:20-225:20, 269:8-270:16.

[174]

      Champion Decl. [DI 401] ¶ 76 & Ex. 2073 (Allen deposition transcript), at 171:18-172:3.

[175]

      Champion Decl. [DI 401] ¶ 77 & Ex. 2074 (Shefftz deposition transcript), at 63:3-21.

*Discussion*

I.    *Summary Judgment Standard*

    A.    *General*

        Summary judgment appropriately is granted where there is no genuine issue of material fact and where, based on those facts, the moving party is entitled to judgment as a matter of law.[176]   A material fact is one that could "affect the outcome of the suit under the governing law."[177]   A dispute of a material fact exists where the evidence is such that a reasonable fact finder "could return a verdict for the nonmoving party."[178]   It is not enough, however, for a party against which an adversary seeks summary judgment to show that "there is some metaphysical doubt as to the material facts."[179]

        Generally speaking, the moving party bears the burden of demonstrating that it is entitled to summary judgment.[180]   Where, however, the non-moving party would have the burden of proof at trial with respect to a given issue, the movant is entitled to summary judgment on the issue if the non-moving party has not shown that its evidence could justify a finding in its favor.[181]

---

[176]

    FED. R. CIV. P. 56(a); *see also D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998).

[177]

    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[178]

    *Id.*

[179]

    *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

[180]

    *See 10 Ellicott Square Court Corp. v. Mtn. Valley Indem. Co.*, 634 F.3d 112, 119 (2d Cir. 2011).

[181]

    *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (where a non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case," summary judgment may be entered against it on that issue); *Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP*, 612 F. Supp. 2d 330, 345 (S.D.N.Y. 2009)

Indeed, the Supreme Court has said that the moving party's burden is only to "inform [ ] the district court of the basis for its motion" and that "regardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment . . . is satisfied."[182]

Finally, evidence in support of or in opposition to a motion for summary judgment ordinarily must be, or be capable of presentation, in a form that would be admissible into evidence at trial.[183]

### B.    S.D.N.Y. Civil Rule 56.1

Local Civil Rule 56.1 is relevant also to this motion.  It provides as follows:

"(a) Upon any motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, there shall be annexed to the motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried.  Failure to submit such a statement may constitute grounds for denial of the motion."

"(b) The papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."

---

("[T]he non-movant has the burden of coming forward with admissible evidence sufficient to raise a genuine issue of fact on a matter as to which non-movant would have the burden of proof at trial, regardless of the existence or adequacy of evidence submitted by the movant . . . ."); FED. R. CIV. P. 56(c)(1)(B).

[182]

*Celotex Corp.*, 477 U.S. at 323.

[183]

*E.g.*, *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009); *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004); *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 123-24 (2d Cir. 2001); *Raskin v. Wyatt Co.*, 125 F.3d 55, 65-66 (2d Cir. 1997).

"(c) Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."

"(d) Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b) including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."[184]

As this Court previously has noted, "[t]he purpose of the rule 'is to assist the Court in understanding the scope of the summary judgment motion by highlighting those facts which the parties contend are in dispute.'"[185]

Chevron filed a statement of undisputed facts in support of its motion and in accordance with Local Civil Rule 56.1(a) ("56.1 Statement"). Its 56.1 Statement contains more than 100 pages of factual statements – 245 individually numbered paragraphs – the contents of which are described as necessary.

The SJ Defendants did not submit a Rule 56.1(d) statement. Their memorandum instead states that:

"[b]y filing this opposition to Chevron's motion for summary judgment and notifying the Court that Chevron's motion is moot, Defendants do not concede or agree with any of the factual allegations presented therein. Defendants contest all of Chevron's factual allegations and intend to disprove them at the appropriate time, when they are germane to an issue actually before the Court for resolution."[186]

---

[184] S.D.N.Y. Civ. R. 56.1 (July 11, 2011).

[185] *Emigra Grp.*, 612 F. Supp. 2d at 347 (citing *Archie Comic Publ'ns, Inc. v. DeCarlo*, 258 F. Supp. 2d 315, 317 (S.D.N.Y. 2003)); *accord, e.g., Goldstick v. The Hartford Inc.*, No. 00 Civ. 8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002); *Fernandez v. DeLeno*, 71 F. Supp. 2d 224, 227-28 (S.D.N.Y. 1999).

[186] DI 450 (SJ Def. Mem.), at 10.

The SJ Defendants go on to argue that "it would be procedurally improper to consider any

"[T]he appropriate time" for the SJ Defendants to "contest all of Chevron's factual allegations" on this motion was when they filed their response to it. As the Second Circuit has said, failing to respond on the merits to a motion for summary judgment is a "risky and imprudent path"[187] – a party that fails to meet a summary judgment motion with evidence contesting the movant's factual allegations "rel[ies] solely on [any] failure [of the movant] to meet its burden of production"[188] or, as is the case here, the correctness of the SJ Defendants' mootness argument. Thus, the effect of their failure to file the statement required by Local Civil Rule 56.1 in response to Chevron's 56.1 Statement, according to the plain terms of the rule, is that they are "deemed to [have] admitted for purposes of th[is] motion" all of the facts detailed in the 245 paragraphs of the

---

of those factual matters until after the Court has ruled on the Donziger Defendants' long-pending Rule 12(b)(6) motion to dismiss Chevron's legally defective Complaint, after the Court rules on any other motions pertaining to exercising personal jurisdiction over any of the Defendants or pertaining to revisions to the pleadings, and after Defendants have been given an opportunity to take full discovery on those matters." *Id.* They are mistaken. A motion for summary judgment may be made "at any time until 30 days after the close of all discovery." FED. R. CIV. P. 56(b). There is no need to await disposition of other motions. In any case, the Donziger Defendants' motion to dismiss the complaint was decided some time ago. At the time the Chevron's motion was made, the LAP Representatives had not even moved to dismiss for lack of personal jurisdiction. And the remedy for any perceived lack of discovery needed to meet a summary judgment motion is an application under FED. R. CIV. P. 56(f)). *E.g.*, *Gurary v. Winehouse*, 190 F.3d 37, 43-44 (2d Cir. 1999); *Meloff v. N.Y. Life Ins. Co.*, 51 F.3d 372, 375 (2d Cir. 1995); *Hudson River Sloop Clearwater, Inc. v. Dep't of Navy*, 891 F.2d 414, 422 (2d Cir. 1989); *accord Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137-38 (2d Cir. 1994); *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 926 (2d Cir. 1985). Indeed, the SJ Defendants so acknowledged in seeking an extension of time on this motion, in part for the purpose of making "a request pursuant to Rule 56(d) for . . . discovery to contradict Chevron's claimed evidentiary basis for the motion." DI 470 (Mar. 11, 2012 letter), at 2. But the SJ Defendants made no such request.

187

*Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 247 (2d Cir. 2004); *see also Amaker v. Foley*, 274 F.3d 677, 681 (2d Cir. 2001) (failure to respond to summary judgment motion a "perilous path").

188

*Vermont Teddy Bear Co.*, 373 F.3d at 247.

56.1 Statement,[189] at least to the extent they are supported by admissible evidence.[190]

II.    *The Res Judicata-Collateral Estoppel Defense Is Properly Before the Court and Is Not Moot*

The SJ Defendants and Chevron agree that "New York law would require Defendants to show that the [Ecuadorian] Judgment is entitled to recognition under the New York Recognition Act in order [for them] to invoke res judicata or collateral estoppel."[191]   The SJ Defendants contend, however, that "[n]o issue concerning recognition of that Judgment can be before this Court" for three reasons.[192]

First, all of the SJ Defendants claim that their affirmative defenses of *res judicata* and collateral estoppel do not and were not intended to rely upon the Judgment.[193]

---

189

S.D.N.Y. CIV. R. 56.1(c) (July 11, 2011).  Furthermore, in an abundance of caution, the Court combed through the extensive record that has amassed in this case, and has made every effort to consider any admissible evidence therein that might work in the SJ Defendants' favor for the purposes of this motion.

190

Many courts have held that FED. R. EVID. 103 applies to the admissibility of evidence on summary judgment motions as it does at trial and, in consequence, that the failure to raise objections to admissibility waives them.  10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 3D § 2722; *see also Davis v. Howard*, 561 F.2d 565, 570 (5th Cir. 1977); *cf. In re Worldcom, Inc.*, 357 B.R. 223, 228 (S.D.N.Y. 2006). While there are no specific objections to particular pieces of evidence relied upon by Chevron, the Court nevertheless has not relied on patently inadmissible evidence in deciding this motion.

191

DI 450 (SJ Def. Mem.), at 1; *accord* DI 397 (Chevron Mem.), at 4 ("Defendants' res judicata and collateral estoppel defenses require as a necessary precondition, and thereby put at issue, the recognizability of the Ecuadorian judgment."); DI 461 (Chevron Reply Mem.), at 10 ("Defendants would have to prove . . . that the Ecuadorian judgment is entitled to recognition" in order "[t]o establish a res judicata or collateral estoppel defense here"); *see also* sources cited *supra* note 130.

192

DI 450 (SJ Def. Mem.), at 1.

193

*See id.*

48

Second, all contend that their affirmative defenses of *res judicata* and collateral estoppel, to any extent that they rested on the Judgment when they were interposed, were mooted by the LAP Representatives' Representation.[194]

Finally, the Donziger Defendants argue that they in any case have no "interest" in the Judgment and therefore could not seek its recognition in New York, at least independent of the LAP Representatives.[195]

A.    *The Answers Are Sufficient to Assert the Judgment As Claim or Issue Preclusive and Were Intended to Do So*

The SJ Defendants' principal tactic in opposing Chevron's motion is to deny that the *res judicata*-collateral estoppel defense they pleaded "refer[s] to the Ecuadorian Judgment" at all.[196] It allegedly refers instead to "a host of judicial decisions and findings" made in "prior rulings by the U.S. Court of Appeals for the Second Circuit and/or other U.S. federal district and appellate courts in related proceedings under 28 U.S.C. § 1782."[197]  Therefore, the SJ Defendants argue, Chevron's motion "presents nothing for this Court to decide."[198]  This argument is without merit.

---

[194]
    *Id.* (entitling their memorandum as opposing Chevron's motion "as moot"), 3 (calling Chevron's motion "moot" in light of LAP Representatives' declarations), 10 (characterizing motion as "moot"), 12 (requesting denial of motion as "moot").

[195]
    *Id.* at 4.

[196]
    *Id.* at 2.

[197]
    *Id.* at 3.

[198]
    *Id.*

1.      *The Answers Sufficiently Assert These Defenses Based on the Judgment*

The SJ Defendants' answers plead that the complaint is barred in whole or in part by *res judicata*, and the LAP Representatives' answer goes farther by relying explicitly on findings by the Lago Agrio court in pleading its unclean hands defense just two pages away.  Nothing more is required to invoke the Judgment for preclusive purposes.  The SJ Defendants' argument to the contrary is not persuasive.

To begin with, the SJ Defendants contend that the general allegation that the claim is barred by *res judicata* and collateral estoppel was not sufficient to invoke the Ecuadorian Judgment.  They assert also, however, that their *res judicata*-collateral estoppel defense actually invoked only "prior rulings by the U.S. Court of Appeals for the Second Circuit and/or other U.S. federal district courts in related proceedings under 28 U.S.C. § 1782"[199] none of which is even mentioned in their answers.  But that is internally inconsistent.  If, as they argue, their answers sufficiently raised *res judicata* and collateral estoppel defenses based on Second Circuit and/or Section 1782 rulings that they did not even mention, they were good enough also to invoke also the Ecuadorian Judgment.  And, in fact, Rule 8(c), which governs the pleading of affirmative defenses – these included – requires no more with respect to the pleading of any of these orders and judgments.[200]  The rule requires only that an answer "affirmatively state any avoidance or

---

[199]

DI 450 (SJ Def. Mem.), at 3.  The LAP Representatives, as discussed above, make this argument despite the fact that their answer's express quotation of purported findings in the Judgment, albeit in a section detailing a separate affirmative defense.

[200]

FED. R. CIV. P. 8(c) (requiring only that, "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including" *res judicata*).

affirmative defense."[201]   Motions to strike bare-bones or conclusory affirmative defenses are

---

[201]

Id.

There are different views as to whether *Bell Atl. Corp v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), ultimately should be extended to require more detailed pleading of affirmative defenses, although no circuit yet has ruled on the subject.

Some courts have held that *Twombly* and *Iqbal* do not apply to affirmative defenses.  One has reasoned persuasively that the difference is justified by a host of factors, including "(1) textual differences between Rule 8(a), which requires that a plaintiff asserting a claim show entitlement to relief, and Rule 8(c), which requires only that the defendant *state* any defenses; (2) a diminished concern that plaintiffs receive notice in light of their ability to obtain more information during discovery; (3) the absence of a concern that the defense is 'unlocking the doors of discovery'; (4) the limited discovery costs, in relation to the costs imposed on a defendant, since it is unlikely that either side will pursue discovery on frivolous defenses; (5) the unfairness of holding the defendant to the same pleading standard as the plaintiff, when the defendant has only a limited time to respond after service of the complaint while plaintiff has until the expiration of the statute of limitations; (6) the low likelihood that motions to strike affirmative defenses would expedite the litigation, given that leave to amend is routinely granted[;] (7) the risk that a defendant will waive a defense at trial by failing to plead it at the early stage of the litigation; (8) the lack of detail in Form 30, which demonstrates the appropriate pleading of an affirmative defense; and (9) the fact that a heightened pleading requirement would produce more motions to strike, which are disfavored."  *Bayer CropScience AG v. Dow AgroSciences LLC*, No. 10 Civ. 1045 , 2011 WL 6934557, at *1-2 (D. Del. Dec. 30, 2011); *accord Kohler v. Big 5 Corp.*, No. 12 Civ. 00500, 2012 WL 1511748, at *2-3 (C.D. Cal. Apr. 30, 2012); *Kohler v. Islands Rests., LP*, 280 F.R.D. 560, 565-66 (S.D. Cal. 2012); *U.S. Bank Nat'l Ass'n v. Educ. Loans Inc.*, No. 11 Civ. 1445, 2011 WL 5520437, at *5-6 (D. Minn. Nov. 14, 2011); *Bennett v. Sprint Nextel Corp.*, No. 09-2122, 2011 WL 4553055, at *1-2 (D. Kan. Sept. 29, 2011); *Unicredit Bank AG v. Bucheli,* No. 10-2436, 2011 WL 4036466, at *4-6 (D. Kan. Sept. 12, 2011).

Others have reached a contrary view, albeit often without much analysis.  *See, e.g.*, *Botell v. United States*, No. 11 Civ. 1545, 2012 WL 1027270, at *2 (E.D. Cal. Mar. 26, 2012) *Barnes v. AT&T Pension Benefit Plan-Nonbargained Program*, 718 F. Supp. 2d 1167, 1171-72 (N.D. Cal. 2012); *Riemer v. Chase Bank USA, N.A.*, 274 F.R.D. 637, 639-40 (N.D. Ill. 2011) (same); *see also, e.g.*, *In re Checking Account Overdraft Litig.*, No. 09 MD 2036, — F.R.D. —, 2012 WL 1134483, at *9 (S.D. Fla. Apr. 3, 2012); *Vargas v. HWC Gen. Maintenance*, No. H-11-875, 2012 WL 948892, at *3 (S.D. Tex. Mar. 20, 2012); *Haley Paint Co. v. E.I. Du Pont De Nemours & Co.*, No. 10 Civ. 318, 279 F.R.D. 331, 335-36 (D. Md. 2012).

But there is no occasion to resolve this question on this motion.  Chevron has not contested the sufficiency of the answers in this respect.  Certainly the SJ Defendants may not be heard to avoid Chevron's motion for partial summary judgment by contending that their own pleadings are insufficiently detailed.

discouraged, and courts regularly deny such attempts.[202]   In any case, the SJ Defendants certainly cannot avoid the merits of Chevron's motion for partial summary judgment on this issue by claiming that their own answers are insufficient.  That is particularly so given the fact that their own words and actions clearly demonstrate that their answers – contrary to what they say now – were intended to plead that the Ecuadorian Judgment as *res judicata* and collateral estoppel. Indeed, their present denial of such an intention is an unworthy pretense.

