UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

CHEVRON CORPORATION,

                  Plaintiff,

     v.

STEVEN DONZIGER, THE LAW OFFICES
OF STEVEN R. DONZIGER; et al.,

               Defendants.

Case No. 11-CV-0691 (LAK)

---

**STEVEN DONZIGER, THE LAW OFFICES OF STEVEN R. DONZIGER, AND DONZIGER & ASSOCIATES, PLLC'S RESPONSE TO CHEVRON CORPORATION'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON ITS EIGHTH CLAIM FOR RELIEF AND STATEMENT OF ADDITIONAL MATERIAL FACTS AS TO WHICH THERE EXISTS A GENUINE ISSUE TO BE TRIED**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 56.1(b), Defendants Steven Donziger, The Law Offices of Steven R. Donziger and Donziger & Associates, PLLC (collectively "Donziger"), hereby submit their Response to Plaintiff's Statement of Material Facts in Support of Motion for Summary Judgment on Its Eighth Claim for Relief (Violation of New York Judiciary Law § 487) and Donziger's Statement of Additional Material Facts as to which there is a genuine issue to be tried. This Response is based on the evidence presently available to Donziger.  As discussed in detail in Donziger's Memorandum of Law, Donziger has not yet had a reasonable opportunity to conduct discovery regarding the issues raised in Chevron's Motion for Summary Judgment and Local Civil Rule 56.1 Statement.

## DONZIGER'S RESPONSE TO PLAINTIFFS' STATEMENT OF MATERIAL FACTS

**I.    DEFENDANTS' ONGOING FRAUD AND OTHER MISCONDUCT PERMEATED THE LAGO AGRIO PROCEEDINGS[1]**

**A.    The Ecuadorian Plaintiffs' Counsel Manipulated Their Nominated Experts, Instructing Them to Find Contamination, but the Court-Appointed Settling Experts Rejected the LAPs' Experts' Opinions, Finding That Concentrations of Contaminants Were Lower Than Allowable Limits and That Health Risk Was "Low"[2]**

---

[1] For the reasons set forth in Donziger's responses to each of Chevron's facts listed under heating I, Donziger also disputes the assertions and conclusions set forth in Chevron's heading I.

[2] For the reasons set forth in Donziger's responses to each of Chevron's facts listed under heading I.A., Donziger also disputes the assertions and conclusions set forth in Chevron's heading I.A.

*1.     During the initial judicial-inspection phase of the trial, Donziger advised one of the LAPs' technical consultants that "the lawyers will control the scope [of the process], not the science people."  Mastro Decl. 2820 (KAMP-NATIVE001786-001793) at KAMP-NATIVE001789.*

1.     Disputed.  Chevron has manipulated the quoted text so as to present a misleading impression.  Although Chevron has inserted a period, rather than an ellipsis, after the word "people" in the quoted sentence, the *full* sentence actually reads: "But the lawyers will control the scope, not the science people, *but we will work together to determine*." Dkt. No.  586-21(Ex. 2820) at KAMP-NATIVE001789 (portion omitted by Chevron added).)  Moreover, Chevron's insertion of the bracketed text "of the process" gives the false impression that Donziger's statement pertains to broader circumstances than the ones actually discussed. The quotation is taken from an e-mail exchange between Donziger and Mark Quarles from E-Tech regarding the scope of E-Tech's work as an environmental consultant for the Ecuadorian Plaintiffs.  Donziger and Quarles were not discussing Lago Agrio evidentiary process, as Chevron's editorializing might suggest.  *See id.*  Further, whether and to what extent the Ecuadorian Plaintiffs' legal team gave direction to their own environmental consultants has no bearing on whether particular statements made to New York courts were actionably false.

*2.     Donziger "instructed" the LAPs' nominated experts to find contamination.  Dkt. 31-21 (Calmbacher Dep. Tr.) at 52:13-18.*

2.     Disputed.  As a preliminary matter, Donziger objects to the use of Calmbacher's deposition testimony because it is inadmissible.  *First,* this testimony was given by a witness with a well-established bias against Donziger, *see, e.g.*, Salazar Dkt. No. [3] 158-24 (Ex. R) at p. 49 (describing how Calmbacher left the Ecuadorian Plaintiffs' team on bad terms, disgruntled

_____

[3] Documents from *Chevron Corporation v. Salazar, et al.,* Case No. 11-CV-3718 (LAK) are hereafter referred to as "Salazar Dkt.".

about non-payment); *id.* (Lago Agrio court's observation that Calmbacher had "a sense of resentment on a personal level against the plaintiffs' team due to labor and money issues,"), at a deposition at which Donziger was not present. *See* Fed. R. Civ. P. 32(a)(1)(a) (requiring that a party be present or represented at the taking of a deposition or had reasonable notice of it); *see* Fed. R. Civ. P. 32(a)(8) (discussing use of deposition testimony from earlier actions). At the very least, Donziger must be afforded the opportunity to depose or cross-examine Calmbacher. *Second*, the portion of the Calmbacher deposition that Chevron chose to introduce into the record at Dkt. No. 31-21 and cite in its factual statement does not even satisfy the requirements of an affidavit; the portion at Dkt. No. 31-21 is not signed by him. *And, third*, the statement upon which Chevron relies is inadmissible hearsay. Chevron cannot rely on Calmbacher's description of what Donziger allegedly told him to prove that Donziger actually made such a statement. Fed. R. Evid. 801, 802.

Chevron also mischaracterizes Calmbacher's testimony. Contrary to Chevron's suggestion, the cited testimony, taken as a whole, demonstrates that there was nothing unusual or nefarious about Donziger's "instruction" to the experts—Donziger expressed a hope that the experts would find evidence to support his clients' theory of the case. *See* Dkt. No. 31-21 at 52:13-18. ("Did Mr. Donziger tell the plaintiff peritos, including yourself, that he wanted to find contamination at the sites? A: I wouldn't put it that way, no. He just – he was hoping to find it and we were instructed, you know, to find it.").

Further, the conclusion that Chevron wishes this Court to draw—that it would be improper for a lawyer to "instruct" experts to find evidence to support his clients' case—cannot be reconciled with the fact that Chevron was instructing its own experts to *avoid* finding contamination. *See* Donziger Statement of Additional Material Facts as to Which there is a

Genuine Issue to be Tried ("Donziger 56.1(b) Statement") Fact No __, *infra*; Dkt. No. 366-5

(Ex. E- Judicial Inspection Playbook); Dkt. No. 366-6 (Ex. F- "Summary of Sampling and

Testing Program for Judicial Inspection Sites" with instructions to "us[e] locations that the PI

team has shown to be clean" and noting that "[l]ocations for perimeter sampling should be

chosen to emphasize clean points around pits when possible").

3.      *The LAPs' technical coordinator, Edison Camino Castro, warned Donziger that "[w]ith so much psychological pressure, an Expert may react by making an accusation to the Court about the abuses, the coercion, the distortion of scientific methods, intellectual harassment, lack of security, systematic degradation of morals and ethics, intervention under threat into technical matters by people that are not educated in engineering, etc." Mastro Decl. 2821 (DONZ-HDD-0066187).*

3.      Disputed.  Chevron has grossly mischaracterized Castro's statement.  The document on

its face shows the author complaining of *Chevron's* pattern of misconduct and the impact it may

have upon experts.  Castro was not "warning" Donziger about the Ecuadorian Plaintiffs'

conduct, as Chevron claims.  The portion of the document that Chevron has omitted makes this

clear:

> The professionally managed propaganda by Texaco may publish everything against, as is their custom.  Their style has always been one of massive alignment through large publicity campaigns. For this reason, there are many professionals who only know Texaco's mass version; some of these professionals have no capacity for technical analysis, or education in environmental engineering, they repeat the information from the propaganda.

> Despite the systematic, perverse, conspiratorial obstacles, the lack of information and documents, the destruction of procedures and duties of the field team, no legal advice from Monica, the team of Experts has completed the first Report. We are working arduously on the rest of the Reports and preparing the program for this year. Our Quito office operates technically, as it should be, because we don't have the poisonous infection. With so much psychological pressure, an Expert may react by making an accusation to the Court about the abuses, the coercion, the distortion of scientific methods, intellectual harassment, lack of security, systematic degradation of morals and ethics, intervention under threat into technical matters by people that are not educated in engineering, etc.

Dkt. No. 586-22 (Ex. 2821) at p. 2.

4.      *On February 1, 2006, the "Report of the 'Settling Experts' on the Judicial Inspection of the Sacha 53 Well" found that "the concentration levels of the elements analyzed are lower than*

*the allowable limits" and thus "the risk to human health is low."  Mastro Decl. 2822 at 26*
*(Report of the "Settling Experts" on the Judicial Inspection of the Sacha 53 Well explaining:*
*"[T]he concentration levels of the elements analyzed are lower than the allowable limits[.]");*
*Dkt. 31-12 at 76 ("[T]he risk to human health is low, with a probability of impact equally low,*
*unless there are drastic changes in the site's current conditions[.]"); id. ("In the case of Mr.*
*Baños's well, no concentrations of hydrocarbons were detected."); see also Dkt. 46-5*
*(DONZ00041662) at 50.*

4.      Disputed. Chevron's purported quotation from p. 26 of the Report of the Settling Experts

is incomplete and misleading.  The report states that "From the analyses submitted by Texpet in

1996 (Mr. Baca's report) it can be seen that the concentration levels of the elements analyzed are

lower than the allowable limits established in the Contract for Implementing Environmental

Remedial Work and Release from Obligations, Liability and Claims, executed on 4 May 1995, as

submitted by the defendant."  Dkt. No.  586-23 (Ex. 2822) at p. 26.  The validity and relevance

of those limits, and the legality of the remediation contract have, to say the least, been a subject

of disagreement between the parties.

Chevron's selective quotation from the Report of the Settling Experts is further

misleading because Chevron has taken quotations relating to results from particular pits and

characterized them as if they apply to the Sacha 53 site generally.  The statement that "the risk to

human health is low" occurs many pages after Chevron's first quotation, relates only to Pit 3, and

is misleadingly and incompletely quoted.  Dkt. No.  31-12 (Ex. 127) at p. 76.  The full sentence

reads: "In view of the fact that the concentration of hydrocarbons (TPH-DRO) and barium are

located at depths of over 0.4 m, the risk to human health is low, with a probability of impact

equally low, unless there are drastic changes in the site's current conditions, which would

increase the risk (removal of the soil by mechanical operations, intense water erosion, felling of

trees with the consequent exposure of roots and soil)."  Elsewhere in the Sacha 53 report, the

experts describe extensive and serious petroleum and chemical contamination found at site. *Id.* at

75-76.  More recently, the Sacha 53 site was investigated by a U.S. journalist.  *See* Werdegar

Decl., Ex. S ("Within a few inches the dirt gives off the pungent odor of petroleum. Within a few feet the dirt glistens with oil residue. When a few handfuls of the soil are dropped into a bucket of water, a thick oil-slick coats the surface.")

Further, to the extent that Chevron suggests that the Ecuadorian Plaintiffs attempted to alter the ordinary course of the trial by putting an end to the "settling expert" process, that suggestion would be an inaccurate portrayal of what occurred in the Lago Agrio trial.  The "settling expert" reports were not originally contemplated as part of the judicial site inspection process determined at the outset of the trial.  *See* Donziger Rule 56.1(b) Statement, Fact No. 177. Rather, the additional step of third expert report (in addition to the two party-affiliated expert reports) was requested by Chevron.  Donziger believed that this maneuver was an attempt to inject more delay into already protracted proceedings.  *See* Dkt. No.  28-9, at 12 (Donziger private journal entry noting that "I broke down how long it would take to finish the case if all the dirimiente [settling expert] reports and responses are done, and we estimated that it would take about six years beyond where we are now."); *id.* at 13 ("Why would Yánez order the [settling expert] reports when he and everyone else knows they are useless?  The dangerous combination of not wanting to make a decision, with the fact they [sic] this is an American case and who cares, people can just keep making money.").  Donziger also believed that Chevron was attempting to corrupt the settling expert process.  *See id.* at 25 (Donziger describing a meeting where "I laid out my tri-partite anti corruption plan about the peritos dirimentes . . . .").

**B.      The LAPs' Counsel Pressured the Ecuadorian Court to End the Judicial Inspection Process and Install a Single "Global" Expert[4]**

*5.      In January and July of 2006, the Lago Agrio Plaintiffs ("LAPs") filed motions seeking to "waive" and "relinquish" their right to conduct the majority of the remaining judicial inspections. Dkt. 31-29 at 92,443 (2006.01.26 filing by Fajardo moving to withdraw from requested judicial inspections at specified sites); Dkt. 31-30 at 116,433 (2006.07.21 filing in which Fajardo moved to relinquish judicial inspections stating: "the plaintiffs are of the opinion that it is unnecessary to conduct further judicial inspections at this stage of the lawsuit, with respect to those inspections requested by the plaintiffs, at Sacha Centro and Shushufindi fields. . . . In the brief [dated January 27, 2006] to which I am referring, I expressed the plaintiffs' willingness to waive their right to conduct judicial inspections at the Sacha and Shushufindi fields.").*

5.      Disputed. Donziger disputes Chevron's misleading characterization of the pleadings cited.  In July 2006, the Ecuadorian Plaintiffs waived their right to the inspections *which the Ecuadorian Plaintiffs had requested*.  Dkt. No.  31-30 (Ex. 145) at p. 4 ("Therefore, I confirm the waiver of the right to conduct the aforementioned judicial inspections.  This is clearly a right held by the plaintiffs, i.e., the right to waive their own evidence, one which belongs to said plaintiffs and solely and exclusively regards their interest."); *id.* ("I repeat: All of these sites whose inspection I am waiving were requested exclusively by the plaintiffs.").  Every site inspection that Chevron had requested for its case-in-chief was performed.  *See* Donziger 56.1(b) Statement, Fact No. 179.

Donziger further disputes Chevron's suggestion that the Ecuadorian Plaintiffs' decision to conclude the judicial inspection process and proceed to the damages phase of the trial was motivated by a lack of confidence in the evidence or the case.  In fact, the Ecuadorian Plaintiffs sought to dispense with their remaining inspections based on the belief that (i) further inspections were unnecessary because the Ecuadorian Plaintiffs had already met their burden of proof and

---

[4] For the reasons set forth in Donziger's responses to each of Chevron's facts listed under heading I.B, Donziger also disputes the assertions and conclusions set forth in Chevron's heading I.B.

the results of the inspections to date strongly indicated contamination at the inspected sites; and that (ii) Chevron intended to use protracted judicial inspections to delay the litigation as much as possible and exhaust the Ecuadorian Plaintiffs' resources. *See* Donziger Rule 56.1(b) Statement, Fact No. 176.

Further, the global expert examination was not intended to, and did not, supplant the judicial inspections or settling expert reports. The Ecuadorian Plaintiffs had requested a global expert examination in October 2003, at the beginning of the trial. Dkt. No. 31-31 (December 4, 2006 LAP filing), at 1 ("Your honor, I respectfully request that you immediately order an expert examination aimed at determining the environmental effects of activities related to the production of hydrocarbons in all of the fields operated by Texaco, as requested in the evidentiary motion on pages 4677 and 4678 of the record. The Court granted that motion in an Order issued on October 29, 2003, at 5:55 p.m., and that Order is final and binding."). The court granted that request, and the global expert examination would have proceeded at some time, whether or not the judicial inspections had continued for a longer period. *Id.* (quoting the Lago Agrio court's October 29, 2003 order that "an expert examination shall be conducted aimed at determining the environmental effects of activities related to the production of hydrocarbons in all of the fields operated by TEXACO . . . ."). *See also* Donziger 56.1(b) Statement, Fact No. 178.

*6.  The LAPs' lawyers met repeatedly with Judge Germán Yánez Ricardo Ruiz, without Chevron representatives present, including to discuss their requests to cancel the majority of the remaining judicial inspections. Dkt. 28-9 (DONZ00036235) at 29 (Donziger's personal journal recount at least two March 2006 meetings between the LAPs' lawyers and Judge Germán Yánez Ricardo Ruiz without Chevron representatives present, stating "Lunch meeting with judge. This was second meeting with judge - had lunch with him the previous Friday in the Cangrejo Rojo. I love it - this lobbying. I am good at it."); id. (DONZ00036233) at 17 ("lunch after with judge, he hits on Atossa and two Scandanavian [sic] woman [sic]."); Dkt. 32-4 (DONZ00023182) at 1 (2006.7.26 Donziger emails Kohn: "Pablo met with the Judge today. The judge, who is on his heels from the charges of trading jobs for sex in the court, said he is going to accept our request*

*to withdraw the rest of the inspections . . . . The judge also I believe wants to forestall the filing of a complaint against him by us, which we have prepared but not yet filed.”); Dkt. 28-9 (DONZ00027256) at 56 (2006.07.25 Donziger journal entry stating that if the judicial inspections are not cancelled “then we are in all-out war with the judge to get him removed”).*

6.      Disputed.  Chevron’s selective and incomplete quotation of documents is misleading.  In particular, Chevron’s selective quotation from DONZ0023182 at 1 could create the false impression that the Ecuadorian Plaintiffs were connected to the charges of Judge Yánez trading jobs for sex in the court.  However, the papers to which Chevron cites establish that the complaint that the Ecuadorian Plaintiffs prepared concerned the judge’s failure to act on the Ecuadorian Plaintiffs’ motion regarding judicial inspections, not the prior sex scandal in which the judge was allegedly involved. Dkt. No.  28-9 (Ex. 76) (DONZ00027256) at p. 55 (2006.07.25 journal entry quoted by Chevron, which also states: “It appears the corruption charges against Yánez which came out in El Comercio two weeks ago have embroiled the entire court in a patricidal war.  . . . He [Pablo] also said there is the feeling in the court that we are behind the complaints against Yánez and Novillo, which we are not, even though we have much to complain about, which is sort of ironic.”).  *See also* Dkt. No.  32-4 (Ex. 149) (DONZ00023182) at p. 1 (“Pablo met with the judge today.  The judge, who is on his heels from the charges of trading jobs for sex in the court, said he is going to accept our request to withdraw the rest of the inspections save the four we still want to do.  This follows our press conference Monday that was attended by 32 journalists and several prominent supporters, and the filing of a very well-written amicus signed by 11 Ecuadorian lawyers supporting the withdrawal of the inspections.  The judge also I believe wants to forestall the filing of a complaint against him by us, which we have prepared but not yet filed.  The judge told Pablo that the Texaco lawyers came by the other day to urge him to make us do all the inspections. The judge told Pablo they were nervous about the peritaje global.”).

Further, Chevron has not established that each meeting occurred without Chevron present because the documents to which Chevron cites do not state whether or not Chevron was present at any meeting, and Chevron has cited to no evidence that establishes Chevron was not present at any particular meeting.

Donziger disputes Chevron's suggestion that *ex parte* contacts with a judge were inappropriate.  At all times relevant to Chevron's motion, there was no law or regulation in Ecuador prohibiting *ex parte* communications with judges.  *See* Donziger Rule 56.1(b) Statement, Fact No. 165; Dkt. No.  154-6 (Affidavit of Dr. Farith Ricardo Simon noting that Ecuadorian law prohibiting judges from "accepting the visit of or meeting with one of the parties or his counsel without first notifying the other" did not come into existence until March 9, 2009—roughly three years after the Ecuadorian Plaintiffs are alleged to have met with Judge Yánez concerning the waiver of judicial inspections and the commencement of the *peritaje global*.).  And Chevron's citation to evidence indicating that the Ecuadorian Plaintiffs' lawyers went out to lunch with the judge, in a public place, after a judicial site inspection undercuts Chevron's suggestion that such meetings were inappropriate or secret.  *See* Dkt. No.  28-9 at 17.  (Donziger journal entry describing lunch with judge in a public place).

Further, sworn eyewitness accounts confirm that Chevron's lawyers' representatives engaged in repeated, substantive *ex parte* meetings and communications with the judges presiding over the Lago Agrio litigation, including specifically meetings and communications relating to the appointment of Richard Cabrera.  *See* Donziger Rule 56.1(b) Statement, Fact No. 166.  Chevron has yet to produce documents regarding its own *ex parte* contacts with the Lago Agrio court and other Ecuadorian judicial officials, including *ex parte* communications relating

to the selection of Richard Cabrera and other Court-appointed experts.[5]  Werdegar Decl. ¶ 13.

Such evidence would further rebut Chevron's insinuation that ex parte contacts with Judge

Yánez were improper under Ecuadorian law and would also further rebut Chevron's suggestion

that the Ecuadorian Plaintiffs were attempting to exert undue influence over the Lago Agrio

court.

7.      *During meetings at which no representative of Chevron was present, the LAPs' counsel
informed Judge Yánez of a complaint they had drafted against him but not yet filed. Dkt. 28-8
(DONZ00027256) at 29 (Donziger: "We wrote up a complaint against Yánez, but never filed it,
while letting him know we might file it if he does not adhere to the law and what we need."); Dkt.
32-4 (DONZ00023182) at 1 (2006.7.26 Donziger emails Kohn: "Pablo met with the Judge
today. The judge, who is on his heels from the charges of trading jobs for sex in the court, said
he is going to accept our request to withdraw the rest of the inspections . . . . The judge also I
believe wants to forestall the filing of a complaint against him by us, which we have prepared but
not yet filed.").*

7.      Disputed.  Donziger disputes that the documents to which Chevron cites establish when

any complaint the Ecuadorian Plaintiffs' counsel had drafted was shown to the judge and

whether Chevron was present.  Donziger further disputes any suggestion that the complaint

concerned allegations of sexual impropriety.

        Chevron's selective and incomplete quotation of documents is misleading.  In particular,

Chevron's selective quotation from DONZ0023182 at 1 could create the false impression that the

Ecuadorian Plaintiffs were connected to the charges of Judge Yánez trading jobs for sex in the

court.  However, the papers to which Chevron cites establish that the complaint that the

Ecuadorian Plaintiffs prepared concerned the judge's failure to act on the Ecuadorian Plaintiffs'

---

[5] On Monday, October 29, 2012, twenty-four days after Chevron filed its motion for
summary judgment, Donziger received an additional document production from Chevron, which
according the Chevron's production cover letter, includes several thousand "Chevron-affiliated
custodian documents[.]"  Werdegar Decl. ¶ 7, Ex. D.  Chevron's production cover letter does not
indicate to which of Donziger's document requests these documents are responsive, and
Donziger has not had sufficient time to review or assess the nature or substance of these newly
produced materials.

motion, not the prior sex scandal in which the judge was involved. Dkt. No. 28-9 (Ex. 76) (DONZ00027256) at p. 55 (2006.07.25 journal entry quoted by Chevron, which also states: "It appears the corruption charges against Yánez which came out in El Comercio two weeks ago have embroiled the entire court in a patricidal war. . . .He [Pablo] also said there is the feeling in the court that we are behind the complaints against Yánez and Novillo, which we are not, even though we have much to complain about, which is sort of ironic."). *See also* Dkt. No. 32-4 (Ex. 149) (DONZ00023182) at p. 1 ("Pablo met with the judge today. The judge, who is on his heels from the charges of trading jobs for sex in the court, said he is going to accept our request to withdraw the rest of the inspections save the four we still want to do. This follows our press conference Monday that was attended by 32 journalists and several prominent supporters, and the filing of a very well-written amicus signed by 11 Ecuadorian lawyers supporting the withdrawal of the inspections. The judge also I believe wants to forestall the filing of a complaint against him by us, which we have prepared but not yet filed. The judge told Pablo that the Texaco lawyers came by the other day to urge him to make us do all the inspections. The judge told Pablo they were nervous about the peritaje global.").

Further, Chevron has not established that each meeting occurred without Chevron present because the documents to which Chevron cites do not state whether or not Chevron was present at any meeting, and Chevron has cited to no evidence that establishes Chevron was not present at any particular meeting.

Donziger disputes Chevron's suggestion that *ex parte* contacts with a judge were inappropriate. At all times relevant to Chevron's motion, there was no law or regulation in Ecuador prohibiting *ex parte* communications with judges. Dkt. No. 154-6 (Affidavit of Dr. Farith Ricardo Simon Campaña noting that Ecuadorian law prohibiting judges from "accepting

the visit of or meeting with one of the parties or his counsel without first notifying the other" did not come into existence until March 9, 2009—roughly three years after the Ecuadorian Plaintiffs are alleged to have met with Judge Yánez concerning the waiver of judicial inspections and the commencement of the peritaje global.).  And Chevron's citation to evidence indicating that the Ecuadorian Plaintiffs' lawyers went out to lunch with the judge, in a public place, after a judicial site inspection undercuts Chevron's suggestion that such meetings were inappropriate or secret. *See* Dkt. No.  28-9 at 20.

Further, sworn eyewitness accounts confirm that Chevron's lawyers' representatives engaged in repeated, substantive *ex parte* meetings and communications with the judges presiding over the Lago Agrio litigation, including specifically meetings and communications relating to the appointment of Richard Cabrera.  *See* Werdegar Decl. ¶ 13, Exs. F, G & N**.** Chevron has yet to produce documents regarding its own *ex parte* contacts with the Lago Agrio Court and other Ecuadorian judicial officials, including *ex parte* communications relating to the selection of Richard Cabrera and other Court-appointed experts.[6]  Werdegar Decl. ¶ 13.   Such evidence would further rebut Chevron's insinuation that ex parte contacts with Judge Yánez were improper under Ecuadorian law and would also further rebut Chevron's suggestion that the Ecuadorian Plaintiffs were attempting to exert undue influence over the Lago Agrio court.

8.      *On September 7, 2006, Judge Yánez ordered that the LAPs could abandon 64 inspections.  Dkt. 402-2 (Ex. 2220) (2006.09.07 Order).*

---

[6] On Monday, October 29, 2012, twenty-four days after Chevron filed its motion for summary judgment, Donziger received an additional document production from Chevron, which according the Chevron's production cover letter, includes several thousand "Chevron-affiliated custodian documents[.]"  Werdegar Decl. ¶ 7, Ex. D.  Chevron's production cover letter does not indicate to which of Donziger's document requests these documents are responsive, and Donziger has not had sufficient time to review or assess the nature or substance of these newly produced materials.

8.      Donziger disputes Chevron's inappropriate and argumentative use of the word "abandon" to characterize the Ecuadorian Plaintiffs' relinquishment of their right to conduct inspections that were part of their own case-in-chief.  Chevron cites to no evidence where Judge Yánez used the word "abandon" to refer to the Ecuadorian Plaintiffs' efforts to move the trial towards resolution. The Ecuadorian Plaintiffs had every right, and very good reason, to seek an end to the individual inspection process that they believed Chevron was using as a way to drag out the trial and bleed the Ecuadorian Plaintiffs' resources.  *See* Donziger Rule 56.1(b) Statement, No. __.

*9.      In December 2006, the LAPs filed a motion requesting that the Ecuadorian court appoint a single expert to "conduct the entire examination."  Dkt. 31-31 at 123,454 (2006.12.04 LAP motion to "appoint an expert to act as an expert witness to conduct the entire examination, which was properly requested and ordered").*

9.      Disputed to the extend that this fact implies that the Ecuadorian Plaintiffs first requested—or that the Lago Agrio court ordered—a global damages assessment only in 2006.  In October 2003, the Lago Agrio court granted the Ecuadorian Plaintiffs' motion for a global expert examination that was made at the outset of the trial.  *See* Donziger Rule 56.1(b) Statement, Fact No. 178; Dkt. No.  31-31 (December 4, 2006 LAP filing) at 1 (requesting that the court immediately order a global expert examination and noting that "[w]e realize that the examination has already been ordered [in an order issued on October 29, 2003 at 5:55 p.m.].  By requesting that it be conducted, we are simply exercising our procedural right to that evidence . . . .").

*10.      The LAPs' lawyers continued to meet repeatedly with Judge Yánez, without Chevron representatives present, including to persuade him to commence the global expert examination and to appoint the global examination expert.  Dkt. 28-8 (DONZ00027256) at 36 (2006.11.20 Donziger journal entry noting: "Meeting with Judge: on Sat night at Lupe's house."); Dkt. 402-13 (Ex. 2312) (DONZ00041865) (2006.11.07 email in which Fajardo reports a meeting with the Judge noting an effort to convince the Judge to adopt the Global Assessment, the Judge's resistance because the request lacked a legal basis, and Fajardo's request for feedback from the team to help strengthen their position); Dkt. 28-8 (DONZ00027256) at 38 (2006.11.16 Donziger journal entry noting: "Meeting with Judge in hotel: On Tuesday night in Hotel Auca."); Dkt. 402-13 (Ex. 2313) (DONZ00042039) (2006.11.28 email in which Sáenz reports that the Judge did not feel the global assessment was justified and that he would not take such an assessment into account when rendering judgment "since I think it entirely lacks legal logic"); Dkt. 402-13*

*(Ex. 2314) (DONZ00042194) (2006.12.21 email in which Fajardo writes that he "met with the Judge today, and I can say that he will definitely not issue the order [authorizing global inspections] before the recess; he will issue it immediately afterward"); Dkt. 28-8 (DONZ00027256) at 26 (2007.01.19 Donziger journal entry recording: "Met with judge last night in house. Humble house, furniture. Made tea. I really like the guy. Remember last August I wanted to ride the wave and get him off case? This was an example of Pablo's total intelligence. We saved him, and now we are reaping the benefits."); Dkt. 28-7 (DONZ00027256) at 10 (2007.03.01 Donziger journal entry stating, "On Friday night, Pablo and Luis met with the judge near the airport in his barrio in a restaurant."); id. (2007.03.01 Donziger journal entry stating: "Pablo returned to Lago and met with the judge. . . . The bottom line is that the judge asked us for help to protect him, like we did last August."); id. (DONZ00027256) at 1 ("Two very disturbing meetings with Judge in Lago on May 21. First with Trudie and Luis Yanza full of his charm and bullshit, starts blaming Texaco for filing too many papers. And then that night, I saw another side of Pablo. He called to ask if I would call the judge so we could go see him at his house. . . . I called the judge and he asked that we bring over some whiskey or some wine. We didn't. When we got there, he was clearly drunk and had a young woman.").*

10.     Disputed in part. Donziger admits that the Ecuadorian Plaintiffs, consistent with the motion referenced in Chevron's Fact No. 9, attempted to persuade Judge Yánez to conduct the global expert examination and to appoint the expert. *See* Dkt. No. 31-31 (Ex. 146) at p. 123,454. Chevron has not established the purpose of the meetings described in Fact No. 10 because the documents to which Chevron cites do not establish the purpose of each meeting. Donziger further disputes that Chevron has established that each meeting occurred without Chevron present because the documents to which Chevron cites do not state whether or not Chevron was present at any meeting, and Chevron has cited to no evidence that establishes Chevron was not present at any particular meeting.

Donziger further disputes Chevron's use of the word "continued," as it suggests that all the meetings Chevron describes occurred subsequent to the Ecuadorian Plaintiffs' December 2006 motion. In fact, four of the documents to which Chevron cites are dated prior to December 2006. *See* Dkt. No. 28-8 (Ex. 76) (DONZ00027256) at 36 (Nov. 20, 2006 Donziger journal entry); Dkt. No. 402-13 (Ex. 2312) (DONZ00041865) (Nov. 7, 2006 email); Dkt. No. 28-8 (DONZ00027256) at 38 (Nov. 16, 2006 Donziger journal entry); Dkt. No. 402-13 (Ex. 2313)

(DONZ00042039) (Nov. 28, 2006 email).

Donziger disputes Chevron's suggestion that *ex parte* contacts with a judge were inappropriate.  At all times relevant to Chevron's motion, there was no law or regulation in Ecuador prohibiting *ex parte* communications with judges. Dkt. No.  154-6 (Affidavit of Dr. Farith Ricardo Simon Campaña noting that Ecuadorian law prohibiting judges from "accepting the visit of or meeting with one of the parties or his counsel without first notifying the other" did not come into existence until March 9, 2009—roughly three years after the Ecuadorian Plaintiffs are alleged to have met with Judge Yánez concerning the waiver of judicial inspections and the commencement of the peritaje global.).  And Chevron's citation to evidence indicating that the Ecuadorian Plaintiffs' lawyers went out to lunch with the judge, in a public place, after a judicial site inspection undercuts Chevron's suggestion that such meetings were inappropriate or secret. *See* Dkt. No.  28-9 at 17.  (Donziger journal entry describing lunch with judge in a public place).

Further, sworn eyewitness accounts confirm that Chevron's lawyers' representatives engaged in repeated, substantive *ex parte* meetings and communications with the judges presiding over the Lago Agrio litigation, including specifically meetings and communications relating to the appointment of Richard Cabrera.  *See* Werdegar Decl. ¶ 13, Exs. F, G & N**.** Chevron has yet to produce documents regarding its own *ex parte* contacts with the Lago Agrio court and other Ecuadorian judicial officials, including *ex parte* communications relating to the selection of Richard Cabrera and other Court-appointed experts.[7]  Werdegar Decl. ¶ 13.   Such

---

[7] On Monday, October 29, 2012, twenty-four days after Chevron filed its motion for summary judgment, Donziger received an additional document production from Chevron, which according the Chevron's production cover letter, includes several thousand "Chevron-affiliated custodian documents[.]"  Werdegar Decl. ¶ 7, Ex. D.  Chevron's production cover letter does not indicate to which of Donziger's document requests these documents are responsive, and Donziger has not had sufficient time to review or assess the nature or substance of these newly

evidence would further rebut Chevron's insinuation that *ex parte* contacts with Judge Yánez were improper under Ecuadorian law and would also further rebut Chevron's suggestion that the Ecuadorian Plaintiffs were attempting to exert undue influence over the Lago Agrio court.

*11.    After ratifying his earlier decision to cancel the judicial inspections on January 22, 2007, Judge Yánez on January 29, 2007, ordered that the global expert examination would proceed. Dkt. 52-8 (2007.01.22 Order); Dkt. 402-15 (Ex. 2333) (2007.01.29 Order).*

11.    Not disputed.  Donziger notes, however, that the Lago Agrio court had, in October 2003, granted the Ecuadorian Plaintiffs' motion for a global expert examination that was made at the outset of the trial.  *See* Donziger Rule 56.1(b) Statement, Fact No. 179; Dkt. No. 31-31 (December 4, 2006 LAP filing) at 1 (requesting that the court immediately order a global expert examination and noting that "[w]e realize that the examination has already been ordered [in an order issued on October 29, 2003 at 5:55 p.m.].  By requesting that it be conducted, we are simply exercising our procedural right to that evidence . . . .").

*12.    Of the 122 site inspections originally ordered, only 45 were conducted by the parties' nominated judicial inspection experts.  Dkt. 33-13 (Cabrera Report) at 16.*

12.    Not disputed.  However, every site inspection that Chevron had requested for its case-in-chief was performed.  *See* Donziger 56.1(b) Statement, infra, Fact No. 177.

Further, to the extent that Chevron suggests that the Ecuadorian Plaintiffs attempted to alter the ordinary course of the trial by putting an end to the "settling expert" process, that suggestion would be an inaccurate portrayal of what occurred in the Lago Agrio trial.  The "settling expert" reports were not originally contemplated as part of the judicial site inspection process determined at the outset of the trial.  *See* Donziger Rule 56.1(b) Statement, Fact No. 177.  Rather, the additional step of a third expert report (in addition to the two party-affiliated expert reports) was requested by Chevron.  Donziger believed that this maneuver was an attempt to

produced materials.

inject more delay into already protracted proceedings. *See* Dkt. No. 28-9, at 12 (Donziger private journal entry noting that "I broke down how long it would take to finish the case if all the dirimiente [settling expert] reports and responses are done, and we estimated that it would take about six years beyond where we are now."); *id.* at 13 ("Why would Yánez order the [settling expert] reports when he and everyone else knows they are useless? The dangerous combination of not wanting to make a decision, with the fact they [sic] this is an American case and who cares, people can just keep making money.").

## C.   The LAPs' Counsel Pressured the Court Into Installing Cabrera as the Global Expert[8]

*13.   Settling experts completed and filed only one report, the "Report of the 'Settling Experts' on the Judicial Inspection of the Sacha 53 Well." Dkt. 31-12 (Report of the "Settling Experts" on the Judicial Inspection of the Sacha 53 Well).*

13.   Not disputed. However, that this report was issued on February 1, 2006, before the Ecuadorian Plaintiffs initiated the global examination process. *See* Dkt. No. 31-12 (Ex. 127) (Report of the "Settling Experts" on the Judicial Inspection of the Sacha 53 Well).

Further, to the extent that Chevron suggests that the Ecuadorian Plaintiffs attempted to alter the ordinary course of the trial by putting an end to the "settling expert" process, that suggestion would be an inaccurate portrayal of what occurred in the Lago Agrio trial. The "settling expert" reports were not originally contemplated as part of the judicial site inspection process determined at the outset of the trial. *See* Donziger Rule 56.1(b) Statement, Fact No. 177. Rather, the additional step of third expert report (in addition to the two party-affiliated expert

---

[8] For the reasons set forth in Donziger's responses to each of Chevron's facts listed under heading I.C, Donziger also disputes the assertions and conclusions set forth in Chevron's heading I.C.

reports) was requested by Chevron.  Donziger believed that this maneuver was an attempt to

inject more delay into already protracted proceedings.  *See* Dkt. No.  28-9, at 12 (Donziger

private journal entry noting that "I broke down how long it would take to finish the case if all the

dirimiente [settling expert] reports and responses are done, and we estimated that it would take

about six years beyond where we are now."); *id.* at 13 ("Why would Yánez order the [settling

expert] reports when he and everyone else knows they are useless?  The dangerous combination

of not wanting to make a decision, with the fact they [sic] this is an American case and who

cares, people can just keep making money.").

