# EXHIBIT 3014

*CERTIFIED TRANSLATION*

**DECLARATION OF RAMIRO FERNANDO REYES CISNEROS**

I, RAMIRO FERNANDO REYES CISNEROS, hereby declare as follows:

1. I am a citizen of Ecuador, born in Quito, Ecuador, on REDACTED. I reside at REDACTED, and my national identification number is REDACTED. I affirm I am over the age of 18 and do not suffer any physical or mental disabilities. I have personal knowledge of the facts set forth herein, and if called upon to testify, I would and could testify thereto.

2. I have not asked for, received, nor been offered any money or other compensation, nor have I received any promises or commitments of future compensation of any kind, in exchange for signing this sworn statement.

3. I am a petroleum and environmental engineer. I received a degree in petroleum engineering from the School of Geological, Mining, Petroleum and Environmental Engineering of the Central University ("School of Geological Mining, Petroleum and Environmental Engineering") in Quito, Ecuador, in 1978. I received a master's degree in petroleum engineering from the School of Geological, Mining, Petroleum and Environmental Engineering, in 1983. I also received a post-graduate degree in environmental control and industrial development from the State University of Ghent, Belgium, in 1988.

4. I have worked in the hydrocarbons field in the state sector, in private industry, and as an independent consultant. Here is an overview of my employment history:  From 1975 to 1987, I worked as a petroleum engineer at the Ministry of Natural and Energy Resources, today called the Ministry of Non-Renewable Natural Resources. Afterwards, from 1987 to 1992, I served as Director of Environmental Rules and Regulations at the National Directorate of Environmental Protection (DINAPA), in the same Ministry. In 1992, I worked as National Director of Environmental Protection at the same Ministry. From 1992 to 1995, I worked as Environmental Coordinator at Maxus Ecuador, Inc. From 1996 to 2000, I was Environmental Manager at Fugro-Petrokem and at ENSR, both environmental consulting companies. Later, for a short time in 2000, I worked as Executive President of PENSERTEC. From 2000 to 2004, I was the Director of the Enhanced Oil Recovery Center (CERMEP) at the Central University of Ecuador. From 2004 to 2007, I worked as an independent consultant for a variety of clients, and in 2007, I worked in

Petroproducción as Coordinator of the Enhanced Oil Recovery Project. From 1988 until the present, I have been an adjunct professor of the Enhanced Oil Recovery course at the Petroleum School of the Faculty of Geology, Mines, Petroleum and Environment at the Central University of Ecuador.

5.  I am currently employed as a petroleum engineer by Ivanhoe Energy Ecuador, which is developing an extra-heavy crude oil production block known as the Pungarayacu Project in Ecuador.

6.  I have published two books. The first one, in 1999, was titled "Prospects of Enhanced Recovery in Ecuador."  In November 2005, I published my most recent book titled "Oil, the Amazon and Natural Capital." I have published more than 30 articles related to the oil industry and environmental control.

7.  My first involvement regarding Texaco's activities in Ecuador was in 1987, when I met Judith Kimerling. At the time, I was the Director of Environmental Rules and Regulations at the National Directorate of Environmental Protection (DINAPA) of the Ministry of Natural and Energy Resources, and Ms. Kimerling visited me in my office to discuss research she was doing on the social and environmental impact of crude oil production in Ecuador. At the time, I was concerned with the issue of environmental remediation, as I am today, and I saw Ms. Kimerling's project as an opportunity to break the Government's official silence on the subject. I advised Ms. Kimerling on the analysis of technical data on oil production activities in the Oriente region [of Ecuador,] which Ms. Kimerling later used in her book titled "Amazon Crude," published in 1990.

8.  Some years later, in 1996, I became involved in the matter of Texaco's activities in Ecuador when I worked as a technical expert for a geotechnical consulting company called Fugro McClelland. Fugro was involved in supervising the environmental remediation in the area of the concession of the Petroecuador-Texaco Consortium, which was being done as part of the agreement between Texaco and the Ecuadoran government at that time. Since then, I kept myself abreast of the various environmental lawsuits brought against Texaco.

9.  Around 2003 or 2004, I do not remember the exact year, I met the attorney for the plaintiffs in the lawsuit against Chevron, named Alberto Wray. In the meeting, he asked me to serve as a

sort of expert witness regarding Texaco's activities in Oriente. I did not want to become involved in the lawsuit, so I asked that they pay me a fee of $30,000 for my professional services, a sum of money I knew the plaintiffs' attorney would not agree to, which is indeed what happened.

10. Later, at the end of 2005, I met Fausto Peñafiel, who worked as a consultant for plaintiffs' counsel in the case against Chevron in Lago Agrio, Ecuador. On Nov. 16, 2005, I held my book launch of "Oil, Amazon and Natural Capital" at the *Casa de la Cultura Ecuatoriana,* in Quito. Many people attended the event, among them Mr. Peñafiel, who was accompanied by Steven Donziger. Pictures of Mr. Donziger and Mr. Peñafiel are attached to this declaration as Exhibits A and B, both of which I have signed. Afterwards, at the cocktail party for the book launch, Mr. Peñafiel introduced me to Mr. Donziger and explained that Mr. Donziger was an American attorney for the plaintiffs in the case against Chevron. We shook hands and spoke briefly. The publication of my book was an important event in my career because it brought me public notice and established me as a recognized expert on the subject of the development of the oil industry in Ecuador and its environmental impacts. That same night, the President of the Association of Geological, Mining, Petroleum and Environmental Engineers (CIGMYP), Gustavo Pinto, who also attended the event, told me that Mr. Donziger and Mr. Peñafiel had asked him to arrange a meeting for the following day, with Mr. Pinto and myself, to discuss the Chevron matter. I agreed to the meeting.

11. The day after the book launch, Nov. 17, 2005, Mr. Peñafiel, Mr. Donziger, Mr. Pinto and I met at CIGMYP's old headquarters, on the second floor of the Rio Amazonas building, located at Amazonas Avenue N21-147 and Roca. A photocopy of my notes from that meeting is attached to this sworn statement as Exhibit C, which I have signed. At the meeting, Mr. Donziger and Mr. Peñafiel explained that there were contradictions among the various expert reports submitted by plaintiffs' counsel and the attorneys for Chevron in the case, and that the Court had appointed a third group of experts, the so-called "settling experts," who were independent of the parties. The settling experts were going to issue a report on the judicial inspection of Sacha 53, and Mr. Donziger proposed the idea of bringing in an "independent institution" to monitor the work of the settling experts. That is why in my planner for that date I wrote: "Looking to form a group of independent 'monitors.'" Given its expertise in environmental engineering, CIGMYP would submit an "impartial and qualified" evaluation of the judicial inspection of Sacha 53.

12. On the morning of Nov. 23, 2005, we had a second meeting for about an hour with Mr. Donziger, Mr. Peñafiel, Mr. Pinto and I. We met in the same location as before, CIGMYP's old headquarters, in Gustavo Pinto's office. A photocopy of my notes from that meeting is attached to this sworn statement as Exhibit D, which I have signed. In this meeting, we agreed that Gustavo Pinto and I would lead the "independent monitorship" of the settling experts under the auspices of CIGMYP. We also agreed that in order to perform this work, the plaintiffs would pay Mr. Pinto and me a fee for our professional services, plus an offer to pay a bonus in case the plaintiffs won the lawsuit. Gustavo Pinto handled the financial arrangements directly with Mr. Donziger; I am sure that I received a payment from Mr. Pinto for this work, but I don't recall the amount. There never existed a formal contract between CIGMYP, Mr. Pinto, myself, Mr. Donziger or Mr. Peñafiel, and all the participants in the meeting agreed that payment by plaintiffs to CIGMYP, to Mr. Pinto and to me for this monitorship would remain secret. In the meeting, Mr. Donziger and Mr. Peñafiel asked Mr. Pinto and me to meet with the group of Court-appointed "settling experts," headed by Engineer Johnny Zambrano. We were supposed to inform them about CIGMYP's monitorship, and that we would be supervising their analysis as settling experts. After reviewing the notes in my planner, I recall that at the meeting we agreed to write a letter to Engineer Johnny Zambrano establishing that CIGMYP had begun the monitorship of the report on Sacha 53 as of Nov. 17, 2005. The purpose of the letter was to provide an official basis for the monitorship. The annotation in my planner for this date states: "Letter stating Thursday 17 CIGMYP Board resolved to set up a scientific-technical monitorship (of) remediation process of Texaco case. Invite them to a work meeting. Acknowledging his appointment as settling expert, we express support of developments within bounds of professional ethics and technical results."

13. As had been agreed, on Nov. 29, 2005, Mr. Pinto and I held a meeting with the settling experts at Mr. Zambrano's office. I don't recall the exact location of his office, but I believe it was on 12 de Octubre Avenue across from the Catholic University. A photocopy of my notes from that meeting is attached to this sworn statement as Exhibit E, which I have signed. The meeting took place in the morning and was brief, lasting no more than half an hour. We discussed the report on the inspection of Sacha 53, which they had been working on, and we asked when they could provide the monitors a draft of the report. They never did, at least not to me. The meeting

centered on reviewing technical issues regarding the mobility of oil and was basically to review the technical aspects of the report the settling experts were preparing on Sacha 53.

14. In January 2006, Mr. Pinto and I continued our monitoring work. The entry in my planner for the date of Jan. 9, 2006, states: "Texaco case letters 1 and 2." This notation in my planner refers to a conversation with Mr. Pinto on the need to write letters certifying our appointment as monitors in the Chevron case. A photocopy of my notes from this conversation is attached to this sworn statement as Exhibit F, which I have signed. One of these letters was sent to Doctor Germán Yánez, the Presiding Judge of the Sucumbíos Court, on Jan. 20, 2006. The letter submitted to the Court detailed our credentials and what our role would be in the process, citing CIGMYP's purpose and various Ecuadoran laws regarding transparency and public participation. In this letter we informed Judge Yánez that CIGMYP's Board of Directors had decided in its expanded session of Nov. 22, 2005, that as a professional association, CIGMYP had standing under Ecuadoran law to be a monitor in the case. The letter delegated to Gustavo Pinto, as leader of the organization, and me, as his collaborator, the responsibility of leading this monitorship, describing us as acknowledged professionals with "vast and extensive experience" in issues relating to oil and environmental engineering. The letter also asked the Court to grant us access to materials relevant to the case. The letter was written on CIGMYP letterhead and signed by Mr. Pinto in his capacity as President of the association. A copy of this letter is attached to this sworn statement as Exhibit G, which I have signed.

15. At this point it is important to clarify that neither Mr. Pinto nor I informed the Judge or the respondent, Chevron, that CIGMYP, and therefore we, were being paid by the plaintiffs to perform this monitorship. Mr. Pinto and I had agreed with Mr. Donziger to keep secret the nature of our arrangement with him, given that we had all discussed that revealing the arrangement would harm CIGMYP's image as an independent and impartial organization. Mr. Donziger told us his goal was to create the image that the monitorship was "independent" of the parties, so that it would be received with deference and respect by the Court.

16. On Jan. 18, 2006, there was a meeting with Mr. Pinto, Mr. Peñafiel, Bill Powers and me regarding the same issue of monitorship in the case. A photocopy of my notes from that meeting is attached to this sworn statement as Exhibit H, which I have signed. The meeting was in the morning and lasted an hour, in CIGMYP's board room. It was the first time I met Mr.

Powers, an engineer from California hired by the plaintiffs. In that meeting we discussed a number of technical issues related to the case. We also discussed the need for Mr. Pinto and me to have a series of meetings to introduce ourselves as monitors of the site inspection done by the experts in Sacha 53: with court-appointed settling expert Johnny Zambrano, with the Judge in the Chevron case, and with representatives from Chevron. The annotation in my planner for this date mentions plans for these meetings.

17.  At some point after the meeting of Jan. 18, 2006, I don't recall the exact date, Mr. Pinto and I met with Judge ~~Efraín Novillo~~ [handwritten] Germán Yánez, who was the new judge in the Chevron case. We met with Judge ~~Novillo~~ [handwritten] Yánez at the National Council on Psychotropic Substances in Quito. The Judge saw us for only a few minutes, during which Mr. Pinto and I explained to him CIGMYP's monitorship and told him we wanted to become involved in the case. The Judge did not express any interest in what we were telling him about the case.

18. On Jan. 31, 2006, Mr. Pinto and I met again with the settling experts. Present at the meeting were Mr. Zambrano, Jorge Jurado, Mr. Pinto and I. A photocopy of my notes from that meeting is attached to this sworn statement as Exhibit I, which I have signed. The meeting took place at Johnny Zambrano's office. We discussed various technical issues related to the case, but at some point Mr. Jurado asked us to identify the exact provisions of the laws that authorized CIGMYP to conduct this monitorship. They also refused to provide us with a copy of their report on Sacha 53, and told us to contact the clerk of the Sucumbíos Court, Liliana Suárez, to obtain a copy of the report. That is the reason why Liliana Suárez's name and her telephone number are annotated in my planner, even though she was not in the meeting.

19. The following day, on Feb. 1, 2006, the settling experts' report on Sacha 53 was submitted to the Court. In February and March of 2006, I had several meetings with the plaintiffs and Mr. Donziger on the issue of Sacha 53. According to my planner, these meetings took place on Feb. 23 and March 6, 2006. A photocopy of my notes from each of these meetings is attached to this sworn statement as Exhibits J and K, each of which I have signed. Also during this time period, I spent two days doing field work, on March 8 and March 9, 2006, at the judicial inspection of Sacha Sur. Photocopies of my notes on these meetings are attached to this sworn statement as Exhibits L and M, each of which I have signed. The meetings in this time period addressed technical issues related to CIGMYP's monitorship and the Sacha 53 report. In these meetings Mr.

Donziger was very upset by the findings of the settling experts' report, and he complained that the report supported Chevron's position and did not support the plaintiffs' position. I also recall that at some point during these meetings I met Pablo Fajardo and Luis Yanza, both of them members of the plaintiffs' team. At least one of these meetings took place at the plaintiffs' office in Quito, which was located in a house on José de Abascal E12A-143 y Portete. I have attached to this sworn statement photographs of Pablo Fajardo and Luis Yanza, which I have signed, as Exhibits N and O, respectively.

20. At one of the meetings with Mr. Donziger and the plaintiffs, Mr. Pinto and I showed them a copy of our comments on the settling experts' report on Sacha 53, and which Mr. Donziger had asked us to prepare. That is the report that Mr. Donziger wanted us to submit to the Court on paper bearing CIGMYP's letterhead. During our discussions, Mr. Dozinger told us that our report should establish that the findings of the settling experts' report on Sacha 53 were wrong, that they lacked objectivity and were biased toward Chevron, and therefore the report should be discounted. However, in my professional opinion the evidence did not support Mr. Donziger's position and I could not twist my professional assessments to make them fit the plaintiffs' interests. In the monitorship report, Mr. Pinto and I pointed out that the settling experts had failed to strictly follow their judicial mandate, but we concluded their report contained enough information for the Court to make its own ruling. In the report we also established that the information submitted by both the plaintiffs and the defendants contained correct elements, but that both also had deficiencies regarding their sampling data. Mr. Donziger expressed disappointment with our report and never asked us to submit it to the Court. A copy of the draft report we wrote is attached to this sworn statement as Exhibit P, which I have signed. I also recall that in this meeting Mr. Donziger suggested that Mr. Pinto and I meet with the Judge again to offer our services as settling experts. Mr. Donziger told us the Judge would be coming to Quito the following week. Nonetheless, this meeting with the Judge never took place.

21. After this, I didn't have any contact with Mr. Donziger or the other plaintiffs' attorneys for several months, until one afternoon when I was driving from Quito back to my house in Valle de los Chillos. I received a call on my cell phone from Mr. Yanza, who asked me if I could come right away to meet with him at their office in Quito, which I knew as the offices of *Amazonía por la Vida*. I told him I was just arriving home and didn't want to go back to Quito, but he was very insistent and so I turned around and drove to the plaintiffs' office, where Mr. Yanza and Mr.

Fajardo were waiting for me. This was the first meeting with plaintiffs' representatives that had nothing to do with Sacha 53. According to the notes on my planner, this meeting took place on Sept. 20, 2006. A photocopy of my notes from that meeting is attached to this sworn statement as Exhibit Q, which I have signed.

22.  Mr. Yanza and Mr. Fajardo began the meeting by telling me that the Judge in the Chevron case had decided to halt the process of judicial inspections and settling experts, and instead was going to appoint a single expert responsible for undertaking a global damages assessment for the case. The idea of a single expert performing a global assessment was one that Donziger had first discussed with me several months earlier, on Jan. 26, 2006. A photocopy of my notes from the Jan. 26, 2006, meeting with Mr. Donziger is attached to this sworn statement as Exhibit R, which I have signed. Between these two meetings, Mr. Donziger, Mr. Fajardo and Mr. Yanza together had explained to me that having a single expert to carry out a global assessment was important to the plaintiffs because they acknowledged that the judicial inspection process had not yielded data to support their claims of contamination. They also said they believed it would be easier to manage one single expert than many. In the meeting of Sept. 20, 2006, Fajardo and Yanza told me they were delivering a proposal from Mr. Donziger for me to take the position of single expert for the global assessment. We discussed the overall concept of the global assessment, the timing, and payment for such work, including the fact that my expert fees, according to them, would be paid 50 percent by Chevron and 50 percent by the plaintiffs. This was the first time I had discussed the global assessment with the plaintiffs in detail. The meeting didn't last more than 30 minutes.

23.  Over the following months, between Oct. 2006 and March 2007, I had several meetings and telephone calls with Mr. Donziger, Mr. Fajardo, Mr. Yanza and other members of the plaintiffs' team regarding the global assessment. Throughout these discussions, I remember that Mr. Donziger, Mr. Yanza and Mr. Fajardo always stated with certainty that the Court was going to name a single expert to assess the costs of remediation and, above all, that the Court would appoint a single expert of their choosing. Mr. Donziger, Mr. Fajardo and Mr. Yanza told me not to worry about this. I assumed that this was because they had very good connections with the incoming Administration of President Correa. For example, Esperanza Martínez, of *Acción Ecológica*, a very important organization that supported the plaintiffs' case against Chevron, was very close to Alberto Acosta, who was one of the leaders of Mr. Correa's campaign and became

Minister of Energy and Mines. I have attached to this sworn statement photographs of Ms. Martínez and Mr. Acosta as Exhibits S and T, respectively, both of which I have signed.

24. I do not have notes in my planner from meetings with the plaintiffs' representatives during October or November 2006, but I remember during this period having one or two telephone conversations with Mr. Donziger in which we discussed the global assessment. I don't know the exact dates, but I am certain they took place. Around that time I was busy working on other projects and because of that I did not spend much time on the Chevron case. I also remember that during this time I was invited by the plaintiffs to a meeting in Oriente. The person who invited me was Esperanza Martínez, of *Acción Ecológica*, whom I had known for some time through my work. The meeting was held at a religious mission called *Los Capuchinos* near Lago Agrio, Ecuador. I recall that the people attending were Esperanza Martínez, Adolfo Maldonado, also of *Acción Ecológica*, Mr. Yanza, Julio Prieto, and a Spanish doctor named Carlos Martín Beristain, and I. I never saw Mr. Beristain again after this meeting. The purpose of this meeting was to discuss the methodology to be used in the global assessment. Because I was the only person at the meeting who had served as an expert on environmental impact cases, I gave the attendees an explanation of technical issues. I don't recall the exact date of this meeting, but I believe it was in October 2006. I have attached to this sworn statement photographs of Mr. Maldonado, Mr. Prieto and Mr. Beristain as Exhibits U, V and W, respectively, all of which I have signed.

