UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
CHEVRON CORPORATION,                          :
                                              :
                          Plaintiff,          :
                                              :
          -against-                           :
                                              :   Case No. 11 Civ. 0691 (LAK)
                                              :
STEVEN R. DONZIGER, et al.,                   :
                                              :
                          Defendants.         :
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**CHEVRON CORPORATION'S MEMORANDUM OF LAW IN SUPPORT
OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON ALL
CLAIMS, COUNTERCLAIMS AND AFFIRMATIVE DEFENSES, AND
SUMMARY JUDGMENT ON DEFENDANTS' AFFIRMATIVE DEFENSE
OF COLLATERAL ESTOPPEL**


GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

*Attorneys for Plaintiff Chevron Corporation*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT .................................................................................. 1

STATEMENT OF FACTS .......................................................................................... 5

I.      Defendants' Initial Frauds: Manipulated Data and Falsified Expert Opinions.................. 5

II.     Defendants Coerced the Court Into Appointing a Special Master They
        Controlled ...................................................................................................... 7

        A.      The Fake "Independent" Special Master.................................................... 7

        B.      The Fake "Independent" Global Assessment............................................. 8

III.    Defendants Bribed the Judge to Issue Their Own Ghostwritten Judgment .................... 12

IV.     The Ecuadorian Judgment Is Tainted by Fraud in Every Material Aspect...................... 17

        A.      "Fusion Memo": Holding Chevron Liable for TexPet's Alleged
                Conduct .............................................................................................. 18

        B.      The Clapp Memo and Selva Viva Data Compilation: Contamination.................. 19

        C.      Cabrera, Phantom Pit Counts, and Potable Water: "Remediation" Costs.............. 20

        D.      The Moodie Memorandum and Clapp: Bungled and Illicit Causation ................. 21

        E.      Creation of a Trust to Assist Defendants' Allocation of Judgment
                Proceeds .............................................................................................. 22

V.      The Appellate Court Refused to Meaningfully Consider the Fraud Evidence ................ 23

VI.     An Increasingly Corrupt Judiciary and Executive Intimidation Presented
        Opportunities for Defendants to Compromise the Court................................................. 24

ARGUMENT ........................................................................................................... 24

I.      Defendants Have Committed RICO Predicate Acts of Wire Fraud ................................ 25

II.     Defendants Have Laundered Money and Violated the FCPA .......................................... 26

III.    All Defendants' Defenses of Collateral Estoppel Fail.................................................... 27

        A.      Judgments Procured by Fraud Are Not Recognizable Where the Fraud
                Undermined the Integrity of the Judicial Process .................................................. 28

        B.      The Lago Agrio Judgment Was Obtained by Fraud and Is
                Unrecognizable ...................................................................................... 30

**TABLE OF CONTENTS**
**(Continued)**

Page

    1.    The LAPs' Unfiled Work Product Nullifies the Judgment ......................... 31

    2.    Defendants' Strategy of Corruption Nullifies the Judgment ..................... 32

    3.    Defendants' Bribery Nullifies the Judgment ............................................. 32

IV.    These Established Facts Partially Resolve Additional Claims and Defenses .................. 32

V.    The LAPs Are Liable for the Acts of Agents Like Donziger, Stratus, and Fajardo ........................................................................................................ 33

CONCLUSION ........................................................................................................ 35

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ackermann v. Levine,*
    788 F.2d 830 (2d Cir. 1986) ................................................................. 27

*Aguinda v. Texaco Inc.,*
    142 F. Supp. 2d 534 (S.D.N.Y. 2001) ................................................... 19

*Alfadda v. Fenn,*
    966 F. Supp. 1317 (S.D.N.Y. 1997) ...................................................... 27

*Aoude v. Mobil Oil Corp.,*
    892 F.2d 1115 (1st Cir. 1989) ............................................................... 30

*Beck v. Manufacturers Hanover Trust Co.,*
    820 F.2d 46 (2d Cir. 1987) .................................................................... 26

*Browning v. Navarro,*
    826 F.2d 335 (5th Cir. 1987) ........................................................... 29, 32

*Buxton Mfg. Co. v. Valiant Moving & Storage, Inc.,*
    657 N.Y.S.2d 450 (N.Y. App. Div. 1997) ............................................... 4

*Caperton v. A. T. Massey Coal Co.,*
    556 U.S. 868129 S. Ct. 2252 (2009)...................................................... 29

*Chemical Bank v. Affiliated FM Ins. Co.,*
    169 F.3d 121 (2d Cir. 1999) .................................................................. 34

*Combs v. Rockwell Int'l Corp.,*
    927 F.2d 486 (9th Cir. 1991) ................................................................ 30

*Dooley v. United Techs. Corp.,*
    1992 U.S. Dist. LEXIS 8653 (D.D.C. June 16, 1992)........................... 27

*Echelon Int'l Corp. v. America West Airlines, Inc.,*
    85 F. Supp. 2d 313 (S.D.N.Y. 2000) ..................................................... 25

*Fraige v. American-National Watermattress Corp.,*
    996 F. 2d 295 (Fed. Cir. 1993) ........................................................ 28, 31

*Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading, Inc.,*
    697 F.3d 59 (2d Cir. 2012) .................................................................... 34

# TABLE OF AUTHORITIES
## (Continued)

Page(s)

*Green v. Mayor & City Council of Baltimore,*
198 F.R.D. 645 (D. Md. 2001) ................................................................ 30

*Harre v. A.H. Robins Co.,*
750 F.2d 1501 (11th Cir. 1985) ............................................................. 32

*Hazel-Atlas v. Hartford-Empire,*
322 U.S. 241 ..................................................................... 5, 30, 31, 32

*Hilton v. Guyot,*
159 U.S. 113 (1895) ..................................................................... 28, 29

*In re Burke,*
374 B.R. 781 (Bankr. D. Colo. 2007) ....................................................... 29

*Madanes v. Madanes,*
981 F. Supp. 241 (S.D.N.Y. 1997) .......................................................... 26

*Manez Lopez v. Ford Motor Co.,*
470 F. Supp. 2d 917 (S.D. Ind. 2006) ...................................................... 29

*McNally v. U.S.,*
483 U.S. 350, 97 L. Ed. 2d 292, 107 S. Ct. 2875 (1987) ................................... 25

*Minneapolis, St. Paul & S.S. Marie Ry. Co. v. Moquin,*
283 U.S. 520, 51 S. Ct. 501, 502 (1931) ................................................... 28

*Morgan v. United States,*
304 U.S. 1 (1938) ..................................................................... 29, 32

*Rider v. Sandoz Pharms. Corp.,*
295 F.3d 1194 (11th Cir. 2002) ............................................................ 22

*Rozier v. Ford Motor Co.,*
573 F.2d 1332 (5th Cir. 1978) ............................................................. 28

*Schmuck v. U.S.,*
489 U.S. 705 (1989) ....................................................................... 25

*Seaboldt v. Pennsylvania RR. Co.,*
290 F.2d 296 (3d Cir. 1961) ............................................................... 28

*Transportes Aereos Pegaso, S.A. de C.V. v. Bell Helicopter Textron, Inc.,*
623 F. Supp. 2d 518 (D. Del. 2009) ........................................................ 29

# TABLE OF AUTHORITIES
## (Continued)

Page(s)

*U.S. v. Autuori,*
  212 F.3d 105 (2d Cir. 2000) ............................................................................ 25, 26

*U.S. v. Piervinanzi,*
  23 F.3d 670 (2d Cir. 1994) .................................................................................... 26

*United States v. Manton,*
  107 F.2d 834 (2d Cir. 1938) ............................................................................ 29, 32

*United States v. Mittelstaedt,*
  31 F.3d 1208 (2d Cir. 1994) ................................................................................. 26

*United States v. Throckmorton,*
  98 US 61 (1878)...................................................................................................... 29

*W. Gillette v. Ariz. Corp. Comm'n,*
  121 Ariz. 541 (Ariz. Ct. App. 1979)...................................................................... 29

**Statutes**

15 U.S.C. § 78dd-3 ...................................................................................................... 27

18 U.S.C. § 1343............................................................................................................ 4, 25

18 U.S.C. § 1952 ............................................................................................................ 26

18 U.S.C. § 1956(a)(2)(A) ............................................................................................ 4, 26

18 U.S.C. § 1961(1) ....................................................................................................... 25, 26

18 U.S.C. § 1961(a) ....................................................................................................... 26

N.Y. Penal L. § 110.00 ................................................................................................... 4

N.Y. Penal L. § 155.05(2)(c) ......................................................................................... 4

**Other Authorities**

Restatement (Second) of Judgments § 70 cmt. d................................................................ 28, 29

**Rules**

Fed. R. Civ. P. 56(a) ...................................................................................................... 25

**TABLE OF AUTHORITIES**
**(Continued)**

Page(s)

Fed. R. Civ. P. 56(g) ............................................................................... 25

N.Y. CPLR § 5304(b)(3) ......................................................................... 27

## TABLE OF ABBREVIATIONS AND DEFINED TERMS

The following abbreviations and defined terms will be used in this Memorandum of Law:

| | |
|---|---|
| Beltman | Defendant Douglas Beltman |
| Cabrera Report | The expert report submitted in the Lago Agrio Litigation under the name of the court-appointed expert, Richard Stalin Cabrera Vega |
| Callejas Dec. | The Declaration of Adolfo Callejas Ribadeneira, filed concurrently herewith as Exhibit E to the Declaration of Randy M. Mastro |
| Campuzano Decl. | The Declaration of Patricio Efrain Campuzano Merino, filed concurrently herewith as Exhibit G to the Declaration of Randy M. Mastro |
| Carvajal Decl. | The Declaration of Enrique Carvajal Salas, filed concurrently herewith as Exhibit H to the Declaration of Randy M. Mastro |
| Defendants | All Defendants to this action generally |
| Donziger | Defendants Steven Donziger, The Law Offices of Steven R. Donziger, and Donziger & Associates PLLC |
| Fajardo | Defendant Pablo Estenio Fajardo Mendoza |
| Guerra Decl. | The Declaration of Alberto Guerra Bastidas, filed concurrently herewith as Exhibit C to the Declaration of Randy M. Mastro |
| Lago Agrio Litigation | *Maria Aguinda et al. v. Chevron-Texaco*, the litigation brought by the LAPs in Lago Agrio, Ecuador |
| LAP Team | The lawyers and other representatives of the LAPs and their agents and employees, including but not limited to Donziger, Fajardo, Yanza, Stratus, Julio Prieto, Juan Pablo Saenz, Selva Viva, and the Amazon Defense Front |
| LAPs | The plaintiffs in the Lago Agrio Litigation, including appearing Defendants Hugo Gerardo Camacho Naranjo and Javier Piaguaje Payaguaje |
| Maest | Defendant Ann Maest |
| Racines Decl. | The Declaration of Ivan Alberto Racines Enriquez, filed concurrently herewith as Exhibit F to the Declaration of Randy M. Mastro |

| | |
|---|---|
| Reyes Decl. | The Declaration of Ramiro Fernando Reyes Cisneros, previously filed at Dkt. 658-18 – 658-21. |
| Rivero Decl. | The Declaration of Andrés Rivero, filed concurrently herewith as Exhibit I to the Declaration of Randy M. Mastro |
| ROE | The Republic of Ecuador |
| Stavers Decl. | The Declaration of Jason B. Stavers, filed concurrently herewith |
| Stratus | Defendants Stratus Consulting, Inc., Douglas Beltman, and Ann Maest |
| St. __ | Chevron's Local Rule 56.1 Statement of Material Facts, filed concurrently herewith |
| Yanza | Defaulted defendant Luis Francisco Yanza Angamarca |

