CCKAACHE1                    Hearing

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   CHEVRON CORPORATION,

4                   Plaintiff,

5              v.                          11 CV 691 (LAK)

6   STEVEN DONZIGER, ET AL.,

7                   Defendants.

8   ------------------------------x
                                          New York, N.Y.
9                                         December 20, 2012
                                          11:00 a.m.
10
    Before:
11
                       HON. LEWIS A. KAPLAN,
12
                                          District Judge
13
                            APPEARANCES
14
    GIBSON DUNN & CRUTCHER
15       Attorneys for Plaintiff Chevron
    BY:  RANDY M. MASTRO
16  CHRISTOPHER M. JORALEMON
    ANDREA E. NEUMAN
17  JASON STAVERS
    WILLIAM E. THOMSON
18  LAUREN ELLIOT

19  SMYSER KAPLAN & VESELKA, LLP
         Attorneys for Defendants Cammacho
20  BY:  LARRY R. VESELKA

21  KEKER & VAN NEST, LLP
         Attorneys for Defendant Donziger
22  BY:  MATTHEW WERDEGAR

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CCKAACHE1                         Hearing

1        (Case called)

2        MR. MASTRO:  Ready, your Honor.

3        THE COURT:  Good morning.

4        MR. VESELKA:  Yes, your Honor, ready.

5        THE COURT:  Good morning.

6        MR. WERDEGAR:  Good morning, your Honor.

7        Matthew Werdegar, on behalf of Donziger defendant.

8        THE COURT:  Good morning.

9        OK.  Now, obviously, we're going to take up the

10  Chevron motion to compel or what is left of it first because it

11  was first in time and, obviously, as the joint submission

12  reflects.  You folks have made a certain amount of progress on

13  narrowing the issues for which I can assure you I am grateful.

14  Let me just get my papers organized.

15        OK.  Now, as a preliminary matter I assume that there

16  is somewhere what is probably a pretty elaborate writing

17  indicating all the points on which you've agreed by indications

18  you've made two requests that have been withdrawn and so forth.

19  Is that correct?

20        MR. MASTRO:  Your Honor, we would be able to provide

21  that, yes, absolutely, your Honor.

22        THE COURT:  Well, there's going to be an order at the

23  end of the day and I need to have it for the order.

24        MR. MASTRO:  Certainly, your Honor.  We have been

25  compiling such a list and we did make substantial progress as

CCKAACHE1                    Hearing

1    your Honor noted, so we're happy to provide that to the Court.

2             THE COURT:  OK.  All right.  Then, we'll begin with

3    the joint report concerning Chevron's motion to compel which I

4    think is Item Number 608 on the docket and it outlines a number

5    of what I guess are more or less points of principle on which

6    you are in dispute and then lists particular requests as to

7    which those five principled points relate.

8             The first one that I understand to be on the table is

9    that the plaintiff Chevron seeks production pursuant to this

10   request through July 10, 2012.  Am I correct in understanding

11   that that is with respect to specific enumerated requests and

12   not generally, is that right?

13            MR. MASTRO:  That is correct, your Honor.  We've

14   substantially narrowed the field of requests to, specifically,

15   the ones in Exhibit A.

16            THE COURT:  OK.  And the position of the defendants

17   represented here today is that the cut-off should be February

18   14, 2011, the date of the -- date I think of the amended

19   complaint, is that right?

20            MR. WERDEGAR:  Your Honor, first I just want to -- the

21   Court mentioned Document 608.  I just want to make sure that

22   the Court is aware that on the 12th of December the parties

23   filed and updated joint report which is Document 663 which

24   reflects the parties' agreements and compromises through that

25   date.

CCKAACHE1                    Hearing

1          THE COURT:  I may have misspoken in saying "608".

2          MR. WERDEGAR:  608 was the motion.

3          THE COURT:  So it's document 667?

4          MR. WERDEGAR:  663, your Honor.

5          THE COURT:  Let me just make, absolutely, certain that

6     the one I am looking at which doesn't have the number on it is,

7     in fact, the same one that's Document 663.

8          (Pause)

9          MR. WERDEGAR:  One way to tell, your Honor, is the 663

10    the updated one should not have an Exhibit 3 because the

11    Exhibit C would resolve --

12         THE COURT:  Okay.  Well, my law clerk has one with a

13    number on it and that's right.  That's what I am looking at.

14         OK.  Well, now I've read your submissions with respect

15    to the general proposition and if somebody wants to add

16    anything briefly with respect to the question of July 10, 2012

17    versus February 14, 2011 I'll, certainly, hear anything you

18    wanted to within reason.  So anybody want to address it?

19         MR. MASTRO:  Yes, your Honor, very briefly.

20         Your Honor, the defendants' position is predicated on

21    misrepresentation of the gravamen of the action.  They say that

22    the cut-off should be February 14, 2011 cause that's the date

23    of the judgment and they mischaracterize the action, the

24    gravamen of the action as being a complaint about obtaining a

25    fraudulent judgment in Ecuador, judgment having been issued on

CCKAACHE1                         Hearing

1    February 14, 2011.

2              Your Honor yesterday in your opinion accurately

3    described the core of this case which is a claim that Steven

4    Donziger, a New York lawyer and others, conceived substantially

5    executed largely funded and significantly directed the scheme

6    to extort and defraud Chevron, a U.S. company, by among other

7    things, one, bringing a lawsuit, fabricating --

8              THE COURT:  Mr. Mastro, slow down.  Bear in mind that

9    since I wrote it as recently as yesterday I have it pretty

10   freshly in mind.

11             MR. MASTRO:  So, your Honor, the fact of the matter is

12   the categories that we have defined where production should

13   occur the date more recent than February 14, 2011 it is in

14   every instance going to the sort of core allegations about the

15   larger extortion scheme originating from the U.S.  Your Honor,

16   we have agreed to provide discovery to the other side in 50

17   separate requests that go beyond February 14, 2011, when it

18   suited their purpose Bohan Nunez which they love to bring up

19   all the time they've agreed that there should be production

20   post February 14, 2011.  So --

21             THE COURT:  I think I've got your position.

22             MR. MASTRO:  Thank you very much, your Honor.

23             THE COURT:  Anybody else?  Mr. Werdegar.

24             MR. WERDEGAR:  Yes, your Honor.

25             Our position is a little more nuanced than a blanket

1   cut-off of February 14, 2011.  We've offered to produce

2   documents up through the point that there are any allegations

3   with any specificity about misconduct on the part of

4   Mr. Donziger or the Ecuadorian plaintiffs.  So, for example,

5   with respect to the appellate process and post judgment events

6   there's one paragraph in the amended complaint that addresses

7   at Paragraph 327 regarding the selection and composition of the

8   intermediate appellate panel in Ecuador and we've offered to

9   agree to produce documents up through the time that that panel

10  was selected.

11          We've also by way of compromise offered to produce

12  documents regarding the criminal charges in the criminal case

13  in Ecuador through June of 2011 when that case concluded and

14  that was full-time range of day to request it.

15          Our position, your Honor, is that anything beyond what

16  they've alleged is really, it's speculative, it's a fishing

17  expedition.  They're just seeking in a very broad strokes, very

18  broad requests more fuel for their fire.  But they had an

19  opportunity to amend their complaint, to add any allegations

20  they thought they had of fraudulent or other kinds of

21  misconduct through up to I believe August of this year and they

22  even requested an extension of time from the Court which the

23  Court granted to do that to supplement their complaint but they

24  consciously chose not to.

25          And so now beyond Paragraph 327 the misconduct they're

CCKAACHE1                    Hearing

1    claiming is not anywhere in their complaint, nothing is pled

2    with any specificity.  And we believe that they shouldn't be

3    entitled to take a broad range of ongoing discovery about

4    conduct and events that appears no where in their pleadings,

5    particularly, when they chose not to update their pleadings,

6    your Honor.

7              THE COURT:  OK.

8              MR. VESELKA:  Your Honor, apologize.

9              THE COURT:  No.  I am sorry.  I thought that was

10   Mr. Matro.  Go right ahead.

11             MR. VESELKA:  For efficiency sake, our positions are

12   identical.  We'll try not to repeat.  So with, particularly,

13   with regard to the Exhibit A issues we're substantially

14   identified with the defenses raised by Mr. Werdegar.

15             THE COURT:  OK.  Fine.  I reject categorically the

16   idea that there ought to be a February 14, 2011 cut-off.  And I

17   reject categorically that there ought to be a cut-off at that

18   date except as to matters alleged with specificity in the

19   complaint.

20             I'll resist the temptation to dictate the Law Review

21   article one could write as to all the reasons that is so.  But

22   I do find helpful Robco Distributors versus General Glass 101

23   Federal Rules decision 547 and Southwest Hide Company versus

24   Goldston 127 Federal Rules decisions 481.

25             In addition, I would point out a couple of other

CCKAACHE1                    Hearing

1   things.  The approach that I am invited by the defendants to

2   take would go even beyond being a throwback to the era of code

3   pleading that antedated, not just the Federal Rules of Civil

4   Procedure but the field code adopted in New York and the Equity

5   Rules of the Supreme Court just adopted, if memory serves, in

6   1912, it was entirely clear well over 100 years ago, for

7   example, that in a patent infringement case a plaintiff could

8   prove at trial evidence of an infringement by a device that was

9   a modification of the accused device that did not even exist

10   when the suit was brought.  There are so many common sense

11   reasons why the defendant's position is wrong that it's

12   mind-boggling.

13          Take, for example, the case in which someone is

14   indicted.  Two people are indicted for committing murder on

15   January 1, 2010.  The indictment is the practical equivalent

16   and it is the equivalent in a criminal case of a complaint.

17   And suppose while the case is awaiting trial Defendant Number

18   One decides to cooperate against Defendant Number Two.  And

19   Defendant Number Two puts out a contract to kill Number One.  I

20   would venture to say there is not a lawyer in this room who

21   would have the slightest doubt that the government would be

22   able to prove on the original indictment the fact that the

23   remaining defendant sought to have his co-defendant who had

24   turned against him, killed for the purpose of establishing

25   consciousness of guilt without any change in the indictment.

CCKAACHE1                    Hearing

1          Take it out of the criminal context and let's put it

2     all in a civil context.  And imagine we have not a criminal

3     indictment but we have a complaint on behalf of the estate of

4     the dead person for wrongful death for exactly the same reasons

5     I have no doubt in the trial of wrongful death action the

6     contract put out on the co-defendant would be admissible and I

7     have no doubt that discovery could be conducted by the

8     plaintiff against the remaining defendant on the issue of

9     whether he tried to have a witness against him killed to prove

10    consciousness of guilt.

11         We then get to the fact that under Rule 404(b) we have

12    extremely broad admissibility of evidence, and mind you, we're

13    not talking about admissibility of evidence.  We're talking

14    about discovery which is still broader for a vast variety of

15    purposes among them in this circuit being proving up the

16    relationships among conspirators, proving up the carrying out

17    of a conspiracy which was at an earlier point in time at the

18    time of the complaint or indictment and a vast number of other

19    purposes.

20         Discovery of those matters in an appropriate case,

21    subject to all the other mechanisms available to a trial judge

22    to manage discovery, is relevant.  It's appropriate.  And all

23    of that is without regard to the fact that this is a complaint

24    which, everybody understands, charges a continuing conspiracy

25    and course of conduct which is alleged to be going on today and

CCKAACHE1                          Hearing

1    is alleged to be likely to continue tomorrow and for the

2    indefinite future and in my view at an absolute minimum.  And

3    the plaintiffs as a matter of relevance are, certainly,

4    entitled to discovery with respect to all of those matters for

5    appropriate purposes.  And that's possibly a different question

6    from exactly how much I am likely to give them because these

7    are discretionary calls for all kinds of reasons.

8           Which brings me to the final preliminary thought that

9    I wanted to offer and I will not be so windy as we go along and

10   it is this.  A good deal of the argumentation that's in the

11   joint report, certainly, from the defendants and I think on

12   some occasions from the plaintiff is to the effect that in

13   ruling on objections to the subpoena served on Patton Boggs I

14   had decided certain matters which, of course, I did but the

15   parties take it one step further and suggest that I decided

16   relevance issues necessarily in each and every case.

17          And so, for example, if I said that a specification

18   seeking documents from Patton Boggs on Proposition X was not

19   going to be allowed, the defense argued that ship has now

20   sailed and you, certainly, can't let the plaintiffs have

21   discovery on that subject against the parties for litigation.

22   That's simply wrong.  And I made it very clear at the beginning

23   of the proceedings on September 25th that that was wrong.

24          I set out a preliminary statement that is set forth in

25   the transcript on September 25th starting at page 3 and

CCKAACHE1                    Hearing

1    continuing through page 8 about just how I was approaching the

2    Patton Boggs subpoena which involves considerations that go

3    well beyond matters of pure relevance and that in most

4    respects, and probably all respects, are not pertinent here and

5    the one that I want to draw your particular attention to is

6    this and it's on page six of that transcript and I said the

7    following:

8              It ought to be plainly understood that I am

9    approaching this first and foremost with Rule 26(B)(2)(c) in

10   mind.  That gives district courts discretion to limit the

11   extent of discovery even of relevant matters for several

12   reasons.  One of them is that its burden or expense outweighs

13   its likely benefit considering the needs of the case, the

14   amount in controversy, the parties' resources, importance of

15   the issues at stake and the importance of the discovery in

16   resolving the issues.  Unless I otherwise indicate the ruling

17   rulings that I make should be understood as practical judgments

18   about the appropriate scope of the subpoena in light of these

19   considerations in the present posture of the case rather than

20   rulings as to relevance as a purely legal matter of the

21   material sought.

