Ccl6che1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    CHEVRON CORPORATION,

4                   Plaintiff,

5              v.                         11 CV 691 (LAK)

6    STEVEN DONZIGER, ET AL.,

7                   Defendants.

8    ------------------------------x
                                         New York, N.Y.
9                                        December 21, 2012
                                         9:30 a.m.
10
     Before:
11
                       HON. LEWIS A. KAPLAN,
12
                                         District Judge
13
                            APPEARANCES
14
     GIBSON DUNN & CRUTCHER
15        Attorneys for Plaintiff Chevron
     BY:  RANDY M. MASTRO
16   CHRISTOPHER M. JORALEMON
     ANDREA E. NEUMAN
17   JASON STAVERS
     WILLIAM E. THOMSON
18   LAUREN ELLIOT

19   SMYSER KAPLAN & VESELKA, LLP
          Attorneys for Defendants Cammacho
20   BY:  LARRY R. VESELKA

21   KEKER & VAN NEST, LLP
          Attorneys for Defendant Donziger
22   BY:  MATTHEW WERDEGAR

23

24

25

Ccl6che1

```
 1          (In open court)

 2          THE COURT:  Good morning, everybody.  I guess you

 3   folks from out of town got maybe a 40-minute taste of what

 4   Hurricane Sandy was like, but a little bit milder than

 5   Hurricane Sandy.  I never saw water come in through closed

 6   windows before.

 7          Now, would I be right in guessing that the folks at

 8   the back table have airplanes they want to make sometime today?

 9          MR. VESELKA:  Yes, your Honor.

10          THE COURT:  Tell me what your timing is.

11          MR. WERDEGAR:  Your Honor, I have a --

12          THE COURT:  Because if I can, I want to accommodate

13   you.

14          MR. WERDEGAR:  Thank you.  I have a 5:30 flight.

15   Given holiday and how the airport was getting here, I am hoping

16   to get out of here -- I would be hopeful that we can do the

17   Donziger motion and get it done optimistically by lunch.  I

18   think Mr. Veselka has a slightly later flight.

19          MR. VESELKA:  My flight is sometime after 7:00 this

20   evening.  I booked the last one to make sure I would get home.

21          THE COURT:  So we'll take them in that order.  I don't

22   know what is going to happen in light of the weather, but I did

23   have a luncheon commitment.  If that vanishes, we'll take a

24   very short lunch to try to get you out.  We'll go from there.

25          I also want to say to everybody that the format in the
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Ccl6che1

way in which these joint reports were presented were enormously

helpful.  I don't know how we would get through this any other

way anything approaching the same amount of time.

        MR. MASTRO:  Thank you, your Honor.

        THE COURT:  So let's start out with Mr. Donziger's

piece of this.

        MR. MASTRO:  Your Honor, just one piece of good news

in the hope springs eternal category.

        THE COURT:  You settled the case?

        MR. MASTRO:  Your Honor, that would be beyond the

holiday season.  We did meet last night, have a meet and confer

on those several issues that your Honor pointed out during the

hearing that we should meet and confer and we did reach an

agreement on them and we will be submitting to the Court a stip

that resolve those issues.

        THE COURT:  Great.

        MR. MASTRO:  Just to be clear your Honor requested at

the beginning of the day yesterday that we provide as to our

motion to compel a comprehensive list of how each issue was

resolved, including the ones resolved before we got to your

Honor.  Do you want that, your Honor, as every request and how

it is being responded to, or just the ones that were part of

the original motion including your rulings yesterday and the

ones that got resolved before we got here?  Whatever you would

like it.

Ccl6che1

```
1            THE COURT:  I would like to have an order, a draft
2    order resolving the motion to compel, which would embody in one
3    part everything that you agreed upon which will wind up being
4    so ordered but which are moot in terms of the motion to compel
5    from the standpoint and of whether I have to decide other than
6    approving your agreement and then the second part giving my
7    adjudications --
8            MR. MASTRO:  Got it, your Honor.
9            THE COURT:  -- as to those items that remained in
10   dispute.
11           MR. MASTRO:  Got it.
12           THE COURT:  Then we'll do the same on the other
13   motions.
14           MR. MASTRO:  Got it.  The only thing that would not be
15   addressed therefore would be the Ecuadorian agency issues,
16   which I gather your Honor will decide.
17           THE COURT:  And the timetables.
18           MR. MASTRO:  The timetables.
19           THE COURT:  The timetables will have to be addressed.
20           MR. MASTRO:  They are.
21           THE COURT:  If they can be worked out, from your lips
22   to God's ears.  If they cannot, you will put in blanks and I
23   will work out the dates.
24           MR. MASTRO:  One other thing in regard to agency, I
25   think they are going to be resolved separately, but I wanted to
```

Ccl6che1

1    point out to the Court other counsel have worked with them who

2    we subpoenaed, Kohn and Garr, we have motions pending as to

3    their productions, arguably has implications for the

4    defendant's productions too as to whether those are persons

5    they should be producing documents from.

6                 THE COURT:  Well, I am just not going there right now.

7                 MR. MASTRO:  Understood, your Honor.

8                 MR. WERDEGAR:  Your Honor, on the timetable issue at

9    least as to the parties present here today, I believe we worked

10   out a stipulated schedule to address further production of

11   documents and the like.  I think we're waiting for -- I beleive

12   we are waiting for confirmation from Stratus's counsel who have

13   not been at this hearing but it has been sent off to them

14   asking them to confirm that they also agree.  So we should be

15   able to submit that very shortly.

16                THE COURT:  Without committing myself irrevocably, I

17   think it will be reasonable to assume you will get a decision

18   on what you are referring to as the agency issue in January.

19   It might conceivably come in two pieces.  It might come in an

20   order which will be the bottom line followed by an opinion.

21                MR. MASTRO:  Understood, your Honor.

22                THE COURT:  I am still working on that and I haven't

23   decided what I want to do.  So let's go with Donziger motion.

24   I suppose you will use the same format we used yesterday.

25                MR. WERDEGAR:  We did, your Honor.  The way the joint

Ccl6che1

1   chart is here we had a series of exhibits attached to our

2   motion to compel that were organized by subject matter.  This

3   joint report now a number of those exhibits it jumps from two

4   to four and so on because we resolved the issues as to some of

5   the subject matter.  That is why when you look at the joint

6   report, it goes from two and then the three and then there is a

7   jump to seven because we resolved four, five and six in our

8   subsequent meet and confer.

9           THE COURT:  So we are starting with Exhibit 2 to the

10  document 655, which is the joint report on the Donziger motion.

11          MR. WERDEGAR:  Yes, your Honor.

12          THE COURT:  I am all ears.

13          MR. WERDEGAR:  With respect to Exhibit 2, this is

14  addresses generally to Chevron's contacts and relationships and

15  payments to the Ecuadorian military and the request at issue

16  here are Requests 40 through 43 and they seek information about

17  documents concerning communications with and documents

18  concerning payments made to two different individuals Manuel

19  Bravo and Arturo Velosco.  Manuel Bravo we understand is a

20  Chevron security operative and/or former military officer and

21  the evidence that we have to date indicates that he on behalf

22  of Chevron engineered the cancelation of the judicial

23  inspection at the Guanta station and he did so by getting Major

24  Arturo Velosco of the Ecuadorian military to submit an

25  affidavit regarding security concerns which was then used as a

Ccl6che1

1    basis to cancel that inspection.

2            This is what we do know:  The dispute here -- Chevron

3    is offered to produce documents concerning other communications

4    and other payments with these two individuals involving the

5    judicial inspections.  We think that limitation is too narrow,

6    your Honor.  There are lots of other instances where the

7    Ecuadorian military we believe did involve itself in the

8    litigation and certainly there is no reason why this should be

9    limited just to the judicial inspection process.  We know that

10   there was these contacts.  We know that Chevron had a

11   relationship with the Ecuadorian military.  There is evidence

12   and we have reason to believe that the military was used to

13   interfere with proceedings during the course of the litigation.

14           So we're asking for all evidence regarding payments to

15   these individuals and all documents concerning communications

16   with them.  We think that is a reasonable -- it is just these

17   individuals that are in dispute and we think that is a very

18   reasonable bound of discovery.

19           THE COURT:  Did you say it is just these two

20   individuals?

21           MR. WERDEGAR:  Well, we're asking about all

22   communications -- yes, Manuel Bravo and then Arturo Velosco.

23   Manuel Bravo was the security operative and Velosco Major who

24   assisted Chevron.

25           THE COURT:  Mr. Mastro.

Ccl6che1

1          MR. MASTRO:  Your Honor, my colleague Chris Joralemon

2     is going to be addressing the defensive issues.

3          MR. JORALEMON:  Good morning, your Honor.  Chris

4     Joralemon.

5          THE COURT:  Are you named after the street or are you

6     named after the street?

7          MR. JORALEMON:  It is the former actually.

8          THE COURT:  Paid for by the New York City Board of

9     Education.

10          MR. JORALEMON:  That's right, yes.

11          I think it might be useful for the Court to set the

12     context of these disputes concerning defendant's request of

13     Chevron.  How did we get here today?  And this will take a

14     minute.  As of now defendants have served over 800 requests for

15     production on Chevron and Chevron has produced in excess of

16     three million pages in counting.  Throughout the extensive meet

17     and confer process as your Honor knows and as commented on

18     Chevron has made a series of comprised proposals that

19     contemplated producing a slew of materials that if they are

20     relevant at all, they are out of the margins.  All of this was

21     with the goal of not burdening your Honor with these tangential

22     disputes about discovery.

23          THE COURT:  Boy, I am glad we haven't had any of

24     those.

25          MR. JORALEMON:  Yes, amazing.  Which brings us to the

Ccl6che1

```
 1    issues that are being teed up today.  I want to apologize in
 2    advance for repeating myself often because the Court is going
 3    to hear me say either this isn't relevant to any party's claims
 4    or defenses or --
 5             THE COURT:  Please spare me the rhetoric.  The
 6    rhetoric on both sides is perfectly understandable, but let's
 7    get to the point.
 8             MR. JORALEMON:  So this is the basic question about
 9    Exhibit 2:  Are these requests within the scope of permissible
10    discovery on Rule 26 or to use Mr. Veselka's language from
11    yesterday are these mere fishing expeditions.
12             THE COURT:  Those are not mutually exclusive
13    categories is one of the problem with the rhetoric.
14             MR. JORALEMON:  So let's talk about the background.
15             THE COURT:  A fishing expedition is a request for
16    discovery that you don't want to give up and something that is
17    relevant is something that you think might be useful.
18             MR. JORALEMON:  Right.  The background here, your
19    Honor is the Guanta station inspection.
20             THE COURT:  I know.  I know the background.  I read
21    the pleadings.  Believe me I don't know as much about this case
22    as the folks at counsel table, but I know about this case.
23             MR. JORALEMON:  Your Honor knows quite a bit, yes.  So
24    chevron has offered to produce in response to these four
25    requests not only Guanta payments or discussions but any
```

Ccl6che1

judicial inspection.  So if you look at Donziger's joint

submission, he admits that he is guessing here.  It says, Such

communications may disclose other attempts or tactics by

Chevron to use the Ecuadorian military to help sabotage or

derail litigation.

THE COURT:  Let me save everybody repetition on my

part.  I don't know what happened in Ecuador exactly.  Though,

as the years have gone by, I am learning more and more.  I have

said very near the first day of this case that I did not assume

that anybody's hands were entirely clean, not in the sense that

phrase is used in the legal doctrine but in a more colloquial

sense, and at some point along the way I made a comment I think

probably in a written opinion that there is something to be

said for letting the sunshine in on the process.

Now, there have to be limits of this case or we're

going to try the history of the Republic of Ecuador, the

Texaco, the Chevron oil company and Mr. Donziger's life story

and there is no end to it.  I fully understand that, but there

is fundamentally in this case in contention that there was a

whole lot of going on in relation to the Lago Agrio litigation.

I am certainly very familiar with what Chevron claims happened

and I understand in general what the defendants here,

plaintiffs there claimed happend and one of the things they

claim is that Chevron was using whatever political influence it

had in Ecuador to try to get a favorable result in that case.

Ccl6che1

1          There is a specifics allegation with respect to the

2     Guanta judicial inspection.  I understand that.  I understand

3     there are no specific allegations of particular instances

4     beyond that, which may not be entirely surprising because, A,

5     nothing else may have happened, or B, something may have

6     happened and they don't know about it because how would they

7     know most of the time.

8          My basic approach here is let's see what the facts

9     are.  So they are asking you for documents relating to these

10    two former Ecuadorian or maybe one former one at the time and

11    one present Ecuadorian military types.  They picked these two

12    because of the involvement whatever happened right, wrong or

13    indifferent with respect to the Guanta inspection and I don't

14    see why as a general proposition that isn't a reasonable

15    approach on their part.

16         Now, that said we all understand that a lot of very

17    high-priced lawyers, which is not in my view pejorative because

18    I was one of them a long time ago and I am not against lawyer

19    earning a living, even a good one, who spent an enormous amount

20    of care and attention trying to draft document requests like

21    trust indentures with all sorts of little exemplars of legal

22    drafter's skill to make sure they get this and don't get --

23    well, they always want more of course -- make sure what they

24    get what they are really hoping to find and then the objections

25    and the compromises are crafted to look as reasonable as

Ccl6che1

1     possible without giving up the crown jewel.  I got all of that.

2              So if there are little drafting things that you think

3     I may have overlooked with respect to these requests, and I

4     understand little drafting things can sometimes be very

5     expensive to deal with if they are not caught, let's get to it.

6     But the basic proposition about what if anything happened with

7     respect to the Lago Agrio litigation between Chevron on the one

8     hand and Bravo and Velosco, that ship has sailed in my mind.

9              MR. JORALEMON:  Understood, your Honor.  There is one

10    point of clarification with respect to Request 41.  This

11    basically seeks information about payments from Chevron to

12    Mr. Bravo.  Mr. Bravo worked for a private security company and

13    was contracted by Chevron to provide securities to its lawyers

14    essentially down in Ecuador.

15             THE COURT:  I hope he hasn't been in Benghazi lately.

16             MR. MASTRO:  For all intents and purposes he was a

17    bodyguard for Chevron lawyers.  Now, this request seeks his

18    salary in that role.

19             THE COURT:  So?

20             MR. JORALEMON:  We would argue that is beyond the

21    scope of any discoverable information here.

22             THE COURT:  One man's salary is another guy's hush

23    money.  I am not saying that is what happened here.  Suppose

24    this bodyguard was getting paid $700,000 a year.  It might have

25    a bearing, don't you think?  I just don't know.  Maybe you are

Ccl6che1

paying him on a W-2 and his Sally was $78,000 a year and that
was totally fair, reasonable and adequate compensation and then
it is a nonissue.  I don't mow what salary means.  It is just
what I am talking about when I talk about the draftsmanship.

          MR. JORALEMON:  Exactly.  Could we limit this request
to documents sufficient to show the amount and purpose Chevron
made payment to Mr. Bravo?

          THE COURT:  What do you say, gentlemen?

          MR. WERDEGAR:  Well, your Honor, I guess my concern
always is -- it is a reasonable proposal except my concern is
what a document doesen't shows in their minds versus what we
would like to see.  We would want to know when he was paid and
when and we would like to have produced or logged if they claim
privilege communications.  Say there was the $700,000 payment
and there was an internal discussion by Chevron, you know, we
need to quiet this guy down and do X and Y, we would like to
see those documents.

          THE COURT:  Why isn't an appropriate resolution of
this very narrow point that you get documents sufficient to
show all payments, the dates of all payments and the stated
purposes of all payments and if that raises any questions in
your mind, you come back?  How about that?

          MR. JORALEMON:  That certainly makes sense, your
Honor.

          MR. WERDEGAR:  I mean, your Honor, I guess again if

Ccl6che1

1    the stated purpose is just an invoice that says "salary," that

2    would be the stated purpose I guess, but that would leave out

3    any kind of internal communications which are explaining what

4    is really going on here.

5         THE COURT:  I understand that.  Look, if what you get

6    back here -- this is what I was talking about about the

7    drafting.  Look, I admire good legal drafting as well as the

8    next guy.  You're concerned that there are all kinds of odd

9    payments here, there and the other place and if all you get is

10   a list of the payments and the dates and for example invoices

11   such as you indicate, well then where are you?  You have

12   something that looks kind of suspicious from your point of view

13   and you haven't really learned all that much about what was

14   really going on if anything.

15        On the other hand if what you get back is a listing

16   that for whatever period of time he was employed by Chevron he

17   got a check every two weeks in substantially the same amount

18   with maybe a 4 percent raise each year and it says "salary" and

19   the amount is reasonable, I think I said that, you would agree

20   with me that that is the end of that issue, right?

21        MR. WERDEGAR:  Yes, your Honor.  The only point I

22   would add if that were the scenario, there is unlikely there

23   would be any internal correspondence anyway so there would be

24   nothing for them to produce.  So there would be nothing else in

25   any event whether that be produced.  They presumably know who

Ccl6che1

1    at Chevron was contacting this company, the point person.  It

2    is a matter of searching their e-mails to see what kind of

3    communications they are having about this guy.  It is not a

4    burdensome search in our view.

5            THE COURT:  How burdensome is it, Mr. Joralemon?

6            MR. JORALEMON:  Well, it is potentially very

7    burdensome, your Honor.  That would pick up every -- if there

8    is a person processing payroll, every time that person makes

9    communication about the act of processing payroll that would

10   pick up that communication.  So I don't know off the top of my

11   head the tenure of Mr. Bravo's role but--

12           THE COURT:  How long has he been there?

13           MR. JORALEMON:  I don't know, your Honor.  Again, he

14   didn't work for Chevron.  He worked for a private security

15   company.

16           THE COURT:  Well, then is it that company still works

17   for Chevron?  Where is that company?

18           MR. JORALEMON:  They are located in Ecuador.

19           THE COURT:  So how was the payroll handled?  That is

20   to say, did you get a bill every month from the security

21   company that said for security in the month of April, $14,000,

22   or was this on the payroll of an entity within Chevron's

23   purview?

24           MR. JORALEMON:  It definitely is not the latter.  He

25   worked with a company that contracted with Chevron.  There is a

Ccl6che1

1    contract between his employer and Chevron to provide security.

2             THE COURT:  So the payroll processing stuff is not

3    likely to be at Chevron, right?

4             MR. JORALEMON:  Not within that company, correct.

5             THE COURT:  What company?

6             MR. JORALEMON:  The security company that Mr. Bravo

7    worked for.

8             THE COURT:  So it is sounding to me if there is a

9    burdensome part here, the burdensome part in terms of routine

10   weekly communications about processing the payroll are at the

11   security company?

12            MR. JORALEMON:  Again, your Honor, the burdensome part

13   would come in where we're searching for whoever was within

14   Chevron's control was interfacing with the security.

15            THE COURT:  Are you saying the security company might

16   have been within your control?

17            MR. JORALEMON:  No.  No.

18            THE COURT:  I am going to allow this one.  It doesn't

19   sound to me like it is a big deal from Chevron's point of view

20   in terms of burden or tedium with no upside benefit.  And to

21   the extent you got stuff in your possession, custody or control

22   relating to this for the reasons I have given, they are going

23   to get them.

24            Anything else on this group, Exhibit 2?

25            MR. JORALEMON:  No, your Honor.

Ccl6che1

1           THE COURT:  Exhibit 3.

2           MR. WERDEGAR:  Exhibit 3 is similar but this focuses

3      on communications with and payments to the Republic of Ecuador

4      and politicians and to influence politicians and political

5      operatives in the Republic of Ecuador, your Honor.  That is the

6      general overarching.  I think some of the issues with the

7      requests are a little bit specific and we probably need to go

8      through them one at a time.  The first, Request 25 is looking

9      for communications between Chevron and any person acting on

10     behalf of the Republic of Ecuador putting aside public

11     pleadings or filings in any U.S. court or Ecuadorian court.  So

12     it is the non-- the ex parte type communications.  The issue

13     here is they agreed to produce documents --

14          THE COURT:  Can you answer one question about this

15     request for me?  I see that it is communications concerning the

16     Aguinda litigation, which is a defined term.

17          MR. WERDEGAR:  Yes.  That is the New York litigation,

18     your Honor.

19          THE COURT:  That is what I thought.

20          MR. WERDEGAR:  Yes.  That is the issue.  So Chevron

21     has taken the position that anything to do with the Aguinda

22     issue in New York, what we believe to be extensive behind the

23     scene efforts to get Chevron -- Ecuador to try intervene in

24     that litigation or have it moved to Ecuador and have it

25     favorable treatment when it got to Ecuador, Chevron's view is

Ccl6che1

