UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CHEVRON CORPORATION,

                Plaintiff,

              -against-                                          11 Civ. 0691 (LAK)

STEVEN DONZIGER, et al.,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION
## (CORRECTED)

Appearances:

Randy M. Mastro
Andrea E. Neuman
Kristen L. Hendricks
Scott A. Edelman
William E. Thompson
GIBSON, DUNN & CRUTCHER, LLP
*Attorneys for Plaintiff*

John W. Keker
Elliot R. Peters
Christopher J. Young
Jan Nielsen Little
Matthew M. Werdeger
Nikki H. Vo
Paula L. Blizzard
William S. Hicks
KEKER & VAN NEST, LLP
*Attorneys for Donziger Defendants*

Julio C. Gomez
JULIO C. GOMEZ, ATTORNEY AT LAW LLC

Tyler G. Doyle
Craig Smyser
Larry R. Veselka
Christina A. Bryan
Garlard D. Murphy, IV
SMYSER KAPLAN & VESELKA, L.L.P.

*Attorneys for Defendants Hugo Gerardo, Camacho
Naranjo and Javier Piaguaje Payaguaje*

Benjamin H. Green
Michael Erik Sims
Stuart Alan Krause
ZEICHNER ELLMAN & KRAUSE LLP

Gordon Mehler
LAW OFFICES OF GORDON MEHLER, P.L.L.C.

Jessica R. Torbin
Joe L. Silver
Martin Beier
SILVER & DEBOSKEY, A PROFESSIONAL
CORPORATION

*Attorneys for Stratus Consulting, Inc.*

2

LEWIS A. KAPLAN, *District Judge.*

Plaintiff Chevron Corporation ("Chevron") moved for a protective order preventing defendants from disclosing two witness declarations that have been filed under seal, from revealing or identifying information concerning the witnesses, except to counsel of record who have appeared in this action.  The dispute that gave rise to the motion concerned principally whether the protection available under a previous protective order should be expanded to include, among other restrictions, the prohibition of disclosure of the witnesses' identities and statements to Ecuadorian counsel in the Lago Agrio litigation, among others.

On February 14, 2013, the Court granted Chevron's motion in significant part and entered a protective order barring defendants from disclosing either of the Doe declarations, or any identifying information about Doe 1 or Doe 2 that has been redacted from other declarations, to anyone other than counsel of record in this action except with prior leave granted on notice to plaintiff and upon such conditions as the Court may impose (the "February 14 order").[1]  This opinion explains the reasons for the Court's action, amplifies its findings, and establishes a framework for additional tailoring to the order, should that prove appropriate, to ensure that the restriction on public access is no broader than is necessary.

*Background*

In order to understand the context of this motion, it is essential to have some of the

---

[1]     DI 802.  The order is being modified in one respect by a separate filing today.

3

complex background of this case.

*The Ecuadorian Judgment and this Litigation*

An Ecuadorian court has entered an $18.2 billion judgment (the "Judgment") against Chevron Corporation ("Chevron")[2] in an action brought by 47 individuals referred to as the Lago Agrio Plaintiffs (the "LAPs"), two of whom, Hugo Gerardo Camacho Naranjo and Javier Piaguaje Payaguaje (the "LAP Representatives"), have appeared in this action.[3]

Chevron brought this action against the LAPs, their lead U.S. attorney, Steven Donziger, and his law offices, and others involved in the Lago Agrio litigation.[4]  It claims in part that the Judgment is the product of fraud and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO").  The RICO and, to some extent, the fraud claims rest on allegations that Donziger, a New York lawyer, and others based in the United States, here conceived, substantially executed, largely funded, and significantly directed a scheme to extort[5] and defraud Chevron by,

---

[2]      DI 168 (Lago Agrio Judgment).

[3]      The other LAPs have defaulted and are not defending against this action.  Hendricks Decl. [DI 206] ¶ 15 & Ex. 16 (Clerk's certificate).

[4]      Chevron alleges also that various "co-conspirators" were part of the RICO enterprise, but they are not named as defendants.

[5]      Amended complaint ("Cpt.") ¶ 1 (alleging that defendants "sought to extort defraud, and otherwise tortiously injure plaintiff Chevron by means of a plan they conceived and substantially executed in the United States."); *id.* ¶ 2 ("The enterprise's ultimate aim is to create enough pressure on Chevron in the United States to extort it into paying to stop the campaign against it.").

4

among other things, (1) bringing the Lago Agrio case;[6] (2) fabricating (principally in the United States) evidence for use in that lawsuit and corrupting and intimidating the Ecuadorian judiciary in order to obtain a tainted judgment;[7] (3) exerting pressure on Chevron to coerce it to pay money not only by means of the Lago Agrio litigation and judgment, but also by subjecting Chevron to public attacks in the United States and elsewhere based on false and misleading statements;[8] (4) inducing U.S. public officials to investigate Chevron;[9] and (5) making false statements to U.S. courts and intimidating and tampering with witnesses in U.S. court proceedings to cover up their improper activities.[10]  The LAPs reportedly are pursuing proceedings to enforce the Judgment in at least Canada, Brazil, and Argentina, this being consistent with an apparent strategy "to pursue an aggressive world-wide enforcement strategy in order to obtain settlement leverage over Chevron."[11]

---

[6]

Id. ¶ 3.

[7]

E.g., id. ¶ 145 ("Back in the United States, preparations were well underway for drafting Cabrera's report [the report of a supposedly independent, court-appointed expert]."); id. ¶ 151 ("While Stratus [LAP environmental consultant] was the primary coordinator of the . . . Cabrera Report, other members of the [LAP's] U.S.-based team of experts . . . also contributed to the report without attribution in the report or disclosure to Chevron."); id. ¶¶ 353–56; Mastro Decl. [DI 746] Ex. C (hereinafter "Guerra Decl.").

[8]

Cpt. ¶ 214.

[9]

Id. ("And they have taken this pressure campaign to U.S. state and federal agencies, seeking their falsely induced assistance in this racketeering scheme."); id. ¶ 216.

[10]

Id. ¶¶ 273–77, 291–300, 311–16.

[11]

Chevron Corp. v. Donziger, 768 F. Supp.2d 581, 622–24 (S.D.N.Y. 2011), rev'd on other grounds sub nom. Chevron Corp. v. Naranjo, 667 F.3d 232 (2d Cir. 2012), cert. denied, 133 S.Ct. 423 (2012).

*The New Evidence – The LAPs' Alleged Bribery of Ecuadorian Judge*

The most recent development in this saga set the stage for Chevron's motion.  On January 28, 2013, Chevron submitted a declaration of Alberto Guerra Bastidas, a former judge of the Provincial Court of Sucumbios, Ecuador,[12] the Court that rendered the Judgment, and at one time the judge assigned to the case against Chevron.   In summary, Guerra states that the LAPs' counsel – Pablo Fajardo and Donziger – bribed the judge who signed the Ecuadorian Judgment to obtain their desired result and, in fact, supplied him with the decision, which the LAPs had written in all important respects.

