UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CHEVRON CORPORATION,

                   Plaintiff,

         -against-                                       11 Civ. 0691 (LAK)

STEVEN DONZIGER et al.,

                   Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## OPINION

Appearances:

| | |
|---|---|
| Randy M. Mastro | John W. Keker |
| Andrea E. Neuman | Elliot R. Peters |
| Scott A. Edelman | KEKER & VAN NEST, LLP |
| Kristen L. Hendricks | *Attorneys for the Donziger Defendants* |
| William E. Thompson | |
| GIBSON, DUNN & CRUTCHER, LLP | Julio C. Gomez |
| *Attorneys for Plaintiff* | JULIO C. GOMEZ, ATTORNEY AT LAW LLC |
| | |
| | Craig Smyser |
| James K. Leader | Larry R. Veselka |
| S. Alyssa Young | Tyler G. Doyle |
| LEADER & BERKON, LLP | SMYSER KAPLAN & VESELKA, L.L.P. |
| *Attorneys for Patton Boggs LLP* | |
| | *Attorney for Defendants Hugo Gerardo Camacho* |
| | *Naranjo and Javier Piaguaje Payaguaje* |

TABLE OF CONTENTS

SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    I.    THE LAGO AGRIO LITIGATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
        A.    THE BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
        B.    THE LAWSUIT, THE TERMINATION OF JUDICIAL INSPECTIONS, THE CABRERA APPOINTMENT, THE MAKING OF CRUDE, AND THE JUDGMENT . . . . . . . . . . . . . . . . . . 8
    II.    THIS LITIGATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    III.    EVIDENCE THAT THE JUDGMENT WAS OBTAINED BY FRAUD . . . . . . . . . . . . . . . . . . 14

    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
        A.    ALLEGED BRIBING OF THE JUDGE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
        B.    ADDITIONAL EVIDENCE THAT THE LAPs – NOT THE JUDGE – WROTE THE JUDGMENT . . . . . . . . 18
        C.    EVIDENCE OF FRAUD WITH RESPECT TO THE JUDICIAL INSPECTION PROCESS . . . . . . . . . . . . . . 22
            1.    DR. CALMBACHER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
            2.    THE TERMINATION OF THE JUDICIAL INSPECTIONS, CABRERA'S APPOINTMENT, AND THE CABRERA REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . 23
            3.    NEW EVIDENCE OF FRAUD IN RESPECT OF THE CABRERA REPORT . . . . . . . . . . . . . 24
            4.    THE "CLEANSING REPORTS" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
    IV.    PB'S INVOLVEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
        A.    THE STRATUS SECTION 1782 PROCEEDING AND EVIDENCE OF FRAUD ON THE COURT . . . . . . . . 30
        B.    THE CLEANSING REPORTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
        C.    POST-TRIAL SUBMISSIONS TO THE LAGO AGRIO COURT . . . . . . . . . . . . . . . . . . . 40
        D.    *PB'S OTHER ACTIVITIES* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
    IV.    PROCEEDINGS WITH RESPECT TO THE PB SUBPOENA . . . . . . . . . . . . . . . . . . . . . . . 43
        A.    PB'S MOTION TO QUASH . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
        B.    ARGUMENT AND THE INITIAL NARROWING OF THE SUBPOENA . . . . . . . . . . . . . . . . . 44
    V.    CHEVRON'S UNSUCCESSFUL ATTEMPTS TO OBTAIN DISCOVERY FROM THE LAP REPRESENTATIVES' AGENTS IN ECUADOR AND FROM THE DEFENDANTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
        A.    DEFENDANTS' REFUSAL TO PRODUCE DOCUMENTS AND EVIDENCE FROM ECUADOR . . . . . . . 46
        B.    DEFENDANTS' REFUSAL TO COMPLY WITH THEIR OTHER DISCOVERY OBLIGATIONS . . . . . . . . 50

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
    I.    IN RE FRIEDMAN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
        A.    ATTORNEY-CLIENT PRIVILEGE AND WORK PRODUCT . . . . . . . . . . . . . . . . . . . . . 54
            1.    BASIC PRINCIPLES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
                (A)    ATTORNEY-CLIENT PRIVILEGE . . . . . . . . . . . . . . . . . . . . . . . 54
                (B)    WORK PRODUCT DOCTRINE . . . . . . . . . . . . . . . . . . . . . . . . . 55
                (C)    THE CRIME-FRAUD EXCEPTION . . . . . . . . . . . . . . . . . . . . . . . . 56
            2.    APPLICATION IN THIS CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
                (A)    IMPROBABILITY OF MANY RESPONSIVE ATTORNEY-CLIENT COMMUNICATIONS, IF ANY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
                (B)    CHEVRON'S SUBSTANTIAL NEED OVERCOMES ORDINARY WORK PRODUCT PROTECTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
                (C)    THE CRIME-FRAUD EXCEPTION . . . . . . . . . . . . . . . . . . . . . . . . 62
            3.    FURTHER LIMITATION OF THE SUBPOENA . . . . . . . . . . . . . . . . . . . . . . . . 65
        B.    PB'S ROLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66
            (1)    WHETHER DISCOVERY WOULD DISRUPT THE LITIGATION . . . . . . . . . . . . . . . . 67
            (2)    WHETHER PB LIKELY HAS RELEVANT EVIDENCE . . . . . . . . . . . . . . . . . . . 67
        C.    THE NEED FOR DISCOVERY FROM PATTON BOGGS AND THE EXTENT OF DISCOVERY ALREADY CONDUCTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67
    II.    ALLEGED UNDUE BURDEN AND COST SHIFTING . . . . . . . . . . . . . . . . . . . . . . . . . . 69

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

LEWIS A. KAPLAN, *District Judge.*

An Ecuadorian court in 2011 entered an $18.2 billion judgment (the "Judgment") against Chevron Corporation ("Chevron")[1] in an action brought by 47 individuals referred to as the Lago Agrio Plaintiffs (the "LAPs"), two of whom, the LAP Representatives, have appeared in this action.[2] Chevron brought this action against the LAPs, their lead U.S. attorney, Steven Donziger and his law offices (the "Donziger Defendants"), and others involved in the Lago Agrio Litigation,[3] claiming among other things that the Judgment is the product of fraud and that it is a central part in a pattern of violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") that has included extortion, fraud, money laundering, and obstruction of justice, among other offenses.

This matter is now before the Court on a dispute over non-party discovery. Patton Boggs LLP ("PB") is a major U.S. law firm that has provided services to the LAPs since early 2010 with respect to the Ecuadorian litigation. It has represented the LAPs in much of the U.S. litigation relating to the Judgment, although not formally in the district court in this case. It has been involved in the Ecuadorian litigation behind the scenes. It is a named co-conspirator in this case. In addition, it has sued Chevron on its own behalf at least three times on claims relating to this controversy.

Chevron served PB with a subpoena *duces tecum* (the "Subpoena") in this case. PB seeks to avoid entirely any obligation to comply or, at least, to minimize the scope of any disclosure. Its position rests mainly on claims of work product protection and attorney-client privilege, and on a contention that the requested discovery would be unduly burdensome.

---

[1] DI 168 (Lago Agrio Judgment).

[2] The other LAPs have defaulted and are not defending this action. DI 469.

[3] In addition, the amended complaint identifies a number of alleged "co-conspirators" who are not named as defendants.

*Summary*

The Court begins with the proposition that depositions of opposing trial counsel are disfavored.[4]  Courts "have resisted the idea that lawyers should routinely be subject to broad discovery."[5]  Nevertheless, "the disfavor with which the practice of seeking discovery from adversary counsel is regarded is not a talisman for the resolution of all controversies of this nature."[6]  The Second Circuit has said that such efforts:

> "require a flexible approach to lawyer depositions whereby the judicial officer supervising discovery takes into consideration all of the relevant facts and circumstances to determine whether the proposed deposition would entail an inappropriate burden or hardship.  Such considerations may include the need to depose the lawyer, the lawyer's role in connection with the matter on which discovery is sought and in relation to the pending litigation, the risk of encountering privilege and work-product issues, and the extent of discovery already conducted . . . .  Under this approach, the fact that the proposed deponent is a lawyer does not automatically insulate him or her from a deposition nor automatically require prior resort to alternative discovery devices, but it is a circumstance to be considered."[7]

These considerations again have led this Court to engage in a painstaking, step-by-step process to deal appropriately with a subpoena addressed to a LAP lawyer, a process that in this instance has consumed months.[8]  In the final analysis, it has reached these conclusions.

First, Chevron has established at least probable cause to believe there was fraud or other

---

[4]

    *See generally In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 71 (2d Cir. 2003) (hereinafter *In re Friedman* ).

[5]

    *Id.* at 70.

[6]

    *Id.* at 71.

[7]

    *Id.* at 72.

[8]

    In a decision affirmed on appeal, it previously granted and enforced a subpoena against Donziger.  *See In re Chevron Corp.*, 749 F. Supp. 2d 141 (S.D.N.Y. 2010) *aff'd sub nom. Lago Agrio Plaintiffs v. Chevron Corp.*, 409 F. App'x 393 (2d Cir. 2010).

4

criminal activity in the procurement of the Judgment and in other respects relating to the Lago Agrio litigation in which that Judgment was rendered and in certain litigations in the United States relating to the Ecuadorian litigation.  Without alluding here to the entirety of its showing, there is probable case to suspect, and often stronger evidence,[9] that:

- Representatives of the LAPs bribed the Ecuadorian judge to obtain the result they wanted and, as part of the deal, wrote the Judgment to which the judge put his name. Indeed, there is substantial evidence corroborating this assertion, not least of it the fact that significant parts of the Judgment match – word-for-word – internal work product documents of the LAPs that never were publicly filed in the Lago Agrio case.  This latter evidence alone at least gives rise to probable cause to conclude that whoever wrote the Judgment had access to and copied non-record materials that originated with the LAPs.

- At an earlier stage of the Lago Agrio litigation, representatives of the LAPs coerced the then-presiding Ecuadorian judge to terminate judicial inspections of alleged pollution sites, to replace that process with a global expert charged with making an independent evaluation, and to appoint the LAPs' candidate, Richard Stalin Cabrera Vega ("Cabrera"), to that position.  They did so by threatening him with a judicial misconduct complaint if he did not accede to their wishes.

- The report that Cabrera ultimately submitted in fact was planned and written, at least in major part and quite possibly entirely, by lawyers and consultants retained on behalf of the LAPs though it was signed by Cabrera and filed as if it were his independent work.  LAP representatives, moreover, took a number of steps to create

---

[9] Some of this evidence is undisputed.  The Court already has determined on a motion for partial summary judgment that there is no genuine issue of material fact as to much of it. *See Chevron v. Donziger*, 886 F. Supp. 2d 235, 286-90 (S.D.N.Y. 2011).

or reinforce the entirely inaccurate contention that the Cabrera report was the unbiased work of an independent expert when, in fact, it had been the work of the LAPs' representatives themselves and was not independent in the slightest respect.

• Once the improprieties surrounding Cabrera began to come to light, the LAPs or their representatives then obstructed justice and committed fraud in at least one Section 1782 proceeding in the United States by submitting to a court in Colorado a deceptive account of the LAPs' relationship with Cabrera.

• At a still earlier stage of the lawsuit in Ecuador, the LAPs filed two site inspection reports with the trial court over the signature of one of their experts that the expert neither adopted nor agreed with. The evidence readily gives rise to the inference that the LAP lawyers wrote the reports, affixed the expert's signature to them in the knowledge that they did not reflect his views, and filed them.

The Court's second conclusion is this. Although the scope of the Subpoena has been limited dramatically in prior proceedings, described below, it will be limited further to avoid any undue imposition on PB's position as counsel, to further reduce any burden of compliance, and to minimize any genuine work product protection and attorney-client privilege issues. It will be limited to documents pertaining to the subjects as to which Chevron has established probable cause to suspect fraud or criminal activity. This limitation will greatly reduce any legitimate claim of work product protection or attorney-client privilege because documents that relate to the crime or fraud and would be discoverable provided only that the documents were in furtherance of the crime or fraud.

Third, Chevron has established substantial need for the materials sought by the Subpoena as further narrowed here. It cannot obtain their substantial equivalent elsewhere without undue hardship, if at all. The qualified protection afforded to "ordinary" work product therefore has been overcome. Documents that fall within the Subpoena as further narrowed here and allegedly protected from disclosure

only by an ordinary work product claim are discoverable without regard to whether they furthered a crime or fraud.

The sum of these three conclusions thus will be that PB must produce (1) all documents responsive to the Subpoena as finally narrowed – that is, documents relating to the subjects as to which there is a probable cause to suspect crime or fraud – as to which either (a) no claim of privilege or work product protection is made, or (b) the only claim of protection from disclosure is that the documents contain ordinary, *i.e.*, non-opinion, work product, and (2) a privilege log as to responsive documents which PB claims did not further the suspected crimes or frauds.

One more preliminary comment is appropriate.  It is important to recognize that the crime-fraud exception to work product protection and the attorney-client privilege is established where there is "probable cause to believe that a fraud or crime has been committed [by *someone*] and that the communications in question were in furtherance of the fraud or crime."[10]  If probable cause exists as to the commission of a fraud or crime, it is not necessary to show also that a lawyer from whom otherwise privileged or protected documents may be sought was a culpable or knowing participant in the fraud or crime.[11]  It therefore is unnecessary to determine for present purposes whether there is probable cause to suspect that PB or any of its personnel was a culpable or knowing participant in any alleged fraud or crime.

The balance of this opinion proceeds as follows.

Part I of the Facts is a basic description of the general course of the Lago Agrio litigation, which is essential to providing the time line with respect to events in Ecuador and a framework for

---

[10]

*United States v. Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997).

[11]

*See Clark v. United States*, 289 U.S. 1, 15 (1933) ("the loss of the [attorney client] privilege [does not] depend . . . upon proof that client and attorney are involved in equal guilt. The attorney may be innocent, and still the guilty client must let the truth come out"); *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1038 (2d Cir. 1984) (attorney client "communications are properly excluded from the scope of the privilege even if the attorney is unaware that his advice is sought in furtherance of . . . an improper purpose.").

understanding the relevance of this and other litigation in the United States.  Part II sets forth the essentials

with respect to this lawsuit.  Part III describes the evidence and makes the finding that Chevron has

established probable cause to suspect fraud or criminal behavior in a number of respects and the scope of that

probable cause finding.  Part IV then addresses PB's role, to the extent it is known, with respect to both the

Ecuadorian and U.S. litigation.  This is relevant to understanding, among other things, the extent to which

the policies that underlie courts' reluctance to subject lawyers to discovery actually apply here and the types,

significance of, and need for, the documents that PB almost certainly has.  With that factual predicate thus

established, the Discussion section analyzes the applicable law and comes to the ultimate conclusions

described above.

*Facts*

I.      *The Lago Agrio Litigation*

        A.      *The Background*

        In 1993, a group of Ecuadorians brought a class action in the Southern District of New York

against Texaco seeking billions of dollars in damages for harm a subsidiary caused during its oil explorations

in Ecuador's Oriente region in the 1960s-1990s (the "*Aguinda* Action").[12]  The case ultimately was dismissed

on *forum non conveniens* grounds.[13]

        On October 9, 2001, while the *Aguinda* Action was pending, a wholly owned subsidiary of

Chevron merged with and into Texaco.  Texaco was the surviving entity.  Chevron became the owner of all

of Texaco's common stock.  Chevron did not acquire or assume any of Texaco's assets or liabilities by

---

[12]       *Republic of Ecuador v. ChevronTexaco Corp.*, 376 F. Supp. 2d 334 (S.D.N.Y. 2005).

[13]       *Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534 (S.D.N.Y. 2001).

8

merger.[14]

        B.       *The Lawsuit, the Termination of Judicial Inspections, the Cabrera Appointment, the Making of Crude, and the Judgment*

The Lago Agrio Litigation began in 2003 when the LAPs, represented by defendant Steven Donziger (albeit not of record in the Ecuadorian courts) and other lawyers, sued Chevron in Ecuador under that country's Environmental Management Act of 1999.[15]   The LAPs asserted, *inter alia*, claims for damages for alleged environmental harm said to have been caused by Texaco.

It is unnecessary to detail every aspect of the long history of the Lago Agrio litigation.  It suffices to highlight only the aspects critical to this dispute.

Beginning in 2004, the Lago Agrio court ordered judicial site inspections to "assess the approximately 122 wells and production installations in the former concession granted by the Ecuadorian government to what was called the PETROECUADOR-TEXACO Consortium."[16]  Each party selected experts to be present during the judicial inspections and to submit their findings to a panel of "settling experts" that would "provide decisive opinions . . . [and] comment solely on the reports presented by the experts appointed by the parties."[17]  Some of the inspections were completed, including two reports, which the LAPs submitted

---

[14]

        *Chevron v. Donziger*, 886 F. Supp. 2d at 243.

[15]

        "In 1999 the [Republic of Ecuador] enacted the Environmental Management Act of 1999 ("EMA"), which created a private right of action for Ecuadorians who have been individually affected to seek damages related to environmental harms to the community." *Id.* at 242.

[16]

        *Id.* at 244 (internal quotation marks omitted).

