**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CHEVRON CORPORATION,

                Plaintiff,

      v.

STEVEN DONZIGER, et al.,

                Defendants.

Case No.  11-CV-0691 (LAK)

**DEFENDANTS HUGO GERARDO CAMACHO NARANJO AND
JAVIER PIAGUAJE PAYAGUAJE'S RESPONSE TO CHEVRON CORPORATION'S
CORRECTED RULE 56.1 STATEMENT OF MATERIAL FACTS IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY JUDGMENT ON ALL CLAIMS,
COUNTERCLAIMS AND AFFIRMATIVE DEFENSES, AND SUMMARY JUDGMENT
ON DEFENDANTS' AFFIRMATIVE DEFENSE OF COLLATERAL ESTOPPEL [764]
AND STATEMENT OF ADDITIONAL MATERIAL FACTS AS TO  WHICH THERE IS
A GENUINE ISSUE TO BE TRIED OR AS TO WHICH THERE IS NO DISPUTE**

Pursuant to Local Civil Rule 56.1, Defendants Hugo Gerardo Camacho Naranjo and

Javier Piaguaje Payaguaje ("Defendants") hereby submit their Response to Chevron Corporation's

Rule 56.1 Statement of Material Facts in Support of its Motion for Partial Summary Judgment on

all claims, counterclaims and Affirmative Defenses, and Summary Judgment on Defendants'

Affirmative Defense of Collateral Estoppel.  This Response is based on the evidence presently

available to Defendants.  As discussed in Defendants Memorandum of Law, Defendants have not

yet had a reasonable opportunity to conduct discovery and review the evidence Chevron has

produced regarding the issues raised in Chevron's Motion for summary Judgment and 56.1

Statement.

## I.    Defendants Are Part of the LAP Team[1]

1.    Donziger is and has been a legal advisor to and representative of the LAPs since at least 2003.

**Response:**

**Disputed.**[2]  **Isolated statements from 2009 do not establish that Donziger represented the Ecuadorian Defendants continuously from 2003 to the present.  Indeed, Donziger does not represent the LAPs in the instant proceeding.  *See* Parties and Counsel, S.D.N.Y. ECF, Case No. 1:11-cv-00691-LAK.   Donziger has also stated that "As an American, I am not licensed to practice law in Ecuador . . . ."  Dkt. No. 9-9 (Ex. 14) (Nov. 3, 2006 Donziger Book Proposal) (DONZ00006707) at p. 21.  This shows that Donziger was not a representative of the LAPs at all times or for all purposes since 2003.  Similarly, the engagement agreements that Chevron cites (Dkt. 1006-3 (Ex. 478) and Dkt. 355-37 (Ex. 1122)) do not establish that Donziger continuously represented the LAPs from 2003 through the present.  Further, these agreements establish that the scope of any representation was specific and limited.  *See id.***

**Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 88).  Chevron provides no reason for the Court to rule any differently on this Renewed Motion.**

2.    In all of the conduct attributed to Donziger in this Separate Statement, Donziger has acted as the LAPs' agent.

**Response:**

**Disputed.  This statement consists of an improper legal conclusion, which the Court should strike or disregard.  *See, e.g.*, *Antunes v. Putnam/N. Westchester Bd. of Co-op. Educ. Services*, 09 Civ. 3063 (CS), 2011 WL 1990872, at \*2 n.9 (S.D.N.Y. May 19, 2011) *aff'd sub nom. Antunes v. Putnam N. Westchester Bd. of Co-op. Educ. Services*, 482 Fed. Appx. 661 (2d Cir. 2012) ("I need not consider statements in a Local Rule 56.1 submission that are "legal conclusions in the guise of an undisputed statement of fact.");  *Cicchetti v. Davis*, 07**

---

[1] For the reasons set forth in Defendants' Responses to Chevron's 56.1 Statements under Heading I, Defendants also dispute the assertions, argument, and conclusions set forth in Chevron's Heading I.

[2] Chevron has failed to provide pincites to the evidence it cites, in particular Dkt. 8-9 (Ex. 6) (150-page portion of deposition transcript).  It is impossible for Defendants (or the Court) to determine, for example, where in a 150-page excerpt from a deposition transcript (Dkt. 8-9 (Ex. 6)), the evidence upon which Chevron would rely can be found. Chevron's failure to provide pinpoint citations has forced Defendants to hunt through voluminous exhibits for any nuggets that Chevron might believe supports its position.  This is a distraction, waste of time, and unnecessary drain on Defendants' already stretched resources.  Further, it has severely prejudiced Defendants' ability to respond to Chevron's alleged facts because Defendants cannot determine precisely what evidence Chevron is citing in support. Defendants respectfully submit that the Court also has no way of determining exactly what evidence Chevron is citing and, for that reason, requests that Chevron's citations to multiple-page documents that are not accompanied by pincites be stricken.

**Civ. 10546 (WCC), 2008 WL 619013, at \*4 n.2 (S.D.N.Y. Mar. 5, 2008) ("Defendant's Rule 56.1 Statement of Undisputed Facts consists of legal conclusions such as 'The Fire Commissioner is a policymaker' . . . .  This does not advance the Court's inquiry.");** ***Jessamy v. City of New Rochelle, New York*, 292 F. Supp. 2d 498, 509 (S.D.N.Y. 2003) (rejecting as an improper legal conclusion the following statement: "At all times relevant hereto, Defendants Deputy Commissioner Wendell, Commissioner Ritchie and Mayor Idoni were acting in their official capacities as employees and/or officers of the City." (Defs. Rule 56.1 Stmt. ¶ 1.)").**

**Moreover, to the extent this Separate Statement alleges a crime or fraud against Donziger, Camacho and Piaguaje each affirm under oath that they "have not engaged in any crime, fraud or violation of court rules" and that they are "unaware of and have not authorized or ratified any crime, fraudulent activity, or violation of court rules by anyone acting on [their] behalf with regard to the Lago Agrio Lawsuit."  (Dkt. 446, at ¶¶ 17-18; Dkt. 447, at ¶¶ 18-19).**

3.      Yanza is and has been a member of the LAP team and has represented the LAPs since the Ecuadorian complaint was filed in 2003.

     **Response:**

     **Disputed in part.  Defendants do not dispute that Luis Yanza has been involved as a coordinator of the communities of the Napo Concession affected by Chevron's contamination.  Defendants dispute that Yanza has "represented the LAPs", as Yanza is not a lawyer.**

4.      In all of the conduct attributed to Yanza in this Separate Statement, Yanza has acted as the LAPs' agent.

     **Response:**

     **Disputed.  This statement consists of an improper legal conclusion, which the Court should strike or disregard.  *See, e.g.*, *Antunes*, 2011 WL 1990872 at\*2 n.9; *Cicchetti*, 2008 WL 619013 at \*4 n.2; *Jessamy*, 292 F. Supp. 2d at 509.**

     **Moreover, to the extent this Separate Statement alleges a crime or fraud against Yanza, Camacho and Piaguaje each affirm under oath that they "have not engaged in any crime, fraud or violation of court rules" and that they are "unaware of and have not authorized or ratified any crime, fraudulent activity, or violation of court rules by anyone acting on [their] behalf with regard to the Lago Agrio Lawsuit."  (Dkt. 446, at ¶¶ 17-18; Dkt. 447, at ¶¶ 18-19).  Camacho and Piaguaje are Plaintiffs in the Lago Agrio lawsuit because they intend to "hold Chevron responsible" for the contamination and failure properly to remediate.  (Smyser Decl., Exs. 12 & 13, ¶ 6).  They "have never had any intention to defraud Chevron, or anyone else related to the case."  (*Id.*).**

5.      Alejandro Ponce Villacís ("Ponce") began working as counsel for the LAPs in the Lago Agrio Litigation in or around June 2005.

**Response:**

**Not disputed.  Ponce served as one of the legal counsel for the Lago Agrio Plaintiffs from June 2005 to November 2008.  Effective December 1, 2008, Ponce withdrew as counsel to the Plaintiffs because he joined the law firm Quevedo & Ponce as a partner.**

**Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 91).  Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion.**

6.      In all of the conduct attributed to Ponce in this Separate Statement, Ponce has acted as the LAPs' agent.

**Response:**

**Disputed.  This statement consists of an improper legal conclusion, which the Court should strike or disregard.  *See, e.g.*, *Antunes*, 2011 WL 1990872 at \*2 n.9; *Cicchetti*, 2008 WL 619013 at \*4 n.2; *Jessamy*, 292 F. Supp. 2d at 509.**

**Moreover, to the extent this Separate Statement alleges a crime or fraud against Ponce, Camacho and Piaguaje each affirm under oath that they "have not engaged in any crime, fraud or violation of court rules" and that they are "unaware of and have not authorized or ratified any crime, fraudulent activity, or violation of court rules by anyone acting on [their] behalf with regard to the Lago Agrio Lawsuit."  (Dkt. 446, at ¶¶ 17-18; Dkt. 447, at ¶¶ 18-19).  Camacho and Piaguaje are Plaintiffs in the Lago Agrio lawsuit because they intend to "hold Chevron responsible" for the contamination and failure properly to remediate.  (Smyser Decl., Exs. 12 & 13, ¶ 6).  They "have never had any intention to defraud Chevron, or anyone else related to the case."  (*Id.*).**

7.      Fajardo is and has been counsel of record for the LAPs in the Lago Agrio Litigation since February 7, 2006.

**Response:**

**Defendants do not dispute that Fajardo is counsel of record for the Plaintiffs in the case of *Maria Aguinda, et al v. Chevron*, Case No. 2003-002, in the Provincial Court of Justice, Sucumbíos Province, Ecuador.  Defendants dispute that Fajardo is counsel of record in any other litigation involving the Lago Agrio Plaintiffs.**

**Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 87).  Chevron provides no reason for the Court to rule any differently on this Renewed Motion.**

8.      In all of the conduct attributed to Fajardo in this Separate Statement, Fajardo has acted as the LAPs' agent.

3

**Response:**

**Disputed.  This statement consists of an improper legal conclusion, which the Court should strike or disregard.  *See, e.g.*, *Antunes*, 2011 WL 1990872 at\*2 n.9; *Cicchetti*, 2008 WL 619013 at \*4 n.2; *Jessamy*, 292 F. Supp. 2d at 509.  In addition, the statement is compound and does not identify with specificity what conduct it refers to.**

**Moreover, to the extent this Separate Statement alleges a crime or fraud against Fajardo, Camacho and Piaguaje each affirm under oath that they "have not engaged in any crime, fraud or violation of court rules" and that they are "unaware of and have not authorized or ratified any crime, fraudulent activity, or violation of court rules by anyone acting on [their] behalf with regard to the Lago Agrio Lawsuit."  (Dkt. 446, at ¶¶ 17-18; Dkt. 447, at ¶¶ 18-19).  Camacho and Piaguaje are Plaintiffs in the Lago Agrio lawsuit because they intend to "hold Chevron responsible" for the contamination and failure properly to remediate.  (Smyser Decl., Exs. 12 & 13, ¶ 6).  They "have never had any intention to defraud Chevron, or anyone else related to the case."  (*Id.*).**

9.    Juan Pablo Sáenz ("Sáenz") is and has been counsel for the LAPs in the Lago Agrio Litigation since at least September 2006.

**Response:**

**Disputed.  The document cited, Dkt. 402-12 (Ex. 2309), does not support the statement that Sáenz is counsel for the LAPs.  It is an email sent by Pablo Fajardo to numerous individuals, including Sáenz, that does not indicate anything in particular about Sáenz.  Defendants do not dispute that Sáenz has assisted Fajardo, who is counsel of record for the Plaintiffs in the case of *Maria Aguinda, et al v. Chevron*, Case No. 2003-002, in the Provincial Court of Justice, Sucumbíos Province, Ecuador.  Defendants dispute that Sáenz is counsel of record in any other litigation involving the Lago Agrio Plaintiffs.**

**Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel.  (Dkt. 398, at St. 89).  Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion.**

10.    In all of the conduct attributed to Saenz in this Separate Statement, Sáenz has acted as the LAPs' agent.

**Response:**

**Disputed.  This statement consists of an improper legal conclusion, which the Court should strike or disregard.  *See, e.g.*, *Antunes*, 2011 WL 1990872 at \*2 n.9; *Cicchetti*, 2008 WL 619013 at \*4 n.2; *Jessamy*, 292 F. Supp. 2d at 509.  In addition, the statement does not identify with specificity what conduct it refers to.**

**Moreover, to the extent this Separate Statement alleges a crime or fraud against Saenz, Camacho and Piaguaje each affirm under oath that they "have not engaged in any**

**crime, fraud or violation of court rules" and that they are "unaware of and have not authorized or ratified any crime, fraudulent activity, or violation of court rules by anyone acting on [their] behalf with regard to the Lago Agrio Lawsuit."  (Dkt. 446, at ¶¶ 17-18; Dkt. 447, at ¶¶ 18-19).  Camacho and Piaguaje are Plaintiffs in the Lago Agrio lawsuit because they intend to "hold Chevron responsible" for the contamination and failure properly to remediate. (Smyser Decl., Exs. 12 & 13, ¶ 6).  They "have never had any intention to defraud Chevron, or anyone else related to the case."  (*Id.*).**

11.     Julio Prieto (Prieto) is and has been counsel for the LAPs in the Lago Agrio Litigation since at least 2006.

      **Response:**

      **Disputed.  The document cited, Dkt. 28-7 (DONZ00027156), does not support the statement that Prieto is counsel for the LAPs.  It is an email sent by Rebecca Gray to Edison Camino-Castro  that does not make any reference to Prieto.  Defendants do not dispute that Prieto has assisted Fajardo, who is counsel of record for the Plaintiffs in the case of Maria Aguinda, et al v. Chevron, Case No. 2003-002, in the Provincial Court of Justice, Sucumbíos Province, Ecuador.  Defendants dispute that Prieto is counsel of record in any other litigation involving the Lago Agrio Plaintiffs.**

      **Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 90).  Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion**

12.     In all of the conduct attributed to Prieto in this Separate Statement, Prieto has acted as the LAPs' agent.

      **Response:**

      **Disputed.  This statement consists of an improper legal conclusion, which the Court should strike or disregard.  *See, e.g.*, *Antunes*, 2011 WL 1990872 at*2 n.9; *Cicchetti*, 2008 WL 619013 at *4 n.2; *Jessamy*, 292 F. Supp. 2d at 509.  In addition, the statement does not identify with specificity what conduct it refers to.**

      **Moreover, to the extent this Separate Statement alleges a crime or fraud against Prieto, Camacho and Piaguaje each affirm under oath that they "have not engaged in any crime, fraud or violation of court rules" and that they are "unaware of and have not authorized or ratified any crime, fraudulent activity, or violation of court rules by anyone acting on [their] behalf with regard to the Lago Agrio Lawsuit."  (Dkt. 446, at ¶¶ 17-18; Dkt. 447, at ¶¶ 18-19).  Camacho and Piaguaje are Plaintiffs in the Lago Agrio lawsuit because they intend to "hold Chevron responsible" for the contamination and failure properly to remediate. (Smyser Decl., Exs. 12 & 13, ¶ 6).  They "have never had any intention to defraud Chevron, or anyone else related to the case."  (*Id.*).**

13.     Stratus began to serve as a member of the LAP team no later than 2007.

**Response:**

**Disputed.  The cited evidence does not support Chevron's characterization.  Douglas Beltman testified that "Kohn Swift & Graf has paid Stratus in relation to the work that we conducted beginning in 2007 under contract to Kohn Swift & Graf to provide technical and scientific assistance to the plaintiff attorneys."  Dkt. 402-11 (Ex. 2288) (2010.12.09 Stratus 30(b)(6) deposition of Douglas Beltman) at 128:18-22.  Stratus was thus a contracted consultant to Kohn Swift & Graf.  *Id.*  Additionally, Chevron's reference to "team" is vague and never defined by Chevron.**

14.     In all of the conduct attributed to Stratus in this Separate Statement, Stratus has acted as the LAPs' agent.

**Response:**

**Disputed.  Stratus was a contracted consultant to Kohn Swift & Graft.  *See* Resp. to St. 13.  This statement consists of an improper legal conclusion, which the Court should strike or disregard.  *See, e.g.*, *Antunes*, 2011 WL 1990872 at*2 n.9; *Cicchetti*, 2008 WL 619013 at *4 n.2; *Jessamy*, 292 F. Supp. 2d at 509.  In addition, the statement does not identify with specificity what conduct it refers to.**

**Moreover, to the extent this Separate Statement alleges a crime or fraud against Stratus, Camacho and Piaguaje each affirm under oath that they "have not engaged in any crime, fraud or violation of court rules" and that they are "unaware of and have not authorized or ratified any crime, fraudulent activity, or violation of court rules by anyone acting on [their] behalf with regard to the Lago Agrio Lawsuit."  (Dkt. 446, at ¶¶ 17-18; Dkt. 447, at ¶¶ 18-19).  Camacho and Piaguaje are Plaintiffs in the Lago Agrio lawsuit because they intend to "hold Chevron responsible" for the contamination and failure properly to remediate.  (Smyser Decl., Exs. 12 & 13, ¶ 6).  They "have never had any intention to defraud Chevron, or anyone else related to the case."  (*Id.*).**

15.     Beltman began to serve as a member of the LAP team no later than 2007.

**Response:**

**Disputed.  The cited evidence does not support Chevron's characterization.  Douglas Beltman testified that "Kohn Swift & Graf has paid Stratus in relation to the work that we conducted beginning in 2007 under contract to Kohn Swift & Graf to provide technical and scientific assistance to the plaintiff attorneys."  Dkt. 402-11 (Ex. 2288) (2010.12.09 Stratus 30(b)(6) deposition of Douglas Beltman) at 128:18-22.  Additionally, Chevron's reference to "team" is vague and never defined by Chevron.**

16.     In all of the conduct described in this Separate Statement, Beltman has acted as the LAPs' agent.

**Response:**

401488.5

**Disputed. This vague and compound statement consists of an improper legal conclusion, which the Court should strike or disregard. *See, e.g., Antunes*, 2011 WL 1990872 at*2 n.9; *Cicchetti*, 2008 WL 619013 at *4 n.2; *Jessamy*, 292 F. Supp. 2d at 509. The statement does not identify with specificity what conduct it refers to.**

**Moreover, to the extent this Separate Statement alleges a crime or fraud against Stratus, Camacho and Piaguaje each affirm under oath that they "have not engaged in any crime, fraud or violation of court rules" and that they are "unaware of and have not authorized or ratified any crime, fraudulent activity, or violation of court rules by anyone acting on [their] behalf with regard to the Lago Agrio Lawsuit." (Dkt. 446, at ¶¶ 17-18; Dkt. 447, at ¶¶ 18-19). Camacho and Piaguaje are Plaintiffs in the Lago Agrio lawsuit because they intend to "hold Chevron responsible" for the contamination and failure properly to remediate. (Smyser Decl., Exs. 12 & 13, ¶ 6). They "have never had any intention to defraud Chevron, or anyone else related to the case." (*Id.*).**

17.    Maest began to serve as a member of the LAP team no later than 2007.

**Response:**

**Disputed. The cited evidence does not support Chevron's characterization. Douglas Beltman testified that "Kohn Swift & Graf has paid Stratus in relation to the work that we conducted beginning in 2007 under contract to Kohn Swift & Graf to provide technical and scientific assistance to the plaintiff attorneys." Dkt. 402-11 (Ex. 2288) (2010.12.09 Stratus 30(b)(6) deposition of Douglas Beltman) at 128:18-22. Additionally, Chevron's reference to "team" is vague and never defined by Chevron.**

18.    In all of the conduct described in this Separate Statement, Ann Maest has acted as the LAPs' agent.

**Response:**

**Disputed. This statement consists of an improper legal conclusion, which the Court should strike or disregard. *See, e.g., Antunes*, 2011 WL 1990872 at*2 n.9; *Cicchetti*, 2008 WL 619013 at *4 n.2; *Jessamy*, 292 F. Supp. 2d at 509. In addition, the statement does not identify with specificity what conduct it refers to.**

**Moreover, to the extent this Separate Statement alleges a crime or fraud against Stratus, Camacho and Piaguaje each affirm under oath that they "have not engaged in any crime, fraud or violation of court rules" and that they are "unaware of and have not authorized or ratified any crime, fraudulent activity, or violation of court rules by anyone acting on [their] behalf with regard to the Lago Agrio Lawsuit." (Dkt. 446, at ¶¶ 17-18; Dkt. 447, at ¶¶ 18-19). Camacho and Piaguaje are Plaintiffs in the Lago Agrio lawsuit because they intend to "hold Chevron responsible" for the contamination and failure properly to remediate. (Smyser Decl., Exs. 12 & 13, ¶ 6). They "have never had any intention to defraud Chevron, or anyone else related to the case." (*Id.*).**

7

19.     A 2011 Engagement Agreement signed by Fajardo affirms that Donziger "acted as the primary United States attorney on behalf of the Plaintiffs to date," and affirms Donziger's past and continued authorization to "assemble and organize United States lawyers and law firms" and "non-legal advisors, experts, and service providers" to "assist the Plaintiffs," "coordinate the efforts to procure funding," and "coordinate the media, public affairs and public relations," including "retaining lobbyists."

**Response:**

**Disputed in part.  Defendants do not dispute that Fajardo signed the 2011 Engagement Agreement relating to Donziger's services.  Defendants dispute the legal effect of Fajardo's signing the Agreement as it relates to their vicarious liability for the allegations in this lawsuit.**

20.     A November 2010 Power of Attorney signed by Defendants Camacho and Piaguaje, and 39 other LAPs, invested Fajardo with "the widest of powers and attributes that the law confers" including the authority to "make and/or sign any kind of agreements for setting up the contracting of any kind of consultant, whether this be a legal professional or not."

**Response:**

**Disputed in part.  Defendants do not dispute that they signed the November 2010 Power of Attorney.  Defendants dispute the legal effect of their signing the Power of Attorney as it relates to alleged vicarious liability for the allegations in this lawsuit.**

21.     The LAPs retrospectively "ratifie[d] and approve[d]" Fajardo's actions in the Lago Agrio Litigation and other litigations, whether "performed directly or through other persons."

**Response:**

**Disputed.  The statement calls for a legal interpretation of an agreement. Defendants do not dispute that they signed the November 2010 Power of Attorney, or that they ratified and approved the actions of Fajardo about which they were aware at the time. Defendants did not, and could not, ratify or approve any acts about which they were unaware.**

**Camacho and Piaguaje each affirm under oath that they "have not engaged in any crime, fraud or violation of court rules" and that they are "unaware of and have not authorized or ratified any crime, fraudulent activity, or violation of court rules by anyone acting on [their] behalf with regard to the Lago Agrio Lawsuit."  (Dkt. 446, at ¶¶ 17-18; Dkt. 447, at ¶¶ 18-19).**

22.     Donziger, Yanza, Fajardo, Stratus Consulting, Beltman, and Maest have performed multiple acts in furtherance of a conspiracy to harm Chevron in which all are coconspirators, as set forth in this Separate Statement.

**Response:**

Disputed.  Defendants incorporate Resp. St. 12-18, 23-214.  This statement consists of an improper legal conclusion, which the Court should strike or disregard.  *See, e.g.*, *Antunes*, 2011 WL 1990872 at*2 n.9; *Cicchetti*, 2008 WL 619013 at *4 n.2; *Jessamy*, 292 F. Supp. 2d at 509.

Moreover, to the extent this Separate Statement alleges a crime or fraud against Donziger, Yanza, Fajardo, Stratus Consulting, Beltman, or Maest, Camacho and Piaguaje each affirm under oath that they "have not engaged in any crime, fraud or violation of court rules" and that they are "unaware of and have not authorized or ratified any crime, fraudulent activity, or violation of court rules by anyone acting on [their] behalf with regard to the Lago Agrio Lawsuit."  (Dkt. 446, at ¶¶ 17-18; Dkt. 447, at ¶¶ 18-19).  Camacho and Piaguaje are Plaintiffs in the Lago Agrio lawsuit because they intend to "hold Chevron responsible" for the contamination and failure properly to remediate.  (Smyser Decl., Exs. 12 & 13, ¶ 6).  They "have never had any intention to defraud Chevron, or anyone else related to the case."  (*Id.*).

## II.     The LAP Team Engaged in a Planned and Carefully Executed Scheme to Defraud in the Lago Agrio Litigation[3]

23.     Early in the Lago Agrio Litigation, the court ordered a series of 122 judicial inspections of various oil drilling and production sites, where experts for the parties would each examine the sites and submit their findings to a panel of settling experts to reconcile the reports and issue final determinations regarding the presence or absence of harmful contamination.

**Response:**

Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.

24.     From January 2005 to June 2006, the LAP team submitted to the Lago Agrio court sampling results for TPH, PAH, and hexavalent chromium in soil from the HAVOC laboratory, but during that time, HAVOC was not accredited to test for those compounds, nor did it have the necessary equipment to perform tests for individual PAHs.

**Response:**

Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.

25.     The LAP team submitted to the Lago Agrio court sampling results from "Selva Viva Laboratories," but there was no entity called "Selva Viva Laboratories"—this was a name the LAPs used when they did their own testing, using testing kits in a hotel room.

**Response:**

Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.

---

[3] For the reasons set forth in Defendants' Responses to Chevron's 56.1 Statements under Heading II, Defendants also dispute the assertions, argument, and conclusions set forth in Chevron's Heading II.

26.     Defendants stopped Chevron from inspecting HAVOC on one occasion by pressuring a judge to cancel a planned inspection and on another occasion by instructing HAVOC to close, because Donziger believed that the inspection would be a "disaster" for the LAPs' case.

        **Response:**

   **Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

27.     In 2005, Donziger offered and agreed to pay Fernando Reyes and Gustavo Pinto to act as "monitors" of the settling experts in the judicial inspection phase of the Lago Agrio Litigation; the agreed upon payments included a bonus if the LAPs won the lawsuit.

        **Response:**

   **Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

28.     Donziger called Reyes "one of the most qualified engineers and academics in the field" and included Reyes as one of two people on his "A List."

        **Response:**

   **Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

29.     The LAP team did not disclose the fact that they were paying Reyes and Pinto, and instructed Reyes and Pinto to keep that fact a secret.

        **Response:**

   **Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

30.     On February 1, 2006, the "Report of the 'Settling Experts' on the Judicial Inspection of the Sacha 53 Well" found that "the concentration levels of the elements analyzed are lower than the allowable limits" and thus "the risk to human health is low."

        **Response:**

   **Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact. Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel.  (Dkt. 398, at St. 103).  Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion.**

31.     Reyes states that "Donziger was very upset by the findings of the settling experts' report, and he complained that the report supported Chevron's position and did not support the plaintiffs' position."

        **Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

32.     Donziger directed Reyes and Pinto that their monitorship report on the Sacha 53 settling experts' report should establish that the findings of the settling experts were wrong, that they lacked objectivity, and that they were biased in favor of Chevron.

      **Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

33.     Once they had reviewed the settling experts' report, Reyes and Pinto found that "the evidence did not support Mr.  Donziger's position," and they could not "twist" their analyses to support the LAPs' position.

      **Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

34.     The monitorship report Reyes and Pinto drafted did not state that the settling experts' findings regarding Sacha 53 were wrong or biased, and the LAP team never asked Reyes and Pinto to submit the monitorship report to the court.

      **Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

35.     Members of the LAP team, including Donziger, told Reyes that they wanted a single expert to carry out a global assessment because the judicial inspection process had not yielded data to support their claims of contamination, and because they believed it would be easier to manage one single expert rather than many.

      **Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

36.     As this Court has already found, "The decisions to terminate judicial inspections, to pursue the global assessment, and to select Cabrera as the global expert were tainted by the duress and coercion applied to [the court] by Fajardo, Donziger, and [others] in ex parte meetings."

      **Response:**

      **Disputed.[4]  Chevron's selective and incomplete quotation of documents is misleading.  In particular, Chevron's selective quotation from DONZ0023182 at 1 could**

---

[4] Defendants are mindful of the Court's admonition not to re-litigate issues that have already been decided.  Defendants submit, however, that the Court's prior observation regarding the decision to terminate  judicial inspections, made based on facts that were undisputed at the time, is not a "finding" that must forever bind the defendants in this

create the false impression that the Ecuadorian Plaintiffs were connected to the charges of Judge Yánez trading jobs for sex in the court.  However, the papers to which Chevron cites establish that the complaint that the Ecuadorian Plaintiffs prepared concerned the judge's failure to act on the Ecuadorian Plaintiffs' motion regarding judicial inspections, not the prior sex scandal in which the judge was allegedly involved. Dkt. No. 28-9 (Ex. 76) (DONZ00027256) at p. 55 (2006.07.25 journal entry, which states: "It appears the corruption charges against Yánez which came out in El Comercio two weeks ago have embroiled the entire court in a patricidal war. . . . He [Pablo] also said there is the feeling in the court that we are behind the complaints against Yánez and Novillo, which we are not, even though we have much to complain about, which is sort of ironic."). *See also* Dkt. No. 32-4 (Ex. 149) (DONZ00023182) at p. 1 ("Pablo met with the judge today.  The judge, who is on his heels from the charges of trading jobs for sex in the court, said he is going to accept our request to withdraw the rest of the inspections save the four we still want to do. This follows our press conference Monday that was attended by 32 journalists and several prominent supporters, and the filing of a very well-written amicus signed by 11 Ecuadorian lawyers supporting the withdrawal of the inspections.  The judge also I believe wants to forestall the filing of a complaint against him by us, which we have prepared but not yet filed.  The judge told Pablo that the Texaco lawyers came by the other day to urge him to make us do all the inspections. The judge told Pablo they were nervous about the peritaje global.").

