# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

CHEVRON CORPORATION,

              Plaintiff,

    v.

STEVEN DONZIGER, THE LAW OFFICES
OF STEVEN R. DONZIGER; et al.,

              Defendants.

Case No. 11-CV-0691 (LAK)

---

**STEVEN DONZIGER, THE LAW OFFICES OF STEVEN R. DONZIGER, AND DONZIGER & ASSOCIATES, PLLC'S RESPONSE TO CHEVRON CORPORATION'S CORRECTED STATEMENT OF MATERIAL FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON ALL CLAIMS, COUNTERCLAIMS AND AFFIRMATIVE DEFENSES, AND SUMMARY JUDGMENT ON DEFENDANTS' AFFIRMATIVE DEFENSE OF COLLATERAL ESTOPPEL; AND**

**STATEMENT OF ADDITIONAL MATERIAL FACTS AS TO WHICH THERE EXISTS A GENUINE ISSUE TO BE TRIED OR AS TO WHICH THERE IS NO DISPUTE**

---

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 56.1(b),

Defendants Steven Donziger, The Law Offices of Steven R. Donziger and Donziger &

Associates, PLLC (collectively "Donziger"), hereby submit their Response to Chevron

Corporation's Corrected statement of material facts in support of motion for partial summary

judgment on all claims, counterclaims and affirmative defenses, and summary judgment on

Defendants' affirmative defense of collateral estoppel, and Donziger's statement of additional

material facts as to which there is a genuine issue to be tried.  This Response is based on the

evidence presently available to Donziger.  As discussed in detail in Donziger's Memorandum of

Law, filed concurrently herewith, Donziger has not yet had a reasonable opportunity to conduct

discovery and review the evidence Chevron has produced regarding the issues raised in

Chevron's Motion for Summary Judgment and Local Civil Rule 56.1 Statement.

## I.    DEFENDANTS ARE PART OF THE LAP TEAM[1]

1.      *Donziger is and has been a legal advisor to and representative of the LAPs since at least
2003.  Dkt. 47-30 (2009.04.28 Statement by Donziger to the Tom Lantos Human Rights
Commission) at 3 ("For the past 15 years I have been part of a joint Ecuadorian-American legal
team that represents thousands of residents of the area in a class-action lawsuit . . . ."); Dkt. 30-
2 (Ex. 91, Crude theatrical transcript) (to Ecuadorian court: "I'm part of Plaintiffs' legal
team"); Dkt. 8-9 (Ex. 6); Dkt. 106-3 (Ex. 478); Dkt. 355-37 (Ex. 1122).*

Disputed.[2]  Isolated statements from The Ecuadorian Plaintiffs do not establish that

Donziger represented the Ecuadorian Plaintiffs continuously from 2003 to the present.  Indeed,

---

[1] For the reasons set forth in Donziger's responses to each of Chevron's facts listed under Heading I, Donziger also disputes the assertions and conclusions set forth in Chevron's Heading I.

[2] Chevron has failed to provide documents to the evidence it cites, in particular Dkt. 8-9 (Ex. 6) (150-page portion of deposition transcript).  It is impossible for Donziger (or the Court) to determine, for example, where in a 150-page excerpt from a deposition transcript (Dkt. 8-9 (Exh. 6)), the evidence upon which Chevron would rely can be

1

Donziger does not represent the Ecuadorian Plaintiffs in the instant proceeding.  *See* Docket.

Donziger has also stated that "As an American, I am not licensed to practice law in

Ecuador . . . ."  Dkt. No. 9-9 (Ex. 14) (Nov. 3, 2006 Donziger Book Proposal) (DONZ00006707)

at p. 21.  This statement shows that Donziger was not a representative of the LAPs at all times or

for all purposes since 2003.  Similarly, the engagement agreements that Chevron cites (Dkt. 106-

3 (Ex. 478)) and Dkt. 355-37 (Ex. 1122) do not establish that Donziger continuously represented

the LAPs from 2003 through the present.  Further, these agreements establish that the scope of

any representation was specific and limited.  *See id.*

2.      *In all of the conduct attributed to Donziger in this Separate Statement, Donziger has acted as the LAPs' agent.  See St. 1.*

        Disputed.  This statement consists of an improper legal conclusion, which the Court

should strike or disregard.  *See, e.g., Antunes v. Putnman/N. Westchester Bd. Of Co-op. Educ.

Services*, 09-CV-3063 CS, 2011 WL 1990872, at *2 n.9 (S.D.N.Y. May 19, 2011) *aff'd sub nom.

Antunes v. Putnam N. Westchester Bd. Of Co-op Educ. Services*, 482 Fed. Appx. 661 (2nd Cir.

2012) ("I need not consider statements in a Local Rule 56.1 submission that are "legal

conclusions in the guise of an undisputed statement of fact."); *Cicchetti v. Davis*, 07 CIV. 10546

(WCC), 2008 WL 619013, at *4 n.2 (S.D.N.Y. Mar. 5, 2008) ("Defendant's Rule 56.1 Statement

---

found.  Chevron's failure to provide pinpoint citations has forced Donziger to hunt through voluminous exhibits for any nuggets that Chevron might believe supports its position.  This is a distraction, waste of time, and unnecessary drain on Donziger's already stretched resources.  Further, it has severely prejudiced Donziger's ability to respond to Chevron's alleged facts because Donziger cannot determine precisely what evidence Chevron is citing in support. Donziger respectfully submits that the Court also has no way of determining exactly what evidence Chevron is citing and, for that reason, requests that Chevron's citations to multiple-page documents that are not accompanied by pincites be stricken.

of Undisputed Facts consists of legal conclusions such as 'The Fire Commissioner is a

policymaker' . . .  This does not advance the Court's inquiry."); *Jessamy v. City of New Rochelle,*

*New York*, 292 F. Supp. 2d 498, 509 (S.D.N.Y. 2003) (rejecting as an improper legal conclusion

the following statement:  "At all times relevant hereto, Defendants Deputy Commissioner

Wendell, Commissioner Ritchie and Mayor Idoni were acting in their official capacities as

employees and/or officers of the City."  (Def. Rule 56.1 Stmt. ¶ 1.)").


*3.      Yanza is and has been a member of the LAP team and has represented the LAPs since the*
*Ecuadorian complaint was filed in 2003.  Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 107:18-*
*24; see also id. at 104:17-105:17; Dkt. 559 at 6-8.*

         Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.


*4.      In all of the conduct attributed to Yanza in this Separate Statement, Yanza has acted as*
*the LAPs' agent.  See St. 3.*

         Disputed.  This statement consists of an improper legal conclusion, which the Court

should strike or disregard.  *See, e.g., Antunes*, 2011 WL 1990872 at *2 n.9; *Cicchetti*, 2008 WL

619013 at *4 n.2; *Jessamy*, 292 F.Supp. 2d at 509.


*5.      Alejandro Ponce Villacís ("Ponce") began working as counsel for the LAPs in the Lago*
*Agrio Litigation in or around June 2005.  Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 4723:10-*
*4724:10.*

         Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.


*6.      In all of the conduct attributed to Ponce in this Separate Statement, Ponce has acted as*
*the LAPs' agent.  See St. 5.*

3

Disputed.  This statement consists of an improper legal conclusion, which the Court should strike or disregard.  *See, e.g., Antunes*, 2011 WL 1990872 at *2 n.9; *Cicchetti*, 2008 WL 619013 at *4 n.2; *Jessamy*, 292 F.Supp. 2d at 509.

7.     *Fajardo is and has been counsel of record for the LAPs in the Lago Agrio Litigation since February 7, 2006.  Dkt. 356-17 (Ex. EJ, Declaration of Pablo Fajardo); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 182:11-183:3; 1096:10-18; 1757:20-1758:3 ("Q. The question was, are any of the plaintiffs' lawyers in Ecuador a party to any written retainer or fee agreement relating to the Aguinda or Lago Agrio cases? A. Yes. Pablo Fajardo."); Dkt. 402-11 (Ex. 2295) (92,873-81) at 92,874; Dkt. 559 at 6-8; Dkt. 106-6 (Ex. 481).*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

8.     *In all of the conduct attributed to Fajardo in this Separate Statement, Fajardo has acted as the LAPs' agent. See St. 7.*

Disputed.  This statement consists of an improper legal conclusion, which the Court should strike or disregard.  *See, e.g., Antunes*, 2011 WL 1990872 at *2 n.9; *Cicchetti*, 2008 WL 619013 at *4 n.2; *Jessamy*, 292 F.Supp. 2d at 509.

9.     *Juan Pablo Sáenz ("Sáenz") is and has been counsel for the LAPs in the Lago Agrio Litigation since at least September 2006. Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 586:25-587:5; Dkt. 402-12 (Ex. 2309) (DONZ00038705).*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

10.     *In all of the conduct attributed to Saenz in this Separate Statement, Sáenz has acted as the LAPs' agent.  See St. 9.*

Disputed.  This statement consists of an improper legal conclusion, which the Court should strike or disregard.  *See, e.g., Antunes*, 2011 WL 1990872 at *2 n.9; *Cicchetti*, 2008 WL 619013 at *4 n.2; *Jessamy*, 292 F.Supp. 2d at 509.

11.     *Julio Prieto (Prieto) is and has been counsel for the LAPs in the Lago Agrio Litigation since at least 2006.  Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 1648:7-12; Dkt. 28-7 (DONZ00027156).*

        Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

12.     *In all of the conduct attributed to Prieto in this Separate Statement, Prieto has acted as the LAPs' agent.  See St. 11.*

        Disputed.  This statement consists of an improper legal conclusion, which the Court

should strike or disregard.  *See, e.g., Antunes*, 2011 WL 1990872 at *2 n.9; *Cicchetti*, 2008 WL

619013 at *4 n.2; *Jessamy*, 292 F.Supp. 2d at 509.

13.     *Stratus began to serve as a member of the LAP team no later than 2007.  Dkt. 32-16 (Exhibit 160) (2007.08.20 Contract between Stratus and Kohn, Swift & Graf P.C.) (STRATUS-NATIVE043270); Dkt. 48-13 – 48-14 (2010.05.05 Declaration of Pablo Fajardo Mendoza); Dkt. 8-9 (Donziger Dep. Tr.) at 2253:5-11; Dkt. 402-11 (Ex. 2288) (2010.12.09 Stratus 30(b)(6) deposition of Douglas Beltman) at 128:11-22; 138:6-12.*

        Disputed.  The cited documents and materials do not support Chevron's characterization.

Douglas Beltman testified that "Kohn Swift & Graf has paid Stratus in relation to the work that

we conducted beginning in 2007 under contract to Kohn Swift & Graf to provide technical and

scientific assistance to the plaintiff attorneys."   Dkt. 402-11 (Ex. 2288) (2010.12.09 Stratus

30(b)(6) deposition of Douglas Beltman) at 128:18-22.

14.     *In all of the conduct attributed to Stratus in this Separate Statement, Stratus has acted as the LAPs' agent.  See St. 13.*

        Disputed.  This statement consists of an improper legal conclusion, which the Court

should strike or disregard.  *See, e.g., Antunes*, 2011 WL 1990872 at *2 n.9; *Cicchetti*, 2008 WL

619013 at *4 n.2; *Jessamy*, 292 F.Supp. 2d at 509.

15.     *Beltman began to serve as a member of the LAP team no later than 2007.  Dkt. 32-16 (Exhibit 160) (2007.08.20 Contract between Stratus and Kohn, Swift & Graf P.C.) (STRATUS-NATIVE043270); Dkt. 32-17 (Exhibit 161) (2008.07.07 Email from J. Kohn to D. Beltman re "approval for upcoming work") (STRATUS-NATIVE066482); Exhibit K (2007.10.23 Email from S. Donziger to D. Beltman re "update – let's talk again") (DONZ00025289) at 2.*

     Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

16.     *In all of the conduct described in this Separate Statement, Beltman has acted as the LAPs' agent.  See St. 15*

     Disputed.  This statement consists of an improper legal conclusion, which the Court

should strike or disregard.  *See, e.g., Antunes*, 2011 WL 1990872 at *2 n.9; *Cicchetti*, 2008 WL

619013 at *4 n.2; *Jessamy*, 292 F.Supp. 2d at 509.

17.     *Maest began to serve as a member of the LAP team no later than 2007.  Dkt. 32-16 (Exhibit 160) (2007.08.20 Contract between Stratus and Kohn, Swift & Graf P.C.) (STRATUS-NATIVE043270); Dkt. 32-23 (Exhibit 167) (2007.09.19 Email from S. Donziger to D. Beltman, A. Maest, J. Lipton, and P. Sowell, copying J. Kohn, re "Important idea") (DONZ00025160).*

     Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

18.     *In all of the conduct described in this Separate Statement, Ann Maest has acted as the LAPs' agent.  See St. 17.*

     Disputed.  This statement consists of an improper legal conclusion, which the Court

should strike or disregard.  *See, e.g., Antunes*, 2011 WL 1990872 at *2 n.9; *Cicchetti*, 2008 WL

619013 at *4 n.2; *Jessamy*, 292 F.Supp. 2d at 509.

19.     *A 2011 Engagement Agreement signed by Fajardo affirms that Donziger "acted as the primary United States attorney on behalf of the Plaintiffs to date," and affirms Donziger's past and continued authorization to "assemble and organize United States lawyers and law firms" and "non-legal advisors, experts, and service providers" to "assist the Plaintiffs," "coordinate the efforts to procure funding," and "coordinate the media, public affairs and public relations," including "retaining lobbyists."  Dkt. 355-37 (Ex. 1122) at 1-3.*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

20.     *A November 2010 Power of Attorney signed by Defendants Camacho and Piaguaje, and 39 other LAPs, invested Fajardo with "the widest of powers and attributes that the law confers" including the authority to "make and/or sign any kind of agreements for setting up the contracting of any kind of consultant, whether this be a legal professional or not."  Dkt. 106-6 (Ex. 481) at 6-7.*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

21.     *The LAPs retrospectively "ratifie[d] and approve[d]" Fajardo's actions in the Lago Agrio Litigation and other litigations, whether "performed directly or through other persons." Dkt. 106-6 (Ex. 481) at 4-5.*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

22.     *Donziger, Yanza, Fajardo, Stratus Consulting, Beltman, and Maest have performed multiple acts in furtherance of a conspiracy to harm Chevron in which all are co- conspirators, as set forth in this Separate Statement.  See St. 12-18, 23-344.*

Disputed.  Donziger incorporates his responses to St. 12-18, 23-344.  This is an argument

disguised as a factual statement and is riddled with legal conclusions (e.g. characterizing persons

as "co-conspirators," is obviously improper in a Rule 56.1 statement).  Accordingly, this

statement consists of an improper legal conclusion, which the Court should strike or disregard.

*See, e.g., Antunes*, 2011 WL 1990872 at *2 n.9; *Cicchetti*, 2008 WL 619013 at *4 n.2; *Jessamy*,

292 F.Supp. 2d at 509.

7

## II.   THE LAP TEAM ENGAGED IN A PLANNED AND CAREFULLY EXECUTED SCHEME TO DEFRAUD IN THE LAGO AGRIO LITIGATION[3]

*23.   Early in the Lago Agrio Litigation, the court ordered a series of 122 judicial inspections of various oil drilling and production sites, where experts for the parties would each examine the sites and submit their findings to a panel of settling experts to reconcile the reports and issue final determinations regarding the presence or absence of harmful contamination. Dkt. 30-32 (Exhibit 120) (2003.10.29 Order regarding evidence and appointment of experts, Lago Agrio Litigation); Dkt. 31-2 - 31-5 (Exhibit 121) (2004.08.07 Summary Oral Hearing No. 002-2003, Terms of reference for the experts carrying out judicial inspections, Lago Agrio Litigation); Dkt. 31-7 (Exhibit 122A) (2004.08.26 Order adopting Procedural Agreement for experts, Lago Agrio Litigation); see Dkt. 31-6 (Exhibit 122) (certified translation of Ecuadorian Code of Civil Procedure, art. 259).*

23.   Disputed.[4]  The documents that Chevron cites do not support Chevron's characterization and conclusions.  Rather, the documents Chevron cites establish the following with respect to inspections:

- On October 29, 2003, the court ordered that certain inspections requested by Chevron be carried out and that certain inspections requested by the Ecuadorian Plaintiffs be carried out.  Dkt. 30-32 at 1, 6.

_____

[3] For the reasons set forth in Donziger's responses to each of Chevron's facts listed under Heading II, Donziger also disputes the assertions and conclusions set forth in Chevron's Heading II.

[4] Chevron has failed to provide pincites to the documents it cites, in particular Dkt. 30-32 (Exhibit 120) (17-page document consisting of court order and translation); Dkt. 31-2 – 31-5 (176 pages consisting of court document and translation); Dkt. 31-7 (9-page document consisting of court order and translation).  It is impossible for Donziger (or the Court) to determine where in these documents the evidence upon which Chevron would rely can be found.  Chevron's failure to provide pinpoint citations has forced Donziger to hunt through voluminous exhibits for any nuggets that Chevron might believe supports its position.  This is a distraction, waste of time, and unnecessary drain on Donziger's already stretched resources.  Further, it has severely prejudiced Donziger's ability to respond to Chevron's alleged facts because Donziger cannot determine precisely what evidence Chevron is citing in support.  For these reasons, Donziger requests that Chevron's citations to multiple-page documents that are not accompanied by pincites be stricken.

8

- On August 7, 2004, a document titled "Summary Oral Hearing No. 002-2003" was issued.  It states that during a hearing "the parties have requested judicial inspections at approximately 122 wells and production installations in the former concession . . . ." Dkt. 31-2 at 1.

- On August 26, 2004, the Lago Agrio Court ordered the parties to comply with the terms of reference they had agreed upon for the inspections.  Dkt. 31-7 at 3.

- Ecuadorian Code of Civil Procedure Article 259 states that "If there are discrepancies between expert reports, the judge shall appoint another expert, if he deems it necessary in order to form his own opinion." Dkt. 31-6 (Ex. 122).

24.     *From January 2005 to June 2006, the LAP team submitted to the Lago Agrio court sampling results for TPH, PAH, and hexavalent chromium in soil from the HAVOC laboratory, but during that time, HAVOC was not accredited to test for those compounds, nor did it have the necessary equipment to perform tests for individual PAHs. Dkt. 111-8 (Ex. 553) (Donziger Dep.) at 3743:14-3744:3 (Donziger testifying that HAVOC was not accredited to perform the tests it was conducting for the LAPs); Dkt. 54-18 (Ex. 446) (Maest Dep.) at 175:17–24 (HAVOC did not have the necessary equipment to perform the tests); Dkt. 54-12 (Ex. 440) (Donziger asks in an email whether "the accreditation process" for HAVOC, which Donziger emphasized was "VITAL," had begun).*

Disputed.  Chevron mischaracterizes Donziger's deposition testimony and Dkt. 54-12 (Ex. 440).  Chevron also omits key evidence in order to create the impression that HAVOC had no accreditations whatsoever.  That is not true.  When asked about the referenced e-mail at his deposition, Donziger testified that he believed HAVOC was not accredited for certain of the work that it was doing as of April 2006.  But the questioner did not follow up to ask—and Donziger did not testify to—what particular work Donziger was referring to.  Dkt. 111-8 (Ex.

9

553) at 3743:15-3744:3.  Further, Ann Maest testified that she believed HAVOC did have certain accreditations.  Werdegar Decl. Ex 11 (Maest Dep. Tr. Vol. II) at 177:10-13 ("It's different in Ecuador than it is in the United States.  And HAVOC did have a number of accreditations, but they were, as I said, different than what's in the United States . . . .").

Chevron also mischaracterizes Maest's testimony.  Maest testified that HAVOC did not have the equipment necessary to analyze samples for individual PAHs.  This testimony does not support Chevron's assertion for two reasons.  *First*, Chevron cites to no testimony regarding HAVOC's equipment for testing for TPH or hexavalent chromium.  In fact, Maest testified that she believed HAVOC *did* have the equipment to test for hexavalent chromium.  Werdegar Decl. Ex 11 (Maest Dep. Tr. Vol. II) at 172:5-7.  *Second*, the cited portion of Maest's testimony shows that HAVOC might not have had the equipment to do one type of PAH analysis.  But the context suggests that there is more than one method of doing such calculations, and that HAVOC was not, in fact, using the method that would have required the equipment Maest discussed.  *Id.* at 175:2-16 (discussing an analysis method HAVOC used "rather than just simply analyze for individual PAHs").

Further, Chevron has not provided any evidence to support its assertions regarding *when* the Ecuadorian Plaintiffs submitted the HAVOC sampling results.  From the materials Chevron cites, it is not clear what HAVOC was or was not accredited for, nor when such accreditations would have been relevant.

Finally, the accreditation issue is not material.  Both sides challenged the accreditation of the other's laboratories.  *See* Dkt. 168 (Chevron's translation of the 2/14/11 Lago Agrio Judgment) at 44-45 (discussing both sides' accusations that the other's laboratory did not have the requisite credentials).  The Lago Agrio Court concluded that Chevron's laboratory also lacked the type of certification that Chevron argued HAVOC lacked.  *Id.* at 45.  The Lago Agrio Court took these issues into account when assessing the laboratories' data.  *Id.* ("As previously stated, this fact [lack of accreditation] will be taken into careful consideration.").

25.    *The LAP team submitted to the Lago Agrio court sampling results from "Selva Viva Laboratory," but there was no entity called "Selva Viva Laboratory"—this was a name the LAPs used when they did their own testing, using testing kits in a hotel room.  Dkt. 31-21 (Ex. 136) at 132:11-133:19.*

Disputed.  As a preliminary matter, Donziger objects to the use of Calmbacher's deposition testimony.  First, this testimony was given by a witness with a well-established bias against Donziger, *see, e.g.*, Salazar Dkt. [5] No. 158-24 (Ex. R) at p. 49 (describing how Calmbacher left the Ecuadorian Plaintiffs' team on bad terms, disgruntled about non-payment); *id.* (Lago Agrio Court's observation that Calmbacher had "a sense of resentment on a personal level against the plaintiffs' team due to labor and money issues,"), at a deposition at which Donziger was not present.  *See* Fed. R. Civ. P. 32(a)(1)(a) (requiring that a party be present or represented at the taking of a deposition or had reasonable notice of it); *see* Fed. R. Civ. P. 32(a)(8) (discussing use of deposition testimony from earlier actions).  *See also* Dkt. 823.

---

[5] Documents from *Chevron Corporation v. Salazar, et al.,* Case No. 11-CV-3718 (LAK) are hereafter referred to as "Salazar Dkt.".

Second, the portion of the Calmbacher deposition that Chevron chose to introduce into the record at Dkt. No. 31-21 and cite in its factual statement does not even satisfy the requirements of an affidavit; the portion at Dkt. No. 31-21 is not signed by him.

26.    *Defendants stopped Chevron from inspecting HAVOC on one occasion by pressuring a judge to cancel a planned inspection and on another occasion by instructing HAVOC to close, because Donziger believed that the inspection would be a "disaster" for the LAPs' case.  Dkt. 54-28 (Ex. 456) (Donziger writing that inspection of HAVOC would be a "DISASTER"); Dkt. 53-5 (Ex. 405) at 3737:22-3739:17 (Donziger testifying that the inspection of the HAVOC lab was "an important issue"); Dkt. 6-2 (Exhibit 1), CRS-052-00-CLIP-05 (2006.03.30 Crude outtake video clip of S. Donziger discussing upcoming meeting with the judge); Dkt. 6-4 (Exhibit 2) (certified transcript) at 16 (Crude outtakes captured Donziger entering the judge's chambers ex parte and insisting that the court not allow inspection of HAVOC; admitting that he "could never do this in the United States but Ecuador, you know, this is how the game is played, it's dirty. We have to occasionally use pressure tactics . . . ."); Dkt. 54-12 (Ex. 440) (Donziger in-quires about whether "the accreditation process" for HAVOC, which Donziger emphasized was "VITAL," had begun); Dkt. 111-8 (Ex. 553) at 3743:14-3744:3 (Donziger testifying that HAVOC had already been doing work for which the accreditation was required).*

Disputed.  Chevron would have the Court believe that the only reason Donziger might not want the HAVOC lab inspected was because of an accreditation issue.  But Donziger testified that it was important to prevent Chevron's abusive and invasive inspection from going forward because Chevron was trying to intimidate HAVOC into not working with the Ecuadorian Plaintiffs.  Werdegar Decl. Ex 12 (Donziger Dep. Tr.) at 3739:18-3740:5.  Donziger denied that any lack of accreditation was a reason that he wanted to prevent Chevron's calculated attempts to inspect HAVOC.  *Id.* at 3740:8-12.  Rather, he opposed Chevron's *ex parte* request for an inspection of HAVOC's laboratory because he believed that Chevron was seeking an inspection in order to intimidate and harass HAVOC and to discourage HAVOC and other laboratories in Ecuador from working with The Ecuadorian Plaintiffs.

Donziger disputes Chevron's characterization of his statement as an "admission."  In the version of this document that was used at Donziger's deposition (Donz. Dep. Exh. 1640), Donziger was discussing Chevron's attempts to "destroy" the laboratory.  He described the latest of these attempts as Chevron's efforts to get a judge to order a judicial inspection of the lab.  Donziger stated that the Ecuadorian Plaintiffs needed to respond to Chevron's pressure tactic in the same way:  by attempting to convince the judge.  Clearly, having informal or unscheduled contacts with judges was "something you would never do in the U.S.," but that was how things worked in Ecuador ("this is how the game is played").  In the outtake cited by Chevron, Donziger states that he believes that the judge is being paid by Chevron:  "we're going to confront the judge who we believe is paid by Texaco."  Dkt. 6-4 at 6.  In both instances, Donziger is discussing the need to fight back against Chevron's attempts to corrupt the process.

Moreover, both sides accused the other of submitting manipulated sampling results to the Lago Agrio Court.  Indeed, the Lago Agrio Court noted that, if it were to consider statements made by Diego Borja, "we must understand that most of the samples collected by the experts suggested by [Chevron] have been manipulated . . . and they would lose all probative value."  *See* Dkt. 168 (Chevron's translation of the 2/14/11 Lago Agrio Judgment) at 52.

Further, the accreditation and laboratory inspection issues are not material.  *See* St. 24.

27.    *In 2005, Donziger offered and agreed to pay Fernando Reyes and Gustavo Pinto to act as "monitors" of the settling experts in the judicial inspection phase of the Lago Agrio Litigation; the agreed upon payments included a bonus if the LAPs won the lawsuit. Dkt. 658-18 (Reyes Declaration), ¶ 12; see also Dkt. 29-2 at 15 (Donziger personal notes: "50 k came today - meet on roof to plan payment [to] GF."); Dkt. 53-5 (Ex. 405) at 3845:17–21 (Donziger testifying that "GF" refers to Gustavo Pinto and Fernando Reyes).*

13

Disputed.  Chevron's self-serving characterization of the evidence is inappropriate in a 56.1 statement.  *Goldstick v. The Hartford, Inc.*, No. 00-cv-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (Rule 56.1 statements are not argument).  Donziger testified that he had asked Pinto and Reyes to work confidentially for the Ecuadorian Plaintiffs in 2005.  Dkt. 53-5 (Ex. 405) at 3846:6-17.

Chevron cannot rely on Reyes's declaration because it is not credible.  His story is inconsistent, highly implausible, and contradicted by other evidence in the record.  To provide a few examples:

- Reyes claims that, in 2003-2004, he did not want to be involved in the lawsuit so he asked the Ecuadorian Plaintiffs for a $30,000 fee.  Dkt. 658-18 (Ex. 3014) at ¶ 9.  This is contradicted by Donziger's notes.  Donziger wrote that Reyes tried to charge the Ecuadorian Plaintiffs $30,000 for certain Chevron documents.  Dkt. 28-8 at 11.

- Reyes fails to provide any evidence to corroborate his assertion that he "could not twist [his] professional assessments to make them fit the plaintiffs' interest," and that he "considered it to be completely ludicrous" that Chevron could be held liable for as much as $10 billion.  Dkt. 658-18 at ¶¶ 22, 29.  Although in an attempt to give his testimony a veneer of truth, Reyes sprinkled throughout his affidavit various irrelevant details such as the type of drink that the parties ordered during an alleged meeting between Donziger, Cabrera, and Reyes (Reyes and Cabrera ordered whiskey; Donziger had nothing (Dkt. 658-18 at ¶31)) and Charlie Champ's attire during another meeting ("bolo tie, instead of a

14

tie, and big cowboy boots" (*Id*. at ¶ 36)), nowhere in his 16-page affidavit does Reyes

provide any corroboration for these assertions.  In particular, while Reyes submits over

150 pages of documents, including pages from his calendar and day planner, and notes

containing irrelevant details about various meetings, nowhere in any of these documents

are his strong setiments and conclusions about what the Ecuadorian Plaintiffs were asking

him to do, even noted.

- Reyes also fails to provide any evidence to corroborate his claim about a key event: his

  contact with Donziger in the "summer of 2007" during which Donziger allegedly paid

  him to draft two technical reports, which were then submitted as "Annex S to the

  'Cabrera Report.'"  *Id*. at ¶ 38.  Reyes fails to provide any contemporaneous evidence

  corroborating his alleged interaction with Donziger.  He fails to provide any drafts of the

  reports (for which he says he was paid $10,000), nor does he have any written

  correspondence discussing the reports.  It is difficult to believe that Reyes has no

  evidence corroborating this key event, in view of the level of colorful and gratuitous

  details provided elsewhere in his affidavit and evidence submitted corroborating other

  irrelevant events and conduct.

- Reyes claims that on January 31, 2006, the settling experts told him to contact the clerk

  of the court for a copy of the Sacha 53 Report.  But the Sacha 53 Report had not been

  issued by January 31, 2006.

- Reyes claims that the Ecuadorian Plaintiffs made the monitorship arrangement with Reyes and Pinto. But then Reyes is deliberately opaque about who wrote the CIGMYP letter to the Lago Agrio Court dated January 20, 2006. If Reyes had written the letter, he would have said so, and he should have submitted a draft letter to corroborate his testimony. If someone else at CIGMYP had written the letter, this fact would suggest that the others at CIGMYP knew about the monitorship arrangement, and it was not secret or improper, as Chevron would now have the Court believe.

In addition, this Court should not credit the hearsay statements contained in Reyes's testimony. *See*, e.g., Dkt. 658-18 at ¶ 9 (Alberto Wray "asked me to serve as a sort of expert witness regarding Texaco's activities in Oriente."); ¶ 22 ("Mr. Yanza and Mr. Fajardo began the meeting by telling me that the Judge in the Chevron case had decided to halt the process of judicial inspections and settling experts, and instead was going to appoint a single expert responsible for undertaking a global damages assessement for the case."); ¶ 27 ("Mr. Fajardo explained to me in more detail the proposal for me to be the global assessment expert, specifically regarding the financial terms for my professional services."); ¶39 ("Mr. Fajardo and Mr. Yanza told me they were there to ask Mr. Garzon to have Petroproduccion suspend all remediation activitiy in the area run by the Petroecuador-Texaco consortium, because the remediation was depriving the plaintiffs of clear evidence on which to base their claims for damages in the case.").

Chevron's suggestion that Donziger met with Reyes and Pinto "on the roof" is designed to create the misleading impression that this meeting was more secret than it was. When

16

questioned about this meeting, Donziger testified that the Ecuadorian Plaintiffs had a roof deck at their office and would often have meetings there. Dkt. 53-5 (Ex. 405) at 3848:24-3849:4.

Finally, this assertion is not material.  Reyes's own affidavit reveals that any efforts he may have made on behalf of the Ecuadorian Plaintiffs in 2005-2006 were wholly unsuccessful. Reyes describes only one meeting with a judge, in which "the Judge did not express any interest in what we were telling him about the case."  Dkt. 658-18 (Ex. 3014) ¶ 17.  Reyes did not submit a report to the Court, nor did he engage in any other meetings with judges.  *Id.* ¶¶ 18-20. According to Reyes, the settling experts refused to provide Reyes with copies of their reports. *Id.* ¶ 18.

28.     *Donziger called Reyes "one of the most qualified engineers and academics in the field" and included Reyes as one of two people on his "A List." Dkt. 658-36 (Ex. 3029) at 2.*

Disputed.  Chevron fails to provide important context for this quotation.  On September 19, 2006, Donziger wrote to C. Mitchell, Raul Herrera, and Eric Bloom regarding possible experts from Ecuador.  Donziger listed Reyes and Pinto in the "A List" category.  Dkt. 658-36 (Ex. 3029) at 2.

29.     *The LAP team did not disclose the fact that they were paying Reyes and Pinto, and instructed Reyes and Pinto to keep that fact a secret. Dkt. 658-18 (Reyes Declaration), ¶ 15; see also Dkt. 29-2 at 15 (Donziger personal notes: "50 k came today - meet on roof to plan payment [to] GF."); Dkt. 53-5 (Ex. 405) at 3845:17–21 (Donziger testifying that "GF" refers to Gustavo Pinto and Fernando Reyes); id. at 3846:6-20 (Donziger testifying that "when [he] cut that deal with Mr. Pinto and Mr. Reyes, it was [his] intention that they keep confidential that they were working for the plaintiffs [a]nd being paid by the plaintiffs").*

Disputed.  The Court should disregard Reyes' declaration because it is inconsistent, highly implausible, and contradicted by other evidence on the record.  *See* St. 27.

17

30.     On February 1, 2006, the "Report of the 'Settling Experts' on the Judicial Inspection of the Sacha 53 Well" found that "the concentration levels of the elements analyzed are lower than the allowable limits" and thus "the risk to human health is low."  Dkt. 586-23 (Ex. 2822) at 26 (Report of the "Settling Experts" on the Judicial Inspection of the Sacha 53 Well explaining: "[T]he concentration levels of the elements analyzed are lower than the allowable limits[.]"); Dkt. 31-12 at 76 ("[T]he risk to human health is low, with a probability of impact equally low, unless there are drastic changes in the site's current conditions[.]"); id. ("In the case of Mr. Banos's well, no concentrations of hydrocarbons were detected."); see also Dkt. 365-14 (DONZ00041662) at 50.

Disputed.  Chevron's purported quotation from page 26 of the Report of the Settling Experts is incomplete and misleading.  The report states that "From the analyses submitted by Texpet in 1996 (Mr. Baca's report) it can be seen that the concentration levels of the elements analyzed are lower than the allowable limits established in the Contract for Implementing Environmental Remedial Work and Release from Obligations, Liability and Claims, executed on 4 May 1995, as submitted by the defendant."  Dkt. No. 586-23 (Ex. 2822) at p. 26.  The validity and relevance of those limits, and the legality of the remediation contract have, to say the least, been a subject of disagreement between the parties.

Chevron's selective quotation from the Report of the Settling Experts is further misleading because Chevron has taken quotations relating to results from particular pits and characterized them as if they apply to the Sacha 53 site generally.  The statement that "the risk to human health is low" occurs many pages after Chevron's first quotation, relates only to Pit 3, and is misleadingly and incompletely quoted.  Dkt. No. 31-12 (Ex. 127) at p. 76.  The full sentence reads: "In view of the fact that the concentration of hydrocarbons (TPH-DRO) and barium are located at depths of over 0.4 m, the risk to human health is low, with a probability of impact equally low, unless there are drastic changes in the site's current conditions, which would

18

increase the risk (removal of the soil by mechanical operations, intense water erosion, felling of trees with the consequent exposure of roots and soil)."  Elsewhere in the Sacha 53 report, the experts describe extensive and serious petroleum and chemical contamination found at site. *Id.* at 75-76.  More recently, the Sacha 53 site was investigated by a U.S. journalist, who noticed obvious evidence of contamination.  *See* Dkt. 613-19 (Ex. S) at 1 ("Within a few inches the dirt gives off the pungent odor of petroleum. Within a few feet the dirt glistens with oil residue. When a few handfuls of the soil are dropped into a bucket of water, a thick oil-slick coats the surface.")

Donziger's ability to respond to allegations such as this one has been hampered by the Court's denial of Donziger's requests to conduct discovery into Chevron's own evidence of the environmental and scientific issues underlying the Lago Agrio Litigation.  Dkt. 720.  Thus, while Chevron has complete discovery into Donziger's internal and confidential thoughts about various expert reports, Donziger has been denied the opportunity to obtain Chevron's internal impressions on the same issues. The reason for the Court's denial of this discovery–Chevron's re-casting of its "sham" litigation allegations–makes the instant factual assertion immaterial. Importantly, Chevron has represented that it does not challenge the scientific basis for the judgment issued against it.  *See* Dkt. 705 at 3 ("Chevron does not intend here to relitigate the environmental conditions existing in the Oriente or the relative, substantive merit of scientists' expert opinions on that subject.").

*31.      Reyes states that "Donziger was very upset by the findings of the settling experts' report, and he complained that the report supported Chevron's position and did not support the plaintiffs' position."  Dkt. 658-18 (Reyes Declaration), ¶ 19.*

Disputed.  For the reasons stated in St. 27, Chevron cannot rely on Reyes's declaration.

For the reasons stated in St. 30, this purported fact is not material.

32.    *Donziger directed Reyes and Pinto that their monitorship report on the Sacha 53 settling experts' report should establish that the findings of the settling experts were wrong, that they lacked objectivity, and that they were biased in favor of Chevron.  Dkt. 658-18 (Reyes Declaration), ¶ 20.*

Disputed.  For the reasons stated in St. 27, Chevron cannot rely on Reyes's declaration.

33.    *Once they had reviewed the settling experts' report, Reyes and Pinto found that "the evidence did not support Mr. Donziger's position," and they could not "twist" their analyses to support the LAPs' position.  Dkt. 658-18 (Reyes Declaration), ¶ 20.*

Disputed.  Chevron provides incomplete quotations, and mischaracterizes its own witness's declaration.  Reyes states that he and Pinto determined that "the settling experts had failed to strictly follow their judicial mandate," and that "the information submitted by both the plaintiffs and the defendants contained correct elements, but that both also had deficiencies regarding their sampling data."  Dkt. 658-18 (Reyes Declaration), ¶ 20.

For the reasons stated in St. 27, Chevron cannot rely on Reyes's declaration.

For the reasons stated in St. 30, this purported fact is not material.

Finally, any analysis of the settling expert report is immaterial because, as Chevron points out, Donziger did not ask for any such report to be submitted to the Court and none was submitted.  Chevron would have the Court make inferences about the reasons that the draft report was not submitted, but such an invitation is inappropriate in a motion for summary judgment. *See, e.g.*, *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989) ("In assessing

20

the record to determine whether there is a genuine issue of fact, the court is required to draw all factual inferences in favor of the party against whom summary judgment is sought."). Further, the Second Circuit has "repeatedly noted that 'summary judgment is ordinarily inappropriate where an individual's intent and state of mind are implicated.'" *Id.* (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).

*34.    The monitorship report Reyes and Pinto drafted did not state that the settling experts' findings regarding Sacha 53 were wrong or biased, and the LAP team never asked Reyes and Pinto to submit the monitorship report to the court. Dkt. 658-18 (Reyes Declaration), ¶ 20; see also id., Ex. P (monitorship report).*

Disputed. Chevron mischaracterizes its own witness's declaration. Reyes states that he and Pinto determined that "the settling experts had failed to strictly follow their judicial mandate," and that "the information submitted by both the plaintiffs and the defendants contained correct elements, but that both also had deficiencies regarding their sampling data." Dkt. 658-18 (Reyes Declaration), ¶ 20.

For the reasons stated in St. 27, Chevron cannot rely on Reyes's declaration.

Further, Reyes's story regarding the draft report is highly suspicious. Reyes claims that the Ecuadorian Plaintiffs' team pushed Reyes very hard to write a report critical of the Sacha 53 report but then simply dropped the subject after Reyes gave them one draft. If the team were as concerned with the Sacha 53 report—and the settling experts in general—as Reyes claims, then why would they completely abandon the entire monitoring exercise after Reyes provided them one draft report?

21

For the reasons stated in St. 30, this purported fact is not material.

35.     *Members of the LAP team, including Donziger, told Reyes that they wanted a single expert to carry out a global assessment because the judicial inspection process had not yielded data to support their claims of contamination, and because they believed it would be easier to manage one single expert rather than many.  Dkt. 658-18 (Reyes Declaration), ¶ 22.*

Disputed.  Reyes's assertions directly conflict with other testimonial and documentary evidence in this case, including Donziger's own testimony.  On summary judgment, this conflict must be resolved in the defendants' favor.  *Ramseur*, 865 F.2d at 465.

The Court should not consider the hearsay in Reyes's declaration (*e.g.* "Mr. Younza and Mr. Fajardo began the meeting by telling me . . .").

Contrary to Reyes's unsupported assertions, the Ecuadorian Plaintiffs sought to waive their remaining tentatively scheduled inspections based on their belief that (i) further inspections were unnecessary because the Ecuadorian Plaintiffs had already met their burden of proof and the results of the inspections to date strongly indicated contamination at the inspected sites; and that (ii) Chevron intended to use protracted judicial inspections to delay the litigation as much as possible and exhaust the Ecuadorian Plaintiffs' resources.  Dkt. 613-20 (Ex T) (12/23/10 Donziger Dep. Tr.), at 1804:13-20 ("We strongly felt that the settling expert reports were not required under Ecuadorian law and that they were being used by Chevron to delay the trial."); Dkt. No. 28-9 (Ex. 76) (DONZ00027256) at p. 55 (July 25, 2006 Donziger private journal entry observing that Chevron is "losing overwhelmingly"); *id.* at p. 19 (DONZ00036234) ("Alberto's initial mistake of asking for 122 inspections without any strategy is just coming back to haunt us so deeply, although we are getting good press and we are using the inspections to build political

22

momentum and get our act together, but the process is just time consuming and ridiculous.");

Dkt 28-8 (Ex. 76) (DONZ00027256) at p. 45 (Donziger journal: "we still have the same money

problems, and nobody has been paid. . . The money issue is killing us.  Pablo told me the

inspections are now going to finish the week of Nov. 13, which is soon—there is a ton of work to

be done before then."); Dkt. 28-7 (Ex. 76) (DONZ00027256) at p. 24 ("Our phone and electricity

will be cut off this week.  We have received no money since November. LY feels the brunt of the

pressure from creditors, the brunt of the pressure from the base communities, and the brunt of the

pressure from staff who have not gotten paid."); Dkt. No. 28-9 (DONZ00036277) at 9 (Donziger

journal entry dated May 31, 2006, discussing risks and benefits of global expert strategy and

stating "We are winning on the proof, but we are losing the larger war because of time."); Dkt.

28-8 (Ex. 76) (DONZ00027256) at p. 37  ("They pulled a stunt on Monday - tried to get the

judge to suspend the inspection for 60 days on the even [sic] of going out to the site.  LY got text

msg judge was leaving Lago - we had out [sic] own intelligence sources. They did this for

Guanta, San Carlos, and now Yuca"); Dkt. No. 28-9 at p. 2 (September 13, 2006 Donziger

private journal entry: "[W]e have to face the prospect of more of the wasteful, time-consuming,

and expensive inspections.[]  Texaco now realizes their best defense is to ask for as many

inspections as possible.").

Further, the global expert examination was not intended to, and did not, supplant the

judicial inspections or settling expert reports.  The Ecuadorian Plaintiffs had requested a global

expert examination in October 2003, at the beginning of the trial.  Dkt. No. 31-31 (December 4,

2006 LAP filing), at p. 1 ("Your honor, I respectfully request that you immediately order an

23

expert examination aimed at determining the environmental effects of activities related to the

production of hydrocarbons in all of the fields operated by Texaco, as requested in the

evidentiary motion on pages 4677 and 4678 of the record.  The Court granted that motion in an

Order issued on October 29, 2003, at 5:55 p.m., and that Order is final and binding.").  The Court

granted that request, and the global expert examination would have proceeded at some time,

whether or not the judicial inspections had continued for a longer period.  *Id.* (quoting the Lago

Agrio court's October 29, 2003 order that "an expert examination shall be conducted aimed at

determining the environmental effects of activities related to the production of hydrocarbons in

all of the fields operated by TEXACO . . . .").

      For the reasons stated in St. 30, this purported fact is not material.

*36.     As this Court has already found, "the decisions to terminate judicial inspections, to
pursue the global assessment, and to select Cabrera as the global expert were tainted by the
duress and coercion applied to [the court] by Fajardo, Donziger, and perhaps others in ex parte
meetings." Dkt. 550 at 90; see also Dkt. 28-9 (DONZ00036235) at 29 (Donziger's personal
journal recounts at least two March 2006 meetings between the LAPs' lawyers and Judge
Germán Yánez Ricardo Ruiz without Chevron representatives present, stating "Lunch meeting
with judge. This was second meeting with judge – had lunch with him the previous Fri- day in
the Cangrejo Rojo. I love it – this lobbying. I am good at it."); id. (DONZ00036233) at 17
("lunch after with judge, he hits on Atossa and two Scandanavian [sic] woman [sic]."); Dkt. 32-
4 (DONZ00023182) at 1 (2006.7.26 Donziger emails Kohn: "Pablo met with the Judge today.
The judge, who is on his heels from the charges of trading jobs for sex in the court, said he is
going to accept our request to with-draw the rest of the inspections . . . . The judge also I believe
wants to forestall the filing of a complaint against him by us, which we have prepared but not yet
filed."); Dkt. 28-9 (DONZ00027256) at 56 (2006.07.25 Donziger journal entry stating that if the
judicial inspections are not cancelled "then we are in all-out war with the judge to get him
removed"); Dkt. 28-8 (DONZ00027256) at 29 (Donziger: "We wrote up a complaint against
Yanez, but never filed it, while letting him know we might file it if he does not adhere to the law
and what we need."); Dkt. 28-8 (DONZ00027256) at 36 (2006.11.20 Donziger journal entry
noting: "Meeting with Judge: on Sat night at Lupe's house."); Dkt. 402-13 (Ex. 2312)
(DONZ00041865) (2006.11.07 email in which Fajardo reports a meeting with the Judge noting
an effort to convince the Judge to adopt the Global Assessment, the Judge's resistance because*

*the request lacked a legal basis, and Fajardo's request for feedback from the team to help strengthen their position); Dkt. 28-8 (DONZ00027256) at 38 (2006.11.16 Donziger journal entry noting: "Meeting with Judge in hotel: On Tuesday night in Hotel Auca."); Dkt. 402-13 (Ex. 2313) (DONZ00042039) (2006.11.28 email in which Sáenz reports that the Judge did not feel the global assessment was justified and that he would not take such an assessment into account when rendering judgment "since I think it entirely lacks legal logic"); Dkt. 402-13 (Ex. 2314) (DONZ00042194) (2006.12.21 email in which Fajardo writes that he "met with the Judge today, and I can say that he will definitely not issue the order [authorizing global inspections] before the recess; he will issue it immediately afterward"); Dkt. 28-8 (DONZ00027256) at 26 (2007.01.19 Donziger journal entry recording: "Met with judge last night in house. Humble house, furniture. Made tea. I really like the guy. Remember last August I wanted to ride the wave and get him off case? This was an example of Pablo's total intelligence. We saved him, and now we are reaping the benefits."); Dkt. 28-7 (DONZ00027256) at 10 (2007.03.01 Donziger journal entry stating, "On Friday night, Pablo and Luis met with the judge near the airport in his barrio in a restaurant."); id. (2007.03.01 Donziger journal entry stating: "Pablo returned to Lago and met with the judge. . . . The bottom line is that the judge asked us for help to protect him, like we did last August."); id. (DONZ00027256) at 1 ("Two very disturbing meetings with Judge in Lago on May 21. First with Trudie and Luis Yanza full of his charm and bullshit, starts blaming Texaco for filing too many papers. And then that night, I saw another side of Pablo. He called to ask if I would call the judge so we could go see him at his house. . . . I called the judge and he asked that we bring over some whiskey or some wine. We didn't. When we got there, he was clearly drunk and had a young woman.").*

Disputed.[6]

37.    *The LAP team expected that the results of the global assessment would be adopted into the judgment. Dkt. 6-2 (Ex. 1), CRS 138-02-01 (Crude outtake) (Donziger ex-plaining to co-conspirator Atossa Soltani that, "we're now entering the final phase which is the expert assessment. . . Once that ends, the case is over in terms of the evidence. It's just final arguments.*

---

[6] Donziger is mindful of the Court's admonition not to re-litigate issues that have already been decided. Donziger submits, however, that the Court's prior observation regarding the decision to terminate judicial inspections, made based on facts that were undisputed for purpose of that particular proceeding, is not a "finding" that must forever bind the defendants in this case. A factual assertion that is not properly disputed may be deemed admitted for the purpose of the summary judgment motion *at issue at that time. See* Local Civ. R. 56.1(c) (discussing when a numbered paragraph in a statement of material facts "will be deemed to be admitted *for purposes of the motion*") (emphasis added). Such facts are not deemed admitted for all purposes in the case. *See, e.g. U.S. Info. Sys., Inc. v. Int'l Brotherhood of Elec. Workers Union Local Union No. 3*, No. 00-cv-4763-RMB-JCF, 2006 WL 2136249, at *4 ("Under Local Rule 56.1(c), facts admitted by the plaintiffs' failure to properly dispute them are deemed admitted for the purposes of the summary judgment motion *only*.") (emphasis added). Further, even facts that have been deemed admitted must be construed in the light most favorable to the non-moving party. *Gadsden v. Jones Lang Lasalle Americas, Inc.*, 210 F. Supp. 2d 430, 441 (S.D.N.Y. 2002).

*So that's critical."); Dkt. 6-8 (Ex. 2) at 76 (certified transcript); Dkt. 28-7 (DONZ00027256) at 15-16 (Donziger writes, referring to Cabrera's appointment as the Global Expert, "I asked Pablo if he was 100% sure the judge would [appoint] Richard and not Echever-ria, and he said yes, but given that this is the most important decision of the case thus far, there is simply no margin for error."); Dkt. 33-2 (2008.02.22 email from Beltman to Stratus employees) (STRATUS-NATIVE043232-33) (Stratus project manager Douglas Beltman telling his team that they will draft the Cabrera Report: "The project is at a key point right now. We have to write, over the next 2 to 3 weeks, probably the single most important technical document for the case. . . . We (the case attorneys, the case team in Quito, and Stratus) have put together a very ambitious outline for this report."); Dkt. 37-8 (DONZ00024227) (Internally, Defendants called the Cabrera Report "the most important thing in the case"); Dkt. 6-2 (Ex. 1) at CRS-187-01-02 ("[T]he most important evidence we have in the case"); Dkt. 6-2 (Ex. 1) at CRS-200-01-30 ("huge for us"); Dkt. 47-16 (Ex. 255) (2008.12.01 Amazon Defense Front press release) (publicly claiming that "courts in Ecuador generally give wide deference to reports prepared by independent experts."); Dkt. 47-30 (2009.04.28 Statement by Donziger to the Tom Lantos Human Rights Commission) at 5 (Donziger told the U.S. Congress that "an independent court expert working with a team of 14 scientists, found that Chevron is liable for up to $27 billion in damages . . . . If the court accepts the damages assessment, then the case could produce the largest judgment ever for an environmental lawsuit."); Dkt. 356-9 at 152 (DONZ-HDD-0113389) (When Cabrera was sworn in as the Global Expert, Donziger called it a "HUGE VICTORY").*

Disputed.[7] Chevron selectively quotes from and mischaracterizes the cited evidence.

Further, none of this evidence compels the conclusion that Chevron draws. Chevron would have

the Court make inferences about the reasons that the Ecuadorian Plaintiffs fought for a global

assessment and their expectations. This is inappropriate on summary judgment. *See, e.g.*,

*Ramseur*, 865 F.2d at 465.

- The Crude outtake Chevron cites actually supports the conclusion that the Ecuadorian

  Plaintiffs' team wanted the global assessment because it would help bring the case to an

  end. Donziger stated, "I mean, first of all the case is coming to an end. Chevron's biggest

---

[7] Dkt. 37-8 does not discuss the Cabrera Report or contain a page Bates-stamped DONZ00024227. Donziger requests that the citation and accompanying argument be stricken.

fear is the case will end, okay.  And we're now entering the final phase which is the

expert assessment which is the cost assessment."  Dkt. 6-8 at 23.  And Donziger's

statement that the case would be over in terms of the evidence after the global assessment

concluded does not suggest anything inappropriate about the global expert process.

Rather, it is entirely consistent with the reasonable and appropriate desire to combat

Chevron's delay tactics.

- Donziger's question to Fajardo about whether he was sure the judge would appoint
  Richard and not Echeverria says nothing about whether meetings were held with the
  judge, whether Chevron attended any meetings, and what the purpose of any meetings
  was.  Fajardo's prediction about which of two experts the judge was going to appoint was
  the result of a simple process of elimination.  Dkt. 28-7 (Ex. 76) (DONZ00027256) at p.
  15-16.

- The context of Donziger's June 13, 2007 e-mail makes clear that Donziger was
  expressing his relief that the expert was finally sworn in because that started the process
  to bring the trial to an end.  It was no secret that the Ecuadorian Plaintiffs were
  attempting to persuade the judge to swear in the expert so that the process could begin.
  "The perito got sworn into [sic] after all those visits to the court… the 120-clock is
  ticking, this is huge for us, WE ARE GOING TO END THE TRIAL!!!!!!!" Moreover,
  the court had announced that Cabrera would be appointed as the global expert three
  months prior, on March 19. 2007.  From the context and timing of events, it is clear that

27

the "victory" to which Donziger is referring is the fact that Cabrera was finally sworn in so that the examination could begin. Dkt. 356-9 (Ex. J) at p. 152.

- Contrary to Chevron's contention, Beltman's e-mail did not inform his team that they would be drafting the Cabrera report. The sentence that Chevron omitted from its quotation is key: "The document will pull together all of the work over the last 15 or so years on the case and make recommendations for the court to consider in making its judgment." Dkt. No. 33-2 (Ex. 168) at 1.

- Nor does the Amazon Defense Front press release support Chevron's conclusion. The sentence preceding the one that Chevron has chosen to quote emphasizes that the final decision is the judge's: "A final decision on Chevron's liability and damages will be made by the trial judge . . . ." Dkt. 47-16 at 2. The same is true for Donziger's statement to the Tom Lantos Human Rights Commission. Dkt. 47-30.

- Finally, the Court should not consider the hearsay contained in unauthenticated e-mails that Donziger never sent or received.

*38.    For the role of the global expert, Donziger wanted someone who would "totally play ball with [the LAP team] and let [the LAP team] take the lead while projecting the image that he is working for the court." Dkt. 28-8 (DONZ00027256) at 30 ("I asked if he could be comfortable slamming them with a 10b judgment. . . . I see using E-tech to give him cover, but he has to totally play ball with us and let us take the lead while projecting the image that he is working for the court."); Dkt. 28-7 (DONZ00027256) at 18 (Donziger writing in his personal notes that he interviewed Cabrera and that he "may be the perfect foil for Chevron").*

Disputed. Chevron's selective quotation of Donziger's journal entry is misleading.

Donziger was discussing a meeting with Fernando Reyes in which Donziger attempted to assess

28

whether Reyes would be strong enough to withstand the pressure that Chevron would exert over whomever was appointed as well as be willing to take on the personal and professional risks of potentially finding against a powerful company such as Chevron.  Dkt. 28-8 (Ex. 76) (DONZ00027256) at 30 ("I told him [Reyes] pointblank that if he did this he likely would never work in the oil industry again in Ecuador, at least for an American company, but that he could be a national hero and have a job the rest of his life being involved in the clean-up.  There is a certain level of "desconfianza" in him for these past jobs, for our previous arrangement as veeduria, for the tepid draft report he wrote, etc.  I asked if he could be comfortable slamming them with a 10b judgment.  He answered yes to tall [sic], but I don't know if he has the internal timber to pull it off but at this point I don't see a Plan B.  Bottom line is that he is an "insider.""). Donziger confirmed this in his deposition, when he testified that "There was a hesitancy, I found, on the part of qualified technical people in Ecuador to work with us out of fear that Chevron would retaliate against them and figure out ways to deny them work from other sources in the future. So part of the vet was to determine his willingness to enter this kind of case knowing that there could be some potential, you know, issues for him in his career down the road from Chevron."  Dkt. 613-8 (Ex. H) (12/8/10 Donziger Depo. Tr.), at 961:22-962:13.

Donziger's description of his interactions with Cabrera undermines several of Chevron's assertions.  First, it undermines Chevron's assertion that the Ecuadorian Plaintiffs had Cabrera in mind from the start.  Donziger expresses surprise at Cabrera's having "showed some surprising independence, telling the judge quietly that Texaco's sampling was [bogus]," Dkt. 28-7 (DONZ00027256) at 18, but also stating that "I thought the idea Reyes would not be the perito

was a case killer" and "I trust Reyes; I don't know Richard, even though he looks promising." *Id.* The full sentence from which Chevron plucks the "foil" comment reveals that Donziger was unsure about Cabrera: "He was a humble man, not very sophisticated, but he seemed smart and under-stated—maybe the perfect foil for Chevron, but there is no way to know for sure so there is risk." *Id.*

Donziger believed that it was appropriate for each side to work closely with the global expert and that it was not improper to vet potential experts beforehand. *See* Dkt. 613-8 (Ex. H) at 959:12-960:13 ("Q. Was it your intention that were Mr. Reyes to be appointed as the global court expert that the plaintiffs' team would take the lead in connection with his work while at the same time Mr. Reyes would make it appear as though he was working for the court? . . . A. I had an impression at the time that all court experts in Ecuador worked closely with the parties and that the parties could have access to them. To the extent that whoever the court expert would be could get valid evidence, data, assistance, materials, from us, yes, that was something we intended to do. I also at that time did not know whether the court would appoint one person or two persons, per the model of judicial inspections, to be the court expert for the global damages."). And Donziger believed that, at the same time, Chevron was trying to advance its own candidates—candidates that it could control. *See, e.g.*, Dkt 28-9 (Ex. 76) (DONZ00027256) at p. 56 ("Texaco will have a slew of available candidates, and will probably pay them on the side to boot, so they can be controlled"); Dkt. 613-15 (Ex. O) (12/13/10 Donziger Depo. Tr.) at 1098: 11-14 ("both parties were presenting names of potential technical people to the court for appointment. And I believe this was part of that process").

39.     *Donziger told Reyes that if he were to be the global expert, he would need to find that Chevron was the only party responsible for the environmental damage and the harm to the local community, and find damages to be awarded to the LAPs in excess of a billion dollars. Dkt. 658-18 (Reyes Declaration), ¶ 25.*

Disputed.  For the reasons stated in St. 27, Chevron cannot rely on Reyes's declaration.

Further, this assertion is not material.  Reyes was not named as the global expert.

40.     *Reyes believed that the ROE bore significant liability for any damage, and thought the LAPs' proposal of damages as high as $10 billion was "completely ludicrous." Dkt. 658-18 (Reyes Declaration), ¶ 29.*

Disputed.  For the reasons stated in St. 27, Chevron cannot rely on Reyes's declaration.

Further, Reyes's apparent skepticism is completely absent from the documents that Reyes provides.  And, if Reyes thought the Ecuadorian Plaintiffs' theories were so "ludicrous," why did he continue to work with them?

Finally, for the reasons stated in St. 30, this purported fact is not material.

41.     *Reyes recommended Cabrera to the LAP team for the global expert role because, in Reyes's words, "for Mr. Cabrera, issues such as independence and professional standards were not that important, and therefore he would have no problem doing what the plaintiffs were proposing." Dkt. 658-18 (Reyes Declaration), ¶ 30.*

Disputed.  For the reasons stated in St. 27, Chevron cannot rely on Reyes's declaration.

Reyes's declaration is also not admissible to support Chevron's assertion.  Reyes states that he provided Cabrera's name because of his beliefs regarding Cabrera.  But Reyes provides no basis for his beliefs about Cabrera's "independence and professional standards," let alone any personal knowledge of Cabrera's standards.  An unsupported opinion such as this one is not

admissible on summary judgment. *See* Fed. R. Civ. P. 56(c)(4) (affidavit must be based on personal knowledge). This is also an inappropriate attempt to slip in inadmissible character evidence. Fed. R. Evid. 404(a)(1).

Finally, Reyes's assertions are simply implausible. Reyes had previously recommended Cabrera to do fieldwork "because he is reserved, hardworking, and responsible." Dkt. 658-18 ¶ 30. Reyes's about-face does not make sense.

*42. To secure Cabrera's appointment, the LAPs' counsel drafted an ethics complaint against Judge Yánez, and threatened to file it if he did not end the judicial inspection process. Dkt. 28-8 (DONZ00027256) at 29 (Donziger: "We wrote up a complaint against Yanez, but never filed it, while letting him know we might file it if he does not adhere to the law and what we need. The worst part is that after the decision – which was covered in the Ec press and the Oil Daily – he told Luis that we needed to back him now as he fights for survival on the court. So instead of a strong judge who sees the viability of our case, we now might have a weak judge who wants to rule correctly for all the wrong, personal reasons. Need to get going on the inspections (looking for perito) and peritaje global."); Dkt. 32-4 (DONZ00023182) at 1 (2006.07.26 Donziger emails Kohn: "Pablo met with the Judge today. The judge, who is on his heels from the charges of trading jobs for sex in the court, said he is going to accept our request to withdraw the rest of the inspections . . . . The judge also I believe wants to forestall the filing of a complaint against him by us, which we have prepared but not yet filed.").*

Disputed. Chevron's selective and incomplete quotation of documents is misleading. In particular, Chevron's selective quotation from DONZ0023182 at 1 is designed to create the false impression that the Ecuadorian Plaintiffs were connected to the charges of Judge Yánez trading jobs for sex in the court. However, the papers to which Chevron cites establish that the complaint that the Ecuadorian Plaintiffs prepared concerned the judge's failure to act on the Ecuadorian Plaintiffs' motion, not the prior sex scandal in which the judge was involved. Dkt. No. 28-9 (Ex. 76) (DONZ00027256) at p. 55 (2006.07.25 journal entry quoted by Chevron, which also states: "It appears the corruption charges against Yánez which came out in El

32

Comercio two weeks ago have embroiled the entire court in a patricidal war. . . .He [Pablo] also

said there is the feeling in the court that we are behind the complaints against Yánez and Novillo,

which we are not, even though we have much to complain about, which is sort of ironic."). *See*

*also* Dkt. No. 32-4 (Ex. 149) (DONZ00023182) at p. 1 ("Pablo met with the judge today. The

judge, who is on his heels from the charges of trading jobs for sex in the court, said he is going to

accept our request to withdraw the rest of the inspections save the four we still want to do. This

follows our press conference Monday that was attended by 32 journalists and several prominent

supporters, and the filing of a very well-written amicus signed by 11 Ecuadorian lawyers

supporting the withdrawal of the inspections. The judge also I believe wants to forestall the

filing of a complaint against him by us, which we have prepared but not yet filed. The judge told

Pablo that the Texaco lawyers came by the other day to urge him to make us do all the

inspections. The judge told Pablo they were nervous about the peritaje global.").

43.     *Donziger wrote of "mobilizing the country, politically, so that no judge can rule against
us and feel like he can get away with it in terms of his career." Dkt. 6-2 (Exhibit 1), CRS-032-00-
CLIP-01 (2006.03.09 Crude outtake video clip of meeting between S. Donziger and unidentified
male); Dkt. 6-4 (Exhibit 2) (certified transcript) at 11; see also Dkt. 356-12 (Exhibit BW)
(2003.12.17 Memorandum from S. Donziger to J. Kohn re "Ecuador trip/General Update")
(DONZ00084015).*

        Disputed. Chevron takes selected quotations out of context in order to create a

misleading impression. The record is replete with evidence that Donziger believed that it was

extremely difficult to find experts and judges who would be willing to take the risk of criticizing

or ruling against Chevron. *See, e.g.*, Dkt. 613-8 (Ex. H) (Donziger Dep. Tr.) at 961:22. ("There

was a hesitancy, I found, on the part of qualified technical people in Ecuador to work with us out

of fear that Chevron would retaliate against them . . . ."). Donziger's notes show that Donziger

33

believed Chevron was attempting to corrupt and illegitimately influence the trial, which required a strong response from the Ecuadorian Plaintiffs' team.  *See, e.g.*, Dkt. 28-7 (DONZ00027256) at p. 9 ("I still have that terrible sinking feeling (which I had on Friday night and Sat morning after the meeting with the judge) that the corruption and pressure are coming back"); *id.* at p. 10 (The secretary told him she got a call from an unknown magistrate of the Supreme Court telling him to slow down the environmental cases (our case and the OCP). We think this is complete bullshit; that nobody actually called, and that was part of Texaco's pressure via the secretary. Further, these pressures to remove the judge have mysteriously and suddenly heated up again, and we think Texaco is behind them."); Dkt. 28-8 (DONZ00027256) at p. 37 ("They pulled a stunt on Monday - tried to get the judge to suspend the inspection for 60 days on the even [sic] of going out to the site. LY got text msg judge was leaving Lago - we had out [sic] own intelligence sources. They did this for Guanta, San Carlos, and now Yuca"); Dkt. 28-7 (DONZ00027156) at p. 1 ("Texaco has kicked it into high gear in an effort to destroy the legitimacy of the process. This has two goals: to set it up so they have an argument on appeal in Ecuador, and ultimately, to have an argument in the U.S. when we move to enforce a judgment. And, if they can accomplish it, to derail the trial itself to prevent it from finishing."); Id. at p. 4 ("Texaco called [the judge] and said, "Esta entregado a los indios." ["you are in the pocket of the Indians"]  Who knows how much they are harassing him. He seemed really nervous and freaked."); *id.* at p. 1 ("[the judge] sat down and immediately looked at me and said Texaco knows what I am doing and not doing every second of the day, that Texaco intelligence agents have been following him").  These materials also demonstrate Chevron's ability to litigate effectively and sometimes successfully against the Ecuadorian Plaintiffs.

34

Chevron's citation to Donziger's 2003 e-mail to Kohn is also misleading and immaterial. First, this e-mail was sent many years prior to the events which Chevron would tie it to. Second, Chevron's suggestion that there is something improper about attempting to build a public relations campaign alongside a pending court case (which is all the memorandum shows) is incorrect and flies in the face of Chevron's own extensive public relations efforts accompanying the Lago Agrio case and even the instant case.

*44.    On March 3, 2007, Donziger, Fajardo, Yanza, Maest and other members of the LAP team met with Cabrera, without any attorney or representative of Chevron present, to plan the global assessment. Dkt. 658-18 (Reyes Declaration), ¶¶ 34-35; Dkt. 6-2 (Exhibit 1) at CRS-191-00-CLIP-03 (2007.03.03 Crude outtake video clip of meeting among P. Fajardo, A. Maest, and others); Dkt. 7-5 (Exhibit 2 (certified transcript)) at 244; Dkt. 6-2 (Exhibit 1) at CRS-187-01-02 (video of March 3, 2007 meeting in Ecuador attended by the LAPs' attor-neys, the LAPs' technical experts, and Cabrera in which Fajardo stated, "[T]he work isn't going to be the expert's. All of us bear the burden. . . . But all of us, all together, have to contribute to that report."); Dkt. 7-5 (Exhibit 2 (certified transcript)) at 245; Dkt. 8-9 at 1120:23-1121:5 (Donziger testifying that "the primary purpose of the [March 3, 2007] meeting" with Cabrera was to "lay out the entire case and legal theory for Mr. Cabrera and the other participants in the meeting"); see also Dkt. 6-2 (Exhibit 1) at 188-00-CLIP-02, 188-01-CLIP-01, 189-00-CLIP-02, 189-00-CLIP-03, 189-00-CLIP-05, 191-00-CLIP-02, 191-00-CLIP-03, 192-00-CLIP-01, 193-00-CLIP-01 (video of the March 3, 2007 meeting with Cabrera and video of subsequent discussions regarding the March 3rd meeting); Dkts. 7-2-7-5 (Exhibit 2 (certified transcript)) at 169-235, 241-53; Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 2147:7-11 (Donziger admitting that during the March 3, 2007 meeting with Cabrera, he assumed Cabrera would be appointed as the court's global expert).*

Disputed. Chevron selectively quotes from the outtake transcripts and presents an incomplete description of what was discussed during the meetings. Chevron's assertion that the purpose of the meeting was "to plan the global expert examination" is unsupported. Donziger testified that the primary purpose of the meeting was to lay out the case and legal theory for

Cabrera and the other participants.[8]  Chevron's characterization suggests that the meeting participants discussed specific details of the content of Cabrera's report—but Chevron's citations do not support such a distortion.

Fajardo describes his prediction of the lengths Chevron would go to interfere with the expert examination.  *See* Dkt. No. 7-5 (Ex. 2) at p. 243 ("There's going to be a constant harassment of the expert and his technical team in the field. . . . Attempts—beware—attempts to bribe the expert with money—and possibly his technical team.  If that doesn't work, they're going to try to threaten, or perhaps sue the expert.").  In this context, Fajardo's statement that "Chevron's main problem right now is that it doesn't know what the hell is going to happen in the global expert examination" shows his belief the Ecuadorian Plaintiffs' work to have the court appoint an expert that could not be controlled by Chevron meant that Chevron was afraid that the true extent of damages would be revealed.

Chevron also omits the surrounding context of Fajardo's statements about the work that the Ecuadorian Plaintiffs' team would do to provide suggestions and material they hoped would be included in Cabrera's report.  Chevron omits Fajardo's statement that "[W]hat the expert is going to do is state his criteria, alright?  and sign [on/in] the report and review it [unintelligible].  But all of us, all together, have to contribute to that report."

---

[8] The quotation that Chevron provides is a quotation from a quotation that Mr. Vinegrad asked Mr. Donziger, not a quotation from Mr. Donziger's testimony.  *See* Dkt. 8-9 (Ex. 6) at 1120:23-1121:3.  Donziger testified "I believe that was the primary purpose of the meeting, yes."  Id. at 1121:4-5.

36

For the reasons stated in St. 27, Chevron cannot rely on Reyes's declaration. Reyes's story raises many additional questions: Why did Reyes allegedly attend this meeting if he did not want to participate in the global expert process? And why, once Reyes "fully realized" the "full extent of the plaintiffs' counsel's intentions," did he still continue to work with the Ecuadorian Plaintiffs and even agree to write to technical analyses? Dkt. 658-18 (Ex. 3014) at ¶ 38.

Finally, there is substantial evidence in the record (much of it never contradicted by Chevron) that Ecuadorian law at the time did not prohibit parties from interacting with court-appointed experts prior to the issuance of the expert's report, including prior to the expert's formal appointment by the court, and providing the expert with documents and information for his consideration and adoption. *See* Dkt. No. 154-5 (Alencastro Aff.) ¶¶ 9-12, 18-19; Dt. No. 154-6 (Simon Aff.) ¶¶ 4-5, 7-8. There is also evidence in the record that Chevron interpreted Ecuadorian law and practice in the same way and engaged in its own private *ex parte* communications with, and provided undisclosed *ex parte* assistance to, court-appointed experts. *See* Dkt. No. 154-7, at 2. *See also* Ecuadorian Plaintiffs' response to St. 36.

45.     *At the March 3, 2007 meeting with Cabrera, the LAPs team indicated that they had already predetermined the findings of the global assessment, and that they them- selves would write a report that would support their claim for billions of dollars against Chevron and put Cabrera's name on it. Dkt. 658-18 (Reyes Declaration), ¶¶ 34-35; Dkt. 6-2 (Exhibit 1) at CRS-187-01-02 (video of March 3, 2007 meeting in Ecuador attended by the LAPs' attorneys, Maest, Reyes, and Cabrera); Dkt. 7-5 (Exhibit 2 (certified transcript)) at 245; Dkt. 8-9 at 1120:23-1121:5 (Donziger testifying that "the primary purpose of the [March 3, 2007] meeting" with Cabrera was to "lay out the entire case and legal theory for Mr. Cabrera and the other participants in the meeting"); see also Dkt. 6-2 (Exhibit 1) at 188-00-CLIP-02, 188-01- CLIP-01, 189-00-CLIP-02, 189-00-CLIP-03, 189-00-CLIP-05, 191-00-CLIP-02, 191-00-CLIP-03, 192-00-CLIP-01, 193-00-CLIP-01 (video of the March 3, 2007 meeting with Cabrera and video*

37

*of subsequent discussions regarding the March 3rd meeting); Dkts. 7-2-7-5 (Exhibit 2 (certified transcript)) at 169-235, 241-53; Dkt. 400-1( Ex. 2010) (Donziger Dep. Tr.) at 2147:7-11 (Donziger admitting that during the March 3, 2007 meeting with Cabrera, he assumed Cabrera would be appointed as the court's global expert).*

Disputed.  Chevron selectively quotes from the outtake transcripts and presents an incomplete description of what was discussed during the meetings.  Chevron's assertion that the purpose of the meeting was "to plan the global expert examination" is unsupported.  Donziger testified that the primary purpose of the meeting was to lay out the case and legal theory for Cabrera and the other participants.  Chevron's characterization suggests that the meeting participants discussed specific details of the content of Cabrera's report—but Chevron's citations do not support such a distortion.

Fajardo describes his prediction of the lengths Chevron would go to interfere with the expert examination.  *See* Dkt. No. 7-5 (Ex. 2) at p. 243 ("There's going to be a constant harassment of the expert and his technical team in the field. . . . Attempts—beware—attempts to bribe the expert with money—and possibly his technical team.  If that doesn't work, they're going to try to threaten, or perhaps sue the expert.").  In this context, Fajardo's statement that "Chevron's main problem right now is that it doesn't know what the hell is going to happen in the global expert examination" shows his belief the Ecuadorian Plaintiffs' work to have the court appoint an expert that could not be controlled by Chevron meant that Chevron was afraid that the true extent of damages would be revealed.

Chevron also omits the surrounding context of Fajardo's statements about the work that the Ecuadorian Plaintiffs' team would do to provide suggestions and material they hoped would

38

be included in Cabrera's report.  Chevron omits Fajardo's statement that "[W]hat the expert is going to do is state his criteria, alright?  and sign [on/in] the report and review it [unintelligible].  But all of us, all together, have to contribute to that report."

For the reasons stated in St. 27, Chevron cannot rely on Reyes's declaration.  Reyes's story raises many additional questions:  Why did Reyes allegedly attend this meeting if he did not want to participate in the global expert process?  And why, once Reyes "fully realized" the "full extent of the plaintiffs' counsel's intentions," did he still continue to work with the Ecuadorian Plaintiffs and even agree to write to technical analyses?  Dkt. 658-18 (Ex. 3014) at ¶ 38.

Finally, there is substantial evidence in the record (much of it never contradicted by Chevron) that Ecuadorian law at the time did not prohibit parties from interacting with court-appointed experts prior to the issuance of the expert's report, including prior to the expert's formal appointment by the court, and providing the expert with documents and information for his consideration and adoption.  *See* Dkt. No. 154-5 (Alencastro Aff.) ¶¶ 9-12, 18-19; Dt. No. 154-6 (Simon Aff.) ¶¶ 4-5, 7-8.  There is also evidence in the record that Chevron interpreted Ecuadorian law and practice in the same way and engaged in its own private *ex parte* communications with, and provided undisclosed *ex parte* assistance to, court-appointed experts.  *See* Dkt. No. 154-7, at 2.  *See also* Ecuadorian Plaintiffs' response to St. 36.

46.    *At the March 3, 2007 meeting with Cabrera, Fajardo stated:  "And here is where we do want the support of our entire technical team . . . of experts, scientists, attorneys, political scientists, so that all of us will contribute to that report—in other words— you see . . . the work isn't going to be the expert's. All of us bear the burden." When someone asked whether the final*

*report would be prepared by Cabrera, Fajardo responded that the expert would "sign the report and review it. But all of us, all together, have to contribute to that report." Defendant Maest said, "But not Chevron," and laughter ensued. Dkt. 6-2 (Exhibit 1) at CRS-187-01-02 (video of March 3, 2007 meeting in Ecuador attended by the LAPs' attorneys, the LAPs' technical experts, and Cabrera); Dkt. 7-5 (Exhibit 2) (certified transcript) at 246.*

Disputed.  Disputed.  Chevron selectively quotes from the outtake transcripts and presents an incomplete description of what was discussed during the meetings.  Chevron's assertion that the purpose of the meeting was "to plan the global expert examination" is unsupported.  Donziger testified that the primary purpose of the meeting was to lay out the case and legal theory for Cabrera and the other participants.  Chevron's characterization suggests that the meeting participants discussed specific details of the content of Cabrera's report—but Chevron's citations do not support such a distortion.

Fajardo describes his prediction of the lengths Chevron would go to interfere with the expert examination.  *See* Dkt. No. 7-5 (Ex. 2) at p. 243 ("There's going to be a constant harassment of the expert and his technical team in the field. . . . Attempts—beware—attempts to bribe the expert with money—and possibly his technical team.  If that doesn't work, they're going to try to threaten, or perhaps sue the expert.").  In this context, Fajardo's statement that "Chevron's main problem right now is that it doesn't know what the hell is going to happen in the global expert examination" shows his belief the Ecuadorian Plaintiffs' work to have the court appoint an expert that could not be controlled by Chevron meant that Chevron was afraid that the true extent of damages would be revealed.

Chevron also omits the surrounding context of Fajardo's statements about the work that the Ecuadorian Plaintiffs' team would do to provide suggestions and material they hoped would

40

be included in Cabrera's report.  Chevron omits Fajardo's statement that "[W]hat the expert is going to do is state his criteria, alright?  and sign [on/in] the report and review it [unintelligible].  But all of us, all together, have to contribute to that report."

For the reasons stated in St. 27, Chevron cannot rely on Reyes's declaration.  Reyes's story raises many additional questions:  Why did Reyes allegedly attend this meeting if he did not want to participate in the global expert process?  And why, once Reyes "fully realized" the "full extent of the plaintiffs' counsel's intentions," did he still continue to work with the Ecuadorian Plaintiffs and even agree to write to technical analyses?  Dkt. 658-18 (Ex. 3014) at ¶ 38.

Finally, there is substantial evidence in the record (much of it never contradicted by Chevron) that Ecuadorian law at the time did not prohibit parties from interacting with court-appointed experts prior to the issuance of the expert's report, including prior to the expert's formal appointment by the court, and providing the expert with documents and information for his consideration and adoption.  *See* Dkt. No. 154-5 (Alencastro Aff.) ¶¶ 9-12, 18-19; Dt. No. 154-6 (Simon Aff.) ¶¶ 4-5, 7-8.  There is also evidence in the record that Chevron interpreted Ecuadorian law and practice in the same way and engaged in its own private *ex parte* communications with, and provided undisclosed *ex parte* assistance to, court-appointed experts.  *See* Dkt. No. 154-7, at 2.  *See also* Ecuadorian Plaintiffs' response to St. 36.

47.     *On March 4, 2007, Donziger said to Maest and other members of the LAP team: "Hold on a second, you know, this is Ecuador, okay.  You can say whatever you want and at the end of the day, there's a thousand people around the courthouse, you're going to get what you want. Sorry, but it's true. Okay. Therefore, if we take our existing evidence on groundwater*

41

*contamination, which admittedly is right below the source. And wanted to extrapolate based on nothing other than our, um, theory that is, they all, we average out to going 300 meters in a radius, depending on the – the, uh—what do you call it when the land goes down? The incline. You know what I mean, . . . The gradient. We can do it. We can do it. And we can get money for it. And if we had no more money to do more work, we would do that. You know what I'm saying? And it wouldn't really matter that much. Because at the end of the day, this is all for the Court just a bunch of smoke and mirrors and bullshit." Dkt. 6-2 (Exhibit 1) at CRS-196-00-CLIP-01 (2007.03.04 Crude outtake video clip of meeting among S. Donziger, A. Maest, R. Kamp, and C. Champ discussing groundwater evidence); Dkt. 7-6 (Exhibit 2) (certified transcript) at 258-60.*

Disputed. Chevron plucks selected quotations from a healthy internal discussion about groundwater remediation and strings them together to create a distorted picture of events. The actual transcript reveals the much more benign truth. The clip begins with a discussion of what evidence had been collected and what evidence was lacking. The group even discussed using the evidence that Chevron had collected from the first two inspections. Dkt. 7-6 at 3. They discussed the need to collect additional evidence and generate additional analyses regarding groundwater contamination and remediation. *Id.* at 4. The group continued to discuss and debate the strengths and weaknesses of their arguments regarding groundwater, even after Donziger posed the questions that Chevron would highlight. Further, these statements were made many years before the Lago Agrio judgment was issued, and do not establish anything about what groundwater evidence was submitted to the court.

For the reasons stated in St. 30, this purported fact is not material.

48.    *On March 19, 2007, the Lago Agrio court announced the appointment of Cabrera as the global expert. Dkt. 32-5 (2007.03.19 court order) at 2 ("Mr. Richard Cabrera is appointed as the expert for the expert evaluation requested by plaintiffs . . . .")*

Not disputed.

42

49.     *In Fajardo's March 26, 2007 email to LAPs' lawyers, his statement:  "Today the cook met with the waiter to coordinate the menu," described the need to pressure the judge (the "cook") to keep him from appointing another expert in connection with the global assessment in addition to Cabrera (the "waiter"). Dkt. 400-2 (Ex. 2012) (DONZ00042758) (referring to the judge as the "cook", Cabrera as the "waiter" and Chevron as "the other restaurant"); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 3822:12-3824:8 (Donziger testifying that Fajardo's code words "the cook," "the waiter," and "the other restaurant" referred to the judge, Cabrera, and Chevron respectively).*

Disputed.  Donziger disputes the insinuation that the use of alternate names is evidence of impropriety by the Ecuadorian Plaintiffs.  Chevron engaged in extensive efforts to spy on the Ecuadorian Plaintiffs' team.  *See* Dkt. 613-5 (Ex. E).  Chevron continues that pattern to this day. *See, e.g.*, Dkt. 895-6 at 4 (surreptitiously taken photograph of Donziger that purports to be from February 27, 2013); Dkt. 754-4, Ex. 3108 (surreptitiously taken photograph of the Ecuadorian Plaintiffs' counsel).

50.     *Cabrera was sworn in by the Lago Agrio court as the global expert on June 13, 2007. Dkt. 32-9 (Cabrera certificate of swearing in) at 130,169.*

Not disputed.

51.     *Cabrera was obligated by court order to be "impartial" and "independent" and to ensure that his work was "transparent" and "independent from the two parties." Dkt. 32-9 at 130,169 (In Cabrera certificate of swearing-in Cabrera swears to perform his duties "faithfully and in accordance with science, technology and the law and with complete impartiality and independence vis-à-vis the parties"); Dkt. 32-6 (132,846) at 2 (2007.10.03 court order regarding Cabrera's duties as expert stating: "The Expert [Cabrera] is hereby reminded that he is an auxiliary to the Court for purposes of providing to the process and to the Court scientific elements for determining the truth."); id. at 6 (ordering Cabrera to "perform his work in an impartial manner and independently with respect to the parties"); id. ("In reference to the persons acting as assistants to [Cabrera] in the sampling and other work being performed by the expert, these must be independent from the two parties."); id. at 10 (ordering Cabrera to maintain "complete impartiality and transparency with respect to the parties and their attorneys").*

43

Disputed.  Chevron has plucked convenient words at random from various court orders and strung them together in a misleading manner, as the full quotations Chevron provides make clear.

Chevron's selective quotation and characterization of the October 3, 2007 order omits the essential fact that, in the very same order, ***the judge ordered Cabrera to make time to meet with the parties and for the parties to make suggestions regarding the proceeding***.  This refutes Chevron's insinuation that Cabrera was not to have contact with the parties or that the parties could not provide materials to, and attempt to persuade, Cabrera.

> He [the expert] shall allow at least thirty minutes every day to meet with the parties, thus complying with the request made in point 6 of the motion.  The content of point 4 was discussed with the parties, and an agreement was reached on it.  The Expert is responsible for the opinions, for the conclusions made by the professionals making up his team and assisting with the preparation of the report.
>
> . . .
>
> With regard to request 2, it has been ruled that the expert will be allowed half an hour prior to the start of the proceeding in order to discuss certain details of the expert testimony with the parties and so that he can give that testimony better, they can make suggestions regarding the proceeding.

Dkt. 32-6 (Ex. 151) at p. 132,846 and 132,849.  The Lago Agrio Court also authorized the parties to submit any materials they wished to Cabrera.  Dkt. 613-13 at 10 ("[T]he parties may submit to the expert whatever documentation they believe may be useful in preparing his report.").  The Lago Agrio Court ordered that materials submitted by Chevron "be delivered directly to the expert, its addressee."  *Id.*

Chevron's repeated invocation of terms like "independent" to accuse the defendants rests on a fundamental misapprehension of Ecuadorian law.  Ecuadorian law did not prohibit the

44

parties from advocating their positions or urging the expert's agreement with and adoption of those positions.  Under Ecuadorian law, the expert's "independence" arises from his free reign to decide whether, in his professional judgment, he believes a party's position to be the correct one and to adopt whatever information is provided by a party as grounds for his opinions.  *See* Dkt, No. 154-5 ¶¶ 11-12, 18; Dkt. No. 154-6 ¶¶ 8-9.  There is substantial evidence already in the record that Ecuadorian law at the time did not prohibit parties from making contact with court-appointed experts prior to the issuance of the expert's report, including prior to the expert's formal appointment by the court.  *See* Dkt. No. 154-5 (Alencastro Aff.) ¶¶ 9-12, 19; Dkt. No. 154-6 (Simon Aff.) ¶¶ 4-5, 7-8.  *See also* Ecuadorian Plaintiffs' response to St. 36.

*52.     The LAP team repeatedly asserted, to the Lago Agrio court, and to other audiences, that Cabrera was a "neutral" and "independent" court-appointed expert or "Special Master," and they denied any improper relationship with Cabrera. Dkt. 402-12 (Ex. 2308) at 134,001, 134,004 (2008.01.11 LAP filing stating in Ecuador court filing that "Cabrera was not proposed by the plaintiffs" and "was not appointed at the suggestion of the plaintiffs," but was nominated by the court); Dkt. 47-57 (2010.07.09 LAP filing in Stratus 1782) at 27 ("Cabrera is not even an expert for one party, but a Court-appointed neutral."); Dkt. 47-30 (Donziger's Lantos Commission Testimony) at 7 ("The best and most recent independent estimate available of the human health impact of this contamination is provided by the expert appointed by the court, Richard Cabrera."); Dkt. 30-5 (2010.06.14 LAP complaint to stay arbitration) ¶ 29 ("The best and most recent independent estimate available of the human health impact of this contamination is provided by the neutral Special Master appointed by the court to provide advice on damages."); Dkt. 400-2 (Ex. 2017) (2009.05.10 LAP filing) at 129,697 (The LAPs re- quested a single expert designated by the court "primarily due to the issue of impartiality . . . . Impartiality because, having not been named by either of the parties, he will be even more objective in his analysis and conclusions . . . ."); see also Dkt. 400-2 (Ex. 2019) at 140,184-85 (2008.04.18 LAP filing stating: "I remind you, Mr. President, that expert Cabrera was given the task because of his professional and personal suitability, and as such, his work should be free of external pressures from the parties, especially when these pressures can compromise the systematic integrity of his work in an attempt to turn this professional designated by the court into a mere executor of their plans and strategies.").*

Disputed.  Chevron does not define what it means by an "improper" relationship. Nowhere in the evidence to which Chevron cites do the Ecuadorian Plaintiffs or Donziger use the word "improper," so it is wholly inaccurate to claim that the Ecuadorian Plaintiffs "denied any improper relationship." Chevron's characterization of what exactly was denied is unsupported and argumentative.  Chevron's suggestion that any contact whatsoever between the Ecuadorian Plaintiffs and Cabrera was "improper" is wrong under Ecuadorian law and is inconsistent with the Lago Agrio court's orders.  Moreover, the insertion of this legal conclusion is not proper in a Rule 56.1 statement.  "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)). Whether Chevron believes that any relationship between the Ecuadorian Plaintiffs and Cabrera was "improper" under Chevron's own standards is not relevant to the instant motion for summary judgment.

Further, Chevron has manipulated quotations and taken words out of context in a manner that creates a misleading impression.  For example:

- Chevron did not include the end of the sentence that begins "Cabrera was not proposed by the plaintiffs."  The full sentence reads: "Engineer Cabrera was not appointed at the suggestion of the plaintiffs.  They originally proposed Dr. Luis Villacreces for the position.  Chevron opposed this, and the Judge listened to this request and appointed another expert."  Dkt. 402-12 (Ex. 2308) at p. 134,004.

- The Stratus pleading that Chevron quotes was an effort by Stratus to resist Chevron's improper § 1782 fishing expedition.  Stratus argued that "There is no Ecuadorian precedent for seeking this discovery of materials given to a court-appointed expert."  Dkt.

46

47-57 (Ex. 295) at p. 27.

- Chevron similarly provides only a selected quotation from the Ecuadorian Plaintiffs'
  April 18, 2008 pleading.  Examination of the full pleading shows that the Ecuadorian
  Plaintiffs' statement was made in the context of attempting to clarify an order from the
  court for Cabrera to "comply" with Chevron's requests.

Nor do Chevron's citations support its assertion that the Ecuadorian Plaintiffs'

"repeatedly" referred to Cabrera as "neutral" "independent" or a "Special Master."  In fact, most

of Chevron's citations provide only that the Ecuadorian Plaintiffs recited the fact that the court

appointed Cabrera.  It is undisputedly true that the court appointed Cabrera.

Finally, Chevron's repeated invocation of terms like "independent" to accuse the

defendants rests on a fundamental misapprehension of Ecuadorian law.  Ecuadorian law did not

prohibit the parties from advocating their positions or urging the expert's agreement with and

adoption of those positions.  Under Ecuadorian law, the expert's "independence" arises from his

free reign to decide whether, in his professional judgment, he believes a party's position to be the

correct one and to adopt whatever information is provided by a party as grounds for his opinions.

*See* Dkt, No. 154-5 ¶¶ 11-12, 18; Dkt. No. 154-6 ¶¶ 8-9.  There is substantial evidence already in

the record that Ecuadorian law at the time did not prohibit parties from making contact with

court-appointed experts prior to the issuance of the expert's report, including prior to the expert's

formal appointment by the court.  *See* Dkt. No. 154-5 (Alencastro Aff.) ¶¶ 9-12, 19; Dkt. No.

154-6 (Simon Aff.) ¶¶ 4-5, 7-8.  *See also* Ecuadorian Plaintiffs' response to St. 36.

53.     *Defendants used code words to conceal their interactions with the Ecuadorian court and
Cabrera. Dkt. 402-2 (Ex. 2221) (DONZ00060634) at 1 (referring to the judge as the "Big
Boss"); Dkt. 400-2 (Ex. 2012) (DONZ00042758) (referring to the judge as the "cook", Cabrera
as the "waiter" and Chevron as "the other restaurant"); Dkt. 32-7 (DONZ00108564) at 1*

47

*(referring to the judge as the "boss"); Dkt. 356-9 (DONZ00043514) (referring to Donziger as "Lagarto 3", Fajardo as "Lagarto 2" while instructing Donziger to only refer to himself on a specific Hotmail address as "Lagarto 3"); Dkt. 400-3 (Ex. 2026) (DONZ-HDD-0125950) (referring to Cabrera as the "Wao"); Dkt. 402-2 (Ex. 2222) (DONZ00066208) (referring to Cabrera as the "wao").*

Disputed.  Donziger disputes the insinuation that the use of alternate names is evidence of impropriety by the Ecuadorian Plaintiffs.  Chevron engaged in extensive efforts to spy on the Ecuadorian Plaintiffs' team.  See Dkt. 613-5 (Ex. E).  Chevron continues that pattern to this day.  *See, e.g.*, Dkt. 895-6 at 4 (surreptitiously taken photograph of Donziger that purports to be from February 27, 2013); Dkt. 754-4, Ex. 3108 (surreptitiously taken photograph of the Ecuadorian Plaintiffs' counsel).

54.    *Among other names, Defendants referred to Cabrera as "Wao" or "Wuao." Dkt. 400-3 (Ex. 2026) (DONZ-HDD-0125950) (referring to Cabrera as the "Wao"); Dkt. 402-2 (Ex. 2222) (DONZ00066208) (referring to Cabrera as the "wao"); Dkt. 356-9 (DONZ-HDD- 0125080) at 210 ("[H]e sends us money to our secret account, to give to Wuao, [to] not stop the work.") (brackets in original).*

Disputed.   Donziger disputes the insinuation that the use of alternate names is evidence of impropriety by the Ecuadorian Plaintiffs.  Chevron engaged in extensive efforts to spy on the Ecuadorian Plaintiffs' team.  See Dkt. 613-5 (Ex. E).  Chevron continues that pattern to this day.  *See, e.g.*, Dkt. 895-6 at 4 (surreptitiously taken photograph of Donziger that purports to be from February 27, 2013); Dkt. 754-4, Ex. 3108 (surreptitiously taken photograph of the Ecuadorian Plaintiffs' counsel).

55.    *Fajardo wrote the following filings submitted by Cabrera in the Lago Agrio Litigation: Dkt. 35-9 (2007.07.23 Cabrera letter) at 131,972 (Fajardo, writing as Cabrera, stating, "I should clarify that I do not have any relation or agreements with the plaintiff, and it seems to me to be an insult against me that I should be linked with the attorneys of the plaintiffs."); Dkt. 400-3 (Ex. 2030) (2007.08.23 Cabrera letter) at 132,263 (Fajardo, writing as Cabrera, reporting*

that, "*In order to demonstrate the transparency and impartiality and objectivity with which I am developing the field work . . . I chose to draft a sample registry sheet*"); Dkt. 400-3 (Ex. 2031) (2007.10.16 Cabrera letter) at 133,254 (Fajardo, writing as Cabrera, stating that Cabrera's "duty as expert is to comply with the law"); Dkt. 400-3 (Ex. 2032) (2007.10.31 Cabrera letter) at 133,465 (Fajardo, writing as Cabrera, stating, "*I can only confirm my commitment to continue my work with absolute impartiality, honesty and transparency.*"); Dkt. 400-3 (Ex. 2033) (2007.11.08 Cabrera letter) at 133,582 (Fajardo, writing as Cabrera, asking the court to order public and private institutions to provide him with essential information so he can "*conduct a thorough, impartial and objective investigation in strict observance of the law*"); Dkt. 400-3 (Ex. 2034) (2007.12.10 Cabrera letter) at 133,907 (Fajardo, writing as Cabrera, stating, "*I hope and I am certain that my report, which is completely impartial, will help bring to light the truth of the matters in dispute.*"); Dkt. 400-4 (Ex. 2041) (2008.01.07 Cabrera letter) (Fajardo, writing as Cabrera, stating that Cabrera's report is almost complete and requesting that the parties supply Cabrera with documents); Dkt. 35-10 (2008.10.07 Cabrera letter – 151,316) at 7 (Fajardo, writing as Cabrera, stating, "*I am an honest man with nothing to hide, and my con- duct as an expert in this case has been as professional, impartial and objective as possible, as can be seen from my expert report. The fact that neither of the two parties is fully satisfied with my report is clear evidence of my impartiality.*"); Dkt. 400-4 (Ex. 2042) (2008.11.07 Cabrera letter) at 152,783 (Fajardo, writing as Cabrera, stating that Cabrera could not produce to Chevron any drafts of his report because "*[t]he digital files that contain these drafts were deleted after the final report was submitted, and the paper was recycled. . . . I was not aware of any obligation to store all the drafts I used in performing my work.*"); Dkt. 36-4 (2009.03.04 Cabrera letter) at 154,580 (Fajardo, writing as Cabrera, responds to questions by Chevron regarding Cabrera's independence: "*Once more I make it a matter of record that I have done my work, with my technical team, in adherence to my principles of integrity and, without a desire to negatively affect or benefit either party . . . .*"); Dkt. 400-3 (Ex. 2035) (2010.03.22 Cabrera letter) at 168,513 (Fajardo, writing as Cabrera, stating, "*Chevron accuses me of having a conflict of interest . . . . Your Honor, this is another serious and false accusation.*"); Dkt. 402-13 (Ex. 2319) (2007.07.12 Cabrera letter) at 131,336 (Fajardo, writing as Cabrera, requesting that the court halt government remediation at inspection sites); Dkt. 400-3 (Ex. 2029) (2007.07.12 Cabrera letter) at 131,338 (Fajardo, writing as Cabrera, referring to "the complete and absolute impartiality with which I must act in carrying out my expert evaluation . . . ."); Dkt. 402-14 (Ex. 2321) (2007.07.23 Cabrera letter) at 131,971 (Fajardo, writing as Cabrera, giving notice of future site inspections). Dkt. 400-16 (Ex. 2105) ¶¶ 3, 9I(iii), Ex. F (2011.06.30 Expert Report of Gerald McMenamin concluding that "(1) the fifteen Cabrera filings identified as a subset of all the Cabrera filings reviewed have a single author, and (2) the author of this subset is Pablo Fajardo Mendoza").

      Disputed.  The only basis for Chevron's assertion that the listed filings were written by

Fajardo is Dr. McMenamin's report.  But Chevron cannot rely on Dr. McMenamin's report (or at

least the version Chevron cites to in its Separate Statement), and all references thereto should be

49

stricken.  Dr. McMenamin's report is unsworn and is not admissible on summary judgment.[9]

*See Berk v. St. Vincent's Hosp. and Med. Ctr.*, 380 F. Supp. 2d 334, 352 (S.D.N.Y. 2005)

("Courts in this Circuit have uniformly held that unsworn expert reports do not satisfy the

admissibility requirements of Fed.R.Civ.P. 56(e), and cannot be used to defeat a summary

judgment motion without additional affidavit support.").

Dr. McMenamin's report is also not admissible because it does not meet the requirements

of Rule 702 and Daubert.  *See id.* at 353; *Cacciola v. Selco Balers, Inc.*, 127 F. Supp. 2d 175,

180 (E.D.N.Y. 2001) ("Evidence contained in an expert's report therefore must be evaluated

under Fed.R.Evid. 702 before it is considered in a ruling on the merits of a summary judgment

motion.").  Dr. McMenamin's report has numerous deficiencies, three of which will be

mentioned here.

*First*, the reliability Dr. McMenamin's method of "forensic stylistic analysis" is, at the

very least, subject to debate.  Other courts have excluded proffered expert testimony as to the

identity of questioned writings that was based on the same forensic stylistic analysis as Dr.

McMenamin's opinions.  *See United States v. Van Wyk*, 83 F. Supp. 2d 515, 522-23 (D.N.J.

2000). In fact, in *Van Wyk* the government offered an article written by Dr. McMenamin in

support of its proffered expert testimony.  *See id.* at 521-23.  The court did not admit the

proffered testimony.

---

[9] A page bearing nothing but the date and McMenamin's signature is attached to the report at Dkt. 400-16 (Ex. 2105) at p. 18.  But this signature does not accompany an oath or any other attestation by McMenamin regarding the report.

*Second*, Dr. McMenamin reaches his conclusion without examining any documents known to be written by Cabrera. See Dkt. 400-16 (Ex. 2105) at p. 17 (noting "the absence of authenticated exemplar writing by Ing. Cabrera"). This is despite his acknowledgement that "The first step in a matter of this type would typically be to compare and contrast the Questioned writings to Known writings of the putative author." *Id.* at p. 98. That Dr. McMenamin could definitively conclude that certain writings were not authored by Cabrera when he didn't even know of any baseline characteristics of Cabrera's writing is highly suspect. At the very least, Donziger should have the opportunity to cross-examine Dr. McMenamin about the effect that the lack of Cabrera writings has on the reliability of his analysis.

*Third*, many of the bases for Dr. McMenamin's conclusions are, on their face, highly questionable. Dr. McMenamin concludes that Fajardo authored certain Cabrera filings because certain errors or formatting choices appear in both the subset of Fajardo writings that Dr. McMenamin analyzed and the subset of Cabrera filings that were labeled "questioned."[10] But many of these errors or choices appear to be commonplace. Dr. McMenamin bases his conclusion on such banal common features of Fajardo's writing and the questioned filings as:

- The format in which time of day is indicated

- Failure to double-space between paragraphs (which is not consistent across either set of writings)

- Use of capital letters for emphasis

---

[10] Dr. McMenamin does not explain how these subsets were selected or by whom, and Donziger should have the opportunity to understand Dr. McMenamin's methodology.

- Omitting letters (e.g. misspelling) words, but not necessarily the same words (only once is the same word misspelled in both a Cabrera filing and a Fajardo writing)

These are hardly convincing indicia of common authorship.  At the very least, Donziger should be afforded the opportunity to depose Dr. McMenamin.

Additionally, Dr. McMenamin did not rely on the same English translations of various Spanish documents for his analysis as the ones Chevron submitted to the Court.  For example, Dr. McMenamin purports to quote an August 23, 2007 letter to the Lago Agrio Court as follows: "in July this year, I chose to create a sample record sheet, noting basic technical information for each sample."  Dkt. 400-16 (Ex. 2105) at 11.  The translation of that letter that Chevron submitted to this Court and cites here provides a different version: "in July of this year, I chose to *draft* a sample *registry* sheet, noting basic technical information for each sample."  Dkt. 400-3 (Ex. 2030) at 3 (differences italicized).  Dr. McMenamin also purports to quote a November 7, 2008 letter to the Lago Agrio Court as follows:  "I understand, Your Honor, that, as an expert, my legal obligation was to deliver the report at the time appointed and answer the questions of the parties, but I did not know of any obligation to store all the drafts I used in the preparation of my work."  Dkt. 400-16 (Ex. 2105) at 14.  The translation of that letter that Chevron submitted to this Court and cites here is entirely different:  "Your Honor, I understand that my legal obligation as the expert was to present the report within the term specified and to answer the questions from the parties, but I was not aware of any obligation to store all the drafts that I used in performing my work."  Dkt. 400-4 (Ex. 2042) at 2.  This is yet another reason that Dr. McMenamin's conclusions are unreliable and should not be credited.  Further, the translation discrepancies raise

serious questions about Chevron's ability to rely on translations in general, because they expose the subjectivity of word choice and the susceptibility of translation to editorializing.

56.     *As this Court has already found, "Cabrera's work plan was drafted by the LAP team and given to Cabrera for his adoption. When the work plan was filed with the Lago Agrio court, it was not disclosed that the LAP team had provided Cabrera with a draft of the work plan." Dkt. 550 at 37; see also Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 2165:2-6 ("Q.  Did the plaintiffs' team draft the Cabrera work plan? A.  I believe the plaintiffs' team drafted a work plan that was given to him for his examination."), 2184:3-2186:4; Dkt. 56  at 2203:4-17 (the LAPs' counsel and consultants wrote Cabrera's work plan); Dkt. 6-2 (Exhibit 1) at CRS-189-00-CLIP-02; Dkt. 7-4 (Exhibit 2 (certified transcripts)) at 223-27 (Donziger proposed forming a "work committee" to draft Cabrera's "work plan" with the goal of having "more or less eighty percent-ninety percent on the way to a plan" in a few days); Dkt. 400-4 (Ex. 2043) (DONZ00038727) at 1 (Fajardo emailing Donziger); see also id. at 3-4 (LAP-drafted chart entitled "Expert Examination Activity Plan" with members of the LAPs' team noted as the individuals responsible for various activities); id. at 5-6 (LAP-drafted document entitled "Final Plan from the Global Expert Examination" containing an outline of tasks to be performed for Cabrera's global examination); Dkt. 400-4 (Ex. 2044) (LAPs' team drafted Cabrera's work plan); Dkt. at 8-9 at 2177:8-2178:15; 2165:2-2166:23; 2406:7-11 (Donziger testified that the LAPs' team was involved in "putting together Cabrera's work team.").*

Disputed.[11]  Chevron provides incomplete and mischaracterized versions of the evidence to which it cites.

For example:

- Chevron asserts that Donziger testified at p. 2203:4-17 that the "LAPs' counsel and consultants wrote Cabrera's work plan."  This mischaracterizes Donziger's testimony. Donziger testified that the Ecuadorian Plaintiffs provided Cabrera with a work plan, that

---

[11] *"See note 6, supra.*

they had been involved in Cabrera's site selection, and he thought that the plaintiffs

suggested sampling protocols to him.  Dkt. 8-9 (Ex. 6) at 2203:4-17.

- When Chevron quotes from Donziger's deposition testimony, it omits Donziger's

    testimony that Donziger did not know if Cabrera adopted the exact plan that the

    Ecuadorian Plaintiffs submitted to him, modified it, or made another version.  Dkt. No.

    400-1 (Ex. 2010) at 2165:2-8 ("Q: Did the plaintiffs' team draft the Cabrera work plan?

    A: I believe the plaintiffs' team drafted a work plan that was given to him for his

    adoption.  *I don't know if he adopted that exact plan, modified it, or did some other*

    *version.*") (portion omitted by Chevron italicized).

- In the Crude clip to which Chevron cites, Donziger discusses "defin[ing] a work plan."

    Dkt. No. 7-4 (Ex. 2) at 223.  But, contrary to Chevron's characterization, there is no

    indication that Donziger is discussing drafting Cabrera's work plan.  Rather, the context

    establishes that Donziger was discussing various litigation-related tasks for the

    Ecuadorian Plaintiffs' team.  See id. ("I believe that the most important task is for us to

    define a work plan.  Specific.  With dates, teams and budget.  [traffic noises].  So, that is

    a very different process than what we've gone through today, up to now.  For me, it

    means defining the objectives. . . .").

- Chevron then claims that Dkt. No. 400-4 (Ex. 2043) supports its assertion that the

    Ecuadorian Plaintiffs drafted the work plan that Cabrera filed with the Lago Agrio court.

    But the document attached to the e-mail in Exhibit 2043 looks *nothing* like the work plan

54

that Cabrera filed with the court. *Compare* Dkt. No. 400-4 (Ex. 2043) (Fajardo's "first draft of the plan and schedule of activities to be carried out") *with* Dkt. No. 400-4 (Ex. 2044) at p. 130,641- 130,651 (work plan filed with the court).

- Dkt. 400-4 (Ex. 2044) is the work plan that Cabrera submitted. Nothing on the face of the document supports Chevron's description of the work plan in the parenthetical accompanying the citation to Dkt. 400-4.

- Donziger's testimony that he remembered "efforts to suggest to him [Cabrera] people who might be competent to carry out various field tasks, suggestions made by members of our team," Dkt. No. 8-9 (Ex. 6) at 2177:18-23, does not establish that the Ecuadorian Plaintiffs drafted the work plan Cabrera filed with the court. The filed work plan does not list any particular individuals; it lists only the "professional profile" and "responsibilities" of the "multi-disciplinary team [that] will be required . . ." Dkt. No. 400-4 (Ex. 2044) at p. 130,650.

57.   *The LAP team secretly contracted with Cabrera, purchased insurance for him, and discussed getting him an office and arranging for one of their girlfriends to be his assistant. Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 3800:9-3805:7, 4842:22-4843:18 (Donziger testifying that the LAPs' counsel had entered into a contract with Cabrera); Dkt. 400-3 (Ex. 2027) (2007.07.01 email from Fajardo explaining that Cabrera called "about a little mistake in the contract" and suggesting that the LAPs' representatives "help [Cabrera] get an office," arrange for Prieto's girlfriend to be his assistant, that it is the LAPs' "duty to help him get insurance"); Dkt. 400-3 (Ex. 2028) (email discussing life insurance quotes for Cabrera); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 3802:5-3808:16 (Donziger testifies that the LAPs purchased life insurance for Cabrera).*

Disputed. Chevron selectively quotes from Fajardo's e-mail and omits the portions that undermine Chevron's chosen story. First, Chevron omits the portion of the e-mail in which

Fajardo states that "it is our obligation to help him [Cabrera]."  Dkt. No. 400-3 (Ex. 2027) at 2.

Fajardo also states that "Even though it's not our obligation, but I think it's our duty to help him

get insurance.  We must understand that he has no structure and we do.  I think that he now needs

to get to the heart of his work.  There's no reason he should be dealing with those

[administrative] things that eat up his time and bother him."  *Id.* at 3 (bracketed text present in

translation but not in original Spanish document).  This undermines Chevron's suggestion that

Cabrera was being paid to do nothing because it shows that Fajardo and Donziger thought that

Cabrera had actual work to do.

      Further, as the Ecuadorian Plaintiffs were required to pay Cabrera, it was appropriate for

them to make provisions for his work, in part to lessen costs that they would ultimately be

responsible for.  Chevron's citations merely underscore the fact that Cabrera was engaged in

substantive field work requiring assistance and that he was under intense psychological

intimidation and pressure from Chevron. *See* Dkt. No. 28-7 (Ex. 76) (DONZ00027256) at p. 14

("Richard said Texaco was already starting to investigate him."); Dkt. 613-8 (Ex. H) (12/8/10

Donziger Depo. Tr.) at 962: 3-6 ("There was a hesitancy, I found, on the part of qualified

technical people in Ecuador to work with us out of fear that Chevron would retaliate against

them").

      Additionally, Chevron's contention that the contract with Cabrera was secret is wholly

unsupported.  The cited material does not discuss whether the contract was "secret," and

Chevron cites to no other facts from which secrecy can be inferred on summary judgment.

56

*58.    On April 17, 2007, Yanza wrote to Donziger: "We have met with Richard [Cabrera] and everything is under control. We gave him some money in advance."  Dkt. 356-9 at 206; see also Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 3781:3-3784:25.*

Donziger disputes Chevron's insinuation that this was inappropriate.  In fact, Donziger testified that there *was* a valid reason for this payment.  *See* Dkt. 613-16 (Ex. P) (1/29/11 Donziger Depo. Tr.), at 3778:4-11 ("Q. Can you think of any valid reason as you sit here now why Richard Cabrera would have been given some money in advance by the plaintiffs' team two months before he was officially appointed and began serving as the global damages assessment expert? A. Yes.").  The reason was that Cabrera had already begun his work.  *See id.* at 3780:19-21 ("I think he began his work before his swearing in, but after his appointment, is my recollection.").

Moreover, Donziger's testimony regarding the "everything is under control" comment clarifies that Yanza was not discussing an illicit payment.  Donziger testified that he thought "everything is under control" meant that everything was under control with respect to "the idea of getting this aspect of the trial moving."  Dkt. No. 400-1 (Ex. 2010) at 3783:21-3784:5.

*59.    On or around June 12, 2007, the LAP team opened a bank account at Banco Pichincha, Lago Agrio Branch in Nueva Loja, Ecuador, ending in number 4298-00.  Dkt. 355-2 (Ex. 1019); Dkt. 355-2 (Ex. 1020).*

Disputed.  The e-mail to which Chevron cites does not establish when any account was opened or by whom.  All that Chevron has established is that on September 12, 2007, Yanza e-mailed Donziger with an account number ending in 98-00 and that Yanza stated the account name was Amazon Defense Front.  Dkt. 355-22 (Ex. 1020).

57

60.     *Yanza referred to the Banco Pichincha account ending in number 4298-00 as the "secret account." Dkt. 400-3 (Ex. 2021) at 2 (Luis Yanza: "To open the account we need at least 2 thousand dollars. Due to the urgency, I suggest that amount (or more, 5 or 10 thousand) be sent to my personal account and I will transfer it to the new secret account."); Dkt. 400-3 (Ex. 2022) at 1; Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 4847:2-24 (Donziger testifying that Yanza referred to the account from which Cabrera was paid as a "secret account"); id. at 853:6-4859:7; Dkt. 400-3 (Ex. 2023) at 3; see also Dkt. 400-3 (Ex. 2024) (email attaching list of total distributions made from Chevron Litigation Fund) at 1; Dkt. 400-3 (Ex. 2025) at 1-2 (list of total distributions from Chevron Litigation Fund reveals payments of $50,000 to Frente de Defensa de la Amazonia on Aug. 15, 2007 and Sept. 14, 2007); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 4848:11-4849:7 ("Q.  Let's actually turn to page 3, where you say at the bottom 'Joe, please transfer 50,000 to the following account in Ecuador. If you have any questions please call.' Do you see that? A. Yes. Q.  And then you provide the information for the account that Mr. Yanza calls the secret account. Do you see that? A. Yes."); Dkt. 400-3 (Ex. 2026); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 3805:8-12 ("Q.  Am I correct, Mr. Donziger, that the plaintiffs' team had a nickname for Mr. Cabrera? He was called Wao, correct? A. Yes."); id. at 327:15-20; Dkt. 356-9 (DONZ-HDD-0125080) at 210 ("[H]e sends us money to our secret account, to give to Wuao, [to] not stop the work.") (final brackets in original); Dkt. 400-3 (Ex. 2021) (DONZ-HDD-0113361); Dkt. 400-3 (Ex. 2022) (DONZ-HDD-0124585).*

Disputed.  Most of the evidence to which Chevron cites has nothing to do with what Yanza called the account ending in 298-00, for example, lists of distributions from the Chevron litigation fund.

Yanza's e-mail makes the purpose of the request to Kohn clear, and the purpose is far more benign than Chevron would have the Court believe.  Chevron was going to great lengths to block and delay the expert inspections, in part by ensuring that he would not be paid.  The subject of the e-mail is "We should not give Texaco the pleasure of stopping the Global Assessment."  He writes:

> Texaco's goal of stopping the global assessment could happen the next business day. . . But the expert's work cannot wait, and the last business day starts next Wednesday, so he will need more money, especially since the groundwater study begins, too, but if there is no money, the work will simply stop.

58

Considering all this, I think we should plan ahead and not give those Texaco bastards the pleasure, using the same mechanism from weeks ago, that is, he sends us money to our secret account, to give to Wuao, [to] not stop the work.

Dkt. 356-9 (Ex. S) (DONZ-HDD-0125080) at p. 210.  Chevron also omits a prior paragraph in the e-mail which shows that the payment that the parties were discussing was a payment that Cabrera had properly requested through the court but the accompanying order was being held up due to Chevron's pending motion for the judge to recuse. *Id.*

Finally, the evidence to which Chevron cites does not establish whether, when, or from what accounts any payments to Cabrera were actually made.

61.     *Yanza explained the purpose of the "secret account" to Donziger: "[Joseph Kohn] sends us money to our secret account, to give to Wuao [Cabrera], [to] not stop work." Dkt. 356-9 (DONZ-HDD-0125080) at 210 ("[H]e sends us money to our secret account, to give to Wuao, [to] not stop the work.") (brackets in original); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 4848:11-4849:7 ("Q.  Let's actually turn to page 3, where you say at the bottom 'Joe, please transfer 50,000 to the following account in Ecuador. If you have any questions please call.' Do you see that? A. Yes. Q.  And then you provide the information for the account that Mr. Yanza calls the secret account. Do you see that? A. Yes."); Dkt. 400-3 (Ex. 2026); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 3805:8-12 ("Q.  Am I correct, Mr. Donziger, that the plaintiffs' team had a nickname for Mr. Cabrera? He was called Wao, correct? A. Yes."); id. at 4327:15-20.*

Disputed.  Donziger incorporates St. 60.

62.     *Donziger knows of no purpose for this account other than to pay Cabrera. Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 4414:16-4415:3 (Donziger testifying that he is aware of no purpose of the secret account besides payments to Cabrera).*

Disputed.  Chevron mischaracterizes Donziger's deposition testimony.  Donziger testified that he knew there was a second account that Yanza kept.  He testified that he did not have signatory authority over the account, and that he did not know whether the account was established for the purpose of paying Cabrera.  Dkt. No. 400-1 (Ex. 2010) at 4414:10-4415:15.

59

63.     *On August 15, 2007 and again on September 14, 2007, acting on Donziger's instructions, Kohn Swift & Graf wired $50,000 from the United States to the "secret account."  Dkt. 400-3 (Ex. 202)5 (list of total distributions from Chevron Litigation Fund reveals payments of $50,000 to Frente de Defensa de la Amazonia on Aug. 15, 2007 and Sept. 14, 2007) at 1-2; Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 4848:11-4849:11 ("Q.  Let's actually turn to page 3, where you say at the bottom 'Joe, please transfer 50,000 to the following account in Ecuador. If you have any questions please call.' Do you see that? A. Yes. Q.  And then you provide the information for the account that Mr. Yanza calls the secret account. Do you see that? A. Yes."); Stavers Decl., Ex. 3130 (Dahlberg Declaration), ¶ 12.*

Donziger does not dispute that Kohn, Swift transferred funds on August 15, 2007 and September 14, 2007 to the account ending in 98-00.

64.     *The LAP team made payments that were not disclosed to either the Ecuadorian court or Chevron to Cabrera from the "secret account."  Compare St. 63 with Dkts. 35-2-35-7 (Filings by P. Fajardo in the Lago Agrio Litigation relating to payments to R. Cabrera).*

Disputed.  Even taking Chevron's purported undisputed facts at face value, this assertion is unsupported.  St. 63 does not provide any evidence of any payments to Cabrera or, in fact, any money flowing out of the second account at all.  All that Chevron even attempts to establish in St. 63 is that funds were deposited into the second account.  Chevron has cited absolutely no evidence regarding where funds from the second account went.  In fact, Chevron's own witness admits that "the documents available to me do not include the financial information necessary to determine which bank accounts funds originated from, to which bank accounts the funds were directed, whether the funds were in fact transferred, the nature and purpose of the transfers, or the final disposition of the funds distributed to various bank accounts."  Dkt. 754-17 ¶ 6.

In fact, the documents to which Chevron cites raises the possibility that funds paid into the second account might have been subsequently transferred to another account, including the Selva Viva account from which Cabrera was paid.  *See* Dkt. 356-9 at 210 (9/12/2007 e-mail from

60

Yanza to Donziger suggesting that Kohn could send $50,000 to the second account "and then we could pass the 20 to [Selva Viva] to save time and paperwork.").

65.    *The Lago Agrio court authorized the LAPs to pay Cabrera a total of $271,814. See Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 4863:17-4864-8 (Discussion of court-authorized payments to R. Cabrera).*

Disputed.  The portions of the deposition transcript to which Chevron cites do not come close to establishing any total amount authorized for Cabrera.  Donziger and Ms. Neuman discussed Exhibit 1816, which Ms. Neuman represented was "a collection of six checks that plaintiffs submitted to the Lago Agrio court for payment to be provided by the court to Cabrera." Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 4862:17-23.  Donziger agreed that, between June 2007 and May 2008, "per exhibit 1816," Cabrera was paid whatever the sum total of the checks in Exhibit 1816 was.  *Id.* at 4863:25-4864:6.   Chevron has made no representation that Exhibit 1816 contained the <u>only</u> authorized payments to Cabrera.

66.    *The Lago Agrio court records include copies of checks from the LAPs to Cabrera totaling $263,899, all drawn on a Banco Pichincha account bearing account number ending 4450-04 and all paid to Cabrera after the court authorized his requests for payment. See Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 4863:17-4864-8 (Discussion of court-authorized payments to R. Cabrera); id. at 4865:23-4869:16 (Testimony regarding process for court-authorized payments to R. Cabrera); Stavers Decl. Ex. 3130 (Dahlberg Decl.), ¶ 8, Exs. A & B.*

Disputed.  Chevron is careful to say that court records "include" copies of certain checks. Chevron never represents that these are the *only* payments reflected in court records.  Further, Donziger's deposition testimony does not establish what was or was not the process for payments to Cabrera.  During his deposition, Donziger did not agree that the procedures Ms. Neuman, Chevron's counsel described, were "the court procedures for paying Cabrera," as

61

Chevron states.  Rather, Donziger testified that the procedure the questioner described was the process for particular identified payments to Cabrera.  Dkt. No. 400-1 (Ex. 2010) at 4869:6-23.  Donziger also testified that he did not have a specific recollection of payments from the second account, but that he would not characterize payments from the second account as outside the court process.  *Id.* at 4870:8-18.

Additionally, the documents to which Chevron cites raises the possibility that funds paid into the second account might have been subsequently transferred to another account, including the Selva Viva account from which Cabrera was paid.  *See* Dkt. 356-9 at 210 (9/12/2007 e-mail from Yanza to Donziger suggesting that Kohn could send $50,000 to the second account "and then we could pass the 20 to [Selva Viva] to save time and paperwork.").

67.    *The LAPs have admitted that they made payments to Cabrera that were not authorized by the Lago Agrio court, but told the United States District Court for the Southern District of Florida that these payments were made "in the amount of his request made to the court so that his work would not 'stop' while Cabera's payment request sat on the judge's desk."  Stavers Decl., Ex. 3121 (2011.06.26 Ecuadorian Plaintiffs' Objection to Order and Recommendation) at 8-9.*

Disputed.  Chevron grossly mischaracterizes the Ecuadorian Plaintiffs' filing.  There was no "admission" of any unauthorized payment.  Rather, in the cited filing, the Ecuadorian Plaintiffs explained that "Cabrera had requested an order from the Ecuadorian trial judge requiring payment for this field work, but the judge had not yet signed the order because he had a number of other motions and requests that Ecuadorian law required him to decide first, because they were filed before Cabrera's request."  Dkt. 754-8 (Ex. 3121) at 3 (p. 8 of filing).

Chevron also fails to identify any particular "unauthorized" payment.  Chevron would have this Court infer that unidentified payments were made to Cabrera, but Chevron has failed to provide any evidence that actually corroborates this assertion.  The best Chevron can do is point to deposits in an account other than the Selva Viva account.  The leap from this simple fact to a host of additional unspecified payments to Cabrera is far too great to make on summary judgment.  Chevron's own evidence suggests that funds paid into the second account were transferred elsewhere – including to the Selva Viva account used to pay Cabrera, or used for other purposes.   *See* Dkt. 356-9 at 210 (9/12/2007 e-mail from Yanza to Donziger suggesting that Kohn could send $50,000 to the second account "and then we could pass the 20 to [Selva Viva] to save time and paperwork.").  Further, Dahlberg admits that "the documents available to me do not include the financial information necessary to determine which bank accounts funds originated from, to which bank accounts the funds were directed, whether the funds were in fact transferred, the nature and purpose of the transfers, or the final disposition of the funds distributed to various bank accounts."  Dkt. 754-17 ¶ 6.

68.     *Cabrera never reimbursed the LAPs for the payments they made to him. Stavers Decl., Ex. 3121 (2011.06.26 Ecuadorian Plaintiffs' Objection to Order and Recommendation) at 8.*

Disputed.  The Ecuadorian Plaintiffs' filing to which Chevron cites does not discuss any lack of "reimbursement."  *See* Dkt. 754-8 (Ex. 3121) at 3 (p. 8 of filing).  Further, this Court should not be distracted by Chevron's invention of an imaginary need for "reimbursement."  Chevron has not identified any payment for which the Ecuadorian Plaintiffs should have been "reimbursed."  Instead, Chevron would have this Court infer that some unidentified payment took place.

63

69.     As this Court has already found, the Cabrera Report "was not entirely or even predominantly [Cabrera's] own work or that of any assistants or consultants working only for him.  There is no genuine issue with respect to the facts that the LAP team secretly prepared his work plan, worked closely with him in carrying it out, and drafted most of the report and its annexes."  Dkt. 550 at 90; see also Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 2165:2-6 ("Q. Did the plaintiffs' team draft the Cabrera work plan? A.  I believe the plaintiffs 'team drafted a work plan that was given to him for his adoption."), 2184:3-2186:4; Dkt. 8-9 at 2203:4-17 (the LAPs' counsel and consultants wrote Cabrera's work plan); Dkt. 6-2 (Exhibit 1) at CRS-189-00-CLIP-02; Dkt. 7-4 (Exhibit 2 (certified transcripts)) at 223-27 (Donziger pro- posed forming a "work committee" to draft Cabrera's "work plan" with the goal of having "more or less eighty percent-ninety percent on the way to a plan" in a few days); Dkt. 400-4 (Ex. 2043) (DONZ00038727) at 1 (Fajardo emailing Donziger); see also id. at 3-4 (LAP-drafted chart enti- tled "Expert Examination Activity Plan" with members of the LAPs' team noted as the individu- als responsible for various activities); id. at 5-6 (LAP-drafted document entitled "Final Plan from the Global Expert Examination" containing an outline of tasks to be performed for Cabrera's global examination); Dkt. 400-4 (Ex. 2044) (LAPs' team drafted Cabrera's work plan); Dkt. at 8-9 at 2177:8-2178:15; 2165:2-2166:23; 2406:7-11 (Donziger testified that the LAPs' team was involved in "putting together Cabrera's work team."); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 2247:2-20 (Donziger testifies that individuals from Stratus and the LAP legal team met with Cabrera in January 2008 where they discussed that "Stratus individuals would draft materials that would be given to Mr. Cabrera for his hoped-for adoption in his report" and that Cabrera "seemed open" to accepting a report drafted by Stratus); Dkt. 400-16 (Ex. 2105) (2011.06.30McMenamin Report) ¶¶ 3, 9(a); Dkt. 33-2 (STRATUS-NATIVE043232- 33) (2008.02.22 email from Beltman to Stratus employees telling his team that they will draft the Cabrera Report:  "The project is at a key point right now.  We have to write, over the next 2 to 3 weeks, probably the single most important technical document for the case. . . .  We (the case attorneys, the case team in Quito, and Stratus) have put together a very ambitious outline for this report.  The people in the Quito office are working on some parts, and we're working on others."); Dkt. 32-20 (STRATUS-NATIVE043857-58) at 11 (the LAPs' agents outlining how they would "attribute" the annexes they were drafting to Cabrera); Dkt. 34-7 (STRATUS-NATIVE063676) (Beltman emailing Donziger regarding the fact that Powers' name needed to be taken off his report before it was filed as an annex to the Cabrera Report); Dkt. 402-2 (Ex. 2217) ¶ 1 (2007.11.14 Fajardo email to Cristobal Villao: "For legal reasons, in the first part, the paragraph which states who hired you to carry out the study is to be omitted"); Dkt. 33-7 (STRATUS-NATIVE069116) at 2 (Beltman: "Here is the Uhl report, cleaned and sanitized."); Dkt. 402-15 (Ex. 2328) (VU0000037) (Letter from UBR providing "a summary outline of a scope of work and cost es- timate for the development of a preliminary analysis of potential costs for the provisions of pota- ble water to the residents of two provinces in the Amazon Region of Ecuador"); Dkt. 402-2 (Ex.2228) (VU0000039) ("This letter will serve as our agreement to retain Uhl, Baron, Rana & As- sociates, Inc."); Dkt. 402-9 (Ex. 2267) (Uhl Dep. Tr.) at 68:12- 69:16 (Vincent Uhl testifying that UBR was retained by Kohn, Swift & Graf "to do the water project in Ecuador"); Dkt. 402-2 (Ex.2228) (VU00000039); Dkt. 402-2 (Ex. 2229) (VU00000063) at 1; Dkt. 402-2 (Ex. 2230) (VU00000122) at 1; Dkt. 402-3 (Ex. 2231)

*(VU00000136) at 1; Dkt. 402-3 (Ex. 2232) (VU00000150) at 1-3; Dkt. 402-9 (Ex. 2228) (VU00000039); Dkt. 402-9 (Ex. 2267) (Uhl Dep. Tr.) at 27:11-17; Dkt. 402-2 (Ex. 2217) ¶ 1 (2007.11.14 Fajardo email to Cristobal Villao stating: "For legal reasons, in the first part, the paragraph which states who hired you to carry out the study is to be omitted"); id. ¶ 5 ("Also for legal reasons, it's necessary to make all working dates to appear as recorded before July 31 or after August 16. This means that between August 1 and August 16, no date in which field work has been carried out should appear."); Dkt. 402-13 (Ex.2320) (UBR Report); compare Dkt. 402-3 (Ex. 2231) (VU00000136) (draft from UBR recommending groundwater study) with Dkt. 402-9 (Ex. 2269) (Cabrera Report, Annex R) (containing no recommendation for groundwater study); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 2325:3-2326:2 (Donziger testifying that Mr. Villao of UBR prepared a potable water systems report that was attached to the Cabrera Report as an annex); Dkt. 33-7 (STRATUS- NATIVE069117) at 2 (Belt-man sending the Uhl potable water report to Donziger on March 6,2008 stating, "Here is the Uhl report, cleaned and sanitized."); Dkt. 402-9 (Ex. 2267) (2011.04.19 Uhl Depo Morning Session) at 64:6-9 ("Q. To your knowledge has Mr. Villao ever communicated with Mr. Cabrera on the work that you and he did in Ecuador? A. To my knowledge he has not."); Dkt. 33-12 (Cabrera Report) at 2; Dkt. 402-15 (Ex. 2334) (Annex V); Dkt. 33-13 (Cabrera Report); Dkt. 400-4 (Ex. 2046) (DONZ00083815) at 1-2 (Internal memo: "The Cabrera Report is a series of 17 annexes; in all, 11 of them were prepared by Stratus and adopted by Cabrera."); Dkt. 356-10 (DONZ-HDD-0004621) at 83 (Donziger: if Chevron ob- tained discovery from Stratus, "they will find that Stratus wrote the bulk of the report adopted by Cabrera and submitted to the court."); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 3400:7-9 (Donziger: "Stratus had drafted a substantial number of annexes that were adopted by [Cabrera] verbatim that were included in his report."); Dkt. 47-55 (DONZ00031368) at 1-3 (the LAPs' counsel: "we do better by explaining that we authored the report," "we authored portions of the report," "[we do not benefit by] denying what is already apparent (that we authored portions of the report)"); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 2377:21-2378:9 (Donziger: Stratus drafted "an actual report with annexes in Cabrera's name"); Dkt. 8-9 at 2253:5-11 (Donziger agreed that "the general idea" was "that Stratus would draft the report in a form that it could be submitted directly to the Ecuadorian court by Mr. Cabrera"); Dkt. 32-16 (STRATUS- NATIVE043270-043278) (Stratus contracted with Kohn, Swift & Graf to write Cabrera Report); Dkt. 32-17 (STRATUS-NATIVE066482-066484) (same); Dkt. 32-18 (DONZ00026949) (same); Dkt. 32-12 (DONZ00062680)) at 1; Dkt. 8-9 at 2433:8-14 (Donziger: Cabrera Report as filed was "pretty much verbatim" as written by the LAPs' counsel and consultants); Dkt. 6-2 (Exhibit 1) at CRS-191-00-CLIP-03; Dkt. 7-5 (Ex-hibit 2 (certified transcripts)) at 245-46 (Fajardo:"And here is where we do want the support of our entire technical team . . . of experts, scientists, attorneys, political scientists, so that all of us will contribute to that report—in other words—you see . . . the work isn't going to be the expert's. All of us bear the burden."); Dkt. 32-13 (DONZ00061973) at 1 (2007.03.28 to 2007.04.03 email exchange in which David Chapman (Stratus) states: "I think the way this would work best is that if Stratus did much of the work, putting the pieces together and writing the report."); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 2165:2-6 ("Q. Did the plaintiffs' team draft the Cabrera work plan? A. I believe the plain- tiffs' team drafted a work plan that was given to him for his adoption."); Dkt. 8-9 at 2203:4-17 (the LAPs' counsel and consultants ghostwrote Cabrera's*

*work plan, were involved in Cabrera's site selection, and suggested Cabrera's sampling protocols); Dkt. 6-2 (Exhibit 1) at CRS-269-01-04, 269-01-08); Dkt. 7-10 (Exhibit 2 (certified transcript)) at 355-62 (Donziger and Stratus dis- cuss damages categories to include in Cabrera Report); Dkt. 33-2 (2008.02.22 email from Belt- man to Stratus employees) (STRATUS-NATIVE043232) (Beltman:  "We have to write, over the next 2 to 3 weeks, probably the single most important technical document for the case.");  Dkt.32-19 (email from Beltman to Donziger attaching draft copy of "Outline for PG Report"); Dkt. 32-20 (STRATUS-NATIVE043849) at 1 (Beltman: "The summary Peritaje Global report (~50 pages).  This is what I will be working on mostly, and it will take most of my time over the next two weeks."); id. (STRATUS-NATIVE043854-STRATUS-NATIVE043859) at 6-11 (plan for attributing authorship to Cabrera and others); Dkt. 33-4 at 1 (Beltman: "Attached is my rough start of the Peritaje Global report. . . . Would you let me know if you think I'm on track in terms of tone, language level, and content?"; Dkt. 33-5 (Powers Dep. Tr.) at 95:14-22, 109:2-7, 251:4-253:1, 255:5-256:13 (LAP expert Bill Powers testifying that a "similar" version of a report he prepared and emailed to Stratus was filed as Annex S of the Cabrera Report and that calculations he prepared were incorporated into Annex T of the Cabrera Report); Dkt. 34-7 (STRATUS- NATIVE063676) at 1 (Beltman emailing Donziger regarding the fact that Powers' name needed to be taken off his report before it was filed as an annex to the Cabrera Report); Dkt. 53-6 (STRATUS-NATIVE063142) (Beltman emailing Ecuadorian counsel and Donziger revisions to the Cabrera Report less than one week before it was filed); Dkt. 104-2 (STRATUS- NATIVE069123-24) at 1-2 (Donziger asking Beltman for feedback regarding the damages tables for the Cabrera Report on March 30, 2008, less than 36 hours before the Cabrera Report was filed); Dkt. 53-8 (2008.04.01 email from Ann Maest to Beltman attaching Cabrera's Declaration Of Findings"); Dkt. 355-42 (DONZ00045505) at 1 (2008.04.01 email from "gringogran- dote@gmail.com" to Donziger attaching a Word version of the Cabrera Report identical to filed version and last saved hours before the Cabrera Report was filed in Ecuador); Dkt. 355-43 (DONZ00045506) at 1-62 (2008.04.01 email from "gringograndote@gmail.com" to Donziger attaching a Word version of the Cabrera Report identical to filed version and last saved hours before the Cabrera Report was filed in Ecuador) at 1-62; Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 5014:22-5016:7 (same); id. at 2490:12-18; Dkt. 33-3 (STRATUS-NATIVE053742) (Beltman "My goal is to have the entire report drafted by COB Tuesday. Based on how things are going, our current translators will take more than a week to turn it around . . . And [sic] that's not much time before it has to go to the court on Monday."); see also Dkt. 32-20 (STRATUS- NATIVE043849) at 1; Dkt. 32-21; Dkt. 33-10 (STRATUS-NATIVE058388 – 419) at 1 (email from Beltman to translators attaching a draft of the Cabrera Summary Report in English and re- questing that it be translated into Spanish for the upcoming submission to the Ecuadorian court); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 2962:9-2963:23 (Donziger testifying:  "I believe Stratus prepared the [November report] materials in the hope that [Cabrera] would adopt them, sort of how they did the with annexes and executive summary."); Dkt. 400-16 (Ex. 2105) (McMenamin Report) at 1, 28; Dkt. 400-4 (Ex. 2046) (DONZ00083815) at 1-2 (Internal memo admitting, "The Cabrera Report is a series of 17 annexes; in all, 11 of them were prepared by Stratus and adopted by Cabrera."); Dkt. 400-4 (Ex. 2047) (DONZ-HDD-0004621) at 1-2 (Donziger admitting that if Chevron's attorneys obtained discovery, "they will find that Stratus wrote the bulk of the report adopted by*

*Cabrera and submitted to the court."); Dkt. 47-55 (DONZ00031368) at 1, 3 (email exchange between the LAPs' counsel, noting "we do better by explaining that we authored the report," discussing a need "to acknowledge that we authored portions of the report," and emphasizing that they would not benefit from "denying what is al- ready apparent (that we authored portions of the report)"); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 2377:21-2378:9 (Donziger testifies that Stratus drafted "an actual report with annexes in Cabrera's name"); id. at 3400:3-9 (Donziger testifies that, as of March 2010, he knew that "Stra- tus had drafted a substantial number of annexes that were adopted by [Cabrera] verbatim that were included in his report"); Dkt. 47-55 (DONZ00031368) at 1 (the LAPs' counsel: "I wonder whether we do better by explaining that we authored the report rather than letting Chevron tell that story like Nancy Drew."); Dkt. 46-2 ¶ 24 (Declaration of Michael F. McGowan concluding that the "text of the 'INFORME SUMARIO VERSION FINAL(Steve).doc' document attached to the Gringograndote Email and the Forwarding Email is identical to text of the report filed by Richard Cabrera on April 1, 2008."); id. ¶ 27 (providing last saved and print times); Dkt. 355-42 (DONZ00045505) and Dkt. 355-43 (DONZ00045506) (email from "gringogran- dote@gmail.com" to Donziger attaching a Word version of the Cabrera Report that according to the metadata was last saved mere hours before the Cabrera Report was filed in Ecuador and that is identical to the filed version of the Report); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 5014:22-5016:7 (Donziger testifying regarding having in his possession a Word version of the Cabrera Report before the Report was filed in Ecuador).*

Disputed.[12] It is impossible for Donziger to respond to Chevron's assertion because it is far from clear what purportedly undisputed fact Chevron is even attempting to submit here. Virtually every "citation" that follows Chevron's quotation of this Court's prior statement contains argument and mischaracterization of the actual evidence, all of which is improper in a 56.1 statement.

The following are but a few examples of evidence that refute Chevron's spin on the actually undisputed evidence in this case:

---

[12] *See* note 6, *supra.*

- Ecuadorian law did not prohibit parties from making contact with court-appointed experts prior to the issuance of the expert's report.

- The Lago Agrio Court authorized the parties to communicate with Cabrera and provide him information.  Dkt. 557-5 (Young Decl. Ex. 29) at 16-18; Dkt. 613-13 (Werdegar Decl. Ex. M) at 10 ("[T]he parties may submit to the expert whatever documentation they believe may be useful in preparing his report.").  The Lago Agrio Court ordered that materials submitted by Chevron "be delivered directly to the expert, its addressee." *Id.*

- Chevron has chosen not to dispute the scientific validity of the conclusions in the Cabrera report.

Chevron made the exact same argument, and cited the same evidence,  in its prior motion for summary judgment on Count Eight.

Donziger hereby incorporates by reference Donziger's prior responses to Chevron's alleged undisputed facts nos. 42, 44, 29, 45, 48, 67, 81, 55, and 58.  Dkt. 614.

70.    *Maest assisted Beltman with the Cabrera Report and made at least two trips to Ecuador, where she coordinated the LAP team's work on the Cabrera Report.  Dkt. 6-2 (Exhibit 1), CRS-187-01-02 (2007.03.03 Crude outtake video clip of meeting at Selva Viva headquarters among S. Donziger, P. Fajardo, L. Yanza, A. Maest, R. Kamp, C. Champ, R. Cabrera, and others); Dkt. 7-2 – 7-4 (Exhibit 2) (certified transcript) at 169-214. Dkt. 8-9 (Exhib- it 6) (Donziger Dep. Tr.) at 2243:7-10, 2245:2-10 (testifying that members of the LAP team, in- cluding Maest, met with Cabrera in Ecuador in January 2008); Dkt. 356-9 (Exhibit N) (2011.01.19 Deposition of Ann S. Maest, Chevron Corp. v. Stratus Consulting, Inc., No. 1:10-cv-00047-MSK-MEH (D.Colo.) ("2011.01.19 Maest Dep.")) at 115:14-24 (testifying that this meeting was held at a private home, and not at the LAP team's offices in Quito, in order to keep the meeting a secret).*

Disputed.  All that the cited evidence establishes is that Maest was in Ecuador on March 3, 2007 and January 2008.

71.      *The LAP team revised the Cabrera Report until hours before Cabrera filed it under his own name.  St. 69; Dkt. 104-2 (STRATUS-NATIVE069123-24) at 1-2 (Donziger asking Beltman for feedback regarding the damages tables for the Cabrera Report on March 30, 2008, less than 36 hours before the Cabrera Report was filed); Dkt. 53-8 (2008.04.01 email from Ann Maest to Beltman attaching Cabrera's Declaration Of Findings"); Dkt. 355-42 (DONZ00045505) at 1 (2008.04.01 email from "gringograndote@gmail.com" to Donziger attaching a Word version of the Cabrera Report identical to filed version and last saved hours be- fore the Cabrera Report was filed in Ecuador); Dkt. 46-2 ¶ 24 ((Declaration of Michael F. McGowan concluding that the "text of the 'INFORME SUMARIO VERSION FINAL(Steve).doc' document attached to the Gringograndote Email and the Forwarding Email is identical to text of the report filed by Richard Cabrera on April 1, 2008."); id. ¶ 27 (providing last saved and print times); Dkt. 355-42 (DONZ00045505) and Dkt. 355-43 (DONZ00045506) (email from "gringogradote@gmail.com" to Donziger attaching a Word version of the Cabrera Report that according to the metadata was last saved mere hours before the Cabrera Report was filed in Ecuador and that is identical to the filed version of the Report); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 5014:22-5016:7 (Donziger testifying regarding having in his possession a Word version of the Cabrera Report before the Report was filed in Ecuador).*

Disputed.  Chevron itself has declined to produce certain document-creation date related metadata in discovery for its own documents in Donziger on grounds that the data is not necessarily accurate.  Dkt. 613 (Werdegar Decl.) at ¶ 18.

Donziger further disputes Chevron's insinuation that the Ecuadorian Plaintiffs' communication with, and provision of materials to, Cabrera was improper.  Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts.  In fact, such contacts were common practice.  *See* Donziger 56.1(b) Statement, Fact Nos. 167-169.  Similarly, Ecuadorian law permits experts to interact and coordinate with parties.  Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties."  Dkt. 614 (Donziger 56.1(b) Statement) Fact No. 168.  In fact, it was understood in Ecuador that court

appointed experts could rely on party resources.  *Id.  See also* Ecuadorian Plaintiffs' response to

St. 36.

72.     *Donziger has admitted that he does not know if Cabrera read the report before he submitted it to the Lago Agrio court under his own name.  Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 2249:3-12, 2590:20-2591:22 (Donziger testifying he does not know whether Cabrera drafted any portion of his report or whether he even reviewed it before it was filed).*

        Disputed.  Chevron's characterization of Donziger's testimony as an "admission" is

argumentative and improper in a 56.1 statement.  Donziger testified that he did not know

whether Cabrera drafted any of the report.

        Further, this statement is immaterial.  Chevron has submitted no evidence that Cabrera

did not agree with and endorse the substance of his reports and other filings.

73.     *The Cabrera Report is dated March 24, 2008.  Dkt. 33-12 (Cabrera Report).*

        Not disputed.

74.     *Richard Cabrera submitted the "Cabrera Report" to the Lago Agrio court on April 1, 2008.  Dkt. 33-12*

        Disputed.  The Lago Agrio Court stamped the Cabrera Report as "received" on April 1,

2008.  Dkt. 33-12.

75.     *The Cabrera Report consists of a 50-page "Summary Report" followed by 17 annexes; Stratus wrote at least 11 of the annexes. Dkts. 33-12 – 33-18; 34-2 – 34-3 (Cabrera Report); Dkt. 400-4 (Ex. 2046) (DONZ00083815) at 1-2 (Internal memo admitting, "The Cabrera Report is a series of 17 annexes; in all, 11 of them were prepared by Stratus and adopted by Cabrera."); Dkt. 400-4 (Ex. 2047) (DONZ-HDD-0004621) at 1-2 (Donziger admitting that if Chevron's attorneys obtained discovery, "they will find that Stratus wrote the bulk of the report adopted by Cabrera and submitted to the court."); Dkt. 47-55 (DONZ00031368) at 1, 3 (email exchange between the LAPs' counsel, noting "we do better by explaining that we authored the report," discussing a need "to acknowledge that we authored portions of the report," and*

70

*emphasizing that they would not benefit from "denying what is already apparent (that we authored portions of the report)"); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 2377:21-2378:9 (Donziger testifies that Stratus drafted "an actual report with annexes in Cabrera's name"); id. at 3400:3-9 (Donziger testifies that, as of March 2010, he knew that "Stratus had drafted a substantial number of annexes that were adopted by [Cabrera] verbatim that were included in his report"); Dkt. 47-55 (DONZ00031368) (the LAPs' counsel: "I wonder whether we do better by explaining that we authored the report rather than letting Chevron tell that story like Nancy Drew."); Dkt. 8-9 at 2253:5-11 (Donziger agreed that "the general idea" was "that Stratus would draft the report in a form that it could be submitted directly to the Ecuadorian court by Mr. Cabrera"); Dkt. 32-16 (STRATUS-NATIVE043270-043278) (Stratus contracted with Kohn, Swift & Graf to write Cabrera Report); Dkt. 32-17 (STRATUSNATIVE066482-066484) (same); Dkt. 32-18 (DONZ00026949) (same); Dkt. 32-12 (DONZ00062680)) at 1; Dkt. 8-9 at 2433:8-14 (Donziger: Cabrera Report as filed was "pretty much verbatim" as written by the LAPs' counsel and consultants); Dkt. 6-2 (Exhibit 1) at CRS-191-00-CLIP-03; Dkt. 7-5 (Exhibit 2 (certified transcripts)) at 245-46 (Fajardo: "And here is where we do want the support of our entire technical team . . . of experts, scientists, attorneys, political scientists, so that all of us will contribute to that report—in other words—you see . . . the work isn't going to be the expert's. All of us bear the burden."); Dkt. 32-13 (DONZ00061973) at 1 (2007.03.28 to 2007.04.03 email exchange in which David Chapman (Stratus) states: "I think the way this would work best is that if Stratus did much of the work, putting the pieces together and writing the report."); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 2165:2-6 ("Q. Did the plaintiffs' team draft the Cabrera work plan? A. I believe the plaintiffs' team drafted a work plan that was given to him for his adoption."); Dkt. 8-9 at 2203:4-17 (the LAPs' counsel and consultants ghostwrote Cabrera's work plan, were involved in Cabrera's site selection, and suggested Cabrera's sampling protocols); Dkt. 6-2 (Exhibit 1) at CRS-269-01-04, 269-01-08); Dkt. 7-10 (Exhibit 2 (certified transcript)) at 355-62 (Donziger and Stratus discuss damages categories to include in Cabrera Report); Dkt. 33-2 (2008.02.22 email from Beltman to Stratus employees) (STRATUS-NATIVE043232) (Beltman: "We have to write, over the next 2 to 3 weeks, probably the single most important technical document for the case."); Dkt. 32-19 (email from Beltman to Donziger attaching draft copy of "Out- line for PG Report"); Dkt. 32-20 (STRATUS-NATIVE043849) at 1 (Beltman: "The summary Peritaje Global report (~50 pages). This is what I will be working on mostly, and it will take most of my time over the next two weeks."); id. (STRATUS-NATIVE043854-STRATUS- NATIVE043859) at 6-11 (plan for attributing authorship to Cabrera and others); Dkt. 33-4 at 1 (Beltman: "Attached is my rough start of the Peritaje Global report. . . . Would you let me know if you think I'm on track in terms of tone, language level, and content?"); Dkt. 33-5 (Powers Dep. Tr.) at 95:14-22, 109:2-7, 251:4-253:1, 255:5-256:13 (LAP expert Bill Powers testifying that a "similar" version of a report he prepared and emailed to Stratus was filed as Annex S of the Cabrera Report and that calculations he prepared were incorporated into Annex T of the Cabrera Report); Dkt. 34-7 (STRATUS-NATIVE063676) at 1 (Beltman emailing Donziger regarding the fact that Powers' name needed to be taken off his report before it was filed as an annex to the Cabrera Report); Dkt. 53-6 (STRATUS-NATIVE063142) (Beltman emailing Ecuadorian counsel and Donziger revisions to the Cabrera Report less than one week before it was filed); Dkt. 104-2 (STRATUS-NATIVE069123-24) at 1-2*

*(Donziger asking Beltman for feed- back regarding the damages tables for the Cabrera Report on March 30, 2008, less than 36 hours before the Cabrera Report was filed); Dkt. 53-8 (2008.04.01 email from Ann Maest to Beltman attaching Cabrera's Declaration Of Findings"); Dkt. 355-42 (DONZ0045505) at 1 (2008.04.01 email from "gringograndote@gmail.com" to Donziger attaching a Word version of the Cabrera Report identical to filed version and last saved hours before the Cabrera Report was filed in Ecuador); Dkt. 355-43 (DONZ0045506) at 1-62 (2008.04.01 email from "gringogran- dote@gmail.com" to Donziger attaching a Word version of the Cabrera Report identical to filed version and last saved hours before the Cabrera Report was filed in Ecuador) at 1-62; Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 5014:22-5016:7 (same); id. at 2490:12-18; Dkt. 33-3 (STRATUSNATIVE053742) (Beltman "My goal is to have the entire report drafted by COB Tuesday. Based on how things are going, our current translators will take more than a week to turn it around . . . And [sic] that's not much time before it has to go to the court on Monday."); see also Dkt. 32-20 (STRATUS-NATIVE043849) at 1; Dkt. 32-21; Dkt. 33-10 (STRATUSNATIVE058388– 419) at 1 (email from Beltman to translators attaching a draft of the Cabrera Summary Report in English and requesting that it be translated into Spanish for the upcoming submission to the Ecuadorian court).*

Disputed.  Donziger disputes Chevron's insinuation that the Ecuadorian Plaintiffs' communication with, and provision of materials to, Cabrera was improper.  Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts.  In fact, such contacts were common practice.  *See* Dkt. 614 (Donziger 56.1(b) Statement) Fact Nos. 167-169.  Similarly, Ecuadorian law permits experts to interact and coordinate with parties.  Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties."  Dkt. 614 (Donziger 56.1(b) Statement) Fact No. 168.  In fact, it was understood in Ecuador that court appointed experts could rely on party resources.  Dkt. 614 (Donziger 56.1(b) Statement) Fact No. 168.

Further, this assertion is not material.  Chevron has submitted no evidence that Cabrera did not agree with and endorse the substance of his reports and other filings.

*76.     Beltman was the primary drafter of the "Summary Report" portion of the Cabrera Report.  Dkt. 32-19 (email from Beltman to Donziger attaching draft copy of "Outline for PG*

72

*Report"); Dkt. 32-20 (STRATUS-NATIVE043849) at 1 (Beltman: "The summary Peritaje Global report (~50 pages). This is what I will be working on mostly, and it will take most of my time over the next two weeks."); id. (STRATUS-NATIVE043854-STRATUS- NATIVE043859) at 6-11 (plan for attributing authorship to Cabrera and others); Dkt. 33-4 at 1 (Beltman: "Attached is my rough start of the Peritaje Global report. . . . Would you let me know if you think I'm on track in terms of tone, language level, and content?"); Dkt. 33-3 (STRATUSNATIVE053742) (Beltman "My goal is to have the entire report drafted by COB Tuesday. Based on how things are going, our current translators will take more than a week to turn it around . . . And [sic] that's not much time before it has to go to the court on Monday."); see also Dkt. 32-20 (STRATUS-NATIVE043849) at 1; Dkt. 32-21; Dkt. 33-10 (STRATUSNATIVE058388– 419) at 1 (email from Beltman to translators attaching a draft of the Cabrera Summary Report in English and requesting that it be translated into Spanish for the upcoming submission to the Ecuadorian court).*

Disputed.  The evidence to which Chevron cites does not support the conclusions that Chevron draws, *e.g.* that Beltman was the "primary drafter" of anything.  This argument is improper in a 56.1 statement.

Donziger incorporates St. 75.

77.    *The opening words of the Summary Report portion of the Cabrera Report are: "This report was prepared by the Expert Richard Stalin Cabrera Vega[.]"  Dkts. 33-12– 33-18; 34-2 – 34-3 (Cabrera Report) at 1.*

Not disputed.

78.    *As this Court has already found, the Cabrera Report "falsely, or, at least, deceptively, stated that it had been 'prepared by the Expert Richard Stalin Cabrera Vega' with the help of 'my technical team, which consists of impartial professionals.'"  See Sts. 69-72, 75-76; Dkt. 550 at 39; see Dkts. 33-12 – 33-18; 34-2 – 34-3 (Cabrera Report) at 1; see also Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 2249:3-12, 2590:20-2591:22 (Donziger testifying he does not know whether Cabrera drafted any portion of his report or whether he even reviewed it before it was filed); Dkt. 356-9 at 174-75 (Maest Dep. Tr.) at 53:25-54:4 (Maest testifying that she did not know whether Cabrera or a person identified as an independent member of Cabrera's team had actually drafted any portion of the Cabrera Report).*

Disputed.[13]  Chevron's conclusion that the statement was "deceptive" is not proper in a 56.1 statement.

Donziger further disputes Chevron's insinuation that the Ecuadorian Plaintiffs' communication with, and provision of materials to, Cabrera was improper.  Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts.  In fact, such contacts were common practice.  *See* Dkt. 614 (Donziger 56.1(b) Statement) Fact Nos. 167-169.  Similarly, Ecuadorian law permits experts to interact and coordinate with parties.  Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties."  Dkt. 614 (Donziger 56.1(b) Statement) Fact No. 168.  In fact, it was understood in Ecuador that court appointed experts could rely on party resources.  Dkt. 614 (Donziger 56.1(b) Statement) Fact No. 168.

Chevron's repeated invocation of terms like "independent" to accuse the defendants rests on a fundamental misapprehension of Ecuadorian law.  Ecuadorian law did not prohibit the parties from advocating their positions or urging the expert's agreement with and adoption of those positions.  Under Ecuadorian law, the expert's "independence" arises from his free reign to decide whether, in his professional judgment, he believes a party's position to be the correct one and to adopt whatever information is provided by a party as grounds for his opinions.  *See* Dkt, No. 154-5 ¶¶ 11-12, 18; Dkt. No. 154-6 ¶¶ 8-9.  There is substantial evidence already in the record that Ecuadorian law at the time did not prohibit parties from making contact with court-

---

[13] *See* note 6, *supra.*

appointed experts prior to the issuance of the expert's report, including prior to the expert's

formal appointment by the court. *See* Dkt. No. 154-5 (Alencastro Aff.) ¶¶ 9-12, 19; Dkt. No.

154-6 (Simon Aff.) ¶¶ 4-5, 7-8. *See also* Ecuadorian Plaintiffs' response to St. 36.

79.     *In a September 16, 2008, filing the LAPs objected to the Cabrera Report as "unjustly
favorable to [Chevron]" and "too conservative" in its damage assessment. Dkt. 8-10 (LAP
comments on Cabrera Report) at 40; Dkt. 402-5 (Ex. 2251) (STRATUSNATIVE058697-98); Dkt.
111-13 ((DONZ00045581) at 1 (Fajardo instructing, after the Cabrera Report was filed, that "I
think it's good to maintain a uniform line. PLEASE WE ARE NOT HAPPY.").*

Disputed.  Donziger disputes the suggestion that this filing was improper.  The

Ecuadorian Plaintiffs' team understood that the submissions they would present to Cabrera for

his adoption had to meet Cabrera's criteria.  Dkt. No. 7-5 (Hendricks Decl. Ex. 2) at 245

(Fajardo's statement that "what the expert is going to do is state his criteria, alright?  and sign

[on/in] the report and review it [unintelligible].  But all of us, all together, have to contribute to

that report.").  And the Ecuadorian Plaintiffs' unfettered view of the evidence differed from the

conservative analysis prepared for Cabrera's adoption.   *See* Dkt. No. 8-10 (Hendricks Decl. Ex.

7) (Ecuadorian Plaintiffs' comments on Cabrera Report).

80.     *As this Court has already found, "The answers filed by Cabrera in response to the LAPs'
(and Chevron's) objections—like the report itself—were drafted at least in substantial part by
the LAP team and written to read as if Cabrera had written them." Case 1:11-cv-00691-LAK
Document 752 Filed 01/28/13 Page 39 of 123 36 Dkt. 550 at 91; see also Dkt. 400-4 (Ex. 2048)
(Cabrera Supplemental Report entitled "Answers by the Expert Richard Cabrera, with the
Support of His Technical Team, to the Questions and Comments Made by the Plaintiff"); Dkt. 9-
4 at 2 (STRATUS-NATIVE051389) (Stratus team members discussed the preparation of the
Supplemental Cabrera Report and the need to "clean up the language" of a portion of the
supplemental report "so it sounds more like the Perito [Cabrera] and less like a comment.");
Dkt. 34-21 (STRATUS-NATIVE053480) at 1; Dkt. 400-1 (Ex. 2010) (Donziger Dep.) at 2962:9-
2963:23 (Donziger testifies: "I believe Stratus prepared the [November report] materials in the
hope that [Cabrera] would adopt them, sort of how they did the with annexes and executive
summary.").*

Disputed.[14]  As Donziger testified, the team prepared materials in the hope that Cabrera would adopt them.  Donziger incorporates St. 75, 78.

81.    *In writing "Cabrera's" responses to the LAPs' objections, Stratus "clean[ed] up" the language so it would "sound[] more like [Cabrera.]" Dkt. 9-4 at 2 (STRATUSNATIVE051389) (Stratus team members discussed the preparation of the Supplemental Cabrera Report and the need to "clean up the language" of a portion of the supplemental report "so it sounds more like the Perito [Cabrera] and less like a comment.")*

Disputed.  As Donziger testified, the team prepared materials in the hope that Cabrera would adopt them.  The team's discussion of style and language does not establish any impropriety.  Donziger incorporates St. 80.

82.    *The LAP team attempted to recruit independent academics to endorse the Cabrera Report, but did not inform those academics they contacted about their role in the writing of the Cabrera Report, and did not obtain a single endorsement from an independent academic. Dkt. 34-29 (STRATUS-NATIVE042610).*

Disputed.  The Beltman e-mail to which Chevron cites provides a variety of reasons why academics would not review or endorse the report, including fear of reprisal from Chevron: "they know that signing their names onto some sort of endorsement of the Cabrera report is setting them up for public attack from Chevron (and perhaps attack within their academic circles as well).  While they would be willing to face this attack to defend their own work, they generally are not willing to do so to defend someone else's work – unless they in essence can adopt it as their own."  Dkt. No. 34-29 (Hendricks Decl. Ex. 204) at 1.

---

[14] *See* note 6, *supra.*

*83.     On December 1, 2008, Stratus published a review of the Cabrera Report entitled "Comments on the Report of the Court-Appointed Expert Ing. Richard Cabrera Vega in the Case of Maria Aguinda y Otros v. Chevron Corp.," but did not disclose its role in the preparation of the Cabrera Report in its review. Dkt. 34-26 at 2 ("We have reviewed the report 'Informe Sumario del Pericial' that was prepared by Ing. Richard Cabrera Vega, who was appointed as the technical expert by the Court in the case of Maria Aguinda y Otros against Chevron Corporation."); Dkt. 34-26 (Stratus' comments on the Cabrera Report); Dt. 402-11 (Ex. 2288) (Beltman Dep. Tr.) at 264:2-16; Dkt. 9-7 (DONZ00056679) at 1 (LAPs' lawyer writing that Stratus's comments on the Cabrera Report were "written in a manner to give the impression that Cabrera was entirely independent and conducted his own research and came up with his own findings," and that it "appears not only that Cabrera and plaintiffs can be charged with a 'fraud' respecting the former's report, but that Stratus was an active conspirator.")*

Disputed.  Donziger disputes that there was any requirement for Stratus to relay all the details of its involvement with the Cabrera report.  And Chevron cannot rely on the e-mail from a lawyer to which it cites.  As a preliminary matter, this argument is based upon inadmissible hearsay.  Chevron would rely on this statement—a first-blush reaction by an attorney who was not familiar with the facts—to establish the truth of the matters asserted.  This also is not a fact, but rather a statement of one person's opinion and legal conclusion.

Further, Chevron's citation does not support the conclusion asserted.  This comment was made by an attorney, during a brainstorming session regarding a working draft of a potential motion, and in which several potential arguments were posed without regard for or knowledge of the underlying facts.  Earlier in the e-mail chain, this same attorney acknowledges that the potential argument being discussed was not grounded in his knowledge of the facts, stating "my argument turns very substantially on the facts.  If there is any interest in reclaiming the argument, these facts need to be checked."  Dkt. No. 9-7 (Hendricks Decl. Ex. 12) (DONZ00056679) at 1. When read in context, this comment is obviously a first-blush opinion about the writing style, rather than an assertion of fact.

77

Most importantly, Chevron's evidence is contradicted by a subsequent e-mail sent by the same attorney to the same recipients two days later, apparently after a more fulsome review of the facts:

> For my part, I have no doubt that Chevron has perpetrated a fraud upon the [Colorado] Court here.  It has made a series of misrepresentations, generally in the form of omissions, particularly concerning what was occurring in Ecuador. . . . Had Chevron included for this Court a complete recitation of the Ecuadorian proceedings – the facts which it knew – it would have been impossible for them to make their strident cries about discovering that the Cabrera report contained 'plagiarized' Stratus material . . . Chevron . . . obviously understood that plaintiffs would be shoveling Stratus material to Cabrera.  ***There was, in sum, no fraud.***

Dkt. No. 532-3 (Young Decl. Ex. L) at p. 1 (emphasis added).

*84.    Upon reviewing Stratus' review of the Cabrera Report, an attorney for the LAPs wrote Donziger and others, "This document may end the discussion. These 'comments' are written in a manner to give the impression that Cabrera was entirely independent and conducted his own research and came up with his own findings. There is no indication in this document that Stratus, ostensibly the company of experts independent from Cabrera, was itself involved in 'ghosting' the Cabrera report. This might not be dispositive if there were other evidence showing that Chevron had actual or constructive knowledge that Stratus had been involved in the creation of the Cabrera report. In such a case Stratus's 'comments' may have been a rather crude and awkward spin by a biased expert—but it would not have been a 'fraud' upon Chevron. But, in the absence of such evidence, then it appears not only that Cabrera and plaintiffs can be charged with a 'fraud' respecting the former's report, but that Stratus was an active conspirator." Dkt. 9-7 (DONZ00056679) at 1.*

Disputed.  Donziger disputes that there was any requirement for Stratus to relay all the details of its involvement with the Cabrera report.  And Chevron cannot rely on the e-mail from a lawyer to which it cites.  As a preliminary matter, this argument is based upon inadmissible hearsay.  Chevron would rely on this statement—a first-blush reaction by an attorney who was not familiar with the facts—to establish the truth of the matters asserted.  This also is not a fact, but rather a statement of one person's opinion and legal conclusion.

78

Further, Chevron's citation does not support the conclusion asserted.  This comment was made by an attorney, during a brainstorming session regarding a working draft of a potential motion, and in which several potential arguments were posed without regard for or knowledge of the underlying facts.  Earlier in the e-mail chain, this same attorney acknowledges that the potential argument being discussed was not grounded in his knowledge of the facts, stating "my argument turns very substantially on the facts.  If there is any interest in reclaiming the argument, these facts need to be checked."  Dkt. No. 9-7 (Hendricks Decl. Ex. 12) (DONZ00056679) at 1.  When read in context, this comment is obviously a first-blush opinion about the writing style, rather than an assertion of fact.

Most importantly, Chevron's evidence is contradicted by a subsequent e-mail sent by the same attorney to the same recipients two days later, apparently after a more fulsome review of the facts:

> For my part, I have no doubt that Chevron has perpetrated a fraud upon the [Colorado] Court here.  It has made a series of misrepresentations, generally in the form of omissions, particularly concerning what was occurring in Ecuador. . . . Had Chevron included for this Court a complete recitation of the Ecuadorian proceedings – the facts which it knew – it would have been impossible for them to make their strident cries about discovering that the Cabrera report contained 'plagiarized' Stratus material . . . Chevron . . . obviously understood that plaintiffs would be shoveling Stratus material to Cabrera.  ***There was, in sum, no fraud.***

> Dkt. No. 532-3 (Young Decl. Ex. L) at p. 1 (emphasis added).

*85.    The LAPs have never disclosed to the Ecuadorian court that persons working at their direction wrote the entirety of the Cabrera Report and all its Annexes. See Sts. 69-72, 75-76, 78; Dkt. 34-10 (DONZ00056668) at 1 (May 16, 2010 email exchange in which LAPs' lawyer Ilann Maazel admits that "neither Cabrera nor plaintiffs disclosed a submission from plaintiffs that contained drafts of part of the expert report written by Stratus"); Dkt. 402-12 (Ex. 2310) (DONZ00040273-74) (email attaching a draft of the LAPs' 2010.06.21 filing with the Lago*

*Agrio court with comments from the LAPs' lawyers including "We are of the opinion that the contacts [with Cabrera] should be laid out in this document" and "I am concerned about describing the first meeting [with Cabrera] in detail[.]"); Dkt. 50-6 (2010.06.21 LAPs' Filing with the Ecuadorian court) (claiming that the LAPs provided Cabrera with "information" including "proposed findings of fact and economic valuations" but not disclosing that the LAPs' team drafted the Cabrera Report).*

Disputed.[15]  The Ecuadorian Plaintiffs stated to the Lago Agrio Court that they "took advantage of the opportunity to advocate their own findings, conclusions, and valuations before Cabrera for him to consider their potential adoption.  The information provided to Cabrera by Plaintiffs' counsel included their proposed findings of fact and economic valuations for the environmental and other damages caused by Texpet's practices and pollution. . . . And, in fact, . . . . Cabrera adopted the proposals, analyses, and conclusions of the Plaintiffs concerning the damages and the valuation."  Dkt. 50-6 (Hendricks Decl. Ex. 377) at 6.

Moreover, Chevron cannot possibly claim that the Lago Agrio Court was not apprised of all of Chevron's contentions regarding Cabrera.  Chevron inundated the trial and appellate courts with allegations of the same type that Chevron makes here.

86.    *As of January 27, 2013, Stratus claimed on its website: "Of the 4,000 pages that comprise the Cabrera report, approximately 200 pages, a mere 5%, rely on information submitted by Stratus to our clients. Moreover, we have already testified before Chevron that we have no involvement in or even knowledge of the collusion amongst Ecuadorian plaintiff attorneys that Chevron has alleged." Stavers Decl., Ex. 3279 (PDF created on 2013.01.27 from* http://stratusconsulting.com/2011/02/stratus-statement-re-chevron-ecuadorlitigation/*).*

---

[15] Dkt. 402-12 (Champion Decl. Ex. 2310) does not contain the alleged comments that Chevron purports to cite. Chevron did not submit the attachment along with the cover e-mail, and the purported citation should be stricken. Further, assuming *arguendo* that such comments were made, they do not establish Chevron's conclusion.  The document that was actually submitted to the Lago Agrio Court speaks for itself.

Disputed.  Chevron does not even quote accurately from the document Stavers attached

to his declaration.  This is yet another example of Chevron's gross disregard for the actual facts.

First, the document attached as Exhibit 3279 has a date of January 28, 2013, not January 27.

Second, and more importantly, the purported quotation that Chevron provides appears nowhere

in the document; nor do the individual sentences even appear in the document.  *See* Dkt. 755-26

(Stavers Decl. Ex. 3279).


87.     *On September 16, 2010, the LAPs submitted, among a total of seven reports, reports from six U.S. experts, none of whom had ever visited the former concession area or gathered new sampling data or offered causation opinions in their respective reports. Dkt. 400-10 (Ex. 2063) (Allen Report); Dkt. 400-10 (Ex. 2064) (Barnthouse Report); Dkt. 401-07 (Ex. 2180) (Picone Report); Dkt. 400-10 (Ex. 2066) (Rourke Report); Dkt. 400-10 (Ex. 2067) (Scardina Report); Dkt. 400-11 (Ex. 2068) (Shefftz Report); Dkt. 400-11 (Ex. 2069) (Anonymous non-expert report written by the LAPs' legal team); Dkt. 400-11 (Ex. 2070) (2010.09.16 LAP filing) at 1-2 (the LAPs' representatives admit that the cleansing reports are "economic assessment[s]."); see also Dkt. 168 (Judgment) at 57-58; see Dkt. 400-11 (Ex. 2071) (Barnthouse Dep. Tr.) at 164:25-165:4 (Barnthouse testified that he has never been to Ecuador and "never personally visited any of the former oil production areas"); Dkt. 400-11 (Ex. 2072) (Picone Dep. Tr. at 195:10-21) (Picone testified that he "never visited any of the former Concession area"); Dkt. 400-11 (Ex. 2073) (Allen Dep. Tr.) at 164:7-13 (Allen admitted that he has "never been to Ecuador" and has "no experience in the oil operations in the concession area"); Dkt. 400-11 (Ex. 2074) (Shefftz Dep. Tr.) at 51:6-7 (Shefftz testified that he has "never been to Ecuador"); Dkt. 400-11 (Ex. 2075) (Rourke Dep. Tr.) at 46:1-11 (Rourke testified he has not been to Ecuador); Dkt. 400-11 (Ex. 2076) (Scardina Dep. Tr.) at 192:9-14 (When asked if he had "ever been to Ecuador," Scardina responded: "No.").*

Disputed.  Chevron's insinuation that the reports are somehow unreliable or dishonest

because they do not rely on "new sampling data" or "causation opinions" is extremely

misleading.  The reports all explicitly describe the data and sources relied upon.

- Allen's report discloses the information and sources relied upon, and Allen does not purport to rely on his own sampling data. Dkt. 400-10 (Champion Decl. Ex. 2063) at p.88 ¶ 1.3.

- Barnthouse's report discloses the information and sources relied upon, and does not purport to rely on new sampling data. Dkt. 400-10 (Champion Decl. Ex. 2064) at p.145.

- Picone's report concerns the costs of delivering health care to the affected population. How sampling data or a causation opinion would even be relevant to this report is far from clear.

- Rourke's report concerns the number and costs of excess cancer deaths associated with residence in oil-producing areas of the relevant provinces in Ecuador. Again, how sampling data or a causation opinion would even be relevant to this report is far from clear.

- Scardina's report concerns the costs associated with a potable water system. Again, how sampling data or a causation opinion would even be relevant to this report is far from clear.

- Shefftz's report is an analysis of unjust enrichment. Again, how sampling data or a causation opinion would even be relevant to this report is far from clear.

Chevron's characterization of the Ecuadorian Plaintiffs' use of the term "economic assessment" as an "admission" is similarly curious. The Lago Agrio Court described these

82

reports as "economic assessments applicable to the remediation . . . in order to give the Court a clear and up-to-date idea of the economic costs . . . ." Dkt. 168 (translated Lago Judgment) at p.58.

For the reasons stated in St. 30, this purported fact is not material. Further, the Lago Agrio Court stated "in the case file there is plenty of information with which the judge can form his opinion and any person with the evidence that has been submitted by the two parties to the proceedings (65 judicial inspections with the respective expert reports, 6 indepent expert reports, testimony, documents and deposition) and even their apparent contradictions—and the resulting debates they have triggered—have served to better illustrate the reality in the eyes of the judge." *See* Dkt. 168 (Chevron's translation of the 2/14/11 Lago Agrio Judgment) at 38.

88.    *The LAP team's purpose in submitting these seven expert reports was, in their words, to "'cleanse' any perceived impropriety related to the Cabrera Report," by "address[ing] Cabrera's findings in such a subtle way that someone reading the new expert report . . . might feel comfortable concluding that certain parts of Cabrera are a valid basis for damages." Dkt. 9-8 (DONZ00067932) ("Patton Boggs attorney Eric Westenberger explained this was "an effort to 'cleanse' any perceived impropriety related to the Cabrera Report"); Dkt. 400-10 (Ex. 2058) (DONZ00127753) at 1 (The LAP counsel instructed the LAP legal team to ensure nothing in a draft filing "compromises the proposed approach in Ecuador" and reiterating that the LAPs must not take any "position that could compromise [their] ability to cleanse the record in [E]cuador"); Dkt. 400-10 (Ex. 2059) (DONZ00040168) at 8 (In an email from LAP counsel attaching draft filing, counsel commented: "if we cannot make clearer representations, we would be better served just to rely solely on the curative additional reports as our 'cleanser,' as opposed to the notion of full disclosure."); Dkt. 356-9 (DONZ00068050) at 214 (Donziger explained how the LAPs' Ecuadorian legal team is "getting nervous that there is an increasing risk that our 'cleansing' process is going to be outrun by the judge"); Dkt. 355-28 (DONZ00031369-70) at 35 (the LAPs' counsel ultimately removed any specific assertions as to their involvement in the Cabrera fraud from the filing, apparently to "balance[] the desire for a 'cleansing'" with the concern that only a partial disclosure of their involvement could "come back to haunt us in a big way"); Dkt. 36-7 (DONZ00031475) at 1 (LAP counsel explained how the cleansing experts should "address Cabrera's findings in such a subtle way that someone reading the new expert report . . . might feel comfortable concluding that certain parts of*

83

*Cabrera are a valid basis for damages"); Dkt. 36-8 (DONZ00031477) at 1 (the LAPs hired consulting firm the Weinberg Group to "conduct a comprehensive review of selected sections of an expert report prepared by Engineer Richard Stalin Cabrera Vega as an independent expert for the court").*

Disputed.  Chevron provides incomplete and mischaracterized citations in an effort to distort the facts.  For example,

Dkt. 9-8 (Hendricks Decl. Ex. 13) is an e-mail discussion of the contemplated filing with the Lago Agrio Court.  Several potential requests for relief were discussed, including requesting the parties to submit additional reports to supplement Cabrera's.  Other e-mails show that the team was concerned that they did not undermine their ability to request this sort of relief.

Dkt. 355-28 (Hendricks Decl. Ex. 1093) (DONZ00031369) at 35 is an e-mail discussing a draft filing to be made to the Lago Agrio Court.  Chevron grossly mischaracterizes even the one attorney's thoughts. The attorney expressed concern that providing a filing that created the impression it provided an exhaustive list of submissions to and contacts with Cabrera could be unwise.

Moreover, this assertion is immaterial, for the reasons stated in St. 30.

89.     *The retention agreement of the Weinberg Group, the entity hired to coordinate the seven expert reports, provides that it was retained for the purpose of "conduct[ing] a comprehensive review of selected sections of an expert report prepared by Engineer Richard Stalin Cabrera Vega as an independent expert for the court." Dkt. 36-8 (DONZ00031477) at 1.*

Disputed.  Chevron's quotation of the document is incomplete and misleading.  The cited letter states that "we will work with counsel to further clarify the exact scope of our analysis and establish the most useful work product.  It is our assumption at this point that The Weinberg

84

Group will assess the validity, strengths, and weaknesses of conclusions outlined in the Cabrera report." Dkt. 36-8 at 1.

90.    *When informed of the true nature of the relationship between the LAP team and Cabrera, Douglas Allen, who authored one of the cleansing expert reports, admitted that the relationship "bother[ed]" him and it would have affected his opinion had he known about it at the time. Ex. 2073 (Allen Dep. Tr.) at 205:13-206: 9(Allen was asked, "Does it not bother you or impact your opinions to the reasonable degree of scientific certainty with which they are made that the report upon which you relied, that by Mr. Cabrera, was not only purported to be written by Mr. Cabrera but in fact has been shown not to be written by Mr. Cabrera but to be written by plaintiffs and plaintiffs' paid consultants?" and Allen responded, "yeah, it might bother me.").*

Disputed.  Page 205 from Allen's deposition is not provided as one of the selections from Allen's deposition that Chevron chose to include in Exhibit 2073, nor is the purported quotation contained in Exhibit 2073.  Chevron's assertion is unsupported and should be stricken.

Further, for the reasons described in Dkt. 823, Donziger objects to the use of depositions from cases in which Donziger was not a party.

91.    *Defendants relied on the Cabrera Report in communications with government agencies, shareholders, and the media, characterizing Cabrera as "independent" and comparing him to a "Special Master" in a U.S. court. Dkt. 402-12 (Ex. 2308) at 134,001, 134,004 (2008.01.11 LAP filing stating in Ecuador court filing that "Cabrera was not proposed by the plaintiffs" and "was not appointed at the suggestion of the plaintiffs," but was nominated by the court); Dkt. 47-57 (2010.07.09 LAP filing in Stratus 1782) at 27 ("Cabrera is not even an expert for one party, but a Court-appointed neutral."); Dkt. 47-30 (Donziger's Lantos Commission Testimony) at 7 ("The best and most recent independent estimate available of the human health impact of this contamination is provided by the expert appointed by the court, Richard Cabrera."); Dkt. 30-5 (2010.06.14 LAP complaint to stay arbitration) ¶ 29 ("The best and most recent independent estimate available of the human health impact of this contamination is provided by the neutral Special Master appointed by the court to provide advice on damages."); Dkt. 400-2 (Ex. 2017) (2009.05.10 LAP filing) at 129,697 (The LAPs requested a single expert designated by the court "primarily due to the issue of impartiality . . . . Impartiality because, having not been named by either of the parties, he will be even more objective in his analysis and conclusions"); see also Ex. 2019 at 140,184-85 (2008.04.18 LAP filing stating: "I remind you, Mr. President, that expert Cabrera was given the task because of his professional and personal suitability, and as such, his*

*work should be free of external pressures from the parties, especially when these pressures can compromise the systematic integrity of his work in an attempt to turn this professional designated by the court into a mere executor of their plans and strategies.").*

Disputed.  Disputed.  Chevron does not define what it means by an "improper" relationship.  Nowhere in the evidence to which Chevron cites do the Ecuadorian Plaintiffs or Donziger use the word "improper," so it is wholly inaccurate to claim that the Ecuadorian Plaintiffs "denied any improper relationship." Chevron's characterization of what exactly was denied is unsupported and argumentative.  Chevron's suggestion that any contact whatsoever between the Ecuadorian Plaintiffs and Cabrera was "improper" is wrong under Ecuadorian law and is inconsistent with the Lago Agrio court's orders.  Moreover, the insertion of this legal conclusion is not proper in a Rule 56.1 statement.  "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)). Whether Chevron believes that any relationship between the Ecuadorian Plaintiffs and Cabrera was "improper" under Chevron's own standards is not relevant to the instant motion for summary judgment.

Further, Chevron has manipulated quotations and taken words out of context in a manner that creates a misleading impression.  For example:

- Chevron did not include the end of the sentence that begins "Cabrera was not proposed by the plaintiffs."  The full sentence reads: "Engineer Cabrera was not appointed at the suggestion of the plaintiffs.  They originally proposed Dr. Luis Villacreces for the position.  Chevron opposed this, and the Judge listened to this request and appointed another expert."  Dkt. 402-12 (Ex. 2308) at p. 134,004.

86

- The Stratus pleading that Chevron quotes was an effort by Stratus to resist Chevron's improper § 1782 fishing expedition. Stratus argued that "There is no Ecuadorian precedent for seeking this discovery of materials given to a court-appointed expert." Dkt. 47-57 (Ex. 295) at p. 27.

- Chevron similarly provides only a selected quotation from the Ecuadorian Plaintiffs' April 18, 2008 pleading. Examination of the full pleading shows that the Ecuadorian Plaintiffs' statement was made in the context of attempting to clarify an order from the court for Cabrera to "comply" with Chevron's requests.
  Nor do Chevron's citations support its assertion that the Ecuadorian Plaintiffs'

"repeatedly" referred to Cabrera as "neutral" "independent" or a "Special Master." In fact, most

of Chevron's citations provide only that the Ecuadorian Plaintiffs recited the fact that the court

appointed Cabrera. It is undisputedly true that the court appointed Cabrera.

Finally, Chevron's repeated invocation of terms like "independent" to accuse the

defendants rests on a fundamental misapprehension of Ecuadorian law. Ecuadorian law did not

prohibit the parties from advocating their positions or urging the expert's agreement with and

adoption of those positions. Under Ecuadorian law, the expert's "independence" arises from his

free reign to decide whether, in his professional judgment, he believes a party's position to be the

correct one and to adopt whatever information is provided by a party as grounds for his opinions.

*See* Dkt, No. 154-5 ¶¶ 11-12, 18; Dkt. No. 154-6 ¶¶ 8-9. There is substantial evidence already in

the record that Ecuadorian law at the time did not prohibit parties from making contact with

court-appointed experts prior to the issuance of the expert's report, including prior to the expert's

formal appointment by the court. *See* Dkt. No. 154-5 (Alencastro Aff.) ¶¶ 9-12, 19; Dkt. No.

154-6 (Simon Aff.) ¶¶ 4-5, 7-8. *See also* Ecuadorian Plaintiffs' response to St. 36.

87

92.    *Stratus sent the Cabrera Report to Congressman Jim McGovern, representing it as the work of an independent Special Master, and did not disclose its role in preparing the report. Dkt. 47-31 (Ex. 270) at 1 (Beltman forwarded Cabrera's reports, stating "[t]he Court Expert's March 2008 report summary is attached," and that "[a]lso attached is the November 2008 response to the [Lago Agrio] Plaintiff's questions that was written by the Court Expert." Beltman failed to disclose that he and the Lago Agrio Plaintiffs' other U.S. consultants ghostwrote the report as well as the response.); Dkt. 47-32 (Ex. 270A) at 1 (Beltman provided United States Congressman Jim McGovern's office "some talking points" for an interview with the Los Angeles Times, telling the Congressman's staff that "[t]he Court Expert reviewed available scientific data and concluded that people in the area suffer from many illnesses caused by the contamination, including cancer." ).*

Disputed.  Disputed.  Donziger disputes that there was any requirement for Stratus to relay all the details of its involvement with the Cabrera report.  And Chevron cannot rely on the e-mail from a lawyer to which it cites.  As a preliminary matter, this argument is based upon inadmissible hearsay.  Chevron would rely on this statement—a first-blush reaction by an attorney who was not familiar with the facts—to establish the truth of the matters asserted.  This also is not a fact, but rather a statement of one person's opinion and legal conclusion.

Further, Chevron's citation does not support the conclusion asserted.  This comment was made by an attorney, during a brainstorming session regarding a working draft of a potential motion, and in which several potential arguments were posed without regard for or knowledge of the underlying facts.  Earlier in the e-mail chain, this same attorney acknowledges that the potential argument being discussed was not grounded in his knowledge of the facts, stating "my argument turns very substantially on the facts.  If there is any interest in reclaiming the argument, these facts need to be checked."  Dkt. No. 9-7 (Hendricks Decl. Ex. 12) (DONZ00056679) at 1.  When read in context, this comment is obviously a first-blush opinion about the writing style, rather than an assertion of fact.

Most importantly, Chevron's evidence is contradicted by a subsequent e-mail sent by the same attorney to the same recipients two days later, apparently after a more fulsome review of the facts:

> For my part, I have no doubt that Chevron has perpetrated a fraud upon the [Colorado] Court here. It has made a series of misrepresentations, generally in the form of omissions, particularly concerning what was occurring in Ecuador. . . . Had Chevron included for this Court a complete recitation of the Ecuadorian proceedings – the facts which it knew – it would have been impossible for them to make their strident cries about discovering that the Cabrera report contained 'plagiarized' Stratus material . . . Chevron . . . obviously understood that plaintiffs would be shoveling Stratus material to Cabrera. **There was, in sum, no fraud.**

Dkt. No. 532-3 (Young Decl. Ex. L) at p. 1 (emphasis added).

93. *Members of the LAP team wrote that the Cabrera Report was the most im-portant evidence in the case and provided the best damages estimate, one that should be afforded wide deference by the Ecuadorian court. Dkt. 6-2 (Ex. 1), CRS 138-02-01 (Crude outtake) (Donziger explaining to co-conspirator Atossa Soltani that, "we're now entering the fi-nal phase which is the expert assessment. . . Once that ends, the case is over in terms of the evi-dence. It's just final arguments. So that's critical."); Dkt. 6-8 (Ex. 2) at 76 (certified transcript); Dkt. 28-7 (DONZ00027256) at 15-16 (Donziger writes, referring to Cabrera's appointment as the Global Expert, "I asked Pablo if he was 100% sure the judge would [appoint] Richard and not Echeverria, and he said yes, but given that this is the most important decision of the case thus far, there is simply no margin for error."); Dkt. 33-2 (2008.02.22 email from Beltman to Stratus employees) (STRATUS-NATIVE043232-33) (Stratus project manager Douglas Beltman telling his team that they will draft the Cabrera Report: "The project is at a key point right now. We have to write, over the next 2 to 3 weeks, probably the single most important technical document for the case. . . . We (the case attorneys, the case team in Quito, and Stratus) have put together a very ambitious outline for this report."); Dkt. 37-8 (DONZ00024227) (Internally, Defendants called the Cabrera Report "the most important thing in the case"); Dkt. 6-2 (Ex. 1) at CRS-187-01-02 ("[T]he most important evidence we have in the case"); Dkt. 6-2 (Ex. 1) at CRS-200-01-30 ("huge for us"); Dkt. 47-16 (Ex. 255) (2008.12.01 Amazon Defense Front press release) (pub-licly claiming that "courts in Ecuador generally give wide deference to reports prepared by inde-pendent experts."); Dkt. 47-30 (2009.04.28 Statement by Donziger to the Tom Lantos Human Rights Commission) at 5 (Donziger told the U.S. Congress that "an independent court expert working with a team of 14 scientists, found that Chevron is liable for up to $27 billion in damag-es . . . . If the court accepts the damages assessment, then the case could produce the largest judgment ever for an environmental lawsuit."); Dkt. 356-9 at 152 (DONZ-HDD-*

89

*0113389) (When Cabrera was sworn in as the Global Expert, Donziger called it a "HUGE VICTORY").*

Disputed.  Chevron crafts a broad, argumentative conclusion that is unsupported by the evidence to which it cites.  This is improper in a 56.1 statement.  Chevron cobbles the quote that it *wishes* it had together by combining quotes that it does have.  In none of the cited evidence does anyone refer to the Cabrera report as "the most important evidence in the case," nor "provid[ing] the best damages estimate," nor "one that should be afforded wide deference by the Ecuadorian court."

94.     *On January 22, 2009, Fajardo wrote to the makers of Crude, asking them that "the images we had discussed be corrected or removed," referring to frames from the film showing Carlos Beristain present in a meeting involving Donziger, himself, and other members of the LAP team, telling the Crude filmmakers: "They are so serious that we can lose everything or a lot just because of those few, miniscule images." Dkt. 47-6 (Ex. 245) at 3.*

Disputed.  The cited e-mail establishes only that Fajardo asked Berlinger to edit certain footage from *Crude*; the document does not disclose what footage.  Donziger further disputes Chevron's characterization to the extent it suggests that Beristain was removed from multiple scenes.  Chevron has alleged that images of Beristain's attendance at only one event were edited out of *Crude*.  The meeting occurred in May 2007; before Cabrera was sworn in as an expert and before Beristain was identified as a member of Cabrera's technical team.  The meeting was a community meeting among the Cofán people and their attorneys "to talk about what they want as compensation for all the damage."  Dkt. No. 30-02 (Ex. 91) at p. 48; *see also* Dkt. No. 48-29 (Ex. 331).  Trudie Styler also observed and spoke to the Cofán people.  Dkt. No. 30-02 (Ex. 91) at p. 49.  Beristain's role at the meeting was "in the form of leading a discussion" with the Cofán people.  Dkt 613-11 (Ex. K) (1/14/11 Donziger Depo. Tr.), at 2919:20-23.

Further, Chevron cites to no evidence that would suggest that Donziger or other members of the Ecuadorian Plaintiffs' team felt the same way as Fajardo regarding the footage at issue.

*95.     In response to Chevron's discovery efforts in U.S. courts, Defendants attempted to conceal their relationship with Cabrera. Dkt. 6-2 (Exhibit 1) at CRS-191-00-CLIP-03 (2007.03.03 Crude outtake video clip of meeting among P. Fajardo, A. Maest, and others); Dkt. 7-5 (Exhibit 2 (certified transcript)) at 244 (Fajardo: "Chevron's main problem right now is that it doesn't know what the hell is going to happen in the global expert examination. In other words, they don't know that. I hope none of you tell them, please."); Dkt. 6-2 (Exhibit 1) at CRS-196-00-CLIP-01 (2007.03.04 meeting among S. Donziger, A. Maest, R. Kamp, and C. Champ discussing groundwater evidence); Dkt. 7-6 (Exhibit 2 (certified transcript)) at 265-67 (Donziger: "Our goal is that they [Chevron] don't know shit . . . and that's why they're so panicked."); Dkt. 32-7 (DONZ00108564) at 1 (Donziger: the LAPs' counsel should consider having Cabrera take action "AGAINST us to prove his independence" and "find ways to Keep Texaco from finding out much about his plan and his work"); Dkt. 47-6 (JBNONWAIVER00008870) (LAPs' counsel Pablo Fajardo imploring the Crude filmmakers to "remove the images that we discussed" of Cabrera team member Dr. Beristain working with LAPs' attorneys because "[t]his is so serious that we could lose everything"); Dkt. 48-31 ¶ 7.1 (Declaration of Mark Quarles stating, among other things, that "Mr. Cabrera and his team have acted independently from both the plaintiffs and the defendant"); Dkt. 48-32 (Quarles Dep. Tr.) at 122:1-5 (testifying that he "would not have signed this declaration" if he had known that "Mr. Cabrera was working directly with the plaintiffs."); Dkt. 33-9 (STRATUS-NATIVE044716) at 1 (Beltman: plan is to treat "our original English version as if it's a translated version" of Cabrera Report); Dkt. 34-23 (STRATUS-NATIVE065062); Dkt. 34-13 (STRATUS-NATIVE061311) at 1 ("We have to talk to Clapp about that 5-pager, and how we have to limit its distribution. It CANNOT go into the Congressional Record as being authored by [Clapp]."); Dkt. 34-14 (STRATUS-NATIVE057803) (Stratus principal Douglas Beltman writes of incriminating citation in the Cabrera Report, "Oh what a tangled web . . . .").*

Disputed.  Many of these citations do not even purport to relate to 1782 proceedings.  In fact, none of the quotations Chevron provides reference a 1782 or discovery efforts.  Chevron conclusions are not undisputed facts, they are inferences about the deendants' mental states.  They are also selectively cobbled together, and re-hash the same misleading arguments made elsewhere in Chevron's 56.1 statement.

91

96      *On March 30, 2010, Prieto wrote to Donziger and others and stated his concern that if the District of Colorado ordered the disclosure of material related to Stratus's authorship of the Cabrera Report, "the effects are potentially devastating in Ecuador (apart from destroying the proceeding, all of us, your attorneys, might go to jail)[.]" Dkt. 9-6 (Exhibit 11) (2010.03.30 Email from J. Prieto to S. Donziger, P. Fajardo, L. Yanza and J. Saenz re "Protection Action") (DONZ00055225).*

Disputed.  Chevron fails to provide the full context of this e-mail.  Prieto begins "Apparently this is normal in the U.S. and there is no risk there, but the problem, my friend, is that the effects are potentially devastating in Ecuador . . . ."  Dkt. No. 9-6 (Ex. 11) (DONZ00055225) at 1.  This is clearly the unconsidered opinion—expressed in the heat of the moment—of but one member of the Ecuadorian Plaintiffs' team.  This opinion is also inconsistent with Ecuadorian law in place at the time, which did not prohibit coordination between parties and experts.

Chevron's repeated invocation of terms like "independent" to accuse the defendants rests on a fundamental misapprehension of Ecuadorian law.  Ecuadorian law did not prohibit the parties from advocating their positions or urging the expert's agreement with and adoption of those positions.  Under Ecuadorian law, the expert's "independence" arises from his free reign to decide whether, in his professional judgment, he believes a party's position to be the correct one and to adopt whatever information is provided by a party as grounds for his opinions.  *See* Dkt, No. 154-5 ¶¶ 11-12, 18; Dkt. No. 154-6 ¶¶ 8-9.  There is substantial evidence already in the record that Ecuadorian law at the time did not prohibit parties from making contact with court-appointed experts prior to the issuance of the expert's report, including prior to the expert's formal appointment by the court.  *See* Dkt. No. 154-5 (Alencastro Aff.) ¶¶ 9-12, 19; Dkt. No. 154-6 (Simon Aff.) ¶¶ 4-5, 7-8.  *See also* Ecuadorian Plaintiffs' response to St. 36.

97.     *To prevent disclosure of their relationship with Cabrera, Defendants followed a delay strategy developed by their new U.S. attorneys at Patton Boggs, the "fundamental principle" of which, "as outlined by Jim [Tyrrell]," was to "appeal everything on the theory that we gain a greater advantage by fighting them on everything, and tying them up, than in conceding any one thing even if we expect to ultimately lose that one thing down the road." Dkt. 48-21 at 1; see also Dkt. 549-3 (Ex. 2406) at 2819:21-2820:23 (Donziger testi-fying that "Jim" is Tyrrell); Dkt. 496-5 (Donziger: "Seems we have a tension [between] the strat-egy as outlined by Jim (fight hard on all fronts all the time and concede nothing, buy as much time as possible)" and the idea that "something should be turned over" regarding the Cabrera fraud); Dkt. 549-4 (Ex. 2422) (Westenberger strategy: "This certainly will cause delay"); Dkt. 47-54 (Separately, Westenberger proposed a delay strategy for Stratus: "What about the following? Appeal; move for stay; if we win with [the District Court Judge] great; if we lose, we produce whatever we want (narrow read); [Gibson Dunn] complains and then we move for clarification. If we lose again, we think about another appeal.").*

Disputed.  Chevron's conclusions are not undisputed facts; they are arguments and inferences about the defendants' mental states.  Such questions cannot be resolved on summary judgment.

Further, the snippets of internal discussions regarding various possible approaches to litigation and other statements plucked out of context do not establish Chevron's sweeping claim.

For example, Dkt. 48-21 contains an attorney-client discussion about whether to appeal from a particular ruling; the group is discussing the pros and cons of an appeal.  There is no indication of what the particular "advantage" being discussed would be.

Chevron insinuates that a litigation strategy of fighting back against Chevron's massive 1782 onslaught, including efforts to obtain mountains of privileged material and core attorney work product, is somehow improper.  Defending oneself is hardly an illegitimate "delay strategy."

98.     *Stratus, through counsel, told the District of Colorado that it was "aston-ish[ed]" to see similarities between its work and the Cabrera report, and that it had never reviewed the report in draft form. Dkt. 47-62 (2010.04.27 Hrg. Transcript in Chevron Corp. v. Stratus Consulting, Inc., 10-cv-00047-MSK-MEH (D. Colo.)) at 58:5-17, 69:12-13; see also Dkt. 355-7 (2011.06.27 Stratus Order) at 4 (Magistrate Judge Hegarty writing, "I asked Stratus' counsel whether*

*Stratus officials had ever met with Cabrera; Stratus' counsel, Mr. Silver, stated that he investigated that issue with his client and, after such investigation, believed that there had been no such meeting ever; when I was told this in open court, I stated, 'You know, in my world that's golden. I'll take a representation like that from a lawyer any day and believe it'; in fact, Stratus' representatives (and Respondents here) Beltman and Maest had a meeting with Cabrera in Ecuador in January 2008. What I thought was 'golden' has lost its luster. I do not accuse Mr. Silver of lying, but I was not given the truth.").*

Disputed.  In the first cited portion of the hearing transcript, Stratus's counsel states that he does not believe that there were direct communications between Stratus and Cabrera.  Dkt. 47-62 at 58:5-13.  Then, in response to the court's question "Mr. Silver, do you know—does your client know what was given to Cabrera?" counsel answered, "In an anecdotal way I know that they are wise to the resemblance of—to their astonishment of product, similarity of product.  So it's anecdotal."  Dkt. No. 47-62 (Ex. 300) at 69:9-14.

99.     *The Burford Group, an investor that purchased a multi-million dollar share of the judgment from the LAPs, has accused Defendants of perpetrating "a multi-month scheme to deceive and defraud in order to secure desperately needed funding" for their litigation/ pressure campaign against Chevron, "all the while concealing material information and misrepresenting critical facts in the fear that we would have walked away had we known the true state of affairs." Dkt. 714-1 (BUR0000845-47) (2011.09.29 letter from Burford Group to S. Donziger, P. Fajardo, L. Yanza, El Frente de Defensa de la Amazonia, and Purrington Moody Weil LLP), at BUR0000846.*

Disputed.  Burford's allegations and insinuations are inadmissible hearsay.  Further, the allegations in the letter are not based on the author's personal knowledge and are also inadmissible for that reason.  Chevron's assertion should be stricken.

94

### III.   THE LAGO AGRIO JUDGMENT INCORPORATES, IN MATERIAL PART, ANALYSIS, DATA, AND CONCLUSIONS TAKEN FROM UNFILED LAPS' WORK PRODUCT AND THE FRAUDULENT CABRERA REPORT[16]

*100.   The following judges served as trial judges for the Lago Agrio litigation for the indicated periods of time:  Alberto Guerra Bastidas (May 13, 2003 to February 4, 2004); Efraín Novillo Guzmán (February 4, 2004 to February 2, 2006; October 3, 2007 to August 25, 2008); Germán Yánez Ruiz  (February 2, 2006 to October 3, 2007); Juan Evangelista Núñez Sanabria (August 25, 2008 to October 21, 2009); Nicolas Augusto Zambrano Lozada (October 21, 2009 through March 12, 2010); Leonardo Ordóñez Pina (March 12, 2010 to October 11, 2010); and Nicolas Augusto Zambrano Lozada (October 11, 2010 through the conclusion of the case).  Dkt. 402-11 (Ex. 2294) (2004.02.04 Order); Dkt. 402-11 (Ex. 2296) (2006.02.02 Order); Dkt. 32-6 (2007.10.03 Order); Dkt. 402-12 (Ex. 2306) (2008.08.25 Order); Dkt. 402-11 (Ex. 2300) (2009.10.21 Order); Dkt. 402-12 (Ex. 2301) (2010.03.12 Order); Dkt. 402-12 (Ex. 2302) (2010.10.11 Order).*

Not disputed.


*101.   At the time the judgment issued, the official court record in the Lago Agrio Litigation consisted of the hand-numbered pages 1 to 216338 maintained by the Provincial Court of Sucumbios in Lago Agrio, Ecuador (the "Lago Agrio Record").  Dkt. 402-6 (Ex. 2257) (Page 1 of the Lago Record); Dkt. 402-17 (Ex. 2354) (First page of Judgment with record number in the upper right); Dkt. 402-15 (Ex. 2326) (Certification Page of Ecuadorian Judgment – RC-CL2065-0216437v).*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.


*102.   The LAP team maintained "a full digitized set of every single document filed in the court." Stavers Decl., Ex. 3273 (WOODS-HDD-0226427); see also Stavers Decl., Ex. 3272 (WOODS-HDD-0226441).*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.


*103.   The Ecuadorian court issued a 188-page single-spaced judgment against Chevron, on February 14, 2011 and issued a Clarification Order regarding that Judgment ("Clarification Order") on March 4, 2011, both signed by Judge Zambrano. These appear in the record of this*

---

[16] For the reasons set forth in Donziger's responses to each of Chevron's purported facts listed under Heading III, Donziger also disputes the assertions and conclusions set forth in Chevron's Heading III.

*action, along with certified English translations, at Dkts. 168 and 186, respectively. Dkt 168 (2011.02.14 judgment); Dkt. 186 (2011.03.04 clarification order).*

Not disputed for purposes of this motion.

*104.    Sections 3, 6, 7, 9, 10, and 15 of the judgment contain text, data or other in-formation found in the LAP team's unfiled work product but not found in the Lago Agrio Record.  Stavers Decl., Ex. 3276 (certified translation of the judgment, highlighted to show overlap with the LAPs' unfiled work product (yellow) and reliance on the Cabrera Report (red)).*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

*105.    Sections 13 and 14 of the judgment contain text, data or other information found in the Cabrera Report and nowhere else in the Lago Agrio record.  Stavers Decl., Ex. 3276 (certified translation of the judgment, highlighted to show overlap with the LAPs' unfiled work product (yellow) and reliance on the Cabrera Report (red)).*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

*106.    Of the judgment's 188 pages, 51 contain text, data or other information found in the LAP team's unfiled work product but not found in the Lago Agrio Record.  Stavers Decl., Ex. 3276 (certified translation of the judgment, highlighted to show overlap with the LAPs' unfiled work product (yellow) and reliance on the Cabrera Report (red)).*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

*107.    Of the judgment's 188 pages, 9 contain text, data or other information found in the Cabrera Report and nowhere else in the Lago Agrio record. Stavers Decl., Ex. 3276 (certified translation of the judgment, highlighted to show overlap with the LAPs' unfiled work product (yellow) and reliance on the Cabrera Report (red)).*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

*108.    The judgment's Introduction and Section 4 falsely disclaim reliance on the Cabrera Report and the Cleansing Expert reports. Dkt. 168 at 51, 57.*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

*109.    The judgment contains overlap with an internal memorandum prepared by a member of the LAPs' team, Katia Gomez.  Dkt. 355-27 (Ex. 1076); Dkt. 168 at 65.*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

*110.    The judgment dismisses Chevron's fraud allegations by stating that the misconduct is entirely Donziger's, and that he is not a party or lawyer of record.  Dkt. 168 at 51.*

Disputed.  Chevron grossly mischaracterizes the Judgment.  First, the cited portion of the

Judgment discusses "the parties' mutual charges of inappropriate conduct by the opposing

party's collaborators . . . ." Dkt. 168 at 51.  Second, the Judgment's discussion is limited to

statements regarding the Ecuadorian judiciary, and not some broader fraud allegations by

Chevron.  *Id*. at 51-52.  ("In addition, the Court notes that although it were to have the power to

judge Mr. Donziger due to his disrespectful statements, it could not do so based on such limited

portions, chosen and edited from hours of taping, and without giving the accused to [sic] right to

defend himself or explain the context of those statements . . . .").  Third, the Lago Agrio Court

did not credit Chevron's allegations because they were drawn from cunningly selected and out-

of-context tape excerpts.  *Id.*

*111.    The judgment awards compensatory damages in the same eight categories as the Cabrera Report, but those categories are supported by nothing else in the record except the Cabrera Report and the LAPs' final alegato, which itself cites throughout to the Cabrera Report. Dkt. 168 at 176–84; Dkt. 6-2 (Exhibit 1) at CRS-269-01-04, 269-01-08; Dkt. 7-10 (Exhibit 2 (certified transcript)) at 355-62 (Donziger meeting with Stratus representatives, without Cabrera, to plan the work for the Cabrera Report and discuss which damages categories to include in the Cabrera Report); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 2421:25-2423:8 (Donziger testifying that he instructed Stratus regarding which damages categories to address in the Cabrera Report, that the damage categories were developed "exclusively" by the LAPs' team, and that the damages categories were not based on any discussions with Cabrera); Dkt. 400-12–13 (Ex. 2077) (2011.02.01 LAP final trial brief discussing relationship between the Cabrera Report and Barnthouse's report) at 67-75; Dkt. 400-22 (Ex. 2140) at 89 (2011.01.17 LAP trial brief stating that "the various categories of damage and injury . . . will be fully*

*addressed at Part Two of Plaintiffs' Alegato Final, forthcoming"); Dkt. 400-12–13 (Ex. 2077) at 4-12 (2011.02.01 LAPs final trial brief section on "remediation of soil and groundwater" citing only: cleansing expert "Douglas Allen" (who offered no causation opinion) and "the Cabrera Report"); Dkt. 356-14 at 41-42 (Beltman told Donziger that he could find no "clear instances where Texpet did not meet the conditions required in the cleanup"); Dkt. 400-22 (Ex. 2140) at 89 (2011.01.17 LAP trial brief stating that "the various categories of damage and injury . . . will be fully addressed at Part Two of Plaintiffs' Alegato Final, forthcoming"); Dkt. 400-12–13 (Ex. 2077) at 4-12 (2011.02.01 LAPs final trial brief section on "remediation of soil and groundwater" citing only: cleansing expert "Douglas Allen" (who offered no causation opinion) and "the Cabrera Report"); Dkt. 400-22 (Ex. 2140) at 89 (2011.01.17 LAP trial brief stating that "the various categories of damage and injury . . . will be fully addressed at Part Two of Plaintiffs' Alegato Final, forthcoming"); Dkt. 400-12–13 (Ex. 2077) at 18-20 (2011.02.01 LAP final trial brief section on "ecosystem" damages citing only: cleansing expert "Dr. Barnthouse" (who offered no causation opinion) and "the Cabrera Report"); Dkt. 108-13 (STRATUSNATIVE067644) at 1-2 (Beltman stating, "I do not think that contamination sufficient to impact the ecology extends very far beyond the pads, pits, and spills at the wells.") Dkt. 400-22 (Ex. 2140) at 89 (2011.01.17 LAP trial brief stating that "the various categories of damage and injury . . . will be fully addressed at Part Two of Plaintiffs' Alegato Final, forthcoming"); Dkt. 400-22 (Ex. 2077) at 20-27 (2011.02.01 LAP final trial brief section on "adverse impacts to indigenous cultures" citing only one expert in support of their claims: "the Cabrera Report"); Dkt. 400-12–13 (Ex. 2140) at 89 (2011.01.17 LAP trial brief stating that "the various categories of damage and injury . . . will be fully addressed at Part Two of Plaintiffs' Alegato Final, forthcoming."); Dkt. 400-22 (Ex. 2077) at 39-48 (2011.02.01 LAP final trial brief section on "devastating effects caused on public health" citing: cleansing expert "Picone" (who offered no causation opinion) and "the Cabrera Report"); Dkt. 400-12–13 (Ex. 2140) at 89 (LAP January 17, 2011 trial brief stating that "the various categories of damage and injury . . . will be fully addressed at Part Two of Plaintiffs' Alegato Final, forthcoming."); Dkt. 400-22 (Ex. 2077) at 48-59 (2011.02.01 LAP final trial brief section on "drinking water" citing only cleansing expert "Scardina" (who offered no causation opinion) and "the Cabrera Report"); Dkt. 400-12–13 (Ex. 2140) at 89 (2011.01.17 LAP trial brief stating that "the various categories of damage and injury . . . will be fully addressed at Part Two of Plaintiffs' Alegato Final, forthcoming."); Dkt. 400-22 (Ex. 2077) at 59-65 (2011.02.01 LAP final trial brief section on "excess cancer" citing only cleansing expert "Rourke" (who offered no causation opinion) and "Cabrera"); Compare Dkt. 33-12 at 5-6 (Cabrera Report recommending a $1.7 billion award for soil remediation), and Dkt. 9-2 at 18, (Supplemental Cabrera Report estimating that the "total cost for remediating the soil to 100 ppm TPH should be $2,743,000,000"), with Dkt. 168 at 182 (Judgment awarding $5,396,160,000.00 to "recover the natural conditions of the soil impacted by Texpet's activities"); Compare Dkt. 33-12 at 6 (Cabrera Report recommending a $428 million award to provide "potable water to the people living in the Concession area and within its area of influence"), and Dkt. 9-2 at 53 (same), with Dkt. 168 at 183-84 (Judgment awarding $150 million for regional potable water systems which will transport water "from other parts of the region through aqueducts . . ."); Compare Dkt. 33-12 at 6, 33-14 at 41, 44-45 (Cabrera Report recommending a $480 million award to provide "healthcare systems for the region's population*

98

. . ."), and Dkt. 9-2 at 53 (same), with Dkt. 168 at 184 (Judgment awarding $1.4 billion for a "health system, to cover the health needs created by the public health problem occasioned by the acts of the defendant . . ."); Compare Dkt. 33-12 at 6, 33-14 at 34-35 (Cabrera Report recommending a $430 million award to "implement a plan for recovering the territory, food supply and culture for the ancestral indigenous groups that have been affected by Texaco's operations"), and Dkt. 9-2 at 53 (same), with Dkt. 168 at 184 (Judgment awarding $100 million for a "community reconstruction and ethnic reaffirmation program" to redress "cultural harm"); Compare Dkt. 33-12 at 7, 9; 33-15 at 48-49 (Cabrera Report claiming that the "[p]eople in the region suffer increased rates of cancer" and recommending a $2,910,400,000 award as "appropriate compensation for the excessive number of deaths from cancer suffered by the people living in the Concession area"), and Dkt. 9-2 at 35-38 (Supplemental Cabrera Report estimating "the total monetary value of excessive deaths due to cancer" at $9.527 billion), with Dkt. 168 at 185 (Judgment claiming "sufficient indications to demonstrate the existence of an excessive number of deaths from cancer"); see id. at 140-46 (Judgment relying on lay witness testimony regarding the cause of cancer and self-reported surveys); Dkt. 400-22 (Ex. 2142) (Annex Q of the Cabrera Report) at 1-5 (citing selfreported cancer surveys); Dkt. at 168 at 132-35 (Judgment citing two studies published by Dr. Miguel San Sebastian: the Yana Curi Report and Cancer in Ecuadorian Amazon); Dkt. 400-22 (Ex. 2143) (Annex P of the Cabrera Report) at 9, 10, 13 (same); Dkt. 402-3 (Ex. 2237) at 9-18 (Dr. Michael A. Kelsh, Ph.D., Rebuttal to Mr. Cabrera's Excess Cancer Death and other Health Effects Claims, and his Proposal for a New Health Infrastructure); Compare Dkt. 33-12 at 6, 33-15 at 49-50 (Cabrera Report recommending between $875 million and $1.697 billion in damages to "restore" tropical rainforest and compensate "for the loss of the rain forest ecosystem"), and Dkt. 9-2 (Supplemental Cabrera Report) at 53 (same), with Dkt. 168 at 183 (Judgment awarding $ 200 million "to recover the native flora, fauna, and the aquatic life of the zone . . ."); Compare Dkt. 9-2 at 12-14, 53 (Supplemental Cabrera Report recommending an award of $3,236,350,000 to remediate groundwater), with Dkt. 168 at 180 (Judgment awarding $600 million for "the cleanup of groundwater").

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

112.    Section 14 of the judgment imposes punitive damages that are illegal under Ecuadorian law, and follows the Cabrera Report's unjust enrichment award in justification and size. Dkt. 400-21 (Ex. 2137) (DONZ00038323) (Donziger writing: "Punitive: no basis in Ecuadorian law, but we could push it and seek it anyway."); Dkt. 400-21 (Ex. 2136) (Expert Report of Dr. Gustavo Romero Ponce) ¶ 6 ("Punitive damages are not recognized by Ecuadorian law."); Dkt. 402-16 (Ex. 2349) (Expert Report of Dr. César Coronel Jones) ¶ 25 ("The choice in the Decision to award punitive damages constitutes a clear violation of Ecuadorian law: (1) There are no legal grounds for asserting the existence of punitive damages in Ecuador. (2) I know of no [other] case in which an Ecuadorian judge has awarded punitive damages in Ecuador."); Compare Dkt. 168 at 184–86 (Judgment) with Dkt. 33-12 at 7 (Cabrera Report).

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

*113.   The judgment recognizes that the LAPs did not request punitive damages in their complaint. Dkt. 29-17 (Lago Complaint); Dkt 168 (Lago Agrio Judgment) at 185.*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

*114.   No single person could have reviewed the entire Lago Agrio Record and written the 188-page judgment between December 17, 2010, when Judge Zambrano claims to have begun reviewing the record, and February 14, 2011, when he issued the judgment. Stavers Decl., Ex. 3124 (Rayner Report) at 5.*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

*115.   Authorship of any portion of the judgment by anyone other than Judge Zambrano, the presiding judge in the case, was illegal under Ecuadorian law. Stavers Decl., Ex. 3123 (Romero Report), ¶¶ 36–43.*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

*116.   Reliance on evidence outside the record by Judge Zambrano (or anyone else) in drafting the judgment was illegal under Ecuadorian law. Stavers Decl., Ex. 3123 (Romero Report), ¶ 44.*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

*117.   Ecuadorian law obligates the judge to read, review, study and analyze all of the existing record before issuing a judgment. Stavers Decl., Ex. 3123 (Romero Report), ¶ 44.*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

*118.   Unlike U.S. judges, judges in Ecuador do not have law clerks or other professional staff who are allowed to assist in the drafting of judicial opinions. Stavers Decl., Ex. 3123 (Romero Report), ¶¶ 37–40.*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

119.     *Oral argument transcripts are part of the record in Ecuador. Stavers Decl., Ex. 3123 (Romero Report), at 24 n88.*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.


120.     *Zambrano was the Provincial Director of the Judicial Council for the court and was personally involved in the selection of the panel for second instance review of the judgment, which was not held by public lottery as the law requires. Dkt. 356-12 at 94-145; Dkt. 400-17 (Ex. 2113); Dkt. 402-1 (Ex. 2207).*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.


121.     *The panel that conducted the second instance review of the judgment changed composition several times before being finalized, issued its affirmance just one month later, and, at the LAPs' request, issued a "Clarification Order" hours after Chevron submitted its objections to the request. Dkt. 356-12 at 94-145; Dkt. 400-17 (Ex. 2113); Dkt. 402-1 (Ex. 2207); Dkt. 400-25 (Ex. 2147) (Clarification Order); Dkt. 400-26 (Ex. 2148) (Chevron's objections to Plaintiffs' Requests for Clarification).*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.


122.     *In its January 3, 2012 order, the second instance review panel stated that it had no "competence" to address the allegations of fraud against the LAP team. Dkt. 383-1 (Appellate Judgment) at 10.*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.


123.     *In its January 13, 2012 "Clarification Order," the second instance review panel stated in reference to the allegations of fraud against the LAP team, that "it stays out of these accusations," but that it did not find the evidence of fraud persuasive. Dkt. 384-1(Appellate Clarification Order) at 5.*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.


124.     *Defendants have only speculated about how the LAPs' unfiled work product made it into the judgment, and do not claim to know how it did. Stavers Decl. Ex. 3101; Dkt. 712 at 5.*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

**Fusion Memo**

*125.    The document bearing Bates numbers DONZ-HDD-0142504-25, a memorandum that begins "La fusión entre Chevron Inc. Y Texaco Inc.," regarding the corporate relationship between Texaco and Chevron (the "Fusion Memo"), was written by the LAP team and consists of the LAP team's unfiled work product. Dkt. 400-17 (DONZ-HDD- 0142504-25) at 1; Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 4258:14-20. id. at 4687:10-13 ("Q. Are you aware of an occasion on which Exhibit 1806A, the Fusion memo, was provided to the court in Lago Agrio? A. No."); id. at 4687:14-20 ("Q. Are you aware of any occasion on which anyone affiliated with the Lago Agrio plaintiffs provided any portion of the text of the Fusion memo in any form to anyone affiliated with the Lago Agrio court? A. I just don't know."); id. at 4701:11-25, 4703:4– 4704:20 (Donziger testifying that the LAPs' team was uncertain as to why the Fusion Memo, which he testifies the LAPs drafted, is not in the Lago Agrio court record); id. at 4702:22-4703:8 ("Q. Have you specifically had discussions with Mr. Fajardo as to whether or not he ever submitted Exhibit 1806A [the Fusion memo] or some version of it to the Ecuadorian court on the record? A. Yes. Q. Was he able to confirm to you whether or not he had submitted Exhibit 1806A [the Fusion memo] or some version of it to the Ecuadorian court on the record? A. No, he was unable to."); id. at 4736:13-20 ("Q. You are referring to when the [Fusion] [M]emo was being drafted? A. Yes. Well, when the research was being done and the intention was to put a document together. It might have been this memo, or, I don't know, I wasn't involved on a day to day basis, but to put into evidence to deal with this issue.").*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

*126.    The Fusion Memo is not in the Lago Agrio Record. Stavers Decl., Ex. 3267 (Juola Report) at 11 ("[T]he overall similarity between [the Judgment] and the other documents cited, including Fusion, could not have derived from secondary sources with the court record.").*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

*127.    As this Court has already found, "Identical or nearly identical word strings" and strings of symbols in the Unfiled Fusion Memo appear in the Judgment and "[p]arts of the Judgment, including a multi-page section dealing with the relationship among Texpet, Texaco, and the Consortium, are virtually identical—character-for-character—with the Unfiled Fusion Memo." Dkt. 550 at 28 n.115, 86; see also Dkt. 658-7 (Leonard Report) at 13 (concluding that "portions of [the Judgment] and the Lago Agrio Plaintiffs' unfiled work product contain matching or similar word strings and strings of symbols whose presence is not explainable either as set phrases or by chance, and that those portions of the [Judgment] are therefore plagiarized from [the LAPs'] unfiled work product"); id. at 15 ("There are multiple instances of verbatim copying of word strings from the Fusion Memo to the [Judgment] that do not appear to be set phrases nor explainable by chance."); id. at 15, 18, 14 (providing examples of "co-occurring identical or*

*nearly identical word string[s]," "identical idiosyncratic numerical ordering and highlighted exhibits showing "strings of text and symbols which were plagiaristically copied from the [LAPs'] unfiled Fusion Memo"); Dkt. 400-19 (Turell Report) at 8, 23-39, 44 (concluding that a portion of the Judgment is "an almost verbatim reproduction" of the Fusion Memo, which "is a clear indication that the latter was plagiarized by the former"); see also Dkt.400-17 (Ex. 2116) (DONZ-HDD-0142503–25) (email attaching fusion memo).*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

*128.    The following language on page 8 of the Fusion Memo appears verbatim or nearly verbatim on page 24 of the Judgment: "Es cierto que por norma general una empresa puede tener subsidiarias con personalidad jurídica completamente distinta. Sin embargo, cuando las subsidiarias comparten el mismo nombre informal, el mismo personal, y están directamente vinculadas con la empresa madre en una cadena ininterrumpida de toma de decisiones operativas, la separación entre personas y patrimonios se difumina bastante. En este caso, se ha probado que en la realidad Texpet y Texaco Inc. funcionaron en el Ecuador como una operación única e inseparable. Las decisiones importante pasaban por diversos niveles de ejecutivos y órganos de decisión de Texaco Inc." Dkt. 658-7 (Leonard Report) at 15 (showing highlighted overlap between the Judgment and the Unfiled Fusion Memo); Dkt. 550 at A5 (recognizing the overlap, highlighted in opinion, here in bold, and reflecting the English translation of the above passage: "It is true that as a general rule a company can have subsidiaries with completely distinct legal status. However, when the subsidiaries share the same informal name, the same personnel, and are directly linked to the parent company in an uninterrupted chain of operational decision-making, the separation between entities and patrimonies is significantly clouded, or even comes to disappear. In this case, it has been proven that in reality Texpet and Texaco Inc. functioned in Ecuador as a single and inseparable operation. Both the important decisions as well as the trivial ones passed through various levels of executives and decision-making bodies of Texaco Inc.").*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

*129.    The following language on page 6 of the Fusion Memo appears verbatim or nearly verbatim on page 21 of the Judgment: "Cartas de funcionarios menores dirigidas a Shields{footnote 13}.- En este apartado se hace referencias a cartas dirigidas a Shields que se originaron en Quito, en manos de funcionarios menores que solicitaban su autorización. William Saville era un ejecutivo de Texpet que operaba en Quito. Él envío muchas y cotidianas comunicaciones a Shields (en Nueva York) solicitando autorizaciones. Por ejemplo, le envía a Shields los costos estimados de la perforación de los pozos Sacha 36 al 41 (doc s/n), y solicita su aprobación para iniciar la licitación de trasporte de combustibles en el oriente (PET031387). J.E.F. Caston, otro ejecutivo de la petrolera ubicado en Quito, solicita la autorización de Shields para licitar varios servicios (PET020758) y para aprobar los costos estimados de*

*instalar bombas sumergibles en cinco pozos en el campo Lago Agrio. Finalmente tenemos a Max Crawford, otro funcionario radicado en Quito, quien también solicitaba periódicamente la aprobación de Shields para diversos objetivos. Aquí se reproducen dos solicitudes para aprobar el inicio de dos licitaciones (PET035974 y doc s/r). {footnote 13} Pedidos de oficiales inferiores dirigidos a Shields [PSV-018/I] Cuerpo 65, fojas 6855, 6856, 6860, 6861, 6875, 6882, 6885." Dkt. 658-7 (Leonard Report) at 16 (showing highlighted overlap between the Judgment and the Unfiled Fusion Memo); Dkt. 550 at A3 (recognizing the overlap, highlighted in opinion, here in bold, and reflecting the English translation of the above passage: "letters and memorandums from Shields and Palmer to John McKinley, coming from the Texaco Inc, and Texpet files. In volume 66, pages 6957, 6958, 6964, 6959, 6960, 6974. That show that both Shields and Palmer maintained a constant flow of letters and memos with McKinley, asking for his authorization and informing him of events relating to the Napo Concession. Likewise, letters from minor officials addressed to Shields, in volume 65, pages 6855, 6856, 6860, 6861, 6875, 6882, 6885, where reference is made to letters addressed to Shields that originated in Quito, in hands of minor officials who requested his authorization, such as William Saville, who was a Texpet executive who operated in Quito, and sent many and daily communications to Shields (in New York) requesting authorizations. For example, he sent Shields the estimated costs of drilling the Sacha 36 to 41 wells (unnumbered doc) and asks his approval to start the tender for fuel transport in the Oriente (PET 031387 at page 6856). J.E.F. Caston, another executive of the oil firm based in Quito, asks Shields for his authorization to call for bids for various services (PET 020758 at page 6860) and to approve the estimated costs of installing submersible pumps in five wells in the Lago Agrio field. Finally, we have Max Crawford, another official based in Quito, who also periodically asked for Shields' approval for various purposes (PET 035974 at page 6882, and unnumbered doc at page 6885)."*

Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

*130.     In the Lago Agrio Litigation, Chevron made multiple submissions regarding corporate separateness to refute the claim that it could be held liable for TexPet's alleged conduct. Dkt. 29-17 (2003.05.07 Complaint in Maria Aguinda Salazar, et al. v. Chevron Corp. litigation); Dkt. 402-1 (Ex. 2202) (Settlement Hearing Transcript, Aguinda et al. v. Chevron Texaco Corporation, No. 002-2003, Superior Court of Justice, Nueva Loja, Record) at 243; Dkt. 402-1 (Ex. 2201) (Judicial Inspection Acta for Sacha 6 filed in Aguinda et al. v. ChevronTexaco Corporation, No. 002-2003, Superior Court of Justice, Nueva Loja, at 3); Dkt. 401-11 (Ex. 2200) (Chevron's Final Alegato filed in Aguinda et al. v. Chevron Texaco Corporation, No. 002-2003, Superior Court of Justice, Nueva Loja) at 24–33; Dkt. 402-1 (Ex. 2201) (Judicial Inspection Acta for Sacha 6 filed in Aguinda et al. v. ChevronTexaco Corporation, No. 002-2003, Superior Court of Justice, Nueva Loja) at 3; Dkt. 401-11 (Ex. 2200) (Chevron's Final Alegato filed in Aguinda et al. v. Chevron Texaco Corporation, No. 002-2003, Superior Court of Justice, Nueva Loja) at 24–33.*

104

Donziger does not dispute that Chevron made such submissions, but Donziger disputes any legal conclusion regarding the submissions' merits.

131.   *Over 20 pages of the judgment address the question of whether Chevron could be held liable for TexPet's alleged conduct. Dkt. 168 at 6-26.*

Not disputed.

132.   *In 2006, in reference to the Lago Agrio Litigation, Donziger admitted that the LAPs "su[ed] the wrong party in the complaint." Dkt. 402-11 (Ex. 2285) (DONZ00036246).*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

133.   *The parties continue to dispute, in this Court, whether Chevron properly may be held liable for TexPet's alleged conduct. Dkt. 181 at 13 n.40.*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

**Clapp Report**

134.   *The document bearing the Bates number DONZ00025296, an analysis entitled, La Explotacion De Petroleo En La Zona Concesionada A Texaco Y Sus Impactos En La Salud De Las Personas (the "Clapp Report"), was written by Richard Clapp in his capacity as a consultant to the LAPs, and consists of LAP team work product. Dkt. 658-7 (Leonard Report) at 9–10 & Ex. 9.*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

135.   *Donziger and Beltman sought to prevent Clapp's authorship of the Clapp Report from being publicly known. Dkt. 34-13 (STRATUS-NATIVE061311) at 1 ("We have to talk to Clapp about that 5-pager, and how we have to limit its distribution. It CANNOT go into the Congressional Record as being authored by [Clapp]."); Dkt. 34-14 (STRATUSNATIVE057803) (Stratus principal Douglas Beltman writes of incriminating citation in the Cabrera Report, "Oh what a tangled web . . . .").*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

136. *On July 28, 2008, acknowledging that the Clapp Report "ended up as an Appendix to the Cabrera Report," Beltman wrote to Dave Mills of Stratus, "Oh what a tangled web,…" Dkt. 34-14 (STRATUS-NATIVE057803).*

Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

137. *On November 18, 2008, Beltman wrote to Donziger, "We have to talk to Clapp about that 5-pager, and how we have to limit its distribution. It CANNOT go into the Congressional Record as being authored by him." Dkt. 34-13 (STRATUS- NATIVE061311) at 1.*

Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

138. *A portion of the Clapp Report appears in the Cabrera Report as Annex K (the Toxicity Annex). Dkt. 34-14 at 1; see also Dkt. 34-23 (Ex. 198) at 1.*

Not disputed for purposes of this motion.

139. *The portion of the Clapp Report that does not appear in the Cabrera Report also does not appear anywhere else in the Lago Agrio Record. Dkt. 658-7 (Leonard Report) at 33–34; Stavers Decl., Ex. 3267 (Juola Report) at ¶¶ 56–61.*

Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

140. *The following 34-word string appears in the Clapp Report and appears verbatim in the judgment, but does not appear in Cabrera Annex K: "Las muestras de suelo y agua tomadas durante las inspecciones judiciales han indicado niveles excesivos de plomo que puede plantear riesgos de salud par alas poblaciones locales. Los niveles de plomo en el suelo mas que duplican el limite legal y prueban que el envenenamiento con plomo es un riesgo real." Stavers Decl., Ex. 3267 (Juola Report) at 6, 11. As Dr. Robert Leonard concluded: "The overlap of identical word strings between the unfiled Clapp Report and the Sentencia is further evidence that portions of the Sentencia were plagiaristically copied from the Lago Agrio Plaintiffs' unfiled work product." Dkt. 658-7 at 34.*

Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

141. *As shown by sampling results submitted by Plaintiffs' expert, Douglas Allen, only one of the 1,675 soil and sediment samples in the Lago Agrio Litigation—which was taken from a community garbage dump—shows lead above the Ecuadorian legal limit set by Ecuador Decree*

1215 for lead in agricultural areas of 100 mg/kg. Ex. 3281 [DA000041.xls]; Dkt. 400 (Ex. 2129) (excerpt of Ecuadorian Decree 1215) at 56.

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

142.    Only one of 253 drinking water samples taken in the Lago Agrio Litigation showed lead at levels above primary drinking water standards, and that was taken from a site that had experienced a recent oil spill. Ex. 3282 (Connor, Response to Statements by Mr. Cabrera Regarding Alleged Impacts to Water Resources in the PetroEcuador-TexPet concession, Oriente Region, Ecuador (Aug. 29, 2008)) at 8-9.

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

**Index Summaries**

143.    The Microsoft Excel spreadsheet bearing Bates numbers DONZ00048820 (filename "pruebas pedidas en etapa de prueba.xls") and GARR-HDD-0003243-3446 (file- name "cuadro_de_pruebas09-05(1).xls") (the "Index Summaries"), which summarize and list certain filings made during the Lago Agrio litigation, were prepared by the LAP team and consist of the LAP team's unfiled work product. Dkt. 400, Ex. 2117 (Leonard Report) at 8; 24-26 & Ex. 4; Ex. 2118 (Leonard Supp. Report) at Ex. A (showing highlighted overlap be- tween the Judgment and the Index Summaries); Ex. 2010 (Donziger Dep. Tr.) at 4822:24-4824:13 (Donziger's attorney, Robert Kaplan, explaining that the document bearing the Bates numbers GARR-HDD-0003243-46, was produced in June 2011); id. at 4815:14–4827:14; id. at 4820:14-17 ("Q. Exhibit 1869A [DONZ00048820] is an internal plaintiff document for the litigation, correct? A. Yes."); id. at 4821:6-16 ("Q. Do you know who created Exhibit 1869A?  A. I don't know specifically. People in our office, and I think it might have been Mr. Prieto and/or Mr. Saenz. Q. Do you know who had the responsibility, if anyone, for maintaining the index that's been marked as Exhibit 1869A?  A. I think it was considered the responsibility of the local legal team."); id. at 4826:4-8 ("Q. Exhibit 1870 [GARR-HDD-0003243-3446], like Exhibit 1869A, is an internal plaintiff document, correct? A. Yes.").

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

144.    The Index Summaries are not in the Lago Agrio Record. Dkt. 400 (Ex. 2102 (2010.12.20 Juola Report)) at 5 ("[T]he overall similarity between [the Judgment] and the LAPs' Work Product Documents cited, including the Memo Fusion, could not have derived from legitimate copies from secondary sources in the Lago Agrio court record.").

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

145.    As Dr. Robert A. Leonard concluded, "[i]dentical or nearly identical word strings" and strings of symbols, including identical citation errors, punctuation errors, and orthographic errors in the Index Summaries appear in the Judgment. Dkt. 400-17 (Ex. 2117) (Leonard Report) at 11 (concluding that "portions of [the Judgment] and the Lago Agrio Plaintiffs' unfiled work product contain matching or similar word strings and strings of symbols whose presence is not explainable either as set phrases or by chance, and that those portions of the [the Judgment] are therefore plagiarized from [the LAPs'] unfiled work product"); id. at 22-26, Ex. 4 at 8-18 (providing examples of "co-occurring identical or nearly identical word string[s]," "identical orthographic errors" and "identical citations errors" in the Index Summaries and the Judgment); id. at 26 (noting that the Judgment "replicates the same citation error" as the LAPs' Index Summaries by incorrectly claiming that the Judicial Inspection Acta "ends at 75013 instead of 75003"); Dkt.400 (Ex. 2118 (Supp. Leonard Report) at 1, Ex. A, (highlighted exhibits showing "strings of text and symbols which were plagiaristically copied" from the LAPs' Index Summaries).

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

146.    And as Dr. Teresa Turrell concluded, "the differences and linguistic strategies observed in [the Index Summary], diverging from the Source texts indexed in the [Index Summary], were reproduced in [the Judgment], something which would allow us to conclude that whoever the author of [the Judgment] is, the writer of such text had access to the [Index Summary] or another containing its contents."  Dkt. 400-20 (Ex. 2129); see also Dkt. 400-19 (Ex. 2120) (DONZ00048819) (email attaching index summary); Champion Decl., (Ex. 2122) (GARR-HDD-0003243-446) (June index summary produced by Laura Garr); Dkt. 400-1 (Ex. 2254) (Judicial Inspection Acta for Shushufindi 13)).

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

147.    The document bearing the Bates number GARR-HDD-0003243-3446 (file name "cuadro_de_pruebas09-05(1).xls") was not produced to Chevron until June 2011 and the LAP team did not otherwise make it available to Chevron before that date. See Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 4822:24-4824:13 (Donziger's attorney, Robert Kaplan, explaining that the document bearing the Bates numbers GARR-HDD-0003243-46, was produced in June 2011).

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

**Draft Alegato**

148.    The document bearing Bates number DONZS00002439, a Microsoft Word document titled "Borrador_Alegato_Final_Parcial_Envio_EEUU_[11_nov_2010].docx" (the "Draft Alegato"), which is a draft of the LAPs' "Final Alegato" in the Lago Agrio Litigation, was

*produced to Chevron in or around January 2011. It is a document written by the LAPs' team and contains the LAP team's unfiled work product. Dkt. 400-1 (Ex. 2010) (Donziger Depo. Tr.). at 4738:8-4745:25; 4792:7-4814:21; Dkt. 400-20 (Ex. 2124) (DONZS00002439).*

Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

*149.   The Draft Alegato is not in the Lago Agrio Record. Stavers Decl., Ex. 3267 (2012 Juola Report) at ¶¶ 68-74; Dkt. 400-16 (Ex. 2102) (2010.12.20 Juola Report) at 5 ("[T]he overall similarity between [the Judgment] and the LAPs' Work Product Documents cited . . . could not have derived from legitimate copies from secondary sources in the Lago Agrio court record."); Dkt. 658-5 – 658-6 (Ex. 3004) at 7 ("The Draft Alegato was not located in the Lago Agrio Record.").*

Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

*150.   As Dr. Leonard concluded, "the Judgment "contains examples of strings of words and symbols identical or nearly identical to both the unfiled Fusion Memo . . . and to the unfiled Draft Alegato." See Dkt. 658-7 – 658-8 (Ex. 3005) (Leonard Report) at 20-22; see also Dkt. 400-17 (Ex. 2117) (Leonard Report) at 11. Dr. Leonard also noted that the "Fusion Memo was intended to be attached to the Draft Alegato," that "the Fusion Memo was not attached" to the filed Final Alegato, and that the "Draft Alegato contains several verbatim word strings from the Fusion Memo," and that the Judgment "was plagiarized from the unfiled Fusion Memo and the unfiled Draft Alegato, as opposed to relying on the filed Final Alegato." Id. at 17-20; see also Dkt. 400-18 (Ex. 2118) (Supp. Leonard Report) at 2, Exs. A, C (highlighted exhibits showing "strings of text and symbols which were plagiaristically copied" from the Draft Alegato); see also Dkt. 400-19 (Ex. 2123) (DONZS00002438-39) (email attaching Draft Alegato).*

Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

*151.   As shown in Exhibits 5 and C to his most recent report, Dr. Leonard found multiple instances of verbatim or nearly verbatim overlap between the Draft Alegato and the Lago Agrio Judgment on pages 23 and 24 of the judgment. See Dkt. 658-7 – 658-8 (Ex. 3005) at Ex. 5 at 23-24, Ex. 7 at 61; see also id. Ex. 4 at A13, A14.*

Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

**Fajardo Trust Email**

*152.    On June 18, 2009, Pablo Fajardo sent the LAPs' team, including Julio Prieto, Juan Pablo Sáenz and Steven Donziger, an email discussing and quoting from the case Andrade v. Conelec (the "Fajardo Trust Email"). See Dkt. 401-07 (Ex. 2174) (DONZ00051504).*

Donziger does not dispute that Fajardo sent the e-mail produced as DONZ00051504.

*153.    The Fajardo Trust Email is not in the Lago Agrio Record. Dkt. 548 ¶ 26 (Affidavit of S. Hernandez, Morningside Translations) ("The Trust Email was not located in the re- viewed record.").*

Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

*154.    No party in the Lago Agrio Litigation requested a trust be created for the judgment proceeds in any public filing with the Lago Agrio court. Dkt. 548 ¶ 26 (Affidavit of S. Hernandez, Morningside Translations)*

Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

*155.    In filings with this Court and the Second Circuit Court of Appeals (joined by Donziger), the LAPs stated that the portions of the June 18, 2009 Fajardo email appearing in the Judgment were "stock language" from published court opinions, but in fact the June 18, 2009 Fajardo email misquotes the Andrade case, and those same misquotations appear in the Judgment. Dkt. 365 at 41 (Opposition to Attachment Motion); Dkt. 400-20 (Ex. 2127) (Chevron v. Salazar, No. 11-1150 (2d Cir. Dec. 6, 2011), Dkt. 606-2) at 11 n.6; Compare Dkt. 168 (Judgment) at 186 with Champion Decl., Ex. 2174 (DONZ00051504) (2009.06.18 email from Fajardo with highlighting showing overlap with the Judgment); Dkt. 401-11 (Ex. 2199) (Highlighted version of the Andrade v. Conelec from the Registro Oficial).Dkt. 365 (Opposition to Attachment Motion) at 41 (in response to evidence of overlap, the LAPs' lawyers stated that the portions of the June 18, 2009, Fajardo email appearing in the Judgment were "stock language" from published court opinions but provided no record citation); Dkt. 400-20 (Ex. 2127) (Chevron v. Salazar, No. 11-1150, (2d Cir. Dec. 6, 2011), Dkt. 606-2) at 11 n.6 (same).*

Disputed in part. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

*156.    As Dr. Robert Leonard concluded, "Much of the data, adduced below, such as identical or nearly identical strings of more than 40 words, identical citation errors, and identicial mistranscriptions, support the opinion, to a reasonable degree of scientific certainty, that the co-occurrence of language between parts of the Sentencia and the unfiled Fajardo Trust email is due to common authorship." Dkt. 658-7 – 658-8 (Ex. 3005) at 30-33.*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

*157.    As Dr. Robert Leonard concluded: (i) the Fajardo email misquotes language from the Andrade v. Conelec case, and the same misquote appears in the judgment; (ii) the Fajardo email miscites the Andrade v. Conelec case and the same erroneous citation appears in the judgment; (iii) another case (the Concha case), having nothing to do with trust law, is incorrectly cited as authority for "the legal basis of the trust" with the same short-hand citation being used in both the Fajardo email and the judgment; and (iv) the same explanatory language and phrases regarding use of judgment trusts appear verbatim in the Fajardo email and the judgment.  Dkt. 58-7 – 658-8 (Ex. 3005) (Leonard December 10, 2012 Rpt) at 30-33 & id. at Ex. 5 at 186 (highlighted copy of portions of the Sentencia showing overlap with Fajardo Trust email) & Ex. 8 (highlighted portion of Fajardo Trust email showing overlap with Sentencia); see also Dkt. 401-11 (Ex. 2199) (highlighted version of the Andrade v. Conelec from the Registro Oficial).*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

*158.    Defendants understood the creation of a trust or trusts to receive any proceeds from the Lago Agrio judgment to be a "core provision[] to protect [Burford's] interest" and was thus essential to obtaining funding from Burford.  Dkt. 549-3 (Ex. 2403) (DONZ00125526).*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

**Selva Viva Data Compilation**

*159.    The documents bearing Bates numbers DA00000040, DA00000041, and DA00000042, which were produced by the LAPs' counsel to Chevron on or around December 1, 2010, are Microsoft Excel spreadsheets containing environmental sampling data created by the LAPs' team known as the "Selva Viva Data Compilation." See Dkt. 402-12 (Ex. 2303) (DA00000040); Dkt. 402-12 (Ex. 2304) (DA00000041); Dkt. 402-12 (Ex. 2305) (DA00000042); Dkt. 400-1 (Ex. 2010) (Donziger Depo. Tr.) at 2605:6-2608:19; 2853:8-2861:18, 4834:1-4842:3; see Dkt. 402-11 (Ex. 2298) (Belanger Dep. Tr.) at 129:25-134:2.*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

160.    The Selva Viva Data Compilation is not in the Lago Agrio Record. See Dkt. 400-16 (Ex. 2102) (2010.12.20 Juola Report) at 5 ("[T]he overall similarity between [the Judgment] and the LAPs' Work Product Documents cited, including the Memo Fusion, could not have derived from legitimate copies from secondary sources in the Lago Agrio court record."); Dkt. 548 ¶ 29 (concluding that the Selva Viva Data Compilation was not located in the record).

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.


161.    More than 100 features of the Selva Viva Data Compilation, including the use of "_sv" and "_tx" in sample names, enclosing measurements of meters or centimeters within parentheses, misstating sample counts, misreporting milligrams per kilogram as micrograms per kilogram, and other errors appear in the Judgment, but not in the sampling results in the Lago Agrio Record. Dkt. 401-08 (Ex. 2182) at Ex. A at 17 (Expert Report of Michael L. Younger) ("I conclude that the Unfiled Selva Viva Data Compilation and the Stratus Compilation were sources of numerous data points cited in the [the Judgment]. It is highly un- likely that the Filed Lab Results from the Judicial Inspection Reports were the source of these data points based on the numerous irregularities found in the [the Judgment] that did not match the Filed Lab Results but that did match data within the Unfiled Selva Viva Data Compilation."); Dkt. 356-12 at 10-11 (2011.03.01 Younger Report) ¶ 17 (concluding that "numerous data points cited" in the Judgment, "in excess of 100 specific repeated irregularities," were "copied, cut-and- pasted, or otherwise taken directly from the [Unfiled] Selva Viva Data Compilation"); id. ¶ 14 (explaining that many "sampling results set forth in the [Judgment] on pages 104-112 ended with the suffix '_sv' or '_tx'" but that Mr. Younger's review of the judicial inspection reports and lab results "failed to show a single sample result referenced in this manner."); see also Dkt. 402-10 (Ex. 2271).

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.


162.    As Michael Younger concluded, "the Court likely relied on and subsequently misinterpreted the Unfiled Selva Viva Compilation, rather than relying on the Filed Lab Results submitted with the Judicial Inspection Reports."  Dkt. 356-12 at 8 (2011.03.01 Younger Report) ¶16.a Stavers Decl., Ex. 3278 at 19-20 (2013.01.24 Expert Report of Michael L. Younger) id. at 2, 14 ("Analysis of the 2011 Sentencia filed in the Lago Agrio litigation shows that it repeats errors found in unfiled court documents. This indicates that the Sentencia was de- rived from material not filed with the court in the Lago Agrio litigation."); Dkt. 401-08 (Ex. 2182) at Ex. A at 17 (2011.06.10 Younger Report) ("I conclude that the Unfiled Selva Viva Data Compilation and the Stratus Compilation were sources of numerous data points cited in the [the Judgment]. It is highly unlikely that the Filed Lab Results from the Judicial Inspection Reports were the source of these data points based on the numerous irregularities found in the [the Judgment] that did not match the Filed Lab Results but that did match data within the Unfiled Selva Viva Data Compilation."); Dkt. 356-12 at 10-11 (2011.03.01 Younger Report) ¶ 17 (concluding that

"numerous data points cited" in the Judgment, "in excess of 100 specific repeated irregularities," were "copied, cut-and-pasted, or otherwise taken directly from the [Unfiled] Selva Viva Data Compilation"); id. ¶ 14 (explaining that many "sampling results set forth in the [Judgment] on pages 104-112 ended with the suffix '_sv' or '_tx'" but that Mr. Younger's review of the judicial inspection reports and lab results "failed to show a single sample result referenced in this manner."); id. ¶ 16.c (explaining that both the Judgment and the Selva Viva Data Compilation show "John Connor as the examiner responsible" for certain test data while "the Judicial Inspection Report filed with the court showed that Professor Fernando Morales was the one who carried out the inspection"); Dkt. 168 at 108 (Judgment stating that "Chevron's expert, John Con- nor, submitted results showing quantities of 9.9 and 2.3 mg/kg. (see samples JL-LAC-PIT1-SD2-SU1.R (1.30-1.90)M and JI-LAC-PIT1-SD1-SUI-R (1.6-2.4)M) in the judicial inspection in Lago Agrio Central"); Dkt. 356-12 at 8 (2011.03.01 Younger Report) ¶16.a (concluding that the author of the Judgment "likely relied on and subsequently misinterpreted the [Unfiled] Selva Viva Data Compilation, rather than relying on the Lab Results filed with the Judicial Inspection Reports" and in so doing, "eliminated any non-detect results and made mercury levels appear higher and more certain than the actual filed results"); Dkt. 168 at 109 (Judgment stating that "alarming levels of mercury have been found in the Sacha, Shushufindi, and Lago Agrio fields, where we found several samples reaching 7 mg/kg"); Dkt. 356-12 at 9 (2011.03.01 Younger Re- port) ¶ 16.b (explaining that the Judgment and [Unfiled] Selva Viva Data Compilation listed "concentrations of substances at specific sites" as milligrams per kilogram (mg/Kg) when the filed lab results "indicated that concentrations for those same substances and sites should be listed as micrograms per kilogram (µg/Kg) – a thousand times less concentrated than the levels reported in the [Judgment]"); Dkt. 168 at 108-09 (Judgment reporting PAH results for various sites in mg/Kg instead of µg/Kg); Dkt. 356-12 at 68 (2011.04.15 Supplemental Younger Report) ¶ 12 (concluding that the Judgment's reference to 1,984 TPH results brought by Chevron's experts "was inaccurate and based on the Selva Viva Data Compilation, not documents filed with the court"); Dkt. 168 at 102 (Judgment stating, "it is noted among these TPH results, 80.4% have been brought by the LAPs' experts (1,984 results)"); Dkt. 356-12 at 69 (2011.04.15 Supple- mental Younger Report) ¶ 15 (concluding that Judgment's claim that experts for the LAPs sub- mitted 420 TPH results "was overstated" and "based on its apparent reliance on the [Unfiled] Selva Viva Data Compilation"); Dkt. 168 at 102 (Judgment stating that the LAPs' "experts have submitted 420 results"); Dkt. 356-12 at 69 (2011.04.15 Supplemental Younger Report) ¶ 15 (concluding that the "erroneous TPH counts in the [Judgment] had the additional effect of distorting the sample percentages listed in the decision"); Dkt. 168 at 101-02 (Judgment listing sample percentages).

Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

163.   The judgment claims that sampling identified the presence of mercury, but every result it identifies as reporting the presence of mercury were actually results showing no detectable mercury had been found. See, e.g., Dkt. 168 at 109 (Judgment stating that "alarming levels of mercury have been found in the Sacha, Shushufindi, and Lago Agrio fields, where we found

*several samples reaching 7 mg/kg"); Dkt. 400-22 (Ex. 2144) (2012.01.03 appellate decision) at 11-12 (indicating that mercury had been found above detection limits); id. at 12 (using "_sv" and "_tx" in sample names); Dkt. 356-12 at 8 (2011.03.01 Younger Report) ¶16.a (concluding that the author of the Judgment "likely relied on and subsequently misinterpreted the [Unfiled] Selva Viva Data Compilation, rather than relying on the Lab Results filed with the Judicial Inspection Reports" and in so doing, "eliminated any non-detect results and made mercury levels appear higher and more certain than the actual filed results"); see also Dkt. 402-9 (Ex. 2268) (Annex E of the Cabrera Report) at 7, 9, 69 (reporting mercury concentrations of 7mg/Kg instead of nondetect results); Dkt. 400-2 (Ex. 2015) (Maest Dep. Tr.) at 27:23-28:1 (Ms. Maest testifying that the LAPs' Quito team prepared Annex E of the Cabrera Report).*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

**Moodie Memo**

*164.   The document bearing the Bates number WOODS-HDD-0012793, a memorandum purporting to analyze causation (the "Moodie Memorandum") was created by the LAP team and contains the LAP team's work product.  Stavers Decl. Ex. 3280, 3283.*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

*165.   LAPs legal intern Nicholas Moodie, the primary author of the Moodie Memorandum, is Australian. Stavers Decl. Ex. 3280, 3283.*

Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

*166.   The Moodie Memo is not in the Lago Agrio Record. Dkt. 658-5 at 5 (12.12.12 Afidavit of Samuel Hernandez, Part 1) ¶ 22; see also Dkt. 658-6 at (12.12.12 Afidavit of Samuel Hernandez, Part 2).*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

*167.   As Michael Green has concluded, the Moodie Memo and the judgment adopt the "substantial factor" test from Rutherford v. Owens-Illinois, Inc., 941 P.2d 1203 (Cal. 1997), but that test was employed in Rutherford "to address a particular problem in asbestos litigation and is not generally applicable in tort contexts that do not present the difficult and specific proof problems present in that case. . . .  Rutherford does not reflect a general approach to causation in toxic substances cases, but rather a response to scientific uncertainty when multiple defendants each contribute to the risk of disease but proof of which defendant's contribution was the but for cause is scientifically impossible. Subsequent cases in California, including toxic*

114

*torts, have confined Rutherford to that specific circumstance." Michael Green Declaration at 7-9, ¶¶ 2-3.*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

*168.    As Michael Green has concluded, "Australian law does distinguish between legal causation and scientific causation," but "[t]here is no doctrine in the United States that distinguishes between legal causation and scientific causation" and the Moodie memorandum and the Aguinda judgment "are both incorrect in attributing such a schism to the United States. Michael Green Declaration at 8, ¶ 1.*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

*169.    As Michael Green has concluded, it is "highly unlikely that the passages in the [judgment regarding causation] were prepared independently of the Moodie memorandum." Michael Green Declaration at 3-4.*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

*170.    As James Spigelman concluded, the concepts which both the Moodie Memorandum and the judgment ascribe to Australian law are either "unknown" to Australian law, or are common phrases which do not carry the specific meaning ascribed to them in the memorandum or the judgment.  James Spigelman Declaration at 2, ¶¶ 10-11 ("The phrase 'probable contributing cause' is unknown in Australian law....The descriptive phrase 'most probable cause' occurs frequently in Australian case law. Most often it has been used in a narrative fashion or citing or paraphrasing the evidence of an expert.").*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

*171.    As James Spigelman concluded, it is "so strange as to constitute an inaccuracy" that both the Moodie Memorandum and the judgment describe a well-established common law principle as a feature of Australian law, and cite an opinion he authored, Seltsam v McGuiness (2000) 49 NSWLR 262 at paras 91 and 98, as the source, even though that opinion, like most references to the principle, cite Wigmore on Evidence.  James Spigelman Declaration at 4-5, ¶¶ 24-26 (Spigelman states that "it is striking that both references attribute this principle to Australian law....To describe it as an Australian legal principle is inaccurate.").*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

115

**Pit Count**

*172.    The judgment's finding that 880 pits require remediation by Chevron is based on the pit count in the Cabrera Report. Stavers Decl., Ex. 3278 (2013.01.24 Younger Report) at 14-16; see also Dkt. 401-08 (Ex. 2182) at Ex. A at 17-18 (Expert Report of Michael L. Younger).*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

*173.    The claim in the Clarification Order that the 880 pit count is based on the court's analysis of "various aerial photographs that form a part of the record and that were certified by the military Geographic Institute" is false. Dkt. 168 at 125 (Judgment stating that "we have 880 pits (proven through aerial photographs certified by the Geographic Military Institute which appear throughout the record analyzed together with the official documents of Petroecuador submitted by the parties and especially by the expert Gerardo Barros . . . ."); Dkt. 400-21 (Ex. 2134) at 15 (2011.03.04 Clarification Order stating "it is emphasized that, as explained in the judgment, the Court analyzed the various aerial photographs that form a part of the record and that were certified by the military Geographic Institute"); see also Dkt. 33-13 at 25 (Cabrera Report claiming that the pit count found in Annex H-1 of the Cabrera Report was derived, in part, from an "in-depth" analysis of "various aerial photographs on file at the Military Geographical Institute"); Dkt. 400-21 (Ex. 2138) at 1-2 (Di Paolo Declaration concluding that "it is impossible for the Ecuadorian court to accurately identify the number of pits or the number of pits requiring remediation using aerial photo interpretation" because, among other reasons, "no aerial photos were found in the record for approximately 35% of the sites"); Dkt. 402-3 (Ex. 2233) (CV of Judge Nicolas Augusto Zambrano Lozada) (Judge Zambrano's CV does not list any expertise in aerial photograph interpretation); Dkt. 402-9 (Ex. 2270) at 17 (2011.02.17 Motion for Clarification requesting that the Ecuadorian court clarify its basis "for concluding that there are 880 pits, as is indicated on page 125 of the Judgment").*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

*174.    There are 880 pits identified in Annex H-1 of the Cabrera Report when those identified as "no impact," "Petroecuador," and "Petroproduccion" are excluded from the 916 total pits. Dkt. 400-22 (Ex. 2182) at Ex. A at 17-18 (Expert Report of Michael L. Younger); see also Champion Decl., Ex. 2139 (Annex H-1 of Cabrera Report including spreadsheet entitled "pit inventory" listing 916 pits in the former concession area); Dkt. 402-5 (Ex. 2252) (May 2000 Woodward-Clyde Report) at 9-1 (stating that "250 pits and 7 spill areas (at 133 sites) were certified by the GOE and Petroecuador as requiring no further action, or remediated" as part of the Remedial Action Plan); compare Dkt. 400-22 (Ex. 2139) (Annex H-1 of Cabrera Report containing comments such as "Petroecuador's responsibility," "no impact found," and "full remediation" under the column "RAP Comments"), with Dkt. 402-5 (Ex. 2252) (May 2000 Woodward-Clyde Report) at tables 3-4, 3-7, 3-10, 3-13, 3-16, 3-19, 3-22, 3-25, 3-28, 3-31*

116

*(tables containing comments such as "Petroecuador Responsibility," "no detected impacts," and "remediation completed").*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

*175.   No record source in the Lago Agrio Litigation except the Cabrera Report identifies more than 632 pits in the former concession area requiring remediation. See Stavers Decl., Ex. 3284 (Expert Report of Gerardo Barros) at 6 (noting that the consortium created approximately 632 pits from 1964-1990 "to hold mud and drill cuttings").*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

*176.   In 2007, Petroecuador determined that there were 370 pits in the former concession area that require remediation. Dkt. 402-16 (Ex. 2346) (December 2007 PEPDA Report).*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

## $200 Million Flora and Fauna Award

*177.   The Judgment's $200 million award "to recover the native flora, fauna, and the aquatic life of the zone" cites the Barnthouse report, and the Barnthouse report relies solely on the Cabrera Report for the $200 million cost.  Dkt. 168 at 182 (Judgment awarding $ 200 million "to recover the native flora, fauna and the aquatic life of the zone" based on the report of Dr. Lawrence W. Barnthouse); id. at 57 (Judgment acknowledging that Dr. Barnthouse "reviewed expert Cabrera's report, but did not prepare a damage report himself"); Dkt. 400-11 (Ex. 2071) (Barnthouse Dep. Tr.) at 39:23-40:3, 52:2-10, 79:1-79:8, 80:13-19, 123:3-124:17 (Dr. Barnthouse concedes that he did not perform a "natural resource damage assessment," that his analysis "couldn't be completely independent" because many of the sources on which he relied "were only available from the Cabrera Report," and that, in his opinion, the damage figures in the Cabrera Report are "uncertain"); Dkt. 400-10 (Ex. 2064) (Barnthouse Report) at 2-9 (citing Cabrera Report); Dkt. 400-14 (Ex. 2078) (DONZ00031590) at 1-2 (the LAPs' U.S. legal team discussing whether or not to file the Barnthouse Report because of its "strict reliance on Cabrera.").*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

## $150 Million Potable Water System Award

*178.   The Judgment's $150 million award for a potable water system cites only the Barros report, but the cited portion of the Barros report is describing and analyzing the Cabrera*

117

*Report's potable water recommendation, which it finds to be "fraudulent" and "grossly exaggerated," in part because it is based on a cost per person between $1024 and $1916, "as much as 19 times higher than the actual costs of the projects that have recently been completed in the region by UNICEF (average cost of $100 per person, UNICEF, 2009), CEREPS, USAID, and others (average cost of $119 per person, CEREPS, 2009; OIM, 2008) in the last decade." Dkt. 33-12 at 6, 33-14 at 43 (Cabrera Report recommending a $428 million award to provide "potable water to the people living in the Concession area and within its area of influence"); Champion Decl., Ex. 2269 (Annex R of the Cabrera Report); Dkt. 9-2 (Supplemental Cabrera Report) at 53 (same); Champion Decl., Ex. 2128 at fojas 167,403 –167,405 (2010.02.11 Barros Report criticizing Cabrera's regional aqueduct system as unnecessary, finding that "the alleged cost of $430 million potable water figure is enormously exaggerated" and "fraudulent," and noting that 65 percent of the population in the former concession area is connected to a public water system); Dkt. 168 (Judgment) at 182-83 (deriving a $150 million award for regional potable water systems by multiplying Cabrera's $428 million figure by 35 percent to cover the 35 percent of the population not serviced by public water systems).*

Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

179. *Barros estimates that the cost of extending potable water to the full population of the region is $7 million, as opposed to the Cabrera Report's number of $430 million. Champion Decl., Ex. 2128 at fojas 167,403 – 167,405 (2010.02.11 Barros Report criticizing Cabrera's regional aqueduct system as unnecessary, finding that "the alleged cost of $430 million potable water figure is enormously exaggerated" and "fraudulent," and noting that 65 per- cent of the population in the former concession area is connected to a public water system); Dkt. 33-12 at 6, 33-14 at 43 (Cabrera Report recommending a $428 million award to provide "potable water to the people living in the Concession area and within its area of influence"); Champion Decl., Ex. 2269 (Annex R of the Cabrera Report); Dkt. 9-2 (Supplemental Cabrera Report) at 53 (same).*

Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

180. *The judgment derives its $150 million potable water figure by multiplying $428 million by 35%, reflecting its determination that 35% of the population is not served by an existing public water system. Dkt. 33-12 at 6, 33-14 at 43 (Cabrera Report recommending a $428 million award to provide "potable water to the people living in the Concession area and within its area of influence"); Champion Decl., Ex. 2128 at fojas 167,403 – 167,405 (2010.02.11 Barros Report criticizing Cabrera's regional aqueduct system as unnecessary, finding that "the alleged cost of $430 million potable water figure is enormously exaggerated" and "fraudulent," and noting that 65 percent of the population in the former concession area is connected to a public water system); Dkt. 168 (Judgment) at 182-83 (deriving a $150 million award for regional potable water systems by multiplying Cabrera's $428 million figure by 35 percent to cover the 35 percent of the population not serviced by public water systems).*

Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

## IV. THE LAP TEAM WROTE THE JUDGMENT AND BRIBED THE COURT $500,000 TO ISSUE IT[17]

181.   *Defendants' internal correspondence reveals plans and an intent to draft the judgment. Dkt. 355-26 (Ex. 1065) (DONZ00049174) at 18 (calling a meeting with "[a]ll the teams" to develop a plan to "obtain a trial judgment in 2009" that would be "favorable and significant" because "[w]e have Correa, the Court and U.S. politics . . . It's now or never"); Dkt. 401-11 (Ex. 2193) (DONZ000493560) at 1 (2009 "Strategic Plan" stating "Order: speed to finish, deal with release, number, reasoned opinion, relationship to alegato, final order for U.S. enforcement, ask for bond and interest to run"); Dkt. 355-39 (Ex. 1140) (DONZ00051338) at 72 (Fajardo explaining that he will give Selva Viva intern Brian Parker "a research assignment for our legal alegato and the judgment, but without him knowing what he is doing"); Dkt. 355-33 (Ex. 1108) (DONZ00066328) at 62 ("Comrade, I don't know if you are coming or not tomorrow. In any case, I'll say that Friday's meeting is key, and I think that you should be there. In that meeting we'll be talking about all of the outcome of the case and what to do, how much money to put in, how to distribute the items and everything."); Dkt. 400-17 (Ex. 2111) (DONZ00051937) at 1 (email circulating citations and links that "will help us with the alegato work and . . ."); Dkt. 355-33 (Ex. 1100) (WOODS-HDD-0148433-34) at 66 (Kohn emails Donziger, "In order to be effective at all in developing a judgment that will be enforceable in the US and elsewhere we need to be involved in the preparation of the final submission and pro- posed judgment, the major task we have all agreed upon repeatedly our firm would work on . . . . None of the RAN efforts, movie, press etc will mean a thing if the jusgment [sic] and other aspects of the case are not right."); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 4758:16-4759:3 (testifying that the LAPs never publicly submitted a proposed judgment to the Lago Agrio court); Dkt. 400-16 (Ex. 2110) (WOODS-HDD-0161016-21) at 2-7 (email attaching minutes from a meeting between Donziger, Garr, Woods, Kohn and others listing "Creation of Final Order," "Trust or 2 phases," and "Kohn, Swift to determine precedence for this in other countries"); Dkt. 400-16 (Exs. 2107, 2108) (DONZ00100266-67) (email circulating a task list which states, "Structure of Judgment: KSG will continue to discuss and think about how to structure the judgment."); Dkt. 400-17 (Ex. 2112) (DONZ00052960) at 1 (Fajardo emails Donziger and Yanza regarding hiring a new attorney to assist with "organizing the office's legal information for the alegato and the other project" and noting that the potential hires are "willing to work at our office and do what we ask them to . . ."); Dkt. 355-27 (Ex. 1084) (DONZ00053642) at 79 (Fajardo told Donziger in an email dated December 29, 2009: "When you come I'll tell you the details, which I can't share*

---

[17] For the reasons set forth in Donziger's responses to each of Chevron's purported Facts listed under Heading IV, Donziger also disputes the assertions and conclusions set forth in Chevron's Heading IV.

119

*by email. I think the plan for the judgment will be fulfilled. I'm not 100 percent sure, but I'm 99.99 percent sure.").*

Disputed.  Chevron takes ambiguous statements made several years before the judgment actually issued out of context and then asks the Court to draw only inferences favorable to Chevron's case.  This is improper on summary judgment.  Chevron conflates the *alegato*, which was a brief to be submitted to the Lago Agrio court, with the judgment itself .  Chevron's argument appears to be that because the Ecuadorian Plaintiffs' team worked on a brief that they would submit to advocate for a ruling they wanted, they had some plan to actually write the judgment.  The Court cannot draw such an inference based on the summary judgment record.  Further, all of the cited evidence is from late 2008 or 2009.  This was several years before the judgment actually issued.  And Judge Zambrano was not presiding over the case at this time.  Judge Ordonez was.  *See* Dkt. 746-3 (Mastro Decl. Exh. C) ¶¶ 20-21 (describing Judge Ordonez's tenure on the case).  Finally, Chevron's chosen story does not square with the version crafted in Guerra's declaration.  Guerra states that he approached Fajardo with an offer to have the plaintiffs write a draft of the judgment *after* Chevron moved to remove Judge Ordonez from the case in 2010.  *Id.* at ¶23.

Dkt. 355-26 (Ex. 1065) (DONZ00049174) at 18 does not reveal "plans and an intent to draft the judgment."  Rather, this e-mail chain establishes only that Fajardo wanted to plan a meeting to discuss strategy to bring the case to a "favorable and significant" conclusion in 2009.  That is no different than what many attorneys in the United States might do on a regular basis:  meet to discuss strategy to persuade the court.  Further, any suggestion that Fajardo thought the court might be favorably inclined towards the Ecuadorian Plaintiffs' cause does not establish that anything improper occurred.  The Ecuadorian Plaintiffs' team had done a good job of convincing

120

the court of the merits of their case.  The same is true for Dkt. 355-33 (Ex. 1108) (DONZ00066328) at 62 and Dkt. 400-17 (Ex. 2111) (DONZ00051937), both of which show only that parties were interested in meeting to discuss strategy and assignments towards their goal of bringing the case to a favorable resolution.  The fact that parties may have discussed working on their alegato does not come close to establishing any plan to write the judgment itself.  Similarly, the "strategic plan," Dkt. 401-11 (Ex. 2193) (DONZ000493560) at 1, shows only that the author of that document had some thoughts or concerns about any order that the Lago Agrio court might issue.

Dkt. 355-39 (Ex. 1140) (DONZ00051338) at 72 does not establish a plan to draft the judgment; it shows only that Donziger and Fajardo discussed what assignments they might give to Bryan [sic].  The phrase "but without him knowing what he is doing" could refer to the fact that Brian did not know the case well at that point, *see id.* (discussing giving Brian Parker materials "so he can get to know the case well"), rather than any improper motives on Fajardo's part.  Also, other evidence contradicts Chevron's interpretation.  On June 11, 2009, Parker wrote Donziger to inform him that Parker would be working "on one of the closing statements."  Werdegar Decl. Ex. 13 (Donz. Dep. Exh. 1853) (DONZ00113455) at 1.  This shows that Parker *did* know what he was doing; he was working on trial arguments and the *alegato*.

Dkt. 355-33 (Ex. 1100) is not the document Chevron purports to cite; it is a summary of the judgment entered on February 14, 2011.  Donziger therefore requests that the citation to Dkt. 355-33 (Ex. 1100) and the accompanying purported quotation be stricken.  Moreover, Donziger testified that he thought Kohn was mistaken when he referred to a proposed judgment, and that

121

Kohn was actually referring to the proposed *alegato*.  *See* Werdegar Decl. Ex. 14  (Donz. Dep. Tr). at 4756:14 – 4757:6 ("I believe that when Mr. Kohn says 'proposed judgment,' what he was really saying is proposed Alegato.").  The excerpt from Donziger's deposition testimony establishes only that, at the time of Donziger's deposition, he did not think that the Ecuadorian Plaintiffs submitted a proposed judgment to the court.  Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 4758:10—4759:3.

The "meeting minutes" and "task list" to which Chevron cites do not establish that anyone had a plan to actually draft the final order.  At most, the meeting minutes could establish that the group was concerned about the form of the final order and considered researching what form they might advocate for.  Dkt. 400-16 (Ex. 2110) (WOODS-HDD-0161016-21) at 2; Dkt. 400-16 (Exs. 2107, 2108) (DONZ00100266-67).

Chevron rearranges and takes out of context quotations from Fajardo's October 25, 2009 e-mail to Yanza and Donziger.  Dkt. 400-17 (Ex. 2112) (DONZ00052960) at 1.   Chevron's insinuation that Fajardo's use of ellipses  is a concealed reference to drafting the judgment is (a) contradicted by other portions of this very e-mail, in which Fajardo uses ellipses to end two other paragraphs that do not discuss drafting *anything*, *id.* at 1 ("I told both of them that they should talk with Luis about pay, but I told the girl that I believe her starting salary would be about 800 and she agreed, but I didn't confirm anything…"; "The idea is for that new person to start working in the office next week. . .") (ellipses in original); and (b) contradicted by Donziger's deposition testimony. Donziger did not know what the "other project" Fajardo mentioned was.  Werdegar Decl. Ex. 14 (Donziger Dep. Tr.) at 4778:9-11.

122

Finally, Chevron would also have the Court draw impermissible inferences from Chevron's out-of-context quotation from Fajardo's December 29, 2009 e-mail.  Dkt. 355-27 (Ex. 1084) (DONZ00053642) at 79-81.  Donziger had expressed anxiety about the amount of time it would take for the case to conclude.  *Id.* at 79 ("This case almost cannot be sustained any longer due to the financial pressure, etc. So it's very upsetting to hear that the delays are continuing without any way to stop them from our side.").  Fajardo responded that he could not share the details regarding timing in e-mail, but that he thought the plan for the judgment would be fulfilled.  *Id.* ("Those times I provided there are not real . . . for sure they are far less.  When you come I'll tell you the details, which I can't share by e-mail.").  Donziger testified that he did not know what details Fajardo could not share.  Werdegar Decl. Ex. 14  (Donz. Dep. Tr.) at 4789:21-23.  Donziger also testified that he thought "the plan for the judgment" referred to the plan for bringing the case to conclusion.  *Id.* at 4790:5-22.  Earlier in that e-mail, Fajardo provides a task list.  It includes "finish the closing argument and the annexes to it," and makes no mention of any drafting of an order or judgment.  Dkt. 355-27 (Ex. 1084) at 80.

*182.     From 2008 to 2012, Judge Zambrano paid Alberto Guerra Bastidas ("Guerra") $1,000 per month to ghostwrite orders and judgments in Zambrano's civil cases. Mastro Decl., Ex. C (Guerra Decl.), ¶¶ 7-10, 20, 30; see also Stavers Decl., Ex. 3278 (Expert Report of Michael L. Younger) at 6-11 (concluding Guerra's hard drive contained drafts of nine of the 12 court orders Zambrano issued during his first tenure on the Chevron case (from October 2009 through March 2010), and drafts of two appellate judgments issued by Zambrano in other cases).*

Disputed.  Donziger objects to Chevron's reliance on declarationsof Doe 1 and Doe 2, which

declarations Donziger's counsel cannot even share with Donziger.  *See* Dkt. 843.[18]  In any

event, Guerra's declaration should not be credited.  Chevron is paying Guerra $12,000 a month

for at least 24 months (totaling at least $288,000), providing health insurance for his family,

providing an automobile, an independent attorney, and immigration assistance, and has already

paid him $38,000.  Dkt. 755-14 (Ex. 3268) at 4-5.  Of course Guerra only mentions the $38,000

payment in his own declaration.  Dkt. 746-3, Mastro Decl. Exh. C pt. 1a ¶ 33.  By his own

admission, Guerra was dismissed as a Judge of the Sucumbios Court and solicited bribes from

Chevron.  *Id.* at ¶¶ 6, 12.  In fact, Guerra was dismissed from the court because he made

numerous public statements that he had already reached a conclusion in Chevron's favor in the

Lago Agrio case and would dismiss it at the first chance he got if he were ever to preside over

the case again.  Dkt. 754-7 (Ex. 3117) 5/29/2008 Order (quoted at Dkt. 754-1 at 9).  Chevron's

own attorneys have described Guerra as "shameless."  Dkt. 746-11 (Mastro Decl. Exh. F)

(Racines Decl.) ¶ 2.  Guerra clearly has no compunction about selling his services to the highest

bidder, and in this case he has sold them to Chevron.  Guerra's story has been specifically and

roundly refuted by other evidence in the record.  *See* Donziger Decl.; Smyser Decl. (Ex. 15)

(Camacho's Supp. Objs. And Resps. To Chevron's Interrogs.) and (Ex. 16) (Piaguaje's Supp.

Objs. And Resps. To Chevron's Interrogs.).

---

[18] This Court's order barring counsel from sharing these declarations has prevented Donziger from investigating and fully rebutting factual allegations in Chevron's motion.

Chevron's own assertions raise significant doubts about Guerra's credibility.  Guerra claims to have been a ghostwriter from 2008-2012.  He provides evidence relating to 2009 and 2010, but he has no copy of an order during Zambrano's second tenure on the court, nor any other corroborating records from that time frame.

Further, Guerra's declaration is riddled with inadmissible hearsay.  For example, what Zambrano told Guerra what Fajardo said.

Nor should Chevron be permitted to rely on the Expert Report of Michael L. Younger.  Donziger has not yet been permitted the opportunity to conduct expert discovery in this case.  Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Donziger has until April 12, 2013 to submit any rebuttal expert disclosures.  Dkt. 703 at 2. Donziger has not been afforded sufficient time to review and analyze the voluminous material provided in this report.  At the very least, Donziger must be given the opportunity to depose or cross-examine Younger.  *See* Fed. R. Civ. P. 56(d).

Donziger has not yet had the opportunity to examine the media upon which Chevron and Younger rely.  Donziger must be given the opportunity to examine this hard drive in order to have an adequate opportunity to assess Michael Younger's conclusions that are based upon that drive.  *See* Fed. R. Civ. P. 56(d).  Among other things, Younger discusses only 17 specific documents that were hand-picked by Gibson Dunn for Younger's analysis, and does not provide a complete list of the files extracted from the hard drive.  Dkt. 755-16 at 9 ("Stroz Friedberg harvested user documents from the Guerra Media and produced these documents to Gibson

125

Dunn for review.  Gibson Dunn then identified 17 specific documents that they wanted Stroz Friedberg to analyze (the "Extracted Guerra Documents").  There are a number of unexplained irregularities in the data that Younger used for his analysis that Donziger must be afforded the opportunity to investigate.  For instance, Younger suggests that the eleven documents he terms "draft providencias" relating to the Lago Agrio case have "created" dates of July 23, 2010 because Windows XP was installed on that date and a hard drive containing a folder named "ALBERTO GUERRA" was also connected to the computer.[19]  *Id.* at p. 9-10 & 10 n.4.  Yet many of the six documents identified as "draft sentencias" for other cases have "created" dates well before July 23, 2010 even though they were allegedly ghostwritten for Zambrano as well. Further, some of these documents have "last written" dates that predate the "created" date, *e.g.*, Document No. 16, which was apparently "last written" on January 22, 2010 but "created" five months later, on June 9, 2010.  *Id.* at 13.  Chevron has noted the unreliability of metadata when resisting defendants' discovery efforts.  *See* Dkt. 613 (Werdegar Decl.) ¶ 18.

*183.    On occasion, litigants would secretly provide Zambrano and Guerra with draft judgments, at both the trial and appellate levels, which Guerra would revise and Zambrano would issue as his own.  Mastro Decl., Ex. C (Guerra Decl.), ¶ 32 & Attachments X & Y; see also Stavers Decl., Ex. 3278 (Expert Report of Michael L. Younger) at 6-11 (concluding Guerra's hard drive contained drafts of two appellate judgments issued by Zambrano in other cases).*

Disputed.  For the reasons stated in St. 182, Chevron cannot rely on Guerra's affidavit oe the Younger report.

---

[19] The hard drive from which Younger assumes the "draft providencias" were copied was not provided to Younger. *See id.* at 9 (listing forensic images provided to Stroz Friedberg).

The Guerra declaration and Mr. Younger's report leave additional questions unanswered. Attachment X to the Guerra declaration appears to be the draft OCP judgment that Guerra refers to at paragraph 32. Dkt. 746-3, Mastro Decl., Ex. C (Guerra Decl.), ¶ 32 & Dkt. 746-6 (Attachment X) at 217. This document also appears to correspond to Document 14 in Tables 5 and 6 of Younger's report. Dkt. 755-16, Stavers Decl., Ex. 3278 (Expert Report of Michael L. Younger) at 10-11. In his affidavit, Guerra states that "OCP representatives gave me the draft of the appellate judgment in a flash drive, which was loaded onto Judge Zambrano's computer with the help of a computer technician." Dkt. 746-3, Guerra Decl. ¶ 32. But document 14 in Younger's report comes from Guerra's media, not Zambrano's. Dkt. 755-16 (Younger Report) at 13 (¶2.1.4). Further, even though the "last saved" and "created" metadata fields for Attachment X to the Guerra Decl. and Document 14 in the Younger Report match, the titles of those documents do not. *Compare* Dkt. 746-3 (Guerra Decl. Attachment X) at 217 ("Title: Corte Provincial de Justicia de Sucumbios") *with* Dkt. 755-16 (Ex. 3278) Younger Report Table 6, Document 14 ("Name: Proyecto Sentencia OCP.doc").

*184.     In 2009, at Zambrano's instruction, Guerra, on multiple occasions, contacted an Ecuadorian lawyer representing Chevron in the Lago Agrio Litigation to offer to issue a judgment in Chevron's favor in exchange for a bribe, but Chevron's lawyer refused to discuss the matter with Guerra and asked Guerra to stop contacting him. Mastro Decl., Ex. C (Guerra Decl.), ¶ 12; Mastro Decl., Ex. F (Racines Decl.), ¶¶ 2-6 & Ex. A; Mastro Decl., Ex. E (Callejas Decl.), ¶¶ 2-6.*

Disputed. For the reasons stated in St. 182, Chevron cannot rely on Guerra's affidavit. Further, Guerra's story about what Chevron's lawyers allegedly said is inadmissible hearsay.

It is curious—and convenient—that, despite Guerra's alleged repeated and persistent attempts to contact Chevron representatives (including Racines) by telephone, Racines is not among the contacts recovered from Guerra's telephones and no telephone records for the time in question have been provided. *See* Dkt. 755-16, Stavers Decl., Ex. 3278 (Expert Report of Michael L. Younger) ¶ 2.2 and Dkt. 755-22 (Exhibits 37-39).

185.   *Chevron's Ecuadorian counsel made two contemporaneous declarations regarding Guerra's failed bribery solicitations. Mastro Decl., Ex. E (Callejas Decl.), Ex. A; Mastro Decl., Ex. F (Racines Decl.), Ex. A.*

Disputed.   For the reasons stated in St. 182, Chevron cannot rely on Guerra's affidavit.  These declarations are all made by persons with an established bias against the defendants in this case. Callejas and Racines have an enormous vested interest in doing anything they can to chip away at the Lago Agrio judgment.  At the very least, Donziger should be afforded the opportunity to depose Guerra and Callejas.

Further, these alleged contemporaneous declarations raise the question of why Chevron did not bring these to anyone's attention in Ecuador – either during or after Zambrano's first tenure on the case.  Notably, Chevron moved for Judge Ordonez to recuse, but apparent not Zambrano. Guerra Decl. ¶ 21.

186.   *After Chevron's refusal, and at Zambrano's instruction, Guerra met with Fajardo to discuss the case and the two agreed that Guerra would "make the case move quickly" in the LAPs favor, and specifically that he would deny Chevron's critical essential error motions —in exchange for $1,000 a month from the LAPs.  Mastro Decl., Ex. C (Guerra Decl.), ¶ 13.*

Disputed.   For the reasons stated in St. 182, Chevron cannot rely on Guerra's affidavit.

187.    At a meeting with Guerra in 2009, Donziger thanked Guerra for his "work as a ghostwriter . . . and for helping steer the case in favor of [the LAPs]." Mastro Decl., Ex. C (Guerra Decl.), ¶ 13.

Disputed.  For the reasons stated in St. 182, Chevron cannot rely on Guerra's affidavit.

Donziger never made such a statement to Guerra.  Donziger is unaware that Guerra has ever ghostwritten decisions in the Lago Agrio litigation, and Donziger is unaware of any "help" by Guerra to "steer" the decision in favor of the plaintiffs in the Lago Agrio litigation.  He never thanked Guerra for these things.  Donziger Decl. at ¶ 3.

188.    In 2010, Guerra, again acting at Zambrano's direction, attempted to contact an Ecuadorian lawyer representing Chevron in the Lago Agrio Litigation, this time to offer that Zambrano would issue a judgment written by Chevron in exchange for a bribe.  Mastro Decl., Ex. C (Guerra Decl.), ¶¶ 21-22; Mastro Decl., Ex. G (Campuzano Decl.), ¶¶ 2-3; Mastro Decl., Ex. E (Callejas Decl.),¶¶ 7-8.

Disputed.  For the reasons stated in St. 182, Chevron cannot rely on Guerra's affidavit.  Further, Guerra's recitation of what Zambrano said is inadmissible hearsay, as are the statements in Campuzano's and Callejas's declarations.

Donziger objects to Chevron's reliance on declarations that Donziger himself cannot review in their unredacted form and on statements of a witness whose identity has been kept secret from Donziger.  In particular, Chevron has redacted the identity of the person who supposedly called Campuzano in 2010.  This redaction—and the inability to discuss the identity of this person with Donziger or anyone else in Ecuador—hamstrings counsel's ability to investigate the veracity of Campuzano's claims.

129

*189.    Guerra attempted this contact through an intermediary, but Chevron's counsel did not respond to his overture.  Mastro Decl., Ex. C (Guerra Decl.), ¶ 22; Mastro Decl., Ex. G (Campuzano Decl.), ¶¶ 2-3; Mastro Decl., Ex. E (Callejas Decl.), ¶¶ 7-8.*

Disputed.  Donziger incorporates Donziger's response to Chevron's alleged fact No. 188.

*190.    In 2010, Guerra met personally with Donziger, Fajardo and Yanza at the Honey & Honey Restaurant in Quito, Ecuador and proposed that the LAP team pay at least $500,000 to Zambrano and Guerra in exchange for a verdict in their favor in the Lago Agrio Litigation. Donziger told Guerra that the LAP team did not at that moment have that sum of money to pay Zambrano and Guerra.  Mastro Decl., Ex. C (Guerra Decl.), ¶ 23.*

Disputed.  For the reasons stated in St. 182, Chevron cannot rely on Guerra's declaration.

Donziger unequivocally denies that he or any member of the Ecuadorian Plaintiffs' legal team offered Guerra $500,000 in exchange for a favorable verdict.  Donziger recalls being at a restaurant in Quito with Guerra, when Guerra asked for a bribe of $500,000.  Donziger refused Guerra, and told him that neither Donziger nor anyone on the Lago Agrio Plaintiffs' team would do such a thing.  Donziger did not respond (as Guerra asserts) that the Lago Agrio Plaintiffs lacked that sum of money "at the moment."  Donziger Decl. at ¶ 5.

*191.    The LAP team subsequently promised Judge Zambrano $500,000, payable upon collection of the judgment, in exchange for issuing the judgment written by the LAP team. Mastro Decl., Ex. C (Guerra Decl.), ¶ 23.*

Disputed.  Donziger incorporates Donziger's response to Chevron's alleged material fact No.

190.  Further, Guerra's recitation of what Zambrano said is inadmissible hearsay.

*192.    Approximately two weeks before February 14, 2011, the LAP team provided Zambrano with a draft judgment, which Zambrano in turn asked Guerra to revise, which he did, in consultation with Fajardo, and then Zambrano issued that judgment as his own.  Mastro Decl., Ex. C (Guerra Decl.), ¶¶ 25-28.*

130

Disputed.  Further, Guerra's recitation of what Zambrano said is inadmissible hearsay.  Guerra's story is contradicted by his prior statements and by Zambrano himself.  Smyser Decl. (Ex. 15) (Camacho's Supp. Objs. And Resps. To Chevron's Interrogs.) and (Ex. 16) (Piaguaje's Supp. Objs. And Resps. To Chevron's Interrogs.).

Further, Chevron cannot rely on this portion of Guerra's affidavit because it is not based on Guerra's personal knowledge.  *See* Fed. R. Civ. P. 56(c)(4) (requiring that affidavits in support of summary judgment motions be based on personal knowledge. Guerra does not profess to have personal knowledge of how Zambrano allegedly obtained the purported draft judgment described in his affidavit.  Guerra states that he found out the origin of the draft judgment *through Zambrano*.  Dkt. 746-3, Mastro Decl. Exh. C (Guerra Decl.) ¶ 25.   For this reason, Donziger also requests that this portion of Guerra's affidavit be stricken.  *Searles v. First Fortis Life Ins. Co.*, 98 F. Supp. 2d 456, 461 (S.D.N.Y. 2000).  *Hollander v. American Cyanamid Co.*, 172 F.3d 192, 198 (2d Cir. 1999), *abrogated on other grounds by Pacenza v. IBM Corp.*, 363 Fed. App'x 128 (2d Cir. 2010) ("A court may [] strike portions of an affidavit that are not based upon the affiant's personal knowledge, contain inadmissible hearsay or make generalized and conclusory statements.").

193.    *On February 14, 2011, the judgment Zambrano issued in the Lago Agrio Litigation was a judgment written predominately by the LAP team. Mastro Decl., Ex. C (Guerra Declaration), ¶¶ 25, 27-28; Mastro Decl., Ex. D (Supp. Guerra Decl.), ¶ 4.*

Disputed.  For the reasons stated in St. 182, Chevron cannot rely on Guerra's declaration.  Guerra's "supplemental declaration," in which he professes to have finally reviewed the Lago Agrio judgment nearly two years after it was issued, is suspect.  As of November 17, 2012, the

131

date of his first declaration, Guerra had not read the judgment and had apparently "distanced [him]self from the Chevron case." Guerra's ability to remember exactly what was and was not in any version of the lengthly judgment is questionable at best. Donziger must be afforded the opportunity to depose or cross-examine Guerra to test the veracity of these claims.

Further, the portions of Guerra's affidavit in which he describes his secondhand knowledge of alleged last-minute editing of the judgment. Dkt. 746-3, Mastro Decl., Ex. C (Guerra Declaration), ¶ 27, 28, are not admissible on summary judgment, must not be considered, and should be stricken.

Finally, Zambrano has refuted Guerra's story. Smyser Decl. (Ex. 15) (Camacho's Supp. Objs. And Resps. To Chevron's Interrogs.) and (Ex. 16) (Piaguaje's Supp. Objs. And Resps. To Chevron's Interrogs.).

*194.     When Guerra reviewed the judgment as issued by Zambrano, he saw that "the final judgment's structure, wording and content largely mirror the draft judgment as I revised it approximately two weeks before the final judgment was issued." Mastro Decl., Ex. D (Supp. Guerra Decl.), ¶ 4.*

Donziger incorporates Donziger's response to Chevron's alleged fact No. 193.

*195.     Guerra admits that he knew at the time that "the agreement in which [he] participated and by which the Plaintiffs' representatives drafted the judgment in the Chevron case which Judge Zambrano issued, with [his] help, was a violation of Ecuadoran laws." Mastro Decl., Ex. C (Guerra Decl.), ¶ 29.*

Disputed. For the reasons stated in St. 182, Chevron cannot rely on Guerra's declaration.

Further, this admission alone significantly impugns Guerra's credibility.

196.    *Defendants have engaged in both foreign travel and email to facilitate the payments of bribes to Guerra and Zambrano.  Stavers Decl., Ex. 3102 (Guerra timeline reflecting travel and extensive email communication related to the bribery of Guerra and Zambrano); Stavers Decl., Ex. 3139 (DONZ00052412) (2009.09.13 email from Fajardo to Donziger and members of the LAPs' Ecuadorian team, explaining that the Núñez scandal poses a "significant risk to our case."  Fajardo continues: "Nevertheless, this is not all bad or worrisome.  I understand that Zambrano himself asked Núñez, should the case fall to him, that Núñez help him with the orders.  That would help with the continuity.  The problem is, who will carry more weight:  Núñez on the one hand, or Liliana and Guerra on the other. . . . I will be in Lago tomorrow trying to set up some things, but I really don't know whether they will work.").*

Disputed.  Exhibit 3102 to the Stavers Declaration is based upon the same flawed and disputed evidence as the rest of Chevron's assertions under this subject heading.  Donziger incorporates Donziger's objections and responses to the purported evidence cited in Exhibit 3102.  Moreover, Exhibit 3012 is argument, not evidence.  It does not fall into any of the categories listed in Fed. R. Civ. P. 65(c)(1)(A), and for that reason should be stricken.

Chevron selectively quotes from the September 13, 2009 e-mail from Fajardo to Donziger in order to create a misleading impression.  The omitted portion of Fajardo's e-mail describes the two motions that Chevron had filed: one asking Zambrano to accept jurisdiction and one asking Zambrano to declare everything that Nunez did null.  Dkt. 754-26 (Ex. 3139) (DONZ00052412) at 1.  These motions constitute the risk to the case that Fajardo discusses.  Fajardo's closing statement about setting up things in Lago relates to general case strategy, and not to Zambrano or Nunez as Chevron would have the Court believe.  *Id.* at 2 ("Colleagues, if you have any ideas, strategies, or plans that you believe we should work on, don't hesitate to say something… I will be in Lago tomorrow trying to set up some things, but I really don't know whether they will work.").

133

In fact, the September 13, 2009 e-mail undermines Chevron's allegations that the Ecuadorian Plaintiffs had a relationship with Zambrano.  Fajardo suggests that *Chevron* might have something up its sleeve with respect to Zambrano, stating "It is clear that Chevron does not want anything to do with Nunez, which gives rise to a slight doubt, because they might have something better with Zambrano."  *Id.* at 1. This statement would make no sense if Chevron's story were true.

197.    *As Michael Younger has concluded, Guerra's hard drive contained drafts of nine of the 12 court orders Zambrano issued during his first tenure on the Chevron case (from October 2009 through March 2010), and drafts of two appellate judgments issued by Zambrano in other cases.  Stavers Decl., Ex. 3278 (Expert Report of Michael L. Younger) at 6-11.*

Disputed.  For the reasons stated in St. 182, Chevron cannot rely on Younger's report.

Evidence of any draft judgments from Zambrano's second tenure is conspicuously absent.

198.    *As Michael Younger concluded, Guerra's hard drive contained a draft of Zambrano's November 23, 2009 order denying Chevron the right to appeal from certain earlier rulings, which draft was last saved on November, 18, 2009.  Stavers Decl., Ex. 3278 (Expert Report of Michael L. Younger) at 10 & Ex. 23.*

Disputed.  For the reasons stated in St. 182, Chevron cannot rely on Younger's report.

Evidence of any draft judgments from Zambrano's second tenure is conspicuously absent.

199.    *Guerra sometimes provided ghostwritten orders to Zambrano by shipping them to him at the Lago Agrio Court via freight packages on TAME airlines, and TAME shipping records show shipments from Guerra to the Lago Agrio Court in 2009 and 2010, some within several days of orders issued by Zambrano in the Lago Agrio Litigation.  Mastro Decl., Ex. C (Guerra Decl.), ¶ 9 & Attachment F; Stavers Decl., Ex. 3278 (Expert Report of Michael L. Younger) at 10 & Ex. 23.*

Disputed.  For the reasons stated in St. 182, Chevron cannot rely on Younger's report.

Evidence of any draft judgments from Zambrano's second tenure is conspicuously absent.

*200.   Guerra's daily planner entry for February 24, 2012 includes a notation, "Nicolas transfers me 2,000.00 account balance 3,747.92."  Mastro Decl., Ex. C (Guerra Decl.), ¶ 10 & Attachment I.*

Disputed.  For the reasons stated in St. 182, Chevron cannot rely on Younger's report.

Evidence of any draft judgments from Zambrano's second tenure is conspicuously absent.

It is curious that Guerra has provided some bank records, but no bank records to substantiate the claimed payment from Zambrano on February 24, 2012.  *Compare* Mastro Decl. Exh. C Attachment F *with* Mastro Decl. Exh. C Attachments G, H.

*201.   Guerra's phone records show calls with Zambrano. Stavers Decl., Ex. 3278 (Expert Report of Michael L. Younger) at 12-14 & Ex. 40.*

Disputed.  The only conclusion that Younger reaches is that phone bills dated between June 6, 2012 and June 23, 2012 show three phone calls with a number identified as belonging to Zambrano.  Younger reaches no conclusions about any alleged calls between Zambrano and Guerra outside of that narrow window in 2012, which is after the judgment in question was issued.  Further, the fact that Guerra and Zambrano might have communicated by phone does not come close to supporting Chevron's allegations.

*202.   Guerra's cell phone contact list includes at least two numbers associated with Fajardo. Stavers Decl., Ex. 3278 (Expert Report of Michael L. Younger) at 12 & Exs. 38, 39.*

Disputed.  The cell phone contact lists contain two numbers that purport to be associated with Fajardo.  There is, however, no independent verification of these contacts.  Nor is there any indication of when prior to September 26, 2012 these contacts might have been entered into

135

Guerra's phones.  Given Guerra's reputation for dishonesty and admitted "shamelessness,"

Donziger should at least be provided the opportunity to depose or cross-examine Guerra and the

opportunity to examine the phones from which this purported evidence was derived.

*203.    Guerra contacted Donziger regarding personal legal matters, and the contacts on Guerra's computer included the email address sdonziger@gmail.com which is an email address used by Donziger.  Mastro Decl., Ex. C (Guerra Decl.), ¶ 19; Stavers Decl., Ex. 3278 (Expert Report of Michael L. Younger) at 14 & Ex. 41.*

Disputed.  For the reasons stated in St. 182, Chevron cannot rely on Guerra's declaration or the

Younger report.

Donziger recalls receiving an e-mail from Guerra but, contrary to Guerra's story, Donziger

simply ignored it.  Donziger Decl. ¶ 4.

*204.    Internally, the LAPs team referred to Zambrano and Guerra as the puppeteer and the puppet.  Stavers Decl., Ex. 3140 (2009.09.15 email from P. Fajardo to S. Donziger, L. Yanza, J. Prieto, and J. Saenz re "PUPPETEER") (DONZ00052470) ("I think that everything is quiet... The puppeteer is pulling the string and the puppet is returning the package... By now it's pretty safe that there won't be anything to worry about...The puppet will finish off the entire matter tomorrow... I hope they don't fail me..."); Stavers Decl., Ex. 3154 (2009.10.27 email from P. Fajardo to S. Donziger and L. Yanza re "NEWS") (DONZ00052993) ("The puppeteer won't move his puppet until the audience doesn't pay him something..."); Stavers Decl., Ex. 3163 (2009.11.27 email from L. Yanza to S. Donziger re "Important to discuss this weekend") (DONZ00128109) ("[T]he budget is higher in relation to the previous months, since we are paying the puppeteer"); St. 204 (reflecting $1,000 payments to Guerra shortly after discussion of payments to the "puppet" and "puppeteer"); Mastro Decl., Ex. C (Guerra Decl.), ¶ 13 (during this period, the LAP team would pay Guerra $1,000 a month for ghostwriting orders in their favor).*

Disputed.  Chevron's only basis for its assumptions about the identities of the "puppet" and

"puppeteer" is the proximity between these e-mails and deposits into Guerra's bank account.  For

the reasons stated in St. 182, Chevron cannot rely on Guerra's affidavit.

Donziger has never sought to pay any money in exchange for a favorable verdict in the Lago Agrio litigation, nor has Donziger encouraged or solicited anyone else to discuss or pursue paying money for a favorable verdict.  Donziger Decl. ¶ 5.

*205.    On October 27, 2009 and November 27, 2009, the LAPs team discussed payments to the "puppet" and "puppeteer" within days of $1,000 deposits appearing in Guer-ra's bank account. Stavers Decl., Ex. 3154 (2009.10.27 email from P. Fajardo to S. Donziger and L. Yanza re "NEWS") (DONZ00052993) ("The puppeteer won't move his puppet until the audience doesn't pay him something..."); Stavers Decl., Ex. 3163 (2009.11.27 email from L. Yanza to S. Donziger re "Important to discuss this weekend") (DONZ00128109) ("[T]he budget is higher in relation to the previous months, since we are paying the puppeteer"); Stavers Decl., Ex. 3274 (2009.10.29 Guerra bank record reflecting $1,000 deposit); Stavers Decl., Ex. 3275 (2009.11.27 Guerra bank record reflecting $1,000 deposit)*

Disputed.  Disputed.  Chevron's only basis for its assumptions about the identities of the "puppet" and "puppeteer" is the proximity between these e-mails and deposits into Guerra's bank account.  For the reasons stated in St. 182, Chevron cannot rely on Guerra's affidavit.

Donziger has never sought to pay any money in exchange for a favorable verdict in the Lago Agrio litigation, nor has Donziger encouraged or solicited anyone else to discuss or pursue paying money for a favorable verdict.  Donziger Decl. ¶ 5.

*206.    On December 23, 2009 and February 5, 2010, two deposits of $1,000 each were made into Guerra's bank account by Selva Viva employee Ximena Centeno.  Mastro Decl., Ex. C (Guerra Decl.), ¶ 14 & Attachment K, L, M, & N; Supp. Stavers Decl., Ex. 3290 (Ecuadorian records for Ximena Centeno matching her to the cedula number that appears on the deposit slip in Attachment N to the Guerra Declaration).*

Disputed.  Chevron's only basis for this assertion in inadmissible hearsay.

For the reasons stated in St. 182, Chevron cannot rely on Guerra's declaration.

## V.   THE ECUADORIAN JUDICIARY SUFFERS FROM ENDEMIC CORRUPTION[20]

*207.   The Ecuadorian judiciary has problems with corruption and lack of due process and is susceptible to the ghostwriting of judgments by lawyers in exchange for bribes. Dkt. 30-30 (U.S. Dept. of State Human Rights Reports (2006-2011) (noting "the susceptibility of the judiciary to bribes for favorable decisions and resolution of legal cases and on judges parcel- ing out cases to outside lawyers, who wrote the judicial sentences and sent them back to the pre- siding judge for signature" ); Dkt. 402-14 (Ex. 2324) (U.S. State Dep't, Bureau of Economic, Energy & Business Affairs, 2009 Investment Climate Statement: Ecuador (Feb. 2009)) at 52 ("The Ecuadorian judicial system is hampered by processing delays, unpredictable judgments in civil and commercial cases, inconsistent rulings, and limited access to the courts." In commercial disputes that involve foreign companies, "[c]riminal complaints and arrest warrants . . . have been used to pressure companies involved in commercial disputes."); Dkt. 402-1 (Ex. 2209) (El Universo Verdict bad precedent for free press in Americas, Committee to Protect Journalists, Feb. 16 2012) at 110-11("El Universo obtained a court order allowing it to clone Paredes' hard drive for forensic examination. A domestic, court-approved consultant found irregularities in the document, while a U.S. consultant hired by the defense said his own examination showed that the judge's decision was actually written by Correa's attorney, Gutemberg Vera. On Tuesday, Judge Monica Encalada, a lower court magistrate who Paredes said had given him scanned documents that sped up the process of writing his ruling, released a video and affidavit claiming that the original ruling against El Universo was written by Vera.").*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

*208.   Ecuadorian President Correa has supported the LAPs, including through personal meetings with the presiding judge in the Lago Agrio Litigation, and the submission of an amicus brief signed by a member of Correa's staff.  Dkts. 356-9 (Ex. F); Dkt. 356-9 (Ex. G).*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

*209.   As this Court has already found, the LAPs team "resorted to pressure tactics directed at the Ecuadorian courts as well as political influence to achieve their objectives . . .  Donziger, Fajardo, Yanza and the ADF have orchestrated a campaign to intimidate the Ecuadorian judiciary." Dkt. 181 at 35; see also Dkt. 30-7 (Ex. 96) (2006.06.14 Email from S. Donziger to A. Villacis re "Need plan") (DONZ00086533) (Donziger instructed one of his co- conspirators to "prepare a detailed plan with the necessary steps to attack the judge through legal, institutional*

---

[20] For the reasons set forth in Donziger's responses to each of Chevron's purported facts listed under Heading V, Donziger also disputes the assertions and conclusions set forth in Chevron's Heading V.

*channels and through any other channel you can think of."); Dkt. 28-9 (Ex. 76)
(DONZ00027256) at 55 (Donziger explained: "[T]he only way the court will respect us is if they
fear us—and . . . the only way they will fear us is if they think we have [s]ome control over their
careers, their jobs, their reputations—that is to say, their ability to earn a livelihood.")*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

210.    *Donziger has admitted that he has no evidence that Chevron ever paid money to a judge
in the Lago Agrio Litigation. Dkt. 356-9 (Ex. D) at 1964:11-14.*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

211.    *Judge Nuñez recused himself from the Lago Agrio Litigation after video tapes emerged
showing him participating in a series of meetings discussing the outcome of the case and
possible bribes. Dkt. 356-9 (Ex. H).*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

212.    *Judge Zambrano was the subject of numerous corruption complaints as both a
prosecutor and as a judge, and was alleged to "fix" cases in exchange for bribes. Stavers Decl.,
Ex. 3131 (1996.07.12 Complaint filed against Zambrano during his time as prosecutor for
bribery and peddling influence); Stavers Decl., Ex. 3290 (1997.03.12 Complaint filed against
Zambrano during his time as prosecutor for extortion and bribery); Stavers Decl., Ex. 3171
(1997.04.07 Sworn testimony alleging that Zambrano, during his time as prosecutor, accepted
bribes in a drug trafficking case); Stavers Decl., Ex. 3168 (2006.12.22: An Ecuadorian anti-
corruption commission files a complaint against Zambrano for irregularities related to the
disposal of a case regarding corruptly awarded public contracts).*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

213.    *Zambrano was ultimately dismissed from the court when, without explanation, he
released a drug trafficker who had been arrested in connection with the seizure of 8.3 tons of
cocaine. Dkt. 431-5 (Ex. 1282) (2012.02.29 dismissal order).*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

214.    *As Dr. McMenamin has concluded, "It is highly probable that the Order of October 15,
2012 has multiple authors, including one or more writers other than Judge Erazo." Dkt. 658-25
(Ex. 3018), ¶ 4 (emphasis in original).*

139

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

215.    *The 8-page embargo order was issued on the first business day following Judge Legna's replacement by Judge Erazo, but expressly states that it is based on a review of the record. Stavers Decl., Ex. 3270 (Legna recusal motion) (reflecting the prior judge's recusal from the proceeding on October 11, 2012); Stavers Decl., Ex. 3147 (notice of court closure on Friday, October 12, 2012); Stavers Decl., Ex. 3269 (2012.10.15 embargo order, eight pages in length, purportedly issued by Judge Erazo, issued the first day after Erazo took over the case, and noting "HAVING REVIEWED THE RECORD").*

Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

## VI.    THE LAP TEAM HAS ENGAGED IN AT LEAST 129 SPECIFIC INSTANCES OF WIRE FRAUD AND MONEY LAUNDERING[21]

216.    *Defendants have made extensive use of email, Internet websites, and wire transfers, including the 129 specific instances identified in the following statements, in furtherance of their ghostwriting of the Cabrera Report, their concealment of that ghostwriting, their illicit payments to Cabrera, Guerra, and Zambrano, their promotion of the Cabrera Report and the Lago Agrio judgment, and their solicitation of funds to support these activities. Each of these constitutes wire fraud in violation of 18 U.S.C. § 1343 by the identified Defendant.*

Donziger incorporates his responses to Chevron's alleged facts nos. 216-344.

---

[21] For the reasons set forth in Donziger's responses to each of Chevron's purported facts listed under Heading VI, Donziger disputes the assertions and conclusions set forth in Chevron's Heading VI.

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|------------------------|-------------------|
| 216. | Donziger | 2006.02.10 | Donziger | Ponce | Donziger sent an email to Ponce asking him to meet with the judge one-on-one to explain their theory of the case and all of the issues from the plaintiffs' perspective. Dkt. 37-6 (Ex. 231). | Disputed.  Chevron's description of this email does not match the document citation.  In the cited email (Dkt. 37-6 (Ex. 231)), Donziger does not ask Ponce or anyone else "to meet with the judge one-on-one to explain their theory of the case and all of the issues from the plaintiffs' perspective."  In any event, Donziger disputes Chevron's unsupported legal conclusion that any such email constitutes a predicate act of wire fraud and/or money laundering.  For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that any such email was incident to or in furtherance of any material misrepresentation or omission.  Donziger also disputes the insinuation that *ex parte* contacts with a judge were inappropriate.  Indeed, in February 2006, there was no law or regulation in Ecuador prohibiting *ex parte* communications with judges.  *See, e.g.,* Dkt. 154-6 (Affidavit of Dr. Farith Ricardo Simon noting that Ecuadorian law prohibiting judges from "accepting the visit of or meeting with one of the parties or his counsel without first notifying the other" did not come into existence until March 9, 2009).  *Ex parte* communication with the judges presiding over the Lago Agrio litigation was the ordinary manner of proceeding throughout the majority of that case.  Chevron, in fact, had *ex parte* meetings of its own with Ecuadorian judges presiding over the Lago Agrio litigation—including meetings regarding the peritaje global.  Donziger incorporates by reference his prior Rule 56.1(b) Response (Dkt. 614) to St. 6, 165-166. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|--------------------------|--------------------|
| 217. | Donziger | 2006.06.14 | Donziger | Ponce | Donziger sent an email to Ponce instructing him to "prepare a detailed plan with the necessary steps to attack the judge through legal, institutional channels and through any other channel you can think of." Dkt. 30-7 (Ex. 96) at 1. | Donziger does not dispute that he sent the cited email, but he disputes Chevron's unsupported legal conclusion that it constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission. Moreover, Donziger disputes Chevron's use of the word "instructing" as it suggests improperly and without any factual basis that Donziger had authority to "instruct" Ponce to take any action. Donziger also incorporates the Ecuadorian Plaintiffs' response to St. 209. |
| 218. | Donziger | 2006.07.12 | Donziger | Fisher | Donziger and Fisher exchanged emails regarding their ongoing efforts to cause an SEC investigation of Chevron. Donziger noted, "I sort of feel this is bogus, but as long as they want to look at it we should keep feeding them stuff." Dkt. 356-10 at 44 (Ex. AI). | Donziger does not dispute that he sent the cited email, but he disputes Chevron's unsupported legal conclusion that it constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission. Moreover, Chevron's description and its selective and incomplete quotation of this email is misleading. Read in context, the complete email string suggests that an SEC investigation into Chevron's misleading press releases was already "active" and that the SEC had requested further information. |
| 219. | Donziger | 2006.07.26 | Donziger | Kohn | Donziger emailed Kohn, | Donziger does not dispute that he sent the cited |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|---|---|---|---|---|---|---|
| | | | | | "Pablo [Fajardo] met with the Judge today.  The judge, who is on his heels from the charges of trading jobs for sex in the court, said he is going to accept our request to withdraw the rest of the inspections. … The judge also I believe wants to forestall the filing of a complaint against him by us, which we have prepared but not yet filed."  Dkt. 32-4 (Ex. 149) at 1. | email, but he disputes Chevron's unsupported legal conclusion that it constitutes a predicate act of wire fraud and/or money laundering.  For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission.  Moreover, Donziger disputes any suggestion that the "complaint" referenced in this email concerned allegations of sexual impropriety or that the Ecuadorian Plaintiffs were connected to the charges of Judge Yanez trading jobs for sex in the court.  The complaint referenced in this email concerned the judge's failure to act on the Ecuadorian Plaintiffs' motion, not the prior sex scandal in which the judge was involved.  Donziger also incorporates his response to St. 42 and his prior Rule 56.1(b) Response (Dkt. 614) to St 7. |
| 220. | Fajardo | 2006.11.07 | Fajardo | Donziger | Fajardo reported a meeting with the Judge and noted an effort to convince the Judge to adopt the Global Assessment, the Judge's resistance because the request lacked a legal basis, and Fajardo's request for feedback from the team to help strengthen their position. Dkt. 402-13 (Ex. | This email is not material, and no response is required by Donziger, because Chevron has not asserted it as a predicate act against Donziger.  In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone.   Chevron has not proven criminal intent or materiality.  Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|------------------------|-------------------|
| | | | | | 2312). | taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue."  Dkt. 550, at 93.  Donziger also disputes Chevron's description of this email as inaccurate and misleading.  This email does not establish that the judge expressed "resistance" to the request to conduct a global expert examination because the request "lacked a legal basis."  Fajardo in fact recounted in the email: "We explained the actual scope of the Global Assessment to him, and he understood somewhat.  I think we have to strengthen our position, the delivery of information and the objectives of the global assessment."   Further, Donziger disputes the insinuation that *ex parte* contacts with a judge were inappropriate.  Indeed, at the time of this email, there was no law or regulation in Ecuador prohibiting *ex parte* communications with judges.  *See, e.g.,* Dkt. 154-6 (Affidavit of Dr. Farith Ricardo Simon).  Donziger also incorporates his response to St. 36 and his prior Rule 56.1(b) Response (Dkt. 614) to St. 6.  *See also* St. 345-346, *infra*. |
| 221. | Fajardo | 2006.12.21 | Fajardo | Donziger | Fajardo wrote that he "met with the Judge today, and I can say that he will definitely not issue the order [authorizing global | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger.  In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|--------------------------|-------------------|
| | | | | | inspections] before the recess; he will issue it immediately afterward." Dkt. 402-13 (Ex. 2314). | predicate act of wire fraud and/or money laundering against anyone. Moreover, Donziger disputes the insinuation that *ex parte* contacts with a judge were inappropriate. Indeed, at the time of this email, there was no law or regulation in Ecuador prohibiting *ex parte* communications with judges. *See, e.g.,* Dkt. 154-6 (Affidavit of Dr. Farith Ricardo Simon noting that Ecuadorian law prohibiting judges from "accepting the visit of or meeting with one of the parties or his counsel without first notifying the other" did not come into existence until March 9, 2009—roughly three years after the Ecuadorian Plaintiffs are alleged to have met with Judge Yánez concerning the waiver of judicial inspections and the commencement of the peritaje global.). Donziger also incorporates his response to St. 36 and his prior Rule 56.1(b) Response (Dkt. 614) to St. 6. *See also* St. 345-346, *infra*. |
| 222. | Donziger | 2007.03.23 | DeLeon | Donziger | Payment via wire transfer of $1,000,000. Dkt. 370-6 (Ex. 1197) (DONZ00132976-79); *see also* Dkt. 658-37 (Ex. 3030) (untitled letter from Donziger to DeLeon). | Disputed. The cited document shows a wire transfer of $1,000,000 on 3/28/2007 (not 3/23/2007) from Donziger to Kohn Swift & Graf (not from DeLeon to Donziger). Donziger also disputes Chevron's unsupported legal conclusion that this transfer constitutes a predicate act of wire fraud and/or money laundering. In particular, Chevron has not made any showing of criminal intent or materiality. Chevron also has not demonstrated that this transfer was in furtherance of any unlawful activity or that it |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|------------------------|-------------------|
| | | | | | | constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A).  Indeed, this document describes a $25.00 charge in connection with the $1,000,000 transfer for an "Outgoing **Domestic** Wire Fee."  DONZ00132978. |
| 223. | Stratus | 2007.04.03 | David Chapman | Donziger Maest, Mills | Stratus and Donziger discussed Stratus' role in drafting the Cabrera Report, and Chapman wrote, "I think the way this would work best is that if Stratus did much of the work, put- ting the pieces together and writing the report." Dkt. 32-13 (Ex. 157) at 1. | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger.  In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering.  Chevron has not established criminal intent or materiality.  Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93.  Donziger also disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper.  Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts.  In fact, such contacts were common practice.  Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169.  *See also* St. 347-48, 351-55, *infra*.  Similarly, Ecuadorian law permits experts to interact and coordinate with parties. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|---|---|---|---|---|---|---|
| | | | | | | Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168.  In fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168.  Donziger incorporates his responses to St. 71, 75, 78, 95, and and his previous Rule 56.1(b) responses (Dkt. 614) to 167-169.  *See also* St. 347-48, 351-55, *infra*. |
| 224. | Fajardo | 2007.03.21 | Fajardo | Donziger | The LAPs' counsel and consultants wrote Cabrera's June 25, 207 "Work Plan for Expert Examination" which Cabrera then submitted to the Ecuadorian court as his own work.  Dkt. 400-4 (Ex. 2043). | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger.  In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering.  Chevron has not established criminal intent or materiality.  Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93.  Donziger also disputes that the document attached to this email is the work plan filed with the court.  The email attachment looks *nothing* like the work plan that Cabrera filed with the court.  *Compare* Dkt. 400-4 (Ex. 2043) (Fajardo's "first draft of the plan and schedule of activities to |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|------------------------|-------------------|
| | | | | | | be carried out") *with* Dkt. 400-4 (Ex. 2044) at p. 130,641- 130,651 (work plan filed with the court). Further, Chevron's assertion that Cabrera "submitted [the work plan] to the Ecuadorian court as his own work" is unsupported. Cabrera does not represent that he personally drafted the work plan. In his cover letter to the court, he describes the plan as "the general plan of activities that I am going to perform as part of the Expert Examination under my authority." Dkt. 400-4 (Ex. 2044) at p. 130,640. Donziger also incorporates his response to St. 56. |
| 225. | Donziger | 2007.05.10 | Donziger | Fajardo | Donziger sent an email to Fajardo stating that they should have Cabrera find against Plaintiffs on some issues to create the illusion that Cabrera was independent, and look for ways to make sure Texaco did not know anything about Cabrera's work or plan. Dkt. 32-7 (Ex. 152). | Donziger does not dispute that he sent the cited email, but he disputes Chevron's unsupported legal conclusion that it constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Donziger also disputes Chevron's conclusion that the Ecuadorian Plaintiffs intended to create "the illusion" of independence as unsupported, |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|-------------------------|-------------------|
|     |           |      |      |     |                         | argumentative, and improper in a Rule 56.1 statement. "Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)). |
| 226. | Donziger | 2007.06.13 | Donziger | Yanza | Donziger and Yanza discussed opening a "new secret account." Dkt. 400-3 (Ex. 2021) at 1-2. | Donziger does not dispute that he sent the cited email, but he disputes Chevron's unsupported legal conclusion that it constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission. Donziger also disputes any insinuation of impropriety with respect to the second account discussed in this email. Chevron was going to great lengths to block and delay the expert inspections, in part by ensuring that Cabrera would not be paid. Yanza described the purpose of the second account was to pay Cabrera so that he could start his work. Dkt. 356-9 (Ex. S) (DONZ-HDD-0125080)) at p. 210. Donziger also incorporates his response to St. 60. |
| 227. | Yanza | 2007.06.13 | Yanza | Donziger | Yanza wrote to Donziger and copied Fajardo, and request that Donziger | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|-------------------------|-------------------|
|  |  |  |  |  | "explain this situation to JK [Joe Kohn] so he can transfer 30 to our Secret Account and 20 to SV [Selva Viva], but he could send the 50 to the secret account, and then we could pass the 20 to SV to save time and paperwork." Dkt. 400-3 (Ex. 2020). | Moreover, Chevron's description of this email does not match the document citation: Dkt. 400-3 (Ex. 2020) is an email dated 4/17/2007 and has nothing to do with a "secret account." In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. In particular, Donziger disputes any insinuation of impropriety with respect to the so-called "secret account." Chevron was going to great lengths to block and delay the expert inspections, in part by ensuring that Cabrera would not be paid. Yanza described the purpose of the second account was to pay Cabrera so that he could start his work. Dkt. 356-9 (Ex. S0 (DONZ-HDD-0125080)) at p. 210. Donziger also incorporates his response to St. 60. |
| 228. | Fajardo | 2007.06.22 | Fajardo | Donziger | Fajardo sent Donziger an email regarding how to access a draft plan for "how to work with the global damages assessment expert" by using the email account examen_pericial@hotmail.com, and with the instruction to only use the code names "Logarto 2" and "Logarto 3" for himself | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. In particular, Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper. Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts. In fact, such contacts |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|-------------------------|-------------------|
| | | | | | and Donziger.  Dkt. 402-13 (Ex. 2315). | were common practice.  Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169.  Similarly, Ecuadorian law permits experts to interact and coordinate with parties.  Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties."  Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168.  In fact, it was understood in Ecuador that court appointed experts could rely on party resources.  Dkt. 614, St. 168.  Chevron has not established criminal intent – nor can such intent be inferred based on the use of alternate names.  Moreover, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue."  Dkt. 550, at 93.  Donziger also incorporates his responses to St. 71, 75, and 78, and  his prior Rule 56.1(b) Response (Dkt. 614) to Fact Nos. 167-169.  *See also* St. 347-48, 351-55, *infra*. |
| 229. | Donziger | 2007.07.17 | Donziger | Yanza, Fajardo | Donziger wrote, "My tendency is to stop Richard [Cabrera] from working much more in the field … or, if he continues doing it, he should continue under the most strict control with an extremely limited number of | Donziger does not dispute that he sent the cited email, but he disputes Chevron's unsupported legal conclusion that it constitutes a predicate act of wire fraud and/or money laundering.  For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission.  Indeed, the |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|-------------------------|-------------------|
| | | | | | samples.  And we'll change the focus of the data at our offices."  Dkt. 32-12 (Ex. 156). | Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue."  Dkt. 550, at 93.  Moreover, Donziger's email does not prove that Cabrera did not perform 48 site inspections on his own.  It only shows that Donziger was concerned about the cost of Cabrera performing more site inspections.  In addition, Chevron provides misleading and incomplete quotations.  Donziger's email discusses various ideas to reduce the amount of money that the Ecuadorian Plaintiffs were spending.  Donziger was concerned that "we are trying to do too much, producing waste and delaying for lack of budget, and, without realizing it, we are helping the enemy's strategy of delaying the trial."  Dkt. 32-12 (Ex. 156) at 1.  Donziger's proposal to limit the additional field work it would request was consistent with this concern. |
| 230. | Donziger | 2007.08.14 | Donziger | Karen Wilson | Donziger sent an email requesting that Kohn Swift transfer $50,000.00 to an account for the Frente in Ecuador.  Donziger explained that Yanza ran the Selva Viva account, which was created "simply | Donziger does not dispute that he sent the cited email, but he disputes Chevron's unsupported legal conclusion that it constitutes a predicate act of wire fraud and/or money laundering.  For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission.  Chevron's |

152

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|---|---|---|---|---|---|---|
| | | | | | as a pass thru mechanism to administer funds for the litigation" in Ecuador, and that the Frente controlled Selva Viva. Dkt. 31-22 (Ex. 137). | insinuation of impropriety is based on pure speculation. Donziger incorporates his responses to St. 60 and 62. |
| 231. | Selva Viva | 2007.08.15 | Kohn, Swift & Graf, P.C. | Selva Viva | Payment via wire transfer of $50,000 to Defendants' "secret account." Stavers Decl., Ex. 3130 (Dahlberg Declaration), ¶ 12. | This alleged wire transfer is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this alleged wire transfer constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not made any showing of criminal intent or materiality. Chevron also has not demonstrated that this alleged transfer was in furtherance of any unlawful activity or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A). Donziger incorporates his responses to St. 60 and 62. |
| 232. | Donziger | 2007.08.28 | Donziger | Raul Herrera, attorney for government of Ecuador | Donziger wrote to ROE lawyer Raul Herrera, "Guys, with the Procurador [Attorney General of Ecuador] I ask the following favors: 1) Try to reignite his interest in the fraud complaint to the DOJ | Donziger does not dispute that he sent the cited email, but he disputes Chevron's unsupported legal conclusion that it constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission. |

153

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|--------------------------|-------------------|
| | | | | | originally made by Borja. It would be great if he could write another letter to the DOJ to keep it alive, and allow us to exploit it for press purposes." In a later email in the same chain, Donziger wrote, "[T]he idea with the other thing (fraud complaint to the DOJ) more than anything it [sic] to keep it up on the radar screen, keep it alive as a pressure point, and get this government and the Procurador to understand why it was done and adopt it as an ongoing policy." Dkt. 402-11 (Ex. 2286). | |
| 233. | Selva Viva | 2007.09.14 | Kohn, Swift & Graf, P.C. | Selva Viva | Payment via wire transfer of $50,000 to Defendants' "secret account." Stavers Decl., Ex. 3130 (Dahlberg Declaration), ¶ 12. | This alleged wire transfer is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this alleged wire transfer constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not made any showing of criminal intent or materiality. Chevron also has not demonstrated that this alleged transfer was in |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|--------------------------|-------------------|
| | | | | | | furtherance of any unlawful activity or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A).  Donziger  also incorporates his responses to St. 60 and 62. |
| 234. | Donziger | 2007.09.19 | Donziger | Beltman, Maest | Donziger sent an email to Stratus asking for help defining the "norms" of clean-up so they could "propose these norms to the Ministry of Energy which governs these norms[,] and whose Minister is a good friend of ours, so that the Ministry issues them as an official decree before the trial ends."  Dkt. 32-23 (Ex. 167) at 1. | Donziger does not dispute that he sent the cited email, but he disputes Chevron's unsupported legal conclusion that it constitutes a predicate act of wire fraud and/or money laundering.  For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission.  In particular, Chevron has not shown that Donziger actually proposed any "norms" to the Ministry of Energy, or that it would have been illegal or improper to do so – much less that the proposal of any such proposed "norms" materially prejudiced Chevron's ability to present a defense on any issue of consequence. |
| 235. | Fajardo | 2007.11.14 | Fajardo | Cristobal Villao | Fajardo and others removed the names of the original authors from what would become annexes to the Cabrera Report, as Fajardo wrote to Cristobal Villao, "For legal reasons, in the first part, the paragraph which states who hired you | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger.  In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone.  Chevron has not established criminal intent or materiality.  Indeed, the Court has already concluded, even without the |

155

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|-------------------------|-------------------|
| | | | | | to carry out the study is to be omitted." Dkt. 402-2 (Ex. 2217) at ¶ 1. | benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Donziger also disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper. Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts. In fact, such contacts were common practice. Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. Similarly, Ecuadorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168. In fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St.167-169. *See also* St. 347-48, 351-55, *infra*. |
| 236. | Fajardo | 2008.01.02 | Fajardo | Donziger; Yanza | Fajardo emailed a list of "necessary tasks" for 2008, including to "knock out" Chevron but to first "cash the juicy checks," to "stir up the cases" in the Supreme Court of Justice | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. Chevron's |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|--------------------------|-------------------|
| | | | | | and Prosecutor's Office by "tak[ing] advantage of the new Prosecutor," to "watch over" the Havoc case, "[c]oordinate with the President of the Republic for defense on the accusation of denial of justice," "watch over the process of naming new Superior Court Justices," "[c]omplete all preparation work for the inspection we need to conduct," including "Annexes: genocide, health . . . .," to "Prepare the legal scenario for the defense of the expert report," "[w]rite the answer to the expert report," "[c]oordinate with the Communications team on the scheduled announcement of the expert report results," and to "exert the maximum possible pressure, so that the judge or the Court, so that the case, does not | insinuation of impropriety with respect to this email is based on pure speculation. |

157

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|---|---|---|---|---|---|---|
| | | | | | become paralyzed." Dkt. 29-6 (Ex. 79) at 2. | |
| 237. | Yanza | 2008.01.29 | Yanza | Donziger | Yanza asks Donziger to "[b]efore you travel please confirm that our friend JK makes the deposit in the other account. I already sent him the bank information." He also reports that "[t]he expert did not appear to answer questions before the court" and that the judge therefore cancelled the hearing, but that "he'll certainly set another date" and "[w]e're on top of this issue." Dkt. 49-15 (Ex. 351) at 1. | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. Chevron's insinuation of impropriety is based on pure speculation. |
| 238. | Beltman | 2008.02.08 | Beltman | Donziger, Maest, Fajardo | Beltman sent an email to Donziger, et al. attaching a draft outline of proposed annexes to the Cabrera Report. Dkt. 32-19 (Ex. 163). | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|-------------------------|-------------------|
| | | | | | | ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93.  Moreover, the cited email suggests only that Stratus drafted documents that Cabrera *adopted*.  Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper.  Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts.  In fact, such contacts were common practice.  Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. Similarly, Ecuadorian law permits experts to interact and coordinate with parties.  Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168.  In fact, it was understood in Ecuador that court appointed experts could rely on party resources.  Dkt. 614, St. 168.  Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St.167-169.  *See also* St. 347-48, 351-55, *infra*. |
| 239. | Selva Viva | 2008.03.11 | Kohn, Swift & Graf, P.C. | Selva Viva | Payment via wire transfer of $20,000.00.  Dkt. 32-18 (Ex. 162). | This alleged wire transfer is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger.  In any event, Donziger disputes Chevron's unsupported legal conclusion that this |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|--------------------------|-------------------|
| | | | | | | alleged wire transfer constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not made any showing of criminal intent or materiality. Chevron also has not demonstrated that this alleged transfer was in furtherance of any unlawful activity or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A). |
| 240. | Beltman | 2008.02.22 | Beltman | Stratus Science Group, David Chapman | Beltman sent an email to other Stratus consultants stating, in reference to the Summary Report section of the Cabrera Report that they were to "write, over the next 2 to 3 weeks, probably the single most important technical document for the case [which] will pull together all of the work over the last 15 or so years on the case and make recommendations for the court to consider in making its judgment." Dkt. 33-2 (Ex.168). | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Moreover, Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper. Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts. In fact, such contacts were common practice. Dkt. 614 (Donziger |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|------------------------|-------------------|
| | | | | | | 56.1(b) Statement) St. 167-169. Similarly, Ecuadorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168. In fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St.167-169. *See also* St. 347-48, 351-55, *infra*. |
| 241. | Beltman | 2008.02.26 | Beltman | Maest | Beltman sent an email to Stratus team, including Maest, regarding schedule for completion of work on the Cabrera Report, and attaching an outline of the report listing true authors of each portion and who the portions would be attributed to (generally Cabrera). Dkt. 32-20 (Ex. 164). | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Moreover, Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, |

161

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|------------------------|-------------------|
| | | | | | | Cabrera was improper.  Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts.  In fact, such contacts were common practice.  Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169.  Similarly, Ecuadorian law permits experts to interact and coordinate with parties.  Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties."  Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168.  In fact, it was understood in Ecuador that court appointed experts could rely on party resources.  Dkt. 614, St. 168.  Donziger incorporates his responses to St. 71, 75, 78, and 95, his previous Rule 56.1(b) responses (Dkt. 614) to St.167-169.  *See also* St. 347-48, 351-55, *infra*. |
| 242. | Beltman | 2008.02.27 | Beltman | Donziger | Beltman sent an email to Donziger stating "[a]ttached is my rough start of the Peritaje Global report," and asks whether it is "on track in terms of tone, language level, and content?" Dkt. 33-4 (Ex. 170) at 1. | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger.  In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone.  For example, Chevron has not established criminal intent or materiality.  Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a |

162

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|-------------------------|-------------------|
| | | | | | | genuine issue." Dkt. 550, at 93.  Moreover, the cited email string suggests only that Stratus drafted documents that Cabrera *adopted*.  Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper.  Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts.  In fact, such contacts were common practice.  Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169.  Similarly, Ecuadorian law permits experts to interact and coordinate with parties.  Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties."  Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168.  In fact, it was understood in Ecuador that court appointed experts could rely on party resources.  Dkt. 614, St. 168.  Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St.167-169.  *See also* St. 347-48, 351-55, *infra*. |
| 243. | Donziger | 2008.02.27 | Donziger | Beltman | Donziger responded to Beltman's email attaching "rough start of the Peritaje Global report" saying "I think it's working.  Keep going." Dkt. 33-4 (Ex. 170) at 1. | Donziger does not dispute that he sent the cited email, but he disputes Chevron's unsupported legal conclusion that it constitutes a predicate act of wire fraud and/or money laundering.  For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission.  Indeed, the |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|-------------------------|-------------------|
| | | | | | | Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Moreover, the cited email string suggests only that Stratus drafted documents that Cabrera *adopted*. Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper.  Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts.  In fact, such contacts were common practice.  Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169.  Similarly, Ecuadorian law permits experts to interact and coordinate with parties.  Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties."  Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168.  In fact, it was understood in Ecuador that court appointed experts could rely on party resources.  Dkt. 614, St. 168.  Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St.167-169.  *See also* St. 347-48, 351-55, *infra*. |
| 244. | Beltman | 2008.02.29 | Beltman | Maest | Beltman sent an email to Maest and another Stratus consultant listing annexes to cut from the final report in | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger.  In any event, Donziger disputes Chevron's unsupported |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|--------------------------|-------------------|
| | | | | | order to have it complete in time "given the turnaround time for translation and review." Dkt. 49-16 (Ex. 352) at 1. | legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone.  For example, Chevron has not established criminal intent or materiality.  Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93.  Moreover, Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper.  Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts.  In fact, such contacts were common practice.  Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169.  Similarly, Ecuadorian law permits experts to interact and coordinate with parties.  Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168.  In fact, it was understood in Ecuador that court appointed experts could rely on party resources.  Dkt. 614, St. 168.  Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St.167-169.  *See also* St. 347-48, 351-55, *infra.* |
| 245. | Beltman | 2008.03.01 | Beltman | Michael | Beltman sent an email to | This email is not material, and no response from |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|--------------------------|-------------------|
| | | | | Carney | another Stratus consultant with comments concerning drafting of an ecorisk annex and considerations surrounding translations. He noted that it will be translated in Spanish and that the "main audience for this is the judge." Dkt. 49-17 (Ex. 353) at 1. | Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Moreover, Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper. Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts. In fact, such contacts were common practice. Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. Similarly, Ecuadorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168. In fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, 75, 78, and 95, and his |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|--------------------------|-------------------|
| | | | | | | previous Rule 56.1(b) responses (Dkt. 614) to St.167-169. *See also* St. 347-48, 351-55, *infra*. |
| 246. | Beltman | 2008.03.05 | Beltman | Brian Lazar | Beltman sent an email to another Stratus consultant discussing edits to an annex concerning soil clean-up costs. Dkt. 49-18 (Ex. 354). | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone.  For example, Chevron has not established criminal intent or materiality.  Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue."  Dkt. 550, at 93.  Moreover, Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper.  Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts.  In fact, such contacts were common practice.  Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169.  Similarly, Ecuadorian law permits experts to interact and coordinate with parties.  Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties."  Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|--------------------------|-------------------|
| | | | | | | 614, St. 168.  In fact, it was understood in Ecuador that court appointed experts could rely on party resources.  Dkt. 614, St. 168.  Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St.167-169.  *See also* St. 347-48, 351-55, *infra*. |
| 247. | Selva Viva | 2008.03.05 | Kohn, Swift & Graf, P.C. | Selva Viva | Payment via wire transfer of $40,000.00.  Ex. 32-18 (Ex. 162). | This alleged wire transfer is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger.  In any event, Donziger disputes Chevron's unsupported legal conclusion that this alleged wire transfer constitutes a predicate act of wire fraud and/or money laundering against anyone.  For example, Chevron has not made any showing of criminal intent or materiality.  Chevron also has not demonstrated that this alleged transfer was in furtherance of any unlawful activity or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A). |
| 248. | Beltman | 2008.03.07 | Beltman | Translating Spanish, Inc. | Beltman sent an email to Translating Spanish, Inc. concerning translation of attached "ecosystem value" annex from English to Spanish, and discussing progress of translation of other annexes such as | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone.  For example, Chevron has not established criminal intent or materiality.  Indeed, |

737758.02

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|--------------------------|-------------------|
| | | | | | "Environmental standards, Pit (plus) cleanup costs, [and] value of human life losses." Dkt. 49-19 (Ex. 355) at 1. | the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Moreover, Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper.  Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts.  In fact, such contacts were common practice.  Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169.  Similarly, Ecuadorian law permits experts to interact and coordinate with parties.  Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties."  Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168.  In fact, it was understood in Ecuador that court appointed experts could rely on party resources.  Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St.167-169.  *See also* St. 347-48, 351-55, *infra*. |
| 249. | Beltman | 2008.03.07 | Beltman | Translating Spanish, Inc. | Beltman sent an email to Translating Spanish, Inc. concerning translation of attached annexes concerning environmental standards and | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|-------------------------|-------------------|
| | | | | | soil remediation. Dkt. 34-5 (Ex. 180). | predicate act of wire fraud and/or money laundering against anyone.  For example, Chevron has not established criminal intent or materiality.  Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue."  Dkt. 550, at 93.  Moreover, Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper.  Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts.  In fact, such contacts were common practice.  Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169.  Similarly, Ecuadorian law permits experts to interact and coordinate with parties.  Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties."  Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168.  In fact, it was understood in Ecuador that court appointed experts could rely on party resources.  Dkt. 614, St. 168.  Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St.167-169.  *See also* St. 347-48, 351-55, *infra*. |
| 250. | Beltman | 2008.03.10 | Beltman | Maest | Beltman sent an email to Maest and other Stratus | This email is not material, and no response from Donziger is required, because Chevron has not |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|---|---|---|---|---|---|---|
| | | | | | consultants concerning review, analysis, and translation of annexes to Cabrera Report including "environmental standards, eco impacts from contamination, pit cleanup costs, value of human life losses, habitat losses, [and] TexPet remediation." Dkt. 32-21 (Ex. 165) at 1. | asserted it as a predicate act against Donziger.  In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone.  For example, Chevron has not established criminal intent or materiality.  Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93.  Moreover, Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper.  Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts.  In fact, such contacts were common practice.  Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169.  Similarly, Ecuadorian law permits experts to interact and coordinate with parties.  Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168.  In fact, it was understood in Ecuador that court appointed experts could rely on party resources.  Dkt. 614, St. 168.  Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|--------------------------|-------------------|
| | | | | | | to St.167-169. *See also* St. 347-48, 351-55, *infra*. |
| 251. | Beltman | 2008.03.10 | Beltman | Maest | Beltman sent an email to Maest asking for help with drafting the main Cabrera Report "now that the annexes [were] out of the way." Dkt. 33-3 (Ex. 169) at 1. | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Moreover, Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper. Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts. In fact, such contacts were common practice. Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. Similarly, Ecuadorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168. In fact, it was understood in Ecuador that court appointed experts could rely on party |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|-------------------------|-------------------|
| | | | | | | resources.  Dkt. 614, St. 168.  Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St.167-169.  *See also* St. 347-48, 351-55, *infra*. |
| 252. | Beltman | 2008.03.10 | Beltman | Donziger | Beltman sent an email to Donziger discussing status of translations of annexes, asking Donziger to make any changes in redline, and stating that with the annexes mostly out of the way, he would now "get back to the [Cabrera] report." Dkt. 49-20 (Ex. 356) at 1. | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger.  In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone.  For example, Chevron has not established criminal intent or materiality.  Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93.  Moreover, Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper.  Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts.  In fact, such contacts were common practice.  Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169.  Similarly, Ecuadorian law permits experts to interact and coordinate with parties.  Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties."  Dkt. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|--------------------------|-------------------|
| | | | | | | 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168.  In fact, it was understood in Ecuador that court appointed experts could rely on party resources.  Dkt. 614, St. 168.  Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St.167-169.  *See also* St. 347-48, 351-55, *infra*. |
| 253. | Beltman | 2008.03.11 | Beltman | Donziger | Beltman sent an email to Donziger attaching an outline of the Cabrera report which  included a listing of who would write each section of the report, and who each section would be attributed to, which was not the actual authors.  Dkt. 32-2 (Ex. 147). | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger.  In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone.  For example, Chevron has not established criminal intent or materiality.  Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue."  Dkt. 550, at 93.  Moreover, Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper.  Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts.  In fact, such contacts were common practice.  Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169.  Similarly, Ecuadorian law permits experts to interact and |

174

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|------------------------|-------------------|
| | | | | | | coordinate with parties.  Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties."  Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168.  In fact, it was understood in Ecuador that court appointed experts could rely on party resources.  Dkt. 614, St. 168.  Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St.167-169.  *See also* St. 347-48, 351-55, *infra*. |
| 254. | Maest | 2008.03.11 | Maest | Beltman | Maest sent an email to Beltman stating she could help Beltman draft the main Cabrera Report. Dkt. 33-3 (Ex. 169). | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone.  For example, Chevron has not established criminal intent or materiality.  Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue."  Dkt. 550, at 93.  Moreover, Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper.  Ecuadorian law did not prohibit parties to a lawsuit from making contact |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|------|------|
| | | | | | | with court-appointed experts.  In fact, such contacts were common practice.  Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169.  Similarly, Ecuadorian law permits experts to interact and coordinate with parties.  Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties."  Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168.  In fact, it was understood in Ecuador that court appointed experts could rely on party resources.  Dkt. 614, St. 168.  Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St.167-169.  *See also* St. 347-48, 351-55, *infra*. |
| 255. | Beltman | 2008.03.12 | Beltman | Translating Spanish, Inc. | Beltman sent an email to Translating Spanish, Inc. attaching "the main report," written in English, and stating it was a high priority to be translated into Spanish because it needed to be filed soon with the court in Ecuador.  The attached report stated that it was written by Richard Cabrera, although it was actually prepared by Beltman and other Stratus consultants.  Dkt. 33-10 (Ex. 176). | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone.  For example, Chevron has not established criminal intent or materiality.  Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue."  Dkt. 550, at 93.  Moreover, Donziger disputes Chevron's insinuation that the |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|--------------------------|-------------------|
| | | | | | | communication with, and provision of materials to, Cabrera was improper.  Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts.  In fact, such contacts were common practice.  Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169.  Similarly, Ecuadorian law permits experts to interact and coordinate with parties.  Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties."  Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168.  In fact, it was understood in Ecuador that court appointed experts could rely on party resources.  Dkt. 614, St. 168.  Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St.167-169.  *See also* St. 347-48, 351-55, *infra*. |
| 256. | Beltman | 2008.03.13 | Beltman | Donziger | Beltman sent an email to Donziger listing what he had sent so far including the "main report" and "annexes."  He notes that the main report still needs to be translated, and "a native Spanish speaker" will need to read the translations "to make sure they make sense." Dkt. 49-22 (Ex. 358) at 2. | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone.  For example, Chevron has not established criminal intent or materiality.  Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|------------------------|-------------------|
| | | | | | | and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93.  Moreover, the cited email suggests only that Stratus drafted documents that Cabrera *adopted*.  Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper. Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts. In fact, such contacts were common practice.  Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. Similarly, Ecuadorian law permits experts to interact and coordinate with parties.  Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties."  Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168. In fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168.  Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) (Dkt. 614) to St.167-169. *See also* St. 347-48, 351-55, *infra*. |
| 257. | Beltman | 2008.03.18 | Beltman | Stratus | Beltman sent an email to other Stratus consultants regarding the "unjust enrichment annex" and attaching copies in Spanish and English.  He asks the consultants to fill in the tables in both versions and | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone.  For example, Chevron has not established criminal intent or materiality.  Indeed, |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|------------------------|-------------------|
| | | | | | send back to him as soon as possible. Dkt. 49-23 (Ex. 359). | the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Moreover, Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper.  Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts.  In fact, such contacts were common practice.  Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169.  Similarly, Ecuadorian law permits experts to interact and coordinate with parties.  Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties."  Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168.  In fact, it was understood in Ecuador that court appointed experts could rely on party resources.  Dkt. 614, St. 168.  Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St.167-169.  *See also* St. 347-48, 351-55, *infra*. |
| 258. | Donziger | 2008.03.18 | Donziger, Amazon Watch | Chairman of the United States Securities and | Amazon Watch sent a letter to the SEC seeking investigation and sanction of Chevron for alleged failure to comply with | Disputed.  Donziger disputes that the cited letter is "from" Donziger; on its face, the letter only identifies Amazon Watch as the author.  Donziger also disputes Chevron's unsupported legal conclusion that this letter constitutes any predicate |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|-------------------------|-------------------|
| | | | | Exchange Commission | securities regulations, emphasizing the forthcoming Cabrera Report, and the independence of its purported author, "an independent special master" that had prepared his report "mak[ing] use of all evidence collected" with "a large team of technical experts under [his] supervision." Dkt. 47-28 (Ex. 267). | act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this letter (which is not from Donziger) was incident to or in furtherance of any material misrepresentation or omission. Donziger also disputes Chevron's inaccurate description, particularly to the extent it insinuates that the Ecuadorian Plaintiffs' interaction with, and provision of materials, to Cabrera was improper, or that it deprived Cabrera of his professional independence. Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts. In fact, such contacts were common practice. Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. Similarly, Ecuadorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168. In fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St. 167-169. *See also* St. 347-48, 351-55, *infra*. |
| 259. | Beltman | 2008.03.20 | Beltman | William Powers | Beltman sent an email to Powers asking for "the status of the report" and | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|--------------------------|-------------------|
| | | | | | noting that "we need to submit everything to the court on Monday (!!!)" Dkt. 49-24 (Ex. 360) at 1. | any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone.  For example, Chevron has not established criminal intent or materiality.  Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue."  Dkt. 550, at 93. Moreover, Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper.  Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts.  In fact, such contacts were common practice.  Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169.  Similarly, Ecuadorian law permits experts to interact and coordinate with parties.  Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties."  Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168.  In fact, it was understood in Ecuador that court appointed experts could rely on party resources.  Dkt. 614, St. 168.  Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St.167-169.  *See also* St. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|--------------------------|-------------------|
| | | | | | | 347-48, 351-55, *infra*. |
| 260. | Maest | 2008.03.20 | Maest | Beltman | Maest sent an email to Beltman, attaching annex regarding soil remediation with her comments. Dkt. 49-25 (Ex. 361). | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone.  For example, Chevron has not established criminal intent or materiality.  Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue."  Dkt. 550, at 93.  Moreover, Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper.  Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts.  In fact, such contacts were common practice.  Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169.  Similarly, Ecuadorian law permits experts to interact and coordinate with parties.  Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties."  Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168.  In fact, it |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|---|---|---|---|---|---|---|
| | | | | | | was understood in Ecuador that court appointed experts could rely on party resources.  Dkt. 614, St. 168.  Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St. 167-169.  *See also* St. 347-48, 351-55, *infra*. |
| 261. | Beltman | 2008.03.21 | Beltman | Brian Lazar | Beltman sent an email to another Stratus consultant concerning an annex regarding soil remediation. Dkt. 49-26 (Ex. 362). | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger.  In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone.  For example, Chevron has not established criminal intent or materiality.  Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue."  Dkt. 550, at 93.  Moreover, Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper.  Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts.  In fact, such contacts were common practice.  Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169.  Similarly, Ecuadorian law permits experts to interact and coordinate with parties.  Such coordination "is not |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|--------------------------|-------------------|
| | | | | | | considered a fault or a violation of his oath to 'faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168.  In fact, it was understood in Ecuador that court appointed experts could rely on party resources.  Dkt. 614, St. 168.  Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St. 167-169.  *See also* St. 347-48, 351-55, *infra*. |
| 262. | Beltman | 2008.03.23 | Beltman | Donziger | Beltman sent an email to Donziger regarding whether Fajardo and Yanza received Powers' report.  He notes that they need to format it and take Powers name off, "but they can figure that out." Dkt. 34-7 (Ex. 182) at 1. | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone.  For example, Chevron has not established criminal intent or materiality.  Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue."  Dkt. 550, at 93.  Moreover, the cited email suggests only that Stratus drafted documents that Cabrera *adopted*.  Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper. Ecuadorian law did not prohibit parties to a lawsuit from making contact |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|--------------------------|-------------------|
| | | | | | | with court-appointed experts.  In fact, such contacts were common practice.  Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169.  Similarly, Ecuadorian law permits experts to interact and coordinate with parties.  Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties."  Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168.  In fact, it was understood in Ecuador that court appointed experts could rely on party resources.  Dkt. 614, St. 168.  Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St. 167-169.  *See also* St. 347-48, 351-55, *infra*. |
| 263. | Beltman | 2008.03.24 | Beltman | David Chapman | Beltman sent an email to other Stratus consultants discussing the validity of survey collected data used for the Cabrera Report. Dkt. 49-28 (Ex. 364). | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone.  For example, Chevron has not established criminal intent or materiality.  Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue."  Dkt. 550, at 93.  Moreover, Donziger disputes Chevron's insinuation that the |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|--------------------------|-------------------|
| | | | | | | communication with, and provision of materials to, Cabrera was improper. Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts. In fact, such contacts were common practice. Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. Similarly, Ecuadorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168. In fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St. 167-169. *See also* St. 347-48, 351-55, *infra*. |
| 264. | Beltman | 2008.03.25 | Beltman | Donziger | Beltman emailed Ecuadorian counsel and Donziger revisions to the Cabrera Report less than one week before it was filed. Dkt. 53-6 (Ex. 406). | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the |

186

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|------------------------|-------------------|
| | | | | | | appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Moreover, the cited email suggests only that Stratus drafted documents that Cabrera *adopted*. Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper. Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts. In fact, such contacts were common practice. Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. Similarly, Ecuadorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168. In fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St. 167-169. *See also* St. 347-48, 351-55, *infra*. |
| 265. | Stratus | 2008.03.27 | Jennifer Peers | Fajardo | A Stratus consultant, Peers, sent an email to Fajardo regarding updated language for annex regarding ecological impacts of contamination. Dkt. 49-29 (Ex. 365). | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|--------------------------|-------------------|
| | | | | | | criminal intent or materiality.  Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue."  Dkt. 550, at 93.  Moreover, Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper.  Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts.  In fact, such contacts were common practice.  Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169.  Similarly, Ecuadorian law permits experts to interact and coordinate with parties.  Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties."  Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168.  In fact, it was understood in Ecuador that court appointed experts could rely on party resources.  Dkt. 614, St. 168.  Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St. 167-169.  *See also* St. 347-48, 351-55, *infra*. |
| 266. | Fajardo | 2008.03.27 | Fajardo | Peers | Fajardo responded to Peers' email regarding updated language, stating that it was | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|------------------------|-------------------|
|     |           |      |      |     | too late to make changes. Dkt. 49-29 (Ex. 365). | event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone.  For example, Chevron has not established criminal intent or materiality.  Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue."  Dkt. 550, at 93. Moreover, Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper.  Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts.  In fact, such contacts were common practice.  Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169.  Similarly, Ecuadorian law permits experts to interact and coordinate with parties.  Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties."  Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168.  In fact, it was understood in Ecuador that court appointed experts could rely on party resources.  Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St. 167-169.  *See also* St. 347-48, 351-55, *infra*. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|---|---|---|---|---|---|---|
| 267. | Fajardo, Amazon Defense Front | 2008.04.03 | Fajardo, Amazon Watch, Amazon Defense Front | n/a | In a press release issued by Amazon Watch and the Front, Fajardo made knowingly false statements about Cabrera's independence. He stated, "Chevron's claim that Professor Cabrera is cooperating with the plaintiffs is completely false," and that "Chevron is frightened by Cabrera precisely because he is an independent and credible expert." Dkt. 47-13 (Ex. 252) at 2. | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. For instance, Chevron has not established criminal intent or materiality. Donziger incorporates his response to St. 52. |
| 268. | Selva Viva | 2008.04.11 | Kohn, Swift & Graf, P.C. | Selva Viva | Payment via wire transfer of $70,000.00. Ex. 32-18 (Ex. 162). | This alleged wire transfer is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this alleged wire transfer constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not made any showing of criminal intent or materiality. Chevron also has not demonstrated that this alleged transfer was in furtherance of any unlawful activity or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|--------------------------|-------------------|
| | | | | | | 28 U.S.C. § 1956(a)(2)(A). |
| 269. | Yanza, Fajardo | 2008.04.29 | Yanza, Fajardo | United States Trade Represent-ative Susan Schwab | Yanza and Fajardo sent a letter to a United States Trade Representative misstating that Cabrera was "an independent court-appointed special master" and misstating that "the bulk of the evidence relied on [by Cabrera] was provided by Chevron itself via its own sampling evidence." Dkt. 47-29 (Ex. 268) at 5. | This communication is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger.  In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone.  For instance, Chevron has not established criminal intent or materiality.  Donziger also incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St.167-169. Donziger incorporates his response to St. 52. |
| 270. | Selva Viva | 2008.05.05 | Kohn, Swift & Graf, P.C. | Selva Viva | Payment via wire transfer of $35,000.00.  Ex. 32-18 (Ex. 162). | This alleged wire transfer is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger.  In any event, Donziger disputes Chevron's unsupported legal conclusion that this alleged wire transfer constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not made any showing of criminal intent or materiality.  Chevron also has not demonstrated that this alleged transfer was in furtherance of any unlawful activity or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A). |
| 271. | Beltman | 2008.05.14 | Beltman | Donziger | Beltman sent an email to | This email is not material, and no response from |

191

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|-------------------------|-------------------|
| | | | | | Donziger stating that "Karen [Hinton] wants to give the Clapp report to a reporter, but we can't do that since it's an Annex.  I'll tell her not to because I'm not sure of the report pedigree, but we need to be careful about this."  Dkt. 33-8 (Ex. 174) at 1. | Donziger is required, because Chevron has not asserted it as a predicate act against Donziger.  In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone.  For example, Chevron has not established criminal intent or materiality.  Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue."  Dkt. 550, at 93.  Donziger incorporates his response to St. 135-37. |
| 272. | Beltman | 2008.05.14 | Beltman | Karen Hinton | Beltman sent an email to Hinton explaining that she could not give out copies of a report by Clapp to reporters, falsely claiming he was "not sure of its pedigree" and failing to disclose that the true reason was that the report was used as an annex to the Cabrera Report. Dkt. 34-12 (Ex. 187). | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger.  In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone.  For example, Chevron has not established criminal intent or materiality.  Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue."  Dkt. 550, at 93.  Donziger incorporates his response to St. 135-37. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|----|--------------------------|-------------------|
| 273. | Amazon Defense Front | 2008.05.21 | Amazon Watch, Amazon Defense Front | n/a | Amazon Watch and the Amazon Defense Front authored a press release falsely stating that Cabrera was independent and misleadingly omitting the RICO Defendants' and their co-conspirators' role in writing his report: "A recent court-ordered report, written by an independent expert, has proposed that Chevron pay a minimum of $7 billion and up to $16 billion to compensate for environmental contamination." Dkt. 49-30 (Ex. 366) at 1. | This document is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this document constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Moreover, Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper. Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts. In fact, such contacts were common practice. Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. Similarly, Ecuadorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168. In fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St. 167-169. *See also* St. 347-48, 351-55, *infra*. |
| 274. | Selva Viva | 2008.06.09 | Kohn, Swift & Graf, | Selva Viva | Payment via wire transfer of $30,000.00. Ex. 32-18 (Ex.162). | This alleged wire transfer is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|---|---|---|---|---|---|---|
| | | | P.C. | | | Donziger.  In any event, Donziger disputes Chevron's unsupported legal conclusion that this alleged wire transfer constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not made any showing of criminal intent or materiality.  Chevron also has not demonstrated that this alleged transfer was in furtherance of any unlawful activity or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A). |
| 275. | Beltman, Stratus | 2008.06.12 | Beltman, Chapman, David Mills | Steve Hampton, California Department of Fish and Game, Office of Spill Prevention and Response | A Stratus consultant sent an email on behalf of himself, Beltman, Chapman, and others at Stratus, asking Hampton to consider reviewing and endorsing the Cabrera Report.  The email fails to disclose Stratus and the other the RICO Defendants' and their co-conspirators' role in ghostwriting the report.  Dkt. 34-27 (Ex. 202). | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone.  For example, Chevron has not established criminal intent or materiality.  Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Donziger also disputes Chevron's use of the word "ghostwriting" and its insinuation that the communication with, and provision of materials to, Cabrera was improper.  Ecuadorian law did not |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|--------------------------|-------------------|
| | | | | | | prohibit parties to a lawsuit from making contact with court-appointed experts. In fact, such contacts were common practice. Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. Similarly, Ecuadorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168. In fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St. 167-169. *See also* St. 347-48, 351-55, *infra*. |
| 276. | Beltman | 2008.06.26 | Beltman | Amazon Watch | Beltman sent an email to Amazon Watch stating that Stratus was working on assembling a team of "well-credentialed experts" to review Cabrera's report and provide support to be shared with the Lago Agrio court and the media. Dkt. 34-25 (Ex. 200). | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. |
| 277. | Donziger | 2008.06.26 | Donziger | Fajardo, | Donziger sent an email | Donziger does not dispute that he sent the cited |

195

737758.02

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|-------------------------|-------------------|
| | | | | Yanza | urging people to "think again and think outside the box of the law if necessary. Think politics, law, or a combination . . . ..If the law is in the way, then tell me how to change the law. If an executive order can help, then tell me how. If the new Constitution can help, tell me how." Dkt. 49-31 (Ex. 367) at 1. | email, but he disputes Chevron's unsupported legal conclusion that it constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission. Moreover, Chevron's selective and incomplete quotation of this email is misleading. In particular, Chevron's selective quotation could create the false impression that Donziger's suggestion to "think outside the box" was in furtherance of unlawful conduct, when Chevron has not made any such showing. Rather, Donziger's stated concern was to "dig deeper on the finality issue" because "if we cannot deliver finality to Chevron then they are not going to pay a settlement and lots of people will suffer over the next several years as a result." |
| 278. | Selva Viva | 2008.07.02 | Kohn, Swift & Graf, P.C. | Selva Viva | Payment via wire transfer of $30,000.00. Ex. 32-18 (Ex. 162). | This alleged wire transfer is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this alleged wire transfer constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not made any showing of criminal intent or materiality. Chevron also has not demonstrated that this alleged transfer was in |

737758.02

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|--------------------------|-------------------|
| | | | | | | furtherance of any unlawful activity or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A). |
| 279. | Beltman | 2008.07.28 | Beltman | Brian Lazar | Beltman sent an email to another Stratus consultant asking for help editing Stratus's original English versions of annexes to the Cabrera report so that they appear to be translations of the Spanish version of the Cabrera report. Dkt. 33-9 (Ex. 175). | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Moreover, Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper. Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts. In fact, such contacts were common practice. Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. Similarly, Ecuadorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties." Dkt. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|------------------------|-------------------|
| | | | | | | 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168.  In fact, it was understood in Ecuador that court appointed experts could rely on party resources.  Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St. 167-169.  *See also* St. 347-48, 351-55, *infra*. |
| 280. | Beltman | 2008.07.28 | Beltman | Mills | Beltman wrote to Mills noting that the report by Richard Clapp was used as an Appendix to the Cabrera Report, "Oh what a tangled web, …" | This communication is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone.  For example, Chevron has not established criminal intent or materiality.  Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue."  Dkt. 550, at 93. Donziger incorporates his response to St. 135-37. |
| 281. | Beltman | 2008.07.29 | Beltman | Donziger | Beltman sent an email to Donziger detailing Stratus's attempts to obtain endorsements for the Cabrera Report, stating they were having difficulty | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|--------------------------|-------------------|
| | | | | | finding academics who were willing to endorse the Cabrera Report, and suggesting they should turn to consultants and/or their internal team for endorsements instead.  Dkt. 34-29 (Ex. 204). | money laundering against anyone.  For example, Chevron has not established criminal intent or materiality.  Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue."  Dkt. 550, at 93.  Donziger incorporates his response to St. 82. |
| 282. | Fajardo | 2008.07.31 | Fajardo | Maest, Beltman | Fajardo sent an email to Maest and Beltman asking about the progress of comments, which they had agreed to draft by the end of July according to the plan they set out during their meeting in Boulder in June. Dkt. 49-32 (Ex. 368). | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone.  For example, Chevron has not established criminal intent or materiality.  Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue."  Dkt. 550, at 93. |
| 283. | Beltman | 2008.08.01 | Beltman | Maest | Beltman sent Maest and other Stratus consultants an | This email is not material, and no response from Donziger is required, because Chevron has not |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|--------------------------|-------------------|
| | | | | | email detailing "what [they] need[ed] to do for the comments on the Cabrera report." Dkt. 9-5 (Ex. 10) at 1. | asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. |
| 284. | Selva Viva | 2008.08.11 | Kohn, Swift & Graf, P.C. | Selva Viva | Payment via wire transfer of $38,000.00. Ex. 32-18 (Ex. 162). | This alleged wire transfer is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger.  In any event, Donziger disputes Chevron's unsupported legal conclusion that this alleged wire transfer constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not made any showing of criminal intent or materiality.  Chevron also has not demonstrated that this alleged transfer was in furtherance of any unlawful activity or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A). |
| 285. | Selva Viva | 2008.09.11 | Kohn, Swift | Selva Viva | Payment via wire transfer of $28,000.00. Ex. 32-18 (Ex. | This alleged wire transfer is not material, and no response from Donziger is required, because |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|------------------------|-------------------|
|  |  |  | & Graf, P.C. |  | 162). | Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this alleged wire transfer constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not made any showing of criminal intent or materiality. Chevron also has not demonstrated that this alleged transfer was in furtherance of any unlawful activity or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A). |
| 286. | Selva Viva | 2008.10.03 | Kohn, Swift & Graf, P.C. | Selva Viva | Payment via wire transfer of $32,000.00. Ex. 32-18 (Ex. 162). | This alleged wire transfer is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this alleged wire transfer constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not made any showing of criminal intent or materiality. Chevron also has not demonstrated that this alleged transfer was in furtherance of any unlawful activity or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A). |
| 287. | Beltman | 2008.10.06 | Beltman | Donziger | Beltman sent an email to Donziger listing current work including revising | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|----|-----|-----|
| | | | | | and reevaluating portions of the Cabrera Report, and working with Donziger on how to prepare responses to Chevron's comments on the report. Dkt. 37-13 (Ex. 235). | any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Moreover, the cited email suggests only that Stratus drafted documents that Cabrera *adopted*. Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper. Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts. In fact, such contacts were common practice. Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. Similarly, Ecuadorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168. In fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|------------------------|-------------------|
| | | | | | | 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St. 167-169. *See also* St. 347-48, 351-55, *infra*. |
| 288. | Beltman | 2008.10.27 | Beltman | Peers | Beltman and Stratus consultant Jennifer Peers exchanged emails regarding work of U.S. consultant 3TM in which Peers noted that they needed to revise 3TM's work to "clean up the language so it [would] sound[] more like [Cabrera] and less like a comment." Dkt. 9-4 (Ex. 9) at 2. | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering.  For example, Chevron has not established criminal intent or materiality.  Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Donziger incorporates his response to St. 80-81. |
| 289. | Beltman | 2008.10.29 | Beltman | Stratus | Beltman sent an email to another Stratus consultant noting his desire that work performed by U.S. consultant 3TM "be in a form that someone in Ecuador could have written." Dkt. 34-21 | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering.  For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|-------------------------|-------------------|
| | | | | | (Ex. 196 196) at 1. | without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93.  Moreover, Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper.  Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts.  In fact, such contacts were common practice.  Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169.  Similarly, Ecuadorian law permits experts to interact and coordinate with parties.  Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168.  In fact, it was understood in Ecuador that court appointed experts could rely on party resources.  Dkt. 614, St. 168.  Donziger incorporates his responses to St. 71, 75, 78, 80-81, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St. 167-169.  *See also* St. 347-48, 351-55, *infra*. |
| 290. | Maest | 2008.10.31 | Maest | Powers | Maest sent an email to Powers asking him to respond to questions to the Cabrera Report posed by the | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|--------------------------|-------------------|
| | | | | | Lago Agrio Plaintiffs.  Dkt. 49-34 (Ex. 370). | legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established criminal intent or materiality.  Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. |
| 291. | Maest | 2008.11.04 | Powers | Maest | Powers drafted answers to the questions posed in response to the Cabrera Report and sent them to Maest.  The answers were later filed with the Lago Agrio court as Cabrera's answers to questions posed by the Lago Agrio Plaintiffs. Dkt. 49-35 (Ex. 371). | This document is not material, and no response from Donzgier is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established criminal intent or materiality.  Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93.  Donziger incorporates his response to St. 257. |
| 292. | Donziger | 2008.11.04 | Donziger | Beltman | Donziger sent an email to Beltman regarding the need to prevent expert Richard Clapp from | Disputed.  Chevron's description is inaccurate and does not match the cited document.  Dkt. 34-23 (Ex. 198) is a 11/06/3008 email that does not contain the quoted language.  In any event, |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|-------------------------|-------------------|
| | | | | | "go[ing] off the reservation" and "talk[ing] to the congressman in a way that damns the Cabrera report with faint praise if you know what I mean." Dkt. 34-23 (Ex. 198) at 1. | Donziger disputes Chevron's unsupported legal conclusion that any such email constitutes a predicate act of wire fraud and/or money laundering.  For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission.  For example, Chevron has not established criminal intent or materiality.  Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue."  Dkt. 550, at 93. |
| 293. | Selva Viva | 2008.11.14 | Kohn, Swift & Graf, P.C. | Selva Viva | Payment via wire transfer of $40,000.00. Ex. 32-18 (Ex. 162). | This alleged wire transfer is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger.  In any event, Donziger disputes Chevron's unsupported legal conclusion that this alleged wire transfer constitutes a predicate act of wire fraud and/or money laundering against anyone.  For example, Chevron has not made any showing of criminal intent or materiality.  Chevron also has not demonstrated that this alleged transfer was in furtherance of any unlawful activity or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A). |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|---|---|---|---|---|---|---|
| 294. | Beltman | 2008.11.18 | Beltman | Donziger | Beltman sent an email to Donziger stating they must limit distribution of a 5-page report written by Clapp regarding his Ecuador trip. Beltman states the report "CANNOT go into the Congressional Record as being authored by him." Dkt. 34-13 (Ex. 188) at 1. | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone.  For example, Chevron has not established criminal intent or materiality.  Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue."  Dkt. 550, at 93. Donziger incorporates his response to St. 135-37. |
| 295. | Stratus, Beltman, Maest | 2008.12.01 | Stratus, Beltman, Maest | n/a | Stratus released a fifteen page document, signed by Beltman, Maest, and other Stratus consultants, distributed by physical and electronic mail and posted online, "analyzing" and defending Cabrera's report as the work of a court appointed neutral expert, but failing to disclose that Stratus and the other RICO Defendants and their co-conspirators actually drafted | This document is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this document constitutes a predicate act of wire fraud and/or money laundering against anyone.  For example, Chevron has not established criminal intent or materiality.  Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue."  Dkt. 550, at 93. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|------------------------|-------------------|
| | | | | | the report.  Dkt. 34-26 (Ex. 201). | Donziger incorporates his response to St. 83. |
| 296. | Donziger, Fajardo, Yanza | 2008.12.15 | Fajardo | Donziger; Yanza | Pablo Fajardo emailed Donziger and Luis Yanza regarding a meeting with "all the teams" to develop a plan to "obtain a trial judgment in 2009" that would be "favorable and significant."  Fajardo also stated, "We have [President] Correa, the Court and U.S. politics… It's now or never…" Dkt. 355-26 (Ex. 1065). | Donziger does not dispute that Fajardo sent the cited email, but he disputes Chevron's unsupported legal conclusion that it constitutes a predicate act of wire fraud and/or money laundering.  For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission.  Indeed, on its face, this email only evidences a desire to bring the case to a successfully conclusion.  There is nothing unlawful in such a goal.  Donziger incorporates his response to St. 181. |
| 297. | Selva Viva | 2008.12.18 | Kohn, Swift & Graf, P.C. | Selva Viva | Payment via wire transfer of $30,000.00.  Ex. 32-18 (Ex. 162). | This alleged wire transfer is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger.  In any event, Donziger disputes Chevron's unsupported legal conclusion that this alleged wire transfer constitutes a predicate act of wire fraud and/or money laundering against anyone.  For example, Chevron has not made any showing of criminal intent or materiality.  Chevron also has not demonstrated that this alleged transfer was in furtherance of any unlawful activity or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A). |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|--------------------------|-------------------|
| 298. | Beltman | 2008.12.19 | Beltman | Cindy Buhl, Office of United States Congressman Jim McGovern | Beltman provided United States Congressman Jim McGovern's office "some talking points" for an interview with the Los Angeles Times, telling the Congressman's staff that "[t]he Court Expert reviewed available scientific data and concluded that people in the area suffer from many illnesses caused by the contamination, including cancer." Dkt. 47-31 (Ex. 270) at 1. | This document is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this document constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. |
| 299. | Donziger, Fajardo, Yanza | 2009.01.14 | Prieto | Donziger, Fajardo, Yanza | Julio Prieto emailed Donziger, Fajardo, Yanza, and others stating, "I don't think our purpose is to increase pressure just because, but that we want to increase it to get a judgment, so I would think that this is a strategy. . . . The judge needs to feel the pressure, but it must be sufficiently subtle so that it can't be alleged that he acted because of that | Donziger does not dispute that Prieto sent the cited email, but he disputes Chevron's unsupported legal conclusion that it constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission. In addition, this email is hearsay to the extent Chevron seeks to use it for the truth of the matters asserted therein. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|--------------------------|-------------------|
| | | | | | pressure.  It's complicated. . . . In short, the strategy needs to be this: 'increase the pressure on the Court but without negatively impacting the image of the Court as independent.'  We can put on political pressure in the form of direct calls to the judge. Preferably avoid public threats!!"  Dkt. 400-16 (Ex. 2101). | |
| 300. | Fajardo | 2009.01.22 | Fajardo | Berlinger | Fajardo sent an email to Bonfiglio and Berlinger reiterating the need to delete the images they had discussed from the Crude documentary, noting the issue was "so serious that we can lose everything." Dkt. 47-6 (Ex. 245) at 3. | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger.  In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering.  For example, Chevron has not established criminal intent or materiality.  Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue."  Dkt. 550, at 93. Donziger incorporates his response to St. 94. |
| 301. | Beltman | 2009.01.31 | Beltman | Cindy | Beltman forwarded | This email is not material, and no response from |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|-------------------------|-------------------|
| | | | | Buhl, Office of United States Congressm an Jim McGovern | Cabrera's reports, stating "[t]he Court Expert's March 2008 report summary is attached," and that "[a]lso attached is the November 2008 response to the [Lago Agrio] Plaintiff's questions that was written by the Court Expert." Beltman failed to disclose that he and the Lago Agrio Plaintiffs' other U.S. consultants ghostwrote the report as well as the response. Dkt. 47-31 (Ex. 270) at 1. | Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Donziger incorporates his response to St. 83. |
| 302. | Selva Viva | 2009.02.04 | Kohn, Swift & Graf, P.C. | Selva Viva | Payment via wire transfer of $30,000.00. Ex. 32-18 (Ex. 162). | This alleged wire transfer is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this alleged wire transfer constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not made any showing of criminal intent or materiality. Chevron also has not demonstrated that this alleged transfer was in furtherance of any unlawful activity or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|-------------------------|-------------------|
| | | | | | | 28 U.S.C. § 1956(a)(2)(A).. |
| 303. | Selva Viva | 2009.03.09 | Kohn, Swift & Graf, P.C. | Selva Viva | Payment via wire transfer of $30,000.00. Ex. 32-18 (Ex. 162). | This alleged wire transfer is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger.  In any event, Donziger disputes Chevron's unsupported legal conclusion that this alleged wire transfer constitutes a predicate act of wire fraud and/or money laundering against anyone.  For example, Chevron has not made any showing of criminal intent or materiality.  Chevron also has not demonstrated that this alleged transfer was in furtherance of any unlawful activity or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A). |
| 304. | Beltman | 2009.03.18 | Beltman | Donziger | Beltman sent Donziger an email containing draft language denying that the Lago Agrio Plaintiffs were in collusion with Cabrera and claiming that "Cabrera's November response to the plaintiffs is clearly his own." However, Beltman knew that he and the Lago Agrio Plaintiffs' other U.S. consultants had drafted the response.  Dkt. 47-17 (Ex. 256). | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger.  In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone.  For example, Chevron has not established criminal intent or materiality.  Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue."  Dkt. 550, at 93. |

212

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|---|---|---|---|---|---|---|
| | | | | | | Donziger also disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper. Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts. In fact, such contacts were common practice. Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. Similarly, Ecuadorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168. In fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St. 167-169. *See also* St. 347-48, 351-55, *infra*. |
| 305. | Selva Viva | 2009.04.21 | Kohn, Swift & Graf, P.C. | Selva Viva | Payment via wire transfer of $10,000.00. Ex. 32-18 (Ex. 162). | This alleged wire transfer is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this alleged wire transfer constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not made any showing of criminal intent or materiality. Chevron also has not demonstrated that this alleged transfer was in furtherance of any unlawful activity or that it constitutes a transfer of funds from the United States |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|--------------------------|-------------------|
| | | | | | | to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A). |
| 306. | Selva Viva | 2009.05.07 | Kohn, Swift & Graf, P.C. | Selva Viva | Payment via wire transfer of $20,000.00.  Ex. 32-18 (Ex. 162). | This alleged wire transfer is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger.  In any event, Donziger disputes Chevron's unsupported legal conclusion that this alleged wire transfer constitutes a predicate act of wire fraud and/or money laundering against anyone.  For example, Chevron has not made any showing of criminal intent or materiality.  Chevron also has not demonstrated that this alleged transfer was in furtherance of any unlawful activity or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A).. |
| 307. | Selva Viva | 2009.05.28 | Kohn, Swift & Graf, P.C. | Selva Viva | Payment via wire transfer of $22,000.00.  Ex. 32-18 (Ex. 162). | This alleged wire transfer is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger.  In any event, Donziger disputes Chevron's unsupported legal conclusion that this alleged wire transfer constitutes a predicate act of wire fraud and/or money laundering against anyone.  For example, Chevron has not made any showing of criminal intent or materiality.  Chevron also has not demonstrated that this alleged transfer was in furtherance of any unlawful activity or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|---|---|---|---|---|---|---|
| | | | | | | 28 U.S.C. § 1956(a)(2)(A). |
| 308. | Donziger, Fajardo | 2009.06.05 | Fajardo | Donziger | Fajardo emailed Donziger stating that he was going to task LAP intern Brian Parker with "a research assignment for our legal alegato and the judgment, but without him knowing what he is doing..." Dkt. 355-39 (Ex. 1140). | Donziger does not dispute that Fajardo sent the cited email, but he disputes Chevron's unsupported legal conclusion that it constitutes a predicate act of wire fraud and/or money laundering.  Chevron's insinuation of impropriety is based on pure speculation.  In particular, Chevron provides no basis for its insinuation that Fajardo's use of the word "judgment" is evidence of "ghostwriting" of the Judgment issued by the Lago Agrio Court. Moreover, Fajardo's email is hearsay to the extent Chevron purports to use it for the truth of the matters asserted therein.  Donziger incorporates his response to St. 181. |
| 309. | Beltman | 2009.06.26 | Beltman | Representative of Brazil's Aggue-Magalhães (Haggai Magellan) Research Center | Beltman sent an email to the Center seeking an endorsement of the Cabrera Report, providing a copy of the report and Stratus's analysis of it, and recommending the Center sign an evaluation that Stratus drafted. Stratus failed to disclose its own consultants ghostwrote the report.  Dkt. 34-28 (Ex. 203). | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud or money laundering. For example, Chevron has not established criminal intent or materiality.  Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93.  Donziger incorporates his response to St. 82. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|------------------------|-------------------|
| | | | | | | |
| 310. | Selva Viva | 2009.06.29 | Kohn, Swift & Graf, P.C. | Selva Viva | Payment via wire transfer of $20,000.00.  Dkt. 32-18 (Ex. 162). | This alleged wire transfer is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger.  In any event, Donziger disputes Chevron's unsupported legal conclusion that this alleged wire transfer constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not made any showing of criminal intent or materiality.  Chevron also has not demonstrated that this alleged transfer was in furtherance of any unlawful activity or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A). |
| 311. | Donziger | 2009.06.30 | DeLeon | Donziger | Payment via wire transfer of $500,000 upon execution of the agreement.  Dkt. 658-38 (Ex. 3031) (DONZ00039161-62). | Disputed.  The cited document is an Investment Agreement (Dkt. 658-38, Ex. 3031), which contemplates that DeLeon would pay $500,000 into the Case Fund promptly upon execution of the agreement.  The agreement does not require DeLeon to make that contribution by "wire transfer."  Nor does the cited document establish that any such contribution was ever made.  Moreover, Donziger disputes Chevron's unsupported legal conclusion that any such payment (by wire transfer or otherwise) constitutes a predicate act of wire fraud and/or mail fraud. |
| 312. | Selva Viva | 2009.07.16 | Kohn, Swift & | Selva Viva | Payment via wire transfer of $70,000.00.  Dkt. 32-18 (Ex. | This alleged wire transfer is not material, and no response from Donziger is required, because |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|--------------------------|-------------------|
| | | | Graf, P.C. | | 162). | Chevron has not asserted it as a predicate act against Donziger.  In any event, Donziger disputes Chevron's unsupported legal conclusion that this alleged wire transfer constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not made any showing of criminal intent or materiality.  Chevron also has not demonstrated that this alleged transfer was in furtherance of any unlawful activity or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A). |
| 313. | Selva Viva | 2009.08.26 | Kohn, Swift & Graf, P.C. | Selva Viva | Payment via wire transfer of $20,000.00.  Dkt. 32-18 (Ex. 162). | This alleged wire transfer is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger.  In any event, Donziger disputes Chevron's unsupported legal conclusion that this alleged wire transfer constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not made any showing of criminal intent or materiality.  Chevron also has not demonstrated that this alleged transfer was in furtherance of any unlawful activity or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A). |
| 314. | Donziger, Fajardo, Yanza | 2009.09.13 | Fajardo | Donziger, Yanza, Saenz, | Email from Fajardo to Donziger, Yanza, and other members of the LAPs' | Disputed.  Chevron has not provided a document citation for this alleged email.  In any event, Donziger disputes Chevron's unsupported legal |

217

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|--------------------------|-------------------|
| | | | | Prieto, Renato Garcia | legal team stating: "I understand that Zambrano himself asked Núñez, should the case fall to him, that Núñez help him with the orders.  That would help with the continuity.  The problem is, who will carry more weight:  Núñez on the one hand, or Liliana and Guerra on the other…"  Stavers Decl. | conclusion that any such email constitutes a predicate act of wire fraud and/or money laundering.  Chevron has made no showing of criminal intent or materiality and its insinuation of impropriety is based on pure speculation.  Donziger incorporates his response to St. 196. |
| 315. | Donziger, Fajardo, Yanza | 2009.09.15 | Fajardo | Donziger, Yanza, Saenz, Prieto, Renato Garcia | Email from Fajardo to Donziger, Yanza and other members of the LAPs' legal team stating:  "I think that everything is quiet… The puppeteer is pulling the string and the puppet is returning the package… By now it's pretty safe that there won't be anything to worry about… The puppet will finish off the entire matter tomorrow…"  Stavers Decl. Ex. 3140. | Donziger does not dispute that Fajardo sent the cited email, but he disputes Chevron's unsupported legal conclusion that it constitutes a predicate act of wire fraud and/or money laundering.  Chevron has made no showing of criminal intent or materiality and its insinuation of impropriety with respect to Fajardo's use of the words "puppet" and "puppeteer" is based on pure speculation.  *See* Donziger Rule 56.1(b) Response to St. 204-205.  Moreover, Fajardo's email is hearsay to the extent Chevron purports to use it for the truth of the matters asserted therein.  Donziger incorporates his response to St. 204-05. |
| 316. | Selva Viva | 2009.09.23 | Kohn, Swift & Graf, P.C. | Selva Viva | Payment via wire transfer of $20,000.00.  Dkt. 32-18 (Ex. 162). | This alleged wire transfer is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|---|---|---|---|---|---|---|
| | | | | | | Donziger.  In any event, Donziger disputes Chevron's unsupported legal conclusion that this alleged wire transfer constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not made any showing of criminal intent or materiality.  Chevron also has not demonstrated that this alleged transfer was in furtherance of any unlawful activity or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A). |
| 317. | Donziger | 2009.09.30 | Donziger | Beltman | Donziger sent an email to Beltman noting he was meeting with the Republic of Ecuador's attorneys in DC and needed Beltman to provide scientific analysis. Dkt. 31-21 (Ex. 110). | Disputed.  Chevron's description of the cited document is inaccurate.  The cited document is a transcript of the 3/29/2010 Calmbacher deposition, not a 9/30/2009 email from Donziger to Beltman.  In any event, Donziger disputes Chevron's unsupported legal conclusion that any such email constitutes a predicate act of wire fraud and/or money laundering. |
| 318. | Beltman | 2009.09.30 | Beltman | Donziger | Beltman agreed to be available for a call to discuss scientific evidence to be provided to the Republic of Ecuador's attorneys. Dkt. 31-21 (Ex. 110). | This document is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. Moreover, Chevron's description of the cited document is inaccurate.  The cited document is a transcript of the 3/29/2010 Calmbacher deposition, not a 9/30/2009 email from Beltman to Donziger.  In any event, Donziger disputes Chevron's unsupported legal conclusion that any such email constitutes a predicate act of wire fraud and/or money laundering. |
| 319. | Selva Viva | 2009.10.20 | Kohn, | Selva Viva | Payment via wire transfer of | This alleged wire transfer is not material, and no |

219

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|------------------------|-------------------|
| | | | Swift & Graf, P.C. | | $27,000.00.  Dkt. 32-18 (Ex. 162). | response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger.  In any event, Donziger disputes Chevron's unsupported legal conclusion that this alleged wire transfer constitutes a predicate act of wire fraud and/or money laundering against anyone.  For example, Chevron has not made any showing of criminal intent or materiality.  Chevron also has not demonstrated that this alleged transfer was in furtherance of any unlawful activity or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A). |
| 320. | Donziger, Fajardo, Yanza | 2009.10.27 | Fajardo | Donziger, Yanza | Email from Fajardo to Donziger and Yanza stating: "The puppeteer won't move his puppet until the audience doesn't [sic] pay him something."  Stavers Decl. Ex. 3154. | Donziger does not dispute that Fajardo sent the cited email, but he disputes Chevron's unsupported legal conclusion that it constitutes a predicate act of wire fraud and/or money laundering.  For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission.  Chevron has made no showing of criminal intent or materiality and its insinuation of impropriety with respect to Fajardo's use of the words "puppeteer" and "audience" is based on pure speculation.  *See* Donziger Rule 56.1(b) Response to St. 204-205.  Moreover, Fajardo's email is hearsay to the extent Chevron purports to use it for the truth of the matters asserted therein.  Donziger incorporates his response |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|--------------------------|-------------------|
| | | | | | | to St. 204-05. |
| 321. | Donziger, Yanza | 2009.11.27 | Yanza | Donziger | "However, it is important to clarify on this that the budget is higher in relation to the previous month, since we are paying the puppeteer, plus two girls who are helping the attorneys." Stavers Decl. Ex. 3163. | Donziger does not dispute that Yanza sent the cited email, but he disputes Chevron's unsupported legal conclusion that it constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission. Chevron has made no showing of criminal intent or materiality and its insinuation of impropriety with respect to Yanza's use of the word "puppeteer" is based on pure speculation. *See* Donziger Rule 56.1(b) Response to St. 204-205. Moreover, Yanza's email is hearsay to the extent Chevron purports to use it for the truth of the matters asserted therein. Donziger incorporates his response to St. 204-05. |
| 322. | Donziger, Fajardo, Yanza | 2009.12.29 | Fajardo | Donziger, Yanza | Donziger, Fajardo, and Yanza exchanged emails with the subject line "very important." Fajardo emailed Donziger copying Yanza stating, "When you come, I'll tell you the details, which I can't share by email. I think the plan for the judgment will be fulfilled. I'm not 100 percent sure, but I'm 99.99 percent sure." | Donziger does not dispute that Fajardo sent the cited email, but he disputes Chevron's unsupported legal conclusion that it constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission. Chevron has made no showing of criminal intent or materiality and its insinuation of impropriety with respect to Fajardo's use of the word "judgment" is based on pure speculation. Nothing in this email supports |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|--------------------------|-------------------|
| | | | | | Dkt. 355-27 (Ex. 1084). | Chevron's "ghostwriting" allegations. Moreover, Fajardo's email is hearsay to the extent Chevron purports to use it for the truth of the matters asserted therein. Donziger incorporates his response to St. 181. |
| 323. | Donziger | 2010.03.10 | DeLeon | Donziger | Payment via wire transfer of $500,000. Dkt. 561-5 (Ex. 2495) (DONZ00132928-35); *see also* Dkt. 658-39 (Ex. 3032) (WOODS-HDD-0212468-96) (email attaching document entitled "Investment Agreement for Chevron/Ecuador Project.") | Donziger does not dispute that the cited document, on its face, shows a wire transfer of $500,000.00 from Magister Law on 3/10/2010. However, Donziger disputes Chevron's unsupported legal conclusion that any such wire transfer constitutes a predicate act of wire fraud and/or mail fraud. For example, Chevron has not made any showing of criminal intent or materiality. Chevron also has not demonstrated that this transfer was in furtherance of any unlawful activity or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A). Indeed, it appears from cited document that the transfer of funds was from outside the United States to an account inside the United States. |
| 324. | Donziger, Yanza, Fajardo | 2010.03.30 | Julio Prieto | Donziger, Yanza, Fajardo | Prieto sent an email to Donziger, Yanza, Fajardo, and Saenz noting that "the effects" of disclosure were "potentially devastating in Ecuador (apart from destroying the proceed-ing, all of us, your | Donziger does not dispute that Prieto sent the cited email. Donziger disputes, however, that Chevron has provided a full description of the email and also disputes that this email establishes that the Ecuadorian Plaintiffs' contacts with Cabrera were improper. Prieto begins "Apparently this is normal in the U.S. and there is no risk there, but the problem, my friend, is that the effects are |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|--------------------------|-------------------|
| | | | | | attorneys, might go to jail)." Dkt. 9-6 (Ex. 11) at 1. | potentially devastating in Ecuador . . . ." Dkt. 9-6 (Ex. 11) (DONZ00055225) at 1. This is clearly the unconsidered opinion—expressed in the heat of the moment—of but one member of the Ecuadorian Plaintiffs' team. This opinion is inconsistent with Ecuadorian law in place at the time, which did not prohibit coordination between parties and experts. *See* Donziger Rule 56.1(b) Statement, St. 71, 75, 78, and 95. Donziger also disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission. Indeed, Donziger has testified that he understood that all court experts in Ecuador worked closely with the parties and that parties could have access to them and that it would not have been improper for Chevron also to privately with Cabrera. Dkt. 613-8 (12/8/10 Donziger Depo. Tr.), at 959:25-960:8. Donziger also incorporates his response to St. 96. |
| 325. | Donziger | 2010.04.23 | Donziger | Wilson | Donziger responded to April 23, 2010 Wilson email re "explaining" collusion with expert, saying "We need a face to face asap. When is beltman | Donziger does not dispute that he sent the cited email, but he disputes Chevron's misleading and inaccurate description of it as involving "collusion with expert." Donziger also disputes Chevron's use of the word "collusion" as unsupported, argumentative, and improper in a Rule 56.1 |

223

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|--------------------------|-------------------|
| | | | | | depo?" Dkt. 47-58 (Ex. 296) at 1. | statement. "Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).   Donziger also disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering.  For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission.  On its face, this privileged communication only evidences Donziger's desire to speak with Wilson regarding the Beltman deposition.  There is nothing in improper in such a request. |
| 326. | Fajardo, RICO Defendants | 2010.05.05 | Fajardo, RICO Defendants | U.S. District Court, District of Colorado | Declaration of Fajardo filed in a U.S. court making false and misleading statements about Cabrera's independence with the intent of deceiving the court. Fajardo falsely claimed Cabrera's work was independent, and grossly | Disputed.  Donziger disputes Chevron's conclusion that the Fajardo declaration contains "false and misleading claims regarding Cabrera's independence with intent of deceiving the court" as unsupported, argumentative, and improper in a Rule 56.1 statement. *See Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.).  Moreover, Chevron's insinuation that the |

224

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|------------------------|-------------------|
| | | | | | misstated the level of disclosure provided to Chevron and the court regarding the RICO Defendants' and their co-conspirators' work with Cabrera. Dkts. 48-13, 48-14 (Ex. 316). | declaration claims that Cabrera operated completely independently from the Ecuadorian Plaintiffs is a mischaracterization of the declaration. Fajardo never asserted that Cabrera operated independently from the Ecuadorian Plaintiffs. Donziger also disputes Chevron's unsupported legal conclusion that the filing of the cited declaration constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that the filing was incident to or in furtherance of any material misrepresentation or omission. Indeed, Donziger has testified that it was his intention that the Fajardo Declaration would be accurate. *See* Dkt. 613-11 (1/14/11 Donziger Depo. Tr.) at 2781:4-23. Donziger also incorporates his previous Rule 56.1(b) response (Dkt. 614) to St. 115, 125, and 189, and his brief in opposition to Chevron's Motion for Summary Judgment on its Eighth Claim for Relief (Dkt. 611) at 17-27. |
| 327. | Donziger, RICO Defendants | 2010.05.07 | Donziger, RICO Defendants | U.S. District Court, Southern District of Texas | Filing in U.S. court by the RICO Defendants and their co-conspirators making false and misleading statements regarding Cabrera's independence with the intent of deceiving the court. The | Disputed. Donziger disputes Chevron's conclusion that the cited evidence contains "false and misleading statements regarding Cabrera's independence with the intent of deceiving the court" as unsupported, argumentative, and improper in a Rule 56.1 statement. *See Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|--------------------------|-------------------|
| | | | | | RICO Defendants and their co-conspirators misrepresented that Cabrera was independent. Dkt. 49-37 (Ex. 373). | 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.). Donziger also disputes Chevron's unsupported legal conclusion that the filing of the cited document constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that the filing was incident to or in furtherance of any material misrepresentation or omission. Indeed, Chevron does not allege that Donziger was even aware that the cited document was filed. Donziger also disputes Chevron's suggestion that the Ecuadorian Plaintiffs' interaction with, and provision of materials, to Cabrera was improper, or that it deprived Cabrera of his professional independence. Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts. Ecuadorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168. In fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St. 167-169. *See also* St. 347-48, 351-55, *infra*. |
| 328. | Fajardo; | 2010.05.07 | Fajardo; | U.S. | Declaration of Fajardo filed | Disputed. Donziger disputes Chevron's conclusion |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|------------------------|-------------------|
| | RICO Defendants | | RICO Defendants | District Court, Southern District of Texas | in a U.S. Court making false and misleading claims regarding Cabrera's independence with intent of deceiving the court. Fajardo falsely claimed Cabrera's work was independent, and grossly misstated the level of disclosure provided to Chevron and the court regarding the RICO Defendants' and their co-conspirators' work with Cabrera.  Dkts. 49-39, 50-2 (Ex. 374). | that the Fajardo declaration contains "false and misleading claims regarding Cabrera's independence with intent of deceiving the court" as unsupported, argumentative, and improper in a Rule 56.1 statement.  *See Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.).  Moreover, Chevron's insinuation that the declaration claims that Cabrera operated completely independently from the Ecuadorian Plaintiffs is a mischaracterization of the declaration.  Fajardo never asserted that Cabrera operated independently from the Ecuadorian Plaintiffs.  Donziger also disputes Chevron's unsupported legal conclusion that the filing of the cited declaration constitutes a predicate act of wire fraud and/or money laundering.  For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that the filing was incident to or in furtherance of any material misrepresentation or omission.  Indeed, Donziger has testified that it was his intention that the Fajardo Declaration would be accurate.  *See* Dkt. 613-11 (1/14/11 Donziger Depo. Tr.)  at 2781:4-23.  Donziger also incorporates his previous Rule 56.1(b) response (Dkt. 614) to St. 115, 125, and 189, and his brief in opposition to Chevron's Motion for Summary Judgment on its Eighth Claim for Relief (Dkt. 611) at 17-27. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|------------------------|-------------------|
| 329. | Stratus, Donziger, RICO Defendants | 2010.05.17 | Stratus, Donziger RICO Defendants | U.S. District Court, District of Colorado | Filing in U.S. court by the RICO Defendants and their co-conspirators making false and misleading statements regarding Cabrera's independence with the intent of deceiving the court. The RICO Defendants and their co-conspirators claimed Cabrera's statements that he was independent occurred before a Lago Agrio court order authorizing submissions from the parties. However, the RICO Defendants and their co-conspirators maintained an ongoing relationship with Cabrera for nearly a year prior to that order. Dkt. 48-15 (Ex. 317). | Disputed. Donziger disputes Chevron's characterization of the evidence as unsupported, argumentative, and improper in a Rule 56.1 statement. "Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19, 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)). Moreover, Donziger disputes Chevron's unsupported legal conclusion that the filing of the cited document constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that the filing was incident to or in furtherance of any material misrepresentation or omission. |
| 330. | Donziger | 2010.05.27 | Westenberger | Donziger | Co-conspirator Westenberger, in discussing strategies for limiting discovery of the Cabrera fraud via email, wrote "What about the | Disputed. Donziger disputes Chevron's characterization of this email as involving "strategies for limiting discovery of the Cabrera fraud." Donziger also disputes Chevron's use of the words "coconspirator" and "Cabrera fraud" as unsupported, argumentative, and improper in a Rule |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|----|--------------------------|-------------------|
| | | | | | following? Appeal; move for stay; if we win with kane great; if we lose, we produce whatever we want (narrow read); gd complains and then we move for clarification. If we lose again, we think about another appeal." Dkt. (Ex. 292) at 1. | 56.1 statement.  "Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).   Donziger also disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering.  For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission.  Donziger also incorporates his Rule 56.1(b) response to St. 97. |
| 331. | Donziger | 2010.05.27 | Donziger | Wilson | Donziger sent an email to Wilson stating, "I think we should appeal on the theory that we gain a greater advantage by fighting them on everything, and tying them up, than in conceding anyone thing even if we expect to ultimately lose that one thing down the road." Dkt. 48-21 (Ex. 323) at 1. | Donziger does not dispute that he sent the cited email, but he disputes Chevron's unsupported legal conclusion that it constitutes a predicate act of wire fraud and/or money laundering.  For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission. Donziger also incorporates his response to St. 97. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|--------------------------|-------------------|
| 332. | Fajardo, RICO Defendants | 2010.06.07 | Fajardo, RICO Defendants | United States District Court, District of New Jersey | Declaration of Fajardo filed in U.S. Court making false and misleading claims regarding Cabrera's independence with intent of deceiving the court. Fajardo falsely claimed Cabrera's work was independent, and grossly misstated the level of disclosure provided to Chevron and the court regarding the RICO Defendants' and their co-conspirators' work with Cabrera.  Dkts. 50-3, 50-4 (Ex. 375). | Disputed.  Donziger disputes Chevron's conclusion that the Fajardo declaration contains "false and misleading claims regarding Cabrera's independence with intent of deceiving the court" as unsupported, argumentative, and improper in a Rule 56.1 statement.  *See Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.).  Moreover, Chevron's insinuation that the declaration claims that Cabrera operated completely independently from the Ecuadorian Plaintiffs is a mischaracterization of the declaration.  Fajardo never asserted that Cabrera operated independently from the Ecuadorian Plaintiffs.  Donziger also disputes Chevron's unsupported legal conclusion that the filing of the cited declaration constitutes a predicate act of wire fraud and/or money laundering.  For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that the filing was incident to or in furtherance of any material misrepresentation or omission.  Indeed, Donziger has testified that it was his intention that the Fajardo Declaration would be accurate.  *See* Dkt. 613-11 (1/14/11 Donziger Depo. Tr.)  at 2781:4-23.  Donziger also incorporates his previous Rule 56.1(b) response (Dkt. 614) to St. 115, 125, and 189, and his brief in opposition to Chevron's Motion for Summary Judgment on its Eighth Claim for Relief (Dkt. 611) at 17-27. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|------------------------|-------------------|
| | | | | | | |
| 333. | Donziger | 2010.06.11 | DeLeon | Donziger | Payment via wire transfer of $250,000.  Dkt. 370-8 (Ex. 1224) (DONZ00132922-27). | Donziger does not dispute that the cited document, on its face, shows a wire transfer of $250,000.00 from Magister Law to Donziger on 6/11/2010. However, Donziger disputes Chevron's unsupported legal conclusion that this transfer constitutes a predicate act of wire fraud and/or money laundering. In particular, Chevron has not made any showing of criminal intent or materiality.  Chevron also has not demonstrated that this transfer was in furtherance of any unlawful activity or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A).  Indeed, this document describes a $15.00 charge in connection with the $250,000.00 transfer for an "Incoming ***Domestic*** Wire Fee." DONZ00132924. |
| 334. | Donziger, Fajardo | 2010.06.18 | Fajardo | Donziger, Sáenz, Prieto | Fajardo emailed Donziger, Prieto, and Sáenz with the subject line "Trust." Portions of Fajardo's email, including misquotations and miscitations to legal authority, appear verbatim in the Judgment. Dkt. 401-7 (Ex. 2174). | Disputed.  Chevron's description of this email contains conclusions based solely on the opinion of a paid expert witness. The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts.  "Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record.  They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19, 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|--------------------------|-------------------|
| | | | | | | June 29, 1999)).  Donziger also disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering.  For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission.  Donziger also incorporates the Ecuadorian Plaintiffs' response to St. 157. |
| 335. | Donziger, Fajardo | 2010.06.18 | Fajardo | Donziger, Sáenz, Prieto | Fajardo emailed Donziger, Julio Prieto, and Juan Pablo Sáenz an Ecuadorian Supreme Court case entitled *Delfina Torres de Concha v. Petroecuador* and stated that "the arguments by the magistrates are very interesting. I think they serve us well for our alegato and … Worth reading." Dkt. 355-46 (Ex. 1167). | Donziger does not dispute that Fajardo sent the cited email, but he disputes Chevron's unsupported legal conclusion that it constitutes a predicate act of wire fraud and/or money laundering.  For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission.  Indeed, on its face, this privileged email only evidences Fajardo's intention to call attention to an opinion that he found interesting and that believed might be useful in preparing the Ecuadorian Plaintiffs' *alegato final*, or final submission to the Lago Agrio Court regarding liability.  Chevron's insinuation of impropriety is based on pure speculation. |
| 336. | Donziger, RICO Defendants | 2010.06.21 | Donziger, RICO Defendants | U.S. District Court, District of Colorado | Filing in U.S. court by the RICO Defendants and their co-conspirators making false and misleading | Disputed.  Donziger disputes Chevron's conclusion that the cited evidence contains "false and misleading statements with the intent of deceiving the court" as unsupported, argumentative, and |

232

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|--------------------------|-------------------|
| | | | | | statements with the intent of deceiving the court. In a "Second Response to 'Update on Lago Agrio Proceeding,'" the RICO Defendants and their co-conspirators falsely claimed that any of their materials which had ultimately been included in Cabrera's report were submitted to Cabrera pursuant to a Lago Agrio court order. Dkt. 50-5 (Ex. 376). | improper in a Rule 56.1 statement. "Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)). Donziger also disputes Chevron's unsupported legal conclusion that the filing of the cited document constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that the filing was incident to or in furtherance of any material misrepresentation or omission. Indeed, Chevron has not not established that Donziger was even aware that the cited document was filed, much less that he possessed a criminal intent to deceive the court. |
| 337. | Fajardo, RICO Defendants | 2010.06.21 | Fajardo, RICO Defendants | U.S. District Court, District of Colorado | Filing in U.S. court by the RICO Defendants and their co-conspirators attaching as an exhibit a filing Fajardo submitted to the Lago Agrio court, which makes false and misleading statements regarding Cabrera's independence, with the intent of deceiving the court. | Disputed. Donziger disputes Chevron's conclusion that the cited evidence contains "false and misleading statements regarding Cabrera's independence, with the intent of deceiving the court" as unsupported, argumentative, and improper in a Rule 56.1 statement. "Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|--------------------------|-------------------|
| | | | | | Dkt. 50-6 (Ex. 377). | 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).  Moreover, Chevron's suggestion that the Fajardo submission makes statements that Cabrera operated completely independently from the Ecuadorian Plaintiffs is a mischaracterization of the evidence.  Fajardo never asserted that Cabrera operated independently from the Ecuadorian Plaintiffs.  Donziger also disputes Chevron's unsupported legal conclusion that the filing of the cited document constitutes a predicate act of wire fraud and/or money laundering.  For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that the filing was incident to or in furtherance of any material misrepresentation or omission.  Indeed, Donziger has testified that he was not involved the decision to file the Fajardo petition in any U.S. court proceeding.  Donziger also incorporates his previous Rule 56.1(b) response (Dkt. 614) to St. 115, 204-205, and his brief in opposition to Chevron's MSJ on its Eighth Claim for Relief (Dkt. 611) at 17-27. |
| 338. | Donziger, Fajardo, Yanza | 2010.07.26 | Fajardo | Donziger, Sáenz, Prieto, Renato Garcia | Fajardo emailed Donziger, Luis Yanza, Julio Prieto, Juan Pablo Sáenz, and Renato Garcia with the subject line "Judgments and Publications" and stating, | Donziger does not dispute that Fajardo sent the cited email, but he disputes Chevron's unsupported legal conclusion that it constitutes a predicate act of wire fraud and/or money laundering.  For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this |

234

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|-----|------------------------|-------------------|
| | | | | | "Colleagues, taking advantage of the facilities in the U.S. and the cooperation of friends here, please find below a series of links and text citations related to our case. Some of them are very interesting and, as a matter of fact, will help us with the alegato and…" Dkt. 400-17 (Ex. 2111). | email was incident to or in furtherance of any material misrepresentation or omission. Indeed, on its face, this privileged email only evidences Fajardo's intention to call attention to resources that he found interesting and that believed might be useful in preparing the Ecuadorian Plaintiffs' *alegato final*, or final submission to the Lago Agrio Court regarding liability. Chevron's insinuation of impropriety is based on pure speculation. Donziger also incorporates his response to St. 181. |
| 339. | Donziger | 2010.08.17 | DeLeon | Donziger | Payment via wire transfer of $1,250,000. Dkt. 370-6 (Ex. 1198) (DONZ000132896-903). | Donziger does not dispute that the cited document, on its face, shows a wire transfer of 1,250,000 from Magister Law to Donziger on 8/17/2010. However, Donziger disputes Chevron's unsupported legal conclusion that this transfer constitutes a predicate act of wire fraud and/or money laundering. In particular, Chevron has not made any showing of criminal intent or materiality. Chevron also has not demonstrated that this transfer was in furtherance of any unlawful activity or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A). Indeed, this document describes a $15.00 charge in connection with the $1,250,000 transfer for an "Incoming ***Domestic*** Wire Fee." DONZ00132898. |
| 340. | Donziger | 2010.08.18 | Adlai Small | Donziger | Small sent an email to | Donziger does not dispute that Small sent the cited |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|---|---|---|---|---|---|---|
| | | | | | Donziger discussing expert report issues, and stated, "One overarching theme to think about throughout this process is how we want the new expert to address the Cabrera report and its conclusion.  While our new expert will most likely rely on some of the same data as Cabrera (and come to the same conclusions as Cabrera), do we think the expert should make specific mention of such consistencies?"  Small explained that he thought they should attempt to structure the new expert reports in such a way that they might rehabilitate the tainted Cabrera report to some degree, so that someone presented with the new reports "might feel comfortable concluding that certain parts of Cabrera are a valid basis for damages."  Dkt. 36-7 (Ex. 214) at 1. | email, but he disputes Chevron's unsupported legal conclusion that it constitutes a predicate act of wire fraud and/or money laundering.  For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission.  Moreover, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue."  Dkt. 550, at 93.  In connection with Patton Boggs subpoena, the Court has also concluded that "there is insufficient factual basis to suspect that the cleansing reports themselves were fraudulent …"  Dkt. 905 at 64.  The Court also noted that "Chevron has not pointed to anything in the cleansing reports themselves that appears to have been fraudulent."  *Id*. |

236

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|----|--------------------------|-------------------|
| 341. | Fajardo, RICO Defendants | 2010.08.24 | Fajardo, RICO Defendants | U.S. District Court, Western District of North Carolina | Declaration of Fajardo filed in U.S. Court making false and misleading claims regarding Cabrera's independence with intent of deceiving the court. Fajardo falsely claimed Cabrera's work was independent, and grossly misstated the level of disclosure provided to Chevron and the court regarding the RICO Defendants' and their co-conspirators' work with Cabrera.  Dkts. 51-4, 51-5 (Ex. 382). | Disputed.  Donziger disputes Chevron's conclusion that the Fajardo declaration contains "false and misleading claims regarding Cabrera's independence with intent of deceiving the court" as unsupported, argumentative, and improper in a Rule 56.1 statement.  *See Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.).  Moreover, Chevron's insinuation that the declaration claims that Cabrera operated completely independently from the Ecuadorian Plaintiffs is a mischaracterization of the declaration.  Fajardo never asserted that Cabrera operated independently from the Ecuadorian Plaintiffs.  Donziger also disputes Chevron's unsupported legal conclusion that the filing of the cited declaration constitutes a predicate act of wire fraud and/or money laundering.  For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that the filing was incident to or in furtherance of any material misrepresentation or omission.  Indeed, Donziger has testified that it was his intention that the Fajardo Declaration would be accurate.  *See* Dkt. 613-11 (1/14/11 Donziger Depo. Tr.)  at 2781:4-23.  Donziger also incorporates his previous Rule 56.1(b) response (Dkt. 614) to St. 115, 125, and 189, and his brief in opposition to Chevron's Motion for Summary Judgment on its Eighth Claim for Relief (Dkt. 611) at 17-27. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|-----|-----------|------|------|----|--------------------------|-------------------|
| | | | | | | |
| 342. | Fajardo, RICO Defendants | 2010.08.25 | Fajardo, RICO Defendants | U.S. District Court, District of New Mexico | Declaration of Fajardo filed in U.S. Court making false and misleading claims regarding Cabrera's independence with intent of deceiving the court. Fajardo falsely claimed Cabrera's work was independent, and grossly misstated the level of disclosure provided to Chevron and the court regarding the RICO Defendants' and their co-conspirators' work with Cabrera. Dkt. 51-6 (Ex. 383). | Disputed.  Donziger disputes Chevron's conclusion that the Fajardo declaration contains "false and misleading claims regarding Cabrera's independence with intent of deceiving the court" as unsupported, argumentative, and improper in a Rule 56.1 statement.  *See Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.).  Moreover, Chevron's insinuation that the declaration claims that Cabrera operated completely independently from the Ecuadorian Plaintiffs is a mischaracterization of the declaration.  Fajardo never asserted that Cabrera operated independently from the Ecuadorian Plaintiffs.  Donziger also disputes Chevron's unsupported legal conclusion that the filing of the cited declaration constitutes a predicate act of wire fraud and/or money laundering.  For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that the filing was incident to or in furtherance of any material misrepresentation or omission.  Indeed, Donziger has testified that it was his intention that the Fajardo Declaration would be accurate.  *See* Dkt. 613-11 (1/14/11 Donziger Depo. Tr.) at 2781:4-23.  Donziger also incorporates his previous Rule 56.1(b) response (Dkt. 614) to St. 115, 125, and 189, and his brief in opposition to Chevron's Motion for Summary Judgment on its |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|---|---|---|---|---|---|---|
| | | | | | | Eighth Claim for Relief (Dkt. 611) at 17-27. |
| 343. | Fajardo, RICO Defendants | 2010.08.28 | Fajardo, RICO Defendants | U.S. District Court, Southern District of New York | Declaration of Fajardo filed in U.S. Court making false and misleading claims regarding Cabrera's independence with intent of deceiving the court. Fajardo falsely claimed Cabrera's work was independent, and grossly misstated the level of disclosure provided to Chevron and the court regarding the RICO Defendants' and their co-conspirators' work with Cabrera. Dkt. 51-7 (Ex. 384). | Disputed. Donziger disputes Chevron's conclusion that the Fajardo declaration contains "false and misleading claims regarding Cabrera's independence with intent of deceiving the court" as unsupported, argumentative, and improper in a Rule 56.1 statement. *See Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.). Moreover, Chevron's insinuation that the declaration claims that Cabrera operated completely independently from the Ecuadorian Plaintiffs is a mischaracterization of the declaration. Fajardo never asserted that Cabrera operated independently from the Ecuadorian Plaintiffs. Donziger also disputes Chevron's unsupported legal conclusion that the filing of the cited declaration constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that the filing was incident to or in furtherance of any material misrepresentation or omission. Indeed, Donziger has testified that it was his intention that the Fajardo Declaration would be accurate. *See* Dkt. 613-11 (1/14/11 Donziger Depo. Tr.) at 2781:4-23. Donziger also incorporates his previous Rule 56.1(b) response (Dkt. 614) to St. 115, 125, and 189, and his brief in opposition to |

239

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response |
|---|---|---|---|---|---|---|
| | | | | | | Chevron's Motion for Summary Judgment on its Eighth Claim for Relief (Dkt. 611) at 17-27. |
| 344. | Donziger | 2010.09.08 | Eric Daleo | Donziger, Westenberger | Daleo, Donziger, and Westenberger discussed via email the importance of having someone defend the Powers deposition, given "[h]e has substantial knowledge and involvement in the Cabrera Report drafting." Dkt. 47-65 (Ex. 303) at 1. | Donziger does not dispute that Daleo sent the cited email, but he disputes Chevron's unsupported legal conclusion that it constitutes a predicate act of wire fraud and/or money laundering.  For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission.  Indeed, there is nothing unlawful or improper about an attorney describing in a privileged communication his assessment as to the importance that a deposition be defended.  Moreover, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue."  Dkt. 550, at 93. |

### STATEMENT OF ADDITIONAL MATERIAL FACTS AS TO WHICH THERE IS A GENUINE ISSUE TO BE TRIED OR AS TO WHICH THERE IS NO DISPUTE.

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1(b), Donziger submits the following list of additional material facts as to which there is a genuine issue to be tried or as to which there is no dispute.

## I.   THE LAGO AGRIO LITIGATION

### A.   Contacts with Experts and Judges

345.   At all times relevant to Chevron's motion, there was no law or regulation in Ecuador prohibiting *ex parte* communications with judges. Dkt. 154-6 (Ex. 60) at 6 (Affidavit of Dr. Farith Ricardo Simon noting that Ecuadorian law prohibiting judges from "accepting the visit of or meeting with one of the parties or his counsel without first notifying the other" did not come into existence until March 9, 2009—roughly three years after the Ecuadorian Plaintiffs are alleged to have met with Judge Yánez concerning the waiver of judicial inspections and the commencement of the peritaje global.); *see also* Ecuadorian Plaintiffs' response to St. 36.

346.   *Ex parte* communication with the judges presiding over the Lago Agrio litigation was the ordinary manner of proceeding throughout the majority of that case.  Chevron, in fact, had *ex parte* meetings of its own with Ecuadorian judges presiding over the Lago Agrio litigation— including meetings regarding the peritaje global.  Eyewitness Donald Rafael Moncayo Jimenez has recounted in a sworn affidavit:  "On multiple occasions, I personally saw the lawyers who represent Chevron Corporation in the Lago Agrio case meeting alone with the judges who heard the case without the presence of the plaintiffs' lawyers" Dkt. 613-6 (Ex. F) at ¶ 3.  Moncayo has

testified that on one occasion, he "saw attorneys Adolfo Callejas Ribadeneira and Ivan Alberto Racines [Chevron's lawyers], and Dr. Efraín Novillo [one of the presiding judges] in the offices of Judge Novillo.  They were talking about the expert designated by the Judge, Mr. Richard Cabrera." *Id.* at ¶ 4.  When Mr. Moncayo "approached the offices, the private security guards of Chevron and a Chevron technician tried to chase [him] away." *Id.*  Moncayo also describes another incident where Judge Juan Núñez, then-President of the Lago Agrio Court, "was talking to Dr. Diego Larrea and Alberto Racines [Chevron's lawyers] about the inspection of the Auca wells and other stations, where there were oil wells, topic of the Lago Agrio case." *Id.* at ¶ 5.  Additionally, during his deposition on September 13, 2011, Moncayo testified under oath to witnessing one of Chevron's lawyers, Dr. Enrique Caravajal, have an *ex parte* meeting with the then-presiding Judge Rafael Ordoñez after business hours on July 30, 2010.  Dkt. 613-7 (Ex. G) at 31:12-32:19, 34:2-36:21.  The *ex parte* meeting lasted roughly 20 minutes, and is captured in photographs that Moncayo took with his mobile phone.  Werdegar Decl. Ex 15 at 37:6-42:22; *see also* Dkt. 613-14 (Ex. N) (Salazar Decl., recounting additional Chevron *ex parte* meetings with the Lago Agrio Court).

347.    Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts prior to the issuance of the expert's report, including prior to the expert's formal appointment by the court.  *See* Dkt. 154-5 (Ex. 59) (Alencastro Aff.) at ¶¶ 9-12, 19; Dkt.154-6 (Ex. 60) (Simon Aff.) at ¶¶ 4-5, 7-8; *see also* Ecuadorian Plaintiffs' response to St. 36.

348.    It was common practice for litigants to make contact with experts and advocate their positions.  Under Ecuadorian law, an expert is permitted to interact and coordinate with a party to the litigation, and that doing so "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties."  Dkt. 154-6 (Ex. 60) at ¶ 8; Dkt. 154-5 (Ex. 59) at ¶¶

242

17-18.  The fact that an expert ultimately adopts one party's views to the exclusion of the other's also does not mean that the expert was not independent or neutral.  *See* id. at ¶ 27; *see also* Ecuadorian Plaintiffs' response to St. 36.

349.    It is understood in Ecuador that court-appointed scientific experts in highly complex cases simply could not be expected to perform their functions without party assistance.  As such, an "independent" expert in Ecuador does not cease to be independent by virtue of reliance on party-resources to carry out his function.  Dkt. 154-5 (Ex. 59) at ¶ 12 ("Meeting with the experts without the other party being present. . . effectively aids the adequate fulfillment of the expert's or experts' functions in situations of a high scientific complexity, given the limited technological resources which our country [Ecuador] has to provide technical information for the efficient administration of justice."); Dkt. 154-6 (Ex. 60) at ¶ 9 ("'[t]here is an actual procedural burden for the parties, to make it easier for the experts to conduct their studies. . . .'").

350.    The Ecuadorian Plaintiffs' meetings with Richard Cabrera in the time leading up to his appointment were not particularly secretive because there was no reason for them to be.  For example, on one occasion on February 27, 2007, Donziger and others met with Cabrera at a "Mister Bagel," notwithstanding their belief that Chevron's operatives were frequently spying on them.  Dkt. 28-7 (Ex. 76) at 15.

351.    Chevron also engaged in *ex parte* communications with, and provided undisclosed *ex parte* assistance to, court-appointed experts, including before experts were formally appointed. *See* Dkt. 154-7 (Ex. 61) at p. 2; (Dr. Marcel Muñoz Herreria letter to Lago Agrio court describing a March 9, 2010 meeting with Chevron representative Alfredo Guerrero at a hotel for a "technical planning meeting"); Dkt. 154-7 (Ex. 61) at p. 3 ("Scope Plan requested and approved by Engineer Guerrero" attached to Muñoz's letter).

352.    Marcelo Munoz, a court-appointed expert in the Lago Agrio litigation, participated in a private meeting with Chevron's technical consultant Alfredo Guerrero, for a "technical [p]lanning meeting" at which the engineer "approved" a work plan.  *See* Dkt. 154-7 (Ex. 61).

353.    Consistent with Ecuadorian law and customary practice, the Lago Agrio Court issued orders affirmatively authorizing the parties to communicate with Cabrera and to provide him with information.  Dkt. 613-13 (Ex. M) (April 14, 2008 Lago Agrio Court Order) at 9; Dkt. 557-5 (Suppl. Young Decl. Ex. 29); Dkt. 154-5 (Ex. 59) at ¶ 17; Dkt. 32-6 (132,846 at 2 and 132,849 at 7).

354.    Cabrera and the Lago Agrio Court repeatedly requested that the parties provide Cabrera with relevant and useful information.  *See, e.g.,* Dkt. 557-5 (Suppl. Young Decl. Exs. 27-29); Dkt. 613-13 (Ex. M) at 9; Dkt. 154-5 (Ex. 59) at ¶ 17; Dkt. 557-5 (Ex. 28) at p. 133,987 (Cabrera Petition dated Jan. 7, 2008 stating, "I request that [the Court] order the parties to provide me with any information that … each party considers necessary in order to incorporate it in this expert report"); Dkt 557-5 (Ex. 29) at p. 134,157 (Court order dated Jan. 30, 2008, responding to Cabrera Petition dated Jan. 7, 2008, ordering the parties to "provide the required information to the expert as soon as possible") Dkt. 154-5 (Ex. 59) at ¶ 17; Dkt. 32-6 (132,846 at 2 and 132,849 at 7); Dkt. 613-13 at 10 ("[T]he parties may submit to the expert whatever documentation they believe may be useful in preparing his report."). The Lago Agrio Court ordered that materials submitted by Chevron "be delivered directly to the expert, its addressee."  *Id.*

355.    Chevron had the opportunity to provide materials to Cabrera.  *See* St. 354; *see also* Dkt. 47-62 (Ex. 300) at 36:18-19 (Chevron's counsel's statement in the Stratus § 1782 that "both sides were allowed to submit data to Cabrera.").

**B.      Sampling, Inspections, and Reports**

244

356.    Chevron had instructed its own experts to avoid finding contamination.  Chevron's
judicial inspection "Playbook" reveals that Chevron directed its experts to visit sites prior to the
official judicial inspections—what Chevron referred to as "Pre-Inspections"—so that they could
take multiple samples with the goal of locating a few clean "delineation points" that the experts
could, with the appearance of randomness, revisit during the official inspections. Dkt. 366-5 (Ex.
E- Judicial Inspection Playbook), at 12. One particular component of the Playbook entitled
"Summary of Sampling and Testing Program for Judicial Inspection Sites," instructed Chevron's
experts as follows: "Locations for perimeter sampling should be chosen to emphasize clean
points around pits when possible." Dkt. 366-6 (Ex. F) at p. 3.  Chevron's experts were further
directed to "collect soil samples at 4 or more locations surrounding the site, using locations that
the PI [Pre-Inspection] team has shown to be clean."  *Id.*

357.    Both sides accused the other of submitting manipulated sampling results to the Lago
Agrio Court.  Indeed, the court noted that, if it were to consider statements made by Diego Borja,
"we must understand that most of the samples collected by the experts suggested by [Chevron]
have been manipulated . . . and they would lose all probative value."  Dkt. 168 (Chevron's
translation of the Lago Agrio Judgment) at 52.

358.    The "settling expert" reports were not originally contemplated as part of the judicial site
inspection process determined at the outset of the trial.  Rather, the additional step of third expert
report (in addition to the two party-affiliated expert reports) was requested by Chevron.
Donziger believed that this maneuver was an attempt to inject more delay into already protracted
proceedings.  *See* Dkt. 613-20 (12/23/10 Donziger Depo. Tr.) at 1804:13-20; Dkt. 28-9, at p. 12
(Donziger private journal entry noting that "I broke down how long it would take to finish the
case if all the dirimiente [settling expert] reports and responses are done, and we estimated that it

245

would take about six years beyond where we are now."); *id.* at 13 ("Why would Yánez order the [settling expert] reports when he and everyone else knows they are useless?  The dangerous combination of not wanting to make a decision, with the fact they [sic] this is an American case and who cares, people can just keep making money.").

359.     The global expert examination was not intended to, and did not, supplant the judicial inspections or settling expert reports.  The Ecuadorian Plaintiffs had requested a global expert examination in October 2003, at the beginning of the trial.  Dkt. 31-31 (December 4, 2006 LAP filing), at p. 1 ("Your honor, I respectfully request that you immediately order an expert examination aimed at determining the environmental effects of activities related to the production of hydrocarbons in all of the fields operated by Texaco, as requested in the evidentiary motion on pages 4677 and 4678 of the record.  The Court granted that motion in an Order issued on October 29, 2003, at 5:55 p.m., and that Order is final and binding.").  The court granted that request, and the global expert examination would have proceeded at some time, whether or not the judicial inspections had continued for a longer period.  *Id.* (quoting the Lago Agrio court's October 29, 2003 order that "an expert examination shall be conducted aimed at determining the environmental effects of activities related to the production of hydrocarbons in all of the fields operated by TEXACO . . . .").

360.     The Ecuadorian Plaintiffs sought to waive their remaining tentatively scheduled inspections based on their belief that (i) further inspections were unnecessary because the Ecuadorian Plaintiffs had already met their burden of proof and the results of the inspections to date strongly indicated contamination at the inspected sites; and that (ii) Chevron intended to use protracted judicial inspections to delay the litigation as much as possible and exhaust the Ecuadorian Plaintiffs' resources.  Dkt. 613 (Ex. T) (12/23/10 Donziger Depo. Tr.), at 1804:13-20

("We strongly felt that the settling expert reports were not required under Ecuadorian law and that they were being used by Chevron to delay the trial."); Dkt. 28-9 (Ex. 76) (DONZ00027256) at p. 55 (July 25, 2006 Donziger private journal entry observing that Chevron is "losing overwhelmingly")]; *id.* at p. 19 (DONZ00036234) ("Alberto's initial mistake of asking for 122 inspections without any strategy is just coming back to haunt us so deeply, although we are getting good press and we are using the inspections to build political momentum and get our act together, but the process is just time consuming and ridiculous."); Dkt 28-8 (Ex. 76) (DONZ00027256) at p. 45 (Donziger journal: "we still have the same money problems, and nobody has been paid. . . The money issue is killing us.  Pablo told me the inspections are now going to finish the week of Nov. 13, which is soon—there is a ton of work to be done before then."); Dkt. 28-7 (Ex. 76) (DONZ00027256) at p. 24 ("Our phone and electricity will be cut off this week.  We have received no money since November. LY feels the brunt of the pressure from creditors, the brunt of the pressure from the base communities, and the brunt of the pressure from staff who have not gotten paid."); Dkt. 28-9 (DONZ00036277) at 9 (Donziger journal entry dated May 31, 2006, discussing risks and benefits of global expert strategy and stating "We are winning on the proof, but we are losing the larger war because of time."); Dkt. 28-8 (Ex. 76) (DONZ00027256) at p. 37  ("They pulled a stunt on Monday - tried to get the judge to suspend the inspection for 60 days on the even [sic] of going out to the site.  LY got text msg judge was leaving Lago - we had out [sic] own intelligence sources. They did this for Guanta, San Carlos, and now Yuca"); Dkt. 28-9 at p. 2 (September 13, 2006 Donziger private journal entry: "[W]e have to face the prospect of more of the wasteful, time-consuming, and expensive inspections.[] Texaco now realizes their best defense is to ask for as many inspections as possible.").

361.    Every site inspection that Chevron requested for its case-in-chief was performed.  *See* Dkt. 168 (certified English translation of the Lago Agrio Court's February 14, 2011 opinion), at

47 (affirming ruling allowing Ecuadorian Plaintiffs to withdraw their remaining inspection requests and noting that "the defendant, Chevron, has been allowed to take all the actions that it requested for its defense" and rejecting Chevron's argument that "it has been caused irreparable harm by not being allowed to carry our 64 procedures requested by the plaintiffs . . . .").

362.     Richard Cabrera was not even the Ecuadorian Plaintiffs' preferred choice to serve as the global damages expert; rather, he was selected only after the Lago Agrio Court—apparently at Chevron's urging—concluded that the expert must be chosen from the small group of experts who had already served in some fashion in the trial.  *See, e.g*., Dkt. 28-7 (Ex. 76) (DONZ00027256) at p. 20 (Donziger writing in his private journal on February 7, 2007:  "The latest is the judge feels bound by an agreement [Ecuadorian Plaintiff attorney Alberto] Wray made with [Chevron counsel Adolfo] Callejas in the first inspection to use peritos already appointed by the court. I thought we had worked this out with the judge, and that Fernando Reyes would be appointed the perito. We have been working with him in preparation. Now, the judge feels he cannot do that. This is a function of T[exaco]'s pressure campaign – Callejas submitted 30-pages of crap yesterday morning.").

363.     The Ecuadorian Plaintiffs' legal team considered petitioning the Lago Agrio Court for the appointment of *two* global experts ("peritos") so that Texaco would not be in a position to co-opt the expert that would wind up working with the Ecuadorian Plaintiffs.  *See, e.g*., Dkt. 28-9 (Ex. 76) (DONZ00027256) at p. 56 (Donziger writing on September 13, 2006, regarding the appointment of an expert to perform the global assessment: "[T]here is a very small pool of technical people who are not 'contagiado' (in the words of Luis).  So the single perito theory sounds good, but it is all in the execution. And you just know that Texaco will have a slew of

248

available candidates, and will probably pay them on the side to boot, so they can be controlled. So I suggested we stick with two peritos . . . .").

364.    Donziger has testified that Fajardo believed he knew who the Lago Agrio Court would appoint Cabrera not because of any ex parte contact with the judge or improper pressure, but by a simple process of elimination based on who already had served as court-appointed experts and therefore possibly could be appointed and who likely would be deemed ineligible for one reason or another.  Dkt. 613-8 (Ex. H) (12/8/10 Donziger Depo. Tr.) at 985:4-986:18.

365.    Chevron engaged in extensive efforts to spy on the Ecuadorian Plaintiffs' team.  Dkt. 613-5 (Ex. E) (August 16, 2010 *The Atlantic Monthly* article detailing how a Chevron agent from Kroll offered the journalist $20,000 "to go undercover as a journalist-spy" "pretend[ing] to write a story . . . [but] actually shilling for Chevron.").  Chevron continues that pattern to this day. *See, e.g.*, Dkt. 895-6 (Ex. 3532) at 4 (surreptitiously taken photograph of Donziger that purports to be from February 27, 2013).

366.    By July 2007 at the latest, Chevron was aware of the Ecuadorian Plaintiffs' support of Cabrera's work.  Dkt. 154-2 (Ex. 56), 154-3 (Ex. 57), 154-4 (Ex. 58) (Chevron-published advertisements in three Ecuadorian national newspapers publicly accusing Cabrera of bias in favor of the Ecuadorian Plaintiffs and calling upon the Lago Agrio Court to disqualify him.); Dkt. 613-17 (Ex. Q) (July 30, 2007 Chevron Press Release attacking Cabrera's work and stating that "Cabrera displayed his utter complicity with Plaintiffs' interests[.]"); *see also* Dkt. 557-4 (Ex. 19) at p. 2 (March 24, 2008 Sylvia Garrigo interview statement that "[T]he expert analysis also is corrupt . . . .  This expert [Cabrera], unfortunately, is working in partnership with the

249

NGO leading the plaintiff's case.  The expert's work plan, instead of following the judge's orders, basically aimed to do fieldwork to find contamination caused by Texaco. . . .").[22]

367.    The Ecuadorian Plaintiffs' team discussed setting up a meeting including Beristain in February 2007—before Cabrera had been appointed by the Lago Agrio Court.  The purpose of this meeting was to begin developing a social plan that could address the social and cultural harms caused by Chevron's pollution.  *See* Dkt. 6-10 (Ex. 2) at p. 129 (Fajardo telling the group "I was proposing to him that on those dates [February 4th and 5th] we could work on a type of-like a type of workshop to define, a bit that-that-that social plan, see the viability and how far we can progress on the social plan in a short time.  I mean, the-the-[unintelligible] listen to him directly, now."); see also id. at p. 132 ( Fajardo continued that he was suggesting that Beristain "develop a plan for us, roughly, and on the fourth and fifth, we work on the plan.").

368.    The actual "meeting" that appears in *Crude*, which took place in May 2007—before Cabrera was sworn in as an expert and before Beristain was asked by Cabrera to join his team— was a community meeting among the Cofán people and their attorneys "to talk about what they want as compensation for all the damage."  *See* Dkt. 48-29 (Ex. 331); Dkt. 32-9 (Ex. 154) (Cabrera sworn in on June 13, 2007); Dkt. 30-02 (Ex. 91), at 48.  Trudie Styler also observed and spoke to the Cofán people.  Id. at p. 49.

369.    Beristain's role at the meeting was "in the form of leading a discussion" with the Cofán people.  Dkt. 613-11 (Ex. K) (1/14/11 Donziger Depo. Tr.), at 2919:20-23.

---

[22] These citations are not offered for the truth of their assertions but, rather, to demonstrate Chevron's awareness of certain issues.

370.    At the time of this meeting, Beristain was working for an environmental group, and not for the Ecuadorian Plaintiffs, and was assisting the Ecuadorian Plaintiffs' team with "community-based information gathering."  Dkt. 613-11 (Ex. K) (1/14/12 Donziger Depo. Tr.) at 2895:13-22, 2896:4-17.

## II.    Alberto Guerra Bastidas

371.    While serving as a magistrate judge, Guerra dismissed certain criminal cases as a "favor" to prosecutor Nicholas Zambrano.  Dkt. 746-3 (Ex. C) at ¶ 7

372.    Guerra was dismissed as a judge on the Sucumbios court for publicly stating his bias in Chevron's favor.  *See* Dkt. 745, Ex. 3117 at CVX-RICO-0507913 (considering the complaint against Guerra for "publicly stating on various occasions that if he were to again become President of the Superior Court of Justice of Nueva Loja, the first thing he would do is to declare null the lawsuits for environmental remediation that the organizations located in the Oriente Region filed, mainly against CHEVRON"); *id.* at CVX-RICO-0507920 (concluding that Guerra "committed a serious disciplinary infraction when he stated his opinion about a proceeding that still has not been decided and that  . . . he would inevitably hear again" and that Guerra's public statements "affect[ed] the image of the judicial branch and the legal certainty of those who use the services of justice").

373.    Shortly after his dismissal from the Sucumbios court, Guerra told Ecuadorian newspaper *El Universo* that he elected not to dismiss the Ecuadorian Plaintiffs' case, even though Ecuador's

251

then-attorney general pressured him to do so. *See* Smyser Decl. Exh. 26 (10/18/2009 article; "I could have done it, but I decided to continue").

374.    Guerra also told *El Universo* that, except for the then-attorney general's pressure to dismiss the case, "during his tenure there was no instance of internal or external pressure." *See* Smyser Decl. Exh. 26.

375.    Guerra states that he solicited bribes from both parties in the Lago Agrio case. Dkt. 746-3 (Ex. C) ¶¶ 12-13, 22-23.

376.    In or about July 2012, Chevron paid Guerra $38,000 for a hard drive, seven USB drives, four day planners, permission to access two Hotmail accounts, copies of bank and phone records, two cell phones, two SIM cards, a floppy disk, and seven CDs. Dkt. 755-14 ¶¶ 5-6. Chevron also provided Guerra with a laptop at this time. *Id.* ¶ 5.

377.    Chevron has relocated Guerra, his wife, his son, and his son's family to the United States. Dkt. 755-14 at p.3  Chevron is paying Guerra $12,000 a month as well as providing Guerra, his wife, and his son's family with health insurance, an automobile, and immigration representation. *Id.*

378.    Guerra already had one son living in Chicago. At one point, that son had immigration issues. Dkt. 746-3 (Ex. C) ¶ 19.

379.    Chevron will make these payments to Guerra for at least 24 months, and they could continue indefinitely. Dkt. 755-14 ¶ 5.

380.    Guerra claims that he wrote "the great majority of the rulings issued in civil cases assigned to Mr. Zambrano, including the Chevron case, which continued until February of 2012. Dkt. 746-3 (Ex. C) ¶ 7.

381.   All of the draft orders Guerra claims to have prepared for Zambrano that were found on Guerra's electronic media were allegedly created in late 2009 or early 2012.  St. 182.

382.   Donziger is unaware that Guerra has ever ghostwritten decisions in the Lago Agrio litigation, and Donziger is unaware of any "help" by Guerra to "steer" the decision in favor of the plaintiffs in the Lago Agrio litigation.  He never thanked Guerra for these things.  Donziger Decl. ¶ 3.

383.   Donziger recalls receiving an e-mail from Guerra seeking immigration assistance on behalf of a relative or friend.  Donziger never sent word through Mr. Fajardo confirming that Donziger "would look into the issue," nor did Donziger take any steps, directly or indirectly, to assist Guerra in any immigration matter.  Instead, Donziger simply ignored Guerra's e-mail. Dozniger Decl. ¶ 4.

384.   Donziger recalls being at a restaurant in Quito with Guerra, when Guerra asked for a bribe of $500,000.  Donziger refused Guerra, and told him that neither Donziger nor anyone on the Lago Agrio Plaintiffs' team would do such a thing.  Donziger did not respond (as Guerra asserts) that the Lago Agrio Plaintiffs lacked that sum of money "at the moment."  Donziger Decl. ¶ 5.

385.   Donziger has never sought to pay any money in exchange for a favorable verdict in the Lago Agrio litigation, nor has Donziger encouraged or solicited anyone else to discuss or pursue paying money for a favorable verdict.  Donziger Decl. ¶ 5.

386.   Larry Veselka, Vanessa Barham, and Pablo Fajardo met with Guerra on July 13, 2011 in Quito, Ecuador.  Guerra stated that in 2003 shortly after the Lago Agrio case was filed, he received pressure from the Ecuadorian Attorney General at the time to dismiss the case against

253

Chevron but that he rebuffed the request and did not dismiss the case in response to political pressure.  Smyser Decl. (Ex. 15) (Camacho's Supp. Objs. and Resps. to Chevron's Interrogs.) and (Ex. 16) (Piaguaje's Supp. Objs. and Resps. to Chevron's Interrogs.).

387.    Also at the July 13, 2011 meeting, Guerra stated that he was unaware of any fraud or corruption in the proceedings other than the approach by the Attorney General and another approach by an influential national government official on behalf of Chevron.  Smyser Decl. (Ex. 15) (Camacho's Supp. Objs. and Resps. to Chevron's Interrogs.) and (Ex. 16) (Piaguaje's Supp. Objs. and Resps. to Chevron's Interrogs.).

388.    Guerra stated that Judge Zambrano was not pressured or influenced by anyone and that Judge Zambrano's actions were clean and appropriate.  Smyser Decl. (Ex. 15) (Camacho's Supp. Objs. and Resps. to Chevron's Interrogs.) and (Ex. 16) (Piaguaje's Supp. Objs. and Resps. to Chevron's Interrogs.).

389.    Guerra stated that he had no knowledge of documents outside the record being provided to Judge Zambrano.  Smyser Decl. (Ex. 15) (Camacho's Supp. Objs. and Resps. to Chevron's Interrogs.) and (Ex. 16) (Piaguaje's Supp. Objs. and Resps. to Chevron's Interrogs.).

390.    Guerra stated that he had no knowledge of the Lago Agrio Plaintiffs or the Ecuadorian government influencing the judgment.  Smyser Decl. (Ex. 15) (Camacho's Supp. Objs. and Resps. to Chevron's Interrogs.) and (Ex. 16) (Piaguaje's Supp. Objs. and Resps. to Chevron's Interrogs.).

391.    Craig , Jarod Stewart, and Pablo Fajardo met with Nicolas Augusto Zambrano on August 16, 2012 in Quito, Ecuador.   The participants discussed Mr. Zambrano's statement that he chose every word that appeared in the February 14, 2011 judgment, that it was his judgment, that he

does not remember the source for every word that appeared in the judgment, that no other person

wrote the judgment, and that Chevron has persecuted and harassed him since the date of the

judgment.  Smyser Decl. (Ex. 15) (Camacho's Supp. Objs. and Resps. to Chevron's Interrogs.)

and (Ex. 16) (Piaguaje's Supp. Objs. and Resps. to Chevron's Interrogs.).


Dated:  March 18, 2013                                  Respectfully submitted,


By: */s/ Matthew M. Werdegar*
    ELLIOT R. PETERS
    JOHN W. KEKER (*pro hac vice*)
    JAN NIELSEN LITTLE (*pro hac vice*)
    MATTHEW M. WERDEGAR *(pro hac vice)*
    633 Battery Street
    San Francisco, CA  94111-1809
    Telephone:  (415) 391-5400
    Facsimile:  (415) 397-7188
    Email:  epeters@kvn.com
    Email:  jkeker@kvn.com
    Email:  jlittle@kvn.com

    Attorneys for STEVEN DONZIGER, THE
    LAW OFFICES OF STEVEN R.
    DONZIGER AND DONZIGER &
    ASSOCIATES, PLLC

737758.02