UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                      :

CHEVRON CORPORATION,              :

                Plaintiff,      :

      -against-           :  Case No. 11 Civ. 0691 (LAK)

                                     :

STEVEN R. DONZIGER, et al.,      :

              Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## CHEVRON CORPORATION'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT ON ALL CLAIMS, COUNTERCLAIMS AND AFFIRMATIVE DEFENSES, AND SUMMARY JUDGMENT ON DEFENDANTS' AFFIRMATIVE DEFENSE OF COLLATERAL ESTOPPEL

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York  10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

*Attorneys for Plaintiff Chevron Corporation*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................................... ii

ABBREVIATIONS AND DEFINED TERMS ........................................................................... v

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ............................................................................................................................. 6

I.      Defendants Fail to Show Need for a Rule 56(d) Delay ..................................... 6

II.     Defendants Fail to Rebut Guerra's Testimony ................................................... 8

III.    Defendants Offer No Contrary Evidence or Plausible Alternative Inference Explaining the Presence of Their Work in the Judgment ................................. 10

        A.      Defendants Do Not Rebut Chevron's Evidence That the Record Does Not Contain Their Unfiled Work Product ............................................. 11

        B.      Defendants Do Not Claim Much Less Show They Filed the Fusion Memo ............................................................................................... 12

        C.      Defendants Do Not Claim They Filed the Selva Viva Database .......................... 13

        D.      Defendants Offer No Meaningful Response to the New Evidence of Overlap Between the Clapp and Moodie Memos and the Judgment .................... 13

IV.     Defendants' Rewriting of Their Relationship With Cabrera and Reyes Does Not Create a Genuine Issue of Material Fact ...................................................... 14

        A.      Defendants Do Not Contest and Cannot Excuse Their Ghostwriting of the Cabrera Report ....................................................................... 14

        B.      Defendants Fail to Proffer Evidence Challenging Reyes's Declaration and Try to Deceive the Court as to the Existence of Corroborating Evidence .......................................................................................... 16

V.      Resolution of the Asserted Facts Will Streamline Trial on the Facts and on Claims and Defenses Resting on Those Facts .................................................... 17

VI.     Defendants' Collateral Estoppel Defense, and Thus the Recognizability of the Ecuadorian Judgment, Remains at Issue ........................................................... 19

VII.    The LAPs Are Vicariously Liable for the Acts of Their Agents. ..................... 19

        CONCLUSION ....................................................................................................... 20

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 106 S.Ct. 2505 (1986)...................................................................... 7

*Brown v. City of Syracuse*,
673 F.3d 141 (2d Cir. 2012) .................................................................................... 6

*Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*,
769 F.2d 919 (2d Cir. 1985) .................................................................................... 7

*Chevron Corp. v. Donziger*,
768 F. Supp. 2d 581 (S.D.N.Y 2011) ...................................................................... 8

*Cooney v. Osgood Mach. Inc.*,
81 N.Y.2d 66 (1993).............................................................................................. 19

*DeLuca v. Atlantic Ref. Co.*,
176 F.2d 421 (2d Cir. 1949) .................................................................................... 3

*Dyer v. MacDougall*,
201 F.2d 265 (2d Cir. 1952) .................................................................................... 8

*Feeley v. Whitman Corp.*,
65 F. Supp. 2d 164 (S.D.N.Y. 1999) ....................................................................... 6

*Global Crossing Bandwidth, Inc. v. Locus Telecomm., Inc.*,
632 F. Supp. 2d 224 (W.D.N.Y. 2009).................................................................. 17

*Gottlieb v. County of Orange*,
84 F.3d 511 (2d Cir. 1996) .................................................................................... 16

*Gray v. Town of Darien*,
927 F. 2d 69 (2d Cir. 1991) .................................................................................... 7

*In re Barbrieri*,
380 B.R. 284 (E.D.N.Y. 2007) .............................................................................. 20

*In re Chevron Corp.*,
749 F. Supp. 2d 170 (S.D.N.Y. 2010) ................................................................... 10

*In re Chevron Corp.*,
No. 11-cv-0395 (D. Md. Feb. 9, 2013) .................................................................. 19

## TABLE OF AUTHORITIES
### (Continued)

Page(s)

*La Belle Heights, Inc. v. Stone*,
  227 A.D. 65 (1st Dep't. 1929) ............................................................................ 20

*Lazard Freres & Co. v. Crown Sterling Mgmt., Inc.*,
  901 F. Supp. 133 (S.D.N.Y. 1995) ...................................................................... 6

*Marine Midland Bank v. John E. Russo Produce Co., Inc.*,
  405 N.E.2d 205 (N.Y. 1980) ............................................................................ 20

*Maritime Ventures Int'l, Inc. v. Caribbean Trading & Fid., LTD*,
  689 F. Supp. 1340 (S.D.N.Y. 1988) .................................................................. 20

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574, 106 S.Ct. 1348 (1986) .................................................................. 3

*Meiri v. Dacon*,
  759 F.2d 989 (2d Cir. 1985) ............................................................................ 18

*Paddington Partners v. Bouchard*,
  34 F.3d 1132 (2d Cir. 1994) .............................................................................. 8

*Rinieri v. Scanlon*,
  254 F. Supp. 469 (S.D.N.Y. 1966) ..................................................................... 8

*Rockey River Dev. Co. v. German Am. Brewing Co.*,
  193 A.D. 197 (4th Dep't. 1920) .................................................................... 6, 20

*Sira v. Morton*,
  380 F.3d 57 (2d Cir. 2004) ................................................................................ 6

*Skinner v. Switzer*,
  131 S. Ct. 1289 (2011) .................................................................................... 18

*United States v. Private Sanitation Indus. Assoc. of Nassau/Suffolk, Inc.*,
  811 F. Supp. 808 (E.D.N.Y. 1992), *aff'd*, 995 F.2d 375 (2d Cir. 1993) .............. 4, 6

*United States v. Wilson*,
  985 F.2d 348 (7th Cir. 1993) ............................................................................. 8

*Woodman v. WWOR-TV, Inc.*,
  411 F.3d 69 (2d Cir. 2005) ............................................................................ 4, 8

*Wyler v. United States*,
  725 F.2d 156 (2d Cir. 1983) .............................................................................. 9

## TABLE OF AUTHORITIES
### (Continued)

Page(s)

*Ying Jing Gan v. City of New York,*
  996 F.2d 522 (2d Cir. 1993) ................................................................................. 7

### Rules

Fed. R. Civ. P. 56(c)(1)(A) ................................................................................. 4

Fed. R. Civ. P. 56(g) ................................................................................. 17

Fed. R. Evid. 801 ................................................................................. 9

## ABBREVIATIONS AND DEFINED TERMS

In addition to the abbreviations and defined terms in Chevron's opening Memorandum of Law (Dkt. 745), which are incorporated herein, the following abbreviations and defined terms are used in this Memorandum of Law:

