# EXHIBIT 3650

# EXHIBIT 9

Page 754

1  UNITED STATES DISTRICT COURT
2  SOUTHERN DISTRICT OF NEW YORK
3  Case No. 10 MC 00001(LAK)
   - - - - - - - - - - - - - - - - - - - - - - - -x
4

   In re:

5
       APPLICATION OF CHEVRON

6
- - - - - - - - - - - - - - - - - - - - - - - - - x
7
                    March 10, 2011
8
                    9:54 a.m.
9
10
11
12
13     CONTINUED VIDEOTAPED DEPOSITION of
14  JOSEPH BERLINGER, pursuant to Notice,
15  held at the offices of Gibson, Dunn &
16  Crutcher LLP, 200 Park Avenue, New York,
17  New York, before Dawn Matera, a
18  Registered Professional Reporter and
19  Notary Public of the State of New York.
20
21              *       *       *
22
23
24
25

Page 755

```
 1   2    APPEARANCES:
 2   3
 3   4        LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.
              Attorneys for Joseph Berlinger
 4   5             321 West 44th Street
                   Suite 510
 5   6             New York, New York 10036
              BY:  DAVID A. SCHULZ, ESQ.
 6   7             dschulz@lskslaw.com
 7   8
 8   9
 9  10        COVINGTON & BURLING LLP
              Attorneys for Ricardo Reis Veiga
10  11             620 Eighth Avenue
                   New York, New York 10018
11  12        BY:  ALAN VINEGRAD, ESQ.
                   avinegrad@cov.com
12  13        BY:  EMILY HOLNESS, ESQ.
                   eholness@cov.com
13  14
14  15
15  16
              RIVERO MESTRE LLP
16  17        Attorneys for Rodrigo Perez Pallares
                   2525 Ponce De Leon Boulevard
17  18             Suite 1000
                   Miami, Florida 33134
18  19        BY:  JORGE MESTRE, ESQ.
                   jmestre@riveromestre.com
19  20
20  21
21  22
22  23
23  24
24
25  25
```

Page 756

```
 1    2     APPEARANCES (Continued):
 2    3
 3    4         GIBSON DUNN & CRUTCHER LLP
               Attorneys for Chevron Corporation
 4    5              200 Park Avenue
                    New York, New York 10166
 5    6         BY:  YONATAN BERKOVITS, ESQ.
                    yberkovits@gibsondunn.com
 6    7
                    - and -
 7    8
               GIBSON DUNN & CRUTCHER LLP
 8    9              3161 Michelson Drive
                    Irvine, California 92612
 9   10         BY:  ANDREA E. NEUMAN, ESQ.
                    aneuman@gibsondunn.com
10   11
                    - and -
11   12
               GIBSON DUNN & CRUTCHER LLP
12   13              1801 California Street
                    Denver, Colorado 80202
13   14         BY:  MICHAEL CRIMMINS, ESQ.
                    mcrimmins@gibsondunn.com
14   15
15   16
16   17
17   18
               Also Present:
18   19
               Max Gitter, Esq., Special Master
19   20
               Justin Ormand, Esq.,
20   21         Assistant to Special Master
21   22
               James Roberts, Videographer
22   23
               Vince Maggiano, Videographer
23   24
24               *       *       *
25   25
```

Page 757

1                    PROCEEDINGS
2              THE VIDEOGRAPHER:  Good morning.
3        We are going on the record.
4              My name is James Roberts, of
5        Veritext Reporting with offices in New
6        York City, New York.
7              Today's date is March 10th,
8        2011.  The time is approximately
9        9:54 a.m.
10             This deposition is being held at
11       Gibson Dunn & Crutcher, located at 200
12       Park Avenue, New York City, New York.
13             The caption of the case, In re:
14       Application of Chevron, in the U.S.
15       District Court, Southern District of
16       New York, Case Number 10 MC 00001
17       (LAK.)
18             The name of the witness is
19       Joseph Berlinger.  This is Volume IV.
20             THE SPECIAL MASTER:  I would
21       like to make a statement on the record
22       first.
23             It is now 5 minutes to 10.  And
24       no lawyer representing the Lago Agrio
25       plaintiffs has shown up at the

1          JOSEPH BERLINGER

2          B, that there was no need to

3   subpoena the footage because now that

4   they had been produced to Chevron, I have

5   already waived my journalist privilege.

6   A position my lawyer -- oh, sorry.  It's

7   too much info.  All right.

8          Q.    Did Mr. Donziger say how they

9   would be disadvantaged in other arenas?

10         A.    It's a question he could not

11   provide me an answer to.

12         Q.    Did he identify the arenas?

13         A.    No.  And in fact -- well.

14         Q.    What did you say in response to

15   Mr. Donziger telling you that they felt

16   it would disadvantage them to have to

17   subpoena the outtakes from you, at this

18   point in time in August of 2010?

19         A.    I believe we didn't come to a

20   resolution.  I told him it was putting me

21   in an uncomfortable position to just hand

22   them over.

23         Q.    And you indicated that at some

24   point in time, you modified this

25   position; is that right?

Page 886

1              JOSEPH BERLINGER

2      A.     Yes.

3      Q.     And you modified it by

4  providing the outtakes to Plaintiffs

5  without a subpoena, correct?

6      A.     Yes.

7      Q.     When did you modify your

8  position?

9      A.     A few days within this period.

10     Q.     A few days after you spoke to

11  Mr. Donziger?

12     A.     Yes.

13     Q.     What caused you to modify your

14  position?

15     A.     The inclusion in your -- well,

16  Mr. Mestre's filing suggesting to the

17  judge that he take possession of all of

18  the footage, not just the produced

19  outtakes.

20             You guys had filed a motion to

21  enforce the subpoena, alleging that we

22  had not fully produced.  One of

23  Mr. Mestre's suggestions was that the

24  Court take possession of all of the

25  footage.

Page 887

1              JOSEPH BERLINGER

2          And for my own strategic

3     purposes, I felt like if I lost control

4     of my own footage, it would put me in a

5     very disadvantaged place.

6          So, I decided I would

7     compromise my journalistic privilege for

8     my own, not knowing what the future of

9     this proceeding was going to be.  I did

10    not want to be in a situation where I did

11    not have control of my own footage.

12       Q.    And why did you think that

13    providing the outtakes to the Plaintiffs

14    without a subpoena would prevent Judge

15    Kaplan from ordering that you turn all of

16    the footage over to the Court?

17       A.    Because I provided for them

18    with the understanding that if I were to

19    need this footage, I would have access to

20    it.

21             MR. SCHULZ:  Can you just state

22        the question again.

23             THE SPECIAL MASTER:  I think the

24        question is objectionable.  Actually,

25        I am going to rule the question

Page 888

                                    JOSEPH BERLINGER

1              objectionable, because that's not what

2              he testified.

3    BY MR. NEUMAN:

4        Q.    Did you provide the Plaintiffs

5    with all of your footage or a copy of the

6    footage?

7                  MR. SCHULZ:  Object to the form.

8                  THE SPECIAL MASTER:  That's

9        overruled.  Answer that question.

10       A.    I arranged for the duplication

11   of my original masters that they paid for

12   and took delivery of duplicated copies.

13   The theory being, because I did not

14   understand where this was going, that if

15   Judge Kaplan ordered that all of my

16   original footage would have to be put

17   into Court protection, I felt I would be,

18   I personally, and Crude Productions, LLC,

19   would be put at a disadvantage by not

20   having access to footage.

21                  So as a protective measure was

22   largely the reason that I provided the

23   Plaintiffs, why I amended my position.

24       Q.    And did you have an

Page 889

                    JOSEPH BERLINGER
1
2    understanding with the Plaintiffs that if
3    Judge Kaplan took possession of your copy
4    of the footage, you would have access to
5    their copy of the footage?
6         A.    Yes.
7         Q.    Did you give Plaintiffs all of
8    the outtakes or only what you had
9    produced to Chevron?
10        A.    Only what I had produced to
11   Chevron.
12        Q.    Did the Plaintiffs pay for the
13   duplication of the masters?
14        A.    Yes.
15        Q.    You also made a clarification
16   this morning of your testimony at Page
17   505 with regard to how Fajardo, Yanza and
18   Donziger came to be on the errors and
19   omission insurance policy for Crude.
20             Do you recall that?
21        A.    Yes.
22        Q.    And your clarification was that
23   Mr. Donziger had actually requested that
24   they be added to the E&O policy; is that
25   right?

# EXHIBIT 3651

# EXHIBIT 10

```
BEG_CTRL_NUM        :  DONZS00014467
END_CTRL_NUM        :  DONZS00014467
DATESENT            = 10/08/2010
TIMESENT            = 11:31:00
LASTMODDATE         = 10/08/2010
TIMELASTMOD         :  11:31:00
FILENAME            :  transition memo.doc
TITLE               :  To:
TEXT                :  To: Steven Donziger; Andrew Woods
```

Fr: Laura Garr
Date: October 8, 2010
Re: Transition Memo

Case Documents:
I have copied all of my case-related documents onto an external harddrive (on table in office); this includes every case-related file that has existed on my computer's harddrive up until October 4, 2010. Copies of the limited files from 10/4-10/8 (deposition summary, edits, outtake translations/summaries, etc) have all been sent via email. [NOTE: All documents referenced below are on this harddrive in addition to the with the contact person listed.]

Video Outtakes:
All videotape outtakes are organized and locked in a filing cabinet in the office.

In the cabinet there is also:
   a) the Berlinger log which includes a description of the content of the footage
   b) the logs I signed from Berlinger's office which lists all the footage we received from them. I was told it is identical to the footage received by Chevron.
   c) The video machine (monthly rental) to watch the tapes in mini DV format. It is $750 a month for the machine. Andrew Woods and Daniel Tobias have information about the rental company.

Note: the Berlinger log description of tapes includes all footage shot, including tapes not responsive to the subpoena and therefore not turned over to either party. Therefore the Berlinger log is more comprehensive than the footage in our possession (or Chevron's).

Transcripts:
Daniel Tobias (dtobias@h5.com) has copies of:
- log of tapes that have been digitized
- log of tapes that have been sent for translation/transcription

Antonio Urbina (auju64@hotmail.com ) has been working on ongoing summaries of various relevant outtakes and he and Daniel have copies of master list of all summaries.

Translation/Transcription Services:
Companies we use:

1) Transperfect (disaster unless it is a document translation- then preferable):

Max Weisman, Esq.

Director of Business Development
TransPerfect Legal Solutions
Three Park Avenue
39th Floor
New York, NY 10016
t +1 212.689.5555 x.1532| f +1 212.689.1059 | m +██████████
legal.transperfect.com <<http://legal.transperfect.com/>>

2) Linguistic Systems (preferable for video outtakes):

Mark Ettinger- mettinger@linguist.com

Keyu Huang
Project Manager
Linguistic Systems Inc.
201 Broadway, Cambridge, MA 02139

617.528.7433 Direct
617.528.7492 Fax

Shelley Podolny and Daniel Tobias have contact information, as well.
Andrew Woods (and previously Shelley) have latest billing/contract information.

NGO Communications:
Weekly Monday 12pm EST conference calls should continue for legal updates and campaign updates.
However, on a rolling basis, we need to continue to do a better job providing pertinent case updates – Iago
rulings, 1782 filings, announcements (team, outtakes, etc). RAN and AW will provide campaign updates on
rolling basis as well via email in between calls.

Last meeting held Oct. 4.

Emails to use to reach full team for both organizations:

RAN CVX team: chevron@ran.org
Amazon Watch: cvxteam@amazonwatch.org

Reminders:
- Tell Goldhaber and AW/RAN about new legal team before official announcement.
- Send BIT updates to Koh
- send relevant docs to local team and check with team before press
- Garro has completed his expert affidavit, but I did not tell him I was leaving
- I did not tell Weinberg group I was leaving – but all files they requested can be found on an FTP sharesite
– Adlai has information and master list I compiled
- Daniel Tobias and Antonio Urbina (resume sent 10/8, via email) work for us, hourly.

My Contact Information:
Cell: ███████████
Home: 646 360 3660
Email: lauragarr@gmail.com
Address: ██████████████, NY, NY 10014
PRIVILEGED & CONFIDENTIAL****

| | | |
|---|---|---|
| AUTHOR | : | Laura Garr |
| CUSTODIAN | : | Donziger, Steven |
| SOURCE | : | Users\Steven R Donziger\AppData\Local\Temp\ |
| PAGES | = | 0 |
| DOCTYPE | : | MS Word for Windows Document (OLE) |
| BOX_NO | = | 0 |
| ITEM_NO | = | 1533 |
| UPDATEDATE | = | 01/27/2011 |
| PRIV_DOC_NO | = | 0 |
| NATIVELINK | : | M:\Production\Gibson\Chevron\CONCORDANCE_DONZIGER_COMPEL\DONZS005\NATIVES\001\DONZS00014467.doc |

# EXHIBIT 3652

## WITNESS STATEMENT OF DOUGLAS BELTMAN

I, Douglas Beltman, of United States citizenship, and residing in Boulder, Colorado, declare under penalty of perjury as follows:

1.    I am an Executive Vice President at Stratus Consulting Inc. ("Stratus") where I have worked since I and others formed Stratus in October 1998. Stratus is an environmental consulting firm located in Boulder, Colorado. I was the Stratus officer in charge of what was referred to within Stratus as the "Ecuador Project," a project related to the case of *Maria Aguinda y otros v. Chevron Corporation* in Lago Agrio, Ecuador. Stratus was hired for the Ecuador Project by Steven Donziger and Kohn, Swift & Graf through a contract with Kohn, Swift & Graf in August of 2007. From approximately August 2007 to approximately April 2010, while Stratus was working on the Ecuador Project, I oversaw and managed the project and needed approval from no one else within Stratus for that work.

## DIRECTION AND CONTROL BY DONZIGER

2.    Stratus began working on the Ecuador Project in August of 2007 after first meeting with Donziger on April 27, 2007 in Stratus's Boulder, Colorado office. From that point forward, Stratus took its direction for its work on the Ecuador Project from Donziger, who described himself as the lead U.S. lawyer for the Lago Agrio Plaintiffs ("LAPs"). Donziger indicated what tasks he wanted Stratus to perform, edited and approved drafts of statements or reports Stratus would prepare, and assigned, approved, oversaw, and managed all of Stratus's work on the Ecuador Project from Stratus's retention in 2007 until its work on the matter ceased. Donziger was Stratus's principal point of contact for its work on the Ecuador Project and directed work on behalf of Kohn, Swift & Graf.



3.     At no time was Stratus's work on the Ecuador Project directed by any of the named plaintiffs in the Lago Agrio Litigation, nor did Stratus ever have any contact with those named plaintiffs or receive an instruction that it understood to come directly from any of the named plaintiffs. Stratus has had no indication that any of those named plaintiffs ever reviewed anything Stratus prepared in connection with the Ecuador Project.  Rather, to the extent Stratus received directions from Ecuadorians, those directions came from individuals such as Luis Yanza and Pablo Fajardo, who I understood to be also representing the Lago Agrio Plaintiffs.

4.     Based on Stratus's experience during its time as an environmental consultant, Donziger exercised near complete control over major decisions of strategy for Stratus's Ecuador Project.  Aside from the issue of funding, I do not recall an instance in which Donziger stated a need to get prior approval from a client or any other individual for a course of action.  While others, including Pablo Fajardo and Luis Yanza, participated in decision making regarding the litigation, it was apparent to Stratus that those in the LAPs' Quito office, including Pablo Fajardo, worked for Donziger and Joe Kohn and not vice versa.

5.     Regarding budgeting and funding of Stratus's Ecuador Project, it was apparent that Donziger had a significant degree of input, but that for large expenditures, approval from Joe Kohn was also needed.  I communicated with Kohn on several occasions to describe Stratus's upcoming work and to seek approval for major expenditures.  Nonetheless, we at Stratus understood Donziger to have control of strategy decisions.

## MARCH 3, 2007 MEETING

6.     It is my understanding that Dr. Ann Maest attended a March 3, 2007 meeting in Ecuador that included Donziger, Pablo Fajardo, Luis Yanza, Fernando Reyes, as well as other



consultants and lawyers for the LAPs.  Based upon conversations and review of a video clip, I understand that Richard Cabrera also attended the meeting.

## STRATUS WAS HIRED AND CONTROLLED BY DONZIGER

7.      I understand that Ann Maest suggested to Donziger that he consider retaining Stratus to conduct a damages assessment, and that that suggestion led to Donziger contacting Stratus.

8.      After some initial contact, Donziger met with Stratus on April 26, 2007, at Stratus's offices in Boulder, Colorado.  A portion of this meeting was filmed by the *Crude* film crew.  Joshua Lipton, Ann Maest, David Chapman, Preston Sowell, and I attended the meeting with Donziger.  At that meeting, Donziger described Stratus's work as the preparation of a damages assessment on behalf of the LAPs for the Lago Agrio Litigation.  Donziger described the specific elements of damages that he wanted to include in the damages assessment using an April 22, 2007, memorandum that he had previously provided to Joshua Lipton.  In a prior email to Joshua Lipton, which I have reviewed, Donziger stated that the damages assessment would help be the basis to justify "a major damages claim, probably in the many billions of dollars."

9.      Stratus entered into a retention agreement with Donziger and Kohn, Swift & Graf on August 20, 2007, to perform, among other things, a damages assessment.  The contract specified that Stratus "shall coordinate with and receive technical direction regarding the scope of work from Clients' Project Manager."  I understood that Donziger was the Clients' Project Manager.

3



## DONZIGER INSTRUCTIONS REGARDING SECRECY

10.     Donziger insisted at all times that all aspects of Stratus's work related to the damages assessment, including Stratus's and the Lago Agrio Plaintiffs' lawyers' and representatives' meeting with Cabrera, their involvement in drafting the damages assessment and the November 2008 responses to the Lago Agrio Plaintiffs' September 2008 questions or comments regarding the Cabrera Report (the "Responses") remain absolutely secret.  Donziger stressed to me and Ann Maest the importance of Stratus ensuring that no one learn of Stratus's involvement in any aspect of the Cabrera Report, including the comments and Responses, unless Donziger directed us to reveal it – which he never did.  Donziger instructed me that Stratus not tell anyone of Stratus's involvement with the Cabrera Report or Responses.  Donziger also instructed me not to tell the LAPs' spokesperson, Karen Hinton, or Donziger's legal associate, Andrew Woods, that Stratus participated in drafting the Cabrera Report and certain of its annexes.

11.     Stratus was aware that Donziger and the LAPs' representatives were not disclosing to the public that the LAPs' lawyers and their consultants had been involved in preparing the Cabrera Report.  At Donziger's direction, Stratus also represented the Cabrera Report as having been prepared by Cabrera, including confirming the understanding of prospective endorser Lou Blanck that the "report is by an expert appointed by the judge…"

12.     Donziger's secrecy instruction led me to affirmatively police communications and documents for anything that could reveal Stratus's or the LAPs' representatives' involvement in drafting the Cabrera Report and Responses.  When Karen Hinton requested a report prepared by Dr. Richard Clapp for Donziger, which Stratus had converted into an annex for the Cabrera Report, after conferring with Donziger, I told her I was "not sure of its

4



pedigree" to keep her from giving it out as authored by Dr. Clapp.  Likewise, when Donziger

wanted to provide Congressman McGovern's office material prepared by Clapp that had either

been included in the Cabrera Report or I believed might be included in the Responses to the LAPs'

comments on the Cabrera Report, I kept that from occurring to avoid distributing "proof" that

Stratus and the LAPs' team wrote the Cabrera Report.

13.     On November 9 and 10, 2008, United States Representative Jim McGovern

visited Ecuador on a "fact-finding trip" in part related to the Lago Agrio litigation.  In early

November 2008, Steven Donziger instructed me to talk to Richard Clapp regarding Clapp's

interactions with the Congressman regarding the Cabrera Report so Clapp didn't "go off the

reservation and talk to the congressman in a way that damns the Cabrera report with faint praise."

Steven Donziger also did not authorize Stratus to disclose its role on the Cabrera Report to the

congressional delegation.  Based on his instructions, I helped Steven Donziger limit the distribution

of one of Richard Clapp's reports, which was intended for the Cabrera Response, so that the

delegation and others would not have that document.  In the following months, Steven Donziger

also instructed me to honor a request from the Congressman's office for talking points and notes.

At no time did Donziger authorize disclosure of Stratus's role in the Cabrera Report and the Cabrera

Response to Congressman McGovern or anyone on his staff.

**CABRERA MEETINGS**

14.     Donziger asked Ann Maest and me to travel to Ecuador in early January

2008 as part of our work on the damages assessment.  On this occasion, we were in Ecuador from

January 13 to 19.  During this trip, at Donziger's request Ann Maest and I met with Richard

Cabrera, Steven Donziger, Pablo Fajardo, Luis Yanza, Luis Villacreces, and others at the private

5



residence of Juan Aulestia in Quito.  Donziger told me that the purpose of Dr. Maest and me

attending this meeting was for Cabrera to meet us.  Based on interactions between Cabrera,

Donziger, and the LAPs' team at this meeting, it was clear that Donziger, the LAPs' legal team, and

Cabrera were working closely together.  No one was present from Chevron and it was evident from

the location and discussion that the meeting was meant to be private. I did not have an

understanding from that meeting that Cabrera said that he needed the LAPs' team's materials in

advance of his report filing deadline with the court.

15.     Based on that meeting with Cabrera and a review of his background, Cabrera

lacked the skill, qualifications, and experience to conduct or review a multi-disciplinary

environmental damages assessment himself.

16.     At no time did I ever see any indication of an independent Cabrera "team"

nor did I ever meet anyone I understood to be a member of Cabrera's "independent team." To the

contrary, individuals that I am aware of who assisted in preparing the Cabrera Report were affiliated

with or working at the direction of Donziger and the LAPs' representatives.

17.     At no point during Stratus's time working on the Ecuador Project, including

at the January 2008 meeting, did I have an understanding that Cabrera was preparing his own report.

It was clear from statements Donziger and others made that the LAPs' team expected the Lago

Agrio court to rely upon the Cabrera Report in rendering its judgment.

18.     To the extent Cabrera was paid for any work associated with drafting the

Cabrera Report, hiring his own expert "team," or drafting any of the responses to the LAPs'

comments regarding the Cabrera Report, I saw no evidence that he actually performed any such

work.



## THE LAPS' FEBRUARY 2008 SUBMISSION TO CABRERA

19.     I understand now that in a document dated February 18, 2008, the LAPs filed a notice with the Lago Agrio court stating that they were providing Cabrera with documents. Stratus had no involvement with this submission and whatever the LAPs submitted as attachments to this February 18, 2008 filing was not material drafted by or provided to the LAPs' legal team by Stratus. Whatever the LAPs' representatives submitted could not have been Stratus's drafts of portions of the Cabrera Report. I did not complete the first draft of the portions of the summary report that Donziger assigned to me until early March 2008.

