UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
   :
CHEVRON CORPORATION,   :
   :
        Plaintiff,   :
   :
      -against-   :   Case No. 11 Civ. 0691 (LAK)
   :
STEVEN R. DONZIGER, et al.,   :
   :
        Defendants.   :
   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## CHEVRON CORPORATION'S REPLY STATEMENT OF MATERIAL FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON ALL CLAIMS, COUNTERCLAIMS AND AFFIRMATIVE DEFENSES, AND SUMMARY JUDGMENT ON DEFENDANTS' AFFIRMATIVE DEFENSE OF COLLATERAL ESTOPPEL

## CHEVRON CORPORATION'S RESPONSE TO DEFENDANTS' STATEMENTS OF ADDITIONAL MATERIAL FACTS

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

*Attorneys for Plaintiff Chevron Corporation*

# TABLE OF CONTENTS

Page

I.    DEFENDANTS ARE PART OF THE LAP TEAM ...........................................................1

II.   THE LAP TEAM ENGAGED IN A PLANNED AND CAREFULLY
      EXECUTED SCHEME TO DEFRAUD IN THE LAGO AGRIO
      LITIGATION..........................................................................................................17

III.  THE LAGO AGRIO JUDGMENT INCORPORATES, IN MATERIAL PART,
      ANALYSIS, DATA, AND CONCLUSIONS TAKEN FROM UNFILED
      LAPS' WORK PRODUCT AND THE FRAUDULENT CABRERA REPORT ...........112

      A.    Fusion Memo ........................................................................... 137

      B.    Clapp Report ........................................................................... 151

      C.    Index Summaries ..................................................................... 158

      D.    Draft Alegato .......................................................................... 164

      E.    Fajardo Trust Email ................................................................ 170

      F.    Selva Viva Data Compilation ................................................. 177

      G.    Moodie Memo ......................................................................... 185

      H.    Pit Count ................................................................................. 196

      J.    $200 Million Flora and Fauna Award.................................... 200

      K.    $150 Million Potable Water System Award ........................... 201

IV.   THE LAP TEAM WROTE THE JUDGMENT AND BRIBED THE COURT
      $500,000 TO ISSUE IT ........................................................................................205

V.    THE ECUADORIAN JUDICIARY SUFFERS FROM ENDEMIC
      CORRUPTION .....................................................................................................231

VI.   THE LAP TEAM HAS ENGAGED IN AT LEAST 129 SPECIFIC
      INSTANCES OF WIRE FRAUD AND MONEY LAUNDERING ..............................244

DONZIGER'S STATEMENT OF ADDITIONAL MATERIAL FACTS AS TO
      WHICH THERE IS A GENUINE ISSUE TO BE TRIED  OR AS TO WHICH
      THERE IS NO DISPUTE ........................................................................................390

I.    THE LAGO AGRIO LITIGATION .........................................................................390

      A.    Contacts with Experts and Judges........................................... 390

      B.    Sampling, Inspections, and Reports......................................... 397

II.   ALBERTO GUERRA BASTIDAS ...........................................................................402

# TABLE OF CONTENTS

Page

LAPS' STATEMENT OF ADDITIONAL MATERIAL FACTS AS TO WHICH
    THERE IS A GENUINE ISSUE TO BE TRIED  OR AS TO WHICH THERE
    IS NO DISPUTE...........................................................................................................410

I.     THE LAGO AGRIO LITIGATION .............................................................410

    A.    Contacts with Experts and Judges....................................................... 410

    B.    Sampling, Inspections, and Reports...................................................... 417

    C.    The Lago Agrio Record ........................................................................ 423

II.    ALBERTO GUERRA BASTIDAS ...............................................................424

## I.   DEFENDANTS ARE PART OF THE LAP TEAM[1]

| Chevron's Corrected Statement of Undisputed Facts[*] | Defendants' Response[**] | Chevron's Reply |
|---|---|---|
| 1. Donziger is and has been a legal advisor to and representative of the LAPs since at least 2003. Dkt. 47-30 (2009.04.28 Statement by Donziger to the Tom Lantos Human Rights Commission) at 3 ("For the past 15 years I have been part of a joint Ecuadorian-American legal team that represents thousands of residents of the area in a class-action lawsuit . . . ."); Dkt. 30-2 (Ex. 91, Crude theatrical transcript) (to Ecuadorian court: "I'm part of Plaintiffs' legal team"); Dkt. 8-9 (Ex. 6); Dkt. 106-3 (Ex. 478); Dkt. 355-37 (Ex. 1122). | **Donziger**: Disputed.[A]  Isolated statements from The Ecuadorian Plaintiffs do not establish that Donziger represented the Ecuadorian Plaintiffs continuously from 2003 to the present.  Indeed, Donziger does not represent the Ecuadorian Plaintiffs in the instant proceeding.  *See* Docket. Donziger has also stated that "As an American, I am not licensed to practice law in Ecuador . . . ." Dkt. No. 9-9 (Ex. 14) (Nov. 3, 2006 Donziger Book Proposal) (DONZ00006707) at p. 21. This statement shows that Donziger was not a representative of the LAPs at all times or for all purposes since 2003.  Similarly, the engagement agreements that Chevron cites (Dkt. 106-3 (Ex. 478)) and Dkt. 355-37 (Ex. 1122) do not establish that Donziger | Undisputed.  The statements to which Defendants point do not contradict the evidence proving that Donziger has served as a legal advisor to the LAPs since at least 2003.  Nor have Defendants disputed that he continues to serve as a legal advisor to the LAPs, a fact evidenced by executed agreements, none of which the LAPs claim to have terminated.  Dkt. 106-3 (Ex. 478); Dkt. 355-37 (Ex. 1122).[2][3] He "exercise[s] overall responsibility for the strategic direction of" the Ecuadorian suit, the Chevron criminal cases, the § 1782 actions, all enforcement actions anywhere in the world, any settlement negotiations with Chevron, and any "related litigation and associated activities." Dkt. 355-37 (Ex. 1122) at 1-2. |

---

[1]  *The following footnote appears at the start of every heading in the Donziger Defendants' and LAPs' 56.1 Statement Response*: *From the Donziger Defendants:*  For the reasons set forth in Donziger's responses to each of Chevron's facts listed under Heading I, Donziger also disputes the assertions and conclusions set forth in Chevron's Heading I. *From the LAPs*:  For the reasons set forth in Defendants' Responses to Chevron's 56.1 Statements under Heading I, Defendants also dispute the assertions, argument, and conclusions set forth in Chevron's Heading I.

[*]  Chevron's Corrected Statement of Undisputed Facts (Dkt. 764) is set forth in this column.  The Donziger Defendants' and the LAPs' 56.1 Responses quote Chevron's prior Statement of Undisputed Facts (Dkt. 752), and do not reflect Chevron's corrections.

[**]  Included in "Defendants' Response" to each 56.1 statement are the Donziger Defendants' Response and the LAPs' Response.  The Responses appear consecutively within the same cell with the Donziger Defendants' Response appearing first and the LAPs' Response appearing second.

[2]  Defendants repeatedly complain of a lack of pincites, but that is because some documents deal with the cited statement throughout.  Any prejudice experienced by Defendants is a consequence of their approach to the 56.1 statement.  Rather than addressing whether a factual issue is genuinely in dispute, they have sought pretexts for disputing statements they know are true.  St. 1 is an example of this unconstructive conduct.  There is no real dispute that Donziger is a legal advisor to the LAPs since 2003—the record is replete with examples of Donziger representing the LAPs and advising their legal team, and before his fraud was revealed, Donziger asserted this routinely, as Chevron's examples show.  *See, also e.g.*, Reply St. 165 (disputing that Nicolas Moodie is an Australian intern who wrote the Moodie Memo when his name is on it, and an email from Defendant Donziger states, "Nick Moodie, who is from Australia, will be joining us as an intern on Jan 4 for about two months." Dkt. 918-49 (Ex. 39) at 1 ("From:  Nicholas Moodie"); Stavers Decl., Ex. 3670 (DONZ00065435).  This unconstructive approach belies Defendants' claim to be "inundated" with motions practice.

[3]  Defendants repeatedly claim that Chevron relied upon similar evidence in its previous motion.  *See* Sts. 1, 5, 7, 9, 11, 30, 38, 44, 48, 49, 50, 51, 52, 53, 55, 57, 58, 61, 74, 75, 79, 82, 83, 85, 87, 95, 96, 101, 114, 122, 123, 125, 126, 127, 128, 129, 132, 143, 144, 146, 147, 148, 149, 159, 161, 172, 173, 174, 177, 178, 179.  That Chevron previously submitted a similar statement in support of a prior motion for summary judgment is irrelevant.  The Court denied Chevron's motion for summary judgment on Defendants' collateral estoppel defense because of the Court's concern at that time regarding the materiality of the evidence presented, not because any of Chevron's separate statements in support of that motion were actually disputed.  *Chevron Corp. v. Donziger*, --- F. Supp. 2d ----, 2012 WL 3538749, at **35-36 (S.D.N.Y. July 31, 2012).  With the instant motion, Chevron has submitted substantial additional evidence demonstrating the material nature of Defendants' fraud.

| Chevron's Corrected Statement of Undisputed Facts[*] | Defendants' Response[**] | Chevron's Reply |
|---|---|---|
| | continuously represented the LAPs from 2003 through the present. Further, these agreements establish that the scope of any representation was specific and limited.  *See id.*<br><br>Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 88). Chevron provides no reason for the Court to rule any differently on this Renewed Motion.<br><br>[^]   Chevron has failed to provide documents to the evidence it cites, in particular Dkt. 8-9 (Ex. 6) (150-page portion of deposition transcript).  It is impossible for Donziger (or the Court) to determine, for example, where in a 150-page excerpt from a deposition transcript (Dkt. 8-9 (Exh. 6)), the evidence upon which Chevron would rely can be found.  Chevron's failure to provide pinpoint citations has forced Donziger to hunt through voluminous exhibits for any nuggets that Chevron might believe supports its position. This is a distraction, waste of time, and unnecessary drain on Donziger's already stretched resources.  Further, it has severely prejudiced Donziger's ability to respond to Chevron's alleged facts because Donziger cannot determine precisely what evidence Chevron is citing in support.  Donziger respectfully submits that the Court also has no way of determining exactly what evidence Chevron is citing and, for that reason, requests that Chevron's citations to multiple-page documents that are not accompanied by pincites be stricken.<br><br>**LAPs:**  Disputed.[^]  Isolated statements from 2009 do not establish that Donziger represented the Ecuadorian Defendants continuously from 2003 to the present. Indeed, Donziger does not represent the LAPs in the instant proceeding.  *See* Parties and Counsel, S.D.N.Y. ECF, Case No. 1:11-cv-00691-LAK. Donziger has also stated that "As an American, I am not licensed to practice law in Ecuador . . . ." Dkt. No. 9-9 (Ex. 14) (Nov. 3, 2006 Donziger Book Proposal) (DONZ00006707) at p. 21.  This shows that Donziger was not a representative of the LAPs at all times or for all purposes since | In any event, Donziger's co-counsel relationship with Fajardo creates agency.  *See, e.g., Aiello v. Adar*, 750 N.Y.S.2d 457, 465-66 (N.Y. Sup. Ct. 2002) (joint representation as part of agreement to share fees creates agency). |

| Chevron's Corrected Statement of Undisputed Facts[*] | Defendants' Response[**] | Chevron's Reply |
|---|---|---|
| | 2003.  Similarly, the engagement agreements that Chevron cites (Dkt. 1006-3 (Ex. 478) and Dkt. 355-37 (Ex. 1122)) do not establish that Donziger continuously represented the LAPs from 2003 through the present.  Further, these agreements establish that the scope of any representation was specific and limited.  *See id.*<br><br>Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 88).  Chevron provides no reason for the Court to rule any differently on this Renewed Motion.<br><br>[^]     Chevron has failed to provide pincites to the evidence it cites, in particular Dkt. 8-9 (Ex. 6) (150-page portion of deposition transcript). It is impossible for Defendants (or the Court) to determine, for example, where in a 150-page excerpt from a deposition transcript (Dkt. 8-9 (Ex. 6)), the evidence upon which Chevron would rely can be found. Chevron's failure to provide pinpoint citations has forced Defendants to hunt through voluminous exhibits for any nuggets that Chevron might believe supports its position.  This is a distraction, waste of time, and unnecessary drain on Defendants' already stretched resources.  Further, it has severely prejudiced Defendants' ability to respond to Chevron's alleged facts because Defendants cannot determine precisely what evidence Chevron is citing in support. Defendants respectfully submit that the Court also has no way of determining exactly what evidence Chevron is citing and, for that reason, requests that Chevron's citations to multiple-page documents that are not accompanied by pincites be stricken. | |
| 2. In all of the conduct attributed to Donziger in this Separate Statement, Donziger has acted as the LAPs' agent.  *See* St. 1. | **Donziger:**  Disputed.  This statement consists of an improper legal conclusion, which the Court should strike or disregard.  *See, e.g., Antunes v. Putnam/N. Westchester Bd. Of Co-op. Educ. Services*, 09-CV-3063 CS, 2011 WL 1990872, at *2 n.9 (S.D.N.Y. May 19, 2011) *aff'd sub nom. Antunes v. Putnam N. Westchester Bd. Of Co-op Educ. Services*, 482 Fed. Appx. 661 (2nd Cir. 2012) ("I need not consider statements in a Local Rule 56.1 submission that are "legal | Undisputed.  Whether Donziger has acted on behalf of the LAPs is an issue of fact.  *See* St. 1.  Defendants have not identified any statements for which Donziger was not acting as the LAPs' agent. |

| Chevron's Corrected Statement of Undisputed Facts[*] | Defendants' Response[**] | Chevron's Reply |
|---|---|---|
| | conclusions in the guise of an undisputed statement of fact."); *Cicchetti v. Davis*, 07 CIV. 10546 (WCC), 2008 WL 619013, at *4 n.2 (S.D.N.Y. Mar. 5, 2008) ("Defendant's Rule 56.1 Statement of Undisputed Facts consists of legal conclusions such as 'The Fire Commissioner is a policymaker' . . . This does not advance the Court's inquiry."); *Jessamy v. City of New Rochelle*, New York, 292 F. Supp. 2d 498, 509 (S.D.N.Y. 2003) (rejecting as an improper legal conclusion the following statement: "At all times relevant hereto, Defendants Deputy Commissioner Wendell, Commissioner Ritchie and Mayor Idoni were acting in their official capacities as employees and/or officers of the City." (Def. Rule 56.1 Stmt. ¶ 1.)").<br><br>**LAPs:** Disputed. This statement consists of an improper legal conclusion, which the Court should strike or disregard. *See, e.g., Antunes v. Putnman/N. Westchester Bd. Of Co-op. Educ. Services*, 09-CV-3063 CS, 2011 WL 1990872, at *2 n.9 (S.D.N.Y. May 19, 2011) *aff'd sub nom. Antunes v. Putnam N. Westchester Bd. Of Co-op Educ. Services*, 482 Fed. Appx. 661 (2nd Cir. 2012) ("I need not consider statements in a Local Rule 56.1 submission that are "legal conclusions in the guise of an undisputed statement of fact."); *Cicchetti v. Davis*, 07 CIV. 10546 (WCC), 2008 WL 619013, at *4 n.2 (S.D.N.Y. Mar. 5, 2008) ("Defendant's Rule 56.1 Statement of Undisputed Facts consists of legal conclusions such as 'The Fire Commissioner is a policymaker' . . . This does not advance the Court's inquiry."); *Jessamy v. City of New Rochelle*, New York, 292 F. Supp. 2d 498, 509 (S.D.N.Y. 2003) (rejecting as an improper legal conclusion the following statement: "At all times relevant hereto, Defendants Deputy Commissioner Wendell, Commissioner Ritchie and Mayor Idoni were acting in their official capacities as employees and/or officers of the City." (Def. Rule 56.1 Stmt. ¶ 1.)"). | |

| Chevron's Corrected Statement of Undisputed Facts[*] | Defendants' Response[**] | Chevron's Reply |
|---|---|---|
| | Moreover, to the extent this Separate Statement alleges a crime or fraud against Donziger, Camacho and Piaguaje each affirm under oath that they "have not engaged in any crime, fraud or violation of court rules" and that they are "unaware of and have not authorized or ratified any crime, fraudulent activity, or violation of court rules by anyone acting on [their] behalf with regard to the Lago Agrio Lawsuit." (Dkt. 446, at ¶¶ 17-18; Dkt. 447, at ¶¶ 18-19). | |
| 3. Yanza is and has been a member of the LAP team and has represented the LAPs since the Ecuadorian complaint was filed in 2003.  Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 107:18-24; *see also id.* at 104:17-105:17; Dkt. 559 at 6-8. | **Donziger:**  Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.  <br><br>**LAPs:**  Disputed in part.  Defendants do not dispute that Luis Yanza has been involved as a coordinator of the communities of the Napo Concession affected by Chevron's contamination.  Defendants dispute that Yanza has "represented the LAPs", as Yanza is not a lawyer. | Undisputed.  The statement does not say that Yanza had represented the LAPs as a "lawyer." |
| 4. In all of the conduct attributed to Yanza in this Separate Statement, Yanza has acted as the LAPs' agent.  *See* St. 3. | **Donziger:**  Disputed.  This statement consists of an improper legal conclusion, which the Court should strike or disregard.  *See, e.g., Antunes,* 2011 WL 1990872 at *2 n.9; *Cicchetti,* 2008 WL 619013 at *4 n.2; *Jessamy,* 292 F.Supp. 2d at 509.  <br><br>**LAPs:**  Disputed.  This statement consists of an improper legal conclusion, which the Court should strike or disregard.  *See, e.g., Antunes,* 2011 WL 1990872 at *2 n.9; *Cicchetti,* 2008 WL 619013 at *4 n.2; *Jessamy,* 292 F.Supp. 2d at 509.  <br><br>Moreover, to the extent this Separate Statement alleges a crime or fraud against Yanza, Camacho and Piaguaje each affirm under oath that they "have not engaged in any crime, fraud or violation of court rules" and that they are "unaware of and have not authorized | Undisputed.  Whether Yanza acted on behalf of the LAPs is an issue of fact.  Defendants have not identified any statements for which Yanza was not acting as the LAPs' agent. |

| Chevron's Corrected Statement of Undisputed Facts[*] | Defendants' Response [**] | Chevron's Reply |
|---|---|---|
| | or ratified any crime, fraudulent activity, or violation of court rules by anyone acting on [their] behalf with regard to the Lago Agrio Lawsuit."  (Dkt. 446, at ¶¶ 17-18; Dkt. 447, at ¶¶ 18-19). Camacho and Piaguaje are Plaintiffs in the Lago Agrio lawsuit because they intend to "hold Chevron responsible" for the contamination and failure properly to remediate.  (Smyser Decl., Exs. 12 & 13, ¶ 6). They "have never had any intention to defraud Chevron, or anyone else related to the case." (*Id.*). | |
| 5. Alejandro Ponce Villacís ("Ponce") began working as counsel for the LAPs in the Lago Agrio Litigation in or around June 2005.  Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 4723:10-4724:10. | **Donziger:**  Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Not disputed. Ponce served as one of the legal counsel for the Lago Agrio Plaintiffs from June 2005 to November 2008.  Effective December 1, 2008, Ponce withdrew as counsel to the Plaintiffs because he joined the law firm Quevedo & Ponce as a partner.<br><br>Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 91).  Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion. | Undisputed. |
| 6. In all of the conduct attributed to Ponce in this Separate Statement, Ponce has acted as the LAPs' agent.  *See* St. 5. | **Donziger:**  Disputed.  This statement consists of an improper legal conclusion, which the Court should strike or disregard.  *See, e.g., Antunes*, 2011 WL 1990872 at *2 n.9; *Cicchetti*, 2008 WL 619013 at *4 n.2; *Jessamy*, 292 F.Supp. 2d at 509.<br><br>**LAPs:**  Disputed.  This statement consists of an improper legal conclusion, which the Court should strike or disregard.  *See, e.g., Antunes*, 2011 WL 1990872 at *2 n.9; *Cicchetti*, 2008 WL 619013 at *4 n.2; *Jessamy*, 292 F.Supp. 2d at 509. | Undisputed.  Whether Ponce acted on behalf of the LAPs is an issue of fact.  Defendants have not identified any statements for which Ponce was not acting as the LAPs' agent. |

| Chevron's Corrected Statement of Undisputed Facts[*] | Defendants' Response[**] | Chevron's Reply |
|---|---|---|
| | Moreover, to the extent this Separate Statement alleges a crime or fraud against Ponce, Camacho and Piaguaje each affirm under oath that they "have not engaged in any crime, fraud or violation of court rules" and that they are "unaware of and have not authorized or ratified any crime, fraudulent activity, or violation of court rules by anyone acting on [their] behalf with regard to the Lago Agrio Lawsuit." (Dkt. 446, at ¶¶ 17-18; Dkt. 447, at ¶¶ 18-19). Camacho and Piaguaje are Plaintiffs in the Lago Agrio lawsuit because they intend to "hold Chevron responsible" for the contamination and failure properly to remediate. (Smyser Decl., Exs. 12 & 13, ¶ 6). They "have never had any intention to defraud Chevron, or anyone else related to the case." (*Id.*). | |
| 7. Fajardo is and has been counsel of record for the LAPs in the Lago Agrio Litigation since February 7, 2006. Dkt. 356-17 (Ex. EJ, Declaration of Pablo Fajardo); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 182:11-183:3; 1096:10-18; 1757:20-1758:3 ("Q. The question was, are any of the plaintiffs' lawyers in Ecuador a party to any written retainer or fee agreement relating to the Aguinda or Lago Agrio cases? A. Yes. Pablo Fajardo."); Dkt. 402-11 (Ex. 2295) (92,873-81) at 92,874; Dkt. 559 at 6-8; Dkt. 106-6 (Ex. 481). | **Donziger:** Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:** Defendants do not dispute that Fajardo is counsel of record for the Plaintiffs in the case of *Maria Aguinda, et al v. Chevron*, Case No. 2003-002, in the Provincial Court of Justice, Sucumbíos Province, Ecuador. Defendants dispute that Fajardo is counsel of record in any other litigation involving the Lago Agrio Plaintiffs.<br><br>Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 87). Chevron provides no reason for the Court to rule any differently on this Renewed Motion. | Undisputed. The statement does not refer to litigation other than the Lago Agrio Litigation. |
| 8. In all of the conduct attributed to Fajardo in this Separate Statement, Fajardo has acted as the LAPs' agent. *See* St. 7. | **Donziger:** Disputed. This statement consists of an improper legal conclusion, which the Court should strike or disregard. *See, e.g., Antunes*, 2011 WL 1990872 at *2 n.9; *Cicchetti*, 2008 WL 619013 | Undisputed. Whether Fajardo acted on behalf of the LAPs is an issue of fact. Defendants have not identified any statements for which Fajardo was not acting as the LAPs' agent. |

| Chevron's Corrected Statement of Undisputed Facts[*] | Defendants' Response[**] | Chevron's Reply |
|---|---|---|
| | at *4 n.2; *Jessamy*, 292 F.Supp. 2d at 509.<br><br>**LAPs:**  Disputed.  This statement consists of an improper legal conclusion, which the Court should strike or disregard.  *See, e.g., Antunes*, 2011 WL 1990872 at *2 n.9; *Cicchetti*, 2008 WL 619013 at *4 n.2; *Jessamy*, 292 F.Supp. 2d at 509.  In addition, the statement is compound and does not identify with specificity what conduct it refers to.<br><br>Moreover, to the extent this Separate Statement alleges a crime or fraud against Fajardo, Camacho and Piaguaje each affirm under oath that they "have not engaged in any crime, fraud or violation of court rules" and that they are "unaware of and have not authorized or ratified any crime, fraudulent activity, or violation of court rules by anyone acting on [their] behalf with regard to the Lago Agrio Lawsuit."  (Dkt. 446, at ¶¶ 17-18; Dkt. 447, at ¶¶ 18-19).  Camacho and Piaguaje are Plaintiffs in the Lago Agrio lawsuit because they intend to "hold Chevron responsible" for the contamination and failure properly to remediate.  (Smyser Decl., Exs. 12 & 13, ¶ 6).  They "have never had any intention to defraud Chevron, or anyone else related to the case." (*Id.*). | |
| 9. Juan Pablo Sáenz ("Sáenz") is and has been counsel for the LAPs in the Lago Agrio Litigation since at least September 2006.  Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 586:25-587:5; Dkt. 402-12 (Ex. 2309) (DONZ00038705). | **Donziger:**  Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed.  The document cited, Dkt. 402-12 (Ex. 2309), does not support the statement that Sáenz is counsel for the LAPs.  It is an email sent by Pablo Fajardo to numerous individuals, including Sáenz, that does not indicate anything in particular about Sáenz.  Defendants do not dispute that Sáenz has assisted Fajardo, who is counsel of record for the Plaintiffs in the case of *Maria Aguinda, et al v. Chevron*, Case No. 2003-002, in the Provincial Court | Undisputed.  The statement does not say that Sáenz was "counsel of record."  Defendants do not dispute that Sáenz is an Ecuadorian-qualified lawyer and admit that he "has assisted Fajardo, who is counsel of record for the [LAPs] in the [Lago Agrio Litigation]." |

| Chevron's Corrected Statement of Undisputed Facts[*] | Defendants' Response[**] | Chevron's Reply |
|---|---|---|
| | of Justice, Sucumbíos Province, Ecuador.  Defendants dispute that Sáenz is counsel of record in any other litigation involving the Lago Agrio Plaintiffs.  Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel.  (Dkt. 398, at St. 89).  Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion. | |
| 10. In all of the conduct attributed to Saenz in this Separate Statement, Sáenz has acted as the LAPs' agent.  *See* St. 9. | **Donziger:**  Disputed.  This statement consists of an improper legal conclusion, which the Court should strike or disregard.  *See, e.g., Antunes*, 2011 WL 1990872 at *2 n.9; *Cicchetti*, 2008 WL 619013 at *4 n.2; *Jessamy*, 292 F.Supp. 2d at 509.  **LAPs:**  Disputed.  This statement consists of an improper legal conclusion, which the Court should strike or disregard.  *See, e.g., Antunes*, 2011 WL 1990872 at *2 n.9; *Cicchetti*, 2008 WL 619013 at *4 n.2; *Jessamy*, 292 F.Supp. 2d at 509.  In addition, the statement does not identify with specificity what conduct it refers to.  Moreover, to the extent this Separate Statement alleges a crime or fraud against Saenz, Camacho and Piaguaje each affirm under oath that they "have not engaged in any crime, fraud or violation of court rules" and that they are "unaware of and have not authorized or ratified any crime, fraudulent activity, or violation of court rules by anyone acting on [their] behalf with regard to the Lago Agrio Lawsuit." (Dkt. 446, at ¶¶ 17-18; Dkt. 447, at ¶¶ 18-19).  Camacho and Piaguaje are Plaintiffs in the Lago Agrio lawsuit because they intend to "hold Chevron responsible" for the contamination and failure properly to remediate.  (Smyser Decl., Exs. 12 & 13, ¶ 6).  They "have never had any intention to defraud Chevron, or anyone | Undisputed.  Whether Sáenz acted on behalf of the LAPs is an issue of fact.  Defendants have not identified any statements for which Sáenz was not acting as the LAPs' agent. |

| Chevron's Corrected Statement of Undisputed Facts[*] | Defendants' Response[**] | Chevron's Reply |
|---|---|---|
| | else related to the case." (*Id.*). | |
| 11. Julio Prieto (Prieto) is and has been counsel for the LAPs in the Lago Agrio Litigation since at least 2006. Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 1648:7-12; Dkt. 28-7 (DONZ00027156). | **Donziger:**  Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed.  The document cited, Dkt. 28-7 (DONZ00027156), does not support the statement that Prieto is counsel for the LAPs.  It is an email sent by Rebecca Gray to Edison Camino-Castro that does not make any reference to Prieto.  Defendants do not dispute that Prieto has assisted Fajardo, who is counsel of record for the Plaintiffs in the case of Maria Aguinda, et al v. Chevron, Case No. 2003-002, in the Provincial Court of Justice, Sucumbíos Province, Ecuador.  Defendants dispute that Prieto is counsel of record in any other litigation involving the Lago Agrio Plaintiffs.<br><br>Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 90).  Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion | Undisputed.  The statement does not say that Prieto was "counsel of record."  Defendants do not dispute that Prieto is an Ecuadorian-qualified lawyer and admit that he "has assisted Fajardo, who is counsel of record for the [LAPs] in the [Lago Agrio Litigation]." |
| 12. In all of the conduct attributed to Prieto in this Separate Statement, Prieto has acted as the LAPs' agent. *See* St. 11. | **Donziger:**  Disputed.  This statement consists of an improper legal conclusion, which the Court should strike or disregard.  *See, e.g., Antunes*, 2011 WL 1990872 at *2 n.9; *Cicchetti*, 2008 WL 619013 at *4 n.2; *Jessamy*, 292 F.Supp. 2d at 509.<br><br>**LAPs:**  Disputed. This statement consists of an improper legal conclusion, which the Court should strike or disregard.  *See, e.g., Antunes*, 2011 WL 1990872 at *2 n.9; *Cicchetti*, 2008 WL 619013 at *4 n.2; *Jessamy*, 292 F.Supp. 2d at 509.  In addition, the statement does not identify with specificity what conduct it refers to. | Undisputed.  Whether Prieto acted on behalf of the LAPs is an issue of fact.  Defendants have not identified any statements for which Prieto was not acting as the LAPs' agent. |

| Chevron's Corrected Statement of Undisputed Facts[*] | Defendants' Response[**] | Chevron's Reply |
|---|---|---|
| | Moreover, to the extent this Separate Statement alleges a crime or fraud against Prieto, Camacho and Piaguaje each affirm under oath that they "have not engaged in any crime, fraud or violation of court rules" and that they are "unaware of and have not authorized or ratified any crime, fraudulent activity, or violation of court rules by anyone acting on [their] behalf with regard to the Lago Agrio Lawsuit." (Dkt. 446, at ¶¶ 17-18; Dkt. 447, at ¶¶ 18-19). Camacho and Piaguaje are Plaintiffs in the Lago Agrio lawsuit because they intend to "hold Chevron responsible" for the contamination and failure properly to remediate. (Smyser Decl., Exs. 12 & 13, ¶ 6). They "have never had any intention to defraud Chevron, or anyone else related to the case." (*Id.*). | |
| 13. Stratus began to serve as a member of the LAP team no later than 2007. Dkt. 32-16 (Exhibit 160) (2007.08.20 Contract between Stratus and Kohn, Swift & Graf P.C.) (STRATUSNATIVE043270); Dkt. 48-13 – 48-14 (2010.05.05 Declaration of Pablo Fajardo Mendoza); Dkt. 8-9 (Donziger Dep. Tr.) at 2253:5-11; Dkt. 402-11 (Ex. 2288) (2010.12.09 Stratus 30(b)(6) deposition of Douglas Beltman) at 128:11-22; 138:6-12. | **Donziger:** Disputed. The cited documents and materials do not support Chevron's characterization. Douglas Beltman testified that "Kohn Swift & Graf has paid Stratus in relation to the work that we conducted beginning in 2007 under contract to Kohn Swift & Graf to provide technical and scientific assistance to the plaintiff attorneys." Dkt. 402-11 (Ex. 2288) (2010.12.09 Stratus 30(b)(6) deposition of Douglas Beltman) at 128:18-22.<br><br>**LAPs:** Disputed. The cited evidence does not support Chevron's characterization. Douglas Beltman testified that "Kohn Swift & Graf has paid Stratus in relation to the work that we conducted beginning in 2007 under contract to Kohn Swift & Graf to provide technical and scientific assistance to the plaintiff attorneys." Dkt. 402-11 (Ex. 2288) (2010.12.09 Stratus 30(b)(6) deposition of Douglas Beltman) at 128:18-22. Stratus was thus a contracted consultant to Kohn Swift & Graf. *Id.* Additionally, Chevron's reference to "team" is vague and never defined by Chevron. | Undisputed. Stratus was paid by Kohn, Swift & Graf P.C. to be part of the LAP team in the Lago Agrio Litigation. Stavers Decl., Ex. 3652 (Beltman Witness St.), ¶ 1 ("Stratus was hired for the Ecuador Project by Steven Donziger and Kohn, Swift & Graf through a contract with Kohn, Swift & Graf in August of 2007."). In addition, the term "LAP Team" is defined in Chevron's motion (Dkt. 745 at vii) and is routinely used by this Court in a manner that includes Stratus. *See, e.g.*, Dkt. 905 at 23 ("There is no genuine issue with respect to the facts that the LAP team secretly prepared his [i.e., Cabrera's] work plan, worked closely with him in carrying it out, and drafted most of the report and its annexes."). |

| Chevron's Corrected Statement of Undisputed Facts[*] | Defendants' Response[**] | Chevron's Reply |
|---|---|---|
| 14. In all of the conduct attributed to Stratus in this Separate Statement, Stratus has acted as the LAPs' agent. *See* St. 13. | **Donziger:**  Disputed.  This statement consists of an improper legal conclusion, which the Court should strike or disregard.  *See, e.g., Antunes,* 2011 WL 1990872 at *2 n.9; *Cicchetti,* 2008 WL 619013 at *4 n.2; *Jessamy,* 292 F.Supp. 2d at 509.<br><br>**LAPs:**  Disputed.  Stratus was a contracted consultant to Kohn Swift & Graft. *See* Resp. to St. 13.  This statement consists of an improper legal conclusion, which the Court should strike or disregard.  *See, e.g., Antunes,* 2011 WL 1990872 at*2 n.9; *Cicchetti,* 2008 WL 619013 at *4 n.2; *Jessamy,* 292 F. Supp. 2d at 509.  In addition, the statement does not identify with specificity what conduct it refers to.<br><br>Moreover, to the extent this Separate Statement alleges a crime or fraud against Stratus, Camacho and Piaguaje each affirm under oath that they "have not engaged in any crime, fraud or violation of court rules" and that they are "unaware of and have not authorized or ratified any crime, fraudulent activity, or violation of court rules by anyone acting on [their] behalf with regard to the Lago Agrio Lawsuit."  (Dkt. 446, at ¶¶ 17-18; Dkt. 447, at ¶¶ 18-19).  Camacho and Piaguaje are Plaintiffs in the Lago Agrio lawsuit because they intend to "hold Chevron responsible" for the contamination and failure properly to remediate.  (Smyser Decl., Exs. 12 & 13, ¶ 6).  They "have never had any intention to defraud Chevron, or anyone else related to the case."  (*Id.*). | Undisputed.  Whether Stratus acted on behalf of the LAPs is an issue of fact.  Defendants have not identified any statements for which Stratus was not acting as the LAPs' agent. |
| 15. Beltman began to serve as a member of the LAP team no later than 2007.  Dkt. 32-16 (Exhibit 160) (2007.08.20 Contract between Stratus and Kohn, Swift & Graf P.C.)  (STRATUSNATIVE043270); Dkt. 32-17 (Exhibit 161) (2008.07.07 Email from J. Kohn to D. | **Donziger:**  Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed.  The cited evidence does not support Chevron's characterization.  Douglas Beltman testified that "Kohn Swift & | Undisputed.  Beltman, as an employee of Stratus, was paid by Kohn, Swift & Graf P.C. to be part of the LAP team in the Lago Agrio Litigation.  *See* Stavers Decl., Ex. 3652 (Beltman Witness St.), ¶ 1 ("I was the Stratus officer in charge of what was referred to within Stratus as the 'Ecuador Project,' a project related to the case of *Maria Aguinda y otros* |

| Chevron's Corrected Statement of Undisputed Facts[*] | Defendants' Response[**] | Chevron's Reply |
|---|---|---|
| Beltman re "approval for upcoming work") (STRATUS-NATIVE066482); Exhibit K (2007.10.23 Email from S. Donziger to D. Beltman re "update – let's talk again") (DONZ00025289) at 2. | Graf has paid Stratus in relation to the work that we conducted beginning in 2007 under contract to Kohn Swift & Graf to provide technical and scientific assistance to the plaintiff attorneys." Dkt. 402-11 (Ex. 2288) (2010.12.09 Stratus 30(b)(6) deposition of Douglas Beltman) at 128:18-22.  Additionally, Chevron's reference to "team" is vague and never defined by Chevron. | *v. Chevron Corporation* in Lago Agrio, Ecuador. Stratus was hired for the Ecuador Project by Steven Donziger and Kohn, Swift & Graf through a contract with Kohn, Swift & Graf in August of 2007."). |
| 16. In all of the conduct described in this Separate Statement, Beltman has acted as the LAPs' agent.  *See* St. 15 | **Donziger:**  Disputed.  This statement consists of an improper legal conclusion, which the Court should strike or disregard.  *See, e.g., Antunes,* 2011 WL 1990872 at *2 n.9; *Cicchetti,* 2008 WL 619013 at *4 n.2; *Jessamy,* 292 F.Supp. 2d at 509.<br><br>**LAPs:**  Disputed.  This vague and compound statement consists of an improper legal conclusion, which the Court should strike or disregard.  *See, e.g., Antunes,* 2011 WL 1990872 at*2 n.9; *Cicchetti,* 2008 WL 619013 at *4 n.2; *Jessamy,* 292 F. Supp. 2d at 509.  The statement does not identify with specificity what conduct it refers to.<br><br>Moreover, to the extent this Separate Statement alleges a crime or fraud against Stratus, Camacho and Piaguaje each affirm under oath that they "have not engaged in any crime, fraud or violation of court rules" and that they are "unaware of and have not authorized or ratified any crime, fraudulent activity, or violation of court rules by anyone acting on [their] behalf with regard to the Lago Agrio Lawsuit."  (Dkt. 446, at ¶¶ 17-18; Dkt. 447, at ¶¶ 18-19).  Camacho and Piaguaje are Plaintiffs in the Lago Agrio lawsuit because they intend to "hold Chevron responsible" for the contamination and failure properly to remediate.  (Smyser Decl., Exs. 12 & 13, ¶ 6).  They "have never had any intention to defraud Chevron, or anyone else related to the case." (*Id.*). | Undisputed.  Whether Beltman acted on behalf of the LAPs is an issue of fact.  Defendants have not identified any statements for which Beltman was not acting as the LAPs' agent.  *See* Stavers Decl., Ex. 3652 (Beltman Witness St.), ¶ 2 ("Stratus began working on the Ecuador Project in August of 2007 after first meeting with Donziger on April 27, 2007 in Stratus's Boulder, Colorado office. From that point forward, Stratus took its direction for its work on the Ecuador Project from Donziger, who described himself as the lead U.S. lawyer for the Lago Agrio Plaintiffs[.]"). |

| Chevron's Corrected Statement of Undisputed Facts[*] | Defendants' Response[**] | Chevron's Reply |
|---|---|---|
| 17. Maest began to serve as a member of the LAP team no later than 2007.  Dkt. 32-16 (Exhibit 160) (2007.08.20 Contract between Stratus and Kohn, Swift & Graf P.C.) (STRATUSNATIVE043270); Dkt. 32-23 (Exhibit 167) (2007.09.19 Email from S. Donziger to D. Beltman, A. Maest, J. Lipton, and P. Sowell, copying J. Kohn, re "Important idea") (DONZ00025160). | **Donziger:**  Disputed.  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed.  The cited evidence does not support Chevron's characterization.  Douglas Beltman testified that "Kohn Swift & Graf has paid Stratus in relation to the work that we conducted beginning in 2007 under contract to Kohn Swift & Graf to provide technical and scientific assistance to the plaintiff attorneys."  Dkt. 402-11 (Ex. 2288) (2010.12.09 Stratus 30(b)(6) deposition of Douglas Beltman) at 128:18-22.  Additionally, Chevron's reference to "team" is vague and never defined by Chevron. | Undisputed.  Maest, as an employee of Stratus, was paid by Kohn, Swift & Graf P.C. to be part of the LAP team in the Lago Agrio Litigation.  Stavers Decl., Ex. 3653 (Maest Witness St.), ¶ 1 ("Stratus is an environmental consulting firm located in Boulder, Colorado. Stratus was hired to work on projects related to the case of *Maria Aguinda y otros v. Chevron Corporation* in Lago Agrio, Ecuador . . . by Steven Donziger and Kohn, Swift & Graf through a contract with Kohn, Swift & Graf in August of 2007, and I began working on the project as a Stratus employee in 2007. Prior to that, between 2006 and 2007, I worked on the 'Ecuador Project' on behalf of E-Tech."). |
| 18. In all of the conduct described in this Separate Statement, Ann Maest has acted as the LAPs' agent.  *See* St. 17. | **Donziger:**  Disputed.  This statement consists of an improper legal conclusion, which the Court should strike or disregard.  *See, e.g.*, *Antunes*, 2011 WL 1990872 at *2 n.9; *Cicchetti*, 2008 WL 619013 at *4 n.2; *Jessamy*, 292 F.Supp. 2d at 509.<br><br>**LAPs:**  Disputed.  This statement consists of an improper legal conclusion, which the Court should strike or disregard.  *See, e.g.*, *Antunes*, 2011 WL 1990872 at *2 n.9; *Cicchetti*, 2008 WL 619013 at *4 n.2; *Jessamy*, 292 F. Supp. 2d at 509. In addition, the statement does not identify with specificity what conduct it refers to.<br><br>Moreover, to the extent this Separate Statement alleges a crime or fraud against Stratus, Camacho and Piaguaje each affirm under oath that they "have not engaged in any crime, fraud or violation of court rules" and that they are "unaware of and have not authorized or ratified any crime, fraudulent activity, or violation of court rules by anyone acting on [their] behalf with regard to the Lago Agrio Lawsuit." (Dkt. 446, at ¶¶ 17-18; Dkt. 447, at ¶¶ 18-19).  Camacho and Piaguaje are Plaintiffs in the Lago Agrio lawsuit because they | Undisputed.  Whether Maest acted on behalf of the LAPs is an issue of fact.  Defendants have not identified any statements for which Maest was not acting as the LAPs' agent.  *See* Stavers Decl., Ex. 3653 (Maest Witness St.), ¶ 1 ("Stratus is an environmental consulting firm located in Boulder, Colorado. Stratus was hired to work on projects related to the case of *Maria Aguinda y otros v. Chevron Corporation* in Lago Agrio, Ecuador . . . by Steven Donziger and Kohn, Swift & Graf through a contract with Kohn, Swift & Graf in August of 2007, and I began working on the project as a Stratus employee in 2007.  Prior to that, between 2006 and 2007, I worked on the 'Ecuador Project' on behalf of E-Tech."). |

| Chevron's Corrected Statement of Undisputed Facts[*] | Defendants' Response[**] | Chevron's Reply |
|---|---|---|
| | intend to "hold Chevron responsible" for the contamination and failure properly to remediate. (Smyser Decl., Exs. 12 & 13, ¶ 6). They "have never had any intention to defraud Chevron, or anyone else related to the case." (*Id.*). | |
| 19. A 2011 Engagement Agreement signed by Fajardo affirms that Donziger "acted as the primary United States attorney on behalf of the Plaintiffs to date," and affirms Donziger's past and continued authorization to "assemble and organize United States lawyers and law firms" and "non-legal advisors, experts, and service providers" to "assist the Plaintiffs," "coordinate the efforts to procure funding," and "coordinate the media, public affairs and public relations," including "retaining lobbyists." Dkt. 355-37 (Ex. 1122) at 1-3. | **Donziger:** Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.  **LAPs:** Disputed in part. Defendants do not dispute that Fajardo signed the 2011 Engagement Agreement relating to Donziger's services. Defendants dispute the legal effect of Fajardo's signing the Agreement as it relates to their vicarious liability for the allegations in this lawsuit**.** | Undisputed. The statement does not say anything about vicarious liability. |
| 20. A November 2010 Power of Attorney signed by Defendants Camacho and Piaguaje, and 39 other LAPs, invested Fajardo with "the widest of powers and attributes that the law confers" including the authority to "make and/or sign any kind of agreements for setting up the contracting of any kind of consultant, whether this be a legal professional or not." Dkt. 106-6 (Ex. 481) at 6-7. | **Donziger:** Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.  **LAPs:** Disputed in part. Defendants do not dispute that they signed the November 2010 Power of Attorney. Defendants dispute the legal effect of their signing the Power of Attorney as it relates to alleged vicarious liability for the allegations in this lawsuit. | Undisputed. The statement does not say anything about vicarious liability. |
| 21. The LAPs retrospectively "ratifie[d] and approve[d]" Fajardo's actions in the Lago Agrio Litigation and other litigations, whether "performed directly or through other persons." Dkt. 106-6 (Ex. 481) at 4-5. | **Donziger:** Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.  **LAPs:** Disputed. The statement calls for a legal interpretation of an agreement. Defendants do not dispute that they signed the November 2010 Power of Attorney, or that they ratified and approved the actions of Fajardo about which they were aware at the time. | Undisputed. The statement does not call for a legal interpretation of an agreement; it merely quotes from the agreement. The agreement does not say anything about the LAPs approving only acts of which they were aware. Defendants present no evidence to contradict the plain language of the agreement, by which the LAPs "ratifie[d] and approve[d]" Fajardo's actions in the Lago Agrio Litigation and other litigations, whether "performed directly or through other persons." Dkt. 106-6 (Ex. 481) at 4- |

| Chevron's Corrected Statement of Undisputed Facts[*] | Defendants' Response[**] | Chevron's Reply |
|---|---|---|
| | Defendants did not, and could not, ratify or approve any acts about which they were unaware.<br><br>Camacho and Piaguaje each affirm under oath that they "have not engaged in any crime, fraud or violation of court rules" and that they are "unaware of and have not authorized or ratified any crime, fraudulent activity, or violation of court rules by anyone acting on [their] behalf with regard to the Lago Agrio Lawsuit." (Dkt. 446, at ¶¶ 17-18; Dkt. 447, at ¶¶ 18-19). | 5. |
| 22. Donziger, Yanza, Fajardo, Stratus Consulting, Beltman, and Maest have performed multiple acts in furtherance of a conspiracy to harm Chevron in which all are co-conspirators, as set forth in this Separate Statement. *See* St. 12-18, 23-344. | **Donziger:** Disputed. Donziger incorporates his responses to St. 12-18, 23-344. This is an argument disguised as a factual statement and is riddled with legal conclusions (e.g. characterizing persons as "co-conspirators," is obviously improper in a Rule 56.1 statement). Accordingly, this statement consists of an improper legal conclusion, which the Court should strike or disregard. *See, e.g., Antunes*, 2011 WL 1990872 at *2 n.9; *Cicchetti*, 2008 WL 619013 at *4 n.2; *Jessamy*, 292 F.Supp. 2d at 509.<br><br>**LAPs:** Disputed. Defendants incorporate Resp. St. 12-18, 23-214. This statement consists of an improper legal conclusion, which the Court should strike or disregard. *See, e.g., Antunes*, 2011 WL 1990872 at *2 n.9; *Cicchetti*, 2008 WL 619013 at *4 n.2; *Jessamy*, 292 F. Supp. 2d at 509.<br><br>Moreover, to the extent this Separate Statement alleges a crime or fraud against Donziger, Yanza, Fajardo, Stratus Consulting, Beltman, or Maest, Camacho and Piaguaje each affirm under oath that they "have not engaged in any crime, fraud or violation of court rules" and that they are "unaware of and have not authorized or ratified any crime, fraudulent activity, or violation of court rules by anyone acting on [their] behalf with regard to the Lago Agrio Law- | Undisputed. The supporting separate statements are not genuinely disputed as shown below. *See* Sts. 23-344. |

| Chevron's Corrected Statement of Undisputed Facts[*] | Defendants' Response[**] | Chevron's Reply |
|---|---|---|
| | suit." (Dkt. 446, at ¶¶ 17-18; Dkt. 447, at ¶¶ 18-19).  Camacho and Piaguaje are Plaintiffs in the Lago Agrio lawsuit because they intend to "hold Chevron responsible" for the contamination and failure properly to remediate. (Smyser Decl., Exs. 12 & 13, ¶ 6).  They "have never had any intention to defraud Chevron, or anyone else related to the case." (*Id.*). | |

## II.     THE LAP TEAM ENGAGED IN A PLANNED AND CAREFULLY EXECUTED SCHEME TO DEFRAUD IN THE LAGO AGRIO LITIGATION

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| 23. Early in the Lago Agrio Litigation, the court ordered a series of 122 judicial inspections of various oil drilling and production sites, where experts for the parties would each examine the sites and submit their findings to a panel of  settling experts to reconcile the reports and issue final determinations regarding the presence or absence of harmful contamination. Dkt. 30-32 (Exhibit 120) (2003.10.29 Order regarding evidence and appointment of experts, Lago Agrio Litigation); Dkt. 31-2 - 31-5 (Exhibit 121) (2004.08.07 Summary Oral Hearing No. 002-2003, Terms of reference for the experts carrying out judicial inspections, Lago Agrio Litigation); Dkt. 31-7 (Exhibit 122A) (2004.08.26 Order adopting Procedural Agreement for experts, Lago Agrio Litigation); *see* Dkt. 31-6 (Exhibit 122) (certified translation of Ecuadorian Code of Civil Procedure, art. 259). | **Donziger:**  Disputed.[B]  The documents that Chevron cites do not support Chevron's characterization and conclusions.  Rather, the documents Chevron cites establish the following with respect to inspections: <br><br> • On October 29, 2003, the court ordered that certain inspections requested by Chevron be carried out and that certain inspections requested by the Ecuadorian Plaintiffs be carried out. Dkt. 30-32 at 1, 6. <br><br> • On August 7, 2004, a document titled "Summary Oral Hearing No. 002-2003" was issued.  It states that during a hearing "the parties have requested judicial inspections at approximately 122 wells and production installations in the former concession . . . ." Dkt. 31-2 at 1. <br><br> • On August 26, 2004, the Lago Agrio Court ordered the parties to comply with the terms of reference they had agreed upon for the inspections.  Dkt. 31-7 at 3. <br><br> • Ecuadorian Code of Civil Procedure Article 259 states that "If there are discrepancies between expert reports, the | Undisputed.  There is no genuine dispute over what constituted the judicial inspection process.  The documents show the request for 122 judicial inspections and procedures for those inspections and the resolution of disputes by settling experts.  Indeed, Defendants do not identify anything in Chevron's statement that they contend is inaccurate.  Dkt. 30-32 (Exhibit 120) at 1–8 (2003.10.29 Order regarding evidence and appointment of experts, Lago Agrio Litigation); Dkt. 31-2 - 31-5 (Exhibit 121) (2004.08.07 Summary Oral Hearing No. 002-2003, Terms of reference for the experts carrying out judicial inspections, Lago Agrio Litigation); Dkt. 31-7 (Exhibit 122A) at 1–3 (2004.08.26 Order adopting Procedural Agreement for experts, Lago Agrio Litigation); *see* Dkt. 31-6 (Exhibit 122) (certified translation of Ecuadorian Code of Civil Procedure, art. 259). |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | judge shall appoint another expert, if he deems it necessary in order to form his own opinion." Dkt. 31-6 (Ex. 122).<br><br>[B]   Chevron has failed to provide pincites to the documents it cites, in particular Dkt. 30-32 (Exhibit 120) (17-page document consisting of court order and translation); Dkt. 31–2 – 31-5 (176 pages consisting of court document and translation); Dkt. 31-7 (9-page document consisting of court order and translation).  It is impossible for Donziger (or the Court) to determine where in these documents the evidence upon which Chevron would rely can be found.  Chevron's failure to provide pinpoint citations has forced Donziger to hunt through voluminous exhibits for any nuggets that Chevron might believe supports its position.  This is a distraction, waste of time, and unnecessary drain on Donziger's already stretched resources. Further, it has severely prejudiced Donziger's ability to respond to Chevron's alleged facts because Donziger cannot determine precisely what evidence Chevron is citing in support. For these reasons, Donziger requests that Chevron's citations to multiple-page documents that are not accompanied by pincites be stricken.<br><br>**LAPs:**  Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact. | |
| 24. From January 2005 to June 2006, the LAP team submitted to the Lago Agrio court sampling results for TPH, PAH, and hexavalent chromium in soil from the HAVOC laboratory, but during that time, HAVOC was not accredited to test for those compounds, nor did it have the necessary equipment to perform tests for individual PAHs. Dkt. 111-8 (Ex. 553) (Donziger Dep.) at 3743:14-3744:3 (Donziger testifying that HAVOC was not accredited to perform the tests it was conducting for the LAPs); Dkt. 54-18 (Ex. 446) (Maest Dep.) at 175:17–24 (HAVOC did not have the necessary equipment to perform the tests); Dkt. 54-12 (Ex. 440) (Donziger asks in an email whether "the accreditation | **Donziger:**  Chevron mischaracterizes Donziger's deposition testimony and Dkt. 54-12 (Ex. 440).  Chevron also omits key evidence in order to create the impression that HAVOC had no accreditations whatsoever.  That is not true.  When asked about the referenced e-mail at his deposition, Donziger testified that he believed HAVOC was not accredited for certain of the work that it was doing as of April 2006.  But the questioner did not follow up to ask—and Donziger did not testify to—what particular work Donziger was referring to.  Dkt. 111-8 (Ex. 553) at 3743:15-3744:3.  Further, Ann Maest testified that she believed HAVOC did have certain accreditations.  Werdegar Decl. Ex 11 (Maest Dep. Tr. Vol. II) at 177:10-13 ("It's different in Ecuador than it is in the United States.  And HAVOC did have a number of accredi- | Undisputed.  Defendants' quibbles with this statement are not responsive and are irrelevant.  The statement does not assert that HAVOC "had no accreditations whatsoever"—to the contrary, it clearly says, "not accredited to test for those compounds."  Defendants concede that Maest testified as Chevron claims, but purport to dispute the statement regardless.  *Compare* Chevron St. 24 ("[HAVOC did not] have the necessary equipment to perform tests for individual PAHs") *with* Defendants St. 24 ("Maest testified that HAVOC did not have the equipment necessary to analyze samples for individual PAHs").  And Defendants' own correspondence confirms that HAVOC could not test for individual PAHs, but rather generated them through "factors."  Dkt. 110-1 (Ex. 526) (STRATUS NATIVE051432); *see also* Stavers Decl., Ex. 3653 (Maest Witness St.), ¶ 46 ("I am aware that LAPs' experts during the judicial inspection utilized |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| process" for HAVOC, which Donziger emphasized was "VITAL," had begun). | tations, but they were, as I said, different than what's in the United States . . . ."). <br><br> Chevron also mischaracterizes Maest's testimony. Maest testified that HAVOC did not have the equipment necessary to analyze samples for individual PAHs. This testimony does not support Chevron's assertion for two reasons. *First*, Chevron cites to no testimony regarding HAVOC's equipment for testing for TPH or hexavalent chromium. In fact, Maest testified that she believed HAVOC did have the equipment to test for hexavalent chromium. Werdegar Decl. Ex 11 (Maest Dep. Tr. Vol. II) at 172:5-7. *Second*, the cited portion of Maest's testimony shows that HAVOC might not have had the equipment to do one type of PAH analysis. But the context suggests that there is more than one method of doing such calculations, and that HAVOC was not, in fact, using the method that would have required the equipment Maest discussed. *Id.* at 175:2-16 (discussing an analysis method HAVOC used "rather than just simply analyze for individual PAHs"). <br><br> Further, Chevron has not provided any evidence to support its assertions regarding when the Ecuadorian Plaintiffs submitted the HAVOC sampling results. From the materials Chevron cites, it is not clear what HAVOC was or was not accredited for, nor when such accreditations would have been relevant. <br><br> Finally, the accreditation issue is not material. Both sides challenged the accreditation of the other's laboratories. *See* Dkt. 168 (Chevron's translation of the 2/14/11 Lago Agrio Judgment) at 44-45 (discussing both sides' accusations that the other's laboratory did not have the requisite credentials). The Lago Agrio Court concluded that Chevron's laboratory also lacked the type of certification that Chevron argued HAVOC lacked. *Id.* at 45. The Lago Agrio Court took these issues into account when assessing the la- | the facilities of the Havoc Lab. I personally visited Havoc Lab. Havoc Lab had two significant shortcomings related to its ability to measure polycyclic aromatic hydrocarbons (PAHs) and chromium VI (Cr(VI)) in samples. Havoc did not have the equipment needed to conduct determinations of individual PAHs and instead did a 'total PAH' and divided it into individual PAHs. This methodology produces unreliable data. Therefore, any Havoc PAH values (total or individual) reported for soil or water are scientifically unsound and cannot be relied upon. In contrast, the method Chevron used for individual PAHs is reliable."); *id.* ¶ 47 ("Additionally Havoc sent out samples for Cr(VI) determination (they did not have the equipment do perform them in-house). The holding time for Cr(VI) measurement in water samples is 24 hours, and it is highly unlikely that any water samples sent out for Cr(VI) analysis by Havoc were analyzed by another laboratory within the holding time. I do not know the name of the laboratory that Havoc sent Cr(VI) samples to and I do not know whether that laboratory."). |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | boratories' data. *Id.* ("As previously stated, this fact [lack of ac-creditation] will be taken into careful consideration.").<br><br>**LAPs:** Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | |
| 25. The LAP team submitted to the Lago Agrio court sampling results from "Selva Viva Laboratory," but there was no entity called "Selva Viva Laboratory"—this was a name the LAPs used when they did their own testing, using testing kits in a hotel room. Dkt. 31-21 (Ex. 136) at 132:11-133:19. | **Donziger:** As a preliminary matter, Donziger objects to the use of Calmbacher's deposition testimony. First, this testimony was given by a witness with a well-established bias against Donziger, *see, e.g.*, Salazar Dkt.[c] No. 158-24 (Ex. R) at p. 49 (describing how Calmbacher left the Ecuadorian Plaintiffs' team on bad terms, disgruntled about non-payment); *id.* (Lago Agrio Court's observation that Calmbacher had "a sense of resentment on a personal level against the plaintiffs' team due to labor and money issues,"), at a deposition at which Donziger was not present. *See* Fed. R. Civ. P. 32(a)(1)(a) (requiring that a party be present or represented at the taking of a deposition or had reasonable notice of it); *see* Fed. R. Civ. P. 32(a)(8) (discussing use of deposition testimony from earlier actions). *See also* Dkt. 823. Second, the portion of the Calmbacher deposition that Chevron chose to introduce into the record at Dkt. No. 31-21 and cite in its factual statement does not even satisfy the requirements of an affidavit; the portion at Dkt. No. 31-21 is not signed by him.<br><br>[c]   Documents from *Chevron Corporation v. Salazar, et al.,* Case No. 11-CV-3718 (LAK) are hereafter referred to as "Salazar Dkt."<br><br>**LAPs:** Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | Undisputed. Defendants do not dispute that the LAPs' team submitted sampling results from "Selva Viva Laboratory"—a hotel room where the LAPs conducted their own testing.<br><br>Both Donziger and the LAPs had prior notice of Calmbacher's deposition, but elected not to participate. Dkt. 631-4 (Ex. 2903) (2010.03.09 "Memo regarding phone conversation between Steven Donziger and David Russell"); Dkt. 631-11 (Ex. 2910) (2010.03.05 Calmbacher subpoena and certificate of service of Calmbacher subpoena on the LAPs' counsel); Dkt. 631-12 (Ex. 2911) (2010.03.17 letter from Chevron counsel to Donziger enclosing courtesy copies of the Calmbacher deposition subpoena and the court order granting Chevron's request to issue that subpoena). Donziger also contacted Calmbacher the week that Chevron served its subpoena and urged Calmbacher not to testify, proving that Donziger had reasonable notice of the deposition in advance. Dkt. 31-21 at 144:14–145:10; *see also* Dkt. 631-4 (Ex. 2903); Dkt. 939 at 5 (finding that Defendants had notice of the Calmbacher deposition, and holding, "A party's decision not to attend a deposition of which it has notice is not a sufficient ground to exclude deposition under Rule 32."). |
| 26. Defendants stopped Chevron from inspecting HAVOC on one occasion by pressuring a judge to cancel a planned inspection and on another occasion by | **Donziger:** Chevron would have the Court believe that the only reason Donziger might not want the HAVOC lab inspected was because of an accreditation issue. But Donziger testified that it | Undisputed. Defendants' response does reflect the statement as written—there is nothing in the statement about "an accreditation issue." There is no genuine dispute that Donziger pressured a judge to cancel the HAVOC |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| instructing HAVOC to close, because Donziger believed that the inspection would be a "disaster" for the LAPs' case.  Dkt. 54-28 (Ex. 456) (Donziger writing that inspection of HAVOC would be a "DISASTER"); Dkt. 53-5 (Ex. 405) at 3737:22-3739:17 (Donziger testifying that the inspection of the HAVOC lab was "an important issue"); Dkt. 6-2 (Exhibit 1), CRS-052-00-CLIP-05 (2006.03.30 Crude outtake video clip of S. Donziger discussing upcoming meeting with the judge); Dkt. 6-4 (Exhibit 2) (certified transcript) at 16 (Crude outtakes captured Donziger entering the judge's chambers ex parte and insisting that the court not allow inspection of HAVOC; admitting that he "could never do this in the United States but Ecuador, you know, this is how the game is played, it's dirty. We have to occasionally use pressure tactics . . . ."); Dkt. 54-12 (Ex. 440) (Donziger inquires about whether "the accreditation process" for HAVOC, which Donziger emphasized was "VITAL," had begun); Dkt. 111-8 (Ex. 553) at 3743:14-3744:3 (Donziger testifying that HAVOC had already been doing work for which the accreditation was required). | was important to prevent Chevron's abusive and invasive inspection from going forward because Chevron was trying to intimidate HAVOC into not working with the Ecuadorian Plaintiffs.  Werdegar Decl. Ex 12 (Donziger Dep. Tr.) at 3739:18-3740:5.  Donziger denied that any lack of accreditation was a reason that he wanted to prevent Chevron's calculated attempts to inspect HAVOC.  *Id.* at 3740:8-12. Rather, he opposed Chevron's *ex parte* request for an inspection of HAVOC's laboratory because he believed that Chevron was seeking an inspection in order to intimidate and harass HAVOC and to discourage HAVOC and other laboratories in Ecuador from working with The Ecuadorian Plaintiffs.

Donziger disputes Chevron's characterization of his statement as an "admission."  In the version of this document that was used at Donziger's deposition (Donz. Dep. Exh. 1640), Donziger was discussing Chevron's attempts to "destroy" the laboratory.  He described the latest of these attempts as Chevron's efforts to get a judge to order a judicial inspection of the lab.  Donziger stated that the Ecuadorian Plaintiffs needed to respond to Chevron's pressure tactic in the same way:  by attempting to convince the judge. Clearly, having informal or unscheduled contacts with judges was "something you would never do in the U.S.," but that was how things worked in Ecuador ("this is how the game is played").  In the outtake cited by Chevron, Donziger states that he believes that the judge is being paid by Chevron:  "we're going to confront the judge who we believe is paid by Texaco."  Dkt. 6-4 at 6.  In both instances, Donziger is discussing the need to fight back against Chevron's attempts to corrupt the process.

Moreover, both sides accused the other of submitting manipulated sampling results to the Lago Agrio Court.  Indeed, the Lago Agrio Court noted that, if it were to consider statements made by Diego Borja, "we must understand that most of the samples collected by | inspection and declared that such an inspection would be a "disaster."  Defendants' responses demonstrate only Donziger's proclivity to rationalize his acts by claiming unspecified or unsupported acts by Chevron forced his actions.  Such responses are irrelevant to the truth of this statement.  If anything, a mistaken belief by Donziger that the "judge is paid by Texaco" would make the statement here more likely to be true. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | the experts suggested by [Chevron] have been manipulated . . . and they would lose all probative value." *See* Dkt. 168 (Chevron's translation of the 2/14/11 Lago Agrio Judgment) at 52.<br><br>Further, the accreditation and laboratory inspection issues are not material. *See* St. 24.<br><br>**LAPs:** Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | |
| 27. In 2005, Donziger offered and agreed to pay Fernando Reyes and Gustavo Pinto to act as "monitors" of the settling experts in the judicial inspection phase of the Lago Agrio Litigation; the agreed upon payments included a bonus if the LAPs won the lawsuit. Dkt. 658-18 (Reyes Declaration), ¶ 12; *see also* Dkt. 29-2 at 15 (Donziger personal notes: "50 k came today - meet on roof to plan payment [to] GF."); Dkt. 53-5 (Ex. 405) at 3845:17–21 (Donziger testifying that "GF" refers to Gustavo Pinto and Fernando Reyes). | **Donziger:** Chevron's self-serving characterization of the evidence is inappropriate in a 56.1 statement. *Goldstick v. The Hartford, Inc.*, No. 00-cv-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (Rule 56.1 statements are not argument). Donziger testified that he had asked Pinto and Reyes to work confidentially for the Ecuadorian Plaintiffs in 2005. Dkt. 53-5 (Ex. 405) at 3846:6-17.<br><br>Chevron cannot rely on Reyes's declaration because it is not credible. His story is inconsistent, highly implausible, and contradicted by other evidence in the record. To provide a few examples:<br><br>• Reyes claims that, in 2003-2004, he did not want to be involved in the lawsuit so he asked the Ecuadorian Plaintiffs for a $30,000 fee. Dkt. 658-18 (Ex. 3014) at ¶ 9. This is contradicted by Donziger's notes. Donziger wrote that Reyes tried to charge the Ecuadorian Plaintiffs $30,000 for certain Chevron documents. Dkt. 28-8 at 11.<br><br>• Reyes fails to provide any evidence to corroborate his assertion that he "could not twist [his] professional assessments to make them fit the plaintiffs' interest," and that he "considered it to be completely ludicrous" that Chevron could be held liable for as much as $10 billion. Dkt. 658- | Undisputed. Defendants do not dispute that Donziger offered and agreed to pay Reyes and Pinto to act as monitors, or that the agreed upon payment would include a bonus if the LAPs won the lawsuit. Donziger, who has personal knowledge of this matter, submitted a declaration in opposition to Chevron's motion, and did not dispute a single one of Reyes's statements.<br><br>Defendants' claim that Chevron cannot rely on Reyes's declaration is meritless. None of the documents cited by Defendants contradict Reyes's account.<br><br>• Donziger's notes state, "Met with Esperanza and Manuel: they want the Peritaje Global to be focused on the human impact, not the science. Suggested we get a sociologist or somebody else to be the expert, not Fernando Reyes (MP reminded me that he wanted to charge us $30,000 for some PE documents at the beginning of the case - I had forgotten about that)." Dkt. 28-8 (Ex. 76) at 36 of 109. Rather than contradict, Donziger's notes corroborate Reyes's testimony that he asked to be paid $30,000 for his professional services.<br><br>• Defendants' commentary regarding the corroborative evidence attached to Reyes's declaration is improper in a 56.1 response, is irrelevant to Chevron's statement of fact, and should be disregarded. Impeachment is not contrary evidence. *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 86 (2d Cir. 2005); *Rinieri v. Scanlon*, 254 F. Supp. 469, |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | 18 at ¶¶ 22, 29.  Although in an attempt to give his testimony a veneer of truth, Reyes sprinkled throughout his affidavit various irrelevant details such as the type of drink that the parties ordered during an alleged meeting between Donziger, Cabrera, and Reyes (Reyes and Cabrera ordered whiskey; Donziger had nothing (Dkt. 658-18 at ¶31)) and Charlie Champ's attire during another meeting ("bolo tie, instead of a tie, and big cowboy boots" (*Id.* at ¶ 36)), nowhere in his 16-page affidavit does Reyes provide any corroboration for these assertions.  In particular, while Reyes submits over 150 pages of documents, including pages from his calendar and day planner, and notes containing irrelevant details about various meetings, nowhere in any of these documents are his strong setiments and conclusions about what the Ecuadorian Plaintiffs were asking him to do, even noted.<br><br>• Reyes also fails to provide any evidence to corroborate his claim about a key event: his  contact with Donziger in the "summer of 2007" during which Donziger allegedly paid him to draft two technical reports, which were then submitted as "Annex S to the 'Cabrera Report.'"  *Id.* at ¶ 38.  Reyes fails to provide any contemporaneous evidence corroborating his alleged interaction with Donziger.  He fails to provide any drafts of the reports (for which he says he was paid $10,000), nor does he have any written correspondence discussing the reports.  It is difficult to believe that Reyes has no evidence corroborating this key event, in view of the level of colorful and gratuitous details provided elsewhere in his affidavit and evidence submitted corroborating other irrelevant events and conduct.<br><br>• Reyes claims that on January 31, 2006, the settling experts told him to contact the clerk of the court for a copy of the | 474 (S.D.N.Y. 1966) ("[T]he opposing party may not merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof.").<br><br>• Defendants cannot in good faith dispute that Reyes authored two reports that were later submitted as part of "Annex S to the 'Cabrera Report.'"  Donziger has produced in discovery August 2007 emails from Fernando Reyes to Steven Donziger attaching the reports.  Stavers Decl., Ex. 3671 (DONZ00089950-51); *id.*, Ex. 3673 (DONZ-HDD-0121153).<br><br>• That the settling expert report was not filed until February 1, 2006, does not contradict Reyes's account that he met with the settling experts the day before and was told to obtain a copy of the report through the court.  *See* Dkt. 31-12 at 2 (Settling Expert Report dated February 1, 2006).<br><br>• Defendants' argument regarding the CIGMYP letter is likewise baseless.  The letter was signed by Gustavo Pinto and Defendants have provided no evidence to contradict the contents of the letter or Reyes's account.  Stavers Decl., Ex. 3657 (2006.01.20 CIGMYP Letter).<br><br>The statements Defendants contend are hearsay are actually party admissions since they are made by Defendants' agents. Fed. R. Evid. 801(d)(2)(D) ("A statement that meets the following conditions is not hearsay: . . .The statement is offered against an opposing party and: . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed[.]").<br><br>Donziger's commentary regarding their rooftop meetings does not contradict Chevron's statement of fact, and is irrelevant.<br><br>Chevron's statement is material because it relates to core allegations of "fraud, extortion, and corruption so deep in the manner of prosecuting that it fundamentally denied Chevron due process and a fair trial." Dkt. 720 at |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
|  | Sacha 53 Report. But the Sacha 53 Report had not been issued by January 31, 2006.<br><br>• Reyes claims that the Ecuadorian Plaintiffs made the monitorship arrangement with Reyes and Pinto. But then Reyes is deliberately opaque about who wrote the CIGMYP letter to the Lago Agrio Court dated January 20, 2006. If Reyes had written the letter, he would have said so, and he should have submitted a draft letter to corroborate his testimony. If someone else at CIGMYP had written the letter, this fact would suggest that the others at CIGMYP knew about the monitorship arrangement, and it was not secret or improper, as Chevron would now have the Court believe.<br><br>In addition, this Court should not credit the hearsay statements contained in Reyes's testimony. *See*, e.g., Dkt. 658-18 at ¶ 9 (Alberto Wray "asked me to serve as a sort of expert witness regarding Texaco's activities in Oriente."); ¶ 22 ("Mr. Yanza and Mr. Fajardo began the meeting by telling me that the Judge in the Chevron case had decided to halt the process of judicial inspections and settling experts, and instead was going to appoint a single expert responsible for undertaking a global damages assessement for the case."); ¶ 27 ("Mr. Fajardo explained to me in more detail the proposal for me to be the global assessment expert, specifically regarding the financial terms for my professional services."); ¶39 ("Mr. Fajardo and Mr. Yanza told me they were there to ask Mr. Garzon to have Petroproduccion suspend all remediation activitiy in the area run by the Petroecuador-Texaco consortium, because the remediation was depriving the plaintiffs of clear evidence on which to base their claims for damages in the case.").<br><br>Chevron's suggestion that Donziger met with Reyes and Pinto "on | 2. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | the roof" is designed to create the misleading impression that this meeting was more secret than it was.  When questioned about this meeting, Donziger testified that the Ecuadorian Plaintiffs had a roof deck at their office and would often have meetings there. Dkt. 53-5 (Ex. 405) at 3848:24-3849:4.

Finally, this assertion is not material.  Reyes's own affidavit reveals that any efforts he may have made on behalf of the Ecuadorian Plaintiffs in 2005-2006 were wholly unsuccessful.  Reyes describes only one meeting with a judge, in which "the Judge did not express any interest in what we were telling him about the case." Dkt. 658-18 (Ex. 3014) ¶ 17. Reyes did not submit a report to the Court, nor did he engage in any other meetings with judges. *Id.* ¶¶ 18-20. According to Reyes, the settling experts refused to provide Reyes with copies of their reports. *Id.* ¶ 18.

**LAPs:**  Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact. | |
| 28. Donziger called Reyes "one of the most qualified engineers and academics in the field" and included Reyes as one of two people on his "A List." Dkt. 658-36 (Ex. 3029) at 2. | **Donziger:**  Disputed.  Chevron fails to provide important context for this quotation.  On September 19, 2006, Donziger wrote to C. Mitchell, Raul Herrera, and Eric Bloom regarding possible experts from Ecuador.  Donziger listed Reyes and Pinto in the "A List" category.  Dkt. 658-36 (Ex. 3029) at 2.

**LAPs:**  Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact. | Undisputed.  Defendants do no dispute that Donziger called Reyes "one of the most qualified engineers and academics in the field."  Nor do they dispute that Donziger listed Reyes on his "'A' List."  The additional "context" provided by Defendants (which appears on the face of the cited document) does not alter the plain meaning of Donziger's words and provides no basis on which to dispute Chevron's statement. |
| 29. The LAP team did not disclose the fact that they were paying Reyes and Pinto, and instructed Reyes and Pinto to keep that fact a secret. Dkt. 658-18 (Reyes Declaration), ¶ 15; *see also* Dkt. 29-2 at 15 (Donziger personal notes: "50 k came today - meet on roof to | **Donziger:**  Disputed.  The Court should disregard Reyes' declaration because it is inconsistent, highly implausible, and contradicted by other evidence on the record. *See* St. 27.

**LAPs:**  Disputed.  Defendants incorporate Donziger Defendants' | Undisputed.  Defendants do not dispute that the LAP team did not disclose that it was paying Reyes and Pinto.  Nor do they dispute that the LAP team instructed Reyes and Pinto to keep that fact secret.  Defendants do not, because they cannot, cite any specific evidence contradicting Chevron's statement.  Rather, they assert that Reyes's declaration should be |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| plan payment [to] GF."); Dkt. 53-5 (Ex. 405) at 3845:17–21 (Donziger testifying that "GF" refers to Gustavo Pinto and Fernando Reyes); *id.* at 3846:6-20 (Donziger testifying that "when [he] cut that deal with Mr. Pinto and Mr. Reyes, it was [his] intention that they keep confidential that they were working for the plaintiffs [a]nd being paid by the plaintiffs"). | response to this purported fact. | disregarded because it is "inconsistent, highly implausible, and contradict-ed by other evidence." But this assertion is false. *See* Reply for St. 27. Donziger admits that he intended for Reyes and Pinto to "keep confiden-tial that they were working for the plaintiffs [a]nd being paid by the plaintiffs." Dkt. 53-5 (Ex. 405) at 3846:6-20. Impeachment is not con-trary evidence. *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 86 (2d Cir. 2005); *Rinieri v. Scanlon*, 254 F. Supp. 469, 474 (S.D.N.Y. 1966) ("[T]he opposing party may not merely recite the incantation, 'Credi-bility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof."). |
| 30. On February 1, 2006, the "Report of the 'Settling Experts' on the Judicial Inspection of the Sacha 53 Well" found that "the concentration levels of the ele-ments analyzed are lower than the allowable limits" and thus "the risk to human health is low." Dkt. 586-23 (Ex. 2822) at 26 (Report of the "Settling Experts") on the Judicial Inspection of the Sacha 53 Well ex-plaining: "[T]he concentration levels of the elements analyzed are lower than the allowable limits[.]"); Dkt. 31-12 at 76 ("[T]he risk to human health is low, with a probability of impact equally low, unless there are drastic changes in the site's current conditions[.]"); *id.* ("In the case of Mr. Baños's well, no concentrations of hydrocarbons were detected."); *see also* Dkt. 356-14 (DONZ00041662) at 50. | **Donziger:** Disputed. Chevron's purported quotation from page 26 of the Report of the Settling Experts is incomplete and misleading. The report states that "From the analyses submitted by Texpet in 1996 (Mr. Baca's report) it can be seen that the concentration lev-els of the elements analyzed are lower than the allowable limits established in the Contract for Implementing Environmental Re-medial Work and Release from Obligations, Liability and Claims, executed on 4 May 1995, as submitted by the defendant." Dkt. No. 586-23 (Ex. 2822) at p. 26. The validity and relevance of those limits, and the legality of the remediation contract have, to say the least, been a subject of disagreement between the parties.

Chevron's selective quotation from the Report of the Settling Ex-perts is further misleading because Chevron has taken quotations relating to results from particular pits and characterized them as if they apply to the Sacha 53 site generally. The statement that "the risk to human health is low" occurs many pages after Chevron's first quotation, relates only to Pit 3, and is misleadingly and in-completely quoted. Dkt. No. 31-12 (Ex. 127) at p. 76. The full sentence reads: "In view of the fact that the concentration of hy-drocarbons (TPH-DRO) and barium are located at depths of over 0.4 m, the risk to human health is low, with a probability of impact | Undisputed. Defendants do not dispute that the Sacha 53 report contains the quoted statements, which speak for themselves. Dkt. 586-23 (Ex. 2822) at 26.

Nor is there any merit to Defendants' contention that quotes are mislead-ing or out of context. They complain that the quote regarding low "risk to human health" is only for pit 3 and not other areas, but the report contains similar conclusions for other areas right above the quoted language. Dkt. 31-12 (Ex. 127) at 75–76 (concluding the "old spill" area it would only be a "source of contamination" if "currently conditions change primarily due to any anthropic activity and by some aggressive natural phenomenon."). Indeed, those conclusions are regarding the same "contamination" that Defendants claim is "extensive and serious." *Id.*

The news article ostensibly authored by a reporter is inadmissible hearsay and is not relevant to the Sacha 53 report, nor is it competent evidence re-garding the environmental conditions at the site. Nor is Defendants' commentary regarding their inability to obtain discovery related to issues beyond the scope of this litigation relevant.

Contrary to Defendants' contention, this statement is relevant to Chev-ron's allegations of "fraud, extortion, and corruption so deep in the man- |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | equally low, unless there are drastic changes in the site's current conditions, which would increase the risk (removal of the soil by mechanical operations, intense water erosion, felling of trees with the consequent exposure of roots and soil)." Elsewhere in the Sacha 53 report, the experts describe extensive and serious petroleum and chemical contamination found at site. *Id.* at 75-76. More recently, the Sacha 53 site was investigated by a U.S. journalist, who noticed obvious evidence of contamination. *See* Dkt. 613-19 (Ex. S) at 1 ("Within a few inches the dirt gives off the pungent odor of petroleum. Within a few feet the dirt glistens with oil residue. When a few handfuls of the soil are dropped into a bucket of water, a thick oil-slick coats the surface.")

Donziger's ability to respond to allegations such as this one has been hampered by the Court's denial of Donziger's requests to conduct discovery into Chevron's own evidence of the environmental and scientific issues underlying the Lago Agrio Litigation. Dkt. 720. Thus, while Chevron has complete discovery into Donziger's internal and confidential thoughts about various expert reports, Donziger has been denied the opportunity to obtain Chevron's internal impressions on the same issues. The reason for the Court's denial of this discovery–Chevron's re-casting of its "sham" litigation allegations–makes the instant factual assertion immaterial. Importantly, Chevron has represented that it does not challenge the scientific basis for the judgment issued against it. *See* Dkt. 705 at 3 ("Chevron does not intend here to relitigate the environmental conditions existing in the Oriente or the relative, substantive merit of scientists' expert opinions on that subject.").

**LAPs:** Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collat- | ner of prosecuting that it fundamentally denied Chevron due process and a fair trial." Dkt. 720 at 2. As Chevron alleged in its Amended Complaint, "[w]hen it became apparent to the conspirators that the judicial inspection process was not going to provide them with the record they needed to extort a payment from Chevron, they abandoned that process and set about developing their false history and factual record, entirely under their control." Dkt. 283, ¶ 100. Among other things, the LAPs pressured the Lago Agrio court to commence a global assessment and appoint Richard Cabrera as the purported independent Global Assessment expert "with whom they would work in secret to ghostwrite his report." *Id.* ¶ 122.

Defendants also falsely claim that "Chevron has represented that it does not challenge the scientific basis for the judgment issued against it." In fact, Chevron explicitly represented, "Chevron does not intend here to relitigate the environmental conditions existing in the Oriente or the relative, substantive merit of scientists' expert opinions on that subject. In that regard the discrete inquiry here will be whether the judgment's findings have any support untainted by fraud in the record that existed before the Ecuadorian court at the time the judgment was issued." Dkt. 720 at 2. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | eral estoppel. (Dkt. 398, at St. 103). Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion. | |
| 31. Reyes states that "Donziger was very upset by the findings of the settling experts' report, and he complained that the report supported Chevron's position and did not support the plaintiffs' position." Dkt. 658-18 (Reyes Declaration), ¶ 19. | **Donziger:** Disputed.  For the reasons stated in St. 27, Chevron cannot rely on Reyes's declaration.  For the reasons stated in St. 30, this purported fact is not material.<br><br>**LAPs:** Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact. | Undisputed.  Defendants do not dispute that Donziger was very upset by the findings of the settling experts' report, and he complained that the report supported Chevron's position.  Defendants do not cite any specific evidence contradicting Chevron's statement.  Rather, they assert that Reyes's declaration should be disregarded because it is "inconsistent, highly implausible, and contradicted by other evidence."  But this assertion is false.  *See* Reply for St. 27.  Defendants' assertion that this statement is not material also lacks merit for reasons stated in Chevron's Reply for St. 30.  Impeachment is not contrary evidence.  *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 86 (2d Cir. 2005); *Rinieri v. Scanlon*, 254 F. Supp. 469, 474 (S.D.N.Y. 1966) ("[T]he opposing party may not merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof."). |
| 32. Donziger directed Reyes and Pinto that their monitorship report on the Sacha 53 settling experts' report should establish that the findings of the settling experts were wrong, that they lacked objectivity, and that they were biased in favor of Chevron. Dkt. 658-18 (Reyes Declaration), ¶ 20. | **Donziger:** Disputed.  For the reasons stated in St. 27, Chevron cannot rely on Reyes's declaration.<br><br>**LAPs:** Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact. | Undisputed.  Defendants do not dispute that Donziger directed Reyes and Pinto that their monitorship report on the Sacha 53 settling experts' report should establish that the settling experts lacked objectivity, were biased in favor of Chevron, and that their findings were wrong.   Defendants do not cite any evidence contradicting Chevron's statement.  Rather, they assert that Reyes's declaration should be disregarded because it is "inconsistent, highly implausible, and contradicted by other evidence."  But this assertion is false.  *See* Reply for St. 27.  Impeachment is not contrary evidence.  *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 86 (2d Cir. 2005); *Rinieri v. Scanlon*, 254 F. Supp. 469, 474 (S.D.N.Y. 1966) ("[T]he opposing party may not merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof."). |
| 33. Once they had reviewed the settling experts' report, Reyes and Pinto found that "the evidence did not sup- | **Donziger:** Disputed.  Chevron provides incomplete quotations, and mischaracterizes its own witness's declaration. Reyes states | Undisputed.  Defendants do not dispute that Reyes and Pinto found "the evidence did not support Mr. Donziger's position" and could not "twist" |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| port Mr. Donziger's position," and they could not "twist" their analyses to support the LAPs' position. Dkt. 658-18 (Reyes Declaration), ¶ 20. | that he and Pinto determined that "the settling experts had failed to strictly follow their judicial mandate," and that "the information submitted by both the plaintiffs and the defendants contained correct elements, but that both also had deficiencies regarding their sampling data." Dkt. 658-18 (Reyes Declaration), ¶ 20.<br><br>For the reasons stated in St. 27, Chevron cannot rely on Reyes's declaration.<br><br>For the reasons stated in St. 30, this purported fact is not material.<br><br>Finally, any analysis of the settling expert report is immaterial because, as Chevron points out, Donziger did not ask for any such report to be submitted to the Court and none was submitted. Chevron would have the Court make inferences about the reasons that the draft report was not submitted, but such an invitation is inappropriate in a motion for summary judgment. *See, e.g., Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989) ("In assessing the record to determine whether there is a genuine issue of fact, the court is required to draw all factual inferences in favor of the party against whom summary judgment is sought."). Further, the Second Circuit has "repeatedly noted that 'summary judgment is ordinarily inappropriate where an individual's intent and state of mind are implicated.'" *Id.* (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).<br><br>__LAPs:__ Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | their analysis to "fit the plaintiffs' interests." Dkt. 658-18 (Reyes Declaration), ¶ 20. That Reyes also stated that the settling experts "failed to strictly follow their judicial mandate" but their "report contained enough information for the Court to make its own ruling" is not contrary to Chevron's statement of fact. *Id.* Nor is Reyes's statement that "the information submitted by both the plaintiffs and the defendants contained correct elements." *Id.*<br><br>Defendants do not cite any evidence contradicting Chevron's statement. Rather, they assert that Reyes's declaration should be disregarded because it is "inconsistent, highly implausible, and contradicted by other evidence." But this assertion is false. *See* Reply for St. 27.<br><br>Chevron's statement is material for the reasons explained in Chevron's Reply for St. 30, including that this statement relates to Chevron's core allegations of "fraud, extortion, and corruption so deep in the manner of prosecuting that it fundamentally denied Chevron due process and a fair trial." *See* Reply for St. 30; Dkt. 720 at 2.<br><br>While Defendants claim it is "inappropriate" for this Court to draw inferences "about the reasons that the draft report was not submitted" to the Lago Agrio court, they offer no alternative inference besides the obvious—that the report was not submitted because "the evidence did not support Mr. Donziger's position" and Reyes and Pinto could not "twist" their analysis to "fit the plaintiffs' interests." Defendants impugn Reyes, but impeachment is not contrary evidence. *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 86 (2d Cir. 2005); *Rinieri v. Scanlon*, 254 F. Supp. 469, 474 (S.D.N.Y. 1966) ("[T]he opposing party may not merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof.").[4] |

---

[4]   Defendants argue throughout that "inferences" are "inappropriate in a motion for summary judgment." *See, e.g.,* Response St. 33, 37, 95, and 181. That is contrary to Rule 56, under which the Court "must determine the legal consequences of these facts and permissible inferences from them." Fed. R. Civ. Proc. 56 (Notes of Advisory Committee on 2010 amendments). Moreover, Defendants omit the operative qualifier for "inferences" in a

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | | Defendant's contention that summary judgment is ordinarily inappropriate where intent and state of mind are implicated is inapposite; Chevron's statement of fact implicated neither Donziger's intent nor state of mind. |
| 34. The monitorship report Reyes and Pinto drafted did not state that the settling experts' findings regarding Sacha 53 were wrong or biased, and the LAP team never asked Reyes and Pinto to submit the monitorship report to the court. Dkt. 658-18 (Reyes Declaration), ¶ 20; *see also id.*, Ex. P (monitorship report). | **Donziger:** Disputed. Chevron mischaracterizes its own witness's declaration. Reyes states that he and Pinto determined that "the settling experts had failed to strictly follow their judicial mandate," and that "the information submitted by both the plaintiffs and the defendants contained correct elements, but that both also had deficiencies regarding their sampling data." Dkt. 658-18 (Reyes Declaration), ¶ 20.<br><br>For the reasons stated in St. 27, Chevron cannot rely on Reyes's declaration.<br><br>Further, Reyes's story regarding the draft report is highly suspicious. Reyes claims that the Ecuadorian Plaintiffs' team pushed Reyes very hard to write a report critical of the Sacha 53 report but then simply dropped the subject after Reyes gave them one draft. If the team were as concerned with the Sacha 53 report—and the settling experts in general—as Reyes claims, then why would they completely abandon the entire monitoring exercise after Reyes provided them one draft report?<br><br>For the reasons stated in St. 30, this purported fact is not material.<br><br>**LAPs:** Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | Undisputed. Defendants do not dispute that the monitorship report Reyes and Pinto drafted did not state that settling experts' findings regarding Sacha 53 were wrong or biased. Nor do they dispute that the LAPs' team did not ask Reyes or Pinto to submit the monitorship report to the Lago Agrio court. That Reyes also stated that the settling experts "failed to strictly follow their judicial mandate" but their "report contained enough information for the Court to make its own ruling" is not contrary to Chevron's statement of fact. Dkt. 658-18 (Reyes Declaration), ¶ 20. Nor is Reyes's statement that "the information submitted by both the plaintiffs and the defendants contained correct elements." *Id.*<br><br>Defendants do not cite any evidence contradicting Chevron's statement. Rather, they assert that Reyes's declaration should be disregarded because it is "inconsistent, highly implausible, and contradicted by other evidence." But this assertion is false. *See* Reply for St. 27. Defendants impugn Reyes, but impeachment is not contrary evidence. *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 86 (2d Cir. 2005); *Rinieri v. Scanlon*, 254 F. Supp. 469, 474 (S.D.N.Y. 1966) ("[T]he opposing party may not merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof.").<br><br>Defendants claim that Reyes's account is suspicious is unsupported by evidence. They cite no evidence contradicting Chevron's statement of fact regarding the content of the draft monitorship report or that the LAPs' team never asked for the monitorship report to be filed. Defendants' ar- |

summary judgment motion: reasonableness. While inferences are to be drawn in favor of the nonmoving party, "[i]t bears emphasis, though, that this standard does not simply require the court to draw all inferences in the nonmovant's favor, but all *reasonable* inferences. The issue is whether a reasonable jury could find for the nonmoving party." *Casciani v. Nesbitt*, 659 F. Supp. 2d 427, 434 (W.D.N.Y. 2009).

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | | gument is not properly made in their 56.1 responses and should be disregarded.<br><br>Chevron's statement is material for the reasons explained in Chevron's Reply for St. 30, including that this statement relates to Chevron's core allegations of "fraud, extortion, and corruption so deep in the manner of prosecuting that it fundamentally denied Chevron due process and a fair trial." *See* Reply for St. 30; Dkt. 720 at 2. |
| 35. Members of the LAP team, including Donziger, told Reyes that they wanted a single expert to carry out a global assessment because the judicial inspection process had not yielded data to support their claims of contamination, and because they believed it would be easier to manage one single expert rather than many. Dkt. 658-18 (Reyes Declaration), ¶ 22. | **Donziger:**  Disputed.  Reyes's assertions directly conflict with other testimonial and documentary evidence in this case, including Donziger's own testimony.  On summary judgment, this conflict must be resolved in the defendants' favor. *Ramseur*, 865 F.2d at 465.<br><br>The Court should not consider the hearsay in Reyes's declaration (*e.g.* "Mr. Younza and Mr. Fajardo began the meeting by telling me . . .").<br><br>Contrary to Reyes's unsupported assertions, the Ecuadorian Plaintiffs sought to waive their remaining tentatively scheduled inspections based on their belief that (i) further inspections were unnecessary because the Ecuadorian Plaintiffs had already met their burden of proof and the results of the inspections to date strongly indicated contamination at the inspected sites; and that (ii) Chevron intended to use protracted judicial inspections to delay the litigation as much as possible and exhaust the Ecuadorian Plaintiffs' resources.  Dkt. 613-20 (Ex T) (12/23/10 Donziger Dep. Tr.), at 1804:13-20 ("We strongly felt that the settling expert reports were not required under Ecuadorian law and that they were being used by Chevron to delay the trial."); Dkt. No. 28-9 (Ex. 76) (DONZ00027256) at p. 55 (July 25, 2006 Donziger private journal entry observing that Chevron is "losing overwhelmingly"); *id.* at | Undisputed.  While Defendants offer additional purported reasons for wanting to waive the judicial inspections, they offer no additional evidence to contradict Reyes's testimony.  Further, whether Defendants had additional reasons that they did not state to Reyes is irrelevant to the truth of this statement.  The statements Defendants contend are hearsay are clearly party admissions since they are made by Defendants' agents. Fed. R. Evid. 801(d)(2)(D) ("A statement that meets the following conditions is not hearsay: . . .The statement is offered against an opposing party and: . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed[.]"). |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | p. 19 (DONZ00036234) ("Alberto's initial mistake of asking for 122 inspections without any strategy is just coming back to haunt us so deeply, although we are getting good press and we are using the inspections to build political momentum and get our act together, but the process is just time consuming and ridiculous."); Dkt 28-8 (Ex. 76) (DONZ00027256) at p. 45 (Donziger journal: "we still have the same money problems, and nobody has been paid. . . The money issue is killing us.  Pablo told me the inspections are now going to finish the week of Nov. 13, which is soon—there is a ton of work to be done before then."); Dkt. 28-7 (Ex. 76) (DONZ00027256) at p. 24 ("Our phone and electricity will be cut off this week.  We have received no money since November. LY feels the brunt of the pressure from creditors, the brunt of the pressure from the base communities, and the brunt of the pressure from staff who have not gotten paid."); Dkt. No. 28-9 (DONZ00036277) at 9 (Donziger journal entry dated May 31, 2006, discussing risks and benefits of global expert strategy and stating "We are winning on the proof, but we are losing the larger war because of time."); Dkt. 28-8 (Ex. 76) (DONZ00027256) at p. 37  ("They pulled a stunt on Monday - tried to get the judge to suspend the inspection for 60 days on the even [sic] of going out to the site.  LY got text msg judge was leaving Lago - we had out [sic] own intelligence sources. They did this for Guanta, San Carlos, and now Yuca"); Dkt. No. 28-9 at p. 2 (September 13, 2006 Donziger private journal entry: "[W]e have to face the prospect of more of the wasteful, time-consuming, and expensive inspections.[] Texaco now realizes their best defense is to ask for as many inspections as possible.").<br><br>Further, the global expert examination was not intended to, and did not, supplant the judicial inspections or settling expert reports.  The Ecuadorian Plaintiffs had requested a global expert examination in October 2003, at the beginning of the trial.  Dkt. No. 31-31 | |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | (December 4, 2006 LAP filing), at p. 1 ("Your honor, I respectfully request that you immediately order an expert examination aimed at determining the environmental effects of activities related to the production of hydrocarbons in all of the fields operated by Texaco, as requested in the evidentiary motion on pages 4677 and 4678 of the record. The Court granted that motion in an Order issued on October 29, 2003, at 5:55 p.m., and that Order is final and binding."). The Court granted that request, and the global expert examination would have proceeded at some time, whether or not the judicial inspections had continued for a longer period. *Id.* (quoting the Lago Agrio court's October 29, 2003 order that "an expert examination shall be conducted aimed at determining the environmental effects of activities related to the production of hydrocarbons in all of the fields operated by TEXACO . . . .").<br><br>For the reasons stated in St. 30, this purported fact is not material.<br><br>**LAPs:** Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | |
| 36. As this Court has already found, "the decisions to terminate judicial inspections, to pursue the global assessment, and to select Cabrera as the global expert were tainted by the duress and coercion applied to [the court] by Fajardo, Donziger, and perhaps others in ex parte meetings." Dkt. 550 at 90; *see also* Dkt. 28-9 (DONZ00036235) at 29 (Donziger's personal journal recounts at least two March 2006 meetings between the LAPs' lawyers and Judge Germán Yánez Ricardo Ruiz | **Donziger:** Disputed.[D]<br><br>[D] Donziger is mindful of the Court's admonition not to re-litigate issues that have already been decided. Donziger submits, however, that the Court's prior observation regarding the decision to terminate judicial inspections, made based on facts that were undisputed for purpose of that particular proceeding, is not a "finding" that must forever bind the defendants in this case. A factual assertion that is not properly disputed may be deemed admitted for the purpose of the summary judgment motion *at issue at that time*. *See* Local Civ. R. 56.1(c) (discussing when a numbered paragraph in a statement of material facts "will be deemed to be admitted *for purposes of* | Undisputed.[5] Defendants cannot dispute that this Court previously found that "the decisions to terminate judicial inspections, to pursue the global assessment, and to select Cabrera as the global expert were tainted by the duress and coercion applied to [the court] by Fajardo, Donziger, and perhaps others in *ex parte* meetings." Dkt. 550 at 90.<br><br>In addition, Defendants do not dispute that the meetings with Ecuadorian court officials took place, that they took place without Chevron present (and there is no evidence that Chevron was present), that the LAPs threatened to file a complaint against Judge Yánez, or that the LAPs intended an |

[5] Defendants argue throughout that prior findings of fact made by this Court—such as the decision to terminate judicial inspections (*see* St. 36)—are only deemed admitted for the limited purpose of those prior proceedings. This is incorrect. The Court has repeatedly affirmed its prior findings of fact (*e.g.*, Dkts. 843, 905), and before issuing its decision on Chevron's prior motion for summary judgment, the Court specifically "combed through the extensive record that has amassed in this case, and has made every effort to consider any admissible evidence therein that might work in the SJ Defendants' favor for the purposes of [that] motion." Dkt. 550 at 47 n.189.

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| without Chevron representatives present, stating "Lunch meeting with judge. This was second meeting with judge – had lunch with him the previous Friday in the Cangrejo Rojo. I love it – this lobbying. I am good at it."); *id.* (DONZ00036233) at 17 ("lunch after with judge, he hits on Atossa and two Scandanavian [sic] woman [sic]."); Dkt. 32-4 (DONZ00023182) at 1 (2006.7.26 Donziger emails Kohn: "Pablo met with the Judge today. The judge, who is on his heels from the charges of trading jobs for sex in the court, said he is going to accept our request to with-draw the rest of the inspections . . . . The judge also I believe wants to fore-stall the filing of a complaint against him by us, which we have prepared but not yet filed."); Dkt. 28-9 (DONZ00027256) at 56 (2006.07.25 Donziger journal entry stating that if the judicial inspections are not can-celled "then we are in all-out war with the judge to get him removed"); Dkt. 28-8 (DONZ00027256) at 29 (Donziger: "We wrote up a complaint against Yanez, but never filed it, while letting him know we might file it if he does not adhere to the law and what we need."); Dkt. 28-8 (DONZ00027256) at 36 (2006.11.20 Donziger journal entry noting: "Meeting with Judge: on Sat night at Lupe's house."); Dkt. 402-13 (Ex. 2312) (DONZ00041865) (2006.11.07 email in which Fajardo reports a meeting with the Judge noting an ef-fort to convince the Judge to adopt the Global Assess-ment, the Judge's resistance because the request lacked a legal basis, and Fajardo's request for feedback from the team to help strengthen their position); Dkt. 28-8 (DONZ00027256) at 38 (2006.11.16 Donziger journal entry noting: "Meeting with Judge in hotel: On Tues-day night in Hotel Auca."); Dkt. 402-13 (Ex. 2313) | *the motion*") (emphasis added). Such facts are not deemed admitted for all purposes in the case. *See, e.g. U.S. Info. Sys., Inc. v. Int'l Brotherhood of Elec. Workers Union Local Union No. 3*, No. 00-cv-4763-RMB-JCF, 2006 WL 2136249, at \*4 ("Under Local Rule 56.1(c), facts admitted by the plain-tiffs' failure to properly dispute them are deemed admitted for the purposes of the summary judgment motion *only*.") (emphasis added). Further, even facts that have been deemed admitted must be construed in the light most favorable to the non-moving party. *Gadsden v. Jones Lang Lasalle Ameri-cas, Inc.*, 210 F. Supp. 2d 430, 441 (S.D.N.Y. 2002).<br><br>**LAPs:**  Disputed.[D]  Chevron's selective and incomplete quotation of documents is misleading.  In particular, Chevron's selective quotation from DONZ0023182 at 1 could create the false impres-sion that the Ecuadorian Plaintiffs were connected to the charges of Judge Yánez trading jobs for sex in the court.  However, the papers to which Chevron cites establish that the complaint that the Ecuadorian Plaintiffs prepared concerned the judge's failure to act on the Ecuadorian Plaintiffs' motion regarding judicial inspec-tions, not the prior sex scandal in which the judge was allegedly involved. Dkt. No. 28-9 (Ex. 76) (DONZ00027256) at p. 55 (2006.07.25 journal entry, which states: "It appears the corruption charges against Yánez which came out in El Comercio two weeks ago have embroiled the entire court in a patricidal war. . . . He [Pablo] also said there is the feeling in the court that we are behind the complaints against Yánez and Novillo, which we are not, even though we have much to complain about, which is sort of ironic."). *See also* Dkt. No. 32-4 (Ex. 149) (DONZ00023182) at p. 1 ("Pablo met with the judge today.  The judge, who is on his heels from the charges of trading jobs for sex in the court, said he is go-ing to accept our request to withdraw the rest of the inspections save the four we still want to do.  This follows our press confer-ence Monday that was attended by 32 journalists and several prominent supporters, and the filing of a very well-written amicus signed by 11 Ecuadorian lawyers supporting the withdrawal of the | "all-out war with the judge to get him removed" if he did not comply with their demands.  Dkt. 28-9 at 56.  Whether Defendants were connected with the sexual misconduct charges against Judge Yánez is irrelevant.<br><br>*See* Chevron's Response to Defendants' Counter Sts. 345-346 regarding the propriety of the LAPs' contacts with judges. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| (DONZ00042039) (2006.11.28 email in which Sáenz reports that the Judge did notfeel the global assessment was justified and that he would not take such an assessment into account when rendering judgment "since I think it entirely lacks legal logic"); Dkt. 402-13 (Ex. 2314) (DONZ00042194) (2006.12.21 email in which Fajardo writes that he "met with the Judge today, and I can say that he will definitely not issue the order [authorizing global inspections] before the recess; he will issue it immediately afterward"); Dkt. 28-8 (DONZ00027256) at 26 (2007.01.19 Donziger journal entry recording: "Met with judge last night in house. Humble house, furniture. Made tea. I really like the guy. Remember last August I wanted to ride the wave and get him off case? This was an example of Pablo's total intelligence. We saved him, and now we are reaping the benefits."); Dkt. 28-7 (DONZ00027256) at 10 (2007.03.01 Donziger journal entry stating, "On Friday night, Pablo and Luis met with the judge near the airport in his barrio in a restaurant."); *id.* (2007.03.01 Donziger journal entry stating: "Pablo returned to Lago and met with the judge. . . . The bottom line is that the judge asked us for help to protect him, like we did last August."); *id.* (DONZ00027256) at 1 ("Two very disturbing meetings with Judge in Lago on May 21. First with Trudie and Luis Yanza full of his charm and bullshit, starts blaming Texaco for filing too many papers. And then that night, I saw another side of Pablo. He called to ask if I would call the judge so we could go see him at his house. . . . I called the judge and he asked that we bring over some whiskey or some wine. We didn't. When we got there, he was clearly drunk and had a young woman."). | inspections. The judge also I believe wants to forestall the filing of a complaint against him by us, which we have prepared but not yet filed. The judge told Pablo that the Texaco lawyers came by the other day to urge him to make us do all the inspections. The judge told Pablo they were nervous about the peritaje global."). <br><br> Chevron's characterization of the November 7, 2006 e-mail from Fajardo is also highly misleading. Fajardo states that the Judge initially thought there was no legal basis for the global assessment as the Judge understood it. Dkt. 402-13 (Ex. 2312) at 2. Fajardo then continued, "We explained the actual scope of the Global Assessment to him, and he understood somewhat. I think we have to strengthen our position, the delivery of information and the objectives of the global assessment." *Id.* Thus, Chevron's suggestion that the actual global assessment lacked a legal basis is contradicted by the very evidence to which Chevron cites. Nor does Saenz's e-mail describing another meeting regarding the global assessment. According to Saenz, the Judge reported that Chevron "has been constantly on top of the matter of the global assessment . . . I would dare say that they already have several motions ready and they are waiting for us to ask for this proceeding in order to create several collateral issues." Dkt. 402-13 (Ex. 2313) at 2. Saenz also reports that, although "we were able to persuade the Judge that he must only order the global assessment strictly following what is in the existing order," he suspected that "the Judge already shares Texaco's position." *Id.* This also refutes Chevron's suggestion that the global assessment was ordered as a rubber-stamp of the Ecuadorian Plaintiffs' motion. <br><br> Defendants dispute Chevron's suggestion that ex parte contacts with a judge were inappropriate. At all times relevant to Chevron's motion, there was no law or regulation in Ecuador prohibiting ex parte communications with judges. *See* Dkt. No. 154-6 | |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | (Affidavit of Dr. Farith Ricardo Simon noting that Ecuadorian law prohibiting judges from "accepting the visit of or meeting with one of the parties or his counsel without first notifying the other" did not come into existence until March 9, 2009—roughly three years after the Ecuadorian Plaintiffs are alleged to have met with Judge Yánez concerning the waiver of judicial inspections and the commencement of the peritaje global); *see also* Smyser Decl., Ex. 17 (Affidavit of Juan Pablo Alban Alencastro) ¶¶ 30-32 ("Article 151 of the Organic Law of the Judicial Branch . . . shows that *ex parte* contacts with a judge were not prohibited"). And Chevron's citation to evidence indicating that the Ecuadorian Plaintiffs' lawyers went out to lunch with the judge, in a public place, after a judicial site inspection undercuts Chevron's suggestion that such meetings were inappropriate or secret. *See* Dkt. No. 28-9 at 20. (Donziger journal entry describing lunch with judge in a public place).<br><br>Further, sworn eyewitness accounts confirm that Chevron's lawyers' representatives engaged in repeated, substantive ex parte meetings and communications with the judges presiding over the Lago Agrio litigation, including specifically meetings and communications relating to the appointment of Richard Cabrera. Ex parte communication with the judges presiding over the Lago Agrio litigation was the ordinary manner of proceeding throughout the majority of that case. Chevron, in fact, had ex parte meetings of its own with Ecuadorian judges presiding over the Lago Agrio litigation—including meetings regarding the peritaje global. Eyewitness Donald Rafael Moncayo Jimenez has recounted in a sworn affidavit: "On multiple occasions, I personally saw the lawyers who represent Chevron Corporation in the Lago Agrio case meeting alone with the judges who heard the case without the presence of the plaintiffs' lawyers" Dkt. 613-6 (Ex. F) ¶ 3.  Moncayo has testified that on one occasion, he "saw attorneys Adolfo Callejas Ribadeneira and Ivan Alberto Racines [Chevron's lawyers], and | |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | Dr. Efraín Novillo [one of the presiding judges] in the offices of Judge Novillo.  They were talking about the expert designated by the Judge, Mr. Richard Cabrera."  *Id.* at ¶ 4.  When Mr. Moncayo "approached the offices, the private security guards of Chevron and a Chevron technician tried to chase [him] away."  *Id.* Moncayo also describes another incident where Judge Juan Núñez, then-President of the Lago Agrio Court, "was talking to Dr. Diego Larrea and Alberto Racines [Chevron's lawyers] about the inspection of the Auca wells and other stations, where there were oil wells, topic of the Lago Agrio case."  *Id.* at ¶ 5.  Additionally, during his deposition on September 13, 2011, Moncayo testified under oath to witnessing one of Chevron's lawyers, Dr. Enrique Caravajal, have an ex parte meeting with the then-presiding Judge Rafael Ordoñez after business hours on July 30, 2010.  Dkt., 613-7 (Ex. G) at 31:11-32:19, 34:2-36:21.  The ex parte meeting lasted roughly 20 minutes, and is captured in photographs that Moncayo took with his mobile phone. *Id.* at 37:6-42:22; *see also* 613-8 (Ex. N) (Salazar Decl., recounting additional Chevron ex parte meetings with the Lago Agrio Court). It occurred after such contacts were prohibited by Ecuadorian law. *See* Smyser Decl., Ex. 17 (Alban Aff.), ¶¶ 30-32.<br><br>    [D]    Defendants are mindful of the Court's admonition not to re-litigate issues that have already been decided.  Defendants submit, however, that the Court's prior observation regarding the decision to terminate  judicial inspections, made based on facts that were undisputed for purpose of that particular proceeding, is not a "finding" that must forever bind the defendants in this case.  A factual assertion that is not properly disputed may be deemed admitted for the purpose of the summary judgment motion *at issue at that time*. *See* Local Civ. R. 56.1(c) (discussing when a numbered paragraph in a statement of material facts "will be deemed to be admitted *for purposes of the motion*") (emphasis added).  Such facts are not deemed admitted for all purposes in the case.  *See, e.g. U.S. Info. Sys., Inc. v. Int'l Brotherhood of Elec. Workers Union Local Union No. 3*, No. 00-cv-4763-RMB-JCF, 2006 WL 2136249, at *4 ("Under Local Rule 56.1(c), facts admitted by the plain- | |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | tiffs' failure to properly dispute them are deemed admitted for the purposes of the summary judgment motion *only*.") (emphasis added). Further, even facts that have been deemed admitted must be construed in the light most favorable to the non-moving party. *Gadsden v. Jones Lang Lasalle Americas, Inc.*, 210 F. Supp. 2d 430, 441 (S.D.N.Y. 2002). | |
| 37. The LAP team expected that the results of the global assessment would be adopted into the judgment. Dkt. 6-2 (Ex. 1), CRS 138-02-01 (Crude outtake) (Donziger explaining to co-conspirator Atossa Soltani that, "we're now entering the final phase which is the expert assessment. . . Once that ends, the case is over in terms of the evidence. It's just final arguments. So that's critical."); Dkt. 6-8 (Ex. 2) at 76 (certified transcript); Dkt. 28-7(DONZ00027256) at 15-16 (Donziger writes, referring to Cabrera's appointment as the Global Expert, "I asked Pablo if he was 100% sure the judge would [appoint] Richard and not Echeverria, and he said yes, but given that this is the most important decision of the case thus far, there is simply no margin for error."); Dkt. 33-2 (2008.02.22 email from Beltman to Stratus employees) (STRATUS-NATIVE043232-33) (Stratus project manager Douglas Beltman telling his team that they will draft the Cabrera Report: "The project is at a key point right now. We have to write, over the next 2 to 3 weeks, probably the single most important technical document for the case. . . . We (the case attorneys, the case team in Quito, and Stratus) have put together a very ambitious outline for this report."); Dkt. 37-8 (DONZ00024227) (Internally, Defendants called the Cabrera Report "the most important thing in the case"); Dkt. 6-2 (Ex. 1) at CRS-187-01-02 | **Donziger:** Disputed.[E] Chevron selectively quotes from and mischaracterizes the cited evidence. Further, none of this evidence compels the conclusion that Chevron draws. Chevron would have the Court make inferences about the reasons that the Ecuadorian Plaintiffs fought for a global assessment and their expectations. This is inappropriate on summary judgment. *See, e.g.*, *Ramseur*, 865 F.2d at 465.<br><br>• The Crude outtake Chevron cites actually supports the conclusion that the Ecuadorian Plaintiffs' team wanted the global assessment because it would help bring the case to an end. Donziger stated, "I mean, first of all the case is coming to an end. Chevron's biggest fear is the case will end, okay. And we're now entering the final phase which is the expert assessment which is the cost assessment." Dkt. 6-8 at 23. And Donziger's statement that the case would be over in terms of the evidence after the global assessment concluded does not suggest anything inappropriate about the global expert process. Rather, it is entirely consistent with the reasonable and appropriate desire to combat Chevron's delay tactics.<br><br>• Donziger's question to Fajardo about whether he was sure the judge would appoint Richard and not Echeverria says nothing about whether meetings were held with the judge, whether Chevron attended any meetings, and what the purpose of any meetings was. Fajardo's prediction about | Undisputed. Defendants' response does not address, let alone dispute, that the LAP team expected that the results of the global assessment would be adopted into the judgment. Indeed, the additional language quoted by Defendants provides further support for Chevron's statement.<br><br>Furthermore, Defendants' assertion that Beltman's email regarding "the single most important technical document for the case" is not about the Cabrera Report is absurd—the additional language they quote is consistent with a description of the Cabrera Report, and no party has ever identified a different document to which Beltman could have been referring. Moreover, the language Defendants cite are telling—Beltman describes recommendations "for the court to consider," and not for the expert to consider. This undermines Defendants' position that they "advocated" their position to Cabrera, who exercised independent judgment. Beltman did not expect Cabrera to "consider" Beltman's recommendations, as in fact he did not.<br><br>The statements Defendants contend are hearsay are clearly party admissions since they are made by Defendants' agents. Fed. R. Evid. 801(d)(2)(D) ("A statement that meets the following conditions is not hearsay: . . .The statement is offered against an opposing party and: . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed[.]"). |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| ("[T]he most important evidence we have in the case"); Dkt. 6-2 (Ex. 1) at CRS-200-01-30 ("huge for us"); Dkt. 47-16 (Ex. 255) (2008.12.01 Amazon Defense Front press release) (publicly claiming that "courts in Ecuador generally give wide deference to reports prepared by independent experts."); Dkt. 47-30 (2009.04.28 Statement by Donziger to the Tom Lantos Human Rights Commission) at 5 (Donziger told the U.S. Congress that "an independent court expert working with a team of 14 scientists, found that Chevron is liable for up to $27 billion in damages . . . . If the court accepts the damages assessment, then the case could produce the largest judgment ever for an environmental lawsuit."); Dkt. 356-9 at 152 (DONZ-HDD-0113389) (When Cabrera was sworn in as the Global Expert, Donziger called it a "HUGE VICTORY"). | which of two experts the judge was going to appoint was the result of a simple process of elimination. Dkt. 28-7 (Ex. 76) (DONZ00027256) at p. 15-16.<br><br>• The context of Donziger's June 13, 2007 e-mail makes clear that Donziger was expressing his relief that the expert was finally sworn in because that started the process to bring the trial to an end. It was no secret that the Ecuadorian Plaintiffs were attempting to persuade the judge to swear in the expert so that the process could begin. "The perito got sworn into [sic] after all those visits to the court… the 120-clock is ticking, this is huge for us, WE ARE GOING TO END THE TRIAL!!!!!!!" Moreover, the court had announced that Cabrera would be appointed as the global expert three months prior, on March 19. 2007. From the context and timing of events, it is clear that the "victory" to which Donziger is referring is the fact that Cabrera was finally sworn in so that the examination could begin. Dkt. 356-9 (Ex. J) at p. 152.<br><br>• Contrary to Chevron's contention, Beltman's e-mail did not inform his team that they would be drafting the Cabrera report. The sentence that Chevron omitted from its quotation is key: "The document will pull together all of the work over the last 15 or so years on the case and make recommendations for the court to consider in making its judgment." Dkt. No. 33-2 (Ex. 168) at 1.<br><br>• Nor does the Amazon Defense Front press release support Chevron's conclusion. The sentence preceding the one that Chevron has chosen to quote emphasizes that the final decision is the judge's: "A final decision on Chevron's liability and damages will be made by the trial judge . . . ." Dkt. 47-16 at 2. The same is true for Donziger's statement | |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | to the Tom Lantos Human Rights Commission.  Dkt. 47-30.<br><br>• Finally, the Court should not consider the hearsay contained in unauthenticated e-mails that Donziger never sent or received.<br><br>[E]   Dkt. 37-8 does not discuss the Cabrera Report or contain a page Bates-stamped DONZ00024227.  Donziger requests that the citation and accompanying argument be stricken.<br><br>**LAPs:**  Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | |
| 38. For the role of the global expert, Donziger wanted someone who would "totally play ball with [the LAP team] and let [the LAP team] take the lead while projecting the image that he is working for the court." Dkt. 28-8 (DONZ00027256) at 30 ("I asked if he could be comfortable slamming them with a 10b judgment. . . . I see using E-tech to give him cover, but he has to totally play ball with us and let us take the lead while projecting the image that he is working for the court."); Dkt. 28-7 (DONZ00027256) at 18 (Donziger writing in his personal notes that he interviewed Cabrera and that he "may be the perfect foil for Chevron"). | **Donziger:**  Disputed.  Chevron's selective quotation of Donziger's journal entry is misleading.  Donziger was discussing a meeting with Fernando Reyes in which Donziger attempted to assess whether Reyes would be strong enough to withstand the pressure that Chevron would exert over whomever was appointed as well as be willing to take on the personal and professional risks of potentially finding against a powerful company such as Chevron.  Dkt. 28-8 (Ex. 76) (DONZ00027256) at 30 ("I told him [Reyes] pointblank that if he did this he likely would never work in the oil industry again in Ecuador, at least for an American company, but that he could be a national hero and have a job the rest of his life being involved in the clean-up.  There is a certain level of "desconfianza" in him for these past jobs, for our previous arrangement as veeduria, for the tepid draft report he wrote, etc.  I asked if he could be comfortable slamming them with a 10b judgment.  He answered yes to tall [sic], but I don't know if he has the internal timber to pull it off but at this point I don't see a Plan B.  Bottom line is that he is an "insider.").  Donziger confirmed this in his deposition, when he testified that "There was a hesitancy, I found, on the part of qualified technical people in Ecuador to work | Undisputed.  Donziger does not dispute that the LAPs' attorneys met with expert candidates to find one who would "totally play ball with [the LAPs] and let [the LAPs] take the lead while projecting the image that he is working for the court," and does not dispute that Donziger asked one candidate whether he was comfortable "slamming" Chevron with a multi-billion dollar judgment.<br><br>Defendants' arguments regarding the propriety of Donziger's conduct are irrelevant. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | with us out of fear that Chevron would retaliate against them and figure out ways to deny them work from other sources in the future.  So part of the vet was to determine his willingness to enter this kind of case knowing that there could be some potential, you know, issues for him in his career down the road from Chevron." Dkt. 613-8 (Ex. H) (12/8/10 Donziger Depo. Tr.), at 961:22-962:13.<br><br>Donziger's description of his interactions with Cabrera undermines several of Chevron's assertions.  First, it undermines Chevron's assertion that the Ecuadorian Plaintiffs had Cabrera in mind from the start.  Donziger expresses surprise at Cabrera's having "showed some surprising independence, telling the judge quietly that Texaco's sampling was [bogus]," Dkt. 28-7 (DONZ00027256) at 18, but also stating that "I thought the idea Reyes would not be the perito was a case killer" and "I trust Reyes; I don't know Richard, even though he looks promising." *Id.*  The full sentence from which Chevron plucks the "foil" comment reveals that Donziger was unsure about Cabrera: "He was a humble man, not very sophisticated, but he seemed smart and under-stated—maybe the perfect foil for Chevron, but there is no way to know for sure so there is risk." *Id.*<br><br>Donziger believed that it was appropriate for each side to work closely with the global expert and that it was not improper to vet potential experts beforehand.  *See* Dkt. 613-8 (Ex. H) at 959:12-960:13 ("Q. Was it your intention that were Mr. Reyes to be appointed as the global court expert that the plaintiffs' team would take the lead in connection with his work while at the same time Mr. Reyes would make it appear as though he was working for the court? . . .  A. I had an impression at the time that all court experts in Ecuador worked closely with the parties and that the parties could have access to them.  To the extent that whoever the court | |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | expert would be could get valid evidence, data, assistance, materials, from us, yes, that was something we intended to do. I also at that time did not know whether the court would appoint one person or two persons, per the model of judicial inspections, to be the court expert for the global damages."). And Donziger believed that, at the same time, Chevron was trying to advance its own candidates—candidates that it could control. *See, e.g.*, Dkt 28-9 (Ex. 76) (DONZ00027256) at p. 56 ("Texaco will have a slew of available candidates, and will probably pay them on the side to boot, so they can be controlled"); Dkt. 613-15 (Ex. O) (12/13/10 Donziger Depo. Tr.) at 1098: 11-14 ("both parties were presenting names of potential technical people to the court for appointment. And I believe this was part of that process").<br><br>**LAPs:** Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 113). Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion. | |
| 39. Donziger told Reyes that if he were to be the global expert, he would need to find that Chevron was the only party responsible for the environmental damage and the harm to the local community, and find damages to be awarded to the LAPs in excess of a billion dollars. Dkt. 658-18 (Reyes Declaration), ¶ 25. | **Donziger:** Disputed. For the reasons stated in St. 27, Chevron cannot rely on Reyes's declaration.<br><br>Further, this assertion is not material. Reyes was not named as the global expert.<br><br>**LAPs:** Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | Undisputed. Defendants do not cite any evidence contradicting Chevron's statement of fact. Rather, they assert that Reyes's declaration should be disregarded because it is "inconsistent, highly implausible, and contradicted by other evidence." But this assertion is false. *See* Reply for St. 27.<br><br>That the LAPs ultimately installed Richard Cabrera as the global expert instead of Reyes does not affect the materiality of Chevron's statement of fact. Donziger's "direct and detailed offer" that Reyes serve as the global expert and his statement that Reyes, if he were to be the global expert, would need to find "that Chevron was the only party responsible for environmental damages and the harm to the local community" and find dam- |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | | ages in excess of $1 billion dollars is material to Chevron's core allegations of "fraud, extortion, and corruption so deep in the manner of prosecuting that it fundamentally denied Chevron due process and a fair trial." Dkt. 720 at 2. |
| 40. Reyes believed that the ROE bore significant liability for any damage, and thought the LAPs' proposal of damages as high as $10 billion was "completely ludicrous." Dkt. 658-18 (Reyes Declaration), ¶ 29. | **Donziger:** Disputed. For the reasons stated in St. 27, Chevron cannot rely on Reyes's declaration.<br><br>Further, Reyes's apparent skepticism is completely absent from the documents that Reyes provides. And, if Reyes thought the Ecuadorian Plaintiffs' theories were so "ludicrous," why did he continue to work with them?<br><br>Finally, for the reasons stated in St. 30, this purported fact is not material.<br><br>**LAPs:** Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | Undisputed. Defendants do not dispute that Reyes believed that the Republic of Ecuador bore significant liability for any damage, or that he thought the LAPs' proposal of damages as high as $10 billion was "completely ludicrous." Dkt. 658-18 (Reyes Declaration), ¶ 29. They do not cite any evidence contradicting Chevron's statement of fact. Rather, they assert that Reyes's declaration should be disregarded because it is "inconsistent, highly implausible, and contradicted by other evidence." But this assertion is false. *See* Reply for St. 27.<br><br>Chevron's statement is material for the reasons explained in Chevron's Reply for St. 30, including that this statement relates to Chevron's core allegations of "fraud, extortion, and corruption so deep in the manner of prosecuting that it fundamentally denied Chevron due process and a fair trial." *See* Reply for St. 30; Dkt. 720 at 2. |
| 41. Reyes recommended Cabrera to the LAP team for the global expert role because, in Reyes's words, "for Mr. Cabrera, issues such as independence and professional standards were not that important, and therefore he would have no problem doing what the plaintiffs were proposing." Dkt. 658-18 (Reyes Declaration), ¶ 30. | **Donziger:** Disputed. For the reasons stated in St. 27, Chevron cannot rely on Reyes's declaration.<br><br>Reyes's declaration is also not admissible to support Chevron's assertion. Reyes states that he provided Cabrera's name because of his beliefs regarding Cabrera. But Reyes provides no basis for his beliefs about Cabrera's "independence and professional standards," let alone any personal knowledge of Cabrera's standards. An unsupported opinion such as this one is not admissible on summary judgment. *See* Fed. R. Civ. P. 56(c)(4) (affidavit must be based on personal knowledge). This is also an inappropriate attempt to slip in inadmissible character evidence. Fed. R. Evid. 404(a)(1). | Undisputed. Defendants do not dispute that Reyes recommended Cabrera to the LAPs' team for the global expert role because, "for Mr. Cabrera, issues such as independence and professional standards were not that important, and therefore he would have no problem doing what the plaintiffs were proposing." Dkt. 658-18 (Reyes Declaration), ¶ 30. They do not cite any evidence contradicting Chevron's statement of fact. Rather, they assert that Reyes's declaration should be disregarded because it is "inconsistent, highly implausible, and contradicted by other evidence." But this assertion is false. *See* Reply for St. 27.<br><br>As to admissibility, Reyes's statement is based on personal knowledge. Reyes certainly has personal knowledge regarding his reasons for recommending that Cabrera serve as the global expert. Additionally, Reyes has |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | Finally, Reyes's assertions are simply implausible. Reyes had previously recommended Cabrera to do fieldwork "because he is reserved, hardworking, and responsible." Dkt. 658-18 ¶ 30. Reyes's about-face does not make sense.<br><br>**LAPs:** Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | personal knowledge of Cabrera, whom he has known "since college." Dkt. 658-18 (Reyes Declaration), ¶ 30. As he explained in his declaration, Reyes knew that Cabrera had "technical limitations" and lacked "the professional skills and experience required to handle a project such as the global assessment." He nonetheless believed that Cabrera "could be the right person for the job" because he "was reserved, hard working, and responsible" and because Reyes believed "that, for Mr. Cabrera, issues such as independence and professional standards were not that important, and therefore he would have no problem doing what the plaintiffs were proposing." *Id.*<br><br>Defendants' objection that Reyes's statement regarding Cabrera's "independence and professional standards" is inadmissible character evidence fails because Chevron does not offer Reyes's statement to show that Cabrera acted in accordance with the trait attributed to him by Reyes. Instead, Chevron cites Reyes's statement for the purpose of showing that the LAPs were seeking an expert with precisely those characteristics. *See* Fed. R. Evid. 404(a)(1).<br><br>Defendants' argument regarding the plausibility of Reyes's statement is not properly made in this 56.1 response and should be disregarded. |
| 42. To secure Cabrera's appointment, the LAPs' counsel drafted an ethics complaint against Judge Yánez, and threatened to file it if he did not end the judicial inspection process. Dkt. 28-8 (DONZ00027256) at 29 (Donziger: "We wrote up a complaint against Yánez, but never filed it, while letting him know we might file it if he does not adhere to the law and what we need. The worst part is that after the decision – which was covered in the Ec press and the Oil Daily – he told Luis that we needed to back him now as he fights for survival on the court. So instead of a strong judge who | **Donziger:** Disputed. Chevron's selective and incomplete quotation of documents is misleading. In particular, Chevron's selective quotation from DONZ0023182 at 1 is designed to create the false impression that the Ecuadorian Plaintiffs were connected to the charges of Judge Yánez trading jobs for sex in the court. However, the papers to which Chevron cites establish that the complaint that the Ecuadorian Plaintiffs prepared concerned the judge's failure to act on the Ecuadorian Plaintiffs' motion, not the prior sex scandal in which the judge was involved. Dkt. No. 28-9 (Ex. 76) (DONZ00027256) at p. 55 (2006.07.25 journal entry quoted by Chevron, which also states: "It appears the corruption | Undisputed. Defendants do not dispute that the LAPs' counsel drafted and threatened to file an ethics complaint against Judge Yánez if he did not end the judicial inspection process.<br><br>Chevron's statement does not claim that Defendants were involved with the sexual misconduct charges against Judge Yánez, as opposed to exploiting them. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| sees the viability of our case, we now might have a weak judge who wants to rule correctly for all the wrong, personal reasons. Need to get going on the inspections (looking for perito) and peritaje global."); Dkt. 32-4 (DONZ00023182) at 1 (2006.07.26 Donziger emails Kohn: "Pablo met with the Judge today. The judge, who is on his heels from the charges of trading jobs for sex in the court, said he is going to accept our request to withdraw the rest of the inspections . . . . The judge also I believe wants to forestall the filing of a complaint against him by us, which we have prepared but not yet filed."). | charges against Yánez which came out in El Comercio two weeks ago have embroiled the entire court in a patricidal war. . . .He [Pablo] also said there is the feeling in the court that we are behind the complaints against Yánez and Novillo, which we are not, even though we have much to complain about, which is sort of ironic."). *See also* Dkt. No. 32-4 (Ex. 149) (DONZ00023182) at p. 1 ("Pablo met with the judge today. The judge, who is on his heels from the charges of trading jobs for sex in the court, said he is going to accept our request to withdraw the rest of the inspections save the four we still want to do. This follows our press conference Monday that was attended by 32 journalists and several prominent supporters, and the filing of a very well-written amicus signed by 11 Ecuadorian lawyers supporting the withdrawal of the inspections. The judge also I believe wants to forestall the filing of a complaint against him by us, which we have prepared but not yet filed. The judge told Pablo that the Texaco lawyers came by the other day to urge him to make us do all the inspections. The judge told Pablo they were nervous about the peritaje global.").<br><br>**LAPs:** Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | |
| 43. Donziger wrote of "mobilizing the country, politically, so that no judge can rule against us and feel like he can get away with it in terms of his career." Dkt. 6-2 (Exhibit 1), CRS-032-00-CLIP-01 (2006.03.09 Crude outtake video clip of meeting between S. Donziger and unidentified male); Dkt. 6-4 (Exhibit 2) (certified transcript) at 11; *see also* Dkt. 356-12 (Exhibit BW) (2003.12.17 Memorandum from S. Donziger to J. Kohn re "Ecuador trip/General Update") | **Donziger:** Disputed. Chevron takes selected quotations out of context in order to create a misleading impression. The record is replete with evidence that Donziger believed that it was extremely difficult to find experts and judges who would be willing to take the risk of criticizing or ruling against Chevron. *See, e.g.*, Dkt. 613-8 (Ex. H) (Donziger Dep. Tr.) at 961:22. ("There was a hesitancy, I found, on the part of qualified technical people in Ecuador to work with us out of fear that Chevron would retaliate against them . . . ."). Donziger's notes show that Donziger believed Chev- | Undisputed. Defendants do not dispute that Donziger made the quoted statement.<br><br>Defendants do not cite any evidence to support their assertion that Donziger was simply responding to pressure from Chevron, and their proposed inference is irrelevant. In any event, such a belief by Donziger would only make him more likely to seek to mobilize the country politically. Thus, Defendants do not contravene the statement. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| (DONZ00084015). | ron was attempting to corrupt and illegitimately influence the trial, which required a strong response from the Ecuadorian Plaintiffs' team.  *See, e.g.*, Dkt. 28-7 (DONZ00027256) at p. 9 ("I still have that terrible sinking feeling (which I had on Friday night and Sat morning after the meeting with the judge) that the corruption and pressure are coming back"); *id.* at p. 10 (The secretary told him she got a call from an unknown magistrate of the Supreme Court telling him to slow down the environmental cases (our case and the OCP).  We think this is complete bullshit; that nobody actually called, and that was part of Texaco's pressure via the secretary.  Further, these pressures to remove the judge have mysteriously and suddenly heated up again, and we think Texaco is behind them."); Dkt. 28-8 (DONZ00027256) at p. 37 ("They pulled a stunt on Monday - tried to get the judge to suspend the inspection for 60 days on the even [sic] of going out to the site. LY got text msg judge was leaving Lago - we had out [sic] own intelligence sources.  They did this for Guanta, San Carlos, and now Yuca"); Dkt. 28-7 DONZ00027156) at p. 1 ("Texaco has kicked it into high gear in an effort to destroy the legitimacy of the process. This has two goals: to set it up so they have an argument on appeal in Ecuador, and ultimately, to have an argument in the U.S. when we move to enforce a judgment.  And, if they can accomplish it, to derail the trial itself to prevent it from finishing."); *Id.* at p. 4 ("Texaco called [the judge] and said, "Esta entregado a los indi-os." ["you are in the pocket of the Indians"]  Who knows how much they are harassing him. He seemed really nervous and freaked."); *id.* at p. 1 ("[the judge] sat down and immediately looked at me and said Texaco knows what I am doing and not do-ing every second of the day, that Texaco intelligence agents have been following him").  These materials also demonstrate Chev-ron's ability to litigate effectively and sometimes successfully against the Ecuadorian Plaintiffs. | |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | Chevron's citation to Donziger's 2003 e-mail to Kohn is also misleading and immaterial.  First, this e-mail was sent many years prior to the events which Chevron would tie it to.  Second, Chevron's suggestion that there is something improper about attempting to build a public relations campaign alongside a pending court case (which is all the memorandum shows) is incorrect and flies in the face of Chevron's own extensive public relations efforts accompanying the Lago Agrio case and even the instant case.<br><br>**LAPs:**  Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | |
| 44. On March 3, 2007, Donziger, Fajardo, Yanza, Maest and other members of the LAP team met with Cabrera, without any attorney or representative of Chevron present, to plan the global assessment.  Dkt. 658-18 (Reyes Declaration), ¶¶ 34-35; Dkt. 6-2 (Exhibit 1) at CRS-191-00-CLIP-03 (2007.03.03 Crude outtake video clip of meeting among P. Fajardo, A. Maest, and others); Dkt. 7-5 (Exhibit 2 (certified transcript)) at 244; Dkt. 6-2 (Exhibit 1) at CRS-187-01-02 (video of March 3, 2007 meeting in Ecuador attended by the LAPs' attorneys, the LAPs' technical experts, and Cabrera in which Fajardo stated, "[T]he work isn't going to be the expert's. All of us bear the burden. . . . But all of us, all together, have to contribute to that report."); Dkt. 7-5 (Exhibit 2 (certified transcript)) at 245; Dkt. 8-9 at 1120:23-1121:5 (Donziger testifying that "the primary purpose of the [March 3, 2007] meeting" with Cabrera was to "lay out the entire case and legal theory for Mr. Cabrera and the other participants in the meeting"); *see also* Dkt. 6-2 (Exhibit 1) at 188- | **Donziger:**  Disputed.  Chevron selectively quotes from the outtake transcripts and presents an incomplete description of what was discussed during the meetings.  Chevron's assertion that the purpose of the meeting was "to plan the global expert examination" is unsupported.  Donziger testified that the primary purpose of the meeting was to lay out the case and legal theory for Cabrera and the other participants.[F]  Chevron's characterization suggests that the meeting participants discussed specific details of the content of Cabrera's report—but Chevron's citations do not support such a distortion.<br><br>Fajardo describes his prediction of the lengths Chevron would go to interfere with the expert examination.  *See* Dkt. No. 7-5 (Ex. 2) at p. 243 ("There's going to be a constant harassment of the expert and his technical team in the field. . . . Attempts—beware—attempts to bribe the expert with money—and possibly his technical team.  If that doesn't work, they're going to try to threaten, or perhaps sue the expert.").  In this context, Fajardo's statement that "Chevron's main problem right now is that it doesn't know what the hell is going to happen in the global expert examination" | Undisputed.  Defendants do not dispute that the meeting occurred, that Chevron representatives were not present, or that the meeting involved planning the global expert examination.  Indeed, the witness statement provided by Ann Maest, who attended the meeting, provides further corroboration of Chevron's statement of fact and the cited evidence. Stavers Decl., Ex. 3653 (Maest Witness St.), ¶ 6 ("During this trip, on March 3, 2007, at the LAPs' representatives offices in Quito, Ecuador (also known as the 'Selva Viva' offices), I participated in a lengthy strategy meeting of the LAPs' team about preparation of the upcoming global expert report."); *id.* ¶ 7 ("Among those attending the March 3, 2007 planning meeting in Quito were Donziger, Pablo Fajardo, Luis Yanza, Fernando Reyes, and other consultants and lawyers for the LAPs. Also attending the meeting was Richard Cabrera, whom Pablo Fajardo referred to as a 'perito,' or expert. Donziger told me prior to the meeting that Cabrera would be there, and he was hoping Cabrera would be appointed as the Ecuadorian Court's expert tasked with performing the global damage assessment requested by the LAPs"). Defendants' added quotations are not contrary to Chevron's statement of fact.<br><br>Donziger's and Fajardo's subjective and unsupported beliefs about Chev- |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| 00-CLIP-02, 188-01-CLIP-01, 189-00-CLIP-02, 189-00-CLIP-03, 189-00-CLIP-05, 191-00-CLIP-02, 191-00-CLIP-03, 192-00-CLIP-01, 193-00-CLIP-01 (video of the March 3, 2007 meeting with Cabrera and video of subsequent discussions regarding the March 3rd meeting); Dkts. 7-2-7-5 (Exhibit 2 (certified transcript)) at 169-235, 241- 53; Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 2147:7-11 (Donziger admitting that during the March 3, 2007 meeting with Cabrera, he assumed Cabrera would be appointed as the court's global expert). | shows his belief the Ecuadorian Plaintiffs' work to have the court appoint an expert that could not be controlled by Chevron meant that Chevron was afraid that the true extent of damages would be revealed.<br><br>Chevron also omits the surrounding context of Fajardo's statements about the work that the Ecuadorian Plaintiffs' team would do to provide suggestions and material they hoped would be included in Cabrera's report. Chevron omits Fajardo's statement that "[W]hat the expert is going to do is state his criteria, alright? and sign [on/in] the report and review it [unintelligible]. But all of us, all together, have to contribute to that report."<br><br>For the reasons stated in St. 27, Chevron cannot rely on Reyes's declaration. Reyes's story raises many additional questions: Why did Reyes allegedly attend this meeting if he did not want to participate in the global expert process? And why, once Reyes "fully realized" the "full extent of the plaintiffs' counsel's intentions," did he still continue to work with the Ecuadorian Plaintiffs and even agree to write to technical analyses? Dkt. 658-18 (Ex. 3014) at ¶ 38.<br><br>Finally, there is substantial evidence in the record (much of it never contradicted by Chevron) that Ecuadorian law at the time did not prohibit parties from interacting with court-appointed experts prior to the issuance of the expert's report, including prior to the expert's formal appointment by the court, and providing the expert with documents and information for his consideration and adoption. *See* Dkt. No. 154-5 (Alencastro Aff.) ¶¶ 9-12, 18-19; Dt. No. 154-6 (Simon Aff.) ¶¶ 4-5, 7-8. There is also evidence in the record that Chevron interpreted Ecuadorian law and practice in the same way and engaged in its own private *ex parte* communications with, and provided undisclosed *ex parte* assistance to, court- | ron's intentions are irrelevant.<br><br>*See* Reply for St. 27 regarding the Reyes Declaration.<br><br>*See* Reply for St. 51 regarding the LAPs' "suggestions" to Cabrera.<br><br>*See* Chevron's Response to Defendants' Counter Sts. 347-350 regarding the propriety of the LAPs' contacts with Cabrera. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | appointed experts. *See* Dkt. No. 154-7, at 2. *See also* Ecuadorian Plaintiffs' response to St. 36.<br><br>[F]   The quotation that Chevron provides is a quotation from a quotation that Mr. Vinegrad asked Mr. Donziger, not a quotation from Mr. Donziger's testimony. *See* Dkt. 8-9 (Ex. 6) at 1120:23-1121:3.  Donziger testified "I believe that was the primary purpose of the meeting, yes." *Id.* at 1121:4-5.<br><br>__LAPs:__  Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.  Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 129).  Chevron provides no reason for the Court to rule any differently on this Renewed Motion. | |
| 45. At the March 3, 2007 meeting with Cabrera, the LAPs team indicated that they had already predetermined the findings of the global assessment, and that they themselves would write a report that would support their claim for billions of dollars against Chevron and put Cabrera's name on it.  Dkt. 658-18 (Reyes Declaration), ¶¶ 34-35; Dkt. 6-2 (Exhibit 1) at CRS-187-01-02 (video of March 3, 2007 meeting in Ecuador attended by the LAPs' attorneys, Maest, Reyes, and Cabrera); Dkt. 7-5 (Exhibit 2 (certified transcript)) at 245; Dkt. 8-9 at 1120:23-1121:5 (Donziger testifying that "the primary purpose of the [March 3, 2007] meeting" with Cabrera was to "lay out the entire case and legal theory for Mr. Cabrera and the other participants in the meeting"); *see also* Dkt. 6-2 (Exhibit 1) at 188-00-CLIP-02, 188-01-CLIP-01, 189-00-CLIP-02, 189-00-CLIP-03, 189-00-CLIP-05, 191-00-CLIP-02, | __Donziger:__  Disputed.  Chevron selectively quotes from the outtake transcripts and presents an incomplete description of what was discussed during the meetings.  Chevron's assertion that the purpose of the meeting was "to plan the global expert examination" is unsupported.  Donziger testified that the primary purpose of the meeting was to lay out the case and legal theory for Cabrera and the other participants.  Chevron's characterization suggests that the meeting participants discussed specific details of the content of Cabrera's report—but Chevron's citations do not support such a distortion.<br><br>Fajardo describes his prediction of the lengths Chevron would go to interfere with the expert examination.  *See* Dkt. No. 7-5 (Ex. 2) at p. 243 ("There's going to be a constant harassment of the expert and his technical team in the field. . . . Attempts—beware—attempts to bribe the expert with money—and possibly his technical team.  If that doesn't work, they're going to try to threaten, | Undisputed.  Defendants do not dispute that the meeting occurred, that the LAP team indicated at the meeting that they had already predetermined the findings of the global assessment, or that they planned to write a multi-billion dollar report in Cabrera's name.  Indeed, the witness statement provided by Ann Maest, who attended the meeting, provides further corroboration of Chevron's statement and the cited evidence.  Stavers Decl., Ex. 3653 (Maest Witness St.), ¶¶ 6-8; *id.* ¶ 9 ("It was clear from the presentations and from my discussions with people at the meeting that the LAPs planned to conduct the global damages assessment. In particular, I understood Fajardo's statements captured in the outtake from *Crude*: '[a]nd here is where we do want the support of our entire technical team . . . of experts, scientists, attorneys, political scientists, so that all of us will contribute to that report—in other words—you see . . . the work isn't going to be the expert's. All of us bear the burden,' to mean that the LAPs' lawyers and consultants would contribute to Cabrera's work and report.").  Defendants' added quotations are not contrary to Chevron's statement of fact. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| 191-00-CLIP-03, 192-00-CLIP-01, 193-00-CLIP-01 (video of the March 3, 2007 meeting with Cabrera and video of subsequent discussions regarding the March 3rd meeting); Dkts. 7-2-7-5 (Exhibit 2 (certified transcript)) at 169-235, 241-53; Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 2147:7-11 (Donziger admitting that during the March 3, 2007 meeting with Cabrera, he assumed Cabrera would be appointed as the court's global expert).. | or perhaps sue the expert."). In this context, Fajardo's statement that "Chevron's main problem right now is that it doesn't know what the hell is going to happen in the global expert examination" shows his belief the Ecuadorian Plaintiffs' work to have the court appoint an expert that could not be controlled by Chevron meant that Chevron was afraid that the true extent of damages would be revealed.<br><br>Chevron also omits the surrounding context of Fajardo's statements about the work that the Ecuadorian Plaintiffs' team would do to provide suggestions and material they hoped would be included in Cabrera's report. Chevron omits Fajardo's statement that "[W]hat the expert is going to do is state his criteria, alright? and sign [on/in] the report and review it [unintelligible]. But all of us, all together, have to contribute to that report."<br><br>For the reasons stated in St. 27, Chevron cannot rely on Reyes's declaration. Reyes's story raises many additional questions: Why did Reyes allegedly attend this meeting if he did not want to participate in the global expert process? And why, once Reyes "fully realized" the "full extent of the plaintiffs' counsel's intentions," did he still continue to work with the Ecuadorian Plaintiffs and even agree to write to technical analyses? Dkt. 658-18 (Ex. 3014) at ¶ 38.<br><br>Finally, there is substantial evidence in the record (much of it never contradicted by Chevron) that Ecuadorian law at the time did not prohibit parties from interacting with court-appointed experts prior to the issuance of the expert's report, including prior to the expert's formal appointment by the court, and providing the expert with documents and information for his consideration and adoption. *See* Dkt. No. 154-5 (Alencastro Aff.) ¶¶ 9-12, 18-19; Dt. No. 154-6 (Simon Aff.) ¶¶ 4-5, 7-8. There is also evidence in the rec- | Donziger's and Fajardo's subjective and unsupported beliefs about Chevron's intentions are irrelevant.<br><br>*See* Reply for St. 27 regarding the Reyes Declaration.<br><br>*See* Reply for St. 51 regarding the LAPs' "suggestions" to Cabrera.<br><br>*See* Chevron's Response to Defendants' Counter Sts. 347-350 regarding the propriety of the LAPs' contacts with Cabrera. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | ord that Chevron interpreted Ecuadorian law and practice in the same way and engaged in its own private *ex parte* communications with, and provided undisclosed *ex parte* assistance to, court-appointed experts. *See* Dkt. No. 154-7, at 2. *See also* Ecuadorian Plaintiffs' response to St. 36.<br><br>**LAPs:** Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | |
| 46. At the March 3, 2007 meeting with Cabrera, Fajardo stated: "And here is where we do want the support of our entire technical team . . . of experts, scientists, attorneys, political scientists, so that all of us will contribute to that report—in other words—you see . . . the work isn't going to be the expert's. All of us bear the burden." When someone asked whether the final report would be prepared by Cabrera, Fajardo responded that the expert would "sign the report and review it. But all of us, all together, have to contribute to that report." Defendant Maest said, "But not Chevron," and laughter ensued. Dkt. 6-2 (Exhibit 1) at CRS-187-01-02 (video of March 3, 2007 meeting in Ecuador attended by the LAPs' attorneys, the LAPs' technical experts, and Cabrera); Dkt. 7-5 (Exhibit 2) (certified transcript) at 246. | **Donziger:** Disputed. Disputed. Chevron selectively quotes from the outtake transcripts and presents an incomplete description of what was discussed during the meetings. Chevron's assertion that the purpose of the meeting was "to plan the global expert examination" is unsupported. Donziger testified that the primary purpose of the meeting was to lay out the case and legal theory for Cabrera and the other participants. Chevron's characterization suggests that the meeting participants discussed specific details of the content of Cabrera's report—but Chevron's citations do not support such a distortion.<br><br>Fajardo describes his prediction of the lengths Chevron would go to interfere with the expert examination. *See* Dkt. No. 7-5 (Ex. 2) at p. 243 ("There's going to be a constant harassment of the expert and his technical team in the field. . . . Attempts—beware—attempts to bribe the expert with money—and possibly his technical team. If that doesn't work, they're going to try to threaten, or perhaps sue the expert."). In this context, Fajardo's statement that "Chevron's main problem right now is that it doesn't know what the hell is going to happen in the global expert examination" shows his belief the Ecuadorian Plaintiffs' work to have the court appoint an expert that could not be controlled by Chevron meant that Chevron was afraid that the true extent of damages would be revealed. | Undisputed. Defendants do not dispute that the meeting occurred or that the quoted statements were made. Indeed, the witness statement provided by Ann Maest, who attended the meeting, provides further corroboration of Chevron's statement and the cited evidence. Stavers Decl., Ex. 3653 (Maest Witness St.), ¶ 9 ("It was clear from the presentations and from my discussions with people at the meeting that the LAPs planned to conduct the global damages assessment. In particular, I understood Fajardo's statements captured in the outtake from *Crude*: '[a]nd here is where we do want the support of our entire technical team . . . of experts, scientists, attorneys, political scientists, so that all of us will contribute to that report—in other words—you see . . . the work isn't going to be the expert's. All of us bear the burden,' to mean that the LAPs' lawyers and consultants would contribute to Cabrera's work and report."). Defendants' added quotations are not contrary to Chevron's statement of fact.<br><br>Donziger's and Fajardo's subjective and unsupported beliefs about Chevron's intentions are irrelevant.<br><br>*See* Reply for St. 27 regarding the Reyes Declaration.<br><br>*See* Reply for St. 51 regarding the LAPs' "suggestions" to Cabrera.<br><br>*See* Chevron's Response to Defendants' Counter Sts. 347-350 regarding the propriety of the LAPs' contacts with Cabrera. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | Chevron also omits the surrounding context of Fajardo's statements about the work that the Ecuadorian Plaintiffs' team would do to provide suggestions and material they hoped would be included in Cabrera's report.  Chevron omits Fajardo's statement that "[W]hat the expert is going to do is state his criteria, alright? and sign [on/in] the report and review it [unintelligible].  But all of us, all together, have to contribute to that report." <br><br> For the reasons stated in St. 27, Chevron cannot rely on Reyes's declaration.  Reyes's story raises many additional questions:  Why did Reyes allegedly attend this meeting if he did not want to participate in the global expert process?  And why, once Reyes "fully realized" the "full extent of the plaintiffs' counsel's intentions," did he still continue to work with the Ecuadorian Plaintiffs and even agree to write to technical analyses?  Dkt. 658-18 (Ex. 3014) at ¶ 38. <br><br> Finally, there is substantial evidence in the record (much of it never contradicted by Chevron) that Ecuadorian law at the time did not prohibit parties from interacting with court-appointed experts prior to the issuance of the expert's report, including prior to the expert's formal appointment by the court, and providing the expert with documents and information for his consideration and adoption.  *See* Dkt. No. 154-5 (Alencastro Aff.) ¶¶ 9-12, 18-19; Dt. No. 154-6 (Simon Aff.) ¶¶ 4-5, 7-8.  There is also evidence in the record that Chevron interpreted Ecuadorian law and practice in the same way and engaged in its own private *ex parte* communications with, and provided undisclosed *ex parte* assistance to, court-appointed experts.  *See* Dkt. No. 154-7, at 2. *See also* Ecuadorian Plaintiffs' response to St. 36. <br><br> **LAPs:**  Disputed.  Defendants incorporate Donziger Defendants' | |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | response to this purported fact. | |
| 47. On March 4, 2007, Donziger said to Maest and other members of the LAP team: "Hold on a second, you know, this is Ecuador, okay.  You can say whatever you want and at the end of the day, there's a thousand people around the courthouse, you're going to get what you want. Sorry, but it's true.  Okay.  Therefore, if we take our existing evidence on groundwater contamination, which admittedly is right below the source.  And wanted to extrapolate based on nothing other than our, um, theory that is, they all, we average out to going 300 meters in a radius, depending on the – the, uh—the what do you call it when the land goes down? The incline.  You know what I mean, . . . The gradient.  We can do it.  We can do it.  And we can get money for it.  And if we had no more money to do more work, we would do that.  You know what I'm saying?  And it wouldn't really matter that much.  Because at the end of the day, this is all for the Court just a bunch of smoke and mirrors and bullshit." Dkt. 6-2 (Exhibit 1) at CRS-196-00-CLIP-01 (2007.03.04 Crude outtake video clip of meeting among S. Donziger, A. Maest, R. Kamp, and C. Champ discussing groundwater evidence); Dkt. 7-6 (Exhibit 2) (certified transcript) at 258-60. | **Donziger:** Disputed.  Chevron plucks selected quotations from a healthy internal discussion about groundwater remediation and strings them together to create a distorted picture of events.  The actual transcript reveals the much more benign truth.  The clip begins with a discussion of what evidence had been collected and what evidence was lacking.  The group even discussed using the evidence that Chevron had collected from the first two inspections. Dkt. 7-6 at 3.  They discussed the need to collect additional evidence and generate additional analyses regarding groundwater contamination and remediation.  *Id.* at 4.  The group continued to discuss and debate the strengths and weaknesses of their arguments regarding groundwater, even after Donziger posed the questions that Chevron would highlight.  Further, these statements were made many years before the Lago Agrio judgment was issued, and do not establish anything about what groundwater evidence was submitted to the court.<br><br>For the reasons stated in St. 30, this purported fact is not material.<br><br>**LAPs:** Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact. | Undisputed.  Defendants do not dispute that the meeting occurred or that the quoted statements were made.  Defendants' characterizations of the topics discussed during the meeting are irrelevant.<br><br>Chevron's statement is material for the reasons explained in Chevron's Reply for St. 30, including that this statement relates to Chevron's core allegations of "fraud, extortion, and corruption so deep in the manner of prosecuting that it fundamentally denied Chevron due process and a fair trial."  *See* Reply for St. 30; Dkt. 720 at 2. |
| 48. On March 19, 2007, the Lago Agrio court announced the appointment of Cabrera as the global expert. Dkt. 32-5 (2007.03.19 court order) at 2 ("Mr. Richard Cabrera is appointed as the expert for the expert evaluation requested by plaintiffs . . . ."). | **Donziger:**  Not disputed.<br><br>**LAPs:**  Disputed. Defendants incorporate Donziger Defendants' response to this purported fact.  Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collat- | Undisputed.  Donziger does not dispute this statement.<br><br>The LAPs do not dispute that the Lago Agrio court appointed Cabrera as global expert on March 19, 2007. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | eral estoppel. (Dkt. 398, at St. 115). Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion. | |
| 49. In Fajardo's March 26, 2007 email to LAPs' lawyers, his statement: "Today the cook met with the waiter to coordinate the menu," described the need to pressure the judge (the "cook") to keep him from appointing another expert in connection with the global assessment in addition to Cabrera (the "waiter"). Dkt. 400-2 (Ex. 2012) (DONZ00042758) (referring to the judge as the "cook", Cabrera as the "waiter" and Chevron as "the other restaurant"); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 3822:12-3824:8 (Donziger testifying that Fajardo's code words "the cook," "the waiter," and "the other restaurant" referred to the judge, Cabrera, and Chevron respectively). | **Donziger:** Disputed. Donziger disputes the insinuation that the use of alternate names is evidence of impropriety by the Ecuadorian Plaintiffs. Chevron engaged in extensive efforts to spy on the Ecuadorian Plaintiffs' team. *See* Dkt. 613-5 (Ex. E). Chevron continues that pattern to this day. *See, e.g.*, Dkt. 895-6 at 4 (surreptitiously taken photograph of Donziger that purports to be from February 27, 2013); Dkt. 754-4, Ex. 3108 (surreptitiously taken photograph of the Ecuadorian Plaintiffs' counsel).<br><br>**LAPs:** Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 117). Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion. | Undisputed. Defendants do not dispute that Fajardo sent the cited e-mail. Defendants also concede that Donziger and the LAPs used code names to hide from Chevron the scope and nature of their relationship with Cabrera and the Lago Agrio Court.<br><br>Defendants' claims that Chevron was "spying" on the LAP team are irrelevant. What is relevant is that the LAP team did not want Chevron to know about their relationship with Cabrera and the Lago Agrio Court. Furthermore, the exhibit cited by Donziger does not support his contention that "Chevron engaged in extensive efforts to spy on the Ecuadorian Plaintiffs' team." Dkt. 613-5. That exhibit, which is inadmissible hearsay, consists of a short article which was published and depicts events occurring after Donziger and the LAPs' counsel adopted code names to conceal their conduct from Chevron. It discusses how the author was approached by a private investigation firm to help determine whether a health study on which the LAPs extensively rely was flawed and rigged from the start. And as was ultimately revealed by the *Crude* outtakes, the author of that health study, Carlos Beristain, *was* secretly working with the LAPs, a fact the LAPs subsequently attempted to conceal from this Court. |
| 50. Cabrera was sworn in by the Lago Agrio court as the global expert on June 13, 2007. Dkt. 32-9 (Cabrera certificate of swearing in) at 130,169. | **Donziger:** Not disputed.<br><br>**LAPs:** Not disputed. Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 119). Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion. | Undisputed. Donziger does not dispute this statement.<br><br>The LAPs do not dispute that Cabrera was sworn in by the Lago Agrio court as global expert on June 13, 2007. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| 51. Cabrera was obligated by court order to be "impartial" and "independent" and to ensure that his work was "transparent" and "independent from the two parties." Dkt. 32-9 at 130,169 (In Cabrera certificate of swearing-in Cabrera swears to perform his duties "faithfully and in accordance with science, technology and the law and with complete impartiality and independence vis-à-vis the parties"); Dkt. 32-6 (132,846) at 2 (2007.10.03 court order regarding Cabrera's duties as expert stating: "The Expert [Cabrera] is hereby reminded that he is an auxiliary to the Court for purposes of providing to the process and to the Court scientific elements for determining the truth."); *id.* at 6 (ordering Cabrera to "perform his work in an impartial manner and independently with respect to the parties"); *id.* ("In reference to the persons acting as assistants to [Cabrera] in the sampling and other work being performed by the expert, these must be independent from the two parties."); *id.* at 10 (ordering Cabrera to maintain "complete impartiality and transparency with respect to the parties and their attorneys"). | **Donziger:** Disputed. Chevron has plucked convenient words at random from various court orders and strung them together in a misleading manner, as the full quotations Chevron provides make clear.<br><br>Chevron's selective quotation and characterization of the October 3, 2007 order omits the essential fact that, in the very same order, *the judge ordered Cabrera to make time to meet with the parties and for the parties to make suggestions regarding the proceeding*. This refutes Chevron's insinuation that Cabrera was not to have contact with the parties or that the parties could not provide materials to, and attempt to persuade, Cabrera.<br><br>He [the expert] shall allow at least thirty minutes every day to meet with the parties, thus complying with the request made in point 6 of the motion. The content of point 4 was discussed with the parties, and an agreement was reached on it. The Expert is responsible for the opinions, for the conclusions made by the professionals making up his team and assisting with the preparation of the report.<br><br>. . .<br><br>With regard to request 2, it has been ruled that the expert will be allowed half an hour prior to the start of the proceeding in order to discuss certain details of the expert testimony with the parties and so that he can give that testimony better, they can make suggestions regarding the proceeding.<br><br>Dkt. 32-6 (Ex. 151) at p. 132,846 and 132,849. The Lago Agrio Court also authorized the parties to submit any materials they wished to Cabrera. Dkt. 613-13 at 10 ("[T]he parties may submit | Undisputed. Defendants do not dispute that the Ecuadorian court ordered Cabrera to be "impartial" and "independent" and that his work be "transparent" and "independent from the two parties."<br><br>Defendants mischaracterize the October 3, 2007 order. The order did not provide an open invitation to the parties to meet with Cabrera *ex parte* and without notice. The court provided that the expert should give "at least 24 hours' advance notice of the site where [his] work will be performed" and allow a small amount of time to meet with the parties in order to "ensure[]" "[t]he transparency of the expert's work." Dkt. 32-6 at 132,846 (back of page). Thus, while the parties were allowed to meet with the expert at preordained testing sites and for a limited amount of time, they were not permitted to control the process or undermine his independence.<br><br>The LAPs wrote both the April and November Cabrera Reports and Cabrera signed and submitted them as he was paid by the LAPs to do. *See, e.g.*, Sts. 44, 60-71. Defendants point to no evidence that Cabrera possessed alternative drafts of the reports or that he prepared any pieces of the reports whatsoever, and thus, Cabrera was entirely reliant on what the LAPs provided to him. Donziger and Stratus admit that they are unaware of any portions of the Cabrera Report written by Cabrera himself, Sts. 72, 78, and Donziger does not offer any evidence of communications between Cabrera and the purported co-authors of the Cabrera Report, *e.g.* St. 69. Despite the record of extensive contact between the LAPs and Cabrera, Defendants do not point to any evidence that the LAPs "advocated" anything to Cabrera, any evidence that Cabrera considered their submissions, or any communications in which Cabrera challenges, questions, or even acknowledges the LAPs' work product or data. All of the evidence shows beyond dispute that the LAPs first selected and then controlled Cabrera, *see, e.g.*, Sts. 42, 44-46, 69, 71, and Defendants do not offer any controverting evidence. The sole reasonable inference that can be draw is that Cabrera was not "independent." |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | to the expert whatever documentation they believe may be useful in preparing his report."). The Lago Agrio Court ordered that materials submitted by Chevron "be delivered directly to the expert, its addressee." *Id.*<br><br>Chevron's repeated invocation of terms like "independent" to accuse the defendants rests on a fundamental misapprehension of Ecuadorian law. Ecuadorian law did not prohibit the parties from advocating their positions or urging the expert's agreement with and adoption of those positions. Under Ecuadorian law, the expert's "independence" arises from his free reign to decide whether, in his professional judgment, he believes a party's position to be the correct one and to adopt whatever information is provided by a party as grounds for his opinions. *See* Dkt, No. 154-5 ¶¶ 11-12, 18; Dkt. No. 154-6 ¶¶ 8-9. There is substantial evidence already in the record that Ecuadorian law at the time did not prohibit parties from making contact with court-appointed experts prior to the issuance of the expert's report, including prior to the expert's formal appointment by the court. *See* Dkt. No. 154-5 (Alencastro Aff.) ¶¶ 9-12, 19; Dkt. No. 154-6 (Simon Aff.) ¶¶ 4-5, 7-8. *See also* Ecuadorian Plaintiffs' response to St. 36.<br><br>**LAPs:**  Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.  Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel.  (Dkt. 398, at St. 122.)  Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion. | |
| 52. The LAP team repeatedly asserted, to the Lago Agrio court, and to other audiences, that Cabrera was a "neutral" and "independent" court-appointed expert or | **Donziger:**  Disputed.  Chevron does not define what it means by an "improper" relationship.  Nowhere in the evidence to which Chevron cites do the Ecuadorian Plaintiffs or Donziger use the | Undisputed.  The additional language provided by Defendants is not contrary to Chevron's statement of fact.  Defendants do not dispute that the LAPs asserted that Cabrera was "neutral" and "independent," or that |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| "Special Master," and they denied any improper relationship with Cabrera. Dkt. 402-12 (Ex. 2308) at 134,001, 134,004 (2008.01.11 LAP filing stating in Ecuador court filing that "Cabrera was not proposed by the plaintiffs" and "was not appointed at the suggestion of the plaintiffs," but was nominated by the court); Dkt. 47-57 (2010.07.09 LAP filing in Stratus 1782) at 27 ("Cabrera is not even an expert for one party, but a Court-appointed neutral."); Dkt. 47-30 (Donziger's Lantos Commission Testimony) at 7 ("The best and most recent independent estimate available of the human health impact of this contamination is provided by the expert appointed by the court, Richard Cabrera."); Dkt. 30-5 (2010.06.14 LAP complaint to stay arbitration) ¶ 29 ("The best and most recent independent estimate available of the human health impact of this contamination is provided by the neutral Special Master appointed by the court to provide advice on damages."); Dkt. 400-2 (Ex. 2017) (2009.05.10 LAP filing) at 129,697 (The LAPs requested a single expert designated by the court "primarily due to the issue of impartiality . . . . Impartiality because, having not been named by either of the parties, he will be even more objective in his analysis and conclusions . . . ."); *see also* Dkt. 400-2 (Ex. 2019) at 140,184-85 (2008.04.18 LAP filing stating: "I remind you, Mr. President, that expert Cabrera was given the task because of his professional and personal suitability, and as such, his work should be free of external pressures from the parties, especially when these pressures can compromise the systematic integrity of his work in an attempt to turn this professional designated by the court into a mere executor of their plans and strategies."). | word "improper," so it is wholly inaccurate to claim that the Ecuadorian Plaintiffs "denied any improper relationship." Chevron's characterization of what exactly was denied is unsupported and argumentative. Chevron's suggestion that any contact whatsoever between the Ecuadorian Plaintiffs and Cabrera was "improper" is wrong under Ecuadorian law and is inconsistent with the Lago Agrio court's orders. Moreover, the insertion of this legal conclusion is not proper in a Rule 56.1 statement. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)). Whether Chevron believes that any relationship between the Ecuadorian Plaintiffs and Cabrera was "improper" under Chevron's own standards is not relevant to the instant motion for summary judgment.<br><br>Further, Chevron has manipulated quotations and taken words out of context in a manner that creates a misleading impression. For example:<br><br>• Chevron did not include the end of the sentence that begins "Cabrera was not proposed by the plaintiffs." The full sentence reads: "Engineer Cabrera was not appointed at the suggestion of the plaintiffs. They originally proposed Dr. Luis Villacreces for the position. Chevron opposed this, and the Judge listened to this request and appointed another expert." Dkt. 402-12 (Ex. 2308) at p. 134,004.<br><br>• The Stratus pleading that Chevron quotes was an effort by Stratus to resist Chevron's improper § 1782 fishing expedition. Stratus argued that "There is no Ecuadorian prece- | Cabrera was the equivalent of a "Special Master." Nor do Defendants dispute that the LAPs repeatedly referred to the Cabrera Report as an "independent" estimate.<br><br>The LAPs' and Cabrera's consistent denial of any substantive interaction between them belie Defendants' claim that their relationship with Cabrera was proper. Dkt. 36-5 at 3 (2008.04.04 LAP filing in Ecuador calling the notion that Cabrera "works for us" "simply ridiculous"); Dkt. 36-6 (2008.04.25 LAP filing in Ecuador) at 2 (labeling the allegation that the LAPs have a "close relationship with the Independent Expert Richard Cabrera" "[a]nother infamy")); Dkt. 35-9 (2007.07.23 Cabrera letter) at 131,972 (Cabrera letter stating, "I do not have any relation or agreements with the plaintiff, and it seems to me to be an insult against me that I should be linked with the attorneys of the plaintiff's."); Dkt. 401-7 (Ex. 2078) at 3 (Cabrera letter stating, "The defendant's attorneys allege that the plaintiff is in 'close contact' with me, and that the plaintiff has provided me with technical information and support staff to assist with the expert examination. This is untrue. If I need any technical information in connection with this case, all I have to do is request it from this Court; the idea that the plaintiffs would be helping me with that is unthinkable."). Moreover, the evidence is that the LAPs' attorneys even wrote Cabrera's letters denying their relationship. *See* St. 55.<br><br>*See* Chevron's Response to Defendants' Counter Sts. 347-350 regarding the propriety of the LAPs' contacts with Cabrera. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | dent for seeking this discovery of materials given to a court-appointed expert." Dkt. 47-57 (Ex. 295) at p. 27.<br><br>• Chevron similarly provides only a selected quotation from the Ecuadorian Plaintiffs' April 18, 2008 pleading. Examination of the full pleading shows that the Ecuadorian Plaintiffs' statement was made in the context of attempting to clarify an order from the court for Cabrera to "comply" with Chevron's requests.<br><br>Nor do Chevron's citations support its assertion that the Ecuadorian Plaintiffs "repeatedly" referred to Cabrera as "neutral" "independent" or a "Special Master." In fact, most of Chevron's citations provide only that the Ecuadorian Plaintiffs recited the fact that the court appointed Cabrera. It is undisputedly true that the court appointed Cabrera.<br><br>Finally, Chevron's repeated invocation of terms like "independent" to accuse the defendants rests on a fundamental misapprehension of Ecuadorian law. Ecuadorian law did not prohibit the parties from advocating their positions or urging the expert's agreement with and adoption of those positions. Under Ecuadorian law, the expert's "independence" arises from his free reign to decide whether, in his professional judgment, he believes a party's position to be the correct one and to adopt whatever information is provided by a party as grounds for his opinions. *See* Dkt, No. 154-5 ¶¶ 11-12, 18; Dkt. No. 154-6 ¶¶ 8-9. There is substantial evidence already in the record that Ecuadorian law at the time did not prohibit parties from making contact with court-appointed experts prior to the issuance of the expert's report, including prior to the expert's formal appointment by the court. *See* Dkt. No. 154-5 (Alencastro Aff.) ¶¶ 9-12, 19; Dkt. No. 154-6 (Simon Aff.) ¶¶ 4-5, 7-8. *See also* Ecuadorian Plaintiffs' response to St. 36. | |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | **LAPs:**  Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.  Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel.  (Dkt. 398, at St. 125).  Chevron provides no reason for the Court to rule any differently on this Renewed Motion. | |
| 53. Defendants used code words to conceal their interactions with the Ecuadorian court and Cabrera.  Dkt. 402-2 (Ex. 2221) (DONZ00060634) at 1 (referring to the judge as the "Big Boss"); Dkt. 400-2 (Ex. 2012) (DONZ00042758) (referring to the judge as the "cook", Cabrera as the "waiter" and Chevron as "the other restaurant"); Dkt. 32-7 (DONZ00108564) at 1 (referring to the judge as the "boss"); Dkt. 356-9 (DONZ00043514) (referring to Donziger as "Lagarto 3", Fajardo as "Lagarto 2" while instructing Donziger to only refer to himself on a specific Hotmail address as "Lagarto 3"); Dkt. 400-3 (Ex. 2026) (DONZ-HDD-0125950) (referring to Cabrera as the "Wao"); Dkt. 402-2 (Ex. 2222) (DONZ00066208) (referring to Cabrera as the "wao"). | **Donziger:**  Disputed.  Donziger disputes the insinuation that the use of alternate names is evidence of impropriety by the Ecuadorian Plaintiffs.  Chevron engaged in extensive efforts to spy on the Ecuadorian Plaintiffs' team.  *See* Dkt. 613-5 (Ex. E).  Chevron continues that pattern to this day.  *See, e.g.*, Dkt. 895-6 at 4 (surreptitiously taken photograph of Donziger that purports to be from February 27, 2013); Dkt. 754-4, Ex. 3108 (surreptitiously taken photograph of the Ecuadorian Plaintiffs' counsel).  <br><br>**LAPs:**  Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.  Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 175).  Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion. | Undisputed.  Donziger concedes that he and the LAPs used code words to hide from Chevron the scope and nature of their relationship with Cabrera and the Lago Agrio Court.  <br><br>*See* Reply for St. 49 regarding Defendants' "spy" claims.  <br><br>Defendants' claims that Chevron was "spying" on the LAP team are at best irrelevant and most likely supportive since their belief provides a motive for the use of code names. |
| 54. Among other names, Defendants referred to Cabrera as "Wao" or "Wuao."  Dkt. 400-3 (Ex. 2026) (DONZ-HDD-0125950) (referring to Cabrera as the "Wao"); Dkt. 402-2 (Ex. 2222) (referring to Cabrera as the "wao"); Dkt. 356-9 (DONZ-HDD-0125080) at 210 ("[H]e sends us money to our secret account, to give to Wuao, [to] not stop the work.") (brackets in original). | **Donziger:**  Disputed.  Donziger disputes the insinuation that the use of alternate names is evidence of impropriety by the Ecuadorian Plaintiffs.  Chevron engaged in extensive efforts to spy on the Ecuadorian Plaintiffs' team.  *See* Dkt. 613-5 (Ex. E).  Chevron continues that pattern to this day.  *See, e.g.*, Dkt. 895-6 at 4 (surreptitiously taken photograph of Donziger that purports to be from February 27, 2013); Dkt. 754-4, Ex. 3108 (surreptitiously taken photograph of the Ecuadorian Plaintiffs' counsel). | Undisputed.  Defendants do not dispute that Donziger and the LAPs' team used code names to refer to Cabrera.  <br><br>*See* Reply for St. 49 regarding Defendants' "spy" claim. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | **LAPs:** Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | |
| 55. Fajardo wrote the following filings submitted by Cabrera in the Lago Agrio Litigation: Dkt. 35-9 (2007.07.23 Cabrera letter) at 131,972 (Fajardo, writing as Cabrera, stating, "I should clarify that I do not have any relation or agreements with the plaintiff, and it seems to me to be an insult against me that I should be linked with the attorneys of the plaintiffs."); Dkt. 400-3 (Ex. 2030) (2007.08.23 Cabrera letter) at 132,263 (Fajardo, writing as Cabrera, reporting that, "In order to demonstrate the transparency and impartiality and objectivity with which I am developing the field work . . . I chose to draft a sample registry sheet"); Dkt. 400-3 (Ex. 2031) (2007.10.16 Cabrera letter) at 133,254 (Fajardo, writing as Cabrera, stating that Cabrera's "duty as expert is to comply with the law"); Dkt.400-3 (Ex. 2032) (2007.10.31 Cabrera letter) at 133,465 (Fajardo, writing as Cabrera, stating, "I can only confirm my commitment to continue my work with absolute impartiality, honesty and transparency."); Dkt. 400-3 (Ex. 2033) (2007.11.08 Cabrera letter) at 133,582 (Fajardo, writing as Cabrera, asking the court to order public and private institutions to provide him with essential information so he can "conduct a thorough, impartial and objective investigation in strict observance of the law"); Dkt. 400-3 (Ex. 2034) (2007.12.10 Cabrera letter) at 133,907 (Fajardo, writing as Cabrera, stating, "I hope and I am certain that my report, which is completely impartial, will help bring to light the truth of the matters in dispute."); Dkt. | **Donziger:** Disputed. The only basis for Chevron's assertion that the listed filings were written by Fajardo is Dr. McMenamin's report. But Chevron cannot rely on Dr. McMenamin's report (or at least the version Chevron cites to in its Separate Statement), and all references thereto should be stricken. Dr. McMenamin's report is unsworn and is not admissible on summary judgment.[G] *See Berk v. St. Vincent's Hosp. and Med. Ctr.*, 380 F. Supp. 2d 334, 352 (S.D.N.Y. 2005) ("Courts in this Circuit have uniformly held that unsworn expert reports do not satisfy the admissibility requirements of Fed.R.Civ.P. 56(e), and cannot be used to defeat a summary judgment motion without additional affidavit support."). Dr. McMenamin's report is also not admissible because it does not meet the requirements of Rule 702 and Daubert. *See id.* at 353; *Cacciola v. Selco Balers, Inc.*, 127 F. Supp. 2d 175, 180 (E.D.N.Y. 2001) ("Evidence contained in an expert's report therefore must be evaluated under Fed.R.Evid. 702 before it is considered in a ruling on the merits of a summary judgment motion."). Dr. McMenamin's report has numerous deficiencies, three of which will be mentioned here.

*First*, the reliability Dr. McMenamin's method of "forensic stylistic analysis" is, at the very least, subject to debate. Other courts have excluded proffered expert testimony as to the identity of questioned writings that was based on the same forensic stylistic analysis as Dr. McMenamin's opinions. *See United States v. Van Wyk*, 83 F. Supp. 2d 515, 522-23 (D.N.J. 2000). In fact, in *Van Wyk* the government offered an article written by Dr. McMenamin in support of its proffered expert testimony. *See id.* at 521-23. The | Undisputed. Defendants do not dispute the facts contained in Dr. McMenamin's report. Defendants do not dispute that Fajardo authored 15 letters to the Ecuadorian court in Cabrera's name, including at least 10 of the 11 letters attesting to Cabrera's "independence" and lack of "relationship" with the LAPs. Defendants complain that McMenamin's declaration is not signed under penalty of perjury, but his opinions are also contained in a declaration that is under penalty of perjury. Dkt. 886-5 (Ex. 3310) at 20.

Defendants' protestation that they must be given "the opportunity" to depose or cross-examine Dr. McMenamin is disingenuous. Defendants did not even include Dr. McMenamin in their February 6, 2013 letter to the Court listing individuals they claimed they needed to depose before responding to Chevron's motion. Dkt. 918-6; *see also* Dkt. 780 at 2 n.3 ("Nothing prevents the defendants from proceeding with discovery prior to the scheduled submission of their papers with respect to the motion for partial summary judgment."). Indeed, Defendants eventually declined to depose any of Chevron's witnesses before filing their opposition. Dkt. 918-10.

Furthermore, Dr. McMenamin did not rely on English translations to perform his analysis as Defendants claim. Dr. McMenamin analyzed the Spanish versions of the documents, which is immediately apparent from the data in his exhibits. *See* Dkt. 400-16 (Ex. 2105) Ex. F. Defendants' argument in this regard is therefore incorrect and irrelevant.

Fajardo's authorship of the Cabrera letters is material to establishing falsity of the claim that Cabrera "do[es] not have any relation or agreements with the plaintiff." Dkt. 35-9 at 131,972. Cabrera's reliance on Fajardo, |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| 400-4 (Ex. 2041) (2008.01.07 Cabrera letter) (Fajardo, writing as Cabrera, stating that Cabrera's report is almost complete and requesting that the parties supply Cabrera with documents); Dkt. 35-10 (2008.10.07 Cabrera letter – 151,316) at 7 (Fajardo, writing as Cabrera, stating, "I am an honest man with nothing to hide, and my conduct as an expert in this case has been as professional, impartial and objective as possible, as can be seen from my expert report. The fact that neither of the two parties is fully satisfied with my report is clear evidence of my impartiality."); Dkt. 400-4 (Ex. 2042) (2008.11.07 Cabrera letter) at 152,783 (Fajardo, writing as Cabrera, stating that Cabrera could not produce to Chevron any drafts of his report because "[t]he digital files that contain these drafts were deleted after the final report was submitted, and the paper was recycled. . . . I was not aware of any obligation to store all the drafts I used in performing my work."); Dkt. 36-4 (2009.03.04 Cabrera letter) at 154,580 (Fajardo, writing as Cabrera, responds to questions by Chevron regarding Cabrera's independence: "Once more I make it a matter of record that I have done my work, with my technical team, in adherence to my principles of integrity, and without a desire to negatively affect or benefit either party . . . ."); Dkt. 400-3 (Ex. 2035) (2010.03.22 Cabrera letter) at 168,513 (Fajardo, writing as Cabrera, stating, "Chevron accuses me of having a conflict of interest . . . . Your Honor, this is another serious and false accusation."); Dkt. 402-13 (Ex. 2319) (2007.07.12 Cabrera letter) at 131,336 (Fajardo, writing as Cabrera, requesting that the court halt government remediation at inspection sites); Dkt. 400-3 (Ex. 2029) (2007.07.12 Cabrera letter) at 131,338 (Fajardo, | court did not admit the proffered testimony.<br><br>*Second*, Dr. McMenamin reaches his conclusion without examining any documents known to be written by Cabrera. *See* Dkt. 400-16 (Ex. 2105) at p. 17 (noting "the absence of authenticated exemplar writing by Ing. Cabrera"). This is despite his acknowledgement that "The first step in a matter of this type would typically be to compare and contrast the Questioned writings to Known writings of the putative author." *Id.* at p. 98. That Dr. McMenamin could definitively conclude that certain writings were not authored by Cabrera when he didn't even know of any baseline characteristics of Cabrera's writing is highly suspect. At the very least, Donziger should have the opportunity to cross-examine Dr. McMenamin about the effect that the lack of Cabrera writings has on the reliability of his analysis.<br><br>*Third*, many of the bases for Dr. McMenamin's conclusions are, on their face, highly questionable. Dr. McMenamin concludes that Fajardo authored certain Cabrera filings because certain errors or formatting choices appear in both the subset of Fajardo writings that Dr. McMenamin analyzed and the subset of Cabrera filings that were labeled "questioned."[G] But many of these errors or choices appear to be commonplace. Dr. McMenamin bases his conclusion on such banal common features of Fajardo's writing and the questioned filings as:<br><br>• The format in which time of day is indicated<br><br>• Failure to double-space between paragraphs (which is not consistent across either set of writings)<br><br>• Use of capital letters for emphasis<br><br>• Omitting letters (e.g. misspelling) words, but not necessarily the same words (only once is the same word mis- | the LAPs' lawyer, to draft court filings for him is at odds with Defendants' assertions about Cabrera's independence. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| writing as Cabrera, referring to "the complete and absolute impartiality with which I must act in carrying out my expert evaluation . . . ."); Dkt. 402-14 (Ex. 2321) (2007.07.23 Cabrera letter) at 131,971 (Fajardo, writing as Cabrera, giving notice of future site inspections). Dkt. 400-16 (Ex. 2105) ¶¶ 3, 9I(iii), Ex. F (2011.06.30 Expert Report of Gerald McMenamin concluding that "(1) the fifteen Cabrera filings identified as a subset of all the Cabrera filings reviewed have a single author, and (2) the author of this subset is Pablo Fajardo Mendoza"). | spelled in both a Cabrera filing and a Fajardo writing) These are hardly convincing indicia of common authorship. At the very least, Donziger should be afforded the opportunity to depose Dr. McMenamin. Additionally, Dr. McMenamin did not rely on the same English translations of various Spanish documents for his analysis as the ones Chevron submitted to the Court. For example, Dr. McMenamin purports to quote an August 23, 2007 letter to the Lago Agrio Court as follows: "in July this year, I chose to create a sample record sheet, noting basic technical information for each sample." Dkt. 400-16 (Ex. 2105) at 11. The translation of that letter that Chevron submitted to this Court and cites here provides a different version: "in July of this year, I chose to *draft* a sample *registry* sheet, noting basic technical information for each sample." Dkt. 400-3 (Ex. 2030) at 3 (differences italicized). Dr. McMenamin also purports to quote a November 7, 2008 letter to the Lago Agrio Court as follows: "I understand, Your Honor, that, as an expert, my legal obligation was to deliver the report at the time appointed and answer the questions of the parties, but I did not know of any obligation to store all the drafts I used in the preparation of my work." Dkt. 400-16 (Ex. 2105) at 14. The translation of that letter that Chevron submitted to this Court and cites here is entirely different: "Your Honor, I understand that my legal obligation as the expert was to present the report within the term specified and to answer the questions from the parties, but I was not aware of any obligation to store all the drafts that I used in performing my work." Dkt. 400-4 (Ex. 2042) at 2. This is yet another reason that Dr. McMenamin's conclusions are unreliable and should not be credited. Further, the translation discrepancies raise serious questions about Chevron's ability to rely on translations in general, because they expose the subjectivity of word choice and | |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | the susceptibility of translation to editorializing.<br><br>   **G**  A page bearing nothing but the date and McMenamin's signature is attached to the report at Dkt. 400-16 (Ex. 2105) at p. 18.  But this signature does not accompany an oath or any other attestation by McMenamin regarding the report.<br><br>**LAPs:**  Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.  Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel.  (Dkt. 398, at St. 127).  Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion. | |
| 56. As this Court has already found, "Cabrera's work plan was drafted by the LAP team and given to Cabrera for his adoption. When the work plan was filed with the Lago Agrio court, it was not disclosed that the LAP team had provided Cabrera with a draft of the work plan."  Dkt. 550 at 37; *see also* Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 2165:2-6 ("Q. Did the plaintiffs' team draft the Cabrera work plan? A. I believe the plaintiffs' team drafted a work plan that was given to him for his adoption."), 2184:3-2186:4; Dkt. 8-9 at 2203:4-17 (the LAPs' counsel and consultants wrote Cabrera's work plan); Dkt. 6-2 (Exhibit 1) at CRS-189-00-CLIP-02; Dkt. 7-4 (Exhibit 2 (certified transcripts)) at 223-27 (Donziger proposed forming a "work committee" to draft Cabrera's "work plan" with the goal of having "more or less eighty percent-ninety percent on the way to a plan" in a few days); Dkt. 400-4 (Ex. 2043) (DONZ00038727) at 1 (Fajardo emailing Donziger); *see also id.* at 3-4 (LAP-drafted chart enti- | **Donziger:**  Disputed.**H**  Chevron provides incomplete and mischaracterized versions of the evidence to which it cites.<br><br>For example:<br><br>• Chevron asserts that Donziger testified at p. 2203:4-17 that the "LAPs' counsel and consultants wrote Cabrera's work plan."  This mischaracterizes Donziger's testimony.  Donziger testified that the Ecuadorian Plaintiffs provided Cabrera with a work plan, that they had been involved in Cabrera's site selection, and he thought that the plaintiffs suggested sampling protocols to him.  Dkt. 8-9 (Ex. 6) at 2203:4-17.<br><br>• When Chevron quotes from Donziger's deposition testimony, it omits Donziger's testimony that Donziger did not know if Cabrera adopted the exact plan that the Ecuadorian Plaintiffs submitted to him, modified it, or made another version.  Dkt. No. 400-1 (Ex. 2010) at 2165:2-8 ("Q: Did the plaintiffs' team draft the Cabrera work plan?  A: I | Undisputed.  Defendants do not dispute that the LAPs' counsel and consultants wrote Cabrera's work plan, which Cabrera then submitted to the Ecuadorian court as his own work.  The additional language cited by Defendants is not contrary to Chevron's statement of fact. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| tled "Expert Examination Activity Plan" with members of the LAPs' team noted as the individuals responsible for various activities); *id.* at 5-6 (LAP-drafted document entitled "Final Plan from the Global Expert Examination" containing an outline of tasks to be performed for Cabrera's global examination); Dkt. 400-4 (Ex. 2044) (LAPs' team drafted Cabrera's work plan); Dkt. at 8-9 at 2177:8-2178:15; 2165:2-2166:23; 2406:7-11 (Donziger testified that the LAPs' team was involved in "putting together Cabrera's work team."). | believe the plaintiffs' team drafted a work plan that was given to him for his adoption. *I don't know if he adopted that exact plan, modified it, or did some other version.*") (portion omitted by Chevron italicized).<br><br>• In the Crude clip to which Chevron cites, Donziger discusses "defin[ing] a work plan." Dkt. No. 7-4 (Ex. 2) at 223. But, contrary to Chevron's characterization, there is no indication that Donziger is discussing drafting Cabrera's work plan. Rather, the context establishes that Donziger was discussing various litigation-related tasks for the Ecuadorian Plaintiffs' team. *See id.* ("I believe that the most important task is for us to define a work plan. Specific. With dates, teams and budget. [traffic noises]. So, that is a very different process than what we've gone through today, up to now. For me, it means defining the objectives. . . .").<br><br>• Chevron then claims that Dkt. No. 400-4 (Ex. 2043) supports its assertion that the Ecuadorian Plaintiffs drafted the work plan that Cabrera filed with the Lago Agrio court. But the document attached to the e-mail in Exhibit 2043 looks *nothing* like the work plan that Cabrera filed with the court. *Compare* Dkt. No. 400-4 (Ex. 2043) (Fajardo's "first draft of the plan and schedule of activities to be carried out") *with* Dkt. No. 400-4 (Ex. 2044) at p. 130,641-130,651 (work plan filed with the court).<br><br>• Dkt. 400-4 (Ex. 2044) is the work plan that Cabrera submitted. Nothing on the face of the document supports Chevron's description of the work plan in the parenthetical accompanying the citation to Dkt. 400-4.<br><br>• Donziger's testimony that he remembered "efforts to suggest to him [Cabrera] people who might be competent to | |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | carry out various field tasks, suggestions made by members of our team," Dkt. No. 8-9 (Ex. 6) at 2177:18-23, does not establish that the Ecuadorian Plaintiffs drafted the work plan Cabrera filed with the court. The filed work plan does not list any particular individuals; it lists only the "professional profile" and "responsibilities" of the "multi-disciplinary team [that] will be required . . ." Dkt. No. 400-4 (Ex. 2044) at p. 130,650.<br><br>⁰⁰ *See* note D, *supra*.<br><br>**LAPs:** Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | |
| 57. The LAP team secretly contracted with Cabrera, purchased insurance for him, and discussed getting him an office and arranging for one of their girlfriends to be his assistant.  Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 3800:9-3805:7, 4842:22-4843:18 (Donziger testifying that the LAPs' counsel had entered into a contract with Cabrera); Dkt. 400-3 (Ex. 2027) (2007.07.01 email from Fajardo explaining that Cabrera called "about a little mistake in the contract" and suggesting that the LAPs' representatives "help [Cabrera] get an office," arrange for Prieto's girlfriend to be his assistant, that it is the LAPs' "duty to help him get insurance"); Dkt. 400-3 (Ex. 2028) (email discussing life insurance quotes for Cabrera); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 3802:5-3808:16 (Donziger testifies that the LAPs purchased life insurance for Cabrera). | **Donziger:**  Disputed.  Chevron selectively quotes from Fajardo's e-mail and omits the portions that undermine Chevron's chosen story.  First, Chevron omits the portion of the e-mail in which Fajardo states that "it is our obligation to help him [Cabrera]." Dkt. No. 400-3 (Ex. 2027) at 2. Fajardo also states that "Even though it's not our obligation, but I think it's our duty to help him get insurance.  We must understand that he has no structure and we do. I think that he now needs to get to the heart of his work.  There's no reason he should be dealing with those [administrative] things that eat up his time and bother him." *Id.* at 3 (bracketed text present in translation but not in original Spanish document).  This undermines Chevron's suggestion that Cabrera was being paid to do nothing because it shows that Fajardo and Donziger thought that Cabrera had actual work to do.<br><br>Further, as the Ecuadorian Plaintiffs were required to pay Cabrera, it was appropriate for them to make provisions for his work, in part to lessen costs that they would ultimately be responsible for. Chevron's citations merely underscore the fact that Cabrera was | Undisputed.  Defendants do not dispute that the LAP team entered into a contract with Cabrera, that they purchased insurance for Cabrera, or that they discussed getting him an office and arranging for one of their girlfriends to be his assistant.  The additional language quoted by Defendants is not contrary to Chevron's statement of fact.<br><br>Defendants do not cite any evidence to support their assertion that the LAP team was simply responding to pressure from Chevron, and their proposed inference is irrelevant. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | engaged in substantive field work requiring assistance and that he was under intense psychological intimidation and pressure from Chevron. *See* Dkt. No. 28-7 (Ex. 76) (DONZ00027256) at p. 14 ("Richard said Texaco was already starting to investigate him."); Dkt. 613-8 (Ex. H) (12/8/10 Donziger Depo. Tr.) at 962: 3-6 ("There was a hesitancy, I found, on the part of qualified technical people in Ecuador to work with us out of fear that Chevron would retaliate against them").<br><br>Additionally, Chevron's contention that the contract with Cabrera was secret is wholly unsupported. The cited material does not discuss whether the contract was "secret," and Chevron cites to no other facts from which secrecy can be inferred on summary judgment.<br><br>**LAPs:** Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 131, 132). Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion. | |
| 58. On April 17, 2007, Yanza wrote to Donziger: "We have met with Richard [Cabrera] and everything is under control. We gave him some money in advance." Dkt. 356-9 at 206; *see also* Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 3781:3-3784:25. | **Donziger:** Donziger disputes Chevron's insinuation that this was inappropriate. In fact, Donziger testified that there *was* a valid reason for this payment. *See* Dkt. 613-16 (Ex. P) (1/29/11 Donziger Depo. Tr.), at 3778:4-11 ("Q. Can you think of any valid reason as you sit here now why Richard Cabrera would have been given some money in advance by the plaintiffs' team two months before he was officially appointed and began serving as the global damages assessment expert? A. Yes."). The reason was that Cabrera had already begun his work. *See id.* at 3780:19-21 ("I think he began his work before his swearing in, but after his ap- | Undisputed. Defendants admit that the LAPs made payments to Cabrera before he was actually sworn in as the court expert, and the additional quotations cited by Defendants are not contrary to Chevron's statement of fact. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | pointment, is my recollection."). Moreover, Donziger's testimony regarding the "everything is under control" comment clarifies that Yanza was not discussing an illicit payment. Donziger testified that he thought "everything is under control" meant that everything was under control with respect to "the idea of getting this aspect of the trial moving." Dkt. No. 400-1 (Ex. 2010) at 3783:21-3784:5.  **LAPs:** Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. Moreover, Chevron previously submitted this same evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 133). Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion. | |
| 59. On or around June 12, 2007, the LAP team opened a bank account at Banco Pichincha, Lago Agrio Branch in Nueva Loja, Ecuador, ending in number 4298-00. Dkt. 355-2 (Ex. 1019); Dkt. 355-2 (Ex. 1020). | **Donziger:** Disputed. The e-mail to which Chevron cites does not establish when any account was opened or by whom. All that Chevron has established is that on September 12, 2007, Yanza e-mailed Donziger with an account number ending in 98-00 and that Yanza stated the account name was Amazon Defense Front. Dkt. 355-22 (Ex. 1020).  **LAPs:** Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | Undisputed. Defendants do not dispute that on or around June 12, 2007, the LAP team opened a bank account at Banco Pichincha, Lago Agrio Branch in Nueva Loja, Ecuador, ending in number 4298-00. Dkt. 754-8 (Ex. 3121) at 8 (LAP objections to Magistrate findings not disputing that they opened the Banco Pichincha secret account). Defendants do not dispute that on June 12, 2007, Yanza emailed Donziger stating, "To open the account we need at least 2 thousand dollars. Due to the urgency, I suggest that amount (or more, 5 or 10 thousand) be sent to my personal account and I will transfer it to the new secret account." Dkt. 355-2 (Ex. 1019) at 3. Donziger testified that, per Yanza's request, Joseph Kohn sent Donziger the money he requested in June 2007 to open the secret account. Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 4860:20-25. Yanza later confirmed to Donziger that the secret account was opened and that the LAPs had previously used that account to pay Cabrera. Dkt. 356-9 (Ex. S) (DONZ-HDD-0125080 (2007.09.12 email from Yanza to Donziger warning that the Global Assessment could be stopped "because Novillo is tak- |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | | ing so long . . . to issue an order on Wao's request that we pay him to cover the costs of the field work." Yanza asks Donziger to "explain this situation" to Kohn so that Kohn will transfer $50,000 to "our secret account" "*using the same mechanism from weeks ago*, that is, he sends us money to our secret account, to give to Wuao, [to] not stop the work.") (emphasis added). |
| 60. Yanza referred to the Banco Pichincha account ending in number 4298-00 as the "secret account." Dkt. 400-3 (Ex. 2021) at 2 (Luis Yanza: "To open the account we need at least 2 thousand dollars. Due to the urgency, I suggest that amount (or more, 5 or 10 thousand) be sent to my personal account and I will transfer it to the new secret account."); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 4847:2-24 (Donziger testifying that Yanza referred to the account from which Cabrera was paid as a "secret account"); *id.* at 4853:6-4859:7; Dkt. 400-3 (Ex. 2023) at 3; *see also* Dkt. 400-3 (Ex. 2024) (email attaching list of total distributions made from Chevron Litigation Fund); Dkt. 400-3 (Ex. 2025) at 1-2 (list of total distributions from Chevron Litigation Fund reveals payments of $50,000 to Frente de Defensa de la Amazonia on Aug. 15, 2007 and Sept. 14, 2007); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 4848:11-4849:7 ("Q. Let's actually turn to page 3, where you say at the bottom 'Joe, please transfer 50,000 to the following account in Ecuador. If you have any questions please call.' Do you see that? A. Yes. Q. And then you provide the information for the account that Mr. Yanza calls the secret account. Do you see that? A. Yes."); Dkt. 400-3 (Ex. 2026); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 3805:8-12 ("Q. Am I correct, | **Donziger:** Disputed. Most of the evidence to which Chevron cites has nothing to do with what Yanza called the account ending in 298-00, for example, lists of distributions from the Chevron litigation fund.<br><br>Yanza's e-mail makes the purpose of the request to Kohn clear, and the purpose is far more benign than Chevron would have the Court believe. Chevron was going to great lengths to block and delay the expert inspections, in part by ensuring that he would not be paid. The subject of the e-mail is "We should not give Texaco the pleasure of stopping the Global Assessment." He writes:<br><br>Texaco's goal of stopping the global assessment could happen the next business day. . . But the expert's work cannot wait, and the last business day starts next Wednesday, so he will need more money, especially since the groundwater study begins, too, but if there is no money, the work will simply stop.<br><br>Considering all this, I think we should plan ahead and not give those Texaco bastards the pleasure, using the same mechanism from weeks ago, that is, he sends us money to our secret account, to give to Wuao, [to] not stop the work.<br><br>Dkt. 356-9 (Ex. S) (DONZ-HDD-0125080) at p. 210. Chevron also omits a prior paragraph in the e-mail which shows that the payment that the parties were discussing was a payment that | Undisputed. Defendants do not dispute that payments were made to Cabrera through what the LAP team referred to as their "secret account." Dkt. 400-3 (Ex. 2021) at 2. The additional language cited by Defendants is not contrary to Chevron's statement of fact.<br><br>Defendants recast what are clearly bribes to Cabrera as advances. The evidence does not support them. The Lago Agrio court authorized $271,814 in payments to Cabrera, and the LAPs submitted $263,899 in payments through the court from an account at Banco Pichincha bearing an account number ending in 4450-04 ("the Selva Viva Account"). Sts. 65, 66. In 2007 and 2008, every court authorization for payment to Cabrera was matched by LAPs payments from the Selva Viva Account, and there is no evidence that Cabrera reimbursed the LAPs for the supposed "advances." Dkt. 754-17 (Ex. 3130 (Dahlberg Decl.)), ¶ 14. Furthermore, at the time the LAPs were "urgently" requesting Kohn to transfer $100,000 into the "secret account," Cabrera's outstanding request was for only $47,000. *Id.* at CVX-RICO-0509542. And when the court approved that $47,000 request, the LAPs paid it in full within a week from the Selva Viva Account. *Id.*<br><br>*See* Chevron's Reply to St. 59. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| Mr. Donziger, that the plaintiffs' team had a nickname for Mr. Cabrera? He was called Wao, correct? A. Yes."); *id.* at 4327:15-20; Dkt. 356-9 (DONZ-HDD-0125080) at 210 ("[H]e sends us money to our secret account, to give to Wuao, [to] not stop the work.") (final brackets in original); Dkt. 400-3 (Ex. 2021) (DONZ-HDD-0113361); Dkt. 400-3 (Ex. 2022) (DONZ-HDD-0124585). | Cabrera had properly requested through the court but the accompanying order was being held up due to Chevron's pending motion for the judge to recuse. *Id.*<br><br>Finally, the evidence to which Chevron cites does not establish whether, when, or from what accounts any payments to Cabrera were actually made.<br><br>**LAPs:** Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | |
| 61. Yanza explained the purpose of the "secret account" to Donziger: "[Joseph Kohn] sends us money to our secret account, to give to Wuao [Cabrera], [to] not stop work." Dkt. 356-9 (DONZ-HDD-0125080) at 210 ("[H]e sends us money to our secret account, to give to Wuao, [to] not stop the work.") (brackets in original); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 4848:11-4849:7 ("Q. Let's actually turn to page 3, where you say at the bottom 'Joe, please transfer 50,000 to the following account in Ecuador. If you have any questions please call.' Do you see that? A. Yes. Q. And then you provide the information for the account that Mr. Yanza calls the secret account. Do you see that? A. Yes."); Dkt. 400-3 (Ex. 2026); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 3805:8-12 ("Q. Am I correct, Mr. Donziger, that the plaintiffs' team had a nickname for Mr. Cabrera? He was called Wao, correct? A. Yes."); *id.* at 4327:15-20. | **Donziger:** Disputed. Donziger incorporates St. 60.<br><br>**LAPs:** Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. Moreover, Chevron previously submitted this same evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 134). Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion. | Undisputed. Defendants do not dispute the content of Yanza's email to Donziger regarding using "our secret account, to give [money] to Wuao [Cabrera], [to] not stop work." Dkt. 356-9 (Ex. S) (DONZ-HDD-0125080).<br><br>*See* Chevron's Reply to Sts. 59 and 60. |
| 62. Donziger knows of no purpose for this account other than to pay Cabrera. Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 4414:16-4415:3 (Donziger testi- | **Donziger:** Disputed. Chevron mischaracterizes Donziger's deposition testimony. Donziger testified that he knew there was a second account that Yanza kept. He testified that he did not have | Undisputed. Defendants do not dispute that Donziger knows of no other purpose for the secret account other than to pay Cabrera. Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 4414:16-4415:3 ("Q. And what other funds |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| fying that he is aware of no purpose of the secret account besides payments to Cabrera). | signatory authority over the account, and that he did not know whether the account was established for the purpose of paying Cabrera. Dkt. No. 400-1 (Ex. 2010) at 4414:10-4415:15.<br><br>**LAPs:** Defendants incorporate Donziger Defendants' response to this purported fact. | went through the secret account other than monies to pay for Mr. Cabrera's work? A. I don't know. Q. Was the secret account established for the purpose of being able to transmit funds to pay Mr. Cabrera? A. I don't know. Q. Do you know of any other purpose for which this secret account was established? A. Not that I can recall.").<br><br>*See* Chevron's Reply to Sts. 59 and 60. |
| 63. On August 15, 2007 and again on September 14, 2007, acting on Donziger's instructions, Kohn Swift & Graf wired $50,000 from the United States to the "secret account." Dkt. 400-3 (Ex. 2025) (list of total distributions from Chevron Litigation Fund reveals payments of $50,000 to Frente de Defensa de la Amazonia on Aug. 15, 2007 and Sept. 14, 2007) at 1-2; Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 4848:11-4849:11 ("Q. Let's actually turn to page 3, where you say at the bottom 'Joe, please transfer 50,000 to the following account in Ecuador. If you have any questions please call.' Do you see that? A. Yes. Q. And then you provide the information for the account that Mr. Yanza calls the secret account. Do you see that? A. Yes."); Stavers Decl., Ex. 3130 (Dahlberg Declaration), ¶ 12. | **Donziger:** Donziger does not dispute that Kohn, Swift transferred funds on August 15, 2007 and September 14, 2007 to the account ending in 98-00.<br><br>**LAPs:** Defendants incorporate Donziger Defendants' response to this purported fact. | Undisputed. |
| 64. The LAP team made payments that were not disclosed to either the Ecuadorian court or Chevron to Cabrera from the "secret account." *Compare* St. 63 *with* Dkts. 35-2-35-7 (Filings by P. Fajardo in the Lago Agrio Litigation relating to payments to R. Cabrera). | **Donziger:** Disputed. Even taking Chevron's purported undisputed facts at face value, this assertion is unsupported. St. 63 does not provide any evidence of any payments to Cabrera or, in fact, any money flowing out of the second account at all. All that Chevron even attempts to establish in St. 63 is that funds were deposited into the second account. Chevron has cited absolutely no evidence regarding where funds from the second account went. In fact, Chevron's own witness admits that "the documents available to me do not include the financial information necessary to determine | Undisputed. Defendants cannot dispute that the LAP team made payments to Cabrera from the "secret account." *E.g.,* Dkt. 356-9 (Ex. S) (DONZ-HDD-0125080 (September 12, 2007 email from Yanza to Donziger warning that the Global Assessment could be stopped "because Novillo is taking so long . . . to issue an order on Wao's request that we pay him to cover the costs of the field work." Yanza asks Donziger to "explain this situation" to Kohn so that Kohn will transfer $50,000 to "our secret account" "*using the same mechanism from weeks ago, that is, he sends us money to our secret account, to give to Wuao,* [to] not stop the |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | which bank accounts funds originated from, to which bank accounts the funds were directed, whether the funds were in fact transferred, the nature and purpose of the transfers, or the final disposition of the funds distributed to various bank accounts." Dkt. 754-17 ¶ 6.<br><br>In fact, the documents to which Chevron cites raises the possibility that funds paid into the second account might have been subsequently transferred to another account, including the Selva Viva account from which Cabrera was paid.  *See* Dkt. 356-9 at 210 (9/12/2007 e-mail from Yanza to Donziger suggesting that Kohn could send $50,000 to the second account "and then we could pass the 20 to [Selva Viva] to save time and paperwork.").<br><br>**LAPs:**  Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact. | work") (emphasis added).  Defendants do not cite any evidence showing that these payments to Cabrera via their secret account were disclosed to the Ecuadorian court, and they do not point to any court-approved payments in addition to those cited at Dkts. 35-2 to 35-7.<br><br>*See* Sts. 59 and 60 and Chevron's Replies thereto. |
| 65. The Lago Agrio court authorized the LAPs to pay Cabrera a total of $271,814.  *See* Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 4863:17-4864-8 (Discussion of court-authorized payments to R. Cabrera). | **Donziger:**  Disputed.  The portions of the deposition transcript to which Chevron cites do not come close to establishing any amount authorized for Cabrera.  Donziger and Ms. Neuman discussed Exhibit 1816, which Ms. Neuman represented was "a collection of six checks that plaintiffs submitted to the Lago Agrio court for payment to be provided by the court to Cabrera."  Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 4862:17-23.  Donziger agreed that, between June 2007 and May 2008, "per exhibit 1816," Cabrera was paid whatever the sum total of the checks in Exhibit 1816 was.  *Id.* at 4863:25-4864:6.  Chevron has made no representation that Exhibit 1816 contained the <u>only</u> authorized payments to Cabrera.<br><br>**LAPs:**  Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact. | Undisputed.  Defendants do not dispute that the Lago Agrio court authorized the LAPs to pay Cabrera $271,814, and they do not cite any evidence to rebut the accuracy of this amount.  *See* Dkt. 754-17 (Ex. 3130 (Dahlberg Decl.)), ¶ 14.  Defendants also do not identify any other payments to Cabrera that were authorized by the Lago Agrio court.<br><br>*See* Chevron's Reply to St. 64. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| 66. The Lago Agrio court records include copies of checks from the LAPs to Cabrera totaling $263,899, all drawn on a Banco Pichincha account bearing account number ending 4450-04 and all paid to Cabrera after the court authorized his requests for payment. *See* Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 4863:17-4864:8 (Discussion of court-authorized payments to R. Cabrera); *id.* at 4865:23-4869:16 (Testimony regarding process for court-authorized payments to R. Cabrera); Stavers Decl. Ex. 3130 (Dahlberg Decl.), ¶ 8, Exs. A & B. | **Donziger:** Disputed.  Chevron is careful to say that court records "include" copies of certain checks.  Chevron never represents that these are the *only* payments reflected in court records.  Further, Donziger's deposition testimony does not establish what was or was not the process for payments to Cabrera.  During his deposition, Donziger did not agree that the procedures Ms. Neuman, Chevron's counsel described, were "the court procedures for paying Cabrera," as Chevron states.  Rather, Donziger testified that the procedure the questioner described was the process for particular identified payments to Cabrera. Dkt. No. 400-1 (Ex. 2010) at 4869:6-23. Donziger also testified that he did not have a specific recollection of payments from the second account, but that he would not characterize payments from the second account as outside the court process. *Id.* at 4870:8-18.<br><br>Additionally, the documents to which Chevron cites raises the possibility that funds paid into the second account might have been subsequently transferred to another account, including the Selva Viva account from which Cabrera was paid. *See* Dkt. 356-9 at 210 (9/12/2007 e-mail from Yanza to Donziger suggesting that Kohn could send $50,000 to the second account "and then we could pass the 20 to [Selva Viva] to save time and paperwork.").<br><br>**LAPs:** Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact. | Undisputed.  Defendants do not dispute that the Lago Agrio court record includes copies of checks from the LAPs to Cabrera totaling $263,899 from Banco Pinchincha account number ending in 4450-04 and all paid to Cabrera after the court authorized Cabrera's requests for payment. *See* Dkt. 754-17 (Ex. 3130 (Dahlberg Decl.)), ¶¶ 8, 14.  Defendants do not identify any other payments to Cabrera that were authorized by the Lago Agrio court, and nothing in Defendants' response is contrary to Chevron's statement of fact.<br><br>*See* Chevron's Reply to St. 64. |
| 67. The LAPs have admitted that they made payments to Cabrera that were not authorized by the Lago Agrio court, but told the United States District Court for the Southern District of Florida that these payments were made "in the amount of his request made to the court so that his work would not 'stop' while Cabrera's | **Donziger:** Disputed.  Chevron grossly mischaracterizes the Ecuadorian Plaintiffs' filing.  There was no "admission" of any unauthorized payment.  Rather, in the cited filing, the Ecuadorian Plaintiffs explained that "Cabrera had requested an order from the Ecuadorian trial judge requiring payment for this field work, but the judge had not yet signed the order because he had a number of | Undisputed.  Chevron's separate statement accurately describes the LAPs' filing.  Indeed, the additional language Defendants cite supports Chevron's statement.  The relevant quote from the cited LAP filing reads in full as follows:  "Cabrera had requested an order from the Ecuadorian trial judge requiring payment for this field work, but the judge had not yet signed the order because he had a number of other motions and requests |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| payment request sat on the judge's desk." Stavers Decl., Ex. 3121 (2011.06.26 Ecuadorian Plaintiffs' Objection to Order and Recommendation) at 8-9. | other motions and requests that Ecuadorian law required him to decide first, because they were filed before Cabrera's request." Dkt. 754-8 (Ex. 3121) at 3 (p. 8 of filing).<br><br>Chevron also fails to identify any particular "unauthorized" payment. Chevron would have this Court infer that unidentified payments were made to Cabrera, but Chevron has failed to provide any evidence that actually corroborates this assertion. The best Chevron can do is point to deposits in an account other than the Selva Viva account. The leap from this simple fact to a host of additional unspecified payments to Cabrera is far too great to make on summary judgment. Chevron's own evidence suggests that funds paid into the second account were transferred elsewhere – including to the Selva Viva account used to pay Cabrera, or used for other purposes. *See* Dkt. 356-9 at 210 (9/12/2007 e-mail from Yanza to Donziger suggesting that Kohn could send $50,000 to the second account "and then we could pass the 20 to [Selva Viva] to save time and paperwork."). Further, Dahlberg admits that "the documents available to me do not include the financial information necessary to determine which bank accounts funds originated from, to which bank accounts the funds were directed, whether the funds were in fact transferred, the nature and purpose of the transfers, or the final disposition of the funds distributed to various bank accounts." Dkt. 754-17 ¶ 6.<br><br>**LAPs:** Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | that Ecuadorian law required him to decide first, because they were filed before Cabrera's request. The Ecuadorian Plaintiffs' counsel paid Cabrera in the amount of his request made to the court so that his work would not 'stop' while Cabrera's payment request sat on the judge's desk." Dkt. 754-8 (Ex. 3121) at 8 (citation omitted).<br><br>The LAPs therefore admitted in the cited filing that "[t]he Ecuadorian Plaintiffs' counsel paid Cabrera *before* the Lago Agrio court signed the order authorizing payment. That is a payment "not authorized" by the court. Moreover, when the Lago Agrio court later issued the authorization, the LAPs paid Cabrera again (*see* Dkt. 754-17 (Ex. 3130) at 51 of 116), and the Defendants do not claim that Cabrera ever paid the LAPs back for the initial payment. |
| 68. Cabrera never reimbursed the LAPs for the payments they made to him. Stavers Decl., Ex. 3121 (2011.06.26 Ecuadorian Plaintiffs' Objection to Order and Recommendation) at 8-9. | **Donziger:** Disputed. The Ecuadorian Plaintiffs' filing to which Chevron cites does not discuss any lack of "reimbursement." *See* Dkt. 754-8 (Ex. 3121) at 3 (p. 8 of filing). Further, this Court should not be distracted by Chevron's invention of an imaginary need for "reimbursement." Chevron has not identified any pay- | Undisputed. Defendants do not dispute that Cabrera never reimbursed the LAPs for the payments they made to him, and they cite no evidence showing that reimbursement was made.<br><br>Furthermore, the LAP team's payment to Cabrera outside the court- |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | ment for which the Ecuadorian Plaintiffs should have been "reimbursed." Instead, Chevron would have this Court infer that some unidentified payment took place.<br><br>**LAPs:** Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | approved process is not "imaginary." In the cited LAP filing, they state, "The Ecuadorian Plaintiffs' counsel paid Cabrera in the amount of his request made to the court so that his work would not 'stop' while Cabrera's payment request sat on the judge's desk." Dkt. 754-8 (Ex. 3121) at 8 (citation omitted). The LAPs have therefore admitted that they "paid Cabrera" *before* the Lago Agrio court signed the order authorizing payment.<br><br>The Lago Agrio court authorized $271,814 in payments to Cabrera, and the LAPs submitted $263,899 in payments through an account at Banco Pichincha bearing an account number ending in 4450-04 ("the Selva Viva Account"). Sts. 65, 66. In 2007 and 2008, every court authorization for payment to Cabrera was matched by LAPs payments from the Selva Viva Account, and there is no evidence that Cabrera reimbursed the LAPs for the supposed "advances." Dkt. 754-17 (Ex. 3130 (Dahlberg Decl.)), ¶ 14. Furthermore, at the time the LAPs were "urgently" requesting Kohn to transfer $100,000 into the "secret account," Cabrera's outstanding request was for only $47,000. *Id.* at CVX-RICO-0509542. And when the court approved that $47,000 request, the LAPs paid it in full within a week from the Selva Viva Account. *Id.*<br><br>*See* Chevron's Reply to St. 64. |
| 69. As this Court has already found, the Cabrera Report "was not entirely or even predominantly [Cabrera's] own work or that of any assistants or consultants working only for him. There is no genuine issue with respect to the facts that the LAP team secretly prepared his work plan, worked closely with him in carrying it out, and drafted most of the report and its annexes." | **Donziger:** Disputed.[1] It is impossible for Donziger to respond to Chevron's assertion because it is far from clear what purportedly undisputed fact Chevron is even attempting to submit here. Virtually every "citation" that follows Chevron's quotation of this Court's prior statement contains argument and mischaracterization of the actual evidence, all of which is improper in a 56.1 statement. | Undisputed. Defendants do not dispute that the LAPs' lawyers and consultants drafted Cabrera's work plan, Cabrera's summary report, and the documents that Cabrera filed as annexes thereto. *See* Stavers Decl., Ex. 3652 (Beltman Witness St.), ¶¶ 20-31; Stavers Decl., Ex. 3653 (Maest Witness St.), ¶¶ 30-31.<br><br>The LAPs' assertions with respect to theoretical contacts are irrelevant, |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| Dkt. 550 at 90; *see also* Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 2165:2-6 ("Q. Did the plaintiffs' team draft the Cabrera work plan? A. I believe the plaintiffs' team drafted a work plan that was given to him for his adoption."), 2184:3-2186:4; Dkt. 8-9 at 2203:4-17 (the LAPs' counsel and consultants wrote Cabrera's work plan); Dkt. 6-2 (Exhibit 1) at CRS-189-00-CLIP-02; Dkt. 7-4 (Exhibit 2 (certified transcripts)) at 223-27 (Donziger proposed forming a "work committee" to draft Cabrera's "work plan" with the goal of having "more or less eighty percent-ninety percent on the way to a plan" in a few days); Dkt. 400-4 (Ex. 2043) (DONZ00038727) at 1 (Fajardo emailing Donziger); *see also id.* at 3-4 (LAP-drafted chart entitled "Expert Examination Activity Plan" with members of the LAPs' team noted as the individuals responsible for various activities); id. at 5-6 (LAP-drafted document entitled "Final Plan from the Global Expert Examination" containing an outline of tasks to be performed for Cabrera's global examination); Dkt. 400-4 (Ex. 2044) (LAPs' team drafted Cabrera's work plan); Dkt. at 8-9 at 2177:8-2178:15; 2165:2-2166:23; 2406:7-11 (Donziger testified that the LAPs' team was involved in "putting together Cabrera's work team."); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 2247:2-20 (Donziger testifies that individuals from Stratus and the LAP legal team met with Cabrera in January 2008 where they discussed that "Stratus individuals would draft materials that would be given to Mr. Cabrera for his hoped-for adoption in his report" and that Cabrera "seemed open" to accepting a report drafted by Stratus); Dkt. 400-16 (Ex. 2105) (2011.06.30 McMenamin Report) ¶¶ 3, 9(a); Dkt. 33-2 (STRATUS- | The following are but a few examples of evidence that refute Chevron's spin on the actually undisputed evidence in this case:

&bull; Ecuadorian law did not prohibit parties from making contact with court-appointed experts prior to the issuance of the expert's report.

&bull; The Lago Agrio Court authorized the parties to communicate with Cabrera and provide him information. Dkt. 557-5 (Young Decl. Ex. 29) at 16-18; Dkt. 613-13 (Werdegar Decl. Ex. M) at 10 ("[T]he parties may submit to the expert whatever documentation they believe may be useful in preparing his report."). The Lago Agrio Court ordered that materials submitted by Chevron "be delivered directly to the expert, its addressee." *Id.*

&bull; Chevron has chosen not to dispute the scientific validity of the conclusions in the Cabrera report.

Chevron made the exact same argument, and cited the same evidence, in its prior motion for summary judgment on Count Eight.

Donziger hereby incorporates by reference Donziger's prior responses to Chevron's alleged undisputed facts nos. 42, 44, 29, 45, 48, 67, 81, 55, and 58. Dkt. 614.

¹   *See* note 6, *supra.*

**LAPs:** Disputed. Defendants incorporate Donziger Defendants' response to this purported fact | and Defendants do not suggest or provide any evidence that Ecuadorian law permitted the LAPs to secretly author Cabrera's work plan, report, or annexes.

*See* Chevron's Response to Defendants' Counter Sts. 347-350 regarding the propriety of the LAPs' contacts with Cabrera.

*See* Chevron's Reply to St. 51 regarding "provid[ing]" Cabrera with "information."

Defendants falsely claim that "Chevron has chosen not to dispute the scientific validity of the conclusions in the Cabrera report." In the Lago Agrio litigation, Chevron repeatedly disputed the scientific validity of the Cabrera Report. However, as Defendants are aware, "Chevron does not intend here to relitigate the environmental conditions existing in the Oriente or the relative, substantive merit of scientists' expert opinions on that subject. In that regard the discrete inquiry here will be whether the judgment's findings have any support untainted by fraud in the record that existed before the Ecuadorian court at the time the judgment was issued." Dkt. 720 at 2. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| NATIVE043232-33) (2008.02.22 email from Beltman to Stratus employees telling his team that they will draft the Cabrera Report: "The project is at a key point right now. We have to write, over the next 2 to 3 weeks, probably the single most important technical document for the case. . . . We (the case attorneys, the case team in Quito, and Stratus) have put together a very ambitious outline for this report. The people in the Quito office are working on some parts, and we're working on others."); Dkt. 32-20 (STRATUS-NATIVE043857-58) at 11 (the LAPs' agents outlining how they would "attribute" the annexes they were drafting to Cabrera); Dkt. 34-7 (STRATUS-NATIVE063676) (Beltman emailing Donziger regarding the fact that Powers' name needed to be taken off his report before it was filed as an annex to the Cabrera Report); Dkt. 402-2 (Ex. 2217) ¶ 1 (2007.11.14 Fajardo email to Cristobal Villao: "For legal reasons, in the first part, the paragraph which states who hired you to carry out the study is to be omitted"); Dkt. 33-7 (STRATUS-NATIVE069116) at 2 (Beltman: "Here is the Uhl report, cleaned and sanitized."); Dkt. 402-15 (Ex. 2328) (VU0000037) (Letter from UBR providing "a summary outline of a scope of work and cost estimate for the development of a preliminary analysis of potential costs for the provisions of potable water to the residents of two provinces in the Amazon Region of Ecuador"); Dkt. 402-2 (Ex. 2228) (VU0000039) ("This letter will serve as our agreement to retain Uhl, Baron, Rana & Associates, Inc."); Dkt. 402-9 (Ex. 2267) (Uhl Dep. Tr.) at 68:12-69:16 (Vincent Uhl testifying that UBR was retained by Kohn, Swift & Graf "to do the water project in Ecuador"); Dkt. 402-2 (Ex. | | |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| 2228) (VU00000039); Dkt. 402-2 (Ex. 2229) (VU00000063) at 1; Dkt. 402-2 (Ex. 2230) (VU00000122) at 1; Dkt. 402-3 (Ex. 2231) (VU00000136) at 1; Dkt. 402-3 (Ex. 2232) (VU00000150) at 1-3; Dkt. 402-9 (Ex. 2228) (VU00000039); Dkt. 402-9 (Ex. 2267) (Uhl Dep. Tr.) at 27:11-17; Dkt. 402-2 (Ex. 2217) ¶ 1 (2007.11.14 Fajardo email to Cristobal Villao stating: "For legal reasons, in the first part, the paragraph which states who hired you to carry out the study is to be omitted"); *id.* ¶ 5 ("Also for legal reasons, it's necessary to make all working dates to appear as recorded before July 31 or after August 16. This means that between August 1 and August 16, no date in which field work has been carried out should appear."); Dkt. 402-13 (Ex. 2320) (UBR Report); *compare* Dkt. 402-3 (Ex. 2231) (VU00000136) (draft from UBR recommending groundwater study) *with* Dkt. 402-9 (Ex. 2269) (Cabrera Report, Annex R) (containing no recommendation for groundwater study); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 2325:3-2326:2 (Donziger testifying that Mr. Villao of UBR prepared a potable water systems report that was attached to the Cabrera Report as an annex); Dkt. 33-7 (STRATUSNATIVE069117) at 2 (Belt-man sending the Uhl potable water report to Donziger on March 6, 2008 stating, "Here is the Uhl report, cleaned and sanitized."); Dkt. 402-9 (Ex. 2267) (2011.04.19 Uhl Depo Morning Session) at 64:6-9 ("Q. To your knowledge has Mr. Villao ever communicated with Mr. Cabrera on the work that you did in Ecuador? A. To my knowledge he has not."); Dkt. 33-12 (Cabrera Report) at 2; Dkt. 402-15 (Ex. 2334) (Annex V); Dkt. 33-13 (Cabrera Report); Dkt. 400-4 (Ex. | | |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| 2046) (DONZ00083815) at 1-2 (Internal memo: "The Cabrera Report is a series of 17 annexes; in all, 11 of them were prepared by Stratus and adopted by Cabrera."); Dkt. 356-10 (DONZ-HDD-0004621) at 83 (Donziger: if Chevron obtained discovery from Stratus, "they will find that Stratus wrote the bulk of the report adopted by Cabrera and submitted to the court."); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 3400:7-9 (Donziger: "Stratus had drafted a substantial number of annexes that were adopted by [Cabrera] verbatim that were included in his report."); Dkt. 47-55 (DONZ00031368) at 1-3 (the LAPs' counsel: "we do better by explaining that we authored the report," "we authored portions of the report," "[we do not benefit by] denying what is already apparent (that we authored portions of the report)"); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 2377:21-2378:9 (Donziger: Stratus drafted "an actual report with annexes in Cabrera's name"); Dkt. 8-9 at 2253:5-11 (Donziger agreed that "the general idea" was "that Stratus would draft the report in a form that it could be submitted directly to the Ecuadorian court by Mr. Cabrera"); Dkt. 32-16 (STRATUSNATIVE043270-043278) (Stratus contracted with Kohn, Swift & Graf to write Cabrera Report); Dkt. 32-17 (STRATUS-NATIVE066482-066484) (same); Dkt. 32-18 (DONZ00026949) (same); Dkt. 32-12 (DONZ00062680)) at 1; Dkt. 8-9 at 2433:8-14 (Donziger: Cabrera Report as filed was "pretty much verbatim" as written by the LAPs' counsel and consultants; Dkt. 6-2 (Exhibit 1) at CRS-191-00-CLIP-03; Dkt. 7-5 (Exhibit 2 (certified transcripts)) at 245-46 (Fajardo: "And here is where we do want the support of our entire technical team . . . of experts, sci- | | |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| entists, attorneys, political scientists, so that all of us will contribute to that report—in other words—you see . . . the work isn't going to be the expert's. All of us bear the burden."); Dkt. 32-13 (DONZ00061973) at 1 (2007.03.28 to 2007.04.03 email exchange in which David Chapman (Stratus) states: "I think the way this would work best is that if Stratus did much of the work, putting the pieces together and writing the report."); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 2165:2-6 ("Q. Did the plaintiffs' team draft the Cabrera work plan? A. I believe the plaintiffs' team drafted a work plan that was given to him for his adoption."); Dkt. 8-9 at 2203:4-17 (the LAPs' counsel and consultants ghostwrote Cabrera's work plan, were involved in Cabrera's site selection, and suggested Cabrera's sampling protocols); Dkt. 6-2 (Exhibit 1) at CRS-269-01-04, 269-01-08); Dkt. 7-10 (Exhibit 2 (certified transcript)) at 355-62 (Donziger and Stratus discuss damages categories to include in Cabrera Report); Dkt. 33-2 (2008.02.22 email from Beltman to Stratus employees) (STRATUS-NATIVE043232) (Beltman: "We have to write, over the next 2 to 3 weeks, probably the single most important technical document for the case."); Dkt. 32-19 (email from Beltman to Donziger attaching draft copy of "Outline for PG Report"); Dkt. 32-20 (STRATUS-NATIVE043849) at 1 (Beltman: "The summary Peritaje Global report (~50 pages). This is what I will be working on mostly, and it will take most of my time over the next two weeks."); id. (STRATUS-NATIVE043854-STRATUS-NATIVE043859) at 6-11 (plan for attributing authorship to Cabrera and others); Dkt. 33-4 at 1 (Beltman: "Attached is my rough start of the Peritaje Global re- | | |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| port. . . . Would you let me know if you think I'm on track in terms of tone, language level, and content?"; Dkt. 33-5 (Powers Dep. Tr.) at 95:14-22, 109:2-7, 251:4-253:1, 255:5-256:13 (LAP expert Bill Powers testifying that a "similar" version of a report he prepared and emailed to Stratus was filed as Annex S of the Cabrera Report and that calculations he prepared were incorporated into Annex T of the Cabrera Report); Dkt. 34-7 (STRATUSNATIVE063676) at 1 (Beltman emailing Donziger regarding the fact that Powers' name needed to be taken off his report before it was filed as an annex to the Cabrera Report); Dkt. 53-6 (STRATUS-NATIVE063142) (Beltman emailing Ecuadorian counsel and Donziger revisions to the Cabrera Report less than one week before it was filed); Dkt. 104-2 (STRATUSNATIVE069123-24) at 1-2 (Donziger asking Beltman for feedback regarding the damages tables for the Cabrera Report on March 30, 2008, less than 36 hours before the Cabrera Report was filed); Dkt. 53-8 (2008.04.01 email from Ann Maest to Beltman attaching Cabrera's Declaration Of Findings"); Dkt. 355-42 (DONZ00045505) at 1 (2008.04.01 email from "gringograndote@ gmail.com" to Donziger attaching a Word version of the Cabrera Report identical to filed version and last saved hours before the Cabrera Report was filed in Ecuador); Dkt. 355-43 (DONZ00045506) at 1-62 (2008.04.01 email from "gringograndote@gmail.com" to Donziger attaching a Word version of the Cabrera Report identical to filed version and last saved hours before the Cabrera Report was filed in Ecuador) at 1-62; Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 5014:22-5016:7 (same); *id.* at 2490:12-18; Dkt. 33-3 (STRATUS- | | |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| NATIVE053742) (Beltman "My goal is to have the entire report drafted by COB Tuesday. Based on how things are going, our current translators will take more than a week to turn it around . . . And [sic] that's not much time before it has to go to the court on Monday."); *see also* Dkt. 32-20 (STRATUSNATIVE043849) at 1; Dkt. 32-21; Dkt. 33-10 (STRATUS-NATIVE058388 – 419) at 1 (email from Beltman to translators attaching a draft of the Cabrera Summary Report in English and requesting that it be translated into Spanish for the upcoming submission to the Ecuadorian court); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 2962:9-2963:23 (Donziger testifying: "I believe Stratus prepared the [November report] materials in the hope that [Cabrera] would adopt them, sort of how they did the with annexes and executive summary."); Dkt. 400-16 (Ex. 2105) (McMenamin Report) at 1, 28; Dkt. 400-4 (Ex. 2046) (DONZ00083815) at 1-2 (Internal memo admitting, "The Cabrera Report is a series of 17 annexes; in all, 11 of them were prepared by Stratus and adopted by Cabrera."); Dkt. 400-4 (Ex. 2047) (DONZ-HDD-0004621) at 1-2 (Donziger admitting that if Chevron's attorneys obtained discovery, "they will find that Stratus wrote the bulk of the report adopted by Cabrera and submitted to the court."); Dkt. 47-55 (DONZ00031368) at 1, 3 (email exchange between the LAPs' counsel, noting "we do better by explaining that we authored the report," discussing a need "to acknowledge that we authored portions of the report," and emphasizing that they would not benefit from "denying what is already apparent (that we authored portions of the report)"); Dkt. 400-1 (Ex. 2010) | | |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| (Donziger Dep. Tr.) at 2377:21-2378:9 (Donziger testifies that Stratus drafted "an actual report with annexes in Cabrera's name"); *id.* at 3400:3-9 (Donziger testifies that, as of March 2010, he knew that "Stratus had drafted a substantial number of annexes that were adopted by [Cabrera] verbatim that were included in his report"); Dkt. 47-55 (DONZ00031368) at 1 (the LAPs' counsel: "I wonder whether we do better by explaining that we authored the report rather than letting Chevron tell that story like Nancy Drew."); Dkt. 46-2 ¶ 24 (Declaration of Michael F. McGowan concluding that the "text of the 'INFORME SUMARIO VERSION FINAL(Steve).doc' document attached to the Gringograndote Email and the Forwarding Email is identical to text of the report filed by Richard Cabrera on April 1, 2008."); *id.* ¶ 27 (providing last saved and print times); Dkt. 355-42(DONZ00045505) and Dkt. 355-43 (DONZ00045506) (email from "gringograndote@gmail.com" to Donziger attaching a Word version of the Cabrera Report that according to the metadata was last saved mere hours before the Cabrera Report was filed in Ecuador and that is identical to the filed version of the Report); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 5014:22-5016:7 (Donziger testifying regarding having in his possession a Word version of the Cabrera Report before the Report was filed in Ecuador). | | |
| 70.     Maest assisted Beltman with the Cabrera Report and made at least two trips to Ecuador, where she coordinated the LAP team's work on the Cabrera Report. Dkt. 6-2 (Exhibit 1), CRS-187-01-02 (2007.03.03 Crude outtake video clip of meeting at | **Donziger:**  Disputed.  All that the cited evidence establishes is that Maest was in Ecuador on March 3, 2007 and January 2008.  <br><br>**LAPs:**  Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact. | Undisputed.  Defendants do not dispute the substance of Chevron's statement, that Maest assisted Beltman with the Cabrera Report and made trips to Ecuador to coordinate the LAP team's work on the report.  *See* Stavers Decl., Ex. 3652 (Beltman Witness St.), ¶¶ 6, 14, 22, 25; Stavers Decl., Ex. 3653 (Maest Witness St.), ¶¶ 5, 26, 30.  The evidence cited by Chevron |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| Selva Viva headquarters among S. Donziger, P. Fajardo, L. Yanza, A. Maest, R. Kamp, C. Champ, R. Cabrera, and others); Dkt. 7-2 – 7-4 (Exhibit 2) (certified transcript) at 169-214; Dkt. 8-9 (Exhibit 6) (Donziger Dep. Tr.) at 2243:7-10, 2245:2-10 (testifying that members of the LAP team, including Maest, met with Cabrera in Ecuador in January 2008); Dkt. 356-9 (Exhibit N) (2011.01.19 Deposition of Ann S. Maest, *Chevron Corp. v. Stratus Consulting, Inc.*, No. 1:10-cv-00047-MSK-MEH (D.Colo.) ("2011.01.19 Maest Dep.")) at 115:14-24 (testifying that this meeting was held at a private home, and not at the LAP team's offices in Quito, in order to keep the meeting a secret). | | supports the statement of fact and Defendants do not cite any evidence to the contrary. |
| 71.    The LAP team revised the Cabrera Report until hours before Cabrera filed it under his own name.  St. 69; Dkt. 104-2 (STRATUS-NATIVE069123-24) at 1-2 (Donziger asking Beltman for feedback regarding the damages tables for the Cabrera Report on March 30, 2008, less than 36 hours before the Cabrera Report was filed); Dkt. 53-8 (2008.04.01 email from Ann Maest to Beltman attaching Cabrera's Declaration Of Findings"); Dkt. 355-42 (DONZ00045505) at 1 (2008.04.01 email from "gringograndote@gmail.com" to Donziger attaching a Word version of the Cabrera Report identical to filed version and last saved hours be-fore the Cabrera Report was filed in Ecuador); Dkt. 46-2 ¶ 24 ((Declaration of Michael F. McGowan concluding that the "text of the 'INFORME SUMARIO VERSION FINAL(Steve).doc' document attached to the Gringograndote Email and the Forwarding Email is identical to text of the report filed by Richard Cabrera | **Donziger:**  Disputed.  Chevron itself has declined to produce certain document creation date related metadata in discovery for its own documents in Donziger on grounds that the data is not necessarily accurate.  Dkt. 613 (Werdegar Decl.) at ¶ 18.<br><br>Donziger further disputes Chevron's insinuation that the Ecuadorian Plaintiffs' communication with, and provision of materials to, Cabrera was improper.  Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts.  In fact, such contacts were common practice.  *See* Donziger 56.1(b) Statement, Fact Nos. 167-169.  Similarly, Ecuadorian law permits experts to interact and coordinate with parties.  Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties."  Dkt. 614 (Donziger 56.1(b) Statement) Fact No. 168.  In fact, it was understood in Ecuador that court appointed experts could rely on party resources.  *Id. See also* Ecuadorian Plaintiffs' response to St. 36. | Undisputed.  Defendants do not dispute that the LAP team revised the Cabrera Report until hours before it was filed.  Indeed, Beltman has recently provided further corroboration for this statement of fact.  Stavers Decl., Ex. 3652 (Beltman Witness St.), ¶ 24 ("I continued to provide comments on and material for the Summary Report and annexes to Donziger and the LAPs' team members in Quito up to the night of March 30, 2008, when I provided comments to Donziger on a draft damages table for the Summary Report that I had received from him.").<br><br>Defendants also do not dispute the accuracy of the metadata in the cited documents and do not offer any basis why it should not be relied upon in this instance.  The Chevron statement regarding metadata cited by Donziger was part of a discussion about Chevron's systems, not Donziger's systems or metadata generally.  Dkt. 613 (Werdegar Decl.), ¶ 18.<br><br>*See* Chevron's Reply to St. 51 regarding "provision of materials" to Cabrera. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| on April 1, 2008."); *id.* ¶ 27 (providing last saved and print times); Dkt. 355-42 (DONZ0045505) and Dkt. 355-43 (DONZ00045506) (email from "gringogradote@gmail.com" to Donziger attaching a Word version of the Cabrera Report that according to the metadata was last saved mere hours before the Cabrera Report was filed in Ecuador and that is identical to the filed version of the Report); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 5014:22-5016:7 (Donziger testifying regarding having in his possession a Word version of the Cabrera Report before the Report was filed in Ecuador). | **LAPs:** Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | *See* Chevron's Response to Defendants' Counter Sts. 347-350 regarding the propriety of the LAPs' contacts with Cabrera. |
| 72.      Donziger has admitted that he does not know if Cabrera read the report before he submitted it to the Lago Agrio court under his own name. Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 2249:3-12, 2590:20-2591:22 (Donziger testifying he does not know whether Cabrera drafted any portion of his report or whether he even reviewed it before it was filed). | **Donziger:** Disputed. Chevron's characterization of Donziger's testimony as an "admission" is argumentative and improper in a 56.1 statement. Donziger testified that he did not know whether Cabrera drafted any of the report.<br><br>Further, this statement is immaterial. Chevron has submitted no evidence that Cabrera did not agree with and endorse the substance of his reports and other filings.<br><br>**LAPs:** Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | Undisputed. Defendants do not dispute that Donziger testified that he does not know if Cabrera read or considered the report before he submitted it to the Lago Agrio court. This statement is not argumentative or improper but is based directly on Donziger's testimony. Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) 2591:8-22 ("Q. Do you have any personal knowledge that Cabrera even read the plaintiff-drafted *peritaje* global report and annexes before he signed them? A. I don't know if he did or didn't. Q. So you have no personal knowledge that he ever actually considered the report before he signed it, correct? A. No.").<br><br>The statement is material. Despite the record of extensive contact between the LAPs and Cabrera, Defendants do not point to any evidence that the LAPs "advocated" anything to Cabrera, any evidence that Cabrera considered their submissions, or any communications in which Cabrera challenges, questions, or even acknowledges the LAPs' work product or data, or that Cabrera "endorse[d] the substance" of the report. All of the evidence shows beyond dispute that the LAPs first selected and then controlled Cabrera, *see, e.g.*, St. 42, 44-46, 69, 71, and Defendants do not offer any controverting evidence. Indeed, the undisputed evidence establishes that the LAP team, including their former consultants at Stratus, |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | | ghostwrote Cabrera's report, that no one on the LAP team was aware of any part of the Cabrera Report actually written by Cabrera or any supposed Cabrera "team," and that Donziger and the LAPs' agents worked on the Cabrera Report up until the time it was filed. Reply Sts. 69-81. |
| 73.     The Cabrera Report is dated March 24, 2008. Dkt. 33-12 (Cabrera Report). | **Donziger:**  Not disputed.<br><br>**LAPs:**  Not disputed. | Undisputed. |
| 74.     Richard Cabrera submitted the "Cabrera Report" to the Lago Agrio court on April 1, 2008.  Dkt. 33-12. | **Donziger:**  Disputed.  The Lago Agrio Court stamped the Cabrera Report as "received" on April 1, 2008. Dkt. 33-12.<br><br>**LAPs:**  Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact. Moreover, Chevron previously submitted this same evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 159.)  Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion. | Undisputed.  Defendants do not dispute that Cabrera submitted the Cabrera Report to the Lago Agrio court on April 1, 2008.  Indeed, that the Lago Agrio court stamped the Cabrera Report as "received" on April 1, 2008 supports Chevron's statement. |
| 75.     The Cabrera Report consists of a 50-page "Summary Report" followed by 17 annexes; Stratus wrote at least 11 of the annexes. Dkts. 33-12 – 33-18; 34-2 – 34-3 (Cabrera Report); Dkt. 400-4 (Ex. 2046) (DONZ00083815) at 1-2 (Internal memo admitting, "The Cabrera Report is a series of 17 annexes; in all, 11 of them were prepared by Stratus and adopted by Cabrera."); Dkt. 400-4 (Ex. 2047) (DONZ-HDD-0004621) at 1-2 (Donziger admitting that if Chevron's attorneys obtained discovery, "they will find that Stratus wrote the bulk of the report adopted by Cabrera and submitted to the court."); Dkt. 47-55 (DONZ00031368) at 1, 3 (email exchange between the | **Donziger:**  Disputed.  Donziger disputes Chevron's insinuation that the Ecuadorian Plaintiffs' communication with, and provision of materials to, Cabrera was improper.  Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts.  In fact, such contacts were common practice. *See* Dkt. 614 (Donziger 56.1(b) Statement) Fact Nos. 167-169.  Similarly, Ecuadorian law permits experts to interact and coordinate with parties.  Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties." Dkt. 614 (Donziger 56.1(b) Statement) Fact No. 168.  In fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614 (Donziger 56.1(b) Statement) Fact No. 168. | Undisputed.  Defendants do not dispute the substance of this statement.<br><br>*See* Chevron's Response to Defendants' Counter Sts. 347-350 regarding the propriety of the LAPs' contacts with Cabrera.<br><br>The statement is material.  Despite the record of extensive contact between the LAPs and Cabrera, Defendants do not point to any evidence that the LAPs "advocated" anything to Cabrera, any evidence that Cabrera considered their submissions, or any communications in which Cabrera challenges, questions, or even acknowledges the LAPs' work product or data, or that Cabrera "endorse[d] the substance" of the report.  All of the evidence shows beyond dispute that the LAPs first selected and then controlled Cabrera, *see, e.g.*, Sts. 42, 44-46, 69, 71, and Defendants do not |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| LAPs' counsel, noting "we do better by explaining that we authored the report," discussing a need "to acknowledge that we authored portions of the report," and emphasizing that they would not benefit from "denying what is already apparent (that we authored portions of the report)"); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 2377:21-2378:9 (Donziger testifies that Stratus drafted "an actual report with annexes in Cabrera's name"); *id.* at 3400:3-9 (Donziger testifies that, as of March 2010, he knew that "Stratus had drafted a substantial number of annexes that were adopted by [Cabrera] verbatim that were included in his report"); Dkt. 47-55 (DONZ00031368) (the LAPs' counsel: "I wonder whether we do better by explaining that we authored the report rather than letting Chevron tell that story like Nancy Drew."); Dkt. 8-9 at 2253:5-11 (Donziger agreed that "the general idea" was "that Stratus would draft the report in a form that it could be submitted directly to the Ecuadorian court by Mr. Cabrera"); Dkt. 32-16 (STRATUS-NATIVE043270-043278) (Stratus contracted with Kohn, Swift & Graf to write Cabrera Report); Dkt. 32-17 (STRATUSNATIVE066482-066484) (same); Dkt. 32-18 (DONZ00026949) (same); Dkt. 32-12 (DONZ00062680)) at 1; Dkt. 8-9 at 2433:8-14 (Donziger: Cabrera Report as filed was "pretty much verbatim" as written by the LAPs' counsel and consultants); Dkt. 6-2 (Exhibit 1) at CRS-191-00-CLIP-03; Dkt. 7-5 (Exhibit 2 (certified transcripts)) at 245-46 (Fajardo: "And here is where we do want the support of our entire technical team . . . of experts, scientists, attorneys, political scientists, so that all of us will contribute to that report—in other words—you see . . . the | Further, this assertion is not material. Chevron has submitted no evidence that Cabrera did not agree with and endorse the substance of his reports and other filings.

**LAPs:** Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.  Moreover, Chevron previously submitted substantially this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel.  (Dkt. 398, at Sts. 154-55.)  Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion. | offer any controverting evidence. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| work isn't going to be the expert's. All of us bear the burden."); Dkt. 32-13 (DONZ00061973) at 1 (2007.03.28 to 2007.04.03 email exchange in which David Chapman (Stratus) states: "I think the way this would work best is that if Stratus did much of the work, putting the pieces together and writing the report."); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 2165:2-6 ("Q. Did the plaintiffs' team draft the Cabrera work plan? A. I believe the plaintiffs' team drafted a work plan that was given to him for his adoption."); Dkt. 8-9 at 2203:4-17 (the LAPs' counsel and consultants ghostwrote Cabrera's work plan, were involved in Cabrera's site selection, and suggested Cabrera's sampling protocols); Dkt. 6-2 (Exhibit 1) at CRS-269-01-04, 269-01-08); Dkt. 7-10 (Exhibit 2 (certified transcript)) at 355-62 (Donziger and Stratus discuss damages categories to include in Cabrera Report); Dkt. 33-2 (2008.02.22 email from Beltman to Stratus employees) (STRATUS-NATIVE043232) (Beltman: "We have to write, over the next 2 to 3 weeks, probably the single most important technical document for the case."); Dkt. 32-19 (email from Beltman to Donziger attaching draft copy of "Outline for PG Report"); Dkt. 32-20 (STRATUS-NATIVE043849) at 1 (Beltman: "The summary Peritaje Global report (~50 pages). This is what I will be working on mostly, and it will take most of my time over the next two weeks."); *id.* (STRATUS-NATIVE043854-STRATUS-NATIVE043859) at 6-11 (plan for attributing authorship to Cabrera and others); Dkt. 33-4 at 1 (Beltman: "Attached is my rough start of the Peritaje Global report. . . . Would you let me know if you think I'm on track in terms of tone, language level, and content?"); | | |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| Dkt. 33-5 (Powers Dep. Tr.) at 95:14-22, 109:2-7, 251:4-253:1, 255:5-256:13 (LAP expert Bill Powers testifying that a "similar" version of a report he pre-pared and emailed to Stratus was filed as Annex S of the Cabrera Report and that calculations he prepared were incorporated into Annex T of the Cabrera Re-port); Dkt. 34-7 (STRATUS-NATIVE063676) at 1 (Beltman emailing Donziger regarding the fact that Powers' name needed to be taken off his report before it was filed as an annex to the Cabrera Report); Dkt. 53-6 (STRATUS-NATIVE063142) (Beltman emailing Ecuadorian counsel and Donziger revisions to the Cabrera Report less than one week before it was filed); Dkt. 104-2 (STRATUS-NATIVE069123-24) at 1-2 (Donziger asking Beltman for feedback regarding the damages tables for the Cabrera Report on March 30, 2008, less than 36 hours before the Cabrera Report was filed); Dkt. 53-8 (2008.04.01 email from Ann Maest to Beltman attaching Cabrera's Declaration Of Find-ings"); Dkt. 355-42 (DONZ00045505) at 1 (2008.04.01 email from "gringograndote@gmail.com" to Donziger attaching a Word version of the Cabrera Report identical to filed version and last saved hours before the Cabrera Report was filed in Ecuador); Dkt. 355-43 (DONZ00045506) at 1-62 (2008.04.01 email from "gringogran-dote@gmail.com" to Donziger at-taching a Word version of the Cabrera Report identical to filed version and last saved hours before the Cabrera Report was filed in Ecuador) at 1-62; Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 5014:22-5016:7 (same); *id.* at 2490:12-18; Dkt. 33-3 (STRATUSNATIVE053742) (Beltman "My goal is to have the entire report drafted by COB Tuesday. Based | | |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| on how things are going, our current translators will take more than a week to turn it around . . . And [sic] that's not much time before it has to go to the court on Monday."); *see also* Dkt. 32-20 (STRATUS-NATIVE043849) at 1; Dkt. 32-21; Dkt. 33-10 (STRATUSNATIVE058388– 419) at 1 (email from Beltman to translators attaching a draft of the Cabrera Summary Report in English and requesting that it be translated into Spanish for the upcoming submission to the Ecuadorian court). | | |
| 76.    Beltman was the primary drafter of the "Summary Report" portion of the Cabrera Report.  Dkt. 32-19 (email from Beltman to Donziger attaching draft copy of "Outline for PG Report"); Dkt. 32-20 (STRATUS-NATIVE043849) at 1 (Beltman: "The summary Peritaje Global report (~50 pages). This is what I will be working on mostly, and it will take most of my time over the next two weeks."); *id.* (STRATUS-NATIVE043854-STRATUS-NATIVE043859) at 6-11 (plan for attributing authorship to Cabrera and others); Dkt. 33-4 at 1 (Beltman: "Attached is my rough start of the Peritaje Global report. . . . Would you let me know if you think I'm on track in terms of tone, language level, and content?"); Dkt. 33-3 (STRATUSNATIVE053742) (Beltman "My goal is to have the entire report drafted by COB Tuesday. Based on how things are going, our current translators will take more than a week to turn it around . . . And [sic] that's not much time before it has to go to the court on Monday."); *see also* Dkt. 32-20 (STRATUS-NATIVE043849) at 1; Dkt. 32-21; Dkt. 33-10 (STRATUSNATIVE058388– 419) at 1 (email from | **Donziger:**  Disputed.  The evidence to which Chevron cites does not support the conclusions that Chevron draws, *e.g.* that Beltman was the "primary drafter" of anything.  This argument is improper in a 56.1 statement.

Donziger incorporates St. 75.

**LAPs:**  Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact. | Undisputed.  Defendants do not dispute that Beltman was the primary drafter of Cabrera's "Summary Report" and the evidence cited by Chevron clearly supports Chevron's statement.  Indeed, Beltman has recently confirmed that he drafted the summary report portion of the Cabrera Report.  Stavers Decl., Ex. 3652 (Beltman Witness St.), ¶ 23 ("I prepared the first draft of substantial parts of the document that would be filed in the Lago Agrio Litigation as the 'Summary Report of Expert Examination' 'By: Richard Stalin Cabrera Vega' on April 1, 2008, and dated March 24, 2008, as the Microsoft Word file 'PG.report.v1.doc.' I emailed my draft of a portion of the Summary Report to Donziger on February 27, 2008. That document and subsequent versions I prepared, with the assistance of other Stratus employees, were drafted in English, in Cabrera's voice, and state in the first sentence that '[t]his report was written by Richard Cabrera' to provide 'expert technical assistance to the Court' in the Lago Agrio Litigation. Later versions were dated March 24, 2008, which is the date I understood the Cabrera Report was to be filed. On March 12, 2008, I sent Stratus's English version of substantial parts of the Summary Report, a Word file named 'PGreport.v1.english.doc' for translation to Spanish. The Summary Report was not at that time complete; it still had notes and placeholders, including for information that would come from specific annexes that were still being completed."); *see also* Stavers Decl., Ex. 3653 (Maest Witness St.), ¶ 30. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| Beltman to translators attaching a draft of the Cabrera Summary Report in English and requesting that it be translated into Spanish for the upcoming submission to the Ecuadorian court). | | Chevron incorporates its Reply to St. 75. |
| 77.    The opening words of the Summary Report portion of the Cabrera Report are: "This report was prepared by the Expert Richard Stalin Cabrera Ve-ga[.]" Dkts. 33-12 – 33-18; 34-2 – 34-3 (Cabrera Report) at 1. | **Donziger:**  Not disputed.<br><br>**LAPs:**  Not disputed. | Undisputed. |
| 78.    As this Court has already found, the Cabrera Report "falsely, or, at least, deceptively, stated that it had been 'prepared by the Expert Richard Stalin Cabrera Vega' with the help of 'my technical team, which consists of impartial professionals.'"  *See* Sts. 69-72, 75-76; Dkt. 550 at 39; *see* Dkts. 33-12 – 33-18; 34-2 – 34-3 (Cabrera Report) at 1; *see also* Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 2249:3-12, 2590:20-2591:22 (Donziger testifying he does not know whether Cabrera drafted any portion of his report or whether he even reviewed it before it was filed); Dkt. 356-9 at 174-75 (Maest Dep. Tr.) at 53:25-54:4 (Maest testifying that she did not know whether Cabrera or a person identified as an independent member of Cabrera's team had actually drafted any portion of the Cabrera Report). | **Donziger:**  Disputed.[1]  Chevron's conclusion that the statement was "deceptive" is not proper in a 56.1 statement.<br><br>Donziger further disputes Chevron's insinuation that the Ecuadorian Plaintiffs' communication with, and provision of materials to, Cabrera was improper.  Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts.  In fact, such contacts were common practice.  *See* Dkt. 614 (Donziger 56.1(b) Statement) Fact Nos. 167-169.  Similarly, Ecuadorian law permits experts to interact and coordinate with parties.  Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties." Dkt. 614 (Donziger 56.1(b) Statement) Fact No. 168.  In fact, it was understood in Ecuador that court appointed experts could rely on party resources.  Dkt. 614 (Donziger 56.1(b) Statement) Fact No. 168.<br><br>Chevron's repeated invocation of terms like "independent" to accuse the defendants rests on a fundamental misapprehension of Ecuadorian law.  Ecuadorian law did not prohibit the parties from advocating their positions or urging the expert's agreement with and adoption of those positions.  Under Ecuadorian law, the expert's "independence" arises from his free reign to decide whether, | Undisputed.  Defendants do not provide any explanation or evidence to dispute this Court's conclusion regarding the quoted false, or at least deceptive, statements in the Cabrera Report.  Indeed, Beltman and Maest have recently corroborated this statement of fact.  Stavers Decl., Ex. 3652 (Beltman Witness St.), ¶ 16 ("At no time did I ever see any indication of an independent Cabrera 'team' nor did I ever meet anyone I understood to be a member of Cabrera's 'independent team.'  To the contrary, individuals that I am aware of who assisted in preparing the Cabrera Report were affiliated with or working at the direction of Donziger and the LAPs' representatives."); *id.* ¶ 17 ("At no point during Stratus's time working on the Ecuador Project, including at the January 2008 meeting, did I have an understanding that Cabrera was preparing his own report. It was clear from statements Donziger and others made that the LAPs' team expected the Lago Agrio court to rely upon the Cabrera Report in rendering its judgment. "); *see also* Stavers Decl., Ex. 3653 (Maest Witness St.), ¶ 28.<br><br>*See* Chevron's Reply to St. 51 regarding the LAPs' "provision of materials" to Cabrera.<br><br>*See* Chevron's Response to Defendants' Counter Sts. 347-350 regarding the propriety of the LAPs' contacts with Cabrera. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | in his professional judgment, he believes a party's position to be the correct one and to adopt whatever information is provided by a party as grounds for his opinions.  *See* Dkt, No. 154-5 ¶¶ 11-12, 18; Dkt. No. 154-6 ¶¶ 8-9.  There is substantial evidence already in the record that Ecuadorian law at the time did not prohibit parties from making contact with court-appointed experts prior to the issuance of the expert's report, including prior to the expert's formal appointment by the court.  *See* Dkt. No. 154-5 (Alencastro Aff.) ¶¶ 9-12, 19; Dkt. No. 154-6 (Simon Aff.) ¶¶ 4-5, 7-8.  *See also* Ecuadorian Plaintiffs' response to St.  36.<br><br>ᴶ   *See note D, supra.*<br><br>**LAPs:**  Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | |
| 79.      In a September 16, 2008, filing the LAPs objected to the Cabrera Report as "unjustly favorable to [Chevron]" and "too conservative" in its damage assessment. Dkt. 8-10 (LAP comments on Cabrera Report) at 40; Dkt. 402-5 (Ex. 2251) (STRATUS-NATIVE058697-98); Dkt. 111-13 ((DONZ00045581) at 1 (Fajardo instructing, after the Cabrera Report was filed, that "I think it's good to maintain a uniform line. PLEASE WE ARE NOT HAPPY."). | **Donziger:**  Disputed.  Donziger disputes the suggestion that this filing was improper.  The Ecuadorian Plaintiffs' team understood that the submissions they would present to Cabrera for his adoption had to meet Cabrera's criteria.  Dkt. No. 7-5 (Hendricks Decl. Ex. 2) at 245 (Fajardo's statement that "what the expert is going to do is state his criteria, alright? and sign [on/in] the report and review it [unintelligible].  But all of us, all together, have to contribute to that report.").  And the Ecuadorian Plaintiffs' unfettered view of the evidence differed from the conservative analysis prepared for Cabrera's adoption.  *See* Dkt. No. 8-10 (Hendricks Decl. Ex. 7) (Ecuadorian Plaintiffs' comments on Cabrera Report).<br><br>**LAPs:**  Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.  Moreover, Chevron previously submitted a similar statement with the same evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 164).  Chevron provides no | Undisputed.  Defendants do not dispute that the September 16, 2008 filing was made or that the filing contains the quoted statements.<br><br>*See* Reply for St. 51 regarding Cabrera's "adoption" of the LAPs' work. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion. | |
| 80. As this Court has already found, "The answers filed by Cabrera in response to the LAPs' (and Chevron's) objections—like the report itself—were drafted at least in substantial part by the LAP team and written to read as if Cabrera had written them." Dkt. 550 at 91; *see also* Dkt. 400-4 (Ex. 2048) (Cabrera Supplemental Report entitled "Answers by the Expert Richard Cabrera, with the Support of His Technical Team, to the Questions and Comments Made by the Plaintiff"); Dkt. 9-4 at 2 (STRATUS-NATIVE051389) (Stratus team members discussed the preparation of the Supplemental Cabrera Report and the need to "clean up the language" of a portion of the supplemental report "so it sounds more like the Perito [Cabrera] and less like a comment."); Dkt. 34-21 (STRATUS-NATIVE053480) at 1; Dkt. 400-1 (Ex. 2010) (Donziger Dep.) at 2962:9-2963:23 (Donziger testifies: "I believe Stratus prepared the [November report] materials in the hope that [Cabrera] would adopt them, sort of how they did the with annexes and executive summary."). | **Donziger:** Disputed.[K] As Donziger testified, the team prepared materials in the hope that Cabrera would adopt them. Donziger incorporates St. 75, 78.<br><br>    [K]    *See* note D, *supra*.<br><br>**LAPs:** Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | Undisputed. Defendants do not provide any explanation or evidence to dispute this Court's conclusion that the answers filed by Cabrera in response to the LAPs' objections were drafted at least in substantial part by the LAP team and written to read as if Cabrera had written them. Indeed, Beltman and Maest have recently corroborated this statement of fact. Stavers Decl., Ex. 3652 (Beltman Witness St.), ¶ 45 ("I understood that Cabrera filed the "Cabrera Reponse" based at least in part on text written by the LAPs' representatives and consultants, including Stratus, on November 17, 2008. The Cabrera Response incorporated work, calculations, and text written by Stratus, among others, and increased the damages assessed in the Cabrera Report from $16 billion to $27 billion."); Stavers Decl., Ex. 3653 (Maest Witness St.), ¶ 43.<br><br>*See* Chevron's Reply to St. 51 regarding the LAPs' provision of "materials" to Cabrera.<br><br>*See* Chevron's Response to Defendants' Counter Sts. 347-350 regarding the propriety of the LAPs' contacts with Cabrera. |
| 81. In writing "Cabrera's" responses to the LAPs' objections, Stratus "clean[ed] up" the language so it would "sound[] more like [Cabrera.]" Dkt. 9-4 at 2 (STRATUS-NATIVE051389) (Stratus team members discussed the preparation of the Supplemental Cabrera Report and the need to "clean up the language" of a portion of the supplemental report "so it sounds more like the Perito [Cabrera] and less like a comment.") | **Donziger:** Disputed. As Donziger testified, the team prepared materials in the hope that Cabrera would adopt them. The team's discussion of style and language does not establish any impropriety. Donziger incorporates St. 80.<br><br>**LAPs:** Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | Undisputed. Defendants do not dispute that the LAP team wrote Cabrera's responses to the LAPs' objections or that the cited email contains the quoted statements. *See* Stavers Decl., Ex. 3652 (Beltman Witness St.), ¶ 43 ("Stratus instructed Brian Lazar to edit the language of portions we had already drafted to sound 'more like the Perito.'").<br><br>*See* Chevron's Reply to St. 51 regarding the LAPs' provision of "materials" to Cabrera. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | | *See* Chevron's Response to Defendants' Counter Sts. 347-350 regarding the propriety of the LAPs' contacts with Cabrera. |
| 82.  The LAP team attempted to recruit independent academics to endorse the Cabrera Report, but did not inform those academics they contacted about their role in the writing of the Cabrera Report, and did not obtain a single endorsement from an independent academic. Dkt. 34-29 (STRATUS-NATIVE042610). | **Donziger:**  Disputed.  The Beltman e-mail to which Chevron cites provides a variety of reasons why academics would not review or endorse the report, including fear of reprisal from Chevron: "they know that signing their names onto some sort of endorsement of the Cabrera report is setting them up for public attack from Chevron (and perhaps attack within their academic circles as well). While they would be willing to face this attack to defend their own work, they generally are not willing to do so to defend someone else's work – unless they in essence can adopt it as their own." Dkt. No. 34-29 (Hendricks Decl. Ex. 204) at 1.

**LAPs:**  Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. Moreover, Chevron previously submitted a similar statement with the same evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel.  (Dkt. 398, at St. 170.) Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion. | Undisputed.  Defendants do not dispute that the LAP team attempted to recruit independent academics to endorse the Cabrera Report, that the LAP team did not inform those academics about their role in writing the Cabrera Report, or that those academics contacted would not endorse the Cabrera Report.  *See* Stavers Decl., Ex. 3652 (Beltman Witness St.), ¶ 58 ("While seeking endorsements, I did not reveal Cabrera's connection to the LAPs' [sic] or Stratus's role in drafting the Cabrera Report.").  Defendants' argument in the 56.1 response is irrelevant and improper and should be disregarded. |
| 83.  On December 1, 2008, Stratus published a review of the Cabrera Report entitled "Comments on the Report of the Court-Appointed Expert Ing. Richard Cabrera Vega in the Case of Maria Aguinda y Otros v. Chevron Corp.," but did not disclose its role in the preparation of the Cabrera Report in its review.  Dkt. 34-26 at 2 ("We have reviewed the report 'Informe Sumario del Pericial' that was prepared by Ing. Richard Cabrera Vega, who was appointed as the technical expert by the Court in the case of Maria Aguinda y Ot- | **Donziger:**  Disputed.  Donziger disputes that there was any requirement for Stratus to relay all the details of its involvement with the Cabrera report.  And Chevron cannot rely on the e-mail from a lawyer to which it cites.  As a preliminary matter, this argument is based upon inadmissible hearsay.  Chevron would rely on this statement—a first-blush reaction by an attorney who was not familiar with the facts—to establish the truth of the matters asserted.  This also is not a fact, but rather a statement of one person's opinion and legal conclusion. | Undisputed.  Defendants do not dispute that Stratus published a review of the Cabrera Report on December 1, 2008, nor do they dispute that Stratus did not disclose its role in the preparation of the Cabrera Report in its review.  *See* Stavers Decl., Ex. 3652 (Beltman Witness St.), ¶¶ 59, 60 ("The December 1, 2008 Stratus Comments do not disclose that Stratus drafted substantial portions of the Cabrera Report, but instead state that the report was prepared by Cabrera.  The decision to issue the Stratus Comments and their content was influenced greatly by Donziger.  I and Stratus deeply regret stating in the Stratus Comments that Cabrera was equivalent to a United States 'Special Master.'  Moreover, the Stratus Comments were |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| ros against Chevron Corporation."); Dkt. 34-26 (Stratus' comments on the Cabrera Report); Dt. 402-11 (Ex. 2288) (Beltman Dep. Tr.) at 264:2-16; Dkt. 9-7 (DONZ00056679) at 1 (LAPs' lawyer writing that Stratus's comments on the Cabrera Report were "written in a manner to give the impression that Cabrera was entirely independent and conducted his own research and came up with his own findings," and that it "appears not only that Cabrera and plaintiffs can be charged with a 'fraud' respecting the former's report, but that Stratus was an active conspirator.") | Further, Chevron's citation does not support the conclusion asserted. This comment was made by an attorney, during a brainstorming session regarding a working draft of a potential motion, and in which several potential arguments were posed without regard for or knowledge of the underlying facts. Earlier in the e-mail chain, this same attorney acknowledges that the potential argument being discussed was not grounded in his knowledge of the facts, stating "my argument turns very substantially on the facts. If there is any interest in reclaiming the argument, these facts need to be checked." Dkt. No. 9-7 (Hendricks Decl. Ex. 12) (DONZ00056679) at 1. When read in context, this comment is obviously a first-blush opinion about the writing style, rather than an assertion of fact.

Most importantly, Chevron's evidence is contradicted by a subsequent e-mail sent by the same attorney to the same recipients two days later, apparently after a more fulsome review of the facts:

    For my part, I have no doubt that Chevron has perpetrated a fraud upon the [Colorado] Court here. It has made a series of misrepresentations, generally in the form of omissions, particularly concerning what was occurring in Ecuador. . . . Had Chevron included for this Court a complete recitation of the Ecuadorian proceedings – the facts which it knew – it would have been impossible for them to make their strident cries about discovering that the Cabrera report contained 'plagiarized' Stratus material . . . Chevron . . . obviously understood that plaintiffs would be shoveling Stratus material to Cabrera. ***There was, in sum, no fraud.***

Dkt. No. 532-3 (Young Decl. Ex. L) at p. 1 (emphasis added). | intended to be an endorsement of the Cabrera Report and Cabrera responses."); *see also* Stavers Decl., Ex. 3653 (Maest Witness St.), ¶ 44.

The statements Defendants contend are hearsay are clearly party admissions since they are made by Defendants' agents. Fed. R. Evid. 801(d)(2)(D) ("A statement that meets the following conditions is not hearsay: . . .The statement is offered against an opposing party and: . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed[.]").

The subsequent email that Defendants cite is not contrary to Chevron's statement of fact. Indeed, in the sentence following the material quoted by Defendants, Horowitz states, "But, we now know that there was a 'problem.' At least on the evidence now known to us, Chevron, in fact, did not know" and it is "very difficult, if not impossible, for us to claim here that Chevron knew everything material about the Cabrera dealings with us, and Stratus . . . ." Dkt. 528-3 (Ex. L) at 16-17; *see* Dkt. 549-4 (Ex. 2410) (email from Horowitz to Donziger seeking "assistance in some way to reconcile the seemingly irreconciliable [sic]" and stating, "If we think that Fajardo's meeting with Cabrera, and unnoticed delivery of the Stratus material to Cabrera, are matters so material as to require that we convene a special meeting with the Lago Agrio Court, it is difficult, if not impossible to maintain that the Court and Chevron already knew everything that was material."). |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | **LAPs:** Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.  Moreover, Chevron previously submitted a similar statement with the same evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 171.)  Chevron provides no new evidence and no reason for the Court to rule any differently on this Renewed Motion. | |
| 84.    Upon reviewing Stratus' review of the Cabrera Report, an attorney for the LAPs wrote Donziger and others, "This document may end the discussion.  These 'comments' are written in a manner to give the impression that Cabrera was entirely independent and conducted his own research and came up with his own findings.  There is no indication in this document that Stratus, ostensibly the company of experts independent from Cabrera, was itself involved in 'ghosting' the Cabrera report.  This might not be dispositive if there were other evidence showing that Chevron had actual or constructive knowledge that Stratus had been involved in the creation of the Cabrera report.  In such a case Stratus's 'comments' may have been a rather crude and awkward spin by a biased expert—but it would not have been a 'fraud' upon Chevron.  But, in the absence of such evidence, then it appears not only that Cabrera and plaintiffs can be charged with a 'fraud' respecting the former's report, but that Stratus was an active conspirator." Dkt. 9-7 (DONZ00056679) at 1. | **Donziger:**  Disputed.  Donziger disputes that there was any requirement for Stratus to relay all the details of its involvement with the Cabrera report.  And Chevron cannot rely on the e-mail from a lawyer to which it cites.  As a preliminary matter, this argument is based upon inadmissible hearsay.  Chevron would rely on this statement—a first-blush reaction by an attorney who was not familiar with the facts—to establish the truth of the matters asserted.  This also is not a fact, but rather a statement of one person's opinion and legal conclusion.<br><br>Further, Chevron's citation does not support the conclusion asserted.  This comment was made by an attorney, during a brainstorming session regarding a working draft of a potential motion, and in which several potential arguments were posed without regard for or knowledge of the underlying facts.  Earlier in the e-mail chain, this same attorney acknowledges that the potential argument being discussed was not grounded in his knowledge of the facts, stating "my argument turns very substantially on the facts.  If there is any interest in reclaiming the argument, these facts need to be checked." Dkt. No. 9-7 (Hendricks Decl. Ex. 12) (DONZ00056679) at 1.  When read in context, this comment is obviously a first-blush opinion about the writing style, rather than an assertion of fact. | Undisputed.  Defendants do not dispute that counsel for the LAPs made the quoted statement.  Defendants also do not dispute that Stratus's comments on the Cabrera Report were written in a manner to give the impression that Cabrera was entirely independent, that he conducted his own research, and that he came up with his own findings.  *See* Stavers Decl., Ex. 3652 (Beltman Witness St.), ¶¶ 59, 60 ("Because I know that the damages assessment in the Cabrera Report and Cabrera Response is not supported by a scientific basis, and because I now believe the Cabrera process was tainted by Donziger and the LAPs' representatives, I withdraw and disavow any endorsement of the Cabrera Report and Cabrera Responses, including the December 1, 2008 Comments.  I have spoken with each of the individuals that signed the Stratus Comments, and each of them similarly withdraws and no longer stands behind or endorses the December 1, 2008 Comments as valid.); Stavers Decl., Ex. 3653 (Maest Witness St.), ¶ 44.<br><br>The statements Defendants contend are hearsay are clearly party admissions since they are made by Defendants' agents. Fed. R. Evid. 801(d)(2)(D) ("A statement that meets the following conditions is not hearsay: . . .The statement is offered against an opposing party and: . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed[.]").<br><br>The subsequent email that Defendants cite is not contrary to Chevron's statement of fact.  Indeed, in the sentence following the material quoted by |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | Most importantly, Chevron's evidence is contradicted by a subsequent e-mail sent by the same attorney to the same recipients two days later, apparently after a more fulsome review of the facts:<br><br>For my part, I have no doubt that Chevron has perpetrated a fraud upon the [Colorado] Court here. It has made a series of misrepresentations, generally in the form of omissions, particularly concerning what was occurring in Ecuador. . . . Had Chevron included for this Court a complete recitation of the Ecuadorian proceedings – the facts which it knew – it would have been impossible for them to make their strident cries about discovering that the Cabrera report contained 'plagiarized' Stratus material . . . Chevron . . . obviously understood that plaintiffs would be shoveling Stratus material to Cabrera. ***There was, in sum, no fraud.***<br><br>Dkt. No. 532-3 (Young Decl. Ex. L) at p. 1 (emphasis added).<br><br>**LAPs:**  Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact. | Defendants, Horowitz states, "But, we now know that there was a 'problem'.  At least on the evidence now known to us, Chevron, in fact, did not know" and it is "very difficult, if not impossible, for us to claim here that Chevron knew everything material about the Cabrera dealings with us, and Stratus . . . ."  Dkt. 528-3 (Ex. L) at 16-17; *see* Dkt. 549-4 (Ex. 2410) (email from Horowitz to Donziger seeking "assistance in some way to reconcile the seemingly irreconciliable [sic]" and stating, "If we think that Fajardo's meeting with Cabrera, and unnoticed delivery of the Stratus material to Cabrera, are matters so material as to require that we convene a special meeting with the Lago Agrio Court, it is difficult, if not impossible to maintain that the Court and Chevron already knew everything that was material."). |
| 85.      The LAPs have never disclosed to the Ecuadorian court that persons working at their direction wrote the entirety of the Cabrera Report and all its Annexes. *See* Sts. 69-72, 75-76, 78; Dkt. 34-10 (DONZ00056668) at 1 (May 16, 2010 email exchange in which LAPs' lawyer Ilann Maazel admits that "neither Cabrera nor plaintiffs disclosed a submission from plaintiffs that contained drafts of part of the expert report written by Stratus"); Dkt. 402-12 (Ex. 2310) (DONZ00040273-74) (email attaching a draft of the LAPs' 2010.06.21 filing with the Lago Agrio court | **Donziger:**  Disputed.[L]  The Ecuadorian Plaintiffs stated to the Lago Agrio Court that they "took advantage of the opportunity to advocate their own findings, conclusions, and valuations before Cabrera for him to consider their potential adoption.  The information provided to Cabrera by Plaintiffs' counsel included their proposed findings of fact and economic valuations for the environmental and other damages caused by Texpet's practices and pollution. . . . And, in fact, . . . Cabrera adopted the proposals, analyses, and conclusions of the Plaintiffs concerning the damages and the valuation."  Dkt. 50-6 (Hendricks Decl. Ex. 377) at 6. | Undisputed.  Defendants do not dispute that the LAPs have never disclosed to the Lago Agrio court that persons working at their direction wrote the entirety of the Cabrera Report and all its Annexes.  The excerpted language cited by Defendants from the LAPs' June 21, 2010 filing does not disclose that their team wrote the entirety of the report and its Annexes.<br><br>That Chevron informed the Lago Agrio court regarding the Cabrera fraud is irrelevant to, and does nothing to rebut, the statement of fact. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| with comments from the LAPs' lawyers including "We are of the opinion that the contacts [with Cabrera] should be laid out in this document" and "I am concerned about describing the first meeting [with Cabrera] in detail[.]"); Dkt. 50-6 (2010.06.21 LAPs' Filing with the Ecuadorian court) (claiming that the LAPs provided Cabrera with "information" including "proposed findings of fact and economic valuations" but not disclosing that the LAPs' team drafted the Cabrera Report). | Moreover, Chevron cannot possibly claim that the Lago Agrio Court was not apprised of all of Chevron's contentions regarding Cabrera. Chevron inundated the trial and appellate courts with allegations of the same type that Chevron makes here.<br><br>1.   Dkt. 402-12 (Champion Decl. Ex. 2310) does not contain the alleged comments that Chevron purports to cite. Chevron did not submit the attachment along with the cover e-mail, and the purported citation should be stricken. Further, assuming *arguendo* that such comments were made, they do not establish Chevron's conclusion. The document that was actually submitted to the Lago Agrio Court speaks for itself.<br><br>**LAPs:** Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. Moreover, Chevron previously submitted the same statement with the same evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 182). Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion. | |
| 86.   As of January 27, 2013, Stratus claimed on its website: "Of the 4,000 pages that comprise the Cabrera report, approximately 200 pages, a mere 5%, rely on information submitted by Stratus to our clients. Moreover, we have already testified before Chevron that we have no involvement in or even knowledge of the collusion amongst Ecuadorian plaintiff attorneys that Chevron has alleged." Stavers Decl., Ex. 3279 (PDF created on 2013.01.27 from http://stratusconsulting.com/2011/02/stratus-statement-re-chevron-ecuador-litigation/). | **Donziger:** Disputed. Chevron does not even quote accurately from the document Stavers attached to his declaration. This is yet another example of Chevron's gross disregard for the actual facts. First, the document attached as Exhibit 3279 has a date of January 28, 2013, not January 27. Second, and more importantly, the purported quotation that Chevron provides appears nowhere in the document; nor do the individual sentences even appear in the document. *See* Dkt. 755-26 (Stavers Decl. Ex. 3279).<br><br>**LAPs:** Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | Undisputed. Chevron inadvertently quoted from a different but very similar press release issued by Stratus regarding its role in drafting the Cabrera Report. The language from the press release cited in Chevron's statement is as follows:<br><br>"The final Cabrera report totals 4,000 pages, out of which only approximately 200 pages rely on information submitted by Stratus to our clients. Chevron's assertions that Stratus 'ghostwrote' a report when only 5% of that report relied on our work under a court-approved process is patently absurd." Dkt. 755-26 (Ex. 3279) at 2. The press release also states, "Stratus principals have already testified under oath that they have no knowledge of the activities that Chevron alleges . . . ." *Id.* |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| 87.      On September 16, 2010, the LAPs submitted, among a total of seven reports, reports from six U.S. experts, none of whom had ever visited the former concession area or gathered new sampling data or offered causation opinions in their respective reports. Dkt. 400-10 (Ex. 2063) (Allen Report); Dkt. 400-10 (Ex. 2064) (Barnthouse Report); Dkt. 401-07 (Ex. 2180) (Picone Report); Dkt. 400-10 (Ex. 2066) (Rourke Report); Dkt. 400-10 (Ex. 2067) (Scardina Report); Dkt. 400-11 (Ex. 2068) (Shefftz Report); Dkt. 400-11 (Ex. 2069) (Anonymous non-expert report written by the LAPs' legal team); Dkt. 400-11 (Ex. 2070) (2010.09.16 LAP filing) at 1-2 (the LAPs' representatives admit that the cleansing reports are "economic assessment[s]."); *see also* Dkt. 168 (Judgment) at 57-58; *see* Dkt. 400-11 (Ex. 2071) (Barnthouse Dep. Tr.) at 164:25-165:4 (Barnthouse testified that he has never been to Ecuador and "never personally visited any of the former oil production areas"); Dkt. 400-11 (Ex. 2072) (Picone Dep. Tr. at 195:10-21) (Picone testified that he "never visited any of the former Concession area"); Dkt. 400-11 (Ex. 2073) (Allen Dep. Tr.) at 164:7-13 (Allen admitted that he has "never been to Ecuador" and has "no experience in the oil operations in the concession area"); Dkt. 400-11 (Ex. 2074) (Shefftz Dep. Tr.) at 51:6-7 (Shefftz testified that he has "never been to Ecuador"); Dkt. 400-11 (Ex. 2075) (Rourke Dep. Tr.) at 46:1-11 (Rourke testified he has not been to Ecuador); Dkt. 400-11 (Ex. 2076) (Scardina Dep. Tr.) at 192:9-14 (When asked if he had "ever been to Ecuador," Scardina responded:  "No."). | **Donziger:**  Disputed.  Chevron's insinuation that the reports are somehow unreliable or dishonest because they do not rely on "new sampling data" or "causation opinions" is extremely misleading.  The reports all explicitly describe the data and sources relied upon.<br><br>• Allen's report discloses the information and sources relied upon, and Allen does not purport to rely on his own sampling data.  Dkt. 400-10 (Champion Decl. Ex. 2063) at p.88 ¶ 1.3.<br><br>• Barnthouse's report discloses the information and sources relied upon, and does not purport to rely on new sampling data. Dkt. 400-10 (Champion Decl. Ex. 2064) at p.145.<br><br>• Picone's report concerns the costs of delivering health care to the affected population.  How sampling data or a causation opinion would even be relevant to this report is far from clear.<br><br>• Rourke's report concerns the number and costs of excess cancer deaths associated with residence in oil-producing areas of the relevant provinces in Ecuador.  Again, how sampling data or a causation opinion would even be relevant to this report is far from clear.<br><br>• Scardina's report concerns the costs associated with a potable water system.  Again, how sampling data or a causation opinion would even be relevant to this report is far from clear.<br><br>• Shefftz's report is an analysis of unjust enrichment.  Again, how sampling data or a causation opinion would even be relevant to this report is far from clear.<br><br>Chevron's characterization of the Ecuadorian Plaintiffs' use of the | Undisputed.  Defendants do not dispute that the LAPs submitted to the Lago Agrio court seven reports from six U.S. experts.  Defendants also do not dispute that none of the six experts had ever visited the former concession area or gathered new sampling data or offered causation opinions in their respective reports.<br><br>Defendants' explanation of the data and sources relied upon by the six experts does not rebut the statement or the evidence cited by Chevron.<br><br>*See* Chevron's Reply to St. 30 regarding Defendants' assertion that this statement of fact is not material.  In addition, Defendants' quotation from the Lago Agrio judgment is irrelevant and does nothing to rebut or dispute Chevron's statement of fact. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | term "economic assessment" as an "admission" is similarly curious.  The Lago Agrio Court described these reports as "economic assessments applicable to the remediation . . . in order to give the Court a clear and up-to-date idea of the economic costs . . . ." Dkt. 168 (translated Lago Judgment) at p.58.<br><br>For the reasons stated in St. 30, this purported fact is not material.  Further, the Lago Agrio Court stated "in the case file there is plenty of information with which the judge can form his opinion and any person with the evidence that has been submitted by the two parties to the proceedings (65 judicial inspections with the respective expert reports, 6 independent expert reports, testimony, documents and deposition) and even their apparent contradictions—and the resulting debates they have triggered—have served to better illustrate the reality in the eyes of the judge."<br><br>*See* Dkt. 168 (Chevron's translation of the 2/14/11 Lago Agrio Judgment) at 38.<br><br>**LAPs:**  Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact.  Moreover, Chevron previously submitted a similar statement with the same evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 186.)  Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion. | |
| 88.      The LAP team's purpose in submitting these seven expert reports was, in their words, to "'cleanse' any perceived impropriety related to the Cabrera Report," by "address[ing] Cabrera's findings in such a subtle way that someone reading the new expert report . . . might feel comfortable concluding that certain | **Donziger:**  Disputed. Chevron provides incomplete and mischaracterized citations in an effort to distort the facts. For example,<br><br>Dkt. 9-8 (Hendricks Decl. Ex. 13) is an e-mail discussion of the contemplated filing with the Lago Agrio Court.  Several potential requests for relief were discussed, including requesting the parties | Undisputed.  Defendants' additional language is not contrary to Chevron's statement of fact.  Moreover, contrary to Defendants' response to St. 30, Chevron's statement of fact relates to its claim that Defendants created a "fabricated and fraudulent record . . . in Ecuador to extort Chevron in the United States," consistent with the Court's sham litigation Order.  Dkt. 720 at 2. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| parts of Cabrera are a valid basis for damages." Dkt. 9-8 (DONZ0067932) ("Patton Boggs attorney Eric Westenberger explained this was "an effort to 'cleanse' any perceived impropriety related to the Cabrera Report"); Dkt. 400-10 (Ex. 2058) (DONZ00127753) at 1 (The LAP counsel instructed the LAP legal team to ensure nothing in a draft filing "compromises the proposed approach in Ecuador" and reiterating that the LAPs must not take any "position that could compromise [their] ability to cleanse the record in [E]cuador"); Dkt. 400-10 (Ex. 2059) (DONZ00040168) at 8 (In an email from LAP counsel attaching draft filing, counsel commented: "if we cannot make clearer representations, we would be better served just to rely solely on the curative additional reports as our 'cleanser,' as opposed to the notion of full disclosure."); Dkt. 356-9 (DONZ00068050) at 214 (Donziger explained how the LAPs' Ecuadorian legal team is "getting nervous that there is an increasing risk that our 'cleansing' process is going to be outrun by the judge"); Dkt. 355-28 (DONZ00031369-70) at 35 (the LAPs' counsel ultimately removed any specific assertions as to their involvement in the Cabrera fraud from the filing, apparently to "balance[] the desire for a 'cleansing'" with the concern that only a partial disclosure of their involvement could "come back to haunt us in a big way"); Dkt. 36-7 (DONZ00031475) at 1 (LAP counsel explained how the cleansing experts should "address Cabrera's findings in such a subtle way that someone reading the new expert report . . . might feel comfortable concluding that certain parts of Cabrera are a valid basis for damages"); Dkt. 36-8 (DONZ00031477) at 1 (the LAPs hired consulting firm | to submit additional reports to supplement Cabrera's. Other e-mails show that the team was concerned that they did not undermine their ability to request this sort of relief.

Dkt. 355-28 (Hendricks Decl. Ex. 1093) (DONZ00031369) at 35 is an e-mail discussing a draft filing to be made to the Lago Agrio Court. Chevron grossly mischaracterizes even the one attorney's thoughts. The attorney expressed concern that providing a filing that created the impression it provided an exhaustive list of submissions to and contacts with Cabrera could be unwise.

Moreover, this assertion is immaterial, for the reasons stated in St. 30.

**LAPs:** Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| the Weinberg Group to "conduct a comprehensive review of selected sections of an expert report prepared by Engineer Richard Stalin Cabrera Vega as an independent expert for the court"). | | |
| 89.     The retention agreement of the Weinberg Group, the entity hired to coordinate the seven expert reports, provides that it was retained for the purpose of "conduct[ing] a comprehensive review of selected sections of an expert report prepared by Engineer Richard Stalin Cabrera Vega as an independent expert for the court." Dkt. 36-8 (DONZ00031477) at 1. | **Donziger:**  Disputed.  Chevron's quotation of the document is incomplete and misleading.  The cited letter states that "we will work with counsel to further clarify the exact scope of our analysis and establish the most useful work product.  It is our assumption at this point that The Weinberg Group will assess the validity, strengths, and weaknesses of conclusions outlined in the Cabrera report." Dkt. 36-8 at 1.

**LAPs:**  Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | Undisputed.  Defendants' additional language is not contrary to Chevron's statement of fact. |
| 90.     When informed of the true nature of the relationship between the LAP team and Cabrera, Douglas Allen, who authored one of the cleansing expert reports, admitted that the relationship "bother[ed]" him and it would have affected his opinion had he known about it at the time.  Ex. 2073 (Allen Dep. Tr.) at 205:13-206: 9(Allen was asked, "Does it not bother you or impact your opinions to the reasonable degree of scientific certainty with which they are made that the report upon which you relied, that by Mr. Cabrera, was not only purported to be written by Mr. Cabrera but in fact has been shown not to be written by Mr. Cabrera but to be written by plaintiffs and plaintiffs' paid  consultants?" and Allen responded, "yeah, it might bother me."). | **Donziger:**  Disputed. Page 205 from Allen's deposition is not provided as one of the selections from Allen's deposition that Chevron chose to include in Exhibit 2073, nor is the purported quotation contained in Exhibit 2073. Chevron's assertion is unsupported and should be stricken.

Further, for the reasons described in Dkt. 823, Donziger objects to the use of depositions from cases in which Donziger was not a party.

**LAPs:**  Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact. | Undisputed.  Defendants do not dispute that the citation to the deposition transcript of Douglas Allen is accurate.  In fact, counsel for the LAPs attended Mr. Allen's deposition in person and counsel for all parties were provided advance notice in order to provide them the opportunity to do the same.  Defendants clearly have pages 205–206 which Chevron now attaches as Exhibit 3661.  Stavers Decl., Ex. 3661.

Further, consistent with the Court's March 26, 2013 Order granting in part Chevron's motion regarding the use of deposition testimony from the 1782 Actions, Mr. Allen's deposition testimony is usable "to the same extent as if taken in [this] action." Dkt. 939 at 8. |
| 91.     Defendants relied on the Cabrera Report in | **Donziger:**  Disputed. Disputed.  Chevron does not define what it | Undisputed.  Defendants' additional language is not contrary to Chevron's |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| communications with government agencies, shareholders, and the media, characterizing Cabrera as "independent" and comparing him to a "Special Master" in a U.S. court.  Dkt. 402-12 (Ex. 2308) at 134,001, 134,004 (2008.01.11 LAP filing stating in Ecuador court filing that "Cabrera was not proposed by the plaintiffs" and "was not appointed at the suggestion of the plaintiffs," but was nominated by the court); Dkt. 47-57 (2010.07.09 LAP filing in Stratus 1782) at 27 ("Cabrera is not even an expert for one party, but a Court-appointed neutral."); Dkt. 47-30 (Donziger's Lantos Commission Testimony) at 7 ("The best and most recent independent estimate available of the human health impact of this contamination is provided by the expert appointed by the court, Richard Cabrera."); Dkt. 30-5 (2010.06.14 LAP complaint to stay arbitration) ¶ 29 ("The best and most recent independent estimate available of the human health impact of this contamination is provided by the neutral Special Master appointed by the court to provide advice on damages."); Dkt. 400-2 (Ex. 2017) (2009.05.10 LAP filing) at 129,697 (The LAPs requested a single expert designated by the court "primarily due to the issue of impartiality . . . . Impartiality because, having not been named by either of the parties, he will be even more objective in his analysis and conclusions"); *see also* Ex. 2019 at 140,184-85 (2008.04.18 LAP filing stating:  "I remind you, Mr. President, that expert Cabrera was given the task because of his professional and personal suitability, and as such, his work should be free of external pressures from the parties, especially when these pressures can compromise the systematic integrity of his work in an attempt to turn this professional designated | means by an "improper" relationship.  Nowhere in the evidence to which Chevron cites do the Ecuadorian Plaintiffs or Donziger use the word "improper," so it is wholly inaccurate to claim that the Ecuadorian Plaintiffs "denied any improper relationship."  Chevron's characterization of what exactly was denied is unsupported and argumentative.  Chevron's suggestion that any contact whatsoever between the Ecuadorian Plaintiffs and Cabrera was "improper" is wrong under Ecuadorian law and is inconsistent with the Lago Agrio court's orders.  Moreover, the insertion of this legal conclusion is not proper in a Rule 56.1 statement.  "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).  Whether Chevron believes that any relationship between the Ecuadorian Plaintiffs and Cabrera was "improper" under Chevron's own standards is not relevant to the instant motion for summary judgment.

Further, Chevron has manipulated quotations and taken words out of context in a manner that creates a misleading impression.  For example:

• Chevron did not include the end of the sentence that begins "Cabrera was not proposed by the plaintiffs." The full sentence reads: "Engineer Cabrera was not appointed at the suggestion of the plaintiffs.  They originally proposed Dr. Luis Villacreces for the position. Chevron opposed this, and the Judge listened to this request and appointed another expert." Dkt. 402-12 (Ex. 2308) at p. 134,004.

• The Stratus pleading that Chevron quotes was an effort by | statement of fact.

Since Chevron's statement of fact did not make any reference to whether Defendants denied an "improper" relationship with Cabrera, Defendants' response objecting to Chevron's use of the word "improper" is nonsense.

Moreover, the propriety of the Defendants' relationship with Cabrera as a matter of Ecuadorian law is irrelevant.  Defendants' assertions, for example, that *ex parte* contacts were permitted under Ecuadorian law, do not in any way affect whether Defendants misrepresented their relationship with Cabrera in subsequent statements, including to U.S. courts.  And whether Cabrera would be considered independent under Ecuadorian law is irrelevant because Defendants did not qualify their representations of Cabrera's independence or otherwise disclose their relationship with Cabrera.

*See* Chevron's Response to Defendants' Counter Sts. 347-350 regarding the propriety of the LAPs' contacts with Cabrera. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| by the court into a mere executor of their plans and strategies."). | Stratus to resist Chevron's improper § 1782 fishing expedition. Stratus argued that "There is no Ecuadorian precedent for seeking this discovery of materials given to a court-appointed expert." Dkt. 47-57 (Ex. 295) at p. 27.<br><br> • Chevron similarly provides only a selected quotation from the Ecuadorian Plaintiffs' April 18, 2008 pleading. Examination of the full pleading shows that the Ecuadorian Plaintiffs' statement was made in the context of attempting to clarify an order from the court for Cabrera to "comply" with Chevron's requests.<br><br>Nor do Chevron's citations support its assertion that the Ecuadorian Plaintiffs' "repeatedly" referred to Cabrera as "neutral" "independent" or a "Special Master." In fact, most of Chevron's citations provide only that the Ecuadorian Plaintiffs recited the fact that the court appointed Cabrera. It is undisputedly true that the court appointed Cabrera.<br><br>Finally, Chevron's repeated invocation of terms like "independent" to accuse the defendants rests on a fundamental misapprehension of Ecuadorian law. Ecuadorian law did not prohibit the parties from advocating their positions or urging the expert's agreement with and adoption of those positions. Under Ecuadorian law, the expert's "independence" arises from his free reign to decide whether, in his professional judgment, he believes a party's position to be the correct one and to adopt whatever information is provided by a party as grounds for his opinions. *See* Dkt, No. 154-5 ¶¶ 11-12, 18; Dkt. No. 154-6 ¶¶ 8-9. There is substantial evidence already in the record that Ecuadorian law at the time did not prohibit parties from making contact with court-appointed experts prior to the issuance of the expert's report, including prior to the expert's formal appointment by the court. *See* Dkt. No. 154-5 (Alencastro Aff.) ¶¶ 9-12, 19; Dkt. No. 154-6 (Simon Aff.) ¶¶ 4-5, | |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | 7-8.  *See also* Ecuadorian Plaintiffs' response to St. 36.<br><br>**LAPs:**  Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact. | |
| 92.      Stratus sent the Cabrera Report to Congressman Jim McGovern, representing it as the work of an independent Special Master, and did not disclose its role in preparing the report.  Dkt. 47-31 (Ex. 270) at 1 (Beltman forwarded Cabrera's reports, stating "[t]he Court Expert's March 2008 report summary is attached," and that "[a]lso attached is the November 2008 response to the [Lago Agrio] Plaintiff's questions that was written by the Court Expert."  Beltman failed to disclose that he and the Lago Agrio Plaintiffs' other U.S. consultants ghostwrote the report as well as the response.); Dkt. 47-32 (Ex. 270A) at 1 (Beltman provided United States Congressman Jim McGovern's office "some talking points" for an interview with the Los Angeles Times, telling the Congressman's staff that "[t]he Court Expert reviewed available scientific data and concluded that people in the area suffer from many illnesses caused by the contamination, including cancer." ). | **Donziger:**  Disputed.  Donziger disputes that there was any requirement for Stratus to relay all the details of its involvement with the Cabrera report.  And Chevron cannot rely on the e-mail from a lawyer to which it cites.  As a preliminary matter, this argument is based upon inadmissible hearsay.  Chevron would rely on this statement—a first-blush reaction by an attorney who was not familiar with the facts—to establish the truth of the matters asserted.  This also is not a fact, but rather a statement of one person's opinion and legal conclusion.<br><br>Further, Chevron's citation does not support the conclusion asserted.  This comment was made by an attorney, during a brainstorming session regarding a working draft of a potential motion, and in which several potential arguments were posed without regard for or knowledge of the underlying facts.  Earlier in the e-mail chain, this same attorney acknowledges that the potential argument being discussed was not grounded in his knowledge of the facts, stating "my argument turns very substantially on the facts.  If there is any interest in reclaiming the argument, these facts need to be checked."  Dkt. No. 9-7 (Hendricks Decl. Ex. 12) (DONZ00056679) at 1.  When read in context, this comment is obviously a first-blush opinion about the writing style, rather than an assertion of fact.<br><br>Most importantly, Chevron's evidence is contradicted by a subsequent e-mail sent by the same attorney to the same recipients two days later, apparently after a more fulsome review of the facts: | Undisputed.  Defendants' statement regarding the propriety of Stratus' conduct is irrelevant, and Defendants' additional language is not contrary to Chevron's statement of fact.  *See* Stavers Decl., Ex. 3652 (Beltman Witness St.), ¶ 13 ("Steven Donziger also instructed me to honor a request from the Congressman's office for talking points and notes. At no time did Donziger authorize disclosure of Stratus's role in the Cabrera Report and the Cabrera Response to Congressman McGovern or anyone on his staff.").<br><br>The statements Defendants contend are hearsay are clearly party admissions since they are made by Defendants' agents. Fed. R. Evid. 801(d)(2)(D) ("A statement that meets the following conditions is not hearsay: . . .The statement is offered against an opposing party and: . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed[.]").  Further, because Chevron's statement of fact number 92 did not rely on any "comment made by an attorney," Defendants' response that the statement by "an attorney" is not an assertion of fact is nonsense. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | For my part, I have no doubt that Chevron has perpetrated a fraud upon the [Colorado] Court here. It has made a series of misrepresentations, generally in the form of omissions, particularly concerning what was occurring in Ecuador. . . . Had Chevron included for this Court a complete recitation of the Ecuadorian proceedings – the facts which it knew – it would have been impossible for them to make their strident cries about discovering that the Cabrera report contained 'plagiarized' Stratus material . . . Chevron . . . obviously understood that plaintiffs would be shoveling Stratus material to Cabrera. ***There was, in sum, no fraud.***<br><br>Dkt. No. 532-3 (Young Decl. Ex. L) at p. 1 (emphasis added).<br><br>**LAPs:**  Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | |
| 93.      Members of the LAP team wrote that the Cabrera Report was the most important evidence in the case and provided the best damages estimate, one that should be afforded wide deference by the Ecuadorian court.  Dkt. 6-2 (Ex. 1), CRS 138-02-01 (Crude outtake) (Donziger explaining to co-conspirator Atossa Soltani that, "we're now entering the final phase which is the expert assessment. . .  Once that ends, the case is over in terms of the evidence. It's just final arguments. So that's critical."); Dkt. 6-8 (Ex. 2) at 76 (certified transcript); Dkt. 28-7 (DONZ00027256) at 15-16 (Donziger writes, referring to Cabrera's appointment as the Global Expert, "I asked Pablo if he was 100% sure the judge would [appoint] Richard and not Echeverria, and he said yes, but given that this is the most | **Donziger:**  Disputed.  Chevron crafts a broad, argumentative conclusion that is unsupported by the evidence to which it cites.  This is improper in a 56.1 statement.  Chevron cobbles the quote that it *wishes* it had together by combining quotes that it does have.  In none of the cited evidence does anyone refer to the Cabrera report as "the most important evidence in the case," nor "provid[ing] the best damages estimate," nor "one that should be afforded wide deference by the Ecuadorian court."<br><br>**LAPs:**  Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact. | Undisputed.  Defendants do not dispute that the cited evidence establishes that members of the LAP team considered the Cabrera Report, among other things, "the single most important technical document for the case," Dkt. 33-2 (STRATUS-NATIVE043232-33), and "the most important evidence we have in the case," Dkt. 6-2 (Ex. 1) at CRS-187-01-02.  Defendants' objection that these quotes were improperly combined is irrelevant and does not contradict Chevron's statement of fact. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| important decision of the case thus far, there is simply no margin for error."); Dkt. 33-2 (2008.02.22 email from Beltman to Stratus employees) (STRATUS-NATIVE043232-33) (Stratus project manager Douglas Beltman telling his team that they will draft the Cabrera Report: "The project is at a key point right now. We have to write, over the next 2 to 3 weeks, probably the single most important technical document for the case. . . . We (the case attorneys, the case team in Quito, and Stratus) have put together a very ambitious outline for this report."); Dkt. 37-8 (DONZ00024227) (Internally, Defendants called the Cabrera Report "the most important thing in the case"); Dkt. 6-2 (Ex. 1) at CRS-187-01-02 ("[T]he most important evidence we have in the case"); Dkt. 6-2 (Ex. 1) at CRS-200-01-30 ("huge for us"); Dkt. 47-16 (Ex. 255) (2008.12.01 Amazon Defense Front press release) (publicly claiming that "courts in Ecuador generally give wide deference to reports prepared by independent experts."); Dkt. 47-30 (2009.04.28 Statement by Donziger to the Tom Lantos Human Rights Commission) at 5 (Donziger told the U.S. Congress that "an independent court expert working with a team of 14 scientists, found that Chevron is liable for up to $27 billion in damages . . . . If the court accepts the damages assessment, then the case could produce the largest judgment ever for an environmental lawsuit."); Dkt. 356-9 at 152 (DONZ-HDD-0113389) (When Cabrera was sworn in as the Global Expert, Donziger called it a "HUGE VICTORY"). | | |
| 94.  On January 22, 2009, Fajardo wrote to the makers of Crude, asking them that "the images we had discussed be corrected or removed," referring to | **Donziger:** Disputed.  The cited e-mail establishes only that Fajardo asked Berlinger to edit certain footage from *Crude*; the document does not disclose what footage.  Donziger further disputes | Undisputed.  Defendants do not dispute that Fajardo wrote to the *Crude* filmmakers on January 22, 2009 asking them to remove "images" showing Beristain present at a meeting involving Donziger and other members of |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| frames from the film showing Carlos Beristain present in a meeting involving Donziger, himself, and other members of the LAP team, telling the Crude filmmakers: "They are so serious that we can lose everything or a lot just because of those few, miniscule images." Dkt. 47-6 (Ex. 245) at 3. | Chevron's characterization to the extent it suggests that Beristain was removed from multiple scenes. Chevron has alleged that images of Beristain's attendance at only one event were edited out of *Crude*. The meeting occurred in May 2007; before Cabrera was sworn in as an expert and before Beristain was identified as a member of Cabrera's technical team. The meeting was a community meeting among the Cofán people and their attorneys "to talk about what they want as compensation for all the damage." Dkt. No. 30-02 (Ex. 91) at p. 48; *see also* Dkt. No. 48-29 (Ex. 331). Trudie Styler also observed and spoke to the Cofán people. Dkt. No. 30-02 (Ex. 91) at p. 49. Beristain's role at the meeting was "in the form of leading a discussion" with the Cofán people. Dkt 613-11 (Ex. K) (1/14/11 Donziger Depo. Tr.), at 2919:20-23.

Further, Chevron cites to no evidence that would suggest that Donziger or other members of the Ecuadorian Plaintiffs' team felt the same way as Fajardo regarding the footage at issue.

**LAPs:** Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | the LAP team. Dkt. 47-6 (Ex. 245) at 3. As Defendants are aware, *Crude* director Joe Berlinger testified during his deposition that after Fajardo viewed *Crude* at Sundance, Fajardo discussed his concern about Dr. Beristain being in the film with *Crude* producer Michael Bonfiglio, who reported it to Mr. Berlinger. Dkt. 47-5 at 266:20–267:2. This testimony was given in response to questions about the email exchange between Berlinger and Fajardo in which Fajardo asks Berlinger to "remove the images that we discussed," further stating that "[t]his is so serious, that we could lose everything." *Id.* at 265:20–267:2. Berlinger ultimately altered the film before release at the RICO defendants' and their co-conspirators' request. *Id.* at 264–92.

A few months later, when Fajardo visited the University of Oregon, he expressed alarm at his discovery that students there had obtained copies of the version showing Beristain, and he told Donziger that they had a "serious problem." Dkt. 47-7 at 2. And while Fajardo assured Donziger that nobody at Oregon knew that there was a "conflict," he said that "[i]f they already have that documentary at this university, then Chevron certainly has it too." *Id.* at 1–2. Fajardo stressed that "we have to think about how to get out of it." *Id.* at 2.

Finally, when the RICO Defendants learned that CNN intended to show clips from *Crude*, they and the filmmaker ensured that the Beristain scenes were not shown, instructing CNN, "Please do NOT include any footage during Trudie's visit to the Cofan community that features a man wearing a white t-shirt." Dkt. 47-8. |
| 95.    In response to Chevron's discovery efforts in U.S. courts, Defendants attempted to conceal their relationship with Cabrera. Dkt. 6-2 (Exhibit 1) at CRS-191-00-CLIP-03 (2007.03.03 Crude outtake video clip of meeting among P. Fajardo, A. Maest, and others); Dkt. 7-5 (Exhibit 2 (certified transcript)) at 244 (Fajar- | **Donziger:** Disputed. Many of these citations do not even purport to relate to 1782 proceedings. In fact, none of the quotations Chevron provides reference a 1782 or discovery efforts. Chevron conclusions are not undisputed facts, they are inferences about the defendants' mental states. They are also selectively cobbled together, and re-hash the same misleading arguments made else- | Undisputed. The evidence cited by Chevron demonstrates that, from the inception of the Cabrera fraud, it has been Defendants' modus operandi to conceal their relationship with Cabrera. These efforts continued in response Chevron's discovery efforts in the United States. For example, as this Court has found, "[T]here is probable cause to suspect that at least some of those involved . . . obstructed justice in at least the Stratus 1782 |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| do: "Chevron's main problem right now is that it doesn't know what the hell is going to happen in the global expert examination. In other words, they don't know that. I hope none of you tell them, please."); Dkt. 6-2 (Exhibit 1) at CRS-196-00-CLIP-01 (2007.03.04 meeting among S. Donziger, A. Maest, R. Kamp, and C. Champ discussing groundwater evidence); Dkt. 7-6 (Exhibit 2 (certified transcript)) at 265-67 (Donziger: "Our goal is that they [Chevron] don't know shit . . . and that's why they're so panicked."); Dkt. 32-7 (DONZ00108564) at 1 (Donziger: the LAPs' counsel should consider having Cabrera take action "AGAINST us to prove his independence" and "find ways to Keep Texaco from finding out much about his plan and his work"); Dkt. 47-6 (JB-NONWAIVER00008870) (LAPs' counsel Pablo Fajardo imploring the Crude filmmakers to "remove the images that we discussed" of Cabrera team member Dr. Beristain working with LAPs' attorneys because "[t]his is so serious that we could lose everything"); Dkt. 48-31 ¶ 7.1 (Declaration of Mark Quarles stating, among other things, that "Mr. Cabrera and his team have acted independently from both the plaintiffs and the defendant"); Dkt. 48-32 (Quarles Dep. Tr.) at 122:1-5 (testifying that he "would not have signed this declaration" if he had known that "Mr. Cabrera was working directly with the plaintiffs."); Dkt. 33-9 (STRATUS-NATIVE044716) at 1 (Beltman: plan is to treat "our original English version as if it's a translated version" of Cabrera Report); Dkt. 34-23 (STRATUS-NATIVE065062); Dkt. 34-13 (STRATUS-NATIVE061311) at 1 ("We have to talk to Clapp about that 5-pager, and how we have to limit its distri- | where in Chevron's 56.1 statement.<br><br>**LAPs:** Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. Moreover, Chevron previously submitted a similar statement with substantially the same evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 176). Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion. | proceeding in Colorado by formulating and filing the Fajardo declaration, which was misleading account of what had happened." Dkt. 905 at 35; *id* at 35 n.134 ("Chevron has submitted subsequently evidence that shows – at the very least – that there is probable cause to suspect that the Fajardo declaration – which was filed electronically with several U.S. courts – misrepresented or concealed material facts about the LAPs' relationship with Cabrera."). Defendants' strategy was to delay the production of documents as long as possible the production of documents revealing the LAP team's relationship with Cabrera. Dkt. 47-54 (Ex. 292) (email exchange among LAP team in which one LAP lawyer writes, "Stratus will be under a court order to produce all materials it gave Cabrera. Stratus will not risk a contempt motion, it will comply. Unless we want the Stratus/Cabrera revelation to come out in CO, which seems like the worst possible place, we need to make our submission in Ecuador and fast" with another LAP attorney responding, "What about the following? Appeal; move for stay; if we win with [the District of Colorado] great; if we lose, we produce whatever we want (narrow read); [Gibson Dunn] complains and then we move for clarification. If we lose again, we think about another appeal."). |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| bution.  It CANNOT go into the Congressional Record as being authored by [Clapp].”); Dkt. 34-14 (STRATUS-NATIVE057803) (Stratus principal Douglas Beltman writes of incriminating citation in the Cabrera Report, “Oh what a tangled web . . . .”). | | |
| 96.     On March 30, 2010, Prieto wrote to Donziger and others and stated his concern that if the District of Colorado ordered the disclosure of material related to Stratus's authorship of the Cabrera Report, “the effects are potentially devastating in Ecuador (apart from destroying the proceeding, all of us, your attorneys, might go to jail)[.]”  Dkt. 9-6 (Exhibit 11) (2010.03.30 Email from J. Prieto to S. Donziger, P. Fajardo, L. Yanza and J. Saenz re “Protection Action”) (DONZ00055225). | **Donziger:**  Disputed.  Chevron fails to provide the full context of this e-mail.  Prieto begins “Apparently this is normal in the U.S. and there is no risk there, but the problem, my friend, is that the effects are potentially devastating in Ecuador . . . .”  Dkt. No. 9-6 (Ex. 11) (DONZ00055225) at 1.  This is clearly the unconsidered opinion—expressed in the heat of the moment—of but one member of the Ecuadorian Plaintiffs' team.  This opinion is also inconsistent with Ecuadorian law in place at the time, which did not prohibit coordination between parties and experts.

Chevron's repeated invocation of terms like “independent” to accuse the defendants rests on a fundamental misapprehension of Ecuadorian law.  Ecuadorian law did not prohibit the parties from advocating their positions or urging the expert's agreement with and adoption of those positions.  Under Ecuadorian law, the expert's “independence” arises from his free reign to decide whether, in his professional judgment, he believes a party's position to be the correct one and to adopt whatever information is provided by a party as grounds for his opinions.  *See* Dkt, No. 154-5 ¶¶ 11-12, 18; Dkt. No. 154-6 ¶¶ 8-9.  There is substantial evidence already in the record that Ecuadorian law at the time did not prohibit parties from making contact with court-appointed experts prior to the issuance of the expert's report, including prior to the expert's formal appointment by the court.  *See* Dkt. No. 154-5 (Alencastro Aff.) ¶¶ 9-12, 19; Dkt. No. 154-6 (Simon Aff.) ¶¶ 4-5, 7-8.  *See also* Ecuadorian Plaintiffs' response to St. 36. | Undisputed.  Defendants' additional language is not contrary to Chevron's statement of fact.

*See* Chevron's Reply St. 347- 350. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | **LAPs:** Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. Moreover, Chevron previously submitted a similar statement with the same evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 177). Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion. | |
| 97.    To prevent disclosure of their relationship with Cabrera, Defendants followed a delay strategy developed by their new U.S. attorneys at Patton Boggs, the "fundamental principle" of which, "as outlined by Jim [Tyrrell]," was to "appeal everything on the theory that we gain a greater advantage by fighting them on everything, and tying them up, than in conceding any one thing even if we expect to ultimately lose that one thing down the road." Dkt. 48-21 at 1; *see also* Dkt. 549-3 (Ex. 2406) at 2819:21-2820:23 (Donziger testifying that "Jim" is Tyrrell); Dkt. 496-5 (Donziger: "Seems we have a new tension [between] the strategy as outlined by Jim (fight hard on all fronts all the time and concede nothing, buy as much time as possible)" and the idea that "something should be turned over" regarding the Cabrera fraud); Dkt. 549-4 (Ex. 2422) (Westenberger strategy: "This certainly will cause delay"); Dkt. 47-54 (Separately, Westenberger proposed a delay strategy for Stratus: "What about the following? Appeal; move for stay; if we win with [the District Court Judge] great; if we lose, we produce whatever we want (narrow read); [Gibson Dunn] complains and then we move for clarification. If we lose again, we think about another appeal."). | **Donziger:** Disputed. Chevron's conclusions are not undisputed facts; they are arguments and inferences about the defendants' mental states. Such questions cannot be resolved on summary judgment. Further, the snippets of internal discussions regarding various possible approaches to litigation and other statements plucked out of context do not establish Chevron's sweeping claim.<br><br>For example, Dkt. 48-21 contains an attorney-client discussion about whether to appeal from a particular ruling; the group is discussing the pros and cons of an appeal. There is no indication of what the particular "advantage" being discussed would be.<br><br>Chevron insinuates that a litigation strategy of fighting back against Chevron's massive 1782 onslaught, including efforts to obtain mountains of privileged material and core attorney work product, is somehow improper. Defending oneself is hardly an illegitimate "delay strategy."<br><br>**LAPs:** Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | Undisputed. Defendants do not dispute that the cited evidence establishes that Defendants' attorneys at Patton Boggs made statements supporting delay, such as, "[A]ppeal on the theory that we gain a greater advantage by fighting [Chevron] on everything, and tying them up, than in conceding any one thing even if we expect to ultimately lose that one thing down the road," Dkt. 48-21 at 1, and "the strategy as outlined by Jim [Tyrrell] (fight hard on all fronts all the time and concede nothing, buy as much time as possible)." Dkt. 496-5 (Ex. 5) at 2; *see also* Stavers Decl., Ex. 3652 (Beltman Witness St.), ¶ 74 ("Donziger and the LAPs' counsel encouraged Stratus's counsel to delay compliance, with the issued subpoena, in ways that Stratus's counsel did not feel were consistent with his ethical obligations. Absent intervention by Donziger and the LAPs' U.S. counsel, Stratus would have turned over to Chevron all documents in accordance with the schedule set forth in the Court proceeding. A litigation consultant working with Donziger and Patton Boggs attorneys obtained Stratus's documents and files several months before the documents were provided to Chevron."); Stavers Decl., Ex. 3653 (Maest Witness St.), ¶ 49. Defendants' objection that these quotes were improperly combined is irrelevant and does not contradict Chevron's statement of fact. Nor does Defendants' additional language contradict Chevron's statement of fact. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| 98.       Stratus, through counsel, told the District of Colorado that it was "astonish[ed]" to see similarities between its work and the Cabrera report, and that it had never reviewed the report in draft form.  Dkt. 47-62 (2010.04.27 Hrg. Transcript in *Chevron Corp. v. Stratus Consulting, Inc.*, 10-cv-00047-MSK-MEH (D. Colo.)) at 58:5-17, 69:12-13; *see also* Dkt. 355-7 (2011.06.27 Stratus Order) at 4 (Magistrate Judge Hegarty writing, "I asked Stratus' counsel whether Stratus officials had ever met with Cabrera; Stratus' counsel, Mr. Silver, stated that he investigated that issue with his client and, after such investigation, believed that there had been no such meeting ever; when I was told this in open court, I stated, 'You know, in my world that's golden. I'll take a representation like that from a lawyer any day and believe it'; in fact, Stratus' representatives (and Respondents here) Beltman and Maest had a meeting with Cabrera in Ecuador in January 2008. What I thought was 'golden' has lost its luster. I do not accuse Mr. Silver of lying, but I was not given the truth."). | **Donziger:**  Disputed.  In the first cited portion of the hearing transcript, Stratus's counsel states that he does not believe that there were direct communications between Stratus and Cabrera.  Dkt. 47-62 at 58:5-13.  Then, in response to the court's question "Mr. Silver, do you know—does your client know what was given to Cabrera?" counsel answered, "In an anecdotal way I know that they are wise to the resemblance of—to their astonishment of product, similarity of product.  So it's anecdotal." Dkt. No. 47-62 (Ex. 300) at 69:9-14.

**LAPs:**  Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact. | Undisputed.  Defendants' additional language is not contrary to Chevron's statement of fact.

*See* Chevron's Reply to St. 97. |
| 99.       The Burford Group, an investor that purchased a multi-million dollar share of the judgment from the LAPs, has accused Defendants of perpetrating "a multi-month scheme to deceive and defraud in order to secure desperately needed funding" for their litigation/pressure campaign against Chevron, "all the while concealing material information and misrepresenting critical facts in the fear that we would have walked away had we known the true state of affairs."  Dkt. 714-1 (BUR0000845-47) (2011.09.29 letter from Bur- | **Donziger:**  Disputed.  Burford's allegations and insinuations are inadmissible hearsay.  Further, the allegations in the letter are not based on the author's personal knowledge and are also inadmissible for that reason.  Chevron's assertion should be stricken.

**LAPs:**  Disputed.  Defendants incorporate Donziger Defendants' response to this purported fact. | Undisputed.  Defendants' hearsay objection fails because the letter is a non-hearsay verbal act of independent legal significance.  Fed. R. Evid. 801(c)(2).  In the letter, Burford declares "you have breached the Funding Agreement – specifically, section 5 and 10 – by withholding vital information and, indeed, working to convince us that Chevron's allegations of wrongdoing by your attorney were false."  The Federal Rules of Evidence "exclude from hearsay the entire category of 'verbal acts' and 'verbal parts of an act,' in which the statement itself affects the legal rights of the parties or is a circumstance bearing on conduct affecting their rights." Fed. R. Evid. 801(c) advisory committee's note.  Since a declaration of breach |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| ford Group to S. Donziger, P. Fajardo, L. Yanza, El Frente de Defensa de la Amazonia, and Purrington Moody Weil LLP), at BUR0000846. | | by one party to an agreement, as Burford made in the letter, is itself a legally significant act, the letter is not hearsay.<br><br>Defendants' objection that Burford's statement is not based on personal knowledge also fails; the letter is admissible because its contents are within the knowledge of Burford in its organizational capacity, and the letter is signed by Burford's authorized representative. |

### III.   THE LAGO AGRIO JUDGMENT INCORPORATES, IN MATERIAL PART, ANALYSIS, DATA, AND CONCLUSIONS TAKEN FROM UNFILED LAPS' WORK PRODUCT AND THE FRAUDULENT CABRERA REPORT

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| 100.    The following judges served as trial judges for the Lago Agrio litigation for the indicated periods of time:  Alberto Guerra Bastidas (May 13, 2003 to February 4, 2004); Efraín Novillo Guzmán (February 4, 2004 to February 2, 2006; October 3, 2007 to August 25, 2008); Germán Yánez Ruiz  (February 2, 2006 to October 3, 2007); Juan Evangelista Núñez Sanabria (August 25, 2008 to October 21, 2009); Nicolas Augusto Zambrano Lozada (October 21, 2009 through March 12, 2010); Leonardo Ordóñez Pina (March 12, 2010 to October 11, 2010); and Nicolas Augusto Zambrano Lozada (October 11, 2010 through the conclusion of the case).  Dkt. 402-11 (Ex. 2294) (2004.02.04 Order); Dkt. 402-11 (Ex. 2296) (2006.02.02 Order); Dkt. 32-6 (2007.10.03 Order); Dkt. 402-12 (Ex. 2306) (2008.08.25 Order); Dkt. 402-11 (Ex. 2300) (2009.10.21 Order); Dkt. 402-12 (Ex. 2301) (2010.03.12 Order); Dkt. 402-12 (Ex. 2302) (2010.10.11 Order). | **Donziger:**  Not disputed.<br><br>**LAPs:**  Not disputed. | Undisputed. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| 101.  At the time the judgment issued, the official court record in the Lago Agrio Litigation consisted of the hand-numbered pages 1 to 216338 maintained by the Provincial Court of Sucumbíos in Lago Agrio, Ecuador (the "Lago Agrio Record").  Dkt. 402-6 (Ex. 2257) (Page 1 of the Lago Record); Dkt. 402-17 (Ex. 2354) (First page of Judgment with record number in the upper right); Dkt. 402-15 (Ex. 2326) (Certification Page of Ecuadorian Judgment – RC-CL2065-0216437v). | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed. The statement is premised on an unsupported legal conclusion of Ecuadorian civil procedure regarding the scope and content of the "official" court record. Genuine issues of dispute exist regarding the scope of documents that are considered part of the official court record. On different occasions, the Lago Agrio Court expressly referenced and incorporated materials from the parties—Chevron included—that were not submitted in hard copy form and by their nature would not have been hand-numbered pages. *See, e.g.,* Smyser Decl., Ex. 36 (excerpts from Lago Agrio Court orders incorporating Chevron's submission of digital materials). In other instances, the parties—Chevron included—would attach to their official submissions disks with supplemental materials and appendices. *See, e.g.,* Smyser Decl., Ex. 37 (excerpts from officially-submitted expert reports noting supplemental materials to report attached in digital media format). Furthermore, the parties in the Lago Agrio Litigation also submitted materials to the Lago Agrio Court via other means, including during Judicial Inspections taking place outdoors at sampling sites. *See, e.g.,* Smyser Decl., Ex. 32 (excerpts from record of Aguarico 02 judicial inspection noting on-site submission of Fusion Memo exhibits); Resp. St. 126 (concerning example of submission of Fusion Memo materials to the Lago Agrio Court). Also, in certain places, pages are missing from important documents, even though the hand number sequence does not reflect the missing materials. *See, e.g.,* Smyser Decl., Ex. 33 (copy of Lago Agrio order pages 211685–86 missing at least one page of content between the numbered pages). Such evidence of the Lago Agrio Court's omission and misnumbering raises fact issues as to how the Lago Agrio Record should be defined and measured. | Undisputed.  There is no genuine dispute that the first page of the Lago Agrio record is 1 and the last page is 216338, as shown by the cited clerk certificates.  Defendants' musings about "the scope of documents that are considered part of the official record" are irrelevant and misleading. Defendants point to the filing of CDs, but that was by Chevron in 2007 and 2008, Dkt. 918-47; Dkt. 918-48; years before it ever obtained the Unfiled Work Product in Section 1782 discovery.  And one of these was simply a judicial inspection report that attached a CD with "electronic copies of all of the appendices to which [the author] will refer in this report." Dkt. 918-47 at 9 (pg. 6 of exhibit).  Whether filings were made indoors or outdoors is irrelevant as the evidence shows that the documents the LAPs intended to file at Aguarico 02 did not include the Fusion Memo and are reflected in the record.  Reply St. 126.<br><br>They claim that "pages are missing from important documents" citing an order they claim is "missing at least one page of content between the numbered pages[.]."  But that is only because the Defendants have attached a copy of the order, issued over one year after the Judgment, that is missing the back page rather than a copy that includes it. *Compare* Dkt. 918-42 at 5-6 (December 16, 2012 order missing page 2) *with* Stavers Decl., Ex. 3664 (December 16, 2012 order that includes page 2).  Chevron produced the "missing" page to the Defendants but they chose not to attach it so as to create the illusion that that the record is unreliable.  Stavers Decl., Ex. 3665 (CVX-RICO-01248927). |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | In contrast, Chevron offers no citation, testimony, or evidence to support its claim that only hand-numbered pages were part of the official court record.<br><br>Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 6). Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion. | |
| 102.    The LAP team maintained "a full digitized set of every single document filed in the court."  Stavers Decl., Ex. 3273 (WOODS-HDD-0226427); *see also* Stavers Decl., Ex. 3272 (WOODS-HDD-0226441). | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed. Examples exist of documents and materials submitted to the Court that may not have been subsequently numbered and organized as part of the hand-numbered pages. *See* St. Resp. 101 (providing examples of submissions to the Court not part of the hand-numbered sequence or omitted by Court numbering). In addition, Chevron omits a crucial qualification stated by another LAP team member in the same conversation cited by Chevron: "The case documentation is exceptionally difficult. Even with an index, people may have problems finding docs (we do)." Dkt. 755-14, at WOODS-HDD-0226441. | Undisputed.  Defendants do not dispute that they maintained "a fully digitized set of every single document filed in the court."  The additional language quoted by Defendants is not contrary to Chevron's statement of fact—that the LAPs' index of the record was not always easy to use does not contradict that the LAP team kept a full digitized copy of each document filed with the court.<br><br>*See* Reply St. 101. |
| 103.    The Ecuadorian court issued a 188-page single-spaced judgment against Chevron, on February 14, 2011 and issued a Clarification Order regarding that Judgment ("Clarification Order") on March 4, 2011, both signed by Judge Zambrano.  These appear in the record of this action, along with certified English translations, at Dkts. 168 and 186, respectively.  Dkt 168 (2011.02.14 judgment); Dkt. 186 (2011.03.04 clarifica- | **Donziger:**  Not disputed for purposes of this motion.<br><br>**LAPs:**  Not disputed for purposes of this motion. | Undisputed. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| tion order). | | |
| 104.     Sections 3, 6, 7, 9, 10, and 15 of the judgment contain text, data or other information found in the LAP team's unfiled work product but not found in the Lago Agrio Record.  Stavers Decl., Ex. 3276 (certified translation of the judgment, highlighted to show overlap with the LAPs' unfiled work product (yellow) and reliance on the Cabrera Report (red)). | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed. Chevron here provides no citation or evidence in this particular statement to support its conclusion that text was "not found in the Lago Agrio Record". Defendants dispute Chevron's characterizations of what constitutes the official court record (*see* Resp. St. 101), and whether Chevron's claimed "unfiled work product" is truly absent from the record (*see* Resp. Sts. 126, 139, 144, 144, 149, 153, 160, 166). Furthermore, Chevron's cited Exhibit No. 3276 (Dkt. 763-5) includes conclusory argument absent in the original source document. *See* Dkt. 763-5, at p. 51 (arguing that judge Zambrano's disclaimer of reliance was false). The same Exhibit also includes as part of its highlighted text of "unfiled work product" quotations from prior Ecuadorian case law, implying that citation to another court opinion was somehow improper. *See id.* at pp. 82–88. | Undisputed.  Defendants do not dispute that Section 3 of the judgment contains text from the LAP team's unfiled Index Summaries, fusion memo, and Draft Alegato.  *See, e.g.,* Dkt. 658-7 (Leonard Report) at 14-30., Ex. 5 (highlighted judgment) at 81-88 of 90; Dkt. 763-5 at 6-7, 20-25.  Defendants do not dispute that Section 6 of the judgment contains text from a memo prepared by Katia Fach Gomez.  Dkt. 355-27 (Ex. 1076); Dkt. 168 at 65; Dkt. 763-5 at 65; St. 109.  Nor do they dispute that Section 7 contains information from the Moodie Memo (Dkt. 755-26 (Ex. 3280) at 3-4; Dkt. 763-5 at 89-90); that Section 9 contains text from the unfiled Index Summaries (Dkt. 658-7 (Leonard Report) at 20, Ex. 5 (highlighted judgment) at 89-90 of 90; Dkt. 763-5 at 100), data from the Selva Viva Data Compilation (Dkt. 401-08 (Ex. 2182) at Ex. A at 9-17; Dkt. 763-5 at 101-02, 104-05, 108-12), and text from the Clapp Report (Dkt. 658-7 (Leonard Report) at 33-34; Dkt. 658-8 at 1-2 of 55; Dkt. 763-5 at 109-110); that Section 10 contains information from the Moodie Memo (Dkt. 755-26 (Ex. 3280) at 3-4; Dkt. 763-5 at 169-171); or that Section 15 contains text from the Fajardo Trust Email (Dkt. 658-7 (Leonard Report) at 30-33; Dkt. 658-8 at 13 of 55; Dkt. 763-5 at 186.<br><br>There is no genuine dispute as to what constitutes the record.  *See* St. 101.  Nor is there any dispute the LAPs' unfiled work product is absent from the record.  *See* Sts. 101, 126, 139, 144, 149, 153, 160, 166.<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact.  It does not.  That declaration does not provide any evidence to dispute that Sections 3, 6, 7, 9, 10, and 15 of the judgment contain text, data or other information found in the LAP team's unfiled work product, and it does not provide any basis to conclude that the unfiled work product is found in the Lago Agrio Record.  In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | | Declaration is inadmissible hearsay and cannot be considered. |
| 105.    Sections 13 and 14 of the judgment contain text, data or other information found in the Cabrera Report and nowhere else in the Lago Agrio record. Stavers Decl., Ex. 3276 (certified translation of the judgment, highlighted to show overlap with the LAPs' unfiled work product (yellow) and reliance on the Cabrera Report (red)). | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed. Chevron here provides no citation or evidence in this particular statement to support its conclusion that text was "nowhere else in the Lago Agrio Record". Defendants dispute Chevron's characterizations of what constitutes the official court record (*see* Resp. St. 101), and whether Chevron's claimed "unfiled work product" is truly absent from the record (*see* Resp. Sts. 126, 139, 144, 144, 149, 153, 160, 166). Furthermore, Chevron's cited Exhibit No. 3276 (Dkt. 763-5) includes conclusory argument absent in the original source document. *See* Dkt. 763-5, at p. 51 (arguing that judge Zambrano's disclaimed reliance was false). | Undisputed.  There is no genuine dispute that Section 13 of the judgment contains text, data, or other information found in the Cabrera Report. The judgment assesses $5.396 billion in soil remediation damages based in part on the conclusion that Chevron is responsible for remediating 880 pits in the former Concession.  Dkt. 763-5 at 125, 180 (Judgment).  There is no genuine dispute that the 880 pit count was derived from Annex H-1 to the Cabrera Report.  St. 172.  Moreover, the judgment relies on the Cabrera Report in assessing $150 million in damages for a potable water system, (St. 178, 180; 763-5 at 183), and its $200 million award to recover native flora and fauna.  St. 177; Dkt. 763-5 at 182.<br><br>Defendants offer nothing to dispute the obvious proposition that Section 14 of the judgment follows the Cabrera Report's unjust enrichment award. Both are numerically similar ($8.42B (Cabrera) vs. $8.64B (Judgment)).  *Compare* Dkt. 763-5 at 184–86 (Judgment) *with* Dkt. 9-2 (Supp. Cabrera Report) at 29.  The Cabrera Report contemplated that unjust enrichment would be awarded under the guise of "punitive" damages, Dkt. 33-15 at 50, and the judgment invokes "the benefits obtained through the wrong, as would be greater profits obtained by a lower cost of oil production," and the "economic benefit obtained" to justify the punitive damages award. Dkt. 763-5 at 185.<br><br>Defendants point to no record source for this information other than Cabrera.  In fact, in their final alegato, the LAPs relied on Cabrera as justification for categories of damages found in the Judgment.  Dkt. 400-12 at 48-58; 67-75 (Alegato "Basis for Damages" chart that includes Cabrera in each damage category).  Additionally, there is no genuine dispute as to what constitutes the record.  *See* St. 101.  Nor is there any dispute the LAPs' unfiled work product is absent from the record.  *See* Sts. 126, 139, 144, 149, 153, 160, 166. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | | Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact. It does not. The declaration does not mention the Cabrera Report or dispute that the judgment relies on the Cabrera Report. In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |
| 106.    Of the judgment's 188 pages, 51 contain text, data or other information found in the LAP team's unfiled work product but not found in the Lago Agrio Record. Stavers Decl., Ex. 3276 (certified translation of the judgment, highlighted to show overlap with the LAPs' unfiled work product (yellow) and reliance on the Cabrera Report (red)). | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed. Chevron here provides no citation or evidence in this particular statement to support its conclusion that text was "not found in the Lago Agrio Record". Defendants dispute Chevron's characterizations of what constitutes the official court record (*see* Resp. St. 101), and whether Chevron's claimed "unfiled work product" is truly absent from the record (*see* Resp. Sts. 126, 139, 144, 144, 149, 153, 160, 166). Furthermore, Chevron's cited Exhibit No. 3276 (Dkt. 763-5) includes conclusory argument absent in the original source document. *See* Dkt. 763-5, at p. 51 (arguing that judge Zambrano's disclaimed reliance was false). The same Exhibit also includes as part of its highlighted text of "unfiled work product" quotations from prior Ecuadorian case law, implying that citation to another court opinion was somehow improper. *See id.* at pp. 82–88. | Undisputed. There is no dispute that text, data, or other information found in the LAPs' unfiled work product appears in the judgment. Dkt. 658-7 (Leonard Report) at 13; Dkt. 658-7, 8 (Leonard Report) at Ex. 5; Dkt. 355-27 (Ex. 1076); Dkt. 763-5 at 65; St. 109; Dkt. 401-08 (Ex. 2182) at Ex. A at 9-17; Dkt. 763-5 at 101-02, 104-05, 108-12.<br><br>There is no genuine dispute as to what constitutes the record. *See* St. 101. Nor is there any dispute the LAPs' unfiled work product is absent from the record. *See* Sts. 126, 139, 144, 144, 149, 153, 160, 166.<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact. It does not. That declaration does not provide any evidence to dispute that the judgment contains text, data or other information found in the LAP team's unfiled work product, and it does not provide any basis to conclude that the unfiled work product is found in the Lago Agrio Record. In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |
| 107.    Of the judgment's 188 pages, 9 contain text, data or other information found in the Cabrera Report and nowhere else in the Lago Agrio record. Stavers Decl., Ex. 3276 (certified translation of the judgment, | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed. Chevron here provides no citation or evidence | Undisputed. There is no genuine dispute that the judgment awards compensatory damages in the same eight categories as the Cabrera Report. Nor is it disputed that those categories are supported by nothing else in the record except the Cabrera Report and the LAPs' final alegato, which |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| highlighted to show overlap with the LAPs' unfiled work product (yellow) and reliance on the Cabrera Report (red)). | in this particular statement to support its conclusion that text was "nowhere else in the Lago Agrio Record". Defendants dispute Chevron's characterizations of what constitutes the official court record (*see* Resp. St. 101), and whether Chevron's claimed "unfiled work product" is truly absent from the record (*see* Resp. Sts. 126, 139, 144, 144, 149, 153, 160, 166). Furthermore, Chevron's cited Exhibit No. 3276 (Dkt. 763-5) includes conclusory argument absent in the original source document. *See* Dkt. 763-5, at p. 51 (arguing that judge Zambrano's disclaimed reliance was false). | itself cites throughout to the Cabrera Report. St. 111.

There is no genuine dispute that Section 13 of the judgment contains text, data, or other information found in the Cabrera Report. The judgment assesses $5.396 billion in soil remediation damages based in part on the conclusion that Chevron is responsible for remediating 880 pits in the former Concession. Dkt. 763-5 at 125, 180. There is no genuine dispute that the 880 pit count was derived from Annex H-1 to the Cabrera Report. St. 172. Moreover, the judgment relies on the Cabrera Report in assessing $150 million in damages for a potable water system, (Sts. 178, 180; Dkt. 763-5 at 183), and its $200 million award to recover native flora and fauna. St. 177; Dkt. 763-5 at 182.

Defendants offer nothing to dispute the obvious proposition that Section 14 of the judgment follows the Cabrera Report's unjust enrichment award. Both are numerically similar ($8.42B (Cabrera) vs. $8.64B (Judgment)). *Compare* Dkt. 763-5 at 184–86 (Judgment) *with* Dkt. 9-2 (Supp. Cabrera Report) at 29. The Cabrera Report contemplated that unjust enrichment would be awarded under the guise of "punitive" damages, Dkt. 33-12 at 50, and the judgment invokes "the benefits obtained through the wrong, as would be greater profits obtained by a lower cost of oil production," and the "economic benefit obtained" to justify the punitive damages award. Dkt. 763-5 at 185.

Additionally, there is no genuine dispute as to what constitutes the record. *See* St. 101. Nor is there any dispute the LAPs' unfiled work product is absent from the record. *See* Sts. 126, 139, 144, 149, 153, 160, 166.

Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact. It does not. The declaration does not mention the Cabrera Report or dispute that the judgment relies on the Cabrera Report. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| 108.    The judgment's Introduction and Section 4 falsely disclaim reliance on the Cabrera Report and the Cleansing Expert reports.  Dkt. 168 at 51, 57. | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed. Chevron's statement that the judgment's disclaimer was "false" is pure attorney argument, improper for Rule 56.1 Statement, and runs counter to the Lago Agrio Judgment's assertion otherwise in the Chevron's cited materials for this statement. *See* Dkt. 168 at 51, 57; *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (citation omitted) ("'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'"). | Undisputed.  Defendants do not dispute that the judgment disclaims reliance on the Cabrera Report even though it uses the Cabrera Report, including for findings on soil remediation costs (pit count), potable water, and flora and fauna damages. *See* Sts. 172–180. Moreover, the determination that a factual statement is "false" is the essence of a fact question. It is not in any sense "attorney argument."<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact.  It does not.  The declaration does not mention the Cabrera Report or dispute that the judgment relies on the Cabrera Report. In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |
| 109.    The judgment contains overlap with an internal memorandum prepared by a member of the LAPs' team, Katia Gomez.  Dkt. 355-27 (Ex. 1076); Dkt. 168 at 65. | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed. Chevron's citation only shows that the judgment cites to the same legal opinion that was also cited by Katia Gomez. Chevron's citations provide no factual basis for any implication in its statement concerning work product "overlap". | Undisputed.  The memorandum prepared by Katia Gomez and the judgment share common citations and the following strings of overlapping text: "la autorización administrativa de la actividad no impone a los perjuicados el deber jurídico de soportarlas", "posibilidad técnica y económicamente razonable de disminuir." Dkt. 355-27 (Ex. 1076); Dkt. 763-5 at 65.<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact.  It does not.  The declaration does not mention the Katia Gomez document or dispute that the judgment contains language from that document.  In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |
| 110.    The judgment dismisses Chevron's fraud allegations by stating that the misconduct is entirely | **Donziger:**  Disputed. Chevron grossly mischaracterizes the Judgment.  First, the cited portion of the Judgment discusses "the par- | Undisputed.  Defendants' additional language is not contrary to Chevron's statement of fact. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| Donziger's, and that he is not a party or lawyer of record.  Dkt. 168 at 51. | ties' mutual charges of inappropriate conduct by the opposing party's collaborators . . . ." Dkt. 168 at 51. Second, the Judgment's discussion is limited to statements regarding the Ecuadorian judiciary, and not some broader fraud allegations by Chevron. *Id.* at 51-52. ("In addition, the Court notes that although it were to have the power to judge Mr. Donziger due to his disrespectful statements, it could not do so based on such limited portions, chosen and edited from hours of taping, and without giving the accused to [sic] right to defend himself or explain the context of those statements . . . ."). Third, the Lago Agrio Court did not credit Chevron's allegations because they were drawn from cunningly selected and out-of-context tape excerpts. *Id.*<br><br>**LAPs:**  Disputed. The statement calls for legal conclusion or interpretation of the Lago Agrio judgment. Further, Chevron's citation does not support the statement. The cited page does state that Donziger is not a party or lawyer of record, but that particular page of text only analyzes "the parties' mutual charges of inappropriate conduct by the opposing party's collaborators". Dkt. 168 at 51. | |
| 111.    The judgment awards compensatory damages in the same eight categories as the Cabrera Report, but those categories are supported by nothing else in the record except the Cabrera Report and the LAPs' final alegato, which itself cites throughout to the Cabrera Report.  Dkt. 168 at 176–84; Dkt. 6-2 (Exhibit 1) at CRS-269-01-04, 269-01-08; Dkt. 7-10 (Exhibit 2 (certified transcript) at 355-62 (Donziger meeting with Stratus representatives, without Cabrera, to plan the work for the Cabrera Report and discuss which damages categories to include in the Cabrera Report); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 2421:25- | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed. Chevron provides no citation or evidence to support its argument that the different damages "are supported by nothing else in the record." Despite pages and pages of citations to Statement 111, not one of them shows that nothing else in the record would have supported those types of damages. The different types of damages are ultimately supported by the evidence of Texpet's activities in the Oriente for many years and the resulting harms to the environment and people. Chevron has conceded that there can exist "a good-faith dispute among scientists about envi- | Undisputed.  Defendants do not dispute that the eight categories of damages mirror those of the Cabrera Report with the same substantive findings for each.  Nor do they dispute that they relied on the Cabrera Report for those categories of damages in their final trial brief to argue causation of the particular harm.  Defendants' argument that there can be a "good-faith" dispute over environmental conditions is irrelevant to the truth of this statement.<br><br>Defendants' assertions of inaccurate citations are themselves inaccurate. Dkt. 7-10 at 355-62 is a meeting between Donziger and Stratus where Donziger speaks of putting together the "categories of damages[.]" Dkt. 7-10 at 358. Dkt. 400-12-13 at 67-75 is a chart where the LAPs list |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| 2423:8 (Donziger testifying that he instructed Stratus regarding which damages categories to address in the Cabrera Report, that the damage categories were developed "exclusively" by the LAPs' team, and that the damages categories were not based on any discussions with Cabrera); Dkt. 400-12–13 (Ex. 2077) at 67-75 (2011.02.01 LAP final trial brief discussing relationship between the Cabrera Report and Barnthouse's report); Dkt. 400-22 (Ex. 2140) at 89 (2011.01.17 LAP trial brief stating that "the various categories of damage and injury . . . will be fully addressed at Part Two of Plaintiffs' Alegato Final, forthcoming"); Dkt. 400-12–13 (Ex. 2077) at 4-12 (2011.02.01 LAPs final trial brief section on "remediation of soil and groundwater" citing only: cleansing expert "Douglas Allen" (who offered no causation opinion) and "the Cabrera Report"); Dkt. 356-14 at 41-42 (Beltman told Donziger that he could find no "clear instances where Texpet did not meet the conditions required in the cleanup"); Dkt. 400-22 (Ex. 2140) at 89 (2011.01.17 LAP trial brief stating that "the various categories of damage and injury . . . will be fully addressed at Part Two of Plaintiffs' Alegato Final, forthcoming"); Dkt. 400-12–13 (Ex. 2077) at 4-12 (2011.02.01 LAPs final trial brief section on "remediation of soil and groundwater" citing only: cleansing expert "Douglas Allen" (who offered no causation opinion) and "the Cabrera Report"); Dkt. 400-22 (Ex. 2140) at 89 (2011.01.17 LAP trial brief stating that "the various categories of damage and injury . . . will be fully addressed at Part Two of Plaintiffs' Alegato Final, forthcoming"); Dkt. 400-12–13 (Ex. 2077) at 18-20 (2011.02.01 LAP final trial brief section on "ecosystem" damages citing only: cleansing expert | ronmental conditions in the Oriente or TexPet's operations there from the 1960s to the 1990s" (Dkt. 720 at 2), so a genuine question of fact remains.<br><br>Additionally, many of Chevron's citations include parentheticals that misquote or distort their cited text. *See, e.g.,* Dkt. 7-10 at 355-62 (contrary to Chevron's parenthetical, cited text does not discuss Cabrera or the Cabrera report); Dkt. 400-1 (Ex. 2010) at 2421:25-2423:8 (citation and parenthetical omit lines 15-24 immediately prior, where Donziger denies the contention that Cabrera did not use his own investigation for his report); Dkt. 400-12 13 (Ex.2077) at 67-75 (Contrary to Chevron's parenthetical, cited pages do not discuss relationship between Cabrera and Barnthouse); Dkt. 356-14 at 41-42 (Chevron's parenthetical omits later sentence regarding sampling finding "very large exception"); Dkt. 400-12-13 (Ex. 2140) at 89 (cited page does not exist); | Cabrera as the "basis for the award of damages" for all eight categories in the judgment. Defendants' claim for Ex. 2140 at 89 that the "cited pages does not exist" is a function of them using the uncorrected version of Chevron's 56.1 statement. See Dkt. 764 at 49 (corrected 56.1 correcting citation of Dkt. 400-12-13 (Ex. 2140 at 89) to Dkt. 400-22 (Ex. 2140 at 89).<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact. It does not. The declaration does not mention the Cabrera Report or dispute that the compensatory damage categories in the judgment are the same as the Cabrera Report. In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| "Dr. Barnthouse" (who offered no causation opinion) and "the Cabrera Report"); Dkt. 108-13 (STRATUSNATIVE067644) at 1-2 (Beltman stating, "I do not think that contamination sufficient to impact the ecology extends very far beyond the pads, pits, and spills at the wells.") Dkt. 400-22 (Ex. 2140) at 89 (2011.01.17 LAP trial brief stating that "the various categories of damage and injury . . . will be fully addressed at Part Two of Plaintiffs' Alegato Final, forthcoming"); Dkt, 400-22 (Ex. 2077) at 20-27 (2011.02.01 LAP final trial brief section on "adverse impacts to indigenous cultures" citing only one expert in support of their claims: "the Cabrera Report"); Dkt. 400-12–13 (Ex. 2140) at 89 (2011.01.17 LAP trial brief stating that "the various categories of damage and injury . . . will be fully addressed at Part Two of Plaintiffs' Alegato Final, forthcoming."); Dkt. 400-22 (Ex. 2077) at 39-48 (2011.02.01 LAP final trial brief section on "devastating effects caused on public health" citing: cleansing expert "Picone" (who offered no causation opinion) and "the Cabrera Report"); Dkt. 400-12–13 (Ex. 2140) at 89 (LAP January 17, 2011 trial brief stating that "the various categories of damage and injury . . . will be fully addressed at Part Two of Plaintiffs' Alegato Final, forthcoming."); Dkt. 400-22 (Ex. 2077) at 48-59 (2011.02.01 LAP final trial brief section on "drinking water" citing only cleansing expert "Scardina" (who offered no causation opinion) and "the Cabrera Report"); Dkt. 400-12–13 (Ex. 2140) at 89 (2011.01.17 LAP trial brief stating that "the various categories of damage and injury . . . will be fully addressed at Part Two of Plaintiffs' Alegato Final, forthcoming."); Dkt. 400-22 (Ex. 2077) at 59-65 | | |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| (2011.02.01 LAP final trial brief section on "excess cancer" citing only cleansing expert "Rourke" (who offered no causation opinion) and "Cabrera"); *Compare* Dkt. 33-12 at 5-6 (Cabrera Report recommending a $1.7 billion award for soil remediation), and Dkt. 9-2 at 18 (Supplemental Cabrera Report estimating that the "total cost for remediating the soil to 100 ppm TPH should be $2,743,000,000"), *with* Dkt. 168 at 182 (Judgment awarding $5,396,160,000.00 to "recover the natural conditions of the soil impacted by Texpet's activities"); *Compare* Dkt. 33-12 at 6 (Cabrera Report recommending a $428 million award to provide "potable water to the people living in the Concession area and within its area of influence"), and Dkt. 9-2 at 53 (same), *with* Dkt. 168 at 183-84 (Judgment awarding $150 million for regional potable water systems which will transport water "from other parts of the region through aqueducts . . ."); *Compare* Dkt. 33-12 at 6, 33-14 at 41, 44-45 (Cabrera Report recommending a $480 million award to provide "healthcare systems for the region's population . . ."), and Dkt. 9-2 at 53 (same), *with* Dkt. 168 at 184 (Judgment awarding $1.4 billion for a "health system, to cover the health needs created by the public health problem occasioned by the acts of the defendant . . ."); *Compare* Dkt. 33-12 at 6, 33-14 at 34-35 (Cabrera Report recommending a $430 million award to "implement a plan for recovering the territory, food supply and culture for the ancestral indigenous groups that have been affected by Texaco's operations"), and Dkt. 9-2 at 53 (same), *with* Dkt. 168 at 184 (Judgment awarding $100 million for a "community reconstruction and ethnic reaffirmation program" to redress "cultural harm"); *Compare* Dkt. 33-12 at 7, 9; | | |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| 33-15 at 48-49 (Cabrera Report claiming that the "[p]eople in the region suffer increased rates of cancer" and recommending a $2,910,400,000 award as "appropriate compensation for the excessive number of deaths from cancer suffered by the people living in the Concession area"), *and* Dkt. 9-2 at 35-38 (Supplemental Cabrera Report estimating "the total monetary value of excessive deaths due to cancer" at $9.527 billion), *with* Dkt. 168 at 185 (Judgment claiming "sufficient indications to demonstrate the existence of an excessive number of deaths from cancer"); *see id.* at 140-46 (Judgment relying on lay witness testimony regarding the cause of cancer and self-reported surveys); Dkt. 400-22 (Ex. 2142) (Annex Q of the Cabrera Report) at 1-5 (citing self-reported cancer surveys); Dkt. at 168 at 132-35 (Judgment citing two studies published by Dr. Miguel San Sebastian: the Yana Curi Report and Cancer in Ecuadorian Amazon); Dkt. 400-22 (Ex. 2143) (Annex P of the Cabrera Report) at 9, 10, 13 (same); Dkt. 402-3 (Ex. 2237) at 9-18 (Dr. Michael A. Kelsh, Ph.D., Rebuttal to Mr. Cabrera's Excess Cancer Death and other Health Effects Claims, and his Proposal for a New Health Infrastructure); *Compare* Dkt. 33-12 at 6, 33-15 at 49-50 (Cabrera Report recommending between $875 million and $1.697 billion in damages to "restore" tropical rainforest and compensate "for the loss of the rain forest ecosystem"), *and* Dkt. 9-2 (Supplemental Cabrera Report) at 53 (same), *with* Dkt. 168 at 183 (Judgment awarding $ 200 million "to recover the native flora, fauna, and the aquatic life of the zone . . ."); *Compare* Dkt. 9-2 at 12-14, 53 (Supplemental Cabrera Report recommending an award of $3,236,350,000 to remediate groundwa- | | |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| ter), *with* Dkt. 168 at 180 (Judgment awarding $600 million for "the cleanup of groundwater"). | | |
| 112.    Section 14 of the judgment imposes punitive damages that are illegal under Ecuadorian law, and follows the Cabrera Report's unjust enrichment award in justification and size.  Dkt. 400-21 (Ex. 2137) (DONZ00038323) (Donziger writing: "Punitive: no basis in Ecuadorian law, but we could push it and seek it anyway."); Dkt. 400-21 (Ex. 2136) (Expert Report of Dr. Gustavo Romero Ponce) ¶ 6 ("Punitive damages are not recognized by Ecuadorian law."); Dkt. 402-16 (Ex. 2349) (Expert Report of Dr. César Coronel Jones) ¶ 25 ("The choice in the Decision to award punitive damages constitutes a clear violation of Ecuadorian law: (1) There are no legal grounds for asserting the existence of punitive damages in Ecuador. (2) I know of no [other] case in which an Ecuadorian judge has awarded punitive damages in Ecuador."); *Compare* Dkt. 168 (Lago Agrio Judgment) at 184–86 *with* Dkt. 33-12 at 7 (Cabrera Report). | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed. The statement is legal argument and conclusion regarding the interpretation of the Lago Agrio Judgment and is improper in a Rule 56.1 statement of facts. Furthermore, the conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)). Moreover, this statement consists of an improper legal conclusion, which the Court should strike or disregard. *See, e.g., Antunes v. Putnam/N. Westchester Bd. of Co-op. Educ. Services*, 09-CV-3063 CS, 2011 WL 1990872 (S.D.N.Y. May 19, 2011) *aff'd sub nom. Antunes v. Putnam N. Westchester Bd. of Co-op. Educ. Services*, 482 Fed. Appx. 661 (2d Cir. 2012) ("I need not consider statements in a Local Rule 56.1 submission that are "legal conclusions in the guise of an undisputed statement of fact.").<br><br>The conclusions contained in St. 112 are based only the reports of paid expert witnesses. Even if considered, Dr. Romero's report is conclusory and unreliable, and offers no citation to statute or case law to substantiate his opinion. Dkt. 400-21 ¶ 6 (citing only his former reports, which are not attached to Romero's report and unverifiable).<br>Even if considered, Dr. Coronel-Jones' report does not sufficiently | Undisputed.  Defendants' assertion that the "opinion of an expert" cannot be used in support of a Rule 56.1 statement is facially ridiculous and not supported by the cases cited.  To the contrary, courts routinely rely on expert evidence in deciding summary judgment motions.  *Mobileye, Inc. v. Picitup Corp.*, 2013 WL 830837, *18 (S.D.N.Y. Mar. 5, 2013); *Gill v. Arab Bank, PLC*, --- F.Supp.2d ----, 2012 WL 5395746, *21 (E.D.N.Y. Nov. 6, 2012); *Maytag Corp. v Electrolux Home Prods.*, 448 F. Supp. 2d 1034, 1064–65 (N.D. Iowa 2006).<br><br>There is no genuine dispute that punitive damages do not exist under Ecuadorian law.  Defendants' own internal memorandum explains "Punitive: no basis in Ecuadorian law, but we could push it and seek it anyway." Dkt. 400-21 (Ex. 2137) (DONZ00038322-23) at 2; *see* Dkt. 462-44 (Ex. 2349), ¶ 25 (Expert Report of Dr. César Coronel Jones).  Defendants have cited nothing to the contrary, which they would be able to do quite easily if Ecuadorian law did provide for punitive damages.<br><br>Defendants offer nothing to dispute the obvious proposition that the judgment follows the Cabrera Report's unjust enrichment award.  Both are numerically similar ($8.42B (Cabrera) vs. $8.64B (Judgment)).  *Compare* Dkt. 168 at 184–86 (Judgment) *with* Dkt. 9-2 (Supp. Cabrera Report) at 29.  The Cabrera Report contemplated that unjust enrichment would be awarded under the guise of "punitive" damages, Dkt. 33-15 at 50, and the judgment invokes "the savings (and profitability) that accrued to Texpet (and later Chevron) from using inappropriate technology to prevent damage in the Amazon."  Dkt. 400-21 (Ex. 2134) (Clarification Order) at 9.<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact.  It does not.  The declaration does not mention the |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | substantiate its conclusions regarding punitive damages. Coronel Jones makes the assertion that "only direct damages can be compensated is a fundamental part of our law", citing his sources in footnotes in paragraphs 25 and 26, and footnotes 40 and 44. Dkt. 402-16 (Coronel Jones Report) at 16. But his citations all speak to contract law, criminal law, or unjust enrichment issues. *Id*. at 15. The Lago Agrio Judgment, however, does not state that the damages multiplier falls under any of those categories. Dkt. 168 at 184–86. Coronel Jones also claims that Ecuador traditionally limits damages to actual harm, but he sites only himself as authority for the proposition. *Id*.<br><br>Nor should Chevron be permitted to rely on the reports of Dr. Romero or Dr. Coronel-Jones. Defendants have not yet been permitted the opportunity to conduct expert discovery in this case. Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures. Dkt. 703 at 2. Dr. Coronel-Jones was not designated as one of Chevron's experts, and his testimony should thus be struck. Defendants have not been afforded sufficient time to review and analyze the material provided in these reports. At the very least, Defendants must be given the opportunity to depose or cross-examine Dr. Romero and Dr. Coronel-Jones. *See* Fed. R. Civ. P. 56(d).<br><br>Chevron's argument that the judgment "follows the Cabrera Report's unjust enrichment award in justification and size" is disputed. Chevron offers no evidence to support this claim. The provided citation to the Lago Agrio Judgment does not state that it is following the Cabrera Report. Dkt. 168 at 184-86. The Lago Agrio Judgment's damages multiplier states that it is based on a variety of different factors. *See, e.g., id*. at 185 ("for punitive and dissuasive purposes"). Finally, the Lago Agrio Judgment disclaims reli- | determination of punitive damages, does not dispute that punitive damages are illegal under Ecuadorian law, and does not dispute that the punitive damages imposed in the judgment follow the Cabrera Report's unjust enrichment award in justification or size. In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | ance on the Cabrera Report. Dkt. 168 at 51. | |
| 113.    The judgment recognizes that the LAPs did not request punitive damages in their complaint.  Dkt. 29-17 (Lago Complaint); Dkt 168 (Lago Agrio Judgment) at 185. | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed. The Judgment includes the qualification that the damages were not "requested in *express* manner". Dkt. 168 at 185 (emphasis added). | Undisputed.  Defendants do not dispute that the cited page of the judgment recognizes that the LAPs did not request punitive damages in their complaint.  Dkt. 400-21 (Ex. 2134) (Clarification Order) at 9 ("Neither did the Court's ruling violate Article 273 of the Code of Civil Procedure by imposing punitive damages, since they cannot be requested in the complaint unless done recklessly and without earnestness . . . ."). |
| 114.    No single person could have reviewed the entire Lago Agrio Record and written the 188-page judgment between December 17, 2010, when Judge Zambrano claims to have begun reviewing the record, and February 14, 2011, when he issued the judgment. Stavers Decl., Ex. 3124 (Rayner Report) at 5. | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed. The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19, 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).<br><br>The conclusion in St. 114 is based only on the opinion of a paid expert witness. Even if considered, Dr. Rayner's report is unreliable because it hinges upon several incorrect, inadmissible, or unsubstantiated assertions. The flaws in Rayner's assumptions render his opinion fatally flawed in turn. First, Rayner's entire report is premised on the assumption that Judge Zambrano did not begin reading the Lago Agrio Record until December 17, 2010. Neither Rayner nor Chevron provide any basis for this assertion. Rayner himself notes that Zambrano had been working on the Lago Agrio case at least since October 21, 2009 (Dkt. 754-11 at CVX-RICO-0509446) but provides no explanation as to why Zambrano could not have begun familiarizing himself with the case filings then. | Undisputed.  There is no genuine dispute that Zambrano could not have reviewed the record or written the judgment in the time he had.  Defendants pick at Dr. Rayner's methods, but not convincingly so.  They claim that Zambrano was on the case since "October 21, 2009," but fail to mention that he only reassumed the case in October 2010.  Stavers Decl., Ex. 3659 (2010.09.17 Ordonez Recusal Order; *id.*, Ex. 3660 (2010.10.11 Zambrano Order).  Defendants complain that a Reuters article is "hearsay," but Rule 703 "permits an expert to rely on hearsay in reaching his own opinion[.]"  *Marvel Worldwide, Inc. v. Kirby*, 777 F. Supp. 2d 720, 729 (S.D.N.Y. 2011).<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact.  It does not.  In the declaration, Zambrano claims that he reviewed "each of the documents submitted by the litigant parties," ¶ 15, and had "concluded reviewing the record" by January of 2011, ¶ 12. Even if Zambrano read the record for eight hours a day, every day that he was acting as the judge presiding over the Lago Agrio case, he could not have completed reading the record by January of 2011.  Dkt. 754-11 (Ex. 3124) at 2-3 ("Even if Judge Zambrano spent 8 hours per day reading [the record], it would have taken him 448 days, or 64 weeks – over one year."). In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | Nothing in Rayner's report or CV indicates any qualification to opine on the procedural rules governing Ecuadorian judges' access to and reading requirements concerning the documents submitted in litigation. Second, Rayner's report also rests on assumptions drawn from unsubstantiated and inadmissible hearsay in the form of a Reuters article. Neither Rayner nor Chevron provide or even cite to a copy of the article discussed. Rayner's assertions as to a Reuters journalist's assertions as to Zambrano's assertions are hearsay, to put it mildly, and call into question all of Rayner's subsequent conclusions as to the timing of Zambrano's review. Third, Rayner provides no firm basis for making his calculations based on average reading speed rather than a composite speed of reading and "skimming". Rather than explain reading strategies, Rayner's report digresses into long asides in his pet topic of eye movement physiology, which does not materially bear on the issues presented for summary judgment. Dkt. 754-11 at 3–5.<br><br>Nor should Chevron be permitted to rely on the report of Dr. Rayner. Defendants have not yet been permitted the opportunity to conduct expert discovery in this case. Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures. Dkt. 703 at 2. Defendants have not been afforded sufficient time to review and analyze the material provided in this report. At the very least, Defendants must be given the opportunity to depose or cross-examine Dr. Rayner. *See* Fed. R. Civ. P. 56(d).<br><br>Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 43). Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion. | In a transparent attempt to refute Chevron's argument that Zambrano did not have enough time to review the record, Defendants offer the inadmissible, purported Zambrano declaration which claims that Zambrano reviewed the record extensively during his first tmer as presiding judge, and worked late during his second.  But even if Zambrano had reviewed the entire record at the point he was assigned off the case in February 2010, he would still have had over 50,000 pages of record to review from the time he started on the case again. At 300 words per minute, reading 8 hours per day, 7 days per week—more than a full time job—it would have taken Zambrano 105 days *just to read* the record, leaving no time for his other duties, or to write the 188-page single-spaced judgment. *See* Ex. 3681 (Supplemental Report of Keith Rayner, April 11, 2013). |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| 115.   Authorship of any portion of the judgment by anyone other than Judge Zambrano, the presiding judge in the case, was illegal under Ecuadorian law. Stavers Decl., Ex. 3123 (Romero Report), ¶¶ 36–43. | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed. The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)). Moreover, this statement consists of an improper legal conclusion, which the Court should strike or disregard. *See, e.g.*, *Antunes v. Putnam/N. Westchester Bd. of Co-op. Educ. Services*, 09-CV-3063 CS, 2011 WL 1990872 (S.D.N.Y. May 19, 2011) *aff'd sub nom. Antunes v. Putnam N. Westchester Bd. of Co-op. Educ. Services*, 482 Fed. Appx. 661 (2d Cir. 2012) ("I need not consider statements in a Local Rule 56.1 submission that are "legal conclusions in the guise of an undisputed statement of fact.").<br><br>The conclusion in St. 115 is based only on the opinion of a paid expert witness. Even if considered, Dr. Romero's report only discusses the participation of others in the adjudicatory process, and not whether the Judge, as author of the judgment, may choose to incorporate other references or language on his own initiative. *See* Dkt. 754-10 at 22. Furthermore, Dr. Romero's opinion assumes facts not yet established in this case.  *Id.* at 25.<br><br>Nor should Chevron be permitted to rely on the report of Dr. Romero. Defendants have not yet been permitted the opportunity to conduct expert discovery in this case. Under the schedule agreed to among the parties, Chevron did not disclose its experts | Undisputed.  Defendants do not dispute that authorship of any portion of the judgment by anyone other than Judge Zambrano was illegal under Ecuadorian law as they offer the unsupported hypothesis that Judge Zambrano's incorporation of other references or language on his own initiative may have been admissible.  *Rodriguez*, 1999 WL 459813, at *1 n.3 ("If the non-movant asserts that a fact claimed by the movant to be undisputed is actually in dispute, the non-movant *must* cite evidence on the record to support its contention.") (emphasis in original).<br><br>Defendants' assertion that the "opinion of an expert" cannot be used in support of a Rule 56.1 statement is facially ridiculous and not supported by the cases cited.  To the contrary, courts routinely rely on expert evidence in deciding summary judgment motions.  *Mobileye, Inc. v. Picitup Corp.*, 2013 WL 830837, *18 (S.D.N.Y. Mar. 5, 2013); *Gill v. Arab Bank, PLC*, --- F.Supp.2d ----, 2012 WL 5395746, *21 (E.D.N.Y. Nov. 6, 2012); *Maytag Corp. v Electrolux Home Prods.*, 448 F. Supp. 2d 1034, 1064–65 (N.D. Iowa 2006). |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures. Dkt. 703 at 2. Defendants have not been afforded sufficient time to review and analyze the material provided in this report. At the very least, Defendants must be given the opportunity to depose or cross-examine Dr. Romero. *See* Fed. R. Civ. P. 56(d). | |
| 116.    Reliance on evidence outside the record by Judge Zambrano (or anyone else) in drafting the judgment was illegal under Ecuadorian law.  Stavers Decl., Ex. 3123 (Romero Report), ¶ 44. | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed. The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)). Moreover, this statement consists of an improper legal conclusion, which the Court should strike or disregard. *See, e.g., Antunes v. Putnam/N. Westchester Bd. of Co-op. Educ. Services*, 09-CV-3063 CS, 2011 WL 1990872 (S.D.N.Y. May 19, 2011) *aff'd sub nom. Antunes v. Putnam N. Westchester Bd. of Co-op. Educ. Services*, 482 Fed. Appx. 661 (2d Cir. 2012) ("I need not consider statements in a Local Rule 56.1 submission that are "legal conclusions in the guise of an undisputed statement of fact.").<br><br>The conclusion in St. 116 is based only on the opinion of a paid expert witness. Even if considered, Dr. Romero's report does not cite Ecuadorian law or Ecuadorian legal authority to the extent, if any, that the Report supports the proposition of St. 116. The relevant paragraph in Dr. Romero's report only cites two works in relation to the proposition of St. 116. Dkt. 754-10 at 24 (citing two | Undisputed.  Defendants do not dispute that reliance on evidence outside the record by Judge Zambrano (or anyone else) in drafting the judgment was illegal under Ecuadorian law as they only offer unsupported, irrelevant objections to the Romero Report.  *Rodriguez*, 1999 WL 459813, at *1 n.3 ("If the non-movant asserts that a fact claimed by the movant to be undisputed is actually in dispute, the non-movant *must* cite evidence on the record to support its contention.") (emphasis in original).<br><br>Defendants' assertion that the "opinion of an expert" cannot be used in support of a Rule 56.1 statement is facially ridiculous and not supported by the cases cited.  To the contrary, courts routinely rely on expert evidence in deciding summary judgment motions.  *Mobileye, Inc. v. Picitup Corp.*, 2013 WL 830837, *18 (S.D.N.Y. Mar. 5, 2013); *Gill v. Arab Bank, PLC*, --- F.Supp.2d ----, 2012 WL 5395746, *21 (E.D.N.Y. Nov. 6, 2012); *Maytag Corp. v Electrolux Home Prods.*, 448 F. Supp. 2d 1034, 1064–65 (N.D. Iowa 2006). |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | works by Hernando Devis Echandia). Neither of these legal texts seems to concern Ecuadorian law. *See* H. Devis Echandia, *Nociones Generales de Derecho Procesal Civil*, 2d Ed. 2009, http://www.scribd.com/doc/95286561/Nociones-Generales-de-Derecho-Procesal-Civil-Hernando-Devis-Echandia; *see also* H. Devis Echandia , *Teoria General de la Prueba Judicial*, http://www.scribd.com/doc/79035479/Teoria-General-de-La-Prueba-Judicial-Tomo-i-Hernando-Devis-Echandia-2.<br><br>Nor should Chevron be permitted to rely on the report of Dr. Romero. Defendants have not yet been permitted the opportunity to conduct expert discovery in this case. Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures. Dkt. 703 at 2. Defendants have not been afforded sufficient time to review and analyze the material provided in this report. At the very least, Defendants must be given the opportunity to depose or cross-examine Dr. Romero. *See* Fed. R. Civ. P. 56(d). | |
| 117.   Ecuadorian law obligates the judge to read, review, study and analyze all of the existing record before issuing a judgment.  Stavers Decl., Ex. 3123 (Romero Report), ¶ 44. | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed. The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)). Moreover, this statement consists of an improper legal conclusion, which the Court should strike or disregard. *See, e.g., Antunes v.* | Undisputed.  Defendants do not dispute that Ecuadorian law obligates the judge to read, review, study, and analyze all of the existing record before issuing a judgment as they only offer unsupported, irrelevant objections to the Romero Report. *Rodriguez*, 1999 WL 459813, at *1 n.3 ("If the non-movant asserts that a fact claimed by the movant to be undisputed is actually in dispute, the non-movant *must* cite evidence on the record to support its contention.") (emphasis in original).<br><br>Defendants' assertion that the "opinion of an expert" cannot be used in support of a Rule 56.1 statement is facially ridiculous and not supported by the cases cited.  To the contrary, courts routinely rely on expert evidence in deciding summary judgment motions.  *Mobileye, Inc. v. Picitup Corp.*, 2013 WL 830837, *18 (S.D.N.Y. Mar. 5, 2013); *Gill v. Arab Bank,* |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | *Putnam/N. Westchester Bd. of Co-op. Educ. Services*, 09-CV-3063 CS, 2011 WL 1990872 (S.D.N.Y. May 19, 2011) *aff'd sub nom. Antunes v. Putnam N. Westchester Bd. of Co-op. Educ. Services*, 482 Fed. Appx. 661 (2d Cir. 2012) ("I need not consider statements in a Local Rule 56.1 submission that are "legal conclusions in the guise of an undisputed statement of fact."). <br><br>The conclusion in St. 117 is based only on the opinion of a paid expert witness. Even if considered, Dr. Romero's report does not cite to any legal authority—other than Romero's own former opinion for Chevron—for the proposition that the judge must read *all* of the existing record. *See* Dkt. 754-10 at 24 (citing Art. 274 of Code of Civil Procedure, which only states that judgments must be grounded "in the law and merits of the proceeding"). <br><br>Nor should Chevron be permitted to rely on the report of Dr. Romero. Defendants have not yet been permitted the opportunity to conduct expert discovery in this case. Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures. Dkt. 703 at 2. Defendants have not been afforded sufficient time to review and analyze the material provided in this report. At the very least, Defendants must be given the opportunity to depose or cross-examine Dr. Romero. *See* Fed. R. Civ. P. 56(d). | *PLC*, --- F.Supp.2d ----, 2012 WL 5395746, *21 (E.D.N.Y. Nov. 6, 2012); *Maytag Corp. v Electrolux Home Prods.*, 448 F. Supp. 2d 1034, 1064–65 (N.D. Iowa 2006). |
| 118.    Unlike U.S. judges, judges in Ecuador do not have law clerks or other professional staff who are allowed to assist in the drafting of judicial opinions. Stavers Decl., Ex. 3123 (Romero Report), ¶¶ 37–40. | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact. <br><br>**LAPs:**  Disputed. The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain con- | Undisputed.  Defendants do not dispute that judges in Ecuador do not have law clerks or other professional staff who are allowed to assist in the drafting of judicial opinions as they only offer unsupported, irrelevant objections to the Romero Report. *Rodriguez*, 1999 WL 459813, at *1 n.3 ("If the non-movant asserts that a fact claimed by the movant to be undisputed is actually in dispute, the non-movant *must* cite evidence on the record to support its contention.") (emphasis in original). |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | clusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)). Moreover, this statement consists of an improper legal conclusion, which the Court should strike or disregard. *See, e.g., Antunes v. Putnam/N. Westchester Bd. of Co-op. Educ. Services*, 09-CV-3063 CS, 2011 WL 1990872 (S.D.N.Y. May 19, 2011) *aff'd sub nom. Antunes v. Putnam N. Westchester Bd. of Co-op. Educ. Services*, 482 Fed. Appx. 661 (2d Cir. 2012) ("I need not consider statements in a Local Rule 56.1 submission that are "legal conclusions in the guise of an undisputed statement of fact."). The conclusion in St. 118 is based only on the opinion of a paid expert witness. Even if considered, Dr. Romero's report cited by Chevron only refers to his conclusions in a former report, not included here, as authority to support the conclusion in St. 118 (comparisons with U.S. judges and clerks). *See* Dkt. 754-10 at 21–22 (citing only previous Romero reports). A further citation provided by Romero allows for a catch-all category of "other servants of the judicial branch" and conflicts with Romero's previous suggestion that clerks could not be part of the judicial offices. *Id.* at 22, n.75 (identifying members of the judiciary). Nor should Chevron be permitted to rely on the report of Dr. Romero. Defendants have not yet been permitted the opportunity to conduct expert discovery in this case. Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures. Dkt. 703 at 2. Defendants have not been afforded sufficient time to review and analyze the material provided in this report. At the very least, Defendants must be given the opportunity to depose or cross-examine Dr. Romero. | Defendants' assertion that the "opinion of an expert" cannot be used in support of a Rule 56.1 statement is facially ridiculous and not supported by the cases cited. To the contrary, courts routinely rely on expert evidence in deciding summary judgment motions. *Mobileye, Inc. v. Picitup Corp.*, 2013 WL 830837, *18 (S.D.N.Y. Mar. 5, 2013); *Gill v. Arab Bank, PLC*, --- F.Supp.2d ----, 2012 WL 5395746, *21 (E.D.N.Y. Nov. 6, 2012); *Maytag Corp. v Electrolux Home Prods.*, 448 F. Supp. 2d 1034, 1064–65 (N.D. Iowa 2006). |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | *See* Fed. R. Civ. P. 56(d). | |
| 119.     Oral argument transcripts are part of the record in Ecuador.  Stavers Decl., Ex. 3123 (Romero Report) at 24 n. 88. | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed. Although certain oral arguments can be incorporated into the record in Ecuador, Defendants dispute the assertion that all argument is transcribed. Furthermore, Defendants dispute Chevron's characterization of the scope of the Lago Agrio Record. *See* Resp. to St. 101.<br><br>The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)). Moreover, this statement consists of an improper legal conclusion, which the Court should strike or disregard. *See, e.g.*, *Antunes v. Putnam/N. Westchester Bd. of Co-op. Educ. Services*, 09-CV-3063 CS, 2011 WL 1990872 (S.D.N.Y. May 19, 2011) *aff'd sub nom. Antunes v. Putnam N. Westchester Bd. of Co-op. Educ. Services*, 482 Fed. Appx. 661 (2d Cir. 2012) ("I need not consider statements in a Local Rule 56.1 submission that are "legal conclusions in the guise of an undisputed statement of fact.").<br><br>The conclusion in St. 119 is based only on the opinion of a paid expert witness. Even if considered, Dr. Romero's report contradicts St. 119 where it reports that for some courtroom hearings, "no *acta* whatsoever is subscribed" into the record. Dkt. 754-10 at 24 n.88. | Undisputed.  Defendants do not dispute that, as a matter of course, oral argument transcripts are part of the record in Ecuador as they only offer the unsupported hypothesis that "all argument is transcribed." *Rodriguez*, 1999 WL 459813, at *1 n.3 ("If the non-movant asserts that a fact claimed by the movant to be undisputed is actually in dispute, the non-movant *must* cite evidence on the record to support its contention.") (emphasis in original).<br><br>Defendants' assertion that the "opinion of an expert" cannot be used in support of a Rule 56.1 statement is facially ridiculous and not supported by the cases cited.  To the contrary, courts routinely rely on expert evidence in deciding summary judgment motions. *Mobileye, Inc. v. Picitup Corp.*, 2013 WL 830837, *18 (S.D.N.Y. Mar. 5, 2013); *Gill v. Arab Bank, PLC*, --- F.Supp.2d ----, 2012 WL 5395746, *21 (E.D.N.Y. Nov. 6, 2012); *Maytag Corp. v Electrolux Home Prods.*, 448 F. Supp. 2d 1034, 1064–65 (N.D. Iowa 2006). |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | Nor should Chevron be permitted to rely on the report of Dr. Romero. Defendants have not yet been permitted the opportunity to conduct expert discovery in this case. Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures. Dkt. 703 at 2. Defendants have not been afforded sufficient time to review and analyze the material provided in this report. At the very least, Defendants must be given the opportunity to depose or cross-examine Dr. Romero. *See* Fed. R. Civ. P. 56(d). | |
| 120.    Zambrano was the Provincial Director of the Judicial Council for the court and was personally in-volved in the selection of the panel for second instance review of the judgment, which was not held by public lottery as the law requires.  Dkt. 356-12 at 94-145; Dkt. 400-17 (Ex. 2113); Dkt. 402-1 (Ex. 2207). | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plain-tiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed. Chevron's only cited material concerning the legal requirements of lottery or discussing Zambrano's "personal" involvement are from Chevron's own previous attorney argument in the form of a March 30, 2011 brief. *See* Dkt. 356-12 at 99–111. Such attorney argument and legal conclusions are inappropriate for a Rule 56.1 statement. *See, e.g., Antunes v. Putnam/N. Westchester Bd. of Co-op. Educ. Services*, 09-CV-3063 CS, 2011 WL 1990872 (S.D.N.Y. May 19, 2011) *aff'd sub nom. Antunes v. Putnam N. Westchester Bd. of Co-op. Educ. Services*, 482 Fed. Appx. 661 (2d Cir. 2012) ("I need not consider statements in a Lo-cal Rule 56.1 submission that are "legal conclusions in the guise of an undisputed statement of fact."). The attorney arguments' cited by Chevron also include hearsay characterizations of Ecuadorian legal texts. | Undisputed.  While Defendants complain of Chevron's reliance on filings in the Lago Agrio litigation, they do not cite any filings or evidence con-taining evidence contradicting this statement. |
| 121.    The panel that conducted the second instance review of the judgment changed composition several times before being finalized, issued its affirmance just | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plain-tiffs' response to this alleged fact. | Undisputed.  Defendants do not dispute the facts set forth in the statement and offer no evidence supporting their bald assertion that Chevron's sup-posed "gloss" is incorrect. *Rodriguez*, 1999 WL 459813, at *1 n.3 ("If the |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| one month later, and, at the LAPs' request, issued a "Clarification Order" hours after Chevron submitted its objections to the request.  Dkt. 356-12 at 94-145; Dkt. 400-17 (Ex. 2113); Dkt. 402-1 (Ex. 2207); Dkt. 400-25 (Ex. 2147) (Clarification Order); Dkt. 400-26 (Ex. 2148) (Chevron's objections to Plaintiffs' Requests for Clarification). | **LAPs:**  Characterization disputed. Chevron's unnecessary gloss of characterization in St. 121 ("several times" "just one month" "hours after") constitutes attorney argument to its statement, which is inappropriate under Rule 56.1. "Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . ." *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (Kaplan, J.) (quotation omitted). The facts in the record also show that Chevron chose to wait almost a week after Plaintiffs submissions to submit its objections, near the end of the business day. Dkt. 400-25 (Ex. 2147); Dkt. 400-26 (2148). | non-movant asserts that a fact claimed by the movant to be undisputed is actually in dispute, the non-movant *must* cite evidence on the record to support its contention.") (emphasis in original).  Defendants' assertion that the "opinion of an expert" cannot be used in support of a Rule 56.1 statement is facially ridiculous and not supported by the cases cited. To the contrary, courts routinely rely on expert evidence in deciding summary judgment motions. *Mobileye, Inc. v. Picitup Corp.*, 2013 WL 830837, *18 (S.D.N.Y. Mar. 5, 2013); *Gill v. Arab Bank, PLC*, --- F.Supp.2d ----, 2012 WL 5395746, *21 (E.D.N.Y. Nov. 6, 2012); *Maytag Corp. v Electrolux Home Prods.*, 448 F. Supp. 2d 1034, 1064–65 (N.D. Iowa 2006). |
| 122.    In its January 3, 2012 order, the second instance review panel stated that it had no "competence" to address the allegations of fraud against the LAP team. Dkt. 383-1 (Appellate Judgment) at 10. | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.  **LAPs:**  Disputed. The cited statements are not factual averments, and the relevant order speaks for itself. Legal conclusions interpreting court orders constitute attorney argument inappropriate under Rule 56.1. Furthermore, the review panel later clarified and asserted its ability to review the allegations of fraud. Dkt. 384-1 at 5–6. Moreover, Chevron previously submitted a similar statement with the same evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 198). Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion. | Undisputed.  The LAPs do not challenge the content of this statement but instead point to a later opinion issued by the second instance review panel addressed in St. 123, below. |
| 123.    In its January 13, 2012 "Clarification Order," the second instance review panel stated in reference to the allegations of fraud against the LAP team, that "it stays out of these accusations," but that it did not find | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.  **LAPs:**  Disputed. The cited statements are not factual averments, | Undisputed.  Defendants' objections are irrelevant.  Defendants do not dispute the facts set forth in the statement and their characterization of the "Clarification Order" is incorrect.  With regard to Chevron's fraud allegations, the second instance review panel specifically "stay[ed] out of these |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| the evidence of fraud persuasive.  Dkt. 384-1 (Appellate Clarification Order) at 5. | and the relevant order speaks for itself. Legal conclusions interpreting court orders constitute attorney argument inappropriate under Rule 56.1. Furthermore, the review panel later clarified and asserted its ability to review the allegations of fraud. Dkt. 384-1 at 5–6. Moreover, Chevron previously submitted a similar statement with the same evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 198). Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion. | accusations, preserving the parties' rights to present formal complaint to the Ecuadorian criminal authorities or to continue the course of the actions that have been filed in the United States." Dkt. 384-1 at 5 (emphasis added). |
| 124.    Defendants have only speculated about how the LAPs' unfiled work product made it into the judgment, and do not claim to know how it did.  Stavers Decl. Ex. 3101; Dkt. 712 at 5. | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed. *See* Defendants' Oppositions to Chevron's Motion for Partial Summary Judgment (Mar. 18, 2013); Resp. St. 101; Resp. St. 126. Additionally, Chevron's characterization of "speculation" is attorney argument and/or a legal conclusion, inappropriate as part of a 56.1 statement. "Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . ." *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quotation omitted). | Undisputed.  Defendants have been, and remain, unable to offer any explanation for the presence of their unfiled work product in the judgment. Their responses to Statements 101 and 126, where they falsely suggest that the Fusion Memo was in the record or that the record is ill-defined and not searched, only underscore this.  *See* Reply Sts. 101, 126. |

A.    **Fusion Memo**

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| 125.    The document bearing Bates numbers DONZ-HDD-0142504-25, a memorandum that begins "La fusión entre Chevron Inc. Y Texaco Inc.," regarding the corporate relationship between Texaco and Chev- | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed. Defendants dispute the vague and conclusory | Undisputed.  The Fusion Memo was clearly written by the LAP's team, predominantly Juan Pablo Sáenz.  Nor is there a genuine dispute that the Fusion Memo was not filed.  *See* Reply St. 126. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| ron (the "Fusion Memo"), was written by the LAP team and consists of the LAP team's unfiled work product.  Dkt. 400-17 (DONZ-HDD-0142504-25) at 1; Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 4258:14-20. *id.* at 4687:10-13 ("Q. Are you aware of an occasion on which Exhibit 1806A, the Fusion memo, was provided to the court in Lago Agrio?  A. No."); *id.* at 4687:14-20 ("Q. Are you aware of any occasion on which anyone affiliated with the Lago Agrio plaintiffs provided any portion of the text of the Fusion memo in any form to anyone affiliated with the Lago Agrio court?  A. I just don't know."); *id.* at 4701:11-25, 4703:4–4704:20 (Donziger testifying that the LAPs' team was uncertain as to why the Fusion Memo, which he testifies the LAPs drafted, is not in the Lago Agrio court record); *id.* at 4702:22-4703:8 ("Q. Have you specifically had discussions with Mr. Fajardo as to whether or not he ever submitted Exhibit 1806A [the Fusion memo] or some version of it to the Ecuadorian court on the record?  A. Yes. Q. Was he able to confirm to you whether or not he had submitted Exhibit 1806A [the Fusion memo] or some version of it to the Ecuadorian court on the record?  A. No, he was unable to."); *id.* at 4736:13-20 ("Q. You are referring to when the [Fusion] [M]emo was being drafted? A. Yes. Well, when the research was being done and the intention was to put a document together. It might have been this memo, or, I don't know, I wasn't involved on a day to day basis, but to put into evidence to deal with this issue."). | terms "unfiled work product" and "LAP team". Furthermore, Chevron's cited materials do not show Donziger asserting that the work product was "unfilled." *See* Dkt. 400-1 (Donziger Dep. Tr.) at 4702:8-14; *see also* Resp. St. 126.<br><br>Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at Sts. 7-8). Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion. | Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact.  It does not.  The declaration does not mention the Fusion Memo, dispute that it was authored by the LAP team, or establish that he Fusion Memo was part of the Lago Agrio Record.  In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |
| 126.    The Fusion Memo is not in the Lago Agrio Record.  Stavers Decl., Ex. 3267 (Juola Report), ¶ 78 | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact. | Undisputed.  Chevron has put forward two expert declarations independently confirming from manual and computer searches of the record |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| ("[T]he overall similarity between [the Judgment] and the other documents cited, including Fusion, could not have derived from secondary sources with the court record."). | **LAPs:** Disputed. The evidence available raises genuine disputes of fact concerning what constitutes the court record in the Lago Agrio case and what is or is not considered part of the record before the court. See Resp. to St. 101. In addition, copies of some of the Fusion Memo's exhibits have been found in the Lago Agrio Record, mostly in order as referenced and would appear accompanying the Fusion Memo. *See* Smyser Decl., Ex. 30 (excerpts from the record showing Fusion Memo materials); *See* Smyser Decl., Ex. 31; (chart providing index of Fusion Memo materials and their location in the Record). The Fusion Memo materials were submitted to the Court at an outdoor judicial inspection at a contaminated well site, during which the LAP team also provided oral argument concerning the subject of the Fusion Memo. *See* Smyser Decl., Ex. 32 (excerpts from Aguarico inspection proceedings discussing Fusion Memo materials). The context and circumstances of the submission of these materials highlight the differences in document and materials submission in Ecuador as compared with U.S. procedure and demonstrate that genuine fact issues remain as to Chevron's claims of "unfilled work product" and as to Chevron's arguments regarding what does or does not constitute part of the Lago Agrio Record. *See* Resp. St. 101.

Furthermore, Chevron supports its assertion only through an expert's conclusions. The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, | that the Fusion Memo is not found therein.  Defendants have no evidence that the Fusion Memo is in the record and do not even represent that they ever filed it.

Although they claim to have "found" exhibits "accompanying the Fusion Memo," that is not true.  The Defendants have not "found" anything. Their supposed 13 "exhibits" are listed, with a record citation and in the same order, on pages 8 and 9 of the judgment.  *Compare* Dkt. 918-34 at 2-3 (Lago Agrio record starting at 140,700 containing cover page listing and attaching 13 documents) *with* Dkt. 168 (Judgment) at 8-9 (listing the same 13 documents in the same order).

No reasonable person would draw the Defendants' inference that the Fusion Memo really was submitted because Defendants' correspondence proves it was not.  On June 08, 2008 – before the Aguarico 02 judicial inspection – Donziger emailed Sáenz, "when can we talk about fusion?  i need to know exactly what you guys are putting in at the inspection . . . ." Dkt. 401-05 (Ex. 2163) (DONZ00110731) at 2.  When Sáenz responded with a general description of the documents, Donziger demanded "a list of EVERY document you are submitting—every court case, everything, even if it is 50 things."  *Id.* at 1 (all caps in original). Sáenz's list of "EVERY document" to be filed was 13 documents and did not include the Fusion Memo.  Dkt. 400-22 (Ex. 2141) (DONZ00093025).  The record document the Defendants cite as supposed "exhibits" are simply those same 13 documents that Sáenz listed, in the same order they appear in Sáenz's list of "EVERY document" to be filed.  *Compare* Dkt. 918-34 at 2-3 (Lago Agrio record starting at 140,700 containing cover page listing and attaching 13 documents) *with* Dkt. 168 (Judgment) at 8-9 (listing the same 13 documents in the same order).  Indeed, as Defendants' emails make clear, the Fusion Memo was at the time of the filing (and remains) an unfinished draft.  Stavers Decl., Ex. 3672 (DONZ00093068) (FDA intern Graham Erion indicating after the inspection that he will work on Fusion Memo). |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | 1999)). | The evidence, in sum, shows the Defendant planning to file 13 specific documents and those documents reliably appeared in the court record, even in the same order the Defendants indicated they would file them. The proposition that an unmentioned, unfinished, internal memo "was openly and legitimately presented," Dkt. 917 at 2, but then somehow omitted from the record that includes every document Defendants planned to file is "wholly fanciful." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005). |
| | The sole basis for this conclusion is the January 27, 2013 report of Dr. Patrick Juola, a paid expert witness. Even if considered, Dr. Juola's report is not admissible because it does not meet the requirements of Rule 702 and Daubert. *See Berk v. St. Vincent's Hosp. and Med. Ctr.*, 380 F. Supp. 2d 334, 352 (S.D.N.Y. 2005); *Cacciola v. Selco Balers, Inc.*, 127 F. Supp. 2d 175, 180 (E.D.N.Y. 2001) ("Evidence contained in an expert's report therefore must be evaluated under Fed.R.Evid. 702 before it is considered in a ruling on the merits of a summary judgment motion."). Dr. Juola's report has numerous deficiencies, three of which will be mentioned here. | |
| | | Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact. It does not. The declaration does not mention the Fusion Memo or establish that he Fusion Memo was part of the Lago Agrio Record. In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |
| | *First*, Dr. Juola's method of purportedly "search[ing] the entire lower court Lago Agrio record" is inherently unreliable. Dr. Juola claims that he received Chevron's copy of the court record, which allegedly consisted of a scanned PDF version of a "photocopied version of the record" that was then "converted to single-page TIFF format and uploaded to an electronic platform, at which point the files were subjected to an automatic 'optical character recognition' (OCR) process." (Dkt. 400-16, at 3). Dr. Juola claims he then converted these scanned photocopies into a "text searchable format." (Id.). The problem with this methodology is that there are "conditions which can interfere with accurate recognition" of text in computer searchable format that "include pages where printing is faint (poor contrast), skewed, overstamped, handwritten, underlined, of low resolution (as facsimile transmission) and unusual mixtures of fonts." Smyser Decl., Ex. 41, Declaration of Richard J. Fateman, Ph.D, at ¶ 24. Many of the pages in Chevron's scanned photocopy of the Lago Agrio trial court record "have hallmark characteristics which interfere with accurate recognition, including poor contrast, overstamps, handwriting, speckle noise | |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | and other conditions." *Id.*, at ¶ 25; *see also* Smyser Decl, Ex. 35, CVX-RICO-1103163. "[I]t is likely that a substantial percentage of the lower court record images cannot be accurately recognized by an OCR program." *Id.*, at ¶ 26. This means that Dr. Juola conducted "only an ineffective search of parts of the lower court record." *Id.*, ¶ 29.<br><br>Dr. Juola's attempt to explain away the problems with optical character recognition analysis of the court record fails. As he acknowledges, "a particularly bad document could produce nothing but gibberish that is impossible to process successfully by computer—or even to read by humans." Stavers Decl., Ex. 3267, ¶ 46. An example of such a document shows the impossibility of relying on the computer analysis for a conclusion that certain text is or is not contained in the court record. Smyser Decl., Ex. 35, CVX-RICO-1103163.<br><br>*Second*, Dr. Juola's conclusions are unsupported by his analysis. He reaches his conclusions that certain documents are or are not in the Lago Agrio court record without examining the text of all documents in the record. The flaws in OCR's ability to convert poor quality images and handwritten comments into searchable text mean that Dr. Juola was not searching every single word in the Lago Agrio court record. At the very least, Defendants should have the opportunity to cross-examine Dr. Juola about the effect that the poor quality of the scans had on the reliability of the OCR process and his resulting searches and analysis.<br><br>*Third*, Dr. Juola merely regurgitates the conclusions of Chevron's other paid experts without engaging in any independent substantive analysis. Dkt. 400-16 (Ex. 2102) (2011.12.20 Juola Report) ("I therefore support the opinion of Drs. Leonard and Turell and of Mr. Younger; in my opinion . . . significant portions of Sentencia | |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | have been plagiarized from LAPs' Work Product Documents (most notably but not limited to the Fusion Memo."). Nor should Chevron be permitted to rely on Dr. Juola's report(s). Defendants have not yet been permitted the opportunity to conduct expert discovery in this case. Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures. Dkt. 703 at 2. Defendants have not been afforded sufficient time to review and analyze the material provided in this report. At the very least, Defendants must be given the opportunity to depose or cross-examine Dr. Juola. *See* Fed. R. Civ. P. 56(d). Moreover, Chevron previously submitted substantially the same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 9) ("The Unfiled Fusion Memo is not in the Ecuadorian trial court record from page 1 to page 216338."). Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion. | |
| 127.   As this Court has already found, "Identical or nearly identical word strings" and strings of symbols in the Unfiled Fusion Memo appear in the Judgment and "[p]arts of the Judgment, including a multi-page section dealing with the relationship among Texpet, Texaco, and the Consortium, are virtually identical—character-for-character—with the Unfiled Fusion Memo." Dkt. 550 at 28 n.115, 86; *see also* Dkt. 658-7 (Leonard Report) at 13 (concluding that "portions of [the Judgment] and the Lago Agrio Plaintiffs' unfiled | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact. **LAPs:**  Disputed. The Statement's commentary on the orders of the Court is not a proper factual assertion for 56.1, and Defendants dispute any characterization that Rule 56.1 assumptions may be established beyond the motion in which they were asserted. Furthermore, the conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 | Undisputed.  Their verbose response notwithstanding, it is indisputable that string of text from the Fusion Memo appears in the judgment.  Thus, the Court has found "[t]hat proposition is incontrovertible as a matter of law."  Dkt. 550 at 86.  Defendants contend that Chevron's experts made an "improper assumption that the Fusion Memo was not filed or officially and openly presented to the Court[.]"  But it was not.  Reply St. 126.  Defendants' attacks on Chevron's experts, such as their dislike of the word "plagiarism," Dkt. 918-50 at 4(b), are irrelevant to whether or not the text of the Fusion Memo was copied into the judgment. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| work product contain matching or similar word strings and strings of symbols whose presence is not explainable either as set phrases or by chance, and that those portions of the [Judgment] are therefore plagiarized from [the LAPs'] unfiled work product"); *id.* at 15 ("There are multiple instances of verbatim copying of word strings from the Fusion Memo to the [Judgment] that do not appear to be set phrases nor explainable by chance."); *id.* at 15, 18, 14 (providing examples of "co-occurring identical or nearly identical word string[s]," "identical idiosyncratic numerical ordering and high-lighted exhibits showing "strings of text and symbols which were plagiaristically copied from the [LAPs'] unfiled Fusion Memo"); Dkt. 400-19 (Turell Report) at 8, 23-39, 44 (concluding that a portion of the Judgment is "an almost verbatim reproduction" of the Fusion Memo, which "is a clear indication that the latter was plagiarized by the former"); *see also* Dkt. 400-17 (Ex. 2116) (DONZ-HDD-0142503–25) (email attaching fusion memo). | statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).<br><br>The conclusion in St. 127 is based on the opinions of paid expert witnesses. Even if considered, Dr. Leonard's report is unreliable because it is based on the improper assumption that the Fusion Memo was not filed or officially and openly presented to the Court. See Resp. to St. 101; Resp. to St. 126; Smyser Decl., Ex. 40 (Expert Report of Dr. Ronald R. Butters, at ¶¶ 4(a), 10). Moreover, Dr. Leonard's characterization of similarities between the Fusion Memo and the Judgment as "plagiarism" is "seriously misleading and prejudicial." Smyser Decl., Ex. 40 (Expert Report of Dr. Ronald R. Butters, at ¶¶ 4(a), 16) ("[T]he characterization of such occasional judicial appropriation-without-specific-attribution as a judge might include in a judicial decision is . . . an inaccurate and inappropriate characterization of whatever occasional alleged unacknowledged appropriation that Nicolás Zambrano Lozada could have made for purposes of introducing material he deemed useful in his 188-page *Sentencia*. Such borrowed 'work or ideas' is not 'plagiarism' because it is not undertaken 'to pass them off as one's own.'"). Lastly, the similarities allegedly found by Dr. Leonard between the Judgment and the Fusion Memo are immaterial. The Judgment contains 88,000 words. The portions that Dr. Leonard found to "overlap" consist of fewer than 1,200 words, "only about 1.4% of the Sentencia's words." Id. at ¶¶ 4(c), 17-19. "Furthermore, the import of much of this parallel material is generally inconsequential—by and large merely factual material that would in all likelihood have been available to Judge Zambrano in a variety of sources." Id. "Chevron has not submitted evidence | Defendants argue that Chevron cannot rely on the Turell Report because Dr. Turell was not designated. But neither is their purported expert on the Lago Agrio record, Ronald Butters. Stavers Decl., Ex. 3674 (2013.03.01 Defendants' Expert Designation). In any event, Professor Turell's report is only one of several pieces of evidence that independently demonstrate plagiarism.<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolás Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact. It does not. That declaration does not provide any evidence to dispute that strings of text from the Fusion Memo are found verbatim or nearly verbatim in the judgment. In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | sufficient to establish that [the relationship among Texpet, Texaco, and the Consortium] was a matter of controversy in Ecuador or, if it was, that Chevron likely was handicapped significantly in fully presenting its defense on that issue by any ex parte submission." Dkt. 550 at 88. Indeed, Chevron admits that it "made multiple submissions regarding corporate separateness to refute the claim that it could be held liable for TexPet's alleged conduct." St. 130.<br><br>Nor should Chevron be permitted to rely on the report of Dr. Leonard. Defendants have not yet been permitted the opportunity to conduct expert discovery in this case. Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures. Dkt. 703 at 2. Defendants have not been afforded sufficient time to review and analyze the material provided in this report. At the very least, Defendants must be given the opportunity to depose or cross-examine Dr. Leonard. *See* Fed. R. Civ. P. 56(d).<br><br>With respect to the other expert opinion cited as a basis for the conclusion in St. 127, the Court should strike Dr. Turell's report for failure to disclose. Chevron did not disclose Dr. Turell as an expert in its March 1, 2013 expert disclosures. The Court should strike the report and disregard the conclusion in this St. 127 and any other statement that relies on Dr. Turell's report. See Fed. R. Civ. P. 37(c)(1).<br><br>Even if considered, Dr. Turell's report is not admissible because it does not meet the requirements of Rule 702 and Daubert. *See Berk v. St. Vincent's Hosp. and Med. Ctr.*, 380 F. Supp. 2d 334, 352 (S.D.N.Y. 2005); *Cacciola v. Selco Balers, Inc.*, 127 F. Supp. 2d 175, 180 (E.D.N.Y. 2001) ("Evidence contained in an expert's report therefore must be evaluated under Fed.R.Evid. 702 before it is | |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | considered in a ruling on the merits of a summary judgment motion."). Dr. Turell's report has numerous deficiencies, three of which will be mentioned here.<br><br>*First*, Dr. Turell's "methodologies are the subject of ongoing controversy among linguistic scholars and have been criticized within the forensic linguistic community as fundamentally unscientific, untested, deeply flawed, and often likely to generate false conclusions." Smyser Decl., Ex. 40 (Expert Report of Dr. Ronald R. Butters, at ¶ 20); *see also id.* at ¶¶ 4(d)-(e), 22-27.<br><br>*Second*, the "scientific validity of [Dr. Turell's] speculations are based on a very small number of linguistic and editorial variables whose worth as authorship indicators have not been tested or established, and whose presence in the analyzed sets of data are subject to more plausible explanations than that they may be indicators of authorial 'idiolect.'" Id., at ¶ 4(e). Dr. Turell's report does not establish, as it sets out to do, "that the operative author of the [Judgment] is anyone other than Judge Zambrano." *Id.*; see also id. at ¶¶ 28, 37-41.<br><br>*Third,* Dr. Turell's report is based on the improper assumption that the Fusion Memo was not filed or officially and openly presented to the Court. *See* Resp. to St. 101; Resp. to St. 126; Smyser Decl., Ex. 40 (Expert Report of Dr. Ronald R. Butters, at ¶¶ 4(a), 10). Moreover, Dr. Turell's characterization of similarities between the Fusion Memo and the Judgment as "plagiarism" is "seriously misleading and prejudicial." Smyser Decl., Ex. 40 (Expert Report of Dr. Ronald R. Butters, at ¶¶ 4(a), 16).<br><br>Irrespective of the expert opinions, the evidence raises genuine disputes of fact concerning what constitutes the court record in the Lago Agrio case and what is or is not considered part of the record | |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | before the court. See Resp. to St. 101.<br><br>Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 12). Chevron provides no evidence other than quoting the Court. | |
| 128.    The following language on page 8 of the Fusion Memo appears verbatim or nearly verbatim on page 24 of the Judgment: "Es cierto que por norma general una empresa puede tener subsidiarias con personalidad jurídica completamente distinta. Sin embargo, cuando las subsidiarias comparten el mismo nombre informal, el mismo personal, y están directamente vinculadas con la empresa madre en una cadena ininterrumpida de toma de decisiones operativas, la separación entre personas y patrimonios se difumina bastante. En este caso, se ha probado que en la realidad Texpet y Texaco Inc. funcionaron en el Ecuador como una operación única e inseparable. Las decisiones importante pasaban por diversos niveles de ejecutivos y órganos de decisión de Texaco Inc." Dkt. 658-7 (Leonard Report) at 15 (showing highlighted overlap between the Judgment and the Unfiled Fusion Memo); Dkt. 550 at A5 (recognizing the overlap, highlighted in opinion, here in bold, and reflecting the English translation of the above passage: "It is true that as a general rule a company can have subsidiaries with completely distinct legal status. However, when the subsidiaries share the same informal name, the same personnel, and are directly linked to the parent company in an uninterrupted chain of operational decision-making, the separation between entities and patrimonies is significantly | **Donziger:** Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:** Disputed. The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).<br><br>The conclusion in St. 128 is based on the opinion of a paid expert witness. Even if considered, Dr. Leonard's report is unreliable, makes improper and misleading characterizations, and is immaterial for the reasons stated in response to St. 127. *See also* Smyser Decl., Ex. 40 (Expert Report of Dr. Ronald R. Butters, at ¶¶ 4(a), 4(c), 10, 16-19).<br><br>Nor should Chevron be permitted to rely on the report of Dr. Leonard. Defendants have not yet been permitted the opportunity to conduct expert discovery in this case. Under the schedule agreed to by the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures. Dkt. 703 at 2. Defendants have not been afforded sufficient time to review and analyze the | Undisputed.  Defendants' assertion that the "opinion of an expert" cannot be used in support of a Rule 56.1 statement is facially ridiculous and not supported by the cases cited.  To the contrary, courts routinely rely on expert evidence in deciding summary judgment motions.  *Mobileye, Inc. v. Picitup Corp.*, 2013 WL 830837, *18 (S.D.N.Y. Mar. 5, 2013); *Gill v. Arab Bank, PLC*, --- F.Supp.2d ----, 2012 WL 5395746, *21 (E.D.N.Y. Nov. 6, 2012); *Maytag Corp. v Electrolux Home Prods.*, 448 F. Supp. 2d 1034, 1064–65 (N.D. Iowa 2006).<br><br>This Court has already found "incontrovertible as a matter of law," Dkt. 550 at 86, that the language from the Fusion Memo appears in the judgment.  Defendants' claims that Dr. Leonard's report is "misleading" is itself disingenuous as their dispute is with the supposed ethical undertones of the word "plagiarism," Dkt. 918-50 at 4(b), not with whether the quoted text was copied from the Fusion Memo into the judgment.<br><br>Defendants' claim that they have "not been afforded sufficient time to review and analyze the material provided in this report," is belied by the fact that they rely on a rebuttal report prepared over one year ago. Dkt. 918-50 at 37.<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact.  It does not.  That declaration does not provide any evidence to dispute that this string of text from the Fusion Memo is found verbatim or nearly verbatim in the judgment.  In addition, for the reasons |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| clouded, or even comes to disappear. In this case, it has been proven that in reality Texpet and Texaco Inc. functioned in Ecuador as a single and inseparable operation. Both the important decisions as well as the trivial ones passed through various levels of executives and decision-making bodies of Texaco Inc."). | material provided in this report. At the very least, Defendants must be given the opportunity to depose or cross-examine Dr. Leonard. *See* Fed. R. Civ. P. 56(d).<br><br>The similarities in language are immaterial. "Chevron has not submitted evidence sufficient to establish that [the relationship among Texpet, Texaco, and the Consortium] was a matter of controversy in Ecuador or, if it was, that Chevron likely was handicapped significantly in fully presenting its defense on that issue by any ex parte submission." Dkt. 550 at 88. Indeed, Chevron admits that it "made multiple submissions regarding corporate separateness to refute the claim that it could be held liable for TexPet's alleged conduct." St. 130.<br><br>Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 10). Chevron provides no new arguments or evidence (other than the updated Leonard report) and no reason for the Court to rule any differently on this Renewed Motion. | stated in Chevron's Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |
| 129.    The following language on page 6 of the Fusion Memo appears verbatim or nearly verbatim on page 21 of the Judgment: "Cartas de funcionarios menores dirigidas a Shields{footnote 13}.- En este apartado se hace referencias a cartas dirigidas a Shields que se originaron en Quito, en manos de funcionarios menores que solicitaban su autorización. William Saville era un ejecutivo de Texpet que operaba en Quito. Él envió muchas y cotidianas comunicaciones a Shields (en Nueva York) solicitando autorizaciones. Por ejemplo, le envía a Shields los costos estimados de la perforación de los pozos Sacha 36 al 41 (doc s/n), y | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed. The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)). | Undisputed.  *See* Reply St. 128.<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact.  It does not.  That declaration does not provide any evidence to dispute that this string of text from the Fusion Memo is found verbatim or nearly verbatim in the judgment.  In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| solicita su aprobación para iniciar la licitación de tra-sporte de combustibles en el oriente (PET031387). J.E.F. Caston, otro ejecutivo de la petrolera ubicado en Quito, solicita la autorización de Shields para licitar varios servicios (PET020758) y para aprobar los costos estimados de instalar bombas sumergibles en cinco pozos en el campo Lago Agrio. Finalmente tenemos a Max Crawford, otro funcionario radicado en Quito, quien también solicitaba periódicamente la aprobación de Shields para diversos objetivos. Aquí se reproducen dos solicitudes para aprobar el inicio de dos lic-itaciones (PET035974 y doc s/r). {footnote 13} Pe-didos de oficiales inferiores dirigidos a Shileds [PSV-018/I] Cuerpo 65, fojas 6855, 6856, 6860, 6861, 6875, 6882, 6885." Dkt. 658-7 (Leonard Report) at 16 (showing highlighted overlap between the Judgment and the Unfiled Fusion Memo); Dkt. 550 at A3 (recog-nizing the overlap, highlighted in opinion, here in bold, and reflecting the English translation of the above pas-sage: "letters and memorandums from Shields and Palmer to John McKinley, coming from the Texaco Inc, and Texpet files. In volume 66, pages 6957, 6958, 6964, 6959, 6960, 6974. That show that both Shields and Palmer maintained a constant flow of letters and memos with McKinley, asking for his authorization and informing him of events relating to the Napo Con-cession. Likewise, letters from minor officials ad-dressed to Shields, in volume 65, pages 6855, 6856, 6860, 6861, 6875, 6882, 6885, where reference is made to letters addressed to Shields that originated in Quito, in hands of minor officials who requested his authorization, such as William Saville, who was a Texpet executive who operated in Quito, and sent | The conclusion in St. 129 is based on the opinion of a paid expert witness. Even if considered, Dr. Leonard's report is unreliable, makes improper and misleading characterizations, and is imma-terial for the reasons stated in response to St. 127. *See also* Smyser Decl., Ex. 40 (Expert Report of Dr. Ronald R. Butters, at ¶¶ 4(a), 4(c), 10, 16-19).<br><br>Nor should Chevron be permitted to rely on the report of Dr. Leonard. Defendants have not yet been permitted the opportunity to conduct expert discovery in this case. Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures. Dkt. 703 at 2. Defendants have not been afforded sufficient time to review and analyze the material provided in this report. At the very least, Defendants must be given the opportunity to depose or cross-examine Dr. Leonard. *See* Fed. R. Civ. P. 56(d).<br><br>The similarities in language are immaterial. "Chevron has not submitted evidence sufficient to establish that [the relationship among Texpet, Texaco, and the Consortium] was a matter of con-troversy in Ecuador or, if it was, that Chevron likely was handi-capped significantly in fully presenting its defense on that issue by any ex parte submission." Dkt. 550 at 88. Indeed, Chevron admits that it "made multiple submissions regarding corporate separate-ness to refute the claim that it could be held liable for TexPet's alleged conduct." St. 130.<br><br>Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 10). Chevron provides no new arguments or evidence (other than an | |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| many and daily communications to Shields (in New York) requesting authorizations. For example, he sent Shields the estimated costs of drilling the Sacha 36 to 41 wells (unnumbered doc) and asks his approval to start the tender for fuel transport in the Oriente (PET 031387 at page 6856). J.E.F. Caston, another executive of the oil firm based in Quito, asks Shields for his authorization to call for bids for various services (PET 020758 at page 6860) and to approve the estimated costs of installing submersible pumps in five wells in the Lago Agrio field. Finally, we have Max Crawford, another official based in Quito, who also periodically asked for Shields' approval for various purposes (PET 035974 at page 6882, and unnumbered doc at page 6885)." | updated expert report) and no reason for the Court to rule any differently on this Renewed Motion. | |
| 130.   In the Lago Agrio Litigation, Chevron made multiple submissions regarding corporate separateness to refute the claim that it could be held liable for Tex-Pet's alleged conduct. Dkt. 29-17 (2003.05.07 Complaint in *Maria Aguinda Salazar, et al. v. Chevron Corp.* litigation); Dkt. 402-1 (Ex. 2202) (Settlement Hearing Transcript, *Aguinda et al. v. Chevron Texaco Corporation*, No. 002-2003, Superior Court of Justice, Nueva Loja, Record) at 243; Dkt. 402-1 (Ex. 2201) (Judicial Inspection Acta for Sacha 6 filed in *Aguinda et al. v. ChevronTexaco Corporation*, No. 002-2003, Superior Court of Justice, Nueva Loja, at 3); Dkt. 401-11 (Ex. 2200) (Chevron's Final Alegato filed in *Aguinda et al. v. Chevron Texaco Corporation*, No. 002-2003, Superior Court of Justice, Nueva Loja) at 24–33; Dkt. 402-1 (Ex. 2201) (Judicial Inspection Acta for Sacha 6 filed in *Aguinda et al. v. ChevronTexaco Cor-* | **Donziger:**  Donziger does not dispute that Chevron made such submissions, but Donziger disputes any legal conclusion regarding the submissions' merits.<br><br>**LAPs:**  Disputed in part. Defendants do not dispute that Chevron made such submissions, but Defendants do dispute any legal conclusion regarding the submissions' merits. | Undisputed.  Defendants' lone objection to this statement is irrelevant. *Rodriguez*, 1999 WL 459813, at *1 n.3 ("If the non-movant asserts that a fact claimed by the movant to be undisputed is actually in dispute, the non-movant *must* cite evidence on the record to support its contention.") (emphasis in original). |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| *poration*, No. 002-2003, Superior Court of Justice, Nueva Loja) at 3; Dkt. 401-11 (Ex. 2200) (Chevron's Final Alegato filed in *Aguinda et al. v. Chevron Texaco Corporation*, No. 002-2003, Superior Court of Justice, Nueva Loja) at 24–33. | | |
| 131.    Over 20 pages of the judgment address the question of whether Chevron could be held liable for TexPet's alleged conduct.  Dkt. 168 at 6-26. | **Donziger:**  Not disputed.<br><br>**LAPs:**  Not disputed. | Undisputed. |
| 132.    In 2006, in reference to the Lago Agrio Litigation, Donziger admitted that the LAPs "su[ed] the wrong party in the complaint."  Dkt. 402-11 (Ex. 2285) (DONZ00036246). | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed. The cited materials do not support the statement. In the cited document, Donziger does not attribute the statement to LAPs but rather to "Alberto" [Wray]. Dkt. 402-11 at DONZ00036246. Donziger's reflection is not a legal fact but rather an excerpt from the musings of his personal diary. *Id.* Moreover, Chevron previously submitted the same statement with the same evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 245). Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion. | Undisputed.  Defendants' objections to this statement are irrelevant. Alberto Wray represented the LAPs in the Lago Agrio litigation. Furthermore, Defendants' attempt to recast Donziger's statements as "musings" does nothing to discredit the truthfulness of the statement itself.  As the Court has already concluded, Donziger was the "fulcrum" of the entire litigation effort, *Chevron Corp v. Donziger*, 768 F. Supp. 2d 581, 601 (S.D.N.Y. 2011), served as the "the epicenter of the legal, political, and media activity surrounding the case both in Ecuador and in the U.S." with "close ties with almost all of the important characters in the story . . . ." Dkt. 550 at 9 n.26. |
| 133.    The parties continue to dispute, in this Court, whether Chevron properly may be held liable for TexPet's alleged conduct.  Dkt. 181 at 13 n.40. | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed. The Parties' legal assertions are not proper for Rule 56.1 statements. Chevron's only citation refers to an opinion written over two years ago, prior to the dismissal of several causes of action and a successful appeal. Dkt. 181 at 126. Additionally, Chevron's cited order was reversed and vacated by the Second Circuit over a year ago. *Chevron Corp. v. Naranjo*, 667 F.3d 232, | Undisputed.  Defendants' objection to Chevron's statement is further proof that it is undisputed that "the parties continue to dispute, in this Court, whether Chevron properly may be held liable for TexPet's alleged conduct."  They mischaracterize the Second Circuit holding.  And to the extent the LAPs construe Naranjo—or any other opinion—as concluding that Chevron is liable for TexPet's alleged conduct is a mischaracterization of those holdings.  For example, in *Republic of Ecuador*, the Second Circuit merely held that because "lawyers from ChevronTexaco appeared in this Court and reaffirmed the concessions that Texaco had made in or- |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | 247 (2d Cir. 2012). Defendants continue to maintain that Chevron may be properly held liable for TexPet's and Texaco's conduct, a position confirmed by the Lago Agrio appellate panel and the Second Circuit. *See Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 390 n.3 (2d Cir. 2011) (finding Chevron accountable for Texaco's concessions). | der to secure dismissal of Plaintiffs' complaint . . . ChevronTexaco bound itself to those concessions" for the limited purposes of the "forum non conveniens dismissal." 638 F.3d at 384 n.3. |

### B.     Clapp Report

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| 134.     The document bearing the Bates number DONZ00025296, an analysis entitled, La Explotacion De Petroleo En La Zona Concesionada A Texaco Y Sus Impactos En La Salud De Las Personas (the "Clapp Report"), was written by Richard Clapp in his capacity as a consultant to the LAPs, and consists of LAP team work product.  Dkt. 658-7 (Leonard Report) at 9–10 & Ex. 9. | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed. The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).<br><br>The conclusion in St. 134 is based on the opinion of a paid expert witness. Even if considered, Dr. Leonard's report is unreliable, makes improper and misleading characterizations, and is immaterial for the reasons stated in response to St. 127. *See also* Smyser Decl., Ex. 40 (Expert Report of Dr. Ronald R. Butters, at ¶¶ 4(a), 4(c), 10, 16-19).<br><br>Nor should Chevron be permitted to rely on the report of Dr. Leonard. Defendants have not yet been permitted the opportunity | Undisputed.  There is no genuine dispute that Clapp wrote the Clapp Report for the LAPs.  His name is on the report, Dkt. 658-7 at 9-10, and emails confirm it. Dkt. 34-23 (STRATUS NATIVE 065062) (stating of Clapp "[a] long while back, he wrote up a summary of the toxic effects of the chemicals in crude oil and drilling fluids, and it was incorporated into the expert report as an annex pretty much as is"). |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | to conduct expert discovery in this case. Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures. Dkt. 703 at 2. Defendants have not been afforded sufficient time to review and analyze the material provided in this report. At the very least, Defendants must be given the opportunity to depose or cross-examine Dr. Leonard. *See* Fed. R. Civ. P. 56(d). | |
| 135.   Donziger and Beltman sought to prevent Clapp's authorship of the Clapp Report from being publicly known. Dkt. 34-13 (STRATUS-NATIVE061311) at 1 ("We have to talk to Clapp about that 5-pager, and how we have to limit its distribution. It CANNOT go into the Congressional Record as being authored by [Clapp]."); Dkt. 34-14 (STRATUS-NATIVE057803) (Stratus principal Douglas Beltman writes of incriminating citation in the Cabrera Report, "Oh what a tangled web . . . ."). | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.  <br><br>**LAPs:**  Disputed. Chevron's selected quotations only show Beltman's—not Donziger's—views regarding distribution of the Report. Dkt. 34-13 at 1; Dkt. 34-14. Furthermore, the quotes do not support Chevron's characterizations of citations being "incriminating" or of attempts to totally prevent knowledge of the Clapp Report. *See* Dkt. 34-13 (specific to Congressional Record). In addition, The Stratus e-mail does not show that Stratus was trying to keep its role secret. The e-mail is discussing providing translations of the Cabrera report Annexes to a reporter. Acknowledging that Cabrera largely adopted the Annexes that Stratus drafted, Beltman appears to be determining which ones they already have English versions of and which ones need to be translated. This establishes only that Stratus was trying to provide accurate English versions of the Cabrera annexes to a reporter. Finally, at least some of these citations are to inadmissible hearsay. Chevron cannot use unauthenticated emails that Defendants Camacho and Piaguaje neither authored nor received as evidence of the truth of the matters asserted within. *See* Dkt. 34-14 (email from Doug Beltman to Dave Mills). | Undisputed.  The email exchanges clearly show suppression efforts. *See also* Dkt. 34-23 (STRATUS NATIVE 065062) ("I don't think we should hand out either one as Clapp's, thereby distributing proof."). Defendants' assertion that suppression was "specific to Congressional Record," is both false, St. 271 (suppressing Clapp Report request from media), and irrelevant since documents going into the "congressional record" can obviously result in them becoming public. |
| 136.   On July 28, 2008, acknowledging that the | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plain- | Undisputed.  The email is between the LAPs' agents and is therefore ad- |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| Clapp Report "ended up as an Appendix to the Cabrera Report," Beltman wrote to Dave Mills of Stratus, "Oh what a tangled web,…" Dkt. 34-14 (STRATUS-NATIVE057803). | tiffs' response to this alleged fact.<br><br>**LAPs:** Disputed. Chevron cites only to inadmissible hearsay. Chevron cannot use unauthenticated emails that Defendants Camacho and Piaguaje neither authored nor received as evidence of the truth of the matters asserted within. *See* Dkt. 34-14 (email from Doug Beltman to Dave Mills). | missible against them. Fed. R. Evid. 801(d)(2)(D) ("A statement that meets the following conditions is not hearsay: . . .The statement is offered against an opposing party and: . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed[.]"). |
| 137.    On November 18, 2008, Beltman wrote to Donziger, "We have to talk to Clapp about that 5-pager, and how we have to limit its distribution. It CANNOT go into the Congressional Record as being authored by him." Dkt. 34-13 (STRATUS-NATIVE061311) at 1. | **Donziger:** Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:** Disputed. Chevron cannot use unauthenticated emails that Defendants did not author as evidence of the truth of the matters asserted within. In addition, The Stratus e-mail does not show that Stratus was trying to keep its role secret. The e-mail is discussing providing translations of the Cabrera report Annexes to a reporter. Acknowledging that Cabrera largely adopted the Annexes that Stratus drafted, Beltman appears to be determining which ones they already have English versions of and which ones need to be translated. This establishes only that Stratus was trying to provide accurate English versions of the Cabrera annexes to a reporter. | Undisputed. The email is between the LAPs' agents and is therefore admissible against them. Fed. R. Evid. 801(d)(2)(D) ("A statement that meets the following conditions is not hearsay: . . .The statement is offered against an opposing party and: . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed[.]"). |
| 138.    A portion of the Clapp Report appears in the Cabrera Report as Annex K (the Toxicity Annex). Dkt. 34-14 at 1; *see also* Dkt. 34-23 (Ex. 198) at 1. | **Donziger:** Not disputed for purposes of this motion.<br><br>**LAPs:** Not disputed for purposes of this motion. | Undisputed. |
| 139.    The portion of the Clapp Report that does not appear in the Cabrera Report also does not appear anywhere else in the Lago Agrio Record. Dkt. 658-7 (Leonard Report) at 33–34; Stavers Decl., Ex. 3267 (Juola Report) at ¶¶ 56–61. | **Donziger:** Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:** Disputed. The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain con- | Undisputed. There is no genuine dispute that portions of the Clapp Report not filed with the Cabrera Report were not otherwise filed. As shown by the Juola report, searches of the record did not reveal them and Defendants have offered no evidence that they were filed.<br><br>Defendants' assertion that the "opinion of an expert" cannot be used in support of a Rule 56.1 statement is facially ridiculous and not supported |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | clusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).<br><br>The conclusion in St. 139 is based solely on the opinions of paid expert witnesses.<br><br>Even if considered, Dr. Patrick Juola's report is not admissible because it does not meet the requirements of Rule 702 and Daubert. *See* Resp. to St. 126; Smyser Decl., Ex. 41 (Declaration of Richard J. Fateman, Ph.D) ¶¶ 24-26, 29.<br><br>Likewise, Dr. Leonard's report, even if considered, is unreliable, makes improper and misleading characterizations, and is immaterial for the reasons stated in response to St. 127. *See also* Smyser Decl., Ex. 40 (Expert Report of Dr. Ronald R. Butters, at ¶¶ 4(a), 4(c), 10, 16-19).<br><br>Nor should Chevron be permitted to rely on the reports of Dr. Leonard and Dr. Juola. Defendants have not yet been permitted the opportunity to conduct expert discovery in this case. Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures. Dkt. 703 at 2. Defendants have not been afforded sufficient time to review and analyze the material provided in this report. At the very least, Defendants must be given the opportunity to depose or cross-examine Dr. Leonard and Dr. Juola. *See* Fed. R. Civ. P. 56(d).<br><br>Moreover, the evidence raises genuine disputes of fact concerning what constitutes the court record in the Lago Agrio case and what is or is not considered part of the record before the court. See | by the cases cited. To the contrary, courts routinely rely on expert evidence in deciding summary judgment motions. *Mobileye, Inc. v. Picitup Corp.*, 2013 WL 830837, *18 (S.D.N.Y. Mar. 5, 2013); *Gill v. Arab Bank, PLC*, --- F.Supp.2d ----, 2012 WL 5395746, *21 (E.D.N.Y. Nov. 6, 2012); *Maytag Corp. v Electrolux Home Prods.*, 448 F. Supp. 2d 1034, 1064–65 (N.D. Iowa 2006).<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact. It does not. That declaration does not mention the Clapp Report or provide any evidence to indicate that the Clapp Report appears in the Lago Agrio Record. In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | Resp. to St. 101. | |
| 140.    The following 34-word string appears in the Clapp Report and appears verbatim in the judgment, but does not appear in Cabrera Annex K: "Las muestras de suelo y agua tomadas durante las inspecciones judiciales han indicado niveles excesivos de plomo que puede plantear riesgos de salud par alas poblaciones locales.  Los niveles de plomo en el suelo mas que duplican el limite legal y prueban que el envenenamiento con plomo es un riesgo real."   Stavers Decl., Ex. 3267 (Juola Report), ¶ 76.  As Dr. Robert Leonard concluded: "The overlap of identical word strings between the unfiled Clapp Report and the Sentencia is further evidence that portions of the Sentencia were plagiaristically copied from the Lago Agrio Plaintiffs' unfiled work product."  Dkt. 658-7 at 34. | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed. The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).<br><br>The conclusion in St. 140 is based on the opinions of paid expert witnesses. Even if considered, Dr. Patrick Juola's report is not admissible because it does not meet the requirements of Rule 702 and Daubert. *See* Resp. to St. 126; Smyser Decl., Ex. 41 (Declaration of Richard J. Fateman, Ph.D), ¶¶ 24-26, 29. Moreover, the cited paragraph of Dr. Juola's report, Stavers Decl. Ex. 3267 ¶ 76, does not support the conclusion that the "34-word string appears in the Clapp Report and appears verbatim in the judgment, but does not appear in Cabrera Annex K." Paragraph 76 of the Juola report does not even mention the Clapp Report, the Ecuadorian Judgment, or Cabrera Annex K.<br><br>Even if considered, Dr. Leonard's report is unreliable, makes improper and misleading characterizations, and is immaterial for the reasons stated in response to St. 127. *See also* Smyser Decl., Ex. 40 (Expert Report of Dr. Ronald R. Butters, ¶¶ 4(a), 4(c), 10, 16-19).<br><br>Nor should Chevron be permitted to rely on the reports of Dr. | Undisputed.  Defendants' assertion that the "opinion of an expert" cannot be used in support of a Rule 56.1 statement is facially ridiculous and not supported by the cases cited.  To the contrary, courts routinely rely on expert evidence in deciding summary judgment motions.  *Mobileye, Inc. v. Picitup Corp.*, 2013 WL 830837, *18 (S.D.N.Y. Mar. 5, 2013); *Gill v. Arab Bank, PLC*, --- F.Supp.2d ----, 2012 WL 5395746, *21 (E.D.N.Y. Nov. 6, 2012); *Maytag Corp. v Electrolux Home Prods.*, 448 F. Supp. 2d 1034, 1064–65 (N.D. Iowa 2006).<br><br>There is no genuine dispute over whether the indicated 34-word string from the Clapp Report, which was not in Annex K of the Cabrera Report, appears in the judgment. Dkt. 658-7 at 33-34.  Defendants' claims that Dr. Leonard's report is "misleading" is itself disingenuous as their dispute is with the supposed ethical undertones of the word "plagiarism," Dkt. 918-50 at 4(b), not with whether the quoted text was copied from the Clapp Report into the judgment.<br><br>Defendants' claim that they have "not been afforded sufficient time to review and analyze the material provided in this report," is belied by the fact that they rely on a rebuttal report prepared over one year ago.  Dkt. 918-50 at 37.<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact.  It does not.  That declaration does not provide any evidence to dispute that this string of text from the Clapp Report is found verbatim or nearly verbatim in the judgment.  In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | Leonard and Dr. Juola. Defendants have not yet been permitted the opportunity to conduct expert discovery in this case. Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures. Dkt. 703 at 2. Defendants have not been afforded sufficient time to review and analyze the material provided in this report. At the very least, Defendants must be given the opportunity to depose or cross-examine Dr. Leonard and Dr. Juola. *See* Fed. R. Civ. P. 56(d). | |
| 141.    As shown by sampling results submitted by Plaintiffs' expert, Douglas Allen, only one of the 1,675 soil and sediment samples in the Lago Agrio Litigation—which was taken from a community garbage dump—shows lead above the Ecuadorian legal limit set by Ecuador Decree 1215 for lead in agricultural areas of 100 mg/kg.  Stavers Decl., Ex. 3281 (DA000041.xls); Dkt. 400-20 (Ex. 2129) (excerpt of Ecuadorian Decree 1215) at 56. | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed. Chevron has ceded that good faith disputes may exist "among scientists about environmental conditions in the Oriente or TexPet's operations there from the 1960s to the 1990s", and, over Defendant's objections, the Court has excluded from this litigation the issues of the "environmental conditions existing in the Oriente in the 1960s to the 1990s or the relative, substantive merit of scientists' expert opinions on that subject." Dkt. 720 at 2. Given this ruling, Statement 141 cannot be established as fact.<br><br>Finally, even if the Court were to create an exception and permit determinations of the environmental conditions existing in the Oriente, Chevron misstates the Ecuadorian legal limits, as "[t]he permitted limits to be applied in a certain project *depend on the subsequent use of the remediated soil*, which will be made a matter of record in the respective Remediation Plan or Project approved by the Office of the Undersecretary of Environmental Protection". Dkt. 400-20 (Ex. 2129) at 56 (emphasis added) (allowing for more stringent limits than Chevron asserts, when applied to sensitive | Undisputed.  Contrary to Defendants' suggestion, this statement goes directly to fraud in the judgment because it shows that a false finding of lead contamination was incorporated into the judgment through the use of the LAPs' unfiled work product.  Defendants do not dispute that only 1 of 1,675 soil and sediment samples for lead in the former concession area were over the agricultural limit of 100 mg/kg.  Defendants speculate that a different level might be used, but offer no evidence that it is or that doing so would significantly change the proportion of lead detections. |

| Chevron's Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | ecosystems). | |
| 142.    Only one of 253 drinking water samples taken in the Lago Agrio Litigation showed lead at levels above primary drinking water standards, and that was taken from a site that had experienced a recent oil spill. Stavers Decl., Ex. 3282 (Connor, Response to Statements by Mr. Cabrera Regarding Alleged Impacts to Water Resources in the PetroEcuador-TexPet concession, Oriente Region, Ecuador (Aug. 29, 2008)) at 8-9. | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed. Chevron has ceded that good faith disputes may exist "among scientists about environmental conditions in the Oriente or TexPet's operations there from the 1960s to the 1990s", and, over Defendant's objections, the Court has excluded from this litigation the issues of the "environmental conditions existing in the Oriente in the 1960s to the 1990s or the relative, substantive merit of scientists' expert opinions on that subject." Dkt. 720 at 2. Given this ruling, Statement 141 cannot be established as fact.<br><br>In addition, the conclusion or opinion of an expert witness (Connor) is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19, 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).<br><br>The conclusion in St. 142 is based on the opinion of a paid expert witness, but Chevron did not even designate Connor as one of Chevron's experts in the initial expert disclosures. Chevron should not be permitted to rely on the report of Mr. Connor. Defendants have not yet been permitted the opportunity to conduct expert discovery in this case. At the very least, Defendants must be given the opportunity to depose or cross-examine Mr. Connor and be permitted to conduct discovery as to the contamination of the drinking water in the Oriente. *See* Fed. R. Civ. P. 56(d). | Undisputed.  Contrary to Defendants' suggestion, this statement goes directly to fraud in the judgment because it shows that a false finding of lead contamination was incorporated into the judgment through the use of the LAPs' unfiled work product. |

## C.    Index Summaries

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| 143.    The Microsoft Excel spreadsheet bearing Bates numbers DONZ00048820 (filename "pruebas pedidas en etapa de prueba.xls") and GARR-HDD-0003243-3446 (file-name "cuadro_de_pruebas09-05(1).xls") (the "Index Summaries"), which summarize and list certain filings made during the Lago Agrio litigation, were prepared by the LAP team and consist of the LAP team's unfiled work product.  Dkt. 400-17 (Ex. 2117) (Leonard Report) at 8; 24-26 & Ex. 4; Dkt. 400-17 (Ex. 2118) (Leonard Supp. Report) at Ex. A (showing highlighted overlap between the Judgment and the Index Summaries); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 4822:24-4824:13 (Donziger's attorney, Robert Kaplan, explaining that the document bearing the Bates numbers GARR-HDD-0003243-46, was produced in June 2011); *id.* at 4815:14–4827:14; *id.* at 4820:14-17 ("Q. Exhibit 1869A [DONZ00048820] is an internal plaintiff document for the litigation, correct?  A. Yes."); *id.* at 4821:6-16 ("Q. Do you know who created Exhibit 1869A?  A. I don't know specifically.  People in our office, and I think it might have been Mr. Prieto and/or Mr. Saenz.  Q. Do you know who had the responsibility, if anyone, for maintaining the index that's been marked as Exhibit 1869A?  A. I think it was considered the responsibility of the local legal team."); *id.* at 4826:4-8 ("Q. Exhibit 1870 [GARR-HDD-0003243-3446], like Exhibit 1869A, is an internal plaintiff document, correct?  A. Yes."). | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

**LAPs:**  Disputed. The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)). The conclusion that the "Index Summaries" "consist of the LAP teams' unfiled work product" is supported only by the conclusion of paid expert witness Dr. Leonard. Even if considered, Dr. Leonard's report is unreliable, makes improper and misleading characterizations, and is immaterial for the reasons stated in response to St. 127. *See also* Smyser Decl., Ex. 40 (Expert Report of Dr. Ronald R. Butters, at ¶¶ 4(a), 4(c), 10, 16-19).

Nor should Chevron be permitted to rely on the report of Dr. Leonard. Defendants have not yet been permitted the opportunity to conduct expert discovery in this case. Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures. Dkt. 703 at 2. Defendants have not been afforded sufficient time to review and analyze the material provided in this report. At the very least, Defendants must be given the opportunity to depose or cross-examine Dr. Leonard. *See* Fed. R. Civ. P. 56(d). | Undisputed.  Defendants' assertion that the "opinion of an expert" cannot be used in support of a Rule 56.1 statement is facially ridiculous and not supported by the cases cited.  To the contrary, courts routinely rely on expert evidence in deciding summary judgment motions.  *Mobileye, Inc. v. Picitup Corp.*, 2013 WL 830837, *18 (S.D.N.Y. Mar. 5, 2013); *Gill v. Arab Bank, PLC*, --- F.Supp.2d ----, 2012 WL 5395746, *21 (E.D.N.Y. Nov. 6, 2012); *Maytag Corp. v Electrolux Home Prods.*, 448 F. Supp. 2d 1034, 1064–65 (N.D. Iowa 2006).

*See* Reply to St. 127.

Chevron's statement of fact that the index summaries are the LAPs' team unfiled work product is further supported by Donziger's testimony that the index summaries were prepared by the LAPs' team (Dkt. 400-1 (Ex. 2010) at 4820:14-17 ("Q. Exhibit 1869A [DONZ00048820] is an internal plaintiff document for the litigation, correct? A. Yes."); *id.* at 4821:6-16 ("Q. Do you know who created Exhibit 1869A?  A. I don't know specifically. People in our office, and I think it might have been Mr. Prieto and/or Mr. Saenz. Q. Do you know who had the responsibility, if anyone, for maintaining the index that's been marked as Exhibit 1869A? A. I think it was considered the responsibility of the local legal team."); *id.* at 4826:4-8 ("Q. Exhibit 1870 [GARR-HDD-0003243-3446], like Exhibit 1869A, is an internal plaintiff document, correct? A. Yes.")), the analysis of Sam Hernandez, whose team reviewed the Lago Agrio record for excerpts of text that appear in both the judgment and index summary, and found "no complete Record Index Excerpt" in the Lago Agrio court record (Dkt. 548 at 9. ), and the conclusions of Dr. Patrick Juola, who analyzed the court record for text from the index summaries and was "unable to find significant matches between the overlap identified" between the judgment and index summaries and "lower court record in the Lago Agrio case." Dkt. |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | Moreover, the evidence raises genuine disputes of fact concerning what constitutes the court record in the Lago Agrio case and what is or is not considered part of the record before the court. See Resp. to St. 101.<br><br>Finally, Chevron previously submitted a similar statement with the same evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at Sts. 13-14.) Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion. | 400-16 (Ex. 2102) at 4.<br><br>Contrary to the Defendants' claims, they have been afforded ample time to review Dr. Leonard's analysis. The majority of Dr. Leonard's analysis, including the textual overlap between the judgment and the index summaries, was disclosed to Defendants in July of 2011. Defendants have therefore had more than 18 months to review and analyze Leonard's analysis of the index summaries. Defendants' protestation that they must be given "the opportunity" to depose or cross-examine Dr. Leonard is likewise disingenuous. Defendants did not even include Dr. Leonard in their February 6, 2013 letter to the Court listing individuals they claimed they needed to depose before responding to Chevron's motion. Dkt. 918-6. Indeed, Defendants eventually declined to depose any of Chevron's witnesses before filing their opposition. Dkt. 918-10.<br><br>*See* Reply to St. 101.<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact. It does not. That declaration does not mention the Index Summaries or provide any evidence to indicate that the Index Summaries appear in the Lago Agrio Record. In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |
| 144.    The Index Summaries are not in the Lago Agrio Record. Dkt. 400-16 (Ex. 2102) (2010.12.20 Juola Report) at 5 ("[T]he overall similarity between [the Judgment] and the LAPs' Work Product Documents cited, including the Memo Fusion, could not have derived from legitimate copies from secondary sources in the Lago Agrio court record."). | **Donziger:** Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:** Disputed. The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 | Undisputed. Defendants' assertion that the "opinion of an expert" cannot be used in support of a Rule 56.1 statement is facially ridiculous and not supported by the cases cited. To the contrary, courts routinely rely on expert evidence in deciding summary judgment motions. *Mobileye, Inc. v. Picitup Corp.*, 2013 WL 830837, *18 (S.D.N.Y. Mar. 5, 2013); *Gill v. Arab Bank, PLC*, --- F.Supp.2d ----, 2012 WL 5395746, *21 (E.D.N.Y. Nov. 6, 2012); *Maytag Corp. v Electrolux Home Prods.*, 448 F. Supp. 2d 1034, 1064–65 (N.D. Iowa 2006). |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).<br><br>The conclusion in St. 144 is based solely on the opinion of a paid expert witness. Even if considered, Dr. Patrick Juola's report is not admissible because it does not meet the requirements of Rule 702 and Daubert. *See* Resp. to St. 126; Smyser Decl., Ex. 41, Declaration of Richard J. Fateman, Ph.D, at ¶¶ 24-26, 29.<br><br>Nor should Chevron be permitted to rely on Dr. Juola's report. Defendants have not yet been permitted the opportunity to conduct expert discovery in this case. Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures. Dkt. 703 at 2. Defendants have not been afforded sufficient time to review and analyze the material provided in this report. At the very least, Defendants must be given the opportunity to depose or cross-examine Dr. Juola. *See* Fed. R. Civ. P. 56(d).<br><br>Moreover, the evidence raises genuine disputes of fact concerning what constitutes the court record in the Lago Agrio case and what is or is not considered part of the record before the court. See Resp. to St. 101.<br><br>Finally, Chevron previously submitted the same statement with the same evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 15). Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion. | *See* Reply to St. 144.<br><br>Contrary to the Defendants' claims, they have been afforded ample time to review Dr. Juola's analysis. Dr. Juola's analysis of the Lago Agrio record for text from the index summaries was disclosed to Defendants on December 20, 2011. Defendants' protestation that they must be given "the opportunity" to depose or cross-examine Dr. Leonard is likewise disingenuous. Chevron agreed to make Dr. Juola available for deposition before Defendants' opposition was due. Dkt. 918-7. Defendants, however, declined to depose Dr. Juola. Dkt. 918-10.<br><br>*See* Reply to St. 101.<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact. It does not. That declaration does not mention the Index Summaries or provide any evidence to indicate that the Index Summaries appear in the Lago Agrio Record. In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |
| 145.    As Dr. Robert A. Leonard concluded, | **Donziger:** Disputed. Donziger incorporates the Ecuadorian Plain- | Undisputed. Defendants' assertion that the "opinion of an expert" cannot |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| "[i]dentical or nearly identical word strings" and strings of symbols, including identical citation errors, punctuation errors, and orthographic errors in the Index Summaries appear in the Judgment. Dkt. 400-17 (Ex. 2117) (Leonard Report) at 11 (concluding that "portions of [the Judgment] and the Lago Agrio Plaintiffs' unfiled work product contain matching or similar word strings and strings of symbols whose presence is not explainable either as set phrases or by chance, and that those portions of the [the Judgment] are therefore plagiarized from [the LAPs'] unfiled work product"); *id.* at 22-26, Ex. 4 at 8-18 (providing examples of "co-occurring identical or nearly identical word string[s]," "identical orthographic errors" and "identical citations errors" in the Index Summaries and the Judgment); *id.* at 26 (noting that the Judgment "replicates the same citation error" as the LAPs' Index Summaries by incorrectly claiming that the Judicial Inspection Acta "ends at 75013 instead of 75003"); Dkt. 400 (Ex. 2118 (Supp. Leonard Report) at 1, Ex. A, (highlighted exhibits showing "strings of text and symbols which were plagiaristically copied" from the LAPs' Index Summaries). | tiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed. Defendants do not dispute that Dr. Leonard may have written that statement, Defendants dispute his conclusions. The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)). Chevron does not even attempt to disguise this "conclusion" as a "fact" because it expressly uses the phrase "As Dr. Robert A. Leonard <u>concluded</u> . . . ."<br><br>The conclusion in St. 145 is based solely on the opinion of a paid expert witness. Even if considered, Dr. Leonard's report is unreliable, makes improper and misleading characterizations, and is immaterial for the reasons stated in response to St. 127. *See also* Smyser Decl., Ex. 40 (Expert Report of Dr. Ronald R. Butters, ¶¶ 4(a), 4(c), 10, 16-19).<br><br>Nor should Chevron be permitted to rely on Dr. Leonard's report(s). Defendants have not yet been permitted the opportunity to conduct expert discovery in this case.<br><br>Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures. Dkt. 703 at 2. Defendants have not been afforded sufficient time to review and analyze the material provided in this report. At the very least, Defendants must be given the opportunity to depose or cross-examine Dr. Leonard. *See* Fed. R. Civ. P. 56(d). | be used in support of a Rule 56.1 statement is facially ridiculous and not supported by the cases cited.  To the contrary, courts routinely rely on expert evidence in deciding summary judgment motions.  *Mobileye, Inc. v. Picitup Corp.*, 2013 WL 830837, *18 (S.D.N.Y. Mar. 5, 2013); *Gill v. Arab Bank, PLC*, --- F.Supp.2d ----, 2012 WL 5395746, *21 (E.D.N.Y. Nov. 6, 2012); *Maytag Corp. v Electrolux Home Prods.*, 448 F. Supp. 2d 1034, 1064–65 (N.D. Iowa 2006).<br><br>*See* Reply to St. 127.<br><br>Contrary to the Defendants' claims, they have been afforded ample time to review Dr. Leonard's analysis.  The majority of Dr. Leonard's analysis, including the textual overlap between the judgment and the index summaries, was disclosed to Defendants in July of 2011.  Defendants have therefore had more than 18 months to review and analyze Leonard's analysis of the index summaries.  Defendants' protestation that they must be given "the opportunity" to depose or cross-examine Dr. Leonard is likewise disingenuous.  Defendants did not even include Dr. Leonard in their February 6, 2013 letter to the Court listing individuals they claimed they needed to depose before responding to Chevron's motion. Dkt. 918-6.  Defendants eventually declined to depose any of Chevron's witnesses before filing their opposition. Dkt. 918-10.<br><br>*See* Reply to St. 101.<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact.  It does not.  That declaration does not mention the Index Summaries or provide any evidence to indicate that the Index Summaries appear in the Lago Agrio Record.  In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | Moreover, "the nature of the[] contents" of the "Index Summaries" makes it "difficult to conclude that any *ex parte* submission of them materially impacted Chevron's ability to present its defense." Dkt. 550 at 88 n. 319. An index that "summarize[s] and list[s] certain filings made during the Lago Agrio litigation" would not have any material impact on Chevron's defense or on the outcome of the lawsuit. | |
| 146.    And as Dr. Teresa Turrell concluded, "the differences and linguistic strategies observed in [the Index Summary], diverging from the Source texts indexed in the [Index Summary], were reproduced in [the Judgment], something which would allow us to conclude that whoever the author of [the Judgment] is, the writer of such text had access to the [Index Summary] or another containing its contents." Dkt. 400-20 (Ex. 2129); *see also* Dkt. 400-19 (Ex. 2120) (DONZ00048819) (email attaching index summary); Dkt. 400-19 (Ex. 2122) (GARR-HDD-0003243-446) (June index summary produced by Laura Garr); Dkt. 402-5 (Ex. 2254) (Judicial Inspection Acta for Shushufindi 13)). | **Donziger:** Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:** Disputed. Defendants do not dispute that Dr. Turell may have written that statement, but Defendants dispute his conclusions. The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19, 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)). Chevron does not even attempt to disguise this "conclusion" as a "fact" because it expressly uses the phrase "As Dr. Teresa Turell <u>concluded</u> . . . ."<br><br>The conclusion in St. 146 is based solely on the opinion of a paid expert witness. Chevron should not be permitted to rely on Dr. Turell's report because Chevron did not disclose Dr. Turell as an expert in its March 1, 2013 expert disclosures. The Court should strike the report and disregard the conclusion in this St. 146 and any other statement that relies on Dr. Turell's report. See Fed. R. Civ. P. 37(c)(1). | Undisputed.  Defendants' assertion that the "opinion of an expert" cannot be used in support of a Rule 56.1 statement is facially ridiculous and not supported by the cases cited.  To the contrary, courts routinely rely on expert evidence in deciding summary judgment motions.  *Mobileye, Inc. v. Picitup Corp.*, 2013 WL 830837, *18 (S.D.N.Y. Mar. 5, 2013); *Gill v. Arab Bank, PLC*, --- F.Supp.2d ----, 2012 WL 5395746, *21 (E.D.N.Y. Nov. 6, 2012); *Maytag Corp. v Electrolux Home Prods.*, 448 F. Supp. 2d 1034, 1064–65 (N.D. Iowa 2006).<br><br>Defendants do not dispute that Professor Turell made these findings.<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact.  It does not.  That declaration does not mention the Index Summaries or provide any evidence to indicate that the Index Summaries appear in the Lago Agrio Record.  In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | Even if considered, Dr. Turell's report is not admissible because it does not meet the requirements of Rule 702 and Daubert. *See* Resp. to St. 127.<br><br>Moreover, "the nature of the[] contents" of the "Index Summaries" makes it "difficult to conclude that any *ex parte* submission of them materially impacted Chevron's ability to present its defense." Dkt. 550 at 88 n. 319. An index that "summarize[s] and list[s] certain filings made during the Lago Agrio litigation" would not have any material impact on Chevron's defense or on the outcome of the lawsuit.<br><br>Finally, Chevron previously submitted a similar statement with the same evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 16). Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion. | |
| 147.    The document bearing the Bates number GARR-HDD-0003243-3446 (file-name "cuadro_de_pruebas09-05(1).xls") was not produced to Chevron until June 2011 and the LAP team did not otherwise make it available to Chevron before that date. *See* Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 4822:24-4824:13 (Donziger's attorney, Robert Kaplan, explaining that the document bearing the Bates numbers GARR-HDD-0003243-46, was produced in June 2011). | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed in part. Defendants do not dispute that the document bearing the Bates number GARR-HD-0003243-3446 was produced to Chevron in or around June 2011. Defendants dispute that this document was produced late or could have been produced sooner than it was. The cited deposition transcript demonstrates that the document was "produced almost immediately after we got it. But I'm guessing it is June." Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 4824:9-11.<br><br>Moreover, Chevron previously submitted a similar statement with | Undisputed.  Defendants do not dispute that the document bearing the Bates number GARR-HDD-0003243-3446 (file name "cuadro_de_pruebas09-05(1).xls") was not produced to Chevron until June 2011 and the LAP team did not otherwise make it available to Chevron before that date.  Defendants' additional commentary on their ability to produce the document sooner is irrelevant. |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | substantially the same evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 13). Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion. | |

### D.    Draft Alegato

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| 148.    The document bearing Bates number DONZS00002439, a Microsoft Word document titled "Borra-ra-dor_Alegato_Final_Parcial_Envio_EEUU_[11_nov_2010].docx" (the "Draft Alegato"), which is a draft of the LAPs' "Final Alegato" in the Lago Agrio Litigation, was produced to Chevron in or around January 2011. It is a document written by the LAPs' team and contains the LAP team's unfiled work product.  Dkt. 400-1 (Ex. 2010) (Donziger Depo. Tr.). at 4736:20-4745:25; 4792:7-4814:21; Dkt. 400-20 (Ex. 2124) (DONZS00002439). | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed in part. Defendants do not dispute that the document bearing Bates number DONZS00002439 is a partial draft of the Lago Agrio Plaintiffs' Final Alegato.<br><br>Defendants dispute the conclusions reached in the final sentence of St. 148. The documents cited, an excerpt of Steven Donziger's deposition testimony and the document attached to a November 10, 2010 email from Juan Pablo Sáenz to Pablo Fajardo and Steven Donziger, do not establish that the document bearing Bates number DONZ00002439 is "unfiled work product." In fact, they support the opposite conclusion:<br><br>Q. Mr. Donziger, will you accept my representation that the references to the merger Fusion memo in the version of the plaintiffs' draft Alegato dated November 11th, 2010 do not appear in the filed versions of plaintiffs' Alegatos?<br>. . .<br><br>A. No. | Undisputed.  Defendants do not dispute that that the document bearing Bates number DONZS00002439 is a draft of their final alegato and that it contains their work product.  Defendants do not assert that they filed the draft alegato with the Lago Agrio court.  The additional language quoted by Defendants is not contrary to Chevron's statement of fact.  Donziger's refusal at deposition to accept a representation that references to the Fusion Memo in the draft alegato do not appear in the filed final alegato does not alter the fact that those references were removed from LAPs' alegato before it was filed with the Lago Agrio court.  Dkt. 658-7 (Ex. 3005) (Leonard Report) at 20-22; Dkt. 400-20 (Ex. 2124) (DONZS00002439).<br><br>*See also* Reply to Sts. 101, 126.<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact.  It does not.  That declaration does not mention the Draft Alegato or provide any evidence to indicate that the Draft Alegato appears in the Lago Agrio Record.  In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | Moreover, because "the similarities of the Draft Alegato to portions of the Judgment [appear] to be coextensive with some of the similarities of the [Fusion Memo] to the Judgment", Dkt. 550 at 29 n. 116, fact issues concerning whether the Fusion Memo was or was not part of the court record or openly and officially presented to the court likewise apply to the Draft Alegato. See Resp. to St. 101; Resp. to St. 126.<br><br>Finally, Chevron previously submitted a similar statement with similar evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 164). Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion. | |
| 149.    The Draft Alegato is not in the Lago Agrio Record.  Stavers Decl., Ex. 3267 (2012 Juola Report) at ¶¶ 68-74; Dkt. 400-16 (Ex. 2102) (2010.12.20 Juola Report) at 5 ("[T]he overall similarity between [the Judgment] and the LAPs' Work Product Documents cited . . . could not have derived from legitimate copies from secondary sources in the Lago Agrio court record."); Dkt. 658-5 – 658-6 (Ex. 3004) at 7 ("The Draft Alegato was not located in the Lago Agrio Record."). | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed. The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).<br><br>Even if considered, Dr. Patrick Juola's report is not admissible because it does not meet the requirements of Rule 702 and Daubert. *See* Resp. to St. 126; Smyser Decl., Ex. 41, Declaration of Richard J. Fateman, Ph.D, at ¶¶ 24-26, 29.<br><br>With respect to Samuel Hernandez's December 2012 affidavit, | Undisputed.  Defendants' assertion that the "opinion of an expert" cannot be used in support of a Rule 56.1 statement is facially ridiculous and not supported by the cases cited.  To the contrary, courts routinely rely on expert evidence in deciding summary judgment motions.  *Mobileye, Inc. v. Picitup Corp.*, 2013 WL 830837, *18 (S.D.N.Y. Mar. 5, 2013); *Gill v. Arab Bank, PLC*, --- F.Supp.2d ----, 2012 WL 5395746, *21 (E.D.N.Y. Nov. 6, 2012); *Maytag Corp. v Electrolux Home Prods.*, 448 F. Supp. 2d 1034, 1064–65 (N.D. Iowa 2006).<br><br>Defendants do not assert that the draft alegato was filed with the Lago Agrio court and do not attempt to identify the draft alegato in the Lago Agrio court record.  Morningside Translations reviewed all portions of the Lago Agrio record that could have contained the draft alegato, including the following categories of documents filed with the Lago Agrio court between November 1, 2010 (10 days before Saenz circulated the Draft Alegato to the LAPs' team) and February 14, 2011 (the date the judgment issued):  all LAP filings, all joint Chevron LAP filings, all filings made by LAPs' nominated experts, all filings by court designated experts, all judi- |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | Dkt. 658-5, it does not support the conclusion that the "Draft Alegato is not in the Lago Agrio Record." As Hernandez acknowledges, Morningside Translations did not review all of the "Lago Agrio Record", which Chevron attempts to define in St. 101 as "hand-numbered pages 1 to 216338 maintained by" the court. Dkt. 658-5, at ¶¶ 27-28. Instead, Morningside looked at only 6,714 of the 236,311 pages of the "record" that they were provided by counsel, a mere 2.8%. *Id.* Hernandez defines the subset that Chevron counsel handpicked and instructed him to review as "Review Set B." *Id.* Obviously "Review Set B" is not the same as "the Lago Agrio Record", which itself (as defined by Chevron) does not comprise the entirety of the official court record. *See* Resp. to St. 101. Reviewing only the portions that counsel instructed them to, while ignoring the rest of the record, does not lead to a reliable conclusion that certain information or text is or is not found in the court record.<br><br>Moreover, Hernandez does not explain how the document reviewers working for him were able to simultaneously maintain a recall of the specific text of a 94-page document while reviewing each page of the court records to determine if any portion of that enormous amount of text was found on a reviewed page. Dkt. 658-5, at ¶ 27. It is unlikely that the reviewers were able to remember all of the words (and the order they appeared in) contained in these numerous single-spaced pages of text ("Review Items B") in order to determine if any of these specific words were found in any single page of the 6,714 pages reviewed. The December 2012 Hernandez affidavit is not a reliable source for the conclusion that "the Draft Alegato is not in the Lago Agrio Record."<br><br>Nor should Chevron be permitted to rely on Dr. Juola's report(s) or Hernandez's affidavit(s). Defendants have not yet been permitted the opportunity to conduct expert discovery in this case. Under | cial inspection actas and submissions made during judicial inspections, all documents filed by judges (except orders and the judgment), all filings by court clerks, and all filings by third parties (except Texaco Inc. and Texaco Petroleum Company). Dkt. 658-5 (Ex. 3004) ¶ 26. Morningside Translations also reviewed all filings made by Chevron from May 28, 2010 (the date on which Chevron first received documents from any Lago Agrio affiliated party through discovery in the U.S.) to February 14, 2011. *Id.*<br><br>Defendants' argument regarding the ability of document reviewers to compare the text of draft alegato to the text of documents in the Lago Agrio court record mischaracterizes Morningside's review and is not properly made in their 56.1 responses and should be disregarded.<br><br>Contrary to the Defendants' claims, they have been afforded ample time to review Dr. Juola's analysis and the Affidavit of Sam Hernandez. Dr. Juola's analysis of the Lago Agrio record for text from the index summaries was disclosed to Defendants on December 20, 2011.  And the Affidavit of Sam Hernandez was filed on December 12, 2012. Dkt. 658-5 (Ex. 3004). Defendants' protestation that they must be given "the opportunity" to depose or cross-examine Dr. Juola and Sam Hernandez is likewise disingenuous.  In a February 6, 2013 letter, Defendants sought an extension of time to respond to Chevron's summary judgment motion on the ground that, among other things, Defendants desired to take depositions of certain declarants.  Among those declarants was Dr. Juola; Defendants did not at that time propose deposing Mr. Hernandez.  Dkt. 918-6.  Chevron agreed to make Dr. Juola available for deposition before Defendants' opposition was due. Dkt. 918-7.  Defendants, however, declined to depose Dr. Juola. Dkt. 918-10.<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact.  It does not.  That declaration does not mention the |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures. Dkt. 703 at 2. Defendants have not been afforded sufficient time to review and analyze the material provided in the reports and affidavits. At the very least, Defendants must be given the opportunity to depose or cross-examine Hernandez and Dr. Juola. *See* Fed. R. Civ. P. 56(d). | Draft Alegato or provide any evidence to indicate that the Draft Alegato appears in the Lago Agrio Record.  In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |
| | The evidence also raises genuine disputes of fact concerning what constitutes the court record in the Lago Agrio case and what is or is not considered part of the record before the court. See Resp. to St. 101. The fact that the "Draft Alegato" (as defined by Chevron) does not appear in its complete form in the Lago Agrio court record (as defined by Chevron) does not mean that portions of the document were not included in other court filings or documents officially and openly presented to the court. Moreover, because "the similarities of the Draft Alegato to portions of the Judgment [appear] to be coextensive with some of the similarities of the [Fusion Memo] to the Judgment", Dkt. 550 at 29 n. 116, fact issues concerning whether the Fusion Memo was or was not part of the court record or openly and officially presented to the court like-wise apply to the Draft Alegato. See Resp. to St. 101; Resp. to St. 126. | |
| | Moreover, Chevron previously submitted a similar statement with nearly the same evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 19). Chevron's additional exhibit is insufficient reason for the Court to rule any differently on this Renewed Motion. | |
| 150.    As Dr. Leonard concluded, "the Judgment "contains examples of strings of words and symbols identical or nearly identical to both the unfiled Fusion | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs | Undisputed.  It is indisputable that strings of text from the Fusion Memo appear in the judgment.  Thus, the Court has found "[t]hat proposition is incontrovertible as a matter of law." Dkt. 550 at 86.  Likewise, the exist- |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| Memo . . . and to the unfiled Draft Alegato." *See* Dkt. 658-7 – 658-8 (Ex. 3005) (Leonard Report) at 20-22; *see also* Dkt. 400-17 (Ex. 2117) (Leonard Report) at 11.  Dr. Leonard also noted that the "Fusion Memo was intended to be attached to the Draft Alegato," that "the Fusion Memo was not attached" to the filed Final Alegato, and that the "Draft Alegato contains several verbatim word strings from the Fusion Memo," and that the Judgment "was plagiarized from the unfiled Fusion Memo and the unfiled Draft Alegato, as opposed to relying on the filed Final Alegato." *Id.* at 17-20; *see also* Dkt. 400-18 (Ex. 2118) (Supp. Leonard Report) at 2, Exs. A, C (highlighted exhibits showing "strings of text and symbols which were plagiaristically copied" from the Draft Alegato); *see also* Dkt. 400-19 (Ex. 2123) (DONZS00042438-39) (email attaching Draft Alegato). | **LAPs:**  Disputed. While Defendants do not dispute that Dr. Leonard may have written that statement, Defendants dispute his conclusions. The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)). Chevron does not even attempt to disguise this "conclusion" as a "fact" because it expressly uses the phrase "As Dr. Leonard <u>concluded</u> . . . ."

The conclusion in St. 150 is based solely on the opinion of a paid expert witness. Even if considered, Dr. Leonard's report is unreliable, makes improper and misleading characterizations, and is immaterial for the reasons stated in response to St. 127. *See also* Smyser Decl., Ex. 40 (Expert Report of Dr. Ronald R. Butters, at ¶¶ 4(a), 4(c), 10, 16-19).

Nor should Chevron be permitted to rely on Dr. Leonard's report(s). Defendants have not yet been permitted the opportunity to conduct expert discovery in this case. Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures. Dkt. 703 at 2. Defendants have not been afforded sufficient time to review and analyze the material provided in this report. At the very least, Defendants must be given the opportunity to depose or cross-examine Dr. Leonard. *See* Fed. R. Civ. P. 56(d). | ence of overlapping text in the Draft Alegato is indisputable.  Dkt. 658-7 – 658-8 (Ex. 3005) (Leonard Report) at 20-22.

Dr. Leonard's report is not "misleading" or "unreliable[.]" Reply St. 127. Defendants' claim that they have "not been afforded sufficient time to review and analyze the material provided in this report," is belied by the fact that they rely on a rebuttal report prepared over one year ago. Dkt. 918-50 at 37.

Defendants' protestation that they must be given "the opportunity" to depose or cross-examine Dr. Leonard is likewise disingenuous.  Defendants did not even include Dr. Leonard in their February 6, 2013 letter to the Court listing individuals they claimed they needed to depose before responding to Chevron's motion. Dkt. 918-6.  Defendants eventually declined to depose any of Chevron's witnesses before filing their opposition. Dkt. 918-10.

Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact.  It does not.  That declaration does not mention the Draft Alegato or provide any evidence to indicate that the Draft Alegato appears in the Lago Agrio Record.  In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| 151.    As shown in Exhibits 5 and 7 to his most recent report, Dr. Leonard found multiple instances of verbatim or nearly verbatim overlap between the Draft Alegato and the Lago Agrio Judgment on pages 23 and 24 of the judgment. *See* Dkt. 658-7 – 658-8 (Ex. 3005) at Ex. 5 at 23-24, Ex. 7 at 61; *see also id.* Ex. 4 at A13, A14. | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed. The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).<br><br>The conclusion in St. 151 is based solely on the opinion of a paid expert witness. Even if considered, Dr. Leonard's report is unreliable, makes improper and misleading characterizations, and is immaterial for the reasons stated in response to St. 127. *See also* Smyser Decl., Ex. 40 (Expert Report of Dr. Ronald R. Butters, at ¶¶ 4(a), 4(c), 10, 16-19).<br><br>Nor should Chevron be permitted to rely on Dr. Leonard's report(s). Defendants have not yet been permitted the opportunity to conduct expert discovery in this case. Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures. Dkt. 703 at 2. Defendants have not been afforded sufficient time to review and analyze the material provided in this report. At the very least, Defendants must be given the opportunity to depose or cross-examine Dr. Leonard. *See* Fed. R. Civ. P. 56(d). | Undisputed.  Defendants' assertion that the "opinion of an expert" cannot be used in support of a Rule 56.1 statement is facially ridiculous and not supported by the cases cited.  To the contrary, courts routinely rely on expert evidence in deciding summary judgment motions.  *Mobileye, Inc. v. Picitup Corp.*, 2013 WL 830837, *18 (S.D.N.Y. Mar. 5, 2013); *Gill v. Arab Bank, PLC*, --- F.Supp.2d ----, 2012 WL 5395746, *21 (E.D.N.Y. Nov. 6, 2012); *Maytag Corp. v Electrolux Home Prods.*, 448 F. Supp. 2d 1034, 1064–65 (N.D. Iowa 2006).<br><br>Dr. Leonard's report is not "misleading" or "unreliable[.]" Reply St. 127. Defendants' claim that they have "not been afforded sufficient time to review and analyze the material provided in this report," is belied by the fact that they rely on a rebuttal report prepared over one year ago. Dkt. 918-50 at 37.<br><br>They have been afforded ample time to review Dr. Leonard's analysis. The majority of Dr. Leonard's analysis, including the textual overlap between the judgment and the Draft Alegato, was disclosed to Defendants in July and August of 2011.  Defendants have therefore had more than 18 months to review and analyze Leonard's analysis of the draft alegato. Defendants' protestation that they must be given "the opportunity" to depose or cross-examine Dr. Leonard is likewise disingenuous.  Defendants did not even include Dr. Leonard in their February 6, 2013 letter to the Court listing individuals they claimed they needed to depose before responding to Chevron's motion.  Dkt. 918-6.  Indeed, Defendants eventually declined to depose any of Chevron's witnesses before filing their opposition. Dkt. 918-10.<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact.  It does not.  That declaration does not mention the Draft Alegato or provide any evidence to indicate that the Draft Alegato |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | | appears in the Lago Agrio Record. In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |

### E.     Fajardo Trust Email

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| 152.    On June 18, 2009, Pablo Fajardo sent the LAPs' team, including Julio Prieto, Juan Pablo Sáenz and Steven Donziger, an email discussing and quoting from the case *Andrade v. Conelec* (the "Fajardo Trust Email"). *See* Dkt. 401-07 (Ex. 2174) (DONZ00051504). | **Donziger:** Donziger does not dispute that Fajardo sent the e-mail produced as DONZ00051504.<br><br>**LAPs:** Defendants do not dispute that Pablo Fajardo sent the email produced as DONZ00051504. | Undisputed. |
| 153.    The Fajardo Trust Email is not in the Lago Agrio Record. Dkt. 548 ¶ 26 (Affidavit of S. Hernandez, Morningside Translations) ("The Trust Email was not located in the Reviewed Record."). | **Donziger:** Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:** Disputed. The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).<br><br>The conclusion in St. 153 is based solely on the opinion of a paid expert witness. Even if considered, Hernandez's July 2012 affidavit does not support the conclusion that the "Fajardo Trust Email is not in the Lago Agrio Record." As Hernandez acknowledges, Morningside Translations did not review all of the "Lago Agrio | Undisputed. Defendants' assertion that the "opinion of an expert" cannot be used in support of a Rule 56.1 statement is facially ridiculous and not supported by the cases cited. To the contrary, courts routinely rely on expert evidence in deciding summary judgment motions. *Mobileye, Inc. v. Picitup Corp.*, 2013 WL 830837, *18 (S.D.N.Y. Mar. 5, 2013); *Gill v. Arab Bank, PLC*, --- F.Supp.2d ----, 2012 WL 5395746, *21 (E.D.N.Y. Nov. 6, 2012); *Maytag Corp. v Electrolux Home Prods.*, 448 F. Supp. 2d 1034, 1064–65 (N.D. Iowa 2006).<br><br>Chevron has put forward two expert declarations independently confirming from manual and computer searches of the record that the trust email is not in it. Dkt. 548, ¶ 26; Juola Report, (Jan 18, 2013), ¶¶ 62-67.<br><br>Defendants' attacks on Hernandez are unavailing. Defendants' claim that Morningside reviewed "a mere 41%" of the record. But that "41%" included all filings by the LAPs and all filings by Chevron after it received the first Section 1782 production. Dkt. 548, ¶ 8. Defendants do not ex- |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | Record", which Chevron defines in St. 101 as "hand-numbered pages 1 to 216338 maintained by" the court. Dkt. 548, ¶ 7. Instead, Morningside looked at only 97,058 of the 236,311 pages of the "record" that they were provided by counsel, a mere 41%. Id. Hernandez defines the subset that Chevron counsel handpicked and instructed him to review as "the Reviewed Record." *Id.* Obviously the "Reviewed Record" is not the same as "the Lago Agrio Record", which itself (as defined by Chevron) does not comprise the entirety of the official court record. *See* Resp. to St. 101. Hernandez also notes that he and his team conducted a "supplemental review" of "a subset of 182 pages" that Chevron's counsel "designated" out of "an additional 358 pages of documents." Dkt. 548, ¶ 31. Reviewing only the portions that counsel instructed him to, while ignoring the rest of the record, does not lead to a reliable conclusion that certain information or text is or is not found in the court record.<br><br>Moreover, Hernandez does not explain how the document reviewers working for him were able to simultaneously maintain a recall of the specific text of all of "[s]ix pages of the Fusion Memo", "[t]wo spreadsheet pages" from "the Record Index", a "two page Spanish language email", "[t]welve pairs of corresponding Spanish language text passages", and "[s]ixty sample names" while reviewing each page of the court records to determine if any portion of that enormous amount of text was found on a reviewed page. Dkt. 548, ¶ 11. It is unlikely that the reviewers were able to remember all of the words (and the order they appeared in) contained in these numerous single-spaced pages of text ("Review Items") in order to determine if any of these specific words were found in any single page of the 97,058 pages reviewed. The Hernandez affidavit is not a reliable source for the conclusion that "the Fajardo Trust Email is not in the Lago Agrio Record." | plain how filings by Chevron before it ever received a Section 1782 production from a LAP agent could conceivably include unfiled LAP work product.  In any event Hernandez identified everything included in the review set and Defendants have not listed any filing that should have been. Dkt. 548, ¶ 7.<br><br>Defendants question how document reviewers could recall the content they were reviewing for.  All were college educated, *id.* ¶ 14, and, as Hernandez's declaration explains, the review was quite thorough.  Indeed, the only overlap between the Selva Viva Data Compilation and the record that Defendants list was identified by that review.  As disclosed by Chevron's expert Samuel Hernandez over eight months ago, the Stratus report "contains one of the [sixty] SV Sample Names" from the judgment.  Dkt. 548, ¶ 28 (identifying filing CL1743-0184163 as containing one SV sample name); Resp. St. 161 (citing Exhibit 34, with records page 184,163, and claiming "Defendants have also identified portions of the record where submissions employ the "_sv" suffix.").<br><br>Contrary to the Defendants' claims, they have been afforded ample time to review and analyze the Affidavit of Sam Hernandez.  The Affidavit of Sam Hernandez regarding the Trust Email was filed on July 27, 2012.  Dkt. 548.  Defendants' protestation that they must be given "the opportunity" to depose or cross-examine Mr. Hernandez is likewise disingenuous.  In a February 6, 2013 letter, Defendants sought an extension of time to respond to Chevron's summary judgment motion on the ground that, among other things, defendants desired to take depositions of certain declarants.  Defendants did not propose deposing Mr. Hernandez at that time. Dkt. 918-6.  Chevron agreed to make Dr. Juola available for deposition before Defendants' opposition was due. Dkt. 918-7.  Defendants, however, declined to depose Dr. Juola.  Dkt. 918-10.<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | The Court should not allow Chevron to rely on the Hernandez affidavit. Defendants have not been permitted to conduct expert discovery, timely disclose responsive rebuttal experts, or review and analyze all material related to Hernandez's affidavit. At the very least, Defendants must be given the opportunity to depose or cross-examine Hernandez. *See* Fed. R. Civ. P. 56(d). | to this material fact. It does not. That declaration does not mention the Fajardo Trust Email or provide any evidence to indicate that the Fajardo Trust Email appears in the Lago Agrio Record. In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |
| 154.    No party in the Lago Agrio Litigation requested a trust be created for the judgment proceeds in any public filing with the Lago Agrio court. Dkt. 548 ¶ 26 (Affidavit of S. Hernandez, Morningside Translations) | **Donziger:** Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:** Disputed. The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).<br><br>The conclusion in St. 154 is based solely on the opinion of a paid expert witness. Even if considered, Hernandez's July 2012 affidavit does not support Chevron's conclusion. Hernandez did not review the entire record. See Resp. to St. 153. Even assuming that the "Fajardo Trust Email" was not located in "the Lago Agrio Record", however, it does not follow that "[n]o party in the Lago Agrio Litigation requested a trust be created for the judgment proceeds in any public filing." Hernandez does not state that Morningside reviewed each page of the "Lago Agrio Record" for the term "trust" in order to determine whether such a request was made in any filing. He does not even state that Morningside reviewed the "Reviewed Record" for this information. There is a disconnect between the affidavit and Chevron's assertion. | Undisputed.  Defendants' assertion that the "opinion of an expert" cannot be used in support of a Rule 56.1 statement is facially ridiculous and not supported by the cases cited. To the contrary, courts routinely rely on expert evidence in deciding summary judgment motions. *Mobileye, Inc. v. Picitup Corp.*, 2013 WL 830837, *18 (S.D.N.Y. Mar. 5, 2013); *Gill v. Arab Bank, PLC*, --- F.Supp.2d ----, 2012 WL 5395746, *21 (E.D.N.Y. Nov. 6, 2012); *Maytag Corp. v Electrolux Home Prods.*, 448 F. Supp. 2d 1034, 1064–65 (N.D. Iowa 2006).<br><br>Defendants offer no evidence to dispute that no party requested that a trust be created for the judgment proceeds in any public filing with the Lago Agrio court. *See* Reply to St. 153. Additionally, Morningside reviewed the Lago Agrio record for "text that appeared identical to, matching, similar to, substantially like, or closely related to, in whole or in part, any of the text" in the Trust Email Excerpt. Dkt. 548, ¶ 17. None was found. *Id.* at 26-27.<br><br>Contrary to the Defendants' claims, they have been afforded ample time to review and analyze the Affidavit of Sam Hernandez. The Affidavit of Sam Hernandez regarding the Trust Email was filed on July 27, 2012. Dkt. 548. Defendants' protestation that they must be given "the opportunity" to depose or cross-examine Mr. Hernandez is likewise disingenuous. In a February 6, 2013 letter, Defendants sought an extension of time to respond to Chevron's summary judgment motion on the ground that, among other things, defendants desired to take depositions of certain de- |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | Defendants have not been permitted to conduct expert discovery, timely disclose responsive rebuttal experts, or review and analyze all material related to Hernandez's affidavit. At the very least, Defendants must be given the opportunity to depose or cross-examine Hernandez. *See* Fed. R. Civ. P. 56(d). | clarants. Defendants did not propose deposing Mr. Hernandez at that time. Dkt. 918-6. Chevron agreed to make Dr. Juola available for deposition before Defendants' opposition was due. Dkt. 918-7. Defendants, however, declined to depose Dr. Juola. Dkt. 918-10. |
| 155.    In filings with this Court and the Second Circuit Court of Appeals (joined by Donziger), the LAPs stated that the portions of the June 18, 2009 Fajardo email appearing in the Judgment were "stock language" from published court opinions, but in fact the June 18, 2009 Fajardo email misquotes the *Andrade* case, and those same misquotations appear in the Judgment. Dkt. 365 at 41 (Opposition to Attachment Motion); Dkt. 400-20 (Ex. 2127) (*Chevron v. Salazar*, No. 11-1150 (2d Cir. Dec. 6, 2011), Dkt. 606-2) at 11 n.6; *Compare* Dkt. 168 (Judgment) at 186 *with* Dkt. 401-7 (Ex. 2174) (DONZ00051504) (2009.06.18 email from Fajardo with highlighting showing overlap with the Judgment); Dkt. 401-11 (Ex. 2199) (Highlighted version of the *Andrade v. Conelec* from the *Registro Oficial*); Dkt. 365 (Opposition to Attachment Motion) at 41 (in response to evidence of overlap, the LAPs' lawyers stated that the portions of the June 18, 2009, Fajardo email appearing in the Judgment were "stock language" from published court opinions but provided no record citation); Dkt. 400-20 (Ex. 2127) (*Chevron v. Salazar*, No. 11-1150, (2d Cir. Dec. 6, 2011), Dkt. 606-2) at 11 n.6 (same). | **Donziger:** Disputed in part. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:** Disputed in part. Defendants do not dispute that they have stated that "[t]he email contains a cut-and-pasted excerpt from a published Ecuadorian Supreme Court opinion dealing with a trust, noting that the same language appears in other Ecuadorian Supreme Court decisions." Dkt. 365 at 41. Defendants dispute that any "misquotations" appear in the "Fajardo email" or in the Ecuadorian Judgment. "[T]he four 'misquoted' words that allegedly demonstrate the identity of the part of the Judgment to this document in three instances are virtual synonyms for each other and the fourth is a gendered article that reflects a different word choice in Spanish. The English translation of the Judgment therefore does not clearly reflect which version, if either, of the Andrade case is being quoted." Dkt. 550, at 29 n. 116. | Undisputed. Defendants offer no evidence disputing that the Fajardo Trust Email misquotes text from the published *Andrade* case, and that those misquotations appear in the judgment. *Compare* Dkt. 168 (Judgment) at 186 *with* Champion Decl., Ex. 2174 (DONZ00051504) (2009.06.18 email from Fajardo with highlighting showing overlap with the judgment); Dkt. 401-11 (Ex. 2199) (Highlighted version of the *Andrade v. Conelec* case from the *Registro Oficial*). The quoted language from this Court's July 31, 2012 Opinion does not contradict Chevron's statement of fact. As the Court later explained: "Portions of that [Fajardo Trust] email – including a misquotation of the Andrade case – appear in the judgment. The Court noted in its opinion on Chevron's motion for partial summary judgment that 'Chevron has submitted no expert reports documenting alleged plagiarism in the Judgment from the Fajardo email, or indicating whether or not the Fajardo email was or was not a part of the Lago Agrio court record.'" Dkt. 905 at 21-22 n.78. Chevron has since filed expert analysis documenting "nearly identical strings of more than 40 words, identical citation errors, and identical mistranscriptions" between the judgment and the Fajardo Trust Email, Dkt. 658-7 – 658-8 (Ex. 3005) at 30-33, and that the Trust email is not in the record. Reply to St. 153. |
| 156.    As Dr. Robert Leonard concluded, "Much of the data, adduced below, such as identical or nearly | **Donziger:** Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact. | Undisputed. Defendants' assertion that the "opinion of an expert" cannot be used in support of a Rule 56.1 statement is facially ridiculous and not |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| identical strings of more than 40 words, identical citation errors, and identical mistranscriptions, support the opinion, to a reasonable degree of scientific certainty, that the co-occurrence of language between parts of the Sentencia and the unfiled Fajardo Trust email is due to common authorship." Dkt. 658-7 – 658-8 (Ex. 3005) at 30-33. | **LAPs:**  Disputed. While Defendants do not dispute that Dr. Leonard may have written that statement, Defendants dispute his conclusions. The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)). Chevron does not even attempt to disguise this "conclusion" as a "fact" because it expressly uses the phrase "As Dr. Robert Leonard <u>concluded</u> . . . ."<br><br>The conclusion in St. 156 is based solely on the opinion of a paid expert witness. Even if considered, Dr. Leonard's report is unreliable, makes improper and misleading characterizations, and is immaterial for the reasons stated in response to St. 127. *See also* Smyser Decl., Ex. 40 (Expert Report of Dr. Ronald R. Butters, at ¶¶ 4(a), 4(c), 10, 16-19).<br><br>Nor should Chevron be permitted to rely on Dr. Leonard's report(s). Defendants have not yet been permitted the opportunity to conduct expert discovery in this case. Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures. Dkt. 703 at 2. Defendants have not been afforded sufficient time to review and analyze the material provided in this report. At the very least, Defendants must be given the opportunity to depose or cross-examine Dr. Leonard. *See* Fed. R. Civ. P. 56(d). | supported by the cases cited.  To the contrary, courts routinely rely on expert evidence in deciding summary judgment motions.  *Mobileye, Inc. v. Picitup Corp.*, 2013 WL 830837, *18 (S.D.N.Y. Mar. 5, 2013); *Gill v. Arab Bank, PLC*, --- F.Supp.2d ----, 2012 WL 5395746, *21 (E.D.N.Y. Nov. 6, 2012); *Maytag Corp. v Electrolux Home Prods.*, 448 F. Supp. 2d 1034, 1064–65 (N.D. Iowa 2006).<br><br>It is indisputable that strings of text from the Fusion Memo appear in the judgment.  Thus, the Court has found "[t]hat proposition is incontrovertible as a matter of law." Dkt. 550 at 86.  Likewise, the existence of overlapping text in the Draft Alegato is indisputable. Dkt. 658-7 – 658-8 (Ex. 3005) (Leonard Report) at 20-22.<br><br>Dr. Leonard's report is not "misleading" or "unreliable[.]" Reply St. 127. Defendants' claim that they have "not been afforded sufficient time to review and analyze the material provided in this report," is belied by the fact that they rely on a rebuttal report prepared over one year ago. Dkt. 918-50 at 37.<br><br>Defendants' protestation that they must be given "the opportunity" to depose or cross-examine Dr. Leonard is likewise disingenuous.  Defendants did not even include Dr. Leonard in their February 6, 2013 letter to the Court listing individuals they claimed they needed to depose before responding to Chevron's motion. Dkt. 918-6.  Indeed, Defendants eventually declined to depose any of Chevron's witnesses before filing their opposition. Dkt. 918-10.<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact.  It does not.  That declaration does not mention the Fajardo Trust Email or provide any evidence to indicate that the Fajardo Trust Email appears in the Lago Agrio Record.  In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | | Declaration is inadmissible hearsay and cannot be considered. |
| 157.    As Dr. Robert Leonard concluded: (i) the Fajardo email *misquotes* language from the *Andrade v. Conelec* case, and the same misquote appears in the judgment; (ii) the Fajardo email *miscites* the *Andrade v. Conelec* case and the same erroneous citation appears in the judgment; (iii) another case (the *Concha* case), having nothing to do with trust law, is incorrectly cited as authority for "the legal basis of the trust" with the same short-hand citation being used in both the Fajardo email and the judgment; and (iv) the same explanatory language and phrases regarding use of judgment trusts appear verbatim in the Fajardo email and the judgment. Dkt. 658-7 – 658-8 (Ex. 3005) (Leonard December 10, 2012 Rpt) at 30-33 & *id.* at Ex. 5 at 186 (highlighted copy of portions of the Sentencia showing overlap with Fajardo Trust email) & Ex. 8 (highlighted portion of Fajardo Trust email showing overlap with Sentencia); *see also* Dkt. 401-11 (Ex. 2199) (highlighted version of the *Andrade v. Conelec* from the *Registro Oficial*). | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

**LAPs:**  Disputed. The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)). Chevron does not even attempt to disguise this "conclusion" as a "fact" because it expressly uses the phrase "As Dr. Robert Leonard <u>concluded</u> . . . ."

The conclusion in St. 157 is based solely on the opinion of a paid expert witness. Even if considered, Dr. Leonard's report is unreliable, makes improper and misleading characterizations, and is immaterial for the reasons stated in response to St. 127. *See also* Smyser Decl., Ex. 40 (Expert Report of Dr. Ronald R. Butters, at ¶¶ 4(a), 4(c), 10, 16-19).

Nor should Chevron be permitted to rely on Dr. Leonard's report(s). Defendants have not yet been permitted the opportunity to conduct expert discovery in this case. Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures. Dkt. 703 at 2. Defendants have not been afforded sufficient time to review and analyze the material provided in this report. At the very least, Defendants must be given the opportunity to depose or cross-examine Dr. Leonard. *See* | Undisputed.  Defendants' assertion that the "opinion of an expert" cannot be used in support of a Rule 56.1 statement is facially ridiculous and not supported by the cases cited.  To the contrary, courts routinely rely on expert evidence in deciding summary judgment motions.  *Mobileye, Inc. v. Picitup Corp.*, 2013 WL 830837, *18 (S.D.N.Y. Mar. 5, 2013); *Gill v. Arab Bank, PLC*, --- F.Supp.2d ----, 2012 WL 5395746, *21 (E.D.N.Y. Nov. 6, 2012); *Maytag Corp. v Electrolux Home Prods.*, 448 F. Supp. 2d 1034, 1064–65 (N.D. Iowa 2006).

There is no genuine dispute that the enumerated findings by Dr. Leonard are correct.  Defendants offer nothing specific to dispute any of them.

Defendants' claims that Dr. Leonard's report is "misleading" is itself disingenuous as their dispute is with the supposed ethical undertones of the word "plagiarism," Dkt. 918-50 at 4(b), not with whether the quoted text was copied from the Fusion Memo into the judgment.

Defendants' claim that they have "not been afforded sufficient time to review and analyze the material provided in this report," is belied by the fact that they rely on a rebuttal report prepared over one year ago.  Dkt. 918-50 at 37.

Defendants' protestation that they must be given "the opportunity" to depose or cross-examine Dr. Leonard is likewise disingenuous.  Defendants did not even include Dr. Leonard in their February 6, 2013 letter to the Court listing individuals they claimed they needed to depose before responding to Chevron's motion. Dkt. 918-6.  Indeed, Defendants eventually declined to depose any of Chevron's witnesses before filing their opposition. Dkt. 918-10.

Defendants assert generically in Dkt. 973 at 3 that the declaration of Nico- |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | Fed. R. Civ. P. 56(d). | las Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact. It does not. That declaration does not mention the Fajardo Trust Email or provide any evidence to indicate that the Fajardo Trust Email appears in the Lago Agrio Record. In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |
| 158.    Defendants understood the creation of a trust or trusts to receive any proceeds from the Lago Agrio judgment to be a "core provision[] to protect [Burford's] interest" and was thus essential to obtaining funding from Burford. Dkt. 549-3 (Ex. 2403) (DONZ00125526). | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed. The cited document, an email from nonparty Nicol Ash (counsel to Burford) to nonparty William Carmody and others, is inadmissible hearsay and cannot support summary judgment. *See Faulkner v. Arista Records LLC*, 797 F. Supp. 2d 299, 305 (S.D.N.Y. 2011) ("Each statement of material fact must be followed by a "citation to evidence which would be admissible, set forth as required by the Federal Rule of Civil Procedure 56(e).' It is therefore the rule that "only admissible evidence" need be considered on summary judgment. 'The principles governing admissibility of evidence do not change on a motion for summary judgment.'") (citations omitted).<br><br>Moreover, the cited document does not support Chevron's conclusion (or surmise) about what "Defendants understood." Chevron, per its counsel's usual modus operandi, removes snippets of the quote to mischaracterize and take it out of context. Chevron's counsel changes "provisions" to the singular "provision" to create the misleading impression that the creation of a trust is the core provision. And the "provisions" referred to in the email do not refer to the creation of a trust. The full quote indicates that Burford's counsel believed that the "core provisions" to protect Burford's interest were "(i) the covenant that each present and future material creditor be caused to execute the intercreditor agreement" and | Undisputed.  Defendants' hearsay objection fails because Chevron offers the statement not for its truth – *i.e.*, that the creation of a trust was essential to obtaining financing from Burford – but instead to show a state of mind, *i.e.*, that Defendants understood that the creation of a trust was essential to obtaining financing from Burford.  Fed. R. Evid. 801(c)(2).<br><br>Defendants' objection that the cited document does not support Chevron's statement of fact also fails.  The cited document was sent to Donziger by Burford's counsel, and it discussed Burford's counsel's view of the "key issues" related to the funding agreement and the "core provisions" of the trust structure.  Defendants' objection that the quote was mischaracterized is irrelevant and does not contradict Chevron's statement of fact because the quote speaks for itself.  Nor does Defendants' additional language contradict Chevron's statement of fact. |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | "(ii) the negative pledge in respect of future security provided in respect of the claim." Burford's counsel does not state that the "creation of a trust or trusts to receive any proceeds from the Lago Agrio judgment" was a "core provision."<br><br>Finally, there is no indication in the email that Defendants Camacho and Piaguaje (or even Steven Donziger) "understood" anything about the alleged importance of creating a trust. Chevron's counsel's speculation about the mental state of "Defendants" is not a basis for granting summary judgment. | |

**F.   Selva Viva Data Compilation**

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| 159.   The documents bearing Bates numbers DA00000040, DA00000041, and DA00000042, which were produced by the LAPs' counsel to Chevron on or around December 1, 2010, are Microsoft Excel spreadsheets containing environmental sampling data created by the LAPs' team known as the "Selva Viva Data Compilation." *See* Dkt. 402-12 (Ex. 2303) (DA00000040); Dkt. 402-12 (Ex. 2304) (DA00000041); Dkt. 402-12 (Ex. 2305) (DA00000042); Dkt. 400-1 (Ex. 2010) (Donziger Depo. Tr.) at 2605:6-2608:19; 2853:8-2861:18, 4834:1-4842:3; *see* Dkt. 402-11 (Ex. 2298) (Belanger Dep. Tr.) at 129:25-134:2. | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed. The referenced documents were produced by Douglas Allen, as is indicated in the very exhibits Chevron's counsel cites as support for this statement, not "the LAPs' counsel." *See, e.g.*, Dkt. 402-12 (Ex. 2303) ("Attached hereto as Exhibit 2303 is a true and correct copy of a printed excerpt from the file produced by Douglas Allen as DA00000040.xls". Moreover, Chevron previously submitted the same statement with the same evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at Sts. 25-26). Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion. | Undisputed.  While the Section 1782 respondent was Douglas Allen, it is undisputed that counsel for the LAPs produced his documents. |
| 160.   The Selva Viva Data Compilation is not in the Lago Agrio Record. *See* Dkt. 400-16 (Ex. 2102) | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact. | Undisputed.  Defendants' assertion that the "opinion of an expert" cannot be used in support of a Rule 56.1 statement is facially ridiculous and not |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| (2010.12.20 Juola Report) at 5 ("[T]he overall similarity between [the Judgment] and the LAPs' Work Product Documents cited, including the Memo Fusion, could not have derived from legitimate copies from secondary sources in the Lago Agrio court record."); Dkt. 548 ¶ 29 (concluding that the Selva Viva Data Compilation was not located in the record). | **LAPs:**  Disputed. The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).

The conclusion in St. 160 is based solely on the opinions of paid expert witnesses. Even if considered, Dr. Patrick Juola's report is not admissible because it does not meet the requirements of Rule 702 and Daubert. *See* Resp. to St. 126; Smyser Decl., Ex. 41, Declaration of Richard J. Fateman, Ph.D, at ¶¶ 24-26, 29.

Even if considered, Hernandez's July 2012 affidavit does not support Chevron's conclusion that the "Selva Viva Data Compilation is not in the Lago Agrio Record." Hernandez did not review the entire court record. *See* Resp. to St. 153. Moreover, Hernandez did not make any conclusions about the presence or absence of the Selva Viva Data Compilation. The Selva Viva Data Compilation is not even mentioned in his affidavit.

Chevron's assertion that the Hernandez affidavit concluded "that the Selva Viva Data Compilation was not in the record" is therefore false.

Defendants have not been permitted to conduct expert discovery, timely disclose responsive rebuttal experts, or review and analyze all material related to Dr. Juola's report and Hernandez's affidavit. At the very least, Defendants must be given the opportunity to depose or cross-examine Hernandez and Dr. Juola. *See* Fed. R. Civ. | supported by the cases cited.  To the contrary, courts routinely rely on expert evidence in deciding summary judgment motions.  *Mobileye, Inc. v. Picitup Corp.*, 2013 WL 830837, *18 (S.D.N.Y. Mar. 5, 2013); *Gill v. Arab Bank, PLC*, --- F.Supp.2d ----, 2012 WL 5395746, *21 (E.D.N.Y. Nov. 6, 2012); *Maytag Corp. v Electrolux Home Prods.*, 448 F. Supp. 2d 1034, 1064–65 (N.D. Iowa 2006).

Chevron has put forward two expert declarations independently confirming from manual and computer searches of the record that the Fusion Memo is not found therein.  Defendants have no evidence that the Fusion Memo is in the record and do not even represent that they ever filed it. Defendants cite the declaration of undesignated expert Fateman to undermine Dr. Juola's computer searches of the record, but that declaration is outdated as Dr. Juola performed additional review to address the issues raised by Fateman. Dkt. 755-13 (Ex. 3267) (2013.01.27 Juola Report), ¶ 78.

Defendants claim that Hernandez made no conclusions "about the presence of absence of the Selva Viva Data Compilation."  That untrue since he found that, with minor exceptions, "_sv" sample names from the Selva Viva Data Compilation that appear in the judgment, Dkt. 355-29 (Ex. 1096) (2011.06.10 Younger Report), are not in the record.  Dkt. 548, ¶ 28. Defendants' claim is particularly bizarre given that they clearly copied from Hernandez their one example of a "_sv" sample name appearing in the record.  *See* Reply to St. 153.

Contrary to the Defendants' claims, they have been afforded ample time to review and analyze the Affidavit of Sam Hernandez.  The Affidavit of Sam Hernandez regarding the Trust Email was filed on July 27, 2012. Dkt. 548.  Defendants' protestation that they must be given "the opportunity" to depose or cross-examine Mr. Hernandez is likewise disingenuous.  In a February 6, 2013 letter, Defendants sought an extension of time to respond to Chevron's summary judgment motion on the ground that, |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | P. 56(d). | among other things, defendants desired to take depositions of certain declarants. Defendants did not propose deposing Mr. Hernandez at that time. Dkt. 918-6. Chevron agreed to make Dr. Juola available for deposition before Defendants' opposition was due. Dkt. 918-7. Defendants, however, declined to depose Dr. Juola. Dkt. 918-10.<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact. It does not. That declaration does not mention the Selva Viva Data Compilation or provide any evidence to indicate that the Selva Viva Data Compilation appears in the Lago Agrio Record. In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |
| 161. More than 100 features of the Selva Viva Data Compilation, including the use of "_sv" and "_tx" in sample names, enclosing measurements of meters or centimeters within parentheses, misstating sample counts, misreporting milligrams per kilogram as micrograms per kilogram, and other errors appear in the Judgment, but not in the sampling results in the Lago Agrio Record. Dkt. 401-08 (Ex. 2182) at Ex. A at 17 (Expert Report of Michael L. Younger) ("I conclude that the Unfiled Selva Viva Data Compilation and the Stratus Compilation were sources of numerous data points cited in the [the Judgment]. It is highly unlikely that the Filed Lab Results from the Judicial Inspection Reports were the source of these data points based on the numerous irregularities found in the [the Judgment] that did not match the Filed Lab Results but that did match data within the Unfiled Selva Viva Data Compilation."); Dkt. 356-12 (Ex. BC) at 10-11 (2011.03.01 | **Donziger:** Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:** Disputed. The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).<br><br>The conclusion in St. 161 is based solely on the opinions of a paid expert witness. Even if considered, Michael Younger's report is unreliable because it is based on the improper assumption that information in the "Selva Viva Data Compilation" was not filed or officially presented to the court in Lago Agrio. Younger did not review the entire court record, nor does he purport to rely on | Undisputed. Defendants' assertion that the "opinion of an expert" cannot be used in support of a Rule 56.1 statement is facially ridiculous and not supported by the cases cited. To the contrary, courts routinely rely on expert evidence in deciding summary judgment motions. *Mobileye, Inc. v. Picitup Corp.*, 2013 WL 830837, *18 (S.D.N.Y. Mar. 5, 2013); *Gill v. Arab Bank, PLC*, --- F.Supp.2d ----, 2012 WL 5395746, *21 (E.D.N.Y. Nov. 6, 2012); *Maytag Corp. v Electrolux Home Prods.*, 448 F. Supp. 2d 1034, 1064–65 (N.D. Iowa 2006).<br><br>There is no genuine dispute that the identified idiosyncrasies are in the Selva Viva Compilation and the judgment, but not the filed lab sheets. Defendants wonder how Younger can know this when he did "not review the entire court record[.]" As explained in his report, he examined the filed lab sheets which are of course dispositive of whether content is or is not in the filed lab sheets.<br><br>The Selva Viva Compilation is not in the record and the one "sv" sample name Defendants list was "identified" by Hernandez, not them. Reply Sts. |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| Younger Report) ¶ 17 (concluding that "numerous data points cited" in the Judgment, "in excess of 100 specific repeated irregularities," were "copied, cut-and-pasted, or otherwise taken directly from the [Unfiled] Selva Viva Data Compilation"); *id.* ¶ 14 (explaining that many "sampling results set forth in the [Judgment] on pages 104-112 ended with the suffix '_sv' or '_tx'" but that Mr. Younger's review of the judicial inspection reports and lab results "failed to show a single sample result referenced in this manner."); *see also* Dkt. 402-10 (Ex. 2271). | someone who has performed a complete review. Indeed, Younger acknowledges that he reviewed only a limited subset of 65 documents (compared to the more than 200,000 pages in the record) that were handpicked by counsel, and then extrapolates that because information from the "Selva Viva Data Compilation" was not in that subset of materials, it was not "filed" with the court. Dkt. 400-08 at 2-3. This "conclusion" is not surprising, given that Chevron's counsel told Younger that the limited set of documents he was reviewing were "not filed in court in the Lago Agrio litigation in Ecuador." *Id.* at 2. And Younger uses the term "Unfiled Selva Viva Data Compilation" without ever engaging in a complete review of the record to determine whether the document was or was not filed or officially presented to the court. The conclusion that certain "features of the Selva Viva Data Compilation" were "not in the sampling results in the Lago Agrio Record" is not supported by Younger's report, which admittedly did not analyze the whole record.<br><br>Nor should Chevron be permitted to rely on Younger's report(s). Defendants have not yet been permitted the opportunity to conduct expert discovery in this case. Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures. Dkt. 703 at 2. Defendants have not been afforded sufficient time to review and analyze the material provided in this report. At the very least, Defendants must be given the opportunity to depose or cross-examine Younger. *See* Fed. R. Civ. P. 56(d).<br><br>Defendants have also identified portions of the record where submissions employ the "_sv" suffix, as referenced in the Judgment and as also allegedly used in the Selva Viva database. *See* Smyser | 153, 160.<br><br>Defendants' claim that they have "not been afforded sufficient time to review and analyze the material provided in this report," is specious. Younger first pointed out the overlap between the Selva Viva Compilation and the judgment nearly two years ago. *Chevron Corp. v. Salazar*, No. 11-cv-3718-LAK, Dkt. 46-3 (Ex. BC) (Younger Decl., filed 2011.06.16).<br><br>Defendants' protestation that they must be given "the opportunity" to depose or cross-examine Younger is likewise disingenuous. In a February 6, 2013 letter, Defendants sought an extension of time to respond to Chevron's summary judgment motion on the ground that, among other things, Defendants desired to take depositions of certain declarants. Among those declarants was Younger. Dkt. 918-6. Chevron agreed to make Younger available for deposition before Defendants' opposition was due. Dkt. 918-7. Defendants, however, declined to depose Younger. Dkt. 918-10.<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact. It does not. That declaration does not mention the Selva Viva Data Compilation or provide any evidence to indicate that the Selva Viva Data Compilation appears in the Lago Agrio Record. In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | Decl., Ex. 34, p. 184474.<br><br>Moreover, "the nature of the[] contents" of the "Selva Viva Data Compilation" makes it "difficult to conclude that any ex parte submission of them materially impacted Chevron's ability to present its defense." Dkt. 550 at 88 n. 319. Chevron presented thousands of sampling results from its own experts, which the Lago Agrio court was free to accept or reject. The Ecuadorian appellate court similarly reasoned that "the judge in his judgment has not assessed each sample and its results separately, as if they described isolated facts, but instead it is the collection of information coming from various sources that undoubtedly has created in the trial judge the conviction of the existence of damage." Dkt. 400-22 (Ex. 2144) at 12.<br><br>Finally, Chevron previously submitted a similar statement with substantially the same evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 172). Chevron provides no new arguments or new evidence and no reason for the Court to rule any differently on this Renewed Motion. | |
| 162.    As Michael Younger concluded, "the Court likely relied on and subsequently misinterpreted the Unfiled Selva Viva Compilation, rather than relying on the Filed Lab Results submitted with the Judicial Inspection Reports."  Dkt. 356-12 (Ex. BC) at 8 (2011.03.01 Younger Report) ¶ 16.a; Stavers Decl., Ex. 3278 at 19-20 (2013.01.24 Expert Report of Michael L. Younger) *id.* at 2, 14 ("Analysis of the 2011 Sentencia filed in the Lago Agrio litigation shows that it repeats errors found in unfiled court documents. This indicates that the Sentencia was derived from ma- | **Donziger:** Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:** Disputed. Though Defendants do not dispute that Mr. Younger may have written that statement, Defendants dispute his conclusions. The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19, 2002) | Undisputed.  Defendants' assertion that the "opinion of an expert" cannot be used in support of a Rule 56.1 statement is facially ridiculous and not supported by the cases cited.  To the contrary, courts routinely rely on expert evidence in deciding summary judgment motions.  *Mobileye, Inc. v. Picitup Corp.*, 2013 WL 830837, *18 (S.D.N.Y. Mar. 5, 2013); *Gill v. Arab Bank, PLC*, --- F.Supp.2d ----, 2012 WL 5395746, *21 (E.D.N.Y. Nov. 6, 2012); *Maytag Corp. v Electrolux Home Prods.*, 448 F. Supp. 2d 1034, 1064–65 (N.D. Iowa 2006).<br><br>There is no genuine dispute that the common errors between the judgment and the Selva Viva Compilation are not in the filed lab results.  Younger |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| terial not filed with the court in the Lago Agrio litigation."); Dkt. 401-08 (Ex. 2182) at Ex. A at 17 (2011.06.10 Younger Report) ("I conclude that the Unfiled Selva Viva Data Compilation and the Stratus Compilation were sources of numerous data points cited in the [the Judgment]. It is highly unlikely that the Filed Lab Results from the Judicial Inspection Reports were the source of these data points based on the numerous irregularities found in the [the Judgment] that did not match the Filed Lab Results but that did match data within the Unfiled Selva Viva Data Compilation."); Dkt. 356-12 at 10-11 (2011.03.01 Younger Report) ¶ 17 (concluding that "numerous data points cited" in the Judgment, "in excess of 100 specific repeated irregularities," were "copied, cut-and-pasted, or otherwise taken directly from the [Unfiled] Selva Viva Data Compilation"); *id.* ¶ 14 (explaining that many "sampling results set forth in the [Judgment] on pages 104-112 ended with the suffix '_sv' or '_tx'" but that Mr. Younger's review of the judicial inspection reports and lab results "failed to show a single sample result referenced in this manner."); *id.* ¶ 16.c (explaining that both the Judgment and the Selva Viva Data Compilation show "John Connor as the examiner responsible" for certain test data while "the Judicial Inspection Report filed with the court showed that Professor Fernando Morales was the one who carried out the inspection"); Dkt. 168 at 108 (Judgment stating that "Chevron's expert, John Connor, submitted results showing quantities of 9.9 and 2.3 mg/kg. (see samples JL-LAC-PIT1-SD2-SU1.R (1.30-1.90)M and JI-LAC-PIT1-SD1-SUI-R (1.6-2.4)M) in the judicial inspection in Lago Agrio Central"); Dkt. 356-12 at 8 (2011.03.01 | (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)). Chevron does not even attempt to disguise this "conclusion" as a "fact" because it expressly uses the phrase "As Michael Younger <u>concluded</u> . . . ."<br><br>The conclusion in St. 162 is based solely on the opinions of paid expert witnesses. Even if considered, Michael Younger's report is unreliable and does not support the conclusion in St. 162. See Resp. to St. 161. Moreover, it is based on assumption and speculation about the mental processes of the Ecuadorian trial court. Dkt. 356-12 at 8 (trial judge "likely relied on and subsequently misinterpreted the Selva Viva data compilation"). There is no evidence from which Younger could divine the judge's thought process or the reasons why he selected the evidence citations that he did.<br><br>Nor should Chevron be permitted to rely on Younger's report(s). Defendants have not yet been permitted the opportunity to conduct expert discovery in this case. Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures. Dkt. 703 at 2. Defendants have not been afforded sufficient time to review and analyze the material provided in this report. At the very least, Defendants must be given the opportunity to depose or cross-examine Younger. *See* Fed. R. Civ. P. 56(d).<br><br>Defendants have also identified portions of the record where submissions employ the "_sv" suffix, as referenced in the Judgment and as also allegedly used in the Selva Viva database. *See* Smyser Decl., Ex. 34, *e.g.* p. 184,474.<br><br>Moreover, "the nature of the[] contents" of the "Selva Viva Data | did not purport to make any findings regarding the "mental process" of whoever drafted the judgment.<br><br>Defendants' claim that they have "not been afforded sufficient time to review and analyze the material provided in this report," is specious. Younger first pointed out the overlap between the Selva Viva Compilation and the judgment nearly two years ago. *Chevron Corp. v. Salazar*, No. 11-cv-3718-LAK, Dkt. 46-3 (Ex. BC) (Younger Decl., filed 2011.06.16).<br><br>Defendants' protestation that they must be given "the opportunity" to depose or cross-examine Younger is likewise disingenuous. In a February 6, 2013 letter, Defendants sought an extension of time to respond to Chevron's summary judgment motion on the ground that, among other things, Defendants desired to take depositions of certain declarants. Among those declarants was Younger. Dkt. 918-6. Chevron agreed to make Younger available for deposition before Defendants' opposition was due. Dkt. 918-7. Defendants, however, declined to depose Younger. Dkt. 918-10.<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact. It does not. That declaration does not mention the Selva Viva Data Compilation or provide any evidence to indicate that the Selva Viva Data Compilation appears in the Lago Agrio Record. In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| Younger Report) ¶16.a (concluding that the author of the Judgment "likely relied on and subsequently misinterpreted the [Unfiled] Selva Viva Data Compilation, rather than relying on the Lab Results filed with the Judicial Inspection Reports" and in so doing, "eliminated any non-detect results and made mercury levels appear higher and more certain than the actual filed results"); Dkt. 168 at 109 (Judgment stating that "alarming levels of mercury have been found in the Sacha, Shushufindi, and Lago Agrio fields, where we found several samples reaching 7 mg/kg"); Dkt. 356-12 at 9 (2011.03.01 Younger Report) ¶ 16.b (explaining that the Judgment and [Unfiled] Selva Viva Data Compilation listed "concentrations of substances at specific sites" as milligrams per kilogram (mg/Kg) when the filed lab results "indicated that concentrations for those same substances and sites should be listed as micrograms per kilogram (µg/Kg) – a thousand times less concentrated than the levels reported in the [Judgment]"); Dkt. 168 at 108-09 (Judgment reporting PAH results for various sites in  mg/Kg instead of µg/Kg); Dkt. 356-12 at 68 (2011.04.15 Supplemental Younger Report) ¶ 12 (concluding that the Judgment's reference to 1,984 TPH results brought by Chevron's experts "was inaccurate and based on the Selva Viva Data Compilation, not documents filed with the court"); Dkt. 168 at 102 (Judgment stating, "it is noted among these TPH results, 80.4% have been brought by the LAPs' experts (1,984 results)"); Dkt. 356-12 at 69 (2011.04.15 Supplemental Younger Report) ¶ 15 (concluding that Judgment's claim that experts for the LAPs submitted 420 TPH results "was overstated" and "based on its apparent reliance on the | Compilation" makes it "difficult to conclude that any ex parte submission of them materially impacted Chevron's ability to present its defense." Dkt. 550 at 88 n. 319. Chevron presented thousands of sampling results from its own experts, which the Lago Agrio court was free to accept or reject. The Ecuadorian appellate court similarly reasoned that "the judge in his judgment has not assessed each sample and its results separately, as if they described isolated facts, but instead it is the collection of information coming from various sources that undoubtedly has created in the trial judge the conviction of the existence of damage." Dkt. 400-22 (Ex. 2144) at 12. | |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| [Unfiled] Selva Viva Data Compilation"); Dkt. 168 at 102 (Judgment stating that the LAPs' "experts have submitted 420 results"); Dkt. 356-12 at 69 (2011.04.15 Supplemental Younger Report) ¶ 15 (concluding that the "erroneous TPH counts in the [Judgment] had the additional effect of distorting the sample percentages listed in the decision"); Dkt. 168 at 101-02 (Judgment listing sample percentages). | | |
| 163.    The judgment claims that sampling identified the presence of mercury, but every result it identifies as reporting the presence of mercury were actually results showing no detectable mercury had been found. *See, e.g.*, Dkt. 168 at 109 (Judgment stating that "alarming levels of mercury have been found in the Sacha, Shushufindi, and Lago Agrio fields, where we found several samples reaching 7 mg/kg"); Dkt. 400-22 (Ex. 2144) (2012.01.03 appellate decision) at 11-12 (indicating that mercury had been found above detection limits); *id.* at 12 (using "_sv" and "_tx" in sample names); Dkt. 356-12 at 8 (2011.03.01 Younger Report) ¶16.a (concluding that the author of the Judgment "likely relied on and subsequently misinterpreted the [Unfiled] Selva Viva Data Compilation, rather than relying on the Lab Results filed with the Judicial Inspection Reports" and in so doing, "eliminated any non-detect results and made mercury levels appear higher and more certain than the actual filed results"); *see also* Dkt. 402-9 (Ex. 2268) (Annex E of the Cabrera Report) at 7, 9, 69 (reporting mercury concentrations of 7mg/Kg instead of nondetect results); Dkt. 400-2 (Ex. 2015) (Maest Dep. Tr.) at 27:23-28:1 (Ms. Maest testifying that the LAPs' Quito team prepared Annex E | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed. The statement calls for a legal interpretation of the Lago Agrio judgment—a conclusion inappropriate in a Rule 56.1 statement. Further, the conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).<br><br>Even if considered, Younger's report is unreliable because it is based on assumption and speculation about the mental processes of the Ecuadorian trial court. Dkt. 356-12 at 8 (trial judge "likely relied on and subsequently misinterpreted the Selva Viva Data compilation"). There is no evidence from which Younger could divine the judge's thought process or the reasons why he selected the evidence citations that he did.<br><br>Even if considered, Younger's report is unreliable because it is based on assumption and speculation about the mental processes | Undisputed.  Defendants' assertion that the "opinion of an expert" cannot be used in support of a Rule 56.1 statement is facially ridiculous and not supported by the cases cited.  To the contrary, courts routinely rely on expert evidence in deciding summary judgment motions. *Mobileye, Inc. v. Picitup Corp.*, 2013 WL 830837, *18 (S.D.N.Y. Mar. 5, 2013); *Gill v. Arab Bank, PLC*, --- F.Supp.2d ----, 2012 WL 5395746, *21 (E.D.N.Y. Nov. 6, 2012); *Maytag Corp. v Electrolux Home Prods.*, 448 F. Supp. 2d 1034, 1064–65 (N.D. Iowa 2006).<br><br>There is no genuine dispute that the judgment claimed there to be "alarming levels of mercury," Dkt. 168 at 109, when none was detected.  Defendants' claim that Younger delved into the "mental processes" of the judgment's author is not serious.  As seen from Younger's analysis of the judgment and the Selva Viva Compilation, the data clearly shows that the Judgment used the Selva Viva Compilation.  There is no need to divine "though process[.]"<br><br>The statement, particularly when combined with other errors imported into the judgment from the LAPs' unfiled work product, is material.  Chevron could not possibly defend itself from errors from the LAPs' unfiled work product that was never filed with the court.  Such errors are only less material in the sense that, as they did with the Cabrera Report, the LAPs were going to ghostwrite the judgment to find in their favor no matter what documents they used. *See* Sts. 181-207. |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| of the Cabrera Report) | of the Ecuadorian trial court. Dkt. 356-12 at 8 (trial judge "likely relied on and subsequently misinterpreted the Selva Viva Data compilation"). There is no evidence from which Younger could divine the judge's thought process or the reasons why he selected the evidence citations that he did.<br><br>Moreover, the other cited materials do not support this conclusion either. The Ecuadorian "appellate decision" does not, as Chevron claims, "indicat[e] that mercury had been found above detection limits." In fact, the appellate decision indicates the exact opposite. The appellate court concluded that "the lower court has over-looked the symbol 'less than' and instead it has assumed the results are 'precise' when they are not. . . . [T]his error in the as-sessment of the laboratory results regarding a contaminating ele-ment does not invalidate the remaining findings or reasoning re-garding others which are in fact characterized as containing ele-ments." Dkt. 400-22 (Ex. 2144) at 11-12.<br><br>This statement is immaterial. The conclusion that there were high levels of mercury in the soils reaching 7 mg/kg did not materially impact Chevron's ability to present its defense or the outcome of the Lago Agrio lawsuit. | |

**G.    Moodie Memo**

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| 164.    The document bearing the Bates number WOODS-HDD-0012793, a memorandum purporting to analyze causation (the "Moodie Memorandum") was created by the LAP team and contains the LAP team's work product. Stavers Decl. Ex. 3280 (Green Decl.), | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plain-tiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed. The cited materials do not support Chevron's statement 164. The only citations are to two expert reports, both of | Undisputed.  There is no genuine dispute that the Moodie Memo was writ-ten by Australian LAP intern Nicholas Moodie.  Stavers Decl., Ex.3670 (DONZ00065435) (Donziger email that "Nick Moodie, who is from Aus-tralia, will be joining us as an intern on Jan 4 for about two months."); Dkt. 918-49 (Ex. 39) (Moodie Memo with heading "FROM: Nicholas |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| 3283 (Spigelman Decl.). | which assume (based on statements from Chevron's counsel) that the document in question was "authored by Nicholas Moodie to Julio Prieto and Juan Saenz, dated February 2, 2009." Stavers Decl. Ex. 3280 (Green Decl.); *see also* Stavers Decl. Ex. 3283 (Spigelman Decl.) ("a memorandum of 2 February 2009 by Nicholas Moodie"). Chevron has not proffered the "Moodie Memorandum as evidence to support this assertion. Chevron does not even define the vague term "LAP team." | Moodie" and re line "The standard of proof in US common-law toxic tort negligence claims.") |
| 165.    LAPs legal intern Nicholas Moodie, the primary author of the Moodie Memorandum, is Australian. Stavers Decl. Ex. 3280 (Green Decl.), 3283 (Spigelman Decl.). | **Donziger:**  Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed. The cited materials do not support Chevron's statement 164. The only citations are to two expert reports, both of which assume (based on statements from Chevron's counsel) that the document in question was "authored by Nicholas Moodie to Julio Prieto and Juan Saenz, dated February 2, 2009." Stavers Decl. Ex. 3280 (Green Decl.); *see also* Stavers Decl. Ex. 3283 (Spigelman Decl.) ("a memorandum of 2 February 2009 by Nicholas Moodie"). Chevron has not proffered the "Moodie Memorandum as evidence to support this assertion. There is no admissible evidence proving that he was "the primary author of the Moodie Memorandum", or that he is Australian. | Undisputed.  It is unclear how Defendants could dispute in good faith that Nicholas Moodie is the primary author of the Moodie Memo, when the memo identifies him as the author on its face, Dkt. 918-49 (Ex. 39), or that he is Australian when Donziger wrote that "Nick Moodie, who is from Australia, will be joining us as an intern on Jan 4 for about two months." Stavers Decl., Ex.3670 (DONZ00065435). |
| 166.    The Moodie Memo is not in the Lago Agrio Record. Dkt. 658-5 at 5 (12.12.12 Affidavit of Samuel Hernandez, Part 1) ¶ 22; *see also* Dkt. 658-6 (12.12.12 Affidavit of Samuel Hernandez, Part 2). | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed. The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19, 2002) | Undisputed.  Defendants' assertion that the "opinion of an expert" cannot be used in support of a Rule 56.1 statement if facially ridiculous and not supported by the cases cited.  To the contrary, courts routinely rely on expert evidence in deciding summary judgment motions. *Mobileye, Inc. v. Picitup Corp.*, 2013 WL 830837, *18 (S.D.N.Y. Mar. 5, 2013); *Gill v. Arab Bank, PLC*, --- F.Supp.2d ----, 2012 WL 5395746, *21 (E.D.N.Y. Nov. 6, 2012); *Maytag Corp. v Electrolux Home Prods.*, 448 F. Supp. 2d 1034, 1064–65 (N.D. Iowa 2006).  The assertion is particularly bizarre here because the "expert opinion" is based on a manual search. |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
|  | (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).<br><br>The conclusion in St. 166 is based solely on the opinions of a paid expert witness. Even if considered, Hernandez's December 2012 affidavit does not support the conclusion that the "Moodie Memo is not in the Lago Agrio Record." As Hernandez acknowledges, Morningside Translations did not review all of the "Lago Agrio Record", which Chevron defines in St. 101 as "hand-numbered pages 1 to 216338 maintained by" the court. Dkt. 658-5, at ¶¶ 8-9. Instead, Morningside looked at only 49,906 of the 236,311 pages of the "record" that they were provided by counsel, a mere 21%. Id. Hernandez defines the subset that Chevron counsel handpicked and instructed him to review as "Review Set A." Id. Obviously "Review Set A" is not the same as "the Lago Agrio Record", which itself (as defined by Chevron) does not comprise the entirety of the official court record. See Resp. to St. 101. Reviewing only the portions that counsel instructed them to, while ignoring the rest of the record, does not lead to a reliable conclusion that certain information or text is or is not found in the court record.<br><br>Moreover, Hernandez does not explain how the document reviewers working for him were able to simultaneously maintain a recall of the specific text of a 13-page legal memorandum and three versions each of five separate text selections while reviewing each page of the court records to determine if any portion of that enormous amount of text was found on a reviewed page. Dkt. 658-5, at ¶ 10-11. It is unlikely that the reviewers were able to remember all of the words (and the order they appeared in) contained in these numerous single-spaced pages of text ("Review Items A") in order to determine if any of these specific words were found in any single page of the 49,906 pages reviewed. The December 2012 Hernandez affidavit is not a reliable source for the conclusion that "the | There is no genuine dispute that the Moodie Memo was not filed. On its face, it is a draft English language legal memo that still includes internal notes to LAP team members, including ones admitting that the LAPs lack causation evidence. Dkt. 918-49 (Ex. 39) at 13 ("I think the main problem we have is that the evidence is all over the place, and while there are observed associations between oil contamination and many different forms of disease, the evidence concerning the causal link of any one particular disease is sparse."). Defendants do not represent, must less prove, that they presented such a document to the Lago Agrio court.<br><br>In contrast, a thorough search of the record did not reveal the Moodie Memo or Spanish-language equivalents. Defendants complain the review included only a subset of the record, but that subset was all documents filed after the Moodie Memo was written. Dkt. 658-5, ¶ 9.<br><br>Defendants question how document reviewers could recall the content they were reviewing for. All were college educated, *id.* ¶ 14, and, as Hernandez's declaration explains, the review was quite thorough.<br><br>Defendants complain that they have not taken depositions yet, but that was their choice. In a February 6, 2013 letter, Defendants sought an extension of time to respond to Chevron's summary judgment motion on the ground that, among other things, Defendants desired to take depositions of certain declarants. Dkt. 918-6. Chevron agreed to make witnesses available for deposition before Defendants' opposition was due. Dkt. 918-7. Defendants declined. Dkt. 918-10.<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact. It does not. That declaration does not mention the Moodie Memo or provide any evidence to indicate that the Moodie Memo appears in the Lago Agrio Record. Further, Zambrano does not indicate |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | Moodie Memo is not in the Lago Agrio Record." <br><br> Defendants have not been permitted to conduct expert discovery, timely disclose responsive rebuttal experts, or review and analyze all material related to Hernandez's affidavit. At the very least, Defendants must be given the opportunity to depose or cross-examine Hernandez. *See* Fed. R. Civ. P. 56(d). | that he can read English—the language of the Moodie Memo—so he could not have used it even if it was provided.  In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |
| 167.    As Michael Green has concluded, the Moodie Memo and the judgment adopt the "substantial factor" test from *Rutherford v. Owens-Illinois, Inc.*, 941 P.2d 1203 (Cal. 1997), but that test was employed in Rutherford "to address a particular problem in asbestos litigation and is not generally applicable in tort contexts that do not present the difficult and specific proof problems present in that case. . . . Rutherford does not reflect a general approach to causation in toxic substances cases, but rather a response to scientific uncertainty when multiple defendants each contribute to the risk of disease but proof of which defendant's contribution was the but for cause is scientifically impossible. Subsequent cases in California, including toxic torts, have confined Rutherford to that specific circumstance." Stavers Decl., Ex. 3280 (Green Decl.) at 7-9, ¶¶ 2-3. | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact. <br><br> **LAPs:**  Disputed. This statement consists of an improper legal conclusion, which the Court should strike or disregard. *See, e.g., Antunes*, 2011 WL 1990872 at *2 n.9; *Cicchetti*, 2008 WL 619013 at *4 n.2. It is not a statement "undisputed fact" that belongs in a Rule 56.1 statement. Moreover, the conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)). <br><br> The sole basis for this statement is the opinion of a paid expert witness. Even if considered, the cited evidence does not support Chevron's counsel's conclusion. Michael Green did not, as Chevron's counsel falsely suggests, conclude that the "Moodie Memo" and the Ecuadorian Judgment "adopt" the "substantial factor" test in Rutherford. Stavers Decl. Ex. 3280 (Green Decl.) at 8-9. Green made no conclusion about the Memo or the Judgment "adopting" any particular causation standard, including substantial factor. *Id.* Chevron's counsel's conclusion about what was "adopted" is also | Undisputed.  Defendants' assertion that the "opinion of an expert" cannot be used in support of a Rule 56.1 statement if facially ridiculous and not supported by the cases cited.  To the contrary, courts routinely rely on expert evidence in deciding summary judgment motions. *Mobileye, Inc. v. Picitup Corp.*, 2013 WL 830837, *18 (S.D.N.Y. Mar. 5, 2013); *Gill v. Arab Bank, PLC*, --- F.Supp.2d ----, 2012 WL 5395746, *21 (E.D.N.Y. Nov. 6, 2012); *Maytag Corp. v Electrolux Home Prods.*, 448 F. Supp. 2d 1034, 1064–65 (N.D. Iowa 2006). <br><br> There is no genuine dispute that both the judgment and the Moodie Memo employ California's *Rutherford* asbestos causation test.  Defendants' claim that the judgment "reviews at least five different causation theories and then arrives at the same conclusions via different theories of causation," (internal citation omitted), is a fabrication.  The judgment explicitly makes its findings of legal medical causation using the *Rutherford* test and a purported Australian causation test. Dkt. 168 at 170. <br><br> Defendants question how document reviewers could recall the content they were reviewing.  All were college educated, Dkt. 658-5, ¶ 13, and, as Hernandez's declaration explains, the review was quite thorough. <br><br> Defendants complain that they have not taken depositions yet, but that was their choice.  In a February 6, 2013 letter, Defendants sought an extension of time to respond to Chevron's summary judgment motion on the ground that, among other things, Defendants desired to take depositions of certain |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | contradicted by the plain text of Green's declaration, the "Moodie Memo" and the Ecuadorian Judgment. The "Moodie Memo" lists the "substantial factor" causation standard as one of many and in no way "adopts" it as the appropriate standard for the Lago Agrio lawsuit against Chevron. Smyser Decl., Ex. 39 (WOODS-HDD-0012793). The Ecuadorian Judgment expressly disclaims reliance on any single theory of causation. Dkt. 168 at 90 ("we must study each type of harm separately, because not all types of harm are equal or have the same causation"). The Judgment reviews at least five different causation theories (*id.* at 87-89) and then arrives at the same conclusions via different theories of causation (*id.* at 170).<br><br>Chevron should not be permitted to rely on Green's declaration for summary judgment. Defendants have not been permitted to conduct expert discovery, timely disclose responsive rebuttal experts, or review and analyze all material related to Green's affidavit. At the very least, Defendants must be given the opportunity to depose or cross-examine Green. *See* Fed. R. Civ. P. 56(d).<br><br>Moreover, Hernandez does not explain how the document reviewers working for him were able to simultaneously maintain a recall of the specific text of a 13-page legal memorandum and three versions each of five separate text selections while reviewing each page of the court records to determine if any portion of that enormous amount of text was found on a reviewed page. Dkt. 658-5, at ¶ 10-11. It is unlikely that the reviewers were able to remember all of the words (and the order they appeared in) contained in these numerous single-spaced pages of text ("Review Items A") in order to determine if any of these specific words were found in any single page of the 49,906 pages reviewed. The December 2012 Hernandez affidavit is not a reliable source for the conclusion that "the Moodie Memo is not in the Lago Agrio Record." | declarants. Dkt. 918-6. Chevron agreed to make witnesses available for deposition before Defendants' opposition was due. Dkt. 918-7. Defendants declined. Dkt. 918-10.<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact. It does not. That declaration does not mention the Moodie Memo or provide any evidence to indicate that the Moodie Memo appears in the Lago Agrio Record. Further, Zambrano does not indicate that he can read English—the language of the Moodie Memo—so he could not have used it even if it was provided. In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | Defendants have not been permitted to conduct expert discovery, timely disclose responsive rebuttal experts, or review and analyze all material related to Hernandez's affidavit. At the very least, Defendants must be given the opportunity to depose or cross-examine Hernandez. *See* Fed. R. Civ. P. 56(d). | |
| 168.   As Michael Green has concluded, "Australian law does distinguish between legal causation and scientific causation," but "[t]here is no doctrine in the United States that distinguishes between legal causation and scientific causation" and the Moodie memorandum and the Aguinda judgment "are both incorrect in attributing such a schism to the United States." Stavers Decl., Ex. 3280 (Green Decl.) at 10, ¶ 1. | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed. Although Defendants do not dispute that Mr. Green has written that statement, Defendants dispute his conclusions. This statement consists of an improper legal conclusion, which the Court should strike or disregard. *See, e.g.*, *Antunes*, 2011 WL 1990872 at *2 n.9; *Cicchetti*, 2008 WL 619013 at *4 n.2. It is not a statement "undisputed fact" that belongs in a Rule 56.1 statement. Moreover, the conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)). Chevron does not even attempt to disguise this "conclusion" as a "fact" because it expressly uses the phrase "As Michael Green has concluded . . . ."<br><br>The sole basis for this statement is the opinion of a paid expert witness. Even if considered, Michael Green's opinion is unreliable because it is based on the unproven assumption that the "Moodie Memo" was not filed or officially presented to the Lago Agrio court. Green acknowledges that he only reviewed a limited num- | Undisputed.  Defendants' assertion that the "opinion of an expert" cannot be used in support of a Rule 56.1 statement if facially ridiculous and not supported by the cases cited.  To the contrary, courts routinely rely on expert evidence in deciding summary judgment motions.  *Mobileye, Inc. v. Picitup Corp.*, 2013 WL 830837, *18 (S.D.N.Y. Mar. 5, 2013); *Gill v. Arab Bank, PLC*, --- F.Supp.2d ----, 2012 WL 5395746, *21 (E.D.N.Y. Nov. 6, 2012); *Maytag Corp. v Electrolux Home Prods.*, 448 F. Supp. 2d 1034, 1064–65 (N.D. Iowa 2006).<br><br>It is undisputed that a common error between the judgment and Moodie Memo is that both claim that United States law distinguishes "legal causation" from "scientific causation."<br><br>Defendants argue that Green reviewed a "limited number of documents" not "the entire Lago Agrio court record."  But those "limited documents" included the trial briefs in the Lago Agrio litigation, Dkt. 755-26 (Ex. 3280), ¶ 16(f), where one would logically expect legal causation arguments to appear.  The review of relevant portions of the Lago Agrio record was performed under the supervision of Hernandez.<br><br>Defendants cite Green's disclosure of the ELAW brief, but the ELAW brief does not include any discussion relevant to this statement.  Dkt. 755-26 (Ex. 3280) at 5, 13; Stavers Decl., Ex. 3658 (2009.06.15 ELAW brief) (not including any discussion of difference between "legal causation" and "scientific causation"). |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | ber of documents (5) and has not reviewed the entire Lago Agrio court record. Stavers Decl. Ex. 3280 (Green Decl.) at ¶ 15(f). To the extent he relies on the affidavit of Samuel Hernandez, Defendants incorporate their arguments and objections as to the sufficiency of that affidavit. See Resp. to St. 166. Moreover, as to one of the five documents Green actually reviewed, a publicly-filed amicus brief, he "found some aspects of the ELAW brief that might have been the basis of some aspects of the causation discussion in the Aguinda judgment." *Id.* at 4 n.2.<br><br>Chevron should not be permitted to rely on Green's declaration for summary judgment. Defendants have not been permitted to conduct expert discovery, timely disclose responsive rebuttal experts, or review and analyze all material related to Green's affidavit. At the very least, Defendants must be given the opportunity to depose or cross-examine Green. *See* Fed. R. Civ. P. 56(d).<br><br>Moreover, this statement about alleged errors in the Moodie Memo and the Ecuadorian Judgment regarding causation law is immaterial. *See* Resp. to St. 167. | Defendants complain that they have not taken depositions yet, but that was their choice. In a February 6, 2013 letter, Defendants sought an extension of time to respond to Chevron's summary judgment motion on the ground that, among other things, Defendants desired to take depositions of certain declarants. Dkt. 918-6. Chevron agreed to make witnesses available for deposition before Defendants' opposition was due. Dkt. 918-7. Defendants declined. Dkt. 918-10.<br><br>The use of the Moodie Memo in ghostwriting the medical causation findings of the judgment, which this statement demonstrates occurred, is deeply material. Medical causation, and particularly scientific evidence informing it, is a core issue in toxic tort type cases. *Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1197 (11th Cir. 2002). Chevron obviously could not have known that the judgment would use an unfiled, English draft memo for causation tests, and therefore was deprived of the ability to litigate them. This is particularly significant because, as the Moodie Memo itself recognizes, the LAPs' purported causation evidence is "haphazard," Dkt. 918-49 (Ex. 39) at 9, "is all over the place," *id.* at 13, and "the evidence concerning the causal link of any one particular disease is sparse," *id.* Indeed, the Moodie Memo disclosed that the LAPs could not prove causation under the United States test the judgment purports to apply. *Compare id.* at 9 ("It is likely that in a US court, these nine criteria would have to be applied to the association between oil contamination and each alleged disease- for example, the causal connection of each individual type of cancer would be analyzed. In the following analysis I have not done so, as the evidence I have at hand is so haphazard. Thus this analysis is about the association between oil contamination and disease in general (which ***would likely be unsatisfactory in a US case***).") (emphasis added) *with* Dkt. 168 at 170 (finding that unspecified substances caused unspecified "adverse impact to their health").<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nico- |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | | las Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact. It does not. That declaration does not mention the Moodie Memo or provide any evidence to indicate that the Moodie Memo appears in the Lago Agrio Record. Further, Zambrano does not indicate that he can read English—the language of the Moodie Memo—so he could not have used it even if it was provided. In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |
| 169. As Michael Green has concluded, it is "highly unlikely that the passages in the [judgment regarding causation] were prepared independently of the Moodie memorandum." Stavers Decl., Ex. 3280 (Green Decl.) at 3-4. | **Donziger:** Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:** Disputed. Although Defendants do not dispute that Mr. Green has written this statement, Defendants dispute his conclusions. this statement itself is not an "undisputed fact" that belongs in a Rule 56.1 statement. Moreover, the conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).<br><br>The sole basis for this statement is the opinion of a paid expert witness. Even if considered, Michael Green's opinion is unreliable. *See* Resp. to St. 168.<br><br>Chevron should not be permitted to rely on Green's declaration for summary judgment. Defendants have not been permitted to conduct expert discovery, timely disclose responsive rebuttal experts, or review and analyze all material related to Green's declaration. | Undisputed. Defendants' assertion that the "opinion of an expert" cannot be used in support of a Rule 56.1 statement if facially ridiculous and not supported by the cases cited. To the contrary, courts routinely rely on expert evidence in deciding summary judgment motions. *Mobileye, Inc. v. Picitup Corp.*, 2013 WL 830837, *18 (S.D.N.Y. Mar. 5, 2013); *Gill v. Arab Bank, PLC*, --- F.Supp.2d ----, 2012 WL 5395746, *21 (E.D.N.Y. Nov. 6, 2012); *Maytag Corp. v Electrolux Home Prods.*, 448 F. Supp. 2d 1034, 1064–65 (N.D. Iowa 2006).<br><br>Defendants do not even attempt to explain any of the idiosyncratic commonalities and errors between the Moodie Memo and the judgment, any one of which would independently prove that the authors of the judgment used the Moodie Memo. Even setting the legal idiosyncrasies aside, no rational person would believe that an Ecuadorian judge, hearing a case in Ecuador brought by Ecuadorians regarding conduct and injuries that allegedly occurred in Ecuador due to Petroleum, would independently select California asbestos law and the causation standard, or Australian law.<br><br>The use of the Moodie Memo in ghostwriting the medical causation findings of the judgment, which this statement demonstrates occurred, is deeply material. *See* Reply St. 168. Disease and cancer findings in the judgment account for $2.4B, Dkt. 168 at 183-84, and also underpin the $8.64B punitive award. *Id.* at 185 (tying punitive damages to "suffering of the victims"). Defendants have not contravened that by using the Moodie |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | At the very least, Defendants must be given the opportunity to depose or cross-examine Green. *See* Fed. R. Civ. P. 56(d). <br><br> Moreover, this statement about causation standards in the Ecuadorian Judgment is immaterial. *See* Resp. to St. 167. | Memo, the judgment imported a more permissive asbestos standard that would not apply in this case, Dkt. 755-26 (Green Decl.) at 13-14.  Chevron had no opportunity to rebut this or any of the other errors imported from the Moodie Memo. <br><br> Defendants complain that they have not taken depositions yet, but that was their choice.  In a February 6, 2013 letter, Defendants sought an extension of time to respond to Chevron's summary judgment motion on the ground that, among other things, Defendants desired to take depositions of certain declarants.  Dkt. 918-6.  Chevron agreed to make witnesses available for deposition before Defendants' opposition was due.  Dkt. 918-7.  Defendants declined.  Dkt. 918-10. <br><br> The use of the Moodie Memo is deeply material.  *See*  Reply St. 168. <br><br> Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact.  It does not.  That declaration does not mention the Moodie Memo or provide any evidence to indicate that the Moodie Memo appears in the Lago Agrio Record.  Further, Zambrano does not indicate that he can read English—the language of the Moodie Memo—so he could not have used it even if it was provided.  In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |
| 170.    As James Spigelman concluded, the concepts which both the Moodie Memorandum and the judgment ascribe to Australian law are either "unknown" to Australian law, or are common phrases which do not carry the specific meaning ascribed to them in the memorandum or the judgment. Stavers Decl., Ex. 3283 (James Spigelman Declaration) at 2, ¶¶ 10-11 ("The phrase 'probable contributing cause' is unknown | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact. <br><br> **LAPs:**  Disputed. Although Defendants do not dispute that Mr. Spigelman may have concluded that for himself, Defendants dispute his conclusions. This statement consists of an improper legal conclusion, which the Court should strike or disregard. *See, e.g.*, *Antunes*, 2011 WL 1990872 at*2 n.9; *Cicchetti*, 2008 WL 619013 | Undisputed.  Defendants' assertion that the "opinion of an expert" cannot be used in support of a Rule 56.1 statement if facially ridiculous and not supported by the cases cited.  To the contrary, courts routinely rely on expert evidence in deciding summary judgment motions.  *Mobileye, Inc. v. Picitup Corp.*, 2013 WL 830837 *18 (S.D.N.Y. Mar. 5, 2013); *Gill v. Arab Bank, PLC*, --- F.Supp.2d ----, 2012 WL 5395746, *21 (E.D.N.Y. Nov. 6, 2012); *Maytag Corp. v Electrolux Home Prods.*, 448 F. Supp. 2d 1034, 1064–65 (N.D. Iowa 2006). |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| to Australian law....The descriptive phrase 'most probable cause' occurs frequently in Australian case law. . . . Most often it has been used in a narrative fashion or citing or paraphrasing the evidence of an expert.''). | at *4 n.2. It is not a statement "undisputed fact" that belongs in a Rule 56.1 statement. Moreover, the conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).<br><br>The sole basis for this statement is the opinion of a paid expert witness. Even if considered, James Spigelman's declaration does not support this conclusion. It states that the "probable contributing cause" test is "unknown to Australian law" but acknowledges that the "most probable cause" test "occurs frequently in Australian case law." Stavers Decl. Ex. 3283 (Spigelman Decl.) at ¶¶ 10-11. He further acknowledges that "[t]here are many such references" to "most probable cause" "including in the context of negligence." Id. at ¶ 11. The Ecuadorian Judgment does not refer to "probable contributing cause", what Spigelman claims is unknown, but rather refers to the "most probable cause" test, which Spigelman acknowledges is<br><br>Chevron should not be permitted to rely on Spigelman's declaration for summary judgment. Defendants have not been permitted to conduct expert discovery, timely disclose responsive rebuttal experts, or review and analyze all material related to Spigelman's declaration. At the very least, Defendants must be given the opportunity to depose or cross-examine Spigelman. *See* Fed. R. Civ. P. 56(d).<br><br>Moreover, this statement about Australian causation standards in the Ecuadorian Judgment is immaterial. *See* Resp. to St. 167. | There is no genuine dispute that the Moodie Memo and judgment make common errors on Australian law. Most notably, both recite the Australian test for contribution as "more than a minimal, trivial or insignificant factor," Dkt. 755-27 at 2-3, a phrase that does not even occur in Australian law. *Id.* at 3.<br><br>Defendants twist Justice Spigelman's declaration to suggest that the judgment's "most probable cause test" is a real causation test in Australia. But what the judgment describes as the operative standard for that test (i.e., "more than a minimal, trivial or insignificant factor"), Dkt. 168 at 90, is not in Australian law.<br><br>Defendants complain that they have not taken depositions yet, but that was their choice. In a February 6, 2013 letter, Defendants sought an extension of time to respond to Chevron's summary judgment motion on the ground that, among other things, Defendants desired to take depositions of certain declarants. Dkt. 918-6. Chevron agreed to make witnesses available for deposition before Defendants' opposition was due. Dkt. 918-7. Defendants declined. Dkt. 918-10.<br><br>The use of the Moodie Memo in ghostwriting the medical causation findings of the Judgment, which this statement demonstrates occurred, is deeply material. *See* Reply Sts. 167-169.<br><br>Defendants assert generally in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact. It does not. That declaration does not mention the Moodie Memo or provide any evidence to indicate that the Moodie Memo appears in the Lago Agrio Record. Further, Zambrano does not indicate that he can read English—the language of the Moodie Memo—so he could not have used it even if it was provided. In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano Declara- |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | | tion is inadmissible hearsay and cannot be considered. |
| 171.   As James Spigelman concluded, it is "so strange as to constitute an inaccuracy" that both the Moodie Memorandum and the judgment describe a well-established common law principle as a feature of Australian law, and cite an opinion he authored, *Seltsam v McGuiness* (2000) 49 NSWLR 262 at paras 91 and 98, as the source, even though that opinion, like most references to the principle, cites Wigmore on Evidence.   Stavers Decl., Ex. 3283 (James Spigelman Declaration) at 4-5, ¶¶ 24-26 (Spigelman states that "it is striking that both references attribute this principle to Australian law….To describe it as an Australian legal principle is inaccurate."). | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed. Although Defendants do not dispute that Mr. Spigelman may have concluded that for himself, Defendants dispute his conclusions. This statement consists of an improper legal conclusion, which the Court should strike or disregard. *See, e.g., Antunes*, 2011 WL 1990872 at *2 n.9; *Cicchetti*, 2008 WL 619013 at *4 n.2. It is not a statement "undisputed fact" that belongs in a Rule 56.1 statement. Moreover, the conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).<br><br>Moreover, the sole basis for this statement is the opinion of a paid expert witness. Even if considered, James Spigelman's opinion does not support this statement. Spigelman did not conclude that "the judgment" cites "an opinion he authored, Seltsam v. McGuiness." The Ecuadorian Judgment does not contain any citation or reference to Seltsam or any of its page numbers. Rather the Ecuadorian Judgment sets forth a principle that Spigelman acknowledges is "widely accepted." Stavers Decl. Ex. 3283 (Spigelman Decl.) at 26.<br><br>This statement about causation standards is immaterial. See Resp. to 167. | Undisputed.  *See* Reply St. 170.<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact.  It does not.  That declaration does not mention the Moodie Memo or provide any evidence to indicate that the Moodie Memo appears in the Lago Agrio Record.  Further, Zambrano does not indicate that he can read English—the language of the Moodie Memo—so he could not have used it even if it was provided.  In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |

## H.    Pit Count

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| 172.    The judgment's finding that 880 pits require remediation by Chevron is based on the pit count in the Cabrera Report. Stavers Decl., Ex. 3278 (2013.01.24 Younger Report) at 14-16, 24-25; *see also* Dkt. 401-08 (Ex. 2182) at Ex. A at 17-18 (Expert Report of Michael L. Younger). | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed. The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).<br><br>The conclusion in St. 172 is based solely on the opinion of a paid expert witness. Even if considered, Michael Younger's report is based on assumption and speculation about the mental processes of the Ecuadorian trial court. Stavers Decl. Ex. 3278 (Younger Report) at 24 ("[T]he count of 880 probably was arrived at by simply sorting on the RAP Comment column within the Stratus Compilation."). There is no evidence from which Younger could divine the judge's thought process or the reasons why he found that 880 pits needed remediation. The objective bases underlying the count of pits requiring remediation are issues that this Court has precluded, and Chevron has conceded that there can exist "a good-faith dispute among scientists about environmental conditions in the Oriente or TexPet's operations there from the 1960s to the 1990s" (Dkt. 720 at 2).<br><br>Nor should Chevron be permitted to rely on Younger's report(s). Defendants have not yet been permitted the opportunity to conduct expert discovery in this case. Under the schedule agreed to among | Undisputed.  Defendants' assertion that the "opinion of an expert" cannot be used in support of a Rule 56.1 statement if facially ridiculous and not supported by the cases cited.  To the contrary, courts routinely rely on expert evidence in deciding summary judgment motions.  *Mobileye, Inc. v. Picitup Corp.*, 2013 WL 830837, *18 (S.D.N.Y. Mar. 5, 2013); *Gill v. Arab Bank, PLC*, --- F.Supp.2d ----, 2012 WL 5395746, *21 (E.D.N.Y. Nov. 6, 2012); *Maytag Corp. v Electrolux Home Prods.*, 448 F. Supp. 2d 1034, 1064–65 (N.D. Iowa 2006).<br><br>There is no genuine dispute that the judgment's pit count of 880 was arrived at using the Cabrera Report pit inventory.  Younger does not claim to divine the "thought process" of the judgment's authors and this statement goes directly to fraud in the judgment since it evidences deceit, Reply St. 173, and the taint of Cabrera on the judgment.  *See* Dkt. 968-9 (Expert Report of James Ebert) at 3-5.<br><br>Defendants complain that they have not taken depositions yet, but that was their choice.  In a February 6, 2013 letter, Defendants sought an extension of time to respond to Chevron's summary judgment motion on the ground that, among other things, Defendants desired to take depositions of certain declarants.  Dkt. 918-6.  Chevron agreed to make witnesses available for deposition before Defendants' opposition was due.  Dkt. 918-7.  Defendants declined.  Dkt. 918-10.<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact.  It does not.  That declaration does not mention the Cabrera Report, the pit count in the judgment, or give any indication that Zambrano had the training or experience to analyze aerial photographs.  Dkt. 968-9 (Ebert Report).  In addition, for the reasons stated in Chevron's |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures. Dkt. 703 at 2. Defendants have not been afforded sufficient time to review and analyze the material provided in this report. At the very least, Defendants must be given the opportunity to depose or cross-examine Younger. *See* Fed. R. Civ. P. 56(d).<br><br>Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 209) ("The 880 pit count in the Judgment is based on Annex H-1 of the Cabrera Report." Champion Decl., Ex. 2182, Ex. A at 17-18 (Expert Report of Michael L. Younger)). Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion. | Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |
| 173.   The claim in the Clarification Order that the 880 pit count is based on the court's analysis of "various aerial photographs that form a part of the record and that were certified by the military Geographic Institute" is false. Dkt. 168 at 125 (Judgment stating that "we have 880 pits (proven through aerial photographs certified by the Geographic Military Institute which appear throughout the record analyzed together with the official documents of Petroecuador submitted by the parties and especially by the expert Gerardo Barros . . . ."); Dkt. 400-21 (Ex. 2134) at 15 (2011.03.04 Clarification Order stating "it is emphasized that, as explained in the judgment, the Court analyzed the various aerial photographs that form a part of the record and that were certified by the military Geographic Institute"); *see also* Dkt. 33-13 at 25 (Cabrera Report | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed. The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)).<br><br>The conclusion in St. 173 is based solely on the opinion of a paid expert witness who has not been disclosed as an expert in this case. Chevron did not disclose DiPaolo as an expert in its March 1, 2013 expert disclosures. The Court should strike the report and | Undisputed.   Defendants' assertion that the "opinion of an expert" cannot be used in support of a Rule 56.1 statement if facially ridiculous and not supported by the cases cited.  To the contrary, courts routinely rely on expert evidence in deciding summary judgment motions.  *Mobileye, Inc. v. Picitup Corp.*, 2013 WL 830837 *18 (S.D.N.Y. Mar. 5, 2013); *Gill v. Arab Bank, PLC*, --- F.Supp.2d ----, 2012 WL 5395746, *21 (E.D.N.Y. Nov. 6, 2012); *Maytag Corp. v Electrolux Home Prods.*, 448 F. Supp. 2d 1034, 1064–65 (N.D. Iowa 2006).<br><br>There is no genuine dispute that the author(s) of the clarification order lied about the source of the pit count in the judgment.  It came from the Cabrera Pit Inventory or the spreadsheet used to create it.  Reply St. 172.  Defendants would have this Court believe that a judge with no aerial photography training personally reviewed aerial photographs from a record that only had them for 65% of sites, and then coincidentally arrived at the same count of 880 pits that sorting the Cabrera Pit Inventory would yield. |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| claiming that the pit count found in Annex H-1 of the Cabrera Report was derived, in part, from an "in-depth" analysis of "various aerial photographs on file at the Military Geographical Institute"); Dkt. 400-21 (Ex. 2138) at 1-2 (Di Paolo Declaration concluding that "it is impossible for the Ecuadorian court to accurately identify the number of pits or the number of pits requiring remediation using aerial photo interpretation" because, among other reasons, "no aerial photos were found in the record for approximately 35% of the sites"); Dkt. 402-3 (Ex. 2233) (CV of Judge Nicolas Augusto Zambrano Lozada) (Judge Zambrano's CV does not list any expertise in aerial photograph interpretation); Dkt. 402-9 (Ex. 2270) at 17 (2011.02.17 Motion for Clarification requesting that the Ecuadorian court clarify its basis "for concluding that there are 880 pits, as is indicated on page 125 of the Judgment"). | disregard the conclusion in this St. 173 and any other statement that relies on DiPaolo's report. See Fed. R. Civ. P. 37(c)(1).<br><br>Even if considered, William D. DiPaolo's expert report is unreliable. DiPaolo provides no support for the assertion that he "reviewed *all* the aerial photographs in the record." Dkt. 400-21 (Ex. 2138), at 1 (emphasis added). He does not state that he reviewed every page of the record. DiPaolo's conclusion that "no aerial photos were found in the record for about 35% of the sites" is therefore unreliable. DiPaolo also does not state that he has any experience in oil remediation or in identifying sites where remediation would be required. The objective bases underlying the count of pits requiring remediation are issues that this Court has precluded, and Chevron has conceded that there can exist "a good-faith dispute among scientists about environmental conditions in the Oriente or TexPet's operations there from the 1960s to the 1990s" (Dkt. 720 at 2).<br><br>Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 207) ("It is impossible for the Ecuadorian court to have accurately identified 880 pits requiring remediation in the former concession area using aerial photo interpretation."). Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion. | This argument is baseless and should be rejected.<br><br>Defendants fault Chevron for relying on Di Paolo when he is not designated. However, Dr. Ebert offers a similar opinion (Dkt. 968-9 at 3-5, 13 ("I conclude to a reasonable degree of scientific certainty that it is nearly impossible for Judge Zambrano to have arrived at the figure of 880 pits from his examination of the aerial photographs in the record, as he claimed in the *Sentencia*.")), and Defendants themselves rely on experts they have not disclosed. *See* Defendants' Response to St. 126 (Defendants relying on undesignated expert Fateman).<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact. It does not. That declaration does not mention the Cabrera Report, the pit count in the judgment, or give any indication that Zambrano had the training or experience to analyze aerial photographs. Dkt. 968-9 (Ebert Report). In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |
| 174.    There are 880 pits identified in Annex H-1 of the Cabrera Report when those identified as "no impact," "Petroecuador," and "Petroproduccion" are excluded from the 916 total pits. Dkt. 400-22 (Ex. 2182) at Ex. A at 17-18 (Expert Report of Michael L. Younger); *see also* Dkt. 400-22(Ex. 2139) (Annex H-1 of | **Donziger:** Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:** Disputed. The cited materials do not support Chevron's statement. The document Chevron calls Annex H-1 of the Cabrera Report does not list "916 total pits." (Dkt. 400-22) (Ex. 2139). The | Undisputed.  There is no genuine dispute that excluding the referenced pits from Annex H-1 yields 880 pits.<br><br>Chevron has not "conceded" that there can exist a good-faith dispute among scientists about environmental conditions in the Oriente or TexPet's operations there from the 1960s to the 1990s.  All of the legitimate |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| Cabrera Report including spreadsheet titled "pit inventory" listing 916 pits in the former concession area); Dkt. 402-5 (Ex. 2252) (May 2000 Woodward-Clyde Report) at 9-1 (stating that "250 pits and 7 spill areas (at 133 sites) were certified by the GOE and Petroecuador as requiring no further action, or remediated" as part of the Remedial Action Plan); *compare* Dkt. 400-22 (Ex. 2139) (Annex H-1 of Cabrera Report containing comments such as "Petroecuador's responsibility," "no impact found," and "full remediation" under the column "RAP Comments"), *with* Dkt. 402-5 (Ex. 2252) (May 2000 Woodward-Clyde Report) at tables 3-4, 3-7, 3-10, 3-13, 3-16, 3-19, 3-22, 3-25, 3-28, 3-31 (tables containing comments such as "Petroecuador Responsibility," "no detected impacts," and "remediation completed"). | objective bases underlying the count of pits requiring remediation are issues that this Court has precluded, and Chevron has conceded that there can exist "a good-faith dispute among scientists about environmental conditions in the Oriente or TexPet's operations there from the 1960s to the 1990s" (Dkt. 720 at 2).<br><br>Moreover, Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 208) ("Annex H-1 of the Cabrera Report lists 880 pits, excluding those identified as 'no impact,' 'Petroecuador,' and 'Petroproduccion.'"). Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion. | scientific evidence gathered during the Lago Agrio Litigation demonstrates that the Defendants' claims about the environmental conditions in the Oriente and TexPet's operations are false. The Defendants' environmental claims lack of merit, however, is not relevant to the present case. Dkt. 720.<br><br>This statement is not about the environmental conditions in the Oriente or about TexPet's operations. It goes directly to fraud in the judgment and demonstrates that the the judgment relies on the fraudulent Cabrera Report despite claiming not to.<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact. It does not. That declaration does not mention the Cabrera Report, the pit count in the judgment, or give any indication that Zambrano had the training or experience to analyze aerial photographs. Dkt. 968-9 (Ebert Report). In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |
| 175.    No record source in the Lago Agrio Litigation except the Cabrera Report identifies more than 632 pits in the former concession area requiring remediation. *See* Stavers Decl., Ex. 3284 (Expert Report of Gerardo Barros) at 6 (noting that the consortium created approximately 632 pits from 1964-1990 "to hold mud and drill cuttings"). | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed and/or mooted by the Court's rulings. This statement relies on the opinion of an expert witness in the underlying Ecuadorian trial, who opined about the number of pits carved out of the earth by Texaco "from 1964-1990." Over Defendant's objections, the Court has excluded from this litigation the issues of the "environmental conditions existing in the Oriente in the 1960s to the 1990s or the relative, substantive merit of scientists' expert opinions on that subject." Dkt. 720 at 2. Given this ruling, Statement 175 cannot be established as fact. To the extent the Court reconsiders its previous ruling, Defendants reserve the right to | Undisputed.  *See* Reply St. 174.<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact. It does not. That declaration does not mention the Cabrera Report, the pit count in the judgment, or give any indication that Zambrano had the training or experience to analyze aerial photographs. Dkt. 968-9 (Ebert Report). In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | supplement this response. | |
| 176.    In 2007, Petroecuador determined that there were 370 pits in the former concession area that require remediation.  Dkt. 402-16 (Ex. 2346) (December 2007 PEPDA Report). | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed. The cited materials do not support Chevron's statement 176. The figure of 370 pits appears nowhere in the PEPDA Report. Chart No. 2 in the PEPDA Report indicates that there were 161 pits "In Process of Elimination" as of December 2007. The Report does not indicate that these were all of the pits "in the former concession area that require remediation." The PEPDA Report only refers to certain oil fields where drilling activity has occurred since 1964, not all fields in the Napo Concession.<br><br>This statement is also mooted by the Court's rulings. Over Defendant's objections, the Court has excluded from this litigation the issues of the "environmental conditions existing in the Oriente in the 1960s to the 1990s or the relative, substantive merit of scientists' expert opinions on that subject." Dkt. 720 at 2. Given this ruling, Statement 175 cannot be established as fact. To the extent the Court reconsiders its previous ruling, Defendants reserve the right to supplement this response. | The December 2007 PEPDA report does show there to be 370 pits in the former concession area.  Stavers Decl., Ex. 3669 (PEPDA 2007) at 101 (Timeline of Elimination of Environmental Liabilities) (showing 91 pits for Lago Agrio field, 100 pits for the Shushufindi field and 85 pits for the Auca field, 94 pits for the Sacha field, all totaling 370 pit).<br><br>This statement is not about the environmental conditions in the Oriente or about TexPet's operations.  It goes directly to fraud in the judgment and demonstrates that the the judgment relies on the fraudulent Cabrera Report despite claiming not to. |

**J.        $200 Million Flora and Fauna Award**

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| 177.    The Judgment's $200 million award "to recover the native flora, fauna, and the aquatic life of the zone" cites the Barnthouse report, and the Barnthouse report relies solely on the Cabrera Report for the $200 | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed. The Judgment cites the report of Dr. Lawrence | Undisputed.  The judgment cites the report of Dr. Lawrence W. Barnthouse regarding the loss of habitat and services in concluding that $200 million "are needed" in order "to recover the native flora, fauna and the aquatic life of the zone." Dkt. 168 at 183.  Further, Defendants do not |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| million cost. Dkt. 168 at 182 (Judgment awarding $ 200 million "to recover the native flora, fauna and the aquatic life of the zone" based on the report of Dr. Lawrence W. Barnthouse); *id.* at 57 (Judgment acknowledging that Dr. Barnthouse "reviewed expert Cabrera's report, but did not prepare a damage report himself"); Dkt. 400-11 (Ex. 2071) (Barnthouse Dep. Tr.) at 39:23-40:3, 52:2-10, 79:1-79:8, 80:13-19, 123:3-124:17 (Dr. Barnthouse concedes that he did not perform a "natural resource damage assessment," that his analysis "couldn't be completely independent" because many of the sources on which he relied "were only available from the Cabrera Report," and that, in his opinion, the damage figures in the Cabrera Report are "uncertain"); Dkt. 400-10 (Ex. 2064) (Barnthouse Report) at 2-9 (citing Cabrera Report); Dkt. 400-14 (Ex. 2078) (DONZ00031590) at 1-2 (the LAPs' U.S. legal team discussing whether or not to file the Barnthouse Report because of its "strict reliance on Cabrera."). | W. Barnthouse as giving a damages figure to compensate for the loss of habitat and services of "between 874 and 1700 million dollars." (Dkt. 168, at 182). The Judgment did not cite Dr. Barnthouse's report as giving a damages figure of $200 million. To conclude the flora and fauna had been negatively impacted and needed restoration, Dr. Barnthouse relied in part on the Texaco-commissioned audits performed by Fugro McClelland and HBT Agra which found that "surface waters in the immediate vicinity of production stations were . . . contaminated sufficiently to impair natural resource services provided by aquatic biotica." (Dkt. 400-10; Ex. 2064 at 4).<br><br>Moreover, this statement is a cut-and-paste job. Chevron previously submitted this same statement and evidence, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 211) ("The Judgment's $200 million award 'to recover the native flora, fauna, and the aquatic life of the zone' cites the Barnthouse report, and the Barnthouse report does no calculation of damages but rather relies entirely on the damages in the Cabrera Report."). Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion. | dispute that they themselves described Dr. Barnthouse's "strict reliance on Cabrera." Dkt. 400-14 (Ex. 2078) (DONZ00031590) at 1-2. Defendants' additional language is not contrary to Chevron's statement of fact.<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact. It does not. That declaration does not mention the Cabrera Report, the Barnthouse report, or the judgment's $200 million award for "native flora, fauna, and the aquatic life of the zone." In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |

**K.      $150 Million Potable Water System Award**

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| 178.      The Judgment's $150 million award for a potable water system cites only the Barros report, but the cited portion of the Barros report is describing and ana- | **Donziger:** Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact. | Undisputed. There is no genuine dispute that the $150 million award for potable water is from the Cabrera Report. This statement is not about the environmental conditions in the Oriente or about TexPet's operations. It |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| lyzing the Cabrera Report's potable water recommendation, which it finds to be "fraudulent" and "grossly exaggerated," in part because it is based on a cost per person  between $1024 and $1916, "as much as 19 times higher than the actual costs of the projects that have recently been completed in the region by UNICEF (average cost of $100 per person, UNICEF, 2009), CEREPS, USAID, and others (average cost of $119 per person, CEREPS, 2009; OIM, 2008) in the last decade."  Dkt. 33-12 at 6, 33-14 at 43 (Cabrera Report recommending a $428 million award to provide "potable water to the people living in the Concession area and within its area of influence"); Dkt. 402-9 (Ex. 2269) (Annex R of the Cabrera Report); Dkt. 9-2 (Supplemental Cabrera Report) at 53 (same); Dkt. 400-20(Ex. 2128) at fojas 167,403 – 167,405 (2010.02.11 Barros Report criticizing Cabrera's regional aqueduct system as unnecessary, finding that "the alleged cost of $430 million potable water figure is enormously exaggerated" and "fraudulent," and noting that 65 percent of the population in the former concession area is connected to a public water system); Dkt. 168 (Judgment) at 182-83 (deriving a $150 million award for regional potable water systems by multiplying Cabrera's $428 million figure by 35 percent to cover the 35 percent of the population not serviced by public water systems). | **LAPs:**  Disputed in part. Defendants do not dispute that in the specific portion of the Judgment where the Court decides the amount of damages for construction of a potable water system for the region, the Court cites the report of Gerardo Barros. Defendants dispute the figures and conclusions presented by Barros. Because the Court, over Defendant's objections, has excluded from this litigation the issues of the "environmental conditions existing in the Oriente in the 1960s to the 1990s or the relative, substantive merit of scientists' expert opinions on that subject," Dkt. 720 at 2, Defendants are apparently precluded from providing evidence or opinion contradicting Barros. Given this ruling, Statement 178 cannot be established as fact because it would require litigating the merits of scientists' expert opinions on the subject of potable water systems for communities affected by oil contamination. To the extent the Court reconsiders its previous ruling, Defendants reserve the right to supplement this response.<br><br>This statement is also based on the conclusion of a paid expert witness who has not been disclosed as an expert in this case. Chevron did not disclose Barros as an expert in its March 1, 2013 expert disclosures. The Court should strike the report and disregard the conclusion in this St. 178 and any other statement that relies on Barros's report. See Fed. R. Civ. P. 37(c)(1).<br><br>Moreover, Chevron previously submitted this same evidence on this topic, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 210) (citing Barros report's criticism of Cabrera Report, "finding that 'the alleged cost of $430 million potable water figure is enormously exaggerated' and 'fraudulent'."). Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion. | goes directly to fraud in the judgment and demonstrates that the the judgment relies on the fraudulent Cabrera report despite claiming not to.<br><br>Defendants' other objections are nonsensical.  Chevron is not relying on the Barros report – the author(s) of the judgment cited the Barros report as a means to covertly rely on the Cabrera Report in the judgment despite claiming not to do so.<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact.  It does not.  That declaration does not mention the Cabrera Report or the judgment's $150 million award for a potable water system.  In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| 179.    Barros estimates that the cost of extending potable water to the full population of the region is $7 million, as opposed to the Cabrera Report's number of $430 million.  Dkt. 400-20(Ex. 2128) at fojas 167,403 – 167,405 (2010.02.11 Barros Report criticizing Cabrera's regional aqueduct system as unnecessary, finding that "the alleged cost of $430 million potable water figure is enormously exaggerated" and "fraudulent," and noting that 65 percent of the population in the former concession area is connected to a public water system); Dkt. 33-12 at 6, 33-14 at 43 (Cabrera Report recommending a $428 million award to provide "potable water to the people living in the Concession area and within its area of influence"); Dkt. 402-9 (Ex. 2269) (Annex R of the Cabrera Report); Dkt. 9-2 (Supplemental Cabrera Report) at 53 (same). | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed in part. Defendants do not dispute that Gerardo Barros' report says the cost of extending potable water to the full population of the region is $7 million. Chevron misquotes the Cabrera report, which estimated the cost at $428 million.<br><br>Defendants dispute the figures and conclusions presented by Barros, including that 65% of the region's population is connected to public water systems. Because the Court, over Defendant's objections, has excluded from this litigation the issues of the "environmental conditions existing in the Oriente in the 1960s to the 1990s or the relative, substantive merit of scientists' expert opinions on that subject," Dkt. 720 at 2, Defendants are apparently precluded from providing evidence or opinion contradicting Barros. Given this ruling, Statement 179 cannot be established as fact because it would require litigating the merits of scientists' expert opinions on the subject of potable water systems for communities affected by oil contamination. To the extent the Court reconsiders its previous ruling, Defendants reserve the right to supplement this response.<br><br>This statement is based in part on the conclusion of a paid expert witness who has not been disclosed as an expert in this case. Chevron did not disclose Barros as an expert in its March 1, 2013 expert disclosures. The Court should strike the report and disregard the conclusion in this St. 179 and any other statement that relies on Barros's report. See Fed. R. Civ. P. 37(c)(1).<br><br>The Judgment provides some support for believing that more than 35% of area residents lack connection to public water systems. The Judgment states that "the Province of Sucumbíos has the low- | Undisputed.  *See* Reply to St. 178.<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact.  It does not.  That declaration does not mention the Cabrera Report or the judgment's $150 million award for a potable water system.  In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | est number of potable water connections in homes of all the Amazonian provinces, as well as access to public taps. This does not mean that the population in these areas does not consume water, but rather necessarily implies that the inhabitants of these provinces have a greater dependency on natural water sources." Dkt. 168, at 127.<br><br>Moreover, Chevron previously submitted this same evidence on this topic, which the Court found insufficient evidence to grant summary judgment on collateral estoppel. (Dkt. 398, at St. 210) (citing Barros report's criticism of Cabrera Report, "finding that 'the alleged cost of $430 million potable water figure is enormously exaggerated' and 'fraudulent'."). Chevron provides no new arguments or evidence and no reason for the Court to rule any differently on this Renewed Motion. | |
| 180.    The judgment derives its $150 million potable water figure by multiplying $428 million by 35%, reflecting its determination that 35% of the population is not served by an existing public water system.  Dkt. 33-12 at 6, 33-14 at 43 (Cabrera Report recommending a $428 million award to provide "potable water to the people living in the Concession area and within its area of influence"); Dkt. 400-20 (Ex. 2128) at fojas 167,403 – 167,405 (2010.02.11 Barros Report criticizing Cabrera's regional aqueduct system as unnecessary, finding that "the alleged cost of $430 million potable water figure is enormously exaggerated" and "fraudulent," and noting that 65 percent of the population in the former concession area is connected to a public water system); Dkt. 168 (Judgment) at 182-83 (deriving a $150 million award for regional potable water systems by multiplying Cabrera's $428 million figure | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed in part. Defendants incorporate by reference as if fully set forth herein their Response to Statement 179. | Undisputed.  *See* Reply to St. 178.<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact.  It does not.  That declaration does not mention the Cabrera Report or the judgment's $150 million award for a potable water system.  In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| by 35 percent to cover the 35 percent of the population not serviced by public water systems). | | |

## IV.  THE LAP TEAM WROTE THE JUDGMENT AND BRIBED THE COURT $500,000 TO ISSUE IT

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| 181.  Defendants' internal correspondence reveals plans and an intent to draft the judgment.  Dkt. 355-26 (Ex. 1065) (DONZ00049174) at 18 (calling a meeting with "[a]ll the teams" to develop a plan to "obtain a trial judgment in 2009" that would be "favorable and significant" because "[w]e have Correa, the Court and U.S. politics . . . It's now or never"); Dkt. 401-11 (Ex. 2193) (DONZ000493560) at 1 (2009 "Strategic Plan" stating "Order: speed to finish, deal with release, number, reasoned opinion, relationship to alegato, final order for U.S. enforcement, ask for bond and interest to run"); Dkt. 355-39 (Ex. 1140) (DONZ0051338) at 72 (Fajardo explaining that he will give Selva Viva intern Brian Parker "a research assignment for our legal alegato and the judgment, but without him knowing what he is doing"); Dkt. 355-33 (Ex. 1108) (DONZ00066328) at 62 ("Comrade, I don't know if you are coming or not tomorrow.  In any case, I'll say that Friday's meeting is key, and I think that you should be there.  In that meeting we'll be talking about all of the outcome of the case and what to do, how much money to put in, how to distribute the items and everything."); Dkt. 400-17 (Ex. 2111) (DONZ00051937) at 1 (email circulating citations and links that "will help us with the alegato work and . . | **Donziger:**  Disputed. Chevron takes ambiguous statements made several years before the judgment actually issued out of context and then asks the Court to draw only inferences favorable to Chevron's case. This is improper on summary judgment.  Chevron conflates the alegato, which was a brief to be submitted to the Lago Agrio court, with the judgment itself.  Chevron's argument appears to be that because the Ecuadorian Plaintiffs' team worked on a brief that they would submit to advocate for a ruling they wanted, they had some plan to actually write the judgment.  The Court cannot draw such an inference based on the summary judgment record.  Further, all of the cited evidence is from late 2008 or 2009.  This was several years before the judgment actually issued. And Judge Zambrano was not presiding over the case at this time.  Judge Ordonez was. See Dkt. 746-3 (Mastro Decl. Exh. C) ¶¶ 20-21 (describing Judge Ordonez's tenure on the case).  Finally, Chevron's chosen story does not square with the version worked in Guerra's declaration.  Guerra states that he approached Fajardo with an offer to have the plaintiffs write a draft of the judgment after Chevron moved to remove Judge Ordonez from the case in 2010.  *Id.* at ¶23.

Dkt. 355-26 (Ex. 1065) (DONZ00049174) at 18 does not reveal "plans and an intent to draft the judgment."  Rather, this e-mail chain establishes only that Fajardo wanted to plan a meeting to discuss strategy to bring the case to a "favorable and significant" | Undisputed.  Defendants do not dispute that they intended to draft the judgment.  Rather than dispute Chevron's statement of fact, Defendants set up a straw man argument—that Chevron has "conflated" the alegato and the judgment and appears to argue that because Defendants worked on a brief, they had some plan to ghostwrite the judgment.  Chevron has done no such thing.  While Defendants' documents make it clear that they intended the judgment to have a "relationship to [their] alegato" (Dkt. 401-11 (Ex. 2193) at 1), their communications draw distinction between their alegato and the judgment, and show that they intended to draft both.  *See e.g.*, Dkt. 355-39 (Ex. 1140) at 72 (Fajardo explaining that he will give Selva Viva intern Brian Parker "a research assignment for our legal alegato and the judgment, but without him knowing what he is doing").

That the Defendants' plan to draft the judgment was hatched shortly after they had successfully ghostwritten the $27 billion Cabrera Report in late 2008, does not contradict Chevron's statement of fact.  St. 69.  Nor does the fact that Judge Núñez—who was forced to recuse himself after being caught on film stating that he would enter judgment against Chevron and who thereafter was approached by Zambrano to "help him with the orders"—presided over the case at the time many of the communications discussing Defendants' plan to draft the judgment were sent. St. 100; 196; 211.  Contrary to Defendants' assertion, their longstanding plan to ghostwrite the judgment corroborates Guerra's account.

Defendants attempt to divorce their communications from the context in |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| ."); Dkt. 355-33 (Ex. 1100) (WOODS-HDD-0148433-34) at 66 (Kohn emails Donziger, "In order to be effective at all in developing a judgment that will be enforceable in the US and elsewhere we need to be involved in the preparation of the final submission and proposed judgment, the major task we have all agreed upon repeatedly our firm would work on . . . . None of the RAN efforts, movie, press etc will mean a thing if the jusgment [sic] and other aspects of the case are not right."); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 4758:16-4759:3 (testifying that the LAPs never publicly submitted a proposed judgment to the Lago Agrio court); Dkt. 400-16 (Exs. 2110) (WOODS-HDD-0161016-21) at 2-7 (email attaching minutes from a meeting between Donziger, Garr, Woods, Kohn and others listing "Creation of Final Order," "Trust or 2 phases," and "Kohn, Swift to determine precedence for this in other countries"); Dkt. 400-16 (Exs. 2107, 2108) (DONZ00100266-67) (email circulating a task list which states, "Structure of Judgment: KSG will continue to discuss and think about how to structure the judgment."); Dkt. 400-17 (Ex. 2112) (DONZ00052960) at 1 (Fajardo emails Donziger and Yanza regarding hiring a new attorney to assist with "organizing the office's legal information for the alegato and the other project" and noting that the potential hires are "willing to work at our office and do what we ask them to . . ."); Dkt. 355-27 (Ex. 1084) (DONZ00053642) at 79 (Fajardo told Donziger in an email dated December 29, 2009: "When you come I'll tell you the details, which I can't share by email. I think the plan for the judgment will be fulfilled. I'm not 100 percent sure, but I'm 99.99 percent sure."). | conclusion in 2009. That is no different than what many attorneys in the United States might do on a regular basis: meet to discuss strategy to persuade the court. Further, any suggestion that Fajardo thought the court might be favorably inclined towards the Ecuadorian Plaintiffs' cause does not establish that anything improper occurred. The Ecuadorian Plaintiffs' team had done a good job of convincing the court of the merits of their case. The same is true for Dkt. 355-33 (Ex. 1108) (DONZ00066328) at 62 and Dkt. 400-17 (Ex. 2111) (DONZ00051937), both of which show only that parties were interested in meeting to discuss strategy and assignments towards their goal of bringing the case to a favorable resolution. The fact that parties may have discussed working on their alegato does not come close to establishing any plan to write the judgment itself. Similarly, the "strategic plan," Dkt. 401-11 (Ex. 2193) (DONZ000493560) at 1, shows only that the author of that document had some thoughts or concerns about any order that the Lago Agrio court might issue.<br><br>Dkt. 355-39 (Ex. 1140) (DONZ00051338) at 72 does not establish a plan to draft the judgment; it shows only that Donziger and Fajardo discussed what assignments they might give to Bryan [sic]. The phrase "but without him knowing what he is doing" could refer to the fact that Brian did not know the case well at that point, *see id.* (discussing giving Brian Parker materials "so he can get to know the case well"), rather than any improper motives on Fajardo's part. Also, other evidence contradicts Chevron's interpretation. On June 11, 2009, Parker wrote Donziger to inform him that Parker would be working "on one of the closing statements." Werdegar Decl. Ex. 13 (Donz. Dep. Exh. 1853) (DONZ00113455) at 1. This shows that Parker did know what he was doing; he was working on trial arguments and the *alegato.*<br><br>Dkt. 355-33 (Ex. 1100) is not the document Chevron purports to | order to obscure their meaning. But there is no genuine dispute that the LAP team's "plan for the judgment" involved them drafting the judgment just as they had drafted Cabrera's reports. Dkt. 355-27 (Ex. 1084) (DONZ00053642) at 79.<br><br>Their plan to "obtain a trial judgment in 2009" that would be "favorable and significant" was implemented at a time when they "ha[d] Correa, the Court and U.S. politics." Dkt. 355-26 (Ex. 1065) (DONZ00049174) at 18. The benign interpretation of the phrase "we have the court" suggested by the Defendants cannot be squared with their history of pressure on, and collusion with, the Lago Agrio court.<br><br>The LAP team assigned Parker a "research assignment for our legal alegato and the judgment, but without him knowing what he is doing." Dkt. 355-39 (Ex. 1140) (DONZ00051338) at 72. Defendants' suggestion that "but without him knowing what he is doing" might mean that Parker did not know the case well cannot be reconciled with Fajardo's statement that he would first give Parker materials "to read so he can get to know the case well." Parker's email confirming that he was working on an alegato related assignment evidences that Fajardo followed through on his plan to assign parker work on the "alegato and judgment."<br><br>The LAP team also circulated materials that they hoped to use in their "alegato and the judgment." In advance of a "key" meeting to "talk about all of the outcome [sic] of the case and what to do, how much money to put in, how to distribute the items and everything," (Dkt. 355-33 (Ex. 1108) (DONZ00066328) at 62), Fajardo circulated the Trust Email, portions of which appear verbatim in the judgment. St. 152, 156. He also circulated the *Torres* case, stating, "the arguments by the magistrates are very interesting. I think they serve us well for *our alegato and ...* Worth reading." Dkt. 355-46 (Ex. 1167) (emphasis added) at 26. The case Fajardo circulated is quoted extensively in the judgment. *Compare* Dkt. 355-46 (Ex. 1167) *with* Dkt. 763-5 at 75–78, 81–89. This was not the only time |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | cite; it is a summary of the judgment entered on February 14, 2011. Donziger therefore requests that the citation to Dkt. 355-33 (Ex. 1100) and the accompanying purported quotation be stricken. Moreover, Donziger testified that he thought Kohn was mistaken when he referred to a proposed judgment, and that<br><br>Kohn was actually referring to the proposed alegato. See Werde-gar Decl. Ex. 14 (Donz. Dep. Tr.) at 4756:14 – 4757:6 ("I believe that when Mr. Kohn says 'proposed judgment,' what he was really saying is proposed Alegato."). The excerpt from Donziger's deposition testimony establishes only that, at the time of Donziger's deposition, he did not think that the Ecuadorian Plaintiffs submitted a proposed judgment to the court. Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 4758:10—4759:3.<br><br>The "meeting minutes" and "task list" to which Chevron cites do not establish that anyone had a plan to actually draft the final order. At most, the meeting minutes could establish that the group was concerned about the form of the final order and considered researching what form they might advocate for. Dkt. 400-16 (Ex. 2110) (WOODS-HDD-0161016-21) at 2; Dkt. 400-16 (Exs. 2107, 2108) (DONZ00100266-67).<br><br>Chevron rearranges and takes out of context quotations from Fajardo's October 25, 2009 e-mail to Yanza and Donziger. Dkt. 400-17 (Ex. 2112) (DONZ00052960) at 1. Chevron's insinuation that Fajardo's use of ellipses is a concealed reference to drafting the judgment is (a) contradicted by other portions of this very e-mail, in which Fajardo uses ellipses to end two other paragraphs that do not discuss drafting *anything*, *id.* at 1 ("I told both of them that they should talk with Luis about pay, but I told the girl that I believe her starting salary would be about 800 and she agreed, but I didn't confirm anything…"; "The idea is for that new person to | they circulated materials they hoped would prove useful for the alegato and the judgment. *See* Dkt. 400-17 (Ex. 2111) (DONZ00051937) (email circulating citations and links that "will help us with the alegato work and . . .").<br><br>While the LAPs' Ecuadorian team circulated materials for the use in the alegato and the Judgment, the LAPs' U.S. team planned how to structure the judgment. Defendants mischaracterize Donziger's deposition testimony—nowhere in his deposition does Donziger "unequivocally" deny that Kohn was referring to the Defendants' scheme to ghostwrite the judgement [sic] when Kohn wrote that his firm intended to be involved "in the preparation of the final submission and proposed judgment." Dkt. 355-33 (Ex. 1109) (WOODS-HDD-0148433-34) at 66. Moreover, Defendants' assertion that Kohn was actually referring to the proposed alegato is non-sensical because Kohn specifically references the "final submission," which is the alegato, and the "proposed judgment" in the same sentence. *See id.* Further, subsequent communications involving Kohn also specifically refer to the "judgment," indicating that Kohn was not "mistaken when he referred to a proposed judgment" as Defendants suggest. A task list created on September 11, 2009, the day after the meeting involving Donziger, Garr, Woods, Kohn and others, listed, "Structure of Judgment: KSG will continue to discuss and think about how to structure the judgment." Dkt. 400-16 (Ex. 2108) at 156; *see also* Dkt. 400-16 (Ex. 2107) at 154. The only "judgment" these documents could plausibly refer to is the one the LAPs' representatives ghostwrote for the Lago Agrio court.<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact. It does not. That declaration does not discuss the LAP team's plan and intent to draft the judgment as evidenced by the cited internal correspondence. If anything, Zambrano's declaration reinforces that the LAP team was planning to draft a judgment in 2009, as Zambrano states that the judgment was being prepared around that time. In |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | start working in the office next week. . .") (ellipses in original); and (b) contradicted by Donziger's deposition testimony. Donziger did not know what the "other project" Fajardo mentioned was.  Werdegar Decl. Ex. 14 (Donziger Dep. Tr.) at 4778:9-11.<br><br>Finally, Chevron would also have the Court draw impermissible inferences from Chevron's out-of-context quotation from Fajardo's December 29, 2009 e-mail. Dkt. 355-27 (Ex. 1084) (DONZ00053642) at 79-81.  Donziger had expressed anxiety about the amount of time it would take for the case to conclude. *Id.* at 79 ("This case almost cannot be sustained any longer due to the financial pressure, etc. So it's very upsetting to hear that the delays are continuing without any way to stop them from our side.").  Fajardo responded that he could not share the details regarding timing in e-mail, but that he thought the plan for the judgment would be fulfilled.  *Id.* ("Those times I provided there are not real . . . for sure they are far less.  When you come I'll tell you the details, which I can't share by e-mail.").  Donziger testified that he did not know what details Fajardo could not share. Werdegar Decl. Ex. 14 (Donz. Dep. Tr.) at 4789:21-23. Donziger also testified that he thought "the plan for the judgment" referred to the plan for bringing the case to conclusion. Id. at 4790:5-22. Earlier in that e-mail, Fajardo provides a task list. It includes "finish the closing argument and the annexes to it," and makes no mention of any drafting of an order or judgment.  Dkt. 355-27 (Ex. 1084) at 80.<br><br>**LAPs:**  Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |
| 182.     From 2008 to 2012, Judge Zambrano paid Alberto Guerra Bastidas ("Guerra") $1,000 per month to ghostwrite orders and judgments in Zambrano's civil | **Donziger:**  Disputed. Donziger objects to Chevron's reliance on declarations of Doe 1 and Doe 2, which declarations Donziger's counsel cannot even share with Donziger.  *See* Dkt. 843.[M]  In any | Undisputed.  Defendants' objections to Chevron's reliance on the declarations of Doe 1 and Doe 2 are irrelevant to Chevron's statement of fact, are not properly made in their 56.1 responses, and should be disregarded. |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| cases. Mastro Decl., Ex. C (Guerra Decl.), ¶¶ 7-10, 20, 30; see also Stavers Decl., Ex. 3278 (Expert Report of Michael L. Younger) at 6-11 (concluding Guerra's hard drive contained drafts of nine of the 12 court orders Zambrano issued during his first tenure on the Chevron case (from October 2009 through March 2010), and drafts of two appellate judgments issued by Zambrano in other cases). | event, Guerra's declaration should not be credited. Chevron is paying Guerra $12,000 a month for at least 24 months (totaling at least $288,000), providing health insurance for his family, providing an automobile, an independent attorney, and immigration assistance, and has already paid him $38,000. Dkt. 755-14 (Ex. 3268) at 4-5. Of course Guerra only mentions the $38,000 payment in his own declaration. Dkt. 746-3, Mastro Decl. Exh. C pt. 1a ¶ 33. By his own admission, Guerra was dismissed as a Judge of the Sucumbios Court and solicited bribes from Chevron. Id. at ¶¶ 6, 12. In fact, Guerra was dismissed from the court because he made numerous public statements that he had already reached a conclusion in Chevron's favor in the Lago Agrio case and would dismiss it at the first chance he got if he were ever to preside over the case again. Dkt. 754-7 (Ex. 3117) 5/29/2008 Order (quoted at Dkt. 754-1 at 9). Chevron's own attorneys have described Guerra as "shameless." Dkt. 746-11 (Mastro Decl. Exh. F) (Racines Decl.) ¶ 2. Guerra clearly has no compunction about selling his services to the highest bidder, and in this case he has sold them to Chevron. Guerra's story has been specifically and roundly refuted by other evidence in the record. See Donziger Decl.; Smyser Decl. (Ex. 15) (Camacho's Supp. Objs. And Resps. To Chevron's Interrogs.) and (Ex. 16) (Piaguaje's Supp. Objs. And Resps. To Chevron's Interrogs.).<br><br>Chevron's own assertions raise significant doubts about Guerra's credibility. Guerra claims to have been a ghostwriter from 2008-2012. He provides evidence relating to 2009 and 2010, but he has no copy of an order during Zambrano's second tenure on the court, nor any other corroborating records from that time frame.<br><br>Further, Guerra's declaration is riddled with inadmissible hearsay. For example, what Zambrano told Guerra what Fajardo said. | Defendants' assertions regarding Guerra's credibility have no weight. Gottlieb v. County of Orange, 84 F.3d 511, 518 (2d Cir. 1996) (party cannot defeat summary judgment with "mere assertions that affidavits supporting the motion are not credible").<br><br>Defendants' mischaracterization of the order dismissing Guerra from the bench does not create a genuine issue of material fact. Guerra testified that he believed the case should be declared "null" because "the settling experts were being appointed in violation of Ecuadorian law." Dkt. 746-3 (Ex. C) ¶ 6; see also Stavers Decl., Ex. 3667 (DONZ00028237) (Fajardo emails Wray, Donziger and others that he overheard Guerra tell Novillo and Yánez that "the process is null and void because of the designation of the Experts"). Moreover, declaring the process null is not the same as "dismiss[ing] the case at the first chance he got." As Fajardo explained, Guerra thought that "the proceeding from the start of the Legal Inspections up to now is null and void," which would delay the trial. Stavers Decl., Ex. 3667 (DONZ00028237). Additionally, Guerra testified that he was dismissed because he "confronted Judges Novillo and Yánez, who succeeded [Guerra] as judges in this case, regarding several dubious and illegal rulings they had issued in the proceedings, and regarding their practice of asking the settling experts for 25 percent of their fees in consideration for having appointed them as such." Dkt. 746-3 (Ex. C), ¶ 6. Donziger's personal notes demonstrate that he was aware that Guerra was at odds with Yánez and Novillo. Dkt. 28-8 (DONZ00027256) at 26 of 109 ("Met with judge last night in house. Humble house, furniture. . . . Remember last August I wanted to ride the wave and get him off [the] case? This was an example of Pablo's total intelligence. We saved him, and now we are reaping the benefits. Explain politics around plot to remove Yanez . . . . He hates Guerra, because Guerra was part of the plot. Guerra will be the judge to decide the case. We have to start lobbying him, working with him."). |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | Nor should Chevron be permitted to rely on the Expert Report of Michael L. Younger. Donziger has not yet been permitted the opportunity to conduct expert discovery in this case. Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Donziger has until April 12, 2013 to submit any rebuttal expert disclosures. Dkt. 703 at 2. Donziger has not been afforded sufficient time to review and analyze the voluminous material provided in this report. At the very least, Donziger must be given the opportunity to depose or cross-examine Younger. *See* Fed. R. Civ. P. 56(d).<br><br>Donziger has not yet had the opportunity to examine the media upon which Chevron and Younger rely. Donziger must be given the opportunity to examine this hard drive in order to have an adequate opportunity to assess Michael Younger's conclusions that are based upon that drive. *See* Fed. R. Civ. P. 56(d). Among other things, Younger discusses only 17 specific documents that were hand-picked by Gibson Dunn for Younger's analysis, and does not provide a complete list of the files extracted from the hard drive. Dkt. 755-16 at 9 ("Stroz Friedberg harvested user documents from the Guerra Media and produced these documents to Gibson Dunn for review. Gibson Dunn then identified 17 specific documents that they wanted Stroz Friedberg to analyze (the "Extracted Guerra Documents"). There are a number of unexplained irregularities in the data that Younger used for his analysis that Donziger must be afforded the opportunity to investigate. For instance, Younger suggests that the eleven documents he terms "draft providencias" relating to the Lago Agrio case have "created" dates of July 23, 2010 because Windows XP was installed on that date and a hard drive containing a folder named "ALBERTO GUERRA" was also connected to the computer.[N] *Id.* at p. 9-10 & 10 n.4. Yet many of the six documents identified as "draft sentencias" for other cases | As detailed in Chevron's Opposition to Defendants' Motion to Strike Affidavits Accompanying Chevron's Motion for Partial Summary Judgment (Dkt. 976), Defendants' contention that Chevron purchased Guerra's testimony is meritless. *Id.* at 3-7. Chevron's fixed sum payment to Guerra for information contained on Guerra's computer and other sources is both permissible and reasonable. *Id.* The measures Chevron has taken to provide for the safety and security of Guerra and his family are likewise legal, ethical, and justified, because as this Court recently recognized, there is an "unacceptable risk of retaliation and harm" to those individuals who have come forward in Ecuador to expose the truth about ghostwriting the judgment. *See* Dkts. 837, 843, 941.<br><br>Also, as explained in Chevron's Opposition to Defendants' Motion to Strike, Defendants' blanket hearsay objection fails. Dkt. 976 at 10-15. The statements at issue either are not hearsay or fall within an exception to the hearsay rule and are therefore admissible. *Id.*; *see also Transportes Aeros Pegaso, S.A. de C.V. v. Bell Helicopter Textron, Inc.*, 623 F. Supp. 2d 518, 530-32 (D. Del. 2009) (finding that attorney's statement that court-appointed expert told the attorney that the expert would sway his opinion in favor of the attorney's client in return for money did not constitute hearsay under Fed. R. Evid. 801(c) because the statement was offered as evidence of verbal act of soliciting bribe and not evidence of truth of the matter asserted).<br><br>Defendants' claim that "Guerra's story has been specifically and roundly refuted by other evidence" likewise fails. Donziger's feigned ignorance that "Guerra has ever ghostwritten decisions in the Lago Agrio litigation" cannot create a material issue of fact when Guerra's media contained drafts of nine orders issued by Zambrano. Dkt. 922, ¶ 3; Dkt. 755-16 (Ex. 3278) at 12–13, 42. Moreover, Donziger's declaration materially corroborates Guerra's account. Donziger admits meeting with Guerra, and that during that meeting, Guerra solicited a $500,000 bribe. Both Guerra and |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | have "created" dates well before July 23, 2010 even though they were allegedly ghostwritten for Zambrano as well.  Further, some of these documents have "last written" dates that predate the "created" date, *e.g.*, Document No. 16, which was apparently "last written" on January 22, 2010 but "created" five months later, on June 9, 2010. *Id.* at 13. Chevron has noted the unreliability of metadata when resisting defendants' discovery efforts.  *See* Dkt. 613 (Werdegar Decl.) ¶ 18.<br><br>  [M]  This Court's order barring counsel from sharing these declarations has prevented Donziger from investigating and fully rebutting factual allegations in Chevron's motion.<br><br>  [N]  The hard drive from which Younger assumes the "draft providencias" were copied was not provided to Younger. *See id.* at 9 (listing forensic images provided to Stroz Friedberg).<br><br>**LAPs:**  Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | Donziger state that no deal was reached during their meeting.  *Compare* Dkt. 746-3 (Ex. C), ¶ 23 *with* Dkt. 922, ¶ 5.<br><br>Defendants also cite their own responses to interrogatories to support their contention, but those responses are inadmissible hearsay.  Defendants' responses purport to describe conversations Guerra and Zambrano had with the LAPs' attorneys.  Defendants do not claim to have been involved in these discussions, and have not submitted sworn testimony regarding those discussions from any of the individuals involved.<br><br>Additionally, Guerra's account is corroborated by forensic and documentary evidence.  In addition to draft Lago Agrio orders, Guerra's media contained draft judgments issued by Zambrano in other cases, including a judgment issued only weeks before Zambrano issued judgment against Chevron. Dkt. 755-16 (Ex. 3278) at 13–14, 42.  In all, Guerra's media contained drafts of more than 100 rulings issued in cases over which Zambrano apparently presided.  Stavers Decl., Ex. 3663 (2013.02.28 Younger Report) at 5; Stavers Decl., Ex. 3680 (2013.04.11 Younger Report) at 2-3; Dkt. 746-3 (Guerra Decl.), ¶¶ 7–8.  TAME shipping records show that Guerra sent and received packages from Lago Agrio, including packages to and from Zambrano, including weeks before the judgment issued.  Dkt. 763-6 (Ex. 3289).  Bank records, phone records, and Guerra's day planners also materially corroborate Guerra's account.  *See e.g.*, Dkt. 746-3 (Guerra Decl.) ¶ 10, attachments G, H, I; Dkt. 755-16 (Ex. 3278) at 15-16.<br><br>Defendants' argument that Younger's report cannot be relied upon because Defendants need an opportunity to depose him is disingenuous.  In a February 6, 2013 letter, Defendants sought an extension of time to respond to Chevron's summary judgment motion on the ground that, among other things, Defendants desired to take depositions of certain declarants.  Among those declarants was Mr. Younger.  Dkt. 918-6.  Chevron agreed to make Younger available for deposition before Defendants' opposition |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | | was due.  Dkt. 918-7.  Defendants, however, declined to depose Younger at that time.  Dkt. 918-10.  Chevron also repeatedly agreed to make the Guerra media available for inspection as early as February 11, 2013.  Dkt. 918-1; Dkt. 918-3.<br><br>Moreover, Defendants' attacks on Younger's report are meritless.  Younger is under no obligation to provide a complete list of all files extracted from the Guerra media.  That Younger's analysis focused on draft rulings extracted from Guerra's media does not rebut Younger's conclusions.  Further, there are no metadata irregularities in Younger's report.  The three draft judgments with creation dates before July 23, 2010, were all extracted from USB drives—not Guerra's hard drive—and thus were unaffected by the installation of an operating system on Guerra's hard drive.  *See* Dkt. 755-16 (Ex. 3278) at 13, Table 5.  Similarly, when files are transferred to USB drives, the file system creation date will be the date on which file was transferred, while the last written date can be the date on which it was last written to machine from which the file was transferred.  Thus, it is not uncommon for files transferred to USB drives to have a last written date that predates the creation date.<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact.  It does not.  That declaration does not even address, let alone dispute, the evidence showing that Judge Zambrano paid Guerra $1,000 per month to ghostwrite orders and judgments in Zambrano's civil cases.  If anything, the declaration's failure to even mention the ghostwriting of Zambrano's orders, in this and other cases, is a tacit admission that it occurred.  In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |
| 183.    On occasion, litigants would secretly provide Zambrano and Guerra with draft judgments, at both the | **Donziger:**  Disputed. For the reasons stated in St. 182, Chevron cannot rely on Guerra's affidavit of the Younger report. | Undisputed.  *See* Chevron's Reply to St. 182. |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| trial and appellate levels, which Guerra would revise and Zambrano would issue as his own. Mastro Decl., Ex. C (Guerra Decl.), ¶ 32 & Attachments X & Y; *see also* Stavers Decl., Ex. 3278 (Expert Report of Michael L. Younger) at 6-11 (concluding Guerra's hard drive contained drafts of two appellate judgments issued by Zambrano in other cases). | The Guerra declaration and Mr. Younger's report leave additional questions unanswered.  Attachment X to the Guerra declaration appears to be the draft OCP judgment that Guerra refers to at paragraph 32. Dkt. 746-3, Mastro Decl., Ex. C (Guerra Decl.), ¶ 32 & Dkt. 746-6 (Attachment X) at 217.  This document also appears to correspond to Document 14 in Tables 5 and 6 of Younger's report. Dkt. 755-16, Stavers Decl., Ex. 3278 (Expert Report of Michael L. Younger) at 10-11. In his affidavit, Guerra states that "OCP representatives gave me the draft of the appellate judgment in a flash drive, which was loaded onto Judge Zambrano's computer with the help of a computer technician." Dkt. 746-3, Guerra Decl. ¶ 32. But document 14 in Younger's report comes from Guerra's media, not Zambrano's. Dkt. 755-16 (Younger Report) at 13 (¶2.1.4). Further, even though the "last saved" and "created" metadata fields for Attachment X to the Guerra Decl. and Document 14 in the Younger Report match, the titles of those documents do not. *Compare* Dkt. 746-3 (Guerra Decl. Attachment X) at 217 ("Title: Corte Provincial de Justicia de Sucumbios") *with* Dkt. 755-16 (Ex. 3278) Younger Report Table 6, Document 14 ("Name: Proyecto Sentencia OCP.doc").

**LAPs:**  Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | Guerra's declaration and the Younger Report speak for themselves.  Guerra's testimony that he received a draft appellate judgment from OCP representatives on a flash drive, which was then loaded onto Zambrano's computer, does not contradict Chevron's statement of fact.  Guerra never claimed not to have a copy of the draft OCP appellate judgment on his media.  Younger's analysis confirms that drafts of the appellate OCP judgment were contained both on Guerra's hard drive on his USB drive. Dkt. 755-16 (Ex. 3278) at 13.  That the title listed in Attachment X to Guerra's declaration does not match the filename of that document is immaterial.  Younger's report identifies files by their filename, while "title" listed on Attachment X to Guerra's declaration simply lists the first line of text in that document.

Furthermore, the Defendants do not even assert that Zambrano's declaration disputes this material fact.  *See* Dkt. 973 at 3. |
| 184.     In 2009, at Zambrano's instruction, Guerra, on multiple occasions, contacted an Ecuadorian lawyer representing Chevron in the Lago Agrio Litigation to offer to issue a judgment in Chevron's favor in exchange for a bribe, but Chevron's lawyer refused to discuss the matter with Guerra and asked Guerra to stop contacting him. Mastro Decl., Ex. C (Guerra Decl.), ¶ 12; Mastro Decl., Ex. F (Racines Decl.), ¶¶ 2- | **Donziger:**  Disputed. For the reasons stated in St. 182, Chevron cannot rely on Guerra's affidavit.  Further, Guerra's story about what Chevron's lawyers allegedly said is inadmissible hearsay.

It is curious—and convenient—that, despite Guerra's alleged repeated and persistent attempts to contact Chevron representatives (including Racines) by telephone, Racines is not among the contacts recovered from Guerra's telephones and no telephone records | Undisputed.  *See* Chevron's Reply to St. 182.  Defendants' hearsay objection fails.  The statements are not offered for the truth of the matter asserted, and even if they were, they fall within the exception for acts of independent legal significance under Fed. R. Evid. 801(c)(2) because they relate an offer and a rejection of that offer.

Defendants' commentary regarding the contents of Guerra's phone contacts and phone records does not contradict Chevron's statement of fact. |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| 6 & Ex. A; Mastro Decl., Ex. E (Callejas Decl.), ¶¶ 2-6. | for the time in question have been provided. *See* Dkt. 755-16, Stavers Decl., Ex. 3278 (Expert Report of Michael L. Younger) ¶ 2.2 and Dkt. 755-22 (Exhibits 37-39).<br><br>**LAPs:**  Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact.  However, Zambrano does not deny that these approaches by Guerra occurred.  It does not.  While Zambrano claims that he never told Guerra to "approach the parties to ask them for money" (Dkt. 974-1, ¶ 14), that statement was in regard to the "judgment that I issued on February 14, 2011" (*Id.*).  Zambrano never denies dispatching Guerra to seek money in 2009.  In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |
| 185.    Chevron's Ecuadorian counsel made two contemporaneous declarations regarding Guerra's failed bribery solicitations.  Mastro Decl., Ex. E (Callejas Decl.), Ex. A; Mastro Decl., Ex. F (Racines Decl.), Ex. A. | **Donziger:**  Disputed. For the reasons stated in St. 182, Chevron cannot rely on Guerra's affidavit.  These declarations are all made by persons with an established bias against the defendants in this case.  Callejas and Racines have an enormous vested interest in doing anything they can to chip away at the Lago Agrio judgment. At the very least, Donziger should be afforded the opportunity to depose Guerra and Callejas.<br><br>Further, these alleged contemporaneous declarations raise the question of why Chevron did not bring these to anyone's attention in Ecuador – either during or after Zambrano's first tenure on the case. Notably, Chevron moved for Judge Ordonez to recuse, but apparent not Zambrano.  Guerra Decl. ¶ 21.<br><br>**LAPs:**  Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | Undisputed.  Defendants' assertion that Chevron cannot rely on Guerra's affidavit is baseless and irrelevant to Chevron's statement of fact.  *See* Chevron's Reply to St. 182.<br><br>Defendants do not dispute that Chevron's Ecuadorian counsel made two contemporaneous declarations regarding Guerra's failed bribery solicitations.  Racines's and Callejas's interest in representing Chevron is irrelevant to Chevron's statement of fact.  Further, Defendants' argument that they need an opportunity to depose Guerra and Callejas is disingenuous.  In a February 6, 2013 letter, Defendants sought an extension of time to respond to Chevron's summary judgment motion on the ground that, among other things, Defendants desired to take depositions of certain declarants.  Among those declarants were Adolfo Callejas and Alberto Guerra.  Dkt. 918-6.  Chevron agreed to make both individuals available for deposition before Defendants' opposition was due.  Dkt. 918-7.  Defendants, however, declined to depose either.  Dkt. 918-10.<br><br>Defendants' argument regarding the questions supposedly raised by these declarations does not contradict Chevron's statement of fact and is not properly made in their 56.1 response and should be disregarded. |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| 186. After Chevron's refusal, and at Zambrano's instruction, Guerra met with Fajardo to discuss the case and the two agreed that Guerra would "make the case move quickly" in the LAPs favor, and specifically that he would deny Chevron's critical essential error motions —in exchange for $1,000 a month from the LAPs. Mastro Decl., Ex. C (Guerra Decl.), ¶ 13. | **Donziger:** Disputed. For the reasons stated in St. 182, Chevron cannot rely on Guerra's affidavit.<br><br>**LAPs:** Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | Undisputed. Defendants offer no evidence to dispute Chevron's statement of fact. *See* Chevron's Reply to St. 182. Instead, they assert that Chevron cannot rely on Guerra's affidavit. This contention is baseless. *Id.*<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact. It does not. Zambrano does not dispute dispatching Guerra to speak with Fajardo in 2009, that the LAPs paid Guerra to ghostwrite orders in the LAPs' favor, or that Zambrano issued those orders. Stavers Decl., Ex. 3680 (2013.04.11 Younger Report) at 2-3 (finding that of the 103 draft orders located on Guerra's electronic media, 94 were from Zambrano cases). In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |
| 187. At a meeting with Guerra in 2009, Donziger thanked Guerra for his "work as a ghostwriter . . . and for helping steer the case in favor of [the LAPs]." Mastro Decl., Ex. C (Guerra Decl.), ¶ 13. | **Donziger:** Disputed. For the reasons stated in St. 182, Chevron cannot rely on Guerra's affidavit.<br><br>Donziger never made such a statement to Guerra. Donziger is unaware that Guerra has ever ghostwritten decisions in the Lago Agrio litigation, and Donziger is unaware of any "help" by Guerra to "steer" the decision in favor of the plaintiffs in the Lago Agrio litigation. He never thanked Guerra for these things. Donziger Decl. at ¶ 3.<br><br>**LAPs:** Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | Not disputed in material part. Defendants assert that Chevron cannot rely on Guerra's affidavit. This contention is baseless. *See* Chevron's Reply to St. 182. Defendants do not deny a 2009 meeting between Donziger and Guerra. While Donziger now conveniently claims to be "unaware" of Guerra ghostwriting decisions for the Lago Agrio court, the evidence, including drafts of nine Lago Agrio orders that Guerra provided, indisputably prove he did so. Donziger's professed lack of knowledge cannot create a material dispute of fact. |
| 188. In 2010, Guerra, again acting at Zambrano's direction, attempted to contact an Ecuadorian lawyer representing Chevron in the Lago Agrio Litigation, this time to offer that Zambrano would issue a judgment | **Donziger:** Disputed. For the reasons stated in St. 182, Chevron cannot rely on Guerra's affidavit. Further, Guerra's recitation of what Zambrano said is inadmissible hearsay, as are the statements in Campuzano's and Callejas's declarations. | Undisputed. Defendants offer no evidence to dispute Chevron's statement of fact. Instead, they assert that Chevron cannot rely on Guerra's affidavit, but this contention is baseless. *See* Chevron's Reply to St. 182. |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| written by Chevron in exchange for a bribe.  Mastro Decl., Ex. C (Guerra Decl.), ¶¶ 21-22; Mastro Decl., Ex. G (Campuzano Decl.), ¶¶ 2-3; Mastro Decl., Ex. E (Callejas Decl.),¶¶ 7-8. | Donziger objects to Chevron's reliance on declarations that Donziger himself cannot review in their unredacted form and on statements of a witness whose identity has been kept secret from Donziger. In particular, Chevron has redacted the identity of the person who supposedly called Campuzano in 2010.  This redaction—and the inability to discuss the identity of this person with Donziger or anyone else in Ecuador—hamstrings counsel's ability to investigate the veracity of Campuzano's claims.<br><br>**LAPs:**  Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | Defendants' hearsay objections fail.  First, Guerra's account of Zambrano's statements is admissible because Zambrano is one of Defendants' co-conspirators.  Fed. R. Evid. 801(d)(2)(E).  Similarly, the DOE statements recounted in the Campuzano declaration are admissible because she was acting as a co-conspirator of the LAPs with Guerra.<br><br>As detailed in Chevron's Opposition to Defendants' Motion to Strike, the statements from Chevron's attorney affidavits are non-hearsay or fall within an exception to the hearsay rule, and are therefore admissible.  Dkt. 976 at 15-18.  Moreover, all of the statements in the Chevron Attorneys' affidavits can be presented in a form admissible at trial and should be considered by the Court on summary judgment.  *Id.*; *see also Hausler v. JPMorgan Chase Bank, N.A.*, 845 F. Supp. 2d 553, 573 n.12 (S.D.N.Y. 2012).<br><br>Defendants' objections to this Court's protective order are not properly made in their 56.1 response and should be disregarded.<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact.  It does not.  Zambrano's declaration is inadmissible hearsay as explained in Chevron's Reply.  Even if the declaration were not hearsay, Zambrano nowhere denies that he ultimately did reach a deal with the LAPs to issue a judgment in their favor in exchange for payment of $500,000 from the judgment's proceeds.  As Guerra explained in his declaration (Dkt. 746-3 (Ex. C), ¶ 23), Zambrano made this deal directly with the LAPs rather than through Guerra. |
| 189.    Guerra attempted this contact through an intermediary, but Chevron's counsel did not respond to his overture.  Mastro Decl., Ex. C (Guerra Decl.), ¶ 22; Mastro Decl., Ex. G (Campuzano Decl.), ¶¶ 2-3; Mas- | **Donziger:**  Disputed. Donziger incorporates Donziger's response to Chevron's alleged fact No. 188.<br><br>**LAPs:**  Disputed. Defendants incorporate Donziger Defendants' | Undisputed.  *See* Chevron's Reply to St. 188.<br><br>Defendants offer no evidence to dispute Chevron's statement of fact.  Instead, they assert that Chevron cannot rely on Guerra's affidavit, but this |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| tro Decl., Ex. E (Callejas Decl.), ¶¶ 7-8. | response to this purported fact. | contention is baseless. *See* Chevron's Reply to St. 182.<br><br>Defendants' hearsay objections fail. First, Guerra's account of Zambrano's statements is admissible because Zambrano is one of Defendants' co-conspirators. Fed. R. Evid. 801(d)(2)(E). Similarly, the DOE statements recounted in the Campuzano declaration are admissible because she was acting as a co-conspirator of the LAPs with Guerra.<br><br>As detailed in Chevron's Opposition to Defendants' Motion to Strike, the statements from Chevron's attorney affidavits are non-hearsay or fall within an exception to the hearsay rule, and are therefore admissible. Dkt. 976 at 15-18. Moreover, all of the statements in the Chevron Attorneys' affidavits can be presented in a form admissible at trial and should be considered by the Court on summary judgment. *Id.*; *see also Hausler v. JPMorgan Chase Bank, N.A.*, 845 F. Supp. 2d 553, 573 n.12 (S.D.N.Y. 2012).<br><br>Defendants' objections to this Court's protective order are not properly made in their 56.1 response and should be disregarded.<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact. It does not. Zambrano's declaration is inadmissible hearsay as explained in Chevron's Reply. Even if the declaration were not hearsay, Zambrano nowhere denies that he ultimately did reach a deal with the LAPs to issue a judgment in their favor in exchange for payment of $500,000 from the judgment's proceeds. As Guerra explained in his declaration (Dkt. 746-3 (Ex. C), ¶ 23), Zambrano made this deal directly with the LAPs rather than through Guerra. |
| 190.    In 2010, Guerra met personally with Donziger, Fajardo and Yanza at the Honey & Honey Restaurant in Quito, Ecuador and proposed that the LAP team pay | **Donziger:** Disputed. For the reasons stated in St. 182, Chevron cannot rely on Guerra's declaration. | Undisputed. Defendants' assertion that Chevron cannot rely on Guerra's affidavit is baseless. *See* Chevron's Reply to St. 182. |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| at least $500,000 to Zambrano and Guerra in exchange for a verdict in their favor in the Lago Agrio Litigation. Donziger told Guerra that the LAP team did not at that moment have that sum of money to pay Zambrano and Guerra.  Mastro Decl., Ex. C (Guerra Decl.), ¶ 23. | Donziger unequivocally denies that he or any member of the Ecuadorian Plaintiffs' legal team offered Guerra $500,000 in exchange for a favorable verdict.  Donziger recalls being at a restaurant in Quito with Guerra, when Guerra asked for a bribe of $500,000.  Donziger refused Guerra, and told him that neither Donziger nor anyone on the Lago Agrio Plaintiffs' team would do such a thing. Donziger did not respond (as Guerra asserts) that the Lago Agrio Plaintiffs lacked that sum of money "at the moment." Donziger Decl. at ¶ 5.<br><br>__LAPs:__  Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | Defendants mischaracterize Donziger's declaration—nowhere in his declaration does Donziger "unequivocally" deny that any member of the LAPs' legal team agreed to pay a bribe in exchange for a favorable verdict.  Further, Donziger's declaration corroborates Guerra's account.  Donziger admits meeting with Guerra.  He also admits that during that meeting Guerra solicited a $500,000 bribe.  Both Guerra and Donziger state that no deal was reached at that meeting.  *Compare* Dkt. 746-3 (Ex. C), ¶ 23 *with* Dkt. 922, ¶ 5.  That the two accounts differ as to the words Donziger used to decline Guerra's offer at the meetings does not create a material issue of fact.<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact.  It does not.  Zambrano's declaration is inadmissible hearsay as explained in Chevron's Reply.  Even if the declaration were not hearsay, Zambrano nowhere denies that he ultimately did reach a deal with the LAPs to issue a judgment in their favor in exchange for payment of $500,000 from the judgment's proceeds.  As Guerra explained in his declaration (Dkt. 746-3 (Ex. C), ¶ 23), Zambrano made this deal directly with the LAPs rather than through Guerra. |
| 191.    The LAP team subsequently promised Judge Zambrano $500,000, payable upon collection of the judgment, in exchange for issuing the judgment written by the LAP team.  Mastro Decl., Ex. C (Guerra Decl.), ¶ 23. | __Donziger:__  Disputed. Donziger incorporates Donziger's response to Chevron's alleged material fact No. 190.  Further, Guerra's recitation of what Zambrano said is inadmissible hearsay.<br><br>__LAPs:__  Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | Undisputed.  Defendants' assertion that Chevron cannot rely on Guerra's affidavit is baseless.  *See* Chevron's Reply to St. 182.<br><br>Donziger's declaration does not contradict Chevron's statement of fact.  Rather, Donziger's declaration corroborates Guerra's account.  Donziger admits meeting with Guerra.  He also admits that during that meeting Guerra solicited a $500,000 bribe.  Both Guerra and Donziger state that no deal was reached at that meeting.  *Compare* Dkt. 746-3 (Ex. C), ¶ 23 *with* Dkt. 922, ¶ 5.  That the two accounts differ as to the words Donziger used to decline Guerra's offer at the meetings does not create a material issue of fact.  Moreover, nowhere in his declaration does Donziger "unequivo- |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | | cally" deny that members of the LAPs' legal team subsequently agreed to pay a bribe in exchange for a favorable verdict.  Defendants do not cite to any evidence contradicting Guerra's account that the LAP team promised to pay Zambrano $500,000 to issue a judgment authored by the LAP team.<br><br>Defendants' hearsay objections fail, since Zambrano is one of Defendants' co-conspirators.  Fed. R. Evid. 801(d)(2)(E).<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact.  It does not.  Zambrano's declaration is inadmissible hearsay as explained in Chevron's Reply.  Even if the declaration were not hearsay, Zambrano nowhere denies that he ultimately did reach a deal with the LAPs to issue a judgment in their favor in exchange for payment of $500,000 from the judgment's proceeds.  Zambrano's failure to deny this arrangement is, in context, a tacit admission. |
| 192.    Approximately two weeks before February 14, 2011, the LAP team provided Zambrano with a draft judgment, which Zambrano in turn asked Guerra to revise, which he did, in consultation with Fajardo, and then Zambrano issued that judgment as his own.  Mastro Decl., Ex. C (Guerra Decl.), ¶¶ 25-28. | **Donziger:**  Disputed. Further, Guerra's recitation of what Zambrano said is inadmissible hearsay.  Guerra's story is contradicted by his prior statements and by Zambrano himself.  Smyser Decl. (Ex. 15) (Camacho's Supp. Objs. And Resps. To Chevron's Interrogs.) and (Ex. 16) (Piaguaje's Supp. Objs. And Resps. To Chevron's Interrogs.).<br><br>Further, Chevron cannot rely on this portion of Guerra's affidavit because it is not based on Guerra's personal knowledge. See Fed. R. Civ. P. 56(c)(4) (requiring that affidavits in support of summary judgment motions be based on personal knowledge. Guerra does not profess to have personal knowledge of how Zambrano allegedly obtained the purported draft judgment described in his affidavit. Guerra states that he found out the origin of the draft judgment through Zambrano. Dkt. 746-3, Mastro Decl. Exh. C (Guerra Decl.) ¶ 25.  For this reason, Donziger also requests that this por- | Defendants' hearsay objections fail, since Zambrano is one of Defendants' co-conspirators.  Fed. R. Evid. 801(d)(2)(E).  Defendants offer no admissible evidence to support their contention that Guerra's account is "contradicted by his prior statements and by Zambrano himself."  The only "evidence" Defendants cite to support their contention is their own responses to Chevron's interrogatories, which purport to describe conversations Guerra and Zambrano had with the LAPs' attorneys.  These responses are inadmissible hearsay.  Defendants do not claim to have been involved in these discussions, and have not submitted sworn testimony regarding those discussions from any of the individuals involved.<br><br>Guerra's testimony is based on personal knowledge of conversations he had with Zambrano and Fajardo.  Guerra has personal knowledge of his conversations with Zambrano, including that Zambrano told him that he obtained the draft judgment from the LAPs' lawyers. Dkt. 746-3 (Ex. C), ¶ 25.  And Guerra has personal knowledge of his call with Fajardo to dis- |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | tion of Guerra's affidavit be stricken. *Searles v. First Fortis Life Ins. Co.*, 98 F. Supp. 2d 456, 461 (S.D.N.Y. 2000). *Hollander v. American Cyanamid Co.*, 172 F.3d 192, 198 (2d Cir. 1999), *abrogated on other grounds by Pacenza v. IBM Corp.*, 363 Fed. App'x 128 (2d Cir. 2010) ("A court may [] strike portions of an affidavit that are not based upon the affiant's personal knowledge, contain inadmissible hearsay or make generalized and conclusory statements."). <br><br> **LAPs:** Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | cuss parts of the draft judgment that confused him. *Id.* ¶ 26. Defendants' argument that portions of the Guerra declaration should be stricken is not properly made in their 56.1 response and should be disregarded. <br><br> Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact. It does not. Zambrano's declaration is inadmissible hearsay as explained in Chevron's Reply. Even if the declaration were not hearsay, Zambrano nowhere denies that he ultimately did reach a deal with the LAPs to issue a judgment in their favor in exchange for payment of $500,000 from the judgment's proceeds. |
| 193.    On February 14, 2011, the judgment Zambrano issued in the Lago Agrio Litigation was a judgment written predominately by the LAP team. Mastro Decl., Ex. C (Guerra Declaration), ¶¶ 25, 27-28; Mastro Decl., Ex. D (Supp. Guerra Decl.), ¶ 4. | **Donziger:** Disputed. For the reasons stated in St. 182, Chevron cannot rely on Guerra's declaration. Guerra's "supplemental declaration," in which he professes to have finally reviewed the Lago Agrio judgment nearly two years after it was issued, is suspect. As of November 17, 2012, the date of his first declaration, Guerra had not read the judgment and had apparently "distanced [him]self from the Chevron case." Guerra's ability to remember exactly what was and was not in any version of the lengthly [sic] judgment is questionable at best. Donziger must be afforded the opportunity to depose or cross-examine Guerra to test the veracity of these claims. <br><br> Further, the portions of Guerra's affidavit in which he describes his secondhand knowledge of alleged last-minute editing of the judgment. Dkt. 746-3, Mastro Decl., Ex. C (Guerra Declaration), ¶ 27, 28, are not admissible on summary judgment, must not be considered, and should be stricken. <br><br> Finally, Zambrano has refuted Guerra's story. Smyser Decl. (Ex. 15) (Camacho's Supp. Objs. And Resps. To Chevron's Interrogs.) and (Ex. 16) (Piaguaje's Supp. Objs. And Resps. To Chevron's | Undisputed. Defendants' assertion that Chevron cannot rely on Guerra's affidavit is baseless. *See* Chevron's Reply to St. 182. <br><br> Defendants' argument regarding Guerra's ability to remember the content of the draft judgment is not properly made in their 56.1 response, and should be disregarded. Further, Defendants' argument that they need an opportunity to depose Guerra is disingenuous. In a February 6, 2013 letter, Defendants sought an extension of time to respond to Chevron's summary judgment motion on the ground that, among other things, Defendants desired to take depositions of certain declarants. Among those declarants was Alberto Guerra. Dkt. 918-6. Chevron agreed to make Guerra available for deposition before Defendants' opposition was due. Dkt. 918-7. Defendants, however, declined to depose Guerra at that time. Dkt. 918-10. <br><br> Defendants' argument that portions of the Guerra declaration should be stricken is not properly made in their 56.1 response and should be disregarded. Additionally, Defendants' argument lacks merit. Guerra certainly has personal knowledge regarding the changes he made to the draft judgment. Dkt. 746-3 (Ex. C), ¶ 27. He likewise has personal knowledge of his conversations with Zambrano, which serve as the basis for his under- |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | Interrogs.).<br><br>**LAPs:** Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | standing that the LAPs attorneys continued to edit the judgment until shortly before it was issued. *Id.* ¶ 28.<br><br>Defendants offer no admissible evidence to support their contention that Zambrano has refuted Guerra's claims. The only "evidence" Defendants cite to support their contention is their own responses to Chevron's interrogatories, which purport to describe conversations between Zambrano and the LAPs' attorneys. These responses are inadmissible hearsay. Defendants do not claim to have been involved in these discussions, and have not submitted sworn testimony regarding those discussions from any of the individuals involved.<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact. It does not. Zambrano's declaration is inadmissible hearsay as explained in Chevron's Reply. Even if the declaration were not hearsay, Zambrano nowhere denies that he ultimately did reach a deal with the LAPs to issue a judgment in their favor in exchange for payment of $500,000 from the judgment's proceeds. |
| 194.    When Guerra reviewed the judgment as issued by Zambrano, he saw that "the final judgment's structure, wording and content largely mirror the draft judgment as I revised it approximately two weeks before the final judgment was issued." Mastro Decl., Ex. D (Supp. Guerra Decl.), ¶ 4. | **Donziger:** Donziger incorporates Donziger's response to Chevron's alleged fact No. 193.<br><br>**LAPs:** Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | Undisputed. Chevron incorporates its Reply for St. 193. Additionally, Defendants' argument that Guerra lacks personal knowledge is unfounded. Guerra has personal knowledge of his review of the judgment, and the similarities he observed between the draft judgment and the final judgment. Dkt. 746-7 (Ex. D), ¶ 4.<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact. It does not. Zambrano's declaration is inadmissible hearsay as explained in Chevron's Reply. Even if the declaration were not hearsay, Zambrano nowhere denies that he ultimately did reach a deal with the LAPs to issue a judgment in their favor in exchange for payment of $500,000 from the judgment's proceeds. |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| 195.    Guerra admits that he knew at the time that "the agreement in which [he] participated and by which the Plaintiffs' representatives drafted the judgment in the Chevron case which Judge Zambrano issued, with [his] help, was a violation of Ecuadoran laws." Mastro Decl., Ex. C (Guerra Decl.), ¶ 29. | **Donziger:** Disputed. For the reasons stated in St. 182, Chevron cannot rely on Guerra's declaration.  Further, this admission alone significantly impugns Guerra's credibility.<br><br>**LAPs:**  Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | Undisputed.  Defendants' assertion that Chevron cannot rely on Guerra's affidavit is baseless.  *See* Chevron's Reply to St. 182.  Defendants' argument regarding Guerra's credibility is not properly made in their 56.1 response and should be disregarded.<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact. It does not.  Zambrano cannot and does not deny that Guerra made the quoted statement, which appears on the face of Guerra's declaration.  Dkt. 746-3 (Ex. C), ¶ 29.  In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |
| 196.    Defendants have engaged in both foreign travel and email to facilitate the payments of bribes to Guerra and Zambrano.  Stavers Decl., Ex. 3102 (Guerra timeline reflecting travel and extensive email communication related to the bribery of Guerra and Zambrano); Stavers Decl., Ex. 3139 (DONZ00052412) (2009.09.13 email from Fajardo to Donziger and members of the LAPs' Ecuadorian team, explaining that the Núñez scandal poses a "significant risk to our case." Fajardo continues: "Nevertheless, this is not all bad or worrisome.  I understand that Zambrano himself asked Núñez, should the case fall to him, that Núñez help him with the orders.  That would help with the continuity.  The problem is, who will carry more weight: Núñez on the one hand, or Liliana and Guerra on the other. . . . I will be in Lago tomorrow trying to set up some things, but I really don't know whether they will work."). | **Donziger:**  Disputed. Exhibit 3102 to the Stavers Declaration is based upon the same flawed and disputed evidence as the rest of Chevron's assertions under this subject heading.  Donziger incorporates Donziger's objections and responses to the purported evidence cited in Exhibit 3102.  Moreover, Exhibit 3012 is argument, not evidence.  It does not fall into any of the categories listed in Fed. R. Civ. P. 65(c)(1)(A), and for that reason should be stricken.<br><br>Chevron selectively quotes from the September 13, 2009 e-mail from Fajardo to Donziger in order to create a misleading impression.  The omitted portion of Fajardo's e-mail describes the two motions that Chevron had filed: one asking Zambrano to accept jurisdiction and one asking Zambrano to declare everything that Nunez did null. Dkt. 754-26 (Ex. 3139) (DONZ00052412) at 1.  These motions constitute the risk to the case that Fajardo discusses.  Fajardo's closing statement about setting up things in Lago relates to general case strategy, and not to Zambrano or Nunez as Chevron would have the Court believe. *Id.* at 2 ("Colleagues, if you have any ideas, strategies, or plans that you believe we should | Undisputed.  Exhibit 3102 is a timeline with citations to numerous documents that corroborate Guerra's account of Defendants' bribery and ghostwriting.  Many of the documents are Defendants' own emails.  Others are shipping records not reasonably subject to dispute.  Defendants do not contradict the evidence cited in Exhibit 3102 and offer no support for their position that Exhibit 3102 is argument rather than evidence.<br><br>Defendants do not create a dispute as to Exhibit 3139, the September 13, 2009 email.  On its face, the email makes clear that Fajardo was attempting to set up an arrangement with the court.<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact.  It does not.  Zambrano's declaration does not dispute the the cited travel, the payment of bribes to Guerra, the meetings between Guerra and the LAP team regarding the judgment, or he ultimately reached a deal with the LAPs to issue a judgment in their favor in exchange for payment of $500,000 from the judgment's proceeds.  In addition, for the reasons stated in Chevron's Reply filed currently herewith, |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | work on, don't hesitate to say something… I will be in Lago tomorrow trying to set up some things, but I really don't know whether they will work."). <br><br> In fact, the September 13, 2009 e-mail undermines Chevron's allegations that the Ecuadorian Plaintiffs had a relationship with Zambrano. Fajardo suggests that Chevron might have something up its sleeve with respect to Zambrano, stating "It is clear that Chevron does not want anything to do with Nunez, which gives rise to a slight doubt, because they might have something better with Zambrano." *Id.* at 1. This statement would make no sense if Chevron's story were true. <br><br> **LAPs:**  Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | the Zambrano Declaration is inadmissible hearsay and cannot be considered. |
| 197.    As Michael Younger has concluded, Guerra's hard drive contained drafts of nine of the 12 court orders Zambrano issued during his first tenure on the Chevron case (from October 2009 through March 2010), and drafts of two appellate judgments issued by Zambrano in other cases.  Stavers Decl., Ex. 3278 (Expert Report of Michael L. Younger) at 6-11. | **Donziger:**  Disputed. For the reasons stated in St. 182, Chevron cannot rely on Younger's report. <br><br> Evidence of any draft judgments from Zambrano's second tenure is conspicuously absent. <br><br> **LAPs:**  Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | Undisputed.  Defendants' assertion that Chevron cannot rely on Younger's affidavit is baseless.  *See* Chevron's Reply to St. 182. <br><br> Guerra's account is corroborated by forensic and documentary evidence.  In addition to draft Lago Agrio orders, Guerra's media contained draft judgments issued by Zambrano in other cases, including a judgment issued only weeks before Zambrano issued the judgment against Chevron.  Dkt. 755-16 (Ex. 3278) at 13–14, 42.  In all, Guerra's media contained drafts of more than 100 rulings issued in cases over which Zambrano presided.  Stavers Decl., Ex. 3663 (2013.02.28 Younger Report) at 5; Stavers Decl., Ex. 3680 (2013.04.11 Younger Report) at 2-3; Dkt. 746-3 (Guerra Decl.), ¶¶ 7–8.  TAME shipping records show that Guerra sent and received packages from Lago Agrio, including packages to and from Zambrano, including weeks before the judgment issued.  Dkt. 763-6 (Ex. 3289).  Bank records, phone records, and Guerra's day planners also materially corroborate Guerra's account.  *See e.g.*, Dkt. 746-3 (Guerra Decl.) ¶ 10, attachments G, H, I; Dkt. 755-16 (Ex. 3278) at 15–16. |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| 198.     As Michael Younger concluded, Guerra's hard drive contained a draft of Zambrano's November 23, 2009 order denying Chevron the right to appeal from certain earlier rulings, which draft was last saved on November, 18, 2009.  Stavers Decl., Ex. 3278 (Expert Report of Michael L. Younger) at 10 & Ex. 23. | **Donziger:** Disputed. For the reasons stated in St. 182, Chevron cannot rely on Younger's report.<br><br>Evidence of any draft judgments from Zambrano's second tenure is conspicuously absent.<br><br>**LAPs:**  Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | Undisputed.  Defendants' assertion that Chevron cannot rely on Younger's affidavit is baseless.  *See* Chevron's Reply to St. 182. |
| 199.     Guerra sometimes provided ghostwritten orders to Zambrano by shipping them to him at the Lago Agrio Court via freight packages on TAME airlines, and TAME shipping records show shipments from Guerra to the Lago Agrio Court in 2009 and 2010, some within several days of orders issued by Zambrano in the Lago Agrio Litigation.  Mastro Decl., Ex. C (Guerra Decl.), ¶ 9 & Attachment F; Stavers Decl., Ex. 3278 (Expert Report of Michael L. Younger) at 10 & Ex. 23. | **Donziger:** Disputed. For the reasons stated in St. 182, Chevron cannot rely on Younger's report.<br><br>Evidence of any draft judgments from Zambrano's second tenure is conspicuously absent.<br><br>**LAPs:**  Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | Undisputed.  Defendants do not dispute Guerra's account that he would sometimes ship Zambrano ghostwritten orders via freight packages on TAME airlines.  Nor do Defendants dispute that TAME shipping records show shipments from Guerra to the Lago Agrio court.  Defendants' assertion that Chevron cannot rely on Younger's affidavit is baseless.  *See* Chevron's Reply for St. 182.<br><br>Defendants' claims regarding the purported lack of evidence regarding draft judgments during Zambrano's second tenure is inaccurate and does not contradict Chevron's statement of fact.  In addition to draft Lago Agrio orders, Guerra's media contained draft judgments issued by Zambrano in other cases, including a judgment issued only weeks before Zambrano issued judgment against Chevron.  Dkt. 755-16 (Ex. 3278) at 13–14, 42.  In all, Guerra's media contained drafts of more than 100 rulings issued in cases over which Zambrano presided.  Stavers Decl., Ex. 3663 (2013.02.28 Younger Report) at 5; Stavers Decl., Ex. 3680 (2013.04.11 Younger Report) at 2-3; Dkt. 746-3 (Guerra Decl.), ¶¶ 7–8.  TAME shipping records show that Guerra sent and received packages from Lago Agrio, including packages to and from Zambrano, including weeks before the judgment issued.  Dkt. 763-6 (Ex. 3289).   Bank records, phone records, and Guerra's day planners also materially corroborate Guerra's account.  *See e.g.*, Dkt. 746-3 (Guerra Decl.) ¶ 10, attachments G, H, I; Dkt. 755-16 (Ex. 3278) at 15–16. |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| 200.    Guerra's daily planner entry for February 24, 2012 includes a notation, "Nicolas transfers me 2,000.00 account balance 3,747.92." Mastro Decl., Ex. C (Guerra Decl.), ¶ 10 & Attachment I. | **Donziger:**  Disputed. For the reasons stated in St. 182, Chevron cannot rely on Younger's report.<br><br>Evidence of any draft judgments from Zambrano's second tenure is conspicuously absent.<br><br>It is curious that Guerra has provided some bank records, but no bank records to substantiate the claimed payment from Zambrano on February 24, 2012. *Compare* Mastro Decl. Exh. C Attachment F *with* Mastro Decl. Exh. C Attachments G, H.<br><br>**LAPs:**  Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | Undisputed.  Defendants do not dispute that Guerra's daily planner contains the quoted language.  Younger's analysis is unrelated to Chevron's statement of fact, and in any event, Defendants' assertion that Chevron cannot rely on Younger's affidavit is baseless.  *See* Chevron's Reply for St. 182.<br><br>Defendants' claims regarding the purported lack of evidence regarding draft judgments during Zambrano's second tenure is inaccurate and does not contradict Chevron's statement of fact.   In addition to draft Lago Agrio orders, Guerra's media contained draft judgments issued by Zambrano in other cases, including a judgment issued only weeks before Zambrano issued the judgment against Chevron. Dkt. 755-16 (Ex. 3278) at 13–14, 42. In all, Guerra's media contained drafts of more than 100 rulings issued in cases over which Zambrano presided. Stavers Decl., Ex. 3663 (2013.02.28 Younger Report) at 5; Stavers Decl., Ex. 3680 (2013.04.11 Younger Report) at 2-3; Dkt. 746-3 (Guerra Decl.), ¶¶ 7–8.  TAME shipping records show that Guerra sent and received packages from Lago Agrio, including packages to and from Zambrano, including weeks before the judgment issued.  Dkt. 763-6 (Ex. 3289).   Bank records, phone records, and Guerra's day planners also materially corroborate Guerra's account.  *See e.g.*, Dkt. 746-3 (Guerra Decl.) ¶ 10, attachments G, H, I; Dkt. 755-16 (Ex. 3278) at 15–16.<br><br>Defendants' argument that Guerra has not provided bank records to substantiate the payment from Zambrano does not contradict Chevron's statement of fact, and is incorrect.  Guerra's bank records reflect a $2,000 deposit on February 24, 2012.  Stavers Decl., Ex. 3666 (CVX-RICO-5913158-59). |
| 201.    Guerra's phone records show calls with Zambrano. Stavers Decl., Ex. 3278 (Expert Report of Michael L. Younger) at 12-14 & Ex. 40. | **Donziger:**  Disputed. The only conclusion that Younger reaches is that phone bills dated between June 6, 2012 and June 23, 2012 show three phone calls with a number identified as belonging to | Undisputed.  Defendants do not dispute that Guerra's phone records show calls with Zambrano.  Defendants' argument regarding the date of those phone records does not contradict Chevron's statement of fact. |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | Zambrano.  Younger reaches no conclusions about any alleged calls between Zambrano and Guerra outside of that narrow window in 2012, which is after the judgment in question was issued.  Further, the fact that Guerra and Zambrano might have communicated by phone does not come close to supporting Chevron's allegations.<br><br>**LAPs:**  Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | |
| 202.    Guerra's cell phone contact list includes at least two numbers associated with Fajardo.  Stavers Decl., Ex. 3278 (Expert Report of Michael L. Younger) at 12 & Exs. 38, 39. | **Donziger:**  Disputed. The cell phone contact lists contain two numbers that purport to be associated with Fajardo.  There is, however, no independent verification of these contacts.  Nor is there any indication of when prior to September 26, 2012 these contacts might have been entered into Guerra's phones.  Given Guerra's reputation for dishonesty and admitted "shamelessness," Donziger should at least be provided the opportunity to depose or cross-examine Guerra and the opportunity to examine the phones from which this purported evidence was derived.<br><br>**LAPs:**  Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | Undisputed.  Defendants do not dispute that Guerra's cell phone contact list includes phone numbers associated with Pablo Fajardo.  The number 093977811 is listed under the contact "Pablo Fajardo" in Guerra's cell phones.  That same number is listed as belonging to Pablo Fajardo in a contacts list prepared by Amazon Watch and Steven Donziger, and Donziger has exchanged text messages with Fajardo at the same number.  Stavers Decl., Ex. 3668 (DONZ00040622); Dkt. 755-25 (Younger Report, Ex. 46) at 17-18.  Another number, 099412922, is listed under the contact name, "Pablo F."  Defendants' argument regarding Guerra's credibility is not properly made in their 56.1 responses and should be disregarded.  Further, Defendants' argument that they need an opportunity to depose Guerra is disingenuous.  In a February 6, 2013 letter, Defendants sought an extension of time to respond to Chevron's summary judgment motion on the ground that, among other things, defendants desired to take depositions of certain declarants.  Among those declarants was Alberto Guerra.  Dkt. 918-6.  Chevron agreed to make Guerra available for deposition before Defendants' opposition was due.  Dkt. 918-7.  Defendants, however, declined to depose Guerra at that time.  Dkt. 918-10.  Chevron repeatedly agreed to make the Guerra media available for inspection as early as February 11, 2013.  Dkt. 918-1; Dkt. 918-3. |
| 203.    Guerra contacted Donziger regarding personal legal matters, and the contacts on Guerra's computer | **Donziger:**  Disputed. For the reasons stated in St. 182, Chevron cannot rely on Guerra's declaration or the Younger report. | Undisputed.  Defendants do not dispute that Guerra contacted Donziger regarding personal legal matters.  To the contrary, Donziger recalls receiv- |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| included the email address sdonziger@gmail.com which is an email address used by Donziger.  Mastro Decl., Ex. C (Guerra Decl.), ¶ 19; Stavers Decl., Ex. 3278 (Expert Report of Michael L. Younger) at 14 & Ex. 41. | Donziger recalls receiving an e-mail from Guerra but, contrary to Guerra's story, Donziger simply ignored it.  Donziger Decl. ¶ 4.<br><br>**LAPs:**  Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | ing an email from Guerra seeking help on a personal legal matter.  Dkt. 922, ¶ 4; *see also* Dkt. 755-7 (Ex. 3221) (DONZ00059141); Dkt. 754-5 (Ex. 3115) (DONZ00063873).  That Donziger claims to have ignored Guerra's email does not contradict Chevron's statement of fact.  Further, Defendants do not dispute that Guerra's Hotmail account address book contained a contact for "Steven Donziger" with an email address of sdonziger@gmail.com, or that Donziger used that email address.  Defendants' assertion that Chevron cannot rely on Guerra's affidavit or the Younger affidavit is baseless.  *See* Reply for St. 182. |
| 204.     Internally, the LAPs team referred to Zambrano and Guerra as the puppeteer and the puppet. Stavers Decl., Ex. 3140 (2009.09.15 email from P. Fajardo to S. Donziger, L. Yanza, J. Prieto, and J. Saenz re "PUPPETEER") (DONZ00052470) ("I think that everything is quiet… The puppeteer is pulling the string and the puppet is returning the package… By now it's pretty safe that there won't be anything to worry about…The puppet will finish off the entire matter tomorrow… I hope they don't fail me…"); Stavers Decl., Ex. 3154 (2009.10.27 email from P. Fajardo to S. Donziger and L. Yanza re "NEWS") (DONZ00052993) ("The puppeteer won't move his puppet until the audience doesn't pay him something…"); Stavers Decl., Ex. 3163 (2009.11.27 email from L. Yanza to S. Donziger re "Important to discuss this weekend") (DONZ00128109) ("[T]he budget is higher in relation to the previous months, since we are paying the puppeteer"); St. 204 (reflecting $1,000 payments to Guerra shortly after discussion of payments to the "puppet" and "puppeteer"); Mastro Decl., Ex. C (Guerra Decl.), ¶ 13 (during this period, the LAP team would pay Guerra $1,000 a month for ghostwrit- | **Donziger:**  Disputed. Chevron's only basis for its assumptions about the identities of the "puppet" and "puppeteer" is the proximity between these e-mails and deposits into Guerra's bank account. For the reasons stated in St. 182, Chevron cannot rely on Guerra's affidavit.<br><br>Donziger has never sought to pay any money in exchange for a favorable verdict in the Lago Agrio litigation, nor has Donziger encouraged or solicited anyone else to discuss or pursue paying money for a favorable verdict.  Donziger Decl. ¶ 5.<br><br>**LAPs:**  Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | Undisputed.  Defendants do not dispute that, internally, the LAPs' team referred to Zambrano and Guerra as the puppeteer and the puppet.  Defendants offer no alternative identification for the puppet and the puppeteer. Moreover, the following evidence corroborates Chevron's statement of fact.<br><br>• 10/19/2009:  Fajardo emails Donziger and the LAPs' team that the "case is already officially in the hands of Dr. Zambrano" who will soon "issue an order" and that the LAPs "must act urgently," Fajardo states, "Our plans don't change, THEY ONLY ACCELERATE." Dkt. 754-35 (Ex. 3148) (DONZ00052927).<br><br>• 10/20/2009:  Guerra last saves a draft order.  Dkt. 755-16 (Ex. 3278) at 12–13.<br><br>• 10/21/2009:  Zambrano issues Guerra's ghostwritten order.  *Id.* at 10.<br><br>• 10/21/2009:  Fajardo emails Donziger the LAPs' team that "things here are under control."  Dkt. 754-36 (Ex. 3149) (DONZ00052946).<br><br>• 10/27/2009:  Fajardo emails Donziger and Yanza that "the puppeteer won't move his puppet until the audience doesn't [sic] pay him something."  Dkt. 754-41 (Ex. 3154).<br><br>• 10/29/2009:  $1000 is deposited into Guerra's bank account.  Dkt. 763-4 (Ex. 3275). |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| ing orders in their favor). | | • 11/27/2009:  Yanza emails Donziger that "the budget is higher in relation to the previous months, since we are paying the puppeteer."  Dkt. 754-50 (Ex. 3163). <br><br> • 11/27/2009:  $1000 is deposited into Guerra's bank account.  Dkt. 755-15 (Ex. 3275). <br><br> • 11/29/2009:  Guerra last saves a draft order.  Dkt. 755-16 (Ex. 3278) at 12–13. <br><br> • 11/29/2009:  Guerra ships documents to a Lago Agrio court employee. Dkt. 746-3 at 50 of 120 (Guerra Declaration, Attachment F). <br><br> • 11/30/2009:  Zambrano issues Guerra's ghostwritten order.  Dkt. 755-16 (Ex. 3278) at 13. <br><br> Defendants' assertion that Chevron cannot rely on Guerra's affidavit is baseless.  *See* Chevron's Reply to St. 182. <br><br> Defendants' claims that Donziger never sought to pay any money in exchange for a favorable verdict in the Lago Agrio litigation, nor has Donziger encouraged or solicited anyone else to discuss or pursue paying money for a favorable verdict, do not contradict Chevron's statement of fact. <br><br> Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact.  It does not.  That declaration does not discuss any of the cited emails and does not dispute that the LAP team referred to Zambrano and Guerra as the puppeteer and the puppet, nor does Zambrano deny that Guerra ghostwrote orders for him.  In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |
| 205.     On October 27, 2009 and November 27, 2009, | **Donziger:**  Disputed. Disputed. Chevron's only basis for its as- | Undisputed.  Defendants do not dispute that the LAPs' team discussed |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| the LAPs team discussed payments to the "puppet" and "puppeteer" within days of $1,000 deposits appearing in Guerra's bank account. Stavers Decl., Ex. 3154 (2009.10.27 email from P. Fajardo to S. Donziger and L. Yanza re "NEWS") (DONZ00052993) ("The puppeteer won't move his puppet until the audience doesn't pay him something…"); Stavers Decl., Ex. 3163 (2009.11.27 email from L. Yanza to S. Donziger re "Important to discuss this weekend") (DONZ00128109) ("[T]he budget is higher in relation to the previous months, since we are paying the puppeteer"); Stavers Decl., Ex. 3274 (2009.10.29 Guerra bank record reflecting $1,000 deposit); Stavers Decl., Ex. 3275 (2009.11.27 Guerra bank record reflecting $1,000 deposit). | sumptions about the identities of the "puppet" and "puppeteer" is the proximity between these e-mails and deposits into Guerra's bank account. For the reasons stated in St. 182, Chevron cannot rely on Guerra's affidavit.<br><br>Donziger has never sought to pay any money in exchange for a favorable verdict in the Lago Agrio litigation, nor has Donziger encouraged or solicited anyone else to discuss or pursue paying money for a favorable verdict. Donziger Decl. ¶ 5.<br><br>**LAPs:** Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | making payments to the puppet and the puppeteer within days of $1,000 deposits appearing in Guerra's bank account. Defendants offer no alternative identification for the puppet or the puppeteer. Moreover, the following evidence corroborates Chevron's statement of fact.<br><br>• 10/19/2009:  Fajardo emails Donziger and the LAPs' team that the "case is already officially in the hands of Dr. Zambrano" who will soon "issue an order" and that the LAPs "must act urgently," Fajardo states, "Our plans don't change, THEY ONLY ACCELERATE." Dkt. 754-35 (Ex. 3148) (DONZ00052927).<br><br>• 10/20/2009:  Guerra last saves a draft order. Dkt. 755-16 (Ex. 3278) at 12–13.<br><br>• 10/21/2009:  Zambrano issues Guerra's ghostwritten order. *Id.* at 10.<br><br>• 10/21/2009:  Fajardo emails Donziger the LAPs' team that "things here are under control." Dkt. 754-36 (Ex. 3149) (DONZ00052946).<br><br>• 10/27/2009:  Fajardo emails Donziger and Yanza that "the puppeteer won't move his puppet until the audience doesn't [sic] pay him something." Dkt. 754-41 (Ex. 3154).<br><br>• 10/29/2009:  $1000 is deposited into Guerra's bank account. Dkt. 763-4 (Ex. 3275).<br><br>• 11/27/2009:  Yanza emails Donziger that "the budget is higher in relation to the previous months, since we are paying the puppeteer." Dkt. 754-50 (Ex. 3163).<br><br>• 11/27/2009:  $1000 is deposited into Guerra's bank account. Dkt. 755-15 (Ex. 3275).<br><br>• 11/29/2009:  Guerra last saves a draft order. Dkt. 755-16 (Ex. 3278) at 12–13.<br><br>• 11/29/2009:  Guerra ships documents to a Lago Agrio court employee. Dkt. 746-3 at 50 of 120 (Guerra Declaration, Attachment F). |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | | • 11/30/2009:  Zambrano issues Guerra's ghostwritten order.  Dkt. 755-16 (Ex. 3278) at 13.<br><br>Defendants' assertion that Chevron cannot rely on Guerra's affidavit is baseless.  *See* Chevron's Reply to St. 182.<br><br>Defendants' claims that Donziger never sought to pay any money in exchange for a favorable verdict in the Lago Agrio litigation, nor has Donziger encouraged or solicited anyone else to discuss or pursue paying money for a favorable verdict, do not contradict Chevron's statement of fact.<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as to this material fact.  It does not.  That declaration does not discuss any of the cited emails and does not dispute that the LAP team referred to Zambrano and Guerra as the puppeteer and the puppet, nor does Zambrano deny that Guerra ghostwrote orders for him.  Zambrano also does not dispute that the cited payments to Guerra took place.  In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |
| 206.    On December 23, 2009 and February 5, 2010, two deposits of $1,000 each were made into Guerra's bank account by Selva Viva employee Ximena Centeno.  Mastro Decl., Ex. C (Guerra Decl.), ¶ 14 & Attachment K, L, M, & N; Supp. Stavers Decl., Ex. 3290 (Ecuadorian records for Ximena Centeno matching her to the cedula number that appears on the deposit slip in Attachment N to the Guerra Declaration). | **Donziger:**  Disputed. Chevron's only basis for this assertion in inadmissible hearsay.<br><br>For the reasons stated in St. 182, Chevron cannot rely on Guerra's declaration.<br><br>**LAPs:**  Disputed. Defendants incorporate Donziger Defendants' response to this purported fact. | Undisputed.  Defendants do not dispute that Ximena Centeno made two $1,000 deposits into Guerra's bank account.  Defendants' assertion that Chevron cannot rely on Guerra's affidavit is baseless.  *See* Chevron's Reply for St. 182.<br><br>Defendants' hearsay objections are not well-taken.  Guerra has personal knowledge of the deposits made by Ximena Centeno into his account and testified accordingly.  Dkt. 746-3, ¶ 14.<br><br>Defendants assert generically in Dkt. 973 at 3 that the declaration of Nicolas Zambrano signed on March 28, 2013 (Dkt. 974-1), creates a dispute as |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | | to this material fact.  It does not.  That declaration does not mention, let alone dispute, the fact that Selva Viva employee Ximena Centeno made two deposits of $1,000 each into Guerra's bank account on December 23, 2009 and February 5, 2010.  In addition, for the reasons stated in Chevron's Reply filed currently herewith, the Zambrano Declaration is inadmissible hearsay and cannot be considered. |

## V.    THE ECUADORIAN JUDICIARY SUFFERS FROM ENDEMIC CORRUPTION

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| 207.    The Ecuadorian judiciary has problems with corruption and lack of due process and is susceptible to the ghostwriting of judgments by lawyers in exchange for bribes. Dkt. 30-30 (U.S. Dept. of State Human Rights Reports (2006-2011) (noting "the susceptibility of the judiciary to bribes for favorable decisions and resolution of legal cases and on judges parceling out cases to outside lawyers, who wrote the judicial sentences and sent them back to the presiding judge for signature" ); Dkt. 402-14 (Ex. 2324) (U.S. State Dep't, Bureau of Economic, Energy & Business Affairs, 2009 Investment Climate Statement: Ecuador (Feb. 2009)) at 52 ("The Ecuadorian judicial system is hampered by processing delays, unpredictable judgments in civil and commercial cases, inconsistent rulings, and limited access to the courts." In commercial disputes that involve foreign companies, "[c]riminal complaints and arrest warrants . . . have been used to pressure companies involved in commercial disputes."); Dkt. 402-1 (Ex. 2209) (El Universo Verdict bad precedent for free press in Americas, Committee to Protect Journalists, | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.

**LAPs:**  Disputed. The characteristics and functions of an entire nation's judicial system are not "facts" that can be established by mere citation to purported "evidence." Instead, this is an argumentative conclusion or opinion, improper for a Rule 56.1 Statement. *See Rodriguez v. Schneider,* No. 95 Civ. 4083(RPP,) 1999 WL 459813, *1 n. 3 (S.D.N.Y. June 29, 1999) (*"Rule 56.1 statements are not argument.* They should contain factual assertions, with citation to the record. They should not contain conclusions . . . ."). Chevron recognizes this by its numerous "expert" opinion reports on the subject of the Ecuadorian judicial system.

Defendants object to Chevron's "evidence" for paragraph 206. Chevron gives the false impression that the quoted statement about "the susceptibility of the judiciary to bribes . . ." was written by the U.S. Dept. of State by deleting the beginning of the sentence which says "The media reported . . .", indicating this was a summary of media reports. Media reports are inadmissible hearsay and cannot support summary judgment. This statement No. 207 is also | Undisputed.  Many reputable sources, including the U.S. State Department, have noted corruption in the Ecuadorian judiciary.  This is a fact appropriate for a Rule 56.1 statement.  Defendants do not contradict these sources. |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| Feb. 16 2012) at 110-11 ("El Universo obtained a court order allowing it to clone Paredes' hard drive for forensic examination. A domestic, court-approved consultant found irregularities in the document, while a U.S. consultant hired by the defense said his own examination showed that the judge's decision was actually written by Correa's attorney, Gutemberg Vera. On Tuesday, Judge Monica Encalada, a lower court magistrate who Paredes said had given him scanned documents that sped up the process of writing his ruling, released a video and affidavit claiming that the original ruling against El Universo was written by Vera."). | immaterial, as Camacho and Piaguaje have stipulated that they will not seek to enforce the Ecuadorian Judgment or have it recognized in New York, making Ecuador's judiciary irrelevant.<br><br>Defendants dispute that "the Ecuadorian judiciary has problems with corruption and lack of due process and is susceptible to the ghostwriting of judgments by lawyers in exchange for bribes." As Professor Joseph Staats has concluded, "Ecuador provides impartial tribunals and procedures compatible with the requirements of due process of law." Smyser Decl., Ex. 38 (Expert Report of Joseph L. Staats, Ph.D) at 1; *see also id.*, Ex. 42 (Expert Report of Dr. Hector Alberto Cabrera Súarez) at 60-61 ("[T]he procedural guaranties, the guaranties of appeal, and the guaranties of due process which endorse Judiciary Independence and the certainty of the rulings of Ecuadorian judges are evidence that is reflected in the standards and regulations that I have quoted and whose full texts I have attached to this document, which shows, in a conclusive manner, that the affirmations formulated by Chevron within the scope of the lawsuit brought in the Southern District of New York are absolutely removed from the legislative and jurisdictional truth of Ecuador, or at least demonstrate an absolute ignorance of this reality, despite the fact that the company itself is constantly using all rights of appeals that are granted to it by the Ecuadorian legislation."); id., Ex. 43 (Expert Report of José Julio Benítez Astudillo) at 55 (declaring his "full conviction that the Rule of Law is a reality lived in Ecuador").<br><br>This statement No. 207 is also immaterial, as Camacho and Piaguaje have stipulated that they will not seek to enforce the Ecuadorian Judgment or have it recognized in New York, making the Ecuadorian judiciary irrelevant in this lawsuit. | |
| 208.    Ecuadorian President Correa has supported the | **Donziger:** Disputed. Donziger incorporates the Ecuadorian Plain- | Undisputed.  Defendants do not dispute that Correa has offered support for |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| LAPs, including through personal meetings with the presiding judge in the Lago Agrio Litigation, and the submission of an amicus brief signed by a member of Correa's staff.  Dkt. 30-22 (Ex. 111) (2009.09.02 Email chain between J. Saenz and S. Donziger re "Chevron Charged With Dirty Tricks in Ecuador") (DONZ00052196) at 1 (following the Nunez bribery solicitation scandal, Saenz wrote to Donziger and assured him that the Front's "sources at the government tell us they're actively looking for [Ecuadorians involved in the scandal], to cut their heads off. We should focu[s] on [the Americans involved], since they're the Chevron stooges. Correa and his cronies will take care of the rest."); Dkt. 356-9 (Ex. F); Dkt. 356-9 (Ex. G) (While presiding over the trial, Judge Núñez publicly stated that the Lago Agrio Litigation had "taken too long" immediately after a two-hour luncheon with President Correa, at which the President complained about delays and demanded "expedited treatment of cases that are of interest to Ecuador."); Supp. Stavers Decl., Ex. 3292 (amicus brief signed by Gustavo Larrea). | tiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed. Defendants object to Chevron's "supporting evidence" for this Statement No. 208. The document cited as Dkt. 356-9 (Ex. F) is a media article and constitutes inadmissible hearsay. *See Faulkner v. Arista Records LLC*, 797 F. Supp. 2d 299, 305 (S.D.N.Y. 2011) ("Each statement of material fact must be followed by a "citation to evidence which would be admissible, set forth as required by the Federal Rule of Civil Procedure 56(e).' It is therefore the rule that "only admissible evidence" need be considered on summary judgment. 'The principles governing admissibility of evidence do not change on a motion for summary judgment.'") (citations omitted); *Metzner v. D.H. Blair & Co.*, 689 F.Supp. 262, 266 n. 6 (S.D.N.Y.1988) ("Newspaper articles are inadmissible hearsay."). Moreover, it does not support the statement because it does not mention the Lago Agrio Plaintiffs or their lawsuit against Chevron.<br><br>The document cited as Dkt. 356-9 (Ex. G.) is a media article and constitutes inadmissible hearsay. *See Faulkner*, 797 F. Supp. 2d at 305. Moreover, to the extent the Court even considers it, the article quotes President Correa stating his opinion about Texaco's improper practices and the contamination. ("Correa, who took office in 2007 and has frequently tangled with oil companies, has said that Texaco's 'savage exploitation' of oil 'killed and poisoned people.' He has also called Texaco's cleanup a charade, in which the company simply covered polluted sites with dirt, and labeled Chevron's Ecuadoran attorneys 'sellouts.'). This quote shows President Correa's support for obtaining justice for the people of the Oriente region of Ecuador. It does not demonstrate "support for the LAPs" in the improper sense that Chevron insinuates, executive interference in the judiciary. | the LAPs.  The article speaks for itself.  Nor do Defendants dispute that the amicus brief was signed by a member of Correa's staff. |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | The document cited as Dt. 30-22 (Ex. 111) does not support the statement. It is an email chain that contains the musings of a lawyer about actions that the President of Ecuador might take in response to the judicial sting operation conducted by Chevron through its operatives Diego Borja (who now lives a comfortable life in the United States thanks to Chevron) and Wayne Hansen (a convicted felon last known to be living like a king in Peru on Chevron's dime). There is no evidence that the President of Ecuador received any communication from the Lago Agrio Plaintiffs' legal team about this incident or that the President of Ecuador took any action in response.<br><br>This statement No. 208 is also immaterial, as Camacho and Piaguaje have stipulated that they will not seek to enforce the Ecuadorian Judgment or have it recognized in New York, making the actions of Ecuador's President irrelevant in this lawsuit. | |
| 209.    As this Court has already found, the LAPs team "resorted to pressure tactics directed at the Ecuadorian courts as well as political influence to achieve their objectives . . . .  Donziger, Fajardo, Yanza and the ADF have orchestrated a campaign to intimidate the Ecuadorian judiciary."  Dkt. 181 at 35; *see also* Dkt. 30-7 (Ex. 96) (2006.06.14 Email from S. Donziger to A. Villacis re "Need plan") (DONZ00086533) (Donziger instructed one of his co-conspirators to "prepare a detailed plan with the necessary steps to attack the judge through legal, institutional channels and through any other channel you can think of."); Dkt. 28-9 (Ex. 76) (DONZ00027256) at 55 (Donziger explained: "[T]he only way the court will respect us is if they fear us—and . . . the only way they | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed. The cited documents do not support Chevron's statement. First, Dkt. 181 is the Court's ruling on Chevron's motion for a preliminary injunction that was subsequently vacated in its entirety by the Second Circuit. In vacating the preliminary injunction order and reversing the Court's judgment, the Second Circuit stripped the Court's preliminary injunction order, including the findings of fact contained therein, of any continuing effect and "cast[] a shadow on past actions taken under the [order's] imprimatur." *Benjamin v. Jacobson*, 172 F.3d 144, 159 (2d Cir. 1999) (discussing vacated consent decree). "The point of vacatur is to prevent" the vacated decision "from spawning any legal consequences, so that no party is harmed by what we have called a 'prelimi- | Undisputed.  Defendants do not provide any basis for disregarding this Court's prior factual findings.  The Second Circuit did not reach the facts at issue here and thus vacateur of the injunction has no bearing on whether the factual findings of this Court were sufficiently supported by the record.<br><br>The cited documents speak for themselves. |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| will fear us if they think we have [s]ome control over their careers, their jobs, their reputations—that is to say, their ability to earn a livelihood.") | nary' adjudication." *Camreta v. Greene*, 131 S.Ct. 2020, 2035 (2011) (internal quotation omitted). Consequently, "[i]t is well-settled in this circuit that a vacated order has no collateral estoppel effect." *Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 970 F.2d 1138, 1146 (2d Cir. 1992); *see also Benjamin*, 172 F.3d at 159 ("'vacate' means 'to annul' or 'to render ... void'" (internal quotation omitted; ellipses in original)); *Falcon v. General Tel. Co.*, 815 F.2d 317, 320 (5th Cir. 1987) ("In essence, when a judgment is vacated 'all is effectually extinguished.'"), cited with approval in *Andrulonis v. United States*, 26 F.3d 1224, 1232 (2d Cir. 1994); *Marino v. N.Y. Tel. Co.*, No. 88 Civ. 5817 (PKL) 1992 WL 212184, at *14 n.8 (S.D.N.Y. Aug. 24, 1992) ("Since the entire judgment was vacated, the findings of fact are of no force and effect to the extent that they are in dispute."). The Court's findings in Dkt. 181 are a nullity and thus provide no support for Chevron's statement.<br><br>Second, the email from Donziger to Alejandro Ponce Villacís, Dkt. 30-7 (Ex. 96), does not reflect any "pressure tactics" or a "campaign to intimidate the Ecuadorian judiciary." It describes attempting to influence the judge with a "legal plan" using "legal institutional channels."<br><br>Third, Chevron's argument that the Lago Agrio Plaintiffs were connected to the charges of Judge Yánez trading jobs for sex in the court is false, based on misleading quotations, and does not demonstrate any "pressure tactics." The papers to which Chevron cites establish that the complaint that the Lago Agrio Plaintiffs prepared concerned the judge's failure to act on the Lago Agrio Plaintiffs' motion regarding judicial inspections, not the *prior* sex scandal in which the judge was involved. Dkt. 28-9 (DONZ00027256) at 56 (2006.07.25 journal entry quoted by Chevron, which also states: "He [Pablo] also said there is the feel- | |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | ing in the court that we are behind the complaints against Yanez and Novillo, which we are not, even though we have much to complain about, which is sort of ironic."). See also Dkt. 32-4 (DONZ00023182) at 1 ("Pablo met with the judge today. The judge, who is on his heels from the charges of trading jobs for sex in the court, said he is going to accept our request to withdraw the rest of the inspections save the four we still want to do. This follows our press conference Monday that was attended by 32 journalists and several prominent supporters, and the filing of a very well-written amicus signed by 11 Ecuadorian lawyers supporting the withdrawal of the inspections. The judge also I believe wants to forestall the filing of a complaint against him by us, which we have prepared but not yet filed. The judge told Pablo that the Texaco lawyers came by the other day to urge him to make us do all the inspections. The judge told Pablo they were nervous about the peritaje global."). | |
| 210.    Donziger has admitted that he has no evidence that Chevron ever paid money to a judge in the Lago Agrio Litigation.  Dkt. 356-9 (Ex. D) at 1964:11-14. | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed. Defendants do not dispute that Donziger's deposition testimony is accurately cited, but that testimony was provided several years ago in 2010. Defendants now have evidence that Chevron has paid or promised to pay hundreds of thousands of dollars to Alberto Guerra Bastidas, a judge in the Lago Agrio Litigation. (Dkt. 755, Ex. 3268). Discovery is not yet complete. | Undisputed.  Defendants do not dispute the statement and no reply is necessary.  Defendants' statement after "accurately cited" is nonresponsive and should be struck or disregarded. |
| 211.    Judge Nuñez recused himself from the Lago Agrio Litigation after video tapes emerged showing him participating in a series of meetings discussing the outcome of the case and possible bribes. Dkt. 356-9 (Ex. H). | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed. Judge Nuñez recused himself from the case after Chevron filed a motion to recuse. The video tapes did not reveal the acceptance of a bribe, i.e., those who have examined the videos | Undisputed.  The articles to which Defendants refer are inadmissible hearsay and should be disregarded.  It is undisputed that Judge Nuñez recused himself following the release of the videotapes.  The videotapes speak for themselves and reflect the fact that Nuñez met with individuals to discuss the case and the possible outcome. |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | noted the absence of any judicial impropriety. *See, e.g.*, Dkt. 366, Ex. O (LA Times: "On the tapes, the men – a former Chevron contractor and an American businessman – press Nunez to say how he will rule, without success. Then, as Nunez prepares to leave, one of the men again maintains that Chevron is guilty, and Nunez replies, 'Yes, sir.' To Chevron, that cinches the argument. But on the video, it's unclear to whom the judge is speaking and whether he is responding to the question or just trying to end the meeting."); Dkt. 366, Ex. P (Financial Times: "The judge refuses several times on the tape to reveal the verdict, before saying, 'Yes, sir,' when asked if he will find Chevron guilty. However, the video raises the question as to whether Judge Nunez understood what he was being asked."); Dkt. 366 Ex. Q (New York Time: "The recordings, made by a former Ecuadorean contractor for Chevron by using hidden recording devices, do not make clear whether Judge Núñez was involved in a bribery scheme — or even whether he was aware of an attempt to bribe him."); Dkt. 366, Ex. R, at 11 (Borja admitting "Because really, there was no bribe. I mean, there's was never . . . there was never a bribe.").<br><br>Moreover, this statement is immaterial and irrelevant to Chevron's fraud allegations. | |
| 212.    Judge Zambrano was the subject of numerous corruption complaints as both a prosecutor and as a judge, and was alleged to "fix" cases in exchange for bribes. Stavers Decl., Ex. 3131 (1996.07.12 Complaint filed against Zambrano during his time as prosecutor for bribery and peddling influence); Stavers Decl., Ex. 3132 (1997.03.12 Letter from Judge Yáñez to Prosecutor General attaching complaints against Zambrano for extortion and bribery); Stavers Decl., Ex. 3171 (1997.04.07 Sworn testimony alleging that Zambrano, | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed. This evidence is inadmissible and cannot support summary judgment. Complaints filed against Nicolas Zambrano over 15 years ago that never resulted in any disciplinary action or charges are not admissible to prove conduct in conformity therewith. Fed. R. Civ. P. 404(b). Three of the complaints cited, Ex. 3131, 3132, and 3171, are from 1996 and 1997. And they are just that—complaints. No charges were filed, and no action was | Undisputed.  The Defendants' objections to this statement are either irrelevant or without merit.  The LAPs do not dispute the contents of the cited complaints against Judge Zambrano.  Their Rule 404(b) and hearsay objections are baseless as Chevron does not offer the underlying complaints as evidence of Judge Zambrano's character, but rather as evidence of the LAPs' knowledge, awareness, opportunity and plan to orchestrate their illegal scheme against Chevron.  *See* Fed. R. Evid. 404(b)(2).  Finally, Rule 609 applies only to evidence of criminal convictions—which is irrelevant to Chevron's statement, regardless of how the LAPs attempt to characterize it. |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| during his time as prosecutor, accepted bribes in a drug trafficking case); Stavers Decl., Ex. 3168 (2006.12.22: An Ecuadorian anti-corruption commission files a complaint against Zambrano for irregularities related to the disposal of a case regarding corruptly awarded public contracts). | ever taken against Nicolas Zambrano based on these allegations. Allegations are not facts. Even if they were criminal convictions (which they are not), these "complaints" would not be admissible as they are all well over ten years old. Fed. R. Evid. 609. The fourth complaint Chevron cites is based on a press release from 2006. This press release is inadmissible hearsay. Moreover, it does not support Chevron's statements that there were any "irregularities" in Nicolas Zambrano's dismissal of a case while serving as acting prosecutor. It simply states that the Superior Prosecutor should revoke Zambrano's dismissal and reinstate the case. <br><br>Chevron's statement that there were "numerous corruption complaints" filed against Nicolas Zambrano while he was serving as a judge is not supported by the evidence cited. None of the "complaints" were presented during Zambrano's tenure as a judge from 2008 to 2012. Chevron's statement is false. <br><br>Moreover, the statement is immaterial. Attacks on Zambrano's character through the use of specific instances of alleged misconduct is improper. *See* Fed. R. Evid. 608 ("Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness."). | |
| 213.    Zambrano was ultimately dismissed from the court when, without explanation, he released a drug trafficker who had been arrested in connection with the seizure of 8.3 tons of cocaine.  Dkt. 431-5 (Ex. 1282) (2012.02.29 dismissal order). | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact. <br><br>**LAPs:**  Disputed. The cited order does not support Chevron's statement that Judge Zambrano released the defendant "without explanation." The order states that "based on the record" Judge Zambrano "decided to order the alternative measure" of "an order prohibiting him from leaving the country and requiring him to appear before the First Criminal Trial Court of Sucumbíos each | Undisputed. Defendants' objections do not relate to this statement of fact. |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
|  | Wednesday" Dkt. 431-5 (Ex. 1282), at 4, 6. Judge Zambrano did not dismiss the charges against the defendant. Judge Zambrano argued that he "violated no law but applied the Constitution of the Republic." Id., at 5. The decision to decline pretrial detention and enter an alternative measure of securing the defendant's appearance at trial was joined by another judge, Leonardo Ordonez, and stated that it was based on "documents exhibit during the hearing" showing that the defendant "Cristián Suquisupa is a well-known honorable person with a good reputation and with no criminal record; he has a stable job in which he works as a caretaker and security guard." Dkt. 755-28 (Ex. 3285) (Oct. 14, 2009 Order). As mentioned in the order, under Ecuador's Constitution, "The judge may always order precautionary measures other than pre-trial detention." Id. Judge Zambrano and Judge Ordonez made a discretionary decision to release the defendant pending trial and require him to report to the Court on a weekly basis. The Judicial Council's decision to dismiss Zambrano and Ordonez as judges for "negligence" because the defendant subsequent did not appear for trial does not mean that they violated the law or that their actions warranted dismissal. If so, that would mean any judge in the United States would be dismissed when a defendant escapes while out on bail pending trial. Moreover, the cited dismissal order also does not support Chevron's statement that the individual was arrested in possession of 8.3 tons of cocaine. The order says 557 kilograms, Dkt. 431-5 (Ex. 1282) at 4, which equals about half a ton (1227.97 pounds). Apparently, Chevron's lawyers struggle with the metric system.

Moreover, the statement is immaterial. Judge Zambrano is not a witness and this attack on his character through the use of specific instances of alleged misconduct is improper. *See* Fed. R. Evid. 608 ("Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's |  |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | conduct in order to attack or support the witness's character for truthfulness."). | |
| 214.     As Dr. McMenamin has concluded, "It is highly probable that the Order of October 15, 2012 has multiple authors, including one or more writers other than Judge Erazo." Dkt. 658-25 (Ex. 3018), ¶ 4 (emphasis in original). | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact.<br><br>**LAPs:**  Disputed. Although Defendants do not dispute that Dr. McMenamin may have written that statement, Defendants dispute his conclusions. The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "'Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.*, No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider*, No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)). Chevron does not even attempt to disguise this "conclusion" as a "fact" because it expressly uses the phrase "As Dr. McMenamin has concluded . . . ."<br><br>Dr. McMenamin's report is not admissible because it does not meet the requirements of Rule 702 and Daubert. See *id.* at 353; *Cacciola v. Selco Balers, Inc.*, 127 F. Supp. 2d 175, 180 (E.D.N.Y. 2001) ("Evidence contained in an expert's report therefore must be evaluated under Fed.R.Evid. 702 before it is considered in a ruling on the merits of a summary judgment motion."). Dr. McMenamin's report has numerous deficiencies, three of which will be mentioned here.<br><br>The reliability of Dr. McMenamin's method of "forensic stylistic analysis" is, at the very least, subject to debate. Other courts have excluded proffered expert testimony as to the identity of questioned writings that was based on the same forensic stylistic analy- | Undisputed.  Defendants' assertion that the "opinion of an expert" cannot be used in support of a Rule 56.1 statement is facially ridiculous and not supported by the cases cited.  To the contrary, courts routinely rely on expert evidence in deciding summary judgment motions.  *Mobileye, Inc. v. Picitup Corp.*, 2013 WL 830837, at *18 (S.D.N.Y. Mar. 5, 2013); *Gill v. Arab Bank, PLC*, --- F.Supp.2d ----, 2012 WL 5395746, at *21 (E.D.N.Y. Nov. 6, 2012); *Maytag Corp. v Electrolux Home Prods., Inc.*, 448 F. Supp. 2d 1034, 1064–65 (N.D. Iowa 2006).<br><br>Defendants do not dispute that Professor McMenamin made this finding, nor do they dispute any of the specific markers he identified that support it.<br><br>Defendants' protestation that they must be given "the opportunity" to depose or cross-examine Dr. McMenamin is disingenuous.  Defendants did not even include Dr. McMenamin in their February 6, 2013 letter to the Court listing individuals they claimed they needed to depose before responding to Chevron's motion. Dkt. 918-6.  Indeed, Defendants eventually declined to depose any of Chevron's witnesses before filing their opposition.  Dkt. 918-10. |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | sis as Dr. McMenamin's opinions. *See United States v. Van Wyk*, 83 F. Supp. 2d 515, 522-23 (D.N.J. 2000). In fact, in *Van Wyk* the government offered an article written by Dr. McMenamin in support of its proffered expert testimony. *See id.* at 521-22. The court did not admit the proffered testimony. *Id.* ("The reliability of text analysis, much like handwriting analysis, is questionable because, as discussed *supra,* there is no known rate of error, no recognized standard, no meaningful peer review, and no system of accrediting an individual as an expert in the field. Consequently, the existing data for forensic stylistics cannot definitively establish, as can DNA data, that a particular person is 'the' author of a particular writing."); *see also* Smyser Decl., Ex. 40 (Expert Report of Dr. Ronald R. Butters, at ¶ 20 (noting that Dr. McMenamin's "methodologies are the subject of ongoing controversy among linguistic scholars and have been criticized within the forensic linguistic community as fundamentally unscientific, untested, deeply flawed, and often likely to generate false conclusions"); *see also id.* at ¶¶ 4(d)-(e), 21, 26-27.<br><br>Nor should Chevron be permitted to rely on the Dr. McMenamin's report. Defendants have not yet been permitted the opportunity to conduct expert discovery in this case. Under the schedule agreed to among the parties, Chevron did not disclose its experts until March 1, 2013, and Defendants have until April 12, 2013 to submit any rebuttal expert disclosures. Dkt. 703 at 2. Defendants have not been afforded sufficient time to review and analyze the voluminous material provided in this report. At the very least, Defendants must be given the opportunity to depose or cross-examine Dr. McMenamin. *See* Fed. R. Civ. P. 56(d). | |
| 215.    The 8-page embargo order was issued on the first business day following Judge Legna's replacement by Judge Erazo, but expressly states that it is | **Donziger:**  Disputed. Donziger incorporates the Ecuadorian Plaintiffs' response to this alleged fact. | Undisputed.  There is no genuine dispute as to these facts.  Defendants dispute the purported "insinuation" that there was something improper about Judge Erazo's issuance of the order the next court after he assumed |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| based on a review of the record.  Stavers Decl., Ex. 3270 (Legna recusal motion) (reflecting the prior judge's recusal from the proceeding on October 11, 2012); Stavers Decl., Ex. 3147 (notice of court closure on Friday, October 12, 2012); Stavers Decl., Ex. 3269 (2012.10.15 embargo order, eight pages in length, purportedly issued by Judge Erazo, issued the first day after Erazo took over the case, and noting "HAVING REVIEWED THE RECORD"). | **LAPs:**  Disputed in part. Defendants do not dispute that Judge Legna recused himself on October 11, 2012 or that the embargo order was issued by Judge Erazo on October 15, 2012.  Defendants dispute this statement to the extent Chevron attempts to insinuate, without evidence, that there was something improper either about Judge Legna's self-recusal or Judge Erazo's issuance of the embargo order four days later.<br><br>The October 11, 2012 recusal order states that Judge Legna recused himself based on Article 856 (6) of the Code of Civil Procedure, which states that a judge should separate himself from the case if he has previously ruled on the same issue or a related issue in a previous phase of the same case. The order cited does not demonstrate anything improper about this recusal.<br><br>Chevron's statement that Judge Erazo's opinion "expressly states that it is based on a review of the record" is not supported by the "evidence" cited and is based on an incorrect and improper translation from Spanish to English. Chevron takes a procedural formality and converts it into a statement that carries much more meaning that the term actually does. The term "VISTOS" as seen in the first paragraph of the original Spanish order, is "a legal formula preceding statement of facts of case" that means "whereas." Smyser Decl. Ex. 44, at 1571 [Simon & Shuster's International Spanish Dictionary (2nd ed. 1997)]; *see also* Smyser Decl., Ex. 45, at 123 [Diccionario de Terminos Legales, Louis A. Robb (1979)] (defining "visto" as "whereas"). Obviously, "whereas" does not mean "HAVING REVIEWED THE RECORD", as Chevron erroneously and improperly asserts. There is no evidence submitted with the summary judgment motion to establish that Judge Erazo did not review the record pertinent to the question at hand, that is the specific filings relating to the embargo order he issued, which | the case, which is not proper.  Even so, they offer nothing to explain how Judge Erazo could have written the order himself. |

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| | states that "at this stage of the proceeding, it is not proper to question what has already been decided, but rather to enforce the ruling of the judgment being enforced." Dkt. 755-14 (Ex. 3270) at 1. If Judge Erazo was not going to review the underlying judgment, there was no reason for him to review the prior trial court proceedings. According to the order, each filing pertinent to the enforcement and requested embargo is addressed in the order. *Id.* Chevron's speculation and conspiracy theories about the embargo order are not evidence, and certainly not the basis for summary judgment. | |

## VI.   THE LAP TEAM HAS ENGAGED IN AT LEAST 129 SPECIFIC INSTANCES OF WIRE FRAUD AND MONEY LAUNDERING

| Statement of Undisputed Fact | Defendants' Response | Chevron's Reply |
|---|---|---|
| 216. Defendants have made extensive use of email, Internet websites, and wire transfers, including the 129 specific instances identified in the following statements, in furtherance of their ghostwriting of the Cabrera Report, their concealment of that ghostwriting, their illicit payments to Cabrera, Guerra, and Zambrano, their promotion of the Cabrera Report and the Lago Agrio judgment, and their solicitation of funds to support these activities. Each of these constitutes wire fraud in violation of 18 U.S.C. § 1343 by the identified Defendant. | **Donziger:**  Donziger incorporates his responses to Chevron's alleged facts nos. 216-344.<br><br>**LAPs:**  Defendants Camacho and Piaguaje are not RICO Defendants, and as Chevron has not alleged any violation of 18 U.S.C. § 1343 against either Camacho or Piaguaje, none of the allegations are material to Chevron's case against Camacho and Piaguaje. None of the allegations set forth in Statement Nos. 216–344 identify Camacho or Piaguaje as an applicable "Defendant". To the extent any response is necessary, Defendants Camacho and Piaguaje incorporate Donziger Defendants' response to each and every purported fact in Statement Nos. 216–344. | *See* Chevron's Replies to Sts. 216-344. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|---|---|---|---|---|---|---|---|
| 216. | Donziger | 2006.02.10 | Donziger | Ponce | Donziger sent an email to Ponce asking him to meet with the judge one-on-one to explain their theory of the case and all of the issues from the plaintiffs' perspective. Dkt. 37-6 (Ex. 231). | Disputed. Chevron's description of this email does not match the document citation. In the cited email (Dkt. 37-6 (Ex. 231)), Donziger does not ask Ponce or anyone else "to meet with the judge one-on-one to explain their theory of the case and all of the issues from the plaintiffs' perspective." In any event, Donziger disputes Chevron's unsupported legal conclusion that any such email constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that any such email was incident to or in furtherance of any material misrepresentation or omission. Donziger also disputes the insinuation that *ex parte* contacts with a judge were inappropriate. Indeed, in February 2006, there was no law or regulation in Ecuador prohibiting *ex parte* communications with judges. *See, e.g.,* Dkt. 154-6 (Affidavit of Dr. Farith Ricardo Simon noting that Ecuadorian law prohibiting judges from "accepting the visit of or meeting with one of the parties or his counsel without first notifying the other" did not come into existence until March 9, 2009). *Ex parte* communication with the judges presiding over the Lago Agrio liti- | Undisputed. Donziger's objection that the citation is incorrect does not contradict Chevron's statement of fact. The correct citation is Dkt. 30-11 (Ex. 100).<br><br>Donziger's argument regarding whether the statement constitutes a predicate act is misleading and false. It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253-54 (S.D.N.Y. 1997). *See also U.S. v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000); Dkt. 745 at 35. Donziger's statements regarding improper contacts with and attempts to influence the Ecuadorian judiciary were "of some independent value" to the scheme, and therefore material. Dkt. 745 at 35.<br><br>Donziger's assertions regarding the propriety of *ex parte* contacts in Ecuador are false and misleading as well. *See* Reply St. 345-346. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|----|-----|-----|-----|
| | | | | | | gation was the ordinary manner of proceeding throughout the majority of that case. Chevron, in fact, had *ex parte* meetings of its own with Ecuadorian judges presiding over the Lago Agrio litigation—including meetings regarding the peritaje global. Donziger incorporates by reference his prior Rule 56.1(b) Response (Dkt. 614) to St. 6, 165-166. | |
| 217. | Donziger | 2006.06.14 | Donziger | Ponce | Donziger sent an email to Ponce instructing him to "prepare a detailed plan with the necessary steps to attack the judge through legal, institutional channels and through any other channel you can think of." Dkt. 30-7 (Ex. 96) at 1. | Donziger does not dispute that he sent the cited email, but he disputes Chevron's unsupported legal conclusion that it constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission. Moreover, Donziger disputes Chevron's use of the word "instructing" as it suggests improperly and without any factual basis that Donziger had authority to "instruct" Ponce to take any action. Donziger also incorporates the Ecuadorian Plaintiffs' response to St. 209. | Undisputed.  Donziger's argument regarding whether the statement constitutes a predicate act is misleading and false.  It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme.  *Madanes v. Madanes*, 981 F. Supp. 241, 253-54 (S.D.N.Y. 1997).  *See also U.S. v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000); Dkt. 745 at 35.  Further, Donziger does not dispute that he instructed Ponce to "attack the judge through legal, institutional channels and through any other channel you can think of." Dkt. 30-7 (Ex. 96) at 1. Donziger's statements regarding improper contacts with and attempts to influence the Ecuadorian judiciary were "of some independent value" to the scheme, and therefore material.  Dkt. 745 at 35. |
| 218. | Donziger | 2006.07.12 | Donziger | Fisher | Donziger and Fisher ex- | Donziger does not dispute that he sent the | Undisputed.  Donziger's argument regarding |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|-------------------------|-------------------|-----------------|
| | | | | | changed emails regarding their ongoing efforts to cause an SEC investigation of Chevron. Donziger noted, "I sort of feel this is bogus, but as long as they want to look at it we should keep feeding them stuff." Dkt. 356-10 at 44 (Ex. AI). | cited email, but he disputes Chevron's unsupported legal conclusion that it constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission. Moreover, Chevron's description and its selective and incomplete quotation of this email is misleading. Read in context, the complete email string suggests that an SEC investigation into Chevron's misleading press releases was already "active" and that the SEC had requested further information. | whether the statement constitutes a predicate act is misleading and false. It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253-54 (S.D.N.Y. 1997). *See also U.S. v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000); Dkt. 745 at 35.  Donziger's statements regarding attempts to extort Chevron via fabricated claims of wrongdoing were "of some independent value" to the scheme, and therefore material.  Dkt. 745 at 35.  Donziger's additional language does not dispute Chevron's statement of fact. |
| 219. | Donziger | 2006.07.26 | Donziger | Kohn | Donziger emailed Kohn, "Pablo [Fajardo] met with the Judge today. The judge, who is on his heels from the charges of trading jobs for sex in the court, said he is going to accept our request to withdraw the rest of the inspections. ... The judge also I believe wants to forestall the filing of a complaint against him by us, which we have prepared but not yet filed." Dkt. 32-4 (Ex. 149) at 1. | Donziger does not dispute that he sent the cited email, but he disputes Chevron's unsupported legal conclusion that it constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission. Moreover, Donziger disputes any suggestion that the "complaint" referenced in this email concerned allegations of sexual impropriety or that the Ecuadorian Plaintiffs were connected to the charges of Judge Yanez trading | Undisputed.  Donziger's argument regarding whether the statement constitutes a predicate act is misleading and false.  It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme.  *Madanes v. Madanes*, 981 F. Supp. 241, 253-54 (S.D.N.Y. 1997).  *See also U.S. v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000); Dkt. 745 at 35.  Donziger cannot dispute that this Court previously found that "the decisions to terminate judicial inspections, to pursue the global as- |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|---|---|---|---|---|---|---|---|
| | | | | | | jobs for sex in the court. The complaint referenced in this email concerned the judge's failure to act on the Ecuadorian Plaintiffs' motion, not the prior sex scandal in which the judge was involved. Donziger also incorporates his response to St. 42 and his prior Rule 56.1(b) Response (Dkt. 614) to St 7. | sessment, and to select Cabrera as the global expert were tainted by the duress and coercion applied to [the court] by Fajardo, Donziger, and perhaps others in *ex parte* meetings." Dkt. 550 at 90.<br><br>In addition, Defendants do not dispute that the meetings with Ecuadorian court officials took place, that they took place without Chevron present (and there is no evidence that Chevron was present), that the LAPs threatened to file a complaint against Judge Yánez, or that the LAPs intended an "all-out war with the judge to get him removed" if he did not comply with their demands. Dkt. 28-9 at 2. Whether Defendants were connected with the sexual misconduct charges against Judge Yánez is irrelevant.<br><br>Donziger's assertions regarding the propriety of *ex parte* contacts in Ecuador are false and misleading as well.  *See* Chevron's Reply St. 345-346. |
| 220. | Fajardo | 2006.11.07 | Fajardo | Donziger | Fajardo reported a meeting with the Judge and noted an effort to convince the Judge to adopt the Global Assessment, the Judge's resistance because the request lacked a legal basis, and Fajardo's request for feedback from the | This email is not material, and no response is required by Donziger, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone.  Chevron | Undisputed.  Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.<br><br>Donziger's argument regarding whether the statement constitutes a predicate act is misleading and false.  It is well-established that the wire communications themselves need not |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|----|-----|-----|-----|
| | | | | | team to help strengthen their position. Dkt. 402-13 (Ex. 2312. | has not proven criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that loin the present record ... the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Donziger also disputes Chevron's description of this email as inaccurate and misleading. This email does not establish that the judge expressed "resistance" to the request to conduct a global expert examination because the request "lacked a legal basis." Fajardo in fact recounted in the email: "We explained the actual scope of the Global Assessment to him, and he understood somewhat. I think we have to strengthen our position, the delivery of information and the objectives of the global assessment." Further, Donziger disputes the insinuation that *ex parte* contacts with a judge were inappropriate. Indeed, at the time of this email, there was no law or regulation in Ecuador prohibiting *ex parte* communications with judges. *See, e.g.,* Dkt. 154-6 (Affidavit of Dr. Farith Ricardo Simon). Donziger also incorporates his response to St. 36 and his prior Rule 56.1(b) Response (Dkt. 614) to St. 6. *See also* St. 345-346, *infra.* | be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253-54 (S.D.N.Y. 1997). *See also U.S. v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000); Dkt. 745 at 35. Defendants' statements regarding improper contacts with and attempts to influence the Ecuadorian judiciary were "of some independent value" to the scheme, and therefore material. Dkt. 745 at 35. Donziger's additional language does not dispute Chevron's statement of fact. Donziger's assertions regarding the propriety of *ex parte* contacts in Ecuador are false and misleading as well. *See* Chevron's Reply St. 345-346. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|-------------------------|-------------------|-----------------|
| 221. | Fajardo | 2006.12.21 | Fajardo | Donziger | Fajardo wrote that he "met with the Judge today, and I can say that he will definitely not issue the order [authorizing global inspections] before the recess; he will issue it immediately afterward." Dkt. 402-13 (Ex. 2314). | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. Moreover, Donziger disputes the insinuation that *ex parte* contacts with a judge were inappropriate. Indeed, at the time of this email, there was no law or regulation in Ecuador prohibiting *ex parte* communications with judges. *See, e.g.,* Dkt. 154-6 (Affidavit of Dr. Farith Ricardo Simon noting that Ecuadorian law prohibiting judges from "accepting the visit of or meeting with one of the parties or his counsel without first notifying the other" did not come into existence until March 9, 2009—roughly three years after the Ecuadorian Plaintiffs are alleged to have met with Judge Yanez concerning the waiver of judicial inspections and the commencement of the peritaje global.). Donziger also incorporates his response to St. 36 and his prior Rule 56.1(b) Response (Dkt. 614) to St. 6. *See also* St. 345-346, *infra*. | Undisputed. Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him. Donziger's argument regarding whether the statement constitutes a predicate act is misleading and false. It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253-54 (S.D.N.Y. 1997). *See also U.S. v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000); Dkt. 745 at 35. Defendants' statements regarding improper contacts with and attempts to influence the Ecuadorian judiciary were "of some independent value" to the scheme, and therefore material. Dkt. 745 at 35. Donziger's assertions regarding the propriety of *ex parte* contacts in Ecuador are false and misleading as well. *See* Chevron's Reply St. 345-346. |
| 222. | Donziger | 2007.03.23 | DeLeon | Donziger | Payment via wire transfer of | Disputed. The cited document shows a | Undisputed. Defendants' responses do not |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|--------------------------|--------------------|------------------|
|  |  |  |  |  | $1,000,000. Dkt. 370-6 (Ex. 1197) (DONZ00132976-79);Donziger *see also* Dkt. 658-37 (Ex. 3030) (untitled letter from Donziger to DeLeon). | wire transfer of $1,000,000 on 3/28/2007 (not 3/23/2007) from to Kohn Swift & Graf (not from DeLeon to Donziger). Donziger also disputes Chevron's unsupported legal conclusion that this transfer constitutes a predicate act of wire fraud and/or money laundering. In particular, Chevron has not made any showing of criminal intent or materiality. Chevron also has not demonstrated that this transfer was in furtherance of any unlawful activity or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A). Indeed, this document describes a $25.00 charge in connection with the $1,000,000 transfer for an "Outgoing Domestic Wire Fee." DONZ00132978. | dispute that the transfers of funds were in furtherance of unlawful activity.<br><br>Further, the facts described constitute the transmission of funds from or to the United States, "with the intent to promote the carrying on of specified unlawful activity." 18 U.S.C. § 1956(a)(2)(A).  It is well-settled that intent may be shown by proving "facts showing a motive for committing fraud and a clear opportunity for doing so," or by identifying strong circumstantial evidence of conscious behavior.  *Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987), *cert. denied,* 484 U.S. 1005 (1988), *overruled on other grounds, United States v. Indelicato,* 865 F.2d 1370 (2d Cir. 1989) (en banc).  The statute reaches wire transfers, and there is no requirement that the source of the funds be unlawful.  *U.S. v. Piervinanzi*, 23 F.3d 670, 678–79 (2d Cir. 1994).<br><br>Defendants' assertion that the statute imposes a requirement that funds be transferred "from the United States to a place outside the United States" is false.  The statute, 18 U.S.C. § 1956(a)(2) provides: "Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States *or to a place in the United States from* |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|---|---|---|---|---|---|---|---|
| | | | | | | | *or through a place outside the United States*" (emphasis added).  The statute thus applies equally to transfers to the United States from places outside the United States and encompasses the transaction at issue here. |
| 223. | Stratus | 2007.04.03 | David Chapman | Donziger Maest, Mills | Stratus and Donziger discussed Stratus' role in drafting the Cabrera Report, and Chapman wrote, "I think the way this would work best is that if Stratus did much of the work, putting the pieces together and writing the report." Dkt. 32-13 (Ex. 157) at 1. | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering. Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that loin the present record ... the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Donziger also disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper. Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts. In fact, such contacts were common practice. Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. *See also* St. 347-48, 351-55, *infra*. Simi- | Undisputed.  Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.

Donziger's argument regarding whether the statement constitutes a predicate act is misleading and false.  It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme.  *Madanes v. Madanes*, 981 F. Supp. 241, 253-54 (S.D.N.Y. 1997).  *See also U.S. v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000); Dkt. 745 at 35.  Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report – and their work to author the Cabrera Report themselves – were "of some independent value" to the scheme, and therefore material.  Dkt. 745 at 35.

Donziger's assertions regarding the propriety of *ex parte* contacts in Ecuador are false and misleading as well.  *See* Chevron's Reply St. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | | | | | | larly, Ecuadorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168. In fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, 75, 78, 95, and his previous Rule 56.1(b) responses (Dkt. 614) to 167-169. *See also* St. 347-48, 351-55, *infra*. | 347-350. |
| 224. | Fajardo | 2007.03.21 | Fajardo | Donziger | The LAPs' counsel and consultants wrote Cabrera's June 25, 207 "Work Plan for Expert Examination" which Cabrera then submitted to the Ecuadorian court as his own work. Dkt. 400- 4 (Ex. 2043). | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering. Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that loin the present record ... the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Donziger also disputes that the document attached | Undisputed.  Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.<br><br>Donziger's argument regarding whether the statement constitutes a predicate act is misleading and false.  It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme.  *Madanes v. Madanes*, 981 F. Supp. 241, 253-54 (S.D.N.Y. 1997).  *See also U.S. v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000); Dkt. 745 at 35.  Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report's true author- |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|-------------------------|-------------------|-----------------|
| | | | | | | to this email is the work plan filed with the court. The email attachment looks *nothing* like the work plan that Cabrera filed with the court. *Compare* Dkt. 400-4 (Ex. 2043) (Fajardo's "first draft of the plan and schedule of activities to be carried out") *with* Dkt. 400-4 (Ex. 2044) at p. 130,641- 130,651 (work plan filed with the court). Further, Chevron's assertion that Cabrera "submitted the work plan] to the Ecuadorian court as his own work" is unsupported. Cabrera does not represent that he personally drafted the work plan. In his cover letter to the court, he describes the plan as "the general plan of activities that I am going to perform as part of the Expert Examination under my authority." Dkt. 400-4 (Ex. 2044) at p. 130,640. Donziger also incorporates his response to St. 56. | ship and illicit payments to him were "of some independent value" to the scheme, and therefore material.  Dkt. 745 at 35. Donziger's assertions regarding the propriety of *ex parte* contacts in Ecuador are false and misleading as well.  *See* Chevron's Reply St. 347-350. |
| 225. | Donziger | 2007.05.10 | Donziger | Fajardo | Donziger sent an email to Fajardo stating that they should have Cabrera find against Plaintiffs on some issues to create the illusion that Cabrera was independent, and look for ways to make sure Texaco did not know anything about Cabrera's work or plan. Dkt. 32-7 (Ex. 152). | Donziger does not dispute that he sent the cited email, but he disputes Chevron's unsupported legal conclusion that it constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission. Indeed, the Court has already concluded, even without the bene- | Undisputed.  Donziger's argument regarding whether the statement constitutes a predicate act is misleading and false.  It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme.  *Madanes v. Madanes*, 981 F. Supp. 241, 253-54 (S.D.N.Y. 1997).  *See also U.S. v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000); Dkt. 745 at 35.  Further, even if the |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | | | | | | fit of any merits opposition, that loin the present record ... the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Donziger also disputes Chevron's conclusion that the Ecuadorian Plaintiffs intended to create "the illusion" of independence as unsupported, argumentative, and improper in a Rule 56.1 statement. "Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford Inc.,* No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider,* No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)). | materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report's true authorship and illicit payments to him were "of some independent value" to the scheme, and therefore material.  Dkt. 745 at 35.<br><br>Donziger's additional language does not dispute Chevron's statement of fact. |
| 226. | Donziger | 2007.06.13 | Donziger | Yanza | Donziger and Yanza discussed opening a "new secret account." Dkt. 400-3 (Ex. 2021) at 1-2. | Donziger does not dispute that he sent the cited email, but he disputes Chevron's unsupported legal conclusion that it constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission. Donziger also disputes | Undisputed.  Donziger's responses do not dispute that the transfers of funds were in furtherance of unlawful activity.<br><br>Further, intent may be shown by proving "facts showing a motive for committing fraud and a clear opportunity for doing so," or by identifying strong circumstantial evidence of conscious behavior.  *Beck v. Manufacturers Hanover Trust Co.,* 820 F.2d 46, 50 (2d Cir. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|----|-----------------------|-------------------|------------------|
| | | | | | | any insinuation of impropriety with respect to the second account discussed in this email. Chevron was going to great lengths to block and delay the expert inspections, in part by ensuring that Cabrera would not be paid. Yanza described the purpose of the second account was to pay Cabrera so that he could start his work. Dkt. 356-9 (Ex. S) (DONZ-HDD-0125080)) at p. 210. Donziger also incorporates his response to St. 60. | 1987), *cert. denied,* 484 U.S. 1005 (1988), *overruled on other grounds, United States v. Indelicato,* 865 F.2d 1370 (2d Cir. 1989) (en banc). Defendants' creation of a secret account constitutes such evidence. The statute reaches wire transfers, and there is no requirement that the source of the funds be unlawful. *U.S. v. Piervinanzi,* 23 F.3d 670, 678–79 (2d Cir. 1994). |
| 227. | Yanza | 2007.06.13 | Yanza | Donziger | Yanza wrote to Donziger and copied Fajardo, and request that Donziger "explain this situation to JK Foe Kohn] so he can transfer 30 to our Secret Account and 20 to SV [Selva Viva], but he could send the 50 to the secret account, and then we could pass the 20 to SV to save time and paperwork." Dkt. 400-3 (Ex. 2020). | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. Moreover, Chevron's description of this email does not match the document citation: Dkt. 400-3 (Ex. 2020) is an email dated 4/17/2007 and has nothing to do with a "secret account." In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. In particular, Donziger disputes any insinuation of impropriety with respect to the so-called "secret account." Chevron was going to great lengths to block and delay the expert inspections, in part by ensuring that Cabrera would not be paid. Yanza described the purpose of the second account | Undisputed. Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him. Donziger's objection that the citation is incorrect does not contradict Chevron's statement of fact. The correct citation is Dkt. 356-9 (Ex. S). Donziger's responses do not dispute that the transfers of funds were in furtherance of unlawful activity. Further, intent may be shown by proving "facts showing a motive for committing fraud and a clear opportunity for doing so," or by identifying strong circumstantial evidence of conscious behavior. *Beck v. Manufacturers Hanover Trust Co.,* 820 F.2d 46, 50 (2d Cir. 1987), *cert. denied,* 484 U.S. 1005 (1988), *overruled on other grounds, United States v. Indelicato,* 865 F.2d 1370 (2d Cir. 1989) (en banc). Defendants' creation of |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|---|---|---|---|---|---|---|---|
| | | | | | | was to pay Cabrera so that he could start his work. Dkt. 356-9 (Ex. SO (DONZ-HDD-0125080)) at p. 210. Donziger also incorporates his response to St. 60. | a secret account constitutes such evidence. The statute reaches wire transfers, and there is no requirement that the source of the funds be unlawful. *U.S. v. Piervinanzi*, 23 F.3d 670, 678–79 (2d Cir. 1994). |
| 228. | Fajardo | 2007.06.22 | Fajardo | Donziger | Fajardo sent Donziger an email regarding how to access a draft plan for "how to work with the global damages assessment expert" by using the email account examen_pericial@hotmail.com, and with the instruction to only use the code names "Logarto 2" and "Logarto 3" for himself and Donziger. Dkt. 402-13 (Ex. 2315). | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. In particular, Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper. Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts. In fact, such contacts were common practice. Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. Similarly, Ecuadorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168. In fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168. Chevron has not established crim- | Undisputed.  Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.

Donziger's argument regarding whether the statement constitutes a predicate act is misleading and false.  It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253-54 (S.D.N.Y. 1997).  *See also U.S. v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000); Dkt. 745 at 35.  Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report – including Defendants' statements about the logistics of manipulating the Cabrera Report – were "of some independent value" to the scheme, and therefore material.  Dkt. 745 at 35.

Donziger's assertions regarding the propriety of *ex parte* contacts in Ecuador are false and misleading as well.  *See* Chevron's Reply St. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | | | | | | inal intent — nor can such intent be inferred based on the use of alternate names. Moreover, the Court has already concluded, even without the benefit of any merits opposition, that loin the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Donziger also incorporates his responses to St. 71, 75, and 78, and his prior Rule 56.1(b) Response (Dkt. 614) to Fact Nos. 167-169. *See also* St. 347-48, 351-55, *infra*. | 347-350. |
| 229. | Donziger | 2007.07.17 | Donziger | Yanza, Fajardo | Donziger wrote, "My tendency is to stop Richard [Cabrera] from working much more in the field … or, if he continues doing it, he should continue under the most strict control with an extremely limited number of samples. And we'll change the focus of the data at our offices." Dkt. 32-12 (Ex. 156). | Donziger does not dispute that he sent the cited email, but he disputes Chevron's unsupported legal conclusion that it constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that loin the present record … the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. | Undisputed.  Donziger's argument regarding whether the statement constitutes a predicate act is misleading and false.  It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme.  *Madanes v. Madanes*, 981 F. Supp. 241, 253-54 (S.D.N.Y. 1997).  *See also U.S. v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000); Dkt. 745 at 35.  Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report – including Donziger's statements the need to control and manipulate Cabrera - were "of some independent value" to the scheme, and |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | | | | | | Moreover, Donziger's email does not prove that Cabrera did not perform 48 site inspections on his own. It only shows that Donziger was concerned about the cost of Cabrera performing more site inspections. In addition, Chevron provides misleading and incomplete quotations. Donziger's email discusses various ideas to reduce the amount of money that the Ecuadorian Plaintiffs were spending. Donziger was concerned that "we are trying to do too much, producing waste and delaying for lack of budget, and, without realizing it, we are helping the enemy's strategy of delaying the trial." Dkt. 32-12 (Ex. 156) at 1. Donziger's proposal to limit the additional field work it would request was consistent with this concern. | therefore material.  Dkt. 745 at 35.<br><br>Donziger's additional language does not dispute Chevron's statement of fact. |
| 230. | Donziger | 2007.08.14 | Donziger | Karen Wilson | Donziger sent an email requesting that Kohn Swift transfer $50,000.00 to an account for the Frente in Ecuador. Donziger explained that Yanza ran the Selva Viva account, which was created "simply as a pass thru mechanism to administer funds for the litigation" in Ecuador, and that the Frente controlled Selva Viva. Dkt. 31-22 (Ex. 137). | Donziger does not dispute that he sent the cited email, but he disputes Chevron's unsupported legal conclusion that it constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission. Chevron's insinuation of impropriety is based on pure speculation. Donziger incorporates his responses to St. 60 and 62. | Undisputed.  Donziger's responses do not dispute that the transfers of funds were in furtherance of unlawful activity.  Further, the facts described constitute the transmission of funds from or to the United States, "with the intent to promote the carrying on of specified unlawful activity."  18 U.S.C. § 1956(a)(2)(A).  It is well-settled that intent may be shown by proving "facts showing a motive for committing fraud and a clear opportunity for doing so," or by identifying strong circumstantial evidence of conscious behavior.  *Beck v. Manufacturers Hanover* |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | | | | | | | *Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987), *cert. denied,* 484 U.S. 1005 (1988), *overruled on other grounds, United States v. Indelicato,* 865 F.2d 1370 (2d Cir. 1989) (en banc). The statute reaches wire transfers, and there is no requirement that the source of the funds be unlawful. *U.S. v. Piervinanzi,* 23 F.3d 670, 678–79 (2d Cir. 1994). |
| 231. | Selva Viva | 2007.08.15 | Kohn, Swift & Graf, P.C. | Selva Viva | Payment via wire transfer of $50,000 to Defendants' "secret account." Stayers Decl., Ex. 3130 (Dahlberg Declaration), ¶ 12. | This alleged wire transfer is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this alleged wire transfer constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not made any showing of criminal intent or materiality. Chevron also has not demonstrated that this alleged transfer was in furtherance of any unlawful activity or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A). Donziger incorporates his responses to St. 60 and 62. | Undisputed. Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.

Donziger's responses do not dispute that the transfers of funds were in furtherance of unlawful activity. Further, the facts described constitute the transmission of funds from or to the United States, "with the intent to promote the carrying on of specified unlawful activity." 18 U.S.C. § 1956(a)(2)(A). It is well-settled that intent may be shown by proving "facts showing a motive for committing fraud and a clear opportunity for doing so," or by identifying strong circumstantial evidence of conscious behavior. *Beck v. Manufacturers Hanover Trust Co.,* 820 F.2d 46, 50 (2d Cir. 1987), *cert. denied,* 484 U.S. 1005 (1988), *overruled on other grounds, United States v. Indelicato,* 865 F.2d 1370 (2d Cir. 1989) (en banc). The statute reaches wire transfers, and |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|---|---|---|---|---|---|---|---|
| | | | | | | | there is no requirement that the source of the funds be unlawful. *U.S. v. Piervinanzi*, 23 F.3d 670, 678–79 (2d Cir. 1994).<br><br>Defendants' assertion that the statute imposes a requirement that funds be transferred "from the United States to a place outside the United States" is false. The statute, 18 U.S.C. § 1956(a)(2) provides: "Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States *or to a place in the United States from or through a place outside the United States*" (emphasis added). The statute thus applies equally to transfers to the United States from places outside the United States and encompasses the transaction at issue here. |
| 232. | Donziger | 2007.08.28 | Donziger | Raul Herrera, attorney for government of Ecuador | Donziger wrote to ROE lawyer Raul Herrera, "Guys, with the Procurador [Attorney General of Ecuador] I ask the following favors: 1) Try to reignite his interest in the fraud complaint to the DOJ originally made by Borja. It would be great if he could write another letter to the DOJ to keep it alive, and allow us to exploit it for | Donziger does not dispute that he sent the cited email, but he disputes Chevron's unsupported legal conclusion that it constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission. | Undisputed. Donziger's argument regarding whether the statement constitutes a predicate act is misleading and false. It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme." *Madanes v. Madanes*, 981 F. Supp. 241, 253-54 (S.D.N.Y. 1997). *See also U.S. v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000); Dkt. 745 at 35. Donziger's statements about manufacturing fabricated claims and |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | | | | | press purposes." In a later email in the same chain, Donziger wrote, "[T]he idea with the other thing (fraud complaint to the DOJ) more than anything it [sic] to keep it up on the radar screen, keep it alive as a pressure point, and get this govern-ment and the Procurador to understand why it was done and adopt it as an ongoing policy." Dkt. 402-11 (Ex. 2286). | | manipulating public Ecuadorian officials were "of some independent value" to the scheme, and therefore material.  Dkt. 745 at 35. |
| 233. | Selva Viva | 2007.09.14 | Kohn, Swift & Graf, P.C. | Selva Viva | Payment via wire transfer of $50,000 to Defendants' "se-cret account." Stayers Decl., Ex. 3130 (Dahlberg Declara-tion), ¶ 12. | This alleged wire transfer is not material, and no response from Donziger is re-quired, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this al-leged wire transfer constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not made any showing of criminal intent or materiality. Chevron also has not demonstrated that this alleged transfer was in furtherance of any unlawful activi-ty or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A). Donziger also | Undisputed.  Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.

Donziger's responses do not dispute that the transfers of funds were in furtherance of un-lawful activity.  Further, the facts described constitute the transmission of funds from or to the United States, "with the intent to promote the carrying on of specified unlawful activi-ty."  18 U.S.C. § 1956(2)(A).  It is well-settled that intent may be shown by proving "facts showing a motive for committing fraud and a clear opportunity for doing so," or by identifying strong circumstantial evidence of conscious behavior.  *Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | | | | | | incorporates his responses to St. 60 and 62. | 1987), *cert. denied,* 484 U.S. 1005 (1988), *overruled on other grounds, United States v. Indelicato,* 865 F.2d 1370 (2d Cir. 1989) (en banc).  The statute reaches wire transfers, and there is no requirement that the source of the funds be unlawful.  *U.S. v. Piervinanzi,* 23 F.3d 670, 678–79 (2d Cir. 1994).

Defendants' assertion that the statute imposes a requirement that funds be transferred "from the United States to a place outside the United States" is false.  The statute, 18 U.S.C. § 1956(a)(2) provides: "Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary in-strument or funds from a place in the United States to or through a place outside the United States *or to a place in the United States from or through a place outside the United States*" (emphasis added).  The statute thus applies equally to transfers to the United States from places outside the United States and encom-passes the transaction at issue here. |
| 234. | Donziger | 2007.09.19 | Donziger | Beltman, Maest | Donziger sent an email to Stratus asking for help defin-ing the "norms" of clean-up so they could "propose these norms to the Ministry of En-ergy which governs these norms[,] and whose Minister is a good friend of ours, so | Donziger does not dispute that he sent the cited email, but he disputes Chevron's unsupported legal conclusion that it con-stitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demon-strated that this email was incident to or in | Undisputed.  Donziger's argument regarding whether the statement constitutes a predicate act is misleading and false.  It is well-established that the wire communications themselves need not be fraudulent, and com-munications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme.  *Madanes v. Madanes,* 981 F. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | | | | | that the Ministry issues them as an official decree before the trial ends." Dkt. 32-23 (Ex 167) at 1. | furtherance of any material misrepresentation or omission. In particular, Chevron has not shown that Donziger actually proposed any "norms" to the Ministry of Energy, or that it would have been illegal or improper to do so — much less that the proposal of any such proposed "norms" materially prejudiced Chevron's ability to present a defense on any issue of consequence. | Supp. 241, 253-54 (S.D.N.Y. 1997). *See also U.S. v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000); Dkt. 745 at 35.  Donziger's statements about manufacturing fabricated claims and manipulating public Ecuadorian officials were "of some independent value" to the scheme, and therefore material.  Dkt. 745 at 35.<br><br>Donziger's additional language does not dispute Chevron's statement of fact. |
| 235. | Fajardo | 2007.11.14 | Fajardo | Cristobal Villao | Fajardo and others removed the names of the original authors from what would become annexes to the Cabrera Report, as Fajardo wrote to Cristobal Villao, "For legal reasons, in the first part, the paragraph which states who hired you to carry out the study is to be omitted." Dkt. 402-2 (Ex. 2217) at ¶ 1. | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that loin the present record ... the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Donziger also disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper. Ecuadorian law did not prohibit | Undisputed.  Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.<br><br>Donziger's argument regarding whether the statement constitutes a predicate act is misleading and false.  It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253-54 (S.D.N.Y. 1997).  *See also U.S. v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000); Dkt. 745 at 35.  Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report's true authorship were "of some independent value" to the scheme, and therefore material.  Dkt. 745 at 35. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | | | | | | parties to a lawsuit from making contact with court-appointed experts. In fact, such contacts were common practice. Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. Similarly, Ecuadorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168. In fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St.167-169. *See also* St. 347-48, 351-55, *infra*. | Donziger's assertions regarding the propriety of *ex parte* contacts in Ecuador are false and misleading as well.  *See* Chevron's Reply St. 347-350. |
| 236. | Fajardo | 2008.01.02 | Fajardo | Donziger; Yanza | Fajardo emailed a list of "necessary tasks" for 2008, including to "knock out" Chevron but to first "cash the juicy checks," to "stir up the cases" in the Supreme Court of Justice and Prosecutor's Office by "tak1ingl advantage of the new Prosecutor," to "watch over" the Havoc case, "1cloordinate with the President of the Republic for defense on the accusation of denial of justice," | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. Chevron's insinuation of impropriety with respect to this email is based on pure speculation. | Undisputed.  Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.

Donziger's argument regarding whether the statement constitutes a predicate act is misleading and false.  It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme.  *Madanes v. Madanes*, 981 F. Supp. 241, 253-54 (S.D.N.Y. 1997).  *See also U.S. v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000); |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|-------------------------|-------------------|-----------------|
| | | | | | "watch over the process of naming new Superior Court Justices," "1complete all preparation work for the in-spection we need to con-duct," including "Annexes: genocide, health . . . .," to "Prepare the legal scenario for the defense of the expert report," "[w]rite the answer to the expert report," "1coordinate with the Communications team on the scheduled announcement of the expert report results," and to "exert the maximum pos-sible pressure, so that the judge or the Court, so that the case, does not become paralyzed." Dkt. 29-6 (Ex. 79) at 2. | | Dkt. 745 at 35.  Defendants' communications regarding manipulation of government actors and fabrication of evidence were "of some independent value" to the scheme, and there-fore material.  Dkt. 745 at 35. |
| 237. | Yanza | 2008.01.29 | Yanza | Donziger | Yanza asks Donziger to "[b]efore you travel please confirm that our friend JK makes the deposit in the oth-er account. I already sent him the bank information." He also reports that "Mlle expert did not appear to answer questions before the court" and that the judge therefore | This email is not material, and no re-sponse from Donziger is required, be-cause Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's un-supported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. Chevron's insinuation of impropriety is based on pure speculation. | Undisputed.  Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.

Donziger's argument regarding whether the statement constitutes a predicate act is mis-leading and false.  It is well-established that the wire communications themselves need not be fraudulent, and communications organiz-ing or managing a fraudulent scheme are |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | | | | | cancelled the hearing, but that "he'll certainly set another date" and "[w]e're on top of this issue." Dkt. 49-15 (Ex. 351) at 1. | | made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253-54 (S.D.N.Y. 1997). *See also U.S. v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000); Dkt. 745 at 35.  Defendants' secret payments and misrepresentations to the court were "of some independent value" to the scheme, and therefore material.  Dkt. 745 at 35. |
| 238. | Beltman | 2008.02.08 | Beltman | Donziger, Maest, Fajardo | Beltman sent an email to Donziger, et al. attaching a draft outline of proposed annexes to the Cabrera Report. Dkt. 32-19 (Ex. 163). | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that [on the present record ... the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Moreover, the cited email suggests only that Stratus drafted documents that Cabrera *adopted*. Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper. Ecuadorian law | Undisputed.  Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.  Donziger's argument regarding whether the statement constitutes a predicate act is misleading and false.  It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253-54 (S.D.N.Y. 1997). *See also U.S. v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000); Dkt. 745 at 35.  Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report – and their work to author the Report themselves – were "of some independent value" to the scheme, and therefore material.  Dkt. 745 at 35.  Donziger's assertions regarding the propriety |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | | | | | | did not prohibit parties to a lawsuit from making contact with court-appointed experts. In fact, such contacts were common practice. Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. Similarly, Ecuadorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168. In fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St.167-169. *See also* St. 347-48, 351-55, *infra*. | of *ex parte* contacts in Ecuador are false and misleading as well. *See* Chevron's Reply St. 347-350. |
| 239. | Selva Viva | 2008.03.11 | Kohn, Swift & Graf, P.C. | Selva Viva | Payment via wire transfer of $20,000.00. Dkt. 32-18 (Ex. 162). | This alleged wire transfer is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this alleged wire transfer constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not made any showing of criminal intent or materiality. Chevron also has not demonstrated that this alleged transfer was in furtherance of any unlawful activi- | Undisputed. Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.

Donziger's responses do not dispute that the transfers of funds were in furtherance of unlawful activity. Further, the facts described constitute the transmission of funds from or to the United States, "with the intent to promote the carrying on of specified unlawful activity." 18 U.S.C. § 1956(a)(2)(A). It is well-settled that intent may be shown by proving "facts showing a motive for committing fraud |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | | | | | | ty or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A). | and a clear opportunity for doing so," or by identifying strong circumstantial evidence of conscious behavior. *Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987), *cert. denied,* 484 U.S. 1005 (1988), *overruled on other grounds, United States v. Indelicato,* 865 F.2d 1370 (2d Cir. 1989) (en banc). The statute reaches wire transfers, and there is no requirement that the source of the funds be unlawful. *U.S. v. Piervinanzi*, 23 F.3d 670, 678–79 (2d Cir. 1994).<br><br>Defendants' assertion that the statute imposes a requirement that funds be transferred "from the United States to a place outside the United States" is false. The statute, 18 U.S.C. § 1956(a)(2) provides: "Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States *or to a place in the United States from or through a place outside the United States*" (emphasis added). The statute thus applies equally to transfers to the United States from places outside the United States and encompasses the transaction at issue here. |
| 240. | Beltman | 2008.02.22 | Beltman | Stratus Science Group, David Chapman | Beltman sent an email to other Stratus consultants stating, in reference to the Summary Report section of the | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any | Undisputed. Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | | | | | Cabrera Report that they were to "write, over the next 2 to 3 weeks, probably the single most important technical document for the case [which] will pull together all of the work over the last 15 or so years on the case and make recommendations for the court to consider in making its judgment." Dkt. 33-2 (Ex.168). | event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that loin the present record ... the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Moreover, Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper. Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts. In fact, such contacts were common practice. Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. Similarly, Ecuadorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to `faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168. In fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, 75, 78, and 95, and his | Donziger's argument regarding whether the statement constitutes a predicate act is misleading and false.  It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme.  *Madanes v. Madanes*, 981 F. Supp. 241, 253-54 (S.D.N.Y. 1997).  *See also U.S. v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000); Dkt. 745 at 35.  Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report – and their work to author the Report themselves – were "of some independent value" to the scheme, and therefore material.  Dkt. 745 at 35.  Donziger's assertions regarding the propriety of *ex parte* contacts in Ecuador are false and misleading as well.  *See* Chevron's Reply St. 347-350. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|--------------------------|-------------------|------------------|
| | | | | | | previous Rule 56.1(b) responses (Dkt. 614) to St.167-169. *See also* St. 347-48, 351-55, *infra*. | |
| 241. | Beltman | 2008.02.26 | Beltman | Maest | Beltman sent an email to Stratus team, including Maest, regarding schedule for completion of work on the Cabrera Report, and attaching an outline of the report listing true authors of each portion and who the portions would be attributed to (generally Cabrera). Dkt. 32-20 (Ex. 164). | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that [o]in the present record ... the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Moreover, Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper. Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts. In fact, such contacts were common practice. Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. Similarly, Ecuadorian law permits experts to interact and coordinate with parties. Such coordination | Undisputed. Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.<br><br>Donziger's argument regarding whether the statement constitutes a predicate act is misleading and false. It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253-54 (S.D.N.Y. 1997). *See also U.S. v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000); Dkt. 745 at 35. Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report – and their work to author the Report themselves – were "of some independent value" to the scheme, and therefore material. Dkt. 745 at 35.<br><br>Donziger's assertions regarding the propriety of *ex parte* contacts in Ecuador are false and misleading as well. *See* Chevron's Reply St. 347-350. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|-------------------------|-------------------|-----------------|
| | | | | | | "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168. In fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, 75, 78, and 95, his previous Rule 56.1(b) responses (Dkt. 614) to St.167-169. *See also* St. 347-48, 351-55, *infra*. | |
| 242. | Beltman | 2008.02.27 | Beltman | Donziger | Beltman sent an email to Donziger stating "[a]ttached is my rough start of the Peritaje Global report," and asks whether it is "on track in terms of tone, language level, and content?" Dkt. 33-4 (Ex. 170) at 1. | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that loin the present record ... the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Moreover, the cited email string suggests only that Stratus drafted documents that Cabrera *adopted*. | Undisputed.  Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.<br><br>Donziger's argument regarding whether the statement constitutes a predicate act is misleading and false.  It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme.  *Madanes v. Madanes*, 981 F. Supp. 241, 253-54 (S.D.N.Y. 1997).  *See also U.S. v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000); Dkt. 745 at 35.  Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report – and their work to author the Report themselves – were "of some independent value" to the scheme, and |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|---|---|---|---|---|---|---|---|
| | | | | | | Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper. Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts. In fact, such contacts were common practice. Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. Similarly, Ecuadorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to `faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), 1 8; Dkt. 614, St. 168. In fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St.167-169. *See also* St. 347-48, 351-55, *infra*. | therefore material.  Dkt. 745 at 35.<br><br>Donziger's assertions regarding the propriety of *ex parte* contacts in Ecuador are false and misleading as well.  *See* Chevron's Reply St. 347-350. |
| 243. | Donziger | 2008.02.27 | Donziger | Beltman | Donziger responded to Beltman's email attaching "rough start of the Peritaje Global report" saying "I think it's working. Keep going." Dkt. 33-4 (Ex. 170) at 1. | Donziger does not dispute that he sent the cited email, but he disputes Chevron's unsupported legal conclusion that it constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission. Indeed, the Court has | Disputed.  Donziger's argument regarding whether the statement constitutes a predicate act is misleading and false.  It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme.  *Madanes v. Madanes*, 981 F. Supp. 241, 253-54 (S.D.N.Y. 1997).  *See also U.S. v. Autuori*, 212 F.3d 105, 115 (2d Cir. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
|  |  |  |  |  |  | already concluded, even without the bene-fit of any merits opposition, that loin the present record ... the ultimate materiality of the taint that indisputably has been es-tablished [as to the appointment of Cabre-ra and the Cabrera report] thus far re-mains a genuine issue." Dkt. 550, at 93. Moreover, the cited email string suggests only that Stratus drafted documents that Cabrera *adopted.* Donziger disputes Chevron's insinuation that the communi-cation with, and provision of materials to, Cabrera was improper. Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed ex-perts. In fact, such contacts were common practice. Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. Similarly, Ecua-dorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168. In fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168. Donziger incorporates his re-sponses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St.167-169. *See also* St. 347-48, 351-55, *infra.* | 2000); Dkt. 745 at 35.  Further, even if the materiality of the Cabrera Report were dis-puted (it is not), Defendants' deceptive omis-sions and lies about the Cabrera Report – and their work to author the Report themselves – were "of some independent value" to the scheme, and therefore material.  Dkt. 745 at 35.<br><br>Donziger's assertions regarding the propriety of *ex parte* contacts in Ecuador are false and misleading as well.  *See* Chevron's Reply St. 347-350. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|-----|-----|-----|
| 244. | Beltman | 2008.02.29 | Beltman | Maest | Beltman sent an email to Maest and another Stratus consultant listing annexes to cut from the final report in order to have it complete in time "given the turnaround time for translation and review." Dkt. 49-16 (Ex. 352) at 1. | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "on the present record ... the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Moreover, Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper. Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts. In fact, such contacts were common practice. Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. Similarly, Ecuadorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to `faithfully and legally' perform his duties. Dkt. 154-6 (Ex. 60),¶ 8; Dkt. | Undisputed. Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.<br><br>Donziger's argument regarding whether the statement constitutes a predicate act is misleading and false. It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253-54 (S.D.N.Y. 1997). *See also U.S. v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000); Dkt. 745 at 35. Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report – and their work to author the Report themselves – were "of some independent value" to the scheme, and therefore material. Dkt. 745 at 35.<br><br>Donziger's assertions regarding the propriety of *ex parte* contacts in Ecuador are false and misleading as well. *See* Chevron's Reply St. 347-350. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|---|---|---|---|---|---|---|---|
| | | | | | | 614, St. 168. In fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St.167-169. *See also* St. 347-48, 351-55, *infra.* | |
| 245. | Beltman | 2008.03.01 | Beltman | Michael Carney | Beltman sent an email to another Stratus consultant with comments concerning drafting of an ecorisk annex and considerations surrounding translations. He noted that it will be translated in Spanish and that the "main audience for this is the judge." Dkt. 49-17 (Ex. 353) at 1. | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record ... the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Moreover, Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper. Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed ex- | Undisputed.  Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him. Donziger's argument regarding whether the statement constitutes a predicate act is misleading and false.  It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme.  *Madanes v. Madanes*, 981 F. Supp. 241, 253-54 (S.D.N.Y. 1997).  *See also U.S. v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000); Dkt. 745 at 35.  Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report – and their work to author the Report themselves – were "of some independent value" to the scheme, and therefore material.  Dkt. 745 at 35. Donziger's assertions regarding the propriety |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|---|---|---|---|---|---|---|---|
| | | | | | | perts. In fact, such contacts were common practice. Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. Similarly, Ecuadorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168. In fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St.167-169. *See also* St. 347-48, 351-55, *infra*. | of *ex parte* contacts in Ecuador are false and misleading as well. *See* Chevron's Reply St. 347-350. |
| 246. | Beltman | 2008.03.05 | Beltman | Brian Lazar | Beltman sent an email to another Stratus consultant discussing edits to an annex concerning soil clean-up costs. Dkt. 49-18 (Ex. 354). | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that [on the present record ... the ultimate materiality of the taint that indisputably has been established [as to the appoint- | Undisputed.  Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.

Donziger's argument regarding whether the statement constitutes a predicate act is misleading and false.  It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253-54 (S.D.N.Y. 1997). *See also U.S. v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000); Dkt. 745 at 35.  Further, even if the materiali- |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|-----|-----|-----|
| | | | | | | ment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Moreover, Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper. Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts. In fact, such contacts were common practice. Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. Similarly, Ecuadorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168. In fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St.167-169. *See also* St. 347-48, 351-55, *infra*. | ty of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report – and their work to author the Report themselves – were "of some independent value" to the scheme, and therefore material. Dkt. 745 at 35.<br><br>Donziger's assertions regarding the propriety of *ex parte* contacts in Ecuador are false and misleading as well. *See* Chevron's Reply St. 347-350. |
| 247. | Selva Viva | 2008.03.05 | Kohn, Swift & Graf, P.C. | Selva Viva | Payment via wire transfer of $40,000.00. Ex. 32-18 (Ex. 162). | This alleged wire transfer is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this alleged wire transfer constitutes a predicate | Undisputed. Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.<br><br>Donziger's responses do not dispute that the transfers of funds were in furtherance of unlawful activity. Further, the facts described |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | | | | | | act of wire fraud and/or money laundering against anyone. For example, Chevron has not made any showing of criminal intent or materiality. Chevron also has not demonstrated that this alleged transfer was in furtherance of any unlawful activity or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A). | constitute the transmission of funds from or to the United States, "with the intent to promote the carrying on of specified unlawful activity." 18 U.S.C. § 1956(a)(2)(A). It is well-settled that intent may be shown by proving "facts showing a motive for committing fraud and a clear opportunity for doing so," or by identifying strong circumstantial evidence of conscious behavior. *Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987), *cert. denied,* 484 U.S. 1005 (1988), *overruled on other grounds, United States v. Indelicato,* 865 F.2d 1370 (2d Cir. 1989) (en banc). The statute reaches wire transfers, and there is no requirement that the source of the funds be unlawful. *U.S. v. Piervinanzi*, 23 F.3d 670, 678–79 (2d Cir. 1994).<br><br>Defendants' assertion that the statute imposes a requirement that funds be transferred "from the United States to a place outside the United States" is false. The statute, 18 U.S.C. § 1956(a)(2) provides: "Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States *or to a place in the United States from or through a place outside the United States*" (emphasis added). The statute thus applies equally to transfers to the United States from places outside the United States and encom- |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | | | | | | | passes the transaction at issue here. |
| 248. | Beltman | 2008.03.07 | Beltman | Translating Spanish, Inc. | Beltman sent an email to Translating Spanish, Inc. concerning translation of attached "ecosystem value" annex from English to Spanish, and discussing progress of translation of other annexes such as "Environmental standards, Pit (plus) cleanup costs, [and] value of human life losses." Dkt. 49-19 (Ex. 355) at 1. | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that loin the present record ... the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Moreover, Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper. Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts. In fact, such contacts were common practice. Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. Similarly, Ecuadorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to `faithfully and legally' perform | Undisputed. Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.

Donziger's argument regarding whether the statement constitutes a predicate act is misleading and false. It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253-54 (S.D.N.Y. 1997). *See also U.S. v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000); Dkt. 745 at 35. Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report – and their work to author the Report themselves – were "of some independent value" to the scheme, and therefore material. Dkt. 745 at 35.

Donziger's assertions regarding the propriety of *ex parte* contacts in Ecuador are false and misleading as well. *See* Chevron's Reply St. 347-350. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|------------------|
| | | | | | | his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168. In fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St.167-169. *See also* St. 347-48, 351-55, *infra*. | |
| 249. | Beltman | 2008.03.07 | Beltman | Translating Spanish, Inc. | Beltman sent an email to Translating Spanish, Inc. concerning translation of attached annexes concerning environmental standards and soil remediation. Dkt. 34-5 (Ex. 180). | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that loin the present record ... the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Moreover, Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper. Ecuadorian law did not prohibit parties to a lawsuit from | Undisputed. Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.<br><br>Donziger's argument regarding whether the statement constitutes a predicate act is misleading and false. It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253-54 (S.D.N.Y. 1997). *See also U.S. v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000); Dkt. 745 at 35. Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report – and their work to author the Report themselves – were "of some independent value" to the scheme, and therefore material. Dkt. 745 at 35. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|---|---|---|---|---|---|---|---|
| | | | | | | making contact with court-appointed experts. In fact, such contacts were common practice. Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. Similarly, Ecuadorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to `faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168. In fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St.167-169. *See also* St. 347-48, 351-55, *infra.* | Donziger's assertions regarding the propriety of *ex parte* contacts in Ecuador are false and misleading as well. *See* Chevron's Reply St. 347-350. |
| 250. | Beltman | 2008.03.10 | Beltman | Maest | Beltman sent an email to Maest and other Stratus consultants concerning review, analysis, and translation of annexes to Cabrera Report including "environmental standards, eco impacts from contamination, pit cleanup costs, value of human life losses, habitat losses, [and] TexPet remediation." Dkt. 32-21 (Ex. 165) at 1. | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record ... the ultimate materiality of the taint that indisput- | Undisputed.  Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him. Donziger's argument regarding whether the statement constitutes a predicate act is misleading and false.  It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme.  *Madanes v. Madanes*, 981 F. Supp. 241, 253-54 (S.D.N.Y. 1997).  *See also U.S. v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000); |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|---|---|---|---|---|---|---|---|
| | | | | | | ably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Moreover, Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper. Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts. In fact, such contacts were common practice. Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. Similarly, Ecuadorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168. In fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St.167-169. *See also* St. 347-48, 351-55, *infra.* | Dkt. 745 at 35.  Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report – and their work to author the Report themselves – were "of some independent value" to the scheme, and therefore material.  Dkt. 745 at 35.<br><br>Donziger's assertions regarding the propriety of *ex parte* contacts in Ecuador are false and misleading as well.  *See* Chevron's Reply St. 347-350. |
| 251. | Beltman | 2008.03.10 | Beltman | Maest | Beltman sent an email to Maest asking for help with drafting the main Cabrera Report "now that the annexes [were] out of the way." Dkt. 33-3 (Ex. 169) at 1. | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email | Undisputed.  Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.<br><br>Donziger's argument regarding whether the statement constitutes a predicate act is mis- |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|----|--------------------------|-------------------|-----------------|
|     |           |      |      |    |                          | constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that loin the present record ... the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Moreover, Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper. Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts. In fact, such contacts were common practice. Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. Similarly, Ecuadorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168. In fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St.167-169. *See also* St. 347-48, | leading and false. It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253-54 (S.D.N.Y. 1997). *See also U.S. v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000); Dkt. 745 at 35. Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report – and their work to author the Report themselves – were "of some independent value" to the scheme, and therefore material. Dkt. 745 at 35. Donziger's assertions regarding the propriety of *ex parte* contacts in Ecuador are false and misleading as well. *See* Chevron's Reply St. 347-350. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|-------------------------|-------------------|-----------------|
| | | | | | | 351-55, *infra*. | |
| 252. | Beltman | 2008.03.10 | Beltman | Donziger | Beltman sent an email to Donziger discussing status of translations of annexes, asking Donziger to make any changes in redline, and stating that with the annexes mostly out of the way, he would now "get back to the [Cabrera] report." Dkt. 49-20 (Ex. 356) at 1. | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that loin the present record ... the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Moreover, Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper. Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts. In fact, such contacts were common practice. Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. Similarly, Ecuadorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to `faithfully and legally' perform | Undisputed. Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.<br><br>Donziger's argument regarding whether the statement constitutes a predicate act is misleading and false. It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253-54 (S.D.N.Y. 1997). *See also U.S. v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000); Dkt. 745 at 35. Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report – and their work to author the Report themselves – were "of some independent value" to the scheme, and therefore material. Dkt. 745 at 35.<br><br>Donziger's assertions regarding the propriety of *ex parte* contacts in Ecuador are false and misleading as well. *See* Chevron's Reply St. 347-350. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|-------------------------|-------------------|-----------------|
| | | | | | | his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168. In fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St.167-169. *See also* St. 347-48, 351-55, *infra*. | |
| 253. | Beltman | 2008.03.11 | Beltman | Donziger | Beltman sent an email to Donziger attaching an outline of the Cabrera report which included a listing of who would write each section of the report, and who each section would be attributed to, which was not the actual authors. Dkt. 32-2the (Ex. 147). | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Indeed, Court has already concluded, even without the benefit of any merits opposition, that loin the present record ... the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Moreover, Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper. Ecuadorian law did not prohibit parties to a lawsuit from | Undisputed.  Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.<br><br>Donziger's argument regarding whether the statement constitutes a predicate act is misleading and false.  It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme.  *Madanes v. Madanes*, 981 F. Supp. 241, 253-54 (S.D.N.Y. 1997).  *See also U.S. v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000); Dkt. 745 at 35.  Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report – and their work to author the Report themselves – were "of some independent value" to the scheme, and therefore material.  Dkt. 745 at 35. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | | | | | | making contact with court-appointed experts. In fact, such contacts were common practice. Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. Similarly, Ecuadorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to `faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168. In fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St.167-169. *See also* St. 347-48, 351-55, *infra.* | Donziger's assertions regarding the propriety of *ex parte* contacts in Ecuador are false and misleading as well. *See* Chevron's Reply St. 347-350. |
| 254. | Maest | 2008.03.11 | Maest | Beltman | Maest sent an email to Beltman stating she could help Beltman draft the main Cabrera Report. Dkt. 33-3 (Ex. 169). | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that loin the present record ... the ultimate materiality of the taint that indisputably | Undisputed.  Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.

Donziger's argument regarding whether the statement constitutes a predicate act is misleading and false.  It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253-54 (S.D.N.Y. 1997). *See also U.S. v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000); |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|----|-----------------------|-------------------|-----------------|
| | | | | | | has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Moreover, Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper. Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts. In fact, such contacts were common practice. Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. Similarly, Ecuadorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168. In fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St.167-169. *See also* St. 347-48, 351-55, *infra*. | Dkt. 745 at 35. Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report – and their work to author the Report themselves – were "of some independent value" to the scheme, and therefore material. Dkt. 745 at 35.<br><br>Donziger's assertions regarding the propriety of *ex parte* contacts in Ecuador are false and misleading as well. *See* Chevron's Reply St. 347-350. |
| 255. | Beltman | 2008.03.12 | Beltman | Translating Spanish, Inc. | Beltman sent an email to Translating Spanish, Inc. attaching "the main report," written in English, and stating it was a high priority to be translated into Spanish | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email | Undisputed. Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.<br><br>Donziger's argument regarding whether the statement constitutes a predicate act is mis- |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|--------------------------|-------------------|-----------------|
| | | | | | because it needed to be filed soon with the court in Ecuador. The attached report stated that it was written by Richard Cabrera, although it was actually prepared by Beltman and other Stratus consultants. Dkt. 33-10 (Ex. 176). | constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that [o]n the present record ... the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Moreover, Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper. Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts. In fact, such contacts were common practice. Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. Similarly, Ecuadorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168. In fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St.167-169. *See also* St. 347-48, | leading and false. It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253-54 (S.D.N.Y. 1997). *See also U.S. v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000); Dkt. 745 at 35. Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report – and their work to author the Report themselves – were "of some independent value" to the scheme, and therefore material. Dkt. 745 at 35.<br><br>Donziger's assertions regarding the propriety of *ex parte* contacts in Ecuador are false and misleading as well. *See* Chevron's Reply St. 347-350. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|---|---|---|---|---|---|---|---|
| | | | | | | 351-55, *infra*. | |
| 256. | Beltman | 2008.03.13 | Beltman | Donziger | Beltman sent an email to Donziger listing what he had sent so far including the "main report" and "annexes." He notes that the main report still needs to be translated, and "a native Spanish speaker" will need to read the translations "to make sure they make sense." Dkt. 49-22 (Ex. 358) at 2. | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that loin the present record ... the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Moreover, the cited email suggests only that Stratus drafted documents that Cabrera *adopted*. Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper. Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts. In fact, such contacts were common practice. Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. Similarly, Ecuadorian law permits experts to interact and coordinate with parties. Such coordination | Undisputed. Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.<br><br>Donziger's argument regarding whether the statement constitutes a predicate act is misleading and false. It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253-54 (S.D.N.Y. 1997). *See also U.S. v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000); Dkt. 745 at 35. Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report – and their work to author the Report themselves – were "of some independent value" to the scheme, and therefore material. Dkt. 745 at 35.<br><br>Donziger's assertions regarding the propriety of *ex parte* contacts in Ecuador are false and misleading as well. *See* Chevron's Reply St. 347-350. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|----|-----|-----|-----|
| | | | | | | "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60),9] 8; Dkt. 614, St. 168. In fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St.167-169. *See also* St. 347-48, 351-55, *infra*. | |
| 257. | Beltman | 2008.03.18 | Beltman | Stratus | Beltman sent an email to other Stratus consultants regarding the "unjust enrichment annex" and attaching copies in Spanish and English. He asks the consultants to fill in the tables in both versions and send back to him as soon as possible. Dkt. 49-23 (Ex. 359). | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that loin the present record ... the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Moreover, Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, | Undisputed. Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.<br><br>Donziger's argument regarding whether the statement constitutes a predicate act is misleading and false. It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253-54 (S.D.N.Y. 1997). *See also U.S. v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000); Dkt. 745 at 35. Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report – and their work to author the Report themselves – were "of some independent value" to the scheme, and |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|---|---|---|---|---|---|---|---|
| | | | | | | Cabrera was improper. Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts. In fact, such contacts were common practice. Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. Similarly, Ecuadorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to `faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168. In fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St.167-169. *See also* St. 347-48, 351-55, *infra*. | therefore material.  Dkt. 745 at 35.<br><br>Donziger's assertions regarding the propriety of *ex parte* contacts in Ecuador are false and misleading as well.  *See* Chevron's Reply St. 347-350. |
| 258. | Donziger | 2008.03.18 | Donziger, Amazon Watch | Chairman of the United States Securities and Exchange Commission | Amazon Watch sent a letter to the SEC seeking investigation and sanction of Chevron for alleged failure to comply with securities regulations, emphasizing the forthcoming Cabrera Report, and the independence of its purported author, "an independent special master" that had prepared his report "mak[ing] use of all evidence collected" | Disputed. Donziger disputes that the cited letter is "from" Donziger; on its face, the letter only identifies Amazon Watch as the author. Donziger also disputes Chevron's unsupported legal conclusion that this letter constitutes any predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this letter (which is not from Donziger) was incident to or in furtherance of any material misrepre- | Undisputed.  Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.<br><br>Donziger's argument regarding whether the statement constitutes a predicate act is misleading and false.  It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|-------------------------|-------------------|-----------------|
| | | | | | with "a large team of technical experts under [his] supervision." Dkt. 47-28 (Ex. 267). | sentation or omission. Donziger also disputes Chevron's inaccurate description, particularly to the extent it insinuates that the Ecuadorian Plaintiffs' interaction with, and provision of materials, to Cabrera was improper, or that it deprived Cabrera of his professional independence. Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts. In fact, such contacts were common practice. Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. Similarly, Ecuadorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168. In fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St. 167-169. *See also* St. 347-48, 351-55, *infra*. | 241, 253-54 (S.D.N.Y. 1997). *See also U.S. v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000); Dkt. 745 at 35. Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about Cabrera's independence and their attempts to leverage the fraudulent Cabrera Report to extort Chevron were "of some independent value" to the scheme, and therefore material. Dkt. 745 at 35. <br><br> Donziger's assertions regarding the propriety of *ex parte* contacts in Ecuador are false and misleading as well. *See* Chevron's Reply St. 347-350. |
| 259. | Beltman | 2008.03.20 | Beltman | William Powers | Beltman sent an email to Powers asking for "the status of the report" and noting that "we need to submit everything to the court on Monday (!!!)" Dkt. 49-24 (Ex. 360) at | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email | Undisputed. Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him. <br><br> Donziger's argument regarding whether the statement constitutes a predicate act is mis- |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|--------------------------|-------------------|------------------|
| | | | | | 1. | constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that loin the present record ... the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Moreover, Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper. Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts. In fact, such contacts were common practice. Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. Similarly, Ecuadorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to `faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168. In fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St.167-169. *See also* St. 347-48, | leading and false.  It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme.  *Madanes v. Madanes*, 981 F. Supp. 241, 253-54 (S.D.N.Y. 1997).  *See also U.S. v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000); Dkt. 745 at 35.  Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report – and their work to author the Report themselves – were "of some independent value" to the scheme, and therefore material.  Dkt. 745 at 35.<br><br>Donziger's assertions regarding the propriety of *ex parte* contacts in Ecuador are false and misleading as well.  *See* Chevron's Reply St. 347-350. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|-------------------------|-------------------|-----------------|
| | | | | | | 351-55, *infra*. | |
| 260. | Maest | 2008.03.20 | Maest | Beltman | Maest sent an email to **Beltman,** attaching annex regarding soil remediation with her comments. Dkt. 49-25 (Ex. 361). | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that loin the present record ... the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Moreover, Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper.  Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts. In fact, such contacts were common practice. Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. Similarly, Ecuadorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to `faithfully and legally' perform | Undisputed.  Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him. Donziger's argument regarding whether the statement constitutes a predicate act is misleading and false.  It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253-54 (S.D.N.Y. 1997). *See also U.S. v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000); Dkt. 745 at 35.  Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report – and their work to author the Report themselves – were "of some independent value" to the scheme, and therefore material.  Dkt. 745 at 35. Donziger's assertions regarding the propriety of *ex parte* contacts in Ecuador are false and misleading as well.  *See* Chevron's Reply St. 347-350. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | | | | | | his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168. In fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St. 167-169. *See also* St. 347-48, 351-55, *infra.* | |
| 261. | Beltman | 2008.03.21 | Beltman | Brian Lazar | Beltman sent an email to another Stratus consultant concerning an annex regarding soil remediation. Dkt. 49-26 (Ex. 362). | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that [o]in the present record ... the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Moreover, Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper. Ecuadorian law did not prohibit parties to a lawsuit from | Undisputed. Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.<br><br>Donziger's argument regarding whether the statement constitutes a predicate act is misleading and false. It is well-established that the wire communications themselves need not be fraudulent, and communications organizing and managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori*, 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35. Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report – and their work to author the Report themselves – were "of some independent value" to the scheme, and therefore material. Dkt. 745 at 35. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|----|--------------------------|-------------------|-----------------|
| | | | | | | making contact with court-appointed experts. In fact, such contacts were common practice. Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. Similarly, Ecuadorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to `faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168. In fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St. 167-169. *See also* St. 347-48, 351-55, *infra*. | Donziger's assertions regarding the propriety of *ex parte* contacts in Ecuador are false and misleading as well.  *See* Reply St. 347–350. |
| 262. | Beltman | 2008.03.23 | Beltman | Donziger | Beltman sent an email to Donziger regarding whether Fajardo and Yanza received Powers' report. He notes that they need to format it and take Powers name off, "but they can figure that out." Dkt. 34-7 (Ex. 182) at 1. | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that loin the present record … the ultimate materiality of the taint that indisputably | Undisputed.  Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.

Donziger's argument regarding whether the statement constitutes a predicate act is misleading and false.  It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme.  *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori*, 212 F.3d 105, 115–18 (2d Cir. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | | | | | | has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Moreover, the cited email suggests only that Stratus drafted documents that Cabrera *adopted*. Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper. Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts. In fact, such contacts were common practice. Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. Similarly, Ecuadorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168. In fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St. 167-169. *See also* St. 347-48, 351-55, *infra*. | 2000); Dkt. 745 at 35. Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report – and their work to author the Report themselves – were "of some independent value" to the scheme, and therefore material. Dkt. 745 at 35.<br><br>Donziger's assertions regarding the propriety of *ex parte* contacts in Ecuador are false and misleading as well. *See* Reply St. 347–350. |
| 263. | Beltman | 2008.03.24 | Beltman | David Chapman | Beltman sent an email to other Stratus consultants discussing the validity of survey collected data used for the | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any | Undisputed.  Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
|  |  |  |  |  | Cabrera Report. Dkt. 49-28 (Ex. 364). | event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that loin the present record ... the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Moreover, Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper. Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts. In fact, such contacts were common practice. Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. Similarly, Ecuadorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to `faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168. In fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, 75, 78, and 95, and his | Donziger's argument regarding whether the statement constitutes a predicate act is misleading and false.  It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme.  *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori*, 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35.  Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report – and their work to author the Report themselves – were "of some independent value" to the scheme, and therefore material.  Dkt. 745 at 35.<br><br>Donziger's assertions regarding the propriety of *ex parte* contacts in Ecuador are false and misleading as well.  *See* Reply St. 347–350. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|-------------------------|-------------------|-----------------|
| | | | | | | previous Rule 56.1(b) responses (Dkt. 614) to St. 167-169. *See also* St. 347-48, 351-55, *infra.* | |
| 264. | Beltman | 2008.03.25 | Beltman | Donziger | Beltman emailed Ecuadorian counsel and Donziger revisions to the Cabrera Report less than one week before it was filed. Dkt. 53-61egal (Ex. 406). | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that loin the present record ... the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Moreover, the cited email suggests only that Stratus drafted documents that Cabrera *adopted.* Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper. Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts. In fact, such contacts were common practice. Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. Similarly, Ecua- | Undisputed. Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him. <br><br> Donziger's argument regarding whether the statement constitutes a predicate act is misleading and false. It is well-established that the wire communications themselves need not be fraudulent, and communications organizing and managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori*, 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35.  Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report – and their work to author the Report themselves – were "of some independent value" to the scheme, and therefore material.  Dkt. 745 at 35. <br><br> Donziger's assertions regarding the propriety of *ex parte* contacts in Ecuador are false and misleading as well.  *See* Reply St. 347–350. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | | | | | | dorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168. In fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St. 167-169. *See also* St. 347-48, 351-55, *infra*. | |
| 265. | Stratus | 2008.03.27 | Jennifer Peers | Fajardo | A Stratus consultant, Peers, sent an email to Fajardo regarding updated language for annex regarding ecological impacts of contamination. Dkt. 49-29 (Ex. 365). | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record ... the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Moreover, Donziger disputes | Undisputed. Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.<br><br>Donziger's argument regarding whether the statement constitutes a predicate act is misleading and false. It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori*, 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35. Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report – and |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | | | | | | Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper. Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts. In fact, such contacts were common practice. Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. Similarly, Ecuadorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168. In fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St. 167-169. *See also* St. 347-48, 351-55, *infra*. | their work to author the Report themselves – were "of some independent value" to the scheme, and therefore material. Dkt. 745 at 35.  Donziger's assertions regarding the propriety of *ex parte* contacts in Ecuador are false and misleading as well. *See* Reply St. 347–350. |
| 266. | Fajardo | 2008.03.27 | Fajardo | Peers | Fajardo responded to Peers' email regarding updated language, stating that it was too late to make changes. Dkt. 49-29 (Ex. 365). | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Indeed, the | Undisputed. Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.  Donziger's argument regarding whether the statement constitutes a predicate act is misleading and false. It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | | | | | | Court has already concluded, even with-out the benefit of any merits opposition, that loin the present record ... the ultimate materiality of the taint that indisputably has been established [as to the appoint-ment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Moreover, Donziger disputes Chevron's insinuation that the communi-cation with, and provision of materials to, Cabrera was improper. Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed ex-perts. In fact, such contacts were common practice. Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. Similarly, Ecua-dorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to `faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168. In fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168. Donziger incorporates his re-sponses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St. 167-169. *See also* St. 347-48, 351-55, *infra*. | made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997);  *see also U.S. v. Autuori*, 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35.  Further, even if the materiality of the Cabrera Report were dis-puted (it is not), Defendants' deceptive omis-sions and lies about the Cabrera Report – and their work to author the Report themselves – were "of some independent value" to the scheme, and therefore material.  Dkt. 745 at 35.<br><br>Donziger's assertions regarding the propriety of *ex parte* contacts in Ecuador are false and misleading as well.  *See* Reply St. 347–350. |
| 267. | Fajardo, Amazon De- | 2008.04.03 | Fajardo, Amazon Watch, Amazon | n/a | In a press release issued by Amazon Watch and the | This email is not material, and no re-sponse from Donziger is required, be- | Undisputed.  Donziger is liable for the acts of his agents and co-conspirators, which may be |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | fense Front | | Defense Front | | Front, Fajardo made knowingly false statements about Cabrera's independence. He stated, "Chevron's claim that Professor Cabrera is cooperating with the plaintiffs is completely false," and that "Chevron is frightened by Cabrera precisely because he is an independent and credible expert." Dkt. 47-13 (Ex. 252) at 2. | cause Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. For instance, Chevron has not established criminal intent or materiality. Donziger incorporates his response to St. 52. | asserted as predicate acts against him.<br><br>Donziger's argument regarding whether the statement constitutes a predicate act is misleading and false.  It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori*, 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35.  Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about Cabrera's independence were "of some independent value" to the scheme, and therefore material.  Dkt. 745 at 35. |
| 268. | Selva Viva | 2008.04.11 | Kohn, Swift & Graf, P.C. | Selva Viva | Payment via wire transfer of $70,000.00. Ex. 32-18 (Ex. 162). | This alleged wire transfer is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this alleged wire transfer constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not made any showing of criminal intent or materiality. Chevron also has not demonstrated that this alleged transfer | Undisputed.  Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.<br><br>Donziger's responses do not dispute that the transfers of funds were in furtherance of unlawful activity.  Further, the facts described constitute the transmission of funds from or to the United States, "with the intent to promote the carrying on of specified unlawful activity."  18 U.S.C. § 1956(a)(2)(A).  It is well-settled that intent may be shown by proving |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|---|---|---|---|---|---|---|---|
| | | | | | | was in furtherance of any unlawful activity or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A). | "facts showing a motive for committing fraud and a clear opportunity for doing so," or by identifying strong circumstantial evidence of conscious behavior. *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987), *overruled en banc on other grounds by U.S. v. Indelicato,* 865 F.2d 1370, 1378 (2d Cir. 1989). The statute reaches wire transfers, and there is no requirement that the source of the funds be unlawful. *See U.S. v. Piervinanzi*, 23 F.3d 670, 678–79 (2d Cir. 1994). <br><br> Defendants' assertion that the statute imposes a requirement that funds be transferred "from the United States to a place outside the United States" is false. The statute, 18 U.S.C. § 1956(a)(2), provides: "Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States *or to a place in the United States from or through a place outside the United States*" (emphasis added). The statute thus applies equally to transfers to the United States from places outside the United States and encompasses the transaction at issue here. |
| 269. | Yanza, Fajardo | 2008.04.29 | Yanza, Fajardo | United States Trade Representative Susan Schwab | Yanza and Fajardo sent a letter to a United States Trade Representative misstating that Cabrera was "an | This communication is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any | Undisputed. Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | | | | | independent court-appointed special master" and misstating that "the bulk of the evidence relied on [by Cabrera] was provided by Chevron itself via its own sampling evidence." Dkt. 47-29 (Ex. 268) at 5. | event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. For instance, Chevron has not established criminal intent or materiality. Donziger also incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St.167-169. Donziger incorporates his response to St. 52. | Donziger's argument regarding whether the statement constitutes a predicate act is misleading and false.  It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme.  *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori*, 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35.  Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about Cabrera's independence were "of some independent value" to the scheme, and therefore material.  Dkt. 745 at 35. |
| 270. | Selva Viva | 2008.05.05 | Kohn, Swift & Graf, P.C. | Selva Viva | Payment via wire transfer of $35,000.00. Ex. 32-18 (Ex. 162). | This alleged wire transfer is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this alleged wire transfer constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not made any showing of criminal intent or materiality. Chevron also has not demonstrated that this alleged transfer was in furtherance of any unlawful activi- | Undisputed.  Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.  Donziger's responses do not dispute that the transfers of funds were in furtherance of unlawful activity.  Further, the facts described constitute the transmission of funds from or to the United States, "with the intent to promote the carrying on of specified unlawful activity." 18 U.S.C. § 1956(a)(2)(A).  It is well-settled that intent may be shown by proving "facts showing a motive for committing fraud |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|------------------|
| | | | | | | ty or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A). | and a clear opportunity for doing so," or by identifying strong circumstantial evidence of conscious behavior. *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987)), *overruled en banc on other grounds by U.S. v. Indelicato*, 865 F.2d 1370, 1378 (2d Cir. 1989). The statute reaches wire transfers, and there is no requirement that the source of the funds be unlawful. *See U.S. v. Piervinanzi*, 23 F.3d 670, 678–79 (2d Cir. 1994).<br><br>Defendants' assertion that the statute imposes a requirement that funds be transferred "from the United States to a place outside the United States" is false. The statute, 18 U.S.C. § 1956(a)(2), provides: "Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States *or to a place in the United States from or through a place outside the United States*" (emphasis added). The statute thus applies equally to transfers to the United States from places outside the United States and encompasses the transaction at issue here. |
| 271. | Beltman | 2008.05.14 | Beltman | Donziger | Beltman sent an email to Donziger stating that "Karen [Hinton] wants to give the Clapp report to a reporter, but we can't do that since it's | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's un- | Undisputed. Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.<br><br>Donziger's argument regarding whether the |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|---|---|---|---|---|---|---|---|
| | | | | | an Annex. I'll tell her not to because I'm not sure of the report pedigree, but we need to be careful about this." Dkt. 33-8 (Ex. 174) at 1. | supported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that [o]n the present record ... the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Donziger incorporates his response to St. 135-37. | statement constitutes a predicate act is misleading and false. It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori*, 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35.  Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the authorship of the Cabrera Report were "of some independent value" to the scheme, and therefore material. Dkt. 745 at 35. |
| 272. | Beltman | 2008.05.14 | Beltman | Karen Hinton | Beltman sent an email to Hinton explaining that she could not give out copies of a report by Clapp to reporters, falsely claiming he was "not sure of its pedigree" and failing to disclose that the true reason was that the report was used as an annex to the Cabrera Report. Dkt. 34-12 (Ex. 187). | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that [o]n the present record ... the ultimate materiality of the taint that indisputably has been established [as to the appoint- | Undisputed.  Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.<br><br>Donziger's argument regarding whether the statement constitutes a predicate act is misleading and false. It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori*, 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35.  Further, even if the |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|---|---|---|---|---|---|---|---|
| | | | | | | ment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Donziger incorporates his response to St. 135-37. | materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the authorship of the Cabrera Report were "of some independent value" to the scheme, and therefore material. Dkt. 745 at 35. |
| 273. | Amazon Defense Front | 2008.05.21 | Amazon Watch, Amazon Defense Front | n/a | Amazon Watch and the Amazon Defense Front authored a press release falsely stating that Cabrera was independent and misleadingly omitting the RICO Defendants' and their co-conspirators' role in writing his report: "A recent court-ordered report, written by an independent expert, has proposed that Chevron pay a minimum of $7 billion and up to $16 billion to compensate for environmental contamination." Dkt. 49-30 (Ex. 366) at 1. | This document is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this document constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Moreover, Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper. Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts. In fact, such contacts were common practice. Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. Similarly, Ecuadorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), 1 8; Dkt. 614, St. 168. In fact, it was understood in Ecuador that | Undisputed. Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.

Donziger's argument regarding whether the statement constitutes a predicate act is misleading and false. It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori*, 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35. Defendants' deceptive omissions and misrepresentations about Cabrera's independence were "of some independent value" to the scheme, and therefore material. Dkt. 745 at 35.

Donziger's assertions regarding the propriety of *ex parte* contacts in Ecuador are false and misleading as well. *See* Reply St. 347–350. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | | | | | | court appointed experts could rely on par-ty resources. Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St. 167-169. *See also* St. 347-48, 351-55, *infra.* | |
| 274. | Selva Viva | 2008.06.09 | Kohn, Swift & Graf, P.C. | Selva Viva | Payment via wire transfer of $30,000.00. Ex. 32-18 (Ex.162). | This alleged wire transfer is not material, and no response from Donziger is re-quired, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this al-leged wire transfer constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not made any showing of criminal intent or materiality. Chevron also has not demonstrated that this alleged transfer was in furtherance of any unlawful activi-ty or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A). | Undisputed.  Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him. Donziger's responses do not dispute that the transfers of funds were in furtherance of un-lawful activity.  Further, the facts described constitute the transmission of funds from or to the United States, "with the intent to promote the carrying on of specified unlawful activi-ty."  18 U.S.C. § 1956(a)(2)(A).  It is well-settled that intent may be shown by proving "facts showing a motive for committing fraud and a clear opportunity for doing so," or by identifying strong circumstantial evidence of conscious behavior.  *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987), *overruled en banc on other grounds by U.S. v. Indelicato,* 865 F.2d 1370, 1378 (2d Cir. 1989).  The statute reaches wire transfers, and there is no requirement that the source of the funds be unlawful.  *U.S. v. Piervinanzi*, 23 F.3d 670, 678–79 (2d Cir. 1994). Defendants' assertion that the statute imposes |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|-------------------------|-------------------|-----------------|
| | | | | | | | a requirement that funds be transferred "from the United States to a place outside the United States" is false.  The statute, 18 U.S.C. § 1956(a)(2), provides: "Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States *or to a place in the United States from or through a place outside the United States*" (emphasis added).  The statute thus applies equally to transfers to the United States from places outside the United States and encompasses the transaction at issue here. |
| 275. | Beltman, Stratus | 2008.06.12 | Beltman, Chapman, David Mills | Steve Hampton, California Department of Fish and Game, Office of Spill Prevention and Response | A Stratus consultant sent an email on behalf of himself, Beltman, Chapman, and others at Stratus, asking Hampton to consider reviewing and endorsing the Cabrera Report. The email fails to disclose Stratus and the other the RICO Defendants' and their co-conspirators' role in ghostwriting the report. Dkt. 34-27 (Ex. 202). | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that loin the present record ... the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. | Undisputed.  Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.

Donziger's argument regarding whether the statement constitutes a predicate act is misleading and false.  It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme.  *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori*, 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35.  Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omis- |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|---|---|---|---|---|---|---|---|
| | | | | | | 550, at 93. Donziger also disputes Chevron's use of the word "ghostwriting" and its insinuation that the communication with, and provision of materials to, Cabrera was improper. Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts. In fact, such contacts were common practice. Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. Similarly, Ecuadorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168. In fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St. 167-169. *See also* St. 347-48, 351-55, *infra*. | sions and lies about the authorship of the Cabrera Report were "of some independent value" to the scheme, and therefore material. Dkt. 745 at 35.<br><br>Donziger's assertions regarding the propriety of *ex parte* contacts in Ecuador are false and misleading as well. *See* Reply St. 347–350. |
| 276. | Beltman | 2008.06.26 | Beltman | Amazon Watch | Beltman sent an email to Amazon Watch stating that Stratus was working on assembling a team of "well-credentialed experts" to review Cabrera's report and provide support to be shared with the Lago Agrio court | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. | Undisputed. Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.<br><br>Donziger's argument regarding whether the statement constitutes a predicate act is misleading and false. It is well-established that the wire communications themselves need not |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|---|---|---|---|---|---|---|---|
| | | | | | and the media. Dkt. 34-25 (Ex. 200). | For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that [o]in the present record ... the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. | be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori*, 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35.  Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report's true authorship  Cabrera's independence were "of some independent value" to the scheme, and therefore material.  Dkt. 745 at 35. |
| 277. | Donziger | 2008.06.26 | Donziger | Fajardo, Yanza | Donziger sent an email urging people to "think again and think outside the box of the law if necessary. Think politics, law, or a combination . . . ..If the law is in the way, then tell me how to change the law. If an executive order can help, then tell me how. If the new Constitution can help, tell me how." Dkt. 49-31 (Ex. 367) at 1. | Donziger does not dispute that he sent the cited email, but he disputes Chevron's unsupported legal conclusion that it constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission. Moreover, Chevron's selective and incomplete quotation of this email is misleading. In particular, Chevron's selective quotation could create the false impression that Donziger's suggestion to "think outside the box" was in furtherance of unlawful conduct, when Chevron has not made any such showing. Rather, Donziger's stated concern was to | Undisputed.  Donziger's argument regarding whether the statement constitutes a predicate act is misleading and false.  It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000); Dkt. 745 at 35.  Donziger's statements about the manipulation of political figures and legal regimes were "of some independent value" to the scheme, and therefore material.  Dkt. 745 at 35. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|-------------------------|-------------------|-----------------|
| | | | | | | "dig deeper on the finality issue" because "if we cannot deliver finality to Chevron then they are not going to pay a settlement and lots of people will suffer over the next several years as a result." | |
| 278. | Selva Viva | 2008.07.02 | Kohn, Swift & Graf, P.C. | Selva Viva | Payment via wire transfer of $30,000.00. Ex. 32-18 (Ex. 162). | This alleged wire transfer is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this alleged wire transfer constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not made any showing of criminal intent or materiality. Chevron also has not demonstrated that this alleged transfer was in furtherance of any unlawful activity or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A). | Undisputed. Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him. Donziger's responses do not dispute that the transfers of funds were in furtherance of unlawful activity. Further, the facts described constitute the transmission of funds from or to the United States, "with the intent to promote the carrying on of specified unlawful activity." 18 U.S.C. § 1956(a)(2)(A). It is well-settled that intent may be shown by proving "facts showing a motive for committing fraud and a clear opportunity for doing so," or by identifying strong circumstantial evidence of conscious behavior. *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987), *overruled en banc on other grounds by U.S. v. Indelicato,* 865 F.2d 1370, 1378 (2d Cir. 1989). The statute reaches wire transfers, and there is no requirement that the source of the funds be unlawful. *See U.S. v. Piervinanzi*, 23 F.3d 670, 678–79 (2d Cir. 1994). Defendants' assertion that the statute imposes a requirement that funds be transferred "from |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | | | | | | | the United States to a place outside the United States" is false. The statute, 18 U.S.C. § 1956(a)(2), provides: "Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States *or to a place in the United States from or through a place outside the United States*" (emphasis added). The statute thus applies equally to transfers to the United States from places outside the United States and encompasses the transaction at issue here. |
| 279. | Beltman | 2008.07.28 | Beltman | Brian Lazar | Beltman sent an email to another Stratus consultant asking for help editing Stratus's original English versions of annexes to the Cabrera report so that they appear to be translations of the Spanish version of the Cabrera report. Dkt. 33-9 (Ex. 175). | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that loin the present record ... the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Moreover, Donziger disputes | Undisputed. Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.<br><br>Donziger's argument regarding whether the statement constitutes a predicate act is misleading and false. It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori*, 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35. Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report – and |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|----|--------------------------|-------------------|-----------------|
| | | | | | | Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper. Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts. In fact, such contacts were common practice. Dkt. 614 (Donziger 56.1(b) Statement) St. 167–169. Similarly, Ecuadorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to `faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168. In fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St. 167-169. *See also* St. 347-48, 351-55, *infra*. | their work to author the Report themselves – were "of some independent value" to the scheme, and therefore material.  Dkt. 745 at 35.<br><br>Donziger's assertions regarding the propriety of *ex parte* contacts in Ecuador are false and misleading as well.  *See* Reply St. 347–350. |
| 280. | Beltman | 2008.07.28 | Beltman | Mills | Beltman wrote to Mills noting that the report by Richard Clapp was used as an Appendix to the Cabrera Report, "Oh what a tangled web, ..." | This communication is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Indeed, the | Undisputed.  Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.<br><br>Donziger's argument regarding whether the statement constitutes a predicate act is misleading and false.  It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|---|---|---|---|---|---|---|---|
| | | | | | | Court has already concluded, even with-out the benefit of any merits opposition, that loin the present record ... the ultimate materiality of the taint that indisputably has been established [as to the appoint-ment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Donziger incorporates his re-sponse to St. 135-37. | made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori*, 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35.  Further, even if the materiality of the Cabrera Report were dis-puted (it is not), Defendants' deceptive omis-sions and lies about the Cabrera Report – and their work to author the Report themselves – were "of some independent value" to the scheme, and therefore material.  Dkt. 745 at 35. |
| 281. | Beltman | 2008.07.29 | Beltman | Donziger | Beltman sent an email to Donziger detailing Stratus's attempts to obtain endorse-ments for the Cabrera Report, stating they were having dif-ficulty finding academics who were willing to endorse the Cabrera Report, and sug-gesting they should turn to consultants and/or their in-ternal team for endorsements instead. Dkt. 34-29 (Ex. 204). | This email is not material, and no re-sponse from Donziger is required, be-cause Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's un-supported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even with-out the benefit of any merits opposition, that loin the present record ... the ultimate materiality of the taint that indisputably has been established [as to the appoint-ment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Donziger incorporates his re-sponse to St. 82. | Undisputed.  Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.  In any event, Donziger's argument is not properly made in his 56.1 statement and should be disregarded.  Donziger's argument is misleading and false. It is well-established that the wire communi-cations themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in further-ance" of the scheme.  *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori*, 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35.  Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' decep- |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|---|---|---|---|---|---|---|---|
| | | | | | | | tive omissions and lies about the Cabrera Report's true authorship and illicit payments to him were "of some independent value" to the scheme, and therefore material.  Dkt. 745 at 35.  In any event, Donziger's argument is not properly made in his 56.1 statement and should be disregarded. |
| 282. | Fajardo | 2008.07.31 | Fajardo | Maest, Beltman | Fajardo sent an email to Maest and Beltman asking about the progress of comments, which they had agreed to draft by the end of July according to the plan they set out during their meeting in Boulder in June. Dkt. 49-32 (Ex. 368). | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record ... the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. | Undisputed.

Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.  In any event, Donziger's argument is not properly made in his 56.1 statement and should be disregarded.

Donziger's argument is misleading and false. It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme.  *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori*, 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35.  Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report's true authorship and illicit payments to him were "of some independent value" to the scheme, and therefore material.  Dkt. 745 at 35.  In any event, Donziger's argument is not |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|--------------------------|-------------------|-----------------|
| | | | | | | | properly made in his 56.1 statement and should be disregarded. |
| 283. | Beltman | 2008.08.01 | Beltman | Maest | Beltman sent Maest and other Stratus consultants an email detailing "what [they] need[ed] to do for the comments on the Cabrera report." Dkt. 9-5 (Ex. 10) at 1. | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "on the present record ... the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. | Undisputed.  Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.  In any event, Donziger's argument is not properly made in his 56.1 statement and should be disregarded.  Donziger's argument is misleading and false.  It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori*, 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35.  Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report's true authorship and illicit payments to him were "of some independent value" to the scheme, and therefore material.  Dkt. 745 at 35.  In any event, Donziger's argument is not properly made in his 56.1 statement and should be disregarded. |
| 284. | Selva Viva | 2008.08.11 | Kohn, Swift & Graf, P.C. | Selva Viva | Payment via wire transfer of $38,000.00. Ex. 32-18 (Ex. 162). | This alleged wire transfer is not material, and no response from Donziger is required, because Chevron has not asserted | Undisputed.  Defendants' responses do not dispute that the transfers of funds were in furtherance of unlawful activity, and their argu- |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | | | | | | it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this al-leged wire transfer constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not made any showing of criminal intent or materiality. Chevron also has not demonstrated that this alleged transfer was in furtherance of any unlawful activi-ty or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A). | ment is not properly made in a 56.1 response and should be disregarded.  Further, the facts described constitute the transmission of funds from or to the United States, "with the intent to promote the carrying on of specified un-lawful activity."  18 U.S.C. § 1956(a)(2)(A). It is well-settled that intent may be shown by proving "facts showing a motive for commit-ting fraud and a clear opportunity for doing so," or by identifying strong circumstantial evidence of conscious behavior.  *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987), *overruled en banc on other grounds by U.S. v. Indelicato*, 865 F.2d 1370, 1378 (2d Cir. 1989).  The statute reaches wire transfers, and there is no requirement that the source of the funds be unlawful.  *See U.S. v. Piervinanzi*, 23 F.3d 670, 678–79 (2d Cir. 1994).<br><br>Defendants' assertion that the statute imposes a requirement that funds be transferred "from the United States to a place outside the United States" is false.  The statute, 18 U.S.C. § 1956(a)(2), provides: "Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary in-strument or funds from a place in the United States to or through a place outside the United States *or to a place in the United States from or through a place outside the United States*" (emphasis added).  The statute thus applies |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|---|---|---|---|---|---|---|---|
| | | | | | | | equally to transfers to the United States from places outside the United States and encompasses the transaction at issue here. |
| 285. | Selva Viva | 2008.09.11 | Kohn, Swift & Graf, P.C. | Selva Viva | Payment via wire transfer of $28,000.00. Ex. 32-18 (Ex. 162). | This alleged wire transfer is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this alleged wire transfer constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not made any showing of criminal intent or materiality. Chevron also has not demonstrated that this alleged transfer was in furtherance of any unlawful activity or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A). | Undisputed.  Defendants' responses do not dispute that the transfers of funds were in furtherance of unlawful activity, and their argument is not properly made in a 56.1 response and should be disregarded.  Further, the facts described constitute the transmission of funds from or to the United States, "with the intent to promote the carrying on of specified unlawful activity."  18 U.S.C. § 1956(a)(2)(A).  It is well-settled that intent may be shown by proving "facts showing a motive for committing fraud and a clear opportunity for doing so," or by identifying strong circumstantial evidence of conscious behavior.  *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987), *overruled en banc on other grounds by U.S. v. Indelicato,* 865 F.2d 1370, 1378 (2d Cir. 1989).  The statute reaches wire transfers, and there is no requirement that the source of the funds be unlawful.  *See U.S. v. Piervinanzi*, 23 F.3d 670, 678–79 (2d Cir. 1994). <br><br> Defendants' assertion that the statute imposes a requirement that funds be transferred "from the United States to a place outside the United States" is false.  The statute, 18 U.S.C. § 1956(a)(2), provides: "Whoever transports, |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|-------------------------|-------------------|-----------------|
| | | | | | | | transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States *or to a place in the United States from or through a place outside the United States*" (emphasis added). The statute thus applies equally to transfers to the United States from places outside the United States and encompasses the transaction at issue here. |
| 286. | Selva Viva | 2008.10.03 | Kohn, Swift & Graf, P.C. | Selva Viva | Payment via wire transfer of $32,000.00. Ex. 32-18 (Ex. 162). | This alleged wire transfer is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this alleged wire transfer constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not made any showing of criminal intent or materiality. Chevron also has not demonstrated that this alleged transfer was in furtherance of any unlawful activity or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A). | Undisputed. Defendants' responses do not dispute that the transfers of funds were in furtherance of unlawful activity, and their argument is not properly made in a 56.1 response and should be disregarded. Further, the facts described constitute the transmission of funds from or to the United States, "with the intent to promote the carrying on of specified unlawful activity." 18 U.S.C. § 1956(a)(2)(A). It is well-settled that intent may be shown by proving "facts showing a motive for committing fraud and a clear opportunity for doing so," or by identifying strong circumstantial evidence of conscious behavior. *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987), *overruled en banc on other grounds by U.S. v. Indelicato*, 865 F.2d 1370, 1378 (2d Cir. 1989). The statute reaches wire transfers, and there is no requirement that the source of the funds be unlawful. *See U.S. v. Piervinanzi*, 23 F.3d 670, 678–79 (2d Cir. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|---|---|---|---|---|---|---|---|
| | | | | | | | 1994). Defendants' assertion that the statute imposes a requirement that funds be transferred "from the United States to a place outside the United States" is false.  The statute, 18 U.S.C. § 1956(a)(2), provides: "Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States *or to a place in the United States from or through a place outside the United States*" (emphasis added).  The statute thus applies equally to transfers to the United States from places outside the United States and encompasses the transaction at issue here. |
| 287. | Beltman | 2008.10.06 | Beltman | Donziger | Beltman sent an email to Donziger listing current work including revising and reevaluating portions of the Cabrera Report, and working with Donziger on how to prepare responses to Chevron's comments on the report. Dkt. 37-13 (Ex. 235). | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that loin the present record ... the ultimate materiality of the taint that indisputably | Undisputed.  Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.  In any event, Donziger's argument is not properly made in his 56.1 statement and should be disregarded. Donziger's argument is misleading and false. It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|-------------------------|-------------------|-----------------|
| | | | | | | has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Moreover, the cited email suggests only that Stratus drafted documents that Cabrera *adopted*. Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper. Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts. In fact, such contacts were common practice. Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. Similarly, Ecuadorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to `faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168. In fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St. 167-169. *See also* St. 347-48, 351-55, *infra*. | *see also U.S. v. Autuori*, 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35.  Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report's true authorship and illicit payments to him were "of some independent value" to the scheme, and therefore material.  Dkt. 745 at 35.  In any event, Donziger's argument is not properly made in his 56.1 statement and should be disregarded. |
| 288. | Beltman | 2008.10.27 | Beltman | Peers | Beltman and Stratus consultant Jennifer Peers exchanged emails regarding work of U.S. consultant 3TM in | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any | Undisputed.  Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.  In any event, Donziger's argument is not properly |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|---|---|---|---|---|---|---|---|
| | | | | | which Peers noted that they needed to revise 3TM's work to "clean up the language so it [would] sound[] more like [Cabrera] and less like a comment." Dkt. 9-4 (Ex. 9) at 2. | event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that loin the present record ... the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Donziger incorporates his response to St. 80-81. | made in his 56.1 statement and should be disregarded.<br><br>Donziger's argument is misleading and false. It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori*, 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35. Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report's true authorship and illicit payments to him were "of some independent value" to the scheme, and therefore material. Dkt. 745 at 35. In any event, Donziger's argument is not properly made in his 56.1 statement and should be disregarded. |
| 289. | Beltman | 2008.10.29 | Beltman | Stratus | Beltman sent an email to another Stratus consultant noting his desire that work performed by U.S. consultant 3TM "be in a form that someone in Ecuador could have written." Dkt. 34-21 (Ex. 196 196) at 1. | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has | Undisputed. Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him. In any event, Donziger's argument is not properly made in his 56.1 statement and should be disregarded.<br><br>Donziger's argument is misleading and false. It is well-established that the wire communications themselves need not be fraudulent, |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|-----|-----|-----|
| | | | | | | already concluded, even without the bene-fit of any merits opposition, that [o]in the present record ... the ultimate materiality of the taint that indisputably has been es-tablished [as to the appointment of Cabre-ra and the Cabrera report] thus far re-mains a genuine issue." Dkt. 550, at 93. Moreover, Donziger disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper. Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts. In fact, such contacts were common practice. Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. Similarly, Ecuadorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to 'faithful-ly and legally' perform his duties." Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 614, St. 168. In fact, it was understood in Ecuador that court appointed experts could rely on par-ty resources. Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, 75, 78, 80-81, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St. 167-169. *See also* St. 347-48, 351-55, *infra*. | and communications organizing or managing a fraudulent scheme are made "in further-ance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori*, 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35. Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' decep-tive omissions and lies about the Cabrera Re-port's true authorship and illicit payments to him were "of some independent value" to the scheme, and therefore material. Dkt. 745 at 35. In any event, Donziger's argument is not properly made in his 56.1 statement and should be disregarded. |
| 290. | Maest | 2008.10.31 | Maest | Powers | Maest sent an email to Pow-ers asking him to respond to questions to the Cabrera Re- | This email is not material, and no re-sponse from Donziger is required, be-cause Chevron has not asserted it as a | Undisputed. Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him. In any |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
|  |  |  |  |  | port posed by the Lago Agrio Plaintiffs. Dkt. 49-34 (Ex. 370). | predicate act against Donziger. In any event, Donziger disputes Chevron's un-supported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established criminal in-tent or materiality. Indeed, the Court has already concluded, even without the bene-fit of any merits opposition, that [o]in the present record ... the ultimate materiality of the taint that indisputably has been es-tablished [as to the appointment of Cabre-ra and the Cabrera report] thus far re-mains a genuine issue." Dkt. 550, at 93. | event, Donziger's argument is not properly made in his 56.1 statement and should be dis-regarded.<br><br>Donziger's argument is misleading and false. It is well-established that the wire communi-cations themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in further-ance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori*, 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35.  Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' decep-tive omissions and lies about the Cabrera Re-port's true authorship and illicit payments to him were "of some independent value" to the scheme, and therefore material.  Dkt. 745 at 35.  In any event, Donziger's argument is not properly made in his 56.1 statement and should be disregarded. |
| 291. | Maest | 2008.11.04 | Powers | Maest | Powers drafted answers to the questions posed in re-sponse to the Cabrera Report and sent them to Maest. The answers were later filed with the Lago Agrio court as Cabrera's answers to ques-tions posed by the Lago Agrio Plaintiffs. Dkt. 49-35 | This document is not material, and no re-sponse from Donziger is required, be-cause Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's un-supported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established criminal in- | Undisputed.  Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.  In any event, Donziger's argument is not properly made in his 56.1 statement and should be dis-regarded.<br><br>Donziger's argument is misleading and false. It is well-established that the wire communi- |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|---|---|---|---|---|---|---|---|
| | | | | | (Ex. 371). | tent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that [o]in the present record ... the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Donziger incorporates his response to St. 257. | cations themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori*, 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35. Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report's true authorship and illicit payments to him were "of some independent value" to the scheme, and therefore material. Dkt. 745 at 35. In any event, Donziger's argument is not properly made in his 56.1 statement and should be disregarded. |
| 292. | Donziger | 2008.11.04 | Donziger | Beltman | Donziger sent an email to Beltman regarding the need to prevent expert Richard Clapp from "go[ing] off the reservation" and "talk[ing] to the congressman in a way that damns the Cabrera report with faint praise if you know what I mean." Dkt. 34-23 (Ex. 198) at 1. | Disputed. Chevron's description is inaccurate and does not match the cited document. Dkt. 34-23 (Ex. 198) is a 11/06/3008 email that does not contain the quoted language. In any event, Donziger disputes Chevron's unsupported legal conclusion that any such email constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission. For example, Chevron has not established criminal intent or ma- | Undisputed. Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him. In any event, Donziger's argument is not properly made in his 56.1 statement and should be disregarded.

Donziger's argument is misleading and false. It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori*, 212 F.3d 105, 115– |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | | | | | | teriality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that loin the present record ... the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. | 18 (2d Cir. 2000); Dkt. 745 at 35.  Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report's true authorship and illicit payments to him were "of some independent value" to the scheme, and therefore material.  Dkt. 745 at 35.  In any event, Donziger's argument is not properly made in his 56.1 statement and should be disregarded. |
| 293. | Selva Viva | 2008.11.14 | Kohn, Swift & Graf, P.C. | Selva Viva | Payment via wire transfer of $40,000.00. Ex. 32-18 (Ex. 162). | This alleged wire transfer is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this alleged wire transfer constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not made any showing of criminal intent or materiality. Chevron also has not demonstrated that this alleged transfer was in furtherance of any unlawful activity or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A). | Undisputed.  The statement remains undisputed, and no reply is necessary.  Defendants' responses do not dispute that the transfers of funds were in furtherance of unlawful activity, and their argument is not properly made in a 56.1 response and should be disregarded.  Further, the facts described constitute the transmission of funds from or to the United States, "with the intent to promote the carrying on of specified unlawful activity."  18 U.S.C. § 1956(a)(2)(A).  It is well-settled that intent may be shown by proving "facts showing a motive for committing fraud and a clear opportunity for doing so," or by identifying strong circumstantial evidence of conscious behavior.  *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987), *overruled en banc on other grounds by U.S. v. Indelicato*, 865 F.2d 1370, 1378 (2d Cir. 1989).  The statute reaches wire transfers, and there is no requirement that the source of the funds be |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | | | | | | | unlawful. *See U.S. v. Piervinanzi*, 23 F.3d 670, 678–79 (2d Cir. 1994).<br><br>Defendants' assertion that the statute imposes a requirement that funds be transferred "from the United States to a place outside the United States" is false. The statute, 18 U.S.C. § 1956(a)(2), provides: "Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States *or to a place in the United States from or through a place outside the United States*" (emphasis added). The statute thus applies equally to transfers to the United States from places outside the United States and encompasses the transaction at issue here. |
| 294. | Beltman | 2008.11.18 | Beltman | Donziger | Beltman sent an email to Donziger stating they must limit distribution of a 5-page report written by Clapp regarding his Ecuador trip. Beltman states the report "CANNOT go into the Congressional Record as being authored by him." Dkt. 34-13 (Ex. 188) at 1. | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that [o]in the present record ... the ultimate | Undisputed. Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him. In any event, Donziger's argument is not properly made in his 56.1 statement and should be disregarded.<br><br>Donziger's argument is misleading and false. It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|---|---|---|---|---|---|---|---|
| | | | | | | materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Donziger incorporates his response to St. 135-37. | 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori*, 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35.  Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report's true authorship and illicit payments to him were "of some independent value" to the scheme, and therefore material.  Dkt. 745 at 35.  In any event, Donziger's argument is not properly made in his 56.1 statement and should be disregarded. |
| 295. | Stratus, Beltman, Maest | 2008.12.01 | Stratus, Beltman, Maest | n/a | Stratus released a fifteen page document, signed by Beltman, Maest, and other Stratus consultants, distributed by physical and electronic mail and posted online, "analyzing" and defending Cabrera's report as the work of a court appointed neutral expert, but failing to disclose that Stratus and the other RICO Defendants and their co-conspirators actually drafted the report. Dkt. 34-26 (Ex. 201). | This document is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this document constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that loin the present record ... the ultimate materiality of the taint that indisputably has been established has to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Donziger incorporates his response to St. 83. | Undisputed.  Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.  In any event, Donziger's argument is not properly made in his 56.1 statement and should be disregarded.<br><br>Donziger's argument is misleading and false.  It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme.  *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori*, 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35.  Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Re- |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|----|-----------------|-----------------|-----------------|
| | | | | | | | port's true authorship and illicit payments to him were "of some independent value" to the scheme, and therefore material.  Dkt. 745 at 35.  In any event, Donziger's argument is not properly made in his 56.1 statement and should be disregarded. |
| 296. | Donziger, Fajardo, Yanza | 2008.12.15 | Fajardo | Donziger; Yanza | Pablo Fajardo emailed Donziger and Luis Yanza regarding a meeting with "all the teams" to develop a plan to "obtain a trial judgment in 2009" that would be "favorable and significant." Fajardo also stated, "We have [President] Correa, the Court and U.S. politics... It's now or never..." Dkt. 355-26 (Ex. 1065). | Donziger does not dispute that Fajardo sent the cited email, but he disputes Chevron's unsupported legal conclusion that it constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission. Indeed, on its face, this email only evidences a desire to bring the case to a successfully conclusion. There is nothing unlawful in such a goal. Donziger incorporates his response to St. 181. | Undisputed.  Donziger's argument is misleading and false.  It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme.  *Madanes v. Madanes*, 981 F. Supp. 241, 253 –54 (S.D.N.Y. 1997); *see also U.S. v. Autuori*, 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35.  The email is material because it goes to Defendants' plans to procure a fraudulent judgment.<br><br>In any event, Donziger's argument is not properly made in his 56.1 statement and should be disregarded.<br><br>On its face, the email reflects Defendants' plan to leverage their control of the Ecuadorian court and political influence to obtain a judgment.  The email also reflects Defendants' belief that they could not obtain a judgment in the absence of such factors ("It's now or never…..").  Dkt. 355-26 (Ex. 1065). Defendants do not even attempt to explain the |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|--------------------------|-------------------|-----------------|
| | | | | | | | quoted language: "We have Correa, the Court and U.S. politics…It's now or never…." *Id.* |
| 297. | Selva Viva | 2008.12.18 | Kohn, Swift & Graf, P.C. | Selva Viva | Payment via wire transfer of $30,000.00. Ex. 32-18 (Ex. 162). | This alleged wire transfer is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this alleged wire transfer constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not made any showing of criminal intent or materiality. Chevron also has not demonstrated that this alleged transfer was in furtherance of any unlawful activity or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A). | Undisputed. Defendants' responses do not dispute that the transfers of funds were in furtherance of unlawful activity, and their argument is not properly made in a 56.1 response and should be disregarded. Further, the facts described constitute the transmission of funds from or to the United States, "with the intent to promote the carrying on of specified unlawful activity." 18 U.S.C. § 1956(a)(2)(A). It is well-settled that intent may be shown by proving "facts showing a motive for committing fraud and a clear opportunity for doing so," or by identifying strong circumstantial evidence of conscious behavior. *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987), *overruled en banc on other grounds by U.S. v. Indelicato,* 865 F.2d 1370, 1378 (2d Cir. 1989). The statute reaches wire transfers, and there is no requirement that the source of the funds be unlawful. *See U.S. v. Piervinanzi*, 23 F.3d 670, 678–79 (2d Cir. 1994). <br><br> Defendants' assertion that the statute imposes a requirement that funds be transferred "from the United States to a place outside the United States" is false. The statute, 18 U.S.C. § 1956(a)(2), provides: "Whoever transports, transmits, or transfers, or attempts to |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|------------------|
| | | | | | | | transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States" (emphasis added). The statute thus applies equally to transfers to the United States from places outside the United States and encompasses the transaction at issue here. |
| 298. | Beltman | 2008.12.19 | Beltman | Cindy Buhl, Office of United States Congressman Jim McGovern | Beltman provided United States Congressman Jim McGovern's office "some talking points" for an interview with the Los Angeles Times, telling the Congressman's staff that "[t]he Court Expert reviewed available scientific data and concluded that people in the area suffer from many illnesses caused by the contamination, including cancer." Dkt. 47-31 (Ex. 270) at 1. | This document is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this document constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that loin the present record ... the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. | Undisputed. Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him. In any event, Donziger's argument is not properly made in his 56.1 statement and should be disregarded.<br><br>Donziger's argument is misleading and false. It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori*, 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35. Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report's true authorship and illicit payments to him were "of some independent value" to the scheme, and therefore material. Dkt. 745 at |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | | | | | | | 35.  In any event, Donziger's argument is not properly made in his 56.1 statement and should be disregarded. |
| 299. | Donziger, Fajardo, Yanza | 2009.01.14 | Prieto | Donziger, Fajardo, Yanza | Julio Prieto emailed Donziger, Fajardo, Yanza, and others stating, "I don't think our purpose is to increase pressure just because, but that we want to increase it to get a judgment, so I would think that this is a strategy. . . . The judge needs to feel the pressure, but it must be sufficiently subtle so that it can't be alleged that he acted because of that pressure. It's complicated. . . . In short, the strategy needs to be this: 'increase the pressure on the Court but without negatively impacting the image of the Court as independent.' We can put on political pressure in the form of direct calls to the judge. Preferably avoid public threats !!" Dkt. 400-16 (Ex. 2101). | Donziger does not dispute that Prieto sent the cited email, but he disputes Chevron's unsupported legal conclusion that it constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission. In addition, this email is hearsay to the extent Chevron seeks to use it for the truth of the matters asserted therein. | Undisputed.  Donziger's argument is misleading and false.  It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme.  *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori*, 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35.  Further, this Court has found that Defendants' applied coercion and duress to the Ecuadorian court to obtain orders cancelling the judicial inspection process and appointing Cabrera as the global expert.  Dkt. 550 at 90-91.  Defendants' pressure strategy thus was "of some independent value" to the scheme, and therefore material.  Dkt. 745 at 35.  In any event, Donziger's argument is not properly made in his 56.1 statement and should be disregarded. |
| 300. | Fajardo | 2009.01.22 | Fajardo | Berlinger | Fajardo sent an email to Bonfiglio and Berlinger reiterating the need to delete the im- | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a | Undisputed.  Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.  In any |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | | | | | ages they had discussed from the Crude documentary, noting the issue was "so serious that we can lose everything." Dkt. 47-6 (Ex. 245) at 3. | predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that loin the present record ... the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Donziger incorporates his response to St. 94. | event, Donziger's argument is not properly made in his 56.1 statement and should be disregarded.<br><br>Donziger's argument is misleading and false. It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori*, 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35.  Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report's true authorship and illicit payments to him were "of some independent value" to the scheme, and therefore material.  Dkt. 745 at 35.  In any event, Donziger's argument is not properly made in his 56.1 statement and should be disregarded. |
| 301. | Beltman | 2009.01.31 | Beltman | Cindy Buhl, Office of United States Congressman Jim McGovern | Beltman forwarded Cabrera's reports, stating "[t]he Court Expert's March 2008 report summary is attached," and that "[ails° attached is the November 2008 response to the [Lago Agrio] Plaintiff's questions that was written by the Court Expert." Beltman | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established criminal in- | Undisputed.  Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.  In any event, Donziger's argument is not properly made in his 56.1 statement and should be disregarded.<br><br>Donziger's argument is misleading and false. It is well-established that the wire communi- |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|---|---|---|---|---|---|---|---|
| | | | | | failed to disclose that he and the Lago Agrio Plaintiffs' other U.S. consultants ghostwrote the report as well as the response. Dkt. 47-31 (Ex. 270) at 1. | tent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that loin the present record ... the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Donziger incorporates his response to St. 83. | cations themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori*, 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35. Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report's true authorship and illicit payments to him were "of some independent value" to the scheme, and therefore material. Dkt. 745 at 35. In any event, Donziger's argument is not properly made in his 56.1 statement and should be disregarded. |
| 302. | Selva Viva | 2009.02.04 | Kohn, Swift & Graf, P.C. | Selva Viva | Payment via wire transfer of $30,000.00. Ex. 32-18 (Ex. 162). | This alleged wire transfer is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this alleged wire transfer constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not made any showing of criminal intent or materiality. Chevron also has not demonstrated that this alleged transfer was in furtherance of any unlawful activity or that it constitutes a transfer of funds from the United States to a place outside | Undisputed. Defendants' responses do not dispute that the transfers of funds were in furtherance of unlawful activity, and their argument is not properly made in a 56.1 response and should be disregarded. Further, the facts described constitute the transmission of funds from or to the United States, "with the intent to promote the carrying on of specified unlawful activity." 18 U.S.C. § 1956(a)(2)(A). It is well-settled that intent may be shown by proving "facts showing a motive for committing fraud and a clear opportunity for doing so," or by identifying strong circumstantial evidence of conscious behavior. *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|-------------------------|-------------------|-----------------|
| | | | | | | the United States, as required by 28 U.S.C. § 1956(a)(2)(A). | Cir. 1987), *overruled en banc on other grounds by U.S. v. Indelicato,* 865 F.2d 1370, 1378 (2d Cir. 1989). The statute reaches wire transfers, and there is no requirement that the source of the funds be unlawful. *See U.S. v. Piervinanzi*, 23 F.3d 670, 678–79 (2d Cir. 1994).<br><br>Defendants' assertion that the statute imposes a requirement that funds be transferred "from the United States to a place outside the United States" is false. The statute, 18 U.S.C. § 1956(a)(2), provides: "Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States *or to a place in the United States from or through a place outside the United States*" (emphasis added). The statute thus applies equally to transfers to the United States from places outside the United States and encompasses the transaction at issue here. |
| 303. | Selva Viva | 2009.03.09 | Kohn, Swift & Graf, P.C. | Selva Viva | Payment via wire transfer of $30,000.00. Ex. 32-18 (Ex. 162). | This alleged wire transfer is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this alleged wire transfer constitutes a predicate act of wire fraud and/or money laundering | Undisputed. Defendants' responses do not dispute that the transfers of funds were in furtherance of unlawful activity, and their argument is not properly made in a 56.1 response and should be disregarded. Further, the facts described constitute the transmission of funds from or to the United States, "with the intent to promote the carrying on of specified un- |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|---|---|---|---|---|---|---|---|
| | | | | | | against anyone. For example, Chevron has not made any showing of criminal intent or materiality. Chevron also has not demonstrated that this alleged transfer was in furtherance of any unlawful activity or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A). | lawful activity."  18 U.S.C. § 1956(a)(2)(A). It is well-settled that intent may be shown by proving "facts showing a motive for committing fraud and a clear opportunity for doing so," or by identifying strong circumstantial evidence of conscious behavior.  *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987), *overruled en banc on other grounds by U.S. v. Indelicato,* 865 F.2d 1370, 1378 (2d Cir. 1989).  The statute reaches wire transfers, and there is no requirement that the source of the funds be unlawful.  *See U.S. v. Piervinanzi*, 23 F.3d 670, 678–79 (2d Cir. 1994). <br><br> Defendants' assertion that the statute imposes a requirement that funds be transferred "from the United States to a place outside the United States" is false.  The statute, 18 U.S.C. § 1956(a)(2), provides: "Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States *or to a place in the United States from or through a place outside the United States*" (emphasis added).  The statute thus applies equally to transfers to the United States from places outside the United States and encompasses the transaction at issue here. |
| 304. | Beltman | 2009.03.18 | Beltman | Donziger | Beltman sent Donziger an | This email is not material, and no re- | Undisputed.  Donziger is liable for the acts of |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|--------------------------|-------------------|-----------------|
| | | | | | email containing draft language denying that the Lago Agrio Plaintiffs were in collusion with Cabrera and claiming that "Cabrera's November response to the plaintiffs is clearly his own." However, Beltman knew that he and the Lago Agrio Plaintiffs' other U.S. consultants had drafted the response. Dkt. 47-17 (Ex. 256). | sponse from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that "[o]n the present record ... the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. <br><br> Donziger also disputes Chevron's insinuation that the communication with, and provision of materials to, Cabrera was improper. Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts. In fact, such contacts were common practice. Dkt. 614 (Donziger 56.1(b) Statement) St. 167-169. Similarly, Ecuadorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), 1 8; Dkt. 614, St. 168. In | his agents and co-conspirators, which may be asserted as predicate acts against him. In any event, Donziger's argument is not properly made in his 56.1 statement and should be disregarded. <br><br> Donziger's argument is misleading and false. It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori*, 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35. Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report's true authorship and illicit payments to him were "of some independent value" to the scheme, and therefore material. Dkt. 745 at 35. In any event, Donziger's argument is not properly made in his 56.1 statement and should be disregarded. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | | | | | | fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St. 167-169. *See also* St. 347-48, 351-55, *infra.* | |
| 305. | Selva Viva | 2009.04.21 | Kohn, Swift & Graf, P.C. | Selva Viva | Payment via wire transfer of $10,000.00. Ex. 32-18 (Ex. 162). | This alleged wire transfer is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this alleged wire transfer constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not made any showing of criminal intent or materiality. Chevron also has not demonstrated that this alleged transfer was in furtherance of any unlawful activity or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A). | Undisputed. Defendants' responses do not dispute that the transfers of funds were in furtherance of unlawful activity, and their argument is not properly made in a 56.1 response and should be disregarded. Further, the facts described constitute the transmission of funds from or to the United States, "with the intent to promote the carrying on of specified unlawful activity." 18 U.S.C. § 1956(a)(2)(A). It is well-settled that intent may be shown by proving "facts showing a motive for committing fraud and a clear opportunity for doing so," or by identifying strong circumstantial evidence of conscious behavior. *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987), *overruled en banc on other grounds by U.S. v. Indelicato,* 865 F.2d 1370, 1378 (2d Cir. 1989). The statute reaches wire transfers, and there is no requirement that the source of the funds be unlawful. *See U.S. v. Piervinanzi*, 23 F.3d 670, 678–79 (2d Cir. 1994).<br><br>Defendants' assertion that the statute imposes |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|-------------------------|-------------------|-----------------|
| | | | | | | | a requirement that funds be transferred "from the United States to a place outside the United States" is false.  The statute, 18 U.S.C. § 1956(a)(2), provides: "Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary in-strument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States" (emphasis added).  The statute thus applies equally to transfers to the United States from places outside the United States and encom-passes the transaction at issue here. |
| 306. | Selva Viva | 2009.05.07 | Kohn, Swift & Graf, P.C. | Selva Viva | Payment via wire transfer of $20,000.00. Ex. 32-18 (Ex. 162). | This alleged wire transfer is not material, and no response from Donziger is re-quired, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this al-leged wire transfer constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not made any showing of criminal intent or materiality. Chevron also has not demonstrated that this alleged transfer was in furtherance of any unlawful activi-ty or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A).. | Undisputed. Defendants' responses do not dispute that the transfers of funds were in fur-therance of unlawful activity, and their argu-ment is not properly made in a 56.1 response and should be disregarded.  Further, the facts described constitute the transmission of funds from or to the United States, "with the intent to promote the carrying on of specified un-lawful activity."  18 U.S.C. § 1956(a)(2)(A). It is well-settled that intent may be shown by proving "facts showing a motive for commit-ting fraud and a clear opportunity for doing so," or by identifying strong circumstantial evidence of conscious behavior.  *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987), *overruled en banc on other grounds by U.S. v. Indelicato*, 865 F.2d 1370, |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|---|---|---|---|---|---|---|---|
| | | | | | | | 1378 (2d Cir. 1989).  The statute reaches wire transfers, and there is no requirement that the source of the funds be unlawful.  *See U.S. v. Piervinanzi*, 23 F.3d 670, 678–79 (2d Cir. 1994).<br><br>Defendants' assertion that the statute imposes a requirement that funds be transferred "from the United States to a place outside the United States" is false.  The statute, 18 U.S.C. § 1956(a)(2), provides: "Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary in- strument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States" (emphasis added).  The statute thus applies equally to transfers to the United States from places outside the United States and encom- passes the transaction at issue here. |
| 307. | Selva Viva | 2009.05.28 | Kohn, Swift & Graf, P.C. | Selva Viva | Payment via wire transfer of $22,000.00. Ex. 32-18 (Ex. 162). | This alleged wire transfer is not material, and no response from Donziger is re- quired, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this al- leged wire transfer constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not made any showing of criminal | Undisputed.  Defendants' responses do not dispute that the transfers of funds were in fur- therance of unlawful activity, and their argu- ment is not properly made in a 56.1 response and should be disregarded.  Further, the facts described constitute the transmission of funds from or to the United States, "with the intent to promote the carrying on of specified un- lawful activity."  18 U.S.C. § 1956(a)(2)(A). It is well-settled that intent may be shown by |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|---|---|---|---|---|---|---|---|
| | | | | | | intent or materiality. Chevron also has not demonstrated that this alleged transfer was in furtherance of any unlawful activity or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A). | proving "facts showing a motive for committing fraud and a clear opportunity for doing so," or by identifying strong circumstantial evidence of conscious behavior. *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987), *overruled en banc on other grounds by U.S. v. Indelicato,* 865 F.2d 1370, 1378 (2d Cir. 1989). The statute reaches wire transfers, and there is no requirement that the source of the funds be unlawful. *See U.S. v. Piervinanzi*, 23 F.3d 670, 678–79 (2d Cir. 1994). <br><br> Defendants' assertion that the statute imposes a requirement that funds be transferred "from the United States to a place outside the United States" is false. The statute, 18 U.S.C. § 1956(a)(2), provides: "Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States *or to a place in the United States from or through a place outside the United States*" (emphasis added). The statute thus applies equally to transfers to the United States from places outside the United States and encompasses the transaction at issue here. |
| 308. | Donziger, Fajardo | 2009.06.05 | Fajardo | Donziger | Fajardo emailed Donziger stating that he was going to task LAP intern Brian Parker | Donziger does not dispute that Fajardo sent the cited email, but he disputes Chevron's unsupported legal conclusion that it | Undisputed. Defendants' arguments regarding "insinuation of impropriety" are irrelevant. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | | | | | with "a research assignment for our legal alegato and the judgment, but without him knowing what he is doing..."basis Dkt. 355-39 (Ex. 1140). | constitutes a predicate act of wire fraud and/or money laundering. Chevron's insinuation of impropriety is based on pure speculation. In particular, Chevron provides no for its insinuation that Fajardo's use of the word "judgment" is evidence of "ghostwriting" of the Judgment issued by the Lago Agrio Court. Moreover, Fajardo's email is hearsay to the extent Chevron purports to use it for the truth of the matters asserted therein. Donziger incorporates his response to St. 181. | Defendants do not offer any alternative explanation for the email. They do not explain what Fajardo's reference to "a research assignment" for the "judgment" means, if not a reference to the ghostwriting of the judgment. Defendants also do not dispute the awareness of wrongdoing reflected in the statement "but without him knowing what he is doing…" They offer no alternative explanation for why Fajardo kept secret from Parker what Parker was doing in regards to the judgment. Moreover, contemporaneous emails reflect that Defendants were planning to ghostwrite the judgment at this time. *See, e.g.*, Dkt. 355-33 (Ex. 1108) (DONZ00066328) at 62 (Fajardo writes to Donziger: "Comrade, I don't know if you are coming or not tomorrow. In any case, I'll say that Friday's meeting is key, and I think you should be there. In that meeting we'll be talking about all the outcome of the case and what to do, how much money to put in, how to distribute the items and everything.") |
| 309. | Beltman | 2009.06.26 | Beltman | Representative of Brazil's Aggue- Magalhaes (Haggai Magellan) Research Center | Beltman sent an email to the Center seeking an endorsement of the Cabrera Report, providing a copy of the report and Stratus's analysis of it, and recommending the Center sign an evaluation | This email is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud | Undisputed. Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him. In any event, Donziger's argument is not properly made in his 56.1 statement and should be disregarded. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | | | | | that Stratus drafted. Stratus failed to disclose its own consultants ghostwrote the report. Dkt. 34-28 (Ex. 203). | and/or money laundering. For example, Chevron has not established criminal intent or materiality. Indeed, the Court has already concluded, even without the benefit of any merits opposition, that [o]n the present record ... the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. Donziger incorporates his response to St. 82. | Donziger's argument is misleading and false. It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori*, 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35.  Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report's true authorship and illicit payments to him were "of some independent value" to the scheme, and therefore material.  Dkt. 745 at 35.  In any event, Donziger's argument is not properly made in his 56.1 statement and should be disregarded. |
| 310. | Selva Viva | 2009.06.29 | Kohn, Swift & Graf, P.C. | Selva Viva | Payment via wire transfer of $20,000.00. Dkt. 32-18 (Ex. 162). | This alleged wire transfer is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this alleged wire transfer constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not made any showing of criminal intent or materiality. Chevron also has not demonstrated that this alleged transfer | Undisputed.  Defendants' responses do not dispute that the transfers of funds were in furtherance of unlawful activity, and their argument is not properly made in a 56.1 response and should be disregarded.  Further, the facts described constitute the transmission of funds from or to the United States, "with the intent to promote the carrying on of specified unlawful activity."  18 U.S.C. § 1956(a)(2)(A). It is well-settled that intent may be shown by proving "facts showing a motive for committing fraud and a clear opportunity for doing |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|-------------------------|-------------------|-----------------|
| | | | | | | was in furtherance of any unlawful activity or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A). | so," by identifying strong circumstantial evidence of conscious behavior.  *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987), *overruled en banc on other grounds by U.S. v. Indelicato,* 865 F.2d 1370, 1378 (2d Cir. 1989).  The statute reaches wire transfers, and there is no requirement that the source of the funds be unlawful.  *See U.S. v. Piervinanzi*, 23 F.3d 670, 678–79 (2d Cir. 1994). <br><br>Defendants' assertion that the statute imposes a requirement that funds be transferred "from the United States to a place outside the United States" is false.  The statute, 18 U.S.C. § 1956(a)(2), provides: "Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States *or to a place in the United States from or through a place outside the United States*" (emphasis added).  The statute thus applies equally to transfers to the United States from places outside the United States and encompasses the transaction at issue here. |
| 311. | Donziger | 2009.06.30 | DeLeon | Donziger | Payment via wire transfer of $500,000 upon execution of the agreement. Dkt. 658-38 (Ex. 3031) (DONZ00039161-62). | Disputed. The cited document is an Investment Agreement (Dkt. 658-38, Ex. 3031), which contemplates that DeLeon would pay $500,000 into the Case Fund promptly upon execution of the agree- | Undisputed.  Defendants do not dispute that DeLeon made the payment.  They merely suggest that the cited document does not establish the payment.  The executed agreement required DeLeon to make the payment, and |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|--------------------------|-------------------|-----------------|
|     |           |      |      |     |                          | ment. The agreement does not require DeLeon to make that contribution by "wire transfer." Nor does the cited document establish that any such contribution was ever made. Moreover, Donziger disputes Chevron's unsupported legal conclusion that any such payment (by wire transfer or otherwise) constitutes a predicate act of wire fraud and/or mail fraud. | thus creates a strong presumption that he did. If DeLeon did not make the payment, then either he or Donziger would know and could have submitted a declaration to that effect. Indeed, Donziger submitted a declaration and made no reference of this.<br><br>Defendants do not submit a sworn statement that DeLeon did not make the agreed payment by wire transfer.  Given DeLeon's practice of making transfers to Donziger by wire, Sts. 323, 333, 339, there is a strong presumption that he made this payment by wire as well. Defendants introduce no evidence to suggest otherwise.<br><br>To the extent the agreement reflects the transfer of funds, Defendants' responses do not dispute that the transfers of funds were in furtherance of unlawful activity, and their argument is not properly made in a 56.1 response and should be disregarded.<br><br>Further, the agreement indicates facts that constitute the transmission of funds from or to the United States, "with the intent to promote the carrying on of specified unlawful activity."  18 U.S.C. § 1956(a)(2)(A).  It is well-settled that intent may be shown by proving "facts showing a motive for committing fraud and a clear opportunity for doing so," or by identifying strong circumstantial evidence of |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | | | | | | | conscious behavior. *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987), *overruled en banc on other grounds by U.S. v. Indelicato,* 865 F.2d 1370, 1378 (2d Cir. 1989). The statute reaches wire transfers, and there is no requirement that the source of the funds be unlawful. *See U.S. v. Piervinanzi,* 23 F.3d 670, 678–79 (2d Cir. 1994). |
| 312. | Selva Viva | 2009.07.16 | Kohn, Swift & Graf, P.C. | Selva Viva | Payment via wire transfer of $70,000.00. Dkt. 32-18 (Ex. 162). | This alleged wire transfer is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this alleged wire transfer constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not made any showing of criminal intent or materiality. Chevron also has not demonstrated that this alleged transfer was in furtherance of any unlawful activity or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A). | Undisputed. Defendants' responses do not dispute that the transfers of funds were in furtherance of unlawful activity, and their argument is not properly made in a 56.1 response and should be disregarded. Further, the facts described constitute the transmission of funds from or to the United States, "with the intent to promote the carrying on of specified unlawful activity." 18 U.S.C. § 1956(a)(2)(A). It is well-settled that intent may be shown by proving "facts showing a motive for committing fraud and a clear opportunity for doing so," or by identifying strong circumstantial evidence of conscious behavior. *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987), *overruled en banc on other grounds by U.S. v. Indelicato,* 865 F.2d 1370, 1378 (2d Cir. 1989). The statute reaches wire transfers, and there is no requirement that the source of the funds be unlawful. *See U.S. v. Piervinanzi,* 23 F.3d 670, 678–79 (2d Cir. 1994). |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | | | | | | | Defendants' assertion that the statute imposes a requirement that funds be transferred "from the United States to a place outside the United States" is false.  The statute, 18 U.S.C. § 1956(a)(2), provides: "Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States *or to a place in the United States from or through a place outside the United States*" (emphasis added).  The statute thus applies equally to transfers to the United States from places outside the United States and encompasses the transaction at issue here. |
| 313. | Selva Viva | 2009.08.26 | Kohn, Swift & Graf, P.C. | Selva Viva | Payment via wire transfer of $20,000.00. Dkt. 32-18 (Ex. 162). | This alleged wire transfer is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this alleged wire transfer constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not made any showing of criminal intent or materiality. Chevron also has not demonstrated that this alleged transfer was in furtherance of any unlawful activity or that it constitutes a transfer of funds from the United States to a place outside | Undisputed.  Defendants' responses do not dispute that the transfers of funds were in furtherance of unlawful activity, and their argument is not properly made in a 56.1 response and should be disregarded.  Further, the facts described constitute the transmission of funds from or to the United States, "with the intent to promote the carrying on of specified unlawful activity."  18 U.S.C. § 1956(a)(2)(A). It is well-settled that intent may be shown by proving "facts showing a motive for committing fraud and a clear opportunity for doing so," or by identifying strong circumstantial evidence of conscious behavior.  *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | | | | | | the United States, as required by 28 U.S.C. § 1956(a)(2)(A). | Cir. 1987), *overruled en banc on other grounds by U.S. v. Indelicato,* 865 F.2d 1370, 1378 (2d Cir. 1989). The statute reaches wire transfers, and there is no requirement that the source of the funds be unlawful. *See U.S. v. Piervinanzi,* 23 F.3d 670, 678–79 (2d Cir. 1994). |
| | | | | | | | Defendants' assertion that the statute imposes a requirement that funds be transferred "from the United States to a place outside the United States" is false. The statute, 18 U.S.C. § 1956(a)(2), provides: "Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States *or to a place in the United States from or through a place outside the United States*" (emphasis added). The statute thus applies equally to transfers to the United States from places outside the United States and encompasses the transaction at issue here. |
| 314. | Donziger, Fajardo, Yanza | 2009.09.13 | Fajardo | Donziger, Yanza, Saenz, Prieto, Renato Garcia | Email from Fajardo to Donziger, Yanza, and other members of the LAPs' legal team stating: "I understand that Zambrano himself asked Nunez, should the case fall to him, that Nunez help him with the orders. That would | Disputed. Chevron has not provided a document citation for this alleged email. In any event, Donziger disputes Chevron's unsupported legal conclusion that any such email constitutes a predicate act of wire fraud and/or money laundering. Chevron has made no showing of criminal intent or materiality and its insinuation of | Undisputed. The citation is Stavers Decl., Ex. 3139 (DONZ00052412). The document is readily identifiable from the date and description. In addition, Chevron cites, and Defendants respond to, the document elsewhere in the 56.1 statement. *See* St. 196. Defendants incorporate their response to St. 196, indicating that they know the citation and document |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|---|---|---|---|---|---|---|---|
| | | | | | help with the continuity. The problem is, who will carry more weight: Nunez on the one hand, or Liliana and Guerra on the other..." Stavers Decl. | impropriety is based on pure speculation. Donziger incorporates his response to St. 196. | at issue.<br><br>Donziger's argument is misleading and false. It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000); Dkt. 745 at 35.<br><br>Defendants' arguments regarding "insinuation of impropriety" are irrelevant.<br><br>Defendants offer no innocent explanation for the email, and Chevron has submitted into evidence a sworn statement reflecting that Defendants had, prior to this email, entered an agreement with Guerra by which they would pay him to ghostwrite orders in their favor. Dkt. 746-3 at 3–8. |
| 315. | Donziger, Fajardo, Yanza | 2009.09.15 | Fajardo | Donziger, Yanza, Saenz, Prieto, Renato Garcia | Email from Fajardo to Donziger, Yanza and other members of the LAPs' legal team stating: **"I think that everything is quiet... The puppeteer is pulling the string and the puppet is returning the package... By now it's pretty safe that there** | Donziger does not dispute that Fajardo sent the cited email, but he disputes Chevron's unsupported legal conclusion that it constitutes a predicate act of wire fraud and/or money laundering. Chevron has made no showing of criminal intent or materiality and its insinuation of impropriety with respect to Fajardo's use of the words "puppet" and "puppeteer" is based | Undisputed.  Donziger's argument is misleading and false.  It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori*, 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|---|---|---|---|---|---|---|---|
| | | | | | won't be anything to worry about... The puppet will finish off the entire matter tomorrow..." Stayers Decl. Ex. 3140. | on pure speculation. *See* Donziger Rule 56.1(b) Response to St. 204-205. Moreover, Fajardo's email is hearsay to the extent Chevron purports to use it for the truth of the matters asserted therein. Donziger incorporates his response to St. 204-05. | 745 at 35.<br><br>Defendants' arguments regarding "insinuation of impropriety" are irrelevant.<br><br>Defendants offer no innocent explanation for the email, and Chevron has submitted into evidence a sworn statement reflecting that Defendants had, prior to this email, entered an agreement with Guerra by which they would pay him to ghostwrite orders in their favor. Dkt. 746-3 at 3–8.<br><br>Referring in part to this email, this Court found: "Two emails appear strongly to corroborate Guerra's assertion that during Judge Zambrano's first tenure as the presiding judge of the Lago Agrio case (September 2009 through March 12, 2010), Judge Zambrano had an arrangement with Fajardo "to quickly move the case along [the LAPs'] favor," that Judge Zambrano suggested that Guerra – who wrote his decisions in civil cases – meet with Fajardo, and that Guerra and Fajardo the[n] agreed that Guerra would move the case quickly, that he would limit Chevron's procedural options, and that the LAPs' representatives would pay Guerra $1,000 per month."  Dkt. 905 at 19 n.69. |
| 316. | Selva Viva | 2009.09.23 | Kohn, Swift & Graf, P.C. | Selva Viva | Payment via wire transfer of $20,000.00. Dkt. 32-18 (Ex. | This alleged wire transfer is not material, and no response from Donziger is re- | Undisputed.  Defendants' responses do not dispute that the transfers of funds were in fur- |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|-------------------------|-------------------|-----------------|
|  |  |  |  |  | 162). | quired, because Chevron has not asserted it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this alleged wire transfer constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not made any showing of criminal intent or materiality. Chevron also has not demonstrated that this alleged transfer was in furtherance of any unlawful activity or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A). | therance of unlawful activity, and their argument is not properly made in a 56.1 response and should be disregarded.  Further, the facts described constitute the transmission of funds from or to the United States, "with the intent to promote the carrying on of specified unlawful activity."  18 U.S.C. § 1956(a)(2)(A).  It is well-settled that intent may be shown by proving "facts showing a motive for committing fraud and a clear opportunity for doing so," or by identifying strong circumstantial evidence of conscious behavior.  *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987), *overruled en banc on other grounds by U.S. v. Indelicato,* 865 F.2d 1370, 1378 (2d Cir. 1989).  The statute reaches wire transfers, and there is no requirement that the source of the funds be unlawful.  *See U.S. v. Piervinanzi*, 23 F.3d 670, 678–79 (2d Cir. 1994).<br><br>Defendants' assertion that the statute imposes a requirement that funds be transferred "from the United States to a place outside the United States" is false.  The statute, 18 U.S.C. § 1956(a)(2), provides: "Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States *or to a place in the United States from or through a place outside the United States*" |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|---|---|---|---|---|---|---|---|
| | | | | | | | (emphasis added).  The statute thus applies equally to transfers to the United States from places outside the United States and encompasses the transaction at issue here. |
| 317. | Donziger | 2009.09.30 | Donziger | Beltman | Donziger sent an email to Beltman noting he was meeting with the Republic of Ecuador's attorneys in DC and needed Beltman to provide scientific analysis. Dkt. 31-21 (Ex. 110). | Disputed. Chevron's description of the cited document is inaccurate. The cited document is a transcript of the 3/29/2010 Calmbacher deposition, not a 9/30/2009 email from Donziger to Beltman. In any event, Donziger disputes Chevron's unsupported legal conclusion that any such email constitutes a predicate act of wire fraud and/or money laundering. | Undisputed.  Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.<br><br>The correct citation is Dkt. 30-21 (Ex. 110). Defendants could not have been prejudiced, however, because the exhibit number is correct and thus, Defendants could easily have located the document.<br><br>Donziger's argument is misleading and false. It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme.  *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori*, 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35.  Communications regarding the provision of scientific evidence to the ROE were made in furtherance of Defendants' extortionate scheme and thus are material.<br><br>In any event, Donziger's argument is not properly made in his 56.1 statement and should be disregarded. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| 318. | Beltman | 2009.09.30 | Beltman | Donziger | Beltman agreed to be available for a call to discuss scientific evidence to be provided to the Republic of Ecuador's attorneys. Dkt. 31-21 (Ex. 110). | This document is not material, and no response from Donziger is required, because Chevron has not asserted it as a predicate act against Donziger. Moreover, Chevron's description of the cited document is inaccurate. The cited document is a transcript of the 3/29/2010 Calmbacher deposition, not a 9/30/2009 email from Beltman to Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that any such email constitutes a predicate act of wire fraud and/or money laundering. | Undisputed. Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.<br><br>The correct citation is Dkt. 30-21 (Ex. 110). Defendants could not have been prejudiced, however, because the exhibit number is correct and thus, Defendants could easily have located the document.<br><br>Donziger's argument is misleading and false. It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori*, 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35. Communications regarding the provision of scientific evidence to the ROE were made in furtherance of Defendants' extortionate scheme and thus are material.<br><br>In any event, Donziger's argument is not properly made in his 56.1 statement and should be disregarded. |
| 319. | Selva Viva | 2009.10.20 | Kohn, Swift & Graf, P.C. | Selva Viva | Payment via wire transfer of $27,000.00. Dkt. 32-18 (Ex. 162). | This alleged wire transfer is not material, and no response from Donziger is required, because Chevron has not asserted | Undisputed. Defendants' responses do not dispute that the transfers of funds were in furtherance of unlawful activity, and their argu- |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | | | | | | it as a predicate act against Donziger. In any event, Donziger disputes Chevron's unsupported legal conclusion that this alleged wire transfer constitutes a predicate act of wire fraud and/or money laundering against anyone. For example, Chevron has not made any showing of criminal intent or materiality. Chevron also has not demonstrated that this alleged transfer was in furtherance of any unlawful activity or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A). | ment is not properly made in a 56.1 response and should be disregarded.  Further, the facts described constitute the transmission of funds from or to the United States, "with the intent to promote the carrying on of specified unlawful activity."  18 U.S.C. § 1956(a)(2)(A).  It is well-settled that intent may be shown by proving "facts showing a motive for committing fraud and a clear opportunity for doing so," or by identifying strong circumstantial evidence of conscious behavior.  *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987), *overruled en banc on other grounds by U.S. v. Indelicato*, 865 F.2d 1370, 1378 (2d Cir. 1989).  The statute reaches wire transfers, and there is no requirement that the source of the funds be unlawful.  *See U.S. v. Piervinanzi*, 23 F.3d 670, 678–79 (2d Cir. 1994).<br><br>Defendants' assertion that the statute imposes a requirement that funds be transferred "from the United States to a place outside the United States" is false.  The statute, 18 U.S.C. § 1956(a)(2), provides: "Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States *or to a place in the United States from or through a place outside the United States*" (emphasis added).  The statute thus applies |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | | | | | | | equally to transfers to the United States from places outside the United States and encompasses the transaction at issue here. |
| 320. | Donziger, Fajardo, Yanza | 2009.10.27 | Fajardo | Donziger, Yanza | Email from Fajardo to Donziger and Yanza stating: "The puppeteer won't move his puppet until the audience doesn't [sic] pay him something." Stayers Decl. Ex. 3154. | Donziger does not dispute that Fajardo sent the cited email, but he disputes Chevron's unsupported legal conclusion that it constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission. Chevron has made no showing of criminal intent or materiality and its insinuation of impropriety with respect to Fajardo's use of the words "puppeteer" and "audience" is based on pure speculation. *See* Donziger Rule 56.1(b) Response to St. 204-205. Moreover, Fajardo's email is hearsay to the extent Chevron purports to use it for the truth of the matters asserted therein. Donziger incorporates his response to St. 204-05. | Undisputed.  Donziger's argument is misleading and false.  It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme.  *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997);  *see also U.S. v. Autuori*, 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35. <br><br> Defendants' arguments regarding "insinuation of impropriety" are irrelevant. <br><br> Defendants offer no innocent explanation for the email, and Chevron has submitted into evidence a sworn statement reflecting that Defendants had, prior to this email, entered an agreement with Guerra by which they would pay him to ghostwrite orders in their favor. Dkt. 746-3 at 3–8. <br><br> Referring in part to this email, this Court found: "Two emails appear strongly to corroborate Guerra's assertion that during Judge Zambrano's first tenure as the presiding judge of the Lago Agrio case (September 2009 through March 12, 2010), Judge Zambrano |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|-------------------------|-------------------|-----------------|
| | | | | | | | had an arrangement with Fajardo "to quickly move the case along in [the LAPs'] favor," that Judge Zambrano suggested that Guerra – who wrote his decisions in civil cases – meet with Fajardo, and that Guerra and Fajardo the[n] agreed that Guerra would move the case quickly, that he would limit Chevron's procedural options, and that the LAPs' representatives would pay Guerra $1,000 per month."  Dkt. 905 at 19 n.69. |
| 321. | Donziger, Yanza | 2009.11.27 | Yanza | Donziger | "However, it is important to clarify on this that the budget is higher in relation to the previous month, since we are paying the puppeteer, plus two girls who are helping the attorneys." Stayers Decl. Ex. 3163. | Donziger does not dispute that Yanza sent the cited email, but he disputes Chevron's unsupported legal conclusion that it constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission. Chevron has made no showing of criminal intent or materiality and its insinuation of impropriety with respect to Yanza's use of the word "puppeteer" is based on pure speculation. *See* Donziger Rule 56.1(b) Response to St. 204-205. Moreover, Yanza's email is hearsay to the extent Chevron purports to use it for the truth of the matters asserted therein. Donziger incorporates his response to St. 204-05. | Undisputed.  Donziger's argument is misleading and false.  It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori*, 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35.<br><br>Defendants' arguments regarding "insinuation of impropriety" are irrelevant.<br><br>Defendants offer no innocent explanation for the email, and Chevron has submitted into evidence a sworn statement reflecting that Defendants had, prior to this email, entered an agreement with Guerra by which they would pay him to ghostwrite orders in their favor. Dkt. 746-3 at 3–8. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | | | | | | | Referring in part to this email, this Court found: "Two emails appear strongly to corroborate Guerra's assertion that during Judge Zambrano's first tenure as the presiding judge of the Lago Agrio case (September 2009 through March 12, 2010), Judge Zambrano had an arrangement with Fajardo "to quickly move the case along in [the LAPs'] favor," that Judge Zambrano suggested that Guerra – who wrote his decisions in civil cases – meet with Fajardo, and that Guerra and Fajardo the[n] agreed that Guerra would move the case quickly, that he would limit Chevron's procedural options, and that the LAPs' representatives would pay Guerra $1,000 per month."  Dkt. 905 at 19 n.69. |
| 322. | Donziger, Fajardo, Yanza | 2009.12.29 | Fajardo | Donziger, Yanza | Donziger, Fajardo, and Yanza exchanged emails with the subject line "very important." Fajardo emailed Donziger copying Yanza stating, "When you come, I'll tell you the details, which I can't share by email. I think the plan for the judgment will be fulfilled. I'm not 100 percent sure, but I'm 99.99 percent sure." Dkt. 355-27 (Ex. 1084). | Donziger does not dispute that Fajardo sent the cited email, but he disputes Chevron's unsupported legal conclusion that it constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission. Chevron has made no showing of criminal intent or materiality and its insinuation of impropriety with respect to Fajardo's use of the word "judgment" is based on pure speculation. | Undisputed.  Donziger's argument is misleading and false.  It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme.  *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori*, 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35.  The Court already has found probable cause that Defendants ghostwrote the judgment, Dkt. 905 at 30, and Defendants do not dispute |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | | | | | | Nothing in this email supports Chevron's "ghostwriting" allegations. Moreover, Fajardo's email is hearsay to the extent Chevron purports to use it for the truth of the matters asserted therein. Donziger incorporates his response to St. 181. | that the ghostwriting of the judgment would be material.<br><br>On its face, this email reflects Defendants' plan to ghostwrite the judgment.  Defendants do not offer any other explanation for why Fajardo referred to a "plan for the judgment" or why he could not share the details by email.  Chevron also has submitted additional evidence from the same period reflecting Defendants' intent to ghostwrite the judgment. *See* St. 181.<br><br>In any event, Donziger's argument is not properly made in his 56.1 statement and should be disregarded. |
| 323. | Donziger | 2010.03.10 | DeLeon | Donziger | Payment via wire transfer of $500,000. Dkt. 561-5 (Ex. 2495) (DONZ00132928-35);from *see also* Dkt. 658-39 (Ex. 3032) (WOODS-HDD-0212468-96) (email attaching document entitled "Investment Agreement for Chevron/Ecuador Project.") | Donziger does not dispute that the cited document, on its face, shows a wire transfer of $500,000.00 Magister Law on 3/10/2010. However, Donziger disputes Chevron's unsupported legal conclusion that any such wire transfer constitutes a predicate act of wire fraud and/or mail fraud. For example, Chevron has not made any showing of criminal intent or materiality. Chevron also has not demonstrated that this transfer was in furtherance of any unlawful activity or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § | Undisputed.  Defendants' responses do not dispute that the transfers of funds were in furtherance of unlawful activity, and their argument is not properly made in a 56.1 response and should be disregarded.  Further, the facts described constitute the transmission of funds from or to the United States, "with the intent to promote the carrying on of specified unlawful activity."  18 U.S.C. § 1956(a)(2)(A). It is well-settled that intent may be shown by proving "facts showing a motive for committing fraud and a clear opportunity for doing so," or by identifying strong circumstantial evidence of conscious behavior.  *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|----|-----------------------|-------------------|-----------------|
| | | | | | | 1956(a)(2)(A). Indeed, it appears from cited document that the transfer of funds was from outside the United States to an account inside the United States. | Cir. 1987), *overruled en banc on other grounds by U.S. v. Indelicato,* 865 F.2d 1370, 1378 (2d Cir. 1989). The statute reaches wire transfers, and there is no requirement that the source of the funds be unlawful. *See U.S. v. Piervinanzi,* 23 F.3d 670, 678–79 (2d Cir. 1994).<br><br>Defendants' assertion that the statute imposes a requirement that funds be transferred "from the United States to a place outside the United States" is false. The statute, 18 U.S.C. § 1956(a)(2), provides: "Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary in-strument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States" (emphasis added). The statute thus applies equally to transfers to the United States from places outside the United States and encom-passes the transaction at issue here. |
| 324. | Donziger, Yanza, Fa-jardo | 2010.03.30 | Julio Prieto | Donziger, Yan-za, Fajardo | Prieto sent an email to Donziger, Yanza, Fajardo, and Saenz noting that "the effects" of disclosure were "potentially devastating in Ecuador (apart from destroy-ing the proceeding, all of us, your attorneys, might go to | Donziger does not dispute that Prieto sent the cited email. Donziger disputes, how-ever, that Chevron has provided a full de-scription of the email and also disputes that this email establishes that the Ecua-dorian Plaintiffs' contacts with Cabrera were improper. Prieto begins "Apparently this is normal in the U.S. and there is no | Undisputed. Donziger's argument is mislead-ing and false. It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori,* |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | | | | | jail)." Dkt. 9-6 (Ex. 11) at 1. | risk there, but the problem, my friend, is that the effects are potentially devastating in Ecuador . . . ." Dkt. 9-6 (Ex. 11) (DONZ00055225) at 1. This is clearly the unconsidered opinion—expressed in the heat of the moment—of but one member of the Ecuadorian Plaintiffs' team. This opinion is inconsistent with Ecuadorian law in place at the time, which did not prohibit coordination between parties and experts. *See* Donziger Rule 56.1(b) Statement, St. 71, 75, 78, and 95. Donziger also disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission. Indeed, Donziger has testified that he understood that all court experts in Ecuador worked closely with the parties and that parties could have access to them and that it would not have been improper for Chevron also to privately with Cabrera. Dkt. 613-8 (12/8/10 Donziger Depo. Tr.), at 959:25-960:8. Donziger also incorporates his response to St. 96. | 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35.  Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report's true authorship and illicit payments to him were "of some independent value" to the scheme, and therefore material.  Dkt. 745 at 35. Donziger's assertions, for example, that ex parte contacts were permitted under Ecuadorian law, do not in any way affect whether Defendants misrepresented their relationship with Cabrera in subsequent statements, including to U.S. courts.  Similarly, allegations that Chevron itself had ex parte contacts have no bearing on Defendants' misrepresentation of their contacts with Cabrera and the Ecuadorian court.  *See* Reply St. 347–52. |
| 325. | Donziger | 2010.04.23 | Donziger | Wilson | Donziger responded to April | Donziger does not dispute that he sent the | Undisputed.  Donziger's argument is mislead- |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|---|---|---|---|---|---|---|---|
| | | | | | 23, 2010 Wilson email re "explaining" collusion with expert, saying "We need a face to face asap. When is beltman depo?" Dkt. 47-58 (Ex. 296) at 1. | cited email, but he disputes Chevron's misleading and inaccurate description of it as involving "collusion with expert." Donziger also disputes Chevron's use of the word "collusion" as unsupported, argumentative, and improper in a Rule 56.1 statement. "Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford Inc.,* No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider,* No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)). Donziger also disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission. On its face, this privileged communication only evidences Donziger's desire to speak with Wilson regarding the Beltman deposition. There is nothing in improper in such a request. | ing and false. It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori,* 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35. Further, this email relates to Defendants' efforts to conceal their relationship with Cabrera and even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report's true authorship and illicit payments to him were "of some independent value" to the scheme, and therefore material. Dkt. 745 at 35. This Court has already found that there is probable cause to suspect at least some of the LAPs' counsel committed obstruction of justice and wire fraud in the Stratus 1782 action. Dkt. 905 at 36. This email is material as it was created in connection with that proceeding in furtherance of efforts to conceal Defendants' relationship with Cabrera. In any event, Donziger's argument is not properly made in his 56.1 statement and should be disregarded. |
| 326. | Fajardo, | 2010.05.05 | Fajardo, RICO | U.S. District | Declaration of Fajardo filed | Disputed. Donziger disputes Chevron's | Undisputed. This Court has already found |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | RICO Defendants | | Defendants | Court, District of Colorado | in a U.S. court making false and misleading statements about Cabrera's independence with the intent of deceiving the court. Fajardo falsely claimed Cabrera's work was independent, and grossly misstated the level of disclosure provided to Chevron and the court regarding the RICO Defendants' and their co-conspirators' work with Cabrera. Dkts. 48-13, 48-14 (Ex. 316). | conclusion that the Fajardo declaration contains "false and misleading claims regarding Cabrera's independence with intent of deceiving the court" as unsupported, argumentative, and improper in a Rule 56.1 statement. *See Goldstick v. The Hartford, Inc.,* No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, **J.**). Moreover, Chevron's insinuation that the declaration claims that Cabrera operated completely independently from the Ecuadorian Plaintiffs is a mischaracterization of the declaration. Fajardo never asserted that Cabrera operated independently from the Ecuadorian Plaintiffs. Donziger also disputes Chevron's unsupported legal conclusion that the filing of the cited declaration constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that the filing was incident to or in furtherance of any material misrepresentation or omission. Indeed, Donziger has testified that it was his intention that the Fajardo Declaration would be accurate. *See* Dkt. 613-11 (1/14/11 Donziger Depo. Tr.) at 2781:4-23. Donziger also incorporates his previous Rule 56.1(b) response (Dkt. 614) to St. 115, 125, and 189, and his brief in opposition to Chevron's Mo- | that "there is probable cause to suspect that at least some of those involved, as alleged extensively in the amended complaint, committed mail and/or wire fraud and obstructed justice in at least the Stratus 1782 proceeding in Colorado by formulating and filing the Fajardo declaration, which was a seriously misleading account of what had happened." Dkt. 905 at 36; *see also id.* at 36 n.134 ("Chevron has submitted subsequently evidence that shows – at the very least – that there is probable cause to suspect that the Fajardo declaration – which was filed electronically with several U.S. courts – misrepresented or concealed material facts about the LAPs' relationship with Cabrera."). <br><br> This Court has also found that the declaration was submitted with the intent to deceive courts as to the relationship with Cabrera. *See id.* at 68 ("PB worked with the LAPs to draft the Fajardo Declaration, which was intended to delay discovery and convince courts across the country that the LAPs' involvement in the judicial inspection process and Cabrera report was entirely proper.") <br><br> It is irrelevant whether or not Donziger, in self-serving testimony, stated that he intended the declaration to be accurate. Even if that were true, a submission can be fraudulent and misleading by virtue of material omissions. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|-------------------------|-------------------|-----------------|
| | | | | | | tion for Summary Judgment on its Eighth Claim for Relief (Dkt. 611) at 17-27. | As this Court found, the Fajardo declaration was a "seriously misleading account of what had happened." Dkt. 905 at 36.  This Court has detailed the material omissions of the declaration: "The Fajardo Declaration that ultimately was filed gave a bland description of the process by which the judicial inspections had been terminated, the global expert proposal adopted, and Cabrera in particular selected.  But it failed to mention that Fajardo and Donziger had threatened the judge with a misconduct complaint unless the judge agreed to their demands and appointed Cabrera.  And while it acknowledged that the LAPs had 'delivered materials to Mr. Cabrera,' it did not mention the March 3, 2007 meeting at which the LAPs laid out the plan for Cabrera's report and indicated that the work would be done by them.  Nor did it reveal that Stratus and the LAPs' counsel in fact had written all or most of Cabrera's report.  In other words, it omitted what the Emery Celli lawyer said was 'the most important part' – that Fajardo 'sent documents that originated from Stratus.'  The declaration similarly neglected to report that the LAPS 'chang[ed] the focus of [Cabrera's] data at [their] offices." *Id.* at 33 (citations omitted). |
| 327. | Donziger, RICO Defendants | 2010.05.07 | Donziger, RICO Defendants | U.S. District Court, Southern District of Texas | Filing in U.S. court by the RICO Defendants and their co-conspirators making false | Disputed. Donziger disputes Chevron's conclusion that the cited evidence contains "false and misleading statements | Undisputed.  Donziger's argument is misleading and false.  It is well-established that the wire communications themselves need not be |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|-------------------------|-------------------|-----------------|
| | | | | | and misleading statements regarding Cabrera's independence with the intent of deceiving the court. The RICO Defendants and their co-conspirators misrepresented that Cabrera was independent. Dkt. 49-37 (Ex. 373). | regarding Cabrera's independence with the intent of deceiving the court" as unsupported, argumentative, and improper in a Rule 56.1 statement. *See Goldstick v. The Hartford, Inc.,* No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, **J.**). Donziger also disputes Chevron's unsupported legal conclusion that the filing of the cited document constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that the filing was incident to or in furtherance of any material misrepresentation or omission. Indeed, Chevron does not allege that Donziger was even aware that the cited document was filed. Donziger also disputes Chevron's suggestion that the Ecuadorian Plaintiffs' interaction with, and provision of materials, to Cabrera was improper, or that it deprived Cabrera of his professional independence. Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts. Ecuadorian law permits experts to interact and coordinate with parties. Such coordination "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60), 1 8; Dkt. 614, St. 168. In | fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori*, 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35.  Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report's true authorship and illicit payments to him were "of some independent value" to the scheme, and therefore material.  Dkt. 745 at 35. This Court has already found probable cause that at least some Defendants committed obstruction of justice and wire fraud in the Stratus 1782 action, Dkt. 905 at 36, and this filing was made as part of a similar effort to conceal Defendants' relationship with Cabrera. Donziger's assertions, for example, that *ex parte* contacts were permitted under Ecuadorian law, do not in any way affect whether Defendants misrepresented their relationship with Cabrera in subsequent statements, including to U.S. courts.  Similarly, allegations that Chevron itself had ex parte contacts have no bearing on Defendants' misrepresentation of their relationship with Cabrera.  And whether Cabrera would be considered independent under Ecuadorian law is irrelevant |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|---|---|---|---|---|---|---|---|
| | | | | | | fact, it was understood in Ecuador that court appointed experts could rely on party resources. Dkt. 614, St. 168. Donziger incorporates his responses to St. 71, 75, 78, and 95, and his previous Rule 56.1(b) responses (Dkt. 614) to St. 167-169. *See also* St. 347-48, 351-55, *infra*. | because Defendants did not qualify their representations of Cabrera's independence or otherwise disclose their relationship with Cabrera.  Moreover, regardless of what Donziger now claims that Ecuadorian law may permit as a theoretical matter, Donziger admitted to co-counsel, contemporaneously with the conduct at issue, that the LAPs' actual relationship with Cabrera was improper under traditional Ecuadorian law.  *See* Dkt. 400-4 (Ex. 2047) ("The traditional Ecuadorian law perspective (which will be asserted by Chevron) would hold that the level of collaboration between one party and the expert is problematic and improper in that all court-appointed experts in Ecuador should be independent.")<br><br>In any event, Donziger's argument is not properly made in his 56.1 statement and should be disregarded. |
| 328. | Fajardo; RICO Defendants | 2010.05.07 | Fajardo; RICO Defendants | U.S. District Court, Southern District of Texas | Declaration of Fajardo filed in a U.S. Court making false and misleading claims regarding Cabrera's independence with intent of deceiving the court. Fajardo falsely claimed Cabrera's work was independent, and grossly misstated the level of disclosure provided to Chevron and | Disputed. Donziger disputes Chevron's conclusion that the Fajardo declaration contains "false and misleading claims regarding Cabrera's independence with intent of deceiving the court" as unsupported, argumentative, and improper in a Rule 56.1 statement. *See Goldstick v. The Hartford, Inc.,* No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, **J.**). Moreover, Chevron's | Undisputed.  This Court has already found that "there is probable cause to suspect that at least some of those involved, as alleged extensively in the amended complaint, committed mail and/or wire fraud and obstructed justice in at least the Stratus 1782 proceeding in Colorado by formulating and filing the Fajardo declaration, which was a seriously misleading account of what had happened."  Dkt. 905 at 36; *see also id.* at 36 n.134 ("Chevron |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|----|--------------------------|-------------------|-----------------|
|     |           |      |      |    | the court regarding the RICO Defendants' and their co-conspirators' work with Cabrera. Dkts. 49-39, 50-2 (Ex. 374). | insinuation that the declaration claims that Cabrera operated completely independently from the Ecuadorian Plaintiffs is a mischaracterization of the declaration. Fajardo never asserted that Cabrera operated independently from the Ecuadorian Plaintiffs. Donziger also disputes Chevron's unsupported legal conclusion that the filing of the cited declaration constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that the filing was incident to or in furtherance of any material misrepresentation or omission. Indeed, Donziger has testified that it was his intention that the Fajardo Declaration would be accurate. *See* Dkt. 613-11 (1/14/11 Donziger Depo. Tr.) at 2781:4-23. Donziger also incorporates his previous Rule 56.1(b) response (Dkt. 614) to St. 115, 125, and 189, and his brief in opposition to Chevron's Motion for Summary Judgment on its Eighth Claim for Relief (Dkt. 611) at 17-27. | has submitted subsequently evidence that shows – at the very least – that there is probable cause to suspect that the Fajardo declaration – which was filed electronically with several U.S. courts – misrepresented or concealed material facts about the LAPs' relationship with Cabrera."). This Court has also found that the declaration was submitted with the intent to deceive courts as to the relationship with Cabrera. *See id.* at 68 ("PB worked with the LAPs to draft the Fajardo Declaration, which was intended to delay discovery and convince courts across the country that the LAPs' involvement in the judicial inspection process and Cabrera report was entirely proper.") It is irrelevant whether or not Donziger, in self-serving testimony, stated that he intended the declaration to be accurate. Even if that were true, a submission can be fraudulent and misleading by virtue of material omissions. As this Court found, the Fajardo declaration was a "seriously misleading account of what had happened." Dkt. 905 at 36. This Court has detailed the material omissions of the declaration: "The Fajardo Declaration that ultimately was filed gave a bland description of the process by which the judicial inspections had been terminated, the global expert proposal adopted, and Cabrera in particular se- |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | | | | | | | lected. But it failed to mention that Fajardo and Donziger had threatened the judge with a misconduct complaint unless the judge agreed to their demands and appointed Cabrera. And while it acknowledged that the LAPs had 'delivered materials to Mr. Cabrera,' it did not mention the March 3, 2007 meeting at which the LAPs laid out the plan for Cabrera's report and indicated that the work would be done by them. Nor did it reveal that Stratus and the LAPs' counsel in fact had written all or most of Cabrera's report. In other words, it omitted what the Emery Celli lawyer said was 'the most important part' – that Fajardo 'sent documents that originated from Stratus.' The declaration similarly neglected to report that the LAPS "chang[ed] the focus of [Cabrera's] data at [their] offices." *Id.* at 33 (citations omitted). |
| 329. | Stratus, Donziger, RICO Defendants | 2010.05.17 | Stratus, Donziger, RICO Defendants | U.S. District Court, District of Colorado | Filing in U.S. court by the RICO Defendants and their co-conspirators making false and misleading statements regarding Cabrera's independence with the intent of deceiving the court. The RICO Defendants and their co-conspirators claimed Cabrera's statements that he was independent occurred before a Lago Agrio court | Disputed. Donziger disputes Chevron's characterization of the evidence as unsupported, argumentative, and improper in a Rule 56.1 statement. "Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford Inc.,* No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, **J.**) (quoting *Rodriguez v. Schneider,* No. 95 Civ. 4083(RPP) 1999 | Undisputed.  Donziger's argument is misleading and false.  It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes,* 981 F. Supp. 241, 253-54 (S.D.N.Y. 1997); *see also U.S. v. Autuori,* 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35.  Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|---|---|---|---|---|---|---|---|
| | | | | | order authorizing submissions from the parties. However, the RICO Defendants and their co-conspirators maintained an ongoing relationship with Cabrera for nearly a year prior to that order. Dkt. 48-15 (Ex. 317). | WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)). Moreover, Donziger disputes Chevron's unsupported legal conclusion that the filing of the cited document constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that the filing was incident to or in furtherance of any material misrepresentation or omission. | about the Cabrera Report's true authorship and illicit payments to him were "of some independent value" to the scheme, and therefore material.  Dkt. 745 at 35.<br><br>This Court has already found probable cause that at least some Defendants committed obstruction of justice and wire fraud in the Stratus 1782 action, Dkt. 905 at 36, and this filing was in furtherance of Defendants' efforts in that action, making this filing material.<br><br>In any event, Donziger's argument is not properly made in his 56.1 statement and should be disregarded. |
| 330. | Donziger | 2010.05.27 | Westenberger | Donziger | Co-conspirator Westenberger, in discussing strategies for limiting discovery of the Cabrera fraud via email, wrote "What about the following? Appeal; move for stay; if we win with kane great; if we lose, we produce whatever we want (narrow read); gd complains and then we move for clarification. If we lose again, we think about another appeal." Dkt. (Ex. 292) at 1. | Disputed. Donziger disputes Chevron's characterization of this email as involving "strategies for limiting discovery of the Cabrera fraud." Donziger also disputes Chevron's use of the words "coconspirator" and "Cabrera fraud" as unsupported, argumentative, and improper in a Rule 56.1 statement. "Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford Inc.,* No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider,* No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 | Undisputed.  Donziger's argument is misleading and false.  It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme.  *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori*, 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35.  Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' efforts to conceal their relationship with Cabrera were "of some independent value" to the scheme, and therefore material. Dkt. 745 at 35. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | | | | | | (S.D.N.Y. June 29, 1999)). Donziger also disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission. Donziger also incorporates his Rule 56.1(b) response to St. 97. | This Court has already found probable cause that at least some of the LAPs' attorneys committed obstruction of justice and wire fraud in the Stratus 1782 action, Dkt. 905 at 36, and this email was in furtherance of Defendants' efforts in that regard, making this email material.<br><br>In any event, Donziger's argument is not properly made in his 56.1 statement and should be disregarded. |
| 331. | Donziger | 2010.05.27 | Donziger | Wilson | Donziger sent an email to Wilson stating, "I think we should appeal on the theory that we gain a greater advantage by fighting them on everything, and tying them up, than in conceding anyone thing even if we expect to ultimately lose that one thing down the road." Dkt. 48-21 (Ex. 323) at 1. | Donziger does not dispute that he sent the cited email, but he disputes Chevron's unsupported legal conclusion that it constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission. Donziger also incorporates his response to St. 97. | Undisputed. Donziger's argument is misleading and false. It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori*, 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35. Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report's true authorship and illicit payments to him were "of some independent value" to the scheme, and therefore material. Dkt. 745 at 35.<br><br>This Court already has found probable cause to suspect that at least some Defendants |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | | | | | | | committed obstruction of justice and wire fraud in the Stratus 1782 proceeding.  Dkt. 905 at 36. |
| 332. | Fajardo, RICO Defendants | 2010.06.07 | Fajardo, RICO Defendants | United States District Court, District of New Jersey | Declaration of Fajardo filed in U.S. Court making false and misleading claims regarding Cabrera's independence with intent of deceiving the court. Fajardo falsely claimed Cabrera's work was independent, and grossly misstated the level of disclosure provided to Chevron and the court regarding the RICO Defendants' and their co-conspirators' work with Cabrera. Dkts. 50-3, 50-4 (Ex. 375). | Disputed. Donziger disputes Chevron's conclusion that the Fajardo declaration contains "false and misleading claims regarding Cabrera's independence with intent of deceiving the court" as unsupported, argumentative, and improper in a Rule 56.1 statement. *See Goldstick v. The Hartford, Inc.,* No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, **J.).** Moreover, Chevron's insinuation that the declaration claims that Cabrera operated completely independently from the Ecuadorian Plaintiffs is a mischaracterization of the declaration. Fajardo never asserted that Cabrera operated independently from the Ecuadorian Plaintiffs. Donziger also disputes Chevron's unsupported legal conclusion that the filing of the cited declaration constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that the filing was incident to or in furtherance of any material misrepresentation or omission. Indeed, Donziger has testified that it was his intention that the Fajardo Declaration would be accurate. | Undisputed.  This Court has already found that "there is probable cause to suspect that at least some of those involved, as alleged extensively in the amended complaint, committed mail and/or wire fraud and obstructed justice in at least the Stratus 1782 proceeding in Colorado by formulating and filing the Fajardo declaration, which was a seriously misleading account of what had happened."  Dkt. 905 at 36; *see also id.* at 36 n.134 ("Chevron has submitted subsequently evidence that shows – at the very least – that there is probable cause to suspect that the Fajardo declaration – which was filed electronically with several U.S. courts – misrepresented or concealed material facts about the LAPs' relationship with Cabrera.").<br><br>This Court has also found that the declaration was submitted with the intent to deceive courts as to the relationship with Cabrera. *See id.* at 68 ("PB worked with the LAPs to draft the Fajardo Declaration, which was intended to delay discovery and convince courts across the country that the LAPs' involvement in the judicial inspection process and Cabrera report was entirely proper.") |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|----|--------------------------|-------------------|------------------|
| | | | | | | *See* Dkt. 613-11 (1/14/11 Donziger Depo. Tr.) at 2781:4-23. Donziger also incorporates his previous Rule 56.1(b) response (Dkt. 614) to St. 115, 125, and 189, and his brief in opposition to Chevron's Motion for Summary Judgment on its Eighth Claim for Relief (Dkt. 611) at 17-27. | It is irrelevant whether or not Donziger, in self-serving testimony, stated that he intended the declaration to be accurate. Even if that were true, a submission can be fraudulent and misleading by virtue of material omissions. As this Court found, the Fajardo declaration was a "seriously misleading account of what had happened." Dkt. 905 at 36. This Court has detailed the material omissions of the declaration: "The Fajardo Declaration that ultimately was filed gave a bland description of the process by which the judicial inspections had been terminated, the global expert proposal adopted, and Cabrera in particular selected. But it failed to mention that Fajardo and Donziger had threatened the judge with a misconduct complaint unless the judge agreed to their demands and appointed Cabrera. And while it acknowledged that the LAPs had 'delivered materials to Mr. Cabrera,' it did not mention the March 3, 2007 meeting at which the LAPs laid out the plan for Cabrera's report and indicated that the work would be done by them. Nor did it reveal that Stratus and the LAPs' counsel in fact had written all or most of Cabrera's report. In other words, it omitted what the Emery Celli lawyer said was 'the most important part' – that Fajardo 'sent documents that originated from Stratus.' The declaration similarly neglected to report that the LAPS "chang[ed] the focus of [Cabrera's] |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|-------------------------|-------------------|-----------------|
| | | | | | | | data at [their] offices." *Id.* at 33 (citations omitted). |
| 333. | Donziger | 2010.06.11 | DeLeon | Donziger | Payment via wire transfer of $250,000. Dkt. 370-8 (Ex. 1224) (DONZ00132922-27).from | Donziger does not dispute that the cited document, on its face, shows a wire transfer of $250,000.00 Magister Law to Donziger on 6/11/2010. However, Donziger disputes Chevron's unsupported legal conclusion that this transfer constitutes a predicate act of wire fraud and/or money laundering. In particular, Chevron has not made any showing of criminal intent or materiality. Chevron also has not demonstrated that this transfer was in furtherance of any unlawful activity or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A). Indeed, this document describes a $15.00 charge in connection with the $250,000.00 transfer for an "Incoming *Domestic* Wire Fee." DONZ00132924. | Undisputed.  Defendants' responses do not dispute that the transfers of funds were in furtherance of unlawful activity, and their argument is not properly made in a 56.1 response and should be disregarded.  Further, the facts described constitute the transmission of funds from or to the United States, "with the intent to promote the carrying on of specified unlawful activity."  18 U.S.C. § 1956(a)(2)(A). It is well-settled that intent may be shown by proving "facts showing a motive for committing fraud and a clear opportunity for doing so," or by identifying strong circumstantial evidence of conscious behavior.  *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987), *overruled en banc on other grounds by U.S. v. Indelicato,* 865 F.2d 1370, 1378 (2d Cir. 1989).  The statute reaches wire transfers, and there is no requirement that the source of the funds be unlawful.  *See U.S. v. Piervinanzi*, 23 F.3d 670, 678–79 (2d Cir. 1994).<br><br>Defendants' assertion that the statute imposes a requirement that funds be transferred "from the United States to a place outside the United States" is false.  The statute, 18 U.S.C. § 1956(a)(2), provides: "Whoever transports, transmits, or transfers, or attempts to |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|---|---|---|---|---|---|---|---|
| | | | | | | | transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States *or to a place in the United States from or through a place outside the United States*" (emphasis added).  The statute thus applies equally to transfers to the United States from places outside the United States and encompasses the transaction at issue here. |
| 334. | Donziger, Fajardo | 2010.06.18 | Fajardo | Donziger, Saenz, Prieto | Fajardo emailed Donziger, Prieto, and Saenz with the subject line "Trust." Portions of Fajardo's email, including misquotations and miscitations to legal authority, appear verbatim in the Judgment. Dkt. 401- 7 (Ex. 2174). | Disputed. Chevron's description of this email contains conclusions based solely on the opinion of a paid expert witness. The conclusion or opinion of an expert witness is not proper for inclusion in a Rule 56.1 statement of facts. "Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.,* No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, **J.**) (quoting *Rodriguez v. Schneider,* No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)). Donziger also disputes Chevron's unsupported legal conclusion that this email constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was | Undisputed.  Donziger's argument is misleading and false.  It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes,* 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori,* 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35.  The Court has found that evidence of overlap between this email and the judgment supports a finding of probable cause that Defendants ghostwrote the judgment, Dkt. 905 at 22–23 n.78, and Defendants do not dispute that the ghostwriting of the judgment would be material. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|----|-----------------------|-------------------|-----------------|
| | | | | | | incident to or in furtherance of any material misrepresentation or omission. Donziger also incorporates the Ecuadorian Plaintiffs' response to St. 157. | |
| 335. | Donziger, Fajardo | 2010.06.18 | Fajardo | Donziger, Saenz, Prieto | Fajardo emailed Donziger, Julio Prieto, and Juan Pablo Saenz an Ecuadorian Supreme Court case entitled *Delfina Torres de Concha v. Petroecuador* and stated that "the arguments by the magistrates are very interesting. I think they serve us well for our alegato and ... Worth reading." Dkt. 355-46 (Ex. 1167). | Donziger does not dispute that Fajardo sent the cited email, but he disputes Chevron's unsupported legal conclusion that it constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission. Indeed, on its face, this privileged email only evidences Fajardo's intention to call attention to an opinion that he found interesting and that believed might be useful in preparing the Ecuadorian Plaintiffs' *alegato final,* or final submission to the Lago Agrio Court regarding liability. Chevron's insinuation of impropriety is based on pure speculation. | Undisputed. Donziger's argument is misleading and false. It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori*, 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35. The Court has found that evidence of overlap between this email and the judgment supports a finding of probable cause that Defendants ghostwrote the judgment, Dkt. 905 at 22–23 n.78, and Defendants do not dispute that the ghostwriting of the judgment would be material.<br><br>Defendants' explanation ignores the ellipses in Fajardo's email: "alegato and …" If Fajardo was referring only to the alegato, as Defendants assert, there would be no reason for the "and …" following "alegato." Evidence reflects that Fajardo used "alegato and …" or similar formulations such as "alegato and the other project" to refer to Defendants' plans for ghostwriting the judgment. *See* St. 181. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|-------------------------|-------------------|-----------------|
| | | | | | | | Defendants' argument regarding "insinuation of impropriety" is irrelevant. |
| 336. | Donziger, RICO Defendants | 2010.06.21 | Donziger, RICO Defendants | U.S. District Court, District of Colorado | Filing in U.S. court by the RICO Defendants and their co-conspirators making false and misleading statements with the intent of deceiving the court. In a "Second Response to `Update on Lago Agrio Proceeding,'" the RICO Defendants and their co-conspirators falsely claimed that any of their materials which had ultimately been included in Cabrera's report were submitted to Cabrera pursuant to a Lago Agrio court order. Dkt. 50-5 (Ex. 376). | Disputed. Donziger disputes Chevron's conclusion that the cited evidence contains "false and misleading statements with the intent of deceiving the court" as unsupported, argumentative, and improper in a Rule 56.1 statement. "Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.,* No. 00-Civ-8577 (LAK), 2002 WL 1906029, at \*1 (S.D.N.Y Aug. 19, 2002) (Kaplan, **J.)** (quoting *Rodriguez v. Schneider,* No. 95 Civ. 4083(RPP) 1999 WL 459813, \*1 n.3 (S.D.N.Y. June 29, 1999)). Donziger also disputes Chevron's unsupported legal conclusion that the filing of the cited document constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that the filing was incident to or in furtherance of any material misrepresentation or omission. Indeed, Chevron has not established that Donziger was even aware that the cited document was filed, much less that he possessed a criminal intent to deceive | Undisputed. Donziger's argument is misleading and false. It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori*, 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35. Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report's true authorship and illicit payments to him were "of some independent value" to the scheme, and therefore material. Dkt. 745 at 35. <br><br> This Court already has found probable cause to suspect that at least some of the LAPs' lawyers committed obstruction of justice and wire fraud in the Stratus 1782 proceeding. Dkt. 905 at 36. As this filing was part of Defendants' effort in that action to conceal their relationship with Cabrera, it is material. <br><br> In any event. Donziger's argument is not properly made in his 56.1 statement and should be disregarded. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|---|---|---|---|---|---|---|---|
| | | | | | | the court. | |
| 337. | Fajardo, RICO Defendants | 2010.06.21 | Fajardo, RICO Defendants | U.S. District Court, District of Colorado | Filing in U.S. court by the RICO Defendants and their co-conspirators attaching as an exhibit a filing Fajardo submitted to the Lago Agrio court, which makes false and misleading statements regarding Cabrera' 5 independence, with the intent of deceiving the court. Dkt. 50-6 (Ex. 377). | Disputed. Donziger disputes Chevron's conclusion that the cited evidence contains "false and misleading statements regarding Cabrera's independence, with the intent of deceiving the court" as unsupported, argumentative, and improper in a Rule 56.1 statement. "Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions . . . .'" *Goldstick v. The Hartford, Inc.,* No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19. 2002) (Kaplan, J.) (quoting *Rodriguez v. Schneider,* No. 95 Civ. 4083(RPP) 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999)). Moreover, Chevron's suggestion that the Fajardo submission makes statements that Cabrera operated completely independently from the Ecuadorian Plaintiffs is a mischaracterization of the evidence. Fajardo never asserted that Cabrera operated independently from the Ecuadorian Plaintiffs. Donziger also disputes Chevron's unsupported legal conclusion that the filing of the cited document constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demon- | Undisputed. Donziger's argument is misleading and false. It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori*, 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35. Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report's true authorship and illicit payments to him were "of some independent value" to the scheme, and therefore material. Dkt. 745 at 35.<br><br>This Court already has found probable cause to suspect that at least some of the LAPs' lawyers committed obstruction of justice and wire fraud in the Stratus 1782 proceeding. Dkt. 905 at 36. As this filing was part of Defendants' effort in that action to conceal their relationship with Cabrera, it is material.<br><br>In any event. Donziger's argument is not properly made in his 56.1 statement and should be disregarded. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|--------------------------|-------------------|-----------------|
| | | | | | | strated that the filing was incident to or in furtherance of any material misrepresentation or omission. Indeed, Donziger has testified that he was not involved the decision to file the Fajardo petition in any U.S. court proceeding. Donziger also incorporates his previous Rule 56.1(b) response (Dkt. 614) to St. 115, 204-205, and his brief in opposition to Chevron's MSJ on its Eighth Claim for Relief (Dkt. 611) at 17-27. | |
| 338. | Donziger, Fajardo, Yanza | 2010.07.26 | Fajardo | Donziger, Saenz, Prieto, Renato Garcia | Fajardo emailed Donziger, Luis Yanza, Julio Prieto, Juan Pablo Saenz, and Renato Garcia with the subject line "Judgments and Publications" and stating, "Colleagues, taking advantage of the facilities in the U.S. and the cooperation of friends here, please find below a series of links and text citations related to our case. Some of them are very interesting and, as a matter of fact, will help us with the alegato and..." Dkt. 400-17 (Ex. 2111). | Donziger does not dispute that Fajardo sent the cited email, but he disputes Chevron's unsupported legal conclusion that it constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission. Indeed, on its face, this privileged email only evidences Fajardo's intention to call attention to resources that he found interesting and that believed might be useful in preparing the Ecuadorian Plaintiffs' *alegato final,* or final submission to the Lago Agrio Court regarding liability. Chevron's insinuation of impropriety is based on pure speculation. Donziger also incorporates his response to St. 181. | Undisputed. Donziger's argument is misleading and false. It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori*, 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35. Chevron has introduced evidence that the email refers to the ghostwriting of the judgment, *see* St. 181, and Defendants do not dispute that the ghostwriting of the judgment would be material.<br><br>Defendants' explanation ignores the ellipses in Fajardo's email: "alegato and …" If Fajardo was referring only to the alegato, as Defendants assert, there would be no reason for the "and …" following "alegato." Evidence |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|---|---|---|---|---|---|---|---|
| | | | | | | | reflects that Fajardo used "alegato and …" or similar formulations such as "alegato and the other project" to refer to Defendants' plans for ghostwriting the judgment.  *See* St. 181.<br><br>Defendants' argument regarding "insinuation of impropriety" is irrelevant. |
| 339. | Donziger | 2010.08.17 | DeLeon | Donziger | Payment via wire transfer of $1,250,000. Dkt. 370-6 (Ex. 1198) (DONZ000132896-903). | Donziger does not dispute that the cited document, on its face, shows a wire transfer of 1,250,000 from Magister Law to Donziger on 8/17/2010. However, Donziger disputes Chevron's unsupported legal conclusion that this transfer constitutes a predicate act of wire fraud and/or money laundering. In particular, Chevron has not made any showing of criminal intent or materiality. Chevron also has not demonstrated that this transfer was in furtherance of any unlawful activity or that it constitutes a transfer of funds from the United States to a place outside the United States, as required by 28 U.S.C. § 1956(a)(2)(A). Indeed, this document describes a $15.00 charge in connection with the $1,250,000 transfer for an "Incoming *Domestic* Wire Fee." DONZ00132898. | Undisputed.  Defendants' responses do not dispute that the transfers of funds were in furtherance of unlawful activity, and their argument is not properly made in a 56.1 response and should be disregarded.  Further, the facts described constitute the transmission of funds from or to the United States, "with the intent to promote the carrying on of specified unlawful activity."  18 U.S.C. § 1956(a)(2)(A). It is well-settled that intent may be shown by proving "facts showing a motive for committing fraud and a clear opportunity for doing so," or by identifying strong circumstantial evidence of conscious behavior.  *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987), *overruled en banc on other grounds by U.S. v. Indelicato,* 865 F.2d 1370, 1378 (2d Cir. 1989).  The statute reaches wire transfers, and there is no requirement that the source of the funds be unlawful.  *See U.S. v. Piervinanzi*, 23 F.3d 670, 678–79 (2d Cir. 1994).<br><br>Defendants' assertion that the statute imposes |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|---|---|---|---|---|---|---|---|
| | | | | | | | a requirement that funds be transferred "from the United States to a place outside the United States" is false.  The statute, 18 U.S.C. § 1956(a)(2), provides: "Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States *or to a place in the United States from or through a place outside the United States*" (emphasis added).  The statute thus applies equally to transfers to the United States from places outside the United States and encompasses the transaction at issue here. |
| 340. | Donziger | 2010.08.18 | Adlai Small | Donziger | Small sent an email to report issues, and stated, "One overarching theme to think about throughout this process is how we want the new expert to address the Cabrera report and its conclusion. While our new expert will most likely rely on some of the same data as Cabrera (and come to the same conclusions as Cabrera), do we think the expert should make specific mention of such consistencies?" Small explained that he thought they should attempt to structure the new | Donziger does not dispute that Small sent the cited conclusion that it constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger' s alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission. Moreover, the Court has already concluded, even without the benefit of any merits opposition, that loin the present record ... the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. In connection with Patton Boggs subpoena, the | Undisputed.  Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him.  In any event, Donziger's argument is not properly made in his 56.1 statement and should be disregarded.<br><br>Donziger's argument is misleading and false.  It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme.  *Madanes v. Madanes*, 981 F. Supp. 241, 253–54 (S.D.N.Y. 1997); *see also U.S. v. Autuori*, 212 F.3d 105, 115–18 (2d Cir. 2000); Dkt. 745 at 35.  Further, even if the materiality of the Cabrera Report |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|----|-----|-----|-----|
| | | | | | expert reports in such a way that they might rehabilitate the tainted Cabrera report to some degree, so that someone presented with the new reports "might feel comfortable concluding that certain parts of Cabrera are a valid basis for damages." Dkt. 36-7 (Ex. 214) at 1. | Court has also concluded that "there is insufficient factual basis to suspect that the cleansing reports themselves were fraudulent ..." Dkt. 905 at 64. The Court also noted that "Chevron has not pointed to anything in the cleansing reports themselves that appears to have been fraudulent." *Id.* | were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report's true authorship and illicit payments to him were "of some independent value" to the scheme, and therefore material. Dkt. 745 at 35.  In any event, Donziger's argument is not properly made in his 56.1 statement and should be disregarded. |
| 341. | Fajardo, RICO Defendants | 2010.08.24 | Fajardo, RICO Defendants | U.S. District Court,<br><br>Western District of North Carolina | Declaration of Fajardo filed in U.S. Court making false and misleading claims regarding Cabrera's independence with intent of deceiving the court. Fajardo falsely claimed Cabrera's work was independent, and grossly misstated the level of disclosure provided to Chevron and the court regarding the RICO Defendants' and their co-conspirators' work with Cabrera. Dkts. 51-4, 51-5 (Ex. 382). | Disputed. Donziger disputes Chevron's conclusion that the Fajardo declaration contains "false and misleading claims regarding Cabrera's independence with intent of deceiving the court" as unsupported, argumentative, and improper in a Rule 56.1 statement. *See Goldstick v. The Hartford, Inc.,* No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, **J.**). Moreover, Chevron's insinuation that the declaration claims that Cabrera operated completely independently from the Ecuadorian Plaintiffs is a mischaracterization of the declaration. Fajardo never asserted that Cabrera operated independently from the Ecuadorian Plaintiffs. Donziger also disputes Chevron's unsupported legal conclusion that the filing of the cited declaration constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron | Undisputed.  This Court has already found that "there is probable cause to suspect that at least some of those involved, as alleged extensively in the amended complaint, committed mail and/or wire fraud and obstructed justice in at least the Stratus 1782 proceeding in Colorado by formulating and filing the Fajardo declaration, which was a seriously misleading account of what had happened."  Dkt. 905 at 36; *see also id.* at 36 n.134 ("Chevron has submitted subsequently evidence that shows – at the very least – that there is probable cause to suspect that the Fajardo declaration – which was filed electronically with several U.S. courts – misrepresented or concealed material facts about the LAPs' relationship with Cabrera.").<br><br>This Court has also found that the declaration was submitted with the intent to deceive courts as to the relationship with Cabrera. |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | | | | | | has not established Donziger's alleged criminal intent, nor has it demonstrated that the filing was incident to or in furtherance of any material misrepresentation or omission. Indeed, Donziger has testified that it was his intention that the Fajardo Declaration would be accurate. *See* Dkt. 613-11 (1/14/11 Donziger Depo. Tr.) at 2781:4-23. Donziger also incorporates his previous Rule 56.1(b) response (Dkt. 614) to St. 115, 125, and 189, and his brief in opposition to Chevron's Motion for Summary Judgment on its Eighth Claim for Relief (Dkt. 611) at 17-27. | *See id.* at 68 ("PB worked with the LAPs to draft the Fajardo Declaration, which was intended to delay discovery and convince courts across the country that the LAPs' involvement in the judicial inspection process and Cabrera report was entirely proper.") It is irrelevant whether or not Donziger, in self-serving testimony, stated that he intended the declaration to be accurate.  Even if that were true, a submission can be fraudulent and misleading by virtue of material omissions. As this Court found, the Fajardo declaration was a "seriously misleading account of what had happened." Dkt. 905 at 36.  This Court has detailed the material omissions of the declaration: "The Fajardo Declaration that ultimately was filed gave a bland description of the process by which the judicial inspections had been terminated, the global expert proposal adopted, and Cabrera in particular selected. But it failed to mention that Fajardo and Donziger had threatened the judge with a misconduct complaint unless the judge agreed to their demands and appointed Cabrera. And while it acknowledged that the LAPs had 'delivered materials to Mr. Cabrera,' it did not mention the March 3, 2007 meeting at which the LAPs laid out the plan for Cabrera's report and indicated that the work would be done by them. Nor did it reveal that Stratus and the LAPs' counsel in fact had written all |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | | | | | | | or most of Cabrera's report. In other words, it omitted what the Emery Celli lawyer said was 'the most important part' – that Fajardo 'sent documents that originated from Stratus.' The declaration similarly neglected to report that the LAPS "chang[ed] the focus of [Cabrera's] data at [their] offices." *Id.* at 33 (citations omitted). |
| 342. | Fajardo, RICO Defendants | 2010.08.25 | Fajardo, RICO Defendants | U.S. District Court, District of New Mexico | Declaration of Fajardo filed in U.S. Court making false and misleading claims regarding Cabrera's independence with intent of deceiving the court. Fajardo falsely claimed Cabrera's work was independent, and grossly misstated the level of disclosure provided to Chevron and the court regarding the RICO Defendants' and their co-conspirators' work with Cabrera. Dkt. 51-6 (Ex. 383). | Disputed. Donziger disputes Chevron's conclusion that the Fajardo declaration contains "false and misleading claims regarding Cabrera's independence with intent of deceiving the court" as unsupported, argumentative, and improper in a Rule 56.1 statement. *See Goldstick v. The Hartford, Inc.,* No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, J.). Moreover, Chevron's insinuation that the declaration claims that Cabrera operated completely independently from the Ecuadorian Plaintiffs is a mischaracterization of the declaration. Fajardo never asserted that Cabrera operated independently from the Ecuadorian Plaintiffs. Donziger also disputes Chevron's unsupported legal conclusion that the filing of the cited declaration constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated | Undisputed. This Court has already found that "there is probable cause to suspect that at least some of those involved, as alleged extensively in the amended complaint, committed mail and/or wire fraud and obstructed justice in at least the Stratus 1782 proceeding in Colorado by formulating and filing the Fajardo declaration, which was a seriously misleading account of what had happened." Dkt. 905 at 36; *see also id.* at 36 n.134 ("Chevron has submitted subsequently evidence that shows – at the very least – that there is probable cause to suspect that the Fajardo declaration – which was filed electronically with several U.S. courts – misrepresented or concealed material facts about the LAPs' relationship with Cabrera."). <br><br> This Court has also found that the declaration was submitted with the intent to deceive courts as to the relationship with Cabrera. *See id.* at 68 ("PB worked with the LAPs to draft the Fajardo Declaration, which was in- |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
|  |  |  |  |  |  | that the filing was incident to or in furtherance of any material misrepresentation or omission. Indeed, Donziger has testified that it was his intention that the Fajardo Declaration would be accurate. *See* Dkt. 613-11 (1/14/11 Donziger Depo. Tr.) at 2781:4-23. Donziger also incorporates his previous Rule 56.1(b) response (Dkt. 614) to St. 115, 125, and 189, and his brief in opposition to Chevron's Motion for Summary Judgment on its Eighth Claim for Relief (Dkt. 611) at 17-27. | tended to delay discovery and convince courts across the country that the LAPs' involvement in the judicial inspection process and Cabrera report was entirely proper.")<br><br>It is irrelevant whether or not Donziger, in self-serving testimony, stated that he intended the declaration to be accurate.  Even if that were true, a submission can be fraudulent and misleading by virtue of material omissions. As this Court found, the Fajardo declaration was a "seriously misleading account of what had happened."  Dkt. 905 at 36.  This Court has detailed the material omissions of the declaration: "The Fajardo Declaration that ultimately was filed gave a bland description of the process by which the judicial inspections had been terminated, the global expert proposal adopted, and Cabrera in particular selected. But it failed to mention that Fajardo and Donziger had threatened the judge with a misconduct complaint unless the judge agreed to their demands and appointed Cabrera. And while it acknowledged that the LAPs had 'delivered materials to Mr. Cabrera,' it did not mention the March 3, 2007 meeting at which the LAPs laid out the plan for Cabrera's report and indicated that the work would be done by them. Nor did it reveal that Stratus and the LAPs' counsel in fact had written all or most of Cabrera's report. In other words, it omitted what the Emery Celli lawyer said was |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | | | | | | | 'the most important part' – that Fajardo 'sent documents that originated from Stratus.' The declaration similarly neglected to report that the LAPS "chang[ed] the focus of [Cabrera's] data at [their] offices." *Id.* at 33 (citations omitted). |
| 343. | Fajardo, RICO Defendants | 2010.08.28 | Fajardo, RICO Defendants | U.S. District Court, Southern District of New York | Declaration of Fajardo filed in U.S. Court making false and misleading claims regarding Cabrera's independence with intent of deceiving the court. Fajardo falsely claimed Cabrera's work was independent, and grossly misstated the level of disclosure provided to Chevron and the court regarding the RICO Defendants' and their co-conspirators' work with Cabrera. Dkt. 51-7 (Ex. 384). | Disputed. Donziger disputes Chevron's conclusion that the Fajardo declaration contains "false and misleading claims regarding Cabrera's independence with intent of deceiving the court" as unsupported, argumentative, and improper in a Rule 56.1 statement. *See Goldstick v. The Hartford, Inc.,* No. 00-Civ-8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y Aug. 19. 2002) (Kaplan, **J.**). Moreover, Chevron's insinuation that the declaration claims that Cabrera operated completely independently from the Ecuadorian Plaintiffs is a mischaracterization of the declaration. Fajardo never asserted that Cabrera operated independently from the Ecuadorian Plaintiffs. Donziger also disputes Chevron's unsupported legal conclusion that the filing of the cited declaration constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that the filing was incident to or in furtherance of any material misrepresenta- | This Court has already found that "there is probable cause to suspect that at least some of those involved, as alleged extensively in the amended complaint, committed mail and/or wire fraud and obstructed justice in at least the Stratus 1782 proceeding in Colorado by formulating and filing the Fajardo declaration, which was a seriously misleading account of what had happened." Dkt. 905 at 35. *See also id.* at 35 n.134 ("Chevron has submitted subsequently evidence that shows – at the very least – that there is probable cause to suspect that the Fajardo declaration – which was filed electronically with several U.S. courts – misrepresented or concealed material facts about the LAPs' relationship with Cabrera."). This Court has also found that the declaration was submitted with the intent to deceive courts as to the relationship with Cabrera. *See id.* at 67 ("PB worked with the LAPs to draft the Fajardo Declaration, which was intended to delay discovery and convince courts across the country that the LAPs' involve- |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|--------------------------|-------------------|------------------|
| | | | | | | tion or omission. Indeed, Donziger has testified that it was his intention that the Fajardo Declaration would be accurate. *See* Dkt. 613-11 (1/14/11 Donziger Depo. Tr.) at 2781:4-23. Donziger also incorporates his previous Rule 56.1(b) response (Dkt. 614) to St. 115, 125, and 189, and his brief in opposition to Chevron's Motion for Summary Judgment on its Eighth Claim for Relief (Dkt. 611) at 17-27. | ment in the judicial inspection process and Cabrera report was entirely proper.")<br><br>It is irrelevant whether or not Donziger, in self-serving testimony, stated that he intended the declaration to be accurate.  Even if that were true, a submission can be fraudulent and misleading by virtue of material omissions. As this Court found, the Fajardo declaration was a "seriously misleading account of what had happened." *Id.* at 35.  This Court has detailed the material omissions of the declaration: "The Fajardo Declaration that ultimately was filed gave a bland description of the process by which the judicial inspections had been terminated, the global expert proposal adopted, and Cabrera in particular selected. But it failed to mention that Fajardo and Donziger had threatened the judge with a misconduct complaint unless the judge agreed to their demands and appointed Cabrera. And while it acknowledged that the LAPs had 'delivered materials to Mr. Cabrera,' it did not mention the March 3, 2007 meeting at which the LAPs laid out the plan for Cabrera's report and indicated that the work would be done by them. Nor did it reveal that Stratus and the LAPs' counsel in fact had written all or most of Cabrera's report. In other words, it omitted what the Emery Celli lawyer said was 'the most important part' – that Fajardo 'sent documents that originated from Stratus.' The |

| No. | Defendant | Date | From | To | Description and Citation | Donziger Response | Chevron's Reply |
|-----|-----------|------|------|-----|------------------------|-------------------|-----------------|
| | | | | | | | declaration similarly neglected to report that the LAPS "chang[ed] the focus of [Cabrera's] data at [their] offices." *Id.* at 32 (citations omitted). |
| 344. | Donziger | 2010.09.08 | Eric Daleo | Donziger, Westenberger | Daleo, Donziger, and Westenberger discussed via email the importance of having someone defend the Powers deposition, given "[h]e has substantial knowledge and involvement in the Cabrera Report drafting." Dkt. 47-65 (Ex. 303) at 1. | Donziger does not dispute that Daleo sent the cited email, but he disputes Chevron's unsupported legal conclusion that it constitutes a predicate act of wire fraud and/or money laundering. For example, Chevron has not established Donziger's alleged criminal intent, nor has it demonstrated that this email was incident to or in furtherance of any material misrepresentation or omission. Indeed, there is nothing unlawful or improper about an attorney describing in a privileged communication his assessment as to the importance that a deposition be defended. Moreover, the Court has already concluded, even without the benefit of any merits opposition, that loin the present record ... the ultimate materiality of the taint that indisputably has been established [as to the appointment of Cabrera and the Cabrera report] thus far remains a genuine issue." Dkt. 550, at 93. | Undisputed. Donziger is liable for the acts of his agents and co-conspirators, which may be asserted as predicate acts against him. In any event, Donziger's argument is not properly made in his 56.1 statement and should be disregarded.

Donziger's argument is misleading and false. It is well-established that the wire communications themselves need not be fraudulent, and communications organizing or managing a fraudulent scheme are made "in furtherance" of the scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 253-54 (S.D.N.Y. 1997); *see also U.S. v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000); Dkt. 745 at 35. Further, even if the materiality of the Cabrera Report were disputed (it is not), Defendants' deceptive omissions and lies about the Cabrera Report's true authorship and illicit payments to him were "of some independent value" to the scheme, and therefore material. Dkt. 745 at 35. In any event, Donziger's argument is not properly made in his 56.1 statement and should be disregarded. |

**DONZIGER'S STATEMENT OF ADDITIONAL MATERIAL FACTS AS
TO WHICH THERE IS A GENUINE ISSUE TO BE TRIED
OR AS TO WHICH THERE IS NO DISPUTE**

## I.     THE LAGO AGRIO LITIGATION

### A.     Contacts with Experts and Judges

345.   At all times relevant to Chevron's motion, there was no law or regulation in Ecuador prohibiting *ex parte* communications with judges. Dkt. 154-6 (Ex. 60) at 6 (Affidavit of Dr. Farith Ricardo Simon noting that Ecuadorian law prohibiting judges from "accepting the visit of or meeting with one of the parties or his counsel without first notifying the other" did not come into existence until March 9, 2009—roughly three years after the Ecuadorian Plaintiffs are alleged to have met with Judge Yánez concerning the waiver of judicial inspections and the commencement of the peritaje global.); *see also* Ecuadorian Plaintiffs' response to St. 36.

**RESPONSE:**  The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  For that reason, it therefore requires no response. Taking it as true for the sake of argument, it does not establish that all ex parte contacts with judges were permissible, much less that the particular contacts Defendants had were lawful.  Allegations that some ex parte communications with judges were permitted under Ecuadorian law does not dispute the evidence that Defendants engaged in contacts with judges whose wrongful nature went beyond their ex parte character, including that they bribed the judge to issue their own ghostwritten judgment.  Br. 7–8, 12–17; St. 36, 182–92, 204–210; *see also* Dkt. 754-10 (Ex. 3123), ¶ 10 ("Even before 2009, an attorney who met with the judge in private without the presence of the attorney of the other party in order to exert pressure or obtain a favorable judgment acted unethically and contrary to the professional honor of attorneys, since he influences and interferes with the Judge in the faithful fulfillment of his duties."); *id.* ¶¶ 7–9.  Indeed, the Court has already concluded that, based upon the Defendants' ex parte contacts with the Ecuadorian Court "the decision to terminate judicial inspections, to pursue the global assessment, and to select Cabrera as the global expert were tainted by the duress and coercion applied to [the judge] by Fajardo, Donziger, and perhaps others in ex parte meetings. . . .  [T]he process in these respects was tainted."  Dkt. 550 at 90.

346.   *Ex parte* communication with the judges presiding over the Lago Agrio litigation was the ordinary manner of proceeding throughout the majority of that case. Chevron, in fact, had *ex parte* meetings of its own with Ecuadorian judges presiding over the Lago Agrio litigation—including meetings regarding the peritaje global. Eyewitness Donald Rafael Moncayo Jimenez has recounted in a sworn affidavit: "On multiple occasions, I personally saw the lawyers who represent Chevron Corporation in the Lago Agrio case meeting alone with the judges who heard the case without the presence of the plaintiffs' lawyers" Dkt. 613-6 (Ex. F) at ¶ 3. Moncayo has testified that on one occasion, he "saw attorneys Adolfo Callejas Ribadeneira and Ivan Alberto Racines [Chevron's lawyers], and Dr. Efraín Novillo [one of the presiding judges] in the offices of Judge Novillo. They were talking about the expert designated by the Judge, Mr. Richard Cabrera." *Id.* at ¶ 4. When Mr. Moncayo "approached the offices, the private security guards of Chevron and a Chevron technician tried to chase [him] away." *Id.* Moncayo also describes another incident where Judge Juan Núñez, then-President of the Lago Agrio Court, "was talking to Dr. Diego Larrea and Alberto Racines [Chevron's lawyers] about the inspection of the

Auca wells and other stations, where there were oil wells, topic of the Lago Agrio case." *Id.* at ¶ 5. Additionally, during his deposition on September 13, 2011, Moncayo testified under oath to witnessing one of Chevron's lawyers, Dr. Enrique Caravajal, have an ex parte meeting with the then-presiding Judge Rafael Ordoñez after business hours on July 30, 2010. Dkt. 613-7 (Ex. G) at 31:12-32:19, 34:2-36:21. The *ex parte* meeting lasted roughly 20 minutes, and is captured in photographs that Moncayo took with his mobile phone. Werdegar Decl. Ex 15 at 37:6-42:22; *see also* Dkt. 613-14 (Ex. N) (Salazar Decl., recounting additional Chevron *ex parte* meetings with the Lago Agrio Court).

**RESPONSE:**  The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  For that reason, it therefore requires no response. Allegations that Chevron itself engaged in ex parte contacts are immaterial to the resolution of these claims; they do not bear on the truth or falsity of the Defendants' representations to U.S. courts regarding the scope and nature of their relationship with Cabrera or their fraudulent scheme to obtain the Ecuadorian judgment.  Furthermore, Chevron's counsel had contact with the court in which procedural or purely administrative matters or motions were discussed as well as a few incidental contacts that occurred as a result of running into members of the court in the small town in which the litigation was conducted.  Chevron has identified those contacts in its response to the LAPs' Interrogatory No. 10, and Defendants offer no evidence or argument that those contacts are in any way similar to their collusion.


347. Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts prior to the issuance of the expert's report, including prior to the expert's formal appointment by the court.  *See* Dkt. 154-5 (Ex. 59) (Alencastro Aff.) at ¶¶ 9-12, 19; Dkt.154-6 (Ex. 60) (Simon Aff.) at ¶¶ 4-5, 7-8; *see also* Ecuadorian Plaintiffs' response to St. 36.

**RESPONSE:**  The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  For that reason, it therefore requires no response. Taking it as true for the sake of argument, it does not establish that all "contacts" with experts were permissible, much less that the particular contacts Defendants had were lawful.  The LAPs' statement of fact does not accurately describe the LAPs' relationship with Cabrera, who is the only "expert" at issue in this motion.  And regardless of what Defendants now claim Ecuadorian law may permit as a theoretical matter, Donziger admitted to co-counsel, contemporaneously with the conduct at issue, that the LAPs' actual relationship with Cabrera was "improper" under traditional Ecuadorian law.  Dkt. 400-4 (Ex. 2047) (DONZ-HDD-0004621–22) ("The traditional Ecuadorian law perspective (which will be asserted by Chevron) would hold that the level of collaboration between one party and the expert is problematic and improper in that all court-appointed experts in Ecuador should be independent.  By working so closely with our local counsel and Stratus, Cabrera violated his duties to the court.").  Furthermore, as demonstrated, (Brief at 8–12), the LAPs' interactions with Cabrera in fact were unlawful, as Julio Prieto recognized.  Sts. 84, 96; Dkt. 9-6 (warning Donziger, Fajardo, and Yanza that disclosure of their relationship with Cabrera could have "devastating" effects: "apart from destroying the proceeding, all of us, your attorneys, might go to jail"); *see also* Dkt. 754-10 (Ex. 3123), ¶¶ 11–24 (Defendants "have flagrantly violated Ecuadorian law, including articles 251 and 256 of the Code of Civil Procedure (hereinafter, the "CCP"), and the orders of the Lago Agrio Court dated June 13, 2007 and October 3, 2007, since the expert would have failed to perform his tasks in a trustworthy and lawful manner and would have failed to comply with the abovementioned Court orders."; "The fact that there is no written provision in Ecuador that expressly prohibit the parties

from meeting with a court-appointed judicial expert does not mean that any kind of interaction between them is permitted."); Chevron's Reply to St. 36.

348. It was common practice for litigants to make contact with experts and advocate their positions. Under Ecuadorian law, an expert is permitted to interact and coordinate with a party to the litigation, and that doing so "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60) at ¶ 8; Dkt. 154-5 (Ex. 59) at ¶¶ 17-18. The fact that an expert ultimately adopts one party's views to the exclusion of the other's also does not mean that the expert was not independent or neutral. *See id.* at ¶ 27; *see also* Ecuadorian Plaintiffs' response to St. 36.

**RESPONSE:** This assertion does not create a genuine issue of material fact and is therefore irrelevant. Taking it as true for the sake of argument, it does not establish that all "contacts" with experts were permissible, much less that the particular contacts Defendants had were lawful. The LAPs' statement of fact does not accurately describe the LAPs' relationship with Cabrera, who is the only "expert" at issue in this motion. And regardless of what Defendants now claim Ecuadorian law may permit as a theoretical matter, Donziger admitted to co-counsel, contemporaneously with the conduct at issue, that the LAPs' actual relationship with Cabrera was "improper" under traditional Ecuadorian law. Dkt. 400-4 (Ex. 2047) (DONZ-HDD-0004621–22) ("The traditional Ecuadorian law perspective (which will be asserted by Chevron) would hold that the level of collaboration between one party and the expert is problematic and improper in that all court-appointed experts in Ecuador should be independent. By working so closely with our local counsel and Stratus, Cabrera violated his duties to the court."). Furthermore, as demonstrated (Brief at 8–12), the LAPs' actual interactions with Cabrera were unlawful, as Julio Prieto recognized. St. 84, 95–99; Dkt. 9-6 (warning Donziger, Fajardo, and Yanza that disclosure of their relationship with Cabrera could have "devastating" effects: "apart from destroying the proceeding, all of us, your attorneys, might go to jail"); *see also* Dkt. 754-10 (Ex. 3123), ¶¶ 11–24 (Defendants "have flagrantly violated Ecuadorian law, including articles 251 and 256 of the Code of Civil Procedure (hereinafter, the 'CCP'), and the orders of the Lago Agrio Court dated June 13, 2007 and October 3, 2007, since the expert would have failed to perform his tasks in a trustworthy and lawful manner and would have failed to comply with the abovementioned Court orders.").

349. It is understood in Ecuador that court-appointed scientific experts in highly complex cases simply could not be expected to perform their functions without party assistance. As such, an "independent" expert in Ecuador does not cease to be independent by virtue of reliance on party-resources to carry out his function. Dkt. 154-5 (Ex. 59) at ¶ 12 ("Meeting with the experts without the other party being present. . . effectively aids the adequate fulfillment of the expert's or experts' functions in situations of a high scientific complexity, given the limited technological resources which our country [Ecuador] has to provide technical information for the efficient administration of justice."); Dkt. 154-6 (Ex. 60) at ¶ 9 ("'[t]here is an actual procedural burden for the parties, to make it easier for the experts to conduct their studies. . . .'").

**RESPONSE:** This assertion does not create a genuine issue of material fact and is therefore irrelevant. Taking it as true for the sake of argument, it does not establish that all "contacts" with experts were permissible, much less that the particular contacts Defendants had were lawful.

Furthermore, it is contradicted by facts that are not genuinely in dispute. *See* Br. at 8–12; Sts. 36, 44–99. The LAPs' statement of fact does not accurately describe the LAPs' relationship with Cabrera, which is the only "expert" at issue in this motion. The Defendants' ex parte contacts with Cabrera were not "procedural" or administrative. *See* Br. at 8–12. And regardless of what Defendants now claim Ecuadorian law may permit as a theoretical matter, Donziger admitted to co-counsel, contemporaneously with the conduct at issue, that the LAPs' actual relationship with Cabrera was "improper" under traditional Ecuadorian law. Dkt. 400-4 (Ex. 2047) (DONZ-HDD-0004621–22) ("The traditional Ecuadorian law perspective (which will be asserted by Chevron) would hold that the level of collaboration between one party and the expert is problematic and improper in that all court-appointed experts in Ecuador should be independent. By working so closely with our local counsel and Stratus, Cabrera violated his duties to the court."). Further-more, as demonstrated, (Brief at 8–12), the LAPs' interactions with Cabrera in fact were unlaw-ful, as Julio Prieto recognized. St. 84, 96; Dkt. 9-6 (warning Donziger, Fajardo, and Yanza that disclosure of their relationship with Cabrera could have "devastating" effects: "apart from de-stroying the proceeding, all of us, your attorneys, might go to jail"); *see also* Dkt. 754-10 (Ex. 3123), ¶¶ 11–24 ("[T]he collaboration of the Lago Agrio Plaintiffs and their attorneys with the global expert appointed by the court, Richard Cabrera, violates Ecuadorian law and the orders issued by the Court. Procedural principles, Court orders and the rules of law categorically pro-hibited such conduct. The replacement of a judicial expert in the drafting of the expert's report is not permitted by the law."); Chevron's Reply to St. 36.

350. The Ecuadorian Plaintiffs' meetings with Richard Cabrera in the time leading up to his appointment were not particularly secretive because there was no reason for them to be. For example, on one occasion on February 27, 2007, Donziger and others met with Cabrera at a "Mister Bagel," notwithstanding their belief that Chevron's operatives were frequently spying on them. Dkt. 28-7 (Ex. 76) at 15.

**RESPONSE:** This assertion does not create a genuine issue of material fact and is therefore ir-relevant. Furthermore, it is contradicted by facts that are not genuinely in dispute. *See* Br. at 10–12; Sts. 36, 44–99. The evidence establishes that Defendants' intended to, and in fact, did, keep their contacts with Cabrera secret. Less than a week after the alleged February 27, 2007 meet-ing, and still before Cabrera was appointed, Donziger stated that, with respect to Defendants' relationship with Cabrera, "Our goal is that they [Chevron] don't know shit . . . ." St. 96. De-fendants used code names to maintain the secrecy of their contacts with Cabrera. Br. at 11; St. 53–54. And Defendant Ann Maest testified that she had "an understanding that [her] contacts with Cabrera . . . needed to be kept confidential or secret." Dkt. 400-2 (Ex. 2015) (2011.01.19 Maest Dep. Tr.) at 121:23–122:3; *see also* Stavers Decl., Ex. 3653 (Maest Witness St.), ¶ 12 ("In discussions around the time of the March 2007 meetings, Donziger made it clear to me that it was vital that the coordination between the LAPs and Cabrera be kept secret."). The LAPs con-sistently denied any improper relationship with Cabrera, including in filings with the Lago Agrio court. Dkt. 36-5 at 3 (2008.04.04 LAP filing in Ecuador calling the notion that Cabrera "works for us" "simply ridiculous"); Dkt. 36-6 at (2008.04.25 LAP filing in Ecuador) at 2 (labeling the allegation that the LAPs have a "close relationship with the Independent Expert Richard Cabre-ra" "[a]nother infamy")). Furthermore, as demonstrated, (Brief at 8–12), the LAPs' interactions with Cabrera in fact were unlawful, as Julio Prieto recognized. Dkt. 9-6 (warning Donziger, Fa-jardo, and Yanza that disclosure of their relationship with Cabrera could have "devastating" ef-fects: "apart from destroying the proceeding, all of us, your attorneys, might go to jail")).

351. Chevron also engaged in ex parte communications with, and provided undisclosed *ex parte* assistance to, court-appointed experts, including before experts were formally appointed. *See* Dkt. 154-7 (Ex. 61) at p. 2; (Dr. Marcel Muñoz Herreria letter to Lago Agrio court describing a March 9, 2010 meeting with Chevron representative Alfredo Guerrero at a hotel for a "technical planning meeting"); Dkt. 154-7 (Ex. 61) at p. 3 ("Scope Plan requested and approved by Engineer Guerrero" attached to Muñoz's letter).

**RESPONSE:**   The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  For that reason, it therefore requires no response.  Donziger alleges that a Chevron engineer met with a Dr. Marcelo Muñoz, a court-appointed expert for a series of judicial inspections Chevron requested.  As the party that requested the inspections, Chevron was responsible for logistics, including providing lodging and transportation for the judge, and any court personnel and court-appointed experts attending.  Contacts between representatives of Chevron and Muñoz were purely logistical in nature and Donziger provides no evidence otherwise.  In a letter from Dr. Muñoz to the Court, he asked that it order Chevron to pay him as he claimed he and Chevron had agreed and "as approved by the President of the Court."  Dkt. 147-7 at 2.  The letter suggests no improper collaboration between Chevron and Dr. Muñoz.  Dkt. 147-7 at 1−2.  And what the letter says occurred at the "technical planning meeting" Donziger refers to is that Dr. Muñoz and a Chevron representative agreed on a budget.  *See* Dkt. 147-7 at 1.  Such contacts are the type of ex parte contacts both Defendants' and Chevron's experts agree are permissible under Ecuadorian law.  *See* Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 154-5 (Ex. 59), ¶¶ 17–18; Dkt. 754-10 (Ex. 3123) ¶ 13 (Romero report recognizing "[t]he fact that there is no written provision in Ecuador that expressly prohibit the parties from meeting with a court-appointed judicial expert does not mean that any kind of interaction between them is permitted.").

352. Marcelo Munoz, a court-appointed expert in the Lago Agrio litigation, participated in a private meeting with Chevron's technical consultant Alfredo Guerrero, for a "technical [p]lanning meeting" at which the engineer "approved" a work plan. *See* Dkt. 154-7 (Ex. 61).

**RESPONSE:**   The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  For that reason, it therefore requires no response.  Donziger alleges that a Chevron engineer met with a Dr. Marcelo Muñoz, a court-appointed expert for a series of judicial inspections Chevron requested.  As the party that requested the inspections, Chevron was responsible for logistics, including providing lodging and transportation for the judge, and any court personnel and court-appointed experts attending.  Contacts between representatives of Chevron and Muñoz were purely logistical in nature and Donziger provides no evidence otherwise.  In a letter from Dr. Muñoz to the Court, he asked that it order Chevron to pay him as he claimed he and Chevron had agreed and "approved by the President of the Court."  Dkt. 147-7 at 2.  The letter suggests no improper collaboration between Chevron and Dr. Muñoz.  Dkt. 147-7 at 1−2.  And what the letter says occurred at the "technical planning meeting" Donziger refers to is that Dr. Muñoz and a Chevron representative agreed on a budget.  *See* Dkt. 147-7 at 1.  Such contacts are the type of ex parte contacts both Defendants' and Chevron's experts agree are permissible under Ecuadorian law.  *See* Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 154-5 (Ex. 59), ¶¶ 17–18; Dkt. 754-10 (Ex. 3123) ¶ 13 (Romero report recognizing "[t]he fact that there is no written provision in Ecuador that expressly prohibit the parties from meeting with a court-

appointed judicial expert does not mean that any kind of interaction between them is permitted.").

353. Consistent with Ecuadorian law and customary practice, the Lago Agrio Court issued orders affirmatively authorizing the parties to communicate with Cabrera and to provide him with information. Dkt. 613-13 (Ex. M) (April 14, 2008 Lago Agrio Court Order) at 9; Dkt. 557-5 (Suppl. Young Decl. Ex. 29); Dkt. 154-5 (Ex. 59), ¶ 17; Dkt. 32-6 (132,846 at 2 and 132,849 at 7).

**RESPONSE:** This assertion does not create a genuine issue of material fact and is therefore irrelevant. Taking it as true for the sake of argument, it does not establish that all "communications" with and "information" provided to Cabrera were permissible, much less that the particular contacts and information Defendants had were lawful. Furthermore, it is contradicted by facts that are not genuinely in dispute. *See* Br. at 10–12; Sts. 36, 44-99. Whether the Lago Agrio court authorized the parties to have some contact with Cabrera is immaterial whether the Lago Agrio court authorized the Defendants' ghostwriting of the Cabrera Report. Furthermore, Chevron notes that, even were Defendants' characterization of the April 14, 2008 order accurate, it would, at most, authorize "the parties to communicate with Cabrera and to provide him with information" two weeks after Defendants had already ghostwritten the Cabrera Report and it had been filed with the court. St. 95. Further, Chevron disputes Donziger's characterization of the cited order. The order states: "Add to the record the submission filed by Attorney Pablo Fajardo Mendoza on February 18, 2008, at 3:00 p.m., consisting of 3,292 pages. With regard to its content, notice has been sent to Expert Engineer Richard Cabrera Vega by means of the order issued on February 25, 2008 at 8:10 a.m." Dkt. 613-13 at 9. It is undisputed that the February 18, 2008 submission of materials to Cabrera did not include materials from Stratus or others who ghostwrote the Cabrera Report. Plaintiffs represented to the Lago Agrio Court in their February 18, 2008 pleading that all the information being submitted was from public entities in Ecuador: "We clarify that all the information we are delivering to the Expert through the Court has been provided to us by various Ecuadorian public institutions over the last four years. The accuracy of the information is therefore guaranteed." Dkt. 401-7. In its order of January 30, 2008, the Lago Agrio court requested that the parties "provide to the expert the information he requested, consisting of aerial photographs taken after 1990 of the sites identified in his document; file documents related to the drilling of wells and pertaining to environmental treatment reports and documentation on spills, mud pits, and environmental accidents, communications and responses from regulatory agencies, [and] in general documents on environmental and related actions; and [d]ocumentation on the environmental audits of the defendant's operations." Dkt. 549-10. Further, the assertion that this order authorized the LAPs' interactions with Cabrera is belied by Donziger's admission that he and his coconspirators "met with and interacted with Mr. Cabrera both before and after" the Lago Agrio court issued its January 2008 order. The LAPs consistently denied cooperation with Cabrera, even after the orders Defendants cite. Br. at 10–12; St. 69 (The Cabrera Report "was not entirely or even predominantly [Cabrera's] own work or that of any assistants or consultants working only for him. There is no genuine issue with respect to the facts that the LAP team secretly prepared his work plan, worked closely with him in carrying it out, and drafted most of the report and its annexes.") (citing Dkt. 550 at 90)), 95–99; Dkt. 36-5 at 3 (2008.04.04 LAP filing in Ecuador calling the notion that Cabrera "works for us" "simply ridiculous"); Dkt. 36-6 (2008.04.25 LAP filing in Ecuador) at 2 (labeling the allegation that the LAPs have a "close relationship with the Independent Expert Richard Cabrera" "[a]nother infamy")).

354. Cabrera and the Lago Agrio Court repeatedly requested that the parties provide Cabrera with relevant and useful information. *See, e.g.*, Dkt. 557-5 (Suppl. Young Decl. Exs. 27-29); Dkt. 613-13 (Ex. M) at 9; Dkt. 154-5 (Ex. 59), ¶ 17; Dkt. 557-5 (Ex. 28) at p. 133,987 (Cabrera Petition dated Jan. 7, 2008 stating, "I request that [the Court] order the parties to provide me with any information that … each party considers necessary in order to incorporate it in this expert report"); Dkt 557-5 (Ex. 29) at p. 134,157 (Court order dated Jan. 30, 2008, responding to Cabrera Petition dated Jan. 7, 2008, ordering the parties to "provide the required information to the expert as soon as possible") Dkt. 154-5 (Ex. 59), ¶ 17; Dkt. 32-6 (132,846 at 2 and 132,849 at 7); Dkt. 613-13 at 10 ("[T]he parties may submit to the expert whatever documentation they believe may be useful in preparing his report."). The Lago Agrio Court ordered that materials submitted by Chevron "be delivered directly to the expert, its addressee." *Id.*

**RESPONSE:**  The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  For that reason, it therefore requires no response.  Whether Cabrera or the court requested provision of some materials to Cabrera is immaterial to Chevron's contention that Defendants not only provided materials to Cabrera but also performed his work.  In addition, Defendants' misleading characterization of both Cabrera's requests and court orders is not supported by the evidence.  Cabrera made specific requests asking on January 7, 2008, that the parties supply him with three categories of documents: (1) "aerial photographs in digital format … before and after 1990"; (2) "[i]nactive file documents related to the drilling of wells [pertaining] to environmental treatment, reports and documentation on spills, pits, environmental accidents, communications to and responses from regulatory authorities, and in general, documents pertaining to environmental actions"; and (3) "[d]ocumentation from the Environmental Authorities related to the defendant's operations."  Dkt. 400-4.  In its order of January 30, 2008, the Lago Agrio court requested that the parties "provide to the expert the information he requested, consisting of aerial photographs taken after 1990 of the sites identified in his document; file documents related to the drilling of wells and pertaining to environmental treatment reports and documentation on spills, mud pits, and environmental accidents, communications and responses from regulatory agencies, [and] in general documents on environmental and related actions; and [d]ocumentation on the environmental audits of the defendant's operations."  Dkt. 549-10.  The April 14, 2008 order referenced (Werdegar Decl., Ex. M at 9) (Dkt. 613-13) came two weeks after the filing of the Cabrera Report on April 1, 2008, and thus did not authorize the LAPs' ghostwriting of that report.  St. 69–78.  The LAPs consistently denied cooperation with Cabrera.  Br. at 10–12; St. 95–99; Dkt. 36-5 at 3 (2008.04.04 LAP filing in Ecuador calling the notion that Cabrera "works for us" "simply ridiculous"); Dkt. 36-6 (2008.04.25 LAP filing in Ecuador) at 2 (labeling the allegation that the LAPs have a "close relationship with the Independent Expert Richard Cabrera" "[a]nother infamy")).  The Ecuadorian court ordered Cabrera to present together "with the report" all sources used and "to cite all of his scientific sources, and analytical and legal documents that he use[d] to perform his work."  Dkt. 402-14 (Ex. 2322) (133,755) at 1 (2007.11.30 Ecuadorian court order regarding materials used in preparing the Cabrera Report: "[A]ll the documents that serve as support or a source of information for the work performed by [Cabrera] must be presented together with the report. . . . [I]n his report the Expert is required to cite all of the scientific sources, and analytical and legal documents that he uses to perform his work.")).  This was not done.  In addition, if, as Defendants assert, that order permitted unlimited provision of material to Cabrera, then there would have been no reason for the LAPs' consultants to "clean up the language" of a portion of the supplemental report "so it sounds more like the Perito [Cabrera] and less like a comment."  Dkt. 9-4 (STRATUS-NATIVE051389) at 2.

355. Chevron had the opportunity to provide materials to Cabrera.  *See* St. 354; *see also* Dkt. 47-62 (Ex. 300) at 36:18-19 (Chevron's counsel's statement in the Stratus § 1782 that "both sides were allowed to submit data to Cabrera.").

**RESPONSE:**  The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  For that reason, it therefore requires no response.  There is no evidence that Chevron had any meaningful opportunity to provide Cabrera anything, since the evidence shows that his "work" was performed and predetermined by the LAP team.  *See* Chevron's Reply to Sts. 44-45, 51, 69-71.  Whether Chevron had "the opportunity" to provide materials to Cabrera is immaterial to Chevron's contention that Defendants not only provided materials to Cabrera but also *performed* his work.

### B.      Sampling, Inspections, and Reports

356. Chevron had instructed its own experts to avoid finding contamination.  Chevron's judicial inspection "Playbook" reveals that Chevron directed its experts to visit sites prior to the official judicial inspections—what Chevron referred to as "Pre-Inspections"—so that they could take multiple samples with the goal of locating a few clean "delineation points" that the experts could, with the appearance of randomness, revisit during the official inspections. Dkt. 366-5 (Ex. E-Judicial Inspection Playbook), at 12. One particular component of the Playbook entitled "Summary of Sampling and Testing Program for Judicial Inspection Sites," instructed Chevron's experts as follows: "Locations for perimeter sampling should be chosen to emphasize clean points around pits when possible." Dkt. 366-6 (Ex. F) at p. 3.  Chevron's experts were further directed to "collect soil samples at 4 or more locations surrounding the site, using locations that the PI [Pre-Inspection] team has shown to be clean."  *Id.*

**RESPONSE:**  The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  For that reason, it therefore requires no response.  Whether Chevron had a judicial inspection "playbook" or how it conducted its inspections is immaterial to Chevron's contention that Defendants not only provided materials to Cabrera but also performed his work and ghostwrote his report.

357. Both sides accused the other of submitting manipulated sampling results to the Lago Agrio Court. Indeed, the court noted that, if it were to consider statements made by Diego Borja, "we must understand that most of the samples collected by the experts suggested by [Chevron] have been manipulated . . . and they would lose all probative value." Dkt. 168 (Chevron's translation of the Lago Agrio Judgment) at 52.

**RESPONSE:**  The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  For that reason, it therefore requires no response.  Whether both sides accused each other of manipulating testing results is immaterial to Chevron's contention and evidence that, in lieu of continuing the judicial inspection process, Defendants coerced the court not only appoint Cabrera but then provided him materials, performed his work and ghostwrote his "independent" report.  *See* Reply St. 26.

358. The "settling expert" reports were not originally contemplated as part of the judicial site inspection process determined at the outset of the trial. Rather, the additional step of third expert report (in addition to the two party-affiliated expert reports) was requested by Chevron. Donziger believed that this maneuver was an attempt to inject more delay into already protracted proceedings. *See* Dkt. 613-20 (12/23/10 Donziger Depo. Tr.) at 1804:13-20; Dkt. 28-9, at p. 12 (Donziger private journal entry noting that "I broke down how long it would take to finish the case if all the dirimiente [settling expert] reports and responses are done, and we estimated that it would take about six years beyond where we are now."); *id.* at 13 ("Why would Yánez order the [settling expert] reports when he and everyone else knows they are useless? The dangerous combination of not wanting to make a decision, with the fact they [sic] this is an American case and who cares, people can just keep making money.").

**RESPONSE:** The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion. For that reason, it therefore requires no response. Whether both sides accused each other of manipulating testing results is immaterial to Chevron's contention and evidence that, in lieu of continuing the judicial inspection process, Defendants coerced the court not only appoint Cabrera but then provided him materials, performed his work and ghostwrote his "independent" report. *See* Sts. 36-99.

359. The global expert examination was not intended to, and did not, supplant the judicial inspections or settling expert reports. The Ecuadorian Plaintiffs had requested a global expert examination in October 2003, at the beginning of the trial. Dkt. 31-31 (December 4, 2006 LAP filing), at p. 1 ("Your honor, I respectfully request that you immediately order an expert examination aimed at determining the environmental effects of activities related to the production of hydrocarbons in all of the fields operated by Texaco, as requested in the evidentiary motion on pages 4677 and 4678 of the record. The Court granted that motion in an Order issued on October 29, 2003, at 5:55 p.m., and that Order is final and binding."). The court granted that request, and the global expert examination would have proceeded at some time, whether or not the judicial inspections had continued for a longer period. *Id.* (quoting the Lago Agrio court's October 29, 2003 order that "an expert examination shall be conducted aimed at determining the environmental effects of activities related to the production of hydrocarbons in all of the fields operated by TEXACO . . . .").

**RESPONSE:** The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion. For that reason, it therefore requires no response. Whether the global expert examination intended to supplant the judicial inspections or settling expert reports is immaterial to Chevron's contention and evidence that Defendants coerced the court not only appoint Cabrera but then provided him materials, performed his work and ghostwrote his "independent" report. *See* Sts. 36-99.

360. The Ecuadorian Plaintiffs sought to waive their remaining tentatively scheduled inspections based on their belief that (i) further inspections were unnecessary because the Ecuadorian Plaintiffs had already met their burden of proof and the results of the inspections to date strongly indicated contamination at the inspected sites; and that (ii) Chevron intended to use protracted judicial inspections to delay the litigation as much as possible and exhaust the Ecuadorian Plaintiffs' resources. Dkt. 613 (Ex. T) (12/23/10 Donziger Depo. Tr.), at 1804:13-20 ("We

strongly felt that the settling expert reports were not required under Ecuadorian law and that they were being used by Chevron to delay the trial."); Dkt. 28-9 (Ex. 76) (DONZ0027256) at p. 55 (July 25, 2006 Donziger private journal entry observing that Chevron is "losing overwhelmingly")]; *id.* at p. 19 (DONZ00036234) ("Alberto's initial mistake of asking for 122 inspections without any strategy is just coming back to haunt us so deeply, although we are getting good press and we are using the inspections to build political momentum and get our act together, but the process is just time consuming and ridiculous."); Dkt 28-8 (Ex. 76) (DONZ00027256) at p. 45 (Donziger journal: "we still have the same money problems, and nobody has been paid. . . The money issue is killing us.  Pablo told me the inspections are now going to finish the week of Nov. 13, which is soon—there is a ton of work to be done before then."); Dkt. 28-7 (Ex. 76) (DONZ00027256) at p. 24 ("Our phone and electricity will be cut off this week. We have received no money since November. LY feels the brunt of the pressure from creditors, the brunt of the pressure from the base communities, and the brunt of the pressure from staff who have not gotten paid."); Dkt. 28-9 (DONZ00036277) at 9 (Donziger journal entry dated May 31, 2006, discussing risks and benefits of global expert strategy and stating "We are winning on the proof, but we are losing the larger war because of time."); Dkt. 28-8 (Ex. 76) (DONZ00027256) at p. 37  ("They pulled a stunt on Monday - tried to get the judge to suspend the inspection for 60 days on the even [sic] of going out to the site. LY got text msg judge was leaving Lago - we had out [sic] own intelligence sources. They did this for Guanta, San Carlos, and now Yuca"); Dkt. 28-9 at p. 2 (September 13, 2006 Donziger private journal entry: "[W]e have to face the prospect of more of the wasteful, time-consuming, and expensive inspections.[] Texaco now realizes their best defense is to ask for as many inspections as possible.").

**RESPONSE:**   The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  For that reason, it therefore requires no response.  Defendants offer no evidence disputing the evidence of the corrupt means they used to convince the judge to end the judicial inspections.  Additionally, all of the evidence upon which Defendants rely in support of this statement is inadmissible hearsay—out of court statements being offered for the truth of the matter asserted therein (Fed. R. Evid. 801(c))—for which there is no valid exception.  Finally, while Defendants offer additional purported reasons for wanting to waive the judicial inspections, they offer no additional evidence to negate Reyes' testimony as set forth in St. 35.


361. Every site inspection that Chevron requested for its case-in-chief was performed. *See* Dkt. 168 (certified English translation of the Lago Agrio Court's February 14, 2011 opinion), at 47 (affirming ruling allowing Ecuadorian Plaintiffs to withdraw their remaining inspection requests and noting that "the defendant, Chevron, has been allowed to take all the actions that it requested for its defense" and rejecting Chevron's argument that "it has been caused irreparable harm by not being allowed to carry our 64 procedures requested by the plaintiffs . . . .").

**RESPONSE:**   The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  For that reason, it therefore requires no response.  Additionally, the evidence upon which Defendants rely in support of this statement is inadmissible hearsay—an out of court statement being offered for the truth of the matter asserted therein (Fed. R. Evid. 801(c))—for which there is no valid exception.

362. Richard Cabrera was not even the Ecuadorian Plaintiffs' preferred choice to serve as the global damages expert; rather, he was selected only after the Lago Agrio Court—apparently at Chevron's urging—concluded that the expert must be chosen from the small group of experts who had already served in some fashion in the trial.  *See, e.g.*, Dkt. 28-7 (Ex. 76) (DONZ00027256) at p. 20 (Donziger writing in his private journal on February 7, 2007:  "The latest is the judge feels bound by an agreement [Ecuadorian Plaintiff attorney Alberto] Wray made with [Chevron counsel Adolfo] Callejas in the first inspection to use peritos already appointed by the court. I thought we had worked this out with the judge, and that Fernando Reyes would be appointed the perito. We have been working with him in preparation. Now, the judge feels he cannot do that. This is a function of T[exaco]'s pressure campaign – Callejas submitted 30-pages of crap yesterday morning.").

**RESPONSE:**  The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  For that reason, it therefore requires no response.  Additionally, the evidence upon which Defendants rely in support of this statement is inadmissible hearsay—an out of court statement being offered for the truth of the matter asserted therein (Fed. R. Evid. 801(c))—for which there is no valid exception.

363. The Ecuadorian Plaintiffs' legal team considered petitioning the Lago Agrio Court for the appointment of *two* global experts ("peritos") so that Texaco would not be in a position to co-opt the expert that would wind up working with the Ecuadorian Plaintiffs.  *See, e.g.*, Dkt. 28-9 (Ex. 76) (DONZ00027256) at p. 56 (Donziger writing on September 13, 2006, regarding the appointment of an expert to perform the global assessment: "[T]here is a very small pool of technical people who are not 'contagiado' (in the words of Luis). So the single perito theory sounds good, but it is all in the execution. And you just know that Texaco will have a slew of available candidates, and will probably pay them on the side to boot, so they can be controlled.  So I suggested we stick with two peritos . . . .").

**RESPONSE:**  The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  For that reason, it therefore requires no response.  Additionally, the evidence upon which Defendants rely in support of this statement is inadmissible hearsay—an out of court statement being offered for the truth of the matter asserted therein (Fed. R. Evid. 801(c))—for which there is no valid exception.

364. Donziger has testified that Fajardo believed he knew who the Lago Agrio Court would appoint Cabrera not because of any ex parte contact with the judge or improper pressure, but by a simple process of elimination based on who already had served as court-appointed experts and therefore possibly could be appointed and who likely would be deemed ineligible for one reason or another. Dkt. 613-8 (Ex. H) (12/8/10 Donziger Depo. Tr.) at 985:4-986:18.

**RESPONSE:**  The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  For that reason, it therefore requires no response.  Additionally, while Defendants offer an additional purported reason for their knowledge that the Lago Agrio court would appoint Cabrera, they offer no additional evidence to negate the fact that Defendants strong-armed the Lago Agrio court in order to procure Cabrera's appointment.  St. 41, 42.

365. Chevron engaged in extensive efforts to spy on the Ecuadorian Plaintiffs' team. Dkt. 613-5 (Ex. E) (August 16, 2010 *The Atlantic Monthly* article detailing how a Chevron agent from Kroll offered the journalist $20,000 "to go undercover as a journalist-spy" "pretend[ing] to write a story . . . [but] actually shilling for Chevron."). Chevron continues that pattern to this day. *See, e.g.*, Dkt. 895-6 (Ex. 3532) at 4 (surreptitiously taken photograph of Donziger that purports to be from February 27, 2013).

**RESPONSE:** The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion. For that reason, it therefore requires no response.

366. By July 2007 at the latest, Chevron was aware of the Ecuadorian Plaintiffs' support of Cabrera's work. Dkt. 154-2 (Ex. 56), 154-3 (Ex. 57), 154-4 (Ex. 58) (Chevron-published advertisements in three Ecuadorian national newspapers publicly accusing Cabrera of bias in favor of the Ecuadorian Plaintiffs and calling upon the Lago Agrio Court to disqualify him.); Dkt. 613-17 (Ex. Q) (July 30, 2007 Chevron Press Release attacking Cabrera's work and stating that "Cabrera displayed his utter complicity with Plaintiffs' interests[.]"); *see also* Dkt. 557-4 (Ex. 19) at p. 2 (March 24, 2008 Sylvia Garrigo interview statement that "[T]he expert analysis also is corrupt . . . . This expert [Cabrera], unfortunately, is working in partnership with the NGO leading the plaintiff's case. The expert's work plan, instead of following the judge's orders, basically aimed to do fieldwork to find contamination caused by Texaco. . . .").**[6]**

**RESPONSE:** The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion. For that reason, it therefore requires no response. Whether Chevron had suspicions of (and made accusations regarding) Cabrera's improper relationship with Cabrera is immaterial to the legality of that relationship and its prejudicial preclusive effect on the Lago Agrio proceedings. *See* Sts. 36–99. In addition, Defendants and Cabrera falsely denied their improper relationship publicly and even in court filings. *See* Reply St. 52.

367. The Ecuadorian Plaintiffs' team discussed setting up a meeting including Beristain in February 2007—before Cabrera had been appointed by the Lago Agrio Court. The purpose of this meeting was to begin developing a social plan that could address the social and cultural harms caused by Chevron's pollution. *See* Dkt. 6-10 (Ex. 2) at p. 129 (Fajardo telling the group "I was proposing to him that on those dates [February 4th and 5th] we could work on a type of-like a type of workshop to define, a bit that-that-that social plan, see the viability and how far we can progress on the social plan in a short time. I mean, the-the-[unintelligible] listen to him directly, now."); see also id. at p. 132 ( Fajardo continued that he was suggesting that Beristain "develop a plan for us, roughly, and on the fourth and fifth, we work on the plan.").

**RESPONSE:** The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion. For that reason, it therefore requires no response. Additionally, the evidence upon which Defendants rely in support of this statement is inadmissi-

---

**[6]** These citations are not offered for the truth of their assertions but, rather, to demonstrate Chevron's awareness of certain issues.

ble hearsay—an out of court statement being offered for the truth of the matter asserted therein (Fed. R. Evid. 801(c))—for which there is no valid exception.

368. The actual "meeting" that appears in Crude, which took place in May 2007—before Cabrera was sworn in as an expert and before Beristain was asked by Cabrera to join his team—was a community meeting among the Cofán people and their attorneys "to talk about what they want as compensation for all the damage." *See* Dkt. 48-29 (Ex. 331); Dkt. 32-9 (Ex. 154) (Cabrera sworn in on June 13, 2007); Dkt. 30-02 (Ex. 91), at 48. Trudie Styler also observed and spoke to the Cofán people. Id. at p. 49.

**RESPONSE:** The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion. For that reason, it therefore requires no response. Defendants' ex post proffered "purpose" of the actual "meeting" is immaterial to their *reaction* to images of Dr. Carlos Beristain at a meeting with Donziger, Fajardo and other members of the LAPs' team being included in the *Crude* documentary, which demonstrate Cabrera and his purported team's lack of independence and their own knowledge of wrongdoing. *See* St. 95–95 and Reply St. 94–95. And as to their reaction, there is no genuine dispute as to that fact. *Id.*

369. Beristain's role at the meeting was "in the form of leading a discussion" with the Cofán people. Dkt. 613-11 (Ex. K) (1/14/11 Donziger Depo. Tr.), at 2919:20-23.

**RESPONSE:** The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion. For that reason, it therefore requires no response. Defendants' proffered "role" at the meeting with the LAP team is immaterial to their *reaction* to images of Dr. Carlos Beristain at a meeting with Donziger, Fajardo and other members of the LAPs' team being included in the *Crude* documentary, which demonstrate Cabrera and his purported team's lack of independence and their own knowledge of wrongdoing. *See* Sts. 94–95 and Reply Sts. 94–95. And as to their reaction, there is no genuine dispute as to that fact. *Id.*

370. At the time of this meeting, Beristain was working for an environmental group, and not for the Ecuadorian Plaintiffs, and was assisting the Ecuadorian Plaintiffs' team with "community-based information gathering." Dkt. 613-11 (Ex. K) (1/14/12 Donziger Depo. Tr.) at 2895:13-22, 2896:4-17.

**RESPONSE:** The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion. Whether Beristain was technically "working for" an "environmental group" while he was "assisting" the LAPs is irrelevant. It is indisputable that Beristain was supposed to be an "independent" member of Cabrera's team and that the LAPs went to great lengths to conceal that he was secretly "assisting" them. Reply St. 94.

## II.   ALBERTO GUERRA BASTIDAS

371. While serving as a magistrate judge, Guerra dismissed certain criminal cases as a "favor" to prosecutor Nicholas Zambrano. Dkt. 746-3 (Ex. C) at ¶ 7.

**RESPONSE:**  The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  Chevron does not dispute that "Zambrano would occasionally ask [Guerra], as a favor, to issue rulings dismissing certain cases.  [Guerra] was careful to issue these rulings with some legal grounds, because [he] became aware that the party benefitting from [his] decisions was paying Mr. Zambrano for arranging to have the case ruled in his favor."  Dkt. 746-3 (Ex. C), ¶ 7.  But this does not help Defendants since it corroborates Guerra's history with Zambrano and Zambrano's corruption.

372.  Guerra was dismissed as a judge on the Sucumbios court for publicly stating his bias in Chevron's favor.  *See* Dkt. 745, Ex. 3117 at CVX-RICO-0507913 (considering the complaint against Guerra for "publicly stating on various occasions that if he were to again become President of the Superior Court of Justice of Nueva Loja, the first thing he would do is to declare null the lawsuits for environmental remediation that the organizations located in the Oriente Region filed, mainly against CHEVRON"); *id.* at CVX-RICO-0507920 (concluding that Guerra "committed a serious disciplinary infraction when he stated his opinion about a proceeding that still has not been decided and that . . . he would inevitably hear again" and that Guerra's public statements "affect[ed] the image of the judicial branch and the legal certainty of those who use the services of justice").

**RESPONSE:**  The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  Defendants' self-serving characterization of the order dismissing Guerra from the bench does not create a genuine issue of material fact.  Guerra's belief that the Chevron case should be declared null was not due to bias, but because of violations of Ecuadorian law.  Guerra testified, "The reason why I believed that the Chevron case should have been declared null was that the settling experts were being appointed in violation of Ecuadorian law."  Dkt. 746-3 (Ex. C), ¶ 6; *see also* Stavers Decl., Ex. 3667 (DONZ00028237) (Fajardo emails Wray, Donziger and others that he overheard Guerra tell Novillo and Yánez that "the process is null and void because of the designation of the Experts. . . . According to him, the manner in which we are proceeding in the designation of the Experts is not the correct one and that because of this error, the proceeding from the start of the Legal Inspections up to now is null and void.").  Additionally, Guerra testified: "In reality, I believe I was dismissed because I confronted Judges Novillo and Yánez, who succeeded me as judges in this case, regarding several dubious and illegal rulings they had issued in the proceedings, and regarding their practice of asking the settling experts for 25 percent of their fees in consideration for having appointed them as such."  Dkt. 746-3 (Ex. C), ¶ 6.  Donziger's personal notes demonstrate that he was aware that Guerra was at odds with Yánez and Novillo.  Dkt. 28-8 (Ex. 76) (DONZ00027256) at 1 ("Met with judge last night in house.  Humble house, furniture.  Remember last August I wanted to ride the wave and get him off the case?  This was an example of Pablo's total intelligence.  We saved him, and now we are reaping the benefits.  Explain politics around plot to remove Yanez . . . . He hates Guerra, because Guerra was part of the plot.  Guerra will be the judge to decide the case.  We have to start lobbying him, working with him.").

373.  Shortly after his dismissal from the Sucumbios court, Guerra told Ecuadorian newspaper *El Universo* that he elected not to dismiss the Ecuadorian Plaintiffs' case, even though Ecuador's then-attorney general pressured him to do so.  *See* Smyser Decl. Exh. 26 (10/18/2009 article; "I could have done it, but I decided to continue").

**RESPONSE:**  The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  The only evidence cited in support of Defendants' contention is inadmissible hearsay—an out of court statement being offered for the truth of the matter asserted therein (Fed. R. Evid. 801(c))—for which there is no valid exception.

374. Guerra also told *El Universo* that, except for the then-attorney general's pressure to dismiss the case, "during his tenure there was no instance of internal or external pressure."  *See* Smyser Decl. Exh. 26.

**RESPONSE:**  The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  The only evidence cited in support of Defendants' contention is inadmissible hearsay.  Moreover, Donziger has admitted pressuring the court in October 2003.  Dkt. 8-4 (CRS-350-04-CLIP-01) at 419. ("We have concluded that we need to do more, politically, to control the court, to pressure the court.  We believe they make decisions based on who they fear the most, not based on what the laws should dictate.  So, what we want to do is take over the court with a massive protest that we haven't done since the first day of the trial, back in October of 2003.  Remember all those people on the street?").

375. Guerra states that he solicited bribes from both parties in the Lago Agrio case.  Dkt. 746-3 (Ex. C) ¶¶ 12-13, 22-23.

**RESPONSE:**  Undisputed.  Chevron notes, however, that it, unlike the Defendants, refused Guerra's advances and has never paid Guerra or Zambrano any bribes.  Sts. 184-91.

376. In or about July 2012, Chevron paid Guerra $38,000 for a hard drive, seven USB drives, four day planners, permission to access two Hotmail accounts, copies of bank and phone records, two cell phones, two SIM cards, a floppy disk, and seven CDs.  Dkt. 755-14 ¶¶ 5-6.  Chevron also provided Guerra with a laptop at this time.  *Id.* ¶ 5.

**RESPONSE:**  The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  The agreement between Chevron and Guerra speaks for itself.  Dkt. 755-14 (Ex. 3268).  As detailed in that agreement, Chevron paid Guerra a fixed sum of $38,000 to take possession of, and for the information contained in, the materials listed in Attachments A and B.  Chevron also provided Guerra with a replacement laptop and phone.  *Id.* ¶¶ 5-6.

377. Chevron has relocated Guerra, his wife, his son, and his son's family to the United States.  Dkt. 755-14 at p.3 Chevron is paying Guerra $12,000 a month as well as providing Guerra, his wife, and his son's family with health insurance, an automobile, and immigration representation.  *Id.*

**RESPONSE:**   The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  The agreement between Chevron and Guerra speaks for itself.  Dkt. 755-14 (Ex. 3268) at p. 3-5.

378. Guerra already had one son living in Chicago.  At one point, that son had immigration issues. Dkt. 746-3 (Ex. C) ¶ 19.

**RESPONSE:**   The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  For that reason, it therefore requires no response.  The cited evidence does not support Defendants' contention.  Dkt. 755-7 (Ex. 3221) (DONZ00059141) (Guerra asks Donziger to help his daughter obtain residency); Dkt. 746-3 (Ex. C) ¶ 19.

379. Chevron will make these payments to Guerra for at least 24 months, and they could continue indefinitely. Dkt. 755-14, ¶ 5.

**RESPONSE:**   The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  The agreement between Chevron and Guerra speaks for itself.  Dkt. 755-14 (Ex. 3268) at p. 3-5.

380. Guerra claims that he wrote "the great majority of the rulings issued in civil cases assigned to Mr. Zambrano, including the Chevron case, which continued until February of 2012. Dkt. 746-3 (Ex. C) ¶ 7.

**RESPONSE:**   The assertion only underscores that Guerra served as Zambrano's ghostwriter. This supports Chevron and fails to create a material issue of fact affecting the disposition of that motion.  Guerra's declaration speaks for itself.  He testified, "I was Mr. Zambrano's 'ghostwriter' and I wrote the great majority of the rulings issued in civil cases assigned to Mr. Zambrano, including the Chevron case, which continued until February of 2012, when Mr. Zambrano was removed from the Provicial Court of Sucumbíos."  Dkt. 746-3 (Ex. C), ¶ 7.

381. All of the draft orders Guerra claims to have prepared for Zambrano that were found on Guerra's electronic media were allegedly created in late 2009 or early 2012.  St. 182.

**RESPONSE:**   The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  Furthermore, it is incorrect.  A draft of the OCP judgment was created in June 2009, and draft of the Zapata decision was created in December 2010.  Dkt. 755-16 (Younger Report) at 10-11.  In all, Guerra's media contained drafts of more than 100 rulings issued in cases over which Zambrano presided, many of which were created in 2010 and 2011.  Stavers Decl., Ex. 3663 (2013.02.28 Younger Report) at 5; Stavers Decl., Ex. 3680 (2013.04.11 Younger Report) at 2-3; Dkt. 746-3 (Guerra Decl.), ¶¶ 7–8.

382. Donziger is unaware that Guerra has ever ghostwritten decisions in the Lago Agrio litigation, and Donziger is unaware of any "help" by Guerra to "steer" the decision in favor of the plaintiffs in the Lago Agrio litigation. He never thanked Guerra for these things.  Donziger Decl. ¶ 3.

**RESPONSE:**  The assertion fails to create a material issue of fact affecting the disposition of Chevron's motion.  Defendants do not deny a 2009 meeting between Donziger and Guerra.  And while Donziger now claims to be "unaware" of Guerra ghostwriting decisions for the Lago Agrio court, the evidence, including drafts of nine Lago Agrio orders that Guerra provided, indisputably prove he did so.  Donziger's professed lack of knowledge cannot create a material dispute of fact, particularly when internal emails demonstrate that he was aware of Guerra's ghostwriting. *See* Reply to Sts. 204-205.

383. Donziger recalls receiving an e-mail from Guerra seeking immigration assistance on behalf of a relative or friend. Donziger never sent word through Mr. Fajardo confirming that Donziger "would look into the issue," nor did Donziger take any steps, directly or indirectly, to assist Guerra in any immigration matter.  Instead, Donziger simply ignored Guerra's e-mail. Donziger Decl. ¶ 4.

**RESPONSE:**   The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  Donziger does not deny that Guerra asked him to help his obtain residency, and offered to "support the matter of Pablo Fajardo so it will come out soon and well." Dkt. 755-7 (Ex. 3221) (DONZ00059141).

384. Donziger recalls being at a restaurant in Quito with Guerra, when Guerra asked for a bribe of $500,000. Donziger refused Guerra, and told him that neither Donziger nor anyone on the Lago Agrio Plaintiffs' team would do such a thing.  Donziger did not respond (as Guerra asserts) that the Lago Agrio Plaintiffs lacked that sum of money "at the moment."  Donziger Decl. ¶ 5.

**RESPONSE:**  The assertion fails to create a material issue of fact affecting the disposition of Chevron's motion.  In fact, Donziger's declaration corroborates Guerra's account.  Donziger admits meeting with Guerra.  He admits that during his meeting with Guerra, Guerra solicited a $500,000 bribe.  Both Guerra and Donziger state that no deal was reached at that meeting. *Compare* Dkt. 746-3 (Ex. C), ¶ 23 *with* Dkt. 922, ¶ 5.  That the two accounts differ as to the words Donziger used to decline Guerra's offer at the meetings does not create a material issue of fact.  Nowhere in his declaration does Donziger deny that any member of LAPs' legal team agreed to pay a bribe in exchange for a favorable verdict.

385. Donziger has never sought to pay any money in exchange for a favorable verdict in the Lago Agrio litigation, nor has Donziger encouraged or solicited anyone else to discuss or pursue paying money for a favorable verdict.  Donziger Decl. ¶ 5.

**RESPONSE:**  The assertion fails to create a material issue of fact affecting the disposition of Chevron's motion.  Nevertheless, Donziger's declaration corroborates Guerra's account.

Donziger admits meeting with Guerra.  He admits that during his meeting with Guerra, Guerra solicited a $500,000 bribe.  Both Guerra and Donziger state that no deal was reached at that meeting.  *Compare* Dkt. 746-3 (Ex. C), ¶ 23 *with* Dkt. 922, ¶ 5.  That the two accounts differ as to the words Donziger used to decline Guerra's offer at the meetings does not create a material issue of fact.  Nowhere in his declaration does Donziger "unequivocally" deny that any member of LAPs' legal team agreed to pay a bribe in exchange for a favorable verdict.

        386. Larry Veselka, Vanessa Barham, and Pablo Fajardo met with Guerra on July 13, 2011 in Quito, Ecuador. Guerra stated that in 2003 shortly after the Lago Agrio case was filed, he received pressure from the Ecuadorian Attorney General at the time to dismiss the case against Chevron but that he rebuffed the request and did not dismiss the case in response to political pressure. Smyser Decl. (Ex. 15) (Camacho's Supp. Objs. and Resps. to Chevron's Interrogs.) and (Ex. 16) (Piaguaje's Supp. Objs. and Resps. to Chevron's Interrogs.).

**RESPONSE:**  The unsupported assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  The only evidence cited in support of Defendants' contention—self-serving responses to Chevron's interrogatories—is inadmissible hearsay; an out of court statement being offered for the truth of the matter asserted therein (Fed. R. Evid. 801(c)), for which there is no valid exception.  Defendants' responses to Chevron's interrogatories purport to describe conversations between Guerra and the LAPs' attorneys.  Defendants do not claim to have personal knowledge of these discussions, and have not submitted sworn testimony regarding those discussions from any of the individuals purportedly involved therein.

        387. Also at the July 13, 2011 meeting, Guerra stated that he was unaware of any fraud or corruption in the proceedings other than the approach by the Attorney General and another approach by an influential national government official on behalf of Chevron.  Smyser Decl. (Ex. 15) (Camacho's Supp. Objs. and Resps. to Chevron's Interrogs.) and (Ex. 16) (Piaguaje's Supp. Objs. and Resps. to Chevron's Interrogs.).

**RESPONSE:**  Disputed.  The only evidence cited in support of Defendants' contention—self-serving responses to Chevron's interrogatories—is inadmissible hearsay; an out of court statement being offered for the truth of the matter asserted therein (Fed. R. Evid. 801(c)), for which there is no valid exception.  Defendants' responses to Chevron's interrogatories purport to describe conversations between Guerra and the LAPs' attorneys.  Defendants do not claim to have personal knowledge of these discussions, and have not submitted sworn testimony regarding those discussions from any of the individuals purportedly involved therein.

        388. Guerra stated that Judge Zambrano was not pressured or influenced by anyone and that Judge Zambrano's actions were clean and appropriate.  Smyser Decl. (Ex. 15) (Camacho's Supp. Objs. and Resps. to Chevron's Interrogs.) and (Ex. 16) (Piaguaje's Supp. Objs. and Resps. to Chevron's Interrogs.).

**RESPONSE:**  The unsupported assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  The only evidence cited in support

of Defendants' contention—self-serving responses to Chevron's interrogatories—is inadmissible hearsay; an out of court statement being offered for the truth of the matter asserted therein (Fed. R. Evid. 801(c)), for which there is no valid exception.  Defendants' responses to Chevron's interrogatories purport to describe conversations between Guerra and the LAPs' attorneys.  Defendants do not claim to have personal knowledge of these discussions, and have not submitted sworn testimony regarding those discussions from any of the individuals purportedly involved therein.

389. Guerra stated that he had no knowledge of documents outside the record being provided to Judge Zambrano. Smyser Decl. (Ex. 15) (Camacho's Supp. Objs. and Resps. to Chevron's Interrogs.) and (Ex. 16) (Piaguaje's Supp. Objs. and Resps. to Chevron's Interrogs.).

**RESPONSE:**  The unsupported assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  The only evidence cited in support of Defendants' contention—self-serving responses to Chevron's interrogatories—is inadmissible hearsay; an out of court statement being offered for the truth of the matter asserted therein (Fed. R. Evid. 801(c)), for which there is no valid exception.  Defendants' responses to Chevron's interrogatories purport to describe conversations between Guerra and the LAPs' attorneys.  Defendants do not claim to have personal knowledge of these discussions, and have not submitted sworn testimony regarding those discussions from any of the individuals purportedly involved therein.

390. Guerra stated that he had no knowledge of the Lago Agrio Plaintiffs or the Ecuadorian government influencing the judgment.  Smyser Decl. (Ex. 15) (Camacho's Supp. Objs. and Resps. to Chevron's Interrogs.) and (Ex. 16) (Piaguaje's Supp. Objs. and Resps. to Chevron's Interrogs.).

**RESPONSE:**  The unsupported assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  The only evidence cited in support of Defendants' contention—self-serving responses to Chevron's interrogatories—is inadmissible hearsay; an out of court statement being offered for the truth of the matter asserted therein (Fed. R. Evid. 801(c)), for which there is no valid exception.  Defendants' responses to Chevron's interrogatories purport to describe conversations between Guerra and the LAPs' attorneys.  Defendants do not claim to have personal knowledge of these discussions, and have not submitted sworn testimony regarding those discussions from any of the individuals purportedly involved therein.

391. Craig, Jarod Stewart, and Pablo Fajardo met with Nicolas Augusto Zambrano on August 16, 2012 in Quito, Ecuador. The participants discussed Mr. Zambrano's statement that he chose every word that appeared in the February 14, 2011 judgment, that it was his judgment, that he does not remember the source for every word that appeared in the judgment, that no other person wrote the judgment, and that Chevron has persecuted and harassed him since the date of the judgment.  Smyser Decl. (Ex. 15) (Camacho's Supp. Objs. and Resps. to Chevron's Interrogs.) and (Ex. 16) (Piaguaje's Supp. Objs. and Resps. to Chevron's Interrogs.).

**RESPONSE:**  The unsupported assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  The only evidence cited in support of Defendants' contention—self-serving responses to Chevron's interrogatories—is inadmissible hearsay; an out of court statement being offered for the truth of the matter asserted therein (Fed. R. Evid. 801(c)), for which there is no valid exception.  In addition, for the reasons stated in Chevron's Reply filed herewith, Zambrano's recently filed declaration is inadmissible hearsay and should not be considered.  Even if Zambrano's declaration were not hearsay, Zambrano does not deny that Guerra ghostwrote orders for Zambrano in the Lago Agrio litigation and other cases (*see* Chevron's Reply to Sts. 182, 197, 200), Zambrano fails to explain how the LAP team's unfiled work product was incorporated word-for-word throughout the judgment (*see* Chevron's Reply to Sts. 125-180), and Zambrano does not deny that he reached a deal with the LAPs to issue a judgment in their favor in exchange for payment of $500,000 from the judgment's proceeds (*see* Chevron's Reply to St. 191).

## LAPS' STATEMENT OF ADDITIONAL MATERIAL FACTS AS TO WHICH THERE IS A GENUINE ISSUE TO BE TRIED OR AS TO WHICH THERE IS NO DISPUTE

**Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1(b), Defendants submit the following list of additional material facts:**

## I.    THE LAGO AGRIO LITIGATION

### A.    Contacts with Experts and Judges

345. At all times relevant to Chevron's motion, there was no law or regulation in Ecuador prohibiting *ex parte* communications with judges. Dkt. 154-6 (Ex. 60) at 6 (Affidavit of Dr. Farith Ricardo Simon noting that Ecuadorian law prohibiting judges from "accepting the visit of or meeting with one of the parties or his counsel without first notifying the other" did not come into existence until March 9, 2009—roughly three years after the Ecuadorian Plaintiffs are alleged to have met with Judge Yánez concerning the waiver of judicial inspections and the commencement of the peritaje global.); Smyser Decl., Ex. 17 (Alban Aff.), ¶¶ 30-32 (Ecuadorian "legislation prior to the month of March, 2009 did not prohibit contact by the parties with the judicial authorities responsible for the legal action without the presence of the opposing party.").

**RESPONSE:**  The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  For that reason, it therefore requires no response.  Taking it as true for the sake of argument, it does not establish that all ex parte contacts with judges were permissible, much less that the particular contacts Defendants had were lawful.  Allegations that some ex parte communications with judges were permitted under Ecuadorian law does not dispute the evidence that Defendants engaged in contacts with judges whose wrongful nature went beyond their ex parte character, including that they bribed the judge to issue their own ghostwritten judgment.  Br. 7–8, 12–17; St. 36, 182–92, 204–210; *see also* Dkt. 754-10 (Ex. 3123), ¶ 10 ("Even before 2009, an attorney who met with the judge in private without the presence of the attorney of the other party in order to exert pressure or obtain a favorable judgment acted unethically and contrary to the professional honor of attorneys, since he influences and interferes with the Judge in the faithful fulfillment of his duties."); *id.* ¶¶ 7–9.  Indeed, the Court has already concluded that, based upon the Defendants' ex parte contacts with the Ecuadorian Court "the decision to terminate judicial inspections, to pursue the global assessment, and to select Cabrera as the global expert were tainted by the duress and coercion applied to [the judge] by Fajardo, Donziger, and perhaps others in ex parte meetings. . . .  [T]he process in these respects was tainted."  Dkt. 550 at 90.

346. *Ex parte* communication with the judges presiding over the Lago Agrio litigation was the ordinary manner of proceeding throughout the majority of that case. Chevron, in fact, had *ex parte* meetings of its own with Ecuadorian judges presiding over the Lago Agrio litigation—including meetings regarding the peritaje global. Eyewitness Donald Rafael Moncayo Jimenez has recounted in a sworn affidavit: "On multiple occasions, I personally saw the lawyers who represent Chevron Corporation in the Lago Agrio case meeting alone with the judges who heard the case without the presence of the plaintiffs' lawyers" Dkt. 613-6 (Ex. F) at ¶ 3. Moncayo has testified that on one occasion, he "saw attorneys Adolfo Callejas Ribadeneira and Ivan Alberto Racines [Chevron's lawyers], and Dr. Efraín Novillo [one of the presiding judges]

in the offices of Judge Novillo. They were talking about the expert designated by the Judge, Mr. Richard Cabrera." *Id.* at ¶ 4. When Mr. Moncayo "approached the offices, the private security guards of Chevron and a Chevron technician tried to chase [him] away." *Id.* Moncayo also de-scribes an-other incident where Judge Juan Núñez, then-President of the Lago Agrio Court, "was talking to Dr. Diego Larrea and Alberto Racines [Chevron's lawyers] about the inspection of the Auca wells and other stations, where there were oil wells, topic of the Lago Agrio case." *Id.* at ¶ 5. Additionally, during his deposition on September 13, 2011, Moncayo testified under oath to witnessing one of Chevron's lawyers, Dr. Enrique Caravajal, have an *ex parte* meeting with the then-presiding Judge Rafael Ordoñez after business hours on July 30, 2010. Dkt. 613-7 (Ex. G) at 31:12-32:19, 34:2-36:21. The *ex parte* meeting lasted roughly 20 minutes, and is captured in photographs that Moncayo took with his mobile phone. (*Id.*, at 37; *see also* Dkt. 613-14 (Ex. N)) (Salazar Decl., recounting additional Chevron *ex parte* meetings with the Lago Agrio Court).

**RESPONSE:**  The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  For that reason, it therefore requires no response. Allegations that Chevron itself engaged in ex parte contacts are immaterial to the resolution of these claims; they do not bear on the truth or falsity of the Defendants' representations to U.S. courts regarding the scope and nature of their relationship with Cabrera or their fraudulent scheme to obtain the Ecuadorian judgment.  Furthermore, Chevron's counsel had contact with the court in which procedural or purely administrative matters or motions were discussed as well as a few incidental contacts that occurred as a result of running into members of the court in the small town in which the litigation was conducted.  Chevron has identified those contacts in its response to the LAPs' Interrogatory No. 10, and Defendants offer no evidence or argument that those contacts are in any way similar to their collusion.

347. Ecuadorian law did not prohibit parties to a lawsuit from making contact with court-appointed experts prior to the issuance of the expert's report, including prior to the expert's for-mal appointment by the court. *See* Dkt. 154-5 (Ex. 59) (Alban Aff.), ¶¶ 9-12, 19; Dkt.154-6 (Ex. 60) (Simon Aff.), ¶¶ 4-5, 7-8.

**RESPONSE:**  The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  For that reason, it therefore requires no response. Taking it as true for the sake of argument, it does not establish that all "contacts" with experts were permissible, much less that the particular contacts Defendants had were lawful.  The LAPs' statement of fact does not accurately describe the LAPs' relationship with Cabrera, who is the only "expert" at issue in this motion.  And regardless of what Defendants now claim Ecuadorian law may permit as a theoretical matter, Donziger admitted to co-counsel, contemporaneously with the conduct at issue, that the LAPs' actual relationship with Cabrera was "improper" under traditional Ecuadorian law.  Dkt. 400-4 (Ex. 2047) (DONZ-HDD-0004621–22) ("The traditional Ecuadorian law perspective (which will be asserted by Chevron) would hold that the level of col-laboration between one party and the expert is problematic and improper in that all court-appointed experts in Ecuador should be independent.  By working so closely with our local counsel and Stratus, Cabrera violated his duties to the court.").  Furthermore, as demonstrated, (Brief at 8–12), the LAPs' interactions with Cabrera in fact were unlawful, as Julio Prieto recog-nized.  Sts. 84, 96; Dkt. 9-6 (warning Donziger, Fajardo, and Yanza that disclosure of their rela-tionship with Cabrera could have "devastating" effects: "apart from destroying the proceeding, all of us, your attorneys, might go to jail"); *see also* Dkt. 754-10 (Ex. 3123), ¶¶ 11–24 (Defend-ants "have flagrantly violated Ecuadorian law, including articles 251 and 256 of the Code of Civ-

il Procedure (hereinafter, the "CCP"), and the orders of the Lago Agrio Court dated June 13, 2007 and October 3, 2007, since the expert would have failed to perform his tasks in a trustworthy and lawful manner and would have failed to comply with the abovementioned Court orders."; "The fact that there is no written provision in Ecuador that expressly prohibit the parties from meeting with a court-appointed judicial expert does not mean that any kind of interaction between them is permitted."); Chevron's Reply to St. 36.

348. It was common practice for litigants to make contact with experts and advocate their positions. Under Ecuadorian law, an expert is permitted to interact and coordinate with a party to the litigation, and that doing so "is not considered a fault or a violation of his oath to 'faithfully and legally' perform his duties." Dkt. 154-6 (Ex. 60) at ¶ 8; *see also id.* at ¶ 9; Dkt. 154-5 (Ex. 59) at ¶¶ 17-18. The fact that an expert ultimately adopts one party's views to the exclusion of the other's also does not mean that the expert was not independent or neutral. *See id.* at ¶ 27.

**RESPONSE:**  This assertion does not create a genuine issue of material fact and is therefore irrelevant.  Taking it as true for the sake of argument, it does not establish that all "contacts" with experts were permissible, much less that the particular contacts Defendants had were lawful. The LAPs' statement of fact does not accurately describe the LAPs' relationship with Cabrera, who is the only "expert" at issue in this motion.  And regardless of what Defendants now claim Ecuadorian law may permit as a theoretical matter, Donziger admitted to co-counsel, contemporaneously with the conduct at issue, that the LAPs' actual relationship with Cabrera was "improper" under traditional Ecuadorian law.  Dkt. 400-4 (Ex. 2047) (DONZ-HDD-0004621–22) ("The traditional Ecuadorian law perspective (which will be asserted by Chevron) would hold that the level of collaboration between one party and the expert is problematic and improper in that all court-appointed experts in Ecuador should be independent.  By working so closely with our local counsel and Stratus, Cabrera violated his duties to the court.").  Furthermore, as demonstrated (Brief at 8–12), the LAPs' actual interactions with Cabrera were unlawful, as Julio Prieto recognized.  St. 84, 95–99; Dkt. 9-6 (warning Donziger, Fajardo, and Yanza that disclosure of their relationship with Cabrera could have "devastating" effects: "apart from destroying the proceeding, all of us, your attorneys, might go to jail"); *see also* Dkt. 754-10 (Ex. 3123), ¶¶ 11–24 (Defendants "have flagrantly violated Ecuadorian law, including articles 251 and 256 of the Code of Civil Procedure (hereinafter, the 'CCP'), and the orders of the Lago Agrio Court dated June 13, 2007 and October 3, 2007, since the expert would have failed to perform his tasks in a trustworthy and lawful manner and would have failed to comply with the abovementioned Court orders.").

349. It is understood in Ecuador that court-appointed scientific experts in highly complex cases simply could not be expected to perform their functions without party assistance. As such, an "independent" expert in Ecuador does not cease to be independent by virtue of reliance on party-resources to carry out his function. Dkt. 154-5 (Ex. 59), ¶ 12 ("Meeting with the experts without the other party being present. . . effectively aids the adequate fulfillment of the expert's or experts' functions in situations of a high scientific complexity, given the limited technological re-sources which our country [Ecuador] has to provide technical information for the efficient administration of justice."); Dkt. 154-6 (Ex. 60), ¶ 9 ("'[t]here is an actual procedural burden for the parties, to make it easier for the experts to conduct their studies. . . .'").

**RESPONSE:** This assertion does not create a genuine issue of material fact and is therefore irrelevant. Taking it as true for the sake of argument, it does not establish that all "contacts" with experts were permissible, much less that the particular contacts Defendants had were lawful. Furthermore, it is contradicted by facts that are not genuinely in dispute. *See* Br. at 8–12; Sts. 36, 44–99. The LAPs' statement of fact does not accurately describe the LAPs' relationship with Cabrera, which is the only "expert" at issue in this motion. The Defendants' ex parte contacts with Cabrera were not "procedural" or administrative. *See* Br. at 8–12. And regardless of what Defendants now claim Ecuadorian law may permit as a theoretical matter, Donziger admitted to co-counsel, contemporaneously with the conduct at issue, that the LAPs' actual relationship with Cabrera was "improper" under traditional Ecuadorian law. Dkt. 400-4 (Ex. 2047) (DONZ-HDD-0004621–22) ("The traditional Ecuadorian law perspective (which will be asserted by Chevron) would hold that the level of collaboration between one party and the expert is problematic and improper in that all court-appointed experts in Ecuador should be independent. By working so closely with our local counsel and Stratus, Cabrera violated his duties to the court."). Furthermore, as demonstrated, (Brief at 8–12), the LAPs' interactions with Cabrera in fact were unlawful, as Julio Prieto recognized. St. 84, 96; Dkt. 9-6 (warning Donziger, Fajardo, and Yanza that disclosure of their relationship with Cabrera could have "devastating" effects: "apart from destroying the proceeding, all of us, your attorneys, might go to jail"); *see also* Dkt. 754-10 (Ex. 3123), ¶¶ 11–24 ("[T]he collaboration of the Lago Agrio Plaintiffs and their attorneys with the global expert appointed by the court, Richard Cabrera, violates Ecuadorian law and the orders issued by the Court. Procedural principles, Court orders and the rules of law categorically prohibited such conduct. The replacement of a judicial expert in the drafting of the expert's report is not permitted by the law."); Chevron's Reply to St. 36.

350. The Ecuadorian Plaintiffs' meetings with Richard Cabrera in the time leading up to his appointment were not particularly secretive because there was no reason for them to be. For ex-ample, on one occasion on February 27, 2007, Donziger and others met with Cabrera at a "Mister Bagel," notwithstanding their belief that Chevron's operatives were frequently spying on them. Dkt. 28-7 (Ex. 76) at 15.

**RESPONSE:** This assertion does not create a genuine issue of material fact and is therefore irrelevant. Furthermore, it is contradicted by facts that are not genuinely in dispute. *See* Br. at 10–12; Sts. 36, 44–99. The evidence establishes that Defendants' intended to, and in fact, did, keep their contacts with Cabrera secret. Less than a week after the alleged February 27, 2007 meeting, and still before Cabrera was appointed, Donziger stated that, with respect to Defendants' relationship with Cabrera, "Our goal is that they [Chevron] don't know shit . . . ." St. 96. Defendants used code names to maintain the secrecy of their contacts with Cabrera. Br. at 11; St. 53–54. And Defendant Ann Maest testified that she had "an understanding that [her] contacts with Cabrera . . . needed to be kept confidential or secret." Dkt. 400-2 (Ex. 2015) (2011.01.19 Maest Dep. Tr.) at 121:23–122:3; *see also* Stavers Decl., Ex. 3653 (Maest Witness St.), ¶ 12 ("In discussions around the time of the March 2007 meetings, Donziger made it clear to me that it was vital that the coordination between the LAPs and Cabrera be kept secret."). The LAPs consistently denied any improper relationship with Cabrera, including in filings with the Lago Agrio court. Dkt. 36-5 at 3 (2008.04.04 LAP filing in Ecuador calling the notion that Cabrera "works for us" "simply ridiculous"); Dkt. 36-6 (2008.04.25 LAP filing in Ecuador) at 2 (labeling the allegation that the LAPs have a "close relationship with the Independent Expert Richard Cabrera" "[a]nother infamy")). Furthermore, as demonstrated, (Brief at 8–12), the LAPs' interactions with Cabrera in fact were unlawful, as Julio Prieto recognized. Dkt. 9-6 (warning Donziger, Fajardo,

and Yanza that disclosure of their relationship with Cabrera could have "devastating" effects: "apart from destroying the proceeding, all of us, your attorneys, might go to jail")).

351. Chevron also engaged in *ex parte* communications with, and provided undisclosed *ex parte* assistance to, court-appointed experts, including before experts were formally appointed. *See* Dkt. 154-7 (Ex. 61) at p. 2; Dkt. 152 (Saenz Decl) at ¶ 58 (Dr. Marcel Muñoz Herreria letter to Lago Agrio court describing a March 9, 2010 meeting with Chevron representative Alfredo Guerrero at a hotel for a "technical planning meeting"); Dkt. 154-7 (Ex. 61) at p. 3 ("Scope Plan requested and approved by Engineer Guerrero" attached to Muñoz's letter); Dkt. 152 ¶ 57 ("In March of 2009, upon Chevron's request for the appointment of an expert to inspect and prepare reports related to a predetermined group of former Texaco sites, the Court appointed Dr. Marcel Muñoz Herreria as Judicial Inspection Expert.").

**RESPONSE:** The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion. For that reason, it therefore requires no response. Donziger alleges that a Chevron engineer met with a Dr. Marcelo Muñoz, a court-appointed expert for a series of judicial inspections Chevron requested. As the party that requested the inspections, Chevron was responsible for logistics, including providing lodging and transportation for the judge, and any court personnel and court-appointed experts attending. Contacts between representatives of Chevron and Muñoz were purely logistical in nature and Donziger provides no evidence otherwise. In a letter from Dr. Muñoz to the Court, he asked that it order Chevron to pay him as he claimed he and Chevron had agreed and "as approved by the President of the Court." Dkt. 147-7 at 2. The letter suggests no improper collaboration between Chevron and Dr. Muñoz. Dkt. 147-7 at 1−2. And what the letter says occurred at the "technical planning meeting" Donziger refers to is that Dr. Muñoz and a Chevron representative agreed on a budget. *See* Dkt. 147-7 at 1. Such contacts are the type of ex parte contacts both Defendants' and Chevron's experts agree are permissible under Ecuadorian law. *See* Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 154-5 (Ex. 59), ¶¶ 17–18; Dkt. 754-10 (Ex. 3123), ¶ 13 (Romero report recognizing "[t]he fact that there is no written provision in Ecuador that expressly prohibit the parties from meeting with a court-appointed judicial expert does not mean that any kind of interaction between them is permitted.").

352. Marcelo Munoz, a court-appointed expert in the Lago Agrio litigation, participated in a private meeting with Chevron's technical consultant Alfredo Guerrero, for a "technical [p]lanning meeting" at which the engineer "approved" a work plan. *See* Dkt. 154-7 (Ex. 61).

**RESPONSE:** The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion. For that reason, it therefore requires no response. Donziger alleges that a Chevron engineer met with a Dr. Marcelo Muñoz, a court-appointed expert for a series of judicial inspections Chevron requested. As the party that requested the inspections, Chevron was responsible for logistics, including providing lodging and transportation for the judge, and any court personnel and court-appointed experts attending. Contacts between representatives of Chevron and Muñoz were purely logistical in nature and Donziger provides no evidence otherwise. In a letter from Dr. Muñoz to the Court, he asked that it order Chevron to pay him as he claimed he and Chevron had agreed and "approved by the President of the Court." Dkt. 147-7 at 2. The letter suggests no improper collaboration between Chevron and Dr. Muñoz.

Dkt. 147-7 at 1−2. And what the letter says occurred at the "technical planning meeting" Donziger refers to is that Dr. Muñoz and a Chevron representative agreed on a budget. *See* Dkt. 147-7 at 1. Such contacts are the type of ex parte contacts both Defendants' and Chevron's experts agree are permissible under Ecuadorian law. *See* Dkt. 154-6 (Ex. 60), ¶ 8; Dkt. 154-5 (Ex. 59), ¶¶ 17−18; Dkt. 754-10 (Ex. 3123), ¶ 13 (Romero report recognizing "[t]he fact that there is no written provision in Ecuador that expressly prohibit the parties from meeting with a court-appointed judicial expert does not mean that any kind of interaction between them is permitted.").


353. Consistent with Ecuadorian law and customary practice, the Lago Agrio Court issued orders affirmatively authorizing the parties to communicate with Cabrera and to provide him with information. Dkt. 613-13 (Ex. M) (April 14, 2008 Lago Agrio Court Order) at 9; Dkt. 557-5 (Suppl. Young Decl. Ex. 29); Dkt. 154-5 (Ex. 59), ¶ 17; Dkt. 32-6 (132,846 at 2 and 132,849 at 7).

**RESPONSE:** This assertion does not create a genuine issue of material fact and is therefore irrelevant. Taking it as true for the sake of argument, it does not establish that all "communications" with and "information" provided to Cabrera were permissible, much less that the particular contacts and information Defendants had were lawful. Furthermore, it is contradicted by facts that are not genuinely in dispute. *See* Br. at 10−12; Sts. 36, 44-99. Whether the Lago Agrio court authorized the parties to have some contact with Cabrera is immaterial whether the Lago Agrio court authorized the Defendants' ghostwriting of the Cabrera Report. Furthermore, Chevron notes that, even were Defendants' characterization of the April 14, 2008 order accurate, it would, at most, authorize "the parties to communicate with Cabrera and to provide him with information" two weeks after Defendants had already ghostwritten the Cabrera Report and it had been filed with the court. St. 95. Further, Chevron disputes Donziger's characterization of the cited order. The order states: "Add to the record the submission filed by Attorney Pablo Fajardo Mendoza on February 18, 2008, at 3:00 p.m., consisting of 3,292 pages. With regard to its content, notice has been sent to Expert Engineer Richard Cabrera Vega by means of the order issued on February 25, 2008 at 8:10 a.m." Dkt. 613-13 at 9. It is undisputed that the February 18, 2008 submission of materials to Cabrera did not include materials from Stratus or others who ghostwrote the Cabrera Report. Plaintiffs represented to the Lago Agrio Court in their February 18, 2008 pleading that all the information being submitted was from public entities in Ecuador: "We clarify that all the information we are delivering to the Expert through the Court has been provided to us by various Ecuadorian public institutions over the last four years. The accuracy of the information is therefore guaranteed." Dkt. 401-7. In its order of January 30, 2008, the Lago Agrio court requested that the parties "provide to the expert the information he requested, consisting of aerial photographs taken after 1990 of the sites identified in his document; file documents related to the drilling of wells and pertaining to environmental treatment reports and documentation on spills, mud pits, and environmental accidents, communications and responses from regulatory agencies, [and] in general documents on environmental and related actions; and [d]ocumentation on the environmental audits of the defendant's operations." Dkt. 549-10. Further, the assertion that this order authorized the LAPs' interactions with Cabrera is belied by Donziger's admission that he and his coconspirators "met with and interacted with Mr. Cabrera both before and after" the Lago Agrio court issued its January 2008 order. The LAPs consistently denied cooperation with Cabrera, even after the orders Defendants cite. Br. at 10−12; St. 69 (The Cabrera Report "was not entirely or even predominantly [Cabrera's] own work or that of any assistants or consultants working only for him. There is no genuine issue with respect to the

facts that the LAP team secretly prepared his work plan, worked closely with him in carrying it out, and drafted most of the report and its annexes.") (citing Dkt. 550 at 90)), 95–99; Dkt. 36-5 at 3 (2008.04.04 LAP filing in Ecuador calling the notion that Cabrera "works for us" "simply ridiculous"); Dkt. 36-6 (2008.04.25 LAP filing in Ecuador) at 2 (labeling the allegation that the LAPs have a "close relationship with the Independent Expert Richard Cabrera" "[a]nother infamy")).

354. Cabrera and the Lago Agrio Court repeatedly requested that the parties provide Cabrera with relevant and useful information. *See, e.g.,* Dkt. 557-5 (Suppl. Young Decl. Exs. 27-29); Dkt. 613-13 (Ex. M) at 9; Dkt. 154-5 (Ex. 59) at ¶ 17; Dkt. 557-5 (Ex. 28) at p. 133,987 (Cabrera Petition dated Jan. 7, 2008 stating, "I request that [the Court] order the parties to provide me with any information that … each party considers necessary in order to incorporate it in this expert report"); Dkt 557-5 (Ex. 29) at p. 134,157 (Court order dated Jan. 30, 2008, responding to Cabrera Petition dated Jan. 7, 2008, ordering the parties to "provide the required information to the ex-pert as soon as possible") Dkt. 154-5 (Ex. 59) at ¶ 17; Dkt. 32-6 (132,846 at 2 and 132,849 at 7); Dkt. 613-13 at 10 ("[T]he parties may submit to the expert whatever documentation they believe may be useful in preparing his report."). The Lago Agrio Court ordered that materials submitted by Chevron "be delivered directly to the expert, its addressee." *Id.*

**RESPONSE:**   The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  For that reason, it therefore requires no response.  Whether Cabrera or the court requested provision of some materials to Cabrera is immaterial to Chevron's contention that Defendants not only provided materials to Cabrera but also performed his work.  In addition, Defendants' misleading characterization of both Cabrera's requests and court orders is not supported by the evidence.  Cabrera made specific requests asking on January 7, 2008, that the parties supply him with three categories of documents: (1) "aerial photographs in digital format … before and after 1990"; (2) "[i]nactive file documents related to the drilling of wells [pertaining] to environmental treatment, reports and documentation on spills, pits, environmental accidents, communications to and responses from regulatory authorities, and in general, documents pertaining to environmental actions"; and (3) "[d]ocumentation from the Environmental Authorities related to the defendant's operations."  Dkt. 400-4.  In its order of January 30, 2008, the Lago Agrio court requested that the parties "provide to the expert the information he requested, consisting of aerial photographs taken after 1990 of the sites identified in his document; file documents related to the drilling of wells and pertaining to environmental treatment reports and documentation on spills, mud pits, and environmental accidents, communications and responses from regulatory agencies, [and] in general documents on environmental and related actions; and [d]ocumentation on the environmental audits of the defendant's operations."  Dkt. 549-10.  The April 14, 2008 order referenced (Werdegar Decl., Ex. M at 9) (Dkt. 613-13) came two weeks after the filing of the Cabrera Report on April 1, 2008, and thus did not authorize the LAPs' ghostwriting of that report.  St. 69–78.  The LAPs consistently denied cooperation with Cabrera.  Br. at 10–12; St. 95–99; Dkt. 36-5 at 3 (2008.04.04 LAP filing in Ecuador calling the notion that Cabrera "works for us" "simply ridiculous"); Dkt. 36-6 (2008.04.25 LAP filing in Ecuador) at 2 (labeling the allegation that the LAPs have a "close relationship with the Independent Expert Richard Cabrera" "[a]nother infamy")).  The Ecuadorian court ordered Cabrera to present together "with the report" all sources used and "to cite all of his scientific sources, and analytical and legal documents that he use[d] to perform his work."  Dkt. 402-14 (Ex. 2322) (133,755) at 1 (2007.11.30 Ecuadorian court order regarding materials used in preparing the Cabrera Report: "[A]ll the documents that serve as support or a source of information for the

work performed by [Cabrera] must be presented together with the report. . . . [I]n his report the Expert is required to cite all of the scientific sources, and analytical and legal documents that he uses to perform his work.")).  This was not done.  In addition, if, as Defendants assert, that order permitted unlimited provision of material to Cabrera, then there would have been no reason for the LAPs' consultants to "clean up the language" of a portion of the supplemental report "so it sounds more like the Perito [Cabrera] and less like a comment." Dkt. 9-4 (STRATUS-NATIVE051389) at 2.

355. Chevron had the opportunity to provide materials to Cabrera. *See* St. 354; *see also* Dkt. 47-62 (Ex. 300) at 36:18-19 (Chevron's counsel's statement in the Stratus § 1782 that "both sides were allowed to submit data to Cabrera.").

**RESPONSE:**  The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  For that reason, it therefore requires no response. There is no evidence that Chevron had any meaningful opportunity to provide Cabrera anything, since the evidence shows that his "work" was performed and predetermined by the LAP team. *See* Chevron's Reply to Sts. 44-45, 51, 69-71.  Whether Chevron had "the opportunity" to provide materials to Cabrera is immaterial to Chevron's contention that Defendants not only provided materials to Cabrera but also *performed* his work.

### B.      Sampling, Inspections, and Reports

356. Chevron had instructed its own experts to avoid finding contamination. Chevron's judicial inspection "Playbook" reveals that Chevron directed its experts to visit sites prior to the official judicial inspections—what Chevron referred to as "Pre-Inspections"—so that they could take multiple samples with the goal of locating a few clean "delineation points" that the experts could, with the appearance of randomness, revisit during the official inspections. Dkt. 366-5 (Ex. E- Judicial Inspection Playbook), at 12. One particular component of the Playbook entitled "Summary of Sampling and Testing Program for Judicial Inspection Sites," instructed Chevron's experts as follows: "Locations for perimeter sampling should be chosen to emphasize clean points around pits when possible."  Dkt. 366-6 (Ex. F) at p. 3. Chevron's experts were further directed to "collect soil samples at 4 or more locations surrounding the site, using locations that the PI [Pre-Inspection] team has shown to be clean." *Id.*

**RESPONSE:**  The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  For that reason, it therefore requires no response. Whether Chevron had a judicial inspection "playbook" or how it conducted its inspections is immaterial to Chevron's contention that Defendants not only provided materials to Cabrera but also performed his work and ghostwrote his report.

357. Both sides accused the other of submitting manipulated sampling results to the Lago Agrio Court.  Indeed, the court noted that, if it were to consider statements made by Diego Borja, "we must understand that most of the samples collected by the experts suggested by [Chevron] have been manipulated . . . and they would lose all probative value." Dkt. 168 (Lago Agrio Judgment) at 52.

**RESPONSE:**  The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  For that reason, it therefore requires no response. Whether both sides accused each other of manipulating testing results is immaterial to Chevron's contention and evidence that, in lieu of continuing the judicial inspection process, Defendants coerced the court not only appoint Cabrera but then provided him materials, performed his work and ghostwrote his "independent" report.  *See* Reply St. 26.

358. The "settling expert" reports were not originally contemplated as part of the judicial site inspection process determined at the outset of the trial. Rather, the additional step of third expert report (in addition to the two party-affiliated expert reports) was requested by Chevron. Donziger believed that this maneuver was an attempt to inject more delay into already protracted proceedings. *See* Dkt. 613-20 (12/23/10 Donziger Depo. Tr.) at 1804:13-20; Dkt. 28-9, at p. 12 (Donziger private journal entry noting that "I broke down how long it would take to finish the case if all the dirimiente [settling expert] reports and responses are done, and we estimated that it would take about six years beyond where we are now."); *id.* at 13 ("Why would Yánez order the [settling expert] reports when he and everyone else knows they are useless? The dangerous combination of not wanting to make a decision, with the fact they [sic] this is an American case and who cares, people can just keep making money.").

**RESPONSE:**  The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  For that reason, it therefore requires no response. Whether both sides accused each other of manipulating testing results is immaterial to Chevron's contention and evidence that, in lieu of continuing the judicial inspection process, Defendants coerced the court not only appoint Cabrera but then provided him materials, performed his work and ghostwrote his "independent" report.  *See* Sts. 36-99.

359. The global expert examination was not intended to, and did not, supplant the judicial inspections or settling expert reports. The Ecuadorian Plaintiffs had requested a global expert examination in October 2003, at the beginning of the trial. Dkt. 31-31 (December 4, 2006 LAP filing), at p. 1 ("Your honor, I respectfully request that you immediately order an expert examination aimed at determining the environmental effects of activities related to the production of hydrocarbons in all of the fields operated by Texaco, as requested in the evidentiary motion on pages 4677 and 4678 of the record. The Court granted that motion in an Order issued on October 29, 2003, at 5:55 p.m., and that Order is final and binding."). The court granted that request, and the global expert examination would have proceeded at some time, whether or not the judicial inspections had continued for a longer period. *Id.* (quoting the Lago Agrio court's October 29, 2003 order that "an expert examination shall be conducted aimed at determining the environmental effects of activities related to the production of hydrocarbons in all of the fields operated by TEXACO . . . .").

**RESPONSE:**  The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  For that reason, it therefore requires no response. Whether the global expert examination intended to supplant the judicial inspections or settling expert reports is immaterial to Chevron's contention and evidence that Defendants coerced the court not only appoint Cabrera but then provided him materials, performed his work and ghostwrote his "independent" report.  *See* Sts. 36-99.

360. The Ecuadorian Plaintiffs sought to waive their remaining tentatively scheduled in-spections based on their belief that (i) further inspections were unnecessary because the Ecuadorian Plaintiffs had already met their burden of proof and the results of the inspections to date strongly indicated contamination at the inspected sites; and that (ii) Chevron intended to use pro-tracted judicial inspections to delay the litigation as much as possible and exhaust the Ecuadorian Plain-tiffs' resources. Dkt. 613 (Ex. T) (12/23/10 Donziger Depo. Tr.), at 1804:13-20 ("We strongly felt that the settling expert reports were not required under Ecuadorian law and that they were being used by Chevron to delay the trial."); Dkt. 28-9 (Ex. 76) (DONZ00027256) at p. 55 (July 25, 2006 Donziger private journal entry observing that Chevron is "losing overwhelming-ly")]; *id.* at p. 19 (DONZ00036234) ("Alberto's initial mistake of asking for 122 inspections without any strategy is just coming back to haunt us so deeply, although we are getting good press and we are using the inspections to build political momentum and get our act together, but the process is just time consuming and ridiculous."); Dkt 28-8 (Ex. 76) (DONZ00027256) at p. 45 (Donziger journal: "we still have the same money problems, and nobody has been paid. . . The money issue is killing us. Pablo told me the inspections are now going to finish the week of Nov. 13, which is soon—there is a ton of work to be done before then."); Dkt. 28-7 (Ex. 76) (DONZ00027256) at p. 24 ("Our phone and electricity will be cut off this week. We have re-ceived no money since November. LY feels the brunt of the pressure from creditors, the brunt of the pressure from the base communities, and the brunt of the pressure from staff who have not gotten paid."); Dkt. 28-9 (DONZ00036277) at 9 (Donziger journal entry dated May 31, 2006, discussing risks and benefits of global expert strategy and stating "We are winning on the proof, but we are losing the larger war because of time."); Dkt. 28-8 (Ex. 76) (DONZ00027256) at p. 37 ("They pulled a stunt on Monday - tried to get the judge to suspend the inspection for 60 days on the even [sic] of going out to the site. LY got text msg judge was leaving Lago - we had out [sic] own intelligence sources. They did this for Guanta, San Carlos, and now Yuca"); Dkt. 28-9 at p. 2 (September 13, 2006 Donziger private journal entry: "[W]e have to face the prospect of more of the wasteful, time-consuming, and expensive inspections.[] Texaco now realizes their best defense is to ask for as many inspections as possible.").

**RESPONSE:**  The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  For that reason, it therefore requires no response. Defendants offer no evidence disputing the evidence of the corrupt means they used to convince the judge to end the judicial inspections.  Additionally, all of the evidence upon which Defend-ants rely in support of this statement is inadmissible hearsay—out of court statements being of-fered for the truth of the matter asserted therein (Fed. R. Evid. 801(c))—for which there is no valid exception.  Finally, while Defendants offer additional purported reasons for wanting to waive the judicial inspections, they offer no additional evidence to negate Reyes' testimony as set forth in St. 35.

361. Every site inspection that Chevron requested for its case-in-chief was performed. *See* Dkt. 168 (certified English translation of the Lago Agrio Court's February 14, 2011 opin-ion), at 47 (affirming ruling allowing Ecuadorian Plaintiffs to withdraw their remaining inspec-tion re-quests and noting that "the defendant, Chevron, has been allowed to take all the actions that it requested for its defense" and rejecting Chevron's argument that "it has been caused irrep-arable harm by not being allowed to carry our 64 procedures requested by the plaintiffs . . . .").

**RESPONSE:** The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion. For that reason, it therefore requires no response. Additionally, the evidence upon which Defendants rely in support of this statement is inadmissible hearsay—an out of court statement being offered for the truth of the matter asserted therein (Fed. R. Evid. 801(c))—for which there is no valid exception.

362. Richard Cabrera was not even the Ecuadorian Plaintiffs' preferred choice to serve as the global damages expert; rather, he was selected only after the Lago Agrio Court—apparently at Chevron's urging—concluded that the expert must be chosen from the small group of experts who had already served in some fashion in the trial. *See, e.g.*, Dkt. 28-7 (Ex. 76) (DONZ00027256) at p. 20 (Donziger writing in his private journal on February 7, 2007: "The latest is the judge feels bound by an agreement [Ecuadorian Plaintiff attorney Alberto] Wray made with [Chevron counsel Adolfo] Callejas in the first inspection to use peritos already appointed by the court. I thought we had worked this out with the judge, and that Fernando Reyes would be appointed the perito. We have been working with him in preparation. Now, the judge feels he cannot do that. This is a function of T[exaco]'s pressure campaign – Callejas submitted 30-pages of crap yesterday morning.").

**RESPONSE:** The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion. For that reason, it therefore requires no response. Additionally, the evidence upon which Defendants rely in support of this statement is inadmissible hearsay—an out of court statement being offered for the truth of the matter asserted therein (Fed. R. Evid. 801(c))—for which there is no valid exception.

363. The Ecuadorian Plaintiffs' legal team considered petitioning the Lago Agrio Court for the appointment of *two* global experts ("peritos") so that Texaco would not be in a position to co-opt the expert that would wind up working with the Ecuadorian Plaintiffs. *See, e.g.*, Dkt. 28-9 (Ex. 76) (DONZ00027256) at p. 56 (Donziger writing on September 13, 2006, regarding the appointment of an expert to perform the global assessment: "[T]here is a very small pool of technical people who are not 'contagiado' (in the words of Luis). So the single perito theory sounds good, but it is all in the execution. And you just know that Texaco will have a slew of available candidates, and will probably pay them on the side to boot, so they can be controlled. So I suggested we stick with two peritos . . . .").

**RESPONSE:** The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion. For that reason, it therefore requires no response. Additionally, the evidence upon which Defendants rely in support of this statement is inadmissible hearsay—an out of court statement being offered for the truth of the matter asserted therein (Fed. R. Evid. 801(c))—for which there is no valid exception.

364. Donziger has testified that Fajardo believed he knew who the Lago Agrio Court would appoint Cabrera not because of any ex parte contact with the judge or improper pressure, but by a simple process of elimination based on who already had served as court-appointed experts and therefore possibly could be appointed and who likely would be deemed ineligible for one reason or another. Dkt. 613-8 (Ex. H) (12/8/10 Donziger Depo. Tr.) at 985:4-986:18.

**RESPONSE:**  The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  For that reason, it therefore requires no response. Additionally, while Defendants offer an additional purported reason for their knowledge that the Lago Agrio court would appoint Cabrera, they offer no additional evidence to negate the fact that Defendants strong-armed the Lago Agrio court in order to procure Cabrera's appointment.  St. 41, 42.

365. Chevron engaged in extensive efforts to spy on the Ecuadorian Plaintiffs' team. Dkt. 613-5 (Ex. E) (August 16, 2010 *The Atlantic Monthly* article detailing how a Chevron agent from Kroll offered the journalist $20,000 "to go undercover as a journalist-spy" "pretend[ing] to write a story . . . [but] actually shilling for Chevron."). Chevron continues that pattern to this day. *See, e.g.*, Dkt. 754-4 (surreptitiously taken photograph of Defendants' counsel in Ecuador); Dkt. 895-6 (Ex. 3532) at 4 (surreptitiously taken photograph of Donziger and Defendants' counsel).

**RESPONSE:**  The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  For that reason, it therefore requires no response.

366. By July 2007 at the latest, Chevron was aware of the Ecuadorian Plaintiffs' support of Cabrera's work. *See* Dkt. 154-2 (Ex. 56), 154-3 (Ex. 57), 154-4 (Ex. 58) (Chevron-published advertisements in three Ecuadorian national newspapers publicly accusing Cabrera of bias in favor of the Ecuadorian Plaintiffs and calling upon the Lago Agrio Court to disqualify him.); Dkt. 613-17 (Ex. Q) (July 30, 2007 Chevron Press Release attacking Cabrera's work and stating that "Cabrera displayed his utter complicity with Plaintiffs' interests[.]"); *see also* Dkt. 557-4 (Ex. 19) at p. 2 (March 24, 2008 Sylvia Garrigo interview statement that "[T]he expert analysis also is corrupt . . . . This expert [Cabrera], unfortunately, is working in partnership with the NGO leading the plaintiff's case. The expert's work plan, instead of following the judge's orders, basically aimed to do fieldwork to find contamination caused by Texaco. . . .").

**RESPONSE:**  The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  For that reason, it therefore requires no response. Whether Chevron had suspicions of (and made accusations regarding) Cabrera's improper relationship with Cabrera is immaterial to the legality of that relationship and its prejudicial preclusive effect on the Lago Agrio proceedings.  *See* Sts. 36–99.  In addition, Defendants and Cabrera falsely denied their improper relationship publicly and even in court filings.  *See* Reply St. 52.

367. The Ecuadorian Plaintiffs' team discussed setting up a meeting including Beristain in February 2007—before Cabrera had been appointed by the Lago Agrio Court. The purpose of this meeting was to begin developing a social plan that could address the social and cultural harms caused by Chevron's pollution. *See* Dkt. 6-10 (Ex. 2) at p. 129 (Fajardo telling the group "I was proposing to him that on those dates [February 4th and 5th] we could work on a type of-like a type of workshop to define, a bit that-that-that social plan, see the viability and how far we can progress on the social plan in a short time. I mean, the-the-[unintelligible] listen to him directly, now."); see also id. at p. 132 ( Fajardo continued that he was suggesting that Beristain "develop a plan for us, roughly, and on the fourth and fifth, we work on the plan.").

**RESPONSE:**  The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  For that reason, it therefore requires no response.  Additionally, the evidence upon which Defendants rely in support of this statement is inadmissible hearsay—an out of court statement being offered for the truth of the matter asserted therein (Fed. R. Evid. 801(c))—for which there is no valid exception.

368. The actual "meeting" that appears in *Crude*, which took place in May 2007—before Cabrera was sworn in as an expert and before Beristain was asked by Cabrera to join his team—was a community meeting among the Cofán people and their attorneys "to talk about what they want as compensation for all the damage." *See* Dkt. 48-29 (Ex. 331); Dkt. 32-9 (Ex. 154) (Cabrera sworn in on June 13, 2007); Dkt. 30-02 (Ex. 91), at 48. Trudie Styler also observed and spoke to the Cofán people. *Id.* at p. 49.

**RESPONSE:**  The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  For that reason, it therefore requires no response.  Defendants' ex post proffered "purpose" of the actual "meeting" is immaterial to their *reaction* to images of Dr. Carlos Beristain at a meeting with Donziger, Fajardo and other members of the LAPs' team being included in the *Crude* documentary, which demonstrate Cabrera and his purported team's lack of independence and their own knowledge of wrongdoing.  *See* St. 95–95 and Reply St. 94–95.  And as to their reaction, there is no genuine dispute as to that fact.  *Id.*

369. Beristain's role at the meeting was "in the form of leading a discussion" with the Cofán people. Dkt. 613-11 (Ex. K) (1/14/11 Donziger Depo. Tr.), at 2919:20-23.

**RESPONSE:**  The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  For that reason, it therefore requires no response.  Defendants' proffered "role" at the meeting with the LAP team is immaterial to their *reaction* to images of Dr. Carlos Beristain at a meeting with Donziger, Fajardo and other members of the LAPs' team being included in the *Crude* documentary, which demonstrate Cabrera and his purported team's lack of independence and their own knowledge of wrongdoing.  *See* Sts. 94–95 and Reply Sts. 94–95.  And as to their reaction, there is no genuine dispute as to that fact.  *Id.*

370. At the time of this meeting, Beristain was working for an environmental group, and not for the Ecuadorian Plaintiffs, and was assisting the Ecuadorian Plaintiffs' team with "community-based information gathering." Dkt. 613-11 (Ex. K) (1/14/12 Donziger Depo. Tr.) at 2895:13-22, 2896:4-17.

**RESPONSE:**  The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  Whether Beristain was technically "working for" an "environmental group" while he was "assisting" the LAPs is irrelevant.  It is indisputable that Beristain was supposed to be an "independent" member of Cabrera's team and that the LAPs went to great lengths to conceal that he was secretly "assisting" them.  Reply St. 94.

### C.    The Lago Agrio Record

371. Not all documents submitted to the Lago Agrio Court appear on series of hand-numbered pages maintained by the Court. On different occasions, the Lago Agrio Court express-ly referenced and incorporated materials from the parties—Chevron included—that were not submitted in hard copy form and by their nature would not have been hand-numbered pages. *See, e.g.,* Smyser Decl., Ex. 36 (excerpts from Lago Agrio Court orders incorporating Chevron's submission of digital materials). In other instances, the parties—Chevron included—would at-tach to their official submissions disks with supplemental materials and appendices. *See, e.g.,* Smyser Decl., Ex. 37 (excerpts from officially-submitted expert reports noting supplemental ma-terials to report attached in digital media format). Furthermore, the parties in the Lago Agrio Lit-igation also submitted materials to the Lago Agrio Court via other means, including during Judi-cial Inspections taking place outdoors at sampling sites. *See, e.g.,* Smyser Decl., Ex. 32 (excerpts from record of Aguarico 02 judicial inspection noting on-site submission of Fusion Memo exhib-its); Resp. St. 126 (concerning example of submission of Fusion Memo materials to the Lago Agrio Court). Also, in certain places, pages are missing from important documents, even though the hand number sequence does not reflect the missing materials. *See, e.g.,* Smyser Decl., Ex. 33 (copy of Lago Agrio order pages 211685–86 missing at least one page of content between the numbered pages). Such evidence of the Lago Agrio Court's omission and misnumbering raises fact issues as to how the Lago Agrio Record should be defined and measured.

**RESPONSE:**  The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  Defendants contrive faults with the Lago Record where there are none.  Isolated filings of CD's by Chevron are irrelevant*, see* Reply St. 101, and Defendants other arguments are without merit.  *Id.*; Reply St. 126.

372. The Lago Agrio Court would examine and at times incorporate materials submitted on digital media disks. *See, e.g.,* Smyser Decl. Ex. 36 at 170,144 ("the Court will admit record-ings or other items like the media that the defendant requests the Court to evaluate them the pro-bative value of the compact discs (sic). It follows logically that these media must be evaluated together with all of the other evidence."); *id.* at 170,137 ("In Section 10) of the Order issued on October 23, 2008, at 9 a.m., the defendant was requested to describe the circumstances under which the CD. (sic) that was requested to be added to the record was produced; its motions are thus resolved").

**RESPONSE:**  The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  Defendants contrive faults with the Lago Record where there are none.  Isolated filings of CD's by Chevron are irrelevant.  *See* Reply St. 101.

373. Court experts would also submit materials submitted on digital media disks. *See, e.g.,* Smyser Decl. Ex. 37, at 128,679 (Barros report providing compact disc along with report); *id.* at 110,238 (same).

**RESPONSE:**  The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.   Defendants do not even attempt to explain how a CD submitted by a court appointed expert could contain their unfiled work product, such as the Fusion Memo.

374. Materials could be and were submitted to the Court during outdoor inspections. *See, e.g.,* Smyser Decl. Ex. 32 (excerpts from Aguarico 02 judicial inspection providing summary of oral argument concerning the Chevron Texaco merger and submission of Fusion Memo Materials); *see also* Smyser Decl. Ex. 30 (copies of Fusion Memo Materials submitted at Aguarico 02 sub-mission).

**RESPONSE:**  The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.   The materials submitted by the Defendants at the Aguarico 2 inspection are reflected in the record.   Reply St. 126.

375. Notaries and court clerks in the Lago Agrio Record would at times provide inaccurate information regarding materials submitted to the Lago Agrio Court. *Compare, e.g.,* Smyser Decl. Ex. 32 at 140,796 (noting submission of 77 pages of Fusion Memo Materials notarized by Roberto Duenas Mera) *with* Smyser Decl. Ex. 30 (showing at least 166 pages of Fusion Memo Materials notarized by Roberto Duenas Mera). The clerical mistakes would also include instances of whole pages of text missing from Court orders but without a corresponding gap in the hand-numbered pagination. *See, e.g.*, Smyser Decl., Ex. 33 at 211285–86 (December 16, 2010 Court order missing entire portions of opinion but keeping consecutive pagination).

**RESPONSE:**  The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  Purported notarizing errors have nothing to do with whether internal work product of the LAPs that was used in the judgment exists in the record—which it does not—or any other issue in Chevron's motion.

## II.   ALBERTO GUERRA BASTIDAS

376. While serving as a magistrate judge, Guerra dismissed certain criminal cases as a "favor" to prosecutor Nicholas Zambrano. Dkt. 746-3 (Ex. C). ¶ 7. This was a violation of Ecuadorian law. *Id.*

**RESPONSE:**  The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  Chevron does not dispute that "Zambrano would occasionally ask [Guerra], as a favor, to issue rulings dismissing certain cases.  [Guerra] was careful to issue these rulings with some legal grounds, because [he] became aware that the party benefitting from [his] decisions was paying Mr. Zambrano for arranging to have the case ruled in his favor."  Dkt. 746-3 (Ex. C), ¶ 7.  But this does not help Defendants since it corroborates Guerra's history with Zambrano and Zambrano's corruption.

377. Guerra was dismissed as a judge on the Sucumbios court for publicly stating his bias in Chevron's favor. *See* Dkt. 745, Ex. 3117 at CVX-RICO-0507913 (considering the complaint against Guerra for "publicly stating on various occasions that if he were to again become President of the Superior Court of Justice of Nueva Loja, the first thing he would do is to declare null the lawsuits for environmental remediation that the organizations located in the Oriente Region filed, mainly against CHEVRON"); *id.* at CVX-RICO-0507920 (concluding that Guerra "committed a serious disciplinary infraction when he stated his opinion about a proceeding that still

has not been decided and that . . . he would inevitably hear again" and that Guerra's public statements "affect[ed] the image of the judicial branch and the legal certainty of those who use the services of justice").

**RESPONSE:**  The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  Defendants' self-serving characterization of the order dismissing Guerra from the bench does not create a genuine issue of material fact affecting the disposition of Chevron's motion.  Guerra's belief that the Chevron case should be declared null was not due to bias, but because of violations of Ecuadorian law.  Guerra testified, "The reason why I believed that the Chevron case should have been declared null was that the settling experts were being appointed in violation of Ecuadorian law."  Dkt. 746-3 (Ex. C), ¶ 6; *see also* Stavers Decl., Ex. 3667 (DONZ00028237) (Fajardo emails Wray, Donziger and others that he overheard Guerra tell Novillo and Yánez that "the process is null and void because of the designation of the Experts. . . . According to him, the manner in which we are proceeding in the designation of the Experts is not the correct one and that because of this error, the proceeding from the start of the Legal Inspections up to now is null and void.").  Additionally, Guerra testified: "In reality, I believe I was dismissed because I confronted Judges Novillo and Yánez, who succeeded me as judges in this case, regarding several dubious and illegal rulings they had issued in the proceedings, and regarding their practice of asking the settling experts for 25 percent of their fees in consideration for having appointed them as such."  Dkt. 746-3 (Ex. C), ¶ 6.  Donziger's personal notes demonstrate that he was aware that Guerra was at odds with Yánez and Novillo. Dkt. 28-8 (Ex. 76) (DONZ00027256) at 1("Met with judge last night in house.  Humble house, furniture.  Remember last August I wanted to ride the wave and get him off the case?  This was an example of Pablo's total intelligence.  We saved him, and now we are reaping the benefits. Explain politics around plot to remove Yanez . . . .  He hates Guerra, because Guerra was part of the plot.  Guerra will be the judge to decide the case.  We have to start lobbying him, working with him.").


378. Shortly after his dismissal from the Sucumbios court, Guerra told Ecuadorian newspaper *El Universo* that he elected not to dismiss the Ecuadorian Plaintiffs' case, even though Ecuador's then-attorney general pressured him to do so. *See* Smyser Decl., Ex. 26 (10/18/2009 article; "I could have done it, but I decided to continue").

**RESPONSE:**  The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  The only evidence cited in support of Defendants' contention is inadmissible hearsay—an out of court statement being offered for the truth of the matter asserted therein (Fed. R. Evid. 801(c))—for which there is no valid exception.


379. Guerra also told *El Universo* that, except for the then-attorney general's pressure to dismiss the case, "during his tenure there was no instance of internal or external pressure." *See id.*

**RESPONSE:**  The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  The only evidence cited in support of Defendants' contention is inadmissible hearsay.  Moreover, Donziger has admitted pressuring the court in October 2003.  Dkt. 8-4 (CRS-350-04-CLIP-01) at 419. ("We have concluded that we need to do more, politically, to control the court, to pressure the court.  We believe they make decisions

based on who they fear the most, not based on what the laws should dictate.  So, what we want to do is take over the court with a massive protest that we haven't done since the first day of the trial, back in October of 2003.  Remember all those people on the street?").

380. Guerra states that he solicited bribes from both parties in the Lago Agrio case. Dkt. 746-3 (Ex. C) ¶¶ 12-13, 22-23.

**RESPONSE:**  Undisputed.  Chevron notes, however, that it, unlike the Defendants, refused Guerra's advances and has never paid Guerra or Zambrano any bribes.  Sts. 184-91.

381. In or about July 2012, Chevron paid Guerra $38,000 for a hard drive, seven USB drives, four day planners, permission to access two Hotmail accounts, copies of bank and phone records, two cell phones, two SIM cards, a floppy disk, and seven CDs. Dkt. 755-14 ¶¶ 4-5. Chevron also provided Guerra with a laptop at this time. *Id.* ¶ 5.

**RESPONSE:**  The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  The agreement between Chevron and Guerra speaks for itself.  Dkt. 755-14 (Ex. 3268).  As detailed in that agreement, Chevron paid Guerra a fixed sum of $38,000 to take possession of, and for the information contained in, the materials listed in Attachments A and B.  Chevron also provided Guerra with a replacement laptop and phone. *Id.* ¶¶ 5-6.

382. Chevron has relocated Guerra, his wife, his son, and his son's family to the United States. Dkt. 755-14 at p.3 Chevron is paying Guerra $12,000 a month as well as providing Guerra, his wife, and his son's family with health insurance, an automobile, and immigration representation. *Id.*

**RESPONSE:**  The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  The agreement between Chevron and Guerra speaks for itself.  Dkt. 755-14 (Ex. 3268) at 3-5.

383. Chevron will make these payments to Guerra for at least 24 months, and they could continue indefinitely. Dkt. 755-14 ¶ 5.

**RESPONSE:**  The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  The agreement between Chevron and Guerra speaks for itself.  Dkt. 755-14 (Ex, 3268) at 3-5.

384. Guerra already had a child living in Chicago. At one point, that child had immigration issues. Dkt. 746-3 (Ex. C) ¶ 19.

**RESPONSE:**  The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  For that reason, it therefore requires no response.  The cited evidence does not support Defendants' contention.  Dkt. 755-7 (Ex. 3221) (DONZ00059141) (Guerra asks Donziger to help his daughter obtain residency); Dkt. 746-3 (Ex. C) ¶ 19.

385. Guerra claims that he wrote "the great majority of the rulings issued in civil cases assigned to Mr. Zambrano, including the Chevron case, which continued until February of 2012.  Dkt. 746-3 (Ex. C) ¶ 7.

**RESPONSE:**  The assertion only underscores that Guerra served as Zambrano's ghostwriter.  This supports Chevron and fails to create a material issue of fact affecting the disposition of that motion.  Guerra's declaration speaks for itself.  He testified, "I was Mr. Zambrano's 'ghostwriter' and I wrote the great majority of the rulings issued in civil cases assigned to Mr. Zambrano, including the Chevron case, which continued until February of 2012, when Mr. Zambrano was removed from the Provicial Court of Sucumbíos."  Dkt. 746-3 (Ex. C), ¶ 7.

386. All of the draft orders Guerra claims to have prepared for Zambrano that were found on Guerra's electronic media were allegedly created in late 2009 or early 2010. Dkt. 746, Ex. C, Attachments O,P, Q, R, S, T, U, V, and W.

**RESPONSE:**  The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  Furthermore, it is incorrect.  A draft of the OCP judgment was created in June 2009, and draft of the Zapata decision was created in December 2010.  Dkt. 755-16 (Younger Report) at 10-11.  In all, Guerra's media contained drafts of more than 100 rulings issued in cases over which Zambrano presided, many of which were created in 2010 and 2011.  Stavers Decl., Ex. 3663 (2013.02.28 Younger Report) at 5; Stavers Decl., Ex. 3680 (2013.04.11 Younger Report) at 2-3; Dkt. 746-3 (Guerra Decl.), ¶¶ 7–8.

387. Donziger is unaware that Guerra has ever ghostwritten decisions in the Lago Agrio litigation, and Donziger is unaware of any "help" by Guerra to "steer" the decision in favor of the plaintiffs in the Lago Agrio litigation. He never thanked Guerra for these things. *See* Donziger Defendants' Response to Chevron's Motion for Partial Summary Judgment, Donziger Declaration.

**RESPONSE:**  The assertion fails to create a material issue of fact affecting the disposition of Chevron's motion.  Defendants do not deny a 2009 meeting between Donziger and Guerra.  And while Donziger now claims to be "unaware" of Guerra ghostwriting decisions for the Lago Agrio court, the evidence, including drafts of nine Lago Agrio orders that Guerra provided, indisputably prove he did so.  Donziger's professed lack of knowledge cannot create a material dispute of fact, particularly when internal emails demonstrate that he was aware of Guerra's ghostwriting.  *See* Reply to Sts. 204-205.

388. Donziger recalls receiving an e-mail from Guerra seeking immigration assistance on be-half of a relative or friend. Donziger never sent word through Mr. Fajardo confirming that Donziger "would look into the issue," nor did Donziger take any steps, directly or indirectly, to assist Guerra in any immigration matter. Instead, Donziger simply ignored Guerra's e-mail. *See* Donziger Defendants' Response to Chevron's Motion for Partial Summary Judgment, Donziger Declaration.

**RESPONSE:**  The assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  Donziger does not deny that Guerra asked him to help his obtain residency, and offered to "support the matter of Pablo Fajardo so it will come out soon and well."  Dkt. 755-7 (Ex. 3221) (DONZ00059141).

389. Donziger recalls being at a restaurant in Quito with Guerra, when Guerra asked for a bribe of $500,000. Donziger refused Guerra, and told him that neither Donziger nor anyone on the Lago Agrio Plaintiffs' team would do such a thing. Donziger did not respond (as Guerra asserts) that the Lago Agrio Plaintiffs lacked that sum of money "at the moment." *See* Donziger Defendants' Response to Chevron's Motion for Partial Summary Judgment, Donziger Declaration.

**RESPONSE:**  The assertion fails to create a material issue of fact affecting the disposition of Chevron's motion.  In fact, Donziger's declaration corroborates Guerra's account.  Donziger admits meeting with Guerra.  He admits that during his meeting with Guerra, Guerra solicited a $500,000 bribe.  Both Guerra and Donziger state that no deal was reached at that meeting. *Compare* Dkt. 746-3 (Ex. C), ¶ 23 *with* Dkt. 922, ¶ 5.  That the two accounts differ as to the words Donziger used to decline Guerra's offer at the meetings does not create a material issue of fact.  Nowhere in his declaration does Donziger "unequivocally" deny that any member of LAPs' legal team agreed to pay a bribe in exchange for a favorable verdict.

390. Donziger has never sought to pay any money in exchange for a favorable verdict in the Lago Agrio litigation, nor has Donziger encouraged or solicited anyone else to discuss or pursue paying money for a favorable verdict. *See* Donziger Defendants' Response to Chevron's Motion for Partial Summary Judgment, Donziger Declaration.

**RESPONSE:**  The assertion fails to create a material issue of fact affecting the disposition of Chevron's motion.  In fact, Donziger's declaration corroborates Guerra's account.  Donziger admits meeting with Guerra.  He admits that during his meeting with Guerra, Guerra solicited a $500,000 bribe.  Both Guerra and Donziger state that no deal was reached at that meeting. *Compare* Dkt. 746-3 (Ex. C), ¶ 23 *with* Dkt. 922, ¶ 5.  That the two accounts differ as to the words Donziger used to decline Guerra's offer at the meetings does not create a material issue of fact.  Nowhere in his declaration does Donziger "unequivocally" deny that any member of LAPs' legal team agreed to pay a bribe in exchange for a favorable verdict.

391. Larry Veselka, Vanessa Barham, and Pablo Fajardo met with Guerra on July 13, 2011 in Quito, Ecuador. Guerra stated that in 2003 shortly after the Lago Agrio case was filed, he received pressure from the Ecuadorian Attorney General at the time to dismiss the case against Chevron but that he rebuffed the request and did not dismiss the case in response to political pressure. Smyser Decl., Ex. 15 (Camacho's Supp. Objs. and Resps. to Chevron's Interrogs.) Supp. Resp. No. 1 and Ex. 16 (Piaguaje's Supp. Objs. and Resps. to Chevron's Interrogs.), Supp. Resp. No. 1.

**RESPONSE:** The unsupported assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  The only evidence cited in support of Defendants' contention—self-serving responses to Chevron's interrogatories—is inadmissible hearsay; an out of court statement being offered for the truth of the matter asserted therein (Fed. R. Evid. 801(c)), for which there is no valid exception.  Defendants' responses to Chevron's interrogatories purport to describe conversations between Guerra and the LAPs' attorneys.  Defendants do not claim to have personal knowledge of these discussions, and have not submitted sworn testimony regarding those discussions from any of the individuals purportedly involved therein.

392. Also at the July 13, 2011 meeting, Guerra stated that he was unaware of any fraud or corruption in the proceedings other than the approach by the Attorney General and another approach by an influential national government official on behalf of Chevron. Smyser Decl., Ex. 15 (Camacho's Supp. Objs. and Resps. to Chevron's Interrogs.) Supp. Resp. No. 1 and Ex. 16 (Piaguaje's Supp. Objs. and Resps. to Chevron's Interrogs.), Supp. Resp. No. 1.

**RESPONSE:**  The unsupported assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  The only evidence cited in support of Defendants' contention—self-serving responses to Chevron's interrogatories—is inadmissible hearsay; an out of court statement being offered for the truth of the matter asserted therein (Fed. R. Evid. 801(c)), for which there is no valid exception.  Defendants' responses to Chevron's interrogatories purport to describe conversations between Guerra and the LAPs' attorneys.  Defendants do not claim to have personal knowledge of these discussions, and have not submitted sworn testimony regarding those discussions from any of the individuals purportedly involved therein.

393. Guerra stated that Judge Zambrano was not pressured or influenced by anyone and that Judge Zambrano's actions were clean and appropriate. Smyser Decl., Ex. 15 (Camacho's Supp. Objs. and Resps. to Chevron's Interrogs.) Supp. Resp. No. 1 and Ex. 16 (Piaguaje's Supp. Objs. and Resps. to Chevron's Interrogs.), Supp. Resp. No. 1.

**RESPONSE:**  The unsupported assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  The only evidence cited in support of Defendants' contention—self-serving responses to Chevron's interrogatories—is inadmissible hearsay; an out of court statement being offered for the truth of the matter asserted therein (Fed. R. Evid. 801(c)), for which there is no valid exception.  Defendants' responses to Chevron's interrogatories purport to describe conversations between Guerra and the LAPs' attorneys.  De-

fendants do not claim to have personal knowledge of these discussions, and have not submitted sworn testimony regarding those discussions from any of the individuals purportedly involved therein.


394. Guerra stated that he had no knowledge of documents outside the record being provided to Judge Zambrano. Smyser Decl., Ex. 15 (Camacho's Supp. Objs. and Resps. to Chevron's Interrogs.) Supp. Resp. No. 1 and Ex. 16 (Piaguaje's Supp. Objs. and Resps. to Chevron's Interrogs.), Supp. Resp. No. 1.

**RESPONSE:**   The unsupported assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  The only evidence cited in support of Defendants' contention—self-serving responses to Chevron's interrogatories—is inadmissible hearsay; an out of court statement being offered for the truth of the matter asserted therein (Fed. R. Evid. 801(c)), for which there is no valid exception.  Defendants' responses to Chevron's interrogatories purport to describe conversations between Guerra and the LAPs' attorneys.  Defendants do not claim to have personal knowledge of these discussions, and have not submitted sworn testimony regarding those discussions from any of the individuals purportedly involved therein.


395. Guerra stated that he had no knowledge of the Lago Agrio Plaintiffs or the Ecuadorian government influencing the judgment. Smyser Decl., Ex. 15 (Camacho's Supp. Objs. and Resps. to Chevron's Interrogs.) Supp. Resp. No. 1 and Ex. 16 (Piaguaje's Supp. Objs. and Resps. to Chevron's Interrogs.), Supp. Resp. No. 1.

**RESPONSE:**   The unsupported assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  The only evidence cited in support of Defendants' contention—self-serving responses to Chevron's interrogatories—is inadmissible hearsay; an out of court statement being offered for the truth of the matter asserted therein (Fed. R. Evid. 801(c)), for which there is no valid exception.  Defendants' responses to Chevron's interrogatories purport to describe conversations between Guerra and the LAPs' attorneys.  Defendants do not claim to have personal knowledge of these discussions, and have not submitted sworn testimony regarding those discussions from any of the individuals purportedly involved therein.


396. Craig Smyser, Jarod Stewart, and Pablo Fajardo met with Nicolas Augusto Zambrano on August 16, 2012 in Quito, Ecuador. The participants discussed Mr. Zambrano's statement that he chose every word that appeared in the February 14, 2011 judgment, that it was his judgment, that he does not remember the source for every word that appeared in the judgment, that no other person wrote the judgment, and that Chevron has persecuted and harassed him since the date of the judgment. Smyser Decl., Ex. 15 (Camacho's Supp. Objs. and Resps. to Chevron's Interrogs.) Supp. Resp. No. 1 and Ex. 16 (Piaguaje's Supp. Objs. and Resps. to Chevron's Interrogs.), Supp. Resp. No. 1.

**RESPONSE:**   The unsupported assertion is irrelevant to Chevron's motion and fails to create a material issue of fact affecting the disposition of that motion.  The only evidence cited in support

of Defendants' contention—self-serving responses to Chevron's interrogatories—is inadmissible hearsay; an out of court statement being offered for the truth of the matter asserted therein (Fed. R. Evid. 801(c)), for which there is no valid exception.  In addition, for the reasons stated in Chevron's Reply filed herewith, Zambrano's recently filed declaration is inadmissible hearsay and should not be considered.  Even if Zambrano's declaration were not hearsay, Zambrano does not deny that Guerra ghostwrote orders for Zambrano in the Lago Agrio litigation and other cases (*see* Chevron's Reply to Sts. 182, 197, 200), Zambrano fails to explain how the LAP team's unfiled work product was incorporated word-for-word throughout the judgment (*see* Chevron's Reply to Sts. 125-180), and Zambrano does not deny that he reached a deal with the LAPs to issue a judgment in their favor in exchange for payment of $500,000 from the judgment's proceeds (*see* Chevron's Reply to St. 191).