# EXHIBIT 3687

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ x

CHEVRON CORPORATION,

               Plaintiff,

       v.

STEVEN DONZIGER, et al.,

             Defendants.

------------------------------------ x

11 Civ. 0691 (LAK)

## DECLARATION OF CHRISTOPHER BOGART

I, Christopher Bogart, hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct or based on reasonable information and belief:

1.     I am the Chief Executive Officer and a co-founder of Burford Capital LLC (formerly known as Burford Group LLC ("BGL")), the US operating subsidiary of Burford Capital Limited ("BCL"), a Guernsey corporation with more than $300 million in capital that is publicly traded in London and focuses on litigation finance.[1] I am also, among other positions, the former Executive Vice President and General Counsel of Time Warner Inc. and a former litigator at Cravath, Swaine & Moore.

2.     Burford prides itself on its highly ethical approach to its business, and has no desire to profit from fraud, deception or unethical behavior. I am providing this declaration contemporaneously with the announcement of Burford's voluntary relinquishment of any

---

[1] For ease of reference, I will refer to BGL, BCL and all of their direct and indirect subsidiaries collectively as "Burford" unless the context requires more specific entity identification.

economic interest arising out of the *María Aguinda y Otros v. Chevron Corporation*, Case No. 002-2003 matter, in the Provincial Court of Justice of Sucumbíos in Ecuador ("Ecuadorian court"), and related litigation matters pending in other jurisdictions ("Lago Agrio Litigation" or the "Litigation"), to provide background to Burford's involvement here and to explain our decision to give up <u>any</u> claim to <u>any</u> recovery, even if the plaintiffs in the Lago Agrio Litigation are ultimately successful in extorting some payment out of Chevron.

3.      As lawyers and as business people, my colleagues at Burford and I have been deeply concerned about the mounting evidence of fraud and misconduct that appears to have permeated the Lago Agrio Litigation. We operate the largest dedicated provider of litigation finance in the world. Our business relies on our clients and their lawyers being truthful and forthcoming with us so that we can properly evaluate potential investments and make prudent investment decisions with our shareholders' capital, and then on the justice system operating fairly and impartially so that our investments obtain full and fair hearings on their merits. Both of those principles appear to have been violated here. We simply do not countenance in any way the kind of behavior that this Court has already found has occurred in this matter and we never would have invested in it in the first place had we been aware of its existence.

4.      I set out below in detail the history of Burford's involvement with the Litigation, but in summary:

- After months of due diligence and negotiation, Burford, through an indirect subsidiary, entered into an agreement (the "Funding Agreement") to provide up to $15 million in financing to Patton Boggs LLP ("Patton Boggs"), a major US law firm, in connection with its entry into the Lago Agrio litigation as plaintiffs' counsel.

2

- Burford is fundamentally a provider of litigation finance to the clients of sophisticated law firms in the US and the UK, with a focus on large, complex matters. The Lago Agrio Litigation is far afield of Burford's usual investment matters, and Burford explicitly undertook this investment because of our "substantial confidence in Jim Tyrrell, the lead partner at Patton Boggs (and a former Latham partner known well to [three of Burford's senior team, all of who are also former Latham partners])" and our "special relationship with and respect for Jim and Patton Boggs".

- Burford did actually provide $4 million in such financing to Patton Boggs before terminating the Funding Agreement in 2011 in light of the evidence that emerged in this and other proceedings.

- During its diligence, Burford relied heavily on the diligence and analysis supplied to it by Patton Boggs, ultimately memorialized in the so-called Invictus memo.

- The Funding Agreement included specific representations, including that none of the plaintiffs *or any of their lawyers* knew anything "reasonably likely to be material to the Funder's assessment of the Claim that has not been disclosed to the Funder". (The Funding Agreement was signed by Steven Donziger as well as by the plaintiffs' representatives.)

