D4gdche1                        Hearing

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    CHEVRON CORPORATION,

4                   Plaintiff,

5            v.                              11 CV 691 (LAK)

6    STEVEN DONZIGER, ET AL.,

7                   Defendants.

8    ------------------------------x

9                                        April 16, 2013
                                         9:35 a.m.
10
     Before:
11
                         HON. LEWIS A. KAPLAN,
12
                                         District Judge
13
                            APPEARANCES
14
     GIBSON DUNN & CRUTCHER
15       Attorneys for Plaintiff Chevron
     BY:  RANDY M. MASTRO
16       ANDREA E. NEUMAN
         JASON B. STAVERS
17       ANNE MARIE CHAMPION
         JEFFERSON ELIOT BELL
18       RACHAEL BROOK

19   SMYSER KAPLAN & VESELKA, LLP
         Attorneys for Defendants Camacho & Piaguaje
20   BY:  LARRY R. VESELKA
         CRAIG SMYSER
21       JAROD STEWART
         – and –
22       JULIO C. GOMEZ

23   KEKER & VAN NEST, LLP
         Attorneys for Defendant Donziger
24   BY:  JOHN W. KEKER

25

D4gdche1                          Hearing

1              THE CLERK:  Chevron against Donziger.

2              Counsel for plaintiff Chevron, are you ready?

3              MR. MASTRO:  Ready, your Honor.

4              THE COURT:  Good morning.

5              MR. MASTRO:  Good morning, your Honor.

6              THE CLERK:  Counsel for defendant Donziger, are you

7    ready.

8              MR. KEKER:  We are, your Honor.  Good morning.

9              THE COURT:  Good morning.

10             THE CLERK:  And counsel for Camacho and Piaguaje, are

11   you ready?

12             MR. VESELKA:  We are.  Good morning, your Honor.

13             THE COURT:  What is it, Mr. Keker?

14             MR. KEKER:  Your Honor, there has been a development

15   in the case last night that I would like to address before the

16   hearing begins.

17             THE COURT:  In what case?

18             MR. KEKER:  This case.  A motion that was filed at

19   11:30 last night after I went to bed that I think affects the

20   nature of this hearing.

21             THE COURT:  Tell me what motion that was.

22             MR. KEKER:  There was a motion filed that I saw this

23   morning, a motion to compel, with a two-day trigger on it,

24   claiming that there is probable cause to believe that a crime

25   was committed with respect to either getting a court order from

D4gdche1                         Hearing

1    Ecuador or suggesting a court order from Ecuador and/or not

2    telling the Court that Ecuadorian counsel, in the face of

3    dueling expert affidavits, was seeking a court order.  Those

4    two things, Chevron has now taken the position, amount to

5    obstruction of justice and that there is on the current record

6    probable cause to believe --

7              THE COURT:  Mr. Keker, you will have time to address

8    this.  Your papers are due, I think, tomorrow night.

9              MR. KEKER:  Well, that is not time to address it,

10   especially when I am here, your Honor, and it changes the

11   nature of decisions I need to make about whether or not we are

12   going to testify.  Mr. Donziger and I, when I went to bed last

13   night, were planning to testify at this hearing.

14             If you believe that there is probable cause on the

15   record before you now to believe that a crime has been

16   committed, we are not going to testify, and that seems to me

17   the only sensible position that we can take.

18             And that leaves us three choices.  We think their

19   position is absurd, that this escalating of a discovery dispute

20   into a probable cause that a crime has been committed is

21   something that you ought to stop right now and say, no, that's

22   not the situation here and that's not what we are dealing

23   with --

24             THE COURT:  I take it your position is that I should

25   do that without having had the benefit of reading it, without

D4gdche1                        Hearing

1    having had a written response from you, I should just on your

2    say so put a stop to it?

3            MR. KEKER:   Then the second alternative, your Honor,

4    would be to give us, in due course -- normal motion practice,

5    not discovery motion practice -- the right to respond to the

6    motion, then you make a ruling, and continue this hearing until

7    a ruling is made.

8            If you think on this record that there is probable

9    cause to believe obstruction of justice has occurred, a crime,

10   then we are not going to testify.   We came to testify.   We were

11   expecting to testify.   Chevron has ratcheted this up to what we

12   think is an absurd, ridiculous level.   But when you are accused

13   by these folks of a crime and they are presenting this to you

14   and you are about to rule on it, as you say, maybe in two days,

15   we are not going to testify in the face of that kind of threat.

16           And, yes, I'm asking you, go read it.   We can talk

17   about it.   We think it's beyond the pale to have this be a

18   hearing on whether or not a crime has been committed.

19           THE COURT:   That's not what this hearing is about, as

20   far as I understand it.   I told you what the issues in this

21   hearing were in writing.

22           MR. KEKER:   Yes, you did, sir, but what they've now

23   done is say --

24           THE COURT:   What they've now done is make, I gather, a

25   discovery motion in connection with that hearing; is that

D4gdche1                         Hearing

1    right?

2               MR. MASTRO:  Correct, your Honor.

3               THE COURT:  Is that right, Mr. Keker?

4               MR. KEKER:  I wouldn't characterize it as a discovery

5    motion --

6               THE COURT:  What is the relief they seek?

7               MR. KEKER:  They seek you to say that there is

8    probable cause to believe that a crime has been committed on

9    the current record --

10              THE COURT:  We are beyond that.

11              MR. KEKER:  -- and then they want some e-mails and

12   they want some discovery.

13              THE COURT:  Right.

14              MR. KEKER:  It is not really a discovery motion.

15              THE COURT:  They want production of certain documents,

16   correct?

17              MR. KEKER:  That's one of the things they've asked

18   for.

19              THE COURT:  What else?

20              MR. KEKER:  Well, most importantly they've asked you

21   to find that there is probable cause to believe a crime has

22   been committed based on the record that's before you now.

23              THE COURT:  As a prerequisite, perhaps, and perhaps

24   not --

25              MR. KEKER:  If that -- I'm sorry.

D4gdche1                        Hearing

```
 1              THE COURT:  Don't interrupt me, Mr. Keker.

 2              As a prerequisite, perhaps to order earning the

 3    production of the documents.  Isn't that right?

 4              MR. KEKER:  No, your Honor.  Call it a prerequisite,

 5    call it whatever you want, for a federal judge to find that on

 6    this record there is probable cause to believe that a crime has

 7    been committed has consequences far beyond discovery, and we

 8    are not going to go there.

 9              THE COURT:  Mr. Keker, look, this hearing was

10    scheduled for a finite purpose.  We are proceeding this

11    morning.  I haven't had time to review with any care whatever

12    got filed at 11:30 last night, and I'm not making any decisions

13    about the hearing that I set up some time ago to decide five or

14    six enumerated issues.

15              You do whatever you want within the confines that I've

16    set.  That's your job; not mine.

17              Now, they've made a motion asking me to compel

18    production of documents.  You have 48 hours to answer it.

19    Those have been the rules that this litigation has gone forward

20    under for a very long time.  That's it.

21              Now, you will answer it, or not, as you choose.  You

22    will prevail on it or not, as I rule.  It will be moot or not,

23    depending on a whole bunch of other things, and we'll see where

24    we are.  And if, after I see your response, assuming you make a

25    timely response, I think you need more time to answer it, I may
```

D4gdche1                    Hearing

1    well give you that.  But we are starting this morning and we

2    are going to proceed, and you will do what you think is

3    appropriate in your best professional judgment to represent

4    your clients.

5              MR. KEKER:  And, your Honor, I'm trying to be -- I

6    mean -- I'm trying to be constructive about this.  We, under

7    these circumstances, can't testify.  We are not going to

8    testify.  It makes the proceeding more difficult for you, for

9    us, for everybody.  We came to do it.  Chevron set this up --

10             THE COURT:  Look, Mr. Keker --

11             MR. KEKER:  OK.

12             THE COURT:  Let's face facts, all right?  I mean, I

13   know nothing much about this except what you just told me.  But

14   if, as you say, they say that there is probable cause to

15   believe that obstruction was committed in the respect alleged

16   and I were to say today for the sake of argument, well, I don't

17   think so, and a grand jury for the Southern District of New

18   York two weeks from now indicts you and takes the view that

19   they think there is probable cause, that's where you are.

20             Now, I'm not suggesting that's what's going to happen.

21   I don't know anything about the merits of it.  But you

22   understand that what you are really saying is you really would

23   like an advisory opinion from me.

24             MR. KEKER:  No, I'm not.  I'm not.

25             I would like you to say that ratcheting up this

D4gdche1                         Hearing

1    discovery dispute, which is about whether or not this opinion

2    that comes out of Ecuador and any of the conduct that went with

3    respect to Mr. Fajardo and whether or not he is controlling,

4    this hearing, which was supposed to be limited to your five

5    questions --

6              THE COURT:  And is.

7              MR. KEKER:  Well, is, but we can't testify in it if

8    they are -- if what they say -- you have to understand that

9    what they're saying is, based on the record before you right

10   now, we've put in affidavits, we've told you what happened,

11   we've told you what the problems are controlling Fajardo --

12   there is no control -- we've told you all of that and they say

13   notwithstanding that there is probable cause to establish a

14   crime.  If that's the position that you're going to take in

15   this proceeding, it has grave consequences.

16             I'm not worried about the Southern District Grand

17   Jury.  That's not going to happen.  But I'm worried about you.

18   And if you're going to take that position based on the record

19   before you now, we're not going to go further with testimony.

20             I'm asking you to figure out a way to make that

21   decision.  Either what I would do if I were in your position is

22   read it and say this is ridiculous, forget it, Randy, go away.

23   That's one.  Second, I would say, OK, I'll let it be briefed.

24   I'll make a decision.  There is no reason we need to do this

25   now.  Come back in two weeks, when Keker is back from

D4gdche1                          Hearing

1   Afghanistan, and we'll have the hearing that we're trying to

2   have now then.

3           The third alternative is not a good alternative.  The

4   third alternative is go ahead with the hearing now under these

5   circumstances.  We can't testify, and won't.  You'll do

6   whatever you do.  And then we'll go whining about it,

7   complaining about it, appealing it, whatever you call it, to

8   the Second Circuit and say this wasn't right, this wasn't fair.

9   That is not a good way to proceed.  We don't want to proceed

10  that way.

11          What we would really like is you to go read the thing,

12  think about what the record is before you, and say, you know,

13  this is a discovery dispute, not a probable cause to believe

14  there is a crime, just forget this motion and let's go forward

15  and have a sanctions hearing as we planned.

16          THE COURT:  Mr. Mastro.

17          MR. MASTRO:  Your Honor, we requested documents from

18  the defendants.  They refused.  We do believe that we've made a

19  prima facie showing that would warrant the discovery -- we're

20  only here about discovery, your Honor, and we think that that

21  discovery will be revelatory.  The discovery is about not only,

22  you know, what they did in connection with ginning up the

23  Ecuadorian court order, but also about any other communications

24  that they had with the Ecuadorian lawyers about document

25  production.

D4gdche1                        Hearing

1              And, your Honor, I think that the discovery is

2       warranted on this record, and that's why we made the motion.

3              So, you know, we would like to go forward today, but

4       we think the motion is well founded, because they should have

5       to produce that information.  They should have to produce the

6       information of the basic communications they had.  They put in

7       an affidavit saying we talked to him, we e-mailed with him,

8       Fajardo, over and over again.  OK?  That's -- certainly the

9       LAPs representative lawyers say that.  And yet -- and they seen

10      describe substance of the communications but they are refusing

11      to produce them.

12             In some cases they've waived.  In other cases it seems

13      to me, your Honor should consider that question, because the

14      documents will speak loudly about what happened.

15             THE COURT:  I'm just skimming quickly.  The first

16      ground of your motion, unless I'm misunderstanding it --

17             MR. MASTRO:  Is waiver.

18             THE COURT:  -- by skimming it so quickly is that there

19      has been a waiver --

20             MR. MASTRO:  Correct.

21             THE COURT:  -- of any privilege or work product

22      protection, and if I were to agree with you on that, I don't

23      have to pass on the issue --

24             MR. MASTRO:  That's correct.

25             THE COURT:  -- of crime fraud.

D4gdche1                    Hearing

1          MR. MASTRO:  On two grounds.  We have waiver and

2     attorney-client privilege.

3          THE COURT:  Mr. Keker, isn't that right?  In other

4     words, if I were disposed to grant this motion at all and I

5     were to do so on the ground that there has been a waiver, there

6     is no question of passing on crime fraud, is there?

7          MR. KEKER:  That certainly is correct, your Honor.

8          But what took me by surprise, and it just shows how

9     naive I am, is that Chevron, which has been recently aggressive

10    in this case, is now taking the position that what we're

11    dealing with here is criminal activity.  And until you tell

12    them to get off it, which in most courts, I mean, somebody

13    would say we're not talking about crimes, we're talking about

14    discovery, we're talking about normal fights between lawyers.

15         THE COURT:  Mr. Keker, please --

16         MR. KEKER:  But anyway, we are not going forward with

17    this motion pending when we don't know what your ruling is

18    going to be.  If you came back and said there is a waiver --

19         THE COURT:  That's fine, Mr. Keker.  You will make

20    whatever call you want to make and we are going to be here for

21    a couple of days and you will have a rule on this before this

22    hearing is over.  You may very well.

23         MR. KEKER:  Will we get a chance to respond, your

24    Honor?

25         THE COURT:  Of course you will get a chance to

D4gdche1                      Hearing

1    respond.

2              MR. KEKER:  Our response would be due -- I mean, this

3    was filed -- they've become the masters of these midnight

4    filings.

5              THE COURT:  Mr. Kicker, you are both masters of it,

6    believe me you are.

7              MR. KEKER:  We are not as good as they are.  Whatever,

8    your Honor.

9              THE COURT:  It is a close contest, at any rate.

10             MR. KEKER:  You know our position and we are going to

11   stick with it, and I have a couple requests.  I would like to

12   have an opportunity to object to the hearing going forward, and

13   I would like to have an opportunity to make an opening

14   statement if the hearing does go forward.  And I'm telling you

15   in advance that neither Mr. Donziger nor I will testify --

16             THE COURT:  Here is what we are going to do.

17             You have objected.  OK.  Fair enough, you have

18   objected.  Insofar as an opening statement is concerned, I have

19   no need for it from either side.  There will be no opening

20   statements.  This hearing will be approximately 15 hours of

21   testimony in total, or less.  Since you have declined by

22   invitation to reach an agreement, at least as far as I can

23   tell, as to the allocation of time, you have seven-and-a-half

24   hours for the plaintiff and seven-and-a-half hours for the

25   defense, or less, as you choose.

D4gdche1                        Hearing

1           Whatever party is examining has the clock running

2    against him, and any argument or colloquy that I think was

3    unnecessary or an inappropriate effort to delay is going to

4    come out of the time of whoever engages in it.

5           That's where we are, and so we will begin.

6           Let me just make sure I didn't have anything else on

7    my checklist here.

8           (Pause)

9           Oh, yes, there is one more thing.

10          MR. SMYSER:  Your Honor, excuse me.

11          For the record, the LAPs adopts the objections made by

12   Mr. Keker.

13          THE COURT:  I never had any doubt.  Thank you.

14          Now, the documents sought in Chevron's motion, docket

15   item 1023, "E-mail exchange on or about October 9, 2012,"

16   Mr. Smyser, where physically are the documents?

17          MR. SMYSER:  The documents are in our office, your

18   Honor.  We have a thumb drive which may have some of the

19   documents on them.

20          THE COURT:  I direct you to have them in court no

21   later than 2 o'clock, and to have them here throughout the

22   proceeding.  In case I order their production, there will be no

23   delay.

24          With respect to the documents that are the subject of

25   the motion that Mr. Keker was just talking about, where are

D4gdche1                         Hearing

1    those documents physically?

2              MR. SMYSER:  That's a much more difficult question to

3    answer, your Honor.  For instance, they seek passports from

4    individuals, including my passport, which is being renewed by

5    the United States government now.  I have a photocopy of my

6    passport.  There are a variety of documents sought.  It is not

7    a single e-mail, and those documents I assume are in our

8    office.

9              THE COURT:  What is the volume?

10             MR. SMYSER:  That's what I assume.

11             THE COURT:  What is the volume?

12             MR. SMYSER:  I am not sure right now, your Honor.

13             THE COURT:  Mr. Keker --

14             MR. SMYSER:  They are asking for all the e-mails

15   regarding discovery.  I don't know.

16             THE COURT:  They are not asking for all e-mails

17   regarding discovery.

18             MR. SMYSER:  I just heard Mr. Mastro say that what is

19   involved is our e-mail correspondence with counsel in Ecuador

20   regarding discovery and production of documents.

21             THE COURT:  Do you want to respond to that,

22   Mr. Mastro?  I take it that is not what you asked for?  It is

23   much broader than what you asked for, isn't it?

24             MR. MASTRO:  It is, your Honor.  What we are asking

25   for, direct exchanges about the obligation to produce the

D4gdche1                        Hearing

1    documents here and what the Ecuadorians were asked and what

2    they responded.  It is intended to be very targeted, your

3    Honor.  And also about the litigation and how it was initiated

4    and what communications there were about that Ecuadorian

5    litigation.

6              THE COURT:  Oh, for God's sake.  We are not going

7    anywhere with that in connection with this proceeding.

8              MR. MASTRO:  OK.  I understand.

9              THE COURT:  OK.  Mr. Keker, it is off the table for

10   now -- not on the merits, but because I want to proceed with

11   this hearing -- and without prejudice to everybody's rights

12   going forward concerning those documents.

13             MR. KEKER:  Do we have to respond?  I would hope we

14   don't have to respond within 48 hours to their motion.  Can we

15   just forget about their motion and they can make a fuss later

16   about whatever they want to?

17             THE COURT:  You can't forget about it but I will think

18   about your response time.

19             MR. MASTRO:  Your Honor, just to be clear.  They have

20   put in declarations where they have said that their documentary

21   communications were very limited about that case.

22             THE COURT:  Let's just see where we get here.

23             MR. MASTRO:  No problem, your Honor.  Thank you, your

24   Honor.

25             Your Honor, before we begin, I just wanted to raise

D4gdche1                    Hearing

1    one question about in the normal practice obviously witnesses

2    who are going to testify in a hearing wouldn't be present while

3    others are testifying.  This is an unusual circumstance with

4    lawyers involved.  So I just wanted to know how your Honor

5    wanted to proceed in that regard.

6            Some of the lawyers are more junior lawyers who are

7    not lead counsel who will be called, like Mr. Stewart.  I don't

8    know how your Honor wants to proceed in that regard.

9            THE COURT:  I am not going to invoke the rule as to

10   the lawyers.

11           MR. MASTRO:  No problem, your Honor.

12           THE COURT:  And apropos of that last point, if in the

13   course of the examination there is some specific document that

14   becomes a subject of the discussion and there is a request for

15   production, I'll deal with that specifically, or not, but I

16   will at least consider it.

17           MR. MASTRO:  Sure.

18           THE COURT:  The other thing to be said as a

19   preliminary matter, and then we'll begin the testimony, is that

20   all witnesses who were identified in the witness list are to

21   remain subject to call and recall until I close this hearing

22   and are not to leave New York until that occurs, because,

23   obviously, things may unfold here in a nonlinear fashion and

24   nobody is going to be excused until it is over.

25           OK.  First witness.

D4gdche1                        Hearing

1              MR. KEKER:  Your Honor, one clarification.

2              It is not your intention to rule on their crime fraud

3     motion, is that -- do I understand that correctly?  Because we

4     can go forward.  If you are not going to rule on it, fine,

5     we'll go.

6              THE COURT:  I have said exactly what I intend to say

7     on it and I'm not saying any more.  OK?  Let's go.

8              MR. KEKER:  I'm sorry, your Honor.  I --

9              THE COURT:  Which part of that wasn't clear?

10             MR. KEKER:  The part that when you say -- it was clear

11    that you say you are not going to say any more, but you haven't

12    dealt -- you haven't given the answer to the thing that was

13    bothering me --

14             THE COURT:  Yes, I know.  I have not given you the

15    advisory opinion that you've asked for --

16             MR. KEKER:  It wasn't an advisory opinion.

17             THE COURT:  -- that may or may not some day be

18    relevant.  I have not done that.

19             MR. KEKER:  I am not asking for that.

20             THE COURT:  Mr. Keker, I understand your point.  Have

21    a seat, please.

22             Call your first witness, Mr. Mastro.

23             MR. MASTRO:  Your Honor, Chevron calls Steven

24    Donziger.

25             MR. KEKER:  Your Honor, may I be heard before?

D4gdche1                      Hearing

1           I am happy to have him testify if you were not

2     planning to rule on the crime fraud motion that Chevron

3     brought.  If you are planning to rule on it, I'm going to

4     advise him not to testify.

5           THE COURT:  Mr. Keker, I have not even completely read

6     it.  I have made clear to you that, from what I understand,

7     that motion, if I reach it, may be disposed of on grounds that

8     have nothing to do with the crime fraud exception.

9           MR. KEKER:  Thank you, your Honor.

10          THE COURT:  And further interruptions of that sort are

11    coming out of your time.

12     STEVEN DONZIGER,

13        called as a witness by the plaintiff,

14        having been duly sworn, testified as follows:

15          THE CLERK:  Thank you.  Please be seated.

16          Please state your name for the record.

17          THE WITNESS:  Steven Donziger.  S-t-e-v-e-n

18    D-o-n-z-i-g-e-r.

19          THE COURT:  Proceed, counsel.

20          MR. MASTRO:  Thank you, your Honor.

21    DIRECT EXAMINATION

22    BY MR. MASTRO:

23    Q.  Mr. Donziger, you are aware, are you not, that on June 7,

24    2012, Chevron served its first request for production of

25    documents on you and your counsel?

D4gdche1                        Donziger - direct

1   A.  I am aware it was about that time, not the specific date.

2   Q.  And, sir, am I correct that since that time you have made

3   seven separate trips to Ecuador?

4   A.  I don't know the exact number but I go to Ecuador

5   frequently and regularly.

6   Q.  About once a month you go to Ecuador, correct, sir?

7   A.  Roughly, yes.

8   Q.  And am I correct that when you go to Ecuador, you go to the

9   law offices of local counsel in Quito, correct?

10  A.  Correct.

11  Q.  Those law offices are located at what's called Selva Viva

12  headquarters, correct, sir?

13  A.  Yes.

14  Q.  And those local lawyers who you visit with there at Selva

15  Viva headquarters when you go on these monthly trips to Ecuador

16  are Pablo Fajardo, correct?

17  A.  Yes.

18  Q.  Julio Prieto, correct?

19  A.  Not necessarily, no.

20  Q.  But he is one of the people whose offices are there,

21  correct?

22  A.  No.

23  Q.  How about Mr. Saenz, is he someone you meet with there?

24  A.  Yes.

25  Q.  And then Mr. Yanza, not a lawyer but associated with the

D4gdche1                        Donziger - direct

1   Amazon Defense Front, the people at the front table, correct?

2   A.  Yes.

3   Q.  Now, sir, since the time that Chevron served its first

4   request for production of documents, have you personally spoken

5   with Mr. Fajardo and asked him to produce documents in Ecuador

6   responsive to Chevron's first request for documents?

7           MR. KEKER:  Objection, your Honor.  Attorney-client

8   privilege.

9           THE COURT:  Overruled.

10          MR. KEKER:  And work product.  They're co-counsel for

11  plaintiffs that they both represent.

12          THE COURT:  At the moment it calls for a yes or no.

13  Overruled.

14  A.  Yes.

15  Q.  How many times have you spoken to Mr. Fajardo about that

16  subject?

17  A.  I think once, maybe twice.

18  Q.  When was the first time you spoke to him about that

19  subject, producing Ecuadorian documents at your local counsel's

20  law offices in response to Chevron's first request for

21  production of documents?

22  A.  Several weeks ago.

23  Q.  Several weeks ago being since March?

24  A.  Umm, I don't recall the specific date.  It was a while

25  back.

D4gdche1                    Donziger - direct

1   Q.  The last time you were in Ecuador was in late

2   February/early March, sir?

3   A.  Umm.  It was the period of time when I think that your side

4   produced a photo taken of me in a hotel, whenever that was.

5   That was my last trip.

6   Q.  That was from February 26th to March the 2nd, correct, sir?

7   A.  I don't know the exact dates.

8           THE COURT:  Is that about when it was?

9           THE WITNESS:  Yes.

10  Q.  Did you speak to Mr. Fajardo at that time for the first

11  time about producing documents in response to Chevron's request

12  for documents?

13  A.  No.

14  Q.  Was it before then?

15  A.  Yes.

16  Q.  Was the first time you spoke to Mr. Fajardo about producing

17  Ecuadorian documents, in response to Chevron's request for

18  documents, after the Ecuadorian Court had entered an order in

19  the Cordova case?

20  A.  I believe it was before that time.

21  Q.  How much before then was it, sir?

22  A.  It was sometime after my attorneys called this issue to my

23  attention, and as a general matter I asked my attorneys to

24  write a letter on my behalf.  But I did have one or maybe two

25  conversations.  I don't know, it was, you know, I would say

D4gdche1                          Donziger – direct

1   weeks before that time.

2   Q.  You said you asked Mr. Fajardo for a letter?

3   A.  No.  I asked my attorneys to write a letter to Mr. Fajardo

4   requesting the documents on my behalf.

5   Q.  Just to clarify the timeframe.

6           Your first conversation with Mr. Fajardo about

7   producing Ecuadorian documents, in response to Chevron's

8   document request, was after Judge Kaplan had granted Chevron's

9   motion to compel production of those Ecuadorian documents on

10  February 13th, 2013, correct?

11  A.  That's not my testimony, sir.

12  Q.  I'm asking you whether it was, sir.

13  A.  No.  It was well before then.

14  Q.  And you asked your attorneys to send Mr. Fajardo a letter,

15  and you told Mr. Fajardo that that's what was going to happen?

16  A.  No.

17  Q.  I just want to clarify, sir.

18          You said the first conversation that you had with

19  Mr. Fajardo was about your attorneys sending him a letter

20  requesting the documents?

21  A.  No.

22  Q.  What was the substance of the first conversation you had

23  with Mr. Fajardo?

24          MR. KEKER:  The same objection, your Honor.  Work

25  product.

D4gdche1                     Donziger - direct

1          THE COURT:  What is the objection?

2          MR. KEKER:  Work product, and attorney-client

3    privilege.  We believe it covers co-counsel's communications.

4    I know you don't, but it is at least work product.

5          THE COURT:  Mr. Mastro?

6          MR. MASTRO:  Your Honor, I asked the substance, the

7    subject matter of the conversation.  I believe he can say what

8    the subject matter of the conversation was since he is not

9    actually specifying exactly when he had the conversation.

10          THE COURT:  Overruled.

11          MR. KEKER:  That wasn't the question, your Honor.  He

12    asked for the substance of the conversation.  "What did you

13    say?"

14          THE COURT:  That is correct, Mr. Keker.

15          Do you want to rephrase the question, Mr. Mastro.

16    BY MR. MASTRO:

17    Q.  What was the subject matter in the first conversation you

18    had with Mr. Fajardo about producing Ecuadorian documents in

19    response to Chevron's request for production of documents?

20    A.  That was the topic we talked about, Chevron's request for

21    documents.

22    Q.  Give me your best estimate of when you had that first

23    conversation.

24    A.  It was at least a few weeks before my attorneys sent

25    Mr. Fajardo a letter making the same request.

D4gdche1                    Donziger - direct

1   Q.  Was it after Chevron had moved to compel the production of

2   Ecuadorian documents in response to its first request for

3   production of documents?

4   A.  If you could tell me the date that you moved to compel, I

5   could answer that.

6   Q.  Was it after August 13th, 2012, when Chevron moved to

7   compel production of Ecuadorian documents in response to its

8   first request for documents?

9   A.  I don't know for sure, but it was sometime between the time

10  the issue first came up and the time that my attorneys sent a

11  letter to Mr. Fajardo.  Several weeks before the letter was

12  sent but I don't know exactly.  If I had to roughly estimate,

13  maybe the fall of that year.

14  Q.  Sir, between the time that Chevron served the first request

15  for documents and the time that Chevron moved to compel

16  production of Ecuadorian documents on August 13th, 2013, can

17  you recall any conversation you had with anyone in Ecuador

18  about producing Ecuadorian documents in response to Chevron's

19  first request for documents?

20  A.  As I testified, I recall having one or two conversations,

21  but I don't know if they were in those dates that you just

22  mentioned.

23  Q.  You knew when Chevron served its first request for

24  documents, from the instructions in that document request, that

25  Chevron was seeking documents from the files of Mr. Fajardo,

D4gdche1                    Donziger - direct

1    Mr. Prieto, Mr. Saenz, Mr. Yanza and the Front, correct, sir?

2    A.   There came a point in time when I knew that.  I don't know

3    when that exactly was.

4    Q.   And did you discuss with your attorneys whether you were

5    going to produce documents from those files?

6            MR. KEKER:   Objection.  Attorney-client privilege.

7            THE COURT:   Overruled.  It is a "yes" or "no."

8    A.   Yes.

9    Q.   Did you know that your attorneys would tell Chevron's

10   attorneys that you would not be producing any documents from

11   Ecuador before Chevron moved to compel?

12   A.   Sir, to clarify, I don't have --

13   Q.   It is a "yes" or "no," sir.  Did you know that?

14   A.   Did I know what?

15   Q.   Did you know, before Chevron had to move to compel on

16   August 13th, 2012, that your attorneys had told Chevron you

17   wouldn't be producing any documents from your Ecuadorian

18   counsel?

