D4HJCHE1                         Trial

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

CHEVRON CORPORATION,

                    Plaintiff,

             v.                              11 CV 691 (LAK)

STEVEN DONZIGER, ET AL.,

                    Defendants.

------------------------------x

                                         April 17, 2013
                                         9:30 a.m.

Before:

                    HON. LEWIS A. KAPLAN,

                                         District Judge

                         APPEARANCES

GIBSON DUNN & CRUTCHER
      Attorneys for Plaintiff Chevron
BY:  RANDY M. MASTRO
      ANDREA E. NEUMAN
      JASON B. STAVERS
      ANNE MARIE CHAMPION
      JEFFERSON ELIOT BELL
      RACHAEL BROOK

SMYSER KAPLAN & VESELKA, LLP
      Attorneys for Defendants Camacho & Piaguaje
BY:  LARRY R. VESELKA
      CRAIG SMYSER
      JAROD STEWART
      – and –
      JULIO C. GOMEZ

KEKER & VAN NEST, LLP
      Attorneys for Defendant Donziger
BY:  JOHN W. KEKER

D4HJCHE1                              Trial

1          (Trial resumes)

2          (In open court)

3          THE COURT:  Good morning, everyone.  Let's resume.

4          MR. KEKER:  Your Honor, before we begin, could I raise

5    two matters that I hope will be brief, if I can?

6          THE COURT:  Proceed.

7          MR. KEKER:  The first deals with a document that you

8    ordered yesterday to be turned over forthwith, and I have it

9    here.  What I am asking is for you to look at it and redact it

10   as follows:

11         Basically everything in it is work product that is not

12   relevant to this hearing except the conclusion.  We don't have

13   any problem with the conclusion, the from-to and the conclusion

14   being given to our adversaries, but we do object strenuously.

15   This is very much case planning strategy and so on, and I'd ask

16   you to look at it before we have to turn it over.

17         THE COURT:  Mr. Mastro.

18         MR. MASTRO:  Your Honor, I have no problem with your

19   Honor doing it in-camera, review of the document.  It is a

20   little hard for me to address the point other than to say I

21   think there has been a waiver on this subject matter given the

22   testimony that was given.  It is hard to imagine how just the

23   conclusion of the document that explains the rationale would

24   not have been waived even if it were work product and we have a

25   need for it under these circumstances.

1              THE COURT:  I'll look at it.

2              MR. KEKER:  May I hand it up, your Honor?

3              THE COURT:  Yes.

4              MR. KEKER:  This is being handed up for examination

5     in-camera.  Thank you.

6              To identify it for the record, it begins -- and I

7     should say a couple of other things.  The first page is a memo

8     from --

9              THE COURT:  Mr. Keker, you asked me to look at it.  I

10    am happy to look at it.  We don't need any further discussion.

11             MR. KEKER:  The second matter, your Honor --

12             THE COURT:  Did you want me to look at it?

13             MR. KEKER:  Look at it now?  I am sorry.  I beg your

14    pardon.

15             (Pause)

16             MR. KEKER:  Your Honor, I should add the English

17    translation in the back is is not an official translation.  It

18    was done by somebody I think in Mr. Smyser's office.

19             (Pause)

20             THE COURT:  What you propose to eliminate is

21    everything but the last --

22             MR. KEKER:  The conclusion, the from-to in the

23    beginning and then give them the conclusion where it says the

24    three points that are the conclusion, that is the only thing

25    that goes to the subject matter that he talked about which is

D4HJCHE1                          Trial

1    his duties.

2              THE COURT:  We'll take this up in more detail later.

3              MR. KEKER:  Your Honor, the second matter, again very

4    briefly, is what we raised yesterday.  We have due today a

5    response to that crime fraud discovery motion.  We ask you

6    please to treat it on a different schedule as a regular motion

7    is what we prefer.

8              THE COURT:  Mr. Keker, as I said yesterday, file your

9    response today.  If you think you need more time, you will

10   explain why in the response and I may or I may not grant it.

11             MR. KEKER:  Okay.  People who aren't even at this

12   hearing are going to have to do it and don't know anything

13   about what is going on.  We can't do that today.  I can't do

14   that.

15             THE COURT:  Mr. Keker, Mr. Werdegar has actually

16   handled before me other court appearances of significant moment

17   on behalf of your client, and you have plenty of resources.

18             MR. KEKER:  That is not true, your Honor, but I

19   understand what you're saying.  Okay, thank you.

20             THE COURT:  Okay.  Mr. Stewart, resume the stand.  I

21   think you're still under examination.  You're still under oath.

22   JAROD STEWART, resumes

23    JAROD STEWART,

24        called as a witness by the Plaintiff,

25        having been duly sworn, continued testifying as follows:

D4HJCHE1                          Trial

1    DIRECT EXAMINATION

2    BY MS. NEUMAN:

3    Q.  Good morning, Mr. Stewart.

4    A.  Good morning.

5    Q.  In the October 4th conversation between yourself, Mr.

6    Smyser, Mr. Veselka and Mr. Fajardo, did you specifically

7    discuss Mr. Camacho and Mr. Piaguaje filing an action in

8    Ecuador seeking access to their documents?

9    A.  We did not.

10   Q.  In that same conversation did you specifically discuss the

11   Lago Agrio plaintiff seeking to preclude Mr. Fajardo from

12   giving Mr. Camacho, Mr. Piaguaje access to Ecuadorian counsel's

13   files?

14   A.  We did not.

15   Q.  Now, after the October 4th conversation you promptly

16   followed up with Mr. Fajardo by e-mail, correct?

17   A.  I did not follow with Mr. Fajardo.

18   Q.  You indicate in your declaration that on October 9th

19   Mr. Fajardo responded -- on October 9th, in response to an

20   e-mail I sent about Mr. Smyser's suggestion to have an

21   Ecuadorian court decide disputed issues of Ecuadorian law,

22   Mr. Fajardo told me he would keep me informed.

23           Do you recall that?

24   A.  Yes.  I did not initiate the e-mail response on October

25   9th.  Mr. Fajardo did.

D4HJCHE1                         Stewart - direct

1   Q.  In your declaration you say, "On October 9th, in response

2   to an e-mail I sent."  Is that not accurate?

3   A.  That is true.  Mr. Fajardo sent me an e-mail.  I respond,

4   and he responds saying he would keep me informed.

5   Q.  So on October 9th three e-mails were exchanged on this

6   topic between yourself and Mr. Fajardo.  Is that right?

7   A.  That's correct.

8            MS. NEUMAN:  We ask those e-mails be produced.

9            THE COURT:  That's the subject of this motion pending,

10  right?

11           MS. NEUMAN:  Yes, your Honor.

12           THE COURT:  Well, I will deal with that after I see

13  what Mr. Keker files tonight.

14  BY MS. NEUMAN:

15  Q.  The first e-mail you received from Mr. Fajardo on October

16  9th, what did that e-mail say?

17           MR. SMYSER:  Objection; work product, attorney-client

18  privilege.

19           THE COURT:  Why shouldn't I rule right now that

20  whatever privilege there otherwise might have been is waived

21  because you're relying on these communications as evidence of

22  your good faith under Bilzarian, the case I am referring to,

23  among others, and simply have these turned over?

24           MR. SMYSER:  Your Honor --

25           THE COURT:  It is you, after all, you personally who

D4HJCHE1                         Stewart - direct

1    asserted in a letter to me that this whole idea of the Cordova

2    action was yours, and then it was in your firm's submissions --

3    specifically Mr. Stewart's declaration at least in part -- that

4    then proceeds to attempt to develop the argument that of course

5    you're in good faith.  You know, this was really a perfectly

6    normal thing to do, this exchange between you and Fajardo about

7    doing this really rather remarkable thing that you folks did in

8    Ecuador.

9             Now, why wasn't that a waiver under various

10   established principles?

11            MR. SMYSER:  As I have said previously, your Honor, we

12   did not choose to make that response.  We were forced to make

13   that response by being accused of bad faith.  If we are accused

14   of bad faith, it cannot be the law --

15            THE COURT:  The law, Mr. Smyser, the law on a question

16   of sanctions for failure to comply with an order to produce

17   documents where there is a blocking statute or other conflict

18   with foreign law alleged is that the burden of demonstrating

19   good faith is on the non-compliant party, which is you.  In an

20   effort to carry that burden, you are asserting here and bear

21   the burden of proving that you have good faith.

22            You place before me your own account of how this

23   happened and Mr. Stewart's account of how this happened, and

24   you say oh, no, but it's privileged, you can't look at the

25   documents, Chevron can't look at them and neither can the

D4HJCHE1                        Stewart - direct

1    Judge.  How can you possibly take that position?

2              MR. SMYSER:  Your Honor, I can take that position

3    because I believe the law does not permit a party to accuse

4    someone of bad faith and then not allow that party to respond

5    without waiving privilege.  Your Honor, I have no choice but --

6              THE COURT:  Mr. Smyser, where was the accusation

7    exactly?

8              MR. SMYSER:  The accusation was in the motion to

9    compel which says we engaged in bad faith.  How can I respond

10   to that, your Honor?

11             How can I say I didn't act in bad faith other than a

12   conclusory way without relying on facts to demonstrate to the

13   court, as an officer of the court, what actions I took to

14   comply with the discovery requirements I have under the rules?

15   I had to do that.

16             THE COURT:  And your position is you're going to tell

17   me that which it suits you to tell me including the existence

18   of communications you claim are privileged and parts of them,

19   those parts that you want to reveal.

20             That is your position?

21             MR. SMYSER:  No, your Honor, my position is not quite

22   that.  One, the court always has the right to examine my

23   documents in-camera, the documents --

24             THE COURT:  That is not what we are talking about, you

25   understand that?

D4HJCHE1                        Stewart - direct

1          MR. SMYSER:  I understood you to say you are not going

2     to let me see.  I was saying no, I was going to let the court

3     see them.

4          THE COURT:  Fair enough, you sure understood what I

5     meant by that is you're not going to allow it to be part of the

6     record in this case.

7          MR. SMYSER:  Yes, your Honor, it should not be part of

8     the record in this case other than to have the court examine

9     them and determine whether they are privileged, but I have no

10    choice.  I can't be put in a Hobson's position of saying I

11    can't defend myself, all I can do is get on the stand and say

12    everything is privileged, I acted in good faith, in which case

13    the court would be empowered to say, Mr. Smyser, you have

14    offered no declaration, you have offered no proof, I can't take

15    your unsupported sworn -- as this Court has said before, I

16    can't take your unsupported, unsworn, un-factually verified

17    conclusions as proof.

18         So I have to respond to the degree I can without

19    totally waiving the privilege.

20         THE COURT:  Right here in Mr. Stewart's affidavit he

21    says on October 9, 2012, in response to an e-mail I sent about

22    Mr. Smyser's suggestion to have an Ecuadorian court decide a

23    disputed issue of Ecuadorian law, Mr. Fajardo told me he would

24    keep me informed.

25         So he wants me to believe, you want me to believe that

D4HJCHE1                    Stewart - direct

1    he sent such an e-mail.  You don't want to produce the e-mail.

2    You want me to accept that it was sent and that's evidence of

3    good faith, but suppose the e-mail said remember Mr. Smyser's

4    suggestion that you go to the Ecuadorian court without notice

5    to Chevron or the court in New York for the purpose of seeing

6    whether you can get an order that would thwart the discovery

7    process in New York because this is the best way we have left

8    to us to shut down what Chevron is attempting to do up there.

9             Now, it might say that, right?

10            MR. SMYSER:  It might.

11            THE COURT:  And certainly you don't want me to accept

12   that it says that without it being produced, right?

13            MR. SMYSER:  Yes, your Honor.  Actually, I believe my

14   duty as an officer of the court runs to the court to do what I

15   am supposed to do under the rules to respond to discovery.  If

16   the court would like to see these e-mails to confirm I am being

17   honest as an officer of the court about what say they, I have

18   no problem with that.

19            THE COURT:  The critical point, sir, is that you are

20   telling us what they say, and by doing that you are disclosing

21   and attempting to use them while at the same time concealing

22   the documents that say the things, if I don't have reason to

23   question it, say the things you say they say.

24            MR. SMYSER:  Yes, your Honor, I have to.  I don't have

25   a choice.  When someone takes the extraordinary -- I never had

D4HJCHE1                         Stewart - direct

1    this happen to me in my career, your Honor, a man accusing me

2    of bad faith in responding to discovery.  This has never

3    happened.  I don't have any choice but to offer facts, that

4    limited disclosure of facts I came to rebut those claims.  It

5    is not something that I want to do.  I am not doing it

6    voluntarily.  I am forced to do this.

7             THE COURT:  Let me hear briefly from Mr. Mastro and I

8    will decide whether I will rule on it right now or wait till

9    this evening.

10            MR. MASTRO:  Certainly, your Honor.

11            We actually made a discrete motion on waiver grounds

12   just on this October 9th exchange for the reasons --

13            THE COURT:  I know you did.

14            MR. MASTRO:  Just to clarify for the record, we moved

15   to compel.  We moved to compel months earlier.  That was not --

16   there was no accusation there other than that they should have

17   to produce the documents from Ecuador because they were their

18   agents.

