D4idche1                       Hearing

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   CHEVRON CORPORATION,

4                   Plaintiff,

5           v.                            11 CV 691 (LAK)

6   STEVEN DONZIGER, et al.,

7                   Defendants.

8   ------------------------------x

9                                        April 18, 2013
                                         9:40 a.m.
10
    Before:
11
                    HON. LEWIS A. KAPLAN,
12
                                         District Judge
13
                        APPEARANCES
14
    GIBSON DUNN & CRUTCHER
15       Attorneys for Plaintiff Chevron
    BY:  RANDY M. MASTRO
16       ANDREA E. NEUMAN
         JASON B. STAVERS
17       ANNE MARIE CHAMPION
         JEFFERSON ELIOT BELL
18       RACHAEL BROOK

19   SMYSER KAPLAN & VESELKA, LLP
         Attorneys for Defendants Camacho & Piaguaje
20   BY:  LARRY R. VESELKA
         CRAIG SMYSER
21       JAROD STEWART
         – and –
22       JULIO C. GOMEZ

23   KEKER & VAN NEST, LLP
         Attorneys for Defendant Donziger
24   BY:  JOHN W. KEKER

25

D4idche1                        Hearing

1          THE COURT:  Good morning.

2          ALL COUNSEL:  Good morning, your Honor.

3          THE COURT:  First of all, I became aware of the filing

4     late yesterday afternoon, after we all had left, of a motion by

5     the defendants for an extension of time on Chevron's two

6     motions to compel.

7          Now, the fiscal situation in Washington has reared its

8     head again.  I did an order disposing of that motion and

9     submitted it, as we do, to the Clerk's office for docketing and

10    learned a little later in the evening that although the Court's

11    policy is to docket on the day that it is submitted to the

12    Clerk's office every order, the court no longer has sufficient

13    personnel to do that all the time, and, therefore, the order

14    that I signed, late yesterday afternoon, was not docketed and

15    may to this moment not be docketed.  My secretary is Xeroxing

16    copies and will make it available to you.

17         When I became aware that it hadn't been docketed, I

18    took the next best alternative, and that is that we have the

19    capability, without the intervention of the Clerk's office, to

20    grant or deny a motion.  So I clicked the button and you got

21    the denial, and I did that so that you would know that you

22    weren't getting the extension at least last night.  And I see

23    Mr. Veselka nodding, and it is perfectly obvious, from the fact

24    that I received submissions in opposition to Chevron's motion

25    later last night, that you all received that.

D4idche1                      Hearing

1              In fact, the decision was a little bit more nuanced

2       than the word "denied," and insofar as the request related to

3       the second of Chevron's motion, that is, to the materials they

4       sought in addition to the October 9, 2012 e-mails, I allowed

5       for the possibility of a renewal of the request for an

6       extension this morning.  We'll get to that in a moment.  In

7       fact, we may as well get to it now.

8              Does anybody on the defense side want to adjourn these

9       proceedings to have the issue relating to the remaining

10      documents unresolved today and come back next week to conclude

11      this proceeding, or are you prepared to have me rule, to the

12      extent the documents have been provided to me for in camera

13      review, on the second of the motions?

14             MR. KEKER:  Your Honor, first of all, I can't be here

15      next week so I really don't have much flexibility about this.

16      But --

17             THE COURT:  But you did sign the request for the

18      extension --

19             MR. KEKER:  Yes, sir.

20             THE COURT:  -- for the submission of papers next

21      Tuesday.

22             MR. KEKER:  But the request for submission did not

23      deal with this hearing; it dealt with this motion to compel.

24      The motion to compel is a motion to compel including my

25      passport and things like that.

D4idche1                        Hearing

1          THE COURT:  Yes, for the purpose of this hearing.

2          MR. KEKER:  OK.  But to the extent that you've already

3    seen some documents and are prepared to rule on them today, I

4    don't think any of us have any objection to you doing that, the

5    ones that were submitted in camera to deal with the Cordova

6    litigation.  The request is much broader-that, and as far as

7    I'm concerned it has nothing to do with this hearing.  But I'm

8    trying to understand what you're -- are you going to rule on

9    that, on the rest of the request, besides the Cordova

10   litigation documents that you already have?

11         THE COURT:  Today?

12         MR. KEKER:  Yes.

13         THE COURT:  No.  And it may well turn out that -- and

14   it is not a promise, it's just a possibility --

15         MR. KEKER:  Yes, right.

16         THE COURT:  -- that the rest of it is going to be

17   moot.  Indeed, there is even an argument that Mr. Mastro is not

18   pressing the rest of it, but I don't know that yet.

19         MR. KEKER:  OK.  I haven't even read our response,

20   frankly.

21         THE COURT:  Well, you know, among the things you did

22   is ask for an extension on the first motion, which, at your

23   request, I ruled on yesterday and which was moot by the time

24   you asked for an extension.

25         MR. KEKER:  Well, that's one of the problems of me

D4idche1                    Hearing

1    being here and them being there and us trying to do things.

2              THE COURT:  Right.  What about Mr. Smyser?

3              MR. SMYSER:  Your Honor, I'm prepared to go forward on

4    the issue of the Cordova e-mails which we have provided the

5    Court in camera and which we allowed Chevron to examine under

6    Rule 502.  We have submitted papers.

7              I have made to the Court the point that I do not

8    believe a waiver occurred because we were required to respond

9    to charges.  The Court observed yesterday, as I recall, that we

10   had the burden of proof on this issue, with which I

11   respectfully disagree.  I don't see how we can have the burden

12   of proof, for instance, on the third issue of whether or not we

13   acted in bad faith.  I don't see how we can have the burden of

14   proof on a negative.

15             Regardless, your Honor, my view is that those e-mails

16   are --

17             THE COURT:  The burden, I believe, though we'll see as

18   we deal with the motion in the fullness of time, is to

19   establish your good faith.  That is an affirmative burden, and

20   we'll see where we get on that.

21             MR. SMYSER:  Well, your Honor --

22             THE COURT:  The question I'm trying to get an answer

23   to is whether you want an extension with respect to those

24   documents that are before me and, if so -- strike the "if

25   so" -- do you want an extension or do you want me to go ahead

D4idche1                    Hearing

1    and decide it today and see whether we can't conclude this?

2              MR. SMYSER:  I've indicated, your Honor, I am prepared

3    to go forward today.  I do want to conclude this.  I don't want

4    to have to come back.  As we have told the Court many times, we

5    are limited in what we can do.  I think we should try and

6    resolve this today.  I would hope that the Court would

7    entertain the argument that I was offering right then as to why

8    I continue to believe we have not waived --

9              THE COURT:  I'm trying to deal with this one step at a

10   type.  Please bear with me.

11             So your position is insofar as Chevron's motion seeks

12   to compel those documents that are before me in camera, you

13   wish me to decide that now and you don't want any further

14   briefing on it.  Is that true?

15             MR. SMYSER:  That is true, your Honor.

16             THE COURT:  And it is true for you, too, right,

17   Mr. Keker?

18             MR. KEKER:  Yes, your Honor.

19             THE COURT:  OK.  So we've got that taken care of.

20             All right.  Now, what I have before me is the packet

21   of e-mails that was sent to me over the luncheon recess

22   yesterday and one other item that I'll come to in a minute.

23   That packet, for present purposes of discussion, includes two

24   things -- two e-mails dated October 9, 2012, as to which I

25   ruled yesterday -- and I take it they have been produced, is

D4idche1                         Hearing

1    that true?

2           MR. MASTRO:  Correct, your Honor.

3           MR. SMYSER:  Yes, your Honor.

4           THE COURT:  OK.  Then we have everything else.  And

5    just to enumerate as to everything else -- oh, here it is -- I

6    have before me translations only -- I understand the translator

7    was the sworn certified interpreter, is that right?  Everybody

8    agree on that?

9           MR. MASTRO:  Yes, your Honor.

10          MR. SMYSER:  Yes, your Honor.

11          THE COURT:  Any dispute about the translations?  You

12   all had the documents overnight.

13          MR. SMYSER:  No problem with the translations, your

14   Honor.

15          THE COURT:  Mr. Keker?

16          MR. KEKER:  No problem, your Honor.

17          THE COURT:  Mr. Mastro?

18          MR. MASTRO:  No, your Honor.

19          THE COURT:  So there is an e-mail exchange -- and I'm

20   not going to go into the substance, this is just dates and the

21   persons involved for the moment -- an e-mail exchange under

22   date of October 22, 2012, and at least one of the e-mails is

23   signed "Jarod," meaning, I take it, Mr. Stewart.  It is not at

24   least self-evident to me who was the other communicant, if I

25   may.

D4idche1                    Hearing

 1           There was an exchange of e-mails between Mr. Stewart

 2     and Mr. Fajardo on January 1st -- dated January 1st, 2013.

 3     There is what appears to be an exchange between Mr. Fajardo and

 4     Mr. Stewart, dated January 9, 2013; another one between the

 5     same two individuals dated January 11, 2013.  There is a

 6     message, which I -- well, there is an exchange -- I'm sorry.

 7     There is a message dated January 15, 2013.  It is not signed,

 8     at least on the one I have.  And then there is a page of

 9     e-mails dated February 14, 2013.

10           The other item, which I was not provided with

11     yesterday but which was sent up to my chambers today, is an

12     e-mail chain, the last of which is a message from Mr. Fajardo

13     to Mr. Stewart, and others, dated November 26, 2012.

14           Now, could we all agree that we are dealing with the

15     same deck of cards, as it were?

16           MR. MASTRO:  Yes, your Honor.

17           I just wanted to clarify two things.  In the Spanish

18     version you can see the to's, the froms and the copies.

19           THE COURT:  All right.  That should be made an exhibit

20     in the course of the day.

21           MR. MASTRO:  Absolutely, your Honor.  But you can see

22     the exchange is between Stewart and Fajardo with Smyser and

23     Veselka copied.

24           THE COURT:  OK.

25           MR. MASTRO:  And, your Honor, we are not seeking -- we

D4idche1                          Hearing

advised the defendants -- your Honor asked us to pare back.  We

are only seeking production of October 22nd, January 1,

January 9, and the one that you just received this morning,

your Honor.  I believe the date on that is sometime in

November.

          THE COURT:  All right.  Well, I've given this all

quite a lot of consideration, and I'll tell you tentatively my

view on it and then I'll hear you.

          The one I was given this morning, the November 26th

chain, without even getting into the question of waiver or

anything else, I just don't see that there is any need for it

for the purpose of this hearing.  So unless you can convince me

otherwise, Mr. Mastro, I am going to take that off the table.

          MR. MASTRO:  OK.  Well, your Honor, I think that it is

relevant, and I think that it should be subject to questioning

because it goes to something that wasn't revealed in either

Mr. Smyser's or Mr. Stewart's declarations that existed, and it

goes to that they were monitoring developments during that

period of time and what they knew when.

          This particular moment in time is -- I will have to

reveal some of my hand that I would have used for cross, but,

your Honor, it comes at a particular time when they've lost,

they've had to appeal, they just got an appellate order, and I

think I should have the right -- and now they are talking

about, you know, it is taking longer but now we are gearing up

D4idche1                        Hearing

1   again --

2              THE COURT:  I don't think this adds anything.

3              MR. MASTRO:  OK.  Certainly, your Honor.

4              THE COURT:  OK.  Now, as to -- I feel pretty much the

5   same way about the October 22, putting aside all issues of

6   waiver and other such.  What about that one?

7              MR. MASTRO:  Well, your Honor, that is a subject that

8   is specifically mentioned in both declarations for purposes of

9   waiver.

10             And, your Honor, I think the importance of it goes

11  to -- and this has to deal with the good faith -- when did they

12  know that a case was going forward even if they didn't realize

13  it had actually been filed yet?  So you have to read

14  October 9th with October 22 -- again, I'm in a -- this would be

15  a subject of questioning.  But in October 9, they are urging --

16  they acknowledge on October 4th that Mr. Smyser had suggested

17  bringing a declarative action which he describes in a certain

18  benign way.  On October 9th Mr. Stewart is now communicating

19  with Mr. Fajardo urging him that if you can bring an action to

20  bar you from having to produce the documents, that would be,

21  you know, helpful to us --

22             THE COURT:  I'm sorry.  On October 9th?

23             MR. MASTRO:  October 9th, yes, your Honor.

24             The actual language that Mr. Stewart uses to

25  Mr. Fajardo:  "If you can file in Ecuador an action requesting

D4idche1                    Hearing

1   a" --

2           THE COURT:  This is an e-mail?

3           MR. MASTRO:  Yes.

4           -- "declaratory judgment that says that you are barred

5   from providing the documents" --

6           THE COURT:  Yes, but I am talking about October 22.

7           MR. MASTRO:  And now we are on October 22.  We are

8   here on the 18th arguing in front of you, your Honor, on this

9   very question.  And these lawyers, Mr. Smyser is telling you,

10  as did Mr. Keker, don't decide the question that I asked you --

11  I said, please decide the Ecuadorian issue, on the Ecuadorian

12  documents, I think it will advance things, and they both agreed

13  with your Honor's preliminary take to not go forward.  We

14  intend to question these witnesses on the fact that they knew

15  then, when they were before you on the 18th, that the

16  Ecuadorian litigation was going forward, and they should have

17  disclosed that to your Honor at that time.

18          The 22nd they know -- they know the case has already

19  been filed.  The language that's used here is not one of --

20          THE COURT:  Don't disclose the language for the

21  moment.

22          MR. MASTRO:  I won't disclose the language.  But, your

23  Honor, when you look at the actual words used, both by

24  Mr. Stewart and Mr. Fajardo, by the 22nd they knew a case had

25  been filed -- they knew a case would be filed, and they tie it

D4idche1                         Hearing

1    to your hearing.  They also want to bring you up to date on

2    what happened at your hearing in terms of the delay on that

3    question.  That's what Mr. Fajardo would want to know about.

4            So I think it is directly relevant to the question of

5    good faith, candor with this Court, what they knew when, and

6    whether they were trying to hide that from this Court and delay

7    the Court from deciding the Ecuadorian documents issue until

8    they could get this thing going.

9            And I am not going to reveal the substance of the

10   e-mails, your Honor, but we think these are highly probative

11   and we should be allowed to question these two witnesses on

12   this.  They gave very misleading declarations on this point.

13           THE COURT:  Well, I will just hold off on that for the

14   moment.

15           And then on January 1st, my tentative view is that of

16   course there is a waiver insofar as Mr. Fajardo's e-mail is

17   concerned, because paragraph 11 of Mr. Stewart's affidavit

18   discloses his version of that e-mail.  And it is certainly a

19   waiver as to the e-mail and the subject matter of the e-mail,

20   putting aside for the moment however the subject waiver matter

21   goes.

22           Then we have Stewart's response.  And my tentative

23   view on that is that the last sentence is within the subject

24   matter waiver.  The first two sentences are not attorney-client

25   privilege and they are not opinion work product; they are pure

D4idche1                     Hearing

1    reportage.  I don't think they are sufficiently important,

2    standing on their own, to say that the limited work product

3    protection for those two sentences has been overcome.  I don't

4    think -- I'm going to assume for purposes of the moment that

5    they are not within the subject matter waiver because they are

6    really on a different subject.

7            And I'm inclined to the view that the third

8    sentence -- I guess I misspoke a moment ago.  It is the last

9    sentence that I think is within the subject matter waiver.

10           The third sentence I think is arguably opinion work

11   product and it is on a slightly different subject than

12   Fajardo's e-mail, and I'm disinclined to order production of

13   the third sentence.

14           So the bottom line on this is that I am inclined to

15   the view that Fajardo's e-mail gets produced and the last

16   sentence of Mr. Stewart's response -- I'm sorry, his previous

17   e-mail gets produced.

18           With that, I will hear Mr. Veselka.  I guess that's

19   the person who wants to address this, right, or am I wrong?

20           Mr. Smyser.

21           MR. SMYSER:  Your Honor, I will address it.

22           And are you asking for addressing your rulings on all

23   of these e-mails so far, or only with respect to the --

24           THE COURT:  The first thing you need to understand is

25   that I spoke about inclinations and preliminary views, and I am

D4idche1                    Hearing

1    always very cautious when lawyers try to put words in my mouth.

2    I haven't made any rulings yet.

3                MR. SMYSER:  You discussed --

4                THE COURT:  With respect to this group of documents.

5                MR. SMYSER:  Yes, your Honor.

6                THE COURT:  And you are welcome to address all of them

7    as briefly as you can.

8                MR. SMYSER:  I will address all of them as briefly as

9    I can.

10               First, your Honor, I will say that there were numerous

11   mischaracterizations of fact in Mr. Mastro's --

12               THE COURT:  I take it as a given that whenever

13   Mr. Mastro speaks, that's your position, and vice versa.

14               MR. SMYSER:  With respect to the October 22nd e-mail,

15   I do not see any contradiction with our declaration.  We stated

16   in our declaration that that was when we first learned of the

17   event, and Mr. Mastro is entitled to cross-examine us right and

18   left as to whether or not that is true, that we learned on that

19   date.

20               The e-mail is not -- there is no waiver.  We, as I

21   said, your Honor, do not have the burden of proof, in my

22   opinion, to prove a negative.  And this deals with question

23   number three of the questions you posed, which is whether or

24   not we acted improperly or in bad faith with respect to the

25   commencement, prosecution and disclosure, or lack thereof, of

D4idche1                        Hearing

1      the proceedings in Ecuador.  I again urge the Court to find

2      that this is core work product and that we have not waived that

3      privilege with respect to these e-mails.

4                  THE COURT:  You are speaking of October 22 alone, or

5      are you speaking --

6                  MR. SMYSER:  No, your Honor.  I was speaking of the

7      group of e-mails to which you have addressed yourself.

