UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CHEVRON CORPORATION,

         Plaintiff,

  -against-

STEVEN R. DONZIGER, et al.,

         Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Case No. 11 Civ. 0691 (LAK)

**CHEVRON CORPORATION'S MEMORANDUM OF LAW
IN RESPONSE TO MOTIONS BY COUNSEL FOR DEFENDANTS
FOR LEAVE TO WITHDRAW AS COUNSEL**

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

*Attorneys for Plaintiff Chevron Corporation*

## TABLE OF CONTENTS

                Page

TABLE OF AUTHORITIES ................................................................................................... iii

PRELIMINARY STATEMENT .............................................................................................. 1

ARGUMENT .............................................................................................................................. 3

I.      If Defendants Cannot Pay Their Bills, It Is Because Their Fraudulent Judgment is Worthless. ................................................................................................. 3

      A.      The "Feverish Pace" of This Litigation Reflects the Accelerating Exposure of Defendants' Fraudulent Campaign. ........................................ 3

      B.      Defendants, Led by Counsel Who Boasts of His "Slashing and Smashing" Style, Have Been Equal Contributors to the Expense of This Litigation ......................................................................................... 6

      C.      This Court Has Been Fair and Even-Handed Throughout the Proceedings .......................................................................................... 9

II.     Withdrawal by Counsel Does Not Affect Chevron's Motion for Sanctions .................... 11

III.    Defendants' Failure to Pay Counsel in this Action is a Calculated Risk ......................... 13

IV.    This Court Should Retain Jurisdiction Over Withdrawing Counsel ................................ 15

CONCLUSION ......................................................................................................................... 15

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Lattanzio v. COMTA,*
    481 F.3d 137 (2d Cir. 2007) .................................................................................................. 15

**PRELIMINARY STATEMENT**

Chevron does not object to the Keker and Smyser firms' coordinated requests to withdraw as counsel for their respective clients, defendants Steven Donziger and the LAPs. In a sense, one can hardly blame them for wanting to get out, with mounting evidence that their clients and co-counsel are engaged in an ongoing fraud that their own acts serve to further and with no credible defense that they can offer to controvert that evidence. The Keker and Smyser withdrawals will not leave Defendants without counsel, since Mr. Gomez remains to represent the LAPs, Donziger is himself a lawyer, and Patton Boggs presumably continues its "behind-the-curtain" role. The withdrawal, therefore, should not serve as a pretext to delay these proceedings, or forestall the outcome of the pending sanctions motion. But while Chevron does not object to counsel's withdrawal, it must respond to the manner in which counsel seek to take their leave, and correct some of the false and disrespectful statements made in their papers that have no place other than to promote their clients' public-relations purposes.

Defendants' counsel claim that their bills have been unpaid since September 2012 (Keker) and for "over a year" (Smyser). This may be so, but their purported financial hardship, including the Smyser firm's contingency fee arrangement, did not abate their aggressive litigation of this case, which has been at least as significant a cost driver as anything Chevron is alleged to have done. Defendants have made nearly the same number of substantive motions as Chevron. Ex. 3722 (March 5, 2013, Hr'g Tr.) at 31:25–32:9. Moreover, Defendants must already have been well in alleged arrears on December 20-21, 2012, when they pressed this Court to sustain their broad requests seeking millions of pages of documents from Chevron—documents of at-best tangential relevance. Chevron has had to incur the considerable expense of having to produce more than 5.5 million pages of documents in response to Defendants' overbroad requests. And as recently as February of this year, Defendants were seeking leave to take

dozens of depositions, identifying no fewer than 123 intended deponents in their February 21, 2013 submission. Ex. 3701.

Nor do Defendants lack for legal representation. Excluding withdrawing trial counsel here, Defendants' privilege logs indicate they have over 100 lawyers from at least 20 law firms working on their behalf on at least two continents. Ex. 3702. Just days ago, one of their lawyers claimed it was "one of the most powerful teams of litigators ever assembled." Ex. 3703.

