UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------- x
CHEVRON CORPORATION,                :
                                    :
            Plaintiff,              :
                                    :  CASE NO. 11-CV-0691 (LAK)
      v.                            :
                                    :
STEVEN DONZIGER et al.,             :
                                    :
            Defendants.             :
---------------------------------- x


**JAVIER PIAGUAJE PAYAGUAJE'S AND HUGO GERARDO CAMACHO NARANJO'S MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS IDENTIFIED ON CHEVRON'S LATE-PRODUCED PRIVILEGE LOG OF JUNE 1, 2013**

On June 1, 2013, shortly after the May 31 close of discovery and after we moved to compel the production of documents on Chevron's privilege logs,[1] Chevron submitted to Defendants a new, 1,891-page privilege log covering 20,061 documents never before logged. (Exs. 1 & 2.) Chevron did so despite the fact that, over the course of our meet-and-confer concerning the parties' outstanding motions to compel production (*see* Dkts. 1193 & 1195), Chevron never mentioned that it was not done submitting logs. Its counsel tried mightily to convince us not to move to compel production, even offering to forego its own motion to compel in return. (*See, e.g.*, Dkt. 1195-11.) This seemed strange; compromise has not been Chevron's way. Now we understand: had we backed off of our demand for documents related to Chevron's "investigative" work and allowed the May 31 discovery deadline to expire, Chevron would have withheld this new log. Defendants' primary focus during the meet-and-confer, and the principal target of their resulting motion to compel, was and is certain investigative material. (*See, e.g.,* Dkt. 1193 at 2-3.) Chevron's eleventh-hour-surprise log is, in fact, *all* about Chevron's use of dozens of investigative personnel to perform surveillance and "flip" witnesses.[2] Chevron did not want us to see it.

The lateness of Chevron's privilege log is reason enough alone for the Court to find a waiver of any claim of privilege over these documents. Add to that (a) Chevron's tactical decision to stay mum regarding this outstanding log during the meet-and-confer process, and (b) the fact that Chevron's gamesmanship appears designed, in part, to deny Defendants access to these documents before the Kroll 30(b)(6) deposition,[3] and waiver is the only just result.

---

[1] Although the Court has extended the deadline for depositions, the Court has made clear that no other discovery deadlines were impacted by that ruling. (*See* Dkt. 1185 at 1, 3.) By stipulated Order, the parties were to produce their privilege logs by March 8, 2013. (*See* Dkt. 789 at 2.) Although all parties amended their logs after that date in accordance with subsequent meet-and-confers, and although Chevron on April 17 produced an additional log *specifically* in response to a Court order (*see* Ex. 3), there is no agreement or order allowing the parties to produce brand new logs after the March 8 deadline. Even if there were, certainly, nothing entitled Chevron to produce an enormous privilege log after the May 31 close of discovery.

[2] The log contains 1,414 entries for investigators' "photographs" and 705 entries for unspecified "investigative material." There are thousands of entries for communications solely between investigative personnel. Indeed, a scan of the log reveals that investigative personnel appear in no more than a *de minimis* number of entries.

[3] Of particular note in this regard, the updated names appendix that Chevron submitted to us in conjunction with its new log identifies 52 Kroll employees who never appeared on the list before. (*See* Ex. 4.)

1

Further, for reasons expressed previously (Dkt. 1193), Defendants at a minimum have a "substantial need" for "ordinary" work product[4] pertaining to: (a) the surveillance of persons who allegedly participated in the "ghostwriting" of the Judgment, including Nicolas Zambrano, Alberto Guerra, Pablo Fajardo, and Steven Donziger; and (b) the use of investigators to coerce or "flip" witnesses.[5] This Court has observed that "'sunlight is said to be the best of disinfectants'. . . . . [Discovery] will contribute to the goal of seeing not only that justice is done, but that it appears to be done."[6] This axiom is a two-way street. We should know what Chevron knows about the movements of persons who supposedly conspired to write the Judgment. We should know why witnesses are "flipping," and why Chevron seems bent on taking testimony in private rather than at a deposition. Secrecy serves no legitimate end here.

Finally, the log includes 3,832 entries concerning the investigation of unspecified "person[s] of interest." (*See generally* Ex. 1.) If the documents involve the surveillance of "persons of interest" who are in fact opposing counsel, they are subject to the crime-fraud exception.[7] At a minimum, the Court should order Chevron to amend its log so as to specify which documents relate to surveillance of counsel opposing Chevron in the Lago Agrio Litigation, related 28 U.S.C. § 1782 litigation, and this litigation,[8] so that Defendants can further assess the validity of Chevron's privilege claims and seek appropriate relief.

---

[4] Chevron cloaks some of its "investigative material" as "opinion" work product by using the magic words "reflecting litigation strategy" in its log descriptions. (*See, e.g.*, Ex. 1 at 9.) The fact that these descriptions do not also purportedly contain "mental impressions and opinions," as other documents allegedly do (*see, e.g.*, Ex. 1 at 60), is telling. At a minimum, the Court should review a sampling of these investigative materials *in camera* to ascertain whether they constitute fact- or opinion-work product.

[5] *See, e.g.,* Declaration of Harry E. Dunkelberger III (Ex. 5). Add this to the well-documented coercion of witnesses like Stratus Consulting (*see, e.g*., Dkt. 768 at 95-116) and Alberto Guerra—who, after admitting that he had no salary and only enough saved two cover two months of expenses, was offered "twenty thousand [cash] in . . . hand" and more depending upon what he could give Chevron. (*See, e.g.,* Dkt. 1078-1 at 19, 51.; 974-1 at 5-6).

[6] *In re Application of Chevron Corporation*, No. 709 F. Supp. 2d 283, 299 (S.D.N.Y. May 10, 2010).

[7] For example, Rule 4.4 of the New York Rules of Professional Conduct prohibits lawyers from "us[ing] methods of obtaining evidence that violate the legal rights of such a [third] person," including "unwarranted intrusions into privileged relationships, such as the client-lawyer relationship." (*See* Ex. 6.) Indeed, the Rules impose upon a lawyer a duty to inform his adversary that he has come into possession of confidential information that he "knows or reasonably should know" the adversary did not intend him to have. (*See id*.) Needless to say, lawyers ordering investigators to spy on opposing counsel more than runs a risk that privileged and confidential information will be surreptitiously acquired—that result is an utter certainty. This conduct is wildly improper, and merits no protection.

[8] We already have seen the tip of the iceberg. (*See* Dkt. 1197-2; Dkt. 754, Exs. 3105-3110.)

Dated: June 6, 2013　　　　　　　　　　　Respectfully submitted,
　　　　　New York, New York

　　　　　　　　　　　　　　　　　　　　*s/ Julio C. Gomez*　　　　　　　　　
　　　　　　　　　　　　　　　　　　　　Julio C. Gomez
　　　　　　　　　　　　　　　　　　　　GOMEZ LLC
　　　　　　　　　　　　　　　　　　　　The Sturcke Building
　　　　　　　　　　　　　　　　　　　　111 Quimby Street, Suite 8
　　　　　　　　　　　　　　　　　　　　Westfield, NJ 07090
　　　　　　　　　　　　　　　　　　　　Telephone:  908.789.1080
　　　　　　　　　　　　　　　　　　　　Facsimile:  908.789.1080
　　　　　　　　　　　　　　　　　　　　Email:  jgomez@gomezllc.com

　　　　　　　　　　　　　　　　　　　　*Counsel for Defendants Hugo Gerardo Camacho*
　　　　　　　　　　　　　　　　　　　　*Naranjo and Javier Piaguaje Payaguaje*