UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHEVRON CORPORATION,<br><br>    Plaintiff,<br><br>  v.<br><br>STEVEN DONZIGER, THE LAW OFFICES OF STEVEN R. DONZIGER; et al.,<br><br>    Defendants. | Case No. 11-CV-0691 (LAK) |

**DONZIGER DEFENDANTS' COMBINED REPLY IN SUPPORT OF MOTIONS FOR STAY AND PROCEDURAL SAFEGUARDS**

This Court is fundamentally mismanaging this case and my motion for a stay is now the latest example. I filed a four-page motion for a stay, citing the undeniably desperate circumstances in which I find myself as a *pro se* human rights advocate fighting a large oil company trying to pin on me what is likely the largest personal liability in the history of our country. Chevron sees an opportunity and files a 31-page response loaded with falsehoods and gratuitous personal attacks. The time I might spend responding to Chevron's overwhelming show of force comes out of the limited pool of waking hours I have to prepare for, take, and sit for more than a dozen days of depositions, appeal constant adverse rulings of the Special Masters made during those depositions, respond to Chevron's all-hours demands, seek substitute counsel, prepare for my own deposition, and prepare my defenses. I will not fall into Chevron's trap. I deny the assertions throughout Chevron's response and direct the Court to the following facts which I aver as an officer of this court are true:

- ***I am pro se.*** Chevron asserts that a solo practitioner, Aaron Page, is helping me in a limited role. Mr. Page's practice focuses on international human rights matters, not federal court litigation, and he is largely assisting me deal with the logistics of suddenly having to address dozens of moving pieces on this case and participate in numerous depositions. Mr. Page is talented young lawyer, but the idea that his assistance somehow obviates my need for relief as a *pro se* litigant in a matter this complex against Chevron's unprecedented army of lawyers is laughable.
- ***I do not have the funds necessary to hire new counsel, so I must seek funds from others.*** Chevron's (and the Court's) unsupported speculation to the contrary doesn't help my situation and doesn't count as a response or relief. If I do not get immediate relief, I

1

will continue unrepresented during the remainder of the discovery period and probably well beyond.

- *Chevron is trying to drive away potential new counsel and funders.* Chevron does not accidentally make statements to the press, such as the misrepresentations Mr. Mastro made regarding the reasons for withdrawal of my former counsel. Chevron does not accidentally sue people in foreign countries, as it is doing against the main funder of the affected rainforest communities. This activity—as Chevron knows—is making it virtually impossible for me to obtain funds to secure adequate representation.[1]

- *I am nonetheless strenuously attempting to fund my defense and secure substitute counsel.* In light of Chevron's hostile activity in this area, this takes enormous time. A stay would allow me to secure adequate counsel and allow the case to proceed in a more orderly and fair manner.

- *The litigation schedule created by the Court is overwhelming for a pro se litigant.* Chevron makes much of the fact that the Special Masters eliminated "double tracking" in the deposition schedule and "built in days off for preparation." But Chevron's lawyers and deponents spend weeks preparing, typically assigning a unique partner to take or defend each deposition.[2] Mr. Gomez and I sometimes are forced to attend depositions until 8 pm one day and start again at 9 a.m. the next. The precious few "days off" are spent struggling to respond to Chevron's many demands for meet-and-confers,

---

[1] Chevron's false, pointless, but vindictive attacks on Mr. Page throughout its response appear to be yet another signal to prospective counsel of what they will face if they dare to entire this case.

[2] The only Gibson Dunn partner who has shown up for more than a few of these depositions is Mr. Mastro, and even only finds the time to drop in for an hour or two when it suits him.

2

procedural gamesmanship, and attempts to manufacture various scandals to taint my efforts. *See, e.g.*, Dkts. 1193, 1218, 1232, 1236. Rather than simply agree to my patently reasonable request that Chevron consolidate its various demands on me into a single daily communication, or even a single point of contact, Chevron's "rescue team" at Gibson Dunn is actively leveraging the efforts of more that 100 attorneys to try to win by might what it cannot win on merit.

- *The procedural rules are unrealistic and prejudicial.*  Chevron suggests I need a sworn declaration to establish that it is unreasonable to demand a *pro se* litigant to file a written appeal to a deposition ruling in as little as 48 hours while attending near-daily depositions and managing a complex litigation. I disagree; it is obvious. The failure of the Special Masters to make any reasonable adjustments—indeed, to exacerbate the situation by taking the position that a failure to appeal can justify a finding of broad subject-matter waiver—illustrates how content this Court is to sit back and watch me get steamrolled.

- *Scope limitations are destroying my right to mount a meaningful defense.*  The breakneck speed and unreasonable procedural rules being imposed by this Court also mean that discovery critical to my defense is slipping away without any meaningful opportunity to establish its necessity. For example, while Chevron partially withdrew its "sham litigation" claim, that withdrawal was highly qualified, leaving on the table the claim that the Ecuadorian plaintiffs' experts "fabricated findings," as well as the "inquiry [as to] whether the judgment's findings have any support untainted by fraud in the record that existed before the Ecuadorian court at the time the judgment was issued." Dkt. 720. In any event, Chevron's withdrawal of one particular allegation does not affect the scope of discovery that I need for my defenses to a whole range of claims, including