### 2.    *The Defendants' Intentions*

The SJ Defendants' repeated and explicit statements and actions in this and other courts demonstrate that it always was there intention to rely in this case on the Judgment as having preclusive effect until it suddenly seemed more attractive to change course in a tactical effort to avoid litigating the recognizability of the Judgment in this action while saving that issue for use in other *fora*.

### a.    *The SJ Defendants' Prior Communication With This Court*

First, the SJ Defendants' current claim be squared with their other actions and statements before this Court.

Shortly after Chevron filed this motion for summary judgment dismissing the *res judicata*-collateral estoppel defense to the extent it is based on the Judgment, the SJ Defendants

---

[202]    *See, e.g.*, 5 WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE: CIVIL 3D § 1274 ("As numerous federal courts have held, an affirmative defense may be pleaded in general terms and will be held to be sufficient, and therefore invulnerable to a motion to strike, as long as it gives the plaintiff fair notice of the nature of the defense." (footnote omitted)).

requested (and later received) an extension of the time within which to file opposing papers.[203] They

argued that:

> "The extension of time [that they sought to respond to the summary judgment motion] would not come close to giving the defendants an amount of time to prepare their response equal to that Chevron enjoyed to prepare its Motion, *but would at least give them an opportunity to organize some response to the legal arguments and thousands of pages of exhibits and some contradicting evidence and/or a request pursuant to Rule 56(d) for the opportunity to take necessary discovery to contradict Chevron's claimed evidentiary bases for the motion.*"[204]

Thus, as of the date of their letter – March 11, 2012 – the SJ Defendants apparently thought that

Chevron's motion for partial summary judgment required a "response to [its] legal arguments" and

the submission of "contradicting evidence" or a request for Rule 56(d) discovery to meet the motion

on its factual merits.

That belief is consistent only with an understanding that the *res judicata*-collateral

estoppel defense was based on the Judgment, as Chevron's motion goes only to that question.  Yet,

after being granted an extension explicitly for the purpose of marshaling their evidentiary response

to the motion,[205] the SJ Defendants did not respond to any of Chevron's legal or factual contentions,

submitted no evidence, and made no Rule 56(d) application.  They instead presented, for the first

time, their contention that they "are not asserting in this lawsuit the affirmative defenses of res

---

[203]

     *See* DI 470 (the "March 11 Letter"); *see* DI 434 (order granting a one-week extension for the filing of opposition papers on Chevron's motion for summary judgment).

[204]

     March 11 Letter, at 2 (emphasis added).

[205]

     The Court granted an extension of time amounting to half of the additional time the SJ Defendants had requested, giving them almost a full month within which to prepare and file opposing papers.  *See* DI 434.

judicata and/or collateral estoppel with respect to the Ecuadorian Judgment"[206] and that those defenses "are not at issue in this case."[207]

### b.    The Argument to the Second Circuit

Nor can the SJ Defendants' current position be squared with the their prior statement to the Second Circuit, where they told that court in no uncertain terms that they were asserting the Judgment as preclusive in this Court on Chevron's fraud claims.

In their appeal from this Court's preliminary injunction, the LAP Representatives argued in the Circuit, among other things, that this Court had erred in enjoining enforcement of the Judgment in other countries because any country in which enforcement might be sought would be entitled to decide the question of enforceability for itself.  In doing so, however, they went on to say that Chevron's fraud claims had been litigated in Ecuador and that "*[p]rinciples of estoppel should preclude Chevron from re-litigating its fraud claims in the lower court, but the district court appears poised to disregard this well-settled principle.*"[208]

Of course, both "the lower court" and "the district court" referred to this Court.  And, as collateral estoppel is an affirmative defense, this Court could not have been "poised to disregard" the supposed preclusive effect of the Judgment, as the LAP Representatives asserted to the Second Circuit, unless the LAP Representatives had pleaded the alleged collateral estoppel effect of the

---

[206]    DI 450 (SJ Def. Mem.), at 1.

[207]    *Id.*

[208]    Champion Decl. [DI 462] ¶ 8 & Ex. 2366 (Reply Br. for Defs.-Appellants Hugo Gerardo Camacho Naranjo and Javier Piaguaje Payaguaje, *Chevron Corp. v. Naranjo*, No. 11-1150, DI 377 (2d Cir. filed July 5, 2011)), at 14, n.33 (emphasis added).

54

Judgment in *this* Court.

It would be difficult to imagine any clearer evidence of what the LAP Representatives meant to plead and thought they had pleaded. Their recently adopted position as to whether they pleaded the Judgment as preclusive is directly at odds with what they said to the Court of Appeals.[209]

### c. The Lack of Any Other Arguable Basis for the Defenses

Finally, there is no other arguable basis for any *res judicata* or collateral estoppel defense in this case. The suggestion in their motion papers that the SJ Defendants rely on "prior rulings by the U.S. Court of Appeals for the Second Circuit and/or other U.S. federal district courts in related proceedings under 28 U.S.C. § 1782"[210] was completely unsubstantiated in their answers and entirely unpersuasive.

No doubt recognizing this, the SJ Defendants attempted to rescue their position in an unauthorized sur-reply in opposition to Chevron's motion in which they gave four supposed "examples" of other rulings with alleged preclusive effect. But none could ground even a reasonable argument for preclusive effect in this case.

They point first to a statement in *Aguinda v. Texaco, Inc.*,[211] that "Texaco consented

---

209

       Their new position is in tension also with arguments they made in the Third Circuit and in the District of Columbia in related cases. In *In re Chevron Corp.*, 650 F.3d 276 (3d Cir. 2011), and *Chevron Corp. v. The Weinberg Grp.*, No. 11-mc-00409, DI 20, at 5 (D.D.C. filed Aug. 15, 2011), both Section 1782(a) discovery matters, they argued that certain findings by the Lago Agrio court should be given preclusive effect.

210

       DI 450 (SJ Def. Mem.), at 3.

211

       303 F.3d 470 (2d Cir. 2002).

to personal jurisdiction in Ecuador as to the Aguinda plaintiffs."[212]  But that was not a finding of fact (which the Court of Appeals does not make in any case) or a ruling of law.  Rather, it was a recapitulation of a document and representations that Texaco repeatedly had made on the record in the district court in that action.[213]

Next, they cite a statement by the Second Circuit in a footnote in *Republic of Ecuador v. Chevron Corp.*[214] to the effect that certain promises made by Texaco in the *Aguinda* case were enforceable against Chevron.[215]  As this Court previously held, however, that statement, right or wrong, was unnecessary to the result in *Republic of Ecuador*.[216]  In view of the settled principle that no finding or ruling may be given collateral estoppel effect unless it "was necessary to support a valid and final judgment on the merits,"[217] there is no colorable claim that the Circuit's footnote has

---

212

    *Id.* at 475.

213

    *See Aguinda*, 142 F. Supp. 2d at 539 ("Texaco has now unambiguously agreed in writing to being sued on these claims (or their Ecuadorian equivalents) in Ecuador, to accept service of process in Ecuador, and to waive for 60 days after the date of this dismissal any statute of limitations-based defenses that may have matured since the filing of the instant Complaints." (citing various documents and filings)).

214

    638 F.3d 384 (2d Cir. 2011).

215

    *Id.* at 389 n.4 ("We . . . conclude that the district court adopted Texaco's promise to satisfy any judgment issued by the Ecuadorian courts, subject to its rights under New York's Recognition of Foreign Country Money Judgments Act, in awarding Texaco the relief it sought in its motion to dismiss.  As a result, that promise, along with Texaco's more general promises to submit to Ecuadorian jurisdiction, is enforceable against Chevron in this action and any future proceedings between the parties, including enforcement actions, contempt proceedings, and attempts to confirm arbitral awards.").

216

    *Chevron Corp. v. Salazar*, 807 F. Supp. 2d 189, 196-99 (S.D.N.Y. 2011).

217

    *Grieve v. Tamerin*, 269 F.3d 149, 153 (2d Cir. 2001) (internal quotation marks and citations omitted).

any preclusive effect in this case.

Finally, the SJ Defendants refer to two district court decisions in Section 1782 proceedings, one of which sought discovery from a consultant who had given evidence used in Ecuador and the other from a former lawyer for the LAPs. They suggest that each decision rejected the fraud claims that Chevron makes in its complaint. But the suggestion rests on selective quotation from each case. These cases involved rulings on the crime-fraud exception to evidentiary privileges and do not bear on Chevron's claims of fraud in the procurement of the Judgment.[218]

In the last analysis, then, the rulings the SJ Defendants say they had in mind in pleading *res judicata* and collateral estoppel quite plainly could have no such effect here. That conclusion seriously undermines their last-minute contention that they never meant to invoke the Ecuadorian Judgment with respect to those defenses, as there was no other judgment upon which those defenses credibly could have been based.

Nor would it matter even if one or another of these rulings arguably might have some preclusive effect on the matters before this Court. For the fundamental point is simple: If the SJ Defendants' *res judicata*-collateral estoppel defense raised these rulings without even mentioning one of them, as the SJ Defendants now argue on this motion, then the SJ Defendants certainly raised the Ecuadorian Judgment even if their answers had not mentioned that decision either. The SJ Defendants are not permitted to plead a defense in the most general fashion and then later, upon

---

[218]    In *In re Application of Chevron*, 762 F. Supp. 2d 242 (D. Mass. 2010), the relevant holding of the court was that Chevron had "not made a *prima facie* showing that the [lawyer witness]'s assistance was sought . . . in furtherance of a crime or fraud." *Id.* at 254. Similarly, in *Chevron Corp. v. Allen*, No. 10 Misc. 91, DI 38 (D. Vt. Dec. 2, 2010), the court, in an *in camera* document review, found "no evidence of fraud, false pretenses or undue influence" in "correspondence and drafts between [the witness] and all firms or attorneys who had contact with him in connection with the creation of his expert report." *Id.* at 12-13. Even if either statement otherwise might satisfy the requirements of issue preclusion, neither ruling would bar Chevron's claims here, in whole or in part.

challenge by an adversary's dispositive motion, attempt selectively and retroactively to identify the bases for that defense to the exclusion of another plausibly – here, far more so than any alternative – encompassed by the pleaded defense.

### d.   The Finality Argument

The SJ Defendants argue in passing that "the Ecuadorian Judgment was not final or entitled to preclusive effect at the time the Defendants filed their answers in 2011"[219] so it could not have been encompassed by their defenses.  But finality for collateral estoppel and, in some respects, *res judicata* purposes does not have the meaning that the SJ Defendants implicitly ascribe to the term.

"As to the need for finality of decision," the Second Circuit has remarked, "collateral estoppel . . . 'does not require a judgment which ends the litigation . . . and leaves nothing for the court to do but execute the judgment.'"[220]  As Judge Friendly wrote, "to borrow Mr. Justice Brandeis' famous phrase, 'final' . . . is 'a word of many meanings[]'; the law of judgments does not use it in relation to conclusiveness . . . to mean only a judgment 'which ends the litigation . . . and leaves nothing for the court to do but execute the judgment.'"[221]  "Rather[,] the concept of finality for collateral estoppel purposes 'includes many dispositions which, though not final in that sense,

---

[219]

DI 450 (SJ Def. Mem.), at 2 n.4.

[220]

*Metromedia Co. v. Fugazy*, 983 F.2d 350, 366 (2d Cir. 1992) (second ellipsis in original) (quoting *Zdanok v. Glidden Co.*, *Durkee Famous Foods Div.*, 327 F.2d 944, 955 (2d Cir.), *cert. denied*, 377 U.S. 934 (1964)) (internal quotation marks omitted), *cert. denied*, 508 U.S. 952 (1993), *abrogated on other grounds by Gustafson v. Alloyd Co.*, 513 U.S. 561 (1994).

[221]

*Lummus v. Commonwealth Oil Refining Co.*, 297 F.2d 80, 89 (2d Cir. 1961) (citation omitted) (quoting *Sw.Bell Tel. Co. v. Pub. Serv. Comm'n*, 262 U.S. 276, 310 (1923)), *cert. denied*, 368 U.S. 986 (1962).

have nevertheless been fully litigated.'"[222]

Nor did the pendency of the appeal in Ecuador preclude the use of *res judicata* or collateral estoppel.  The better view, and that applied in New York and in the federal courts, "is that a judgment otherwise final remains so despite the taking of an appeal."[223]  This is so "even" – as particularly relevant here – if "a statute or rule of court  provides that the judgment cannot be executed upon or otherwise enforced during the period allowed for making such a motion and the further period until the motion if made is decided."[224]

* * *

In sum, the SJ Defendants' current position that they have not asserted, and did not intend to assert, any alleged preclusive effect of the Judgment in response to Chevron's amended complaint is (1) inconsistent with their pleadings, (2) inconsistent with their statement to the Court of Appeals in *Naranjo*, and (3) inconsistent with their statements to this Court as well as with other evidence.  It is a recently conceived argument intended to avoid meeting Chevron's motion on its

---

[222]

*Fugazy*, 983 F.2d at 366 (quoting *Zdanok*, 327 F.2d at 955); *accord* RESTATEMENT (SECOND) OF JUDGMENTS § 13 (1982).

[223]

RESTATEMENT (SECOND) OF JUDGMENTS § 13 cmt. f  ("The better view is that a judgment otherwise final remains so despite the taking of an appeal unless what is called an appeal actually consists of a trial de novo; finality is not affected by the fact that the taking of the appeal operates automatically as a stay or supersedeas of the judgment appealed from that prevents its execution or enforcement, or by the fact that the appellant has actually obtained a stay or supersedeas pending appeal."); *accord DiSorbo v. Hoy*, 343 F.3d 172, 183 (2d Cir. 2003) ("Under New York law, 'the mere pendency of an appeal does not prevent the use of the challenged judgment as the basis of collaterally estopping a party to that judgment in a second proceeding.'" (quoting *Amica Mut. Ins. Co. v. Jones*, 85 A.D.2d 727, 728, 445 N.Y.S.2d 820, 822 (2d Dep't 1981))); *Huron Holding Corp. v. Lincoln Mine Operating Co.*, 312 U.S. 183, 189 (1941) ("[I]n the federal courts the general rule has long been recognized that while appeal with proper supersedeas stays execution of the judgment, it does not – until and unless reversed – detract from its decisiveness and finality.").

[224]

RESTATEMENT (SECOND) OF JUDGMENTS § 13 cmt. f.

merits without moving to discontinue the defense without prejudice and risking an adverse ruling.

B.    *The Disclaimer of Intention to Seek Enforcement of the Judgment in New York Neither Moots the Defenses Nor Sufficed to Withdraw Them Without Prejudice*

The SJ Defendants' central argument in favor of the "moot[ness]"[225] of their *res judicata*-collateral estoppel defense with respect to the Ecuadorian Judgment is that the LAP Representatives stated that they would "never . . . seek recognition of the Ecuadorian Judgment in New York 'by any means or under any law.'"[226]  But that Representation does not moot the issue raised by Chevron's motion.  Moreover, it is nothing but a unilateral attempt to discontinue the defense without prejudice by means of an unauthorized amendment to their answers.

1.    *The Representation Would Be Ineffective Even on Its Own Terms*

Even if one were to put aside all of the foregoing problems, the Representation the LAP Representatives put forward as a last-minute tactical maneuver less than ten days before the Court of Appeals heard the preliminary injunction appeal would not bear the weight placed upon it[227] for two simple reasons.

---

[225]

DI 450 (SJ Def. Mem.), at 2.

[226]

*Id.* at 1 (quoting Representation, at 1).

[227]

Chevron points out that the SJ Defendants further "submitted a Lago Agrio court filing" in which "the LAPs stated that they would 'refrain from ever filing any action of any type' and 'will not attempt to enforce any Ruling in this legal action . . . in the State of New York.'" DI 461 (Chevron Reply Mem.), at 5 n.2 (quoting, in translation, *Chevron Corp. v. Salazar*, No. 11 Civ. 3718 (LAK), DI 296, Ex. B (S.D.N.Y. filed Sept. 7, 2011)).  The SJ Defendants refer only in passing to this Lago Agrio filing in their opposition to this motion.  *See* DI 450 (SJ Def. Mem.), at 4.  Even if the LAP Representatives had sought to rely upon the Lago Agrio filing independently of the Representation, they would have faced a host of difficulties in successfully relying upon it here, including (a) the fact that there is no reason

60

First, the Donziger Defendants are not parties to the Representation and are not bound by the actions of the LAP Representatives. The Donziger Defendants' *res judicata*-collateral estoppel defense therefore cannot be affected by the LAP Representatives' Representation in any event.