*14.    The LAPs' attorneys met with potential experts to be appointed by the Ecuadorian court
for the Peritaje Global ("global expert examination") to find one that would "totally play ball
with [the LAPs] and let [the LAPs] take the lead while projecting the image that he is working
for the court," asking one whether he was comfortable "slamming" Chevron with a multi-billion
dollar judgment.  Dkt. 28-8 (DONZ00027256) at 30 ("I asked if he could be comfortable
slamming them with a 10b judgment. . . . I see using E-tech to give him cover, but he has to
totally play ball with us and let us take the lead while projecting the image that he is working for
the court."); id. at 18 (Donziger writing in his diary that he interviewed Cabrera and that he
"may be the perfect foil for Chevron").*

14.    Disputed.  Chevron's selective quotation of Donziger's journal entry is misleading.

Donziger was discussing a meeting with Fernando Reyes in which Donziger attempted to assess

whether Reyes would be strong enough to withstand the pressure that Chevron would exert over

whomever was appointed as well as be willing to take on the personal and professional risks of

potentially finding against a powerful company such as Chevron.  Dkt. 28-8 (Ex. 76)

(DONZ00027256) at 30 ("I told him [Reyes] pointblank that if he did this he likely would never

work in the oil industry again in Ecuador, at least for an American company, but that he could be

a national hero and have a job the rest of his life being involved in the clean-up.  There is a

certain level of "desconfianza" in him for these past jobs, for our previous arrangement as

veeduria, for the tepid draft report he wrote, etc.  I asked if he could be comfortable slamming

them with a 10b judgment.  He answered yes to tall [sic], but I don't know if he has the internal timber to pull it off but at this point I don't see a Plan B.  Bottom line is that he is an "insider."). Donziger confirmed this in his deposition, when he testified that "There was a hesitancy, I found, on the part of qualified technical people in Ecuador to work with us out of fear that Chevron would retaliate against them and figure out ways to deny them work from other sources in the future. So part of the vet was to determine his willingness to enter this kind of case knowing that there could be some potential, you know, issues for him in his career down the road from Chevron."  Werdegar Decl., Ex. H (12/8/10 Donziger Depo. Tr.), at 961:22-962:13.

Donziger believed that it was appropriate for each side to work closely with the global expert and that it was not improper to vet potential experts beforehand.  *See Id.* at 959:12-960:13] ("Q. Was it your intention that were Mr. Reyes to be appointed as the global court expert that the plaintiffs' team would take the lead in connection with his work while at the same time Mr. Reyes would make it appear as though he was working for the court? . . . A. I had an impression at the time that all court experts in Ecuador worked closely with the parties and that the parties could have access to them. To the extent that whoever the court expert would be could get valid evidence, data, assistance, materials, from us, yes, that was something we intended to do.  I also at that time did not know whether the court would appoint one person or two persons, per the model of judicial inspections, to be the court expert for the global damages.").  And Donziger believed that, at the same time, Chevron was trying to advance its own candidates— candidates that it could control.  *See, e.g.*, Dkt 28-9 (Ex. 76) (DONZ00027256) at p. 56 ("Texaco will have a slew of available candidates, and will probably pay them on the side to boot, so they can be controlled"); Werdegar Decl., Ex. O (12/13/10 Donziger Depo. Tr.) at 1098: 11-14 ("both parties were presenting names of potential technical people to the court for appointment. And I

believe this was part of that process").

*15. Representatives of the LAPs, including Fajardo, met with Judge Yánez without Chevron representatives present, to arrange to have Richard Cabrera appointed as the court's expert for the global expert examination. Dkt. 28-7 (DONZ00027256) at 6-7; Dkt. 400-2 (Ex. 2011) (DONZ-HDD-0100386) at 1 ("Pablo's a clever character and in [sic] pretty in with the judge, right, so I'm sure some solution will come up"); Dkt. 6-2 (Crude footage) at CRS-158-02-CLIP-06; Dkt. 6-9 (certified transcripts of Crude footage) at 94-95 (Fajardo "had two meetings with the President of the court" and had "more or less an idea of who" the global expert "could be"); Dkt. 28-7 (DONZ00027256) at 15-16 (Donziger writes, "I asked Pablo if he was 100% sure the judge would appoint Richard and not Echeverria, and he said yes. But given that this is the most important decision of the case thus far, there is simply no margin for error."); Dkt. 356-9 (DONZ-HDD-0113389) at 152 (Donziger describes appointment of Cabrera as a "HUGE VICTORY" and states "that visit to the judge last week was a huge help"); Dkt. 400-2 (Ex. 2012) (DONZ00042758) at 1; Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 965:11-968:5, 3822:12-3824:3; Dkt. 28-8 (DONZ00027256) at 29 (Donziger: "We wrote up a complaint against Yánez, but never filed it, while letting him know we might file it if he does not adhere to the law and what we need. The worst part is that after the decision - which was covered in the Ec press and the Oil Daily - he told Luis that we needed to back him now as he fights for survival on the court. So instead of a strong judge who sees the viability of our case, we now might have a weak judge who wants to rule correctly for all the wrong, personal reasons. Need to get going on the inspections (looking for perito) and peritaje global.").*

15. Disputed. Chevron has manipulated, mischaracterized, and taken out of context the cited

materials in a way that creates an inaccurate impression.

- In the cited portion of the transcript, Fajardo states that he recently had meetings with Yánez. Dkt. 6-9 (Ex. 2) at p. 94. In response to the question "was [he] specified," Fajardo responded "Yes, we have more or less an idea of who it could be, but it has yet to be specified." *Id.* at p. 94-95. Nowhere in the cited portions of the transcript does Fajardo state that Chevron representatives were not present, nor does he state that the purpose of any meeting was to have Cabrera appointed as the global expert. Chevron piles inference upon inference in making its purported statement of fact. Further, Donziger has testified that Fajardo believed he knew who the Lago Agrio court would appoint Cabrera not because of any *ex parte* contact with the judge or improper pressure, but by a simple process of elimination based on who already had served as court-appointed experts and therefore possibly could be appointed and who likely would be deemed ineligible for one reason or another. Werdegar Decl., Ex. H (12/8/10 Donziger Depo. Tr.), at 985:4-986:18.

- The quotation from Dkt. 400-2 (Ex. 2011) is a statement by Aaron Marr Page, not Donziger. The more complete quotation shows that Mr. Page was not confident that the judge would order a global assessment, let alone appoint a particular expert. Page observes, "but Pablo's a clever character and in pretty in [sic] with the judge, right, so I'm sure some solution will come up. worst case scenario is just calling out

'irreconcilable differences' and asking the judge to name two peritos each to do their own assessment, maybe?" Moreover, Mr. Page is responding to an e-mail from Donziger in which Donziger expresses his uncertainty regarding what Judge Yánez will do. "Things are so mysterious here… the judge is not doing what we thought he would do, but it is unclear what he is doing, and it is unclear if what he is doing is going to hurt us or help us." *Id.*

- Donziger's question to Fajardo about whether he was sure the judge would appoint Richard and not Echeverria says nothing about whether meetings were held with the judge, whether Chevron any attended meetings, and what the purpose of any meetings was. Fajardo's prediction about which of two experts the judge was going to appoint was the result of a simple process of elimination. Dkt. 28-7 (Ex. 76) (DONZ00027256) at p. 15-16.

- The context of Donziger's June 13, 2007 e-mail makes clear that Donziger was expressing his relief that the expert was finally sworn in because that started the process to bring the trial to an end. It was no secret that the Ecuadorian Plaintiffs were attempting to persuade the judge to swear in the expert so that the process could begin. "The perito got sworn into [sic] after all those visits to the court… the 120-clock is ticking, this is huge for us, WE ARE GOING TO END THE TRIAL!!!!!!!" Moreover, the court had announced that Cabrera would be appointed as the global expert three months prior, on March 19. 2007. *See* Chevron Fact No. 16. From the context and timing of events, it is clear that the "victory" to which Donziger is referring is the fact that Cabrera was finally sworn in so that the examination could begin. Dkt. 356-9 (Ex. J) at p. 152.

Further, there is nothing untoward about the Ecuadorian Plaintiffs' advocating for their preferred global expert. It was important to have an expert appointed who had the strength and the will to stand up to Chevron, and the competence to engage the complex task of assembling a damages assessment for claims encompassing decades of conduct and thousands of acres of land. *See* Dkt. 400-2 (Ex. 2011) (Donziger: "my worst nightmare is we will never be able to present a full damages claim to the court because of some idiot perito [expert]").

Finally, Chevron has yet to produce documents regarding its own *ex parte* contacts with the Lago Agrio Court and other Ecuadorian judicial officials, including ex parte communications

relating to the selection of Richard Cabrera and other Court-appointed experts.[9]  Werdegar Decl.

¶ 13.  However, sworn eyewitness accounts confirm that Chevron's lawyers' representatives

engaged in repeated, substantive *ex parte* meetings and communications with the judges

presiding over the Lago Agrio litigation, including specifically meetings and communications

relating to the appointment of Richard Cabrera.  See Werdegar Decl. ¶ 13, Exs. F, G & N. Such

evidence would further rebut Chevron's insinuation that *ex parte* contacts with Judge Yánez

were improper under Ecuadorian law and would also further rebut Chevron's suggestion that the

Ecuadorian Plaintiffs were attempting to exert undue influence over the Lago Agrio court.

*16.     On March 19, 2007, Judge Yánez ordered that: "Mr. Richard Cabrera is appointed as the expert for the expert evaluation requested by plaintiffs . . . ." Dkt. 32-5 (2007.03.19 court order) at 2.*

16.     Not disputed.

*17.     After Cabrera was appointed, Donziger stated: "[A]ll this bullshit about the law and facts . . . but in the end of the day it is about brute force . . . . [The judge] never would have done [Cabrera's appointment] had we not really pushed him." Dkt. 6-2 (Ex. 1) at CRS-361-11-CLIP-01; Dkt. 8-5 (Ex. 2 (certified transcript)) at 431, 434.*

17.     Disputed.  Chevron's selective quotation and combination of quotations to make them

appear as if they were stated in sequence is misleading.  The full quotation, reproduced below,

makes clear that Donziger was attempting to resist and counter the massive pressure that

*Chevron* was exerting on the court.

> It's just a matter of force.  It's pure force.  Who can put the most pressure
> and who can resist.  It's just like – you know? All this bullshit about the law and
> the facts, you know? . . . but in the end of the day it is about brute force.  Who can

---

[9] On Monday, October 29, 2012, twenty-four days after Chevron filed its motion for summary judgment, Donziger received an additional document production from Chevron, which according the Chevron's production cover letter, includes several thousand "Chevron-affiliated custodian documents[.]"  Werdegar Decl. ¶ 7, Ex. D.  Chevron's production cover letter does not indicate to which of Donziger's document requests these documents are responsive, and Donziger has not had sufficient time to review or assess the nature or substance of these newly produced materials.

apply the pressure and who can withstand the pressure, and can you get them to the breaking point.  It's the only way to litigate a case against a powerful company on behalf of people who have no power.

…

The scenario that we might lose is out there, but I just… I'm having a hard time seeing how that one's gonna go down, unless there's an—a pure act of corruption in the court.

…

So, I felt – frankly I felt just overcome with emotion in that moment, 'cause I know how hard we've tried just to get here, to finish [honking] the case, you know? And we have struggled every step of the way to get everything we've earned.  Nothing, nothing has been given to us, and, you know, this took five months, you know? five months of delay to do something the court could have done last December… and never would have done had we not really pushed him.

Dkt. 8-5 (Ex. 2) at p. 431, 433-34 (ellipses in original).  Further, the context makes clear that Donziger is not talking about the Cabrera appointment process or putting pressure on the Lago Agrio court in connection with any other issue.  Rather, he is talking in general about the challenges of litigating "on behalf of people who have no power" against a "powerful company" and explaining that "in the end of the day" the side that can stand the pressure of the litigation the longest will prevail.  Dkt. 8-5 (Ex. 2) at p. 431.

In the second snippet, which appears three pages later in the transcript, Donziger is talking about Cabrera's appointment.  But read in context, it is clear that Donziger is stating that the Ecuadorian Plaintiffs had push the Court finally to make a decision and appoint someone after five months of delay.  Dkt. 8-5 (Ex. 2) at p. 434.  Nothing in the transcript suggests that the Ecuadorian Plaintiffs pushed specifically for Cabrera to be appointed.

Moreover, Donziger's notes show that Donziger believed Chevron was attempting to corrupt and illegitimately influence the process, which required a strong response from the Ecuadorian Plaintiffs' team.  *See, e.g.*, Dkt. 28-7 (DONZ00027256) at p. 9 ("I still have that terrible sinking feeling (which I had on Friday night and Sat morning after the meeting with the

judge) that the corruption and pressure are coming back"); *id.* at p. 10 (The secretary told him

she got a call from an unknown magistrate of the Supreme Court telling him to slow down the

environmental cases (our case and the OCP). We think this is complete bullshit; that nobody

actually called, and that was part of Texaco's pressure via the secretary. Further, these pressures

to remove the judge have mysteriously and suddenly heated up again, and we think Texaco is

behind them."); Dkt. 28-8 (DONZ00027256) at p. 37 ("They pulled a stunt on Monday - tried to

get the judge to suspend the inspection for 60 days on the even [sic] of going out to the site. LY

got text msg judge was leaving Lago - we had out [sic] own intelligence sources. They did this

for Guanta, San Carlos, and now Yuca"); Dkt. 28-7 (DONZ00027156) at p. 1 ("Texaco has

kicked it into high gear in an effort to destroy the legitimacy of the process. This has two goals:

to set it up so they have an argument on appeal in Ecuador, and ultimately, to have an argument

in the U.S. when we move to enforce a judgment. And, if they can accomplish it, to derail the

trial itself to prevent it from finishing."); Dkt. 28-7 (DONZ00027256) at p. 4 ("Texaco called

[the judge] and said, "Esta entregado a los indios." ["you are in the pocket of the Indians"]  Who

knows how much they are harassing him. He seemed really nervous and freaked."); *id.* at p. 1

("[the judge] sat down and immediately looked at me and said Texaco knows what I am doing

and not doing every second of the day, that Texaco intelligence agents have been following

him").  These materials also demonstrate Chevron's ability to litigate effectively and sometimes

successfully against the Ecuadorian Plaintiffs.  These facts undercut Chevron's insinuation that

the court was unduly influenced by the Ecuadorian Plaintiffs.  *See, e.g.*, *id.* at p. 9-10 ("the reality

is that T has cleverly and effectively delayed the PG for several weeks with its escritos (get from

Pablo) that because of Ecuador civil law procedure require [sic] the judge to jump thru a bunch

of hoops to deal with this stuff before ordering the process"); 28-7 at 14 ("I was really pissed off

at the news they reported - that the judge still did not want to rule . . . Clearly, T's strategy is working.").

*18.      In a March 26, 2007, email to the LAPs' lawyers, Pablo Fajardo stated: "Today the cook met with the waiter to coordinate the menu," which was code for the judge (the cook) meeting with Cabrera (the waiter), and described the need to pressure the judge to keep him from appointing another expert in addition to Cabrera. Dkt. 400-2 (Ex. 2012) (DONZ00042758) (referring to the judge as the "cook", Cabrera as the "waiter" and Chevron as "the other restaurant"); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 3822:12-3824:8 (Donziger testifying that Fajardo's code words "the cook," "the waiter," and "the other restaurant" referred to the judge, Cabrera, and Chevron respectively).*

18     Donziger does not dispute that Fajardo sent the cited e-mail.  Donziger disputes the insinuation that the use of alternate names is evidence of impropriety by the Ecuadorian Plaintiffs.  Chevron engaged in extensive efforts to spy on the Ecuadorian Plaintiffs' team.  *See* Werdegar Decl. Ex. E.

Donziger also disputes Chevron's suggestion that *ex parte* contacts with a judge were inappropriate.  Sworn eyewitness accounts confirm that Chevron's lawyers' representatives engaged in repeated, substantive *ex parte* meetings and communications with the judges presiding over the Lago Agrio litigation, including specifically meetings and communications relating to the appointment of Richard Cabrera.  *See* Werdegar Decl. ¶ 13, Exs. F, G & N**.**  Chevron has yet to produce documents regarding its own *ex parte* contacts with the Lago Agrio Court and other Ecuadorian judicial officials, including *ex parte* communications relating to the selection of Richard Cabrera and other Court-appointed experts.[10]  Werdegar Decl. ¶ 13.  Such

---

[10] On Monday, October 29, 2012, twenty-four days after Chevron filed its motion for summary judgment, Donziger received an additional document production from Chevron, which according the Chevron's production cover letter, includes several thousand "Chevron-affiliated custodian documents[.]"  Werdegar Decl. ¶ 7, Ex. D.  Chevron's production cover letter does not indicate to which of Donziger's document requests these documents are responsive, and Donziger has not had sufficient time to review or assess the nature or substance of these newly produced materials.

evidence would further rebut Chevron's insinuation that ex parte contacts with Judge Yánez were improper under Ecuadorian law and would also further rebut Chevron's suggestion that the Ecuadorian Plaintiffs were attempting to exert undue influence over the Lago Agrio court.

Nor has Chevron produced documents regarding its regarding its intensive surveillance and harassment of the Ecuadorian Plaintiffs' legal team and Cabrera and his team, including documents from its agents at the corporate security and investigation firm Kroll. Donziger believes that Chevron's and Kroll's documents will confirm the allegations contained in Cabrera's complaint to the Lago Agrio Court that he was being threatened and harassed by Chevron, reveal additional improper attempts by Chevron to spy on and interfere with the Ecuadorian Plaintiffs' legal team, and explain why the Ecuadorian Plaintiffs' legal team took precautionary measures to prevent Chevron improperly from learning of their litigation efforts and strategies, such as using code names.

*19.     In May 2007, Fajardo met with Judge Yánez, who he referred to as "the boss," and the judge confirmed that "[t]here is no turning back. He will ratify Richard [Cabrera] and everything that's been ordered." Dkt. 32-7 (DONZ00108564) at 1; Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 3830:19-3836:14.*

19.     Disputed. As a preliminary matter, the evidence to which Chevron cites is inadmissible hearsay. Chevron cannot rely on Fajardo's alleged statement to establish what Judge Yánez said to Fajardo.

Further, Chevron mischaracterizes the Fajardo e-mail to which it cites. Fajardo does not purport to quote the judge, and Chevron's suggestion that the "no turning back" quotation is from the judge is not supported.

Chevron also mischaracterizes Donziger's deposition testimony. The citation—which does not provide any actual quotation from that testimony—could suggest that Donziger acknowledged the alleged meeting or alleged statement by Judge Yánez. But Donziger's actual

deposition testimony does not confirm or deny any of the purported facts Chevron asserts.  The portion of the deposition transcript to which Chevron cites indicates only that Donziger sees Fajardo's e-mail—no more.  Dkt. 400-1 (Ex. 2010) at 3836:10-14.

Donziger disputes Chevron's suggestion that *ex parte* contacts with a judge were inappropriate.  At all times relevant to Chevron's motion, there was no law or regulation in Ecuador prohibiting *ex parte* communications with judges. Dkt. 154-6 (Affidavit of Dr. Farith Ricardo Simon Campaña noting that Ecuadorian law prohibiting judges from "accepting the visit of or meeting with one of the parties or his counsel without first notifying the other" did not come into existence until March 9, 2009—roughly three years after the Ecuadorian Plaintiffs are alleged to have met with Judge Yánez concerning the waiver of judicial inspections and the commencement of the peritaje global.).  And Chevron's citation to evidence indicating that the Ecuadorian Plaintiffs' lawyers went out to lunch with the judge, in a public place, after a judicial site inspection undercuts Chevron's suggestion that such meetings were inappropriate or secret. *See* Dkt. 28-9 at 20.

Further, sworn eyewitness accounts confirm that Chevron's lawyers' representatives engaged in repeated, substantive *ex parte* meetings and communications with the judges presiding over the Lago Agrio litigation, including specifically meetings and communications relating to the appointment of Richard Cabrera.  *See* Werdegar Decl. ¶ 13, Exs. F, G & N**.** Chevron has yet to produce documents regarding its own *ex parte* contacts with the Lago Agrio court and other Ecuadorian judicial officials, including *ex parte* communications relating to the selection of Richard Cabrera and other Court-appointed experts.[11] Werdegar Decl. ¶ 13.   Such

---

[11] On Monday, October 29, 2012, twenty-four days after Chevron filed its motion for summary judgment, Donziger received an additional document production from Chevron, which

evidence would further rebut Chevron's insinuation that *ex parte* contacts with Judge Yánez were improper under Ecuadorian law and would also further rebut Chevron's suggestion that the Ecuadorian Plaintiffs were attempting to exert undue influence over the Lago Agrio court.

*20.     Cabrera was sworn in as the Ecuadorian court's global examination expert on June 13, 2007.  Dkt. 32-9 (Cabrera certificate of swearing in) at 130,169.*

20.     Not disputed.

*21.     The LAPs' team discussed opening a "new secret [bank] account" on the same day Cabrera was sworn in as the Ecuadorian court's global examination expert— June 13, 2007. Dkt. 400-3 (Ex. 2021) (DONZ-HDD-0113361-62) at 1-2 (Donziger and Yanza discuss opening a "new secret account"); Dkt. 32-9 (Cabrera certificate of swearing in) at 130,169; Dkt. 356-9 (DONZ-HDD-0125080) at 210 (Email from Yanza to Donziger, copying Fajardo, requesting Donziger to "explain this situation to JK so he can transfer 30 to our Secret Account and 20 to SV, but he could send the 50 to the secret account, and then we could pass the 20 to SV to save time and paperwork").*

21.     Disputed.  Yanza's e-mail makes the purpose of the account clear, and the purpose is far less nefarious than Chevron would have the Court believe.  Chevron was going to great lengths to block and delay the expert inspections, in part by ensuring that he would not be paid.  The pruprose of the second account was to pay Cabrera so that he could start his work.

> Texaco's goal of stopping the global assessment could happen the next business day. . . But the expert's work cannot wait, and the last business day starts next Wednesday, so he will need more money, especially since the groundwater study begins, too, but if there is no money, the work will simply stop.
>
> Considering all this, I think we should plan ahead and not give those Texaco bastards the pleasure, using the same mechanism from weeks ago, that is, he sends us money to our secret account, to give to Wuao, [to] not stop the work.

Dkt. 356-9 (Ex. S0 (DONZ-HDD-0125080) at p. 210.

---

according the Chevron's production cover letter, includes several thousand "Chevron-affiliated custodian documents[.]"  Werdegar Decl. ¶ 7, Ex. D.  Chevron's production cover letter does not indicate to which of Donziger's document requests these documents are responsive, and Donziger has not had sufficient time to review or assess the nature or substance of these newly produced materials.

**D.      The Court Ordered Cabrera, and He Swore, to Maintain "Complete Impartiality And Independence Vis-À-Vis The Parties"[12]**

*22.      At his June 13, 2007 swearing in, Cabrera swore to carry out his duties "faithfully and in accordance with science, technology and the law and with complete impartiality and independence vis-à-vis the parties." Dkt. 32-9 (Cabrera certificate of swearing in) at 130,169.*

22.      Not disputed.

*23.      The Ecuadorian court ordered Cabrera to be "impartial" and "independent" and that his work be "transparent" and "independent from the two parties." Dkt. 329 at 130,169 (In Cabrera certificate of swearing in Cabrera swears to perform his duties "faithfully and in accordance with science, technology and the law and with complete impartiality and independence vis-à-vis the parties"); Dkt. 32-6 (132,846) at 2 (2007.10.03 court order regarding Cabrera's duties as expert stating: "The Expert [Cabrera] is hereby reminded that he is an auxiliary to the Court for purposes of providing to the process and to the Court scientific elements for determining the truth."); id. at 6 (ordering Cabrera to "perform his work in an impartial manner and independently with respect to the parties"); id. ("In reference to the persons acting as assistants to [Cabrera] in the sampling and other work being performed by the expert, these must be independent from the two parties."); id. at 10 (ordering Cabrera to maintain "complete impartiality and transparency with respect to the parties and their attorneys").*

23.  Disputed.  Chevron has plucked convenient words at random from various court orders and strung them together in a misleading manner, as the full quotations Chevron provides make clear.

More importantly, Chevron's selective quotation and characterization of the October 3, 2007 order omits the essential fact that, in the very same order, ***the judge ordered Cabrera to make time to meet with the parties and for the parties to make suggestions regarding the proceeding***.  This refutes Chevron's insinuation that Cabrera was not to have contact with the parties or that the parties could not provide materials to, and attempt to persuade, Cabrera.

He [the expert] shall allow at least thirty minutes every day to meet with the parties, thus complying with the request made in point 6 of the motion.  The content of point 4 was discussed with the parties, and an agreement was reached on it.  The Expert is responsible for the opinions, for the conclusions made by the professionals making up his team and assisting with the preparation of the report.

---

[12] For the reasons set forth in Donziger's responses to each of Chevron's facts listed under heading I.D, Donziger also disputes the assertions and conclusions set forth in Chevron's heading I.D.

. . .

>    With regard to request 2, it has been ruled that the expert will be allowed
> half an hour prior to the start of the proceeding in order to discuss certain details
> of the expert testimony with the parties and so that he can give that testimony
> better, they can make suggestions regarding the proceeding.

Dkt. 32-6 (Ex. 151) at p. 132,846 and 132,849.

*24.    The Ecuadorian court ordered that Cabrera be solely responsible for "the entire report,
the methodology used, for the work done by his assistants." Dkt. 32-6 (132,850) at 10
(2007.10.03 court order regarding Cabrera's duties as expert stating: "The expert is responsible
for the entire report, the methodology used, for the work done by his assistants, etc."); id. at 17
("The expert has agreed to be responsible for all information and conclusions contained in the
expert report."); id. (Ecuadorian court stating that "the expert Richard Cabrera . . . was
appointed as the sole expert").*

24.    Disputed.  Chevron's selective quotation is misleading and designed to create the

impression that the Court ordered Cabrera to work alone. The court did no such thing.  The court

order to which Chevron cites states that Cabrera would be responsible for the report and that he

was appointed as the sole expert.  The court did not state that Cabrera was to be solely

responsible for the report, as Chevron claims.  Dkt. 32-6 (Ex. 151) at P 132,850 and 132,854.

*25.    The Ecuadorian court ordered Cabrera to present together "with the report" all sources
used and "to cite all of his scientific sources, and analytical and legal documents that he use[d]
to perform his work." Dkt. 402-14 (Ex. 2322) (133,755) at 1 (2007.11.30 Ecuadorian court
order regarding materials used in preparing the Cabrera Report: "[A]ll the documents that
serve as support or a source of information for the work performed by [Cabrera] must be
presented together with the report. . . . [I]n his report the Expert is required to cite all of the
scientific sources, and analytical and legal documents that he uses to perform his work.").*

25.    Disputed.  Chevron's selective quotation of documents is misleading.  In response to a

request by Chevron, the court ordered "all the documents that serve as support or as a source of

information for the work performed by the Expert must be presented together with the report.  At

that time all those documents will be provided to the parties.  For the foregoing reasons, in his

report the Expert is required to cite all of the scientific sources, and analytical and legal

documents that he uses to perform his work.  Independently, if the defendant company has an

interest in having the documents requested by Engineer Richard Cabrera, then send official

letters to the institutions for them to also provide these documents to the defendant." Dkt. 402-14 (Ex. 2322) at p. 133,755.

Chevron has not yet completed its production of documents in response to Donziger's request that Chevron provide all documents concerning communications between or among Chevron and any expert concerning the Ecuadorian litigation, including payments or offers of payment to any person or company affiliated with such experts; nor has Chevron completed its production of documents in response to Donziger's request that Chevron provide all documents concerning communications between or among Chevron and any person serving as a court-appointed expert or advisor in connection with the Ecuadorian litigation. CITE Werdegar Decl. ¶. To the extent that contacts between a party in the Ecuadorian litigation and experts are relevant to Chevron's Eighth Claim for Relief, evidence that Chevron had such contacts would, among other things, demonstrate the falsity of Chevron's assertion that such contacts were improper.

26.     *The LAPs repeatedly asserted that Cabrera was a "neutral" and "independent" court-appointed expert or "Special Master." Dkt. 402-12 (Ex. 2308) at 134,001, 134,004 (2008.01.11 LAP filing stating in Ecuador court filing that "Cabrera was not proposed by the plaintiffs" and "was not appointed at the suggestion of the plaintiffs," but was nominated by the court); Dkt. 47-57 (2010.07.09 LAP filing in Stratus 1782) at 27 ("Cabrera is not even an expert for one party, but a Court-appointed neutral."); Dkt. 47-30 (Donziger's Lantos Commission Testimony) at 7 ("The best and most recent independent estimate available of the human health impact of this contamination is provided by the expert appointed by the court, Richard Cabrera."); Dkt. 30-5 (2010.06.14 LAP complaint to stay arbitration) ¶ 29 ("The best and most recent independent estimate available of the human health impact of this contamination is provided by the neutral Special Master appointed by the court to provide advice on damages."); Dkt. 400-2 (Ex. 2017) (2009.05.10 LAP filing) at 129,697 (The LAPs requested a single expert designated by the court "primarily due to the issue of impartiality . . . . Impartiality because, having not been named by either of the parties, he will be even more objective in his analysis and conclusions"); see also Dkt. 400-2 (Ex. 2019) at 140,184-85 (2008.04.18 LAP filing stating: "I remind you, Mr. President, that expert Cabrera was given the task because of his professional and personal suitability, and as such, his work should be free of external pressures from the parties, especially when these pressures can compromise the systematic integrity of his work in an attempt to turn this professional designated by the court into a mere executor of their plans and strategies.").*

26.     Disputed.  Chevron has manipulated quotations and taken words out of context in a manner that creates a misleading impression.  For example:

- Chevron did not include the end of the sentence that begins "Cabrera was not proposed by the plaintiffs."  The full sentence reads: "Engineer Cabrera was not appointed at the suggestion of the plaintiffs.  They originally proposed Dr. Luis Villacreces for the position.  Chevron opposed this, and the Judge listened to this request and appointed another expert."  Dkt. 402-12 (Ex. 2308) at p. 134,004.

- The Stratus pleading that Chevron quotes was an effort by Stratus to resist Chevron's improper § 1782 fishing expedition.  Stratus argued that "There is no Ecuadorian precedent for seeking this discovery of materials given to a court-appointed expert."  Dkt. 47-27 (Ex. 295) at p. 27.

- Chevron similarly provides only a selected quotation from the Ecuadorian Plaintiffs' April 18, 2008 pleading.  Examination of the full pleading shows that the Ecuadorian Plaintiffs' statement was made in the context of attempting to clarify an order from the court for Cabrera to "comply" with Chevron's requests.

Further, Chevron's citations do not support its assertion that the Ecuadorian Plaintiffs' "repeatedly" referred to Cabrera as "neutral" "independent" or a "Special Master."  In fact, most of Chevron's citations provide only that the Ecuadorian Plaintiffs recited the fact that the court appointed Cabrera.  It is undisputedly true that the court appointed Cabrera.

27.     *The LAPs denied any improper relationship with Cabrera. Dkt. 36-5 at 3 (2008.04.04 LAP filing in Ecuador calling the notion that Cabrera "works for us" "simply ridiculous"); Dkt. 36-6 at 140,266 (2008.04.25 LAP filing in Ecuador) at 2 (labeling the allegation that the LAPs have a "close relationship with the Independent Expert Richard Cabrera" "[a]nother infamy"); Dkt. 359-9 at 3362:7-3363:20 (Donziger testifying that the LAPs' counsel "[s]ought to prevent Stratus' role relative to the Cabrera report from coming out"); Dkt. 401-5 (Ex. 2165) (Press Release, Chevron Accused of Lying to Shareholders Over $16 Billion Damages Claim in Ecuador Rainforest Case by Amazon Defense Coalition, Apr. 3, 2008) ("Chevron's claim that Professor Cabrera is cooperating with the plaintiffs is completely false....Chevron is frightened by Cabrera precisely because he is an independent and credible expert.").*

27.     Disputed.  Chevron selectively quotes from pleadings in a manner that suggests that the quotations are more favorable to Chevron than they really were.  For example, in their April 4, 2008 filing, the Ecuadorian Plaintiffs characterized Chevron's assertion that "if we're [the Ecuadorian Plaintiffs] not attacking Mr. Cabrera it must be because he works for us.  That's

34

simply ridiculous." Dkt. 36-5 (Ex. 212) at p. 140,167.

 Chevron does not define what it means by an "improper" relationship. Nowhere in the evidence to which Chevron cites do the Ecuadorian Plaintiffs or Donziger use the word "improper," so it is wholly inaccurate to claim that the Ecuadorian Plaintiffs "denied any improper relationship." Chevron's characterization of what exactly was denied is unsupported and argumentative. Chevron's suggestion that any contact whatsoever between the Ecuadorian Plaintiffs and Cabrera was "improper" is wrong under Ecuadorian law and is inconsistent with the Lago Agrio court's orders. Moreover, the insertion of this legal conclusion is not proper in a Rule 56.1 statement. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).Whether Chevron believes that any relationship between the Ecuadorian Plaintiffs and Cabrera was "improper" under Chevron's own standards is not relevant to Chevron's Eighth Claim for Relief.

 Chevron has not yet completed its production of documents in response to Donziger's request that Chevron provide all documents concerning communications between or among Chevron and any expert concerning the Ecuadorian litigation, including payments or offers of payment to any person or company affiliated with such experts; nor has Chevron completed its production of documents in response to Donziger's request that Chevron provide all documents concerning communications between or among Chevron and any person serving as a court-appointed expert or advisor in connection with the Ecuadorian litigation. Werdegar Decl. ¶__. To the extent that contacts between a party in the Ecuadorian litigation and experts are relevant

to Chevron's Eighth Claim for Relief, evidence that Chevron had such contacts would, among

other things, demonstrate the falsity of Chevron's assertion that such contacts were improper.

*28.      Cabrera filed at least 11 letters with the Ecuadorian court claiming his independence, impartiality, fairness, and honesty. Dkt. 35-9 (2007.07.23 Cabrera letter) at 131,972 (Fajardo, writing as Cabrera, stating, "I should clarify that I do not have any relation or agreements with the plaintiff, and it seems to me to be an insult against me that I should be linked with the attorneys of the plaintiffs."); Dkt. 400-3 (Ex. 2030) (2007.08.23 Cabrera letter) at 132,263 (Fajardo, writing as Cabrera, reporting that, "In order to demonstrate the transparency, impartiality and objectivity with which I am performing the field work . . . I chose to draft a sample registry sheet"); Dkt. 401-7 (Ex. 2178) (2007.10.11 Cabrera Letter) at 133,178-80 (claiming that it is "untrue" that "the plaintiff is in 'close contact' with me" and asserting that he "performed [his] work with absolute impartiality, honesty, transparency and professionalism"); Dkt. 400-3 (Ex. 2031) (2007.10.16 Cabrera letter) at 133254 (Fajardo, writing as Cabrera, stating that Cabrera's "duty as expert is to comply with the law"); Dkt. 400-3 (Ex. 2032) (2007.10.31 Cabrera letter) at 133,465 (Fajardo, writing as Cabrera, stating, "I can only confirm my commitment to continue my work with absolute impartiality, honesty and transparency."); Dkt. 400-3 (Ex. 2033) (2007.11.08 Cabrera letter) at 133,582 (Fajardo, writing as Cabrera, asking the court to order public and private institutions to provide him with essential information so he can "conduct a thorough, impartial and objective investigation in strict observance of the law"); Dkt. 4003 (Ex. 2034) (2007.12.10 Cabrera letter) at 133907 (Fajardo, writing as Cabrera, stating, "I hope and I am certain that my report, which is completely impartial, will help bring to light the truth of the matters in dispute."); Dkt. 35-10 (2008.10.07 Cabrera letter) at 151,316 (Fajardo, writing as Cabrera, stating, "I am an honest man with nothing to hide, and my conduct as an expert in this case has been as professional, impartial and objective as possible, as can be seen from my expert report. The fact that neither of the two parties is fully satisfied with my report is clear evidence of my impartiality."); Dkt. 36-4 (2009.03.04 Cabrera letter) at 154,580 (Fajardo, writing as Cabrera, responds to questions by Chevron regarding Cabrera's independence: "Once more I make it a matter of record that I have done my work, with my technical team, in adherence to my principles of integrity and, without a desire to negatively affect or benefit either party . . . ."); Dkt. 400-3 (Ex. 2035) (2010.03.22 Cabrera letter) at 168,513 (Fajardo, writing as Cabrera, stating, "Chevron accuses me of a conflict of interest . . . . Your Honor, this is a serious and false accusation."); Dkt. 400-3 (Ex. 2029) (2007.07.12 Cabrera letter) at 131,338 (Fajardo, writing as Cabrera, referring to "the complete and absolute impartiality with which I must act in carrying out my expert evaluation . . . .").*

28.      Disputed.  As a preliminary matter, Chevron cannot rely on Dr. McMenamin's report,

and all references thereto should be stricken.  Dr. McMenamin's report is unsworn and is not

admissible on summary judgment.[13]  *See Berk v. St. Vincent's Hosp. and Med. Ctr.*, 380 F.