25. On the morning of Friday, Dec. 15, 2006, I had an hour-long meeting with Mr. Donziger at the *Amazonía por la Vida* office, and which I remember very well. A photocopy of my notes from that meeting is attached to this sworn statement as Exhibit X, which I have signed. Mr. Donziger was dressed in his customary attire of white shirt with the sleeves rolled up, blue blazer and jeans. This is the way he almost always dressed for our meetings, varying the color of his shirts and sometimes wearing slacks instead of jeans. But I don't recall ever seeing him wear a tie or a suit. As usual, he was very friendly and sociable. In this meeting, Mr. Donziger made me a direct and detailed offer that I should be the expert for the global assessment. He explained that the Court had halted the judicial inspections at the plaintiffs' request and that as soon as the following week a single expert would be appointed to begin the global assessment. Mr. Donziger told me in the meeting what would be expected of me in the role of expert. Mr. Donziger emphasized the need for the expert to state that Chevron was the only party responsible for the

environmental damages and the harm to the local community. We also talked about the valuation of damages and Mr. Donziger explained that, as the expert, I would be the person to submit an estimate of costs to the Court. He asked me directly if I would be willing to estimate damages at more than a billion dollars. I remember replying that it could be possible. Mr. Donziger also told me that the estimated amount of damages had to be multiplied by 3.5 so that we could then talk about billions, but I never understood why and he never explained it to me. Later, I had doubts about these requirements, but at the time I was interested in the notion of playing an important role in what was the most significant case in the world involving oil and the environment, because this is precisely my area of specialization.

26. At that same meeting of Dec. 15, 2006, I remember that when Mr. Donziger and I were by ourselves, I made it known to him that there were issues that could keep me from serving as single expert or that Chevron would use to attack me. The most important were: 1) In my book I had already advocated for joint responsibility between the Ecuadoran government and Texaco for environmental impacts, which could be used against me if I, as the expert, were to do as the plaintiffs wanted and found Chevron to be the sole responsible party, and 2) that in 1996 I had worked as a technical expert for a company, Fugro, involved in the remediation of the Shushufindi oil field formerly operated by Texaco. Mr. Donziger dismissed these concerns and said none of them would prevent me from serving as the expert, that I shouldn't worry and that I couldn't stop helping them, the plaintiffs. Mr. Donziger's reaction was typical of him, given that he was always very persistent and impulsive, the kind of person who never takes "no" for an answer. In any case, the issue was not decided at this meeting and I was left with many questions about how real the plaintiffs' proposal was. Shortly after the meeting, Mr. Donziger returned to the United States and we didn't broach the subject until the following month.

27. On Jan. 5, 2007, I had a conversation with Mr. Fajardo. A photocopy of my notes from that meeting is attached to this sworn statement as Exhibit Y, which I have signed. I don't recall whether this was a telephone conversation or a meeting in person. In the discussion Mr. Fajardo explained to me in more detail the proposal for me to be the global assessment expert, specifically regarding the financial terms for my professional services. According to my notes from the meeting, the proposal from Mr. Fajardo was that I would be paid monthly fees of $3,000, plus a bonus of $15,000 for writing the report. My notes include Mr. Fajardo's e-mail

address, pafam@ecuanex.net.ec. I also recall that in January I had a telephone conversation with Mr. Donziger on the issue of the global assessment. We did not meet in person in January because for a good deal of the month I was working on a different project in Peru that required my full attention.

28. On Feb. 1, 2007, I met with several members of the plaintiffs' legal team. I do not recall precisely where this was, but I believe the meeting was in the *Amazonía por la Vida* office. My notes from the meeting indicate that this was a detailed working meeting with in-depth discussion of technical issues on the methodology for the global assessment. A photocopy of my notes from that meeting is attached to this sworn statement as Exhibit Z, which I have signed. This was one of a number of discussions I had with the plaintiffs' legal and technical team in preparation for the global assessment. The notes on my planner indicate there was extensive discussion in this meeting on the cost of reparations that would be included in the global assessment report. It was clear from this discussion during the meeting that the plaintiffs' team was preparing a technical and legal strategy of having the global assessment presuppose from the start that Chevron was the only party responsible for paying for reparations. The plaintiffs' main idea regarding the global assessment was to do an "*ex-post facto*" environmental impact assessment that would justify a large monetary judgment against Chevron for remediation and reparations.

29. Shortly after that meeting, I don't remember the exact date but sometime in early February, I had a conversation with Mr. Donziger in which he told me that the judge in the Lago Agrio case was putting up hurdles to my appointment as expert. Mr. Donziger told me that there was a requirement, of which I was not aware, that the expert for the global assessment had to be chosen from a list of experts who had already performed expert work in the case. My involvement in the CIGMYP monitorship did not meet this requirement and I was not on the list. When Mr. Donziger told me about this, he told me not to worry, that he would succeed in getting me appointed as expert. Personally, I had mixed feelings. Initially, the notion of being the single expert interested me, because I have always been passionate about the issue of environmental protection and remediation in the Amazon. But as time passed, I had grown increasingly uncomfortable, especially with the plaintiffs' insistence that Chevron be held as the sole responsible party, while in my book, which had been the most important professional achievement in my career to that moment, I put forth the thesis of joint responsibility between the State and the former operator Texaco for the environmental and social damages done in the

Amazon. Also, in our discussions on global assessment, plaintiffs' counsel continued increasing the amount of damages they wanted the expert to establish against Chevron, mentioning even as much as $10 billion, which I considered to be completely ludicrous. That is why I was relieved when Mr. Donziger told me the Judge was putting hurdles to my appointment as expert, but Mr. Donziger kept telling me that I couldn't quit and had to continue helping the plaintiffs.

30.  I remember that in early February 2007, there were several calls to discuss how to respond to the crisis, and it was obvious from these conversations that the issue of the appointment of the expert seemed to take the plaintiffs by surprise. At some point around that time, Mr. Donziger telephoned and asked me to recommend someone as a possible "Plan B" [expert,] someone who would be able to handle the matter and replace me if matters with the Judge didn't turn out as Mr. Donziger wanted. During this call, and I don't recall the exact date, Mr. Donziger and I discussed the possibility that Richard Cabrera could be appointed as expert in case the Court did not accept me. I had originally provided the name of Mr. Cabrera to the plaintiffs in 2006, but I had serious doubts about suggesting Mr. Cabrera for the position of single expert, and I submitted his name to Mr. Donziger, as we say in Ecuador, "*a la cansada*" ["as a last resort,"] in other words, with serious doubts. I had known Mr. Cabrera since college and I knew he had certain technical limitations regarding the oil industry, and at that time he did not possess the professional skills and experience required to handle a project such as the global assessment in the Chevron case. However, on the other hand, I suggested Mr. Cabrera for the field work in Oriente because he is reserved, hard working, and responsible. Also, because I believed that for Mr. Cabrera, issues such as independence and professional standards were not that important, and therefore he would have no problem doing what the plaintiffs were proposing. In that sense, I believed Mr. Cabrera could be the right person for the job. But I also did not have another name to give to Mr. Donziger, and he was pressuring me very much because he was desperate. In any case, Mr. Donziger thanked me and told me that I would continue being "Plan A" and that he was going to fix things with the Judge. However, I was relieved to be able to give him another name and to distance myself even more from that process.

31.  Mr. Donziger asked me to introduce him to Mr. Cabrera, and I arranged a meeting which took place on Feb. 9 or 10, 2007, at the Hotel Quito, where Mr. Donziger always stayed while in Ecuador. We didn't have lunch, only a drink. I ordered whiskey, the same as Mr. Cabrera. Mr. Donziger didn't order anything. At this meeting, Mr. Cabrera and Mr. Donziger each wrote down

their email addresses in my planner, in their own hand. A photocopy of my notes from that meeting is attached to this sworn statement as Exhibit AA, which I have signed. The purpose of this meeting was purely social, to give Mr. Donziger a chance to get to know Mr. Cabrera, but several aspects of the global assessment were also discussed. At that time it was discussed that I, through Richard Cabrera, would continue supporting and advising behind the scenes on the technical issues of the global assessment. In general, Mr. Donziger said that I would continue working "in the shadows," with the idea of reviewing Mr. Cabrera's reports.

32. In this same time period and as a follow-up to that introductory meeting, I remember we had several telephone conversations with Mr. Cabrera and Mr. Donziger regarding the global assessment and especially regarding my and Mr. Cabrera's role in it. The annotations in my calendar for Feb. 24, 2007, reflect the concept of the global assessment and that I would be a sort of "technical shadow" of Cabrera's work. A photocopy of my notes from that meeting is attached to this sworn statement as Exhibit BB, which I have signed. If I remember correctly, on this date we had a telephone call with Mr. Donziger, since he wasn't in Ecuador. Mr. Donziger said that Mr. Cabrera, referred to in the planner as "our friend," would receive my advice and supervision with his reports, which in my notes I referred to as "my help." To be "in the shadows" meant reviewing everything Mr. Cabrera did on the technical part of the project. I was supposed to receive periodic reports, and supposedly I would be paid $1,500 per month for my professional services. That is what Mr. Donziger told me and I believe I received two monthly payments. As these discussions continued, Mr. Donziger became more comfortable with the idea of Mr. Cabrera acting as the single expert.

33. I also remember another meeting during this time period with Mr. Donziger, Mr. Cabrera, Mr. Yanza and Mr. Fajardo. This meeting took place in a restaurant called Mister Bagel, on Portugal Avenue, where the four of us had breakfast. I don't recall the date of this meeting and I do not believe I made any annotations about it in my planner. I remember that Richard called and told me they were waiting for me at that location. Then I went and met with them to talk about the global assessment, but I do not recall exact details of the conversation.

34. On March 3, 2007, I participated in a very important meeting on the global assessment at the *Amazonía por la Vida* office in Quito. A photocopy of my notes from that meeting is attached to this sworn statement as Exhibit CC, which I have signed. The meeting started in the morning and

lasted all day, with lunch ordered in. There were at least a dozen people at the meeting, including Mr. Donziger, Mr. Fajardo, Mr. Yanza, Mr. Prieto and other members of the plaintiffs' legal and technical team. There were also several American technical experts who were helping the plaintiffs, including Charlie Champ, Ann Maest, and Dick Kamp. I went to this meeting with Mr. Cabrera. I have attached to this sworn statement pictures, signed by me, of Mr. Champ, Ms. Maest and Mr. Kamp, as Exhibits DD, EE and FF, respectively.

35. This meeting was the moment when I truly recognized the full extent of the plaintiffs' counsel's intentions regarding the global assessment. At the meeting, Mr. Fajardo, Mr. Yanza and Mr. Donziger dropped any pretense that Mr. Cabrera would act independently in writing an expert report that would be technically sound and executed according to professional standards. On the contrary, it was obvious that the plaintiffs had already predetermined the findings of the global assessment, that they themselves would write a report that would support their claim for billions of dollars against Chevron and would simply put Mr. Cabrera's name on it. The purpose of the meeting was to establish all the conditions for controlling and managing the expert's work, in secret, in accordance to the plaintiffs' interests. Based on what they said in the meeting, I have no doubt that everyone there understood this. In 2011, I watched approximately one hour of a video of this meeting that was shot by American filmmakers for the movie *Crude*, and this video refreshed my recollection regarding what took place at the meeting. One scene in particular impressed me, because that scene is the moment when it became obvious that the team was in place and ready to control and manage the global assessment. In the scene, Mr. Fajardo talked about how everyone there had the responsibility to help write the expert's report, and the American technical expert, Anne Maest, asked, "But not Chevron?" And everyone at the meeting laughed.

36. Something else I remember that struck me from the meeting was the American expert Charlie Champ, whose name I wrote phonetically in my calendar as "Charlie Chang."  He was introduced to me as an oilman from Texas. Mr. Champ spoke with a strong accent and wore very peculiar attire that included a Texan bolo tie, instead of a tie, and big cowboy boots. Mr. Champ gave a presentation about a remediation plan, which was very interesting to me as a petroleum engineer with knowledge and experience in environmental remediation issues, which is why I took several notes during his presentation.

37. The meeting of March 3, 2007, was the last meeting I remember having with the plaintiffs. Mr. Donziger went on with the idea of keeping me close to the plaintiffs' team, offering me a position as advisor and the role as Mr. Cabrera's "shadow," but I actually never played that role. Mr. Cabrera did not give me the partial reports so that I could review them and our relationship gradually cooled. I recall that during one of my last conversations with Mr. Cabrera, I told him he should not turn over any reports to the plaintiffs until they had paid for our professional services. After that, I lost contact with Mr. Cabrera.

38. I had contact once more with Mr. Donziger and the plaintiffs, when they asked me to write two technical analyses, one on the cost of produced waters reinjection and the other on natural gas. I wrote these analyses during the summer of 2007 and was paid around $10,000 by Mr. Donziger for this professional service. Long after the report was filed with the Court, I learned that these two analyses were submitted as Annex S to the "Cabrera Report," which I was not aware of previously.

39. In April or May 2007, I don't recall exactly, while I was working for Petroproducción, I ran into Mr. Yanza and Mr. Fajardo as they were leaving the office of the Vice President of Petroproducción, Oscar Garzón. Mr. Fajardo and Mr. Yanza told me they were there to ask Mr. Garzón to have Petroproducción suspend all remediation activity in the area run by the Petroecuador-Texaco consortium, because the remediation was depriving the plaintiffs of clear evidence on which to base their claims for damages in the case.

40. Finally, on Feb. 22, 2008, I attended a meeting in Lago Agrio, on the invitation by Natalie Weemaels of *Acción Ecológica*, to discuss environmental issues and the changes to the Ecuadoran Constitution. Mr. Fajardo attended this meeting. The Chevron matter was not discussed.

41. I have not had further contact with the representatives of the Lago Agrio plaintiffs since that time, except on one occasion in 2012, when I happened to run into Mr. Fajardo at the intersection of Amazonas and Gaspar de Villaroel Avenues in Quito, and we exchanged friendly greetings.

I declare under penalty of perjury under the laws of Ecuador and the United States of America and under the laws of the States of California, Alabama, Alaska, Arizona, Arkansas, Colorado,

Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, and Wyoming, and under the laws of the District of Columbia, and under the laws of any other applicable jurisdiction, that the foregoing is true and correct, and that this Sworn Statement was executed on Oct. 12, 2012, in Bogota, Colombia.

_____ [Signature] _____

RAMIRO FERNANDO REYES CISNEROS

Citizenship ID Number REDACTED

[Handwritten:]

On Page 5, Numeral 17, I replaced, in my handwriting, the name of Judge Efraín Novillo with that of Germán Yánez.
[Page 6, Numeral 17 in the English translation.]

EXHIBITS --

[Signature]                                   [Fingerprint]
Dec. 6 – 12
12:35 p.m.



[This stamp of the Third Notary Public's Office of Cartagena, Colombia, appears on all 13 pages of the original Spanish document, on the lower right corner.]

## *RIVERA   INTERPRETING,   INC.*

*Tel. 310.621.7683* ■ *jrivera62@yahoo.com* ■ *Fax 818.341.8958*

Dec. 10, 2012

### Re: DECLARATION OF RAMIRO FERNANDO REYES CISNEROS

To Whom It May Concern:

I, Jesús Rivera, affirm that I am a certified judicial interpreter and translator of the Spanish and English languages. I am certified by:

- The Judicial Council of the State of California, since 2000,
- The Administrative Office of the U.S. Courts, since 2006,
- The American Translators Association (English ↔ Spanish) since 2008.

I affirm that on Dec. 10, 2012, as contracted by Gibson, Dunn & Crutcher LLP, I finished translating from the Spanish into the English language a 16-page document titled "DECLARATION OF RAMIRO FERNANDO REYES CISNEROS," and that said translation is true and accurate to the best of my ability.

Sincerely,

Jesús Rivera

YO, RAMIRO FERNANDO REYES CISNEROS, declaro lo que sigue a continuación:

1.     Soy ciudadano ecuatoriano, nacido en Quito, Ecuador, el REDACTED y domiciliado en la calle REDACTED con cédula de identidad número REDACTED Declaro que soy mayor de 18 años y que no tengo ningún impedimento físico ni mental. Tengo conocimiento personal de los hechos expuestos en este documento, y si soy llamado a testificar sobre estos hechos, lo haría y puedo declarar lo mismo.

2.     No he pedido o recibido, ni se me ha ofrecido, dinero u otra recompensa, ni he recibido promesas o compromisos de ninguna compensación en el futuro, a cambio de firmar esta declaración juramentada.

3.     Soy ingeniero especializado en las áreas de Petróleos y Ambiental. Recibí mi título de ingeniería en petróleos de la Universidad Central del Ecuador, Escuela de Ingeniería en Geología, Minas, Petróleos y Ambiental ("Escuela de Ingeniería en Geología, Minas, Petróleos y Ambiental") en Quito, Ecuador, en 1978. En 1983 obtuve una maestría en ingeniería de producción de petróleo de la Escuela de Ingeniería en Geología, Minas, Petróleos y Ambiental. En 1988 recibí un postgrado en Control Ambiental del Desarrollo Industrial en la Universidad Estatal de Gante, Bélgica

4.     He trabajado en el área de los hidrocarburos con el Gobierno, en la industria privada, y como consultor independiente  He aquí un resumen de mi historial de empleo: De 1975 a 1987, trabajé como ingeniero de petróleos en el Ministerio de Recursos Naturales y Energéticos, hoy llamado Ministerio de Recursos Naturales no Renovables. Posteriormente, entre 1987 a 1992, me desempeñé como Director de Leyes y Reglamentos Ambientales de la Dirección Nacional de Protección Ambiental (DINAPA) del mismo Ministerio, y en 1992, trabajé como Director Nacional de Protección Ambiental en el mencionado Ministerio. De 1992 a 1995, trabajé como Coordinador de Medio Ambiente en Maxus Ecuador Inc. De 1996 al 2000, ocupé como la Gerencia de Medio Ambiente en Fugro-Petrokem y en ENSR, compañías de consultoría ambiental, y luego por un corto tiempo en el 2000, trabajé como Presidente Ejecutivo de PENSERTEC. Del 2000 al 2004, fui Director del Centro de Recuperación Mejorada de Petróleo (CERMEP por sus siglas en español) en la Universidad Central del Ecuador. Del 2004 al 2007, trabajé como consultor independiente para una variedad de clientes, y en el 2007, trabajé en Petroproducción como Coordinador del Proyecto de Recuperación Mejorada de Petróleo. Desde 1988 hasta la fecha, soy profesor de la catedra de Recuperación Mejorada de Petróleo, en la Escuela Petróleos de la Facultad de Geología Minas, Petróleo y Ambiental de la Universidad Central del Ecuador.

5.     Actualmente estoy contratado como Ingeniero de Petróleos por Ivanhoe Energy Ecuador, que está desarrollando un bloque de producción de petróleo extra pesado conocido como Proyecto de Pungarayacu en el Ecuador.

6.     He publicado dos libros. El primero en el año 1999 y se titula "Perspectivas de la Recuperación Mejorada en el Ecuador". En noviembre del 2005, publiqué mi libro más reciente, titulado "Petróleo, Amazonía y



Capital Natural". También he publicado más de 30 artículos relacionados con la industria del petróleo y el control ambiental.

7.    Mi primera participación en el tema de las actividades de Texaco en Ecuador fue en 1987, cuando conocí a Judith Kimerling. En ese momento yo era Director de Normas y Reglamentos Ambientales de la Dirección Nacional de Protección Ambiental (DINAPA) del Ministerio de Recursos Naturales y Energéticos, y la Srta. Kimerling me visitó en mi oficina para discutir el proyecto de investigación que ella estaba realizando sobre el impacto socio ambiental de la producción de petróleo en el Ecuador. En ese momento yo estaba preocupado por el tema de remediación ambiental, como lo sigo estando actualmente, y visualicé el proyecto de la Srta. Kimerling como una oportunidad para romper el silencio oficial de parte del Gobierno sobre el tema. Asesoré a la Srta. Kimerling con el análisis de los datos técnicos sobre la explotación petrolera en el Oriente ecuatoriano, que ella posteriormente utilizó para su libro titulado "Crudo Amazónico" ("Amazon Crude" en inglés), publicado en 1990.