## PRELIMINARY STATEMENT

Despite many opportunities, Defendants have never even attempted to defend their conduct in key areas of Chevron's case against them. Instead, they have grasped at every conceivable procedural straw to try to avoid having to defend the indefensible, invented irrelevant falsehoods about Chevron's supposed conduct in Ecuador, and smeared this Court with fabricated and shameful charges. Two years into this case, the record of Defendants' misconduct remains, in every meaningful sense, undisputed. And now, key insiders to Defendants' scheme—including Alberto Guerra Bastidas, who participated in Defendants' ghostwriting of the Ecuadorian judgment itself and whose account is corroborated at every turn—have come forward to testify about Defendants' corruption. It is time for Defendants' evasion to end. The Court should enter summary judgment or partial summary judgment on aspects of Defendants' misconduct that are not in genuine dispute, resolving key claims, counterclaims, or affirmative defenses, in whole or in part, and thereby streamline the case for trial.

This is especially true of the fraud and corruption that produced the $18 billion Ecuadorian judgment against Chevron—the threat and then actuality of which has long been a key component of Defendants' scheme, which has included acts of extortion, money laundering, and mail, wire, and common law fraud. This Court previously found, on a more limited record, that Defendants' relationship with the supposedly "independent" Ecuadorian "Special Master," Richard Stalin Cabrera Vega, was "tainted by fraud," and that evidence showing overlap between the LAPs' internal files and the wording of the judgment itself was "troublesome."  Dkt. 550 at 88, 91. While the Court concluded then that more was needed to meet the rigorous summary judgment standard, now there is so much more: more evidence from the LAPs' internal files, more evidence of material overlap throughout the ghostwritten judgment, and now, the sworn testimony of an inside "whistleblower"—corroborated by contemporaneous documents and several oth-

ers' sworn accounts—revealing the truth that these Defendants bribed the judge in exchange for being able to write this fraudulent, multi-billion-dollar judgment in their own favor.

Alberto Guerra testifies that he secretly ghostwrote Zambrano's orders in the Chevron case (and other cases), and that the LAPs paid him $1,000 a month to draft favorable rulings for Zambrano to issue. St. 182, 186. After dispatching Guerra to try to shake down Chevron, only to be rejected, Zambrano cut a deal with the LAPs allowing them to draft the judgment, which Guerra then modestly edited, in exchange for a bribe of $500,000, to be paid out of the LAPs' judgment proceeds. St. 188–94. Guerra's own documents corroborate his account: his computer contains drafts of Zambrano court orders, including orders in the Chevron case; his bank records document LAP payments to him by a Selva Viva/LAP employee while he was ghostwriting orders for Zambrano; and his shipping records and calendar confirm regular exchanges with Zambrano. St. 197–203. And Guerra's account is further corroborated by sworn statements from several other witnesses whom Guerra approached to solicit bribes on Zambrano's behalf to fix the Lago Agrio judgment, including two contemporaneous declarations from Chevron's Ecuadorian attorneys describing the failed bribery solicitations.[1] St. 185. And internal LAP emails confirm Guerra was ghostwriting for the court and discuss, among other things, the need to pay "the puppeteer" to "move his puppet." St. 204. Guerra's testimony and corroborating evidence confirm what the extensive overlap between the LAPs' internal files and the judgment already prove: that the LAPs corrupted the Ecuadorian court and wrote the $18 billion judgment against Chevron.

And Chevron has identified more examples of Defendants' confidential work product copied into the judgment, infecting virtually every material aspect of that document. For exam-

---

[1]  In addition to Guerra's first-hand testimony to Defendants' fraud and the several corroborating witnesses, there is the powerful testimony of Fernando Reyes, who has come forward to reveal that Donziger secretly paid him to pose as an "independent" judicial monitor, offering him "a bonus in case the plaintiffs won the lawsuit[.]" St. 27.

ple, new evidence shows that the judgment's legal basis for causation—without question "material"—is cribbed from an unfiled LAP memo; that one of the judgment's major contamination and causation findings is taken from another internal LAP analysis; and that the judgment's findings of the presence of certain dangerous substances can only have come from the LAPs' files. As the Court already knows, lengthy passages of the LAPs' internal "Fusion Memo"—arguing their only conceivable hook for imposing liability on Chevron—shows up word-for-word in the judgment, even though the memo is not in the court record. St. 125–29. Moreover, the judgment's requirement that the proceeds be put in a trust tracks internal LAP work product, not publicly available cases (which both the LAPs' internal product and the judgment identically misquote), yet the LAPs never asked the court on the record to impose a trust. St. 152–57.

Faced with this unambiguous evidence, Defendants have never denied the overlap between their confidential files and the judgment. Nor have they ever explained it. Just as they did to keep the Cabrera fraud concealed, Defendants' response, instead, has been to fabricate outlandish, hypothetical musings about how their fingerprints "could have" ended up in the purported work of a judicial official. But if this overlap were the result of a legitimate process, Defendants would have no trouble explaining it, especially given the overlap's magnitude. If Defendants had legitimately provided the court with major legal memos, a 65,000-row database, a 57-page index, and an expert report, they would know it, and they would be able to readily account for it. They have never done so. Instead, they have falsely claimed that the Lago Agrio Litigation had no defined "record," or that this voluminous material "could have" somehow made it to the court by way of an unidentified "press packet," an "informal submission," or even at "oral argument." St. 124. Most recently, they even argued they should be entitled to discovery into "whether Chevron set up the ghostwriting issue . . . they might have set it up by them slipping it to the

judge." *Id*. These are fantasies and fabrications, not inferences.

Defendants' scheme to threaten and obtain a corrupt Ecuadorian judgment against Chevron was largely masterminded in New York, substantially executed in Colorado and Ecuador, funded from Philadelphia, and required extensive use of the interstate and international mails and wires. This incontrovertible record establishes, as a matter of law, that Defendants have engaged in a "scheme or artifice to defraud" subjecting them to liability for multiple predicate acts of wire fraud, 18 U.S.C. § 1343, and money laundering, 18 U.S.C. § 1956(a)(2)(A). And their threatened and then successful scheme to obtain a multi-billion dollar Ecuadorian judgment by fraud and corruption constitutes a key underlying factual predicate for Chevron's extortion, 18 U.S.C. § 1951, N.Y. Penal L. §§ 110.00, 155.05(2)(c), & 155.42; and common law fraud claims, *Buxton Mfg. Co. v. Valiant Moving & Storage, Inc*., 657 N.Y.S.2d 450, 453-54 (N.Y. App. Div. 1997). Moreover, all of these wrongful acts were undertaken in the name of, and on behalf of, the Lago Agrio Plaintiffs, who are liable for the frauds and corrupt acts of their agents.

For the same reasons, Defendants' affirmative defense of collateral estoppel fails as a matter of law because there is no legitimate judgment with preclusive effect on issues in this case. Defendants have ascribed such authority to the Lago Agrio judgment, but the undisputed facts show it was obtained by fraud and cannot be recognized. Similarly, to the extent Defendants' counterclaims or other affirmative defenses, such as "unclean hands," attempt to rely on the Ecuadorian judgment, they must fail. U.S. courts have vacated judgments and terminated lawsuits on far less damning facts than those here. In *Hazel-Atlas Glass Co. v. Hartford-Empire*, the Supreme Court set aside a judgment, and condemned the misconduct in the strongest of terms, where a litigant had ghostwritten an article about its technology, published it as the work of a third-party, and then quoted it back to the court to support its case. 322 U.S. 238, 241-47, 251

(1944). Defendants' conduct here is far more egregious, including bribing the Ecuadorian judge to permit them to ghostwrite the *judgment* they claim has preclusive effect in other U.S. courts, and that they seek to enforce in other countries.

Accordingly, Chevron respectfully requests that the Court enter summary judgment on Defendants' affirmative defense of collateral estoppel, grant partial summary judgment on Chevron's RICO claim that Defendants committed predicate acts of 129 counts of wire fraud, as well as money laundering and violations of the Travel Act, partial summary judgment on all claims, counterclaims, and defenses to the extent they rely on or deny the facts of Defendants' corruption of the Lago Agrio Litigation, and hold the LAPs liable for the acts of their agents.

## STATEMENT OF FACTS

### I.    Defendants' Initial Frauds: Manipulated Data and Falsified Expert Opinions

During the judicial inspection phase of the Lago Agrio Litigation (St. 23), Defendants set up a bogus "independent" monitor to criticize contrary court findings, and submitted sampling results from uncertified or nonexistent laboratories and forged expert reports.

In 2005, Donziger approached Fernando Reyes about serving as an "independent" monitor of the settling experts. St. 27. Donziger considered Reyes, the author of two books and over 30 articles on issues related to the oil industry and environmental control (Reyes Decl. ¶¶ 3–8), to be "one of the most qualified engineers and academics in the field," and one of only two people on what he called the "'A' List." St. 28. Along with Gustavo Pinto, the President of the Association of Geological, Mining, Petroleum, and Environmental Engineers, Reyes agreed to work for the LAPs. Donziger instructed them to "keep secret the nature of our arrangement," St. 29, including the fact that the LAPs were paying them and they would receive a bonus if the LAPs won the case, because Donziger's "goal was to create the image that the monitorship was 'independent' of the parties, so that it would be received with deference and respect by the Court." *Id*.