22             And, certainly, among the concerns and considerations

23   I brought to bear in making the rulings of the Patton Boggs

24   subpoena was a sensitivity to the fact that Patton Boggs is a

25   law firm and that is I have written before in this or its

CCKAACHE1                          Hearing

related case, the Donziger 1782 matter.  I am sensitive to the

concerns about subpoenas addressed to lawyers and that has been

true with respect to the subpoenaed to Patton Boggs and will

continue to be true without forecasting a result.  And my

endeavor there was to try to cut that subpoena and the scope of

the material as to which we're going to wind up litigating

crime fraud as to which they may or may not persist questions

as to burden to the absolute minimum.  And the materials that

have been submitted so far show, although I can't quote all the

statistics, that that endeavor has been enormously successful

because the latest submission by Patton Boggs with respect to

the issue of burden demonstrates that the scope of the search

and the documents they expect might be generated is, if I

remember it accurately and I'll stand to be corrected if it

needs to be, a small fraction of what they were talking about

then that means was first served.  So everybody needs to

understand that and I think it'll save us a lot of time going

forward to have that before us.

        Now given the ruling I made with respect to the time

period, we can now begin going through Exhibit A to see whether

any of the remaining requests as to which there are disputes

remain in dispute given the overall ruling and what, if

anything, ought to be done about it.

        Now is there some convenient way of grouping these

that you want to recommend to me?  Because the list is 35 pages

CCKAACHE1                        Hearing

1   long in small print.

2            MR. MASTRO:  Your Honor, I can suggest some categories

3   and the specific RFPs that fall into those categories and maybe

4   would help us and if the defendants are still objecting then

5   that would still be something that would require a ruling but I

6   can give the category and the requests that are in that

7   category and we can take it from there.

8            THE COURT:  OK.

9            MR. MASTRO:  First category would be Agency Theory and

10  Authority to Act and Donziger's communications with the lapse

11  themselves.  So this is in the category of authorization to

12  represent agency who is acting on their behalf, who is going to

13  act on their behalf and Donziger's communications with them.

14  That would be Request Number One, 11, 12, 13, 14, and 24 of the

15  Donziger RFPs and there are corresponding one to the lapse.

16  We'll know the exact numbers.

17           THE COURT:  That's Category Number One.  Category

18  Number, two.

19           MR. MASTRO:  Would be a category I would describe as

20  money flow, funding allocation of money and money laundering

21  and that would be Donziger RFP requests 25, 26, 28, 29, 30, 33,

22  35, 115, 116, 117 and 118.  And that would include the money

23  flow payoffs to certain people including Cabrera and how funds

24  were allocated.

25           Third category would be exclusive activity,

CCKAACHE1                        Hearing

1    ghostwriting and Cabrera's lack of independence in that

2    context.  So that would be collusion with the ROE, the

3    judiciary and court appointed experts, Cabrera, ghostwriting of

4    reports and court opinions and then the lack of Cabrera's

5    independence.  That would be Donziger requests 98, 99, 105,

6    106, 108, 110, 119, 120, 121, 122, 123, and 125 and, of course,

7    our allegations are that there's continue to be allusive

8    activity and influence into the appellate process and a

9    cover-up that has occurred since.

10          Now, Category Four would be in the area of enforcement

11   as well as it's origins of Invictus that would be Donziger

12   Request Number 31, 32 and 119.

13          And final category I would describe, your Honor, as

14   obstruction, false representations to U.S. courts, witness

15   tampering or intimidation.  And that would be Donziger Request

16   23, 83 and 86 and 87.  I think those would be six general

17   categories, your Honor.

18          THE COURT:  I counted five.

19          MR. MASTRO:  Your Honor, my math is off by one.

20   Excuse me.  I just came in on a redeye.  Sorry.

21          THE COURT:  It's OK.  And I take it that this

22   left-hand column in Exhibit A which indicates the request

23   numbers for both Mr. Donziger and the lapse --

24          MR. MASTRO:  It does, your Honor.

25          THE COURT:  -- is the cross reference points.  So we

CCKAACHE1                        Hearing

1    can just -- unless there's one that there's a request to

2    Donziger and no corresponding request the other way or vice

3    versa, we can just speak in terms of Donziger?

4              MR. MASTRO:  Correct, your Honor.  There should be a

5    cross reference for each --

6              THE COURT:  You agree?

7              MR. VESELKA:  Yes, your Honor.  I was going to make

8    sure the Court saw that both of those were listed.

9              THE COURT:  I appreciate that.

10             OK.  Well, just in the hope of getting off to a

11   manageable and, perhaps, successful start and getting everybody

12   feeling that this is actually doable, let's start with the

13   Fourth Category which counsel described as enforcement and

14   Invictus which are Donziger Requests 31, 32 and 119.

15             All right.  Number 31, all documents related to Andres

16   Snader.  I realize we addressed this in the Patton Boggs days

17   but forgive me for not remembering every name in the case, so I

18   have no idea who he is as I sit here this morning.  What's the

19   story with this fellow?

20             MR. MASTRO:  He is a consultant to the Lapse with the

21   firm called Nextent and they have been consulting on

22   enforcement activity around the world, your Honor.  He is a

23   person again, had a law degree but he is not functioning as a

24   lawyer in this capacity.  He is functioning as a consultant and

25   that's why we requested that he has been advising them on

CCKAACHE1                    Hearing

1    enforcement issues.

2              THE COURT:  So that picks up Number 32 as well which

3    is Nextent, right?

4              MR. MASTRO:  Yes, your Honor.

5              THE COURT:  And then let me just look at -- OK.  Let's

6    talk about those two, 31 and 32.  I understand the plaintiff's

7    position.  What's defendants' position apart from the Patton

8    Boggs argument?

9              MR. WERDEGAR:  Your Honor, I think our position would

10   be the same as articulated by Patton Boggs during the Patton

11   Boggs subpoena hearing your identical requests.  We don't

12   believe that Chevron should be entitled to use this proceeding

13   to obtain discovery about other international proceedings that

14   are ongoing related to the enforcement of the Ecuadorian

15   judgment.  Those proceedings are going on.  Chevron has

16   whatever rights it has, whatever discovery options it has with

17   respect to the enforcement internationally and I am sure it'll

18   exercise those to its fullest.  It shouldn't be permitted to

19   use this proceeding as a way of gaining a strategic advantage

20   with respect to those separate international ongoing

21   proceedings.  And I think that that's consistent with the

22   Second Circuit's holding with respect to the Count Nine action,

23   your Honor.

24             THE COURT:  Well, the Second Circuit's holding is

25   rather more limited than the defense seems to think it is but

CCKAACHE1                        Hearing

1    go ahead, sir.

2                MR. VESELKA:  Want to give all arguments so you can

3    address them all at once.

4                THE COURT:  Absolutely.

5                MR. VESELKA:  I think also at this stage of the

6    proceeding trying to get the case ready for trial that be --

7    going into the enforcement actions and dealing with all what

8    potential privilege issues would be raised with regard to

9    enforcement would be a burden on all the parties that would be

10   interfered.  So we think opening up discovery on ongoing or

11   prospective enforcement actions would not help in getting the

12   case prepared for trial as to the liability -- what has gone on

13   and what's addressed in the action.

14               THE COURT:  Mr. Mastro, here is my concern about this.

15   Those two requests are as broad as all outdoors.  Now, putting

16   aside the question of technical relevance cause I think it's

17   technically relevant.  To the extent these requests are likely

18   to turn up material, I suppose one of the things they're likely

19   to turn up is material with respect to plans about what to do

20   next and where, right?

21               MR. MASTRO:  That's true, your Honor.  I would like to

22   be in that category.

23               THE COURT:  Now, it also may turn up stuff as to

24   what's been done already and why but let's put that to one side

25   for a moment.  Now, to the extent it turns up material about

CCKAACHE1                    Hearing

1     what do next and where it's almost, certainly, going to be met

2     with a claim that this is material prepared in anticipation of

3     litigation which, initially, seems to me probably right and in

4     some cases at least it's likely to be what I'll loosely call

5     opinion work product.

6             Now, as to any opinion work product, putting aside

7     crime fraud for the moment, seems to me the plaintiff is not

8     likely ever to get it anyway.  As to non opinion work product,

9     I suppose it's pretty speculative to think that you'd wind up

10    getting it.  And so as to so much of these requests as the

11    future oriented, seems it's got to generate a whole lot of

12    effort, the bottom line of which quite likely will be that you

13    are not going to get it anywhere.  So what's your response to

14    that?

15            MR. MASTRO:  If I may, your Honor?  Mr. Snader and

16    Nextent we view as co-conspirators with Donziger.  They

17    solicited Mr. Snader, solicited funders, like Ross DeLeon the

18    Internet gambling fugitive felon living in Gibraltar.  And we

19    believe that these documents could show that he was aware that

20    this was a fraud, yet they pursued enforcement activities

21    despite the fact that he would have been privy to the fact that

22    this was a fraud.

23            So, we're really trying to get those documents to show

24    that this is a person knowingly seeking to enforce a judgment

25    that he knows was procured by fraud which we think is a fraud.

CCKAACHE1                    Hearing

1        THE COURT:  Now, the narrow issue here is not a

2   general objection to Requests 31 and 32.  It is, rather,

3   whether I should permit discovery.

4        MR. MASTRO:  Understood.

5        THE COURT:  Post the defendant's date?

6        MR. MASTRO:  Yes, your Honor.

7        THE COURT:  Right.

8        MR. MASTRO:  Yes, your Honor.

9        THE COURT:  OK.  As to that limited.  I am sorry.

10        MR. VESELKA:  As to how it's presented and why it's

11   here in Exhibit A on that issue --

12        THE COURT:  OK.

13        MR. WERDEGAR:  Your Honor, I think our position more

14   broadly is irregardless of the date cut-off whatever discovery,

15   whatever the temporal scope may be, we do believe that

16   discovery into ongoing and contemplated enforcement proceedings

17   and is inappropriate.  It's not simply the date range.  That's

18   why it also appears in the Exhibit B portion.

19        THE COURT:  I'm only dealing with the Exhibit A

20   portion right now.  So as to 31 and 32 the cut-off date is

21   February 14, 2011 and we'll see whether those survive at all.

22   But assuming that they're at issue later on but we're only at

23   this point talking cut-off date.

24        OK.  Now we're going to go to 119.  And 119 is all

25   documents relating to communications with foreign governments

CCKAACHE1                    Hearing

1    in connection with any attempt it enforce the judgment.  And

2    that's been modified.  And it's not any longer all documents

3    related to but, rather, all communications.

4            MR. MASTRO:  Yes, your Honor.

5            THE COURT:  Same ruling.

6            MR. MASTRO:  Your Honor, any documents that might be

7    relevant in this category would necessarily have occurred after

8    February 14, 2011 because the communications about enforcement

9    would occur after the judgment was entered.  That's why we

10   thought it was appropriate that the date be extended out.

11           THE COURT:  OK.  Why shouldn't I just -- I am sorry.

12           MR. VESELKA:  I was just going to respond, your Honor,

13   that the Invictus memo which is they've dealt with before was

14   before that.  So to the extent it could have been contacts with

15   various governments at some point before the judgment.  So it

16   would pick up things if there had been those at that time

17   which --

18           THE COURT:  OK.  The cut-off is 2/14/11 except as to

19   Brazil, Argentina and Canada as to which it's the later date.

20           OK.  So we have now knocked off one whole category.

21   Just look at that.  Let's go to category five and see if we can

22   continue on the roll.  So that's request 23, 83, 86 and 87.

23           OK.  Number 23, obviously, what you are looking for,

24   Mr. Mastro, is that you hope there will be correspondence that

25   will reveal that some of these law firms got out of this

CCKAACHE1                    Hearing

1    situation because they were persuaded that something was going

2    on which wasn't according to --

3             MR. MASTRO:  Correct, your Honor.

4             THE COURT:  OK.  Let me hear from the defense.

5             MR. VESELKA:  With the February 14, '11 cut-off that

6    was still address any actions that were taken by any of these

7    firms with regard to the notoriety.  We say that arose once the

8    1782 started, once the action with regard to Cruz so there was

9    a good portion of the efforts by Chevron in the press and

10   through the 1782s and other ways to raise issues that is what

11   they're suspecting led to what they think as to certain firms

12   so that they would be getting a substantial period of time.  It

13   would be hard to think of who was wanting to get out after

14   February 14th when there was now a judgment.

15            THE COURT:  So that says to me no harm, no foul.

16   What's the problem?

17            MR. VESELKA:  Well, I think it's saying that they were

18   going to get -- if it's anything that they want I think they're

19   going to get it subject to what all privilege issues are going

20   to be get dealt with at the appropriate time.

21            THE COURT:  Ergo, what's the harm?

22            MR. VESELKA:  They don't need the time later as to

23   that and they can't show that they -- they don't know if any

24   pure fishing in that sense at that time.

25            MR. WERDEGAR:  Your Honor, this is a theme that will

CCKAACHE1                    Hearing

 1    continue so I'll try not to repeat it, but a problem with a lot

 2    of these where we think they're seeking discovery about which

 3    there's no allegation haven't been any particularized

 4    allegations either in the complaints or otherwise beyond the

 5    14th is the -- it's not purely relevant.  It's also the burden

 6    and expense of having to continue to search for, gather,

 7    review, log and produce all these materials.  And I think that

 8    there is -- so, it's the practical, the benefit to them versus

 9    the ongoing burden and expense to the defendants of having to

10    deal with what has really been an onslaught of discovery for

11    many years now.  So I want to make sure that the Court keeps

12    that in mind.

13            THE COURT:  Sure, I'll keep it in mind but seems to me

14    it's very overblown.  What you've got is Patton Boggs which

15    we're handling in another way.  You've got Mr. Donziger.  And

16    at least in theory they already have his documents up to about

17    a year or so ago.  So we're not talking about very much.  And

18    I'd rather imagine that his habits with respect to the

19    retention of documents changed dramatically about the time they

20    got his materials and there's not much there.  And then what

21    we've got is either nothing at all or a handful of things.

22            Would I be wrong in supposing that's the lay of the

23    land, Mr. Werdegar?