```
1    that that is irrelevant as to this lawsuit and we certainly

2    disagree with that.

3              First of all, in terms of the relevance Chevron in its

4    own complaint, its affirmative allegations in the story it

5    tells, that story starts with the filing of the Aguinda

6    litigation in New York.  They accuse of my clients of being in

7    collusion with Republic of Ecuador from day one.  This is

8    evidence that goes to disproving those allegations in Chevron's

9    complaint, the affirmative allegations that they have in their

10   complaint about the collusion between --

11             THE COURT:  Where in their complaint do they say that?

12             MR. WERDEGAR:  It's paragraph 60 through 63, your

13   Honor.  Also 70 through to 75 is directly on point with

14   collusion with Ecuador.  That collusion began according to them

15   during the course of the Aguinda litigation.

16             THE COURT:  Is that right, Mr. Mastro, before I look

17   it up?

18             MR. MASTRO:  Your Honor, I don't think that is

19   accurately characterizes it.  There are allegations about

20   Aguinda and that being the start of the disputes.

21             THE COURT:  The reason I question it is quite simply

22   this:  The logic of what you are saying is that Chevron

23   litigated in this court and in the Second Circuit in the

24   Aguinda case from 1993 to 2001 to get the litigation moved to

25   Ecuador where allegedly you were in bed with government of
```

Ccl6che1

```
 1    Ecuador.  They have been accused of a lot of things, but a
 2    desire to commit suicide is not one of them I think.
 3              MR. WERDEGAR:  Your Honor, I would direct you to those
 4    paragraphs I just referenced, 60 through 62.  They have the
 5    allegations that we were, that is Chevron, working to get the
 6    case dismissed and sent to Ecuador.  According to Chevron,
 7    Donziger and the Ecuadorian plaintiffs side of the case were
 8    working -- were colluding with the government to get the
 9    Environmental Management Act passed, were doing various things
10    to set up a favorable playing field in Ecuador.  That is their
11    theory.
12              THE COURT:  Oh, yes, that I remember.
13              MR. MASTRO:  That's a little different than what he
14    said before.  Colluded from day one is what he said before.
15              MR. WERDEGAR:  The transcript will reflect what it
16    says, but that is what their allegation -- their allegations
17    about their collusion date back to the 1990s.
18              THE COURT:  Their allegation about collusion with
19    respect to the passage of the EMA, yes, absolutely; but they
20    certainly weren't as your remarks led me to believe whether
21    inadvertantly or otherwise, and I am not casting aspersions,
22    and what I said before they were certainly not trying to move
23    this litigation to Ecuador where you were in collusion with the
24    Ecuadorian government in the broad sense that I understood you.
25              MR. MASTRO:  And your Honor will recall the EMA issue
```

Ccl6che1

```
1    arose after there was the commitment on Texaco's part to try to
2    move the case.
3              THE COURT:  Yes, indeed.  It may even have been after
4    the case had been dismissed once in favor of Ecuador.
5              Isn't that right, Mr. Werdegar.
6              MR. WERDEGAR:  I believe the EMA --
7              THE COURT:  EMA is 1099 and didn't Judge Rakoff
8    dismiss it the first time earlier than that?
9              MR. WERDEGAR:  It was still being litigated in the
10   United States.  You are correct, your Honor.
11             THE COURT:  So let's go on.
12             MR. WERDEGAR:  Go on to the next request?
13             THE COURT:  No.  No.  So far you haven't explained the
14   relevancy of this to me satisfactory.
15             MR. WERDEGAR:  Well, so the one relevance is with
16   respect to their allegations.  We discussed that.  The other
17   relevance is with respect to what you described, your Honor, as
18   it is Donziger's belief and our position of this litigation as
19   reflected in our counterclaims as well as our affirmative
20   defenses that Chevron as you described has in our theory been
21   engineering -- trying to engineer the transfer of the case to
22   Ecuador because they believe it would receive favorable
23   treatment there and were working both during that period of
24   time and --
25             THE COURT:  What you mean by engineered the transfer
```

Ccl6che1

1    of the case is filing a motion in this court before a United

2    States district judge to dismiss it on the ground that Ecuador

3    is a more convenient forum, right?

4              MR. WERDEGAR:  With certain specific promises, your

5    Honor.

6              THE COURT:  Right.  But that's engineering?

7              MR. WERDEGAR:  Fair enough, your Honor.  Fair enough.

8    Their goal was to get the case to Ecuador.

9              THE COURT:  No question it.

10             MR. WERDEGAR:  It used the legal processes available

11   to do so and also made various representations which have been

12   the subject of many pleadings in this case.

13             THE COURT:  History plays games with people and one of

14   the great games in all of this is that the trip to Ecuador

15   turned out 180 degrees opposite what each party thought when

16   they took their positions about whether that should happen.  I

17   understand all that.

18             MR. WERDEGAR:  So it's our view, and I think there is

19   evidence that we know about that supports this, that throughout

20   that period of time and then continuing throughout the

21   Ecuadorian litigation Chevron has been endeavoring to use

22   whatever political influence it has in Ecuador to in that case

23   I belive the appropriate verb would be engineer a favorable

24   outcome of the case.

25             THE COURT:  Let me assume that's right.  Suppose it's

Ccl6che1

1     right.

2              MR. WERDEGAR:  I think we're entitled, your Honor, in

3     telling that story to be able to put that story in context to

4     show how this is a pattern and practice of Chevron's over

5     multiple years in dealing with this lawsuit and it shouldn't

6     artificially --

7              THE COURT:  Suppose that's right.  Suppose that's

8     right.  How does that give rise to any claim or defense in this

9     case?

10             MR. WERDEGAR:  Well, your Honor, it gives rise to our

11    unclean hand -- as it relates to our unclean hands defense.

12             THE COURT:  Well, your unclean hands defense consists

13    three words:  Unclean hands, dismissed.  I looked at the

14    pleading again this morning.  Your unclean hands defense says

15    nothing.  It is like an index heading in the back of a torts

16    book or something.

17             The people who have spelled out or made an attempt to

18    spell out an unclean hands defense is Mr. Veselka's clients

19    which led to a motion to strike it, which led to a decision

20    that I spent a lot of time on.

21             Now, is the substance of your proposed unclean hands

22    defense any different from the one that they alleged your

23    client's clients?

24             MR. WERDEGAR:  Based on the information available to

25    us, it is very similar.  I think it also would be amplified by

Ccl6che1

1    whatever evidence comes to light since that time, but it

2    certainly is similar for us.

3           THE COURT:  Now, the part of their unclean hands

4    defense that I allowed to go forward with respect only to the

5    prayer for and injunction was very narrow and I explained why.

6    I allowed to go forward that part of it which was based on

7    allegations of misconduct in or in relation to the Ecuadorian

8    litigation and that is because -- and I am looking for the

9    quote here.  It is not leaping off the page at me -- there has

10   to be a close relationship.  Here I have now found it.  There

11   has to be an immediate and necessary relation to the equity

12   that the plaintiffs seeks in respect of the matter in

13   litigation in order for an unclean hands defense to be viable.

14   I cited for that Specialty Minerals v. Pluess-Staufer, 395

15   F.Supp.2d 109, at 112.

16          Now, the rationale that I took there was if and to the

17   extent Chevron is seeking injunctive relief in this case in

18   relation to the Lago Agrio judgment, misconduct with relation

19   to that litigation by Chevron is at least arguably related to

20   the equity they are seeking to enforce.  There may well have

21   been misconduct all around with respect to the earlier New York

22   litigation.  I don't know.  But assuming that there was, I

23   don't see its relationship as being sufficiently tied to their

24   claim for injunction here with respect to the Lago Agrio

25   judgment and litigation to make it viable here.

Ccl6che1

1            MR. WERDEGAR:  Can I try to stay it one more way?

2            THE COURT:  Please do.

3            MR. WERDEGAR:  Certainly with respect to the scenario

4     outlined in your order and any misconduct by Chevron with

5     respect to the litigation in Ecuador would have a relevance so

6     too would we believe that kind of conduct have relevance to our

7     defense Chevron's affirmative claims.  They accuse of improper

8     pressure, collusion, doing all these bad deeds.  In our view

9     any alleged conduct has to be viewed in the context of us going

10    down there.  If we are going to meet with a judge not to try

11    and bribe him but because we think Chevron has just bribed him

12    and we are tying to see what is happening, those are two

13    different scenarios and you cannot tell the story of the

14    alleged misconduct of Mr. Donziger without knowing what was

15    going on in the overall context of the litigation because

16    context I think would be very, very important.

17            Now, that said with respect to this, if there are

18    people that Chevron is communicating with at length during this

19    period leading up to the case moving to Ecuador, having

20    extensive meetings, contacts, payments being made to them

21    perhaps, whatever it may be, we see that history of Chevron's

22    relationship with them and then suddenly those people are

23    actors that are important during the course of the Ecuadorian

24    litigation.  Chevron is continuing to meet with them.  A

25    meeting in 2004 by itself, that is all we know about, could be

Ccl6che1

1    very innocuous; but if you know a history of this, it could

2    take on a very different light.  So to put all of this into

3    context I think we need to understand this case didn't pop out

4    of the blue, a relationship with Ecuador didn't pop out of the

5    blue in 2003 when it was filed in Ecuador and Chevron's

6    interactions with these people didn't start then.  I think

7    we're entitled to explore the nature of the relationship and

8    who Chevron has been working with and trying to influence

9    during the entire span of this litigation.

10             THE COURT:  Mr. Joralemon.

11             MR. JORALEMON:  Very briefly, your Honor.

12   Respectfully to Mr. Werdegar we fail to see the nexus between a

13   conversation that Chevron may have had 20 years ago about a

14   lawsuit filed in New York with Mr. Donziger and his cohorts

15   ghost wrote the report or judgment.  There is no connection.

16   For Mr. Werdegar to suggest that a conversation Chevron may

17   have had with the ROE will impact Mr. Donziger's state of mind

18   about the Cabrera file or the ghost writing judgment frankly

19   makes no sense.

20             MR. WERDEGAR:  One last word if I may.  If this case

21   were about-- if Chevron's allegation were just the Cabrera

22   report and ghost writing that would be make this case a whole

23   lot simpler, but that is not what they are complaining.  Their

24   complaint goes far beyond that.  They talk about collusion,

25   about ex parte meetings, bribing judges.  That's all there.

Ccl6che1

1          THE COURT:  That's all in relation to the Ecuadorian

2    litigation.

3          MR. WERDEGAR:  Correct, your Honor.  If Mr. Donziger

4    is meeting with someone -- and this is what we believe to be

5    the case -- if he is meeting with someone, We have to go

6    confront the judge, one of their famous quotes, if you gave

7    that quote the full outtake that quote is going to confront

8    them because they believe that Chevron -- that he was dirty and

9    that Chevron had been interfering with him.  That is the story

10   we're entitled to tell and we're entitled to get documents from

11   them regarding the nature of those contacts and relationships.

12   I think that should go back to when the litigation began.

13         THE COURT:  I am not saying whether Mr. Donziger's

14   state of mind at a time when, assuming for the sake of argument

15   it ever occurred, he engaged in some improper behavior with a

16   judge in Ecuador is or is not relevant here.  There is a nice

17   question and maybe not even so hard, but there is a question

18   anyway I recognize as to whether he is entitled to bribe the

19   judge even if he genuinely believes the judge was bribed by

20   someone else.

21         There is an old line about one of the problems with

22   some people is not that they take bribes but that they don't

23   stay bought.  I have heard that line somewhere.  I understand

24   that argument.  I am having a little trouble with the question

25   of why you are entitled in effect to go back to the Aguinda

Ccl6che1

case, which ended 11 years ago finally for the purpose of

finding evidence that you hope Mr. Donziger could now say, Ah

well, that proves I was right.  If he is going to get on the

stand and as proper evidence and say, Look, my understanding

was the whole Ecuadorian judiciary was corrupt -- God knows he

has said that -- and therefore I felt I had to fight fire with

fire, and be subject to cross-examination as to what the basis

of his knowledge was assuming the first part comes in at all,

so be it.  We have a trial.

          MR. WERDEGAR:  Your Honor, aren't we entitled to Mr.

Donziger getting on the stand hypothetically speaking he is

being examined or cross-examined about a meeting that takes

place in the Aguinda case and he testifies, We thought Chevron

was bribing this judge and we wanted to see and talk to this

judge to see what was going on.  I am not saying he was going

there to bribe him --

          THE COURT:  I understand.

          MR. WERDEGAR:  -- confront him.  He is entitled to

give his own testimony and state of mind of the purpose of the

meeting, but aren't we also entitled to corroborate that state

of mind if we can show that there is documents that Chevron had

interactions with this judge or this judge's former employer

over a course of years that they had an established

relationship.

          THE COURT:  I don't know and I am not going to rule on

Ccl6che1

         1    that now, but I will point out to you that everything you have

         2    talked about relates to what went on in the Lago Agrio

         3    litigation, not the New York litigation years before.

         4                MR. WERDEGAR:  Again, one last time, your Honor.

         5    Maybe this is I am beating a horse.  The point is that --

         6                THE COURT:  Look, I want to get this right.  Let's

         7    take some time on it.

         8                MR. WERDEGAR:  For discovery purposes and given the

         9    broad view of discovery, which Mr. Mastro discussed at length

        10    yesterday, I think we're entitled to find out the background.

        11    I am not saying at trial that something would happen in the

        12    Aguinda litigation would be admissible for unclean hands

        13    because it happened in the Aguinda litigation, but what I am

        14    saying is we're entitled to discovering about the

        15    communications and relationships that Chevron had established,

        16    tried to build with influence makers in Ecuador, which then

        17    they kept during the course of the Ecuadorian litigation but

        18    those relationships to understand them they will explain to the

        19    jury how Chevron had been working with these people and trying

        20    to establish its influence with them for years, those

        21    relationships -- and we know they were meeting with people all

        22    through the '90s about this case down in Ecuador with

        23    politicians and ministers -- we would like to able to show the

        24    history of those relationships, the fact that Chevron had been

        25    working with and trying to influence those people for years and

Ccl6che1

1  lo and behold come 2007, 2008 it was bearing fruit where

2  Donziger had not --

3          THE COURT:  It bore a lot of fruit, 19 billion

4  dollars' worth of fruit.

5          MR. JORALEMON:  If I may, your Honor.  This is about

6  line drawing.

7          THE COURT:  I got that.

8          MR. JORALEMON:  We're producing --

9          THE COURT:  Even in baby judge school, I got that.

10          MR. JORALEMON:  Now, what is getting lost in

11  Werdegar's  statement is Chevron is producing all

12  communications --

13          THE COURT:  I am sorry?

14          MR. JORALEMON:  We're producing all communications

15  from the ROE about the Lago Agrio litigation.

16          THE COURT:  Before we get to Mr. Veselka, which we

17  will -- well, go ahead, Mr. Veselka.

18          MR. VESELKA:  I apologize, your Honor.

19          THE COURT:  You don't have to apologize.  You are

20  doing your job.

21          MR. VESELKA:  This is his motion.  I have a similar

22  one.  So when we get to mine, I have a precise --

23          THE COURT:  I don't want to do this all twice.  If it

24  is overlap, I want to hear from you.

25          MR. VESELKA:  That's what I assumed.  There is already

Ccl6che1

information or evidence or documents that reflect that the
Chevron before Lago Agrio case is filed has relations and
dealings with ROE such that as soon as it is filed they come
down, they have meetings with the press, they have meetings
with various ministers and they have meetings with the attorney
general and they get the attorney general to call the judge to
try to kill the case.

THE COURT:  To call what judge?

MR. VESELKA:  The judge presiding over the case, the
Lago Agrio case.  The background of what the relations in
getting the case ultimately dismissed and approved by the
Second Circuit what they were willing to say based upon what
arrangements or understanding they thought they had with ROE,
we think you have to back it up before the March 2003.  I think
that is why we're going back into Aguinda.  Now, whether it has
to go back to 1992, maybe not.  We think that the dealings that
were going on and trying to get the ROE to participate in the
case and what arrangements they had to say, If we get it down
there, we will be able to take care of it, we think it would be
relevant particularly to the unclean hands and --

THE COURT:  How can it be relevant to the unclean
hands?  So far as you are concerned, I have already ruled to
the contrary.  So that ship sailed where you are concerned.  So
what we're talking about is how is it relevant to Chevron's
complaint and to Donziger's counterclaim?  That is what we're

Ccl6che1

1     talking about.

2            MR. WERDEGAR:  Your Honor, one way to maybe cut

3     through this is how when they say they are producing all

4     communications with the Republic of Ecuador about the

5     Ecuadorian litigation, my understanding is the time frame that

6     they have selected to do that only goes back to 2003.  So what

7     we're trying to capture --

8            THE COURT:  Nobody talked to me about the time frame

9     on this.  That was not a point anybody ever said was in

10    dispute.  I don't know whether what you said is right or wrong.

11           MR. WERDEGAR:  What we're trying to do is there is a

12    way to get communications to go back somewhat further in time

13    and whether you call them about the Aguinda case in New York

14    because that case is still going on or whether it is about

15    planning for what Chevron hopes is going to happen in Ecuador.

16    This is where the draftsmanship gets a little blurry, but I

17    think what we're most interested in is what Mr. Veselka has

18    described as Cheveron's efforts when they looks like they are

19    getting the case moved to Ecuador to lay the groundwork for

20    what they think is going to be a favorable outcome.  So maybe

21    shifting the timeframe back and with the understanding that is

22    what we're looking for, that would satisfy us, your Honor.  It

23    doesn't need to go back to 1993.

24           THE COURT:  What about that, Mr. Joralemon?

25           MR. JORALEMON:  Certainly if it relates to the Lago

Ccl6che1

1    Agrio litigation, your Honor, we're fine with that.

2              THE COURT:  Well, that's filed when?

3              MR. JORALEMON:  That's filed in early 2003.

4              THE COURT:  Suppose it was the Aguinda litigation back

5    to 2000 just to give an example?

6              MR. JORALEMON:  So modifying the request --

7              THE COURT:  Modifying the request to just have a time

8    period on it, 2000 to 2003 or whatever.  I guess it ends in

9    2001.

10             MR. JORALEMON:  That seems reasonable.  How about the

11   final end of the Aguinda litigation through that day?

12             THE COURT:  Do we have a sale here or not?

13             MR. VESELKA:  The concern is that they are willing to

14   make commitments to the Second Circuit and Judge Rakoff about

15   what will happen if they get it dismissed on forum non

16   conveniens based upon agreements they have with the ROE of what

17   will happen if the case is refiled.  So if you wait until after

18   all the commitments are made, that is why January 1st of 2000

19   is something we had thrown out at one time I believe but it

20   never got an agreement from them on that.  I think January 1,

21   2000.

22             MR. JORALEMON:  That is the first I am hearing of the

23   January 1, 2000 date.  Again, we would be comfortable going

24   back to the conclusion of the Aguinda case, having that being

25   the kickoff communications about the Lago Agrio case.

Ccl6che1