Turning to the details, Guerra's declaration, which is corroborated in some particulars by other publicly filed declarations,[13] states that when Judge Nicholas Zambrano[14] was assigned the Chevron case, he asked Guerra "to get in touch with the attorneys for Chevron in order to negotiate an agreement by which the company would pay Mr. Zambrano and [Guerra] for issuing the final

---

[12]

Mr. Guerra was dismissed as a judge in 2008, ostensibly for private statements to the effect that the case against Chevron should be dismissed.  He avers, however, that the real reason for his dismissal was his confrontation of two judges who later served on the Chevron case "regarding several dubious and illegal rulings that had issued in the proceedings, and regarding their practice of asking the settling experts for 25 percent of their fees in consideration for having them appointed as such."  Guerra Decl. ¶ 6.

[13]

Mastro Decl. [DI 746] Ex. E (hereinafter "Callejas Decl."); *id.* Ex. F (hereinafter "Racines Decl."); *id.* Ex. G (hereinafter "Campuzano Decl."), *id.* Ex. H (hereinafter "Carvajal Decl.").

[14]

Judge Zambrano reportedly was removed from the bench after rendering the decision against Chevron "for releasing a suspected drug trafficker in an act of 'obvious negligence or an inexcusable mistake."  Eduardo Garcia and Alexandria Valencia, *Chevron Hopes to Benefit from Ecuador's Judge Dismissal*, REUTERS (Mar. 12, 2012) (available at http://www.reuters.com/article/2012/03/09/ecuador-chevron-idUSL2E8E9ETI20120309) (last visited Feb. 17, 2013).

judgment in Chevron's favor."[15]  Guerra obliged, but Chevron rejected the overture.  So Judge Zambrano, who had told Guerra that he already had reached an agreement with the LAPs' representatives "to quickly move the case along in their favor," suggested that Guerra meet with the LAPs' Ecuadorian lawyer, Fajardo.[16]  Guerra then met with Fajardo.  They discussed the fact that Guerra already had an arrangement with Zambrano pursuant to which Guerra wrote Zambrano's decisions in civil cases.  Guerra and Fajardo then agreed that (1) Guerra would make the Chevron case move quickly, (2) "Chevron's procedural options would be limited by not granting their motions on alleged essential errors in rulings [Guerra] was to write," and (3) the LAPs' "representatives would pay [Guerra] approximately USD $1,000 per month for writing the court rulings Mr. Zambrano was supposed to write."[17]

This arrangement is said to have continued until Judge Zambrano was replaced on the Chevron case by a Judge Ordoñez.[18]  In time, however, a motion to recuse Judge Ordoñez in the Chevron case came before Judge Zambrano, which the latter allegedly "saw . . . as an opportunity to once again take control of the Chevron case, and asked [Guerra] to help him write the court ruling sustaining Judge Ordoñez's disqualification from the case."[19]  Judge Zambrano allegedly "saw this as

---

[15]     Guerra Decl. ¶ 12.

[16]     *Id.* ¶ 13.

[17]     *Id.*

[18]     *Id.* ¶ 20.

[19]     *Id.* ¶ 21.

an opportunity to once again approach Chevron's attorneys to see if they were willing to pay to have the case decided in their favor."[20]  He dispatched Guerra to explore that possibility, but Chevron again rejected the overture.[21]

At that point, Judge Zambrano, according to Guerra, "suggested and authorized [Guerra] to seek an agreement with the Plaintiffs' representatives so that they could obtain a verdict in their favor, in exchange for a payment of at least USD $500,000 to Mr. Zambrano; and whatever amount [Guerra] could negotiate or agree to for [himself].  The proposal entailed Plaintiffs writing a draft of the judgment and Judge Zambrano signing it and issuing it as his own."[22]  Guerra took the offer to Fajardo, who expressed interest and said that he would discuss it with Donziger.  Later, Guerra received a call from Fajardo who asked him to a meeting with himself, Donziger, and Luis Yanza.[23] At that meeting, Guerra summarized the proposal.  Donziger replied that they, the LAPs, did not then have that sum of money.  Subsequently, however, Zambrano told Guerra that he had been in direct contact with Fajardo and that "the Plaintiffs' representatives had agreed to pay him USD $500,000 from whatever money they were to collect on the judgment, in exchange for allowing them to write

---

[20]

  *Id.*¶ 22.

  Judge Zambrano was appointed to replace Judge Ordoñez on the Chevron case in the fall of 2010.  Carvajal Decl. ¶ 3.

[21]

  Guerra Decl. ¶  22.

[22]

  *Id.* ¶ 23.

[23]

  Yanza is the co-founder of the Amazon Defense Front ("ADF"), a non-profit organization that purports to represent the LAPs, and the general manager of Selva Viva, an Ecuadorian company that administers funds for the Lago Agrio litigation.

the judgment in Plaintiffs' favor."[24]   Zambrano told Guerra that he would share the money with Guerra.[25]

Guerra then resumed his role as Judge Zambrano's ghostwriter.  When it came to the final judgment, however, Guerra relates that his role changed somewhat.  About two weeks before the Judgment was issued, "Zambrano gave [Guerra] a draft of the judgment [that had been written by the attorneys for the plaintiffs and delivered to Zambrano] so that [Guerra] could revise it."  Zambrano asked Guerra "to work on the document to fine-tune and polish it so it would have a more legal framework."[26] He did so at Zambrano's residence using Fajardo's computer.[27]  He made few changes, making "it seem more like a judgment issued by the Sucumbios [*i.e.*, Lago Agrio] court."[28]

When Guerra was through, he returned the document to Zambrano, which "was not too different from the one the Plaintiffs had given him."  Zambrano told him that the LAPs' lawyers made changes to the judgment "up to the very last minute before it was published."[29]

As noted, Guerra's account is corroborated in a number of respects by other

---

[24]   Guerra Decl. ¶ 23.

[25]   *Id.*

[26]   *Id.* ¶ 25.

[27]   *Id.*

[28]   *Id.* ¶¶ 26–27.

[29]   *Id.* ¶ 28.

declarations that recently were filed publicly.[30]

*This Court's Previous Rulings With Respect to the Fraud Allegations*

Even before the Guerra declaration was filed, Chevron had presented substantial evidence of fraud in the procurement of the Judgment.  In this regard, the Court incorporates by reference its July 2012 decision on Chevron's motion for partial summary judgment.[31]  Pertinent highlights are that this Court then concluded, on a record less complete than now is before it, that there was no genuine issue of fact as to at least the following:

- Donziger and Fajardo, the LAPs' principal Ecuadorian lawyer, coerced an Ecuadorian judge to (1) terminate the judicial inspections that previously had been ordered, (2) substitute a single global inspection to determine the extent of the alleged environmental damage, and (3) select a "global expert" chosen by the LAPs, Richard Cabrera, to conduct it.  They did so by threatening the judge with the filing of a misconduct complaint if he failed to comply with their wishes.