[17]

        *Id.* (quoting Hendricks Decl. [DI 31] ¶ 198 & Ex. 121 pt.1 (Aug. 7, 2004 oral hearing summary), at 1).

9

under the signature of one of their experts, Dr. Charles Calmbacher.[18]  By 2006, however, the LAPs asked the Lago Agrio court to end the judicial inspection process and petitioned for the appointment of an independent expert to perform a global assessment of the alleged environmental effects.[19]  The Lago Agrio court adopted that proposal, appointed Richard Stalin Cabrera Vega ("Cabrera") to serve as the independent global expert, and cancelled most of the remaining inspections.[20]  As will appear below, these events and subsequent activities are among several *foci* of this case.

While all of this was going on, Steven Donziger, then the key lawyer on the LAP side, approached film maker Joe Berlinger to create a documentary depicting the Lago Agrio case from the perspective of his clients.  For the next three years, Berlinger and his crew shadowed the plaintiffs' lawyers and filmed "the events and people surrounding the trial," compiling six hundred hours of raw footage.[21]

On April 1, 2008, Cabrera submitted what purported to be his independent report which attributed $16.3 billion in damages to Chevron.[22]  A supplement to the report increased the damage assessment to $27.3 billion.[23]

In 2009, Berlinger released two versions of his purported documentary, which is called *Crude,* one on DVD and the other on Netflix.  The Netflix version contained a scene or scenes not included

---

[18]

    *Id.*

[19]

    *Id.*

[20]

    *Id.*

[21]

    *In re Application of Chevron Corp.,* 709 F. Supp. 2d 283, 287 (S.D.N.Y. 2010) (internal quotation marks omitted), *aff'd sub nom. Chevron Corp. v. Berlinger,* 629 F.3d 297 (2d Cir. 2011).

[22]

    *Chevron Corp. v. Donziger*, 886 F. Supp. 2d at 244.

[23]

    *Id.*

on the DVD version.  As has been discussed in prior opinions, it revealed or at least suggested that the LAPs and Donziger had collaborated with Cabrera.  It suggested also that his report had been prepared by the LAPs and was not Cabrera's independent work product.

This led to the filing by Chevron and others in April 2010 of a Section 1782 action against Berlinger that sought the video that Berlinger had shot that did not appear in the released films, which is referred to as outtakes.[24]  This Court granted that discovery in May 2010 and the Second Circuit affirmed in January 2011.[25]  The pendency of the appeal, however, did not long delay the release of most of the outtakes, as the Court of Appeals in July 2010 directed that Berlinger comply in major part with this Court's disclosure order.[26]

Following the release of *Crude* and, in some cases, the outtakes, Chevron sought other discovery in the United States under 28 U.S.C. § 1782 relating to the Lago Agrio litigation and the Cabrera report.[27]  Based in part on evidence gathered through the Section 1782 proceedings, Chevron argued that the Calmbacher reports, Cabrera's appointment, and the Cabrera report were fraudulent.[28] In an effort to meet the mounting evidence of fraud, the LAP team hired new experts to address Cabrera's findings and submit new reports – referred to as "cleansing reports"– to the Lago Agrio court.  On September 10, 2010, seven reports were submitted.

---

[24]
    The actions were filed on the Court's miscellaneous docket, which at that time was not electronic.  The relevant docket entries appear in Berlinger's brief and appendix in the Court of Appeals, *Chevron Corp. v. Berlinger*, 2d Cir.  Nos. 10-1918, 10-1919, at DI 196-98.

[25]
    *See In re Application of Chevron Corp.*, 709 F. Supp.2d 283; *Chevron Corp. v. Berlinger*, 629 F.3d 297 (2d Cir. 2011).

[26]
    *Chevron Corp. v. Berlinger*, 2d Cir. Nos. 10-1918, 10-1919, DI 277.

[27]
    *Chevron Corp. v. Donziger*, 886 F. Supp. 2d at 245.

[28]
    *Id.*

The Lago Agrio court issued the Judgment on February 14, 2011.[29]  It awarded $8.646 billion in remediation damages and another $8.646 billion to be paid unless Chevron issued a public apology within 15 days.  Chevron issued no apology.[30]

Both the LAPs and Chevron appealed.  The LAPs sought additional damages, and Chevron sought to have the Judgment reversed or declared a nullity on multiple grounds, including fraud.[31]  The appellate court affirmed the Judgment on January 3, 2012.[32]  It declined to address many of Chevron's allegations of fraud.  In affirming the damages award, the appellate court specified that two trusts were to be set up and managed by defendant Amazon Defense Front ("ADF") – one for the $8.646 billion in remediation damages and the other for the $8.646 in punitive damages.[33]

Chevron sought clarification on several aspects of the appellate decision, including whether the appellate court had considered Chevron's claims that the Judgment "had been based on information foreign to the record" and that the Lago Agrio court "ha[d] received 'secret assistance' in drafting it."[34]  The court rejected what it described as Chevron's "accusations" that "'the [J]udgment ha[d] been based on information foreign to the record' and that the Lago Agrio court 'had received "secret assistance" in drafting' it."[35]

---

[29]

  *Id.*

[30]

  *Id.* at 246.

[31]

  *Id.*

[32]

  *Id.*

[33]

  *Id.* at 247.

[34]

  *Id.*

[35]

  *Id.* (quoting Lago Agrio Judgment).

II.     *This Litigation*

Chevron brought this action on February 1, 2011 against the LAPs, the Donziger Defendants,[36] the Stratus Defendants,[37] and a number of other individuals and entities. Chevron alleges among other things that the Judgment is the product of fraud and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). The RICO and, to some extent, the fraud claims rest on allegations that Donziger, a New York lawyer, and others based in the United States, here conceived, substantially executed, largely funded, and significantly directed a scheme to extort[38] and defraud Chevron by, among other things, (1) bringing the Lago Agrio case;[39] (2) fabricating (principally in the United States) evidence for use in that lawsuit and corrupting and intimidating the Ecuadorian judiciary in order to obtain a tainted judgment;[40] (3) exerting pressure on Chevron to coerce it to pay money not only by means of the Lago Agrio litigation and judgment, but also by subjecting Chevron to public attacks in the United States and elsewhere based on false

---

[36]

The Donziger Defendants are Steven Donziger and his law firm, variously referred to as the Law Offices of Steven Donziger and Donziger & Associates, PLLC.

[37]

The Stratus Defendants are Stratus Consulting, Inc. ("Stratus"), the consulting firm, that allegedly wrote all or most of the Cabrera report, and two of its personnel, Douglas Beltman and Ann Maest.

[38]

Amended complaint ("Cpt.") ¶ 1 (alleging that defendants "sought to extort, defraud, and otherwise tortiously injure plaintiff Chevron by means of a plan they conceived and substantially executed in the United States."); *id.* ¶ 2 ("The enterprise's ultimate aim is to create enough pressure on Chevron in the United States to extort it into paying to stop the campaign against it.").

[39]

*Id.* ¶ 3.

[40]

*E.g., id.* ¶ 145 ("Back in the United States, preparations were well underway for drafting Cabrera's report [the report of a supposedly independent, court-appointed expert]."); *id.* ¶ 151 ("While Stratus [LAP environmental consultant] was the primary coordinator of the . . . Cabrera Report, other members of the [LAP's] U.S.-based team of experts . . . also contributed to the report without attribution in the report or disclosure to Chevron."); *id.* ¶¶ 353–56; Mastro Decl. [DI 746] Ex. C (hereinafter "Guerra Decl.").

and misleading statements;[41] (4) inducing U.S. public officials to investigate Chevron;[42] and (5) making false statements to U.S. courts and intimidating and tampering with witnesses in U.S. court proceedings to cover up their improper activities.[43]  PB was named as a co-conspirator but not a defendant.[44]

Several counts of Chevron's complaint have been dismissed by this Court on motions by the defendants.[45] One count, which had been severed and became a separate action, was dismissed at the direction of the Court of Appeals (the "Count 9 Action").[46]  The principal counts remaining are the RICO and state law fraud counts.[47]

---

[41]

    Cpt. ¶ 214.

[42]

    *Id.* ("And they have taken this pressure campaign to U.S. state and federal agencies, seeking their falsely induced assistance in this racketeering scheme."); *id.* ¶ 216.

[43]

    *Id.* ¶¶ 273-77, 291-300, 311-16.

[44]

    *Id.* ¶ 18(s).

[45]

    *Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229 (S.D.N.Y. 2012); DI 472 (May 24, 2012 Decision on Stratus Defendants' Motion to Dismiss).

[46]

    Count 9 of Chevron's complaint sought a declaration that the Judgment was unenforceable and unrecognizable because it was tainted by fraud in a judicial system (Ecuador's) which could not afford a fair and impartial proceeding.  The Court issued a preliminary injunction barring enforcement of the Judgment *pendente lite* in March 2011.  *Chevron Corp. v. Donziger*, 768 F. Supp. 2d. 581 (S.D.N.Y. 2011).  The Second Circuit vacated the preliminary injunction and remanded with instructions to dismiss Count 9 entirely on the ground that, in its view, "the procedural device [Chevron] has chosen to present those claims [in Count 9] is simply unavailable: The [New York Recognition of Foreign Country money Judgments Act] nowhere authorizes a court to declare a foreign judgment unenforceable on the preemptive suit of a putative judgment creditor."  *Chevron Corp. v. Naranjo*, 667 F.3d 232, 240 (2d Cir. 2012), *cert. denied,* 133 S. Ct. 423, 184 L. Ed. 2d 288 (U.S. 2012).

[47]

    Also remaining are claims for tortious interference with contract, trespass to chattels, and conspiracy against defendants, and a claim that the Donziger Defendants violated Section 487 of the New York Judiciary Law.

III.     *Evidence that the Judgment Was Obtained by Fraud*

Chevron has contended since the inception of this lawsuit that the Cabrera report was not written by Cabrera but by the LAPs, who then foisted it upon the world and a perhaps unsuspecting Ecuadorian judge as the work of an independent, neutral expert.   Soon after the Judgment came down, Chevron pointed to evidence that, it argued, suggested that portions of the Cabrera report were copied from the LAPs' internal documents.   Most recently, Chevron has come forward with evidence that, if credited, would establish that the Judgment was written by the LAPs, who bribed the Lago Agrio judge to submit it under his name.

A.      *Alleged Bribing of the Judge*

On January 28, 2013, Chevron submitted a declaration of Alberto Guerra Bastidas, a former judge of the Provincial Court of Sucumbios, Ecuador,[48] the court that rendered the Judgment, and at one time the judge assigned to the case against Chevron.   In summary, Guerra states that the LAPs' counsel – Pablo Fajardo and Donziger – bribed the judge who signed the Ecuadorian Judgment to obtain their desired result and, in fact, supplied him with the decision, which the LAPs had written in all important respects.

Turning to the details, Guerra's declaration, which is corroborated in some particulars by other publicly filed declarations,[49] states that when Judge Nicolás Zambrano was assigned the Chevron case

---

[48]     Mr. Guerra was dismissed as a judge in 2008, ostensibly for private statements to the effect that the case against Chevron should be dismissed.  He avers, however, that the real reason for his dismissal was his confrontation of two judges who later served on the Chevron case "regarding several dubious and illegal rulings that had issued in the proceedings, and regarding their practice of asking the settling experts for 25 percent of their fees in consideration for having them appointed as such."  Guerra Decl. ¶ 6.

[49]     Mastro Decl. [DI 746] Ex. E (hereinafter "Callejas Decl."); *id.* Ex. F (hereinafter "Racines Decl."); *id.* Ex. G (hereinafter "Campuzano Decl."), *id.* Ex. H (hereinafter "Carvajal Decl.").

on the first of two occasions,[50] he asked Guerra "to get in touch with the attorneys for Chevron in order to negotiate an agreement by which the company would pay Mr. Zambrano and [Guerra] for issuing the final judgment in Chevron's favor."[51]  Guerra obliged, but Chevron rejected the overture.  So Judge Zambrano, who had told Guerra that he already had reached an agreement with the LAPs' representatives "to quickly move the case along in their favor," suggested that Guerra meet with the LAPs' Ecuadorian lawyer, Fajardo.[52] Guerra then met with Fajardo.  They discussed the fact that Guerra already had an arrangement with Zambrano pursuant to which Guerra wrote Zambrano's decisions in civil cases.  Guerra and Fajardo then agreed that (1) Guerra would make the Chevron case move quickly, (2) "Chevron's procedural options would be limited by not granting their motions on alleged essential errors in rulings [Guerra] was to write," and (3) the LAPs' "representatives would pay [Guerra] approximately USD $1,000 per month for writing the court rulings Mr. Zambrano was supposed to write."[53]

This arrangement is said to have continued until Judge Zambrano was replaced on the Chevron case by a Judge Ordoñez.[54]  In time, however, a motion to recuse Judge Ordoñez in the Chevron case came before Judge Zambrano, which the latter allegedly "saw . . . as an opportunity to once again take control of the Chevron case, and asked [Guerra] to help him write the court ruling sustaining Judge Ordoñez's

---

[50]

     Judge Zambrano first began presiding over the case in September – October 2009 when he replaced Judge Nuñez.  Stavers Decl. [DI 754] Ex. 3102, at 4-6.  He was replaced by Judge Ordoñez on March 12, 2010.  *Id.* at 15.  As will appear, Judge Zambrano later replaced Judge Ordoñez in October 2010.  *Id.* at 18-19.

[51]

     Guerra Decl. ¶ 12.

[52]

     *Id.* ¶ 13.

[53]

     *Id.*

[54]

     *Id.* ¶ 20.

disqualification from the case."[55]  Judge Zambrano allegedly "saw this as an opportunity to once again approach Chevron's attorneys to see if they were willing to pay to have the case decided in their favor."[56] He dispatched Guerra to explore that possibility, but Chevron again rejected the overture.[57]

At that point, Judge Zambrano, according to Guerra, "suggested and authorized [Guerra] to seek an agreement with the Plaintiffs' representatives so that they could obtain a verdict in their favor, in exchange for a payment of at least USD $500,000 to Mr. Zambrano; and whatever amount [Guerra] could negotiate or agree to for [himself].  The proposal entailed Plaintiffs writing a draft of the judgment and Judge Zambrano signing it and issuing it as his own."[58]  Guerra took the offer to Fajardo, who expressed interest and said that he would discuss it with Donziger.  Later, Guerra received a call from Fajardo who asked him to a meeting with himself, Donziger, and Luis Yanza.[59]  At that meeting, Guerra summarized the proposal. Donziger replied that they, the LAPs, did not then have that sum of money.  Subsequently, however, Zambrano told Guerra that he had been in direct contact with Fajardo and that "the Plaintiffs' representatives had agreed to pay him USD $500,000 from whatever money they were to collect on the judgment, in exchange for allowing them to write the judgment in Plaintiffs' favor."[60]  Zambrano told Guerra that he would

---

[55]

   *Id.* ¶ 21.

[56]

   *Id.*¶ 22.

   As noted, Judge Zambrano replaced Judge Ordoñez on the Chevron case in the fall of 2010. *Supra* note 50; *see also* Carvajal Decl. ¶ 3.

[57]

   Guerra Decl. ¶  22.

[58]

   *Id.* ¶ 23.

[59]

   Yanza is the co-founder of the Amazon Defense Front ("ADF"), a non-profit organization that purports to represent the LAPs, and the general manager of Selva Viva, an Ecuadorian company that administers funds for the Lago Agrio litigation.

[60]

   Guerra Decl.¶ 23.

share the money with Guerra.[61]

Guerra then resumed his role as Judge Zambrano's ghostwriter.  When it came to the final judgment, however, Guerra relates that his role changed somewhat.  About two weeks before the Judgment was issued, "Zambrano gave [Guerra] a draft of the judgment [that had been written by the attorneys for the plaintiffs and delivered to Zambrano] so that [Guerra] could revise it."  Zambrano asked Guerra "to work on the document to fine-tune and polish it so it would have a more legal framework."[62]  He did so at Zambrano's residence using Fajardo's computer.[63]  He made few changes, making "it seem more like a judgment issued by the Sucumbios [*i.e.*, Lago Agrio] court."[64]

When Guerra was through, he returned the document to Zambrano, which "was not too different from the one the Plaintiffs had given him."[65]  Zambrano told him that the LAPs' lawyers "made changes to the judgment up to the very last minute before it was published."[66]

As noted, Guerra's account is corroborated in a number of respects by other declarations that recently were filed, some publicly and two under seal.  And Chevron has submitted further corroborating evidence, including drafts of nine of the twelve court orders that Judge Zambrano[67] issued during his tenure

---

61      *Id.*

62      *Id.* ¶ 25.

63      *Id.*

64      *Id.* ¶¶ 26–27.

65      *Id.* ¶ 27.

66      *Id.* ¶ 28.

67      Judge Zambrano reportedly was removed from the bench after rendering the decision against Chevron "for releasing a suspected drug trafficker in an act of 'obvious negligence or an inexcusable mistake.'"  Eduardo Garcia and Alexandria Valencia, *Chevron Hopes to Benefit from Ecuador's Judge Dismissal*, REUTERS (Mar. 9, 2012) (available at

on the Chevron case that were found on Guerra's computer[68] and emails among Donziger and Fajardo and others that appear to confirm the arrangement the LAPs had with Guerra.[69]

The Guerra affidavit, if it ultimately is credited, establishes that the Judgment was fraudulently obtained by the LAPs. Even before the Guerra affidavit was filed, however, Chevron had presented substantial evidence of fraud in the procurement of the Judgment. More recently, it has submitted still more.