Chevron's characterization of the November 7, 2006 e-mail from Fajardo is also highly misleading.  Fajardo states that the Judge initially thought there was no legal basis for the global assessment as the Judge understood it.  Dkt. 402-13 (Ex. 2312) at 2.  Fajardo then continued, "We explained the actual scope of the Global Assessment to him, and he understood somewhat.  I think we have to strengthen our position, the delivery of information and the objectives of the global assessmenti." *Id.*  Thus, Chevron's suggestion that the actual global assessment lacked a legal basis is contradicted by the very evidence to which Chevron cites.  Nor does Saenz's e-mail describing another meeting regarding the global assessment.  According to Saenz, the Judge reported that Chevron "has been constantly on top of the matter of the global assessment . . . I would dare say that they already have several motions ready and they are waiting for us to ask for this proceeding in order to create several collateral issues." Dkt. 402-13 (Ex. 2313) at 2.  Saenz also reports that, although "we were able to persuade the Judge that he must only order the global assessment strictly following what is in the existing order," he suspected that "the Judge already shares Texaco's position."  *Id.*  This also refutes Chevron's suggestion that the global assessment was ordered as a rubber-stamp of the Ecuadorian Plaintiffs' motion.

---

case.  A factual assertion that is not properly disputed may be deemed admitted for the purpose of the summary judgment motion *at issue at that time*.  *See* Local Civ. R. 56.1(c) (discussing when a numbered paragraph in a statement of material facts "will be deemed to be admitted *for purposes of the motion*") (emphasis added).  Such facts are not deemed admitted for all purposes in the case.  *See, e.g. U.S. Info. Sys., Inc. v. Int'l Brotherhood of Elec. Workers Union Local Union No. 3*, No. 00-cv-4763-RMB-JCF, 2006 WL 2136249, at *4 ("Under Local Rule 56.1(c), facts admitted by the plaintiffs' failure to properly dispute them are deemed admitted for the purposes of the summary judgment motion *only*.") (emphasis added).  Further, even facts that have been deemed admitted must be construed in the light most favorable to the non-moving party.  *Gadsden v. Jones Lang Lasalle Americas, Inc.*, 210 F. Supp. 2d 430, 441 (S.D.N.Y. 2002).

Defendants dispute Chevron's suggestion that ex parte contacts with a judge were inappropriate.  At all times relevant to Chevron's motion, there was no law or regulation in Ecuador prohibiting ex parte communications with judges.  *See* Dkt. No. 154-6 (Affidavit of Dr. Farith Ricardo Simon noting that Ecuadorian law prohibiting judges from "accepting the visit of or meeting with one of the parties or his counsel without first notifying the other" did not come into existence until March 9, 2009—roughly three years after the Ecuadorian Plaintiffs are alleged to have met with Judge Yánez concerning the waiver of judicial inspections and the commencement of the peritaje global); *see also* Smyser Decl., Ex. 17 (Affidavit of Juan Pablo Alban Alencastro) ¶¶ 30-32 ("Article 151 of the Organic Law of the Judicial Branch . . . shows that *ex parte* contacts with a judge were not prohibited").  And Chevron's citation to evidence indicating that the Ecuadorian Plaintiffs' lawyers went out to lunch with the judge, in a public place, after a judicial site inspection undercuts Chevron's suggestion that such meetings were inappropriate or secret.  *See* Dkt. No. 28-9 at 20.  (Donziger journal entry describing lunch with judge in a public place).

Further, sworn eyewitness accounts confirm that Chevron's lawyers' representatives engaged in repeated, substantive ex parte meetings and communications with the judges presiding over the Lago Agrio litigation, including specifically meetings and communications relating to the appointment of Richard Cabrera.  Ex parte communication with the judges presiding over the Lago Agrio litigation was the ordinary manner of proceeding throughout the majority of that case.  Chevron, in fact, had ex parte meetings of its own with Ecuadorian judges presiding over the Lago Agrio litigation—including meetings regarding the peritaje global.  Eyewitness Donald Rafael Moncayo Jimenez has recounted in a sworn affidavit: "On multiple occasions, I personally saw the lawyers who represent Chevron Corporation in the Lago Agrio case meeting alone with the judges who heard the case without the presence of the plaintiffs' lawyers" Dkt. 613-6 (Ex. F)  ¶ 3.  Moncayo has testified that on one occasion, he "saw attorneys Adolfo Callejas Ribadeneira and Ivan Alberto Racines [Chevron's lawyers], and Dr. Efraín Novillo [one of the presiding judges] in the offices of Judge Novillo.  They were talking about the expert designated by the Judge, Mr. Richard Cabrera." *Id*. at ¶ 4.  When Mr. Moncayo "approached the offices, the private security guards of Chevron and a Chevron technician tried to chase [him] away." *Id*.  Moncayo also describes another incident where Judge Juan Núñez, then-President of the Lago Agrio Court, "was talking to Dr. Diego Larrea and Alberto Racines [Chevron's lawyers] about the inspection of the Auca wells and other stations, where there were oil wells, topic of the Lago Agrio case." *Id*. at ¶ 5.  Additionally, during his deposition on September 13, 2011, Moncayo testified under oath to witnessing one of Chevron's lawyers, Dr. Enrique Caravajal, have an ex parte meeting with the then-presiding Judge Rafael Ordoñez after business hours on July 30, 2010. Dkt., 613-7 (Ex. G) at 31:11-32:19, 34:2-36:21.  The ex parte meeting lasted roughly 20 minutes, and is captured in photographs that Moncayo took with his mobile phone. *Id*. at 37:6-42:22; *see also* 613-8 (Ex. N) (Salazar Decl., recounting additional Chevron ex parte meetings with the Lago Agrio Court).  It occurred after such contacts were prohibited by Ecuadorian law.  *See* Smyser Decl., Ex. 17 (Alban Aff.), ¶¶ 30-32.

37.    The LAP team expected that the results of the global assessment would be adopted into the judgment.

401488.5

**Response:**

**Disputed. Defendants incorporate Donziger Defendants' response to this purported fact.**

38.     For the role of the global expert, Donziger wanted someone who would "totally play ball with [the LAP team] and let [the LAP team] take the lead while projecting the image that he is working for the court."

      **Response:**

**Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 113). Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion.**

39.     Donziger told Reyes that if he were to be the global expert, he would need to find that Chevron was the only party responsible for the environmental damage and the harm to the local community, and find damages to be awarded to the LAPs in excess of a billion dollars.

      **Response:**

**Disputed. Defendants incorporate Donziger Defendants' response to this purported fact.**

40.     Reyes believed that the ROE bore significant liability for any damage, and thought the LAPs' proposal of damages as high as $10 billion was "completely ludicrous."

      **Response:**

**Disputed. Defendants incorporate Donziger Defendants' response to this purported fact.**

41.     Reyes recommended Cabrera to the LAP team for the global expert role because, in Reyes's words, "for Mr. Cabrera, issues such as independence and professional standards were not that important, and therefore he would have no problem doing what the plaintiffs were proposing."

      **Response:**

**Disputed. Defendants incorporate Donziger Defendants' response to this purported fact.**

42.     To secure Cabrera's appointment, the LAPs' counsel drafted an ethics complaint against Judge Yánez, and threatened to file it if he did not end the judicial inspection process.

      **Response:**

**Disputed. Defendants incorporate Donziger Defendants' response to this purported fact.**

43. Donziger wrote of "mobilizing the country, politically, so that no judge can rule against us and feel like he can get away with it in terms of his career."

**Response:**

**Disputed. Defendants incorporate Donziger Defendants' response to this purported fact.**

44. On March 3, 2007, Donziger, Fajardo, Yanza, Maest and other members of the LAP team met with Cabrera, without any attorney or representative of Chevron present, to plan the global assessment.

**Response:**

**Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 129). Chevron provides no reason for the Court to rule any differently on this Renewed Motion.**

45. At the March 3, 2007 meeting with Cabrera, the LAPs team indicated that they had already predetermined the findings of the global assessment, and that they themselves would write a report that would support their claim for billions of dollars against Chevron and put Cabrera's name on it.

**Response:**

**Disputed. Defendants incorporate Donziger Defendants' response to this purported fact.**

46. At the March 3, 2007 meeting with Cabrera, Fajardo stated: "And here is where we do want the support of our entire technical team . . . of experts, scientists, attorneys, political scientists, so that all of us will contribute to that report—in other words—you see . . . the work isn't going to be the expert's. All of us bear the burden." When some-one asked whether the final report would be prepared by Cabrera, Fajardo responded that the expert would "sign the report and review it. But all of us, all together, have to contribute to that report." Defendant Maest said, "But not Chevron," and laughter ensued.

**Response:**

**Disputed. Defendants incorporate Donziger Defendants' response to this purported fact.**

47. On March 4, 2007, Donziger said to Maest and other members of the LAP team: "Hold on a second, you know, this is Ecuador, okay. You can say whatever you want and at the end of the day, there's a thousand people around the courthouse, you're going to get what you want. Sorry, but it's true. Okay. Therefore, if we take our existing evidence on groundwater contamination, which admittedly is right below the source. And wanted to extrapolate based on nothing other than our, um, theory that is, they all, we average out to going 300 meters in a radius, depending on the – the, uh—what do you call it when the land goes down? The incline. You know what I mean, . . . The gradient. We can

do it. We can do it. And we can get money for it. And if we had no more money to do more work, we would do that. You know what I'm saying? And it wouldn't really matter that much. Because at the end of the day, this is all for the Court just a bunch of smoke and mirrors and bullshit."

**Response:**

**Disputed. Defendants incorporate Donziger Defendants' response to this purported fact.**

48. On March 19, 2007, the Lago Agrio court announced the appointment of Cabrera as the global expert.

**Response:**

**Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 115). Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion.**

49. In Fajardo's March 26, 2007 email to LAPs' lawyers, his statement: "Today the cook met with the waiter to coordinate the menu," described the need to pressure the judge (the "cook") to keep him from appointing another expert in connection with the global assessment in addition to Cabrera (the "waiter").

**Response:**

**Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 117). Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion.**

50. Cabrera was sworn in by the Lago Agrio court as the global expert on June 13, 2007.

**Response:**

**Not disputed. Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 119). Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion.**

51. Cabrera was obligated by court order to be "impartial" and "independent" and to ensure that his work was "transparent" and "independent from the two parties."

**Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.  Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel.  (Dkt. 398, at St. 122).  Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion.**

52.     The LAP team repeatedly asserted, to the Lago Agrio court, and to other audiences, that Cabrera was a "neutral" and "independent" court-appointed expert or "Special Master," and they denied any improper relationship with Cabrera.

       **Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.  Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel.  (Dkt. 398, at St. 125).  Chevron provides no reason for the Court to rule any differently on this Renewed Motion.**

53.     Defendants used code words to conceal their interactions with the Ecuadorian court and Cabrera.

       **Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.  Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel.  (Dkt. 398, at St. 175).  Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion.**

54.     Among other names, Defendants referred to Cabrera as "Wao" or "Wuao."

       **Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

55.     Fajardo wrote the following filings submitted by Cabrera in the Lago Agrio Litigation: Dkt. 35-9 (2007.07.23 Cabrera letter) at 131,972 (Fajardo, writing as Cabrera, stating, "I should clarify that I do not have any relation or agreements with the plaintiff, and it seems to me to be an insult against me that I should be linked with the attorneys of the plaintiffs."); Dkt. 400-3 (Ex. 2030) (2007.08.23 Cabrera letter) at 132,263 (Fajardo, writing as Cabrera, repo¶rting that, "In order to demonstrate the transparency and impartiality and objectivity with which I am developing the field work ¶ . . I chose to draft a sample registry sheet"); Dkt. 400-3 (Ex. 2031) (2007.10.16 Cabrera letter) at 133,254 (Fajardo, writing as Cabrera, stating that Cabrera's "duty as expert is to comply with the law"); Dkt. 400-3 (Ex. 2032) (2007.10.31 Cabrera letter) at 133,465 (Fajardo, writing as Cabrera, stating, "I can only confirm my commitment to continue my work with absolute impartiality, honesty and transparency."); Dkt. 400-3 (Ex. 2033) (2007.11.08 Cabrera letter) at 133,582 (Fajardo, writing as Cabrera, asking the court to

order public and private institutions to provide him with essential information so he can "conduct a thorough, impartial and objective investigation in strict observance of the law"); Dkt. 400-3 (Ex. 2034) (2007.12.10 Cabrera letter) at 133,907 (Fajardo, writing as Cabrera, stating, "I hope and I am certain that my report, which is completely impartial, will help bring to light the truth of the matters in dispute."); Dkt. 400-4 (Ex. 2041) (2008.01.07 Cabrera letter) (Fajardo, writing as Cabrera, stating that Cabrera's report is almost complete and requesting that the parties supply Cabrera with documents); Dkt. 35-10 (2008.10.07 Cabrera letter – 151,316) at 7 (Fajardo, writing as Cabrera, stating, "I am an honest man with nothing to hide, and my conduct as an expert in this case has been as professional, impartial and objective as possible, as can be seen from my expert report. The fact that neither of the two parties is fully satisfied with my report is clear evidence of my impartiality."); Dkt. 400-4 (Ex. 2042) (2008.11.07 Cabrera letter) at 152,783 (Fajardo, writing as Cabrera, stating that Cabrera could not produce to Chevron any drafts of his report because "[t]he digital files that contain these drafts were deleted after the final report was submitted, and the paper was recycled. . . . I was not aware of any obligation to store all the drafts I used in performing my work."); Dkt. 36-4 (2009.03.04 Cabrera letter) at 154,580 (Fajardo, writing as Cabrera, responds to questions by Chevron regarding Cabrera's independence: "Once more I make it a matter of record that I have done my work, with my technical team, in adherence to my principles of integrity and, without a desire to negatively affect or benefit either party . . .."); Dkt. 400-3 (Ex. 2035) (2010.03.22 Cabrera letter) at 168,513 (Fajardo, writing as Cabrera, stating, "Chevron accuses me of having a conflict of interest . . . . Your Honor, this is another serious and false accusation."); Dkt. 402-13 (Ex. 2319) (2007.07.12 Cabrera letter) at 131,336 (Fajardo, writing as Cabrera, requesting that the court halt government remediation at inspection sites); Dkt. 400-3 (Ex. 2029) (2007.07.12 Cabrera letter) at 131,338 (Fajardo, writing as Cabrera, referring to "the complete and absolute impartiality with which I must act in carrying out my expert evaluation . . . . "); Dkt. 402-14 (Ex. 2321) (2007.07.23 Cabrera letter) at 131,971 (Fajardo, writing as Cabrera, giving notice of future site inspections).

**Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact. Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel.  (Dkt. 398, at St. 127).  Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion.**

56.   As this Court has already found, "Cabrera's work plan was drafted by the LAP team and given to Cabrera for his adoption.  When the work plan was filed with the Lago Agrio court, it was not disclosed that the LAP team had provided Cabrera with a draft of the work plan."

**Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

18

57.     The LAP team secretly contracted with Cabrera, purchased insurance for him, and discussed getting him an office and arranging for one of their girlfriends to be his assistant.

**Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact. Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel.  (Dkt. 398, at St. 131, 132).  Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion.**

58.     On April 17, 2007, Yanza wrote to Donziger: "We have met with Richard [Cabrera] and everything is under control.  We gave him some money in advance."

**Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact. Moreover, Chevron previously submitted this same evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel.  (Dkt. 398, at St. 133).  Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion.**

59.     On or around June 12, 2007, the LAP team opened a bank account at Banco Pichincha, Lago Agrio Branch in Nueva Loja, Ecuador, ending in number 4298-00.

**Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

60.     Yanza referred to the Banco Pichincha account ending in number 4298-00 as the "secret account."

**Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

61.     Yanza explained the purpose of the "secret account" to Donziger: "[Joseph Kohn] sends us money to our secret account, to give to Wuao [Cabrera], [to] not stop work."

**Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact. Moreover, Chevron previously submitted this same evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel.  (Dkt. 398, at St. 134).  Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion.**

62.     Donziger knows of no purpose for this account other than to pay Cabrera.

        **Response:**

   **Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

63.     On August 15, 2007 and again on September 14, 2007, acting on Donziger's instructions, Kohn Swift & Graf wired $50,000 from the United States to the "secret account."

        **Response:**

   **Defendants incorporate Donziger Defendants' response to this purported fact.**

64.     The LAP team made payments that were not disclosed to either the Ecuadorian court or Chevron to Cabrera from the "secret account."

        **Response:**

   **Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

65.     The Lago Agrio court authorized the LAPs to pay Cabrera a total of $271,814.

        **Response:**

   **Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

66.     The Lago Agrio court records include copies of checks from the LAPs to Cabrera totaling $263,899, all drawn on a Banco Pichincha account bearing account number ending 4450-04 and all paid to Cabrera after the court authorized his requests for payment.

        **Response:**

   **Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

67.     The LAPs have admitted that they made payments to Cabrera that were not authorized by the Lago Agrio court, but told the United States District Court for the Southern District of Florida that these payments were made "in the amount of his request made to the court so that his work would not 'stop' while Cabera's payment request sat on the judge's desk."

        **Response:**

   **Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

68.     Cabrera never reimbursed the LAPs for the payments they made to him.

        **Response:**

   **Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

69.   As this Court has already found, the Cabrera Report "was not entirely or even predominantly [Cabrera's] own work or that of any assistants or consultants working only for him.  There is no genuine issue with respect to the facts that the LAP team secretly prepared his work plan, worked closely with him in carrying it out, and drafted most of the report and its annexes."

   **Response:**

   **Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

70.   Maest assisted Beltman with the Cabrera Report and made at least two trips to Ecuador, where she coordinated the LAP team's work on the Cabrera Report.

   **Response:**

   **Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

71.   The LAP team revised the Cabrera Report until hours before Cabrera filed it under his own name. St.  69; Dkt.  104-2 (STRATUS-NATIVE069123-24) at 1-2 (Donziger

   **Response:**

   **Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

72.   Donziger has admitted that he does not know if Cabrera read the report before he submitted it to the Lago Agrio court under his own name.

   **Response:**

   **Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

73.   The Cabrera Report is dated March 24, 2008.

   **Response:**

   **Not disputed.**

74.   Richard Cabrera submitted the "Cabrera Report" to the Lago Agrio court on April 1, 2008.

   **Response:**

   **Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact. Moreover, Chevron previously submitted this same evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel.  (Dkt. 398, at St. 159).  Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion.**

75.    The Cabrera Report consists of a 50-page "Summary Report" followed by 17 annexes; Stratus wrote at least 11 of the annexes.

     **Response:**

     **Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. Moreover, Chevron previously submitted substantially this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at Sts. 154-55). Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion.**

76.    Beltman was the primary drafter of the "Summary Report" portion of the Cabrera Report.

     **Response:**

     **Disputed. Defendants incorporate Donziger Defendants' response to this purported fact.**

77.    The opening words of the Summary Report portion of the Cabrera Report are: "This report was prepared by the Expert Richard Stalin Cabrera Vega[.]"

     **Response:**

                 **Not disputed.**

78.    As this Court has already found, the Cabrera Report "falsely, or, at least, deceptively, stated that it had been 'prepared by the Expert Richard Stalin Cabrera Vega' with the help of 'my technical team, which consists of impartial professionals.'"

     **Response:**

     **Disputed. Defendants incorporate Donziger Defendants' response to this purported fact.**

79.    In a September 16, 2008, filing the LAPs objected to the Cabrera Report as "unjustly favorable to [Chevron]" and "too conservative" in its damage assessment.

     **Response:**

     **Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. Moreover, Chevron previously submitted a similar statement with the same evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 164). Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion.**

80.    As this Court has already found, "The answers filed by Cabrera in response to the LAPs' (and Chevron's) objections—like the report itself—were drafted at least in substantial part by the LAP team and written to read as if Cabrera had written them."

     **Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

81.    In writing "Cabrera's" responses to the LAPs' objections, Stratus "clean[ed] up" the language so it would "sound[] more like [Cabrera.]"

    **Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

82.    The LAP team attempted to recruit independent academics to endorse the Cabrera Report, but did not inform those academics they contacted about their role in the writing of the Cabrera Report, and did not obtain a single endorsement from an independent academic.

    **Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact. Moreover, Chevron previously submitted a similar statement with the same evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 170).  Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion.**

83.    On December 1, 2008, Stratus published a review of the Cabrera Report entitled "Comments on the Report of the Court-Appointed Expert Ing.  Richard Cabrera Vega in the Case of Maria Aguinda y Otros v.  Chevron Corp.," but did not disclose its role in the preparation of the Cabrera Report in its review.

    **Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact. Moreover, Chevron previously submitted a similar statement with the same evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 171).  Chevron provides no new evidence and no reason for the Court to rule any differently on this Renewed Motion.**

84.    Upon reviewing Stratus' review of the Cabrera Report, an attorney for the LAPs wrote Donziger and others, "This document may end the discussion.  These 'comments' are written in a manner to give the impression that Cabrera was entirely independent and conducted his own research and came up with his own findings.  There is no indication in this document that Stratus, ostensibly the company of experts independent from Cabrera, was itself involved in 'ghosting' the Cabrera report.  This might not be dispositive if there were other evidence showing that Chevron had actual or constructive knowledge that Stratus had been involved in the creation of the Cabrera report.  In such a case Stratus's 'comments' may have been a rather crude and awkward spin by a biased expert—but it would not have been a 'fraud' upon Chevron.  But, in the absence of such evidence, then it appears not only that Cabrera and plaintiffs can be charged with a 'fraud' respecting the former's report, but that Stratus was an active conspirator."

**Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

85.     The LAPs have never disclosed to the Ecuadorian court that persons working at their direction wrote the entirety of the Cabrera Report and all its Annexes.

**Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact. Moreover, Chevron previously submitted the same statement with the same evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel.  (Dkt. 398, at St. 182).  Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion.**

86.     As of January 27, 2013, Stratus claimed on its website: "Of the 4,000 pages that comprise the Cabrera report, approximately 200 pages, a mere 5%, rely on information submitted by Stratus to our clients.  Moreover, we have already testified before Chevron that we have no involvement in or even knowledge of the collusion amongst Ecuadorian plaintiff attorneys that Chevron has alleged."

**Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

87.     On September 16, 2010, the LAPs submitted, among a total of seven reports, reports from six U.S.  experts, none of whom had ever visited the former concession area or gathered new sampling data or offered causation opinions in their respective reports.

**Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact. Moreover, Chevron previously submitted a similar statement with the same evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel.  (Dkt. 398, at St. 186).  Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion.**

88.     The LAP team's purpose in submitting these seven expert reports was, in their words, to "'cleanse' any perceived impropriety related to the Cabrera Report," by "address[ing] Cabrera's findings in such a subtle way that someone reading the new expert report . . . might feel comfortable concluding that certain parts of Cabrera are a valid basis for damages."

**Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

89.     The retention agreement of the Weinberg Group, the entity hired to coordinate the seven expert reports, provides that it was retained for the purpose of "conduct[ ing] a comprehensive review of selected sections of an expert report prepared by Engineer Richard Stalin Cabrera Vega as an independent expert for the court."

**Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

90.     When informed of the true nature of the relationship between the LAP team and Cabrera, Douglas Allen, who authored one of the cleansing expert reports, admitted that the relationship "bother[ed]" him and it would have affected his opinion had he known about it at the time.

**Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

91.     Defendants relied on the Cabrera Report in communications with government agencies, shareholders, and the media, characterizing Cabrera as "independent" and comparing him to a "Special Master" in a U.S. court.

**Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

92.     Stratus sent the Cabrera Report to Congressman Jim McGovern, representing it as the work of an independent Special Master, and did not disclose its role in preparing the report.

**Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

93.     Members of the LAP team wrote that the Cabrera Report was the most important evidence in the case and provided the best damages estimate, one that should be afforded wide deference by the Ecuadorian court.

**Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

94.     On January 22, 2009, Fajardo wrote to the makers of Crude, asking them that "the images we had discussed be corrected or removed," referring to frames from the film showing Carlos Beristain present in a meeting involving Donziger, himself, and other members of the LAP team, telling the Crude filmmakers: "They are so serious that we can lose everything or a lot just because of those few, miniscule images."

**Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

95.    In response to Chevron's discovery efforts in U.S. courts, Defendants attempted to conceal their relationship with Cabrera.

**Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact. Moreover, Chevron previously submitted a similar statement with substantially the same evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel.  (Dkt. 398, at St. 176).  Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion.**

96.    On March 30, 2010, Prieto wrote to Donziger and others and stated his concern that if the District of Colorado ordered the disclosure of material related to Stratus's authorship of the Cabrera Report, "the effects are potentially devastating in Ecuador (apart from destroying the proceeding, all of us, your attorneys, might go to jail)[.]"

**Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact. Moreover, Chevron previously submitted a similar statement with the same evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel.  (Dkt. 398, at St. 177).  Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion.**

97.    To prevent disclosure of their relationship with Cabrera, Defendants followed a delay strategy developed by their new U.S.  attorneys at Patton Boggs, the "fundamental principle" of which, "as outlined by Jim [Tyrrell]," was to "appeal everything on the theory that we gain a greater advantage by fighting them on everything, and tying them up, than in conceding any one thing even if we expect to ultimately lose that one thing down the road."

**Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

98.    Stratus, through counsel, told the District of Colorado that it was "astonish[ed]" to see similarities between its work and the Cabrera report, and that it had never reviewed the report in draft form.

**Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

99.    The Burford Group, an investor that purchased a multi-million dollar share of the judgment from the LAPs, has accused Defendants of perpetrating "a multi-month scheme to deceive and defraud in order to secure desperately needed funding" for their

litigation/pressure campaign against Chevron, "all the while concealing material information and misrepresenting critical facts in the fear that we would have walked away had we known the true state of affairs."

**Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

**III.    The Lago Agrio Judgment Incorporates, In Material Part, Analysis, Data, and Conclusions Taken From Unfiled LAPs' Work Product and the Fraudulent Cabrera Report[5]**

100.    The following judges served as trial judges for the Lago Agrio litigation for the indicated periods of time: Alberto Guerra Bastidas (May 13, 2003 to February 4, 2004); Efraín Novillo Guzmán (February 4, 2004 to February 2, 2006; October 3, 2007 to August 25, 2008); Germán Yánez Ruiz (February 2, 2006 to October 3, 2007); Juan Evangelista Núñez Sanabria (August 25, 2008 to October 21, 2009); Nicolas Augusto Zambrano Lozada (October 21, 2009 through March 12, 2010); Leonardo Ordóñez Pina (March 12, 2010 to October 11, 2010); and Nicolas Augusto Zambrano Lozada (October 11, 2010 through the conclusion of the case).

**Response:**

**Not disputed.**

101.    At the time the judgment issued, the official court record in the Lago Agrio Litigation consisted of the hand-numbered pages 1 to 216338 maintained by the Provincial Court of Sucumbios in Lago Agrio, Ecuador (the "Lago Agrio Record").

**Response:**

**Disputed.  The statement is premised on an unsupported legal conclusion of Ecuadorian civil procedure regarding the scope and content of the "official" court record. Genuine issues of dispute exist regarding the scope of documents that are considered part of the official court record.  On different occasions, the Lago Agrio Court expressly referenced and incorporated materials from the parties—Chevron included—that were not submitted in hard copy form and by their nature would not have been hand-numbered pages.  *See, e.g.,* Smyser Decl., Ex. 36 (excerpts from Lago Agrio Court orders incorporating Chevron's submission of digital materials).  In other instances, the parties— Chevron included—would attach to their official submissions disks with supplemental materials and appendices.  *See, e.g.,* Smyser Decl., Ex. 37 (excerpts from officially-submitted expert reports noting supplemental materials to report attached in digital media format).  Furthermore, the parties in the Lago Agrio Litigation also submitted materials to the Lago Agrio Court via other means, including during Judicial Inspections taking place outdoors at sampling sites.  *See, e.g.,* Smyser Decl., Ex. 32 (excerpts from record of**

---

[5] For the reasons set forth in Defendants' Responses to Chevron's 56.1 Statements under Heading III, Defendants also dispute the assertions, argument, and conclusions set forth in Chevron's Heading III.