Beltman ¶                  References by paragraph number to the Witness Statement of Douglas Beltman, filed concurrently herewith as Exhibit 3652

Centeno                    Ximena Centeno, former Selva Viva employee

Count 9                    *Chevron Corp. v. Salazar, et al.*, Case No. 11-cv-3718 (LAK)

Maest ¶                    References by paragraph number to the Witness Statement of Douglas Beltman, filed concurrently herewith as Exhibit 3653

## PRELIMINARY STATEMENT

This Court has found, as have others, ample evidence of Defendants' pattern of deceit and coercion, culminating in their ghostwriting of the Ecuadorian judgment itself. Obligated on summary judgment to offer contrary evidence, and having well over a year to come up with explanations for their own conduct and their own documents, Defendants offer nothing to rebut any of the major factual predicates to this pattern of corruption:

- Defendants offer no evidence that court-expert Richard Cabrera exercised any independent judgment or even read the report Defendants drafted in his name, and no evidence rebutting the tens of thousands in dollars in payments Defendants used to keep him in line.

- Defendants offer no evidence rebutting Alberto Guerra's testimony that he ghostwrote orders favoring the LAPs in exchange for $1,000 monthly payments from them.

- Defendants offer no evidence explaining their employee's $1,000 deposits in Guerra's account, or the draft Lago Agrio litigation orders on Guerra's computer.

- Defendants offer no competent evidence rebutting Guerra's testimony that Judge Zambrano issued a ghostwritten judgment in exchange for a $500,000 share of the proceeds. (indeed, Donziger corroborates in his own declaration Guerra's sworn account that he directly solicited that $500,000 bribe from Donziger).[1]

- Defendants offer no evidence that they publicly submitted to the court any of the eight categories of confidential work product that appear in the Lago Agrio judgment.

Indeed, Defendants do not deny that the LAPs paid Guerra to ghostwrite orders

---

[1]   Defendants have moved to supplement the record with a Zambrano declaration and other "evidence." Dkt. 973. Chevron opposes the motion. The timing of the submission is obvious gamesmanship—Defendants had two months to obtain it in a timely fashion and then held it for almost a week. And Zambrano's declaration is preposterous on its face. Among other flaws, the declaration fails to address the verbatim overlap between the unfiled LAP work product and the judgment, does not explain the presence on Guerra's computer of draft Zambrano orders from the Chevron case and others, the shipping records between Guerra and Zambrano, or Guerra's other corroborating evidence. The declaration's one attempt to grapple with the record is a preposterous response to the fact that it was impossible for Zambrano to have reviewed the entire record in the time allotted. Now, Zambrano claims that, in violation of Ecuadorian law (Ex. 3679), he started working on the judgment over a year before the case concluded, even though at the time he was not scheduled to be the presiding judge when it did conclude, that he lied to the press about when he started and how much work he had left to do. But the same expert who showed that Zambrano could not have read the record in the time he originally claimed, shows that Zambrano would have essentially had to do nothing but read all day, every day, for his entire second term as presiding judge, in order to review the record as he *now* claims to have done. Ex. 3681. In any event, the Zambrano declaration is inadmissible hearsay that cannot be reduced to admissible form, as Defendants do not claim to be able to produce Zambrano to testify. *See* Dkt. 982-1.

1

(Donziger says only that he is "unaware" that this took place), or that they promised Zambrano $500,000 to issue their ghostwritten judgment (Donziger says only that he has not "encouraged or solicited anyone else to discuss or pursue paying money for a favorable verdict"). Fajardo, who is the LAPs' Ecuadorian counsel, says nothing, nor do any of the LAPs' other Ecuadorian representatives. And while the LAPs' U.S counsel offers a blanket denial supposedly heard from Zambrano, and Defendants belatedly submitted a substantively similar declaration, both are classic hearsay, and even if admissible, they fail to dispute the substantial evidence in the record.

Meanwhile, evidence of Defendants' fraud with respect to the Cabrera report has only grown. Former defendants Douglas Beltman and Ann Maest, who were chiefly responsible for ghostwriting the Cabrera Report, have provided sworn statements confirming that "Cabrera lacked the skill, qualifications, and experience to conduct or review a multi-disciplinary environmental damages assessment himself," (Beltman ¶ 15; *see also* Maest ¶ 27), and that "[a]t no time did I ever see any indication of an independent Cabrera 'team' nor did I ever meet anyone I understood to be a member of Cabrera's 'independent team.'" Beltman ¶ 16; *see also* Maest ¶ 28. In numerous trips to Ecuador and two separate meetings with Cabrera, neither Beltman nor Maest "discussed the substance of any part of the Cabrera Report or any annex with Richard Cabrera" (Maest ¶ 30), "nor received any inquiry from him regarding that report" (Beltman ¶ 29). The LAPs' February 2008 submission of documents to Cabrera "could not have been Stratus's drafts of portions of the Cabrera Report" (Beltman ¶ 19) and in fact, Beltman continued to revise the report "up to the night of March 30, 2008" (*id*. ¶ 24)—the report that Cabrera would file as his own the next day. Beltman and Maest came to realize that "Cabrera was not neutral, and had not conducted himself in the same manner as a Technical Special Master in the U.S. would conduct himself." Beltman ¶ 59; *see also* Maest ¶ 44. Accordingly, "each of the individ-

uals that signed the Stratus Comments," which made these claims, "withdraws and no longer stands behind or endorses" the Comments.  Beltman ¶ 60; *see also* Maest ¶ 44.

In light of this substantial, unrebutted evidence, the Court should hold as a matter of law that these central facts have been established.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.") (quotation omitted).  Defendants offer no competent evidence upon which a rational trier of fact could reach any conclusion but that Defendants controlled the contents of the Cabrera Report and subsequently sought to deceive others as to that control, and that the LAP team corrupted the issuance of the judgment.  Even with Zambrano's (inadmissible) declaration, there is no evidence how any—much less all—of the confidential LAP materials came to appear in the judgment.  Instead, there is only unsupported speculation that maybe "Chevron set up the ghost writing issue . . . by them slipping it to the judge" (Dkt. 754-1 (Ex. 3103)), vague "disputes about whether and how the disputed materials were submitted" (Dkt. 917 at 25), and an assertion that unidentified papers were left at Zambrano's office door (Dkt. 974-1 at ¶ 16).  "[I]f a motion for summary judgment is to have any office whatever, it is to put an end to such frivolous possibilities when they are the only answer."  *DeLuca v. Atl. Ref. Co.*, 176 F.2d 421, 423 (2d Cir. 1949) (Hand, J.).