## DRAFTING OF THE CABRERA REPORT AND ANNEXES

20.     I and others at Stratus understood, based on information provided to us and personal observation, that the former concession area is currently an active oil producing area containing operations by Petroecuador. I did not see any indication that the Republic of Ecuador planned to discontinue its extensive oil production operations in the former concession or surrounding area. To the contrary, I am aware that since the TexPet/Petroecuador concession ended in 1992, Petroecuador has operated in and expanded oil operations in the Oriente.

21.     I first visited the Oriente in January of 2008, 18 years after TexPet ceased all oil production operations in Ecuador. Petroecuador was conducting extensive oil operations in the area and had caused contamination as a result of its operations there. Donziger never asked Stratus to conduct an assessment of the contamination caused by Petroecuador or to attempt to allocate any identified contamination between TexPet and Petroecuador. Furthermore, the environmental sampling designed and conducted by the LAPs' representatives indicates that Donziger and the



LAPs' representatives were not concerned with allocating the contamination caused by Petroecuador to anyone but TexPet, and in fact their data do not allow for such an allocation.

22.    At Stratus, I was the primary contact with Donziger, and managed the team of Stratus employees doing work for the Cabrera Report. Donziger had generally told me that Stratus's work on the Cabrera Report was permitted and authorized by court order. I prepared the first draft of substantial parts of the document that would be filed as the "Summary Report of Expert Examination," which was the main body of the Cabrera Report. At Donziger's direction, I drafted my portions of the report in the first person as though it was written by Richard Cabrera. I supervised the preparation by Dr. Maest and other Stratus personnel or subcontractors of 11 of the 24 sub-reports and appendices, known as "Annexes," to the Cabrera Report. I reviewed and revised 10 of those annexes before they were filed as part of the Cabrera Report.

23.    I prepared the first draft of substantial parts of the document that would be filed in the Lago Agrio Litigation as the "Summary Report of Expert Examination" "By: Richard Stalin Cabrera Vega" on April 1, 2008, and dated March 24, 2008, as the Microsoft Word file "PG.report.v1.doc." I emailed my draft of a portion of the Summary Report to Donziger on February 27, 2008. That document and subsequent versions I prepared, with the assistance of other Stratus employees, were drafted in English, in Cabrera's voice, and state in the first sentence that "[t]his report was written by Richard Cabrera" to provide "expert technical assistance to the Court" in the Lago Agrio Litigation. Later versions were dated March 24, 2008, which is the date I understood the Cabrera Report was to be filed. On March 12, 2008, I sent Stratus's English version of substantial parts of the Summary Report, a Word file named "PGreport.v1.english.doc" for translation to Spanish. The Summary Report was not at that time complete; it still had notes and

8



placeholders, including for information that would come from specific annexes that were still being completed.

24.     I continued to provide comments on and material for the Summary Report and annexes to Donziger and LAPs' team members in Quito up to the night of March 30, 2008, when I provided comments to Donziger on a draft damages table for the Summary Report that I had received from him.  On the morning of April 1, 2008, Donziger emailed a Microsoft Word version of the Summary Report named "Informe Sumario Version Final (Steve).doc" to me and Dr. Maest "for translation" to English.  It was my understanding that this was an electronic version of the Summary Report that Richard Cabrera was filing that same morning in the Lago Agrio court.

25.     In addition to the Summary Report, Stratus or its subcontractors prepared drafts of 11 of the 24 annexes that were filed with the Cabrera Report.  Ann Maest personally drafted or managed the drafting of Annexes B, D, and G, and participated in the drafting or reviewing of others.  Other Stratus employees drafted Annexes C, J, K, N, O, Q, and T.  Stratus employee Mike Carney drafted Annex J, Stratus employees David Mills and Megan Lawson drafted Annex O, David Mills drafted Annex Q, and Eric English and David Mills drafted Annex T.  Stratus also hired the subcontractor, William Powers, who wrote the report that was incorporated into Annex S and also used in Annex T.  Richard Clapp prepared for Donziger the report that was incorporated into Annex K.  With regard to the other annexes filed with the Cabrera Report, my understanding is that Taniya Naranjo and Ximena Echevarria on the LAPs' Quito team drafted Annex E, and others assisted with Annex H, and a company by the name of Uhl, Baron, Rana and Associates ("UBR") drafted the report that was used for Annex R.



26.    Stratus retained 3TM International ("3TM"), a small environmental consulting firm located in Houston, Texas, to conduct environmental cleanup costing analyses as part of a mediation process between the LAPs and Chevron. Stratus has worked with 3TM on another project to estimate soil remediation costs. For the Ecuadorian Project, 3TM provided Stratus with drafts of potential soil remediation and unjust enrichment reports around November 2007. Donziger said that for the Cabrera Report he wanted environmental cleanup cost estimates that were different than those conducted by 3TM. As a result, Stratus did not use 3TM's work in conducting the damages assessment work for the Cabrera Report.

27.    Donziger and Fajardo told me to whom authorship of the various Cabrera Report Annexes should be attributed, and I recorded those names in a table. Donziger told me that the reason for the attribution was to make it more difficult to uncover that Stratus had written the Annexes. Donziger told Stratus to indicate on the draft Summary Report that it was written "By Richard Cabrera" and instructed Stratus to draft its portions of the Summary Report in the first person (e.g. "I, Richard Cabrera, find..."). Stratus was provided with a format for annexes from the LAPs that indicated the annexes were written by the "Cabrera Technical Team" rather than Stratus.

28.    Misattribution of authorship is not standard practice for Stratus. In other cases, when Stratus has drafted materials for submission to a court or administrative hearing, or any similar proceeding, Stratus had submitted those materials to our clients under Stratus's name or otherwise made it clear that Stratus participated in drafting the materials, or with no attribution at all.

29.    I never discussed the substance of any part of the Cabrera Report or any annex with Richard Cabrera nor received any inquiry from him regarding that report. During the



time of working on materials for the Cabrera Report, I never saw or heard any indications from Donziger, Fajardo, or any other member of the LAPs' team, or anyone else, that Chevron was able to submit information, documents, or their own report to Cabrera. In the many discussions of the drafting of the report, no one affiliated with the LAPs' team suggested that Chevron would be able to provide their own comments, documents, information, data, narratives, summaries, analyses, or reports to Cabrera for his report or that Chevron ever had the opportunity to do so.

30.    All of the damage amounts that were included in the draft Summary Report and Annexes provided by Stratus to the LAPs' team appear unchanged in the report filed by Cabrera. The only persons I am aware of working on the Cabrera Report were the LAPs' consultants, lawyers, and affiliates. Although most of my work took place in the U.S., I spent time physically working in the LAPs' team's Quito office at various times in January, February and March of 2008. I never saw any indication of input by Richard Cabrera on the Summary Report or annexes. In fact, the day before I left Quito after working there for a week on the Cabrera Report materials, I saw what I was told was Annex A of the Cabrera Report boxed up in the LAP team's office for transport to and filing in the Lago Agrio court.

31.    In all the work Stratus performed, including the drafting of portions of the Cabrera Report, Donziger never instructed Stratus to conduct any analysis of the contamination in the former concession area caused by Petroecuador, including recent spills by Petroecuador. In Stratus's review of the evidence, it observed that some of the samples with the highest levels of petroleum in soil were at sites where Petroecuador had operated or was currently operating. From the documents I reviewed, TexPet had remediated all of the pits it was responsible for in accordance with its settlement agreements with the Government of Ecuador. Nonetheless,



Donziger never told Stratus or me to attribute any of the contaminated soil samples and open pits to Petroecuador.

## OVERARCHING ASSUMPTIONS OF THE CABRERA REPORT

32.     Stratus used a series of overarching assumptions at the direction of Donziger in developing the opinions and conclusions set forth in the Cabrera Report. These assumptions, combined with specific instructions from Donziger as to each damage category, are determinative of the dollar values calculated in the Cabrera Report's damages assessment.

33.     The first assumption Stratus was directed to make was that it was not necessary to allocate any of the responsibility to Petroecuador for the condition of any of the sites in the former concession area. Yet, Stratus was aware of the Settlement Agreement and Release that existed between TexPet, Petroecuador and the Republic of Ecuador. Stratus was also aware that pursuant to the Remedial Action Plan ("RAP") that was part of that settlement, TexPet had agreed to remediate specified sites in the former concession area. The damages assessment in the Cabrera Report is not limited to only those sites that TexPet agreed to remediate in the RAP. To the contrary, the majority of the sites included in the Cabrera Report's damages assessment are sites that were not TexPet's responsibility to clean-up pursuant to the RAP.

34.     Second, Donziger directed Stratus to ignore the ongoing clean-up in the former concession area, which was known at the time as the "PEPDA" program. Stratus was not asked to determine the likely cost of carrying out a remediation in the former concession area of the same type as that being conducted by PEPDA. An estimate of the cost to remediate pits or stations in the former concession area should be based on the actual costs of similarly remediating pits or stations in the former concession area, if available. Petroecuador has substantial experience with



similarly remediating pits and stations in the former concession area. Petroecuador's historical costs are the best evidence of unit costs for remediating the pits and stations in the Oriente.

35.    The Cabrera Report does not address whether the remedial actions it recommends Chevron pay for were already being undertaken or contemplated by others or had been completed. Stratus was aware that the PEPDA program was remediating pits in the former concession area. Donziger instructed Stratus to ignore the PEPDA remediation in calculating damages for the Cabrera Report. As a result, many of the pits that the Cabrera Report finds require cleanup had already been remediated or were in the process of being remediated by Petroecuador as part of the PEPDA program at the time the Cabrera Report was filed.

36.    The third assumption of the Cabrera Report was that the soil cleanup levels identified by the LAPs' lawyers were the appropriate ones to use in the damages assessment. I indicated in a March 4, 2008 email to Juan Pablo Saenz "[s]omewhere along the line someone decided that the 1,000 mg/kg [equivalent to 1,000 ppm] TPH standard for 'ecosistemas sensibles' is the one to use for our case, and I'm trying to write up a justification for it." I came to understand that Donziger and the LAPs' lawyers had decided that the 1,000 ppm standard should be used for the damages assessment, and they later decided that the cleanup level should be lowered from 1,000 ppm to 100 ppm. Per the Agency for Toxic Substances and Diseases Registry ("ATSDR"), "TPH itself is not a direct indicator of risk to humans or to the environment." Donziger instructed us to use the 100 ppm cleanup level for damage calculations knowing it would elevate the remediation cost estimates, and we followed his instructions.

37.    The fourth overarching assumption provided to Stratus was the number of pits in the former concession. LAPs' representatives provided Stratus with a "pit inventory" to use



in conducting the damages assessment work that listed 916 or 917 pits as having been constructed by TexPet. Stratus understood that this pit inventory was created by the LAPs' representatives or their associates. Stratus was never requested to, and did not do, a verification that the 916 or 917 pits shown on the inventory in fact existed. Donziger nonetheless instructed Stratus to use the pit inventory as the basis for a remediation cost assessment assuming that its "pit count" was accurate, which we did.

## THE CABRERA NOVEMBER 2008 RESPONSE

38.     Despite the fact that the LAPs' lawyers and consultants drafted the Cabrera Report, after the Cabrera Report was submitted to the Ecuador court on April 1, 2008, Donziger instructed me to conduct additional damages assessment work for comments on the Cabrera Report that would seek to increase the damages assessed by billions of dollars. I began the process of preparing comments in June 2008. I never before or since have been involved in a situation where I have participated in drafting a report and after that report was adopted by the Court's expert, commented on it.

39.     We began planning comments on the Cabrera Report shortly after it was filed. We (Steven Donziger, Pablo Fajardo, Luis Yanza, Jen Peers, Ann Maest and I) met in Boulder June 4-5, 2008 to discuss, among other things, the planned comments. Karen Hinton was also present on June 4th. I understood these comments to be a "formal response to the Court about the Expert's Report." Stratus created an extensive to-do list for the comments project. Ann Maest, David Mills, Jen Peers, and I all worked on portions of the text for the comments. We completed our work on the comments in the U.S. and sent it to the LAPs' team.



40.     The comments generally approve of the Cabrera Report but claim that "[t]he omissions we have been able to detect in Expert Richard Cabrera's Expert Report greatly favor the interests of the defendant, given that said omissions either minimize or fail to consider certain environmental damage and legislation that should definitely be taken into account in the evaluation." The comments, including the portions prepared by Stratus, do not disclose the drafting of the Cabrera Report by Stratus or the LAPs' representatives, i.e., that the LAPs' representatives were commenting on their own report. For example, at Donziger's direction Stratus prepared the soil remediation cost estimate to the Cabrera Report of $1.7B based on a remediation standard of 1,000 ppm of TPH. It then prepared comments claiming that "the cleanup proposed by the Perito is inadequate, and it will not restore the environment to its original state before the environmental damage occurred" and "we consider 100 ppm TPH to be a much better cleanup level that will achieve an environmental restoration that is much closer to the conditions prior to the damage caused by Texaco, as instructed by the Court." The text then states "the total cost to remediate soils to 100 ppm TPH should be $2,743,000,000." For context, Donziger had insisted on using a standard of 1,000 ppm even though the standard used by PEPDA is 2,500 ppm. He then insisted on further lowering that to 100 ppm.

41.     I understand that on September 16, 2008, the LAPs submitted their comments to "the Expert Report filed by Expert, Richard Cabrera Vega", containing Stratus's work.

42.     I also understand that on September 15, 2008, Chevron filed extensive objections to the Cabrera Report, including 22 scientific expert reports. Donziger did not ask Stratus to analyze Chevron's objections or draft any response to Chevron's objections to the Cabrera Report.



43.     In October 2008, shortly after the LAPs filed their comments, I received a list of questions the LAPs had directed to Cabrera that the Quito team assigned to Stratus for response. The responses were divided among Ann Maest, Bill Powers, Jen Peers myself and others at Stratus. Continuing to follow Donziger's instructions as to the confidentiality of Stratus's role, Stratus instructed Brian Lazar to edit the language of portions we had already drafted to sound "more like the Perito." Stratus drafted "Cabrera's" responses to the LAPs' comments throughout October and November 2008.

44.     I understood that portions of the Cabrera Response that Stratus was drafting would be filed with the Lago Agrio court as if written by Cabrera. My discussions about this work with Donziger and the LAPs' representatives confirmed that Donziger and the LAPs' team wanted the Cabrera's Responses to increase the damages assessed by billions of dollars.

45.     I understood that Cabrera filed the "Cabrera Response" based at least in part on text written by the LAPs' representatives and consultants, including Stratus, on November 17, 2008. The Cabrera Response incorporated work, calculations, and text written by Stratus, among others, and increased the damages assessed in the Cabrera Report from $16 billion to $27 billion.

46.     Stratus sent Joe Kohn its invoices for the work it did in drafting the Cabrera Report and certain of its annexes, for drafting the comments to the Cabrera Report, and for drafting the Cabrera Response to the comments. In addition to its invoices, Stratus sent Joe Kohn budgets for this work and also sent him memos or emails regarding the work to address questions he raised about the work being done. In addition, Stratus met with Joe Kohn to discuss its work on the



Ecuador Project. Based on our invoices and memos or emails to him and conversations with him,

Joe Kohn paid Stratus's drafting of portions of the Cabrera Report and Cabrera Response.

## DAMAGES CATEGORIES IN THE CABRERA REPORT
## AND CABRERA RESPONSE

47.    Stratus prepared or revised draft annexes in the Cabrera Report finding

more than $14.6 billion in damages.  Stratus also prepared or revised support for damage

calculations in the Cabrera Response finding an additional $7.8 billion in damages.  These

findings of $22.4 billion accounted for approximately 80% of the $27.3 billion in damages in

the Cabrera Response.  Below are the categories of damages that the Cabrera Report and

Cabrera Response assessed against Chevron.  The Cabrera damages assessment is tainted and

not supported by reliable scientific bases and I disavow it.

48.    **Soil ($2.7B) (Cabrera Response and Annex N).**  The soil remediation

damages assessment of $2.7 billion in the Cabrera Response is dependent on the LAPs' pit count, as

well as on Donziger's instruction not to use the LAPs' Ecuador remediation costs compiled by

3TM.  Notably, 3TM's calculations which Donziger explicitly directed me not to use, produced

cleanup costs much lower than those in the Cabrera Report and Cabrera Response.  Likewise,

relying on the publicly available costs for Ecuadorian remediation contractors or the costs reported

by Petroecuador would have produced cleanup of a fraction of those in the Cabrera Report and

Cabrera Response.  These local unit costs represent the best measure of unit costs that would be

actually incurred in conducting a remediation in the former concession.  Stratus at no time made any

independent determination of the number of pits in the former concession that either (a) existed or

(b) required remediation. Stratus at no time verified as reasonable for Ecuador the cost it was

instructed to use in connection with the soil remediation estimate.  The $2.7B damages assessment



in the Cabrera Responses and Annex N cannot be relied upon to support any claim of damages against Chevron, and it is not an accurate, reliable, or valid estimate.

49.     **Groundwater ($3.2B) (Cabrera Response).**  Stratus determined that there was insufficient scientific data available to estimate the cost of any groundwater cleanup in the former concession.  Due to the lack of data proving the extent of any groundwater contamination, Stratus did not include a groundwater damages assessment in the Cabrera Report, and instead estimated unit costs to remediate groundwater in the text it drafted for the Cabrera Response.  However, a $3.2 billion groundwater damages assessment that appears to be based on Stratus's unit costs is included in the Cabrera Response.  There are no scientific data to support a $3.2 billion groundwater remediation, nor am I aware of any scientific basis for the $600 million for groundwater remediation award in the judgment.  The $3.2 billion damages assessment and the $600 million damages award for groundwater remediation cannot be relied upon to support any claim of damages against Chevron, and they are not accurate, reliable, or valid estimates.

50.     **Potable Water ($428M) (Annex R).**  This damages assessment as originally prepared by UBR recommended that a groundwater study be conducted to determine the existence and extent of any groundwater contamination in the former concession.  That study was not done.  In the absence of such a study, the damages assessment calculates an estimated cost of a potable water system.  Stratus is not aware of any scientific evidence that people in the former concession area are drinking water contaminated with petroleum.  To the contrary, none of the drinking water samples I have seen exceeded the drinking water guidelines or standards established by WHO and the U.S. EPA for any chemical compound related to oil operations, let alone exclusively TexPet operations.  In light of the absence of any evidence that people are drinking water contaminated with petroleum compounds, there is no basis for the need to build a potable



water supply system because of any petroleum contamination, let alone contamination linked

explicitly to TexPet. The $428 million damages assessment for potable water cannot be relied upon

to support any claim of damages against Chevron for ongoing petroleum contamination of drinking

water caused by TexPet.

      51.    **Healthcare System ($480) (Annex P).** Stratus was not involved with the

preparation of this annex. Stratus did not attempt to verify the conclusions of this annex. I am not

aware of any scientific data that shows that any adverse health effects are caused by contamination

from petroleum operations in the Oriente.

      52.    **Natural Resources Damages ($1.7B) (Annex O).** This $1.7 billion

damages assessment includes land lost due to the construction of roads, wells and stations. Natural

resource damages assessment laws and regulations in the U.S. for hazardous waste sites typically do

not allow for the assessment of damages for construction of roads and facilities. Donziger

nonetheless instructed Stratus to include in this damages assessment land lost due to the

construction of roads and facilities, which we did. The remainder of these damages is based on

there being a compensable loss associated with oil contamination in the Oriente, without providing

any direct evidence of the magnitude of that loss. Moreover, the damages assessment for tropical

rainforest losses is based on the application of an economic approach that is not relevant to any

losses incurred by the LAPs. Therefore, the claim for Natural Resource Damages in Annex O

cannot be relied upon to support any claim of damages against Chevron for damages to the

environment caused by TexPet.

      53.    **Cancer ($9.5B) (Cabrera Response and Annex Q).** The amount of $6.8

million per cancer death used in this annex was not based on any type of damages assessment.



Stratus had never previously performed any type of human cancer assessment in this case. During the Ecuador Project, Donziger repeatedly emphasized to Stratus the idea of recovering for region-wide "excess cancer" deaths. Also in accordance with the instructions of Donziger, Stratus used the results of the Beristain/Maldonado survey and a San Sebastian study despite the uncertainties inherent in those studies. Both the Maldonado and San Sebastian surveys are flawed and have large uncertainties for calculating excess cancer deaths in the Oriente from petroleum contamination. Neither establishes that there were, in fact, any actual "excess cancer" deaths from exposure to petroleum contamination. Moreover, Stratus received comments from San Sebastian that his data had been used incorrectly. Accordingly, the conclusion that there were 1,400 "excess cancer" deaths near the oil operations area is invalid and unsupported. Stratus is not aware of the "value of lives lost" as being used to calculate resource damages in U.S. courts, but Stratus was encouraged by Donziger to use this figure and did so. Stratus never determined that any individual actually got cancer as a result of oil production. The Cabrera Report cannot be relied upon to conclude that any individual actually has gotten cancer as a result of living near oil operations in the Oriente, that there was any elevated risk of cancer from living near oil operations in the Oriente, or that there is any reliable or valid basis for the damages assessed to Chevron.

54. **Unjust Enrichment ($8.4B) (Cabrera Response and Annex T).** Donziger instructed Stratus to prepare this estimate without any discussion of who would actually have been responsible for paying the "avoided" cost under TexPet's operating agreement. Stratus used data from Bill Powers, who included costs for fields operated exclusively by Petroecuador, and who made assumptions that I did not attempt to verify. I understand this category is a form of punitive damages in Ecuador. I have never used this category before in any damages assessment, and I have no basis to believe that this is a valid claim.



55.     **Indigenous Culture Recovery ($430M) (Annex M).** Stratus was not involved with the preparation of this annex, and made no attempt to verify any of the alleged damages or proposed remedies. I have no basis to believe that these damages are valid or accurate.

56.     **Infrastructure Improvements for Petroecuador ($375M) (Annex S).** This damages assessment is premised on the assumption provided to Stratus by Donziger that Chevron should be liable for upgrading the infrastructure used by Petroecuador. Stratus did not attempt to verify this assumption, but rather included this category of damages at Donziger's direction. Stratus does not know that this assumption is valid or reasonable.

57.     Per Donziger's instructions, Stratus had to conduct damages assessment work for the Ecuador Project using only the data and information that were provided to us at Donziger's direction. Stratus was not allowed to collect the additional data that it thought was relevant to the damages assessment. The damages assessment in the Cabrera Report and Cabrera Response are based on many assumptions provided by Donziger and the LAPs' representatives that Stratus does not know to be true, reasonable or accurate. In addition, I now believe the Cabrera process was tainted by Donziger and the LAPs' representatives. As a consequence, the damages assessment in the Cabrera Report and Cabrera Response are tainted and not supported by reliable scientific bases and therefore I disavow the Cabrera Report and Cabrera Response.