- Burford had made it clear that it was concerned about Chevron's public allegations about the Cabrera report. However, in their initial discussions with Burford in 2009, the plaintiffs assured Burford in writing that Cabrera was an "independent", "court-appointed" expert akin to a US

3

Special Master supervising "14 independent scientists" in preparing a
"court-ordered damages report" and that Chevron's attacks on Cabrera
were "false" and "twisting of the truth". Later, in the 2010 Invictus
memo, Patton Boggs concluded that "reality is being distorted" by
Chevron and suggested that the plaintiffs' interactions with Cabrera were
consistent with Ecuadorean law. Significantly, none of Patton Boggs,
Donziger or the plaintiffs disclosed to Burford what later evidence shows
that they knew about the true extent of the involvement of the plaintiffs
with Cabrera. Had Burford received the full disclosure to which it was
entitled under the Funding Agreement, it certainly would not have
invested in this matter.

- Burford was particularly appalled later to learn of 2010 emails – predating
  the Funding Agreement by many months – among the plaintiffs' counsel
  indicating that they could "go to jail" if the true facts came out. Again, the
  existence of that sentiment – whether or not well-founded – would clearly
  have been material to Burford's investment decision, was not disclosed to
  Burford and would have resulted in Burford declining to invest.

- Following its review of the public filings in this case in 2011, Burford
  determined that it had been deceived and terminated the Funding
  Agreement. Upon termination, Burford told the plaintiffs and their
  lawyers that it had been defrauded into funding the litigation: "[W]e
  believe that you and particularly your US representatives engaged in a
  multi-month scheme to deceive and defraud in order to secure desperately

needed funding from Treca, all the while concealing material information
and misrepresenting critical facts in the fear that we would have walked
away had we known the true state of affairs."

**I.      Burford Is Introduced to the Lago Agrio Litigation and Undertakes Due Diligence in Connection with a Possible Investment**

5.      In November 2009, Nicolas Economou of the New York litigation services firm
H5 contacted Burford to solicit investment capital for international judgment enforcement
activities in connection with the Lago Agrio Litigation, in which a very large judgment was
expected in Ecuador. Economou introduced Burford to Steven Donziger, who described himself
as the lead U.S. lawyer for the LAPs[2] and also the overall strategist behind the Litigation.
Burford began reviewing the matter as a potential investment, but rapidly made it clear that it
was outside its usual investment parameters and that Burford could only even consider the matter
if highly regarded US litigation counsel were involved.

6.      By early 2010, Patton Boggs had secured a leading role in the Litigation, with Jim
Tyrrell as the lead partner. Burford had a "special" and multi-faceted relationship with both
Tyrrell personally and the Patton Boggs firm, and was enthusiastic about the entry of the firm
into the Litigation. To begin with, Tyrrell was a former partner at Latham & Watkins, and
Burford had a close relationship with Latham, with four former Latham partners (all of whom
knew and worked with Tyrrell while at Latham) occupying senior Burford positions at various
times. Tyrrell was also an advocate and enthusiast of litigation funding, regularly speaking

---

[2] Because it appears to be common usage in this litigation, I refer to the plaintiffs in the Lago
Agrio Litigation as the "Lago Agrio Plaintiffs" or "LAPs". I understand the term "LAPs"
also to generally include the Lago Agrio Plaintiffs' attorneys and representatives, including
Steven Donziger, Pablo Fajardo, the Frente de Defensa de la Amazonia ("FDA"), and Luis
Yanza.

publicly about the asset class, and he and Patton Boggs provided support and encouragement to start-up funders. Indeed, Patton Boggs provided Burford with rent-free office space in its New York City offices for the first year or so of Burford's existence before Burford moved into its own dedicated space; thus, Burford's New York City-based employees were actually occupying space at Patton Boggs during the pendency of the diligence and negotiation process of this matter. Tyrrell was also a highly regarded complex case litigator, and indeed was completing his role as lead counsel in the World Trade Counsel litigation when this Litigation came to his attention; the widely respected Chambers litigation guide describes him thus: "He is described as *"brilliant, knowledgeable and experienced,"* and impresses with *"his meticulous preparedness, his flexible and strategic thinking, and his tremendous skills during argument in court: he has vision, he has principles, and he exudes a confidence and professionalism that is inspiring."* From Burford's perspective, Tyrrell's and Patton Boggs' assumption of a leadership role in the Lago Agrio Litigation transformed it as an investment possibility, as long as our financing was going to support Patton Boggs' activities and remained under Tyrrell's tight personal control.