19           MR. KEKER:   I object.  No foundation.  I think that's

20   false.

21           THE COURT:   Overruled.  He can answer it.

22   A.   I never had documents to produce, so the discussions with

23   my attorney centered on that fundamental fact.

24   Q.   When you go to Selva Viva headquarters once a month, do you

25   have access to the files there?

D4gdche1                          Donziger - direct

1    A.   There are no files at the Selva Viva headquarters other

2    than files kept by individual attorneys.

3    Q.   Has Mr. Fajardo ever denied you access to looking at the

4    case files on this case when you have been in Quito?

5    A.   I don't recall.  I do not ask Mr. Fajardo to look at his

6    files.  Sometimes he offers me files or court documents to look

7    at, but generally I do not get involved in the day-to-day

8    aspects of the Ecuador litigation in Ecuador.

9    Q.   Can you name a single time when you have asked Mr. Fajardo

10   for documents --

11             THE COURT:  Use the lectern, Mr. Mastro.

12             MR. MASTRO:   Sorry.

13   Q.   -- other than the request that you say you discussed with

14   Mr. Fajardo once or twice and that your counsel wrote to him

15   once about producing Ecuadorian documents in this litigation,

16   can you name me a single time ever when Mr. Fajardo denied you

17   access to documents in Ecuador?

18   A.   He's always denied me access to documents if they were for

19   the purpose of U.S. litigation.

20   Q.   Sir --

21   A.   I'm his co-counsel --

22   Q.   Sir, it is a "yes" or "no" question.

23             MR. KEKER:  It wasn't a "yes" or "no" question.  Can

24   he answer it, your Honor, and not be interrupted?

25             THE COURT:  He had answered.  We were getting on to a

D4gdche1                      Donziger - direct

1    speech.

2              MR. MASTRO:  OK.

3              THE COURT:  You'll have an opportunity to question

4    him.

5    BY MR. MASTRO:

6    Q.  Mr. Donziger, is it your testimony that when you have

7    requested documents from Mr. Fajardo in connection with U.S.

8    litigations, he has denied you access to those documents?

9              MR. KEKER:  I object as to form.

10             THE COURT:  Overruled.

11   A.  For purposes of your motion in this litigation, yes.

12   Q.  That's the only motion -- strike that.

13             Other than in connection with this motion to compel

14   production of documents in Ecuador in this litigation, is there

15   any other time when Mr. Fajardo has denied you access to

16   documents when you've requested them from Ecuador?

17   A.  Not that I can recall.

18   Q.  Isn't it a fact that when you needed powers of attorney to

19   produce in connection with the 1782 litigations in America, you

20   requested them of Mr. Fajardo in Ecuador, and he not only

21   obtained them, he produced them by PDF to you within two

22   months, correct, sir?

23   A.  I don't recall the dates.  I did request powers of attorney

24   so we could hire local counsel to deal with this --

25   Q.  And you got those in short order from Mr. Fajardo as soon

D4gdche1                    Donziger - direct

1    as you requested them, didn't you, sir, yes or no?

2    A.   I got them at some point.  Yes.

3    Q.   Thank you.  Now, Mr. Donziger, don't you review drafts of

4    pleadings that are filed in Ecuador?

5    A.   I do but infrequently, not generally.

6    Q.   You review the drafts and comment on them, correct?

7    A.   Generally, no, I don't.

8    Q.   It's your testimony that you don't review drafts of what's

9    drafted in Ecuador?

10   A.   It is my testimony, as I already testified in my

11   depositions, that as a general matter I do not review pleadings

12   in Ecuador before they are filed.  Sometimes I do but

13   generally --

14   Q.   Did you review the comment on the Alegato --

15            MR. KEKER:  Excuse me.  Can he finish rather than cut

16   him off and yell at him?

17            THE COURT:  The only yelling I heard was not from

18   Mr. Mastro.

19            MR. MASTRO:  Thank you, your Honor.

20            MR. KEKER:  Then, your Honor, you should have listened

21   to --

22            THE COURT:  Mr. Keker, I am going to run this

23   courtroom and you are not going to tell me how.

24            MR. MASTRO:  Yes, sir.  Could he finish his answer

25   before Mr. Mastro interrupts him, please?

D4gdche1                        Donziger - direct

1          THE COURT:  I appreciate the tone of your request.

2          Let's have the question reread and have the witness'

3     answer.

4          (Pause)

5          MR. MASTRO:  Your Honor, I am happy to move on and ask

6     a more specific question.

7          THE COURT:  OK.  If you want to go on, go on.

8     BY MR. MASTRO:

9     Q.  Mr. Donziger, isn't it a fact that you reviewed drafts of

10    the Alegato that was submitted in the Ecuadorian litigation?

11    A.  I reviewed english language drafts that were drafted, I

12    believe, in the United States.

13    Q.  Isn't it a fact, sir, that you have -- strike that.

14         Mr. Donziger, isn't it a fact that when you had to

15    respond to the subpoena in the 1782 action that was brought

16    against you, that you requested documents from Ecuadorian

17    counsel and you received those documents?

18         MR. KEKER:  Objection, your Honor.  Outside the scope

19    of your Order.  You have said the taking of evidence will be

20    limited to the following issues, and the 1782 proceeding --

21         THE COURT:  Listen, one of them is whether this

22    gentleman has practical control over the documents in Ecuador.

23    And it seems to me abundantly clear that whether he has in the

24    past requested documents from Ecuador and received them on

25    request goes directly to that issue.  Overruled.

D4gdche1                    Donziger - direct

1    A.  If I remember correctly, I --

2    Q.  It is a "yes" or a "no," sir.

3    A.  Sir, I can't answer yes or no.

4         If I remember correctly, I saw documents that were my

5    documents in the Quito office, not Mr. Fajardo's documents, and

6    I was able to come up with a handful of documents that were

7    down there that I produced.

8    Q.  Do you recall testifying that -- at your deposition that

9    you gathered materials responsive to the subpoena from the law

10   office in Equador?

11        THE COURT:  Mr. Mastro, if you are going to confront a

12   witness with a deposition, I would like you to read the

13   relevant question and answer and then put a question.

14        MR. MASTRO:  Certainly, your Honor.

15        THE COURT:  Instead of getting involved in a whole

16   waste of time about the accuracy of summaries.

17        MR. MASTRO:  Certainly, your Honor.

18        THE COURT:  Back to the lectern, Mr. Mastro.

19   BY MR. MASTRO:

20   Q.  Mr. Donziger, in your 1782 proceeding, did you contact the

21   law office in Ecuador and ask Erica Torres to gather materials

22   responsive to the subpoena and ship them to you?  Yes or no?

23   A.  Your Honor, I'm sorry, is that what you are reading, from

24   the deposition, or am I supposed to answer that as a question.

25        MR. MASTRO:  It is a question.

D4gdche1                          Donziger - direct

 1              THE COURT:  It is a question.

 2   A.  I made a request to somebody in that office, I don't

 3   remember who --

 4   Q.  Thank you.

 5              THE COURT:  Let him finish that answer, Mr. Mastro.

 6              MR. MASTRO:  Certainly, your Honor.

 7   A.  -- for documents.  My documents.

 8              (Continued on next page)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D4GJCHE2                     Donziger - direct

1    BY MR. MASTRO:

2    Q.  Sir, and she shipped those documents to you, correct?

3    A.  I believe so, yes.

4    Q.  And am I correct that you asked your co-counsel in Ecuador

5    whether they could find any of your old flash drives or thumb

6    drives?

7    A.  I believe that I did make that request, yes.

8    Q.  And you asked your co-counsel in Ecuador to help you in any

9    way identify responsive documents to the subpoenas, 1782

10   subpoenas, that were there but you no longer had in the United

11   States, correct?

12   A.  That's correct, as related to my documents.

13   Q.  And they provided you with the documents responsive to the

14   subpoena, correct, sir?

15   A.  That is correct, related to my documents.

16   Q.  Mr. Donziger, am I correct that Mr. Fajardo has an

17   obligation under his retainer agreement to give you access to

18   his files in Ecuador?

19   A.  I haven't reviewed the retainer agreement in some time.  I

20   do know that Mr. Fajardo's view is that responding to your

21   document request in this case would violate Ecuador law.

22   Q.  That wasn't the question, sir.  A simple question.

23        Am I correct that Mr. Fajardo's retention agreement

24   requires him to give you access to case files in Ecuador, yes

25   or no?

D4GJCHE2                        Donziger - direct

1    A.  I don't know.

2    Q.  I just want to make this crystal clear because we're going

3    to come back to that.

4              MR. KEKER:  Objection to the preamble and move to

5    strike.

6              THE COURT:  Yes, sustained.

7    BY MR. MASTRO:

8    Q.  You said you had one or two conversations with Mr. Fajardo

9    about producing documents from the Ecuadorian files in response

10   to Chevron's request for document production here, correct?

11             MR. KEKER:  Objection to form of the question and move

12   to strike.

13             THE COURT:  Overruled.  I don't think there is

14   anything wrong with it from that point of view.

15   A.  Yes.

16   BY MR. MASTRO:

17   Q.  Did you have any conversations ever with Mr. Fajardo about

18   producing Ecuadorian documents?

19   A.  No.

20   Q.  Did you ever have any conversations ever with Mr. Saenz

21   about producing Ecuadorian documents in response to Chevron's

22   request for document production in this case?

23   A.  I don't recall, but the letter my attorney sent, in my

24   mind, covered requests to all of those individuals on the legal

25   team.

D4GJCHE2                      Donziger - direct

1  Q.  Sir, I am just asking about your conversations.

2  A.  I don't recall.

3  Q.  Did you ever have any conversations with Mr. Yanza about

4  producing documents responsive to Chevron's document request in

5  this case from Ecuadorian files?

6  A.  I don't believe so.

7  Q.  So the only person in Ecuador you ever had any

8  conversations about producing documents responsive to Chevron's

9  document request in this case was Mr. Fajardo, correct?

10 A.  That's correct, but he has authority over those other

11 individuals.

12 Q.  And you say you had one or two conversations with

13 Mr. Fajardo on that subject, correct?

14 A.  Yes.

15 Q.  You say you think the first of those was sometime in the

16 fall of 2012 or later, correct, sir?

17 A.  As I said, I don't remember the specific date.  That was a

18 very rough estimate or sometime after you filed papers seeking

19 them and sometime well before my attorney sent the letter.

20 Q.  It was after we moved to compel on August 13, 2012, but

21 before your attorney wrote to Mr. Fajardo on February 14th,

22 2013, correct, sir?

23 A.  That was not my testimony, sir.  My testimony was sometime

24 between the time that your side filed your initial motion

25 seeking the documents and the time that my attorneys sent a

D4GJCHE2                        Donziger - direct

1    letter to Mr. Fajardo, but I will say, as I have testified, it

2    was at least several weeks before my attorney sent that letter,

3    but I don't know exactly when.

4    Q.  Do you have any record that would reflect when you had that

5    conversation?

6    A.  No.

7    Q.  Sir, let me ask you some questions about Mr. Fajardo's

8    retention agreement and his obligations under that agreement?

9              THE COURT:  Is that an exhibit on this motion or was

10   it also in the record?

11             MR. MASTRO:  Your Honor, it is Exhibit 1106.  It is a

12   docket entry No. 355-32.  We'll mark it as hearing Exhibit No.

13   1 and hand it up to the witness.

14             MR. KEKER:  Could we have a copy as well, your Honor?

15             THE COURT:  Do you have a copy, Mr. Mastro?

16             MR. MASTRO:  Yes.  It is being handed out.

17             (Pause)

18             THE COURT:  Do you have a copy for me, Mr. Mastro?

19             MR. MASTRO:  Yes.

20             THE COURT:  You can use the electronics there, Mr.

21   Mastro if you want.

22             MR. MASTRO:  Thank your Honor.

23   BY MR. MASTRO:

24   Q.  Mr. Donziger, am I correct that this is a copy of

25   Mr. Fajardo's retainer agreement, dated January 5, 2011?

D4GJCHE2                       Donziger - direct

1    A.  I don't know.  I don't have a copy of it.  I am looking at

2    a little bit of it on the screen.  Can I get a hard copy,

3    please?

4              THE COURT:  I think he handed it to you?

5              THE WITNESS:  No, nobody handed me a hard copy.

6              THE COURT:  Do you have it now, Mr. Donziger?

7              THE WITNESS:  Yes.

8              (Pause)

9    BY MR. MASTRO:

10   Q.  Mr. Donziger, am I correct the reference here to the lawyer

11   is to Mr. Fajardo, correct?

12             MR. KEKER:  Objection to having him interpret a

13   document that is not his.  We don't have any objection to you

14   looking at it and considering it as evidence.  He can't

15   interpret this agreement any better than the rest of us can.

16             THE COURT:  Give me a moment.

17             (Pause)

18             THE COURT:  Well, I'll sustain the objection just as

19   to form, Mr. Mastro.  It is perfectly obvious the lawyer is

20   Mr. Fajardo.  He signed it in that capacity -- or at least

21   somebody did with his name.

22             MR. MASTRO:  Okay, your Honor, I'll move on.

23   BY MR. MASTRO:

24   Q.  Mr. Donziger, you're described here as the plaintiff's U.S.

25   representative, correct?

D4GJCHE2                    Donziger - direct

1   A.  Can you please direct me to where you're reading from?

2   Q.  The fourth whereas clause on Page 1.

3   A.  Can you repeat the question, please.

4   Q.  You are described here as the plaintiff's U.S.

5   representative, correct, sir?

6   A.  Yes.

7   Q.  And also with Mr. Yanza as other plaintiff's

8   representatives, correct, the same paragraph, sir?

9               THE COURT:  Look, Mr. Mastro, I can read it.

10              MR. MASTRO:  I understand.

11  BY MR. MASTRO:

12  Q.  Am I correct, Mr. Donziger, that Mr. Fajardo was required

13  under this agreement to cooperate with you and Mr. Yanza in

14  connection with the various litigations in which your clients

15  were involved?

16              MR. KEKER:  Objection; mischaracterizes the document

17  and calls for a legal conclusion.  The court can read this as

18  well as the rest of us.  It says what it says.

19              THE COURT:  Well, yes, of course it says what it says,

20  but at least if you call his attention to what you're referring

21  to, Mr. Mastro, I am going to allow it.

22              MR. KEKER:  I am not sure it has been established he

23  has ever seen it before, your Honor.

24              THE COURT:  I am sure you'll ask him that, Mr. Keker,

25  if Mr. Mastro doesn't.

D4GJCHE2                     Donziger - direct

 1   BY MR. MASTRO:

 2   Q.  Mr. Donziger, am I correct that this is the operative

 3   agreement that defines Pablo Fajardo's retention in connection

 4   with the various litigations involving the Aguinda plaintiffs?

 5   A.  No.  It described in my retention, not his.

 6   Q.  This is the retention agreement that he signed?

 7   A.  I am confused.  There is a lot of retention agreements that

 8   have been signed.  I don't remember which one this is exactly,

 9   and without really taking the time to read it, I don't know the

10   answer to that question.

11   Q.  Okay.  Mr. Donziger, am I correct that Mr. Fajardo's

12   retention agreement provided that he will provide the other

13   plaintiff's representatives, including yourself, with access to

14   the plaintiff's files at such reasonable times as may be

15   requested by the other plaintiff's representatives, including

16   yourself?

17   A.  Well, not if it violated Ecuador law, no.

18   Q.  Is that what this agreement provides, that he has to

19   provide you with access to the plaintiff's files at such

20   reasonable times as may be requested by you?

21   A.  I don't know.  If you could point me to someplace in the

22   agreement, I might be able to answer your question.

23   Q.  Page 5 of the retainer agreement, sir.  Do you see there

24   where it expressly says on Page 5, "The lawyer will provide the

25   other plaintiff's representatives with access to the

D4GJCHE2                         Donziger - direct

1    plaintiff's files at such reasonable times as may be requested

2    by the other plaintiff's representatives."

3              Do you see that, sir?

4    A.  Yes.

5    Q.  Did Mr. Fajardo honor that contractual obligation to you to

6    provide you access to the plaintiff's files at such reasonable

7    times as you may have requested?

8    A.   In this instance, no, because he felt like it would violate

9    Ecuadorian law.

10   Q.  Sir --

11             MR. KEKER:  Excuse me.  I am sorry, Mr. Mastro.  May I

12   make an objection.  Could he finish the answer?

13             THE COURT:  I thought he did.

14             MR. KEKER:  No, he hasn't.  He was still talking.

15             THE COURT:  The answer was, "In this instance, no,

16   because he felt like it would violate Ecuadorian law.

17             Actually everything after "no" was unresponsive

18   anyway, but I think you completed your answer, didn't you,

19   Mr. Donziger?

20             THE WITNESS:  He talked over me, but I got the words

21   out.

22   BY MR. MASTRO:

23   Q.  Is there any other instance in your experience where

24   Mr. Fajardo did not comply with his contractual obligation to

25   you to provide you access to the plaintiff's files at such

D4GJCHE2                          Donziger - direct

1  reasonable times as you may have requested?

2  A.  As I testified already today --

3  Q.  A yes or no?

4  A.  Not that I can recall.  I already testified to that, sir.

5  Q.  Thank you.

6          Sir, am I also correct that Mr. Fajardo was

7  contractual obligated to you to promptly respond to any

8  reasonable request for information received by you?

9  A.  I don't know.  I mean based on this document?

10  Q.  Look at Page 4, do you see where it says, "The lawyer shall

11  promptly respond to any reasonable request for information

12  received from one of the other plaintiff's representatives"?

13          Do you see that, sir?

14  A.  No.  Where?  I am looking at Page 4.

15          THE COURT:  Paragraph 4.

16  BY MR. MASTRO:

17  Q.  Paragraph 4, do you see that, sir?

18  A.  I see it.

19  Q.  Other than in this instance responding to Chevron's motion

20  for Ecuadorian documents as part of its document request, is

21  there any other time that you can recall where Mr. Fajardo

22  didn't promptly respond to any reasonable request for

23  information he received from you?

24  A.  Yes.

25  Q.  How many other times did he not reasonably respond to you?

D4GJCHE2                        Donziger - direct

1    A.   Well, I would say in the last two years after I completed

2    my production in the 1782 process, he was very skeptical of

3    giving me documents because of what happened in that case.  We

4    had to turn over the entire case file based on a waiver.  At

5    that point he often would not share documents with me out of

6    fear they would be produced to Chevron.

7    Q.   Sir, did you ever attempt to enforce your rights under this

8    contract, that a prompt response to your request for

9    information and to have access to the plaintiff's files, did

10   you ever attempt to enforce your rights under this contract

11   vis-a-vis Mr. Fajardo?

12           MR. KEKER:  Objection, your Honor, to the form of the

13   question.  It calls for a legal conclusion and there is nothing

14   to establish he has any rights, he has any rights under this

15   contract.  He is not a party to the contract.

16           THE COURT:  Overruled.

17           MR. MASTRO:  I will rephrase the question, your Honor.

18   BY MR. MASTRO:

19   Q.   Mr. Donziger, at any point did you say to Mr. Fajardo, "I'm

20   entitled to a prompt response to my reasonable information

21   requests, so send me the information I am requesting?"

22           MR. KEKER:  Objection.

23   BY MR. MASTRO:

24   Q.   Did you ever say that to Mr. Fajardo after you got

25   Chevron's request for production of documents from Ecuador?

D4GJCHE2                        Donziger - direct

1              MR. KEKER:  Attorney-client privilege, work products,

2     calling for substance of the conversation between them.

3              THE COURT:  Overruled.

4              MR. KEKER:  Objection.

5              THE COURT:  Overruled.

6     A.   When I asked Mr. Fajardo for documents, he made it very

7     clear he was not going to turn them over for various reasons,

8     among them to be would be --

9     BY MR. MASTRO:

10    Q.   It was a very specific question.

11             THE COURT:  Mr. Mastro, you have got to stop that.

12             MR. MASTRO:  He is giving speeches, your Honor.

13             THE COURT:  And you're shouting down the witness.

14    Let's get on with it.

15    BY MR. MASTRO:

16    Q.   Go ahead, Mr. Donziger, is there anything else you want to

17    say?

18    A.   I believe I finished my answer.

19    Q.   A simple question.  Did you ever say to Mr. Fajardo, "I'm

20    entitled to promptly receive information I reasonably request,

21    so I must insist that you produce the Ecuadorian documents to

22    me," did you ever say that to him?

23    A.   I asked Mr. Fajardo for documents.  He told me he would not

24    produce them for the purposes of this litigation for reasons I

25    have stated --

D4GJCHE2                    Donziger - direct

1    Q.  You never asked him that, did you?

2           MR. KEKER:  Objection.

3           THE COURT:  You have interrupted him again, Mr.

4    Mastro.

5           MR. MASTRO:  Sorry, your Honor.

6    A.  I did not take the language in this agreement and repeat it

7    to him, no, I did not do that.

8    BY MR. MASTRO:

9    Q.  Did you ever say to Mr. Fajardo, "I am entitled to access

10   to plaintiff's files in Ecuador and I demand access to those

11   files so I can respond to Chevron's document request in this

12   case," did you ever a say that to Mr. Fajardo?

13   A.  Sir, I already testified that I asked him for documents.  I

14   did not use this language.  I asked him for documents.  He

15   refused on the grounds I mentioned and other grounds.

16   Q.  Did you ever consider bringing suit against Mr. Fajardo in

17   Ecuador to compel him to give you the documents, that he was

18   denying you the access to those documents?

19   A.  Absolutely not, I would not do such a thing.

20   Q.  Did you ever consider intervening in the Cordova lawsuit to

21   assert your interests in the documents and being able to

22   produce them in this proceeding?

23   A.  No.

24   Q.  Mr. Donziger, am I also correct that Mr. Fajardo was

25   obligated under this agreement to cooperate and coordinate his

D4GJCHE2                         Donziger - direct

1    efforts with you?

2    A.  Mr. Fajardo and I generally worked closely together.  We

3    still work together, not as closely because of these

4    litigations.  I don't know in this agreement where it says

5    that.  That is generally how we worked.

6    Q.  Am I also correct that Mr. Fajardo was permitted to

7    disclose even confidential information to third parties under

8    this agreement if he was specifically authorized by you as one

9    of the plaintiff's representatives?

10   A.  I don't know.

11   Q.  Am I also correct that Mr. Fajardo was authorized under

12   this agreement to disclose confidential information to

13   plaintiffs or third parties if legally required to do so?

14   A.  Sir, I don't know.  I have not reviewed this document in

15   detail before I came in today.

16   Q.  Let's go to Page 5 of the document.  Do you see there where

17   it says, "the lawyer" -- Mr. Fajardo, correct -- "shall not

18   disclose any confidential information of the plaintiff's to any

19   third party including other clients unless" --

20   A.  Sir, where are you reading from exactly, please?

21   Q.  I am reading on Page 5 of the document.

22   A.  I see it.

23   Q.  Thank you.

24            "Unless specifically authorized by the plaintiffs or

25   the other plaintiff's representatives," do you see that, sir?

D4GJCHE2                          Donziger - direct

1    A.   Yes.

2    Q.   And you were one of the other plaintiff's representatives,

3    correct, sir?

4    A.   I believe I was.  I don't know -- yes, I was U.S.

5    plaintiff's representative.

6    Q.   It also says, does it not, that the lawyer should not

7    disclose any confidential information of the plaintiffs to any

8    third parties other than clients unless legally required to do

9    so.  Do you see that, sir?

10   A.   Yes.

11   Q.   It doesn't say they're legally required to do so in

12   Ecuador, correct?

13   A.   That's correct.

14   Q.   Unless legally required to do so?

15   A.   That's correct, it is silent on that point, yes.

16   Q.   Judge Kaplan's order legally required production of those

17   documents here, correct?

18   A.   Yes, if I could get them, which I couldn't.

19   Q.   Did you ever say to Mr. Fajardo, "I authorize you to

20   disclose Ecuadorian case files in the context of the U.S.

21   litigation to Chevron," did you ever say that to Mr. Fajardo?

22   A.   Sir, Mr. Fajardo made it clear that it would be --

23   Q.   It is a simple yes or no.

24   A.   -- against Ecuador law to turn over those documents.  I

25   would face imprisonment.

D4GJCHE2                      Donziger - direct

1            THE COURT:  That is stricken.  Answer the question.

2    BY MR. MASTRO:

3    Q.  Did you ever say that to Mr. Fajardo, that I want you to

4    turn over confidential information in the Ecuadorian case files

5    to Chevron?  Did you ever say that to Mr. Fajardo?

6    A.  Absolutely not and I wouldn't.

7            MR. MASTRO:  Your Honor, I'd like to turn to

8    Mr. Donziger's retention agreement.  That's Exhibit 1106 in the

9    depositions, document number -- I am sorry.  It is Exhibit No.

10   1122.

11           THE COURT:  1122 or 1106?

12           MR. MASTRO:  1106 is Fajardo retention agreement.

13   1122 is Donziger, and it is Docket No. 355-37 of the record.

14   We'll mark this as Chevron hearing Exhibit No. 2.

15           (Pause)

16   BY MR. MASTRO:

17   Q.  Mr. Donziger, am I correct that that is a copy of your

18   retention agreement, dated January 5, 2011, in connection with

19   the various Aguinda-related litigations?

20   A.  Yes.

21   Q.  Am I correct you signed this agreement with the other

22   plaintiff's representatives, including Mr. Fajardo, after the

23   crude outtakes had already been ordered produced and many of

24   them filed in the court here, correct?

25   A.  Yes.

D4GJCHE2                          Donziger - direct

1   Q.  And after there had already been a ruling that you waived

2   privilege and your files had to be produced, and many of those

3   files have been publicly filed in the Southern District here,

4   correct?

5   A.  Yes.

6   Q.  Even after all those events, you entered into this new

7   retainer agreement in January 5, 2011 with Mr. Fajardo and

8   other plaintiff's representatives in connection with the

9   Aguinda-related litigations, correct?

10  A.  Yes.

11  Q.  Am I also correct that -- strike that.

12          You said earlier that you had not been involved in the

13  day-to-day management of the Aguinda litigation in Ecuador,

14  correct?

15  A.  That's correct.

16  Q.  Am I also correct under this agreement you are to play a

17  coordinating role in connection with all of the related

18  litigations, Aguinda in Ecuador, existing 1782s and potential

19  future 1782s and enforcement actions, correct, sir?

20  A.  The word "coordinated" can be a lot of things.  My role was

21  to help bring together a legal team in the U.S. to deal with

22  all the litigation matters your client generated among other

23  things.

24  Q.  I simply asked you a question, sir, that in entering into

25  this agreement, you were retained to play a coordinating role

D4GJCHE2                         Donziger - direct

1    in connection with the litigation which included Aguinda in

2    Ecuador, existing 1782s and future 1782s, enforcement

3    litigations and other prospective litigations, correct?

4    A.   I was to play a coordinating role in a general sense for

5    the various litigations among other people, yes.

6    Q.   Thank you.

7         Am I also correct under this agreement, you were

8    retained to exercise overall responsibility for the strategic

9    direction of the litigation and day-to-day management of the

10   litigation?

11   A.   I don't know where it says that in this agreement.

12   Q.   I am asking you whether you were retained to do that under

13   this agreement?

14   A.   Sir, I don't know.

15   Q.   Why don't you go to Page 2, 2 B, do you see where it says

16   that the plaintiffs appoint you to act as their U.S.

17   representative, "to exercise overall responsibility for the

18   strategic direction of the litigation and the day-to-day

19   management of the litigation," do you see that, sir?

20   A.   Yes.

21   Q.   And the litigation defined in the above whereas clauses

22   includes Aguinda in Ecuador, existing 1782s, future 1782s and

23   enforcement proceedings and other future litigations, correct,

24   sir?

25   A.   That's what it says, sir.

D4GJCHE2                     Donziger - direct

1    Q.  Have you played that overall -- have you fulfilled your

2    obligations under this agreement since then?

3    A.  Sir, my obligations are what my clients requested I do.

4    This is not an accurate description by any means what I have

5    done since this retainer agreement was signed.

6    Q.  Do you consider yourself to have fulfilled your obligations

7    to your clients, the plaintiffs, under this retention

8    agreement, sir?

9    A.  Yes, I do.

10   Q.  Now, Mr. Donziger, it goes on to say that you have primary

11   responsibility for, "coordinating the overall legal strategy of

12   the plaintiffs to pursue and defend all aspects of the

13   litigation, including without limitation coordinating the

14   United States legal strategy and the Ecuadorian legal

15   strategy," do you see that, sir?

16   A.  No, but if it says that, that is not how it actually

17   happened.

18   Q.  Is that your contractual obligation under this contract,

19   sir, on Pages 2 and 3 of the contract, 2 B 1?

20   A.  I have not read this contract in full before coming in here

21   today.  I don't know.  As far as I was concerned, my

22   contractual obligation was to do my best to fulfill requests by

23   my clients, to take care of these responsibilities listed in

24   here, but this is a very broad mandate.  As it actually

25   happened in practice, the things I was doing were not all the

D4GJCHE2                      Donziger - direct

1    things that are mentioned in this contract.

2    Q.  Am I correct that you had the contractual right and

3    responsibility to coordinate the overall legal strategy?

4             MR. KEKER:  Asked and answered, your Honor.

5             THE COURT:  Overruled.

6    A.  I had responsibilities all that were outlined in this

7    contract were always subject to client requests, approval and

8    the like, so the things I was doing were not always the things

9    mentioned in the contract and they were usually much more

10   limited in the responsibilities mentioned in the contract.