19            We had a hearing on March 5th.  I hadn't moved for

20   sanctions yet.  I did say to the court that we wanted to in the

21   future move for sanctions, but I hadn't even moved for

22   sanctions yet.  He chose to write to the court after that

23   hearing, and I had sent a letter to the court about certain

24   things I thought had been misrepresented and Mr. Donziger is a

25   pariah.

D4HJCHE1                        Stewart - direct

1              He chose to respond before we made a sanctions motion

2       with his explanation and his admission that he had suggested

3       it, and he starts to lay out his story about that collusive

4       Ecuadorian suit.  He can't very well say that I already made

5       specific accusations in that regard because my sanctions motion

6       hadn't even been filed.

7              Finally, your Honor, he has chosen to come forward

8       with the information he has come forward with.  These documents

9       happen at a critical period.  It happens on October 9th when

10      your Honor has the documents, these exchanges, when your Honor

11      ordered a scheduling hearing.  They're trying to find out what

12      the status of that Ecuadorian suit is in advance of your

13      Honor's October 18th scheduling hearing.  That is why this

14      exchange is occurring.  These documents are so clearly

15      relevant, they open the door through Stewart's affidavit, but

16      even before that, through Smyser's letter.

17             It is waived.  We have a right to see that.  This is

18      not about them being forced to do something.  He chose to speak

19      up and tell his version of events before we even moved for

20      sanctions.  So I think this isn't a close case under the law,

21      your Honor, and I think it is not a close case on the facts.

22             THE COURT:  I will think about it a little further.

23      Let's go on with the testimony.

24      BY MS. NEUMAN:

25      Q.  Mr. Stewart, did Mr. Fajardo tell you on October 9th that

D4HJCHE1                         Stewart - direct

1    he would be filing a lawsuit in Ecuador?

2    A.   No.

3    Q.   But Mr. Fajardo did on October 9th say he would keep you

4    informed about his progress on implementing Mr. Smyser's

5    suggestion an action be brought in Ecuador, correct?

6    A.   No.  He simply said he would keep me informed.

7    Q.   Keep you informed about what?

8    A.   He didn't indicate anything --

9            THE COURT:  Were there any other subjects discussed in

10   your conversation or in the e-mail exchange?

11           THE WITNESS:  I don't believe so.

12   BY MS. NEUMAN:

13   Q.   On October 22nd, Mr. Stewart, Mr. Fajardo told you that an

14   action had been filed in Ecuador, correct?

15   A.   He indicated that a case was proceeding in Ecuador.

16   Q.   What did he say exactly?

17   A.   The case is proceeding.

18   Q.   What case?

19   A.   He didn't say.

20   Q.   When he told you that the case was proceeding in Ecuador,

21   you understood him to be referring to the lawsuit that Mr.

22   Smyser had suggested be brought, correct?

23   A.   I understood him to be referring to some action to resolve

24   the disputed question of Ecuadorian law.

25   Q.   About the documents?

D4HJCHE1                        Stewart - direct

1   A.   Yes.

2   Q.   Was this the first time that you are aware the Cordova

3   action had been filed?

4   A.   The first time I became aware of the Cordova action was on

5   January 15th.

6   Q.   But the lawsuit that was, Mr. Fajardo told you was filed in

7   October is the Cordova action, right, they're one and the same?

8   A.   I learned that on January 15th a lawsuit was called the

9   Cordova lawsuit.  I did not know the proceedings, who the

10  parties were, where it was filed, what relief was sought in

11  October 2012, ma'am.

12  Q.   Did Mr. Fajardo tell you at any time before the Cordova

13  lawsuit was filed he had decided to produce documents to

14  Chevron?

15  A.   Before October 18th, Mr. Fajardo did not say that to me.

16  Q.   Mr. Fajardo told you on October 22nd that a case had been

17  filed because that was important information for you to know,

18  correct?

19  A.   He told me that a case was proceeding, and I took from that

20  a case had been filed before October 22nd.  I did not know when

21  it had been filed or where.

22  Q.   Fajardo gave you that information because he understood

23  that information to be important to you.  Is that right?

24  A.   I don't know what Mr. Fajardo understands.

25  Q.   You're diligent in representing your clients, sir?

D4HJCHE1                          Stewart - direct

 1    A.   I do my best.

 2    Q.   After Mr. Fajardo told you a case was proceeding related to

 3    your client's access to the Ecuadorian lawyer's files in

 4    Ecuador, did you follow up diligently with Mr. Fajardo what was

 5    happening in that case?

 6    A.   I asked Mr. Fajardo for information, and Mr. Fajardo

 7    provided the information he wanted to.

 8    Q.   On how many occasions between October 22nd and January 1st

 9    did you ask Mr. Fajardo for information about the case that was

10    proceeding in Ecuador?

11    A.   Two or three times.

12    Q.   Were those requests made in writing or on the phone?

13    A.   I believe one may have been in writing and the other is on

14    the phone.

15    Q.   When you asked Mr. Fajardo in writing about the case that

16    was proceeding in Ecuador related to the document production

17    issue, what did he tell you?

18             MR. SMYSER:   Your Honor, the same objection, work

19    product, attorney-client privilege, directly asking what

20    Mr. Fajardo told him and what he told Mr. Fajardo.

21             THE COURT:   I tell you what, we are going to interrupt

22    the examination of this witness and we are going to resume it

23    tomorrow because this is a pointless exercise, and I will

24    consider whatever you file tonight and you better have all

25    these documents here in case I rule that they're going to be

D4HJCHE1                        Stewart - direct

1    produced.

2              MR. SMYSER:  Yes, your Honor, we have, I believe, the

3    majority of the documents here now.

4              THE COURT:  Well, you get the totality of them here.

5              MR. SMYSER:  We will exercise every effort we can to

6    get every document here, your Honor.

7              THE COURT:  Furthermore, I want to you to submit them

8    to my Chambers at least for in-camera inspection by 4:30.

9              MR. SMYSER:  I don't know that I can have all the

10   documents.  The documents I have with me, I will have to take

11   time from the court to go get them presented to submit.

12             THE COURT:  There will be a lunch break and,

13   furthermore, you have an office in Texas that can fax you

14   whatever you didn't bring with you.

15             MR. SMYSER:  Yes, your Honor, I will have to be

16   excused to call my office to make this happen.

17             THE COURT:  You may.

18             THE WITNESS:  May I step down?

19             THE COURT:  Yes.

20             MR. SMYSER:  May I have a fax destination, phone

21   number?  I am in a hotel and I will have to go back and get

22   them in a hotel.

23             THE COURT:  Well, then you just have to do that at the

24   end of the day.  I want these documents turned over from you to

25   me, to my Chambers.  I don't want them going into any fax

D4HJCHE1                          Stewart - direct

1   machine somewhere.

2              MR. SMYSER:  May I fax them to you, your Honor, your

3   Chambers?

4              THE COURT:  No.

5              MR. SMYSER:  E-mail them to your Chambers?  We can get

6   them e-mailed or put them on e-mail for the court?

7              THE COURT:  In this one instance only you may e-mail

8   them to my Deputy.

9              MR. SMYSER:  Thank you.

10             MR. MASTRO:  Your Honor, it had been our intention to

11  call Mr. Smyser today as well, but obviously --

12             THE COURT:  He is not excused for the day.  You want a

13  delay on it; is that right?

14             MR. MASTRO:  No.  We'll call our other witnesses.  He

15  would be called tomorrow as well when Mr. Stewart comes back on

16  the stand.  It is the same documents to examine him on.

17             THE COURT:  Then in light of that, unless we fill the

18  whole day today, we'll go from about 9:30 to 1:00 or maybe a

19  little later tomorrow and resume around 3:30 tomorrow.

20             MR. MASTRO:  Fine, your Honor.  We are going to do

21  everything we can to finish the hearing, all our witnesses

22  today besides Mr. Stewart and Mr. Smyser and then finish them

23  tomorrow.

24             THE COURT:  What is it, Mr. Keker?

25             MR. KEKER:  Why don't you have Mr. Smyser give

D4HJCHE1                          Stewart - direct

 1    whatever testimony they want from him.  If you end up

 2    disclosing the documents, you can call back whoever.  Why don't

 3    we get this thing done rather than have it -- I understand your

 4    frustration with the Mr. Stewart part, but if they have

 5    questions for Mr. Smyser, let them ask the questions.  Then if

 6    there are documents he need to be recalled about, do it.

 7              THE COURT:  That is a good suggestion.  Do you want to

 8    proceed that way?

 9              MR. MASTRO:  Your Honor, that is fine by me.  The key

10    examination is in this sequence, but I will cover the other

11    areas today.

12              THE COURT:  Fine.

13              MR. MASTRO:  Thank your Honor.

14              THE COURT:  We'll interrupt Mr. Stewart and we'll

15    proceed either with Mr. Smyser or your next witness, but in any

16    event, you're free to call Mr. Smyser today, and if we have to

17    resume tomorrow with him, we will.

18              (Witness excused)

19              MR. MASTRO:  Our next witness, your Honor, is

20    Mr. Piaguaje, and he will be examined by Peter Seley.

21     JAVIER PIAGUAJE,

22         called as a witness by the Plaintiff,

23         having been duly sworn, testified as follows:

24    DIRECT EXAMINATION

25              (Mr. Jesus Rivera, Spanish Interpreter, was duly

D4HJCHE1                          Piaguaje - direct

 1   sworn)

 2   BY MR. SELEY:

 3   Q.  You are a plaintiff in the lawsuit against Chevron in

 4   Ecuador, correct?

 5   A.  Yes.

 6   Q.  You understand that you are a defendant in the lawsuit here

 7   in New York, correct?

 8   A.  Yes.

 9   Q.  You are here today to answer questions about documents in

10   Ecuador.  Is that right?

11   A.  Yes.

12   Q.  Your American lawyers asked you to come here today.  Is

13   that correct?

14   A.  Yes.

15   Q.  Who first contacted you about coming here?

16   A.  My attorneys.

17   Q.  Who in particular?

18   A.  Jerry.

19   Q.  Are you talking about Jarod Stewart?

20   A.  I only know Jarod because I don't speak English.

21            THE COURT:  Is the person you are referring to in this

22   room, Mr. Piaguaje?

23            THE WITNESS:  Yes.

24            THE COURT:  Would you point him out and indicate an

25   article of clothing he is wearing.

D4HJCHE1                        Piaguaje - direct

|    |                                                                    |
|----|--------------------------------------------------------------------|
| 1  |          THE WITNESS:  My attorney was the one who was             |
| 2  | testifying earlier.                                                |
| 3  |          THE COURT:  Is it stipulated it is Mr. Stewart, Mr.       |
| 4  | Veselka?                                                            |
| 5  |          MR. VESELKA:  Yes.                                        |
| 6  |          THE COURT:  Mr. Keker?                                    |
| 7  |          MR. KEKER:  Yes.                                          |
| 8  |          THE COURT:  Mr. Mastro?                                   |
| 9  |          MR. MASTRO:  Yes, sir.                                    |
| 10 | BY MR. SELEY:                                                      |
| 11 | Q.  When were you first contacted about coming here?              |
| 12 | A.  It was very soon for me.  It was Friday.                      |
| 13 | Q.  Did Mr. Stewart tell you it was required under U.S. law       |
| 14 | that you come here to answer questions?                           |
| 15 |          MR. VESELKA:  Objection, your Honor; attorney-client     |
| 16 | privilege.                                                         |
| 17 |          MR. SELEY:  Let me rephrase.                             |
| 18 | BY MR. SELEY:                                                      |
| 19 | Q.  Did anyone tell you it was required under U.S. law you come   |
| 20 | here to answer questions?                                         |
| 21 |          MR. VESELKA:  Lack of foundation.  It wasn't            |
| 22 | established any question he asked him about is not one of his     |
| 23 | counsel.                                                          |
| 24 |          THE COURT:  Rephrase the question.                       |
| 25 | BY MR. SELEY:                                                      |

D4HJCHE1                         Piaguaje - direct

1   Q.  Do you understand it was required for you to come here to

2   answer questions?

3              MR. VESELKA:  Objection.

4              THE COURT:  Sustained.

5   BY MR. SELEY:

6   Q.  Mr. Piaguaje, if your lawyers tell you that something is

7   required under U.S. law, do you listen to them?

8              MR. VESELKA:  Objection; speculative, your Honor.

9              THE COURT:  Overruled.

10  A.  Yes, but I have other laws in Ecuador.

11  BY MR. SELEY:

12  Q.  Did you volunteer to come to New York, sir?

13  A.  For this meeting?  For this meeting?

14  Q.  Yes.

15  A.  Yes, to testify.

16  Q.  Because you thought it would help your case?

17  A.  Yes, to tell the truth.

18  Q.  Did you travel to New York by yourself, sir?

19  A.  On the way here, yes.

20  Q.  Have you met with any of your Ecuadorian lawyers here in

21  New York?

22  A.  No.

23  Q.  Did you talk with Pablo Fajardo about coming to New York to

24  testify?

25  A.  Yes.

D4HJCHE1                         Piaguaje - direct

1    Q.  After talking with Mr. Fajardo, you told your lawyers, your

2    American lawyers, you would testify here in New York.  Is that

3    correct?