8                  THE COURT:  OK.  Thank you.

9                  Mr. Keker, anything on this?

10                 MR. KEKER:  No, your Honor.

11                 THE COURT:  Mr. Mastro, anything else?

12                 MR. MASTRO:  Yes, just very briefly, your Honor.

13                 I think, at a minimum, the October 22nd e-mail chain,

14     Mr. Fajardo's portion of the e-mail -- and I won't say what it

15     says, but there has been a waiver there.  You have both

16     Mr. Smyser's declaration, paragraph 4:  "I did not learn until

17     October 22nd that a legal proceeding had been initiated in

18     Ecuadoran until," it says, "Mr. Fajardo informed me" --

19                 THE COURT:  Mr. Mastro, nobody can listen when you

20     talk that fast.  It is impossible.

21                 MR. MASTRO:  Sorry.

22                 MR. KEKER:  Your Honor, I object to reading from the

23     document before you rule, putting it in the record, which is

24     what he is doing.

25                 THE COURT:  It is a good thing nobody can understand

D4idche1                         Hearing

1    it, but if that is what you were doing --

2            MR. MASTRO:  It is not, your Honor.  I am reading from

3    his declaration, paragraph 4.

4            THE COURT:  Thank you.

5            MR. MASTRO:  That there was a waiver, and he says

6    Mr. Fajardo informed him and Mr. Stewart.

7            And Mr. Stewart says the same thing in paragraph 10,

8    that Mr. Fajardo informed him that a lawsuit had been filed.

9    So I think at least on the October 22nd chain it is clear that

10   Mr. Fajardo's portion of the e-mail informing them has been

11   waived and the language used there we should be able to

12   question on.

13           THE COURT:  Tell me, because you have the Spanish

14   language ones, which is Mr. Fajardo's portion?

15           MR. MASTRO:  It's the one, your Honor, that just

16   starts with -- and this is not revealing any of the

17   substance -- the word "greetings," comma.

18           THE COURT:  Or --

19           MR. MASTRO:  In the middle.

20           THE COURT:  You mean "greetings," period?

21           MR. MASTRO:  I'm sorry.  "Greetings," period.  And

22   then there is a word that I cannot --

23           THE COURT:  Don't say it.

24           MR. MASTRO:  OK.

25           THE COURT:  Don't say it.

D4idche1                        Hearing

1          (Pause)

2              MR. SMYSER:  Your Honor, may I add one final point?

3              THE COURT:  Yes, sir.

4              MR. SMYSER:  The final point would be the information

5      which we disclosed that he maintains is a waiver is a minimal

6      kind of information which is ordinarily revealed in the course

7      of a privilege log disclosure.  It is not a waiver disclosure.

8      It is what is necessary to respond to accusations.

9              THE COURT:  Well, you didn't just in your affidavits

10     give the date, the author, the addressee the subject matter and

11     the names of other persons to whom it had been disclosed.  You

12     purported to state the substance of what Mr. Fajardo -- and I

13     am looking at Mr. Stewart's document, paragraph 10 -- what

14     Mr. Fajardo said to him.  You don't usually put the substance

15     of the allegedly privileged communication in the privilege log;

16     do you?

17             MR. SMYSER:  Your Honor, I --

18             THE COURT:  My experience is lawyers don't do that.

19             MR. SMYSER:  Again, it depends on how you define

20     "subject matter."  But if you say e-mail from Pablo Fajardo to

21     Jarod Stewart, subject regarding lawsuit, I mean, that is

22     essentially what that discloses.

23             THE COURT:  It is not essentially what it says.  It

24     says Mr. Fajardo informed me that a lawsuit had been filed in

25     Ecuador to seek certain specified relief that he described.  He

D4idche1                    Hearing

 1    put in issue exactly what the e-mail deals with.

 2                MR. SMYSER:  Your Honor --

 3                THE COURT:  I think that's it.

 4           So as to October 22, the ruling is there is no work

 5    product if there is -- the necessary showing has been made to

 6    overcome it, and in any case, by their affirmative descriptions

 7    of the communications of October 22, counsel have waived any

 8    privilege that otherwise may have existed, and so the

 9    October 22 exchange is to be produced.  That said, whether it

10    has any real probative value on anything is a whole other

11    matter, but it is to be produced.

12           And then I will adopt, with respect to the January 1

13    exchange, the tentative views I expressed before, and that is

14    to say, Mr. Fajardo's e-mail gets produced.  It is a waiver of

15    any privilege that -- or work product that might have applied.

16    And the last sentence of Mr. Stewart's response gets produced,

17    because Fajardo's waiver is as to the subject matter, and I am

18    not now going to get into the question of how far that goes.

19    It certainly goes sufficiently far to take up Mr. Stewart's

20    e-mail of the same date that elicited Fajardo's communication.

21           As to the rest of Mr. Stewart's e-mail of that date,

22    I'm not going to rule on any privilege issues regarding it.  It

23    just is not sufficiently useful to fight about.

24           So that is the ruling as to that group of documents.

25           And that takes care of all the documents that are

D4idche1                        Hearing

1    before me, right, today?

2              MR. SMYSER:  Your Honor, I believe there is the

3    November -- I don't recall whether --

4              THE COURT:  The November 26th, but I think I dealt

5    with that.

6              MR. MASTRO:  Yes, you did, your Honor.

7              MR. SMYSER:  I'm sorry, your Honor.

8              THE COURT:  By saying there is just no point in

9    reaching it; it's not important enough.

10             OK.  That takes care of all of that.

11             Now, the only other --

12             MR. MASTRO:  Your Honor, the only other document was

13   January 9th was the only other one.

14             THE COURT:  I skipped one, huh?  OK.

15             (Pause)

16             There is no reference to the January 9th e-mail in

17   Mr. Stewart's affidavit or declaration, I believe.  Am I

18   mistaken?

19             MR. MASTRO:  No, there isn't a reference to the

20   January 9th e-mail, your Honor.

21             THE COURT:  Nor in Mr. Smyser's, right?

22             MR. MASTRO:  Nor in Mr. Smyser's, but it is a follow

23   up from the January 1 communications they both said they had

24   about the upcoming hearing.

25             THE COURT:  I am not ordering their production.

D4idche1                    Hearing

```
 1              MR. MASTRO:  Thank you, your Honor.
 2              THE COURT:  OK.  So October 22 and January 1, in part,
 3    at least, are to be produced.  The rest of it is not.
 4              OK.  The final detail that I wanted to raise with
 5    counsel is this.
 6              Mr. Smyser, as you have no doubt adduced from an order
 7    I entered recently, the new practice on your firm's part of
 8    submitting to chambers written copies of motion papers that are
 9    hundreds and in some cases I believe thousands of pages long,
10    without exhibit tabs, labels, or anything of that kind, just
11    masses of paper, stacked, is entirely unacceptable.  And there
12    are two motions pending, I think one by you and in one of your
13    papers in response to Chevron, in which you have done that
14    before my order.  One has to do with a motion to strike Chevron
15    expert reports.  That submission is somewhere north of 300
16    pages, according to my recollection.  And I am told -- I have
17    not gotten a yardstick out myself -- that your papers in
18    opposition to the summary judgment motion are a little less
19    than waist high with no labels or anything like that.
20              You are to provide me with two copies of each set of
21    papers, fully labeled, and with an index to the exhibits.
22              MR. SMYSER:  Yes, your Honor.
23              THE COURT:  It is completely unacceptable to just
24    deliver reams of paper that came out of the copy machine like
25    this.  And they are to be bound.
```

D4idche1                    Hearing

1          MR. SMYSER:  Yes, your Honor.  I apologize for

2   inconveniencing the Court.  I apologize.

3          THE COURT:  OK.  I accept your apology.  Thank you.

4   Somebody was probably just not paying attention.

5          All right.  We are going to have a little testimony

6   this morning?

7          MR. MASTRO:  Yes, your Honor.

8          THE COURT:  Let's see if we can --

9          MR. SMYSER:  One other minor point, your Honor.  I

10  assume the documents which we submitted will be put under seal

11  and maintained in the record.

12         THE COURT:  My recollection is that all of the

13  documents that we have discussed this morning were part of

14  Court Exhibit B.  Am I right?

15         MR. SMYSER:  The one I think --

16         THE COURT:  Except the one that Mr. Veselka sent up to

17  chambers or to the robing room before I came on the bench, and

18  we will mark that Court Exhibit C.  He also sent up a proposed

19  redaction.  It may as well be included with Court Exhibit C,

20  but inasmuch as I haven't ordered its production, I imagine it

21  is academic but we will file it under seal.

22         OK.  Call your witness.

23         Now, you are going to have one or two witnesses this

24  morning?

25         (Court Exhibit C marked in evidence)

D4idche1                      Hearing

1          MR. MASTRO:  Your Honor, we are going to resume with

2     Mr. Stewart.

3          THE COURT:  OK.

4          MR. MASTRO:  We are going to have Mr. Donziger for a

5     very short period to put in that document that he was ordered

6     to produce, and then we are going to have Mr. Smyser.  And that

7     will conclude the hearing, your Honor.

8          MR. KEKER:  Your Honor, I object to Mr. Donziger.  The

9     document that he was ordered to produce we have no objection to

10    going into --

11         THE COURT:  You can work out a stipulation.

12         Is there anything else you want other than to

13    authenticate it through him?

14         MR. MASTRO:  I would have questioned him some on the

15    substance, your Honor.

16         THE COURT:  Well, then I will allow you to do it.

17         MR. MASTRO:  Thank you.

18         THE COURT:  OK.  Let's go.

19         Mr. Stewart.  You are still under oath.  Take the

20    stand, please.

21     JAROD STEWART,

22         Recalled, and testified further as follows:

23         THE COURT:  All right.  Ms. Neuman, you may proceed.

24         MS. NEUMAN:  Thank you, your Honor.

25    DIRECT EXAMINATION

D4idche1                          Stewart – direct

1   BY MS. NEUMAN:

2   Q.  Good morning, Mr. Stewart.

3   A.  Good morning.

4   Q.  Is your declaration still up there with you?

5   A.  It is not.

6           MS. NEUMAN:  Can we provide Mr. Stewart with his

7   declaration, Exhibit 11?

8           (Pause)

9           THE COURT:  Did we really come here this morning to

10  start an examination of Mr. Stewart with his affidavit and we

11  don't have a copy for him?  We are standing here waiting for

12  one, on question number one?

13          MS. NEUMAN:  I apologize, your Honor.  I thought I had

14  it in the stack.

15          May I approach the witness, your Honor?

16          THE COURT:  Yes.

17          THE WITNESS:  Thank you.

18  BY MS. NEUMAN:

19  Q.  Mr. Stewart, in your declaration, in paragraph 9, you

20  declare that you spoke with Mr. Fajardo on October 4, 2012.

21          That conversation was in Spanish?

22  A.  Yes.

23  Q.  Everyone participating in that conversation -- I believe

24  you previously testified was yourself, Mr. Veselka and

25  Mr. Smyser -- were able to participate in the Spanish-language

D4idche1                        Stewart - direct

1    conversation?

2    A.   Yes and no.  Mr. Smyser and Mr. Veselka both understand

3    Spanish to a degree.  There are times when I have to stop the

4    conversation and translate for them, or translate from what

5    they say in English to Spanish for Mr. Fajardo to understand

6    the Spanish.  I act as a translator.

7    Q.   And do they speak in Spanish on these conversations or do

8    they only listen to the Spanish?

9    A.   At times both Mr. Smyser and Mr. Veselka do speak in

10   Spanish to some degree, but, as I said, neither of them are

11   fluent.

12   Q.   Now, in paragraph 9 of your declaration, you state,

13   "Mr. Smyser suggested that given the competing expert

14   declarations on an issue of Ecuadorian law relevant to

15   Chevron's motion to compel production of documents in the

16   above-captioned matter, the best way to resolve the issue would

17   be to ask an Ecuadorian court for a ruling on the rights and

18   obligations of the lawyers and the clients in the relationship

19   governed by Ecuadorian law."  Period.

20           Do you see that?

21   A.   I do.

22   Q.   Did you draft that language yourself?

23   A.   I was probably the person who drafted this first.  I don't

24   know if there were comments on it afterwards.

25   Q.   You don't recall one way or the other?

D4idche1                    Stewart - direct

1    A.  I don't.

2    Q.  The same language appears in paragraph 2 of Mr. Smyser's

3    declaration.  Does that refresh your recollection in any way as

4    to who drafted the language?

5    A.  I hadn't looked at Mr. Smyser's declaration recently.

6    Q.  I just meant the fact that the language is the same in both

7    declarations; does that refresh your recollection?

8    A.  I recall that I worked on both declarations at some point

9    in time, yes.

10   Q.  Now, the thrust of your statement in paragraph 9 was that

11   there were different views of Ecuadorian law by the parties,

12   and the best way to resolve the dispute was to ask an

13   Ecuadorian court to rule?

14           MR. KEKER:  I object to the form.

15           THE COURT:  Sustained.

16           Look, it is not going to be very helpful to just have

17   an argument about characterizations here.  It says what it

18   says.

19   BY MS. NEUMAN:

20   Q.  You went on in your declaration, in paragraph 9,

21   Mr. Smyser, to state -- I'm sorry, Mr. Stewart.

22   A.  We both have S's, it is OK.

23   Q.  -- to state, "Mr. Fajardo did not indicate then whether he

24   would act on the suggestion on October 9, 2012, in response to

25   an e-mail I sent about Mr. Smyser's suggestion to have an

D4idche1                          Stewart - direct

1    Ecuadorian court decide a disputed issue of Ecuadorian law.

2    Mr. Fajardo told me he would keep me informed."

3           You participated in an exchange of e-mails on the

4    9th with Mr. Fajardo, correct?

5    A.  I did.

6           MS. NEUMAN:  I would like to mark as the next exhibit

7    the October 9th e-mail exchange and provide it --

8           THE COURT:  Hearing Exhibit 10.

9           MS. NEUMAN:  I believe his declaration is Exhibit

10   10 your Honor.

11          THE COURT:  Hearing Exhibit 11.

12          MS. NEUMAN:  And I would like to mark the Spanish with

13   the attachment.

14          May I approach the witness?

15          THE COURT:  Yes.  And I hope you have a copy for me.

16          MS. NEUMAN:  May I have the judge's copy?

17          MR. KEKER:  Your Honor, we will stipulate that his

18   declaration says what it says and the e-mails say what it say,

19   and people can argue all they want.

20          THE COURT:  There may be some questions about it,

21   Mr. Keker.  Obviously, they say what they say.

22          (Court Exhibit 11 marked in evidence)

23   BY MS. NEUMAN:

24   Q.  Do you have Exhibit 11 in front of you, Mr. Stewart?

25   A.  Yes.  It has some handwriting on it.  I don't know if you

D4idche1                    Stewart - direct

1    want to use this copy or not.

2              THE COURT:  Is the handwriting on the original?

3              THE WITNESS:  No, sir.

4              THE COURT:  Do you have a clean copy?  Let's use the

5    clean copy.  If not, we'll use this and everybody ignores the

6    handwriting.

7              (Pause)

8              MS. NEUMAN:  We don't have another copy, your Honor.

9              THE COURT:  All right.  Everybody ignore the

10   handwriting.  It is not part of the exhibit.

11             Let's proceed.

12   BY MS. NEUMAN:

13   Q.  Go to the second page of Exhibit 11, Mr. Stewart, the first

14   e-mail in the chain.

15   A.  OK.

16   Q.  These are e-mails exchanged between yourself and Pablo

17   Fajardo, with copies to you and people, including Mr. Veselka

18   and Mr. Smyser, is that right?

19   A.  I believe so.  This doesn't have the Spanish original.  It

20   would indicate that, but that is my recollection.

21             THE COURT:  Could we all play with the same deck of

22   cards, Ms. Neuman?  The one you handed me has the Spanish.

23             MS. NEUMAN:  I believe the one I had handed the

24   witness had the Spanish attached, your Honor.

25             THE COURT:  Let me see it, please.

D4idche1                        Stewart - direct

1          THE WITNESS:  Here, your Honor.

2          THE COURT:  No, it doesn't, Ms. Neuman.  This is

3     partly the same document and partly a marked-up version of the

4     January 1st e-mail.

5          Now, let's use the copy you handed me, which seems to

6     be the Spanish language version as the last two pages and the

7     English as the first, and it is marked Exhibit 11, and I have

8     now initialed it.  This is the exhibit.  You can take back this

9     other thing.

10          I really expect better from lawyers of the caliber in

11     this case all around.

12          MS. NEUMAN:  I apologize, your Honor.  We weren't

13     provided with the Spanish yesterday until your Honor ruled

14     today.

15          MR. KEKER:  That's not true, your Honor.

16          THE COURT:  You just spent the entire afternoon

17     working on the translations.

18          MR. KEKER:  But they gave them the October 9 one

19     yesterday.  They really ought to say things that are right.

20          THE COURT:  I don't know when they gave them the

21     October 9 one.

22          MR. KEKER:  They did.

23          THE COURT:  Ment last I heard was from Mr. Stewart, I

24     think, at the end of the day yesterday saying Chevron still

25     wanted the October 9th one.  I don't know what you folks did,

D4idche1                          Stewart - direct

1    but we now have the exhibit identified and let's go on.

2    BY MS. NEUMAN:

3    Q.  Mr. Stewart, can you turn to the second page of Exhibit 11.

4    And I'm going to work off the English translation.

5              THE COURT:  But the second page is Spanish, right?

6              THE WITNESS:  It is printed on both sides, and so

7    there appears to be some small portion in English.

8              THE COURT:  Let me see the second page.

9              THE WITNESS:  Yes.

10             (Pause)

11             THE COURT:  For the sake of clarity, this document

12   consists of three pages.  The first page is in English, and on

13   the back of the first page are a few lines of English.  The

14   second page is printed only on the first side and apart from

15   headers it is entirely in Spanish.  And the same is true of the

16   third page, printed only on the face, headers in English,

17   everything else in Spanish.