It was only in late March that Defendants' counsel first began laying the groundwork for this withdrawal motion, informing the Court that their clients would not pay the Special Masters the Court had appointed. Ex. 3723. This marked change in course tracked the collapse of Defendants' case around them, as Chevron uncovered further unrefuted proof that the LAP team fabricated evidence, manipulated and manufactured "expert" reports, bribed the Ecuadorian judge, and ghostwrote the Ecuadorian judgment in their own favor. These revelations have come from "insiders" Alberto Guerra, Fernando Reyes, Stratus Consulting, and the LAP team's former funder Burford Capital, among others, and their sworn accounts are corroborated by contemporaneous evidence. Counsel brought their motions to withdraw last week, two weeks after an evidentiary hearing revealed counsel's complicity in a collusive Ecuadorian lawsuit that was designed to evade their U.S. discovery obligations, two days after Chevron defeated the LAPs' enforcement action in Canada, and the day after former judge Alberto Guerra recounted in detail at deposition the LAP team's corruption of the Ecuadorian case and judgment.

In sum, Defendants' counsels' assertion that their clients' failure to pay them is due to Chevron's "litigation strategy" is a smokescreen. Defendants have matched and even exceeded Chevron motion for motion, discovery request for discovery request, and have sought to expand, not limit, the scope of this action. If Defendants, in fact, cannot pay their counsel, it is not be-

2

cause of Chevron's litigation strategy, but because of the facts. It is because the evidence adduced in this proceeding and elsewhere has hampered their efforts to raise capital on the back of their fraudulent judgment. While it is understandable why these counsel would choose to withdraw, they should at least be honest about it. They have no one to blame but themselves for taking on this case, knowing at the time that there was already so much evidence of fraud and wrongdoing that other lawyers felt constrained to withdraw in other proceedings, rather than continue to take positions they no longer believed in good faith they could assert. So while these counsel should be permitted to withdraw, their attacks on Chevron and this Court are baseless and dishonorable.

## ARGUMENT

**I.     If Defendants Cannot Pay Their Bills, It Is Because Their Fraudulent Judgment is Worthless.**

    **A.     The "Feverish Pace" of This Litigation Reflects the Accelerating Exposure of Defendants' Fraudulent Campaign.**

Defendants' counsel are right about one thing—there has been increasing activity in this case over the past few months. Dkt. 1110 at 2. In part, this is the natural rhythm of a case as it proceeds to the close of discovery, with various disputes over production, depositions, and privilege coming to a head. Here, however, there is more. As John Keker suggests in his declaration, a "review of the docket sheet" (Dkt. 1111, ¶ 5) is revealing—but the story it tells is not the one he suggests. In fact, the docket over the last six months is a diary of the accelerating exposure of Defendants' misconduct and fabrications.

> **Indigenous Ecuadorians sue Donziger and the LAPs' counsel for exploiting them. Docket 645 (November 30, 2012):** Alleging that Donziger was falsely holding himself out as their representative, and that his and the Amazon Defense Front's true interest was "collecting as much of the judgment as possible for their own use and benefit," the Huaorani people sought to intervene in this action. Dkt. 646 at 26. The LAPs responded by accusing their countrymen of attempting to "hijack" the litigation. Dkt. 689 at 1. When the Huaorani's request was denied,

3

they sued Donziger in state court, where their action remains pending. *Huani et al. v. Donziger et al.*, Index No. 151372/2013 (Sup. Ct. N. Y., February 13, 2013).

**Unrebutted evidence shows the LAPs' unfiled internal work product appears in the Ecuadorian judgment.  Docket 658-5 – 658-6 (December 12, 2012):**  In an analysis commissioned by Chevron's attorneys, Morningside Translations reported that it had completed a multi-level review of every page of the Lago Agrio record that could have been the possible source for the verbatim overlap between the LAPs' unfiled work product and passages in the Ecuadorian judgment—and that no record source was found for the judgment's language.

**Fernando Reyes comes forward to bear witness to Donziger and the LAPs' fraud and corrupt practices.  Docket 658-18 – 658-21 (December 12, 2012):**  One-time LAPs collaborator, Donziger's first choice for the role of global expert, Fernando Reyes described in a sworn declaration how Donziger had initially involved him in a fraudulent "monitorship" scheme during the judicial inspection phase of the Lago Agrio litigation, how Reyes recommended Richard Cabrera to Donziger for the rigged global assessment, even though Cabrera "did not possess the professional skills and experience required," because, "for Mr. Cabrera, issues such as independence and professional standards were not that important, and therefore he would have no problem doing what the plaintiffs were proposing." Dkt. 658-18, ¶ 30.  Reyes also described how it became apparent to him by March 2007 "that the plaintiffs had already predetermined the findings of the global assessment, that they themselves would write a report that would support their claim for billions of dollars against Chevron and would simply put Mr. Cabrera's name on it." *Id.*, ¶ 35.