3

challenging the scienter showing that Chevron must make for each of its claims, especially its predicate RICO allegations.[3] My defense also involves showing that much of Chevron's evidence against me was manufactured through means including bribery, coercion, and tampering of witnesses, often accomplished through intimidation and harassment by private investigators. Yet the vast majority of information on that activity has been withheld as factual work product, despite the weak protection it provides relative to my substantial need.[4]

---

[3] "'Essential to a scheme to defraud is fraudulent intent.' . . 'It is not sufficient that [the] defendant realizes that the scheme is fraudulent and that it has the capacity to cause harm to its victims. Instead, the proof must demonstrate that the defendant had a conscious knowing intent to defraud'") (quoting *United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994), *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999), and *United States v. Leonard*, 61 F.3d 1181, 1187 (5th Cir. 1995)). Chevron's weak response that I need not "inquire further" regarding the scienter issue because I can only rely on information I had at the time is silly; there is obvious value in supporting my testimony about my state of mind and the reasonableness thereof with corroborating evidence.

[4] With my motion I submitted sworn declarations showing that I had in fact been followed and surveilled, including outside of my family's home. Dkts. 1197-1, 1997-2. Chevron insultingly argues that this surveillance—and surely much worse—is "irrelevant" and has not resulted in any prejudice to me. I suspect Chevron's attorneys would feel differently if the cars were sitting in front of their houses instead of mine. In any event, it is certainly possible that such surveillance and related intimidation and harassment directed at, say, Douglas Beltman or Christopher Bogart could have had a serious impact on their ultimate willingness to provide untruthful testimony to get Chevron "off their backs." I also have a substantial need for information regarding Chevron's surveillance in Ecuador that would undermine Chevron's speculations as to why the Ecuadorian plaintiffs' team at time used "code words" and held meetings in unusual places, and that could probe the quality of evidence and testimony relating to "ghostwriting" and other manufactured claims. For example, if Chevron had a comprehensive surveillance operation in place targeting Judges Zambrano and/or Guerra, whether that operation picked up (or didn't) any of the countless alleged meetings between the two in Quito and Lago Agrio would be highly probative sufficient to support a finding of substantial need overriding Chevron's claim of factual work product. *See Bachir v. Transoceanic Cable Ship Co.*, 98 Civ. 4625 (JFK), 1998 U.S. Dist. LEXIS 19528, 2-3 (S.D.N.Y. Dec. 15, 1998); *Ward v. CSX Transportation, Inc.*, 161 F.R.D. 38, 40-41 (E.D.N.C. 1995).

Much of Chevron's 31-page response to my 4-page stay motion involves baseless and gratuitous attacks. Chevron now accuses the Republic of Ecuador—or more precisely, its lawyers at Winston & Strawn litigating the BIT arbitration for the Republic—of using "cleansing" experts in the same vein as its attack against Patton Boggs. The "fraud" conspiracy expands yet again. Chevron throws in gratuitous summaries of three expert depositions—two of which I have no concrete information on because I can't afford the rush transcript fee. The one I have seen, however, entirely contradicts Chevron's misleading characterization, which quotes from answers to staged, hypothetical questions with no established bearing to the facts in this case.

The one part of its response that Chevron should have focused on—the law applicable to the granting of a stay—it instead glosses over and gets entirely wrong. Each of the cases Chevron cites for the proposition a stay is "an extraordinary remedy and disfavored" involved the question of an indefinite stay pending resolution of parallel litigation, not a simple stay to address case management issues. What is required for the latter type of stay is simply a finding of appropriateness under "the power inherent in every court to control the disposition of the causes on its own docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. North American Co.*, 299 U.S. 248, 254 (1936).

Finally, Chevron's claim that it would be substantially prejudiced by imposition of a three-month stay is ridiculous on its face. Its only support is the existence of a handful of enforcement actions that, as developments in recent weeks have shown, are still in their early

5

stages of a multi-year process.[5]  A three-month stay here would not prejudice Chevron in the slightest with respect to these actions, whereas the same stay is absolutely critical to allowing me to adjust to the realities of my new *pro se* status, protect my rights, and avoid the ugly conclusion in which (in the words of my former counsel John Keker) I get to play the role of a goat tethered to a stake in a show trial.

Respectfully submitted,

Dated:  June 17, 2013

By: */s/ Steven R. Donziger*
Steven R. Donziger
Law Offices of Steven R. Donziger, P.C.
245 W. 104th Street, #7D
New York, NY  10025
Tel:      (917) 678-3943
Fax:     (212) 409-8628
Email:   StevenRDonziger@gmail.com

*Pro Se*

---

[5] *See, e.g.*, Pablo Gonzalez, *Chevron Argentina Asset Freeze Revoked Easing Shale Development*, Bloomberg, June 5, 2013, at http://goo.gl/8w628; Joe Carroll & Katia Dmitrieva, *Canadian Judge Stays Ecuadorean Claim Against Chevron Assets*, Bloomberg, May 1, 2013, at http://goo.gl/CgwKl.

Dated:  June 17, 2013										LAW OFFICES OF STEVEN R. DONZIGER, P.C.

By: */s/ Steven R. Donziger*
Steven R. Donziger
245 W. 104th Street, #7D
New York, NY  10025
Tel:	(212) 570-4499
Fax:	(212) 409-8628
Email:	StevenRDonziger@gmail.com

Attorney for Defendants Law Offices of Steven R. Donziger LLC and Donziger & Associates, PLLC

7