Second, as has been demonstrated, the LAP Representatives' unilateral declaration does not even bind the LAP Representatives themselves. It therefore cannot reasonably be given any effect in this case.

> a.     *The Donziger Defendants Are Not Foreclosed from Asserting the Judgment as Res Judicata or Collateral Estoppel on the Theory that They Are Not Judgment Creditors and Hold No Rule 24 "Interest" in the Judgment*

Because the Donziger Defendants are not parties to the Representation, they have constructed an additional argument that seeks to have the same effect. In order to understand the Donziger Defendants' argument as to this specific point, it is necessary to have a bit of background.

When the Court severed the count that sought a declaratory judgment against the LAPs and ordered it to trial, Donziger moved to intervene, arguing in part that his contingent fee arrangement was an "interest" in the Judgment within Rule 24(a) and that he therefore was entitled to intervene as of right.[228] The Court held against him on that point.[229] Donziger now argues that

---

to believe that the Lago Agrio filing would be enforceable either as a legal or practical matter, and (b) a possible bar under Ecuadorian law. *See* DI 461 (Chevron Reply Mem.), at 5 n.2; Champion Decl. [DI 462] ¶¶ 35-36 & Exs. 2393-94 (provisions of Ecuadorian Code of Civil Procedure).

[228]

*See* DI 292 (Apr. 29, 2011 order to show cause).

[229]

*See Chevron Corp. v. Donziger*, No. 11 Civ. 691 (LAK), 2011 WL 2150450, at *5-8 (S.D.N.Y. May 31, 2011). It granted limited intervention as a matter of discretion. *Id.*

the Court's holding that he lacks an "interest" in the Judgment within the meaning of Rule 24(a)[230] "deprive[s] the Donziger Defendants of an interest on the basis of which they could seek recognition of the Ecuadorian Judgment," independent of the LAPs and the LAP Representatives.[231] He is mistaken.

To begin with, non-mutual collateral estoppel is a firmly established legal doctrine.[232] Where all other requirements are satisfied, a party may be "barred from relitigating an issue decided in a prior proceeding, [even] where the parties were not the same in the prior proceeding."[233] Thus, despite the fact that the Donziger Defendants were not parties to the Lago Agrio Litigation, Chevron

---

[230]

    *See id.* at *5 (holding that Donziger's "financial interest in the outcome is not the type of interest contemplated by Rule 24(a)(2)").

[231]

    DI 450 (SJ Def. Mem.), at 4.

[232]

    In *United States v. Mendoza*, 464 U.S. 154 (1984), the Supreme Court explained that "[u]nder the judicially-developed doctrine of collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision is conclusive in a subsequent suit based on a different cause of action involving a party to the prior litigation." *Id.* at 158. "In furtherance of the[] policies" behind the common-law application of collateral estoppel, the Supreme Court "broadened the scope of the doctrine of collateral estoppel beyond its common law limits . . . by abandoning the requirement of mutuality of parties, and by conditionally approving the 'offensive' use of collateral estoppel by a non-party to a prior lawsuit." *Id.* at 158-59.

[233]

    *United States v. Ustica*, 847 F.2d 42, 49 n.14 (2d Cir. 1988); *accord Faulkner v. Nat'l Geographic Enters. Inc.*, 409 F.3d 26, 37 (2d Cir.) ("Under the doctrine of offensive collateral estoppel, a plaintiff may preclude a defendant from relitigating an issue the defendant has previously litigated and lost to another plaintiff. In order for a plaintiff to bar a defendant from litigating an issue on collateral estoppel grounds: (1) the issues in both proceedings must be identical, (2) the issue in the prior proceeding must have been actually litigated and actually decided, (3) there must have been a full and fair opportunity for litigation in the prior proceeding, and (4) the issue previously litigated must have been necessary to support a valid and final judgment on the merits." (citations and internal quotation marks omitted)), *cert. denied*, 546 U.S. 1076 (2005); *May Ship Repair Contracting Corp. v. Barge Columbia N.Y.*, 160 F. Supp. 2d 594, 599 (S.D.N.Y. 2001) ("Under the doctrine of non-mutual offensive collateral estoppel, a plaintiff can foreclose the defendant from litigating an issue which the defendant has previously litigated unsuccessfully in another action with another party.").

62

theoretically might be barred here from relitigating against the Donziger Defendants issues decided against Chevron in Ecuador, assuming of course that all of the other requirements for issue preclusion were met.  And that determination[234] would have nothing to do with the question whether Donziger's contingent fee arrangement was an "interest" in the Judgment within the meaning of FED. R. CIV. P. 24(a).

Nor is there any reason to conclude that the LAP Representatives' Representation would foreclose the Donziger Defendants from contending, in an effort to make out their own *res judicata*-collateral estoppel defense, that the Judgment is recognizable and enforceable, even if it would foreclose the LAP Representatives themselves.  The Recognition Act, which reflects New York's adoption of the Uniform Foreign-Money Judgments Recognition Act (the "Uniform Act") in force in a majority of states, explicitly contemplates the recognition and enforcement of a foreign judgment in the context of an affirmative defense,[235] including claim or issue preclusion.  The Donziger Defendants have asserted such an affirmative defense, yet they have made no Representation comparable to that of the LAP Representatives and have done nothing else to forgo the benefit of that defense until their argument on this motion.[236]

In short, whatever the effect of the Representation on the positions of the LAP Representatives, it has no bearing on the former adjudication defenses pleaded by the Donziger Defendants.

---

234

    *See Faulkner*, 409 F.3d at 37.

235

    *See* N.Y. CPLR § 5303.

236

    The Court considers below the effect of the Representation on the LAP Representatives' position.

> b.     *The Representation Does Not Even Bind the LAP Representatives*

Finally, it is important to recognize the Representation for what it is – a unilateral declaration by two litigants of their then-present intention not to seek recognition or enforcement of the Judgment in any court located in the State of New York.[237] But intentions change.  And even if the document were construed as a purported unequivocal commitment, unaffected by the preambulatory words about then-present "intent," the LAP Representatives could not be prevented from turning around tomorrow and seeking recognition and enforcement in a court in this State. After all, the Representation is not a bilateral contract, enforceable by Chevron or any other contracting party.  It is merely a unilateral statement without agreement from an adversary or the binding imprimatur of a court. The only conceivable basis upon which it might be asserted that the document is binding would be the doctrine of judicial estoppel, but the requirements of that doctrine do not apply here.

Judicial estoppel arises where (1) "a party's later position is clearly inconsistent with its earlier position"; (2) "the party's former position has been adopted in some way by the court in the earlier proceeding"; and (3) "the party asserting the two positions would derive an unfair advantage against the party seeking estoppel."[238]  The same is true under New York law.[239]

---

[237]

   *See* Representation, at 1 (Defendants Naranjo and Piayaguaje "do not intend and specifically disclaim any intent to enforce . . . the Lago Agrio Judgment in the State of New York.").

[238]

   *DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010); *accord Madeira v. United Talmudical Acad. of Kiryas Joel*, 351 F. Supp. 2d 162, 164 (S.D.N.Y. 2004) ("What is necessary to apply a judicial estoppel is that (1) the party against whom estoppel is sought has pursued an inconsistent factual position in an earlier proceeding, and (2) this prior inconsistent position was somehow adopted by the first court.").

[239]

   *See, e.g.*, *Prudential Home Mortg. Co. v. Neildan Constr. Corp.*, 209 A.D.2d 394, 395, 618 N.Y.S.2d 108, 110 (2d Dep't 1994); *Kimco of N.Y., Inc. v. Devon*, 163 A.D.2d 573, 575,

The Representation upon which the LAP Representatives rely cannot satisfy that standard.  Even assuming that a later attempt by the LAP Representatives to obtain recognition or enforcement of the Judgment in a court in New York would be "clearly inconsistent" with the Representation, the Representation has not gained "adopt[ion] . . . by the court."[240]  Such adoption is indispensable because "judicial acceptance of an inconsistent position in a later proceeding would create the perception that the first or second court was misled . . . [while] a party's later inconsistent position [alone] introduces no risk of inconsistent court determinations . . . and thus poses little threat to judicial integrity."[241]  Likewise, detrimental reliance on the statements or actions of the party against whom it is invoked is an essential element, and no such detrimental reliance has been demonstrated here.[242]  The LAP Representatives' Representation is without legal effect.

### 2.   *The Representation Did Not Moot the Defenses*

The SJ Defendants maintain that the Ecuadorian Judgment is entitled to recognition and enforcement, which they acknowledge is a prerequisite to its use for purposes of their pleaded defenses of *res judicata* and collateral estoppel.  Indeed, they purport to have reserved the right to

---

558 N.Y.S.2d 630, 632 (2d Dep't 1990) ("The doctrine [of judicial estoppel] is invoked to estop parties from adopting such contrary positions because the judicial system cannot tolerate this playing fast and loose with the courts." (internal quotation marks omitted)).

[240]

*DeRosa*, 595 F.3d at 103.

[241]

*New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (internal quotation marks and citations omitted); *accord In re Adelphia Recovery Trust*, 634 F.3d 678, 696 (2d Cir. 2011) ("[J]udicial estoppel may only apply where the earlier tribunal accepted the accuracy of the litigant's statements.").

[242]

*See, e.g.*, *Lee v. Burkhart*, 991 F.2d 1004, 1009 (2d Cir. 1993) (equitable estoppel); *Aramony v. United Way Replacement Benefit Plan*, 191 F.3d 140, 151 (2d Cir. 1999) (promissory estoppel).

claim that the Judgment is entitled to recognition and enforcement under New York law.[243]

Chevron just as stoutly maintains that the Judgment is not entitled to recognition or enforcement, whether under New York or other law, and that it therefore may not be given any preclusive effect. The controversy has not lost even the tiniest bit of life.  In fact, the Second Circuit made clear in *Naranjo* – despite the LAP Representatives' contention that the Representation had eliminated any case or controversy as to the recognizability or enforceability of the judgment[244] – that Chevron's substantive objections to the Judgment and the actions of their adversaries in procuring it "may be addressed as relevant in other litigation before the district court or elsewhere."[245]  All the LAP Representatives even purport to have done is to give up one possible venue – New York – in which they might pursue affirmative relief on the basis of their position.  Even assuming *arguendo* that they effectively had given up New York as a venue for affirmative relief, a matter discussed below, the Representation would moot nothing.

> "[A] case is moot when the issues presented are no longer 'live' or the parties lack

---

[243]

The Representation states that they reserve "their right to seek enforcement of the judgment in any jurisdiction other than New York under any applicable law," Representation at 1, which of course includes the law of New York.

[244]

Smyser Decl. [DI 445] ¶ 15 & Ex. N (Second Circuit oral argument transcript), at 25-26 ("Mr. Tyrell:  [M]y clients put in a declaration that they will never seek to enforce this judgment in New York . . . .  There's no case or controversy here."); *id.* at 38-39 ("Mr. Keker: . . .  The silver bullet is that there is no subject matter jurisdiction because there's not an actual controversy before the court . . . .").

[245]

*Naranjo*, 667 F.3d at 247.

Had the Second Circuit thought that the Representation had mooted the controversy as to the recognizability and enforceability of the Judgment, it would have been obliged to dismiss the Count 9 Action for want of subject matter jurisdiction.  Implicit in its ruling, therefore, is a rejection of the position now taken by the SJ Defendants.

a legally cognizable interest in the outcome."[246]  And while the "liveness" of a controversy present at the outset "may abate," such abatement occurs only when (1) "there is no reasonable expectation" that the dispute will flair again, and (2) "events have completely and irrevocably eradicated" the controversy.[247]

Here, the issues whether the Judgment is recognizable or enforceable, including under New York law, and, in addition, whether it is entitled to claim or issue preclusive effect, retain undiminished vitality.   There is therefore no colorable mootness argument based on the Representation.


### 3.   The Representation Was an Ineffective Unilateral Amendment to the SJ Defendants' Answers

The present use of the Representation in any case is nothing more than an attempted unilateral amendment of the answers.  Indeed, the SJ Defendants admitted precisely this when they wrote in April 2012 that if the language in the answers "was sufficient to invoke the affirmative defense . . . with respect to the" Judgment, "Defendants effectively withdrew that specific defense in this case" by means of the Representation.[248]

Rule 15(a) of the Federal Rules of Civil Procedure provides in relevant part that "[a]

---

[246]

    *Powell v. McCormack*, 395 U.S. 486, 496 (1969); *Alexander v. Yale Univ.*, 631 F.2d 178, 183 (2d Cir. 1980) ("A party's case or controversy becomes moot . . . when it becomes impossible for the courts, through the exercise of their remedial powers, to do anything to redress the injury.").

[247]

    *See L.A. Cnty. v. Davis*, 440 U.S. 625, 631 (1979); *accord Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.*, 191 F.3d 198, 202 (2d Cir. 1999), *cert. denied*, 531 U.S. 1069 (2001).

[248]

    *See* DI 464 (Apr. 4, 2012 letter), at 2.

party may amend its [answer] once as a matter of course within . . . 21 days after serving it."[249] Where that time period has elapsed, amendments may be made only if the opposing party consents or the Court grants leave.[250]  Moreover, as the SJ Defendants tacitly have conceded in the past, a purported amended pleading improperly served or filed without leave of court or consent of the adversary is improper and should be stricken.[251]  Accordingly, the SJ Defendants' attempt to drop the defenses – without prejudice and solely in this venue – had no legal effect in this action.

To be sure, there would not be much point in reaching such a conclusion if leave to amend would have been granted had the SJ Defendants merely sought it.  But this is not such a case.

Count 9 of the amended complaint in this case, filed on April 20, 2011, sought among other things a declaration that the Judgment is not entitled to recognition or enforcement outside Ecuador.[252]  The Court ordered a separate trial on that count and directed expedited proceedings in accordance with FED. R. CIV. P. 57.[253]  After consultation with the parties, a scheduling order was

---

[249]

FED. R. CIV. P. 15(a)(1)(A).

[250]

*Id.* 15(a)(1)(B).

[251]

*Chevron Corp. v. Salazar*, Nos. 11 Civ. 3718 & 11 Civ. 691 (LAK), 2011 WL 3628843, at *2-3 (S.D.N.Y. Aug. 17, 2011); *accord Murray v. Archambo*, 132 F.3d 609, 612 (10th Cir. 1998) ("Generally speaking, an amendment that has been filed or served without leave of court or consent of the defendants is without legal effect."); *Hoover v. Blue Cross & Blue Shield*, 885 F.2d 1538, 1544 (11th Cir. 1988) (same); *Ritzer v. Gerovicap Pharm. Corp.*, 162 F.R.D. 642, 644 (D. Nev. 1995) (same); *In re Crazy Eddie Sec. Litig.*, 792 F. Supp. 197, 204 (E.D.N.Y. 1992) (same).

[252]

*See* Cpt., at 147.

[253]

*See* DI 328 (May 31, 2011 order severing Count 9).

68

entered that required the completion of all discovery by September 15, 2011,[254] and the Court set a trial date of November 14, 2011.[255]  The Representation upon which the LAP Representatives mistakenly rely as having taken the issue of recognizability and enforceability out of the case was not even filed until September 7, 2011, just days before the scheduled close of discovery.[256]  At that point, the question whether the Judgment is entitled to recognition or enforcement already had been litigated virtually to the point of trial readiness.

It of course is well settled that leave to amend "shall be freely given when justice so requires."[257]  But the matter is committed to the discretion of the district court.[258]  Moreover, "undue delay, bad faith . . . , [and] undue prejudice to the opposing party" all are appropriate reasons for denying leave.[259]  All of these factors are present here.

---

[254]

*See* DI 279 (Apr. 15, 2011 scheduling order).  That date later was extended, insofar as it pertained to expert witness discovery, until September 29, 2011.  *Chevron Corp. v. Salazar*, No. 11 Civ. 3718 (LAK), DI 187 (S.D.N.Y. Aug. 8, 2011), at 5.