Supp. 2d 334, 352 (S.D.N.Y. 2005) ("Courts in this Circuit have uniformly held that unsworn

expert reports do not satisfy the admissibility requirements of Fed.R.Civ.P. 56(e), and cannot be

used to defeat a summary judgment motion without additional affidavit support.").

Dr. McMenamin's report is also not admissible because it does not meet the requirements

of Rule 702 and Daubert.  See *id.* at 353; *Cacciola v. Selco Balers, Inc.*, 127 F. Supp. 2d 175,

180 (E.D.N.Y. 2001) ("Evidence contained in an expert's report therefore must be evaluated

under Fed.R.Evid. 702 before it is considered in a ruling on the merits of a summary judgment

motion.").  Dr. McMenamin's report has numerous deficiencies, three of which will be

mentioned here.

*First*, the reliability Dr. McMenamin's method of "forensic stylistic analysis" is, at the

very least, subject to debate.  Other courts have excluded proffered expert testimony as to the

identity of questioned writings that was based on the same forensic stylistic analysis as Dr.

McMenamin's opinions.  *See United States v. Van Wyk*, 83 F. Supp. 2d 515, 522-23 (D.N.J.

2000). In fact, in *Van Wyk* the government offered an article written by Dr. McMenamin in

support of its proffered expert testimony.  *See id.* at  521-23.  The court did not admit the

proffered testimony.

*Second*, Dr. McMenamin reaches his conclusion without examining any documents

known to be written by Cabrera.  See Dkt. 400-16 (Ex. 2105) at p. 112 (noting "the absence of

authenticated exemplar writing by Ing. Cabrera").  This is despite his acknowledgement that

"The first step in a matter of this type would typically be to compare and contrast the Questioned

---

[13] A page bearing nothing but the date and McMenamin's signature is attached to the report at Dkt. 400-16 (Ex. 2105) at p. 113.  But this signature does not accompany an oath or any other attestation by McMenamin regarding the report.

writings to Known writings of the putative author."  *Id.* at p. 98.  That Dr. McMenamin could

definitively conclude that certain writings were not authored by Cabrera when he didn't even

know of any baseline characteristics of Cabrera's writing is highly suspect. At the very least,

Donziger should have the opportunity to cross-examine Dr. McMenamin about the effect that the

lack of Cabrera writings has on the reliability of his analysis.

*Third*, many of the bases for Dr. McMenamin's conclusions are, on their face, highly

questionable.  Dr. McMenamin concludes that Fajardo authored certain Cabrera filings because

certain errors or formatting choices appear in both the subset of Fajardo writings that Dr.

McMenamin analyzed and the subset of Cabrera filings that were labeled "questioned."[14] But

many of these errors or choices appear to be commonplace. Dr. McMenamin bases his

conclusion on such banal common features of Fajardo's writing and the questioned filings as:

- The format in which time of day is indicated

- Failure to double-space between paragraphs (which is not consistent across either set of
  writings)

- Use of capital letters for emphasis

- Omitting letters (e.g. misspelling) words, but not necessarily the same words (only once
  is the same word misspelled in both a Cabrera filing and a Fajardo writing)

These are hardly convincing indicia of common authorship.  **At the very least, Donziger**

**should be afforded the opportunity to depose Dr. McMenamin.**

Donziger does not dispute that the eleven letters listed were filed with the court.  Even if

Chevron *could* establish that Fajardo had some part in drafting a letter that Cabrera filed with the

court (which it has not done), that fact would not establish that anything in such letters was not

---

[14] Dr. McMenamin does not explain how these subsets were selected or by whom, and
Donziger should have the opportunity to understand Dr. McMenamin's methodology.

true.  Regardless of who drafted them, Chevron does not dispute that Cabrera signed and filed these letters.

Chevron has not yet completed its production of documents in response to Donziger's request that Chevron provide all documents concerning communications between or among Chevron and any expert concerning the Ecuadorian litigation, including payments or offers of payment to any person or company affiliated with such experts; nor has Chevron completed its production of documents in response to Donziger's request that Chevron provide all documents concerning communications between or among Chevron and any person serving as a court-appointed expert or advisor in connection with the Ecuadorian litigation.  Werdegar Decl. ¶__. To the extent that contacts between a party in the Ecuadorian litigation and experts are relevant to Chevron's Eighth Claim for Relief, evidence that Chevron had such contacts would, among other things, demonstrate the falsity of Chevron's assertion that such contacts were improper.

29.    *As Dr. McMenamin concluded, LAPs' counsel Pablo Fajardo authored at least 15 letters to the Ecuadorian court in Cabrera's name, including at least 10 of the 11 Cabrera letters attesting to Cabrera's "independence" and lack of "relationship" with the LAPs. Dkt. 400-16 (Ex. 2105) ¶¶ 3, 9(c)(iii), Ex. F (2011.06.30 Expert Report of Gerald McMenamin concluding that "(1) the fifteen Cabrera filings identified as a subset of all the Cabrera filings reviewed have a single author, and (2) the author of this subset is Pablo Fajardo Mendoza"); see also Dkt. 35-9 (2007.07.23 Cabrera letter) at 131,972 (Fajardo, writing as Cabrera, stating, "I should clarify that I do not have any relation or agreements with the plaintiff, and it seems to me to be an insult against me that I should be linked with the attorneys of the plaintiffs."); Dkt. 400-3 (Ex. 2030) (2007.08.23 Cabrera letter) at 132,263 (Fajardo, writing as Cabrera, reporting that, "In order to demonstrate the transparency and impartiality and objectivity with which I am developing the field work . . . I chose to draft a sample registry sheet"); Dkt. 400-3 (Ex. 2031) (2007.10.16 Cabrera letter) at 133,254 (Fajardo, writing as Cabrera, stating that Cabrera's "duty as expert is to comply with the law"); Dkt. 400-3 (Ex. 2032) (2007.10.31 Cabrera letter) at 133,465 (Fajardo, writing as Cabrera, stating, "I can only confirm my commitment to continue my work with absolute impartiality, honesty and transparency."); Dkt. 400-3 (Ex. 2033) (2007.11.08 Cabrera letter) at 133,582 (Fajardo, writing as Cabrera, asking the court to order public and private institutions to provide him with essential information so he can "conduct a thorough, impartial and objective investigation in strict observance of the law"); Dkt. 400-3 (Ex. 2034) (2007.12.10 Cabrera letter) at 133,907 (Fajardo, writing as Cabrera, stating, "I hope and I am certain that my report, which is completely impartial, will help bring to light the truth of the matters in dispute."); Dkt. 400-4 (Ex. 2041) (2008.01.07 Cabrera letter) (Fajardo, writing as*

*Cabrera, stating that Cabrera's report is almost complete and requesting that the parties supply Cabrera with documents); Dkt. 35-10 (2008.10.07 Cabrera letter – 151,316) at 7 (Fajardo, writing as Cabrera, stating, "I am an honest man with nothing to hide, and my conduct as an expert in this case has been as professional, impartial and objective as possible, as can be seen from my expert report. The fact that neither of the two parties is fully satisfied with my report is clear evidence of my impartiality."); Dkt. 400-4 (Ex. 2042) (2008.11.07 Cabrera letter) at 152,783 (Fajardo, writing as Cabrera, stating that Cabrera could not produce to Chevron any drafts of his report because "[t]he digital files that contain these drafts were deleted after the final report was submitted, and the paper was recycled. . . . I was not aware of any obligation to store all the drafts I used in performing my work."); Dkt. 36-4 (2009.03.04 Cabrera letter) at 154,580 (Fajardo, writing as Cabrera, responds to questions by Chevron regarding Cabrera's independence: "Once more I make it a matter of record that I have done my work, with my technical team, in adherence to my principles of integrity and, without a desire to negatively affect or benefit either party . . . ."); Dkt. 400-3 (Ex. 2035) (2010.03.22 Cabrera letter) at 168,513 (Fajardo, writing as Cabrera, stating, "Chevron accuses me of a conflict of interest . . . . Your Honor, this is a serious and false accusation."); Dkt. 400-3 (Ex. 2036) (2007.12.17 email from Fajardo to Donziger attaching draft of the Cabrera letter in which Cabrera claimed to be threatened by Chevron ("Cabrera threat letter")); Dkt. 400-3 (Ex. 2037) (draft of Cabrera threat letter sent by Fajardo to Donziger with the metadata showing the author as "Pablo" and that the document was last modified six days before the threat letter was filed in Cabrera's name); Dkt. 402-13 (Ex. 2318) at 133,469 (2007.11.05 filed version of the Cabrera threat letter in which Fajardo, writing as Cabrera, claims "my life, as well as the lives of my family and collaborators, are in serious danger" because of Chevron); Dkt. 32-11 at 133,759 (2007.11.29 Ecuadorian court order ordering police protection for Cabrera as a result of Fajardo's ghostwritten letter); see also Dkt. 402-13 (Ex. 2319) (2007.07.12 Cabrera letter) at 131,336 (Fajardo, writing as Cabrera, requesting that the court halt government remediation at inspection sites); Dkt. 400-3 (Ex. 2029) (2007.07.12 Cabrera letter) at 131,338 (Fajardo, writing as Cabrera, referring to "the complete and absolute impartiality with which I must act in carrying out my expert evaluation . . . ."); Dkt. 402-14 (Ex. 2321) (2007.07.23 Cabrera letter) at 131,971 (Fajardo, writing as Cabrera, giving notice of future site inspections).*

29.     Disputed.  As a preliminary matter, Chevron cannot rely on Dr. McMenamin's report, and all references thereto should be stricken.  Dr. McMenamin's report is unsworn and is inadmissible on summary judgment.[15]  *See Berk v. St. Vincent's Hosp. and Med. Ctr.*, 380 F. Supp. 2d 334, 352 (S.D.N.Y. 2005) ("Courts in this Circuit have uniformly held that unsworn expert reports do not satisfy the admissibility requirements of Fed.R.Civ.P. 56(e), and cannot be

---

[15] A page bearing nothing but the date and McMenamin's signature is attached to the report at Dkt. 400-16 (Ex. 2105) at p. 113.  But this signature does not accompany an oath or any other attestation by McMenamin regarding the report.

used to defeat a summary judgment motion without additional affidavit support.").

Dr. McMenamin's report is also not admissible because it does not meet the requirements of Rule 702 and Daubert.  *See id.* at 353; *Cacciola v. Selco Balers, Inc.*, 127 F. Supp. 2d 175, 180 (E.D.N.Y. 2001) ("Evidence contained in an expert's report therefore must be evaluated under Fed.R.Evid. 702 before it is considered in a ruling on the merits of a summary judgment motion.").  Dr. McMenamin's report has numerous deficiencies, three of which will be mentioned here.

*First*, the reliability Dr. McMenamin's method of "forensic stylistic analysis" is, at the very least, subject to debate.  Other courts have excluded proffered expert testimony as to the identity of questioned writings that was based on the same forensic stylistic analysis as Dr. McMenamin's opinions.  *See United States v. Van Wyk*, 83 F. Supp. 2d 515, 522-23 (D.N.J. 2000). In fact, in *Van Wyk* the government offered an article written by Dr. McMenamin in support of its proffered expert testimony.  *See id.* at  521-23.  The court did not admit the proffered testimony.

*Second*, Dr. McMenamin reaches his conclusion without examining any documents known to be written by Cabrera.  See Dkt. 400-16 (Ex. 2105) at p. 112 (noting "the absence of authenticated exemplar writing by Ing. Cabrera").  This is despite his acknowledgement that "The first step in a matter of this type would typically be to compare and contrast the Questioned writings to Known writings of the putative author."  *Id.* at p. 98.  That Dr. McMenamin could definitively conclude that certain writings were not authored by Cabrera when he didn't even know of any baseline characteristics of Cabrera's writing is highly suspect. At the very least, Donziger should have the opportunity to cross-examine Dr. McMenamin about the effect that the lack of Cabrera writings has on the reliability of his analysis.

*Third*, many of the bases for Dr. McMenamin's conclusions are, on their face, highly questionable.  Dr. McMenamin concludes that Fajardo authored certain Cabrera filings because certain errors or formatting choices appear in both the subset of Fajardo writings that Dr. McMenamin analyzed and the subset of Cabrera filings that were labeled "questioned."[16]  But many of these errors or choices appear to be commonplace. Dr. McMenamin bases his conclusion on such banal common features of Fajardo's writing and the questioned filings as:

- The format in which time of day is indicated

- Failure to double-space between paragraphs (which is not consistent across either set of writings)

- Use of capital letters for emphasis

- Omitting letters (e.g. misspelling) words, but not necessarily the same words (only once is the same word misspelled in both a Cabrera filing and a Fajardo writing)

    These are hardly convincing indicia of common authorship.

    Furthermore, Chevron has selectively quoted from the cited letters in a manner that is misleading.  Chevron suggests that, in each letter, Cabrera attests to his independence and lack of relationship with the Ecuadorian Plaintiffs.  But the letters to which Chevron cites do not support this broad assertion:

- October 16, 2007 letter:  "I clarify that my duty as an expert is to comply with the law, with the timely requests of the parties, and with the orders of the judge in the case."  Dkt 400-3 (Ex. 2031).

- December 10, 2007 letter, which responds to a brief filed by Chevron, also states that "I do not believe it is proper for the parties to tell me where and how I should collect the samples.  I have stated that I accept the technical suggestions the parties make to me, but I cannot subject myself to their criteria . . . ." Dkt. 400-3 (Ex. 2034).

---

[16] Dr. McMenamin does not explain how these subsets were selected or by whom, and Donziger should have the opportunity to understand Dr. McMenamin's methodology.

- January 7, 2008 letter:  In a portion of the letter that Chevron chose not to reproduce, Cabrera requests that the court "***order the parties to provide me with any information that they consider necessary to incorporate into the expert's report***.  I should clarify that the information that the parties provide to me, if they choose to, will be selected by me." Dkt. 400-4 (Ex. 2041) (emphasis added).

- March 22, 2010 letter:  The alleged conflict of interest to which Cabrera is referring has nothing to do with the Ecuadorian Plaintiffs, as the sentences that Chevron omitted make clear.  "Chevron accuses me of having a conflict of interest.  *According to the attorneys for the company Chevron, I have a conflict of interest because I am the manager of an environmental remediation company and this company has contracts with the company Petroecuador.  Your Honor, this is another serious and false accusation.  It is indeed true that I work for a company authorized to perform environmental remediation projects, but I have never thought or would think of trying to submit proposals for any environmental remediation contracts that may result from this case.*"  Dkt. 400-3 (Ex. 2035) at 3 (portions omitted by Chevron italicized).

Further, even if Chevron *could* establish that Fajardo had some part in drafting a letter

that Cabrera filed with the court (which it has not done), that fact would not establish that

anything in such letters was not true.  Regardless of who drafted them, Chevron does not dispute

that Cabrera signed and filed these letters.

## E.  The LAPs' Counsel Colluded With and Bribed Cabrera, and Ghostwrote His Court Filings and Reports[17]

*30.  On March 3, 2007, Donziger, Fajardo, Yanza, Maest, and other of the LAPs' representatives met with Cabrera, without Chevron representatives present, to plan the global expert examination. Dkt. 6-2 (Ex. 1) at CRS-191-00-CLIP-03 (2007.03.03 Crude outtake video clip of meeting among P. Fajardo, A. Maest, and others); Dkt. 7-5 (Ex. 2 (certified transcript)) at 244 (Fajardo: "Chevron . . . doesn't know what the hell is going to happen in the global expert examination. . . . I hope none of you tell them, please. [laughter] . . . . [I]t's Chevron's problem."); Dkt. 6-2 (Ex. 1) at CRS-187-01-02 (video of March 3, 2007 meeting in Ecuador attended by the LAPs' technical experts, the LAPs' attorneys, and Cabrera in which Fajardo stated, "[T]he work isn't going to be the expert's. All of us bear the burden. . . . [Cabrera will] sign the report and review it. But all of us, all together, have to contribute to that report." At which Maest added: "But not Chevron" [laughter]); Dkt. 7-5 (Ex. 2 (certified transcript)) at 245; Dkt. 8-9 at 1120:23-1121:5 (Donziger testifying that "the primary purpose of the [March 3, 2007] meeting" with Cabrera was to "lay out the entire case and legal theory for Mr. Cabrera*

_____

[17] For the reasons set forth in Donziger's responses to each of Chevron's facts listed under heading I.E., Donziger also disputes the assertions and conclusions set forth in Chevron's heading I.E.

*and the other participants in the meeting"); see also Dkt. 6-2 (Ex. 1) at 188-00-CLIP-02, 188-01CLIP-01, 189-00-CLIP-02, 189-00-CLIP-03, 189-00-CLIP-05, 191-00-CLIP-02, 191-00-CLIP03, 192-00-CLIP-01, 193-00-CLIP-01 (video of the March 3, 2007 meeting with Cabrera and video of subsequent discussions regarding the March 3rd meeting); Dkt. 7-2-7-5 (Ex. 2 (certified transcript)) at 169-235, 241-53; Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 2147:7-11 (Donziger admitting that during the March 3, 2007 meeting with Cabrera, he assumed Cabrera would be appointed as the court's global expert).*

30.     Disputed.  Chevron selectively quotes from the outtake transcripts and presents an incomplete description of what was discussed during the meetings.  Chevron's assertion that the purpose of the meeting was "to plan the global expert examination" is unsupported.  Donziger testified that the primary purpose of the meeting was to lay out the case and legal theory for Cabrera and the other participants.[18]  Chevron's characterization suggests that the meeting participants discussed specific details of the content of Cabrera's report—but Chevron's citations do not support such a distortion.

Fajardo describes his prediction of the lengths Chevron would go to interfere with the expert examination.  *See* Dkt. 7-5 (Ex. 2) at p. 243 ("There's going to be a constant harassment of the expert and his technical team in the field. . . . Attempts—beware—attempts to bribe the expert with money—and possibly his technical team.  If that doesn't work, they're going to try to threaten, or perhaps sue the expert.").  In this context, Fajardo's statement that "Chevron's main problem right now is that it doesn't know what the hell is going to happen in the global expert examination" shows his belief the Ecuadorian Plaintiffs' work to have the court appoint an expert that could not be controlled by Chevron meant that Chevron was afraid that the true extent of damages would be revealed.

_____

[18] The quotation that Chevron provides is a quotation from a quotation that Mr. Vinegrad asked Mr. Donziger, not a quotation from Mr. Donziger's testimony.  See Dkt. 8-9 (Ex. 6) at 1120:23-1121:3.  Donziger testified "I believe that was the primary purpose of the meeting, yes." Id. at 1121:4-5.

Chevron also omits the surrounding context of Fajardo's statements about the work that the Ecuadorian Plaintiffs' team would do to provide suggestions and material they hoped would be included in Cabrera's report.  Chevron omits Fajardo's statement that "[W]hat the expert is going to do is state his criteria, alright?  and sign [on/in] the report and review it [unintelligible].  But all of us, all together, have to contribute to that report.

*31.   When one of the LAPs' consulting experts commented that the LAPs' March 3, 2007, team meeting with Cabrera was "bizarre," Donziger replied, "Don't talk about it," and "that's the way it works," and Donziger told the Crude camera crew filming the discussion, "that is off the record." Dkt. 6-2 (Ex. 1) at CRS196-01-CLIP-01; Dkt. 8-5 (Ex. 2 (certified transcript)) at 451-55.*

31.   Disputed.  Chevron omits the surrounding discussion regarding the global examination process, which shows that the group agreed that there was not anything improper about Cabrera's presence.  It was "bizarre" because the process was new and certainly not the way things would work in an American court.  But the fact that it was unfamiliar does not mean that anyone believed it was wrong.  *See* Dkt. 7-6 (Ex. 2) at 266, 268 (Donziger:  "There's no way they [Chevron] can control this, because they didn't ask for it" and "Believe me, I would much rather have it [the court process] work in the normal way."); *id*. at 268 (Kamp, the person who made the "bizarre" comment, clarifying that "I was just surprised not that that there was advanced meeting . . . But there was a meeting in which everything is being laid out.").

*32.   The LAPs' counsel secretly contracted with Cabrera. Dkt. 400-3 (Ex. 2027) (2007.07.01 email from Fajardo explaining that Cabrera called "about a little mistake in the contract" and suggesting that the LAPs' representatives "help [Cabrera] get an office," arrange for Julio Prieto's girlfriend to be his assistant, that it is the LAPs' "duty to help him get insurance"); Dkt. 400-3 (Ex. 2028) (email discussing life insurance quotes for Cabrera); supra ¶ 126.*

32.   Disputed.  Chevron selectively quotes from Fajardo's e-mail and omits the portions that undermine Chevron's chosen story.  First, Chevron omits the portion of the e-mail in which Fajardo states that "it is our obligation to help him [Cabrera]."  Dkt. 400-3 (Ex. 2027) at 2. Fajardo also states that "Even though it's not our obligation, but I think it's our duty to help him

get insurance.  We must understand that he has no structure and we do.  I think that he now needs

to get to the heart of his work.  There's no reason he should be dealing with those

[administrative] things that eat up his time and bother him."  *Id.* at 2 (bracketed text present in

translation but not in original Spanish document).  This undermines Chevron's suggestion that

Cabrera was being paid to do nothing because it shows that Fajardo and Donziger thought that

Cabrera had actual work to do.

Further, as the Ecuadorian Plaintiffs were required to pay Cabrera, it was appropriate for

them to make provisions for his work, in part to lessen costs that they would ultimately be

responsible for.  Chevron's citations merely underscore the fact that Cabrera was engaged in

substantive field work requiring assistance and that he was under intense psychological

intimidation and pressure from Chevron.  *See* Dkt. 28-7 (Ex. 76) (DONZ00027256) at p. 14

("Richard said Texaco was already starting to investigate him."); [Werdegar Decl., Ex. H

(12/8/10 Donziger Depo. Tr.) at 962: 3-6] ("There was a hesitancy, I found, on the part of

qualified technical people in Ecuador to work with us out of fear that Chevron would retaliate

against them").

Additionally, Chevron's contention that the contract with Cabrera was secret is wholly

unsupported.  The cited material does not discuss whether the contract was "secret," and

Chevron cites to no other facts from which secrecy could be inferred.

*33.    The LAPs' counsel purchased insurance for Cabrera and discussed getting him an office
and arranging for one of their girlfriends to be his assistant. Dkt. 400-1 (Ex. 2010) (Donziger
Dep. Tr.) at 3800:9-3805:7, 4842:22-4843:18 (Donziger testifying that the LAPs' counsel had
entered into a contract with Cabrera); Dkt. 400-3 (Ex. 2027) (2007.07.01 email from Fajardo
explaining that Cabrera called "about a little mistake in the contract" and suggesting that the
LAPs' representatives "help [Cabrera] get an office," arrange for Julio Prieto's girlfriend to be
his assistant, that it is the LAPs' "duty to help him get insurance"); Dkt. 4003 (Ex. 2028) (email
discussing life insurance quotes for Cabrera); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at
3802:5-3808:16 (Donziger testifies that the LAPs purchased life insurance for Cabrera).*

33.    Disputed.  Chevron selectively quotes from Fajardo's e-mail and omits the portions that

46

undermine Chevron's chosen story.  First, Chevron omits the portion of the e-mail in which

Fajardo states that "it is our obligation to help him [Cabrera]."  Dkt. 400-3 (Ex. 2027) at p. 1.

Fajardo also states that "Even though it's not our obligation, but I think it's our duty to help him

get insurance.  We must understand that he has no structure and we do.  I think that he now needs

to get to the heart of his work.  There's no reason he should be dealing with those

[administrative] things that eat up his time and bother him."  *Id.* at p. 2 (bracketed text present in

translation but not in original Spanish document).  This undermines Chevron's suggestion that

Cabrera was being paid to do nothing because it shows that Fajardo and Donziger thought that

Cabrera had actual work to do.

Chevron also fails to include the portion of the e-mail regarding life insurance quotes in

which Prieto states that "assault coverage raises the price of any policy."  Dkt. 400-3 (Ex. 2028)

at 1.  This shows that Ecuadorian Plaintiffs felt it was their duty to help Cabrera get life

insurance—including assault coverage—because they believed that Cabrera might be in danger

because of his willingness to serve as an expert.  *See* Dkt. 28-7 (Ex. 76) (DONZ00027256) at p.

14 ("Richard said Texaco was already starting to investigate him."); [Werdegar Decl., Ex. H

(12/8/10 Donziger Depo. Tr.) at 962: 3-6] ("There was a hesitancy, I found, on the part of

qualified technical people in Ecuador to work with us out of fear that Chevron would retaliate

against them").

Chevron's contention that Donziger testified that the Ecuadorian Plaintiffs purchased life

insurance for Cabrera is a gross mischaracterization of the cited portion of Donziger's testimony.

Donziger testified that he did not know whether the plaintiffs' team purchased insurance for

Cabrera.  Dkt. 400-1 (Ex. 2010) at 3805:4-7.  After Donziger was shown an e-mail that included

a discussion of specifics regarding insurance for Cabrera, Donziger responded that he did not

think that the e-mail refreshed his recollection about the Ecuadorian Plaintiffs purchasing insurance for Cabrera "But based on this, you know - - based on this e-mail, it looks to me like insurance for Cabrera was purchased, if that's your question."  *Id.* at 3808:9-16.  And, although Donziger acknowledged that he was apprised of a contract that Cabrera had with the Ecuadorian Plaintiffs, he also testified that he did not think that he had seen a copy of it and did not know who the signatories were.  *Id.* at 4842:22-4843:18.

34.     *On or before April 17, 2007, after he had been appointed the global assessment expert, but before he had been sworn in, the LAPs' representatives paid money to Cabrera. Dkt. 356-9 at 206 (2007.04.17 email from Yanza to Donziger: "We have met with Richard [Cabrera] and everything is under control. We gave him some money in advance."); see also Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 3781:3-3784:25.*

34.     Donziger does not dispute that this payment was made, but disputes the suggestion that such payment was improper.  Chevron has not established that it was inappropriate (or that Donziger believed it was inappropriate) for the Ecuadorian Plaintiffs to pay Cabrera before he was formally sworn in.

In fact, Donziger testified that there *was* a valid reason for this payment.  *See* [Werdegar Decl., Ex. P (1/29/11 Donziger Depo. Tr.), at 3778:4-11] ("Q. Can you think of any valid reason as you sit here now why Richard Cabrera would have been given some money in advance by the plaintiffs' team two months before he was officially appointed and began serving as the global damages assessment expert? A. Yes.").  The reason was that Cabrera had already begun his work.  *See id.* at 3780:19-21 ("I think he began his work before his swearing in, but after his appointment, is my recollection.").

Moreover, Donziger's testimony regarding the "everything is under control" comment clarifies that Yanza was not discussing an illicit payment.  Donziger testified that he thought "everything is under control" meant that everything was under control with respect to "the idea of getting this aspect of the trial moving."  Dkt. 400-1 (Ex. 2010) at 3783:21-3784:5.

35.     *The LAPs' representatives paid Cabrera outside the disclosed court process from what was referred to in their internal emails as "our secret account." Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 4869:6-16 (Donziger describing court procedures for paying Cabrera); Dkt. 400-3 (Ex. 2021) at 2 (Luis Yanza: "To open the account we need at least 2 thousand dollars. Due to the urgency, I suggest that amount (or more, 5 or 10 thousand) be sent to my personal account and I will transfer it to the new secret account."); Dkt. 400-3 (Ex. 2022) at 1; Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 4847:2-24 (Donziger testifying that Yanza referred to the account from which Cabrera was paid as a "secret account"); id. at 4853:6-4859:7; Dkt. 400-3 (Ex. 2023) at 3; see also Dkt. 400-3 (Ex. 2024) (email attaching list of total distributions made from Chevron Litigation Fund) at 1; Dkt. 400-3 (Ex. 2025) (list of total distributions from Chevron Litigation Fund reveals payments of $50,000 to Frente de Defensa de la Amazonia on Aug. 15, 2007 and Sept. 14, 2007) at 1-2; Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 4848:11-4849:11 ("Q. Let's actually turn to page 3, where you say at the bottom 'Joe, please transfer 50,000 to the following account in Ecuador. If you have any questions please call.' Do you see that? A. Yes. Q. And then you provide the information for the account that Mr. Yanza calls the secret account. Do you see that?  A. Yes."); Dkt. 400-3 (Ex. 2026); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 3805:8-12 ("Q. Am I correct, Mr. Donziger, that the plaintiffs' team had a nickname for Mr. Cabrera?  He was called Wao, correct?  A. Yes."), id. at 4327:15-20; Dkt. 356-9 (DONZ-HDD-0125080) at 210 ("[H]e sends us money to our secret account, to give to Wuao, [to] not stop the work.") (brackets in original); Dkt. 400-3 (Ex. 2021) (DONZHDD-0113361); Dkt. 400-3 (Ex. 2022) (DONZ-HDD-0124585); Dkt. 402-2 (Ex. 2222) (DONZ00066208) ("The economic subject is chaotic. . . . the wao is also very uncomfortable (and this is dangerous)" so it was "urgent for money to arrive next week."); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 4414:16-4415:3 (Donziger is aware of no purpose of the secret account besides payments to Cabrera).*

35.     Disputed.  *First*, Chevron has not established what the alleged "disclosed court process" was.  Donziger did not agree that the procedures Ms. Neuman, Chevron's counsel Ms. Neuman described were "the court procedures for paying Cabrera," as Chevron states.  Rather, Donziger testified that the procedure the questioner described was the process for particular identified payments to Cabrera.  Dkt. 400-1 (Ex. 2010) at 4869:6-23.  Donziger also testified that he did not have a specific recollection of payments from the second account, but that he would not characterize payments from the second account as outside the court process.  *Id.* at 4870:8-18.  Thus, the "disclosed court process" that Chevron refers to in Fact No. 35 is undefined and unsupported by citations to admissible evidence.  Chevron cites to no document describing the "disclosed court process."

        *Second*, Chevron also draws inferences from incomplete citations, mischaracterizations,

and a misleading non-chronological arrangement of facts and documents. When each piece of evidence is examined, it is clear that Chevron's citations do not support the broad conclusions it asserts:

- Chevron omits essential portions of documents. For example, Chevron's selective quotation from the September 12, 2007 e-mail from Luis Yanza, Dkt. 356-9 (Ex. S) (DONZ-HDD-0125080) at p. 210, omits two portions of that e-mail which undermine Chevron's characterization. First, Chevron omits a prior paragraph in the e-mail which shows that the payment that the parties were discussing was a payment that Cabrera had properly requested through the court but the accompanying order was being held up due to Chevron's pending motion for the judge to recuse. *Id.* Second, Chevron omits the first portion of the quoted sentence, which makes clear that this is Yanza's suggestion as to how to alleviate the pressure placed on Cabrera and the threat that Chevron would be successful in its efforts to further delay or derail the global expert examination. *Id.* ("Considering all this, I think we should plan ahead and not give those Texaco bastards the pleasure, using the same mechanism from weeks ago, that is, he sends us money to our secret account, to give to Wuao, [to] not stop the work.")[19]

- Chevron has ordered its alleged facts in order to present the impression of a link between the pre-appointment money allegedly paid to Cabrera and the alleged second bank account. But, by Chevron's own allegations, the second account had not been opened on the day that Cabrera was sworn in. *See* Fact No. 21.

- Similarly, Chevron cites to documents that were written well after Cabrera submitted his report but, misleadingly, fails to include the dates of such documents in its citations. For example, Chevron cites to an e-mail from Donziger to Luis Francisco that discusses the need to pay salaries and office expenses. Dkt. 402-2 (Ex. 2222) (DONZ00066208). This e-mail was sent on May 16, 2009.

- Chevron mischaracterizes Donziger's deposition testimony. Donziger testified that he knew there was a second account that Yanza kept. He testified that he did not have signatory authority over the account, and that he did not know whether the account was established for the purpose of paying Cabrera. Dkt. 400-1 (Ex. 2010) at 4414:10-4415:15.

- Chevron mischaracterizes the evidence when it suggests that the account in question was always referred to as the "secret account." In fact, many of the e-mails to which Chevron

---

[19] Chevron states that the brackets in its quotation are in the original. [CITE THEIR BRIEF]. This is not true. The brackets around the "H" in Chevron's quotation do not appear in the English translation or Spanish version of the document. The bracketed "to" appears in the English translation of the e-mail but not in the original Spanish version.

cites do not refer to the account in that way but, rather, refer to it as a separate account. *See, e.g.*, Dkt. 400-3 (Ex. 2023).

Third, the relevance of some of Chevron's citations to its asserted fact is entirely unclear. For example, Chevron cites to an e-mail from Donziger to Kohn's assistant asking for a list of all distributions from the Chevron Litigation Fund as well as the attachment itself. Dkt. 400-3 (Ex. 2024, 2025). Chevron does not explain how this list of distributions establishes what funds were paid to Cabrera or through what process. Moreover, the e-mail from Donziger states that he needs the list of disbursements in Word form so that he can "add a column explaining each expenditure before I send it to him." Dkt. 400-3 (Ex. 2024) at 1. Donziger's explanation indicates the opposite of a person who is attempting to hide the nature of various expenditures.

*36.     Separate from any payments through the "secret account," the LAPs' counsel paid at least $263,000 to Cabrera through the Ecuadorian court. Dkt. 402-3 (Ex. 2239) (2007.06.28 LAP filing attaching check from Selva Viva to Cabrera in the amount of $59,349.00); Dkt. 402-3 (Ex. 2240) (2007.10.10 LAP filing attaching check from Selva Viva to Cabrera in the amount of $47,000.00); Dkt. 402-4 (Ex. 2241) (2007.11.28 LAP filing attaching check in the amount of $30,000 for Expert Cabrera, paid by Selva Viva); Dkt. 402-4 (Ex. 2242) (2008.01.30 LAP filing attaching payment to Cabrera for $25,000, paid by Selva Viva); Dkt. 402-4 (Ex. 2243) (2008.03.24 LAP filing submitting check for $9,000 paid for by Selva Viva); Dkt. 402-4 (Ex. 2244) (2008.05.12 LAP filing submitting $33,000 payment to Cabrera, paid by Selva Viva); Dkt. 402-4 (Ex. 2245) (2008.09.03 LAP payment to Cabrera for $12,000, paid by Selva Viva); Dkt. 402-4 (Ex. 2246) (2008.12.09 LAP payment to Cabrera for $13,550, paid by Selva Viva); Dkt. 402-4 (Ex. 2247) (2009.07.06 LAP payment of $10,000.00 to Cabrera); Dkt. 402-3 (Ex. 2235) (2009.10.19 LAP payment of $25,000.00 to Cabrera); see, e.g., Dkt. 402-20 (Ex. 2358) (2008.12.15 Cabrera filing requesting payment of $42,915 purportedly for "preparing clarifications to my report, the hiring of experts in various areas of science . . . in addition to some logistical details, such as the letting of offices, service of assistants, and more"); Dkt. 402-2 (Ex. 2219) (Cabrera filing accepting receipt of $47,000 payment from the LAPs); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 4865:20-4869:23 (discussing funds requested by and paid to Cabrera through Court-approved process); Dkt. 402-3 (Ex. 2234) at 2 (2007.10.15 Cabrera filing requesting $97,000 "to cover the costs required for supplementing the expert examination").*

36.     Donziger does not dispute that the cited payments were made to Cabrera. For the reasons stated in Donziger's response to Fact No. 35, Donziger disputes Chevron's argumentative and prejudicial characterization of a bank account as "the secret account."