8.    Unos años después, en 1996, me involucré en el tema Texaco en Ecuador, cuando trabajé como perito para una compañía de consultoría geotécnica llamada Fugro McClelland  Fugro estaba involucrada en la supervisión de las actividades de remediación ambiental en el área correspondiente a la concesión del consorcio Petroecuador-Texaco, que estaba siendo llevada a cabo como parte del acuerdo entre el gobierno de Ecuador y Texaco en ese momento. Desde entonces me mantuve informado de las diferentes demandas ambientales entabladas en contra de Texaco.

9.    Aproximadamente en el año 2003 o 2004, no recuerdo exactamente el año, conocí al abogado de los demandantes del litigio en contra de Chevron, llamado Alberto Wray. En la reunión él me pidió que sirviera de una especie de testigo pericial acerca de las actividades de Texaco en el Oriente. Yo no quería involucrarme en el litigio entonces pedí que me pagaran un honorario de 30,000 dólares por mis servicios profesionales, una suma de dinero que yo sabía que el abogado de los demandantes no iba a aceptar, lo cual efectivamente ocurrió.



10.   Posteriormente, a finales del 2005, conocí a Fausto Peñafiel, quien trabajaba como consultor para los abogados de los demandantes en el caso contra la Chevron en Lago Agrio, Ecuador. El 16 de noviembre del 2005, realicé el lanzamiento de mi libro "Petróleo, Amazonía y Capital Natural" en la Casa de la Cultura Ecuatoriana, en Quito. Al evento asistieron muchas personas, entre ellas Sr. Peñafiel quien estaba en compañía de Steven Donziger. Adjunto a esta declaración juramentada, las fotos del Sr. Donziger y el Sr. Peñafiel firmadas por mí, como Anexos A y B, respectivamente. Posteriormente, en el cocktail que hicimos como parte de la presentación del libro, el Sr. Peñafiel me presentó al Sr. Donziger y me explicó que el Sr. Donziger era un abogado americano para los demandantes en el caso en contra de Chevron. Nos estrechamos la mano y hablamos brevemente. La publicación de mi libro fue un acontecimiento importante en mi carrera, ya que me lanzó a la luz pública y me consagró como un reconocido experto en el tema del desarrollo de la industria del petróleo en el Ecuador y de sus impactos ambientales. Esa misma noche, el presidente del Colegio de Ingenieros en Geología, Minas, Petróleo y Ambiental (CIGMYP), Gustavo Pinto, quien también estaba en el



2

evento, me dijo que el Sr. Donziger y el Sr. Peñafiel le habían solicitado coordinar una reunión para el día siguiente, con el Sr. Pinto y conmigo, para discutir el caso Chevron. Yo acepté tener la reunión.

11. Al día siguiente del lanzamiento de mi libro, el 17 de noviembre del 2005, el Sr. Peñafiel, el Sr. Donziger, el Sr. Pinto y yo nos reunimos en la antigua sede del CIGMYP, en el segundo piso del edificio Río Amazonas, ubicado en la Avenida Amazonas N21-147 y Roca. Adjunto a esta declaración juramentada copia firmada por mí de mis anotaciones sobre esa reunión, como Anexo C. En la reunión, el Sr. Donziger y el Sr. Peñafiel explicaron que había contradicciones entre los diferentes informes periciales entregados por los abogados de los demandantes y por los abogados de Chevron en el caso, y que la Corte había designado un tercer grupo de expertos, denominados "peritos dirimentes", quienes eran independientes de las partes. Los peritos dirimentes iban a emitir un informe sobre la inspección judicial de Sacha 53, y el Sr. Donziger propuso la idea de traer a una "institución independiente" para hacer una veeduría del trabajo de los peritos dirimentes. Es por eso que anoté en mi agenda de esa fecha: "Buscando formar un grupo de 'veedores' independientes". Dado su conocimiento en temas de ingeniería ambiental, el CIGMYP entregaría una evaluación "imparcial y calificada" de la inspección judicial de Sacha 53.

12. Durante la mañana del 23 de noviembre del 2005, tuvimos una segunda reunión por una hora más o menos, con el Sr. Donziger, el Sr. Peñafiel, el Sr. Pinto y yo. Nos reunimos en el mismo sitio de antes, en la antigua sede del CIGMYP, en la oficina de Gustavo Pinto. Adjunto a esta declaración juramentada copia firmada por mí de mis anotaciones sobre esa reunión, como Anexo D. En esta reunión, acordamos que Gustavo Pinto y yo dirigiríamos la "veeduría independiente" de los peritos dirimentes bajo los auspicios del CIGMYP. También acordamos que los demandantes nos pagarían para llevar a cabo este trabajo una comisión a Gustavo Pinto y a mí por nuestros servicios profesionales, más el ofrecimiento de la entrega de un bono en el caso de que los demandantes ganen el juicio. Gustavo Pinto se encargó del acuerdo económico directamente con el Sr. Donziger, estoy seguro que recibí un pago de parte del Sr. Pinto por este trabajo, pero no recuerdo la cantidad. Nunca existió un contrato formal entre CIGMYP, el Sr. Pinto, yo, el Sr. Donziger, o el Sr. Peñafiel, y se acordó por todos los participantes en la reunión que el pago de los demandantes al CIGMYP, al Sr. Pinto y a mí por hacer esta veeduría, permanecería en secreto. En la reunión el Sr. Donziger y el Sr. Peñafiel nos pidieron al Sr. Pinto y a mí que nos reuniéramos con el grupo de "peritos dirimentes" designados por la Corte, encabezados por el ingeniero Johnny Zambrano. Se suponía que les comunicáramos sobre la veeduría del CIGMYP, y que supervisaríamos su análisis como peritos dirimentes. Según recuerdo basado en las anotaciones de mi agenda, en esa reunión acordamos escribir una carta al ingeniero Johnny Zambrano estableciendo que el CIGMYP había iniciado esta veeduría del informe de Sacha 53 a partir del 17 de noviembre del 2005. El propósito de esa carta era darle carácter oficial a la veeduría. La anotación de mi agenda en esa fecha dice "Carta diciendo jueves 17 directorio CIGMYP resolvió instalar una veeduría técnica científica proceso de remediación de juicio Texaco. Invitarles a reunión de trabajo. Conocedor de su designación como perito dirimente, expresamos respaldo al desarrollo enmarcados en ética profesional y resultados técnicos".



3

13.     Como se había acordado, el 29 de noviembre del 2005, el Sr. Pinto y yo hicimos una reunión con los peritos dirimentes en la oficina del Sr. Zambrano. No recuerdo exactamente donde estaba ubicada su oficina, pero creo que era en la avenida 12 de Octubre frente a la Universidad Católica. Adjunto a esta declaración juramentada copia firmada por mí de mis anotaciones sobre esa reunión, como Anexo E. La reunión fue rápida en la mañana, por un máximo de una media hora. Discutimos sobre el informe de la inspección de Sacha 53 en el cual ellos estaban trabajando, y les preguntamos cuándo podrían entregarnos a los veedores un borrador del informe. Nunca lo entregaron, por lo menos no a mí. La reunión se centró en la revisión de los temas técnicos de la movilidad del petróleo y fue básicamente para revisar los aspectos técnicos del informe que los peritos dirimentes estaban preparando sobre Sacha 53.

14.     En enero del 2006, el Sr. Pinto y yo continuamos nuestro trabajo de la veeduría. La anotación en mi agenda para el 9 de enero del 2006, dice: "Cartas caso Texaco 1 y 2". Esa anotación en mi agenda se refiere a una conversación con el Sr. Pinto sobre la necesidad de escribir unas cartas certificando nuestro nombramiento como veedores en el caso Chevron. Adjunto a esta declaración juramentada copia firmada por mí de mis anotaciones sobre esa conversación, como Anexo F. Una de estas cartas fue enviada al Doctor German Yánez, Presidente de la Corte de Sucumbíos, el 20 de enero del 2006. La carta presentada a la Corte mostraba nuestras credenciales y el papel que estaríamos cumpliendo en el proceso, citando las funciones del CIGMYP y varias leyes ecuatorianas relacionadas con la transparencia y la participación pública. En esta carta le informamos al Doctor Yánez, que la Junta Directiva del CIGMYP había determinado en la Sesión Ampliada del 22 de noviembre del 2005 que, como asociación profesional, el CIGMYP estaba legitimado bajo la ley ecuatoriana para ser un grupo veedor en el caso. La carta delegada a Gustavo Pinto como líderes de esta organización, y a mí como su colaborador, la responsabilidad de dirigir esta veeduría, describiéndonos como reconocidos profesionales con "vasta y amplia experiencia" en temas de ingeniería petrolera y ambiental. En la carta también se solicitaba a la Corte que nos otorgara acceso a los materiales relevantes del caso. La carta fue escrita en papel con membrete del CIGMYP y firmada por el Sr. Pinto en su calidad de Presidente del grupo colegiado. Adjunto a esta declaración juramentada copia firmada por mí de esta carta, como Anexo G.

15.     En este momento, es importante aclarar que ni el Sr. Pinto ni yo, le informamos al juez o a la demandada, Chevron, que el CIGMYP, y por consiguiente nosotros, estamos siendo pagados por los demandantes para elaborar esta veeduría. El Sr. Pinto y yo acordamos con el Sr. Donziger en mantener en secreto la naturaleza de nuestro acuerdo con él, ya que todos discutimos que la divulgación del acuerdo supondría un perjuicio para la imagen de CIGMYP como una organización independiente e imparcial. El Sr. Donziger nos informó que su objetivo era generar la imagen de una veeduría "independiente de las partes", para que fuera recibida con deferencia y atención por la Corte.



16.     El 18 de enero del 2006, hubo una reunión con el Sr. Pinto, el Sr. Peñafiel, Bill Powers y yo para el mismo tema de la veeduría en el caso. Adjunto a esta declaración juramentada copia firmada por mí de mis anotaciones sobre esa reunión, como Anexo H. La reunión fue en la mañana por una hora, en la sala de juntas de la Presidencia del CIGMYP. Fue la primera vez que vi al Sr Powers, quien era un ingeniero de California



contratado por los demandantes. En esa reunión discutimos una serie de temas técnicos relacionados con el caso. También discutimos la necesidad de que el Sr. Pinto y yo tuviéramos una serie de reuniones para presentarnos como veedores de la inspección realizada por los peritos en el Sacha 53 con: el perito dirimente nombrado por la corte, Johnny Zambrano, el juez del caso Chevron; y con los representantes de Chevron. La anotación en mi agenda de esta fecha hace referencia a la planificación de estas reuniones.

17.    En algún momento después de la reunión del 18 de enero del 2006, en una fecha que no recuerdo exactamente, el Sr. Pinto y yo nos reunimos con el juez Efraín Neville, quien para ese entonces era el nuevo juez del caso Chevron. Nos reunimos con el juez Novillo en el Consejo Nacional de Sustancias Sicotrópicas en Quito. El juez nos recibió por sólo unos pocos minutos, en los cuales el Sr. Pinto y yo le explicamos la veeduría del CIGMYP y le dijimos que queríamos involucrarnos en el caso. El juez no expresó ningún interés en lo que le estábamos exponiendo en relación con el caso.

18.    El 31 de enero del 2006 el Sr. Pinto y yo nos reunimos nuevamente con los peritos dirimentes. Los participantes en la reunión eran el Sr. Zambrano, Jorge Jurado, el Sr. Pinto y yo. Adjunto a esta declaración juramentada copia firmada por mí de mis anotaciones sobre esa reunión, como Anexo I. La reunión se hizo en la oficina de Johnny Zambrano. Discutimos varios temas técnicos relacionados al caso, pero en un momento el Sr. Jurado nos pidió que identificáramos exactamente los textos de la ley que amparaban que el CIGMYP hiciera esa veeduría. También se negaron a darnos una copia de su informe de Sacha 53, y nos indicaron que contactáramos a la secretaria de la Corte en Sucumbíos, Liliana Suárez, para obtener una copia del informe. Esta es la razón por la cual está anotado el nombre de Liliana Suárez y su número de teléfono en mis anotaciones de esa fecha, a pesar de que ella no estuvo presente en la reunión.

19.    El día siguiente, el 1 de febrero del 2006, fue presentado a la Corte el informe de los peritos dirimentes sobre el Sacha 53. En febrero y marzo del 2006 tuve varias reuniones con los demandantes y el Sr Donziger para el tema de Sacha 53. De acuerdo a mi agenda, estas reuniones fueron el 23 de febrero, y el 6 de marzo del 2006. Adjunto a esta declaración juramentada copia firmada por mí de mis anotaciones sobre estas reuniones, como Anexos J, y K. También durante este periodo de tiempo pasé dos días de trabajo de campo, el 8 y 9 de marzo del 2006, en la inspección judicial de Sacha Sur. Adjunto a esta declaración juramentada copia firmada por mí de mis anotaciones sobre estas reuniones, como Anexos L y M. Las reuniones en este periodo de tiempo eran de temas técnicos relacionados con la veeduría del CIGMYP y el informe de Sacha 53. En estas reuniones el Sr. Donziger estaba muy molesto por el resultado del informe de los peritos dirimentes y se quejó que ese informe apoyaba la posición de Chevron y no apoyaba la posición de los demandantes. Recuerdo también que en algún momento durante estas reuniones conocí a Pablo Fajardo y a Luis Yanza; ámbos miembros del equipo de los demandantes. Por lo menos una de estas reuniones tuvo lugar en las oficinas de los demandantes en Quito que estaba localizada en una casa en José de Abascal E12A-143 y Portete. Adjunto a esta declaración juramentada las fotos de Pablo Fajardo, Luis Yanza, firmadas por mí, como Anexos N, y O respectivamente.



20.    En una de las reuniones con el Sr. Donziger y los demandantes, el Sr. Pinto y yo les mostramos una copia de nuestros comentarios al informe de los peritos dirimentes sobre Sacha 53, que el Sr. Donziger nos había encargado preparar. Ese es el informe que el Sr. Donziger quería que enviáramos a la Corte con papel timbrado de CIGMYP. En nuestras discusiones, el Sr. Donziger nos había dicho que nuestro informe debía establecer que las conclusiones del informe de los peritos dirimentes sobre el Sacha 53 estaban erradas, que carecían de objetividad y estaban inclinadas hacia Chevron, y que por eso el informe no podía ser tenido en cuenta. Ahora bien, en mi criterio profesional las evidencias no apoyaban la opinión del Sr. Donziger y yo no podía amoldar mi opinión profesional a los intereses de los demandantes. En el informe de veeduría el Sr. Pinto y yo señalamos que los peritos dirimentes no habían seguido estrictamente su mandato legal, pero concluimos que ellos habían entregado en su reporte suficientes elementos para que la Corte tomara una decisión. En el informe también establecimos que tanto la información presentada por los demandantes y por los demandados tenía elementos acertados, pero que ambos tenían limitaciones en la información de las muestras. El Sr. Donziger expresó que estaba decepcionado con nuestro informe y nunca nos pidió que se lo entregáramos a la Corte. Adjunto a esta declaración juramentada copia del borrador del informe que escribimos, como Anexo P. También recuerdo que en esta reunión el Sr. Donziger sugirió que el Sr. Pinto y yo nos reuniéramos con el Juez nuevamente para ofrecerle nuestra participación como peritos dirimentes. El Sr. Donziger nos dijo que el Juez vendría a Quito la semana siguiente. No obstante, esta reunión con el Juez nunca se llevó a cabo.

21.    Después de esto, no me comuniqué más ni con el Sr. Donziger ni con los otros abogados de los demandantes por varios meses, hasta que una tarde en la que estaba manejando de regreso a mi casa en el Valle de los Chillos, recibí una llamada del Sr. Yanza en mi celular en la que me pidió que fuera en ese momento a reunirme con él en la oficina de ellos en Quito, que yo conocía como la oficina de la Amazonía por la Vida. Les dije que acababa de llegar a mi casa y que no quería regresar a Quito, pero él fue muy insistente, así que regresé a la oficina de los demandantes donde el Sr. Yanza y el Sr. Fajardo me estaban esperando. Esta fue la primera reunión con los representantes de los demandantes que no tuvo nada que ver con Sacha 53. De acuerdo con las anotaciones en mi agenda, esta reunión fue el 20 de septiembre del 2006. Adjunto a esta declaración juramentada copia firmada por mí de mis anotaciones sobre esa reunión, como Anexo Q.

22.    Los Sres. Fajardo y Yanza comenzaron la reunión diciéndome que el Juez en el caso Chevron había decidido detener el proceso de las inspecciones judiciales y los peritos dirimentes, y en su lugar, iba a asignar a un solo perito con la responsabilidad de realizar una evaluación global de los daños y perjuicios (peritaje global) para el caso. La idea de utilizar solamente a un perito para realizar el peritaje global fue un tema que el Sr. Donziger había discutido conmigo algunos meses atrás, enero del 2006. Adjunto a esta declaración juramentada copia firmada por mí de mis anotaciones de esta reunión con el Sr. Donziger del 26 de enero de 2006, como Anexo R. Entre estas dos reuniones, los Sres. Donziger, Fajardo y Yanza, me explicaron que tener un solo perito para llevar a cabo la valoración el peritaje global era importante para ellos ya que ellos reconocían que el proceso de inspecciones judiciales no había resultado en información contundente que apoyara sus alegatos sobre los niveles de contaminación. También dijeron que creían que era más fácil controlar a un solo perito que controlar a muchos. En la reunión del 20 de septiembre del 2006, los Sres. Fajardo y Yanza me

dijeron que ellos traían una propuesta del Sr. Donziger para que yo fuera quien ocupara la posición de perito en el peritaje global. Nosotros conversamos sobre el concepto general del peritaje global, su duración, el pago por este trabajo, incluyendo el hecho de que mis honorarios como perito, según ellos, serían pagados 50% por Chevron y 50% por los demandantes. Esta fue la primera vez que conversé detalladamente con los demandantes sobre los temas del peritaje global. La reunión no duró más de 30 minutos.

23.     Durante los siguientes meses, entre octubre del 2006 y marzo del 2007, tuve varias reuniones y llamadas telefónicas con los Sres. Donziger, Fajardo, Yanza, y otros miembros del equipo de los demandantes relacionadas con el peritaje global. Durante estas conversaciones, recuerdo que los Sres. Donziger, Yanza, y Fajardo siempre hablaban muy seguros de que el tribunal nombraría a un solo perito para llevar a cabo la evaluación de los costos de la remediación y, sobre todo, que ese perito sería alguien que ellos eligieran. Los Sres. Donziger, Fajardo, y Yanza me dijeron que no me preocupara por eso. Yo asumí que esto se debía al hecho de que ellos tenían muy buenas conexiones con la administración entrante del Presidente Correa. Por ejemplo, Esperanza Martínez miembro de Acción Ecológica, una organización muy importante que apoyó el caso de los demandantes contra Chevron, tenía una relación muy cercana con Alberto Acosta, quien era uno de los líderes de la campaña del Presidente Correa y quien posteriormente se convirtió en el Ministro de Energía y Minas. Adjunto a esta declaración juramentada las fotos de la Sra. Martínez y el Sr. Acosta, firmadas por mí, como Anexos S y T, respectivamente.

24.     No tengo anotaciones en mi agenda que sean de reuniones con los demandantes durante octubre y noviembre del 2006, pero recuerdo que durante ese período tuve un par de conversaciones telefónicas con el Sr. Donziger en las cuales discutimos el peritaje global. No tengo exactamente la fecha de eso, pero tengo claro que ocurrieron. En esa época yo estaba ocupado trabajando en otros proyectos, por eso no le dedicaba mucho tiempo al tema del caso Chevron. También recuerdo que durante esta etapa fui invitado por los demandantes a una reunión en Oriente. Quien me invitó fue Esperanza Martínez de Acción Ecológica, a quien yo conocía hacía tiempo debido a mi trabajo. La reunión tuvo lugar en una misión religiosa llamada Los Capuchinos, cerca de Lago Agrio, Ecuador. Recuerdo que estábamos presentes Esperanza Martínez, Adolfo Maldonado (también de Acción Ecológica), el Sr. Yanza, Julio Prieto, un médico español llamado Carlos Martín Beristain, y yo. Yo no volví a ver al Sr. Beristain después de esa reunión. El propósito de la reunión era discutir la metodología a utilizarse en el peritaje global. Yo era en esa reunión la única persona que había sido perito en temas de impacto ambiental y por eso les di una explicación técnica a los asistentes de la reunión. No recuerdo exactamente la fecha de esa reunión, pero creo que fue en octubre del 2006. Adjunto a esta declaración juramentada las fotos del Sr. Maldonado, el Sr. Prieto y el Sr. Beristain, firmadas por mí, como Anexos U, V, y W respectivamente.