Donziger ensured there would be "no written agreement," and took other steps to keep the relationship secret, as reflected by this entry in his private notebook, in which "GF" refers to "Gustavo" and "Fernando": "50 k came today - meet on roof to plan payment [to] GF." *Id.* As Donziger described the scheme, "I feel like I have gone over to the dark side." *Id.*

When the settling experts decided against the LAPs at Sacha 53, Reyes states, "Donziger was very upset by the findings" and "he complained that the report supported Chevron's position and did not support the plaintiffs' position." St. 31. He directed Reyes and Pinto to discredit the settling experts' report. St. 32. But once they had reviewed the report that they were hired to attack, Reyes and Pinto found that "the evidence did not support Mr. Donziger's position," and they could not "twist" their analyses to do so. St. 33. Donziger abandoned the monitorship. St. 34

Defendants also tried more direct forms of fraud in their submissions during the judicial inspection process. When Dr. Charles Calmbacher, one of their designated experts in the judicial inspection phase, reached conclusions that did not suit their case, they submitted forged reports in his name. Dkt. 550 at 10. And the LAPs' expert reports were based on testing results from unaccredited Ecuadorian laboratories, including one, which Defendants called the "Selva Viva Lab," that was just a name the LAPs used when they did their own testing. St. 25. During the proceedings, Chevron attempted to execute court-ordered inspections of these laboratories, but Donziger alerted his co-conspirators that such an inspection, of a lab called HAVOC, would be a "DISASTER." St. 26. Defendants successfully pressured the court into cancelling the inspections, through tactics that Donziger characterized as "something you would never do in the United States. . . . But Ecuador, you know, there's almost no rules here. And this is how the game is played, it's dirty." Adding for the cameras, "they're dirty, we're honest . . . we have to occasionally use, um, pressure tactics to neutralize their corruption," he asked a colleague, "Did I explain

it well?" (Donziger has admitted he has no evidence Chevron paid any judges. St. 210.) Then, abandoning pretense, he stated, "the only language that I believe this judge is gonna' understand is one of pressure, intimidation and humiliation. And that's what we're doing today. We're gonna' let him know what time it is."  St. 26.

## II.  Defendants Coerced the Court Into Appointing a Special Master They Controlled

The Reyes and Pinto "monitor" scheme would become the blueprint for Donziger's strategy for the rest of the Lago Agrio Litigation and beyond. Again and again, Donziger would find, or create, a third party with no admitted connection to the LAPs, feed him contentions written up by Donziger's own team, and then have the "independent" third party release the LAPs' material as his own work. This was Donziger's intent with the global inspection procedure.

### A.  The Fake "Independent" Special Master

A few months after abandoning the monitoring program, Donziger, Fajardo, and Yanza met with Reyes to recruit him to their new scheme. They "acknowledged that the judicial inspection process had not yielded data to support their claims of contamination. They also said they believed it would be easier to manage one single expert than many." St. 35. In his own notes, Donziger described the criteria he had in mind for the global expert: to "totally play ball with us and let us take the lead while projecting the image that he is working for the court." St. 38. Reyes was not comfortable with the plan, however, especially with Donziger's requirement that he find Chevron solely liable for any damages, since in Reyes's view the ROE bore liability—and he thought the LAPs' $10 billion damages proposal was "completely ludicrous."  St. 40.

At Donziger's request Reyes recommended Richard Cabrera as the "Plan B" expert. Reyes's recommendation reflected how well he understood what Donziger was seeking:

> I had known Mr. Cabrera since college and I knew he had certain technical limitations regarding the oil industry, and at that time he did not possess the professional skills and experience required to handle a project such as the global assessment

in the Chevron case. However, on the other hand, I suggested Mr. Cabrera for the field work in Oriente because he is reserved, hard working, and responsible. Also, because *I believed that for Mr. Cabrera, issues such as independence and professional standards were not that important, and therefore he would have no problem doing what the plaintiffs were proposing.* In that sense, I believed Mr. Cabrera could be the right person for the job.

St. 41 (emphasis added). Donziger coerced Cabrera's appointment, threatening the judge with a complaint and "mobilizing the country, politically, so that no judge can rule against us and feel like he can get away with it in terms of his career." St. 43. "[T]he decision to terminate judicial inspections, to pursue the global assessment, and to select Cabrera as the global expert were tainted by the duress and coercion applied to [the judge] by Fajardo, Donziger, and perhaps others in *ex parte* meetings. . . . the process in these respects was tainted." Dkt. 550 at 90.

## B.      The Fake "Independent" Global Assessment

Once Cabrera was appointed, there "is no genuine dispute as to exactly what happened." Dkt. 550 at 38. Stratus ghostwrote the "Cabrera Report," and, together with the other Defendants, engaged in an elaborate deception to burnish its "independent" bona fides. St. 56, 69–83.

Reyes was present at the March 3, 2007 meeting between Defendants and Cabrera, captured by the *Crude* cameras. Donziger and the others "dropped any pretense that Mr. Cabrera would act independently in writing an expert report that would be technically sound and executed according to professional standards." St. 45. In a presentation outlining the planned report to the LAP team—now including Cabrera—Fajardo stated: "And here is where we do want the support of our entire technical team . . . all of us will contribute to that report—in other words— you see . . . *the work isn't going to be the expert's. All of us bear the burden.*" St. 46. When someone asked whether the final report would be prepared by Cabrera, Fajardo responded that the expert would "sign the report and review it. But all of us . . . have to contribute to that report." *Id.* Defendant Maest added, with a smile, "But not Chevron," and everyone laughed. *Id.*

The next day, when Maest and other members of the team bemoaned the lack of evidence, Donziger responded, "[T]his is Ecuador, okay, . . . You can say whatever you want and at the end of the day, there's a thousand people around the courthouse, you're going to get what you want. . . . [I]f we take our existing evidence on groundwater contamination, which admittedly is right below the source . . . [a]nd wanted to extrapolate based on nothing other than our, um, theory . . . [w]e can do it. And we can get money for it. Because at the end of the day, this is all for the Court just a bunch of smoke and mirrors and bullshit."  St. 47.

It became "obvious" to Reyes that "the plaintiffs had already predetermined the findings of the global assessment, that they themselves would write a report that supported their claim for billions of dollars against Chevron and would simply put Mr. Cabrera's name on it."  St. 45. "The purpose of the meeting," Reyes realized, "was to establish all the conditions for controlling and managing the expert's work, in secret, in accordance to the plaintiffs' interests."  *Id*.

Events proved Reyes correct. As this Court has already found, the report Cabrera filed "was not entirely or even predominantly his own work or that of any assistants or consultants working only for him. There is no genuine issue with respect to the facts that the LAP team secretly prepared his work plan, worked closely with him in carrying it out, and drafted most of the report and its annexes." St. 69. In the spring of 2008, Beltman, Maest and other Stratus consultants exchanged hundreds of emails discussing draft outlines of the report, proposed annexes, and detailed schedules and work assignments. *Id*. Donziger ensured that Cabrera worked only "under the most strict control with an extremely limited number of samples."  *Id*. "And we'll change the focus of the data at our offices," he wrote. St.229. Stratus oversaw the translation of the report into Spanish, and made sure the names of the report's true authors were "taken off" the documents Cabrera would file. St. 69. The LAP team revised the report until hours before Cabrera

filed it, and Donziger does not know if Cabrera even read it. St. 72. After filing the initial report, Defendants submitted sham objections to it, criticizing it as "unjustly favorable to" Chevron. St. 79. Stratus and other Defendants then ghostwrote "Cabrera's" responses to their fake objections, the language of which Stratus "clean[ed] up" so it would "sound[] more like [Cabrera.]" St. 81.

Defendants kept Cabrera in line with tens of thousands of dollars in undisclosed payments, facilitated by a series of international wire transfers into what Yanza called the LAPs' "secret account." St. 58–68. Weeks after Cabrera's appointment, Yanza wrote to Donziger: "We have met with Richard [Cabrera] and everything is under control. We gave him some money in advance." St. 58. The LAPs then opened their "secret account," the use of which Yanza explained: "[Joseph Kohn] sends us money to our secret account, to give to Wuao [Cabrera]"). Over the next three months Kohn's firm wired at least $100,000 into the "secret account." St. 61. Donziger has testified that he knows of no purpose for this account other than to pay Cabrera, and the LAPs have admitted that they paid Cabrera outside the normal court process. St. 62, 67.

Defendants intended the "independent" "Special Master" to deliver the decisive blow. St. 37. Donziger described Cabrera's appointment as a "HUGE VICTORY," and "the final phase." *Id*. Beltman called the Cabrera Report "the most important thing in the case," "the most important evidence we have in the case," "huge for us," and "probably the single most important technical document for the case." *Id*. Defendants publicly claimed that "courts in Ecuador generally give wide deference to reports prepared by independent experts," (*id*.) and Donziger cited the Cabrera Report to the U.S. Congress, claiming that it was "[t]he best and most recent independent estimate . . . provided by the court-appointed expert, a man named Richard Cabrera, who worked with a team of 14 technical officials." *Id*.

Defendants denied their relationship with Cabrera, and repeatedly described him as "in-

dependent." St. 52. They praised his appointment "primarily due to the issue of impartiality . . . because, having not been named by either of the parties, he will be even more objective in his analysis and conclusions." *Id*. Cabrera, in filings secretly written by Fajardo (St. 55), proclaimed his independence, declaring it "unthinkable" and an "insult" to suggest that he might "have any relation or agreement with the plaintiff." *Id*. Defendants took great pains to hide the ghostwriting, using code words such as "the cook," "restaurant," "waiter," and the "Wao" in their email correspondence. St. 53–54. Stratus solicited independent scholars to endorse the Cabrera Report without disclosing Stratus's role, and, failing that, published a false peer "review" online, written to sound like Cabrera had done his own work and developed his own findings. St. 82–83.

Defendants worried that discovery of their collusion would "destroy" their case, that "all of us, your attorneys, might go to jail," and that they "can be charged with a 'fraud.'" St. 84, 96. When a single scene in the initial version of *Crude* showed Donziger and others meeting with Carlos Beristain, a member of Cabrera's purportedly independent team, Fajardo emailed the U.S. filmmakers, imploring that "the images [of Beristain with Donziger] we had discussed be corrected or removed" because "[t]hey are so serious that we can lose everything[.]" St. 94. The filmmakers complied, but inadvertently gave Netflix an unedited version. Dkt. 181 at 21–22.