24            MR. WERDEGAR:  Well, your Honor, there is -- it's the

25    universe of materials.  They have his materials at least for

CCKAACHE1                    Hearing

1    e-mail up until about February of 2011 and paper documents as

2    far as 1728 went.  There wasn't anything generated after that

3    period of time.  And I don't know that the relevant volumes is

4    in the thousands, perhaps, tens of thousands of pages of

5    material has to be reviewed, cataloged and much of it is

6    privileged because not only privileged vis-a-vis the litigation

7    in Ecuador but also at that point in time this case had started

8    up and so there's communications pertaining to this case and it

9    has to be gone through.  It's not an insignificant amount.

10          THE COURT:  Are you suggesting to me that he's got

11   documents relating to the withdrawal or resignation of lawyers

12   in this case and that looking for them would be very

13   burdensome?

14          MR. WERDEGAR:  I am suggesting, your Honor, that as an

15   individual he has an e-mail account and so it's not like a

16   large law firm like Patton Boggs where things might all be

17   categorized.  You might have to go through the mass of

18   information as we go through letters to withdraw or other

19   topics, you still have to get through that entire body of

20   information.

21          THE COURT:  As applied to Mr. Donziger a two person

22   show and an e-mail account, I am just not impressed.  Indeed

23   the fact that it's an e-mail account if that's the bulk of it

24   makes it ever so much easier in electronic form and you can go

25   through it easily.  So the date on number 23 is July 10, 2012.

CCKAACHE1                    Hearing

1           Let's go to number 83.  Look prima facie seems to me

2      that status is a key player here and that they're entitled to

3      it.  Why not, folks?  When I "say entitled to it" I mean down

4      to the later date.  That's what I am talking about now.

5           MR. VESELKA:  They would be co-defendant after this

6      case is started.

7           THE COURT:  Sure.

8           MR. VESELKA:  So if it's going to involve an even

9      further step with regard to the common entrance communications

10     and things of that sort that may protect in the privilege.  So

11     the burden of trying to go through all that for what might

12     ultimately be obtained seems to be not commensurate with what

13     that would be as opposed to getting other things that we need

14     to be getting down to prepare for trial.

15          MR. WERDEGAR:  This is drafted as broadly as it could

16     be drafted and it's not limited to documents concerning

17     Stratus' work in connection with litigation in Ecuador.  And

18     because they are now a co-defendant and we're commonly having

19     to defend against Chevron's allegations I, certainly, would

20     hope that this is not to be read to include communications

21     pertaining to the defense of this case as opposed to the events

22     here that underlie this action.

23          THE COURT:  But the problem about that that

24     immediately occurs to me is the communications about the

25     defense of this case involves almost by absolute necessity

CCKAACHE1                         Hearing

1   communications about whether and to what extent Stratus rather

2   than Cabrera, wrote the Cabrera report?  Whether and to what

3   extend they lied in the 1782 proceedings?  Whether and to what

4   extend they muscled employees to give false evidence or no

5   evidence at all in 1782 proceedings?  And a whole bunch of

6   other related subjects that are very much at the heart of this

7   lawsuit and on which I imagine we'll have some conversations

8   about the crime fraud exception but we'll see.  But to just cut

9   out anything that relates to the defense of a lawsuit seems to

10  me unworkable.

11           Now, maybe there's some more precise way of dealing

12  with that problem but it doesn't occur to me offhand.  And

13  after all what we're talking about here at the moment is only a

14  very small incremental point.  And the very small incremental

15  point is should the cut-off date be February 14th of 2011 or

16  July 10, 2012 which is 17 months?

17           MR. VESELKA:  Yes, your Honor.  You just described

18  though what could be a distinction, if it's documents just with

19  regard to responding to the defense as opposed to documents or

20  the portions of the document dealing with the facts of what

21  occurred with regard to Cabrera are in the 1782 or any of those

22  other actions prior to the lawsuit that that may be a

23  distinction right there that the Court could draw.

24           THE COURT:  I am not sure I understand it.

25           MR. VESELKA:  You are referring to how you thought it

CCKAACHE1                    Hearing

 1    might be relevant or temporally to have documents after

 2    February 14, 2011, if the documents were discussing Stratus'

 3    involvement vis-a-vis the Cabrera report or affecting what

 4    people were willing to do or not do and in how to respond to

 5    1782.  If the request here were limited to items about that as

 6    opposed to items about defending the case in this instance what

 7    motions to file, what witnesses to look for and things that

 8    there might be a way to remove some of the burden of preparing

 9    and/or logging and/or going through the process later.

10              THE COURT:  OK.  I have your point.  I'll tell you

11    what.  My inclination is to run it through to July 10th of

12    2012.  But you've said enough to make me think that if you and

13    Mr. Matro sat down you might be in a position to come to some

14    limitation that would limit the post February 11 material in

15    some way that might help.  I am not sure but it's worth a shot

16    and maybe you can invite Mr. Boehner and the president maybe

17    you'll even make a grand bargain.  Who knows?  But I am not

18    holding my breath for either one.  Hopeful but not naive.

19              OK.  86 and say 87.  Who associates Juan Cristobal

20    Delano Apez.

21              What's the story here, Mr. Mastro?

22              MR. MASTRO:  Your Honor, this is in its own way a

23    subset of Cabrera fraud and ghostwriting fraud.

24              THE COURT:  Who was one of the so-called -- experts?

25              MR. MASTRO:  No.  Your Honor, Delano who was somebody

CCKAACHE1                    Hearing

 1   who was working for Yul was put forward in the Cabrera report

 2   as if he were part of Cabrera's independent team.  In reality

 3   he was on the payroll.  Yul and their worker Delano were on the

 4   payroll of the plaintiffs.  There was a report prepared on

 5   Potable Water and, in fact, the test run that's been given to

 6   date represented by the way, Yul represented by Patton Boggs

 7   the test run today has been, even the report that was prepared

 8   Mr. Fajardo, apparently, altered in material ways to give a

 9   false impression that there was some huge damage resulting from

10   this when, in fact, the report os originally written --

11             THE COURT:  Got it.  Let me hear from the other side.

12             MR. MASTRO:  One next thing, your Honor.  We haven't

13   been able to get the discovery yet because Patton Boggs has

14   managed so skillfully to obstruct in New Jersey so far.  But

15   anyway, thank you.

16             THE COURT:  In New Jersey?  Oh, that's another matter,

17   yes.

18             MR. WERDEGAR:  Your Honor, very briefly we've agreed

19   to produce everything up to the 14 so it is a timeframe to a

20   relevance issue.  Except to the extent that all this work that

21   they're talking about all the alleged wrongdoing I think -- I

22   don't think there's a dispute that it all took place before

23   that time.  So it's the burden of having to chase after --

24   additional documents.

25             THE COURT:  It's another search term or 17 months is

CCKAACHE1                    Hearing

1    what it is.  July 10, 2012.

2           OK.  Two categories completed.  Let's try something

3    more burdensome.  The Agency Theory one, 11 through 14 and 24.

4           OK.  My first reaction to these are the following:

5    That I would run the time period to July 10, 2012 on one and 12

6    through 14 but not even 11.  I imagine we may get to questions

7    about whether these should be complied with at all later on but

8    just on the time period.  Because it seems to me that documents

9    related to the payment of these folks goes pretty directly to

10   motive if nothing else certainly does.

11          The issues as to authority go to all kinds of

12   questions including the responsibility of the lapse for the

13   action of Donziger and Patton Boggs and Fajardo and Yanza and

14   Prito and Syance and so forth.  And in general -- goes to

15   jurisdiction anyway.  But I am happy to hear any contrary view.

16          MR. VESELKA:  As to jurisdiction, if the Court's

17   referring to personal jurisdiction, I don't believe actions

18   taken after this case is filed can determine personal

19   jurisdiction.

20          THE COURT:  Yes, that's probably true.  I think you've

21   got a good point on that.  But on the other hand, doesn't it go

22   to your Morrison argument regardless of when it happened?

23          MR. VESELKA:  I don't follow how so but --

24          THE COURT:  Well, you sought dismissal of the RICO

25   claims on the ground that applying RICO here would be an

CCKAACHE1                    Hearing

1     impermissible extraterritorial application of the statute.

2                MR. VESELKA:  I represent Camacho.

3                THE COURT:  That was a generic "you".

4                MR. VESELKA:  That was alleged against you.  We

5     didn't --

6                THE COURT:  Yes.  I understand.  It seems to me that

7     where any tortious behavior was going on and by whose authority

8     may, ultimately, prove of significance to the Morrison question

9     at trial, no?

10               MR. VESELKA:  I am not following the logic of how that

11    would trump the issue.  I am trying to create personal

12    jurisdiction arising after the case.

13               THE COURT:  No.  I am discussing it.  I at least

14    tentatively concede your point, the point as to which you

15    consider personal jurisdiction.  I'd like to think about it

16    some more before I decide it but I think you are probably right

17    but quite apart from personal jurisdiction.

18               MR. VESELKA:  As it goes to claims related to the

19    RICO.

20               THE COURT:  No.  As it goes to personal jurisdiction

21    against your clients in particular, it may not be of

22    significance.  But the question may be relevant to whether and

23    to what extent Chevron is seeking an extraterritorial

24    application of RICO, I am not sure about that but it seems that

25    it may be.

CCKAACHE1                    Hearing

1           Mr. Werdegar.

2           MR. WERDEGAR:  Your Honor, frankly, this is the first

3    I am hearing.  I am thinking on my feet a little bit.

4           THE COURT:  God, I hope not.  I'll give you first time

5    today.

6           MR. WERDEGAR:  It does -- it occurs to me that with

7    respect to the Morrison issue you know sort of where things are

8    and there's the various tests that are kind of revolving out

9    there how to apply that to RICO.  But, certainly, proving who

10   did what in the United States versus who did what in Ecuador

11   will be relevant to that question.  But because -- beyond the

12   fact that the Ecuadorian plaintiffs have hired the lawyers in

13   Ecuador and have retained lawyers in the United States, I don't

14   know how documents about, just about whose power of attorney or

15   retention we've agreed to produce through a period of time, I

16   don't see how that's going to shift the balance in terms of

17   center of gravity or whatever tests you apply in terms of the

18   RICO, the locust of the RICO for purposes of Norex and

19   Morrison.

20          MR. VESELKA:  And I understood the Court that we are

21   referring to Question 11.

22          THE COURT:  No.  We were talking about -- well, it's

23   11 but it's also some subsequent ones.

24          MR. VESELKA:  So as to 11 since it's only dealing with

25   the counsel --

CCKAACHE1                    Hearing

1          THE COURT:  I understand that.

2          MR. VESELKA:  Right.

3          THE COURT:  I started out by saying I thought 11 was a

4     shorter topic.

5          MR. VESELKA:  Right.

6          THE COURT:  So, Mr. Mastro, what do you got to say on

7     this?

8          MR. MASTRO:  Well, your Honor, I think, your Honor --

9          THE COURT:  I'll bet you'll draft more precise

10    document requests in the future, won't you?

11         MR. MASTRO:  I appreciate the Court's time in going

12    through each of these.  And the answer is "yes".  But, your

13    Honor, seems to me they are relevant on multiple levels to go

14    beyond the timeframe.  But also they go to responsibility,

15    culpability, liability, issues, relationships between Donziger

16    and his supposed clients and these other law firms and what

17    they're doing as a matter of their own criminal activity.  I

18    think that we're allowed to probe that and it's highly

19    relevant.  I understand the distinction on 11 but I think that

20    one, 12, 13, 14 and 24 all should go to the later date.

21         THE COURT:  Well, I imagine we're going to revisit

22    this overall substance later but on one, 12 through 14 and 24

23    will go to July 10, 2012 and on the number 11 we'll go to

24    February 14, 2011.  I think that's the right date.

25         OK.  So let's go to category two, money flow and so

CCKAACHE1                    Hearing

1    forth.

2             MR. MASTRO:  And, your Honor, I am reminded there are

3    two more to add there, so 27 to 34 the sequence, actually, goes

4    25 through 30 then 33 through 35 and then 115.

5             THE COURT:  Sorry.  25 to 30.

6             MR. MASTRO:  33 to 35 and 115 to 118.

7             THE COURT:  OK.  Well, let's start with 25 to 30 and

8    focusing just on time period, what practical difference does it

9    make if it goes to the more recent date to whatever extent they

10   understand all together?  Anybody want to take that on the

11   defense side?

12            MR. VESELKA:  I don't believe it would be

13   substantially different.  There may have been additional

14   counsel hired for appeal to pick up one additional counsel.

15            THE COURT:  OK.  So the cut-off date for 25 to 30

16   would be July 10th.

17            MR. VESELKA:  I was addressing 25.  I apologize, your

18   Honor.

19            THE COURT:  Look at the others.

20            MR. VESELKA:  The others 26 because it did deal with

21   documents with regard to all docks raised -- This is such a

22   mishmash of between funders versus counsel versus NGOs.  I have

23   trouble dealing with how that goes.  There would be -- it would

24   be substantially more burdensome to deal with just because of

25   that mishmash and the funding part would -- there would be

CCKAACHE1                    Hearing

1   substantially more after February 14, 2011.

2            THE COURT:  Mr. Werdegar.

3            MR. WERDEGAR:  Your Honor, just beyond what's already

4   been said really our concerns here is not so much timeframe ant

5   scope of the priority of the requests overall.

6            THE COURT:  All right.  Now is that true also through

7   number 30?

8            MR. WERDEGAR:  That's through the series 25 through

9   30, your Honor, yes.

10            THE COURT:  OK.  I imagine we're going to revisit subs

11   substantively but the cut-off date is going to be any discovery

12   on 25 through 30 would be July 10, 2012.  Let's look at 33

13   through 35.

14            You know, Mr. Mastro, I've got to tell you 33 looks so

15   overbroad to me.  Why is -- also 34.

16            MR. MASTRO:  Well, your Honor, in both of those

17   instances these were vehicles for making the illicit payments.

18   The Kohn firm's is the ones that would wire the funds into the

19   secret bank account or into the Selva Viva account and so --

20            THE COURT:  Well, you said it.  I understand.  I

21   hadn't focused on that.  What have you got to say to that,

22   gentlemen at the back table?