```
 1              THE COURT:  Look, I am going to sustain the objection
 2    to 25 to the extent it seeks documents prior to January 1, 2000
 3    and overrule it as to January 1, 2000 coming forward.  That
 4    should not be understood as a relevancy determination as is
 5    always the case here.
 6              MR. WERDEGAR:  Understood, your Honor.  The next
 7    request is Request No. 39, your Honor.  This is seeking
 8    basically documents concerning payments Chevron has made to
 9    politicians, political figures, candidates in the Republic of
10    Ecuador.  This is not a time frame issue and the time frame
11    here is during the course of the Lago Agrio litigation in
12    Ecuador.  We offered in a meet and confer to limit this to
13    payments made for the benefit of any political party or
14    candidate with whom Chevron has had communications regarding
15    the litigation or regarding related issues such as remediation,
16    the release, criminal charges.
17              So what we're looking for is who is Chevron talking to
18    in Ecuador about these issues of concern to Chevron and is
19    Chevron making payments to those people.  It is a limited
20    universe.  Maybe they weren't talking to anybody in which case
21    they don't need to produce anything.  We do have a lot of
22    evidence of communications between Chevron and politicians in
23    Ecuador about this case.  I think they have provided in
24    interrogatories in that case that listed a whole slew of those
25    meetings and communications.
```

Ccl6che1

1          MR. JORALEMON:  Your Honor, we are producing any

2     payments to anyone listed in that interrogatory response.  This

3     issue is very narrow.  During the meet and confer we asked him

4     for any factual basis to suggest that Chevron was making

5     political contributions in Ecuador.

6          THE COURT:  Let me interrupt you.

7          Mr. Werdegar, is it correct as Mr. Joralemon just said

8     that they have undertaken to produce evidence of payments to

9     anybody on the list and that the list is a list of everybody

10    they communicated with about the Ecuadorian case?

11         MR. WERDEGAR:  Your Honor, this actually is the first

12    time I believe, and we had a lot of meet and confers, I heard

13    that that I remember.  I may have missed it, but that is the

14    first time I heard that.  As far as the list goes, I know there

15    is an interrogatory response in Count 9 asking for it, but I

16    don't know if there were limitations that Chevron placed in

17    terms of its due diligence or what it was going be providing to

18    that because we weren't part of that discovery directly.

19    Certainly if the two premises you said are correct, your Honor,

20    that goes a long way towards resolving this.

21         THE COURT:  You guys work this one out.

22         No. 47.

23         MR. WERDEGAR:  Your Honor, we're seeking basically the

24    information to identify any bank accounts that Chevron used to

25    make payments to political figures in Ecuador with whom it was

Ccl6che1

1    simultaneously or having discussions about this litigation.

2                THE COURT:  Well, given what Mr. Joralemon just said,

3    it is my understanding that they are going to give you or have

4    given you -- I am not sure which it is, but one or the other --

5    a list of everybody that they met with in relation to the Lago

6    Agrio litigation and any payments that were made to any of

7    those people.

8                Now, why do you need the specific bank accounts for?

9                MR. WERDEGAR:  Your Honor, I think if we get the

10   information that he has represented, it would lead to the

11   complete information to show the nature, the purpose and timing

12   of all the payments and to whom and we probably don't need this

13   additional information.

14               THE COURT:  That one is gone.

15               MR. JORALEMON:  Your Honor, for the sake of efficiency

16   this is a subset of the issue raised by the LAPs.  LAPs are not

17   only seeking LAPs to ROE, they are seeking bank account

18   payments to anyone, including Chevron's lawyers contractors,

19   etc.

20               THE COURT:  We'll get to that.

21               (Continued on next page)

22

23

24

25

CCLAACHE2                    Hearing

1          THE COURT:  OK.  So, 47 is out.  You'll work this out

2    in the context of the Nascent compromise on number 39 and,

3    fortunately, I hope nobody has to go to a party caucus to get

4    this approved.  OK.  That takes care of Exhibit 3.

5          MR. WERDEGAR:  Next is Exhibit 7, your Honor, and this

6    relates generally to communications to and payments with

7    experts involved in the litigation in Ecuador.  And the

8    defining term of experts it was intended to encompass everyone

9    that we knew about on any side that had been an expert in the

10   Lago Agrio litigation.  But it's a little confusing because we

11   referred to it as the New York action.  So I want to make sure

12   that's --

13         THE COURT:  So Aguinda experts means New York?

14         MR. WERDEGAR:  No.  It means experts who participated

15   in the trial in Ecuador, so poor drafting.  I want to make sure

16   there is no confusion on the outset of that.

17         We are seeking all of Chevron's communications,

18   certainly, with any of the Court appointed experts in the

19   litigation and then documents related to those communications

20   as well as any communications they may have had with experts

21   working with the plaintiff's side of the case and documents

22   related to those communications.  And then we are seeking

23   communications pertaining to Chevron's communications with its

24   testifying experts, those experts it hired and paid for that

25   weren't Court appointed such as Cabrera.

CCLAACHE2                      Hearing

1          THE COURT:  Let's take the last group first.  So what

2     you now want to do is the trial's over, the judgment's there,

3     it's affirmed on appeal and now you want discovery of what

4     transpired between the losing party and the losing party's

5     experts.

6          MR. WERDEGAR:  Your Honor, this is relevant on several

7     grounds.  And it's relevant because first of all Donziger on

8     its counterclaims.  Chevron has said publicly and they vilify

9     Donziger publicly on the grounds that all the legitimate

10    scientific evidence that disproves this case in Ecuador that

11    the contamination down there is not posing a human threat.

12    They make these public statements repeatedly about the state of

13    the scientific evidence down there.  We have reason to believe

14    and there's evidence to suggest that Chevron during the course

15    of the Lago Agrio mitigation was manipulating the scientific

16    evidence that was presented or not presented to the Court.

17    There is evidence of them taking sampling from, selecting only

18    clean sites and taking samples from other places and passing it

19    off as sampling from the inspected sites.  And we have a

20    handful of internal communications between their experts

21    expressing concern or speaking candidly about the evidence.

22    And I think we're entitled to show first of all for the

23    counterclaim purposes that when Chevron is saying the

24    legitimate scientific evidence is "X" that they know that not

25    to be true based on their own internal knowledge and

CCLAACHE2                    Hearing

1  communications.

2          THE COURT:  And let's suppose that happened.  This

3  injured Mr. Donziger how?

4          MR. WERDEGAR:  He is being -- it's injuring him now

5  because he is facing --

6          THE COURT:  It wasn't "now".  It was "how"?

7          MR. WERDEGAR:  "How"?  He is -- Chevron is in the

8  process of trying to extort him, your Honor.  The theory set

9  forth in our counterclaim Chevron is using this public pressure

10  and vilification campaign and these false statements to damage

11  and destroy his reputation.  He's been forced incur legal fees

12  to defend against Chevron's false public statements about him

13  and Chevron is endeavoring to isolate him to force him to

14  abandon this case because he no longer can pursue is --

15          THE COURT:  So he had to spend legal fees because they

16  said all the legitimate scientific evidence says there's no

17  pollution Ecuador?  Is that why or might it have been because

18  they sued him if, in fact, he incurred legal fees?

19          MR. WERDEGAR:  Your Honor, he's incurred legal fees

20  because they've sued him.  And he's incurred legal fees having

21  to investigate the falsity of Chevron's claims about him and

22  about the scientific evidence and it's the same legal fees

23  theory that Chevron case is premised on here.  They claim that

24  they've incurred legal fees investigating and uncovering the

25  truth about Mr. Donziger in Ecuador.  Mr. Donziger is incurring

CCLAACHE2                    Hearing

1    legal fees in the very same way in terms of uncovering the

2    truth.  Chevron's found out -- about him about the scientific

3    evidence, about the state of contamination, about that there's

4    no health or human impact to the environment as a result of

5    Texaco's operation.

6              THE COURT:  So Chevron could file a supplemental

7    complaint here saying that they're now incurring more legal

8    fees as a result of the unfounded counterclaims -- this was

9    their words, hypothetically -- that the pleadings you filed in

10   this case are causing them --

11             MR. WERDEGAR:  Your Honor --

12             THE COURT:  -- would that be right?

13             MR. WERDEGAR:  I'd have to research that.  I'm not

14   sure I could say that as a snap judgment.  But it also goes

15   directly to unclean hands, your Honor, putting aside the

16   counterclaims.  If Chevron on the one hand its experts are

17   saying certain things to the Court.  At the same time Chevron

18   knows its experts know of scientific evidence that is different

19   and less favorable for them and that is not being provided to

20   the Court, that Chevron is a suppressing dirty samples, sending

21   them to a secret laboratory.  That is all directly related to

22   Chevron's conduct of the litigation in Ecuador and goes to the

23   heart of what I think your Honor's recognized to be a valid and

24   unclean hands defense at least as alleged.

25             THE COURT:  I actually said something a little

CCLAACHE2                    Hearing

1    different but it is still in the case to a limited degree.

2              Mr. Veselka.

3              MR. VESELKA:  We have similar issue RFPs as they go

4    beyond just the communications with experts.  They go,

5    particularly, looking to things that may not have been

6    communicated with the experts.  But I think because it's the

7    same issue of the relevance of the inquiry, if the Court wants

8    to hear about that.

9              One of the founding blocks as the Court has recognized

10   as mentioned in your opinion the other day and as Mr. Mastro

11   read your words back to you yesterday about this is that this

12   is a case about trying to extort money from Chevron by among

13   other things, bringing the Lago Agrio litigation.  That's that

14   first component which they then refer to as "sham litigation"

15   in one words or another, sham litigation, fraudulent

16   litigation, objectively frivolous and fraudulent.  As a

17   demonstrative if the Court wants to see it, where we've

18   highlighted the 15 times in the complaint where they use these

19   characterizations about being sham litigations is one of their

20   factual assertions and therefore their knowledge and/or their

21   expert's knowledge about information about other testing, about

22   other sampling, about work they had done not just in that case,

23   if they'd done other work that they had knowledge of the

24   pollution, if they had knowledge of the contamination, if they

25   had knowledge of the deleterious public affects on

CCLAACHE2                    Hearing

Mr. Cammacho, Mr. Piaguaje and other folks that were plaintiffs

in Ecuador that would be raising the question of validity of

the testimony they submitted, the truth of their assertions in

their complaint about that, it would corroborate the

defendant's subjective intent and not believing it was a sham

litigation when they filed it.  And they're also accused of

continuing the conspiracy by refusing to admit that it was sham

litigation.  And to the extent that evidence is there to be

learned about that contamination and in their, in Chevron's own

files or in their experts that they use sometimes either work

they had on another occasion but that information that they had

and did not submit to the Court, we believe that that goes to

corroborating the defendant's objective intent.  Also may go to

causation of any damages from the fraud and it goes to --

          THE COURT:  But you don't even have a counterclaim in

this case, right?

          MR. VESELKA:  No.  In defending the case, I am talking

about their claim against us saying it's a sham litigation,

defending that accusation.

          THE COURT:  I see.  So your proposal is that we're

going to try the Ecuador case all over again here?

          MR. VESELKA:  No, your Honor.  We're going to show

that there's evidence.

          THE COURT:  If you want to do that, maybe can I final

another judge who wants to do that.

CCLAACHE2                    Hearing

1          MR. VESELKA:  You are not volunteering for that, I

2     take it, your Honor.

3          THE COURT:  Certainly, not this morning.  It's almost

4     Christmas eve.  What am I crazy?

5          MR. VESELKA:  What I am talking about today is

6     discovery.  What information is in their files or their expert

7     files or what they hid from their experts or what sampling they

8     had?  So that we can discover how to use that at trial to

9     defend the accusation that my part, my clients engaged in some

10    kind of third party fraud by bringing a litigation that they

11    claim was objectively frivolous and fraudulent when we want to

12    show that there's evidence that they knew.  So that when they

13    make that accusation the jury would be entitled to know that

14    they evidence --

15         THE COURT:  Look, let's just -- I mean that's kind of

16    an interesting issue, so let me just explore it for a minute.

17         Let's suppose that Texaco polluted the Dickens out of

18    the rainforest, that everything Lago Agrio plaintiffs claimed

19    in Ecuador was correct and, notwithstanding, all of that they

20    won the case because the judge was paid a gigantic bribe to

21    rule in their favor.  I am not saying that happened, believe me

22    I am not.  It's a hypothetical for the purposes of discussion.

23         That judgment is obtained by fraud even if it's right,

24    isn't that true?

25         MR. VESELKA:  You have to have all the information in

CCLAACHE2                    Hearing

1    terms -- The judge maybe was going to do it whether he got the

2    payment or not.  And first there's no evidence --

3        THE COURT:  You know, actually, in an important sense

4    that maybe even in a controlling sense but I haven't thought

5    that all the way through, the Second Circuit has ruled on that

6    issue.  Probably not.  It's not squarely but very close in a

7    way in United States versus Mantin where a judge in the Second

8    Circuit was prosecuted for taking bribes.  The charge I think

9    was not literally bribery but that was the gist of the claim.

10   And the defense was his official conduct was never affected by

11   the bribe.  What he did was that he would decide the case and

12   then he would send the bagman to the party that he knew was

13   going to win and ex -- "extort"  Is the wrong word here --

14   obtain a payment which the payor for the intended was a bribe

15   but which then said it was not a bribe at all because it was

16   not an official conduct.  He'd already decided the case.  And

17   the Second Circuit said no, the process has to be clean.

18   That's what the crime is.

19        Now, it seems to me it's kind of analogous and it

20   speaks to the hypothetical, doesn't it?

21        MR. VESELKA:  It would speak to that hypothetical

22   because there is no evidence that they found any payments to

23   any judges.

24        THE COURT:  I didn't say -- Mr. Veselka, let's be

25   absolutely clear.  I didn't say that.  I have never said that.

CCLAACHE2                    Hearing

1    I am not implying it.  I have asked you, as judges ask lawyers

2    all the time in the United States, a hypothetical question.

3    Suppose the following facts, then what?

4              MR. VESELKA:  Right.

5              THE COURT:  I don't want to see that out of context

6    anywhere, Mr. Veselka.  I promise you.

7              MR. VESELKA:  I am trying to go as to the

8    hypothetical.  If they don't find any of that evidence or are

9    we not going to be entitled to show the substance to show the

10   aspect of sham litigation if it's what they're saying our

11   conspiracy is filing sham litigation when it wasn't, if they

12   don't find evidence of a bribery of the judge.

13             THE COURT:  But the point of the matter is for all the

14   rhetoric here and they're probably as guilty of the rhetoric as

15   your side of the case is and it's a hotly contested case.  I

16   understand that.  Everybody's filled with rhetoric.  The gist

17   of their case is not that it was sham litigation, I think.

18   That may be the PR.  But the gist of the case is different as I

19   understand it.

20             MR. VESELKA:  Your opinion Wednesday said by among