- The report that Cabrera ultimately rendered:

  "was not entirely or even predominantly his own work or that of any assistants or consultants working only for him.  There is no genuine issue with respect to the facts that the LAP team secretly prepared his work plan, worked closely

---

[30]

     *See generally* Callejas Decl.; Racines Decl.; Campuzano Decl.; Carvajal Decl.

[31]

     *See Chevron Corp. v. Donziger*, — F.Supp.2d —, 2012 WL 3538749 (S.D.N.Y. July 31, 2012).

with him in carrying it out, and drafted most of the report and its annexes.  Nor is there any genuine issue regarding the fact that the LAP team then publicly objected to the very report that they, in large part, secretly had drafted as 'unjustly favorable to [Chevron]' and 'too conservative' in its damage assessment.  The answers filed by Cabrera in response to the LAPs' (and Chevron's) objections – like the report itself – were drafted at least in substantial part by the LAP team and written to read as if Cabrera had written them.  This uncontradicted evidence demonstrates that the report and subsequent responses filed in Cabrera's name were tainted by fraud."[32]

- Portions of the Judgment, which supposedly had been written by Judge Zambrano, in fact were substantially identical to an internal memo prepared for the LAPs that was not part of the Ecuadorian court record.[33]  Thus, at least part of the decision was written by the LAPs and adopted unchanged by the judge, all in secret.  This conclusion, of course, preceded the Guerra declaration, which if true makes clear that the LAPs bribed Zambrano and Guerra to adopt a judgment written by the LAPs.

- The Judgment, although professing that it did not consider the Cabrera report, in fact relied on it at least to some extent.[34]

*Fraud Findings By Other Courts*

Nor is this Court alone in finding substantial evidence of fraud.

Chevron, the LAPs, and others have been litigating Section 1782 and other discovery

---

[32]   *Chevron Corp.*, 2012 WL 3538749, at *33 (footnote omitted).

[33]   *Id.* at *31.

[34]   *Id.* at *33.

11

proceedings before other district courts around the country for well over a year.  Persons resisting

disclosure to Chevron in these proceedings, including the LAPs, typically have asserted claims of work

product protection and attorney client privilege.  Chevron has countered that any work product

protection or attorney-client privilege has been overcome by the crime-fraud exception.

At this writing, at least six other federal district courts have concluded – all preceding

the filing of the Guerra declaration and related materials – that Chevron established a *prima facie* case

of fraud with respect to the procurement of the Judgment.[35]


*The Subjects of the Protective Order Motion*

Guerra obviously is an important witness in this case.  He claims that he was on the

inside of a corrupt conspiracy to fix the case against Chevron and now says that he has revealed

internal workings of the conspiracy.

In any case with a witness of this sort, one expects an attack on credibility.  And just

as in any other such case, corroboration of the witness's story can be very important.

Among the evidence that Chevron has submitted is declarations of two witnesses, Doe

1 and Doe 2, which have been filed under seal and made available only to the Court and counsel of

record in this action.  Both witnesses reside in Ecuador.  Both fear reprisals against their families and

---

[35]
*See Chevron Corp. v. Champ*, No. 10-mc-27, 2010 WL 3418394, at *6 (W.D.N.C. Aug. 30, 2010); *In re Applic. of Chevron Corp.*, No. 10-cv-1146-IEG, 2010 WL 3584520, at *6 (S.D. Cal. Sept. 10, 2010); *In re Applic. of Chevron Corp.*, 633 F.3d 153, 166 (3d Cir. 2011); Transcript of Hearing at 43:13–44:16, *In re Applic. of Chevron Corp.*, No. cv-10-2675 (D.N.J. June 11, 2010), DI 33; *Chevron Corp. v. Salazar*, 275 F.R.D. 437, 442 (S.D.N.Y. 2011); Transcript of Hearing at 56:23–58:10, *Chevron Corp. v. Page*, No. RWT-11-1942 (D. Md. Jan. 25, 2013).

12

themselves.   One of the declarations contains information that, if credited, would substantially corroborate Guerra.  The other offers more modest corroboration but contains important information regarding the risk of reprisals against these and other witnesses.

*Discussion*

Defendants say that Federal Rule of Civil Procedure 26(c) authorizes the relief sought here on a showing of "good cause."  In any case, "[i]t is . . . fundamental that '[e]very court has supervisory power over its own records and files,'"[36] that it may seal them and prevent their disclosure in appropriate circumstances,[37] and that all such actions are informed by presumptions of public access to judicial records under the common law and the First Amendment.  The Court begins from these premises.

---

[36]

*Gambale v. Deutsche Bank AG*, 377 F.3d 133, 140–41 (2d Cir. 2004) (quoting *Nixon v. Warners Comm'ns, Inc.*, 435 U.S. 589, 598 (1978)).

[37]

*E.g.*, *Bridge C.A.T. Scan Assoc's v. Technicare Corp.*, 710 F.2d 940, 945 (2d Cir. 1983); *Int'l Prods. Corp. v. Koons*, 325 F.2d 403, 407–08 (2d Cir. 1963) ("Whether or not the Rule itself authorizes so much of the order as also seals all affidavits submitted by defendants on various motions, we have no question as to the court's jurisdiction to do this under the inherent 'equitable powers of courts of law over their own process, to prevent abuses, oppression, and injustices,' *Gumbel v. Pitkin*, 124 U.S. 131, 144, 8 S.Ct. 379, 31 L.Ed. 374 (1888); *Parker v. Columbia Broadcasting System*,[], 320 F.2d [937,] 938 [(2d Cir. 1963)].").

13

*Good Cause*

As an initial matter, and putting to one side for the moment the presumptions of public access, district courts may issue protective and sealing orders to protect a party or person from "annoyance, embarrassment, oppression, or undue burden or expense,"[38] not to mention even graver concerns. Here, the disclosure of the identities of the Does to the LAPs and, especially their Ecuadorian counsel and allies, particularly at this juncture, would entail serious risks.

*The LAPs' Ecuadorian Counsel and Allies*

Several considerations bear on the risk of disclosure to the LAPs and their Ecuadorian counsel and allies.

*Refusal to Recognize or Comply With Orders of this Court*

First, although Fajardo, Yanza, and all of the LAPs are defendants in this action, were duly served with process, all – save for the two LAP Representatives – have defaulted, thus waiving any jurisdictional defenses. Fajardo, Yanza, the ADF, and forty-five of the LAPs do not recognize either the jurisdiction of this Court or the binding effect of its orders.[39] Fajardo and others repeatedly

---

[38] The burden of establishing good cause then is on the party seeking relief. *Gambale v. Deutsche Bank AG*, 377 F.3d 133, 142 (2d Cir. 2004).

[39] *See, e.g.*, Champion Decl. [DI 770] Ex. 2, at 2 (Fajardo "stated that Judge Kaplan does not have jurisdiction over the non-American lawyers or plaintiffs, and therefore he felt no obligation to comply with his order" granting the preliminary injunction.).

have refused to cooperate in discovery.[40]  There is no reason to believe that they would comply with any restrictions that might be placed on their use of information regarding the Does or their other actions if the information were released either to the public generally or to these individuals in particular.