B.    *Additional Evidence that the LAPs – Not the Judge – Wrote the Judgment*

On July 31, 2012, the Court granted in part and denied in part Chevron's motion for partial summary judgment seeking dismissal of the defenses of collateral estoppel and *res judicata*.[70] In that opinion,

---

[68]    http://www.reuters.com/article/2012/03/09/ecuador-chevron-idUSL2E8E9ETI20120309) (last visited Feb. 17, 2013).

[69]    Mastro Decl. [DI 746] Ex. C (Guerra Decl.) & Attachment O, P, Q, R, S, T, U, V, W.

Two emails appear strongly to corroborate Guerra's assertion that during Judge Zambrano's first tenure as the presiding judge of the Lago Agrio case (September 2009 through March 12, 2010), Judge Zambrano had an arrangement with Fajardo "to quickly move the case along in [the LAPs'] favor," that Judge Zambrano suggested that Guerra – who wrote his decisions in civil cases – meet with Fajardo, and that Guerra and Fajardo the agreed that Guerra would move the case quickly, that he would limit Chevron's procedural options, and that the LAPs' representatives would pay Guerra $1,000 per month.

On September 15, 2009, Fajardo wrote to Donziger and others: "The puppeteer [allegedly referring to Guerra] is pulling the string and the puppet [Judge Zambrano] is returning the package . . . . By now it's pretty safe that there won't be anything to worry about . . . ." Stavers Decl. [DI 754] Ex. 3140. A month later, Fajardo wrote to Donziger and Yanza that "[t]he puppeteer won't move his puppet until the audience doesn't pay him something . . . ." *Id.* Ex. 3154. Deposit slips in Guerra's bank records show that $1,000 was deposited into Guerra's account a month later by someone whom Chevron identifies as a LAP employee. Guerra Decl. ¶ 14 & Attachment K, L, M, & N; DI 752, Rule 56.1 Statement ¶ 205. Chevron has submitted other bank records showing further $1,000 deposits made into Guerra's account by the same employee.

[70]    *Chevron Corp. v. Donziger*, 886 F. Supp.2d 292.

the Court held that there was no genuine issue of material fact that fraud tainted various aspects of the Lago Agrio litigation.  Chevron subsequently has submitted additional evidence that further suggests that the Judgment was obtained by fraud.

In its motion for partial summary judgment, Chevron's "ghostwriting" allegations related principally to three internal LAP documents – that is, documents that were not part of the court record but parts of which wound up in the Judgment:

- A document entitled *The Merger of Chevron Inc. And Texaco Inc.* (the "Unfiled Fusion Memo") that was written by one or more members of the LAP team and that addresses, among other things, successor liability.[71]

- The Index Summaries – spreadsheets prepared by the LAP team that list and summarize documents filed in the Lago Agrio court.

- The Selva Viva Data Compilation, which "consists of spreadsheets containing environmental sampling data."[72]

Chevron submitted analyses by experts that established that portions of each of these documents appeared verbatim in the Judgment.[73]  Thus, Chevron contended that (1) relevant portions of the Judgment either were written by the LAPs, who had generated the documents, and passed to the judge *ex parte* or (2) these documents themselves were provided *ex parte* to the Lago Agrio court, which copied at least parts of them word-for-word into the Judgment.

There was no evidence disputing the fact that parts of the Judgment were virtually identical to the Unfiled Fusion Memo.  This Court therefore held that this virtual identity "demonstrate[d] as a matter of law that whoever wrote the Judgment had access to and copied portions of the [Unfiled Fusion] Memo."[74]

---

[71] *Id.* at 253.

[72] *Id.*

[73] *Id.* at 253-54.

[74] *Id.* at 286.

The Court, however, concluded that "[t]he identity of language between parts of the Unfiled Fusion Memo and parts of the Judgment – troublesome as it is – d[id] not alone warrant the conclusion that Chevron has established that there is no genuine issue of material fact on this issue."[75]   With respect to the Index Summaries and Selva Viva Data Compilation, the Court held that "[w]hile the similarities between those documents and aspects of the Judgment supports the premise that the author or authors of the Judgment had access to and copied them, the nature of their contents makes it more difficult to conclude that any *ex parte* submission of them materially impacted Chevron's ability to present its defense."[76]

Chevron now has submitted additional evidence that, it claims, shows that at least three other portions of the Judgment are identical to other internal LAP documents that never were part of the Ecuadorian court record:

- A memorandum by a Donziger intern (the "Moodie Memorandum"), which analyzes causation under a doctrine applied in California asbestos litigation.

- An analysis entitled *La Explotacion De Petroleo En La Zona Conesionada A Texaco Y Sus Impactos En La Salud De Las Personas*, which was written by LAP consultant Richard Clapp (the "Clapp Report").

- An email regarding trusts sent by Fajardo to alleged co-conspirators on June 18, 2009 (the "Fajardo Trust Email").

Chevron supports its contention with respect to each document by expert analyses that conclude that (1) the language or analysis in the relevant LAP internal document and the Judgment is nearly identical, and (2) the analysis or language is found nowhere else in the court record.[77]   In each case, Chevron's evidence is sufficient to warrant the conclusion that the items in question further support the existence of probable cause

---

[75]     *Id.* at 288.

[76]     *Id.* at 287 n.319.

[77]     *See, e.g.*, Mastro Decl. [DI 658], Ex. 3003 (Green Decl.), at 2, ¶ 12 ("it is highly unlikely, perhaps even more so than highly, that the passages in the [judgment regarding causation] were prepared independently of the Moodie memorandum.").

to suspect that the LAPs, not the judge, wrote the relevant part of the Judgment.[78]

_____

[78]

    *Moodie Memorandum.* Chevron's expert explains that both the Moodie Memorandum and the Judgment analyze "causation law of the United States and Australia, not Ecuador. . . . Absent some explanation, [he] would consider it highly unlikely that an Ecuadorian court would independently choose United States and Australian causation law, rather than Ecuadorian causation law."  Mastro Decl. [DI 658], Ex. 3003 (Green Decl.), at 4, ¶ 13. Moreover, the expert opines that the causation analysis in both the Judgment and the memorandum was incorrect under U.S. law and, in any case, inapplicable to the Lago Agrio case.  While the LAPs argue that the expert's work was not thorough and would not be admissible in its present form at trial, it affords a sufficient factual basis to support the finding of probable cause given the standard applicable here – probable cause to suspect a crime or fraud.

    *Clapp Report.* Chevron has submitted evidence showing that portions of the Clapp Report were included in an annex to the Cabrera Report.  Mastro Decl. [DI 658], Ex. 3005 (Leonard Report) at 9-10, 13. Emails between Donziger and a Stratus employee make clear that they sought to keep the Clapp Report's true authorship secret, presumably to create the appearance that Cabrera had written it.  *See* Hendricks Decl. [DI 34], Ex. 188 (Email from Doug Beltman at Stratus to Donziger stating "We have to talk to Clapp about that 5-pager, and how we have to limit its distribution.  It CANNOT go into the Congressional Record as being authored by him."). The annex to the Cabrera report, however, "did not contain the entirety of the Clapp Report . . . , and portions that were *not* included appear in the judgment."  DI 657, at 7; Mastro Decl. [DI 658], Ex. 3005 (Leonard Report) at 33-34. Chevron's expert notes that this includes a 34-word string which appears both in the Clapp Report and the Judgment, as well as two additional 16-word overlaps.  Ex. 3006 (Juola Report) at ¶¶ 23, 24. The portions of the Clapp Report that appear in the Judgment appear nowhere else in the Lago Agrio court record.  *Id.* at ¶ 29.

    The LAPs do not dispute that sections of the Clapp Report appear verbatim in the Judgment and are nowhere else in the Lago Agrio court record.  They argue only that "Chevron has not proved that the materials [including the Clapp Report] were not provided to the Judge in some informal manner such that the materials did not get signed and numbered as part of the record."  DI 712, at 5. But the LAPs point to no evidence that the Clapp Report ever was submitted to the judge in a manner that did not result in its being part of the court record much less that any such submission would not have been improper.  Given the identity of language in parts of the Clapp Report and the Judgment and the absence of that language anywhere in the court record, this too supports the conclusion that there is probable cause to suspect fraud.

    *Fajardo Trust Email.* The same can be said for the Fajardo Trust email.  On June 18, 2009, Fajardo sent an email to Donziger and others concerning Ecuadorian trust law and the *Andrade v. Conolec* case.  DI 401, Ex. 2174. Portions of that email – including a misquotation of the *Andrade* case – appear in the Judgment.  The Court noted in its opinion on Chevron's motion for partial summary judgment that "Chevron has submitted no expert reports documenting alleged plagiarism in the Judgment from the Fajardo email, or indicating whether or not the Fajardo email was or was not a part of the Lago Agrio court

C.     *Evidence of Fraud With Respect to the Judicial Inspection Process*

1.     *Dr. Calmbacher*

As indicated above, Dr. Charles Calmbacher was the LAPs' expert for some of the early judicial inspections. Indeed, two reports were filed with the Lago Agrio court under his name and with his signature. Those two reports, however, contained conclusions and findings that he later testified he did not reach.[79] The Court held on summary judgment that "the evidence is uncontradicted" that "[w]hile his signatures on the reports were genuine, the text associated with them was not."[80] The Court therefore concluded that "[i]t . . . is at least arguable that Chevron has established from Dr. Calmbacher's uncontradicted testimony . . . that the LAP lawyers wrote the reports submitted over Dr. Calmbacher's signatures and that Calmbacher did not in fact hold the views there stated."[81] But the Court declined to decide on summary judgment whether the submission of the purported Calmbacher report was fraudulent. The

---

record." *Chevron v. Donziger*, 886 F. Supp. 2d at 254 n.116. It recounted the LAPs' contention that any language that was common to the Fajardo Trust Email and the Judgment was merely "stock language" that could have been found4independently in the court record. *Id.* The Court therefore declined to find that there was no genuine issue of material fact that the Fajardo Trust Email had been submitted fraudulently to the court.

Chevron's new evidence overcomes these deficiencies, at least for present purposes. Chevron's expert now concludes that "parts of the [Judgment] must likely have had their origin in the unfiled Fajardo Trust email." Mastro Decl. [DI 658] Ex. 3005(Leonard Decl.), at 33. This includes identical word strings which are found nowhere else in the court record, *id.* at 30, and improper reliance on *Andrade*, which both the Fajardo Trust email and the Judgment incorrectly cite as dealing with "the legal basis of the trust," although the case itself says nothing about trusts. *Id.* at 31. Furthermore, following a complete review of the Lago Agrio court record, Chevron's expert now has concluded that the Fajardo Trust Email is found nowhere within it. Hernandez Aff. [DI 548] ¶ 26. The LAPs do not attempt to explain how the language from the Fajardo Trust email ended up in the Judgment despite the fact that it was never part of the Lago Agrio court record. Thus, the Fajordo Trust Email further supports the probable cause finding.

[79]

*Chevron Corp. v. Donziger*, 886 F. Supp. 2d at 288.

[80]

*Id.*

[81]

*Id.*

evidence, however, warrants a finding of probable cause, which the Court makes.

### 2.    *The Termination of the Judicial Inspections, Cabrera's Appointment, and the Cabrera Report*

As noted, the LAPs applied to the Lago Agrio court to terminate the judicial inspections that it had ordered.  While that application was pending, Donziger drafted a misconduct complaint against the judge to whom the case then was assigned.  The complaint accused the judge of "trading jobs for sex in the court."[82]  Pablo Fajardo, the LAPs' principal Ecuadorian lawyer, then had *ex parte* meetings with the judge, during which he (1) attempted to persuade the judge to appoint Cabrera as the global expert, which ultimately occurred on March 19, 2007, and (2) "let [the judge] know [the LAPs] might file it [*i.e.*, the misconduct complaint] if he does not adhere to the law and what we need."[83]

The Court held in its summary judgment opinion that there was no genuine issue of material fact that "the decisions to terminate judicial inspections, to pursue the global assessment, and to select Cabrera as the global expert were tainted by the duress and coercion applied to [the judge] by Donziger, Fajardo, and perhaps other."[84]  The Court held also that there was no genuine issue of fact that Cabrera's

> "report was not entirely or even predominantly his own work or that of any assistants or consultants working only for him.  There is no genuine issue with respect to the facts that the LAP team secretly prepared his [*i.e.*, Cabrera's] work plan, worked closely with him in carrying it out, and drafted most of the report and its annexes.  Nor is there any genuine issue regarding the fact that the LAP team then publicly objected to the very report that they, in large part, secretly had drafted . . . .  The answers filed by Cabrera in response to the LAPs' (and Chevron's) objections – like the report itself – were drafted at least in substantial part by the LAP team and written to read as if Cabrera had written them."[85]

---

[82]     *Id.* (internal quotation marks omitted).

[83]     *Id.* (internal quotation marks omitted).

[84]     *Id.* at 289.

[85]     *Id.*

It concluded as well that, while the Lago Agrio court "disclaimed reliance" on the Cabrera report, Chevron had presented evidence from which it could be concluded that the Lago Agrio court had in fact relied on the Cabrera report at least for certain determinations.[86]

### 3.    New Evidence of Fraud in Respect of the Cabrera Report

Subsequent to the partial summary judgment decision, Chevron submitted a declaration of Ramiro Fernando Reyes Cisneros ("Reyes"),[87] an Ecuadorian petroleum and environmental engineer,[88] that supports the conclusion that the object of terminating the original judicial inspections and appointing a single global expert was to obtain the appointment of someone chosen by the LAPs who would "play ball" with them.

Reyes' declaration states that he was asked by the LAPs' attorneys, before the termination of the judicial inspections and the appointment of Cabrera as the global expert, to serve as an independent expert to "monitor" the settling experts in the Lago Agrio case.  Donziger explained to Reyes at the time that he was unhappy with the reports plaintiffs' then-experts had submitted and wanted Reyes to submit to the Lago Agrio court another report that established "that the findings of the settling experts' report . . . were wrong."[89]  Reyes makes clear that Donziger and the other attorneys aimed to keep their relationship with Reyes secret so that his report would appear to be "independent."[90]  He claims that, despite Donziger's wishes, he believed that "the evidence did not support Mr. Donziger's position and [he] could not twist [his]

---

[86]

Id. at 289-90.

[87]

See Mastro Decl. [DI 658] Ex. 3014 (Reyes Decl.).

[88]

Id. ¶ 3.

[89]

Id. ¶ 20.

[90]

Id. ¶ 15.

professional assessments to make them fit the plaintiffs' interests."[91]  Accordingly, in the report Reyes prepared and showed to Donziger, he concluded that, while "the settling experts had failed to strictly follow their judicial mandate . . . their report contained enough information for the Court to make its own ruling."[92] Donziger was dissatisfied with Reyes' report and did not ask him to submit it to the court.[93]

In 2006, after the Lago Agrio court halted the judicial inspections, Donziger and the other LAP lawyers informed Reyes that they wanted him to serve as the global "court-appointed" expert[94] and that he would "need . . . to state that Chevron was the only party responsible for environmental damages and the harm to the local community."[95]  When Donziger later told Reyes that the "judge . . . was putting up hurdles to [Reyes'] appointment as expert," Reyes and Donziger discussed appointing Cabrera instead.[96]  At a later meeting with Cabrera and certain LAP attorneys which Reyes attended, "Mr. Fajado, Mr. Yanza and Mr. Donziger dropped any pretense that Mr. Cabrera would act independently in writing an expert report that would be technically sound and executed according to professional standards.  On the contrary, it was obvious that the plaintiffs had already predetermined the findings of the global assessment, that they themselves would write a report that would support their claim . . . and would simply put Mr. Cabrera's name on it."[97]

---

[91]     *Id.* ¶ 20.

[92]     *Id.*

[93]     *Id.*

[94]     *Id.* ¶ 22.

[95]     *Id.* ¶ 25.

[96]     *Id*. ¶¶ 29-30.

[97]     *Id.* ¶ 35.

####     4.      The "Cleansing Reports"

As the evidence of infirmities in and affecting the Cabrera fraud were coming to light, the LAP team privately began to "acknowledge[] problems associated with Cabrera's lack of independence."[98] The LAPs' lawyers' planned to hire a new expert to address Cabrera's findings and "submit an additional expert report to the Lago Agrio court that would appear to be independent of but, in fact, would rely on the data and conclusions reached in the Cabrera report."[99]   One of the LAPs' lawyers explained that, with the cleansing report:

> "The path for an Ecuadorian decision will be simple.  We would hope the judge would say/rule: There has been much controversy surrounding the Cabrera report, and objections to it. [Perhaps: The court did not anticipate that there was the degree of collaboration between plaintiffs' counsel and Cabrera, that they may have been.  Given these issues, the court is not relying on Cabrera for its ruling.]  However, the Court now has additional submissions from the parties . . . The court finds the new report (demonstrating damages of $ — billion) to be persuasive, reliable and accurate and therefore rules . . . ."[100]

Ultimately, the LAPs petitioned the Lago Agrio court to allow the parties to submit "supplementary information to aid th[e] Court in the process of assessing the global damages."[101]   The court granted the LAPs' request and the LAPs submitted seven new reports to the Lago Agrio court from newly hired experts.[102]  The new experts had been instructed to rely on the Cabrera report, but were not told that it

---

[98]

*Chevron Corp. v. Donziger*, 886 F. Supp. 2d at 261.