Aguarico 02 judicial inspection noting on-site submission of Fusion Memo exhibits); Resp. St. 126 (concerning example of submission of Fusion Memo materials to the Lago Agrio Court).  Also, in certain places, pages are missing from important documents, even though the hand number sequence does not reflect the missing materials.  *See, e.g.*, Smyser Decl., Ex. 33 (copy of Lago Agrio order pages 211685–86 missing at least one page of content between the numbered pages).  Such evidence of the Lago Agrio Court's omission and misnumbering raises fact issues as to how the Lago Agrio Record should be defined and measured.

In contrast, Chevron offers no citation, testimony, or evidence to support its claim that only hand-numbered pages were part of the official court record.

Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 6).  Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion.

102.  **The LAP team maintained "a full digitized set of every single document filed in the court."**

**Response:**

Disputed.  Examples exist of documents and materials submitted to the Court that may not have been subsequently numbered and organized as part of the hand-numbered pages.  *See* St. Resp. 101 (providing examples of submissions to the Court not part of the hand-numbered sequence or omitted by Court numbering).  In addition, Chevron omits a crucial qualification stated by another LAP team member in the same conversation cited by Chevron: "The case documentation is exceptionally difficult.  Even with an index, people may have problems finding docs (we do)."  Dkt. 755-14, at WOODS-HDD-0226441.

103.  The Ecuadorian court issued a 188-page single-spaced judgment against Chevron, on February 14, 2011 and issued a Clarification Order regarding that Judgment ("Clarification Order") on March 4, 2011, both signed by Judge Zambrano.  These appear in the record of this action, along with certified English translations, at Dkts.  168 and 186, respectively.

**Response:**

**Not disputed for purposes of this motion.**

104.  Sections 3, 6, 7, 9, 10, and 15 of the judgment contain text, data or other information found in the LAP team's unfiled work product but not found in the Lago Agrio Record.

**Response:**

Disputed.  Chevron here provides no citation or evidence in this particular statement to support its conclusion that text was "not found in the Lago Agrio Record".  Defendants dispute Chevron's characterizations of what constitutes the official court

record (*see* Resp. St. 101), and whether Chevron's claimed "unfiled work product" is truly absent from the record (*see* Resp. Sts. 126, 139, 144, 144, 149, 153, 160, 166).  Furthermore, Chevron's cited Exhibit No. 3276 (Dkt. 763-5) includes conclusory argument absent in the original source document. *See* Dkt. 763-5, at p. 51 (arguing that judge Zambrano's disclaimer of reliance was false).  The same Exhibit also includes as part of its highlighted text of "unfiled work product" quotations from prior Ecuadorian case law, implying that citation to another court opinion was somehow improper.  *See id.* at pp. 82–88.

105.   Sections 13 and 14 of the judgment contain text, data or other information found in the Cabrera Report and nowhere else in the Lago Agrio record.

   **Response:**

   **Disputed.  Chevron here provides no citation or evidence in this particular statement to support its conclusion that text was "nowhere else in the Lago Agrio Record".  Defendants dispute Chevron's characterizations of what constitutes the official court record (*see* Resp. St. 101), and whether Chevron's claimed "unfiled work product" is truly absent from the record (*see* Resp. Sts. 126, 139, 144, 144, 149, 153, 160, 166).  Furthermore, Chevron's cited Exhibit No. 3276 (Dkt. 763-5) includes conclusory argument absent in the original source document. *See* Dkt. 763-5, at p. 51 (arguing that judge Zambrano's disclaimed reliance was false).**

106.   Of the judgment's 188 pages, 51 contain text, data or other information found in the LAP team's unfiled work product but not found in the Lago Agrio Record.

   **Response:**

   **Disputed.  Chevron here provides no citation or evidence in this particular statement to support its conclusion that text was "not found in the Lago Agrio Record".  Defendants dispute Chevron's characterizations of what constitutes the official court record (*see* Resp. St. 101), and whether Chevron's claimed "unfiled work product" is truly absent from the record (*see* Resp. Sts. 126, 139, 144, 144, 149, 153, 160, 166).  Furthermore, Chevron's cited Exhibit No. 3276 (Dkt. 763-5) includes conclusory argument absent in the original source document. *See* Dkt. 763-5, at p. 51 (arguing that judge Zambrano's disclaimed reliance was false).  The same Exhibit also includes as part of its highlighted text of "unfiled work product" quotations from prior Ecuadorian case law, implying that citation to another court opinion was somehow improper.  *See id.* at pp. 82–88.**

107.   Of the judgment's 188 pages, 9 contain text, data or other information found in the Cabrera Report and nowhere else in the Lago Agrio record.

   **Response:**

   **Disputed.  Chevron here provides no citation or evidence in this particular statement to support its conclusion that text was "nowhere else in the Lago Agrio Record".  Defendants dispute Chevron's characterizations of what constitutes the official court record (*see* Resp. St. 101), and whether Chevron's claimed "unfiled work product" is truly**

**absent from the record (see Resp. Sts. 126, 139, 144, 144, 149, 153, 160, 166). Furthermore, Chevron's cited Exhibit No. 3276 (Dkt. 763-5) includes conclusory argument absent in the original source document. See Dkt. 763-5, at p. 51 (arguing that judge Zambrano's disclaimed reliance was false).**

108.   The judgment's Introduction and Section 4 falsely disclaim reliance on the Cabrera Report and the Cleansing Expert reports.

**Response:**

**Disputed. Chevron's statement that the judgment's disclaimer was "false" is pure attorney argument, improper for Rule 56.1 Statement, and runs counter to the Lago Agrio Judgment's assertion otherwise in the Chevron's cited materials for this statement. See Dkt. 168 at 51, 57; Goldstick v. The Hartford, Inc., No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (citation omitted) ("'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'").**

109.   The judgment contains overlap with an internal memorandum prepared by a member of the LAPs' team, Katia Gomez.

**Response:**

**Disputed. Chevron's citation only shows that the judgment cites to the same legal opinion that was also cited by Katia Gomez. Chevron's citations provide no factual basis for any implication in its statement concerning work product "overlap".**

110.   The judgment dismisses Chevron's fraud allegations by stating that the misconduct is entirely Donziger's, and that he is not a party or lawyer of record.

**Response:**

**Disputed. The statement calls for legal conclusion or interpretation of the Lago Agrio judgment. Further, Chevron's citation does not support the statement. The cited page does state that Donziger is not a party or lawyer of record, but that particular page of text only analyzes "the parties' mutual charges of inappropriate conduct by the opposing party's collaborators". Dkt. 168 at 51.**

111.   The judgment awards compensatory damages in the same eight categories as the Cabrera Report, but those categories are supported by nothing else in the record except the Cabrera Report and the LAPs' final alegato, which itself cites throughout to the Cabrera Report.

**Response:**

**Disputed. Chevron provides no citation or evidence to support its argument that the different damages "are supported by nothing else in the record." Despite pages and pages of citations to Statement 111, not one of them shows that nothing else in the record would**

have supported those types of damages.  The different types of damages are ultimately supported by the evidence of Texpet's activities in the Oriente for many years and the resulting harms to the environment and people.  Chevron has conceded that there can exist "a good-faith dispute among scientists about environmental conditions in the Oriente or TexPet's operations there from the 1960s to the 1990s" (Dkt. 720 at 2), so a genuine question of fact remains.

Additionally, many of Chevron's citations include parentheticals that misquote or distort their cited text.  *See, e.g.,* Dkt. 7-10 at 355-62 (contrary to Chevron's parenthetical, cited text does not discuss Cabrera or the Cabrera report); Dkt. 400-1 (Ex. 2010) at 2421:25-2423:8 (citation and parenthetical omit lines 15-24 immediately prior, where Donziger denies the contention that Cabrera did not use his own investigation for his report); Dkt. 400-12-13 (Ex.2077) at 67-75 (Contrary to Chevron's parenthetical, cited pages do not discuss relationship between Cabrera and Barnthouse); Dkt. 356-14 at 41-42 (Chevron's parenthetical omits later sentence regarding sampling finding "very large exception"); Dkt. 400-12-13 (Ex. 2140) at 89 (cited page does not exist);

112.   Section 14 of the judgment imposes punitive damages that are illegal under Ecuadorian law, and follows the Cabrera Report's unjust enrichment award in justification and size.

Response:

Disputed.  The statement is legal argument and conclusion regarding the interpretation of the Lago Agrio Judgment and is improper in a Rule 56.1 statement of facts.  Furthermore, the conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts.  "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record.  They should not contain conclusions . . . .'"  *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19, 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).  Moreover, this statement consists of an improper legal conclusion, which the Court should strike or disregard.  *See, e.g., Antunes v. Putnam/N. Westchester Bd. of Co-op. Educ. Services*, 09-CV-3063 CS, 2011 WL 1990872 (S.D.N.Y. May 19, 2011) *aff'd sub nom. Antunes v. Putnam N. Westchester Bd. of Co-op. Educ. Services*, 482 Fed. Appx. 661 (2d Cir. 2012) ("I need not consider statements in a Local Rule 56.1 submission that are "legal conclusions in the guise of an undisputed statement of fact.").

The conclusions contained in St. 112 are based upon the reports of paid expert witnesses.  Even if considered, Dr. Romero's report is conclusory and unreliable, and offers no citation to statute or case law to substantiate his opinion.  Dkt. 400-21 ¶ 6 (citing only his former reports, which are not attached to Romero's report and unverifiable).

Even if considered, Dr. Coronel-Jones' report does not sufficiently substantiate its conclusions regarding punitive damages.  Coronel Jones makes the assertion that "only direct damages can be compensated is a fundamental part of our law", citing his sources in footnotes in paragraphs 25 and 26, and footnotes 40 and 44.  Dkt. 402-16 (Coronel Jones Report) at 16.  But his citations all speak to contract law, criminal law, or unjust

enrichment issues.  *Id.* at 15.   The Lago Agrio Judgment, however, does not state that the damages multiplier falls under any of those categories.  Dkt. 168 at 184–86.  Coronel Jones also claims that Ecuador traditionally limits damages to actual harm, but he sites only himself as authority for the proposition.  *Id.*

Nor should Chevron be permitted to rely on the reports of Dr. Romero or Dr. Coronel-Jones.  Defendants have not yet been permitted the opportunity to conduct expert discovery in this case.  Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures.  Dkt. 703 at 2.  Dr. Coronel-Jones was not designated as one of Chevron's experts, and his testimony should thus be struck.  Defendants have not been afforded sufficient time to review and analyze the material provided in these reports.  At the very least, Defendants must be given the opportunity to depose or cross-examine Dr. Romero and Dr. Coronel-Jones.  *See* Fed. R. Civ. P. 56(d).

Chevron's argument that the judgment "follows the Cabrera Report's unjust enrichment award in justification and size" is disputed.  Chevron offers no evidence to support this claim.  The provided citation to the Lago Agrio Judgment does not state that it is following the Cabrera Report.  Dkt. 168 at 184-86.  The Lago Agrio Judgment's damages multiplier states that it is based on a variety of different factors.  *See, e.g., id.* at 185 ("for punitive and dissuasive purposes").  Finally, the Lago Agrio Judgment disclaims reliance on the Cabrera Report.  Dkt. 168 at 51.

113.    The judgment recognizes that the LAPs did not request punitive damages in their complaint.

**Response:**

Disputed.  The Judgment includes the qualification that the damages were not "requested in *express* manner".  Dkt. 168 at 185 (emphasis added).

114.    No single person could have reviewed the entire Lago Agrio Record and written the 188-page judgment between December 17, 2010, when Judge Zambrano claims to have begun reviewing the record, and February 14, 2011, when he issued the judgment.

**Response:**

Disputed. The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts.  "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record.  They should not contain conclusions . . . .'"  *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).

The conclusion in St. 114 is based only on the opinion of a paid expert witness.  Even if considered, Dr. Rayner's report is unreliable because it hinges upon several incorrect, inadmissible, or unsubstantiated assertions.  The flaws in Rayner's assumptions render his

opinion fatally flawed in turn.  First, Rayner's entire report is premised on the assumption that Judge Zambrano did not begin reading the Lago Agrio Record until December 17, 2010.  Neither Rayner nor Chevron provide any basis for this assertion.  Rayner himself notes that Zambrano had been working on the Lago Agrio case at least since October 21, 2009 (Dkt. 754-11 at CVX-RICO-0509446) but provides no explanation as to why Zambrano could not have begun familiarizing himself with the case filings then.  Nothing in Rayner's report or CV indicates any qualification to opine on the procedural rules governing Ecuadorian judges' access to and reading requirements concerning the documents submitted in litigation.  Second, Rayner's report also rests on assumptions drawn from unsubstantiated and inadmissible hearsay in the form of a Reuters article.  Neither Rayner nor Chevron provide or even cite to a copy of the article discussed.  Rayner's assertions as to a Reuters journalist's assertions as to Zambrano's assertions are hearsay, to put it mildly, and call into question all of Rayner's subsequent conclusions as to the timing of Zambrano's review.  Third, Rayner provides no firm basis for making his calculations based on average reading speed rather than a composite speed of reading and "skimming".  Rather than explain reading strategies, Rayner's report digresses into long asides in his pet topic of eye movement physiology, which does not materially bear on the issues presented for summary judgment.  Dkt. 754-11 at 3–5.

Nor should Chevron be permitted to rely on the report of Dr. Rayner.  Defendants have not yet been permitted the opportunity to conduct expert discovery in this case.  Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures.  Dkt. 703 at 2.  Defendants have not been afforded sufficient time to review and analyze the material provided in this report.  At the very least, Defendants must be given the opportunity to depose or cross-examine Dr. Rayner.  *See* Fed. R. Civ. P. 56(d).

Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 43).  Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion.

115.    Authorship of any portion of the judgment by anyone other than Judge Zambrano, the presiding judge in the case, was illegal under Ecuadorian law.

**Response:**

Disputed. The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record.  They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).  Moreover, this statement consists of an improper legal conclusion, which the Court should strike or disregard. *See, e.g.*, *Antunes v. Putnam/N. Westchester Bd. of Co-op. Educ. Services*, 09-CV-3063 CS, 2011 WL 1990872 (S.D.N.Y. May 19, 2011) *aff'd sub nom. Antunes v. Putnam N. Westchester Bd. of Co-op. Educ. Services*, 482 Fed. Appx. 661 (2d Cir. 2012) ("I need not consider statements

in a Local Rule 56.1 submission that are "legal conclusions in the guise of an undisputed statement of fact.").

The conclusion in St. 115 is based only on the opinion of a paid expert witness. Even if considered, Dr. Romero's report only discusses the participation of others in the adjudicatory process, and not whether the Judge, as author of the judgment, may choose to incorporate other references or language on his own initiative. *See* Dkt. 754-10 at 22. Furthermore, Dr. Romero's opinion assumes facts not yet established in this case. *Id.* at 25.

Nor should Chevron be permitted to rely on the report of Dr. Romero. Defendants have not yet been permitted the opportunity to conduct expert discovery in this case. Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures. Dkt. 703 at 2. Defendants have not been afforded sufficient time to review and analyze the material provided in this report. At the very least, Defendants must be given the opportunity to depose or cross-examine Dr. Romero. *See* Fed. R. Civ. P. 56(d).

116.    Reliance on evidence outside the record by Judge Zambrano (or anyone else) in drafting the judgment was illegal under Ecuadorian law.

**Response:**

Disputed. The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)). Moreover, this statement consists of an improper legal conclusion, which the Court should strike or disregard. *See, e.g.*, *Antunes v. Putnam/N. Westchester Bd. of Co-op. Educ. Services*, 09-CV-3063 CS, 2011 WL 1990872 (S.D.N.Y. May 19, 2011) *aff'd sub nom. Antunes v. Putnam N. Westchester Bd. of Co-op. Educ. Services*, 482 Fed. Appx. 661 (2d Cir. 2012) ("I need not consider statements in a Local Rule 56.1 submission that are "legal conclusions in the guise of an undisputed statement of fact.").

The conclusion in St. 116 is based only on the opinion of a paid expert witness. Even if considered, Dr. Romero's report does not cite Ecuadorian law or Ecuadorian legal authority to the extent, if any, that the Report supports the proposition of St. 116. The relevant paragraph in Dr. Romero's report only cites two works in relation to the proposition of St. 116. Dkt. 754-10 at 24 (citing two works by Hernando Devis Echandia). Neither of these legal texts seems to concern Ecuadorian law. *See* H. Devis Echandia, *Nociones Generales de Derecho Procesal Civil*, 2d Ed. 2009, http://www.scribd.com/doc/95286561/Nociones-Generales-de-Derecho-Procesal-Civil-Hernando-Devis-Echandia; *see also* H. Devis Echandia , *Teoria General de la Prueba Judicial*, http://www.scribd.com/doc/79035479/Teoria-General-de-La-Prueba-Judicial-Tomo-i-Hernando-Devis-Echandia-2.

**Nor should Chevron be permitted to rely on the report of Dr. Romero. Defendants have not yet been permitted the opportunity to conduct expert discovery in this case. Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures. Dkt. 703 at 2. Defendants have not been afforded sufficient time to review and analyze the material provided in this report. At the very least, Defendants must be given the opportunity to depose or cross-examine Dr. Romero. *See* Fed. R. Civ. P. 56(d).**

117.    Ecuadorian law obligates the judge to read, review, study and analyze all of the existing record before issuing a judgment.

    **Response:**

    **Disputed. The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at \*1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, \*1 n.3 (S.D.N.Y. June 29, 1999)). Moreover, this statement consists of an improper legal conclusion, which the Court should strike or disregard. *See, e.g., Antunes v. Putnam/N. Westchester Bd. of Co-op. Educ. Services*, 09-CV-3063 CS, 2011 WL 1990872 (S.D.N.Y. May 19, 2011) *aff'd sub nom. Antunes v. Putnam N. Westchester Bd. of Co-op. Educ. Services*, 482 Fed. Appx. 661 (2d Cir. 2012) ("I need not consider statements in a Local Rule 56.1 submission that are "legal conclusions in the guise of an undisputed statement of fact.").**

    **The conclusion in St. 117 is based only on the opinion of a paid expert witness. Even if considered, Dr. Romero's report does not cite to any legal authority—other than Romero's own former opinion for Chevron—for the proposition that the judge must read *all* of the existing record. *See* Dkt. 754-10 at 24 (citing Art. 274 of Code of Civil Procedure, which only states that judgments must be grounded "in the law and merits of the proceeding").**

    **Nor should Chevron be permitted to rely on the report of Dr. Romero. Defendants have not yet been permitted the opportunity to conduct expert discovery in this case. Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures. Dkt. 703 at 2. Defendants have not been afforded sufficient time to review and analyze the material provided in this report. At the very least, Defendants must be given the opportunity to depose or cross-examine Dr. Romero. *See* Fed. R. Civ. P. 56(d).**

118.    Unlike U.S. judges, judges in Ecuador do not have law clerks or other professional staff who are allowed to assist in the drafting of judicial opinions.

    **Response:**

Disputed. The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)). Moreover, this statement consists of an improper legal conclusion, which the Court should strike or disregard. *See, e.g.*, *Antunes v. Putnam/N. Westchester Bd. of Co-op. Educ. Services*, 09-CV-3063 CS, 2011 WL 1990872 (S.D.N.Y. May 19, 2011) *aff'd sub nom. Antunes v. Putnam N. Westchester Bd. of Co-op. Educ. Services*, 482 Fed. Appx. 661 (2d Cir. 2012) ("I need not consider statements in a Local Rule 56.1 submission that are "legal conclusions in the guise of an undisputed statement of fact.").

The conclusion in St. 118 is based only on the opinion of a paid expert witness. Even if considered, Dr. Romero's report cited by Chevron only refers to his conclusions in a former report, not included here, as authority to support the conclusion in St. 118 (comparisons with U.S. judges and clerks). *See* Dkt. 754-10 at 21–22 (citing only previous Romero reports). A further citation provided by Romero allows for a catch-all category of "other servants of the judicial branch" and conflicts with Romero's previous suggestion that clerks could not be part of the judicial offices. *Id.* at 22, n.75 (identifying members of the judiciary).

Nor should Chevron be permitted to rely on the report of Dr. Romero. Defendants have not yet been permitted the opportunity to conduct expert discovery in this case. Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures. Dkt. 703 at 2. Defendants have not been afforded sufficient time to review and analyze the material provided in this report. At the very least, Defendants must be given the opportunity to depose or cross-examine Dr. Romero. *See* Fed. R. Civ. P. 56(d).

119.   Oral argument transcripts are part of the record in Ecuador.

**Response:**

Disputed. Although certain oral arguments can be incorporated into the record in Ecuador, Defendants dispute the assertion that all argument is transcribed. Furthermore, Defendants dispute Chevron's characterization of the scope of the Lago Agrio Record. *See* Resp. to St. 101.

The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)). Moreover, this statement consists of an improper legal conclusion, which the Court should strike or disregard. *See, e.g.*, *Antunes v. Putnam/N. Westchester Bd. of Co-op. Educ. Services*, 09-CV-3063 CS, 2011 WL 1990872

(S.D.N.Y. May 19, 2011) *aff'd sub nom. Antunes v. Putnam N. Westchester Bd. of Co-op. Educ. Services*, 482 Fed. Appx. 661 (2d Cir. 2012) ("I need not consider statements in a Local Rule 56.1 submission that are "legal conclusions in the guise of an undisputed statement of fact.").

The conclusion in St. 119 is based only on the opinion of a paid expert witness.  Even if considered, Dr. Romero's report contradicts St. 119 where it reports that for some courtroom hearings, "no *acta* whatsoever is subscribed" into the record.  Dkt. 754-10 at 24 n.88.

Nor should Chevron be permitted to rely on the report of Dr. Romero.  Defendants have not yet been permitted the opportunity to conduct expert discovery in this case.  Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures.  Dkt. 703 at 2.  Defendants have not been afforded sufficient time to review and analyze the material provided in this report.  At the very least, Defendants must be given the opportunity to depose or cross-examine Dr. Romero.  *See* Fed. R. Civ. P. 56(d).

120.    Zambrano was the Provincial Director of the Judicial Council for the court and was personally involved in the selection of the panel for second instance review of the judgment, which was not held by public lottery as the law requires.

**Response:**

Disputed.  Chevron's only cited material concerning the legal requirements of lottery or discussing Zambrano's "personal" involvement are from Chevron's own previous attorney argument in the form of a March 30, 2011 brief.  *See* Dkt. 356-12 at 99– 111.  Such attorney argument and legal conclusions are inappropriate for a Rule 56.1 statement.  *See, e.g.*, *Antunes v. Putnam/N. Westchester Bd. of Co-op. Educ. Services*, 09-CV-3063 CS, 2011 WL 1990872 (S.D.N.Y. May 19, 2011) *aff'd sub nom. Antunes v. Putnam N. Westchester Bd. of Co-op. Educ. Services*, 482 Fed. Appx. 661 (2d Cir. 2012) ("I need not consider statements in a Local Rule 56.1 submission that are "legal conclusions in the guise of an undisputed statement of fact."). The attorney arguments' cited by Chevron also include hearsay characterizations of Ecuadorian legal texts.

121.    The panel that conducted the second instance review of the judgment changed composition several times before being finalized, issued its affirmance just one month later, and, at the LAPs' request, issued a "Clarification Order" hours after Chevron submitted its objections to the request.

**Response:**

Characterization disputed.  Chevron's unnecessary gloss of characterization in St. 121 ("several times" "just one month" "hours after") constitutes attorney argument to its statement, which is inappropriate under Rule 56.1. "Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record.  They should not contain conclusions . . . ." *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002

**WL 1906029, at \*1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quotation omitted).  The facts in the record also show that Chevron chose to wait almost a week after Plaintiffs submissions to submit its objections, near the end of the business day.  Dkt. 400-25 (Ex. 2147); Dkt. 400-26 (2148).**

122.    In its January 3, 2012 order, the second instance review panel stated that it had no "competence" to address the allegations of fraud against the LAP team.

      **Response:**

      **Disputed.  The cited statements are not factual averments, and the relevant order speaks for itself.  Legal conclusions interpreting court orders constitute attorney argument inappropriate under Rule 56.1.  Furthermore, the review panel later clarified and asserted its ability to review the allegations of fraud.  Dkt. 384-1 at 5–6.  Moreover, Chevron previously submitted a similar statement with the same evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel.  (Dkt. 398, at St. 198).  Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion.**

123.    In its January 13, 2012 "Clarification Order," the second instance review panel stated in reference to the allegations of fraud against the LAP team, that "it stays out of these accusations," but that it did not find the evidence of fraud persuasive.

      **Response:**

      **Disputed.  The cited statements are not factual averments, and the relevant order speaks for itself.  Legal conclusions interpreting court orders constitute attorney argument inappropriate under Rule 56.1.  Furthermore, Chevron's St. 123 mischaracterizes the appellate court's findings.  Dkt. 384-1 at 5–6 ("This is a civil proceeding in which the Division does not find evidence of "fraud" by the plaintiffs or their representatives" and "The first request, returns once again to the question of the evidence alleged by the defendant as proof of a supposed fraud, for which we refer back to the preceding lines in which the Division clarifies the judgment, indicating that it has considered the allegations of Chevron Corporation and finds that they do not constitute evidence of any irregular conduct.").  Moreover, Chevron previously submitted a similar statement with the same evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel.  (Dkt. 398, at St. 123).  Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion.**

124.    Defendants have only speculated about how the LAPs' unfiled work product made it into the judgment, and do not claim to know how it did.

      **Response:**

      **Disputed.  *See* Defendants' Oppositions to Chevron's Motion for Partial Summary Judgment (Mar. 18, 2013); Resp. St. 101; Resp. St. 126.  Additionally, Chevron's characterization of "speculation" is attorney argument and/or a legal conclusion,**

**inappropriate as part of a 56.1 statement. "Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record.  They should not contain conclusions . . . ."** *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19. 2002) (Kaplan, J.) (quotation omitted).

### A.      Fusion Memo

125.   The document bearing Bates numbers DONZ-HDD-0142504-25, a memorandum that begins "La fusión entre Chevron Inc.   Y Texaco Inc.," regarding the corporate relationship between Texaco and Chevron (the "Fusion Memo"), was written by the LAP team and consists of the LAP team's unfiled work product.

### Response:

**Disputed.  Defendants dispute the vague and conclusory terms "unfiled work product" and "LAP team".  Furthermore, Chevron's cited materials do not show Donziger asserting that the work product was "unfilled."  *See* Dkt. 400-1 (Donziger Dep. Tr.) at 4702:8-14; *see also* Resp. St. 126.**

**Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at Sts. 7-8).  Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion.**

126.   The Fusion Memo is not in the Lago Agrio Record.

**Response:**

**Disputed.  The evidence available raises genuine disputes of fact concerning what constitutes the court record in the Lago Agrio case and what is or is not considered part of the record before the court. See Resp. to St. 101.  In addition, copies of some of the Fusion Memo's exhibits have been found in the Lago Agrio Record, mostly in order as referenced and would appear accompanying the Fusion Memo.  *See* Smyser Decl., Ex. 30 (excerpts from the record showing Fusion Memo materials); *See* Smyser Decl., Ex. 31; (chart providing index of Fusion Memo materials and their location in the Record).  The Fusion Memo materials were submitted to the Court at an outdoor judicial inspection at a contaminated well site, during which the LAP team also provided oral argument concerning the subject of the Fusion Memo.  *See* Smyser Decl., Ex. 32 (excerpts from Aguarico inspection proceedings discussing Fusion Memo materials).  The context and circumstances of the submission of these materials highlight the differences in document and materials submission in Ecuador as compared with U.S. procedure and demonstrate that genuine fact issues remain as to Chevron's claims of "unfilled work product" and as to Chevron's arguments regarding what does or does not constitute part of the Lago Agrio Record.  *See* Resp. St. 101.**

**Furthermore, Chevron supports its assertion only through an expert's conclusions. The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts.  "'Rule 56.1 statements are not argument. They should contain factual**

assertions, with citation to the record.  They should not contain conclusions . . . .'"
*Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y
Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999
WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).

The sole basis for this conclusion is the January 27, 2013 report of Dr. Patrick Juola,
a paid expert witness.  Even if considered, Dr. Juola's report is not admissible because it
does not meet the requirements of Rule 702 and Daubert.  *See Berk v. St. Vincent's Hosp.
and Med. Ctr.*, 380 F. Supp. 2d 334, 352 (S.D.N.Y. 2005); *Cacciola v. Selco Balers, Inc.*, 127
F. Supp. 2d 175, 180 (E.D.N.Y. 2001) ("Evidence contained in an expert's report therefore
must be evaluated under Fed.R.Evid. 702 before it is considered in a ruling on the merits of
a summary judgment motion.").  Dr. Juola's report has numerous deficiencies, three of
which will be mentioned here.