Furthermore, no amount of additional time or discovery will create a triable issue.  Defendants have had three years to produce evidence of Cabrera's "independence" and two years to produce evidence explaining the presence of their unfiled work product, verbatim, in the judgment, but have come forth with nothing.  Despite two months to respond to Chevron's motion, Defendants likewise fail to rebut the Guerra and Reyes affidavits—they cannot even explain their own employee's $1,000 deposits to Guerra's account.  These facts relate to Defendants'

3

own conduct, and if any rebuttal evidence existed it would be found in their own files.  But there is no evidence, and "[t]here is no reason to grant a continuance to a litigant who has personal and intimate knowledge of the underlying facts for the purported purpose of conducting discovery to ascertain those identical facts."  *United States v. Private Sanitation Indus. Assoc. of Nassau/Suffolk, Inc.*, 811 F. Supp. 808, 817 (E.D.N.Y. 1992), *aff'd*, 995 F.2d 375 (2d Cir. 1993).[2]

Defendants try to suggest they are making progress in identifying such evidence by asserting that they "recently found" exhibits to the Fusion Memo in the record (Dkt. 917 at 2)—but not the Fusion Memo itself—and that they are "beginning to uncover more examples" of materials that might have been in the record (*id.* at 24-25).  This is a smoke screen.  The "recently found" exhibits to the Fusion Memo are identified in the judgment itself, alongside the verbatim text from the Fusion Memo that they cannot explain—and that they have never claimed to have submitted.  Dkt. 168 at 8-9.  Defendants' other purported "discovery" is a single record appearance of the "_sv" suffix that is otherwise found only in the judgment and their internal database.  Dkt. 917 at 25.  But this appearance of "_sv" was identified and disclosed by Chevron in July 2012 (Dkt. 548 at 12)—and it does not appear in a LAPs' submission at all, but in a Chevron motion regarding the ghostwriting of the Cabrera Report.  Dkt. 918-44 (Ex. 34).

Nor have the LAPs identified any evidence, in over three years, to support their argument that Cabrera was "independent" or that their role in the drafting and promotion of "his" report

---

[2]    The LAPs have no response to Guerra and Reyes but to continue their smear campaign.  In his declaration, Donziger has nothing to say about Reyes's testimony, and skirts Guerra's, stating only that he is "unaware" if Guerra ghostwrote orders favoring the LAPs and that he personally never "sought" to bribe Zambrano or "encouraged" anyone else to do so.  Dkt. 922 ¶¶ 3, 5.  Instead of denying the facts, Defendants argue that Reyes and Guerra are "untrustworthy" (Dkt. 920 at 26) and "lacking in credibility" (Dkt. 920 at 20) but impeachment alone is not contrary evidence.  *See Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 86 (2d Cir. 2005).  And their complaints that Reyes and Guerra do not offer corroboration are wrong:  testimony is evidence, (Fed. R. Civ. P. 56(c)(1)(A)), and while corroboration is not required, their testimony is corroborated.  In fact, Guerra's testimony that the LAP team wrote the judgment is corroborated by the otherwise unexplained presence of the LAP team's materials in the judgment itself and the sworn witness accounts of Guerra soliciting bribes for Judge Zambrano on that basis.

was anything other than improper and deceitful.  Their dated expert opinions do not address the actual facts—the Ecuadorian court's orders regarding Cabrera, the real nature of the LAP team's relationship with Cabrera and their role in preparing the reports, objections, supplemental report, and subsequent "comments," their secret payments, and their extensive denials of all this.  And nobody has submitted a sworn statement to this Court that Cabrera exercised any independent judgment in "adopting" the LAP-authored report—or that he even read it.  To the contrary, the LAPs' former consultants at Stratus, now cooperating with Chevron, have testified that they were the source of Cabrera's report, that no one on the LAP team was aware of any part of the Cabrera Report actually written by Cabrera or any supposed Cabrera "team," and that Donziger and the LAPs' agents worked on the Cabrera Report up until the time it was filed.  St. 69-81.

Defendants do not dispute that these facts render their fraudulent judgment unrecognizable in U.S. courts—instead they reprise their bad faith " withdrawal" of the collateral estoppel defense, while continuing to rely on the judgment in other jurisdictions and even in their Rule 56.1 statement before this Court.  Dkt. 920 at 17; Dkt. 917 at 6–7; Dkt. 919 ¶ 167.

Defendants give short shrift to the other aspects of the relief Chevron seeks.  Donziger claims his supposed "intent" is a talisman against summary judgment, but he has no answer to the evidence showing he knew their actions were wrong and that they might all "go to jail" as a result.  *See* Dkt. 920 at 28–30; St. 96.  And the LAPs, for their part, seek to escape liability for the torts of their agents (Dkt. 917 at 9–15), even as they have ratified and seek to benefit from those acts.  But, "a principal, even though ignorant and innocent, cannot receive the benefits of . . . a fraudulent transaction without adopting as an incident thereto the means used by the agent to produce the result." *Rockey River Dev. Co. v. German Am. Brewing Co.*, 193 A.D. 197,

201 (4th Dep't 1920).[3]  Defendants also argue that Chevron has not tied each fact to each specif-

ic element of each claim for which Chevron seeks relief, but there is no need—Chevron laid out

in detail the undisputed facts and explained their relevance to claims in this action.  Dkts. 745,

764.  There is no need for a jury to consider these undisputed facts, and for all of these reasons,

summary judgment is now warranted.

## ARGUMENT

## I.    Defendants Fail to Show Need for a Rule 56(d) Delay

Defendants seek more time and discovery to remedy the deficiencies in their oppositions,

but they do not need it.  The deficiencies do not result from a lack of time.  Defendants have had

seven weeks to determine why they made $1,000 deposits in Guerra's account and to ask Zam-

brano how Guerra obtained drafts of Zambrano's orders.  They have had two years to explain the

presence of their unfiled work product in the judgment, and three years to support their claim

that Cabrera was "independent."  Nor do the deficiencies result from insufficient resources or

discovery.  The facts at issue are facts about *Defendants'* conduct, and the evidence comes from

*Defendants'* documents.  Defendants do not need discovery from Chevron, or anyone else, to

explain their own actions.  *See Private Sanitation Indus. Assoc.*, 811 F. Supp. at 817.[4]

Defendants have failed to satisfy the requirements for a Rule 56(d) continuance:  (1) what

facts are sought and how they are to be obtained; (2) how those facts are reasonably expected to

---

[3]    Defendants' complaint about "successive" summary judgment motions is unavailing.  Dkt. 920 at 15-17; Dkt.
917 at 3-5.  This motion seeks different relief and Chevron presents significant new evidence that it did not possess
in March 2012, including more material in the judgment taken from the LAPs' files (St. 164-170); a page-by-page
review of the record that confirms the LAPs' material is not there (Dkt. 548); and the testimony of Reyes and Guer-
ra.  Chevron has "expanded the factual record," and the Court may thus properly consider this motion.  *Brown v.
City of Syracuse*, 673 F.3d 141, 147 n.2 (2d Cir. 2012); *Sira v. Morton*, 380 F.3d 57, 68 (2d Cir. 2004).
[4]    *See also Lazard Freres & Co. v. Crown Sterling Mgmt., Inc.*, 901 F. Supp. 133, 137 (S.D.N.Y. 1995) ("[a]ny
misrepresentations made to defendant are matters within its own knowledge"); *Feeley v. Whitman Corp.*, 65 F.
Supp. 2d 164, 172 (S.D.N.Y. 1999) ("plaintiff does not need discovery from Midas to prove that [plaintiff's assign-
or] relied upon Midas's misrepresentations").