## FAILED ENDORSEMENTS AND THE STRATUS COMMENTS

58.     At Donziger's request and direction, I sought to secure endorsements of the Cabrera Report from scientists and academics. While seeking endorsements, I did not reveal Cabrera's connection to the LAPs' or Stratus's role in drafting the Cabrera Report. I understood that Donziger's effort to secure endorsements for the Cabrera Report was designed to bolster the



report's legitimacy and value. Though done at Donziger's instruction, I regret not being transparent with everyone I solicited comments from on the Cabrera Report regarding Stratus's role in drafting the report.

59.     Because the effort to secure third party endorsements failed, Donziger directed me to provide him with the December 1, 2008, "Stratus Comments" endorsing the Cabrera Report. I drafted the Stratus Comments, and they were signed by myself and four other Stratus scientists. Other than Donziger, no one outside of Stratus endorsed the Stratus Comments. In his edits, Donziger included language in the Stratus Comments describing Cabrera as a "neutral expert" equivalent to that of a United States "Special Master." By then it was apparent that Cabrera was not neutral, and had not conducted himself in the same manner as a Technical Special Master in the US would conduct himself. Nonetheless, I did not remove that language in the Stratus Comments.

60.     The December 1, 2008 Stratus Comments do not disclose that Stratus drafted substantial portions of the Cabrera Report, but instead state that the report was prepared by Cabrera. The decision to issue the Stratus Comments and their content was influenced greatly by Donziger. I and Stratus deeply regret stating in the Stratus Comments that Cabrera was equivalent to a United States "Special Master." Moreover, the Stratus Comments were intended to be an endorsement of the Cabrera Report and Cabrera responses. Because I know that the damages assessment in the Cabrera Report and Cabrera Response is not supported by a scientific basis, and because I now believe the Cabrera process was tainted by Donziger and the LAPs' representatives, I withdraw and disavow any endorsement of the Cabrera Report and Cabrera Responses, including the December 1, 2008 Comments. I have spoken with each of the individuals that signed the Stratus Comments, and each of them similarly withdraws and no longer stands behind or endorses the December 1, 2008 Comments as valid.



61.    Throughout the time I worked on the Ecuador Project, I and others at Stratus regularly communicated with Donziger and the other LAPs' representatives via e-mail and over the phone. We exchanged drafts and discussed the Cabrera Report, the comments to the Cabrera Report, and Cabrera Response and the Stratus Comments all via e-mail and over the phone on numerous occasions. Stratus and its subcontractors did the bulk of their work on the Ecuador Project in the U.S. so these types of communications were a necessary and integral part of the work.

## PRESENTATIONS TO FUNDERS

62.    Under Donziger's direction and oversight, I drafted and made presentations to funders and potential funders of the litigation, including Patton Boggs and Bartlit Beck Herman Palenchar &Scott. At Donziger's insistence, I did not reveal Stratus's or the LAPs' representatives' involvement in drafting the Cabrera Report or the Cabrera Response, or Cabrera's connection to the LAPs during any of these presentations.

## MEDIA COMMUNICATIONS

63.    Throughout the entire time I worked on the Ecuador Project, I visited the Oriente on approximately seven occasions between January 2008 and October 2009. Many of the sites I visited in the Oriente were chosen for me by Donziger or the LAPs' representatives. I do not know the extent to which the conditions I saw at those sites are representative of all the sites in the former concession. Donziger did not tell me to consider or evaluate whether any of the conditions at all the sites I visited were the responsibility of Petroecuador or any operator other than TexPet. I am now aware that of the sites I previously visited, some have been remediated by Petroecuador. When I made public statements, whether to the media or otherwise, regarding the conditions I observed in Ecuador, those statements were based on my visits to a limited



number of sites in the former concession and on information provided to me by the LAPs'
representatives regarding site operating history, which I did not personally observe.

64.     While working on the Ecuador Project, I made a number of statements
appearing in press releases and published media reports. I am a scientist. I have learned from this
experience that I should stick to science and leave public relations to others. I regret that I allowed
myself to be pressured by Donziger to make those public statements. Because of insufficient data
and unconfirmed and unsupported assumptions provided to me by Donziger and the LAPs'
representatives, and information I have learned since working on the Ecuador Project, I cannot say
who may have any responsibility for any environmental contamination in the Oriente, what the
extent of such contamination may be or what the appropriate damages amounts may be to remediate
any such contamination. Because of this, and because I now believe the Cabrera process was
tainted by Donziger and the LAPs' representatives, I cannot stand behind any statements I made to
the media concerning these matters.

65.     On May 3, 2009, *60 Minutes* aired a segment called Amazon Crude. I was
present in Ecuador during the *60 Minutes* filming. Per Donziger's instructions, I did not reveal
Stratus's or the LAPs' involvement in drafting the Cabrera Report, or Cabrera's connection to the
LAPs' team when dealing with *60 Minutes* or any other media outlet.

66.     *60 Minutes* televised the following statements by me: "It's a disgrace. They
treated Ecuador like a trash heap." "[I]t wouldn't have happened in the United States. And if it had
happened they wouldn't have gotten away with leaving it here for thirty years." I knew at the time
that Chevron had never been involved in petroleum explorations activities in Ecuador, that TexPet
had conducted a remediation meeting the standards agreed to by the Government of Ecuador, and



that Petroecuador had operated in the region for the past 20 years.  Video and still imagery shown during this *60 Minutes* segment reflected Petroecuador rather than TexPet operations.  Accordingly, these images and my statements were misleading in the context in which they were presented.  I understand Petroecuador has publicly confirmed that they are responsible for remediating the pits at the sites visited by *60 Minutes* (AG4, SSF 38, SSF 61).  During the segment, *60 Minutes* visits the home of Manuel Salinas.  The water in Mr. Salina's well met USEPA drinking water standards (MCLs).

### FALSE PUBLIC STATEMENTS BY THE LAPS' TEAM

67.    I understand that the LAPs have stated in court filings that "Texaco knowingly polluted a wide swath of the Amazon rainforest in Ecuador—it is undisputed that the company discharged roughly 16 billion gallons of toxic wastewater directly into the surface waters of the Amazon basin."  I never provided the LAPs' team with, and am not aware of, any evidence that would support the statement that the discharged water caused contamination that still exists.  During my visits to Ecuador, I never performed any analyses of the discharged water to determine its chemical composition or toxicity.

68.    I am aware that Steven Donziger testified to the congressional Tom Lantos Commission that "at least 30 times the amount of oil spilled in the Exxon Valdez disaster has been dumped onto the ancestral lands and onto the waterways of indigenous groups."  I am not aware of any credible scientific evidence that would support this statement. .

69.    I am aware that Steven Donziger testified to the Lantos Commission that "[i]n this area of Ecuador, the water, soil and air of the Amazon rainforest on which thousands of people depend for almost every aspect of their daily sustenance is for the most part poisoned."  I am



not aware of any credible scientific evidence that supports the statement that the water, soil, and air in the Amazon rainforest are, for the most part, poisoned.

70.     I am aware that there is a video posted on the website, http://chevrontoxico.com, that states "[i]n several independent health evaluations, including one conducted in the village of San Carlos, cancer rates were up to 30 times higher than normal, and the incidence of childhood leukemia was found to have reached alarming levels. One analysis of health and population data found that more than 9,000 people in the area of TexPet's operations are going to contract cancer in the coming decades—even assuming Chevron undertakes an immediate and comprehensive remediation." I am not aware of any credible scientific evidence that supports the statement that cancer rates were up to 30 times higher than normal, or that the incidence of childhood leukemia was found to have reached alarming levels. I am not aware of credible scientific evidence that more than 9,000 people in the area of oil operations in Ecuador are going to contract cancer in the coming decades or that links any such incidence to oil operations.

71.     I am aware of a post on http://chevrontoxico.com/news-and-multimedia/chevrons-corruption that the LAPs' team authored and posted which states, "[f]rom 1964 to 1990, Chevron (then Texaco) was the sole operator of an oil concession in Ecuador that ravaged thousands of square miles of once-pristine rainforest, poisoned the environment of tens of thousands of people, and decimated Indigenous tribes who had lived sustainably in the region for millennia." I am not aware of any credible scientific evidence that supports the statement that TexPet's operation of the concession ravaged thousands of square miles of once-pristine rainforest, that it poisoned the environment of tens of thousands of people, or that it decimated indigenous tribes who lived in the region.



72.     I am aware of a post on http://chevrontoxico.com/about/rainforest-chernobyl that the LAPs' team authored and posted which states, "Texaco conducted a sham 'clean-up' of less than 1% of the damage of its former sites beginning in 1995, in most cases merely covering open pits with dirt or burning off the crude by-products." I am not aware of any credible scientific evidence that supports the statement that TexPet (much less Texaco or Chevron) cleaned up only 1% of the damage of its former sites for which it was responsible, or that it did so by merely covering up with dirt or burning off the crude by-products.

73.     Based on my own experience in this matter and my own observations of the conduct of Donziger and the LAPs' representatives, I have no scientific bases to believe any of the public statements referenced above to be true.

## STRATUS 1782 PROCEEDINGS

74.     Stratus became aware of Chevron's request for discovery under Section 1782 around February 2010. Stratus was, at that time, prepared to make full disclosure and turn over documents requested regarding the Cabrera Report and Stratus's role in it. Indeed, Stratus disclosed all material facts regarding its involvement in the Cabrera Report to Stratus's own counsel, Joe Silver and Martin Beier of Silver & DeBoskey, and to Jeff Shinder of Constantine & Cannon. Donziger and the LAPs' counsel encouraged Stratus's counsel to delay compliance, with the issued subpoena, in ways that Stratus's counsel did not feel were consistent with his ethical obligations. Absent intervention by Donziger and the LAPs' U.S. counsel, Stratus would have turned over to Chevron all documents in accordance with the schedule set forth in the Court proceeding. A litigation consultant working with Donziger and Patton Boggs attorneys obtained Stratus's documents and files several months before the documents were provided to Chevron.



75.     I have reviewed the notes of Martin Beier from the meeting held on March 17, 2010, and attended by Martin Beier, Joe Silver, Jeff Shinder, and myself.  These notes accurately reflect the information I provided at that meeting with one exception.  The notes indicate that I saw the entire Cabrera Report boxed and ready to be shipped for filing in the LAPs' representatives offices in Ecuador.  My current recollection is that I saw what I was told was Annex A boxed up in the LAPs' representatives offices ready to be shipped to Lago Agrio for filing by Cabrera.

76.     For all my reports and testimony, including my deposition on September 9, 2011, I based my opinions and conclusions on a series of assumptions and data provided to me by Donziger and the LAPs' representatives that I do not know to be true.  In addition, the damages assessment in the Cabrera Report and Cabrera Response are tainted.  Therefore, I disavow any and all findings and conclusions in all of my reports and testimony on the Ecuador Project.  I deeply regret that I allowed myself and my company to be used in the Lago Agrio Litigation in the way that we were, as detailed throughout this declaration.

I state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on March 21, 2013, in New York, New York.

DOUGLAS BELTMAN

Sworn to before me on this
21st day of March 2013

Notary Public

CHEIKH S. DIENG
Notary Public, State of New York
No. 01DI6271613
Qualified in New York County
Commission Expires Nov. 05, 2016

28

# EXHIBIT 3653

## WITNESS STATEMENT OF ANN MAEST

I, Ann Maest, of United States citizenship, and residing in Boulder, Colorado, declare under penalty of perjury as follows:

1.        I am a Managing Scientist at Stratus Consulting, Inc. ("Stratus"), where I have worked intermittently since 1993.   Stratus is an environmental consulting firm located in Boulder, Colorado. Stratus was hired to work on projects related to the case of *Maria Aguinda y otros v. Chevron Corporation* in Lago Agrio, Ecuador (the "Lago Agrio Litigation") by Steven Donziger and Kohn, Swift & Graf through a contract with Kohn, Swift & Graf in August of 2007, and I began working on the project as a Stratus employee in 2007.  Prior to that, between 2006 and 2007, I worked on the "Ecuador Project" on behalf of E-Tech.

## INITIAL RETENTION AND ROLE IN THE CASE WITH E-TECH INTERNATIONAL

2.        My initial contact with Steven Donziger was in or around November 2005 through the organization I was working with at the time, E-Tech. E-Tech is a nonprofit organization providing environmental technical consulting support to communities in less industrialized countries. My first discussion with Steven Donziger was during a conference call on November 29, 2005.  Kohn, Swift & Graf hired E-Tech and me to do environmental consulting in connection with the Lago Agrio Litigation. Donziger directed our work on behalf of Kohn, Swift & Graf.

3.        I formally began working for Donziger on behalf of the Lago Agrio Plaintiffs (LAPs) in the Lago Agrio Litigation in or around January 2006, providing environmental consulting services.  In that role, I took direction from Donziger, who described himself as the lead United States lawyer for the LAPs. Donziger told me what tasks he wanted me to perform. He

*AM*

edited and approved drafts of statements or reports I would issue, and otherwise directed all of my work and the work of E-Tech.

4.        My initial role in the case was as a technical consultant on behalf of the LAPs, and I publicly appeared in the matter by issuing reports on behalf of the LAPs. At Donziger's direction, I authored a report in conjunction with William Powers and Mark Quarles titled "How Chevron's Sampling and Analysis Methods Minimizes Evidence of Contamination" dated March 8, 2006.   This report was just an initial assessment based on incomplete information.   I never performed a follow-up analysis as the judicial inspections progressed.

### THE GLOBAL INSPECTION PROJECT, THE MARCH 2007 MEETINGS IN ECUADOR AND *CRUDE* FILMING

5.        In March 2007, I traveled to Ecuador to meet with the LAPs' legal and technical team and Donziger. Also on this trip were Charles Champ and Richard ("Dick") Kamp. We were in Ecuador on this trip from March 2 to March 6, 2007. The purpose of this trip as described to me by Donziger was to show Charles Champ around the concession and bring him up to speed.

6.        During this trip, on March 3, 2007, at the LAPs' representatives offices in Quito, Ecuador (also known as the "Selva Viva" offices), I participated in a lengthy strategy meeting of the LAPs' team about preparation of the upcoming global expert report.

7.        The March 3rd meeting and other meetings in which I was involved with Donziger were videotaped by the *Crude* film crew. Based on my personal observations, the film crew took direction from Donziger regarding what to film and when to turn their cameras on and off.  I saw the *Crude* film crew follow Donziger's instructions on many occasions.

8.      Among those attending the March 3, 2007 planning meeting in Quito were Donziger, Pablo Fajardo, Luis Yanza, Fernando Reyes, and other consultants and lawyers for the LAPs. Also attending the meeting was Richard Cabrera, whom Pablo Fajardo referred to as a "perito," or expert.  Donziger told me prior to the meeting that Cabrera would be there, and he was hoping Cabrera would be appointed as the Ecuadorian Court's expert tasked with performing the global damage assessment requested by the LAPs.

9.      It was clear from the presentations and from my discussions with people at the meeting that the LAPs planned to conduct the global damages assessment. In particular, I understood Fajardo's statements captured in the outtake from *Crude*: "[a]nd here is where we do want the support of our entire technical team . . . of experts, scientists, attorneys, political scientists, so that all of us will contribute to that report—in other words—you see . . . the work isn't going to be the expert's. All of us bear the burden," to mean that the LAPs' lawyers and consultants would contribute to Cabrera's work and report.

10.     I reviewed the Declaration of the Fernando Reyes regarding the March 3, 2007 meeting.  Mr. Reyes's recollections of the events for which we both were present are consistent with my own, except that I do not recall Mr. Champ's presentation.

11.     During a lunch with Kamp, Donziger and Charles Champ on March 4, 2007, Kamp told Donziger that having the perito at the meeting was "bizarre." Donziger told Kamp not to talk about it and said, "That's the way it works."

12.     In discussions around the time of the March 2007 meetings, Donziger made it clear to me that it was vital that the coordination between the LAPs and Cabrera be kept secret.

3



13.     At the March 4, 2007, meeting, Kamp, Champ and I raised issues with Donziger about the environmental data we had seen. In particular, I found in my analysis of the data that there was no evidence that contamination had migrated away from the pits. As I told Donziger, "all the reports are saying it's [*i.e.*, groundwater contamination] just at the pits and the stations and nothing has spread anywhere at all." And when Champ told Donziger that "there is not enough information on that groundwater" and that "the one hole in the remediation is the water," Donziger instructed the camera crew capturing the conversation to stop filming, stating, "[T]here's another point I got to make . . . to these guys, but I can't get this on camera."

14.     The only water sampling evidence I saw from the LAPs' team involved testing water from hand auger samples taken in or near pits. This is not a proper methodology for collecting groundwater samples unless the soil particles are removed by filtering or by allowing them to settle out. I am aware that at least some of the LAPs' sampling results were unreliable because of the presence of soil particles in the samples. I requested from Donziger and the Quito team on multiple occasions that additional groundwater sampling be conducted but never received approval for that sampling. At no time while working on the Ecuador Project did I see any data supporting a finding of groundwater contamination from TexPet operations away from the pits.

15.     When I told Donziger that there was a significant gap in the groundwater data, he suggested that we could "extrapolate" to ascribe contamination to areas where no sampling had been done and "get money for it." He then said that all of this "for the court is just smoke and mirrors and bullshit." Donziger's statements on film focusing on "getting money" and using and misusing facts and data to support whatever position he wanted to take in the litigation are representative of Donziger's statements on these subjects.



16.     It was my impression that Donziger was not interested in the results of scientific evaluations of the area unless he could use them to attack Chevron. Donziger seemed interested in increasing the damage claims as high as possible.

17.     When Champ told Donziger during a March 4, 2007 meeting that we needed to be totally transparent with Chevron in terms of what sampling was to be conducted and what the sampling data was showing, Donziger informed us that his goal was that "they don't know shit." To achieve this goal, Donziger indicated to me to keep my involvement with Cabrera and the global damages assessment, and that of the other LAPs' consultants and lawyers, secret. I followed his instructions in that regard at all times while I was working on the Ecuador Project.

## DIRECTION AND CONTROL BY DONZIGER

18.     In conversations with Donziger about the scope of the work that would need to be done for a global damages assessment, it became apparent that a larger consulting firm would be needed. I had previously worked for Stratus Consulting and suggested to Donziger that he retain them for this work.

19.     Donziger first contacted Stratus on or about March 27, 2007, via a conference call I arranged that included Donziger, David Chapman, David Mills, and me. Donziger then met with Stratus on April 26, 2007, at Stratus' offices in Boulder, Colorado. A portion of this meeting was filmed by the *Crude* film crew. Joshua Lipton, Douglas Beltman, David Chapman, Preston Sowell, and I attended the meeting with Donziger. At that meeting, Donziger described Stratus' work as the preparation of a damage assessment for the Lago Agrio litigation. Donziger described the specific elements of damages that he wanted to include in the assessment using an April 22, 2007 memorandum that he had previously provided to Joshua Lipton. In a prior email to

5



Joshua Lipton, which I have reviewed, Donziger stated that the damages claim would probably be "many billions of dollars[.]" At some point in time, Donziger said damages against Chevron could be in the range of $5-6 billion dollars.

20.     I am aware that Stratus entered into a retention agreement with Kohn, Swift & Graf on August 20, 2007.

21.     Stratus began working on the Ecuador Project in August of 2007 after first meeting with Donziger on April 27, 2007 in Stratus's Boulder, Colorado office. I had previously taken direction for my work on the project from Donziger, and, from that point forward, Stratus took its direction for its work on the Ecuador Project from Donziger, who described himself as the lead American lawyer for the LAPs. Donziger indicated what tasks he wanted Stratus to perform, edited and approved drafts of statements or reports Stratus would issue, and assigned, approved, and directed all of Stratus' work on the Ecuador Project. It is my understanding that from Stratus's retention in August 2007 until its work on the matter ceased, Donziger was Stratus's principal point of contact for its work on the Ecuador Project, and he directed work on behalf of Kohn, Swift & Graf.

22.     At no time was my work on the Ecuador Project directed by any of the named plaintiffs in the Lago Agrio Litigation, nor did I ever have any contact with those named plaintiffs or receive an instruction that I understood to come directly from any of the named plaintiffs. I have had no indication that any of those named plaintiffs ever reviewed anything Stratus or I prepared in connection with the Ecuador Project. Rather, to the extent I received directions from Ecuadorians, those directions came via individuals such as Pablo Fajardo, who I understood to be also representing the LAPs.

6



23.     Based on my experience during my time as one of the LAPs' environmental consultants, Donziger exercised near complete control over major decisions of strategy for the Ecuador Project, particularly as related to our work, the media, and public relations. Aside from the issue of funding, I do not recall an instance in which Donziger stated a need to get prior approval from any other individual for a course of action. While others, including Pablo Fajardo, participated in decisionmaking regarding the litigation, it was apparent to me that those in the LAPs' Quito office, including Pablo Fajardo, looked to Donziger for direction.

24.     Regarding budgeting and funding, it was apparent that Donziger had a significant degree of control, but that for large expenditures, he initially reported to Joe Kohn. Nonetheless, we at Stratus understood Donziger to have control of strategy decisions.

## DONZIGER INSTRUCTIONS REGARDING SECRECY

25.     Donziger insisted at all times that all aspects of Stratus' work, including Stratus' meetings with Cabrera, their involvement in drafting the Cabrera Report and the November 2008 Cabrera Response to the LAPs' September 2008 comments or objections regarding the Cabrera Report (the "Cabrera Response") remain absolutely secret.

## CABRERA MEETINGS

26.     Donziger asked Douglas Beltman and me to travel to Ecuador in early January 2008. During this trip, Douglas Beltman and I met with Richard Cabrera, Steven Donziger, Luis Villacreces, perhaps Pablo Fajardo and Luis Yanza, and others at the private residence of Juan Aulestia in Quito. Based on interactions between Cabrera, Donziger and Villacreces, they were

familiar with each other. No one was present from Chevron, and it was evident from the location and discussion that the meeting was meant to be secret.

27.     Based on my two interactions with Cabrera and a review of his background, Cabrera lacked the qualifications and experience to prepare a multidisciplinary environmental damage assessment himself or to design such a report.

28.     At no time did I ever see any indication or meet anyone I understood to be a member of Cabrera's independent team of experts. To the contrary, individuals that I am aware of who assisted in preparing the Cabrera Report and Cabrera Response were affiliated with or working at the direction of Donziger and the LAPs.