7.      Burford thus began more significant diligence and commenced commercial negotiations over investment terms. Our contacts for both diligence and negotiation were generally with Donziger and/or Patton Boggs. The magnitude, complexity and uniqueness of the Litigation and the duration and complexity of the economic negotiations meant that there were substantial contacts extending over a number of months. I personally attended several meetings with Donziger at Patton Boggs' offices, and my colleagues attended yet more. Donziger made it clear that he had broad authority from the LAPs to negotiate financing arrangements and to be the primary interface with Burford, although we did meet once, in mid-2010, with Ecuadorian

counsel for the LAPs, Pablo Fajardo, and their Ecuadorian representative, Luis Yanza, in New York, at the offices of Patton Boggs.

8.     While Burford conducts extensive due diligence in connection with each possible investment it reviews, it adapts its diligence to each situation at hand. In the Lago Agrio Litigation, it was not feasible for Burford to, for example, review the massive record amassed in the Ecuadorean proceeding, or to travel to Ecuador to conduct its own on-site diligence. Because Patton Boggs needed to do that work in connection with its own entry into the case in any event, it was agreed that Patton Boggs would provide its analysis on those issues as well as its judgment enforcement strategy to Burford, and that Burford would not try independently to perform that work, although Burford remained in close and active contact with Tyrrell and his partner Eric Westenberger about their work. That work was ultimately memorialized in the Invictus memo provided by Patton Boggs to Burford which was then presented to the Burford investment committee in September 2010, which approved the investment. It was clear to Donziger and Patton Boggs that Burford was relying on that work; Burford had made clear that it could not proceed to its investment committee for consideration of the investment without the memo and the committee's consideration was delayed during the summer of 2010 because of delays in the production of the memo, and at one point it was even proposed that Tyrrell appear by video link before the investment committee. Separately, Burford and its outside counsel conducted its own diligence on other aspects of the potential investment that were more amenable to direct diligence, such as the enforceability of a potential funding contract under Ecuadorian law, the documentation required to bind the LAPs, and how to ensure Burford's investment was appropriately secured. Burford also conducted diligence on the possible effect of ongoing investment treaty arbitration between Chevron and the Republic of Ecuador on any potential

7

judgment.

**A.      Cabrera**

9.      Burford was concerned about the allegations being made regarding Cabrera during the diligence process.  As set forth in our internal analysis to the Burford investment committee, we understood that Chevron was likely to argue that any judgment against it in the Lago Agrio Litigation was unenforceable based "on communications between plaintiffs and the neutral, court-appointed expert Cabrera that, in Chevron's view, render Cabrera's report tainted and undermine the soundness of any court judgment."  We were candid that these allegations "gave us some pause," and we shared with Donziger and Patton Boggs our concerns.

10.      Patton Boggs sought to alleviate Burford's concerns about the Cabrera Report.  Its Invictus memo stated that Chevron and Gibson Dunn, as counsel to Chevron, were "distort[ing]" reality with their allegations regarding the illegality of the contacts between Cabrera and the LAPs' representatives:  "Cleverly using the lens of U.S. norms to distort what transpired in Ecuador, Chevron has used its findings regarding Plaintiffs' involvement with the Cabrera Report to create the impression that it is the victim of an injustice in Ecuador."

11.      Patton Boggs described as "especially frivolous" Chevron's attempts to have the Lago Agrio Litigation dismissed on the basis of the "alleged procedural improprieties related to the preparation of the Cabrera Report."  And Patton Boggs asserted that "Chevron was free to meet with Mr. Cabrera just as plaintiffs did," and that "no Ecuadorian law or rule" prohibited the contacts between the LAPs' representatives and Cabrera.

12.      Patton Boggs and Donziger also specifically assured us that the contacts that had occurred between the LAPs and Cabrera were both limited and permissible.

13.      As we later learned, the representations that Patton Boggs made to us in Invictus and otherwise during our diligence process were false and misleading in several respects.  There

8

is absolutely no question that Burford would not have invested in the Litigation – which we described as having "greater uncertainty" than our usual investment and "significant" risks that were "not capable of complete evaluation" – had we known the whole truth about Cabrera. Indeed, Donziger knew as much: when debating how much to conceal, he wrote his colleagues (including Patton Boggs) in June 2010, during a period of active negotiations with Burford, that they "need to probe" what admitting the truth would mean "at a time we are trying to raise money" because there would be "negative fallout" and it "might be better to be general". Of course, we were unaware of this behind the scenes debate about their deception until after we invested.