11   BY MR. MASTRO:

12   Q.  Sir, was it in your contractual right and responsibility to

13   coordinate efforts to procure funding or financing for the

14   litigation?

15            MR. KEKER:  Objection.  This is outside the scope of

16   this hearing.  Your order says that we'll deal with those five

17   questions.

18            THE COURT:  Yes, I understand that.

19            MR. MASTRO:  Your Honor, I will tie it in very

20   quickly.

21            THE COURT:  Go ahead, tie it up.

22            THE WITNESS:  I am sorry.  Could you repeat the

23   question.

24   BY MR. MASTRO:

25   Q.  You also had primary responsibility under your retention

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D4GJCHE2                    Donziger - direct

1    agreement for coordinating the efforts to producer funding or

2    financing for the litigation?

3    A.  I did at one time.

4    Q.  Am I correct that you have continued out of your accounts

5    since the signing of this agreement to pay Mr. Fajardo and

6    others on the Ecuadorian legal team?

7    A.  On occasion I paid small amounts out of my accounts for

8    case expenses, yes.

9    Q.  Isn't it correct, sir, you paid Mr. Fajardo $50,000 in 2011

10   after you signed this retention agreement?  Isn't that correct,

11   sir?

12   A.  I don't know.

13   Q.  You've also paid Mr. Yanza in 2011, correct, out of the

14   accounts you controlled,?

15   A.  Sir, I don't know.  I paid people from my accounts case

16   expenses including salaries of people in Ecuador from time to

17   time, yes, I have.

18   Q.  So you have actually been a person who continues to be

19   responsible after January 5, 2011 for paying some of the salary

20   and expenses of Mr. Fajardo, Mr. Yanza and the other Ecuadorian

21   team, correct?

22   A.  I would say it was a shared responsibility.  I did the best

23   I could to make sure people were paid.  On occasion I paid them

24   out of my own account relatively small amounts compared to

25   overall case expenses.

D4GJCHE2                          Donziger - direct

1    Q.  Mr. Donziger, am I correct that when you -- am I correct

2    that you have also been responsible for coordinating the hiring

3    of additional attorneys in the case?

4    A.  That's not accurate.

5    Q.  Am I correct that you are the person who recommended the

6    hiring of Patton Boggs on the case?

7    A.  I took a role on behalf of the client as their U.S.

8    representative to seek additional counsel for this case, that I

9    would recommend to the clients, yes, including Patton Boggs.

10   Q.  Sir, can you recall what it was on June 28th, 2011 that you

11   were paying Mr. Fajardo $50,000 from personal savings account

12   of Chase?

13   A.  I don't recall specifically other than I can assure you it

14   was related to case expenses in Ecuador.

15   Q.  Now, sir, I want to ask you the same questions about

16   Ecuador.  Am I correct that since January 1, 2011, you have

17   made 24 trips to Ecuador?

18   A.  I don't know how many trips I made.

19   Q.  Does that sound approximately right to you, 24 trips?

20   A.  Generally, Mr. Mastro, I travel to Ecuador once a month, so

21   that might be a rough approximation.

22   Q.  Am I correct that prior to January 2011, you, between 2005

23   and 2010, had 59 trips to Ecuador?

24   A.  Sir, I am happy to stipulate to the fact that for many

25   years I have been going to Ecuador once a month.  You obviously

D4GJCHE2                    Donziger - direct

```
 1   know more about my travels than I do, but I have been going
 2   once a month for many years.
 3   Q.  You have continued to go once a month to Ecuador since
 4   January 2011, correct?
 5   A.  Roughly once a month, maybe a little less frequently than
 6   that.
 7   Q.  Am I correct that since February 1, 2011 when this RICO
 8   case was filed, you've made 22 trips to Ecuador?
 9   A.  Sir, I don't know how many trips I've made.  As I
10   previously testified, I travel roughly once a month to Ecuador.
11   Q.  You continue to do that since the filing of the RICO
12   action?
13   A.  Roughly, yes, maybe a little less frequently as I just
14   testified.
15   Q.  In terms of your communications with the Ecuadorian
16   lawyers, you've produced a privilege log in this litigation,
17   correct, sir?
18   A.  Yes.
19   Q.  In the original privilege log that you produced in this
20   litigation, am I correct that there are over a thousand
21   entries, from January 1, 2011 to July 10, 2012, of
22   communications from Ecuadorian counsel to you?
23            MR. KEKER:  Excuse me.  The privilege log was produced
24   under protective order which is now being violated by Mr.
25   Mastro.  We object to it.
```

D4GJCHE2                    Donziger - direct

1          MR. MASTRO:  Your Honor, I am happy to produce however

2   you wanted to.  I have not revealed any of the substance of the

3   log other than total numbers.  So I did not consider that to be

4   an issue, but I am --

5          THE COURT:  Why should that be an issue, Mr. Keker?

6          MR. KEKER:  I haven't counted it.  I don't know if it

7   is right or wrong.  What we have got is a privilege log which

8   was produced under your order, covered by a protective order

9   and now he is chatting about it in open court.  That is a

10  violation of the protective order.

11         THE COURT:  I don't know.  One thing is for sure, I

12  entered no order that says privilege logs are confidential.

13  That is for sure.  I entered a protective order that said

14  parties in certain circumstance could designate various things

15  confidential in some circumstances, the precise terms of which

16  I don't have in my memory.

17         MR. KEKER:  Nor do I.

18         THE COURT:  Okay.  So I am asking you as a very

19  practical matter what is the difference when we're talking

20  about how many lines there were for a particular kind of claim?

21         MR. KEKER:  This is outside the scope of your order

22  regarding the hearing.  I don't know whether he --

23         THE COURT:  I don't think it it is outside the scope

24  at all.  What counsel is trying to do to show the guy who calls

25  the shots here across-the-board is sitting to my right, it is

D4GJCHE2                    Donziger - direct

1    Mr. Donziger, and if he tells Mr. Fajardo that he is to produce

2    the documents, they will be produced.

3           As evidence of that, he is attempting to demonstrate

4    that he is in Ecuador every month or thereabouts, there have

5    been hundreds if not thousands of communications between him

6    and Mr. Fajardo and others there and all the other things we

7    have been watching or listening to.  It seems to me it is all

8    relevant.  The conclusion ultimately to be drawn I will draw

9    one of these days, but that is the theory of the evidence.

10          So let's just focus on your immediate objection,

11   please, which I understood to be that there is a legitimate

12   interest in having under seal the question of whether it was

13   1200 communications or 900 commissions or 1600 communications

14   or whatever.  If there is, I am perfectly amenable to adopting

15   such a position if somebody can explain it to me.

16          MR. KEKER:  We designated the confidential

17   communications under a privilege log as under seal and they

18   ought to stay under seal.  There is no reason to lift the seal.

19   They're confidential communications which are privileged.

20          THE COURT:  Excuse me.  Maybe you can enlighten me as

21   to what the confidential communications are?

22          MR. KEKER:  I don't know because I don't have the

23   privilege log in front of me.  He is up here and you just did

24   it, there is 1600, there is 900, 1200.

25          THE COURT:  I didn't just do it, Mr. Keker.  I used

D4GJCHE2                    Donziger - direct

1    examples that have absolutely no connection to reality because

2    I don't actually know what the reality is.

3              MR. KEKER:  My problem is that Mr. Mastro may be doing

4    the same thing, your Honor.  I will just leave it at that.  I

5    can't believe he is going to know whether or not Mr. Mastro's

6    numbers are accurate, either.

7              THE COURT:  Mr. Mastro, do you have a response to Mr.

8    Keker here on this point?

9              MR. MASTRO:  Your Honor, I --

10             THE COURT:  Is it designated confidential under the

11   order?

12             MR. MASTRO:  Your Honor, the privilege log is

13   something that was designated confidential, but I understood

14   that to be the substance of the individual entries, not

15   cumulative numbers.  They've put out, both sets of lawyers have

16   put out to the press how many of our attorneys are listed on

17   the privilege log, and ours is also marked confidential.  I

18   didn't consider that to be a violation of the confidentiality

19   of the substantive entries on the log.

20             I am simply trying to convey to the court a simple

21   proposition which is how voluminous the communication has been

22   between Mr. Donziger and the Ecuadorian attorneys every day

23   since January 2011.

24             THE COURT:  Look, the most sensible way of dealing

25   with this particular problem is to move on, isn't it, because I

D4GJCHE2                           Donziger - direct

1   am certainly entitled to look at it.

2            MR. MASTRO:  Correct, your Honor.  Right, your Honor.

3   I will be happy to move on.

4   BY MR. MASTRO:

5   Q.  Mr. Donziger --

6            THE COURT:  If both sides would spend a lot less time

7   thinking about what is going to be in the press, everything

8   would be a lot better in this case.

9            MR. MASTRO:  I agree, your Honor.  I didn't appreciate

10  how many lawyers from my firm they --

11           THE COURT:  Mr. Mastro, believe me I said "both" for a

12  reason.

13           MR. MASTRO:  I understand, your Honor.

14  BY MR. MASTRO:

15  Q.  Mr. Donziger, would it be fair to say that you have

16  communication with the lawyers in Ecuador virtually every day?

17  A.  Yes, I work with them.

18  Q.  That you, in fact, exchange several e-mails a day on

19  average with the lawyers in Ecuador, correct?

20  A.  It depends on the day.  I would say my electronic

21  communication with the lawyers in Ecuador has been greatly

22  diminished in quantity since these actions began in this

23  country.

24  Q.  Would it surprise you to know that you exchanged e-mails

25  with lawyers in Ecuador on average three to four times a day?

D4GJCHE2                         Donziger - direct

1    A.   No, that is not very much given we are all working full

2    time on this case, in my opinion.

3    Q.   You're working full time on this case, correct, sir?

4    A.   Close to full time.

5    Q.   Am I correct you also regularly have phone calls to people

6    in Ecuador?

7    A.   On occasion, yes.

8    Q.   And that you also have texts with people in Ecuador?

9    A.   On rare occasion, yes.

10   Q.   And that you travel to Ecuador about once a month, correct?

11              THE COURT:  Come on, we are repeating and repeating.

12              MR. MASTRO:  I understand that.  Your Honor, I am

13   going to try to streamline the rest of the examination, so if

14   we can take a brief break, I will try and expedite the rest of

15   the examination.

16              THE COURT:  All right.  We'll take a short break,

17   about 10 minutes.

18              (Recess)

19              THE COURT:  Okay, let's continue.

20              MR. MASTRO:  Thank your Honor.

21   BY MR. MASTRO:

22   Q.   Mr. Donziger, you testified this morning that there are

23   times when Mr. Fajardo gives you documents to review, correct?

24   A.   Yes.

25   Q.   How often would you say Mr. Fajardo gives you documents to

D4GJCHE2                        Donziger - direct

1    review?

2    A.  Very infrequently.

3    Q.  What kind of documents, pleadings, press releases, what

4    kind of documents?

5    A.  On occasion a pleading that has been filed, on other

6    occasions a draft of a pleading, that sort of thing but very

7    rarely.

8    Q.  When you go to the Selva Viva offices in Quito, the law

9    offices for Pablo Fajardo and other of the Ecuadorian lawyers,

10   do you have an office or a desk you use?

11   A.  No.

12   Q.  Do you bring your own computer with you?

13   A.  Yes.

14   Q.  Do you ever work off of the computers there?

15   A.  No.

16   Q.  Have you ever been denied access to the computers in the

17   Selva Viva office if you needed to look up something there?

18   A.  I don't know if I've ever asked.  I don't believe I have

19   been denied.  I don't believe I have asked for access.

20   Q.  Any paper files there, file cabinets, things like that?

21   A.  Yes.

22   Q.  Have you ever been denied access to look at those paper

23   files at the Selva Viva offices?

24   A.  I don't think I have ever requested to look at those other

25   than when I sought my own documents for the purposes of the

D4GJCHE2                          Donziger - direct

1    1782 production.

2    Q.  You have never been denied access to those files, correct,

3    sir?

4    A.  I don't believe I have ever sought access.

5    Q.  So you have never been denied, correct?

6    A.  That would be correct if I never sought it, yes.

7    Q.  Sir, am I correct that the Ecuadorian lawyers have

8    occasionally referred to you as commander?

9    A.  It's a term of affection, not a term of description of a

10   hierarchy.  That is how I would describe it.  Yes, they have

11   referred to me as that.

12   Q.  And Mr. Fajardo has sent you documents to review in draft

13   and referred to you in those documents as commander, correct,

14   sir?

15   A.  Again I don't know, but if it is, it is a term of

16   affection, not a term I have control over him.  That does not

17   mean that if that is what you're suggesting.

18   Q.  I am just asking whether Mr. Fajardo has ever sent you

19   documents to review and referred to you in the e-mail conveying

20   the document as commander?

21   A.  I don't know.

22   Q.  Mr. Donziger, I am going to hand you what we'll mark as

23   Exhibit 3.

24          MR. MASTRO:  Your Honor, I should, I know this is not

25   a formal trial, but Exhibits 1 and 2, I would ask they the

D4GJCHE2                          Donziger - direct

1    court receive them.

2              THE COURT:  1 and 2 are received without objection.

3              (Plaintiff's Exhibits 1 and 2 received in evidence)

4    BY MR. MASTRO:

5    Q.  I am going to show you, Mr. Donziger, what has been marked

6    as Chevron Hearing Exhibit No. 3, and it is Exhibit 1817 A in

7    the record here.

8    A.  Thank you.

9    Q.  Sir, am I correct this is a December 17th, 2007 e-mail from

10   Pablo Fajardo to you conveying a document that you've requested

11   from an expert in the Ecuadorian case?  Am I correct, sir?

12   A.  It looks like an e-mail sending me a document that I

13   requested, yes.  I don't know what document it is.

14   Q.  Am I correct, sir, that Mr. Fajardo refers to you here as

15   commander, correct, sir?

16   A.  Yes.

17   Q.  Now, that is not the only time that Mr. Fajardo referred to

18   you as commander, is it, sir?

19   A.  We would often call each other commandant, which is a term

20   of affection.  Roughly it is, "Hey, good buddy."

21   Q.  I am simply asking you, sir, a simple yes or no question.

22   A.  I already answered the question.

23   Q.  Mr. Fajardo --

24   A.  Yes.

25   Q.  -- would occasionally refer to you as commander, correct,

D4GJCHE2                         Donziger - direct

1    sir?

2    A.  Yes.

3    Q.  Now, sir, am I also correct that Mr. Fajardo would send you

4    important draft documents about the Ecuadorian litigation for

5    your review at your request?

6    A.  On occasion, yes.

7    Q.  Was he violating Ecuadorian secrecy law when he sent you

8    draft documents from the Ecuadorian case files for you to

9    review?

10   A.  I don't believe so, no.

11   Q.  So it is okay for him to send you anything that he wanted

12   to in draft form out of the Ecuadorian files, that wouldn't

13   violate Ecuadorian secrecy laws, is that your testimony?

14   A.  We were operating under a privilege.  That is the

15   difference.

16   Q.  The distinction you're making is that anything conveyed by

17   the Ecuadorian lawyers from the case files to you would be

18   privileged, so that wouldn't violate Ecuadorian law even though

19   he was sending it to you here in the United States.  Is that

20   your testimony?

21   A.  My testimony is there is a very significant distinction

22   between that and asking him to turn over documents for this

23   case which would violate Ecuadorian law.

24   Q.  Are you an expert on Ecuadorian law, sir?

25   A.  I am not.  Based that on what he told me --

D4GJCHE2                        Donziger - direct

1             MR. KEKER:  Can he finish his answer.

2             THE COURT:  Let him finish his answer.

3    BY MR. MASTRO:

4    Q.  Is there anything you want to add, Mr. Donziger?

5    A.  It is based on what he told me, based on legal analyses

6    what has been done in Ecuador of Ecuadorian law.

7    Q.  We're going to come that, sir.

8             MR. KEKER:  I move to strike the statement.

9             THE COURT:  Overruled.

10   BY MR. MASTRO:

11   Q.  Sir, am I correct that in July of 2010 you asked

12   Mr. Fajardo to send you an executive summary of the court case

13   against Chevron in Ecuador in draft form for you to review and

14   comment on?

15   A.  I don't recall.

16   Q.  I would like to hand the witness what I'll mark as Exhibit

17   No. 4 for this hearing, it is Exhibit 3630 in the record.

18            THE COURT:  Thank you.

19   BY MR. MASTRO:

20   Q.  Sir, am I correct that this is an e-mail from Pablo Fajardo

21   to you, dated July 22, 2010, conveying to you the memorial

22   final, otherwise entitled executive summary of the court case

23   against Chevron in Ecuador that you had requested he send you?

24   A.  Yes.

25   Q.  And he immediately responded the same day to your request,

D4GJCHE2                         Donziger - direct

1    correct, sir?

2    A.  I think that is what the e-mail says.

3    Q.  It attaches that executive summary draft, correct, sir?

4    A.  This document you just gave me has the executive summary

5    draft attached.

6    Q.  Am I correct that when -- strike that.

7            You didn't pull any punches with your Ecuadorian

8    colleagues in ordering them to do things, did you, sir?

9    A.  I would often make my opinion heard in forceful terms

10   through the years, yes.  I don't know what you're talking about

11   specifically.

12   Q.  Am I correct that you wrote to Pablo Fajardo in June 2009

13   and told him that he had to go to Correa to put an end to this

14   S H I T once and for all?

15   A.  I don't know.  It is quite possible I did tell him that.

16   Q.  That is the way you typically would speak to your

17   Ecuadorian co-counsel?

18   A.  No.

19   Q.  Am I correct that in June 2008, you wrote to Mr. Saenz

20   about a draft motion get this done on time and don't F U C K

21   up, please?  Do you remember writing that?

22   A.  No.

23            MR. MASTRO:  We'll mark as Exhibits 5 and 6.

24            (Pause)

25            MR. MASTRO:  Exhibit 5 is in the record.  Exhibit

D4GJCHE2                        Donziger - direct

1    3618, I am sorry, that is Exhibit 6.  It is in the record as

2    Exhibit 3618, and Exhibit 5 is docket entry 9 out of 6.  I'll

3    hand this up to the witness and the court now.

4              (Pause)

5              THE COURT:  Okay.

6              MR. KEKER:  We'll stipulate he used the words S H I T

7    and F U C K in that, we are not contesting.

8              THE COURT:  Thank you.  That is so stipulated that he

9    used those words, Mr. Mastro.

10             MR. KEKER:  In this exhibit.

11             THE COURT:  Thank you.  That is very helpful.

12             MR. KEKER:  I didn't want to say them.

13   BY MR. MASTRO:

14   Q.  That was in giving directions to your --

15             THE COURT:  I think I remember learning once you're a

16   former Marine, Mr. Keker.  I bet you have said them.  Would I

17   be right?

18             MR. KEKER:  I cannot tell a lie.  Yes, I have said

19   them -- in fact, fairly frequently with a lot of adjectives

20   around them.

21             THE COURT:  Nor are you alone at the trial Bar.

22             MR. KEKER:  Right.

23   BY MR. MASTRO:

24   Q.  Mr. Donziger, just to close the loop on this subject, you

25   have used those terms that your counsel just stipulated to in

D4GJCHE2                    Donziger - direct

1    giving directions to your Ecuadorian colleagues in connection
2    with litigation efforts, correct, sir?
3    A.  I don't accept the premise of the question.  I would often
4    urge them to do stuff that I thought needed to be done using
5    cuss words, yes, on occasion.
6    Q.  Now, Mr. Donziger, am I correct that Mr. Fajardo has been
7    very responsive to your requests for information in connection
8    with U.S. litigations where you needed testimony or letters,
9    correct?
10   A.  I think on occasion I or other counsel on our U.S. team
11   have requested information from him, and subject to his
12   analysis, as I understand it, of his obligations under Ecuador
13   law, he has on occasion responded to those requests.
14   Q.  When you needed a declaration in the District of Colorado
15   in the Stratus 1782, it was Mr. Fajardo who gave you that
16   declaration, dated May 5, 2010, correct?
17   A.  He gave that to U.S. counsel, yes.
18   Q.  You're actually the one who helped with editing it and
19   translating it for him, weren't you?
20   A.  I did, yes.
21   Q.  That is the declaration where he said Cabrera wasn't an
22   "independent" expert, correct, sir?
23   A.  I don't know.  I don't have it in front of me.
24   Q.  Am I correct that Mr. Fajardo has come to New York --
25              THE COURT:  Excuse me for a minute.  Was the question

D4GJCHE2                          Donziger - direct

 1   that is the declaration he said Cabrera was an independent
 2   expert or wasn't?
 3            MR. MASTRO:  Was, your Honor.
 4            THE COURT:  I think there is a transcript error.
 5   BY MR. MASTRO:
 6   Q.  I said that's the declaration where Mr. Fajardo swore
 7   Cabrera was an independent expert.
 8            THE COURT:  All right.  With the question restated in
 9   that form, Mr. Donziger, what is your answer?
10   A.  It is the same.  I don't know the answer to that question.
11   I haven't reviewed that affidavit for quite some time.
12            THE COURT:  Let's proceed.
13   BY MR. MASTRO:
14   Q.  Am I correct Mr. Fajardo has come to New York four or five
15   or six times over the course of litigation?
16   A.  I don't know the exact number.  A handful of times, yes.
17   Q.  And that when he comes to New York, he stayed with you in
18   your apartment?
19   A.  I think on at least one occasion he did.  On other
20   occasions, if I remember, correctly he stayed in hotels.
21   Q.  Am I correct Mr. Saenz was here in New York in September of
22   2011?
23   A.  I remember one time he was here in New York.  I don't
24   remember the date.
25   Q.  It was coincided with the Second Circuit argument on the

D4GJCHE2                        Donziger - direct

1    Count 9 appeal, didn't it, sir?

2    A.  I don't remember.

3    Q.  You don't remember him being here in 2011, correct?

4    A.  I remember him being here at one point.  I don't remember

5    the date or year.  It was at least a year ago or maybe longer.

6    Q.  Did he stay with you when he came here?

7    A.  I don't believe so, but he might have.  I don't remember.

8    Q.  Mr. Yanza has also been to New York on several occasions at

9    the request of --

10   A.  Correct.

11   Q.  Has he stayed with you in your apartment?

12   A.  I don't recall.  Maybe on occasion.

13   Q.  How about Mr. Prieto, has he been to New York?

14   A.  I don't know.

15   Q.  When was the last time Mr. Fajardo was in New York, to your

16   knowledge?

17   A.  I don't recall.

18   Q.  Am I correct that -- was it since this litigation was

19   filed?

20   A.  When you say this litigation?

21   Q.  February 2011, this RICO litigation?

22   A.  I don't believe so.

23   Q.  Am I correct after this RICO litigation was filed, you

24   spoke to Mr. Fajardo about sending a letter to this Court

25   demanding a jury trial and reserving defenses?

D4GJCHE2                    Donziger - direct

1    A.  I sent a letter?

2    Q.  No.  You spoke to Mr. Fajardo about sending this Court a

3    letter?

4             THE COURT:  Sustained as to form.  It is not clear as

5    to who the sender was to have been.

6             MR. MASTRO:  I'll rephrase it.

7    BY MR. MASTRO:

8    Q.  Mr. Donziger, am I correct in February 2011, after this

9    RICO action was filed, you spoke to Mr. Fajardo to urge him to

10   send this Court a letter demanding a jury trial, seeking an

11   extension and reserving defenses?

12   A.  Sir, I don't recall.  It is quite possible.  I do not

13   recall.

14   Q.  Are you aware that Mr. Fajardo sent this Court a letter in

15   late February 2011 in English, demanding a jury trial, seeking

16   an extension and reserving defenses?

17   A.  I have a recollection that a letter was sent.  I don't

18   remember specifics about it or even if my recollection is the

19   letter that you're describing.

20   Q.  He doesn't speak English or write in English, correct, sir?

21   A.  That's correct, but he is able to work with translators to

22   understand English --

23   Q.  Someone helped him --

24             THE COURT:  Let him finish the answer.

25             MR. MASTRO:  Certainly, your Honor.

D4GJCHE2                        Donziger - direct

1    BY MR. MASTRO:

2    Q.  -- someone helped him craft that letter to know to use

3    terms like demanding a jury trial, answer and reserving

4    defenses?

5    A.  I think that's true, and if that did happen in the way you

6    describe, I don't know if that was me or some other counsel on

7    our team.

8    Q.  You have no recollection of that one way or the other or

9    you do recall speaking to him?

10   A.  No, I don't.

11   Q.  But someone on the U.S. legal team asked him to do that,

12   correct, sir?

13   A.  I testified I don't recall what you're talking about.  If

14   that did, indeed, happen as you describe it, yes, I assume

15   someone on the U.S. legal team asked him to do that.

16   Q.  Am I also correct that when you needed in late 2010 powers

17   of attorney from Mr. Fajardo because the legitimacy of the

18   representation had been challenged by Chevron, that Mr. Fajardo

19   produced the powers of attorney and even a declaration, dated

20   January 19th, 2011, to submit to this Court, correct?

21   A.  I don't recall.  I do recall requesting a clarified power

22   of attorney at some point.  Whether it was for that purpose,

23   another or both, I don't recall.

24   Q.  And Mr. Fajardo delivered those powers of attorney to you,

25   correct?

D4GJCHE2                      Donziger - direct

1    A.  To the team, yes.

2    Q.  And you were then able to submit them to this Court by

3    January 2011, correct?

4    A.  I don't recall if there was an issue related to a dispute

5    over proper representation.  I would assume he would have done

6    that, yes.

7    Q.  Was he violating Ecuadorian secrecy law by turning over to

8    you powers of attorney between himself and the Ecuadorian

9    clients about his obligations and rights vis-a-vis them?

10   A.  I would assume if he did that, in his estimation, no, he

11   was not violating Ecuador law by doing that.

12   Q.  This isn't the first time -- strike that.

13           Sir, do you know as you sit here today what I mean by

14   the Cordova lawsuit?

15   A.  I believe I do.

16   Q.  Have you ever discussed with Mr. Fajardo the Cordova

17   lawsuit?

18   A.  Not in any substance.  He once mentioned it in passing to

19   me.

20   Q.  When did he mention it in passing to you?

21   A.  Sometime several weeks ago.  I don't remember the date.

22   Q.  That was before there was an order issued by the Ecuadorian

23   court concerning the production of documents in this case?

24   A.  I believe so, yes.

25   Q.  Tell me what Mr. Fajardo told you about the Cordova

D4GJCHE2                     Donziger - direct

1    lawsuit.

2             MR. KEKER:  Objection, your Honor; attorney-client

3    privilege and work product.

4             THE COURT:  I don't see communication between lawyer

5    and client, and let me see counsel at sidebar.

6             (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          THE COURT:  Explain the work product argument.

3          MR. KEKER:  Let me say first what I am concerned about

4   is waiver and a privilege waiver.  Everything that he talks

5   about with Fajardo is joint defense, people representing the

6   same client that have the same interests in protecting those

7   clients.  All of his conversations I consider attorney-client

8   privilege, you don't, but at least they're work product.

9          The answer to this is innocuous.  If you make him

10  answer, I suppose he will, but I don't want it to be a

11  voluntary waiver of anything.  I hope that's clear.  There is

12  nothing here, but I am concerned about Chevron using it later

13  as they have, as claiming waiver as they're doing in that

14  motion we were talking about this morning.

15         THE COURT:  Mr. Mastro.

16         MR. MASTRO:  Your Honor, I don't see how it can be

17  attorney-client communication.  I don't see how it is work

18  product.  He is not involved in the lawsuit at all and it is

19  not going to be a broader waiver.  Mr. Donziger is being told

20  by Mr. Fajardo what Mr. Fajardo is doing separately.

21         THE COURT:  I don't know what he was told, you know?

22         MR. KEKER:  Could I respond to that?  That is too

23  absurd for words.

24         MR. MASTRO:  Thank you for your kindness.

25         THE COURT:  Just cut it out, both of you.

D4GJCHE2                      Donziger - direct

1             I don't know what he is going to say and I don't know

2      what happened, and conceivably he communicated work product and

3      conceivably he communicated what from the standpoint of any

4      privilege protection would be exactly the same as what the

5      soccer scores were in Quito that night; in other words,

6      something that was no reflection of any strategy, opinion, work

7      product, anything like that, and insofar as it might be

8      ordinary work product, I am quite satisfied good cause has been

9      shown and there is no other source for it and you, after all,

10     Mr. Keker, put good faith in issue here.

11             MR. KEKER:  You actually put good faith in issue.  We

12     think there is no question about good faith.

13             THE COURT:  Mr. Keker, you will stop those references

14     to me.

15             MR. KEKER:  Yes, sir.

16             THE COURT:  You will just stop it.  Do you understand?

17             MR. KEKER:  I understand.  I do understand.

18             THE COURT:  All right.  Let's go.

19             (Continued on next page)

20

21

22

23

24

25

D4GJCHE2                          Donziger - direct

1              (In open court)

2              THE COURT:  The objection is overruled.  Please read

3     the question back to the witness.

4              (Record read)

5              THE COURT:  Please answer, Mr. Donziger.

6     A.  Just its existence, nothing of substance.

7     BY MR. MASTRO:

8     Q.  Did he tell you what the status of the litigation was?

9     A.  No.

10    Q.  Did he tell you who the parties were to the litigation?

11    A.  No.

12    Q.  Did he tell you that the first judge on the case had

13    rejected the application?