4              MR. VESELKA:  Objection; assumes facts not in evidence

5    as to the sequence, your Honor.

6              THE COURT:  Overruled.

7              MR. VESELKA:  Attorney-client privilege.

8              THE COURT:  Overruled.

9    A.  Yes.

10   BY MR. SELEY:

11   Q.  You've met with Jarod Stewart before today, correct?

12   A.  Yes, to greet him.

13   Q.  I am sorry?

14             THE INTERPRETER:  To greet him.

15   Q.  Not counting this trip to New York, how many times have you

16   met with Mr. Stewart since June 7th of 2012?

17   A.  Of 2012?

18   Q.  Yes.

19   A.  Once, one time, one time it seems about a month and a half

20   ago.

21   Q.  How many times have you met with Larry Veselka since June

22   7th, 2012?

23   A.  Around three times, I think.

24   Q.  Since June 7th, 2012?

25   A.  Yes, because I'm also referring to 2011.  I am counting

D4HJCHE1                        Piaguaje - direct

1    since 2011.

2    Q.  I am asking since June of 2012, how many times have you met

3    with Larry Veselka?

4    A.  Here in New York or --

5    Q.  Anywhere?

6    A.  One time, I think.

7    Q.  When was that?

8    A.  Also recently, about a month and a half ago, it seems.

9    Q.  Have you ever met with Craig Smyser?

10   A.  What was that again?

11   Q.  Have you ever met with Craig Smyser?

12   A.  No.

13   Q.  How many times since June of 2012 have you spoken on the

14   phone with Mr. Stewart, Mr. Veselka or Mr. Smyser?

15   A.  My attorney?

16   Q.  Yes.

17   A.  On the phone, yes, several times, but I don't know how

18   many.

19   Q.  In July of 2011 you said you used two different cell

20   phones.  Is that still true today?

21   A.  Of mine?

22   Q.  Yes.

23   A.  Yes.

24   Q.  Did you sign any kind of retainer agreement with the law

25   firm of Smyser Kaplan?

D4HJCHE1                        Piaguaje - direct

1    A.  No.

2    Q.  Did you personally buy both of your cell phones, sir?

3    A.  Yes.

4    Q.  Are both of your cell phones registered in your name?

5    A.  Yes.

6    Q.  Do you still have a laptop computer?

7         MR. VESELKA:  Your Honor, I have been letting this go,

8    but I object to the scope here to find out --

9         THE COURT:  I am as curious as you are.

10        MR. SELEY:  It goes to the communication.  We heard

11   from Mr. Stewart it was very difficult to reach out to him and

12   get information from him.  I am trying to establish it isn't

13   difficult.

14        THE COURT:  Let's get to this very quickly.

15        MR. SELEY:  I will, sir.

16   BY MR. SELEY:

17   Q.  Do you use e-mail to communicate with your American

18   attorneys?

19   A.  No.

20   Q.  Do you use e-mail to communicate with Mr. Fajardo?

21   A.  Very little.  He gives me information.  And also because I

22   live in the jungle, the service is not continuous.  Sometimes

23   it goes for weeks or months.

24   Q.  Do you use Facebook?

25   A.  Yes.

D4HJCHE1                      Piaguaje - direct

1    Q.  You update it regularly?  You update it regularly?

2    A.  When there is reception.

3    Q.  When your American attorneys ask you questions about the

4    case in Ecuador, have you ever refused to answer those

5    questions?

6    A.  Yes, because some questions they've asked I don't know, so

7    how can I say anything.

8    Q.  But if you know the answer to the question that they're

9    asking, you provide them the answer, correct?

10   A.  Some, not all.

11   Q.  When your American attorneys ask you for documents, have

12   you refused to produce those documents to them?

13   A.  Well, as far as me, I would say yes.  Also for me I have

14   requested that Fajardo provide documents.

15   Q.  All right, sir, you've provided to your lawyers all the

16   documents that you have in your possession, correct?

17   A.  Yes, to Pablo.

18            THE COURT:  Mr. Seley, I hope we are going to get to

19   some relevant point soon.

20            MR. SELEY:  Yes, your Honor.

21   BY MR. SELEY:

22   Q.  You have talked to Mr. Stewart by phone on January 10th and

23   11th of this year to provide him information in response to

24   Chevron's interrogatories.  Is that correct?

25   A.  Of this year?

D4HJCHE1                        Piaguaje - direct

1    Q.   Yes.

2    A.   I don't recall exactly.

3    Q.   But you did talk to him by phone to provide him information

4    in response to interrogatories, right?

5    A.   No.

6              THE COURT:  Mr. Seley, I have not previously been

7    aware of any claim by Chevron that the two individuals did not

8    furnish information that was physically in the possession of

9    the two individuals.  I thought this was all about something

10   else.  Are we going to get somewhere relevant to what I think

11   it is about?

12             MR. SELEY:  Your Honor, I believe two things:

13             First, I want to make sure that that is accurate.  We

14   haven't had a chance to talk to him.

15             THE COURT:  You're not taking my day to have a

16   deposition of this man about whether he gave you whatever

17   documents he has got in his house.

18             MR. SELEY:  I understand, your Honor.  All of this

19   goes to points that the other side made.  I am getting to

20   exactly the questions about all the allegations they made about

21   what they need to do in Ecuador.  That is what I am leading up

22   to.

23             THE COURT:  You have been at it for some time.  As far

24   as I know, we are not close.

25             MR. SELEY:  Thank your Honor.  I'll move on.

D4HJCHE1                          Piaguaje - direct

```
 1   BY MR. SELEY:
 2   Q.  Mr. Piaguaje, did anyone tell you before you provided
 3   information to your American lawyers that you needed to get
 4   permission from every single one of the other 46 Ecuadorian
 5   plaintiffs?
 6           MR. VESELKA:  Objection; calls for attorney-client
 7   communication.  If the question goes to attorneys, it also
 8   lacks foundation.
 9           THE COURT:  I imagine the foundation would be if he
10   heard such a statement made to him, there would be foundation.
11   If he didn't, he'll tell us.  Overruled.
12   A.  No.
13   BY MR. SELEY:
14   Q.  Are you aware that Mr. Fajardo has sent hundreds of e-mails
15   and documents to Mr. Donziger about the --
16           THE COURT:  Mr. Seley, get to the point or finish.
17           MR. SELEY:  Your Honor, if I can get this question,
18   then I can ask him if Mr. Fajardo ever sought permission from
19   him, which is what they say they have to do.  That goes
20   directly to what they're alleging they need to do under
21   Ecuadorian law.  That is the heart of their defense here,
22   right?
23           If you don't believe that is relevant, your Honor, I
24   can move on.  I believe it is directly relevant to what they're
25   saying.
```

D4HJCHE1                    Piaguaje – direct

 1              MR. VESELKA:  We object to this.

 2              THE COURT:  Look, Mr. Seley, you go ahead if you want.

 3    The clock is running against you.  I have permitted the time.

 4    If you think you're helping yourself with this, go through it.

 5    Maybe you'll persuade me it is of some significance that I

 6    haven't realized.

 7              MR. SELEY:  All right, I will move on.

 8    BY MR. SELEY:

 9    Q.  You understand that Chevron asked for documents in this

10    case from your Ecuadorian lawyers?

11    A.  Yes.

12    Q.  Are you aware that Judge Kaplan ordered you to produce

13    documents from your Ecuadorian lawyers?

14    A.  Yes.

15    Q.  Did you demand that Mr. Fajardo give you access to the

16    Ecuadorian case files?

17    A.  I don't understand.

18    Q.  Did you go to Mr. Fajardo and demand that he give you the

19    documents that you were ordered to produce in this case?

20    A.  If I demanded it from Fajardo?

21    Q.  Yes.

22    A.  Orally.

23    Q.  What did Mr. Fajardo say?

24    A.  Fajardo stated two things.  He said, the first thing that

25    he said was there is a law in Ecuador that does not allow to

1    provide these items from an attorney.  The second thing he said

2    was that the full assembly of the plaintiffs have to be in

3    agreement.

4    Q.  When did you demand the documents from Mr. Fajardo?

5    A.  There is a document that was made through my attorneys.  I

6    don't know the exact date.

7    Q.  Can you give me your best estimate?

8    A.  June of 2012 or 2011 I think it is.

9    Q.  June of 2011?

10   A.  I don't know exactly.

11          THE COURT:  Mr. Seley, correct me if I am wrong.

12          There is no evidence in this record anywhere that this

13   individual or Mr. Camacho ever went to Fajardo and said give me

14   all the documents.  Is that correct?

15          MR. SELEY:  That's correct, your Honor.

16          THE COURT:  And there is no evidence that either of

17   them ever demanded that Fajardo turn them over in U.S.

18   discovery.  Is that right?

19          MR. SELEY:  That is my understanding, your Honor.

20          THE COURT:  And there is no evidence they ever sued

21   him to force turning them over, right?

22          MR. SELEY:  That is my understanding as well.

23          THE COURT:  Mr. Veselka, do you dispute any of those

24   three propositions?

25          MR. VESELKA:  The first one.  He just testified he did

D4HJCHE1                           Piaguaje - direct

1    address Mr. Fajardo, ask him I believe he said orally, and then

2    he knew of the communications --

3              THE COURT:  The proposition was this:  There is no

4    evidence in this record anywhere that this individual or

5    Mr. Camacho ever went to Fajardo and said give me all the

6    documents.  Do you agree that that is an accurate statement?

7              MR. VESELKA:  I don't believe so.  I believe he just

8    testified that he asked Mr. Fajardo to give him the documents.

9    He was expressing he knew that we were seeking it.  He

10   expressed that, and then Fajardo, he explained why Mr. Fajardo

11   said he couldn't.  I believe that is what he just testified to.

12             THE COURT:  Then we'll listen to more of this.

13             MR. VESELKA:  I am happy to stipulate as to the other

14   two you were saying.

15             THE COURT:  Well, fine.  Let's go on.

16             MR. VESELKA:  We can cut that as to the one issue of

17   he had asked and he knew we were asking I believe is, I believe

18   the evidence is, and then he said what Mr. Fajardo told him and

19   what he said needing to agree as well as to the Ecuadorian law.

20             THE COURT:  Mr. Veselka, you know there is actually a

21   difference between asking and demanding, there is, but let's go

22   on.

23             MR. VESELKA:  I wasn't focusing on that.

24             THE COURT:  Yes.  Let's go on.

25             (Continued on next page)

1              THE COURT:  Let's go on.

2    BY MR. SELEY:

3    Q.  When you spoke to Mr. Stewart, did he ever tell you that he

4    knew that there was a hearing in the Cordova case to block the

5    production of documents in Ecuador?

6    A.  No.  I didn't hear that.

7    Q.  And he never told you to go make an appearance in that case

8    and demand your right to the documents, is that correct?

9              MR. VESELKA:  Objection.  Attorney-client

10   communication.  Lack of foundation.

11             THE COURT:  Sustained as to form, at least.

12   Q.  You didn't make an appearance in that case and assert your

13   right to the documents, is that correct, sir?

14             MR. VESELKA:  We will stipulate that.

15             THE COURT:  So stipulated.

16             Mr. Keker, do you stipulate to that?

17             MR. KEKER:  No, your Honor.  I'm not stipulating to

18   any of this.  I think this is an outrage, and I don't think

19   that --

20             THE COURT:  Mr. Keker, I asked you a simple question.

21   I did not invite you to make a speech.

22             MR. KEKER:  No, your Honor.  We don't stipulate.

23             THE COURT:  Go ahead, counsel.

24   BY MR. SELEY:

25   Q.  Mr. Piaguaje, did you ever make an appearance in the

D4hdche2                           Piaguaje - direct

1   Cordova case and assert your rights to the documents?

2   A.  No.

3              MR. SELEY:  All right.  Nothing further, your Honor.

4              THE COURT:  Pardon me?

5              MR. SELEY:  Nothing further, your Honor.

6              THE COURT:  Any further questions for this witness

7   from the other side?

8              MR. VESELKA:  Very briefly, your Honor.

9   CROSS-EXAMINATION (Through the Interpreter)

10  BY MR. VESELKA:

11  Q.  Good morning, Mr. Piaguaje.

12  A.  Good morning.

13  Q.  I'm Larry Veselka.  You remember which one of us I am?

14  A.  Yes.

15  Q.  You sometimes have trouble remembering whether it is me or

16  Mr. Smyser, is that true, because you do most of the talking

17  with Jarod?

18  A.  Yes.

19  Q.  You have a position with the Siekopai Indigenous Group?

20  A.  Yes.  I was the president from 2010 to 2012, I was the

21  president of my nationality, but since June of 2012, when my

22  presidency came to an end, I had been a former president.

23  Q.  And as president of your nationality, which is sometimes

24  referred to as the Secuoya and is more technically and properly

25  named Siekopai, did that enable you to -- did that lead you to

1   have a role with regard to either the Assemblea, the Assembly

2   of the Afectados, or the Executive Committee?

3   A.  Yes, when I was president.

4   Q.  Correct.  And as one of the plaintiffs in the Lago Agrio

5   case, you have been aware of the -- and through your role in

6   the Assembly, or the Executive, you have been aware of matters

7   in this case as well as in Lago Agrio, correct?