18             Let's move on.

19   BY MS. NEUMAN:

20   Q.  Looking at the back of the first page, Mr. Stewart, do you

21   see there the first e-mail in the chain from Mr. Fajardo to

22   yourself?

23   A.  I do.

24   Q.  Mr. Fajardo wrote:  "Greetings, Jarod.  I need urgent

25   delivery of the documents ordering Hugo and Javier to provide

D4idche1                          Stewart - direct

1   all the information in the case."

2           You understood that Fajardo was requesting documents

3   in order to implement Mr. Smyser's suggestion of bringing a

4   lawsuit in Ecuador?

5   A.   I would assume that's what it was; we had discussed with

6   Mr. Fajardo over the phone a few days prior.

7   Q.   And that was the assumption you made at the time when you

8   got the e-mail, that that's why you wanted the documents?

9   A.   To the best of my recollection, yes.

10  Q.   You responded to Mr. Fajardo:  "Until now, Judge Kaplan has

11  not issued an order settling the arguments in these filings.

12  If you (plural) can file in Ecuador an action requesting a

13  declaratory judgment that says you (singular) are barred from

14  providing the documents without permission of all your clients,

15  we could file the complaint before Judge Kaplan to inform him

16  this issue will be decided by a judge in Ecuador and that Judge

17  Kaplan has to wait before issuing his decision until the court

18  in Ecuador had issued its ruling.  Let me know if you have any

19  questions."

20          Did you attach documents to your response to

21  Mr. Fajardo?

22  A.   I don't believe so.

23          Yes, I did, the filings for the motions to compel.

24  Q.   Did you attach any orders with your response to

25  Mr. Fajardo?

D4idche1                        Stewart - direct

1    A.  No.  There was no order at that time.

2    Q.  The intent on October 9th was to get a copy of the

3    Ecuadorian complaint and file it with Judge Kaplan?

4    A.  That was an option that was discussed, but I'm

5    communicating things to Mr. Fajardo in Spanish at the direction

6    of those who were in charge of the legal strategy of this case.

7    Q.  And who are you referring to when you say those who are in

8    charge of the legal strategy of this case?

9    A.  I'm an associate with three-and-a-half years of experience,

10   ma'am, and I take directions from Mr. Smyser and Mr. Veselka.

11   I can no more direct the strategy of the case than a junior

12   lawyer at Gibson Dunn can tell you what to do.  So Mr. Smyser

13   and Mr. Veselka.

14   Q.  The complaint in the Ecuadorian action was never filed with

15   Judge Kaplan.  Who made the decision not to get the copy of the

16   complaint and file it?

17   A.  I don't believe there was ever such a decision made.

18   Q.  After October 9th were you involved in any other

19   discussions regarding obtaining the Ecuadorian complaint and

20   filing it with Judge Kaplan?

21   A.  I don't believe so.

22   Q.  Do you have any other knowledge as to why the Ecuadorian

23   complaint, a copy that wasn't obtained and that it wasn't filed

24   with Judge Kaplan?

25   A.  I don't.

1    Q.  When Mr. Fajardo responded "I will keep you informed," you

2    understood he was going to keep you informed about the lawsuit

3    in Ecuador?

4    A.  Yes.

5    Q.  Now, Mr. Fajardo originally asked for the urgent delivery

6    of the documents ordering Hugo and Javier provide all the

7    information in the case.  Do you see that?

8    A.  Yes.

9    Q.  Did you subsequently provide Mr. Fajardo with the orders

10   from the Count 9 action to file in Ecuador?

11   A.  I did not.

12   Q.  Were you aware the orders from the Count 9 action were

13   filed as part of the Cordova complaint?

14   A.  I became aware of that after I received the pleadings in

15   the Cordova lawsuit that were filed by your client in

16   connection with the sanction motion.

17   Q.  Do you know from whom Mr. Fajardo received those orders to

18   attach to the Cordova complaint?

19   A.  I believe Mr. Saenz received orders from Eric DeLeo and

20   Patton Boggs.

21   Q.  Was Patton Boggs involved in initiating and pursuing the

22   Cordova action?

23   A.  I don't have any knowledge of that.  I don't believe they

24   were.

25   Q.  When you say that Mr. DeLeo sent Mr. Saenz the orders from

D4IJCHE2                          Stewart - direct

1   Count 9, at what point in time are you referring to?

2   A.  I was copied on an e-mail in which --

3        MR. SMYSER:  Excuse me.  Mr. Stewart, I would ask that

4   you not disclose attorney work product communication.

5        THE WITNESS:  Okay.

6        THE COURT:  Do you have a position on that, Ms.

7   Neuman?

8        MS. NEUMAN:  Well, your Honor, he has already

9   testified to the e-mail exchange of what he said.  I was asking

10  him for the date on which that occurred.  I don't see that as

11  work product.

12       MR. SMYSER:  I have no objection to him testifying

13  about a date.

14       THE COURT:  All right.

15  A.  I believe it was in October of 2012.

16  BY MS. NEUMAN:

17  Q.  You were copied on an e-mail between Mr. DeLeo and Mr.

18  Saenz in which Mr. DeLeo sent Mr. Saenz Judge Kaplan's orders

19  regarding discovery from the Count 9 proceeding, correct?

20       MR. SMYSER:  Objection, your Honor.  This is work

21  product.  She is going into areas involving a waiver of work

22  product.

23       MS. NEUMAN:  He testified to those facts without any

24  objection, your Honor.

25       THE COURT:  I think he may have.  Let me go back over

D4IJCHE2                         Stewart - direct

1    the transcript.

2              (Pause)

3              THE COURT:  Can the reporter go back, because I have

4    only the draft transcript, to the Question 4 or 5 or 6 ago that

5    begins were you aware that the orders from the Count 9 action

6    were filed and so forth, and just read back a few questions and

7    answers, please.

8              (Record read)

9              THE COURT:  All right.  Is there another question?

10   BY MS. NEUMAN:

11   Q.  The Count 9 orders that were sent from Mr. DeLeo to Mr.

12   Saenz in October of 2012 is the same Count 9 orders filed in

13   the Cordova action?

14   A.  I haven't done the comparison.  I have seen orders filed in

15   the pleadings your client filed in connection with sanctions

16   motion, but I have not done a document-by-document comparison.

17   Q.  Do you know why Mr. DeLeo was sending Mr. Saenz those Count

18   9 orders in October of 2012?

19             MR. SMYSER:  Objection, your Honor.

20             THE COURT:  It calls for a yes or no.

21   A.  No.

22   BY MS. NEUMAN:

23   Q.  When you told Mr. Fajardo "If you, plural, can file an

24   Ecuadorian action requesting declaratory judgment saying that

25   you, singular, are barred from providing the documents without

D4IJCHE2                        Stewart - direct

1    the permission of your clients, we could file this complaint

2    before Judge Kaplan to inform him this issue will be decided by

3    a judge in Ecuador."

4              Did you send that with the approval of Mr. Smyser and

5    Mr. Veselka?

6    A.   I don't recall whether or not, but I would assume so.

7    Q.   Had you discussed with them prior to October 9th the fact

8    that if you were able to get a complaint on file in Ecuador,

9    you would be filing it with Judge Kaplan?

10   A.   I don't recall.

11   Q.   Do you believe you would have written this in the e-mail to

12   Mr. Fajardo if you hadn't already discussed that with Mr.

13   Smyser and Mr. Veselka?

14   A.   I don't know one way or the other.

15   Q.   You don't have any recollection?

16   A.   I don't.

17   Q.   On October 9th the court issued an order requesting a

18   status conference on Chevron's motion to compel which was held

19   on October 18th.  At any time between October 9th and October

20   18th did you receive any further updates on the Ecuador action?

21   A.   I did not.

22   Q.   So you didn't know whether Fajardo had actually filed an

23   action to prohibit disclosure on October 18th?

24   A.   I did not.

25   Q.   Shortly before the October 18th status conference, did you

1    inquire of Mr. Fajardo --

2             THE COURT:  Hold on.  Would you, when you talk about

3    developments in one case or another, indicate which case you're

4    talking about.

5             MS. NEUMAN:  Yes, your Honor.

6    BY MS. NEUMAN:

7    Q.  Shortly before the October 18th status conference in this

8    case, you didn't go back to Fajardo to find out whether he

9    sought in Ecuador, as you had told him, "a declaratory judgment

10   that says you, singular, are barred from providing the

11   documents without the permission of your clients"?

12   A.  I know I did not.  My third son was worn on October 14th,

13   and I took a couple of days off, and I had to take another

14   deposition in another case on the 16th and 17th, so I did not

15   have any communications with Mr. Fajardo during that time

16   period.

17   Q.  In your declaration, at Paragraph 10, you declared on

18   October 22nd, 2012, "Mr. Fajardo informed me that a lawsuit had

19   been filed in Ecuador to seek a declaration from an Ecuadorian

20   court as to the rights and obligations of the Aguinda

21   plaintiffs and their lawyers.  Mr. Fajardo did not share any

22   other details about the suit, including where or when it was

23   filed, who filed the suit or what relief was sought."

24            Did you talk to Mr. Fajardo between the 18th and the

25   22nd regarding the Ecuador action?

1    A.  I don't believe I did.  I was taking depositions in another

2    case in that time period.  I think my only communication with

3    Mr. Fajardo in that time period was the October 22nd e-mail.

4              MS. NEUMAN:  I am going to mark as Exhibit 12 the

5    October 22nd communications between Mr. Fajardo and Mr.

6    Stewart.  May I approach the witness, your Honor?

7              THE COURT:  Yes, you may.

8              (Pause)

9    BY MS. NEUMAN:

10   Q.  Do you have Exhibit 12 in front of you, Mr. Stewart?

11   A.  I do.

12   Q.  Is this your October 22nd e-mail exchange between Pablo

13   Fajardo?

14   A.  Pablo Fajardo and others, yes.

15   Q.  Who else is included on the e-mail exchange we have marked

16   as Exhibit 12?

17   A.  Juan Pablo Saenz, Craig Smyser and Larry Veselka.

18   Q.  You wrote to Mr. Fajardo, "Can we have a brief call today?

19   We want to know the current situation regarding the complaint

20   for declaratory judgment in Ecuador regarding providing

21   documents to Mr. Camacho and Piaguaje.  Also we want to tell

22   you, plural, about what happened last Thursday in the hearing

23   before Judge Kaplan."

24              When you said you wanted to know "the current

25   situation regarding the complaint for a declaratory judgment,"

D4IJCHE2                          Stewart - direct

```
 1    were you asking for a status report on the complaint?
 2              THE COURT:  Please, Ms. Neuman, really!  He wasn't
 3    asking what he shot on the Back 9.
 4    BY MS. NEUMAN:
 5    Q.  You knew at the time of the October 22nd e-mail that a
 6    complaint was in progress, an action was in progress?
 7    A.  I did not.  I did not have any communications with
 8    Mr. Fajardo during that time period.  This was my first
 9    communication with him, I believe, since October 9th.
10              THE COURT:  And no one else had told you?
11              THE WITNESS:  No, sir, no, your Honor.
12              THE COURT:  Thank you.
13    BY MS. NEUMAN:
14    Q.  During the time that you were busy with important events,
15    was anyone else in contact with Mr. Fajardo and Mr. Saenz
16    regarding the Ecuador action in your absence?
17    A.  I don't believe so.  I am generally the primary
18    Spanish-speaker communicator with Mr. Fajardo for our office.
19    Q.  Mr. Fajardo responds, "Greetings, WPA."  I think that in
20    English WPA refers to Juan Pablo Saenz?
21    A.  I think that's right.
22    Q.  "WPA is in Quito and I am in Lago Agrio.  If it is
23    necessary that we talk, we can do so on Wednesday at 1:00 pm
24    Ecuadorian time.  In summary, the case here is moving forward.
25    We hope to have news soon.  Please confirm."
```

1            After Fajardo told you that the case was moving

2    forward, you didn't ask for more information right away?

3    A.  No.

4    Q.  Did you ask for any copy of the pleadings at that time or

5    shortly thereafter?

6    A.  No.

7    Q.  You didn't inform this Court that the proceeding had been

8    filed and was moving forward at that time?

9    A.  I didn't have any information to provide, no, I did not.

10   Q.  Did you ever inform Mr. Donziger's counsel the case had

11   been filed and was moving forward?

12   A.  I did not.

13   Q.  Do you know if anyone else did?

14   A.  I don't.

15   Q.  Did you ever inform Mr. Donziger himself?

16   A.  I don't believe so.

17   Q.  Do you know whether Mr. Donziger was aware that an action

18   had been filed in Ecuador regarding the documents?

19   A.  I don't think I had interaction with Mr. Donziger during

20   the pendency of that action.  I believe -- no, I don't think I

21   talked to Mr. Donziger during that period.

22   Q.  Whether you recall speaking to him or not, do you know

23   whether he knew about the case in Ecuador?

24   A.  Without talking to him, I wouldn't know that.

25   Q.  Did you understand Mr. Fajardo to be representing

D4IJCHE2                          Stewart - direct

```
 1    Mr. Camacho and Mr. Piaguaje in this ongoing action in Ecuador?
 2    A.   I did not.  Mr. Fajardo had told us for a year and a half
 3    that he was prohibited under Ecuadorian law from turning over
 4    documents, so I assumed if that is his position, he would be
 5    seeking a declaratory judgment to obtain an order to that
 6    effect, but I did not know who the parties were or what was
 7    being sought.
 8    Q.   But you assumed he was the plaintiff?
 9    A.   I didn't know who the plaintiff was.  I assumed it was a
10    declaratory judgment action because that was the suggestion.
11    Q.   Did you understand there was a plaintiff and a defendant?
12    A.   I didn't have any understanding as to what the parties were
13    and what the relief was sought, the nature of the action, so I
14    couldn't know what was happening or make an assumption about
15    that.
16    Q.   You understood if an order was issued in this Ecuador
17    action, it would impact your clients, Mr. Camacho,
18    Mr. Piaguaje's rights to obtain access to their Ecuadorian
19    counsel's files?
20    A.   I understood that Chevron was seeking documents from our
21    two clients who were unable to obtain them from their
22    attorneys, and that that would have an impact on their defense
23    of this case and their ability to produce documents to Chevron,
24    and that Chevron would seek to hold them responsible for
25    Mr. Fajardo's failure to turn over the documents.  I understood
```

D4IJCHE2                        Stewart - direct

1   that.

2   Q.  You understood that the order in Ecuador would impact your

3   Ecuadorian client's rights to get documents from Mr. Fajardo?

4   A.  I understood that an order being sought in Ecuador would

5   resolve the disputed question of Ecuadorian law, as to whether

6   or not Mr. Fajardo was correct in his position that he had

7   provided for over 18 months to us who were representing Camacho

8   and Piaguaje.

9   Q.  And who, if anyone, did you understand to be representing

10  Mr. Camacho, Mr. Piaguaje's interest in producing the documents

11  in this litigation that you knew was ongoing in Ecuador?

12  A.  I didn't have any understanding who would be representing

13  Mr. Camacho and Piaguaje in Ecuador.  Our firm represents

14  Mr. Camacho and Piaguaje in their interests in this case.

15  Q.  The proceeding in Ecuador was going to impact the ability

16  there, their ability, your client's ability to comply with the

17  court order in this case, yes?

18  A.  It could.  I don't know what the result would be.

19          THE COURT:  How much longer do you expect to be with

20  this witness?

21          MS. NEUMAN:  Not too much longer, your Honor.

22          THE COURT:  Thank you.

23          MS. NEUMAN:  On October 22nd, the same day that you

24  were e-mailing with Mr. Fajardo, Judge Rubolina issued an order

25  denying Mr. Cordova's complaint for constitutional protection

D4IJCHE2                          Stewart - direct

1   action.  Did you have any information regarding Judge

2   Rubolina's order at or around the time it was issued?

3   A.  The first time I learned of Judge Rubolina's order was when

4   your client filed a motion for sanctions and attached the

5   pleadings to it.  I did not see any pleadings or orders.

6            The only thing I saw before your client filed that was

7   the January 15th order of the court that Mr. Fajardo forwarded

8   to me.

9   Q.  At any time while the Cordova case was pending, after you

10  knew it had been filed, did you ever request any of the

11  pleadings from Ecuadorian counsel?

12  A.  I did not.

13  Q.  Was there a decision made affirmatively within Smyser

14  Kaplan not to request those pleadings?

15  A.  No, there was no decision made affirmatively not to request

16  the pleadings, to my knowledge.

17  Q.  When you did get the copy of Judge Rubolina's order from

18  October 22nd, did you note that the plaintiff, Mr. Cordova, was

19  receiving notice of the ruling at Mr. Fajardo's mailbox --

20  sorry -- e-mail?

21  A.  I did not review that order in great detail, ma'am.

22  Q.  That order states by Judge Rubolina, "I have served a copy

23  of the preceding decision using court service slips on Cordova,

24  in that Mailbox No. 78 and --

25            THE COURT:  This is in the record, right?

D4IJCHE2                              Stewart - direct

1           MS. NEUMAN:  Yes, your Honor.

2           THE COURT:  Could we stop wasting my time, please?

3    BY MS. NEUMAN:

4    Q.  Mr. Stewart, did you participate in meet-and-confers on the

5    document production with Chevron's counsel in October, November

6    or December of 2012?

7    A.  I did not.  During those months I was extremely busy in

8    another matter with dozens of depositions and mediation out of

9    the country.  I was not involved in the meet-and-confers in

10   document production in this case.

11   Q.  When was the next time after October 22nd that you had any

12   communication with Ecuadorian counsel about the action to

13   prohibit the disclosure of documents?

14   A.  I wouldn't characterize it as an action to prohibit

15   disclosure of documents.  The next time I received information

16   from Ecuadorian counsel about a declaratory judgment suit was I

17   believe the November correspondence produced this morning,

18   November 26, 2012.

19   Q.  Then did you receive any further updates after November

20   26th before January 1st?