**Alberto Guerra provides testimony and corroborating evidence that the LAPs bribed the Ecuadorian judge to permit them to ghostwrite the judgment.  Docket 746 (January 28, 2013):**  In a sworn declaration, former Judge Alberto Guerra Bastidas described how he worked as ghostwriter for Judge Zambrano, the judge who signed the $18 billion judgment, how he took money from the LAP team to ensure that case rulings went their way, and how he and Judge Zambrano participated in a $500,000 bribery scheme and permitted the LAP team to draft the judgment Zambrano would sign and issue as his own.  Guerra's account is corroborated by deposit slips, draft Zambrano judgments and orders, and sworn, contemporaneous accounts from others he contacted regarding bribery in the case.  Along with the Morningside review and other evidence of the LAP team's fingerprints on the judgment, this powerful new evidence prompted Chevron to file a motion for partial summary judgment (Dkt. 744).  In his subsequent deposition, Guerra affirmed his written testimony, offering clear and consistent responses under hours of aggressive questioning by Defendants' counsel—the same counsel now moving to withdraw.  Ex. 3704.

**Stratus Consulting confirms the Cabrera fraud and lack of scientific basis for the Ecuadorian judgment.  Docket 1007-1 (April 12, 2013):**  Defendants Douglas Beltman and Ann Maest, chief authors of the ghostwritten Cabrera Re-

4

port, in their own sworn declarations, acknowledged that they had no evidence Cabrera had any role in the preparation of the report he submitted, and that "Cabrera lacked the skill, qualifications, and experience to conduct or review a multi-disciplinary environmental damages assessment himself." Dkt. 1007-1 (Ex. 3652), ¶ 15. They admitted that the findings of the Cabrera Report had no scientific basis, and they disavowed it (*id.*, ¶ 57), as well as the numerous public statement the LAP team has made regarding the supposed scientific basis for their claims (*id.*, ¶ 73).

**Donziger and the LAPs' former funders comes forward to accuse them of fraud. Docket 1039 (April 17, 2013):** In a sworn declaration, Christopher Bogart, CEO of Burford Capital LLC, a litigation-finance firm that invested $4 million in the LAP team's litigation efforts, described how they had been defrauded by Donziger and Patton Boggs, and had provided the financing to the LAP team only based on the express reliance on false statements regarding the independence of the Cabrera Report and other material issues. Bogart recounted a January 27, 2011 phone call with Jim Tyrrell of Patton Boggs, and provided his handwritten notes of the conversation, in which Tyrrell alleged to Bogart that Donziger had lied to all of them about the nature of the Cabrera relationship, and that "Donziger was a fool." Dkt. 1039-2 at 20-21; Ex. 3705.

Mr. Smyser's remorse at the business deal he made to accept ownership shares in the LAPs' enforcement scheme in return for his services is also understandable, but again has no relation to Chevron's conduct of the RICO litigation. On May 3, just two days before counsel moved to withdraw, a Canadian court rejected the LAPs' attempt to enforce the judgment, finding that the LAPs could not pursue collection against Chevron or its subsidiaries in Canada: "The plaintiffs have no hope of success in their assertion that the corporate veil of Chevron Canada should be pierced[.]" Ex. 3707 at 41. Chevron expects similar results to follow in any jurisdiction that respects the rule of law.

And just days *after* Defendants' counsel moved to withdraw, yet another former LAP team expert, David Russell, has now come forward to reveal the truth about the fraud. In a sworn declaration, filed concurrently herewith, Russell describes how as "lead environmental scientist for the plaintiffs," in 2004, he found that the "environmental evidence did not and does not support the plaintiff's claims." Ex. 3708 ¶ 3. He further describes how Donziger would