[255]

DI 279 (Apr. 15, 2011 scheduling order).

[256]

Representation, at 1.

[257]

FED. R. CIV. P. 15(a).

*See Foman v. Davis*, 371 U.S. 178, 182 (1962).  In the Second Circuit, "[r]easons for a proper denial of leave to amend include undue delay, bad faith, futility of the amendment, and perhaps most important, the resulting prejudice to the opposing party."  *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981); *see McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) ("Although Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend 'shall be freely given when justice so requires,' it is within the sound discretion of the district court to grant or deny leave to amend.").

[258]

*McCarthy*, 482 F.3d at 200.

[259]

*Williams v. Citigroup Inc.*, 659 F.3d 208, 214 (2d Cir. 2011).

First and foremost, allowing the SJ Defendants to take the issue of recognizability and enforceability off the table in this case while preserving it in every other court in this and other nations would be to acquiesce in a blatant exercise in forum shopping. This is particularly so because it is abundantly obvious that the effort has been made for the sole purposes of (a) avoiding what the SJ Defendants evidently fear would be an adverse result, and (b) shifting the issue to other *fora* more to their liking.

Second, the SJ Defendants easily could have attempted precisely the same tactic months earlier than they did. Had such an attempt been successful, the SJ Defendants would have saved themselves, their adversary, and the courts the enormous resources expended litigating precisely the issue they now seek to take to other *fora*. They have offered no excuse for their failure to have put forward the Representation until such a late hour.

Moreover, the analogy to Rule 41 of the Federal Rules is especially persuasive. That rule permits a plaintiff, once issue is joined or a motion for summary judgment filed, to discontinue an action without prejudice only with the adversary's consent or leave of the court.[260] Its purposes include preventing a plaintiff from subjecting a defendant to the cost and expense of litigation and then, if the plaintiff fears an unwanted result in the court in which the action is pending, stealing away only to refile elsewhere.[261]

---

[260]

See FED. R. CIV. P. 41(a)(1).

[261]

See *Harvey Aluminum, Inc. v. Am. Cyanamid Co.*, 203 F.2d 105, 107 (2d Cir. 1953) (Hand, J.) (noting that the "essential purpose" of Rule 41 is to "prevent[] arbitrary dismissals after an advanced stage of a suit has been reached"); *Ramirez v. iBasis, Inc.*, No. 08 Civ. 5125, 2010 WL 1223589, at *3 (E.D.N.Y. Mar. 24, 2010) ("Rule 41(d) is intended to serve as a deterrent to forum-shopping and vexatious litigation." (internal quotation marks omitted)); *Phillips v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 05 Civ. 1959, 2006 WL 6589918, at *6 (D. Conn. July 26, 2006) ("The forum-shopping that Rule 41(d) is intended to guard against occurs when a plaintiff voluntarily dismisses the initial suit and refiles the same action in another court, forcing the defendant to incur further costs, because the

While Rule 41 by its terms applies only to the voluntary dismissal of actions, its logic applies here.[262]  The policies that animate it likewise support denial of what amounts to the withdrawal of a defense without prejudice in an effort to avoid the possibility of an adverse result while preserving that defense for use in a forum more to the defendants' liking.

Accordingly, even if the Court were to treat the Representation – which the SJ Defendants themselves characterize as an attempt withdraw this defense, but only in this case – as a motion for leave to amend, that motion would be denied.

### C.   *Nothing in Naranjo Forecloses Consideration of the Defenses*

Finally, the SJ Defendants argue also that were this Court to "[a]ddress the merits of Chevron's summary judgment motion, when Defendants have not sought, are not seeking, and will not seek recognition of the Ecuadorian Judgment in New York," it "would result in the speculative determination that the Second Circuit condemned in its . . . opinion" in *Naranjo*, "constitut[ing] a request for an improper advisory opinion" that would be reversible error.[263]  They are mistaken.

The SJ Defendants interposed the affirmative defense based on the Judgment and, moreover, asserted that the defense depends upon the Judgment's recognizability and enforceability. Yet *Naranjo* specifically acknowledged that the questions of recognizability and enforceability

---

plaintiff believes he may capture more favorable law in the second venue than the first.").

[262]

In *Quad Envtl. Techs. Corp. v. Union Sanitary Dist.*, No. C-88-1806, 1990 U.S. Dist. LEXIS 18685 (N.D. Cal. Feb. 21, 1990), the court, by analogy to Rule 41, rejected the defendants' attempt to withdraw affirmative defenses in the face of a motion for summary judgment and granted summary judgment dismissing them.

[263]

DI 450 (SJ Def. Mem.), at 9.

under the Recognition Act are properly raised in the context of an affirmative defense.[264]  Moreover, the *Naranjo* court noted that those questions could "be addressed as relevant in other litigation before the district court or elsewhere."[265]  They now are relevant by virtue of the SJ Defendants' actions; they decidedly are not subjects of an advisory opinion on matters not before the Court.

## III.     *The Enforceability and Recognizability of the Judgment*

        The parties agree that New York law "require[s]" the SJ Defendants "to show that the Judgment is entitled to recognition under the New York Recognition Act in order to invoke res judicata or collateral estoppel."[266]  The first step in determining the motion for partial summary judgment dismissing the *res judicata*-collateral estoppel defense therefore is to consider whether Chevron is entitled to summary judgment holding that the Ecuadorian Judgment is not recognizable or enforceable under the Recognition Act.[267]

---

[264]

      667 F.3d at 241.

[265]

      *Id.* at 246 n.17.

[266]

      DI 450 (SJ Def. Mem.), at 1; *accord* DI 397 (Chevron Mem.), at 4 ("Defendants' res judicata and collateral estoppel defenses require as a necessary precondition, and thereby put at issue, the recognizability of the Ecuadorian judgment."); DI 461 (Chevron Reply Mem.), at 10 ("Defendants would have to prove . . . that the Ecuadorian judgment is entitled to recognition" in order "[t]o establish a res judicata or collateral estoppel defense here"); *see also* sources cited *supra* note 130.

[267]

      The parties in this case all assume in their respective papers that New York law governs the determination of whether the Judgment is recognizable or enforceable.  This Court applied New York law in *Donziger I*, for reasons it elaborated upon at greater length in that opinion. *See Donziger I*, 768 F. Supp. 2d at 630 & n.278. To the extent, however, that there is any question of whether federal law should be used to determine whether the Judgment here would be enforceable, the standard under federal law is substantially the same as it is under New York law.  *See Hilton v. Guyot*, 159 U.S. 113, 202-03 (1895); *Nelson v. George*, 399 U.S. 224, 229 (1970) ("[T]he Full Faith and Credit Clause does not require that sister States enforce a foreign penal judgment.").  The Court therefore applies New York law in

A.    *Burdens of Proof With Respect to Recognizability and Enforceability of the Judgment*

A preliminary word with respect to burdens of proof is in order.

The Recognition Act, Article 53 of the CPLR, reflects New York's enactment of the Uniform Act, which sets forth a number of mandatory and discretionary basis for non-recognition of foreign country money judgments that fall within its ambit.[268]  Although the matter is not entirely settled, it appears that the proponent of recognition of a foreign money judgment probably bears the burden of establishing that no mandatory basis for non-recognition exists while its adversary bears the burden of proof as to the existence of discretionary basis for non-recognition such as fraud or contravention of the public policy of the forum.[269]  Thus, in order to prevail on the precondition to the availability of its *res judicata*-collateral estoppel defense – in other words, on the question of the recognizability and enforceability of the Judgment – the SJ Defendants would bear the burden of proof with respect to mandatory grounds for non-recognition.  On the other hand, Chevron would bear the burden of proof as to other grounds for non-recognition and non-enforceability.  That said,

---

discussing whether the Judgment is recognizable and enforceable for present purposes.  The result would be the same if federal law applied, however.

[268]

N.Y. CPLR §§ 5304-05.

[269]

*See, e.g., Naranjo*, 667 F.3d at 241 n.15 ("burden may be on . . . would-be judgment-creditors to establish that . . . judgment was *not* the [*sic*] procured from . . . inadequate judicial system"); *Ackermann*, 788 F.2d at 842 n.12 (proponent of judgment bears burden of proving certain essentials including adequacy of legal system in which judgment rendering while adversary "may then raise, e.g., fraud and public policy"); *Flame S.A. v. Indus. Carriers, Inc.*, 777 F. Supp. 2d 717, 719 (S.D.N.Y. 2011) (proponent of judgment has burden of making at least "*prima facie* showing that . . . mandatory bases for non-recognition" are absent) (citing *Wimmer Can., Inc. v. Abele Tractor & Equip. Co.*, 299 A.D.2d 47, 49, 750 N.Y.S.2d 331 (3d Dep't 2002)); *see also S.C. Chimexim S.A. v. Velco Enters. Ltd.*, 36 F. Supp. 2d 206, 212 (S.D.N.Y. 1999) (appears that proponent has burden of proving lack of mandatory basis for non-recognition, but opponent of recognition has burden of proof as to discretionary bases).

the burdens of proof have little bearing here save in one respect.

Chevron invokes one mandatory ground of non-recognizability in support of this motion – lack of personal jurisdiction.[270]  As will appear, it is not entitled to summary judgment dismissing the *res judicata*-collateral estoppel defense on that ground regardless of which side bears the burden of proof.

Its second argument – that the Judgment is not entitled to recognition and enforcement because it is penal in character – is based on undisputed and indisputable facts.  The Judgment granted the relief it granted and stated the reasons the court gave for doing so.  That relief and those reasons either make the judgment penal as a matter of law or they do not.

Chevron's final argument on this motion – that the Judgment was procured by fraud – does seriously implicate the burden of proof question.  Chevron argues that the SJ Defendants have offered no evidence in response to Chevron's specific evidence of fraud, that they therefore have failed to raise a genuine issue of fact as to any of them, and that Chevron consequently is entitled to summary judgment dismissing the *res judicata*-collateral estoppel defense on the ground that the Judgment is not recognizable or enforceable.  And it quite likely would be correct if the SJ Defendants bore the burden of proving that the Judgment was not procured by fraud.[271]  But this

---

[270]

> While Chevron maintains also that the Judgment is not entitled to recognition and enforcement because it was rendered in a judicial system that does not provide impartial tribunals or procedures compatible with due process, *see* CPLR § 5304(a)(1), it has not advanced that contention on the present motion.

[271]

> As noted, if the SJ Defendants bore the burden of proof on that issue, it would be sufficient for Chevron to assert that they could not sustain their burden, in which case it would be entitled to summary judgment unless the SJ Defendants came forward with admissible evidence sufficient to raise a genuine issue of material fact as to whether the Judgment was *not* tainted by fraud. *Celotex Corp.*, 477 U.S. at 322-23 (holding that where a non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case," summary judgment may be entered against it on that issue); Fed. R. Civ. P. 56(c)(1)(B).

74

Court holds, consistent with virtually every other court to express a view on the issue,[272] that a party resisting enforcement of a foreign judgment on the ground of fraud in its procurement bears the burden of proving the alleged fraud.

### B.    Lack of Personal Jurisdiction

Chevron argues that the Judgment may not be recognized or enforced because Ecuador lacked jurisdiction over its person.  But CPLR Section 5305 provides in relevant part that a "foreign country judgment shall *not* be refused recognition for lack of personal jurisdiction if . . . the defendant voluntarily appeared in the proceedings, other than for the purpose of . . . contesting the jurisdiction of the court over him"[273] – in other words, if the defendant exceeded the limits of "what New York used to call and some places still call a 'special appearance.'"[274]  So, for example, a defendant who did not appear at trial in Romania but appealed the default judgment entered against it on at least one ground that went to the merits was held to have lost the ability to contest the recognizabilty of the judgment for lack of personal jursidiction.[275]

---

[272]

        *E.g.*, *S.W. Livestock & Trucking Co. v. Ramon*, 169 F.3d 317, 320 (5th Cir. 1999); *Banque Libanaise Pour Le Commerce v. Kreich*, 915 F.2d 1000, 1005 (5th Cir. 1990); *Osorio v. Dole Food Co.*, 665 F. Supp. 2d 1307, 1324 (S.D. Fla. 2009) (stating that party seeking enforcement "has the initial burden of proof that the judgment is final, conclusive, and enforceable where rendered" but that the burden then shifts to the resisting party to show why judgment should not be enforced); *Kramer v. von Mitschke-Collande*, 5 So. 3d 689, 690 (Fla. App. 3d Dist. 2008) (same); *Kam-Tech Systs. Ltd. v. Yardeni*, 340 N.J. Super. 414, 42324, 774 A.2d 644, 649-50 (App. Div. 2001); *Dart v. Balaam*, 953 S.W.2d 478, 480 (Tex. App. 1997).

[273]

        CPLR § 5305(a)(2) (emphasis added).

[274]

        David D. Siegel, *Practice Commentaries* § C5225:5 (McKinney 1997) (emphasis added).

[275]

        *S.C. Chimexim S.A.*, 36 F. Supp. 2d at 215.

Chevron's own evidence shows that Chevron did far more before the Lago Agrio court than contest personal jurisdiction.[276]  While it "maintained its position that the Ecuadorian courts lacked jurisdiction over it as the trial proceeded, and reiterated its objection in its final alegato,"[277] it argued in its final *alegato* the merits of the case[278] and appears also to have filed various motions and objections to evidence in the case,[279] moved for clarification and amplification after the Judgment was entered,[280] sought to have the Judgment reversed or nullified on various grounds,[281] and sought further clarification after the appellate court issued its ruling on both parties' appeals.[282]

Chevron thus has failed to show that it is entitled to judgment as a matter of law foreclosing recognition or enforcement of the Judgment on the ground that the Ecuadorian court lacked jurisdiction over its person.

---

[276]

Champion Decl. [DI 401] ¶ 204 & Ex. 2200 (Chevron's Final Alegato), at i (table of contents showing that Chevron argued, *inter alia*, that "The Plaintiffs Have No Viable Claim" and that "The Plaintiffs Have Not Proven Essential Factual Elements of Their Claim").

[277]

Pl. 56.1 St. [DI 398] ¶ 244.

[278]

Champion Decl. [DI 401] ¶ 204 & Ex. 2200 (Chevron's Final Alegato), at i.

[279]

*See, e.g.*, DI 168 (Lago Agrio Judgment), at 57; Pl. 56.1 St. [DI 398] ¶ 183.

[280]

*See* DI 186 (Mar. 4, 2011 Lago Agrio court clarification decision).

[281]

DI 417, Ex. A (Jan. 3, 2012 Ecuadorian appellate court decision), at 2.

[282]

*See id.*, Ex. B (Jan. 13, 2012 Ecuadorian appellate court clarification decision).

C.      *Penal Character of the Judgment*

Chevron argues that the Judgment is penal in character and therefore not appropriately recognized or enforced in this country.  It cites, appropriately, *The Antelope*,[283] in which Chief Justice John Marshall famously wrote that "the courts of no country execute the penal laws of another,"[284] a proposition that remains a fundamental principle of American law.[285]  But Chief Justice Marshall did not define his word "penal," and nearly two centuries have passed during which courts and scholars have grappled with its meaning with varying degrees of clarity and consistency.

There are reasons to believe that at least part of the Judgment may be penal in the relevant sense.  But Chevron is entitled to summary judgment determining that the Judgment, or part of it that bears on the *res judicata*-collateral estoppel defense, is not entitled to recognition or enforcement only by showing that the Judgment is penal in whole or in material part as a matter of law.  Its submission on this important and, in at least some respects, difficult issue of law, however, is limited to two paragraphs.  Chevron's submission on this point is so cursory as to fail to persuade.  Accordingly, so much of the motion as rests on the alleged penal character of the Judgment will be denied although the issue remains in the case.

---

[283]

23 U.S. (10 Wheat.) 66 (1825).

[284]

*Id.* at 123.

[285]

*See, e.g.*, *Pasquantino v. United States*, 544 U.S. 349, 361 (2005); *Banco Frances e Brasileiro S.A. v. Doe*, 36 N.Y.2d 592, 596 (1975); *Loucks v. Std. Oil Co. v. N.Y.*, 224 N.Y. 99, 102 (1918) (Cardozo, J.).