37.   *The LAPs paid Cabrera through the Ecuadorian court for the preparation of the Cabrera Report and its Annexes, even though those were prepared by LAPs' representatives, and not Cabrera. Dkt. 400-16 (Ex. 2105) (2011.06.30 McMenamin Report finding that the Cabrera Report and the supplemental report were written by the LAPs' counsel and their consultants); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 2165:2-6, 2184:3-2186:4 ("Q. Did the plaintiffs' team draft the Cabrera work plan? A. I believe the plaintiffs' team drafted a work plan that was given to him for his adoption."); Dkt. 8-9 (Donziger Dep. Tr.) at 2203:4-17 (the LAPs' counsel and consultants wrote Cabrera's work plan); Dkt. 400-4 (Ex. 2044) (2007.06.25 filed Cabrera work plan (written by the LAPs representatives) including budget of $59,349 for "the amount necessary to start the activities or field work immediately"); Dkt. 400-2 (Ex. 2016) at 130,660 (2007.06.29 letter from Fajardo to the court stating "I proceeded to pay by check 100% of the amount set by the Expert to start the expert examination, as timely requested"); Dkt. 402-15 (Ex. 2329) at 131,993 (2007.07.27 filing by Cabrera requests the Lago Agrio Court to order that "the party that requested the Expert exam deposit the sum of $47,118" to pay "technical personnel, laboratories, and other services"); Dkt. 402-3 (Ex. 2240) (2007.10.10 LAP filing) at 133,132-33 (LAPs submit a check through Selva Viva to the Lago Agrio Court for $47,000 as payment to Cabrera stating "[t]he sum or the amount of money indicated in the check being delivered to him corresponds to 100% of the estimate requested to continue the work of the expert examination."); Dkt. 402-3 (Ex. 2234) at 133,210 (2007.10.15 Cabrera filing stating: "in view of continuing to progress with the expert examination under my supervision, and to comply with the payments of all technical personnel, laboratories and my expenses for the same examination" that the LAPs pay $97,000 which "shall be used to cover the costs required for supplementing the expert examination."); Dkt. 402-15 (Ex. 2330) at 133,764 (2007.12.04 Cabrera filing acknowledging payment of $30,000 as "an advance of the Ninety-Seven Thousand Dollars I requested as part of the estimate."); Dkt. 402-15 (Ex. 2331) at 134,163 (2008.02.08 Cabrera filing acknowledging $25,000 as "an advance of Ninety-Seven Thousand Dollars requested by the Expert as part of the budget request."); Dkt. 402-15 (Ex. 2332) at 140,267 (2008.04.28 Cabrera filing stating "the plaintiffs have only paid the amount of 64,000 dollars of the total of NINETY-SEVEN THOUSAND DOLLARS.").*

37.   Disputed.  Chevron provides incomplete and mischaracterized versions of the evidence to which it cites.

For example, Chevron asserts that Donziger testified at p. 2203:4-17 that the "LAPs' counsel and consultants wrote Cabrera's work plan."  This mischaracterizes Donziger's testimony.  Donziger testified that the Ecuadorian Plaintiffs provided Cabrera with a work plan, that they had been involved in Cabrera's site selection, and he thought that the plaintiffs suggested sampling protocols to him.  2203:4-17.  And when Chevron quotes from Donziger's deposition testimony, it omits Donziger's testimony that Donziger did not know if Cabrera adopted the exact plan that the Ecuadorian Plaintiffs submitted to him, modified it, or made

another version.  Dkt. 400-1 (Ex. 2010) at 2165:2-8 ("Q: Did the plaintiffs' team draft the

Cabrera work plan?  A: I believe the plaintiffs' team drafted a work plan that was given to him

for his adoption.  *I don't know if he adopted that exact plan, modified it, or did some other*

*version.*") (portion omitted by Chevron italicized).

Even taking Chevron's incomplete and mischaracterized evidence at face value, the

purported evidence does not support the broad conclusion that Chevron would draw.  Even if

Chevron had established that the Ecuadorian Plaintiffs had submitted a work plan and a report

that Cabrera adopted (which it has not), these facts do not establish that all of the cited payments

were for activities that Cabrera did not perform.  For example, one cited payment is for field

work.  Chevron has not suggested that Cabrera did not perform field work, such as taking

samples.

*38.    The LAPs paid Cabrera through the Ecuadorian court for preparing responses to the
LAPs' questions, even though those responses were prepared by LAPs' representatives, and not
Cabrera. Dkt. 400-16 (Ex. 2105) (2011.06.30 McMenamin Report finding that the Cabrera
Report and the supplemental report were written by the LAPs' counsel and their consultants);
Dkt. 402-20 (Ex. 2358) (2008.12.15 Cabrera filing requesting payment of $42,915 purportedly
for "preparing clarifications to my report, the hiring of experts in various areas of science . . . in
addition to some logistical details, such as the letting of offices, service of assistants, and
more"); Dkt. 402-2 (Ex. 2218) (DONZ00051767) ("On July 3, 2009, Mr. Yanza emailed Mr.
Donziger: "Friend, we are paying Cabrera 10 today to calm him down."); Dkt. 402-15 (Ex.
2335) at 157,515 (2008.07.13 Cabrera filing acknowledging $10,000 "FOR payment to
professionals who made up the technical group to answer questions from the parties.").*

38.    Disputed.  As a preliminary matter, Chevron cannot rely on Dr. McMenamin's report,

and all references thereto should be stricken.  Dr. McMenamin's report is unsworn and is not

admissible on summary judgment.[20]  *See Berk v. St. Vincent's Hosp. and Med. Ctr.*, 380 F.

Supp. 2d 334, 352 (S.D.N.Y. 2005) ("Courts in this Circuit have uniformly held that unsworn

_____

[20] A page bearing nothing but the date and McMenamin's signature is attached to the
report at Dkt. 400-16 (Ex. 2105) at p. 113.  But this signature does not accompany an oath or any
other attestation by McMenamin regarding the report.

expert reports do not satisfy the admissibility requirements of Fed.R.Civ.P. 56(e), and cannot be used to defeat a summary judgment motion without additional affidavit support.").

Dr. McMenamin's report is also not admissible because it does not meet the requirements of Rule 702 and Daubert.  *See id.* at 353; *Cacciola v. Selco Balers, Inc.*, 127 F. Supp. 2d 175, 180 (E.D.N.Y. 2001) ("Evidence contained in an expert's report therefore must be evaluated under Fed.R.Evid. 702 before it is considered in a ruling on the merits of a summary judgment motion.").  Dr. McMenamin's report has numerous deficiencies, three of which will be mentioned here.

*First*, the reliability Dr. McMenamin's method of "forensic stylistic analysis" is, at the very least, subject to debate.  Other courts have excluded proffered expert testimony as to the identity of questioned writings that was based on the same forensic stylistic analysis as Dr. McMenamin's opinions.  *See United States v. Van Wyk*, 83 F. Supp. 2d 515, 522-23 (D.N.J. 2000). In fact, in *Van Wyk* the government offered an article written by Dr. McMenamin in support of its proffered expert testimony.  *See id.* at  521-23.  The court did not admit the proffered testimony.

*Second*, Dr. McMenamin reaches his conclusion without examining any documents known to be written by Cabrera.  See Dkt. 400-16 (Ex. 2105) at p. 112 (noting "the absence of authenticated exemplar writing by Ing. Cabrera").  This is despite his acknowledgement that "The first step in a matter of this type would typically be to compare and contrast the Questioned writings to Known writings of the putative author."  *Id.* at p. 98.  That Dr. McMenamin could definitively conclude that certain writings were not authored by Cabrera when he didn't even know of any baseline characteristics of Cabrera's writing is highly suspect. At the very least, Donziger should have the opportunity to cross-examine Dr. McMenamin about the effect that the

lack of Cabrera writings has on the reliability of his analysis.

*Third*, many of the bases for Dr. McMenamin's conclusions are, on their face, highly questionable.  Dr. McMenamin concludes that Fajardo authored certain Cabrera filings because certain errors or formatting choices appear in both the subset of Fajardo writings that Dr. McMenamin analyzed and the subset of Cabrera filings that were labeled "questioned."[21] But many of these errors or choices appear to be commonplace.  Dr. McMenamin basis his conclusion on such banal common features of Fajardo's writing and the questioned filings as:

- The format in which time of day is indicated

- Failure to double-space between paragraphs (which is not consistent across either set of writings)

- Use of capital letters for emphasis

- Omitting letters (e.g. misspelling) words, but not necessarily the same words (only once is the same word misspelled in both a Cabrera filing and a Fajardo writing)

These are hardly convincing indicia of common authorship.  **At the very least, Donziger should be afforded the opportunity to depose McMenamin**.

Chevron also neglects to reveal the context in which Yanza's comment that he would pay Cabrera "to calm him down" was made.  The payment to Cabrera was made by Selva Viva and submitted to the Court on July 6, 2009.  Dkt. 402-4 (Ex. 2247).  The Ecuadorian Plaintiffs' July 6, 2009 filing shows that the court had ordered the Ecuadorian Plaintiffs to pay an outstanding debt to Cabrera on April 17, 2009.  *Id.*  The Ecuadorian Plaintiffs had asked for an extension of time for payment.  *Id.*  This context suggests that Cabrera was upset that he had not been paid the money that the court had ordered be paid to him.  Further, in his e-mail, Yanza explained that the

---

[21] Dr. McMenamin does not explain how these subsets were selected or by whom, and Donziger should have the opportunity to understand McMenamin's methodology.

Ecuadorian Plaintiffs were making a number of payments to "calm down" Cabrera, consultants, and employees to whom the Ecuadorian Plaintiffs owed money. *See* Dkt. 402-2 (Ex. 2218) (DONZ00051767) ("Friend, we are paying Cabrera 10 today to calm him down but that means that we are at zero again and have nothing to pay May expenses. So yesterday I made an emergency overdraft to pay everyone's salaries ***and calm them down as well***, but I have to pay the bank by next Wednesday, at the latest. That's why it's important to send the letter to JK as soon as possible to see if he reacts and sends us more money quickly and to find another option.") (emphasis added).

*39.    The LAPs paid Cabrera through the Ecuadorian court for the "outstanding balances" of a "multidisciplinary team" of "professionals that have cooperated in carrying out" the work on the Cabrera Report and its Annexes, even though those were prepared by the LAPs' representatives. Dkt. 400-16 (Ex. 2105) (2011.06.30 McMenamin Report finding that the Cabrera Report and the supplemental report were written by the LAPs' counsel and their consultants); Dkt. 8-9 (Donziger Dep. Tr.) at 2177:8-2178:15; 2165:2-2166:23; 2406:7-11 (Donziger testified that the LAPs' team was involved in "putting together Cabrera's work team"); Dkt. 402-15 (Ex. 2332) (2008.04.28 Cabrera filing stating "[t]he expert report that I responsibly delivered to you . . . . in an impartial, objective and real manner, I required the participation of a very experienced multidisciplinary team," and requesting that the court order the LAPs to pay "the amount of TWENTY-FIVE THOUSAND FIVE HUNDRED FIFTY DOLLARS OF THE UNITED STATES OF AMERICA, (USD 25,550) which budget request or money will be used to pay the outstanding balances of the professionals that have worked on this case").*

39.    Disputed.  As a preliminary matter, Chevron cannot rely on Dr. McMenamin's report, and all references thereto should be stricken.  Dr. McMenamin's report is unsworn and is inadmissible on summary judgment.[22] *See Berk v. St. Vincent's Hosp. and Med. Ctr.*, 380 F. Supp. 2d 334, 352 (S.D.N.Y. 2005) ("Courts in this Circuit have uniformly held that unsworn expert reports do not satisfy the admissibility requirements of Fed.R.Civ.P. 56(e), and cannot be

---

[22] A page bearing nothing but the date and McMenamin's signature is attached to the report at Dkt. 400-16 (Ex. 2105) at p. 113.  But this signature does not accompany an oath or any other attestation by McMenamin regarding the report.

used to defeat a summary judgment motion without additional affidavit support.").

Dr. McMenamin's report is also not admissible because it does not meet the requirements of Rule 702 and *Daubert*. *See id.* at 353; *Cacciola v. Selco Balers, Inc.*, 127 F. Supp. 2d 175, 180 (E.D.N.Y. 2001) ("Evidence contained in an expert's report therefore must be evaluated under Fed.R.Evid. 702 before it is considered in a ruling on the merits of a summary judgment motion."). Dr. McMenamin's report has numerous deficiencies, three of which will be mentioned here.

*First*, the reliability Dr. McMenamin's method of "forensic stylistic analysis" is, at the very least, subject to debate. Other courts have excluded proffered expert testimony as to the identity of questioned writings that was based on the same forensic stylistic analysis as Dr. McMenamin's opinions. *See United States v. Van Wyk*, 83 F. Supp. 2d 515, 522-23 (D.N.J. 2000). In fact, in *Van Wyk* the government offered an article written by Dr. McMenamin in support of its proffered expert testimony. *See id.* at 521-23. The court did not admit the proffered testimony.

*Second*, Dr. McMenamin reaches his conclusion without examining any documents known to be written by Cabrera. See Dkt. 400-16 (Ex. 2105) at p. 112 (noting "the absence of authenticated exemplar writing by Ing. Cabrera"). This is despite his acknowledgement that "The first step in a matter of this type would typically be to compare and contrast the Questioned writings to Known writings of the putative author." *Id.* at p. 98. That Dr. McMenamin could definitively conclude that certain writings were not authored by Cabrera when he didn't even know of any baseline characteristics of Cabrera's writing is highly suspect. At the very least, Donziger should have the opportunity to cross-examine Dr. McMenamin about the effect that the lack of Cabrera writings has on the reliability of his analysis.

*Third*, many of the bases for Dr. McMenamin's conclusions are, on their face, highly questionable.  Dr. McMenamin concludes that Fajardo authored certain Cabrera filings because certain errors or formatting choices appear in both the subset of Fajardo writings that Dr. McMenamin analyzed and the subset of Cabrera filings that were labeled "questioned."[23]  But many of these errors or choices appear to be commonplace.  Dr. McMenamin basis his conclusion on such banal common features of Fajardo's writing and the questioned filings as:

- The format in which time of day is indicated

- Failure to double-space between paragraphs (which is not consistent across either set of writings)

- Use of capital letters for emphasis

- Omitting letters (e.g. misspelling) words, but not necessarily the same words (only once is the same word misspelled in both a Cabrera filing and a Fajardo writing)

These are hardly convincing indicia of common authorship.  At the very least, Donziger should be afforded the opportunity to depose Dr. McMenamin.

Notably, the April 28, 2008 Cabrera filing that Chevron cites is not on Dr. McMemanin's list of "questioned" Cabrera filings Dkt. 400-16 (Ex. 2105) and Chevron has not alleged that this filing was authored by anyone other than Cabrera.

Chevron also mischaracterizes Donziger's testimony.  Donziger did not testify that the LAPs' team was "involved in 'putting together Cabrera's work team.'"  That was the characterization of the questioner.  Donziger testified that he remembered "efforts to suggest to him people who might be competent to carry out various field tasks, suggestions made by members of our team."  Dkt. 8-9 (Ex. 6) (Donziger Dep. Tr.) at 2177:8-23.  At most, Donziger's

---

[23] McMenamin does not explain how these subsets were selected or by whom, and Donziger should have the opportunity to understand McMenamin's methodology.

testimony establishes that the Ecuadorian Plaintiffs could have suggested personnel to Cabrera. The other string-cited portions of the Donziger deposition concern the Ecuadorian Plaintiffs' submission of a work plan to Cabrera.  Dkt. 400-1 (Ex. 2010) at 2165:2-2166:23; 2406:7-11.

40.     *The LAPs' representatives controlled the manner in which Cabrera carried out his duties as the Ecuadorian court's global examination expert, including specifically, determining his sampling and associated protocols, site selection and team composition. Dkt. 32-12 (Donziger: "My tendency is to stop Richard from working much more in the field . . . or, if he continues doing it, he should continue under the most strict control with an extremely limited number of samples. And we'll change the focus of the data at our offices.") (emphasis in original); Dkt. 6-2 (Ex. 1) at CRS-196-00-CLIP-01 (2007.03.04 Crude outtake video clip of meeting among S. Donziger, A. Maest, R. Kamp, and C. Champ discussing groundwater evidence); Dkt. 7-6 (Ex. 2 (certified transcript)) at 265-67; Dkt. 8-9 at 2203:11-13 (Donziger: the LAPs' representatives were "involved in Mr. Cabrera's site selection"); Dkt. at 8-9 at 2177:82178:15 (Donziger testified that the LAPs' team was involved in "putting together Cabrera's work team"); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 2163:2-2166:22 (Donziger: the LAPs' representatives were involved in "putting together Cabrera's work team"); Dkt. 8-9 at 2203:14-17 (Donziger: the LAPs' representatives "were involved in [Cabrera's] sampling protocols."); id. at 2203:4-17; Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 3833:16-3834:6 (the LAPs' counsel and consultants wrote Cabrera's work plan, were involved in Cabrera's site selection, and suggested Cabrera's sampling protocols).*

40.     Disputed.  The evidence Chevron cites does not establish the conclusion it would draw. Chevron provides misleading incomplete quotations. Donziger's July 17, 2007 e-mail discusses various ideas to reduce the amount of money that the Ecuadorian Plaintiffs were spending. Donziger was concerned that "we are trying to do too much, producing waste and delaying for lack of budget, and, without realizing it, we are helping the enemy's strategy of delaying the trial."   Dkt. 32-12 (Ex. 156) at 1.  Donziger's proposal to limit the additional field work it would request was consistent with this concern:  "*When I get there, we'll re analyze the work and the budget with Richard.  And we'll adjust with a much smaller team.*  My tendency is to stop Richard from working much more in the field…" *Id.* (underlining omitted) (portion omitted by Chevron italicized).

Next, Chevron cites to a meeting among Donziger, Maest, Kamp, and Champ in which they discuss groundwater evidence.  But Chevron does not even attempt to relate this discussion

to Cabrera.  Surely lawyers and consultants cannot be faulted for discussing their strategy regarding evidence and proof of damages among themselves.  Further, this discussion occurred before Cabrera was even appointed as the global expert.

Chevron cites to Donziger's deposition testimony.  But Donziger testified that the Ecuadorian Plaintiffs were "involved" in Cabrera's site selection and "protocols were suggested to him by the plaintiffs."  Dkt. 8-9 (Ex. 6) at 2203:7-17.  He also testified that the Ecuadorian Plaintiffs' team drafted a work plan that was given to Cabrera for his adoption, but he did not know whether Cabrera adopted the exact plan, modified it, or used some other version.[24]  Dkt. 400-1 (Ex. 2010) at 2165:4-8.  This does not establish that the Ecuadorian Plaintiffs "controlled" Cabrera.  Rather, this testimony establishes that the Ecuadorian Plaintiffs--consistent with the law and court orders--made suggestions to Cabrera.

Donziger disputes Chevron's suggestion that the Ecuadorian Plaintiffs' suggestions to Cabrera were improper.  Both parties had the opportunity to provide suggestions to Cabrera.  In fact, the Lago Agrio court ordered Cabrera to set aside time before proceedings in order to allow the parties to "make suggestions regarding the proceeding."  Dkt. 32-6 (Ex. 151) at p. 7; *see also* Dkt. 400-3 (Ex. __) (Cabrera filing stating that "I accept the technical suggestions the parties make to me….")

*41.     On June 22, 2007, Pablo Fajardo sent Steven Donziger an email regarding how to access a draft plan for "how to work with the global damages assessment expert" by using the email account "examen_pericial@hotmail.com," and with the instruction to only use the code names "Lagarto 2" and "Lagarto 3" for himself and Donziger. Dkt. 402-15 (Ex. 2315)*

---

[24] Donziger did not testify at pp. 2163-2166 regarding Cabrera's "work team."  The phrase "work team" does not appear anywhere in the 298-page exhibit (Ex. 2010) containing excerpts of Donziger's deposition testimony to which Chevron cites.  In another portion of Donziger's deposition testimony, included at  Dkt. 8-9 (Ex. 6) at 2177:18-23, Donziger testified that he remembered "efforts to suggest to him [Cabrera] people who might be competent to carry out various field tasks, suggestions made by members of our team."

*(DONZ00043514); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 3057:13-3058:16 ("Q. And as you look at this e-mail now, does it refresh your recollection that the plan he is referring to is the plan for how to work with the global damages assessment expert on his report? A. I believe so, yes.").*

41.     Not disputed.

*42.     The LAPs' counsel and consultants wrote Cabrera's June 25, 2007 "Work Plan for Expert Examination," which Cabrera then submitted to the Ecuadorian court as his own work. Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 2165:2-6 ("Q. Did the plaintiffs' team draft the Cabrera work plan?  A. I believe the plaintiffs' team drafted a work plan that was given to him for his adoption."), 2184:3-2186:4; Dkt. 8-9 at 2203:4-17 (the LAPs' counsel and consultants wrote Cabrera's work plan); Dkt. 6-2 (Ex. 1) at CRS-189-00-CLIP-02; Dkt. 7-4 (Ex. 2 (certified transcripts)) at 223-27 (Donziger proposed forming a "work committee" to draft Cabrera's "work plan" with the goal of having "more or less eighty percent-ninety percent on the way to a plan" in a few days); Dkt. 400-4 (Ex. 2043) (DONZ00038727) at 1 (Fajardo emailing Donziger); see also id. at 3-4 (LAP-drafted chart entitled "Expert Examination Activity Plan" with members of the LAPs' team noted as the individuals responsible for various activities); id. at 5-6 (LAP-drafted document entitled "Final Plan from the Global Expert Examination" containing an outline of tasks to be performed for Cabrera's global examination); Dkt. 400-4 (Ex. 2044) (LAPs' team drafted Cabrera's work plan); Dkt. at 8-9 at 2177:8-2178:15; 2165:2-2166:23; 2406:7-11 (Donziger testified that the LAPs' team was involved in "putting together Cabrera's work team.").*

42.     Donziger does not dispute that the Ecuadorian Plaintiffs drafted a work plan that was

submitted to Cabrera.  *See* Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 2165:2-6 ("Q. Did the

plaintiffs' team draft the Cabrera work plan?  A. I believe the plaintiffs' team drafted a work plan

that was given to him for his adoption.").  Donziger disputes Chevron's unsupported

characterizations of the evidence to which it cites.

- In the Crude clip to which Chevron cites, Donziger discusses "defin[ing] a work plan." Dkt. 7-4 (Ex. 2) at 223.  But, contrary to Chevron's characterization, there is no indication that Donziger is discussing drafting Cabrera's work plan.  Rather, the context establishes that Donziger was discussing various litigation-related tasks for the Ecuadorian Plaintiffs' team.  *See id.* ("I believe that the most important task is for us to define a work plan.  Specific.  With dates, teams and budget.  [traffic noises].  So, that is a very different process than what we've gone through today, up to now.  For me, it means defining the objectives. . . .").

- Chevron then claims that Dkt. 400-4 (Ex. 2043) supports its assertion that the Ecuadorian Plaintiffs drafted the work plan that Cabrera filed with the Lago Agrio court.  But the document attached to the e-mail in Exhibit 2043 looks *nothing* like the work plan that

Cabrera filed with the court.  *Compare* Dkt. 400-4 (Ex. 2043) (Fajardo's "first draft of the plan and schedule of activities to be carried out") *with* Dkt. 400-4 (Ex. 2044) at p. 130,641- 130,651 (work plan filed with the court).

- Donziger's testimony that he remembered "efforts to suggest to him [Cabrera] people who might be competent to carry out various field tasks, suggestions made by members of our team," Dkt. 8-9 (Ex. 6) at 2177:18-23, does not establish that the Ecuadorian Plaintiffs drafted the work plan Cabrera filed with the court.  The filed work plan does not list any particular individuals; it lists only the "professional profile" and "responsibilities" of the "multi-disciplinary team [that] will be required . . ." Dkt. 400-4 (Ex. 2044) at p. 130,650.

Further, Chevron's assertion that Cabrera "submitted [the work plan] to the Ecuadorian court as his own work" [CITE CHEVRON STATEMENT] is unsupported.  Cabrera does not represent that he personally drafted the work plan.  In his cover letter to the court, he describes the plan as "the general plan of activities that I am going to perform as part of the Expert Examination under my authority." Dkt. 400-4 (Ex. 2044) at p. 130,640.

*43.    Stratus met with Cabrera in January 2008. Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 2247:2-20 (Donziger testifies that individuals from Stratus and the LAP legal team met with Cabrera in January 2008 where they discussed that "Stratus individuals would draft materials that would be given to Mr. Cabrera for his hoped-for adoption in his report" and that Cabrera "seemed open" to accepting a report drafted by Stratus).*

43.    Not Disputed.

*44.    Stratus planned who would draft portions of the documents that would become the Cabrera Report and its Annexes. Dkt. 400-16 (Ex. 2105) (2011.06.30 McMenamin Report) ¶¶ 3, 9(a); Dkt. 33-2 (2008.02.22 email from Beltman to Stratus employees) (STRATUS-NATIVE043232-33) (Stratus project manager Douglas Beltman telling his team that they will draft the Cabrera Report: "The project is at a key point right now. We have to write, over the next 2 to 3 weeks, probably the single most important technical document for the case. . . . We (the case attorneys, the case team in Quito, and Stratus) have put together a very ambitious outline for this report. The people in the Quito office are working on some parts, and we're working on others."); Dkt. 32-20 (SRATUS-NATIVE043857-58) (the LAPs' agents outlining how they would "attribute" the annexes they were drafting to Cabrera).*

44.    Disputed.  As a preliminary matter, Chevron cannot rely on Dr. McMenamin's report, and all references thereto should be stricken.  Dr. McMenamin's report is unsworn and is

inadmissible on summary judgment.[25]  *See Berk v. St. Vincent's Hosp. and Med. Ctr.*, 380 F.

Supp. 2d 334, 352 (S.D.N.Y. 2005) ("Courts in this Circuit have uniformly held that unsworn

expert reports do not satisfy the admissibility requirements of Fed.R.Civ.P. 56(e), and cannot be

used to defeat a summary judgment motion without additional affidavit support.").

 Dr. McMenamin's report is also not admissible because it does not meet the requirements

of Rule 702 and *Daubert*.  *See id.* at 353; *Cacciola v. Selco Balers, Inc.*, 127 F. Supp. 2d 175,

180 (E.D.N.Y. 2001) ("Evidence contained in an expert's report therefore must be evaluated

under Fed.R.Evid. 702 before it is considered in a ruling on the merits of a summary judgment

motion.").  Dr. McMenamin's report has numerous deficiencies, three of which will be

mentioned here.

 *First*, the reliability Dr. McMenamin's method of "forensic stylistic analysis" is, at the

very least, subject to debate.  Other courts have excluded proffered expert testimony as to the

identity of questioned writings that was based on the same forensic stylistic analysis as Dr.

McMenamin's opinions.  *See United States v. Van Wyk*, 83 F. Supp. 2d 515, 522-23 (D.N.J.

2000). In fact, in *Van Wyk* the government offered an article written by Dr. McMenamin in

support of its proffered expert testimony.  *See id.* at  521-23.  The court did not admit the

proffered testimony.

 *Second*, Dr. McMenamin reaches his conclusion without examining any documents

known to be written by Cabrera.  See Dkt. 400-16 (Ex. 2105) at p. 112 (noting "the absence of

authenticated exemplar writing by Ing. Cabrera").  This is despite his acknowledgement that

"The first step in a matter of this type would typically be to compare and contrast the Questioned

_____

25 A page bearing nothing but the date and McMenamin's signature is attached to the
report at Dkt. 400-16 (Ex. 2105) at p. 113.  But this signature does not accompany an oath or any
other attestation by McMenamin regarding the report.

writings to Known writings of the putative author." *Id.* at 98.  That Dr. McMenamin could definitively conclude that certain writings were not authored by Cabrera when he didn't even know of any baseline characteristics of Cabrera's writing is highly suspect. At the very least, Donziger should have the opportunity to cross-examine Dr. McMenamin about the effect that the lack of Cabrera writings has on the reliability of his analysis.

*Third*, many of the bases for Dr. McMenamin's conclusion that "the Stratus consulting group, in conjunction with Lago Agrio Plaintiffs and consultants in Quito" are the authors of the Cabrera Report and Annexes are, at best, highly questionable.  Dr. McMenamin bases his conclusion on the following observations:

- Spanish-language errors in the report (i.e. scattered missing accent marks)
- Fact that the Cabrera report is written in the first person
- Stratus's purported observations about the language in the report
- "External evidence," (i.e. e-mails that do not include Cabrera in the list of writers)

The conclusion that Stratus authored the report does not necessarily follow from the observation that the report contains spelling or grammatical errors.  It is difficult to see how the second and third observations are at all probative of the report's author.  And the fourth observation is obviously an inappropriate matter for expert testimony.  *See* Fed. R. Evid. 702(a).

Contrary to Chevron's contention, Beltman's e-mail did not inform his team that they would be drafting the Cabrera report.  [CITE CHEVRON STATEMENT].  The sentence that Chevron omitted from its quotation is key:  "The document will pull together all of the work over the last 15 or so years on the case and make recommendations for the court to consider in making its judgment." Dkt. 33-2 (Ex. 168) at 1.

Donziger disputes Chevron's conclusory assertion that the document included at Dkt. 32-

20 shows that the was Ecuadorian Plaintiffs' "agents" authored the attached outline.

*45.     Stratus removed the names of the original authors from what would become annexes to the Cabrera Report. Dkt. 34-7 (STRATUS-NATIVE063676) (Beltman emailing Donziger regarding the fact that Powers' name needed to be taken off his report before it was filed as an annex to the Cabrera Report); Dkt. 402-2 (Ex. 2217) ¶ 1 (2007.11.14 Fajardo email to Cristobal Villao: "For legal reasons, in the first part, the paragraph which states who hired you to carry out the study is to be omitted"); Dkt. 33-7 (STRATUS-NATIVE069116) at 2 (Beltman: "Here is the Uhl report, cleaned and sanitized.").*

45.     Disputed.  The documents to which Chevron cites do not establish that Stratus removed

any names.  In the first e-mail, Beltman states that the Powers report "needs to be formatted a bit

and his name taken off . . . ."  Dkt. 34-7 (Ex. 182) (STRATUS-NATIVE063676).  This e-mail

does not establish that Stratus removed any name.  The second e-mail does not include anyone

from Stratus and does not discuss any actions by Stratus.  Furthermore, Fajardo's suggestion that

"the paragraph which states who hired you to carry out the study is to be omitted" does not

establish that Fajardo suggested that the *author's* name be taken off the report.  Dkt. 402-2 (Ex.

2217) (VU00000082.0001) at p. 1.  Finally, Chevron apparently infers that "cleaned and

sanitized" in Beltman's March 2008 e-mail, Dkt. 33-7 (Ex. 173) (STRATUS-NATIVE069117),

means "removed the names of the original authors," but Chevron provides no basis for that

inference.

*46.     The LAPs' counsel hired Uhl, Baron & Rana ("UBR") to draft a report regarding potable water systems in the former concession area. Dkt. 402-15 (Ex. 2328) (VU0000037) (Letter from UBR providing "a summary outline of a scope of work and cost estimate for the development of a preliminary analysis of potential costs for the provisions of potable water to the residents of two provinces in the Amazon Region of Ecuador"); Dkt. 402-2 (Ex. 2228) (VU0000039) ("This letter will serve as our agreement to retain Uhl, Baron, Rana & Associates, Inc."); Dkt. 402-9 (Ex. 2267) (Uhl Dep. Tr.) at 68:12-69:16 (Vincent Uhl testifying that UBR was retained by Kohn, Swift & Graf "to do the water project in Ecuador").*

46.     Not disputed.

*47.     Cristobal Villao worked for UBR on the potable water project for the LAPs' counsel. Dkt. 402-2 (Ex. 2228) (VU00000039); Dkt. 402-2 (Ex. 2229) (VU00000063) at 1; Dkt. 402-2 (Ex. 2230) (VU00000122) at 1; Dkt. 402-3 (Ex. 2231) (VU00000136) at 1; Dkt. 402-3 (Ex. 2232) (VU00000150) at 1-3.*

47.  Not disputed.

48.     *UBR performed all of its work on the potable water project for the LAPs' counsel and was paid by the LAPs' counsel. Dkt. 402-2 (Ex. 2228) (VU00000039); Dkt. 4029 (Ex. 2267) (Uhl Dep. Tr.) at 27:11-17.*

48.  Disputed.  The first document to which Chevron cites is a retainer agreement.  The second

document to which Chevron cites is an exhibit containing excerpts from Uhl's deposition.

However, the page Chevron cites (p. 27) is not included within the exhibit.

49.     *After receiving a draft of the UBR potable water report, the LAPs' counsel, Pablo Fajardo, instructed Cristobal Villao to remove from the report the statement that "Uhl, Baron, Rana & Associates, Inc. (UBR) was retained by Kohn, Swift, & Graf, P.C. in July 2007" and the dates on which the work was performed. Dkt. 402-2 (Ex. 2217) ¶ 1 (2007.11.14 Fajardo email to Cristobal Villao stating: "For legal reasons, in the first part, the paragraph which states who hired you to carry out the study is to be omitted"); id. ¶ 5 ("Also for legal reasons, it's necessary to make all working dates to appear as recorded before July 31 or after August 16. This means that between August 1 and August 16, no date in which field work has been carried out should appear.").*

49.  Not disputed.

50.     *In Section 5.0 of UBR's report, UBR recommended "a minimum of $20,000,000 to $30,000,000 will be required just to evaluate the extent of impact to the groundwater resources in these two provinces" because "no detailed groundwater investigations [had] been conducted." Dkt. 402-13 (Ex. 2320) (UBR Report).*

50.     Not disputed.  Donziger does dispute, however, any suggestion that the UBR report

indicated an absence of contamination.  The report provided estimates of the cost for water

supply systems.  Dkt. 402-13 (Ex. 2320) at STRATUS-NATIVE070461-62.  The report

recommended that a study be conducted "that will evaluate the extent of groundwater

contamination impact.  This is an essential study given the 334 oil production wells, pipeline

pumping stations, 60 salt water injection wells; processing refineries; drilling pits; waste ponds;

wellheads that are unprotected; etc. with respect to *known* and potential *sources of groundwater*

*contamination* within the 5 Cantons where past and present oil facilities are located.  To our

knowledge, no detailed groundwater investigations have been conducted by Texaco or others to

document the magnitude and extent (horizontal and vertical) of groundwater impact from the

various activities associated with oil development . . . ." *Id.* at STRATUS-NATIVE070463.

(emphasis added).

*51.     The LAPs' representatives removed Section 5.0 of the UBR report and the altered UBR report was submitted to the Ecuadorian court as Annex R to the Cabrera Report. Compare Dkt. 402-3 (Ex. 2231) (VU00000136) (draft from UBR recommending groundwater study) with Dkt. 402-9 (Ex. 2269) (Cabrera Report, Annex R) (containing no recommendation for groundwater study); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 2325:3-2326:2 (Donziger testifying that Mr. Villao of UBR prepared a potable water systems report that was attached to the Cabrera Report as an annex); Dkt. 33-7 (STRATUS-NATIVE069117) at 2 (Beltman sending the Uhl potable water report to Donziger on March 6, 2008 stating, "Here is the Uhl report, cleaned and sanitized.").*

51.     Disputed.  Chevron's citations do not establish who removed the groundwater study

recommendation from the report, nor why.  Chevron's citations establish only that: (i) on January

18, 2008, Uhl sent Villao a draft of the report, Dkt. 402-3 (Ex. 2231), that included a section

regarding groundwater studies; (ii) on March 5, 2008, Beltman sent Donziger a draft of the Uhl

report that included a section regarding groundwater studies, Dkt. 33-7 (Ex. 173); and (iii)

Annex R to the Cabrera report does not recommend a groundwater study, Dkt. 402-9 (Ex. 2269).

Donziger testified that "some version of  the potable water system report that Villao helped

prepare was included in the Cabrera report.  Dkt. 400-1 (Ex. 2010) at 2325:22-2326:2.

Further, the Ecuadorian Plaintiffs' final alegato and the court's order are consistent with

UBR's conclusion.  *See* Dkt. 155-9 (Ecuadorian Plaintiffs' *alegato final*, or final submission to

the Lago Agrio Court regarding liability), at 8 ("Once again, the DCA's [supplemental 2010

damgaes assessment] approach was highly conservative – DCA's conceptual model assumed that

dissolved phase groundwater contamination is not widespread or migrating significantly such

that off-site risks are present.") (footnote omitted); Dkt. 153-7 (certified English translation of

the Lago Agrio Court's February 14, 2011 opinion), at 180.

Further, the Ecuadorian Plaintiffs' final alegato and the court's order are consistent with

UBR's conclusion. *See* Dkt. 155-9 (Ecuadorian Plaintiffs' *alegato final*, or final submission to the Lago Agrio Court regarding liability), at 8 ("Once again, the DCA's [supplemental 2010 damgaes assessment] approach was highly conservative – DCA's conceptual model assumed that dissolved phase groundwater contamination is not widespread or migrating significantly such that off-site risks are present.") (footnote omitted); Dkt. 153-7 (certified English translation of the Lago Agrio Court's February 14, 2011 opinion), at 180.

52.     *Cristobal Villao never met or communicated with Cabrera. Dkt. 402-9 (Ex. 2267) (2011.04.19 Uhl Depo Morning Session) at 64:6-9 ("Q. To your knowledge has Mr. Villao ever communicated with Mr. Cabrera on the work that you and he did in Ecuador? A. To my knowledge he has not.").*

52.     Not disputed.

53.     *Cristobal Villao was identified in the Cabrera Report executive summary as "part of my technical team, which consists of impartial professionals with impeccable credentials, as can be observed in Exhibit V to this report."  Dkt. 33-12 (Cabrera Report) at 2; Dkt. 402-15 (Ex. 2334) (Annex V).*

53.     Disputed.  Chevron's incomplete quotation could suggest that the report claimed that Cabrera collaborated with the "technical team."  This would be incorrect.  The report states that experts who made technical analyses are part of the technical team:  "This Expert Report required a lot of work in order to deal with all of the requirements made by the Court.  As stipulated in the Court order mentioned initially, my work is based on the assistance provided by other experts in making some of the technical analyses.  These experts have therefore been part of my technical team, which consists of impartial professionals with impeccable credentials, as can be observed in Exhibit V to this report."  Dkt. 33-12 (Ex. 178) (Cabrera Report) at p. 2.