25.     En la mañana del viernes 15 de diciembre del 2006 tuve una reunión de una hora con el Sr. Donziger en la oficina de Amazonia por la Vida, de la que me acuerdo muy bien. Adjunto a esta declaración juramentada copia firmada por mí de mis anotaciones sobre esa reunión, como Anexo X. El Sr. Donziger estaba vestido de camisa blanca con las mangas remangadas, blazer azul y jeans, su atuendo habitual. Él se vestía así

casi en todas la reuniones con variables en el color de la camisa y a veces se ponía pantalón en vez de jeans. Pero no recuerdo haberlo visto nunca con corbata o vestido con ropa formal. Como de costumbre, era muy simpático y muy sociable. En ese encuentro el Sr. Donziger me hizo el ofrecimiento directo y con detalles para que yo fuera el perito para el peritaje global. Me explicó que el tribunal había interrumpido las inspecciones judiciales a petición de los demandantes y que tan pronto como la siguiente semana, se asignaría a un perito para comenzar el peritaje global. En esa reunión el Sr. Donziger también me explicó lo que se esperaba de mí en el rol de perito. El Sr. Donziger me enfatizó en la necesidad de declarar que Chevron era el único responsable de los daños ambientales y los perjuicios a la comunidad local. También hablamos de la tasación de los daños y perjuicios, y el Sr. Donziger me dijo que como perito yo sería el responsable de presentar al tribunal un estimado de los costos. Me preguntó directamente si yo estaba dispuesto a estimar daños por encima de mil millones de dólares. Recuerdo que le contesté que podía ser posible. El Sr. Donziger también me dijo que el monto que se estableciera como daños y perjuicios se tenía que multiplicar por 3,5 para que llegáramos a hablar de miles de millones, pero nunca entendí el por qué y él tampoco me lo explicó. Después tuve dudas sobre estos requisitos, pero en aquel entonces estaba interesado en la idea de ocupar un rol importante en lo que era el caso más trascendente en el mundo relacionado con el petróleo y el medio ambiente, porque es exactamente el área de mi especialidad.

26.     En esa misma reunión del 15 de diciembre del 2006, recuerdo que cuando ya estábamos solos el Sr. Donziger y yo, le manifesté que habían asuntos que podrían impedir que yo ejerciera como perito, o que Chevron usaría para atacarme, siendo los más importantes: 1) por haber mantenido en mi libro una posición de corresponsabilidad entre el gobierno ecuatoriano y Texaco por impactos ambientales, lo cual podría ser usado en mi contra si, como perito, hacía lo que los abogados de los demandantes querían que era hallar a Chevron como el único responsable; y 2) porque en 1996 fui perito para una compañía llamada Fugro que estaba involucrada en la remediación de Shushufindi, que fue un campo operado por Texaco. El Sr. Donziger desechó los argumentos que le di y me dijo que nada de eso me impediría ser perito, que no me preocupara y que no podía dejar de ayudarles a ellos, los demandantes. La reacción del Sr. Donziger fue típica, ya que él siempre era muy persistente e impulsivo, una de esas personas que no admite un no. Pero de todas maneras, el tema no quedó decidido en esa reunión y yo quedé con muchas dudas de qué tan real podía ser la propuesta de los demandantes. Poco después de la reunión el Sr. Donziger regresó a los Estados Unidos y no volvimos a hablar del tema hasta el siguiente mes.

27.     El 5 de enero del 2007, tuve una conversación con el Sr. Fajardo. Adjunto a esta declaración juramentada copia firmada por mí de mis anotaciones sobre esa reunión, como Anexo Y. No recuerdo si fue una reunión en persona o una llamada telefónica. En la conversación el Sr. Fajardo me explicó con más detalles la propuesta que yo fuera el perito del peritaje global, en específico de los términos económicos por mis servicios profesionales De acuerdo a mis anotaciones de la reunión, la propuesta del Sr. Fajardo era que se me iba a pagar unos honorarios de 3,000 dólares mensuales, más un bono de 15,000 dólares por escribir el informe. Mis notas incluyen la dirección de correo electrónico del Sr. Fajardo que es pafam@ecuanex.net ec. También recuerdo que durante enero, tuve una conversación telefónica con el Sr. Donziger sobre el tema del peritaje

global. No nos reunimos en persona en enero ya que durante gran parte del mes estuve trabajando en un proyecto en Perú que necesitaba de toda mi atención.

28.    El 1 de febrero del 2007, me reuní con varios miembros del equipo legal de los demandantes. No recuerdo exactamente donde pero creo que la reunión fue en la oficina de Amazonía por la Vida. Mis notas de esa reunión indican que fue una reunión de trabajo detallada donde se discutió a fondo los temas técnicos de la metodología del peritaje global. Adjunto a esta declaración juramentada copia firmada por mí de mis anotaciones sobre esa reunión, como Anexo Z. Esta fue una de varias reuniones que tuve con el equipo legal y técnico de los demandantes en preparación para el peritaje global. Las anotaciones de mi agenda revelan que en esta reunión se discutió ampliamente el tema de los costos de reparación que serían presentados en el informe de peritaje global. De esta discusión en la reunión era claro que el equipo de los demandantes estaba preparando una estrategia técnica y legal para que el peritaje global asumiera de partida que Chevron era la única responsable de pagar reparaciones. La idea principal de los demandantes para el peritaje global era hacer una valoración del impacto ambiental *ex-post facto* que justificara una indemnización monetaria de gran cuantía en contra de Chevron por la remediación y reparación.

29.    Poco después de esa reunión, no recuerdo con exactitud la fecha, pero fue en los primeros días de febrero, tuve una conversación con el Sr. Donziger en la cual me comentó que el juez del caso de Lago Agrio estaba poniendo trabas para que me nombraran como perito. El Sr. Donziger me dijo que había un requisito, que yo no conocí previamente, que el perito del peritaje global debía ser seleccionado de una lista de peritos que habían servido en uno de los trabajos de peritazgo anteriores del caso. Mi participación en el monitoreo de CIGMYP no cumplía con estos requisitos y yo no estaba en la lista. Cuando el Sr. Donziger me comentó esto, él me dijo que no me preocupara ya que él iba a lograr que fuera yo el perito. Por mi parte, tenía una mezcla de sentimientos. Al inicio había estado interesado con la idea de ser perito ya que siempre me ha apasionado el tema de la protección y reparación ambiental en la Amazonía. Pero al acercarse el momento, me sentía cada vez más incómodo, especialmente por la insistencia de los demandantes de que Chevron fuera la única parte responsable, ya que en mi libro, que había sido el logro profesional más importante de mi carrera hasta ese momento, yo sostengo la tesis que existe corresponsabilidad entre el Estado y la ex operadora Texaco en los daños ambientales y sociales ocasionados en la Amazonía. Además, en nuestras conversaciones sobre el peritaje global, los abogados de los demandantes continuaron incrementando el monto de los daños que querían que el perito estableciera en contra de Chevron, hasta llegar a hablar de montos tan elevados como $10 mil millones de dólares, lo cual yo consideraba totalmente disparatado. Por eso me sentí aliviado cuando el Sr. Donziger me dijo que el juez estaba poniendo problemas para que yo sirviera como perito, pero el Sr. Donziger continuó diciéndome que no podía renunciar y tenía que seguir ayudando a los demandantes.



30.    Recuerdo que en los primeros días del mes de febrero del 2007, tuvimos varias llamadas para discutir cómo responder a la crisis, y era evidente en estas conversaciones que el problema del nombramiento del perito pareció sorprender a los demandantes. En algún momento de esos días, el Sr. Donziger me llamó telefónicamente y me pidió que le recomendara a una persona para un posible plan B de perito, quien pudiera

manejar el asunto y que me remplazara a mí por si las cosas no salían como el Sr. Donziger quería con el juez. Durante la llamada, no recuerdo exactamente la fecha, el Sr. Donziger y yo discutimos la posibilidad de que Richard Cabrera fuese nombrado perito si la Corte no me aceptaba a mí. Yo les había dado el nombre del Sr. Cabrera a los demandantes originalmente en 2006, pero dudé mucho en dar el nombre del Sr. Cabrera como posible perito y le presenté su nombre al Sr. Donziger, como decimos en Ecuador, "a la cansada", es decir, con mucha reserva. Conozco al Sr. Cabrera desde la universidad, y sabía que tenía ciertas limitaciones técnicas relacionadas a la industria del petróleo y ese momento no poseía la capacidad profesional y experiencia suficiente para manejar un proyecto como el peritaje global en el caso Chevron. Pero, por otro lado, recomendé al Sr. Cabrera porque es un tipo introvertido, trabajador y responsable para el trabajo de campo en el Oriente. También porque consideraba que para el Sr. Cabrera no eran tan importantes los temas de la independencia y los estándares profesionales, y por lo tanto no tendría ningún problema en hacer lo que estaban proponiendo los demandantes. En ese sentido, creí que el Sr. Cabrera podía ser la persona indicada para ese trabajo. Pero tampoco tenía otro nombre para darle al Sr. Donziger y él me estaba presionando demasiado ya que él estaba desesperado. El Sr. Donziger de todas maneras me agradeció y me dijo que yo seguía siendo el plan A y que iba a arreglar las cosas con el juez, pero me sentí aliviado al poder darle otro nombre y salir cada vez más de ese proceso.

31.    El Sr. Donziger me pidió que le presentara al Sr. Cabrera y organicé una reunión que tuvo lugar el 9 o 10 de febrero del 2007, en el Hotel Quito, donde siempre se hospedaba el Sr. Donziger. No almorzamos, sino que nos tomamos un trago. Yo pedí un whiskey, al igual que el Sr. Cabrera. El Sr. Donziger no pidió nada. En esta reunión, los Sres. Cabrera y Donziger escribieron sus direcciones de correo electrónico con su propia letra en mi agenda. Adjunto a esta declaración juramentada copia firmada por mí de mis anotaciones sobre esa reunión, como Anexo AA. El objetivo de la reunión era meramente social, para que el Sr. Donziger tuviera la oportunidad de conocer al Sr. Cabrera, pero también se discutieron varios aspectos del peritaje global. En ese momento se habló de que yo, por medio de Richard Cabrera, siguiera asesorando y apoyando tras bastidores en los aspectos técnicos del peritaje global. En general el Sr. Donziger dijo que yo iba a seguir trabajando "desde la sombra" con la idea de revisar los informes del Sr. Cabrera.

32.    En esa misma época y como seguimiento a esa reunión de presentación, recuerdo que tuvimos varias llamadas telefónicas con los Sres. Donziger y con Cabrera, sobre el peritaje global, y especialmente sobre mi participación y la del Sr. Cabrera. Las anotaciones en mi agenda del 24 de febrero del 2007 reflejan la idea del peritaje global y de que yo iba a ser como "una sombra técnica" en el trabajo del Sr. Cabrera. Adjunto a esta declaración juramentada copia firmada por mí de mis anotaciones sobre esa reunión, como Anexo BB. Si bien recuerdo, en esa fecha tuvimos una llamada telefónica con el Sr. Donziger ya que él no estaba en Ecuador. El Sr. Donziger dijo que el Sr. Cabrera, mencionado en la agenda como "our friend" ["nuestro amigo"] recibiría mi asesoría y supervisión con sus informes, en lo que mi anotación se refiere como "my help" ["mi ayuda"]. Estar "en la sombra" significaba revisar todo lo que hacía el Sr. Cabrera en la parte técnica del proyecto. Se suponía que yo iba a recibir informes periódicos, y supuestamente iba a tener una paga de 1,500 dólares al mes por mis servicios profesionales. Eso fue lo que me dijo el Sr. Donziger y creo que recibí dos pagos mensuales. A medida



que estas conversaciones continuaron, el Sr. Donziger se iba sintiendo más cómodo con la idea de que el Sr. Cabrera fuera el perito.

33.     También recuerdo otra reunión durante esta época con los Sres. Donziger, Cabrera, Yanza y Fajardo. Esta reunión fue en un restaurante llamado Mister Bagel en la Avenida Portugal, donde los cuatro tomamos desayunos. No recuerdo la fecha de esa reunión y creo que no hice anotaciones en mi agenda al respecto. Recuerdo que me llamó Richard y él me dijo que me estaban esperando en ese lugar. Entonces fui y me reuní con ellos para hablar del peritaje global, pero no recuerdo con exactitud los detalles de la conversación.

34.     El 3 de marzo del 2007, participé en una reunión muy importante acerca del peritaje global en la oficina de Amazonia por la Vida en Quito. Adjunto a esta declaración juramentada copia firmada por mí de mis anotaciones sobre esa reunión, como Anexo CC. La reunión comenzó en la mañana y duró todo el día, con almuerzo que se había pedido. Había por lo menos unas doce personas en la reunión, incluyendo a los Sres. Donziger, Fajardo, Yanza, Prieto y otros miembros del equipo legal y técnico de los demandantes. Había también varios especialistas técnicos americanos que estaban ayudando a los demandantes, incluyendo a Charlie Champ, Ann Maest, y Dick Kamp. Fui a esta reunión con el Sr. Cabrera. Adjunto a esta declaración juramentada las fotos, firmadas por mí, del Sr. Champ, la Srta. Maest, y el Sr. Kamp, como Anexos DD, EE, y FF, respectivamente.

35.     Esta reunión fue el momento en que realmente reconocí completamente las intenciones de los abogados de los demandantes con respecto al peritaje global. En la reunión los Sres. Fajardo, Yanza y Donziger dejaron a un lado la apariencia de que el Sr. Cabrera actuaría de forma independiente para escribir un informe pericial bien fundamentado técnicamente y ejecutado de acuerdo a los estándares profesionales. Por el contrario, era obvio que los demandantes tenían ya predeterminadas las conclusiones del peritaje global y que ellos mismos escribirían el reporte que apoyaría su demanda por miles de millones de dólares contra Chevron, y simplemente le pondrían el nombre del Sr. Cabrera. El propósito de la reunión fue generar todas las condiciones para controlar y manejar el trabajo del perito, en secreto, de acuerdo a los intereses de los demandantes. Basado en lo que dijeron en la reunión, no tengo dudas que todas las personas que estaban ahí entendían esto. En el 2011 vi aproximadamente una hora de un video de esta reunión que fue filmado por los cineastas americanos para la película *Crude*, y este video refrescó mi memoria sobre lo que ocurrió en la reunión. Una escena en particular fue impactante ya que en esa escena es el momento donde se evidencia que el equipo estaba completo y listo para llevar a cabo el control y manejo del peritaje global. En la escena el Sr. Fajardo estaba hablando de como era la responsabilidad de todos allí ayudar a escribir el informe del perito, y la especialista técnica americana Anne Maest preguntó "¿Pero Chevron no?", y todos en la reunión tienen

36.     Otra cosa que recuerdo que me impactó mucho de esa reunión fue el especialista técnico americano Charlie Champ, cuyo nombre anoté en mi agenda fonéticamente como "Charlie Chang". Él fue presentado a mí como un petrolero de origen tejano. El Sr. Champ hablaba con un acento muy fuerte y tenía



una vestimenta muy particular que incluía un lazo tejano, en vez de corbata, y grandes botas de vaquero. El Sr. Champ hizo una presentación sobre un plan de remediación el cual fue muy interesante para mí como ingeniero de petróleos con conocimientos y experiencia en temas de remediación ambiental, por lo cual tomé varias notas durante su presentación.

37.    La reunión del marzo 3 del 2007, fue la última reunión que recuerdo que tuve con los demandantes. El Sr. Donziger continuó con la idea de tenerme cercano al equipo de los demandantes ofreciéndome una posición como asesor y para ser la "sombra" del Sr. Cabrera, pero en realidad nunca cumplí ese rol. El Sr. Cabrera no me entregó los informes parciales para que yo los revisara y nuestra relación se fue enfriando paulatinamente. Recuerdo que en una de mis últimas conversaciones con el Sr. Cabrera, le dije que no debería entregarles a los demandantes ningún informe hasta que ellos no pagaran por nuestros servicios profesionales. Después de eso, perdí el contacto con el Sr. Cabrera.

38.    Tuve un contacto más con el Sr Donziger y los demandantes cuando ellos me pidieron que escribiera dos estudios técnicos, uno sobre el costo de re-inyección de aguas de formación, y el otro sobre el uso de gas natural. Escribí ambos estudios durante el verano del 2007 y el Sr. Donziger me pagó alrededor de 10.000 dólares por este servicio profesional. Mucho después de que el informe fue entregado a la Corte, me enteré que estos dos estudios fueron presentados como Anexo "S" al Informe de Cabrera, de lo cual yo no tenía conocimiento previo.

39.    En abril o mayo del 2007, no recuerdo con exactitud, mientras trabajaba en Petroproducción tuve un encuentro casual con los Sres. Yanza y Fajardo mientras ellos salían de la oficina del vicepresidente de Petroproducción, Oscar Garzón. Los Sres. Yanza y Fajardo me dijeron que estaban ahí para solicitarle al Sr. Garzón que Petroproducción suspendiera toda actividad de remediación en el área donde operó el consorcio Petroecuador-Texaco porque las actividades de remediación estaban dejando a los demandantes sin evidencias claras sobre las que se fundamentaran las reclamaciones de daños hechas por ellos en el caso.

40.    Por último, el 22 de febrero del 2008 asistí a una reunión en Lago Agrio que me invitó Natalia Weemaels de Acción Ecológica, para discutir temas relacionados con el medio ambiente y los cambios a la Constitución ecuatoriana. El Sr. Fajardo estaba en esa reunión. No se habló del caso Chevron.

41.    No he tenido ningún otro contacto con los representantes de los demandantes de Lago Agrio desde entonces, exceptuando una ocasión en el 2012 en que me encontré por coincidencia al Sr Fajardo en la intersección de las calles de Avenida Amazonas y Avenida Gaspar de Villarroel, en Quito, y nos saludamos cordialmente.

Declaro que lo anterior es verdadero y correcto bajo la pena de perjurio y de acuerdo con las leyes de Ecuador y de los Estados Unidos de América, y las leyes de los estados de California, Alabama, Alaska, Arizona, Arkansas, Carolina del Norte, Carolina del Sur, Colorado, Connecticut, Dakota del Norte, Dakota del

Sur, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, Nueva Jersey, Nueva York, Nuevo Hampshire, Nuevo México, Ohio, Oklahoma, Oregón, Pennsylvania, Rhode Island, Tennessee, Texas, Utah, Vermont, Virginia, Virginia Occidental, Washington, Wisconsin y Wyoming, y de acuerdo a las leyes del Distrito de Columbia, y de acuerdo a las leyes de cualquier jurisdicción competente, y que esta declaración juramentada se ejecutó en la ciudad de Bogotá, Colombia, el día 12 de Octubre de 2012.