As Chevron's discovery actions began to unravel Defendants' fraud, Defendants tried to buy time, following a delay strategy developed by their new U.S. lawyers at Patton Boggs, "as outlined by Jim [Tyrrell]." St. 97; *In re Chevron Corp.*, 749 F. Supp. 2d 170, 185 (S.D.N.Y. 2010). Stratus, through counsel, told the District of Colorado that it was "astonish[ed]" to see similarities between its work and the Cabrera report, and that it had never reviewed the report in draft from. *Id*. Meanwhile, Defendants tried to "'cleanse' any perceived impropriety related to the Cabrera Report" by passing off a misleading filing by Fajardo as "full disclosure" in Ecuador

and unlawfully submitting new reports, designed to "address Cabrera's findings in such a subtle way that someone reading the new expert report . . . might feel comfortable concluding that certain parts of Cabrera are a valid basis for damages." St. 88. None of these experts ever travelled to Ecuador or did any independent analysis. St. 87. When told the truth about Cabrera, one of the experts admitted it "bother[ed]" him and it would have affected his opinion. St. 90.

Even as more evidence of their corruption was coming out, Defendants obtained millions of dollars in funding from investors based on false statements. St. 99. At least one, The Burford Group, has accused Defendants of perpetrating "a multi-month scheme to deceive and defraud in order to secure desperately needed funding" for their litigation/pressure campaign against Chevron, "all the while concealing material information and misrepresenting critical facts in the fear that we would have walked away had we known the true state of affairs." St. 99.

### III.   Defendants Bribed the Judge to Issue Their Own Ghostwritten Judgment

When Cabrera was revealed as Defendants' agent, and not a "neutral" "Special Master" as they had long insisted, Defendants stepped up their efforts to leverage the corrupt Ecuadorian legal system. It has long been apparent that the LAP team had a hand in drafting the judgment, which includes extensive material taken verbatim from the LAPs' unfiled work product. *See* Dkt. 397 at 14–18. Eyewitness testimony now reveals how Defendants committed this fraud.

Alberto Guerra is a former judge of the Provincial Court of Sucumbíos who presided over the case against Chevron in 2003 and 2004. After his dismissal from that court in 2008, Guerra worked as an illicit ghostwriter for Judge Zambrano, the nominal author of the Lago Agrio Judgment. "For $1,000 per month," Guerra drafted "writs and rulings" in Zambrano's civil cases. St. 182. Litigants sometimes secretly provided Zambrano and Guerra with draft judgments, which Guerra would revise and Zambrano would issue as his own. St. 183. This ghostwriting took place at both the trial level, and on appellate "second instance" review. *Id.*

On the Chevron case, however, Guerra was not just Zambrano's ghostwriter—he was the LAPs' as well. At Zambrano's instruction, Guerra entered into a deal directly with Fajardo and Donziger whereby they paid him $1,000 per month in exchange for "mak[ing] the case move quickly" and ensuring that the orders he drafted for Zambrano went the LAPs' way. St. 186. Guerra met with Donziger and Fajardo "perhaps twice per month," and they guided his ghost-writing, in particular by directing Guerra to deny Chevron's motions challenging the scientific merits of the LAPs' so-called environmental evidence. *Id*. Donziger thanked Guerra for his "work as a ghostwriter . . . and for helping steer the case in favor of [the LAPs]." St. 187.

As the trial came to a close, Zambrano cut a more lucrative deal: "Mr. Zambrano told me he was in direct contact with Mr. Fajardo and that the Plaintiffs' representatives had agreed to pay him USD $500,000 from whatever money they were to collect from the judgment, in ex-change for allowing them to write the judgment in the Plaintiffs' favor. Mr. Zambrano told me he would share with me part of that money once it was paid to him." St. 191.

"In late January or early February of 2011, approximately two weeks before the trial court in the Chevron case issued the judgment, Mr. Zambrano gave me a draft of the judgment so that I could revise it. It was through him that I found out that the attorneys for the Plaintiffs had written that judgment and had delivered it to him." St. 192. Guerra "worked on that document in Mr. Zambrano's residence in Lago Agrio using Mr. Fajardo's computer." *Id*.

Guerra discussed some questions with Fajardo directly, and then "spent the following day making around 20 changes to improve its structure and make it seem more like a judgment is-sued by the Sucumbíos Court." *Id*. When Guerra reviewed the judgment as issued by Zambrano, he saw that "the final judgment's structure, wording and content largely mirror the draft judg-ment as I revised it approximately two weeks before the final judgment was issued." St. 194.

Guerra admits he knew this agreement and conduct "was a violation of Ecuadoran laws." St. 195.

Multiple sources confirm that Zambrano shopped the Lago Agrio litigation to the highest bidder, and accepted Donziger's contingent payment offer only after Chevron refused his solicitations. When it first became apparent that Zambrano would likely be taking over the case from Judge Núñez—who was forced to recuse himself after he was caught up in another bribery solicitation scandal related to the case—Zambrano instructed Guerra to get in touch with Chevron's counsel and offer to resolve the case in Chevron's favor in exchange for a bribe. St. 184. He reasoned to Guerra that "Chevron would have much more money than the Plaintiffs[.]" *Id.*

Thus in early October 2009, Guerra called Chevron outside counsel Alberto Racines to tell him that Guerra could "act as an intermediary" with Zambrano and "'fix' the entire case." *Id.* As Racines explains in his sworn, contemporaneous declaration, he put Guerra off, and when Guerra called again a few days later, this time suggesting that he could arrange for a favorable result at either the trial or appellate level, he told Guerra not to call anymore. St. 184–85. Zambrano also reached out through a former court employee to Chevron's lead counsel, Adolfo Callejas, proposing an ex parte meeting to discuss the case, which Callejas declined, as confirmed in his sworn, contemporaneous declaration. St. 185. These Chevron lawyers prepared contemporaneous declarations describing Zambrano's overtures (both subtle and blunt) but refused to authorize their release because of fear of reprisal by the ROE or others in Ecuador. These lawyers have since authorized the release of their declarations only after (and because) Guerra came forward. In addition, there are two other independent witnesses that further corroborate Guerra's account, and their declarations have been filed with the Court under seal at their requests because they fear reprisals in Ecuador for coming forward.  Mastro Decl. ¶ 2.

When Zambrano returned as presiding judge, he had Guerra try again, this time through a

friend who knew some of Chevron's lawyers. Zambrano and Guerra reasoned that "Chevron could pay more money than the Plaintiffs and could pay immediately, instead of paying only after the case was resolved." St. 188. As confirmed in the sworn declaration of the Chevron lawyer that Guerra's friend approached on his behalf, Guerra told his friend that Zambrano "wanted to know if Chevron would be interested in drafting the final judgment of the trial court," in exchange for a bribe, and asked the friend to contact Chevron's lawyer. St. 189. But after informing Chevron's lead counsel of the communication, the Chevron lawyer called Guerra's friend and stated, "as to the matter we discussed, negative." *Id*. Zambrano subsequently abandoned his efforts to solicit a bribe from Chevron, as a former colleague of Guerra's confirmed to another Chevron lawyer, as described in the Chevron lawyer's sworn declarations. *Id*, St. 185. *See also* Stavers Decl. Ex. 3102 (timeline detailing Guerra and Zambrano's ghostwriting activities).

Guerra's testimony regarding his arrangement with Fajardo and Donziger is also corroborated by their internal communications and by Guerra's bank records and computer files.[2] When the Núñez scandal broke and Zambrano's resumption of the case became likely, Fajardo's emails to Donziger and others discuss who would be writing Zambrano's orders and have the most influence over them: "I understand that Zambrano himself asked Núñez, should the case fall to him, that Núñez help him with the orders. That would help with the continuity. The problem is, who will carry more weight: Núñez on the one hand, or Liliana and Guerra on the other." St. 196. Two days later, Defendants were using code names, and Fajardo provided another update: "I think that everything is quiet… The puppeteer is pulling the string and the puppet is returning the package… By now it's pretty safe that there won't be anything to worry about… The puppet will finish off the entire matter tomorrow… I hope they don't fail me. . ." St. 204.

---

[2]  It also explains how the judgment was issued by February 14, 2011, since it would have been impossible for Zambrano review the 200,000 page record and write a 188-page, single-spaced opinion in the time available. St. 114.

Later correspondence confirms the code names referred to Zambrano and Guerra. With Zambrano in place and the Guerra deal operational, Defendants sent emails about paying "the puppet" and "puppeteer" within days of $1,000 deposits appearing in Guerra's account. St. 205

- October 27, 2009: "The puppeteer won't move his puppet until the audience doesn't pay him something." Two days later: $1,000 deposit in Guerra's account. *Id.*

- November 27, 2009: "[T]he budget is higher in relation to the previous months, since we are paying the puppeteer." The same day: $1,000 deposit in Guerra's account. *Id.*

Over the next few months, two additional deposits of $1,000 each were made into Guerra's bank account by a LAP employee. St. 206. Guerra's computer hard drive, package shipment records, and his daily planner all further corroborate his testimony. Forensic analysis of Guerra's computer revealed drafts of 9 of the 12 court orders Zambrano issued during his first tenure on the Chevron case (from October 2009 through March 2010), and drafts of two appellate judgments issued by Zambrano in other cases. St. 197–98. Shipping records show Guerra sending packages to Zambrano at the Lago Agrio court corresponding to Zambrano's orders in the Chevron case and in other actions. St. 199. For example, forensic analysis revealed that on November 18, 2009, Guerra saved a draft of Zambrano's November 23, 2009 order denying Chevron the right to appeal from certain earlier rulings. *Id.* Shipping records show that the very next day, Guerra sent documents from Quito to Lago Agrio, addressed to and received by the assistant to the Lago Agrio court clerk. *Id.* And Guerra's phone records show calls with Zambrano, he had Donziger's email address in his address book, communicated with Donziger about personal legal matters, and had numbers associated with Fajardo in his cell phone. St. 200–03.

In April 2012, shortly after Zambrano's dismissal from the court (for the unexplained release of a drug trafficker arrested in connection with the seizure of 8.3 tons of cocaine, St. 213), Zambrano "authorized [Guerra] to begin talks with Chevron's representatives to reveal the truth

16

regarding the drafting of the judgment." Guerra Decl., ¶ 33. Guerra ultimately turned over his relevant records, including bank statements, phone bills, and daily planner, along with his computer, cell phones, and other materials, and gave a full account of the events. Guerra Decl., ¶ 33.[3]

Zambrano himself was continuing to meet with the LAP team, including meetings with Fajardo and, in August 2012, with Craig Smyser, counsel for the LAPs. Stavers Decl. Ex. 3105–11. "Zambrano has had a change of heart for reasons he has not fully explained to [Guerra], and now says he is not willing to cooperate with Chevron to reveal the truth." Guerra Decl., ¶ 33.