23            MR. WERDEGAR:  Your Honor, to the extent we're talking

24   about sort of the breadth of the these requests as opposed to

25   timeframe, we've agreed to produce documents related to any

CCKAACHE1                    Hearing

1    payments involving Cabrera, any court appointed expert and any

2    payment to any Ecuadorian judicial official or government

3    official, so we've offered to produce that and we agree that

4    they can get that.  What our problem is that they seek every

5    piece of paper of any sort related in any way to the funding or

6    expenditures for litigation and it's stuff that has no bearing

7    on the actual allegations to fraud.

8              THE COURT:  Right now we're on time period.  Time

9    period on those two is July 10, 2012.  I imagine we will be

10   revisiting scope later, right?

11             Any reason why it shouldn't be the same ruling on 35?

12   Same ruling.

13             115 to 118, anybody with anything to add on time

14   period?

15             MR. VESELKA:  We could accept that adding the time

16   period dealing with all of the various documents about trust

17   that would be set up pursuant to the judgment and it would be

18   an increased burden if everything's going to have to be logged

19   and fought through in that regard and it wouldn't change the

20   issues as showing any potential liability for the fraud that

21   was discussed before.

22             THE COURT:  Mr. Mastro?

23             MR. MASTRO:  Well, your Honor, again, I think that as

24   to this entire group of requests many of the relevant documents

25   are likely to be in the period post judgment.  They go to

CCKAACHE1                    Hearing

1    allocating, secreting, selling off pieces and so I think that's

2    why we feel if we are going to get substance under period the

3    time cut-off should be the June.

4            THE COURT:  The time period is July 10, 2012.

5            Last group, the collusion ones, 98, 99, 105, 106, 108,

6    110 and so on.

7            MR. MASTRO:  And, your Honor, I am reminded by my

8    colleagues two more to add in that category, 39 and 81.

9            THE COURT:  All right.  We'll start with 39 and maybe

10   we can speed this up.  I mean my basic view here is that the

11   time period should go to the later date but if there's some

12   particular reason why defense counsel thinks it should be the

13   earlier date and that that would really matter in some way, I'd

14   like to know that.

15           MR. WERDEGAR:  May we have a moment, your Honor?

16           THE COURT:  Sure.  In fact, if you'd like we could

17   take a five minutes recess and you could go through them.

18           MR. MASTRO:  Thank you very much your Honor.

19           (Recess)

20

21

22

23

24

25

CCKAACHE1                    Hearing

1        (Continued on next page)

2        THE COURT:  Just a word on scheduling.  We're going to

3   go to about five to 1:00 and come back after lunch.  Andy tells

4   me we have to finish this this afternoon because the Mayan

5   apocalypse.

6        What about this latest bunch?

7        MR. VESELKA:  Your Honor, I believe that we have

8   concerns about the temporal issue in particular with regard to

9   98, 99, 105 and 108.  I hadn't gotten all the way to the 121

10  through 25.  Because to the extent that those issues are

11  looking at unfiled documents that may have been in the judgment

12  or other items, the way it is written it will require any time

13  any of the parties in this case are in any of the related

14  actions, we would have to be addressing every time we discussed

15  that.  It would be a substantially burdensome search for

16  documents that would clearly be work product and/or

17  attorney-client privilege in just trying to defend this case as

18  to those items.

19       THE COURT:  Let's just take a look at that.

20       MR. VESELKA:  98 might inquire us to be producing

21  documents that are they have would have gotten.  They are parts

22  of the record in the appellate case.

23       THE COURT:  98 I think it is limited to documents

24  related to communications ultimately with the Ecuador courts,

25  right?

Cck6che2

1              MR. VESELKA:  Yes, your Honor.

2              THE COURT:  We're not talking about the U.S.  99, that

3      is obviously true.  105 is certainly limited to Ecuador.  105

4      is limited to Ecuador.  So is 106, right?

5              MR. MASTRO:  Yes, your Honor.

6              THE COURT:  And 108?  Certainly because I assume the

7      capitalized words are the defined term that I am familiar with

8      from the summary judgment motion?

9              MR. MASTRO:  Yes, your Honor.

10             THE COURT:  And 110 likewise.  Here is what we're

11     going to do:  We're tentatively going to make this all

12     July 10th, 2012, but I will revisit that in some way if you

13     folks can't work out -- and I think it is most acutely a

14     problem and maybe exclusively a problem with 98 -- some

15     limitation that would somehow pull out of this documents that

16     are just communications that relate to some item that got filed

17     in the Ecuadorian litigation as to which there is no issue of

18     ghost writing or any of the other things that the plaintiffs

19     have been talking about.  Do you think that is doable,

20     gentlemen?

21             MR. MASTRO:  I think so, your Honor.

22             MR. VESELKA:  I believe it would be worthwhile for us

23     to explore and confer and find some limitation that carves out

24     part of what would not be on the later time frame.  Yes, your

25     Honor.

Cck6che2

             THE COURT:  I think that is worth a try anyway.  So on
this whole group then are there any other individual ones we
need to revisit?

             MR. WERDEGAR:  Your Honor, just with respect to 108,
which relates to their define term unfiled Lago Agrio
plaintiffs work product.  There, your Honor, when you get
beyond February 14th, 2011 is that problem where there could be
documents and communications, and certainly there are,
pertaining to those materials in the sense that it is a big
part of Chevron's allegations in this case and so you are
having -- this document communicates pertaining to how do we
address these allegations.

             THE COURT:  Same problem.  So I leave with you trying
to work out a carve-out particularly for essentially briefs and
drafts of briefs in this case discussing that stuff.

             Are you with me, Mr. Mastro.

             MR. MASTRO:  I am, your Honor, but I would add this
though for your consideration:  This goes to us the heart of
the judgment ghost writing and the communications afterwards.
We think this goes to the heart of one of the crime fraud
issues in the case the extent to which the judgment was ghost
written by the plaintiffs and their original product was used.
So they should be logging that postjudgment period when they
are talking about, Wow, how the hell are we going to cover this
one up.

Cck6che2

1          THE COURT:  I am not disagreeing with that.  I am just

2     raising the possibility that there may be some subset of stuff,

3     certainly stuff that winds up being filed in this case.  Those

4     are documents relating to.

5          MR. MASTRO:  Hope springs eternal.  So I will hope to

6     work out a carve-out.  I am just explaining to your Honor why

7     it is a problem.

8          THE COURT:  I understand.

9          MR. MASTRO:  Thank you, your Honor.

10          THE COURT:  You will report back to me on 98 and 108,

11     but otherwise for this whole group it is July 10, 2012.  So

12     that takes care of the time period stuff I think, right?

13          MR. MASTRO:  Yes, your Honor.

14          THE COURT:  Now we'll get a start on and maybe finish

15     Category B1.  So if I haven't skimmed this over too quickly

16     again and if my memory is accurate Category B1 is a narrow

17     proposition and is analogous to something I have already ruled

18     on.  Do I correctly understand that the plaintiff wants a lot

19     of discovery about possible ghost writing by the plaintiffs or

20     their affiliates of various Ecuadorian judicial decisions and

21     the like and the defense takes the view that the motion to

22     compel is limited to possible ghost writing of the appellate

23     decision in the intermediate appellate court in Ecuador and

24     that the plaintiff shouldn't get that because they haven't up

25     to now made a specific allegation about that particular paper;

Cck6che2

1     is that an accurate summary of the dispute?

2              MR. VESELKA:  It's accurate that we don't believe

3     paragraph 327, which raises issues with regard to a

4     constitution of the appellate panel does not raise issues of

5     ghost writing of the decision that later emanated from the

6     appellate panel and that they have nothing but a pure fishing

7     expedition to do anything with regard to ghost writing of any

8     part of the appellate decisions.

9              THE COURT:  Therefore?

10             MR. VESELKA:  Therefore, if it is overbroad and not

11    relevant to the claims of the case are overbroad to be fishing

12    for maybe the ghost wrote something else and we don't know

13    about it as opposed to having addressed the ghost writing

14    alleged in the complaint, which was merely the ghost writing in

15    the original judgment.

16             MR. WERDEGAR:  Just to add briefly to what Mr. Veselka

17    said they haven't -- there is no allegation of ghost writing.

18    There hasn't been in there --

19             THE COURT:  There couldn't have been when the

20    complaint was filed, there was no appellate decision in

21    existence.

22             MR. WERDEGAR:  But I haven't seen it elsewhere either,

23    your Honor, in their pleadings, a specific allegation or

24    evidence of an appellate ghost writing.  I apologize if I

25    missed something, but I don't believe I have seen that.  This

Cck6che2

```
 1    goes to the idea of this is -- it is sweeping into our already
 2    broad scope of this discovery, your Honor.  Basically the
 3    entire appellate process down in Ecuador and to the extent that
 4    there are concerns about seeking discovery from a lawyer and
 5    law firms involved in litigation, about that litigation, I
 6    think that is heightened when that litigation process is still
 7    ongoing and I think they need to come forward with some sort of
 8    specific allegations and essentially offer of proof or
 9    evidentiary showing before that door should be opened rather
10    than say, Well, it relates to our conspiracy generally and we
11    are interested and we think something may have happened.  I
12    don't think that is enough to get this kind of broad new range
13    of discovery, your Honor.
14         MR. VESELKA:  They at least had the opportunity to
15    amend if they had some sufficient basis to make an allegation.
16    They could have amended as late of August 15th or 22nd of this
17    year, just four months ago, after the appellate decision has
18    come out.  So they forgo or forwent that opportunity.
19         MR. MASTRO:  Your Honor, as your Honor knows we had
20    amended as of rights shortly after the filing of the complaint.
21    We could not possibly have therefore included at that early
22    stage what really is deja vu all over again.  We flagged even
23    if that amendment that there seemed to be certain improprieties
24    in the selection of the judicial panel, something that was
25    supposed to happen by random draw and the appellate panel.
```

Cck6che2

There were so many shifts.  But, your Honor, we also have

uncovered, and I am happy for share with the Court now and we

will be developing this evidence further as with the

irregularities in the judgment, in the appellate decision, we

have uncovered that in fact somehow incredibly a draft was

issued prematurely to a press organization in Ecuador.  That

draft appears on its face to have come from a source other than

the courthouse and even seems to have an identification number

for an ROE government agency.  It has different formating, much

the same substance but different formating.  That was leaked to

a press organization before the final opinion had actually been

released.  It had no presiding listed judge on it, but a

handpicked presiding judge in this bizarre process of changing

the panel shows up in the final version the next day.

        Your Honor, it looks like once again like ROE

collusion with the lapse to manipulate even the appellate

decision.  So we believe that we have more than sufficient

evidence to explore what happened there and have the LAPs

colluded with a ROE to basically put up a trumped up appellate

decision rubber stamping the opinion while trying to improve

their position and enforcement.

        MR. VESELKA:  We have plenty of real issues that have

been joined and documented in evidence to deal with in this

case.  For them to dream up that something got to the ROE when

the appellate panel was going to release a decision that had

Cck6che2

        such a potential interest to the government that if somehow the

        ROE saw a draft of that nowhere in there did he say that he has

        got any evidence or any good faith claim that any of the

        defendants had anything to do with that draft going to ROE or

        to the press.  So that shows how they are trying to go on

        various fishing expeditions.  If they had some basis, they

        could have amended as late as four months ago and alleged it.

        They decided not to and left it with the allegation as to the

        makeup of the panel.

                MR. MASTRO:  Your Honor, just one quick thing.  This

        was all under Zambrano.  It is not an appellate panel in the

        sense we have a Second Circuit and it is a separate court.

        Zambrano was still pulling all the strings on the appellate

        panel that kept shifting, even putting in substitute judges to

        make sure they had it wired.  We believe that there will be

        relevant discovery about the role that the plaintiffs and

        Donziger played in those machinations with the ROE and Zambrano

        and the appellate decision being produced and approved by a

        manipulated panel.

                THE COURT:  Just give me a second here.

                Go ahead.  Mr. Mastro's fertile imagination using his

        background as a prosecutor where they get very imaginative as

        to what they think may be out there.  I don't want our silence

        to count.  So we believe that there is involvement with

        defendants with regard to any of that.  Just like we don't

Cck6che2

1      believe it is appropriate to refer to elements of a fugitive.

2      I believe that is a proper characterization.

3              The issue is he is speculating a lot and with all we

4      have got to deal with to try to get ready I think expanding

5      discovery in these other areas imposes a burden and imposes a

6      burden on the whole process of this case to go through all of

7      those issues to where we're running down rabbit holes.

8              THE COURT:  There is a great deal of evidence in this

9      case that the defendants ghost wrote the Cabrera report or most

10     of it.  There is a great deal of evidence in this case that the

11     defendants got the then presiding judge to terminate the

12     judicial inspection process and to appoint a global expert at

13     least by threatening him with a disciplinary complaint.  There

14     is a great deal of evidence that they got Cabrera appointed,

15     their chosen individual, by the same means.  There is a great

16     deal of evidence that they and Cabrera both falsely represented

17     that Cabrera was independent.  There is a great deal of

18     evidence that they had stratused the principal author of most

19     of the Cabrera report and on defendant's payroll wrote and

20     published a critique of the Cabrera report which they

21     themselves had written in order to create the appearance that

22     the defendants had some problems with the Cabrera report and

23     thus to bolster the public perception that was independent and

24     we have a trial court decision that contains at least one

25     significant and substantial passage that will is lifted right

Cck6che2

out of a document prepared by the defendants that was never
publicly filed in the Court, alternatively I suppose that the
defendants wrote all or part of the trial level decision in
Ecuador.

There is a great deal of evidence of cooperation
between the defendants here, plaintiffs in Ecuador and
government of Ecuador.  There is a great deal of evidence that
indicates significant issues with respect to the independence
and fairness of the Ecuadorian judiciary, particularly in cases
of this nature.  And I do not regard this discovery in general
without regard to particulars of particular requests at all
inappropriate.  I probably would not regard it as inappropriate
even without that huge evidentiary record, most of which has
been unanswered by the defendants over a period of what is now
a couple years.  Indeed, as to many elements I have already
found that there are no genuine issues of fact as to most of
it.