21   other things and it listed a number of items and number one is

22   bring the case.

23             THE COURT:  Well, yes, that's part of their rhetoric

24   and I think I accurately captured their rhetoric in some

25   respects.  I can't possibly capture all the rhetoric on both

CCLAACHE2                    Hearing

1   sides.  I won't live long enough.

2           MR. VESELKA:  In their complaint has paragraph after

3   paragraph --

4           THE COURT:  I know, Mr. Veselka.

5           MR. VESELKA:  So we think we're entitled to discovery

6   to dispute that fact to disprove that allegation.

7           MR. WERDEGAR:  Your Honor?

8           MR. VESELKA:  It's just a -- I'm sorry.  It may in

9   the -- we find anything or we're trying to introduce but we

10  think we are entitled to discovery.

11          THE COURT:  I understand the point.

12          MR. WERDEGAR:  That was my point, your Honor.  As you

13  said earlier in the hearing that sunshine is the best

14  disinfectant.  We're seeking discovery.  We have a basis for

15  seeking this.

16          THE COURT:  Well, I understand your point.  Maybe an

17  editor's blue pencil might solve the problem, Mr. Mastro.

18          MR. MASTRO:  Well, your Honor, I just -- I'm going to

19  avoid my usual inclination to use rhetoric.  So I appreciate

20  that your Honor doesn't need to hear rhetoric.

21          I just wanted to follow-up on two things though that

22  your Honor mentioned.  One, in addition to Mantin there's a

23  long line of cases Hazel Atlas in the Supreme Court.

24          THE COURT:  Yes, absolutely.  I remember.

25          MR. MASTRO:  And, of course, there it was the mere

CCLAACHE2                        Hearing

 1    ghostwriting of an article to support the case whether the case

 2    had merit or not, whether the article had merit or not.  Aoude,

 3    a First Circuit case where a contract was offered that

 4    exaggerated then the real contract they couldn't even proceed

 5    on the real contact.

 6              THE COURT:  But look, your complaint is filled with

 7    this sham --

 8              MR. MASTRO:  But, your Honor, this I wanted to address

 9    that next briefly.  A sham occurs on many levels, your Honor.

10    A sham litigation because of collusion with the government, a

11    sham litigation because of fixing the process with the Court in

12    Ecuador, a sham litigation because they sue Chevron which never

13    even did business in Ecuador instead of Texaco, a sham

14    litigation because they changed the law in Ecuador in the

15    interim after the original commitment to go there and then

16    applied that law retroactively.  But, your Honor, just follow

17    me.  One point Mr. Werdegar mentioned, he says there's injury

18    to his client because his client incurred attorney's fees.  In

19    fact, Mr. Werdegar --

20              THE COURT:  I know.  I read the papers.  You say he

21    testified that, in fact, he hadn't paid any attorneys fees.  He

22    is not paying his attorney's fees.

23              MR. MASTRO:  Yes, your Honor.

24              THE COURT:  Right.  I understand.  I actually read

25    this stuff.

CCLAACHE2                    Hearing

1           MR. MASTRO:  Oh, I know.  But he might want to confirm

2     that to the Court because that happens to be his own client's

3     testimony.

4           THE COURT:  I imagine at some appropriate point

5     there'll be a 300 page motion addressed to that issue.  I do.

6           MR. JORALEMON:  Your Honor, if I may, on a practical

7     level, Chevron takes the position that with respect to the

8     environmental evidence or the science as we call it, at most it

9     has to be limited to what was in the record.  And that's what

10    your Honor said two days ago in the decision on third party

11    subpoenas and that's the position Chevron is taking.  If the

12    Lago Agrio court did not consider the science, then it's not

13    relevant to any parties' claims or defenses here.

14          THE COURT:  The point made by your colleague at the

15    back table is you allege they brought sham litigation.  They

16    said they're entitled to show that there was at least some

17    scientific evidence of which you were aware that suggests

18    otherwise.  I understand the point.  I am going to defer on

19    this one Number 35 and I am going to suggest that all of you go

20    back to the drawing -- to the conference room on this.  It may

21    be that Chevron really means to assert by using the term "sham

22    litigation" that it was a lawsuit that transparently had no

23    merit at the inception if in a scientific sense.  And it may

24    mean, it may be that they're really asserting something else.

25    And if they're really asserting something else, that may change

CCLAACHE2                    Hearing

the scope of the discovery that may be appropriate here and I

don't see any reason why I should rule on this particular point

before you have exhausted the ability, the possibility of

resolving it along those lines.

          Now, of course, if everybody wants to cycle back a

decade or more and go back to where this all would have stood

before the Aguinda form dismissal and start from square one in

a U.S. court, let me know.  I'll try to get on a plane.

          MR. MASTRO:  Your Honor, I just want to be crystal

clear and we will have those conversations and we will clarify

this to the Court.  It is not our intention at all to retry the

Lago Agrio case and we will clarify these issues consistent

with your Honor's most recent opinions to make that crystal

clear as to the limitations of what we intend to prove and what

the discovery we think should be therefore.

          THE COURT:  Yes.

          MR. MASTRO:  Thank you, your Honor.

          THE COURT:  Well, it's going to take three to tango

here.  What else in this group?

          MR. WERDEGAR:  Oh, no.  There's the final one in this

section are payments to experts, your Honor, and we're seeking

in 36 we want information regarding the payments that were made

to any expert who served during the Lago Agrio litigation

payments made by Chevron.

          THE COURT:  These are experts who testified for

CCLAACHE2                    Hearing

1    Chevron?

2         MR. WERDEGAR:  Testified for Chevron, were court

3    appointed, meaning neutral or supposedly neutral or payments

4    made to any of the plaintiff's experts.  So we want all those

5    categories.  And our understanding is that with respect to

6    they're going to comply, they say they'll comply with Rule 26

7    with respect to payments to their own experts and then they say

8    that will also provide documents sufficient to show any

9    payments made to the court appointed experts.

10        With respect to that, your Honor, we don't think

11   documents sufficient to show satisfies the discovery that we

12   should be entitled to.

13        THE COURT:  It's going to satisfy it for the first

14   cut.  That's for sure.  If there aren't any, that's that.  If

15   there are, then we'll talk about it.

16        MR. WERDEGAR:  OK.  Your Honor, so as long as it's

17   understood the attorneys out there, there are payments and we

18   are not seeking additional information, that makes sense.

19        THE COURT:  Right.  OK.  That's number 36 is it or 36

20   and 38?

21        MR. WERDEGAR:  Give me a second, your Honor.

22        THE COURT:  And 37.

23        (Pause)

24        MR. WERDEGAR:  Your Honor, 37 is really, it's the same

25   issue as 35.  37 also seeks communications with experts.

CCLAACHE2                    Hearing

1           THE COURT:  OK.

2           MR. WERDEGAR:  So that should be wrapped into the meet

3    and confer.

4           THE COURT:  35 and 37 we're conferring.

5           MR. WERDEGAR:  Correct.

6           THE COURT:  And 38?

7           MR. WERDEGAR:  My 38 is different from my 36.

8           THE COURT:  I know it can be a challenge and it's not

9    just you.

10          MR. WERDEGAR:  I understand that.  38 should be, I

11   think it's resolved by the ruling you just gave of 36 and court

12   appointed experts, so there were no payments.

13          THE COURT:  OK.

14          MR. WERDEGAR:  If there are payments then we have the

15   right --

16          THE COURT:  You'll contact.  OK.  Now that's Exhibit

17   7.

18          We'll take five minutes and move on.

19          (Recess)

20          THE COURT:  OK.  So we're up to nine.  You may be

21   looking good, Mr. Werdegar, but I do have -- I will be going to

22   lunch at 12:30.

23          MR. WERDEGAR:  Yeah, I think we're going to cautiously

24   optimistic we're going to make this through fine.

25          First of all, I am happy me to report that number 124,

CCLAACHE2                    Hearing

1    the parties resolved that after this submission was made but on

2    Wednesday.

3              THE COURT:  OK.

4              MR. WERDEGAR:  So 14 has been resolved.  We will, as

5    per your instructions regarding yesterday's proceedings, and we

6    will memorialize these agreements and resolutions in a joint

7    document as you described this morning.

8              THE COURT:  Yes.

9              MR. WERDEGAR:  The rest in this series, your Honor,

10   are all requests and I think they can be taken largely

11   together.  They're all requests seeking evidence in Chevron's

12   possession regarding contamination and the state of the

13   environment in the former concessionary.  To eliminate any, try

14   to eliminate or alleviate at least any burden objection with

15   respect to this series, we offered during the meet and confer

16   process that Chevron has identified some archives and some

17   custodians that it's agreeing to search with respect to the

18   responsive information.  We said, we are not asking you to go

19   beyond what you've already agreed to search.  But as you

20   encounter things in the search you are already doing with the

21   materials you've already agreed to review, if you encounter

22   responsive materials, materials concerning ground water

23   contamination, soil contamination and the like, can you please

24   produce those as well?  And they've declined to do so.  And I

25   think their basis for doing so is relevance, your Honor, and I

CCLAACHE2                          Hearing

1    think it relates back to the discussions we were having before

2    the break about whether and to what extent scientific evidence

3    of contamination or documentary evidence might be percipient

4    witness evidence that Chevron had in its possession but didn't

5    make it into the record during the Lago Agrio litigation

6    because Chevron didn't provide it to its experts and its

7    experts therefore didn't account for it in their reports.  It

8    wasn't turned over by whatever other mechanisms of discovery

9    there were, is relevant to this case.  And as we talked at

10   length during the break it's, certainly, our position it's

11   relevant to unclean hands whether Chevron was manipulating the

12   record and manipulating the evidence and concealing evidence --

13           THE COURT:  So let's just focus on that one for a

14   minute.  Your view then would be that in, for example, a

15   product liability case the manufacture would have a duty to

16   give any relevant information in its possession to a testifying

17   expert that it had engaged, is that right?  And that the

18   failure to do so would be unclean hands?

19           MR. WERDEGAR:  I think, your Honor, that if the

20   company knew that the information it was providing to its

21   expert if it was aware of information is directly contradicted

22   what it was asking to rely, its expert to rely upon it says

23   here are our records of whatever this product liability thing.

24   Here are our testing records that show that we did "X" and the

25   result was "Y".  And they've only given them half the records

CCLAACHE2                    Hearing

1    and they leave out the ones that show that the product broke

2    six times out of seven and they just they don't disclose those

3    to their expert, then their expert then goes on to testify and

4    says that I was provided all the companies records.  I do think

5    there could be an unclean hands issue there, your Honor.  It's

6    sort of yielding false or misleading testimony or reports.

7            THE COURT:  Suppose that what they do is they engage

8    in expert and they say look, expert, we're being sued for

9    deficient design.  You're a design expert.  Look at the device.

10   We want you to give an opinion, whatever your opinion is after

11   making whatever tests you wish.  Unclear hands to fail to give

12   information to the expert?

13           MR. WERDEGAR:  Your Honor, just use a slightly

14   different hypothetical because I don't think the scenario you

15   describe is just to look at and the test the device and the

16   expert looks at and tests the device.  I guess in your

17   hypothetical what if the expert looked at and tested the device

18   and his first test of the device was, OK, he did a slightly

19   different test and the device explodes and would hurt the

20   little child.  Then he gives his expert report and he doesn't

21   disclose test number two.  And he gives also opinions about

22   test number one.

23           And here there is evidence, for example, that Chevron

24   had samples that it was taking, soil samples during the course

25   of the litigation and certain samples are provided in one

CCLAACHE2                    Hearing

1    laboratory and other samples are sent to another laboratory

2    that wasn't an official laboratory

3           THE COURT:  What's an official laboratory of record?

4           MR. WERDEGAR:  My understanding of how this works is

5    that each side had a laboratory that was disclosed as being the

6    facility in which its samples were being tested and that there

7    was a -- that both sides knew which laboratory was processing

8    that side's samples and this was another laboratory that hadn't

9    been disclosed.

10          Now I may -- that's my secondhand understanding.  But

11   I do know that there's evidence regarding samples being sent to

12   different laboratories based on whether they were dirty or not

13   and the laboratory that, again, it is my understanding

14   laboratory that certain samples were sent to is not a

15   laboratory that knowing to be a laboratory Chevron was using in

16   connection with this litigation.  So, again, this is back to

17   the hypothetical.

18          THE COURT:  We're all talking hypothetically here,

19   again, because we're trying to get our minds around this.  Take

20   your unclean hands point, that is to say I've heard it and I

21   know what you are saying.  And the problem that I am having

22   with it is the same problem I have been having with this

23   unclean hands defense all along.  And it is both sides were up

24   to shenanigans and one side is successful with the shenanigans.

25   That should disable the other side from, which is the injured

CCLAACHE2                      Hearing

party ultimately, although, obviously, they intended to injure

the prevailing party themselves.  The injured party should be

cut-off relief?  Maybe.  I don't know.

         MR. WERDEGAR:  Your Honor, this, obviously, is an

issue that is briefed from the last case.  No doubt we've

briefed again in this case.  But as a very important level

which I know that you know well, the principles of unclean

hands is you have to get -- to equitable relief from the Court

you need one who seeks equity must do equity.  So I think the

principle is and how it applies here is something that but,

yes, you can be, I think you can be barred from getting the

equitable relief from the Court if your own conduct in

connection with the matter was sufficiently unclean, corrupt.

So I do think that's the basic principle.

         But, again, we're talking about discovery here, your

Honor.  It may prove down the road that we can't prove all the

things that we think we will be able to prove or maybe we can

prove them all and there'll be a fight over whether it really

does support the unclean hands defense.  But for purposes of

discovery and under the principles of discovery we, certainly,

believe that we should be entitled to know if there's

scientific evidence about the examination that Chevron knew,

had in its possession and didn't share with its experts, didn't

otherwise make part of the record.  So that there was

Chevron -- Chevron knew all along as it's accusing us of sham

CCLAACHE2                    Hearing

1   litigation, accusing, saying making public statements about

2   this being sham in pleadings in this case and everything else

3   that it's sitting on information that shows to the contrary

4           THE COURT:  Well, if the argument is sham litigation

5   then this is --

6           MR. WERDEGAR:  Then there's several arguments, your

7   Honor.  Sham is one of them.  Unclean hands, we've now been

8   discussing but I think it also pertains to the earlier

9   discovery request we have been talking about.  That's why --

10          THE COURT:  Well, you mean 35 and 37?

11          MR. WERDEGAR:  Correct.

12          THE COURT:  Well, we were discussing that principally

13  in terms of this.

14          MR. WERDEGAR:  So the overarching question is whether

15  we should be entitled to get in evidence Chevron's possession

16  or scientific evidence of contamination or specific evidence of

17  contamination for the various purposes we have been talking

18  about.  And, again, with respect to these, we're only asking

19  them to search within the universe of documents that they're

20  already searching, your Honor.

21          THE COURT:  Let me hear from Mr. Veselka.