*Threats to Other Witnesses*

Second, Yanza and Fajardo already have threatened two other Chevron witnesses – Guerra and Reyes[41] – with slander suits and criminal prosecution based on their submission of evidence in this Court.[42]  As previously determined, there is no genuine issue of material fact that

---

[40]

For example, despite the Court's ruling in the Count 9 Action (11 Civ. 3718) that the LAPs' attorneys were agents for their clients and that the LAP Representatives therefore were obliged to produce all documents in their custody or control, Fajardo, Yanza, and others persisted in their refusal to produce a single responsive document, claiming that Ecuadorian law prevents them from doing so.  *See* DI 562, 563.  Most recently, when Chevron noticed the deposition of Pablo Saenz – one of the LAPs' Ecuadorian lawyers – counsel for the LAPs informed Chevron that Saenz refused to make himself available for deposition.  *See* Champion Decl. [Ex. 770] Ex. 4; *see also* DI 778.

[41]

Ramiro Fernando Reyes Cisneros ("Reyes") is an Ecuadorian petroleum and environmental engineer who claims that he was asked by Donziger and Fajardo to serve as the "independent" court-appointed global expert.  After the team settled on Cabrera instead, Reyes claims to have been present at a meeting with Fajardo, Donziger, and Yanza during which they "dropped any pretense that Mr. Cabrera would act independently in writing an expert report that would be technically sound and executed according to professional standards."  Mastro Decl. [DI 658] Ex. 3014 (Reyes Decl.).

[42]

Neuman Decl. [DI. 796] Ex. 11, at 6 (Yanza – "we're going to file legal actions against the, uh, former judge, uhm, of the Court [Guerra] and Mr. Reyes . . . because what they're saying and doing is really, uh, slanderous or – or serious crimes *that affect the leaders, the case and the very government of Ecuador*") (emphasis added); Ex. 12 (Fajardo - "We'll file a criminal claim [against Guerra] here in Ecuador so that [he] will come and answer for a felony").

Fajardo participated in coercing an Ecuadorian judge to terminate the judicial inspections and appoint Cabrera as the global expert by threatening the judge with a disciplinary complaint.  In addition, as the foregoing shows, there is substantial evidence that at least Fajardo and Yanza bribed the trial judge in order to obtain a judgment favorable to the LAPs.  According to Guerra, both Fajardo and Yanza personally participated in the meeting at which the bribery proposal was put to the plaintiffs by Guerra and it was Fajardo who later is said to have conveyed the counteroffer of the LAP Representatives for the corrupt bargain that Zambrano allegedly accepted.  Now that Guerra's declaration is on the public record, Fajardo, Yanza, and their associates have enormous personal and economic stakes in attempting to protect themselves and the Judgment by attacking Guerra and anyone whose testimony could corroborate Guerra.  And Fajardo has made clear that the LAP team closely monitors "people tied to Chevron" like Guerra and Reyes, so they can "know what they're doing and where they're traveling frequently."[43]  Fajardo admitted, for example, that they found out about prior activities of Guerra by "ask[ing] for the information – the migration movements of Mr. Guerra . . . where he goes, and where he can be" found.[44]

While the question whether Guerra's account is accurate will be decided on another day, the threats by Yanza and Fajardo against Reyes and Guerra as well as Fajardo's undisputed role in coercing the judge with respect to the judicial inspections and Cabrera's appointment, the persistent obstruction of discovery in this case, and virtually the entire record evidence a substantial risk that

---

[43] Champion Decl. [DI 759] Ex. 3, at 4.

[44] *Id.* at 4–5.

Fajardo, Yanza, and their associates would attempt to coerce, intimidate, and initiate reprisals against the Does if they learned their identities.

### Intimidation of the Ecuadorian Courts

Third, the LAPs' strategy in Ecuador, at least until they bribed Judge Zambrano if indeed that is what occurred, was to intimidate the judiciary in order to obtain the result they wanted.

We have seen already that the LAPs, through Fajardo, brought pressure to bear on the Lago Agrio judge to secure adoption of their proposal for a global assessment and the selection of Cabrera as the court-appointed expert. But they did not stop there.

Donziger has served as the field general in what he describes in the *Crude* outtakes[45] as a "political battle . . . being played out through a legal case,"[46] a view that dovetails with his assessment of the Ecuadorian court system as corrupt and driven by politics.  Donziger, Fajardo, Yanza, and the ADF have made determined efforts to intimidate the Ecuadorian judiciary.  According to Donziger, it has been important to mobilize the country politically "so that no judge can rule against [the plaintiffs] and feel like he can get away with it in terms of his career."[47]  Donziger directed a member of the LAPs' legal team to "prepare a detailed plan with the necessary steps to attack the judge

---

[45]

       A discussion of the film *Crude* and the outtakes is found in *In re Chevron Corp.*, 749 F. Supp. 2d 141, 146 (S.D.N.Y. 2010) *aff'd sub nom. Lago Agrio Plaintiffs v. Chevron Corp.*, 409 F. App'x 393 (2d Cir. 2010).

[46]

       Hendricks Decl., [DI 41, No. 10–MC–00002 (LAK) ] (hereinafter "Hendricks Decl. I") Ex. A, CRS–060–00–04.

[47]

       *Id.*, CRS–032–00–01.

through legal, institutional channels and through any other channel [he could] think of."[48]   One

example, depicted in part in *Crude*, shows Donziger and other LAP representatives traveling to an *ex*

*parte* meeting with a judge on March 30, 2006.  Prior to the meeting, Donziger described his plan to

"intimidate," "pressure," and "humiliate" the judge:

> "The only language that I believe this judge is gonna understand is one of pressure,
> intimidation and humiliation.  And that's what we're doin' today.  We're gonna let him
> know what time it is. . . .  As a lawyer, I never do this.  You don't have to do it in the
> United States.  It's, it's dirty.  I hate it, hate it, but it's necessary.  I'm not lettin' 'em
> get away with this stuff."[49]

Donziger further explained to the film maker's camera that:

> "[T]he judicial system [in Ecuador] is so utterly weak.  Like, the only way that you can
> secure a fair trial is if you do things like that.  Like go in and confront the judge with
> media around.  And fight, and yell, and scream, and make a scene.  And, you know,
> that would never happen in the United States.  That would never happen in any judicial
> system that had integrity."[50]

> "They're all [i.e., the Ecuadorian judges] corrupt!  It's—it's their birthright to be
> corrupt."[51]   "You can solve anything with politics as long as the judges are intelligent
> enough to understand the politics. . . .  [T]hey don't have to be intelligent enough to
> understand the law, just as long as they understand the politics."[52]

> "[I]t's a problem of institutional weakness in the judiciary, generally, and of this court,

---

[48]

Hendricks Decl., [DI 6, No. 11 Civ. 0691 (LAK)] (hereinafter "Hendricks Decl. II") Ex. 96.