[99]

*Id.*

[100]

Champion Decl. [DI 400] Ex. 2060 (June 14, 2010 email).

[101]

Stavers Decl. [DI 549] Ex. 2420 (Fajardo declaration submitted to Lago Agrio court (the "Fajardo Lago Agrio Decl.")), at 2.

[102]

*Chevron Corp. v. Donziger*, 886 F. Supp. 2d at 261.

had been written by Stratus and the LAP team rather than Cabrera,[103] even though, in the words of Donziger, the LAP team's "general idea" had been that "Stratus would draft the report in a form that could be submitted directly to the Ecuadorian court by Mr. Cabrera."[104]  "[T]he known [new] experts that submitted reports later admitted that they never had traveled to Ecuador for the purpose of gathering data to support their reports. At least four relied on the data and conclusions in the Cabrera report."[105]  For example, one of the purportedly independent cleansing experts later admitted that he had "relied on parts of the Cabrera report" and "made no efforts to independently verify underlying data."[106]  Another expert said he relied on "data series and cost figures" from the Cabrera report without "know[ing] one way or the other whether they're correct or not."[107]

        In the Judgment, the Lago Agrio court disclaimed reliance on the Cabrera report.  The Judgment, however, appears to reveal that the court in fact relied upon it by its reliance on the cleansing reports.  For example, in assessing damages, the Lago Agrio court cited a cleansing report that "contain[ed] no damage assessment independent of that in the Cabrera report."[108]  Thus, this Court concluded on the partial summary judgment motion  that "[t]he uncontradicted evidence . . . shows that the Cabrera report was tainted and that the Lago Agrio court relied to some extent on that report, both directly and via its reliance on the

---

[103]

       *See e.g.*, Stavers Decl. [DI 549] Ex. 2417 (Shefftz deposition transcript), at 68:14-24 (cleansing expert was told "that the Cabrera report was prepared by an independent [and neutral] expert").

[104]

       Hendricks Decl. [DI 8] Ex. 6 (Donziger deposition transcript), at 2253:5-11.

[105]

       *Chevron Corp. v. Donziger*, 886 F. Supp. 2d at 261.

[106]

       Champion Decl. [DI 400] Ex. 2073 (Allen deposition transcript), at 171:18-172:3.

[107]

       Champion Decl. [DI 400] Ex. 2074 (Shefftz deposition transcript), at 63:3-21.

[108]

       *Chevron Corp. v. Donziger*, 886 F. Supp. 2d at 290.

[cleansing] report."[109]

* * *

Although this Court concluded that summary judgment was not warranted with respect to certain of the incidents described above – *e.g.*, the Calmbacher report and the preparation of the Judgment – *i.e.*, that the standard relevant to the crime-fraud exception to the work product doctrine and the attorney client privilege is less demanding. The privilege is overcome, in relevant part, by a showing of probable cause – "a prudent person ha[s] a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud."[110]

This record establishes probable cause to suspect, taking the matters essentially in chronological order, that (1) the LAPs wrote the Calmbacher reports that were filed with the Lago Agrio court and attached Calmbacher's signatures to them, knowing that the reports did not reflect his views, (2) the judicial inspection process was terminated, the global expert proposal adopted, and Cabrera selected as the global expert as a result of the LAPs' threat that they would file a misconduct complaint against the judge if he did not accede to their wishes that he take these actions, (3) the LAPs secretly planned and wrote all or at least the great majority of Cabrera's report, were complicit in its presentation to the Lago Agrio court as Cabrera's independent work, and took other steps to bolster the false pretense that the report had been independent, (5) the LAPs entered into an improper relationship with Judge Zambrano during his first tenure as the presiding judge pursuant to which Judge Zambrano agreed "to quickly move the case along in their favor," (6) and  the LAPs then entered into a supplementary and equally improper relationship with Guerra pursuant to which Guerra agreed to move the case quickly and limit Chevron's procedural options "by not granting their motions on alleged essential errors in rulings [Guerra] was to write, in exchange for payment

---

[109]
  *Id.*

[110]
  *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1934*, 731 F.2d at 1029.

by the LAPs' representatives of "approximately USD $1,000 per month for writing the court rulings Mr. Zambrano was supposed to write."  In addition, there is probable cause also to suspect that LAP lawyers and other representatives later bribed Judge Zambrano to obtain the result they wanted and, pursuant to the arrangement they struck with him, actually wrote the decision to which he signed his named after some cosmetic and inconsequential editing by Guerra.

*IV.    PB's Involvement*

PB argues that requiring it to produce documents would be inappropriate because, among other things, it was not retained until February 2010 and it neither participated in nor has much if any direct knowledge of the preceding events.  But that is too facile and misleading a contention.  Careful consideration of PB's role with respect to the Lago Agrio litigation, the Judgment, and certain other events, shows that PB participated heavily in certain critical activities that make it likely that it is an important and, in many respects, unique source of evidence of the alleged fraud that is available nowhere else and that at least some of the materials in its possession or control were in furtherance of crimes or frauds regardless of whether PB was aware of them.

The period from PB's initial involvement, which apparently began in February 2010, through the filing of the Lago Agrio court's Judgment in February 2011 is particularly telling.  It is important to understand where matters stood when PB came on the scene and then to focus on three of PB's activities that went on, in varying degrees, at the same time during this period:  (1) PB's efforts to assist in preventing Chevron from obtaining discovery from Stratus in a Section 1782 proceeding it had begun in December 2009 – discovery that eventually occurred and made clear that Stratus had had extensive contact with Cabrera and substantially written the Cabrera report, thus destroying or at least badly undermining the pretense that he had been an independent expert; (2) PB's role in recruiting and orchestrating the work of the so-called "cleansing experts," whose reports were submitted to the Lago Agrio court in order to provide a basis for a decision favorable to the LAPs; and (3) PB's role in drafting the final *alegato* – the closing argument or closing briefs

– submitted on behalf of the LAPs to the Lago Agrio court.

     A.    *The Stratus Section 1782 Proceeding and Evidence of Fraud on the Court*

     In December 2009, Chevron brought a Section 1782 proceeding against Stratus and related individuals in the District of Colorado.[111]  Chevron argued that discovery was appropriate because similarities between the Cabrera report and documents created by Stratus and its employees suggested that Stratus had written all or at least part of the Cabrera report.  It contended that it was entitled to discovery to determine the degree to which that in fact was so as well as the LAPs' involvement in the process.[112]  That application was pending when PB arrived on the LAP scene in February 2010.

     The District of Colorado granted Chevron's Section 1782 application on March 4, 2010.[113]  The LAPs, realizing that production from Stratus was virtually inevitable, were anxious to "minimize the effects" of the court-ordered production of Stratus' documents.[114]  In an email to Donziger, Fajardo, and others, Julio Prieto, one of the LAPs' Ecuadorian lawyers wrote:

> "Today Pablo [Fajardo] and Luis [Yanza] were kind enough to tell us what was going on in Denver, and the fact that ALL will be made public, including correspondence . . . . Apparently this is normal in the U.S. and there is no risk there, but *the problem, my friend, is that the effects are potentially devastating in Ecuador (apart from destroying the proceeding, <u>all of us, your attorneys, might go to jail</u>), and we are not willing to minimize our concern and to sit to wait for whatever happens.  For us <u>it is NOT acceptable for the correspondence, the e-mails, between Stratus and Juanpa [Saenz] and myself to be divulged.</u>*"[115]

---

[111]

     *Chevron v. Stratus Consulting, Inc.*, No. 10 Civ. 00047 (D. Colo.).

[112]

     *Id.* DI 2 (Chevron Mem. of Points and Authorities in Support of Petition).

[113]

     *Id.* DI 22.

[114]

     Hendricks Decl. [DI 9], Ex. 11 (March 30, 2010 Email from Julio Prieto to Donziger, Fajardo and Others).

[115]

     *Id.*  (all emphasis added).

A month later, the LAPs filed a motion for a protective order with the District of Colorado, claiming that the documents and testimony that Stratus had been ordered to produce were protected from disclosure by the attorney-client privilege and work product protection.[116]  The motion was later supported by a declaration of Pablo Fajardo (the "Fajardo Declaration"), the LAPs' lead Ecuadorian counsel.[117]

PB was heavily involved in drafting the Fajardo Declaration[118] which, in the words of one PB partner, Eric Westenberger, was intended to "'cleanse any perceived impropriety related to the Cabrera Report."[119]  The LAPs' American lawyers debated what the affidavit should reveal and whether Fajardo should be the one to sign it.  When PB circulated a draft of the affidavit on May 3, 2010, one lawyer from Emery Celli Brincherhoff & Abady, LLC, which also represented the LAPs, responded:

> "I don't quite get the purpose of this affidavit.  Pablo mentions one document submission but not the other.  *If he's submitting an affidavit about what happened, why omit the most important part*?  It seems misleading at best.  *I just don't see how he can sign an aff. that documents his submissions to Cabrera without mentioning that he sent documents that originated from Stratus which is the one thing the judge is going to want to know about* . . . . [And] I wouldn't emphasize too much that Cabrera was independent and court-appointed.  Once [Fajardo] says that in an American court, we'll never be able to back off from it."[120]

Westenberger expressed his concern that Fajardo might "be subject to deposition[.] This is why we struggled with who would sign the declaration.  If Steve [Donziger] signs, he will most certainly be deposed.  Same for any other counsel in the US.  We figured that with [Fajardo], they likely would not slow down the process

---

116

    *Chevron Corp. v. Stratus Consulting, Inc.*, No. 10 Civ. 00047, DI 68.

117

    *Id.*  DI 99 (filed May 5, 2010).

118

    *See* Stavers Decl. [DI 549] Ex. 2407 (May 3, 2010 email from PB attorney to others attaching "a draft of Pablo Fajardo Mendoza's Declaration in support of our motion to be filed in Denver.").

119

    Hendricks Decl. [DI 9] Ex. 13 (email from Westenberger to others).

120

    Stavers Decl. [DI 549] Ex. 2407 (May 3, 2010 email from Ilann Maazel).

by deposing him."[121]

   The Fajardo Declaration that ultimately was filed gave a bland description of the process by which the judicial inspections had been terminated, the global expert proposal adopted, and Cabrera in particular selected.  But it failed to mention that Fajardo and Donziger had threatened the judge with a misconduct complaint unless the judge agreed to their demands and appointed Cabrera.  And while it acknowledged that the LAPs had  "delivered materials to Mr. Cabrera,"[122] it did not mention the March 3, 2007 meeting at which the LAPs laid out the plan for Cabrera's report and indicated that the work would be done by them.[123]  Nor did it reveal that Stratus and the LAPs' counsel in fact had written all or most of Cabrera's report.[124]  In other words, it omitted what the Emery Celli lawyer said was "the most important part" – that Fajardo "sent documents that originated from Stratus."  The declaration similarly neglected to report that the LAPS "chang[ed] the focus of [Cabrera's] data at [their] offices."[125]

   Notwithstanding the Fajardo Declaration, the District of Colorado denied the LAPs' motion for a protective order and ultimately ordered Stratus to turn over its documents.[126] Following that ruling, the LAP team brainstormed ways to delay further the production of Stratus' documents and, realizing that

---

121

   *Id.* (May 3, 2010 email from Westenberger).

122

   *Chevron Corp. v. Stratus Consulting, Inc.*, No. 10 Civ. 00047, DI 99, ¶ 17.

123

   *Chevron Corp. v. Donziger*, 886 F. Supp. 2d at 258.

124

   *Id.* at 258-260.

125

   Hendricks Decl. [DI 32], Ex. 156 (July 17, 2007 email from Donziger) ("we think that Richard [Cabrera] should suspend his work in the field and we should not pay the team until after the recess.  We just need him to tell the team and Texaco that he's going to start all over after the recess so there is nothing strange, everything appears normal.")

126

   *Chevron Corp. v. Stratus Consulting, Inc.*, No. 10 Civ. 00047 (MSK) (MEH), 2010 WL 2135217 (D. Colo. May 25, 2010) *order clarified*, No. 10 Civ. 00047 (MSK) (MEH), 2010 WL 2232371 (D. Colo. June 1, 2010).

production was inevitable, to mitigate its effects.  One of the LAPs' lawyers sent an email to the LAP team emphasizing that "Stratus will be under a court order to produce all materials it gave Cabrera.  Stratus will not risk a contempt motion, it will comply. Unless we want the Stratus/Cabrera revelation to come out in CO, which seems like the worst possible place, we need to make our submission in Ecuador and fast."[127]  PB's Westenberger responded, "[w]hat about the following?  Appeal; move for stay; if we win with [the District of Colorado] great; if we lose, we produce whatever we want (narrow read); [Gibson Dunn] complains and then we move for clarification.  If we lose again, we think about another appeal."[128]

Nearly five months after the court denied the LAPs' motion for a protective order, Chevron had yet to receive the majority of responsive documents from Stratus and filed a motion to compel production.  The District of Colorado granted Chevron's motion on October 1, 2011;[129] the LAPs filed an emergency motion to stay pending appeal three days later.  The District of Colorado denied the LAPs' motion the next day,[130] and Stratus began producing documents.

The Prieto email[131] makes it clear, or at least highly likely, that the LAPs' Ecuadorian counsel knew what had taken place among themselves, Stratus and Cabrera – the Cabrera report was not the work of an independent expert but of Stratus, and the LAPs and the various statements and other tactics designed to portray the report as independent were, and were intended to be, highly misleading.  They made at least a good part of that clear to the American lawyers.  PB and Emery Celli, among others, then collaborated on the drafting of the Fajardo Declaration, which acknowledged having "delivered materials to Mr. Cabrera" without

---

[127]
      Hendricks Decl. [DI 47] Ex. 292 (May 27, 2010 email).

[128]
      *Id.*

[129]
      *Chevron Corp. v. Stratus Consulting, Inc.*, 2010 WL 3923092, at *12.

[130]
      *Chevron Corp. v. Stratus Consulting, Inc.*, No. 10 Civ. 00047, DI 268.

[131]
      *See supra* pp. 30-31.

revealing that the LAPs had prepared the plan for the report he had filed, had extensive contacts with Cabrera, had had Stratus write all or most of the report itself.  That declaration then was submitted to the court in Denver for the purpose of persuading it that nothing amiss had occurred with respect to the Cabrera report in an effort to prevent the disclosure of Stratus' files, including "the e-mails between Stratus and Juanpa [Saenz] and myself" that Prieto was determined to keep concealed lest the case in Ecuador be destroyed and the LAPs' Ecuadorian attorneys "go to jail."[132]

---

[132]

The LAPs argue that "a close[] reading" of Prieto's email suggests that the email betrayed concern that disclosure of the emails between Stratus, on the one hand, and Prieto and Saenz, on the other was not acceptable because it would have violated duties they owed to their clients as Ecuadorian lawyers, not, as Chevron maintains, that he was concerned that disclosure of what had occurred vis-a-vis Cabrera amounted to misconduct such that the lawyers might go to jail.  DI 712, 10-11.  Perhaps.  But that contention, whatever impact it someday may have before a trier of fact, is neither material at this stage nor, in all the circumstances, persuasive.

First, the issue for present purposes is whether "a prudent person [would have] a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud."  *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d at 1039.  Regardless of the Prieto email, the ultimate question with respect to the proceedings in Colorado is whether there is probable cause to suspect that the Fajardo declaration that was submitted to the district court there was fraudulent because it suggested that nothing was amiss with respect to Cabrera and his report but failed to disclose a host of highly material facts plainly suggesting the contrary.  As discussed above, probable cause exists to suspect fraud in that respect independent of the interpretation of the Prieto email.  The Prieto email goes to the motive for that nondisclosure, not to its deceptive nature.  Moreover, even if the Prieto email shed light on the latter issue, and even if PB's interpretation were plausible, "a finding of probable cause," as discussed below, "is not negated by 'an innocent explanation which may be consistent with the facts alleged."  *United States v. McDonald*, 01-CR-1168JSWDW, 2002 WL 31956106, at *5 (E.D.N.Y. May 9, 2002) (quoting *A.I.A. Holdings, S.A. v. Lehman Bros. Inc.*, 97 Civ. 4978 (LMM) (HBP), 1999 WL 61442, at *5 (S.D.N.Y. Feb. 3, 1999) (citing *United States v. Farma*, 758 F.2d 834, 838 (2d Cir. 1985)).

Second, Chevron's interpretation of the email is more plausible than PB's.  Prieto's expressed concern was not only with potential criminal exposure for the Ecuadorian lawyers.  He was concerned also that disclosure of what had gone on between Stratus and the Ecuadorian lawyers could or would "destroy[] the proceeding," *i.e.*, the Lago Agrio case.  It is quite improbable that a disclosure of the Stratus documents by the Ecuadorian lawyers in breach of professional responsibilities, even in criminal breach of such responsibilities, would have destroyed the Lago Agrio case, whatever consequences it might have had for the lawyers themselves .  Indeed, the Stratus documents were disclosed and the Ecuadorian court entered the Judgment anyway.