*First*, Dr. Juola's method of purportedly "search[ing] the entire lower court Lago
Agrio record" is inherently unreliable.  Dr. Juola claims that he received Chevron's copy of
the court record, which allegedly consisted of a scanned PDF version of a "photocopied
version of the record" that was then "converted to single-page TIFF format and uploaded
to an electronic platform, at which point the files were subjected to an automatic 'optical
character recognition' (OCR) process."  (Dkt. 400-16, at 3).  Dr. Juola claims he then
converted these scanned photocopies into a "text searchable format."  (Id.).  The problem
with this methodology is that there are "conditions which can interfere with accurate
recognition" of text in computer searchable format that "include pages where printing is
faint (poor contrast), skewed, overstamped, handwritten, underlined, of low resolution (as
facsimile transmission) and unusual mixtures of fonts."  Smyser Decl., Ex. 41, Declaration
of Richard J. Fateman, Ph.D, at ¶ 24.  Many of the pages in Chevron's scanned photocopy
of the Lago Agrio trial court record "have hallmark characteristics which interfere with
accurate recognition, including poor contrast, overstamps, handwriting, speckle noise and
other conditions."  *Id.*, at ¶ 25; *see also* Smyser Decl, Ex. 35, CVX-RICO-1103163.  "[I]t is
likely that a substantial percentage of the lower court record images cannot be accurately
recognized by an OCR program."  *Id.*, at ¶ 26.  This means that Dr. Juola conducted "only
an ineffective search of parts of the lower court record." *Id.*, ¶ 29.

Dr. Juola's attempt to explain away the problems with optical character recognition
analysis of the court record fails.  As he acknowledges, "a particularly bad document could
produce nothing but gibberish that is impossible to process successfully by computer—or
even to read by humans."  Stavers Decl., Ex. 3267, ¶ 46.  An example of such a document
shows the impossibility of relying on the computer analysis for a conclusion that certain
text is or is not contained in the court record.  Smyser Decl., Ex. 35, CVX-RICO-1103163.

*Second*, Dr. Juola's conclusions are unsupported by his analysis.  He reaches his
conclusions that certain documents are or are not in the Lago Agrio court record without
examining the text of all documents in the record.  The flaws in OCR's ability to convert
poor quality images and handwritten comments into searchable text mean that Dr. Juola
was not searching every single word in the Lago Agrio court record.  At the very least,
Defendants should have the opportunity to cross-examine Dr. Juola about the effect that

the poor quality of the scans had on the reliability of the OCR process and his resulting searches and analysis.

**Third**, Dr. Juola merely regurgitates the conclusions of Chevron's other paid experts without engaging in any independent substantive analysis. Dkt. 400-16 (Ex. 2102) (2011.12.20 Juola Report) ("I therefore support the opinion of Drs. Leonard and Turell and of Mr. Younger; in my opinion . . . significant portions of Sentencia have been plagiarized from LAPs' Work Product Documents (most notably but not limited to the Fusion Memo.").

Nor should Chevron be permitted to rely on Dr. Juola's report(s). Defendants have not yet been permitted the opportunity to conduct expert discovery in this case. Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures. Dkt. 703 at 2. Defendants have not been afforded sufficient time to review and analyze the material provided in this report. At the very least, Defendants must be given the opportunity to depose or cross-examine Dr. Juola. *See* Fed. R. Civ. P. 56(d).

Moreover, Chevron previously submitted substantially the same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 9) ("The Unfiled Fusion Memo is not in the Ecuadorian trial court record from page 1 to page 216338."). Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion.

127.    As this Court has already found, "Identical or nearly identical word strings" and strings of symbols in the Unfiled Fusion Memo appear in the Judgment and "[p]arts of the Judgment, including a multi-page section dealing with the relationship among Texpet, Texaco, and the Consortium, are virtually identical—character-for-character—with the Unfiled Fusion Memo."

**Response:**

Disputed. The Statement's commentary on the orders of the Court is not a proper factual assertion for 56.1, and Defendants dispute any characterization that Rule 56.1 assumptions may be established beyond the motion in which they were asserted.

Furthermore, the conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).

The conclusion in St. 127 is based on the opinions of paid expert witnesses. Even if considered, Dr. Leonard's report is unreliable because it is based on the improper assumption that the Fusion Memo was not filed or officially and openly presented to the Court. See Resp. to St. 101; Resp. to St. 126; Smyser Decl., Ex. 40 (Expert Report of Dr.

41

Ronald R. Butters, at ¶¶ 4(a), 10). Moreover, Dr. Leonard's characterization of similarities between the Fusion Memo and the Judgment as "plagiarism" is "seriously misleading and prejudicial." Smyser Decl., Ex. 40 (Expert Report of Dr. Ronald R. Butters, at ¶¶ 4(a), 16) ("[T]he characterization of such occasional judicial appropriation-without-specific-attribution as a judge might include in a judicial decision is . . . an inaccurate and inappropriate characterization of whatever occasional alleged unacknowledged appropriation that Nicolás Zambrano Lozada could have made for purposes of introducing material he deemed useful in his 188-page *Sentencia*. Such borrowed 'work or ideas' is not 'plagiarism' because it is not undertaken 'to pass them off as one's own.'"). Lastly, the similarities allegedly found by Dr. Leonard between the Judgment and the Fusion Memo are immaterial. The Judgment contains 88,000 words. The portions that Dr. Leonard found to "overlap" consist of fewer than 1,200 words, "only about 1.4% of the *Sentencia's* words." Id. at ¶¶ 4(c), 17-19. "Furthermore, the import of much of this parallel material is generally inconsequential—by and large merely factual material that would in all likelihood have been available to Judge Zambrano in a variety of sources." Id. "Chevron has not submitted evidence sufficient to establish that [the relationship among Texpet, Texaco, and the Consortium] was a matter of controversy in Ecuador or, if it was, that Chevron likely was handicapped significantly in fully presenting its defense on that issue by any ex parte submission." Dkt. 550 at 88. Indeed, Chevron admits that it "made multiple submissions regarding corporate separateness to refute the claim that it could be held liable for TexPet's alleged conduct." St. 130.

Nor should Chevron be permitted to rely on the report of Dr. Leonard. Defendants have not yet been permitted the opportunity to conduct expert discovery in this case. Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures. Dkt. 703 at 2. Defendants have not been afforded sufficient time to review and analyze the material provided in this report. At the very least, Defendants must be given the opportunity to depose or cross-examine Dr. Leonard. *See* Fed. R. Civ. P. 56(d).

With respect to the other expert opinion cited as a basis for the conclusion in St. 127, the Court should strike Dr. Turell's report for failure to disclose. Chevron did not disclose Dr. Turell as an expert in its March 1, 2013 expert disclosures. The Court should strike the report and disregard the conclusion in this St. 127 and any other statement that relies on Dr. Turell's report. See Fed. R. Civ. P. 37(c)(1).

Even if considered, Dr. Turell's report is not admissible because it does not meet the requirements of Rule 702 and Daubert. *See Berk v. St. Vincent's Hosp. and Med. Ctr.*, 380 F. Supp. 2d 334, 352 (S.D.N.Y. 2005); *Cacciola v. Selco Balers, Inc.*, 127 F. Supp. 2d 175, 180 (E.D.N.Y. 2001) ("Evidence contained in an expert's report therefore must be evaluated under Fed.R.Evid. 702 before it is considered in a ruling on the merits of a summary judgment motion."). Dr. Turell's report has numerous deficiencies, three of which will be mentioned here.

*First*, Dr. Turell's "methodologies are the subject of ongoing controversy among linguistic scholars and have been criticized within the forensic linguistic community as fundamentally unscientific, untested, deeply flawed, and often likely to generate false

42

conclusions." Smyser Decl., Ex. 40 (Expert Report of Dr. Ronald R. Butters, at ¶ 20); *see also id.* at ¶¶ 4(d)-(e), 22-27.

*Second*, the "scientific validity of [Dr. Turell's] speculations are based on a very small number of linguistic and editorial variables whose worth as authorship indicators have not been tested or established, and whose presence in the analyzed sets of data are subject to more plausible explanations than that they may be indicators of authorial 'idiolect.'" Id., at ¶ 4(e). Dr. Turell's report does not establish, as it sets out to do, "that the operative author of the [Judgment] is anyone other than Judge Zambrano." *Id.*; see also id. at ¶¶ 28, 37-41.

*Third,* Dr. Turell's report is based on the improper assumption that the Fusion Memo was not filed or officially and openly presented to the Court. *See* Resp. to St. 101; Resp. to St. 126; Smyser Decl., Ex. 40 (Expert Report of Dr. Ronald R. Butters, at ¶¶ 4(a), 10). Moreover, Dr. Turell's characterization of similarities between the Fusion Memo and the Judgment as "plagiarism" is "seriously misleading and prejudicial." Smyser Decl., Ex. 40 (Expert Report of Dr. Ronald R. Butters, at ¶¶ 4(a), 16).

Irrespective of the expert opinions, the evidence raises genuine disputes of fact concerning what constitutes the court record in the Lago Agrio case and what is or is not considered part of the record before the court. See Resp. to St. 101.

Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 12). Chevron provides no evidence other than quoting the Court.

128.    The following language on page 8 of the Fusion Memo appears verbatim or nearly verbatim on page 24 of the Judgment: "Es cierto que por norma general una empresa puede tener subsidiarias con personalidad jurídica completamente distinta. Sin embargo, cuando las subsidiarias comparten el mismo nombre informal, el mismo personal, y están directamente vinculadas con la empresa madre en una cadena ininterrumpida de toma de decisiones operativas, la separación entre personas y patrimonios se difumina bastante. En este caso, se ha probado que en la realidad Texpet y Texaco Inc. funcionaron en el Ecuador como una operación única e inseparable. Las decisiones importante pasaban por diversos niveles de ejecutivos y órganos de decisión de Texaco Inc."

Response:

Disputed. The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).

The conclusion in St. 128 is based on the opinion of a paid expert witness. Even if considered, Dr. Leonard's report is unreliable, makes improper and misleading

characterizations, and is immaterial for the reasons stated in response to St. 127.  *See also* Smyser Decl., Ex. 40 (Expert Report of Dr. Ronald R. Butters, at ¶¶ 4(a), 4(c), 10, 16-19).

Nor should Chevron be permitted to rely on the report of Dr. Leonard.  Defendants have not yet been permitted the opportunity to conduct expert discovery in this case. Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures.  Dkt. 703 at 2.  Defendants have not been afforded sufficient time to review and analyze the material provided in this report.  At the very least, Defendants must be given the opportunity to depose or cross-examine Dr. Leonard.  *See* Fed. R. Civ. P. 56(d).

The similarities in language are immaterial.  "Chevron has not submitted evidence sufficient to establish that [the relationship among Texpet, Texaco, and the Consortium] was a matter of controversy in Ecuador or, if it was, that Chevron likely was handicapped significantly in fully presenting its defense on that issue by any ex parte submission."  Dkt. 550 at 88.  Indeed, Chevron admits that it "made multiple submissions regarding corporate separateness to refute the claim that it could be held liable for TexPet's alleged conduct." St. 130.

Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 10).  Chevron provides no new arguments or evidence (other than the updated Leonard report) and no reason for the Court to rule any differently on this Renewed Motion.

129.    The following language on page 6 of the Fusion Memo appears verbatim or nearly verbatim on page 21 of the Judgment: "Cartas de funcionarios menores dirigidas a Shields{footnote 13}.- En este apartado se hace referencias a cartas dirigidas a Shields que se originaron en Quito, en manos de funcionarios menores que solicitaban su autorización.  William Saville era un ejecutivo de Texpet que operaba en Quito.  Él envío muchas y cotidianas comunicaciones a Shields (en Nueva York) solicitando autorizaciones. Por ejemplo, le envía a Shields los costos estimados de la perforación de los pozos Sacha 36 al 41 (doc s/n), y solicita su aprobación para iniciar la licitación de trasporte de combustibles en el oriente (PET031387).  J.E.F. Caston, otro ejecutivo de la petrolera ubicado en Quito, solicita la autorización de Shields para licitar varios servicios (PET020758) y para aprobar los costos estimados de instalar bombas sumergibles en cinco pozos en el campo Lago Agrio.  Finalmente tenemos a Max Crawford, otro funcionario radicado en Quito, quien también solicitaba periódicamente la aprobación de Shields para diversos objetivos.  Aquí se reproducen dos solicitudes para aprobar el inicio de dos licitaciones (PET035974 y doc s/r).  {footnote 13} Pedidos de oficiales inferiores dirigidos a Shileds [PSV-018/I] Cuerpo 65, fojas 6855, 6856, 6860, 6861, 6875, 6882, 6885."

**Response:**

Disputed.  The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts.  "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record.  They should not contain conclusions

. . . .'"  *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).

The conclusion in St. 129 is based on the opinion of a paid expert witness.  Even if considered, Dr. Leonard's report is unreliable, makes improper and misleading characterizations, and is immaterial for the reasons stated in response to St. 127.  *See also* Smyser Decl., Ex. 40 (Expert Report of Dr. Ronald R. Butters, at ¶¶ 4(a), 4(c), 10, 16-19).

Nor should Chevron be permitted to rely on the report of Dr. Leonard.  Defendants have not yet been permitted the opportunity to conduct expert discovery in this case.  Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures.  Dkt. 703 at 2.  Defendants have not been afforded sufficient time to review and analyze the material provided in this report.  At the very least, Defendants must be given the opportunity to depose or cross-examine Dr. Leonard.  *See* Fed. R. Civ. P. 56(d).

The similarities in language are immaterial.  "Chevron has not submitted evidence sufficient to establish that [the relationship among Texpet, Texaco, and the Consortium] was a matter of controversy in Ecuador or, if it was, that Chevron likely was handicapped significantly in fully presenting its defense on that issue by any ex parte submission."  Dkt. 550 at 88.  Indeed, Chevron admits that it "made multiple submissions regarding corporate separateness to refute the claim that it could be held liable for TexPet's alleged conduct."  St. 130.

Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel.  (Dkt. 398, at St. 10).  Chevron provides no new arguments or evidence (other than an updated expert report) and no reason for the Court to rule any differently on this Renewed Motion.

130.    In the Lago Agrio Litigation, Chevron made multiple submissions regarding corporate separateness to refute the claim that it could be held liable for TexPet's alleged conduct.

**Response:**

Disputed in part.  Defendants do not dispute that Chevron made such submissions, but Defendants do dispute any legal conclusion regarding the submissions' merits.

131.    Over 20 pages of the judgment address the question of whether Chevron could be held liable for TexPet's alleged conduct.

**Response:**

Not disputed.

132.    In 2006, in reference to the Lago Agrio Litigation, Donziger admitted that the LAPs "su[ed] the wrong party in the complaint."

**Response:**

**Disputed. The cited materials do not support the statement. In the cited document, Donziger does not attribute the statement to LAPs but rather to "Alberto" [Wray]. Dkt. 402-11 at DONZ00036246. Donziger's reflection is not a legal fact but rather an excerpt from the musings of his personal diary. *Id.* Moreover, Chevron previously submitted the same statement with the same evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 245). Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion.**

133.    The parties continue to dispute, in this Court, whether Chevron properly may be held liable for TexPet's alleged conduct.

**Response:**

**Disputed. The Parties' legal assertions are not proper for Rule 56.1 statements. Chevron's only citation refers to an opinion written over two years ago, prior to the dismissal of several causes of action and a successful appeal. Dkt. 181 at 126. Additionally, Chevron's cited order was reversed and vacated by the Second Circuit over a year ago. *Chevron Corp. v. Naranjo*, 667 F.3d 232, 247 (2d Cir. 2012). Defendants continue to maintain that Chevron may be properly held liable for TexPet's and Texaco's conduct, a position confirmed by the Lago Agrio appellate panel and the Second Circuit. *See Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 390 n.3 (2d Cir. 2011) (finding Chevron accountable for Texaco's concessions).**

### B.    Clapp Report

134.    The document bearing the Bates number DONZ00025296, an analysis entitled, La Explotacion De Petroleo En La Zona Concesionada A Texaco Y Sus Impactos En La Salud De Las Personas (the "Clapp Report"), was written by Richard Clapp in his capacity as a consultant to the LAPs, and consists of LAP team work product.

**Response:**

**Disputed. The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).**

**The conclusion in St. 134 is based on the opinion of a paid expert witness. Even if considered, Dr. Leonard's report is unreliable, makes improper and misleading**

characterizations, and is immaterial for the reasons stated in response to St. 127.  *See also* Smyser Decl., Ex. 40 (Expert Report of Dr. Ronald R. Butters, at ¶¶ 4(a), 4(c), 10, 16-19).

Nor should Chevron be permitted to rely on the report of Dr. Leonard.  Defendants have not yet been permitted the opportunity to conduct expert discovery in this case. Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures. Dkt. 703 at 2.  Defendants have not been afforded sufficient time to review and analyze the material provided in this report.  At the very least, Defendants must be given the opportunity to depose or cross-examine Dr. Leonard.  *See* Fed. R. Civ. P. 56(d).

135.   Donziger and Beltman sought to prevent Clapp's authorship of the Clapp Report from being publicly known.

**Response:**

Disputed.  Chevron's selected quotations only show Beltman's—not Donziger's— views regarding distribution of the Report. Dkt. 34-13 at 1; Dkt. 34-14.  Furthermore, the quotes do not support Chevron's characterizations of citations being "incriminating" or of attempts to totally prevent knowledge of the Clapp Report.  *See* Dkt. 34-13 (specific to Congressional Record).  In addition, The Stratus e-mail does not show that Stratus was trying to keep its role secret. The e-mail is discussing providing translations of the Cabrera report Annexes to a reporter. Acknowledging that Cabrera largely adopted the Annexes that Stratus drafted, Beltman appears to be determining which ones they already have English versions of and which ones need to be translated. This establishes only that Stratus was trying to provide accurate English versions of the Cabrera annexes to a reporter. Finally, at least some of these citations are to inadmissible hearsay.  Chevron cannot use unauthenticated emails that Defendants Camacho and Piaguaje neither authored nor received as evidence of the truth of the matters asserted within. *See* Dkt. 34-14 (email from Doug Beltman to Dave Mills).

136.   On July 28, 2008, acknowledging that the Clapp Report "ended up as an Appendix to the Cabrera Report," Beltman wrote to Dave Mills of Stratus, "Oh what a tangled web,…"

**Response:**

Disputed.  Chevron cites only to inadmissible hearsay.  Chevron cannot use unauthenticated emails that Defendants Camacho and Piaguaje neither authored nor received as evidence of the truth of the matters asserted within. *See* Dkt. 34-14 (email from Doug Beltman to Dave Mills).

137.   On November 18, 2008, Beltman wrote to Donziger, "We have to talk to Clapp about that 5-pager, and how we have to limit its distribution.  It CANNOT go into the Congressional Record as being authored by him."

**Response:**

**Disputed.  Chevron cannot use unauthenticated emails that Defendants did not author as evidence of the truth of the matters asserted within. In addition, The Stratus e-mail does not show that Stratus was trying to keep its role secret. The e-mail is discussing providing translations of the Cabrera report Annexes to a reporter. Acknowledging that Cabrera largely adopted the Annexes that Stratus drafted, Beltman appears to be determining which ones they already have English versions of and which ones need to be translated. This establishes only that Stratus was trying to provide accurate English versions of the Cabrera annexes to a reporter.**

138.    A portion of the Clapp Report appears in the Cabrera Report as Annex K (the Toxicity Annex).

    **Response:**

        **Not disputed for purposes of this motion.**

139.    The portion of the Clapp Report that does not appear in the Cabrera Report also does not appear anywhere else in the Lago Agrio Record.

    **Response:**

    **Disputed.  The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record.  They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).**

    **The conclusion in St. 139 is based solely on the opinions of paid expert witnesses.**

    **Even if considered, Dr. Patrick Juola's report is not admissible because it does not meet the requirements of Rule 702 and Daubert.  *See* Resp. to St. 126; Smyser Decl., Ex. 41 (Declaration of Richard J. Fateman, Ph.D) ¶¶ 24-26, 29.**

    **Likewise, Dr. Leonard's report, even if considered, is unreliable, makes improper and misleading characterizations, and is immaterial for the reasons stated in response to St. 127.  *See also* Smyser Decl., Ex. 40 (Expert Report of Dr. Ronald R. Butters, at ¶¶ 4(a), 4(c), 10, 16-19).**

    **Nor should Chevron be permitted to rely on the reports of Dr. Leonard and Dr. Juola.  Defendants have not yet been permitted the opportunity to conduct expert discovery in this case.  Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures.  Dkt. 703 at 2.  Defendants have not been afforded sufficient time to review and analyze the material provided in this report.  At the very least, Defendants must be given the opportunity to depose or cross-examine Dr. Leonard and Dr. Juola.  *See* Fed. R. Civ. P. 56(d).**

**Moreover, the evidence raises genuine disputes of fact concerning what constitutes the court record in the Lago Agrio case and what is or is not considered part of the record before the court.  See Resp. to St. 101.**

140.  The following 34-word string appears in the Clapp Report and appears verbatim in the judgment, but does not appear in Cabrera Annex K: "Las muestras de suelo y agua tomadas durante las inspecciones judiciales han indicado niveles excesivos de plomo que puede plantear riesgos de salud par alas poblaciones locales.  Los niveles de plomo en el suelo mas que duplican el limite legal y prueban que el envenenamiento con plomo es un riesgo real."

**Response:**

**Disputed.  The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts.  "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record.  They should not contain conclusions . . . .'"** *Goldstick v. The Hartford, Inc.***, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at \*1 (S.D.N.Y Aug. 19, 2002) (Kaplan, J.) (quoting** *Rodriguez v. Schneider***, No. 95 Civ. 4083(RPP) 1999 WL 459813, \*1 n.3 (S.D.N.Y. June 29, 1999)).**

**The conclusion in St. 140 is based on the opinions of paid expert witnesses.  Even if considered, Dr. Patrick Juola's report is not admissible because it does not meet the requirements of Rule 702 and Daubert.** *See* **Resp. to St. 126; Smyser Decl., Ex. 41 (Declaration of Richard J. Fateman, Ph.D), ¶¶ 24-26, 29.  Moreover, the cited paragraph of Dr. Juola's report, Stavers Decl. Ex. 3267 ¶ 76, does not support the conclusion that the "34-word string appears in the Clapp Report and appears verbatim in the judgment, but does not appear in Cabrera Annex K."  Paragraph 76 of the Juola report does not even mention the Clapp Report, the Ecuadorian Judgment, or Cabrera Annex K.**

**Even if considered, Dr. Leonard's report is unreliable, makes improper and misleading characterizations, and is immaterial for the reasons stated in response to St. 127.** *See also* **Smyser Decl., Ex. 40 (Expert Report of Dr. Ronald R. Butters, ¶¶ 4(a), 4(c), 10, 16-19).**

**Nor should Chevron be permitted to rely on the reports of Dr. Leonard and Dr. Juola.  Defendants have not yet been permitted the opportunity to conduct expert discovery in this case.  Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures.  Dkt. 703 at 2.  Defendants have not been afforded sufficient time to review and analyze the material provided in this report.  At the very least, Defendants must be given the opportunity to depose or cross-examine Dr. Leonard and Dr. Juola.** *See* **Fed. R. Civ. P. 56(d).**

141.  As shown by sampling results submitted by Plaintiffs' expert, Douglas Allen, only one of the 1,675 soil and sediment samples in the Lago Agrio Litigation—which was taken from a community garbage dump—shows lead above the Ecuadorian legal limit set by Ecuador Decree 1215 for lead in agricultural areas of 100 mg/kg.

**Response:**

  **Disputed. Chevron has ceded that good faith disputes may exist "among scientists about environmental conditions in the Oriente or TexPet's operations there from the 1960s to the 1990s", and, over Defendant's objections, the Court has excluded from this litigation the issues of the "environmental conditions existing in the Oriente in the 1960s to the 1990s or the relative, substantive merit of scientists' expert opinions on that subject." Dkt. 720 at 2. Given this ruling, Statement 141 cannot be established as fact.**

  **Finally, even if the Court were to create an exception and permit determinations of the environmental conditions existing in the Oriente, Chevron misstates the Ecuadorian legal limits, as "[t]he permited limits to be applied in a certain project *depend on the subsequent use of the remediated soil*, which will be made a matter of record in the respective Remediation Plan or Project approved by the Office of the Undersecretary of Environmental Protection". Dkt. 400-20 (Ex. 2129) at 56 (emphasis added) (allowing for more stringent limits than Chevron asserts, when applied to sensitive ecosystems).**

142. Only one of 253 drinking water samples taken in the Lago Agrio Litigation showed lead at levels above primary drinking water standards, and that was taken from a site that had experienced a recent oil spill.

**Response:**

  **Disputed. Chevron has ceded that good faith disputes may exist "among scientists about environmental conditions in the Oriente or TexPet's operations there from the 1960s to the 1990s", and, over Defendant's objections, the Court has excluded from this litigation the issues of the "environmental conditions existing in the Oriente in the 1960s to the 1990s or the relative, substantive merit of scientists' expert opinions on that subject." Dkt. 720 at 2. Given this ruling, Statement 142 cannot be established as fact.**

  **In addition, the conclusion or opinion of an expert witness (Connor) is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19, 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).**

  **The conclusion in St. 142 is based on the opinion of a paid expert witness, but Chevron did not even designate Connor in as one of Chevron's experts in the initial expert disclosures. Chevron should not be permitted to rely on the report of Mr. Connor. Defendants have not yet been permitted the opportunity to conduct expert discovery in this case. At the very least, Defendants must be given the opportunity to depose or cross-examine Mr. Connor and be permitted to conduct discovery as to the contamination of the drinking water in the Oriente. *See* Fed. R. Civ. P. 56(d).**

  **C.**  **Index Summaries**

143. The Microsoft Excel spreadsheet bearing Bates numbers DONZ00048820 (filename "pruebas pedidas en etapa de prueba.xls") and GARR-HDD-0003243-3446 (filename "cuadro_de_pruebas09-05(1).xls") (the "Index Summaries"), which summarize and list certain filings made during the Lago Agrio litigation, were prepared by the LAP team and consist of the LAP team's unfiled work product.

**Response:**

**Disputed.  The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts.  "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record.  They should not contain conclusions . . . .'"** *Goldstick v. The Hartford, Inc.*, **No. 00-Civ-8577 (LAK), 2002 WL 1906029, at \*1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting** *Rodriguez v. Schneider*, **No. 95 Civ. 4083(RPP) 1999 WL 459813, \*1 n.3 (S.D.N.Y. June 29, 1999)).**

**The conclusion that the "Index Summaries" "consist of the LAP teams' unfiled work product" is supported only by the conclusion of paid expert witness Dr. Leonard. Even if considered, Dr. Leonard's report is unreliable, makes improper and misleading characterizations, and is immaterial for the reasons stated in response to St. 127.** *See also* **Smyser Decl., Ex. 40 (Expert Report of Dr. Ronald R. Butters, at ¶¶ 4(a), 4(c), 10, 16-19).**

**Nor should Chevron be permitted to rely on the report of Dr. Leonard.  Defendants have not yet been permitted the opportunity to conduct expert discovery in this case. Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures. Dkt. 703 at 2.  Defendants have not been afforded sufficient time to review and analyze the material provided in this report.  At the very least, Defendants must be given the opportunity to depose or cross-examine Dr. Leonard.** *See* **Fed. R. Civ. P. 56(d).**

**Moreover, the evidence raises genuine disputes of fact concerning what constitutes the court record in the Lago Agrio case and what is or is not considered part of the record before the court.  See Resp. to St. 101.**

**Finally, Chevron previously submitted a similar statement with the same evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at Sts. 13-14).  Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion.**

144. The Index Summaries are not in the Lago Agrio Record.

**Response:**

**Disputed.  The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts.  "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record.  They should not contain conclusions . . . .'"** *Goldstick v. The Hartford, Inc.*, **No. 00-Civ-8577 (LAK), 2002 WL 1906029, at \*1**

51

(S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).

 The conclusion in St. 144 is based solely on the opinion of a paid expert witness. Even if considered, Dr. Patrick Juola's report is not admissible because it does not meet the requirements of Rule 702 and Daubert. *See* Resp. to St. 126; Smyser Decl., Ex. 41, Declaration of Richard J. Fateman, Ph.D, at ¶¶ 24-26, 29.

 Nor should Chevron be permitted to rely on Dr. Juola's report. Defendants have not yet been permitted the opportunity to conduct expert discovery in this case. Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures. Dkt. 703 at 2. Defendants have not been afforded sufficient time to review and analyze the material provided in this report. At the very least, Defendants must be given the opportunity to depose or cross-examine Dr. Juola. *See* Fed. R. Civ. P. 56(d).

 Moreover, the evidence raises genuine disputes of fact concerning what constitutes the court record in the Lago Agrio case and what is or is not considered part of the record before the court. See Resp. to St. 101.

 Finally, Chevron previously submitted the same statement with the same evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 15). Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion.

145. As Dr. Robert A. Leonard concluded, "[i]dentical or nearly identical word strings" and strings of symbols, including identical citation errors, punctuation errors, and orthographic errors in the Index Summaries appear in the Judgment.