create a genuine issue of material fact; (3) what efforts the affiant has made to obtain those facts; and (4) why those efforts were unsuccessful. *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 926 (2d Cir. 1985). First, Defendants speculate that they might get unspecified grounds to impeach Guerra, Reyes, and other affiants, or otherwise prove them false. Dkt. 921 ¶ 21; Dkt. 918 ¶¶ 8, 10, 19. But "an opposing party's mere hope that further evidence may develop prior to trial is an insufficient basis upon which to justify the denial of [a summary judgment] motion." *Gray v. Town of Darien*, 927 F.2d 69, 74 (2d Cir. 1991) (quotation omitted); *see also Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir. 1993) (party "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible"). Second, even were Defendants to impeach Guerra and the other affiants, it would not create a genuine issue. Chevron has already submitted substantial evidence, beyond this testimony demonstrating the LAP team's involvement in drafting the judgment, and that it was their *modus operandi* to ghostwrite purportedly "independent" documents. St. 45, 52, 55, 56, 69, 78, 80, 103-111, 125-205. Even discrediting Guerra and the other affiants would not help because "discredited testimony is not [normally] considered a sufficient basis for drawing a contrary conclusion." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S. Ct. 2505, 2514 (1986). As for the third and fourth factors, Defendants have not shown they made reasonable efforts to obtain contrary evidence let alone excuse their lack of success. Neither Reyes nor Guerra, nor their testimony, is "new" to Defendants, who have always known about their own payments to them, and admit that they had contemporaneous knowledge that Guerra was soliciting bribes on Zambrano's behalf (Dkt. 922 ¶ 5). Defendants do not explain their failure to obtain timely and admissible rebuttal testimony from Fajardo (their lawyer), Zambrano (who is cooperating with them), or Centeno (their employee). Defendants also chose not to depose Guerra and

Reyes to oppose this motion.  Dkt. 977 (Exs. 3639-42); *see Paddington Partners v. Bouchard*, 34

F.3d 1132, 1139 (2d Cir. 1994) ("Requests for discovery in the face of motions for summary

judgment put forth by parties who were dilatory in pursuing discovery are disfavored.").[5]

## II.   Defendants Fail to Rebut Guerra's Testimony

Defendants do not affirmatively deny the core issue presented in Guerra's testimony:

Defendants bribed Zambrano to issue their ghostwritten judgment.  They submit no timely or

admissible witness declarations except Donziger's brief, careful statement, and he skirts the criti-

cal questions.  Dkt. 922.  They offer no plausible alternative inferences that could be drawn from

the forensic, documentary and testimonial evidence offered by Chevron, let alone credible evi-

dence to support such an alternative inference.[6]  Instead, Defendants attack Guerra's credibility,

claiming that they have not deposed him and "issues of untruthfulness, bias, and lack of credibil-

ity mandate denial of summary judgment."  Dkt. 917 at 15.  But impeachment alone is not evi-

dence, *Woodman*, 411 F.3d at 86,[7] and Defendants cannot complain about the lack of a deposi-

tion they refused to take.[8]  Dkt. 977 (Exs. 3639-42).  Moreover, Defendants' impeachment strat-

egy is illogical—they argue Guerra is lying about ghostwriting the judgment for Zambrano be-

---

[5]   Defendants claim that "Chevron has only recently produced to Defendants the materials Chevron obtained in [the § 1782] proceedings."  Dkt. 918 ¶ 4.  The claim that Defendants are just now learning about what occurred in the § 1782 proceedings is false; they were directly involved.  *See, e.g.*, Dkt. 51-10 (copying Donziger on email regarding intentional delays producing Stratus's documents); *Chevron Corp. v. Donziger*, 768 F. Supp. 2d 581, 610 (S.D.N.Y 2011) ("[T]here is extensive evidence that counsel for the LAPs and Donziger made Herculean and perhaps questionable efforts in the Section 1782 proceedings to prevent or delay the disclosure of material."); Dkt. 939 at 6–7 (Donziger and the LAPs had "substantially identical" interests § 1782 actions).  This is also not the first time Defendants have misrepresented their access to § 1782 evidence.  In August 2011, they sought a continuance of the Count 9 trial in part based on their assertion that they did not have the *Crude* outtakes.  Ex. 3678 at 4.  In fact, they had obtained the footage over a year earlier (Ex. 3650 at 888:11–889:11) and had reviewed it, preparing summaries and ordering transcripts (Ex. 3651).  Defendants have never withdrawn or explained this misrepresentation.

[6]   Even if Zambrano were credited, he cannot explain the extensive evidence corroborating Guerra's statement.

[7]   *See also Dyer v. MacDougall*, 201 F.2d 265, 269 (2d Cir. 1952) (Hand, J.).  "[T]he opposing party may not merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof."  *Rinieri v. Scanlon*, 254 F. Supp. 469, 474 (S.D.N.Y. 1966).

[8]   Defendants are wrong that "[t]he Court cannot grant summary judgment on this record" because Guerra "must be the subject of cross-examination" on his supposed past misconduct.  Dkt. 917 at 19.  The only case Defendants cite is inapposite.  *United States v. Wilson*, 985 F.2d 348 (7th Cir. 1993), was not a summary judgment case and does not guide the Court's evidentiary decisions here.

cause (they concede) he ghostwrote other orders for Zambrano.[9]  Dkt. 917 at 18-19.[10]

The Donziger declaration is more telling for what it admits and omits than for what it denies.  Donziger now admits that he met with Guerra, admits that Guerra solicited a bribe for a favorable judgment, and does not deny that a deal was ultimately struck.  Dkt. 922 ¶ 5.  He carefully states only:  "I have never sought to pay any money in exchange for a favorable verdict in the Lago Agrio litigation, nor have I encouraged or solicited anyone else to discuss or pursue paying money for a favorable verdict."  *Id*.  This does not rebut Guerra's testimony that after he failed to close a deal with Donziger, Zambrano "was in direct contact with Mr. Fajardo."  Dkt. 746-3 (Ex. C) ¶ 23.  Donziger does not deny knowledge of bribery, or that the LAP team wrote the judgment—he says only that he is "unaware" of Guerra's ghostwriting.  Dkt. 922 ¶ 3.