29.     At no point during my time working on the Ecuador Project, including at the January 2008 meeting was there any suggestion that Cabrera was preparing his own report.

## DRAFTING OF THE CABRERA REPORT AND ANNEXES

30.     I have reviewed the witness statement of Douglas Beltman regarding drafting of the Cabrera Report and annexes. I am not aware of any facts or data that contradict any of his statements or conclusions. His recollection of the drafting process and related events are consistent with my own. I never discussed the substance of any part of the Cabrera Report or any annex with Richard Cabrera nor received any inquiry from him regarding that report. During the time of working on materials for the Cabrera Report, I never saw or heard any indications from Donziger, Fajardo, or any other member of the LAPs' team, or anyone else, that Chevron was given the opportunity to submit information or documents to Cabrera. In the many discussions of the drafting of the report, no one affiliated with the LAPs' team suggested that Chevron would be given



the opportunity to provide their own comments, documents, information, data, narratives, summaries, analyses, or reports to Cabrera.

31.     In all the work Stratus performed, including the drafting of portions of the Cabrera Report, Donziger never instructed Stratus or me to conduct any analysis of the contamination in the former concession area caused by PetroEcuador, including recent spills by PetroEcuador. Donziger never told Stratus or me to attribute any of the contaminated soil samples or pits to PetroEcuador.

## OVERARCHING ASSUMPTIONS OF THE CABRERA REPORT

32.     Donziger directed Stratus not to take into account the ongoing remediation in the former concession area, which was known at the time as the "PEPDA" program, when developing the damages assessment.

33.     I was aware of the Settlement Agreement and Release that existed between TexPet, Petroecuador and the Republic of Ecuador. I was also aware that pursuant to the Remedial Action Plan ("RAP") that was part of that settlement, TexPet had agreed to remediate specified sites in the former concession area. The damages assessment in the Cabrera Report is not limited to only those sites that TexPet agreed to remediate in the RAP. To the contrary, the majority of the sites included in the Cabrera Report's damages assessment are sites that were not TexPet's responsibility to remediate pursuant to the RAP.

34.     The Cabrera Report does not address whether the cleanup actions it recommends Chevron pay for were already being undertaken or contemplated by others or had been completed. Stratus and I were aware that PEPDA was remediating a number of pits in the former

9



concession area. Therefore, a number of the pits that the Cabrera Report finds require cleanup had already been remediated or were in the process of being remediated by PetroEcuador as part of the PEPDA program at the time the Cabrera Report was filed.

35.     Donziger did not seem to be happy about the PEPDA program even though its purpose was to remediate the very petroleum pits that the LAPs and Donziger said were causing contamination. Donziger made it clear to me that it would not be good for the litigation if the area was cleaned up by PetroEcuador, or if people in the region were provided with better housing by other organizations.

36.     An assumption of the Cabrera Report was that the soil cleanup levels identified by the LAP lawyers were the appropriate ones to use in the damages assessment. During my work on the Cabrera Report, I was aware that the total petroleum hydrocarbon (TPH) cleanup level in the former concession area used by Ecuador in 2008 for the PEPDA remediation was 2,500 ppm TPH. However, as Douglas Beltman indicated in a March 4, 2008 email to Juan Pablo Saenz "[s]omewhere along the line someone decided that the 1,000 mg/kg [equivalent to 1,000 ppm] TPH standard for 'ecosistemas sensibles' is the one to use for our case, and I'm trying to write up a justification for it." I came to understand that Donziger and the LAP lawyers had decided that the 1,000 ppm standard should apply, and that they later decided that the cleanup level should be lowered from 1,000 ppm to 100 ppm. This resulted in a very large increase to the damage figure for soil clean-up.

37.     Another overarching assumption provided to Stratus was the number of pits in the former concession area. The LAPs' representatives provided us with a "pit inventory" that they created to use in conducting the damages assessment that listed 917 pits as having been



constructed by TexPet. We never verified the existence of the 917 pits shown on the inventory. Obviously, the pit count is a critical variable in determining the scope of any remediation. I have no independent basis to believe the pit count provided to us by the LAPs was accurate or reliable.

38.      Pursuant Donziger's instructions, Stratus had to conduct its damages assessment work using only the data and information that was provided to us. Stratus was not allowed to collect the additional data that it thought was relevant to the assessment. The damages assessment in the Cabrera Report and Cabrera Response are based on many assumptions provided by Donziger and the LAPs' representatives that neither I nor Stratus know to be true or accurate. In addition, I have come to understand that the Cabrera process was tainted by Donziger and the LAPs' representatives. As a consequence, the damages assessment in the Cabrera Report and Cabrera Response are not reliable. I disavow the Cabrera Report and Cabrera Response, and they are not reliable bases for the Ecuadorian court to rely upon in rendering its judgment.

## THE CABRERA NOVEMBER 2008 RESPONSE

39.      The LAPs' comments on the Cabrera Report generally approve of the report but claim that "[t]he omissions we have been able to detect in Expert Richard Cabrera's Expert Report greatly favor the interests of the defendant, given that said omissions either minimize or fail to consider certain environmental damage and legislation that should definitely be taken into account in the evaluation." The comments, including the portions prepared by Stratus, do not disclose that the Cabrera Report was drafted by Stratus or the LAPs' representatives. With the comments the LAPs were literally commenting on their own work. For example, at Donziger's direction Stratus prepared the soil remediation cost estimate to the Cabrera Report of $1.7B based on a remediation standard of 1,000 ppm of TPH. It then prepared comments claiming that "the



cleanup proposed by the Perito is inadequate, and it will not restore the environment to its original state before the environmental damage occurred" and "we consider 100 ppm TPH to be a much better cleanup level that will achieve an environmental restoration that is much closer to the conditions prior to the damage caused by Texaco, as instructed by the Court." The text then states "the total cost to remediate soils to 100 ppm TPH should be $2,743,000,000." For context, Donziger had insisted on using a standard of 1,000 ppm even though the remediation level used by PEPDA is 2,500 ppm. He then insisted on further lowering that to 100 ppm in the Cabrera Response.

40.     We began planning the LAPs' comments on the Cabrera Report shortly after it was filed. Steven Donziger, Pablo Fajardo, Luis Yanza, Doug Beltman, Jen Peers, and I met in Boulder June 4-5, 2008, to discuss, among other things, the planned comments. Karen Hinton was also present on June 4th. I understood these comments to be a "formal response to the Court about the Expert's Report." Douglas Beltman communicated an extensive to-do list for the comments project. Douglas Beltman, David Mills, Jennifer Peers, and I all worked on portions of the text for the comments. We completed our work in the United States and sent our work on the comments to the LAPs' team when completed. Stratus instructed Brian Lazar to alter the language of portions we had already drafted to sound "more like the Perito." Stratus drafted portions of "Cabrera's" responses to the LAPs comments throughout October and November 2008. I assumed that the portions of the Cabrera Response that Stratus was drafting would be filed with the Ecuadorian Court as if written by Cabrera.

41.     The LAPs' comments, including the portions prepared by Stratus, do not disclose that the Cabrera Report was drafted by Stratus or the LAPs.



42.     I understood that on September 16, 2008, the LAPs submitted their comments to "the Expert Report filed by Expert, Richard Cabrera Vega," containing our work on the comments.

## DAMAGES CATEGORIES IN THE
## CABRERA REPORT AND CABRERA RESPONSE

43.     I have reviewed the witness statement of Douglas Beltman regarding the damages categories in the Cabrera Report and Cabrera Response.  I am not aware of any facts or data that contradict any of his statements or conclusions.  As to the limited portions of the Cabrera Report and Cabrera Response I was involved in, I agree with and adopt Mr. Beltman's statements and conclusions.  As to the parts I was not involved in, I am not qualified to verify any of the alleged damages or proposed remedies in those portions of the Cabrera Report and Cabrera Response.  I have no basis to believe that those damages or proposed remedies are valid or accurate. I have reviewed Mr. Beltman's statements and have no reason to doubt his conclusion that the Cabrera damages assessment is tainted, is not supported by reliable information, and cannot support a valid damage claim.  I therefore disavow the Cabrera Report and Cabrera Response.

## THE STRATUS COMMENTS

44.     Douglas Beltman drafted the Stratus Comments and they were signed by myself and 4 other Stratus scientists.  By the time I signed the comments, it was apparent that Cabrera was not neutral.  Because the Cabrera Report and Cabrera Response are not supported by reliable information and because I now understand that the Cabrera Process was tainted by Donziger and the LAPs' representatives, I withdraw and disavow any endorsement of the Cabrera Report and Cabrera Response, including the December 1, 2008 Stratus comments.



## SITE VISITS

45.      Throughout the time I worked on the Ecuador Project, I only visited the

Oriente on 3 or 4 occasions. In total, I have visited approximately 20-25 sites in the former

concession area. Most of the sites I visited were chosen for me by Donziger or the LAPs'

representatives. I do not know whether the visible surface conditions I saw at those sites are

representative of all sites in the former concession. I do not have personal knowledge of whether the

conditions I saw at those sites, including any pits or spills, were caused by the activities of

PetroEcuador, TexPet or some other operator.

## HAVOC LAB

46.      I am aware that LAPs' experts during the judicial inspection utilized the

facilities of the Havoc Lab.  I personally visited Havoc Lab.  Havoc Lab had two significant

shortcomings related to its ability to measure polycyclic aromatic hydrocarbons (PAHs) and

chromium VI (Cr(VI)) in samples. Havoc did not have the equipment needed to conduct

determinations of individual PAHs and instead did a "total PAH" and divided it into individual

PAHs.  This methodology produces unreliable data. Therefore, any Havoc PAH values (total or

individual) reported for soil or water are scientifically unsound and cannot be relied upon.  In

contrast, the method Chevron used for individual PAHs is reliable.

47.      Additionally Havoc sent out samples for Cr(VI) determination (they did

not have the equipment do perform them in-house). The holding time for Cr(VI) measurement in

water samples is 24 hours, and it is highly unlikely that any water samples sent out for Cr(VI)

analysis by Havoc were analyzed by another laboratory within the holding time.  I do not know the

name of the laboratory that Havoc sent Cr(VI) samples to and I do not know whether that laboratory



had the proper equipment or utilized proper methodologies. I thus have no basis for concluding that any of the Cr(VI) data submitted by the LAPs during the judicial inspections were valid.

48.     I understand that in the judgment the court relied upon expert reports from the judicial inspections. Thus the comparisons between PAH and Cr(VI) concentrations in the LAPs' samples and Ecuadorian standards are unreliable.

### STRATUS 1782 PROCEEDINGS

49.     I became aware of Chevron's request for discovery under Section 1782 around February 2010. I was, at that time, prepared to make full disclosure and turn over documents requested regarding my role in the Cabrera Report and Cabrera Response. Indeed, I disclosed all material facts regarding my involvement in the Cabrera Report to my counsel, Joe Silver and Martin Beier, of Silver & DeBoskey.

15



50.     For all of my reports and testimony, I based my opinions and conclusions on a series of assumptions and data provided to me by Donziger and the LAPs' representatives that I do not know to be true.  In addition, I now believe that the damages assessment in the Cabrera Report and Cabrera Response is tainted.  Therefore, I disavow any and all findings and conclusions in all of my reports and testimony on the Ecuador Project.  Like my colleague Douglas Beltman, I deeply regret that I allowed myself to be used in the Lago Agrio Litigation in the way that I was, as detailed throughout this statement.

I state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on March 21, 2013 in New York, New York.

_____

ANN MAEST

Sworn to before me on this 22nd day of March 2013

_____

Notary Public

CHEIKH S. DIENG
Notary Public, State of New York
No. 01DI6271613
Qualified in New York County
Commission Expires Nov. 05, 2016

# EXHIBIT 3654

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHEVRON CORPORATION, | |
| Plaintiff, | CASE NO. 11-CV-3718 (LAK) |
| v. | |
| MARIA AGUINDA SALAZAR, *et al.*, | |
| Defendants, | |
| -and- | |
| STEVEN DONZIGER *et al.*, | |
| Intervenors. | |

### DEFENDANTS HUGO GERARDO CAMACHO NARANJO'S AND JAVIER PIAGUAJE PAYAGUAJE'S MOTION FOR CONTINUANCE

The trial setting on this case must be continued. The Ecuadorian Plaintiffs cannot adequately prepare this case for trial under the schedule currently set. The Court's "streamlined" procedure is now bloated into a trial on the merits with fact discovery due to be completed in five weeks. A trial on this schedule would not only be unfair to the Ecuadorian plaintiffs but would also not be consistent with procedures compatible with due process. Here are the reasons why a continuance is necessary:

**Trial on this schedule for a case of this complexity is not in accord with due process.**

The Ecuadorian Plaintiffs do not have a final judgment. The Ecuadorian Plaintiffs did not file to enforce a judgment in New York. Nonetheless, Chevron, after shopping the country for a favorable forum, filed a premature, preemptory action in this court to declare invalid a non-existent final judgment. Not only did the Court choose to exercise jurisdiction over the claim and over the Ecuadorian Plaintiffs (who continue to object to jurisdiction) but it also set the

302484.1

seems to have accepted Chevron's characterization of these Ecuadorians as some sort of sophisticated organization with resources comparable to those Chevron has assembled to swamp this and other Courts. That characterization is not true. Unlike Chevron, the Ecuadorian Plaintiffs do not have their experts or fact witnesses on retainer. The Ecuadorian Plaintiffs, unlike Chevron, lack the resources to put former employees in nice homes to insure their loyalty as Chevron and its agents or those working in concert with the company have done. Many of the fact witnesses, individuals who could describe how decades of pollution impacted their lives and property, live in remote villages, are afraid to come to the United States and lack the money to do so in any event.

**Chevron's head start cannot be overcome in this time frame.**

Chevron has taken more than 20 depositions related to this dispute in Section 1782 proceedings.[2] Chevron's first §1782 deposition was taken in 2009. Ostensibly for use in foreign proceedings, Chevron's §1782 discovery served as the basis for this lawsuit. The Ecuadorian Plaintiffs cannot possibly catch up to this factual discovery advantage in the four weeks left for fact discovery and could not have caught up even if they had begun two months earlier. Federal Rule of Civil Procedure 30(a) limits the number of depositions to 10 per side. The Ecuadorian Plaintiffs could not duplicate Chevron's 24 depositions in this Count 9 suit.

Among the other advantages Chevron gained in its §1782 strategy was to obtain copies of the outtakes of the movie "Crude" regarding the conduct of the trial in Ecuador. Chevron has used the outtakes as part of its program to attack the lawyers. Based on only a small sampling, Chevron removed the outtake selections it used from their proper context. The Ecuadorian Plaintiffs, who do not have a copy of the outtakes, have asked Chevron to produce the outtakes

---

[2] Chevron to date has taken 24 §1782 depositions, a list of which is attached as Exhibit 1.

so that they can review the outtakes to restore context to the outtakes Chevron used. Based on information and belief, the outtakes alone entail more than 600 hours of material. Using one employee to watch the outtakes continuously would take 15 weeks of 40 hours per week, just to review the video, much less to sort it in a responsive manner.

**Chevron refuses to take depositions in Ecuador.**

Chevron, understanding the difficulties the Court's August 8 Order imposes on the Ecuadorian Plaintiffs, now refuses to take depositions of fact or expert witnesses in Ecuador. Three of the Ecuadorian Plaintiffs' expert witnesses—two former members of the Ecuadorian Supreme Court and one former judge in this case—live in Ecuador. The Ecuadorian Plaintiffs have arranged dates for three of their expert witnesses to be presented for deposition in Quito. Many of the important fact witnesses on the extent and duration of Chevron's pollution of the rainforest live in the Amazon River basin, as do the Ecuadorian Plaintiffs themselves. Nonetheless, without any justification for its position other than its apparent confidence that the Court will sustain any argument Chevron makes, Chevron insists that depositions take place in the United States, and, when any conflict arises about location, in New York where Chevron's lawyers are stationed.

The Ecuadorian Plaintiffs have further identified five fact witnesses whose depositions they desire to take in Ecuador. Chevron will not agree to take any of them in Ecuador where the witnesses work and live.

While Chevron's counsel promises the Court a streamlined process and professes a desire to keep the November 14 trial setting, out of sight of the Court, Chevron imposes every possible road block to permitting the Ecuadorian Plaintiffs to prepare the case in a timely fashion and bloats the trial into a proceeding that it will be impossible to be prepared for by November 14.

The situation is this: without a final judgment, without a complete trial record, without an enforcement proceeding anywhere in the world, let alone in New York, and without any threat to Chevron other than a lawyer's preliminary think-piece on potential judgment enforcement options somewhat grandiosely entitled "Invictus," the Court is accepting uncritically Chevron's cries of "wolf" -- a/k/a disruption of oil supply -- and pushing this case towards a trial date for which the Ecuadorian Plaintiffs cannot possibly be prepared. Continuing on this course will prejudice the Ecuadorian Plaintiffs, deprive them of their due process rights, foster an injustice, and result in a proceeding with the same pre-determined result that Chevron claims was its fate in Ecuador.

For these reasons, the Court should continue this case.

Dated:   August 10, 2011

By: _/s/  Tyler Doyle_____
 TYLER DOYLE
 CRAIG SMYSER (*pro hac vice*)
 LARRY R. VESELKA (*pro hac vice*)
 SMYSER KAPLAN & VESELKA, L.L.P.
 700 Louisiana, Suite 2300
 Houston, TX 77002
 Telephone: 713.221.2330
 Facsimile:  713.221.2320
 Email:     tydoyle@skv.com
 Email:     csmyser@skv.com
 Email:     lveselka@skv.com

By: _/s/  Julio C. Gomez_____
 Julio C. Gomez
 GOMEZ LLC
 The Trump Building
 400 Wall Street, 28th Floor
 New York, NY  10005
 Tel:    212.400.7150
 Fax:    212.400.7151
 Email:  jgomez@gomezllc.com

10

Carlos A. Zelaya, II
F. GERALD MAPLES, PA
365 Canal Street, Suite 2650
New Orleans, LA 70130
Tel:    504.569.8732
Fax:    504.525.6932
Email: czelaya@fgmapleslaw.com
*Attorneys for Defendants the Ecuadorian Plaintiffs*

# EXHIBIT 3655

| | |
|---|---|
| **From:** | Pablo Fajardo Mendoza [pafabibi@gmail.com] |
| **Sent:** | August 23, 2007 10:20 AM |
| **To:** | STEVEN DONZIGER; LUIS YANZA; PABLO FAJARDO |
| **Subject:** | Re: REPLY WATER R FR |

Commander Steven, Luis and me

I quickly read the groundwater reinjection program FR proposed. I have some remarks.

I believe that with some modifications, we could use the document for the expert assessment or PM. Here are suggestions:

a. The document should distinguish between what was Texaco's operation and what is Petroecuador's operation. In other words, when he calculates the amount of formation water, he should break in June 1990. To know exactly how much water Texaco dumped into the environment.

b. The document should briefly analyze the technique P[e]tro uses today to reinject formation water. The solution is not to reinject the water; the solution is to properly reinject it. Currently there are several reinjection wells that have serious problems, and the water is coming to the surface, i.e., they are making the environmental problem in the area even worse. This is a bit sensitive to be included in the document for the court, but it is necessary to say that the equipment Texaco delivered in '96 to reinject formation water is no good and is not enough.

c. The document does not need to include so much literature. I think that a lot of that unnecessary data can be taken out.

d. The volume of formation water currently produced and the volume of water currently reinjected need to be stated more precisely.

e. The document should state and clarify or confirm that Texaco never re-injected formation water.

f. The information must be classified; for example, Cuyabeno field is not part of the case. That information is more useful to Petroproducción, not us.

Summing up, the document needs to be polished and tailored to our interests. It needs to clearly say what Texaco's responsibilities are, and what has to be done to fix the damage caused by Texaco … (now, Petroproducción).

Who will talk to Reyes about correcting the document?

This is my humble opinion.

Pablo Fajardo M.

# MERRILL CORPORATION



Merrill Communications LLC

225 Varick Street
New York, NY 10014 • (212) 620-5600

| | | |
|---|---|---|
| State of New York | ) | |
| Estado de Nueva York | ) | ss: |
| | ) | a saber: |
| County of New York | ) | |
| Condado de Nueva York | ) | |

### Certificate of Accuracy
### Certificado de Exactitud

This is to certify that the attached translation is, to the best of our knowledge and belief, a true and accurate translation from Spanish into English of the attached document.

Por el presente certifico que la traducción adjunta es, según mi leal saber y entender, traducción fiel y completa del idioma español al idioma inglés del documento adjunto.

Dated: April 4, 2013
Fecha: 4 de abril de 2013

_Kate Alexander_
Kate Alexander
Project Manager – Legal Translations
Merrill Brink International/Merrill Corporation

_____ [firmado] _____
Kate Alexander
Gerente de Proyecto – Traducciones Legales
Merrill Brink International/Merrill Corporation

ROBERT J. MAZZA
Notary Public, State of New York
No. 01MA5057911
Qualified in Kings County
Commission Expires April 1, 2014

Sworn to and signed before
Jurado y firmado ante
Me, this ____4th____ day of
mí, a los ____4____ días del
____April____ 2013
mes de ___abril___ de 2013

Notary Public
Notario Público

[firmado]
[sello]

OFFICES IN MAJOR CITIES THROUGHOUT THE WORLD

.

| | |
|---|---|
| **From:** | Pablo Fajardo Mendoza [pafabibi@gmail.com] |
| **Sent:** | Thursday, August 23, 2007 10:20 AM |
| **To:** | STEVEN DONZIGER; LUIS YANZA; PABLO FAJARDO |
| **Subject:** | RESPUESTA R. AGUA FR |

Comandante Stven, Luis y yo

Estuve realizando una lectura rápida del programa de reinyección de agua subterránea propuesto por FR. Tengo algunas observaciones.

Creo que con algunas modificaciones el documento nos puede servir para el examen pericial o PM, mis sugerencias son:

    a. Se debe hacer una diferenciación entre lo que fue operación de Texaco y lo que es la operación de Petroecuador. Es decir, cuando él hace la cuantificación del volumen de agua de formación debe hacer una pausa en Junio de 1990. Para saber exactamente cuanta agua arrojó Texaco al ambiente.

    b. Se debe hacer un breve análisis de la técnica que hoy utiliza Patro para reinyectar el agua de formación. La solución no es reinyectar el agua, la solución es reinyectarla bien. Actualmente varios pozos reinyectares tienen serios problemas y el agua está saliendo a la superficie, es decir que están agravando aún más el problema ambiental en la zona. Eso es un poco delicado ponerlo en el documento para el juicio, pero si es necesario indicar que los equipos que entregó Texaco en el 96 para la reinyección del agua de formación no son buenos y no son suficientes.

    c. No es necesario poner tanta literatura en el documento, creo que se puede suprimir muchos de esos datos innecesarios.

    d. Se debe indicar con más precisión del volumen de agua de formación producida y el volumen de agua reinyectada actualmente.

    e. Se debe indicar y aclarar o ratificar que Texaco nunca reinyectó el agua de formación.

    f. Hay que clasificar la información, por ejemplo el campo Cuyabeno no es parte del proceso judicial. Esa información sirve más para Petroproducción, no para nosotros.