14.    To begin with, it became clear from evidence that came to light in this case that the contacts between the LAPs' representatives and Cabrera were not "permissible" at all, but instead were illegal and violated Ecuadorian law. This was bluntly acknowledged in an email in which the LAPs' Ecuadorian attorneys observed that if the full scope of their interaction with Cabrera came out, they could all "go to jail." Burford did not see this email until early 2011— after it had invested in the Lago Agrio Litigation—and even then, it was not provided to Burford by Donziger or Patton Boggs, but rather obtained from Chevron's filings in this case.

15.    Then, it became clear that the contacts between the LAPs and Cabrera were not "limited" either – and indeed that the issue was not even the scope and propriety of *ex parte* contacts but rather the wholesale ghostwriting of the Cabrera report. For example, in an email dated June 14, 2010, in the midst of negotiations over the Funding Agreement and long before delivery of the Invictus memo, one of the LAPs' US lawyers wrote to a number of other lawyers, including a number of Patton Boggs lawyers, a lengthy discussion weighing the pros and cons of what would happen if "we cop to having written portions of the report". The next day, the email

9

scheming continued, with multiple emails among the lawyers debating the issue, with choice passages such as "we will still be denying what is apparent (that we authored portions of the report)" and including the succinct view of one lawyer: "which is why we're not admitting everything – only what we have to". Again, all of this was occurring outside Burford's view.

16.     Indeed, Patton Boggs represented to us that it had a plan to address concerns regarding the Cabrera Report raised by Chevron. As Patton Boggs described in its Invictus memo, the LAPs petitioned the Ecuadorian court to allow the parties to make supplemental damages submissions from other experts separate from the Cabrera report. Patton Boggs referred to these submissions as the "cleansing expert" reports. Patton Boggs considered the Ecuadorian court's decision allowing these supplemental reports to be submitted to be a "significant tactical victory for the Plaintiffs, insofar as it substantially weakens Chevron's argument' about the Cabrera report's infirmities. Burford relied on Patton Boggs's representations in regard to these "cleansing expert" reports, and they were material to Burford's funding decision. If Burford had been aware of information indicating that the underlying bases of the Cabrera report were tainted (as opposed to the Cabrera issue being solely around impermissible contacts and influence on his report) and thus that the reports of these "cleansing experts" would be relying on those tainted bases as well (which would not solve the problem), Burford would not have entered into the Funding Agreement.

17.     Burford was entitled under the Funding Agreement to be informed of any facts known to the lawyers "reasonably likely to be material to the Funder's assessment of the Claim". Burford did not just wait to be told: we asked specifically about the Cabrera report. How any New York lawyer could believe that the fact that portions of the Cabrera report had been written by the LAPs would not be "reasonably likely to be material" to Burford's assessment is utterly

unfathomable to me.

18.     The reality, of course, is what Donziger presciently forecast:  there would indeed have been "negative fallout" if Burford had been told the complete truth.  Indeed, Burford would have walked away immediately.  Instead, Burford relied upon the representations made by Patton Boggs and Donziger that the contacts between the LAPs' representatives and Cabrera were limited and permissible under Ecuadorian law, and that Chevron's fraud allegations were exaggerated and unfounded.  These representations by Patton Boggs and Donziger were material to Burford's decision to enter into the Funding Agreement.

### B.   *Crude* Outtakes

19.     During Burford's diligence period in 2010, there was collateral litigation ongoing between Chevron and others to obtain the outtakes of the documentary *Crude: The Real Price of Oil*.  We were aware of this issue and asked that it be addressed in the Invictus memo, but I did not view the outtakes myself at the time, and my recollection is that they were not readily available publicly in a manageable form.