14    A.  No.

15    Q.  Did he tell you who the plaintiff was in the litigation?

16    A.  No.  He told me nothing about the litigation, only about

17    its existence.

18    Q.  Is it your testimony that you only learned that such a suit

19    had been filed after it had been filed?

20             MR. KEKER:  Objection; argumentative.  I object to the

21    form.

22             THE COURT:  Rephrase it.

23    BY MR. MASTRO:

24    Q.  Mr. Donziger, did you only learn -- strike that.

25             Before the Cordova lawsuit was filed, did you have any

D4GJCHE2                          Donziger - direct

1    discussions with Mr. Fajardo about filing such an action to

2    determine what Ecuadorian law would be on the question of

3    producing documents from the Ecuadorian counsel to Chevron?

4    A.  Other than what I just testified to, no.

5    Q.  Was that conversation before Cordova was filed with

6    Mr. Fajardo?

7    A.  I don't know.

8    Q.  So you may have discussed with him before that action was

9    filed that an action should be filed to determine whether

10   Ecuadorian law -- strike that.

11            The conversation with Mr. Fajardo about the filing of

12   a lawsuit in Ecuador concerning producing Ecuadorian documents

13   to Chevron may have occurred before the lawsuit was even

14   brought?

15   A.  I don't recall the date, sir, as I testified.

16            THE COURT:  He did not ask you the date, Mr. Donziger.

17            To the best of your recollection, was the conversation

18   before the lawsuit was filed or afterward?

19            THE WITNESS:  I don't know.  I don't even know when it

20   was filed.  I don't have a date on when it was filed.  I don't

21   know when it was filed.

22   BY MR. MASTRO:

23   Q.  When, approximately, do you believe you had this

24   conversation with Mr. Fajardo?

25   A.  A few weeks ago.

D4GJCHE2                         Donziger – direct

1   Q.  When you had that conversation with Mr. Fajardo, did you

2   convey the substance of the conversation to your lawyer in this

3   case?

4           MR. KEKER:  Excuse me.  That is attorney-client

5   privilege, and I object on that ground.

6           THE COURT:  I'll give you a voir dire if you would

7   like to try to establish that it is covered by the

8   attorney-client privilege, Mr. Keker.  It is your burden.

9           MR. KEKER:  Sure.

10           THE COURT:  Without leading, please.

11  VOIR DIRE EXAMINATION

12  BY MR. KEKER:

13  Q.  Mr. Donziger, am I and others in my firm your lawyer in

14  this case?

15  A.  Yes.

16  Q.  Do we sometimes have conversations about the substance of

17  the case?

18  A.  Yes.

19  Q.  Would any conversation we have about what is going on in

20  Ecuador be, as far as you're concerned, attorney-client

21  communications?

22  A.  Yes.

23           THE COURT:  Anything else, Mr. Keker?

24           MR. KEKER:  No, your Honor.

25           THE COURT:  Overruled.  Answer the question.

D4GJCHE2                         Donziger - direct

1              THE WITNESS:  I don't recall.

2     DIRECT EXAMINATION (Continued)

3     BY MR. MASTRO:

4     Q.  Do you know when your lawyers in this case became aware of

5     the filing of the Cordova lawsuit?

6     A.  No.

7     Q.  Did you ever discuss with your lawyers the filing of the

8     Cordova lawsuit?

9     A.  No.

10             MR. KEKER:  The same objection.

11             THE COURT:  I will sustain that.  The answer is

12    stricken.

13    BY MR. MASTRO:

14    Q.  When Mr. Fajardo told you about the Cordova lawsuit, did

15    you consider intervening yourself in that lawsuit so the

16    Ecuadorian court would know of your unique interest in

17    producing the Ecuadorian documents?

18             MR. KEKER:  Asked and answered.  He has been over

19    this.

20             THE COURT:  I think so.  Sustained.

21    BY MR. MASTRO:

22    Q.  Mr. Donziger, when Mr. Fajardo told you about the Cordova

23    lawsuit, were you concerned that that lawsuit be considered

24    collusive?

25    A.  I don't understand your question.  Collusive as to what?

D4GJCHE2                          Donziger - direct

1    Q.  Was there anyone in that lawsuit as far as you were aware,

2    that Cordova lawsuit, who was advocating zealously for

3    production of the Ecuadorian documents?

4    A.  Sir, I really don't know much about that lawsuit at all

5    other than what Mr. Fajardo said and what I've since read.  The

6    answer is I have no idea who was advocating for who, what the

7    proceedings were, who showed up in court.  I know none of that.

8    Q.  Are you aware it was argued by the petitioner in that case

9    that production of the Ecuadorian documents to Chevron "would

10   cause us irreparable harm with disastrous consequences?

11             MR. KEKER:  Objection; no foundation.

12             THE COURT:  Overruled.

13   A.  No.

14   BY MR. MASTRO:

15   Q.  Does that concern you that that argument was made in the

16   Cordova lawsuit?

17             MR. KEKER:  Objection; no foundation and irrelevant.

18             THE COURT:  Well, there is plenty of foundation, but

19   I'll sustain the objection anyway.

20   BY MR. MASTRO:

21   Q.  Sir, were you aware that the petitioner in the Cordova case

22   argued that, "the information that the oil company is demanding

23   seriously threatens the rights of the inhabitants of the

24   Ecuadorian Amazon."

25             Are you aware that was the argument that was made?

D4GJCHE2                    Donziger - direct

1   A.  No.

2   Q.  Sir, you say that you've not personally reviewed the

3   Ecuadorian lawyer's files in the Selva Viva office, correct?

4   A.  Sir, you have to be more specific when you say, "files."

5   What are you talking about?

6   Q.  The documents that Chevron seeks produced from the

7   Ecuadorian lawyer's files in the Selva Viva files, it is your

8   testimony that you haven't actually reviewed those documents

9   yourself, correct, sir?

10  A.  I have not accessed the computer files of Mr. Fajardo with

11  the other lawyers to review their documents, no, I have not.

12          THE COURT:  What about paper?

13          THE WITNESS:  The answer is there's very little paper.

14  These are the way lawyers down there work is with computers and

15  electronic files.  Even stuff in court now is filed

16  electronically down there.

17          THE COURT:  What about the paper?

18          THE WITNESS:  I did not review paper.  I asked, as I

19  mentioned, Mr. Fajardo.  We made a formal request through a

20  letter for all production which includes paper, and he

21  concluded, based on his analysis, he couldn't do it because it

22  would violate Ecuador law.

23          THE COURT:  Thank you.  Go ahead.

24  BY MR. MASTRO:

25  Q.  So as you sit here today, you can't say one way or the

D4GJCHE2                          Donziger - direct

 1   other whether the production of those Ecuadorian files to

 2   Chevron, "would cause us irremediable harm with disastrous

 3   consequences," correct, sir?

 4   A.   What I can say is --

 5   Q.   That is a yes or no, sir.

 6   A.   I can't answer that question yes or no, so I am not going

 7   to.

 8   Q.   Then I withdraw the question.  I will ask a simple yes or

 9   no question.

10           As you sit here today, can you say one way or the

11   other whether the information that the oil companies demanded

12   seriously threaten the rights of the inhabitants of the

13   Ecuadorian Amazon, yes or no?

14   A.   I believe it does by violating their confidentiality with

15   their attorneys based on a legal analysis done in Ecuador by

16   our local counsel.

17   Q.   Now, sir, this isn't the first time that the legal team

18   representing the Aguinda plaintiffs has considered the gamut of

19   going into court in Ecuador to get an order to preclude U.S.

20   discovery, is it, sir?

21   A.   I wouldn't characterize it as a gamut, sir.

22           THE COURT:  Rephrase the question.

23   BY MR. MASTRO:

24   Q.   This is not the first time that you all on the Aguinda

25   legal team have considered going into court in Ecuador to get

D4GJCHE2                        Donziger - direct

1    orders to preclude production of Ecuadorian documents in U.S.

2    proceedings, is that correct, sir?

3              MR. KEKER:  As framed, it calls for work product, your

4    Honor.

5              THE COURT:  Give me a moment.

6              (Pause)

7              THE COURT:  Put a time-frame on it.

8    BY MR. MASTRO:

9    Q.  Since 2010, January 2010, this isn't the first time that

10   the legal team representing the Aguinda plaintiffs has

11   considered going into court in Ecuador to try to get an order

12   to preclude production of documents in the United States?

13             MR. KEKER:  The same objection, plus the time-frame is

14   too broad for this hearing.

15             THE COURT:  The latter is certainly right.  I take it,

16   Mr. Mastro, you are referring to material that has already been

17   produced --

18             MR. MASTRO:  Correct, your Honor.

19             THE COURT:  -- in relation to the possibility of an

20   attempt some years ago to shut down the Stratus and possibly

21   other 1782 proceedings by an application to the Ecuadorian

22   court.  Am I right?

23             MR. MASTRO:  That's correct, your Honor.

24             THE COURT:  Let's frame it appropriately.

25   BY MR. MASTRO:

D4GJCHE2                    Donziger - direct

1    Q.  Am I correct, Mr. Donziger, that in March 2010 Julio Prieto

2    wrote to you and Mr. Fajardo and Mr. Saenz and proposed that --

3    in fact, said the Ecuadorian lawyers had decided, "to file a

4    writ of protection before a judge in Ecuador asking the judge

5    to write to the judge in Denver not to reveal the

6    correspondence with Stratus because this would affect our

7    fundamental rights"?

8    A.  Do I remember that, is that your question?

9    Q.  Yes, sir.

10   A.  I have a recollection that happened, yes.

11   Q.  That was in the same e-mail Mr. Prieto said if the Stratus

12   documents came out, we might all go to jail, correct, sir?

13   A.  I don't recall.

14   Q.  He went on to tell you at that time "this is an idea that

15   may not work, but with perhaps with adequate support we can do

16   it."Do you remember that, sir, in that e-mail?

17           MR. MASTRO:  We'll mark this as Exhibit 7 in the

18   hearing, your Honor.

19           (Pause)

20   BY MR. MASTRO:

21   Q.  Sir, this is a March 30, 2010 e-mail from Mr. Prieto to you

22   and Mr. Yanza and Mr. Fajardo.  Do you see that, sir?

23   A.  Yes.  .

24   Q.  Do you see where he writes to you about the Stratus

25   production ordered in Denver, that "the effects are potentially

D4GJCHE2                         Donziger - direct

1    devastating in Ecuador.  Apart from destroying the proceeding,

2    all of us, your attorneys, might go to jail."

3            Do you see that, sir?

4    A.  I see where he wrote that, yes.

5    Q.  Isn't it the case he then proposed to you and the others --

6    in fact, said it had already been decided "to avoid this, we

7    have decided to file a writ of protection before a judge in

8    Ecuador, asking the judge to write to the judge in Denver not

9    to reveal the correspondence because this would affect our

10   fundamental rights," do you see that, sir?

11   A.  Sir, I stipulate he wrote this e-mail.  I don't know what

12   you're getting at.

13   Q.  Thank you.  He acknowledged to you it is an idea that may

14   not work, but with adequate support, perhaps --

15           THE COURT:  Mr. Mastro, it says what it says.

16           MR. MASTRO:  I understand.

17           THE COURT:  If you have another question, let's get to

18   it.

19   BY MR. MASTRO:

20   Q.  Am I also correct there was a 1782 proceeding in the

21   District of Columbia involving Alberto Wray?

22   A.  I remember such a proceeding.

23   Q.  You were involved in that proceeding, correct?

24           You were following that proceeding, correct?

25   A.  Not very much, no.

D4GJCHE2                          Donziger - direct

1   Q.  Wray was the head lawyer for the Ecuadorian plaintiffs

2   before you fired him and had Mr. Fajardo take over, correct?

3   A.  Sir, I did not fire Mr. Wray.  Yes, at one point he was the

4   chief lawyer in Ecuador before Mr. Fajardo became the lawyer.

5   Q.  Did you ask Mr. Wray at any point to produce his documents

6   from Ecuador in response to Chevron's first request for

7   document production?

8   A.  You're confusing me.  In response to Chevron's request for

9   document production in this case?

10  Q.  Yes, did you ask Mr. Wray to produce his documents from

11  Ecuador?

12  A.  No.  Mr. Wray is represented by counsel.

13  Q.  Sir, am I correct that in the 1782 proceeding against

14  Mr. Wray in the District of Columbia, he made this very same

15  argument that Ecuadorian secrecy laws prevented him from being

16  able to produce the Ecuadorian documents?

17  A.  I don't know what arguments Mr. Wray made.  As I sit here

18  today, I don't know.

19  Q.  Am I correct that Judge Patelli rejected that argument, and

20  Mr. Wray then produced his documents from Ecuador in response

21  to that 1728 proceeding, correct?

22  A.  Sir, I have no knowledge of any of that.

23  Q.  And Mr. Wray has not been charged, gone to prison, faced

24  any consequence from having produced those Ecuadorian

25  documents, has he, sir?

D4GJCHE2                    Donziger - direct

```
 1   A.  Sir, I have no idea.
 2            MR. MASTRO:  No further questions.
 3            THE COURT:  All right.  Thank you.  Mr. Keker.
 4            MR. KEKER:  Could I get some guidance from the court
 5   about when we'll take the lunch break?  I am prepared to go
 6   forward as long as you want.  I am wondering about timing?
 7            THE COURT:  30 to 45 minutes.
 8            MR. KEKER:  Great, thank you.
 9   CROSS-EXAMINATION
10   BY MR. KEKER:
11   Q.  Mr. Donziger, you heard Judge Kaplan say that Chevron's
12   theory is that you control Fajardo and other people in Ecuador.
13   Did you hear that?
14            THE COURT:  That would be an inaccurate summary of
15   what I said, counselor.
16            MR. MASTRO:  Objection, your Honor.
17   BY MR. KEKER:
18   Q.  Do you control Pablo Fajardo and what he does with respect
19   to this case?
20   A.  No.
21   Q.  Have you ever controlled Pablo Fajardo and the legal team
22   down there?
23   A.  No.
24   Q.  When did you meet Pablo Fajardo?
25   A.  I met Mr. Fajardo several years ago, probably in the early
```

D4GJCHE2                    Donziger - cross

1  stages of the Ecuador phase of the case in 2003 or 2004.

2  Q.  Can you tell Judge Kaplan what the relationship, what his

3  role was when he started and what his relationship with

4  Mr. Yanza, with Selva Viva, the Amazon Defense Fund is?

5  A.  Mr. Fajardo was working as a member of our legal team under

6  Dr. Wray, who is a former Supreme Court Justice in Ecuador.

7  Our initial (Spanish) a very formal term under Ecuador law

8  meaning the lawyer who actually appears in court and represents

9  the clients and has the authority.

10        Over time when the case began and judicial inspections

11  began in the field, in the Amazon rain forest, it was apparent

12  Dr. Wray wanted to phase into a different kind of role, not

13  that role because of the, I think the amount of work required

14  was more than anyone had anticipated, so at that point, I think

15  around 2004 or 5, Mr. Fajardo took over the role of (Spanish).

16  At that point he became the lead lawyer in Ecuador.

17  Q.  Who is Mr. Yanza and what is Mr. Fajardo's relationship

18  with Mr. Yanza?

19  A.  Mr. Yanza is a non-lawyer who, through the course of the

20  litigation, beginning in the early 1990's, served as the lead

21  organizer for the indigenous and farming communities in Ecuador

22  affected by Texaco's obligation.

23  Q.  What is Selva Viva?

24  A.  Selva Viva is an administrative entity created in Ecuador

25  used as a conduit for funds that were paid to support the case

D4GJCHE2                      Donziger - cross

1    in Ecuador.

2    Q.  What is the Amazon Defense Fund and their relationship to

3    the other people you were talking about?

4    A.  The Amazon Defense Fund is otherwise known as the Frente in

5    Ecuador, is the non-profit, non-governmental organization based

6    in this region of Ecuador that exists to assert the rights of

7    the people with regard to environmental protection and

8    correcting environmental injustice, but it is not a legal

9    organization; it is a community-based advocacy organization.

10   Q.  Has your relationship with these people changed over the

11   years and in particular since the 1782 was filed?

12            MR. MASTRO:  Objection, your Honor.  He is leading

13   him.  It is his witness.  He should ask him open-ended

14   questions.

15            THE COURT:  Overruled.

16   A.  Yes, the relationship has evolved.  I would say it has

17   changed significantly since the 1782 process was ordered by

18   this Court to turn over my entire case file.

19            Then subsequent to that, when the RICO case was filed,

20   that was I believe the Fall of 2010, a few months later when

21   this action, this RICO action was filed, I would say the

22   relationship changed still further, such that the clients,

23   while we continued to work together on broad strategic issues,

24   have to some significant degree tried to distance themselves

25   from me in terms of our degree of collaboration.

D4GJCHE2                    Donziger - cross

1   Q.  Did you learn anything about the reaction of the people in

2   Ecuador, starting with Pablo Fajardo, to the fact that this

3   Court issued a preliminary injunction against you soon after

4   this RICO case was filed?

5   A.  Yes.

6   Q.  Can you tell us what you learned about their reaction?

7            THE COURT:  I am sorry.  Tell us what who learned

8   about whose reaction?

9            MR. KEKER:  What Mr. Donziger learned about his

10  clients and his associated lawyer's reaction to the preliminary

11  injunction decision in this case.

12           THE COURT:  Okay.  So I understand the rules of

13  evidence are not strictly applied here, but basically we're

14  into multiple hearsay, right?

15           MR. MASTRO:  Yes.

16           MR. KEKER:  I don't think so because we are not trying

17  to prove the truth of the matter.  What we are trying to do is

18  establish Mr. Donziger's understanding of his lack of control

19  over people in Ecuador, exactly contrary to what Mr. Mastro was

20  trying to prove.

21           THE COURT:  Okay.  You may answer the question.

22  A.  So the decisions made in this Court both in the 1782 action

23  against me as well as in the RICO action, including the

24  preliminary injunction, led to a situation where the clients

25  concluded that they could not get a fair hearing in this Court,

D4GJCHE2                         Donziger – cross

```
 1    and they concluded that comments, no disrespect, your Honor,
 2    but comments made by this Court in the context of various
 3    actions related to the Ecuador case were inappropriate, unfair
 4    and very prejudicial to them.  I think they lost complete faith
 5    in this process.
 6    BY MR. KEKER:
 7    Q.  Did you have any understanding as the RICO case began,
 8    after you made your broad discovery in the 1782 actions, after
 9    you had been deposed for 16 days, did you have any
10    understanding about whether or not Mr. Fajardo and the rest of
11    his and your clients were interested in participating in these
12    proceedings before they had been sued by Chevron?
13    A.  They concluded, based on what I just said, that this Court
14    would not have jurisdiction over them, could not exercise
15    jurisdiction over them and that they, as a result of that and
16    some other reasons, they would not appear.  That is what they
17    told me.
18                (Continued on next page)
19
20
21
22
23
24
25
```

D4gdche3                    Donziger - cross

1   BY MR. KEKER:

2   Q.  Now, did the issue of surveillance of you by Chevron come

3   up over the last couple of years?

4   A.  Yes.

5   Q.  And what do you know about surveillance of you by Chevron

6   over the last couple of years?

7           MR. MASTRO:  Objection, your Honor.

8           THE COURT:  Sustained.

9   Q.  Well, do you know whether or not surveillance of you by

10  Chevron has affected your relationship with your clients and

11  Mr. Fajardo and others?

12          MR. MASTRO:  Objection.

13  A.  Yes.

14          THE COURT:  The objection is sustained.  The answer is

15  stricken.

16          Proceed.

17          MR. KEKER:  Could I be heard at sidebar, your Honor?

18          THE COURT:  I don't think so, sir.  I have already

19  read what you submitted on this.

20  Q.  Based on -- well, let's go to this.

21          Based on what you know about what's going on in

22  Ecuador, is it conceivable that Chevron did not know about this

23  case that was pending that is the subject of this hearing?

24          MR. MASTRO:  Objection.

25          THE COURT:  Sustained.

D4gdche3                    Donziger - cross

1          MR. KEKER:  Could I make an offer of proof on that,

2     your Honor?

3          THE COURT:  You can do that at the sidebar.

4          MR. KEKER:  OK.  Should we do it now?

5          THE COURT:  Yes.

6          (At the sidebar)

7          MR. KEKER:  The offer proof is that Mr. Donziger would

8     testify, if he were permitted, that he is personally aware of

9     surveillance of him in Ecuador.  He is now aware of additional

10    surveillance because Ecuador has just gotten all of his customs

11    records, apparently, which we understand is in violation of

12    Ecuadorian law and probably can't be done without bribery,

13    which would be a Foreign Corrupt Practices Act violation; that

14    he is personally aware of surveillance that's being done by

15    them of him here; that given the level of surveillance, the

16    work of Kroll, Sam Anson, and other investigative companies in

17    Ecuador, it is simply inconceivable, since they followed

18    Fajardo around, they followed Donziger around, that they didn't

19    know about Fajardo, this case, this Cordova case, and that it's

20    probably --

21         THE COURT:  Keep your voice down.

22         MR. KEKER:  -- highly likely that they already have

23    Fajardo's files and are trying through this proceeding to find

24    a way to legitimize them since they got them illegally by

25    hacking.

D4gdche3                    Donziger - cross

1              MR. MASTRO:  I know Mr. Keker is from California.

2      There is something different in the air there.  That is

3      fantasy.  These are official public records.  This is migration

4      forms that we obtained by making a request to the government.

5      But everything turned out to be illegal when you get

6      information out of Ecuador.  It is not illegal.

7              Number two.  We are not going to speak to the

8      surveillance.  I am not going to waive privilege, like he just

9      did with the line of questions that he did with Mr. Donziger

10     about what conclusions and thoughts they had about these

11     proceedings, we'll come back to that later.  But thank you,

12     Mr. Keker.  The fact of the matter is that there is no

13     substance to what he is saying.  There is no substance to it.

14     We didn't know about it.

15             If we had known about it, we would have been in here

16     in a red hot second.  We would have wanted to appear.  We would

17     have wanted to be represented there.

18             That is a crazy, crazy notion.  So if we are going to

19     be in fantasyland, that is one thing.  But the reality is

20     surveillance is irrelevant to this.  We didn't know about these

21     proceedings beforehand, the migration records.  So damning to

22     his case, because he has had trips to Ecuador every month, even

23     more often than he did before the lawsuit was brought, as

24     opposed to his testimony.  It is just, your Honor, I don't even

25     know where to begin to say how ludicrous this is.

D4gdche3                        Donziger – cross

1            THE COURT:  The keyword was irrelevant.

2            Sustained.

3            MR. MASTRO:  Thank you, your Honor.

4            THE COURT:  And I am going to rule on the protective

5    order motion now.

6            (In open court)

7            THE COURT:  Because it is implicated by the ruling I

8    made and the ruling that I adhere to at the sidebar, I will

9    rule on a pending motion before me that has been fully briefed

10   both by the plaintiff and the defendants, and that is Chevron's

11   motion, which they style one for a protective order, which is

12   actually a motion in limine, to preclude the defendants from

13   calling Mr. Mastro, Anne Champion, who are the Chevron

14   officers, employees, contractors, or agents most knowledgeable

15   about electronic, visual or other surveillance for purposes of

16   this hearing.

17           Chevron, as I indicate, moves to preclude any such

18   evidence.  The witnesses, according to the defendants,

19   supposedly go to the question of whether the defendants'

20   failure to notify either Chevron or this Court of their

21   commencing what has been referred to as the Cordova litigation

22   in Ecuador, the object of which was to obtain a court ruling in

23   Ecuador prohibiting Fajardo, and others, from complying with

24   discovery in this case, quote, had some effect on the instant

25   litigation, close quote.  The quote is from the defense brief.

D4gdche3                    Donziger - cross

1           The defendants speculate that Chevron has engaged in

2    surveillance of the Ecuadorian counsel and, of course, as we've

3    just heard, Mr. Donziger.  They speculate that it is so

4    pervasive that it is inconceivable that Chevron was unaware of

5    the Cordova litigation.  They speculate even further in their

6    papers that Chevron may have had access to Mr. Fajardo's

7    computer through electronic surveillance and, thus, presumably

8    were not surprised when suddenly a decision in the Cordova

9    litigation in Ecuador was disclosed by them.

10          The first proposition is that that entire argument

11   comes entirely too late.  Chevron moved for sanctions based on

12   the alleged failures of the defendants to comply with their

13   discovery obligations and my Order.  On the 12th of March, the

14   motion rested in part on the defendants' behavior in respect of

15   the Cordova litigation, including, but not limited to, the

16   contention by Chevron that the Cordova litigation was brought

17   without disclosing the fact that it had been brought either to

18   the Court or to Chevron.

19          The defendants responded on March 26th.  Nowhere in

20   their papers did they suggest that Chevron knew of the Cordova

21   litigation any earlier than Chevron said, whether by

22   surveillance of Fajardo or anybody else or Fajardo's computer.

23   The briefing was fully closed on April 2nd.  These contentions

24   now are too late.

25          Furthermore, the speculations -- and I refer to them

D4gdche3                          Donziger - cross

advisedly -- are unsupported by a single affidavit,

declaration, or other evidence at least in the papers submitted

by defendants recently or at this hearing.

          Secondly, putting aside the question that the entire

argument is untimely, this hearing was scheduled to consider

only specific questions relating to Chevron's motion for

sanctions, including the defendants' good faith and their

practical ability to produce the Ecuadorian documents.  The

subjects as to which the defendants allegedly wish to question

those Chevron witnesses that are the subject of the motion and

Mr. Donziger at the moment are not at all relevant to this

hearing.

          Furthermore, the suggestion, which is made in their

papers, that my order requiring that any of the counsel in this

case who were sought by the adversaries as witnesses had to

show up constituted a predetermination, that anything that

either side might wish to examine opposing counsel about

necessarily was relevant, or would be relevant, is simply not

worthy of slightest degree of credence.

          But all of that is relatively minor compared to the

most important point.

          The most important point is that the question before

this Court is whether these defendants should be sanctioned for

their alleged defiance of their discovery obligations under the

laws of the United States and this Court's order that they

D4gdche3                    Donziger - cross

produce responsive documents, whether they are in Ecuador or

anywhere else.  Among the issues pertinent to that

determination are whether these defendants have practical

control over those documents and whether these defendants have

acted in good faith.

        What Chevron knew and when it knew it about the

Cordova litigation simply has no bearing on whether the

defendants have control of the documents or acted in good

faith.  It is a red herring.

        Furthermore, the defendants' suggestion that on the

assumption, for the purposes of discussion, that the defendants

in fact do control the documents in Ecuador and that they in

fact have acted in bad faith in disclosing relevant evidence in

this litigation would somehow matter simply because Chevron,

hypothetically, was aware of one little bit of what was going

on down there in Ecuador -- and I refer to the Cordova

litigation -- earlier is simply without merit.  It's just

entirely without merit.  So that subject is entirely off

limits.

        Mr. Keker, you may continue your examination.

        MR. KEKER:  Thank you, your Honor.

BY MR. KEKER:

Q.  Did you initiate the Cordova litigation, Mr. Donziger?

A.  No.

Q.  Did you have anything to do with initiating it?

D4gdche3                          Donziger - cross

1   A.  No.

2   Q.  We were talking about changes in your relationship with

3   Fajardo and others down there.  Was there any other factor

4   after the filing of the RICO case, the issuing of a preliminary

5   injunction, your order to turn over all your documents in the

6   1782 case, was there any other factor that has changed your

7   relationship with them?

8   A.  Yes.

9   Q.  What is it?  Would you explain to the Court, please?

10  A.  Yes, I will.  My role in Ecuador has always been from the

11  beginning vis-a-vis the local legal team one of an advisor, not

12  a person in control or in command of decisions.  There have

13  been times through the years when I had a lot of influence.  I

14  think the lawyers in Ecuador when I give advice assess it and

15  decide whether they believe it is within the interest of the

16  clients to take it.

17          I have never had the authority to order an Ecuador

18  lawyer to do something, to file something in court, to give me

19  stuff that he or she would not decide to do on his or her own.

20          Over time, with the decisions by this Court for me to

21  turn over my entire case file, as well as the filing of the

22  RICO case, my advice to the clients I believe has had a

23  significantly diminished degree of influence as a result of the

24  position that I'm put in, and I believe deliberately put in, by

25  my adversaries at Chevron.

D4gdche3                        Donziger - cross

1              So at this point to me it is preposterous to think

2      that I can order Pablo Fajardo to turn over his case file to

3      me.  He has made his own decision based on his own analysis,

4      and I do not have any ability to do that other than to continue

5      asking him and hear the same reasons why he can't.

6              MR. MASTRO:  Your Honor, I move to strike.  That's not

7      a factor; that was a speech.  He didn't say anything that had

8      actually happened that was a factor.  He just gave a

9      self-serving speech, so I move to strike it.

10             THE COURT:  I will take it for what it is worth,

11     Mr. Mastro.

12             MR. MASTRO:  OK.  Thank you, your Honor.

13             THE COURT:  I understand that is his position.

14     BY MR. KEKER:

15     Q.  Well, Mr. Donziger, has Mr. Fajardo made his position

16     plain, in your mind at least, about whether or not he is

17     interested and willing to participate in discovery in this

18     case --

19     A.  Yes, he has.

20     Q.  -- with these documents?

21     A.  Yes, he has.

22     Q.  Do you remember -- let me show you what is attached as

23     Exhibit -- I'm sorry, I don't have copies of this, your

24     Honor -- this is Exhibit 3522 to Chevron's motion for

25     sanctions.