8   A.  Yes.

9   Q.  You have provided all the documents that you personally

10  have to your lawyers in this case for production in this case,

11  correct -- everything that you had individually?

12  A.  No.

13  Q.  OK.  The documents, you gave some of them to Mr. Fajardo

14  and they were then passed on to us?

15  A.  One time it was requested because for the case here, I

16  think it was for Chevron, that I provide things, but I gave my

17  e-mail code, the key, one time.  That's what I provided, one

18  time.

19  Q.  All right.  So you are aware that we, as your lawyers, were

20  seeking documents pertaining to the case as a whole from

21  Mr. Fajardo?

22              MR. SELEY:  Objection, your Honor.  Leading.

23              THE COURT:  Leading, indeed.  Sustained.

24  Q.  Have you authorized us, as your lawyers, to seek

25  documents --

D4hdche2                          Piaguaje - cross

1          MR. SELEY:  Objection.

2     Q.  -- requested in this litigation?

3          MR. SELEY:  Objection.  Leading.

4          THE COURT:  Overruled.

5     A.  The power of attorney to undertake this procedure?

6     Q.  Let me rephrase the question.

7          Even before -- the issue of our obtaining documents in

8     Ecuador came up even before the most recent request in 2012.

9     Do you remember that?

10    A.  Yes.  In order to -- the request for -- I don't know.

11    Q.  Do you remember the discussion -- there being discussion --

12    do you remember being aware of efforts to collect documents

13    from Mr. Fajardo back in 2011 in the related earlier part of

14    this case?

15         MR. SELEY:  Objection.  Leading.

16         THE COURT:  You are leading.

17         Next question.

18    Q.  Do you remember the issue of obtaining documents about the

19    Ecuadorian case for production in the case in New York --

20         MR. SELEY:  Objection.  Leading.

21    Q.  -- coming up?

22         THE COURT:  Overruled.

23    A.  Yes.  But I'm not always aware of these things because they

24    are in the files, so ...

25    Q.  Right.  Do you recall -- even if you don't remember when,

D4hdche2                         Piaguaje - cross

1    you were asked a question earlier about when you may have had a

2    telephone conversation with Mr. Stewart and/or Mr. Smyser and

3    I.  Do you remember telephone conversations where we went

4    through and described questions from Chevron to determine what

5    information you have?

6              MR. SELEY:  Objection.  Leading.

7              THE COURT:  I will allow it.

8              MR. VESELKA:  He allowed it.

9    A.  Yes.

10   Q.  Do you know whether the Assembly turned down Mr. Fajardo's

11   request, or objected to his producing documents from the

12   Ecuadorian case?

13             MR. SELEY:  Objection.

14             THE COURT:  Sustained.

15   Q.  What action, if any, did the Assembly take in respect to

16   any request from Mr. Fajardo?

17             MR. SELEY:  Objection.  It lacks foundation.

18             THE COURT:  Sustained.

19   Q.  You testified earlier that you had come as requested

20   because of Chevron's request that you testify here.  How long

21   did it take --

22             THE COURT:  I didn't hear that testimony.  Why don't

23   you just ask your question.

24   Q.  How long did it take for you to get here for this

25   testimony?

D4hdche2                    Piaguaje - cross

1           THE COURT:  Mr. Veselka, that's relevant how?

2           MR. VESELKA:  We are going to be questioning on the

3    veracity, if we use it later, of discussions as to the purpose

4    of Chevron trying to drag him here in 36 hours.  It's not

5    relevant to the bad faith other than that we --

6           THE COURT:  It certainly is not relevant to this

7    hearing.  Let's move on.

8    BY MR. VESELKA:

9    Q.  Mr. Piaguaje, have you attempted to cooperate with your

10   North American lawyers to comply with the orders of this Court,

11   to the best of your knowledge?

12          MR. SELEY:  Objection.

13          THE COURT:  Overruled.

14   A.  In coming here?

15   Q.  Throughout the last two or three years in dealings with us.

16          MR. SELEY:  Objection.

17          THE COURT:  Overruled.

18   A.  Yes.

19          MR. VESELKA:  May I consult a second, your Honor?

20          (Pause)

21          We will pass the witness, your Honor.

22          MR. KEKER:  I have a few questions, your Honor.

23          THE COURT:  All right.

24   CROSS-EXAMINATION

25   BY MR. KEKER:

D4hdche2                        Piaguaje - cross

1    Q.  Sir, what is the Assembly of Afectados?

2              MR. SELEY:  Objection.

3              THE COURT:  Sustained.

4              MR. KEKER:  Your Honor, may I make an offer of proof

5    and explain to you why that is totally relevant in this case?

6    It couldn't be more relevant.  It is the most relevant fact

7    here.

8              THE COURT:  Really?

9              MR. KEKER:  Yes.

10             THE COURT:  That is quite a statement.

11             I will hear it at the sidebar.

12             MR. KEKER:  Thank you, your Honor.

13             (At the sidebar)

14             MR. KEKER:  Your Honor, the Assembly of Afectados, as

15   I understand it, is the assembly of the clients, the affected

16   ones, in the region that Chevron and Texaco polluted.  They are

17   the ones that make decisions.  They are the ones that are the

18   client that give the powers of attorney to Mr. Fajardo.

19             Mr. Fajardo came to the Assembly and told them that

20   Chevron was making these demands, told them -- in fact, they

21   made the decisions about all of this -- are they going to

22   appear, who is going to appear in the United States.  He told

23   them that these demands were being made and that they wanted --

24   did they want him to turn over his files to this Court.  And

25   they voted and they voted no.

D4hdche2                      Piaguaje - cross

1          Now, this man happened to be the president of the

2     Assembly when they made that vote.  What is more relevant to

3     this proceeding than that?  I understand --

4          THE COURT:  And this, in your estimation, occurred

5     when?

6          MR. KEKER:  I'm not sure when the vote was but the

7     vote was at a material time.  It was while he was president.

8     He was president in the last couple of years.

9          THE COURT:  Well, he hasn't been president since

10    sometime in 2012.

11         MR. MASTRO:  Correct.  That was his testimony today,

12    that he wasn't.

13         MR. KEKER:  That is right.  But when he was on the

14    Assembly they voted that they did not want their documents.

15         THE COURT:  Mr. Keker, when did it happen?

16         MR. KEKER:  I don't know because I haven't talked to

17    this man.  But isn't it relevant -- why don't we find out

18    through testimony when it happened?

19         MR. MASTRO:  We didn't even ask for the documents

20    until June of 2012, long after he was no longer --

21         THE COURT:  And the order wasn't added until when?

22         MR. KEKER:  February 10th.

23         THE COURT:  Of what year?

24         MR. MASTRO:  2013.

25         MR. KEKER:  2013.  Can we just talk about this a

1    little bit more?

2             This has been on the table since the Count Nine

3    action.

4             THE COURT:  Where were the affidavits on this?

5             MR. KEKER:  On what?

6             THE COURT:  On everything you are saying now.

7             MR. SMYSER:  Mr. Stewart has testified that the

8    requests were made back in 2011.  We have had been requesting

9    these documents since Count Nine started.  This issue has been

10   teed up for a long time, your Honor.

11            MR. KEKER:  Can I say -- I'm sorry.  Excuse me.

12            THE COURT:  No.  You may not right now, Mr. Keker.

13   You keep talking over me and you keep talking over others.

14            MR. KEKER:  I'm sorry.  I don't mean to.

15            THE COURT:  I understand.  It is a flaw that I share

16   with you sometimes -- at least my wife will tell you that.

17            But if all this was so relevant, why wasn't it in any

18   of your papers?

19            MR. SMYSER:  Which part, your Honor?  I think it is in

20   our papers that Mr. Fajardo demanded that these documents be

21   turned over, and it was rejected.

22            THE COURT:  Mr. Fajardo demanded it?

23            MR. SMYSER:  We demanded it of our clients.  We

24   demanded it of Mr. Fajardo.  Mr. Fajardo demanded it of the

25   Assembly.  I have no rights in the Assembly.

D4hdche2                      Piaguaje - cross

1              THE COURT:  He demanded it?

2              MR. SMYSER:  That's my understanding, your Honor.

3              THE COURT:  And we are going to then have Mr. Fajardo

4    testify as to what happened there and what advice he gave them?

5              MR. SMYSER:  No, your Honor.

6              THE COURT:  We are going to get what advice he gave

7    them?

8              MR. SMYSER:  He will not testify.  He has declined to

9    come.

10             MR. GOMEZ:  Excuse me, your Honor.  This witness --

11             THE COURT:  Who are you?

12             MR. GOMEZ:  Julio Gomez, on behalf of --

13             THE COURT:  I've got one, two, three lawyers for your

14   clients.  I'm going to hear from one of them.  Who is it?

15             MR. SMYSER:  It would be me, your Honor.

16             THE COURT:  All right.

17             MR. SMYSER:  I can't add anything more to what I have

18   said.  Mr. Fajardo will not testify.  We have asked him to

19   testify.  He has refused.

20             THE COURT:  And have you put in any affidavits

21   whatsoever about this supposed event with the Afectados

22   anywhere in your affidavits?

23             MR. SMYSER:  I can't recall off the top of my head,

24   your Honor.  I will look and see if I can find it.  I will let

25   the Court know.

D4hdche2                    Piaguaje - cross

1           THE COURT:  What about you, anything in the

2    affidavits, Mr. Keker?

3           MR. KEKER:  I don't know, but the affidavit has been

4    in our responses.  We have said --

5           THE COURT:  In what responses?

6           MR. KEKER:  In our responses to the sanctions motion,

7    in our responses to the discovery --

8           THE COURT:  Where?  I want to know where.  I want to

9    see it.

10          MR. KEKER:  You didn't let me finish what I was going

11   to say about what was in there.

12          THE COURT:  Go ahead.

13          MR. KEKER:  What was in their response is we said that

14   this is a setup and this has been perfectly obvious it was

15   going to happen since the very beginning of the original RICO

16   case, that Fajardo has made his position plain.  This idea

17   there is a difference between asking and demanding when you've

18   got somebody who says I ain't doing it, it's illegal in

19   Ecuador, no way am I doing it, for you to draw some huge

20   distinction between asking and demanding I think is not

21   justified on this record.  And in our response --

22          THE COURT:  Mr. Keker, we are here at the sidebar to

23   hear your offer of proof.  I know you are unhappy with rulings

24   I have made.

25          MR. KEKER:  Very, your Honor.

D4hdche2                         Piaguaje - cross

1                THE COURT:  I understand that.

2                MR. KEKER:  Yes, sir, your Honor.

3                THE COURT:  Now, what is the offer of proof?

4                MR. KEKER:  The offer of proof is that there was an

5       Assembly meeting at which Fajardo came and this is -- Fajardo

6       came and said that we have been demanded of, asked of, to

7       produce the documents that I have in the Chevron litigation up

8       in New York.  And the Assembly, as I understand it, voted on it

9       and said no.

10               THE COURT:  When?

11               MR. KEKER:  And I just told you, I can't tell you the

12      date, but it was obviously after these demands began.  So it is

13      after the RICO action was filed.

14               THE COURT:  Before or after the Order was entered this

15      year?

16               MR. KEKER:  Well, I would assume it's got to be before

17      the order was entered this year of February 10, 2013.

18               Could I say about that Order, your Honor, that Order

19      says -- and somehow you had made a decision in that Order that

20      these documents had to be produced in the New York action.  You

21      said, in the last line, a reasoned -- I'm going to explain my

22      reasoning.  We still don't know your reasoning about why you

23      thought at that time, knowing what Fajardo's position was,

24      knowing what the Ecuadorian Court had said, why you thought it

25      was appropriate to order us to produce these documents when you

D4hdche2                    Piaguaje - cross

1   knew that that was a physical impossibility for us to do.

2           And so that kind of leaves us somewhat stymied in

3   dealing -- and then the next thing that comes, instead of a

4   reasoned opinion, comes this claim that we're acting in bad

5   faith.  Plus, I get letters from this guy telling me that I am

6   a liar because when I say he is a pariah, when I say he is

7   being pushed away --

8           THE COURT:  This time is all coming out of your time

9   here because this has been mainly not an offer of proof, it has

10  been mainly a grievance session, and we are just not going to

11  continual on that basis.  And if the offer of proof is

12  finished, I would like to know it.

13          MR. KEKER:  It is, your Honor.  I've said everything

14  that I know about -- and I can't give you that date.

15          THE COURT:  Well, except that you told me it was

16  before the Order was entered.

17          MR. KEKER:  Right.

18          THE COURT:  So far as an opinion is concerned, you

19  will undoubtedly get it with respect to the sanctions motion,

20  and it just ultimately seemed to me that it was pointless to do

21  it twice.

22          MR. SMYSER:  Your Honor, excuse me.  I didn't mean to

23  interrupt.

24          THE COURT:  No.  I was finished.

25          MR. SMYSER:  Can we ask this witness about whether or

D4hdche2                    Piaguaje - cross

1    not that vote occurred and the date when that vote occurred?