21   A.  I don't believe so.  I think the e-mail correspondence

22   should be it.

23   Q.  The November 26th update that you received, did you pass

24   that on to Mr. Smyser and Mr. Veselka?

25   A.  I believe they were copied on the e-mail.

D4IJCHE2                           Stewart - direct

1    Q.  Did you have any further conversations with them regarding

2    the Cordova action in that time-frame, October 22nd to January

3    1st?

4    A.  No.  Like I said, I wasn't heavily involved in this case

5    during that time period.  I was communicating with Mr. Fajardo

6    because of my fluidity with Spanish.

7    Q.  You also had e-mail communication with Mr. Fajardo on

8    January 1st?

9    A.  Yes.

10           MS. NEUMAN:  I would like to mark as Exhibit 13 the

11   e-mail communications between Mr. Stewart and Mr. Fajardo that

12   occurred on January 1st.  May I approach the witness, your

13   Honor?

14           THE COURT:  You may.

15           (Pause)

16           THE COURT:  Thank you very much.

17   BY MS. NEUMAN:

18   Q.  In Exhibit 13 you wrote on January 1st, you wrote, "We know

19   that you, plural, are doing everything that is possible to

20   obtain a declaratory judgment in Ecuador that says you,

21   singular, cannot provide the documents to Camacho and Piaguaje,

22   but we wanted to tell you about this event in the hearing."

23           You have a sense of urgency in this e-mail to push

24   Fajardo to get the declaratory judgment in Ecuador that says

25   you cannot provide the documents to Camacho and Piaguaje?

D4IJCHE2                          Stewart - direct

1   A.  I don't believe I had a sense of urgency.  I knew

2   Mr. Fajardo insisted for a long period of time he could not

3   give the documents under Ecuadorian law.  If that was his

4   position, he needed to get a court order to support that

5   position, and so I believe that is the purpose of this

6   communication.

7   Q.  Mr. Fajardo responds, "Thanks, Jarod, for the information.

8   As I told you previously, the hearing is scheduled for January

9   11th.  Let's hope the judge will rule on the issue a few days

10  later."

11          When had Mr. Fajardo first told you there was a

12  January 11th hearing in the Cordova matter?

13  A.  I may have had a phone call with Mr. Fajardo some time in

14  the day or two before that.

15  Q.  In the phone call did he tell you anything about the action

16  other than there was an upcoming hearing?

17  A.  I don't believe so.

18  Q.  Did you request any additional information that he refused

19  to provide?

20  A.  I don't believe I requested any additional information.

21  Q.  Did you tell your clients, Mr. Camacho and Piaguaje, about

22  the hearing?

23  A.  I don't think so.

24  Q.  Did you do anything to have Mr. Camacho or Mr. Piaguaje

25  represented at the hearing?

D4IJCHE2                          Stewart - direct

1    A.  I'm an American lawyer.  I don't think I have anything to

2    do with with getting representation in Ecuador.  I obviously

3    leave that up to the decision-makers on the case in the United

4    States.

5    Q.  Mr. Stewart, the Lago Agrio attorneys retained at least

6    five experts in Ecuadorian law on behalf of Mr. Camacho and

7    Mr. Piaguaje in this case?

8    A.  I believe that is accurate.

9    Q.  You have worked with those experts, or at least some of

10   them?

11   A.  Some of them, yes.

12   Q.  Your understanding they're all licensed to practice law in

13   Ecuador?

14   A.  I believe so.  I haven't done the background check on our

15   experts.

16   Q.  You didn't check their credentials at the time you hired

17   them?

18   A.  I have seen CV and resumes, yes.

19   Q.  You believe those to be accurate?

20   A.  Someone had given me a document --

21            THE COURT:  Ms. Neuman, what is this all about?

22            MS. NEUMAN:  I want to establish, your Honor, they had

23   the clear ability to provide their clients with counsel in the

24   Cordova action to protect their rights, to assert that they

25   were entitled to the documents in the Ecuadorian counsel's

D4IJCHE2                          Stewart - direct

1   files.

2              THE COURT:  This is not the best use of time that I

3   have seen of late.

4              MS. NEUMAN:  Understood, your Honor.  I have no

5   further questions at this time.

6              THE COURT:  Thank you.  Is there any cross?

7              MR. SMYSER:  If I may, your Honor?

8              THE COURT:  Yes, Mr. Smyser.

9   CROSS-EXAMINATION

10  BY MR. SMYSER:

11  Q.  Mr. Stewart, how old are you, as a brief background?

12  A.  I am 33 years' old.

13  Q.  You attended college where?

14  A.  Brigham Young University.

15  Q.  You went to law school?

16  A.  Yes, at Duke University.

17  Q.  Were you a scholarship student at Duke?

18  A.  I was.

19             THE COURT:  Mr. Smyser, you may notice the jury box is

20  empty.  This is a hearing on questions that do not involve this

21  gentleman's curriculum vitae.  There is a great desire

22  expressed to me to finish this by lunchtime today.

23             I gave Ms. Neuman several prompts to move it along and

24  get with it.  I heard this man say he is associate three and a

25  half years out of school.  I assume he is admitted to the Bar.

D4IJCHE2                          Stewart - cross

 1    He certainly signed a lot of legal papers in this case.

 2              Could we get to something relevant?

 3              MR. SMYSER:  Yes, your Honor.  I wanted two minutes to

 4    establish this person for the court.

 5    BY MR. SMYSER:

 6    Q.  For instance, how did you learn Spanish?

 7    A.  I spent two years as a missionary for my church in Queens,

 8    New York, working with Spanish-speaking people.

 9              THE COURT:  Mr. Smyser, move on with it.

10    BY MR. SMYSER:

11    Q.  Mr. Stewart, the court has asked you three questions, asked

12    us three questions -- five questions, actually -- one of which

13    is not directed to us.

14              The first question asked whether and to what extent

15    Donziger, the LAP representatives and their respective U.S.

16    counsel acted in good faith to produce documents that are

17    responsive to Chevron's first request for production of

18    documents and they're located in Ecuador.

19              I wonder if you would answer that question for the

20    court and tell him what actions we took in good faith to obtain

21    documents responsive to Chevron's first request for production

22    of documents that are located in Ecuador.

23              MS. NEUMAN:  Objection; calls for narrative and legal

24    conclusion.

25              THE COURT:  No.  I will allow it.

D4IJCHE2                          Stewart - cross

1    A.  Since my initial involvement in this case, I have attempted

2    to obtain from Mr. Fajardo documents that would be helpful to

3    the defense of our two clients in this case, documents that

4    would be relevant and documents that could be produced.

5            I have made several trips to Ecuador.  I have made

6    several phone calls.  I have made several written requests.  In

7    all those communications, all of those communications have

8    asked Mr. Fajardo or Mr. Saenz oftentimes for specific

9    documents, other times for any documents they had in particular

10   areas.

11           I know that others at our firm have done the same

12   thing, and Mr. Fajardo has consistently stated that he could

13   not provide those documents to the two clients without the

14   other group of clients' consent, but we have persisted asking

15   in the face of that refusal many times, and even as recently as

16   my last trip to Ecuador in late February of this year, I have

17   made that same request to Mr. Fajardo, Mr. Saenz to give the

18   documents.

19   Q.  Do you remember whether or not you were aware of

20   Mr. Fajardo's position that he would not turn over documents

21   prior to receiving Chevron's first request for production of

22   documents in Cause No. 691?

23   A.  I was.  I learned that, I believe, in my first trip to

24   Ecuador in the summer of 2011.

25   Q.  What did you learn?

D4IJCHE2                         Stewart - cross

A.  I learned that Mr. Fajardo stated that he was prohibited by

Ecuadorian law from turning over documents from the case files

there to Camacho and Piaguaje for use or production in the

litigation or production to third parties.

Q.  Do you remember whether you knew prior to that time whether

this Court had ever been informed of Mr. Fajardo's position on

that issue?

A.  I believe I have seen filings that were filed before our

firm's involvement in the Count 9 case that reflected that

position, yes.

Q.  Can you tell the court whether or not you believe you have

acted in good faith in an attempt in writing and in person and

by phone to obtain all the documents requested in Chevron's

first request for production from our clients first and then

from Mr. Fajardo and the other legal team down there?

A.  Yes.  I mean, I have visited personally with our clients on

several occasions and have asked them both in person and over

the phone to provide me with all documents that they had that

related in any way to Chevron or the case in Ecuador and have

received either myself or others or from Mr. Fajardo documents

that our two clients, Camacho and Piaguaje, have provided, and

so I believe we have done everything we can to get all the

documents that are in the possession of our two clients to

provide for production in this case.

        With respect to Mr. Fajardo, I did say that I visited

D4IJCHE2                          Stewart - cross

1    with him and other members including Mr. Saenz.  I have also

2    spoken with Mr. Yanza in person to request documents from him

3    as well as Mr. Julio Prieto, and each of those individuals has

4    refused to turn over documents specifically before we received

5    the request for production and then after we received request

6    for production.

7    Q.  Move on to Question 2.  The court has asked whether and to

8    what extent Donziger and the LAP representatives and their

9    respective U.S. counsel have acted in good faith to comply with

10   the court's order of February 13th, 2013.  You remember that

11   question?

12   A.  I do.

13   Q.  Can you answer that question.

14   A.  Yes.  I believe that I and everyone I've worked with on

15   this case has acted in good faith to obtain the documents we

16   could obtain to the best of our ability before the court enter

17   intervened.  We acted in good faith to obtain documents in

18   response to this Court's order in February of 2013.

19   Q.  Do you remember what action was taken when the court

20   entered its order on February 13th in order to communicate the

21   terms of that order to counsel in Ecuador?

22   A.  Yes.  I translated the order from English into Spanish so

23   that the individuals in Ecuador would have the exact terms of

24   this Court's order.  I provided that order to Mr. Fajardo and

25   Mr. Saenz.

D4IJCHE2                          Stewart - cross

1   Q.  How did you provide it to them?

2   A.  I sent it to them by e-mail.

3   Q.  Did you have any conversations with anyone about the

4   orders?

5   A.  I did.  After I sent Mr. Fajardo and Mr. Saenz the

6   translation into Spanish of this Court's order, I participated

7   in a phone call with them to request that they let us know if

8   they intended to comply with the court's order at that time.

9   Q.  Do you remember whether or not you or anyone else asked

10  that they comply with the court order?

11  A.  Yes.  I mean our two clients are being sued here in New

12  York and are being ordered to do something, and if Mr. Fajardo

13  and Mr. Saenz refused, I knew that would have consequences for

14  my clients.

15          Yes, I believe I asked, I believe you asked

16  Mr. Fajardo and Mr. Saenz if they would comply and asked them

17  to comply because of the risks to our clients of any potential

18  affects of not complying with the court's order.

19  Q.  Do you remember you, me or anyone with our law firm

20  instructing them in any way to try to prevent compliance with

21  the court's order?

22  A.  I have never --

23          MS. NEUMAN:  Objection; leading.

24  A.  -- with this court's order.  I would never do such a thing.

25  It is offensive for anyone to suggest I would do so.

1  Q.  Do you remember whether or not you sent a letter to

2  Mr. Fajardo on February 15th regarding the order?

3  A.  I believe the letter was signed by you.  I believe I worked

4  on the letter and the Spanish translation of that letter.

5  Q.  Do you remember receiving a response to that letter on

6  February 18th?

7  A.  I did.

8  Q.  Do you remember the general outline of that response?

9  A.  Mr. Fajardo informed us that he was prohibited by

10  Ecuadorian law from turning over the documents pursuant to the

11  court's order, that the U.S. Court did not have jurisdiction

12  over him and he would not comply and that he was barred by an

13  order in Ecuador from turning over the documents.

14        So Mr. Fajardo refused to comply, and I believe he did

15  that knowing, as we had explained to him, that we wanted him to

16  comply because that presented a risk for our clients.

17  Q.  Do you remember whether or not you then traveled in person

18  to Ecuador to discuss this issue with Mr. Fajardo and the team

19  down there?

20  A.  I did, I traveled to Ecuador in late February of this year.

21  Q.  Do you remember whether or not at those meetings you

22  discussed compliance with the court's order and production of

23  documents in response to the court's order with Mr. Fajardo and

24  the team?

25  A.  I did discuss that with them.

D4IJCHE2                          Stewart – cross

1    Q.   What was their response?

2    A.   The response was the same response they had given for 18

3    months, that they would not turn over the documents, that they

4    did not believe this Court had jurisdiction over them, and they

5    did that despite our repeated requests and knowing that there

6    was a potential problem for our clients in them not complying.

7                THE COURT:  Did he at any time ever tell you or anyone

8    in your presence that he had told the Ecuadorian court that he

9    had, in fact, decided to turn over the documents?  Did he ever

10   tell you that?

11               THE WITNESS:  Mr. Fajardo never told me that, your

12   Honor.

13               THE COURT:  Did you read that in the Ecuadorian court

14   papers?

15               THE WITNESS:  I read that in the Ecuadorian court

16   papers that were filed in connection with the sanctions motions

17   by Chevron.

18               THE COURT:  The statement he made there to the

19   Ecuadorian court was absolutely totally inconsistent with

20   everything he had ever told you or your firm, is that correct,

21   on that subject?

22               THE WITNESS:  Mr. Fajardo never told me he decided to

23   turn over the documents to our two clients Camacho and

24   Piaguaje, no.

25               THE COURT:  On every single occasion, according to

D4IJCHE2                          Stewart - cross

```
1    your testimony, that you ever had any communication with him on
2    that subject, his position was he would not do so.  Is that
3    right?
4              THE WITNESS:  Yes.
5              THE COURT:  Go ahead, counselor.
6    BY MR. SMYSER:
7    Q.  In your conversations with Mr. Fajardo in which you
8    discussed compliance with this Court's order and Mr. Fajardo's
9    refusal to turn the documents over, was there ever any kind of
10   wink-wink or nod-nod or implication of any kind we were saying
11   you don't really have to comply with this order or there is
12   some way we can escape it?
13   A.  Never.
14             MS. NEUMAN:  Objection.
15   A.  We insisted he had to do so because of the risk to our
16   clients, and as somebody defending my clients in this case, I
17   would never do that.
18   Q.  Did Mr. Fajardo ever produce any documents to you in
19   response to the court order or to us, to your knowledge?
20   A.  To my knowledge, he didn't provide any documents in
21   response to this Court's order either to Mr. Camacho or
22   Piaguaje or to our firm.
23   Q.  During that trip in February did you also visit with our
24   clients?
25   A.  I did.
```

D4IJCHE2                          Stewart - cross

1   Q.  Did you inform them of the court's order and Mr. Fajardo's

2   decision?

3   A.  I did.

4   Q.  Did the clients instruct you in any way not to demand the

5   documents to be produced from Mr. Fajardo?

6   A.  No, they did not.  My understanding is that they had also

7   asked Mr. Fajardo for the documents and had authorized us to

8   seek the documents so that they could comply.

9   Q.  The third question the court asked you is whether -- us --

10  whether and to what extent Donziger, the LAP representatives

11  and respective U.S. counsel acted improperly or in bad faith

12  with respect to the commencement, prosecution and disclosure or

13  lack thereof of proceedings in Ecuador that culminated in the

14  Ecuadorian court decision and in relation to the delay of

15  proceedings in this Court during the pendency of that

16  Ecuadorian proceeding.

17          Can I ask you to give your answer to the court whether

18  or not you acted in bad faith with respect to any of those

19  items inquired about?

20  A.  I have never acted in bad faith with respect to any of the

21  items stated in the court's question, initiation, commencement

22  or prosecution of the lawsuit in Ecuador.

23          I believe everything that was done was proper, it was

24  the best course of action when there was competing declarations

25  on an issue of Ecuadorian law.  I know that in that situation a

D4IJCHE2                      Stewart – cross

court would be making an international Erie decision, and in

that situation, if the issue is governed by Ecuadorian law,

then a court of competent jurisdiction in Ecuador should decide

the question, and if Mr. Fajardo's belief was that, that he

should obtain a declaratory judgment to that effect, and I

believe that suggesting that course of action, there is nothing

wrong with that.

It is sound legal strategy, it makes sense for if

Mr. Fajardo believes that is his position, then that should be

decided by a court in Ecuador.

Q.  I want to take you back to August of 2012.  Did you and I

take a trip to Ecuador in August of 2012?

A.  We did.

Q.  During that trip did we meet with Mr. Fajardo and discuss

whether or not the documents that were responsive to Chevron's

request for production should be produced?

A.  We did.

Q.  What did Mr. Fajardo tell us?

A.  Mr. Fajardo again repeated that he had looked at the

requests and he would not be providing documents responsive to

those requests.

Q.  What was the basis for his position?

A.  That there were numerous provisions of Ecuadorian law that

prohibited him from turning over the documents that he had to

Camacho and Piaguaje.

D4IJCHE2                         Stewart - cross

1    Q.  Do you remember whether or not we elected to visit with

2    another lawyer to determine the validity of that position?

3    A.  We did.

4    Q.  With whom did we shift?

5    A.  Dr. Armando Bermeo Castillo.

6    Q.  What was Dr. Armando Bermeo Castillo's credential for

7    submitting an opinion to us on Ecuadorian law?

8    A.  My understanding is he is a former justice of the

9    Ecuadorian Supreme Court and president of that court for some

10   period of time.

11   Q.  Does he currently have a position with the Ecuadorian court

12   system?

13   A.  My understanding is that recently he was appointed to be

14   the general counsel for the National Judiciary Council of

15   Ecuador.

16   Q.  Do you remember what we did to determine the legal validity

17   as best we could, being non-Ecuadorian lawyers, of the position

18   that Mr. Fajardo has taken in conference with Mr. Bermeo?

19   A.  We reviewed with Dr. Bermeo the provisions of Ecuadorian

20   law that Mr. Fajardo had cited, to read them, to review them.