5

knowingly refuse to conduct, or would cancel, testing that exonerated TexPet's operations (*id.*, ¶ 16–20). "I came to realize that Donziger did not really want to know what, if anything, was causing harm to residents. His primary focus was on sticking it to Chevron and he had limited interest in investigating any other causes of health harm." *Id.*, ¶ 21. And he confirms what documents already show, that Donziger's recent testimony that he was merely a "consultant" to the LAP team is false. In fact, "Donziger was always in control of the case, dictating case strategy, overseeing the activities of the legal and technical team . . . I also saw Donziger directing the work of other members of the plaintiffs' team, including Pablo Fajardo . . . . Donziger ordered them around and yelled at them and berated them if they did not comply with his orders quickly enough." *Id.*, ¶ 14. Russell also testifies that "Chevron's scientists and experts conducted an appropriate investigation of the oil production sites and used scientifically sound methods." *Id.*, ¶ 13.

Defendants' counsel's citation to the volume of activity in this case is an implicit recognition of the fact that they face what another federal court has described as "mounds of evidence," (Dkt. 485-2 (Ex. B) at 4) against their clients. It is this showing of rampant fraudulent conduct by their clients, and not Chevron's "litigation strategy," that is at the source of counsel's calculation that "There is no reasonable prospect of SKV's recovery of its current outstanding receivable[.]" Dkt. 1114, ¶ 7; *see also* Dkt. 1111, ¶ 11. They do not believe that they will get paid because their clients' only asset is a judgment obtained by fraud.

### B. Defendants, Led by Counsel Who Boasts of His "Slashing and Smashing" Style, Have Been Equal Contributors to the Expense of This Litigation

This has been, and will continue to be, a hard-fought case. Donziger, after all, is the leader of a criminal enterprise trying to extort $19 billion from Chevron. He has raised millions of dollars to fund his legal team on the promise of payouts from those proceeds, and Chevron

6

must protect its business and shareholders by challenging those who would steal from it. Chevron has retained experienced counsel, as have Donziger and the LAPs. Indeed, counsel for Donziger is among the most prominent criminal defense lawyers in the country, who describes his own style as "slashing and smashing," has been described as "exceptionally combative even by the standard of most American trial lawyers," known for "filing flurries of unsuccessful trial motions for discovery purposes." Ex. 3709. The record does not support Defendants' counsel's narrative that that they are the victim of "Chevron's legal blitzkrieg" by which Chevron seeks to "bulldoze a result using its limitless financial resources to win a self-created war of attrition in New York." Dkt. 1113 at 3–4. The *evidence* Chevron has amassed by itself debunks that theory.

In fact, it is the *LAPs'* avowed litigation "strategy as outlined by Jim [Tyrell at Patton Boggs] ([to] fight hard on all fronts all the time and concede nothing, buy as much time as possible)" (Dkt. 496-5), based on their "theory that [they] gain a greater advantage by fighting [Chevron] on everything, and tying them up, than in conceding any one thing even if we expect to ultimately lose that one thing down the road" Dkt. 48-21 (Ex. 323).[1] Consistent with this strategy, the LAPs have filed numerous motions and appeals in multiple courts, and initiated an aggressive international judgment enforcement plan in several countries, even though all of Chevron Corporation's assets are located in the United States, and not in the countries where the LAPs have mounted enforcement actions. At the same time, they have conducted an elaborate media campaign, issuing a steady stream of press releases and interviews demonizing Chevron and hurling personal attacks at the district judge—accusing him of being "open . . . for Chevron's

---

[1] Tyrrell, who represents the LAPs in the Second Circuit and elsewhere, and whose firm has sued Chevron three times on baseless theories arising out of this dispute—but has declined to appear in this Court—is another prominent national attorney in the LAPs' stable. Counting among his clients the manufacturers of Agent Orange, Tyrrell proudly refers to himself as the "Master of Disaster," but has been described as "rapacious and underhanded," and his other nickname is the "Devil's Advocate." Exs. 3710, 3711.

7

business" and in a "conspiracy" with Chevron, "corrupt," a "zealot[]," "biased," pursuing "a personal vendetta against Donziger," having an "arrogant, racist attitude," and being "a shining international example of judging gone awry." Exs. 3712-15.  Any objection by the Court to these statements will no doubt promptly be described as "bias" in yet more motions to the Court of Appeals.