D.      Fraud

The Court begins the discussion of the merits of Chevron's fraud arguments by considering the legal standards governing fraud as a basis for denial of recognition or enforcement of a foreign judgment.

1.      The Extrinsic-Intrinsic Fraud Distinction

a.      United States v. Throckmorton

In *United States v. Throckmorton*,[286] the United States sought to set aside a twenty-year-old decree of a federal district court, which had confirmed a determination by a board of land claim commissioners.  The government contended that the confirmation decree should be vacated on the ground that the original petitioner had submitted fraudulent, falsified documents to the board, the award of which had been confirmed by the district court.[287]

The *Throckmorton* Court sustained the dismissal of the government's petition on the ground of legal insufficiency.  It held that a bill in equity collaterally attacking a prior judgment was insufficient unless it alleged that the prior judgment had been procured by fraud that was "extrinsic or collateral[ ] to the matter tried by the first court, and not . . . fraud in the matter on which the decree was rendered."[288]  The Court defined extrinsic fraud to include situations in which:

> "by reason of something done by the successful party to a suit, there was in fact no adversary trial or decision of the issue in the case. Where the unsuccessful party has been prevented from exhibiting fully his case, by fraud or deception practised on him by his opponent, as by keeping him away from court, a false promise of a

---

[286]   98 U.S. 61 (1878).

[287]   *Id.* at 62.

[288]   *Id.* at 68.

compromise; or where the defendant never had knowledge of the suit, being kept in ignorance by the acts of the plaintiff; or where an attorney fraudulently or without authority assumes to represent a party and connives at his defeat; or where the attorney regularly employed corruptly sells out his client's interest to the other side."[289]

Traditional examples of extrinsic fraud include "[k]eeping the unsuccessful party away from the court by a false promise of a compromise, or purposely keeping him in ignorance of the suit; or, where an attorney fraudulently pretends to represent a party, and connives at his defeat or, being regularly employed, corruptly sells out his client's interest."[290]  It includes also instances in which a judgment is obtained by coercion or duress.[291]

*Throckmorton* thus contrasted extrinsic fraud – where "there has never been a real contest in the trial or hearing of the case"[292] – with intrinsic fraud, which "pertains to the issues involved in the original action" and usually is accomplished through perjury, submitting forged or altered documents into evidence,[293] or concealing or suppressing material evidence.[294]

---

[289]

    *Id.* at 65-66.

[290]

    *Kimes v. Stone*, 84 F.3d 1121, 1127 n.3 (9th Cir. 1996) (citations and quotations omitted).

[291]

    *See Bailey v. IRS*, 188 F.R.D. 346, 354 (D. Ariz. 1999); *see also Griffith v. Bank of N.Y.*, 147 F.2d 899, 903 (2d Cir. 1945) ("It seems fairly clear, therefore, that New York does allow collateral attack on a judgment for extrinsic fraud or duress . . . .").

[292]

    *Throckmorton*, 98 U.S. at 66.

[293]

    *Id.*; *see also Bailey*, 188 F.R.D. at 354 (stating that intrinsic fraud "pertains to the issues involved in the original action and is most often accomplished through perjury or the submission of forged or altered documents into evidence").

[294]

    *See, e.g.*, *Kachig v. Boothe*, 99 Cal. Rptr. 393, 22 Cal. App. 3d 626, 634 (Ct. App. 1971).

79

### b.    The Questionable Vitality of Throckmorton

*Throckmorton*'s extrinsic-intrinsic distinction has been the subject of much criticism.[295]  Indeed, it arguably has been overruled and, in any case, at least undermined by the Supreme Court's subsequent decisions in *Marshall v. Holmes*[296] and *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*[297]

The plaintiff in *Marshall* alleged that twenty-four state court judgments had been entered against her on the basis of a forged letter and obtained a preliminary injunction restraining their enforcement.  The case later was removed to federal court, then remanded to the state court, and there tried to a judgment for the defendant.  The case ultimately reached the Supreme Court, where the defendant argued for affirmance on the bases that (1) the remand had been appropriate and, in any case, (2) federal court review of the underlying state court judgments would be impermissible.[298]

The Supreme Court held that the removal had been proper and the remand erroneous. Moreover, it held that the plaintiff's collateral attack on the state court judgments was legally sufficient despite the fact that it rested on intrinsic fraud – the use of the forged letter.  In doing so, it made clear that:

---

[295]
See, e.g., *Shammas v. Shammas*, 9 N.J. 321, 329 (1952) ("Whether the *Throckmorton* principle is still controlling law in the federal courts is not clear.  It has been suggested that the case may have been overruled by the subsequent decision in *Marshall v. Holmes* . . . ." (citations omitted)); James Wm. Moore & Elizabeth B. A. Rogers, *Federal Relief from Civil Judgments*, 55 YALE L.J. 623, 658 (1946) ("Furthermore at times it is a journey into futility to attempt a distinction between extrinsic and intrinsic matter.").

[296]
141 U.S. 589 (1891).

[297]
322 U.S. 238 (1944).

[298]
*Marshall*, 141 U.S. at 593-94 (argument for defendants in error).

> "any fact which clearly proves it to be against conscience to execute a judgment, and of which the injured party could not have availed himself in a court of law, or of which he might have availed himself at law, but was prevented by fraud or accident, unmixed with any fault or negligence in himself or his agents, will justify an application to a court of chancery."[299]

Thus, *Marshall* was very much at odds with *Throckmorton.*

The availability of relief based on the use of false evidence in a prior case draws further support from *Hazel-Atlas.* That case turned on a claim of fraud perpetrated by the use – before the Patent Office and, in addition, the Third Circuit in an appeal from the dismissal of a patent infringement action – of a bogus article. The article had resulted in the affirmance of the dismissal of the infringement suit, the entry of judgment for the defendant by the district court pursuant to the Court of Appeals' mandate, and the defendant's acquiescence in a costly license agreement with the plaintiff-patentee. The Third Circuit denied relief from the earlier judgment on the ground, among others, that it lacked the power to set it aside because the term during which it had been rendered had expired. But the Supreme Court reversed. It stated in relevant part:

> "Every element of the fraud here disclosed demands the exercise of the historic power of equity to set aside fraudulently begotten judgments. This is not simply a case of a judgment obtained with the aid of a witness who, on the basis of after-discovered evidence, is believed possibly to have been guilty of perjury. Here, even if we consider nothing but Hartford's sworn admissions, we find a deliberately planned and carefully executed scheme to defraud not only the Patent Office but the Circuit Court of Appeals. *Cf. Marshall v. Holmes*, *supra.* Proof of the scheme, and of its complete success up to date, is conclusive. *Cf. United States v. Throckmorton*, *supra.*
>
> *   *   *
>
> "We have, then, a case in which undisputed evidence filed with the Circuit Court of Appeals in a bill of review proceeding reveals such fraud on that Court as demands, under settled equitable principles, the interposition of equity to devitalize the 1932 judgment despite the expiration of the term at which that judgment was finally

---

[299]   *Id.* at 596 (citations and quotations omitted).

entered."[300]

Thus, the Supreme Court in *Hazel-Atlas* unmistakably, despite its arguably puzzling citation to both *Marshall* and *Throckmorton*, said that "settled equitable principles" demanded "devitalization" of the prior judgment in a paradigmatic case of intrinsic fraud – the use of false evidence before a court.

All of that said, the facts that (1) neither *Marshall* nor *Hazel-Atlas* definitively stated that *Throckmorton* had been overruled, (2) *Hazel-Atlas* even cited it, and (3) the Supreme Court in the ensuing years has cited one or another of these cases with apparent approval has led to a controversy as to the Court's ultimate view.[301]   Nevertheless, there is no doubt as to where the Second Circuit stands.

In *Dictograph Products Co. v. Sonotone Corp.*,[302] a case involving the alleged submission of false evidence before the Patent Office, Judge Learned Hand wrote for a unanimous court as follows:

> "It is plain that the [Supreme] Court [in *Hazel-Atlas*] did not mean to annul the 'salutary general rule * * * that in most instances society is best served by putting an end to litigation after a case has been tried and judgment entered.' 322 U.S. at page 244, 64 S.Ct. at page 1000. It did not decide that the unsuccessful party to an action may always reopen a judgment upon producing evidence of fraud in procuring it, even though the evidence was inaccessible at the trial; especially it did not so decide when the trial had turned upon the issue of fraud and the new evidence was another version of what had originally appeared.  On the other hand, *it did mean to abandon the distinction made in United States v. Throckmorton*, 98 U.S. 61, 25 L.Ed.

---

[300]

       *Hazel-Atlas*, 322 U.S. at 245-47.

[301]

       *E.g.*, *id.* at 244-45 (citing both *Throckmorton* and *Holmes*); *see also Graver v. Faurot*, 76 F. 257, 262 (7th Cir. 1896); *Shammas*, 9 N.J. at 321 ("Whether the *Throckmorton* principle is still controlling law in the federal courts is not clear.").

[302]

       230 F.2d 131 (2d Cir. 1956).

93, *between 'extrinsic' and 'intrinsic' fraud, as the Restatement of Judgments had already done.*  Indeed, it is impossible to draw any line based upon that distinction; for all fraud is designed to prevent, and, when successful, does prevent, the unsuccessful party from proving the facts that determine his rights.  The fact that he does not at first succeed in unmasking the machinations of his adversary is no reason for denying him relief after he has finally succeeded in penetrating the complete disguise.  And yet it is obvious that there must be a limit, else the mere assertion of relevant evidence, though it was inaccessible at the trial, will be enough to upset any judgment.  From this dilemma there is no escape unless in each case we balance the conflicting interests and make a decision ad hoc; and that is as we understand the decisions of the Supreme Court that we have cited.  Hence we must consider the occasion at bar in its concrete details and without the help of any controlling general postulate."[303]

The Circuit subsequently reaffirmed that view in *Gleason v. Jandrucko*.[304]  While that case was decided under Rule 60(b)(3) – which by then expressly had  abandoned the extrinsic-intrinsic distinction[305] – it did not rely only upon the language of the rule.  It placed its decision squarely on the view that *Throckmorton*'s extrinsic-intrinsic distinction had been overruled.  It wrote:

"[P]laintiff claims that the district court erred in finding the alleged fraud to be intrinsic to the prior proceeding. Although we agree with plaintiff that relief from a judgment by way of an independent action need not be premised on a showing of extrinsic as opposed to intrinsic fraud, *see Averbach v. Rival Mfg. Co.*, 809 F.2d 1016, 1022 (3d Cir.) ("'extrinsic'-'intrinsic'" distinction which is based on a statement in *United States v. Throckmorton* . . . was overruled, if it was ever the law, by *Marshall v. Holmes* . . . ; *see also Serzysko* [*v. Chase Manhattan Bank*], 461 F.2d [699] at 702 n.2 [2d Cir. 1972]; 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2868, at 240-41 (1973) (distinction between extrinsic and intrinsic fraud is 'most unfortunate, if true. [It] rests on clouded and confused authorities, its soundness as a matter of policy is very doubtful, and it is extremely difficult to

---

[303]

    *Id.* at 137 (emphasis added) (footnote omitted).

[304]

    860 F.2d 556 (2d Cir. 1988).

[305]

    FED. R. CIV. P. 60(b)(3) (stating that "fraud (whether previously called intrinsic or extrinsic)" can relieve a party from a final judgment); *see* Advisory Committee Note to the 1946 Amendments to Rule 60.

apply. It ought not to persist as a limit on independent actions' under Fed. R. Civ. P. 60(b).), an aggrieved party seeking relief under the saving clause of Rule 60(b) still must be able to show that there was no 'opportunity to have the ground now relied upon to set aside the judgment fully litigated in the original action.'"[306]

### c.    Does the Recognition Act Incorporate the Extrinsic-Intrinsic Distinction?

Neither *Throckmorton*, *Marshall*, *Dictograph*, nor *Jandrucko* – nor any other authority – addresses directly the standard that governs fraud as the term is used in the Recognition Act.  And while a handful of New York courts has paid at least lip service to the extrinsic-intrinsic distinction,[307] none of those involved, and all but two predated the enactment of, the Recognition Act.  The question therefore is entirely open as a matter of New York law.

This Court previously has indicated its preliminary rejection of the view "that only extrinsic, as opposed to intrinsic, fraud is a basis for relief under Article 53 of the CPLR" for several reasons,[308] some of which have been mentioned above.  Nevertheless, in light of the basis upon which this motion is resolved, it is unnecessary now to reach a definitive conclusion on the issue.

---

[306]

    *Jandrucko*, 860 F.2d at 560.

[307]

    *E.g.*, *Tamimi v. Tamimi*, 38 A.D.2d 197, 199, 328 N.Y.S.2d 477, 479 (2d Dep't 1972) (citing *Throckmorton*); *Fischel v. Abrahams*, 227 N.Y.S.2d 935, 938 (Sup. Ct. Nassau Co. 1962) (applying extrinsic-intrinsic distinction); *J.J. Miller Const. Co. v. Berlanti Const. Co.*, 197 N.Y.S.2d 818, 819-20 (Sup. Ct. Westchester Co. 1960); *see Fuhrmann v. Fanroth*, 254 N.Y. 479, 482 (1930); *Overmyer v. Eliot Realty*, 83 Misc. 2d 694, 705, 371 N.Y.S.2d 246, 257-58 (Sup. Ct. Westchester Co. 1975).

[308]

    *Chevron Corp. v. Salazar*, No. 11 Civ. 3718 (LAK), 2011 WL 7130825, at *4 (S.D.N.Y. Aug. 31, 2011).

2.    *Other Requirements*

In considering whether a litigant is entitled to relief from a prior judgment on the ground of fraud, courts usually consider whether (1) the fraud (whether intrinsic or extrinsic) prevented a full and fair presentation of the litigant's claim or defense in the prior action or otherwise would render it unconscionable to give effect to the prior judgment, (2) the party seeking relief was diligent in discovering the fraud and attacking the judgment, and (3) evidence of the fraud is clear and convincing.[309]  The same considerations are pertinent in determining whether a judgment should be recognized or enforced, either offensively or by means of an affirmative defense, under the Uniform Act, which in New York is CPLR Article 53.

For the purpose of this motion, only the first of these considerations needs additional explication.  When courts are asked to grant relief from or to decline to recognize a prior judgment on the ground of fraud, a central question is whether such an outcome is appropriate to "protect the fairness and integrity of litigation."[310]  Hence, a litigant making such a claim need not prove that the outcome of the prior case would have been different absent the fraud.[311]  It ordinarily must show

---

[309]

See RESTATEMENT (SECOND) OF JUDGMENTS § 70 cmt. d; *see also Toledo Scale Co. v. Computing Scale Co.*, 261 U.S. 399, 421 (1923) ("[I]t must appear that the fraud charged really prevented the party complaining from making a full and fair defense"); *Marshall*, 141 U.S. at 596; *Lundborg v. Phoenix Leasing, Inc.*, 91 F.3d 265, 271 (1st Cir. 1996) (due diligence; clear and convincing evidence); *Diaz v. Methodist Hosp.*, 46 F.3d 492, 497 (5th Cir. 1995) (full and fair opportunity to present case); *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 71 (2d Cir. 1990) (due diligence and lack of fault on part of party attacking judgment); *Green v. Foley*, 856 F.2d 660, 665 (4th Cir. 1988) (fully and fairly presenting case), *cert. denied*, 490 U.S. 1031 (1989).

[310]

12 MOORE'S FEDERAL PRACTICE § 60.43[1][d] (3d ed. 2012) (quoting *Lonsdorf v. Seefeldt*, 47 F.3d at 898 (7th Cir. 1995)).

[311]

*E.g., Ty Inc. v. Softbelly's Inc.*, 353 F.3d 528, 536-37 (7th Cir. 2003); *Schultz v. Butcher*, 24 F.3d 626, 631 (4th Cir. 1994); *Anderson v. Cryovac, Inc.*, 862 F.2d 910, 924 n.10 (1st

only that the fraud "prevented the losing party from fully fairly presenting his case or defense" or otherwise significantly tainted the process.[312]   Implicit in this criterion is a requirement of materiality, as judgments will not be set aside or denied recognition where the only impact of the misconduct or other taint is to prevent a litigant from presenting cumulative evidence, to deceive as to a peripheral issue, or the like.[313]

---

Cir. 1988).