54.     *The Cabrera Report consists of a summary report titled "Summary Report of Expert Examination" and supporting Annexes A through V. Dkt. 33-13 (Cabrera Report).*

54.     Not disputed.

55.     *The LAPs' counsel and others working at their direction wrote the April 1, 2008 "Summary Report of Expert Examination" and Annexes A through V. Dkt. 400-4 (Ex. 2046)*

(DONZ00083815) at 1-2 (Internal memo: "The Cabrera Report is a series of 17 annexes; in all, 11 of them were prepared by Stratus and adopted by Cabrera."); Dkt. 356-10 (DONZ-HDD-0004621) at 83 (Donziger: if Chevron obtained discovery from Stratus, "they will find that Stratus wrote the bulk of the report adopted by Cabrera and submitted to the court."); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 3400:7-9 (Donziger: "Stratus had drafted a substantial number of annexes that were adopted by [Cabrera] verbatim that were included in his report."); Dkt. 47-55 (DONZ00031368) at 1-3 (the LAPs' counsel: "we do better by explaining that we authored the report," "we authored portions of the report," "[we do not benefit by] denying what is already apparent (that we authored portions of the report)"); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 2377:21-2378:9 (Donziger: Stratus drafted "an actual report with annexes in Cabrera's name"); Dkt. 8-9 at 2253:5-11 (Donziger agreed that "the general idea" was "that Stratus would draft the report in a form that it could be submitted directly to the Ecuadorian court by Mr. Cabrera"); Dkt. 32-16 (STRATUS-NATIVE043270-043278) (Stratus contracted with Kohn, Swift & Graf to write Cabrera Report); Dkt. 32-17 (STRATUS-NATIVE066482066484) (same); Dkt. 32-18 (DONZ00026949) (same); Dkt. 32-12 (DONZ00062680)) at 1; Dkt. 8-9 at 2433:8-14 (Donziger: Cabrera Report as filed was "pretty much verbatim" as written by the LAPs' counsel and consultants); Dkt. 6-2 (Ex. 1) at CRS-191-00-CLIP-03; Dkt. 7-5 (Ex. 2 (certified transcripts)) at 245-46 (Fajardo: "And here is where we do want the support of our entire technical team . . . of experts, scientists, attorneys, political scientists, so that all of us will contribute to that report—in other words—you see . . . the work isn't going to be the expert's. All of us bear the burden."); Dkt. 32-13 (DONZ00061973) at 1 (2007.03.28 to 2007.04.03 email exchange in which David Chapman (Stratus) states: "I think the way this would work best is that if Stratus did much of the work, putting the pieces together and writing the report."); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 2165:2-6 ("Q. Did the plaintiffs' team draft the Cabrera work plan? A. I believe the plaintiffs' team drafted a work plan that was given to him for his adoption."); Dkt. 8-9 at 2203:4-17 (the LAPs' counsel and consultants ghostwrote Cabrera's work plan, were involved in Cabrera's site selection, and suggested Cabrera's sampling protocols; Dkt. 6-2 (Ex. 1) at CRS-269-01-04, 269-01-08); Dkt. 7-10 (Ex. 2 (certified transcript)) at 355-62 (Donziger and Stratus discuss damages categories to include in Cabrera Report); Dkt. 33-2 (2008.02.22 email from Beltman to Stratus employees) (STRATUS-NATIVE043232) (Beltman: "We have to write, over the next 2 to 3 weeks, probably the single most important technical document for the case."); Dkt. 32-19 (email from Beltman to Donziger attaching draft copy of "Outline for PG Report"; Dkt. 32-20 (STRATUS-NATIVE043849) at 1 (Beltman: "The summary Peritaje Global report (~50 pages). This is what I will be working on mostly, and it will take most of my time over the next two weeks."); id. (STRATUS-NATIVE043854-STRATUSNATIVE043859) at 6-11 (plan for attributing authorship to Cabrera and others); Dkt. 33-4 at 1 (Beltman: "Attached is my rough start of the Peritaje Global report. . . . Would you let me know if you think I'm on track in terms of tone, language level, and content?"; Dkt. 33-5 (Powers Dep. Tr.) at 95:14-22, 109:2-7, 251:4-253:1, 255:5-256:13 (LAP expert Bill Powers testifying that a "similar" version of a report he prepared and emailed to Stratus was filed as Annex S of the Cabrera Report and that calculations he prepared were incorporated into Annex T of the Cabrera Report); Dkt. 34-7 (STRATUS-NATIVE063676) at 1 (Beltman emailing Donziger regarding the fact that Powers' name needed to be taken off his report before it was filed as an annex to the Cabrera Report); Dkt. 53-6 (STRATUS-NATIVE063142) (Beltman emailing Ecuadorian counsel and Donziger revisions to the Cabrera Report less than one week before it was filed); Dkt. 104-2 (STRATUS-NATIVE069123-24) at 1-2

*(Donziger asking Beltman for feedback regarding the damages tables for the Cabrera Report on March 30, 2008, less than 36 hours before the Cabrera Report was filed); Dkt. 53-8 (2008.04.01 email from Ann Maest to Beltman attaching Cabrera's Declaration Of Findings"); Dkt. 355-42 (DONZ00045505) at 1 (2008.04.01 email from "gringograndote@gmail.com" to Donziger attaching a Word version of the Cabrera Report identical to filed version and last saved hours before the Cabrera Report was filed in Ecuador); Dkt. 355-43 (DONZ00045506) at 1-62 (2008.04.01 email from "gringograndote@gmail.com" to Donziger attaching a Word version of the Cabrera Report identical to filed version and last saved hours before the Cabrera Report was filed in Ecuador) at 1-62; Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 5014:22-5016:7 (same); id. at 2490:12-18; Dkt. 33-3 (STRATUS-NATIVE053742) (Beltman "My goal is to have the entire report drafted by COB Tuesday. Based on how things are going, our current translators will take more than a week to turn it around . . . And [sic] that's not much time before it has to go to the court on Monday."); see also Dkt. 32-20 (STRATUSNATIVE043849) at 1; Dkt. 32-21; Dkt. 33-10 (STRATUS-NATIVE058388 – 419) at 1 (email from Beltman to translators attaching a draft of the Cabrera Summary Report in English and requesting that it be translated into Spanish for the upcoming submission to the Ecuadorian court); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 2962:9-2963:23 (Donziger testifying: "I believe Stratus prepared the [November report] materials in the hope that [Cabrera] would adopt them, sort of how they did the with annexes and executive summary.").*

55.     Disputed.  The evidence to which Chevron cites establishes that Stratus and the Ecuadorian Plaintiffs' team drafted documents that Cabrera *adopted* as the report and Annexes A through V.

Donziger further disputes Chevron's insinuation that the Ecuadorian Plaintiffs' communication with, and provision of materials to, Cabrera was improper.  Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts.  In fact, such contacts were common practice.  *See* Donziger 56.1(b) Statement, Fact No. 167  Similarly, Ecuadorian law permits experts to interact and coordinate with parties.  Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties."  Dkt. 154-6 (Ex. 60), ¶ 8; Donziger 56.1(b) Statement, Fact No. 168.  In fact, it was understood in Ecuador that court appointed experts could rely on party resources.  Donziger 56.1(b) Statement, Fact No. 169.

Donziger also disputes Chevron's suggestion that it was not aware of the collaboration between the Ecuadorian Plaintiffs and Cabrera.  On March 24, 2008, before Cabrera's report was

filed, Chevron publicly complained that Cabrera was "working in partnership with the NGO leading the plaintiff's case." Dkt. 557-4 (Ex. 19) at p. 4 (March 24, 2008 Sylvia Garrigo statement); *see* Donziger 56.1(b) Statement, Fact No. 184.

56.     *Stratus created the initial draft of the April 1, 2008 "Summary Report of Expert Examination" in English, in the first person, and in the voice of Cabrera. Dkt. 40016 (Ex. 2105) (McMenamin Report) at 1, 28.*

56.     Disputed.  Chevron cannot rely on Dr. McMenamin's report, and all references thereto should be stricken.  Dr. McMenamin's report is unsworn and is not admissible on summary judgment.[26]  *See Berk v. St. Vincent's Hosp. and Med. Ctr.*, 380 F. Supp. 2d 334, 352 (S.D.N.Y. 2005) ("Courts in this Circuit have uniformly held that unsworn expert reports do not satisfy the admissibility requirements of Fed.R.Civ.P. 56(e), and cannot be used to defeat a summary judgment motion without additional affidavit support.").

Dr. McMenamin's observation that an identified English version of the Cabrera report is written in the first person is not an appropriate matter for expert testimony.  *See* Fed. R. Evid. 702(a).  A factfinder is more than capable of determining what use of the pronoun "I" signals.

57.     *Stratus drafted the majority of the Annexes to the Cabrera Report. Dkt. 400-4 (Ex. 2046) (DONZ00083815) at 1-2 (Internal memo admitting, "The Cabrera Report is a series of 17 annexes; in all, 11 of them were prepared by Stratus and adopted by Cabrera."); Dkt. 400-4 (Ex. 2047) (DONZ-HDD-0004621) at 1-2 (Donziger admitting that if Chevron's attorneys obtained discovery, "they will find that Stratus wrote the bulk of the report adopted by Cabrera and submitted to the court."); Dkt. 47-55 (DONZ00031368) at 1, 3 (email exchange between the LAPs' counsel, noting "we do better by explaining that we authored the report," discussing a need "to acknowledge that we authored portions of the report," and emphasizing that they would not benefit from "denying what is already apparent (that we authored portions of the report)"); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 2377:21-2378:9 (Donziger testifies that Stratus drafted "an actual report with annexes in Cabrera's name"); id. at 3400:3-9 (Donziger testifies that, as of March 2010, he knew that "Stratus had drafted a substantial number of annexes that were adopted by [Cabrera] verbatim that were included in his report"); Dkt. 47-55*

_____

[26] A page bearing nothing but the date and McMenamin's signature is attached to the report at Dkt. 400-16 (Ex. 2105) at p. 113.  But this signature does not accompany an oath or any other attestation by McMenamin regarding the report.

*(DONZ00031368) (the LAPs' counsel: "I wonder whether we do better by explaining that we authored the report rather than letting Chevron tell that story like Nancy Drew.").*

57. Not disputed.

*58.       The content of the "Summary Report of Expert Examination," filed on April 1, 2008, by Cabrera, is identical to a Microsoft Word document circulated by the LAPs' counsel that was created on March 30 and last printed on March 31, 2008. Dkt. 46-2 ¶ 24 (Declaration of Michael F. McGowan concluding that the "text of the 'INFORME SUMARIO VERSION FINAL(Steve).doc' document attached to the Gringograndote Email and the Forwarding Email is identical to text of the report filed by Richard Cabrera on April 1, 2008."); id. ¶ 27 (providing last saved and print times); Dkt. 355-42 (DONZ00045505) and Dkt. 355-43 (DONZ00045506) (email from "gringograndote@gmail.com" to Donziger attaching a Word version of the Cabrera Report that according to the metadata was last saved mere hours before the Cabrera Report was filed in Ecuador and that is identical to the filed version of the Report); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 5014:22-5016:7 (Donziger testifying regarding having in his possession a Word version of the Cabrera Report before the Report was filed in Ecuador).*

58.       Disputed.

Donziger further disputes Chevron's reliance on unauthenticated metadata.  Chevron itself has declined to produce certain document-creation date related metadata in discovery for its own documents in Donziger on grounds that the data is not necessarily accurate.  Werdegar Decl. ¶ 18.  Donziger disputes Chevron's argumentative and unsupported characterizations of the evidence, e.g. that one event happened "mere hours" before another.

Donziger did not testify that he had a Word version of the Cabrera Report in his possession before it was filed.  *See* Dkt. 400-1 (Ex. 2010) at 5016:14-20.

Finally, Chevron has provided no evidence to suggest that Cabrera's filing was false.  It is undisputed that Cabrera signed and filed a document.

Nor has Cevron produced documents regarding its intensive surveillance…

*59.       Cabrera submitted the Cabrera Report with Annexes A through V to the Ecuadorian court at 8:30 a.m. on April 1, 2008. Dkts. 33-12 – 33-18; 34-2 – 34-3 (Cabrera Report).*

59.       Disputed.  The time indicated on the "received" label in the reproduction to which Chevron is not sufficiently legible to determine when the court indicated it received the report.

Dkts. 33-12 – 33-18; 34-2 – 34-3 (Ex. 178).

60.    *The Cabrera Report states: "This report was prepared by the Expert Richard Stalin Cabrera Vega[.]"  Dkts. 33-12 – 33-18; 34-2 – 34-3 (Cabrera Report) at 1.*

60.    Not disputed.

61.    *Cabrera did not author any portion of the Cabrera Report or any Annex attached to it. Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 2249:3-12, 2590:20-2591:22 (Donziger testifying he does not know whether Cabrera drafted any portion of his report or whether he even reviewed it before it was filed); Dkt. 356-9 at 174-75 (Maest Dep. Tr.) at 53:2554:  4 (Maest testifying that she did not know whether Cabrera or a person identified as an independent member of Cabrera's team had actually drafted any portion of the Cabrera Report).*

61.    Disputed.  Chevron's citations do not support the broad conclusion it asserts.  The fact

that Donziger and Maest both testified that they did not know whether Cabrera drafted any

portion of the report does not affirmatively establish that Cabrera did not.  Chevron has failed to

meet its burden of proof on this purported fact.

    Donziger also disputes the suggestion that Cabrera claimed to have authored each of the

Annexes.  The report states that other experts made some of the technical analyses.  Dkt. 33-12

(Ex. 178) (Cabrera Report) at 2.

62.    *Cabrera Report Annexes were originally drafted in English and translated into Spanish. Dkt. 33-9 (STRATUS-NATIVE044716) ("There's another set that we wrote in English, had translated into Spanish up here, then sent down the Spanish versions to Quito. Once in Quito, the team down there edited the Spanish versions to make them read better, and to fit them into Ecuadorean Spanish.").*

62.  Disputed to the extent that Chevron suggests that all annexes were originally drafted in

English.  The e-mail to which Chevron cites states that *some* of the annexes were written in

English.  Dkt. 33-9 (Ex. 175) at STRATUS-NATIVE044716.

63.    *On July 28, 2008, Douglas Beltman emailed Stratus employee Brian Lazar, instructing him that if the differences between the filed Spanish Cabrera Report and Stratus's draft Spanish version of the Cabrera Report "are minor in nature, then we go ahead and use our original English version as if it's been translated." Dkt. 33-9 (STRATUS-NATIVE044716).*

63.    Not disputed.

*64. The LAPs filed a pleading on September 16, 2008, with comments and objections to the Cabrera Report stating that the Cabrera Report was "unjustly favorable to [Chevron]" because the report's calculations were "too conservative." Dkt. 8-10 (LAP comments on Cabrera Report) at 40; Dkt. 402-5 (Ex. 2251) (STRATUS-NATIVE058697-98); Dkt. 111-13 ((DONZ00045581) at 1 (Fajardo instructing, after the Cabrera Report was filed, that "I think it's good to maintain a uniform line. PLEASE WE ARE NOT HAPPY.").*

64. Donziger does not dispute that the filing was made. Donziger disputes the suggestion that this filing was improper. The Ecuadorian Plaintiffs' team understood that the submissions they would present to Cabrera for his adoption had to meet Cabrera's criteria. Dkt. 7-5 (Ex. 2) at 245 (Fajardo's statement that "what the expert is going to do is state his criteria, alright? and sign [on/in] the report and review it [unintelligible]. But all of us, all together, have to contribute to that report."). And the Ecuadorian Plaintiffs' unfettered view of the evidence differed from the conservative analysis prepared for Cabrera's adoption. *See* [FIND GOOD CITE IN SUPPLEMENTAL EXPERT REPORTS ] Dkt. 8-10 (Ex. 7) (LAP comments on Cabrera Report).

*65. On November 17, 2008, Richard Cabrera filed "Answers by the Expert Richard Cabrera, with the Support of His Technical Team, to the Questions and Comments Made by the Plaintiffs," as a supplement to the Cabrera Report. Dkt. 400-4 (Ex. 2048) (Cabrera Supplemental Report entitled "Answers by the Expert Richard Cabrera, with the Support of His Technical Team, to the Questions and Comments Made by the Plaintiff").*

65. Not disputed.

*66. The LAPs' representatives and those working at their direction—not Richard Cabrera—wrote the November 17, 2008 supplement to the Cabrera Report increasing the damage assessment from $16.3 billion to $27.3 billion. Dkt. 9-4 at 2 (STRATUS-NATIVE051389) (Stratus team members discussed the preparation of the Supplemental Cabrera Report and the need to "clean up the language" of a portion of the supplemental report "so it sounds more like the Perito [Cabrera] and less like a comment."); Dkt. 34-21 (STRATUS-NATIVE053480) at 1; Dkt. 400-1 (Ex. 2010) (Donziger Dep.) at 2962:9-2963:23 (Donziger testifies: "I believe Stratus prepared the [November report] materials in the hope that [Cabrera] would adopt them, sort of how they did the with annexes and executive summary."); Dkt. 6-2 (Ex. 1) at CRS-193-00-CLIP-01; Dkt. 7-5 (Ex. 2 (certified transcript)) at 252-53 (2007.03.03 meeting during which Donziger states they could "jack this thing up to thirty billion" in one day).*

66. Not disputed.

*67.     Stratus was directed by the LAPs' representatives to "ignore" the "ongoing PEPDA cleanup," which was "cleaning up scores and scores of sites," when developing the cost estimate for cleanup in the Cabrera Reports. Dkt. 32-20 (STRATUSNATIVE043849-59) at 10 (An outline for the Cabrera Report circulated by Douglas Beltman notes "How do we deal with the ongoing PEPDA cleanup? They're cleaning up scores and scores of sites, we have no or little data on how good the cleanup is. Our cost estimates assume they haven't done anything, yet they have.?? Luis says proceed with data we have. We essentially ignore it.").*

67.     Disputed.  Chevron's incomplete quotation creates an inaccurate and misleading impression.  The Ecuadorian Plaintiffs did not "ignore" the PEPDA remediation; it was properly taken into account.  Since it was not effective, it did not reduce the costs of remediation.

*68.     Stratus evaluated TexPet's remediation and informed the LAPs' counsel on August 1, 2008, that after "carefully review[ing] the technical requirements for the cleanup," there were "no clear instances where TexPet did not meet the conditions required in the cleanup." Dkt. 356-14 at 41-42 (Beltman told Donziger that he could find no "clear instances where Texpet did not meet the conditions required in the cleanup"); see also Dkt. 356-15 (STRATUS-NATIVE062132-61) at 5 (the LAPs' technical team's internal comments on the Cabrera Report state that "results show that the pits were properly remediated" and "results indicate that Texaco did remediate and that the Expert is partial").*

68.     Disputed.  Chevron plucks selected phrases from Beltman's e-mail in order to create the impression that Beltman concluded that Chevron's remediation was adequate.  Beltman reached the opposite conclusion.  First, he states that "Cabrera already points out that the Texpet work did not actually clean up the pits, and the idea of this analysis was to determine if we could further criticize the Texpet cleanup for not complying with the technical requirements."  Dkt. 356-14 (Ex. DK) (STRATUS-NATIVE063668) at p. 41. Thus, the focus of Beltman's analysis was not whether Chevron's cleanup was adequate but, rather, whether it was additionally flawed because it failed to meet the technical requirements specified in the remedial action plan and related documents.

Further, Beltman significantly qualified his conclusion that he could not find a clear instance where those requirements were not met:

I did not find any clear instances where Texpet did not meet the conditions required in the cleanup. *The very large exception, of course, is that sampling*

*during the Judicial Inspections and by Cabrera showed that the 'cleaned' pits are in fact still contaminated – however, the sampling done by Woodward Clyde post-cleanup showed the pits to be in compliance with the contract requirements. This important discrepancy has already been addressed by Cabrera in his report. There is also the issue that the RAP conflicts with Ecuadorian laws, but again I did not evaluate that here.*

*Id.* at 42 (STRATUS-NATIVE063669) (emphasis added).

Chevron's incomplete citation to the internal comments on the Cabrera report is even more misleading.  Chevron omitted the question marks at the end of each comment.  See Dkt. 356-15 (Ex. DN) (STRATUS-NATIVE062132-61) at p. 3 ("These results show that the pits were properly remediated *???*" and "these 26 results indicate that Texaco did remediate and that the Expert is partial*?*") (punctuation omitted by Chevron italicized).

69.    *A consulting epidemiologist for the LAPs stated on August 25, 2008, that "the calculation of excess [cancer] cases [in the Cabrera report] is incorrect." Dkt. 355-22 (STRATUS-NATIVE052295-97) at 26 (the LAPs' consulting epidemiologist San Sebastian emailing David Mills of Stratus regarding the invalidity of Annex Q of the Cabrera Report: "The calculation of excess [cancer] cases is incorrect. The study uses the number 1.73 (which as mentioned above has no sense) to calculate that excess. To calculate excess of disease in epidemiology, we use the absolute difference between two risk or rates; the interpretation of this excess is done always assuming causality between the exposure (oil) and the outcome (cancer). These data are lacking in the study."); id. at 1 (the LAPs' consulting epidemiologist Miguel San Sebastian emailing David Mills of Stratus regarding the excess cancer claims in the April 1, 2008 Cabrera Report: "Quality of data: Cancer cases are based on a questionnaire, from an epidemiological point of has little validity.").*

69.    Not disputed.

## F.    The LAPs' Counsel Attempted to Conceal Their Involvement in the Cabrera Fraud[27]

70.    *LAPs' representatives contacted academic experts to try to obtain endorsements of the Cabrera report, and on July 20, 2008, Douglas Beltman emailed Donziger and others and explained, "Our original concerns about this have come to pass. . . . [S]ome of the underlying work in the Cabrera work has weaknesses that an academic would probably have a hard time defending." Dkt. 34-29 (STRATUSNATIVE042610).*

---

[27] For the reasons set forth in Donziger's responses to each of Chevron's facts listed under heading I.F., Donziger also disputes the assertions and conclusions set forth in Chevron's heading I.F.

70.     Disputed.  Chevron selectively quotes from Beltman's e-mail to create the impression

that no academic expert would endorse the report because each found that the analysis was

flawed.  But Beltman's e-mail provides a variety of reasons why academics would not review or

endorse the report, including fear of reprisal from Chevron:  "they know that signing their names

onto some sort of endorsement of the Cabrera report is setting them up for public attack from

Chevron (and perhaps attack within their academic circles as well).  While they would be willing

to face this attack to defend their own work, they generally are not willing to do so to defend

someone else's work – unless they in essence can adopt it as their own."  Dkt. 34-29 (Ex. 204) at

1.

71.     *On December 1, 2008, Stratus published a review of the Cabrera Report entitled*
*"Comments on the Report of the Court-Appointed Expert Ing. Richard Cabrera Vega in the Case*
*of Maria Aguinda y Otros v. Chevron Corp." Dkt. 34-26 at 2 ("We have reviewed the report*
*'Informe Sumario del Pericial' that was prepared by Ing. Richard Cabrera Vega, who was*
*appointed as the technical expert by the Court in the case of Maria Aguinda y Otros against*
*Chevron Corporation.").*

71.     Not disputed.

72.     *Stratus did not disclose in its review of the Cabrera Report that it had developed the*
*findings attributed to Cabrera and drafted language in the Cabrera Report. Dkt. 34-26 (Stratus'*
*comments on the Cabrera Report); Dkt. 402-11 (Ex. 2288) (Beltman Dep. Tr.) at 264:2-16.*

72.     Disputed.  First, Chevron has not established that Stratus "developed the findings

attributed to Chevron."  Second, Donzinger disputes that there was any requirement for Stratus to

relay all the details of its involvement with the Cabrera report.

73.     *Stratus's comments on the Cabrera Report were "written in a manner to give the*
*impression that Cabrera was entirely independent and conducted his own research and came up*
*with his own findings," and an attorney for the LAPs stated that it "appears not only that*
*Cabrera and plaintiffs can be charged with a 'fraud' respecting the former's report, but that*
*Stratus was an active conspirator." Dkt. 9-7 (DONZ00056679) at 1; Dkt. 3426.*

73.     Disputed.  As a preliminary matter, this fact is based upon inadmissible hearsay.

Chevron would rely on this statement—a first-blush reaction by an attorney who was not familiar

with the facts—to establish the truth of the matters asserted.  This also is not a fact, but rather a statement of opinion and legal conclusion.

Further, Chevron's citation does not support the conclusion asserted.  This comment was made by an attorney, during a brainstorming session regarding a working draft of a potential motion, and in which several potential arguments were posed without regard for or knowledge of the underlying facts.  Earlier in the e-mail chain, this same attorney acknowledges that the potential argument being discussed was not grounded in his knowledge of the facts, stating "my argument turns very substantially on the facts.  If there is any interest in reclaiming the argument, these facts need to be checked."  Dkt. 9-7 (Ex. 12) (DONZ00056679) at 1.  When read in context, this comment is obviously a first-blush opinion about the writing style, rather than an assertion of fact.

Most importantly, Chevron's evidence is contradicted by a subsequent e-mail sent by the same attorney to the same recipients two days later, apparently after a more fulsome review of the facts:

> For my part, I have no doubt that Chevron has perpetrated a fraud upon the [Colorado] Court here.  It has made a series of misrepresentations, generally in the form of omissions, particularly concerning what was occurring in Ecuador. . . . Had Chevron included for this Court a complete recitation of the Ecuadorian proceedings – the facts which it knew – it would have been impossible for them to make their strident cries about discovering that the Cabrera report contained 'plagiarized' Stratus material . . . Chevron . . . obviously understood that plaintiffs would be shoveling Stratus material to Cabrera.  ***There was, in sum, no fraud.***

Dkt. 528-3 (Ex. L) at p. 1.

74.  *The LAPs' counsel used code names in internal emails when discussing their dealings with Cabrera. Dkt. 402-2 (Ex. 2221) (DONZ00060634) at 1 (referring to the judge as the "Big Boss"); Dkt. 400-2 (Ex. 2012) (DONZ00042758) (referring to the judge as the "cook", Cabrera as the "waiter" and Chevron as "the other restaurant"); Dkt. 32-7 (DONZ00108564) at 1 (referring to the judge as the "boss"); Dkt. 356-9 (DONZ00043514) (referring to Donziger as "Lagarto 3", Fajardo as "Lagarto 2" while instructing Donziger to only refer to himself on a specific Hotmail address as "Lagarto 3"); Dkt. 46-3 (DONZ-HDD0125950) (referring to Cabrera as the "Wao"); Dkt. 402-2 (Ex. 2222) (DONZ00066208) (referring to Cabrera as the "wao").*

74.     Donziger does not dispute that counsel used alternate names.  As Donziger explained in response to the virtually identical allegations in Chevron's Fact No. 18, Donziger disputes the insinuation that the use of alternate names is evidence of impropriety by the Ecuadorian Plaintiffs.  Chevron engaged in extensive efforts to spy on the Ecuadorian Plaintiffs' team.  See Werdegar Decl. Ex. E; Donziger Rule 56.1(b) Statement, Fact No. 183.

75.     *Stratus understood that their meetings with Cabrera and their work on the Cabrera Report and its Annexes were to be kept "confidential" or "secret." Dkt. 402-11 (Ex. 2288) (2010.12.09 Beltman Dep. Tr.) at 156:15-19 ("Q. At that same time, was any instruction given to persons at Stratus whether or not to keep confidential any of its work with respect to the Peritaje Global? A. Yes."); Dkt. 400-2 (Ex. 2015) (2011.01.19 Maest Dep. Tr.) at 121:23-122:3 ("Q. After the meeting at Juan Aulestia's house in January of 2008 with Mr. Cabrera, did you have an understanding that your contacts with Mr. Cabrera . . . needed to be kept confidential or secret? A. Yes."); see also id. at 111:20-24.*

75.     Disputed.  The material to which Chevron cites does not support its assertion.  Chevron omits Beltman's answer to the question of what the nature of the instruction "whether or not to keep confidential any of [Stratus's] work" was.  Beltman responded that "As with all work that we do for attorneys on litigation cases, we do not release materials to the public or to any parties other than either our client or expressly allowed . . . ."  Dkt. 402-11 (Ex. 2288) at 156:15-25. Beltman and Maest's testimony is consistent with the common and unremarkable fact that litigation strategy, and the work of retained consultants, is often kept confidential.

II.   **DONZIGER, AS COUNSEL FOR THE LAPS, LED A SCHEME TO DECEIVE U.S. COURTS, INCLUDING COURTS IN NEW YORK, REGARDING THE NEUTRALITY AND INDEPENDENCE OF CABRERA**[28]

G.   **Donziger Has Served as Lead U.S. Counsel for the LAPs and Coordinated the Litigation Against Chevron**[29]

*76.   Donziger was one of the lawyers who represented the plaintiffs in Aguinda v. Texaco and appears on the complaint filed in 1993. Mastro Decl. 2824 (Complaint, Aguinda v. Texaco, Inc., No. 93 Civ. 7527 (JSR) (S.D.N.Y. Nov. 3, 1993)), at 38.*

76.   Not disputed.  Of course, the fact that Donziger, at one time, represented the Ecuadorian

Plaintiffs in the case that Chevron fought tooth and nail to have dismissed in favor of litigation in

Ecuador does not establish that Donziger was acting as an attorney in other proceedings in New

York over 16 years later.

*77.   Following dismissal of Aguinda, Donziger continued his involvement in the Ecuadorian litigation. He has explained that his "role is to be the lawyer and manage the Ecuadorian legal team," and that he "play[s] an integral role i[n] designing the trial strategy and working closely with the local team of lawyers." Dkt. 9-9 (2006.11.03 S. Donziger Book Proposal) (DONZ00006707) at 20, 21.*

77.   Disputed.  Donziger's statements in his 2006 book proposal, when read in context, do not

establish that he continued to represent the Ecuadorian Plaintiffs for all purposes.  When

describing the Kohn firm's relationship to the case, Donziger contrasted his role with that of

Kohn:  "My small practice has an agreement with the Kohn firm to litigate the Ecuador case as a

team – my role is to be the lawyer and manage the Ecuadorian legal team, while Kohn provides

overall guidance and money."  Dkt. 9-9 (Ex. 14) (Nov. 3, 2006 Donziger Book Proposal)

(DONZ00006707 ) at p. 20.  In this context, it is clear that Donziger means that his role is to

---

[28] For the reasons set forth in Donziger's responses to each of Chevron's facts listed under heading II, Donziger also disputes the assertions and conclusions set forth in Chevron's heading II.

[29] For the reasons set forth in Donziger's responses to each of Chevron's facts listed under heading II.A., Donziger also disputes the assertions and conclusions set forth in Chevron's heading II.A.

assist with legal strategy and management of legal personnel with respect to the Lago Agrio litigation in Ecuador.  Donziger further clarifies his role on the next page.  He states that "As an American, I am not licensed to practice law in Ecuador but I play in [sic] integral role is [sic] designing the trial strategy and working closely with the local team of lawyers."  *Id*. at 21.

And, of course, the fact that Donziger was involved with the Lago Agrio litigation and worked to shape legal strategy in 2006 does not establish that he acted as an attorney in any subsequent litigation in New York courts.  It is undisputed that Donziger never represented the Ecuadorian Plaintiffs in any of the New York actions at issue in the instant motion at the time of any allegedly deceitful pleading.

78.     *Donziger has stated that he was responsible for recruiting and managing the team of lawyers representing the LAPs: "I am the person primarily responsible for putting this team together and supervising it." Dkt. 9-9 (2006.11.03 S. Donziger Book Proposal) (DONZ00006707) at 2.*

78.     Disputed.  Chevron takes a single quotation from the opening of a 2006 book proposal out of context.  It would have this court believe that the statement "I am the person primarily responsible for putting this team together and supervising it so we can forestall this impending disaster" caused by Chevron's complete disregard for and devastation of the Ecuadorian rainforest, amounts to uncontrovertible evidence that Donziger directed or condoned very single action that any attorney who represented the Ecuadorian Plaintiffs ever took.

And, of course, the fact that Donziger was involved with the Lago Agrio litigation and worked to shape legal strategy in 2006 does not establish that he acted as an attorney in any subsequent litigation in New York courts.  It is undisputed that Donziger never represented the Ecuadorian Plaintiffs in any of the New York actions at issue in the instant motion at the time of any allegedly deceitful pleading.

79.     *Donziger has stated that he "had various face to face meetings with counsel for the Lago plaintiffs, particularly the Emery Celli counsel, counsel from other law firms as well, where we*

*discussed a whole variety of issues including the Cabrera issue." Mastro Decl. 2801 (Donziger Dep. Tr.) at 1162:8-13.*

79.    Not disputed.

*80.    When asked whether he had "a meeting or meetings where the subject of the Stratus work product and Mr. Cabrera's report was discussed," Donziger testified: "I've had a number of discussions with counsel about that issue, both by phone, e-mail, in person." Mastro Decl. 2801 (Donziger Dep. Tr.) at 1162:25-1163:15.*

80.    Not disputed.

*81.    In an April 17, 2010, letter to co-counsel, Donziger stated: "The traditional Ecuadorian law perspective (which will be asserted by Chevron) would hold that the level of collaboration between one party and the expert is problematic and improper in that all court-appointed experts in Ecuador should be independent. By working so closely with our local counsel and Stratus Cabrera violated his duties to the court." Dkt. 400-4 (Ex. 2047) (DONZ-HDD-0004621-22).*

81.    Disputed.  Chevron presents an incomplete quotation from this letter in order to present

the false impression that Donziger had concluded that the collaboration with Cabrera was

improper.  In fact, Chevron's selected quotation is from Donziger's description of what

Chevron's position would be, and not a description of the Ecuadorian Plaintiffs' team's

assessment.  Chevron's mischaracterization is readily apparent when the quotation is read in

context:

> *Our local counsel indicates there will be two very different perspectives on these facts.*  The traditional Ecuadorian law perspective (which will be asserted by Chevron) would hold that the level of collaboration between one party and the expert is problematic and improper in that all court-appointed experts in Ecuador should be independent.  By working so closely with our local counsel and Stratus, Cabrera violated his duties to the court.  *Under this perspective, treating Cabrera like a U.S. –style expert as we did will be seen as a violation of local court rules. Whether the court will see these facts as no big deal, improper, some sort of procedural defect that can be corrected, or (as the Gibson lawyers will surely assert) a fraud is uncertain.   Our side believes we can weather the storm with good advocacy in both the court and the media, in Ecuador and in the U.S. . . . Local counsel agrees that we need to immediately take steps to expand and fortify our team in Ecuador to have in place a plan to defend the process in a timely manner.*

Dkt. 400-4 (Ex. 2047) at DONZ-HDD-0004621-22.

Most importantly, Chevron failed to reveal the subsequent paragraph of this letter in

which Donziger describes the second perspective: ***Donziger and Ecuadorian counsel's opinion***

***that the collaboration with Cabrera was proper under the rules and practices of the case:***

> The other perspective is that given the customs and practices of the *Aguinda* case, nothing improper happened. The information in the Cabrera report is sound, and is consistent with the high quality of work that Stratus has done as a world class environmental consultancy. As you know, all of the court-appointed experts in the judicial inspections have been working closely with the parties in one form or another for several years with full knowledge of the court, and Cabrera was no different. Chevron's experts, including U.S. citizens appointed by the judge at Chevron's request were working with Chevron's counsel. Even though Cabrera was not an expert put forth by the parties, given that the plaintiffs unilaterally sought the global expert report and are paying him, that Chevron boycotted the process, and that the court ordered the parties to turn over materials to Cabrera and otherwise assist him, then the role of local counsel and Stratus was well within our rights and custom under the rules and practices of the *Aguinda* case as they had evolved since its inception almost seven years ago. Further, there are three other court-appointed experts preparing reports right now at Chevron's behest along the same lines as Cabrera, with Chevron paying all costs and Chevron counsel presumably working closely with the individual experts.

*Id*. at DONZ-HDD-0004622.

## H.   Donziger Convinced Consultant Mark Quarles to Submit a False Declaration Regarding Cabrera's Independence[30]

82.     *In September 2007, Donziger and his co-conspirators induced one of the LAPs' consultants, Mark Quarles, to sign a declaration that attested to the independence of Cabrera. Dkt. 48-31 (2007.09.17 Declaration of M. Quarles, Republic of Ecuador v. Chevron-Texaco, No. 04CV8378LBS (S.D.N.Y.)) at 3.*

82.     Disputed. Chevron's use of the loaded term "induced" is wholly unsupported by the

evidence to which it cites. Chevron cites only Quarles's declaration itself in support of its

assertion that Donziger and other unspecified persons "induced" Quarles to sign the declaration.

But the fact that Quarles made the declaration does not show that he was "induced" to sign it or

at whose request he signed it.

Moreover, Chevron's contention that the declaration "attested to the independence of

_____

[30] For the reasons set forth in Donziger's responses to each of Chevron's facts listed under heading II.B., Donziger also disputes the assertions and conclusions set forth in Chevron's heading II.B.

Cabrera" mischaracterizes Quarles's statements.  Quarles stated the following conclusions with respect to Cabrera's independence:

- Cabrera and his team acted independently from both the plaintiffs and the defendants at the three Phase II inspections that were witnessed on September 6-7, 2007.  Dkt. 48-31 (Ex. 333) at p. 3-4.