RAMIRO FERNANDO REYES CISNEROS
Cédula de Ciudadanía: REDACTED

EN LA PÁGINA 5 / NUMERAL 17 CORREGÍ, CON MI PUÑO Y LETRA
EL NOMBRE DEL JUEZ EFRAIN NOVILLO POR EL DE GERMÁN GÓMEZ

ANEXOS --

6-DIC-12
12h35



13

*C E R T I F I E D   T R A N S L A T I O N*

# Exhibit A

[PHOTO]

## Steven Donziger



[Stamp of the 3rd Notary Public of
Cartagena, Republic of Colombia]

_____
[Signature]
Ramiro Fernando Reyes Cisneros

*CERTIFIED TRANSLATION*

# Exhibit B

[PHOTO]

## Fausto Peñafiel



[Stamp of the 3rd Notary Public of
Cartagena, Republic of Colombia]

_____
[Signature]
Ramiro Fernando Reyes Cisneros

*RIVERA INTERPRETING, INC.*
*Certified by:  U.S. & California Courts, American Translators Assn.  –  Tel. 310.621.7683*

*C E R T I F I E D   T R A N S L A T I O N*

1

# Exhibit C

Annotations by Mr. Reyes Cisneros regarding the meeting of November 17, 2005, with Mr. Peñafiel, Mr. Donziger and Mr. Pinto in CIGMYP's former headquarters.



_____ [Signature] _____
Ramiro Fernando Reyes Cisneros

*C E R T I F I E D   T R A N S L A T I O N*

2

[*Exhibit C*]

# Thursday              November              17

Texaco Case:

*  Looking to form a group of independent "overseers"



*C E R T I F I E D   T R A N S L A T I O N*

# Exhibit D

Annotations by Mr. Reyes Cisneros regarding the meeting of November 23, 2005, with Mr. Donziger, Mr. Peñafiel and Mr. Pinto in CIGMYP's former headquarters.



_____ [Signature] _____
Ramiro Fernando Reyes Cisneros

*C E R T I F I E D   T R A N S L A T I O N*

[*Exhibit D*]

# Wednesday                November                23

Texaco Case:    Steeve Dozinger [sic]
                Fausto Peñafiel

- Meeting with Johnny Zambrano and the other experts
                Marielo Echeverría
                Eng. Gerardo Barros
                Dr. Luis Albuja
                Jorge Jurado
                Galo Albán
                Vinicio Melo

Letter stating Thursday 17 CIGMYP Board resolved to set up a scientific-technical oversight [of] remediation process of Texaco case. Invite them to a work meeting. Acknowledging his appointment as settling expert, we support, ~~at the same time~~ the development [illegible] [of] professional ethics and technical results.

Life has its own rules, at times it seems unfair.
Accept it.
Anonymous

# 2005



# Exhibit E

Annotations by Mr. Reyes Cisneros regarding the meeting of November 29, 2005, with Mr. Pinto and the settling experts, in Mr. Zambrano's office.



_____ [Signature] _____
Ramiro Fernando Reyes Cisneros

[*Exhibit E*]

# Tuesday                    November                    29

Texaco Case: Johnny Zambrano

- The settling experts are not consistent. Discretionality.
- Expert for inspection. 20 done, 10 remain
- 2 per inspection
- They just recently got the report first 0 # 1 of well Sa 53
- Only Technical Responsibility
- The report is [drafted] jointly by the five of them, under the responsibility of the expert in charge.

- Plaintiffs =  Suing party
  Texaco = Defendant
- The issue of social-environmental risk is included

2:45 p.m.  Gamavisión. Petroleum Forum



*R I V E R A   I N T E R P R E T I N G ,   I N C .*
*Certified by:  U.S. & California Courts, American Translators Assn.  –  Tel. 310.621.7683*

CERTIFIED TRANSLATION

# Exhibit F

Annotations by Mr. Reyes Cisneros regarding the meeting of January 9, 2006, with Mr. Pinto.



_____ [Signature] _____
Ramiro Fernando Reyes Cisneros

*RIVERA INTERPRETING, INC.*
*Certified by:  U.S. & California Courts, American Translators Assn.  –  Tel. 310.621.7683*

*C E R T I F I E D   T R A N S L A T I O N*

2

[*Exhibit F*]

# January
# 9
# Monday

[illegible]@petroprodeuccion.com.ec

( [illegible| )

--Letters Texaco case   1.      2.

--Proposals on studies:

GN for the Amazon

--MEOR analyzed

[illegible]

Board's resolution ---- [illegible]


Supported [by] organic law

[illegible] [illegible] to facilitate the

[illegible]

---

PERSONAL BOOKS TO BE BILLED

Rolando Moya

Former student (made [illegible] the borrowed disc)

Jaime [Illegible]

Jácome of UIDT

Friend [illegible/illegible]

Jaramillo [illegible]

Fellow [illegible] UTE

"Envy and anger shorten one's life."

*Ecclesiastes – The Bible*

# 2006



# Exhibit G

Letter sent to Judge German Yañez, President of the Sucumbíos Court,
on January 20, 2006.



[This stamp also appears on Page 2,
bottom right margin.]

_____ [Signature] _____
Ramiro Fernando Reyes Cisneros

*C E R T I F I E D   T R A N S L A T I O N*      *P a g e | 2*

MEMBER OF THE SOCIETY
OF ENGINEERS OF ECUADOR

97,414
Ninety-seven thousand
four hundred fourteen

## REGIONAL ASSOCIATION OF GEOLOGICAL, MINING, PETROLEUM AND ENVIRONMENTAL ENGINEERS, CIGMYP

Letter No. 043-CIGMYP-2006
Quito, Jan. 20, 2006

The Honorable
Germán Yáñez
CRIMINAL JUDGE
SUPERIOR COURT OF SUCUMBIOS
By hand delivery

Honorable Judge:

The **Association of Geological, Mining, Petroleum and Environmental Engineers, CIGMYP, Northern Region,** which includes more than 1,500 professionals, has among its purposes: to continuously analyze the country's geological, mining and petroleum problems; advise the State and Public or Private Law institutions on the implementation of studies, presentation of projects, research, contracting, execution, supervision and control of works and projects related to geological, mining and petroleum engineering, while safeguarding the country's comprehensive development; and to contribute in defending and strengthening principles aimed at protecting and caring for the country's natural resources.

The Organic Law on Transparency and Access to Public Information, Law No. 2004-34, establishes among other things, in Article 2, Purpose of the Law, letter c) **"Allow the oversight of public administration and public resources, giving effect to true social control,"** and in Article 4, Principles on the Application of the Law, letter e) **"Guarantee the transparent handling of public information in a way that makes possible citizen participation in decisions of general interest and accountability by the various authorities holding governmental powers."**

Based on the foregoing, it is my duty to inform you that in an expanded session of CIGMYP's Board of Directors, on Nov. 22, 2005, it was decided that our professional association establish an Oversight [process] to monitor the Texaco case being heard in the Court under your able guidance.

To ensure the utmost performance and transparency of the proceedings surrounding the Oversight, in the above-mentioned session the Board of Directors appointed Engineers Fernando Reyes Cisneros and Gustavo Pinto Arteaga, both acknowledged professionals in Petroleum Engineering, with vast and extensive experience in Environmental Management of hydrocarbon-related activities.

Therefore, I respectfully request that both professionals be accorded all relevant considerations so they may satisfactorily fulfill the responsibility entrusted to them.

I take this opportunity to reiterate to you my utmost high esteem and consideration.

Sincerely,

[*signature*]
GUSTAVO PINTO ARTEAGA
PRESIDENT

[*stamp:*]
SUPERIOR COURT OF JUSTICE
OF NUEVA LOJA, PRESIDING JUDGE
[*stamp:*]
HON. SUPERIOR COURT OFJUSTICE
NUEVA LOJA

Edificio Río Amazonas   •   Av. Amazonas 447 y Roca   •   Oficinas 212/214  Teléfono: 2541-740 / 2567-794
Fax: 2232-006   •   e-mail: cigmyp@ulo.satnet.net    QUITO, ECUADOR, SUDAMERICA

*R I V E R A   I N T E R P R E T I N G ,   I N C .   –   Certified by: U.S. & California Courts, ATA*

*C E R T I F I E D   T R A N S L A T I O N*

1

# Exhibit H

Annotations by Mr. Reyes Cisneros regarding the meeting of January 18, 2006, with Mr. Pinto, Mr. Peñafiel and Bill Powers.



_____ [Signature] _____
Ramiro Fernando Reyes Cisneros

[*Exhibit H*]

# January

# 18

## Wednesday

[in  English:]

Meet with Texaco Case

- G. Pinto, F. Reyes, F. Peñafiel, Bill Powers  Environmental Mechanical Eng.
- Texaco's [illegible] Reports

The Chevron [people] apply a different methodology from the one by the Amazon Defense Front.

- Texaco Strategy:  rely on renowned academics.

HC's cannot migrate

- TPH analyze by ranges of TPH, such as gasoline, diesel. If it is high in TCLP (leachates)
- $Cr^{+6}$ is not being analyzed. $Cr^{+3}$ can become $Cr^{+6}$ with the help of acids.
- See if we have a meeting with J. Zambrano
  this Friday 20th            Efraín Novillo
- Monday 23rd with the new judge on the case
- Tuesday 24th with Texaco
- Questions that they may ~~ask us~~ give us for the Settling Expert.

Bill Powers. P. E.
Bpowers@powersengineering.com
619 – 295 – 2072  office

> "There are few things more
> destructive than an unsound idea
> persuasively expressed."
> *Hill Bernbach*

# 2006



*C E R T I F I E D   T R A N S L A T I O N*

1

# Exhibit I

Annotations by Mr. Reyes Cisneros regarding the meeting of January 31, 2006, with Mr. Pinto, Mr. Zambrano and Jorge Jurado.



_____   [Signature]   _____
Ramiro Fernando Reyes Cisneros

[*Exhibit I*]

AGD: Gabriel

# JANUARY
# 31
Tuesday

María Aguinda vs Texaco lawsuit

<u>Meet with Settling Experts</u>

Johnny Zambrano                    Dr. Liliana Suárez
Jorge Jurado                       (06) 2831596

Report on Sa-53 to be submitted morning of October 1

- The experts establish the sampling methodology
- Chevron [illegible] allows the other party to take samples.
- Settling experts have the discretion of accepting or not the sampling methodologies and even the results.
- Jorge asks that we deliver to them the text of the law that authorizes the oversight of the Texaco case
- Aquifers, underground water, water wells
- TPH          $C_6 \rightarrow C_{35}$          $Cr_{+6}$ Sampling
  BTEX
  TPH   DRO%          GRO
- there should be 110 reports, of which 1 is being delivered tomorrow

Judicial Inspections

# 2006



C E R T I F I E D   T R A N S L A T I O N

1

# Exhibit J

Annotations by Mr. Reyes Cisneros regarding the meeting of February 23, 2006.



_____ [Signature] _____
Ramiro Fernando Reyes Cisneros

*R I V E R A   I N T E R P R E T I N G ,   I N C .*
*Certified by:  U.S. & California Courts, American Translators Assn.  –  Tel. 310.621.7683*

C E R T I F I E D   T R A N S L A T I O N

2

[*Exhibit J*]

# FEBRUARY
# 23
Thursday

Texaco – Meet

- Wednesday, March 8 in San Carlos is the [illegible] inspection. It is also the possible date of national work stoppage.

- Pressures labs *for don't receipt the samples of pits.*

- Judge Yánez *is coming to Quito next Thursday or Friday*

   Enrique Ramón  099223066



2006

*R I V E R A   I N T E R P R E T I N G ,   I N C .*
*Certified by:  U.S. & California Courts, American Translators Assn.  –  Tel. 310.621.7683*

*C E R T I F I E D   T R A N S L A T I O N*

1

# Exhibit K

Annotations by Mr. Reyes Cisneros regarding the meeting of March 6, 2006.



_____ [Signature] _____
Ramiro Fernando Reyes Cisneros

*R I V E R A   I N T E R P R E T I N G ,   I N C .*
*Certified by:  U.S. & California Courts, American Translators Assn.  –  Tel. 310.621.7683*

[*Exhibit K*]

# MARCH 6
Monday

Meet with Texaco Case

- Scientific critique indicating which should be the methodology used.
- That in the 3.5 m of water that fall on the platform and Oriente, if the water did not filter in the pits → it overflowed.
- About the new soil that should not have been contaminated, now it is contaminated

> "We must constantly build dikes of courage to hold back the flood of fear."
> *Martin Luther King Jr.*

# 2006



*CERTIFIED TRANSLATION*

1

# Exhibit L

Annotations by Mr. Reyes Cisneros regarding two days of field work, on March 8, 2006, at the judicial inspection of Sacha Sur.



_____[Signature]_____
Ramiro Fernando Reyes Cisneros

[*Exhibit L*]

8-03-06


Sacha Sur Station

Germán Yánez

Texaco case:

- Explanation by the Judge
- Explanation by Texaco
- He says that responsibilities are held jointly [illegible] was PETECU who did the *water injection* [illegible]

Alfredo Guerrero: He explains what is [illegible] [illegible] of production. [Illegible] past [illegible]


- [Illegible] photographic, 2004 is where [illegible] [illegible] --- [illegible] --- areas of industrial use


- [illegible] is <u>not</u> oil-related


- Dr. Callejas did not say that the station already [illegible] in 1972
  Reply from [illegible] Dr. Pablo Fajardo
- Alejandro Ponce


  THE SETTLING EXPERTS ARE NOT PRESENT

  CONTINUED . . . ⟶



*R I V E R A   I N T E R P R E T I N G ,   I N C .*
*Certified by:  U.S. & California Courts, American Translators Assn.  –  Tel. 310.621.7683*

# Exhibit M

Annotations by Mr. Reyes Cisneros regarding two days of field work, on March 9, 2006, at the judicial inspection of Sacha Sur.



_____ [Signature] _____
Ramiro Fernando Reyes Cisneros

*C E R T I F I E D   T R A N S L A T I O N*

2

[*Exhibit M*]

<u>3-09-06</u>

<u>Taking of samples</u>

3 pits          2 test drillings [illegible]

[illegible]          [illegible]  oh Texaco

Taking of samples between today and tomorrow

- Texaco will <u>not</u> drill the pits, but rather on the perimeter

- Texaco drills by [illegible]

- Manual [illegible]

Why does Texaco decide *to drill or to take soil samples in a perimetral area and no inspection of statation [sic] drainage.*

Fausto Peñafiel          (093) 835615



*C E R T I F I E D   T R A N S L A T I O N*

# Exhibit N

[PHOTO]

# Pablo Fajardo



[Stamp of the 3rd Notary Public of
Cartagena, Republic of Colombia]

_____
[Signature]
Ramiro Fernando Reyes Cisneros

*R I V E R A   I N T E R P R E T I N G ,   I N C .*
*Certified by:  U.S. & California Courts, American Translators Assn.  –  Tel. 310.621.7683*

*C E R T I F I E D   T R A N S L A T I O N*

# Exhibit O

[PHOTO]

# Luis Yanza



[Stamp of the 3rd Notary Public of
Cartagena, Republic of Colombia]

_____
[Signature]
Ramiro Fernando Reyes Cisneros

*R I V E R A   I N T E R P R E T I N G ,   I N C .*
*Certified by:  U.S. & California Courts, American Translators Assn.  –  Tel. 310.621.7683*

*C E R T I F I E D   T R A N S L A T I O N*
*Page **1** of **30***

# Exhibit P

Draft of the report prepared by Mr. Reyes Cisneros and Mr. Pinto commenting on the report by the settling experts on Sacha 53



[The Notary Public's stamp appears on all 30 pages of Exhibit P on the bottom right corner.]

_____
[Signature]
Ramiro Fernando Reyes Cisneros

*C E R T I F I E D   T R A N S L A T I O N*
*Page 2 of 30*

Quito, DM, Jan. 17, 2006
OF.

Honorable Judge
Germán Yánez
PRESIDING JUDGE
SUPERIOR COURT OF NUEVA LOJA
By hand delivery

cc. María Aguinda et al.
cc. Callejas Chevron-Texaco

Honorable Presiding Judge:

In our capacity as Monitors appointed by the Geological, Mining, Petroleum and Environmental Association to oversee the Texaco case being heard in the Court you so ably preside, I hereby attach and please find the Monitors' Report on the Settling Experts' Report regarding the Judicial Inspection of Well Sacha-53.

The Report at issue was prepared by the Settling Experts Mr. Galo Albán, Eng., Dr. Luis Albuja, Mr. Gerardo Barros, Eng., Mr. Jorge Jurado, Eng., Mr. Johnny Zambrano, Eng., and is dated Feb. 1, 2006.

Warm regards,

Mr. Gustavo Pinto Arteaga, Eng.                    Mr. Fernando Reyes Cisneros, Eng.
Monitor                                            Monitor
ID: REDACTED                                       ID: REDACTED



*C E R T I F I E D   T R A N S L A T I O N*
*Page 3 of 30*

# ASSOCIATION OF GEOLOGICAL, MINING, PETROLEUM AND ENVIRONMENTAL ENGINEERS CIGMYP

## MONITORSHIP REPORT

### MARIA AGUINDA ET AL.  VS

### CHEVRON TEXACO CORPORATION

### SETTLING EXPERTS' REPORT
### ON THE JUDICIAL SITE INSPECTION OF WELL SACHA-53

**February 1, 2006**

**Mr. Gustavo Pinto Arteaga, Eng.**               **Mr. Fernando Reyes Cisneros, Eng.**



# MONITORS' REPORT ON THE REPORT BY THE SETTLING EXPERTS ON THE JUDICIAL INSPECTION OF WELL SACHA-53

## 1.    INTRODUCTION

On Feb. 1, 2006, Mr. Galo Alban, Eng.; Dr. Luis Albuja;, Mr. Gerardo Barros, Eng.; Mr. Jorge Jurado, Eng., and Mr. Johnny Zambrano, Eng., issue their Report in their capacity as Settling Experts for the Judicial Inspection of Well Sacha-53, addressed to the Presiding Judge of the Court of Nueva Loja, Case No. 002-2003.

## 2.    CONTENT ANALYSIS

The report is based on the transcription of portions of each of the Parties' Expert Reports, which serve as foundations for the Settling Experts to issue their respective commentary.

### 2.1    Regarding the Background (I)

The report's structure does not include a chapter regarding the expert analysis' resulting conclusions. They barely include a chapter in which the Settling Experts make related commentary.

Two tables are included: Table Dir. 1, which shows the information analyzed by the settling experts, and Table Dir. 2, which relates to the topics and correspondence between the questions by the Defendant (Chevron) and Plaintiffs (María Aguinda.) Mr. Ernesto Baca, Eng., is the expert for the Defendant, while Mr. Edison Camino, Eng., is the expert for Plaintiffs.