In fact, Zambrano now appears to be operating as the LAPs' agent in their ongoing smear campaign against Chevron and anyone who comes forward and tells the truth. On January 21, 2013, the LAPs issued two press releases accusing Chevron of corrupting Ecuadorian judges. Stavers Decl. Exs. 3103, 3271. The LAPs claim they have audiotape of U.S. counsel for late Chevron lawyer Rodrigo Perez Pallares (who for years had faced the fabricated criminal charges pressed by the LAPs as part of their extortion scheme). St. 3271. The LAPs have not released the recording or disclosed that Zambrano gave it to them. But it can only have come from Zambrano, because the U.S. lawyer called Zambrano to tell him Guerra was going to go public with the truth and urged him to tell the truth, too. Instead, Zambrano taped the conversation and immediately turned the tape over to the LAPs, underscoring their collusion. Rivera Decl., ¶ 9.

## IV.   The Ecuadorian Judgment Is Tainted by Fraud in Every Material Aspect

Every substantive aspect of the Ecuadorian judgment, as well as its overall structure, con-

---

[3]  For providing this valuable physical evidence corroborating his account (and for the time and expense necessary to collect it over several months), Chevron paid Guerra $38,000. Guerra Decl., ¶ 33. Moreover, because of Guerra's legitimate concern that, remaining in Ecuador, he would be risking his personal safety and that of his family by coming forward (concerns that Chevron confirmed by having an independent third-party assessment conducted, Mastro Decl., ¶ 2–3), Chevron has taken reasonable steps to protect Guerra and his family's safety by relocating them to the United States. Guerra Decl., ¶ 34; Stavers Decl. Ex. 3268. Besides Guerra, none of the several Ecuadorian fact witnesses whose declarations are being submitted in connection with this motion (including Fernando Reyes, whose declaration is already before the Court, Dkt. 658-18) has received anything and they remain in Ecuador. *See* Reyes, ¶ 2.

firms Guerra's account because it bears markers of the LAPs' fraud—including text and other

elements taken directly from the Cabrera Report and the LAPs' unfiled work product:

- The judgment's **Introduction** and **Section 4** *falsely* disclaim reliance on the Cabrera Report and the Cleansing Experts, which is a marker of a fraudulent or corrupt tribunal, and dismisses Chevron's fraud allegations with the transparent subterfuge that the misconduct is entirely Donziger's, who is not a party or lawyer of record. St. 108.

- **Section 3** rejects Chevron's anterior and dispositive defenses, including the corporate separateness defense, and draws extensively on the LAPs' unfiled "Fusion Memo." St. 104.

- **Sections 7 and 10** establish and apply the judgment's theory of causation, drawing on the LAPs' unfiled "Moodie Memo," and relying, complete with verbatim errors, on Fajardo's unfiled analysis of the *Torres Delfina* case. *Id*.

- **Section 9** contains the major contamination findings, and is run through with markers of fraud, including sections of a report drafted for the LAPs by expert Richard Clapp but never filed, data and conclusions whose only record source is the Cabrera Report, numerous instances of reliance on the LAPs' internal record-keeping system (the "Index Summaries"), and over a dozen examples demonstrating that the judgment's true author relied on a 65,000-row database maintained by the LAPs (the "Selva Viva Data Compilation"). *Id*.

- **Section 13** assigns damages in eight categories that exactly match those in the Cabrera Report, and whose only record source for $6 billion of the $8 billion in damages (soil remediation and potable water system) is the Cabrera Report. St. 105.

- **Section 14** imposes punitive damages that are illegal under Ecuadorian law, and follows the Cabrera Report's unjust enrichment award in justification and size. St. 105.

- **Section 15** orders that judgment proceeds be placed in a trust, a remedy never requested by any party, and relies on text taken verbatim from an internal Fajardo email. St. 104.

To date, Chevron has identified markers of fraud on 60 of the 188 pages in the judgment—and

this is without discovery from Patton Boggs or Ecuadorian lawyers. St. 106–07; Dkt. 563, 564.

### A.    "Fusion Memo": Holding Chevron Liable for TexPet's Alleged Conduct

Whether Chevron could be held liable for TexPet's alleged conduct was a threshold issue

in the case, and one that was hotly contested in Lago Agrio (and continues to be contested). St.

130–33. As this Court found, the judgment's analysis of this issue relies heavily on the LAPs'

unfiled work product. *See* Dkt. 550 at 28 (concluding that "at least one extended section" of the

Fusion Memo "appears verbatim in the judgment"). But the Court declined to enter summary

judgment at that time. Dkt. 550 at 87-88. Further analysis illuminates the overlap's materiality.

Chevron contested the LAPs' claim that it could be held liable for TexPet's alleged conduct, a threshold issue that would have been a complete bar to recovery had the court accepted Chevron's position. *See* Dkt. 168 at 6. Chevron submitted evidence in support of its position throughout the case, St. 130, and the defense was viable. *Aguinda v. Texaco Inc.*, 142 F. Supp. 2d 534, 548 (S.D.N.Y. 2001) ("While plaintiffs continue to allege in conclusory fashion that Texaco directed the Consortium's oil operations from the United States, they have wholly failed, despite years of discovery, to adduce competent evidence to support this assertion."). The LAPs recently told *this* Court that it was "critical." Dkt. 305 at 5 n.6. Accordingly, it was the first defense considered and the judgment devoted 20 pages to it. St. 131Crucial portions of these 20 pages are lifted verbatim from the LAPs' Fusion Memo, including the conclusion: "In this case, it has been proven that in reality Texpet and Texaco Inc. functioned in Ecuador as a single and inseparable operation." St. 128; Dkt. 550 at A5 (indicating overlap in page 24 of the judgment).

**B.     The Clapp Memo and Selva Viva Data Compilation: Contamination**

Section 9 of the judgment purports to find dangerous, area-wide contamination. Every award in the judgment, from the $5.39 billion remediation for the "dangerous elements that must be monitored and, eventually eliminated," Dkt. 168 at 107, to the $8.6 billion punitive damage award for the "suffering of the victims of the defendant's conduct," *id.* at 185, is predicated on findings of contamination in Section 9. But this section is permeated with evidence that it was not based on the record, but written using the Defendants' unfiled work product. St.134–42.

Section 9 relies on an unfiled report by LAP expert Richard Clapp, including verbatim, unattributed quotation, for the conclusion that "soil and water samples" indicate an excess of lead in the former concession. St. 138–40. The record does not contain this conclusion, nor any basis for it. To the contrary, only *one* of the 1,675 soil and sediment samples—taken from a

community garbage dump—shows lead above the legal limit, and only *one* of 253 drinking water sampling events showed lead at levels above primary drinking water standards, and that was associated with a *recent* oil spill. St. 141, 142. Had the LAPs publicly submitted the Clapp Report, Chevron could have challenged its conclusions, but Chevron was unable to present its case.

The judgment also purports to find a threat to health based on samples of "benzene, toluene, PAH's . . . chromium VI, barium or mercury" from the judicial inspections. Dkt. 168 at 107. But the judgment's conclusion that these compounds were found in relevant concentrations is erroneous, and flows directly from its improper reliance on the Selva Viva Data Compilation, rather than the sampling results from the judicial inspection reports. St. 162.

### C.  Cabrera, Phantom Pit Counts, and Potable Water: "Remediation" Costs

Despite disclaiming reliance on the Cabrera Report, St. 108, the judgment awards compensatory damages in the same eight categories as that report. Those categories are supported by nothing else in the record except the LAPs' final alegato, which itself cites throughout to the Cabrera Report. The majority of the judgment's dollar awards are based on factual assumptions found nowhere else in the record but the Cabrera Report. St. 111. And every dollar of compensatory damages is effectively doubled by the judgment's illegal punitive damages award, which matches the Cabrera Report's "unjust enrichment" award in rationale and effect, and has no other record source. St. 112. Though expressing reservations about the materiality of the judgment's reliance on Cabrera, this Court found that Chevron had presented evidence demonstrating reliance and, specifically, found evidence of reliance as to three categories of damages (soil remediation, potable water, and flora and fauna) which together, when doubled by the illegal punitive damage award, total more than $11 billion of the $19 billion judgment. *See* Dkt. 550 at 91-92.

The largest single component of the damages award, the $5.4 billion award for soil remediation, relies significantly on the Cabrera Report. To calculate damages for soil remediation, the

court used a "pit count" of 880 as a multiplier to determine the volume of material that required

remediation. The pit count purportedly represented the court's estimate of pits at sites where

TexPet had conducted operations in the former concession area. *See* Dkt. 168 at 125 ("The con-

tamination in the area of the concession extends to 7,392,000 cubic meters (m3), a figure that is

arrived at considering that we have 880 pits"). While the court claimed to derive this number by

reviewing aerial photographs, the aerial photography evidence in the record does not support that

finding. St. 173. But the Cabrera Report's Annex H provides precisely this number when the pits

it identifies as Petroecuador pits are excluded from its 916 pit count. St. 174.[4]

### D.      The Moodie Memorandum and Clapp: Bungled and Illicit Causation

Among the judgment's oddities is that, in a lawsuit brought by Ecuadorians in Ecuador

under Ecuadorian law, for harm that oil production allegedly caused in Ecuador, it purports to

apply California asbestos causation standards and principles of Australian law. The explanation

for this incongruity is that the author(s) of the judgment used a confidential memorandum written

by the LAPs' Australian legal intern: the "Moodie Memorandum." St. 169.

The judgment and the Moodie Memorandum both purport to analyze causation under the

"substantial factor" test, a narrow doctrine from California state law that applies only to a unique

challenge in asbestos litigation: there are typically numerous potential sources of asbestos expo-

sure, any of which could have caused injury, but, because of the nature of the harm, only one

did—but which one is unknowable. This test is inapplicable to the facts of the Lago Agrio case.

St. 167. The judgment and the Moodie Memo both purport to apply principles of Australian law.

---

[4]  The judgment also awards $150 million for a potable water system. Dkt. 168 at 182-83. This comes directly from the Cabrera Report. The judgment concludes that 35 percent of the population lacks access to potable water, Dkt. 168 at 182, and reaches the $150 million figure by taking 35 percent of the $428 million assessment in Annex R of the Cabrera Report. St. 180. The judgment's attempt to source the figure to Barros only confirms reliance on Cabre-ra, since the Barros portion cited is a review of the Cabrera water treatment recommendation, which Barros finds "fraudulent." St. 178. And the judgment's nominal reliance on cleansing expert Barnthouse for a $200 million award to restore flora and fauna is a reliance on the Cabrera Report, since that was Barnthouse's only source. St.177.