Moreover, if the plaintiffs succeed in finding
evidence suggesting ghost writing or other misconduct involving
the defendants with the appellate decision, that would be
admissible I believe, though I don't need to decide it now, as
probative of whether similar misconduct occurred with respect
to the trial court decision under 404(b) among other
principles.

So in principle the discovery is going to happen.  Now

Cck6che2

the details, however, we need to sort out because I am mindful
of issues of burden and overbreadth and some of these other
things.  So I take it what we have here are three requests.
Donziger 121, 123, 124, 125.

MR. VESELKA:  And 121, sir.

MR. MASTRO:  Yes, your Honor.

THE COURT:  Did I skip one?

MR. MASTRO:  Right.

MR. VESELKA:  120, 121, 123, 124 and 125.

MR. MASTRO:  There are five in all, your Honor.

THE COURT:  Thank you.  I stand corrected.  We're on
substance so let's take up 121.  The argument is I take it it
is irrelevant because the complaint doesn't allege misconduct
with respect to the appellate decision.  Is that about the size
of it, gentlemen?

MR. VESELKA:  We had agreed it would be relevant to
produce documents with regard to what led to the makeup, any
documents that we have that led to the makeup in the
constitution of the panel.

THE COURT:  Right.  Your objection is going beyond the
makeup?

MR. VESELKA:  Right.

MR. WERDEGAR:  Yes, your Honor.  That with the overall
burden of having to gather and review and log documents in this
time frame, but I think you have rejected most of the primary

Cck6che2

1   basis that I would assert.

2           THE COURT:  This was on 120.  So 120 the objections

3   are overruled.  Is it any different on any of these others?

4           MR. MASTRO:  I don't believe so, your Honor.

5           THE COURT:  Let me give the defense a chance to

6   disagree with you.

7           MR. MASTRO:  Certainly, your Honor.

8           MR. VESELKA:  Well, I think again 121 appears to track

9   into these issues where we pick up anything that was being

10  filed with the appellate court or work being done.  It's just

11  part of the normal process of defending the appeal.  So the

12  burden of having to go through all of that part is maybe part

13  of that issue as to whether there can be a defined carve-out of

14  some aspect of the --

15          THE COURT:  Look, I can see that.  That can't be too

16  hard to deal with.  A cover letter saying, Dear Clerk of Court,

17  here is our filing on thus and such.  You are not looking for

18  that, Mr. Mastro, right?

19          MR. MASTRO:  No.  I think our definitions, your Honor,

20  made clear that the things that were officially submitted to

21  the Court on the record are not covered by that request.

22          THE COURT:  Is that accurate?  Does that solve your

23  problem, Mr. Veselka?

24          MR. VESELKA:  Well, no, your Honor.  Because to the

25  extent that there are communications between counsel or between

Cck6che2

counsel and client with regard to what was going to be filed,
to discuss what is going to be filed as opposed to discussions
pertaining to the issue of that what he is speculating about
something being slipped over that is not being filed,
communication other than that is going to be through normal
court channels.

          THE COURT:  So just so I can share my thinking with
you -- and if I am going down a rabbit hole, you will tell me
and if you think I am right, I will change my view -- on these
we are dealing with questions of relevance in general for
reasons I have indicated I think it is appropriate discovery
because it is likely to lead to relevant material.  I am not
trying to quote the standard exactly, but that is the general
drift.  It may be that you will have some work product
objections with respect to discussions among counsel with
respect to what you ought to file, what it ought to say and the
consequence of my overruling your objection here is simply that
you are going to have to schedule them on a privilege log and
then I am going to have to decide a couple of things.  The
first thing I am going to have to decide is whether there is a
factual basis giving rise to a reasonable suspicion, I believe
it is in my opinion of yesterday, of crime fraud, basically
probable cause more less, and if this particular document was
in furtherance of that crime fraud.

          Now, I rather imagine that in this category we're

Cck6che2

going to have to go all the way on that, but what I am hoping

is that you folks can work together to draft carve-outs for

this small group of requests that will avoid the need to

schedule things like transmittal letters and the like that

nobody is interested in and everybody knows nobody is

interested in but nobody has taken the time yet, not that you

all have greats amounts of time on your hand, but nobody has

figured out how to picking up in the net.  We can reduce the

burden on everybody on that and if so that is fine.  And if not

it may ultimately be me, ultimately more things for me to be

looking at in camera and I will be aggravated looking at

transmittal letters and so what is the bottom line.  That is

the way I am viewing it.

          Does anybody think I am missing something?

          MR. MASTRO:  We don't have any problem trying to do

that, your Honor.  I just a wanted the Court to know we think

we already defined --

          THE COURT:  Defined it out.

          MR. MASTRO:  We defined that out.  This is a red

herring just like on the earlier issue with court filings.

          THE COURT:  So you need to sit with each other and

either convince the defense, Mr. Mastro, that it is already

carved out or if it is not carved out figure out a better way

to do it.

          MR. MASTRO:  Certainly, your Honor.

Cck6che2

1          THE COURT:  I would like to you do that and I would

2    like everybody to do that.

3          Now, putting aside that kind of stuff is there

4    anything else left on this Exhibit B1 that requires individual

5    discussion?

6          MR. WERDEGAR:  Your Honor, just the only other point

7    and this may be very much what we need to meet and confer with

8    Mr. Mastro further about this is Donziger 121, which unlike the

9    others that are focused on things outside the record that may

10   have made to appellate court and the like this seeks all

11   documents related to any communications between really anyone

12   between or among the plaintiffs side of the case regarding --

13   it says, All documents relating to any communication with the

14   appellate court or any Ecuadorian court.  So the communications

15   are one thing, but then it is asking for any internal

16   discussion or communication pertaining to those.  It is not --

17   it is related to Chevron litigation, which is broadly defined.

18   So it is really asking for any internal communication that in

19   any way pertains to a communication with the Ecuadorian

20   judiciary and it just seems it goes beyond ghost writing and

21   alike.

22         THE COURT:  It goes beyond ghost writing all right,

23   but can you suggest to me why for example just to take your

24   concern there could be any legitimate reason for anybody on the

25   Ecuadorian plaintiffs side of this case having an ex parte and

Cck6che2

secret communication with an Ecuadorian judge about what is

going on in the American litigation?

             MR. WERDEGAR:  Your Honor, the request is not limited

to ex parte communications.  It is any communication with

anyone in the Ecuadorian judiciary.  So that would be internal

discussions about the brief we are going to file tomorrow or

internal discussions about what we received from the court.

             THE COURT:  You had internal discussions about the

brief you are going to file tomorrow with an Ecuadorian judge?

             MR. WERDEGAR:  No.  Maybe I am misreading this.  This

is seeking all documents -- it is not just seeking the

communication with the Court.  I understand that is one thing.

It is seeking all documents related to those.  So a document

relating to communication would be -- could be any internal

discussion about do we send this letter, do we file this brief.

I get your point about the communications themselves.  I am

raising the issue of the all documents related to.

             THE COURT:  I understand that point and I could

conceivably imagine -- and this is just a trial balloon on my

part.  I haven't thought it through.  I am not suggesting it.

There may be a way to take out of this preemptively the Court

of opinion work product about a document that ultimately gets

publicly filed in Ecuador.  That is what you are concerned

about?

             MR. VESELKA:  That is what I tried to raise so

Cck6che2

unartfully beforehand.

MR. WERDEGAR:  Yes.  You hit upon my certain, yes.

THE COURT:  Mr. Mastro, you need to talk to them about it.  That doesn't seem totally crazy off the face of it.

MR. MASTRO:  Your Honor, the definition of Chevron litigation doesn't include the Aguinda case so why are they talking to Ecuadorian judges in the courthouse about their filings and other cases?

THE COURT:  Well, has that helped your memory on that, Mr. Werdegar?

MR. MASTRO:  I am sorry, your Honor.  My colleagues have corrected me.  That the New York Aguinda case was exempted from this grouping.  So I will talk to him about that.

THE COURT:  So now you can see what direction you need to go in?

MR. MASTRO:  I understand.  Obviously we're not talking about how they would prepare a brief.

THE COURT:  Right.  Given the hour I think we're finished with B1.  We'll resume with B3 at 2:30.  Maybe you can caucus over the lunch hour or not.  We're not going to finish today I can see that.  So you will have a chance to do it overnight.  So we have three or four or five outstanding issues here, but we're going to get this all done before the Mayan apocalypse.

MR. MASTRO:  Thank you, your Honor.

Cck6che2

 1          (Luncheon recess)

 2              A F T E R N O O N   S E S S I O N

 3                  2:30 p.m.

 4          THE COURT:  Sorry to keep you.  First of all, did you

 5   resolve any of these open issues over lunch?

 6          MR. MASTRO:  Your Honor, there was some discussion.  I

 7   understand that they have to go back and talk to their

 8   colleagues.

 9          MR. VESELKA:  But we also spent some time looking on

10   the forward to resolve some of the ones we're getting today,

11   which ones are dealt with by the daytime and which ones we can

12   start a group for you as we go so try to move it as

13   expeditiously as possible.

14          THE COURT:  Thank you.  Okay, B3.  Let me just scan

15   for a moment.  How to you propose we tackle these three?

16          MR. MASTRO:  Your Honor, there are 16 particular

17   requests and I think that in this category we have to go one by

18   one.

19          THE COURT:  Okay.

20          MR. MASTRO:  They cover a variety of related but

21   different subjects.

22          THE COURT:  All right.

23          MR. MASTRO:  Number one this applies to Mr. Donziger.

24   It is to obtain information about his pay and compensation in

25   connection with his work on the case.

Cck6che2

```
 1              THE COURT:  Why shouldn't I quote this?

 2              MR. WERDEGAR:  Well, your Honor, we have agreed to

 3    produce his retainer agreements with Aguinda plaintiffs as well

 4    as your ruling on the Patton Boggs executed funding agreements

 5    to the extent Chevron doesn't already have them.

 6              THE COURT:  But I know you heard what I said about the

 7    Patton Boggs claims.

 8              MR. WERDEGAR:  Oh, I understand, your Honor.  I am

 9    saying consistent with that these are what we have agreed to

10    produce.  The question is beyond the funding agreements, which

11    lay out whose is investing and how people who have invested or

12    have a stake in the outcome on this as far as the legal side go

13    will ultimately be compensated should there be a recovery, we

14    don't see the relevance and certainly not the relevance

15    proportionate to the burden and intrusion of turning over every

16    document about what money Donziger has received in connection

17    with be it a monthly stipend as part of his work on case or

18    whatever it is.  There is no question that he stands some

19    financial benefit should there be a recovery and that is their

20    motion theory, but why does every financial piece of paper

21    about his work on this case which has been a large portion of

22    his work over the years need to be turned over?  It seems

23    intrusive and burdensome and to a degree far beyond what I

24    think is legitimately necessary for them to prove what they

25    intend it prove given what we have offered to produce.
```

Cck6che2

```
 1              THE COURT:  So far as intrusion is concerned, I gather
 2      you folks have negotiated a confidentiality order, is that
 3      right?
 4              MR. VESELKA:  We have.
 5              THE COURT:  I haven't signed it yet.
 6              MR. VESELKA:  There was one phrase that was disputed
 7      between some of the parties, but it has been submitted.
 8              THE COURT:  I understand that.
 9              What is the short answer to that argument?
10              MR. MASTRO:  The short answer to that, your Honor, is
11      that Mr. Donziger and his financial arrangements with the LAPs
12      and the changes that have occurred in these financial
13      arrangements as we worked with other coconspirators, gave
14      shares of it to DeLeon and others of his interest.  He is also
15      is a person through whom revenue flowed and then he dolled it
16      out.  You will see Request No. 35 deals with the multiple
17      accounts.
18              THE COURT:  Let's stick with No. 1 for a moment.
19              MR. MASTRO:  I am just saying he received a lot of
20      compensation.  He also received revenue that I then took in and
21      dolled out of his personal accounts for some of the we think
22      illicit payments, payments to Yanza that we think went to
23      others in Ecuador.  We need to follow the money.  We need to
24      follow the money that came into him.  It goes to his motive and
25      interest and who else he involved in the conspiracy by who he
```

Cck6che2

1   cut in and what he did with the money that came in to him and

2   how he had it flow out from him.

3            THE COURT:  The objection is overruled.

4            No. 25.

5            MR. VESELKA:  I believe this was resolved by the time

6   ruling that was involved.

7            THE COURT:  No. 26.

8            MR. MASTRO:  Your Honor, this has to do with persons

9   who have financially supported or invested in the enterprise.

10  It goes to the operation of the enterprise, how it was funded,

11  who stands to benefit, who the coconspirators are and how the

12  enterprise functioned financially to be able to extort Chevron

13  and pay for various other schemes to extort Chevron.  We use

14  specific names here of individuals involved Burford, DeLeon and

15  others.  We provide information to the Court before.  Part of

16  that scheme also Kohn, Amazon Watch.  We were very specific

17  about.

18           THE COURT:  I thought you said "included but not

19  limited to"?

20           MR. MASTRO:  That's true, your Honor.  So if your

21  Honor decided to limit it to these specifically named parties,

22  we would understand that.  These are basically your

23  coconspirators or parties who have financially invested in or

24  benefited from the enterprise and worked in collusion with the

25  plaintiffs.  So we think it is essential to prove the scheme.

Cck6che2

1          THE COURT:  It is modified.  I am striking the word

2     "person" in the second line and substituting there for the

3     words "of" and following the word of with "Burford" and the

4     rest of the names listed at the end of it.  And then after the

5     phrase "criminal cases" putting in a period and striking

6     "including but not limited to."

7          MR. MASTRO:  Your Honor, the next would be No. 28.

8          MR. WERDEGAR:  Your Honor, can I just be briefly heard

9     on 26?