22          MR. VESELKA:  The example that your Honor started with

23  there about the product liability case, you always get to

24  discover what evidence the company has as to the scientific

25  testing other than something maybe done by consulting expert

CCLAACHE2                    Hearing

1   but if they --

2          THE COURT:  But that's because you are litigating the

3   fundamental question of whether you've got a defective device

4   or product.  And the reason that's not an answer to this

5   problem is because we are not here litigating the question of

6   whether the rainforest is polluted and who did and who's

7   responsible for it.  That's not the issue in this case.

8          MR. VESELKA:  But because of their allegations where

9   they say, specifically, that it was -- it's fraudulent to claim

10  that it was polluted, that it was --

11         THE COURT:  Well, this is the sham discussion.

12         MR. VESELKA:  There are other specific parts.  To the

13  extent that they had information that they didn't give to their

14  experts, we think the jury should be able to hear about that's

15  how they conducted the trial to take into account.

16         THE COURT:  Well, unclean hands is an equitable

17  question all together.  So the jury is not hearing it on that

18  theory.

19         MR. VESELKA:  I am talking about on judging what

20  they're saying maybe we did vis-a-vis how we worked with

21  Cabrera or some other experts.  They're talking about dealings

22  with every expert.  We want to know how they were dealing --

23         THE COURT:  I know you want to know about it.

24         MR. VESELKA:  What we find in the discovery we might

25  be able to present to the Court and show how it would be

CCLAACHE2                      Hearing

1    something the jury should be able to take into account in

2    determining how we dealt with an expert who is appropriate or

3    not.

4              THE COURT:  Look, I'd rather imagine that if we ever

5    get to that point and there's ever any evidence supporting all

6    of this, that if you endeavor to do that I will be met with a

7    very strong objection.  And the objection will be it's got

8    nothing do with it, judge.  Two wrongs don't make a right.  To

9    put it in the simplest terms.  In other words, I think the

10   argument will be made and I am not deciding it today but the

11   argument will be made that if both parties were trying to

12   procure a corrupt result and one party succeeded, the fact that

13   the other party was trying to procure corrupt result is not a

14   defense to a RICO or a fraud action.  That's what I think the

15   arguments being to be and, therefore, that evidence is not

16   relevant and if it were relevant it should go out under 403

17   because among other things it's an invitation to do something

18   that the jury, perhaps, is not permitted to do.  Now, that's

19   what I anticipate.

20             MR. VESELKA:  We anticipate that.  And our ability we

21   should be able to discover what the evidence is to see how we

22   can argue whether it should be excluded or not.  That's why at

23   the discovery point I think we should be able to get it in

24   order to be able to see if it would be excluded on that ground

25   or have grounds based in the facts of what's there to show the

CCLAACHE2                    Hearing

1   Court to make that decision.

2           THE COURT:  Perhaps.  That's what we're talking about.

3   Who wants to answer for the plaintiff?

4           MR. MASTRO:  Your Honor, I just want to speak briefly

5   to the issue because I think your Honor has hit on it.

6           THE COURT:  Can you get closer to a microphone,

7   Mr. Mastro?  My hearing isn't what it once was.

8           MR. MASTRO:  No problem.  I am unusually soft spoken

9   today.

10          THE COURT:  I won't tell anyone.

11          MR. MASTRO:  Thank you.  Your Honor, first this does

12  go to the issue we were discussing before and we will clarify

13  the limitations of the case we intend to present in light of

14  your Honor's rulings as well.  We were not here to retry the

15  Lago Agrio case, number one.

16          Number two, on unclean hands I think your Honor has

17  hit on it precisely.  It has to do with its relation and its

18  magnitude and its materiality whether the evidence offered in

19  defense is something that --

20          THE COURT:  No way to know all that till we know what

21  the evidence is.

22          MR. MASTRO:  Understood.  But the very sample that

23  they're using, your Honor, in the context of experts, experts

24  are hired all the time.  Sometimes it's consulting experts.

25  Sometimes they do testing outside the court process.  The

CCLAACHE2                    Hearing

1    notion that the fact that there were experts retained to

2    consult with, maybe not testify, that there was some testing

3    done as a result, the very instance they're citing to is an

4    example that we were using yesterday where Mr. Page wrote to

5    three of our experts accusing them of, basically, you were

6    misled.  There was other testing.  There was another lab.  They

7    chose cites.  And those experts all responded, it's not true.

8    We aren't misled one wit.  You wrote to our deans and accused

9    us of this.  And it didn't happen one wit.  That's what they're

10   saying oh, give us this sweeping discovery into something that

11   is common in litigation when you are working with experts.  So

12   I think that this is really trying to reopen the whole can of

13   worms that this case isn't about.  And it would be incredibly

14   burdensome, not relevant to any --

15              THE COURT:  Well, how burdensome is it to give them

16   these documents to the extent they appear in the universe that

17   you are searching anyway?

18              MR. MASTRO:  Your Honor, one, it was a lot of

19   communications over many years.  So it is within the universe

20   that we are going to search but it would be a lot of documents

21   to review, number one.  And then determine which ones are

22   responsive, which ones there might be some arguments about,

23   whether they have to be produce.

24              But also, your Honor, it goes to fundamental questions

25   of relevance.  And this is your classic situation of trying to

CCLAACHE2                    Hearing

1    retry the case.  And we know what has happened here.  They are

2    trying to retry the science case to then use the information

3    not for a relevant purpose in the case but for irrelevant and

4    we believe not proper purposes.

5         THE COURT:  The irony of that, of course, is

6    remarkable because it's only a little over a year ago when they

7    were going berserk at the thought that you were going to call

8    experts who might say something about the science case.

9         MR. MASTRO:  Right.  Exactly, your Honor.  So these

10   are really my points, your Honor.  So I think they are tried to

11   the 35 and 37.  We will explain to the Court the limitations of

12   what we intend to prove so that it will be clear that we're not

13   talking about something sweeping and retrying the science case

14   and we'll talk to them about those issues.

15        THE COURT:  You'd better because I don't want to come

16   back and do this again.

17        MR. MASTRO:  Understood.  But to try and get this

18   through the back door, your Honor, it's just not right.  It's

19   just not relevant.

20        MR. WERDEGAR:  Your Honor, two last observations, if I

21   could, on this issue.  First, obviously, we weren't part of

22   the -- Donziger defendants weren't part of defendant Count

23   Nine.  These are different claims.  It's a different case.

24        With respect to just one more point on the relevance

25   point, your Honor.  They have accused, as you are well aware,

CCLAACHE2                    Hearing

of Cabrera, the Cabrera report is one of the center pieces of
their fraud and they generally say that the plaintiff's side
manufactured evidence.  The Cabrera report fraud is, in their
view, is both the authorship and how the report was generated.
But I also believe they are accusing the results in that report
of being inaccurately reflecting the sort of scientific
evidence of what's going on and in the form of concessionary.

          THE COURT:  Possibly.  But to be frank with you, as we
sit here at the moment, that's not what I remember about their
case on the Cabrera report.

          MR. WERDEGAR:  If they would agree that the report
itself is accurate but I don't think that's what they're
saying.  They are saying Stratus wrote it but I think they're
also saying that Stratus science, they didn't do the science
right or they doctored the science.  But they have evidence
showing and corroborating the scientific results that they are
saying are fraudulent, both in the Cabrera report and in other
plaintiff's experts that goes to relevance too to show that
these scientific reports that they are claiming are fraudulent
are not in fact fraudulent.  They are corroborated by evidence
that Chevron itself has.  Again, this is not unclean hands.
This goes to the defense of the allegations against my client.

          MR. VESELKA:  And very briefly, your Honor.  The
reasons we were not -- we were opposing scientific evidence in
Count Nine because the issue there was impartiality of the

CCLAACHE2                        Hearing

1    tribunal and the system of justice.

2              THE COURT:  And whether the judgment was obtained by

3    fraud precisely the issue here -- well, not precisely but

4    closely related to the issue here.  So closely that you or

5    Mr. Donziger or both resisted severance of Count Nine on the

6    ground that the fraud issue was all over Count Nine and

7    everything else.  I remember these things most of the time, not

8    always.

9              OK.  You're all going to talk.  I hope you solve this

10   problem.  And that takes care of Mr. Donziger's stuff, right,

11   Mr. Werdegar?

12             MR. WERDEGAR:  Sure, your Honor.  We will talk to them

13   and hopefully reach agreement.  We have reached agreements in a

14   lot of areas.  If heaven forbid we remain at loggerheads do we

15   just submit it to you for ruling?

16             THE COURT:  Yes.  And I have a very busy January and,

17   therefore, I am going to ask you to do that.  Get whatever has

18   to be gotten to me by the 3rd of January.  I hope that's doable

19   without any horrendous problems from anybody.

20             MR. WERDEGAR:  We'll discuss.  I don't see that we

21   need to further brief this issue.  We have the record.  We have

22   the argument.  I was envisioning a joint letter saying we have

23   not been able to resolve our issues with respect to these

24   categories.

25             THE COURT:  I also want the order resolving everything

CCLAACHE2                    Hearing

1   else, the schedule, the whole thing ready to go January 3.

2          Now, I also want to know one other thing because it

3   has a bearing conceivably on this.  And that is a lot of this

4   has hinged on the arguments by Mr. Donziger's counsel with

5   respect to his counterclaims, not a little but a lot of it.

6          (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CCL6CHE3

1          THE COURT:  Chevron contended when they moved for

2     leave to amend that the counterclaims were legally

3     insufficient.  I declined to decide that on a motion to amend.

4     I wanted better and fuller briefing.

5          When is that motion going to be forthcoming because it

6     may affect the scope of this?

7          MR. MASTRO:  Yes, your Honor.  Our response date is

8     the 24th, this coming Monday, and we'll be moving to dismiss.

9          THE COURT:  Okay.

10         MR. MASTRO:  Thank you, your Honor.

11         THE COURT:  We can get a start on Mr. Veselka's part

12    of the problem.

13         MR. VESELKA:  Your Honor, I want to first make sure

14    the Court appreciates how much has been resolved.

15         THE COURT:  Let me say something about that.  I really

16    do.  There have been times in this litigation when at least to

17    my perception the acrimony among counsel could be cut with a

18    knife.  Furthermore, the requests that everybody has drafted

19    and the objections to them went so far overboard in every way

20    that I can imagine that they are textbook and they may some day

21    be a textbook.  They are Exhibit A on some concerns about where

22    we are on litigation in 2012.  That said, I am enormously

23    appreciative of the effort and degree of success that has been

24    achieved on this stuff.

25         MR. MASTRO:  Thank you.

CCL6CHE3

1          MR. VESELKA:  The majority of the requests that we had

2     have been worked out.

3          THE COURT:  I understand that.

4          MR. VESELKA:  And a large slug of that being under the

5     process the Court has said before we'll produce this now, we'll

6     look at it and if there are specific things we want to ask

7     about later, we can ask about and they agree we have the right

8     to move to compel them.  We resolved a large part.

9          As you can see on page 4 of 23 of Document 666, we

10    have seven.  That is a little index of the seven categories

11    there just to give you somewhat of a precis.

12         THE COURT:  I am confused.  Page .

13         MR. VESELKA:  Page 4 of 23 of the court filing

14    numbers.

15         THE COURT:  Oh, I see.  The header on the ECF.

16         MR. VESELKA:  Yes, sir.

17         THE COURT:  Got it.

18         MR. VESELKA:  You see the first one, the first

19    category really is the issue we have just been discussing.  So

20    I think we may have unless there is something that want to do

21    to see if that whole category is part of what we need to go

22    back and confer on.

23         THE COURT:  I am not sure I am understanding what you

24    are telling me.

25         MR. VESELKA:  To the extent we were seeking to discuss

CCL6CHE3

1   issues with regard to scientific evidence of what had occurred

2   in the past are that Chevron has that they would look for that

3   we were going to confer about rather they are going to find

4   ways either by adjusting what they are alleging and/or what

5   we're going to find an easy way to look for it and start with

6   that process rather than address these or not.  At one time we

7   had asked them specifically as to some of the potentially

8   historical scientific evidence, do you know where it is, how

9   handy is it, can we find a way to address any burden issue as

10  the Court has just recommended be done with Donziger's request.

11  So we're amenable to that process.

12          THE COURT:  Mr. Joralemon.

13          MR. JORALEMON:  Yes, your Honor, if I may just to try

14  to clarify and preview for the Court how I expect this going to

15  unfold.  There are a total of four exhibits in play here and

16  they are duplicative, two of the LAPs and two of Donziger.

17  They deal with the experts.

18          THE COURT:  You lost me right there.

19          MR. JORALEMON:  Your Honor, we are repeating many

20  things before your Honor.  I apologize for that.  Let's take it

21  by subject.  There are two subjects.  One is, let's call, Lago

22  Agrio expert related discovery not in the record.  That is

23  subject one.  Subject two is evidence of historical

24  contamination that goes back to the '60s.  Those two subjects

25  and Chevron's objection in discovery directed at those two

CCL6CHE3

1    subjects will be resolved by the clarification of Chevron's

2    case.  Now, I suspect that the parties are not going to be able

3    to resolve this on their own.  We'll submit to the Court, Here

4    is Chevron's case, and then your Honor will have to resolve the

5    objections relating to those two subjects.  Sorry, Lago Agrio

6    experts, historical contamination.

7            So what Mr. Veselka is saying is Exhibit 1 of the LAP

8    joint submission here is the historical contamination subject.

9    We did not spend any time on this today further than we already

10   have because it will get swept up in what is coming to you.

11           MR. VESELKA:  That is what I was trying to say, your

12   Honor.  I think that process will be how we can try to

13   address -- it is a lot more at peace because we asked it in a

14   more granule way to be sure it would be clear, but it is all

15   covering the same thing.

16           THE COURT:  I take it your answer to Mr. Joralemon's

17   question is yes?

18           MR. VESELKA:  Yes, sir.  Besides Exhibit 1, Exhibit 5

19   is the one dealing with the experts.  So those are the two that

20   I think we have a procedure in place to deal with pursuant to

21   the Court's suggestion.  So I think we can begin with Exhibit

22   2.

23           THE COURT:  Do you agree?

24           MR. JORALEMON:  Yes, sir.

25           THE COURT:  You guys don't want me to take back all

CCL6CHE3

1    the nice things I just said, do you?

2              MR. VESELKA:  No.  No.

3              THE COURT:  That was really confusing.  We'll start

4    with Exhibit 2 then.

5              MR. VESELKA:  This, your Honor, deals with requests

6    about dealings with the Republic of Ecuador or Petra Ecuador

7    and/or the court personnel.

8              THE COURT:  Look, we just went through all of this

9    with Mr. Donziger.  You and Mr. Donziger know each other I hear

10   and if there is anything here that need to be addressed that is

11   not adequately dealt with on the Donziger proposals, tell me

12   what it is and we'll deal with it and otherwise you are going

13   to get the discovery that Mr. Donziger gets on this and we'll

14   be done with Exhibit 2.

15             MR. VESELKA:  I believe that it is resolved by the