[49]

Hendricks Decl. I Ex. A, CRS–052–00–06.  This is not the first time that Donziger deployed
such a strategy.  When an Ecuadorian judge would not allow Donziger to appear in court
because he did not have his passport.  Donziger instructed an Ecuadorian attorney to lie and
say that the judge called Donziger a "gringo."  *Id.*, CRS–046–02–01.

[50]

*Id.*, CRS–053–02–01.

[51]

*Id.*, CRS–053–02–03.

[52]

Hendricks Decl. II Ex. 1, CRS–129–00–02.

in particular. . . .  We believe they make decisions based on who they fear the most, not based on what the laws should dictate."[53]

In addition, among the events filmed by the crew was a conversation between Donziger and Fajardo in which the two discussed the need to "be more and more aggressive" and to "organize pressure demonstrations at the court."  In the same clip, Donziger referred to the litigation as a "matter of combat" that requires "actually  . . .  put[ting] an army together."[54]

The *Crude* outtakes captured a June 6, 2007 meeting in which Donziger outlined a strategy to pressure the Ecuadorian court.  Donziger told those present that the LAPs needed to "do more, politically, to control the court, to pressure the court" because Ecuadorian courts "make decisions based on who they fear most, not based on what the laws should dictate."[55] Donziger expressed concern that no one feared the plaintiffs, and he stated that the plaintiffs would not win unless the courts began to fear them.[56]  He described also his desire to take over the court with a massive protest as a way to send a message to the court of "don't fuck with us anymore—not now, and not—not later, and never."[57] He then proposed raising "our own army" to which Yanza interjected "a

---

53

        Hendricks Decl. I Ex. A, CRS–350–04–01.

54

        *Id.*, CRS–346–00–02.

55

        *Id.*, CRS–350–04–01.

56

        *Id.*

57

        *Id.*

specialized group . . . for immediate action."[58]  The conversation about raising an army to pressure

the court then continued, with Yanza waving the camera away as he told Donziger that the "army"

could be supplied with weapons.[59]

Two days later, speaking directly to the camera, Donziger continued to emphasize the

importance of pressuring the judge in the Lago Agrio litigation.  According to Donziger, the plaintiffs'

"biggest problem" to that point had been their inability to pressure the judge.  He explained that suing

Chevron for moral damages or pressuring the Prosecutor General to open criminal investigations was

not sufficient to make the judge feel pressure.[60]  Donziger asserted that the plaintiffs needed to do

things that the judge would "really feel" such as having the president of the country or the supreme

court "call[] him out," implying that Donziger and others could develop strategies that would result

in such actions.  Later that month, Donziger asked Berlinger and his crew to film the LAPs' "private

'army,'" which he characterized as being "very effective" because "it followed a Texaco lawyer into

the judge's chambers and had a confrontation" "a critical part of [the] strategy . . . allowing the case

to go forward . . . ."[61]

Finally, Donziger participated in a dinner conversation about what might happen to a

judge who ruled against the LAPs. One or more other participants in the conversation suggested that

---

[58]

   *Id.*, CRS–350–04–02.

[59]

   *Id.*

[60]

   *Id.*, CRS–376–04–01.

[61]

   Hendricks Decl. II Ex. 99, at 1.

a judge would be "killed" for such a ruling. Donziger replied that the judge "might not be [killed], but he'll think—he thinks he will be  . . . [w]hich is just as good."[62]   The comment reveals at least Donziger's desire to benefit from fear engendered in the Ecuadorian judges.

In sum, there is ample evidence that the LAPs' counsel in the Lago Agrio case and allies deliberately pursued a strategy of intimidation and coercion aimed at the judiciary at least until the point at which they are alleged to have bribed the trial judge, thus perhaps making further intimidation unnecessary.

### *The Alliance Between the LAPs and the Ecuadorian Government and the Consequent Risks to the Does*

#### *The Reopening of Closed Criminal Allegations at the LAPs' Instance*

The *Crude* outtakes include a brief interview with Donziger on his way to President Correa's January 2007 inauguration.  For present purposes, it is relevant that Donziger boasted that President Correa's inauguration was a potentially "critical event" for the outcome of the Lago Agrio litigation.  Soon thereafter, Donziger explained that the LAPs and the ROE had "been really helping each other"[63] and discussed the importance of working his contacts in the new government.[64]  A short time later, the LAPs, in a radio segment, named TexPet's attorneys and accused them of being "accomplices," "Ecuadorians who are more interested in making money than on showing solidarity

---

[62]       Hendricks Decl. I Ex. A, CRS–129–00–02.

[63]       Hendricks Decl. I Ex. I, CRS–163–02–02.

[64]       *Id.*

towards their fellow countrymen whose lives are in peril."[65]

      This campaign continued. The outtakes show Donziger and others planning a press conference to pressure the Prosecutor General to bring criminal charges.[66]  On the following day, Donziger asked that posters be made of "Texaco's four accomplices,"[67] including Pérez and Veiga—posters that later were displayed at a press conference and a demonstration.

      In March 2007, President Correa pledged his full support for the LAPs.[68]  He followed that pledge with a meeting with Yanza.  In a telephone conversation on or about April 23, 2007, Yanza reported to Donziger and Fajardo on a conversation he had had with President Correa.  To the extent that his report may be gleaned from the outtakes, Yanza told Donziger that President Correa had an interest in learning more about the alleged environmental harm and "fraud . . . in the field."[69]  He added to Donziger that President Correa "insist[ed]" that he continued to "[think] about doing something in the Prosecutor's Office."[70]  A day or two later, Yanza again reported to Donziger and Fajardo,

---

65

     *Id.* Ex. 17.

66

     Hendricks Decl., [DI 14, No. 10–MC–00002] (hereinafter "Hendricks Decl. III") Ex. 2, CRS–198–00–04.

67

     Hendricks Decl. I Ex. A, CRS–204–01–02.

68

     Dans Decl., [DI 40, No. 10–MC–00002 (LAK)] (hereinafter "Dans Decl.") Ex. 12.

69

     *Id.* Ex. 2, CRS–248–03–01.

70

     *Id.*

asserting on that occasion that Yanza had "coordinat[ed] everything" with President Correa.[71]

Within a few days, President Correa, Yanza, Fajardo, and others boarded a government helicopter together to tour the Oriente region.[72] In a voiceover in *Crude,* Donziger bragged: "We have achieved something very important in the case. We are now friends with the President." That "friendship" immediately became apparent. On the same day as his visit to the Oriente region, President Correa issued a press release "urg[ing] the Office of the Prosecutor to permit the Prosecution of the Petroecuador officials who accepted the remediation carried out by Texaco."[73]

The fact that there was no mention of the TexPet lawyers apparently bothered Donziger. In a telephone conversation the next day that was captured in the *Crude* outtakes, Donziger said that "perhaps it is time to ask for the head of Pérez Pallares—given what the President said."[74] On the following day, President Correa broadcast a call for the criminal prosecution of "Chevron–Texaco . . . '*homeland-selling lawyers*'" in addition to the prosecution of Petroecuador officials.[75]

Finally, in one of the outtakes, Fajardo reported: "So, the President thinks that if we put in a little effort, before getting the public involved, the Prosecutor will yield, and will re-open that

---

[71]

Hendricks Decl. II Ex. 4 (*Crude* ), 1:03:03.