In these circumstances, there is probable cause to suspect that at least some of those involved, as alleged extensively in the amended complaint,[133] committed mail and/or wire fraud[134] and obstructed justice in at least the Stratus 1782 proceeding in Colorado by formulating and filing the Fajardo declaration, which was a seriously misleading account of what had happened.

PB's involvement in the Section 1782 proceedings was not limited to the one in Colorado. It has represented the Ecuadorian plaintiffs in at least six of the proceedings across the country[135] and was

---

Finally, the suggestion that Prieto was concerned that the disclosure of the emails would have violated Article 335.1 of the Ecuadorian Judicial Code (DI 712, at 11 ) borders on the fanciful. Although the LAPs were desperately seeking to stop disclosure of the Stratus documents in Colorado, no such argument was made to that Court. Nor was any such argument made to this Court when Donziger's files were subpoenaed and produced in the 1782 proceeding or in the Count 9 action when the depositions of Ecuadorian lawyers were noticed. The notion that discovery from the Ecuadorian lawyers would violate Ecuadorian law first was raised in 2012 in this case, more than two years after the date of the Prieto email and almost two years after the submission of Fajardo's declaration to the Colorado district court.

[133]

*See e.g.*, Am. Cpt. ¶¶ 266-303, 354-55, 359-65.

[134]

"The elements of mail or wire fraud are (i) a scheme to defraud (ii) to get money or property, (iii) furthered by the use of interstate mail or wires." *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000). "[T]he well-settled meaning of 'fraud' require[s] a misrepresentation or *concealment* of *material* fact." *Neder v. United States,* 527 U.S. 1, 22 (1999) (first emphasis added, second in original). Chevron alleged in its amended complaint that the RICO defendants committed wire fraud by the electronic filing of court papers that contained false and misleading statements. ¶ 354(e). For example, the Fajardo declaration "falsely attested that Cabrera was 'independent' and omitted from his declaration the substantial role he and other conspirators had played in securing Cabrera's appointment, his numerous personal meetings with Cabrera . . . and the massive, U.S. project to write, translate and submit the fraudulent Cabrera Report." ¶ 287. Chevron has submitted subsequently evidence that shows – at the very least – that there is probable cause to suspect that the Fajardo declaration – which was filed electronically with several U.S. courts – misrepresented or concealed material facts about the LAPs' relationship with Cabrera.

[135]

*See Chevron Corporation v. Allen*, No. 2:10-mc-00091-wks (D. Vt.); *In re Chevron Corp.*, No. 1:10-mc-00053-SSB-KLL (S.D. Ohio); *In re Chevron Corp.*, No. 7:10-mc-00067 (W.D. Va.); *In re Chevron Corp.*, No. 2:10-mc-00208-JD (E.D. Pa.); *Chevron Corp. v. Picone*, No. 8:10-cv-02990-AW (D. Md.); *In re Chevron Corp.*, No. 2:10-cv-02675-KM-MCA (D.N.J.).

involved behind the scenes in others.[136]  Just as in Colorado, the LAPs' employed PB's strategy of "fight[ing]

hard on all fronts all the time and conced[ing] nothing, [to] buy as much time as possible."[137]  Indeed, the

LAPs filed the Fajardo Declaration in at least fifteen other Section 1782 proceedings across the country,

including this one.[138]

B.      The Cleansing Reports

In May 2010, the District of Colorado granted discovery from Stratus, although documents

were not produced until much later.  Also in May 2010, this Court granted Chevron's application to subpoena

---

[136]

See, e.g., Mastro Decl. [DI 658], Ex. 3010 (1/17/2011 text message from Westenberger to
Donziger) ("I've convened a call for 1230 on the 1782s."); Stavers Decl. [DI 547] Ex. 241
(Dec. 13, 2010 E-mail from Eric Daleo of Patton Boggs) ("we have prepared for transfer
documents that previously appeared on privilege logs in the Allen (Vermont), Picone
(Maryland), Rourke (Maryland), and Scardina (Virginia) [Section 1782] proceedings.")

[137]

DI 496, Ex. 5; see also Hendricks Decl. [DI 48] Ex. 323 (email from Donziger explaining
that it is important to "adhere to the fundamental principle of our strategy as outline by Jim"
Tyrrell of Patton Boggs to "appeal everything on the theory that we gain a greater advantage
by fighting them on everything, and tying them up, than conceding any one thing").

[138]

Stavers Decl. [DI 549] ¶ 44; see In re Chevron Corp., 11-cv-24599 (S.D. Fla. June 26, 2012
& Apr. 16, 2012) Dkts. 55-26 & 86-26; Chevron Corp. v. Donziger, 11-cv-0691 (S.D.N.Y.
Feb. 8, 2011 and Feb. 25, 2011) Dkts. 66-2 & 138-13; In re Application of Chevron Corp.,
No. 2:10-cv-02675-SRC-MAS (D.N.J. June 7, 2010 and May 17, 2011) Dkts. 5-15 & 54-10;
Chevron Corp. v. Allen, No. 2:10-mc-00091-WKS (D. Vt. Nov. 16, 2010) Dkt. 23-9; In re
Chevron Corp., No. 1:10-mc-0053-SSB-KLL (S.D. Oh. Nov. 16, 2010) Dkt. 20-10; Chevron
Corp. v. Picone, No. 8:10-cv-02990 (D. Md. Nov. 16, 2010) Dkt. 19-9; In re Chevron Corp.,
No. 10-mc-10352 (D. Mass. Nov. 16, 2010) Dkt. 25-5; Chevron Corp. v. Scardina, No. 7:10-
cv-00549-JCT (W.D. Va. Nov. 16, 2010) Dkt. 15-9; In re Application of Chevron Corp., No.
10-mc-00021-JCH-LFG (D.N.M. Aug. 26, 2010) Dkt. 63-2; Chevron Corp. v. Champ, No.
10-mc-00027 (W.D.N.C. Aug. 24, 2010) Dkt. 20-10; In re Application of Chevron Corp.,
No. 3:10-cv-00686 (M.D. Tenn. Aug. 11, 2010) Dkt. 44-9; In re Application of Chevron
Corp., No. 10-cv-01146-IEG-WMC (S.D. Cal. June 26, 2010) Dkt. 16-4; In re Application
of Chevron Corp., No. 10-mc-00371-CKK (D.D.C. June 11, 2010) Dkt. 22-2; Chevron Corp.
v. 3TM Int'l, Inc., No. 4:10-mc-00134 (S.D. Tex. May 18, 2010) Dkt. 49-3; In re Chevron
Corp., No. 10-cv-00047 (D. Colo. May, 5, 2010).

the *Crude* outtakes from the filmmaker, Joseph Berlinger.[139]  The outtakes further supported Chevron's contention that Donziger and the LAPs had orchestrated Cabrera's appointment and written his report in whole or in major part.  In this context, PB then led efforts – in the words chosen by PB's Mr. Westenberger– to "cleanse any perceived impropriety related to the Cabrera Report."[140]

First, as explained above, the LAP team – by way of another Fajardo declaration – petitioned the Lago Agrio court to order supplemental reports on the issue of damages.[141] The declaration, drafted by PB and other LAP American lawyers, also was intended to argue that the submissions the LAPs' had made to Cabrera were appropriate and acceptable under Ecuadorian law.  Discovery has shown, however, that the LAPs' lawyers debated whether and to what extent the declaration should reveal the LAPs' "meetings with Cabrera"[142] and the nature and extent of their relationship with him.  A June 5, 2010 email by PB lawyer Edward Yennock said:

> "The sole open issue [with the declaration] is the specificity with which we describe the 'meetings' with Cabrera . . . If we . . . are to have no more certainty than we do today, we are inclined to revise this to include little or no information about the meetings, as much as we'd like to be able to use this submission to fully air the facts.  However, two events might occur to change that approach: (1) The Stratus emails are expeditiously uploaded into a searchable format that allows us to identify any communications related to the meetings by early next week; and/or (2) we are somehow able to review the relevant Crude outtakes."[143]

Yennock made clear that understanding what the *Crude* outtakes and the Stratus documents would reveal was crucial to determining whether to disclose the true nature of the LAPs' relationship with Cabrera.  He wrote

---

[139]

In re Chevron Corp., 709 F. Supp. 2d 283 (S.D.N.Y. 2010).

[140]

Hendricks Decl. [DI 9] Ex. 13 (email from Westenberger to others).

[141]

Stavers Decl. [DI 549] Ex. 2420 (Fajardo Declaration submitted to Lago Agrio court); Hendricks Decl. [DI 9] Ex. 13 (email from Westenberger at PB to others attaching draft outline of petition to be filed in Ecuadorian court.)

[142]

Champion Decl. [DI 400] Ex. 2060 (June 5, 2010 Email from PB lawyer Edward Yennock).

[143]

Id.

that "the pivotal nature of this submission, and the potentially devastating effect of making a representation that is later proven to be wrong or incomplete by way of the emails or the outtakes (assuming Chevron gets them), would seem to warrant a review [of the documents and the outtakes] if it can be done quickly."[144]

An Emery Celli lawyer responded that there was not enough time to review the outtakes and the Stratus emails because "a court ruling – relying solely on Cabrera – is potentially imminent [in Ecuador] if we don't get something on file immediately."[145]  He proposed that they:

> "[T]ake out any references to alleged 'contacts' between Cabrera and plaintiffs' counsel and/or with plaintiffs' consulting experts and *just confess to having authored specific portions of the report*.  We emphasize we think there was nothing wrong with this . . . . . The 'contacts' issue is too uncertain and gaining clarity will take too long.  *If we cop to having written portions of the report*, the details of exactly how that might have been accomplished will be for another day, when and if the relevant people are deposed as part of the 1782s, but hopefully by that time, the process of having both sides cure this with new submissions will be under way and render the details of the Cabrera report a thing of the past."[146]

Ultimately, the declaration informed the court that the LAPs had made submissions to Cabrera but did not actually "confess to having authored specific portions of the report."[147]  Instead, it stated that "Chevron enjoyed the same opportunity as the Plaintiffs to provide information to Cabrera in support of its position in the case,"[148] and, while

> "Chevron elected to ignore this opportunity . . . [t]he Plaintiffs . . . took advantage of the opportunity to defend their own findings, conclusions and valuations to Cabrera in order for the latter to consider potentially adopting them.  The information the plaintiff provided to Cabrera included proposed factual findings and economic valuations of the environmental and other damages Texpet's practices and contamination caused.  Naturally, Cabrera was

---

144

    *Id.*

145

    *Id.* (June 14, 2010 email).

146

    *Id.* (emphasis added).

147

    *Id.*

148

    Stavers Decl. [DI 549] Ex. 2020 (Fajardo Declaration submitted to Lago Agrio court), at 6.

free to adopt the plaintiff's viewpoint, proposed findings and valuations.  And of course, because he apparently considered them credible, Cabrera adopted the plaintiffs' proposals, analysis and conclusions regarding the damages and assessment."[149]

This declaration went farther than that filed in Denver with its statement that the plaintiffs had provided Cabrera with "proposed factual findings and economic valuations of the . . . damages" and its contention that Cabrera adopted them "because he apparently considered them credible."  But that too appears to have been deceptive, whether or not PB then was aware of the extent to which that was the case.  There is at least probable cause to suspect that Cabrera was handpicked by the Lago Agrio plaintiffs because he would "play ball" with them, that the entire report was planned and written by the LAPs and Stratus, and that Cabrera "played ball" by simply affixing his name to it, acting all the while under the pretense – fostered by the LAPs – that the report was Cabrera's independent work.

The Lago Agrio court granted the LAPs' request to file additional damages assessments, and the LAPs put together the new team.  PB "hired the Weinberg Group to manage the [cleansing] process,"[150] in August 2010.[151]  The two firms facilitated the hiring of new experts.  PB was the "lead"[152] in developing the strategy for the new expert reports,[153] and had continuous "interaction" with the Weinberg Group and the cleansing experts.[154]

As explained previously, the new experts were instructed to use Cabrera's data as a "starting

---

[149]

*Id.* at 6-7.

[150]

Stavers Decl. [DI 549] Ex. 2406 (Donziger deposition transcript), at 1666.

[151]

Hendricks Decl. [DI 36] Ex. 215 (Weinberg retention agreement).

[152]

Stavers Decl. [DI 549] Ex. 2406 (Donziger deposition transcript), at 1666.

[153]

*See, e.g.*, Hendricks Decl. [DI 36] Ex. 214 (Aug. 18, 2010 email from PB lawyer Adlai Small to others).

[154]

Stavers Decl. [DI 549] Ex. 2406, at 1666-67.

point . . . to develop [their] own valuation[s]."[155] But at least one of the experts has testified that he was not told that Stratus and the LAPs had written all or at least most of Cabrera's report[156] Another has admitted that he relied directly on parts of the Cabrera report and made no efforts independently to verify Cabrera's data.[157] None of the new experts ever traveled to Ecuador to gather their own data. Indeed, as one PB attorney wrote to Donziger, the purpose of the cleansing reports was to "address Cabrera's findings in such a subtle way that someone reading the new expert report (the Court in Lago or an enforcement court elsewhere) might feel comfortable concluding that certain aspects of Cabrera [were] a valid basis for damages.'"[158]

In the end, seven new reports were filed with the Lago Agrio court on September 16, 2010. Six of the seven were by U.S. experts; one was anonymous.[159]

The Lago Agrio court issued the Judgment in February 2011. It disclaimed reliance on the Cabrera report, but noted that it had considered other expert assessments, including some of the reports submitted by the new experts hired by PB, in rendering the Judgment.[160]

C.    *Post-Trial Submissions to the Lago Agrio Court*

PB was involved also in drafting the LAPs' post-trial submissions to the Lago Agrio court. Beginning no later than March 2010, it revised and re-wrote the *alegatos* – post-trial briefs– before they were

---

[155]

Champion Decl. [DI 400] Ex. 2073 (Allen deposition transcript), at 140:25-141:11.

[156]

Stavers Decl. [DI 549] Ex. 2417 (Shefftz deposition transcript), at 68:14-24.

[157]

Champion Decl. [DI 400] Ex. 2073 (Allen deposition transcript), at 140:25-141:11.

[158]

Hendricks Decl. [DI 36] Ex. 214.

[159]

*Chevron Corp. v. Donziger*, 886 F. Supp. 2d at 261.

[160]

DI 168 (Lago Agrio Judgment) at 48-51.

filed.[161]  It "handle[d] the alegato assignments"[162] and worked on "re-draft[ing]" and "complet[ing]" the

*alegatos* before they ultimately were submitted to the Lago Agrio court in December 2010 and January

2011.[163]

> D.      *PB's Other Activities*

PB's role has gone beyond that described above.

PB authored an undated memorandum called "Invictus," which laid out a plan to enforce the

Judgment "quickly, if not immediately, on multiple enforcement fronts – in the United States and abroad."[164]

The memorandum, which recognized that enforcement of the Judgment may be difficult in the United States,

emphasized that "Patton Boggs' current and former representation of numerous, geographically diverse

foreign governments means that barriers to judgment recognition in a given country may not necessarily

preclude enforcement there."[165]  It further elaborated that "Patton Boggs will use its political connections and

strategic alliances to ascertain which nations' governments are not beholden to Chevron, so as to minimize

---

161

   On March 6, 2010, Aaron Marr Page, who worked for Donziger, sent an email to Donziger, attaching the draft *alegato* and explaining that "I think the draft attached here can be sent to selected counsel, as we discussed . . . . I think that may be precisely what new counsel needs to see to understand where we are in the process and to start thinking about how they can effectively engage." Mastro Decl. [DI 658] Ex. 3007.  On April 8, 2010, Laura Garr, another individual working for Donziger, sent an email to Eric Westenberger attaching "the latest working draft of the Alegato in the Ecuador trial."  Hendricks Decl. [DI 355] Ex. 1135.

162

   Mastro Decl. [DI 658] Ex. 3010 (text message on 1/14/11 at 1:00 p.m. from Westenberger to Donziger saying "I'll handle alegato assignments"); DI 558 (PB Mem. Of Law in Support of Mot. to Quash the Subpoena), at 8 ("Recognizing that these filings may be read by U.S. courts and abroad . . . Patton Boggs provided drafting assistance.").

163

   Stavers Decl. [DI 549] Ex. 2439.

164

   Hendricks Decl. [DI 6] Ex. 341 (Invictus Memorandum), at 12.

165

   *Id.* at 19.

the prospect of adverse governmental interference in the enforcement process."[166]  Subsequently, PB has been heavily involved in the LAPs' efforts to enforce of the Judgment in other countries.