 **Response:**

 Disputed. Defendants do not dispute that Dr. Leonard may have written that statement, Defendants dispute his conclusions. The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)). Chevron does not even attempt to disguise this "conclusion" as a "fact" because it expressly uses the phrase "As Dr. Robert A. Leonard <u>concluded</u> . . . ."

 The conclusion in St. 145 is based solely on the opinion of a paid expert witness. Even if considered, Dr. Leonard's report is unreliable, makes improper and misleading characterizations, and is immaterial for the reasons stated in response to St. 127. *See also* Smyser Decl., Ex. 40 (Expert Report of Dr. Ronald R. Butters, ¶¶ 4(a), 4(c), 10, 16-19).

 Nor should Chevron be permitted to rely on Dr. Leonard's report(s). Defendants have not yet been permitted the opportunity to conduct expert discovery in this case.

Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures.  Dkt. 703 at 2.  Defendants have not been afforded sufficient time to review and analyze the material provided in this report.  At the very least, Defendants must be given the opportunity to depose or cross-examine Dr. Leonard.  *See* Fed. R. Civ. P. 56(d).

Moreover, "the nature of the[] contents" of the "Index Summaries" makes it "difficult to conclude that any *ex parte* submission of them materially impacted Chevron's ability to present its defense."  Dkt. 550 at 88 n. 319.  An index that "summarize[s] and list[s] certain filings made during the Lago Agrio litigation" would not have any material impact on Chevron's defense or on the outcome of the lawsuit.

146.    And as Dr. Teresa Turrell concluded, "the differences and linguistic strategies observed in [the Index Summary], diverging from the Source texts indexed in the [Index Summary], were reproduced in [the Judgment], something which would allow us to conclude that whoever the author of [the Judgment] is, the writer of such text had access to the [Index Summary] or another containing its contents."

Response:

Disputed.  Defendants do not dispute that Dr. Turrell may have written that statement, but Defendants dispute his conclusions.  The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts.  "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record.  They should not contain conclusions . . . .'"  *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19, 2002) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).  Chevron does not even attempt to disguise this "conclusion" as a "fact" because it expressly uses the phrase "As Dr. Teresa Turell <u>concluded</u> . . . ."

The conclusion in St. 146 is based solely on the opinion of a paid expert witness.  Chevron should not permitted to rely on Dr. Turell's report because Chevron did not disclose Dr. Turell as an expert in its March 1, 2013 expert disclosures.  The Court should strike the report and disregard the conclusion in this St. 146 and any other statement that relies on Dr. Turell's report.  See Fed. R. Civ. P. 37(c)(1).

Even if considered, Dr. Turell's report is not admissible because it does not meet the requirements of Rule 702 and Daubert.  *See* Resp. to St. 127.

Moreover, "the nature of the[] contents" of the "Index Summaries" makes it "difficult to conclude that any *ex parte* submission of them materially impacted Chevron's ability to present its defense."  Dkt. 550 at 88 n. 319.  An index that "summarize[s] and list[s] certain filings made during the Lago Agrio litigation" would not have any material impact on Chevron's defense or on the outcome of the lawsuit.

Finally, Chevron previously submitted a similar statement with the same evidence, which the Court found insufficient evidence to grant summary judgment on collateral

**estoppel. (Dkt. 398, at St. 16). Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion.**

147.     The document bearing the Bates number GARR-HDD-0003243-3446 (filename "cuadro_de_pruebas09-05(1).xls") was not produced to Chevron until June 2011 and the LAP team did not otherwise make it available to Chevron before that date.

**Response:**

**Disputed in part. Defendants do not dispute that the document bearing the Bates number GARR-HD-0003243-3446 was produced to Chevron in or around June 2011. Defendants dispute that this document was produced late or could have been produced sooner than it was. The cited deposition transcript demonstrates that the document was "produced almost immediately after we got it. But I'm guessing it is June." Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 4824:9-11.**

**Moreover, Chevron previously submitted a similar statement with substantially the same evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 13). Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion.**

**D.     Draft Alegato**

148.     The document bearing Bates number DONZS00002439, a Microsoft Word document titled "Borrador_Alegato_Final_Parcial_Envio_EEUU_[11_nov_2010].docx" (the "Draft Alegato"), which is a draft of the LAPs' "Final Alegato" in the Lago Agrio Litigation, was produced to Chevron in or around January 2011. It is a document written by the LAPs' team and contains the LAP team's unfiled work product.

**Response:**

**Disputed in part. Defendants do not dispute that the document bearing Bates number DONZS00002439 is a partial draft of the Lago Agrio Plaintiffs' Final Alegato.**

**Defendants dispute the conclusions reached in the final sentence of St. 148. The documents cited, an excerpt of Steven Donziger's deposition testimony and the document attached to a November 10, 2010 email from Juan Pablo Sáenz to Pablo Fajardo and Steven Donziger, do not establish that the document bearing Bates number DONZ00002439 is "unfiled work product." In fact, they support the opposite conclusion:**

**Q.     Mr. Donziger, will you accept my representation that the references to the merger Fusion memo in the version of the plaintiffs' draft Alegato dated November 11th, 2010 do not appear in the filed versions of plaintiffs' Alegatos?**

**. . .**

**A.     No.**

Moreover, because "the similarities of the Draft Alegato to portions of the Judgment [appear] to be coextensive with some of the similarities of the [Fusion Memo] to the Judgment", Dkt. 550 at 29 n. 116, fact issues concerning whether the Fusion Memo was or was not part of the court record or openly and officially presented to the court likewise apply to the Draft Alegato. *See* Resp. to St. 101; Resp. to St. 126.

Finally, Chevron previously submitted a similar statement with similar evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 164). Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion.

149.   The Draft Alegato is not in the Lago Agrio Record.

**Response:**

Disputed. The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).

Even if considered, Dr. Patrick Juola's report is not admissible because it does not meet the requirements of Rule 702 and Daubert. *See* Resp. to St. 126; Smyser Decl., Ex. 41, Declaration of Richard J. Fateman, Ph.D, at ¶¶ 24-26, 29.

With respect to Samuel Hernandez's December 2012 affidavit, Dkt. 658-5, it does not support the conclusion that the "Draft Alegato is not in the Lago Agrio Record." As Hernandez acknowledges, Morningside Translations did not review all of the "Lago Agrio Record", which Chevron attempts to define in St. 101 as "hand-numbered pages 1 to 216338 maintained by" the court. Dkt. 658-5, at ¶¶ 27-28. Instead, Morningside looked at only 6,714 of the 236,311 pages of the "record" that they were provided by counsel, a mere 2.8%. *Id.* Hernandez defines the subset that Chevron counsel handpicked and instructed him to review as "Review Set B." *Id.* Obviously "Review Set B" is not the same as "the Lago Agrio Record", which itself (as defined by Chevron) does not comprise the entirety of the official court record. *See* Resp. to St. 101. Reviewing only the portions that counsel instructed them to, while ignoring the rest of the record, does not lead to a reliable conclusion that certain information or text is or is not found in the court record.

Moreover, Hernandez does not explain how the document reviewers working for him were able to simultaneously maintain a recall of the specific text of a 94-page document while reviewing each page of the court records to determine if any portion of that enormous amount of text was found on a reviewed page. Dkt. 658-5, at ¶ 27. It is unlikely that the reviewers were able to remember all of the words (and the order they appeared in) contained in these numerous single-spaced pages of text ("Review Items B") in order to determine if any of these specific words were found in any single page of the

6,714 pages reviewed.  The December 2012 Hernandez affidavit is not a reliable source for the conclusion that "the Draft Alegato is not in the Lago Agrio Record."

Nor should Chevron be permitted to rely on Dr. Juola's report(s) or Hernandez's affidavit(s).  Defendants have not yet been permitted the opportunity to conduct expert discovery in this case.  Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures.  Dkt. 703 at 2.  Defendants have not been afforded sufficient time to review and analyze the material provided in the reports and affidavits.  At the very least, Defendants must be given the opportunity to depose or cross-examine Hernandez and Dr. Juola.  *See* Fed. R. Civ. P. 56(d).

The evidence also raises genuine disputes of fact concerning what constitutes the court record in the Lago Agrio case and what is or is not considered part of the record before the court.  See Resp. to St. 101.  The fact that the "Draft Alegato" (as defined by Chevron) does not appear in its complete form in the Lago Agrio court record (as defined by Chevron) does not mean that portions of the document were not included in other court filings or documents officially and openly presented to the court.  Moreover, because "the similarities of the Draft Alegato to portions of the Judgment [appear] to be coextensive with some of the similarities of the [Fusion Memo] to the Judgment", Dkt. 550 at 29 n. 116, fact issues concerning whether the Fusion Memo was or was not part of the court record or openly and officially presented to the court likewise apply to the Draft Alegato.  See Resp. to St. 101; Resp. to St. 126.

Moreover, Chevron previously submitted a similar statement with nearly the same evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel.  (Dkt. 398, at St. 19).  Chevron's additional exhibit is insufficient reason for the Court to rule any differently on this Renewed Motion.

150.   As Dr. Leonard concluded, "the Judgment "contains examples of strings of words and symbols identical or nearly identical to both the unfiled Fusion Memo .  .  .  and to the unfiled Draft Alegato."

**Response:**

Disputed.  While Defendants do not dispute that Dr. Leonard may have written that statement, Defendants dispute his conclusions.  The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts.  "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record.  They should not contain conclusions . . . .'"  *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).  Chevron does not even attempt to disguise this "conclusion" as a "fact" because it expressly uses the phrase "As Dr. Leonard <u>concluded</u> . . . ."

The conclusion in St. 150 is based solely on the opinion of a paid expert witness.  Even if considered, Dr. Leonard's report is unreliable, makes improper and misleading

characterizations, and is immaterial for the reasons stated in response to St. 127.  *See also* Smyser Decl., Ex. 40 (Expert Report of Dr. Ronald R. Butters, at ¶¶ 4(a), 4(c), 10, 16-19).

Nor should Chevron be permitted to rely on Dr. Leonard's report(s).  Defendants have not yet been permitted the opportunity to conduct expert discovery in this case. Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures. Dkt. 703 at 2.  Defendants have not been afforded sufficient time to review and analyze the material provided in this report.  At the very least, Defendants must be given the opportunity to depose or cross-examine Dr. Leonard.  *See* Fed. R. Civ. P. 56(d).

151.    As shown in Exhibits 5 and C to his most recent report, Dr.  Leonard found multiple instances of verbatim or nearly verbatim overlap between the Draft Alegato and the Lago Agrio Judgment on pages 23 and 24 of the judgment.

**Response:**

Disputed.  The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record.  They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).

The conclusion in St. 151 is based solely on the opinion of a paid expert witness. Even if considered, Dr. Leonard's report is unreliable, makes improper and misleading characterizations, and is immaterial for the reasons stated in response to St. 127.  *See also* Smyser Decl., Ex. 40 (Expert Report of Dr. Ronald R. Butters, at ¶¶ 4(a), 4(c), 10, 16-19).

Nor should Chevron be permitted to rely on Dr. Leonard's report(s).  Defendants have not yet been permitted the opportunity to conduct expert discovery in this case. Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures. Dkt. 703 at 2.  Defendants have not been afforded sufficient time to review and analyze the material provided in this report.  At the very least, Defendants must be given the opportunity to depose or cross-examine Dr. Leonard.  *See* Fed. R. Civ. P. 56(d).

E.    **Fajardo Trust Email**

152.    On June 18, 2009, Pablo Fajardo sent the LAPs' team, including Julio Prieto, Juan Pablo Sáenz and Steven Donziger, an email discussing and quoting from the case Andrade v. Conelec (the "Fajardo Trust Email").

**Response:**

Defendants do not dispute that Pablo Fajardo sent the email produced as DONZ00051504.

57

153.     The Fajardo Trust Email is not in the Lago Agrio Record.

**Response:**

**Disputed.  The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts.  "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record.  They should not contain conclusions . . . .'"** *Goldstick v. The Hartford, Inc.*, **No. 00-Civ-8577 (LAK), 2002 WL 1906029, at \*1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting** *Rodriguez v. Schneider*, **No. 95 Civ. 4083(RPP) 1999 WL 459813, \*1 n.3 (S.D.N.Y. June 29, 1999)).**

**The conclusion in St. 153 is based solely on the opinion of a paid expert witness.  Even if considered, Hernandez's July 2012 affidavit does not support the conclusion that the "Fajardo Trust Email is not in the Lago Agrio Record."  As Hernandez acknowledges, Morningside Translations did not review all of the "Lago Agrio Record", which Chevron defines in St. 101 as "hand-numbered pages 1 to 216338 maintained by" the court.  Dkt. 548, ¶ 7.  Instead, Morningside looked at only 97,058 of the 236,311 pages of the "record" that they were provided by counsel, a mere 41%.  Id.  Hernandez defines the subset that Chevron counsel handpicked and instructed him to review as "the Reviewed Record."  Id.  Obviously the "Reviewed Record" is not the same as "the Lago Agrio Record", which itself (as defined by Chevron) does not comprise the entirety of the official court record.  See Resp. to St. 101.  Hernandez also notes that he and his team conducted a "supplemental review" of "a subset of 182 pages" that Chevron's counsel "designated" out of "an additional 358 pages of documents."  Dkt. 548, ¶ 31.  Reviewing only the portions that counsel instructed them to, while ignoring the rest of the record, does not lead to a reliable conclusion that certain information or text is or is not found in the court record.**

**Moreover, Hernandez does not explain how the document reviewers working for him were able to simultaneously maintain a recall of the specific text of all of "[s]ix pages of the Fusion Memo", "[t]wo spreadsheet pages" from "the Record Index", a "two page Spanish language email", "[t]welve pairs of corresponding Spanish language text passages", and "[s]ixty sample names" while reviewing each page of the court records to determine if any portion of that enormous amount of text was found on a reviewed page.  Dkt. 548, ¶ 11.  It is unlikely that the reviewers were able to remember all of the words (and the order they appeared in) contained in these numerous single-spaced pages of text ("Review Items") in order to determine if any of these specific words were found in any single page of the 97,058 pages reviewed.  The Hernandez affidavit is not a reliable source for the conclusion that "the Fajardo Trust Email is not in the Lago Agrio Record."**

**The Court should not allow Chevron to rely on the Hernandez affidavit.  Defendants have not been permitted to conduct expert discovery, timely disclose responsive rebuttal experts, or review and analyze all material related to Hernandez's affidavit. At the very least, Defendants must be given the opportunity to depose or cross-examine Hernandez.  See Fed. R. Civ. P. 56(d).**

154.   No party in the Lago Agrio Litigation requested a trust be created for the judgment proceeds in any public filing with the Lago Agrio court.

**Response:**

**Disputed. The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'"** *Goldstick v. The Hartford, Inc.*, **No. 00-Civ-8577 (LAK), 2002 WL 1906029, at \*1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting** *Rodriguez v. Schneider*, **No. 95 Civ. 4083(RPP) 1999 WL 459813, \*1 n.3 (S.D.N.Y. June 29, 1999)).**

**The conclusion in St. 154 is based solely on the opinion of a paid expert witness. Even if considered, Hernandez's July 2012 affidavit does not support Chevron's conclusion. Hernandez did not review the entire court record. See Resp. to St. 153. Even assuming that the "Fajardo Trust Email" was not located in "the Lago Agrio Record", however, it does not follow that "[n]o party in the Lago Agrio Litigation requested a trust be created for the judgment proceeds in any public filing." Hernandez does not state that Morningside reviewed each page of the "Lago Agrio Record" for the term "trust" in order to determine whether such a request was made in any filing. He does not even state that Morningside reviewed the "Reviewed Record" for this information. There is a disconnect between the affidavit and Chevron's assertion.**

**Defendants have not been permitted to conduct expert discovery, timely disclose responsive rebuttal experts, or review and analyze all material related to Hernandez's affidavit. At the very least, Defendants must be given the opportunity to depose or cross-examine Hernandez.** *See* **Fed. R. Civ. P. 56(d).**

155.   In filings with this Court and the Second Circuit Court of Appeals (joined by Donziger), the LAPs stated that the portions of the June 18, 2009 Fajardo email appearing in the Judgment were "stock language" from published court opinions, but in fact the June 18, 2009 Fajardo email misquotes the Andrade case, and those same misquotations appear in the Judgment.

**Response:**

**Disputed in part. Defendants do not dispute that they have stated that "[t]he email contains a cut-and-pasted excerpt from a published Ecuadorian Supreme Court opinion dealing with a trust, noting that the same language appears in other Ecuadorian Supreme Court decisions." Dkt. 365 at 41. Defendants dispute that any "misquotations" appear in the "Fajardo email" or in the Ecuadorian Judgment. "[T]he four 'misquoted' words that allegedly demonstrate the identity of the part of the Judgment to this document in three instances are virtual synonyms for each other and the fourth is a gendered article that reflects a different word choice in Spanish. The English translation of the Judgment therefore does not clearly reflect which version, if either, of the Andrade case is being quoted." Dkt. 550, at 29 n. 116.**

**Moreover, Chevron previously submitted a similar statement with the same evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel.  (Dkt. 398, at St. 24).  Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion.**

156.  As Dr. Robert Leonard concluded, "Much of the data, adduced below, such as identical or nearly identical strings of more than 40 words, identical citation errors, and identicial mistranscriptions, support the opinion, to a reasonable degree of scientific certainty, that the co-occurrence of language between parts of the Sentencia and the unfiled Fajardo Trust email is due to common authorship."

**Response:**

**Disputed.  While Defendants do not dispute that Dr. Leonard may have written that statement, Defendants dispute his conclusions.  The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts.  "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record.  They should not contain conclusions . . . .'"  *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at \*1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, \*1 n.3 (S.D.N.Y. June 29, 1999)).  Chevron does not even attempt to disguise this "conclusion" as a "fact" because it expressly uses the phrase "As Dr. Robert Leonard <u>concluded</u> . . . ."**

**The conclusion in St. 156 is based solely on the opinion of a paid expert witness.  Even if considered, Dr. Leonard's report is unreliable, makes improper and misleading characterizations, and is immaterial for the reasons stated in response to St. 127.  *See also* Smyser Decl., Ex. 40 (Expert Report of Dr. Ronald R. Butters, at ¶¶ 4(a), 4(c), 10, 16-19).**

**Nor should Chevron be permitted to rely on Dr. Leonard's report(s).  Defendants have not yet been permitted the opportunity to conduct expert discovery in this case.  Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures.  Dkt. 703 at 2.  Defendants have not been afforded sufficient time to review and analyze the material provided in this report.  At the very least, Defendants must be given the opportunity to depose or cross-examine Dr. Leonard.  *See* Fed. R. Civ. P. 56(d).**

157.  As Dr.  Robert Leonard concluded: (i) the Fajardo email misquotes language from the Andrade v.  Conelec case, and the same misquote appears in the judgment; (ii) the Fajardo email miscites the Andrade v.  Conelec case and the same erroneous citation appears in the judgment; (iii) another case (the Concha case), having nothing to do with trust law, is incorrectly cited as authority for "the legal basis of the trust" with the same short-hand citation being used in both the Fajardo email and the judgment; and (iv) the same explanatory language and phrases regarding use of judgment trusts appear verbatim in the Fajardo email and the judgment.

**Response:**

Disputed.  The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts.  "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record.  They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).  Chevron does not even attempt to disguise this "conclusion" as a "fact" because it expressly uses the phrase "As Dr. Robert Leonard <u>concluded</u> . . . ."

The conclusion in St. 157 is based solely on the opinion of a paid expert witness.  Even if considered, Dr. Leonard's report is unreliable, makes improper and misleading characterizations, and is immaterial for the reasons stated in response to St. 127.  *See also* Smyser Decl., Ex. 40 (Expert Report of Dr. Ronald R. Butters, at ¶¶ 4(a), 4(c), 10, 16-19).

Nor should Chevron be permitted to rely on Dr. Leonard's report(s).  Defendants have not yet been permitted the opportunity to conduct expert discovery in this case.  Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures.  Dkt. 703 at 2.  Defendants have not been afforded sufficient time to review and analyze the material provided in this report.  At the very least, Defendants must be given the opportunity to depose or cross-examine Dr. Leonard.  *See* Fed. R. Civ. P. 56(d).

158.    Defendants understood the creation of a trust or trusts to receive any proceeds from the Lago Agrio judgment to be a "core provision[]" to protect [Burford's] interest" and was thus essential to obtaining funding from Burford.

**Response:**

Disputed.  The cited document, an email from nonparty Nicol Ash (counsel to Burford) to nonparty William Carmody and others, is inadmissible hearsay and cannot support summary judgment. *See Faulkner v. Arista Records LLC*, 797 F. Supp. 2d 299, 305 (S.D.N.Y. 2011) ("Each statement of material fact must be followed by a "citation to evidence which would be admissible, set forth as required by the Federal Rule of Civil Procedure 56(e).' It is therefore the rule that "only admissible evidence" need be considered on summary judgment. 'The principles governing admissibility of evidence do not change on a motion for summary judgment.'") (citations omitted).

Moreover, the cited document does not support Chevron's conclusion (or surmise) about what "Defendants understood."  Chevron, per its counsel's usual modus operandi, removes snippets of the quote to mischaracterize and take it out of context.  Chevron's counsel changes "provisions" to the singular "provision" to create the misleading impression that the creation of a trust is the core provision.  And the "provisions" referred to in the email do not refer to the creation of a trust.  The full quote indicates that Burford's counsel believed that the "core provisions" to protect Burford's interest were "(i) the covenant that each present and future material creditor be caused to execute the intercreditor agreement" and "(ii) the negative pledge in respect of future security provided in respect of the claim."  Burford's counsel does not state that the "creation of a

61

trust or trusts to receive any proceeds from the Lago Agrio judgment" was a "core provision."

Finally, there is no indication in the email that Defendants Camacho and Piaguaje (or even Steven Donziger) "understood" anything about the alleged importance of creating a trust.  Chevron's counsel's speculation about the mental state of "Defendants" is not a basis for granting summary judgment.

### F.      Selva Viva Data Compilation

159.   The documents bearing Bates numbers DA00000040, DA00000041, and DA00000042, which were produced by the LAPs' counsel to Chevron on or around December 1, 2010, are Microsoft Excel spreadsheets containing environmental sampling data created by the LAPs' team known as the "Selva Viva Data Compilation."

**Response:**

**Disputed.  The referenced documents were produced by Douglas Allen, as is indicated in the very exhibits Chevron's counsel cites as support for this statement, not "the LAPs' counsel."  *See, e.g.*, Dkt. 402-12 (Ex. 2303) ("Attached hereto as Exhibit 2303 is a true and correct copy of a printed excerpt from the file produced by Douglas Allen as DA00000040.xls".  Moreover, Chevron previously submitted the same statement with the same evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel.  (Dkt. 398, at Sts. 25-26).  Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion.**

160.   The Selva Viva Data Compilation is not in the Lago Agrio Record.

**Response:**

**Disputed.  The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts.  "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19, 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).**

**The conclusion in St. 160 is based solely on the opinions of paid expert witnesses. Even if considered, Dr. Patrick Juola's report is not admissible because it does not meet the requirements of Rule 702 and Daubert.  *See* Resp. to St. 126; Smyser Decl., Ex. 41, Declaration of Richard J. Fateman, Ph.D, at ¶¶ 24-26, 29.**

**Even if considered, Hernandez's July 2012 affidavit does not support Chevron's conclusion that the "Selva Viva Data Compilation is not in the Lago Agrio Record." Hernandez did not review the entire court record.  *See* Resp. to St. 153.  Moreover, Hernandez did not make any conclusions about the presence or absence of the Selva Viva Data Compilation.  The Selva Viva Data Compilation is not even mentioned in his affidavit.**

**Chevron's assertion that the Hernandez affidavit concluded "that the Selva Viva Data Compilation was not in the record" is therefore false.**

**Defendants have not been permitted to conduct expert discovery, timely disclose responsive rebuttal experts, or review and analyze all material related to Dr. Juola's report and Hernandez's affidavit. At the very least, Defendants must be given the opportunity to depose or cross-examine Hernandez and Dr. Juola.** *See* **Fed. R. Civ. P. 56(d).**

161.    More than 100 features of the Selva Viva Data Compilation, including the use of "_sv" and "_tx" in sample names, enclosing measurements of meters or centimeters within parentheses, misstating sample counts, misreporting milligrams per kilogram as micrograms per kilogram, and other errors appear in the Judgment, but not in the sampling results in the Lago Agrio Record.

**Response:**

**Disputed.  The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record.  They should not contain conclusions . . . .'"** *Goldstick v. The Hartford, Inc.***, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at \*1 (S.D.N.Y Aug. 19, 2002) (Kaplan, J.) (quoting** *Rodriguez v. Schneider***, No. 95 Civ. 4083(RPP) 1999 WL 459813, \*1 n.3 (S.D.N.Y. June 29, 1999)).**

**The conclusion in St. 161 is based solely on the opinions of a paid expert witness. Even if considered, Michael Younger's report is unreliable because it is based on the improper assumption that information in the "Selva Viva Data Compilation" was not filed or officially presented to the court in Lago Agrio.  Younger did not review the entire court record, nor does he purport to rely on someone who has performed a complete review. Indeed, Younger acknowledges that he reviewed only a limited subset of 65 documents (compared to the more than 200,000 pages in the record) that were handpicked by counsel, and then extrapolates that because information from the "Selva Viva Data Compilation" was not in that subset of materials, it was not "filed" with the court. Dkt. 400-08 at 2-3. This "conclusion" is not surprising, given that Chevron's counsel told Younger that the limited set of documents he was reviewing were "not filed in court in the Lago Agrio litigation in Ecuador."** *Id.* **at 2.  And Younger uses the term "Unfiled Selva Viva Data Compilation" without ever engaging in a complete review of the record to determine whether the document was or was not filed or officially presented to the court.  The conclusion that certain "features of the Selva Viva Data Compilation" were "not in the sampling results in the Lago Agrio Record" is not supported by Younger's report, which admittedly did not analyze the whole record.**

**Nor should Chevron be permitted to rely on Younger's report(s).  Defendants have not yet been permitted the opportunity to conduct expert discovery in this case.  Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures. Dkt. 703 at 2.  Defendants have not been afforded sufficient time to review and analyze the**

material provided in this report.  At the very least, Defendants must be given the opportunity to depose or cross-examine Younger.  *See* **Fed. R. Civ. P. 56(d).**

Defendants have also identified portions of the record where submissions employ the "_sv" suffix, as referenced in the Judgment and as also allegedly used in the Selva Viva database.  *See* Smyser Decl., Ex. 34, p. 184474.

Moreover, "the nature of the[] contents" of the "Selva Viva Data Compilation" makes it "difficult to conclude that any ex parte submission of them materially impacted Chevron's ability to present its defense." Dkt. 550 at 88 n. 319.  Chevron presented thousands of sampling results from its own experts, which the Lago Agrio court was free to accept or reject.  The Ecuadorian appellate court similarly reasoned that "the judge in his judgment has not assessed each sample and its results separately, as if they described isolated facts, but instead it is the collection of information coming from various sources that undoubtedly has created in the trial judge the conviction of the existence of damage." Dkt. 400-22 (Ex. 2144) at 12.

Finally, Chevron previously submitted a similar statement with substantially the same evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel.  (Dkt. 398, at St. 172).  Chevron provides no new arguments or new evidence and no reason for the Court to rule any differently on this Renewed Motion.

162.   As Michael Younger concluded, "the Court likely relied on and subsequently misinterpreted the Unfiled Selva Viva Compilation, rather than relying on the Filed Lab Results submitted with the Judicial Inspection Reports."

**Response:**

Disputed.  Though Defendants do not dispute that Mr. Younger may have written that statement, Defendants dispute his conclusions.  The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts.  "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record.  They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).  Chevron does not even attempt to disguise this "conclusion" as a "fact" because it expressly uses the phrase "As Michael Younger <u>concluded</u> . . . ."

The conclusion in St. 162 is based solely on the opinions of paid expert witnesses.  Even if considered, Michael Younger's report is unreliable and does not support the conclusion in St. 162.  See Resp. to St. 161.  Moreover, it is based on assumption and speculation about the mental processes of the Ecuadorian trial court.  Dkt. 356-12 at 8 (trial judge "likely relied on and subsequently misinterpreted the Selva Viva Data compilation").  There is no evidence from which Younger could divine the judge's thought process or the reasons why he selected the evidence citations that he did.

Nor should Chevron be permitted to rely on Younger's report(s). Defendants have not yet been permitted the opportunity to conduct expert discovery in this case. Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures. Dkt. 703 at 2. Defendants have not been afforded sufficient time to review and analyze the material provided in this report. At the very least, Defendants must be given the opportunity to depose or cross-examine Younger. *See* Fed. R. Civ. P. 56(d).