Defendants claim Zambrano denied issuing a ghostwritten judgment (Dkt. 917 at 24; Dkt. 920 at 22), but offer no admissible evidence.  Initially, they relied on LAP counsel Craig Smyser's unsworn claim that he discussed with Zambrano whether Zambrano stated that he "chose every word" in the judgment (Dkt. 918-15 at 19), and then they belatedly submitted a purported declaration from Zambrano to the same effect (Dkt. 974–1).  Both are classic inadmissible hearsay.[11]  Fed. R. Evid. 801; *see Wyler v. United States*, 725 F.2d 156, 160 (2d Cir. 1983) ("An affidavit of the opposing party's attorney which . . . is not based on first-hand knowledge is not entitled to any weight.").  Defendants have not made Zambrano available for deposition (Dkt. 982-1), despite the fact that he is cooperating with them, Dkt. 746-14 (Ex. I) ¶¶ 8–9.

---

[9]   Zambrano does not deny this point either.

[10]   Chevron addressed Defendants' hearsay argument (Dkt. 917 at 23; Dkt. 920 at 22) in its opposition to Defendants' motion to strike, which it incorporates here by reference.  Dkt. 976 at 9-18.  As explained there, the statements in Guerra's and the other affidavits are admissible as non-hearsay or hearsay subject to an exception.  The same cannot be said for Zambrano.

[11]   In its opposition to Defendants' Motion to Supplement the Summary Judgment Record with New Evidence, Chevron will address the hearsay and credibility issues the Zambrano declaration presents.  If the Court adds that declaration to the record on this motion, Chevron incorporates its opposition brief herein by reference.

Defendants note that Guerra did not provide drafts of the judgment itself, drafts of orders, or shipping records from the time period of Zambrano's second tenure (Dkt. 917 at 22-23; Dkt. 920 at 23), but as Guerra explains, those records do not exist because the drafts of the judgment were created and kept on a laptop provided by and returned to Fajardo.  Dkt. 746-3 (Ex. C) ¶ 24. The reason for the LAP team's heightened security is clear—Chevron had already initiated § 1782 discovery proceedings against Donziger.  *In re Chevron Corp.*, 749 F. Supp. 2d 170, 182-85 (S.D.N.Y. 2010).  In any event, Defendants' reference to this material is an implicit acknowledgment that the receipts, drafts and records which are present for Zambrano I—and which Zambrano does not explain—corroborate Guerra's testimony that he ghostwrote orders favoring the LAPs in exchange for $1,000 a month.  Dkt. 746-3 (Ex. C) ¶¶ 9-10, 14, 18.

Offering no contrary evidence, Defendants concede that Guerra was their paid ghostwriter during Zambrano's first tenure, and offer no evidence for why they would have abandoned that arrangement when the stakes were at their highest.  In fact, recent analysis reveals 103 additional draft orders found on Guerra's computer from other cases during this time.  *See* Ex. 3663. And just in the last few days, Guerra, reviewing his hard-copy files in response to a subpoena from Defendants, located another piece of corroborating evidence—the "memory aid" provided by Fajardo to Guerra in connection with Guerra's work on the judgment.  Exs. 3675–3676; *see* Dkt. 746-3 ¶ 26 ("Mr. Fajardo e-mailed me a document of around 10 to 12 pages titled 'Memory Aid,' with some information about the case.").  Forensic linguist Gerald McMenamin has examined this document and opines that it is "highly probable that Pablo Fajardo Mendoza is the author[.]"  Ex. 3677 at 1.  Not only does the document bear characteristics of Fajardo's writing, it includes verbatim text from other documents known to have been written by Fajardo.  *Id*. at 3–4.

## III.   Defendants Offer No Contrary Evidence or Plausible Alternative Inference Explaining the Presence of Their Work in the Judgment

The LAP team's fingerprints have been discovered on one-third of the pages of the judgment, and on every material conclusion.  Dkt. 745 at 17–23.  In two years, Defendants have not offered any plausible explanation for this, or provided a sworn denial controverting the only logical explanation:  the LAP team drafted the judgment.  This alone warrants summary judgment even were Guerra and all of the corroborating evidence of his testimony not credited.

In their opposition, Defendants do not offer even a *theory* as to how their unfiled work product found its way into every material aspect of the judgment.  They have abandoned their unsupported "Chevron did it" theory.  *See* St. 124.  And while they suggest that there are "fact questions about . . . whether the [Fusion] Memo was openly and legitimately presented" (Dkt. 917 at 2), and assert supposedly "major differences between Ecuadorian and American procedure for submitting documents" (*id.* at 25), they never claim to have openly submitted any of the unfiled work product to the court.  If Defendants had legitimately provided the court with major legal memos, a 65,000-row database, a 57-page index, and an expert report, they would know it, and they would be able to account for it, either with record cites, declarations from those who did the submitting or receiving, or forensic analysis.  Dkt. 745 at 3.  There is no such evidence and no legitimate explanation for the presence of the work product in the record.

A.  **Defendants Do Not Rebut Chevron's Evidence That the Record Does Not Contain Their Unfiled Work Product**

Chevron's experts performed two different and redundant reviews of the Lago Agrio record, which showed Defendants' unfiled work product does not appear.[12]  Defendants do not affirmatively claim this work product appears in the record.  Instead, Defendants claim the extent

_____

[12]   Spanish-speaking attorneys reviewed every relevant page of the record individually.  Dkt. 548.  Separately, a computational forensic linguist digitally analyzed the entire record, from "CL0000-00000" "through" the "February 14, 2011 Judgment," (Dkt. 370-7 (Ex. 1209)) , then "hand-reviewed" images of documents that were not captured. Dkt. 755-13 (Ex. 3267) at 2.  None of the LAPs' work product was found.

of the record is essentially unknowable and incalculable, so Chevron's dual analyses cannot assuredly say what is present and what is not. Those criticisms are unfounded. Dkt. 917 at 26. Defendants claim the physical record is illegible.[13] But Defendants' evidence is a malformed production scan that Chevron inadvertently made in discovery, and later replaced with a legible version. Ex. 3662. Defendants also claim that their work product may exist in some unknown, unnumbered part of the record (Dkt 917 at 26), but that is unsupported speculation.[14]

### B.      Defendants Do Not Claim Much Less Show They Filed the Fusion Memo

The LAP team's Fusion Memo, a legal analysis of Chevron's potential liability for the acts of TexPet, is a major verbatim source for the judgment. St. 125-133. In two years, Defendants have been unable to identify any evidence that they filed the Memo with the court, and their internal documents reveal that they decided *not* to file it in support of their final *alegato*. St. 125-26, 150; Dkt. 549-10 (Ex. 2438). Defendants now claim to have "found" exhibits to the Fusion Memo in the record. But it has always been clear the *exhibits* can be found in the record because the judgment cites them. Dkt. 168 at 8–9. The *memo* is not so found and cited, and Defendants do not affirmatively contend to the contrary. Rather, they imply that the Fusion Memo may have been submitted "in the field," with its exhibits, and then the Fusion Memo (but not its exhibits) may have been lost "before finding a resting place in the court secretary's office." Dkt. 917 at 25. Defendants know that is not true. Before the "field" inspection they cite, Donziger demanded from Sáenz "a list of EVERY document you are submitting—every court case, everything, even if it is 50 things." Dkt. 401-5 (Ex. 2163). Sáenz responded, "Here's the list of the documents that'll be submitted to Court during Thursday's inspection." Dkt. 400-22 (Ex. 2141).