En fin, hay que pulir el documento y adecuarlo a nuestros intereses, se debe indicar con claridad lo que es de responsabilidad de Texaco y lo que hay que hacer para reparara el daño de Texaco… (hoy Petroproducción).

Quien habla con Reyes para que corrija el documento?

Estas son mis humildes opiniones.

Pablo Fajardo M.

# EXHIBIT 3656

| | |
|---|---|
| **From:** | Steven Donziger [sdonziger@gmail.com] |
| **Sent:** | Thursday, August 23, 2007, 10:25 AM |
| **To:** | Pablo Fajardo Mendoza |
| **Cc:** | LUIS YANZA; PABLO FAJARDO |
| **Subject:** | Re: REPLY WATER R FR |

I agree with everything you say. We have three options: I talk to him by phone, you talk to him face to face, or we both talk to him together on 4-5 September over bagels. You decide, Commander.

On 8/23/07, **Pablo Fajardo Mendoza** <pafabibi@gmail.com> wrote:
Commander Steven, Luis and me

I quickly read the groundwater reinjection program FR proposed. I have some remarks.

I believe that with some modifications, we could use the document for the expert assessment or PM. Here are suggestions:

  a. The document should distinguish between what was Texaco's operation and what is Petroecuador's operation. In other words, when he calculates the amount of formation water, he should break in June 1990. To know exactly how much water Texaco dumped into the environment.
  b. The document should briefly analyze the technique P[e]tro uses today to reinject formation water. The solution is not to reinject the water; the solution is to properly reinject it. Currently there are several reinjection wells that have serious problems, and the water is coming to the surface, i.e., they are making the environmental problem in the area even worse. This is a bit sensitive to be included in the document for the court, but it is necessary to say that the equipment Texaco delivered in '96 to reinject formation water is no good and is not enough.
  c. The document does not need to include so much literature. I think that a lot of that unnecessary data can be taken out.
  d. The volume of formation water currently produced and the volume of water currently reinjected need to be stated more precisely.
  e. The document should state and clarify or confirm that Texaco never re-injected formation water.
  f. The information must be classified; for example, Cuyabeno field is not part of the case. That information is more useful to Petroproducción, not us.

Summing up, the document needs to be polished and tailored to our interests. It needs to clearly say what Texaco's responsibilities are, and what has to be done to fix the damage caused by Texaco … (now, Petroproducción).

Who will talk to Reyes about correcting the document?

This is my humble opinion.

Pablo Fajardo M.

--
Steven Donziger
212-570-4499 (land)
212-570-9944 (fax)
████████████ (cell)

Steven R. Donziger
Law Offices of Steven R. Donziger, P. C.
██████ ███ ███
New York, New York 10025
Email: sdonziger@gmail.com

# MERRILL CORPORATION

Merrill Communications LLC



225 Varick Street
New York, NY 10014 • (212) 620-5600

State of New York                    )
Estado de Nueva York                 )
                                     )              ss:
                                     )              a saber:
County of New York                   )
Condado de Nueva York

### Certificate of Accuracy
### Certificado de Exactitud

This is to certify that the attached translation is, to the best of our knowledge and belief, a true and accurate translation from Spanish into English of the attached document.

Por el presente certifico que la traducción adjunta es, según mi leal saber y entender, traducción fiel y completa del idioma español al idioma inglés del documento adjunto.

Dated: March 22, 2013
Fecha: 22 de marzo de 2013

*Kate Alexander*

Kate Alexander
Project Manager – Legal Translations
Merrill Brink International/Merrill Corporation
_____[firmado]_____
Kate Alexander
Gerente de Proyecto – Traducciones Legales
Merrill Brink International/Merrill Corporation

ROBERT J. MAZZA
Notary Public, State of New York
No. 01MA5057911
Qualified in Kings County
Commission Expires April 1, 2014

Sworn to and signed before
Jurado y firmado ante
Me, this _____22nd_____ day of
mí, a los _____22_____ días del
_____March_____ 2013
mes de _____marzo_____ de 2013

_____
Notary Public
Notario Público

[firmado]
[sello]

OFFICES IN MAJOR CITIES THROUGHOUT THE WORLD

.

| | |
|---|---|
| From: | Steven Donziger [sdonziger@gmail.com] |
| Sent: | Thursday, August 23, 2007 10:25 AM |
| To: | Pablo Fajardo Mendoza |
| Cc: | LUIS YANZA; PABLO FAJARDO |
| Subject: | Re: RESPUESTA R. AGUA FR |

De acuerdo con todo lo que dices.  Tenemos tres opciones: yo hablo con el por telefono, tu hablas con el cara a cara, o los dos nosotros hablamos con el conjunto el 4-5 de Septiembre comiendo bagels.  Tu decides Comandante.

On 8/23/07, **Pablo Fajardo Mendoza** <pafabibi@gmail.com> wrote:
Comandante Stven, Luis y yo

Estuve realizando una lectura rápida del programa de reinyección de agua subterránea propuesto por FR. Tengo algunas observaciones.

Creo que con algunas modificaciones el documento nos puede servir para el examen pericial o PM, mis sugerencias son:

a. Se debe hacer una diferenciación entre lo que fue operación de Texaco y lo que es la operación de Petroecuador. Es decir, cuando él hace la cuantificación del volumen de agua de formación debe hacer una pausa en Junio de 1990. Para saber exactamente cuanta agua arrojó Texaco al ambiente.

b. Se debe hacer un breve análisis de la técnica que hoy utiliza Patro para reinyectar el agua de formación. La solución no es reinyectar el agua, la solución es reinyectarla bien. Actualmente varios pozos reinyectares tienen serios problemas y el agua está saliendo a la superficie, es decir que están agravando aún más el problema ambiental en la zona. Eso es un poco delicado ponerlo en el documento para el juicio, pero si es necesario indicar que los equipos que entregó Texaco en el 96 para la reinyección del agua de formación no son buenos y no son suficientes.

c. No es necesario poner tanta literatura en el documento, creo que se puede suprimir muchos de esos datos innecesarios.

d. Se debe indicar con más precisión del volumen de agua de formación producida y el volumen de agua reinyectada actualmente.

e. Se debe indicar y aclarar o ratificar que Texaco nunca reinyectó el agua de formación.

f. Hay que clasificar la información, por ejemplo el campo Cuyabeno no es parte del proceso judicial. Esa información sirve más para Petroproducción, no para nosotros.

En fin, hay que pulir el documento y adecuarlo a nuestros intereses, se debe indicar con claridad lo que es de responsabilidad de Texaco y lo que hay que hacer para reparara el daño de Texaco… (hoy Petroproducción).

Quien habla con Reyes para que corrija el documento?


Estas son mis humildes opiniones.


Pablo Fajardo M.

--
Steven Donziger
212-570-4499 (land)
212-570-9944 (fax)
███████████ (cell)

Steven R. Donziger
Law Offices of Steven R. Donziger, P.C.
███████████████████
New York, New York 10025
Email: sdonziger@gmail.com

# EXHIBIT 3657

[Handwritten] 97,414
Ninety-seven thousand four hundred fourteen [initials]

MEMBER OF THE SOCIETY OF ENGINEERS OF ECUADOR

### REGIONAL ASSOCIATION OF GEOTECHNICAL, MINING, OIL AND ENVIRONMENTAL STUDIES ENGINEERS (CIGMYP)

**Official Letter No. 043· CIGMYP-2006**
**Quito, January 20, 2006**

**Dr. Germán Yánez**
**CRIMINAL COURT JUDGE**
**SUCUMBIOS SUPERIOR COURT**
Hand-delivered

Your Honor:

One of the purposes of the **Regional Association of Geotechnical, Mining, Oil and Environmental Studies Engineers, CIGMYP, North**, which has more than 1,500 members, is: to conduct ongoing analysis of the country's geological, mining and oil problems; to advise the State and public- and private-law institutions in conducting studies, presenting projects, and conducting research, contracting, performance, supervision and oversight of works and projects associated with geotechnical engineering, mines and petroleum, ensuring the country's comprehensive development and contributing to the defense and strengthening of the principles aimed at protecting the country's natural resources.

The Transparency and Access to Public Information Act, Law No. 2004-34, provides inter alia, in Article 2, Purpose of the law, Section c) "**Allow the supervision of public administration and public resources, attaining real public oversight**" and in Article 4, Principles of Enforcement, Section e) "**Ensure the transparent handling of public information so as to enable citizen participation in general decision-making and accountability of the different authorities that exercise public power."**

Against this background, I wish to inform you that at the Extended Session of the CIGMYP Board on November 22, 2005, it was decided that our professional association would form an oversight group to monitor the Texaco case being heard by the Court which you so ably preside over.

For best performance and transparent management of the oversight group, at the above-mentioned Board Meeting, oversight was delegated to Fernando Reyes Cisneros and Gustavo Pinto Arteaga, both recognized petroleum engineering professionals, with broad and extensive experience in Environmental Management of hydrocarbon activities.

Therefore I request that the two professionals be provided the necessary assistance to enable them to satisfactorily comply with the task entrusted to them.

I offer my most esteemed regards.

Sincerely,
[signature]
Mr. Gustavo Pinto Artega
PRESIDENT

> [Rectangular filing stamp] SUPERIOR COURT OF JUSTICE OF NUEVA LOJA
> OFFICE OF THE PRESIDENT - RECEIVED in Nueva Loja on January 23, 2006, at 4:45 p.m.
> _copies and -- attached [signature] CLERK

---

Rio Amazonas Building        Av. Amazonas 447 y Roca        Offices 212/214 Telephone: 2541 [illegible]
●        Fax: 2232-006        email: cigmyp@uio.satnet.net   QUITO    ECUADOR, SOUTH AMERICA

[Circular stamp] SUPERIOR COURT OF JUSTICE – NUEVA LOJA [seal]

OFFICE OF THE PRESIDENT'S CLERK [initials]

CERT. MERRILL VER: JD

# MERRILL CORPORATION



Merrill Communications LLC

225 Varick Street
New York, NY 10014 • (212) 620-5600

| | |
|---|---|
| State of New York | ) |
| Estado de Nueva York | ) |
| | )      ss: |
| | )      a saber: |
| County of New York | ) |
| Condado de Nueva York | |

### Certificate of Accuracy
### Certificado de Exactitud

This is to certify that the attached translation is, to the best of our knowledge and belief, a true and accurate translation from Spanish into English of the attached document.

Por el presente certifico que la traducción adjunta es, según mi leal saber y entender, traducción fiel y completa del idioma español al idioma inglés del documento adjunto.

Dated: April 1, 2013
Fecha: 1 de abril de 2013

*Kate Alexander*

Kate Alexander
Project Manager – Legal Translations
Merrill Brink International/Merrill Corporation

_____[firmado]_____

Kate Alexander
Gerente de Proyecto – Traducciones Legales
Merrill Brink International/Merrill Corporation

ROBERT J. MAZZA
Notary Public, State of New York
No. 01MA5057911
Qualified in Kings County
Commission Expires April 1, 2014

Sworn to and signed before
Jurado y firmado ante
Me, this ____1st____ day of
mí, a los ____1____ días del
____April____ 2013
mes de ____abril____ de 2013

Notary Public
Notario Público

[firmado]
[sello]

MIEMBRO DE LA SOCIEDAD
DE INGENIEROS DEL ECUADOR



# COLEGIO REGIONAL DE INGENIEROS GEOLOGOS, DE MINAS , PETROLEOS Y AMBIENTAL, CIGMYP

**Oficio No. 043- CIGMYP-2006**
**Quito, 20 de Enero del 2006**

Señor Doctor
**Germán Yánez**
**JUEZ DE LO PENAL**
**CORTE SUPERIOR DE SUCUMBIOS**
En su despacho

Señor Juez:

**El Colegio de Ingenieros Geólogos de Minas, Petróleos y Ambiental, CIGMYP, Región Norte,** que agrupa a más de 1500 profesionales tiene entre sus finalidades: realizar análisis permanentes de los problemas geológicos, mineros, petroleros del país; Asesorar al Estado y a las Instituciones de Derecho Público o Privado en la realización de estudios, presentación de proyectos, investigaciones, contrataciones, ejecución, supervisión y fiscalización de obras y proyectos relacionados con la Ingeniería Geológica, de Minas y Petróleos velando por el desarrollo integral del país; y, Coadyuvar a la defensa y fortalecimiento de los principios encaminados a proteger y precautelar los recursos naturales del país.

La Ley Orgánica de Transparencia y Acceso a la Información Pública, Ley No. 2004-34, establece entre otras cosas, en su Artículo 2. Objeto de la Ley, literal c) **"Permitir la fiscalización de la administración pública y de los recursos públicos, efectivizándose un verdadero control social"** y en el Artículo 4. Principios de Aplicación de la Ley, literal e) **"Garantizar el manejo transparente de la información pública, de manera que se posibilite la participación ciudadana en la toma de decisiones de interés general y la rendición de cuentas de las diferentes autoridades que ejerzan el poder público".**

Con estos antecedentes, cúmpleme comunicarle que en Sesión Ampliada de Directorio del CIGMYP del 22 de noviembre del 2005, decidió que nuestro gremio profesional conforme una Veeduría para el seguimiento del Caso Texaco que se ventila en la Corte de sus acertada conducción.

Para el mejor cumplimiento y gestión transparente en torno a la Veeduría, en la mencionada Sesión de Directorio, se delegó a los Ingenieros Fernando Reyes Cisneros y Gustavo Pinto Arteaga, ambos reconocidos profesionales de la Ingeniería en Petróleos, con vasta y amplia experiencia en la Gestión Ambiental de la actividad hidrocarburífera.

Por consiguiente, me permito solicitar que a los dos profesionales se les brinde las facilidades del caso, para que puedan cumplir a satisfacción con la responsabilidad a ellos encomendada.

Aprovecho la oportunidad para reiterar a usted los sentimientos de alta consideración y estima.

*Atentamente,*

**ING. GUSTAVO PINTO ARTEAGA**
**PRESIDENTE**

# EXHIBIT 3658

[Handwritten] 157,419
One hundred fifty-seven thousand four hundred nineteen[initials]

*Amicus Curiae* – **Alianza Mundial de Derecho Ambiental**                    [logo]
**Environmental Law Alliance Worldwide**

## María AGUINDA et al. v. CHEVRON TEXACO

## Superior Court of Justice

The Environmental Law Alliance Worldwide (ELAW) and ELAW members from around the world whose names are signed at the end of this document respectfully submit this brief as an *amicus curiae*.

The institution of the *amicus curiae* has its origins in both Roman law and English [common] law, and, even though it is a much more extensive practice in U.S. law, it is also found in several countries.[1] Although neither obligatory nor binding within the proceeding, there have been many cases in which an *amicus curiae* brief points out to the Court a relevant question that the parties have not yet indicated, so it can provide substantial assistance. In this particular case, this brief reference serves as a preamble to convey to the President of the Lago Agrio Superior Court our profound interest in the matters to be decided by this Court.

ELAW hereby requests the Honorable Court of Sucumbíos to accept this brief as a support for its ruling on the claims filed by María Aguinda and the thirty thousand residents of the Ecuadorian Amazon area against the Chevron Texaco Corporation ("Chevron Texaco").

ELAW is a network of over 300 attorneys and scientists in 70 nations who are working to protect the environment and human rights through the law. ELAW was established in 1993 and is currently considered a leading organization in international environmental law. ELAW offers a unique viewpoint on the issues presented to this Court,

---

[1] See *Regents of the University of California v. Bakke*, 438 U.S. 265, and *Toll v. Moreno*, 458 U.S. 1 (1982). Courts in other countries also accept *amicus curiae* briefs; for example, Balverdi, Juan Antonio et al. d/infr. Law 23,737 (Argentina), *Lange v. Australian Broadcasting Corporation* [1997][189 CLR 520 (Australia), and *United Democratic Movement v. President of the Republic of South Africa and Others* (No. 1) (CCT23/02) [2002] ZACC 33;2003 (1) SA 488 (CC); 2002 (11) BCLR 1213 (CC) (October 4, 2002) (Rep. of South Africa). A 1984 article that reviews the use of filings by "Friends of the Court" with the U.S. Supreme Court states: "it has become commonplace for various *amicus* organizations, sometimes even dozens, to file briefs on a given case. Since the briefs submitted by a friend of the court are filed in two thirds of the cases where the rulings of the Supreme Court are made by an opinion, and since it is typical for more than one *amicus* to participate in a given case, it is quite likely that the Supreme Court will actually review more *amicus* briefs than briefs from the parties." Bruce J. Ennis, *Symposium on Supreme Court Advocacy*: Effective Amicus Briefs, 33 *Cath. U.L. Rev.* 603, 604 (1984).

1

CERT. INTERMARK VER: JD

[Handwritten] 157,419, back

given the collective experience of its members, who represent communities and individuals seeking environmental justice in Latin America and the world.

ELAW and the 41 organizations and individuals filing this brief are closely following this proceeding and recognize that this Court faces monumental decisions. As friends of the Court, and with all due respect, we wish to share our knowledge about the legal issues being debated in this case. The corporations and others who are responsible for serious negative impacts on public health and the environment must assume the consequences of their actions. In this particular case, the local communities have sought to obtain justice for many years by confronting a corporation that appears to be determined to elude its responsibility by seeking interminable delays in the lawsuit against it.

Throughout the world we are awaiting the decisions of this Court and its ruling on this important case. With regard to our own concerns, we have observed that the attorneys representing the communities and individuals affected by Chevron Corporation have made significant legal arguments. This concerns us because the way that the Court rules on this case will in all likelihood have an influence on similar cases around the world. The world is watching and anxiously awaiting the results of this proceeding.

The law is in constant evolution due to the need to resolve the problems of the complex world that we live in. At ELAW we have seen how the civil law and the common law are being adapted to deal with issues of law and equity arising out of contamination incidents that cause severe environmental damage and impacts on human health. With the advances in technology and science and increased global trade, the impacts on local communities and the environment have also increased—not only in terms of their scale but also with regard to their effects and consequences. In many of the cases involving the discharge of toxic chemicals into the environment, the Courts have found it necessary to find a way of balancing the disparity between the innocent communities and the powerful corporations that have caused damage during the course of their operations. Traditional legal theories often cannot resolve modern environmental problems.

We are submitting this brief to the Court in order to help clarify some of the fundamental legal issues raised by the communities and individuals seeking justice in this case. In particular, this brief describes the doctrine that should be applied in environmental-law cases of this type: 1) Non-extinguishment of legal actions; 2) Right of individuals to obtain remediation of the environment; 3) Strict liability; and 4) Proof of causation using epidemiological studies.

The majority of Ecuadorian people support these principles calling for the contaminating parties to be held responsible, as reflected in last year's approval of the new Constitution. As this Court is aware,

[Handwritten] 157,420
One hundred fifty-seven thousand four hundred twenty[initials]

Ecuador's Constitution incorporates many of these legal principles as part of a global recognition of the importance of environmental rights.

For example, the Constitution provides that "There is strict liability for environmental damage. Any damage to the environment shall result in not only the imposition of applicable sanctions but also the obligation to fully restore the ecosystem and compensate the affected persons and communities. Each party involved in the processes of producing, distributing, marketing, and using goods or services shall assume direct responsibility for preventing any environmental impact, for mitigating and repairing the damage caused, and for maintaining an on-going system of environmental controls. Legal actions to prosecute and penalize environmental damage shall not be time barred." Article 396.

The Ecuadorian Constitution refers to the importance of protecting the environment and acknowledges that in the event of uncertainty about the impacts of a given activity on the environment, any questions raised shall be resolved in favor of protecting the environment. The Constitution states: "[i]f there is any question about the scope of legal provisions regarding environmental matters, then the provisions shall be applied in the sense most favorable to protecting nature." Article 395(4).

The Constitution also refers to "the individual and collective right to live in a healthy and ecologically balanced environment." Consequently, the State is required to "[a]llow any individual or legal entity, collective, or human group to file lawsuits and to have recourse to the courts of law … without prejudice to their direct interest, in order to obtain effective protection in environmental matters[.]" Article 397.

Finally, the Constitution provides that "the party engaged in the activity or the defendant will bear the burden of proving that there is no actual or potential damage." Article 397(1).

These same principles are expressed in the doctrine discussed in this brief, which has been applied by several courts of law in cases of environmental contamination such as the one filed with this Court.

## I.      Environmental Damage Can Persist Despite the Amount of Time Elapsed

Environmental damage differs in substantial ways from ordinary civil damage, especially with regard to the persistent discharge of toxic substances where the damage is continuous and lasting.

The presence of total petroleum hydrocarbons (TPH) has been documented in the areas operated by Chevron Corporation in Ecuador, as evidenced by the Summary Report of the Expert Inspection Performed by Richard Stalin Cabrera Vega, the expert appointed by the Nueva Loja Court on March 24 , 2008, which indicates that "chemical concentrations [TPH] [were found]  in the soil and water, metals in the soil and water, BTEX and polycyclic aromatic hydrocarbons in

3

CERT. INTERMARK VER: JD

[Handwritten] 157,420, back

the water, chlorides in the water] in the concession [at levels that] exceed the thresholds of toxicity. For example, figures 1 and 2 compare the TPH concentrations in the surface soil in samples taken inside and outside of the pits (respectively) to the threshold of 1,000 mg/kg [standard in Ecuador]. The figures appear together with the data on a logarithmic scale <u>due to the wide concentration range of the data</u>. Figure 1 shows that many samples taken from the surfaces of the pits have concentrations considerably higher than 1,000 mg/kg. The concentrations are up to 1,000 times greater than the threshold values (in the Sacha and Lago Agrio fields), which indicates that <u>the soil is very toxic</u>. Both figures show that high TPH concentrations are found <u>at all fields where the samples were taken</u>.

Fig. 1. TPH concentrations in the surface soil inside the pit areas, by field. The line identifies the threshold value of 1,000 mg/kg. Note that the data are indicated on a logarithmic scale.



Source: Cabrera Vega, R.S. *Summary Report of the Expert Inspection*, March 24, 2008. Expert appointed by the Court of Justice, Nueva Loja, Ecuador.

Fig. 2. TPH concentrations in the surface soil outside the mud pits, by field. The line identifies the threshold value of 1,000 mg/kg. Note that the data are indicated on a logarithmic scale.