20.     In the Invictus memo, Patton Boggs assured us that Chevron's allegations regarding the outtakes were exaggerated:  "Chevron claims that the outtakes show unlawful collusion between Plaintiffs, their experts, and Mr. Cabrera, and that they contain admissions by Plaintiffs' counsel and experts that there is no factual basis for damages.  But as with virtually any other claim by Chevron in this litigation, reality is being distorted here."  Patton Boggs also reassured us that there were no new bombshells in the remaining footage, and that it was, in fact, positive for the Plaintiffs:  "The collection of outtakes submitted to the various Section 1782 courts by Chevron represents less than 0.1% of the total footage produced.  The remainder of the footage vindicates Plaintiffs' position, and indeed, evidences Chevron's own misconduct."

21.     Especially given the difficulty of viewing the outtakes ourselves, Burford relied

on Patton Boggs' representations regarding the *Crude* outtakes footage. Moreover, Patton Boggs was so forceful and unambiguous in its views and conclusions about the outtakes that Burford did not attach much importance to the outtakes at the time, viewing them as just another round of the parties' constant PR sparring, and did not even mention the outtakes in its internal analysis of the investment. I did not see any of the outtakes until after our due diligence had been completed and our investment committee had already approved the investment. Although I still have not viewed more than a handful of the outtakes, those that I viewed caused me serious concern and appear to be inconsistent with the representations in Invictus. Those representations were material to Burford's decision to fund, and Burford would not have entered into the Funding Agreement had Burford known that those representations were false.

### C.   Kohn, Swift & Graf P.C.

22.     During the course of diligence and negotiations, Donziger represented that a former co-counsel and funder of the Litigation, Kohn, Swift & Graf P.C., did not have the resources necessary to implement enforcement strategies and that the LAPs would not be able to hire enforcement counsel of the desired reputation and experience on solely a contingency basis. Donziger also represented that, due to disagreements in strategy, the LAPs had decided to cease their relationship with Kohn and that Kohn would not be available to sign the Intercreditor Agreement, an agreement executed along with the Funding Agreement that set forth the priority of recovery for the LAPs' contingency fee lawyers and funders.

23.     Burford later learned through documents in this case that Donziger failed to disclose facts regarding Kohn's termination which would have been material to Burford, including, among other things, that Kohn wrote in an August 2010 letter that he was (1) "shocked by recent disclosures concerning potentially improper and unethical, if not illegal, contacts with the court-appointed expert, Mr. Cabrera," and that (2) Kohn was not only unaware

12

of these contacts, he found them to be "contrary to assurances that Donziger and [Ecuadorian counsel] made to [Kohn] on numerous occasions."

24.     Burford relied on Donziger's representations regarding the position with Kohn. As we stated in our September 23, 2011 letter to Donziger, Pablo Fajardo, Luis Yanza, and others, "it is now clear that you were willing to do and say anything to attract new funding. You misled us about Kohn's relationship with you and the current status of that relationship, and the reasons you would not be able to deliver Kohn as a signatory to the intercreditor agreement. Those too were material misrepresentations." In other words, had Burford known Donziger's representations regarding Kohn were false, it would not have entered into the Funding Agreement.

**II.     Burford and the LAPs Execute the Funding Agreement**

25.     The Funding Agreement contemplated three tranches of funding to Patton Boggs that would total $15 million. The first tranche, due November 1, 2010, was $4 million. The next two tranches, if funded, were to consist of $5.5 million each. The Funding Agreement required the LAPs to request funding of each subsequent tranche, which Burford could decline under specified conditions. Burford's funding was to be paid only and directly to Patton Boggs and held in a trust account, and Tyrrell's personal approval was required for its disbursement.

26.     As is common practice in the investment fund world, Burford typically creates a new subsidiary for each new investment. On October 26, 2010, just prior to executing the Funding Agreement, Burford created Treca Financial Solutions, a Cayman Islands company. Treca is the entity that stands to recover any proceeds under the funding agreement and the related Intercreditor Agreement. Treca is an indirect subsidiary of BCL.

27.     The Funding Agreement provided that Treca's interest in any eventual judgment proceeds is to be calculated based on a "Funding Compensation Percentage" of the "Net

Recovery Amount," both of which are defined in the Funding Agreement. The base Funding Compensation Percentage is 5.545% of the Net Recovery Amount, which is defined as the difference between the proceeds of the judgment or settlement amount (if the settlement is $1 billion or more) and certain costs and expenses. Treca's recovery is calculated as the product of the Funding Compensation Percentage and the Net Recovery Amount. If the case settles for less than $1 billion, then the Net Recovery Amount is deemed to be $1 billion for purposes of calculating Burford's recovery.