D4gdche3                      Donziger - cross

1              MR. KEKER:  Can I give this to the witness?

2              THE COURT:  Well, as soon as you tell me what exhibit

3      it really is, because I have Chevron's motion and I don't have

4      anything attached to it that's numbered 3522, I don't think,

5      unless there is something I am not aware of.

6              (Pause)

7              I see.  The tabs don't -- I think I may have it.  Let

8      me see.

9              MR. KEKER:  I was told that these tabs are all sort

10     of --

11             THE COURT:  They are constructively -- there is a 35

12     in front of them imaginarily; is that right?

13             MR. KEKER:  I don't know.  Mine is marked 3522.  This

14     is what my office gave me.  It is the letter -- it is a

15     March 2, '11 letter from Mr. Fajardo to you.

16             THE COURT:  Mr. Mastro, maybe you know where in your

17     exhibit binder this is.

18             MR. KEKER:  May I show you mine, your Honor?  I will

19     give you mine.

20             MR. MASTRO:  I am having it pulled now, your Honor.

21             THE COURT:  Oh, I see.

22             All right.  I have found it now.  Thank you.

23             MR. KEKER:  May I approach the witness and give him a

24     copy of it?

25             THE COURT:  Yes.

D4gdche3                        Donziger - cross

1          MR. KEKER:  Thank you.  And now I don't have a copy

2     but I will ask a question about it.

3          MR. MASTRO:  Can I get a copy of it?

4          MR. KEKER:  If I can't get a copy, I doubt you can get

5     a copy.  You have to look at your motion, sir.  I don't have a

6     copy.  I am here alone.

7          THE COURT:  Put it on the document camera.

8          MR. KEKER:  Your Honor, Mr. Mastro is here to argue a

9     motion that he filed, and this is an exhibit to his motion.  He

10    must be able to put it in front of him.

11         THE COURT:  Look, Mr. Keker, we could do without that.

12         MR. KEKER:  Sorry.

13         (Pause)

14         THE COURT:  All right.  Everybody have it?

15         MR. KEKER:  Everybody but me, your Honor.

16         THE COURT:  Everybody but you?

17         MR. KEKER:  No.  I've got it.  Mine, I know what is in

18    it.

19    BY MR. KEKER:

20    Q.  Is this a letter dated March 11, 2011 that Mr. Fajardo

21    wrote at the beginning of the -- relatively close to the

22    beginning of the RICO case to Judge Kaplan?

23    A.  Yes.  It is dated March 2, 2011, yes.

24    Q.  And did you see that letter sometime around there?

25    A.  I believe I did, yes.

D4gdche3                        Donziger - cross

1    Q.  And were you aware of whether or not Mr. Fajardo was

2    going -- accepted the jurisdiction of the Court or was going to

3    participate in the RICO case?

4    A.  Yes.

5    Q.  Did that letter tell you what the answer to that was?

6    A.  Yes.

7    Q.  And what was Mr. Fajardo's position, according to that

8    letter, about participation in the RICO case?

9    A.  The answer was no, and he said he vigorously opposes the

10   exercise of this Court's jurisdiction over him and his

11   colleagues.

12   Q.  Now, are you aware as time went on that Mr. Fajardo made

13   statements in the press and otherwise, statements that in many

14   cases Chevron would bring to the attention of Judge Kaplan,

15   about what he thought of the proceedings in the RICO case?

16   A.  Yes.

17   Q.  And would you look at in that same volume, 3525 -- and we

18   don't have to go into the details of it.

19          MR. KEKER:  Can I go up there with him, your Honor,

20   and show him 3525?

21          THE COURT:  No.  You can direct his attention.

22   Q.  3525.  And I think on the second page, it is a transcript

23   that Chevron has provided about Mr. Fajardo's statements.  Can

24   you tell us when the statements were made from looking at that

25   exhibit?

D4gdche3                        Donziger – cross

1    A.   Yes.

2    Q.   When?

3    A.   October 23rd, 2012, I believe.

4    Q.   And in it, in the second page, are there -- is there a

5    transcription, a translation of what Mr. Fajardo had to say

6    about this Court -- you don't have to read it, just tell me

7    whether or not there is a description of what he is saying

8    about this Court and what he thinks of these proceedings.

9    A.   There is such a description.

10   Q.   OK.  You don't need to read it.  It is there in the record

11   of the case.

12            From these and other communications that Mr. Fajardo

13   had in the press and publicly, did you gain an understanding of

14   whether or not he had any interest in turning over his files to

15   Chevron as a result of discovery in this case?

16            MR. MASTRO:  Objection to form, your Honor.  He keeps

17   saying his files.  They are co-counsel for plaintiffs.

18            THE COURT:  Look, I understand entirely.  Mr. Keker

19   wants to make a record here that Mr. Fajardo is, at least for

20   the public record, hostile to the exercise of jurisdiction by

21   this Court regardless of what the laws of the United States

22   are, regardless of the fact that he is a defendant in this

23   case, regardless of the fact that there is a default

24   outstanding against him, and I'm going to let him do it.  I

25   mean, there it is.

D4gdche3                          Donziger - cross

1           MR. MASTRO:  I understand, your Honor.  It is just

2    they are not his files.  They are not Fajardo's files.  That's

3    all.

4           THE COURT:  I understand.

5           Go ahead.

6    BY MR. KEKER:

7    Q.  Let me explore that just a second.

8           Fajardo is your co-counsel with respect to the

9    litigation; you represent the same people, is that right?

10   A.  We represent the same people but I work for him; he does

11   not work for me.

12   Q.  OK.  Can you tell him what to do with respect to this

13   litigation?

14   A.  I can make suggestions, and I'd like to think my

15   suggestions have mattered to him and have influence over him,

16   but I cannot order him to do anything with respect to this

17   litigation.

18   Q.  At the time that Judge Kaplan issued his order, his

19   April -- or, excuse me, February 14 order, I guess, did you ask

20   your attorneys to write to Mr. Fajardo and say please give us

21   the files that are called for by Chevron?

22   A.  Yes.

23   Q.  Yes.  And was his response a surprise to you?

24   A.  No.

25          MR. KEKER:  Your Honor, I am referring to the

D4gdche3                    Donziger - cross

February 14 letter, which was written by me.  It is Exhibit A

to Mr. Donziger's response to the Court Order of February 13

regarding Ecuadorian documents, and that's Exhibit -- it is

docket number 787.  It is my letter.

       And it says, among other things, "I write on behalf of

Mr. Donziger and his firm to ask you to notify me immediately

whether or not you, or any other persons or entities associated

with the litigation in Aguinda v. Chevron will provide to us

the materials sought by Chevron on the schedule set forth by

Judge Kaplan in the enclosed Order."

BY MR. KEKER:

Q.  Was that letter sent in bad faith?

A.  Absolutely --

       MR. MASTRO:  Objection.

       THE COURT:  Overruled.

Q.  Did you believe that you were carrying out your

responsibilities under Judge Kaplan's Order by telling your

attorneys to write to Fajardo and ask him to check with all his

clients about whether or not they were going to comply with the

Judge's order up here to turn over the documents in Ecuador in

this case?

A.  Yes.  That was the entire purpose of that letter.

Q.  And then Mr. Fajardo wrote back in a letter dated

February 18 -- and that is Exhibit B to that same exhibit, your

Honor, 787 -- and in it he makes plain -- I mean, he says -- I

D4gdche3                          Donziger - cross

1   don't know if he makes plain but he says, "We are not attorneys

2   for Steven Donziger.  It's obvious that" -- well, you can read

3   it.  "It is obvious that Judge Louis Kaplan, induced by Chevron

4   Corporation, is very much mistaken and falsely asserting that

5   we attorneys in Ecuador are attorneys and agents of Mr. Steven

6   Donziger."

7              This is completely untrue.

8              Did you put him up to saying that?

9   A.  No.

10  Q.  Did you tell him what to say?

11  A.  No.

12  Q.  Does Pablo Fajardo have a mind of his own?

13  A.  Yes.

14  Q.  Is that what -- as far as you know what he said, as opposed

15  to something that you made him say?

16  A.  Yes.

17             THE COURT:  Do you think you might be leading a

18  little, just a teensy bit?

19             MR. KEKER:  A teensy bit, your Honor.  I will admit

20  that.  I'm sorry.

21  Q.  The second -- and the letter speaks for itself, and you see

22  it goes on to say the Court of the Honorable Lewis Kaplan has

23  no jurisdiction over me or my work team in Ecuador."  He goes,

24  "I have no obligation to comply."

25             Did you suggest any of this response of Mr. Fajardo to

D4gdche3                         Donziger - cross

1   the letter that I sent?

2   A.  No.  And I did not write that letter and I never saw a

3   draft of that letter before you received it.

4   Q.  OK.  And then he goes on to say, "The constitutionally

5   expressly prohibits and describes an offense defined in the

6   case of providing the requested information," and he talks

7   about that.

8          What did you know about that at the time this letter

9   was sent?

10  A.  I knew there was an issue of Ecuadoran law that he felt

11  prevented him from turning over these documents per my request,

12  and what he's describing there, as I understand it, is that

13  issue.

14  Q.  Based on what you knew about --

15          THE COURT:  Can I know the date of that, please,

16  Mr. Keker?

17          MR. KEKER:  Yes, sir.  It is February 18, and it's --

18          THE COURT:  Of this year?

19          MR. KEKER:  Yes.  You ordered on February 10, I think,

20  that we get documents from Ecuador.  I wrote on

21  February 14th --

22          THE COURT:  I just want to know the date of the

23  letter.

24          MR. KEKER:  I'm sorry.

25          THE COURT:  Thank you.

D4gdche3                    Donziger – cross

1              MR. KEKER:  And it is all attached as Exhibit A and B

2      to Donziger's response to the Order, to your Order, which is --

3      they're telling me is actually docket number 829.  OK.  Sorry.

4      Docket number 829.  And it's in the Court file.

5      BY MR. KEKER:

6      Q.  Is there anything about that exchange that was manipulated

7      by you?

8      A.  No.

9      Q.  Is there anything about that exchange that was discussed

10     between you and Fajardo?

11     A.  No.

12     Q.  Was there anything about that exchange that seemed

13     different from the position that Fajardo had made plain ever

14     since the RICO case was filed?

15     A.  No.

16     Q.  Now, the judge had some questions for this hearing about

17     your practical ability to get documents out of Ecuador.  You've

18     traveled to Ecuador, you've testified, right?

19     A.  Yes.

20     Q.  And you can meet with Fajardo and Yanza and others at their

21     offices?

22     A.  Yes.

23     Q.  Can you take documents out of there without their

24     permission?

25     A.  No.

D4gdche3                    Donziger – cross

1              MR. MASTRO:  Objection.

2     BY MR. KEKER:

3     Q.  Well, tell us, what is your access to documents that are in

4     those offices, particularly on their computers?

5     A.  I cannot get access to their computers or documents in

6     their computers unless they give me permission, and they have

7     declined to give me permission, and, therefore, I could not get

8     those documents.

9     Q.  Why wouldn't you, while you were in the offices and their

10    back is turned, why wouldn't you scoop up, for example, the

11    paper files?

12    A.  That would be theft, and I refuse to engage in that kind of

13    behavior.

14    Q.  Why wouldn't you go to some of the nonlawyers and get them

15    to access documents without telling them what you were going to

16    use them for, in other words, go behind Mr. Fajardo's back?

17    A.  My responsibilities to the clients preclude me from doing

18    such a thing.  It would be an ethical violation and that's

19    just -- I can't do that.

20    Q.  Have you ordered Fajardo to do anything in Ecuador about

21    his documents?

22    A.  I'm not sure I understand the question.

23    Q.  With respect to this discovery demand by Chevron and Judge

24    Kaplan's order that, to the extent -- well, it is his order to

25    get documents out of Ecuador, can you order him to give you the

D4gdche3                        Donziger - cross

1  documents that he doesn't want to give?

2  A.  I don't have the practical ability to order him to give me

3  documents.  I've made that request through letter from counsel

4  as well as orally, as I testified, and he has made his own

5  determination based on what he has told me is his own analysis

6  of his situation and Ecuadoran law issues and potential

7  liability he has to his clients, and based on that he's decided

8  he's not turning over those documents to me.

9  Q.  Did you have anything to do with that decision, helping him

10 make it?

11 A.  No.  Nothing at all.

12 Q.  Were you aware that Chevron got somebody in Ecuador that

13 they say is an expert to say that there is no problem with

14 Fajardo giving confidential client files to this -- in

15 discovery in this case?

16 A.  Yes.

17 Q.  And were you aware that there was a dueling affidavit filed

18 by the Lago Agrio plaintiffs' counsel, Mr. Smyser, Mr. Veselka,

19 that said the opposite?

20 A.  Yes.

21 Q.  Do you consider it bad faith for somebody to get an

22 Ecuadorian Court to try to resolve these dueling expert

23 affidavits?

24         MR. MASTRO:  Objection.

25         THE COURT:  It's nonjury.  Overruled.

D4gdche3                    Donziger - cross

1    A.  I don't consider it bad faith at all.  I consider it

2    appropriate.

3    Q.  These exhibits that you were shown, for example, Exhibit 1,

4    the Fajardo -- I don't even need to show you again, but it

5    describes you as the U.S. representative.

6           Do you want to look at it again?

7    A.  I don't need to look at it.

8    Q.  What do you understand the U.S. representative was as

9    described in a document that you are not a part of the Fajardo

10   retainer agreement?

11   A.  It was the person who was going to represent the Ecuadoran

12   representatives in the United States for various purposes,

13   including trying to find counsel to handle the litigations that

14   would be submitted to the representatives in Ecuador for

15   consideration.

16           I will say that at this point in time I do not believe

17   that the clients consider me to be their U.S. representative.

18   That's a change.

19           THE COURT:  That's stricken, too.

20           MR. KEKER:  OK.

21   Q.  Do the clients currently believe you to be their U.S.

22   representative?

23   A.  I don't believe --

24           MR. MASTRO:  Objection.

25           THE COURT:  Sustained.

D4gdche3                          Donziger - cross

1    Q.  Are you currently the clients' U.S. representative?

2    A.  No.

3            THE COURT:  Has either of those agreements been

4    modified or terminated by a written instrument, so far as you

5    are aware, Mr. Donziger?

6            THE WITNESS:  I don't know if there is a written

7    instrument but I believe --

8            THE COURT:  Just answer the question, sir.  If

9    Mr. Keker wants to ask you anything else, he may.

10           THE WITNESS:  I don't know.

11           THE COURT:  You don't know.  OK.

12   BY MR. KEKER:

13   Q.  Have the description of your duties been modified by

14   attorney-client communications from Ecuador, the descriptions

15   in the agreement?

16   A.  Yes.

17   Q.  And when did that happen most recently?

18   A.  Maybe around January of this year.

19   Q.  With respect to -- would you please look at I guess it was

20   Exhibit -- was it 1?  Is that the Fajardo agreement?

21           Do you have it in front of you?

22   A.  Yes.

23   Q.  Look at paragraph 11.  Does paragraph 11 make this

24   agreement subject to be governed, construed, and interpreted in

25   accordance with the laws of the Republic of Ecuador without

D4gdche3                    Donziger - cross

1   reference to principles or conflicts of laws?

2   A.  Yes.

3   Q.  So it is your understanding that whatever this agreement

4   means, it's to be determined under Ecuadorian law?

5   A.  Yes.

6   Q.  Look at Exhibit 7, please.  That is the go-to-jail memo.

7   Do you have that up there?

8   A.  Yes.

9   Q.  And that's, as I understand it, an e-mail from Julio Prieto

10  to you and to Luis Yanza and Pablo Fajardo?

11  A.  Yes.

12  Q.  All right.  And the first page shows the translation, and

13  it talks about -- do you remember the circumstances in which

14  you first saw this letter, and what was he talking about?

15  A.  I do remember the circumstances.  He was talking about his

16  fear that by turning over documents in the United States via

17  the Stratus 1782, that it would violate their Ecuadoran law

18  obligations in Ecuador among local counsel.

19  Q.  So the issue was if they gave confidential information of

20  their clients to a U.S. court that wanted it in the Stratus

21  1782 litigation, what was the risk, as you understood it?

22          MR. MASTRO:  Objection.

23          THE COURT:  Well, I'm going to sustain the objection,

24  but I imagine we are going to hear more about this.

25  Q.  Well, what did you understand when you said apart from

D4gdche3                    Donziger - cross

1   destroying the proceeding, all of us, your attorneys might go

2   to jail?

3          THE COURT:  Sustained.  We are not going to have his

4   understanding about that.  It is not relevant to anything here.

5          MR. KEKER:  Well, then I move to strike all the

6   comments about it in direct examination, your Honor.

7          THE COURT:  Denied, unless you can bring my attention

8   specifically to something that you think opens the door to that

9   question.

10          MR. KEKER:  I've put my recollection -- and I don't

11   have the transcript in front of me.  My recollection is that

12   this was used to try to imply that this tactic, or whatever,

13   had been nefariously used in the past to deny justice in the

14   United States of America's courts at --

15          THE COURT:  Look, there certainly was a suggestion

16   that -- more than a suggestion, I think your client admitted

17   it -- that there had been consideration, at sometime in 2010,

18   given to bringing a proceeding in Ecuador to shut down the 1782

19   case against Stratus and possibly others.  I remember that.

20          MR. KEKER:  I don't remember the part about shut down

21   the case, but I do remember the consideration to not having

22   documents from -- confidential documents from Ecuador produced,

23   and the inference on Mr. Mastro's side was this reference to go

24   to jail was something because they felt guilty about something.

25   And what I am trying to get at is the understanding that was

D4gdche3                    Donziger – cross

1      had at the time, which is the issue was Ecuadorian law,

2      confidential documents being improperly disclosed in American

3      courts.  It puts a completely given gloss on it than what

4      Mr. Mastro was trying to say.

5           THE COURT:  Well, the question that I noted, the

6      question and answer, and possibly there is more context that I

7      didn't note, was this:

8      "Q  Am I correct Mr. Donziger that in March 2010, Julio Prieto

9      wrote to you and Mr. Fajardo and Mr. Saenz and proposed that --

10     in fact said -- the Ecuadorian lawyers had decided, quote, to

11     file a writ of protection before a judge in Ecuador asking the

12     judge to write to the judge in Denver not to reveal the

13     correspondence with Stratus because this would affect our

14     fundamental rights?

15     "A  Do I remember that?  Is that your question?

16     "Q  Yes, sir.

17     "A  I have a recollection that happened, yes."

18           That's what I have here.

19           MR. KEKER:  And then he went on to talk about the

20     e-mail and the go to jail and meet the inference --

21           THE COURT:  Let's take a look.

22           MR. KEKER:  You've got me.  I don't have that.  I

23     appreciate it.  That is great.

24           (Pause)

25           THE COURT:  It doesn't work as quickly as one would

D4gdche3                         Donziger - cross

1    like.

2               (Pause)

3               Well, it went on:

4    "Q  That was in the same mail Mr. Prieto said as Stratus

5    documents came out" -- and it looks like the word "if" might

6    have been dropped -- "we all go to jail, correct, sir?"

7               And then I see the reporter had included

8    parenthetically the word "if," so he was aware it had been left

9    out in the text.

10   "A  I don't recall.

11   "Q  He went on to tell you at that time, quote, this is an idea

12   that may not work but with -- perhaps with adequate support we

13   can do it.  Do you remember that, sir, in the e-mail?"

14              And then Exhibit 7 was marked, and he was shown the

15   e-mail.

16   "Q  Do you see where he writes to you about the Stratus

17   production ordered in Denver, that the effects are potentially

18   devastating in Ecuador, apart from destroying the proceeding,

19   all of us, your attorneys, might go to jail; do you see that?

20   "A  I see where he wrote that.

21   "Q  Isn't it the case he then proceeded to you -- proposed to

22   you and the others -- in fact, said it had already been

23   decided -- to avoid this, we have decided to file a writ of

24   protection before a judge in Ecuador asking the judge to write

25   to the judge in Denver not to reveal the correspondence because

D4gdche3                    Donziger - cross

this would affect our fundamental rights; do you see that, sir?
"A   Sir, I stipulate he wrote this e-mail.  I don't know what
you're getting at."

          And then it passed off into a discussion of Mr. Wray.

          So do you have another question?

          MR. KEKER:  Are you talking to me, your Honor?

          THE COURT:  Yes.  You.

          MR. KEKER:  Well, I guess not about that.

BY MR. KEKER:

Q.  Did you at any time believe that there was anything wrong
with asking an Ecuadorian court -- somebody, an Ecuadorian
lawyer asking an Ecuadorian court for a ruling on a matter of
procedure or otherwise?

          MR. MASTRO:  Objection to form.

A.  Absolutely.

          THE COURT:  Yes.  I will sustain the objection to
form.

Q.  Did you -- well, did you have -- I think you said you had
nothing to do with this Cordova litigation.  Once you learned
about it and learned that Fajardo had gone to court, or
somebody had gone to court and they had gotten this ruling from
an Ecuadorian court, did you see anything wrong with that?

A.  I did not.

Q.  When you learned about it, did it strike you as something
that was done in bad faith?

D4gdche3                      Donziger - cross

1    A.  Not in the least.

2    Q.  When you learned about it, did it strike you as --

3              THE COURT:  Would you stipulate that Mr. Donziger will

4    testify, if asked, that he sees nothing wrong with anything

5    that was done on their side of the case?  Maybe we could save

6    some time.

7              MR. MASTRO:  Your Honor, that is obviously going to be

8    his testimony.  I haven't been objecting each time because you

9    are going to let him make his record.  But, yes, that is going

10   to be his testimony.

11             THE COURT:  And I will, Mr. Keker, if this is the way

12   you want to use your time, I will let him do that.

13             MR. MASTRO:  That is what he is going to say and then

14   I will cross him.

15             THE COURT:  And you are welcome to do that.

16             MR. KEKER:  Then I think I will.  I'd like to

17   establish --

18             THE COURT:  We'll take our lunch break here, it is a

19   quarter to 1, and I'll see you all at 2.

20             What is it, Mr. Mastro?

21             MR. MASTRO:  Just two very quick things, your Honor.

22             Exhibits 3 through 7, I just ask that they be received

23   here.  Those are the different e-mail communications.

24             THE COURT:  Received.

25             (Plaintiff's Exhibits 3 through 7 received in

D4gdche3                    Donziger - cross

1   evidence)

2              THE COURT:  What is it, Mr. Keker?

3              MR. KEKER:  I wanted to ask you about a rule that is

4   different in different courts all over the United States.

5              Can I talk to my clients while he is on the stand?

6              THE COURT:  No, sir.

7              MR. MASTRO:  And, your Honor, one last thing.

8              He just testified he had a written communication in

9   January 2013 with the plaintiffs that he said informed him on

10  his thinking about his status on the case.  January 2013,

11  exactly when they are getting the Court order in Ecuador about

12  not producing the documents.

13             I think he should have to produce that.  I think he

14  has waived, and I think he should have to produce that document

15  forthwith.

16             MR. KEKER:  He didn't say anything about a writing.

17  You should go back and check the record.

18             MR. MASTRO:  "Written communication from Ecuador" was

19  the phrase he used in January of 2013 --

20             THE COURT:  Let's see.

21             (Pause)

22             THE COURT:  How long ago?  Was this quite recent in

23  the testimony?

24             MR. KEKER:  It was reasonably recent because it was

25  from me.

D4gdche3                      Donziger - cross

1            MR. MASTRO:  It was 10 to 15 minutes ago, your Honor.

2            THE COURT:  And you are sure there was a reference to

3     January?

4            MR. MASTRO:  I'm quite sure --

5            MR. KEKER:  He said January; I think that is correct.

6            MR. MASTRO:  Written communication from Ecuador in

7     January 2013 is what I took down.

8            THE COURT:  Is this what you are referring to?

9     "Q  Have the description of your duties been modified by

10    attorney-client communications from Ecuador, the descriptions

11    in the agreement?

12    "A  Yes.

13    "Q  And when did that happen most recently?

14    "A  Maybe around January of this year."

15            Is that what you were referring to?

16            MR. MASTRO:  That is what I was referring to, your

17    Honor.

18            THE COURT:  All right.  You are welcome to

19    cross-examine as to whether it was written or otherwise.

20            MR. MASTRO:  Thank you, your Honor.  Thank you very

21    much.

22            THE CLERK:  All rise.

23            (Luncheon recess)

24

25

D4GJCHE4                    Donziger - redirect

1            AFTERNOON SESSION

2            2:00 p.m.

3            (Hearing resumes)

4            (In open court)

5            THE COURT:  Okay.  Let's resume.  The witness is

6    reminded he is still under oath.

7            MR. KEKER:  Good afternoon, your Honor.  I have no

8    further questions.  Thank you.

9            THE COURT:  Thank you.  Mr. Mastro.

10   REDIRECT EXAMINATION

11   BY MR. MASTRO:

12   Q.  Mr. Donziger, before the break you were asked by the Court

13   whether your retention agreement had been modified or

14   terminated by a written instrument.  You testified "I don't

15   know."  Do you recall that testimony?

16   A.  No.

17   Q.  Do you know whether your retention agreement has been

18   modified by a writing?

19   A.  I don't believe it has.

20   Q.  You're aware, are you not, that your retention agreement

21   expressly provides that there can be no modification of it

22   without a writing, correct, sir?

23   A.  I am not aware of that.

24   Q.  I refer you to Page 10, Paragraph 13.

25           MR. MASTRO:  It is Exhibit 2 in this record, your

D4GJCHE4                    Donziger - redirect

1     Honor.

2               THE COURT:  I am sorry.  Exhibit 2 in this record,

3     meaning Hearing Exhibit 2?

4               MR. MASTRO:  Yes, Hearing Exhibit 2.  Page 10,

5     Paragraph 13, modification in writing.

6     BY MR. MASTRO:

7     Q.  Mr. Donziger, you were then asked by Mr. Keker whether your

8     duties have been modified in any way through an attorney-client

9     communication from Ecuador.  Do you recall that?

10    A.  Yes.

11    Q.  Is that a communication in writing?

12    A.  Yes.

13              MR. MASTRO:  Your Honor, I would ask that the witness

14    have to produce the communication since he relied on it in his

15    testimony.

16              MR. KEKER:  He didn't rely on any writing.  He was

17    asked a general question.  He has not waived any privilege,

18    your Honor.  We object on attorney-client privilege grounds.

19              THE COURT:  How is a modification of a contract for

20    which you are claiming legal effect attorney-client privilege?

21              MR. KEKER:  The communication that he is referring to,

22    I am not sure what communication he is referring to, but if he

23    is referring to a communication with his clients, then it is

24    attorney-client privilege.

25              THE COURT:  Well, this may be something I am going to

D4GJCHE4                        Donziger - redirect

1    learn from you on, but when I went to law school, not all

2    communications from client to attorney or vice versa were

3    protected by privilege.  Has there been some development of

4    which I am unaware?

5              MR. KEKER:  There has, your Honor, a great broadening,

6    more than I understand the court accepts, of the concept of

7    what I left out in my voir dire, a communication for the

8    purpose of seeking legal advice.

9              The law as I understand it in general is that

10   virtually all conversations between counsel and client about

11   the scope of the representation, the representation, what

12   they're doing, getting information and so on, it falls into

13   that rubric of attorney-client privilege because it is for the

14   purpose of getting legal advice ultimately.

15             It doesn't have to be every single --

16             THE COURT:  Do you have a case?

17             MR. KEKER:  No.  The only case I can remember is

18   Hickman versus Taylor.  That is work product, your Honor.  No,

19   I don't have a case.  I am sure I do have a case, but I don't

20   have a case here in this Court.

21             THE COURT:  Well, your view and mine are rather

22   different.  I am not aware of any authority that takes it

23   anywhere close to where you are.  Furthermore, I have not heard

24   anything about a communication involving a client here.

25             MR. KEKER:  That is where I think we're going and that

D4GJCHE4                          Donziger - redirect

1    is the problem.

2             THE COURT:  If, as and when we ever get there, I am

3    sure you'll bring it to my attention.  But you are saying or

4    your client is saying there is a writing that altered an

5    agreement which is before the court, and it seems to me if

6    there is, it is an operative fact and it's not privileged.

7             MR. KEKER:  I believe --

8             THE COURT:  This would be tantamount I suppose to some

9    investment banking firm claiming that an underwriting agreement

10   to bring out an issue of securities is attorney-client

11   privilege.  It makes no sense to me at all.

12            MR. KEKER:  If I may, your Honor, I am not sure of all

13   the facts, but I believe that the retention agreement that you

14   are looking at was produced pursuant to your order that he had

15   technically, because of his failure to file a privilege log in

16   a timely fashion --

17            THE COURT:  There was no technicality at all.

18            MR. KEKER:  No technicality?  Anyway, you said he

19   waived his attorney-client privilege.  All of that went to the

20   Second Circuit.  The Second Circuit said there was this great

21   emergency; therefore, it was okay but we should be careful

22   about this in the future.

23            Now we are back here.  The only reason you have that

24   first agreement is because of this waiver issue.  We are not

25   waiving subsequent issues.  We are not waiving -- this is 2010

D4GJCHE4                    Donziger - redirect

1      he is talking about, and what is relevant to this hearing is

2      his control over Pablo Fajardo and so on starting at the time

3      in 2012 that they made their motion to the present.  So we're

4      objecting on that ground, your Honor.