2              THE COURT:  You cannot lead him.  And I will allow

3    you, if you first lay a proper foundation -- because at the

4    moment the best judgment I can form on the record is whatever

5    he has got is complete hearsay, but that may be wrong, that's

6    the way I'm reading it because he said he was involved with

7    that organization when he was the president of this other thing

8    and that ended in 2012, and none of it postdates the Court

9    Order -- I will let you go a little way with it, but I think

10   this is really a serious imposition.  I think that, if I'm

11   correct in remembering, this is a brand new argument launched

12   here today, after full briefing and affidavits, and it has a

13   little something -- some significance on the question of

14   credibility.

15             MR. KEKER:  Judge, could I respond to that?

16             THE COURT:  No.

17             MR. KEKER:  Because --

18             THE COURT:  No.  Let's move on.

19             (In open court)

20             THE COURT:  You may proceed.

21             MR. KEKER:  Thank you, your Honor.

22   BY MR. KEKER:

23   Q.  Sir, what is the Assembly of Afectados, very briefly?

24   A.  The Assembly of the Afectados is a group, a group of people

25   who were affected by the pollution.

D4hdche2                          Piaguaje - cross

1    Q.  Were you the president of the Assembly at some point?

2    A.  No.

3    Q.  Did you hold any office in the Assembly of Afectados?

4    A.  The only time I was a leader was when I was in the

5    committee but not in the Assembly.

6    Q.  What's the committee?

7    A.  No.  It is an assembly of all the people affected.  Right?

8    And then there are committees, or cooperatives, for each of the

9    nationalities and according to those chosen, according to their

10   leaders.

11   Q.  Were you a leader of one of those cooperatives?

12   A.  No.  Well, yes, but within my nationality.  Yes.

13   Q.  And is that called Secuoya?

14   A.  Yes.

15   Q.  And did the Secuoya committee meet with the other

16   committees in the Assembly?

17   A.  Of course, when an assembly would meet, all the

18   representatives would meet; all of us representatives would

19   meet.

20   Q.  When the representatives met, when you were there, did the

21   subject of providing documents in this case to Chevron ever

22   come up?

23            MR. SELEY:  Objection, your Honor.  Leading.

24            THE COURT:  No.  Overruled.

25   A.  If the attorneys would give legal -- judicial information,

D4hdche2                    Piaguaje – cross

1    because for my part I don't know about legal information, so

2    they would inform us.

3    Q.  And did any attorney discuss with the Assembly whether or

4    not to produce documents to Chevron in this case in New York,

5    in the United States?

6               MR. SELEY:  I object to form, your Honor.

7               THE COURT:  Pardon me?

8               MR. SELEY:  I object to form, your Honor.

9               THE COURT:  Mr. Piaguaje, answer that question "yes"

10   or "no" with respect only to occasions when you were present.

11              MR. SELEY:  OK.

12   A.  In those meetings, no.  We would be only informed -- just

13   given the report that Chevron is requesting documents.

14   Q.  And did the Assembly take any action with respect to that

15   report?

16              MR. SELEY:  Objection, your Honor.

17              THE COURT:  Sustained.  That is leading.

18   Q.  As a result of that report, did anything happen?

19   A.  Yes.  Then I had to look for the other colleagues and they

20   were in agreement that it couldn't be done.

21   Q.  And how did they come to that agreement, was it by vote or

22   some other way?

23              MR. SELEY:  Objection, your Honor.  I want to make

24   sure he is talking about when he was actually present.

25              THE COURT:  Were you present on the occasion you are

D4hdche2                        Piaguaje - cross

```
 1    discussing, Mr. Piaguaje?
 2               THE WITNESS:  Yes -- no.  No, not a lot but I was at
 3    some meetings.
 4               MR. SELEY:  Well --
 5               THE COURT:  Go ahead, Mr. Keker.
 6    Q.  Were you ever at a meeting when a decision was made about
 7    producing documents?
 8               MR. MASTRO:  Objection.
 9               THE COURT:  What is the objection?
10               One lawyer, please.
11               MR. MASTRO:  Sorry.  Go ahead.
12               MR. SELEY:  Objection.  Leading, your Honor.
13               THE COURT:  I think so.  Rephrase your question.
14    BY MR. KEKER:
15    Q.  When you were present, did anything happen with respect to
16    producing documents or not in this case in the United States?
17    A.  When I was in a meeting -- well, not all the -- it was only
18    the representatives and not all the plaintiffs were there.
19    Q.  When you were in a meeting with the representatives of the
20    various private groups, was any action taken with respect to
21    producing documents in this case?
22               MR. SELEY:  Objection.
23               THE COURT:  Overruled.
24    A.  We had talked about that issue, but then if Attorney
25    Fajardo later says that it cannot be done because there are
```

D4hdche2                         Piaguaje - cross

1    laws in Ecuador, laws that say that it couldn't be done, then

2    also the other colleagues are also in agreement.

3    Q.  When you say "the other colleagues," who are you referring

4    to?

5    A.  Well, I mean the plaintiffs.

6    Q.  The plaintiffs in the Lago Agrio case?

7    A.  Yes.

8    Q.  Did the plaintiffs ever have a vote on that subject?

9            MR. SELEY:  Objection.

10           THE COURT:  Sustained.

11   Q.  Do you remember when this conversation that you heard with

12   Attorney Fajardo happened?

13   A.  This was not too long ago, a-month-and-a-half ago that I

14   talked about this issue.  Yes, it's since then we started

15   talking about this.

16   Q.  So you think this was a discussion that was had in this

17   year, 2013?

18   A.  Yes.

19   Q.  Do you know if it happened -- or did you -- did anybody

20   ever say that Judge Kaplan issued an order on the subject of

21   documents in Ecuador this year?  Did you learn that?

22           MR. SELEY:  Objection.  Leading.

23           MR. KEKER:  I'm trying to move this along, your Honor.

24   This is a man who is not totally sophisticated as a witness.

25           THE COURT:  Well, yeah, and you are.

D4hdche2                          Piaguaje - cross

1           And the objection is sustained.

2   Q.  A month and a half ago is around March 1st.  Do you believe

3   that this was discussed by the Afectados and the Assembly

4   around March 1st, 2013?

5           MR. SELEY:  Objection, your Honor.

6           THE COURT:  Sustained.  It is leading.

7           MR. KEKER:  Nothing further.

8   Thank you.

9           THE COURT:  Thank you.

10          MR. KEKER:  Thank you, sir.

11          THE COURT:  Any further examination by plaintiff?

12          MR. SELEY:  No further questions, your Honor.

13          THE COURT:  All right.  Is there any reason I

14  shouldn't excuse this witness altogether at this point?

15          MR. MASTRO:  None, your Honor.

16          MR. VESELKA:  Not that we are aware of, your Honor.

17          THE COURT:  Mr. Keker.

18          MR. KEKER:  Yes, your Honor, we would like him

19  excused.

20          THE COURT:  Mr. Piaguaje, thank you and thank you for

21  coming, and you are excused and I wish you a good journey.

22          THE WITNESS:  Thank you.

23          (Witness excused)

24          THE COURT:  OK.  Let's take a short break, ten

25  minutes.

D4hdche2

1           THE CLERK:  All rise.

2           (Recess)

3           THE COURT:  OK.  Next.

4           MR. KEKER:  Your Honor, their next witness is an

5     expert, and we have an objection to his testimony.

6           Could I make that objection?

7           THE COURT:  I would like to know who the expert is

8     first and what it is about.

9           MR. MASTRO:  Your Honor, Ms. Neuman is going to do

10    that examination so she will respond.

11          MS. NEUMAN:  Your Honor, the expert Chevron would call

12    is Dr. Santiago Efrain Velazquez Coello.  He is an expert in

13    Ecuadorian law.

14          THE COURT:  What is the full name?

15          MS. NEUMAN:  Santiago Efrain Velazquez Coello.

16          THE COURT:  The last name is spelled?

17          MS. NEUMAN:  The second last name is spelled

18    C-o-e-l-l-o.  The witness will go by Dr. Velazquez.

19          THE COURT:  All right.  And what in general is he

20    supposed to say?

21          MS. NEUMAN:  In general, Dr. Velazquez will testify

22    regarding Ecuadorian secrecy law, whether the clients are

23    entitled to their files, whether co-plaintiffs have to consent

24    or not in the Cordova action.

25          THE COURT:  Don't we have all of this in the record?

D4hdche2

1          MS. NEUMAN:  I believe this is largely covered by

2     Dr. Velazquez's reports, your Honor.

3          THE COURT:  And is that in the record?

4          MS. NEUMAN:  His first report is but his rebuttal

5     report is not yet in the record.

6          THE COURT:  And it will be when?

7          MS. NEUMAN:  We are going to have him confirm it

8     today, but it was served on the other side on April 12th, when

9     the rebuttal reports were due.

10          THE COURT:  So why don't you just give me the reports.

11          MS. NEUMAN:  OK, your Honor.

12          THE COURT:  Is there any objection to that?

13          MR. KEKER:  No, your Honor, except there is an

14     objection to the relevance of the reports, but I don't object

15     to the procedure of you taking the reports in rather than

16     listening to this guy.

17          THE COURT:  OK.

18          MR. KEKER:  But I do object to using the information

19     in any way.  If I could say why?

20          THE COURT:  Briefly.

21          MR. KEKER:  His testimony about Ecuadorian law is not

22     relevant to any of your five questions.  And much more

23     particularly, by the time you issued your order which the

24     sanctions motion is on, you had obviously made up your mind

25     about what Ecuadorian law requires.

D4hdche2

| | |
|---|---|
| 1 | THE COURT:  I would say that is rather a presumptuous |
| 2 | statement on your part, Mr. Keker, but go ahead. |
| 3 | MR. KEKER:  You had -- well, the whole premise of the |
| 4 | order was we told you that we don't have control over these |
| 5 | documents and we couldn't do it.  You ordered us -- |
| 6 | THE COURT:  Mr. Keker, I am not here to argue with |
| 7 | you.  That's not why I said what said.  I said it because I |
| 8 | didn't want to let it go unanswered -- |
| 9 | MR. KEKER:  Yes, your Honor. |
| 10 | THE COURT:  -- only to have you then argue in some |
| 11 | other place that I agreed with you. |
| 12 | MR. KEKER:  I -- |
| 13 | THE COURT:  You know, I've said what I have to say. |
| 14 | MR. KEKER:  Then the objection is this:  The objection |
| 15 | is that at the time of the Order that the five questions are |
| 16 | addressed to, the Ecuadorian Court had issued its opinion, |
| 17 | there were dueling expert reports -- one from Velazquez, one |
| 18 | from our -- from the LAP side.  So we all knew about that.  You |
| 19 | made a decision on the Order.  And then you issued this Order |
| 20 | saying we're going to have a decision on good faith, on |
| 21 | practical ability and so on.  What Dr. Velazquez says about |
| 22 | Ecuadorian law doesn't add anything to that. |
| 23 | And, in particular, I would point you to that opinion |
| 24 | that was mentioned yesterday where Judge Kollar-Kotelly, in the |
| 25 | District -- |

D4hdche2

1          THE COURT:  I got the point that your position is it

2     is not relevant to the subject of this hearing.  I understand

3     that.  OK?  I am not here having oral argument on this whole

4     proposition.

5          MR. KEKER:  Sure.  Then we would object to him

6     testifying.

7          THE COURT:  Well, it has already been agreed that he

8     is not going to do that, that I am going to take the reports.

9          MR. KEKER:  OK.  Then we object to you using the

10    reports for any purpose.  But we don't object to you getting

11    the reports, and if you are going to use them, taking the

12    reports, as opposed to his testimony.

13         THE COURT:  Fine.  That's all we were trying to

14    accomplish here.

15         OK.  Next witness.

16         MR. MASTRO:  Your Honor, we would call Craig Smyser,

17    but we will not be questioning him today on the circumstances

18    in which the Cordova lawsuit was initiated, carried out, and

19    the knowledge of his firm and participation of his firm in that

20    process.

21         THE COURT:  Understood.

22         Go ahead, Mr. Smyser.

23    CRAIG SMYSER,

24         called as a witness by the plaintiff,

25         having been duly sworn, testified as follows:

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D4hdche2

| | |
|---|---|
| 1 | THE CLERK:  Thank you.  Please be seated. |
| 2 | If you can please state your name for the record? |
| 3 | THE WITNESS:  Craig Smyser, S-m-y-s-e-r. |
| 4 | THE COURT:  You may proceed, Mr. Mastro. |
| 5 | MR. MASTRO:  Thank you, your Honor. |

DIRECT EXAMINATION

BY MR. MASTRO:

Q.  Mr. Smyser, am I correct that it was Mr. Fajardo who arranged for you to get a declaration from Nicholas Zambrano?

A.  Not entirely.

Q.  Did Mr. Fajardo help arrange for you to meet with Mr. Zambrano?

A.  Yes.

Q.  And he arranged that meeting for you in person with Mr. Zambrano on August 14, 2012, correct, sir?

A.  I think that was the date.

Q.  You and Mr. Stewart met with Mr. Zambrano and Mr. Fajardo that day, correct?

A.  Yes.

Q.  And did there come a time when you all decided you wanted to try to get a declaration from Mr. Zambrano?

MR. KEKER:  Objection, your Honor.  Scope.

THE COURT:  Yes.