21          We reviewed other provisions that Dr. Bermeo pointed

22   out relevant to the topic, and at that time I believe

23   Mr. Fajardo's position had a sound basis and that Dr. Bermeo's

24   opinion was the same.

25   Q.  Did we look at the Ecuadorian constitutional provisions?

D4IJCHE2                          Stewart – cross

1    A.  Yes.

2              MS. NEUMAN:  Strike the hearsay recital what Dr.

3    Bermeo.

4    BY MR. SMYSER:

5    Q.  Dr. Bermeo has given a declaration?

6    A.  Two declarations.

7    Q.  Does his --

8              THE COURT:  That is asking the witness to express a

9    view as to the credibility of the person, right?

10             MR. SMYSER:  Fair enough, your Honor.

11   BY MR. SMYSER:

12   Q.  Following that review of the Ecuadorian law provisions, did

13   we reach a conclusion as to what the validity of Mr. Fajardo's

14   position was under Ecuadorian law, being not Ecuadorian

15   lawyers?

16   A.  Not being Ecuadorian lawyers, we did.  We concluded that

17   Mr. Fajardo's position was based in Ecuadorian law and valid.

18   Q.  The court was referred I believe now on Tuesday to a

19   decision called the Wray decision that Chevron provided to the

20   court regarding a decision about whether or not Ecuadorian law

21   permitted or prohibited disclosure of documents.

22             Do you recall that?

23   A.  I do recall that.

24             THE COURT:  Counsel, if you want to make a legal

25   argument, if you want to submit a brief, we'll talk about that,

D4IJCHE2                         Stewart - cross

1    but we are not going to have it from the witness stand.

2    BY MR. SMYSER:

3    Q.  Was it your understanding that under United States law,

4    that seeking a ruling from a court in the jurisdiction where

5    the witness said he was not going to comply with discovery was

6    the proper legal strategy?

7               MS. NEUMAN:  Objection; calls for legal conclusion.

8               THE COURT:  Yes, sustained.

9               MR. SMYSER:  Your Honor, this goes to whether or not

10   we had a good-faith basis to file or suggest that this case be

11   filed if, in fact, it is the case under United States law that

12   this is the right procedure, that is part of --

13              THE COURT:  The right procedure, right?

14              You're going to tell me that you have an authoritative

15   case, that on facts comparable to this, the thing the lawyer

16   must do is what you guys did?  You are going to tell me that?

17              MR. SMYSER:  Your Honor, I am going to tell you

18   something very close to that.  The Wray case says absent

19   authoritative decision from the jurisdiction involved, it is

20   simply a matter, as Mr. Stewart suggested, an Erie

21   international guess and that you should seek an opinion,

22   authoritative opinion.

23              THE COURT:  We'll see, and we'll move on.  We're not

24   doing any closing argument from the witness stand.  I have

25   given you great latitude.

D4IJCHE2                        Stewart – cross

1           MR. SMYSER:  Thank you, your Honor.

2    BY MR. SMYSER:

3    Q.  Mr. Stewart, while we were in Ecuador in August, did we

4    receive -- do you remember whether or not we received a motion

5    to compel from Chevron?

6    A.  It was filed while we were there, yes.

7    Q.  Do you remember whether we took actions in order to respond

8    to that motion to compel?

9           MS. NEUMAN:  Objection; leading.

10   Q.  Do you remember?

11          THE COURT:  Overruled.

12   A.  I do.

13   Q.  What actions did we take?

14   A.  A response was drafted, and after having visited with Dr.

15   Bermeo, we requested he provide an opinion in writing as to

16   Ecuadorian law on the subject.  That was provided and submitted

17   along with our response to the motion to compel.

18   Q.  Subsequently, did Chevron file a dueling expert

19   declaration?

20   A.  Yes, that was the first time Chevron had raised an

21   Ecuadorian law issue.

22   Q.  At the point of that declaration being filed, do you recall

23   whether or not anyone in our law firm had ever discussed filing

24   an action in Ecuador or suggested filing an action in Ecuador

25   regarding this issue?

1  A.  That had never been discussed before that declaration was

2  filed.

3  Q.  Do you remember what month that declaration was filed?

4  A.  The declaration was filed I believe September 5th.

5  Q.  Do you remember the date we first suggested to Mr. Fajardo

6  that he might want to seek a declaratory judgment action in

7  Ecuador to resolve these dueling declarations?

8  A.  I believe it was in early October.

9  Q.  Do you remember whether there was any conversation among

10 the lawyers at our law firm ever suggesting that the idea was

11 to prevent production of the documents?

12 A.  There was never discussion about preventing production of

13 documents.  It was always about obtaining definitive resolution

14 of the dueling expert opinions, especially because Mr. Fajardo

15 had insisted that was correct, and so the discussion was about

16 giving an order to that effect or not to that effect.

17 Q.  Do you remember whether we ever directed the form in which

18 the action should take place in Ecuador?

19 A.  No, our firm had nothing to do with the form or parties or

20 jurisdiction or anything.

21 Q.  Did we take any action with respect to commencement of this

22 lawsuit other than the act of suggesting that some form of

23 action might be filed?

24 A.  Other than suggesting a declaratory judgment to obtain a

25 ruling on this issue which Mr. Fajardo stated he was basing his

D4IJCHE2                          Stewart - cross

refusal to turn over the documents, there was never any

discussion beyond that.

Q.  Do you remember, apart from the discussions which counsel

has already gone over with you, the e-mails, did you have any

substantive discussions, do you remember, with Mr. Fajardo

about the nature of the action, the style of the pleadings, who

the parties were, any of that?

A.  I never had any substantive discussions with Mr. Fajardo

about any of those topics about commencement, location,

pleadings.  I had no die idea about any of these things.

        I know the suggestion was made that a declaration be

sought, and if that is what Mr. Fajardo wanted to do, he could

do that.  Was not involved and I don't believe anybody in our

firm was involved in the commencement or prosecution or filing

of anything in the action we later learned was the Cordova

lawsuit.

        MS. NEUMAN:  I move to strike the last portion as

speculation.

        THE COURT:  Denied.

BY MR. SMYSER:

Q.  Mr. Stewart, there was a hearing in this Court that you did

not participate in on October 18th.  Do you recall that?

A.  I am aware there was a hearing that day in this Court.

Q.  Have you since then read the transcript of that hearing?

A.  I have.

D4IJCHE2                           Stewart - cross

1   Q.  At the time of that hearing, to your knowledge, do you

2   remember whether anyone in our law firm had any knowledge that

3   the Cordova lawsuit had been commenced?

4            MS. NEUMAN:  Objection to form.

5            THE COURT:  Overruled.

6   A.  I don't believe anybody in our firm had any knowledge about

7   any lawsuit being filed in Ecuador, much less the Cordova

8   lawsuit.

9   BY MR. SMYSER:

10  Q.  Do you remember when we first became aware that a lawsuit

11  had been filed?

12  A.  I believe it was --

13           THE COURT:  Speak for yourself on this one.

14  BY MR. SMYSER:

15  Q.  Do you recall when you first became aware of the lawsuit

16  being filed?

17  A.  My first knowledge that a lawsuit had been filed was when

18  Mr. Fajardo sent me e-mail saying the case here is progressing.

19  I took that to mean if the case was progressing, that it had

20  been filed.

21  Q.  Do you remember whether you received any information from

22  me or Mr. Veselka or anyone else at the law firm prior to that

23  date a lawsuit had been filed?

24  A.  I don't believe I had received -- no, I didn't receive any

25  information.  I was working on another case.  I just had a new

D4IJCHE2                        Stewart - cross

baby, so there was no information exchanged or discussed with

anybody within our firm about the lawsuit that had been filed

in Ecuador.

Q.  Do you remember whether you have since received any

information indicating that Mr. Veselka, myself or anyone else

with our law firm had knowledge of the Cordova lawsuit before

that conversation which you just related to us where you found

out about it?

A.  I have never seen any information that would indicate you

or Mr. Veselka or anyone else in our firm had any knowledge of

the Cordova lawsuit we learned about on January 15th, that

anybody had any knowledge of the filing of that suit or of any

suit in Ecuador before or during the hearing that was before

this Court on October 18th.

Q.  Do you remember whether there was any discussion with you,

with us, with Mr. Veselka of concealing from this Court the

fact that the Cordova lawsuit lad been filed?

A.  There was never a discussion about concealing anything

about a lawsuit in Ecuador.

Q.  Was there any discussion with respect to that lawsuit?

        Do you remember any discussion with respect to the

Cordova lawsuit in this Court?  Were those two topics ever

discussed in terms of disclosure or nondisclosure to this Court

ever?

        MS. NEUMAN:  Objection to form.

D4IJCHE2                         Stewart - cross

1    A.  What time period are you talking about?

2    BY MR. SMYSER:

3    Q.  I am talking about up until this motion for sanctions was

4    filed?

5    A.  Other than the statements that are in my October 9th

6    e-mail, I don't believe there was ever any discussion about

7    concealing or not anything that was happening in Ecuador from

8    this court.

9    Q.  Did you or anyone, to your knowledge, in our law firm act

10   in bad faith with respect to the prosecution of the Cordova

11   lawsuit?

12           MS. NEUMAN:  Objection; calls for speculation.

13   Q.  Can you answer the question?

14           THE COURT:  Just a minute.

15           (Pause)

16           THE COURT:  I'll let him answer.  I don't know what

17   value, given the form of the question it asked.  Go ahead.

18   A.  I don't believe anyone in our firm or anybody involved in

19   defense of our two clients acted in any way in bad faith with

20   respect to what later became known as the Cordova lawsuit.

21           I believe everything that we did was proper.  It was

22   the best course of action, and I agreed with the suggestion at

23   the time and I still do to this day.

24   Q.  Let me ask you more specifically, with respect to the

25   prosecution, are you aware of any facts that our law firm or

D4IJCHE2                          Stewart – cross

1    you were involved in the prosecution of the Cordova lawsuit at

2    all?

3    A.  No.  There is no way we could have acted in bad faith with

4    respect to prosecution.  We had zero involvement with the

5    prosecution of that lawsuit.

6    Q.  The court asked also whether or not you or our law firm

7    acted with bad faith with respect to disclosure or lack thereof

8    of proceedings in Ecuador.

9              Specifically, I'd like to ask you, prior to the time

10   that you received the order from the Ecuadorian lawsuit, did we

11   have any knowledge of what the Cordova lawsuit?  Did we have

12   any knowledge that there was such a thing called a Cordova

13   lawsuit other than the general idea

14   A.  The first time I ever learned the name Octavio Esmael

15   Cordova Huanca, H U A N C A, was on January 15th of this year

16   when Mr. Fajardo forwarded me a decision that was issued in

17   that case on that day.  So I did not know about a Cordova

18   lawsuit or any lawsuit or who the parties were at any time

19   before January 15th of this year.

20   Q.  Do you remember the date you first received any pleadings

21   in the Cordova lawsuit?

22   A.  The pleading I received that day was the order of the court

23   issued on January 15th.  The first time I saw any other

24   pleading in the case was when Chevron filed them with this

25   Court.

D4IJCHE2                          Stewart - cross

1   Q.  Let's turn to the fifth question the court asked.  The

2   fourth asked related to a question related to Mr. Donziger.

3   I'll pass over that.

4           The fifth question asked whether and to what extent

5   the LAP representatives, individually and through Donziger,

6   Donziger's U.S. counsel and their own U.S. counsel have and

7   have had the practical ability to obtain documents and

8   information from the LAPs Ecuadorian counsel, Luis Yanza, Selva

9   Viva and Amazon Defense Front.

10          What is your understanding of the practical ability we

11  have to obtain documents?

12  A.  Our practical ability is limited by what Mr. Fajardo, who

13  acts on behalf of Mr. Saenz and Mr. Prieto, who act at his

14  direction, I understand, based on what he says, he is willing

15  to do under what he believes are restrictions of Ecuadorian

16  law.

17          My understanding is that Mr. Fajardo acts on behalf of

18  Selva Viva as well, and I and others have made multiple

19  requests, and I think our practical ability is limited there to

20  short of walking into their office and stealing their files.

21          With respect to Mr. Yanza, who I understand represents

22  the Amazon defense Front --

23  Q.  Have you ever spoken with Mr. Yanza and asked him to

24  produce documents?

25  A.  Yes, on several occasions.

D4IJCHE2                        Stewart - cross

1    Q.  What, with respect to the practical ability do we have with

2    respect to Mr. Yanza that differs in your mind from practical

3    ability we have with Mr. Fajardo or any of the other

4    individuals you mentioned?

5    A.  I don't believe there is any difference.  I don't believe

6    that Mr. Yanza has any documents that he is willing to give to

7    us.  I asked him for documents.  He has not given us documents.

8              MR. SMYSER:  I pass the witness.

9              THE COURT:  Any redirect examination?

10             MS. NEUMAN:  Just a couple, your Honor.

11   REDIRECT EXAMINATION

12   BY MS. NEUMAN:

13   Q.  Mr. Stewart, when you met with Dr. Bermeo in August of

14   2012, how long did that meeting last?

15   A.  I believe a couple of hours.

16   Q.  Did you provide Mr. Bermeo with any of the documents such

17   as Mr. Fajardo's retention agreement which state that the

18   Ecuadorian counsel's files in the Lago case are the property of

19   the client?

20   A.  I don't believe that is what the document says.  It says

21   they're the property of the plaintiffs, and no, I did not

22   provide Dr. Bermeo with a copy of that retention agreement at

23   that time.

24   Q.  Did you provide him with any of the other agreements that

25   discussed the issue of client files in the Lago Agrio case?

1    A.  I don't believe I provided Dr. Bermeo with documents at

2    that time.  We were in Ecuador when you filed your motion to

3    compel, and we visited with Dr. Bermeo about these provisions

4    of Ecuadorian law, and he provided a declaration.

5    Q.  Did I understand you to testify when Mr. Smyser was

6    questioning you that your clients authorized you to seek the

7    documents from Mr. Fajardo?

8    A.  Yes, in addition to them seeking the documents themselves

9    by their request to Mr. Fajardo, they also said we could

10   continue to do the same on their behalf.

11   Q.  You understood that your clients wanted if possible to

12   force Mr. Fajardo to turn over the documents so that they could

13   use them in this case?

14   A.  Yes.

15   Q.  You state you and your firm had zero involvement in the

16   Cordova action.  Did you have the practical ability to hire

17   Ecuadorian counsel to represent your clients in that action?

18   A.  I didn't know where the action was pending or anything

19   about the action.

20   Q.  Could you have easily discovered that information, sir?

21   A.  I don't believe so.  When I asked Mr. Fajardo for

22   information, he provides what information he provides me.  So I

23   don't believe I could have easily discovered where the lawsuit

24   was pending or who the parties were.

25   Q.  You never asked Mr. Fajardo for that information, did you?

D4IJCHE2                         Stewart - redirect

1   A.  I did not.

2   Q.  You said Mr. Fajardo has refused to produce documents since

3   2011.  Is that right?

4   A.  Yes.

5   Q.  But since 2011 through the present, Mr. Fajardo has, in

6   fact, produced many documents to your firm for use in this

7   case, correct?

8   A.  He has produced documents that he believes are not

9   prohibited from being turned over.

10          THE COURT:  That actually calls for you to

11   psychoanalyze Mr. Fajardo, doesn't it?

12          THE WITNESS:  That is my understanding, based on

13   considerations with Mr. Fajardo and what he told me what he is

14   providing, that is my understanding.

15          THE COURT:  So you're accepting whatever he tells you

16   at face value?

17          THE WITNESS:  I ask him for documents, he tells me why

18   or why not he cannot provide them, and I am not an Ecuadorian

19   lawyer.  I can review provisions of Ecuadorian law he cites,

20   and that is all I can do.

21   BY MS. NEUMAN:

22   Q.  Did you have a discussion with Mr. Fajardo as to how he was

23   able to turn over the Zambrano declaration with recordings

24   attached after the Cordova court issued its order saying he

25   could not turn over any such documents to, "anyone"?

D4IJCHE2                        Stewart – redirect

1    A.  I don't know if the declaration or recordings are covered

2    by the Cordova order, and whether or not Mr. Fajardo chooses

3    what he chooses to do is not in my control.

4            MS. NEUMAN:  I move to strike as nonresponsive.

5            THE COURT:  I will allow it.

6    BY MS. NEUMAN:

7    Q.  Did you or did you not ask him, yes or no, as to how he was

8    able to produce anything to you after the issuance of the

9    Cordova order?

10   A.  I did not ask him that.

11           MS. NEUMAN:  Nothing further, your Honor.

12           THE COURT:  Thank you.  Mr. Smyser?  Mr. Keker?

13           MR. KEKER:  No, your Honor, nothing.

14           THE COURT:  All right.  Thank you.  You may down.

15           (Witness excused)

16           THE COURT:  Let's take 10 minutes and we'll go on.

17   Who will be next?

18           MR. MASTRO:  I will try to streamline things.  I will

19   call Mr. Smyser and see if we can speed this up.

20           THE COURT:  I hope so.

21           (Recess)

22           THE COURT:  Okay, let's proceed.

23           MR. MASTRO:  Thank you, your Honor.  We recall Craig

24   Smyser back to the stand.

25           THE COURT:  The witness is still under oath.

D4IJCHE2                          Stewart - redirect

1                THE WITNESS:  Yes.

2     CRAIG SMYSER,

3          recalled as a witness by the Plaintiff,

4          having been previously duly sworn, testified as follows:

5     DIRECT EXAMINATION

6     BY MR. MASTRO:

7     Q.  Mr. Smyser, I want to ask you some questions about the

8     Cordova suit and your firm's role in that suit.

9                Do you remember writing Judge Kaplan a letter on March

10    8th, 2013, in which you told him that that Cordova action, your

11    words, "The Ecuadorian action for protection was not

12    collusive."  Do you remember writing those words, sir, to Judge

13    Kaplan?

14    A.  I don't remember, but I don't have any reason to doubt that

15    I did.

16                MR. MASTRO:  Your Honor, that is Docket 895-1.

17    BY MR. MASTRO:

18    Q.  Mr. Smyser, the reason you wrote those words is because a

19    lawyer acting in good faith would not rely on an order from a

20    collusive action, correct, sir?