In this action, Defendants have filed 43 substantive motions, to Chevron's 47.  Ex. 3730. They have invested substantial resources in baseless motions to recuse the presiding judge in this Court (as they previously sought to recuse Judge Rakoff in the original *Aguinda* action) and, along with their behind-the-scenes counsel Patton Boggs, LLP, have launched baseless lawsuits and taken frivolous appeals that have been rightly rejected by the Second Circuit (Dkt. 1091, 1099) all calculated to support a public relations strategy, not a legal strategy.

The actual facts of the parties' discovery demands are even more telling.  Counsel asserts that "Chevron served over 210 document requests to Donziger, many with subparts, as well as dozens of pages of interrogatories and 1,228 requests for admission, many with multiple subparts."  Dkt. 1111, ¶ 6 (Chevron served virtually identical request on the LAPs).  But they ignore the fact that Donziger served 335 discovery requests on Chevron (Dkt. 624), and the LAPs 265 (Dkt. 661)—which, while duplicative in parts, are not identical.  These numbers are not the whole story, either.  The LAPs claim to have almost no documents of their own (they have produced a total of 1,005 pages of documents in this action) so the number of requests is largely irrelevant, and Donziger had already produced his own responsive documents through October 2011 in the § 1782 proceeding, so his counsel had only a few months of documents to review and produce (he has produced a total of 19,429 pages in this action).  Chevron, on the other hand, has produced over 5.5 million pages of documents plus hundreds of video files, 60GB worth of

8

web site materials and four hard drives worth of clips from *Crude*—all in response to Defendants' sweeping discovery requests. Indeed, after litigating fiercely to force Chevron to produce this material, Defendants have turned around and complained about the volume of material they received in response to their demands. Ex. 3724.

Counsel also complain about the costs of deposition (Dkt. 1110 at 2), but at the time of their withdrawal motion, precisely three depositions had been taken, and Donziger had not sent counsel to any of them. And in fact, it has been Defendants who, until very recently, had been pushing for extensive depositions, asserting only a few months ago that they would take 45 depositions of Chevron witnesses, then identifying 123 witnesses they claimed to want to depose, before abruptly reversing course to support their new strategy and seeking to limit depositions.

In short, if Defendants really are out of money, it is not because they have been drained of their resources by Chevron. To the contrary, Defendants have throughout this case litigated without regard to merit or their own resources, and sought to raise the cost to Chevron at every opportunity, to pressure a settlement that facts and law cannot support. Indeed, this Court recently noted that "both sides" have been overly free with the filing of motions, rejecting Donziger's suggestion that this was unique to Chevron. *See* Ex. 3722 (March 5, 2013 Hr'g Tr.) at 33:13–34:6.

### C. This Court Has Been Fair and Even-Handed Throughout the Proceedings

Counsel reserve their most insulting allegations for this Court. In language pitched for the press, Donziger's counsel asserts that the case has become a "Dickensian farce," because of "this Court's implacable hostility to Donziger" (Dkt 1110 at 1) and that the Court has "made matters worse by consistently and cumulatively increasing the litigation burden on defendants" *(id*. at 2), forcing Defendants to pay the special masters' "exorbitant fees" (which are substantially less than the hourly rate reportedly charged by the Keker firm's eponymous lead lawyer), and

9

overall acting as a "hostile court" (*id*. at 4).  This continues Defendants' longstanding pattern of contemptuous abuse for this Court, and indeed for every court that has ruled against them.[2]

Just like Defendants' mischaracterizations of discovery in this case, Defendants' allegations against the Court are unsupported by the record.  The Court has not hesitated to rule in favor of Defendants on motions from both sides.  *See, e.g.*, Dkt. 468 (dismissing several Chevron state law claims)[3]; Dkt. 471 (denying Chevron's attachment motion and request for injunctive relief); Dkt. 550 (denying in part Chevron's motion for summary judgment on collateral estoppel defense)[4]; Dkt. 738 (granting LAP motion for protective order prohibiting Chevron from enforcing certain subpoenas); Dkt. 878 (denying Chevron's motion for summary judgment on state-law deceit claim); Dkt. 937 (granting Donziger's motion for reconsideration).