[312]

*Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1339 (5th Cir. 1978); *see Ty Inc.*, 353 F.3d at 536-37.

The point is analogous to that made by the Second Circuit in the infamous *Manton* case, a criminal prosecution of a Court of Appeals judge for taking bribes from litigants.   The defendant argued that the trial court had erred in failing to instruct the jury that "there could be no obstruction of justice unless the decisions [of which the judge taking bribes took part in] were wrong."   The Circuit rejected the argument, stating:

"We cannot doubt that the other judges who sat in the various cases acted honestly and with pure motives in joining in the decisions. No breath of suspicion has been directed against any of them and justly none could be. And for aught that now appears we may assume for present purposes that all of the cases in which Manton's action is alleged to have been corruptly secured were in fact rightly decided. But the unlawfulness of the conspiracy here in question is in no degree dependent upon the indefensibility of the decisions which were rendered in consummating it.  *Judicial action, whether just or unjust, right or wrong, is not for sale; and if the rule shall ever be accepted that the correctness of judicial action taken for a price removes the stain of corruption and exonerates the judge, the event will mark the first step toward the abandonment of that imperative requisite of even-handed justice proclaimed by Chief Justice Marshall more than a century ago; that the judge must be 'perfectly and completely independent with nothing to influence or control him but God and his conscience.'*" *United States v. Manton*, 107 F.2d 834, 846 (2d Cir. 1939) (emphasis added).

[313]

*See* RESTATEMENT (SECOND) OF JUDGMENTS § 70 cmt. d; *see Greiner v. City of Champlain*, 152 F.3d 787, 789 (8th Cir. 1998) (denying relief on ground of fraud consisting of alleged withholding of report that would have been cumulative); *see also Robinson v. Volkswagenwerk AG*, 56 F.3d 1268, 1274 n.5 (10th Cir. 1995) ("[C]oncealment of *material* information by a party may justify a refusal to give preclusive effect to a judgment.") (emphasis added); *Standard Chlorine of Del., Inc. v. Sinibaldi*, 821 F. Supp. 232, 253 (D. Del. 1992).

> 3.    *Does Chevron's Evidence of Fraud Warrant Summary Judgment of Non-Recognition?*
>
> > a.    *The Alleged Ghost-Writing of the Judgment*

Viewing Chevron's ghost-writing allegation from the standpoint of the evidence, stripped of the rhetoric, the facts are these:

- Parts of the Judgment, including a multi-page section dealing with the relationship among Texpet, Texaco, and the Consortium, are virtually identical – character-for-character – with the Unfiled Fusion Memo. That proposition is incontrovertible as a matter of law.

- The virtual identity of portions of the Unfiled Fusion Memo with portions of the Judgment demonstrates as a matter of law that whoever wrote the Judgment had access to and copied portions of the Memo.[314]

- At least one expert has opined, on the basis of his analysis of the internal consistency of the prose in the Judgment and a comparison of the Judgment with known examples of the trial judge's prior writings, that (1) the Judgment "has multiple authors" and (2) the trial judge "did not author a significant amount of" it.[315]  There is no contrary evidence.

- Assuming for purposes of discussion that the expert opinion establishes the foregoing conclusion as a matter of law, it follows that some person or persons other than the trial judge had access to and copied parts of the UnfiledFusion Memo, an internal LAP document that is not part of the Lago Agrio court record into the Judgment.

---

[314]  The issue in substance is identical to that presented in copyright cases, where an infringement plaintiff must prove access to and copying of the copyrighted work by the alleged infringer.  Where the accused work is so similar to the copyrighted work that no reasonable trier of fact could fail to conclude that the defendant had access to and copied the copyrighted work, summary judgment is appropriate on the issues of access and copying.  *Rogers v. Koons*, 960 F.2d 301, 307 (2d Cir. 1992) (affirming summary judgment where, *inter alia*, "no reasonable juror could find that copying did not occur in this case"); *Peker v. Masters Collection*, 96 F. Supp. 2d 216, 218-19 (E.D.N.Y. 2000) (summary judgment granted for plaintiff where, *inter alia*, "no average attentive lay observer would fail to recgnize defendant's appropriation of [plaintiff's] work"); OSTERBERG & OSTERBERG, SUBSTANTIAL SIMILARITY IN COPYRIGHT LAW § 3.1.1[C] (2003).

[315]  Champion Decl. [DI 400] ¶ 109 & Ex. 2106 (McMenamin report), at 2.

Hence, while Chevron has not articulated the point in exactly this way, it is implicit in its position that the LAPs or someone acting on their behalf (1) wrote all or much of the Judgment, gave that work to the judge *ex parte*, and the judge adopted it, or (2) gave the unfiled documents to the judge, who copied parts of them in preparing the Judgment.[316]

To begin with, even assuming the judge did not draft much of the Judgment,[317] there is no admissible evidence as to the identity of the author or authors. The record is silent, for example, even as to such a basic matter as whether the trial judge had professional staff assisting him, which could account for multiple authors and for certain dissimilarities in style between the Judgment and prior writings of the judge.

Second, even assuming that members of the LAP team wrote the portions of the Judgment that are identical to the Unfiled Fusion Memo and gave them to the judge, or that the judge or any public sector staff members copied those portions from the Unfiled Fusion Memo itself

---

[316]   While the uncritical adoption of findings of fact and conclusions of law submitted by a litigant is disapproved of in the federal courts, *e.g.*, *United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 656 (1964); *Cuthbertson v. Biggers Bros., Inc.*, 702 F.2d 454, 458-59 (4th Cir. 1983); *FMC Corp. v. Varco Int'l, Inc.*, 677 F.2d 500, 501 n.2 (5th Cir. 1982), there is no *per se* rule prohibiting it in circumstances in which the other side has notice of the proposed findings and conclusions and has had a full opportunity to present its case, *see e.g.*, *El Paso Natural Gas Co.*, 376 U.S. at 656; *Schnell v. Allbright-Nell Co.*, 348 F.2d 444, 446 (7th Cir. 1965).

[317]   There is a question whether and in what circumstances even an uncontradicted, unimpeached expert opinion may be the basis for summary judgment. *See generally Powers v. Bayliner Marine Corp.*, 83 F.3d 789, 797 (6th Cir. 1996) ("There are many circumstances in which testimony need not be accepted even though formally uncontradicted." (quotations and citations omitted)); *Hassan v. Stafford*, 472 F.2d 88, 96 (3d Cir. 1973) ("[A] trier of fact is not bound to accept an expert's opinion merely because it is uncontradicted."); *Webster v. Offshore Food Serv., Inc.*, 434 F.2d 1191, 1193 (5th Cir. 1970) ("Second, and perhaps more important, is the general recognition that the trier of fact is not bound by expert testimony and may substitute its own common-sense judgment for that of the experts.").

after receiving it *ex parte*, there remains an issue of materiality.  The section of extensive overlap between the Judgment and the Unfiled Fusion Memo relates to the relationship among Texpet, Texaco, and the Consortium.[318]  But Chevron has not submitted evidence sufficient to establish that that subject was a matter of controversy in Ecuador or, if it was, that Chevron likely was handicapped significantly in fully presenting its defense on that issue by any *ex parte* submission.

While more could be said on this point, that is sufficient.  The identity of language between parts of the Unfiled Fusion Memo and parts of the Judgment – troublesome as it is – does not alone warrant the conclusion that Chevron has established that there is no genuine issue of material fact on this issue.[319]

### b.    The Calmbacher Reports

As noted, Dr. Calmbacher was the LAPs' chosen expert for at least some of the early judicial inspections, and two of his reports filed in Lago Agrio by the LAPs stated conclusions and findings that he later testified he did not reach.[320]  While his signatures on the reports were genuine,

---

318

   The largest instance of overlap between the Judgment and the Unfiled Fusion Memo is illustrated in the Appendix to this opinion.

319

   Chevron's argument with respect to the Index Summaries and the Selva Viva Data Compilation is considerably weaker in the summary judgment context.  While the similarities between those documents and aspects of the Judgment supports the premise that the author or authors of the Judgment had access to and copied them, the nature of their contents makes it more difficult to conclude that any *ex parte* submission of them materially impacted Chevron's ability to present its defense.

320

   *See supra* notes 119-23.

   His testimony was given in a Section 1782 proceeding in the United States in March 2010 – almost a year before the Judgment.  *See* Champion Decl. [DI 402] ¶ 159 & Ex. 2156 (Calmbacher deposition transcript), at 1:11-16.

the text associated with them was not.  This evidence is uncontradicted, as is (1) Calmbacher's testimony that Donziger threatened him with legal action unless he joined in moving to quash the subpoena in a Section 1782 proceeding, and (2) Donziger's statement in the email described above that "we [i.e., the LAP lawyers] might have to write" Calmbacher's reports "in Quito."  It therefore is at least arguable that Chevron has established from Dr. Calmbacher's uncontradicted testimony and Donziger's email that the LAP lawyers wrote the reports submitted over Dr. Calmbacher's signatures and that Calmbacher did not in fact hold the views there stated.  But the Court need not decide this issue.

There is, barely, enough in Donziger's email, assuming it were admissible, to support an argument that Dr. Calmbacher was unhappy with the LAPs or their lawyers.  Chevron put the document into the record.  Accordingly, there is a sufficient issue of credibility to prevent the Court from reaching a determination as a matter of law on this point.  In any case, the subsequent abandonment of the judicial inspections in favor of the global expert procedure and the Lago Agrio court's disclaimer of reliance upon Dr. Calmbacher leave a genuine issue as to the materiality of the entire Calmbacher incident, at least if considered in isolation, even assuming that it involved fraud.

<em>c.     The Termination of Judicial Inspections and Cabrera's Appointment</em>

As detailed, the LAPs applied to the court to terminate the judicial inspections.  While that application was pending, the judge to whom the case then was assigned, in Donziger's words, was "on his heels from . . . charges of trading jobs for sex in the court."  Donziger drafted a complaint against the judge.  Fajardo had *ex parte* meetings with the judge and, in one such meeting, he "let [the judge] know [the LAPs] might file it if he does not adhere to the law and what

we need."   Judge Yánez then ruled in the LAPs favor and terminated most of the judicial inspections.  *Ex parte* meetings between the LAP team and Judge Yánez continued, during which the LAPs lobbied for the conduct of a global assessment and the selection of Cabrera.  In time, Judge Yánez appointed Cabrera as the LAP team had urged him to do.

In these circumstances, the decisions to terminate judicial inspections, to pursue the global assessment, and to select Cabrera as the global expert were tainted by the duress and coercion applied to him by Fajardo, Donziger, and perhaps others in *ex parte* meetings.  The fact that it cannot be said with certainty that the decisions were incorrect or would not have been made absent the duress and coercion applied to Judge Yánez is immaterial.  The point is that the undisputed facts show that the process in these respects was tainted.[321]

### d.      The Cabrera and "Cleansing" Reports

The problems did not stop there.  Cabrera ultimately filed a report recommending billions in damages against Chevron.  But the report was not entirely or even predominantly his own work or that of any assistants or consultants working only for him.  There is no genuine issue with respect to the facts that the LAP team secretly prepared his work plan, worked closely with him in carrying it out, and drafted most of the report and its annexes.  Nor is there any genuine issue regarding the fact that the LAP team then publicly objected to the very report that they, in large part, secretly had drafted as "unjustly favorable to [Chevron]" and "too conservative" in its damage

---

[321]    This would be so under any reasonable definition of extrinsic fraud.

assessment.[322]  The answers filed by Cabrera in response to the LAPs' (and Chevron's) objections – like the report itself – were drafted at least in substantial part by the LAP team and written to read as if Cabrera had written them.  This uncontradicted evidence demonstrates that the report and subsequent responses filed in Cabrera's name were tainted by fraud.

The significance of the tainted Cabrera report, however, is a separate inquiry.  For the purposes of this motion, relevant questions include whether Chevron was impaired materially in presenting its case fully and fairly and whether the taint in the Cabrera report was carried over into the Judgment, either directly or by means of the "cleansing" reports.

Chevron raised the issue of the Cabrera report's propriety before the Lago Agrio court.  The court disclaimed reliance on it.  On this motion, however, Chevron has presented evidence from which it might be concluded that the Lago Agrio court did rely on the Cabrera report at least to determine the number of oil pits requiring remediation[323] and in calculating the cost of a

---

[322]   Pl. 56.1 St. [DI 398] ¶ 164; Hendricks Decl. [DI 8] ¶ 79 & Ex. 7 pt. 1 (LAPs' objections to the Cabrera report), at 40.

[323]   Pl. 56.1 St. [DI 398] ¶¶ 204-09; Champion Decl. [DI 401] ¶ 141 & Ex. 2138 (Di Paolo declaration), at 1-2 (stating that "it is impossible for the Ecuadorian court to accurately identify the number of pits or the number of pits requiring remediation using aerial photo interpretations"); *id.* ¶ 185 & Ex. 2182 (Younger report), Ex. A, at 17-18 (concluding that the pit count in the Judgment is based on Annex H-1 of the Cabrera report).

potable water system[324] and quite possibly well beyond that.[325]  Moreover, the Lago Agrio court cited one of the "cleansing" reports – the Barnthouse report – for the cost related "to recover[ing] the native flora, fauna, and the aquatic life of the zone."[326]  The Barnthouse report, however, contains no damage assessment independent of that in the Cabrera report.[327]

The uncontradicted evidence therefore shows that the Cabrera report was tainted and that the Lago Agrio court relied to some extent on that report, both directly and via its reliance on the Barnthouse report.  But the contention that the Lago Agrio court, despite its disclaimer, relied heavily on the Cabrera report rests in some significant measure upon the lack of references to evidence supportive of the trial court's findings and independent of the Cabrera report  in certain filings by the LAPs.[328]  While there may be no such independent evidence, this Court may not appropriately so infer on a motion for summary judgment.

---

[324]

     Pl. 56.1 St. [DI 398] ¶ 210; Champion Decl. [DI 401] ¶ 274 & Ex. 2269 (Annex R of the Cabrera report), at 13-16 (recommending a $428 million award for potable water system); *id.* ¶ 131 & Ex. 2128 (Barros report) (relying on the Cabrera report for the alleged damage award of $430 million for a potable water system but noting that 65 percent of the affected area is connected to a public water system); DI 168 (Lago Agrio Judgment), at 182-83 (awarding $150 million in damages for a potable water system based on multiplying $430 million in damages by the 35 percent of the population in the affected area not serviced by the public water system).

[325]

     Pl. 56.1 St. ¶¶ 204-23.

[326]

     DI 168 (Lago Agrio Judgment), at 182.

[327]

     Pl. 56.1 St. [DI 398] ¶ 210; DI 168 (Lago Agrio Judgment), at 182 (awarding $200 million "to recover the native flora, fauna and the aquatic life of the zone" based on Barnthouse report); Champion Decl. [DI 401] ¶ 67 & Ex. 2064 (Barnthouse report), at 2-9 (relying on damage calculations in the Cabrera report).

[328]

     Pl. 56.1 St. ¶¶ 214-21.

Certainly the uncontradicted evidence relating to the Cabrera report and its relationship to the Judgment is disturbing. It perhaps would justify a trier of fact in inferring conclusions broader than is appropriate on this motion. Moreover, additional evidence may emerge as the case develops. On the present record, however, the ultimate materiality of the taint that indisputably has been established thus far remains a genuine issue.

IV.     *Chevron's Former Adjudication Arguments*

Chevron, in a brief section of its opening memorandum, argues that it is entitled to partial summary judgment dismissing the collateral estoppel defense based on the Judgment on the grounds that (a) it did not have a full and fair opportunity to litigate its defense in Ecuador, and (b) the Ecuadorian courts did not adjudicate the merits of its fraud claim. It contends also that the Judgment is not *res judicata* because the "claims" at issue here differ from those in question in Ecuador.[329]

As an initial matter, a party resisting the application of collateral estoppel on the ground that it lacked a full and fair opportunity to litigate the issues said to be foreclosed by the previous judgment bears the burden of proof on that question.[330] Despite the undisputed facts referred to above, Chevron has failed irrefutably to establish such a lack, essentially for reasons previously stated.