- The phase II inspections on September 6-7 were transparent because both the Ecuadorian Plaintiffs and Chevron were allowed to fully monitor Cabrera's activities.  *Id.* at p. 4.

    Thus, contrary to Chevron's suggestion, the Quarles declaration did not generally attest to Cabrera's overall independence.  Rather, the declaration states narrow conclusions about the sampling that occurred over two days.  Quarles concluded that Cabrera acted independently during this sampling activity.

*83.    Quarles's declaration was submitted on September 17, 2007 in an action that the Republic of Ecuador and Petroecuador had filed in the Southern District of New York and that was pending before Judge Sand. Dkt. 48-31 (2007.09.17 Declaration of M. Quarles, Republic of Ecuador v. ChevronTexaco, No. 04CV8378LBS (S.D.N.Y.)).*

83    Not disputed.  Donziger notes that he was *never* counsel of record in the *Republic of Ecuador* action.  *See In re Appl. of Chevron Corp.*, 749 F. Supp. 2d 135, 136 (S.D.N.Y. 2010) (identifying counsel in the Donziger 1782 action); Donziger Rule 56.1(b) Statement, Fact No. 198.

*84.    Quarles's declaration stated that "Mr. Cabrera and his team have acted independently from both the [Lago Agrio] plaintiffs and the defendant at the three (3) Phase II inspections that were witnessed on September 6 – 7, 2007." Dkt. 48-31 (2007.09.17 Declaration of M. Quarles, Republic of Ecuador v. ChevronTexaco, No. 04CV8378LBS (S.D.N.Y.)) at 3-4.*

84.  Disputed.  Quarles's observation that Cabrera acted independently of the parties at the inspection was not a representation about Cabrera's subjective independence from the parties but, rather, an observation that he acted free from interference at the inspections. The surrounding context shows that Quarles made this statement based on his observation of the

actual inspection.  See Dkt. 48-31 (Ex. 333) at p. 4 (discussing "The Phase II inspections that

were witnessed on September 6-7, 2007"); See also Donziger Rule 56.1(b) Statement of Fact No.

186 (Quarles testified that "he personallydid all the work on which this declaration is based[.]").

And, the sentence that immediately follows Chevron's quotation is "In fact, armed guards were

present to accompany Mr. Cabrera and his team and to prevent plaintiff and defendant personnel

from interfering with execution of the sampling plan."  *Id.*

85.     *On September 16, 2007, Donziger sent Quarles an email attaching Quarles's draft
declaration. Dkt. 48-33 (2007.09.16 Email with attachment from S. Donziger to M. Quarles re
"your affidavit edited") (DONZ00063081) at 4-5.*

85.  Disputed.  Donziger did not tell Quarles to execute the draft as Donziger had edited.  Rather,

Donziger sent the draft to Quarles with the statement "*Let me know if* you can revise it based on

the attached."  Dkt. 48-33 (Ex. 335) (DONZ00063081) at p. 1 (emphasis added).  In other words,

Donziger proposed that Quarles make the edits only if they were accurate.

86.     *Where Quarles had written a paragraph discussing the qualifications of Cabrera's team,
Donziger requested that he replace that language with the following statements: "Mr. Cabrera
has at all times acted independently from both the plaintiffs and the defendant. At no time has
Mr. Cabrera entertained suggestions or even met with plaintiffs or their representatives
regarding his current work plan." Dkt. 48-33 (2007.09.16 Email with attachment from S.
Donziger to M. Quarles re "your affidavit edited") (DONZ00063081) at 4.*

86.  Disputed.  The language Donziger actually used contradicts Chevron's characterization.  The

material that Chevron quotes was prefaced with the statement "I would delete para in favor of the

following language, if true:" Dkt. 48-33 (Ex. 335) (DONZ00063082) at p. 4.  Thus, the quoted

paragraph was proposed for inclusion *only if the statement were true*.

Further, it is not clear from the face of the document whether Donziger was suggesting that the

preceding paragraph, which discussed whether the critical elements needed to complete an

investigation were in place, or the subsequent paragraph, which is the full paragraph discussed in

Chevron's Fact No. 87 (*infra*), be deleted.

Chevron does not contend that the declaration that Quarles actually signed and submitted contained this proposed edit. Instead, the filed version of the declaration clearly focused on the three specific site inspections that Quarles personally witnessed. Dkt. 48-31 (Ex. 333) at p. 4-5.

87. *Donziger then told Quarles to delete language suggesting that if any such contacts had taken place, "a degree of biasness would have been introduced into the sampling plan." Dkt. 48-33 (2007.09.16 Email with attachment from S. Donziger to M. Quarles re "your affidavit edited") (DONZ00063081) at 5.*

87. Disputed. Donziger suggested that an entire paragraph be deleted, not just the phrase that Chevron has chosen to quote. See Dkt. 48-33 (DONZ00063082) at 5.

Chevron does not contend that the declaration that Quarles actually signed and submitted contained this proposed edit. Instead, the filed version of the declaration clearly focused on the three specific site inspections that Quarles personally witnessed. Dkt. 48-31 (Ex. 333) at p. 4-5.

88. *Quarles accepted Donziger's request to delete the "biasness" passage, and ultimately signed a version containing the core of the claim of independence that Donziger had added. Dkt. 48-31 (2007.09.17 Declaration of M. Quarles, Republic of Ecuador v. ChevronTexaco, No. 04CV8378LBS (S.D.N.Y.)), at 3 ("Mr. Cabrera and his team have acted independently from both the plaintiffs and the defendant").*

88. Disputed. As explained in Donziger's response to Fact No. 87, Chevron's insinuation that Donziger's proposed edits reveal some evidence of wrongdoing is unfounded, improper, and ignores the everyday realities of the iterative drafting process.

Chevron's characterization of Quarles's declaration is inaccurate. Quarles's observation that Cabrera acted independently of the parties at the inspection was not a representation about Cabrera's subjective independence from the parties but, rather, an observation that he acted free from interference at the inspections. The surrounding context shows that Quarles made this statement based on his observation of the actual inspection. See Dkt. 48-31 (Ex. 333) at p. 4 (discussing "The Phase II inspections that were witnessed on September 6-7, 2007"). And, the sentence that immediately follows Chevron's quotation is "In fact, armed guards were present to

accompany Mr. Cabrera and his team and to prevent plaintiff and defendant personnel from interfering with execution of the sampling plan." *Id.*

89. *Quarles later testified the statement concerning Cabrera's independence in his declaration was based not only on his observation of the global assessment process in 2007, but also on specific false representations by Donziger. Dkt. 48-32 (2010.09.01 Deposition of Mark Quarles, In re Application of Chevron Corp., No. 3:10-cv-00686 (M.D. Tenn.)) at 115-16, 118-19, 121-22.*

89. Disputed.  As a preliminary matter, Chevron uses testimony from a deposition where Donziger was not present and a case in which Donziger was not a party.  Donziger had no opportunity to ask questions of Quarles or to object to the questions that were asked of him. Chevron should not be permitted to use this testimony—which would be inadmissible at trial—to manufacture purportedly undisputed facts.

Chevron mischaracterizes Quarles's testimony.  At p. 115, Quarles testified that Donziger represented that Cabrera drafted Exhibit 6 to his deposition.  Quarles testified that he relied on that representation in reaching "the conclusion that you reached in Exhibit 4, [the declaration]" but the questioner does not ask, and Quarles does not testify to, which particular conclusions. Dkt. 48-32 (Ex. 334) 115:20-116:4.  Quarles also testified that he "personally did all the work on which this declaration is based[.]"  *Id.* at 96:16-18; *see* Donziger Rule 56.1(b) Statement, Fact No. 186.

90. *Quarles further testified that Donziger paid him to conduct his observations and sign the declaration, and that if he had known that Cabrera was working directly with the lawyers for the LAPs, he would not have signed the declaration. Dkt. 48-32 (2010.09.01 Deposition of Mark Quarles, In re Application of Chevron Corp., No. 3:10-cv00686 (M.D. Tenn.))) at 115-16, 118-19, 121-22.*

90. Disputed.  As a preliminary matter, Chevron uses testimony from a deposition where Donziger was not present and a case in which Donziger was not a party.  Donziger had no opportunity to ask questions of Quarles or to object to the questions that were asked of him. Chevron should not be permitted to use this testimony—which would be inadmissible at trial—to

manufacture purportedly undisputed facts.  Further, the apparent conflict between Quarles's

deposition testimony and the declaration that he actually signed and submitted under oath –

which states that the declaration was based only on his own review of Cabrera's work plan, his

knowledge of past Phase I Judicial Inspections, his site visits, and his professional experience—

and *not* on anything Donziger or any other counsel representing the Ecuadorian Plaintiffs may or

may not have told him,  Dkt. 48-31 (Ex. 333) at p. 1, 3 – demonstrates, at a minimum, a genuine

issue of fact that cannot be resolved on summary judgment.

      Nowhere in the cited testimony does Quarles state that *anyone* paid him to conduct his

observations and/or sign the declaration, let alone that Donziger did.

      Chevron also mischaracterizes Quarles's testimony by characterizing Quarles's

declaration as broader than it is.  As Quarles's declaration did not concern Cabrera generally but,

rather, Cabrera's sampling work during the phase II site inspections that Quarles observed, the

question posed to Quarles was highly misleading.  Quarles was asked whether he would have

signed the declaration "[i]f you'd had knowledge at the time that you signed Exhibit 4 that, in

fact, Mr. Cabrera was working directly with the plaintiffs . . . ."  Dkt. 48-32 (Ex. 334) (Quarles

Dep.) at 122:1-4.  But Quarles did not observe Cabrera working directly with the Ecuadorian

Plaintiffs *during the sampling he observed and discussed in the declaration*.  Clearly, Quarles

would not have said that he observed that Cabrera was taking samples on his own if he knew that

Cabrera was not taking the samples. But Chevron has never established or even suggested that

this was not the case and that Quarles's observation that Cabrera took samples without

interference from either side was incorrect.  Quarles also testified that he "personally did all the

work on which this declaration is based[.]"  Dkt. 48-32 (Ex. 334) at p. 96; *see* Donziger Rule

56.1(b) Statement, Fact No. 186.

Even this flawed testimony does not suggest that anything in Quarles's declaration was false. Quarles did not testify that any of the statements in his declaration were false. What Quarles said (after abusive and misleading questioning by Chevron) that he would or would not have done does nothing to establish the falsity of the declaration.

## I.     Donziger Recruited Emery Celli to Represent the LAPs in the United States[31]

*91.     Donziger and Jonathan S. Abady, a partner at the law firm Emery Celli Brinckerhoff & Abady LLP, have been friends since college. Mastro Decl. 2801 (Donziger Dep. Tr.) at 3198:24-3199:2 (both attended American University); Mastro Decl. 2802 (DONZ00018643) (2010.01.21 email in which Donziger describes Abady as a "college friend"); Mastro Decl. 2803 (DONZ00105785) (2010.09.08 email in which Abady states he has known Donziger for 30 years).*

91.     Not disputed. Of course, Donziger's friendship with an attorney that has represented the Republic of Ecuador and/or the Ecuadorian Plaintiffs does nothing to establish that Donziger represented the Ecuadorian Plaintiffs in any particular action, let alone the specific New York actions at issue in Chevron's motion. It is undisputed that Donziger never represented the Ecuadorian Plaintiffs in any of the New York actions at issue in the instant motion at the time of any allegedly deceitful pleading.

*92.     Abady attended Donziger's wedding. Mastro Decl. 2801 (Donziger Dep. Tr.) at 3202:3-10.*

92.     Not disputed. Of course, Donziger's friendship with an attorney that has represented the Republic of Ecuador and/or the Ecuadorian Plaintiffs does nothing to establish that Donziger represented the Ecuadorian Plaintiffs in any particular action, let alone the specific New York actions at issue in Chevron's motion. It is undisputed that Donziger never represented the

---

31 For the reasons set forth in Donziger's responses to each of Chevron's facts listed under heading II.C., Donziger also disputes the assertions and conclusions set forth in Chevron's heading II.C.

Ecuadorian Plaintiffs in any of the New York actions at issue in the instant motion at the time of any allegedly deceitful pleading. *See* Donziger Rule 56.1(b) Statement, Fact No. __.

*93.    Abady and Donziger traveled to Ecuador together in 1993 or 1994. Mastro Decl. 2801 (Donziger Dep. Tr.) at 3199:5-10.*

93.    Not disputed. Of course, Donziger's friendship with an attorney that has represented the Republic of Ecuador and/or the Ecuadorian Plaintiffs does nothing to establish that Donziger represented the Ecuadorian Plaintiffs in any particular action, let alone the specific New York actions at issue in Chevron's motion. It is undisputed that Donziger never represented the Ecuadorian Plaintiffs in any of the New York actions at issue in the instant motion at the time of any allegedly deceitful pleading. See Donziger Rule 56.1(b) Statement, Fact No. __.

*94.    Abady began to represent the Republic of Ecuador in 1996. See Mastro Decl. 2804 (Republic of Ecuador's Motion to Intervene, Aguinda v. Texaco, Inc., No. 93-CV7527 (JSR) (S.D.N.Y. Dec. 20, 1996) (Jonathan Abady for Beldock, Levine & Hoffman LLP listed as attorney for the Republic of Ecuador; Abady signed the filing).*

94. Not disputed. Of course, Donziger's friendship with an attorney that has represented the Republic of Ecuador and/or the Ecuadorian Plaintiffs does nothing to establish that Donziger represented the Ecuadorian Plaintiffs in any particular action, let alone the specific New York actions at issue in Chevron's motion. It is undisputed that Donziger never represented the Ecuadorian Plaintiffs in any of the New York actions at issue in the instant motion at the time of any allegedly deceitful pleading. See Donziger Rule 56.1(b) Statement, Fact No. __.

*95.    Donziger, on behalf of the LAPs, hired Emery Celli in the fall of 2009 to bring an action on behalf of the LAPs in the Southern District of New York seeking to stay the Bilateral Investment Treaty ("BIT") arbitration that Chevron had initiated against the Republic of Ecuador. Mastro Decl. 2801 (Donziger Dep. Tr.) at 3202:13-17; see also Mastro Decl. 2800 (DONZ00036556-58) (Donziger writes, "I proposed to the clients in the meeting in Quito that we contract with the Abady law firm . . . .").*

95. Disputed. Donziger did not write that he proposed that the Ecuadorian Plaintiffs hire Emery Celli "to bring an action on behalf of the LAPs seeking to stay" the BIT arbitration. Donziger

wrote that he recommended that the Ecuadorian Plaintiffs contract with the firm "to represent the interests of the Lago plaintiffs in determining a strategy and acting on it."  Dkt. 586-1 (Ex. 2800) at p. 4.

Further, the fact that Donziger was involved in the hiring of a law firm for the Ecuadorian Plaintiffs in 2009 does not mean that Donziger was acting as counsel in those proceedings or any others.  It is undisputed that Donziger never represented the Ecuadorian Plaintiffs in any of the New York actions at issue in the instant motion at the time of any allegedly deceitful pleading. See Donziger Rule 56.1(b) Statement, Fact No. __.

96.      *The LAPs' initial retainer agreement with Emery Celli was signed by Donziger "in [his] capacity as the [LAPs'] U.S. representative at the time." Mastro Decl. 2801 (Donziger Dep. Tr.) at 3208:11-13; see also Mastro Decl. 2805 (DONZ-HDD-0215169-73) (executed retainer agreement with Emery Celli) at DONZ-HDD-0215171.*

96. Disputed.  The retainer agreement was expressly conditioned on a direct retention between Emery Celli and the plaintiff class.  Dkt. 586-6 (Ex. 2805) (DONZ-HDD-0215171) at p. 3.  This was accomplished through the signatures of Yanza and Fajardo.  Id.  ("You have represented to us that Luis Yanza and Pablo Fajardo have authority to represent the plaintiff class and that their signatures below satisfy this requirement" [of direct retention by the plaintiff class].).

The fact that Donziger signed a 2009 retainer agreement "in [his] capacity as the [LAPs'] U.S. representative at the time" –a retainer that was conditioned on Yanza and Fajardo's signatures as direct representatives of the plaintiffs—does not establish that Donziger represented the Ecuadorian Plaintiffs in subsequent New York litigation.  Moreover, Chevron admits that the Ecuadorian Plaintiffs and Emery Celli signed a subsequent retainer in 2010—a retainer among the firm, the Ecuadorian Plaintiffs, the Frente de Defenda de la Amazonia, and the Asamblea de Afectados por Texaco.

97.      *In mid-2010, Emery Celli began to represent the LAPs in Chevron's discovery actions brought under 28 U.S.C. § 1782. Mastro Decl. 2806 (2010.04.23 Notice of Entry of Appearance*

*by Ilann Maazel, Chevron Corp. v. Stratus Consulting, Inc., No. 1:10-cv00047 (MSK) (MEH) (D. Colo.)), Dkt. 62).*

97.    Not disputed.

*98.    A second retainer agreement between the LAPs and Emery Celli, which Donziger may also have signed, was executed in either September or October 2010. Mastro Decl. 2807 (2010.09.16 draft agreement between Emery Celli, Plaintiffs "through their duly authorized representatives," the Frente, and the Asamblea de Afectados por Texaco); Mastro Decl. 2801 (Donziger Dep. Tr.) at 3208:23-3209:11 (testifying that Emery Celli entered into an agreement with Fajardo, Yanza, and Chavez, the president of the Frente, in September or October 2010 and that Donziger may have signed the agreement).*

98.    Not disputed.

## J.    When Seeking to Stay the BIT Arbitration, Defendants Falsely Claimed That Cabrera Was Neutral and Independent[32]

*99.    On January 14, 2010, Emery Celli filed an action on behalf of the LAPs in the Southern District of New York that sought to stay the BIT arbitration. Dkt. 30-5 (2010.01.14 Lago Agrio Plaintiffs' Complaint to Stay Arbitration, Yaiguaje v. Chevron Corp., No. 10-CV-0316 (LBS) (S.D.N.Y.), Dkt. 1).*

99.    Not disputed.  It is also undisputed that Donziger only appeared in the BIT arbitration

stay action on behalf of the Ecuadorian Plaintiffs on March 9, 2010, nearly three months *after* the

filing the Ecuadorian Plaintiffs' allegedly deceitful complaint.  *See* Dkt. 30-5 (Ex. 94); Dkt. 586-

24 (Ex. 2823); Donziger Rule 56.1(b) Statement, Fact. No. __.  In fact, Donziger did not sign or

file any substantive pleading in the BIT arbitration stay action.  *Id.*, Fact No. __.

*100.    Donziger entered an appearance as counsel for the LAPs in the BIT arbitration stay proceeding. Mastro Decl. 2823 (2010.03.09 Notice of Appearance by Steven Donziger, Yaiguaje v. Chevron Corp., No. 10-CV-0316 (LBS) (S.D.N.Y.), Dkt. 30).*

100.    Not disputed. It is also undisputed that Donziger only appeared in the BIT arbitration

action on behalf of the Ecuadorian Plaintiffs on March 9, 2010, nearly three months *after* the

---

[32] For the reasons set forth in Donziger's responses to each of Chevron's facts listed under heading II.D., Donziger also disputes the assertions and conclusions set forth in Chevron's heading II.D.

filing the Ecuadorian Plaintiffs' allegedly deceitful complaint. *See* Dkt. 30-5 (Ex. 94); Dkt. 586-24 (Ex. 2823); Donziger Rule 56.1(b) Statement, Fact. No. __. In fact, Donziger did not sign or file any substantive pleading in the BIT arbitration stay action. *Id.*, Fact No. __.

*101. The LAPs' complaint in the BIT arbitration stay proceeding alleged that "[t]he best and most recent independent estimate available of the human health impact of this contamination is provided by the neutral Special Master [Cabrera] appointed by the [Lago Agrio] court to provide advice on damages," and that "the final report [was] produced by the Cabrera team" consisting of "14 technical officials" that Cabrera had appointed. Dkt. 30-5 (2010.01.14 Lago Agrio Plaintiffs' Complaint to Stay Arbitration, Yaiguaje v. Chevron Corp., No. 10-CV-0316 (LBS) (S.D.N.Y.), Dkt. 1 ¶¶ 29-30)) (emphasis added).*

101    Disputed. Chevron's insertion of the word "was" into the quotation creates the incorrect impression that the complaint attempted to rebut an assertion that the report was not produced by the Cabrera team. Not so. Rather, the complaint uses the phrase Chevron altered when describing what the report said: "Using conservative measures, the final report produced by the Cabrera team estimated 1,401 excess cancer deaths in the region where Chevron operated due to oil contamination." Dkt. 30-5 (Ex. 94), ¶ 30.

*102. This statement closely tracked Donziger's statement to the congressional Tom Lantos Human Rights Commission on April 28, 2009: "The best and most recent independent estimate available of the human health impact of this contamination is provided by the expert appointed by the court, Richard Cabrera. This expert, along with a team of 14 technical officials, reviewed all the data in evidence as well as several peer-reviewed health studies." Dkt. 47-30 at 7.*

102.    Disputed. Donziger disagrees that even Chevron's garbled characterization of the complaint "closely tracks" Donziger's statement made nine months earlier. This subjective determination is not a fact, it is Chevron's opinion. Furthermore, the statement Chevron cobbled together by rearranging phrases might appear similar to Donziger's statement made nine months earlier, but that is only because Chevron crafted its characterization of the complaint to better align with Donziger's statement.

The inference that Chevron would have the Court draw from the purported similarity between a statement in a complaint and a statement made by Donziger is not apparent. The

purported similarity could indicate any number of things, including the completely innocent

possibility that the drafters of the complaint referenced Donziger's earlier statements when

reviewing the factual support for the allegations.

*103.   The LAPs' complaint in the BIT arbitration stay proceeding alleged that "[e]nvironmental remediation experts from the United States have reviewed the Cabrera report and found its conclusions reasonable and its damages assessment consistent with the costs of other large environmental clean-ups around the world." Dkt. 30-5 (2010.01.14 Lago Agrio Plaintiffs' Complaint to Stay Arbitration, Yaiguaje v. Chevron Corp., No. 10-CV0316 (LBS) (S.D.N.Y.)), ¶ 31.*

103.   Not disputed.

*104.   This statement closely tracked Donziger's statement to the congressional Tom Lantos Human Rights Commission on April 28, 2009: "Numerous qualified scientists have reviewed this report and found its conclusions reasonable and the damages assessment consistent with the costs of other large environmental clean-ups." Dkt. 47-30 at 5.*

104.   Disputed.  Donziger disagrees that the complaint "closely tracks" Donziger's statement

made nine months earlier. This subjective determination is not a fact, it is Chevron's opinion.

        The inference that Chevron would have the Court draw from the purported similarity

between a statement in a complaint and a statement made by Donziger is not apparent.  The

purported similarity could indicate any number of things, including the completely innocent

possibility that the drafters of the complaint referenced Donziger's earlier statements when

reviewing the factual support for the allegations.

*105.   As Donziger has admitted, while the LAPs attempted to obtain endorsements from other scientists, "no expert other than Stratus signed on to the written endorsement of the Cabrera report." Mastro Decl. 2801 (Donziger Dep. Tr.) at 2967:7-18.*

105.   Not disputed.  However, this fact does not make Donziger's statement to the Lantos

Commission or the Ecuadorian Plaintiffs' complaint in the arbitration stay proceeding false.

First, the Stratus scientists who reviewed the report are qualified scientists.  Second, the fact that

only Stratus signed a written endorsement of the Cabrera report does not mean that other

scientists could not have reviewed the report and found its conclusions reasonable, etc.  All that

94

this fact means is that other scientists did not sign on to a particular written endorsement.

*106.   On December 1, 2008, Stratus released a fifteen-page document purporting to analyze and defend the Cabrera Report. In this document, which bears the signatures of Beltman and Maest, as well as other Stratus employees, Stratus claimed, "Mr. Cabrera is thus acting in the capacity of a neutral 'expert' to the Court, and his role is to assist the Court in evaluating the scientific and technical information that was collected and compiled for the case. In the U.S. Court system, Mr. Cabrera would be called a Technical Special Master." Dkt. 34-26 (2008.12.01 Comments on the Report of the Court-Appointed Expert Richard Cabrera Vega in the Case of Maria Aguinda y Otros v. Chevron Corp., Stratus Consulting) at 1.*

106.   Not disputed.

*107.   One of the LAPs' lawyers wrote regarding the Stratus comments: "This document might end the discussion. These 'comments' are written in a manner to give the impression that Cabrera was entirely independent and con-ducted his own research and came up with his own findings. There is no indication in this document that Stratus, ostensibly the company of experts independent from Cabrera, was itself involved in 'ghosting' the Cabrera report. This might not be dispositive if there were other evidence showing that Chevron had actual or constructive knowledge that Stratus had been involved in the creation of the Cabrera report. In such a case Stratus's 'comments' may have been a rather crude and awkward spin by a biased expert - but it would not have been a 'fraud' upon Chevron. But, in the absence of such evidence, then it appears not only that Cabrera and [the Lago Agrio] plaintiffs can be charged with a 'fraud' respecting the former's report, but that Stratus was an active conspirator." Dkt. 9-7 (2010.05.16 Email chain among J. Horowitz, A. Wilson, S. Donziger, and others re "Rule60(b) And Stratus Materials") (DONZ00056679)) at 1.*

107.   Disputed.  As a preliminary matter, this statement is inadmissible hearsay.  Chevron would rely on this statement—a first-blush reaction by an attorney who did not represent Stratus and was not familiar with the facts, was and made in the context of a group brainstorming session where many potential arguments were posed without regard for or knowledge of the underlying facts—to establish the truth of the matters asserted.

The "discussion" to which the attorney refers was an attorney group brainstorming session regarding a working draft of a potential motion, and in which several potential arguments were posed without regard for or knowledge of the underlying facts.  Earlier in the e-mail chain, this same attorney acknowledges that the potential argument being discussed was not grounded in his knowledge of the facts, stating "my argument turns very substantially on the facts.  If there

is any interest in reclaiming the argument, these facts need to be checked."  Dkt. 9-7 (Ex. 12) (DONZ00056679) at 1.

Most importantly, Chevron's evidence is contradicted by a subsequent e-mail sent by the same attorney to the same recipients two days later, apparently after a more fulsome review of the facts, in which Colorado counsel stated:

For my part, I have no doubt that Chevron has perpetrated a fraud upon the [Colorado] Court here.  It has made a series of misrepresentations, generally in the form of omissions, particularly concerning what was occurring in Ecuador. . . . Had Chevron included for this Court a complete recitation of the Ecuadorian proceedings – the facts which it knew – it would have been impossible for them to make their strident cries about discovering that the Cabrera report contained 'plagiarized' Stratus material . . . Chevron . . . obviously understood that plaintiffs would be shoveling Stratus material to Cabrera.  **There was, in sum, no fraud.**

Dkt. 528-3 (Ex. L) at p. 1.

*108.    Donziger testified that he personally initiated the process that led to the Stratus review of the Cabrera report: "I asked [Stratus] to prepare what we call a peer review of the Cabrera report ... and it evolved into this piece of work." Mastro Decl. 2801 (Donziger Dep. Tr.) at 2966:18-23.*

108.    Not disputed.

*109.    Asked whether he "instruct[ed] Stratus not to disclose in the Stratus comments that were published the fact that they had been involved in writing the Cabrera report," Donziger testified that "as a general policy it was understood that that would be kept confidential." Mastro Decl. 2801 (2011.01.14 Donziger Dep. Tr.) at 2966:24-2967:6.*

109.    Not disputed.

**K.      In Opposing Chevron's § 1782 Applications, Defendants Resorted to Deception in an Attempt to Prevent the Revelation of the Cabrera Fraud[33]**

*110.     Julio Prieto sent an email to Donziger and Fajardo that stated that: "[T]he effects are potentially devastating in Ecuador (apart from destroying the proceeding, all of us, your attorneys, might go to jail)[.]" Dkt. 9-6 (2010.03.30 Email from J. Prieto to S. Donziger, P. Fajardo, L. Yanza and J. Saenz re "Protection Action") (DONZ00055225)).*

110.     Donziger does not dispute that Prieto sent the cited e-mail.  Donziger disputes, however, that Chevron has provided a full description of the e-mail and also disputes that Prieto's e-mail establishes that this e-mail establishes that the Ecuadorian Plaintiffs' contacts with Cabrera were improper.

Prieto begins "Apparently this is normal in the U.S. and there is no risk there, but the problem, my friend, is that the effects are potentially devastating in Ecuador . . . ." Dkt. 9-6 (Ex. 11) (DONZ00055225) at 1.  This is clearly the unconsidered opinion—expressed in the heat of the moment—of but one member of the Ecuadorian Plaintiffs' team.  This opinion is inconsistent with Ecuadorian law in place at the time, which did not prohibit coordination between parties and experts.  *See* Donziger Rule 56.1(b) Statement, Fact No. __.  Donziger also testified that he understood that all court experts in Ecuador worked closely with the parties and that parties could have access to them" and that it would not have been improper for Chevron also to privately with Cabrera.  Werdegar Decl., Ex. H (12/8/10 Donziger Depo. Tr.), at 959:25-960:8; Donziger Rule 56.1(b) Statement, Fact No. __.

*111.     Donziger has stated that Defendants and their co-conspirators set out to prevent any disclosure of the true nature of their relationship with Cabrera in Chevron's § 1782 proceedings. Mastro Decl. 2801 (Donziger Dep. Tr.) at 3358:22-3363:20 (Donziger testifying that "the truth about Stratus' role in drafting the Cabrera report" was "not something*

―――――――――――――

[33] For the reasons set forth in Donziger's responses to each of Chevron's facts listed under heading II.E., Donziger also disputes the assertions and conclusions set forth in Chevron's heading II.E.

*[defendants] wanted known"; and that defendants "[s]ought to prevent Stratus' role relative to the Cabrera report from coming out").*

111.   Disputed.  Donziger did not testify that anyone "sought to prevent Stratus' role relative to the Cabrera report from coming out."  [cite Chevron statement].  Rather, that was Mr. Mastro's characterization, which Donziger did not adopt.  Dkt. 586-2 (Ex. 2801) (Donziger Dep. Tr.) at 3360:10-3362:8.

Chevron's broad assertion mischaracterizes the testimony.  Donziger did not testify that he—or anyone else—set out to prevent all disclosure related to Stratus.  Rather, Donziger testified that there was an effort to keep confidential litigation strategy from coming out.  Dkt. 586-2 (Ex. 2801) (Donziger Dep. Tr.) at 3361:12-22.  (Donziger's testimony that filings in the § 1782 proceedings "were part of our litigation strategy," and "to prevent confidential information from coming out.").  Surely Chevron cannot suggest that all efforts to limit a litigation adversary's discovery amounts to an effort to hide the truth or mislead a court.

112.   *The LAPs' counsel sought to prevent the disclosure of their relationship with Cabrera and their role in his work before and after Chevron filed a Section 1782 proceeding in the District of Colorado seeking discovery from Stratus. Dkt. 6-2 (Ex. 1) at CRS191-00-CLIP-03 (2007.03.03 Crude outtake video clip of meeting among P. Fajardo, A. Maest, and others); Dkt. 7-5 (Ex. 2 (certified transcript)) at 244 (Fajardo: "Chevron's main problem right now is that it doesn't know what the hell is going to happen in the global expert examination. In other words, they don't know that. I hope none of you tell them, please. [laughter]....[I]t's Chevron's problem."); Dkt. 6-2 (Ex. 1) at CRS-196-00-CLIP-01 (2007.03.04 meeting among S. Donziger, A. Maest, R. Kamp, and C. Champ discussing groundwater evidence); Dkt. 7-6 (Ex. 2 (certified transcript)) at 265-67 (LAPs' consultant Charles Champ told Donziger, "I know we have to be totally transparent with Chevron in showing them what we're doing," but Donziger responded, "No, no," and stated, "because they will find out everything we do." He continued: "Our goal is that they [Chevron] don't know shit . . . and that's why they're so panicked."); Dkt. 32-7 (DONZ00108564) at 1 (Donziger: the LAPs' counsel should consider having Cabrera take action "AGAINST us to prove his independence" and "find ways to Keep Texaco from finding out much about his plan and his work"); Dkt. 47-6 (JB-NONWAIVER00008870) (LAPs' counsel Pablo Fajardo imploring the Crude filmmakers to "remove the images that we discussed" of Cabrera team member Dr. Beristain working with LAPs' attorneys because "[t]his is so serious that we could lose everything"); Dkt. 48-31 ¶ 7.1 (Declaration of Mark Quarles stating, among other things, that "Mr. Cabrera and his team have acted independently from both the plaintiffs and the defendant"); Dkt. 48-32 (Quarles Dep. Tr.) at 122:1-5 (testifying that he "would not have signed this declaration" if he had known that "Mr. Cabrera was working directly with the*

*plaintiffs."); Dkt. 33-9 (STRATUS-NATIVE044716) at 1 (Beltman: plan is to treat "our original English version as if it's a translated version" of Cabrera Report); Dkt. 34-23 (STRATUS-NATIVE065062); Dkt. 34-13 (STRATUS-NATIVE061311) at 1 ("We have to talk to Clapp about that 5-pager, and how we have to limit its distribution. It CANNOT go into the Congressional Record as being authored by [Clapp]."); Dkt. 34-14 (STRATUSNATIVE057803) (Stratus principal Douglas Beltman writes of incriminating citation in the Cabrera Report, "Oh what a tangled web . . . .").*

112.    Disputed.  As a preliminary matter, much of this evidence is inadmissible hearsay.

Chevron cannot use unauthenticated e-mails that Donziger neither authored nor received as

evidence of the truth of  the matters asserted therein. See, e.g. Dkt. 34-14 (Ex. 189) (e-mail to

Dave Mills from Doug Beltman).

Further, Chevron's incomplete or mischaracterized citations do not actually support the

assertions it makes.

- Chevron selectively quotes from the outtake transcripts in order to present a biased and one-sided description of what was discussed during the meetings.  Fajardo describes his prediction of the lengths Chevron would go to interfere with the expert examination.  See Dkt. 7-5 (Ex. 2) at 243 ("There's going to be a constant harassment of the expert and his technical team in the field. . . . Attempts—beware—attempts to bribe the expert with money—and possibly his technical team.  If that doesn't work, they're going to try to threaten, or perhaps sue the expert."  In this context, Fajardo's statement that "Chevron's main problem right now is that it doesn't know what the hell is going to happen in the global expert examination" shows his belief the Ecuadorian Plaintiffs' work to have the court appoint an expert that could not be controlled by Chevron meant that Chevron was afraid that the true extent of damages would be revealed.

- Donziger's statement to Maest and Champ was in the context of a discussion of the fact that "There's no way they [Chevron] can control this, because they didn't ask for it." Dkt. 7-6 (Ex. 2) at 266.  Of course it was Donziger's goal that Chevron would not know what the Ecuadorian Plaintiffs were doing.  It is generally good litigation strategy to try to make sure that one's adversary does not know your strategy.

- Quarles's declaration did not generally attest to Cabrera's independence.  The surrounding context shows that Quarles made this statement based on his observation of the actual inspection. See Dkt. 48-31(Ex. 333) at p. 4 (discussing "The Phase II inspections that were witnessed on September 6-7, 2007").  Quarles's observation that Cabrera acted independently of the parties at the inspection was not a representation about Cabrera's subjective independence from the parties but, rather, an observation that he acted free from interference at the inspections.  The sentence that immediately follows Chevron's quotation is "In fact, armed guards were present to accompany Mr. Cabrera

and his team and to prevent plaintiff and defendant personnel from interfering with execution of the sampling plan." Id.

- The Stratus e-mail does not show that Stratus was trying to keep its role secret. The e-mail is discussing providing translations of the Cabrera report Annexes to a reporter. Acknowledging that Cabrera largely adopted the Annexes that Stratus drafted, Beltman appears to be determining which ones they already have English versions of and which ones need to be translated. This establishes only that Stratus was trying to provide accurate English versions of the Cabrera annexes to a reporter.

- Chevron's conclusion that a citation in the Cabrera report was "incriminating" is unsupported, argumentative, and improper in a Rule 56.1 statement. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" Goldstick v. The Hartford Inc., No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19, 2002) (Kaplan, J.) (quoting Rodriguez v. Schneider, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).

*113.    At an April 2010 hearing in the Stratus 1782, counsel for Defendant Stratus told a U.S. magistrate judge that Stratus had been "astonish[ed]" to see similarity between its work product and the Cabrera Report. Dkt. 47-62 (2010.04.27 Hr'g Tr., Chevron Corp. v. Stratus Consulting, Inc., No. 10-cv-00047 (MSK) (MEH) (D. Colo.))) at 69:12-13.*

113.    Disputed.  Chevron's assertion is incorrect and obviously inconsistent with the record.

In response to the court's question "Mr. Silver, do you know—does your client know what was

given to Cabrera?" counsel answered, "In an anecdotal way I know that they are wise to the

resemblance of—to their astonishment of product, similarity of product.  So it's anecdotal." Dkt.

47-62 (Ex. 300) at 69:9-14.