### 2.2    Regarding the analysis of the Parties' Reports and Commentary by the Settling Experts (II)

Item 1    Location, Description of the Area of Well Sacha-53

    *No comments.*

Item 2    Remediation of Pits at Well Sacha-53

    *It should be noted that this Item deals with the **Remediation of Pits at Well Sacha-53**, therefore, sampling and laboratory results should have been performed in the area around the pits. Sampling and laboratory analysis that are unrelated to the area of the pits should not be accepted as valid for remediation.*

    2.1 *Sampling Sites*

*Expert Baca*

*Darcy's law and its modifications is what is most commonly used to study the flow of fluids such as oil and water in a porous environment, such as an oilfield, and is also applicable to the ground and subsoil in which both fluids may be present. Thus, maintaining that "environmental remediation does not entail the complete removal of a pit or the subsoil from a site given crude oil's characteristics of no mobility and non-toxicity…" is an unfounded statement and a contradiction in terms regarding what actually happens in a porous environment, because this refers not only to the mobility of crude oil, but also to the mobility of water and mainly the mobility correspondence between both fluids. It is for this reason that in most cases, water, in addition to having greater mobility in a porous environment, tends to displace the oil in the path flow of least resistance.*

*Also, when it is stated that "…the applicable criterion for approving the remediation of these pits was a maximum limit of TPH in TCLP of 1000 mg/l…," it makes no difference that the TPH (Total Petroleum Hydrocarbon) is not part of the TCLP (Toxicity Characteristic Leaching Procedure), as the latter one is applicable when measuring the toxicity of leachate substances, which does not necessarily include TPH.*

*The depths at which ground soil samples were taken (maximum of 1.15 m.) can be described as superficial, because at best they represent no more than 50% of the depth of the remediated pits. Expert Baca makes no comments regarding the depth of the pits.*

*2.1: Sampling Sites*

*Expert Camino*

*The depths of pit 1 (6.8 m.) and pit 2 (3.4 m.) are included, where a total of six in-depth samples were taken.*

## THE SETTLING EXPERTS' COMMENTARY ON THE SAMPLING

**The Settling Experts initially refer to the location of the samples and pits (Table Dir. 3), the codes for the soil and water samples from both parties (Table Dir. 4), in order to then state that "In the case of the Defendant, the samples have been taken in a timely fashion at a determined depth, while the Plaintiffs have taken the sample at different depths. For this reason it cannot be stated that these are like samples with equal characteristics, and therefore their values will differ."**

**Regarding this, in the first place we point out that the results obtained in the laboratory have different values, but this is because sampling by the Plaintiffs entailed taking samples at various depths between 0.60 and 5.65 meters, while Defendant did so at between 1.10 and 1.15 meters. We also underscore the fact that the sampling was carried out with new soils brought from other sites and that were used to cover the pits.**

*In our opinion, the Settling Experts must establish which of the two samplings is valid; it cannot be both. It is either the one they consider to be sufficient when surface samples were taken, or the one where samples were taken from almost at the surface to the bottom of the pits. Once this has been defined, the Settling Experts, based on the laboratory results, must establish which samples and at what depth violate Ecuadoran regulations, specifically the Environmental Rules for Hydrocarbon Operations in Ecuador, and based on that they must determine if the remediation carried out by the Defendant is acceptable.*

*Regarding the Pits, they only submitted one Table showing the differences between the Parties' respective codes.*

*Regarding the site of "Prior Spillage," they submit one Table with the corresponding codes and one column of commentary, which states that the samples were taken from different depths, but without differentiating between them.*

*For Water Wells for Household Use, likewise, there is a Table which states the sample was taken by the Defendant and not the Plaintiffs.*

*For Water Samples from the Water Table Level, it is noted that the sample was taken by the Plaintiffs and not the Defendant.*

*In conclusion, the Settling Experts are not settling, because they have not adjusted, concluded or solved the controversies that arose between Plaintiffs and Defendant.*

2.2   *Sampling Methodology*

Expert Baca

It is stated that two samples were taken at different depths at each borehole, but only one of the depths is stated (1.1 m.) One of the sampling boreholes was outside pits 1 and 2. It is not stated if the samples, once at the surface, were subjected to lithologic and contamination prevention controls, and if the appropriate chain of custody was available to ship them to the laboratory for analysis.

Expert Camino

The samples that were obtained, once they were at the surface, were subjected to lithologic and contamination prevention controls. The appropriate chain of custody was in place in order to ship them to the laboratory for analysis. The depths at which the corresponding samples were taken were not included.

## THE SETTLING EXPERTS' COMMENTARY ON THE SAMPLING METHODOLOGY

**Emphasis is placed on Expert Camino's mistake in confusing Pit 1 with a spill site and his subsequent rectification. But there is no commentary or conclusions on the depths at which samples were taken, how that was done, the lithologic analyses and the chain of custody to the laboratory.**

Questions 3.2.1, L. 27, 28, 29 and 33

Expert Baca

*Regarding the use of a detergent or a surfactant such as PCS, it is worth mentioning that, indeed, when there is a change in the interfacial tension between water and oil and the surface tension between oil and the soil, in fact oil will be released. Oil, being less dense than water, will reach the surface, but some of the released oil can migrate into the ground or subsoil through the pit's walls or bottom, which is reasonable given the high-pressure pumping used when applying PECS.*

*It is not reasonable to consider a depth of 1.15 meters as deep ground, when the pits were more than 3 meters deep.*

*If Ecuadoran rules establish a finding of TPH in order to establish hydrocarbon contamination, what is sought by reporting the analyses not as TPH, but as TPH-DRO?*

Expert Camino

*He does not answer the questions.*

## THE SETTLING EXPERTS' COMMENTARY ON THE QUESTIONS

**They establish that well Sacha 53 was included in the Scope of Remediation Work. But they do not comment nor draw conclusions regarding the questions answered by Expert Baca.**

*Questions 4.1.2.2 and L.7*

Expert Baca

He limits himself to establishing that according to the Remedial Action Plan, pits 1 and 2 required remediation, closing and revegetation and that pits 3 and 4, because of their characteristics, were designated as "No Additional Action."

Expert Camino

He emphasizes this is a legal issue and refers to the work reported by CVX, which states that pit 1 has 5,929 ppm of TPHs and that 122.15 cubic meters of crude have been extracted to be delivered to Station 1, collection pit. He also questions PECS-based treatment, stating that it cannot indeed be considered as having no toxic chemicals (heavy metals, HAPs, etc.), and that given its manufacture origin based on alkyl monophenols, one can expect an increase in toxic compounds such as phenolic compounds.

## THE SETTLING EXPERTS' COMMENTARY ON THE QUESTIONS

**They highlight that the Contract for the Execution of Environmental Remedial Work and Release of Obligations, Responsibilities and Claims establishes the criteria and guidelines for remediation activities. They underscore that TPH content expressed as "percent" or "ppm" establishes the criteria for determining what pits have to be remediated. This is in relation to Expert Baca's reply, but they omit commentary regarding Expert Camino's reply.**

**Later they do a DETAILED ANALYSIS of the laboratory results obtained for the sludge and water from pits 1, 2, 3 and 4 according to chart No. 2 of the Environmental Rules for Hydrocarbon Operations in Ecuador, Agreement No. 621. On the tables included in their commentary columns, it is noted that the great majority of parameters are under the limits allowed by chart No. 2, but inexplicably TCLP values for water treatment are included, even though this parameter is not part of that chart.**

**Regarding PECS, they make reference to the Technical Data Sheet on Specifications and Safety, stating that it is biodegradable in 45 days, used as a surfactant for the removal of crude oil. However, they do not establish its components and chemical composition in order to determine if it contains or not phenolic compounds, as maintained by Expert Camino.**

*Questions 4.1.2.3 and L.8*

Expert Baca

*He states that between June and September of 1996, Texpet performed all remedial action work required for well Sacha 53. He states that it is proved in a large number of documents.*

*He includes a table that shows that the oil-remediation methods used in pits 1 and 2 was soil washing by the contractor PECS-DESMI, which applied the PECS surfactant.*

Expert Camino

*He states he has not found remediation procedures in the documents registered and submitted by CVX at the Judicial Inspection. Later on he states that the mechanical work of mixing soil, crude, produced water and surfactants with additives cannot be considered as remediation work. He goes on to say that some surfactants could increase phenols in the polluted matrix, emphasizing that detergents are manufactured based on alkyl (C8-C9-C12) monophenolic compounds. He asks if the toxic mixture can be stabilized, because several tons of dirt brought from nearby sited are placed over it. In his judgment this is a serious error, as he states, because it is well known that due to the effects of the rain and water table movements, toxic waste will reach surface water systems. He concludes by pointing out that page 9085 does not state the TPH content at the beginning of the PECS physical process, nor at its ending. And he concludes by saying that the field work document should not have been admitted toward the delivery of the remediated pit, as it lacked the key indicators.*

## THE SETTLING EXPERTS' COMMENTARY ON THE QUESTIONS

**They state that from the analyses submitted in 1996 by TexPet, it is noted that the concentration levels of the analyzed elements are inferior to the permissible limits established in the Contract for Execution of Environmental Remedial Work…. But, oddly, they no longer refer to chart No. 2 of the Environmental Rules for Hydrocarbon Operations in Ecuador, Agreement No. 621.**

**They also mention that Defendant, in Appendix D, Page 41.911, submitted the methodology employed on the remediation work of pits 1 and 2, which corresponds to the "soil washing" that uses surfactants to release the crude oil retained on the ground, and which consists of leveling, debris removal, removal of crude, water treatment (filtration and flocculation,) water treatment (filtration, flocculation and ventilation,) ground treatment by means of surfactant agents, refilling and revegetation. And they conclude by commenting that Plaintiffs submit no evidence of the existence of surfactant-generated phenols used in the process of remediating the pits.**

**They do not comment regarding the role that both rain water and water table dynamics could have played regarding the quality of the remediation process, which does not necessarily conclude when the pit is covered, because the pit is part of surface and sub-surface water dynamics.**

*Questions 4.1.2.3 and L.8*

Expert Baca

*He restates his answer provided to questions 4.1.2.3 and L.8, adding that the procedures on pit closures established in Decree 2982, article 30, and the requirements on water discharge of Ministerial Agreement 621, chart 2, were followed.*

*On the Verification of Remediation Criterion chart… …, the analytical method that was established is the one known as TCLP-TPH, which is defined as "TPH analysis of a sample of leached soils," where leachate is understood to be "a liquid that includes any type of component suspended in it, that has percolated or has been drained from dangerous waste," or it is also the "solution resulting from the transport of water through the porosity or fissures of the ground or another solid porous environment and resulting from the physicochemical interactions of this water with the ground's mineral and organic components," as defined in the Superseding Rules to the Environmental Rules for Hydrocarbon Operations in Ecuador. From these two definitions, or from the latter, if so desired, it can be clearly established that such **leached soil** does not exist, but rather that the leachate is a water-based liquid and for that reason there is no such TCLP-TPH analytical method.*

Expert Camino

*Replies that the question is a legal issue, but points out that Ministerial Agreements 2144 and 14629 were not taken into account, nor the international rules that the operator Texaco was required to follow.*

## THE SETTLING EXPERTS' COMMENTARY ON THE QUESTIONS

**They do not reply since they deem it as legal in nature, while the questions also are of a technical and scientific nature, particularly when related to the TCLP-TPH analytical method.**

*Questions 4.1.2.5 and L.10*

Expert Baca

*Answers these questions in the affirmative.*

Expert Camino

*Replies that the question is a legal issue, but clarifies that according to the previous answers, technically… …, pits 1 and 2 could not have been remediated by a mixture of sludge and produced water with detergents. He points out there are in Petroproducción several technical reports (Letter 3733-AMB-96) that report the violations and deficiencies in the Environmental Remediation Plan carried out by Texaco before the signing of the Certificates of delivery of the pits. On this matter it is worth clarifying that if the pits did*

*contain produced water, its presence was isolated and could have come from the reconditioning of wells.*

## THE SETTLING EXPERTS' COMMENTARY ON THE QUESTIONS

**They point out that having reviewed the documents, the aforementioned Letter 3733-AMB-96 was not found, and state that Expert Baca has submitted the documents on the acceptance of the remediation work on well Sacha 53.**

*Questions 4.2.1 and L.12*

Expert Baca

*Replies that the remediated pits are not causing any impact, stating that: the surface grounds are clean, the local water wells have not been impacted by the operations of the oil fields, there is no potential for impact on surface water from the remediated pits and there is no potential for impact to the air because of the remediated pits. To that end he states his grounds.*

Expert Camino

*Points out that this is a legal issue, later stating that the expert report shows that all toxic waste is limited to the ground and water of the so-called pits 1 and 2, and that the laboratory reports (Table 5, 6 and 9) show very high levels of chemicals that are considered dangerous to human health under Ecuadoran environmental law. He adds that CVX affirms that the so-called pit 3 contains drilling sludge, whose characteristics Petroproducción has in the final drilling report and in its Technical Files.*

## THE SETTLING EXPERTS' COMMENTARY ON THE QUESTIONS

**They emphasize that these are strictly legal issues. They point out that the Defendant has submitted the analyses for pits 1, 2 and 3, and these include the parameters that have been determined, with permissible limits established in various national regulations and in Mexico, Canada and the Netherlands, as well as the methods employed. Then they analyze each of the pits, stating that for Pit 1 the analyzed parameters show lower values than the constant permissible limits in TULAS and the RAOH 1215. Regarding Pit 2, they determine the presence of crude with a value of 520 mg/kg. It should be noted that here they refer to crude and not to TPH or TCLP. For Pit 3 they point out that the TPH-DRO is above the permissible limit for soils in sensitive ecosystems and below that for agricultural soils (RAOH 1215, table 6,) and that barium exceeds the limit established by TULAS.**

**Regarding the Plaintiffs, they point out that their report of November 29, 2004, does not relate to pits 1 and 2, but to the so-called "Area of prior spillage," and that they lack the results for the testing done on samples coded as: SA53P1, SA53P2, and SA53P3.**

**They conclude by stating that the analysis of the *samples* taken for pits 1, 2 and 3 fulfill the permissible limits agreed to in 1996, but that they bear limitations regarding current Ecuadoran rules (TULAS and RAOH.)**

*Questions 4.4.1 and L.25, 26, 27, 28, 29 and 31*

Expert Baca

*He includes a lengthy explanation regarding the impossibility that degraded crude may have the characteristics of mobile petroleum, because if this were the case, the hydrocarbon would have the capability to migrate. However, we point out that the explanation is very limited, given that the samples that were taken are from the surface, from a depth of less than 1.20 meters, from new clay, which are not sufficient to adequately establish the saturation with crude in the pits' entire volume. The presence of a concentration of 520 mg/kg of TPH in the sample of new clay, which was supposed to be clean, without even traces of petroleum hydrocarbon suggest that locally there could be a migratory phenomenon.*

Expert Camino

*He states that the geology analysis proves there is displacement of toxic waste from oil in the water table of pit 1. To that end said analysis would have to establish that the porous environment which constitutes the water table layer is connected to the stream located to the east. It is reasonable to expect that the use of the PECS detergent, because of its effect on interfacial and surface tensions, when it "washed" the sludge and soils, may have made it possible for crude reached* [sic] *to have reached the water table and even migrated.*

**THE SETTLING EXPERTS' COMMENTARY ON THE QUESTIONS**

**They begin by replying to the questions asked to other experts, emphasizing the fact that in the area of the pits and their surroundings they did not observe crude on the surface, and that the premise on the migration of possible contaminants via hydro-geological phenomena lacks scientific evidence. They do not comment at all regarding the presence or absence of mobile oil in the soil of the pits covered with new soil, not the original soil.**

*Questions 3.2.1 and L.11*

Expert Baca

*He explains why pits 3 and 4 were not remediated. His basis is that those pits with oil concentrations below 5,000 mg/kg were classified in the category of "No Action Required."*

Expert Camino

*He indicates that the questions are legal issues, but states that in the pit, TEXACO did not determine the presence of Barium, Chrome VI, and HAPs, so as to, according to the results, proceed to remediate the contamination from these heavy metals and hydrocarbons.*

**THE SETTLING EXPERTS' COMMENTARY ON THE QUESTIONS**

**They contradict the statement by Expert Camino when, based on the Agreement 621, they suggest that the testing was done for Barium, Chrome VI and HAPS, indicating there are no limits established for the first one, the second is below the permissible limit, and the third is not included in the Agreement.**

## 3. AREAS OUTSIDE THE SCOPE OF THE REMEDIATION PLAN

*Questions 3.4.1 and L32.L33*

Expert Baca

*He begins by stating that no other area impacted by oil was ever found that was different from the ones included in the remediation plan,…  and that any area impacted by oil,…… was a consequence of operation or maintenance activities carried out subsequently to the time of the remediation (1996)…, is Petroecuador's sole responsibility.*
*Then he mentions that during the Judicial Inspection, a 60m-by-80m area with degraded oil residue was found west of pit 1, an area which in his opinion the Plaintiffs erroneously called pits 1 and 2 and that they requested that samples be taken from three points in that area. He calls the results that were obtained altered because, in his opinion, of the inappropriate sampling method [used] by the Plaintiffs and because they are not representative of the soil at the sampling level, but rather a mix of all the soils from the drilling, and reaches conclusions that are obviously different from the Plaintiffs'.*

*Regarding the Flow of Underground Water, he questions what in his understanding are changing criteria by the Plaintiffs, and then emphasizes that establishing the directions of the flow of underground water in Oriente is an extremely complex task given that the land is extremely clayish, even though he admits there are some silty or sandy hanging*

*lenses of different sizes but short expanse. He gives a definition of a hanging lens, tells what happens when drilling is done at different depths, and concludes by stating that the aquifer is not present at that level.*

*On this matter it is worth clarifying that the so-called "Orient region" does not exist, but rather the Oriente Basin or Amazon Basin, which is a predominantly sedimentary basin. For that purpose it is recommended that the most accredited sources of geological studies be consulted. In the former area of Texaco's operations, what he calls "extremely clayish" land is found mainly on the hills, but it disappears gradually as it nears big and medium-sized rivers such as the Napo, the Coca, or the Jivino. The big dispersal plains that resulted from the water system's dynamics are not made up mostly of clays. Much of the Sacha field, its facilities and wells, have been located in these plains. If the platform for well Sacha 53 had been built on a hill, because of the movement of surface soils, the surface clay was removed totally or partially, and along with it the "hanging lenses," if they ever existed. This statement is supported by the SETTLING EXPERTS' COMMENTARY to questions 4.4.1 and L.25, 26, 27, 28, 29 on page 38, third paragraph, which literally says: "The lithological record shows alternating levels of silt, clays, sand-clays, clay-silt; beginning at a depth of 4.10 meters at borehole NW4, and 5.99 meters at borehole NW6, there is a pocket of sand ranging from gray to brown in color." That is to say, nowhere is there any "extremely clayish land."*

*One of the questions that deserves an answer has to do with the infiltration of run-off water and its ending point in the subsoil. If the argument that the "land is extremely clayish" were true, pits 1 and 2 of well Sacha 53 possibly were open on this land, and for that reason the rainwater, which falls at an annual average of more than 3 meters in height per square meter of surface, would have filled the pits every year and even caused them to overflow. However, it is reasonable to think that the land on which the pits were built is not completely impermeable, that is to say it has certain porosity or empty pockets, which in addition to contributing to retaining fluids like water and oil, allow these fluids to move from areas of higher pressure to areas of lower pressure; because of the low pressure at the surface, gravity plays an important role in the movement of these fluids. The flow's direction can be studied with the use of tracers and monitoring.*

Expert Camino

*He makes no comments regarding the Flow of Underground Water and states that pit 3 should not have been excluded from the remediation given its contents of toxic wastes from drilling and those used in maintaining well Sacha 53, and to that end he quotes page 36, Table 1 and Table 2, page 10, as the basis for his statement.*

## THE SETTLING EXPERTS' COMMENTARY ON THE QUESTIONS

They submit Table Dir 8 to which they attach the conclusion that in eleven of the samples analyzed by both parties, the TPH values exceed 5,000 mg/kg, agreed to in the Remediation Plan between the Government of Ecuador and Texaco. Then they point out that Mr. Edison Camino, Eng., in his reports mixes up pits 1 and 2 with the "area of the prior spill."

Regarding the underground water, [the settling experts] consider that it has not been defined with certainty, and thus close the possibility that contaminants may have migrated through the dynamics of that water. They issue no opinion related to the statements by Expert Baca when he discussed the issue of underground water, nor do they provide their professional commentary on the matter.