But James Spigelman, the former Chief Justice of the Supreme Court of New South Wales, and the *author* of one of the cases cited in the Moodie Memo, concluded that concepts that both the Moodie Memo and the judgment ascribe to Australian law are either "unknown" to Australian law, or are common phrases that do not carry the specialized meaning ascribed to them in the memorandum and the judgment. St. 170. Moreover, Spigelman found it "so strange as to constitute an inaccuracy" that both the Moodie Memo the judgment describe a well-established common law principle as particularly Australian, and cite an opinion he authored, *Seltsam v McGuiness*, as the source, even though that opinion, like most references to the principle, cites the very non-Australian *Wigmore on Evidence* as support. St. 171. An Ecuadorian court would have no reason to cite these principles as Australian, unlike the memo's Australian author.

Professor Michael Green has concluded that these and other commonalities between the Moodie Memorandum and the judgment render it "highly unlikely that the passages in the [judgment regarding causation] were prepared independently of the Moodie memorandum." St. 174. There is no question that application of an idiosyncratic causation standard secretly cribbed from one litigant's internal work product is material. "Toxic tort cases . . . are won or lost on the strength of the scientific evidence presented to prove causation." *Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1197 (11th Cir. 2002). Here, the legal framework by which the judgment analyzed this critical issue was not only wrong, it was clandestinely provided by the LAPs, without any opportunity for Chevron to rebut.

The aforementioned illicit reliance on the Clapp Report is material to the judgment's causation conclusion as well. The Clapp Report is the only source for the judgment's conclusion that "lead poisoning is a real risk" in the area. St. 138–40.

### E.    Creation of a Trust to Assist Defendants' Allocation of Judgment Proceeds

Serving the LAPs' objectives, the judgment orders that any proceeds be placed in a

"trust" controlled by defendant Amazon Defense Front. In so doing, the judgment relies on language found in the LAPs' unfiled work product (the Fajardo Trust Email) to justify this result—despite the fact that no one, in any *public* filing, requested creation of a trust. St. 154.

New expert analysis now confirms that the language common to the Fajardo Trust Email and the judgment is a marker of fraud. *Cf.* Dkt. 550 at 29 n.116. Dr. Robert Leonard has concluded "that portions of the [judgment] and the [unfiled Fajardo Trust email] contain matching or similar word strings and strings of symbols whose presence is not explainable either as set phrases or by chance, and that those portions of the [judgment] are therefore plagiarized from [the LAPs'] unfiled work product." St. 156. The overlap includes: (i) misquoted language from the key case cited; (ii) incorrect citation of the key case cited; (iii) the same short-hand citation to another case, which has nothing to do with trust law; and (iv) explanatory language and phrases regarding use of judgment trusts. St. 157.[5]

## V.    The Appellate Court Refused to Meaningfully Consider the Fraud Evidence

Both Chevron and the LAPs appealed the Ecuadorian judgment. The appellate process, hindered by significant procedural irregularities (St. 120–21), failed to meaningfully address, and even disclaimed the ability to review, the evidence of fraud. Judge Zambrano, the purported author of the trial court judgment, was the Provincial Director of the Judicial Council of that court and was involved in the constitution of the panel, which did not proceed, as the law required, by public lottery, and which saw a revolving door of personnel and other suspicious events. St. 120. Guerra had previously asserted that Zambrano had the power to fix the appellate proceedings. St. 183. Once the panel was finalized, it took just one month to affirm the judgment, despite the large record, and refused to consider Chevron's fraud allegations, because it had no "compe-

---

[5]  The judgment's disposition of funds was material; Defendants' fundraising depends on control over it. Dkt. 158.

tence" to do so. St. 122. The LAPs (not Chevron) sought "clarification," and the court, in an order issued just hours after Chevron filed its objections, confirmed that "it stays out of these accusations." St. 123. It nonetheless contradicted itself by claiming it had reviewed some of the fraud evidence, and, after a minimal "analysis," declared itself unconvinced there was a fraud. *Id.*

## VI.   An Increasingly Corrupt Judiciary and Executive Intimidation Presented Opportunities for Defendants to Compromise the Court

The significant corruption in Ecuador facilitated Defendants' illicit dealings with court officials. Since his election in 2006, President Rafael Correa has established his personal control over the judiciary at all levels. St. 207. The U.S. State Department has reported on "the susceptibility of the [Ecuadorian] judiciary to bribes for favorable decisions and resolution of legal cases and on judges parceling out cases to outside lawyers, who wrote the judicial sentences and sent them back to the presiding judge for signature," *id.*; and Ecuador is among the lowest tiers of nations for rule of law and judicial corruption in rankings by international organizations. *Id.* Correa has publicly supported the LAPs, personally meetings with them and at least one presiding judge, and an important figure in his administration signed an "amicus" brief urging the court to end the judicial inspections and commence a global assessment. St. 208.

Defendants have embraced this corruption. Donziger has proclaimed that Ecuadorian judges are "all corrupt! It's—it's their birthright to be corrupt," and repeatedly instructed his team to put "political pressure" on the court and leverage the court's "fear" of ruling against them, while his co-conspirator assured him that "Correa and his cronies" could take care of problems that arose. St. 209. And this Court has found at least one "undisputed instance of the LAPs' team's coercion of and duress on one of the judges to obtain a desired result." Dkt. 550 at 97.

## ARGUMENT

Where "there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law," the Court "shall grant summary judgment" on a "claim or defense" or on a "part" of a claim or defense. Fed. R. Civ. P. 56(a). Furthermore, the Court "may enter an order stating any material fact . . . that is not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g). The Court should do so here. The facts set forth in the accompanying Rule 56.1 Statement are material, in whole or in part, to every one of Chevron's claims, to Defendants' counterclaims, and to significant affirmative defenses. Certainly, Defendants are in no position to dispute this—they have been insisting on the centrality of the Lago Agrio litigation throughout this action.[6]  Resolution of these facts will substantially streamline future motion practice, the parties' preparation for trial, and trial itself. *See Echelon Int'l Corp. v. America West Airlines, Inc.*, 85 F. Supp. 2d 313, 315 (S.D.N.Y. 2000).

## I.     Defendants Have Committed RICO Predicate Acts of Wire Fraud

Wire fraud is a RICO "predicate act"—one of the federal crimes that may constitute part of the "pattern of racketeering activity." 18 U.S.C. § 1961(1). Federal law prohibits the use of wires "in furtherance" of a "scheme or artifice to defraud." 18 U.S.C. § 1343; *Schmuck v. U.S.*, 489 U.S. 705, 710 (1989). A scheme to defraud is "a plan to deprive a person 'of something of value by trick, deceit, chicane or overreaching.'" *U.S. v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000) (quoting *McNally v. U.S.*, 483 U.S. 350, 358, 97 L. Ed. 2d 292, 107 S. Ct. 2875 (1987)). To show a "scheme to defraud," a plaintiff must prove "(i) the existence of a scheme to defraud, (ii) the requisite scienter (or fraudulent intent) on the part of the defendant, and (iii) the materiali-

---

[6]  *See, e.g.*, Dkt. 322 at 23 ("The gravamen of Chevron's RICO claim against the Stratus Defendants is its allegations that the Stratus Defendants 'secretly' collaborated with the LAP's counsel and Mr. Cabrera to 'ghostwrite" the Cabrera Report, and to conceal any sign that the Stratus Defendants and others engaged by Mr. Donziger and/or the Stratus Defendants were allegedly involved in preparing that report."); Dkt. 624 at 3 ("the gravamen of Chevron's complaint is that Defendants conspired to obtain a fraudulent judgment against it"). While these characterizations overstate the case—there is substantial misconduct alleged in Chevron's complaint beyond the Lago Agrio corruption—they highlight the importance of these issues to this action.

ty of the misrepresentations."[7] *Id.* The wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253-54 (S.D.N.Y. 1997).

This Court has already found Defendants engaged in numerous actions "tainted" by fraud, Dkt. 550 at 97, and the record is replete with examples of Defendants' use of the wires to further their fraud.[8] The deceptive omissions and lies about the Cabrera Report's true authorship and their payments to him were "of some independent value" and thus material. *Autuori*, 212 F.3d at 118. Defendants' fake monitorship scheme with Reyes, their use of unaccredited laboratories, and their collusion with and bribery of Guerra and Zambrano were all deceptive and fraudulent. Nothing more is required to constitute wire fraud.

## II.    Defendants Have Laundered Money and Violated the FCPA

Money laundering is a RICO "predicate act"—one of the federal crimes that may constitute part of the "pattern of racketeering activity." 18 U.S.C. § 1961(1). The money laundering statute prohibits the transmission of funds from or to the United States, "with the intent to promote the carrying on of specified unlawful activity." 18 U.S.C. § 1956(a)(2)(A). It reaches wire transfers, and there is no requirement that the *source* of the funds be unlawful. *U.S. v. Piervinanzi*, 23 F.3d 670, 678–79 (2d Cir. 1994). The statute defines "specified unlawful activity" as the offenses listed in 18 U.S.C. § 1961(a)—the RICO predicate acts provision. Moreover, the Travel

---

[7]  The defendant's fraudulent intent may be shown either by proving "facts showing a motive for committing fraud and a clear opportunity for doing so" or by identifying strong circumstantial evidence of conscious behavior by the defendant. *Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987). "'To be material, the information withheld either must be of some independent value or must bear on the ultimate value of the transaction.'" *Autuori*, 212 F.3d at 118 (quoting *U.S. v. Mittelstaedt*, 31 F.3d 1208, 1217 (2d Cir. 1994)).

[8]  They used the wires to arrange for and transmit bribes for Cabrera to sign the report written in his name, St. 61, to draft the fraudulent Cabrera Report (along with the LAPs' objections to the Report, and "Cabrera's" responses to those objections), St. 69, and to arrange for and draft the "cleansing" expert reports, St. 87. They emailed the makers of Crude in an effort to cover up their collusion. St. 94. Through email, they solicited funding for their scheme in part based on false assertions about Cabrera, St. 99, and received those funds via wire transfers. St. 216. They have emailed journalists and U.S. government officials to falsely tout the independence of the Cabrera Report. St. 37.

Act (18 U.S.C. § 1952) is also an enumerated RICO predicate (18 U.S.C. § 1961(1)), and prohib-

its the use of "any facility of interstate or foreign commerce" in the furtherance of, *inter alia*, a

violation of the Foreign Corrupt Practices Act (FCPA) (15 U.S.C. § 78dd-3). In turn, the FCPA

prohibits any "offer, payment, [or] promise to . . . giv[e] anything of value to []any foreign offi-

cial for purposes of[] influencing any act or decision of such foreign official[.]" 15 U.S.C. §

78dd-3. *See Dooley v. United Techs. Corp.*, 1992 WL 167053 at *9 (D.D.C. June 16, 1992).