10          THE COURT:  Yes.

11          MR. WERDEGAR:  There is two questions.  One question

12     is whether there should be discovery into the financing of the

13     litigation.  The second question is even assuming the Court

14     wants to allow discovery into that and I am guessing that it

15     does from what you just said is --

16          THE COURT:  Well, it goes to enterprise issue.  The

17     goes to the Donziger's role in the enterprise.  It goes to the

18     roles of others in the enterprise.

19          MR. WERDEGAR:  The issue of all documents, and it is

20     all documents related to these individuals.  It is not limited

21     to the funding or financing.  And so, for example, one of the

22     individuals on this list is Donziger's brother.  So he being

23     asked to produce all documents related to his brother.  Another

24     individual is his brother-in-law.  I am not 100 percent sure

25     which name that is.  I think it might be Glen Brevlin, but I

Cck6che2

1    would have to confirm that, your Honor.  There should be some

2    subject matter limitation beyond all documents relating to this

3    whole laundry list of organizations and individuals.  Cohn,

4    Swift and Rask had a role as a funder, but they also had other

5    roles.  Same with Rain Forrest Action Network.  Same with all

6    these entities.

7         THE COURT:  I must tell you this is not an objection

8    that is included in or statement of position here, but what

9    about it, Mr. Mastro?

10        MR. MASTRO:  Your Honor, two specific individuals he

11   mentioned are funders in the litigation.

12        THE COURT:  No.  I took the point to be it is one

13   thing to ask for all documents relating to financial support or

14   investment or offer financial in support of litigation by A, B,

15   C and D.  It is another thing to ask for all documents that

16   relate to A, B, C and D.

17        MR. WERDEGAR:  Exactly, your Honor.

18        THE COURT:  For example, he said a copy for his

19   brother's birth certificate is called for.

20        MR. MASTRO:  I would add relating in any way to the

21   Chevron litigations.  So we will have an elimination of the

22   brother's birth certificate.

23        THE COURT:  So you want to say all documents related

24   to A, the Chevron litigations, and B any person?

25        MR. MASTRO:  Exactly.

Cck6che2

1          THE COURT:  Does that solve your problem?

2          MR. WERDEGAR:  Yes, your Honor.

3          MR. VESELKA:  It has to meet both parts.

4          THE COURT:  That's right.  That's right.  No. 28.

5          MR. MASTRO:  Your Honor, I think this is taking care

6    by the time limitation.

7          THE COURT:  Yes.

8          MR. VESELKA:  The time part of it has been resolved,

9    your Honor.  It also goes to an issue that it is requesting all

10   documents related to these accounts which would be documents --

11   not just documents sufficient to show the payments, which

12   identify and produce any documents with regard to payments but

13   we don't think we should have to provide identifying

14   information with the bank accounts themselves.

15         MR. WERDEGAR:  May I add to this?  This is one that

16   there is a grouping of them.  Once we resolve this one, I think

17   we'll resolve one way or another a group.  We have offered to

18   produce documents to show any and all payments to Mr. Cabrera

19   and his team, the Lago Agrio court, other members of the

20   judiciary, the Republic of Ecuador, payments that relate to

21   their allegations of misconduct.  The question as to these

22   requests is whether they are entitled to all documents

23   regarding these accounts such they can see all transactions

24   that took -- financial transactions that took place on the

25   plaintiff's side be it to pay something entirely innocuous, the

Cck6che2

1      water vendor, to pay other types of vendors or support or bills

2      that are not alleged to be improper in any way in this case and

3      do they get that full scope of financial discovery or should be

4      limited in some sense to the kinds of payments that our clients

5      are being accused of having been improper and we think it

6      should be the latter.

7               MR. MASTRO:  So, your Honor, this is really the

8      question, 28, 29, 30, 33, 34 and 35, these are all the various

9      bank accounts or account information relating the heart of how

10     the scheme was carried out.  This is the accounts that we

11     used -- the secret accounts to pay off Cabrera and other

12     accounts to pay off Cabrera and his team.  These are from Banco

13     Pichincha.  They are from Chase where Donziger maintained

14     multiple accounts and would move accounts around like a shell

15     game.  They are from Selva Viva accounts, which was the front

16     organization where they funneled money through to Cabrera

17     separate from his secret accounts.  The Kohn funding, which was

18     used to go into those accounts, including the secret Cabrera

19     account, and payments were made out of those.

20              Now, your Honor, when you look at the scheme to

21     suggest that they should be able to decide which of the items

22     should be revealed out of those bank accounts is like asking

23     the wolf to decide which of the hens has to be killed.  The

24     fact of the matter --

25              THE COURT:  Wolves usually do make that decision.

Cck6che2

1          MR. MASTRO:  I understand, your Honor.  Your Honor,

2     we're talking about a complex fraud scheme where Donziger would

3     literally get money into his Chase accounts -- he had one

4     listed as Ecuador and then he had one listed as his first bank

5     account and then his personal account and he had seven, eight

6     of these accounts and then he would funnel money.  Sometimes he

7     would pay Yanza out of his personal account.  Sometimes he

8     would he pay for Yanza out of the Ecuador account.  Money would

9     come in and out in patterns that we could only discern when we

10    work with forensic accounts to go through those bank records,

11    the bank records for Banco Pichincha.  That is where the secret

12    account was.  Their words, not mine.  Their secret account was

13    to pay Cabrera.  Banco Pichincha was also where there was Selva

14    Viva accounts.  They have the Selva Viva records.  Chase is

15    where Donziger had his accounts.  And then there is the Kohn

16    bank accounts where they would go for Joe Kohn and Joe Kohn was

17    clearly being directed from his office to send money to our

18    secret account.

19          So therefore you have to follow the money.  That is

20    how you follow the money.  They can't dictate which of those

21    payments came out.  They are going to -- their clients are the

22    ones who are accused of these fraudulent transactions and these

23    crimes.  We have to see the accounts to put it together.

24          THE COURT:  The objection is overruled.

25          MR. MASTRO:  81P.  This is all documents relating to

Cck6che2

```
 1    the Cabrera or the.

 2              THE COURT:  81?

 3              MR. MASTRO:  81P.  That is on page 15.  Your Honor, I

 4    think this is about the financial support for Cabrera.  It was

 5    being asked to financially support it.  So this is a key

 6    element of the Cabrera fund, the payments and the financing.

 7              THE COURT:  Well, I have read Mr. Donziger's position

 8    here and I don't understand it.

 9              MR. WERDEGAR:  Well, your Honor, this was originally a

10    -- well, P was a part of a multi, multi subpart request about

11    Cabrera and the only piece of that --

12              THE COURT:  Everything in this case is.

13              MR. WERDEGAR:  And the only piece of that multi prong

14    request that we objected to was P, which related to basic

15    communications with funders or potential funders and it was

16    tied up with the same concern we had about their entitlement to

17    take broad ranging discovery, which has been addressed.  So I

18    think this was resolved on your prior rulings, your Honor.

19    That was the basis for the objection.

20              THE COURT:  Overruled.

21              (Continued on next page)

22

23

24

25
```

CCKAACHE3                    Argument

1          THE COURT:  Thank you.  Overruled.

2          MR. MASTRO:  Next, your Honor, I think you can take as

3     group 115, 116, 117 and 118.  That's on pages 16 through 18.

4          THE COURT:  The cutting up of the file.

5          MR. MASTRO:  Yes.  How the -- my was cut-up,

6     obviously, it goes to the operation of the enterprise motive,

7     how they were divying the pie.  Also, how they are involved in

8     secreting or selling assets to further the scheme.

9          And I have to say, your Honor, on 116 goes to

10    Donziger's allegation in particular.  So you know the

11    ringleader of conspiracy.  And 118 goes to not simply the

12    concept of creating a trust to determine offshore trust,

13    determine how to wide the pie.  It's also the documents

14    relating to the trust issue go pivotally to the ghostwriting of

15    the judgment because we have, as your Honor knows, internal

16    documents, Fajardo's e-mail where elements of that e-mail exact

17    wording from that e-mail misquoting a case misciting that case,

18    misciting other cases that have nothing to do with trust and

19    then some of the very words of his analysis showing up, all of

20    those elements showing up word-for-word in the judgment, yet no

21    where in the record anywhere, anywhere is that sequence or that

22    case cited.

23         THE COURT:  What's that got to do with the trust?

24         MR. MASTRO:  It has to do, your Honor, the issues

25    relating to creating a trust, the judgment creates a trust.

CCKAACHE3                    Argument

1          THE COURT:  Oh, I see.  You are saying the piece of

2     the Fajardo document that winds up in the decision relates to a

3     trust.

4          MR. MASTRO:  Correct.  That e-mail is all about how a

5     trust should be created, yet it was never in the record before

6     or briefed in any way and it shows up in the judgment in all

7     those material respects and, therefore, the trust issue is sort

8     of a critical part.

9          THE COURT:  I see.  So, basically -- let me see if I

10    understand.  I am not sure I, if ever quite understood it this

11    way before.  You wind up with this 18 plus billion dollars

12    judgment in Ecuador which says more or less that apart from

13    some cut going to the lawyers, the money is to be paid into an

14    Ecuadorian trust.  Is that right so far?

15         MR. MASTRO:  Not even.  To be set up.  They --

16         THE COURT:  OK.  So to be paid into a trust of some

17    unknown -- and not one that exists at the time.

18         MR. MASTRO:  Correct.

19         THE COURT:  And you're saying that at no point up

20    until the moment this trust concept appears in the trial

21    court's decision is there a word in the evidence anywhere or in

22    the submissions to the court in Ecuador about the concept of

23    the judgment being payable in whole or in part into a trust.

24    Is that true?

25         MR. MASTRO:  Before the opinion comes out creating --

CCKAACHE3                    Argument

1          THE COURT:  Before the opinion comes out.

2          MR. MASTRO:  That's correct, your Honor.  And I am

3    told that the remediation position is supposed to be in a trust

4    in Ecuador but they also talk in their documents a trust

5    outside of Ecuador.

6          THE COURT:  You are telling me that there is not a

7    word about either piece, either of those trusts prior to the --

8    in the record, prior to the decision coming down.  Is that what

9    you are saying?

10          MR. MASTRO:  That is my understanding, your Honor.

11          MR. VESELKA:  I am not in a position to agree.

12          THE COURT:  Let me find out what I am being told here.

13          MR. MASTRO:  That's my understanding, your Honor.

14          THE COURT:  And then we have this Fajardo document

15    talking about a trust shot through with misquotations and

16    errors, you say.

17          MR. MASTRO:  Yes, your Honor.

18          THE COURT:  And then lo and behold, from the forehead

19    of Zeus in the decision by the Ecuadorian judge, all of a

20    sudden this concept of a trust to receive the proceeds appears

21    and it is, at least in part in -- along with all the errors

22    from the Fajardo document that was never in the record.

23          MR. MASTRO:  That's what I'm saying.

24          THE COURT:  Now I understand.  All right.  Folks, now

25    I understand why he wants this.  What have you got to say?

CCKAACHE3                    Argument

1              MR. WERDEGAR:  First all, your Honor, I am not in a

2    position to agree with or expressly disagree with anything he

3    said.  This is a new theory that wasn't something that we had

4    back and forth about.  This wasn't included in their so-called

5    ghostwriting thing, so I want to check on --

6              THE COURT:  Oh, no.  It was -- I know that there was

7    earlier on in conjunction with the motion for summary judgment

8    a discussion about this Fajardo document and the fact that

9    pieces of it suddenly appeared, though the Fajardo document

10   never had been in the record in the judge's opinion.  I think I

11   remembered that accurately.

12             MR. WERDEGAR:  You are correct about that, your Honor.

13   But as to a basis to seek financial information about how

14   the -- what I understand they're interested in is how the money

15   that is to be paid to the lawyers is to be divided up, that

16   piece of the analysis is new.

17             THE COURT:  Well, but he -- all right.  Stay with me

18   because I am trying to get my arms around it.  118 is asking

19   for documents concerning the concept of necessity or

20   desirability or the creation of any trust to hold the proceeds.

21   Including, but not limited to documents concerning the judgment

22   trust discussed in the court decision and communications with

23   the Court in Ecuador concerning the trust.

24             Now what he's getting at very directly here is

25   ghostwriting.  He is getting at the theory that this bright

CCKAACHE3                     Argument

1   idea of a trust to hold the proceeds of judgment is a creation

2   of the plaintiffs, the Ecuadorian plaintiffs, and that it is

3   slipped, secretly, to the judge down there and that he buys it

4   is hook, line and sinker and typographical errors and sticks it

5   in the judgment.  And I take it, Mr. Mastro, you're suggesting

6   also that you anticipate that there are other documents which

7   will show the motives for the trust, particularly, the offshore

8   part of it, right?

9           MR. MASTRO:  Correct, your Honor.

10          THE COURT:  And am I correct in remembering that

11  there's been something in the record in this case about

12  limitations on either the amount or the nature of legal fees

13  payable in Ecuador and a desire to keep judgment proceeds

14  offshore so that the lawyers can cut up the pie in a way that

15  would not be permissible if the money ever reached Ecuador, am

16  I --

17          MR. MASTRO:  Yes, your Honor.  It's actually in the

18  Invictus memo.  It's proposed that such an offshore trust be

19  set-up so that the funds can be divided in a way outside of the

20  government of Ecuador and Ecuadorian law.

21          THE COURT:  See, I remember all that and you know this

22  case a whole lot better than I do, Mr. Werdegar.  Am I off

23  base?  It seems to me it makes sense.

24          MR. VESELKA:  If I may, your Honor.  To the extent any

25  of this as it pertains to the ghostwriting, it's applicable --

CCKAACHE3                    Argument

1    vis-a-vis ghostwriting.  I think that's been resolved on other

2    issues.

3              THE COURT:  If and to the extent that's true then it's

4    nothing to worry about.

5              MR. VESELKA:  That would be the description of that

6    document and I don't remember whether the issue of trust

7    generically came up before that or not.  I just don't remember.