16   rulings.

17             THE COURT:  Okay.

18             MR. VESELKA:  The issue about agreement the Court was

19   going to defer on that I think.  Oh, the time frame.  The time

20   frame is off.  Yes, your Honor.  That goes to 238 and 239.

21             MR. JORALEMON:  If I may briefly on Exhibit 2, there

22   are actually two different subjects.  One is the Aguinda

23   contacts.  That is resolved by the Donziger resolution.  The

24   second subject, however, is bank account information.  Now,

25   this is what we raised with your Honor and this goes far beyond

CCL6CHE3

1    what Mr. Donziger was seeking and what the LAPs want is all

2    Chevron's bank account information of any payment relating to

3    anyone, including their lawyers and there is a list there.

4             THE COURT:  This is No. 128?

5             MR. JORALEMON:  Correct.

6             THE COURT:  I thought I misunderstood Mr. Veselka to

7    say that to answer affirmatively in response to my suggestion

8    that what the Lago Agrio claims are going to get is what

9    Mr. Donziger is going to get on this and that is it.

10            MR. VESELKA:  I was talking about the -- they are

11   going to provide payments, sufficient to show payments, and

12   then rather than fighting over what we need additional

13   document.  They are claiming damages from legal fees.  So I

14   think we can get payments as to the lawyers.  This also goes to

15   payments to the experts.  We're trying to track who all got

16   paid to see where it may go and they were saying they would

17   provide us with the experts documents sufficient to show the

18   payment and then we reserve the right to come back and look and

19   that is all I am asking here, that they show documents

20   sufficient to show what payments were made as to these

21   categories of counsel, consultants, experts, personnel of the

22   court and any ROE official.

23            THE COURT:  You think they are trying to recover for

24   payments they made to court personnel?

25            MR. VESELKA:  No.  No.  I believe the Court addressed

CCL6CHE3

1    this on a different one.  If they are bribing officials and

2    they have got the records --

3              THE COURT:  You are confusing, Mr. Veselka.  The first

4    thing I said was, Is there anything here that is not adequately

5    covered by the discovery ordered in response to Mr. Donziger's

6    request.  And although because of the way the question was

7    asked the answer is yes, the substantive answer that I got from

8    you as I now phrase the question was no.  In other words, the

9    Donziger's rulings take care of everything.  Then you talk some

10   more and I thought that was all finished.  Then Mr. Joralemon

11   got up and said, It is resolved as to the Aguinda, Republic of

12   Ecuador stuff but it is not resolved because you want bank

13   records.  And then all of a sudden we're talking about damages

14   and I don't know what we're talking about.

15             MR. VESELKA:  I apologize.  I was addressing I thought

16   the process that resolved payments with regard to experts which

17   is one of the subcategories here.

18             THE COURT:  I am not talking about that or maybe I am

19   but I am not intending to talk about that specifically or to

20   limit my remarks to that.  This whole Exhibit 2 relates to

21   discovery of payments made to counsel in the what you call the

22   Chevron litigations.  Now, what does that mean?

23             MR. VESELKA:  The Chevron litigations it was the

24   1782s, this case, Count 9, and Lago Agrio and the bit

25   arbitration I believe.  Our definition I think the difference

CCL6CHE3

1    between the two is added the bit and you all didn't add the

2    bit.

3            THE COURT:  Well, I have the bit in my mouth right

4    now.  Now, that was an unfortunate but necessary digression not

5    just the comment about the bit in the mouth.

6            Let's come back to this.  You wanted payments

7    information with respect to the Chevron litigations, the

8    definition of which you just described, consultants, experts,

9    personnel in the Lago Agrio court, Republic of Ecuador and

10   various other categories.

11           Now we just had a whole long discussion with

12   Mr. Werdegar and Mr. Joralemon and Mr. Mastro about payments at

13   least in relation to Republic of Ecuador people and maybe more

14   broadly with respect to Mr. Donziger's request, right?

15           MR. VESELKA:  Yes, sir.

16           THE COURT:  Tell me exactly what areas of information

17   you want that they did not ask for and that you are still

18   pressing?

19           MR. VESELKA:  They asked for payments vis-a-vis

20   Republic of Ecuador and I believe vis-a-vis experts.

21           MR. WERDEGAR:  The lawyers, consultants are categories

22   that were not addressed.

23           THE COURT:  Were or were not?

24           MR. WERDEGAR:  Were not, your Honor.

25           MR. VESELKA:  At some part we added a subpart.  In

CCL6CHE3

1    subpart 128 A.

2              THE COURT:  Maybe that is a better way to do it.

3              MR. VESELKA:  Yes.

4              THE COURT:  Tell me which ones of these numbers in

5    your view are still alive?

6              MR. VESELKA:  128 A and B consultants.  Experts I

7    believe was covered by Mr. Donziger.  And I think D and E were.

8              MR. WERDEGAR:  And F.

9              THE COURT:  D and E?

10             MR. VESELKA:  D and E were covered.  So C, D and E was

11   covered by the decision of Donziger.  We're trying A, B and F.

12             THE COURT:  And 238 and 239?

13             MR. VESELKA:  Those were resolved.  That was the same

14   as the Donziger.

15             THE COURT:  And 128?

16             MR. VESELKA:  128 is just the subheading for the 128

17   A, B, C, D, E, F.

18             THE COURT:  I see.  Now I understand.  Now that we

19   have some idea of what is going on here --

20             MR. VESELKA:  So what I was asking is whether we would

21   use the same process if they provide information sufficient to

22   show payments and then we see if there is anything else to talk

23   about.

24             THE COURT:  Any problem?

25             MR. JORALEMON:  Yes, your Honor, a big problem

CCL6CHE3

1   unfortunately.  Mr. Veselka is conflating different requests

2   here.  There are a host of requests seeking payments, payment

3   information, what did Chevron pay to whom.  This request wants

4   the bank records underlying such payments.

5           THE COURT:  He just bailed out that one.  He just said

6   documents sufficient to show.

7           MR. JORALEMON:  What he is doing is turning this bank

8   records request into the specific request for counsel payments.

9   Chevron is not producing its payments to counsel in any Chevron

10  litigation.  Chevron is not producing payment for consultants

11  for investigators.  Those objections are elsewhere, not teed up

12  with in Mr. Veselka's chart today.  This chart tees up whether

13  they get banking records.

14          I am sorry if I am not being clear, your Honor.  This

15  request subsumes Chevron has agreed to produce payments to

16  consultants or investigators.  Chevron has not agreed to

17  produce that.  Essentially the way this is set up, your Honor,

18  Mr. Veselka is trying to back-door those requests, the

19  objection to those requests, into this broader bank account

20  information request.

21          THE COURT:  I am lost.  I don't understand you.

22          MR. JORALEMON:  Okay.

23          THE COURT:  He is asking for bank records on a half a

24  dozen different topics.  He says one, two, three, four of half

25  of the dozen things are already taken care of.

CCL6CHE3

1          MR. VESELKA:  That we were going to deal with Donziger

2     and now we're asking to have the same process on the other

3     categories.

4          THE COURT:  As I understand what he is saying he is

5     saying that in light of the rulings with respect to Donziger

6     and whatever agreements were made with respect to Donziger,

7     whatever they may have been he is no longer pressing 128 A, B,

8     D and E.  I am sorry.  I misspoke.  No longer pressing 128 C, D

9     and E.

10          MR. JORALEMON:  Right.

11          THE COURT:  He is still pressing A, B and F.

12          MR. JORALEMON:  Right.

13          THE COURT:  With respect to A, B and F all he wants is

14     documents sufficient to show the payments.

15          MR. JORALEMON:  Right.  Here is the problem, your

16     Honor:  First C, D and E Chevron has agreed to produce payment

17     information to Mr. Donziger.  For A, B and F Chevron hasn't

18     agreed to produce any.

19          THE COURT:  That is why we're going to talk about A, B

20     and F.

21          MR. JORALEMON:  What I am saying, your Honor, is the

22     way Mr. Veselka has teed this up is this is a pile-on request.

23     He asked elsewhere for the payment information.  Here he wants

24     the bank records relating to that.

25          THE COURT:  Where did he ask for the payment

CCL6CHE3

1    information?

2              MR. JORALEMON:  In other requests.

3              THE COURT:  Does he matter?  Because he is now saying

4    he is not asking you for the bank records anymore on this.  He

5    wants documents sufficient to show what the payments were and

6    then reserve the right to come back later.

7              Now, if he is elsewhere asked for documents sufficient

8    to show what the payments were and he is now content to take

9    those documents as at least a sufficient first cut at A, B and

10   F, what is the problem?

11             MR. JORALEMON:  The problem your Honor is that Chevron

12   has objected to producing documents sufficient to show this

13   payment information in these other requests.

14             THE COURT:  So let's talk about it.  I think I must

15   have taken my stupid pills this morning or something.

16             Mr. Veselka's position is that this is at least in

17   part the damages you claim.

18             MR. JORALEMON:  That's incorrect, your Honor.  It

19   mischaracterize Chevron's claim.  To the extent Chevron is

20   claiming any component of any of this is damages, we're

21   producing documents.  That is another request.  I apologize,

22   your Honor, the reality we're dealing with 800 requests here.

23             THE COURT:  Yes, I know that.  I am challenged at

24   keeping them all in my head at one time.

25             MR. JORALEMON:  So I think the question for your

CCL6CHE3

1    Honor --

2                 THE COURT:  So your position is that in response to

3    other requests you have agreed, and whether you agreed to them

4    or not, you are now agreeing to produce documents sufficient to

5    show payments that you claim as damages in this case?

6                 MR. JORALEMON:  Exactly, your Honor.

7                 THE COURT:  Mr. Veselka, why isn't that sufficient?

8                 MR. VESELKA:  Well, that term of recovery is a large

9    portion of it.  The other would have been wanting to see is the

10   example if an investigator whose running around providing

11   security service for them or something like that while they are

12   in Ecuador is paid, Oh, gee they got paid $1.2 million while

13   serving as security, it might lead to request on something

14   else.  The fact that if they have done a nefarious payment,

15   they wouldn't claim it as damages, then they don't show it.

16                THE COURT:  I asked you what the reasons for those

17   requests were and you said, Well, these are the damages they

18   are claiming.  Well, okay, that I understand.  They are not

19   fighting with you about that.  So you are having trouble taking

20   yes for an answer.

21                MR. VESELKA:  We'll take yes for an answer under the

22   agreements we have got right now.

23                THE COURT:  So that takes care of all the 128 items

24   and everything else in Exhibit 2 has been resolved, right?

25                MR. VESELKA:  Yes, your Honor.

CCL6CHE3

1           THE COURT:  Is Exhibit 3 still alive?

2           MR. VESELKA:  I thought that was the expert.

3           THE COURT:  That's the expert.  That one is gone,

4      correct?

5           MR. JORALEMON:  Correct.

6           MR. VESELKA:  No. 4 is a very straightforward and

7      simple one, your Honor.

8           THE COURT:  Famous last words.

9           MR. VESELKA:  The Court may remember hearing about the

10     Yasuni.

11          THE COURT:  You do me too much credit.

12          MR. VESELKA:  Ecuador has a project of using a certain

13     part of the rain forest because of the parts of the world as to

14     biodiversity there.  They have talked about setting aside a

15     world biodiversity preserve.  If they can raise enough money,

16     they will say we won't drill for oil and do other extractive

17     industries in there.  They have been soliciting contributions

18     and that has been run or one time the government official

19     dealing with that is Yvonne Bachie who had a various number of

20     positions in the government over the years and met with Chevron

21     a number of times and met with Chevron with regard to this

22     project and it has been a concern about Chevron trying to

23     corrupt the government of Ecuador in how it deals with trying

24     to inject itself into this lawsuit.  If they're being paid a

25     billion and a half dollars for the Yasuni project, we want to

CCL6CHE3

1  find out about those dealings to see if there is any dealings

2  quid pro quo vis-a-vis the government taking a position on the

3  Lago Agrio litigation.

4         MR. JORALEMON:  Your Honor, where is the Yasuni

5  project mentioned anywhere?  This is a UN sponsored order

6  project that was lodged six months from the fraudulent sanction

7  had issued.  Mr. Veselka has not suggested in any way --

8         THE COURT:  Is that right, Mr. Veselka, this project

9  came into existence six months before the judgment?

10         MR. VESELKA:  I don't remember exactly.  I was

11  thinking it was either late '09 or 2010.  Six months may be

12  right.

13         MR. JORALEMON:  August 3, 2010.

14         MR. VESELKA:  All right.

15         MR. JORALEMON:  There is no allegation anywhere that

16  Chevron had anything to do with this Yasuni project.  So it is

17  just a head-scratcher from our perspective.  What does this

18  have to do with the litigation?

19         MR. VESELKA:  Well, there are numerous press accounts

20  from Ecuador about Chevron discussing a meeting with Minister

21  Bachie and potential amounts to be contributed.  At the time

22  they are dealing with -- as those conversations going on after

23  the Lago Agrio decision has come out and they are trying to get

24  the Court to -- they are trying to get government, the

25  executive branch of the government to somehow intervene in the

CCL6CHE3

1    judgment or its appeals or enforceability knowing what they are

2    saying and/or contributing there we think would be discoverable

3    to determine if it is related.

4             THE COURT:  You guys want to revisit Chevron's

5    requests for everything that ever passed between you guys and

6    any government in the world where the judgment might be taken

7    for enforcement?

8             MR. VESELKA:  I don't know what would be scooped up in

9    it, but I don't want to revisit that, your Honor.

10            THE COURT:  So I take it you will withdraw these,

11   right?

12            MR. VESELKA:  The only thing I have to be careful

13   about --

14            THE COURT:  There is not a direct cause and effect

15   line here, but let me tell you this is about as far fetched as

16   anything and in this case that is quite an accolade.

17            MR. VESELKA:  We'll withdraw this topic.  Just to

18   clarify for the Court and to note Exhibit 86 is dealing with

19   this Minister Bachie and the parties had agreed she would be in

20   the category of things they will be producing some things

21   unrelated to the Yasuni project.  So that part will survive.

22   It is just the part as to the Yasuni.

23            THE COURT:  All we're talking about is to preserve the

24   rain forest movement here.  This particular exhibit.  I don't

25   think I have heard the defese claim that Chevron -- claim

CCL6CHE3

1    previously that Chevron was improperly doing things to preserve

2    the rain forest and I am not making light of it either,

3    counsel.

4         MR. VESELKA:  We thought it was so out of character

5    that is why we thought we ought to look into it.

6         THE COURT:  Well, you better check up on whether they

7    are giving aid and comfort to the hurricane victims, too.

8         MR. VESELKA:  Item 5.  There are two experts that they

9    have reports from that predate bringing the litigation -- one

10   of them has a report that is predating bringing the litigation

11   and one that we believe may have done work before they made a

12   decision to bring the litigation.  This is Sproz Freiberg,

13   which --

14        THE COURT:  To bring which litigation?

15        MR. VESELKA:  This litigation.

16        THE COURT:  Okay.

17        MR. VESELKA:  This is Sproz Freiberg, which does IT

18   analysis work and they were and then this and Gus Leftenvich

19   and we have requested to the extent that there are work that

20   they performed unrelated -- before it was going to be decided

21   that it was going to be used in this litigation if it is.

22        THE COURT:  Isn't it perfectly obvious that if there

23   was this material prepared in anticipation of litigation?

24        MR. VESELKA:  The timing is what we don't know.  That

25   is why we're trying to get the timing.

CCL6CHE3