[72]

Portions of President Correa's visit are depicted in *Crude* and the outtakes. *See also id.* Ex. 230A.

[73]

Dans Decl. Ex. 14.

[74]

Hendricks Decl. III Ex. 1, CRS–268–00–01.

[75]

Dans. Decl. Ex. 13 (emphasis added).

investigation into the fraud of–of the contract between Texaco and the Ecuadorian Government."[76]

On November 30, 2007, Ecuador's then new Constituent Assembly, which was controlled by President Correa,[77] removed the Prosecutor General, who had found no basis to support criminal charges against the Individual Petitioners and former ROE officials, and replaced him with Dr. Washington Pesántez Muñoz.  Dr. Pesántez had been the District Prosecutor who had decided in March 2007 that "the report on the special audit conducted by the Comptroller General of Ecuador . . . showed that there was no evidence of civil, administrative or criminal nature liability on the part of  . . .  representatives of the TEXACO company, with respect to environmental damage that had allegedly been caused in the Amazon region."[78]  Several months later, however, Dr. Pesántez decided that the criminal case should be reopened.[79]

On March 31, 2008, less than a week after Cabrera reported a damages finding of $16 billion and a day before he filed his report with the court, Pérez and Veiga received notice that the new Prosecutor General had reactivated the criminal charges based on "new" evidence.[80]  On July 31, 2008, representatives of the LAPs, including Donziger, held a press conference during which Yanza commented that the plaintiffs had presented evidence to the Prosecutor General's office to encourage

---

[76]      Hendricks Decl. II Ex. 1, CRS–376–03–01.

[77]      *In re Chevron Corp.*, 749 F.Supp.2d at 155.

[78]      Hendricks Decl. II Ex. 394, at 9.

[79]      Dans Decl. Ex. 15.

[80]      *Id.*

an investigation.[81]  President Correa, in a radio address less than two weeks later, offered his support

for the criminal prosecutions:

> "But previous governments supported Texaco Chevron and betrayed our people: they
> signed agreements saying that everything was resolved, which has been one of the
> principal arguments by Texaco Chevron in its defense, when in fact nothing was
> resolved.  Now, the Prosecutor General (Washington Pesántez), has, very properly,
> opened an investigation to punish those people, because it was a lie: there was nothing,
> nothing resolved, nothing cleaned up, of all the pollution."[82]

In the end, the reopening of the prosecution appears to have backfired.  The two

lawyers who were charged criminally joined with Chevron in seeking discovery in the United States

under Section 1782(a) of the Judicial Code[83] in order to defend themselves in Ecuador.  This Court

ordered, among other things, disclosure by Donziger and concluded that he had forfeited any work

product or attorney-client privilege.  In affirming that ruling on December 15, 2010, with a hearing in

the Ecuadorian criminal case scheduled for January 5, 2011, the Second Circuit wrote:

> "[A]s this panel observed at oral argument and the District Court stressed several times
> in its orders, *see, e.g., In re Chevron Corp.,* 749 F. Supp.2d 170, 173–75, 2010 WL
> 4922312, at *2, *the severity of the consequences imposed by the District Court in this
> case are justified almost entirely by the urgency of petitioners' need for the discovery
> in light of impending criminal proceedings in Ecuador.*"[84]

The subsequent history of the criminal case in Ecuador is instructive.  On January 5,

2011, the LAPs' counsel advised the Third Circuit, which was hearing a related matter, that the hearing

---

[81]

Hendricks Decl. II Ex. 224, at 5–6.

[82]

Dans Decl. Ex. 23.

[83]

28 U.S.C. § 1782(a).

[84]

*Lago Agrio Plaintiffs v. Chevron Corp.*, 409 F. App'x 393, 395-96 (2d Cir. 2010) (emphasis
added).

in Ecuador "had been postponed indefinitely.  Though it was later rescheduled for March 2, it was postponed yet again."[85]  And then it reportedly was dropped altogether in June 2011.[86]  While we may never know exactly what occurred, the probable interpretation of the events is that the criminal prosecution of the allegedly "homeland-selling lawyers" became inconvenient to the LAPs and so the government abandoned it.

*   *   *

In sum, the Republic of Ecuador is an avowed supporter of the LAPs.  It reopened long closed criminal accusations against former TexPet lawyers at the LAPs' instance. And then abandoned the case when that served the LAPs' interests.  Given its past actions with respect to this case and its actions with respect to critics of the current regime that are discussed below, not to mention the evidence of other uses and threatened uses of state power to intimidate persons assisting Chevron that is discussed in the sealed supplement to this decision, the declarants are justified in fearing reprisals at the hands of their own government if their identities become known.

*The Broader Ecuadorian Environment*

Account must be taken also of the environment in which these confidential witnesses live.  Ecuador's record with respect to crime, violence, law enforcement, and the legal process gives little comfort that these witnesses, were their identities revealed at this stage, would be safe from

---

85

     *In re Chevron Corp.,* 650 F.3d 276, 286 n.13 (3d Cir. 2011).

86

     *See* Lawrence Hurley, *Dropping Charges in Ecuador Could Affect Chevron Racketeering Case, N Y   T I M E S ,   J u n e   3 ,   2 0 1 1 ,   a v a i l a b l e   a t* http://www.nytimes.com/gwire/2011/06/03/03greenwire-dropped-charges-in-ecuador-could-affect-chevro-90134.html (last visited Feb. 20, 2012).

retribution.

First, it has been reported widely that the current government of Ecuador has been intolerant of dissent, at least in one well known incident.  In the *El Universo* case, three newspaper executives and a columnist were criminally prosecuted for and convicted of criminal defamation and sentenced to jail terms and multimillion dollar fines, reportedly for statements critical of the president. Although the individuals eventually were pardoned, all reportedly fled Ecuador.[87]  Moreover, the president, on the occasion of the affirmance of the convictions but before the pardons, said that the case was an historic precedent and "that nobody has the right to tarnish the truth."[88]

Second, it is well to consider conclusions reached by the U.S. Department of State. Among the findings set out in the 2011 Country Report on Human Rights Practices in Ecuador are these:

- "[T]here continued to be credible reports that security forces, particularly

---

[87]    *Ecuador journalists convicted in Correa libel case*, BBC NEWS, July 21, 2011, *available at* http://www.bbc.co.uk/news/world-latin-america-14234695 (last visited Feb. 19, 2013); *Ecuador's Assault on Free Speech*, NY TIMES, Feb. 21, 2012, *available at* http://www.nytimes.com/2012/02/22/opinion/ecuadors-assault-on-free-speech.html?_r=0 (last visited Feb. 19, 2013); *Ecuador journalist Emilio Palacios granted asylum in the US*, BBC NEWS, Aug. 21, 2012, *available at* http://www.bbc.co.uk/news/world-latin-america-19431682 (last visited Feb. 19, 2013); *Ecuador's media Muzzled*, Economist, Feb. 17, 2012, *available at* http://www.economist.com/blogs/americasview/2012/02/ecuadors-media (last visited Feb. 19, 2013); *Correa pardons journalists jailed by Ecuadorian court for libel*, EL PAÍS, March 1, 2012, *available at* http://elpais.com/elpais/2012/03/01/inenglish/1330619576_394133.html (last visited Feb. 19, 2013).