PB also controls, at least to some degree, how the LAP team spends the money it receives to fund the litigation.  In October 2010, the LAPs entered into a funding agreement with Treca Financial pursuant to which Treca agreed to provide for legal expenses in return for a stake in the Judgment.[167]  Not only did PB play the "primary role" in "convincing [Treca's financial advisor] to invest in the Lago Agrio litigation,"[168] it also had authority over how the funds Treca provided were spent.  Indeed, "fees and out-of-pocket expenses of lawyers . . . advisors, experts, witnesses and others . . . ." were subject to the approval of "James Tyrrell (the lead partner at Patton Boggs LLP)," as well as Donziger.[169]  Any costs associated with court proceedings, arbitral tribunals, fees relating to claims or counterclaims by or against the LAPs, and fees and expenses of LAPs' counsel were subject also to Tyrrell's and Donziger's approval.[170]

Finally, PB itself has become an active litigant in cases related to this one.  PB has brought three actions against Chevron in which PB itself is the plaintiff – two in the District Court for the District of

---

[166]

    *Id.*

[167]

    11 Civ. 3718 (LAK), Champion Decl. [DI 44] Ex. 46 (Treca Funding Agreement).

[168]

    Stavers Decl. [DI 549] Ex. 2406 (Donziger deposition transcript), at 3239:22-2340:03.

[169]

    11 Civ. 3718 (LAK), Champion Decl. [DI 44] Ex. 46 (Treca Funding Agreement), at 2.

[170]

    *Id.*  Treca has since terminated its relationship with the LAPs.  On September 29, 2011, the Burford Group, Treca's financial advisor, sent a letter to Donziger and the LAPs, stating that "[i]t is clear from the evidence that has come to light subsequent to our discussions with you and Treca's entry into the Funding Agreement that [you] have engaged in conduct and activity that gives rise to numerous breaches of the Funding Agreement.  In addition to breaching the Funding Agreement – through misrepresentations and other failures – the conduct discovered amounts to fraud."  Elliot Decl. [DI 714] Ex. 1.

Columbia[171] and one in the District of New Jersey, which recently was transferred to this Court.[172]

### IV.    Proceedings With Respect to the PB Subpoena

The Subpoena was served on June 15, 2012, and contained 58 discrete requests for the production of documents.

### A.    PB's Motion to Quash

PB moved to quash on July 20, 2012.[173]  It argued principally that the Subpoena would require it to disclose privileged or other protected material and that compliance would subject it to undue burden.[174]

On the issue of privilege, the Court held  that (1) "there [was] reason to doubt whether many – if any – of the subpoenaed documents [were] protected by the attorney-client privilege,"[175] (2) PB's motion "essentially ignore[d] the fact that the protection accorded to attorney work product in important respects is less extensive than that accorded to attorney client communications,"[176] and (3) PB had failed to show that it was not in possession of responsive documents obtained from third parties that were not protected from

---

[171]

*Patton Boggs, LLP v. Chevron Corp.*, No. 10 Civ. 1975 (HHK) (D. DC); *Patton Boggs LLP v. Chevron Corp.*, No 11-00799 (HHK) (D.DC).

[172]

*Patton Boggs, LLP v. Chevron Corp.*, No. 12 Civ. 9176 (LAK).

[173]

DI 522.

[174]

*See* DI 527.

[175]

DI 571 at 2.

[176]

*Id.* at 3.

disclosure.[177]   Moreover, the Court noted that certain of the protected documents might be subject to disclosure under the crime-fraud exception to the attorney client privilege and the work product doctrine.[178]

With respect to burden, the Court determined that it was premature to quash the Subpoena as unduly burdensome before its scope had been resolved.[179]  The  Court noted also that "it is far from clear that the burden of complying with this subpoena . . . would be out of line with what occurs in comparable litigation in this electronic age."[180]

The Court denied the motion to quash without prejudice to PB's privilege and burden claims, which it would consider in connection with any Rule 45(c)(2)(B) objections PB might raise.  The Court deferred PB's obligation to produce a privilege log until further notice.[181]

B.    Argument and the Initial Narrowing of the Subpoena

PB then served Chevron with 186 pages of objections to the Subpoena.  The Court held a hearing on September 25 and 27, 2012 to address them, ruling on the majority during the hearings[182] and the

---

[177]

Id. at 4.

[178]

Id. at 4-5.

[179]

Id. at 6.

[180]

Id. at 7.

[181]

Id. at 8.

[182]

The Court made clear that its rulings rested not only on relevancy, but on Fed. R. Civ. P. 26(b)(2)(c), which "gives district courts discretion to limit the extent of discovery, even of relevant matters, for several reasons. One of them is that its burden or expense outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake, and the importance of the discovery in resolving the issues."  It sustained many objections in whole or in part in order to reduce alleged burden on PB and intrusion into its role as litigating counsel rather than on the ground that the information sought was not relevant. *See e.g.*, Tr., Sept. 25, 2012, at 6-7.

balance in a November 16, 2012, order (the "November Order"), which also memorialized the rulings it had

made at the hearings.  The Court sustained PB's objections to 15 of the 58 requests and limited 10 others.[183]

Both sides agree that the Court's rulings substantially limited the Subpoena's scope and the

extent of the effort that would be necessary to comply with it as modified.  According to Chevron's experts,

the effect of the Court's rulings was to reduce by 90 to 99 percent the amount of data that would have to be

searched and reviewed in order to comply[184] and reduced the cost of compliance by 85 percent.[185]  PB's

experts estimate that, even using Chevron's proposed search terms, the November Order reduced the cost of

reviewing and logging responsive documents by over 80 percent.[186]

Subsequent to the November Order, the Court received supplemental briefing on (1) the

extent to which the Subpoena as modified is unduly burdensome, and (2) whether the Subpoena in its

modified form sought materials in areas in which "the first of the two prongs of the crime-fraud exception

[to the attorney client privilege] is satisfied."[187]

PB contends that the Subpoena still is impermissibly overbroad.  PB complains principally

that Chevron seeks information from its "adversary's litigation counsel" that "it will likely obtain . . . from

---

183

> *See* DI 621.

184

> DI 713, at 7-8.

185

> *Id.*

186

> *Compare* DI 665, at 2-3 (To review and log the documents resulting from Chevron's search terms will likely . . . cost between $1,060,000 and $1,290,000.") *with* DI 527, at 2-3 ("At a minimum, it is estimated that the review of electronic documents alone will cost the firm between $6.35 million and $7.75 million dollars, plus roughly $550,000 for electronic document collection").

187

> Sept. 27, 2012 Tr., at 139.

the parties or other nonparties."[188]  Moreover, PB claims that the Subpoena seeks documents concerning events in which PB had no involvement and asks that the Court "limit its areas of inquiry to Chevron's allegations of Patton Boggs' purported misconduct or alleged conduct witnessed by counsel and to exclude historical information learned in Patton Boggs' role as counsel."[189]  Finally, PB argues that most of the documents it has are privileged or attorney work product and that the crime-fraud exception does not apply.

Chevron argues that compliance with the Subpoena – at least given the extent to which it has been narrowed by the Court and the parties' agreements – would impose no undue burden.[190]  Moreover, Chevron contends that it has provided sufficient evidence to satisfy the first prong of the crime-fraud exception to the work product doctrine and attorney client privilege.

V.      *Chevron's Unsuccessful Attempts to Obtain Discovery from the LAP Representatives' Agents in Ecuador and From the Defendants*

It is important to recognize that the LAPs and their Ecuadorian lawyers and associates have refused to provide any meaningful discovery of documents and witnesses located in Ecuador or to include information from Ecuador in their own responses to discovery requests.

A.      *Defendants' Refusal To Produce Documents and Evidence from Ecuador*

In both this action and the Count 9 action,[191] defendants have refused to produce any

---

188
    DI 665, at 3.

189
    *Id.* at 4.

190
    *See* DI 713.

191
    "Count 9 action" refers to 11 Civ. 3718 (LAK), which came into existence by the severance of Count 9 of Chevron's amended complaint in this action.  The Count 9 action has been dismissed.

documents in the possession, custody, or control of their attorneys and agents in Ecuador despite orders by this Court compelling them to do so.  While the bottom line has been consistent, the rationale has changed.

In the Count 9 action, defendants contended that they were unable to produce those documents because the Ecuadorian attorneys were not their agents and therefore were not subject to their control.  After the Court held otherwise and ordered the documents produced,[192] defendants refused again, arguing that collecting, reviewing, and producing documents from their "approximately 87 lawyers" in Ecuador would be too burdensome.[193]

In this action, defendants' obstinance with respect to discovery of evidence from Ecuador has reached a new level.  Chevron moved on August 13, 2012 to compel the LAP Representatives and the Donziger Defendants to produce documents in the hands of their Ecuadorian lawyers and other associates.[194] Although this time they conceded that Fajardo is the LAP Representatives' agent, the LAP Representatives nevertheless resisted, arguing *inter alia* that the motion was premature and, in any case, that the Ecuadorian lawyers were precluded from complying by Ecuadorian law and that the defendants here therefore did not control them.[195]  They submitted a declaration by an Ecuadorian lawyer that purported to support their position.  Chevron replied with, *inter alia,* a declaration by another Ecuadorian lawyer that disputed the conclusions of the first.[196]  And while that motion was pending, Chevron renewed its contention in a second

---

[192]    11 Civ. 3718, DI 101, at 2-3.

[193]    *See* 11 Civ. 3718, DI 240, at 7.

[194]    DI 562.

[195]    DI 563, DI 564.

[196]    Ltr., Randy Mastro, Sept. 5, 2012.

motion to compel on November 6, 2012.[197]  In due course, the Court ordered production regardless of whether responsive documents are in Ecuador.[198]  These defendants, however, have refused to comply with the order.[199]  Now, however, they advance a new basis.

      While Chevron's motion was pending and unbeknownst to the Court or to Chevron, Attorney Smyser, counsel for the LAP Representatives in this case, by his own admission, "suggest[ed] to the Ecuadorian legal team that someone should consider seeking an Ecuadorian court ruling on the issue of document production."[200]  In consequence, a lawsuit was filed in Ecuador in October 2012 in the name of one of the non-appearing LAPs, Octavio Ismael Cordova Huanca, against Cordova's attorneys – Fajardo, Saenz, and Prieto as well as the head of the Amazon Defense Front, Luis Yanza – to bar them from turning over any information in discovery in this case.  The case obviously was collusive in the sense that, as the judgment recites, the ostensible defendants agreed with the ostensible plaintiff.[201]  Indeed, section FOUR quotes Fajardo

---

[197]

    DI 608, at 4.

[198]

    DI 787.

[199]

    *See* DI 836, DI 841.

[200]

    Ltr., Craig Smyser and Larry R. Veselka, Mar. 8, 2013, at 2.

[201]

    DI 734, Ex. A (Ecuadorian Judgment).  In addition, Fajardo holds a broad power of attorney on behalf of all of the LAPs.  Hendricks [DI 106] Ex. 481.  He thus was in a position to facilitate all of the U.S. discovery on behalf of all of them, not to mention himself, had he wished to do so.  He likewise was in a position to have resisted the Cordova suit, both individually and on behalf of the other LAPs, had he so desired.  Moreover, it bears noting that Fajardo held the power to institute the action against himself and his colleagues in Mr. Cordova's name.  To this it must be added that Mr. Smyser claims, in an unsworn letter, that "the two parties to the [Ecuadorian] proceeding were represented by separate counsel." *Supra* note 200.  On that last point, however, there is no evidence of record that this was indeed the case.  The record does disclose, however, that only one attorney appearance is noted on the decision – that of Fajardo.

at length in support of the arguments advanced, supposedly *against* Fajardo, on behalf of Mr. Cordova.[202] The Ecuadorian court did what all of the parties before it – the plaintiff and the defendants – asked it to do: it entered an order barring disclosure to this Court of any information possessed by or known to the defendants in that case concerning the Chevron litigation.[203]

The fact that this collusive lawsuit was brought in the name of one of the LAPs against his own lawyers likewise is troublesome, especially when one recognizes that the only attorney appearance listed on the decision is that of Fajardo. The fact that this was done behind the back both of Chevron and of this Court while a motion to compel was pending is even more troublesome. The Court notes also the following:

Section FIVE of the Ecuadorian court's decision, which contains its reasoning, begins as follows:

1    "The plaintiff, in bringing a suit for the protection of constitutional rights, must prove that
2    rights referred to that might be violated will cause <u>him</u> serious harm, which has been proven
3    in this case.    Therefore, it is appropriate to apply Section 21 of Art. 66, and Arts. 75 and 76
4    of the Constitution of the Republic of Ecuador referred to by the plaintiff. On pages 51 et
5    seq. of the record and in the public hearing, the plaintiff submitted documentation with a
6    translation into Spanish by [name omitted], in which it appears that the Judge of the United
7    States of American Lewis A. Kaplan of the second district of the State of New York
8    demands <u>our</u> confidential information in favor of his jurisdiction, this has been requested
9    from <u>our</u> attorneys . . ."[204]

Note that the writer of the decision on line 2 spoke of the plaintiff in the third person — as "him." Two

---

[202]    DI 734, Ex. A.

[203]    *Id.* at 4-5.

[204]    *Id.* at 4 (emphasis added).

sentences later, however, in lines 8 and 9, the writer referred to the confidential information and the LAPs'

attorneys as "our" information and "our" attorneys instead of the plaintiff's information and the plaintiff's

attorneys.  For present purposes, however, it is unnecessary to decide exactly how, why, and by whom the

decision came to be written in this curious way.

But the bottom line here is that the LAP Representatives and the Donziger Defendants are

defying this Court's order to produce information in the hands of their Ecuadorian attorneys and even their

non-lawyer associates.  Rather than attempt to facilitate the full and fair disclosure to which any litigant is

entitled, they have engaged in extraordinary efforts to raise obstacles to such disclosure.  This episode lends

further strength to Chevron's contention that relevant disclosure from PB – which is at the heart of the LAPs'

and Donziger's efforts both in the United States and, it appears in Ecuador and elsewhere – is extremely

important and certainly unlikely to be forthcoming from Ecuador.

B.      *Defendants' Refusal to Comply with Their Other Discovery Obligations*

Chevron has fared no better in getting the LAPs (or their agents and experts) to submit to

deposition[205] or to provide adequate responses to its interrogatories and requests for admission ("RFAs").

In both the Count 9 action and this one, the LAPs have made many baseless objections and arguments in

efforts to justify their refusal to respond adequately to Chevron's RFAs.[206]  In the Count 9 action, the LAPs

---

[205]

> The LAP Representatives refused to submit to deposition in New York in the Count 9 action.
> *See* 11 Civ. 3718, DI 225.  And in that action, counsel for one or the other group of these
> defendants repeatedly directed witnesses Aaron Page, Laura Garr, and Andrew Woods, the
> latter two of whom were employed by Donziger at various points, not to answer questions
> on ground of alleged privilege despite prior rulings by magistrate judges in both the District
> of Maryland and this Court that the claimed privileges had been waived, vitiated by the
> crime-fraud exception or both.  DI 797, at 1-2.  Most recently in this action, when Chevron
> noticed the deposition of Saenz – one of the LAPs' Ecuadorian lawyers – counsel for the
> LAPs informed Chevron that Saenz refused to make himself available for deposition.  *See*
> Champion Decl. [Ex. 770] Ex. 4; *see also* DI 778.

[206]

> For example, in the Count 9 action, the LAPs refused to respond to any of Chevron's RFAs
> because they claimed the term "drafted" was ambiguous.  *See* 11 Civ. 3718, DI 71, Ex. 3.

claimed not to have knowledge of or recollect the information necessary to answer many of Chevron's interrogatories.[207]  In this action, the LAPs and Donziger initially refused to respond to a single interrogatory propounded by Chevron based on an unfounded numerosity objection.[208]

Donziger has been little more forthcoming in certain respects.  When Chevron subpoenaed him in the Section 1782 proceeding, Donziger sought to avoid complying with the subpoena, first by moving unsuccessfully to quash it on burden and privilege grounds[209] and then by providing an untimely privilege log that was 2,000 pages long and claimed privilege as to 8,652 documents.[210]  In fact, however, not one of the documents "was written by or addressed to any of the Lago Agrio plaintiffs – the clients whose privilege supposedly [was] being asserted."[211]  Moreover, Donziger's motion and the privilege log lacked any detail or substance, which "foreclosed any serious attempt to come to grips with the specific privilege claims," and "served the tactical interests of Donziger and the Lago Agrio plaintiffs and substantially prejudiced the parties seeking discovery."[212]  And when Donziger was deposed in the Section 1782 proceeding, he "gave many unresponsive, self-serving answers to questions that should have been answered directly, with no embellishment."[213]  So evasive and unresponsive was Donziger at the outset that the Special Master

---

[207]
      *See* 11 Civ. 3718, DI 72, Ex. 3, 4.

[208]
      DI 781 Exs. 4, 5; DI 809 (Order Granting Chevron's Motion to Compel).

[209]
      *In re Chevron Corp.* 749 F. Supp. 2d 135, 140 (S.D.N.Y. 2010).

[210]
      *In re Chevron Corp.*, 749 F. Supp. 2d 170, 173 (S.D.N.Y. 2010).

[211]
      *Id.*

[212]
      *Id.* at 183.

[213]
      Hendricks Decl. [DI 48], Ex. 336 (Feb. 6, 2011 Order).

overseeing the proceeding requested that this Court intervene to order his compliance.[214]

Chevron's inability to obtain appropriate discovery underscores its need to get it from PB, to the extent it may do so consistent with governing principles.  PB has been intimately involved in shaping and carrying out defendants' strategy since early 2010 – a role that necessarily involves awareness not only of what has transpired since it came onto the matter, but of what occurred before.  It is against this backdrop that the Court proceeds to resolve the remaining issues concerning the Subpoena.