Defendants have also identified portions of the record where submissions employ the "_sv" suffix, as referenced in the Judgment and as also allegedly used in the Selva Viva database. *See* Smyser Decl., Ex. 34, p. 184,474.

Moreover, "the nature of the[] contents" of the "Selva Viva Data Compilation" makes it "difficult to conclude that any ex parte submission of them materially impacted Chevron's ability to present its defense." Dkt. 550 at 88 n. 319. Chevron presented thousands of sampling results from its own experts, which the Lago Agrio court was free to accept or reject. The Ecuadorian appellate court similarly reasoned that "the judge in his judgment has not assessed each sample and its results separately, as if they described isolated facts, but instead it is the collection of information coming from various sources that undoubtedly has created in the trial judge the conviction of the existence of damage." Dkt. 400-22 (Ex. 2144) at 12.

163.   The judgment claims that sampling identified the presence of mercury, but every result it identifies as reporting the presence of mercury were actually results showing no detectable mercury had been found.

**Response:**

Disputed. The statement calls for a legal interpretation of the Lago Agrio judgment—a conclusion inappropriate in a Rule 56.1 statement. Further, the conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).

Even if considered, Younger's report is unreliable because it is based on assumption and speculation about the mental processes of the Ecuadorian trial court. Dkt. 356-12 at 8 (trial judge "likely relied on and subsequently misinterpreted the Selva Viva Data compilation"). There is no evidence from which Younger could divine the judge's thought process or the reasons why he selected the evidence citations that he did.

Moreover, the other cited materials do not support this conclusion either. The Ecuadorian "appellate decision" does not, as Chevron claims, "indicat[e] that mercury had been found above detection limits." In fact, the appellate decision indicates the exact opposite. The appellate court concluded that "the lower court has overlooked the symbol

'less than' and instead it has assumed the results are 'precise' when they are not. . . . [T]his error in the assessment of the laboratory results regarding a contaminating element does not invalidate the remaining findings or reasoning regarding others which are in fact characterized as containing elements." Dkt. 400-22 (Ex. 2144) at 11-12.

This statement is immaterial.  The conclusion that there were high levels of mercury in the soils reaching 7 mg/kg did not materially impact Chevron's ability to present its defense or the outcome of the Lago Agrio lawsuit.

### G.    Moodie Memo

164.    The document bearing the Bates number WOODS-HDD-0012793, a memorandum purporting to analyze causation (the "Moodie Memorandum") was created by the LAP team and contains the LAP team's work product.

**Response:**

Disputed.  The cited materials do not support Chevron's statement 164.  The only citations are to two expert reports, both of which assume (based on statements from Chevron's counsel) that the document in question was "authored by Nicholas Moodie to Julio Prieto and Juan Saenz, dated February 2, 2009." Stavers Decl. Ex. 3280 (Green Decl.); see also Stavers Decl. Ex. 3283 (Spigelman Decl.) ("a memorandum of 2 February 2009 by Nicholas Moodie").  Chevron has not proffered the "Moodie Memorandum as evidence to support this assertion.  Chevron does not even define the vague term "LAP team."

165.    LAPs legal intern Nicholas Moodie, the primary author of the Moodie Memorandum, is Australian.

**Response:**

Disputed.  The cited materials do not support Chevron's statement 164.  The only citations are to two expert reports, both of which assume (based on statements from Chevron's counsel) that the document in question was "authored by Nicholas Moodie to Julio Prieto and Juan Saenz, dated February 2, 2009." Stavers Decl. Ex. 3280 (Green Decl.); see also Stavers Decl. Ex. 3283 (Spigelman Decl.) ("a memorandum of 2 February 2009 by Nicholas Moodie"). Chevron has not proffered the "Moodie Memorandum as evidence to support this assertion.  There is no admissible evidence proving that he was "the primary author of the Moodie Memorandum", or that he is Australian.

166.    The Moodie Memo is not in the Lago Agrio Record.

**Response:**

Disputed.  The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts.  "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record.  They should not contain conclusions . . . .'" Goldstick v. The Hartford, Inc., No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1

(S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).

The conclusion in St. 166 is based solely on the opinions of a paid expert witness. Even if considered, Hernandez's December 2012 affidavit does not support the conclusion that the "Moodie Memo is not in the Lago Agrio Record." As Hernandez acknowledges, Morningside Translations did not review all of the "Lago Agrio Record", which Chevron defines in St. 101 as "hand-numbered pages 1 to 216338 maintained by" the court. Dkt. 658-5, at ¶¶ 8-9. Instead, Morningside looked at only 49,906 of the 236,311 pages of the "record" that they were provided by counsel, a mere 21%. Id. Hernandez defines the subset that Chevron counsel handpicked and instructed him to review as "Review Set A." Id. Obviously "Review Set A" is not the same as "the Lago Agrio Record", which itself (as defined by Chevron) does not comprise the entirety of the official court record. See Resp. to St. 101. Reviewing only the portions that counsel instructed them to, while ignoring the rest of the record, does not lead to a reliable conclusion that certain information or text is or is not found in the court record.

Moreover, Hernandez does not explain how the document reviewers working for him were able to simultaneously maintain a recall of the specific text of a 13-page legal memorandum and three versions each of five separate text selections while reviewing each page of the court records to determine if any portion of that enormous amount of text was found on a reviewed page. Dkt. 658-5, at ¶ 10-11. It is unlikely that the reviewers were able to remember all of the words (and the order they appeared in) contained in these numerous single-spaced pages of text ("Review Items A") in order to determine if any of these specific words were found in any single page of the 49,906 pages reviewed. The December 2012 Hernandez affidavit is not a reliable source for the conclusion that "the Moodie Memo is not in the Lago Agrio Record."

Defendants have not been permitted to conduct expert discovery, timely disclose responsive rebuttal experts, or review and analyze all material related to Hernandez's affidavit. At the very least, Defendants must be given the opportunity to depose or cross-examine Hernandez. *See* Fed. R. Civ. P. 56(d).

167.   As Michael Green has concluded, the Moodie Memo and the judgment adopt the "substantial factor" test from *Rutherford v. Owens-Illinois, Inc.*, 941 P.2d 1203 (Cal. 1997), but that test was employed in *Rutherford* "to address a particular problem in asbestos litigation and is not generally applicable in tort contexts that do not present the difficult and specific proof problems present in that case. . . . *Rutherford* does not reflect a general approach to causation in toxic substances cases, but rather a response to scientific uncertainty when multiple defendants each contribute to the risk of disease but proof of which defendant's contribution was the but for cause is scientifically impossible. Subsequent cases in California, including toxic torts, have confined *Rutherford* to that specific circumstance."

**Response:**

Disputed.  This statement consists of an improper legal conclusion, which the Court should strike or disregard.  *See, e.g.*, *Antunes*, 2011 WL 1990872 at *2 n.9; *Cicchetti*, 2008 WL 619013 at *4 n.2.  It is not a statement "undisputed fact" that belongs in a Rule 56.1 statement.  Moreover, the conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts.  "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record.  They should not contain conclusions . . . .'"  *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).

The sole basis for this statement is the opinion of a paid expert witness.  Even if considered, the cited evidence does not support Chevron's counsel's conclusion.  Michael Green did not, as Chevron's counsel falsely suggests, conclude that the "Moodie Memo" and the Ecuadorian Judgment "adopt" the "substantial factor" test in Rutherford.  Stavers Decl. Ex. 3280 (Green Decl.) at 8-9.  Green made no conclusion about the Memo or the Judgment "adopting" any particular causation standard, including substantial factor.  *Id.*  Chevron's counsel's conclusion about what was "adopted" is also contradicted by the plain text of Green's declaration, the "Moodie Memo" and the Ecuadorian Judgment.  The "Moodie Memo" lists the "substantial factor" causation standard as one of many and in no way "adopts" it as the appropriate standard for the Lago Agrio lawsuit against Chevron.  Smyser Decl., Ex. 39 (WOODS-HDD-0012793).  The Ecuadorian Judgment expressly disclaims reliance on any single theory of causation. Dkt. 168 at 90 ("we must study each type of harm separately, because not all types of harm are equal or have the same causation").  The Judgment reviews at least five different causation theories (*id.* at 87-89) and then arrives at the same conclusions via different theories of causation (*id.* at 170).

Chevron should not be permitted to rely on Green's declaration for summary judgment. Defendants have not been permitted to conduct expert discovery, timely disclose responsive rebuttal experts, or review and analyze all material related to Green's affidavit. At the very least, Defendants must be given the opportunity to depose or cross-examine Green.  *See* Fed. R. Civ. P. 56(d).

Moreover, this statement about causation standards is immaterial, as the Judgment analyzes various causation theories *other* than Australian principles (including causation theories based on French, English, and American law, *see* Dkt. 168 at 87-90)  and, in fact, expressly disclaims reliance on any single theory, *id.* at 90 ("Therefore from this analysis, which only briefly summarizes the different theories that can be applied, it is obvious that due to the complexity of the case, the nature of the harm and the diversity of theories, it is imperative that in any consideration of the causation of harm, we must study each type of harm separately ….."); *id.* at 154 ("At this point in the judgment, it is appropriate to analyze the different theories of causation explained above to the hard, since as we shall see below different theories of causation apply depending on the type of harm ….."); *id.* at 173 (acknowledging that "the different theories on the qualification of the causal link, that have been set forth in writing, are an important guide for the judge; but they do not limit his discretion to evaluate the relevant facts considering the specific circumstances of the matters submitted for his consideration").

168.   As Michael Green has concluded, "Australian law does distinguish between legal causation and scientific causation," but "[t]here is no doctrine in the United States that distinguishes between legal causation and scientific causation" and the Moodie memorandum and the Aguinda judgment "are both incorrect in attributing such a schism to the United States."

**Response:**

**Disputed.   Although Defendants do not dispute that Mr. Green has written that statement, Defendants dispute his conclusions.  This statement consists of an improper legal conclusion, which the Court should strike or disregard.  *See, e.g.*, *Antunes*, 2011 WL 1990872 at\*2 n.9; *Cicchetti*, 2008 WL 619013 at \*4 n.2.  It is not a statement "undisputed fact" that belongs in a Rule 56.1 statement.  Moreover, the conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts.  "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'"  *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at \*1 (S.D.N.Y Aug. 19, 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, \*1 n.3 (S.D.N.Y. June 29, 1999)).  Chevron does not even attempt to disguise this "conclusion" as a "fact" because it expressly uses the phrase "As Michael Green has concluded . . . ."**

**The sole basis for this statement is the opinion of a paid expert witness.  Even if considered, Michael Green's opinion is unreliable because it is based on the unproven assumption that the "Moodie Memo" was not filed or officially presented to the Lago Agrio court.  Green acknowledges that he only reviewed a limited number of documents (5) and has not reviewed the entire Lago Agrio court record.  Stavers Decl. Ex. 3280 (Green Decl.) at ¶ 15(f).  To the extent he relies on the affidavit of Samuel Hernandez, Defendants incorporate their arguments and objections as to the sufficiency of that affidavit.  See Resp. to St. 166.  Moreover, as to one of the five documents Green actually reviewed, a publicly-filed amicus brief, he "found some aspects of the ELAW brief that might have been the basis of some aspects of the causation discussion in the Aguinda judgment." *Id.* at 4 n.2.**

**Chevron should not be permitted to rely on Green's declaration for summary judgment.  Defendants have not been permitted to conduct expert discovery, timely disclose responsive rebuttal experts, or review and analyze all material related to Green's affidavit.  At the very least, Defendants must be given the opportunity to depose or cross-examine Green.  *See* Fed. R. Civ. P. 56(d).**

**Moreover, this statement about alleged errors in the Moodie Memo and the Ecuadorian Judgment regarding causation law is immaterial.  *See* Resp. to St. 167.**

169.   As Michael Green has concluded, it is "highly unlikely that the passages in the [judgment regarding causation] were prepared independently of the Moodie memorandum." Michael Green Declaration at 3-4.

**Response:**

**Disputed.  Although Defendants do not dispute that Mr. Green has written this statement, Defendants dispute his conclusions.  this statement itself is not an "undisputed fact" that belongs in a Rule 56.1 statement.  Moreover, the conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts.  "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record.  They should not contain conclusions . . . .'"  *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at \*1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, \*1 n.3 (S.D.N.Y. June 29, 1999)).**

**The sole basis for this statement is the opinion of a paid expert witness.  Even if considered, Michael Green's opinion is unreliable.  *See* Resp. to St. 168.**

**Chevron should not be permitted to rely on Green's declaration for summary judgment.  Defendants have not been permitted to conduct expert discovery, timely disclose responsive rebuttal experts, or review and analyze all material related to Green's declaration. At the very least, Defendants must be given the opportunity to depose or cross-examine Green.  *See* Fed. R. Civ. P. 56(d).**

**Moreover, this statement about causation standards in the Ecuadorian Judgment is immaterial.  *See* Resp. to St. 167.**

170.  As James Spigelman concluded, the concepts which both the Moodie Memorandum and the judgment ascribe to Australian law are either "unknown" to Australian law or are common phrases which do not carry the specific meaning ascribed to them in the memorandum or the judgment.

**Response:**

**Disputed.  Although Defendants do not dispute that Mr. Spigelman may have concluded that for himself, Defendants dispute his conclusions.  This statement consists of an improper legal conclusion, which the Court should strike or disregard.  *See, e.g.*, *Antunes*, 2011 WL 1990872 at\*2 n.9; *Cicchetti*, 2008 WL 619013 at \*4 n.2.  It is not a statement "undisputed fact" that belongs in a Rule 56.1 statement.  Moreover, the conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts.  "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record.  They should not contain conclusions . . . .'"  *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at \*1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, \*1 n.3 (S.D.N.Y. June 29, 1999)).**

**The sole basis for this statement is the opinion of a paid expert witness.  Even if considered, James Spigelman's declaration does not support this conclusion.  It states that the "probable contributing cause" test is "unknown to Australian law" but acknowledges that the "most probable cause" test "occurs frequently in Australian case law."  Stavers Decl. Ex. 3283 (Spigelman Decl.) at ¶¶ 10-11.  He further acknowledges that "[t]here are many such references" to "most probable cause" "including in the context of negligence."**

Id. at ¶ 11.  The Ecuadorian Judgment does not refer to "probable contributing cause", what Spigelman claims is unknown, but rather refers to the "most probable cause" test, which Spigelman acknowledges is

Chevron should not be permitted to rely on Spigelman's declaration for summary judgment.  Defendants have not been permitted to conduct expert discovery, timely disclose responsive rebuttal experts, or review and analyze all material related to Spigelman's declaration. At the very least, Defendants must be given the opportunity to depose or cross-examine Spigelman.  *See* Fed. R. Civ. P. 56(d).

Moreover, this statement about Australian causation standards in the Ecuadorian Judgment is immaterial.  *See* Resp. to St. 167.

171.    As James Spigelman concluded, it is "so strange as to constitute an inaccuracy" that both the Moodie Memorandum and the judgment describe a well-established common law principle as a feature of Australian law, and cite an opinion he authored, Seltsam v McGuiness (2000) 49 NSWLR 262 at paras 91 and 98, as the source, even though that opinion, like most references to the principle, cites Wigmore on Evidence.

**Response:**

Disputed.  Although Defendants do not dispute that Mr. Spigelman may have concluded that for himself, Defendants dispute his conclusions.  This statement consists of an improper legal conclusion, which the Court should strike or disregard.  *See, e.g.*, *Antunes*, 2011 WL 1990872 at*2 n.9; *Cicchetti*, 2008 WL 619013 at *4 n.2.  It is not a statement "undisputed fact" that belongs in a Rule 56.1 statement.  Moreover, the conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts.  "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record.  They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).

Moreover, the sole basis for this statement is the opinion of a paid expert witness.  Even if considered, James Spigelman's opinion does not support this statement.  Spigelman did not conclude that "the judgment" cites "an opinion he authored, Seltsam v. McGuiness."  The Ecuadorian Judgment does not contain any citation or reference to Seltsam or any of its page numbers.  Rather the Ecuadorian Judgment sets forth a principle that Spigelman acknowledges is "widely accepted."  Stavers Decl. Ex. 3283 (Spigelman Decl.) at 26.

This statement about causation standards is immaterial.  See Resp. to 167.

### H.     Pit Count

172.    The judgment's finding that 880 pits require remediation by Chevron is based on the pit count in the Cabrera Report.

**Response:**

**Disputed.  The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts.  "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record.  They should not contain conclusions . . . .'"** *Goldstick v. The Hartford, Inc.*, **No. 00-Civ-8577 (LAK), 2002 WL 1906029, at \*1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting** *Rodriguez v. Schneider*, **No. 95 Civ. 4083(RPP) 1999 WL 459813, \*1 n.3 (S.D.N.Y. June 29, 1999)).**

**The conclusion in St. 172 is based solely on the opinion of a paid expert witness. Even if considered, Michael Younger's report is based on assumption and speculation about the mental processes of the Ecuadorian trial court.  Stavers Decl. Ex. 3278 (Younger Report) at 24 ("[T]he count of 880 probably was arrived at by simply sorting on the RAP Comment column within the Stratus Compilation.").  There is no evidence from which Younger could divine the judge's thought process or the reasons why he found that 880 pits needed remediation.  The objective bases underlying the count of pits requiring remediation are issues that this Court has precluded, and Chevron has conceded that there can exist "a good-faith dispute among scientists about environmental conditions in the Oriente or TexPet's operations there from the 1960s to the 1990s" (Dkt. 720 at 2).**

**Nor should Chevron be permitted to rely on Younger's report(s).  Defendants have not yet been permitted the opportunity to conduct expert discovery in this case.  Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures. Dkt. 703 at 2.  Defendants have not been afforded sufficient time to review and analyze the material provided in this report.  At the very least, Defendants must be given the opportunity to depose or cross-examine Younger.  *See* Fed. R. Civ. P. 56(d).**

**Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 209) ("The 880 pit count in the Judgment is based on Annex H-1 of the Cabrera Report." Champion Decl., Ex. 2182, Ex. A at 17-18 (Expert Report of Michael L. Younger)).  Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion.**

173.    The claim in the Clarification Order that the 880 pit count is based on the court's analysis of "various aerial photographs that form a part of the record and that were certified by the military Geographic Institute" is false.

**Response:**

**Disputed.** The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).

The conclusion in St. 173 is based solely on the opinion of a paid expert witness who has not been disclosed as an expert in this case. Chevron did not disclose DiPaolo as an expert in its March 1, 2013 expert disclosures. The Court should strike the report and disregard the conclusion in this St. 173 and any other statement that relies on DiPaolo's report. See Fed. R. Civ. P. 37(c)(1).

Even if considered, William D. DiPaolo's expert report is unreliable. DiPaolo provides no support for the assertion that he "reviewed *all* the aerial photographs in the record." Dkt. 400-21 (Ex. 2138), at 1 (emphasis added). He does not state that he reviewed every page of the record. DiPaolo's conclusion that "no aerial photos were found in the record for about 35% of the sites" is therefore unreliable. DiPaolo also does not state that he has any experience in oil remediation or in identifying sites where remediation would be required. The objective bases underlying the count of pits requiring remediation are issues that this Court has precluded, and Chevron has conceded that there can exist "a good-faith dispute among scientists about environmental conditions in the Oriente or TexPet's operations there from the 1960s to the 1990s" (Dkt. 720 at 2).

Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 207) ("It is impossible for the Ecuadorian court to have accurately identified 880 pits requiring remediation in the former concession area using aerial photo interpretation."). Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion.

174.    There are 880 pits identified in Annex H-1 of the Cabrera Report when those identified as "no impact," "Petroecuador," and "Petroproduccion" are excluded from the 916 total pits.

**Response:**

**Disputed.** The cited materials do not support Chevron's statement. The document Chevron calls Annex H-1 of the Cabrera Report does not list "916 total pits." (Dkt. 400-22) (Ex. 2139). The objective bases underlying the count of pits requiring remediation are issues that this Court has precluded, and Chevron has conceded that there can exist "a good-faith dispute among scientists about environmental conditions in the Oriente or TexPet's operations there from the 1960s to the 1990s" (Dkt. 720 at 2).

Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel.

**(Dkt. 398, at St. 208) ("Annex H-1 of the Cabrera Report lists 880 pits, excluding those identified as 'no impact,' 'Petroecuador,' and 'Petroproduccion.'"). Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion.**

175. No record source in the Lago Agrio Litigation except the Cabrera Report identifies more than 632 pits in the former concession area requiring remediation.

    **Response:**

    **Disputed and/or mooted by the Court's rulings. This statement relies on the opinion of an expert witness in the underlying Ecuadorian trial, who opined about the number of pits carved out of the earth by Texaco "from 1964-1990." Over Defendant's objections, the Court has excluded from this litigation the issues of the "environmental conditions existing in the Oriente in the 1960s to the 1990s or the relative, substantive merit of scientists' expert opinions on that subject." Dkt. 720 at 2. Given this ruling, Statement 175 cannot be established as fact. To the extent the Court reconsiders its previous ruling, Defendants reserve the right to supplement this response.**

176. In 2007, Petroecuador determined that there were 370 pits in the former concession area that require remediation.

    **Response:**

    **Disputed. The cited materials do not support Chevron's statement 176. The figure of 370 pits appears nowhere in the PEPDA Report. Chart No. 2 in the PEPDA Report indicates that there were 161 pits "In Process of Elimination" as of December 2007. The Report does not indicate that these were all of the pits "in the former concession area that require remediation." The PEPDA Report only refers to certain oil fields where drilling activity has occurred since 1964, not all fields in the Napo Concession.**

    **This statement is also mooted by the Court's rulings. Over Defendant's objections, the Court has excluded from this litigation the issues of the "environmental conditions existing in the Oriente in the 1960s to the 1990s or the relative, substantive merit of scientists' expert opinions on that subject." Dkt. 720 at 2. Given this ruling, Statement 175 cannot be established as fact. To the extent the Court reconsiders its previous ruling, Defendants reserve the right to supplement this response.**

    **I.    $200 Million Flora and Fauna Award**

177. The Judgment's $200 million award "to recover the native flora, fauna, and the aquatic life of the zone" cites the Barnthouse report, and the Barnthouse report relies solely on the Cabrera Report for the $200 million cost.

    **Response:**

    **Disputed. The Judgment cites the report of Dr. Lawrence W. Barnthouse as giving a damages figure to compensate for the loss of habitat and services of "between 874 and**

1700 million dollars."  (Dkt. 168, at 182).  The Judgment did not cite Dr. Barnthouse's report as giving a damages figure of $200 million.  To conclude the the flora and fauna had been negatively impacted and needed restoration, Dr. Barnthouse relied in part on the Texaco-commissioned audits performed by Fugro McClelland and HBT Agra which found that "surface waters in the immediate vicinity of production stations were . . . contaminated sufficiently to impair natural resource services provided by aquatic biotica."  (Dkt. 400-10; Ex. 2064 at 4).

Moreover, this statement is a cut-and-paste job.  Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel.  (Dkt. 398, at St. 211) ("The Judgment's $200 million award 'to recover the native flora, fauna, and the aquatic life of the zone' cites the Barnthouse report, and the Barnthouse report does no calculation of damages but rather relies entirely on the damages in the Cabrera Report.").  Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion.

**J.      $150 Million Potable Water System Award**

178.    The Judgment's $150 million award for a potable water system cites only the Barros report, but the cited portion of the Barros report is describing and analyzing the Cabrera Report's potable water recommendation, which it finds to be "fraudulent" and "grossly exaggerated," in part because it is based on a cost per person between $1024 and $1916, "as much as 19 times higher than the actual costs of the projects that have recently been completed in the region by UNICEF (average cost of $100 per person, UNICEF, 2009), CEREPS, USAID, and others (average cost of $119 per person, CEREPS, 2009; OIM, 2008) in the last decade."

**Response:**

Disputed in part.  Defendants do not dispute that in the specific portion of the Judgment where the Court decides the amount of damages for construction of a potable water system for the region, the Court cites the report of Gerardo Barros.  Defendants dispute the figures and conclusions presented by Barros.  Because the Court, over Defendant's objections, has excluded from this litigation the issues of the "environmental conditions existing in the Oriente in the 1960s to the 1990s or the relative, substantive merit of scientists' expert opinions on that subject," Dkt. 720 at 2, Defendants are apparently precluded from providing evidence or opinion contradicting Barros.  Given this ruling, Statement 178 cannot be established as fact because it would require litigating the merits of scientists' expert opinions on the subject of potable water systems for communities affected by oil contamination.  To the extent the Court reconsiders its previous ruling, Defendants reserve the right to supplement this response.

This statement is also based on the conclusion of a paid expert witness who has not been disclosed as an expert in this case.  Chevron did not disclose Barros as an expert in its March 1, 2013 expert disclosures.  The Court should strike the report and disregard the

conclusion in this St. 178 and any other statement that relies on Barros's report.  See Fed.
R. Civ. P. 37(c)(1).

Moreover, Chevron previously submitted this same evidence on this topic, which the
Court found insufficient evidence to grant summary judgment on collateral estoppel.  (Dkt.
398, at St. 210) (citing Barros report's criticism of Cabrera Report, "finding that 'the
alleged cost of $430 million potable water figure is enormously exaggerated' and
'fraudulent'.").  Chevron provides no new arguments or evidence and no reason for the
Court to rule any differently on this Renewed Motion.

179.   Barros estimates that the cost of extending potable water to the full population of the
region is $7 million, as opposed to the Cabrera Report's number of $430 million.

**Response:**

Disputed in part.  Defendants do not dispute that Gerardo Barros' report says the
cost of extending potable water to the full population of the region is $7 million.  Chevron
misquotes the Cabrera report, which estimated the cost at $428 million.

Defendants dispute the figures and conclusions presented by Barros, including that
65% of the region's population is connected to public water systems.  Because the Court,
over Defendant's objections, has excluded from this litigation the issues of the "environmental
conditions existing in the Oriente in the 1960s to the 1990s or the relative, substantive merit of
scientists' expert opinions on that subject," Dkt. 720 at 2, Defendants are apparently precluded
from providing evidence or opinion contradicting Barros.  Given this ruling, Statement 179
cannot be established as fact because it would require litigating the merits of scientists' expert
opinions on the subject of potable water systems for communities affected by oil contamination.
To the extent the Court reconsiders its previous ruling, Defendants reserve the right to
supplement this response.

This statement is based in part on the conclusion of a paid expert witness who has not
been disclosed as an expert in this case.  Chevron did not disclose Barros as an expert in its
March 1, 2013 expert disclosures.  The Court should strike the report and disregard the
conclusion in this St. 179 and any other statement that relies on Barros's report.  See Fed.
R. Civ. P. 37(c)(1).

The Judgment provides some support for believing that more than 35% of area
residents lack connection to public water systems.  The Judgment states that "the Province
of Sucumbios has the lowest number of potable water connections in homes of all the
Amazonian provinces, as well as access to public taps.  This does not mean that the
population in these areas does not consume water, but rather necessarily implies that the
inhabitants of these provinces have a greater dependency on natural water sources." Dkt.
168, at 127.

Moreover, Chevron previously submitted this same evidence on this topic, which the
Court found insufficient evidence to grant summary judgment on collateral estoppel.  (Dkt.
398, at St. 210) (citing Barros report's criticism of Cabrera Report, "finding that 'the

**alleged cost of $430 million potable water figure is enormously exaggerated' and 'fraudulent'."). Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion.**

180.   The judgment derives its $150 million potable water figure by multiplying $428 million by 35%, reflecting its determination that 35% of the population is not served by an existing public water system.

   **Response:**

   **Disputed in part.   Defendants incorporate by reference as if fully set forth herein their Response to Statement 179.**

## IV.   The LAP Team Wrote the Judgment and Bribed the Court $500,000 to Issue It[6]

181.   Defendants' internal correspondence reveals plans and an intent to draft the judgment.

   **Response:**

**Disputed.   Defendants incorporate Donziger Defendants' response to this purported fact.**

182.   From 2008 to 2012, Judge Zambrano paid Alberto Guerra Bastidas ("Guerra") $1,000 per month to ghostwrite orders and judgments in Zambrano's civil cases.

   **Response:**

**Disputed.   Defendants incorporate Donziger Defendants' response to this purported fact.**

183.   On occasion, litigants would secretly provide Zambrano and Guerra with draft judgments, at both the trial and appellate levels, which Guerra would revise and Zambrano would issue as his own.

   **Response:**

**Disputed.   Defendants incorporate Donziger Defendants' response to this purported fact.**

184.   In 2009, at Zambrano's instruction, Guerra, on multiple occasions, contacted an Ecuadorian lawyer representing Chevron in the Lago Agrio Litigation to offer to issue a judgment in Chevron's favor in exchange for a bribe, but Chevron's lawyer refused to discuss the matter with Guerra and asked Guerra to stop contacting him.