---

[13]    If true, this would rebut nothing, because an illegible page of the record could not have been the source for the judge's verbatim copying of the LAP team materials.

[14]    Defendants' observation that some material was submitted on CD is irrelevant. It was Chevron that submitted the CDs in question, and it did so before it possessed the LAP team's work product. Dkt. 918-46, Dkt. 918-47.

He lists the exhibits to the Fusion Memo, but not the Memo itself.  *Id.*

### C.   Defendants Do Not Claim They Filed the Selva Viva Database

Chevron discovered and disclosed almost two years ago that the contamination section of the judgment was written using Defendants' Selva Viva Data Compilation, based in part on the appearance on both documents of the suffix "_sv" attached to sampling results.  St. 161.  Now, Defendants claim they have "identified portions of the record of submissions that employ the '_sv' suffix, as referenced in the Judgment and as also allegedly used in the Selva Viva data-base," claiming that the "suffixes' presence in the record contradicts Chevron's allegations of collusion and conspiracy."  Dkt. 917 at 25.  But Defendants submit no affirmative evidence that they in fact submitted the Selva Viva Data Compilation to the court, and the only evidence of a submission with an "_sv" suffix to which the LAPs point (Dkt. 917 at 25-26) is a *Chevron* filing that proved the overlap between a Stratus document and the Cabrera Report.  Dkt. 918-43.  Thus, the only evidence the LAPs have "found" is evidence of their own wrongdoing.

### D.   Defendants Offer No Meaningful Response to the New Evidence of Overlap Between the Clapp and Moodie Memos and the Judgment

Defendants do not claim that the Moodie Memo or a portion of the Clapp Report was filed with the court, or deny that they were used in drafting the judgment.  They argue instead that the Moodie Memo was not material to the judgment's analysis of disease causation because multiple theories were supposedly used.  Dkt 917 at 27-28.  This is misleading.  The judgment does review various theories initially (Dkt. 168 at 87-89), but when it turns to medical causation, 100 pages later, it applies just two, both drawn from the Moodie Memo (Dkt. 168 at 169–700; Dkt. 755-26 (Ex. 3280); Dkt 755-27 (Ex. 3283)).  As to the Clapp Report, Defendants' claim that "liability and damages are not premised on lead poisoning" is wrong.  The judgment finds lead contamination (Dkt. 168 at 109-10) even though there is no record evidence in support (St. 140-

42), and then bases every damage finding on contamination generally (Dkt. 168 at 177-84).

## IV.   Defendants' Rewriting of Their Relationship With Cabrera and Reyes Does Not Create a Genuine Issue of Material Fact

### A.   Defendants Do Not Contest and Cannot Excuse Their Ghostwriting of the Cabrera Report

Defendants offer no reason for this Court to reconsider its prior findings that Defendants coerced the Ecuadorian court into cancelling the judicial inspection process and appointing Cabrera as the global expert, and that Cabrera's report was written by the LAP team in a manner intended to deceive, and was thus tainted by fraud. Dkt. 905 at 23-24; Dkt. 550 at 90-91.[15] Defendants do not even mention in their oppositions that Cabrera was paid from a "secret account" to keep him in line. Instead, Defendants settle for claiming that their interaction with Cabrera was somehow excused by Ecuadorian law. Dkt. 917 at 32-33; Dkt 920 at 24-25. It was not.[16]

The LAP team knew what they were doing with Cabrera was wrong. Donziger wrote that it was "a violation of local court rules," and "improper" under a "traditional Ecuadorian law perspective. By working so closely with our local counsel and Stratus, Cabrera "violated his duties to the court." Dkt. 400-4 (Ex. 2047).[17] Fajardo wrote that disclosure was "so serious that we

---

[15]   Defendants falsely claim that "there are genuine issues of fact about Cabrera's decision to approve the report and sign his name to it. . . . As the Court already ruled before, Chevron cannot prevail on summary judgment as to these issues." Dkt. 917 at 32–33 (citing Dkt. 550 at 94–95). But in the portion of the opinion Defendants cite, the Court was considering the unrelated grounds that "the Ecuadorian courts did not adjudicate the merits of its fraud claim." Dkt. 550 at 93. In fact, the Court has found that Cabrera was not "independent" in any meaningful sense, including in the order cited by Defendants. Dkt. 550 at 90–91; Dkt. 843 at 9–10; Dkt. 905 at 4–5, 23–24.

[16]   Defendants suggest that appellate affirmance of the fraudulent judgment protects them from summary judgment here, and quote out of context this Court's prior analysis of whether the appellate opinion resolved any issues present in this action, misleadingly implying that this Court had made a broader finding about the legitimacy of that opinion. *Compare* Dkt. 917 at 30–31 *with* Dkt. 550 at 95. But the Ecuadorian appellate court's cursory whitewash could not and does not cure Defendants' fraud, regardless of the corruption of that court (*see* Dkt. 745 at 23-24). Even if appellate review could "cure" a fraudulently procured judgment (and Defendants cite no authority suggesting it could) the Ecuadorian appellate court expressly stated that it "stay[ed] out of" the fraud allegation, and its review of the evidence sidestepped the issue. *See* Dkt. 397 at 19-21.

[17]   Defendants have tried to explain this document by arguing that Donziger was not describing the state of Ecuadorian law, but what Chevron would argue. The document they cite does not support that interpretation: "*The traditional Ecuadorian law perspective* (which will be asserted by Chevron) would hold that the level of collaboration between one party and the expert is *problematic and improper.*" Dkt. 400-4 (Ex. 2047) (emphasis added).

could lose everything," and that "the entire case will simply fall apart on us."  Dkt. 47-6; Dkt. 29-4 at 369:9-370:23.  Prieto wrote that he and Sáenz believed that disclosure of their relationship with Cabrera would "destroy" the case and send the Ecuadorian lawyers "to jail."  Dkt. 9-6 (Ex. 11); Dkt. 905 at 33 ("the various statements and other tactics designed to portray the report as independent were, and were intended to be, highly misleading").  Similarly, U.S. counsel acknowledged that Cabrera was not independent:  "I wouldn't emphasize too much that Cabrera was independent and court-appointed.  Once [Fajardo] says that in an American court, we'll never be able to back off from it."  Dkt. 549-3 (Ex. 2407).  Indeed, the very process of "cleansing" the Cabrera report acknowledges that it was tainted in the first place.[18]