[Handwritten] 157,421
One hundred fifty-seven thousand four hundred twenty-one[initials]



Source: Cabrera Vega, R.S. *Summary Report of the Expert Inspection*, March 24, 2008. Expert appointed by the Court of Justice, Nueva Loja, Ecuador.

It is important to note that these results reported in March 2008, which exceed the toxicity thresholds, reveal that concentrations of contaminants exist even after the partial degradation process due to the action of the elements to which they are exposed in the environment and that they reflect the continued presence of these contaminants after the passage of time. In this regard, the March 2008 expert report by Mr. Cabrera states that "the concentrations of barium, copper and zinc exceed the threshold values in many surface soil samples collected during the lawsuit. The information on TPH and metals shows that a large portion of the surface soil at the wells and stations within the concession area have a high enough degree of contamination to cause toxicity in earth organisms." Cabrera Vega, R.S. *Summary Report of the Expert Inspection*, March 24, 2008. Expert appointed by the Court of Justice, Nueva Loja, Ecuador, p. 42.

It is a widely known fact that crude oil contains highly toxic components and polycyclic aromatic hydrocarbons.[2] Recently, scientific studies conducted in Texas concluded, among other things, that polycyclic aromatic hydrocarbons remain present at hydrocarbons exploration and production sites. These scientists established that:

> Hydrocarbons, primarily measured as total petroleum hydrocarbons (TPH), make up the majority of crude oil's components, which contain hundreds of individual compounds. One of these components is polycyclic aromatic hydrocarbons (PAHs), which are the subject of concern due to their proven carcinogenicity and toxicity in the environment

---

[2] Sugiura, K., et al., "Physiochemical Properties and Biodegradability of Crude Oil," *Environmental Science and Technology* 31, 45-51 (1997).

[Circular stamp] PROVINCIAL COURT OF JUSTICE - SUCUMBÍOS [seal]
OFFICE OF THE PRESIDENT'S CLERK [initials]

CERT. INTERMARK VER: JD

[Handwritten] 157,421, back

(Zemanck et al., 1997; Harvey, 1991; ATSDR, 2005). *PAHs have a unique stable chemical structure that allows them to remain in the environment even long after other chemical components have degraded* (Sugiura et al., 1997).

The U.S. Environmental Protection Agency (U.S. EPA) has classified 16 of these PAHs as priority contaminants, based on their toxicity, potential human exposure, frequency of their existence in hazardous waste sites, and other available information. … Of these PAHs, the EPA considers seven chemical compounds to be human carcinogens: benzo(a)anthracene, chrysene, benzo(a)pyrene, benzo(b)fluoranthene, benzo(k)fluoranthene, dibenzo(a,h)anthracene, and indene(1,2,3-cd)pyrene[.][3]

It is our understanding that in this case the Court must determine whether the passage of time has limited the rights of the plaintiffs to initiate a legal action. In environmental matters, it is essential to understand that environmental damage continue to happen every day. Each day that the contaminants remain in the soil, new damage is occurring. We have noted that the Ecuadorian Constitution recognizes this principle and establishes that "[l]egal actions to prosecute and penalize environmental damage shall not be time barred."

## II.     The Plaintiffs have a Right to File this Lawsuit

It is known that the right to claim relief for damage from the person who caused the damage is a substantive right that has been available to the citizens of Ecuador since the 19th century, when the Civil Code was drafted.

Similarly, the obligation to provide relief for damage also has its legal basis in the Civil Code. Art. 2214.  *Any one who commits an intentional tort or an unintentional tort that harms another person is obligated to compensate that person; without prejudice to the penalty that the laws may impose for the intentional tort or unintentional tort.*  Art. 2229 also establishes that, *As a general rule, any damage that may be imputed to the wrongful intent or negligence of another person must be repaired by this person.*

With regard to standing to sue, Ecuador's Environmental Management Act permits any person to file lawsuits for harms to health or the environment.  Article 43 of the Environmental Management Act (EMA) establishes that: "Persons or entities or human groups bound by a common interest and directly affected by a harmful act or omission may file suits for damages and for the deterioration caused to the health or to the environment, including

---

[3] Bojes, H.K & Pope, P.G., "Characterization of EPA's 16 priority pollutant polycyclic aromatic hydrocarbons (PAHs) in tank bottom solids and associated contaminated soils at oil exploration and production sites in Texas," *Regulatory Toxicology and Pharmacology* 47: 288-295 (2007) (emphasis added)

CERT. INTERMARK VER: JD                                                                        6

[Handwritten] 157,422
One hundred fifty-seven thousand four hundred twenty-two[initials]

biodiversity and its constituent elements, with the court of competent jurisdiction." We understand that the old Ecuadorian Civil Code also provides that "*As a general rule, a popular action lawsuit may be pursued in all cases of contingent harm due to someone's negligence or imprudence that threatens undetermined persons. But if the danger threatens only specific persons, then only one of these persons may initiate the action.*" (Art. 2236.)

These rules do not permit restriction of people's right to seek relief for the harm they suffer; indeed, people affected by environmental harm are expressly given standing to sue, and the rules even provide for a popular action lawsuit when there is a threat of harm to undetermined persons.

This right to file suit must include the right to seek protection of the environment. Ecuadorian law is clear that citizens have the right to seek relief, not just for particular harm, but also for harm as a collective-community affected by the damages to the environment, including biodiversity and human health and life (Art. 43, EMA).

## III.     It is Appropriate for the Court to Apply Strict Liability in the Present Case

Many countries apply the theory of strict liability or similar theories in cases where one party engages in hazardous activities (such as petroleum exploration and production) that have caused environmental contamination and harm. Traditional principles of civil liability require proof of intent (fault-based liability) in order to hold the defendant liable for damages. This view of liability focuses almost exclusively on the protection of private interests at the expense of the public interest. This focus suffers severe limitations in situations in which environmental harm has occurred.

Recognizing these limitations, many legal systems have concluded that it is appropriate under certain circumstances to impose liability upon the defendant regardless of intent. The doctrine of strict liability takes as a general rule that a party that engages in dangerous or hazardous activities is liable for any harm caused, regardless of such party's intent. Strict liability is particularly applicable to cases of environmental harm because it requires polluters to internalize the costs of their hazardous activities by incorporating the "polluter pays" principle."[4]

---

[4] The "polluter pays" principle is part of Principle 16 of the Rio Declaration on Environment and Development (1992): "National authorities should endeavour to promote the internalization of environmental costs and the use of economic instruments, taking into account the approach that the polluter should, in principle, bear the cost of pollution, with due regard to the public interest

[Circular stamp] HON. PROVINCIAL COURT OF JUSTICE – SUCUMBIOS [seal]
OFFICE OF THE PRESIDENT'S CLERK [initials]

[Circular stamp] PROVINCIAL COURT OF JUSTICE - SUCUMBÍOS [seal]
OFFICE OF THE PRESIDENT'S CLERK [initials]

CERT. INTERMARK VER: JD

[Handwritten] 157,422, back

Many civil-law and civil-code countries have adopted the doctrine of strict liability. Article 396 of the Ecuadorian Constitution includes a provision regarding strict liability, stating in part: "Liability for environmental damage is strict." Under the laws of Brazil, civil liability for environmental damage is imposed independently of intent. Any person who takes advantage of an economic activity that is known to cause contamination is liable for any adverse impact and must repair the environmental harm and compensate third persons affected by the activity.[5] Mexico and Argentina have similar provisions in their respective civil codes.[6]

In 2001, the Supreme Court of Costa Rica recognized that strict liability must be applied in cases involving environmental harm. In *Flor y Fauna Dos v. Aviación Agricola* case,[7] the court established: "The liability for damage to nature … has always been universally recognized as being strict liability.[8]

The court explained that even though recent constitutional amendments incorporated the constitutional right to a healthy and ecologically balanced environment, the principle of strict liability has always existed:

> Dating back to the most ancient legal documents this principle has always prevailed … if the harm-causing actor has assumed a risk, even though engaged in a lawful activity, if the possible effects of that activity include causing harm to third parties. The decisions of this court have so stated on repeated occasions[.][9]

Outside of the Americas, there is also a strong trend to apply strict liability in cases of environmental harm. In recognition of the dominant nature of environmental contamination derived from industrial activities, fifteen years ago the European Commission researched the need for a consistent standard of civil liability. A 1993 report observes:

---

and without distorting international trade and investment."
http://www.un.org/esa/sustdev/documents/agenda21/spanish/riodeclaration htm
http://www.un.org/documents/ga/conf151/aconfl15126-1annex1 htm
[5] Section 14.1, Environmental Policy Act. No. 6,938 (1981).
[6] Federal Civil Code, Art. 1913 (Mexico); Civil Code of the Republic of Argentina, Art. 1113.
[7] Flor y Fauna Dos v. Aviación Agricola, First Division of the Supreme Court of Justice, Exp. 97-000311-298-AG; Res 00098-F-01 (June 6, 2001), available at:
http://200.91.68.20/scij/busqueda/jurisprudencia/jur_repartidor.asp?param1=XYZ&param2-1&nValor1=1&nValor2-164285&strTipM=T&1Resultado=6.
[8] *Id.*
[9] *Id.*

[Handwritten] 157,423
One hundred fifty-seven thousand four hundred twenty-three[initials]

A community-wide system of civil liability for environmental damage would recover a basic and universal principle of civil law, the concept that a person should rectify the damage that person causes. This legal principle is strongly related to two principles that form the basis of community environmental policy … the principle of prevention and the "polluter pays" principle.

The "polluter pays" principle is evoked because civil liability is a means of making parties that pollute pay for the resulting damage. The prevention principle is involved because the potential polluters who know they will be liable for the costs of remedying the damage they cause will have a strong incentive to avoid causing such damage.[10]

Subsequently, the Commission adopted the Environmental Liability Directive,[11] which imposes strict liability for environmental damage caused by hazardous activities. The majority of the member states of the European Union already have national laws or have adopted such laws that incorporate this standard.[12]

In common law jurisdictions, the doctrine of strict liability for environmental damages has existed since the end of the nineteenth century, when the House of Lords of the United Kingdom held the owner of a water reserve responsible for the harm occasioned when the water from the reserve flooded the underground mining well of a nearby property.[13]  Subsequently, the doctrine was adopted by the courts of Australia, Canada, and the United States of America, among others. A court in the United States of America used the theory of strict liability to hold an oil company liable for ground water contamination caused by the discharge of formation waters into unlined wells.[14]  The court held that, "**An industrial polluter can and must assume the costs of the contamination as a cost of business instead of assigning the loss to a completely innocent party**."[15]

---

[10] Green Paper on Remedying Environmental Damage, COM(93) 47 (Brussels, May 14, 1993), p.5.

[11] 2004/35/CE (April 21, 2004).

[12] See, e.g., Section 432, Civil Code of the Czech Republic; Environmental Damage Liability Law (Denmark); Section 345, Civil Code of Hungary; 2007 Environmental Damages Law (Germany); Law 26/2007, October 23, Environmental Liability (Spain).

[13] Rylands v. Fletcher, (1866) L.R. 1 Exch. 265, 277-280, testimony in the House of Lords, (1868) L.R. 3 H.L. 330, 338-340.

[14] Branch v. Western Petroleum, Inc., 657 p.2d 267 (Utah, 1982) (USA).

[15] Id., 657 F.2d at 275

9

[Circular stamp] PROVINCIAL COURT OF JUSTICE - SUCUMBÍOS [seal]
OFFICE OF THE PRESIDENT'S CLERK [initials]

CERT. INTERMARK VER: JD

[Handwritten] 157,423, back

There is no doubt that the oil exploration and production activities for which ChevronTexaco was responsible must be evaluated under the strict liability standard. Imposing strict liability in this case is compatible with the Ecuadorian Constitution and with the judicial decisions and laws of common-law and civil-law jurisdictions around the world.

### IV.   Health Effects Must Be Proved Under the "More Probable than Not" Standard

Causation is an important element in this case as in any other that involves impacts to health and to the environment due to contamination. Despite the efforts of the scientific community, we do not know -- and may never know -- with certainty the way in which certain chemical compounds and substances interact with natural systems, including the human body. For this reason, plaintiffs seeking damages for adverse impacts on the environment and damage to public health find it difficult to prove causation. Polluters take advantage of this uncertainty, and conduct their activities with impunity, causing injustice to innocent communities and to the environment.

To prevent these injustices and to hold polluters liable, especially in civil cases involving toxic substances (civil torts), the burden of proof to prove causation should not be as rigorous as in cases of traditional negligence. Otherwise, plaintiffs would never obtain damages for the harm caused, since they would not be able to prove beyond a reasonable doubt that a specific toxic substance caused an illness. Article 397 of the Ecuadorian Constitution addresses this inequality in establishing: "[t]he party engaged in the activity or the defendant will bear the burden of proving that there is no actual or potential damage." As explained a few lines down, this court should adopt a similar principle with respect to causation in this case in particular.

A modern causation standard regularly used in common-law jurisdictions is one of "reasonable medical probability" described generally as "more probable than not." To satisfy this standard, the plaintiff must establish general causation (that a chemical substance or toxin can produce the harm at issue in the case) and must also establish this specific causation through epidemiological studies. As the U.S. Court of Appeals for the Ninth Circuit explains: "Causation can be proved even when we don't know precisely *how* the damage occurred, if there is sufficiently compelling proof that the agent must have caused the harm *somehow*. One method of proving causation in these circumstances is statistical evidence."[16] Epidemiological studies employ statistical tools to determine whether there is a causal relation between a specific factor (such as a toxin or a chemical substance) and a specific human illness.

---

[16] Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311, 1314 (9th Cir. 1995) (emphasis in original).

CERT. INTERMARK VER: JD                                                                                    10

Because the "more probable than not" standard requires a percentage of probability greater than 50 percent, the courts consider the approximate calculation of "relative risk" reported in epidemiological studies.  "Relative risk" is a number that describes the increase in the incidence of the disease in question in the population exposed to the toxin in comparison to the control population not exposed to the toxin.  For example, a relative risk of 1.0 means that the toxin or chemical does not have an effect on the incidence of the disease.  To the extent that the relative risk exceeds 1, there is a stronger causal connection between the toxin and the disease in question.  If the relative risk exceeds 2.0, it can be said that there is a greater than 50 percent probability that the toxin has caused the disease in question.

A relative risk greater than 2.0 permits us to infer that the plaintiff's disease "is more probably than not" caused by a particular toxin or chemical substance.  A considerable number of courts in numerous cases have accepted this reasoning.[17]  In this case, the epidemiological studies submitted by the citizens affected by the contamination produced by ChevronTexaco in the Ecuadorian Amazon clearly establish a sufficient causal connection:

– A study of leukemia in children demonstrated a relative risk of more than 2.0.[18]

– A study that compares cancer rates in towns near the oil fields that demonstrates relative risk values greater than 2.0 with respect to stomach, rectal, skin, kidney and tissue cancers, in men; cervical and lymphatic system cancers in women and hematopoietic cancer in children under 10 years old.[19]

When the epidemiological studies produce a relative risk of 2.0 or less, the courts still consider these studies together with other clinical or laboratory evidence, which strengthens the relationship of causation and the disease.  Like the strands in a cable, this evidence taken together circumstantially proves causation with sufficient probability (for example: we can say more than 50 percent).[20]

---

[17] Green, M.D., et al, Reference Guide on Epidemiology, 384 (published as part of the Reference Manual on Scientific Evidence (2000) prepared for the U.S. judges by the Federal Judicial Center.  Available at http://www.fjc.gov/puhlic/pdf.nsf/lookup/sciman07.pdf/$file/sciman07.pdf.

[18] Hurtig, AK. & San Sebastian, M., Incidence of Childhood Leukemia and Oil Exploitation in the Amazon Basin of Ecuador, 10 International Journal of Occupational and Environmental Health, 245, 250 (2004).

[19] Hurtig, AK and San Sebastian, M., Geographical differences in cancer incidence in the Amazon Basin in Ecuador in relation to residence near oil fields, 31 International Journal of Epidemiology, 1021, 1027 (2002).

[20] See, e.g., In Re Joint Eastern and Southern District Asbestos Litigation, 52 F. 3d 1124, 1128 (2nd Cir. 1995) (USA case).

11

[Circular stamp] PROVINCIAL COURT OF JUSTICE - SUCUMBÍOS [seal]
OFFICE OF THE PRESIDENT'S CLERK [initials]

CERT. INTERMARK VER: JD

[Handwritten] 157,424, back

A similar approach is used in Australia, where the Court of Appeals of New South Wales established: "the test of actual persuasion does not require epidemiological studies to reach the level of a Relative Risk of 2.0, even where that is the only evidence available to a court. Nevertheless, the closer the ratio approaches 2.0, the greater the significance that can be attached to the studies for the purposes of drawing an inference of causation in an individual case. The 'strands in the cable' must be capable of bearing the weight of the ultimate inference."[21]

The court must apply a "more probable than not" causation standard, because it reflects the modern focus of causation analysis in litigation in the civil arena—particularly when toxic substances are involved (such as PAHs) that are known or suspected to be carcinogenic substances and that remain in the environment for long periods of time.  This principle is succinctly summarized in the U.S. District Court case *Allen v. United States*:

> In a case where a plaintiff tries to establish a factual connection between a particular "cause" and a delayed, non-specific effect such as cancer or leukemia, the strongest evidence of the relationship is likely to be statistical in form. Where the injuries are causally indistinguishable, and where experts cannot determine whether an individual injury arises from culpable human cause or non-culpable natural causes, evidence that there is an increased incidence of the injury in a population following exposure to defendant's risk-creating conduct may justify an inference of "causal linkage" between defendant's conduct and plaintiff's injuries.[22]

## CONCLUSION

ELAW and its members who sign the bottom of this brief respectfully submit this Amicus Curiae brief to share with the court our collective experience in the field of environmental law and damages, with the hope that the court will find the current report informative for the evaluation of the legal issues debated in the current case.

Dated: June 15, 2009

[Rectangular filing stamp] SUPERIOR COURT OF JUSTICE OF NUEVA LOJA-OFFICE OF THE PRESIDENT - RECEIVED in Nueva Loja on June 21, 2009, at [illegible time] - [signature] CLERK

[Signed]
Bern Johnson
Executive Director
Environmental Law Alliance Worldwide

[Stamp] Official Seal of the Notary Public of Oregon, Nancy Garboden, Commission No. 419718, Commission Expires July 19, 2011

---

[21] Seltsam Ply. Ltd. v. McGuiness [2000] NSCWA 29 [illegible] 137.

[22] Allen v. United States, 588 F. Supp. 247, 416 (D. Utah 1984), rev'd on other grounds, 816 F.2d 1417 (10th Cir. 1988), cert. denied 484 U.S. 1004 (1988).

[Handwritten] 157,425
One hundred fifty-seven thousand four hundred twenty-five[initials]

Sarguna Kumaari Munusamy, Legal Advisor, Consumers' Association of Penang (Malaysia)

Theivanai Amarthalingam, Legal Advisor, Consumers' Association of Penang (Malaysia)

Fernando Ochoa, [Mexican Center for Defense of the Environment] (Mexico)

Carla O. Garcia Zendejas, Environmental lawyer (Mexico)

Gustavo Alanis, [Mexican Center for Defense of the Environment] (Mexico)

Carlos Valentín Veyna Martínez, [Environmental Law Institute] (Mexico)

Ivonne Alvarez Gutiérrez, [Environmental Law Institute] (Mexico)

Tonio Kellner Lassard, [Environmental Law Institute] (Mexico)

Rosa Elena López de Rivera, [Environmental Law Institute] (Mexico)

Lottie Cunningham, CEJUDHCAN [Center for Justice and Human Rights on the Atlantic Coast of Nicaragua] (Nicaragua)

Yersil Nikolas Sánchez Espino, [Center of Environmental Incidence] (Panama)

Anne Kajir, Public Interest Environmental Lawyers and Environmental Law Centre (Papa New Guinea)

Effrey Dademo, PNG Eco-Forestry Forum (Papa New Guinea)

Sarah N. Tsiamalili, Environmental Law Center Ltd. (Papa New Guinea)

Diana Mewerimbe, LLB, Public Interest Environmental Lawyer, Environmental Law Centre (Papa New Guinea)

César Leonidas Gamboa Balbín, President, [Law, Environment, and Natural Resources] (Peru)

Ekologicka Pravni Servis (Czech Republic)

Euren Cuevas Medina, President of the [Institute of Lawyers for Protection of the Environment] (Dominican Republic)

Martin Stoffa, Attorney (Slovakia)

Hemantha Withanage, Executive Director, Centre for Environmental Justice (Sri Lanka)

Rugemeleza Nshala, Lawyers Environmental Action Team (Tanzania)

14

[Circular stamp] PROVINCIAL COURT OF JUSTICE - SUCUMBÍOS [seal]
OFFICE OF THE PRESIDENT'S CLERK [initials]

CERT. INTERMARK VER: JD

[Handwritten] 157,425, back

*Other signatory organizations and individuals*:

Environmental Defender's Office Ltd (NSW) (Australia)

Candy Gonzalez, Belize Institute of Environmental Law and Policy (Belize)

Andrés P. Pirazzoli, Environmental attorney (Chile)

Jingjing Zhang, Attorney (China)

Ruth Solano Vásquez, Director of Litigation, Justice for Nature (Costa Rica)

Emily Yozell Wolf, President, [Justice for Nature] (Costa Rica)

[Association for Environmental Justice] (Spain)

Eduardo Salazar Ortuño, Environmental attorney (Spain)

John Bonine, Law Professor, University of Oregon School of Law (United States)

Cheryl Coon, Attorney (United States)

Merab Barbakadze, Legal Society Association (Georgia)

Augustine Niber, Executive Director, Center for Public Interest Law (Ghana)

Mara Bocaletti, [Environmental and Water Law Alliance] (Guatemala)

Jeanette de Noack, [Environmental and Water Law Alliance] (Guatemala)

Nityanand Jayaraman, Corporate Accountability Desk (India)

P.B. Sahasranaman (India)

Jamaica Environment Trust (Jamaica)

Michael Ochieng Odhiambo, Resource Conflict Institute and the Western Kenya Environmental Law Centre (Kenya)

Maurice Odhiambo Makoloo, Director, Institute for Law and Environmental Governance (Kenya)

Jessica Ram Binwani, Legal Advisor, Consumers' Association of Penang (Malaysia)

[Trans: Pages so numbered in source]

CERT. INTERMARK VER: JD                                                          13

## CERTIFICATE OF ACCURACY

STATE OF GEORGIA

                                        SS:

COUNTY OF WALKER

Thomas West, being duly sworn, deposes and says:

That the translation into English of the attached documents in the Spanish language is a true and complete translation to the best of my knowledge, ability and belief.

_____

Thomas West
INTERMARK LANGUAGE
SERVICES CORPORATION

Subscribed and sworn to before me this day, <u>Monday, March 28, 2011</u>.