28.     Treca funded the first tranche of $4 million on November 2, 2010.

### III.     Burford Learns of the Fraud

29.     On February 1, 2011, Chevron filed the captioned action. Chevron also sought a temporary restraining order ("TRO") and preliminary injunction to preclude the LAPs from taking any steps to enforce the Lago Agrio Judgment. The court issued such a TRO on February 9, 2011. The TRO provided that "Defendants, their officers, agents, servants, employees and attorneys and all other persons in active concert or participation with any of the foregoing be and they hereby are restrained . . . from funding, commencing, prosecuting, advancing in any way, or receiving benefit from, directly or indirectly, any action or proceeding for recognition or enforcement of any judgment" in the Lago Agrio Litigation.

30.     On March 7, 2011, the Court then entered a preliminary injunction restraining Defendants from enforcing or taking any action to enforce the Lago Agrio Judgment. The preliminary injunction decision included extensive factual findings based on documents and information that had never been disclosed to Burford during the due diligence process, before it agreed to fund, and that would have been material to Burford's decision to enter into the Funding Agreement.

### IV.     Burford Refuses to Fund the Second Tranche

31.     On February 15, 2011, the LAPs issued a "Funding Notice" requesting funding of the second tranche of the Funding Agreement.

32.     On February 21, 2011, Treca informed the LAPs that the Funding Notice issued by the LAPs was invalid because the TRO "bar[red the LAPs] from issuing a Funding Notice." Treca further informed the LAPs that providing further funding likely would violate the TRO because that order "prohibit[ed] the [LAPs] and any person 'in active concert or participation' with Claimants from '*funding*, commencing, prosecuting, *advancing in any way*, or receiving benefit from, directly or indirectly, any action or proceeding for recognition or enforcement of any judgment entered against Chevron." Accordingly, Treca notified the LAPs that, "until the order is lifted, [it was] unable to consider any request for the Second Tranche Funding or take any preliminary steps toward the provision of such funding." Treca suggested that the LAPs seek clarification of the TRO from Judge Kaplan if they disagreed with Treca's reading of the TRO, which the LAPs did not do.

33.     Treca also noted that the serious allegations of fraud and other misconduct then coming to light in the "appear to contravene directly the representations made to the Funder in the Funding Agreement," among other violations of the Funding Agreement.

34.     The LAPs responded with quite an extraordinary letter from Steven Donziger on March 14, 2011. To begin with, despite ignoring Burford's suggestion to seek clarification of the TRO from the Court, the LAPs threatened Burford with a massive lawsuit unless it violated Judge Kaplan's order, committed contempt of court, and continued funding despite the TRO being quite clear that "funding" was enjoined. Then, rather than proffering some sort of substantive explanation or justification for their conduct, the LAPs went on instead to assert that Burford could not have been deceived because all the information about the LAPs' frauds had

already been public at the time of the execution of the Funding Agreement (despite this action yielding discovery showing just the opposite to be true, and ignoring their prior representations that Chevron's allegations were "lacking credibility" and "manipulation").

## V.      Burford Terminates the Funding Agreement

35.      By the time the U.S. Court of Appeals for the Second Circuit lifted the preliminary injunction on September 19, 2011, Treca had determined that the LAPs were in breach of the Funding Agreement and decided to terminate it.  On September 23, 2011, Burford informed the LAPs of that termination by letter and stated:  "It is clear from the evidence that has come to light subsequent to our discussions with you and Treca's entry into the Funding Agreement that Claimants, the FDA, their affiliates and their attorneys (collectively, 'you') have engaged in conduct and activity that gives rise to numerous material breaches of the Funding Agreement.  In addition to breaching the Funding Agreement – through misrepresentations and other material failures – the conduct discovered amounts to fraud."