5              THE COURT:  Okay.  You are directed to produce the

6      writing your client has just spoken of and to do so forthwith.

7              MR. KEKER:  Could I find out, talk to Mr. Donziger

8      about what he is referring to?  I don't know.  I don't have

9      such a writing.

10             THE COURT:  After we're through with the examination.

11             MR. KEKER:  Then I can't produce something --

12             THE COURT:  You can't do it till then, yes, that is

13     certainly clear.

14     BY MR. MASTRO:

15     Q.  Mr. Donziger, did you read the brief that your lawyer

16     submitted to this Court on March 26th in opposition to

17     Chevron's sanctions motion?

18     A.  I believe I did.  I am not a hundred percent sure.

19     Q.  Are you aware that on Page 13 of that brief your lawyers

20     represented to this Court that the operative agreement in

21     effect is the retention agreement that you signed on January 5,

22     2011 that has been marked as Exhibit 2 in this hearing record?

23     A.  No.

24             THE COURT:  What document are you referring to?

25             MR. MASTRO:  I am referring to the opposition brief

D4GJCHE4                        Donziger - redirect

1    that they filed, your Honor, on sanctions.

2              THE COURT:  This is the document 947 in the record?

3              MR. MASTRO:  Yes, I believe so, your Honor.

4              THE COURT:  It is Page 13?

5              MR. MASTRO:  Yes, your Honor.

6              MR. KEKER:  I am sorry, your Honor.  I am looking at

7    Page 13.  I don't know what he is talking about.  Could I get,

8    by the way, my Chevron Volume I back from him?

9              THE COURT:  Yes, you may.

10             MR. KEKER:  Thank you.  I am looking at Page 13, and

11   if it is there --

12             MR. MASTRO:  947 is the document, your Honor.

13             THE COURT:  Yes.  You might look at the first sentence

14   of the first full paragraph on Page 13.

15             MR. KEKER:  Where does that say the operative

16   agreement of 2010?

17             THE COURT:  It says in short Donziger and Fajardo's

18   retainer agreements and various other things.

19             MR. KEKER:  What are the operative retainer

20   agreements?

21             THE COURT:  Why don't you read the beginning of the

22   brief you filed.  I think it is clear there.

23             MR. MASTRO:  I will move on.

24             MR. KEKER:  I don't think it is so clear.  Let's stick

25   with this.

D4GJCHE4                    Donziger - redirect

1              THE COURT:  Mr. Mastro, I would like to know where, if

2        at all, earlier in that brief the antecedent of operative

3        retainer agreements appears.

4              MR. MASTRO:  On Pages 11 and 12, your Honor, there are

5        references to the specific documents.

6              THE COURT:  Yes, exactly on Page 11.  It says the

7        first sentence of the second full paragraph, "Specifically

8        Donziger's operative retainer agreement makes clear that he is

9        the Ecuadorian plaintiff's representatives and he is employed

10       by Fajardo, Yanza and Amazon Defense Fund not vice-versa,

11       citing Docket No. 355-37, also known as Exhibit 1122.

12             MR. MASTRO:  Correct, your Honor.

13             THE COURT:  And, thus, there was -- and that document

14       is Hearing Exhibit 2.  So there was a flat representation, Mr.

15       Keker, in your brief that the operative retainer agreement was

16       Hearing Exhibit 2 and no suggestion that it had ever been

17       modified either orally or otherwise, right?

18             MR. KEKER:  With respect to the -- no, that is not

19       right.  What this is talking about is the operative retainer

20       agreement that deals with this question of who's who's agent.

21       It is dealing with agency.  There is no -- and what it is

22       saying, the conclusion is that he doesn't have any agents in

23       Ecuador.  The Ecuadorians are the principal and he is the

24       agent.  That is what we are representing to you and that is all

25       we are representing to you.

D4GJCHE4                    Donziger - redirect

1           THE COURT:  Well, Mr. Keker, we'll see.  Let's

2     proceed.

3           MR. MASTRO:  Thank your Honor.

4     BY MR. MASTRO:

5     Q.  Mr. Donziger, the modification you just referred to, that

6     didn't modify your compensation or what you're entitled to

7     under your retainer agreement that you entered into in January

8     5th of 2011, correct, sir?

9     A.  I think I misspoke in my earlier testimony.  After reading

10    Paragraph 13, I don't think what I described qualifies as

11    modification under this contract.

12    Q.  So your compensation remains the same today as it was under

13    the retainer agreement dated January 5, 2011, correct, sir?

14    A.  That's correct.  My point is a larger one.  I don't think

15    there was a modification under this paragraph.

16    Q.  When we see the writing, we'll be able to tell.

17          Mr. Donziger, you testified under questioning from Mr.

18    Keker that you "work for Fajardo."  Do you remember that

19    testimony?

20    A.  Yes.

21    Q.  Were you working for Fajardo when you wrote your book

22    proposal saying you are "the lead lawyer in the class action

23    trial that seeks damages for clean up Aguinda correctly being

24    heard by the Superior Court of Madiloba in Ecuador."

25          Were you working for Mr. Fajardo when you made that

D4GJCHE4                              Donziger - redirect

1   representation, your book proposal you're the lead lawyer in

2   that case?

3   A.  Yes.

4           MR. MASTRO:  That is docket 9-9, at 234, your Honor.

5   BY MR. MASTRO:

6   Q.  Were you working for Mr. Fajardo when you wrote Joe Coen in

7   July 2009 that the process "the process of the case is managed

8   by myself, Pablo Fajardo and Luis Yanza"?

9   A.  Yes.

10  Q.  Were you working for Mr. Fajardo when your lawyer told the

11  Second Circuit in 2011 that litigating and trying this case

12  without Steven Donziger is like staging a production of Hamlet

13  without Hamlet"?

14  A.  What is your question?

15  Q.  Were you working for Pablo Fajardo when your lawyer made

16  that representation?

17  A.  Sir, let me make this simple for you.  From the day I --

18  Q.  It is a yes or no?

19  A.  I can't answer yes or no.

20          THE COURT:  Mr. Donziger, stop!  Answer the question

21  yes or no.  No speeches.

22          THE WITNESS:  I am not going to answer yes or no.

23          THE COURT:  I direct you to answer the question

24  directly.

25          THE WITNESS:  I have always worked for Mr. Fajardo or

D4GJCHE4                          Donziger - redirect

1   the lead Ecuador counsel while this case was in Ecuador.

2   BY MR. MASTRO:

3   Q.  Were you working for Fajardo when you paid him $50,000 in

4   June of 2011?

5   A.  Yes.

6   Q.  Mr. Fajardo doesn't pay your salary, does he, sir?

7   A.  Actually, he does.

8   Q.  He has written you checks, sir?

9   A.  He controls the budget that pays monies to me for work I do

10  on this case, yes.

11  Q.  So you consider him to pay your salary.  Is that your

12  testimony here today?

13  A.  The clients out of a case budget pay me.

14  Q.  Am I correct, sir, that you have continued to raise money

15  from investors in 2011 and 2012?

16  A.  On behalf of the clients, yes.

17  Q.  You have raised more than 1.6 million since the beginning

18  of 2011 from at least two funders, DeLeon and Jarvis?

19          MR. KEKER:  Objection, your Honor; outside of the

20  scope of the order.  Limited to the following issues.

21          THE COURT:  It goes to control.

22          MR. MASTRO:  Correct, your Honor.

23          THE COURT:  Overruled.

24  BY MR. MASTRO:

25  Q.  Mr. Donziger --

D4GJCHE4                    Donziger - redirect

1    A.   That is not correct.

2    Q.   -- am I correct that you have raised more than 1.6 million

3    since January 2011 to support the various litigations in

4    Ecuador and the United States?

5    A.   I have helped the clients raise money to support the

6    litigations, yes.

7    Q.   Has Mr. Fajardo himself brought in any funders for the

8    litigation?

9    A.   He has helped.

10   Q.   But you have had hundreds of communications with funders

11   since January 2011, correct?

12   A.   I don't know how many it is.

13   Q.   How many funders has Mr. Fajardo met with since January

14   2011, do you know?

15   A.   I know of at least two, maybe more.

16   Q.   Were those funders that you introduced Mr. Fajardo to?

17            MR. KEKER:  Objection, your Honor; scope.

18            THE COURT:  It goes to control.  Overruled.

19   A.   Those particular two, yes.

20   BY MR. MASTRO:

21   Q.   Sir, it doesn't say anywhere in your retention agreement

22   that you work for Mr. Fajardo, does it, sir?

23            THE COURT:  It speaks for itself.  Move on.

24   BY MR. MASTRO:

25   Q.   Can you cite to this Court any document anywhere where it

D4GJCHE4                    Donziger - redirect

1   says you work for Mr. Fajardo?

2   A.   There's a pattern of communications, some reflected in

3   documents, yes, that do reflect that, where I am getting orders

4   from Mr. Fajardo, yes.

5   Q.   Don't you give him instructions on things to do, sir?

6   A.   As I have already testified, I ask him to do things.

7   Sometimes he does them and sometimes he doesn't.

8   Q.   Sir, let me ask you about the following.

9          You knew back in March 2011 from a letter Mr. Keker

10   showed you when you were testifying earlier that Mr. Fajardo

11   would not produce Ecuadorian documents and not submit to this

12   Court's jurisdiction, correct, sir?

13          THE COURT:   Compound.   Sustained.

14   BY MR. MASTRO:

15   Q.   You knew from a letter you received from Mr. Fajardo back

16   in March 2011 that he would not produce Ecuadorian documents in

17   connection with this litigation, correct, sir?

18   A.   I knew that was his position at that time.

19   Q.   When you learned of the Cordova litigation from

20   Mr. Fajardo, did you know that Mr. Fajardo was a defendant in

21   that litigation?

22   A.   No.

23   Q.   Did you know who the plaintiff was in that litigation?

24   A.   No.

25   Q.   You didn't bother to ask him who the plaintiff was?

1    A.   Sir, I already testified I knew nothing about this

2    substantive about that litigation other than what he told me in

3    passing he was going to seek a declaratory judgment.

4    Q.   Would it have concerned you to know that the plaintiff in

5    the litigation was one of your clients that both you and

6    Mr. Fajardo represent and that the defendant in the litigation

7    was Mr. Fajardo who you already knew didn't want to produce

8    Ecuadorian documents in this litigation?

9            Would that have concerned you to know that those were

10   the parties, yes or no?

11   A.   I rely on Pablo Fajardo's judgment in Ecuador to handle

12   issue of Ecuadorian law, so the answer to that would be no.

13   This is the first time I am hearing about it.  On my initial

14   reaction just hearing about it, no.

15   Q.   Would it have bothered you to know that the judge who

16   originally handled the case denied the application, denied the

17   application on reconsideration, and then when the matter was

18   sent back to him after an appeal, he recused himself?

19           MR. KEKER:  Objection to the form of the question and

20   outside the scope.  He said he didn't know, so whether it would

21   have bothered him to know --

22           MR. MASTRO:  He testified --

23           THE COURT:  Sustained.

24   BY MR. MASTRO:

25   Q.   Mr. Donziger, would it have concerned you to know that

D4GJCHE4                    Donziger - redirect

1   after the trial court entered the order that it did against

2   Mr. Fajardo, that he didn't even take an appeal?

3           MR. KEKER:  The same objection, your Honor.  It is

4   irrelevant whether it would have concerned him now.  He

5   testified to facts.  He did not know any of this back then --

6           MR. MASTRO:  He testified, your Honor, it wasn't in

7   bad faith, that litigation --

8           MR. KEKER:  Your Honor --

9           THE COURT:  Mr. Keker, your adversary is now speaking.

10  It was reasonable for all of us to have concluded that you had

11  finished.  Please don't talk over him.

12          MR. KEKER:  Yes, sir.

13          THE COURT:  What is it, Mr. Mastro?

14          MR. MASTRO:  Your Honor, I would just like to inform

15  you he testified on a leading question the litigation wasn't in

16  bad faith, and now I am trying to probe whether, since he

17  doesn't know the underlying facts of what happened there, that

18  would have concerned him if he had actually known that thing.

19          THE COURT:  Yes, but he has already said he knows

20  nothing about it.

21          MR. MASTRO:  I'll move on.

22          THE COURT:  He didn't exactly say that, but that's a

23  fair approximation for the moment.

24          MR. MASTRO:  I'll move on, your Honor.

25  BY MR. MASTRO:

D4GJCHE4                        Donziger - redirect

1    Q.  Mr. Donziger, am I correct that -- strike that.

2             You've testified that you consider yourself to work

3    for Mr. Fajardo, but am I also correct that you stand to gain

4    more than three times the amount of money that he does if you

5    all ultimately collect any money on the Ecuadorian judgment?

6    A.  Something of the sort.

7    Q.  So you personally stand to gain more than $1 billion if you

8    were to collect on the entirety of the Ecuadorian judgment, you

9    personally, correct, sir?

10   A.  I don't know what the amount would be exactly, but it would

11   be a percentage of the recovery.

12   Q.  And Mr. Fajardo's percentage of that recovery is less than

13   a third of what yours would be, correct?

14   A.  I don't believe that's the case, no.

15   Q.  Yeah.  Sir, under Mr. Fajardo's retention agreement, he

16   gets 10 percent of the contingency fee.  Isn't that correct,

17   sir?

18   A.  I don't know.

19            MR. MASTRO:  That is on Page 2, Paragraph 3 A, your

20   Honor, of Mr. Fajardo's retention agreement.

21   BY MR. MASTRO:

22   Q.  Sir, am I correct that you get 31 percent of the total

23   contingency fee recovered?

24            MR. KEKER:  Outside the scope.  I object on that

25   ground.

D4GJCHE4                      Donziger - redirect

1              THE COURT:  It goes to control.

2    BY MR. MASTRO:

3    Q.  Correct, Mr. Donziger?

4    A.  I get a not insignificant portion of a contingency fee

5    payment the clients have set aside for lawyers and investors to

6    sustain the case, yes.

7              MR. MASTRO:  On Pages 3 and 4 of Mr. Donziger's

8    retention agreement, Paragraph 3 A, your Honor.

9    BY MR. MASTRO:

10   Q.  So you make more than three times what Mr. Fajardo makes on

11   this case, but you work for him.  That is your testimony in

12   this Court?

13   A.  Yes, it is.

14   Q.  Mr. Donziger, you've said that there have been

15   communications that modify your role in this case, correct,

16   sir?

17   A.  Yes.

18   Q.  Yet you continue to go to Ecuador on average once a month,

19   correct, sir?

20             THE COURT:  We have covered that, Mr. Mastro.

21   BY MR. MASTRO:

22   Q.  In fact, you led the court to believe that you are not as

23   welcomed by the Ecuadorian lawyers as you used to be, correct?

24   A.  I have testified to that truthfully.  That is the case,

25   sir.

D4GJCHE4                    Donziger - redirect

1   Q.  Yet you, in fact, on average have gone to Ecuador more

2   since the beginning of 2011 than you did before 2011?

3   A.  I don't believe that is true, sir.

4          THE COURT:  I think we have covered it, haven't we,

5   Mr. Mastro?

6          MR. MASTRO:  Yes, we have.  My ratio records will

7   speak for themselves.

8   BY MR. MASTRO:

9   Q.  Sir, you testified earlier that you "asked your attorneys

10  to write to Fajardo and ask him to please give you the files."

11         Do you recall that testimony?

12  A.  Today?

13  Q.  Yes.

14  A.  Yes.

15  Q.  Did you actually see the letter that your lawyer, Mr.

16  Keker, sent to Mr. Fajardo?

17  A.  I did see it, yes.

18  Q.  Did you review it in advance?

19  A.  I don't recall if I did, but I trust Mr. Keker to put

20  together a letter that reflects what we had discussed.

21  Q.  That he should please ask Mr. Fajardo to give you the

22  files?

23  A.  Yes.

24  Q.  Sir, I would like to show you the letter Mr. Keker actually

25  sent to Mr. Fajardo on February 14th, 2013.  I'll mark this as

D4GJCHE4                       Donziger - redirect

hearing Exhibit 8.  Please review it for just a minute, sir,

and I have a few questions.

A.   (Pause)

Q.   Now, when you asked Mr. Keker to write to Fajardo to ask

him to please give you the files, did you expect him to write

that Mr. Donziger does not consider you, Mr. Fajardo, to be his

attorney nor his agent?

A.   I did not, I never had a discussion at that level of detail

with Mr. Keker, sir.

Q.   Is there anywhere in this letter where Mr. Keker actually

asked Fajardo to please give you, Steven Donziger, the files?

        Do you see that anywhere in this letter, he asked him

to please give you the files?

A.   Sir, this letter, the purpose of this letter was to get

documents consistent with the court's order and that is what

the letter reflects.

Q.   And the only thing remotely making any kind of ask of

Mr. Fajardo in this letter by Mr. Keker was "I write on behalf

of Mr. Donziger and his firm to ask you to notify me

immediately whether or not you or any other persons or entities

associated with the litigation of Aguinda v. Chevron will

provide us the materials sought by Chevron on the schedule set

forth by Judge Kaplan in the enclosed order."

        Correct, sir?

A.   That's correct.

D4GJCHE4                    Donziger - redirect

1   Q.  Was that what you had in mind when you asked Mr. Keker to

2   ask Fajardo to please give you the files?  That is what you had

3   in mind?

4   A.  What I had in mind is for Mr. Keker write a letter

5   reflecting this Court's order, and that is exactly what he did.

6   Q.  You consider that to be exactly what he did?  Okay.

7   A.  This letter --

8   Q.  Let me ask you about Mr. Fajardo's response.

9       You were asked whether you helped Mr. Fajardo write

10  his response, and you said no, you didn't.  Mr. Fajardo didn't

11  need you to help him, did he, sir?

12  A.  I have no idea, sir.

13  Q.  Because Mr. Keker had already told him in his letter what

14  to say, hadn't he, sir?

15  A.  I don't know what you're talking about.

16  Q.  Now I am going to show you Mr. Fajardo's response.  I will

17  mark that Exhibit No. 9 to his hearing.

18  A.  (Pause)

19  Q.  Is this Mr. Fajardo's February 18th, 2013 response to Mr.

20  Keker's letter?

21  A.  It looks like a translation of it.

22  Q.  So after Mr. Keker wrote to Mr. Fajardo telling him that,

23  "Mr. Donziger does not consider you to be his attorney nor his

24  agent," Mr. Fajardo writes back, "we are not attorneys for

25  Steven Donziger."  Do you see that, sir?

D4GJCHE4                    Donziger - redirect

1    A.  Yes.

2    Q.  That is in the very first numbered paragraph, correct, sir?

3    A.  Yes.

4    Q.  And the very first sentence that he writes in that first

5    point in his letter is, "It is obvious that Judge Lewis Kaplan,

6    induced by Chevron Corporation, is very much mistaken in

7    asserting we attorneys in Ecuador are attorneys and agents of

8    Mr. Steven Donziger."  Do you see that, sir?

9    A.  Yes, I do.

10   Q.  You didn't have any doubt whatsoever, and your attorneys

11   didn't have any doubt whatsoever, what Mr. Fajardo's response

12   to Mr. Keker's February 14th letter was going to be, did you,

13   sir?

14   A.  That is not correct, sir.

15   Q.  Did you talk to Mr. Fajardo?

16   A.  I am not finished.

17             THE COURT:  Let him finish.

18             MR. KEKER:  Excuse me!

19             THE COURT:  Thank you, Mr. Keker.  I had the point

20   before you rose.  Let him finish.

21   A.  I expected him to maintain the position he earlier

22   communicated to Judge Kaplan and to me but, no, I did not know

23   what he would put in this letter.

24   BY MR. MASTRO:

25   Q.  Did you tell Mr. Fajardo Mr. Keker's letter would be

D4GJCHE4                    Donziger - redirect

1    coming?

2    A.  I don't recall.  I might have.  I don't remember.

3    Q.  Do you know why your lawyer, Mr. Keker, in then telling the

4    court in a filing on February 20th what had transpired between

5    himself and Mr. Fajardo, do you know why he wrote that "in an

6    abundance of caution" I wrote to Mr. Fajardo?  Do you know why

7    he wrote that?

8    A.  No.

9    Q.  Sir, as we sit here today, it's your testimony that --

10            MR. KEKER:  Objection to form, your Honor.

11            MR. MASTRO:  I will rephrase.

12            THE COURT:  Rephrase.

13            MR. MASTRO:  I'll rephrase, your Honor.

14   BY MR. MASTRO:

15   Q.  Mr. Donziger, am I correct that -- strike that.

16            Mr. Donziger, is there any steps of which you're aware

17   that your lawyers took to obtain documents from your Ecuadorian

18   co-counsel in Ecuador before Mr. Keker wrote this one letter on

19   February 14, 2013?

20   A.  I don't -- I am not aware of any other efforts by them.

21            MR. MASTRO:  Thank you, Mr. Donziger.  No further

22   questions.

23            THE COURT:  Mr. Keker.  I am assuming the other

24   defendants don't wish to examine.  Is that right?

25            MR. SMYSER:  Your Honor, I have no questions of

D4GJCHE4                        Donziger - redirect

 1   Mr. Donziger.

 2              THE COURT:  All right.  Thank you.

 3   RECROSS EXAMINATION

 4   BY MR. KEKER:

 5   Q.  Mr. Donziger, referring you to Exhibit 8, my letter to

 6   Mr. Fajardo, dated Valentine's Day of this year, does it quote

 7   Judge Kaplan's order in the third paragraph?

 8   A.  Yes.

 9   Q.  Does that order talk about documents in the possession,

10   custody and control of their Ecuadorian attorneys and agents?

11   A.  Yes.

12   Q.  Did you at the time of this letter or at any time consider

13   that you had attorneys or agents in Ecuador that were your

14   attorneys or agents?

15   A.  No.

16   Q.  Do you know whether or not, when we argued against this

17   motion, your lawyers made that point, that he doesn't have

18   attorneys or agents?  If you don't know, it is all right, never

19   mind.

20              In the next paragraph, the fourth one, I said while

21   Mr. Donziger does not consider you to be his attorney nor his

22   agent, Judge Kaplan or Chevron may disagree.  Therefore, due to

23   this Court's order, I write on behalf of Mr. Donziger and his

24   firm to ask you, blah, blah, blah.

25              Did you believe that Mr. Fajardo was your agent when

1  we asked him to consider whether or not he wanted to follow

2  this Court order?

3  A.  No, I don't believe he has ever been my agent.

4  Q.  Now let's turn to his response.  We'll go through all the

5  details.  Some of it is fairly harsh, but he makes the point,

6  Mr. Mastro pointed out we are not attorneys for Donziger.  This

7  is completely untrue.

8          He goes on to say I am the attorney and sole legal

9  representative of the complainants in the lawsuit filed by

10  Aguinda et al against Chevron Corporation.

11          Is that true, in Ecuador he is the sole legal

12  representative appearing in court down there?

13  A.  Yes.

14  Q.  Do you appear in court in Ecuador?

15  A.  No.

16  Q.  Do you have any legal control over that proceeding to

17  appear, file papers, do anything down there?

18  A.  No.

19  Q.  Are you authorized to practice law in Ecuador?

20  A.  No.

21  Q.  He goes on to say I am the person with authorization of the

22  complainants to hire --

23          THE COURT:  Mr. Keker, I would appreciate it if you

24  slow down.  I can't listen as fast as you can talk.

25          MR. KEKER:  Nobody can, your Honor.  I am sorry.  I

D4GJCHE4                    Donziger - recross

1    beg your pardon.  The court reporter doesn't appreciate it

2    much, either.

3    BY MR. KEKER:

4    Q.  He goes on to say I am the person with authorization of the

5    complainants to hire attorneys in various parts of the world to

6    defend their rights and interests.  We, the complainants and I,

7    requested the services of attorney Steven Donziger to

8    coordinate certain legal actions in the United States.

9            Is that true?

10   A.  Yes.

11   Q.  Therefore, Steve Donziger is our attorney.  Mr. Donziger

12   has never been nor will he be the person who gives instructions

13   to the complainants or their attorneys, as Judge Kaplan

14   mistakenly asserts in his orders.

15           Forget about the last clause.  Is that true, you have

16   never been nor will he be the person who gives instructions to

17   the complainants?

18   A.  That's correct.

19   Q.  Look at your retention agreement, would you please, that

20   was marked I guess as Exhibit 2.  In the last whereas clause on

21   the first page, do you see where it says whereas by virtue of

22   having acted as the primary United States Attorney on behalf of

23   the plaintiffs to date, the plaintiffs desire to appoint Steven

24   R. Donziger, Esquire to act as plaintiff's U.S. representative

25   defined below with such responsibilities as are set forth below

D4GJCHE4                         Donziger - recross

1    and to cooperate in such capacity with Pablo Fajardo Mendoza,

2    Esquire and Luis Yanza, foregoing collectively with any

3    successors thereto, the "other plaintiff's representatives."

4              Do you see that?

5    A.   Yes.

6    Q.   Did you understand your retention agreement meant that you

7    were working for the plaintiffs in Ecuador and were co-counsel

8    with -- and Mr. Fajardo was also working for those plaintiffs

9    in Ecuador?

10   A.   Yes.

11   Q.   You're an attorney working for Ecuadorian nationals.  Is

12   that what you understood?

13   A.   That's correct, with the caveat that I also have you,

14   Mr. Fajardo, as their authorized legal representative, so much

15   of my contact was with him on behalf -- and he operated on

16   behalf of the clients.

17   Q.   On Page 3 of your retainer agreement, just above where it

18   says No. 3 fees and expenses, do you see where that last

19   sentence says, "The plaintiff's U.S. representative may not

20   enter into agreements," do you see where I am reading?

21   A.   Page 3?

22   Q.   Page 3, and it is the last paragraph --

23   A.   I see it.

24   Q.   -- of Paragraph 2.  The last couple of sentences say the

25   plaintiff's are U.S. representatives may not enter into

1    agreements, settlements or negotiations with representatives,

2    agents, lobbyists or any other persons associated with Chevron

3    without authorization and direction from the plaintiffs.

4              Who are the plaintiffs in that sentence?

5    A.  They're the individuals in Ecuador from whom I take

6    direction, Mr. Fajardo being the representative of the

7    plaintiffs.

8    Q.  Then it goes on to say this authorization and direction may

9    be given by the other plaintiff's representative in the

10   Republic of Ecuador.  That is a defined term.  We looked at it,

11   that is Fajardo and Yanza, right?

12   A.  Yes.

13   Q.  Who is working for whom under this retention agreement?

14   A.  I'm working for them.

15   Q.  And then without respect -- I don't see anything in my

16   letter about this, but in Mr. Fajardo's letter back, he writes

17   in Paragraph No. 2 about the court of the Honorable Louis

18   Kaplan has no jurisdiction over me or over my work team in

19   Ecuador.  Do you see that?  It is Exhibit 9?

20   A.  Yes.

21   Q.  The last couple of sentences there is, "I have no

22   obligation to comply with orders from foreign courts which have

23   no jurisdiction over me.  The same is applicable to my

24   Ecuadorian work team made up of Ecuadorians working in Ecuador

25   that has worked on different phases of the lawsuit against

D4GJCHE4                         Donziger - recross

1   Chevron."

2           Was that your understanding of the control situation

3   with respect to what happened in Ecuador?

4           MR. MASTRO:  Objection to form.

5           THE COURT:  I didn't hear an objection.  Is there an

6   objection?

7           MR. MASTRO:  Objection to the form of the question,

8   your Honor.

9           THE COURT:  Overruled.  Answer it.

10  BY MR. KEKER:

11  Q.  Is that your understanding?

12  A.  Yes, that is my understanding.

13  Q.  And then he goes on to talk about the Constitution

14  expressly prohibiting and describing an offense defined in the

15  case of providing requested information and says -- did you

16  suggest any of the information that he provides in this

17  paragraph to him?

18  A.  No.

19  Q.  He says current Ecuadorian law requires attorneys like

20  myself and my work team to respect the principle of

21  confidentiality and professional secrecy.  In my letter of

22  August 14, 2012 to Messrs. Camacho and Piaguaje, I explained

23  these arguments which are reasonably have been ignored by Judge

24  Kaplan.

25          Did you know what he was talking about communicating

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D4GJCHE4                    Donziger - recross

1   with couple of his clients and your clients back in August of

2   2012 about this subject?

3   A.  I knew that was his general position.  I am not sure I knew

4   about this letter he is referring to.

5   Q.  Then Paragraph 4 says the information does not belong only

6   to those two, Camacho and Piaguaje?

7   A.  Yes, I understood that to be the case.

8   Q.  Did you suggest that he put that in this letter?

9   A.  No.

10  Q.  Then he says there's an order from a competent court

11  prohibiting us from complying with orders from Judge Kaplan.

12  He talks about that.  Did you suggest he put that in this

13  letter?

14  A.  No.

15  Q.  And he goes on with some further harsh language.  Did you

16  suggest any of the rest of the language, the comment about

17  xenophobic attitudes and so on?

18  A.  No.

19  Q.  Do you know whether or not what Mr. Mastro calls migration

20  records, people coming and going from Ecuador, are available to

21  the public?

22  A.  I don't believe they are.  I think they're private.

23          MR. KEKER:  Nothing further.

24          THE COURT:  Mr. Mastro.

25  REDIRECT EXAMINATION

D4GJCHE4                     Donziger - redirect

1    BY MR. MASTRO:

2    Q.  Mr. Donziger, you just testified that under your retention

3    agreement and Mr. Fajardo's retention agreement, plaintiff's

4    representatives were yourself, Mr. Fajardo and Mr. Yanza,

5    correct, sir?