MR. MASTRO:  It goes, your Honor, to Mr. Fajardo facilitating getting them information or work product when it

D4hdche2                        Smyser - direct

1   suited their purposes but not producing documents when he

2   didn't want to.

3           MR. KEKER:  I think the record is very clear that

4   Mr. Fajardo does both as he chooses, your Honor.  That's what

5   the testimony has been.  He will help when he thinks it is

6   useful.  He won't when he doesn't want to do it.  Mr. Fajardo

7   is his own man.

8           MR. MASTRO:  I think that is a startling statement but

9   I will go on.

10          MR. VESELKA:  I disagree with the characterization of

11  the witness statement declaration by Mr. Zambrano.

12          THE COURT:  I'm sorry?

13          MR. VESELKA:  I disagree with Mr. Mastro's

14  characterization of the witness statement as work product.

15  Once the declaration was there and he provided it, it is a

16  witness statement.

17          THE COURT:  So far all the witness has said was that

18  he met with Messrs. Zambrano and Fajardo, and the pending

19  question is only did there come a time when you all decided you

20  wanted to try to get a declaration from Mr. Zambrano.  All of

21  this discussion is a little bit off that point.

22          Do you want to rephrase the question, possibly, in a

23  way that obviates any such issues?

24          MR. MASTRO:  Certainly, your Honor.

25  BY MR. MASTRO:

D4hdche2                        Smyser – direct

1   Q.  Did Mr. Fajardo work with your firm on the drafting of the

2   Zambrano declaration?

3   A.  In part.

4   Q.  Did you exchange communications with Mr. Fajardo about the

5   draft Zambrano declaration?

6           MR. KEKER:  Objection.  Scope.

7           THE COURT:  Oh, no.  I think it is appropriate.

8   A.  Yes.

9   Q.  Did Mr. Fajardo make written revisions on the draft

10  Zambrano declaration that he sent to you?

11  A.  I wouldn't call it revisions.

12  Q.  Changes.

13  A.  Mr. Fajardo prepared a draft of a declaration, and I

14  understand that draft to have been different from anything we

15  sent.

16  Q.  And he prepared that in Ecuador, correct?

17  A.  Yes.

18  Q.  And he sent that document to you in the United States,

19  correct, sir?

20  A.  No.

21  Q.  You worked on that with him in Ecuador?

22  A.  No.

23  Q.  Mr. Fajardo did a draft declaration for Mr. Zambrano that

24  you reviewed, correct, sir?

25  A.  I can't remember if I reviewed a draft of a declaration or

D4hdche2                        Smyser - direct

1    whether I heard that Mr. Fajardo had prepared a draft.

2    Q.  And Mr. Fajardo prepared that draft at your request,

3    correct, sir?

4    A.  No.  We did not ask him to prepare that draft.

5    Q.  Did you ask him to speak to Mr. Zambrano about giving a

6    declaration?

7    A.  We spoke to Mr. Zambrano asking him for a declaration.

8    Q.  And you then spoke to Mr. Fajardo about drafting

9    Mr. Zambrano's declaration, correct?

10   A.  We spoke to Mr. Fajardo about obtaining the declaration

11   from Mr. Zambrano.

12   Q.  And when did you have that conversation, sir?

13   A.  After October 14, 2012.

14   Q.  And Mr. Zambrano ultimately did give you a declaration,

15   correct?

16   A.  Correct.

17   Q.  And it was Mr. Fajardo who had drafted it and then brought

18   it to Mr. Zambrano to review, correct?

19   A.  That's not my understanding.

20   Q.  But Mr. Zambrano -- strike that.

21          Mr. Fajardo did do a draft declaration, correct?

22   A.  My understanding is that he prepared a draft declaration

23   which was not the declaration that Mr. Zambrano ultimately

24   produced.

25   Q.  Did you see the draft declaration that Mr. Fajardo

D4hdche2                         Smyser - direct

1   prepared?

2   A.  I've already said I don't recall whether I reviewed it or

3   heard about it.

4   Q.  And is it your understanding that Mr. Zambrano received

5   Mr. Fajardo's draft and reviewed and edited it?

6   A.  I have no understanding one way or the other about that.

7   Q.  Did you ask -- strike that.

8        Am I correct that it was Mr. Fajardo who had the

9   interactions with Mr. Zambrano about securing the content of

10  Mr. Zambrano's declaration?

11  A.  I don't know if it was Mr. Fajardo who interacted with

12  Mr. Zambrano to secure --

13  Q.  It wasn't you, was it, sir?

14  A.  It was not me.

15  Q.  It wasn't Mr. Stewart, it wasn't Mr. Veselka, it wasn't

16  anybody from the Smyser Kaplan & Veselka, was it, sir?

17  A.  Correct.

18  Q.  It was lawyers in Ecuador working for the LAPs, correct?

19  A.  I have no idea who it was in Ecuador.

20  Q.  Are you saying as you sit here now you don't know that

21  Mr. Fajardo communicated with Mr. Zambrano about the substance

22  of his declaration?

23  A.  I didn't say that.

24  Q.  OK.  So he did, Mr. Fajardo, communicate with Mr. Zambrano?

25  A.  I assume he did.  I don't know that he did.

D4hdche2                          Smyser - direct

1    Q.  Who delivered the declaration to you, sir?

2    A.  I believe we received it by e-mail.

3    Q.  From Mr. Fajardo, correct?

4    A.  I believe it was Mr. Fajardo or someone in his office.

5    Q.  One of the lawyers in Ecuador working for the LAPs,

6    correct?

7    A.  I believe that's correct.

8    Q.  And am I also correct that in that context Mr. Fajardo was

9    able to obtain for you a tape recording that Mr. Zambrano had

10   made of a conversation that he had on the telephone in

11   January 2013 with Andres Rivera, a lawyer representing Chevron?

12   A.  I'm not sure I understand your reference there.  The "he"

13   in that sentence is --

14   Q.  Mr. Fajardo, when he conveyed to you Mr. Zambrano's

15   declaration, was also able to convey to you a copy of this tape

16   recording that Mr. Zambrano had made of a telephone

17   conversation he had with Andres Rivera in January 2013,

18   correct, sir?

19   A.  That he, Mr. Zambrano, had?  Yes, he conveyed that.

20   Q.  Now, you'll recall that Chevron made a motion to compel the

21   plaintiffs, the LAP representatives, your clients, in this case

22   to produce that tape recording, correct?

23   A.  Yes.

24   Q.  And you responded to that motion, quote, We do not have the

25   recordings that are the subject of Chevron's motion, and that

D4hdche2                         Smyser – direct

1   you never had them; do you recall that, sir?

2   A.  Yes.

3   Q.  But am I also correct that your lawyers in Ecuador,

4   Mr. Fajardo and others, had obtained a copy of that tape

5   recording?

6            MR. KEKER:  Objection to the form of the question.

7   "Your lawyers in Ecuador."

8            THE COURT:  Rephrase.

9            MR. MASTRO:  Certainly.

10            (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D4HJCHE3                        Smyser - direct

1   Q.  Isn't it a fact, sir, that the Ecuadorian lawyers

2   representing your similar clients, Mr. Fajardo, and the other

3   Ecuador I can't lawyers had obtained a copy of that tape

4   recording that Mr. Zambrano made?

5   A.  All I know is that they had a copy that they sent to me

6   with Mr. Zambrano's declaration.

7   Q.  So when you told this Court, in opposing our motion, that,

8   "We do not have the recordings that are the subject of

9   Chevron's motion," did you know whether your lawyers in

10  Ecuador -- strike that.

11          When you represented to the court that, "We do not

12  have the recordings that are the subject of Chevron's motion,"

13  did you know at that time whether any of the Ecuadorian lawyers

14  representing your same clients, Mr. Fajardo or others, had a

15  copy of that tape recording?

16  A.  No.

17  Q.  Did you ask them at the time that you made that

18  representation to the court whether they had a copy of that

19  tape recording?

20  A.  No.

21  Q.  Did you know from press reports that appeared in Ecuador in

22  January 2013 and that had been submitted to this Court in our

23  pleadings that you received copies in the normal course of this

24  litigation, that your Ecuadorian lawyers were commenting on the

25  substance of that tape recording --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D4HJCHE3                          Smyser – direct

1            MR. KEKER:  Objection to form.

2    Q.  -- in public statements in January 2013?

3            MR. KEKER:  Objection to the form of the question.

4            THE COURT:  Overruled.

5    A.  I knew there were comments about a tape recording.

6    BY MR. MASTRO:

7    Q.  So shouldn't you have, if you were exercising a reasonable

8    diligence that you're supposed to exercise in complying with

9    discovery requests and court orders, have asked the Ecuadorian

10   lawyers, including Pablo Fajardo who commented publicly in

11   January 2013 about the substance of that tape recording that

12   Mr. Zambrano made, do you have the tape, can you give it to me

13   so I can give it to Judge Kaplan?

14   A.  No.

15   Q.  Or to Chevron because they have asked for it in a motion?

16   A.  No.

17   Q.  You never asked that question, did you?

18   A.  No, I did not because discovery has passed.

19   Q.  Let's go onto something else.

20           THE COURT:  That is the reason you didn't ask at the

21   time for discovery was passed?

22           THE WITNESS:  That is certainly what I am thinking

23   now, your Honor.  I didn't ask because I didn't think to ask

24   for it.

25   BY MR. MASTRO:

D4HJCHE3                      Smyser - direct

1   Q.  But you did think to represent to this Court that "we do

2   not have it," when you had every reason to know the Ecuadorian

3   lawyers representing your same clients had it in their

4   possession incredibly from Mr. Zambrano at the time you made

5   the recording because they commented on it publicly?

6   A.  We means me.  We did not have the recording, had not seen

7   the recording, had not listened to the recording --

8   Q.  You didn't ask for it, sir, you --

9            THE COURT:  Now you are interrupting the witness.

10           MR. MASTRO:  Sorry, your Honor.

11  BY MR. MASTRO:

12  Q.  Go ahead, Mr. Smyser.

13  A.  We did not have the recording.  We had not heard the

14  recording, listened to the recording.  For all I knew, the

15  recording was in the possession of Mr. Fajardo, but it was not

16  in our possession, and Mr. Fajardo always refused to turn

17  documents over to us at our request, and you know that.

18  Q.  Sir, so every time you say "we" to the court, even though

19  the discovery requests are to defendants and those who are

20  their co-counsel, agents or representatives, including the

21  Ecuadorian lawyers like Mr. Fajardo, when you say "we" to the

22  court, you just mean you, correct, sir?

23  A.  No.

24  Q.  All right.  I will go on.  If Mr. Fajardo had that tape

25  recording -- strike that.

D4HJCHE3                            Smyser - direct

1          Assuming Mr. Fajardo had that tape recording in

2   January 2013, would you have considered that to be work product

3   that he had collected?

4   A.  I didn't know the circumstances about how he had gotten the

5   recording.  I knew nothing about that.

6   Q.  But when it suited Mr. Fajardo's purpose to make that tape

7   recording available as an exhibit to Mr. Zambrano's

8   declaration, you were happy to receive it and he was happy to

9   give it, wasn't he, sir?

10  A.  I do not know how Mr. Fajardo obtained that recording,

11  whether he obtained that recording in conjunction with

12  obtaining the declaration and what he produced was Mr.

13  Zambrano's original that Mr. Fajardo did not have in his

14  possession.  I do not accept the premise of your question.

15  Q.  Let's try this premise, sir.

16          THE COURT:  Let's try questions.

17  Q.  Am I correct you have received hundreds of draft pleadings

18  of the Ecuadorian lawyers related to their case?

19          You have been shipped hundreds of draft pleadings by

20  Mr. Fajardo and his colleagues in Ecuador for you to see and

21  review here in the United States, correct, sir, hundreds?

22  A.  I am actually not sure that that is entirely correct.  I

23  know we have received pleadings from the old case down in

24  Ecuador, drafts of those.  I don't think it's the hundreds and

25  hundreds that you --

D4HJCHE3                          Smyser - direct

1    Q.  Do you want to refresh your recollection looking at your

2    own privilege log, the first 22 pages of the log?  Do you want

3    to refresh your recollection?  Do we have to waste the court's

4    time to do that?

5            THE COURT:  Ask a question.

6    A.  That is your decision.

7            MR. MASTRO:  Certainly, your Honor.

8    BY MR. MASTRO:

9    Q.  It would be fair to say you have received well north of 400

10   draft pleadings from the Ecuadorian lawyers, Fajardo and the

11   other Ecuadorian lawyers representing the -- correct, sir?

12   A.  I don't really know.

13   Q.  Certainly more than a hundred, correct, sir?

14   A.  I think that's correct.

15   Q.  Thank you.  Am I also correct, sir, that you wrote a letter

16   to Mr. Fajardo on February 15th, 2013 in regard to the court's

17   order of February 13th, 2013 compelling production of the

18   Ecuadorian documents?  Do you recall that, sir?

19   A.  I do.

20   Q.  Mr. Keker also --

21           MR. KEKER:  You know, I am --

22   Q.  -- also to Mr. Fajardo on February --

23           MR. KEKER:  -- I am tired of this hostile -- do we

24   have to be polite to them?  If we want to call each other

25   punks, I am willing to do that, but what is this?  Can we just

D4HJCHE3                        Smyser - direct

 1   have a hearing, your Honor?