21    A.  No.

22    Q.  You, as a lawyer acting in good faith, would not rely on an

23    order that resulted from a collusive action?

24    A.  The way I understand you used "collusive," yes, anything we

25    do is collusive in your vocabulary.

D4IJCHE2                           Smyser - direct

1           THE COURT:  The answer is stricken.

2           Mr. Smyser, I am fully aware of the bad feelings in

3    this case among counsel.  We are not going to let that carry

4    over here.  You're a lawyer.  You're a trial lawyer.  You know

5    your job is to answer the question.

6           THE WITNESS:  Yes, your Honor.

7    BY MR. MASTRO:

8    Q.  Mr. Smyser, would you agree with this definition from

9    Black's Law Dictionary that a collusive action is, "Between two

10   parties who have no actual controversy, being merely for the

11   purpose of determining a legal question or receiving a

12   precedent that might prove favorable in a related action"?

13          MR. KEKER:  Objection to the form of the question,

14   scope, relevance, and I thought we were here to get facts that

15   aren't yet in the record, your Honor.  I object.

16          MR. MASTRO:  We are.

17          THE COURT:  Overruled.

18   A.  I understand that is the definition you just read me.

19   BY MR. MASTRO:

20   Q.  You, as a lawyer acting in good faith, would not rely on an

21   order that resulted from a collusive action, correct?

22          MR. KEKER:  Asked and answered and argumentative and

23   scope.

24          THE COURT:  What does "scope" mean, sir?

25          MR. KEKER:  Scope means the scope you said of this

D4IJCHE2                           Smyser – direct

1    hearing.  There are five questions.

2                THE COURT:  One of them is the good faith or lack

3    thereof of a number of individuals, including him.

4                MR. KEKER:  Why don't we ask him about that instead of

5    what Black's Law Dictionary says?

6                THE COURT:  Mr. Keker, following your confirmation by

7    the Senate and your commissioning by the President, you will

8    make rulings.  Now I make them.

9                MR. KEKER:  Yes, sir.

10               THE COURT:  Have a seat.  Overruled.

11               MR. KEKER:  That will never happen, your Honor, I am

12   sure.

13               THE WITNESS:  I do not believe this was a collusive

14   lawsuit.

15               MR. MASTRO:  I move to strike, your Honor.

16   BY MR. MASTRO:

17   Q.  You, as a lawyer acting in good faith, would not rely on an

18   order produced from a collusive action, correct, sir?

19   A.  Generally I agree with that proposition.

20   Q.  Now, sir, when you made that statement, that representation

21   to Judge Kaplan that the, "Ecuadorian action for protection was

22   not collusive," you hadn't actually read any of the record from

23   the Ecuadorian action, had you, sir?

24   A.  I had read only what you know, which is the opinion.

25   Q.  Sir, let me go over some of the history here.

D4IJCHE2                         Smyser - direct

1          your colleague, Mr. Stewart, just testified that

2    Mr. Fajardo always maintained that he would not produce the

3    documents.  Do you agree with that, sir?

4    A.  I do.

5    Q.  And that he gave you that same response always that he

6    would never produce the documents, correct, sir?

7    A.  Yes.

8    Q.  And am I also correct, sir, that he was actually the party

9    listed as the defendant in that action, supposedly advocating

10   on behalf of producing the documents?

11   A.  I understand he was the defendant in the lawsuit.

12   Q.  And that the plaintiff was one of your LAP clients

13   supposedly protesting the production of the documents from

14   Mr. Cordova, correct?

15   A.  Mr. Cordova was the plaintiff in the case.

16   Q.  And he was against production of the documents, correct?

17   A.  That's my understanding.

18   Q.  So you had Mr. Cordova on one side, the plaintiff, who

19   opposed production, correct?

20   A.  Yes.

21   Q.  And you had Mr. Fajardo as the defendant who had always

22   told you he would never produce the documents, correct, sir?

23   A.  Yes.

24   Q.  Now, Mr. Smyser, I'm going to ask you the following

25   question, exactly what Judge Kaplan asked your colleague, Mr.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D4IJCHE2                          Smyser - direct

1   Stewart.

2              Did Mr. Fajardo at any time ever tell you or anyone in

3   your presence that he told the Ecuadorian court that he had, in

4   fact, decided to turn over the documents?

5   A.  No.

6   Q.  Do you read Mr. Fajardo's statement to the Ecuadorian court

7   that he had, in fact, decided to turn over the documents?

8   A.  Yes.

9   Q.  And Mr. Fajardo's statement to the Ecuadorian court was

10  absolutely totally inconsistent with everything he had ever

11  told you or your firm, correct, sir?

12  A.  He had never said that to my firm.

13  Q.  So it was totally inconsistent with everything he had ever

14  told you or your firm, correct, sir?

15  A.  He had never said that to my firm.

16  Q.  Or to you personally, correct, sir?

17  A.  Or to me personally.

18  Q.  Sir, I want to come to the sequence of events because your

19  colleague, Mr. Stewart, testified that it was zero involvement

20  with the prosecution of that lawsuit Cordova, correct, sir?

21              MR. KEKER:  I move to strike the testimony of counsel,

22  your Honor.

23              MR. MASTRO:  I am asking if he agrees with the

24  testimony his colleague, Mr. Stewart, just gave that his firm

25  had "zero involvement with the prosecution" --

1          MR. KEKER:  Objection to form, whether he agrees with

2     testimony.

3          THE COURT:  Rephrase the question, Mr. Mastro.

4          MR. MASTRO:  I will, your Honor.

5     BY MR. MASTRO:

6     Q.  Is it your testimony your firm had zero involvement with

7     the prosecution of the Cordova lawsuit?

8     A.  Yes.

9     Q.  Didn't the Cordova lawsuit come about because of your

10    suggestion on October 4th, 2012?

11    A.  I had no idea if it came about because of my suggestion.

12    Q.  Am I correct that you wrote to the court that it occurred

13    to you to suggest to the Ecuadorian legal team that someone

14    should consider seeking an Ecuadorian court ruling on the issue

15    of document production, that that occurred to you on or about

16    October 4, 2012?

17    A.  Yes.

18    Q.  Now, sir, you said that that occurred to you because for

19    the first time there had been a conflict in expert opinions.

20    Do you recall that, sir?

21    A.  Yes.

22    Q.  Now, you came on to this case, you and your firm, back in

23    mid-2011.  Do you remember that, sir?

24    A.  July 2011.

25    Q.  At that very time this same issue was being litigated in

D4IJCHE2                         Smyser - direct

the Count 9 context, Chevron had moved to compel production of

Ecuadorian documents, correct?

A.   That's my understanding.

Q.   And the legal team representing the LAPs had objected to

that motion, correct?

A.   That's my understanding, Mr. Gomez who is here today filed

papers to that effect.

Q.   At no point in objecting to Ecuadorian document production

in the Count 9 proceedings did the LAPs legal representatives

argue that it was illegal under Ecuadorian law to produce those

documents, did they, sir?

A.   I don't remember what they argued.

Q.

          MR. MASTRO:   Those documents will speak for

themselves.   Your Honor, we'll point it out to you.

BY MR. MASTRO:

Q.   So for the first time in 2012, summer of 2012, the argument

is raised this is illegal under Ecuadorian law to produce the

Ecuadorian documents, correct, sir?

          MR. VESELKA:   Objection, your Honor; mischaracterized

earlier testimony, lack of foundation.

          THE COURT:   Lack of foundation?   Interesting!

          MR. MASTRO:   Your Honor, I am happy to add --

BY MR. MASTRO:

Q.   To your knowledge, the first time this issue of production

D4IJCHE2                           Smyser – direct

1    of Ecuadorian documents being illegal under Ecuadorian law

2    arose in this case in the summer of 2012?

3    A.  I don't recall if that is true or not.  Actually, it may

4    have been before that, but I certainly know that I will agree

5    with you that in the summer of 2012 that issue came to the

6    front.

7    Q.  It was never raised in 2011 when the same issue of

8    compelling production of Ecuadorian documents was litigated in

9    Count 9, correct, sir?

10   A.  I have already testified I don't remember.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D4idche3                          Smyser - direct

1   Q.  Sir, let's come back to the suggestion that you made.

2        That was in a phone conversation with Mr. Fajardo?

3   A.  Yes.

4   Q.  And you made that suggestion in Spanish, correct, sir?

5   A.  I actually don't recall whether I made it in Spanish.  As

6   Mr. Stewart has accurately stated, my Spanish is not fluent,

7   and for other than routine kind of conversations I usually rely

8   on Mr. Stewart to communicate in Spanish.

9   Q.  So, Mr. Smyser, you are on the phone on October 4.

10  Mr. Stewart is on phone on October 4.  Mr. Veselka there, too?

11  A.  I don't recall.

12  Q.  And on the other end of the line is Mr. Fajardo?

13  A.  Yes.

14  Q.  Anybody else that you know of?

15  A.  I don't recall there being anyone else.  There could have

16  been but I don't recall that.

17  Q.  And am I correct that Mr. Fajardo responded favorably to

18  your suggestion?

19  A.  I don't know that he respond favorably.

20  Q.  What did he say exactly to you in response to your

21  suggestion?

22  A.  I don't remember what he said exactly to me.

23  Q.  Let's --

24        THE COURT:  Do you remember what he said approximately

25  to you?

D4idche3                    Smyser - direct

1           THE WITNESS:  Your Honor, I do not remember anything

2      of the substance of the conversation.  Since he did speak in

3      Spanish and spoke rapidly, I do not remember what he said.

4      BY MR. MASTRO:

5      Q.   How about what Mr. Stewart said when he translated for you?

6      Do you recall approximately what the translation was?

7      A.   I will tell you that the way our conversations -- well, no,

8      but there is an assumption there that I don't necessarily think

9      is accurate.

10          Our conversations proceed generally rapidly.

11     Mr. Stewart sometimes translates word for word.  Sometimes he

12     counts on me getting the general drift, and then he will

13     translate if he thinks there is something that I'm not able to

14     follow.  So I don't know whether in that particular

15     conversation he was translating word for word.

16     Q.   Sir, after you have this telephone conversation on

17     October 4th, when is -- strike that.

18          Am I correct that the next time after you have this

19     phone conversation with Mr. Fajardo on October 4th that you

20     learn anything about the status of what Mr. Fajardo is

21     considering doing in Ecuador concerning Ecuadorian document

22     production is on or about October 9?

23     A.   You are correct.

24     Q.   And that's because you, along with your colleague

25     Mr. Veselka, are copied on an e-mail chain between your

D4idche3                          Smyser – direct

1    colleague Jarod Stewart and Mr. Fajardo, correct?

2    A.  I believe we are copied on that e-mail chain.  I will tell

3    you that does not necessarily mean that I --

4    Q.  Sir, it was a simple "yes" or "no" question.

5    A.  And I hope that I can give you an explanation, but I will

6    abide by what the Court says.

7    Q.  You received that e-mail chain, correct, sir?

8    A.  I did.

9    Q.  You didn't mention that in your declaration to the Court,

10   did you, sir?

11   A.  I did not.

12   Q.  And in that e-mail chain, your colleague Mr. Stewart is

13   responding -- strike that.

14          The first e-mail in that chain is Mr. Fajardo asking

15   for, quote, urgent delivery of the documents that are before

16   this Court, seeking an order, if there is one, from this Court

17   on production of the documents; correct, sir?

18   A.  I don't remember exactly what it says, but I think we have

19   it as an exhibit here so it says what it says.

20   Q.  Please look at Exhibit 11, the last page in English.  It is

21   Mr. Fajardo requesting urgent delivery of the documents,

22   correct, sir?

23          MR. VESELKA:  Mischaracterizes the document, your

24   Honor.

25          THE COURT:  We all have the document in front of us.

D4idche3                        Smyser - direct

 1              Look, Mr. Mastro, it says what it says.

 2              MR. MASTRO:  I know.

 3              THE COURT:  Do you have a question?

 4              MR. MASTRO:  I do.

 5    BY MR. MASTRO:

 6    Q.  When you received that e-mail, did you take that as a good

 7    sign that Mr. Fajardo was preparing his lawsuit?

 8    A.  I don't remember if I took it as any sign at all.

 9    Q.  Did you discuss it with Mr. Stewart at the time that

10    Mr. Fajardo's e-mail came in requesting urgent delivery of the

11    documents?

12    A.  I don't remember that.

13    Q.  Sir, Mr. Stewart responds by saying that if you can file in

14    Ecuador an action requesting a declaratory judgment that says

15    you are barred from providing the documents without the

16    permission of all your clients, we could file this complaint

17    before Judge Kaplan to inform him this issue will be decided by

18    a judge in Ecuador and that Judge Kaplan has to wait before

19    issuing his decision until the court in Ecuador has issued its

20    ruling.  End quote.  Do you see that, sir?

21    A.  Yes, I do.

22    Q.  Now, sir, when Mr. Stewart wrote that to Mr. Fajardo, is

23    that something that he had discussed at any point with you?

24    A.  I don't recall whether he did or not, but I fully authorize

25    and support this e-mail.

D4idche3                         Smyser - direct

1    Q.  So you saw no reason on October 9th to correct anything he

2    had written in this e-mail?

3    A.  I did not and I do not today.

4    Q.  And you saw no reason to correct his characterization of

5    the declaratory judgment action that Mr. Fajardo should bring,

6    correct, sir?

7    A.  I don't understand that necessarily to be his

8    characterization.

9    Q.  Mr. Stewart's characterization, sir.

10   A.  I don't understand that necessarily to be Mr. Stewart's

11   characterization.

12   Q.  You saw no reason to correct Mr. Stewart's statement that

13   could inform the Judge of the filing of that action, correct?

14   A.  No, I did not.

15   Q.  Sir, did there come a time -- strike that.

16           Mr. Smyser, you say in your declaration you first

17   learned that the lawsuit in Ecuador had actually been filed on

18   October 22nd, 2012; is that correct, sir?

19   A.  That's what my declaration says, yes.

20   Q.  That's again because of an e-mail trail that you received,

21   correct, sir?

22   A.  I assume so, or discussion that occurred as a result of the

23   e-mail being received by Mr. Stewart.

24   Q.  OK.  When you learned that that lawsuit had been filed by

25   October 22nd, at that point you did not ask to see a copy of

D4idche3                              Smyser - direct

1    what had been filed; is that your testimony?

2    A.  Yes.

3    Q.  You didn't ask Mr. Stewart to get a copy of what had been

4    filed?

5    A.  Yes.

6    Q.  So by October 22nd you had gone -- sorry.  From October 4th

7    to October 22nd, you had gone from wanting the complaint to

8    give it to Judge Kaplan to not even asking to see the

9    complaint, who the parties were, what the allegations were, or

10   anything else about the lawsuit other than it had been filed;

11   is that your testimony?

12   A.  Yes.  Do you want to know why?

13   Q.  I'll ask the questions, sir.

14   A.  Fine.

15   Q.  Between the 9th, when you learned that Mr. Fajardo was --

16   made an urgent request for documents, and the 22nd, when you

17   learned he had initiated a suit, did you have any discussions

18   with anyone about the status of that lawsuit?

19   A.  No.

20   Q.  Did you understand that Mr. Fajardo was going to be filing

21   a lawsuit on behalf of Camacho and Piaguaje?

22   A.  No.

23   Q.  Did you understand that Mr. Fajardo was going to be filing

24   a lawsuit on behalf of himself?

25   A.  I had no understanding about on whose behalf or indeed

D4idche3                        Smyser - direct

1  whether Mr. Fajardo himself would be filing a lawsuit.

2  Q.  Wouldn't it be relevant to a lawyer acting in good faith

3  who wanted to be able to present an order to a U.S. court to

4  know who the parties would have been to a lawsuit in a foreign

5  country whose orders out of which he plans to give to a U.S.

6  court.

7  A.  No. I have no understanding of Ecuadorian law.  The parties

8  would be determined under Ecuadorian law.

9  Q.  You know there have been lots of charges in this case about

10  collusive conduct in Ecuador between the lawyers and the

11  courts, correct, sir?

12  A.  There have been charges of that kind.

13  Q.  And on this sensitive subject, going into an Ecuadorian

14  court while Judge Kaplan is considering whether to compel

15  production of Ecuadorian documents, to get an order from, to

16  use your colleague's words, to bar your clients from providing

17  the documents, isn't that something you would have wanted to

18  know more about the underlying action, who the parties were,

19  what the allegations are, and what court it was in?

20  A.  No.  I did not.

21  Q.  Sir, did you discuss with Mr. Fajardo in the period from

22  October 4 to October 22nd, at any point, whether Judge Kaplan

23  should be informed of the pendency of the Ecuadorian action?

24  A.  No.  I never discussed that issue with Mr. Fajardo.  I

25  never even considered that issue.

D4idche3                        Smyser - direct

1   Q.  At some point you decided, despite the prior representation

2   of Mr. Fajardo that you were going to tell Judge Kaplan about

3   that Ecuadorian action when it was filed, not to tell Judge

4   Kaplan, correct?

5   A.  I told you if you want to know why, I'll explain it to you.

6   Q.  Sir, when you were in court here on October 18th before

7   Judge Kaplan, you fully expected Mr. Fajardo, who had made an

8   urgent request for documents, to be imminently filing an action

9   in Ecuador, correct?

10  A.  I know you would like to think that but, no, I didn't.

11  Q.  You had urged him to file it; that was your suggestion

12  personally, correct?