Defendants' repeated allegations of "bias" in this Court reflect a dissatisfaction with substantive rulings that have gone against them.  But this Court is not alone in recognizing the weight of the evidence showing Defendants' fraud.  For example, the District of Maryland recently found that "Chevron has shown to anyone with common sense that this [Ecuadorian judgment] is a blatant cut and paste exercise" from documents "internal to Ecuadorian Plaintiffs' counsel" that were "incorporated into [the] judgment."  Ex. 3725.  And the Western District of North Carolina concluded, "what has blatantly occurred in this matter would in fact be consid-

---

[2]  Defendants have accused this Court of being "open . . . for Chevron's business" and in a "conspiracy" with Chevron, as well as being "corrupt," "biased," "racist," and a "zealot[.]"  Ex. 3712-15. They told the Second Circuit this Court is "Chevron's single greatest ally," whose "partiality clouds his view of each and every facet of this case," (Ex. 3732) and characterized its handling of this case as "cause for national embarrassment" (Dkt. 561-2 (Ex. 2459) at 2). They have called the Bilateral Investment Treaty Arbitral tribunal a "Kangaroo court," and Donziger stated on camera the Judge Rakoff (whom they also tried to recuse) was "corrupt," "totally biased against us," and a "dishonest judge."  Dkt. 179, Ex. 2.  This is all calculated behavior pursuant to plan.  Indeed, on a February 2006 strategic plan for the Lago Agrio action, Donziger matter-of-factly included under the heading "Legal," "We accuse [judge] of falling into Texaco's corruption; We request his removal."  Dkt. 30-15 (Ex. 104).

[3]  Defendants praised this ruling as a "devastating setback" for Chevron, "gutt[ing]" its fraud claims. Ex. 3716-17.

[4]  Defendants told the media that this ruling showed that "fraud hasn't been proven and the Ecuador judgment can be enforced," and described it as "yet another rebuke to the oil giant's fabricated fraud charges."  Ex. 3718.

ered fraud by any court." *In re Chevron Corp.*, 2010 WL 3418394, at *6. Many other U.S. courts have similarly rejected the LAPs' narrative and made crime-fraud rulings implicating their agents in this illicit scheme.[5] And the tribunal that is hearing the treaty arbitration between Chevron and the Republic of Ecuador has found that Ecuador is in violation of its orders that the government of Ecuador suspend enforcement of the LAPs' fraudulent judgment, and ordered the ROE to show cause why it should not compensate Chevron for any injury to Chevron flowing from that enforcement. Dkt. 824.

## II.     Withdrawal by Counsel Does Not Affect Chevron's Motion for Sanctions

Among the significant developments in this case preceding these motions to withdraw has been Defendants' failure to comply with this Court's orders to produce documents held by their agents in Ecuador, and the subsequent evidentiary hearing held on Chevron's motion for sanctions. Prior to the hearing, counsel now seeking to withdraw had put their own factual knowledge and conduct at issue. Keker established Donziger's position with respect to Ecuadorian documents when he told this Court that Donziger was a "pariah" in Ecuador, and that he had been "separated and severed" from the Ecuadorian lawyers and other agents. Dkt. 895-1 (Ex. 3501)(March 5, 2013 Tr.) at 30:10–24. And Smyser admitted to the Court that he had "suggested" the lawsuit that would become the collusive Cordova action.[6] Dkt. 895-1 (Ex. 3502).

---

[5] *See* Dkt. 905 at 62-63; Hr'g Tr. at 56:23 – 58:10, *Chevron Corp. v. Aaron Marr Page*, Civil Action No. RWT-11-395 (Jan. 25, 2013); *Chevron Corp. v. Donziger*, No. 11-cv-00691, slip op. at 97 (S.D.N.Y. July 31, 2012); *In re Chevron Corp.*, No. 11-24599-CV, slip op. at 4, 26 (S.D. Fla. June 12, 2012); Hr'g Tr. at 43:13-44:16, *In re Chevron Corp.*, No. 2:10-cv-02675 (SRC) (D.N.J. June 11, 2010), and Order Granting 1782 Application at 2, *In re Chevron Corp.*, No. 2:10-cv-02675 (SRC) (D.N.J. June 15, 2010), *rev'd on other grounds,* 633 F.3d 153, 167 (3d Cir. 2011); *Chevron Corp. v. Donziger*, 768 F. Supp. 2d 581, 636 (S.D.N.Y. 2011), *rev'd on other grounds sub nom.*, *Chevron Corp. v. Naranjo*, 667 F.3d 232 (2d Cir. 2012); *In re Chevron Corp.*, 633 F.3d 153, 166 (3d Cir. 2011); *In re Chevron Corp.*, 749 F. Supp. 2d 141, 167 (S.D.N.Y. 2010); *In re Chevron Corp.*, No. 10-cv-1146-IEG (WMC), 2010 WL 3584520, at *6 (S.D. Cal. Sept. 10, 2010); *In re Chevron Corp.*, Nos. 1:10-mc-00021-22 (JH/LFG), slip op. at 3-4 (D.N.M. Sept. 2, 2010); *Chevron Corp. v. Champ*, Nos. 1:10-mc-27 & 1 :10-mc-28, 2010 WL 3418394, at *6 (W.D.N.C. Aug. 30, 2010).