Moving to the second argument, essential prerequisites to collateral estoppel include that the issue said to be preclusive is identical to an issue actually litigated and necessarily decided

---

[329]     DI 397 (Chevron Mem.), at 32-35.

[330]     *E.g.*, *Hickerson v. City of New York*, 146 F.3d 99, 109 (2d Cir. 1998).

in the previous action.[331]  But Chevron's contention that the Ecuadorian courts did not adjudicate any part of the fraud arguments that it advanced there, despite language strongly suggestive of that view, perhaps goes too far on the present record.

      Certainly the Lago Agrio trial court declined to permit submission of evidence "which would allow [Chevron] to prove its accusations."[332]  And the appellate court initially said that "this Division has no competence to rule on the conduct of counsel, experts or other officials or administrators and auxiliaries of justice, if that were the case."[333]  In response to the clarification applications, however, the appellate court first observed that it was "difficult to conceive" that the trial court had received any secret assistance that "would have allowed for the introduction of arguments that were decisive."[334]  It then concluded that Chevron had not identified any "samples, documents, reports, testimonies, interview, transcripts and minutes" that were not in the record.[335]  It proceeded to say that "it stay[ed] out of [Chevron's] accusations, preserving . . . [its] rights to . . . continue . . . the actions that have been filed in the United States."[336]  And it purportedly

---

331

    *ICD Holdings S.A. v. Frankel*, 976 F. Supp. 234, 239 (S.D.N.Y. 1997) (quoting *Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 44 (2d Cir. 1986), *cert. denied*, 480 U.S. 948 (1987)).

332

    DI 168 (Lago Agrio Judgment), at 50-51.

    This statement ignored the fact that at least some evidence had been submitted in support of various Chevron motions.  Pl. 56.1 St. [DI 398] ¶ 183.

333

    DI 417, Ex. A (Jan. 3, 2012 Ecuadorian appellate court decision), at 11.

334

    *Id.*, Ex. B (Jan. 13, 2012 Ecuadorian appellate court clarification decision), at 4.

335

    *Id.*

336

    *Id.* at 5.

declined to "hear and resolve proceedings that correspond to another jurisdiction" or to "make a pronouncement on the interminable and reciprocal accusations over misconduct . . . [because they] could not affect the final result of the lawsuit."[337]

The meaning of all this for collateral estoppel purposes is far from clear to an American observer.[338] Perhaps the refusal to make a "pronouncement" on the various fraud allegations because such a ruling "could not affect the final result of the lawsuit" was, in Ecuadorian law, an implicit conclusion that proof of all of Chevron's allegations of fraud would not have been a defense to the action and thus a ruling that, in appropriate circumstances, might be preclusive on that issue.[339] Perhaps the appellate court, however, meant only that the judgment appealed from was valid because it was supported by evidence in the record and that the issues relating to the conduct of lawyers, experts, and others outside the courts were not matters for its consideration. Or perhaps its difficulty in conceiving that the alleged *ex parte* contacts or alleged copying of parts of the Judgment from LAP materials not found in the record "would have allowed for the introduction of arguments that were decisive," in the context of the law of Ecuador, was a finding of fact. Without appropriate evidence on the relevant Ecuadorian law, the Court is not prepared to hold that Chevron is entitled to judgment rejecting the collateral estoppel defenses as a matter of law on the ground that the Ecuadorian courts adjudicated no issue with respect to Chevron's fraud claims.

---

[337]

    *Id.*

[338]

    This implies no disrespect to the Ecuadorian courts. Judicial decisions are products of the legal system and culture in which they are rendered and best understood by those steeped in that environment. The Court assumes that the decisions in question here are quite clear to those more familiar with the Ecuadorian system.

[339]

    *See, e.g.*, RESTATEMENT (SECOND) OF JUDGMENTS § 27 (issue preclusion applies to issues of law).

The *res judicata* defense is another matter.  The general principle is that a judgment in favor of a plaintiff precludes the defendant, in an action to enforce the judgment, from availing himself of defenses he might have interposed, or did interpose, in the first action.[340]  But that rule does not apply where "[t]he court in the first action has expressly reserved the [litigant's] right to maintain the second action."[341]  That is precisely this case in view of the appellate court's statement that it was "preserving . . . [Chevron's] rights to . . . continue . . . the actions that have been filed in the United States."[342]  Accordingly, Chevron is entitled to partial summary judgment dismissing the *res judicata* defenses.

*Conclusion*

The issues before the Court are whether (a) there is a genuine issue as to any fact material to the bases on which Chevron seeks dismissal of the *res judicata*-collateral estoppel defense, and (b) Chevron is entitled to that relief as a matter of law, and (c) Chevron in any case is entitled to judgment based on the law of former adjudication without regard to the recognizability or enforceability of the Judgment.  Thus, the question is not whether the Court thinks it likely that Chevron ultimately will prevail on these arguments.

The crux of the motion is the contention that the Lago Agrio Judgment should not

---

[340]

    *Id.* § 18(b).

[341]

    *Id.* § 26(1)(b).  The general rule stated in Section 18(b) expressly is made subject to the exceptions stated in Section 26.

[342]

    The same result would be reached under Section 26(1)(c) in view of the appellate court's statement that it had "no competence to rule on the conduct of counsel, experts or other officials or administrators and auxiliaries of justice."

be recognized or enforced by reason of fraud. As the foregoing demonstrates, the LAPs' procurement of the termination of judicial inspections, the adoption of the global assessment, and the appointment of Cabrera all unquestionably were tainted. The secret participation of the LAP team in Cabrera's activities and its secret drafting of the bulk of Cabrera's report were tainted as well. Moreover, there are serious questions concerning the preparation of the Judgment itself in view of the identity between some portions of the Judgment and the Unfiled Fusion Memo, especially in light of the undisputed pattern of *ex parte* advocacy in the Lago Agrio Litigation and the undisputed instance of the LAP team's coercion of and duress on one of the judges to obtain a desired result.

But it cannot be said at this stage of the proceedings that Chevron is entitled to a determination in its favor as to the recognizability and enforceability of the Judgment or the collateral estoppel defense in view of the issues as to whether any of this materially affected Chevron's ability fully to present its defense or corrupted the judicial process so as to warrant such a determination. The Court, however, has reached a different conclusion as to *res judicata*. Accordingly, Chevron's motion for partial summary judgment dismissing the LAP Representatives' and the Donziger Defendants' affirmative defenses of *res judicata* and collateral estoppel [DI 396] is granted to the extent that the *res judicata* defenses are dismissed but otherwise denied.

SO ORDERED.

Dated:      July 31, 2012

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

# APPENDIX
## JULY 31, 2012
## OPINION ON PARTIAL SUMMARY JUDGMENT MOTION
(Highlighted Portions Copied into Judgment from Unfiled Fusion Memo)

A2

| Page 20 of Judgment from Leonard Supplemental Report | Page 20 of Judgment – English Translation |
|---|---|

actividades son las personas que proveen las autorizaciones y los fondos, que frecuentemente se encuentren cobijadas tras la máscara de personalidad jurídica, haciendo necesario que en ciertos casos se desestime la estructura formal del ente societario para evitar la defraudación de terceros. En el expediente, en el cuerpo 65, fojas 6827, 6828,6830, 6831, 6826, 6833, constan las traducciones de varios pedidos de autorización de Shields a Palmer, en los que el señor Shields hace pedidos a nombre de la "División Ecuatoriana" de Texaco Inc. a sus superiores de Texaco Inc., solicitando su aprobación para diversos asuntos propios de las operaciones en el Oriente ecuatoriano. Constan en el expediente autorizaciones para asuntos cotidianos, de administración regular, como la licitación de servicios de catering y limpieza para los sitios de operaciones del consorcio en Quito y el Oriente (traducción de documento PET 029369 en foja 6827 y PET 028910 en foja 6830), o la contratación de servicios de entretenimiento cinematográfico en las instalaciones del Oriente (PET 029086 en foja 6831). Del mismo modo encontramos una autorización para la contratación de equipos y personal para el mantenimiento de oleoductos (PET 019212 en foja 6828) y construcción de puentes en Aguarico y Coca (PET 016879 en foja 6833). Finalmente, Shields solicita la autorización de Palmer para iniciar la exploración del pozo Sacha-84, en octubre de 1976 (PET 012134). También constan del expediente varios documentos de los archivos Texpet, con pedidos de autorización de Bischoff a Palmer, en el cuerpo 65, fojas 6839, 6840, 6843, 6844, 6848, donde consta que del mismo modo que Shields, Palmer se refiere a las operaciones de Texpet en el Oriente como "la División Ecuatoriana". Entre sus pedidos de autorización, consta el urgente pedido para aprobar la licitación de dos torres de "workover" (soporte y mantenimiento) para la explotación en el Oriente (PET 030919 en foja 6839), y la licitación de un camino entre los pozos Yuca y Culebra (PET 016947 en foja 6843), aspectos claves para el desarrollo de las operaciones de Texpet. También se solicita autorización para extender un contrato de servicios de ferri en la zona (PET 032775 en foja 6844), y con mayor importancia, se solicita aprobación de los documentos de aprobación del Pozo Vista-1. Consta además un memorando de especial importancia revelando la existencia de una cadena lineal de autorización existente entre estos ejecutivos, pues Bischoff le solicita a Palmer que, de aprobar el documento, lo firme y reenvíe a McKinley, un ejecutivo superior de Texaco Inc (PET 022857 en foja 6848), denotando la existencia de una cadena de mando, que hacía que las decisiones sobre todo aspecto relacionado con la operación de Texpet en Ecuador sean tomadas por ejecutivos de Texaco Inc, en EEUU. Adicionalmente, constan en el expediente sendos pedidos de autorización de Palmer

activities are the people who provide the authorizations and the funds, which frequently are sheltered behind the mask of the legal entity, making necessary that in certain cases the formal structure of the corporate entity be disregarded in order to avoid defrauding third parties. In the record at volume 65, pages 6827, 6828,6830, 6831, 6826, 6833, are the translations of various requests for authorization from Shields to Palmer, in which Mr. Shields makes requests in the name of the "Ecuadorian Division" of Texaco Inc. to his superiors at Texaco Inc., requesting his approval for various matters pertaining to the operations in the Ecuadorian Oriente. The record contains authorizations for everyday matters, of routine administration, such as tenders for catering services and the cleaning of the Consortium's operating sites in Quito and the Oriente region (translation of document PET 029369 at page 6827 and PET 028910 at page 6830), or the contracting of motion picture entertainment services at the Oriente installations (PET 029086 at page 6831). Likewise we find an authorization for the contracting of equipment and personnel for pipeline maintenance (PET 019212 on page 6828) and construction of bridges in Aguarico and Coca (PET 016879 at page 6833). Finally, Shields requests Palmer's authorization to begin the exploration of the Sacha-84 well, in October 1976 (PET 012134). Also in the record are various documents from the Texpet archives, containing authorization requests from Bischoff to Palmer, in volume 65, pages 6839, 6840, 6843, 6844, 6848, where it appears that, like Shields, Palmer refers to Texpet's operations in the Oriente as "the Ecuadorian Division." Among his requests for authorization is the urgent request to approve the tender for two "workover" towers (support and maintenance) for production in the Oriente (PET 030919 at page 6839), and the tender on a road between the Yuca and Culebra wells (PET 016947 at page 6843), key aspects for the development of Texpet's operations. Authorization also is requested to extend the contract for ferry services in the zone (PET 032775 at page 6844), and more importantly, approval is requested of the approval documents for Vista-l Well. There is also a memorandum of special importance revealing the existence of a lineal chain of authorization existing between these executives, since Bischoff asks Palmer who, after approving the document, signs and forwards it to McKinley, a higher executive of Texaco Inc (PET 022857 at page 6848), denoting the existence of a chain of command, which meant that the decisions regarding every aspect relating to the operation of Texpet in Ecuador were made by executives of Texaco Inc in the U.S. In addition, there are respective authorization requests in the record from Palmer

A3

| Page 21 of Judgment from Leonard Supplemental Report | Page 21 of Judgment – English Translation |
|---|---|

a Granville, en el cuerpo 66, fojas 6930, 6938, 6943, que demuestran que la cadena de autorizaciones se extiende más arriba de Palmer, ya que haciendo eco de un pedido de Shields (ver PET 019212, en foja 6828), Palmer le solicita a Granville la autorización para contratar equipos y personal para el mantenimiento de oleoductos (PET 029976, en foja 69309) y según el requerimiento de Bischoff (ver PET 030919, en foja 6839) aprueba una de las ofertas para la construcción de las torres de "workover", sometiendo dicha aprobación al visto bueno de Granville (PET 029991, en foja 6943). Existen además en el expediente cartas y memorandos de Shields y Palmer a John McKinley, provenientes de los archivos Texaco Inc, y Texpet. En el cuerpo 66, fojas 6957, 6958, 6964, 6959, 6960, 6974. Que demuestran que tanto Shields como Palmer mantenían un flujo constante de cartas y memos con McKinley, solicitando su autorización e informándole acerca de acontecimientos relacionados con la Concesión Napo. Del mismo modo, cartas de funcionarios menores dirigidas a Shields, en el cuerpo 65, fojas 6855, 6856, 6860, 6861, 6875, 6882, 6885, donde se hace referencias a cartas dirigidas a Shields que se originaron en Quito, en manos de funcionarios menores que solicitaban su autorización, como William Saville, que era un ejecutivo de Texpet que operaba en Quito, y envió muchas y cotidianas comunicaciones a Shields (en Nueva York) solicitando autorizaciones. Por ejemplo, le envía a Shields los costos estimados de la perforación de los pozos Sacha 36 al 41 (doc s/n), y solicita su aprobación para iniciar la licitación de transporte de combustibles en el Oriente (PET 031387 en foja 6856). J.E.F. Caston, otro ejecutivo de la petrolera ubicado en Quito solicita la autorización de Shields para licitar varios servicios (PET 020758 en foja 6860) y para aprobar los costos estimados de instalar bombas sumergibles en cinco pozos en el campo Lago Agrio. Finalmente tenemos a Max Crawford, otro funcionario radicado en Quito, quien también solicitaba periódicamente la aprobación de Shields para diversos objetivos (PET 035974 en foja 6882, y doc s/r en foja 6885). Por otro lado, debe ser considerado el hecho probado de que las decisiones del "Comité Ejecutivo" de Texpet debían ser, aprobadas por el directorio de Texaco Inc, como vemos que en el Acta de Directorio No. 478 (Cuerpo 25, foja 2427), donde éste aprobó la decisión de Texpet de entrar en negociaciones con el Ecuador para oponerse a una elevación en el impuesto a la renta para la petrolera, y pagos adicionales, del mismo modo que el directorio de Texaco Inc. aprobó la compra de un avión de USD 850.000, Acta 456 (Cuerpo 24, foja 2351), demostrando el poder de decisión de Texaco Inc. sobre las compras realizadas por Texpet. En mi criterio estas actas demuestran el constante escrutinio que la matriz Texaco Inc. mantenía sobre toda operación y noticias

to Granville, in volume 66, pages 6930, 6938, 6943, which show that the chain of authorizations extends higher than Palmer, since in echoing a request from Shields (see PET 019212 at page 6828), Palmer asks Granville for authorization to contract equipment and personnel for pipeline maintenance (PET 029976 at page 69309) and per Bischoffs requirement (see PET 030919, at page 6839), approves one of the offers for the construction of the "workover" towers, submitting said approval to Granville for an O.K. (PET 029991, at page 6943). The record also contains letters and memorandums from Shields and Palmer to John McKinley, coming from the Texaco Inc, and Texpet files. In volume 66, pages 6957, 6958, 6964, 6959, 6960, 6974. That show that both Shields and Palmer maintained a constant flow of letters and memos with McKinley, asking for his authorization and informing him of events relating to the Napo Concession. Likewise, letters from minor officials addressed to Shields, in volume 65, pages 6855, 6856, 6860, 6861, 6875, 6882, 6885, where reference is made to letters addressed to Shields that originated in Quito, in hands of minor officials who requested his authorization, such as William Saville, who was a Texpet executive who operated in Quito, and sent many and daily communications to Shields (in New York) requesting authorizations. For example, he sent Shields the estimated costs of drilling the Sacha 36 to 41 wells (unnumbered doc) and asks his approval to start the tender for fuel transport in the Oriente (PET 031387 at page 6856). J.E.F. Caston, another executive of the oil firm based in Quito, asks Shields for his authorization to call for bids for various services (PET 020758 at page 6860) and to approve the estimated costs of installing submersible pumps in five wells in the Lago Agrio field. Finally, we have Max Crawford, another official based in Quito, who also periodically asked for Shields' approval for various purposes (PET 035974 at page 6882, and unnumbered doc at page 6885). On the other hand, it is necessary to consider the proven fact that the decisions of the "Executive Committee" of Texpet had to be approved by the board of directors of Texaco Inc, as we see that in the Minutes of the Board of Directors No. 478 (Volume 25, page 2427), where it approved Texpet's decision to enter into negotiations with Ecuador to object to an increase in the income tax for the oil company, and additional payments, in the same way that the Texaco Inc board of directors approved the purchase of a plane for US$ 850,000, Minutes 456 (Volume 24, page 2351), demonstrating the decision-making power of Texaco Inc. over the purchases made by Texpet. In my opinion, these minutes demonstrate the constant scrutiny that the parent firm Texaco Inc. maintained over all operations and new