*114.    Counsel for Stratus also stated to the court in the Stratus 1782 that Stratus did not have "an opportunity to review Cabrera's report in draft form," that there had been no "direct communications between anyone at Stratus and Mr. Cabrera," and that what they provided the LAPs' counsel including Donziger was "intended to assist them in their analysis of data," and in the "mediation," not "to assist Cabrera." Dkt. 47-62 (2010.04.27 Hr'g Tr., Chevron Corp. v. Stratus Consulting, Inc., No. 10-cv-00047 (MSK) (MEH) (D. Colo.))) at 40:10-12; 58.5-17; 56:25-57:4.*

114.    Disputed.  Counsel for Stratus stated that, to his knowledge, Stratus did not have an

opportunity to review Cabrera's report in draft form.  This was in the context of a discussion of

whether Stratus had direct contact with Cabrera.  And counsel clarified that Stratus would not be

taking the position that direct communications between Stratus and Cabrera were privileged. Dkt. 47-62 (Ex. 300) at 40:10-24.

Stratus's counsel never represented, as Chevron now suggests, that Stratus never provided documents that made their way to Cabrera. *See, e.g.*, Dkt. 47-62 (Ex. 300) at 52:1-6 ("I think the issue here is that because the principal relationship is between Stratus and plaintiff's counsel, and then my understanding is that documents that are communicated to Cabrera are going through local Ecuadorian counsel . . . ."); *see also id.* at 55:25 -56:3 (Q: … and certain results of that went to Cabrera, right?  A:  As a consulting expert it went to who engaged us."). Further, counsel represented that, *based on the investigation and diligence performed so far*, he did not believe there had been direct communications between Stratus and Cabrera.  *Id.* at 58:5-17.  But counsel also qualified this representation and stated that the investigation and diligence was ongoing and had not yet been completed.  *Id.* at 58:19-24.  ("Now, that investigation, that due diligence hasn't ended . . . because of the breadth of it.").

Finally, it should be noted that counsel raised a privilege objection when the court asked counsel whether anyone at Stratus knew "that the ultimate purpose [of Stratus's work] was to provide information for a damages expert who was court appointed."  The court did not demand an answer of counsel, and the question was never answered.  *Id.* at 57:7-19.  Chevron's insinuation that Stratus's counsel lied to the court is contradicted by the record.

*115.    The LAPs filed a declaration on May 5, 2010 from Fajardo in the Stratus 1782 containing statements about the expert process in the Lago Agrio Litigation and the independence of Cabrera.  Dkt. 48-13-48-14 (2010.05.05 Declaration of P. Fajardo in Support of Lago Agrio Plaintiffs' Motion for Protective Order, Chevron Corp. v. Stratus Consulting, Inc., No. 10-cv-00047 (MSK) (MEH) (D. Colo.)).*

115.    Disputed.  Chevron's suggestion that the declaration claims that Cabrera operated completely independently from the Ecuadorian Plaintiffs is a mischaracterization of the declaration.  Fajardo describes Cabrera as:

- an "Ecuadorian court-appointed expert," Dkt. 48-13 (Ex. 316) at ¶ 2.  This is true.

- A member of the "pool of seven independent experts it [the court] previously appointed in the case.  *Id.* at ¶ 11.  This is true.

- A person "who, in November 2006, had been appointed by the court and served as an expert for three judicial site inspections."  *Id.*  This is true.

- An expert who "was also free to consider materials submitted to him by the parties."  *Id.* at ¶ 16.  This is true.

Fajardo never asserted that Cabrera operated independently from the Ecuadorian

Plaintiffs.  The declaration stated that "the [Ecuadorian] court concluded that the global damages

assessment expert would be selected from the pool of seven independent experts it previously

appointed in the case.  Of the seven, the court appointed Richard Cabrera Vega who, in

November 2006, had been appointed by the court and served as an expert for three judicial site

inspections."  Dkt. 586-12 (Ex. 2811) ¶ 11.  The word "independent" describes the seven

independent experts [the court] previously appointed.  This is an accurate description of these

seven prior experts; they were independent experts in the sense that they were appointed by the

court.  Earlier, Fajardo explained that these court-appointed experts were not necessarily neutral

or free of contact with either party, because they were selected by and worked closely with one

party or another.  *See id.* ¶ 5 ("Each of these experts, though selected by the parties, was

appointed by the court consistent with Ecuadorian procedural rules.  Technically, these

individuals were considered court-appointed experts even though they worked closely with the

parties.").  Chevron's attempt to pluck the word "independent" out of context and turn it into an

allegedly misleading representation is inconsistent with the evidence.

Fajardo's declaration also states that "Throughout the process, by virtue of Cabrera's

status as a court-appointed expert, Chevron enjoyed the same opportunity as Plaintiffs to provide

materials to Cabrera supportive of its position in the litigation.  Indeed, Mr. Cabrera actively

sought documents from Chevron, including environmental audits prepared by Chevron's own consultants. But Chevron chose to forego this opportunity, and refused to partake in the process." *Id.* at ¶ 21.

Chevron has provided no evidence that Fajardo's statement is false. **In fact, Chevron's counsel has admitted that "both sides were allowed to submit data to Cabrera."** [Neuman statement in Stratus § 1782, Dkt. 47-62 (Ex. 300) at 36:18-19]. Chevron has provided no evidence that Cabrera refused to accept any materials they proffered. Rather, the evidence suggests that Chevron boycotted the global expert examination process. *See* Donziger Rule 56.1(b) Statement, Fact No. __..

*116.   The LAPs filed the same Fajardo declaration on August 28, 2010 in the Donziger 1782, in support of their motion to quash subpoenas that Chevron had served on Donziger. Mastro Decl. 2811 (In re Application of Chevron Corp., No. 1:10-mc-00002-LAK (S.D.N.Y. Aug. 28, 2010), Dkt. 31-6).*

116.   Donziger does not dispute that the declaration was filed. Donziger disputes Chevron's insinuation that the declaration was false.

*117.   Fajardo's declaration omitted the improper pressure Donziger and his cocounsel placed on the Ecuadorian judge to appoint Cabrera. Mastro Decl. 2811 (In re Application of Chevron Corp., No. 1:10-mc-00002-LAK (S.D.N.Y. Aug. 28, 2010), Dkt. 31-6), ¶ 11.*

117.   Disputed. Chevron mischaracterizes Fajardo's declaration. The declaration stated that "the [Ecuadorian] court concluded that the global damages assessment expert would be selected from the pool of seven independent experts it previously appointed in the case. Of the seven, the court appointed Richard Cabrera Vega who, in November 2006, had been appointed by the court and served as an expert for three judicial site inspections." Dkt. 586-12 (Ex. 2811) ¶ 11. The word "independent" describes the seven independent experts [the court] previously appointed. This is an accurate description of these seven prior experts; they were independent experts in the sense that they were appointed by the court. Earlier, Fajardo explained that these court-

appointed experts were not necessarily neutral or free of contact with either party, because they were selected by and worked closely with one party or another. *See id.* ¶ 5 ("Each of these experts, though selected by the parties, was appointed by the court consistent with Ecuadorian procedural rules. Technically, these individuals were considered court-appointed experts even though they worked closely with the parties."). Chevron's attempt to pluck the word "independent" out of context and turn it into an allegedly misleading representation is inconsistent with the evidence.

Fajardo's declaration also states that "Throughout the process, by virtue of Cabrera's status as a court-appointed expert, Chevron enjoyed the same opportunity as Plaintiffs to provide materials to Cabrera supportive of its position in the litigation. Indeed, Mr. Cabrera actively sought documents from Chevron, including environmental audits prepared by Chevron's own consultants. But Chevron chose to forego this opportunity, and refused to partake in the process." *Id.* at ¶ 21.

Chevron has provided no evidence that Fajardo's statement is false. ***In fact, Chevron's counsel has admitted that "both sides were allowed to submit data to Cabrera."*** [Neuman statement in Stratus § 1782, Dkt. 47-62 (Ex. 300) at 36:18-19]. Chevron has provided no evidence that Cabrera refused to accept any materials they proffered. Rather, the evidence suggests that Chevron boycotted the global expert examination process. *See* Donziger Rule 56.1(b) Statement, Fact No. __.

*118.    Fajardo's declaration omitted the improper pressure Donziger and his cocounsel placed on the Ecuadorian judge to appoint Cabrera. Mastro Decl. 2811 (In re Application of Chevron Corp., No. 1:10-mc-00002-LAK (S.D.N.Y. Aug. 28, 2010), Dkt. 31-6), ¶ 11.*

118.    Disputed. Chevron's conclusory assertion that any contact with Judge Yánez was "improper" is unsupported. Donziger has disputed, and refuted, Chevron's evidence suggesting that ex-parte contacts with Yánez were improper, *see, e.g.* response to Fact No. 10 —and

provided affirmative evidence that they were not, s*ee* Donziger Rule 56.1(b) Statement, Fact No.

___.  Donziger has disputed, and refuted, Chevron's attempt to conflate a prior sex scandal

involving the judge with a completely separate complaint that the Ecuadorian Plaintiffs drafted

regarding the judge's delay in making rulings relating to the global expert.  *See, e.g.* Response to

Fact No. 7.  And Donziger has provided evidence that Cabrera's appointment was the result of

process of elimination, rather than any persuasion by the Ecuadorian Plaintiffs.  *See* Donziger

Rule 56.1(b) Statement, Fact No. ___.

*119.    Fajardo's declaration states that the court independently appointed Cabrera "from the pool of seven independent experts it previously appointed in the case" because the "parties ultimately could not reach an agreement" on who should be the global damages expert. Mastro Decl. 2811 (In re Application of Chevron Corp., No. 1:10-mc-00002LAK (S.D.N.Y. Aug. 28, 2010), Dkt. 31-6), ¶ 11.*

119.    Not disputed.

*120.    Fajardo's declaration states that "On November 6, 2007, Mr. Cabrera filed an official complaint with the Lago Agrio Court claiming that members of Chevron's legal team in Ecuador subjected him to threats and insults when he would complete his field work." Mastro Decl. 2811 (In re Application of Chevron Corp., No. 1:10-mc-00002-LAK (S.D.N.Y. Aug. 28, 2010), Dkt. 31-6), ¶ 15.*

120.    Not disputed.

*121.    Fajardo's declaration failed to disclose that Fajardo personally ghostwrote that complaint for Cabrera. Dkt. 400-3 (Ex. 2036) (2007.12.17 email from Fajardo to Donziger attaching draft of the Cabrera letter in which Cabrera claimed to be threatened by Chevron ("Cabrera threat letter")); Dkt. 400-3 (Ex. 2037) (draft of Cabrera threat letter sent by Fajardo to Donziger with the metadata showing the author as "Pablo" and that the document was last modified six days before the threat letter was filed in Cabrera's name); Dkt. 402-13 (Ex. 2318) at 133,469 (2007.11.05 filed version of the Cabrera threat letter in which Fajardo, writing as Cabrera, claims "my life, as well as the lives of my family and collaborators, are in serious danger" because of Chevron); see also Dkt. 32-11 at 133,759 (2007.11.29 Ecuadorian court order ordering police protection for Cabrera as a result of Fajardo's ghostwritten letter).*

121.    Disputed.  As a preliminary matter, Donziger disputes Chevron's reliance on

unauthenticated metadata.  Chevron itself has declined to produce certain document-creation date

related metadata in discovery for its own documents in Donziger on grounds that the data is not

necessarily accurate.  Werdegar Decl. ¶ 18.

The metadata—even if accurate—does not demonstrate that Fajardo authored the letter. Cabrera just as easily could have provided the complaint to Fajardo in advance.

Further, even if Fajardo had drafted the complaint for Cabrera, that would not establish that the letter is false.  Chevron does not claim that Cabrera did not actually sign and submit the complaint.  Nor does Chevron claim that the contents of the Cabrera complaint are false—*i.e.,* Chevron does not claim, or offer any facts that could support a claim, that its agents did not threaten, intimidate, insult and harass Cabrera and his team.

Finally, Donziger testified at his deposition that he did not believe it was the practice of Fajardo to draft pleadings and then have them filed by Cabrera under Cabrera's name, and he further testified that he was not aware of Fajardo having any involvement in the drafting of the Cabrera complaint.  7/19/11 Donziger Depo. Tr., at 4879:21-4882:19; Donziger Rule 56.1(b) Statement, Fact No. __.

122.  *Fajardo's declaration states that "Mr. Cabrera performed no less than forty-eight (48) separate site inspections on his own, in constant communication with the court." Mastro Decl. 2811 (In re Application of Chevron Corp., No. 1:10-mc-00002-LAK (S.D.N.Y. Aug. 28, 2010), Dkt. 31-6), ¶ 13.*

122.  Not disputed.

123.  *A contemporaneous email from Donziger accurately states that Cabrera's field work would only "continue under the most strict control with an extremely limited number of samples." Donziger continued, "And we'll change the focus of the data at our offices." Dkt. 32-12 (DONZ00062680) (2007.07.17 email from Donziger to Yanza and Fajardo).*

123.  Disputed.  Donziger's email does not prove that Cabrera did not perform 48 site inspections on his own.  It only shows that Donziger was concerned about the cost of Cabrera performing more site inspections.  Chevron provides misleading incomplete quotations. Donziger's July 17, 2007 e-mail discusses various ideas to reduce the amount of money that the Ecuadorian Plaintiffs were spending.  Donziger was concerned that "we are trying to do too

much, producing waste and delaying for lack of budget, and, without realizing it, we are helping

the enemy's strategy of delaying the trial."   Dkt. 32-12 (Ex. 156) at 1.  Donziger's proposal to

limit the additional field work it would request was consistent with this concern:  "When I get

there, we'll re analyze the work and the budget with Richard.  And we'll adjust with a much

smaller team.  My tendency is to stop Richard from working much more in the field…"  Id.

(portion omitted by Chevron italicized).

*124.    Fajardo's declaration was drafted by Donziger and other lawyers for the LAPs. See Mastro Decl. 2809 (DONZ00067809) at 2 (Edward Yennock of Patton Boggs sending a "revised draft of the Fajardo Declaration" to Donziger and lawyers from Emery Celli and Patton Boggs); Mastro Decl. 2810 (DONZ00067813) (Donziger sending "Final slight edits to Fajardo affidavit").*

124.    Not disputed.

*125.    Donziger testified that he had, at least in part, provided the facts on which Edward Yennock of Patton Boggs based the original draft of the Fajardo declaration. Mastro Decl. 2801 (Donziger Dep. Tr.) at 2783:22-25.*

125.    Not disputed.  Donziger testified that it was his intention that the Fajardo Declaration

"would be accurate[.]"  Werdegar Decl., Ex. K (1/14/11 Donziger Depo. Tr., at 2781:4-23);

Donziger Rule 56.1(b) Statement, Fact No. __. And the contemporaneous emails between

Donziger and counsel for the Ecuadorian Plaintiffs confirms that everyone involved in drafting

and editing the Fajardo Declaration wanted it to be factually accurate.  *Id.*

*126.    Donziger participated in a discussion between lawyers from Emery Celli and Patton Boggs that focused on how best to present the Defendants' improper relationship with Cabrera in the declaration they were drafting, and which they eventually decided Fajardo should sign. Dkt. 48-6 (DONZ00031261) (2010.05.04 email chain among Donziger and attorneys at Emery Celli and Patton Boggs regarding the Fajardo declaration); see also Mastro Decl. 2801 (Donziger Dep. Tr.) at 2773:3-15 (Donziger testifying that he had "conversations with [Patton Boggs] about the contents of [the declaration] as it was being drafted" and made edits to the declaration).*

126.    Disputed.  Donziger disputes that the Ecuadorian Plaintiffs' relationship with Cabrera

was "improper."  "'Rule 56.1 statements are not argument. They should contain factual

assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting Rodriguez v. Schneider, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).

Further, the e-mail exchange among Donziger, Emery Celli, and Patton Boggs shows that the group was discussing the content of Fajardo's declaration and took steps to ensure that it was accurate. Nowhere in this e-mail is an admission that the relationship was somehow improper. In fact, the group discussed that "[w]e have an expert who is prepared to say that local counsel did nothing wrong under ecuador [sic] law." Dkt. 48-6 (Ex. 309) (DONZ00031261) at 1.

Donziger testified that it was his intention that the Fajardo Declaration "would be accurate[.]" Werdegar Decl., Ex. K (1/14/11 Donziger Depo. Tr., at 2781:4-23); Donziger Rule 56.1(b) Statement, Fact No. __. And the contemporaneous emails between Donziger and counsel for the Ecuadorian Plaintiffs confirms that everyone involved in drafting and editing the Fajardo Declaration wanted it to be factually accurate. *Id.*

127.    *One Emery Celli attorney wrote that the declaration should not describe Cabrera as "neutral," while another noted that "[t]he more we emphasisze [sic] his neutrality the less sense it makes that we were talking to him out of school." Dkt. 48-6 (DONZ00031261) (2010.05.04 email chain among Donziger and attorneys at Emery Celli and Patton Boggs regarding the Fajardo declaration).*

127.    Not disputed. The e-mail exchange among Donziger, Emery Celli, and Patton Boggs shows that the group was discussing the content of Fajardo's declaration and took steps to ensure that it was accurate. Nowewhere in this e-mail is an admission that the relationship was somehow improper. In fact, the group discussed that "[w]e have an expert who is prepared to say that local counsel did nothing wrong under ecuador [sic] law." Dkt. 48-6 (Ex. 309) (DONZ00031261) at 1.

Donziger testified that it was his intention that the Fajardo Declaration "would be

accurate[.]" Werdegar Decl., Ex. K (1/14/11 Donziger Depo. Tr., at 2781:4-23); Donziger Rule

56.1(b) Statement, Fact No. ___. And the contemporaneous emails between Donziger and counsel

for the Ecuadorian Plaintiffs confirms that everyone involved in drafting and editing the Fajardo

Declaration wanted it to be factually accurate. *Id.*

*128.    After Abady asked "Isn't Cabrera a non testifying expert whether or not he labeled 'nuetral' [sic]?" Donziger responded, "Will call u later." Dkt. 48-6 (DONZ00031261) (2010.05.04 email chain among Donziger and attorneys at Emery Celli and Patton Boggs regarding the Fajardo declaration).*

128.    Not disputed.

*129.    In the days leading up to the filing of his declaration, Fajardo was staying at Donziger's apartment. Mastro Decl. 2808 (DONZ00056160) at 2 (2010.05.02 email from Fajardo: "I am staying at Steven's house.").*

129.    Not disputed.

*130.    Fajardo was originally scheduled to return to Ecuador on May 4, 2010. Mastro Decl. 2825 (DONZ00067808) (2010.05.04 email from S. Donziger to A. Woods).*

130.    Not disputed.

*131.    On the morning of May 4, 2010, Donziger emailed Woods and informed him that the "top priority" was to change the flight so that Fajardo would not leave New York until May 5, 2010, the day the defendants filed Fajardo's declaration. Mastro Decl. 2825 (DONZ00067808) (2010.05.04 email from S. Donziger to A. Woods).*

131.    Not disputed.

*132.    On May 4, 2010, the day before filing, a Patton Boggs lawyer asked Donziger in an email if he could "push for sign off on the declaration asap, if Pablo believes the facts set forth therein to be accurate." Donziger responded "going over it now." Mastro Decl. 2809 (DONZ00067809).*

132.    Not disputed.  Chevron's quotation, on its face, demonstrates that the attorneys involved

wanted Fajardo's declaration to be accurate.  *See also* Donziger Rule 56.1(b) Statement, Fact No.

___.

*133.    On May 4, 2010, Donziger sent attorneys at Patton Boggs "Final slight edits to Fajardo affidavit." Mastro Decl. 2810 (DONZ00067813); see also Mastro Decl. 2801 (Donziger Dep.*

*Tr.) at 2773:3-15 (Donziger testifying that he had "conversations with [Patton Boggs] about the contents of [the declaration] as it was being drafted" and made edits to the declaration).*

133.   Not disputed.

*134.   Donziger, meeting with Fajardo in his own apartment, finalized the declaration and obtained Fajardo's signature on the declaration. Mastro Decl. 2809 (DONZ00067809) (2010.05.04 email from Patton Boggs lawyer asking Donziger if he could "push for sign off on the declaration asap, if Pablo believes the facts set forth therein to be accurate." Donziger responded "going over it now."); Mastro Decl. 2810 (DONZ00067813) (2010.05.04 email from Donziger to Patton Boggs lawyers sending "Final slight edits to Fajardo affidavit); Mastro Decl. 2801 (Donziger Dep. Tr.) at 2794:24-2795:15 (Donziger testifying that, meeting in his New York apartment, he "translat[ed] the declaration paragraph by paragraph and discuss[ed] any concerns [Fajardo] had.").*

134.   Chevron's quotation, on its face, demonstrates that the attorneys involved wanted

Fajardo's declaration to be accurate.  *See also* Donziger Rule 56.1(b) Statement, Fact No. __.

*135.   Donziger had to explain the document to Fajardo. See Mastro Decl. 2801 (Donziger Dep. Tr.) at 2772:19-2773:2 (asked whether, in May 2010, Fajardo could read English, Donziger testified: "Maybe a teeny bit. Generally he is not bilingual"); id. at 2779:15-23 (Donziger testifying that he did not know if there was a Spanish translation of the declaration before Fajardo signed it on May 5, 2010, but that Donziger had orally translated the declaration for Fajardo).*

135.   Disputed.  Chevron's assertion is unsupported speculation.

*136.   The LAPs' U.S. counsel prepared a petition for Fajardo to submit to "the Ecuadorian court in an effort to 'cleanse' any perceived impropriety related to the Cabrera Report." Dkt. 9-8 (DONZ00067932-33) (2010.05.20 email from Westenberger to Abady, Donziger, and others).*

136.   Not disputed.

*137.   The LAPs' U.S. counsel submitted the Fajardo petition to the Second Circuit in their appeal of Judge Sand's decision in the BIT arbitration stay proceeding on August 23, 2010. Mastro Decl. 2812 (Republic of Ecuador v. Chevron Corp., Case No. 10-1020 (2d Cir. Aug. 23, 2010), Ex. 5 to Declaration of Andrew Wilson, Dkt. 202-6).*

137.   Not disputed.  Donziger has testified that he was not involved the decision to file the

Fajardo petition in any U.S. court proceeding.  Werdegar Decl., Ex. K (1/14/11 Donziger Depo.

Tr.), at 2768:3-16, 2773:20-2774:5; Donziger Rule 56.1(b) Statement, Fact No. __.

*138.   The LAPs' U.S. counsel submitted the Fajardo petition to this Court in the Berlinger 1782 on August 12, 2010. Mastro Decl. 2813 (In re Chevron Corp., Case No. 1:10mc-00001 (LAK) (S.D.N.Y. Aug. 12, 2010), Ex. 11 to Declaration of Andrew Wilson, Dkt. 1811).*

138.   Not disputed.  Donziger has testified that he was not involved the decision to file the

Fajardo petition in any U.S. court proceeding.  Werdegar Decl., Ex. K (1/14/11 Donziger Depo.

Tr.), at 2768:3-16, 2773:20-2774:5; Donziger Rule 56.1(b) Statement, Fact No. __.

*139.   The LAPs' U.S. counsel submitted the Fajardo petition to this Court in the Donziger 1782 on August 28, 2010. Mastro Decl. 2814 (In re Chevron Corp., Case No. 1:10mc-00002 (LAK) (S.D.N.Y. Aug. 28, 2010), Ex. 11 to Declaration of Andrew Wilson, Dkt. 2911).*

139.   Not disputed.  Donziger has testified that he was not involved the decision to file the

Fajardo petition in any U.S. court proceeding, and that he was not even aware that the Fajardo

Declaration was filed by the Ecuadorian Plaintiffs in connection with the Donziger 1782 action.

Werdegar Decl., Ex. K (1/14/11 Donziger Depo. Tr.), at 2768:3-16, 2773:20-2774:5; Donziger

Rule 56.1(b) Statement, Fact No. __.

*140.   The Fajardo petition falsely claimed that Cabrera was "independent" and that "Chevron enjoyed the same opportunity as Plaintiffs to provide information to Cabrera in support of its position in the case." Mastro Decl. 2812 (Republic of Ecuador v. Chevron Corp., Case No. 10-1020 (2d Cir. Aug. 23, 2010), Ex. 5 to Declaration of Andrew Wilson, Dkt. 202-6) at 6, 7; Mastro Decl. 2813 (In re Chevron Corp., Case No. 1:10-mc-00001 (LAK) (S.D.N.Y. Aug. 12, 2010), Ex. 11 to Declaration of Andrew Wilson, Dkt. 18-11) at 6, 7; Mastro Decl. 2814 (In re Chevron Corp., Case No. 1:10-mc-00002 (LAK) (S.D.N.Y. Aug. 28, 2010), Ex. 11 to Declaration of Andrew Wilson, Dkt. 29-11) at 6, 7.*

140.   Disputed.  Chevron mischaracterizes Fajardo's declaration.  The declaration stated that "the

[Ecuadorian] court concluded that the global damages assessment expert would be selected from

the pool of seven independent experts it previously appointed in the case.  Of the seven, the court

appointed Richard Cabrera Vega who, in November 2006, had been appointed by the court and

served as an expert for three judicial site inspections."  Dkt. 586-12 (Ex. 2811) ¶ 11.  The word

"independent" describes the seven independent experts [the court] previously appointed.  This is

an accurate description of these seven prior experts; they were independent experts in the sense

that they were appointed by the court.  Earlier, Fajardo explained that these court-appointed

experts were not necessarily neutral or free of contact with either party, because they were

selected by and worked closely with one party or another.  *See id.* ¶ 5 ("Each of these experts,

though selected by the parties, was appointed by the court consistent with Ecuadorian procedural

rules.  Technically, these individuals were considered court-appointed experts even though they

worked closely with the parties.").  Chevron's attempt to pluck the word "independent" out of

context and turn it into an allegedly misleading representation is inconsistent with the evidence.

Fajardo's declaration also states that "Throughout the process, by virtue of Cabrera's

status as a court-appointed expert, Chevron enjoyed the same opportunity as Plaintiffs to provide

materials to Cabrera supportive of its position in the litigation.  Indeed, Mr. Cabrera actively

sought documents from Chevron, including environmental audits prepared by Chevron's own

consultants.  But Chevron chose to forego this opportunity, and refused to partake in the

process."  *Id.* at ¶ 21.

Chevron has provided no evidence that Fajardo's statement is false.  ***In fact, Chevron's***

***counsel has admitted that "both sides were allowed to submit data to Cabrera."***  [Neuman

statement in Stratus § 1782, Dkt. 47-62 (Ex. 300) at 36:18-19].  Chevron has provided no

evidence that Cabrera refused to accept any materials they proffered.  Rather, the evidence

suggests that Chevron boycotted the global expert examination process.  *See* Donziger Rule

56.1(b) Statement, Fact No. __.

*141.    Donziger has testified that he and James Tyrrell of Patton Boggs were the two U.S.*
*attorneys who had "[f]inal approval over the draft that would be sent to local counsel." Mastro*
*Decl. 2801 (Donziger Dep. Tr.) at 2606:3-2607:5.*

141.    Disputed.  Donziger's testimony related to the draft of the Fajardo petition that was

intended to be filed in the Lago Agrio court.  *See* [Werdegar Decl., Ex. R, (Donziger Depo. Ex

826].  Donziger also testified that he was not responsible for approving U.S. court filings made by

counsel of record on behalf of the Ecuadorian Plaintiffs.  *See* Werdegar Decl., Ex. K (1/14/11

Donziger Depo. Tr.), at 2768:20-25; *Id.* at 2838:11-21; *id.* Ex. J (1/8/11 Donziger Depo. Tr.), at

2637:11-16; Donziger Rule 56.1(b) Statement, Fact No. __.

*142.    In email discussions with the LAPs' other U.S. lawyers, Donziger argued against*
*admitting in the petition that Stratus-prepared annexes appeared "verbatim" in Cabrera's*
*report, because doing so would lead to "negative fallout in a number of areas." Mastro Decl.*
*2815 (DONZ00031341) (2010.06.01 email from Donziger to Abady).*

142.  Disputed.  Chevron's characterization is not supported by the e-mail to which it cites.

Donziger did not argue against admitting anything.  When Abady posed a "question for the

group" as to whether the Fajardo petition (to be filed in Ecuador) should include the Stratus

annexes and "essentially admit that he [Cabrera] adopted these," Donziger replied "Not sure."

Donziger mused whether it "[m]ight be better to be general but I too want to hear what people

think."  Dkt. 586-16 (Ex. 2815) at DONZ00031341 at p. 1.  Further, context shows that the

potential "negative fallout" that Donziger mentioned concerned funding.  *Id.* ("There will be

negative fallout in a number of areas.  We could probably absorb it, but we need to probe what it

means at a time we are trying to raise money and keep the shaky ship afloat.").

Further, the Fajardo petition states that "Cabrera adopted the proposals, analyses, and

conclusions of the Plaintiffs concerning the damages and the valuation."  Dkt. 586-13 (Ex. 2812)

at 8.

*143.    Donziger was copied on emails discussing the "Final Proposed Draft" of the petition*
*and whether the LAPs should fully disclose their relationship with Cabrera. Dkt. 47-55*
*(2010.06.15 email chain among Donziger and lawyers from Patton Boggs, Emery Celli, and*
*Motley Rice).*

143.    Disputed.  The cited e-mail chain does not debate "full disclosure."  The document shows

that attorneys expressed differing opinions as to what exactly the petition should include, and

what the litigation objectives of the petition were.  And, in fact, the attorneys expressed

significant concern with ensuring that the petition was correct.  *See, e.g.*, Dkt. 47-55 (Ex. 293)

("If we submit something that is inaccurate and Chevron learns that it is inaccurate through the 1782 proceedings, Chevron will hang us with it repeatedly and claim this submission was simply a perpetuation of the fraud.").

*144.   Asked whether he was involved in preparing the petition, Donziger testified "I looked at it and made comments on it." Mastro Decl. 2801 (Donziger Dep. Tr.) at 2342:6-10.*

144.   Not disputed.

*145.   Donziger testified that he was "personally involved in the editing of" the English and Spanish versions of the petition. Mastro Decl. 2801 (Donziger Dep. Tr.) at 2603:16-2604:4.*

145.   Disputed.  When asked whether he was personally involved in the editing of "these documents," Donziger replied "At some point in time, but I wasn't tremendously involved." (Donziger Dep. Tr.) at 2603:16-2604:4.

*146.   In response to Chevron's discovery that a scene in Crude had been modified at the Defendants' request in order to suppress evidence of meetings between them and Cabrera team member Carlos Beristain, the LAPs told this Court that the meeting was "innocuous" and "of no relevance to anything." Dkt. 48-27 (2010.04.23 Lago Agrio Plaintiffs' Memorandum in Opposition to Application, In re Application of Chevron, No. M-19-111 (S.D.N.Y.) at 8.*

146.   Donziger does not dispute that the Ecuadorian Plaintiffs made a filing and that the quoted words appear in that filing.  Donziger disputes Chevron's assertion that Chevron "discovered" anything and Chevron's unsupported legal conclusion regarding the intent behind modifications to *Crude.*

Donziger further disputes Chevron's suggestion that multiple "meetings" involving Beristain are at issue.  Chevron has alleged that images of Beristain's attendance at only one event were edited out of *Crude.*  The meeting occurred in May 2007; before Cabrera was sworn in as an expert and before Beristain was identified as a member of Cabrera's technical team.  The meeting was a community meeting among the Cofán people and their attorneys "to talk about what they want as compensation for all the damage."  Dkt. 30-02 (Ex. 91), at 48; *see also* Dkt. No. 48-29.  Trudie Styler also observed and spoke to the Cofán people.  Dkt. No. 30-02, at 49.

Beristain's role at the meeting was "in the form of leading a discussion" with the Cofán people.

Werdegar Decl., Ex. K (1/14/11 Donziger Depo. Tr.), at 2919:20-23.  Most critically, the global

damages assessment was not discussed or planned during this meeting.  *See id* at 48-49.  *See also*

Donziger Rule 56.1(b) Statement, Fact No. __.

*147.    The LAPs also stated that Chevron's contention that the "outtakes [would] reveal evidence of substantial relevance to the Lago Agrio Court or the BIT" was "unsupported speculation." Dkt. 48-27 (2010.04.23 Lago Agrio Plaintiffs' Memorandum in Opposition to Application, In re Application of Chevron, No. M-19-111 (S.D.N.Y.) at 8.*

147.    Not disputed.

*148.    The LAPs told the Second Circuit that they had requested Berlinger to delete the scene from the DVD version of Crude only to "avoid the misimpression, cynically fostered by Chevron below, that [the Lago Agrio] plaintiffs participated in one of Dr. Beristain's focus groups after he was a court expert." Dkt. 48-28 (2010.06.14 Brief and Special Appendix for Respondent-Appellant Lago Agrio Plaintiffs, Chevron Corp. v. Berlinger, No. 10-1918-cv(L) (2d Cir.)) at 22-23.*

148.    Not disputed.

*149.    The meeting from which Beristain was carefully edited out of was not "innocuous" and not "of no relevance to anything." Dkt. 6-2 (Ex. 1), CRS-161-01-01-CLIP-01 (Crude outtake video clip of meeting among S. Donziger, P. Fajardo, and L. Yanza re C. Beristain's role in expert report); Dkt. 6-10 (Ex. 2) at 128-135; Dkt. 30-2 (Transcript of J. Berlinger film Crude) (MB-NONWAIVER00092726) at 48-49; Dkt. 8-7 (Crude DVD) at 2:14-2:16; Dkt. 48-29 (2007.05.07 Email from P. Fajardo to C. Beristain re "CALENDARIO DE REUNIONES" ["MEETINGS PLAN WITH C"]) (DONZ00043170) at 1.*

149.    Disputed.  This is not a fact; this is Chevron's opinion.  The parties' disagreement over

the relevance of evidence cannot be resolved on summary judgment.  And Chevron itself has

argued before this Court that "debatable interpretation[s] of evidence" are not actionable.  Dkt.

574 at p. 27; *see also Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1069 (5th Cir. 1994)

("[T]he defendants were under no duty to employ the adjectorial characterization that the

plaintiffs believe is more accurate." (citation and internal quotation marks omitted)).

        Further, the meeting at which Beristain was present *was* innocuous.  The meeting

occurred in May 2007; before Cabrera was sworn in as an expert and before Beristain was

identified as a member of Cabrera's technical team.  The meeting was a community meeting among the Cofán people and their attorneys "to talk about what they want as compensation for all the damage."  Dkt. 30-02 (Ex. 91) at p. 48; *see also* Dkt. 48-29 (Ex. 331).  Trudie Styler also observed and spoke to the Cofán people.  Dkt. 30-02 (Ex. 91) at P. 49.  Beristain's role at the meeting was "in the form of leading a discussion" with the Cofán people.  Werdegar Decl., Ex. K (1/14/11 Donziger Depo. Tr.), at 2919:20-23.  Most critically, the global damages assessment was not discussed or planned during this meeting.  *See* Dkt. 30-02 at p. 48-49.  *See also* Donziger Rule 56.1(b) Statement, Fact No. __.

*150.    When Fajardo asked Berlinger to edit Beristain out of Crude, he stated that the potential disclosure of the relationship between the LAPs' counsel and Beristain was "so serious that we could lose everything." Dkt. 47-6 (2010.08.03 Email chain between J. Berlinger and S. Donziger re "GRACIAS") (JB-NONWAIVER91320).*

150.    Disputed.  The cited e-mail establishes only that Fajardo asked Berlinger to edit certain footage from *Crude*; the document does not indicate what footage.  Donziger further disputes Chevron's characterization to the extent it suggests that Beristain was removed from multiple scenes.  Chevron has alleged that images of Beristain's attendance at only one event were edited out of *Crude*.  The meeting occurred in May 2007; before Cabrera was sworn in as an expert and before Beristain was identified as a member of Cabrera's technical team.  The meeting was a community meeting among the Cofán people and their attorneys "to talk about what they want as compensation for all the damage."  Dkt. 30-02 (Ex. 91) at p. 48; *see also* Dkt. 48-29 (Ex. 331).  Trudie Styler also observed and spoke to the Cofán people.  Dkt. No. 30-02 (Ex. 91) at p. 49.  Beristain's role at the meeting was "in the form of leading a discussion" with the Cofán people.  Werdegar Decl., Ex. K (1/14/11 Donziger Depo. Tr.), at 2919:20-23.  Most critically, the global damages assessment was not discussed or planned during this meeting.  *See* Dkt. 30-02 (Ex. 91) at p. 48-49.  *See also*  Donziger Rule 56.1(b) Statement, Fact No. __.

Further, Chevron cites to no evidence that would suggest that Donziger or other members of the Ecuadorian Plaintiffs' team felt the same way as Fajardo regarding the footage at issue.

*151.    The Crude outtakes revealed that the LAPs' counsel and consultants secretly met with Cabrera himself two weeks before his appointment to plan the expert report. Dkt. 6-2 (Ex. 1), CRS-187-01-02 (2007.03.03 Crude outtake video clip of meeting at Selva Viva headquarters among S. Donziger, P. Fajardo, L. Yanza, A. Maest, R. Kamp, C. Champ, R. Cabrera, and others).*

151.    Disputed.  Chevron cites no evidence to support its assertion that the meeting was "secret."  Further, the meeting was not improper.  *See, e.g.*,  Response to Fact No. 30. Ecuadorian law at the time did not prohibit parties to a lawsuit from making contact with court-appointed experts prior to the issuance of the expert's report, including prior to the expert's formal appointment by the court.  *See* Dkt. No. 152 (Saenz Decl.) ¶¶ 56, 59, Dkt. No. 154-5 (Ex. 59) (Alencastro Aff.) ¶¶ 9-12, 19; Dkt. No. 154-6 (Ex. 60) (Simon Aff.) ¶¶ 4-5, 7-8.  Instead, it was common practice in Ecuador for both sides to communicate and meet with court-appointed experts and advocate their positions.  Donziger Rule 56.1(b) Statement, Fact No. __.