## 4. STANDARDS, ALLOWABLE LIMITS AND DEFINITIONS

*Questions 4.1.1.1 and L.40*

Expert Baca

*He does not clearly establish a reasonable concept of "Environmental Remediation," because what he calls "[actions taken] …. the threat of emission of a substance that is dangerous to the environment, to avoid or minimize … present or future or the well-being or the environment.", taken from the U.S. National Contingency Plan (40 CFR 330.5), has nothing to do with the most accepted concepts and large-scale practices regarding the subject of environmental remediation that are in place in the United States. Rather, it seems as if the aforementioned Expert seeks to impose the notion that environmental remediation does not involve the chemical's complete removal…. Just as he suggests occurs in well Sacha 53.*

Expert Camino

*Transcribes the definition of environmental restoration from Decree 1215, and also includes the definition issued by Flores and coll.*

## THE SETTLING EXPERTS' COMMENTARY ON THE QUESTIONS

**They do not establish the clear differences that without a doubt exist between the clear definitions by Expert Camino and the jumble of ideas submitted by Expert Baca.**

*Questions 4.1.1.2 and L.36*

Expert Baca

*He limits himself to explaining that the standards and permissible limits that were applied to the remediation work are the ones specified in the Remedial Action Plan agreed to by Texaco and the Government.*

Expert Camino

*He indicates this is a legal issue. He claims that chart 2 of Rule 621 does not provide the determination of major toxic chemicals such as Chrome VI, Barium, HAPs and BTEX. He clarifies that Texaco did not use some environmental rules even though it had mentioned them in its environmental evaluations.*

## THE SETTLING EXPERTS' COMMENTARY ON THE QUESTIONS

**They limit themselves to providing the list of documents from the Environmental Regulations in force in 1995. They neither conclude nor settle.**

*Questions 4.1.1.3 and L.37*

Expert Baca

*In addition to restating when he non-technically assumes that TPH and TCLP are similar and can be used without distinction, again he points out that the maximum limit set by the parties for establishing the criterion of "No Additional Action" is a TPH concentration of 5,000 mg/kg, and based on alleged subsequent tests he maintains that concentrations of ground oil lesser than 10,000 mg/kg are harmless to plants and cause no effects in stock (hogs, cattle, fowl, etc.) on soils with TPH levels below the range of 19,000 and 50,000 mg/kg.*

Expert Camino

*He states that Decree 1215 includes a definition of TPH, and without specifying the rule, states that the Ecuadoran law required that the ground in the pit has to have less than a thousand parts per million of total oil hydrocarbons, and thus pit 1 should not have been declared as remediated… ….*

## THE SETTLING EXPERTS' COMMENTARY ON THE QUESTIONS

**In addition to limiting themselves to defining the TCLP, they state that the RAOH includes it as one of its analytical methods. They neither conclude nor settle, especially when it comes to the statements of Expert Baca regarding the concentrations of TPH that are harmless to plants and have no effect on stock. According to the book "Pipeline Risk Management Manual," by W. Kent Muhlbauer, the dangerousness of a hydrocarbon is measured in relation to the rate of absorption of a substance by a living organism and its chronic danger. The rate depends on the toxicity, flammability and reactivity. The substance's toxicity in turn is divided in aquatic toxicity, toxicity in mammals, flammability, chronic toxicity and potential carcinogen. Regarding toxicity in mammals he makes reference to the type of ingestion that could take place, be it oral, through the skin or by inhalation, measured in ranges of $LD_{50}$ and $LC_{50}$, for the first two and third, respectively. Are the studies referenced by Expert Baca the product of field research or mere references?**

*Questions 4.1.1.4 and L.38*

Expert Baca

*He does not adequately answer the question. Rather, he takes the opportunity to justify the use of the criterion called TCLP. He does not make the distinction that the TPH (Total Petroleum Hydrocarbon or* Hidrocarburos Totales de Petróleo*) is not part of the TCLP (Toxicity Characteristic Leaching Procedure or* Procedimiento para establecer Características Tóxicas de Lixiviados*), because the latter is applied to measuring the toxicity of leachates, which does not necessarily include TPH.*

Expert Camino

*He answers the question fluently.*

## THE SETTLING EXPERTS' COMMENTARY ON THE QUESTIONS

**It can be inferred that they tacitly agree with the answers provided by Expert Camino. But they issue no comment regarding the answers from Expert Baca.**

*Questions 4.1.1.5 and L.24*

Expert Baca

*He establishes that Texpet's remediation standards are documented in several documents such as the Remedial Action Plan and the Final Report of the Remedial Action Project. He also included in his arguments the rules on Remediation of Oil Fields in Ecuador 1995-1998, Agreement 621 of 1992, Decree 2982 of 1995 and the Regulation Requirements in Countries from Central and South America, especially those of Colombia and Venezuela, as well as those of the National and International Organizations, such as those published by the API. And he concludes by stating that the remediated pits pose no potential impact to surface water or the air.*

Expert Camino

*He states that the registered documents do not include the international rules referred to by Expert Camino, that Rule 621 does not require that concentrations of Chrome VI, BTEX and HAPs be determined, and he indicates that the Action Plan did not take into account Ministerial Agreements Nos. 2144 pertaining to the Regulation for the Prevention and Control of Environmental Contamination on Water Resources, and to the Regulation for the Prevention and Control of Environmental Contamination on Soil Resources.*

*C E R T I F I E D   T R A N S L A T I O N*
*Page 19 of 30*

## THE SETTLING EXPERTS' COMMENTARY ON THE QUESTIONS

**They limit themselves to saying that the question was answered in numeral 4.1.2 and L.36. They insist in not concluding or settling.**

## 5. IMPACT ON AREAS ADJACENT TO WELL SACHA 53

*Questions 3.5.1 and L.44, L15 and L.23*

Expert Baca

Risk does not occur, as it is the measure of occurrence of an event. Risk is also not an event, in the way contamination is an event or the quality of human health is. The measurement of risk, if one does not have a considerable number of observations, tends to be subjective and intuitive. For the case of well Sacha 53, it is evident that during several years, the pits and their toxic contents were open and went un-remediated. There were always potential receptors, starting from microorganisms up to the people who inhabit their area of influence, and species that were introduced, such as livestock or fowl, and obviously it was established through the air (BTEX cases), through run-off and even through the dynamics of aquifers.

The impact on human health and animal life does not come about in the short term, but it depends on the time of exposure and the means of ingestion of the contaminant (skin, airways and digestive tract.) Therefore to assume based on this that because now we have the presence of highly degraded oil west of pit 1 there is no risk to health, this means rejecting the contaminating activity that existed before remediation and its relation to living beings. Or when it is stated that there is a shortage of receptors, what is being done is to ignore that despite what it appears, one is in the presence of a reconstituted and dynamic food chain that begins with microorganisms, fungi, insects, batrachians, etc., up to the final consumers.

When he states that for ruminants (cows,) ingestion of more than 4,400 mg/kg of crude oil does not harm them, in the first place it is worth noting that these ruminants have not been described as a bioindicator species for the study of the effects of oil in a tropical rainforest, and on the other hand, if an adult cow were to ingest 10 kg of grass per day, it would also be ingesting 440 grams of crude oil a day, and in one year it would add 160.60 kg of crude oil to its metabolism and it would be eating its own weight in crude oil in less than 4 years.

Expert Camino

He is not mentioned in the report.

## THE SETTLING EXPERTS' COMMENTARY ON THE QUESTIONS

**They do not comment on the statements by Expert Camino. They persist in not concluding and not settling.**

<u>*Question 4.2.2 and L.13, L.15*</u>

Expert Baca

*When he states there are no environmental impacts in well Sacha 53 that may be attributable to the former Petroecuador-Texpet Consortium, he does so according to the results and analyses obtained during the remediation and the subsequent analyses of water and soil samples previously mentioned. He mentions that sites were found whose subsoil contains degraded oil in places outside the pits that were remediated by Texaco, and that are not having any impact…, he forgets that these impacts are not only attributable to contamination, but that for the quality and maintenance of the tropical rainforest's ecosystem, the main impact is the deforestation, which includes the stump of trees and the movement of soil for the preparation of the platform. Obviously, this impact was enlarged several times by the colonization.*

Expert Camino

*He clarifies a few points regarding that there is subsoil contamination at a depth of 6.80 meters and that CVX reports high levels of contamination at 6.28 meters, inferring that this contamination resulted from Texaco's operations. He later emphasizes that the environmental impacts are attributable to the drilling operations and reconditioning of wells, and to chemical products such as the chrome found in the soil samples.*

## THE SETTLING EXPERTS' COMMENTARY ON THE QUESTIONS

**They begin by commenting that the Plaintiffs confuse the location of pits 1 and 2 with the area of prior spillage. Regarding this, they do not establish if responsibility lies with Petroproducción or Texaco, but its designation as prior suggests that the spill could be a result of Texaco's operations, something that has to be cleared up by the settling process.**

**They mention having identified two areas that potentially could be considered sources of contamination. We consider that the term "sources" is not appropriate, because operationally the sources of contamination were the drilling of the well, its completion, the reconditioning and the transportation of the fluids (gas, oil and water) produced by the flow line. It is also incorrect to state that the two mentioned areas were identified, because once identified the contamination was characterized by taking and analyzing the samples they mention.**

<u>*Question 4.2.4 and L.34*</u>

Expert Baca

*He answers the questions in the negative, basing his reply on the results that were obtained. He includes a chart of the maintenance activities performed by Petroecuador, subsequent to the remediation tasks, emphasizing that the wellhead does not have a retention bund, and for that reason he implies that in case of an overflow the fluids possibly reached surfaces beyond the platform.*

Expert Camino

*He underscores that after the so-called remediation, Texaco reported the presence of several toxic chemicals that exceeded the concentrations allowed by rule 3516 and even those allowed by the EPA. He concluded by stating that the toxic chemicals constitute a great risk (a subjective and intuitive evaluation?) for human health, because they have great means of transportation such as the water table, surface streams, livestock, agriculture, etc.*

**THE SETTLING EXPERTS' COMMENTARY ON THE QUESTIONS**

**Based on Table Dir. 10, which compares parameters for water samples with Ecuadoran Environmental Law starting in 1989, they conclude that the analytical results from water on pits 1, 2 and 3 satisfy the permissible limits established in the Environmental Regulations for Hydrocarbon Activities of 1992 and 2001, but not so with the limits established by the TULAS and RO 204. If that is so, why do they not settle this? What is acceptable and what is not?**

## 6.   IMPACTS TO HUMAN HEALTH FROM SOLID, LIQUID AND GASEOUS SUBSTANCES

*Questions 4.6.1, 4.6.2 and L.22, L.32, L.16*

Expert Baca

*He begins by presenting the elements contained in a risk evaluation process, among which he emphasizes: description of the source of hazard, evaluation of toxicity, evaluation of exposure, description of the risks and their respective conclusions.*

*Regarding the source of danger, it is not correct that he classifies as heavy those hydrocarbons included between $C_{16}$ and $C_{35}$, because those from $C_{16}$ are still within the range of solvents or light ones, and the ones from $C_{35}$ are media that correspond to linear alkanes and paraffins.*

*Regarding the evaluation of toxicity, the most accepted way of doing it is a function of the indices known as $LC_{50}$ and $LD_{50}$. And this is not what was done.*

*Regarding the lixiviation toward underground water, it is worth emphasizing that the results obtained are from the ground samples, whose maximum sampling depth did not exceed 1.30 meters.*

*The conclusion arrived at is closely related to the statements that support it. But it is not enough to maintain that it is not required for characterizing the site's specific risks, since at least the risks should have been characterized subjectively and even intuitively. Also, the conclusion avoids addressing the risk assessment asked for in question L.22.*

Expert Camino

*From a non-technical point of view, he indicates that the geological tests (?) indicate there is the presence of oil on the researched sites. He states that the risk to human health is very high, given that the toxic chemicals are deposited amid a very dynamic water table. It is noted that his statements tend to be subjective, because the testing done by the parties in this area are not satisfactorily conclusive.*

## THE SETTLING EXPERTS' COMMENTARY ON THE QUESTIONS

**It is worth emphasizing that one of the Settling Experts' obligations has to do with the quality of the questions' content. Thus question 4.6.2 has been conceptually poorly conceived, because as we stated previously, risks are not caused, but rather evaluated, because what takes place are events, for example impacts to human health.**

**As a conclusion it is evident that the commentary by the Settling Experts tends to coincide with the arguments submitted by Expert Baca. However, the Settling Experts do not indicate that the parties have not abundantly replied to the requirements of questions 4.6.1 and L.22. Also, in our opinion, they lapse into inaccuracies, since they state that the texture of soils made up of clay to clay-silt is a barrier that prevents the free vertical mobilization of contaminants. If [sic] this were so, the rainfall in the Amazon region would translate only into runoff water, because it would not easily migrate in the subsoil until becoming meteoric water.**

*Questions 4.6.2, L.32, L.16*

Expert Baca

*Based on the field and laboratory testing previously discussed, he concludes that no health impact would be anticipated, even if human contact were to occur.*

Expert Camino

*On the contrary, he states that when dangerous wastes (high potential) that are found as solutions and in an immiscible stage reach the flow of the Sur, they will be a deadly*

*danger for livestock and human beings. He states that in the water well there is a relationship between the source, transportation and the transmission of toxic chemicals….*

## THE SETTLING EXPERTS' COMMENTARY ON THE QUESTIONS

**Regarding the area of the "prior spill," they conclude that this area has probabilities (high, medium, low?) of becoming a source of contamination in case that the current conditions change due to any anthropic activity, mainly, or because of some aggressive natural phenomenon. Thence it follows that the presence of contaminants in the area is evident.**

## 7.    IMPACT TO VEGETATION AND LIVESTOCK

*Questions 4.7.1, L.17 and L.18*

Expert Baca

*The arguments he submits to try to show that there is no impact on vegetation and livestock are naive, to say the least. How is it possible to state that hogs can be exposed to soil containing over 19,000 mg/kg of fresh crude oil without suffering any effects? It's possible that could be so, but for a very brief period of exposure. But, what happens if that period lasts one day and then it is every day? Do his statements correspond to the $LC_{50}$ and $LD_{50}$ toxicity indices for hogs, in this case? We assume they do not. A similar interpretation can be made in the case of cows and vegetation. The bottom line is that he does not answer the questions satisfactorily.*

Expert Camino

*He bases his arguments on the statement by Mr. Aníbal Baño and on a bibliographic description of hydrocarbons' effects on abiotic and biotic  environments and on humans, but does not submit concrete results that these effects are manifesting. He also refers to geological research, as the basis for expecting that toxic chemicals may have been incorporated into the surface water consumed by livestock and in agriculture.*

**THE SETTLING EXPERTS' COMMENTARY ON THE QUESTIONS**

**They conclude that the evidence submitted by the parties are not enough to be able to confirm or reject the impact on vegetation and livestock in the area surrounding the well. We agree with this opinion.**

## 8.      RECONDITIONING WORK ON WELL SACHA 53 BY PETROECUADOR

*Questions 4.3.1, L.21*

Expert Baca

In addition to submitting a chart of the three reconditioning works performed by Petroecuador on well Sacha 53, he suggests that because the wellhead does not have a fluid retention bund, if the bund overflowed the fluids possibly reached surfaces beyond the platform.

Expert Camino

Submits similar details regarding the reconditioning, but refers to the toxicity from hydrochloric acid, used in stimulating the well, and at the same time declares that the contractor for the well's maintenance has the obligation to take the toxic waste to the plant of a company specializing in the final disposal.


**THE SETTLING EXPERTS' COMMENTARY ON THE QUESTIONS**

**They agree with Expert Camino, nonetheless it is worth noting that the operator had and has the obligation of applying the relevant Environmental Management Plan (EMP), and if it complied with the Environmental Rules, you need to have the relevant reports on the application of the aforementioned EMP.**

## 9.    THE COMPOSITION OF OIL

*Questions 4.5.2, F.41.749 (Eng. Baca) and L.2, F.52.791 (Eng. Camino)*

Expert Baca

He does not submit the physical and chemical composition of the oil from the Sacha field; he barely states general opinions on the presence of metals, BTEX and PAHs in the composition of crude oil. In summary, he does not answer the questions.

Expert Camino

He submits the undated description of the crude from Sacha Norte Station, carried out at the laboratory at the School of Chemical Engineering of the Central University. A significant presence of metals can be observed. This description is incomplete, because it does not include the chromatographic details, which are important in establishing the molar fraction of each component or groups of components of hydrocarbons in oil.

**THE SETTLING EXPERTS' COMMENTARY ON THE QUESTIONS**

**Because there was not a complete description of the crude oil from the Sacha field, it is not reasonable that the potential danger from the presence of this crude in the environment be understood solely based on the presence of some heavy metals.**

*Questions 4.5.2, F.41.749 (Eng. Baca) and L.2, F.52.791 (Eng. Camino)*

## 10.   NATURAL BIODEGRADATION

*Questions 4.5.1, F.41.746 (Eng. Baca) and L.1, F.52.791, L.3, F.52.793 (Eng. Camino)*

Expert Baca

*The opinions and analyses submitted regarding crude oil's natural biodegradation, especially in its first stages of occurrence in the Oriente Region, are in accordance with the testing and observations available on the subject. However, it is not correct to state that as a result of biodegradation the hydrocarbon changes to an immobile and less toxic state. Obviously, a clear distinction between the occurrence of natural biodegradation into aerobic conditions (presence of oxygen) and the natural biodegradation into anaerobic conditions (absence of oxygen) has to be established.*

*He is correct when he states that as a product of natural aerobic biodegradation, plus the action of other surface factors such as temperature, precipitation, relative humidity, available nutrients and others, the total mass of the oil will decrease in variable proportions that depend on the aforementioned factors and the composition of the oil. This implies that the remaining crude, because it no longer has the light components, will be composed of long-chain and complex compounds, in addition to heavy metals. If we compare the viscosity of the original oil with that of degraded and biodegraded oil, the latter's viscosity will be greater than that of the former's. Viscosity is understood to be the property of a substance to resist the flow when it is subjected to a force that seeks to give it movement. The greater the viscosity of a substance is, the greater its resistance to flow. But this does not mean it cannot move, that it remains immobile.*

*In conditions of surface drainage, given by the velocity of runoff water, the slope of the ground and any prevailing creeping vegetation, the oil, in addition to moving because of gravity, will move more dynamically because of the dragging strength of water. In the subsoil, due to the covered pits, the oil will enter into competition with water to continue occupying the porous environment. Because the Amazon region gets more than three meters of rainfall per square meter per year, part of that volume will be introduced into the pits and will shift any oil that may have mobility, that is to say, that is not wetting primarily the porous medium and that is not subjected to the effects of capillary pressures, which decrease as the capillary's diameter increases. Then the volume of mobile oil will be displaced toward a site or sites of lesser resistance or with better flow conditions, and for this reason it is likely that it will remain in the pit, reach the surface and even migrate to the aquifers.*

Expert Camino

*Possibly from a geochemical point of view, the natural degradation of oil in anaerobic conditions may occur between one million and ten million years, which is partially*

*corroborated by G. Montenegro and M. García (Geochemical Analysis of Crude of Oriente in Ecuador, p. 99, Report from the 7th Congress on Geology, Oil and the Environment,) when they state that "the relationship between the depth of the reservoirs and the API gravity is impacted by the biodegradation that occurs at higher levels than the occurrence of the sterilization temperature of the reservoirs; for example, in the Libertador field we have found the occurrence of biodegraded oils only for "U" sandstone, never for "T" sandstone…."*

*In addition, it is known that in several oilfields around the world specialized strains of bacteria have been inoculated in order to extract more oil than was anticipated through the metabolism of chain n-alkanes and paraffin, which entails the partial biodegradation of oil in very short periods of time.*

**THE SETTLING EXPERTS' COMMENTARY ON THE QUESTIONS**

**They are in accordance with the statements by Expert Baca, emphasizing that the testing of the research of biodegradation on oil from Central Sacha is for laboratory conditions. They conclude that the processes of biodegradation are complex and that the time in which crude degrades varies and depends on the oil's characteristics, the environment and diversity of the organisms degrading fractions of hydrocarbons. But when referring to the case of well Sacha 53, when referring [sic] to the oil contamination, they stress the "in the first years, these contaminants must have caused serious harm to organisms of the tropical ecosystem, which gradually, over more than 30 years, degraded some of the hydrocarbon compounds. After this period we can then state that there still exist in the area fractions of recalcitrant crude." Meaning that, in this case, the degradation and biodegradation did take place, but were not enough to make all the oil disappear. They do not comment on the supposed immobility of the remaining degraded oil.**

## 11.    BENEFITS OF THE MITIGATION

*Questions 4.7.2, F.41.766 (Eng. Baca) and L.19, F.52.801 (Eng. Camino)*

Expert Baca

*Reiterates his opinion that the degraded oil that is present in the subsoil nor [sic] the asphalt represent a threat to livestock and plants, and does not merit corrective actions.*
Expert Camino

*He estimates that the surface of an area of 6,522 $m^2$ is about to be remediated, that the presence of oil must be at a minimum depth of 8 meters, and therefore the volume of soil to be remediated would be 521,776 $m^3$.*

## THE SETTLING EXPERTS' COMMENTARY ON THE QUESTIONS

They partially agree with Expert Camino when they mention that the "area of the Prior Spill," by the way, not acknowledged by the Defendant, must be remediated, despite not knowing the origin of the contamination (due to the lack of scientific evidence.)