    Since at least 2006, Defendants have transferred millions of dollars from the United

States to Ecuador in furtherance of their criminal scheme. In particular, they have made transfers

from the U.S. to Ecuador for the purposes of paying bribes to a foreign official, the court-

appointed expert, Richard Cabrera, St. 63, and have engaged in both foreign travel and email to

facilitate the payments of bribes to Guerra and Zambrano. St. 187, 190, 191, 204, 205.

### III.    All Defendants' Defenses of Collateral Estoppel Fail

    All Defendants have pleaded the affirmative defense of collateral estoppel, but none iden-

tifies any applicable judgment.[9] Dkts. 307 at 71, 350 at 106, 474 at 88. Defendants have previ-

ously asserted that the Lago Agrio judgment is preclusive. Dkt. 550 at 51–54; Dkt. 474 at 90;

Dkt. 732 at 116. And they continue to rely on the judgment in this action and elsewhere—

including by seeking to enforce the judgment. Dkt. 549-4 (Ex. 2424, 2425), 675-8–675-10.

    All parties agree that Defendants must show that that Lago Agrio judgment is entitled to

recognition in order to be afforded preclusive effect.[10] A judgment should not be recognized

where there was "fraud in procuring the judgment." *Hilton v. Guyot*, 159 U.S. 113, 202-03

---

[9]  The week before Chevron filed this motion, Donziger and the LAP Representatives attempted to file new answers, disclaiming reliance on the Lago Agrio judgment and asserting additional cases in support of their collateral estop-pel defense. Dkt. 731, 732. Chevron has concurrently moved to strike these improper pleadings, and explained there-in why the additional cases cited by Defendants would not, in any event, support the defense.

[10]  *See* Dkt. 550 at 71, Dkt. 450 at 1; *Alfadda v. Fenn*, 966 F. Supp. 1317, 1325 (S.D.N.Y. 1997). "[T]he standard [for recognition] under federal law is substantially the same as it is under New York law." Dkt. 550 at 71, n.267; *see also Ackermann v. Levine*, 788 F.2d 830, 842 n.12 (2d Cir. 1986).

(1895); *see also* N.Y. § 5304(b)(3)).

### A.     Judgments Procured by Fraud Are Not Recognizable Where the Fraud Undermined the Integrity of the Judicial Process

Fraud in the procurement of a judgment renders it unrecognizable where the fraud "'prevented the losing party from fully [and] fairly presenting his case or defense' or otherwise significantly tainted the process." Dkt. 550 at 84–85 (quoting *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1339 (5th Cir. 1978). This standard is satisfied where a judgment rests on false, concealed, or otherwise tainted evidence, Dkt. 550 at 84-85; *Rozier*, 573 F.2d at 1339, although a judgment might be recognized where the fraudulent or concealed evidence is "merely cumulative or relevant only to a peripheral issue."  Restatement (Second) of Judgments § 70 cmt. d; Dkt. 550 at 85.

Materiality does not require that the fraud "be of such nature as to alter the result in the case." *Rozier*, 573 F.2d at 1339. In *Rozier*, for example, the court vacated a judgment where the plaintiff might have advanced an additional legal theory had she known of improperly concealed evidence. 573 F.2d at 1345. The court did not consider whether that legal theory would have prevailed—it was dispositive that plaintiff was prevented from advancing it. *Id*. And in *Fraige v. American-National Watermattress Corp.*, the court held that the effect of the defendant's forged evidence was irrelevant, and the district court's attempt "to evaluate [the fraud's] effect on the jury" was an abuse of discretion.  996 F. 2d 295, 296–99 (Fed. Cir. 1993). The fraud nullified the judgment even if the defendant would have prevailed on grounds unaffected by the fraud. *Id*.[11]

Even where the materiality of the fraud is not manifested in the judgment, corruption of the judicial process, such that it is not a true adversarial proceeding, is fatal to any resulting

---

[11]  *See also Seaboldt v. Penn. RR. Co.*, 290 F.2d 296, 300 (3d Cir. 1961) ("a litigant who has engaged in misconduct is not entitled to 'the benefit of calculation, which can be little better than speculation, as to the extent of the wrong inflicted upon his opponent.'") (quoting *Minneapolis, St. Paul & S.S. Marie Ry. Co. v. Moquin*, 283 U.S. 520, 521-522, 51 S. Ct. 501, 502 (1931))).

judgment.[12] The paradigmatic means of corrupting a tribunal is collusion with court officials, and any judgment issued by a paid-off court is unrecognizable—regardless of its content. "Judicial action, whether just or unjust, right or wrong, is not for sale." *United States v. Manton*, 107 F.2d 834, 846 (2d Cir. 1938) ("[I]f the rule shall ever be accepted that the correctness of judicial action taken for a price removes the stain of corruption and exonerates the judge, the event will mark the first step toward the abandonment of that imperative requisite of even-handed justice"). The case law is replete with examples of courts condemning this practice, and judgments obtained thereby.[13] But any misconduct pursuant to a conscious scheme to defraud, including the submission of false evidence, can rise to the level of corruption of the tribunal. And where such a scheme is shown, a judgment cannot stand *regardless of* whether or not the fraud had any material effect on the judgment itself, *and regardless of the merits of the dispute*.

In the Supreme Court's seminal fraudulent procurement case, *Hazel-Atlas*, attorneys for the prevailing party helped ghostwrite an article that was then published as the work of an osten-

---

[12] *See, e.g., United States v. Throckmorton*, 98 US 61, 65 (1878) (holding that a judgment cannot stand "where, by reason of something done by the successful party to a suit, there was in fact no adversary trial or decision of the issue in the case.")*; see also Caperton v. A. T. Massey Coal Co.*, 556 U.S. 868, 87, 129 S. Ct. 2252, 2259 (2009) ("It is axiomatic that a fair trial in a fair tribunal is a basic requirement of due process.") (quotations and alterations omitted). "When a judgment is shown to have been procured by the prevailing party through corruption of the tribunal . . . no worthwhile interest is served in protecting the judgment." Restatement (Second) of Judgments § 70, cmt. b. "Comity . . . does not require, but rather forbids [recognition] where such a recognition works a direct violation of the policy of our laws, and does violence to what we deem the rights of our citizens." *Hilton*, 159 U.S. at 193.

[13] *See, e.g., Morgan v. United States,* 304 U.S. 1, 19-20 (1938) ("[If] a special master or the trial judge permitted the plaintiff's attorney to formulate the findings upon the evidence, conferred *ex parte* with the plaintiff's attorney regarding them, and then adopted his proposals without affording an opportunity to his opponent to know their contents and present objections, there would be no hesitation in setting aside the report or decree as having been made without a fair hearing."); *Browning v. Navarro*, 826 F.2d 335, 345–46 (5th Cir. 1987) (setting aside judgment issued after lawyers for one party held substantive, ex parte communications with the court); *Transportes Aereos Pegaso, S.A. de C.V. v. Bell Helicopter Textron, Inc.,* 623 F. Supp. 2d 518, 538 (D. Del. 2009) (denying enforcement on the basis of fraud where, among other things, the court appointed an expert outside of the regular procedure who then solicited a bribe from the judgment debtor); *In re Burke*, 374 B.R. 781, 796-97 (Bankr. D. Colo. 2007) (setting aside judgment obtained through improper procedures and bribery); *Manez Lopez v. Ford Motor Co.*, 470 F. Supp. 2d 917, 923-29 (S.D. Ind. 2006) (where plaintiffs' attorney had family relationship with judicial clerk and funneled materials to the clerk which appeared verbatim in a court order, the court had "no difficulty or hesitancy in concluding, on the basis of the evidence adduced . . . [that the Mexican judgments] are not entitled to recognition in the United States"); *W. Gillette v. Ariz. Corp. Comm'n*, 121 Ariz. 541, 542 (Ariz. Ct. App. 1979) ("The participation in the actual decision making process by only one party to a controversy is inimical to the notions of fairness which underlie the due process of law.").

sibly disinterested expert and presented as such to the court. 322 U.S. at 240–41. Finding that this was "not simply a case of a judgment obtained with the aid of a witness who, on the basis of after-discovered evidence, is believed possibly to have been guilty of perjury," but rather, "a deliberately planned and carefully executed scheme to defraud," the Court held it to be "a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistent with the good order of society." *Id.* at 246. The Court rejected the argument that the ghostwritten article was not "basic" to the judgment. 322 U.S. at 246–47. Those committing the fraud, the Court reasoned, "thought the article material . . . and went to considerable trouble and expense to get it published." Thus, the Court concluded, "[t]hey are in no position now to dispute its effectiveness," and there was no need to "appraise the influence that the article exerted on the judges." *Id.* at 247. "Neither should they now be permitted to escape the consequences of Hartford's deceptive attribution of authorship to Clarke on the ground that what the article stated was true. Truth needs no disguise." *Id.*[14]

## B.    The Lago Agrio Judgment Was Obtained by Fraud and Is Unrecognizable

Defendants' conduct, and the evidence of that conduct in their files, in the statements of witnesses to their fraud, and in the judgment itself, renders the Lago Agrio judgment unrecognizable. This is so because the judgment relies in material part on LAPs' work product never publicly filed or made available to challenge by Chevron, and because Defendants engaged in a

---

[14]  Similarly, in *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1116 (1st Cir. 1989), where the plaintiff had relied on forged evidence, the First Circuit found that satisfied the stringent requirements of the "fraud on the court" doctrine, because he had "sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter[.]" *Id.* at 1118. The court expressly rejected a materiality defense, holding that it mattered not that Aoude's scheme was ultimately discovered, and the forged agreement substituted with the real agreement. *Id.* at 1122. "The failure of a party's corrupt plan does not immunize the defrauder from the consequences of his misconduct." *Id.* at 1120. Numerous cases arising in the context of terminating sanctions agree. *See, e.g., Green v. Mayor & City Council of Baltimore*, 198 F.R.D. 645, 647 (D. Md. 2001) ("It is settled that the sanction of dismissal may properly be imposed without regard to the merits *vel non* of the underlying lawsuit: 'Once a litigant chooses to practice fraud, that misconduct infects his cause of action . . . .'") (*quoting Aoude*, 892 F.2d at 1121); *Combs v. Rockwell Int'l Corp.*, 927 F.2d 486, 489 (9th Cir. 1991).

battery of efforts to corrupt the tribunal, including bogus "independent" monitoring, a fake "Special Master," and secret access to the illegal ghostwriter of the court's orders. And Defendants promised the judge half a million dollars to issue the judgment they had secretly written.