8    But the question here is also going to the account -- to the

9    extent it goes to the other items of analysis of the benefits

10   of a trust, what kind of trust, this or that or the other that

11   don't go to the documents that pertain to ghostwriting.  The

12   only one that would pertain to ghostwriting is the one that

13   they've pointed out that's in there.

14             The other considerations such as the Invictus memo

15   thinking about trust is the way to preserve the funds or

16   remediation or some other things that were kicked around would

17   not be necessarily ghostwriting.  So as to -- there's some part

18   of this that wouldn't go to ghostwriting then the question is

19   what's relevance and is all of that properly relevant and/or is

20   it overly broad?

21             THE COURT:  You want to respond to that, Mr. Mastro?

22             MR. MASTRO:  Well, your Honor, I am just trying to

23   make sure that I have confirmed exactly the facts.

24             What I could tell your Honor is that the contents of

25   the Fajardo, the content of a trust is something that may have

CCKAACHE3                    Argument

 1   been mentioned in the record but the content of the Fajardo

 2   e-mail, the way he describes setting up the trust, the case he

 3   cites at all is not anywhere in the record.  The content of the

 4   Fajardo e-mail and the way he describes the trust issue,

 5   quoting that case, citing that case and citing other cases is

 6   no where in the record anywhere and we have confirmation from a

 7   complete review of the record.  And then what shows up in the

 8   judgment itself is not merely a reference to a trust.  It is --

 9              THE COURT:  No.  That's the whole thing with --

10              MR. MASTRO:  Citing the case, the wrong citation, the

11   other cases they don't and quoting from the Fajardo e-mail

12   itself.  So I don't want your Honor to think there is no

13   reference in the trust.

14              THE COURT:  All right.  I appreciate the correction.

15   So let's come back to the nub of the issue.

16              Counsel behind you are saying that the consequence of

17   what they've agreed to and the rulings I've made, you are

18   getting everything relating to the ghostwriting of the decision

19   shorthand but we all know what we're talking about which would

20   include the part of the decision relating to a trust.

21              Now, this request is a little bit broader than that.

22              MR. MASTRO:  Correct, your Honor.

23              THE COURT:  This request is going to documents they

24   may have including documents that may never have been given to

25   the judge about this idea of, well, maybe we should have a

CCKAACHE3                        Argument

1   trust or something like that.

2           Now, what's your argument as to relevance of that

3   above and beyond the ghostwriting stuff?

4           MR. MASTRO:  Because this is part of the operation of

5   the scheme, your Honor.  We expect there to be documentation

6   relating to the trust about how they're going to divvy up the

7   money, who is going to get money out of the trust, how it's

8   going to be dispensed and operated, where it's going to be set

9   up.  This is in the nature of how they're allocating the

10  judgment.  This is an essential piece.  Let's set up the trust,

11  then we'll be able to control how we give divvy the money to

12  ourselves and those we want to give money to.  So it's equally

13  relevant on those issues about operation of the enterprise,

14  motive, etc.

15          MR. WERDEGAR:  Your Honor, again, we've agreed to

16  produce the executed funding agreements which are going to

17  provide them with information about who is entitled to a piece

18  of it, provide them but the idea that -- nothing I've heard

19  Mr. Mastro as saying justifies getting into all aspects of how

20  the litigation is financed and how the money is going to be

21  allocated.  If with the executed financing agreements is going

22  to cover that and it's very intrusive discuss discovery that is

23  going to involve a lot of logging.  It's irrelevant.

24          THE COURT:  The point that keeps occurring to me is

25  this.  My recollection and Mr. Mastro more or less confirmed it

CCKAACHE3                        Argument

1   and nobody disputed it, is that the judgment provides for a

2   trust to receive proceeds and the trust either is to be --

3   provides for more than one trust and at least one of the trusts

4   either is required to be or may be offshore to Ecuador.  You

5   all agree on that?

6          MR. VESELKA:  Off the top of my head one is just not

7   specified.  One at least in one part of the -- I thought it was

8   said to be an Ecuadorian trust.

9          THE COURT:  OK.  Well, now, so it's not specified.

10  And given the fact that somebody went to the trouble of

11  specifying that one was to be Ecuadorian and distinguishing the

12  other is at least consistent with the view that there was a

13  fair probability it would be offshore, reasonable inference?

14         MR. VESELKA:  I'm not sure only because I can't

15  remember if the nature of the second one came out of the

16  appellate decision which is where I had some memory that the

17  second trust came out of appellate decision.  Or maybe it was

18  more just the who was going to set it up or I may be confusing,

19  greater detail that came out of the appellate decision rather

20  than the trial decision.

21         THE COURT:  Well --

22         MR. VESELKA:  It was one of a series of possible

23  inferences.

24         THE COURT:  Divvy.  OK.  And am I right in thinking

25  that if all the money went into Ecuador what the lawyers might

CCKAACHE3                    Argument

1   take out of this would be very different assuming Ecuadorian

2   law applied than if a bunch of the money went into a trust

3   outside of Ecuador?

4          MR. VESELKA:  There are documents in the case that

5   reflect legal questions as to -- that there my be some effect

6   of that.  I am not saying I know what the effect would be.

7   There are, certainly, documents that have been discovered and

8   produced where that issue raised would it have some impact?

9   Divvy, your Honor.

10          THE COURT:  OK.  And in a case in which Mr. Donziger

11   and Mr. Fajardo are both the defendants and in which other

12   lawyers are named as co-conspirators, though not defendants,

13   why wouldn't it be extremely relevant to know whether and how

14   they developed a strategy to keep a lot of the money outside of

15   Ecuador in order to help themselves to big parts of it that

16   they couldn't get in if it wound up in Ecuador all the while

17   wrapping themselves in the Ecuadorian flag and the interests of

18   the poor -- people of the Rainforest.

19          Now, I don't mean to put down or to be derogatory in

20   any way toward the people in the rainforest or to be in any way

21   disrespectful.  I am not.

22          MR. VESELKA:  Thank you for that, your Honor.

23          THE COURT:  I am just --

24          MR. VESELKA:  I apologize for interrupting.

25          THE COURT:  Thank you.

CCKAACHE3                        Argument

1            The fact is there's a whole lot of rhetoric in this

2       case.  It has been for decades.  And here you have the people

3       who are perpetrating the rhetoric or using the rhetoric.  And

4       the theory is well, gee, they really were trying to structure

5       this in a way to enrich themselves at the expense to people

6       they were supposedly representing.  And not only that -- and I

7       am not endorsing this as a matter of fact yet.  I don't have

8       enough evidence.  But there's some evidence in what I take to

9       be the plaintiff's theory.  And not only that, they're slipping

10      language to the judge.  At least that's the hypothesis, haven't

11      proven yet, to effectuate this result.  Seems kind of relevant,

12      doesn't it?  I mean at least to the point that maybe they're

13      entitled to take a look at it and see whether it's exactly what

14      happened or totally baseless.

15           MR. VESELKA:  I believe that the evidence as to

16      whatever the lawyers are going to get having any interest,

17      regardless, of how hard or less hard it would be to get it goes

18      to motive.  They can be shown to have motive.  So the Court has

19      raised motive as a basis for discovery so far today.  Rather,

20      there's more or less of it there vis-a-vis their clients that

21      would not be vis-a-vis Chevron and it would not be -- This is

22      not a case about neither defrauding the funders or defrauding

23      the client.

24           THE COURT:  So just assume hypothetically that there

25      were evidence at trial in a case involving whether they

CCKAACHE3                 Argument

1    defrauded the Court or were in collusion with the Court

2    effectively to defraud Chevron that at the same time they were

3    doing that they were effectively defrauding the clients or

4    breaching duties owed to the clients to put it in what might

5    even be more accurate terms.  But, nonetheless, don't you think

6    the second is relevant to whether the first happened?

7            MR. VESELKA:  I don't see where that's automatically

8    so, no.

9            THE COURT:  I didn't say "automatically".  I mean, if

10   they were doing this to their clients doesn't it make it

11   somewhat more probable that they were engaged in something

12   deceitful vis-a-vis the Court and Chevron under 404(b) is

13   doesn't it clearly come in in a criminal case?

14           MR. VESELKA:  If it's in a criminal case, obviously.

15           THE COURT:  Doesn't matter the rules same in and

16   indeed it's more permissive, as I remember.

17           MR. VESELKA:  And I won't digress.  We all agree that

18   that's the way the law is supposed to be how in practice

19   between criminal cases and civil cases.  It is doesn't always

20   work out that way.

21           THE COURT:  I'll tell you in a case about money rather

22   than somebody's life or liberty, I think I'd be a little bit

23   more restrictive in the case involving life or liberty.

24           MR. VESELKA:  And I understand that.  My problem is

25   having been around in certain courts, not in New York, in

CCKAACHE3                    Argument

1   Washington, some courts in regard to criminal cases it

2   sometimes becomes much less restrictive there than I can

3   sometimes bring in civil cases in times as a plaintiff's civil

4   lawyer than a civil lawyer.  But I don't want to take that much

5   time on that, your Honor.  But I don't think that how they

6   relate to their other counsel or the funders or their client is

7   that relevant.  Potentially probative of a how they're

8   defrauding Chevron in light of the burden that is due because

9   it's going to involve so many other documents of drafts or

10  consideration beyond just the operative documents which all the

11  parties agree they should get.

12          THE COURT:  Yeah, but I think you've gotten off the

13  subject of Request 118 and onto a somewhat different subject.

14          Overruled as to 118.  Now, anything else on?

15          MR. MASTRO:  Last one, your Honor, is 150.

16          THE COURT:  105?

17          MR. MASTRO:  Divvy.  It is related to some of the

18  earlier requests, documents relating to Selva Viva and that's

19  the organization through which they would funnel resources,

20  make payments that were ordered by the Court to Cabrera and

21  conduct many of their activities through that front in Ecuador

22  that we say are part and parcel of the fraudulent scheme there.

23          THE COURT:  Isn't this redundant at this point?

24          MR. MASTRO:  Sorry, your Honor?

25          THE COURT:  Isn't it redundant of other requests?

CCKAACHE3                    Argument

1          MR. MASTRO:  There's definitely overlap of other

2    requests.

3          THE COURT:  So what, if any, area is not overlapping,

4    please?

5          MR. MASTRO:  Well, this would be broader than just the

6    funding in solicitation documents.  It would be other documents

7    related to Selva Viva as well but if your Honor wanted to limit

8    it, I understand.

9          MR. VESELKA:  I don't see how it could be any broader

10   than Donziger 25 all agreements relating to --

11         THE COURT:  One is agreements.  One is documents

12   related to.

13         MR. MASTRO:  It's really all documents related to

14   Selva Viva including the funding and solicitation documents

15   which your Honor had already ruled on.  So we understand if

16   your Honor thinks this would be redundant or too broad beyond

17   the funding and solicitation documents which is the principal

18   reason for wanting to have them.

19         THE COURT:  Sustained.  OK.  I think that takes us to

20   B4.

21         MR. MASTRO:  Yes, your Honor.  These are two related

22   requests, your Honor.  These are on pages 20 to 22.  119

23   involves communications with foreign governments in connection

24   with any -- to enforce the Lago Agrio judgment and I think your

25   Honor previously ruled in the context of the scope or timeframe

CCKAACHE3                    Argument

1   scope that that would be limited to Canada, Argentina and

2   Brazil.  So with that limitation, we ask your Honor to require

3   production.  We asked for broader but we understand your

4   Honor's ruling.

5           THE COURT:  As limited any problems, gentlemen, beyond

6   what we've already dealt with?

7           MR. WERDEGAR:  Your Honor, my only hesitation is and I

8   just this is purely hypothetical I must admit but I don't know

9   if there have been communications that by the rules or the

10  nature of the proceedings any one of these jurisdictions are

11  meant to be confidential communication.  I just don't know.

12  And so if there was an obligation to keep something

13  confidential there I don't know how that would interface with

14  your Honor's ruling here.

15          THE COURT:  Well, I'll worry about that if it happens.

16          But let me ask you this, Mr. Mastro.  Every single

17  court file in these three other countries are communications

18  with foreign governments, aren't they?

19          MR. MASTRO:  Your Honor, we're not asking for official

20  court filings that we have notice of.  We're asking for other

21  forms of communication.  It's the same issue, red herring issue

22  that they raised before.

23          THE COURT:  Well, they didn't raise it.  I raised it.

24          MR. MASTRO:  I understand, your Honor.

25          THE COURT:  Not trying to get in the spirit of fishing

CCKAACHE3                    Argument

1   expedition.

2              MR. MASTRO:  We're not asking for that, your Honor.

3              THE COURT:  OK.  So it excludes court filings, public

4   court filings, right, satisfactory?

5              MR. MASTRO:  Yes, your Honor.

6              THE COURT:  OK.

7              MR. MASTRO:  The second request here, your Honor, has

8   to deal with documents relating to the Invictus memo and

9   communication to third parties regarding the Invictus memo

10  because that was used to shop around for financiers and

11  investors like Burford and others.

12             THE COURT:  I am inclined to sustain this objection.

13  Why shouldn't I?

14             MR. MASTRO:  Well, your Honor, I think for the

15  fundamental reason that the Invictus memo lays out key elements

16  of the extortion scheme and how they LAPS intends to use the

17  judgment in furtherance of extortion.  Then we know that they

18  actually used it to try to solicit others to join the

19  conspiracy to invest in it.

20             THE COURT:  I see your point. so your point is really

21  not with respect to "A" but with respect to "B".

22             MR. MASTRO:  Correct, your Honor.

23             THE COURT:  In other words, you're saying that far

24  from being some think piece like law firms do all the time,

25  this was not some summer associate off in a library filling his

CCKAACHE3                    Argument

1    time with useless occupation.  This was, in fact, a key part of

2    the scheme.  And moreover, they were selling interest in the

3    lawsuit on the theory that the odds are that they could create

4    so much trouble for Chevron by forcing it to litigate

5    simultaneously all over the word that sooner or later Chevron

6    would buy piece without regard to the merits of the underlying

7    situation.