```
1           THE COURT:  The material prepared even before somebody
2   decides to bring litigation falls into that category if there
3   is a sufficient nexus and believe me everything between your
4   side of the table and Chevron has been in litigation for the
5   last 20 some years.  How could it not be in anticipation of
6   litigation?  I don't see any reason to suppose in anticipation
7   of a big contribution to the Metropolitan museum of Art.
8           MR. VESELKA:  In which case they would -- if we were
9   allowed to go forward with this with discovery, they would put
10  it and log it and we would know and that would show us when.
11  There are issues we have got --
12          THE COURT:  How would that help you?
13          MR. VESELKA:  For example --
14          THE COURT:  I spent two whole days here trying to
15  narrow really at the instance of your clients, though I don't
16  any of you were here, the subpoena to Patton Boggs precisely to
17  spare the burden of logging information as to which I know
18  privilege claims will be made across the board.  So why
19  shouldn't in this little tiny way I apply the same principle to
20  this where it is so obvious that there is going to be a
21  privilege claim.  Unless there is some serious argument to be
22  made that you need to get it logged because, A, it is relevant,
23  and B, this there is some reason to think you can overcome work
24  product protection.
25          MR. VESELKA:  Your Honor, my concern is this:  They
```

CCL6CHE3

1    were obtaining numerous documents in 1782s including documents

2    that may be the documents about which they claim being the

3    evidence of ghost writings from the judgment.  They had

4    possession.  If they had these experts working on those

5    documents before the judgment is ever issued, it may go to lead

6    to discovery as to whether Chevron set up the ghost writing

7    issue just as they tried to bribe one of the judges in order

8    to --

9          THE COURT:  Let me understand.  You are saying that

10   you need this because it might help you show that Chevron set

11   up the ghost writing issue, which I understand to mean caused

12   people as is alleged, not yet necessarily proven, on your side

13   to either write part of the decision for the judge or slip the

14   judge documents that the judge copied all without notice to the

15   other side, that's how they set it up?

16         MR. VESELKA:  Well, they might have set it up by them

17   slipping if to the judge.

18         THE COURT:  I see.  They helped them write the

19   judgment awarding $19 billion against them?

20         MR. VESELKA:  It is to be able to attack it for

21   claiming it is ghost written if they had the documents and they

22   somehow slipped them in.  It is timing.

23         THE COURT:  Slipped them in?  I see.

24         MR. VESELKA:  Somehow providing them to the court not

25   in the record.  That is what we're trying to --

CCL6CHE3

1    THE COURT:  So they wrote parts of this decision

2  hammering them as bad as anybody in world history has ever been

3  hammered so that they could then attack it because the judge

4  copied the bad stuff from them.  Oh, please, Mr. Veselka.  No.

5    If I misunderstood you, please tell me.

6    MR. VESELKA:  The issue we're trying to investigate is

7  whether they may have taken the documents that they provided

8  somehow to the court, that the court used, not with any

9  involvement by the plaintiffs' team, in drawing up its judgment

10  because they knew and had planned they would claim and

11  accused --

12    THE COURT:  Those were documents that Mr. Faharro

13  wrote your guy, right?

14    MR. VESELKA:  Some of those documents that are written

15  by Mr. Faharro, but they may have already obtained them.

16    THE COURT:  Well, look, I suppose it is theoretically

17  possible that they wrote the whole decision awarding $19

18  billion against them and they paid off the judge to enter it so

19  they can get it blown out of the water.  I suppose it could

20  happen, right?

21    MR. VESELKA:  That is not what I said.  I am not

22  saying they knew what the amount would be.  I believe I

23  asserted all along we believe they knew from a year or two out

24  as it was closing out that they thought the judge was going to

25  rule against them.  They thought it would be substantial so

CCL6CHE3

1   they were looking for ways to try to undercut --

2           THE COURT:  Any time you come back do me with any

3   evidence that suggests that I should give the slightest

4   credence to this, I am prepared to reconsider, but no.

5           MR. VESELKA:  So the purpose in looking for when Sproz

6   Freiberg started working on that.

7           THE COURT:  Terrific.  No.

8           I have to give you credit for imagination on that, Mr.

9   Veselka.  I mean, really.

10          Anything else left?

11          MR. VESELKA:  Two short ones.

12          THE COURT:  Two short ones.

13          MR. VESELKA:  The Court has a lunch.

14          THE COURT:  I have the rest of the day, too, Mr.

15  Veselka.  I am prepared to stay.

16          MR. VESELKA:  I am happy to get it over by lunch, your

17  Honor.

18          THE COURT:  I am sure everybody wants it over with.

19          MR. VESELKA:  The next one --

20          THE COURT:  We're going to have a discovery cliff

21  here. I am told we're safe on the Mayan apocalypse.  I am told

22  it was midnight last night.

23          MR. VESELKA:  The sun came up.  We were wondering

24  about it with the storm, but the sun did come up.

25          THE COURT:  I am worried about the Mayan Y2K problem.

CCL6CHE3

1          MR. VESELKA:  Your Honor, Exhibit 6 goes to dealings

2    by Chevron with the filmmakers and the people involved with

3    making of fruit.

4          THE COURT:  On what theory?

5          MR. VESELKA:  The question is trying to find out if

6    there are threats that they made to those people to obtain

7    information from them and/or if they have entered into any

8    agreements with them that restrict their ability to testify

9    truthfully as witnesses.

10         THE COURT:  If you have anything that suggests

11   probable cause to believe that happened, you take it right over

12   to the U.S. Attorney's Office.

13         MR. VESELKA:  All right.

14         THE COURT:  Next?

15         MR. VESELKA:  We had had information provided that --

16         THE COURT:  Hey, if the U.S. Attorney's Office thinks

17   it is credible, I am sure they will be the right thing.

18         Anything else?

19         MR. VESELKA:  Yes.  Exhibit 7, your Honor.

20         THE COURT:  So to be clear Exhibits 5 and 6 the

21   objections are sustained.

22         MR. VESELKA:  Exhibit 7 is a mishmash of a number of

23   different items, but they pertain in sense to two topics.  One

24   is the information regarding the Texaco Chevron merger as it

25   relates to discussing knowledge of the risk or the

CCL6CHE3

1    litigation -- of risk from the contamination and existence of

2    contamination and how that was assessed for purposes of making

3    the decision to acquire.

4              THE COURT:  That is relevant how?

5              MR. VESELKA:  That is relevant how if in assessing

6    this they had communication with the Republic of Ecuador and

7    they say, Look, once we get this case, don't worry about the

8    risk.  Yes, they are seeking a lot of money and they say it is

9    a lot of contamination and we know there is a lot of

10   contamination, but we have an agreement with Republic if we get

11   the case dismissed in New York and if it gets refiled down

12   there, they will be able put a kibosh on it.

13             THE COURT:  But I think Count 1 of your request under

14   this heading asks for anything having to do with communications

15   with the Republic of Ecuador.

16             MR. VESELKA:  Those were elsewhere, but this is asking

17   about the merger that particularly Mr. Scott was an official

18   with Chevron and was active with regard to operations at that

19   time and the dealings, met with a number of government

20   officials.

21             THE COURT:  What government?  What official?

22             MR. VESELKA:  The Republic of Ecuador.  I am sorry.

23             THE COURT:  So on that theory you want all documents

24   from Mr. Scott about the Chevron litigations?  What was his

25   position?

CCL6CHE3

1      MR. VESELKA:  He is in-house counsel and senior --

2  senior vice-president for -- I am blanking.  In-house counsel

3  and a senior vice-president.  Assistant general counsel and

4  senior vice-president and was involved in dealing with the

5  Republic of Ecuador and met with the presidents.

6      THE COURT:  That is not what you are asking for here.

7  You asked before and are getting boat loads of stuff involving

8  communications of Chevron with the government of Ecuador.

9      MR. VESELKA:  Right.

10      THE COURT:  So you can't justify this by saying, Oh,

11  it might be one from the Republic of Ecuador because we already

12  determined the extent to which you are getting that.

13      MR. VESELKA:  We believe that he was a person involved

14  so he should have been -- one of the original -- I am sorry.  I

15  am blanking.  Pertinent people, custodians.

16      THE COURT:  I am missing something.

17      MR. JORALEMON:  If I may be heard on this.  Hopefully

18  I can clarify.  There are really two separate topics in this

19  exhibit.  First is the merger.  Let's deal with that.  The

20  request concerning the merger are two and they are tied to

21  specific custodians.  It is Hugh Pate, the now general counsel

22  for Chevron, and John Watson, the now chief executive officer.

23  That is the extent of the merger related requests.

24      THE COURT:  I see 211 is Pate.

25      MR. JORALEMON:  Right.  It is 211 and 212.

CCL6CHE3

 1            THE COURT:  I see.  Go ahead.

 2            MR. JORALEMON:  So let's start with the subject of the

 3    merger.  Your Honor has written extensively about this topic in

 4    this case.  It is shocking that they have gone back to the well

 5    again when you've provided crystal clear guidance I think on

 6    the scope of relevance as it relates to the merger.  We sort of

 7    rest on this Court's prior rulings on that.

 8            With respect to the individuals identified here, Hugh

 9    Pate did not join Chevron until 2009.  So why they would be

10    asking about his files regarding a merger that happened eight,

11    nine years prior is not clear to us.

12            THE COURT:  Well, Mr. Veselka, let's take those two.

13            MR. VESELKA:  Mr. Watson was the senior vice-president

14    for business development at the time who was the business head

15    for the merger.  So he has actual firsthand knowledge of the

16    consideration of the merger and how the potential liability or

17    how they were dealing with that risk.

18            THE COURT:  What does it have to do with this lawsuit?

19            MR. VESELKA:  As part of that there were issues where

20    they had a deal to try to preclude the litigation.  It's

21    another place to look for that information that we described

22    earlier.

23            THE COURT:  And which you are getting, right?

24            MR. VESELKA:  Yes.

25            THE COURT:  Therefore, a request for all documents

CCL6CHE3

1    regarding the merger is just a tad overbroad, wouldn't you say?

2              MR. VESELKA:  It's one of the problems.

3              THE COURT:  211 and 212, objection sustained.

4              MR. WERDEGAR:  Your Honor, just one point of

5    clarification, which I think hasn't come out yet; but I think

6    one of the things that was driving these requests from the

7    codefendants is these are individuals, and Mr. Joralemon can

8    correct me if I am wrong, these are individuals who are not

9    listed within the universe of custodians that Chevron had

10   agreed to collect documents from when Mr. Donziger served his

11   requests.  So I think the Ecuadorians plaintiffs reviewing what

12   had already been done and what Chevron agreed to do and said,

13   These are additional individuals we should be collecting from

14   so we're going to seek discovery as to those individuals'

15   files because they are in not within the universe that Chevron

16   was going to produce in response?

17             THE COURT:  Any problem, Mr. Joralemon --

18             MR. JORALEMON:  Yes.

19             THE COURT:  -- with adding those two individuals --

20             MR. JORALEMON:  Yes, your Honor.

21             THE COURT:  Just a moment.

22             MR. JORALEMON:  Sorry.

23             THE COURT:  -- with respect to those specifications

24   dealing with communications between Chevron and the Republic of

25   Ecuador that have been sustained and that is that I have

CCL6CHE3

1   allowed you to go forward?

2           MR. JORALEMON:  Certainly.  I think this might be

3   captured within the broader issue of the custodians, your

4   Honor.

5           THE COURT:  Well, I don't know about the broader

6   issue.

7           MR. JORALEMON:  With your permission I would like to

8   address that.  I hesitate to go back to the Court what it has

9   already said, but two days ago again in the decision on the

10  third party subpoenas, your Honor noted that the subpoenas

11  themselves raised a substantial issue as to the good faith and

12  I think that applies here as well.

13          Now, let me give you the background.  Again, this is

14  very important, your Honor.  At the beginning of this year as

15  you noted the other party has had access, an ability to serve

16  requests for the entire year now almost.  Earlier this year you

17  asked the parties to submit a joint report on the status of

18  discovery.  We did that on March 7th.  In that report Chevron

19  laid out very clearly how it was going to approach collecting

20  and producing documents, including identifying the specific

21  sets of custodians and common sources.  We also included in

22  that joint report the good faith offer that if after reviewing

23  our production they thought there was someone missing that

24  would have noncumulative, nonprivileged materials they can come

25  back and ask for that and we would consider that.  We proceeded

CCL6CHE3

1    with that discovery.  Donziger and Stratus have not objected to

2    that approach.  We have had productive meet and confers about

3    that and that is where we stand today having produced three

4    million dollars.

5            Here come the LAPs six weeks before the close of fact

6    discovery serving 240 requests and saying, By the way, we want

7    all of your CEO's documents, ignoring the process they had set

8    up nine months earlier about how we're going to approach this

9    and thinking that they are just going to come in and say give

10   us all your general counsel's files and your CEO's files.  So

11   there is the issue of good faith.

12           Now, let's look at the substance of this.  There are

13   four individuals they identified -- the CEO, the general

14   counsel, Kari Endries who is a corporate secretary who has

15   nothing to do with the underlying litigation.  She signed the;

16   interrogatory responses after spending time with the lawyers

17   and Scott who is a lawyer, in-house lawyer.  Chevron is

18   producing files from 17 lawyers, your Honor, including 60 from

19   outside counsel in Ecuador.  For Mr. Veselka to blunder-bust