[88]    Mariano Costillo and Nelson Quinones, *Ecuador high court upholds $40 million libel suit*, CNN, Feb. 16, 2012, *available at* http://www.cnn.com/2012/02/16/world/americas/ecuador-libel-lawsuit (last visited Feb. 19, 2013).  President Correa repeatedly praised the ruling: "We have set a precedent. This sentence and this process are historic. They demonstrate that nobody has the right to tarnish the truth . . . . Not only is the person who wrote it responsible, but also the directors who allowed the offense and the newspaper where it was printed." *Id.*

police units, used excessive force and committed isolated unlawful killings."

- "The National Police are responsible in law and practice for internal security and law enforcement and are under the authority of the Ministry of Interior. National Police effectiveness was impaired by corruption, poor hiring procedures, and insufficient training, supervision, and resources."

- "Authorities charged with determining the validity of detention often allowed frivolous charges to be brought, either because they were overworked or because the accuser bribed them. The system frequently was used as a means of harassment in civil cases in which one party sought to have the other arrested on criminal charges."

- "While the constitution provides for an independent judiciary, in practice the judiciary was susceptible to outside pressure and corruption. The media reported on the susceptibility of the judiciary to bribes for favorable decisions and faster resolution of legal cases. Judges occasionally reached decisions based on media influence or political and economic pressures."

- "In some cases the outcome of trials appeared predetermined, and there were credible allegations by defendants and the press that verdicts delivered by judges were not actually written by them.  In the libel suit brought by President Correa against the newspaper *El Universo* . . . , the presiding judge published a 156-page decision 25 hours after the hearing."

- "The law provides criminal penalties for official corruption. However, the government did not implement the law effectively, and officials sometimes engaged in corrupt practices with impunity."

- "Academics and think tank analysts said that legal cases were not processed unless the police and judicial officials were bribed."

Likewise, the State Department's travel advisory for Ecuador states the following:

- "Due to the spread of organized crime, drug and small-arms trafficking, and incursions by terrorist organizations near Ecuador's border with Colombia, the U.S. Embassy in Quito advises caution when traveling to northern Ecuador, including the provinces of Sucumbios [the province containing Lago Agrio], northern Orellana, Carchi, and northern Esmeraldas. U.S. government personnel are prohibited from traveling alone or staying overnight in these areas."

- "Crime is a severe problem in Ecuador. . . .  Very low rates of apprehension and conviction of criminals – due to limited police and judicial resources – contribute to Ecuador's high crime rate."

*Summary as to Good Cause*

Without passing on the question whether Guerra will prove a credible witness at trial, the testimony set out in his declaration is potentially devastating to the LAPs, to their Ecuadorian counsel and Mr. Donziger, and to their various associates and allies. Their incentive to intimidate and retaliate against him – and against anyone who corroborates his story even in part – is enormous. The Does plainly would be potential targets of intimidation, retribution, and conceivably worse if their identities became known.

No comfort can be taken from the past behavior of the potential sources of such behavior. It already has been determined that there is no genuine issue of fact with respect to the intimidation of an Ecuadorian judge by Fajardo and Donziger with the threat of a disciplinary complaint if he did not go along with their plan to end the judicial inspections and appoint their choice, Cabrera, as the global expert. They have openly threatened Guerra and Reyes with civil litigation and criminal prosecution for providing evidence in this case. They previously prevailed upon the Ecuadorian government to prosecute two of Chevron's Ecuadorian counsel criminally. The LAPs' determination to intimidate Ecuadorian judges to get their way is evident from statements made by their lawyers in *Crude* and the video outtakes. And there is little reason to suppose that any of these individuals could be constrained by any order this Court might issue to restrict their behavior if the identity of the Does became known to them.

This situation is compounded both by the alliance between the LAPs and the Ecuadorian government and the limited effectiveness of Ecuadorian law enforcement and judiciary in the best of circumstances. The president of Ecuador is an advocate for the LAPs and played a role in securing the now abandoned criminal prosecution of two of Chevron's attorneys that included his inflammatory broadcast call for the criminal prosecution of "Chevron–Texaco . . . 'homeland-selling

29

lawyers.'"  The sealed supplement to this decision provides other reasons for concern with respect to reprisals by the government.  Moreover, Ecuador as this is written is defying a highly pertinent order of a tribunal issued by a panel of the Permanent Court of Arbitration.

In all the circumstances, the Court finds that the disclosure of the Does' identities in any manner that could lead to their identities being learned by the LAPs, their counsel and allies in Ecuador, including the Ecuadorian government, is substantially likely to result in reprisals against them as well as efforts to intimidate them and thus to cause them to alter their testimony.  There is good cause for preventing any such disclosure for as long as possible.

*Public Access to Judicial Documents*

Our Circuit has made clear that there is a common law presumption of public access to judicial documents which may be overcome by countervailing factors including "the privacy interests of those resisting disclosure,"[89] that there is in addition a "qualified First Amendment right to attend judicial proceedings and to access certain judicial documents,"[90] that the qualified First Amendment right extends "to documents submitted to the court in connection with a summary judgment motion,"[91] that the weight of the presumption favoring public availability of such documents

---

[89]

    *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119–20 (2d Cir. 2006) (quoting *United States v. Amodeo*, 71 F.3d 1044, 1050 (2d Cir. 1995) ("*Amodeo II*") (internal quotation marks omitted)).

[90]

    *Lugosch*, 435 F.3d at 120 (quoting *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 91 (2d Cir. 2004) (internal quotation marks omitted)).

[91]

    *Lugosch*, 435 F.3d at 124.

"is of the highest,"[92] and that "continued sealing of [such] documents may be justified only with specific, on-the-record findings that sealing is necessary to preserve higher values and only if the sealing order is narrowly tailored to achieve that aim."[93]  The Court therefore turns to balancing the need for protection of the identities of the Does and to the tailoring of the order.

### The Balance

In *Amodeo II,* the Circuit stated that "the weight to be given the presumption of access" is determined by where a particular document falls along "a continuum from matters that directly affect an adjudication to matters that come within a court's purview solely to insure their irrelevance."[94]  We deal here with two declarations submitted in support of a motion for partial summary judgment.  And though it has been argued with some force that the weight of the presumption for such documents ought to depend on whether they ultimately play a role in the determination of the motion, *Lugosch* stated that the weight of the presumption favoring public availability of such documents "is of the highest."[95]  But *Lugosch* made clear also that the presumption, even at its weightiest,  may be overcome by "competing considerations" including but not limited to "the privacy interests of those

---

[92]    *Id.* at 123.