*Discussion*

I.      *In re Friedman*

The Subpoena is directed to a law firm.  Although PB has not formally appeared before this Court in this case, it has been involved in the Court of Appeals.  It has assisted the LAPs in the Ecuadorian litigation, and it has appeared on their behalf in other U.S. litigation relating to the broad controversy at issue here.

There is an obvious tension between ensuring a lawyer's ability to represent the lawyer's clients vigorously and preserving an adverse party's right to obtain evidence necessary to prosecute its case.  Where, as here, discovery is sought from attorneys, especially attorneys actively involved in litigation against an adversary seeking discovery from such attorneys, "[c]ourts have been especially concerned about the burdens imposed on the adversary process . . . and have resisted the idea that lawyers should routinely be subject to broad discovery."[215]  Nevertheless, the Second Circuit has made clear that the fact that a party seeks discovery from a lawyer "does not automatically insulate [the lawyer]. . . nor automatically require prior

---

[214]     *See id.* ("I have cautioned [Mr. Donziger] many times and have stricken unresponsive, evasive, self-serving testimony . . . [but] my instructions to the witness and striking portions of his answers seemed to have little effect.").

[215]     *In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 70 (2d Cir. 2003).

resort to alternative discovery devices."[216]  In *In re Subpoena Issued to Dennis Friedman*, it instructed courts

to take a "flexible approach" to discovery of lawyers "whereby the [court] . . . takes into consideration all of

the relevant facts and circumstances to determine whether the proposed [discovery] would entail an

inappropriate burden or hardship."[217]  These include "the need to [get discovery from] the lawyer, the lawyer's

role in connection with the matter on which discovery is sought and in relation to the pending litigation, the

risk of encountering privilege and work-product issues, and the extent of discovery already conducted."[218]

      As a preliminary matter, the Court turns first to Chevron's argument that *Friedman* has no

bearing here because PB quite deliberately has not appeared in the district court in this case.  It argues that

*Friedman* is inapplicable because it involved depositions of opposing litigation counsel whereas this

Subpoena  seeks only documents and those from a firm that is not formally involved in this action.

      While PB's avoidance of an appearance before this Court may be relevant in some respects,

the Court sees no reason to disregard *Friedman*'s wise teachings entirely on that account.  It cannot be

gainsaid that PB, whatever its formal role before this Court, is broadly involved in this controversy as  an

adversary to Chevron.  Many of the concerns that arise when an adverse trial counsel is subjected to

deposition – *e.g.*, possible compromise of the attorney-client relationship or intrusion on an attorney's work

product – also are present when a law firm involved behind the scenes is required to provide documents to

an adversary.  Chevron has presented no compelling reason that the Court should not be guided by the factors

set forth in *Friedman*, taking account of all of the relevant circumstances.

      That said, it must be recognized that this Subpoena presents a very unusual situation.  The

Subpoena in major part – but not entirely – seeks discovery with respect to subjects on which the LAPs'

---

[216]     *Id.* at 72.

[217]     *Friedman*, 350 F.3d at 72.

[218]     *Id.*

Ecuadorian lawyers and non-lawyer associates reasonably might be expected to have the most complete information.  If they, their clients, and the Donziger Defendants were fully cooperative and responsive in discovery, there might be only very limited need to pursue discovery from PB.  But the LAP Representatives and the Donziger Defendants have refused to produce documents or give fully responsive replies to other discovery requests, claiming that the Ecuadorians will not provide the information.  Yet PB has been interacting with the Ecuadorians for over three years now and doing so with respect to many of the subjects on which the LAP Representatives, their Ecuadorian lawyers and associates, and the Donziger Defendants decline to provide discovery.  As will appear below, it is entirely likely that PB has responsive documents – especially but not only emails and other correspondence with the Ecuadorians about critically important events in Ecuador – that in the circumstances of this case are not practically available from anyone else.  Moreover, PB has been a primary actor in a number of key events.

With these preliminary comments, the Court turns to the *Friedman* factors.  It begins with the question whether enforcement of the modified Subpoena would entail attorney-client privilege and work product difficulties that are so substantial as to refuse enforcement altogether and whether any such problems can be ameliorated.  It then will proceed to the remaining factors.

A.      *Attorney-Client Privilege and Work Product*

1.      *Basic Principles*

(a)      *Attorney-Client Privilege*

A party invoking the attorney-client privilege must demonstrate that the communication as to which privilege is asserted was "(1) a communication between client and counsel, which (2) was intended to be and was in fact kept confidential, and (3) made for the purpose of obtaining or providing legal advice."[219]  As the Court noted in its opinion denying Donziger's motion to quash the subpoena served on

---

[219]      *United States v. Constr. Products Research, Inc.*, 73 F.3d 464, 473 (2d Cir. 1996).

him in a Section 1782 proceeding:

> "The 'predominant purpose' of a communication must involve legal advice.  A court should determine predominant purpose of a communication 'dynamically and in light of the advice being sought or rendered, as well as the relationship, between advice that can be rendered only consulting the legal authorities and advice that can be given by a non-lawyer'."[220]

### (b)    Work Product Doctrine

The work product doctrine "provides qualified protection for materials prepared by or at the behest of counsel in anticipation of litigation or for trial."[221]  The doctrine "is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye towards litigation,' free from unnecessary intrusion by his adversaries."[222]  The doctrine now is codified in Rule 26(b) of the Federal Rules of Civil Procedure.

> "The Rule states that documents 'prepared in anticipation of litigation or for trial' are discoverable only upon a showing of substantial need of the materials and inability, without undue hardship, to obtain their substantial equivalent elsewhere. Even where this showing has been made, however, the Rule provides that the court 'shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.'"[223]

The party invoking work product protection "bears the burden of establishing its applicability to the case at hand."[224]  Thus, once a party establishes that the material in question constitutes work product,

---

[220]

      *In re Chevron Corp.*, 749 F. Supp. 2d at 165 (quoting *In re County of Erie*, 473 F.3d 413, 420-21 (2d Cir. 2007).

[221]

      *In re Grand Jury Subpoenas Dated March 19, 2002 & August 2, 2002*, 318 F.3d 379, 383 (2d Cir. 2003).

[222]

      *United States v. Adlman,* 134 F.3d 1194, 1196 (2d Cir.1998) (quoting *Hickman v. Taylor,* 329 U.S. 495 (1947)).

[223]

      *United States v. Adlman*, 134 F.3d 1194, 1197 (2d Cir. 1998) (quoting Fed. R. Civ. P. 26(b)(3)).

[224]

      *In re Grand Jury Subpoenas Dated March 19, 2002 & August 2, 2002,* 318 F.3d at 384.

the party seeking disclosure of that material must show that it has a "substantial need" for the otherwise protected documents[225] and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means.'"[226]

"As for work-product that shows 'mental impressions, conclusions, opinions, or legal theories of an attorney,'" the Second Circuit has suggested that, "at a minimum such material is to be protected unless a highly persuasive showing [of need] is made."[227]

### (c)     The Crime-Fraud Exception

"It is well-established that communications that otherwise would be protected by the attorney-client privilege or the attorney work product privilege are not protected if they relate to client communications in furtherance of contemplated or ongoing criminal or fraudulent conduct."[228]  Importantly, especially in this case, communications in furtherance of contemplated or ongoing criminal or fraudulent conduct "are properly excluded from the scope of the privilege even if the attorney is unaware that his advice is sought in furtherance of such an improper purpose."[229]

In order successfully to invoke the crime-fraud exception, a party seeking disclosure must demonstrate that there is "probable cause to believe that a fraud or crime has been committed and that the

---

[225]
 *In re Grand Jury Proceedings*, 219 F.3d 175, 190 (2d Cir. 2000).

[226]
 *In re Grand Jury Subpoenas Dated March 19, 2002 & August 2, 2002*, 318 F.3d at 383 (quoting Fed. R. Civ. P. 26(b)(3)).

[227]
 *In re Grand Jury Proceedings*, 219 F.3d at 190 (quoting Fed. R. Civ. P. 26(b)(3)).

[228]
 *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1038 (2d Cir. 1984).

[229]
 *Id.*

communications in question were in furtherance of the fraud."[230]  Probable cause exists where "a prudent person ha[s] a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud, and that the communications were in furtherance thereof."[231]  Moreover, "a finding of probable cause is not negated by 'an innocent explanation which may be consistent with the facts alleged.'"[232]  Thus, in order to obtain disclosure of otherwise privileged or protected evidence by means of the crime-fraud exception, the party seeking disclosure must show a factual basis to support a conclusion that there is probable cause to believe that (1) a crime or fraud was or is being committed, and (2) the communication in question was or is in furtherance of the crime or fraud.[233]

### 2.      Application in this Case

Although one normally would expect that a subpoena such as this would encounter substantial privilege and work product obstacles, the extent to which that is so here is very much more limited than one might expect for three reasons.  First, it is unlikely that there are many, if any, responsive attorney-client communications.  Second, Chevron has overcome the work product protection as to any documents that contain only ordinary work product.  Third, to whatever extent there are any attorney-client communications

---

[230]

  *United States v. Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997).

[231]

  *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d at 1039 (2d Cir. 1984).

[232]

  *United States v. McDonald*, 01-CR-1168JSWDW, 2002 WL 31956106, at *5 (E.D.N.Y. May 9, 2002) (quoting *A.I.A. Holdings, S.A. v. Lehman Bros. Inc.*, 97 Civ. 4978 (LMM) HBP, 1999 WL 61442, at *5 (S.D.N.Y. Feb. 3, 1999) (citing *United States v. Farma*, 758 F.2d 834, 838 (2d. Cir. 1985)).

[233]

  *United States v. Jacobs*, 117 F.3d at 87. Once the party has satisfied the first of these requirements, "the decision whether to engage in an *in camera* review of the evidence lies in the discretion of the district court. . . . [I]f and when there has been an *in camera* review, the district court exercises its discretion again to determine whether the facts are such that the exception applies."  *Id.*

or documents that constitute opinion work product, the crime-fraud exception may well vitiate any protection.

(a)      *Improbability of Many Responsive Attorney-Client*
         *Communications, If Any*

In considering whether PB's responsive documents include many attorney-client communications, one must keep in mind the characteristics and location of the clients whose privilege PB asserts. The LAP Representatives have been described by their counsel as "a *campesino* and a canoe operator living in the remote Ecuadorian jungle."[234] PB's Tyrrell has called the LAPs "indigenous people living in the jungle in Ecuador."[235] As the Court noted in denying PB's motion to quash the Subpoena, "[t]he likelihood of any material number of attorney-client communications between the LAPs and PB, which are the sole focus of the attorney-client privilege . . . is slim."[236] PB has not suggested that it has any responsive documents that are or memorialize confidential communications involving any of the LAPs. Moreover, when Chevron served Donziger with a subpoena in the Section 1782 proceeding, Donziger – who has been involved in these matters since their inception about twenty years ago – moved to quash the subpoena, objecting, *inter alia*, that the information Chevron sought from him was privileged. When he (belatedly) filed a privilege log, it did not list even a single document said to involve a communication with any of the LAPs.

A second factor further supports the view that the extent to which attorney-client privilege will play a role here is extremely limited. Major *foci* of the Subpoena include evidence of communications between the LAP lawyers and non-lawyer associates, on the one hand, and Cabrera or Ecuadorian judges and

---

[234]

DI 518 (LAP Reps. Memo in Support of Motion to Dismiss for Lack of Personal Jurisdiction), at 1.

[235]

Smyser Decl. [DI 445] Ex. N (Transcript of September 16, 2011 oral argument in *Chevron Corp. v. Naranjo*, 667 F.3d 232 (2d Cir. 2011)), at 88:9.

[236]

DI 571, at 2.

officials on the other.[237]  None of these persons stands in a privileged relationship either with PB or with anyone else on the LAP side of the case.  Attorney-client privilege by definition does not extend to such materials.

> ### (b)   *Chevron's Substantial Need Overcomes Ordinary Work Product Protection*

While it is unlikely that there are many responsive documents that even arguably come within the attorney-client privilege, the same is not true with respect to work product.  But it is important to bear in mind that there are two kinds of work product – materials that are nothing more than documents prepared in anticipation of litigation and materials that, in addition, include mental impressions, conclusions, opinions, or legal theories of an attorney.  As noted above, the former are discoverable on a showing of substantial need and inability to obtain their substantial equivalent elsewhere without undue hardship.  Chevron has made that showing.

First, most of the events about which the Subpoena as narrowed seeks documents – *e.g.*, the Calmbacher report, the appointment of Cabrera and submission of his report, and the authorship of the Judgment – took place to a material degree, although most certainly not entirely[238] – in Ecuador.  These events underlie many of the RICO and fraud allegations in Chevron's complaint.  "A substantial need for work product materials exists where the information sought is 'essential' to the party's defense, is 'crucial' to the determination of whether the defendant could be held liable for the acts alleged, or carries great probative

---

[237]

> *See, e.g.*, Specification Nos. 14 (documents related to drafting of orders by Lago Agrio court); 18 (communications with Calmbacher); 19 (communications with court experts); 20 (communications with Cabrera); 26 (communications with the Lago Agrio court); 27 (communications with Ecuadorian judges); 30 (documents provided by LAPs to author of Lago Agrio court).

[238]

> For example, the Cabrera report, or most of it, was written by Stratus, which is located in Denver.  Donziger, a central figure, is based in New York.

value on contested issues."[239]  Chevron is in substantial need of documents concerning these events, and it is unlikely to obtain them from other sources, for reasons previously discussed.

PB contends, however, that Chevron has already received "millions of document pages" from the Section 1782 proceedings, Donziger, and the third parties it has subpoenaed in this action and does not need further discovery from PB.[240]  Moreover, many of the events that Chevron contends were tainted by fraud – e.g., the writing and filing of the Calmbacher and Cabrera reports – occurred before PB was brought on in early 2010.  PB argues that Chevron does not need from PB documents about events that preceded its involvement in the case.  The Court disagrees.

While it is true that Chevron has received a substantial number of documents from Donziger and others in the Section 1782 proceedings, the documents it has obtained do not tell the whole story of what went on in Ecuador and elsewhere leading to the Judgment.  Understanding that entire story is vital to the resolution of this case.   Moreover, as noted above, it is clear that Chevron will be unable to obtain these documents from the people who were on the ground in Ecuador – e.g., Fajardo, Prieto, Saenz, and others – and were directly involved in orchestrating these events.  Defendants have refused to produce documents or other information from their Ecuadorian agents.

And, although PB was not yet on the LAP team when the Calmbacher and Cabrera reports were written and submitted, PB was brought on specifically to deal with their fallout.  Indeed, PB worked with the Ecuadorian lawyers, to whom it has referred as its "Ecuadorian co-counsel,"[241] to come up with a strategy to delay production from Stratus and to cleanse the Cabrera report.  PB drafted the Fajardo

---

[239]

Nat'l Cong. for Puerto Rican Rights v. City of New York, 194 F.R.D. 105, 110 (S.D.N.Y. 2000) (internal citations omitted) (plaintiff established substantial need where withheld documents contained information that was "directly relevant to plaintiffs' claims").

[240]

DI 718, at 22.

[241]

DI 718, at 10.

declarations that were submitted to the Colorado and Ecuadorian courts.  PB gave the marching orders to the

new experts to "subtly address" Cabrera's findings.  And PB drafted the final post-trial briefs the LAPs

submitted to the Lago Agrio court.  PB undoubtedly has documents concerning these events and those they

were intended to "cleanse."  As Chevron is unable to obtain them from the LAPs' Ecuadorian counsel, it

needs them from PB.

　　　　　Second, sight cannot be lost of the fact that PB is an alleged co-conspirator in this case.

Chevron alleges that PB "developed the RICO Defendants' strategy for pursuing the assets of Chevron and

its subsidiaries around the world on the basis of the fraudulent judgment in Ecuador, and has also been

instrumental in the cover-up and obstruction of Chevron's U.S. discovery proceedings."[242]  In order for

Chevron to link PB to the alleged conspiracy, which could prove essential to hold the defendants responsible

for its actions, it must show not only that there was a conspiracy, but that PB knowingly and intentionally

acted to further the conspiracy's aim.  While inferences of PB's knowledge and involvement – particularly

with respect to the Fajardo Declaration – can be drawn from certain emails and documents  produced thus

far, PB is in the unique position to provide documents that will shed further light on the extent – if any – of

PB's involvement in the alleged conspiracy.

　　　　　Chevron has shown that it has a substantial need for the documents responsive to the

remaining specifications of the Subpoena with which the Court has concluded that PB should comply and

that Chevron cannot obtain their equivalent elsewhere without undue hardship.  As a practical matter,

therefore, the question comes down to whether there will be substantial issues as to the second category of

work product – so called "opinion" work product – if the Subpoena is enforced.  That brings us to the crime-

fraud exception.

---

[242] ¶18(s).

### (c)    The Crime-Fraud Exception

As the Court already has noted, Chevron has established that "a prudent person ha[s] a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud"[243] – in other words, probable cause – in the following respects:

First, the Guerra declaration, in and of itself, establishes probable cause to suspect that the LAPs' representatives, including Fajardo, Donziger, and Yanza, bribed Judge Zambrano to obtain their desired result in the Ecuadorian case and the privilege of writing the Judgment and that they took advantage of the latter. The latter point, moreover, is supported by abundant evidence that portions of the Judgment are identical or substantially similar to internal documents prepared by the LAPs that never were filed with the Court.