   **Response:**

**Disputed.   Defendants incorporate Donziger Defendants' response to this purported fact.**

---

[6] For the reasons set forth in Defendants' Responses to Chevron's 56.1 Statements under Heading IV, Defendants also dispute the assertions, argument, and conclusions set forth in Chevron's Heading IV.

185.   Chevron's Ecuadorian counsel made two contemporaneous declarations regarding Guerra's failed bribery solicitations.

**Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

186.   After Chevron's refusal, and at Zambrano's instruction, Guerra met with Fajardo to discuss the case and the two agreed that Guerra would "make the case move quickly" in the LAPs favor, and specifically that he would deny Chevron's critical essential error motions —in exchange for $1,000 a month from the LAPs.

**Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

187.   At a meeting with Guerra in 2009, Donziger thanked Guerra for his "work as a ghostwriter . . .  and for helping steer the case in favor of [the LAPs]."

**Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

188.   In 2010, Guerra, again acting at Zambrano's direction, attempted to contact an Ecuadorian lawyer representing Chevron in the Lago Agrio Litigation, this time to offer that Zambrano would issue a judgment written by Chevron in exchange for a bribe.

**Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

189.   Guerra attempted this contact through an intermediary, but Chevron's counsel did not respond to his overture.

**Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

190.   In 2010, Guerra met personally with Donziger, Fajardo and Yanza at the Honey & Honey Restaurant in Quito, Ecuador and proposed that the LAP team pay at least $500,000 to Zambrano and Guerra in exchange for a verdict in their favor in the Lago Agrio Litigation.  Donziger told Guerra that the LAP team did not at that moment have that sum of money to pay Zambrano and Guerra.

**Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

191.   The LAP team subsequently promised Judge Zambrano $500,000, payable upon collection of the judgment, in exchange for issuing the judgment written by the LAP team.

   **Response:**

   **Disputed. Defendants incorporate Donziger Defendants' response to this purported fact.**

192.   Approximately two weeks before February 14, 2011, the LAP team provided Zambrano with a draft judgment, which Zambrano in turn asked Guerra to revise, which he did, in consultation with Fajardo, and then Zambrano issued that judgment as his own.

   **Response:**

   **Disputed. Defendants incorporate Donziger Defendants' response to this purported fact.**

193.   On February 14, 2011, the judgment Zambrano issued in the Lago Agrio Litigation was a judgment written predominately by the LAP team.

   **Response:**

   **Disputed. Defendants incorporate Donziger Defendants' response to this purported fact.**

194.   When Guerra reviewed the judgment as issued by Zambrano, he saw that "the final judgment's structure, wording and content largely mirror the draft judgment as I revised it approximately two weeks before the final judgment was issued."

   **Response:**

   **Disputed. Defendants incorporate Donziger Defendants' response to this purported fact.**

195.   Guerra admits that he knew at the time that "the agreement in which [he] participated and by which the Plaintiffs' representatives drafted the judgment in the Chevron case which Judge Zambrano issued, with [his] help, was a violation of Ecuadoran laws."

   **Response:**

   **Disputed. Defendants incorporate Donziger Defendants' response to this purported fact.**

196.   Defendants have engaged in both foreign travel and email to facilitate the payments of bribes to Guerra and Zambrano.

   **Response:**

   **Disputed. Defendants incorporate Donziger Defendants' response to this purported fact.**

197.   As Michael Younger has concluded, Guerra's hard drive contained drafts of nine of the 12 court orders Zambrano issued during his first tenure on the Chevron case (from

October 2009 through March 2010), and drafts of two appellate judgments issued by Zambrano in other cases.

**Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

198.　As Michael Younger concluded, Guerra's hard drive contained a draft of Zambrano's November 23, 2009 order denying Chevron the right to appeal from certain earlier rulings, which draft was last saved on November, 18, 2009.

**Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

199.　Guerra sometimes provided ghostwritten orders to Zambrano by shipping them to him at the Lago Agrio Court via freight packages on TAME airlines, and TAME shipping records show shipments from Guerra to the Lago Agrio Court in 2009 and 2010, some within several days of orders issued by Zambrano in the Lago Agrio Litigation.

**Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

200.　Guerra's daily planner entry for February 24, 2012 includes a notation, "Nicolas transfers me 2,000.00 account balance 3,747.92."

**Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

201.　Guerra's phone records show calls with Zambrano.

**Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

202.　Guerra's cell phone contact list includes at least two numbers associated with Fajardo.

**Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

203.　Guerra contacted Donziger regarding personal legal matters, and the contacts on Guerra's computer included the email address sdonziger@gmail.com which is an email address used by Donziger.

**Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

204.    Internally, the LAPs team referred to Zambrano and Guerra as the puppeteer and the puppet.

**Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

205.    On October 27, 2009 and November 27, 2009, the LAPs team discussed payments to the "puppet" and "puppeteer" within days of $1,000 deposits appearing in Guerra's bank account.

**Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

206.    On December 23, 2009 and February 5, 2010, two deposits of $1,000 each were made into Guerra's bank account by Selva Viva employee Ximena Centeno.

**Response:**

**Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.**

**V.    The Ecuadorian Judiciary Suffers From Endemic Corruption[7]**

207.    The Ecuadorian judiciary has problems with corruption and lack of due process and is susceptible to the ghostwriting of judgments by lawyers in exchange for bribes.

**Response:**

**Disputed.  The characteristics and functions of an entire nation's judicial system are not "facts" that can be established by mere citation to purported "evidence."  Instead, this is an argumentative conclusion or opinion, improper for a Rule 56.1 Statement.  *See Rodriguez v. Schneider,* No. 95 Civ. 4083(RPP,) 1999 WL 459813, *1 n. 3 (S.D.N.Y. June 29, 1999) ("*Rule 56.1 statements are not argument.* They should contain factual assertions, with citation to the record.  They should not contain conclusions . . . .").  Chevron recognizes this by its numerous "expert" opinion reports on the subject of the Ecuadorian judicial system.**

**Defendants object to Chevron's "evidence" for paragraph 206.  Chevron gives the false impression that the quoted statement about "the susceptibility of the judiciary to bribes . . ." was written by the U.S. Dept. of State by deleting the beginning of the sentence which says "The media reported . . .", indicating this was a summary of media reports.  Media reports are inadmissible hearsay and cannot support summary judgment.  This statement No. 207 is also immaterial, as Camacho and Piaguaje have stipulated that they**

---

[7] For the reasons set forth in Defendants' Responses to Chevron's 56.1 Statements under Heading V, Defendants also dispute the assertions, argument, and conclusions set forth in Chevron's Heading V.

will not seek to enforce the Ecuadorian Judgment or have it recognized in New York, making Ecuador's judiciary irrelevant.

Defendants dispute that "the Ecuadorian judiciary has problems with corruption and lack of due process and is susceptible to the ghostwriting of judgments by lawyers in exchange for bribes." As Professor Joseph Staats has concluded, "Ecuador provides impartial tribunals and procedures compatible with the requirements of due process of law." Smyser Decl., Ex. 38 (Expert Report of Joseph L. Staats, Ph.D) at 1; *see also id.*, Ex. 42 (Expert Report of Dr. Hector Alberto Cabrera Súarez) at 60-61 ("[T]he procedural guaranties, the guaranties of appeal, and the guaranties of due process which endorse Judiciary Independence and the certainty of the rulings of Ecuadorian judges are evidence that is reflected in the standards and regulations that I have quoted and whose full texts I have attached to this document, which shows, in a conclusive manner, that the affirmations formulated by Chevron within the scope of the lawsuit brought in the Southern District of New York are absolutely removed from the legislative and jurisdictional truth of Ecuador, or at least demonstrate an absolute ignorance of this reality, despite the fact that the company itself is constantly using all rights of appeals that are granted to it by the Ecuadorian legislation."); id., Ex. 43 (Expert Report of José Julio Benítez Astudillo) at 55 (declaring his "full conviction that the Rule of Law is a reality lived in Ecuador").

This statement No. 207 is also immaterial, as Camacho and Piaguaje have stipulated that they will not seek to enforce the Ecuadorian Judgment or have it recognized in New York, making the Ecuadorian judiciary irrelevant in this lawsuit.

208.    Ecuadorian President Correa has supported the LAPs, including through personal meetings with the presiding judge in the Lago Agrio Litigation, and the submission of an amicus brief signed by a member of Correa's staff.

**Response:**

Disputed. Defendants object to Chevron's "supporting evidence" for this Statement No. 208. The document cited as Dkt. 356-9 (Ex. F) is a media article and constitutes inadmissible hearsay. *See Faulkner v. Arista Records LLC*, 797 F. Supp. 2d 299, 305 (S.D.N.Y. 2011) ("Each statement of material fact must be followed by a "citation to evidence which would be admissible, set forth as required by the Federal Rule of Civil Procedure 56(e).' It is therefore the rule that "only admissible evidence" need be considered on summary judgment. 'The principles governing admissibility of evidence do not change on a motion for summary judgment.'") (citations omitted); *Metzner v. D.H. Blair & Co.*, 689 F.Supp. 262, 266 n. 6 (S.D.N.Y.1988) ("Newspaper articles are inadmissible hearsay."). Moreover, it does not support the statement because it does not mention the Lago Agrio Plaintiffs or their lawsuit against Chevron.

The document cited as Dkt. 356-9 (Ex. G.) is a media article and constitutes inadmissible hearsay. *See Faulkner*, 797 F. Supp. 2d at 305. Moreover, to the extent the Court even considers it, the article quotes President Correa stating his opinion about Texaco's improper practices and the contamination. ("Correa, who took office in 2007 and has frequently tangled with oil companies, has said that Texaco's 'savage exploitation' of

oil 'killed and poisoned people.' He has also called Texaco's cleanup a charade, in which the company simply covered polluted sites with dirt, and labeled Chevron's Ecuadoran attorneys 'sellouts.').  This quote shows President Correa's support for obtaining justice for the people of the Oriente region of Ecuador.  It does not demonstrate "support for the LAPs" in the improper sense that Chevron insinuates, executive interference in the judiciary.

The document cited as Dt. 30-22 (Ex. 111) does not support the statement.  It is an email chain that contains the musings of a lawyer about actions that the President of Ecuador might take in response to the judicial sting operation conducted by Chevron through its operatives Diego Borja (who now lives a comfortable life in the United States thanks to Chevron) and Wayne Hansen (a convicted felon last known to be living like a king in Peru on Chevron's dime).  There is no evidence that the President of Ecuador received any communication from the Lago Agrio Plaintiffs' legal team about this incident or that the President of Ecuador took any action in response.

This statement No. 208 is also immaterial, as Camacho and Piaguaje have stipulated that they will not seek to enforce the Ecuadorian Judgment or have it recognized in New York, making the actions of Ecuador's President irrelevant in this lawsuit.

209.   As this Court has already found, the LAPs team "resorted to pressure tactics directed at the Ecuadorian courts as well as political influence to achieve their objectives . . . . Donziger, Fajardo, Yanza and the ADF have orchestrated a campaign to intimidate the Ecuadorian judiciary."

**Response:**

Disputed.  The cited documents do not support Chevron's statement.  First, Dkt. 181 is the Court's ruling on Chevron's motion for a preliminary injunction that was subsequently vacated in its entirety by the Second Circuit.  In vacating the preliminary injunction order and reversing the Court's judgment, the Second Circuit stripped the Court's preliminary injunction order, including the findings of fact contained therein, of any continuing effect and "cast[] a shadow on past actions taken under the [order's] imprimatur." *Benjamin v. Jacobson*, 172 F.3d 144, 159 (2d Cir. 1999) (discussing vacated consent decree).  "The point of vacatur is to prevent" the vacated decision "from spawning any legal consequences, so that no party is harmed by what we have called a 'preliminary' adjudication."  *Camreta v. Greene*, 131 S.Ct. 2020, 2035 (2011) (internal quotation omitted).  Consequently, "[i]t is well-settled in this circuit that a vacated order has no collateral estoppel effect."  *Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 970 F.2d 1138, 1146 (2d Cir. 1992); *see also Benjamin*, 172 F.3d at 159 ("'vacate' means 'to annul' or 'to render ... void' " (internal quotation omitted; ellipses in original)); *Falcon v. General Tel. Co.*, 815 F.2d 317, 320 (5th Cir. 1987) ("In essence, when a judgment is vacated 'all is effectually extinguished.'"), cited with approval in *Andrulonis v. United States*, 26 F.3d 1224, 1232 (2d Cir. 1994); *Marino v. N.Y. Tel. Co.*, No. 88 Civ. 5817 (PKL) 1992 WL 212184, at *14 n.8 (S.D.N.Y. Aug. 24, 1992) ("Since the entire judgment was vacated, the findings of fact are of no force and effect to the extent that they are in dispute.").  The Court's findings in Dkt. 181 are a nullity and thus provide no support for Chevron's statement.

**Second, the email from Donziger to Alejandro Ponce Villacís, Dkt. 30-7 (Ex. 96), does not reflect any "pressure tactics" or a "campaign to intimidate the Ecuadorian judiciary." It describes attempting to influence the judge with a "legal plan" using "legal institutional channels."**

**Third, Chevron's argument that the Lago Agrio Plaintiffs were connected to the charges of Judge Yánez trading jobs for sex in the court is false, based on misleading quotations, and does not demonstrate any "pressure tactics." The papers to which Chevron cites establish that the complaint that the Lago Agrio Plaintiffs prepared concerned the judge's failure to act on the Lago Agrio Plaintiffs' motion regarding judicial inspections, not the *prior* sex scandal in which the judge was involved. Dkt. 28-9 (DONZ00027256) at 56 (2006.07.25 journal entry quoted by Chevron, which also states: "He [Pablo] also said there is the feeling in the court that we are behind the complaints against Yanez and Novillo, which we are not, even though we have much to complain about, which is sort of ironic."). See also Dkt. 32-4 (DONZ00023182) at 1 ("Pablo met with the judge today. The judge, who is on his heels from the charges of trading jobs for sex in the court, said he is going to accept our request to withdraw the rest of the inspections save the four we still want to do. This follows our press conference Monday that was attended by 32 journalists and several prominent supporters, and the filing of a very well-written amicus signed by 11 Ecuadorian lawyers supporting the withdrawal of the inspections. The judge also I believe wants to forestall the filing of a complaint against him by us, which we have prepared but not yet filed. The judge told Pablo that the Texaco lawyers came by the other day to urge him to make us do all the inspections. The judge told Pablo they were nervous about the peritaje global.").**

210.    Donziger has admitted that he has no evidence that Chevron ever paid money to a judge in the Lago Agrio Litigation.

**Response:**

> **Disputed. Defendants do not dispute that Donziger's deposition testimony is accurately cited, but that testimony was provided several years ago in 2010. Defendants now have evidence that Chevron has paid or promised to pay hundreds of thousands of dollars to Alberto Guerra Bastidas, a judge in the Lago Agrio Litigation. (Dkt. 755, Ex. 3268). Discovery is not yet complete.**

211.    Judge Nuñez recused himself from the Lago Agrio Litigation after video tapes emerged showing him participating in a series of meetings discussing the outcome of the case and possible bribes.

**Response:**

> **Disputed. Judge Nuñez recused himself from the case after Chevron filed a motion to recuse. The video tapes did not reveal the acceptance of a bribe, i.e., those who have examined the videos noted the absence of any judicial impropriety. *See, e.g.*, Dkt. 366, Ex. O (LA Times: "On the tapes, the men – a former Chevron contractor and an American businessman – press Nunez to say how he will rule, without success. Then, as Nunez**

prepares to leave, one of the men again maintains that Chevron is guilty, and Nunez replies, 'Yes, sir.' To Chevron, that cinches the argument. But on the video, it's unclear to whom the judge is speaking and whether he is responding to the question or just trying to end the meeting."); Dkt. 366, Ex. P (Financial Times: "The judge refuses several times on the tape to reveal the verdict, before saying, 'Yes, sir,' when asked if he will find Chevron guilty. However, the video raises the question as to whether Judge Nunez understood what he was being asked."); Dkt. 366 Ex. Q (New York Time: "The recordings, made by a former Ecuadorean contractor for Chevron by using hidden recording devices, do not make clear whether Judge Núñez was involved in a bribery scheme — or even whether he was aware of an attempt to bribe him."); Dkt. 366, Ex. R, at 11 (Borja admitting "Because really, there was no bribe. I mean, there's was never . . . there was never a bribe.").

**Moreover, this statement is immaterial and irrelevant to Chevron's fraud allegations.**

212.   Judge Zambrano was the subject of numerous corruption complaints as both a prosecutor and as a judge, and was alleged to "fix" cases in exchange for bribes.

**Response:**

**Disputed. This evidence is inadmissible and cannot support summary judgment. Complaints filed against Nicolas Zambrano over 15 years ago that never resulted in any disciplinary action or charges are not admissible to prove conduct in conformity therewith. Fed. R. Civ. P. 404(b). Three of the complaints cited, Ex. 3131, 3132, and 3171, are from 1996 and 1997. And they are just that—complaints. No charges were filed, and no action was ever taken against Nicolas Zambrano based on these allegations. Allegations are not facts. Even if they were criminal convictions (which they are not), these "complaints" would not be admissible as they are all well over ten years old. Fed. R. Evid. 609. The fourth complaint Chevron cites is based on a press release from 2006. This press release is inadmissible hearsay. Moreover, it does not support Chevron's statements that there were any "irregularities" in Nicolas Zambrano's dismissal of a case while serving as acting prosecutor. It simply states that the Superior Prosecutor should revoke Zambrano's dismissal and reinstate the case.**

**Chevron's statement that there were "numerous corruption complaints" filed against Nicolas Zambrano while he was serving as a judge is not supported by the evidence cited. None of the "complaints" were presented during Zambrano's tenure as a judge from 2008 to 2012. Chevron's statement is false.**

**Moreover, the statement is immaterial. Attacks on Zambrano's character through the use of specific instances of alleged misconduct is improper. *See* Fed. R. Evid. 608 ("Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness.").**

85

213.    Zambrano was ultimately dismissed from the court when, without explanation, he released a drug trafficker who had been arrested in connection with the seizure of 8.3 tons of cocaine.

**Response:**

**Disputed.  The cited order does not support Chevron's statement that Judge Zambrano released the defendant "without explanation."  The order states that "based on the record" Judge Zambrano "decided to order the alternative measure" of "an order prohibiting him from leaving the country and requiring him to appear before the First Criminal Trial Court of Sucumbíos each Wednesday" Dkt. 431-5 (Ex. 1282), at 4, 6.  Judge Zambrano did not dismiss the charges against the defendant.  Judge Zambrano argued that he "violated no law but applied the Constitution of the Republic."  Id., at 5.  The decision to decline pretrial detention and enter an alternative measure of securing the defendant's appearance at trial was joined by another judge, Leonardo Ordonez, and stated that it was based on "documents exhibit during the hearing" showing that the defendant "Cristián Suquisupa is a well-known honorable person with a good reputation and with no criminal record; he has a stable job in which he works as a caretaker and security guard." Dkt. 755-28 (Ex. 3285) (Oct. 14, 2009 Order).  As mentioned in the order, under Ecuador's Constitution, "The judge may always order precautionary measures other than pre-trial detention."  Id.  Judge Zambrano and Judge Ordonez made a discretionary decision to release the defendant pending trial and require him to report to the Court on a weekly basis.  The Judicial Council's decision to dismiss Zambrano and Ordonez as judges for "negligence" because the defendant subsequent did not appear for trial does not mean that they violated the law or that their actions warranted dismissal.  If so, that would mean any judge in the United States would be dismissed when a defendant escapes while out on bail pending trial.  Moreover, the cited dismissal order also does not support Chevron's statement that the individual was arrested in possession of 8.3 tons of cocaine.  The order says 557 kilograms, Dkt. 431-5 (Ex. 1282) at 4, which equals about half a ton (1227.97 pounds).  Apparently, Chevron's lawyers struggle with the metric system.**

**Moreover, the statement is immaterial.  Judge Zambrano is not a witness and this attack on his character through the use of specific instances of alleged misconduct is improper.  *See* Fed. R. Evid. 608 ("Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness.").**

214.    As Dr. McMenamin has concluded, "It is highly probable that the Order of October 15, 2012 has multiple authors, including one or more writers other than Judge Erazo."

**Response:**

**Disputed.  Although Defendants do not dispute that Dr. McMenamin may have written that statement, Defendants dispute his conclusions.  The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts.  "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record.  They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-**

Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).  Chevron does not even attempt to disguise this "conclusion" as a "fact" because it expressly uses the phrase "As Dr. McMenamin has concluded . . . ."

Dr. McMenamin's report is not admissible because it does not meet the requirements of Rule 702 and Daubert.  See *id.* at 353; *Cacciola v. Selco Balers, Inc.*, 127 F. Supp. 2d 175, 180 (E.D.N.Y. 2001) ("Evidence contained in an expert's report therefore must be evaluated under Fed.R.Evid. 702 before it is considered in a ruling on the merits of a summary judgment motion.").  Dr. McMenamin's report has numerous deficiencies, three of which will be mentioned here.

The reliability of Dr. McMenamin's method of "forensic stylistic analysis" is, at the very least, subject to debate.  Other courts have excluded proffered expert testimony as to the identity of questioned writings that was based on the same forensic stylistic analysis as Dr. McMenamin's opinions. *See United States v. Van Wyk*, 83 F. Supp. 2d 515, 522-23 (D.N.J. 2000). In fact, in *Van Wyk* the government offered an article written by Dr. McMenamin in support of its proffered expert testimony. *See id.* at  521-22.  The court did not admit the proffered testimony.  *Id.* ("The reliability of text analysis, much like handwriting analysis, is questionable because, as discussed *supra*, there is no known rate of error, no recognized standard, no meaningful peer review, and no system of accrediting an individual as an expert in the field. Consequently, the existing data for forensic stylistics cannot definitively establish, as can DNA data, that a particular person is 'the' author of a particular writing."); *see also* Smyser Decl., Ex. 40 (Expert Report of Dr. Ronald R. Butters, at ¶ 20 (noting that Dr. McMenamin's "methodologies are the subject of ongoing controversy among linguistic scholars and have been criticized within the forensic linguistic community as fundamentally unscientific, untested, deeply flawed, and often likely to generate false conclusions"); *see also id.* at ¶¶ 4(d)-(e), 21, 26-27.

Nor should Chevron be permitted to rely on the Dr. McMenamin's report. Defendants have not yet been permitted the opportunity to conduct expert discovery in this case.  Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures. Dkt. 703 at 2.  Defendants have not been afforded sufficient time to review and analyze the voluminous material provided in this report.  At the very least, Defendants must be given the opportunity to depose or cross-examine Dr. McMenamin. *See* Fed. R. Civ. P. 56(d).

215.   The 8-page embargo order was issued on the first business day following Judge Legna's replacement by Judge Erazo, but expressly states that it is based on a review of the record.

**Response:**

Disputed in part.  Defendants do not dispute that Judge Legna recused himself on October 11, 2012 or that the embargo order was issued by Judge Erazo on October 15, 2012.  Defendants dispute this statement to the extent Chevron attempts to insinuate,

without evidence, that there was something improper either about Judge Legna's self-recusal or Judge Erazo's issuance of the embargo order four days later.

The October 11, 2012 recusal order states that Judge Legna recused himself based on Article 856 (6) of the Code of Civil Procedure, which states that a judge should separate himself from the case if he has previously ruled on the same issue or a related issue in a previous phase of the same case. The order cited does not demonstrate anything improper about this recusal.

Chevron's statement that Judge Erazo's opinion "expressly states that it is based on a review of the record" is not supported by the "evidence" cited and is based on an incorrect and improper translation from Spanish to English. Chevron takes a procedural formality and converts into a statement that carries much more meaning that the term actually does. The term "VISTOS" as seen in the first paragraph of the original Spanish order, is "a legal formula preceding statement of facts of case" that means "whereas." Smyser Decl. Ex. 44, at 1571 [Simon & Shuster's International Spanish Dictionary (2nd ed. 1997)]; *see also* Smyser Decl., Ex. 45, at 123 [Diccionario de Terminos Legales, Louis A. Robb (1979)] (defining "visto" as "whereas"). Obviously, "whereas" does not mean "HAVING REVIEWED THE RECORD", as Chevron erroneously and improperly asserts. There is no evidence submitted with the summary judgment motion to establish that Judge Erazo did not review the record pertinent to the question at hand, that is the specific filings relating to the embargo order he issued, which states that "at this stage of the proceeding, it is not proper to question what has already been decided, but rather to enforce the ruling of the judgment being enforced." Dkt. 755-14 (Ex. 3270) at 1. If Judge Erazo was not going to review the underlying judgment, there was no reason for him to review the prior trial court proceedings. According to the order, each filing pertinent to the enforcement and requested embargo is addressed in the order. *Id.* Chevron's speculation and conspiracy theories about the embargo order are not evidence, and certainly not the basis for summary judgment.

## VI.    The LAP Team Has Engaged In At Least 129 Specific Instances of Wire Fraud and Money Laundering.[8]

215.(through 344)    Defendants have made extensive use of email, Internet websites, and wire transfers, including the 129 specific instances identified in the following statements, in furtherance of their ghostwriting of the Cabrera Report, their concealment of that ghostwriting, their illicit payments to Cabrera, Guerra, and Zambrano, their promotion of the Cabrera Report and the Lago Agrio judgment, and their solicitation of funds to support these activities. Each of these constitutes wire fraud in violation of 18 U.S.C. § 1343 by the identified Defendant.

---

[8] For the reasons set forth in Defendants' Responses to Chevron's 56.1 Statements under Heading VI, Defendants also dispute the assertions, argument, and conclusions set forth in Chevron's Heading VI. Additionally, Defendants dispute Chevron's use of the vague and conclusory term "LAP Team", especially where it purports to extend any RICO liability beyond the parties against whom Chevron asserts RICO liability. Given the allegations in Chevron's Amended Complaint, Chevron makes no RICO allegations against Defendants Camacho and Piaguaje.

**Response:**

**Defendants Camacho and Piaguaje are not RICO Defendants, and as Chevron has not alleged any violation of 18 U.S.C. § 1343 against either Camacho or Piaguaje, none of the allegations are material to Chevron's case against Camacho and Piaguaje.  None of the allegations set forth in Statement Nos. 216–344 identify Camacho or Piaguaje as an applicable "Defendant".  To the extent any response is necessary, Defendants Camacho and Piaguaje incorporate Donziger Defendants' response to each and every purported fact in Statement Nos. 215–344.**

---

**STATEMENT OF ADDITIONAL MATERIAL FACTS AS TO  WHICH THERE IS A GENUINE ISSUE TO BE TRIED OR AS TO WHICH THERE IS NO DISPUTE**

---

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1(b), Defendants submit the following list of additional material facts:

**I.      The Lago Agrio Litigation**

**A.      Contacts with Experts and Judges**

345.    At all times relevant to Chevron's motion, there was no law or regulation in Ecuador prohibiting *ex parte* communications with judges. Dkt. 154-6 (Ex. 60) at 6 (Affidavit of Dr. Farith Ricardo Simon noting that Ecuadorian law prohibiting judges from "accepting the visit of or meeting with one of the parties or his counsel without first notifying the other" did not come into existence until March 9, 2009—roughly three years after the Ecuadorian Plaintiffs are alleged to have met with Judge Yánez concerning the waiver of judicial inspections and the commencement of the peritaje global.); Smyser Decl., Ex. 17 (Alban Aff.), ¶¶ 30-32 (Ecuadorian "legislation prior to the month of March, 2009 did not prohibit contact by the parties with the judicial authorities responsible for the legal action without the presence of the opposing party.").

346.    *Ex parte* communication with the judges presiding over the Lago Agrio litigation was the ordinary manner of proceeding throughout the majority of that case.  Chevron, in fact, had *ex parte* meetings of its own with Ecuadorian judges presiding over the Lago Agrio litigation— including meetings regarding the peritaje global.  Eyewitness Donald Rafael Moncayo Jimenez has recounted in a sworn affidavit:  "On multiple occasions, I personally saw the lawyers who represent Chevron Corporation in the Lago Agrio case meeting alone with the judges who heard the case without the presence of the plaintiffs' lawyers" Dkt. 613-6 (Ex. F) at ¶ 3.  Moncayo has

testified that on one occasion, he "saw attorneys Adolfo Callejas Ribadeneira and Ivan Alberto Racines [Chevron's lawyers], and Dr. Efraín Novillo [one of the presiding judges] in the offices of Judge Novillo. They were talking about the expert designated by the Judge, Mr. Richard Cabrera." *Id.* at ¶ 4. When Mr. Moncayo "approached the offices, the private security guards of Chevron and a Chevron technician tried to chase [him] away." *Id.* Moncayo also describes another incident where Judge Juan Núñez, then-President of the Lago Agrio Court, "was talking to Dr. Diego Larrea and Alberto Racines [Chevron's lawyers] about the inspection of the Auca wells and other stations, where there were oil wells, topic of the Lago Agrio case." *Id.* at ¶ 5. Additionally, during his deposition on September 13, 2011, Moncayo testified under oath to witnessing one of Chevron's lawyers, Dr. Enrique Caravajal, have an *ex parte* meeting with the then-presiding Judge Rafael Ordoñez after business hours on July 30, 2010. Dkt. 613-7 (Ex. G) at 31:12-32:19, 34:2-36:21. The *ex parte* meeting lasted roughly 20 minutes, and is captured in photographs that Moncayo took with his mobile phone. (*Id.*, at 37; *see also* Dkt. 613-14 (Ex. N) (Salazar Decl., recounting additional Chevron *ex parte* meetings with the Lago Agrio Court).