Neither Ecuadorian court orders nor supposed expert opinions on Ecuadorian law justify Defendants' conduct.  The orders were issued in 2008, well after the recruitment, appointment, and corruption of Cabrera—one is two weeks *after* the report was filed, and the other permits only specific categories of documents.  Dkt. 917 at 32; Dkt. 549-8; Dkt. 549-10.  Defendants' two-year-old expert opinions purportedly bless "contacts" with Cabrera (Dkt. 917 at 32 (citing Dkt. 154-5 (Albán); Dkt. 154-6 (Simon)), but even if "contacts" were permissible, the evidence shows that Cabrera did not make the "ultimate decision" to "include or exclude data or analyses from the parties" as Defendants contend (Dkt 917 at 32–33).  There is no evidence Cabrera read the report, raised a question about it, or did anything except sign his name to what he was given.  St. 229, 253.  And the LAP team never doubted their work would be adopted verbatim.  St. 45, 69.  In addition, none of Defendants' experts opine that wholesale ghostwriting, coercion of the

---

[18]    Even if it were credible, Defendants' response only addresses the ghostwriting of the Cabrera Report itself. Defendants have no explanation for their broader fraud—the selling of the Cabrera Report to audiences including the U.S. Congress as "independent," and "neutral."  St. 37, 82–84, 91, 92.  Nor does it address their subsequent obstruction of discovery into their relationship with Cabrera, including misconduct before this Court and others, or the "cleansing" process.  St. 87-88, 95, 97, 98; Dkt. 905 at 4–5.  Were Defendants' relationship with Cabrera proper under Ecuadorian law, there would have been no reason to conceal it from the Ecuadorian court, or anyone else.

court, or bribery of Cabrera is permitted under Ecuadorian law—to the contrary, to the extent

they address these actions at all, they condemn them.  *See* Dkt. 154-5 ¶ 13.

## B.   Defendants Fail to Proffer Evidence Challenging Reyes's Declaration and Try to Deceive the Court as to the Existence of Corroborating Evidence

Though Defendants attack Reyes's testimony as "full of holes" and "suspicious and un-

trustworthy" (Dkt. 920 at 25-26), they fail to offer any contrary evidence, or identify any "holes"

in his statements.  Donziger does not mention Reyes in his declaration, and no other witness is

offered to counter Reyes's testimony.  *See* Dkt. 922.  And Defendants concede much of Reyes's

account.  *See, e.g.*, Dkt. 923 ¶ 27 ("Donziger testified that he had asked Pinto and Reyes to work

confidentially for the Ecuadorian Plaintiffs in 2005.").  Instead, Defendants' only real argument

is that Reyes is not credible because he supposedly did not provide corroborating evidence on all

points in his testimony.  That does not create a genuine dispute of fact.  *Gottlieb v. County of Or-*

*ange*, 84 F.3d 511, 518 (2d Cir. 1996) (holding "[the nonmovant] cannot defeat the motion by

relying . . . on mere assertions that affidavits supporting the motion are not credible").  Moreo-

ver, at least with respect to Reyes's authorship of Annex S to the Cabrera Report, Defendants'

challenge is disingenuous—the corroborating evidence is in Donziger's own files.[19]

Defendants devote most of their response to Reyes to arguing that his testimony is not

material because it "does not support Chevron's argument that it was prevented from fully and

fairly litigating its case."  Dkt. 920 at 26.  This is not true, for the events Reyes describes show

that Defendants engaged in pervasive fraud, but more importantly, that question is implicated

only by Defendants' collateral estoppel defense—it is the materiality standard for the judgment

---

[19]   *Compare* Dkt. 920 at 26 ("Reyes fails to provide any contemporaneous evidence corroborating his alleged interaction with Donziger.  He fails to provide any drafts of the reports . . . , nor does he have any written correspondence discussing the reports.") *with* Ex. 3671 (Reyes sends Donziger papers on natural gas and formation water); Ex. 3655 (Fajardo writes regarding budget for reinjection of groundwater proposed by Reyes:  "I believe that with some modifications we could use the document for the expert assessment or PM" and suggests they meet); Ex. 3656 (Donziger agrees with Fajardo).

recognition analysis.  *See* Dkt. 745 at 28.  The fake monitoring program Reyes describes, and

corrupt recruitment of Cabrera, is a "scheme or artifice to defraud," regardless of its impact on

the judgment.  And Reyes's testimony is further evidence that the LAP team engaged in fraud

when it promoted the Cabrera Report as "independent" evidence of Chevron's liability.

## V.    Resolution of the Asserted Facts Will Streamline Trial on the Facts and on Claims and Defenses Resting on Those Facts

Notwithstanding their criticism of Chevron for seeking adjudication of their collateral de-

fense (*e.g.,* Dkt. 920 at 1-2, 5-8), Defendants insist on viewing Chevron's motion through that

prism.  But the core of Chevron's motion is a defined set of facts relevant to all aspects of this

action:  Defendants' corruption of the Lago Agrio trial, in particular the ghostwriting of the

Cabrera Report and the judgment itself.  The LAPs admit that this Court may permissibly decide

"to dispose of a material fact that is not genuinely in dispute" apart from deciding claims and de-

fenses in whole (Dkt. 917 at 34).  Indeed, partial resolution of claims or defenses by establishing

facts on summary judgment is appropriate to "take certain issues out of the case, so that the even-

tual trial could be conducted more efficiently, with the focus on those areas that remain genuine-

ly in dispute."  *Global Crossing Bandwidth, Inc. v. Locus Telecomm., Inc.*, 632 F. Supp. 2d 224,

238 (W.D.N.Y. 2009); Fed. R. Civ. P. 56(g).  That is just what Chevron seeks here and Defend-

ants do not dispute that resolving these facts now would streamline the case for trial.

Defendants have some quibbles with Chevron's proposed factual findings, but they are

baseless.  Defendants object that Chevron does not identify "the facts which apply to each

[claim]."  Dkt. 917 at 5.  But such an exercise is unnecessary, because all of the cited facts con-

cerning the Lago Agrio fraud go to the heart of Chevron's RICO and fraud claims.  Besides wire

fraud and money laundering, predicate acts for Chevron's RICO claims, discussed *infra*, the facts

of the Lago Agrio fraud are relevant to extortion and money laundering, to fraud, and to various

defenses and counterclaims.  *See* Dkt. 745 at 33.

Defendants also argue that Chevron's proposed findings do not adequately support relief on Chevron's RICO claims.  However Defendants do not dispute that they caused, in furtherance of their scheme, the 129 uses of the wires that Chevron identified in its motion as predicate acts of wire fraud.  Instead, Defendants conflate the question of whether the Cabrera fraud was material to the judgment with whether it was part of a "scheme or artifice to defraud."  Dkt. 920 at 31. The two are unrelated, and there is no question that Defendants' attempt to obtain property from Chevron through the deceitful manufacture of the false Cabrera Report constituted a "scheme or artifice to defraud."  Chevron does not offer a "cursory argument" on this point, as Defendants' assert (Dkt. 920 at 31)—Chevron has already prevailed on this point (Dkt. 905 at 23-24).