_____
Notary Public

Notary Public, Walker County, Georgia
My Commission Expires July 8, 2011



*157419*
*Ciento Cincuenta y*
*Siete mil, Cuatro cient.*
*diez i nueve*

**Amicus Curiae -- Alianza Mundial de Derecho Amiental**

**María AGUINDA y Otros vs. CHEVRONTEXACO**

**Corte Superior de Justicia**

La Alianza Mundial de Derecho Ambiental (Environmental Law Alliance Worldwide - ELAW) y los miembros de ELAW alrededor del mundo quienes firman al pie del presente documento, respetuosamente presentan este informe como Amicus Curiae.

La institución del *amici curiae*, proviene tanto del derecho romano como del derecho inglés, pero aunque es conocido que se trata de una práctica mucho más extendida en el derecho estadounidense la encontramos en varios países[1]. Sin que sea obligatorio ni vinculante dentro del proceso, se han dado muchos casos en los que un escrito de un *amicus curiae* destaca ante la Corte una cuestión relevante que las partes aún no le han señalado, por lo que puede brindarle una ayuda considerable. En este caso, esta breve referencia sirve de preámbulo para expresar a la Presidencia de la Corte Superior de Lago Agrio nuestro profundo interés en los asuntos que tendrá que decidir esta Corte.

ELAW solicita a la Honorable Corte de Justicia de Sucumbíos que acepte este informe como sustento para resolver acerca de las pretensiones presentadas por María Aguinda y los treinta mil habitantes de la Amazonía Ecuatoriana contra la Corporación ChevronTexaco ("ChevronTexaco").

ELAW es una red de más de 300 abogados y científicos en 70 países que trabajan para proteger el medio ambiente y los derechos humanos a través de la ley. ELAW se formó en 1993 y es considerada actualmente una organización líder en derecho ambiental internacional. ELAW ofrece una perspectiva única a las cuestiones presentadas ante esta

---

[1] Ver *Regents of the University of California v. Bakke* 438 U.S. 265 y *Toll v. Moreno*, 458 U.S.1(1982). Los tribunales en otros países también aceptan los documentos de *Amicus Curiae*, por ejemplo, Balverdi, Juan Antonio y otros d/infr. a la ley 23.737 (Argentina), *Lange v. Australian Broadcasting Corporation* [1997][ 189 CLR 520 (Australia), y *United Democratic Movement v. President of the Republic of South Africa and Others* (No. 1) (CCT23/02) [2002] ZACC 33;2003 (1) SA 488 (CC); 2002 (11) BCLR 1213 (CC) (4 de octubre del 2002) (Rep. de Sudafrica). Un artículo de 1984 que revisa el uso de las sumisiones de los Amigos de la Corte" en la Corte Suprema de los EEUU indica: "ha llegado a ser común para varias organizaciones del amicus, a veces docenas, someter informes en un caso determinado. Puesto que los documentos entregados por un amigo de la corte se presentan en dos tercios de todos los casos en los que las decisiones de la Corte Suprema se toman por opinion, y en vista que es común que mas de un amicus participe en un determinado caso, es muy posible que la Corte Suprema ahora revise mas informes de amici que de las partes." Bruce J. Ennis, *Symposium On Supreme Court Advocacy:* Effective Amicus Briefs, 33 Cath .U.L. Rev. 603, 604 (1984).

Corte debido a la experiencia colectiva de sus miembros que representan a comunidades e individuos en búsqueda de justicia ambiental en América Latina y el mundo.

ELAW y las 41 organizaciones e individuales que presentan este informe están siguiendo de cerca este proceso y reconocen que esta Corte enfrenta decisiones monumentales. Como amigos de la Corte y con el debido respeto queremos compartir nuestros conocimientos acerca de las cuestiones legales debatidas en el presente caso. Las corporaciones y otros responsables por impactos negativos graves a la salud pública y al medio ambiente deben asumir las consecuencias de sus acciones. En el presente caso, las comunidades locales han procurado obtener justicia por muchos años enfrentándose a una Corporación que parece determinada a eludir su responsabilidad mediante el logro de interminables retrasos en el proceso legal seguido en su contra.

Al alrededor del mundo estamos a la espera de las decisiones de esta Corte y la manera en que esta resuelva este importante caso. En lo que nos concierne hemos notado que los abogados representantes de las comunidades e individuos afectados por la empresa Chevron Corporation han presentado argumentos legales importantes. Nos concierne porque la manera en que la Corte resuelva este caso muy posiblemente influirá en las decisiones de casos similares alrededor del mundo. El mundo está observando y esperando con ansias los resultados de este proceso.

El Derecho se encuentra en constante evolución debido a la necesidad de resolver los problemas del mundo complejo en el que vivimos. En ELAW, hemos observado como el derecho civil y anglosajón se están adaptado para poder lidiar con cuestiones legales y de equidad derivadas de incidentes de contaminación causantes de daños ambientales severos e impactos a la salud humana. Con los avances en la tecnología, la ciencia y el incremento del comercio mundial, los impactos a las comunidades locales y el medio ambiente también han aumentado—no solo en escala sino también en cuanto a sus efectos y consecuencias. En muchos de los casos que involucran la descarga de sustancias químicas tóxicas en el medio ambiente, las Cortes se han visto en la necesidad de encontrar la forma de equilibrar la disparidad entre las comunidades inocentes y los poderosas corporaciones que han causado daños durante el curso de sus operaciones. Con frecuencia las teorías legales tradicionales no pueden resolver los problemas ambientales modernos.

Presentamos este informe a la Corte con la finalidad de aportar con el esclarecimiento sbre algunas de las cuestiones legales fundamentales planteadas por las comunidades e individuos quienes se encuentran en búsqueda de justicia en este caso. En particular este informe describe las doctrinas que deberían ser aplicadas en casos de derecho ambiental de esta naturaleza: 1) Imprescriptibilidad de acciones legales; 2) Derecho de los individuos a obtener la remediación del medio ambiente; 3) Responsabilidad objetiva; y 4) Prueba de la causalidad mediante estudios epidemiológicos.

El pueblo de la Republica del Ecuador en su mayoría respalda estos principios de responsabilidad de los contaminadores, como ha sido reflejado en la aprobación de la nueva Constitución de la Republica el año pasado. Como es de conocimiento de esta

2

157420
Ciento cincuentay
siete mil, cuatrocientos
veinte

Corte, la Constitución ecuatoriana incorpora muchas de estas doctrinas como parte de un reconocimiento global de la importancia de los derechos ambientales.

Por ejemplo, la Constitución establece que "La responsabilidad por los daños ambientales es objetiva. Todo daño al ambiente, además de las sanciones correspondientes, implicará también la obligación de restaurar integralmente los ecosistemas e indemnizar a las personas y comunidades afectadas. Cada uno de los actores de los procesos de producción, distribución, comercialización y uso de bienes o servicios asumirá la responsabilidad directa de prevenir cualquier impacto ambiental, de mitigar y reparar los daños que ha causado, y de mantener un sistema de control ambiental permanente. Las acciones legales para perseguir y sancionar por daños ambientales serán imprescriptibles." Art. 396.

La Constitución ecuatoriana se refiere a la importancia de la protección del medio ambiente y reconoce que en caso de incertidumbre sobre los impactos de una actividad en el medio ambiente, cualquier pregunta al respecto será resuelta a favor de la protección del medio ambiente. La Constitución dice: "[e]n caso de duda sobre el alcance de las disposiciones legales en materia ambiental, éstas se aplicarán en el sentido más favorable a la protección de la naturaleza." Art. 395(4).

También la Constitución hace referencia al "derecho individual y colectivo a vivir en un ambiente sano y ecológicamente equilibrado." Por lo que de manera consecuente se requiere que el Estado "[p]ermit[a] a cualquier persona natural o jurídica, colectividad o grupo humano, ejercer las acciones legales y acudir a los órganos judiciales. . . sin perjuicio de su interés directo, para obtener de ellos la tutela efectiva en materia ambiental[.]" Art. 397.

Finalmente la Constitución establece que "[l]a carga de la prueba sobre la inexistencia de daño potencial o real recaerá sobre el gestor de la actividad o el demandado." Art. 397(1).

Estos mismos principios están expresados en las doctrinas legales presentadas en este informe, los cuales han sido aplicados por varias cortes de justicia en casos de contaminación ambiental como el presentado en esta Corte.

## I.   El Daño Ambiental Puede Persistir a Pesar del Tiempo Transcurrido

El daño ambiental es distinto en formas considerable a los daños ordinarios civiles. Particularmente con respecto a la descarga de sustancias tóxicas y persistentes en las que el daño es continuo y duradero.

Se ha documentado la presencia de hidrocarburos totales de petróleo (TPH) en las áreas de operación de la empresa Chevron Corporation en el Ecuador como consta en el Dictamen Pericial, Informe Sumario del Examen Pericial a cargo del Ingeniero Richard Stalin Cabrera Vega, Perito de la Corte de Justicia de Nueva Loja con fecha 24 de Marzo del 2008, el que señala que se encontraron "concentraciones químicas [THP en suelo, agua, metales en el suelo y en el agua, BTEX e hidrocarburos aromáticos policíclicos em...

*157490*
*Vuelta*

el agua, cloruros en agua] en la concesión [a niveles que] exceden los umbrales de toxicidad. Por ejemplo, las figuras 1 y 2 comparan las concentraciones de TPH en los suelos superficiales en muestras tomadas por dentro y fuera de las piscinas (respectivamente) con el umbral de 1.000 mg/kg [estándar de Ecuador]. Las cifras aparecen con los datos en una escala logarítmica debido a la amplia variedad en la concentración de los datos. La figura 1 indica que muchas muestras tomadas de las superficies de las piscinas presentan concentraciones muy por encima de los 1.000 mg/kg. Las concentraciones son hasta 1.000 veces superiores al umbral (en los campos Sacha y Lago Agrio),, lo que indica que el suelo es muy tóxico. Ambas figuras muestran que altas concentraciones de TPH se presentan en todos los campos donde se tomaron las muestras.

Fig. 1 Concentraciones e TPH en los suelos superficiales del área de las piscinas, por campo. La línea representa el umbral de 1.000 mg/kg. Tener en cuenta que los datos se muestran en escala logarítmica



Fuente: Cabrera Vega, R.S. *Informe Sumario del Examen Pericial, Dictamen Pericial,* 24 de marzo del 2008. Perito de la Corte de Justicia de Nueva Loja, Ecuador.

Fig. 2. Concentraciones de TPH en los suelos superficiales fuera de las piscinas por campo. La línea representa el umbral de 1.000 mg/kg. Tener en cuenta que los datos se muestran en una escala logarítmica

4

157 421
Ciento Cincuenta y
siete mil, cuatrocientos
veintiuno.



Fuente: Cabrera Vega, R.S. *Informe Sumario del Examen Pericial, Dictamen Pericial,*
24 de marzo del 2008. Perito de la Corte de Justicia de Nueva Loja, Ecuador.

Es necesario precisar que estos resultados reportados en Marzo del 2008 que exceden los
umbrales de toxicidad dan cuenta de concentraciones de contaminantes aun después del
proceso parcial de degradación por acción de los elementos a los que se encuentran
expuestos en el ambiente y que reflejan la persistencia de estos contaminantes aun
transcurrido el tiempo. El informe pericial del Ing. Cabrera Vega de Marzo del 2008
sostiene a este respecto que "las concentraciones de bario, cobre y zinc exceden los
umbrales en muchas muestras de suelo superficial recolectadas durante el litigio. La
información sobre TPH y metales muestra que una gran parte del suelo superficial en los
pozos y estaciones dentro de la concesión presentan una contaminación lo
suficientemente alta como para provocar la toxicidad en los organismos terrestres",
Cabrera Vega, R.S. *Informe Sumario del Examen Pericial, Dictamen Pericial,* 24 de
marzo del 2008. Perito de la Corte de Justicia de Nueva Loja, Ecuador p. 42.

Es de conocimiento general que el petróleo crudo contiene elementos altamente tóxicos e
hidrocarburos policíclicos aromáticos.[2] Recientemente entre las conclusiones de estudios
científicos del Estado de Texas en los Estados Unidos de Norteamérica se encuentran la
confirmación de la continua presencia de hidrocarburos policíclicos aromáticos en
lugares de exploración y producción de hidrocarburos. Estos científicos establecieron
que:

> Los hidrocarburos, principalmente medidos como hidrocarburos totales de
> petróleo (TPH), comprenden la mayoría de los componentes del petróleo crudo,
> los que contienen cientos de compuestos individuales. Uno de estos componentes
> son los hidrocarburos policíclicos aromáticos (PAHs), objeto de preocupación
> debido a demostrada carcinogenicidad y toxicidad en el medio ambiente

---

[2] Sugiura, K., et al., *Physiochemical Properties and Biodegradability of Crude Oil*
Environmental Science and Technology 31, 45-51 (1997).

*157. 421*
*Vuelta*

(Zemanek et al., 1997; Harvey, 1991; ATSDR, 2005). *Los PAHs tienen una estructura química estable única que resulta en su persistencia continua en el ambiente aun por mucho tiempo después que otros compuestos químicos se degradan* (Sugiura et al., 1997).

La Agencia de Protección del Ambiente de los EEUU [U.S. Environmental Protection Agency - EPA] ha clasificado 16 de estas PAHs como contaminadores prioritarios, basándose en su toxicidad, potencial exposición humana, frecuencia de su existencia en lugares de sustancias peligrosas e información disponible.....De estos PAHs, la EPA considera siete compuestos químicos como carcinogénicos humanos: benzo(a) antraceno, criseno, benzo(a) pireno, benzo(b) fluoranteno, benzo(k) fluoranteno, dibenzo(a,h) antraceno, y el indeno(1,2,3-cd) pireno[.][3]

Nosotros entendemos que en el presente caso, la Corte debe determinar si el paso del tiempo ha limitado los derechos de los demandantes a iniciar una acción legal. En materia ambiental, es crítico entender que los daños ambientales continúan sucediendo cada día. Cada día que los contaminantes continúan en el suelo un nuevo daño está ocurriendo. Hemos notado que la Constitución ecuatoriana reconoce este principio y establece lo siguiente: "[l]as acciones legales para perseguir y sancionar por daños ambientales serán imprescriptibles."

## II.   Los Demandantes Tienen Derecho a Iniciar la Presente Acción Legal

Es conocido que el derecho a reclamar la reparación de daños al causante de los mismos es un derecho sustantivo que ampara a los ciudadanos del Ecuador desde el siglo XIX, en que se escribió el Código Civil.

Del mismo modo, la obligación de indemnizar los daños también tiene asidero legal en el Código Civil. *Art. 2214.- El que ha cometido un delito o cuasidelito que ha inferido daño a otro, está obligado a la indemnización; sin perjuicio de la pena que le impongan las leyes por el delito o cuasidelito.* También dispone que *Art. 2229.- Por regla general todo daño que pueda imputarse a malicia o negligencia de otra persona debe ser reparado por ésta.*

En cuanto a la legitimación activa, la ley ambiental del Ecuador permite a cualquier persona iniciar acción legal por daños a la salud o al medio ambiente. El Artículo 43 de la Ley de Gestión Ambiental (LGA) establece: "Las personas naturales, jurídicas o grupos humanos, vinculados por un interés común y afectados directamente por la acción u omisión dañosa podrán interponer ante el juez competente, acciones por daños y perjuicios y por el deterioro causado a la salud o al medio ambiente incluyendo la

---

[3] Bojes, H.K. & Pope, P.G., *Characterization of EPA's 16 priority pollutant polycyclic aromatic hydrocarbons (PAHs) in tank bottom solids and associated contaminated soils at oil exploration and production sites in Texas,* 47 Regulatory Toxicology and Pharmacology 288-295 (2007) (énfasis añadido).

157422
Ciento Cincuenta y
Siete mil, Cuatrocient
veinti dos.

biodiversidad con sus elementos constitutivos." Tenemos entendido que del mismo modo en el antiguo Código Civil ecuatoriano también se establece que *"Por regla general se concede acción popular en todos los casos de daño contingente que por imprudencia o negligencia de alguno amenace a personas indeterminadas. Pero si el daño amenazare solamente a personas determinadas, sólo alguna de éstas podrá intentar la acción."* (Art. 2236).

Estas normas no permiten que se restrinja el derecho de las personas a buscar la reparación de los daños que sufren, a tal punto que expresamente se establece la legitimación para los afectados por daños ambientales, e incluso se prevé la acción popular ante amenazas de daños a personas indeterminadas.

Este derecho a interponer acciones debe incluir el derecho a solicitar la protección del medio ambiente. La ley del Ecuador es clara al establecer que los ciudadanos tienen el derecho a buscar la reparación no sólo de los daños sufridos a título particular, sino también como comunidad-colectividad afectada por los daños al medio ambiente, incluyendo la biodiversidad, la salud y vida de las personas (art.43 LGA).

### III.   Es Apropiado que la Corte Aplique el Principio de Responsabilidad Objetiva en el Presente Caso

Muchos países aplican la teoría de la responsabilidad objetiva u teorías legales similares, en casos donde una parte se ha visto involucrada en actividades peligrosas (tales como exploración y explotación de petróleo) que han causado contaminación ambiental y daños. Los principios tradicionales de responsabilidad civil requieren que se pruebe la intención (responsabilidad subjetiva) a efecto de establecer la responsabilidad de la parte demandada en cuanto al pago de la compensación por daños. Esta posición con respecto a la responsabilidad se enfoca casi de forma exclusiva en la protección de los intereses privados a costa del interés público. Dicho enfoque tiene severas limitaciones en situaciones en las cuales ha ocurrido un daño al ambiente.

Reconociendo estas limitaciones, muchos sistemas judiciales han determinado que es apropiado bajo ciertas circunstancias imponer la responsabilidad en el demandado sin importar su intención. La doctrina de la responsabilidad objetiva tiene como regla general que la parte que realiza actividades peligrosas o riesgosas es responsable por el daño ocasionado sin importar la intención. La responsabilidad objetiva es particularmente aplicable en casos de daño al medio ambiente por cuanto obliga a los contaminadores a internalizar los costos de sus actividades riesgosas incorporando el principio "del contaminador pagador"[4].

---

[4] El principio de "el que contamina paga" es parte del Principio 16 de la Declaración de Río sobre Medio Ambiente y Desarrollo (1992): *"Las autoridades nacionales deberían procurar fomentar la internalización de los costos ambientales y el uso de instrumentos económicos, teniendo en cuenta el criterio de que el que contamina debe, en principio, cargar con los costos de la contaminación, teniendo debidamente en cuenta el interés*

*1 5 + 422*

*vuelta*

Muchos países dentro del sistema de derecho civil o codificado han adoptado la doctrina de la responsabilidad objetiva. La Constitución ecuatoriana en su artículo 396 incluye una provisión acerca de la responsabilidad objetiva que señala en parte: "La responsabilidad por daños ambientales es objetiva." Bajo las leyes de Brasil, la responsabilidad civil por daños ambientales se impone en forma independiente a la intención. Cualquier persona que tome ventaja de una actividad económica conocida como causante de contaminación es responsable por cualquier impacto adverso y debe reparar el daño causado al medio ambiente y a terceras personas afectadas por la actividad.[5] México y Argentina tienen provisiones similares en sus respectivos códigos civiles.[6]

En el 2001, la Corte Suprema de Costa Rica reconoció que debe aplicarse la responsabilidad objetiva en los casos que involucran daños ambientales. En el caso *Flor y Fauna Dos v. Aviación Agrícola*,[7] la Corte estableció: "La responsabilidad derivada de daños causados a la naturaleza... universalmente siempre se ha considerado como una responsabilidad de carácter objetiva."[8]

La Corte explicó que aunque las enmiendas constitucionales recientes incorporan el derecho constitucional a un ambiente sano y ecológico equilibrado, el principio de responsabilidad objetiva siempre ha existido:

> Desde los más remotos documentos jurídicos este criterio siempre ha imperado... si el agente dañoso ha asumido un riesgo, aún cuando sea bajo una dimensión de una actividad lícita, si dentro de sus posibles efectos se pueden incluir el causarle un mal a terceros. La jurisprudencia de esta Sala se ha pronunciado en repetidas ocasiones[.]"[9]

Fuera de las Américas, existe también una fuerte tendencia de aplicar la responsabilidad objetiva en caso de daño ambiental. En reconocimiento de la naturaleza dominante de la contaminación ambiental derivada de actividades industriales, la Comisión Europea hace quince años, investigó la necesidad de un estándar consistente de responsabilidad civil. Un reporte de 1993 observa:

---

*público y sin distorsionar el comercio ni las inversiones internacionales*."
http://www.un.org/esa/sustdev/documents/agenda21/spanish/riodeclaration.htm
http://www.un.org/documents/ga/conf151/aconf15126-1annex1.htm.
[5] Section 14.1, Environmental Policy Act No. 6.938 (1981).
[6] Código Civil Federal Art. 1913 (México); Código Civil de la República Argentina, Art. 1113.
[7] *Flor y Fauna Dos v. Aviación Agrícola*, Sala Primera de la Corte Suprema de Justicia, Exp. 97-000311-298-AG; Res 000398-F-01 (6 de junio del 2001), disponible en: http://200.91.68.20/scij/busqueda/jurisprudencia/jur_repartidor.asp?param1=XYZ&param2=1&nValor1=1&nValor2=164285&strTipM=T&lResultado=6.
[8] *Id.*
[9] *Id.*

8

157 423
Ciento Cincuenta y siete
mil, cuatrociento veint
tres.

Un sistema a nivel comunitario de responsabilidad civil en relación al
daño ambiental rescataría un principio básico y universal del derecho civil,
el concepto que una persona debe rectificar los daños que ha causado.
Este principio legal está fuertemente relacionado con dos principios que
forman la base de las políticas ambientales de la Comunidad . . . el
principio de prevención y el principio "el que contamina paga".