36.      The letter went on to describe the various facts of which Burford had become aware, largely through discovery and proceedings in this action, that demonstrated that the LAPs and their "US representatives engaged in a multi-month scheme to deceive and defraud in order to secure desperately needed funding from Treca, all the while concealing material information and misrepresenting critical facts in the fear that we would have walked way had we known the true state of affairs."

37.      Specifically, as the termination letter explained, the LAPs' representatives, including their counsel, Steven Donziger and Patton Boggs, misled Burford by making at least the following specific misrepresentations:  "(1) that your ex parte communications with Cabrera were limited, (2) that they were lawful under Ecuadorian law, and (3) that Chevron's suggestions to the contrary were false."   Burford also noted the misrepresentations from Patton Boggs in the

16

Invictus memo, in particular, on these topics:

> In the Invictus report, we were told: 'Chevron claims that the outtakes show
> unlawful collusion between Plaintiffs, their experts, and Mr. Cabrera .... But as
> with virtually any other claim by Chevron in this litigation, reality is being
> distorted here.' (Page 4). The Invictus report also said that 'Chevron has cited in
> its submissions no Ecuadorian law or rule that prevents ex parte communication'
> (page 5) and that Chevron is '[c]leverly using the lens of U.S. norms to distort
> what transpired in Ecuador' and 'us[ing] its findings regarding Plaintiffs'
> involvement with the Cabrera Report to create the impression that it is the victim
> of an injustice in Ecuador.' (Page 4) Throughout, you characterize Chevron's
> 'arguments concerning Mr. Cabrera' as 'misleading.' (Page 4) Separately from
> the Invictus Report, you assured us that your contacts with Cabrera were limited
> and entirely permissible.

38.     In addition, Burford highlighted Donziger's admissions in his deposition taken by

Chevron pursuant to its Section 1782 discovery proceeding against Donziger that the LAPs'

team had ghostwritten the entire Cabrera Report and then engaged in an extensive cover up of

that fact.  As explained in the letter, Burford would not have agreed to enter into the Funding

Agreement had it been informed of the truth about the Cabrera Report.

39.     On January 27, 2011, Tyrrell called me to discuss the status of the Litigation.

Tyrrell told me that Donziger had not told Patton Boggs the truth about the extent of his prior

contacts with Cabrera.  Tyrrell told me that Patton Boggs was "discussing its ethical obligations"

and "evaluating what to do".  While I do not always take detailed notes of conversations, this call

was such that I did so; those notes are attached hereto.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.  Executed this 16th day of April, 2013 at London, England.

Christopher Bogart

17

Attachment A

1.27.11   Tywell/medva/catz etc

new judge & final briefing

&  team in Ecuador            Jain put together complete plan
                              and ran process

- 120 page module on liability done
- damages piece done and being translated
- further module on US stuff
    - conduct on both sides
    - US decisions ...
            David Boies      Feb 16
              ↳ magistrate

    Chevron & submitted final briefs
    320 pages : not in English

Pablo + Luis & due to meet Boggs, Tywell & range of expectations
    ↳ snowed in - meeting proceeding
- plan to reach out to Greg Craig - awaiting call per Ben Barnes
    ↳ authorisation letter

at peace with how used Cabrera report

all 6 experts & disclosed extent to which they relied on Cabrera

"Donziger not told the truth to new counsel of extent of his
    prior contacts with Cabrera"

at time we told by Donziger set of facts when we    | ex parte ok in
trying to find out full extent of                   | Ecuador but
told contacts were quite limited                    | question of
voluminous contacts, in fact                        | degree (form
                                                    | JB never told

law firms discussing their ethical obligations

Donziger never disclosed vast majority of contacts
despite being asked specifically about them

only has come out in Donziger's NY deposition

JT refuses to discuss Donziger's testimony with him

Patton Boggs evaluating what to do — and procedurally
   what to do about it
not at peace with extent of D's test. varied from
   - what D. told PB earlier and then what PB
   told Burford.

June filing ↗ very concerned that nothing be misleading
   but because didn't get proper facts we
   didn't include / take them all into account

2

   Ecuadorean principle — lawyer wrongdoing does
   not cause clients to suffer

- Donziger was a fool

• feel good about underlying case
   difficult to believe that no award of significant damages
   judgment enforceable in many countries
   new, unexpect judge

   enormous financial pressure @ PB