6    A.  Yeah.  I don't know if it is limited to that but, yes, I

7    think all three of us were.

8    Q.  Described as representatives?

9    A.  Yes.

10   Q.  Correct?

11        Now, you know, sir, that in Chevron's first request

12   for production of documents, Docket No. 895-1, the instruction

13   was to produce documents in the possession of defendant or

14   subject to the custody or control of defendant, including

15   documents in the possession, custody --

16        THE COURT:  Slow down.

17        MR. MASTRO:  -- of defendant's agents, attorneys or

18   representatives, including but not limited to attorneys in this

19   action, attorneys in the litigation, Pablo Fajardo Mendoza,

20   Luis Yanza, Julio Mendez, (inaudible) Brian Parker, Joseph Coen

21   and -- (inaudible).  That was the instruction?

22   A.  Yes.

23   Q.  Now, sir, you said you also considered Mr. Fajardo to be

24   the authorized legal representative of plaintiffs, correct?

25   A.  Yes.

D4GJCHE4                         Donziger - redirect

1    Q.  Plaintiffs being the 47 Aguinda individual-named

2    plaintiffs, correct?

3    A.  Yes.

4    Q.  That is because he had powers of attorney for all 47 of

5    them, correct?

6    A.  I believe so.

7    Q.  With those powers of attorney, he had the right to make

8    commitments on their behalf, correct?

9    A.  He had the right to make commitments subject to those

10   powers.  I think they were not limited rights but, yes, he

11   could make --

12   Q.  You said when they were referring to client communications,

13   that was really communications you had with Mr. Fajardo as the

14   authorized representative of those 47 Aguinda plaintiffs

15   because of the powers of attorney he had, correct, sir?

16   A.  That's correct.

17   Q.  So you never actually spoke to any of the 47 individual

18   Aguinda plaintiffs about whether they would authorize the

19   release of the Ecuadorian documents in connection with this

20   litigation, did you, sir?

21   A.  I did not.

22   Q.  Sir, am I also correct that -- strike that.

23            So one time you're aware Mr. Fajardo went to all 47 of

24   the Aguinda plaintiffs was to get powers of attorney from each

25   of them in late 2010 after Chevron challenged the

D4GJCHE4                    Donziger - redirect

1  representation status, correct, sir?

2  A.  Yes.

3  Q.  And a second time Mr. Fajardo went to the 47 individual

4  Aguinda plaintiffs was to ask them whether they would consent

5  to the release of the Ecuadorian documents, is that correct,

6  sir?

7  A.  I don't know what happened or what he did at that point so

8  I can't testify to that.  I have no knowledge of that.

9  Q.  You don't know whether he actually went to the 47, correct?

10  A.  For this purpose, I don't know.

11  Q.  Can you name any other time, any other time when

12  Mr. Fajardo polled the 47 Aguinda plaintiffs before he made a

13  decision under his powers of attorney?

14  A.  I will say that it takes weeks to poll 47 people who live

15  in the jungle.  I know on occasion Mr. Fajardo gathers up,

16  tries to gather up the people or painstakingly goes to visit

17  them one-by-one.

18           Through the years this has happened on occasion.  It

19  is very burdensome.  It doesn't happen often.  I can't remember

20  any time since getting the power of attorney, but I don't know

21  if he did it in this instance or not.

22  Q.  Sir, am I correct that Mr. Fajardo also had obligations to

23  you under his retention agreement as a representative of the

24  plaintiffs, correct, sir?

25  A.  He did have such obligations, but not such that would

D4GJCHE4                          Donziger - redirect

 1    override Ecuadorian law.

 2              THE COURT:  Mr. Donziger, you had finished after the

 3    word "obligations."  The rest of it is unresponsive and

 4    stricken.

 5    BY MR. MASTRO:

 6    Q.  He had an obligation to cooperate with you?

 7              THE COURT:  We have been all over this, Mr. Mastro.

 8              MR. MASTRO:  I understand, your Honor.

 9    Q.  The fact he had --

10              THE COURT:  Let's act on that understanding.

11    BY MR. MASTRO:

12    Q.  Mr. Donziger, you said in response to Mr. Keker's questions

13    you never appeared in court in Ecuador.  Do you recall that

14    testimony?

15    A.  Yes.

16    Q.  Referring you to the movie crude and the crude outtakes,

17    you did appear before a judge in Ecuador, didn't you, sir?

18    A.  That was not a formal proceeding, sir.  I never appeared in

19    court in Ecuador.

20    Q.  You argued in judge's chambers for him to quash a subpoena,

21    correct?

22    A.  That was not a formal appearance, sir.

23              THE COURT:  Answer the question.

24    A.  That clip in the movie speaks for itself.  Yes, I argued

25    before a judge in an informal setting.  I did not and have

D4GJCHE4                          Donziger – redirect

1    never appeared in court in Ecuador on behalf of my clients in

2    any formal way.

3    Q.  You would agree, would you not, Mr. Donziger, that in the

4    hundreds of hours of crude outtake footage, you and Mr. Fajardo

5    and Mr. Yanza and Mr. Saenz and Mr. Prieto, you have many

6    attorney-client communications, confidences of your clients on

7    those outtakes, correct, sir?

8    A.  There were, those outtakes captured meetings and

9    discussions between lawyers, yes.

10   Q.  And were you violating Ecuadorian secrecy law when you

11   allowed -- and Mr. Fajardo allowed -- those hundreds of hours

12   of crude outtake footage to be taken where you were revealing

13   your client's confidences before the cameras?

14          Were you violating Ecuadorian secrecy law then?

15   A.  I can't answer that question, sir.

16          MR. MASTRO:  No further questions.

17          MR. KEKER:  No questions your Honor.

18          THE COURT:  You may step down, Mr. Donziger.  You are

19   subject to recall.

20          (Witness excused)

21          THE COURT:  Who will be the next witness?

22          MR. MASTRO:  Your Honor, we call, Chevron calls Jarod

23   Stewart.

24          THE COURT:  All right.  My colleague will be doing the

25   examination, your Honor.

D4GJCHE4                    Donziger - redirect

1     JAROD STEWART,

2          called as a witness by the Plaintiff,

3          having been duly sworn, testified as follows:

4     DIRECT EXAMINATION

5     BY MS. NEUMAN:

6     Q.  Good afternoon, Mr. Stewart.

7     A.  Good afternoon.

8              MS. NEUMAN:  May I approach the witness to hand him

9     the declaration he submitted to the court, dated March 26th,

10    2013, Docket No. 951?

11             THE COURT:  Yes.

12             MR. MASTRO:  While Ms. Neuman approaches, I want to

13    make sure I moved for Exhibits 8 and 9 to be received as part

14    of the records.

15             THE COURT:  They're received.

16             (Plaintiffs' Exhibits 8 and 9 received in evidence)

17             MR. KEKER:  While we're doing that, I assume the

18    papers that have been filed and the exhibits are all part of

19    this hearing, but I specifically want to move in the ones that

20    I referred to, the exhibits that were attached to the motion.

21    I guess I assumed that --

22             THE COURT:  Whatever is in the record in general is

23    fair game on this from beginning to end.

24             MR. KEKER:  Yes, sir.  Thank you.

25             THE COURT:  And I mean the whole record.

D4GJCHE4                    Donziger - redirect

 1   BY MS. NEUMAN:
 2   Q.  Mr. Stewart, you are currently an associate at Smyser
 3   Kaplan.  Is that correct?
 4   A.  Yes.
 5   Q.  You are involved in that firm's representation of Mr.
 6   Camacho and Mr. Piaguaje in this action?
 7   A.  I am.
 8   Q.  When did Smyser Kaplan begin representing Mr. Camacho and
 9   Mr. Piaguaje in this action?
10   A.  My understanding is that the representation began in the
11   summer of 2011, June or July.
12   Q.  Were you involved from the beginning of the representation,
13   sir?
14   A.  I was not.
15   Q.  When did you become involved in the matter?
16   A.  Around late July of 2011.
17   Q.  Were you the associate at Smyser Kaplan primarily
18   responsible for preparing Mr. Camacho's and Mr. Piaguaje's
19   responses to Chevron's first set of request for production in
20   this action, served in June of 2012?
21   A.  Request for production, I was not.
22   Q.  Did you work on the responses to the request for
23   production, Mr. Stewart?
24   A.  I may have reviewed them and provided comments, but I was
25   not the principal associate or lawyer working on those.

D4GJCHE4                    Donziger - redirect

1    Q.  Who was the principal lawyer working on those, if you know?

2    A.  I don't recall.

3    Q.  Did you ever discuss the request for production of

4    documents with Mr. Camacho and Mr. Piaguaje?

5    A.  I did.

6    Q.  Were you the lawyer who was responsible for doing that

7    aspect of responding, discussing the request for the client?

8    A.  Yes, I was.

9    Q.  When did you first discuss the request with your clients?

10   A.  I can't recall the exact date, but it would have been

11   sometime after the requests were served in the fall.

12   Q.  If the requests were served in the summer of 2012, can you

13   give us an estimate of when you would have talked to your

14   clients?

15   A.  It would have been a number of weeks after the requests

16   were served.

17   Q.  When you spoke to your clients, did you discuss with them

18   the need to produce the documents of their Ecuadorian agents,

19   their Ecuadorian lawyers?

20   A.  Yes, that wasn't the first time I talked to them about

21   that.

22   Q.  When was the first time you talked to them about it?

23   A.  I met with Mr. Camacho and Mr. Piaguaje in Lago Agrio near

24   Ecuador in the Fall of 2011.

25   Q.  In the Fall of 2011, did you discuss with your clients

D4GJCHE4                    Donziger - redirect

1   producing documents from their Ecuadorian lawyers?

2   A.  I did.

3   Q.  Was that in connection with discovery requests that were

4   pending in Count 9 at that time?

5   A.  That was.

6   Q.  In 2011, did your clients gather any documents from their

7   Ecuadorian counsel?

8   A.  I don't believe they did.

9   Q.  Do you know with certainty one way or the other?

10  A.  I don't.  I know that our clients did provide documents

11  that they had in their personal possession in 2011.

12  Q.  Did you have any dealings in 2011 with your client's

13  Ecuadorian counsel on the issue of producing documents in

14  connection with Count 9?

15  A.  I did.  I spoke with Mr. Fajardo.

16  Q.  Do you recall when in 2011 you spoke with Mr. Fajardo about

17  producing documents?

18  A.  I've spoken, probably the first time would have been in

19  July of 2011.

20  Q.  Were you requesting that he produce documents at that time,

21  Mr. Fajardo?

22  A.  I was asking him for documents to produce to Chevron and

23  any documents we could get that would be helpful to represent

24  our clients.

25  Q.  At that time in July 2011 did Mr. Fajardo provide you with

1    any documents to either produce to Chevron or to assist in your

2    defense of your clients in this action?

3    A.  Mr. Fajardo provided some documents.

4            I believe some that he had received from Mr. Camacho

5    and Piaguaje and some other documents that I believe were

6    public documents, and everything that we received from Camacho

7    or Piaguaje or from Mr. Fajardo was produced or put on a

8    privilege log.

9    Q.  Other than providing you with documents that he had

10   received from your mutual clients, Mr. Camacho and

11   Mr. Piaguaje, and the public documents, did Mr. Fajardo provide

12   you with anything else in July of 2011?

13   A.  To the best of my recollection, nothing else in July 2011.

14   Q.  Did Mr. Fajardo relate to you in July of 2011 that he

15   believed he was unable to produce documents in response to

16   discovery requests from the United States?

17   A.  Yes, he did at some point.  Whether it was July or August,

18   I couldn't tell you, but I do know it was one of those two

19   months, during one of my first visits to Ecuador.

20   Q.  Did you do that in writing or orally?

21   A.  That was orally.

22   Q.  In July of 2011, what reason did Mr. Fajardo give for being

23   unable to produce documents in the Ecuadorian client files at

24   Selva Viva?

25   A.  Mr. Fajardo stated that he represented a group of clients

D4GJCHE4                        Donziger - redirect

1    and that without the consent of the full group, he could not

2    provide those documents to myself or other counsel for Messrs.

3    Camacho and Piaguaje.

4    Q.  Did he have any other reason for being unable to produce

5    the documents at that time?

6    A.  He referred to provisions of Ecuadorian law that would

7    subject him to penalties.  I don't recall the exact provisions,

8    but it was discussed at that time in July or August of 2011.

9    Q.  In July of 2011 did Mr. Fajardo tell you that if all 47

10   clients consented, he then would be able to produce his files?

11   A.  I don't recall.

12   Q.  In 2011 did you consult on behalf of your clients any

13   Ecuadorian lawyers other than Mr. Fajardo on the issue of your

14   client's rights to access their Ecuadorian lawyer's files?

15   A.  I did not.

16   Q.  Do you know whether anyone at Smyser Kaplan did?

17   A.  I don't know.

18   Q.  Were you also the associate at Smyser Kaplan primarily

19   responsible for preparing Mr. Camacho's and Mr. Piaguaje's

20   responses to Chevron's first set of interrogatories in this

21   action?

22   A.  I was one of the associates who worked on the responses to

23   interrogatories, yes.

24   Q.  Are you fluent in Spanish, Mr. Stewart?

25   A.  Yes, ma'am.

D4GJCHE4                      Donziger - redirect

1   Q.  Am I correct you're able to read, write and speak fluently

2   in Spanish?

3   A.  Yes.  I wouldn't say my Spanish is perfect, but I'm able to

4   communicate both orally and in writing.

5   Q.  You were the person who translated the interrogatories for

6   Mr. Camacho and Mr. Piaguaje to respond to.  Is that right?

7   A.  Yes, I was.

8   Q.  Is it also accurate that of all the lawyers at Smyser

9   Kaplan, you handled the majority of the contact between Smyser

10  Kaplan and your client's Ecuadorian counsel?

11  A.  No.  Mr. Veselka and Mr. Smyser also speak Spanish,

12  although not as fluently as myself, so both of them have

13  handled contacts with Mr. Fajardo, but I've been involved with

14  many of the contacts with Ecuadorian counsel.

15  Q.  Are any of your client's Ecuadorian counsel fluent in

16  English?

17  A.  Mr. Saenz speaks English fairly well.

18  Q.  Any one else?

19  A.  No, not that I can think of.

20  Q.  During the course of your representation of Mr. Camacho and

21  Mr. Piaguaje in this action, on how many occasions have you met

22  with your Ecuadorian counsel in person?

23  A.  In person, at least 7 or 8 times.

24  Q.  Which of the Ecuadorian counsel have you met with?

25  A.  I have met in person with Pablo Fajardo, Juan Pablo Saenz

D4GJCHE4                         Donziger - redirect

1    and Luis Prieto.

2    Q.  Have all those meetings been in Ecuador?

3    A.  Yes.

4    Q.  Is it fair to say you communicated extensively with your

5    client's Ecuadorian counsel over the past two years in

6    defending them in this action?

7    A.  In defending whom?

8    Q.  Mr. Piaguaje and Mr. Camacho?

9    A.  I communicate with Ecuadorian counsel as required by the

10   circumstances of the case.  I don't know that I would call it

11   extensively.

12   Q.  Could you estimate the number of times that you've

13   exchanged e-mails with Ecuadorian counsel?

14   A.  It just depends on the flow of the case.  When it is a busy

15   time, maybe once a day, but that's pretty rare.  Probably more

16   like a couple of times a month is my best guess.

17   Q.  Could you estimate your level of phone interaction with

18   your client's Ecuadorian counsel?

19   A.  Probably similar in terms of if there are busy periods in

20   the case, there may be one call a week, but there have been

21   time periods where I have not spoken with them by phone for a

22   month or two.

23   Q.  Have your client's Ecuadorian counsel generally been

24   cooperative in assisting you in defending Mr. Camacho and

25   Mr. Piaguaje in this action?

D4GJCHE4                        Donziger – redirect

1   A.   Generally, Mr. Fajardo responds to e-mails and phone calls,

2   yes.

3                (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D4gdche5                         Stewart - direct

1   Q.  And during your representation of Mr. Camacho and

2   Mr. Piaguaje in this action, Ecuadorian counsel have provided

3   you with documents to use in the defense of your clients,

4   correct, from Ecuador?

5   A.  As part of our representation we've requested documents on

6   many occasions, and Mr. Fajardo and Mr. Saenz and Mr. Prieto

7   have chosen what documents that they believe they are able to

8   share with us based on the provisions of Ecuadorian law.

9   Q.  Well, Mr. Stewart, when you asked for a document from

10  Mr. Fajardo and Mr. Saenz separate from these document

11  production requests, have they provided the documents you've

12  requested?

13  A.  Usually no.

14  Q.  Can you give me -- let me withdraw that.

15          Are there times when you've requested information from

16  Ecuadorian counsel that they have provided you that information

17  and then you have used that information in defense of

18  Mr. Camacho and Mr. Piaguaje in this action?

19  A.  It depends on how broadly you define "information."  I

20  mean, are you talking about documents?

21  Q.  Have they ever provided you -- let's start with documents.

22          Had they provided you with documents that you then

23  used in this action in defense of your clients?

24  A.  Mr. Fajardo, as I said, gave our firm documents in 2011

25  that were documents that he had gathered from our two common

D4gdche5                        Stewart - direct

1   clients, Camacho and Piaguaje, and public documents.  I know

2   that we produced those.  I believe, to the best of my

3   recollection, some of those may have been filed in conjunction

4   with various motions in the case.

5          Apart from that, I cannot recall any specific document

6   that we have filed.  There may be but I just can't think of

7   one.

8   Q.  You can't think of any other documents that you've used in

9   the defense of this case that you've received from Ecuadorian

10  counsel?

11  A.  No, I can't.

12  Q.  Did you receive the Zambrano declaration from Ecuadorian

13  counsel?

14  A.  Yes.

15  Q.  And have you filed that Zambrano declaration in this

16  action, sir?

17  A.  We did file that declaration in response to the summary

18  judgment for our clients.

19  Q.  And you received the Zambrano declaration from Ecuadorian

20  counsel after the Cordova Court issued its order, correct?

21  A.  We did.

22  Q.  And who among your clients, Ecuadorian counsel, sent you

23  the Zambrano declaration?

24  A.  Mr. Fajardo.

25          MS. NEUMAN:  Speaking of Mr. Fajardo, I would like to

D4gdche5                         Stewart - direct

1   approach the witness and provide him a copy of Mr. Fajardo's

2   retention agreement.

3              THE COURT:  All right.  And this is which exhibit?

4              MS. NEUMAN:  Exhibit 1 for the purposes of this

5   hearing, your Honor.

6   BY MS. NEUMAN:

7   Q.  Mr. Stewart, Exhibit 1, do you have that in front of you

8   now, sir?

9   A.  I do.

10  Q.  This is Mr. Fajardo's retention agreement dated January 5,

11  2011.

12             And in connection with your representation of

13  Mr. Camacho and Mr. Piaguaje, have you reviewed this document

14  before?

15  A.  I have seen this document before.  I have not reviewed it

16  in great detail.

17  Q.  Let me direct your attention to paragraph 1 of the

18  agreement that provides that "Mr. Fajardo will cooperate and

19  coordinate with any other lawyers or law firms retained by the

20  plaintiffs in connection with the litigation (whether such

21  efforts are to occur in Ecuador, the United States or

22  elsewhere)."

23             Do you see that, sir?

24  A.  I do.

25  Q.  And in your understanding, is Smyser Kaplan included among

D4gdche5                              Stewart – direct

1    the other law firms retained by the plaintiffs for the purposes

2    of this agreement?

3    A.  I wasn't involved in the retention but I know that we have

4    been retained by Camacho and Piaguaje.

5    Q.  Do you know whether Mr. Camacho and Piaguaje signed the

6    retainer, or whether someone else signed it on their behalf?

7    A.  I do know Mr Camacho and Piaguaje signed the retainer.

8    I've seen it.

9    Q.  Did Mr. Fajardo also sign the retainer?

10   A.  I believe so.

11   Q.  That is a yes?

12   A.  I believe so.

13   Q.  If you look at the fourth whereas clause on Exhibit 1, do

14   you see that it defines other plaintiffs' representatives as

15   Donziger, Yanza, and any successors?

16          THE COURT:  Ms. Neuman, haven't we really been all

17   through this, and what is the use of doing it with this

18   witness?

19          MS. NEUMAN:  I was going to ask, your Honor, if they

20   have undertaken to assert any of their clients' rights under

21   this agreement to obtain access.

22          THE COURT:  OK.  Go ahead.  Go directly to it.

23   Q.  Do you see that, Mr. Stewart?

24   A.  I do see it.

25   Q.  And then Section 6, starting at the bottom of page 4 with

D4gdche5                          Stewart - direct

1   the heading and then continuing on to page 5, the agreement

2   prohibits Mr. Fajardo from disclosing confidential information

3   with three exceptions.  One exception is when he is authorized

4   to do so by the plaintiffs.  Do you see that?

5   A.  I see those words.  Yes.

6          THE COURT:  Could we go directly to it?  We have been

7   over this document quite a bit today.

8          MS. NEUMAN:  Yes, your Honor.

9   Q.  This document authorizes Mr. Fajardo to release

10  information, if directed to do so, by either Mr. Donziger or

11  Mr. Yanza.

12         On behalf of your clients, have you ever requested

13  that Mr. Donziger use his rights under this agreement to get

14  documents from Ecuadorian counsel?

15  A.  Have I requested Mr. Donziger to use this agreement to get

16  documents?

17  Q.  Yes.

18  A.  The answer to that question is no.

19  Q.  Have you ever requested that Mr. Yanza, on behalf of your

20  clients, exercise his right to access the Ecuadorian counsel's

21  files under this agreement?

22  A.  I've asked Mr. Yanza for documents on several occasions.

23  I've never referenced this agreement.

24  Q.  This agreement also provides that the client file shall be

25  the property of the plaintiffs in Section 7.

D4gdche5                         Stewart - direct

1           Do you see that?

2    A.  I do.

3    Q.  Have you ever brought any actions on behalf of your clients

4    to get access to those files which are their property in

5    connection with this document production?

6    A.  I have not.  I'm not a lawyer in Ecuador or authorized to

7    practice there.

8    Q.  Have you ever at any time attempted to retain counsel for

9    Mr. Camacho and Piaguaje in Ecuador in order to force their

10   Ecuadorian counsel to provide them with access to the files

11   there?

12   A.  I have not done that.

13   Q.  Do you know whether anyone at Smyser Kaplan has done that?

14   A.  I don't.

15   Q.  The retention agreement notes that counsel who are retained

16   will become parties to the Master Agreement.

17          Are you familiar with that, Mr. Stewart?

18   A.  I am not.

19   Q.  Do you know whether or not Smyser Kaplan is a party to the

20   Master Agreement?

21   A.  I do not.

22   Q.  Has Ecuadorian counsel previously turned over to Smyser

23   Kaplan hundreds of draft pleadings from the Ecuador action?

24   A.  I believe that there are draft pleadings, yes, produced to

25   our firm.

D4gdche5                          Stewart - direct

1   Q.  And who of the Ecuadorian counsel provided you those

2   hundreds of draft pleadings?

3   A.  Juan Pablo Saenz and Julio Prieto.

4   Q.  When did they provide those documents to you?

5   A.  April of 2012.

6   Q.  And in response to whose direction or request did Mr. Saenz

7   and Mr. Prieto provide you with hundreds of draft pleadings

8   from the Ecuador action?

9   A.  It was a request made by Mr. Veselka and myself.

10  Q.  And was there any objection to that request at the time it

11  was made, or did they just give you the document?

12  A.  I don't believe there was an objection at the time.

13  Q.  You mentioned that you have been to Ecuador seven or eight

14  times, is that right?

15  A.  Six to eight times, yeah.

16  Q.  And on any those occasions have you visited the Ecuadorian

17  counsel Selva Viva law offices?

18  A.  I have.

19  Q.  On how many occasions?

20  A.  I think every time I have been there.

21  Q.  On the six to eight times that you visited the Selva Viva

22  law offices, have you seen files there, paper documents, file

23  cabinets, that sort of thing?

24  A.  I've seen the binders of the court record in a room, but

25  other than that I can't recall any other paper file.

D4gdche5                         Stewart - direct

1   Q.   And the lawyers there had computers on which they were

2   working, is that right?

3   A.   The lawyers I have seen used laptop computers.

4   Q.   While you were at the Selva Viva offices on these seven to

5   eight occasions, were you allowed to look in the binders of the

6   court record?

7   A.   I never asked.

8   Q.   Did you look at any documents on any of the occasions that

9   you were at the Selva Viva offices in Ecuador?

10  A.   I may have looked at documents that I brought with me to

11  review with Ecuadorian counsel.

12  Q.   Did you ever look at any of their documents while you were

13  there?

14  A.   Not that I can recall.

15  Q.   Did you ever have access to any of their computers while

16  you were there?

17  A.   I did not.

18  Q.   On the seven or eight occasions that you were in Ecuador at

19  the Selva Viva offices, were you working with Ecuadorian

20  counsel on your clients' defense in this case?

21  A.   Yeah.  I mean, that's the purpose of our visit.

22  Q.   On any of the occasions that you were at the Selva Viva

23  offices with Ecuadorian counsel, was Mr. Donziger also there?

24  A.   One time.

25  Q.   On the occasion -- the one occasion that you were at Selva

D4gdche5                          Stewart – direct

1   Viva at the same time as Mr. Donziger, was he participating in

2   the meetings where you were working on the defense of your

3   clients in this action?

4   A.   No, he was not.

5   Q.   Have you ever witnessed Mr. Donziger accessing any of the

6   files in the Selva Viva offices on that one occasion?

7   A.   No.  I mean, he came in shortly, said hello to some people,

8   and had to leave to go somewhere else.

9   Q.   Do you have your declaration which we marked as Exhibit 10

10  in front of you, Mr. Stewart?

11  A.   I do.

12  Q.   Is there anything in this declaration that is not true and

13  correct?

14  A.   Nope.

15  Q.   OK.  I would like to turn your attention to paragraph 5.

16          In paragraph 5, you state that, "After receiving

17  Chevron's first requests for production to Camacho and

18  Piaguaje, on June 7, 2012, I spoke with Pablo Fajardo by

19  telephone concerning the requests for production and forwarded

20  a copy of Chevron's requests to him."

21          Is that accurate?

22  A.   It is.  And I would also like -- there is some highlighting

23  on this document that I don't believe was in my original

24  declaration, just for the record.

25          THE COURT:  Just ignore the highlighting.  Let's go

D4gdche5                          Stewart – direct

1    on.

2    Q.  Was your conversation by phone with Mr. Fajardo on the

3    7th or is that simply the date the requests were served?

4    A.  It is the date the requests were served.

5    Q.  So when was your phone conversation with Mr. Fajardo?

6    A.  Sometime a week or two after that.

7    Q.  When you spoke to Mr. Fajardo on June 7th, 2012, did he

8    tell you that he would not be willing to produce any documents

9    in response to Chevron's requests?

10   A.  I didn't talk to him on June 7th.

11   Q.  I'm sorry.  When you spoke to Mr. -- do you know the date

12   on which you did talk to him?

13   A.  No.

14   Q.  OK.  When you spoke to him at some point in June 2012, did

15   Mr. Fajardo tell you that he would not be producing documents

16   in response to Chevron's requests?

17   A.  He did.

18   Q.  He did?

19   A.  Yeah.  He told me not, just as he told me not in 2011.

20   Q.  And he told you that he would not be producing any

21   documents in response to the requests before he had seen the

22   requests, correct?

23   A.  No.  I forwarded Mr. Fajardo a copy of the requests.

24   Q.  So by the time that you spoke to him in June, he had

25   reviewed the requests prior to your call?

D4gdche5                         Stewart - direct

1    A.  I don't know whether he reviewed them or not, but I believe

2    he had them at the time we spoke.

3    Q.  Did you ever review the individual requests with

4    Mr. Fajardo and discuss whether he would produce any documents

5    on a request-by-request basis?

6    A.  We talked about certain individual requests, but I don't

7    think we went over all the 180, or however many there were.

8    Q.  Were there any on which he was willing to produce

9    documents?

10   A.  No.

11   Q.  Were you able to confirm in your discussions with

12   Mr. Fajardo that he had documents that were responsive to

13   Chevron's request for production of documents?

14   A.  No.

15          THE COURT:  All right.  We are going to take a break

16   for about ten minutes here.

17          THE CLERK:  All rise.

18          (Recess)

19          THE CLERK:  All rise.

20          Please be seated.

21          THE COURT:  Before we proceed with Mr. Stewart, I've

22   reflected a little bit further, Mr. Keker, about a ruling I

23   made on your cross of Mr. Donziger in which I sustained an

24   objection to the question -- this is in relation to the

25   March 30th Prieto e-mail.  You know which one I am talking

D4gdche5                       Stewart - direct

1    about?

2              MR. KEKER:  Yes, sir.

3              THE COURT:  I sustained two objections.  The first was

4    as to this question:  "So the issue was if they gave

5    confidential information of their clients to a U.S. court that

6    wanted it in the Stratus 1782 litigation, what was the risk, as

7    understood it?"

8              And the second question you followed up immediately,

9    and you asked:  "Well, what did you understand when you said,

10   apart from destroying the proceeding, all of us, your

11   attorneys, might go to jail?"

12             And I sustained that objection.

13             I'm going to allow you to pose those questions and

14   follow up on them to Mr. Donziger, if you wish to do so, and

15   we'll interrupt Mr. Stewart and you can go ahead, within

16   reason.  And then if there is any redirect, I'll deal with it.