 2            THE COURT:  We have been trying for two days, Mr.

 3   Keker.

 4            MR. KEKER:  I think we are doing fine until we get

 5   into this kind of super hostile.  If we are supposed to be

 6   polite, he has to be a bit polite.  If nobody will be polite,

 7   that is fine, too.  We can play either way.

 8            THE COURT:  Everybody is going to be polite.  That

 9   includes all counsel.

10   BY MR. MASTRO:

11   Q.  Am I also correct that Mr. Keker sent a letter to

12   Mr. Fajardo on February 14th, 2013 on that same subject?

13   A.  Yes.

14   Q.  Am I correct that Mr. Keker's letter sent the day before

15   yours was a letter that you saw before you sent your letter?

16   A.  I don't know that to be true.  I would assume so, but I

17   don't know.  I don't remember.

18   Q.  Would it refresh your recollection as to whether you saw

19   Mr. Keker's letter before you sent your letter to know that

20   both of you used the same formulation of inquiry when you said

21   to Mr. Fajardo, first Mr. Keker on the 14th and then you on the

22   15th, that you wanted him to, "notify me immediately whether,"

23   he would produce the Ecuadorian documents?

24   A.  I've seen Mr. Keker's letter recently.  I don't think it

25   would refresh my recollection on the subject you're asking me

D4HJCHE3                          Smyser - direct

1    about.

2    Q.  Do I have to show you both used that same formulation?

3              THE COURT:  I don't know why we're taking time to have

4    colloquy with the witness about a comparison of two letters I

5    am perfectly capable of reading for myself.

6              MR. MASTRO:  I am coming to the point now, your Honor.

7    BY MR. MASTRO:

8    Q.  Mr. Smyser, when you made your request of Mr. Fajardo, you

9    didn't ask him to please send you the documents because you

10   were under a court order; you asked him to notify you whether

11   he would, correct, sir?

12   A.  In the letter, the letter speaks for itself.  I believe

13   you're correct in the letter.  We had a phone conversation in

14   which we asked him to send us the documents.

15   Q.  In the exercise of reasonable diligence to comply with the

16   court's order, don't you think you should have made the request

17   for him to do it as opposed to whether he would do it?

18             THE COURT:  Mr. Mastro, this is just not helpful.

19             MR. MASTRO:  I will move on, your Honor?

20   A.  We translated --

21             THE COURT:  There is no question pending, please.

22             THE WITNESS:  Sorry.

23   BY MR. MASTRO:

24   Q.  Now, Mr. Smyser, am I correct that --

25             THE COURT:  You know, I said I set aside the

D4HJCHE3                          Smyser - direct

1    equivalent of up to three days, but the keywords are "up to."

2    There is no obligation to fill them.

3              MR. MASTRO:  I understand.  We are not going to, your

4    Honor.  This is our last witness for the purposes of this

5    hearing.  So we have cut back on the witnesses, your Honor.

6    This is our last witness.

7    BY MR. MASTRO:

8    Q.  Mr. Smyser, am I correct that you report on this case to

9    Mr. Fajardo about what is going on in this case?

10   A.  I give communications to Mr. Fajardo about what goes on in

11   this case.

12   Q.  Do you communicate with Mr. Fajardo about what is going on

13   in this case more often than you communicate with your two

14   named clients, Mr. Camacho and Mr. Piaguaje?

15   A.  Yes.

16   Q.  Am I also correct you communicate with Mr. Donziger about

17   what is going on in this case?

18   A.  Yes.

19   Q.  Is it Mr. Fajardo who signed your retention agreement?

20   A.  As did Mr. Piaguaje.

21   Q.  Who would be the person who would have the ability to fire

22   you if you were to no longer be retained on the case?

23   A.  I assume Mr. Fajardo would have that power.  I assume my

24   client would have that power.

25   Q.  Was Mr. Donziger the person responsible for your firms

D4HJCHE3                         Smyser - direct

1    hiring in the first place?

2    A.  Mr. Donziger was one of the persons we spoke to about the

3    case before we were hired.

4    Q.  Who else did you speak to before you were hired?

5    A.  Mr. Fajardo and Mr. Yanza.

6    Q.  Would those three persons, Mr. Donziger, Mr. Fajardo and

7    Yanza, would those also be the persons who would decide whether

8    you would continue on the case?

9    A.  I do not believe Mr. Donziger has any role whether we

10   continue in the case.

11   Q.  You believe that would be Mr. Fajardo?

12   A.  As I understand it, I think Mr. Fajardo has the pertinent

13   power of attorney, and my client.

14   Q.  So when Mr. Fajardo refuses one of your requests, your

15   request is being refused by a person who you believe has the

16   authority to fire you?

17   A.  I think he might.  I have never thought of it before, but I

18   think he might.

19   Q.  Am I also correct that you represent all 47 of the LAPs in

20   the other related U.S. proceedings?

21   A.  It is my understanding there is one other related

22   proceeding we represent.

23   Q.  You represent all 47 LAPs in that case, correct?

24   A.  Yes.

25   Q.  When the motion to compel production of the Ecuadorian

D4HJCHE3                      Smyser - direct

1   documents was granted, did you make any attempt to communicate

2   with any of the 47 LAPs, Camacho, Piaguaje, any of the others

3   about consenting to production of the Ecuadorian documents?

4   A.   Yes.

5   Q.   Which one?

6   A.   We spoke to our clients.

7   Q.   Which clients, sir?

8   A.   Mr. Piaguaje and Mr. Camacho.

9   Q.   You spoke to both of them after Judge Kaplan's February 13,

10  2013 order about whether they consented to producing the

11  Ecuadorian lawyer's documents?

12  A.   We spoke to them about Mr. Kaplan, Judge Kaplan's order --

13  Q.   Did you ask --

14          THE COURT:  Let him finish.

15          MR. MASTRO:  Certainly, your Honor.

16  A.   -- that we were required to produce these documents.  That

17  included documents from other of the 47 clients.

18  BY MR. MASTRO:

19  Q.   Did you ask either Mr. Camacho or Mr. Piaguaje to demand of

20  Mr. Fajardo that the Ecuadorian lawyer's documents be produced

21  in response to Judge Kaplan's February 13, 2013 order granting

22  our motion to compel?

23  A.   I don't recall the exact formulation of the words I used

24  with Mr. Camacho and Mr. Piaguaje.  I know we informed them of

25  the court's order.  We had the court's order translated.  We

D4HJCHE3                          Smyser - direct

1  discussed the order with them.

2  Q.  To your knowledge, neither of them did make such a demand

3  of Mr. Fajardo, correct, sir?

4  A.  To my knowledge, they made a demand through us to

5  Mr. Fajardo.

6  Q.  They did not personally make a demand of Mr. Fajardo,

7  correct?

8  A.  I have no idea whether they did or not.

9  Q.  Did they demand of you that you make such a demand?

10  A.  I don't recall that.

11       MR. MASTRO:  Your Honor, the remainder of my line of

12  questioning is on the subject of the suggestion by Mr. Smyser

13  of bringing a suit in Ecuador and then the subsequent history.

14       THE COURT:  Which is awaiting the other side's papers

15  this evening.

16       MR. MASTRO:  Correct, your Honor.

17       THE COURT:  And a ruling.

18       MR. KEKER:  Could I make a suggestion to hopefully

19  move things along.  I understand -- Mr. Smyser can correct

20  me -- these documents are available for your review and maybe

21  after lunch or sometime we can finish this today if he is the

22  last witness, you look at the documents, you make a decision

23  about what is going to happen, and if Mr. Stewart or Mr. Smyser

24  needs to testify further about them, whatever, we can do it

25  today rather than come back tomorrow if that meets with the

D4HJCHE3                          Smyser – direct

1   court's approval.  There are not that many, I don't think.

2              THE COURT:  I thought I understood not two hours ago

3   from Mr. Smyser that some of them are in Texas.

4              MR. KEKER:  They are, but now because of the miracles

5   of the digital age, they're in this courtroom because I have a

6   laptop, thanks to your -- not laptop, but an iPad and that

7   digits are going around, electronic data, and here they are.

8              THE COURT:  So you got them over s wireless

9   connection?

10             MR. KEKER:  I got them over a wireless connection so

11  that they could review --

12             THE COURT:  Mr. Keker, you know I signed an order

13  consistent with the standing orders of this Court based on an

14  application to bring that laptop in --

15             MR. KEKER:  IPad.

16             THE COURT:  -- which certified that any wireless

17  capability was disabled.

18             MR. KEKER:  Well, then that was my mistake, your

19  Honor.  I didn't realize that.

20             THE COURT:  Let's not have it happen again.

21             MR. KEKER:  Yes, sir.

22             THE COURT:  The security around here is not something

23  we take lightly, especially this week.

24             MR. KEKER:  I should say.  I will disable it this

25  second.

D4HJCHE3                         Smyser - direct

1           THE COURT:  All right.

2           MR. KEKER:  I am sorry.

3           THE COURT:  What about the proposal, Mr. Mastro?

4           MR. MASTRO:  Your Honor, I am fine with that proposal.

5       If your Honor is going to rule today on those

6   documents, assuming they're limited in number, there is also

7   the document Mr. Donziger is producing.

8           THE COURT:  Yes, I have looked at that.  I am prepared

9   to allow it to be produced in a redacted form, albeit not in

10  exactly the redacted form Mr. Keker asked.

11          Mr. Keker, you can follow along.  Nobody else can, but

12  you have the document.

13          MR. KEKER:  Right.

14          THE COURT:  I am working only from the translation, so

15  this would have to be extended to cover the Spanish part of it.

16          On the page that is headed "Translation," I would

17  leave the first two lines, that is, the word "Translation" and

18  what comes after it and nothing else.  You could redact the

19  red.

20          MR. KEKER:  February and greetings, just to make sure

21  I got it right?

22          THE COURT:  February 11, that line that starts

23  February 11.  The following page I would permit you to redact.

24  On the page after that, I would allow redaction of the first

25  four paragraphs.

D4HJCHE3                          Smyser - direct

1          MR. KEKER:  The first full -- they're all full.

2          THE COURT:  Yes, and the very last paragraph that has

3     the letter F in front of it.

4          MR. KEKER:  What we provide is under changes A through

5     E?

6          THE COURT:  Correct, and on the last page, I would

7     allow you to redact G, if you wish to do so, Paragraph 3.  I

8     didn't understand that to be within your request.

9          MR. KEKER:  We'll decide.  I will prepare such a

10    document, your Honor.

11         THE COURT:  All right.  Then you can show it to me.

12         Now the one you have handed up I will mark Court

13    Exhibit A and file it under seal.

14         MR. KEKER:  We are going to have to -- we'll cut this

15    up.  I don't have the ability to make a good --

16         THE COURT:  I can get my staff to do it for you and

17    show it to you.

18         MR. KEKER:  That would be most helpful.

19         THE COURT:  We'll do that.  Andy, this one marked

20    Court Exhibit A, but leave all the sticky papers for the

21    moment.  Now, does anyone want a cross of Mr. Smyser thus far

22    or do you want to wait with that?

23         MR. VESELKA:  I prefer to wait until the completion of

24    his testimony.

25         THE COURT:  Today is Wednesday.  We can plan to sit

D4HJCHE3                          Smyser - direct

1     this afternoon.  How fast can you get these other documents to

2     me?

3                MR. VESELKA:  Within 15 minutes.

4                THE COURT:  All right, get them to my Chambers.  We'll

5     adjourn until 2:00 o'clock and see whether we can't finish.

6                I take it that implicit in everything that has been

7     said is that once we're through with Mr. Smyser and Mr.

8     Stewart, that's it, the hearing is over.  Is that correct?

9                MR. KEKER:  Yes, your Honor, unless you want argument.

10    I can take a wild guess that you don't.

11               THE COURT:  That would be right.  If there is one

12    thing this case is long on, it is argument.

13               MR. VESELKA:  I would have to confirm just because we

14    didn't know we were getting here this fast, but I assume that

15    that would be it.

16               MR. SMYSER:  Yes.

17               THE COURT:  So you have just had it confirmed.  Then

18    we'll break until 2:00 o'clock, and assuming I get these papers

19    on time and that it is not voluminous, maybe we can resolve the

20    whole thing.

21               MR. MASTRO:  That would be our aim, your Honor.  Just

22    one last thing.  I haven't seen the Donziger document.  They

23    will give it to me, I assume, over the lunch break redacted.

24    Depending on what it says, whether I need to ask him any

25    questions.

D4HJCHE3                         Smyser - direct

1            THE COURT:  I understand that.

2            MR. SMYSER:  May I make one more point while you

3    consider the e-mails?

4            THE COURT:  Yes.

5            MR. SMYSER:  I believe the disclosures we made are

6    consistent with the case law that says if they're the kind of

7    disclosures that are made in connection with a privilege log,

8    that those don't constitute a waiver.  This is on the waiver

9    argument.