13  A.  I did not urge him to file it.  I had --

14  Q.  You had suggested that he file it?

15  A.  Excuse me.  May I finish my answer, please?

16  Q.  Go ahead.

17  A.  I had suggested to him that it be filed.

18  Q.  And you knew he was taking actions in furtherance of that

19  suggestion because he requested documents on an urgent basis,

20  correct?

21  A.  I knew he requested documents on an urgent basis.

22  Q.  And when you were here on the 18th you argued that Judge

23  Kaplan should delay ruling on the motion to compel Ecuadorian

24  documents, didn't you, sir?

25  A.  Actually, I did not.  That's not how the argument unfolded,

D4idche3                         Smyser - direct

1    and if you -- it just gets into the explanation.

2    Q.  Sir, on that day, October 18th, was the subject not raised

3    as to whether Judge Kaplan should hold off on ruling on that

4    issue until he ruled on all the other discovery issues?

5    A.  Actually, my understanding, based on my review of the

6    transcript, was that Judge Kaplan indicated that this action

7    should not be decided now, that he would take it up in the

8    fullness of time when all of the discovery issues were ready

9    for decision, which is exactly what we had suggested in our

10   papers originally.

11   Q.  And you agreed with what Judge Kaplan said that day?

12   A.  I certainly agreed that.

13   Q.  Now, sir, the 22nd comes.  You know an action has been

14   filed; you don't ask for the complaint and you don't tell Judge

15   Kaplan, correct?

16   A.  Correct.

17   Q.  Your colleague Larry Veselka comes in here on December 20

18   and 21 to argue about discovery issues.  Ecuadorian documents

19   come up?  Don't tell Judge Kaplan that there is an action

20   pending in Ecuador to get an order to bar production of

21   Ecuadorian documents.  Correct?

22   A.  Yes.  Although I don't agree with your characterization of

23   the action.  I agree that an action had been filed in Ecuador

24   that we knew about that we did not mention to Judge Kaplan or

25   to Chevron.

D4idche3                         Smyser - direct

1    Q.  Not my characterization, sir.  Your colleague wrote there

2    was an action to bar production of documents from Ecuador.

3    Those are his words.

4    A.  Well, fair enough --

5    Q.  I will withdraw that.

6            Sir, the -- do you, as you sit hire today -- strike

7    that.

8            You now know, between the time that you learned the

9    suit was filed and the time we were here in court in December,

10   that Mr. Fajardo had actually -- strike that.

11           You now know, from having reviewed the case file, that

12   in Ecuador the first judge dismissed that case, correct?

13   A.  I understand that happened.  I have not reviewed the case

14   file, however.

15   Q.  Did Mr. Fajardo tell you at any point that the first judge

16   on the case had in fact denied the application?

17   A.  Not that I recall.

18   Q.  Am I correct that you communicated with Mr. Fajardo on

19   Monday, October 22nd, 2012?

20   A.  I don't know whether it was a Monday or not but that's the

21   date of the e-mail.

22   Q.  And that's the date when you say you first learned that the

23   action had actually been filed in Ecuador, correct, sir?

24   A.  I said this six times.

25   Q.  And there Mr. Fajardo tells you not that the case has been

D4idche3                       Smyser - direct

1   filed but that the case is, quote, moving forward, end quote?

2   A.  Yes.

3   Q.  And he's responding to your colleague's statement about,

4   quote, the current situation regarding the complaint for a

5   declaratory judgment as if it had already been filed, correct,

6   sir?

7   A.  No.  I don't agree with that.

8   Q.  And, sir, am I also correct that you now know that

9   October 22nd was the same day that the case in Ecuador had been

10  dismissed by the first judge?

11  A.  No, I don't know that but I'll take your word for it.

12  Q.  So you're having communication with Mr. Fajardo about the

13  case will move forward and actually that same day the case is

14  dismissed and he never tells you that?

15  A.  He never tells me that.

16  Q.  Sir, did he tell you that at any point after October 22nd?

17  A.  No, not to my recollection.

18  Q.  At any point did you think it would have been prudent,

19  acting in good faith, to have obtained the pleadings in

20  Ecuador, to have found out who the parties are, to have found

21  out who the judge was, to have found out the status of the case

22  in any way?

23  A.  You've asked me that previously.  My answer remains the

24  same.

25  Q.  Sir, when is the next time after October 22nd that you had

D4idche3                    Smyser - direct

1    any communication about the Cordova litigation?

2    A.  I don't remember specific dates.  I assume this e-mail

3    trail will indicate that communications were had with

4    Mr. Stewart, and if I was copied on e-mails I would have seen

5    the e-mails or I would have had a discussion with Mr. Stewart

6    about it.

7    Q.  And am I correct that you were hoping what would result

8    from the Ecuadorian suit was an order that the Ecuadorian

9    lawyers cannot provide the documents to Camacho and Piaguaje?

10   A.  No.

11   Q.  Now, your clique, Mr. Stewart -- strike that.

12          On January 1, 2013, were you a part of an e-mail trail

13   on an update status on the Ecuadorian lawsuit?

14   A.  If it says I was, I was.

15   Q.  Isn't it a fact that your colleague Mr. Stewart wrote that

16   day that, quote, We know you are doing everything --

17          THE COURT:  We have the e-mail.  Could we move along?

18          MR. MASTRO:  Yes, your Honor.  I'm just trying to make

19   the point as to what the suit was really about and he knew

20   that.  So I'm confronting him with his own colleague's

21   statement.

22          THE COURT:  Yes, I understand that.  And he's

23   acknowledged that if he is on the e-mail, he got it.

24   BY MR. MASTRO:

25   Q.  And was it the case, sir, that, you know, you recognized

D4idche3                    Smyser - direct

1    that Mr. Fajardo was doing everything possible to obtain a

2    declaratory judgment in Ecuador that says you cannot provide

3    the documents to Camacho and Piaguaje.

4    A.   Again, I didn't have a conversation with Mr. Piaguaje -- I

5    mean, with Mr. Fajardo that I recall to that effect, but I

6    understood that that would be what he would want because that

7    was his position under the law.

8    Q.   So you have a lawsuit that he's a party to but not Camacho

9    and Piaguaje, right?

10   A.   I don't know that until later.

11              THE COURT:  Come on, Mr. Mastro.

12              MR. MASTRO:  I am almost done, your Honor.

13   Q.   As far as you know, Camacho and Piaguaje are not involved

14   in that lawsuit at all, correct?

15   A.   I have no understanding about that one way or the other.

16   Q.   It would have been in the United States in Camacho and

17   Piaguaje's interest to do every reasonable measure possible to

18   comply with the Court's order, correct?

19   A.   Yes.

20   Q.   Yet you took no action to try to confirm whether their

21   interests, in connection with taking all reasonable steps here

22   to comply with the Court's orders in the United States, were

23   being furthered in any way in the Ecuadorian proceeding because

24   you didn't even know who the parties were or what the

25   allegations were, correct, sir?

1    A.  I disagree with that.

2    Q.  Sir, if in good faith you were taking all reasonable steps

3    to protect Camacho and Piaguaje from potential sanctions for

4    violating U.S. court orders and you knew a proceeding had been

5    brought in Ecuador, wouldn't you want to make sure there was

6    someone there in Ecuador who was advocating on their behalf for

7    production of the documents?

8    A.  No.

9    Q.  Isn't it --

10   A.  Mr. Fajardo wasn't going to turn over the documents anyway.

11   He had said that repeatedly.

12   Q.  So no matter what order came out of Ecuador, he was not

13   going to turn over the documents, correct?

14   A.  I don't know that.

15   Q.  You just said he was not going to turn over the documents.

16   A.  What I have just said was he had told me repeatedly he

17   would not turn over the documents without a court order.  There

18   was no chance he would turn over the documents.

19   Q.  You had no expectation ever that Mr. Fajardo was ever going

20   to turn over those documents, correct, sir?

21   A.  My understanding was Mr. Fajardo would do what he was going

22   to do, and he had filed a proceeding in Ecuador.  And if the

23   proceeding turned out to order him to produce the documents, I

24   don't know what he would have done.

25             THE COURT:  I think there may be an issue in the

D4idche3                        Smyser - direct

1    transcript.

2          Just a moment ago I understood you, Mr. Smyser, to say

3    Mr. Fajardo was or would in no way turn over the documents

4    anyway, he said that repeatedly.  Did I hear you correctly?

5          THE WITNESS:  I think he's asking you --

6          THE COURT:  I'm asking you.

7          THE WITNESS:  I'm sorry.  Would you ask that again,

8    your Honor?

9          THE COURT:  Yes.  I understood you to say a moment

10   ago, quote, Mr. Fajardo would in no way turn over the documents

11   anyway.  He said that repeatedly.  Close quote.

12         The draft transcript is different and inconsistent

13   with the sense of that.

14         THE WITNESS:  Yes.  That's consistent with the sense

15   of that.  I agree with that.

16         THE COURT:  My statement?

17         THE WITNESS:  Your statement is Mr. Fajardo had

18   consistently told me he was not turning over documents that he

19   felt he was prohibited from doing so.

20         THE COURT:  I was just trying to avoid an issue with

21   the transcription.  Go ahead.

22         MR. MASTRO:  I understand, your Honor.

23   BY MR. MASTRO:

24   Q.  And when Mr. Fajardo lost in this case in Ecuador, he

25   didn't even tell you he lost, correct?

D4idche3                        Smyser - direct

1   A.  Correct.

2   Q.  And Mr. Fajardo didn't want you to tell Judge Kaplan about

3   the proceedings in Ecuador, isn't that correct?

4   A.  I have no idea what Mr. Fajardo thought.

5   Q.  Because Mr. Fajardo wasn't going to turn over those

6   documents whether -- strike that.

7           MR. MASTRO:  Your Honor, I have no further questions.

8           THE COURT:  Thank you.

9           Mr. Veselka.

10           MR. VESELKA:  Your Honor, I take it you don't need me

11   to spend any time on Mr. Smyser's professional accomplishments?

12           THE COURT:  Correct.

13           MR. VESELKA:  All right.

14   CROSS-EXAMINATION

15   BY MR. VESELKA:

16   Q.  Mr. Smyser, it's been alleged in the pleadings by Chevron

17   that the LAP and the U.S. counsel manufactured a ruling

18   designed to justify their discovery failure.  Is that correct?

19   A.  I understand that's in their pleading.

20   Q.  Do you agree with that?

21   A.  No.  Of course not.

22   Q.  Is their statement true?

23   A.  No.  Their statement is not true.

24   Q.  They also allege in their motion that the LAPs and their

25   U.S. attorneys actively sought to prevent compliance with the

D4idche3                      Smyser - cross

1      Court's order with a collusive Ecuadorian court proceeding.  Is

2      that true?

3      A.  I categorically reject --

4              MR. MASTRO:  He is leading, your Honor.  This is

5      just -- all right.

6              THE COURT:  It is what it is.

7      A.  Absolutely not.

8      Q.  And can you explain why you don't believe that's true?

9      A.  I've explained at great length, as has Mr. Stewart, that

10     there was a question under Ecuadorian law as to whether or not

11     Mr. Fajardo had a legal duty to turn over the documents, or did

12     not.  The best way to resolve that issue, it seemed to us, both

13     under United States law and in the interest of my clients, was

14     to have that issue resolved by an Ecuadorian court who would

15     make a decision one way or the other.  I suggested that to

16     Mr. Fajardo.

17             Mr. Fajardo filed a lawsuit, as I understand, or

18     Mr. Cordova filed a lawsuit, and a resolution was had and we

19     notified the Court as soon as we got that resolution.  Told the

20     Court what the resolution was.  Visited, as the Court knows,

21     with Mr. Fajardo about the Court's order.  Subsequent to that,

22     directing that the documents be produced.  Translated the

23     Court's order.  Asked that Mr. Fajardo produce the documents.

24     Demanded that Mr. Fajardo produce the documents.  He declined

25     to do so.

D4idche3                        Smyser – cross

1              Mr. Stewart went down in person and visited with

2     Mr. Fajardo.  Again demanded production of the documents.

3     Mr. Fajardo declined to do so.

4     Q.  Did you at any time collude with anybody with regard to the

5     action that was ultimately filed in Ecuador that we now know as

6     the Cordova suit?

7     A.  No.

8              MR. MASTRO:  Objection to form.

9              THE COURT:  Overruled.

10    Q.  It's also alleged in the motion that we are here about by

11    Chevron that the only attempts on behalf of our clients,

12    Mr. Camacho and Mr. Piaguaje, the only attempts consisted of

13    sending letters to Fajardo asking if he intended to provide

14    them with materials.  Is that accurate?

15    A.  No, that's not accurate.

16    Q.  What's the truth?

17    A.  The truth is Mr. Camacho and Mr. Piaguaje had made requests

18    themselves that he turn over the documents.

19    Q.  And had --

20             THE COURT:  Were you present on any such occasion?

21             THE WITNESS:  I was not.

22    BY MR. VESELKA:

23    Q.  And had our firm, before you sent the letter after the

24    Court's order of February 13th, had there been any efforts to

25    collect documents before then?

D4idche3                          Smyser - cross

1    A.  Repeated efforts.

2    Q.  Over what period of time?

3    A.  Over months, dating back to 2011.  Vigorous, virtually

4    unceasing efforts.

5    Q.  At the October 18th hearing before the Court, did you have

6    any knowledge that there was an action being filed that day in

7    Ecuador?

8    A.  No, I did not.

9    Q.  Did you -- what did you know as to whether there would or

10   there wouldn't be anything filed in Ecuador?

11   A.  I had no idea whether there would or would not be anything

12   filed in Ecuador.

13   Q.  Can you tell the Court what, if any, understanding you have

14   as to what Mr. Fajardo was going to do after your conversation

15   on October 4th, where you made your suggestion?

16   A.  I had no idea what Mr. Fajardo would do.

17   Q.  So you did not know that he was going to file something?

18   A.  I did not know that.

19   Q.  And did you know, if he did file something, what the nature

20   of the action would be or who the parties would be?

21   A.  I had no knowledge of that.

22   Q.  And did you ever learn that until the January 15th notice?

23   A.  I did not.

24   Q.  Did you or anybody else in the firm, to your knowledge,

25   have any involvement in reviewing any pleadings, drafting any

D4idche3                        Smyser - cross

1    pleadings, or in any way being involved in any prosecution of

2    that action?

3    A.  No.  Never saw any pleadings until after Chevron filed a

4    copy of the pleadings.

5    Q.  So were you attempting, as alleged by Chevron in their

6    motion, to keep the Court in the dark?

7    A.  I was not.

8              (Pause)

9              And if you want me to, I will explain the question I

10   was trying to explain to Mr. Mastro.

11             MR. VESELKA:  That's where I was trying to go to in my

12   notes to set up.

13   Q.  You were asked with regard to what your understanding was

14   on October 4th and why you did not see a need to inform the

15   Court and asked if you could give an explanation --

16             MR. KEKER:  October 22nd.

17             MR. VESELKA:  I'm sorry.  What did I say?

18   Q.  October 22nd.  Give that explanation, please.

19   A.  Yes.  The idea was, as expressed in Mr. Stewart's e-mail,

20   was that if a proceeding had been filed in Ecuador, we would

21   ask the Court to delay its ruling on the question of Ecuadorian

22   law production.  Once the Court on its own decided to delay

23   that, in response to the arguments we had filed, there was no

24   reason to alert the Court or anyone else to the fact that the

25   case had been filed.  And, in fact, as events played out, the

D4idche3                         Smyser - cross

1   decision in Ecuador came down before the Court made its ruling,

2   which is exactly what we would have asked for.

3   Q.  And how did that affect your conclusion as to whether there

4   was any action you needed to take before then?

5   A.  Frankly, after the Court made its decision on October 18th,

6   I never thought another thing one way or the other about

7   disclosing this issue to the Court.  It didn't even occur to

8   me.

9   Q.  And at the risk of belaboring the obvious, the Court would

10  be very aware of but I believe the record needs to have

11  somewhere reflect, were there other things going on in our

12  defense of Mr. Camacho and Piaguaje in October and November and

13  December?

14  A.  There are always things going on.

15  Q.  All right.  Let's turn to the questions that the Court has

16  decided need to be addressed in this hearing today.  The same

17  that you went through with Mr. Stewart --

18          THE COURT:  Mr. Mastro, would you be prepared to

19  stipulate that if asked the questions, Mr. Smyser's answers

20  would be substantially the same as Mr. Stewart's?

21          MR. MASTRO:  Yes, I would, your Honor.

22          THE COURT:  Is that satisfactory to you?

23          MR. VESELKA:  I'll just ask:

24  Q.  Is there anything, Mr. Smyser, you think you need to add to

25  Mr. Stewart's answers with regard to those questions?

D4idche3                          Smyser - cross

1    A.  I don't remember anything missing from Mr. Stewart's

2    answers.  I'm satisfied with them.

3              THE COURT:  So I take it that you so stipulate, right?

4              MR. VESELKA:  Yes.

5              THE COURT:  Mr. Keker?

6              MR. KEKER:  Yes, sir.

7              THE COURT:  OK.

8              MR. VESELKA:  Nothing further, your Honor.

9              THE COURT:  Any examination, Mr. --

10             MR. VESELKA:  May I ask one more question?

11             THE COURT:  Yep.

12   BY MR. VESELKA:

13   Q.  I know how much you feel about being accused of acting in

14   bad faith.  Is there anything further you want to tell the

15   Court with regard to defending your good-faith actions in this

16   regard?

17             MR. MASTRO:  Objection, your Honor.

18             MR. VESELKA:  I'll strike the lead-in.

19             THE COURT:  I'll hear it.

20   A.  Your Honor, as I told this Court, in some 33 years of

21   practice, I've never been accused of bad faith.  I've never

22   been accused of not satisfying my duties to the court or to

23   opposing counsel.  I've never been sanctioned in my legal

24   career.  I find these suggestions extremely offensive.  They

25   are an attempt to personalize what is an already very

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D4idche3                          Smyser - cross

1    contentious dispute.  And I highly resent being photographed

2    when I'm interviewing witnesses, with recording devices.  I

3    highly resent the intrusive --

4              THE COURT:  I thought you were going to talk about the

5    accusation of bad faith instead of making a press release here.