[6] The complete story of the *Cordova* action is not yet known, but Chevron has prepared a timeline recounting the
[Footnote continued on next page]

11

At the evidentiary hearing, counsel and clients doubled down on their positions. Donziger testified that he had no control over Fajardo or other Ecuadorians, and testified, in contradiction to all the contemporaneous evidence, that he had always "worked for Mr. Fajardo" and that he was a but a "consultant" to the LAP team. Ex. 3726 (April 16, 2013 Hr'g Tr.) at 86:18–23, 98:2–25, 104:7–17. Meanwhile, Smyser and an associate at his firm described how they knew that Fajardo was seeking an order defying this Court's discovery, but did nothing to intervene or even educate themselves about the nature of the proceeding, admitting that they had not even read the pleadings when they submitted the collusive judgment to the Court. Ex.3727 (April 18, 2013 Hr'g Tr.) at 325:1–326:15, 328:9–12, 353:6–19, 385:17–386:4.

Since the hearing, additional evidence obtained in this action and in a § 1782 action continues to underscore the relevance of the Ecuadorian documents to this case, and the practical ability of Defendants to obtain them. An email produced by H5 reveals that Donziger, despite his testimony, exercised his ability to obtain electronic documents from the LAP team lawyers. The document shows that Defendants created a "document 'holding pen'" in the United States, and that Donziger associate Andrew Woods had two other associates then in Ecuador with Donziger "gather what they can on portable media storage for return to the U.S." Ex. 3720 And records produced by Banco Pichincha confirm that on August 17, 2007, the LAPs transferred $33,000 from their "secret account," to the account of Richard Cabrera, a payment never disclosed to the Ecuadorian court. Ex. 3721.

Chevron remains prejudiced by Defendants' failure to produce the Ecuadorian documents, and regardless of counsel's role in that failure, the sanctions motion is neither mooted nor cured by the withdrawal of counsel. To the extent that new counsel or Donziger appearing as

---

[Footnote continued from previous page]
events as they are now available, which demonstrates the collusive and corrupt nature of the action. *See* Ex. 3719.

counsel seek to take advantage of their counsel's withdrawal in this fashion, it should not be countenanced.

### III. Defendants' Failure to Pay Counsel in this Action is a Calculated Risk

Defendants' apparent decision to stop paying their lawyers in this action is a calculated decision, borne of desperation, perhaps, but not economic hardship. Defendants submit no evidence that they are unable to pay their attorneys—the only evidence, declarations from Keker and Smyser, is that Defendants have not paid them. Donziger issued a press release in which he claimed he could not pay the lawyers, but has submitted nothing under oath, or any other evidence. His personal, contingent interest in the Ecuadorian judgment potentially reaches almost $1 billion, making it difficult to believe that he cannot finance his own personal defense if he thought it more likely to produce a favorable outcome than the current public relations maneuver. In fact, LAP lawyer Graham Erion recently denied that the LAP team lacks funds, responding to an article by Paul Barrett in Bloomberg Businessweek (Ex. 3703):

> In falling for Chevron's narrative, Barrett also gets his facts wrong when he says funds have "dried up" for the legal case. If that's true, why are a number of the world's top litigation law firms in the U.S., Canada, Brazil, Ecuador and Argentina fighting for the Ecuadorian communities as part of one of the most powerful teams of litigators ever assembled?