| Page 22 of Judgment from Leonard Supplemental Report | Page 22 of Judgment – English Translation |
|---|---|

relativas a Texpet en Ecuador. Si analizamos este hecho independientemente, quizás se pueda confundir como el normal control que ejerce un directorio sobre sus subsidiarias. Sin embargo debemos analizar este control de la matriz sobre su subsidiaria dentro de su contexto, tomando en cuenta también que el Directorio de Texaco Inc. además entregaba las "asignaciones" de dinero con las cuales Texpet operaba, lo cual implica que Texpet carecía no solo de autonomía administrativa, sino financiera, ya que era Texaco Inc. quien controlaba no solo las decisiones, sino que también autorizaba los fondos que Texpet necesitaba para el normal desenvolvimiento de actividades. Partiendo del hecho admitido de que Texpet es una empresa subsidiaria de cuarto nivel perteneciente ciento por ciento a un dueño único, Texaco Inc., y que Texpet operaba con fondos provenientes de las arca de Texaco Inc., ha quedado demostrado que no existe una separación real de patrimonio. Entendemos que personalidades jurídicas distintas, necesariamente implican patrimonios diferenciados, según las reglas de los atributos de la personalidad, sin embargo en este caso la confusión de patrimonios es hace evidente, confundiendo del mismo modo las personalidades. Entre las pruebas que nos llevan a este convencimiento citamos adicionalmente el acta de reunión de directorio de Texaco Inc. No. 380, de fecha 22 de enero de 1965 (Cuerpo 22, foja 2166), que estableció asignaciones a favor de la Cia. Texaco Petróleos del Ecuador por un monto de USD 30.312,oo. El acta de reunión de directorio de Texaco Inc. No. 387, de fecha 17 de septiembre de 1965 (Cuerpo 22, foja 2176) estableció asignaciones a favor de Texaco Petroleum Company (Texpet), por un monto de USD 27.625,oo. El acta de reunión de Directorio de Texaco Inc. No. 393, de fecha 19 de abril de 1966 (Cuerpo 22, foja 2182) estableció asignaciones a favor de Texaco Petróleum Company (Texpet), por un monto de USD 331.272,oo, y a favor de la Cia. Texaco Petróleos del Ecuador por USD 13.631, queda de este modo establecida la convicción de esta Presidencia respecto a que Texaco Inc., controlaba los fondos tanto de la empresa que ejercía los derechos de la concesión (Texaco Petróleos del Ecuador) como de la que fuera contratada para operar la concesión de los campos, por lo que resulta evidente que TEXPET fue una empresa sin capital ni autonomía suficiente para afrontar el giro normal del negocio, lo cual a su vez se configura como otra evidencia de falta de independencia de la subsidiaria respecto a la principal, llevándonos a la convicción de que TEXPET era una empresa infracapitalizada, que dependía tanto económica como administrativamente de su matriz. El monto de los contratos que requieren autorizaciones hacer presumible la indisponibilidad de capital propio, lo cual es una indicación de incapacidad para hacer frente a las eventuales

relative to Texpet in Ecuador. If we analyze this fact independently, perhaps it could be confused with the normal control that a board of directors exercises over its subsidiaries. However we must analyze this control by the parent firm over its subsidiary in its context, taking into account also that the Board of Directors of Texaco Inc. also delivered the "allocations" of money with which Texpet operated, which implies that Texpet lacked not only administrative autonomy, but also financial, since it was Texaco Inc. that controlled not only the decisions, but that also authorized the funds that Texpet needed for the normal course of activities. Starting with the admitted fact that Texpet is a fourth level subsidiary company belonging one hundred per cent to a single owner, Texaco Inc., and that Texpet operated with funds coming from the coffer of Texaco Inc., it has been shown that there is not a real separation of patrimony. We understand that different legal entities necessarily imply differentiated patrimony, according to the rules of the attributes of the entity, however in this case, the confusion of patrimony is obvious, plus a confusion of entities in the same manner. Among the evidence that lead us to this conviction we cite additionally the minutes of a board of directors meeting of Texaco Inc. No. 380, dated January 22, 1965 (Volume 22, page 2166), which established allocations in favor of the Cia. Texaco Petr6leos del Ecuador for an amount of US$ 30,212.00. The minutes of the board of directors meeting of Texaco Inc. No. 387, dated September 17, 1965, (Volume 22, page 2176), established allocations in favor of Texaco Petroleum Company (Texpet) for an amount of US$ 27,625.00. Minutes of the board of directors meeting of Texaco Inc. No. 393, dated April 19, 1966 (Volume 22, page 2182), established allocations in favor of Texaco Petroleum Company (Texpet) for an amount of US$ 331,272.00, and in favor of the Cia. Texaco Petroleos del Ecuador for an amount of US$ 13,631. establishing in this way the conviction of this Presidency regarding that Texaco Inc., controlled the funds both of the company exercising the concession rights (Texaco Petr6leos del Ecuador) and of the one contracted to operate the concession of the fields, which makes it obvious that TEXPET was a company without any capital or sufficient autonomy to face the normal course of business, which in turn constitutes more evidence of lack of independence of the subsidiary with respect to the principal, leading us to the conviction that TEXPET was an undercapitalized company, that depended both economically and administratively on its parent company. The amount of the contracts that require authorizations to make likely the unavailability of its own capital, which is an indication of inability to face the possible

| Page 24 of Judgment from Leonard Supplemental Report | Page 24 of Judgment – English Translation |
| --- | --- |
| ejemplo, el señor Robert C. Shields, desempeñó el cargo de Vicepresidente de Texaco Inc. entre 1971 y 1977, siendo a la vez Jefe de la Junta de Directores de Texpet, según consta en su declaración juramentada (cuerpo 63, foja 6595). Al revisar el expediente consta que Shields suscribe sus cartas a nombre de Texpet, cuando según su mismo testimonio entre 1971 y 1977 ostentaba el cargo de Vicepresidente de Texaco Inc. Este hecho guarda coherencia con lo declarado por Bischoff, acerca de que Texpet era la división de Texaco Inc. que operaba en Latinoamérica, y no una mera subsidiaria, como sostiene la defensa de la parte demandada. Del mismo modo, el señor Robert M. Bischoff durante su carrera ostentó cargos de Texaco Inc. tanto en EEUU como en América Latina. Entre 1962 y 1968 trabajó como Vicepresidente en la división de producción para América Latina, a la cual el mismo llama Texaco Petroleum Company (Texpet), según consta en su declaración juramentada, en cuerpo 63, foja 6621. Esto demuestra cómo inclusive los mismos ejecutivos de Texaco Inc. pensaban en Texpet como una división de Texaco Inc., y no como una empresa separada. Al igual que Shields, ha quedado claro en el expediente que Bischoff participaba activamente en las complejas cadenas y procesos de toma de decisiones que involucraban a Texaco Inc. y Texpet. En su declaración juramentada Bischoff explica cómo los contratos del cuartel general de Texpet, ubicados en Florida, que excedieran de USD 500.000,oo debían ser aprobados por un abogado de apellido Wissel, jefe de los abogados de Texaco Inc. En este caso, vemos como la relación entre Texpet y Texaco Inc. no estaba limitada a qué ésta sea propietaria de las acciones de aquella, sino que ambas trabajaban íntimamente vinculadas, tomando Texaco Inc. todas las decisiones mientras que Texpet se limita a ejecutarlas. Es cierto que por norma general una empresa puede tener subsidiarias con personalidad jurídica completamente distinta. Sin embargo, cuando las subsidiarias comparten el mismo nombre informal, el mismo personal, y están directamente vinculadas con la empresa madre en una cadena ininterrumpida de toma de decisiones operativas, la separación entre personas y patrimonios se difumina bastante, o incluso llega a desaparecer. En este caso, se ha probado que en la realidad Texpet y Texaco Inc. funcionaron en el Ecuador como una operación única e inseparable. Tanto las decisiones importantes como las triviales pasaban por diversos niveles de ejecutivos y órganos de toma de decisiones de Texaco Inc., a tal punto que la subsidiaria dependía de la matriz para contratar un simple servicio de catering. En este sentido este sentido es completamente normal que el Directorio de una empresa subsidiaria esté conformado por algunos oficiales de su matriz, y que también es normal que la matriz reciba informes periódicos | example, Mr. Robert C. Shields held the position of Vice President of Texaco Inc. between 1971 and 1977, while at the same time being the Head of Texpet's Board of Directors, according to his sworn statement (volume 63, page 6595). Review of the record shows that Shields signs his letters on behalf of Texpet, when according to his own testimony between 1971 and 1977 he held the position of Vice President of Texaco Inc. This fact is consistent with Bischoffs statement that Texpet was the division of Texaco Inc. that operated in Latin America, and not a mere subsidiary, as the defendant's defense maintains. In the same way, over the course of his career, Mr. Robert M. Bischoff held positions with Texaco Inc. both in the United States and in Latin America. Between 1962 and 1968 he worked as Vice President in the production division for Latin America, which he himself calls Texaco Petroleum Company(Texpet), according to his sworn statement in volume 63, page 6621. This shows how even the executives of Texaco Inc. themselves thought of Texpet as a division of Texaco Inc., and not as a separate company. Like Shields, the record clearly shows that Bischoff actively participated in the complex decision-making chains and processes that involved Texaco Inc. and Texpet. In his sworn statement Bischoff explains how the contracts of Texpet's headquarters, located in Florida, that exceeded US$500,OOO.00 had to be approved by an attorney of the last name Wissel, head of Texaco Inc.'s attorneys. In this case, we see how the relationship between Texpet and Texaco inc. was not limited to this one owning the shares of the other, but rather that both worked intimately linked, with Texaco Inc. taking all the decisions while Texpet was limited to carrying them out. It is true that as a general rule a company can have subsidiaries with completely distinct legal status. However, when the subsidiaries share the same informal name, the same personnel, and are directly linked to the parent company in an uninterrupted chain of operational decision-making, the separation between entities and patrimonies is significantly clouded, or even comes to disappear. In this case, it has been proven that in reality Texpet and Texaco Inc. functioned in Ecuador as a single and inseparable operation. Both the important decisions as well as the trivial ones passed through various levels of executives and decision-making bodies of Texaco Inc., to the extent that the subsidiary depended on the parent company to contract a simple catering service. In this regard this regard it is completely normal that the Board of Directors of a subsidiary company is made up of some officers from its parent company, and it is also normal that the parent company receive periodic reports |

A6

| Page 25 of Judgment from Leonard Supplemental Report | Page 25 of Judgment – English Translation |
|---|---|
| sobre su estado, y tomen ciertas decisiones que por su importancia están por sobre la administración regular. Sin embargo, en el caso de Texaco Inc. y su subsidiaria Texaco Petroleum Company (Texpet), el rol de los Directores trascienden los roles que pueden considerarse normales, pues éstos recibían información y tomaban decisiones acerca de la gran mayoría de hechos y actos de Texpet sobre asuntos cotidianos de la operación de la concesión Petrolera Napo, respondiendo a una cadena de mando bien establecida, como ha quedado demostrado en el expediente. 3.-Finalmente se considera que la doctrina del levantamiento del velo societario es especialmente aplicable frente a los abusos que se pueda cometer en detrimento del orden público o de derechos de terceros, para evitar el fraude y la injusticia, es decir, que se debe levantar el velo societario siempre que no hacerlo favorezca una defraudación o promueva la injusticia, cómo sería el caso, en que encontremos esquemas intencionalmente creados para dejar los beneficios en la compañía matriz, mientras que las obligaciones quedan en una subsidiaria, que por lo general es incapaz de satisfacerlas. Como bien lo dicen López Mesa y José Cesano: "Aún cuando se admita por vía de hipótesis que dos sociedades están sometidas a una unidad de decisión o constituyen una unidad económica o grupo de sociedades, estos no son datos suficientes para prescindir de la autonomía jurídica de cada uno de los sujetos societarios implicados en las actuaciones, en tanto no se alegue y pruebe que se haya instrumentado las formas jurídicas para perjudicar al demandante en sus derechos, pues lo adecuado es respetar la separación patrimonial de la sociedad, en tanto ésta no sea probablemente el medio de violación de otras reglas jurídicas, ya que la desestimación de la personalidad o atribución de responsabilidad a personas en apariencias distintas, tiene por exclusivo fundamento la comprobación del abuso del privilegio concedido en detrimento del orden público o de derechos de terceros" (Págs. 145 y 146). En este sentido se nota que la parte actora si ha alegado de manera expresa que Texpet fue una compañía instrumentada para mantener las responsabilidades pendientes sobre una compañía sin capital suficiente, mientras se mantiene el capital de la matriz libre de responsabilidades, con el objeto precisamente de evadir las potenciales responsabilidades con terceros, al tiempo que consta en el expediente abundante evidencia, como ha sido anotado en líneas anteriores, que demuestra el profundo nivel de vinculación y falta de independencia de la subsidiaria con respecto a su matriz, que fue quien realmente tomó las decisiones y se benefició de los actos de su subsidiaria, quien además es incapaz de hacer frente a las potenciales de sus responsabilidades que se le exijan. Se considera finalmente lo dicho | on its condition, and take certain decisions that for their importance are beyond the reach of the regular administration. However, in the case of Texaco Inc. and its subsidiary Texaco Petroleum Company (Texpet), the role of the Directors transcends roles that might be considered normal, as they received information and made decisions about the great majority of Texpet's deeds and acts regarding everyday matters of the operation of the Napo Oil concession, responding to a well-established chain of command, as has been shown in the record. 3.-Finally, it is considered that the doctrine of lifting the corporate veil is especially applicable in the face of the abuses that can be committed in detriment to the public order or the rights of third parties, in order to avoid fraud and injustice, that is, that the corporate veil must be lifted whenever not doing so favors a fraud or promotes injustice, as would be the case in which we fmd schemes intentionally created to leave the profits in the parent company, while the obligations remain in a subsidiary, which in general is incapable of satisfying them. As Lopez Mesa and Jose Cesano rightly say: "Even when it is admitted as a hypothesis that two corporations are subordinate to a decision-making unit or constitute an economic unit or corporate group, this is not sufficient data to dispense with the legal autonomy of each one ofthe corporate subjects implicated in the acts, as long as it is not alleged and proved that the legal forms have been implemented to prejudice the plaintiff in his rights, since what is appropriate is to respect the corporation's separation of assets , as long as this is not likely to be the means of violation of other legal rules, since rejection of the status or attribution of responsibility to persons in distinct appearances, is exclusively based on proving the abuse of the privilege granted to the detriment of public order or the rights of third parties" (Pages 145 and 146). Along these lines it is noted that the plaintiffs have indeed expressly alleged that Texpet was a company implemented to keep pending responsibilities in a company without sufficient capital, while keeping the capital of the parent company free of responsibilities, with the precise objective of avoiding potential liabilities with third parties, while the record contains abundant evidence, as has been noted above, demonstrating the subsidiary's deep ties and<br><br>lack of independence with respect to its parent company, which was who actually took the decisions and benefited from the acts of its subsidiary, which is moreover incapable of meeting the extent of the responsibilities that are demanded of it. Consideration is finally given to what |