*152.    When the Second Circuit ordered Berlinger to produce the outtake footage, one of Donziger's attorneys, Ilann Maazel of Emery Celli, disclosed in an email to Donziger and others that he already knew that this Cabrera meeting was captured on those tapes.  Dkt. 48-30 at 3.*

152.    Disputed.  Chevron's assertion that Maazel "disclosed" anything is argumentative and inappropriate in a Rule 56.1 statement.  Further, Maazel's knowledge that the Cabrera meeting was included within the outtake footage does not render any statements false.  Emery Celli could have legitimately held the opinion that the Cabrera meeting would not be of relevance to the Lago Agrio court or the BIT.

*153.    Maazel had signed the brief calling Chevron's argument that the tapes would reveal just such a relationship, "unsupported speculation."  Dkt. 48-27 at 8.*

153.  Not disputed.

**L.      Chevron Incurred Damages as the Result of the Misrepresentations to NewYork Courts[34]**

*154.     The LAPs filed an opposition to Chevron's application in the Berlinger 1782 in which they falsely claimed that the meeting with Beristain found in a Crude outtake—which the LAPs deemed "the linchpin for [Chevron's] extraordinary application"— was an "innocuous meeting, which is of no relevance to anything." Dkt. 48-27 (2010.04.23 Lago Agrio Plaintiffs' Memorandum in Opposition to Application, In re Application of Chevron Corp., No. M-19-111-LAK (S.D.N.Y.) at 8.*

154.     Donziger does not dispute that such filing was made, but, for the reasons described in Donziger's responses to Fact 149, Donziger disputes Chevron's characterization that any claims were false.

Donziger was never counsel of record in the Berlinger 1782 action.  *In re Appl. of Chevron Corp.*, 709 F. Supp. 2d 283, 284 (S.D.N.Y. 2010) (identifying counsel in Berlinger 1782 action).

*155.     In response, Chevron was forced to address in its reply brief the relevance of the Beristain meeting. Mastro Decl. 2816 (In re Application of Chevron Corp., M-19-111LAK, Reply Memorandum in Support of Petition and Application for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in Foreign Proceedings (S.D.N.Y. Apr. 29, 2010)) at 2-3, 16-19.*

156.     Donziger does not dispute that Chevron responded.  Chevron's assertion that it "was forced" to do anything is unsupported argument that is not appropriate in a Rule 56.1 statement. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'"  Goldstick v. The Hartford, Inc., No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting Rodriguez v. Schneider, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).

---

[34] For the reasons set forth in Donziger's responses to each of Chevron's facts listed under heading II.F., Donziger also disputes the assertions and conclusions set forth in Chevron's heading II.F.

*156.     When the LAPs appealed this Court's decision in the Berlinger 1782, they again relied on false statements regarding the Beristain meeting. Dkt. 48-28 (2010.06.14 Brief and Special Appendix for Respondent-Appellant Lago Agrio Plaintiffs, Chevron Corp. v. Berlinger, No. 10-1918-cv(L) (2d Cir.))*

156.     Donziger does not dispute that the filing was made but, for the reasons described in

Donziger's responses to Fact 149, Donziger disputes Chevron's characterization that any claims

were false.

Donziger was never counsel of record in the Berlinger 1782 action.  *In re Appl. of*

*Chevron Corp.*, 709 F. Supp. 2d 283, 284 (S.D.N.Y. 2010) (identifying counsel in Berlinger

1782 action)

*157.     In an attempt to undermine what they called the "centerpiece of [Chevron's] entire application," the LAPs claimed that they had requested Berlinger to delete the Beristain scene from the DVD version of the film only to "avoid the misimpression, cynically fostered by Chevron below, that [the Lago Agrio] plaintiffs participated in one of Dr. Beristain's focus groups after he was a court expert." Dkt. 48-28 (2010.06.14 Brief and Special Appendix for Respondent-Appellant Lago Agrio Plaintiffs, Chevron Corp. v. Berlinger, No. 10-1918-cv(L) (2d Cir.)), at 22-23.*

157.     Donziger does not dispute that the Ecuadorian Plaintiffs stated their reasons for

requesting that Berlinger delete the disputed scene.  Donziger disputes Chevron's unsupported

and argumentative characterizations of the Ecuadorian Plaintiffs' motivations or goals.

Donziger was never counsel of record in the Berlinger 1782 action.  *In re Appl. of*

*Chevron Corp.*, 709 F. Supp. 2d 283, 284 (S.D.N.Y. 2010) (identifying counsel in Berlinger

1782 action)

*158.     In its appellate brief, Chevron was forced to counter the LAPs' false statements regarding the Beristain meeting by again establishing the relevance of the outtakes. Mastro Decl. 2817 (Brief for Petitioner-Appellee Chevron Corporation, Chevron Corp. v. Berlinger, No. 10-1918-cv(L) (2d Cir. June 21, 2010))).*

158.     Donziger does not dispute that Chevron responded.  Chevron's assertion that it "was

forced" to do anything is unsupported argument that is not appropriate in a Rule 56.1 statement.

"'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to

the record. They should not contain conclusions . . . .'"  Goldstick v. The Hartford, Inc., No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting Rodriguez v. Schneider, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).

Donziger does not dispute that the filing was made but, for the reasons described in Donziger's responses to Fact 149, Donziger disputes Chevron's characterization that any claims were false.

Donziger was never counsel of record in the Berlinger 1782 action.  *In re Appl. of Chevron Corp.*, 709 F. Supp. 2d 283, 284 (S.D.N.Y. 2010) (identifying counsel in Berlinger 1782 action)

*159.   Chevron argued that "[t]he presence of Plaintiffs' legal team at a meeting with Dr. Beristain is directly relevant to the issue of whether Cabrera and his team were 'neutral' and 'independent of the parties.'" Mastro Decl. 2817 (Brief for Petitioner-Appellee Chevron Corporation, Chevron Corp. v. Berlinger, No. 10-1918-cv(L) (2d Cir. June 21, 2010)), at 22.*

160.   Donziger does not dispute that Chevron made this argument, but disagrees with the legal conclusions therein.

*160.   In support of their motion to quash subpoenas issued in the Donziger 1782, the LAPs submitted Fajardo's declaration and petition, both containing false statements regarding the defendants' relationship with Cabrera. Mastro Decl. 2811 (In re Application of Chevron Corp., No. 1:10-mc-00002-LAK (S.D.N.Y. Aug. 28, 2010), Dkt. 31-6), ¶¶ 11, 21 (Fajardo declaration claiming that Cabrera was "independent" and that "Chevron enjoyed the same opportunity as Plaintiffs to provide materials to Cabrera."); Mastro Decl. 2814 (In re Application of Chevron Corp., No. 1:10-mc-00002 (LAK) (S.D.N.Y. Aug. 28, 2010), Ex. 11 to Declaration of Andrew Wilson, Dkt. 29-11) (Ecuador Petition making same claims).*

160.   Donziger does not dispute that such documents were filed.  For the reasons described in Donziger's responses to Fact Nos. 117, 121, and 140, Donziger disputes that the declaration or petition contained false statements.

Donziger was party-defendant and witness represented by counsel in the Donziger 1782 action.  *See In re Appl.* of *Chevron Corp.*, 749 F. Supp. 2d 135, 136 (S.D.N.Y. 2010) (identifying

counsel in the Donziger 1782 action).

161.    *The LAPs' made the propriety of contact with Cabrera a significant focus of their brief. Mastro Decl. 2818 (The Ecuadorian Plaintiffs' Memorandum of Law In Support of Their Motion to Quash or Modify Subpoenas Served Upon Steven R. Donziger, In re Application of Chevron Corp., No. 1:10-mc-00002-LAK, (S.D.N.Y. Aug. 28, 2010), Dkt. 28), at 2.*

161.    Not disputed.  Donziger was party-defendant and witness represented by counsel in  the

Donziger 1782 action.  See *In re Appl. of Chevron Corp.*, 749 F. Supp. 2d 135, 136 (S.D.N.Y.

2010) (identifying counsel in the Donziger 1782 action).

162.    *Chevron's opposition to the motion to quash specifically countered the LAPs' false statements regarding Cabrera—statements that were supported by the false Fajardo declaration and petition. Mastro Decl. 2819 (In re Application of Chevron Corp., No. 1:10-mc-00002 (LAK) (S.D.N.Y. Sept. 1, 2010), Chevron's Combined Opposition to the Motions to Quash or Modify Subpoenas Submitted by (1) Steven R. Donziger and (2) the Ecuadorian Plaintiffs, Dkt. 38).*

162.    Donziger does not dispute that Chevron made the described filing.  Donziger disputes

Chevron's conclusion that its brief "countered" anything.  Donziger further disputes that the

Fajardo declaration or petition contained false statements.

163.    *Chevron's opposition focused heavily on the LAPs' relationship with Cabrera and the impropriety of that relationship. Mastro Decl. 2819 (In re Application of Chevron Corp., No. 1:10-mc-00002 (LAK) (S.D.N.Y. Sept. 1, 2010), Chevron's Combined Opposition to the Motions to Quash or Modify Subpoenas Submitted by (1) Steven R. Donziger and (2) the Ecuadorian Plaintiffs, Dkt. 38), at 13-14, 20-22.*

163.    Donziger does not dispute that Chevron made the described filing.  For the reasons

described in Donziger's responses to Fact Nos. 117, 121, and 140, Donziger disputes that the

declaration or petition contained false statements.

Donziger was party-defendant and witness represented by counsel in the Donziger 1782

action.  *See In re Appl. of Chevron Corp.*, 749 F. Supp. 2d 135, 136 (S.D.N.Y. 2010) (identifying

counsel in the Donziger 1782 action).

164.    *Chevron devoted more than five full pages to establishing, contrary to the LAPs' misrepresentations, that the LAPs' relationship with Cabrera violated both U.S. and Ecuadorian law. Mastro Decl. 2819 (In re Application of Chevron Corp., No. 1:10-mc-00002 (LAK) (S.D.N.Y. Sept. 1, 2010), Chevron's Combined Opposition to the Motions to Quash or Modify*

*Subpoenas Submitted by (1) Steven R. Donziger and (2) the Ecuadorian Plaintiffs, Dkt. 38), at 22-27.*

164.    Donziger does not dispute that Chevron made the described filing.  Donziger disputes Chevron's conclusion that its brief "established" anything, and its contention that the Ecuadorian Plaintiffs' relationship with Cabrera violated U.S. or Ecuadorian law.  Such legal conclusions are obviously improper in a Rule 56.1 statement.  "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record.  They should not contain conclusions . . . .'"  Goldstick v. The Hartford, Inc., No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting Rodriguez v. Schneider, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).

## STATEMENT OF ADDITIONAL MATERIAL FACTS AS
## TO WHICH THERE IS A GENUINE ISSUE TO BE TRIED.

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1(b), Donziger submits the following list of additional material facts as to which there is a genuine issue to be tried.

165.   At all times relevant to Chevron's motion, there was no law or regulation in Ecuador prohibiting *ex parte* communications with judges. Dkt. 154-6 (Affidavit of Dr. Farith Ricardo Simon noting that Ecuadorian law prohibiting judges from "accepting the visit of or meeting with one of the parties or his counsel without first notifying the other" did not come into existence until March 9, 2009—roughly three years after the Ecuadorian Plaintiffs are alleged to have met with Judge Yánez concerning the waiver of judicial inspections and the commencement of the peritaje global.).

166.   *Ex parte* communication with the judges presiding over the Lago Agrio litigation was the ordinary manner of proceeding throughout the majority of that case.  Chevron, in fact, had *ex parte* meetings of its own with Ecuadorian judges presiding over the Lago Agrio litigaiton— including meetings regarding the peritaje global.  Eyewitness Donald Rafael Moncayo Jimenez has recounted in a sworn affidavit:  "On multiple occasions, I personally saw the lawyers who represent Chevron Corporation in the Lago Agrio case meeting alone with the judges who heard the case without the presence of the plaintiffs' lawyers" Werdegar Decl., Ex. F at ¶ 3.  Moncayo has testified that on one occasion, he "saw attorneys Adolfo Callejas Ribadeneira and Ivan Alberto Racines [Chevron's lawyers], and Dr. Efraín Novillo [one of the presiding judges] in the offices of Judge Novillo.  They were talking about the expert designated by the Judge, Mr.

Richard Cabrera." *Id.* at at ¶ 4.  When Mr. Moncayo "approached the offices, the private security

guards of Chevron and a Chevron technician tried to chase [him] away."  *Id.*  Moncayo also

describes another incident where Judge Juan Núñez, then-President of the Lago Agrio Court,

"was talking to Dr. Diego Larrea and Alberto Racines [Chevron's lawyers] about the inspection

of the Auca wells and other stations, where there were oil wells, topic of the Lago Agrio

case."  *Id.* at at ¶ 5.  Additionally, during his deposition on September 13, 2011, Moncayo

testified under oath to witnessing one of Chevron's lawyers, Dr. Enrique Caravajal, have an *ex

parte* meeting with the then-presiding Judge Rafael Ordoñez after business hours on July 30,

2010.  Werdegar Decl., Ex. G, at 31:11-32:19, 34:2-36:21.  The *ex parte* meeting lasted roughly

20 minutes, and is captured in photographs that Moncayo took with his mobile phone.  *Id.*

at 37:6-42:22; *see also* Werdegar Decl., Ex. N (Salazar Decl., recounting additional Chevron *ex

parte* meetings with the Lago Agrio Court).

167.    Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-

appointed experts prior to the issuance of the expert's report, including prior to the expert's

formal appointment by the court.  *See* Dkt. 152 (Saenz Decl.) ¶¶ 56, 59, Dkt. No. 154-5

(Alencastro Aff.) ¶¶ 9-12, 19; Dkt. 154-6 (Simon Aff.) ¶¶ 4-5, 7-8.

168.    It was common practice for litigants to make contact with experts and advocate their

positions.  *See* Saenz Decl. ¶¶ 56, 59.  Under Ecuadorian law, an expert is permitted to interact

and coordinate with a party to the litigation, and that doing so "is not considered a fault or a

violation of his oath to 'faithfully and legally' perform his duties."  Dkt. 154-6 ¶ 8; *see also id.* ¶

9; Dkt. 152 ¶ 61; Dkt. No. 154-5 ¶¶ 17-18.  The fact that an expert ultimately adopts one party's

views to the exclusion of the other's also does not mean that the expert was not independent or

neutral.  *See* Dkt. No. 154-5 ¶ 27.

169.    It is understood in Ecuador that court-appointed scientific experts in highly complex cases simply could not be expected to perform their functions without party assistance.  As such, an "independent" expert in Ecuador does not cease to be independent by virtue of reliance on party-resources to carry out his function.  Dkt. No. 154-5  ¶ 12 ("Meeting with the experts without the other party being present. . . effectively aids the adequate fulfillment of the expert's or experts' functions in situations of a high scientific complexity, given the limited technological resources which our country [Ecuador] has to provide technical information for the efficient administration of justice."); Dkt. No. 154-6 ¶ 9 ("'[t]here is an actual procedural burden for the parties, to make it easier for the experts to conduct their studies. . . .").

170.    The Ecuadorian Plaintiffs' meetings with Richard Cabrera in the time leading up to his appointment were not particularly secretive because there was no reason for them to be.  For example, on one occasion on February 27, 2007, Donziger and others met with Cabrera at a "Mister Bagel," notwithstanding their belief that Chevron's operatives were frequently spying on them.  Dkt. No.  28-7 at 15; *see infra*, ¶ 74.

171.    Chevron also engaged in *ex parte* communications with, and provided undisclosed *ex parte* assistance to, court-appointed experts, including before experts were formally appointed. See Dkt. No.  154-7, at p. 2; Dkt. No.  152 ¶ 58 (Dr. Marcel Muñoz Herreria letter to Lago Agrio court describing a March 9, 2010 meeting with Chevron representative Alfredo Guerrero at a hotel for a "technical planning meeting"); Dkt. No.  157-7, at p. 3 ("Scope Plan requested and approved by Engineer Guerrero" attached to Muñoz's letter); Dkt. No.  152 ¶ 57 ("In March of 2009, upon Chevron's request for the appointment of an expert to inspect and prepare reports related to a predetermined group of former Texaco sites, the Court appointed Dr. Marcel Muñoz Herreria as Judicial Inspection Expert.").

172.    Marcelo Munoz, a court-appointed expert in the Lago Agrio litigation, participated in a private meeting with Chevron's technical consultant Alfredo Guerrero, for a "technical planning meeting" at which the engineer "approved" a work plan.  *See* Dkt. No.  154-7.

173.    Consistent with Ecuadorian law and customary practice, the Lago Agrio Court issued orders affirmatively authorizing the parties to communicate with Cabrera and to provide him with information.  Werdegar Decl., Ex. M (April 14, 2008 Lago Agrio Court Order), at 9; Dkt. No. 557-5 (Suppl. Young Decl. Ex. 29); Dkt. No. 154-5 ¶ 17; Dkt. No. 32-6, at 2, 7.

174.    Cabrera and the Lago Agrio Court repeatedly requested that the parties provide Cabrera with relevant and useful information.  *See, e.g.,* Dkt. No.  557-5 (Suppl. Young Decl. Exs. 27-29); Werdegar Decl. Ex. M, at 9; Dkt. No.  154-5 (Ex. 59)  ¶ 17; Dkt. No.  557-5 (Ex. 28) at p. 133,987 (Cabrera Petition dated Jan. 7, 2008 stating,"I request that [the Court] order the parties to provide me with any information that … each party considers necessary in order to incorporate it in this expert report"); Dkt 557-5 (Ex. 29) at p. 134,157 (Court order dated Jan. 30, 2008, responding to Cabrera Petition dated Jan. 7, 2008, ordering the parties to "provide the required information to the expert as soon as possible") Dkt. No.  154-5 ¶ 17; Dkt. No. 32-6, at 2, 7.

175.    Chevron had instructed its own experts to avoid finding contamination.  Chevron's judicial inspection "Playbook" reveals that Chevron directed its experts to visit sites prior to the official judicial inspections—what Chevron referred to as "Pre-Inspections"—so that they could take multiple samples with the goal of locating a few clean "delineation points" that the experts could, with the appearance of randomness, revisit during the official inspections. Dkt. No.  366-5 (Ex. E- Judicial Inspection Playbook), at  p.12. One particular component of the Playbook entitled "Summary of Sampling and Testing Program for Judicial Inspection Sites," instructed

Chevron's experts as follows: "Locations for perimeter sampling should be chosen to emphasize clean points around pits when possible." Dkt. No. 366-6 at p. 3.  Chevron's experts were further directed to "collect soil samples at 4 or more locations surrounding the site, using locations that the PI [Pre-Inspection] team has shown to be clean."  *Id.*

176.    The Ecuadorian Plaintiffs sought to waive their remaining tentatively scheduled inspections based on their belief that (i) further inspections were unnecessary because the Ecuadorian Plaintiffs had already met their burden of proof and the results of the inspections to date strongly indicated contamination at the inspected sites; and that (ii) Chevron intended to use protracted judicial inspections to delay the litigation as much as possible and exhaust the Ecuadorian Plaintiffs' resources.  Werdegar Decl. Ex T (12/23/10 Donziger Depo. Tr.), at 1804:13-20 ("We strongly felt that the settling expert reports were not required under Ecuadorian law and that they were being used by Chevron to delay the trial."); Dkt. No.  28-9 (Ex. 76) (DONZ00027256) at p. 55 (July 25, 2006 Donziger private journal entry observing that Chevron is "losing overwhelmingly")]; *id.* at p. 19 (DONZ00036234) ("Alberto's initial mistake of asking for 122 inspections without any strategy is just coming back to haunt us so deeply, although we are getting good press and we are using the inspections to build political momentum and get our act together, but the process is just time consuming and ridiculous."); Dkt 28-8 (Ex. 76) (DONZ00027256) at p. 45 (Donziger journal: "we still have the same money problems, and nobody has been paid. . . The money issue is killing us.  Pablo told me the inspections are now going to finish the week of Nov. 13, which is soon—there is a ton of work to be done before then."); Dkt. 28-7 (Ex. 76) (DONZ00027256) at p. 24 ("Our phone and electricity will be cut off this week.  We have received no money since November. LY feels the brunt of the pressure from creditors, the brunt of the pressure from the base communities, and the brunt of the pressure from

staff who have not gotten paid."); Dkt. No. 28-9 (DONZ00036277) at 9 (Donziger journal entry dated May 31, 2006, discussing risks and benefits of global expert strategy and stating "We are winning on the proof, but we are losing the larger war because of time."); Dkt. 28-8 (Ex. 76) (DONZ00027256) at p. 37 ("They pulled a stunt on Monday - tried to get the judge to suspend the inspection for 60 days on the even [sic] of going out to the site. LY got text msg judge was leaving Lago - we had out [sic] own intelligence sources. They did this for Guanta, San Carlos, and now Yuca"); Dkt. No. 28-9 at p. 2 (September 13, 2006 Donziger private journal entry: "[W]e have to face the prospect of more of the wasteful, time-consuming, and expensive inspections.[] Texaco now realizes their best defense is to ask for as many inspections as possible.").

177.     The "settling expert" reports were not originally contemplated as part of the judicial site inspection process determined at the outset of the trial. Rather, the additional step of third expert report (in addition to the two party-affiliated expert reports) was requested by Chevron. Donziger believed that this maneuver was an attempt to inject more delay into already protracted proceedings. *See* Werdegar Decl. Ex T (12/23/10 Donziger Depo. Tr.), at 1804:13-20; Dkt. No. 28-9, at p. 12 (Donziger private journal entry noting that "I broke down how long it would take to finish the case if all the dirimiente [settling expert] reports and responses are done, and we estimated that it would take about six years beyond where we are now."); *id.* at 13 ("Why would Yánez order the [settling expert] reports when he and everyone else knows they are useless? The dangerous combination of not wanting to make a decision, with the fact they [sic] this is an American case and who cares, people can just keep making money.").

178.     The global expert examination was not intended to, and did not, supplant the judicial inspections or settling expert reports. The Ecuadorian Plaintiffs had requested a global expert

examination in October 2003, at the beginning of the trial.  Dkt. No. 31-31 (December 4, 2006

LAP filing), at p. 1 ("Your honor, I respectfully request that you immediately order an expert

examination aimed at determining the environmental effects of activities related to the

production of hydrocarbons in all of the fields operated by Texaco, as requested in the

evidentiary motion on pages 4677 and 4678 of the record.  The Court granted that motion in an

Order issued on October 29, 2003, at 5:55 p.m., and that Order is final and binding.").  The court

granted that request, and the global expert examination would have proceeded at some time,

whether or not the judicial inspections had continued for a longer period.  *Id.* (quoting the Lago

Agrio court's October 29, 2003 order that "an expert examination shall be conducted aimed at

determining the environmental effects of activities related to the production of hydrocarbons in

all of the fields operated by TEXACO . . . .").

179.    Every site inspection that Chevron requested for its case-in-chief was performed.  *See*

Dkt. No. 153-7 (certified English translation of the Lago Agrio Court's February 14, 2011

opinion), at 48 (affirming ruling allowing Ecuadorian Plaintiffs to withdraw their remaining

inspection requests and noting that "the defendant, Chevron, has been allowed to take all the

actions that it requested for its defense")..

180.    Richard Cabrera was not even the Ecuadorian Plaintiffs' preferred choice to serve as the

global damages expert; rather, he was selected only after the Lago Agrio Court—apparently at

Chevron's urging—concluded that the expert must be chosen from the small group of experts

who had already served in some fashion in the trial.  *See, e.g.*, Dkt. 28-7 (Ex. 76)

(DONZ00027256) at p. 20 (Donziger writing in his private journal on February 7, 2007:  "The

latest is the judge feels bound by an agreement [Ecuadorian Plaintiff attorney Alberto] Wray

made with [Chevron counsel Adolfo] Callejas in the first inspection to use peritos already

appointed by the court. I thought we had worked this out with the judge, and that Fernando Reyes would be appointed the perito. We have been working with him in preparation. Now, the judge feels he cannot do that. This is a function of T[exaco]'s pressure campaign – Callejas submitted 30-pages of crap yesterday morning.").

181.    The LAP's legal team considered petitioning the Lago Agrio Court for the appointment of *two* global experts ("peritos") so that Texaco would not be in a position to co-opt the expert that would wind up working with the Ecuadorian Plaintiffs.  *See, e.g.*, Dkt. No.  28-9 (Ex. 76) (DONZ00027256) at p. 56 (Donziger writing on September 13, 2006, regarding the appointment of an expert to perform the global assessment: "[T]here is a very small pool of technical people who are not 'contagiado' (in the words of Luis).  So the single perito theory sounds good, but it is all in the execution. And you just know that Texaco will have a slew of available candidates, and will probably pay them on the side to boot, so they can be controlled.  So I suggested we stick with two peritos . . . .").

182.    Donziger has testified that Fajardo believed he knew who the Lago Agrio Court would appoint Cabrera not because of any ex parte contact with the judge or improper pressure, but by a simple process of elimination based on who already had served as court-appointed experts and therefore possibly could be appointed and who likely would be deemed ineligible for one reason or another.  Werdegar Decl., Ex. H (12/8/10 Donziger Depo. Tr.), at 985:4-986:18.

183.    Chevron engaged in extensive efforts to spy on the Ecuadorian Plaintiffs' team. Werdegar Decl. Ex. E (August 16, 2010 *The Atlantic Monthly* article detailing how a Chevron agent from Kroll offered the journalist $20,000 "to go undercover as a journalist-spy" "pretend[ing] to write a story . . . [but] actually shilling for Chevron.").

184.    By July 2007 at the latest, Chevron was aware of the Ecuadorian Plaintiffs' support of

Cabrera's work.  *See* Dkt. No.  No. 152 ¶ 54; Dkt. No.  154-2, 154-3, 154-4 (*Chevron-published*

advertisements in three Ecuadorian national newspapers publicly accusing Cabrera of bias in

favor of the Ecuadorian Plaintiffs and calling upon the Lago Agrio Court to disqualify him.);

Werdegar Decl. Ex. Q (July 30, 2007 Chevron Press Release attacking Cabrera's work and

stating that "Cabrera displayed his utter complicity with Plaintiffs' interests[.]"); *see also* Dkt.

No. 557-4 (Ex. 19) at p. 4 (March 24, 2008 Sylvia Garrigo interview statement that "[T]he expert

analysis also is corrupt . . . .  This expert [Cabrera], unfortunately, is working in partnership with

the NGO leading the plaintiff's case.  The expert's work plan, instead of following the judge's

orders, basically aimed to do fieldwork to find contamination caused by Texaco. . . .").

185.    The Quarles Declaration was filed in the Re*public of Ecuador* action in September 2007,

more than three years before Chevron filed its complaint in this action.  Dkt. No. 48-31, at 6.

186.    Quarles testified at his deposition that he "personally did all the work on which this

declaration is based[.]"  Dkt. 48-3 (Ex. 334) at p. 96:16-18.

187.    Quarles declared under oath that his declaration was based only on his own review of

Cabrera's work plan, his knowledge of past Phase I Judicial Inspections, his site visits, and his

professional experience—and not on anything Donziger or any other counsel representing the

Ecuadorian Plaintiffs may have told him.  Dkt. No. 48-31, at 1, 3.

188.    Donziger testified that he believed the as-filed statement in the Quarles Declaration is not

inaccurate.  Werdegar Decl., Ex. I (12/29/10 Donziger Depo. Tr.), at 2210:17-2211:4.

189.    Donziger and the Ecuadorian Plaintiffs' legal team intended for the Fajardo declaration to

be accurate.  Werdegar Decl., Ex. K (1/14/11 Donziger Depo. Tr., at 2781:4-23); *id.* at 2346:3-8

(Donziger's testimony that he "verif[ied] all of the information in the as-filed Fajardo declaration

with Mr. Fajardo[.]"); Dkt. No. 557-5 (Young Suppl. Decl. Ex. 25) (email among counsel transmitting draft of Fajardo Declaration and stating "[m]ost importantly, please be sure that Pablo confirms the accuracy of the facts set forth in the Declaration."); *see also id.* (Young Suppl. Decl. Ex. 26) (Laura Garr writing to Donziger: "It is obviously very important that you verify the info with pablo."); Dkt. 586-10 (Ex. 2809) (DONZ00067809) at p. 1 (Donziger confirming that he is reviewing declaration with Fajardo in response to attorney request that Fajardo sign the declaration "if Pablo believes the facts set forth therein to be accurate").

190.    The Ecuadorian Plaintiffs legal team preferred using Fajardo as the declarant, in significant part, because "he can speak to the facts better than anyone else."  Dkt. No. 542-8.

191.    At the time the Fajardo Declaration was being prepared the Ecuadorian Plaintiffs' American counsel had conferred with an expert whose opinion was that "local counsel did nothing wrong under ecuador [sic] law."  Dkt. No. 48-6 (Ex. 309) (DONZ00031261) at p. 1.

192.    At the time the Fajardo Declaration was being prepared, Donziger understood "that all court experts in Ecuador worked closely with the parties and that parties could have access to them," that Chevron itself was working direclty with other court-appointe experts, and that it would not have been improper for Chevron also to privately with Cabrera.  Werdegar Decl., Ex. H (12/8/10 Donziger Depo. Tr.), at 959:25-8; id. Ex. I (12/29/10 Donziger Depo. Tr.), at 2346:3-8; Dkt. No. 400-4 (Ex. 2047), at DONZ-HDD-0004622.

193.    Donziger did not believe that it was Fajardo's practice to draft pleadings and have them filed by Cabrera under Cabrera's name.  At the time the Fajardo Declaration was being prepared, Donziger was not aware of Fajardo having any involvement in the drafting of the Cabrera complaint.  1/19/11 Donziger Depo. Tr., at 4879:21-4882:19.

194.    The Ecuadorian Plaintiffs' team discussed setting up a meeting including Beristain in

February 2007—before Cabrera had been appointed by the Lago Agrio Court.  The purpose of

this meeting was to begin developing a social plan that could address the social and cultural

harms caused by Chevron's pollution.  See Dkt. No.  6-10 (Ex. 2) at p. 129 (Fajardo telling the

group "I was proposing to him that on those dates [February 4th and 5th] we could work on a

type of-like a type of workshop to define, a bit that-that-that social plan, see the viability and

how far we can progress on the social plan in a short time.  I mean, the-the-[unintelligible] listen

to him directly, now."); see also id. at p. 132 ( Fajardo continued that he was suggesting that

Beristain "develop a plan for us, roughly, and on the fourth and fifth, we work on the plan.").

195.    The actual "meeting" that appears in *Crude*, which took place in May 2007—before

Cabrera was sworn in as an expert and before Beristain was asked by Cabrera to join his team—

was a community meeting among the Cofán people and their attorneys "to talk about what they

want as compensation for all the damage."  *See* Dkt. No.  48-29; Dkt. No.  32-9 (Cabrera sworn

in on June 13, 2007); Dkt. No.  30-02 (Ex. 91), at 48.  Trudie Styler also observed and spoke to

the Cofán people.  Dkt. No.  30-02, at p. 49.

196.    Beristain's role at the meeting was "in the form of leading a discussion" with the Cofán

people.  Werdegar Decl., Ex. K (1/14/11 Donziger Depo. Tr.), at 2919:20-23.

197.    At the time of this meeting, Beristain was working for an environmental group, and not

for the Ecuadorian Plaintiffs, and was assisting the Ecuadorian Plaintiffs' team with

"community-based information gathering."  Werdegar Decl., Ex. K (1/14/12 Donziger Depo.

Tr.), at 2895:13-22, 2896:4-17.

198.    Donziger was never counsel of record in the Republic of Ecuador action, the Donziger

1782 action, or the Berlinger 1782 action.  *See In re Appl. of Chevron Corp.*, 749 F. Supp. 2d

135, 136 (S.D.N.Y. 2010) (identifying counsel in the Donziger 1782 action); *In re Appl. of Chevron Corp.*, 709 F. Supp. 2d 283, 284 (S.D.N.Y. 2010) (identifying counsel in Berlinger 1782 action).

199.    Donziger was party-defendant *a*nd witness represented by counsel in the Donziger 1782 action. *See In re Appl. of Chevron Corp.,* 749 F. Supp. 2d 135, 136 (S.D.N.Y. 2010) (identifying counsel in the Donziger 1782 action and identifying Donziger as the defendant-respondent).

200.    Donziger only appeared in the BIT arbitration stay action on behalf of the Ecuadorian Plaintiffs on March 9, 2010, nearly three months after the filing the Ecuadorian Plaintiffs' allegedly deceitful complaint. *See* Dkt. No. 30-5; Mastro Decl. 2823.

201.    Donziger was never counsel of record in the BIT arbitration stay action appeal. *See Republic of Ecuador v. Chevron Corp*., 638 F.3d 384, 387 (2d Cir. 2011) (listing counsel on appeal).

202.    Chevron examined Donziger repeatedly about his role during his Section 1782 deposition, and Donziger affirmatively testified that it was not his role to sign or file, or approve the filing of, pleadings in United States court actions. Werdegar Decl., Ex. K (1/14/11 Donziger Depo. Tr.), at 2768:20-25; *see also id.* Ex. J (1/8/11 Donziger Depo. Tr.), at 2637:11-16. ("Q: Other than the persons who signed the individual pleadings, did anyone on the plaintiffs' U.S. legal team have to approve each pleading before it was filed in the U.S.? A:  No."); *id.* Ex. K (1/14/11 Donziger Depo. Tr.), at 2838:11-21 ("Q:  Have you ever filed on behalf of the plaintiffs in any U.S. court a pleading that reveals all of the facts with regard to Cabrera that are known to you to all U.S. judges? A:  I don't know.  I have not personally filed pleadings. Q:  Why is it that none of the pleadings in the U.S. are filed under your name? A:  It is not my role.").

203.    Donziger's testimony confirms that he was not responsible for approving U.S. court filings made by counsel of record on behalf of the Ecuadorian Plaintiffs.  *See* Werdegar Decl., Ex. K (1/14/11 Donziger Depo. Tr.), at 2768:20-25; Id. at 2838:11-21 (emphasis added); *id.* Ex. J (1/8/11 Donziger Depo. Tr.), at 2637:11-16.

204.    Donziger testified that he was not involved in the decision to file the Fajardo petition in any United States court proceeding. Werdegar Decl., Ex. K (1/14/11 Donziger Depo. Tr.), at 2768:3-16, 2773:20-2774:5.

205.    Donziger testified that he was not aware that the Fajardo Declaration was filed by the Ecuadorian Plaintiffs in connection with the Donziger 1782 action.  Werdegar Decl., Ex. K (1/14/11 Donziger Depo. Tr.), at 2768:3-16, 2773:20-2774:5.

206.    Chevron affirmatively raised the issue of Cabrera's independence and the propriety of the Ecuadorian Plaintiffs' contacts with Cabrera and his team in both the Berlinger 1782 action and the Donziger 1782 action.  *See* Case No. 10-mc-0001 (LAK) Dkt. No. 3; Case No. 10-mc-00002 (LAK) Dkt. No. 11.

207.    The issue of Cabrera's and his team's independence was only one of a host of issues relating to the propriety of Chevron's discovery requests litigated in the Berlinger 1782 action and the Donziger 1782 action.  *See, e.g.,* Mastro Decl. Ex. 2818 (Ecuadorian Plaintiffs' memorandum in support of motion to quash Chevron's Donziger subpoena raising numerous bases for quashing or modifying Chevron's subpoenas, only one of which was the propriety of the Ecuadorian Plaintiffs' legal team's contacts with Cabrera); *id.* Ex. 2816 (Chevron reply brief in Berlinger 1782 action addressing numerous arguments, in addition to arguments regarding Cabrera and Beristain, raised by appellants); *id.* Ex. 2817 (Chevron Berlinger 1782 appeal brief

addressing numerous arguments, in addition to arguments regarding Cabrera and Beristain,
raised by appellants).


Dated:                                              Respectfully submitted,


                                        By: /s/ John W. Keker
                                            ELLIOT R. PETERS
                                            JOHN W. KEKER (*pro hac vice*)
                                            JAN NIELSEN LITTLE (*pro hac vice*)
                                            MATTHEW M. WERDEGAR (*pro hac vice*)
                                            633 Battery Street
                                            San Francisco, CA  94111-1809
                                            Telephone:        (415) 391-5400
                                            Facsimile:        (415) 397-7188
                                            Email:            epeters@kvn.com
                                            Email:            jkeker@kvn.com
                                            Email:            jlittle@kvn.com
                                            Email:            mwerdegar@kvn.com

                                            Attorneys for STEVEN DONZIGER, THE
                                            LAW OFFICES OF STEVEN R. DONZIGER
                                            AND DONZIGER & ASSOCIATES, PLLC

700360