### MONITORSHP'S CONCLUSION

It is evident that the Experts from both the Plaintiffs and the Defendant have answered the questions by the Presiding Judge of the Superior Court of Justice of Nueva Loja, with the aim of having their scientific, technical, environmental and social arguments prevail. That is why their focus, opinions and conclusions almost did not coincide.

In these circumstances, the role to be played by the Settling Experts is key, because theoretically their function is to reach precise conclusions and recommendations that may allow the Judge hearing the case to fairly rule in favor or against Plaintiffs or Defendant, in favor or against both. But this has not happened, given that the Settling Experts, having avoided their capacity and obligation to settle, have limited themselves only to making comments on the questions answered by the Experts from each of the parties.

Nevertheless, this Monitorship considers that the contents of the answers to the questions, even though some contain inaccuracies and even a lack of knowledge of the basic laws of Earth Sciences, make it possible to settle [issues] fairly, and consequently, allow the Judge in this case to issue his verdict.

CERTIFIED TRANSLATION

# Exhibit Q

Annotations by Mr. Reyes Cisneros regarding the meeting of September 20, 2006, with the Plaintiffs.



_____ [Signature] _____
Ramiro Fernando Reyes Cisneros

[*Exhibit Q*]

# SEPTEMBER
# 20
Wednesday

The Court wants it to be decided by one expert only, which could be inadmissible

It was proposed to me that I go to this address.
GLOBAL ASSESSMENT: Diagnosis of the operations area that can begin in October
November

       C.V.:

               50% Chevron
Payments:          50% Amazonía Vida

-------------------- 0 -------------------- 0 --------------------
               CIGMYP

-     Dr. Barriga – International Law
          Books

1     About inspected crude
      Perform an assessment
2     Inspection Block 15
         Property Plant or Equipment
         UR:   Property Plant and Equipment
             M. Baquero

"What is goodness?
It is simply love."
*Leo Tolstoy*

# 2006



# Exhibit R

Annotations by Mr. Reyes Cisneros regarding the meeting of January 26, 2006, with Mr. Donziger



_____
[Signature]
Ramiro Fernando Reyes Cisneros

[*Exhibit R*]

# JANUARY
## 26
### Thursday

Meet S. Dozzinger [sic] / F. Peñafiel


1.    Chevron arbitration, sues the Ecuadoran State

  Ecuador has hired law firm

  1977 → 65.5% state, has to do with the

  arbitration. Needs witnesses

  Copy of documents

2.  Johnny has deadline of February 1

  Submitted to judge of Lago Agrio

  Adolfo Callejas


3.    a) Texaco seeks [illegible]  evidence and
  b) Delay the trial
  Pablo Fajardo, plaintiffs' attorney
  Texaco <u>30</u> inspections
  Plaintiffs <u>122</u> inspections, and proceed to
  a specialized global assessment
  35 inspections performed, need 10 from Texaco



# 2006

*C E R T I F I E D   T R A N S L A T I O N*

# Exhibit S

[PHOTO]

# Esperanza Martínez



[Stamp of the 3rd Notary Public of
Cartagena, Republic of Colombia]

[Signature]
Ramiro Fernando Reyes Cisneros

*R I V E R A   I N T E R P R E T I N G ,   I N C .*
*Certified by:  U.S. & California Courts, American Translators Assn.  –  Tel. 310.621.7683*

*C E R T I F I E D   T R A N S L A T I O N*

# Exhibit T

[PHOTO]

# Alberto Acosta



[Stamp of the 3rd Notary Public of
Cartagena, Republic of Colombia]

_____
[Signature]
Ramiro Fernando Reyes Cisneros

*R I V E R A   I N T E R P R E T I N G ,   I N C .*
*Certified by:  U.S. & California Courts, American Translators Assn.  –  Tel. 310.621.7683*

*C E R T I F I E D   T R A N S L A T I O N*

# Exhibit U

[PHOTO]

# Adolfo Maldonado



[Stamp of the 3rd Notary Public of
Cartagena, Republic of Colombia]

_____
[Signature]
Ramiro Fernando Reyes Cisneros

*R I V E R A   I N T E R P R E T I N G ,   I N C .*
*Certified by:  U.S. & California Courts, American Translators Assn.  –  Tel. 310.621.7683*

*CERTIFIED TRANSLATION*

# Exhibit V

[PHOTO]

# Julio Prieto



[Stamp of the 3rd Notary Public of
Cartagena, Republic of Colombia]

_____
[Signature]
Ramiro Fernando Reyes Cisneros

*RIVERA INTERPRETING, INC.*
*Certified by:  U.S. & California Courts, American Translators Assn.  –  Tel. 310.621.7683*

*CERTIFIED TRANSLATION*

# Exhibit W

[PHOTO]

# Carlos Martín Beristain



[Stamp of the 3rd Notary Public of
Cartagena, Republic of Colombia]

[Signature]
Ramiro Fernando Reyes Cisneros

*RIVERA INTERPRETING, INC.*
*Certified by:  U.S. & California Courts, American Translators Assn.  –  Tel. 310.621.7683*

*C E R T I F I E D   T R A N S L A T I O N*

1

# Exhibit X

Annotations by Mr. Reyes Cisneros regarding the meeting of December 15, 2006, with Mr. Donziger at the Amazonía por la Vida office.



_____  [Signature]  _____
Ramiro Fernando Reyes Cisneros

*C E R T I F I E D   T R A N S L A T I O N*

2

[*Exhibit X*]

# DECEMBER
# 15
Friday

### STEEVE [sic] DOZINGER [sic]

- Possible appointment expert *next week*
- Global assessment         |* costs damages
  NAPO Concession           |* Responsibility Technical Arguments
- I would establish the costs

$$3.5 \longrightarrow 1$$

$$547 \longrightarrow 0.238$$

$$X \longrightarrow 0.762$$

$$\cancel{2298 \longrightarrow 24 \text{ hours}}$$

production + power oil

$$490 \longrightarrow 5 \text{ hours} \qquad 2352$$

$$X \ ---- \ 24 \text{ hrs} \quad = \quad \cancel{11760} \text{ bfpd}$$
14"

Well production = 500 bppd          $\cancel{7056}$ bppd
                                      941

Power oil = 900 bppd          $\cancel{4704}$ bapd

---

1 foot  =  [illegible]

   X          Y
93'382.864
73'629.144
19'753.720

"Work to prevent crime in order to
avoid punishment."
*Confucius*

# 2006



*C E R T I F I E D   T R A N S L A T I O N*

1

# Exhibit Y

Annotations by Mr. Reyes Cisneros regarding the discussion of January 5, 2007, with Pablo Fajardo.



_____ [Signature] _____
Ramiro Fernando Reyes Cisneros

[*Exhibit Y*]

# Friday                    5                    January

## <u>Texaco Case</u>

Financial issue          Monthly $3,000
                         Report $15,000

Work [that] was done by the team from here

pafam@ecuanex.net.ec



"Refusing to do unimportant things
is a decisive precondition for success."
*Alexander Mackenzie*

2007

*C E R T I F I E D   T R A N S L A T I O N*

1

# Exhibit Z

Annotations by Mr. Reyes Cisneros regarding the meeting of February 1, 2007, with several members of the Plaintiffs' legal team.



_____[Signature]_____
Ramiro Fernando Reyes Cisneros
[*Exhibit Z*]

# Thursday        1        February

Roads take you there and back

Mayas

TEXACO CASE
- Possible application of methodology
  Impact evaluation.
- Differences in practices between TX-PETECU
- Mechanisms used
- Exploration areas
- Accumulation  and  Synergies

IT IS ABOUT AN EX POST EIA [Environmental Impact Assessment] THAT
RESULTS IN THE REPARATION

|  |  |  |
|---|---|---|
|  |  | Restitution [illegible] |
|  | IMPACTS | Compensation |
|  | TYPE | Rehabilitation |
|  |  | Satisfaction |
|  |  | Guarantees No Repetition |

REPARATION      Individual/Group → Beneficiaries

| | | |
|---|---|---|
| Expectations and Process Info + Formation [illegible] | Include the process | |
| Explore Alternatives | [Illegible] | Expert assessment Post. |
| | Posterior | [illegible] [illegible] |



2007

*C E R T I F I E D   T R A N S L A T I O N*

1

# Exhibit AA

Annotations by Mr. Reyes Cisneros regarding the meeting of February 9 or 10 of 2007, at the Quito Hotel, with Mr. Donziger and Mr. Cabrera.



_____ [Signature] _____
Ramiro Fernando Reyes Cisneros

[*Exhibit AA*]

Friday                              9                         February


Ivonne  -  Daimi Services

Ticket:

7129   Steve


Steven Donziger
sdonziger@gmail.com


Richard  Cabrera
ingrcabrerav@hotmail.com


DAIMIPERU:              (511)  2427273
                       (511)  4450686


www.conam.gov.pe



"Cherish your visions and your dreams
as they are the children of your soul;
the blueprints of your ultimate achievements."
*Napoleon Hill*

2007

# Exhibit BB

Annotations by Mr. Reyes Cisneros of February 24 or 10 of 2007,
regarding the telephone call with Messrs. Donziger, about the expert assessment.



_____ [Signature] _____
Ramiro Fernando Reyes Cisneros

[*Exhibit BB*]

# Saturday                    24              February

COUSINS

6 x 12 = $72
<u>30</u>
$102

JORGE REYES 30052734-04

CHECKING ACCT.

-------------------- 0 -------------------- 0 -------------------- 0 -------------------- 0 --------------------

STEVE          And Others

GLOBAL ASSESSMENT

-   It is not possible <u>two</u> experts          | 1. Our friend
    In the Term of 90 days          | 2. My help

# Sunday                    25              February



# 2007

*C E R T I F I E D   T R A N S L A T I O N*                    Page **1** of **3**

# Exhibit CC

Annotations by Mr. Reyes Cisneros regarding the meeting of March 3, 2007, regarding the global assessment, at the office of Amazonía por la Vida, in Quito.



_____ [Signature] _____
Ramiro Fernando Reyes Cisneros

*R I V E R A   I N T E R P R E T I N G ,   I N C .*
*Certified by:  U.S. & California Courts, American Translators Assn.  –  Tel. 310.621.7683*

[*Exhibit CC*]

# Friday                    2                    March

<u>EXPERT'S GLOBAL ASSESSMENT PLAN</u>

(The remainder of the page consists of handwritten notes in English.)

"The saddest part of life lies not in the
act of dying, but in failing to truly live
while we are alive."

*Robin S. Sharma*

2007



| Saturday | 3 | March |
|---|---|---|

HOUSE
2923044
AL ECHEV.

[The remainder of the page includes mostly handwritten notes in English.]

| Sunday | 4 | March |
|---|---|---|

$1 \times 10^9$ feet$^3$ of [illegible] to disperse the water

*no rivers, streams  containment barrier*
absorbent material

17 – 20 years
1000 [illegible]
200 [illegible]
 80 [illegible] the first 3 years

------------------- 0 ------------------- 0 -------------------

## T A S K S

- Definition – Work Plan   |Dates
  |Work
  |Costs

2007



*C E R T I F I E D   T R A N S L A T I O N*

# Exhibit DD

[PHOTO]

# Charlie Champ



[Stamp of the 3rd Notary Public of
Cartagena, Republic of Colombia]

_____
[Signature]
Ramiro Fernando Reyes Cisneros

*C E R T I F I E D   T R A N S L A T I O N*

# Exhibit EE

[PHOTO]

# Ann Maest



[Stamp of the 3rd Notary Public of
Cartagena, Republic of Colombia]

_____
[Signature]
Ramiro Fernando Reyes Cisneros

*C E R T I F I E D   T R A N S L A T I O N*

# Exhibit FF

[PHOTO]

# Dick Kamp



[Stamp of the 3rd Notary Public of
Cartagena, Republic of Colombia]

_____
[Signature]
Ramiro Fernando Reyes Cisneros

## *RIVERA INTERPRETING, INC.*

*Tel. 310.621.7683 ▪ jrivera62@yahoo.com ▪ Fax 818.341.8958*

Dec. 11, 2012

Re: "Exhibits to the Declaration of Ramiro Fernando Reyes Cisneros"

To Whom It May Concern:

I, Jesús Rivera, affirm that I am a certified judicial interpreter and translator of the Spanish and English languages. I am certified by:

*   The Judicial Council of the State of California, since 2000,
*   The Administrative Office of the U.S. Courts, since 2006,
*   The American Translators Association (English ↔ Spanish) since 2008.

I affirm that on Dec. 11, 2012, as contracted by Gibson, Dunn & Crutcher LLP, I finished translating from the Spanish into the English language 32 documents consisting of 32 Exhibits to the "DECLARATION OF RAMIRO FERNANDO REYES CISNEROS," and that said translations are true and accurate to the best of my ability.

The translated documents bear the following titles:

| Exhibit A | Exhibit B | Exhibit C | Exhibit D | Exhibit E | Exhibit F |
| --- | --- | --- | --- | --- | --- |
| Exhibit G | Exhibit H | Exhibit I | Exhibit J | Exhibit K | Exhibit L |
| Exhibit M | Exhibit N | Exhibit O | Exhibit P | Exhibit Q | Exhibit R |
| Exhibit S | Exhibit T | Exhibit U | Exhibit V | Exhibit W | Exhibit X |
| Exhibit Y | Exhibit Z | Exhibit AA | Exhibit BB | Exhibit CC | Exhibit DD |
| Exhibit EE | Exhibit FF | | | | |
| | | | | | |

Sincerely,

Jesús Rivera

Certified by: U.S. & California Courts and the American Translators Association

# Anexo A



# Steven Donziger





Ramiro Fernando Reyes Cisneros

# Anexo B



# Fausto Peñafiel





Ramiro Fernando Reyes Cisneros



# **Anexo C**

Anotaciones del Sr. Reyes Cisneros sobre la reunión del 17 de noviembre del 2005, con el Sr. Peñafiel, el Sr. Donziger, y el Sr. Pinto, en la antigua sede del CIGMYP.





Ramiro Fernando Reyes Cisneros



Thursday
Jueves                    Noviembre                    17

CASO 7ETACO!

· Buscado forma un grupo de "veedores"
  independientes

# **Anexo D**

Anotaciones del Sr. Reyes Cisneros sobre la reunión del 23 de noviembre del 2005, con el Sr. Donziger, el Sr. Peñafiel, y el Sr. Pinto en la antigua sede del CIGMYP.



Ramiro Fernando Reyes Cisneros

Wednesday
Miércoles

23

Caso Texaco  Steven Donziger
Fausto Penafil

• Reunión en Johnny Zambrano (oir los puntos
   Miriela Esteban?
   Ing. Gerardo Barros
   Dr. Luis Alhy.
   Jorge juride
   [illegible]
   Pavio Melo

• Carta de lo que se hará en [illegible]
  [illegible handwritten lines]
  [illegible handwritten lines]
  [illegible handwritten lines]
  [illegible handwritten lines]
  [illegible handwritten lines]
  [illegible]

COMENTARIOS





# **Anexo E**

Anotaciones del Sr. Reyes Cisneros sobre la reunión del 29 de noviembre del 2005, con el Sr. Pinto y los peritos dirimentes, en la oficina del Sr. Zambrano.





Ramiro Fernando Reyes Cisneros

Tuesday
Martes

November

29

Caso Texaco: Jonny Zambrano

- los demandas no se publico. Demanda Cofn
  - ante las inspecciones Hay Los 29, febrero 201
  - 2 por inspección -

- Revisión legal que promueve cyst e del
  180 JA-13

- Seguiente recriminaciones Texaco
- Jurisma es constatado. se les envio notos
  la responsabilidad del respuesto
  texto.

- Acceso: Seguiente
  texacos 35 mayoria
- Se mueve el tema se anticipo sous potensial

- news germanios Feri Petroleros

COMENTARIOS





# **Anexo F**

Anotaciones del Sr. Reyes Cisneros sobre la reunión de 9 enero del 2006, con el Sr.
Pinto.





Ramiro Fernando Reyes Cisneros

ENERO.......

9

lunes.......

- Ca—tas ....... .....
- P.......... de .........:
- MFR.........

.......... .......... .......

.......... .......... ..........

LIBROS PERSONALES POR COBRAR

.......... ..........

Ex .......... ..........

.......... ....ing

J........ de VIST

.......... Washi /B....

.......... pag....

.......... /p.fe VTR





# **Anexo G**

Carta enviada al Doctor German Yañez, Presidente de la Corte de Sucumbíos, el 20 de enero del 2006.





Ramiro Fernando Reyes Cisneros



MIEMBRO DE LA SOCIEDAD
DE INGENIEROS DEL ECUADOR

# COLEGIO REGIONAL DE INGENIEROS GEOLOGOS, DE MINAS , PETROLEOS Y AMBIENTAL, CIGMYP

Oficio No. 043- CIGMYP-2006
Quito,  20 de Enero del 2006

Señor Doctor
Germán Yánez
JUEZ DE LO PENAL
CORTE SUPERIOR DE SUCUMBIOS
En su despacho

Señor Juez:

El Colegio de Ingenieros Geólogos de Minas, Petróleos y Ambiental, CIGMYP, Región Norte, que agrupa a más de 1500 profesionales tiene entre sus finalidades: realizar análisis permanentes de los problemas geológicos, mineros, petroleros del país; Asesorar al Estado y a las Instituciones de Derecho Público o Privado en la realización de estudios, presentación de proyectos, investigaciones, contrataciones, ejecución, supervisión y fiscalización de obras y proyectos relacionados con la Ingeniería Geológica, de Minas y Petróleos velando por el desarrollo integral del país; y, Coadyuvar a la defensa y fortalecimiento de los principios encaminados a proteger y precautelar los recursos naturales del país

La Ley Orgánica de Transparencia y Acceso a la Información Pública, Ley No. 2004-34, establece entre otras cosas, en su Artículo 2. Objeto de la Ley, literal c) **"Permitir la fiscalización de la administración pública y de los recursos públicos, efectivizándose un verdadero control social"** y en el Artículo 4. Principios de Aplicación de la Ley, literal a) **"Garantizar el manejo transparente de la Información pública, de manera que se posibilite la participación ciudadana en la toma de decisiones de interés general y la rendición de cuentas de las diferentes autoridades que ejerzan el poder público".**

Con estos antecedentes, cúmpleme comunicarle que en Sesión Ampliada de Directorio del CIGMYP del 22 de noviembre del 2005, decidió que nuestro gremio profesional conforme una Veeduría para el seguimiento del Caso Texaco que se ventila en la Corte de sus acertada conducción.

Para el mejor cumplimiento y gestión transparente en torno a la Veeduría, en la mencionada Sesión de Directorio, se delegó a los Ingenieros Fernando Reyes Cisneros y Gustavo Pinto Arteaga, ambos reconocidos profesionales de la Ingeniería en Petróleos, con vasta y amplia experiencia en la Gestión Ambiental de la actividad hidrocarburífera

Por consiguiente, me permito solicitar que a a los dos profesionales se les brinde las facilidades del caso, para que puedan cumplir a satisfacción con la responsabilidad a ellos encomendada;

Aprovecho la oportunidad para reiterar a usted  los sentimientos de alta consideración y estima.

Atentamente,

ING. GUSTAVO PINTO ARTEAGA
PRESIDENTE

Edificio Río Amazonas  •  Av. Amazonas 447 y Roca  •  Oficinas 212 / 214  Teléfono: 2541-740 / 2567-730
Fax: 2232-006  •  e-mail: cigmyp@ulo.satnet.net      QUITO - ECUADOR, SUDAMERICA