### 1.    The LAPs' Unfiled Work Product Nullifies the Judgment

This Court previously considered whether markers of fraud in the judgment—verbatim passages from the LAPs' internal files and evidence of reliance on the tainted Cabrera Report— were material to the disposal of any matters "of controversy in Ecuador."  Dkt. 550 at 87-88. On that analysis, the Court found the evidence "troublesome," but not yet sufficient to carry Chevron's burden on summary judgment. *Id*. at 88, 92. New evidence establishes that the overlap between confidential LAP files and the judgment is material, and precludes recognition of the judgment. Far from being "merely cumulative or relevant only to a peripheral issue," tainted material forms the backbone of the judgment's analysis of Chevron's threshold defense (the Fusion Memo) and causation (the Moodie Memo), and appears throughout the judgment's factual findings and conclusions regarding injury (Selva Viva Data Compilation, Clapp Memo) and damages (Cabrera Report). The LAP representatives would not have undertaken these extraordinary efforts, with the acknowledged risk that they might all "go to jail," if they did not believe that these efforts were necessary to their case.  Courts have nullified judgments showing far less evidence of improper influence. *See*, *e.g.*, *Hazel-Atlas*, 322 U.S. at 246–47; *Fraige*, 996 F. 2d 296–99.

There is no genuine dispute that the judgment was written with secret access to the LAPs' files.[15] Whether it was Zambrano himself, or if he received pre-written materials is irrelevant: Regardless of *how* this material made its way into the judgment, its presence there shows conclu-

---

[15]  Zambrano alone could not possibly have reviewed the record and prepared the 188-page judgment in the time he supposedly did so. St. 114 . And two separate analyses, including an extensive hand-review, confirm that none of the materials identified in this motion as LAPs' unfiled work product appear in the Lago Agrio Record. St. 126, 139, 144, 149, 153, 160, 166.

sively that the LAPs enjoyed unfair access to the decision-making process, denying Chevron the opportunity to fully and fairly present its case. *See* Dkt. 550 at 84–85. Such collusion nullifies the judgment. *Morgan*, 304 U.S. at 19-20; *Browning*, 826 F.2d at 345-46. Moreover, Ecuadorian judges do not have clerks, St. 118 and are required to draft judgments personally. St. 115. In any event, the involvement of staff would not cure the collusion: This material's presence in the judgment shows conclusively that the LAPs enjoyed access to the decision-making process not shared by Chevron, denying it the ability to fully and fairly present its case. Dkt. 550 at 84–85.

### 2.       Defendants' Strategy of Corruption Nullifies the Judgment

Facts this Court has already found beyond dispute—the coercion of the court to appoint Cabrera, the ghostwriting of his report, and the concealment of that fraud thereafter—are on all fours with cases setting aside judgments and terminating lawsuits in the strongest of terms. *See*, *e.g.*, *Hazel-Atlas*. And Defendants' now-exposed scheme with Zambrano and Guerra exceeds these cases in all respects. A judgment procured in a proceeding so tainted is unrecognizable. *Hazel-Atlas*, 322 U.S. at 245-46; *Harre v. A.H. Robins Co.*, 750 F.2d 1501, 1505 (11th Cir. 1985) (denial of Rule 60(b)(3) motion abuse of discretion where "a material expert witness, with complicity of counsel . . . falsely testif[ied] on the ultimate issue of causation").

### 3.       Defendants' Bribery Nullifies the Judgment

Where fraud is shown, the authorities are clear that a reviewing court is not to unduly burden itself with parsing the "influence" of a fraud upon the judgment in question. *Hazel-Atlas*, 322 U.S. at 246–7. But where outright bribery procures the issuance of a judgment written by the prevailing party, the analysis is unequivocally at an end. *Manton*, 107 F.2d at 846. The Lago Agrio judgment, issued upon promise of payment by the prevailing party, cannot be recognized.

### IV.      These Established Facts Partially Resolve Additional Claims and Defenses

Resolution of the facts of Defendants' corruption of the Lago Agrio Litigation is material

to every aspect of this case. Defendants' commission of the RICO predicate of extortion rests in significant part on the economic fear they believed they could generate based on the sham validation provided by Cabrera and the judgment, and the corrupt nature of the judgment establishes that Defendants' use of that fear is "wrongful." 18 U.S.C. § 1951(b). The concealment of their now-proven fraud was the purpose of Defendants' obstruction of justice, establishing their corrupt intent and the false and evasive nature of their conduct before U.S. courts. 18 U.S.C. § 1503; *United States v. Cohn*, 452 F.2d 881, 884 (2d Cir. 1971) ("false and evasive" testimony may constitute obstruction of justice). The facts proven here render Defendants' numerous representations of Cabrera's independence and the judgment's validity to be *mis*representations—including those made to the Ecuadorian criminal authorities, U.S. government officials, litigations financiers, and Chevron shareholders and market analysts—an element of Chevron's fraud claim. *Buxton*, 657 N.Y.S.2d at 453-54.  The LAPs' unclean hands and *in pari delicto* defenses expressly rely on the judgment (Dkt. 63 at 103, 105), and numerous other defenses implicate the judgment or are undermined by the facts of their fraud.  *See*, e.g., Donziger defenses 13, 18, 19, 21, 23; Stratus defenses 7, 11, 12, 18, 24; & LAPs defense 16, 19, 24, 25, 28, 33, 34, 40, 42-44, 47. These facts are also relevant to both Donziger's and Stratus's counterclaims, as they demonstrate that, among other things, Chevron has not made fraudulent statements.

V.     **The LAPs Are Liable for the Acts of Agents Like Donziger, Stratus, and Fajardo**

Defendants' fraudulent scheme was undertaken at all times in the LAPs' name, and with their implicit and explicit authority and approval. Accordingly, Defendants and their co-conspirators are the LAPs' agents, under both apparent and actual agency theories, and the LAPs are liable for all consequences flowing from the facts established by the record here.

Here, there is overwhelming evidence that Defendants acted as agents with both actual

and apparent authority.[16] Every aspect of the fraud is predicated on a lawsuit filed in the LAPs'

names. Donziger has repeatedly invoked the LAPs in public statements, including in testimony

before the U.S. Congress, in which he claimed to be their "legal advisor." St. 1.  Donziger has

acted at least once in Ecuadorian court on behalf of the LAPs, as captured in the film *Crude*,

blocking Chevron's inspection of the HAVOC lab, telling a Quito judge, "I'm part of plaintiffs'

legal team." *Id*. And Donziger has managed the LAPs' legal representation in the United States,

including hiring and firing counsel on their behalf. *Id*. Fajardo, in a sworn declaration submitted

to this Court in January 2011, has affirmed that he represents the Lago Agrio Plaintiffs as their

attorney and is authorized to pursue and defend their interests in domestic and foreign courts. St.

7. Yanza, upon issuance of the Lago Agrio judgment, appeared at a press conference with Fajar-

do and asserted that he was the "coordinator" of the organization "that represents the affected

persons and makes the major decisions on the development of this court case[.]" St. 3. Finally,

Stratus told this Court that it was "hired to provide technical assistance to attorneys representing

a group of indigenous Ecuadorians in a lawsuit in Ecuador against Chevron" and that it acted "at

the direction of and under the process dictated by its client." St. 13.

To avoid imputation of an agency relationship, the LAPs must disclaim such representa-

tion, thereby avoiding "reasonably giv[ing] an appearance of authority." *Greene v. Hellman*, 51

N.Y.2d 197, 204 (1980). But to the contrary, they have sought to enforce the corrupt judgment

their agents obtained, and taken every possible step to defend the acts of their agents, including

appearing in dozens of U.S. legal proceedings to assert privilege over documents held by, among

others, Donziger and Stratus. Two of them have appeared here and actively litigated every facet

---

[16]  "[A]pparent authority . . . requires the third party only to demonstrate some manifestation attributable to the prin-
cipal." *Chem. Bank v. Affil. FM Ins. Co.*, 169 F.3d 121, 130 (2d Cir. 1999). Actual authority requires "explicit per-
mission from the principal."  *Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading, Inc.*, 697 F.3d 59, 71 (2d
Cir. 2012).

of this case in undisguised coordination with Donziger.[17]

And the LAPs, including Camacho and Piaguaje, ratified their agents' conduct in a series of "re-engagement" letters with Donziger and Fajardo, their lead U.S. and Ecuadorian represent-atives. The 2011 Donziger engagement agreement affirms that he "acted as the primary United States attorney on behalf of the Plaintiffs to date," and affirms Donziger's past and continued authorization to retain consul and consultants, "assist the Plaintiffs," "coordinate the efforts to procure funding," and "coordinate the media, public affairs and public relations[.]" St. 19. And a November 2010 Power of Attorney signed by Camacho, Piaguaje, and 39 other LAPs, invested Fajardo with "the widest of powers and attributes that the law confers" including the authority to "make and/or sign any kind of agreements for setting up the contracting of any kind of consult-ant, whether this be a legal professional or not." St. 20. As with Donziger, the LAPs "ratifie[d] and approve[d]" Fajardo's actions in the Lago Agrio litigation and other litigations, whether "performed directly or through other persons." St. 21. This "explicit permission" establishes ac-tual agency. *Garanti Finansal Kiralama A.S.*, 697 F.3d at 71.

## CONCLUSION

There is no genuine dispute as to Defendants' scheme to defraud and extort. The Court should enter summary judgment on Defendants' affirmative defense of collateral estoppel, grant partial summary judgment on Chevron's RICO claim that Defendants engaged in acts of wire fraud, money laundering, and violations of the Travel Act, and partial summary judgment as to all claims, counterclaims, and defenses on the facts set forth in Chevron's Statement of Material Facts, including holding the LAPs liable for the acts of their agents.

---

[17]  Furthermore, in the Count 9 action, when this Court noted in reference to Chevron's efforts to compel the LAPs to produce documents in Fajardo's possession, "lawyers are agents for their clients," (Case No. 003718, Dkt. 101 at 3), the LAPs did not dispute this, but instead argued that Fajardo refused to provide them his documents, *id.*—an argument they have reprised in this action. Dkt. 563 at 2–3.

Dated:  January 28, 2012
New York, New York

Respectfully submitted,

_____/s/ *Randy M. Mastro*_____
Randy M. Mastro
Andrea E. Neuman
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Telephone: 212.351.4000
Facsimile:  212.351.4035

William E. Thomson
333 South Grand Avenue
Los Angeles, California 90071
Telephone: 213.229.7000
Facsimile:  213.229.7520

*Attorneys for Chevron Corporation*