8            MR. MASTRO:  Correct, your Honor.  And we know they

9    shopped to Burford and others.

10           THE COURT:  Gentlemen?

11           MR. WERDEGAR:  Your Honor, with respect to "B" to the

12   extent that the Invictus memo was sent to a third party, that

13   was not part of a privileged communication.  I think we would

14   agree to produce that and then I guess if it's a matter of

15   communications that are this memo was being passed from one law

16   firm to another or from a law firm from someone within a common

17   interest or the like and I think that potentially even sharing

18   it with investors there's case law regarding that, that that

19   would be a protected communication but beyond privilege.

20           THE COURT:  We'll see whether it is or not but I do

21   remember once at least three maybe four decades ago having

22   somebody explain to me, a layperson I must confess, that there

23   was really no difficulty fixing prices in the United States as

24   long as the lawyer for Company A called the lawyer for Company

25   B, no problem.  Privileged.  So it's not always that simple.

CCKAACHE3                    Argument

1        MR. WERDEGAR:  Understood, your Honor, and I didn't

2   mean to imply that it was.  But I think that if the focus here

3   is on "B" and it's subject to our searches what we believe to

4   be genuine claims of privilege, I think that universe of

5   communication could be very small in any event.  Well, I

6   thought that too.  So the objection is sustained as to Part A

7   and overruled as to Part B.

8        OK.  We're done with B4 I think.  Right?

9        MR. MASTRO:  Yes, your Honor.

10        THE COURT:  Moving right along.  B5.

11        MR. MASTRO:  B5 three requests, your Honor, related to

12   the Pressure Campaign, 131, 139 and 140.  I can go through them

13   quickly.  They all relate to aspects of the Pressure Campaign

14   to try and put pressure on Chevron to settle.  The first

15   request, 131, deals with the use of NGOs like Amazon Watch and

16   others.

17        Your Honor, I think we have addressed the defendants'

18   issue here.  We provided them yesterday with a list of NGOs

19   consistent with what we did at your Honor's direction with

20   Patton Boggs.  So they have a list of specific group of NGOs

21   who are covered and their NGOs who have relationship with the

22   defendants.  So, that's an essential part of their pressure

23   campaign to use the supposedly not-for-profit groups that they

24   were in some cases funding.

25        THE COURT:  OK.  So, we've dealt with the time period

CCKAACHE3                    Argument

1    already.  You've got a list instead of an open-ended question.

2    Donziger previously had agreed to produce subject, to produce

3    this material subject to the time period issue.  What's left?

4            MR. WERDEGAR:  Your Honor, I think the issue is very

5    narrow one at this point and it's really our view is these are

6    all phrased again as these all documents related to and

7    related, of course, being any possible connection.  We've tried

8    to negotiate to have this be the communication that they're

9    talking about and documents discussing those communications to

10   try and at least somehow narrow the realm of this.  So it's not

11   including every possible internal document or e-mail related

12   again to those organizations what's related to as defined as

13   broadly as you can imagine.

14           MR. MASTRO:  Actually, it's relating to, regarding

15   Chevron or the Chevron litigation.  So it's already been built

16   into the requirement.

17           THE COURT:  Isn't the phone bill that reflects a call

18   in which such a communication took place a document related to

19   such a communication?

20           MR. MASTRO:  Exactly, your Honor.

21           MR. WERDEGAR:  Well, your Honor, that's a fair point

22   that we're, obviously, not looking just for that.

23           THE COURT:  So fix this.

24           MR. MASTRO:  OK.  We should be able to fix it just

25   fine.

CCKAACHE3                    Argument

1            MR. VESELKA:  Our suggestion was that it be

2     communications or documents discussing communications is what

3     we had suggested is reflected on here, your Honor.

4            (Pause)

5            MR. MASTRO:  We should be able to work that out.  I

6     just wanted to point out that this is about communications with

7     NGOs and also their own documents about affecting their

8     Pressure Campaign strategies through the use of NGOs.  So it

9     covers both communications with NGOs and Pressure Campaign to

10    use NGOs.

11           THE COURT:  Well, I am reasonably confident that you

12    can work out some language on this.

13           MR. MASTRO:  Understood, your Honor.

14           Your Honor, 139, again, part of the Pressure Campaign

15    are documents related to contemplated rational communications

16    with Chevron expert witnesses.  Now this is a pretty limited to

17    universe, your Honor.  Since they wouldn't ordinarily be

18    communicating with our expert witnesses but in this

19    extraordinary case there are actually lawyers for the

20    plaintiff's side who wrote threatening letters to our experts

21    and they've used that as part and put them out publicly to try

22    to create pressure on Chevron and on those experts.  I am

23    talking, specifically, your Honor, about Mr. Page who worked

24    with Mr. Donziger as a lawyer, an associate of Mr. Donziger's,

25    writing letters to three Chevron experts, Macky, Henshy and

CCKAACHE3                    Argument

Alvarez and copying their academic deans to try and create a

scandal.  And there may be other instances.  I think they would

be very limited but highly probative, not only the question of

Pressure Campaign but also the question of witness intimidation

and tampering.

          MR. VESELKA:  We've not objected, provided any

documents that are communications directly with any of their

experts.  It's the fact of the breadth of going to relate to

contemplated or actual.  So any document about contemplating

about -- when there was none, we think is overbroad.  And any

document, for example, that Mr. Page sent this letter, so I am

supposed to produce back to them Mr. Mastro's letter to me

accusing me of engaging in unprofessional conduct because of

Mr. Page's having done that, then our letter responding back to

him on that.  I think that's far afield.

          THE COURT:  Well, I am sure Mr. Mastro is not looking

for that and would readily agree to exclude from the scope of

this request communications between Chevron as lawyers on one

hand and the Ecuadorian plaintiffs or Mr. Donziger and their

lawyers on the other.  That's not what they're talking about.

And I am sure he'll give it to you in writing, right,

Mr. Mastro?

          MR. MASTRO:  That's correct, your Honor.

          THE COURT:  OK.  So I read the business with Mr. Page.

And I think, particularly, in light of the business with

CCKAACHE3                    Argument

1    Mr. Page and also the business, the testimony of Charles

2    Kambacker they're going to get this and I think everybody ought

3    to be extremely sensitive to the witness tampering issue, if

4    you get my drift.

5           MR. VESELKA:  We always are.

6           MR. MASTRO:  Your Honor, the last of these on the

7    Pressure Campaign are documents relating to submissions to

8    various international agencies including the American

9    Commission on Human Rights.  Part of the scheme has been to try

10   and generate pressure on Chevron through getting these

11   intergovernmental organizations to feeding them false

12   information and trying to get them to say something on the

13   issue to embarrass Chevron.  So this is one where --

14          THE COURT:  Isn't this a case where at least for

15   starters it would not -- it would suffice to get the

16   communications first if there are any and then if there's some

17   reason to go further, go further?

18          MR. VESELKA:  That's what we had offered.

19          MR. MASTRO:  Your Honor, we're willing to do that and

20   on the basis that if we feel there's a basis there to find out

21   more, we'll come back to your Honor.

22          THE COURT:  Right.  And I understand a trust from

23   defendants that if after getting what they're offering you feel

24   you want to go back and get communications relating to the

25   communications or documents relating to the communications,

CCKAACHE3                    Argument

```
 1    we're not going to have an argument that the last date we're
 2    asking for documents with December 1st on that one point alone.
 3              MR. WERDEGAR:  Understood, your Honor.
 4              MR. VESELKA:  That's consistent with an agreement
 5    we've already worked out as to the whole bunch of our documents
 6    we'll present to you as you asked to give you the agreements.
 7    We've already work out that process is what we -- now.
 8              THE COURT:  OK.
 9              MR. MASTRO:  Your Honor, actually, Donziger's counsel
10    had agreed to produce documents of that request.  It was just a
11    LAPS.
12              THE COURT:  He probably doesn't have any.  I am being
13    facetious.
14              MR. MASTRO:  We only have one more, your Honor.
15              THE COURT:  I thought we were done.
16              MR. MASTRO:  So close.  B7 it really is just --
17              THE COURT:  B7?
18              MR. MASTRO:  It relates to obstruction and witness
19    tampering and it's point "H" that appears in request 158
20    through 61.  Again, it has to do again with Mr. Page and we
21    want documents relating to communications with him concerning
22    his deposition and production of documents in the 1782 action.
23    In light of the role that he played in pressuring Chevron
24    expert witnesses and he's represented by LAPS counsel at that
25    1782 proceeding.  And we would like to get those documents as
```

CCKAACHE3                    Argument

1    well that go to the heart of his collusion with the LAPS in

2    Donziger and what they've done to sort of obstruct the

3    discovery there and here.

4             MR. WERDEGAR:  Your Honor, we've use the word "fishing

5    expedition" a few times today but this truly is getting pretty

6    far afield and Chevron has had every opportunity.  The 1782

7    proceeding is ongoing.  If they have concerns they can bring up

8    in that proceeding with the judge who is presiding over the

9    discovery from Mr. Page in connection with this proceeding.

10            THE COURT:  I thought that matter was concluded.

11            MR. MASTRO:  Actually, what happened, your Honor, was

12   there was a production that Mr. Page and we think it will be

13   illuminating to see the communications with defendants' counsel

14   arrange a clawback because Count Nine was dismissed.  So we are

15   still litigating there.  He's actual actually effected the

16   obstruction his materials would be used out of that proceeding.

17   And he's the one whose been sending these missives to our own

18   witnesses that intending to intimidate them.  So we really want

19   to find out how it came about Page was working with the LAPS

20   counsel as his own counsel has affected obstruction there.

21            MR. WERDEGAR:  Your Honor, to call this obstruction

22   he's been litigating an issue in the District of Maryland.  Mr.

23   Page and his counsel won on appeal before the D.C. Circuit.  To

24   say is a winning on appeal is somehow obstruction of justice if

25   really unfair.  In any event, it's an ongoing proceeding.  They

CCKAACHE3                    Argument

1    can take this up with the judge down there.  This seems like

2    it's trying to turn the defense of this case into another

3    subject for discovery.  It is snowballing on its own.

4            MR. MASTRO:  They actually didn't win a D.C. appeal.

5    Your Honor, it was because Count Nine was dismissed.

6            THE COURT:  The last time I checked appeals from

7    Maryland went to the Fourth Circuit.

8            MR. MASTRO:  Correct, your Honor.

9            They agreed to this on every other witness, your

10   Honor, except Mr. Page because Mr. Page has played a unique

11   henchman role here.  That's why they don't want to give as to

12   Page when they have been willing to give as to every other

13   witness.

14           THE COURT:  The objection is overruled.  OK.  That

15   takes care of this.

16           Now, have you a whole, not a big number but a number

17   of points to come back to me on.  One is Request 83.  With

18   respect to the time period, you are going to look at carve-outs

19   for items discussed on the record.  With respect to the 98 and

20   108 there's an open issue on 121 according to my notes.  You

21   are going to exclude public filings on 119.  It's limitation

22   according to my notes on 131 and 139 and 140 was going to be

23   modified.  That's my list.

24           Does anybody have a different list?

25           MR. MASTRO:  No.  That is my list, your Honor and

CCKAACHE3                    Argument

1   there's really only one other outstanding issue in this regard

2   I think for today's purposes in terms of our motions to compel.

3           THE COURT:  What's that?

4           MR. MASTRO:  That is the continuing position of the

5   defendants that they don't intend to produce documents from

6   their co-counsel and agents in Ecuador.

7           THE COURT:  I understand that point.  I'll issue a

8   decision on that.

9           MR. MASTRO:  Thank you, your Honor.

10          THE COURT:  OK.

11          MR. VESELKA:  I apologize, your Honor.  I am just not

12  as -- can you give me that?  I'll be able to get it off --

13          THE COURT:  Yeah, Mr. Mastro has it.

14          So I would like to have when we meet tomorrow a

15  supplement to your joint report making all the appropriate

16  modifications.  And to the extent you are still in

17  disagreement, I hope there aren't any but any disagreements on

18  these open issues from today and we'll get that all wrapped up.

19          Now, if I'm not mistaken, we are now at a point where

20  all outstanding objections, save privilege, have been resolved

21  to the document requests to the non Stratus defendants.  Is

22  that correct?

23          MR. MASTRO:  Divvy, your Honor.

24          MR. VESELKA:  So those that were served before

25  November 29th and I can't --

CCKAACHE3                    Argument

1              THE COURT:  Well, the ones --

2              MR. VESELKA:  The ones that you set for a hearing

3    today.

4              THE COURT:  Yeah, the ones affected by motion to

5    compel number 608 on the docket.

6              MR. VESELKA:  Yes, your Honor.

7              THE COURT:  OK.  Therefore, the time has come to start

8    gathering the documents, folks.  I understand we're going to

9    have a privilege log time has come to start preparing the

10   privilege log and --

11             MR. VESELKA:  I apologize, your Honor.  The parties

12   have worked out how they propose timing and potential protocol

13   that we'd like to present with regard to the privilege log that

14   we need to try to finalize and present.

15             THE COURT:  All right.  Well, are you going to be in a

16   position to do that tomorrow?

17             MR. VESELKA:  That was what our objectives were that

18   we sort of got sidetracked yesterday and prepared for these

19   things to deal with the Court's ruling and as I've described

20   them so.

21             THE COURT:  Well, let's see if we can do it any way.

22   You know if you can't, you can't.  But I would much prefer and

23   I do not intend to lose entirely the next couple of weeks,

24   notwithstanding, the holidays.  I mean I understand everybody

25   wants to take some time and relax over the holidays and I am

CCKAACHE3                    Argument

1   all for it but this going to have to move forward and I will

2   have that in mind when I talk about the schedule.  This has

3   been dragging long enough and I set a schedule that I thought

4   was realistic and it is still my intention to meet it.

5              OK.  See you in the morning, 9:30.

6              (Adjourned to Friday, December 21, 201 at 9:30 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300