20   say, Give us the general counsel's files without any

21   consideration of the framework we set up or whether any

22   consideration, there has something nonduplicative in Pate's

23   file that wouldn't otherwise be privilege from what we're

24   giving them doesn't make any sense from Chevron's perspective.

25           MR. VESELKA:  We've talked about the merger and one

CCL6CHE3

1   other sort of category focused on this is outside

2   communications.  Mr. Watson --

3           THE COURT:  Before we get to that, let's stick with

4   what we're dealing with.

5           MR. VESELKA:  As to custodians when we looked at the

6   list, remember that our discovery was served later because we

7   did not want to prejudice our context of personal jurisdiction.

8           THE COURT:  You keep saying that, but without in any

9   way trying to being critical of you and God knows who made the

10  decision, there is no merit to that argument at all.  It's just

11  an excuse.

12          MR. VESELKA:  They were then issued and as we did that

13  and we looked at the custodians and it didn't include Mr. Scott

14  who has been active and involved, attended meetings with two or

15  three different presidents, attended meetings with various

16  ministers.  So he had been active so we thought he ought to be

17  a custodian.

18          Mr. Watson not only was the person in charge of

19  selling to the board the merger and has made numerous public

20  statements, specific statements on this case about the merits

21  referring to the lawyers, including present counsel as

22  criminals.  So we wanted to see evidence about what public

23  statements he has made.  So Ms. Endries signed interrogatories

24  with regard to the merger in Count Nine so we assumed she had

25  information about the merger so that is why we thought -- she

CCL6CHE3

1     was listed as a custodian.

2            THE COURT:  In your Exhibit 7 21 of 23 on the ECF

3     numbering, the ostensible justification for this request is

4     that Chevron as characterized the Lago Agrio case as sham

5     litigation and you then suggest that the reason you want the

6     information is because Chevron's assessment of potential

7     liability in Ecuador would be somehow relevant to be accurate

8     at the time of the acquisition would be somehow relevant to the

9     veracity of the sham litigation assertion.  That is the theory,

10    right?  Is that right?

11           MR. VESELKA:  That theory about how he assessed the

12    liability and/or how it might get resolved in order to reduce

13    that risk, yes.

14           THE COURT:  Well, that second part, that is not

15    anything you wrote here.

16           MR. VESELKA:  I did not.

17           THE COURT:  Maybe it is.  You referred to containing

18    the risk, which involves dealing with the Republic of Ecuador

19    and we have already covered that, right?

20           MR. VESELKA:  I now understand the Court has given a

21    ruling and we will get certain information about the dealings.

22           THE COURT:  Absolutely.

23           MR. VESELKA:  We will cover that.

24           THE COURT:  So we're now back to two things.  We're

25    back to somehow their assessment of the risk goes to the

CCL6CHE3

1    varsity of the assertions that it is a sham litigation and as

2    to that Mr. Mastro has singled about as strongly as he signals

3    things that they will define what they mean by "sham

4    litigation" and I rather imagine this one disappears to the

5    extent it rests on that theory.

6            Now, then the other question is the question of the

7    document custodians and what I am taking from this -- now the

8    document custodians with respect to the search for all the

9    documents, not just this one, right?

10           MR. JORALEMON:  Correct, your Honor.

11           THE COURT:  And what I am getting is there was an

12   agreed framework for what the scope of the search was to be in

13   responding to these document requests.  Did I understand that

14   correctly?

15           MR. JORALEMON:  I imagine anticipating Mr. Werdegar's

16   response would be a nonobjectionable framework that Chevron

17   since February has put out there and continued to abide by.

18   They haven't objected to it.

19           MR. VESELKA:  They said that is what they were doing

20   and we did not ever agree that would be the only custodians

21   because, well, we were going to look and see but we did not

22   object.

23           THE COURT:  What is it you were going to look and see?

24           MR. VESELKA:  We were going to see what came out of

25   that production first.

CCL6CHE3

1          THE COURT:  Before what?

2          MR. VESELKA:  Back at the time we thought things were

3    moving more quickly.

4          THE COURT:  I am sorry disappoint you.

5          MR. VESELKA:  No.  Because the parties trying to work

6    through this so far and with the various other motions that

7    came up, it got us off course.

8          MR. WERDEGAR:  The framework, your Honor, was here are

9    the proposed custodians we're willing to search for, here are

10   the repositories and the arrangement -- the working

11   understandings at our meet and confers has been you are

12   searching within here if either we in reviewing documents or

13   material determine that you are missing someone we think should

14   be on there, we get to ask you, we can have a discussion, you

15   don't have to agree, we can ask you to add to it.  And also if

16   they in their review also uncover, Hey, we missed someone in

17   our initial list, they have a good faith obligation to say,

18   Hey, we are going to add someone.  It was never meant to be the

19   exclusive list for all time.

20         THE COURT:  I see.  The guy that you never suggested

21   to them until Mr. Veselka six weeks ago served his document

22   request, and "you" I mean both of you, and who never occurred

23   to you by somebody who should have been on the list was the

24   CEO, that is the one you missioned, the CEO and the general

25   counsel?

CCL6CHE3

1            MR. WERDEGAR:  Well, your Honor, I don't think that is

2   entirely an accurate characterization as this played out.

3   Chevron's document production is ongoing and their production

4   of documents that documents other than them reproducing

5   materials they got in various 1782s only started happening

6   recently.  I think late October is when we first got Chevron

7   custodian materials.  So we haven't had an opportunity go

8   through all this stuff.  I think the concern was as the

9   discovery cutoff was arriving, we didn't make sure we had

10   covered our bases with respect to custodians because these

11   individuals were not on the list.

12            Now, they were served by the LAPs, but that was

13   concern driving it, is that these were not custodians listed.

14   We hadn't had the opportunity to fully review the production,

15   but we wanted to the make sure we had some coverage with

16   respect to these individuals.

17            MR. VESELKA:  And, your Honor, we want to get them in,

18   particularly address merger and they had these public

19   statements to various outside folks talking about the case

20   where they are characterizing the case we think sometimes

21   inappropriately.

22            THE COURT:  Well, I am sure they think everything you

23   guys have said is inappropriate, too.

24            MR. VESELKA:  That's right.

25            THE COURT:  I don't think we're going to have that

CCL6CHE3

1   litigation.

2           MR. VESELKA:  Not in this case.  So as to those topics

3   in the working assumption between the parties that we're

4   working on with regard to privilege is that so much of their --

5   the privilege work as opposed to outside statements or

6   statements outside of that is going to be exempt.  It was not

7   going to be a burden.  We're working on our protocol to have

8   their counsel's conversations in this case.  They wouldn't need

9   to bother at all.  It was not perceived as being burdensome.

10          MR. JORALEMON:  Your Honor, may I?

11          THE COURT:  Yes.

12          MR. JORALEMON:  Very briefly.  I am troubled by what

13  Mr. Werdegar has said and here is why:  Since February Chevron

14  has said to all defendants if you think someone should be on

15  the list, come to us and explain to us why you think they

16  should be on the list, specifically are they going to have

17  nonduplicative or cumulative materials that are not otherwise

18  privileged, and we'll consider it in good faith.  That has been

19  our standing offer.  It has been in the joint report submitted

20  to this Court.  It has been in our meet and confer

21  correspondence to the Donziger defendants throughout.  And now

22  I am here from Mr. Werdegar while those meet and confers were

23  going on, he was drafting the LAP's requests six weeks before

24  the close of fact discovery.  He didn't want to come to me and

25  say, Hey, we think Watson should be on the list.  That should

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CCL6CHE3

1    be in the LAP's request.

2              THE COURT:  Look, let's try the problem solvers not

3    problem creators.

4              MR. JORALEMON:  Yes.

5              MR. WERDEGAR:  Your Honor, that mischaracterized what

6    I just said.

7              THE COURT:  Enough of who shot John for now.

8              MR. VESELKA:  As to the merger, they were agreeing to

9    produce very limited -- people who he knew who were directly

10   involved in the merger we put on this list.

11             THE COURT:  Look, it is my working hypothesis that

12   this sham litigation argument is going to go away because you

13   are going to resolve it by virtue of Chevron stating more

14   specifically what their allegation is and what it isn't.  So to

15   the extent these requests are sought to be justified on the

16   ground that they go to the varsity of the sham litigation

17   argument, I am just not going to deal with it now.

18             The other statement in the document submitted by the

19   Lago Agrio claims is that they are looking for stuff about

20   containment of the risk through dealings with the Republic of

21   Ecuador.  It strikes me that the appropriate way of dealing

22   with that is to modify these requests to call for

23   communications with the Republic of Ecuador about how to

24   contain the risk of liability to Chevron as a result of Lago

25   Agrio litigation and for that purpose the universe of

CCL6CHE3

1   custodians would be Watson, Pate and Scott.

2          Now, I am sure nobody is happy with that and by in

3   this respect proposing to alter the list of custodians, I am

4   not necessarily rejecting the argument that Mr. Joralemon is

5   making about the manner in which discovery was being conducted,

6   but does that solve this problem in a way that everybody can

7   live with?

8          MR. VESELKA:  That certainly solves the problem from

9   210 down, your Honor.  They are the first things you are

10  dealing with.  Communications with the Chamber of Commerce and

11  ACTL are the dealings with them that led to Mr. Donahue -- he

12  issued a statement about some litigation that mischaracterized

13  this litigation in a way in trying to see whether Chevron had

14  mischaracterized anything.

15         THE COURT:  We'll deal with those after lunch.  Maybe

16  you can come up with a more eloquent solution.

17         MR. VESELKA:  Your Honor, the Donziger motions is

18  concluded.  I am asking if I can be excused to try it make my

19  airplane.  I don't think I need to weigh in on anything

20  further.

21         THE COURT:  That is your call.  If you wish to be, you

22  are.  I wish you very happy holiday and a good New Years'.

23         MR. MASTRO:  Thank you, your Honor.  Mr. Joralemon

24  will be here this afternoon.  So happy holidays to you.

25         THE COURT:  Everybody is heading for the country.

CCL6CHE3

1           MR. MASTRO:  Your Honor, I am not actually.  I am

2      heading to the U.S. Attorney's Office.

3           THE COURT:  Okay.

4           MR. WERDEGAR:  When are you planing to reconvene?

5           THE COURT:  Thank you.  I am going to shoot for 2:00.

6           MR. MASTRO:  Thank you, your Honor.

7           MR. WERDEGAR:  If I am not here, your Honor, happy

8      holidays.

9           (Luncheon recess)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CCLAACHE4                    Hearing

AFTERNOON SESSION

2:05 p.m.

1

2

3        THE COURT:  OK.  Well, we've certainly lost the

4   audience.  I don't know.  It must be me.  What's up, guys?

5        MR. VESELKA:  The two remaining on Exhibit 7 that

6   you've not already dealt with are 208 and 209, we will withdraw

7   those, your Honor.

8        THE COURT:  Well, that's a solution.  Good.

9        MR. VESELKA:  And that's everything.

10       THE COURT:  That's everything.  Well, excellent.  So

11   we have --

12       MR. JORALEMON:  Your Honor, yes.

13       THE COURT:  So, we have a qualification.

14       MR. JORALEMON:  Yes.  A minor qualification about

15   Exhibit 7 and this relates to the custodial issue.

16       THE COURT:  You resolved that point between you.

17       MR. JORALEMON:  Well, the Court resolved it, actually,

18   in the problem solving mode.  And we appreciate that effort and

19   the limited focus of extolling documents with respect to

20   Messieurs Page, Watson and Scott.

21       I just wanted to note for the record, your Honor,

22   really express a concern that what Chevron does not what to

23   have happen is have this be a toll hold by which defendants

24   unravel the nine month frame framework under which we were

25   operating where we had said back in March this is the universe.

CCLAACHE4                    Hearing

1    This is what we're searching.  If you have a good faith basis

2    to go beyond that for non duplicative stuff, we'll consider it.

3    So, I just wanted to sort of flag that issue for counsel and

4    for your Honor.

5            MR. VESELKA:  We had looked as preparedly and these

6    were the ones that we found that and that's why to get them in

7    we got them in.  We're not looking to go look for others.  So,

8    I understand and we agree that that's the concept of where we

9    are.

10           THE COURT:  OK.  Excellent.  OK.  I think that does

11   it.  Well, I repeat my expressions of appreciation from this

12   morning.  I wish everybody a wonderful Christmas or whatever

13   you celebrate and the happiest and best possible new year.

14           MR. JORALEMON:  Thank you, your Honor.

15           Just one personal note.  Some 15 years ago my first

16   court appearance as an attorney was before your Honor, so it

17   was great to be back here today.  I imagine that appearance was

18   more memorable for me than it was for you.

19           THE COURT:  I could dissemble and say that I remember

20   it vividly but everybody would know that I was dissembling.  So

21   I certainly won't even think of it.  But one of the nice things

22   about doing what I do is that one sees a great many very bright

23   young lawyers starting in the profession and maturing and

24   gaining skills and judgment and talent.  And I have no doubt

25   based on the last couple of days think that is true in your

CCLAACHE4                    Hearing

1    case as it is in some others.  So thank you all.

2                           (Adjourned)