[93]    *Id.* at 124.

[94]    71 F.3d at 1049.

[95]    435 F.3d at 123.

resisting disclosure"[96] and the need "to preserve higher values."[97]

In this case, there are weighty considerations that support protection of the identities of the Does.  If their identities become known in Ecuador, it is all but certain that they will be subjected to vilification and economic reprisals by the LAPs and their allies.  There is a significant risk of such actions by the government.  Although the record does not establish that others in similar positions have been victims of violence in the past, the climate in Ecuador, the stakes of this litigation, the attitude of those representing the LAPs in Ecuador, and the characteristics of Ecuadorian law enforcement noted by our State Department combine to justify the finding that the risk of physical violence cannot be disregarded entirely in the balance of interests.[98]  Finally, there is an important public and private interest in ensuring that those with knowledge of whatever went on in Ecuador come forward with pertinent evidence.  As the Circuit recognized in *Amodeo II,* the likely consequences of failure to protect the identities of confidential sources such as these weigh

in favor of keeping that information from the public.[99]

In all the circumstances, the Court finds that the privacy interests of the Does, the need

---

[96]

Id. at 120 (quoting *Amodeo II*, 71 F.3d at 1049–50).

[97]

*Lugosch*, 435 F.3d at 120 (quoting *In re New York Times Co.*, 828 F.3d 110, 116 (2d Cir. 1987) (internal quotation marks omitted)).

[98]

Where there are concerns for witness safety, a district court may restrict a defendants access to the witness's identity or other information, such as the witness's address.  *Morgan v. Bennett*, 204 F.3d 360, 367 (2d Cir. 2000); *United States v. Cavallaro*, 553 F.2d 300, 304 (2d Cir. 1977).

[99]

*See Amodeo II,* 71 F.3d at 1047–48, 1050 (" If . . . confidentiality cannot be assured, cooperation will not be forthcoming.").

This is so notwithstanding that these individuals are confidential sources of Chevron rather than of law enforcement officials particularly in light of the fact that the Ecuadorian government is openly aligned against Chevron.

to safeguard them from intimidation and economic and physical reprisals, and ensuring as far as possible that the public and private interests in obtaining the cooperation of witnesses with pertinent evidence in this and related cases are higher values that outweigh the private interests of the defendants and overcome the presumption of public access to judicial documents to the extent that the Doe declarations identify them or contain information that would be likely to lead to their identification.

*Tailoring the Protection*

So far as public access is concerned, the presumption has been overcome only to the extent that the documents filed with the Court would identify the Does, directly or indirectly. Yet the parties have addressed the issues before the Court on an all or nothing basis, effectively assuming that the entirety of Doe declarations and the redacted identifying information in other declarations either should or should not be sealed. That is why the Court's February 14 order took the form it did. Nonetheless, the Court accepts in theory that there may be parts of the Doe declarations that could be unsealed without compromising the protection properly afforded to the Does identities. Defendants – whose counsel of record in this action have copies of the unredacted declarations – are free to apply to the Court to unseal portions of the declarations that they believe could be made public without material risk of harm to higher values.

Defendants also have an important interest in properly preparing this action for trial and, in particular, in preparing to meet the testimony of the Does that is foretold by their declarations. That interest is served, at least to a very important extent and perhaps fully, by the fact that their counsel of record have the sealed declarations of the Does and the unredacted declarations of other witnesses and thus can prepare, subject always to their duties not to reveal the identities of the Does or any information that might lead to their identification. To whatever extent they feel that some

relaxation of the terms of the order is needed for specific purposes in order for them properly to serve their clients, they are free to apply to the Court for appropriate relief on terms consistent with the values articulated here.

One final point.  Chevron's motion initially sought an order blocking defendants from sharing the information in question "with anyone in Ecuador, other than, if necessary, the two appearing LAP Defendants, after making them aware of their court-ordered obligation to maintain the strict confidentiality of the information."[100] Thus, as the motion was drafted, Chevron apparently was willing to permit disclosure to the two LAP Representatives and to Donziger,[101] if that were necessary, in reliance on their promise to comply with a court order requiring them to maintain the information in confidence.

The LAP Representatives' counsel found that confusing in view of Chevron's stated desire to avoid having the Doe information disseminated in Ecuador.[102]  When queried at oral argument, Chevron's counsel said that she thought that the defendants' counsel  "need to share the information with  their client [i.e., the LAP Representatives and Donziger] if their clients agree[d] to keep it confidential in a way where it cannot be made public or otherwise distributed in Ecuador."[103] Paradoxically, however, she then said that (1) it would be inappropriate to send the declarations to Ecuador, (2) the LAP Representatives should not be permitted to share the information with their Ecuadorian counsel, (3) both Chevron and "[t]he witnesses would prefer . . . that no one in Ecuador

---

[100]

DI 757, at 2.

[101]

See DI 769, at 10 & n.11.

[102]

See Tr., Feb. 4, 2013, at 23–24

[103]

Id. at 41.

have the information," and (4) "[t]he point . . . is to provide for and address the safety concerns that these witnesses have raised, by keeping their identities out of Ecuador and out of the possession of people who have shown to have a pattern and practice of attacking the witnesses."[104]

If this application concerned purely the private interests of Chevron, there would be little reason not to accept its original formulation of the relief it sought – i.e., to allow disclosure of the information to the LAP Representatives and to Donziger if that proved necessary, subject to their agreement to comply with confidentiality restrictions.  But the interests of these witnesses in personal safety and in freedom from reprisals and intimidation, not merely Chevron's private interests, are at stake here.  The Court would have no effective means of remedying any breach by the LAP Representatives of restrictions on their use of the Doe information, assuming it were disclosed to them, even if such a breach could be laid unequivocally at their doorsteps.  Donziger's actions give little comfort that he would comply with confidentiality obligations imposed upon him, at least on those occasions where he is in Ecuador.  In the interest of the safety and well being of these witnesses, the Court therefore has granted the relief warranted by the record and that Chevron ultimately seeks despite the confusion and internal inconsistency in Chevron's initial position.  To the extent counsel later believes that disclosure to the two LAP Representatives or Donziger is necessary, they may apply to the Court for appropriate relief.

Upon further consideration from the February 14 order, however, the Court is not persuaded that the Stratus defendants cannot be trusted to comply with the terms of the protective order.  Accordingly, on its own motion and by order of even date, the Court modifies the February 14 order to the extent that it applies to the Stratus defendants.

---

[104]

*Id.* at 41–43.

*Conclusion*

The foregoing sets forth the reasoning and amplifies the findings underlying the Court's February 14 order and constitutes findings of fact and conclusions of law for the purposes of this motion.

SO ORDERED.

Dated:          February 21, 2013
Corrected:    February 21, 2013, 11:55 a.m.

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)