Second, as explained above, additional evidence establishes, at a minimum, probable cause to suspect that a crime or fraud occurred with respect to

- the Calmbacher report,

- the termination of the judicial inspection process, and

- the selection and appointment of Cabrera, the preparation and submission of his report to the Lago Agrio court, and its presentation as his independent work.

Third, the evidence concerning the representations made to the United States District Court for the District of Colorado in an effort to prevent the disclosure of the Stratus documents that confirmed that Stratus had written all or most of the Cabrera report – most importantly the Fajardo declaration filed there and in many other courts – establishes probable cause to suspect that the LAPs committed wire fraud and obstructed justice in that respect.

To be sure, PB contends otherwise. But its arguments are speculative and unpersuasive when one bears in mind the relevant legal standard that governs the first prong of the crime-fraud analysis –

---

[243]    *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d at 1039 .

whether Chevron has provided a factual basis that would "strike a prudent person as constituting a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud."[244]  Chevron has done so, and neither the LAPs nor PB have presented any compelling evidence or arguments to the contrary.

This leaves one significant question with respect to the existence of probable cause – whether there is a sufficient basis to suspect that there was criminal or fraudulent activity with regard to the cleansing reports.

Chevron's fundamental contention is that the cleansing reports were developed at PB's instance in collaboration with the Weinberg Group as a means "to backdoor Cabrera's findings into the Ecuadorian record"[245] in the guise of new expert reports not subject to the attack that had been made on Cabrera.  It points to the fact that the new experts developed no new substantive analysis, were instructed to rely on the Cabrera report, and were not told that the Cabrera report had been written, at least in major part, by the LAPs and Stratus.  The point of the exercise, as described in an email by a PB lawyer, was to "address Cabrera's findings in such a subtle way that someone reading the new expert report . . . might feel comfortable concluding that certain parts of Cabrera are a valid basis for damages."[246]

PB, for its part, says that nothing in the preparation, submission or subsequent litigation about the cleansing reports can be regarded as fraudulent.  The LAPs sought leave of the Lago Agrio court to submit additional reports to show that the theories advanced in the Cabrera report, whatever its authorship, were sound.  While four of the reports relied on data from the Cabrera report, that reliance was fully disclosed.

As an initial matter, PB is wrong in asserting that there was nothing that can be regarded as fraudulent with respect to the submission of the cleansing reports.  As noted previously, the Fajardo

---

244
          *Jacobs*, 117 F.3d at 87 (internal citation and quotation marks omitted).

245
          DI 541, at 12.

246
          *See id.* (quoting Hendricks Decl. [DI 36] Ex. 214).

declaration that was submitted to the Lago Agrio court in support of the application for leave to submit those reports was deceptive, whether or not PB knew it at the time. As noted earlier, "[t]here is at least probable cause to suspect that Cabrera was handpicked by the Lago Agrio plaintiffs because he would "play ball" with them, that the entire report was planned and written by the LAPs and Stratus, and that Cabrera "played ball" by simply affixing his name to it, acting all the while under the pretense – fostered by the LAPs – that the report was Cabrera's independent work." None of that was disclosed to the court. So there is probable cause to suspect that the reports got in through courthouse door as a result of fraud.

That said, the fact remains that Chevron has not pointed to anything in the cleansing reports themselves that appears to have been fraudulent. It may be that the experts would not have reached the same conclusions, or would have declined their engagements altogether, if they had been told the full truth about the relationship among the LAPs, Stratus, and Cabrera and his report. But their reliance on Cabrera in most cases was disclosed in their reports.

In the last analysis, then, the Court concludes that, on the present record, there is insufficient factual basis to suspect that the cleansing reports themselves were fraudulent, whatever may have been done to convince the Ecuadorian court to permit their filing.

\*   \*   \*

In sum, the likelihood of privilege and work product issues so substantial as to defeat the attempt to enforce the Subpoena is greatly limited. PB has not shown any material likelihood of the existence of any significant number of responsive documents as to which the attorney-client privilege could apply. Insofar as the Subpoena seeks "ordinary" work product, Chevron has overcome the qualified protection that enjoys, at least with respect to responsive documents going to the subjects as to which it has established probable cause. It has satisfied the first of the two prong test that governs the crime-fraud exception as to a number of key subjects. This leaves determination with respect to documents concerning those subjects only the question whether particular responsive documents – regardless of whether they include so-called

"opinion" work product or, less likely, attorney-client communications – were in furtherance of a crime or fraud.  And even this issue can be further limited by a further narrowing of the Subpoena.

### 3.  *Further Limitation of the Subpoena*

As noted above, *Friedman* requires that a Court confronted with an effort to obtain discovery from an attorney involved in litigating against the discovering party consider the need for the discovery. Similarly, Federal Rule of Civil Procedure 26(b)(2)(C) permits a court to limit the frequency or extent of discovery otherwise allowed if it determines that (1) the discovery sought is unreasonably cumulative or duplicative, or more readily obtainable from another source; (2) the party seeking discovery already has had ample opportunity to obtain the information sought; or (3) the burden or expense of the proposed discovery outweighs its likely benefit.[247]

Here, the Subpoena seeks discovery which, although limited already to a considerable degree, touches on a variety of topics.  In view of the desirability of focusing only on that which is most important, of limiting the discovery required from these adversary attorneys, and of avoiding unduly complicated or time consuming privilege issues to the extent that would be fair and reasonable, the Court has concluded that the Subpoena should be further limited, at least at the present time.  Chevron has established probable cause – and thus satisfied the first of the two prong test that governs the crime-fraud exception to attorney-client privilege and work product protection – as to six subjects:

- The alleged bribery of the Ecuadorian judge and the writing of the Judgment and other judicial documents in the Lago Agrio case.

- The claim that the LAPs wrote the reports submitted over Calmbacher's signature and affixed signature pages, knowing that the reports did not reflect his views.

- The circumstances in which the Lago Agrio court terminated the judicial inspection

---

[247] FED. R .CIV. P. 26(b)(2)(i)-(iii).

process.

- The selection and appointment of Cabrera, the preparation and submission of his report to the Lago Agrio court, and its presentation as his independent work.

- The submission of deceptive accounts of the LAPs' and Stratus' relationship with Cabrera in the District of Colorado and elsewhere in Section 1782 proceedings.

Accordingly, the Subpoena in substance will be limited further by confining its analysis, at least for now, to those specifications that seek documents relating to the foregoing subjects. The Court now proceeds to consider the remaining aspects of the *Friedman* analysis[248] and the remaining arguments with respect to the Subpoena as thus effectively limited.

### B.    *PB's Role*

*Friedman* directs the Court to focus on the role of the lawyer from whom discovery is sought both in the litigation in question and in relation to the subjects on which disclosure is sought. "The first of these considerations bears on the extent to which the discovery would disrupt the litigation by injecting one of the lawyers charged with its conduct into the case as a witness or by making the advocate's conduct or knowledge an issue in the proceeding."[249] The second "goes at least in part to the issue whether the lawyer is likely to have first-hand evidence that is important to the resolution of the lawsuit."[250] Both of these factors cut in favor of requiring PB to produce the documents requested in the Subpoena as modified thus far.

---

[248]    This involves consideration only of the remaining specifications, which are: 2, 14, 18, 19, 21, 22, 26, 28 through 32, 35, 49, 55 though 58, as modified below.

[249]    *In re Chevron Corp.*, 749 F. Supp. 2d 141, at 163 (S.D.N.Y. 2010).

[250]    *Id.*

*(1)      Whether Discovery Would Disrupt the Litigation*

First, enforcement of what remains of the Subpoena would not inject a lawyer charged with the conduct of this case as a witness.  PB has deliberately avoiding appearing before this Court in this case, which is conducted on behalf of the LAP Representatives by other counsel.

Second, enforcement of what remains would not place an advocate's conduct or knowledge in issue.  PB is named in the amended complaint as an alleged co-conspirator.  Its actions and knowledge will be issues in this case regardless of whether the Subpoena is enforced.

*(2)      Whether PB Likely Has Relevant Evidence*

Given the nature and extent of PB's involvement, it doubtless has firsthand knowledge that is important to the resolution of this lawsuit. PB was brought on to the LAP team one year before Zambrano issued the Judgment that allegedly was written by the LAPs.  PB was involved in hiring and overseeing the cleansing experts – whose reports Judge Zambrano ultimately claimed to have relied upon –  and it took the lead on drafting the final brief filed with the court.   PB worked with the LAPs to draft the Fajardo Declaration, which was intended to delay discovery and convince courts across the country that the LAPs' involvement in the judicial inspection process and Cabrera report was entirely proper.  And PB is leading the LAPs' efforts to enforce the Judgment throughout the world.  Given PB's role as strategist since the time it became involved and as architect of the LAPs' closing arguments and submissions made to the Lago Agrio court, this Court has every reason to expect that PB has documents that bear directly on the question whether the Judgment was obtained by fraud, including documents containing statements by other persons directly involved in events at which PB was not present.

C.      *The Need for Discovery from Patton Boggs and the Extent of Discovery Already Conducted*

The last two *Friedman* factors focus on the need to obtain the discovery from PB and the

extent to which that discovery has already been conducted.  As the extent of discovery already conducted informs the degree to which Chevron needs discovery from PB, the Court analyzes these factors together.

Chevron contends that it needs discovery from PB because PB "likely possesses critical relevant documents that Chevron cannot obtain from any other sources precisely because PB played a key role in planning, executing, and perpetuating the fraud against Chevron."[251]  PB claims that Chevron does not need discovery from PB because (1) it already has amassed an enormous amount of discovery, and (2) "it is in the midst of a discovery campaign in this action that is largely cumulative and duplicative of what Chevron has requested from" PB.[252]

PB is correct that, to the extent Chevron can obtain or has obtained documents from the third parties it has subpoenaed, it does not need them from PB.  But it is doubtful that these parties will provide Chevron with the discovery it seeks from PB.  None of the parties has been nearly as involved in this overall dispute since early 2010 as PB, which has had a hand in almost every major development in this action and related ones since it joined the LAP team. And, as previously described, although Chevron has obtained a substantial number of documents from Donziger and others in the Section 1782 proceedings, it has been unable to obtain *any* documents from PB's "co-counsel in Ecuador"– documents which are crucial to this case – except to the limited extent that they were emails or other communications produced by Donziger. Substantial information from and communications with those co-counsel and non-lawyers in Ecuador – emails, correspondence, and memoranda, if not more – are likely to be in PB's files.

Especially in light of defendants' obstinate refusal to provide Chevron with discovery from Ecuador, Chevron has shown that it needs discovery from PB.

* * *

---

[251]  DI 713, at 19.

[252]  DI 665, at 12.

In sum, the *Friedman* factors cut strongly in favor of requiring this limited production from PB, particularly in light of the fact that PB has never appeared before this Court.

## II.      Alleged Undue Burden and Cost Shifting

In a recent submission to the Court, PB estimated that "it will take between 30 and 40 weeks to complete the review, production, and privilege logging of the email and non-email [electronically stored information]" required to comply with the Subpoena, even as modified by the September 2012 hearing and the November Order.[253]  Moreover, PB contends that Chevron should bear the costs associated with PB's efforts to comply with the Subpoena because PB "is not a party to this action and does not have a direct interest in the outcome of the RICO action."[254]

PB has not sustained its burden of persuasion.

As an initial matter, PB is no ordinary, unrelated non-party witness.  It is an alleged co-conspirator and some of its actions are at issue in this case regardless of whether the Subpoena as narrowed is enforced.  Moreover, it stands to reap a fee that has been estimated at hundreds of millions of dollars if the Judgment is enforced and collected.  Like any lawyer's contingent fee matter, whether the contingency is all or just part of the compensation arrangements, certain investments of time and money are necessary in order to obtain the potential benefit of a successful outcome.  PB's attempt to portray itself as a nonparty with no interest in the matter is unsupportable.

Second, PB has overstated the burden of compliance, in terms both of the cost and the required time and has avoided engaging with options that give strong promise of reducing that cost and

---

[253]      DI 847, at 2-3.  Chevron submitted a response on March 7, 2013.  Given that the Court did not ask for or permit a response from Chevron, and that Chevron waited nearly two weeks to submit it, the Court does not consider Chevron's response, nor any submissions made in reply to it.

[254]      DI 527, at 30-31.

burden.  For example:

- At the September 2012 hearing, the Court urged the parties to analyze, in their subsequent submissions with respect to burden, whether and to what extent predictive coding[255] could "reduce the burden and effort" required to comply with the Subpoena.[256]  Apart from one footnote,[257] PB's submission ignored the subject entirely.  The logical inference is that PB failed to address the subject because it would not have aided its argument.

- PB's cost and time estimates presuppose that every document would be reviewed at least twice by"Patton Boggs attorneys"[258] and that it would take 15 to 20 lawyers working an average of 40 hours per week approximately 40 weeks to complete the review.  But the Court sees no legitimate reason why (1) far less costly contract attorneys could not do all or most of the review, as is common in the legal community today, (2) two or certainly three levels of review are necessary, or (3) more reviewers could not be used.

Third, all of the cost and time estimates upon which PB relies antedate the further and

---

[255]

Predictive coding is an automated method that credible sources say has been demonstrated to result in more accurate searches at a fraction of the cost of human reviewers.  *See e.g.*, *Moore v. Publicis Groupe*, 287 F.R.D. 182, 191 (S.D.N.Y. 2012) *adopted sub nom. Moore v. Publicis Groupe SA*, 11 Civ. 1279 ALC AJP, 2012 WL 1446534 (S.D.N.Y. Apr. 26, 2012) ("Computer-assisted review appears to be better than the available alternatives, and thus should be used in appropriate cases."); DI 713, at 9; Joe Palazzolo, *How a Coputer Did the Work of Many Lawyers,* WSJ LAW BLOG, Jan. 17, 2013.

[256]

Tr., Sept. 27, 2012, at 138:24-139:7.

[257]

DI 665, at 9 n.10 ("the use of predictive coding is still under investigation").

[258]

DI 847, at 2-3.  It estimates that 15 percent of the documents would be reviewed a third time by "senior attorneys."  *Id.* at 3.

substantial narrowing of the Subpoena effected by this opinion.  They are obsolete.

But putting all that aside, PB's last estimate of the cost of reviewing and logging the documents in order to comply with the Subpoena was in the range of $1,060,000 and $1,290,000.[259]  Even assuming that were accurate today, and the Court does not so assume, the burden on PB would not be undue given its role in this case, its size (reportedly over $300 million in gross revenues in 2012), and its economic interest in this controversy.  Indeed, there is no persuasive evidence that the compliance costs are out of line with what would be typical for nonparty witness in complex commercial litigation.

Nor is the Court persuaded that any part of the cost should be shifted to Chevron.  Many of the events in which it was involved underlie Chevron's main allegations.  "Where a nonparty was substantially involved in the underlying transaction and could have anticipated that [it] would reasonably spawn some litigation, expenses should not be awarded."[260]  Here, PB was well aware of Chevron's fraud allegations when it joined the LAP team – indeed it was brought on to combat them – and understood Chevron's intention to fight this matter vigorously.  Any failure to have anticipated that its involvement could lead to discovery obligations and expenditures on its own behalf, if there was such a failure, would have reflected an uncommon lack of foresight.[261]

### Conclusion

PB shall produce documents responsive to the following specifications, as modified by the November 2012 Order: 2, 14, 18, 19, 21, 22, 26, 28 through 32, 35, 49, and 55 though 58 and, in addition,

---

[259]

DI 665, at 2-3.

[260]

*In re First Am. Corp.*, 184 F.R.D. 234, 242 (S.D.N.Y. 1998) (internal citation and quotation marks omitted).

[261]

Furthermore, PB has initiated three separate suits against Chevron.  Where "nonparties were involved in litigation arising out of the same facts, courts have viewed such parties as 'not neutral' for purposes of awarding costs."  *Id.* (internal citation and quotation marks omitted).

72

specification 20 insofar as it seeks documents described in the margin.[262]

To the extent PB claims that any documents responsive to these requests are protected by the attorney-client privilege or the protection afforded to "opinion" work product, such claims shall be asserted in conformity with S.D.N.Y. Local Civil Rule 26.2. To the extent PB claims that any documents responsive to these requests constitute fact work product, Chevron has overcome its burden, and PB must produce them.

Production both of documents and the privilege log shall take place on a rolling basis commencing no later than March 28, 2013, with continuing production of each to occur no less than weekly. The Court recognizes that there is some uncertainty in present circumstances as to how quickly compliance reasonably can be achieved. For the present, the complete privilege log shall be due and production of all responsive documents not scheduled on the privilege log shall be completed on or before May 1, 2013. While the Court will consider a well supported request for additional time, any motion for an extension of the May 1 date shall made no later than April 14, 2013.

SO ORDERED.

Dated:          March 15, 2013

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

[262]          Specification 20 is modified to seek "All DOCUMENTS or draft DOCUMENTS or other writings filed with the LAGO AGRIO COURT under the signature of or in the name CABRERA." Thus, PB is being compelled to comply with only 19 of the Subpoena's 58 specifications.