347.   Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts prior to the issuance of the expert's report, including prior to the expert's formal appointment by the court. *See* Dkt. 154-5 (Ex. 59) (Alban Aff.), ¶¶ 9-12, 19; Dkt.154-6 (Ex. 60) (Simon Aff.), ¶¶ 4-5, 7-8.

348.   It was common practice for litigants to make contact with experts and advocate their positions. Under Ecuadorian law, an expert is permitted to interact and coordinate with a party to the litigation, and that doing so "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60) at ¶ 8; *see also id.* at ¶ 9; Dkt. 154-5 (Ex.

59) at ¶¶ 17-18.  The fact that an expert ultimately adopts one party's views to the exclusion of the other's also does not mean that the expert was not independent or neutral.  *See id.* at ¶ 27.

349.   It is understood in Ecuador that court-appointed scientific experts in highly complex cases simply could not be expected to perform their functions without party assistance.  As such, an "independent" expert in Ecuador does not cease to be independent by virtue of reliance on party-resources to carry out his function.   Dkt. 154-5 (Ex. 59), ¶ 12 ("Meeting with the experts without the other party being present. . . effectively aids the adequate fulfillment of the expert's or experts' functions in situations of a high scientific complexity, given the limited technological resources which our country [Ecuador] has to provide technical information for the efficient administration of justice."); Dkt. 154-6 (Ex. 60), ¶ 9 ("'[t]here is an actual procedural burden for the parties, to make it easier for the experts to conduct their studies. . . .'").

350.   The Ecuadorian Plaintiffs' meetings with Richard Cabrera in the time leading up to his appointment were not particularly secretive because there was no reason for them to be.  For example, on one occasion on February 27, 2007, Donziger and others met with Cabrera at a "Mister Bagel," notwithstanding their belief that Chevron's operatives were frequently spying on them.  Dkt. 28-7 (Ex. 76) at 15.

351.   Chevron also engaged in *ex parte* communications with, and provided undisclosed *ex parte* assistance to, court-appointed experts, including before experts were formally appointed.  *See* Dkt. 154-7 (Ex. 61) at p. 2; Dkt. 152 (Saenz Decl) at ¶ 58 (Dr. Marcel Muñoz Herreria letter to Lago Agrio court describing a March 9, 2010 meeting with Chevron representative Alfredo Guerrero at a hotel for a "technical planning meeting"); Dkt. 154-7 (Ex. 61) at p. 3 ("Scope Plan requested and approved by Engineer Guerrero" attached to Muñoz's letter); Dkt. 152 ¶ 57 ("In

March of 2009, upon Chevron's request for the appointment of an expert to inspect and prepare reports related to a predetermined group of former Texaco sites, the Court appointed Dr. Marcel Muñoz Herreria as Judicial Inspection Expert.").

352.    Marcelo Munoz, a court-appointed expert in the Lago Agrio litigation, participated in a private meeting with Chevron's technical consultant Alfredo Guerrero, for a "technical [p]lanning meeting" at which the engineer "approved" a work plan. *See* Dkt. 154-7 (Ex. 61).

353.    Consistent with Ecuadorian law and customary practice, the Lago Agrio Court issued orders affirmatively authorizing the parties to communicate with Cabrera and to provide him with information.  Dkt. 613-13 (Ex. M) (April 14, 2008 Lago Agrio Court Order) at 9; Dkt. 557-5 (Suppl. Young Decl. Ex. 29); Dkt. 154-5 (Ex. 59) at ¶ 17; Dkt. 32-6 (132,846 at 2 and 132,849 at 7).

354.    Cabrera and the Lago Agrio Court repeatedly requested that the parties provide Cabrera with relevant and useful information.  *See, e.g.,* Dkt. 557-5 (Suppl. Young Decl. Exs. 27-29); Dkt. 613-13 (Ex. M) at 9; Dkt. 154-5 (Ex. 59) at ¶ 17; Dkt. 557-5 (Ex. 28) at p. 133,987 (Cabrera Petition dated Jan. 7, 2008 stating, "I request that [the Court] order the parties to provide me with any information that … each party considers necessary in order to incorporate it in this expert report"); Dkt 557-5 (Ex. 29) at p. 134,157 (Court order dated Jan. 30, 2008, responding to Cabrera Petition dated Jan. 7, 2008, ordering the parties to "provide the required information to the expert as soon as possible") Dkt. 154-5 (Ex. 59) at ¶ 17; Dkt. 32-6 (132,846 at 2 and 132,849 at 7); Dkt. 613-13 at 10 ("[T]he parties may submit to the expert whatever documentation they believe may be useful in preparing his report."). The Lago Agrio Court ordered that materials submitted by Chevron "be delivered directly to the expert, its addressee." *Id.*

355. Chevron had the opportunity to provide materials to Cabrera.  *See* St. 354; *see also* Dkt. 47-62 (Ex. 300) at 36:18-19 (Chevron's counsel's statement in the Stratus § 1782 that "both sides were allowed to submit data to Cabrera.").

### B.    Sampling, Inspections, and Reports

356. Chevron had instructed its own experts to avoid finding contamination.  Chevron's judicial inspection "Playbook" reveals that Chevron directed its experts to visit sites prior to the official judicial inspections—what Chevron referred to as "Pre-Inspections"—so that they could take multiple samples with the goal of locating a few clean "delineation points" that the experts could, with the appearance of randomness, revisit during the official inspections. Dkt. 366-5 (Ex. E-Judicial Inspection Playbook), at 12. One particular component of the Playbook entitled "Summary of Sampling and Testing Program for Judicial Inspection Sites," instructed Chevron's experts as follows: "Locations for perimeter sampling should be chosen to emphasize clean points around pits when possible." Dkt. 366-6 (Ex. F) at p. 3.  Chevron's experts were further directed to "collect soil samples at 4 or more locations surrounding the site, using locations that the PI [Pre-Inspection] team has shown to be clean."  *Id.*

357. Both sides accused the other of submitting manipulated sampling results to the Lago Agrio Court.  Indeed, the court noted that, if it were to consider statements made by Diego Borja, "we must understand that most of the samples collected by the experts suggested by [Chevron] have been manipulated . . . and they would lose all probative value."  Dkt. 168 (Lago Agrio Judgment) at 52.

358. The "settling expert" reports were not originally contemplated as part of the judicial site inspection process determined at the outset of the trial.  Rather, the additional step of third expert

report (in addition to the two party-affiliated expert reports) was requested by Chevron. Donziger believed that this maneuver was an attempt to inject more delay into already protracted proceedings. *See* Dkt. 613-20 (12/23/10 Donziger Depo. Tr.) at 1804:13-20; Dkt. 28-9, at p. 12 (Donziger private journal entry noting that "I broke down how long it would take to finish the case if all the dirimiente [settling expert] reports and responses are done, and we estimated that it would take about six years beyond where we are now."); *id.* at 13 ("Why would Yánez order the [settling expert] reports when he and everyone else knows they are useless?  The dangerous combination of not wanting to make a decision, with the fact they [sic] this is an American case and who cares, people can just keep making money.").

359.    The global expert examination was not intended to, and did not, supplant the judicial inspections or settling expert reports.  The Ecuadorian Plaintiffs had requested a global expert examination in October 2003, at the beginning of the trial.  Dkt. 31-31 (December 4, 2006 LAP filing), at p. 1 ("Your honor, I respectfully request that you immediately order an expert examination aimed at determining the environmental effects of activities related to the production of hydrocarbons in all of the fields operated by Texaco, as requested in the evidentiary motion on pages 4677 and 4678 of the record.  The Court granted that motion in an Order issued on October 29, 2003, at 5:55 p.m., and that Order is final and binding.").  The court granted that request, and the global expert examination would have proceeded at some time, whether or not the judicial inspections had continued for a longer period.  *Id.* (quoting the Lago Agrio court's October 29, 2003 order that "an expert examination shall be conducted aimed at determining the environmental effects of activities related to the production of hydrocarbons in all of the fields operated by TEXACO . . . .").

360.    The Ecuadorian Plaintiffs sought to waive their remaining tentatively scheduled inspections based on their belief that (i) further inspections were unnecessary because the Ecuadorian Plaintiffs had already met their burden of proof and the results of the inspections to date strongly indicated contamination at the inspected sites; and that (ii) Chevron intended to use protracted judicial inspections to delay the litigation as much as possible and exhaust the Ecuadorian Plaintiffs' resources.  Dkt. 613 (Ex. T) (12/23/10 Donziger Depo. Tr.), at 1804:13-20 ("We strongly felt that the settling expert reports were not required under Ecuadorian law and that they were being used by Chevron to delay the trial."); Dkt. 28-9 (Ex. 76) (DONZ00027256) at p. 55 (July 25, 2006 Donziger private journal entry observing that Chevron is "losing overwhelmingly")]; *id.* at p. 19 (DONZ00036234) ("Alberto's initial mistake of asking for 122 inspections without any strategy is just coming back to haunt us so deeply, although we are getting good press and we are using the inspections to build political momentum and get our act together, but the process is just time consuming and ridiculous."); Dkt 28-8 (Ex. 76) (DONZ00027256) at p. 45 (Donziger journal: "we still have the same money problems, and nobody has been paid. . . The money issue is killing us.  Pablo told me the inspections are now going to finish the week of Nov. 13, which is soon—there is a ton of work to be done before then."); Dkt. 28-7 (Ex. 76) (DONZ00027256) at p. 24 ("Our phone and electricity will be cut off this week.  We have received no money since November. LY feels the brunt of the pressure from creditors, the brunt of the pressure from the base communities, and the brunt of the pressure from staff who have not gotten paid."); Dkt. 28-9 (DONZ00036277) at 9 (Donziger journal entry dated May 31, 2006, discussing risks and benefits of global expert strategy and stating "We are winning on the proof, but we are losing the larger war because of time."); Dkt. 28-8 (Ex. 76) (DONZ00027256) at p. 37  ("They pulled a stunt on Monday - tried to get the judge to suspend the inspection for 60 days

on the even [sic] of going out to the site.  LY got text msg judge was leaving Lago - we had out

[sic] own intelligence sources. They did this for Guanta, San Carlos, and now Yuca"); Dkt. 28-9

at p. 2 (September 13, 2006 Donziger private journal entry: "[W]e have to face the prospect of

more of the wasteful, time-consuming, and expensive inspections.[]  Texaco now realizes their

best defense is to ask for as many inspections as possible.").

361.    Every site inspection that Chevron requested for its case-in-chief was performed.  *See*

Dkt. 168 (certified English translation of the Lago Agrio Court's February 14, 2011 opinion), at

47 (affirming ruling allowing Ecuadorian Plaintiffs to withdraw their remaining inspection re-

quests and noting that "the defendant, Chevron, has been allowed to take all the actions that it

requested for its defense" and rejecting Chevron's argument that "it has been caused irreparable

harm by not being allowed to carry our 64 procedures requested by the plaintiffs . . . .").

362.    Richard Cabrera was not even the Ecuadorian Plaintiffs' preferred choice to serve as the

global damages expert; rather, he was selected only after the Lago Agrio Court—apparently at

Chevron's urging—concluded that the expert must be chosen from the small group of experts

who had already served in some fashion in the trial.  *See, e.g*., Dkt. 28-7 (Ex. 76)

(DONZ00027256) at p. 20 (Donziger writing in his private journal on February 7, 2007:  "The

latest is the judge feels bound by an agreement [Ecuadorian Plaintiff attorney Alberto] Wray

made with [Chevron counsel Adolfo] Callejas in the first inspection to use peritos already ap-

pointed by the court. I thought we had worked this out with the judge, and that Fernando Reyes

would be appointed the perito. We have been working with him in preparation. Now, the judge

feels he cannot do that. This is a function of T[exaco]'s pressure campaign – Callejas submitted

30-pages of crap yesterday morning.").

363.    The Ecuadorian Plaintiffs' legal team considered petitioning the Lago Agrio Court for the appointment of *two* global experts ("peritos") so that Texaco would not be in a position to co-opt the expert that would wind up working with the Ecuadorian Plaintiffs.  *See, e.g.*, Dkt. 28-9 (Ex. 76) (DONZ00027256) at p. 56 (Donziger writing on September 13, 2006, regarding the appointment of an expert to perform the global assessment: "[T]here is a very small pool of technical people who are not 'contagiado' (in the words of Luis).  So the single perito theory sounds good, but it is all in the execution. And you just know that Texaco will have a slew of available candidates, and will probably pay them on the side to boot, so they can be controlled.  So I suggested we stick with two peritos . . . .").

364.    Donziger has testified that Fajardo believed he knew who the Lago Agrio Court would appoint Cabrera not because of any ex parte contact with the judge or improper pressure, but by a simple process of elimination based on who already had served as court-appointed experts and therefore possibly could be appointed and who likely would be deemed ineligible for one reason or another.  Dkt. 613-8 (Ex. H) (12/8/10 Donziger Depo. Tr.) at 985:4-986:18.

365.    Chevron engaged in extensive efforts to spy on the Ecuadorian Plaintiffs' team.  Dkt. 613-5 (Ex. E) (August 16, 2010 *The Atlantic Monthly* article detailing how a Chevron agent from Kroll offered the journalist $20,000 "to go undercover as a journalist-spy" "pretend[ing] to write a story . . . [but] actually shilling for Chevron.").  Chevron continues that pattern to this day. *See, e.g.*, Dkt. 754-4 (surreptitiously taken photograph of Defendants' counsel in Ecuador); Dkt. 895-6 (Ex. 3532) at 4 (surreptitiously taken photograph of Donziger and Defendants' counsel).

366.    By July 2007 at the latest, Chevron was aware of the Ecuadorian Plaintiffs' support of Cabrera's work.  *See* Dkt. 154-2 (Ex. 56), 154-3 (Ex. 57), 154-4 (Ex. 58) (Chevron-published

advertisements in three Ecuadorian national newspapers publicly accusing Cabrera of bias in favor of the Ecuadorian Plaintiffs and calling upon the Lago Agrio Court to disqualify him.); Dkt. 613-17 (Ex. Q) (July 30, 2007 Chevron Press Release attacking Cabrera's work and stating that "Cabrera displayed his utter complicity with Plaintiffs' interests[.]"); *see also* Dkt. 557-4 (Ex. 19) at p. 2 (March 24, 2008 Sylvia Garrigo interview statement that "[T]he expert analysis also is corrupt . . . . This expert [Cabrera], unfortunately, is working in partnership with the NGO leading the plaintiff's case. The expert's work plan, instead of following the judge's orders, basically aimed to do fieldwork to find contamination caused by Texaco. . . .").[9]

367.    The Ecuadorian Plaintiffs' team discussed setting up a meeting including Beristain in February 2007—before Cabrera had been appointed by the Lago Agrio Court. The purpose of this meeting was to begin developing a social plan that could address the social and cultural harms caused by Chevron's pollution. *See* Dkt. 6-10 (Ex. 2) at p. 129 (Fajardo telling the group "I was proposing to him that on those dates [February 4th and 5th] we could work on a type of-like a type of workshop to define, a bit that-that-that social plan, see the viability and how far we can progress on the social plan in a short time. I mean, the-the-[unintelligible] listen to him directly, now."); see also id. at p. 132 ( Fajardo continued that he was suggesting that Beristain "develop a plan for us, roughly, and on the fourth and fifth, we work on the plan.").

368.    The actual "meeting" that appears in *Crude*, which took place in May 2007—before Cabrera was sworn in as an expert and before Beristain was asked by Cabrera to join his team— was a community meeting among the Cofán people and their attorneys "to talk about what they want as compensation for all the damage." *See* Dkt. 48-29 (Ex. 331); Dkt. 32-9 (Ex. 154)

---

[9] These citations are not offered for the truth of their assertions but to demonstrate Chevron's awareness of certain issues.

(Cabrera sworn in on June 13, 2007); Dkt. 30-02 (Ex. 91), at 48.  Trudie Styler also observed and spoke to the Cofán people.  *Id.* at p. 49.

369.    Beristain's role at the meeting was "in the form of leading a discussion" with the Cofán people.  Dkt. 613-11 (Ex. K) (1/14/11 Donziger Depo. Tr.), at 2919:20-23.

370.    At the time of this meeting, Beristain was working for an environmental group, and not for the Ecuadorian Plaintiffs, and was assisting the Ecuadorian Plaintiffs' team with "community-based information gathering."  Dkt. 613-11 (Ex. K) (1/14/12 Donziger Depo. Tr.) at 2895:13-22, 2896:4-17.

### C.    The Lago Agrio Record

371.    Not all documents submitted to the Lago Agrio Court appear on series of hand-numbered pages maintained by the Court.  On different occasions, the Lago Agrio Court expressly referenced and incorporated materials from the parties—Chevron included—that were not submitted in hard copy form and by their nature would not have been hand-numbered pages.  *See, e.g.,* Smyser Decl., Ex. 36 (excerpts from Lago Agrio Court orders incorporating Chevron's submission of digital materials).  In other instances, the parties—Chevron included—would attach to their official submissions disks with supplemental materials and appendices.  *See, e.g.,* Smyser Decl., Ex. 37 (excerpts from officially-submitted expert reports noting supplemental materials to report attached in digital media format).  Furthermore, the parties in the Lago Agrio Litigation also submitted materials to the Lago Agrio Court via other means, including during Judicial Inspections taking place outdoors at sampling sites.  *See, e.g.,* Smyser Decl., Ex. 32 (excerpts from record of Aguarico 02 judicial inspection noting on-site submission of Fusion Memo exhibits); Resp. St. 126 (concerning example of submission of Fusion Memo materials to the Lago Agrio

Court).  Also, in certain places, pages are missing from important documents, even though the hand number sequence does not reflect the missing materials.  *See, e.g.*, Smyser Decl., Ex. 33 (copy of Lago Agrio order pages 211685–86 missing at least one page of content between the numbered pages).  Such evidence of the Lago Agrio Court's omission and misnumbering raises fact issues as to how the Lago Agrio Record should be defined and measured.

372.    The Lago Agrio Court would examine and at times incorporate materials submitted on digital media disks.  *See, e.g.,* Smyser Decl. Ex. 36 at 170,144 ("the Court will admit recordings or iother items like the media that the defendant requests the Court to evaluate them the probative value of the compact discs (sic).  It follows logically that these media must be evaluated together with all of the other evidence."); *id.* at 170,137 ("In Section 10) of the Order issued on October 23, 2008, at 9 a.m., the defendant was requested to describe the circumstances under which the CD. (sic) that was requested to be added to the record was produced; its motions are thus resolved").

373.    Court experts would also submit materials submitted on digital media disks.  *See, e.g.,* Smyser Decl. Ex. 37, at 128,679 (Barros report providing compact disc along with report); *id.*at 110,238 (same).

374.    Materials could be and were submitted to the Court during outdoor inspections.  *See, e.g.,* Smyser Decl. Ex. 32 (excerpts from Aguarico 02 judicial inspection providing summary of oral argument concerning the Chevron Texaco merger and submission of Fusion Memo Materials); *see also* Smyser Decl. Ex. 30 (copies of Fusion Memo Materials submitted at Aguarico 02 submission).

375.    Notaries and court clerks in the Lago Agrio Record would at times provide inaccurate information regarding materials submitted to the Lago Agrio Court.  *Compare, e.g.,* Smyser Decl. Ex. 32 at 140,796 (noting submission of 77 pages of Fusion Memo Materials notarized by Roberto Duenas Mera) *with* Smyser Decl. Ex. 30 (showing at least 166 pages of Fusion Memo Materials notarized by Roberto Duenas Mera).  The clerical mistakes would also include instances of whole pages of text missing from Court orders but without a corresponding gap in the hand-numbered pagination.  *See, e.g.*, Smyser Decl., Ex. 33 at 211285–86 (December 16, 2010 Court order missing entire portions of opinion but keeping consecutive pagination).

## II.    Alberto Guerra Bastidas

376.    While serving as a magistrate judge, Guerra dismissed certain criminal cases as a "favor" to prosecutor Nicholas Zambrano.  Dkt. 746-3 (Ex. C).  ¶ 7.  This was a violation of Ecuadorian law.  *Id.*

377.    Guerra was dismissed as a judge on the Sucumbios court for publicly stating his bias in Chevron's favor.  *See* Dkt. 745, Ex. 3117 at CVX-RICO-0507913 (considering the complaint against Guerra for "publicly stating on various occasions that if he were to again become President of the Superior Court of Justice of Nueva Loja, the first thing he would do is to declare null the lawsuits for environmental remediation that the organizations located in the Oriente Region filed, mainly against CHEVRON"); *id.* at CVX-RICO-0507920 (concluding that Guerra "committed a serious disciplinary infraction when he stated his opinion about a proceeding that still has not been decided and that  . . . he would inevitably hear again" and that Guerra's public statements "affect[ed] the image of the judicial branch and the legal certainty of those who use the services of justice").

378.    Shortly after his dismissal from the Sucumbios court, Guerra told Ecuadorian newspaper *El Universo* that he elected not to dismiss the Ecuadorian Plaintiffs' case, even though Ecuador's then-attorney general pressured him to do so.  *See* Smyser Decl., Ex. 26 (10/18/2009 article; "I could have done it, but I decided to continue").

379.    Guerra also told *El Universo* that, except for the then-attorney general's pressure to dismiss the case, "during his tenure there was no instance of internal or external pressure."  *See id.*

380.    Guerra states that he solicited bribes from both parties in the Lago Agrio case.  Dkt. 746-3 (Ex. C) ¶¶ 12-13, 22-23.

381.    In or about July 2012, Chevron paid Guerra $38,000 for a hard drive, seven USB drives, four day planners, permission to access two Hotmail accounts, copies of bank and phone records, two cell phones, two SIM cards, a floppy disk, and seven CDs.  Dkt. 755-14 ¶¶ 4-5.  Chevron also provided Guerra with a laptop at this time.  *Id.* ¶ 5.

382.    Chevron has relocated Guerra, his wife, his son, and his son's family to the United States.  Dkt. 755-14 at p.3  Chevron is paying Guerra $12,000 a month as well as providing Guerra, his wife, and his son's family with health insurance, an automobile, and immigration representation.  *Id.*

383.    Chevron will make these payments to Guerra for at least 24 months, and they could continue indefinitely.  Dkt. 755-14 ¶ 5.

384.    Guerra already had a child living in Chicago.  At one point, that child had immigration issues.  Dkt. 746-3 (Ex. C) ¶ 19.

401488.5

385.    Guerra claims that he wrote "the great majority of the rulings issued in civil cases as-signed to Mr. Zambrano, including the Chevron case, which continued until February of 2012. Dkt. 746-3 (Ex. C) ¶ 7.

386.    All of the draft orders Guerra claims to have prepared for Zambrano that were found on Guerra's electronic media were allegedly created in late 2009 or early 2010.  Dkt. 746, Ex. C, Attachments O,P, Q, R, S, T, U, V, and W.

387.    Donziger is unaware that Guerra has ever ghostwritten decisions in the Lago Agrio litiga-tion, and Donziger is unaware of any "help" by Guerra to "steer" the decision in favor of the plaintiffs in the Lago Agrio litigation.  He never thanked Guerra for these things.  *See* Donziger Defendants' Response to Chevron's Motion for Partial Summary Judgment, Donziger Declara-tion.

388.    Donziger recalls receiving an e-mail from Guerra seeking immigration assistance on be-half of a relative or friend.  Donziger never sent word through Mr. Fajardo confirming that Donziger "would look into the issue," nor did Donziger take any steps, directly or indirectly, to assist Guerra in any immigration matter.  Instead, Donziger simply ignored Guerra's e-mail.  *See* Donziger Defendants' Response to Chevron's Motion for Partial Summary Judgment, Donziger Declaration.

389.    Donziger recalls being at a restaurant in Quito with Guerra, when Guerra asked for a bribe of $500,000.  Donziger refused Guerra, and told him that neither Donziger nor anyone on the Lago Agrio Plaintiffs' team would do such a thing.  Donziger did not respond (as Guerra as-serts) that the Lago Agrio Plaintiffs lacked that sum of money "at the moment."  *See* Donziger

Defendants' Response to Chevron's Motion for Partial Summary Judgment, Donziger Declaration.

390.    Donziger has never sought to pay any money in exchange for a favorable verdict in the Lago Agrio litigation, nor has Donziger encouraged or solicited anyone else to discuss or pursue paying money for a favorable verdict.  *See* Donziger Defendants' Response to Chevron's Motion for Partial Summary Judgment, Donziger Declaration.

391.    Larry Veselka, Vanessa Barham, and Pablo Fajardo met with Guerra on July 13, 2011 in Quito, Ecuador.  Guerra stated that in 2003 shortly after the Lago Agrio case was filed, he received pressure from the Ecuadorian Attorney General at the time to dismiss the case against Chevron but that he rebuffed the request and did not dismiss the case in response to political pressure.  Smyser Decl., Ex. 15 (Camacho's Supp. Objs. and Resps. to Chevron's Interrogs.) Supp. Resp. No. 1 and Ex. 16 (Piaguaje's Supp. Objs. and Resps. to Chevron's Interrogs.), Supp. Resp. No. 1.

392.    Also at the July 13, 2011 meeting, Guerra stated that he was unaware of any fraud or corruption in the proceedings other than the approach by the Attorney General and another approach by an influential national government official on behalf of Chevron.  Smyser Decl., Ex. 15 (Camacho's Supp. Objs. and Resps. to Chevron's Interrogs.) Supp. Resp. No. 1 and Ex. 16 (Piaguaje's Supp. Objs. and Resps. to Chevron's Interrogs.), Supp. Resp. No. 1.

393.    Guerra stated that Judge Zambrano was not pressured or influenced by anyone and that Judge Zambrano's actions were clean and appropriate.  Smyser Decl., Ex. 15 (Camacho's Supp. Objs. and Resps. to Chevron's Interrogs.) Supp. Resp. No. 1 and Ex. 16 (Piaguaje's Supp. Objs. and Resps. to Chevron's Interrogs.), Supp. Resp. No. 1.

394.    Guerra stated that he had no knowledge of documents outside the record being provided to Judge Zambrano.  Smyser Decl., Ex. 15 (Camacho's Supp. Objs. and Resps. to Chevron's Interrogs.) Supp. Resp. No. 1 and Ex. 16 (Piaguaje's Supp. Objs. and Resps. to Chevron's Interrogs.), Supp. Resp. No. 1.

395.    Guerra stated that he had no knowledge of the Lago Agrio Plaintiffs or the Ecuadorian government influencing the judgment.  Smyser Decl., Ex. 15 (Camacho's Supp. Objs. and Resps. to Chevron's Interrogs.) Supp. Resp. No. 1 and Ex. 16 (Piaguaje's Supp. Objs. and Resps. to Chevron's Interrogs.), Supp. Resp. No. 1.

396.    Craig Smyser, Jarod Stewart, and Pablo Fajardo met with Nicolas Augusto Zambrano on August 16, 2012 in Quito, Ecuador.   The participants discussed Mr. Zambrano's statement that he chose every word that appeared in the February 14, 2011 judgment, that it was his judgment, that he does not remember the source for every word that appeared in the judgment, that no other person wrote the judgment, and that Chevron has persecuted and harassed him since the date of the judgment.  Smyser Decl., Ex. 15 (Camacho's Supp. Objs. and Resps. to Chevron's Interrogs.) Supp. Resp. No. 1 and Ex. 16 (Piaguaje's Supp. Objs. and Resps. to Chevron's Interrogs.), Supp. Resp. No. 1.

Dated:      March 18, 2013
            Houston, Texas

By:      */s/ Tyler Doyle*
         TYLER G.  DOYLE
         CRAIG SMYSER (*pro hac vice*)
         LARRY R.  VESELKA (*pro hac vice*)
         SMYSER KAPLAN & VESELKA, L.L.P.
         700 Louisiana, Suite 2300
         Houston, TX 77002
         Telephone:     713.221.2330
         Facsimile:     713.221.2320
         Email:         tydoyle@skv.com
         Email:         csmyser@skv.com
         Email:         lveselka@skv.com

         Julio C.  Gomez
         GOMEZ LLC
         The Trump Building
         40 Wall Street, 28th Floor
         New York, NY  10005
         Telephone:     212.400.7150
         Facsimile:     212.400.7151
         Email:         jgomez@gomezllc.com

         *Attorneys for Defendants Hugo Gerardo Camacho*
         *Naranjo and Javier Piaguaje Payaguaje*