Defendants are likewise wrong that the evidence does not "demonstrate that the defendant had a conscious knowing intent to defraud."  Dkt. 920 at 29.  Defendants' contemporaneous communications and their use of code names and secret bank accounts (St. 49, 54, 60-64), confirm they knew their means were wrongful.  Indeed, Donziger frequently shared his state of mind with the *Crude* cameras.  *See*, *e.g.*, (St. 26) ("Ecuador, you know, this is how the game is played, it's dirty.").  This evidence is sufficient to remove intent from the jury's purview.  *See Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985) ("The summary judgment rule would be rendered sterile, however, if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion.").

Defendants also cannot avoid summary judgment on money laundering as a RICO predicate act by objecting that Chevron did not plead its precise legal theory.  Dkt. 920 at 33.  Chevron's claim is for RICO violations, and its detailed pleading of that claim more than satisfies Rule 8.  *See* Dkt. 288 ¶ 358; *Skinner v. Switzer*, 131 S. Ct. 1289, 1296 (2011).

## VI.   Defendants' Collateral Estoppel Defense, and Thus the Recognizability of the Ecuadorian Judgment, Remains at Issue

Defendants insist that they are not asserting a collateral estoppel defense based on the Ecuadorian judgment.  Dkt. 920 at 17; Dkt. 917 at 1, 6–7.  But the defense remains and Defendants have never identified any other judgment with a potentially preclusive effect.  *See* Dkt. 550 at 54-57; Dkt. 743 at 6-7 n.2.  Accordingly, abandoning the Lago Agrio judgment would not "moot" Chevron's motion for summary judgment on the collateral estoppel defense (Dkt. 920 at 17; Dkt. 917 at 7)—it would concede it.  This Court has already held that Defendants' partial and bad faith disavowal of the judgment, combined with their continued reliance upon it in other U.S. courts, was insufficient to evade review of the defense here.  Dkt. 550 at 51.  Nothing has changed.[20]  Indeed, Defendants repeatedly rely on the judgment in their oppositions.[21]

## VII.   The LAPs Are Vicariously Liable for the Acts of Their Agents.

The LAPs attempt to escape liability for their agents by claiming that they know nothing of their agents' acts and did not ratify them and that Ecuadorian law applies.  This is incorrect.

New York law applies here because "the law of the jurisdiction where the tort occurred will generally apply," *Cooney v. Osgood Mach. Inc.*, 81 N.Y.2d 66, 72 (1993), and Chevron's fraud claim arises from activity planned, funded, and largely executed from the United States and aimed at a U.S. corporation.  Dkt. 468 at 10-12; Dkt. 559; Dkt. 355-37 (Ex. 1122).  Under New York law, "[w]hen . . . agents are acting within the scope of their authority, the principal is liable

---

[20]   This Court has acknowledged that Defendants have relied upon the Ecuadorian judgment repeatedly. Dkt. 550 at 54 n.209.  Since Chevron last sought review, Defendants have made these assertions in federal court in Maryland (*In re Chevron Corp.*, No. 11-cv-0395, Dkt. 56 at 21 (D. Md. Feb. 9, 2013); *id.*, Dkt. 64 at 10 (D. Md. Mar. 12, 2013), and they have not withdrawn their previous reliance anywhere.  Defendants also have no response to the case law, cited by Chevron, holding that federal courts will not recognize judgments where the process by which they were obtained was "significantly tainted by fraud."  *See* Dkt 745 at 28-32.  This Court has also already "preliminarily rejected" Defendants' attempt to exhume the defunct "extrinsic" versus "intrinsic" distinction.  Dkt. 550 at 77–83.
[21]   For example, "Donziger object[ed] to the use of Calmbacher's deposition testimony [as] given by a witness with a well-established bias" and cited the Lago Agrio court as authority.  *See* Dkt. 923 ¶¶ 25-26 ("Indeed, the Lago Agrio Court noted. . . ."), ¶ 87 ("The Lago Agrio Court described these reports as . . . .").

for any acts of fraud the agents commit." *Maritime Ventures Int'l, Inc. v. Caribbean Trad. & Fid., LTD*, 689 F. Supp. 1340, 1355 (S.D.N.Y. 1988). This Court has already found that Fajardo *et al*. are the LAPs' agents. And the LAPs have expressly ratified Fajardo's conduct in their retainer agreement (Dkt. 356-17 (Ex. EJ) ¶ 9), and they have implicitly ratified their agents' acts by seeking to benefit from them. "A principal that accepts the benefits of its agent's misdeeds is estopped to deny knowledge of the facts of which the agent was aware." *Marine Midland Bank v. John E. Russo Produce Co., Inc.*, 405 N.E.2d 205, 212 (N.Y. 1980).[22] The LAPs benefit from enforcement actions in Ecuador, Canada, Brazil, and Argentina, as well as their admitted "intent to hold Chevron responsible" for supposed pollution in Lago Agrio, Dkt. 917 at 9. If the LAPs did not want responsibility for their agents' misdeeds, they had "a duty to repudiate the act within a reasonable time period after receipt of information of the unauthorized acts." *In re Barbieri*, 380 B.R. 284, 295 (E.D.N.Y. 2007).

Furthermore, Defendants are wrong about Ecuadorian law. As a matter of law, a principal is liable for the acts of his agent, even illegal acts outside the scope of the agency agreement, if the principal becomes or should have become aware of those acts and ratifies them tacitly or expressly, such as by accepting their benefits. Ex. 3678. Given the LAPs' ratification of their agents' behavior, the same conclusion would follow even if Ecuadorian law applied here.

## CONCLUSION

For the foregoing reasons, Chevron requests that this Court enter summary judgment on Defendants' affirmative defense of collateral estoppel, and enter partial summary judgment on all claims as to the undisputed facts identified in Chevron's Local Rule 56.1 Statement.

---

[22] *See also La Belle Heights, Inc. v. Stone*, 227 A.D. 65, 66 (1st Dep't. 1929); *Rockey River Dev. Co. v. German Am. Brewing Co.*, 193 A.D. 197, 201 (4th Dep't. 1920) ("[A] principal, even though ignorant and innocent, cannot receive the benefits of . . . a fraudulent transaction without adopting as an incident thereto the means used by the agent to produce the result.").

Dated:   April 12, 2012

New York, New York

Respectfully submitted,

_____/s/ Randy Mastro_____
Randy M. Mastro
Andrea E. Neuman
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York  10166
Telephone:  212.351.4000
Facsimile:  212.351.4035

William E. Thomson
333 South Grand Avenue
Los Angeles, California  90071
Telephone:  213.229.7000
Facsimile:  213.229.7520

*Attorneys for Chevron Corporation*