Se evoca el principio "el que contamina paga" debido a que la
responsabilidad civil es un medio para que las partes causantes de la
contaminacion paguen por los daños resultantes. El principio de
prevención es implicado por que los potenciales contaminadores que
saben que serán responsables por los costos de remediación el daño que
causan tengan un incentivo importante de evitar dicho daño. [10]

Por subsiguiente la Comisión adopta la Directiva sobre Responsabilidad
Medioambiental,[11] la cual impone la responsabilidad objetiva por daño al medio ambiente
causado por actividades peligrosas. La mayoría de los Estados miembros de la Unión
Europea ya tienen o han adoptado leyes nacionales que incorporan este estándar.[12]

En jurisdicciones de derecho anglosajón, la doctrina de responsabilidad objetiva acerca
de los daños ambientales ha existido desde finales del siglo diecinueve, cuando la Casa
de los Caballeros del Reino Unido responsabilizó al dueño de una reserva de agua por los
daños ocurridos cuando el agua contenida inundó el pozo subterráneo minero de una
propiedad cercana.[13] Posteriormente, la doctrina ha sido adoptada por las Cortes de
justicia de Australia, Canadá y los Estados Unidos de Norteamérica entre otros. Una
Corte en los Estados Unidos de Norteamérica uso la teoría de responsabilidad objetiva
para responsabilizar a una empresa petrolera por contaminación de agua subterránea
causada por el vertimiento de las aguas de formación en pozos sin revestimiento.[14] La
corte sostuvo que **"Un contaminador industrial puede y debe asumir los costos de la
contaminación como un gasto de las actividades comercial en lugar de cargar la
pérdida a una parte enteramente inocente."**[15]

---

[10] *Green Paper on Remedying Environmental Damage*, COM(93) 47 (Bruselas, 14 de
mayo de 1993), p. 5.
[11] 2004/35/CE (21 de abril del 2004).
[12] Ver, e.g., Sección 432, Código Civil de la Republica Checa; Ley de Responsabilidad
por Daño Ambiental (Dinamarca); Sección 345, Código Civil de Hungría; Ley de Daño
Ambiental 2007 (Alemania); Ley 26/2007, de 23 de octubre, de Responsabilidad
Ambiental (España).
[13] *Rylands v Fletcher*, (1866) L.R. 1 Exch. 265, 277-280, testimonio por la Cámara de
los Lores, (1868) L.R. 3 H.L. 330, 338-340.
[14] *Branch v. Western Petroleum, Inc.*, 657 P.2d 267 (Utah, 1982) (EEUU).
[15] *Id.*, 657 P.2d a 275.

*151 423*

*vuelta*

No hay duda que las actividades de exploración y explotación petroleras a cargo de ChevronTexaco deben evaluarse bajo el estándar de responsabilidad objetiva. El imponer la responsabilidad objetiva en este caso es compatible con la Constitución ecuatoriana, y con las decisiones judiciales y legislación de las jurisdicciones anglosajonas y civiles del mundo.

## IV.    Los Impactos en la Salud Deben Probarse Mediante el Estándar "Más Probable que No"

La causalidad es un elemento importante en este como en cualquier otro que comprenda impactos a la salud y al medio ambiente debido a la contaminación. A pesar de los esfuerzos de la comunidad científica, no sabemos -- y tal vez nunca se pueda conocer -- a cabalidad la forma cómo ciertos compuestos químicos y substancias interactúan con los sistemas naturales incluyendo el cuerpo humano. Por esta razón, los demandantes que solicitan compensación por impactos negativos al medio ambiente y daños a la salud pública encuentran que es muy difícil probar la causalidad. Los contaminadores toman ventaja de esta incertidumbre, y conducen sus actividades con impunidad causando injusticias a comunidades inocentes y al medio ambiente.

Para prevenir estas injusticias y responsabilizar a los contaminadores, especialmente en casos en el área civil que involucran substancias tóxicas (ilícito civil) la carga de la prueba para probar causalidad no debería ser tan rigurosa como es en los casos de negligencia tradicional. De lo contrario, los demandantes nunca lograrían ser indemnizados por los daños causados, ya que no podrían probar mas allá de la duda razonable que una sustancia tóxica específica causó una enfermedad. El artículo 397 de la Constitución ecuatoriana se refiere a esta inequidad al establecer: "[l]a carga de la prueba sobre la inexistencia de daño potencial o real recaerá sobre el gestor de la actividad o el demandado." Como se explica líneas abajo, es apropiado que esta Corte adopte un principio similar respecto a la causalidad en este caso en particular.

Un estándar moderno de causalidad usado en forma regular en las jurisdicciones anglosajonas es el de "probabilidad médica razonable" generalmente descrito como "más probable que no." Para alcanzar este estándar, el demandante debe establecer una causalidad general (que una sustancia química o toxina puede producir el daño objeto del caso) y también establecer esta causalidad específica a través de estudios epidemiológicos. Como la Corte de Apelaciones del Noveno Circuito de los EEUU explica: "La causalidad puede ser probada, aun cuando no se sepa con precisión *cómo* ocurrió el daño, si es que existe suficiente prueba concluyente que el agente causó el daño *de alguna manera*. Un método de probar la causalidad específica en este tipo de circunstancias es la evidencia estadística."[16] Los estudios epidemiológicos utilizan instrumentos estadísticos para determinar si hay una relación causal entre un factor determinado (como una toxina o una sustancia química) y una enfermedad humana específica.

---

[16] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1314 (9th Cir. 1995) (énfasis en original).

10

157.424
Ciento cincuenta y
siete mil, cuatrociento
veinticuatro.

Debido a que el estándar "más probable que no" requiere un porcentaje de probabilidad mayor al 50 por ciento, las cortes consideran el calculo aproximado de "riesgo relativo" reportado en estudios epidemiológicos. "Riesgo relativo" es un número que describe el incremento de la incidencia de la enfermedad en cuestión en la población expuesta a la toxina en comparación a la población de control no expuesta a la toxina. Por ejemplo, un riesgo relativo de 1.0, significa que la toxina o el químico no tiene efecto en la incidencia de la enfermedad. A medida que el riesgo relativo supera 1, hay una conexión causal más fuerte entre la toxina y la enfermedad en cuestión. Si el riesgo relativo supera 2.0, se puede decir que existe mas del 50 por ciento de probabilidad que la toxina haya causado la enfermedad en cuestión.

Un riesgo relativo mayor a 2.0 permite inferir que la enfermedad del demandante "es más probable que no" haya sido causada por una toxina o químico en particular. Un número considerable de cortes en numerosos casos ha aceptado este razonamiento.[17] En este caso, los estudios epidemiológicos introducidos por los ciudadanos afectados por la contaminación producida por ChevronTexaco en la amazonía ecuatoriana claramente establece una conexión causal suficiente:

- Un estudio de leucemia en niños mostró un riesgo relativo de más de 2.0.[18]

- Un estudio que compara las tasas de cáncer en pueblos próximas a los campos de petroleo que mostra valores de riesgo relativo mayores a 2.0 con respecto al cáncer del estómago, recto, piel, riñones y tejidos en los hombres, en el cáncer de cuello uterino y sistema linfático en las mujeres, y el cáncer de hematopoyética en los niños menores de diez años.[19]

Cuando los estudios epidemiológicos producen un riesgo relativo de 2.0 o menor, todavía las cortes consideran estos estudios conjuntamente con otra evidencia clínica o experimental lo cual fortalece la relación de causalidad y la enfermedad. Como cabos de cuerda, estos elementos de prueba combinados prueban la causalidad circunstancialmente con suficiente probabilidad (ejemplo: vale decir más del 50 por ciento).[20]

---

[17] Green, M.D., et al, *Reference Guide on Epidemiology*, 384 (publicado como parte del Manual de Referencias sobre la Evidencia Científica (2000) preparado para los jueces de los EEUU por el Centro Judicial Federal). Disponible en http://www.fjc.gov/public/pdf.nsf/lookup/sciman07.pdf/$file/sciman07.pdf.

[18] Hurtig, AK. & San Sebastián, M., *Incidence of Childhood Leukemia and Oil Exploitation in the Amazon Basin of Ecuador*, 10 International Journal of Occupational and Environmental Health 245-250 (2004).

[19] Hurtig, AK & San Sebastián, M., *Geographical Differences in cancer incidence in the Amazon Basin of Ecuador in relation to residence near oil fields*, 31 International Journal of Epidemiology 1021-1027 (2002).

[20] Ver, e.g. *In Re Joint Eastern and Southern District Asbestos Litigation*, 52 F.3d 1124, 1128 (2nd Cir. 1995) (caso de los EEUU).

157.499

vuelta

Un enfoque similar se aplica en Australia, donde la Corte de Apelaciones de Nueva Gales del Sur estableció: "la prueba para una persuasión real no requiere que los estudios epidemiológicos lleguen a un nivel de Riego Relativo de 2.0 aun cuando es la única evidencia presentada en la Corte. Sin embargo, mientras más cercana se encuentre la relación a 2.0, mayor importancia se dará a los estudios a fin de señalar la inferencia de la causalidad en un caso individual. Las 'cabos de cuerda" deben ser capaces de cargar el peso de la última inferencia".[21]

La Corte debe aplica un estándar de causalidad de "más probable que no", porque refleja el enfoque moderno de la evaluación de la causalidad en un caso de litigio en el área civil– particularmente cuando sustancias tóxicas están involucradas (como los PAH) que se conoce o se sospecha que son sustancias carcinogénicas y que persisten en el medio ambiente por largos periodos de tiempo. Este principio se resume de una manera muy acertada en el caso de la Corte del Distrito de los EEUU *Allen v. United States*:

> En el caso que el demandante trate de establecer la conexión de hecho entre la "causa específica" y el efecto retardado y no específico como es el caso de cáncer o leucemia, es probable que la evidencia más fuerte de la relación sea de forma estadística. Cuando no pueda distinguirse la causalidad de las lesiones, y cuando los expertos no puedan determinar si el daño individual resulta de una causa humana culpable o de las causas naturales no culpable, la evidencia que existe una mayor incidencia de la lesión en una población expuesta a una conducta riesgosa a cargo del demandado puede justificar la inferencia "del vínculo causal" entre la conducta del demandado y el daño del demandante.[22]

## CONCLUSION

ELAW y sus miembros firmantes al pie de este informe, respetuosamente presentan este Amicus Curiae para compartir con la Corte nuestra experiencia colectiva en el campo de derecho ambiental y los daños, con la esperanza que la Corte encuentre informativo el presente informe para la evaluación de las cuestiones legales debatidas en el presente caso.

Fecha: 15 Junio 2009

_firma_
Pern Johnson
Director Ejecutivo
Environmental Law Alliance Worldwide

CORTE PROVINCIAL DE JUSTICIA
DE SUCUMBIOS
**PRESIDENCIA**
RECIBIDO en Nueva Loja, a...21...
Junio 2009
a las ........... en
copias y adjunta
SECRETARIA

_firma_ Nancy Garboden
Notario Público

OFFICIAL SEAL
NANCY GARBODEN
NOTARY PUBLIC-OREGON
COMMISSION NO. 419718
MY COMMISSION EXPIRES JULY 19, 2011

---

[21] *Seltsam Pty. Ltd. v. McGuiness* [2000] NSWCA 29, (Commission Expires July 19, 2011) 37.
[22] *Allen v. United States*, 588 F. Supp. 247, 416 (D. Utah 1984); revisado en otro sustento, 816 F.2d 1417 (10th Cir. 1988), cert. negado 484 U.S. 1004 (1988).

*157.425*
*Ciento Cincuenta y*
*Siete mil, cuatrocientos*
*veinticinco.*

Sarguna Kumaari Munusamy, Asesora Legal, Consumers' Association of Penang (Malasia)

Theivanai Amarthalingam, Asesora Legal, Consumers' Association of Penang (Malasia)

Fernando Ochoa, Centro Mexicano para la Defensa del Medio Ambiente A.C. (México)

Carla O. Garcia Zendejas, Abogada ambiental (México)

Gustavo Alanis, Centro Mexicano de Derecho Ambiental, A.C. (México)

Carlos Valentín Veyna Martínez, Instituto de Derecho Ambiental, AC (México)

Ivonne Alvarez Gutiérrez, Instituto de Derecho Ambiental, AC (México)

Tonio Kellner Lassard, Instituto de Derecho Ambiental, AC (México)

Rosa Elena López de Rivera, Instituto de Derecho Ambiental, AC (México)

Lottie Cunningham, CEJUDHCAN (Nicaragua)

Yersil Nikolas Sánchez Espino, Centro de Incidencia Ambiental (Panamá)

Anne Kajir, Public Interest Environmental Lawyers and Environmental Law Centre (Papua Nueva Guinea)

Effrey Dademo, PNG Eco-Forestry Forum (Papua Nueva Guinea)

Sarah N. Tsiamalili, Environmental Law Center Ltd. (Papua Nueva Guinea)

Diana Mewerimbe, LLB, Public Interest Environmental Lawyer, Environmental Law Centre (Papua Nueva Guinea)

César Leonidas Gamboa Balbín, Presidente, Derecho, Ambiente y Recursos Naturales (Perú)

Ekologicka Pravni Servis (República Checa)

Euren Cuevas Medina, Presidente del Instituto de Abogados para la Protección del Medio Ambiente (República Dominicana)

Martin Stoffa, Abogado (República de Eslovaquia)

Hemantha Withanage, Director Ejecutivo, Centre for Environmental Justice (Sri Lanka)

Rugemeleza Nshala, Lawyers Environmental Action Team (Tanzania)

*157.425*
*vuelta*

*Los otras organizaciones e individuales que lo firman:*

Environmental Defender's Office Ltd (NSW) (Australia)

Candy Gonzalez, Belize Institute of Environmental Law and Policy (Belice)

Andrés P. Pirazzoli, Abogado ambiental (Chile)

Jingjing Zhang, Abogada (China)

Ruth Solano Vásquez, Directora de Litigio, Justicia para la Naturaleza (Costa Rica)

Emily Yozell Wolf, Presidenta, Justicia para la Naturaleza (Costa Rica)

Asociación para la Justicia Ambiental (España)

Eduardo Salazar Ortuño, Abogado ambiental (España)

John Bonine, Catedático de Derecho, University of Oregon School of Law (Estados Unidos de Norteamérica)

Cheryl Coon, Abogada (Estados Unidos de Norteamérica)

Merab Barbakadze, Legal Society Association (Georgia)

Augustine Niber, Director Ejecutivo, Center for Public Interest Law (Ghana)

Mara Bocaletti, Alianza de Derecho Ambiental y Agua (Guatemala)

Jeanette de Noack, Alianza de Derecho Ambiental y Agua (Guatemala)

Nityanand Jayaraman, Corporate Accountability Desk (India)

P. B. Sahasranaman (India)

Jamaica Environment Trust (Jamaica)

Michael Ochieng Odhiambo, Resource Conflict Institute and the Western Kenya Environmental Law Centre (Kenia)

Maurice Odhiambo Makoloo, Director, Institute for Law & Environmental Governance (Kenia)

Jessica Ram Binwani, Asesora Legal, Consumers' Association of Penang (Malasia)

13

# EXHIBIT 3659

[Handwritten] 206,828
Two hundred six thousand eight hundred twenty-eight

**RECUSAL PROCEEDING No. 002-2010**

*DR. ADOLFO CALLEJAS        63*

**DEPUTY PRESIDENT OF THE PROVINCIAL COURT OF SUCUMBIOS – Nueva Loja, on September 17, 2010, at 8:10 a.m.** The brief filed on September 16, 2010, at 4:00 p.m., by Pablo Fajardo Mendoza, attorney for María Aguinda et al. within Recusal Proceeding No. 002-2010 filed by Chevron Corporation against the President of the Provincial Court of Sucumbíos having been brought before me for a ruling at 5:35 p.m. on the same day. With respect to the main matter, I once again reaffirm the text of the order issued on September 16, 2010, at 8:05 a.m., because: a) The text of the certified copies that I attached thereto contains the reasons that led me to file a request to voluntarily recuse myself from continuing to hear summary verbal proceeding No. 002-2003 brought by the plaintiffs María Aguinda et al. against the defendant Chevron Corporation; and also, the duly founded legal reasoning on which the Sole Division of the Provincial Court of Sucumbíos based its unanimous opinion granting the request for voluntary recusal submitted by Dr. Juan Evangelista Nuñez Sanabria in my capacity as First Judge of the Case. b) "Jurisdiction is suspended in cases of voluntary recusal and recusal upon the motion of a party. In the former, from the time the voluntary recusal is entered into the record until the order denying it becomes final; and in the second, from the date it is requested until the order denying it becomes final …," under Art. 164 of the Judiciary Act. In the main proceeding, I voluntarily recused myself and the recusal was accepted and "the secondary case follows the fate of the principal proceeding," so it is therefore logical that I cannot hear this recusal proceeding. Section 25 of the Codification of the Code of Civil Procedure states "Recusal Proceeding," and under Article 889 ibid. "Orders or decisions issued in cases heard under this Section are unappealable," a provision that was declared to be in full force and effect by the Constitutional Court, as published in the Supplement to Official Register No. 192 dated May 13, 2010. The foregoing shall serve as grounds for reaffirming my recusal pronouncement in this recusal proceeding, No. 002-2010. I return the motion with this order and order notification hereof to Attorney Nicolás Augusto Zambrano Lozada, Second Sitting Provincial Judge, for the relevant purposes. Having been designated for such purpose by virtue of official letter No. 389-010-CJ-DPS, dated September 17, 2010, signed by the Acting Provincial Director of the Sucumbíos and Orellana Judiciary Council, Attorney Fanny Jumbo will act as Clerk of the Sucumbíos Provincial Court, be it so ordered. **THIS ORDER SHALL BE SERVED ON THE PARTIES**.

signed) Dr. Juan Núñez Sanabria, DEPUTY PRESIDENT OF THE PROVINCIAL COURT OF SUCUMBIOS: I hereby certify: Fanny Jumbo Gómez, ACTING CLERK AND COURT REPORTER. I do hereby certify.

Nueva Loja, September 20, 2010

[signature]
**Dr. Mariela Salazar Jaramillo**
**ACTING CLERK AND COURT REPORTER**

[Circular stamp] HON. PROVINCIAL COURT OF JUSTICE – SUCUMBIOS [seal]
SOLE DIVISION [initials]

[Circular stamp] PROVINCIAL COURT OF JUSTICE - SUCUMBÍOS [seal]
OFFICE OF THE PRESIDENT'S CLERK [initials]

[CERT.GEOTEXT VER: JD]



translations@geotext.com
www.geotext.com

STATE OF NEW YORK        )
ESTADO DE NUEVA YORK     )
                         )     ss
COUNTY OF NEW YORK       )
CONDADO DE NUEVA YORK    )

**CERTIFICATION/**
**CERTIFICACIÓN**

This is to certify that the attached translation is, to the best of my knowledge and belief, a true

and accurate translation from Spanish into English of the attached document.

Por la presente certifico que la traducción adjunta de español a inglés es, a mi leal saber y

entender, traducción fiel y exacta del documento adjunto.

_____

Kristin Santizo, Project Manager/Gerente de projectos
Geotext Translations, Inc.

Sworn to and subscribed before me/Suscrito y jurado ante mí

this _26_ day of _November_ 20 _12_.

a los _26_ días del mes de _November_ de 20 _12_.

_____

LYNDA GREEN
NOTARY PUBLIC-STATE OF NEW YORK
No. 01GR6205401
Qualified in New York County
My Commission Expires May 11, 2013

| | | | | |
|---|---|---|---|---|
| New York | Washington, D.C. | Chicago | Houston | San Francisco |
| t: +1.212.631.7432 | t: +1.202.828.1267 | t: +1.312.242.3756 | t: +1.713.353.3909 | t: +1.415.576.9500 |
| London | Paris | Stockholm | Frankfurt | Hong Kong |
| t: +44.20.7553.4100 | t: +33.1.42.68.51.47 | t: +46.8.463.11.87 | t: +49.69.7593.8434 | t: +852.2159.9143 |

206.1828
Doscientos seis mil
ochocientos veinte
y ocho

JUICIO DE RECUSACION No. 002-2010

DR. ADOLFO CALLEJAS.          63.

PRESIDENTE SUBROGANTE DE LA CORTE PROVINCIAL DE JUSTICIA DE SUCUMBIOS. – Nueva Loja, a 17 de septiembre del 2010, a las 08H10.- Se ha puesto para mi conocimiento y despacho el escrito presentado el 16 de septiembre del 2010, a las 16H00, por el señor Abogado Pablo Fajardo Mendoza, Procurador Común de María Aguinda y Otros, dentro del juicio de recusación No. 002-2010 presentado por Chevron Corportion, en contra del Presidente de la Corte Provincial de Justicia de Sucumbios, y puesto para mi despacho el mismo día mes y año a las 17H35. En lo principal, una vez más me ratifico en el texto de la providencia dictada el 16 de septiembre del 2010, a las 08H05, en razón de que: a) En el texto de las copias certificadas que me permití adjuntar consta las razones que motivaron para presentar mi excusa de seguir conociendo el juicio verbal sumario No. 002-2003 que siguen los Actores María Aguinda y Otros en contra del demandado Chevron Corporation; así también, los razonamientos jurídicos fundamentados en base a los cuales la Sala Unica de la Corte Provincial de Justicia de Sucumbios, en pronunciamiento unánime admitió la excusa que fue presentada por el Dr. Juan Evangelista Núñez Sanabria en mi condición de Primer Juez de la Causa. b) "Se suspende la competencia en los casos de excusa y recusación. En el primero, desde que la excusa consta de autos hasta que se ejecutoría la providencia que declare sin lugar, y en el segundo, desde que es solicitada hasta que se ejecutoría la providencia que deniegue la recusación..." menciona el Art. 164 del Código Orgánico de la Función Judicial. En el juicio principal me excuse y fue aceptada la excusa y "lo accesorio sigue la suerte de lo principal", resultando lógico que no pueda conocer el presente juicio de recusación. En la sección 25ª consta "Del juicio de recusación" de la Codificación del Código de Procedimiento Civil y en el artículo 889 Ibidem, señala "Cualquier providencia o resolución en los casos de esta Sección, no será susceptible de recurso alguno", disposición jurídica que fue declarada de plena vigencia y legalidad por la Corte Constitucional, según publicación realizada en el Suplemento del Registro Oficial No. 192 de 13 de mayo del 2010. Sirve de fundamentación lo expuesto para ratificar me pronunciamiento de excusa en el presente juicio de recusación No. 002-2010.- Devuelvo el escrito con la presente providencia y póngase en conocimiento del señor Ab. Nicolás Augusto Zambrano Lozada, Segundo Juez Provincial Titular, para los fines del caso. Por haber sido encargada mediante oficio No. 389-040-CJ-DPS, de fecha 17 de septiembre de 2010, suscrito por el Director Provincial del Consejo de la Judicatura de Sucumbíos y Orellana, de la Secretaría de la Corte Provincial de Justicia de Sucumbíos, la señora Abogada Fanny Jumbo, cuéntese con la misma. NOTIFIQUESE.-

f.) Dr. Juan Núñez Sanabria., PRESIDENTE SUBROGANTE DE LA CORTE PROVINCIAL DE JUSTICIA DE SUCUMBIOS; Lo Certifico: Ab. Fanny Jumbo Gómez, SECRETARIA RELATORA (e).- Certifico:

Nueva Loja, 20 de Septiembre del 2010

Dra. Mariela Salazar Jaramillo
SECRETARIA RELATORA (e)