17             MR. KEKER:  I'm willing at this point just to move on,

18   your Honor.

19             THE COURT:  OK.

20             MR. KEKER:  Just for the record, though, I think the

21   question was -- and I don't have the transcript in front of

22   me -- it wasn't what you said, because he didn't write the

23   e-mail, it was what was your understanding when he said the go

24   to jail piece.  Donziger didn't write it, and I was asking

25   Donziger his understanding.

D4gdche5                          Stewart - direct

1           THE COURT:  I'm not sure whether it was an error in

2    the draft transcript, and it is only a draft transcript.  I

3    certainly understood the sense of your question to be just what

4    you said.  Whether there was a slip of the tongue on your part

5    or a transcription problem, that was my understanding of the

6    sense.

7           MR. KEKER:  Thank you.

8           THE COURT:  And it is not fair to tax anybody with a

9    transcription problem because this is only a draft transcript

10   and the reporters, of course, do a magnificent job and they

11   have to clean it up at the end of the day.

12          MR. KEKER:  If they clean it up -- if they clean me up

13   appropriately, I always appreciate the reporters at the end of

14   the day, your Honor.  Thank you.

15          THE COURT:  Well, we all do.

16          OK.  Let's continue.

17   BY MS. NEUMAN:

18   Q.  Mr. Stewart, do you still have Exhibit 10, your

19   declaration, in front of you?

20   A.  I do.

21   Q.  Returning to paragraph 5, you state there, in the first

22   full sentence on page 3, "Mr. Fajardo informed me that under

23   Ecuadorian law he was prohibited from providing Messrs. Camacho

24   and Piaguaje with these documents unless he obtained the

25   permission of all Aguinda plaintiffs."  Do you see that?

D4gdche5                        Stewart - direct

1    A.  I do.

2    Q.  Is that an accurate statement of what Mr. Fajardo told you

3    in your phone call?

4    A.  He said that to me and I believe Mr. Smyser and Veselka as

5    well.

6    Q.  All three of you were on the same call?

7    A.  I believe so, or some combination of one or the other or

8    both of Mr. Smyser and myself.

9    Q.  Was there anyone else on the call than yourself,

10   Mr. Smyser, Mr. Veselka and Mr. Fajardo?

11   A.  I don't believe so.

12   Q.  When Mr. Fajardo said that Ecuadorian law prohibited him

13   from providing these documents, was he referring to any

14   documents of any kind that were responsive to Chevron's

15   request?

16   A.  I'm not sure what Mr. Fajardo was referring to.  He was

17   referring to documents that he had in his possession that

18   belonged to the Aguinda plaintiffs.  That's what I understood

19   him to be referring to.

20   Q.  Did you understand Mr. Fajardo in June of 2012 to be

21   refusing to produce to his clients, Mr. Camacho and

22   Mr. Piaguaje, for example, any communication that he had had

23   with Richard Cabrera?

24   A.  I understood that was one of Chevron's requests, so I

25   understood that he was not going to provide that to Camacho or

D4gdche5                          Stewart - direct

1    Piaguaje or their counsel; that is Smyser Kaplan & Veselka.

2    Q.  Did you also understand from Mr. Fajardo in this June 2012

3    conversation that he was refusing to provide any communications

4    that Ecuadorian counsel had had with any judge who had presided

5    over the Ecuador litigation?

6    A.  If those were included in Chevron's requests and if such

7    documents existed, my understanding is that he would not

8    produce documents that were in his possession if they existed.

9    Q.  Was it also your understanding that Mr. Fajardo's refusal

10   was based on Ecuador secrecy doctrine?

11   A.  My understanding is it was based on a number of provisions,

12   including the Constitution and several civil and penal

13   provisions of the Ecuadorian codes.

14   Q.  And was it your understanding that those provisions covered

15   communications between Ecuadorian counsel and third parties?

16   A.  I'm not an Ecuadorian lawyer and I don't have an

17   understanding of the intricacies of Ecuadorian law.

18   Q.  Did you have anyone analyze whether the Ecuadorian --

19   anyone other than Mr. Fajardo analyze whether Ecuadorian

20   secrecy laws actually covered communications between Ecuadorian

21   counsel and third parties like the judge in the case?

22   A.  We obtained several opinions from former members of the

23   Ecuadorian Supreme Court as to the legal prohibitions on

24   Mr. Fajardo turning over documents that belonged to a group of

25   clients, to just two of his clients, but I do not believe the

D4gdche5                         Stewart - direct

1   question you are posing was proposed to either of those former

2   justices.

3   Q.  So no opinion was obtained as to that issue, correct?

4   A.  Your specific question, no, ma'am.

5   Q.  You then state in your declaration that Mr. Fajardo said he

6   would request permission from his other clients to provide

7   Messrs. Camacho, Piaguaje information in his possession related

8   to the Aguinda suit, is that right?

9   A.  Yes.  That's correct.

10  Q.  And did Mr. Fajardo tell you in this June conversation that

11  if the other Ecuadorian plaintiffs consented, he would then

12  produce the requests documents, at least to your clients?

13  A.  I don't think he took it that far down the line of

14  discussion.

15  Q.  Well, Mr. Fajardo told you in this conversation that he was

16  going to seek this consent, correct?

17  A.  Right.

18  Q.  And was the implication that if he obtained the consent he

19  would then produce the documents?

20  A.  He didn't talk about whether or not he would produce the

21  documents.  He said he would seek consent.  That's what we

22  discussed.

23  Q.  Was there ever a time that Mr. Fajardo told you that if all

24  47 consented to the production, he would actually produce the

25  documents?

D4gdche5                            Stewart - direct

1    A.   Sitting here today, I don't recall such a statement.

2    Q.   Is it fair to say that, at a minimum, Mr. Fajardo made

3    clear that if the other 45 did not consent, then he would not

4    produce the documents, correct?

5    A.   In this conversation in June of 2012, Mr. Fajardo did not

6    talk about what his action would be based on the results of

7    seeking consent.

8    Q.   One way or the other?

9    A.   No.

10   Q.   And you didn't ask him?

11   A.   No.

12   Q.   Did Mr. Fajardo indicate in this June conversation how soon

13   he would know whether or not the other plaintiffs had

14   consented?

15   A.   No.  He said it would take a while to get in touch with

16   everybody.  I understand that they have regular meetings with

17   representatives of the plaintiffs and the plaintiffs, but he

18   didn't say how long it would be.

19   Q.   During the time that you have represented Mr. Piaguaje and

20   Mr. Camacho, are you aware of Mr. Fajardo ever seeking their

21   permission to disclose documents related to the Ecuador

22   litigation?

23   A.   I am aware based on -- yes, I'm aware that he has done

24   that.

25   Q.   On how many occasions?

D4gdche5                          Stewart - direct

1    A.   A few occasions.  I don't know exactly how many.

2    Q.   Do you know if the permission was given?

3    A.   I don't believe it was.

4    Q.   And did Mr. Fajardo seek this permission from your clients

5    in writing?

6    A.   I believe Mr. Fajardo discussed obtaining -- or, I'm sorry,

7    producing documents with Messrs. Camacho and Piaguaje in 2011

8    orally and also in 2012 orally.

9    Q.   When Mr. Fajardo was discussing producing documents with

10   Mr. Piaguaje and Mr. Camacho, was he discussing producing

11   documents in this action or in another action?

12   A.   I wasn't present in those conversations.

13   Q.   So you don't know one way or the other?

14   A.   I don't.  I just know that conversations occurred.

15   Q.   Did Mr. Camacho and Mr. Piaguaje ever put in writing to

16   Mr. Fajardo their consent to his producing documents in this

17   action?

18   A.   No.  I don't think there has ever been anything in writing

19   about that.

20   Q.   Did Mr. Camacho and Mr. Piaguaje ever put in writing to

21   Mr. Fajardo their demand that he give them access to the

22   Ecuadorian counsel files?

23   A.   I don't believe such a demand has been made in writing by

24   Messrs. Camacho or Piaguaje themselves.

25   Q.   Has Smyser Kaplan made such a written demand on their

D4gdche5                          Stewart - direct

1   behalf?

2   A.   I believe Mr. Smyser has sent letters to -- no, I actually

3   don't.  I can't recall whether there has been a written demand,

4   a formal written demand.  I've sent requests in person and over

5   the phone, and there may be an e-mail in which a request has

6   been made for documents, but I can't say that for certain.

7   Q.   When Mr. Fajardo told you in June 2012 that he could not

8   provide copies of the files to your clients, did you ask

9   Mr. Fajardo if you could review and at least log the responsive

10  documents without making copies?

11  A.   Yes.

12  Q.   What was his response to that?

13  A.   He would not let us do that.

14  Q.   And did he cite you to any provision of Ecuadorian law that

15  would prevent your clients from having access solely for the

16  purpose of logging the documents?

17  A.   I don't believe there is any -- I don't understand

18  Ecuadorian law in terms of privilege logging.  So, no, I don't

19  believe he did.

20  Q.   And is it accurate that you explained to Mr. Fajardo that

21  the U.S. process is that you gather the responsive documents,

22  you evaluate whether or not they are privileged, and if they

23  are privileged you log them, and only if they are not

24  privileged do you produce them?  Did you explain that to him?

25  A.   We've explained U.S. procedures to Mr. Fajardo many times,

D4gdche5                          Stewart - direct

1   and I don't think he believes it applies to him.  He is an

2   Ecuadorian lawyer in Ecuador.

3   Q.  Now, in June of 2012, at the same time Mr. Fajardo was

4   refusing to turn over documents in connection with this case,

5   he was providing Smyser Kaplan with information on analogous

6   topics for use in the Banco Pichincha 1782, correct?

7   A.  I was not involved in the Banco Pichincha 1782

8   representation to a great degree.  So, no, I don't know.

9   Q.  You are aware that Smyser Kaplan represents -- let me

10  withdraw that.

11          You are aware that Chevron has brought a Section 1782

12  action in the federal district court in Miami seeking the

13  production of documents from Banco Pichincha, including

14  documents held in the Selva Viva in secret accounts, correct?

15  A.  I'm aware that there is a 1782 action that Chevron has

16  filed against Banco Pichincha, yes.

17  Q.  And you are aware that Smyser Kaplan represents all 47

18  plaintiffs in that action, is that right?

19  A.  I did not know that.  I have not been heavily involved in

20  the Banco Pichincha proceeding.

21  Q.  Have you ever been involved on updating the 47 clients that

22  are represented there on the status of the Banco Pichincha

23  proceeding?

24  A.  I have not.  I have spoken with Mr. Camacho and

25  Mr. Piaguaje about that proceeding.

D4gdche5                          Stewart - direct

1   Q.  And you have not spoken to the other 45 Smyser Kaplan

2   clients about that proceeding, is that right?

3   A.  I have not.

4   Q.  And who has primary responsibility for the Banco Pichincha

5   proceeding?

6   A.  Mr. Veselka has worked on the Banco Pichincha matter.

7   Q.  Did you have any involvement in the objection that Smyser

8   Kaplan filed to the Magistrate Judge's Order and Recommendation

9   that the subpoena issue in the Banco Pichincha matter in June

10  of 2012?

11  A.  I believe I probably reviewed a draft, like most pleadings.

12  I may have provided comments, but I did not draft that

13  document.

14  Q.  There is a statement in that pleading as follows:  "The

15  Ecuadorian plaintiffs' counsel paid Cabrera in the amount of

16  his request made to the Court so that his work would not stop

17  while Cabrera's payment requests sat on the Judge's desk."

18          Are you familiar with that statement?

19  A.  I am.

20  Q.  Were you involved in getting any information from

21  Ecuadorian counsel in support of that assertion?

22  A.  I was a participant on a phone call where that was

23  discussed.

24  Q.  Were any checks from the Banco Pichincha account which show

25  that Ecuadorian counsel paid Cabrera in the amount of his

D4gdche5                          Stewart - direct

1    request that was pending at that time provided to Smyser

2    Kaplan?

3    A.   No.

4    Q.   Were any other documents that verify the statement made in

5    the objections pleading filed in Miami provided to Smyser

6    Kaplan?

7    A.   I don't know.

8    Q.   In the phone call in which you participated, who was

9    providing information to Smyser Kaplan about the payments to

10   Cabrera?

11   A.   Mr. Fajardo.

12   Q.   So is it accurate that at the same time Mr. Fajardo is

13   telling you he can't provide case information for production in

14   this case, he is on a phone call providing you with factual

15   information about the Ecuadorian litigation for use in the

16   Banco Pichincha matter?

17   A.   Mr. Fajardo discloses the information that he believes he

18   is permitted to disclose, and we use all the information we can

19   obtain from him to diligently represent our clients.

20   Q.   Well, in the Banco Pichincha matter, Mr. Fajardo was

21   disclosing information about his interactions with Cabrera,

22   correct?

23   A.   His or other Ecuadorian plaintiffs' representative, I

24   believe.

25   Q.   OK.  So when Mr. Fajardo voluntarily disclosed that

```
 1    information to you on the phone call about the Banco Pichincha

 2    matter, did you say to him, you know, Chevron has a request for

 3    production of documents related to your communications with

 4    Cabrera.  So if you can provide us information on that topic,

 5    will you at least produce the Cabrera documents?

 6    A.  We had a similar discussion that Mr. Fajardo has told us he

 7    could not provide responsive documents but that he was

 8    providing us some information, and asked for an understanding

 9    of why Mr. Fajardo provided information.  And he said that

10    under the provisions of Ecuadorian law that applied, he was

11    providing what he was legally able to provide at that time.

12    Q.  And how did he describe this legal line that he was

13    drawing?

14    A.  I don't believe it was discussed in that call about the

15    Banco Pichincha matter.

16    Q.  Well, has it become apparent to you in working with

17    Mr. Fajardo and receiving information at times and not

18    receiving it at other times, that Mr. Fajardo provides you with

19    information when he thinks it will be helpful to your clients'

20    case and that at all other times he refuses to provide you with

21    information?

22    A.  I don't think that is an accurate statement.  There are

23    plenty of times when we have asked for information that we

24    think would be helpful and it would be apparent to Mr. Fajardo

25    that it would be helpful for the defense of our clients that he
```

D4gdche5                         Stewart - direct

1   has refused to provide that information.

2   Q.  Even though he has had it?

3   A.  Yes.

4   Q.  And what information would that be?

5   A.  Throughout the case we've asked --

6              MR. SMYSER:  Excuse me, your Honor.  Objection.  I

7   think he is getting into work product now asking him what

8   information he would be asking Mr. Fajardo to provide him in

9   the defense of the case.

10             THE COURT:  Rephrase your question.

11             You are asking what information he's refused to

12  provide?

13             MS. NEUMAN:  Yes, your Honor.

14  BY MS. NEUMAN:

15  Q.  What specific information has Mr. Fajardo refused to

16  provide other than his blanket refusal to respond to Chevron's

17  requests for production of documents?

18             MR. SMYSER:  The same objection, your Honor.  It is

19  work product.  He is asking -- in order to say what information

20  he has refused to provide, he's going to have to say this is

21  information that he asked for, which is core attorney work

22  product.

23             THE COURT:  What do you say to that, Ms. Neuman?

24             MS. NEUMAN:  Well, your Honor, I think they've waived

25  the work product to the extent that they're saying that they

D4gdche5                          Stewart - direct

1    have examples of when Mr. Fajardo has refused to provide

2    helpful information.  We have no way to test whether that

3    information exists, whether in fact he refused to provide it.

4              MR. SMYSER:  Your Honor, none of the questions so far

5    have gotten into work product to the extent this question got

6    into it.  We have to answer the questions they ask in order to

7    demonstrate -- in order to respond to the accusations against

8    us, but we are being very careful doing our best not to allow

9    work product to be penetrated.  And I don't want to be in a

10   position of waiving work product, having this argument made.

11             I think this is a core work product question.

12             THE COURT:  Well, it might or it might not be.  Is

13   there any argument it doesn't apply here at all, Ms. Neuman, or

14   not?

15             MS. NEUMAN:  Well, your Honor, if he has refused to

16   provide information that's not protected in the first place,

17   such as communications with judges or Cabrera or others, I

18   don't see how his refusal is work product.

19             THE COURT:  I will sustain it for now.  I will think

20   about it overnight.

21             MS. NEUMAN:  Thank you, your Honor.

22   BY MS. NEUMAN:

23   Q.  Mr. Stewart, your firm is in possession of videos that they

24   allege were commissioned by Chevron which allegedly show

25   conduct related to the judicial inspections.  Are you familiar

D4gdche5                                Stewart – direct

1  with those videos?

2  A.  I know they exist.  I have not seen them.

3  Q.  And is it your understanding that those videos were

4  obtained from Pablo Fajardo?

5  A.  Yes.

6  Q.  Do you have any documents demonstrating that your client

7  consented to those videos being turned over to Smyser -- I'm

8  sorry.  Withdraw that.

9          Do you have any documents indicating the 48 Lago

10  plaintiffs consented to those videos being turned over to your

11  firm?

12  A.  I don't.

13  Q.  Of all the information that your firm has received from

14  Mr. Fajardo, including the hundreds of draft pleadings, the

15  factual information provided over the phone, the Zambrano

16  declaration, the videos and other information, have you ever

17  seen any documents or hear any evidence that all 47 plaintiffs

18  consented to the release of each piece of information as it was

19  released to your firm?

20  A.  I have not seen a consent to each piece of information, but

21  I don't know that all of those pieces of information you

22  described required consent, as I understand it.

23          THE COURT:  Ms. Neuman, just fill me in on one thing.

24  These draft pleadings, are these materials that Chevron

25  requested production of?

D4gdche5                          Stewart - direct

1          MS. NEUMAN:  Yes, your Honor.  These are materials

2     that are logged.  Based on the earlier conversation regarding

3     the log, I didn't put the log in front of the witness.

4          THE COURT:  OK.  Go ahead.

5     BY MS. NEUMAN:

6     Q.  I want to move, Mr. Stewart, from June to August.

7          On August 13, 2012, Chevron moved to compel the

8     production of the documents in the possession of Mr. Camacho

9     and Mr. Piaguaje's agents.  You are familiar with that, sir?

10    A.  Yes.

11    Q.  And you understood those agents to include Mr. Fajardo,

12    Mr. Prieto, Mr. Saenz and Mr. Yanza, correct?

13    A.  Yes.

14    Q.  You made a trip to Ecuador in August of 2012, correct?

15    A.  I did.

16    Q.  What were the dates of your trip?

17    A.  I traveled to Ecuador with Mr. Smyser on the evening of

18    August 13th and returned on the morning of August 15th.

19    Q.  In your declaration you state that you and Mr. Smyser met

20    with Mr. Fajardo and Mr. Saenz in Ecuador on the 14th.  Is that

21    accurate?

22    A.  Yes.

23    Q.  Was there anyone else present at that meeting?

24    A.  No.

25    Q.  Was the purpose of this meeting to work on the defense for

D4gdche5                     Stewart - direct

1    your clients in this action?

2    A.  Yes.

3    Q.  And did the meeting take place at the Selva Viva offices?

4    A.  It did.

5    Q.  At this meeting did Mr. Fajardo tell you that he had not

6    received the consent of the other 45 plaintiffs to provide

7    documents?

8    A.  I don't believe at that time Mr. Fajardo had been able to

9    contact all of the 47 plaintiffs.  So I don't recall him making

10   that statement in August of 2012.

11   Q.  Can I direct your attention to paragraph 6 of your

12   declaration.

13           In the third -- I'm sorry, yes, third sentence, you

14   state:  "Mr. Fajardo confirmed that he had requested the

15   consent of his other clients to provide the requested documents

16   and that he did not receive such consent."

17           Do you see that?

18   A.  I do.

19   Q.  Is that sentence not describing something that Mr. Fajardo

20   told you in the August 14th meeting?

21   A.  I believe so.  I'm not sure if he had been able to get in

22   touch with all 45.  I think there was a few that he had not

23   gotten in touch with.

24   Q.  At the time of the meeting?

25   A.  At the time of the meeting, I believe so.

D4gdche5                          Stewart - direct

1    Q.   But were there some who at the time of the meeting he told

2    you had not consented?

3    A.   He had not received consent from anyone he had asked.

4    Q.   And had he received from anyone rejection of the idea of

5    producing the documents?

6    A.   I believe that's what everyone gave him when they didn't

7    give consent.

8    Q.   Was it your understanding that Mr. Fajardo was contacting

9    the other 45 plaintiffs on an individual basis?

10   A.   I don't have an understanding as to how he was going about

11   getting consent.

12   Q.   Now, on August 14, the same day as your meeting with

13   Mr. Fajardo in the Selva Viva offices, he sent a letter to your

14   clients telling them that he would not provide them the

15   documents created in connection with their case in Ecuador,

16   correct?

17   A.   That is correct, with a copy to Mr. Smyser.

18   Q.   Did you or Mr. Smyser ask Mr. Fajardo to draft his

19   August 14th letter?

20   A.   Mr. Fajardo told us his position in the meeting, and we

21   asked him to provide his same position in writing.  So, yes.

22   Q.   And did you or Mr. Smyser participate in the drafting of

23   Mr. Fajardo's August 14th correspondence?

24   A.   We did not.

25   Q.   Did Mr. Fajardo draft that correspondence while you were

D4gdche5                        Stewart - direct

1   present in the Selva Viva offices on August 14th?

2   A.  I don't believe so.  We had other things to do in Quito

3   that day.

4   Q.  Did you have any conversations with Mr. Fajardo about what

5   the August 14th correspondence should say?

6   A.  No.

7   Q.  Did Mr. Fajardo deliver that letter to Mr. Smyser on the

8   14th of August in 2012?

9   A.  I don't recall.  If he did, it would have been that evening

10  or it would have been via e-mail.  But I don't recall him

11  turning it over to Mr. Smyser during the meeting that we had in

12  the morning.

13  Q.  The letter does not have addresses for your clients.  Does

14  Mr. Fajardo e-mail them correspondence?

15  A.  I'm not sure how he does that.  I know that there are

16  individuals who make home deliveries to our clients often

17  because they live in very remote areas of the jungle where

18  e-mail and things like that are not available.

19  Q.  Are you saying both your clients live in remote areas of

20  the jungle, sir?

21  A.  Mr. Camacho lives in Joya de los Sachas; it is a remote

22  area.  And Mr. Piaguaje lives in an area outside of

23  Shushufindi, and my understanding is that at their homes they

24  did not have regular access to e-mail, so I believe Mr. Fajardo

25  has documents delivered to them by messenger, but I don't know

D4gdche5                          Stewart - direct

1    how in particular he delivered this particular letter.

2    Q.  But is it accurate that Mr. Fajardo sends correspondence to

3    Mr. Smyser by e-mail?

4    A.  Often.  Sometimes he'll send it via mail.  Yes.

5    Q.  Is it fair to say that in the August 14, 2012 meeting, both

6    Mr. Fajardo and Mr. Saenz made it clear that they would not be

7    providing any documents in response to Chevron's discovery

8    requests in this action?

9    A.  Yes.  This was --

10             THE COURT:  Ms. Neuman, this is very repetitious.

11   BY MS. NEUMAN:

12   Q.  On August 15th, did you meet with Dr. Bermeo in Ecuador?

13   A.  No.  I left Ecuador the morning of August 15th.

14   Q.  Your clients had previously submitted two declarations from

15   Dr. Bermeo, one dated August 15 and one dated September 10th,

16   on the issues of Ecuadorian law that we're discussing; do you

17   recall that?

18   A.  Yes.

19   Q.  Both those declarations are now withdrawn, is that correct?

20   A.  I can't speak to that.  I take directions from Mr. Smyser

21   and Mr. Veselka.  I am just an associate on the case.

22   Q.  But do you understand that Dr. Bermeo is no longer

23   available to be an expert in the matter?

24   A.  Dr. Bermeo has been recently appointed to a position within

25   the Ecuadorian judiciary.  That is my understanding.

D4gdche5                          Stewart - direct

1   Q.  Dr. Bermeo signed his first report on August 15th, 2012.

2              THE COURT:  Ms. Neuman, are you saying they have been

3   formally withdrawn?

4              MS. NEUMAN:  I believe so, your Honor.  I received a

5   letter from Mr. Veselka on March 28, 2012, stating that,

6   "Dr. Bermeo, one of defendants' designated expert witnesses,

7   was just appointed to serve as General Counsel to the National

8   Judicial Council of Ecuador as a judicial employee.  He will no

9   longer be able to serve as an expert in pending litigation."

10             I assume that meant his declarations were withdrawn.

11             THE COURT:  Is that what it means?

12             MR. SMYSER:  No, your Honor.  It does not mean that.

13             THE COURT:  Don't do that, please, Ms. Neuman.  It

14  just doesn't say that.

15             Let's move on.

16  BY MS. NEUMAN:

17  Q.  Was Mr. Fajardo involved in retaining Dr. Bermeo?

18  A.  I don't believe so.  Mr. Fajardo suggested the name of

19  Bermeo but did not -- was not involved in the retainer of

20  Dr. Bermeo.

21  Q.  Was he involved in working with Dr. Bermeo at all on his

22  expert declarations?

23  A.  No.

24  Q.  Now, on October 4th you participated in a phone call with

25  Pablo Fajardo and Craig Smyser, correct?

D4gdche5                          Stewart - direct

1    A.   Yes.

2    Q.   Was there anyone else on that call?

3    A.   I believe Mr. Veselka was on the call but I can't say for

4    100 percent certainty.

5    Q.   You state in your declaration that during this call,

6    Mr. Smyser suggested to Mr. Fajardo to ask an Ecuadorian court

7    for a ruling on the rights and obligations of the lawyers and

8    the clients in this relationship governed by Ecuadorian law.

9             Is that right?

10   A.   Yes.  That's what it says.

11   Q.   Can you tell me exactly what it was Mr. Smyser suggested?

12   A.   Exactly what it says here, that we had declarations from

13   Dr. Bermeo, a former justice on the Supreme Court, and a

14   subsequent declaration from an expert retained by Chevron that

15   came to different conclusions under Ecuadorian law, and so

16   Mr. Smyser suggested that the best way to resolve doing expert

17   opinions on a question of Ecuadorian law would be to ask an

18   Ecuadorian court to provide a declaration as to the rights and

19   obligations of the clients and the lawyers in that relationship

20   governed by Ecuadorian law.

21            THE COURT:  OK.  We are going to stop right here for

22   today.  I have one or two questions for counsel.

23            Mr. Mastro, this morning you made some reference to a

24   ruling in the 1782 case in Washington involving Mr. Wray.

25            MR. MASTRO:  Yes, your Honor.

D4gdche5                          Stewart - direct

1          THE COURT:  And I would like to know the reference to

2     it.

3          MR. MASTRO:  Sure.  Your Honor, we will be happy to

4     submit the ruling.  It was Mr. Wray -- Dr. Wray, who was the

5     former lead counsel for the Ecuadorian --

6          THE COURT:  I know who he was.

7          MR. MASTRO:  Right.  And in opposing the 1782

8     discovery had made a similar argument about Ecuadorian secrecy,

9     and Judge Kollar-Kotelly rejected --

10         THE COURT:  I heard what you said earlier.  Thank you.

11         I just want to see the reference.  I want to see the

12    ruling.

13         MR. MASTRO:  Sure.  Absolutely.

14         THE COURT:  And I want to see what lead up to it.

15         MR. MASTRO:  Sure.  Absolutely, your Honor.

16         THE COURT:  If it is online on PACER, I can look

17    myself.  I just want to know where it is.

18         MR. MASTRO:  No problem.  We will get that for the

19    Court.

20         THE COURT:  OK.  So I will see you all at 9:30.

21         MR. MASTRO:  Thank you, your Honor.

22         THE CLERK:  All rise.

23         THE COURT:  Mr. Smyser, what is on your mind?

24         MR. SMYSER:  I'm sorry, your Honor.  I understood the

25    Court earlier to put restrictions on lawyers speaking with

D4gdche5                          Stewart - direct

1    witnesses who are on the stand.  I would ask the Court to

2    permit me to speak with my lawyer that I'm working with on this

3    case tonight.

4              THE COURT:  You may, but not about the examination or

5    anything that you think may come up in the examination or any

6    response to further questions by either side in this hearing.

7              And I understand that some allowance is appropriate in

8    light of the fact that you are all working on the case, but

9    there are going to be some ground rules on that.

10             MR. KEKER:  Can we leave our boxes here, your Honor?

11             THE COURT:  Andy will work with you on that.

12             MR. MASTRO:  Thank you, your Honor.

13             (Adjourned to 9:30 a.m., Wednesday, April 17, 2013)

14

15

16

17

18

19

20

21

22

23

24

25

1                          INDEX OF EXAMINATION

2    Examination of:                              Page

3    STEVEN DONZIGER

4    Direct By Mr. Mastro . . . . . . . . . . . . .18

5    Cross By Mr. Keker . . . . . . . . . . . . . .86

6    Redirect By Mr. Mastro . . . . . . . . . . . 121

7    Recross By Mr. Keker . . . . . . . . . . . . 142

8    Redirect By Mr. Mastro . . . . . . . . . . . 149

9    JAROD STEWART                                154

10                         PLAINTIFF EXHIBITS

11   Exhibit No.                              Received

12    1 and 2   . . . . . . . . . . . . . . . . . .61

13    3 through 7   . . . . . . . . . . . . . . . 118

14    8 and 9   . . . . . . . . . . . . . . . . . 154

15

16

17

18

19

20

21

22

23

24

25