10           THE COURT:  All right.  Thank you.

11           (Luncheon recess)

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

D4HJCHE3                           Smyser - direct

1         AFTERNOON SESSION

2         2:00 pm

3         (Hearing resumes)

4         (In open court)

5         THE COURT:  Good afternoon, everyone.

6         Let's see whether we can deal with these documents.

7         First of all, with respect to Court Exhibit A, I have

8    asked my law clerk to prepare -- and I will ask her to give it

9    to Mr. Keker, first of all -- what seemed to me to be the

10   appropriate redaction which I have described previously.  I had

11   not then focused on the cover page to the Spanish version, but

12   in any case, there you have it, Mr. Keker.

13        If there is nothing further to be said on that, we'll

14   give it to everybody else.

15        MR. KEKER:  It looks exactly right, your Honor, to me.

16        THE COURT:  Okay.

17        MR. KEKER:  The fact that I am not objecting to Steven

18   Donziger to me, Ms. Little and Mr. Werdegar, I think that is

19   attorney-client privilege, but as long as it is --

20        THE COURT:  You're talking about the cover e-mail from

21   Jan Little?

22        MR. KEKER:  From Donziger to Keker, Little and

23   Werdegar.

24        THE COURT:  The one that says, "Pablo sent this

25   message to the American legal team this morning," that is

D4HJCHE3                         Smyser - direct

1    privileged?

2              MR. KEKER:  That is covered by attorney-client

3    privilege, but as long as it is not a waiver, I don't care.

4              THE COURT:  I don't think it is covered by

5    attorney-client privilege.  So there you are.  My law clerk

6    will distribute the redacted versions to counsel.  That takes

7    care of that.

8              Secondly, I received -- I am informed from Mr.

9    Smyser -- over the lunch hour a packet of e-mails to which

10   there was reference earlier.  We'll mark those collectively

11   Court Exhibit B.  Shawn, that packet originally included, did

12   it not, the October 9th e-mails?  And they're in here or not?

13              (Off-the-record discussion)

14              THE COURT:  That packet will be Court Exhibit B.  Now,

15   they're all in Spanish.  I am not a Spanish-speaker.  With the

16   assistance of my law clerk, I have been through the two October

17   9th e-mails.  Independent of their contents, my ruling is that

18   if there ever was any privilege with respect to those two

19   e-mails, it was waived by the defendant's references to it in

20   their papers, as Chevron has contended.  So those two e-mails

21   are to be produced.

22              MR. SMYSER:  Yes, your Honor, we understand that.  As

23   Mr. Keker said, that is a ruling overruling our objection to

24   producing those documents?

25              THE COURT:  Yes, it is.  Now, as to the rest of them,

D4HJCHE3                      Smyser - direct

1    I can't read them, so I am simply going to ask you to provide

2    me with translations.  If this is still an issue, then we are

3    going to be back tomorrow.  If it is not going to be an issue,

4    then it is not going to be an issue.

5           What is your pleasure?

6           MR. SMYSER:  Mr. Stewart, who is the author of the

7    e-mails, can translate them for the court immediately if the

8    court would so desire.

9           THE COURT:  I don't think it is appropriate for -- you

10   are proposing that be done ex-parte?

11          MR. SMYSER:  I am proposing he sit here and do it

12   right this second, translate them and provide the translation

13   to the court.

14          MR. VESELKA:  In writing.

15          MR. MASTRO:  We have a court translator here in the

16   courtroom to be able to assist your Honor with that.

17          THE COURT:  If somebody wants to provide me with

18   written translation, fine.

19          MR. MASTRO:  I would propose that that translator, who

20   both sides have used in the case, translate the documents so

21   that your Honor can review them and maybe we can complete

22   today.

23          MR. KEKER:  This is short enough, could the court

24   translator go into Chambers with you and read you the documents

25   so you know what is in them?  That would be fine with us.

D4HJCHE3                          Smyser - direct

1              MR. MASTRO:  I will need a translation, your Honor,

2     because I will then, if your Honor were to rule they are

3     produced, I can question.

4              MR. KEKER:  If you produce them, Mr. Jarod can say

5     what they said to Mr. Mastro.  It is not that complicated.

6              MR. MASTRO:  That would greatly constrain my

7     examination.

8              THE COURT:  Look, isn't the practical way of handling

9     this for the three of you to agree that the interpreter of your

10    choice will read them to the three of you on a without waiver

11    basis, and then you can come back and tell me whether anybody

12    cares about this any further?

13             MR. MASTRO:  That will be fine by me, your Honor.

14             MR. SMYSER:  Let me confer.

15             (Off-the-record discussion)

16             MR. KEKER:  I'll do anything I can do to get back to

17    California, your Honor.

18             THE COURT:  I picked that up a long time ago this

19    morning, Mr. Keker.

20             MR. SMYSER:  Assuming these are provided under

21    protection of 502, Rule 502, where we are providing them to

22    them, they're going to read them with the translator, all three

23    of us, and if they decide they want to do something further

24    with them, then we submit them to the court if we can't reach

25    an agreement on them.

D4HJCHE3                          Smyser – direct

1              THE COURT:  Is that acceptable to you, Mr. Mastro?

2              MR. MASTRO:  Yes, your Honor.

3              THE COURT:  Mr. Keker?

4              MR. KEKER:  Yes, your Honor.

5              THE COURT:  Then have at it.  Let's mark these Court

6       Exhibit B, and let Andy know when you're ready.

7              (Recess)

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D4hdche4                        Smyser - direct

1              (Time noted at 3:40 p.m.)

2              THE COURT:  What is taking so long?

3              MR. SMYSER:  Your Honor, the e-mails have been

4     translated with Mr. Mastro -- counsel for both sides.  They are

5     now -- the translations are now being typed up.  It has turned

6     out to be difficult to transpose the translations to a thumb

7     drive to get them printed so that the Court can review them,

8     and the difficulty is a technical one that we hope to resolve

9     in the next 15 minutes or so.

10             THE COURT:  Is any of this truly necessary?

11             MR. MASTRO:  Yes, your Honor, because at least three

12    of the trails -- and they each have several e-mails on them --

13    we think are going to be very relevant to this hearing and what

14    transpired in the Cordova case.  So --

15             THE COURT:  Give me a preview, please.  I mean, you've

16    seen the translations, I have not.

17             MR. MASTRO:  Yes.  I think we should do it at the

18    sidebar, if that is OK, your Honor.

19             THE COURT:  Yes.  Sure.

20             (At the sidebar)

21             MR. MASTRO:  Your Honor got a rough translation of the

22    chain on October 9th.  And since your Honor has ordered

23    production, that chain goes to -- we believe directly

24    contradicts the declarations of the testimony that has been

25    given about --

D4hdche4                    Smyser - direct

1          THE COURT:  The October 9 chain?

2          MR. MASTRO:  The October 9th.  It was a direction to

3   file an action to get an order to bar production.  That's --

4   "prohibition," that's the word used in it, to get an order to

5   prohibit, bring a dec. action to get an order to prohibit the

6   production is what it says, a dec. action to define the rights

7   of the parties, as the affiants have said.

8          THE COURT:  As the what said?

9          MR. MASTRO:  As the two declarants, Mr. Smyser and

10  Mr. Stewart, have said, using similar language about bring an

11  action to get a declaration of the rights and responsibilities

12  of the parties and document production under Ecuadorian law.

13          Mr. Stewart -- and, also, that they didn't know what

14  the status was.  Mr. Fajardo said he would keep them apprised,

15  but they didn't know what the status was in Ecuador.

16          Well, actually the chain is send me Judge Kaplan's

17  order right away, thinking an order had already been entered

18  that they had to produce the documents and Jarod Stewart

19  responding with the status here, that the order hadn't actually

20  been entered yet, but if you could get that declarative action

21  on file, one that seeks to prohibit the production.

22          He then goes on to say, incredibly, we -- we would

23  bring that to your attention that there is such an action

24  pending to define Ecuadorian law.  Somehow that fell out of the

25  equation later completely.  And they never mentioned that in

D4hdche4                        Smyser - direct

1   any of their declarations or have it  in any of their testimony

2   today.

3           Then on October 22nd, I will describe what I

4   understand to be the import.  On the 22nd, Mr. Stewart has

5   follow-up exchanges with Mr. Fajardo finding on what the status

6   is, and here they are saying they didn't know an action had

7   been brought.  They ask no questions about an action.  The

8   response that comes back is that it is moving forward, the

9   language suggesting you knew it had already been filed.  It is

10  moving forward, not that we just filed it.

11          THE COURT:  All right.  So get this translation --

12          MR. MASTRO:  And then --

13          THE COURT:  I'm sure you disagree with some of this.

14          MR. SMYSER:  With virtually everything he said, your

15  Honor.

16          THE COURT:  I'm sure you do.

17          MR. SMYSER:  This is like listening to --

18          THE COURT:  I'm sure you do, but I'm not going to

19  decide this here, I am going to wait, and I'll see the

20  translations, and if there is further testimony, there will be

21  further testimony.

22          MR. MASTRO:  That is right, your Honor --

23          THE COURT:  I just want to understand what the point

24  of this is.

25          MR. SMYSER:  There is no point to this dispute at all.

1          MR. MASTRO:  Your Honor, there is at lease one other

2     chain on January 1.  There are other January chains, too.  On

3     January 1, where Mr. Stewart and Mr. Fajardo have an exchange

4     about the status, and, you know, it's a very clear and

5     unequivocal statement that how important it would be to get an

6     order barring production, that that's what this is about.

7          So I think those --

8          THE COURT:  Who is the speaker, you say?

9          MR. MASTRO:  Hold on a second.

10         THE COURT:  Who makes that statement, you say?

11         MR. MASTRO:  Mr. Stewart says, to Mr. Fajardo, we know

12    that you are doing everything possible to obtain a declaration

13    to that effect.

14         MR. SMYSER:  What kind of declaration to what effect?

15    You are putting --

16         THE COURT:  Look, we are not going to argue the facts

17    here.  All I did was ask what's taking so long and whether this

18    was worth it.  Mr. Mastro seems to think it is worth it, so I

19    will wait and we will get the translations and if there is need

20    for more testimony, we will see.

21         MR. KEKER:  So come back tomorrow?

22         THE COURT:  Well, is that what you prefer?

23         MR. KEKER:  No.  I prefer to stay and do it, but it

24    sounds -- I don't know how long it is going to take and what

25    your schedule is.

D4hdche4                              Smyser - direct

1          THE COURT:  Let me --

2          MR. KEKER:  We would prefer to finish it today.

3          MR. MASTRO:  Your Honor, as I mentioned to your

4    courtroom deputy, while I would prefer to finish tonight, I

5    teach at the University of Pennsylvania Law School on Wednesday

6    nights, so I take the end-of-the-day Acela and get down there

7    and teach my class at night.  So if we went past 5 I would miss

8    my train tonight.  So that would be a problem but I, of

9    course --

10         THE COURT:  If you miss your train, what happens?

11         MR. MASTRO:  It means that I will be an hour late for

12   my class, which is, you know, two hours --

13         THE COURT:  Your constraints, Mr. Keker, are what?

14         MR. KEKER:  I don't have constraints.  I was planning

15   to stay as long as you were making us this week.  I can't be

16   here next week.

17         MR. MASTRO:  We can finish tomorrow.

18         THE COURT:  How long is this?

19         MR. MASTRO:  Your Honor, we will finish tomorrow, I

20   promise you.  We will finish tomorrow.

21         THE COURT:  By lunchtime?

22         MR. MASTRO:  By lunchtime.

23         THE COURT:  All right.  Well, OK, fine.  You will get

24   me the translations as soon as you can, and we are adjourned

25   until 9:30.

D4hdche4                              Smyser – direct

1              MR. SMYSER:  Your Honor, here is how we are doing the

2      translations to try to speed it up.  Instead of translating the

3      entire e-mail to/from, all of that sort of stuff, which is

4      fairly obvious, we are translating the text of the e-mail, and

5      then the text will be affixed to the to and from so that the

6      Court will have that frame.  The idea is to get the Court the

7      text as rapidly as possible.

8              THE COURT:  Whatever is acceptable for present

9      purposes to you people I will cope with in that respect.  And

10     then if these things do come in, then we will want to get the

11     proper form, the full translation.  All right?

12             MR. MASTRO:  Thank you very much, your Honor.

13             THE COURT:  Does that satisfy everybody.

14             MR. SMYSER:  Mm-hmm.

15             THE COURT:  Mr. Keker, I am in very much sympathy with

16     you, having waited every Friday, years back, to find out

17     whether the judge was going to adjourn my trial in Los Angeles

18     in time for me to get on a plane to New York.

19             MR. KEKER:  Isn't it awful?  I know that feeling.

20             THE COURT:  Total sympathy.

21             MR. KEKER:  Thank you, your Honor.

22             MR. MASTRO:  Thank you.

23             (Adjourned to 9:30 a.m., Thursday, April 18, 2013)

24

25

1                        INDEX OF EXAMINATION

2      Examination of:                              Page

3      JAROD STEWART

4      Direct By Ms. Neuman . . . . . . . . . . . . 203

5      JAVIER PIAGUAJE

6      Direct   . . . . . . . . . . . . . . . . . . 216

7      Cross By Mr. Veselka . . . . . . . . . . . . 230

8      Cross By Mr. Keker . . . . . . . . . . . . . 234

9      CRAIG SMYSER

10     Direct By Mr. Mastro . . . . . . . . . . . . 252

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25