6              THE WITNESS:  I'm not --

7              THE COURT:  I'm going to let you say whatever you want

8    to say about how you feel about the accusation made here, if,

9    indeed, that's a fair way to put it; I'll hear that.  But if

10   you want to do this, I am going to give the other side at least

11   equal time to say whatever they want about the behavior of you

12   and your co-counsel and your clients or anything else they want

13   to do, and I don't think that is appropriate on either side and

14   I would like to avoid it.

15             THE WITNESS:  Yes, your Honor.  Fair enough.

16             MR. VESELKA:  Sorry.

17             THE WITNESS:  I said what I need to say.

18             MR. VESELKA:  I pass the witness, your Honor.

19             THE COURT:  Thank you.

20             Mr. Keker, did you want to examine?

21             MR. KEKER:  No, your Honor.  No questions.

22             THE COURT:  Mr. Mastro, anything else?

23             MR. MASTRO:  Very briefly, your Honor.

24   REDIRECT EXAMINATION

25   BY MR. MASTRO:

1   Q.  Mr. Smyser, you said you decided not to tell the Court,

2   this Court, about the pendency of the Cordova action, once you

3   learned it had actually been filed on October 22nd, because the

4   Court had decided to put off ruling until it ruled on all the

5   other discovery disputes, the question of Ecuadorian documents,

6   correct?

7   A.  Actually, it wasn't even a decision.  It was after the

8   Court had made its decision to postpone the decision.  It did

9   not occur to me again to the issue of -- raising the issue with

10  the Court, because the reason I had originally thought about it

11  was to suggest to the Court to delay decision, and once that

12  had happened it just never even crossed my mind again.

13  Q.  So when Mr. Veselka was here on December 20 and 21 and the

14  Court actually made rulings on the outstanding discovery issues

15  and then at any moment thereafter could have ruled on

16  Ecuadorian documents issue, it didn't occur to any of your

17  firm's lawyers to raise with this Court, to disclose to this

18  Court, that there was an action pending in Ecuador that might

19  address a related question?  It didn't occur to you at that

20  point, when you had already resolved the discovery issues and

21  we were --

22           THE COURT:  Which part of that treatise would you like

23  him to address?

24           MR. MASTRO:  I will cut it down, your Honor.

25  Q.  You are aware that on December 20 and 21 that Judge Kaplan

D4idche3                      Smyser - redirect

```
 1   held two days of hearings to resolve outstanding discovery
 2   issue, correct?
 3   A.  I am aware that he had hearings on those dates.
 4   Q.  And, therefore, you are aware that at any point thereafter
 5   he could have decided the question of compelling production of
 6   Ecuadorian documents, correct?
 7   A.  I guess so.  I mean, I didn't think of that at the time.
 8   Q.  And nobody from your firm thought to raise with him that,
 9   hey, there is a suit going on in Ecuador where there is a
10   request for a declaratory judgment on whether Ecuadorian law
11   bars the production of the documents?
12   A.  I can't undertake to say what anyone in my firm thought.  I
13   can tell you I did not think about it nor did anyone in my firm
14   ever discuss that idea with me.
15   Q.  Yet it occurred to you all, at the outset when you
16   suggested that a declaratory judgment action be brought to get
17   an Ecuadorian court to order a bar on production of Ecuadorian
18   documents, that you should tell the Court about that while the
19   action was pending, correct?
20   A.  As I said, in order to seek a delay of a ruling until the
21   Ecuadorian issue of law was resolved, it occurred to me to
22   notify the Court of the pendency of the lawsuit.
23   Q.  Sir, you and the lawyers of your firm never told anyone at
24   Chevron that there was an action pending for a declaratory
25   judgment in Ecuador to address the question of production of
```

D4idche3                    Smyser - redirect

1   Ecuadorian documents, correct?

2   A.  No, we did not, any more than Chevron told us the pleadings

3   it filed in other areas.

4           MR. VESELKA:  Objection.

5   Q.  And, sir, isn't it a fact that you knew if Chevron knew

6   about such an action it might want to intervene and actually

7   advocate on behalf of production of Ecuadorian documents in

8   that Ecuadorian proceeding?

9   A.  Never occurred to me.  It never occurred to me that I would

10  ever inform Chevron about the pendency of something like that.

11  Q.  Sir, a lawyer, acting in good faith to have reasonably

12  diligent efforts on behalf of Camacho and Piaguaje, shouldn't

13  that lawyer have made sure that their interests in obtaining

14  the rights to produce the Ecuadorian documents be preserved in

15  that proceeding?

16  A.  I assume Mr. Fajardo would do that.

17  Q.  And you were asked some questions by Mr. Veselka about

18  whether you were part of a proceeding in Ecuador to manufacture

19  a court order, correct?

20  A.  I was asked that question.

21  Q.  Yes.  It was on your suggestion that that action be

22  brought --

23          MR. KEKER:  Asked and answered, your Honor.

24          MR. MASTRO:  I am just going to be very brief, your

25  Honor.

1                THE COURT:  Overruled.

2  A.  I have already said that I don't know whether it was my

3  suggestion that led to that lawsuit or not.

4  Q.  And you don't actually know what Mr. Fajardo did -- you

5  didn't get pleadings, you didn't file the lawsuit, you didn't

6  even know who the parties were -- you don't know what he did to

7  get that order, do you?

8  A.  Correct.

9  Q.  So you don't know whether what you suggested resulted in a

10 manufactured order that came out of Ecuador, do you, sir?

11 A.  Well, what I know is that I didn't manufacture that order.

12 Q.  You urged Mr. -- strike that.

13             MR. MASTRO:  No further questions, your Honor.

14             THE COURT:  Thank you.

15             Any further examination of this witness?

16             MR. KEKER:  Yes.  I've got a few questions, your

17 Honor, based on that.

18 RECROSS-EXAMINATION

19 BY MR. KEKER:

20 Q.  Mr. Smyser, did you ever seek to delay the Court's ruling

21 on Chevron's motion to compel in order to buy time to get an

22 order in Ecuador about Mr. Fajardo's documents?

23 A.  No.

24 Q.  What difference would it make, or did it make, whether the

25 Ecuadorian ruling came out before Judge Kaplan ruled or after

D4idche3                    Smyser - recross

1    Judge Kaplan ruled?

2    A.  Well, it might make a difference.  Actually, I'm not sure

3    it would make a difference if it came out after Judge Kaplan

4    ruled.

5    Q.  Judge Kaplan -- the order came out January 15 and you told

6    Judge Kaplan about it, right?

7    A.  Yes.

8    Q.  Judge Kaplan ruled on February 13 that all these documents

9    in Ecuador had to be produced and he would announce his opinion

10   and his reasoning later, right?

11   A.  Yes.

12          MR. MASTRO:  Your Honor, that was just a speech.  I

13   was trying -- I stood to object to form and he --

14          THE COURT:  Sustained.

15          MR. MASTRO:  And he just -- I move to strike the prior

16   answer he just gave, like speculation.  I don't know what

17   difference it would have made.  So --

18   BY MR. KEKER:

19   Q.  To this day, Mr. Smyser, do you know what Judge Kaplan

20   thinks Ecuadorian law is with respect to this issue which you

21   suggested should be decided by an Ecuadorian court?

22   A.  I do not.

23          MR. KEKER:  Thank you.  Nothing further.

24          THE COURT:  All right.  Is that it for this witness?

25          MR. MASTRO:  That's it for this witness, your Honor.

D4idche3                          Smyser - recross

1          THE COURT:  You may step down, sir.

2          THE WITNESS:  Thank you, your Honor.

3          (Witness excused)

4          MR. MASTRO:  Mr. Keker and I had a brief discussion,

5     and we did promise we would finish before lunch.  We are just

6     going to stipulate on that other document.  It's the Donziger

7     document from January.

8          THE COURT:  Fine.  Then do it.

9          MR. MASTRO:  So we will be submitting to the Court

10    attached to an attorney declaration that document and the

11    Velazquez rebuttal report, who is the expert witness who was

12    going to testify but we'll do it by his report.

13         THE COURT:  Is that agreed among all counsel?

14         MR. KEKER:  Sure, your Honor, although the Donziger

15    document that you've redacted could just be marked as Trial

16    Exhibit 14.  We don't need an attorney declaration.  Let's just

17    put it in.

18         MR. MASTRO:  That is fine by us, your Honor.

19         THE COURT:  All right.  Let's do it right now.

20         MR. KEKER:  The other one was Velazquez.

21         MR. MASTRO:  The other one was the Velazquez rebuttal

22    report.  If we have it here, we can just do the same thing with

23    that, your Honor.

24         MR. VESELKA:  I thought the Court already ruled that

25    that is already before the Court and it is even available

D4idche3

1    because it is on file.

2            MR. MASTRO:  The rebuttal report was not, your Honor.

3    That is the one that we had just served last Friday.

4            THE COURT:  So we have got two pieces of paper that

5    you are about to mark.

6            MR. KEKER:  This is the one -- I'm not sure why this

7    part of the redaction was made, but I don't care enough about

8    it to matter.  It says -- the words that were left out -- "all

9    teams must make clear that this is a dispute.  This dispute is

10   between Chevron and made clear the dispute" --

11           THE COURT:  Paragraph 3?

12           MR. KEKER:  Paragraph 3.  I don't know why that was

13   taken out.

14           THE COURT:  I indicated yesterday, I think, that I was

15   content to have it redacted, and then you said something and I

16   don't remember what.

17           MR. KEKER:  It doesn't -- it is fine just like that.

18           THE COURT:  All right.  So we are marking as Hearing

19   Exhibit 14 an English language translation with a cover page

20   which is an e-mail or an e-mail string, I don't remember which,

21   of February 11th, and there is apparently a forwarded -- that's

22   fine.  I think it was accurate.  So that's Hearing Exhibit 14

23   and that is received, and along with everything else that

24   counsel have referred to that were referred to as hearing

25   exhibits.

D4idche3

1              (Court Exhibit 14 marked in evidence)

2              MR. MASTRO:  Exactly.  10 through 13, you have

3    admitted, your Honor, the ones that we used today.

4              Your Honor, we are now marking the supplementary and

5    rebuttal report of Dr. Santiago Velazquez Coello as hearing

6    Exhibit 15.

7              THE COURT:  All right.  That's received also, right?

8    No problem?

9              MR. KEKER:  Yes.  No objections, your Honor.

10             MR. SMYSER:  All right, your Honor.

11             (Court Exhibit 15 marked in evidence)

12             MR. MASTRO:  The only other issue, your Honor, in

13   terms of the record in the case relates to their proffered

14   expert, by declaration, Bermeo, who was referred to in

15   Mr. Smyser's testimony.

16             THE COURT:  I remember the reference.

17             MR. MASTRO:  Yes.

18             THE COURT:  What is the issue?

19             MR. MASTRO:  Well, the issue, your Honor, is that he

20   submitted declarations.  He is no longer available to testify.

21   So we are not able to call him here to question him, and he is

22   now in a government position, as the testimony was.  So we

23   intend to move to strike his declaration as part of the record

24   here.

25             THE COURT:  If I could stop the flood of motions, I

D4idche3

1    would.

2              MR. KEKER:  Your Honor, could I say?  You can't.

3    Let's decide this right now.  The point is there were dueling

4    declarations.  You can't take out of this record the fact that

5    there were dueling declarations at the time all of this was

6    going on.  The fact that he is now in the government and may

7    not be able to testify at trial doesn't vitiate that at all.

8              THE COURT:  That sounds right to me.

9              MR. MASTRO:  Yes.

10             THE COURT:  It goes to the fact that he said these

11   things, not to the truth, right?

12             MR. MASTRO:  The motion to strike was made, that his

13   declarations could not be considered for the truth or for

14   the --

15             THE COURT:  Come on.

16             MR. MASTRO:  We don't want --

17             THE COURT:  Let's not waste a lot of time.  You've

18   wasted plenty of time as it is.

19             MR. MASTRO:  Your Honor, we appreciate all of the time

20   that you have given to this.

21             THE COURT:  All right.  There is one further thing

22   that I want from counsel with respect to all of this.  Can

23   someone remind me of which exhibit to the sanctions motion is

24   the transcript -- here it is, I think I found it.  Exhibit 16

25   purports to be a transcript of a public hearing in the Cordova

D4idche3

1    action on January 11th.

2         Do I have the right document, folks?

3         MR. MASTRO:  Yes, your Honor.  It's document, in the

4    record, 895-3, previously marked as Exhibit 3516.

5         THE COURT:  All right.  Right near the end of the

6    document, the English translation, Mr. Fajardo is quoted as

7    saying:  "To conclude, in the face of strong pressure that we,

8    the attorneys and social leaders are receiving in this case,

9    and in the face of a growing threat, even the threat of our

10   attorneys being sanctioned in the United States, we have

11   discussed the matter and decided to turn over the information

12   Chevron is requesting," and he then goes on.  But I'm focused

13   on that point, up to there.

14        I would, if either party thinks that the issue is any

15   different in Ecuador than it is here, like evidence on this

16   question, was the statement I just read to you relevant in any

17   way to whether any of the relief sought in the Cordova action,

18   or any other action by the court in that case, could, would or

19   might have been granted?

20        That's my question.  If you think about the case or

21   controversy clause of the third article of the United States

22   Constitution, you'll know why I'm asking.

23        MR. MASTRO:  So you will take additional submissions

24   on that?

25        THE COURT:  I will take submission on Ecuadorian law

D4idche3

 1    on that point alone.  No argument.  No nothing.  I want to see

 2    appropriate evidence on Ecuadorian law on that point if either

 3    side thinks it relevant.

 4              MR. KEKER:  Your Honor, we'll stipulate that they'll

 5    find some person in Ecuador to say what that person thinks in

 6    favor of Chevron.  I mean, they can buy any expert for Chevron.

 7              THE COURT:  Mr. Keker, you are out of order.  You are

 8    out of order.

 9              MR. KEKER:  Could we ask that they just cite the

10    statutes or a phrase in the Constitution rather than bring in

11    some expert to answer that question?

12              THE COURT:  Well, there is an easy answer to this.

13              If both parties agree that to whatever extent I think

14    the question relevant, that I will decide it under U.S. law,

15    because there is no showing of any conflict of laws, then I'll

16    do it and then we don't need any expert or anything.

17              MR. KEKER:  Well --

18              THE COURT:  Satisfactory?

19              MR. KEKER:  We think it should be cited under

20    Ecuadorian law -- I mean, obviously under Ecuadorian law.  But

21    all I am saying is they should put in, citing a decision, not

22    some declaration from an expert that Chevron has worked with

23    but instead statutes, Constitution, the things that would allow

24    you to determine what the Ecuadorian law would be rather than

25    simply listening to an expert.

D4idche3

| | |
|---|---|
| 1 | THE COURT:  Which side, if either, is prepared to |
| 2 | provide me an English language version of the relevant |
| 3 | Constitution's statutes of Equador, for which I have been |
| 4 | searching lo these three years without having located a single |
| 5 | one in the United States? |
| 6 | MR. KEKER:  We'll try. |
| 7 | MR. MASTRO:  Your Honor, we'll certainly do that. |
| 8 | THE COURT:  Do what? |
| 9 | MR. MASTRO:  Try to get English language translations |
| 10 | for you of some of these things, if you want us to. |
| 11 | THE COURT:  Well, look, you know, if I were dealing |
| 12 | with this as a matter of U.S. law, I would know where to go. |
| 13 | Right? |
| 14 | MR. MASTRO:  Understood. |
| 15 | MR. KEKER:  Right. |
| 16 | THE COURT:  But I can't do that here.  I mean, I'm not |
| 17 | even sure I could find most of this stuff in Spanish in the |
| 18 | United States.  But both I and the whole federal court library |
| 19 | here in this building have been looking for this stuff in |
| 20 | English for a long time, with no success. |
| 21 | So I'm not going to limit you.  You've got ten days to |
| 22 | give me whatever you want, either side, on this, and, please, |
| 23 | have a little mercy in terms of the volume. |
| 24 | MR. MASTRO:  Understood, your Honor. |
| 25 | THE COURT:  You guys don't seem to think filings under |

D4idche3

1   a thousand pages are permitted here.  That goes for both sides.

2              MR. MASTRO:  I understand, your Honor, and, obviously,

3   it has been a hotly litigated case.

4              But I can't thank your Honor enough for giving us all

5   this time and giving us this opportunity.  Thank you.

6              THE COURT:  I thank everybody.  At least we managed to

7   get it finished this week and I'm appreciative.

8              MR. MASTRO:  Thank you, your Honor.

9              THE COURT:  Thank you.

10             THE CLERK:  All rise.

11

12                             -   -   -

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION

 2   Examination of:                         Page

 3   JAROD STEWART

 4   Direct By Ms. Neuman . . . . . . . . . . . . . 309

 5   Cross By Mr. Smyser  . . . . . . . . . . . . . 333

 6   Redirect By Ms. Neuman . . . . . . . . . . . . 355

 7   CRAIG SMYSER

 8   Direct By Mr. Mastro . . . . . . . . . . . . . 359

 9   Cross By Mr. Veselka . . . . . . . . . . . . . 382

10   Redirect By Mr. Mastro . . . . . . . . . . . . 389

11   Recross By Mr. Keker . . . . . . . . . . . . . 393

12                      COURT EXHIBITS

13   Exhibit No.                             Marked

14    C  . . . . . . . . . . . . . . . . . . . . . 307

15    11  . . . . . . . . . . . . . . . . . . . . . 312

16    14  . . . . . . . . . . . . . . . . . . . . . 397

17    15  . . . . . . . . . . . . . . . . . . . . . 397

18

19

20

21

22

23

24

25
```