In another press release, released even before the motions to withdraw were filed, Pablo Fajardo revealed their strategic choice: "[W]e are scaling back in New York to focus on the main issue: enforcing the $19 billion judgment around the world. . . . The New York case is a distraction, a sideshow aimed at exhausting our resources." Ex. 3728. In related litigation, Donziger continues to be represented by counsel. He is being sued in New York by the Huaorani, and in Louisiana by a former lawyer alleging unpaid fees, and he is not representing himself. *F. Gerald Maples, P.A. v. Donziger et al.*, Case No. 2:2013-cv-00223 (La. E. Dis. Ct., Feb. 6, 2013  He is the designated "U.S. Representative" (Dkt. 355-37 (Ex. 1122)) overseeing nu-

13

merous firms in an array of other related actions (over 100 lawyers from at least 20 law firms (Ex. 3702), and he continues to make monthly trips to Ecuador, supervising the LAP team's global operation (Dkt. 966-1 (Ex. 3601)). And these are not separate funds—Donziger's retainer agreements provide that his defense is to be covered by LAP team litigation funds. Dkt. 355-37 (Ex. 1122), ¶ 9.

Perhaps it is becoming more difficult for Defendants to raise capital, as one would expect the mounting evidence of fraud to discourage investment. But they continue to claim to have substantial resources—their lawyer Graham Erion has told the media that assets "in the seizure process" in Ecuador total $200 million. Ex. 3729. Defendants likely have not taken the final step in order to avoid an unjust enrichment claim in this action (*cf.* Dkt. 873 at 9 (opposing Chevron's motion to reinstate unjust enrichment claim on grounds that "the trademarks have not been seized, auctioned, or sold") but there is no reason to doubt that they could pay their attorneys here if they chose.

Moreover, in its motion, the Keker firm foreshadows that Defendants "may" choose to pay after all, stating that Donziger may "re-engage" the Keker firm for trial.[7] Dkt. 1110 at 10. This undermines the Keker firm's assertion, just a page earlier, that it faces "no realistic prospect of payment for its efforts," (*id*. at 9) and highlights the tactical nature of this withdrawal. So does the manner of the Keker firm's leave-taking, by a motion and supporting declaration that reads like a LAPs press release, heaping scorn and baseless accusations—the posture of a partisan who intends to fight another day, not that of a professional advocate resigning a commission. Meanwhile, the Smyser firm has not sought to withdraw from its representation of the LAPs in

---

[7] The Keker firm assumes that its lawyers would once again be authorized to appear pro hac vice, though given their contemptuous treatment of this Court, there is no reason to assume that any pro hac application would be granted.

14

connection with their writ petition in the Second Circuit seeking reassignment of this case, nor from their representation of all 47 LAPs in opposing Chevron's § 1782 discovery from Banco Pichincha (where the "secret account" used to bribe Cabrera is held).  If lack of payment is their real reason for withdrawing, then they should withdraw fully forthwith.[8]

### IV.     This Court Should Retain Jurisdiction Over Withdrawing Counsel

With their active participation in Defendants' defiance of this Court, counsel are now witnesses, and potentially sanctionable parties, in this affair.  Since the issue is not yet concluded, the Court should retain jurisdiction over them.  *See* Dkt. 888 (retaining jurisdiction over former counsel for Stratus).

### CONCLUSION

Chevron does not object to these motions to withdraw.  If the Court permits counsel to withdraw, it should retain jurisdiction over them.

Dated:  May 10, 2013                                              Respectfully submitted,
       New York, New York

                                                    */s/ Randy M. Mastro*
                                             Randy M. Mastro
                                             Andrea E. Neuman
                                             GIBSON, DUNN & CRUTCHER LLP
                                             200 Park Avenue
                                             New York, New York 10166
                                             Telephone: 212.351.4000
                                             Facsimile:  212.351.4035

                                             William E. Thomson
                                             333 South Grand Avenue
                                             Los Angeles, California 90071

---

[8]  If Donziger appears on behalf of himself and his law firms, he should not be considered a pro se litigant—artificial entities may only appear through licensed counsel.  *Lattanzio v. COMTA*, 481 F.3d 137, 139–140 (2d Cir. 2007).  Of note, should Donziger proceed as counsel, he will not have access to a discrete category of court-ordered confidential materials, such as the identity of the Doe witnesses, but current and future LAPs counsel Julio Gomez does have access to those materials. Dkt. 802, 837.

Telephone: 213.229.7000
Facsimile:  213.229.7520

*Attorneys for Chevron Corporation*