# **Exhibit C**

Page 1

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    11 CIV 0691(LAK)

5    -----------------------------------x

     CHEVRON CORPORATION,

6

              Plaintiff,

7

8        - against -

9

     STEVEN DONZIGER, et al.,

10

              Defendants.

11

     -----------------------------------x

12                    June 5, 2013

13                    9:06 a.m.

14

15          Videotaped Deposition of LAURA

16    GARR, taken by Plaintiff, pursuant to

17    Notice, held at the offices of Gibson Dunn

18    & Crutcher LLP, 200 Park Avenue, New York,

19    New York, before Todd DeSimone, a

20    Registered Professional Reporter and

21    Notary Public of the State of New York.

22

23

24

25

Page 2

1
2 A P P E A R A N C E S .
3 GIBSON, DUNN & CRUTCHER LLP
  200 Park Avenue
4 New York, New York 10166
  Attorneys for Plaintiff
5 BY: REED BRODSKY, ESQ
  rbrodsky@gibsondunn.com
6  MARY BETH MALONEY, ESQ
  mmaloney@gibsondunn.com
7  ANDREA E. NEUMAN, ESQ
  aneuman@gibsondunn.com
8  RANDY M. MASTRO, ESQ
  rmastro@gibsondunn.com
9
10 GOMEZ LLC
  111 Quimby Street
11 Suite 8
  Westfield, New Jersey 07090
12  Attorneys for Defendants Javier
  Piaguaje Payaguaje and Hugo Gerardo
13  Camacho Naranjo
  BY. JULIO C. GOMEZ, ESQ
14
15 WHITE & CASE LLP
  1155 Avenue of the Americas
16 New York, New York 10036
  Attorneys for The Witness
17 BY JENNIFER PARADISE, ESQ
  jparadise@whiteandcase.com
18  DAVID G. HILLE, ESQ
  dhille@whiteandcase.com
19
20 ALSO PRESENT:
21  MAX GITTER, ESQ  Special Master
22  JUSTIN ORMAND, ESQ , Assistant to the
  Special Master
23
  BRENT WELLS, Videographer
24
  JOSE LUIS MARTIN, ESQ , Chevron
25 Corporation

Page 4

1
2 themselves and the parties they represent,
3 after which our court reporter, Todd
4 DeSimone, representing Veritext, will
5 swear in the witness and we can proceed.
6          MR. BRODSKY:  Good morning,
7 Ms. Garr.  My name is Reed Brodsky on
8 behalf of Chevron Corporation with Gibson
9 Dunn & Crutcher.
10          MS. MALONEY:  Mary Beth Maloney
11 on behalf of Chevron Corporation of Gibson
12 Dunn & Crutcher.
13          MR. MARTIN:  Jose Martin from
14 Chevron Corporation.
15          THE SPECIAL MASTER:  Max
16 Gitter, the Special Master, and sitting
17 next to me is Justin Ormand, my assistant.
18          MR. GOMEZ:  Julio Gomez of
19 Gomez LLC on behalf of Hugo Camacho and
20 Javier Piaguaje.
21          MR. HILLE:  David Hille from
22 White & Case here for the witness, Laura
23 Garr.
24          MS. PARADISE:  Jennifer
25 Paradise, White & Case, also representing

Page 3

1
2          THE VIDEOGRAPHER:  We are now
3 on the record.  Please note that the
4 microphones are sensitive and may pick up
5 whispering and private conversations.
6 Please turn off all cell phones or place
7 them away from the microphones as they can
8 interfere with the deposition audio.
9 Recording will continue until all parties
10 agree to go off the record.
11          My name is Brent Wells
12 representing Veritext New York.  The date
13 today is June 5th, 2013 and the time is
14 approximately 9:06 a.m.
15          This deposition is being held
16 at Gibson Dunn located at 200 Park Avenue,
17 New York, New York.  The caption of this
18 case is Chevron Corporation versus Steven
19 Donziger, et al.  This case is filed in
20 the United States District Court, Southern
21 District of New York, case number 11 CIV
22 0691 (LAK).  The name of the witness is
23 Laura Garr.
24          At this time the attorneys
25 present in the room will identify

Page 5

1        ,
2 the witness, Laura Garr.
3        *   *   *
4 L A U R A   G A R R,
5 called as a witness, having been first
6 duly sworn, was examined and testified
7 as follows:
8 EXAMINATION BY MR. BRODSKY:
9    Q.     Good morning, Ms. Garr.
10   A.     Good morning.
11   Q.     If you don't understand any of
12 my questions, please let me know so I can
13 rephrase it in a way that you understand
14 it.
15          Is there anything interfering
16 with --
17          THE SPECIAL MASTER:  Actually,
18 I'm sorry to interrupt, I can't hear your
19 questions.  So if you could speak up, it
20 would be better.
21          MR. BRODSKY:  Sure.
22   Q.     Is there anything interfering
23 with your ability today, Ms. Garr, to
24 testify truthfully?
25   A.     No.

2 (Pages 2 - 5)

1           L. GARR
2    Q.    Did you prepare for today's
3 deposition?
4    A.    Yes.
5    Q.    How did you prepare?
6    A.    I met with Dave Hille and
7 Jennifer Paradise on two separate
8 occasions and reviewed documents.
9    Q.    For approximately how long did
10 you meet with your counsel?
11   A.    Approximately six hours.
12   Q.    What documents did you review?
13   A.    150 documents that were sent
14 over under protective order by Gibson Dunn
15 and then an additional 11 documents I
16 believe yesterday that were sent over as
17 well.
18   Q.    The 150 documents are the
19 documents with a Garr Bates stamp in the
20 bottom right-hand corner?
21   A.    I believe that's correct.
22   Q.    And those are documents that
23 were produced pursuant to a 502(d)
24 agreement?
25   A.    My understanding is yes, that's

1           L. GARR
2 correct.
3    Q.    Did you review any court
4 filings in preparation for today's
5 deposition?
6    A.    No.
7    Q.    Did you review any videotapes
8 or outtakes of the documentary Crude?
9    A.    No.
10   Q.    Deposition transcripts?
11   A.    I did review my prior
12 deposition transcript.
13   Q.    The one in or about September
14 2011?
15   A.    Yes.
16   Q.    Did you review any other
17 testimony in connection with your
18 preparation for today?
19   A.    No.
20   Q.    Did you speak with others about
21 your testimony today, putting aside your
22 attorneys and your family?
23   A.    No.
24   Q.    Have you spoken to Steven
25 Donziger since your testimony in or about

1           L. GARR
2 September 2011?
3    A.    No.
4    Q.    Have you communicated with him
5 in any way since September 2011?
6    A.    I don't believe so.
7    Q.    Have you spoken to Andrew Woods
8 since your testimony in or about September
9 2011?
10   A.    No, not to my knowledge, no.
11   Q.    Have you spoken to Aaron Marr
12 Page since in or about September 2011?
13   A.    No.
14   Q.    Have you spoken to any of the
15 Ecuadorian representatives of the Lago
16 Agrio plaintiffs since in or about
17 September 2011?
18   A.    No.
19   Q.    Other than through your
20 conversations with your lawyers, are you
21 aware that Pablo Fajardo has refused to
22 testify in this case?
23   A.    No.
24   Q.    Other than through your
25 lawyers, are you aware that Julio Prieto

1           L. GARR
2 has refused to testify in this case?
3    A.    No.
4    Q.    Other than through your
5 lawyers, are you aware that Luis Yanza has
6 refused to testify in this case?
7    A.    No.
8    Q.    Other than through your
9 lawyers, are you aware that Juan Pablo
10 Saenz has refused to testify in this case?
11   A.    No.
12   Q.    Have you spoken with
13 Mr. Fajardo since September 2011?
14   A.    No.
15   Q.    Julio Prieto, have you spoken
16 to him since September 2011?
17   A.    No.
18   Q.    Or communicated with either one
19 of them in any way?
20   A.    No.
21   Q.    And the same question for Luis
22 Yanza?
23   A.    No, I have not.
24   Q.    Or Juan Pablo Saenz?
25   A.    No.

3 (Pages 6 - 9)

L. GARR

1
2    Q.    Have you followed the
3  developments in the Lago Agrio litigation
4  in Ecuador since you left Mr. Donziger's
5  employment in October 2010?
6    A.    Yes.
7    Q.    How have you followed the
8  developments?
9    A.    Just newspaper articles or
10 press releases that have come out, Law 360
11 articles, things of that nature.
12   Q.    When it comes to the news
13 articles that you referred to, what
14 sources, in addition to Law 360, did you
15 read?
16   A.    I think there have been
17 articles on Bloomberg or Court News
18 Reporter type articles, the Wall Street
19 Journal.
20   Q.    Have you followed any of the
21 developments through any blogs or other
22 non-mainstream media?
23   A.    I don't recall. I might have
24 seen a blog or two. I don't recall.
25   Q.    You referred -- you mentioned

L. GARR

1
2  press releases. What did you mean by
3  press releases?
4    A.    Press releases that have been
5  in the news either posted by Chevron or by
6  the plaintiffs.
7    Q.    How did you access or learn
8  about the press releases posted by the
9  representatives of the Lago Agrio
10 plaintiffs or the plaintiffs themselves?
11   A.    I have had a Google alert on my
12 computer since when I was working on the
13 case that I still -- any article from the
14 case generally I will get alerted to.
15   Q.    And how often has that happened
16 since you left Mr. Donziger's employment
17 in or about October 2010?
18   A.    That I've gotten an alert or
19 that I have read the article?
20   Q.    That you have gotten an alert
21 and then we will get to reading the
22 article.
23   A.    It varies. Sometimes once
24 every few months. Sometimes once every
25 few weeks. Sometimes every few days. It

L. GARR

1
2  depends on the case.
3    Q.    And how often, let's take in
4  2010, since leaving Mr. Donziger's
5  employment in or about October 2010, so
6  just from November and December 2010, do
7  you recall generally how often you would
8  access the articles and read them?
9    A.    I'm sorry, from November until
10 the present day?
11   Q.    November 2010 and December
12 2010, just those two.
13   A.    In those two months? Oh, I
14 don't know.
15        THE SPECIAL MASTER: Excuse me,
16 I apologize. I have not read her previous
17 testimony. It probably came up there.
18 When exactly in October of 2010 did you
19 leave the employ of Donziger & Associates?
20        THE WITNESS: I don't know the
21 exact date. I think it was the first week
22 of October, but I'm not certain.
23        THE SPECIAL MASTER: Thank you.
24   Q.    Ms. Garr, in 2011 how often did
25 you access the articles that you received

L. GARR

1
2  Google alerts about relating to the Lago
3  Agrio litigation?
4    A.    I don't know for sure. I would
5  say a handful of times maybe.
6    Q.    And in 2012?
7    A.    Again, I would be guessing.
8  I'm not quite sure.
9    Q.    When is the most recent time
10 that you accessed an article or read an
11 article relating to the Lago Agrio
12 litigation in Ecuador?
13   A.    I think there was one recently.
14 I'm sorry, I don't recall.
15   Q.    Have you followed Chevron's
16 lawsuit against Mr. Donziger and others
17 filed in the Southern District of New York
18 through any means?
19   A.    I've only seen major news
20 sources, again, that have covered it, but
21 I have seen some articles that have talked
22 about it.
23   Q.    And what newspapers or articles
24 did you see relating to it, to the best of
25 your recollection?

4 (Pages 10 - 13)

L. GARR

1
2   A.   I don't recall the sources.
3   Q.   Do you remember the most recent
4 time you read an article relating to
5 Chevron's lawsuit against Mr. Donziger and
6 others?
7   A.   I'm sorry, I don't.  I don't
8 recall.
9   Q.   Did you read the complaint that
10 Chevron filed against Mr. Donziger?
11  A.   No.
12  Q.   The amended complaint, did you
13 read that?
14  A.   No.
15  Q.   Did you read any of Judge
16 Kaplan's published decisions relating
17 to -- in connection with Chevron's lawsuit
18 against Mr. Donziger and others?
19  A.   I don't believe so, no.
20  Q.   Did you read articles
21 discussing Judge Kaplan's published
22 decisions?
23  A.   I have, yes.
24  Q.   And putting aside articles and
25 conversations with your counsel, have you

L. GARR

1
2 learned about developments relating to
3 Chevron's lawsuit against Mr. Donziger and
4 others in other ways?
5   A.   No.
6   Q.   Have you followed any
7 developments in the Section 1782
8 proceedings around the country?
9   A.   Again, just if it was in -- if
10 it was referenced in a major news
11 articles.
12  Q.   And, again, putting aside your
13 conversations with counsel, did you learn
14 about developments relating to the Section
15 1782 proceedings through any other --
16 through any person?
17  A.   No.
18  Q.   Describe the nature of your
19 relationship with Mr. Donziger in 2007.
20  A.   In 2007 was the summer after my
21 first year of law school, and I first met
22 him interviewing to do an internship in
23 Ecuador and I saw him on a few occasions
24 when he came down to Ecuador, I was there
25 interning for the ten weeks in that summer

L. GARR

1
2 after my first year of law school, and he
3 came down on a few occasions during that
4 summer.
5   Q.   And describe your relationship
6 with him that summer.
7   A.   Friendly.
8   Q.   In early 2009 you worked for
9 Mr. Donziger again, correct?
10  A.   Yes.
11  Q.   How would you describe your
12 relationship with Mr. Donziger between the
13 summer of 2007 and early 2009 when you
14 worked for Mr. Donziger?
15  A.   I don't know if we had any
16 contact.  It might have been minimal
17 contact.  I don't recall if we even had
18 any relationship whatsoever during that
19 time.
20  Q.   In early 2009, describe your
21 relationship with Mr. Donziger during that
22 period when you worked for him.
23  A.   When I was in law school still,
24 I did an externship in 2009 doing discrete
25 projects.  So I had some communication

L. GARR

1
2 with him during that time, and it was,
3 again, friendly.
4      I'm sorry, I don't know how
5 else to --
6   Q.   How many projects -- you said
7 you did discrete projects for Mr. Donziger
8 in early 2009 while you were in law
9 school?
10  A.   Yes.
11  Q.   How many projects did you do
12 for Mr. Donziger, to the best of your
13 recollection?
14  A.   I don't recall.  I know the
15 externship had an hours requirement, but I
16 don't recall what it was.
17  Q.   Do you have an approximate
18 estimate of how many hours you worked for
19 Mr. Donziger in early 2009 per week?
20  A.   Minimal.  I mean, on a weekly
21 basis it was maybe an hour or two, if
22 that.
23  Q.   And you went to work for
24 Mr. Donziger again starting in the fall of
25 2009?

5 (Pages 14 - 17)

L. GARR
1
2    A.    Yes, that is correct.
3    Q.    And how would you describe your
4  relationship with Mr. Donziger between
5  early 2009 when you were -- after you
6  finished your externship with him and
7  before you started working for him again
8  in the fall of 2009?
9    A.    Can you -- maybe it would be
10  more helpful, what do you mean like my
11  relationship?  Like my communication with
12  him, if any?
13    Q.    Describe it generally.  Were
14  you friendly with him?  Were you
15  socializing with him?  Was it a
16  professional relationship?
17    A.    Yeah, when I said friendly, it
18  was always a professional relationship,
19  and no, we didn't socialize, usually,
20  except if we were meeting to discuss work
21  we might do it over iced tea and chopped
22  salad generally.
23         But otherwise I don't -- it
24  was between, again, minimal, if any,
25  contact probably until discussing my

L. GARR
1
2  deferral year with White & Case.
3    Q.    Between the fall of 2009 and in
4  or about October 2010 when you worked for
5  Mr. Donziger, describe your relationship.
6    A.    I worked, again -- throughout
7  this time I was working on the litigation
8  with Steven Donziger.  During the 2009 to
9  2010 time period I worked more closely
10  with him at his home generally daily.
11         So, again, a professional
12  relationship, friendly relationship.
13    Q.    His home was located at 245
14  West 104th Street at that time?
15    A.    Yes.
16    Q.    And when you say you worked at
17  his home, what do you mean by that?
18    A.    We worked at his kitchen/dining
19  room table.
20    Q.    Describe to the best you can
21  how it was set up.  Was that an office of
22  Mr. Donziger?
23    A.    It was a kitchen/dining room.
24  So it was a long, like dining room table
25  outside the kitchen, or right in front of

L. GARR
1
2  the kitchen space, and there was another
3  room that was the living room.  It was in
4  his apartment.  It was a two-bedroom
5  apartment.
6    Q.    How many people worked on a
7  daily basis in this space with you and
8  Mr. Donziger?
9    A.    Andrew Woods was generally
10  there as well.
11    Q.    Did each of you have computers?
12    A.    Yes, we had laptops.
13    Q.    And how was the equipment set
14  up?
15    A.    Generally I sat on the seat
16  closest to the kitchen and Andrew sat to
17  the right of me and Steven sat across the
18  table from me.
19    Q.    And did each of you have
20  BlackBerries or other devices to
21  communicate as part of Steven Donziger &
22  Associates, or were they personal devices?
23    A.    They were personal devices.  I
24  mean, the laptops were the personal
25  devices, and I don't recall when I had a

L. GARR
1
2  laptop, but it was my own personal device.
3    Q.    What about cell phones, were
4  cell phones given as part of employment
5  for Steven Donziger & Associates or did
6  each person have their own personal phone?
7    A.    No, there were no devices of
8  any kind given by Steven.
9    Q.    During the year between,
10  roughly, between the fall of 2009 and
11  October -- withdrawn.
12         Approximately when did you
13  start in the fall of 2009?
14    A.    The end of August, I believe.
15    Q.    Between the end of August 2009
16  and October 2009, how often were you
17  working in Mr. Donziger's apartment?
18    A.    Throughout most of that
19  year-plus time period, almost five days a
20  week would be in his kitchen, in his
21  apartment.
22    Q.    Mr. Woods was there with you
23  during that period of time as well?
24    A.    Yes.
25    Q.    Mr. Donziger, how often was he

6 (Pages 18 - 21)

Page 22

L. GARR

1
2 present in his apartment during that
3 period of time between August 2009 and
4 October 2010, approximately?
5    A.    Again, there would be days
6 where we would not be there or people
7 would be traveling, but usually at some
8 point if he was in New York at some point
9 every day, if we were at the apartment, he
10 would be there at some point during that
11 day.
12    Q.    And Mr. Donziger conducted
13 business relating to Lago Agrio litigation
14 in your presence?
15    A.    Yes.
16    Q.    Did he use the phone
17 frequently?
18    A.    Yes.
19    Q.    You were present during the
20 conversations Mr. Donziger had with others
21 using the phone?
22    A.    Some.
23    Q.    Did Mr. Donziger have a
24 practice of leaving the room when he was
25 speaking to other people relating to the

Page 23

L. GARR

1
2 Lago Agrio litigation when you were in
3 that room or did he speak about it in
4 front of you?
5    A.    Both. Sometimes he would walk
6 away. Sometimes he would be there.
7    Q.    Did you have access to his
8 computer when you were working for him
9 between August 2009 and October 2010?
10    A.    If we were working together, I
11 would sometimes go over to his computer to
12 help edit a document or something with
13 him. But generally I didn't have
14 independent access if he was not there,
15 no.
16    Q.    Did you consider Mr. Donziger a
17 mentor in the period of August 2009 and
18 October 2010?
19    A.    He was senior to me, obviously,
20 and I did work under him in part. I guess
21 so, yes, in some ways.
22    Q.    Did you admire him?
23    A.    In some respects, yes.
24    Q.    In other respects no?
25    A.    Yes.

Page 24

L. GARR

1
2    Q.    What didn't you admire about
3 him?
4       MR. GOMEZ: Objection,
5 relevance.
6       THE SPECIAL MASTER: I will
7 sustain that. I want to just get some
8 basic material that probably came out in
9 your first deposition. I'm sorry, I
10 didn't read it.
11       As I hear your testimony, you
12 were deferred a year by White & Case,
13 right?
14       THE WITNESS: Yes.
15       THE SPECIAL MASTER: And you
16 spent that year working for Mr. Donziger,
17 correct?
18       THE WITNESS: Well, I worked
19 with the Amazon Defense Coalition the
20 summer, my summer after first year of law
21 school, and Selva Viva is the Ecuadorian
22 branch of it, and that's who I worked for,
23 again, when I externed.
24       And when I did the deferral
25 year, it was again with that organization,

Page 25

L. GARR

1
2 but Steven Donziger was the U.S.
3 supervisor of the project.
4       THE SPECIAL MASTER: And were
5 you an employee of Steven Donziger &
6 Associates?
7       THE WITNESS: Until the very
8 end, August of 2010, the last two months,
9 I stayed on working for him and then was
10 paid from him to stay on longer than the
11 year.
12       But prior to that time it
13 was -- he was -- I was deferred from White
14 & Case and working just generally on the
15 litigation where he was the supervisor.
16       THE SPECIAL MASTER: And when
17 did you become a member of the bar?
18       THE WITNESS: In May 2010.
19       THE SPECIAL MASTER: You
20 described Mr. Woods. Was he there the
21 entire time you were there?
22       THE WITNESS: Yes.
23       THE SPECIAL MASTER: Working
24 for Mr. Donziger?
25       THE WITNESS: Yes.

7 (Pages 22 - 25)

L. GARR

1
2        THE SPECIAL MASTER:  As an
3  employee?
4        THE WITNESS:  Yes, I believe
5  so.
6        THE SPECIAL MASTER:  And you
7  described the fact that you had a laptop,
8  right?
9        THE WITNESS:  Yes.
10        THE SPECIAL MASTER:  Did you
11  have more than one?
12        THE WITNESS:  No.
13        THE SPECIAL MASTER:  What about
14  Mr. Woods, did he have more than one
15  laptop?
16        THE WITNESS:  Not that I'm
17  aware of, no.
18        THE SPECIAL MASTER:  Mr.
19  Donziger, did he have a laptop or desktop,
20  or both?
21        THE WITNESS:  I think it was a
22  laptop, but I don't recall now.  It might
23  have been a full computer.  I don't
24  recall.
25        THE SPECIAL MASTER:  Now I'm

L. GARR

1
2  going to display some ignorance.
3  Mr. Page, when did he join?
4        THE WITNESS:  He did not -- he
5  worked kind of on and off.  He would help
6  out on occasion.  But he didn't work daily
7  at all and I don't know exactly when he
8  got involved.
9        THE SPECIAL MASTER:  And in the
10  time you were there, were there interns at
11  various times, that is there working for
12  Mr. Donziger in his apartment?
13        THE WITNESS:  No one was --
14  there were interns I believe during that
15  time, but never with us in the apartment.
16        THE SPECIAL MASTER:  Where did
17  they work?
18        THE WITNESS:  I think they
19  would just do discrete projects and they
20  would do them from their university or
21  wherever they were independently.
22        THE SPECIAL MASTER:  Did you
23  come to know any of them?
24        THE WITNESS:  I usually would
25  receive the resumés, and I've met I think

L. GARR

1
2  one or two people at some point, I think,
3  but I didn't work closely with any of
4  them.
5        THE SPECIAL MASTER:  Sorry to
6  interrupt.  Go ahead.
7  BY MR. BRODSKY:
8     Q.    Did Mr. Donziger have one phone
9  or more than one phone?
10     A.    He had a cell phone and there
11  was a landline.
12     Q.    And Mr. Donziger had one cell
13  phone or more than one cell phone during
14  the time you worked closely with him
15  between August 2009 and October 2010?
16     A.    I believe only one cell phone.
17     Q.    And do you know whether he had
18  one e-mail address or more than one e-mail
19  address during that period of time?
20     A.    I don't recall.
21     Q.    Do you recall what e-mail
22  address he used during that period of
23  time?
24     A.    I think it was Gmail, but I'm
25  not sure.  I don't recall, I'm sorry.

L. GARR

1
2     Q.    Are you familiar with any other
3  e-mail addresses that Mr. Donziger used?
4     A.    Similar to me, I had a Donziger
5  & Associate address, but it just was
6  forwarded directly to my Gmail account.
7  So I think he had the same situation, but
8  I don't recall now.
9        So I only accessed my Gmail
10  account but I had -- I mean, it was two
11  e-mail addresses, I guess, but it was only
12  accessed from Gmail.
13     Q.    Do you know if Mr. Donziger
14  prior to August 2009 used any other e-mail
15  addresses?
16     A.    I don't remember.  I don't
17  recall.  It would auto-populate.
18     Q.    Between August 2009 and October
19  2010, describe Mr. Donziger's role in
20  connection with the Lago Agrio litigation
21  in Ecuador.
22     A.    Mr. Donziger was a -- he would
23  do U.S. press-related activities and
24  coordinated with local counsel and counsel
25  in the U.S. and oversaw various

8 (Pages 26 - 29)

Page 30

L. GARR

1    litigation.
3    Q.    What do you mean by "oversaw
4  various litigation"?
5    A.    Would attend meetings with
6  counsel regarding litigation or meet for
7  press activities or for public awareness
8  or NGOs, coordinated.
9    Q.    You used the word "oversaw."
10  What did you mean by "oversaw the various
11  litigation"?
12    A.    If there were strategy meetings
13  or -- he didn't generally -- he didn't
14  draft actual motions, but he would review
15  motions or other, you know, court
16  submissions.
17    Q.    Is it fair to say he was in
18  charge of strategy?
19    A.    He collaborated on the
20  strategy.
21    Q.    And did he direct others to
22  prepare motions?
23    A.    Generally -- well, in Ecuador
24  he didn't -- I don't think he day to day
25  directed what motions were filed.  I did

Page 31

L. GARR

1    not witness that.
3    In the U.S., I think it was
4  just the major motions that were going to
5  be filed he would kind of discuss.  It
6  wasn't every motion that was filed, I
7  don't think he saw or directed.
8    Q.    Going to your -- what's the
9  basis of your knowledge about
10  Mr. Donziger's -- withdrawn.
11    How often did you observe
12  Mr. Donziger interact with the Ecuadorian
13  representatives of the Lago Agrio
14  plaintiffs between August 2009 and October
15  2010?
16    A.    How frequently did he interact
17  with them?
18    Q.    How frequently did you observe
19  him interacting with them?
20    A.    It varied.  I don't know.  With
21  some frequency.
22    Q.    Is it fair to say there were
23  many occasions where Mr. Donziger
24  interacted with the representatives of the
25  Lago Agrio plaintiffs in Ecuador without

Page 32

L. GARR

1    your participation?
3    MR. GOMEZ:  Objection to form.
4    THE SPECIAL MASTER:  You may
5  answer.
6    A.    Yes.
7    Q.    Is it fair to say that
8  Mr. Donziger communicated with the
9  representatives of the Lago Agrio
10  plaintiffs in Ecuador without your
11  participation?
12    A.    It is possible.  I mean, it is
13  possible, yes.
14    Q.    Did you overhear Mr. Donziger
15  speaking, during the period of time of
16  August 2009 through October 2010, did you
17  overhear Mr. Donziger speaking with
18  Mr. Fajardo?
19    A.    Yes.
20    Q.    Do you recall those
21  conversations?
22    A.    I mean, no distinct
23  conversation stands out, but I recall that
24  he would have conversations with
25  Mr. Fajardo either by phone or in person.

Page 33

L. GARR

1    Q.    And did you listen to -- at the
3  time did you listen to the entire
4  conversations, all the conversations they
5  were having, when you were present and you
6  overheard Mr. Donziger speaking with
7  Mr. Fajardo, did you listen to the entire
8  conversation?
9    A.    I mean, not always, no.
10  Generally if it was a phone conversation,
11  I would be working.  I was not listening,
12  but I was aware he was on the phone.
13    Q.    The same question with respect
14  to Mr. Prieto, were you present when
15  Mr. Donziger spoke to Mr. Prieto by phone?
16    A.    On some occasions, I'm sure.
17    Q.    Did you listen to the entire
18  conversation when Mr. Donziger was
19  speaking to Mr. Prieto?
20    A.    By phone, it is very unlikely
21  that I would have listened to the entire
22  conversation.
23    Q.    And between August 2009 and
24  October 2010, were you present when
25  Mr. Donziger spoke by telephone with Luis

9 (Pages 30 - 33)

Page 34
```
1            L. GARR
2 Yanza?
3    A.    I don't recall a specific
4 conversation, but I'm sure I was present
5 at some time that he spoke with Luis Yanza
6 by phone.
7    Q.    And were you able to listen to
8 the entire -- all the conversation, the
9 entire conversation when Mr. Donziger
10 spoke to Mr. Yanza?
11    A.    No.
12    Q.    And with Mr. Juan Pablo Saenz,
13 were you present when Mr. Donziger spoke
14 to Mr. Saenz by telephone?
15    A.    I'm sure, again, I was present
16 for a phone call, a phone call throughout
17 that time where they spoke.
18    Q.    And were you able to listen to
19 the entire conversation that they were
20 having when you were present?
21    A.    Again, I don't know.  I don't
22 know.
23    Q.    Did Mr. Donziger during the
24 period between August 2009 and October
25 2010 take trips to Ecuador without you?
```

Page 35
```
1            L. GARR
2    A.    Yes, I believe so, yes.
3    Q.    During the time that
4 Mr. Donziger was in Ecuador without you,
5 were you able to -- you weren't able to
6 observe whatever he was doing?
7    A.    No.
8    Q.    Is it fair to say between
9 August 2009 and October 2010 Mr. Donziger
10 was in charge of litigation strategy
11 relating to -- based on your
12 observations -- relating to the Section
13 1782 proceedings?
14    A.    I wouldn't say he was in
15 charge.  I think he -- I think he was
16 always -- no, I wouldn't -- no.
17    Q.    You think he was always
18 involved in the strategy meetings?
19    A.    I think he was generally
20 involved in major strategy meetings, but I
21 never observed him -- I think he was -- it
22 was -- I think he relied -- he didn't do
23 the actual legal work.
24    Q.    He didn't draft the motions?
25    A.    Yes, he didn't draft the
```

Page 36
```
1            L. GARR
2 motions, and also I don't think he was
3 aware -- I recall there were many
4 occurring at the same time.
5        I don't think he was -- I think
6 he kind of overall was part of some
7 strategy discussions, but then was not
8 really day to day involved with the actual
9 motions is what I observed.
10    Q.    Based on your observations, do
11 you know whether or not Mr. Donziger was
12 involved in the hiring of these firms, of
13 these law firms?
14    A.    I believe so, yes.
15    Q.    Mr. Donziger was the one who
16 was making the decision to select which
17 U.S. law firm would represent the
18 Ecuadorian Lago Agrio plaintiffs in
19 various actions in the U.S.?
20    A.    I wasn't involved in the
21 process of hiring, but I believe Steven
22 was, I think so, but I don't know.  But I
23 believe so.
24    Q.    Based on your observations
25 between August 2009 and October 2010, was
```

Page 37
```
1            L. GARR
2 Mr. Donziger -- what was Mr. Donziger's
3 role in raising funds to hire lawyers and
4 pursue the litigation in Ecuador?
5    A.    Again, that wasn't an aspect I
6 worked on ever, so I didn't witness it,
7 but I believe he was active in seeking
8 fundraising.
9    Q.    What is the basis for your view
10 that -- for your statement that he was
11 actively seeking fundraising?
12    A.    I was aware if he would be
13 going to attend meetings that I believe
14 were to either seek law firms to get
15 involved or potential fundraising, but I
16 didn't -- I didn't ever attend the
17 meetings and didn't always know exactly --
18 I guess it was assumption, sometimes, or
19 maybe I was told I'm going to a meeting to
20 see if we can get this firm involved, but
21 I didn't really know anything beyond that.
22        But that made me believe that
23 he was actively seeking fundraising, or
24 funds, or firms, to get involved.
25    Q.    Who, if anyone, worked with
```

10 (Pages 34 - 37)

Page 38

L. GARR

1  L. GARR
2  Mr. Donziger in raising funds based on
3  your observations between August 2009 and
4  October 2010?
5     A.    I think Andrew might have,
6  Andrew Woods might have, and H5 was
7  involved at one point, but, again, I'm not
8  sure exactly if they assisted in that.
9  Otherwise I don't -- I don't know.
10    Q.    What's your basis for
11 Mr. Woods' involvement in helping
12 Mr. Donziger raise funds?
13    A.    I don't know that he did.
14 There would be times that he would attend
15 meetings with Steven that I -- maybe, and,
16 again, I'm not entirely sure, I think it
17 was either with law firms, so that's more
18 of an assumption on my part. I'm not
19 entirely sure.
20    Q.    Did Mr. Donziger ever invite
21 you to attend a meeting in connection with
22 raising funds?
23    A.    No, not that I recall.
24    Q.    Did you ever attend, regardless
25 of whether you were invited or not, did

Page 39

1  L. GARR
2  you ever attend a meeting where
3  Mr. Donziger was raising funds?
4     A.    No, not that I recall, no.
5     Q.    Did Mr. Woods ever invite you
6  to meetings to raise money between --
7     A.    No. I'm sorry.
8     Q.    -- when you worked for
9  Mr. Donziger?
10    A.    No.
11    Q.    Did you report to Mr. Woods
12 during August 2009 and October 2010?
13    A.    I guess on some occasions. We
14 worked together but he -- he had been
15 working longer than I had, so in some
16 instances I guess, yes.
17    Q.    Were there instances where
18 Mr. Woods directed you to do things?
19    A.    I guess. I don't really recall
20 now. I think there were probably.
21    Q.    And Mr. Page, were there
22 instances where Mr. Page directed you to
23 do things?
24    A.    I don't recall.
25    Q.    What was -- describe the

Page 40

1  L. GARR
2  frequency of your communications with
3  representatives of the Lago Agrio
4  plaintiffs in Ecuador between August 2009
5  and October 2010.
6     A.    I'm sorry?
7     Q.    Describe the frequency of your
8  communication with the representatives of
9  the Lago Agrio plaintiffs in Ecuador
10 between August 2009 and October 2010.
11    A.    When you say the
12 representatives of the plaintiffs, I'm
13 sorry?
14    Q.    Describe the frequency of your
15 communication with Mr. Pablo Fajardo
16 between August 2009 and October 2010.
17    A.    I would on occasion go down to
18 Ecuador, and when I was there I would
19 speak with Pablo Fajardo. I believe
20 during that year there would be a few
21 e-mail correspondence as well, but minimal
22 e-mail correspondence probably with
23 Mr. Fajardo. I didn't work a lot directly
24 with him.
25    Q.    Did Mr. Donziger make any

Page 41

1  L. GARR
2  statements to you about his financial
3  interest in the litigation in Lago Agrio?
4     A.    I don't recall any specific
5  statements, no.
6     Q.    Do you recall any general
7  statements?
8     A.    I'm not sure if it was from
9  him.
10        THE SPECIAL MASTER: Excuse me,
11 Mr. Brodsky, you have a contract. You
12 have 1782 testimony from the horse's
13 mouth. Why do we need to sit here and
14 listen to these generalities? Can we get
15 to things that are relevant to me, for
16 example, because I have an obligation to
17 go through the documents at the judge's
18 order, so why don't we get to specifics
19 instead of these, you know, generalities,
20 tell me roughly what you did.
21        MR. BRODSKY: Understood.
22        THE SPECIAL MASTER: Please.
23 They are your seven hours. You can spend
24 them how you want. If you want to spend
25 them with generalities like that, I think

11 (Pages 38 - 41)

L. GARR

1
2 I could go do something better with my
3 time.
4       MR. BRODSKY: Understood.
5    Q.    Ms. Garr, let me direct your
6 attention to the Aguinda versus Chevron
7 case.
8       Did you have any -- did you
9 know who -- did you meet any of the
10 plaintiffs in the Lago Agrio case in
11 Ecuador?
12   A.    I believe so, yes.
13   Q.    In between the period of August
14 2009 and October 2010 did you meet with
15 any of them in person?
16   A.    I don't recall if I did during
17 that time.
18   Q.    Let me direct your attention to
19 Richard Stalin Cabrera Vega. Who is
20 Mr. Cabrera?
21   A.    My understanding is that he was
22 the global assessment expert in the
23 litigation in Ecuador.
24   Q.    What is that understanding
25 based on?

L. GARR

1
2    A.    From documents filed and also
3 in 2007 I observed field inspections that
4 he was taking at the time.
5    Q.    Did you ever meet him in
6 person?
7    A.    I don't think I was ever
8 introduced to him, but I observed him in
9 the field, in person. I saw him.
10   Q.    Did Mr. Donziger talk to you
11 about Mr. Cabrera in 2007 when you worked
12 for him?
13   A.    I don't recall if there was
14 discussion specifically about him, but I
15 was aware of his role in the work that was
16 being done at the time, that he was doing
17 field inspections at the time.
18   Q.    When you say he was doing field
19 inspections, you mean Mr. Cabrera?
20   A.    Yes, sorry.
21       THE SPECIAL MASTER: And that
22 was before he became the global expert,
23 correct?
24       THE WITNESS: I believe that
25 was while he was performing his work as

L. GARR

1
2 the global assessment expert.
3    Q.    Did Mr. Donziger talk to you
4 about Mr. Cabrera between -- in 2009 and
5 2010?
6    A.    Yes.
7    Q.    In early 2009 when you had an
8 externship with Mr. Donziger, did he talk
9 to you about Mr. Cabrera?
10   A.    No, not that I recall.
11   Q.    What's your earliest
12 recollection of Mr. Donziger discussing
13 Mr. Cabrera when you started working for
14 him in August of 2009?
15   A.    I don't recall exactly when it
16 was, but it was when the 1782 filing in
17 Colorado took place, and, I'm sorry, and
18 there were also -- I would see his name in
19 various references to the damage report as
20 well in documents, but no discussion
21 really outside of that.
22   Q.    When you say his damage report,
23 you mean --
24   A.    Mr. Cabrera.
25   Q.    Mr. Cabrera's report?

L. GARR

1
2    A.    Yes.
3    Q.    His final report that was -- a
4 final report submitted with the name
5 Richard Stalin Cabrera Vega in Ecuador?
6    A.    Yes.
7    Q.    I'm going to show you Exhibit
8 723. Let me show you Exhibit 723 and
9 Exhibit 724. And we will distribute
10 copies to everybody.
11       (Plaintiff's Exhibit 723 marked
12 for identification.)
13       (Plaintiff's Exhibit 724 marked
14 for identification.)
15   Q.    Ms. Garr, did you ever see
16 Exhibit 723 -- well, let's start with the
17 Spanish first.
18       Did you ever see Exhibit 724
19 before?
20   A.    If this is the actual Cabrera
21 report, then I have. I don't fully
22 recognize it completely now, but if this
23 is, then I have, then yes.
24   Q.    When did you see the Cabrera
25 report, or the report filed under

12 (Pages 42 - 45)

Page 46

```
1            L. GARR
2 Cabrera's name, Exhibit 724?
3     A.     There was a copy of the English
4 and Spanish version I believe posted on
5 the website of the Lago Agrio plaintiffs.
6 So for various reasons I would have seen
7 this document.
8     Q.     In the period between -- when
9 Mr. Donziger first mentioned Mr. Cabrera
10 to you in connection with the 1782
11 proceedings, did Mr. Donziger describe his
12 relationship, if any, with Mr. Cabrera to
13 you?
14     A.     In the first communication
15 related to 1782?
16     Q.     The first time he brought it
17 up.
18     A.     No.
19     Q.     At any point in time after he
20 first brought it up through October 2010,
21 did Mr. Donziger describe his interactions
22 with Mr. Cabrera in the past?
23     A.     There were discussions about --
24 there were discussions about documents
25 that were given to Richard Cabrera,
```

Page 47

```
1            L. GARR
2 although I don't think -- I don't recall
3 him ever saying he was -- those were
4 personal interactions he had with Cabrera,
5 but it was the Lago Agrio team.
6     Q.     What do you remember
7 Mr. Donziger saying about those
8 interactions between the Lago Agrio team
9 and Mr. Cabrera?
10     A.     That there were documents
11 submitted to Mr. -- that the Lago Agrio
12 plaintiffs did submit documents to
13 Mr. Cabrera for use in the damages report,
14 in the global assessment report.
15     Q.     What, if anything, did
16 Mr. Donziger say regarding who on the Lago
17 Agrio plaintiffs' team provided these
18 documents to Mr. Cabrera?
19     A.     I don't recall personally -- I
20 don't recall specifically who personally
21 delivered, if I ever knew that.
22     Q.     Did Mr. Donziger ever tell you
23 that Stratus Consulting -- are you
24 familiar with Stratus Consulting?
25     A.     Yes.
```

Page 48

```
1            L. GARR
2     Q.     At the time in August -- in
3 2010 were you familiar with Stratus
4 Consulting?
5     A.     Yes.
6     Q.     Did Mr. Donziger describe to
7 you Stratus Consulting's role in
8 connection with Mr. Cabrera's report, in
9 the Cabrera report?
10     A.     Yes, in part, yes.
11     Q.     What did Mr. Donziger tell you?
12     A.     That Stratus Consulting was the
13 one that drafted and prepared the
14 materials that were submitted to
15 Mr. Cabrera.
16     Q.     Did Mr. Donziger tell you that
17 Stratus had written the report?
18     A.     I think it was portions of the
19 report was my understanding of what was
20 said, that there were portions of the
21 report.
22     Q.     What's your earliest
23 recollection of when Mr. Donziger told you
24 this?
25     A.     I don't recall the exact date.
```

Page 49

```
1            L. GARR
2 It was after the 1782 filing.  I don't
3 know exactly when that was.
4     Q.     And when you reference a 1782
5 filing, do you mean the action filed in
6 the District of Colorado?
7     A.     Yes.
8     Q.     Was it shortly after the action
9 was filed or months after the action was
10 filed?
11     A.     I think it was -- I don't know
12 if it was -- I don't recall.  It was not
13 immediately, but I don't recall exactly
14 when.
15          MS. PARADISE:  Objection to
16 form.  Can you clarify what you mean by
17 "the report"?
18          THE SPECIAL MASTER:  It is a
19 little late, and there is no speaking
20 objection.
21          MS. PARADISE:  I apologize.
22     Q.     Did Mr. Donziger tell you
23 anything about the delivery of the Cabrera
24 report to Mr. Cabrera on the day the
25 report was filed?
```

13 (Pages 46 - 49)

L. GARR

1
2    A.    I'm sorry, can you repeat that?
3    Q.    Did Mr. Donziger tell you that
4 Stratus or -- withdrawn.
5        Did Mr. Donziger tell you
6 anything about the -- tell you anything
7 that a report was given -- a document was
8 given to Mr. Cabrera to be filed on the
9 day the Cabrera report was filed?
10   A.    I don't recall anything that
11 specific.
12   Q.    Did Mr. Donziger tell you
13 anything about Stratus Consulting writing
14 the report using the name of Richard
15 Cabrera Vega in the report?
16       MS. PARADISE: Objection to
17 form.
18       THE SPECIAL MASTER: You may
19 answer.
20   A.    I don't know if it was
21 Mr. Donziger who told me that. I do
22 recall becoming aware that Stratus'
23 written product included the name Richard
24 Cabrera, I mean, was written using the
25 name Richard Cabrera.

L. GARR

1
2    Q.    How did you become aware of
3 that?
4    A.    I don't recall. It might have
5 been Steven. I don't recall.
6    Q.    Do you recall learning it from
7 a person or seeing documents?
8    A.    Again, I don't recall. I don't
9 know if it was the filings. I don't
10 recall.
11       THE SPECIAL MASTER: Excuse me,
12 were you in Ecuador at or about April
13 2008?
14       THE WITNESS: No.
15   Q.    Did you speak to -- withdrawn.
16       Were other people present when
17 you learned that Stratus had written a
18 report or portions of a report using the
19 name Richard Cabrera Vega?
20       MR. GOMEZ: Objection to form.
21       MS. PARADISE: Objection to
22 form.
23       THE SPECIAL MASTER: You may
24 answer. Overruled.
25   A.    I don't recall exactly when or

L. GARR

1
2 how I learned that, so it is possible
3 there were people present. I just don't
4 remember that specific detail.
5    Q.    Did you have an understanding
6 at the time in 2010 that the report filed
7 under the name Richard Cabrera Vega
8 purported to include all the names of
9 people and experts who contributed to the
10 report?
11   A.    I'm sorry, can you repeat the
12 question?
13   Q.    Did you have an understanding
14 in 2010 that the report filed under the
15 name Richard Cabrera Vega, Exhibit 723,
16 724 in Spanish, purported to list all the
17 names of the experts and others who
18 contributed to the report?
19   A.    I mean, I don't -- I don't
20 recall if I had that understanding then.
21   Q.    Did you know whether or not
22 Stratus Consulting's name appeared
23 anywhere in the report filed under the
24 name Richard Cabrera Vega?
25   A.    I don't know.

L. GARR

1
2    Q.    Did you know at the time?
3    A.    Not that I recall, no.
4    Q.    Do you recall any discussion
5 about that?
6    A.    No.
7    Q.    Did you have conversations with
8 Mr. Woods about the fact that Stratus
9 Consulting had prepared portions of the
10 Cabrera report using the name Richard
11 Cabrera Vega?
12       MS. PARADISE: Objection to
13 form.
14   A.    I don't recall any specific
15 conversations with Andrew about that
16 detail and I don't recall specific
17 discussions with him, but I know -- I
18 recall there being discussions about the
19 documents being submitted.
20       I don't know about the name
21 detail that you are speaking about, but
22 just the documents being submitted.
23   Q.    Did you have an understanding
24 that, in 2010, that Mr. Cabrera was
25 supposed to be an independent expert?

14 (Pages 50 - 53)

Page 54

L. GARR

2 A.    Yes.
3 Q.    And he was supposed to be an
4 impartial expert?
5 A.    I had an understanding that it
6 was an independent court-appointed expert.
7 Q.    And did you have an
8 understanding that he had to be impartial?
9 A.    I believe so, yes.
10 Q.    Did Mr. Donziger tell you that
11 Stratus had written the Cabrera report?
12 A.    No. I mean, he never said
13 that, but he did say that Stratus had
14 prepared materials that were given to
15 Cabrera for use in his report.
16 Q.    Did you take any trips to
17 Ecuador in 2010 in connection with
18 assisting Mr. Donziger in responding to
19 Chevron's allegations in the 1782 action
20 filed in the District of Colorado?
21 A.    Yes.
22 Q.    When was your first trip?
23 A.    I believe it was sometime in
24 March of 2010.
25 Q.    Did you go alone or with other

Page 55

L. GARR

2 people on that trip?
3 A.    I believe it was just me from
4 the U.S. that went.
5 Q.    How long was your trip?
6 A.    I don't recall. Maybe a week.
7 I don't recall.
8 Q.    Who told you to take that trip?
9 A.    Steven, and I don't know if
10 there were other people that were
11 involved, but Steven.
12 Q.    What did Mr. Donziger tell you
13 the purpose of your trip was?
14 A.    I don't recall specifically
15 what was stated at the time. I think just
16 generally it was to go speak with a local
17 team to find any court orders or other
18 documentation from the Ecuadorian record
19 related to the documents being provided to
20 Cabrera.
21 Q.    In addition to looking at the
22 court record, did he tell you that you
23 were going to do anything else?
24 A.    No, although I don't know it
25 was that specific either. I think there

Page 56

L. GARR

2 wasn't -- it was just to kind of -- no,
3 not that I recall, no.
4 Q.    Did he tell you who you were
5 going to be meeting with?
6 A.    No, but it was to go to the
7 local -- to the Ecuadorian legal team to
8 work with them.
9 Q.    And when you went there, who
10 did you meet with and work with during
11 that first trip to Ecuador in 2010?
12 A.    Julio Prieto and Juan Pablo
13 Saenz, and I don't recall if Pablo Fajardo
14 was there or not during that time. And
15 then there was -- I don't recall the name.
16     There is usually -- there is
17 sometimes women working in the office as
18 well and others that kind of help to pull
19 court records, there is kind of like
20 administrative help there.
21 Q.    Do you recall his or her name?
22 A.    I don't, I'm sorry.
23 Q.    Heredia, does the name Heredia
24 sound familiar to you?
25 A.    I don't know, I'm sorry.

Page 57

L. GARR

2 Q.    And what did you do when you
3 were in Ecuador?
4 A.    I worked -- I don't recall
5 specifically if it was Juan Pablo or Julio
6 or if there was somebody else, but going
7 through the record related to that time
8 period of when Cabrera -- when documents
9 were being submitted to Cabrera and
10 looking for court orders relevant to
11 document submission.
12     (Plaintiff's Exhibit 4207
13 marked for identification.)
14 Q.    Let me show you what's marked
15 as Exhibit 4207, a one-page document from
16 Aaron Marr Page on March 3rd, 2010 to
17 lauragarr@gmail.com, subject line, Re --
18     THE SPECIAL MASTER: Excuse me,
19 is this a document that was produced, is
20 this one of the 150 documents?
21     MR. BRODSKY: Yes.
22     THE SPECIAL MASTER: Why don't
23 we identify it. It has got the Bates
24 stamp number GARR00064446.
25 Q.    Ms. Garr, do you recognize the

15 (Pages 54 - 57)

L. GARR

2 document?
3    A.    This is one of the ones that I
4 had reviewed in preparation, so yes.
5    Q.    Do you recall exchanging --
6 communicating with Mr. Page about your
7 trip to Ecuador?
8    A.    I don't recall from then, but I
9 see it now.
10   Q.    Does this refresh your
11 recollection one way or the other -- let
12 me direct your attention to Mr. Page's
13 e-mail at the bottom where he says "Laura,
14 if you are booking at Hotel Quito for you
15 and Steven, can you get a room for me as
16 well?"
17          Do you see that?
18   A.    Uh-huh.
19   Q.    And then your response, "Room
20 will be taken care of, see you tom," and
21 then Mr. Page's response, "You on the same
22 Delta flight?  When is Steven getting in?"
23          Do you see that?
24   A.    I do.
25   Q.    Does this refresh your

L. GARR

2 recollection that Mr. Donziger was in
3 Ecuador at the same time?
4    A.    No, I don't recall him being
5 there.  He might have been, but I don't
6 recall.
7    Q.    And you don't recall any
8 observations of Mr. Donziger during the
9 time -- during this trip when you went to
10 Ecuador?
11   A.    It is possible.  I really just
12 don't remember, I'm sorry.
13   Q.    Let me show you Exhibit 879.
14       (Plaintiff's Exhibit 879 marked
15 for identification.)
16          THE SPECIAL MASTER:  Excuse me,
17 Ms. Garr, were you down there basically
18 the entire month of March?
19          THE WITNESS:  No.  I think I
20 went on a few occasions, so this might be
21 a different trip than the one I was
22 thinking of of going through the court
23 record.
24          THE SPECIAL MASTER:  You went
25 on a few occasions during the month of

L. GARR

2 March?
3          THE WITNESS:  I think so.  I
4 don't recall, but I think so.
5    Q.    Let me show you Exhibit 4267.
6       (Plaintiff's Exhibit 4267
7 marked for identification.)
8          THE SPECIAL MASTER:  We are not
9 using 879, we are doing something else
10 first?
11          MR. BRODSKY:  Yes.
12          THE SPECIAL MASTER:  Okay.
13   Q.    Ms. Garr, I'm showing you a
14 one-page document with a certified
15 translation behind it.  The one-page
16 document at the top says Comprehensive
17 Information System of the National Police
18 of Ecuador, National Migration Office,
19 Certificate of Border Crossing Activity,
20 and report date states April 29, 2013.
21          Directing your attention to the
22 column where it says Date, Arrival In
23 Quito, March 3rd, 2010, and Departure,
24 March 9, 2010; do you see that?
25   A.    I do.

L. GARR

2    Q.    Does that refresh any
3 recollection that you were in Quito,
4 Ecuador from March 3rd through March 9th?
5          MR. GOMEZ:  Objection.
6    A.    I believe that to be true, yes.
7    Q.    To the best of your
8 recollection, were you there approximately
9 six days?
10   A.    It sounds about right.
11   Q.    Do you see --
12   A.    I'm sorry, I don't recall if
13 this was when I was talking about a trip
14 where I went through the court record.  I
15 don't know if it was during this time
16 period.
17   Q.    You don't know if it was the
18 first trip?
19   A.    Yeah.
20   Q.    Do you see where it says
21 arrival, then, on March 17th, 2010 to
22 Quito, departure, March 23rd, 2010?
23   A.    Yes.
24   Q.    Do you recall taking a second
25 trip to Ecuador in March 2010?

16 (Pages 58 - 61)

Page 62

L. GARR

1
2   A.   Very vaguely, yes. I don't
3 recall the exact, but yes.
4   Q.   Do you recall that the length
5 of your second trip to Ecuador in March of
6 2010 was approximately the same length as
7 your first trip to Ecuador?
8   A.   I generally recall always it
9 being around a week that I would be gone
10 for.
11   Q.   And then directing your
12 attention to April 12th, 2010, arrival in
13 Quito and departure, April 15th, 2010, do
14 you see that?
15   A.   Uh-huh, yes.
16   Q.   Did you take a trip to Ecuador,
17 a third trip to Ecuador in April 2010?
18   A.   I believe, looking at this, I
19 believe I did, but I don't recall
20 specifically.
21   Q.   Do you recall sitting here
22 today what the purpose of each of those
23 trips was?
24   A.   I don't, not independently. I
25 know one of the trips was to go through

Page 63

L. GARR

1
2 the court record.
3   Q.   Sitting here today, you don't
4 remember whether that was the first trip,
5 the second trip or the third trip?
6   A.   I don't, I'm sorry.
7   Q.   Let me show you Exhibit 879.
8 It is a four -- I'm sorry, it is a
9 four-page document labeled In the United
10 States District Court for the District of
11 Colorado, Chevron, Petitioner, to Issue
12 Subpoenas for the Taking of Depositions
13 and the Production of Documents, Affidavit
14 of Andrew Woods in Support of Motion for
15 Leave to File Brief in Opposition to
16 Chevron's 28 U.S.C. Section 1782 Petition.
17       Do you see that?
18   A.   I'm sorry?
19   Q.   Do you see the document?
20   A.   Yes, I do, sorry.
21   Q.   Are you familiar with this
22 document, the declaration, or affidavit of
23 Andrew Woods?
24   A.   Yes, I saw this, again, in
25 preparation for this.

Page 64

L. GARR

1
2   Q.   Prior to seeing it in
3 preparation, do you remember seeing this
4 in or about March of 2010 or February of
5 2010?
6   A.   I recall that Andrew had filed
7 an affidavit during that time, yes.
8   Q.   Did you have any role in
9 drafting the affidavit?
10   A.   Not that I recall, no.
11   Q.   Did you speak with Mr. Woods
12 regarding this affidavit at the time?
13   A.   I recall when this was being --
14 that he was doing an affidavit, so I'm
15 sure we had some communication.
16   Q.   Did you speak with Mr. Woods
17 regarding the purpose of filing this
18 affidavit?
19       MR. GOMEZ: Objection. I just
20 instruct the witness to be mindful not to
21 reveal any attorney work product,
22 attorney-client communication.
23       THE SPECIAL MASTER: Overruled.
24 There are a great many waivers that are
25 involved here. One of them is the one I

Page 65

L. GARR

1
2 told you about and that I ruled on at the
3 McDermott deposition, which is this
4 subject, the Colorado proceeding and the
5 Cabrera report were the subject of very
6 substantial questioning of Mr. Donziger at
7 which were present counsel -- three
8 different ones for the Lago Agrio
9 plaintiffs and counsel for Mr. Donziger,
10 and throughout hours of testimony on the
11 subject, not a single privilege objection
12 was asserted, never mind ruled upon, and
13 therefore as I ruled in the McDermott
14 deposition, there was a waiver by the Lago
15 Agrio plaintiffs and counsel with respect
16 to work product as well as with respect to
17 attorney-client communications, and
18 therefore your privilege objection is
19 overruled for that reason alone.
20       It is also a subject of, as you
21 know, one of the specifications of fraud
22 ruled on by Judge Kaplan, that is the
23 Cabrera report, the fraud in connection
24 therewith, and the fraud upon the court in
25 connection with the Colorado proceeding,

17 (Pages 62 - 65)

Page 66

L. GARR

1
2 and with respect to those subjects,
3 independently of the waiver, the court has
4 ruled that the first branch of the
5 crime-fraud exception has been met in that
6 there is substantial reason to believe
7 that a reasonable person would conclude
8 there is probable cause that a fraud or
9 crime was committed.
10        The second branch is the one
11 that falls to me to rule on the question
12 whether a particular communication under
13 the case law in the Second Circuit is in
14 furtherance of the fraud, and I think it
15 is fair to say that a communication
16 submitted to the court in Colorado by
17 Mr. Woods relating to Cabrera is in
18 furtherance of both of the frauds
19 specified by Judge Kaplan, that is the
20 Cabrera fraud as well as the fraud upon
21 the court.
22        So your objection is overruled
23 for that reason as well.
24        You may answer the question.
25    A.    I'm sorry, can you repeat the

Page 67

L. GARR

1
2 question?
3        THE SPECIAL MASTER:  The
4 question was, did you speak with Mr. Woods
5 regarding the purpose of filing this
6 affidavit?
7        THE WITNESS:  I don't recall
8 any specific conversations.
9    Q.    Do you recall a general
10 conversation?
11    A.    Not really, no, I'm sorry.
12    Q.    Do you recall any conversation
13 with Mr. Donziger about the filing of this
14 affidavit?
15    A.    I don't recall any specific
16 conversations.
17    Q.    Do you recall any general
18 conversations with Mr. Donziger?
19    A.    No.  But reading this now --
20 no, I'm sorry, I don't recall any
21 conversations.
22    Q.    Do you recall any conversations
23 with Mr. Woods at any time after this
24 affidavit was filed where Mr. Woods
25 expressed concern regarding his filing of

Page 68

L. GARR

1
2 this affidavit?
3    A.    I recall -- yeah, I recall him
4 being concerned at some point after
5 filing.
6    Q.    What did Mr. Woods tell you
7 regarding his concerns?
8    A.    Again, I don't recall any
9 specific conversation, but I recall there
10 being something filed by Chevron saying
11 that -- or an affidavit filed saying that
12 there was something inaccurate about
13 Ecuadorian law I believe in this -- that
14 was in Andrew Woods' affidavit and him
15 expressing concern that he filed an
16 affidavit that would have inaccurate
17 information in it, that he was relying on
18 Ecuadorian counsel to provide Ecuadorian
19 law, and if it was inaccurate, he was
20 concerned about that.
21        MR. GOMEZ:  Excuse me, your
22 Honor, should I continue to object just to
23 preserve the record?
24        THE SPECIAL MASTER:  Yes, if
25 you want to object --

Page 69

L. GARR

1
2        MR. GOMEZ:  As opposed to a
3 standing objection?
4        THE SPECIAL MASTER:  Yes.
5        MR. GOMEZ:  Okay.  I understand
6 your ruling and I'm sure likely it will
7 apply, but just to preserve the record.
8        THE SPECIAL MASTER:  Are you
9 objecting?  The answer was given.
10        MR. GOMEZ:  Not yet.  The
11 answer was given.  Going forward.
12    Q.    You spoke to Mr. Woods when he
13 expressed this concern?
14    A.    I don't recall the specifics of
15 the conversation, but I remember there
16 being -- I believe it was maybe directed
17 at Steven, but I was present, but I
18 remember him voicing concern after an
19 affidavit was filed saying his affidavit
20 had inaccurate information.
21    Q.    You remember, was this in
22 Mr. Donziger's apartment?
23    A.    I believe so, but I'm not
24 entirely sure.  I believe so.
25    Q.    Mr. Woods was expressing

18 (Pages 66 - 69)

Page 70

1           L. GARR
2   concern regarding the accuracy of the
3   affidavit to Mr. Donziger in your
4   presence?
5           MR. GOMEZ: Objection.
6           THE SPECIAL MASTER: Overruled.
7   A.    I believe there was an
8   affidavit or some filing where it was --
9   there was an allegation or it was stated
10  that there was -- Ecuadorian law, if I'm
11  recalling correctly, that Ecuadorian law
12  was misrepresented, so Andrew was
13  expressing concern if that was true, then
14  I was relying on Ecuadorian counsel to
15  explain Ecuadorian law to me.
16          It was not that -- he didn't
17  know if his was inaccurate or not, it was
18  the allegation that something under
19  Ecuadorian law was improper, and he was
20  saying I'm concerned because this went in
21  under my name and I was relying on what I
22  was told by Ecuadorian counsel about
23  Ecuadorian law.
24  Q.    What did Mr. Donziger say in
25  response?

Page 71

1           L. GARR
2           MR. GOMEZ: Objection.
3           THE SPECIAL MASTER: Overruled.
4   A.    Again, I don't recall
5   specifically, but I believe it was then --
6   there was an effort to again revisit the
7   Ecuadorian law point to see if in fact the
8   information was accurate.
9   Q.    Let me direct your attention to
10  paragraph 9 of the affidavit of Mr. Woods
11  where it said in the first sentence
12  "Chevron had numerous opportunities to
13  seek in Ecuador the same discovery it
14  seeks in the United States. Likewise,
15  Chevron had many opportunities and
16  substantial time to seek information to
17  impeach the credibility of the
18  court-appointed expert in Ecuador, Richard
19  Stalin Cabrera Vega."
20          Do you recall whether that was
21  of concern to Mr. Woods?
22          MR. GOMEZ: Objection.
23          THE SPECIAL MASTER: Overruled.
24  A.    Not that I recall.
25  Q.    If you look at the next page of

Page 72

1           L. GARR
2   the affidavit, paragraph 10, it says "In
3   order to oppose Chevron's petition,
4   plaintiffs' attorney must obtain the bulk
5   of their information from Ecuador,
6   including possible travel to Ecuador."
7           Do you see that?
8   A.    Yes.
9   Q.    Did you have any conversation
10  with Mr. Woods regarding that statement?
11          MR. GOMEZ: Objection.
12  A.    Not that I recall.
13          THE SPECIAL MASTER: Overruled.
14  Is this a privilege objection?
15          MR. GOMEZ: Yes.
16          THE SPECIAL MASTER: All he
17  asked was whether or not she had a
18  conversation on a subject. Are you
19  still --
20          MR. GOMEZ: I will withdraw the
21  objection.
22          THE SPECIAL MASTER: That's
23  what I thought. Move on.
24  A.    Not that I recall.
25  Q.    Did you have a conversation

Page 73

1           L. GARR
2   with Mr. Donziger about that?
3   A.    No, not that I recall.
4   Q.    In the next paragraph, it says
5   "The plaintiffs and their attorneys must
6   conduct investigation in Ecuador, obtain
7   affidavits from witnesses, wade through
8   portions of the 200,000 page trial record
9   and Ecuadorian statutes and rules in order
10  to present the court with a thorough
11  opposition."
12          Do you see that?
13  A.    I do see that.
14  Q.    Did Mr. Donziger tell you that
15  you were going to Ecuador to conduct an
16  investigation?
17  A.    I don't recall that language,
18  no.
19  Q.    Did you have an understanding
20  that you were in Ecuador to conduct an
21  investigation?
22  A.    I understood that I was to look
23  into the court record to find any relevant
24  court orders.
25  Q.    Did you understand -- did you

19 (Pages 70 - 73)

Page 74

1        L. GARR
2  have any role -- did Mr. Donziger ask you
3  to obtain affidavits from witnesses when
4  you were there?
5      A.    Not that I recall.
6      Q.    Are you aware of whether
7  Mr. Donziger obtained any affidavits from
8  witnesses while there in Ecuador?
9      A.    I don't recall.  I believe
10  affidavits were obtained related to the
11  evidentiary period.  I believe affidavits
12  were obtained, I don't know if it was in
13  Ecuador, but I believe there were
14  affidavits obtained for purposes of the
15  1782, but I don't recall now.
16      Q.    Do you see where it says "wade
17  through portions of the 200,000 page trial
18  record"?
19      A.    Yes.
20      Q.    Did you understand that that's
21  what you were doing in Ecuador at some
22  point between March and April 2010?
23      A.    I mean, I understood that I was
24  looking into the trial record for the
25  court orders.

Page 75

1        L. GARR
2      Q.    And how did you do that when
3  you were down there?
4      A.    Worked with the local counsel
5  there to go through the trial record and
6  find the relevant portions, looking
7  through -- they had copies of the record
8  in a huge room of just the trial record,
9  so it was trying to find the relevant
10  dates and documents.
11      Q.    When you say they had copies of
12  the trial record, who do you mean by
13  "they"?
14      A.    The Ecuadorian lawyers there,
15  so Julio and Juan Pablo and Pablo Fajardo,
16  in the Quito office, they had copies of
17  the trial record, hard copies.
18      Q.    Hard copies of the trial
19  record?
20      A.    Hard copies of the trial
21  record.
22      Q.    Did part of your job in going
23  through, looking at the trial record,
24  include obtaining Mr. Cabrera's statements
25  in 2007 to the Lago Agrio Ecuadorian court

Page 76

1        L. GARR
2  regarding his role as an expert?
3      A.    I believe I was looking at his
4  request for documents to the court.  I
5  don't recall now specifically of like
6  initial things about his role, but I think
7  there was some included in the ones
8  related to his --
9      Q.    Who, if anybody, directed you
10  what to look for in the Ecuadorian record
11  relating to Cabrera?
12      A.    Well, the Ecuadorian -- the
13  Ecuadorian attorneys were the ones that
14  had a knowledge of the trial record, so
15  they were the ones that were specifically
16  kind of pulling the files.  I just
17  reviewed them once they pulled them.
18      Q.    And were you looking for
19  specific support for the notion that
20  Stratus and others on behalf of the
21  Ecuadorian Lago Agrio plaintiffs were
22  permitted to provide information to
23  Mr. Cabrera?
24          MR. GOMEZ:  Objection.
25          THE SPECIAL MASTER:  Overruled.

Page 77

1        L. GARR
2      A.    It was, yes, that documents had
3  been provided to Cabrera on behalf of the
4  Lago Agrio plaintiffs and court rulings or
5  Cabrera seeking that information and any
6  court order that proved the submission of
7  documents to Cabrera.
8      Q.    Did you come across statements
9  Cabrera made relating to his role as an
10  independent expert?
11      A.    I don't recall on that trip.  I
12  do recall seeing statements -- I do recall
13  seeing statements that Cabrera had made to
14  the court regarding his role, but I don't
15  recall if it was during that time period,
16  or I mean that visit.
17      Q.    The trial record that you went
18  through in the Quito office of the Lago
19  Agrio plaintiff lawyers, whose office was
20  it again?  Was it Pablo Fajardo's office?
21      A.    It is a building, it is kind of
22  like a house kind of, so there is just
23  many rooms in it and common areas, and
24  within that is Julio Prieto, Juan Pablo
25  Saenz, Pablo Fajardo all kind of have

20 (Pages 74 - 77)

Page 78

1        L. GARR
2 space in there.
3    Q.    And the trial record that was
4 there, was that -- was it your
5 understanding that was an exact duplicate
6 copy of the court trial record in Lago
7 Agrio?
8    A.    I believe so, although I think
9 it was -- my understanding is that it is
10 not fully complete, as in there is a delay
11 from when the documents are actually
12 physically copied and then brought to the
13 office, so it was -- it might not have
14 been the exact duplicate of the court
15 record, but it was up until the point of
16 the last time somebody made photocopies of
17 the record.
18    Q.    Your understanding, it was a
19 complete record up until the point where
20 photocopies could be made of the last
21 entries in the court record?
22    A.    Yes, or up until the time that
23 somebody physically went and made the
24 copies that might have been available for
25 copy, but had not been done yet.

Page 79

1        L. GARR
2    Q.    Was this the same location in
3 2007 that you worked in, the offices that
4 you described with the trial record, the
5 copy of the trial record, was that the
6 same offices that you worked in in 2007?
7    A.    Yes.
8    Q.    Those are the offices of Selva
9 Viva?
10   A.    Yes.
11   Q.    Same layout, same Julio Prieto,
12 Juan Pablo Saenz, Pablo Fajardo there?
13   A.    Yes.
14        MR. BRODSKY: Mr. Gitter, maybe
15 this is a good time for the morning break.
16        THE SPECIAL MASTER: Morning
17 break, that is fine.
18        Before we go off the record,
19 however, I meant to say before when I was
20 addressing Mr. Gomez's objection at some
21 length, when I was addressing it at some
22 length, I neglected to mention that at the
23 McDermott deposition when I first raised
24 this point about waiver by dint of
25 Mr. Donziger's unobjected to testimony, we

Page 80

1        L. GARR
2 gave to Mr. Gomez the complete transcript
3 totaling some 6,000 pages electronically
4 of the Donziger transcript and we also
5 gave him a small sampling of the many
6 hundreds of pages which we had identified
7 as constituting some of the pages dealing
8 with the subject matter as to which there
9 was waiver.
10        Fair statement, Mr. Gomez?
11        MR. GOMEZ: Yes, fair
12 statement.
13        THE SPECIAL MASTER: Thank you.
14 We are taking our break.
15        THE VIDEOGRAPHER: We are going
16 off the record. The time is 10:34 a.m.
17        (Recess taken.)
18        THE VIDEOGRAPHER: We are back
19 on the record. The time is 10:55 a.m.
20 This is the beginning of disk two.
21        THE SPECIAL MASTER: Before you
22 continue, I would like to ask a few
23 clarifying questions for the court, and my
24 order of appointment, Mr. Hille, permits
25 me to ask questions of a witness as if I

Page 81

1        L. GARR
2 were a judge.
3        MR. HILLE: Understood.
4        THE SPECIAL MASTER: Ms. Garr,
5 just a few additional questions.
6        You described the layout of the
7 offices down in Quito and that there was
8 one room which was devoted to housing at
9 least the court record. Were there also
10 other rooms with other files relating to
11 the litigation throughout?
12        THE WITNESS: Yes.
13        THE SPECIAL MASTER: And did
14 you have access to those files when you
15 were down there, not necessarily on that
16 occasion, but generally when you went down
17 there?
18        THE WITNESS: I never -- I
19 don't know. I think the other documents,
20 I believe some of them were like in desk
21 drawers of other people that worked there,
22 so I don't know if they were locked or
23 not. I didn't ever seek any documents
24 elsewhere.
25        THE SPECIAL MASTER: You never

21 (Pages 78 - 81)

Page 82

L. GARR

1  sought any documents other than the court
2  record in any of your travels down there?
3      THE WITNESS:  I always did
4  obtain documents from people, but I
5  didn't -- it was always given to me by
6  people that worked there.  So I don't know
7  exactly where they were.
8      THE SPECIAL MASTER:  And did
9  you bring some of those documents back to
10  the United States?
11      THE WITNESS:  Usually they were
12  scanned, whatever the relevant documents
13  were, unless it was too large to scan,
14  then there would be hard copies brought
15  back.
16      THE SPECIAL MASTER:  And were
17  some of the ones that were scanned sought
18  back for use by local counsel in the
19  various proceedings that were going on in
20  the United States?
21      THE WITNESS:  I believe so,
22  yes.
23      THE SPECIAL MASTER:  And did
24  you experience any delays in getting such

Page 83

L. GARR

1  documents?
2      The reason for the question
3  being that there is an allegation, and I'm
4  supposed to do privilege rulings here,
5  about delays.  Did you experience any
6  delays in getting documents that were
7  wanted or needed by the lawyers in the
8  United States for delivering to courts,
9  for example?
10      THE WITNESS:  There was always
11  a time lag of when documents were
12  requested and if they were obtained it was
13  always a lengthy, inefficient process I
14  would say.
15      THE SPECIAL MASTER:  But apart
16  from inefficiency, was there any
17  deliberate delay to prevent it from going
18  to the courts?
19      THE WITNESS:  Not that I'm
20  aware of.
21      THE SPECIAL MASTER:  And was
22  there anybody who ever said no, we are not
23  going to give you these documents because
24  there is some law in Ecuador that prevents

Page 84

L. GARR

1  us from giving something to an American
2  court, did you ever hear anything like
3  that down there?
4      THE WITNESS:  Not that I have
5  heard, although there was discussion about
6  under Ecuadorian law a lot of the
7  documents would not be discoverable.
8      THE SPECIAL MASTER:  And
9  discoverable in Ecuador; what about in the
10  United States?
11      THE WITNESS:  I don't recall if
12  there were discussions about that.
13      THE SPECIAL MASTER:  But you
14  sent back documents -- there were
15  documents that were sent back for use in
16  courts in the United States, correct?
17      THE WITNESS:  I'm not sure if
18  they ended up in court, but I did send
19  back documents, yes.
20      THE SPECIAL MASTER:  Thank you.
21      MR. BRODSKY:  Just for the
22  record, Mr. Gitter, Andrea Neuman from
23  Gibson Dunn joined us at the break on
24  behalf of Chevron.

Page 85

L. GARR

1  BY MR. BRODSKY:
2  Q.    Let me show you, Ms. Garr,
3  following up on Mr. Gitter's questions,
4  Exhibit 4229.
5      (Plaintiff's Exhibit 4229
6  marked for identification.)
7  Q.    Would you take a moment to
8  review this two-page document which at the
9  top has an e-mail from Shelley Podolny
10  sent April 13th, 2010 to
11  awoods@donzigerandassociates.com, subject,
12  Re: Documents.
13      (Witness perusing document.)
14  A.    Okay.
15  Q.    Do you know who Shelley Podolny
16  is from H5?
17  A.    Yes.
18  Q.    Who was she?
19  A.    I don't know her official
20  title.  She seemed to handle more
21  administrative matters at H5.
22  Q.    What was H5's role?
23  A.    I'm not entirely clear, but I
24  know H5 was working toward the end of my

22 (Pages 82 - 85)

Page 86

1          L. GARR
2 work on the case, we worked out of their
3 offices in part and they -- I don't know
4 the exact role, but they assisted in the
5 litigation.
6    Q.    You worked out of which
7 offices, what location?
8    A.    They had an office space in
9 Madison Avenue and there was a room that
10 we worked in.
11   Q.    In Manhattan?
12   A.    In Manhattan, yes, I'm sorry.
13   Q.    H5 is a U.S. company? Or H5 --
14   A.    At least had an office in New
15 York. I don't know their --
16   Q.    Directing your attention to
17 where it says "Shelley said we are trying
18 to get a document holding pen together,"
19 do you have an understanding of -- did
20 you, when you were in Ecuador or working
21 for Mr. Donziger in 2010, know that there
22 was a holding pen? Did you have an
23 understanding what that meant?
24   A.    No.
25   Q.    Do you see the last sentence

Page 87

1          L. GARR
2 where it says "By the way, if Steven can
3 bring back any information back with him
4 on a DVD that folks might need soon, that
5 would be great." Do you see that?
6    A.    I see that, yes.
7    Q.    And then in Mr. Woods'
8 response, it says, in his last sentence,
9 "I'm going to forward your request
10 regarding information from Ecuador to two
11 of our associates who are with Steven,
12 Laura and Aaron, to have them gather what
13 they can on portable storage media for
14 return to the U.S."
15         Do you see that?
16   A.    I do see that, yes.
17   Q.    Do you recall being in Ecuador
18 with Mr. Donziger and Mr. Page in April
19 2010?
20   A.    I don't recall specifically,
21 but I do recall Aaron -- being on a trip
22 with Aaron and Steven. I don't remember
23 if it was in April. I wouldn't be
24 surprised if that were the case.
25   Q.    Do you recall the trip with

Page 88

1          L. GARR
2 Mr. Page and Mr. Donziger was in 2010?
3    A.    I believe so, yes.
4    Q.    And do you recall that was in
5 connection with collecting information
6 relating to Cabrera?
7    A.    I believe so. I don't
8 specifically recall what the purpose of
9 that trip was, but if it was during that
10 time period it would make sense that it
11 was related to Cabrera.
12   Q.    Do you recall getting a request
13 from Mr. Woods to collect documents on a
14 portable storage media?
15   A.    No, I do not.
16   Q.    Do you recall -- did you return
17 to the United States from any of your
18 trips in March or April 2010 with portable
19 storage media or DVDs or some ability --
20 with some digital information that you
21 gathered in Ecuador?
22         MR. GOMEZ: Objection,
23 compound.
24         THE SPECIAL MASTER: If you can
25 answer it, answer it.

Page 89

1          L. GARR
2    A.    At one point I did, and I don't
3 know exactly when, but did obtain a copy
4 of the kind of index that was made
5 regarding the trial record, and that was
6 transferred I believe by UBS onto my
7 laptop, which was an index of the court
8 filing in Ecuador.
9    Q.    Did you observe on these trips
10 Mr. Donziger in the offices of --
11         THE SPECIAL MASTER: Excuse me,
12 is this an index you got at the courthouse
13 or an index created by the plaintiffs at
14 the Selva Viva offices?
15         THE WITNESS: It was an index
16 created by the plaintiffs was my
17 understanding. I don't believe there was
18 a court index in the Ecuadorian court.
19         THE SPECIAL MASTER: Thank you.
20   Q.    Did you help prepare that
21 index?
22   A.    No.
23   Q.    Do you know who did that?
24   A.    I don't.
25   Q.    When you were on the trips to

23 (Pages 86 - 89)

Page 90

L. GARR

1
2 Ecuador in March and April 2010, did you
3 observe Mr. Donziger in the offices where
4 you were working in Quito?
5    A.    Yes.
6    Q.    Did Mr. Donziger bring a laptop
7 with him?
8    A.    I don't recall specifically.  I
9 would believe so, yes.
10   Q.    Did you observe Mr. Donziger
11 using the offices -- what desk did he use,
12 for example?
13   A.    It varied.  Sometimes a table
14 downstairs or up in Luis' office
15 sometimes, if Luis wasn't there, or
16 sometimes at a table with people.  There
17 was a few rooms.  There was not a specific
18 spot that he would be.
19   Q.    When you mentioned Luis, is
20 that Luis Yanza?
21   A.    Yes.
22   Q.    Did anybody prohibit
23 Mr. Donziger from accessing, to your
24 observation, any documents on any desks or
25 any drawers when you were there?

Page 91

L. GARR

1
2    A.    I did not witness that, no.
3    Q.    Did you witness Mr. Donziger
4 accessing documents when you were there?
5    A.    No.
6    Q.    Looking at the trial record?
7    A.    Not that I recall.
8    Q.    Did anybody tell you that you
9 couldn't look at any files or any
10 documents when you were in Ecuador?
11   A.    No one ever said that to me,
12 no.
13   Q.    Mr. Fajardo never said that to
14 you?
15   A.    I didn't ask to view anything,
16 but no one ever said to me I could not.
17   Q.    And did Mr. Fajardo provide you
18 with documents with the understanding --
19 withdrawn.
20        Did he provide you with
21 documents while you were in Ecuador?
22   A.    I don't recall if Mr. Fajardo
23 ever provided me with documents, no.
24   Q.    Who, if anyone, helped you look
25 through the trial record to collect

Page 92

L. GARR

1
2 information relating to Mr. Cabrera that
3 was in the Quito office?
4    A.    Julio Prieto, Juan Pablo Saenz,
5 and, again, there were -- I'm sorry that
6 I'm forgetting their names, but a woman, a
7 younger girl as well as other people that
8 were to assist as well, and communications
9 people, they didn't really help with the
10 records.
11   Q.    Let's show you Exhibit -- oh,
12 one more question about documents.
13        Were there computers on the
14 desks of Mr. Prieto, Mr. Saenz,
15 Mr. Fajardo and Mr. Yanza?
16   A.    They all had their own laptops.
17   Q.    Did you communicate with
18 Mr. Fajardo in Spanish or in English?
19   A.    Both.
20   Q.    Did you communicate with
21 Mr. Prieto in Spanish or in English?
22   A.    Both.
23   Q.    Mr. Saenz?
24   A.    Both.
25   Q.    And Mr. Yanza?

Page 93

L. GARR

1
2    A.    Spanish.
3    Q.    I'm showing you Exhibit 4209.
4        (Plaintiff's Exhibit 4209
5 marked for identification.)
6    Q.    Ms. Garr, it is from
7 lauragarr@gmail.com sent March 4th, 2010
8 to Aaron, Steven Donziger, subject is
9 Outline, the attachment says Denver
10 Outline 1782 Response.doc.  The Bates
11 number is DONZ00054540.
12        Do you remember sending this
13 e-mail relating to an outline for a
14 response to Chevron's 1782 proceeding?
15   A.    I don't recall.
16   Q.    Did you work on drafting or
17 assisting Mr. -- withdrawn.
18        Did you work on assisting with
19 the drafting of a response to Chevron's
20 1782 proceeding?
21   A.    Not with the drafting, no.  Not
22 that I recall.
23   Q.    Do you remember preparing an
24 outline?
25   A.    I mean, this looks -- I mean, I

24 (Pages 90 - 93)

Page 94

1      L. GARR
2  believe this was sent from me, I just
3  don't recall doing it.
4      Q.    Let me show you Exhibit 4210.
5          (Plaintiff's Exhibit 4210
6  marked for identification.)
7      Q.    It is a two-page document from
8  Laura Garr sent March 4th, 2010 to Andrew
9  Woods, subject, Call with Denver - Notes,
10 Bates numbered WOODS-HDD-0158292.
11     A.    Can I review this document?
12     Q.    Yes, please.
13         (Witness perusing document.)
14     A.    Okay.
15     Q.    Did you participate on a call
16 while you were in Ecuador with
17 Mr. Donziger and Mr. Page relating to the
18 1782 proceeding?
19     A.    I must have, yes.
20     Q.    Do you independently recall it?
21     A.    I believe there was a Skype
22 call. I don't --
23     Q.    You have a general recollection
24 there was a Skype call?
25     A.    Yeah. I'm not sure if -- I'm

Page 95

1      L. GARR
2  guessing again, I'm sorry, I don't recall.
3      Q.    Do you recall taking notes
4  during whatever call you generally
5  remember participating in, this Skype
6  call?
7      A.    These appear to be notes that
8  were taken from a call.
9          THE SPECIAL MASTER: Excuse me,
10 are these notes of a conversation with
11 Mr. Donziger and Mr. Page or are these
12 notes of a conversation with somebody from
13 the Brownstein firm in Denver? Take a
14 look at the last line.
15         THE WITNESS: It appears to be
16 notes from a call with Denver counsel.
17         THE SPECIAL MASTER: That's
18 what I thought, Mr. Brodsky, that they
19 just look from the face of it -- you just
20 read it wrong.
21     Q.    Was Mr. Donziger and Mr. Page
22 participating in this call with you?
23     A.    I don't recall. I would assume
24 that -- I don't recall. I don't recall
25 ever having a conversation with counsel

Page 96

1      L. GARR
2  alone, so I would assume Steven would be
3  on the call, but I don't recall.
4      Q.    Directing your attention to the
5  bottom of the page, do you see where it
6  says "Most we can likely get is finding
7  that much of what they are seeking is
8  privileged and only thing they are
9  entitled to get is that which is not
10 privileged," do you see that? The bottom
11 of the first page.
12     A.    I'm sorry, yes. Yes.
13     Q.    Was there a discussion among
14 you and others that the Ecuadorian Lago
15 Agrio plaintiffs would assert privilege to
16 documents?
17         MR. GOMEZ: Objection.
18         THE SPECIAL MASTER: Overruled,
19 waiver, the waiver I described previously.
20     A.    Yes, it appears that there was
21 a conversation about that.
22     Q.    Do you remember conversations
23 about an objective being not to disclose
24 documents of Stratus Consulting in the
25 Section 1782 proceeding to Chevron?

Page 97

1      L. GARR
2          MR. GOMEZ: Objection.
3          THE SPECIAL MASTER: I want to
4  hear the answer first.
5      A.    I recall that there were
6  discussions around privilege, an
7  Ecuadorian privilege and technical, like
8  technical privilege as applies to
9  technical experts.
10         THE SPECIAL MASTER: I overrule
11 the objection both on waiver and
12 crime-fraud grounds. I'm not saying that
13 she, the witness, acted in furtherance of
14 the fraud, but the person she is
15 describing and identifying as the source
16 of the material that she is talking about
17 and those conversations were in
18 furtherance of the fraud.
19     Q.    Who were you talking to
20 regarding the assertion of privilege?
21     A.    I recall discussions between
22 Steven Donziger and with Emery Celli, the
23 law firm of Emery Celli, and with the law
24 firm of Patton Boggs, I believe,
25 discussing privilege.

25 (Pages 94 - 97)

Page 98

```
1                L. GARR
2      Q.    And who from Emery Celli was a
3  part of these discussions?
4      A.    I just have a general
5  recollection of discussions, so I'm not
6  sure of specific conversations, so I just
7  know generally who worked in Emery Celli.
8      Q.    You don't remember who from
9  Emery Celli participated in these
10 discussions?
11     A.    No.
12     Q.    You just remember Emery Celli
13 did?
14     A.    Again, just generally speaking
15 about privilege as it related to the
16 1782s. I don't know specifically and I
17 don't know if it was specifically in
18 relation to this call, I don't know.
19     Q.    Was there a discussion of a
20 strategy of trying to find a means not to
21 produce the documents that Chevron was
22 seeking?
23           MR. GOMEZ: Objection.
24           THE SPECIAL MASTER: Let me
25 hear the answer.
```

Page 99

```
1                L. GARR
2      A.    I don't know about a strategy,
3  but there were discussions about
4  privilege, what documents were privileged
5  versus not.
6            THE SPECIAL MASTER: Are we
7  talking about Stratus documents basically?
8            THE WITNESS: Well, I'm not
9  sure. It was documents I think that were
10 the subject of the 1782.
11           THE SPECIAL MASTER: Okay.
12 Your objection is overruled on both
13 grounds, both waiver and crime-fraud, and,
14 again, I'm not ruling that the witness had
15 conversations in furtherance of the fraud,
16 but the people she is describing who had
17 those conversations did.
18           (Plaintiff's Exhibit 4211
19 marked for identification.)
20     Q.    Before we get to 4211 --
21     A.    I don't have a copy of it.
22     Q.    Before we get to that, on the
23 second page of this 4210 document under
24 where it describes Gibson Dunn, it says
25 "we misled the Denver firm."
```

Page 100

```
1                L. GARR
2            Do you see that?
3      A.    Yes.
4      Q.    Do you know who said that and
5  the context in which it was said?
6      A.    I mean, I don't. It appears
7  that I'm speaking of -- it appears I'm
8  summarizing what Denver counsel was
9  describing, that it was Gibson Dunn's --
10 about them saying they are professional,
11 pleasant to work with, but that they don't
12 trust us, what we say, and that they
13 allege that we misled the Denver firm.
14     Q.    Do you know what it means by
15 "the Denver firm"?
16     A.    I don't.
17     Q.    Let me show you 4211, which is
18 a four-page document Bates numbered
19 GARR10902, which has been produced
20 pursuant to a 502(d) agreement. It is
21 from Laura Garr dated March 5th, 2010 to
22 Guadalupe De Heredia, "Subject: por fa,"
23 and the attachment says
24 BrownsteinChecklist.doc.
25           Let me know when you have had a
```

Page 101

```
1                L. GARR
2  chance to look at it.
3            THE SPECIAL MASTER: Excuse me,
4  is this exhibit number a new exhibit
5  number?
6            MR. BRODSKY: Yes.
7            THE SPECIAL MASTER: I believe
8  this document was introduced and marked at
9  the McDermott deposition. I could be
10 wrong, but I remember seeing something
11 very much like this, a slightly different
12 version. Maybe I'm wrong.
13     Q.    Have you had a chance to review
14 it?
15     A.    I'm just --
16     Q.    Sorry.
17           (Witness perusing document.)
18     A.    Okay.
19     Q.    What was Brownstein Hyatt
20 Farber Schreck's role at this time?
21     A.    I believe they were the law
22 firm in Colorado responding to the 1782 --
23 1782 files with respect to Stratus
24 Consulting.
25     Q.    Do you remember printing out
```

26 (Pages 98 - 101)

Page 102

1            L. GARR
2 this document or having this document
3 printed for Mr. Donziger when you were in
4 Ecuador?
5    A.    I don't, but I see that I had
6 asked for it to be printed.
7    Q.    Did you participate in
8 conversations with Mr. Donziger and
9 Mr. Woods regarding the collection of
10 information requested by the Brownstein
11 firm?
12    A.    In reading this, I recall
13 specific questions regarding like the
14 close of the evidentiary period and things
15 like that, but I don't -- I don't
16 recall -- I don't recall these points or
17 seeing it in this, you know, viewing it in
18 this form.
19    Q.    Do you see the second bullet
20 point under (A)(1) where it says "a list
21 and copies of all documents produced by
22 Stratus that were provided to Cabrera or
23 the Ecuadorian court in any form"?
24    A.    I'm sorry, (A)(1)?
25    Q.    It is on the second page of the

Page 103

1            L. GARR
2 document.
3    A.    Yes.
4    Q.    Did you participate in
5 collecting documents produced by Stratus
6 that were provided to Cabrera?
7    A.    I'm sorry, can you repeat the
8 question?
9    Q.    Did you participate in any way
10 in the process of collecting documents
11 that were produced by Stratus that were
12 provided to Cabrera?
13    A.    Collecting documents?  No, not
14 that I recall, no.
15    Q.    Do you know who, if anyone, had
16 that responsibility?
17    A.    No.  Well, I'm sorry, like the
18 underlying documents that were submitted,
19 is that what you are --
20    Q.    The Stratus documents, any
21 Stratus documents that were communicated
22 to and provided to Cabrera.
23    A.    I'm not sure, but I believe
24 document -- I'm not sure, I'm sorry, I
25 don't know.

Page 104

1            L. GARR
2    Q.    Do you see on the second page,
3 the last bullet point, it says "documents
4 that could be alternative source for
5 materials Chevron alleges show improper
6 contact between Cabrera and Stratus"?
7    A.    Okay, yes.
8    Q.    Did you participate in
9 discussions about finding an alternative
10 source for materials that Chevron alleged
11 showed improper contact between Cabrera
12 and Stratus?
13    A.    I don't recall.
14    Q.    In the third page of this memo,
15 under Part 3, the second bullet point says
16 "directing your attention to proof of any
17 contact between Cabrera and Chevron or
18 Chevron's experts," do you see that?
19    A.    Yes.
20    Q.    Did you participate in
21 collecting alleged proof of contact
22 between Cabrera and Chevron or Chevron's
23 experts?
24    A.    I don't recall.  I don't
25 recall.  I recall looking for, I think

Page 105

1            L. GARR
2 there was photos or -- I don't recall, I'm
3 sorry, I don't recall.
4    Q.    And where it says Draft
5 Opposition Brief on Part B, under the
6 Facts section, it has A. Woods and S.
7 Donziger and two attorneys from
8 Brownstein; do you see that?
9    A.    Yes.
10    Q.    And the Legal Argument section
11 has Donziger and Woods also in that, in
12 parentheses?
13    A.    I see.
14    Q.    Did you observe Mr. Donziger
15 drafting part of the briefs that were
16 going to be filed in Denver in response to
17 Chevron's Section 1782 proceedings?
18    A.    Not that I recall, no.
19    Q.    Let me direct your attention to
20 4212.
21        (Plaintiff's Exhibit 4212
22 marked for identification.)
23    Q.    This is a five-page document.
24 At the top, the last e-mail in the chain
25 is from Laura Garr to S. Donziger dated

27 (Pages 102 - 105)

Page 106

1         L. GARR
2  March 7, 2010, "Re: Chevron misstatement
3  of Cabrera mandate and alternative
4  sources," Bates numbered DONZ54640.
5         (Witness perusing document.)
6    Q.    Ms. Garr, I will be directing
7  your attention to certain parts.
8         If you look at the first page,
9  at the bottom of the page, it says to
10 Steven Donziger from Laura Garr, dated
11 March 6, 2010.  Did you draft those series
12 of paragraphs with footnotes?
13   A.    I don't recall, but it appears
14 that I did, yes.
15   Q.    You don't independently have
16 any recollection of it?
17   A.    Not really, no.
18   Q.    The information that's
19 contained there, did you have any personal
20 knowledge of the information based on your
21 own observations and your -- your own
22 observations?
23   A.    No.
24   Q.    Who, if anyone, did you rely
25 on, do you recall, for this information

Page 107

1         L. GARR
2  that's contained here?
3    A.    Well, I'm sorry, I didn't read
4  the full thing, but it appears to be
5  referencing the Cabrera report itself, so
6  it would be an analysis I guess of that,
7  which would be reading -- I guess
8  comparing statements in a motion versus
9  what was stated directly in the report,
10 unless I am -- I didn't read all the way
11 through, if there is something in addition
12 to that.
13   Q.    If you would look at the second
14 page of the document at the top, it refers
15 to Richard Cabrera Vega is the independent
16 court-appointed special master.
17        Do you see that?
18   A.    Yes.
19   Q.    Did there come a time when you
20 were told not to refer to Mr. Cabrera as
21 an independent expert?
22   A.    I don't know if I was ever
23 specifically told not to refer to him as
24 that.
25   Q.    Did there come a time when the

Page 108

1         L. GARR
2  representatives of Lago Agrio plaintiffs
3  in Ecuador stopped referring to
4  Mr. Cabrera as independent.
5    A.    I don't know.  I think there
6  might have been -- I'm recalling a press
7  release or something where that was taken
8  out.  I don't recall.
9    Q.    If you look at page 4 of the
10 document, let me direct you to just one
11 particular line in the last paragraph of
12 page 4, above the footnotes, where it says
13 "Moreover," in the middle of the
14 paragraph, "there are distinctions between
15 the Stratus materials from the mediation
16 and the Cabrera report."
17   A.    I'm sorry, what page is this?
18   Q.    This is page 4 of 5.  It is in
19 the middle of the first paragraph.  "There
20 are distinctions between the Stratus
21 materials from the mediation and the
22 Cabrera report."
23        Do you know where you obtained
24 that information?
25   A.    I don't, I'm sorry.

Page 109

1         L. GARR
2    Q.    Did there come a time when
3  anyone representing the Lago Agrio
4  plaintiffs told you that the Stratus
5  information provided to Mr. Cabrera was
6  verbatim of what appeared in Mr. Cabrera's
7  report?
8    A.    I'm sorry, can you repeat the
9  question?
10   Q.    Did there come a time when you
11 learned in 2010 that the Stratus
12 information provided to Mr. Cabrera was
13 verbatim what Mr. Cabrera filed as his
14 report?
15   A.    There was -- there did come a
16 time when I did come to learn that
17 materials that were provided by Stratus
18 was adopted wholesale by Cabrera.
19        I don't know if it was the -- I
20 still don't think it was -- my
21 understanding is it was not the entire
22 report, but that certain sections were
23 adopted from Stratus.
24        THE SPECIAL MASTER:  Excuse me,
25 when you say "materials," are you talking

28 (Pages 106 - 109)

Page 110

```
1           L. GARR
2  about actual narrative pages?
3           THE WITNESS: Yes.
4           THE SPECIAL MASTER: As opposed
5  to materials?
6           THE WITNESS: Yes.
7           THE SPECIAL MASTER: Thank you.
8    Q.    And what was provided, you came
9  to learn what was provided to Mr. Cabrera
10 was narrative pages that contained
11 Mr. Cabrera's name, as if written by
12 Mr. Cabrera?
13          MS. PARADISE: Objection to
14 form.
15          THE SPECIAL MASTER: You may
16 answer.
17   A.    My understanding was that there
18 were sections that were drafted that were
19 adopted by Cabrera in his report. I don't
20 know exactly what those sections were.
21 Maybe I did at the time. I don't recall
22 now. But there were full sections that
23 were adopted by Cabrera.
24   Q.    Verbatim?
25   A.    Yes, I believe verbatim.
```

Page 111

```
1           L. GARR
2    Q.    Who told you that?
3    A.    I believe Steven and --
4    Q.    Steven Donziger?
5    A.    Steven Donziger, and -- I don't
6  recall -- there was I think a meeting, I'm
7  not sure who was at that meeting and who
8  spoke, but I know Steven was there, and I
9  think either he had just spoken with local
10 counsel or maybe Pablo and Luis were at
11 the meeting. I don't recall.
12   Q.    Do you remember whether this
13 meeting was in Ecuador or the meeting was
14 in the United States?
15   A.    It was in the United States.
16   Q.    Do you remember Mr. Fajardo
17 being present?
18   A.    I'm not sure. I know there was
19 a meeting where he was present regarding
20 this issue, but I'm not sure that was a
21 meeting when it was fully discussed then.
22   Q.    At that meeting, did
23 Mr. Fajardo answer questions regarding his
24 communications with Stratus -- withdrawn.
25          Did Mr. Fajardo answer
```

Page 112

```
1           L. GARR
2  questions regarding his communications
3  with Cabrera?
4    A.    I believe he did speak about
5  that part, yes.
6    Q.    We will get to that.
7           Let me ask you to turn to
8  Exhibit 4212. Your e-mail at 14:27,
9  p.m., March 6th, 2010, the second e-mail
10 in the chain, to Mr. Donziger, copied to
11 Mr. Woods and Mr. Page, the last sentence
12 says "Note: This is for explanatory
13 purposes for counsel with the
14 understanding that the privilege issue to
15 block access to the information is the
16 initial objective."
17          Do you see that?
18   A.    I do, yes.
19   Q.    You remember being told that
20 the purpose of responding to Chevron was
21 to block access for Chevron to get the
22 information that they were requesting?
23          MR. GOMEZ: Objection.
24          MS. PARADISE: Objection to
25 form.
```

Page 113

```
1           L. GARR
2           THE SPECIAL MASTER: Clearly
3  waived, so it is overruled on that ground.
4  Let me hear the answer to the question on
5  that ground, and then I will tell you if
6  I'm going to also rule that it is subject
7  to the crime-fraud exception.
8    A.    I'm sorry, I didn't fully
9  understand your question. If you could
10 repeat it.
11   Q.    Were you told that --
12 withdrawn.
13          Who told you that the purpose
14 was to block access -- the privilege
15 purpose was to block access to the
16 information?
17          MR. GOMEZ: Objection,
18 foundation.
19   A.    I don't know that I was ever
20 told the -- there were discussions that
21 whether or not the underlying documents
22 sought -- and I'm sorry, I'm hazy now on
23 what the exact requests were of the 1782
24 at that time, but I recall there being
25 discussions of whether or not the
```

29 (Pages 110 - 113)

Page 114

L. GARR

1    L. GARR
2 underlying documents were entitled to
3 privilege or not, and that was something I
4 remember discussions on that, whether
5 under Ecuadorian law or U.S. law these
6 were privileged or work product or what
7 privilege applied.
8        So I know that was something
9 that was always being debated. So I think
10 that -- and, again, I don't -- but I think
11 the --
12   Q.    What's your understanding of
13 what this means, "the privilege issue to
14 block access to the information is the
15 initial objective"?
16   A.    I think, and it is, again,
17 looking at it now, but I think, if I
18 recall, there was -- there was -- if I
19 recall from the discussions at that time,
20 it was that the information was
21 privileged, viewed privileged, or there
22 was an argument for privilege in the first
23 instance, and then -- but here is a
24 response to the underlying arguments if
25 privilege does not apply.

Page 115

1        L. GARR
2   Q.    Was there a discussion -- did
3 you participate in a discussion or were
4 you present for a discussion regarding
5 concerns if the information was disclosed
6 to Chevron?
7        MR. GOMEZ: Objection.
8        THE SPECIAL MASTER: Overruled
9 on both grounds.
10   A.   I'm sorry, can you repeat the
11 question? I'm sorry.
12   Q.   Were you present for or did you
13 participate in a discussion in which
14 concerns were raised if the information
15 from Stratus was disclosed to Chevron?
16        MR. GOMEZ: Same objection.
17        THE SPECIAL MASTER: Overruled.
18   A.   I was present for conversations
19 where -- yes.
20   Q.   Who expressed concerns?
21        MR. GOMEZ: Objection.
22        THE SPECIAL MASTER: Overruled.
23   A.   I recall discussions that were
24 had -- I don't know who was -- I don't
25 know that that's maybe the way I would

Page 116

1        L. GARR
2 phrase it, but I remember there being
3 discussions of Ecuadorian -- and I don't
4 know if I was directly or if I was told
5 that there was concern from Ecuadorian
6 counsel of full disclosure of all
7 materials -- of turning over all
8 materials.
9        And there were -- I recall
10 meetings with discussions, again, the
11 privilege issue with Steven present,
12 again.
13        I'm sorry, can you repeat the
14 question? I feel like I'm going off track
15 here.
16   Q.   I had asked you, were you
17 present or did you participate in the
18 discussion in which concerns were raised
19 if the information from Stratus was
20 disclosed to Chevron, and you said "I was
21 present for the conversations where --
22 yes," and I asked you who expressed those
23 concerns.
24   A.   I think there was concern
25 raised about --

Page 117

1        L. GARR
2        THE SPECIAL MASTER: I think he
3 is asking you who. Who were the people
4 that expressed the concerns? Just name
5 them if you can.
6        THE WITNESS: I think it was,
7 and I'm not sure that they directly
8 expressed it, I think there was concern
9 from Ecuadorian counsel.
10   Q.   Who was speaking at this
11 meeting or this discussion which you
12 participated relaying these concerns if
13 the information from Stratus was disclosed
14 to Chevron?
15        MR. GOMEZ: Objection.
16        THE SPECIAL MASTER: Overruled.
17 He is asking you who were the people who
18 were expressing concerns. He is not
19 asking you now what the concerns were.
20 Just tell him who the people were.
21 Ecuadorian counsel is one set. Therefore
22 he is asking further which Ecuadorian
23 counsel. If they are more than Ecuadorian
24 counsel, then name the others, please.
25        THE WITNESS: Again, I don't

30 (Pages 114 - 117)

Page 118

L. GARR

1
2 recall if it was Ecuadorian counsel that
3 said it to me or if Steven relayed
4 Ecuadorian counsel has a concern of
5 disclosing this. And it was more that
6 this -- and Steven expressed that this --
7         THE SPECIAL MASTER: Please,
8 just name the people.
9         THE WITNESS: I believe Steven.
10 I don't recall the specific conversation,
11 so I'm sorry, it is difficult.
12         THE SPECIAL MASTER: But don't
13 add the content yet. Just tell him who
14 expressed the concerns.
15         THE WITNESS: I'm sorry.
16 Q.    Steven Donziger?
17 A.    Steven Donziger, and on behalf
18 of Ecuadorian counsel or potentially
19 Ecuadorian counsel.
20 Q.    And when you say "Ecuadorian
21 counsel" --
22 A.    Pablo Fajardo and Julio Prieto
23 and Juan Pablo Saenz would be my
24 understanding.
25 Q.    And was this one conversation

Page 119

L. GARR

1
2 you are recalling or a series of
3 conversations?
4 A.    I'm kind of recalling a series
5 of conversations.
6 Q.    Over what period of time?
7 What's your recollection of the earliest
8 conversation where these concerns were
9 expressed through the last conversation?
10 A.    It would be after the 1782 was
11 filed and the allegations were raised over
12 a time period that I don't know if it was
13 weeks or months.
14 Q.    Let me turn to 4020A.
15 A.    Can I clarify one thing, I'm
16 sorry?
17 Q.    Sure.
18 A.    It was a concern of the way --
19 when I said there was concern, it was not
20 concern to -- it was concern over the way
21 the characterization was and how to
22 respond to it was the concern of how to
23 submit materials and the framework that it
24 was being -- like that was the big concern
25 of trying to understand the underlying law

Page 120

L. GARR

1
2 and how do we -- how do we -- how -- there
3 was this question of trying to understand
4 what the Ecuadorian law overlap was and
5 then replying to the information.
6         I don't know if that helps, but
7 "concern" was kind of vague and I didn't
8 know how to reply to that.
9 Q.    Prior to the 1782 proceeding
10 being filed by Chevron in the District of
11 Colorado, had Mr. Donziger and/or --
12 withdrawn.
13         Had Mr. Donziger been open
14 about Stratus' role in preparing a
15 narrative for Mr. Cabrera?
16         MS. PARADISE: Objection to
17 form.
18         THE SPECIAL MASTER: You may
19 answer.
20 A.    My understanding of Stratus'
21 role was that they served as technical
22 experts. Before that I didn't have any
23 other understanding of their role prior to
24 that.
25 Q.    And where did that

Page 121

L. GARR

1
2 understanding come from?
3 A.    Steven Donziger.
4 Q.    Mr. Donziger?
5 A.    Yes.
6 Q.    And was -- when you were in
7 Ecuador, you reviewed a number of the
8 filings related to Cabrera, correct?
9 A.    Yes.
10 Q.    Prior to -- do you recall a
11 filing in which Mr. Cabrera requested
12 information from the parties?
13 A.    Yes.
14 Q.    Do you recall that being in
15 January of 2008?
16 A.    The order itself?
17 Q.    Yes, the order.
18 A.    I don't recall, but it -- I
19 knew it at one point and I saw it on a
20 document somewhere.
21 Q.    Did you come -- regardless of
22 the actual date of the court order, did
23 you come to learn that Stratus had been
24 communicating with and writing things for
25 Mr. Cabrera prior to that?

31 (Pages 118 - 121)

Page 122

```
 1          L. GARR
 2      MR. GOMEZ: Objection.
 3      MS. PARADISE: Objection to
 4  form.
 5          THE SPECIAL MASTER: Overruled.
 6      A.   I don't recall when they -- I
 7  don't recall the date or timeline of the
 8  participation.
 9          (Plaintiff's Exhibit 4020A
10  marked for identification.)
11          (Plaintiff's Exhibit 4020B
12  marked for identification.)
13      Q.   4020A and 4020B. 4020A is the
14  one-page e-mail from Aaron Marr Page dated
15  March 9, 2010 to McDermott, Englert, M.
16  Hoke, copied to Donziger and Laura Garr,
17  subject, SRD Team Thoughts/Research, with
18  an attachment that is 4020B, and it is
19  stamped DONZ54731 and 54732.
20          Take a moment, Ms. Garr, to
21  take a look at this one-page e-mail and
22  attachment of three pages.
23          (Witness perusing document.)
24      Q.   Before we get to this document,
25  did there come a time when Mr. Donziger
```

Page 123

```
 1          L. GARR
 2  told you that the representatives of the
 3  Ecuadorian Lago Agrio plaintiffs had
 4  drafted the entire report for Mr. Cabrera
 5  with his -- as if it was written by him
 6  for his signature?
 7      MS. PARADISE: Objection to
 8  form.
 9          THE SPECIAL MASTER: Go ahead,
10  answer the question.
11      A.   No.
12          THE SPECIAL MASTER: Hold on,
13  let me hear that question again, please,
14  and I want to hear that answer again.
15          (The record was read.)
16          THE SPECIAL MASTER: Go ahead.
17      Q.   Did anybody tell you that?
18      A.   No.
19      Q.   Turning to this document,
20  4020A, do you recognize the attachment
21  which is to John McDermott, Erica Englert,
22  Michael Hoke, from Aaron Page, Steven
23  Donziger and you, dated March 9th, 2010?
24          MR. HILLE: You are referring
25  to 4020B?
```

Page 124

```
 1          L. GARR
 2      MR. BRODSKY: 4020B, correct,
 3  the attachment to 4020A.
 4      A.   Yes.
 5      Q.   Were you in Ecuador to -- did
 6  you participate in drafting this document?
 7      A.   I believe it was drafted by
 8  Aaron, but I think I summarized the
 9  preliminary documents that are included.
10          THE SPECIAL MASTER: I'm sorry,
11  I didn't hear that.
12          THE WITNESS: I think I might
13  have summarized the preliminary documents
14  or provided the document information that
15  are bullet points on page 2.
16      Q.   Before this was sent to
17  McDermott, Englert and Hoke, did you
18  review the document?
19      A.   I don't recall.
20      Q.   Does it refresh your memory --
21  was it your practice at the time to review
22  a document that went out from you and
23  others?
24          THE SPECIAL MASTER: Didn't the
25  thing you had before show her flying on
```

Page 125

```
 1          L. GARR
 2  March 9th?
 3      MR. BRODSKY: Yes. It does not
 4  have a time.
 5      A.   I don't recall drafting this or
 6  if I reviewed it or not.
 7      Q.   Let me ask you to turn to a few
 8  sections. The section you pointed out you
 9  drafted was on page 2, the bullet points?
10          MR. GOMEZ: Objection,
11  foundation.
12          MS. PARADISE: Objection to
13  form.
14          MR. GOMEZ: Mischaracterizes.
15          MR. BRODSKY: I'll withdraw it.
16          THE SPECIAL MASTER: She didn't
17  say she drafted it. She said they came
18  from her in effect.
19      Q.   You summarized the documents
20  that are listed in those bullet points?
21      A.   Yeah. I don't know that I
22  summarized it in this fashion, but I
23  believe I had kind of made a bullet point
24  list of the documents that were found in
25  the court order, that are referenced here.
```

32 (Pages 122 - 125)

**Page 126**

1          L. GARR
2     Q.     Did you obtain these various
3 documents referenced in these bullet
4 points?
5     A.     Yes, I reviewed -- I reviewed
6 copies of these documents.
7     Q.     That came from where?
8     A.     From the Ecuadorian court, or
9 the trial record.
10     Q.     In the Quito office?
11     A.     In the Quito office, copies of
12 the trial record in the Quito office.
13     Q.     And who provided them to you?
14     A.     I don't recall now, but they
15 were provided generally by either Julio,
16 Juan Pablo or the other members of the
17 staff there that worked.
18     Q.     And let me direct your
19 attention to a few parts of it.
20          Do you see, it says "Dear
21 Counsel" -- do you understand who
22 McDermott, Englert and Hoke were?
23     A.     I guess they are Brownstein
24 counsel.
25     Q.     Do you see where it says, on

**Page 127**

1          L. GARR
2 the second paragraph, "With respect to
3 the" -- well, on the first page, the last
4 full paragraph, "With respect to the
5 Stratus documents mentioned above, we have
6 determined that a package of material
7 approx 3,000 pages was submitted by local
8 counsel to the court in early 2008 in
9 response to a court order asking both
10 parties to turn over any materials they
11 thought might assist Cabrera in carrying
12 out this mandate"; do you see that?
13     A.     Yes.
14          THE SPECIAL MASTER: I'm sorry,
15 I really don't understand the purpose of
16 this questioning. We had McDermott for a
17 half day. Mr. Gomez will correct me if
18 I'm wrong, but I think this was the very
19 first document about which I ruled that
20 the crime-fraud exception applies because
21 this document contains false material
22 about Cabrera, it is clearly in
23 furtherance of the fraud, it was directed
24 at the -- it was intended to go to the
25 court, and it was examined about, and it

**Page 128**

1          L. GARR
2 speaks for itself.
3          Why in the world are we going
4 any further?
5          MR. BRODSKY: Okay. We will
6 move to the next document.
7          THE SPECIAL MASTER: I'm sorry?
8          MR. BRODSKY: We will move to
9 the next document. That is fine.
10          THE SPECIAL MASTER: Let's move
11 on.
12     Q.     Let's go to 4214.
13          (Plaintiff's Exhibit 4214
14 marked for identification.)
15     Q.     This is a four-page document
16 from Laura Garr sent March 12th, 2010 to
17 Steven Donziger and Aaron,
18 Brownstein/Shinder Call is the subject
19 line, DONZ54812.
20          Let me know when you are
21 finished reviewing. I will direct your
22 attention, Ms. Garr, to various sections.
23          (Witness perusing document.)
24     Q.     Let me ask you, on the first
25 page of the e-mail, Ms. Garr --

**Page 129**

1          L. GARR
2     A.     I didn't finish reading the
3 whole thing, but if I don't need to --
4     Q.     Did you finish reading the
5 first page of the e-mail?
6     A.     Yes, I did.
7     Q.     Did you participate in drafting
8 what is called the Pablo affidavit?
9          MR. HILLE: Ms. Garr, you are
10 being directed to the first page of the
11 exhibit.
12          THE WITNESS: Oh, I'm sorry.
13     A.     Not that I recall, no.
14     Q.     Do you have an understanding of
15 what you meant when you wrote "AMP is
16 editing the Pablo affidavit"?
17     A.     I assume -- I assume AMP is
18 Aaron Marr Page, and I don't know what the
19 Pablo affidavit is that it is referring
20 to, although I do recall seeing an
21 affidavit from Pablo Fajardo.
22     Q.     Let me direct your attention to
23 the page 3 of 4, the bullet point under
24 (C)(2) says "proof of any contact between
25 Cabrera and Chevron or Chevron's experts."

33 (Pages 126 - 129)

L. GARR

1
2   Do you see that?
3   A.   Yes.
4   Q.   It says SV, the Selva Viva
5 Ecuador team, and Mr. Donziger were
6 responsible, under the Responsible Party.
7 Do you see that?
8   A.   Yes.
9   Q.   Did you have any responsibility
10 in connection with collecting proof of
11 that?
12   A.   I don't. I guess these were
13 the photos that I was recalling though. I
14 recall there being some photos of -- or
15 hearing about photos of Chevron
16 representatives with Cabrera.
17   Q.   Was that during the sampling
18 back in 2007?
19   A.   I'm not sure. I believe so. I
20 don't know.
21   Q.   Let me ask you to turn to 4217.
22       (Plaintiff's Exhibit 4217
23 marked for identification.)
24   Q.   Take a look at this one-page
25 document containing two e-mails. The top

L. GARR

1
2 of it is from Jeffrey Shinder, dated March
3 15th, 2010, to Laura Garr, copied to
4 sdonziger@gmail.com, subject, Privileged
5 and Confidential - 1782 Denver.
6   A.   Yes.
7   Q.   Have you had a chance to read
8 it?
9   A.   I'm sorry, I'm finishing
10 reading it now.
11       (Witness perusing document.)
12   A.   Okay.
13   Q.   In the e-mail you wrote to
14 Mr. Shinder -- who is Mr. Shinder?
15   A.   I believe he was an attorney
16 from Constantine.
17   Q.   Constantine Cannon?
18   A.   Yes, I believe so.
19   Q.   What was his role?
20   A.   I recall him -- I don't know if
21 he was working on behalf of the plaintiffs
22 for a short time or for -- I don't recall
23 exactly. I know he was -- just a brief
24 time that he worked.
25   Q.   You write, "Hi Jeff: I am in

L. GARR

1
2 the process of researching alternative
3 sources of information for the Cabrera
4 Report to counter Chevron's claims in
5 their 1782 motion."
6       Do you see that?
7   A.   Yes.
8   Q.   What were you doing to find
9 alternative sources of information?
10       MR. GOMEZ: Objection.
11       THE SPECIAL MASTER: Overruled,
12 waiver, the waiver I was talking about
13 before.
14   A.   I'm sorry, can I look back at
15 this document that I think referenced the
16 different roles or should I not? Because
17 otherwise I don't --
18   Q.   You are referring to Exhibit
19 4214?
20   A.   Yes.
21   Q.   Okay, sure.
22       (Witness perusing document.)
23   A.   I'm sorry, can you repeat the
24 question now?
25   Q.   What were you researching --

L. GARR

1
2 where were you researching the alternative
3 sources of information?
4   A.   I don't recall if -- I don't
5 recall. I think there might have been
6 exhibits that were attached to the 1782
7 from Chevron, and it was looking at that
8 information compared to the -- I don't
9 recall at this time, or other -- I guess
10 it looked like other documents that were
11 submitted to the court.
12   Q.   Let me go to 4219.
13       MR. GOMEZ: Mr. Gitter, I have
14 a concern I would like to raise. Can we
15 excuse the witness?
16       THE SPECIAL MASTER: Sure.
17       (Witness departs the room.)
18       MR. BRODSKY: Mr. Gitter, will
19 we be going off the video record for time?
20       MR. GOMEZ: Let's stay on the
21 record, but not counting it off the
22 question time.
23       THE SPECIAL MASTER: Your time
24 isn't being charged.
25       THE VIDEOGRAPHER: Are we going

34 (Pages 130 - 133)

1          L. GARR
2 off the video?
3          THE SPECIAL MASTER:  No.
4          MR. GOMEZ:  The concern I'm
5 raising is that I hear the witness saying
6 "I don't recall" and then saying "I
7 think," and my concern is whether she --
8 and I think in good faith she is trying to
9 remember, but I think she is speculating.
10 That's what I'm hearing.
11          And I think in an attempt to
12 try to answer the questions, she is --
13 sometimes she has used the word "guess"
14 and, in my view, she is speculating.  I
15 don't know if it is worth consulting with
16 her about whether she is actually
17 remembering something or if she is trying
18 to piece things together and speculating.
19 That's my concern, whether she needs some
20 sort of instruction not to speculate.  If
21 she recalls, she recalls; if she doesn't,
22 then she doesn't.
23          THE SPECIAL MASTER:  I think
24 she is trying to avoid a transcript that
25 reads "I don't recall, I don't recall, I

1          L. GARR
2 don't recall, I don't recall, I don't
3 recall."
4          I had a little bit of the same
5 concern that you had.  But having seen a
6 transcript just yesterday which read for
7 200 pages "I don't recall, I don't recall,
8 I don't recall," I'm actually in favor of
9 a witness who tries very hard to recall
10 after saying "But I don't really recall."
11          But I think I can do a fair --
12 you will leave it to me.  Are you prepared
13 to leave it to me?
14          MR. GOMEZ:  Yes.
15          THE SPECIAL MASTER:  Good,
16 thank you.  Bring the witness in.
17          (Witness returns to the room.)
18          THE SPECIAL MASTER:  Ms. Garr,
19 the subject of this little sidebar was
20 concern by counsel for the Lago Agrio
21 plaintiffs, and I heard a little of it,
22 about the use of the words "I don't
23 recall."
24          If you don't recall, you don't
25 recall.  If you don't recall, but you are

1          L. GARR
2 trying to recall recollection, that's
3 fine, and you can start it with -- if
4 saying it -- saying "I don't really
5 recall, but I'm trying to get
6 recollection," and it is not speculation
7 totally, but there is a semblance of
8 recollection there, it is perfectly okay
9 to do that.
10          THE WITNESS:  Okay.
11          THE SPECIAL MASTER:  But you
12 shouldn't speculate or totally guess.  All
13 right?
14          THE WITNESS:  Yes.
15          (Plaintiff's Exhibit 4219
16 marked for identification.)
17 BY MR. BRODSKY:
18     Q.     Let me show you Exhibit 4219,
19 an e-mail from Aaron Marr Page dated March
20 17th, 2010 to Laura Garr, and the subject
21 is Update, and it is subject to the 502(d)
22 agreement, GARR69213.
23          This is one of the documents
24 you reviewed prior to coming here today,
25 correct?

1          L. GARR
2     A.     It is.
3     Q.     Starting at the bottom, the
4 earliest e-mail in time where it says "On
5 Wed, March 17, 2010, Laura Garr wrote," do
6 you see that there?
7     A.     Yes.
8     Q.     "Hey there, Aaron, just wanted
9 to check in with you and see what the
10 latest is out of Colorado.  I understand
11 there is a change in strategy and would
12 love to hear what is going on from your
13 perspective."
14          You were in Quito at the time
15 of this e-mail exchange?
16     A.     I appear to be, yes.
17     Q.     What was the change in strategy
18 that's referred to by you in this e-mail?
19          MR. GOMEZ:  Objection.
20          THE SPECIAL MASTER:  Overruled,
21 waiver, and depending on what the answer
22 is, there also may be a ruling that it is
23 subject to the crime-fraud exception.
24     A.     I don't recall.
25     Q.     Do you recall that there was an

35 (Pages 134 - 137)

Page 138

1          L. GARR
2 initial strategy and then that you learned
3 that there was another strategy in place?
4          MR. GOMEZ: Objection.
5          THE SPECIAL MASTER: Overruled.
6    A.    I don't independently recall
7 that, no.
8    Q.    This doesn't refresh your
9 memory?
10   A.    No.
11   Q.    Your e-mail goes on to say
12 "I'll be here in Quito (apparently
13 unnecessarily now??? awesome)," and then
14 Mr. Page responds in three paragraphs,
15 correct?
16   A.    Yes.
17   Q.    Do you see at the top where he
18 says "you being in Quito is far from
19 unnecessary"?
20   A.    Yes.
21   Q.    Do you remember why it was
22 important for you to remain in Quito?
23   A.    No.
24   Q.    Do you see where it says "but
25 forget everything we talked about earlier

Page 139

1          L. GARR
2 in the week.  As of right now, we probably
3 will not need any experts"?
4    A.    I do see that, yes.
5    Q.    What's your understanding of
6 what that meant by Mr. Page?
7          MR. GOMEZ: Objection.
8          THE SPECIAL MASTER: Overruled.
9    A.    I'm assuming I --
10         THE SPECIAL MASTER: By the
11 way, this one, there is an additional
12 waiver on the grounds that Judge Kaplan
13 and Judge Francis ruled on, and depending
14 on the answer, there also may be a
15 crime-fraud exception basis for the
16 ruling.
17         Go ahead.
18   A.    I'm sorry, can you repeat the
19 question?
20   Q.    What's your understanding of
21 what Mr. Page meant when he said "forget
22 everything we talked about earlier in the
23 week"?
24   A.    I don't recall. I'm just
25 basing it out of context here, so I don't

Page 140

1          L. GARR
2 know.
3    Q.    What about where he says "we
4 probably will not need any experts"?
5          MR. GOMEZ: Objection.
6          THE SPECIAL MASTER: Overruled,
7 same grounds.
8    A.    I don't recall.
9    Q.    The second paragraph, Mr. Page
10 states "Tomorrow can you get together in
11 an e-mail all four of Cabrera's responses
12 to the attacks referenced in the e-mail
13 you just sent"; do you see that?
14   A.    Yes.
15   Q.    Do you remember what e-mail you
16 sent regarding all four of Cabrera's
17 responses to the attacks?
18   A.    I don't.
19   Q.    Then Mr. Page says "and have
20 everybody in the office rack their brains
21 (oh, and the record, for what that's
22 worth) to come up with any other instance
23 of Cabrera saying anything on the record."
24         Do you see that?
25   A.    Yes.

Page 141

1          L. GARR
2    Q.    What's your understanding of
3 what Mr. Page meant when he said
4 "everybody in the office should rack their
5 brains (oh, and the record, for what
6 that's worth)"?
7          MR. GOMEZ: Objection.
8          THE SPECIAL MASTER: Overruled.
9    A.    I mean, I don't recall. I'm
10 just reading from context now, so I don't
11 know.
12   Q.    Mr. Page goes on to say, in the
13 last paragraph, "Probably we will have a
14 strategy call tomorrow afternoon."
15         Do you know if that occurred?
16   A.    I don't.
17   Q.    He says "If you could encourage
18 Julio to be there, that would be great."
19         What is your understanding of
20 why Mr. Page -- well, withdrawn.
21         Do you recall encouraging Julio
22 Prieto to be there?
23   A.    I don't recall, no.
24   Q.    Mr. Page then says, the last
25 statement is "Sorry I can't share anything

36 (Pages 138 - 141)

Page 142

```
1            L. GARR
2  else on e-mail." Do you see that?
3     A.    I do.
4     Q.    Do you have an understanding of
5  why Mr. Page could not share anything else
6  on e-mail?
7            MR. GOMEZ: Objection.
8            THE SPECIAL MASTER: Overruled.
9     A.    I would be speculating again.
10    Q.    Is this the first time that
11 Mr. Page ever said to you that he couldn't
12 share information on e-mail to you?
13    A.    I don't know.
14    Q.    Is this the first time that --
15 did Mr. Donziger, prior to this, in the
16 statement by Mr. Page on March 17, 2010,
17 ever tell you that he could not share
18 certain information with you on e-mail?
19           MR. GOMEZ: Objection.
20           THE SPECIAL MASTER: Overruled.
21    A.    I don't recall.
22    Q.    Did Mr. Donziger ever give you
23 any instructions not to put certain things
24 in writing?
25           MR. GOMEZ: Objection.
```

Page 143

```
1            L. GARR
2            THE SPECIAL MASTER: Overruled.
3     A.    I believe so, yes.
4     Q.    When did he give those
5  instructions to you?
6     A.    I don't recall specifically.
7     Q.    Do you generally recall between
8  the period -- was it generally after the
9  1782 proceeding was filed by Chevron in
10 Denver?
11    A.    I recall it being general
12 discussions after the 1782 proceedings
13 began to be more vigilant about e-mail
14 communication, I believe.
15    Q.    What did Mr. Donziger -- where
16 did Mr. Donziger -- where was this
17 conversation?
18    A.    I don't recall.
19    Q.    Was it in the United States or
20 in Ecuador?
21    A.    I don't recall. I believe in
22 the United States.
23    Q.    Was anybody else present for
24 it?
25    A.    I don't recall.
```

Page 144

```
1            L. GARR
2     Q.    What words did Mr. Donziger
3  use, to the best of your recollection?
4            MR. GOMEZ: Objection.
5            THE SPECIAL MASTER: Overruled
6  on the waiver grounds and likely in light
7  of the witness' testimony to be in
8  furtherance of the fraud relating to the
9  Colorado proceeding. So let's hear it.
10           Please answer the question as
11 fully as you can, please.
12    A.    I'm sorry, can you repeat the
13 question?
14           MR. BRODSKY: Would you read
15 that back.
16           (The record was read.)
17    A.    I don't recall a specific
18 conversation. I think it came up multiple
19 times of just -- that there was always I
20 think an awareness that there might --
21 that e-mail correspondence might -- all
22 written correspondence might become
23 discoverable at some point, and there was
24 a practice of e-mailing everything, so I
25 think it was becoming more vigilant about
```

Page 145

```
1            L. GARR
2  putting attorney-client privilege or
3  having -- just -- I guess just being more
4  aware of jokes that could be misconstrued
5  that used to go back and forth, of no
6  longer -- just being more vigilant of
7  e-mail correspondence.
8            THE SPECIAL MASTER: Excuse me,
9  this chain of questioning began with the
10 question did he ever instruct you not to
11 use e-mail, and you said yes. Is that
12 part of your answer to this?
13           MR. GOMEZ: Objection. Your
14 Honor, I'm not sure that that's exactly
15 what the question was.
16           THE SPECIAL MASTER: The first
17 question in this line was just that. Just
18 one second.
19           "Question: Did Mr. Donziger
20 ever give you any instructions not to put
21 certain things in writing?
22           "Answer: I believe so, yes."
23           MR. GOMEZ: "In writing." You
24 said e-mail.
25           THE SPECIAL MASTER: Well, I
```

37 (Pages 142 - 145)

Page 146

1          L. GARR
2 consider e-mails to be in writing.
3          MR. GOMEZ: There was a
4 difference there.
5          THE SPECIAL MASTER: Well, not
6 much. Go ahead, please. Now would you
7 answer my question.
8          THE WITNESS: I'm sorry?
9          THE SPECIAL MASTER: Not to put
10 it in e-mail -- your last answer was "be
11 vigilant about not joking, be vigilant
12 about what you say that might be
13 misconstrued," and my question was, does
14 this include being vigilant in not putting
15 everything in writing?
16          THE WITNESS: There was never a
17 statement of don't use e-mail anymore or
18 anything like that. It was more if there
19 was -- what I recall with Steven, there
20 were sometimes jokes made where it was,
21 you know, stop, because it can be
22 misconstrued at this point and be careful
23 of what you are putting in e-mails now.
24     Q.     Is it fair to say that when
25 looking at Mr. Page's e-mail on March

Page 147

1          L. GARR
2 17th, 2010 that Mr. Page was not referring
3 to sharing jokes on e-mail?
4     A.     Yes.
5     Q.     Did Mr. Donziger -- putting
6 aside jokes, did Mr. Donziger ever
7 instruct you not to put other things in
8 writing?
9          MR. GOMEZ: Objection.
10          THE SPECIAL MASTER: Overruled.
11     A.     I don't recall any specific
12 from Mr. Donziger.
13     Q.     Do you recall a general
14 instruction --
15     A.     Not from Mr. Donziger, no.
16          THE SPECIAL MASTER: Wait a
17 second. Are you now changing the answer
18 to the question, "Did Mr. Donziger ever
19 give you any instructions not to put
20 certain things in writing?" "Answer: I
21 believe so, yes," are you changing that
22 answer now?
23          THE WITNESS: Well, I think he
24 said other than jokes or other than --
25          THE SPECIAL MASTER: Oh, I see.

Page 148

1          L. GARR
2 Okay. Got it.
3          THE WITNESS: So I don't recall
4 a specific instruction from him other than
5 in general be more vigilant, and like the
6 privilege, there was no specific content
7 other than jokes that were made, saying
8 don't put that in writing.
9     Q.     Did anybody else give you that
10 instruction?
11     A.     Yes.
12     Q.     Who?
13     A.     I recall during the time
14 additional experts were brought in that it
15 was to minimize e-mail correspondence as
16 much as possible.
17     Q.     When you refer to the
18 additional experts being brought in, are
19 you referring to the cleansing experts?
20          MS. PARADISE: Objection to
21 form.
22          THE SPECIAL MASTER: You may
23 answer.
24     A.     I believe it was the
25 Dunkelberger Weinberg Group, I believe.

Page 149

1          L. GARR
2          THE SPECIAL MASTER: The word
3 "cleansing" is not his word, it is from an
4 e-mail.
5          THE WITNESS: I think that is
6 describing who you are speaking of.
7     Q.     And who gave the instruction to
8 minimize e-mail correspondence as much as
9 possible relating to the additional
10 experts?
11     A.     I don't recall, again, a
12 specific instruction, but there were --
13 there was a general discussion that it was
14 presumed in light of the 1782s all
15 correspondence would likely be turned
16 over, so to minimize as much e-mail
17 correspondence as possible.
18     Q.     Who said that?
19     A.     I don't recall.
20          THE SPECIAL MASTER: Who was
21 involved in saying it? Does that help
22 you?
23          THE WITNESS: It would be, I
24 guess -- I don't know if it was Patton
25 Boggs or H5 or Emery Celli group, I don't

38 (Pages 146 - 149)

Page 150

```
 1              L. GARR
 2  recall exactly who was present at the
 3  time.
 4     Q.     Did this happen in person, over
 5  the telephone; do you remember?
 6     A.     I don't recall.
 7     Q.     Did this happen -- did this
 8  instruction happen on one occasion or more
 9  than one occasion?
10     A.     I don't recall.
11     Q.     Did you have conversations
12  about this instruction with other people
13  after getting this instruction to minimize
14  e-mail correspondence relating to the
15  additional experts?
16         MR. GOMEZ: Objection.
17         THE SPECIAL MASTER: Overruled.
18     A.     I think I recall at one point
19  there becoming again a lot of e-mail
20  traffic and someone saying, you know, we
21  need to kind of minimize this again, I
22  think. I don't recall completely.
23     Q.     You don't remember the person
24  who said that?
25     A.     I don't. I think it might have
```

Page 151

```
 1              L. GARR
 2  been somebody from -- I don't, I'm sorry.
 3     Q.     It wasn't an instruction put in
 4  e-mail like Mr. Page, don't put anything
 5  else in -- minimize your e-mail
 6  correspondence, was it?
 7     A.     I think it was an e-mail of
 8  saying we need to cut -- there is a lot of
 9  e-mail traffic again, this needs to be cut
10  down.
11     Q.     You think that was put in
12  writing?
13     A.     I think so, yes.
14     Q.     Was it a Patton Boggs lawyer
15  who said that?
16     A.     I think so, yes.
17     Q.     What's your best recollection
18  of who said that from Patton Boggs?
19     A.     Again, I'm guessing here, I
20  think it would be Adlai Small.
21         MR. GOMEZ: Objection.
22         THE SPECIAL MASTER: No, no,
23  let's hear this. I have been hearing it,
24  too. When she is saying I would be
25  guessing, she I think is really saying not
```

Page 152

```
 1              L. GARR
 2  just making a wild guess, but to the best
 3  of my recollection, you know, it would
 4  have been so and so.
 5         THE WITNESS: I'm sorry,
 6  because I really am guessing a bit,
 7         THE SPECIAL MASTER: Well, then
 8  stop guessing, but you were about to
 9  mention a name and you were interrupted.
10         THE WITNESS: I'm just going
11  off of the context of who I was speaking
12  with at the time I think would be Adlai
13  Small.
14     Q.     Your best recollection -- you
15  don't have a specific recollection of it?
16     A.     No.
17     Q.     Is it fair to say that your
18  best recollection of -- well, withdrawn.
19         You have a recollection of
20  being given this instruction to minimize
21  e-mail correspondence relating to
22  additional experts, right?
23     A.     Yes.
24     Q.     And you have a general
25  recollection that same instruction was
```

Page 153

```
 1              L. GARR
 2  given again after there was an increased
 3  number of e-mails relating to the
 4  additional experts?
 5     A.     Yes.
 6     Q.     Your best recollection based on
 7  the context of these instructions is that
 8  it was Adlai Small who gave you this
 9  instruction?
10     A.     Yes, although I really don't --
11  I really don't recall.
12     Q.     This instruction was given in
13  2010 though, correct?
14         MR. GOMEZ: Objection,
15  foundation.
16         THE SPECIAL MASTER: Overruled.
17     A.     Assuming there was such an
18  instruction, if I'm recalling correctly
19  that there was, it would be in that time
20  period I guess, if that's when the reports
21  were being done.
22     Q.     You do remember being told to
23  minimize e-mail correspondence relating to
24  additional experts, correct?
25     A.     I don't remember getting a
```

39 (Pages 150 - 153)

Page 154

1           L. GARR
2 direct statement of that. I think there
3 was a general sense that it seemed that a
4 lot of materials that were previously
5 considered to be privileged were being
6 turned over at that time in light of the
7 1782 actions, and there was a sense that
8 -- there was this sense that Chevron would
9 seek to do a 1782 immediately regarding
10 the experts or as much as they could.
11          So it was a kind of general
12 sense of correspondence, that there needed
13 to be more vigilance about putting
14 attorney work product or privileged stamps
15 on things, that was not being done
16 previously, that there needed to be a
17 little more awareness of the fact that
18 documents might be viewed, and so that --
19 I don't know that there was an instruction
20 as much as kind of just once the 1782s
21 began and different things were done, and,
22 again, with the experts, that it was this
23 kind of sense that Chevron was going to
24 seek everything, and so it was just an
25 awareness of that, I think, it wasn't so

Page 155

1           L. GARR
2 much an instruction.
3    Q.    Did there come a time that you
4 learned Constantine Cannon was withdrawing
5 as counsel?
6    A.    I think so, yes.
7    Q.    And who did you learn that
8 from?
9    A.    I think Steven.
10   Q.    Did you learn the reason, did
11 Mr. Donziger give you a reason as to why
12 Constantine Cannon was withdrawing?
13   A.    I believe so.
14   Q.    You were in New York at the
15 time?
16   A.    I believe so.
17   Q.    What did Mr. Donziger tell you?
18          MR. GOMEZ: Objection.
19          THE SPECIAL MASTER: Overruled,
20 waiver.
21   A.    I don't fully recall. I think
22 it was a mix of funding and the
23 complicated nature of the case.
24          THE SPECIAL MASTER: Now I add
25 crime-fraud, that conversation was in

Page 156

1           L. GARR
2 furtherance of the crime-fraud relating to
3 Cabrera/Colorado.
4    Q.    Did you speak to Mr. Woods --
5          THE SPECIAL MASTER: If that
6 was the stated reason, that is stated by
7 Donziger, and the witness has testified it
8 was, then it is in furtherance of the
9 fraud.
10   Q.    Did you speak to Mr. Woods
11 regarding the withdrawal of Constantine
12 Cannon?
13   A.    I don't recall.
14   Q.    Did there come a time when
15 Mr. Woods spoke to you regarding any
16 concerns he had about information he
17 learned from Mr. Donziger --
18          MR. GOMEZ: Objection.
19   Q.    -- relating to Mr. Beltman?
20          MR. GOMEZ: Objection.
21          THE SPECIAL MASTER: Is that a
22 privilege objection?
23          MR. GOMEZ: Yes.
24          THE SPECIAL MASTER: Overruled,
25 and at least on the ground of subject

Page 157

1           L. GARR
2 matter waiver, and depending on the answer
3 it may also be in furtherance of the
4 fraud.
5          MS. PARADISE: Do you need the
6 question again?
7          THE WITNESS: Yeah, I would
8 appreciate it.
9    Q.    Did there come a time when
10 Mr. Woods spoke to you regarding any
11 concerns he had about information he
12 learned from Mr. Donziger relating to
13 Mr. Beltman?
14   A.    I don't recall specific
15 conversations, no.
16   Q.    General conversation?
17   A.    I believe so, yes.
18   Q.    What was the nature of the
19 general conversation?
20          MR. GOMEZ: Objection.
21          THE SPECIAL MASTER: Overruled,
22 same grounds. I want to hear the answer
23 before deciding on whether or not there is
24 a crime-fraud reason here as well.
25   A.    I believe at the time the 1782

40 (Pages 154 - 157)

Page 158

L. GARR

1       L. GARR
2  motion was filed and the allegations
3  within, we both discussed our concern at
4  the allegations raised.
5       Q.    Mr. Woods expressed concerns
6  that if the allegations were true, that he
7  didn't want to be a part of what was
8  alleged?
9       MR. GOMEZ:  Objection.
10       THE SPECIAL MASTER:  Overruled.
11      A.    I don't recall any specific
12  conversation of that nature.
13      Q.    Do you generally recall
14  expressing that, that if the allegations
15  made by Chevron were true regarding the
16  relationship between the Lago Agrio
17  plaintiffs' Ecuadorian representatives and
18  Mr. Cabrera, that you didn't want to be a
19  participant in it?
20       MR. GOMEZ:  Objection.
21       THE SPECIAL MASTER:  Overruled,
22  waiver.
23      A.    I don't recall any
24  conversations specific about that.
25      Q.    Did Mr. Woods talk to you about

Page 159

L. GARR

1       L. GARR
2  any conversation he had with Mr. Donziger
3  regarding Mr. Woods learning the level of
4  cooperation Mr. Cabrera had with Stratus?
5      A.    I don't recall.
6      Q.    Did you ever see a memo that
7  Mr. Woods wrote to the file relating to a
8  conversation he had with Mr. Donziger
9  regarding Constantine Cannon's decision
10  not to participate in the case?
11      A.    No, I don't believe so, no.
12      Q.    Mr. Woods never shared that
13  with you?
14      A.    I don't recall.  Not that I
15  recall.
16       (Plaintiff's Exhibit 1730
17  marked for identification.)
18       (Witness perusing document.)
19      Q.    Ms. Garr, looking at this
20  document, does it refresh any recollection
21  of seeing it before?
22       MS. PARADISE:  Do you need more
23  time to review the document?
24       THE WITNESS:  Yeah, I'm sorry,
25  can I finish reading it?

Page 160

L. GARR

1       L. GARR
2       MR. BRODSKY:  All right.
3       (Witness perusing document.)
4      Q.    Does this refresh your
5  recollection of having seen it before?
6      A.    I'm not sure if I have seen
7  this before but it does -- I do recall
8  kind of conversations discussing various
9  aspects of this at the time, or I don't
10  know if it was at this time.
11      Q.    Take us through it.  What do
12  you recall discussing and with whom?
13       THE SPECIAL MASTER:  I think
14  you better save this until after the lunch
15  hour.
16       MR. BRODSKY:  Okay.
17       THE SPECIAL MASTER:  We will
18  come back to this.  You had a two-minute
19  warning.  By now it is gone, the time is
20  gone, and we might as well take our lunch
21  break.
22       MR. BRODSKY:  All right.
23       THE VIDEOGRAPHER:  We are going
24  off the record.  The time is 12:31 p.m.
25       (Luncheon recess:  12:31 p.m.)

Page 161

L. GARR

1       L. GARR
2  A F T E R N O O N   S E S S I O N
3       1:21 p.m.
4  L A U R A   G A R R, resumed.
5       THE VIDEOGRAPHER:  We are back
6  on the record.  The time is 1:21 p.m.
7  This is the beginning of disk three.
8  CONTINUED EXAMINATION
9  BY MR. BRODSKY:
10      Q.    Ms. Garr, before the break you
11  were shown Exhibit 1730.  You had said "I
12  do recall kind of conversations discussing
13  various aspects of this at the time, or I
14  don't know if it was at this time."
15       You recall discussing with whom
16  various aspects of what's mentioned in
17  Mr. Woods' March 18th memo to the file?
18      A.    I believe I had conversations
19  with Steven about various aspects of this,
20  and I think Andrew Woods as well, and I
21  believe there were conversations with
22  Patton Boggs attorneys and I guess the
23  Emery Celli attorneys as well.
24      Q.    Are you remembering one
25  particular conversation or multiple

41 (Pages 158 - 161)

1          L. GARR
2 conversations?
3    A.    Multiple conversations.
4    Q.    Did you have a conversation
5 with Mr. Donziger and Mr. Woods together
6 or separately with Mr. Donziger and
7 Mr. Woods, or both?
8    A.    I don't recall specifically.
9    Q.    Who from Patton Boggs did you
10 have conversations with about various
11 aspects of what's mentioned here in
12 Mr. Woods' memo to the file?
13    A.    I don't recall exactly who was
14 at a meeting, but I recall a meeting
15 discussing where Pablo Fajardo and Luis
16 Yanza attended a meeting discussing what
17 documents had been provided to Cabrera.
18    Q.    That was a meeting in New York?
19    A.    In New York, yes.
20    Q.    At Patton Boggs' offices?
21    A.    I believe, yes.
22    Q.    Was it a two-day meeting?
23    A.    I don't recall.
24    Q.    We will get to that. Let me
25 ask you, focusing your attention on 1730,

1          L. GARR
2 in the second paragraph, it says at the
3 end "the plaintiffs" -- the last full
4 sentence, "Steven indicated that Shinder
5 said he felt that now that he knows the
6 level of cooperation between Beltman and
7 Cabrera by way of the plaintiffs' local
8 counsel, the plaintiffs had functionally
9 written Cabrera's report for him while we
10 held Cabrera out as an independent expert
11 to the world."
12        Do you see that?
13    A.    I do.
14    Q.    Did Mr. Donziger tell you at
15 some point in 2010 that the plaintiffs had
16 functionally written Cabrera's report for
17 him?
18        MR. GOMEZ: Objection.
19        THE SPECIAL MASTER: Overruled,
20 the waiver ground, and depending on the
21 answer perhaps also the crime-fraud
22 exception.
23    A.    I don't recall him stating it
24 specifically like that, no.
25    Q.    Do you recall him using words

1          L. GARR
2 to that effect?
3        MR. GOMEZ: Objection.
4        THE SPECIAL MASTER: Same
5 ruling.
6    A.    My understanding was --
7        THE SPECIAL MASTER: I'm sorry,
8 he is asking you what Donziger said. I
9 mean, what your understanding from before
10 is not what he is asking you about now.
11        THE WITNESS: Okay.
12    A.    Can you repeat the question
13 again?
14    Q.    Did Mr. Donziger tell you at
15 some point in 2010 that the plaintiffs had
16 functionally written Cabrera's report for
17 him, in those words or words to that
18 effect?
19        MR. GOMEZ: Objection.
20        THE SPECIAL MASTER: Overruled.
21    A.    I guess more or less.
22    Q.    More or less, yes? In sum and
23 substance, yes; is that fair?
24        THE SPECIAL MASTER: Let her
25 answer.

1          L. GARR
2    A.    I understood, I was told by
3 Steven, that Stratus had drafted -- I
4 don't know that it was ever the full
5 report, I never understood that, but large
6 sections that were adopted wholly by
7 Stratus -- I mean by Cabrera for use in
8 his report.
9    Q.    That's the extent of what
10 Mr. Donziger said in substance?
11        MR. GOMEZ: Objection.
12        THE SPECIAL MASTER: Overruled,
13 and now having heard what Donziger said,
14 the crime-fraud exception applies to that
15 conversation.
16    A.    That I recall.
17    Q.    In the next full paragraph, it
18 says "I inquired to Steven regarding the
19 level of cooperation with Cabrera since I
20 had been under the impression that while
21 we had turned over voluminous levels of
22 materials to Cabrera, some with the
23 expectation that they had been adopted,
24 that we had not worked directly with him."
25        Did you have an understanding

42 (Pages 162 - 165)

L. GARR

1
2 -- withdrawn.
3        Mr. Donziger tell you that
4 Stratus and the Ecuadorian Lago Agrio
5 plaintiffs' representatives had turned
6 over voluminous levels of materials to
7 Cabrera but had not worked directly with
8 Cabrera?
9        MR. GOMEZ: Objection.
10        THE SPECIAL MASTER: Overruled,
11 on the waiver ground, and when I hear the
12 answer it may be on the crime-fraud ground
13 as well.
14   A.    I don't recall that.
15   Q.    Did Mr. Donziger indicate to
16 you that --
17        THE SPECIAL MASTER: Excuse me,
18 when you say I don't recall that or do you
19 mean to the best of your recollection he
20 did not say that?
21        THE WITNESS: I don't recall
22 him ever saying that to me.
23        THE SPECIAL MASTER: That is
24 the latter of the two things I said?
25        THE WITNESS: I'm sorry?

L. GARR

1
2        THE SPECIAL MASTER: In other
3 words, to the best of your recollection he
4 did not say that?
5        THE WITNESS: He might have
6 said that. I don't recall him ever saying
7 that to me though.
8   Q.    Did Mr. Donziger indicate to
9 you that while the Lago Agrio plaintiffs'
10 representatives and him had not worked
11 directly with Cabrera, that Mr. Beltman
12 had worked in the area continuously with
13 Mr. Cabrera?
14   A.    No, not that I recall, no.
15   Q.    At the end of the third full
16 paragraph, do you see where it says
17 "Steven indicated that this would not
18 create an ethical problem under Ecuadorian
19 law, but he was unsure as to what impact
20 it would have under U.S. ethical rules"?
21        Did Mr. Donziger ever say in
22 those words or in similar words the same
23 thing to you?
24        MR. GOMEZ: Objection.
25        THE SPECIAL MASTER: Overruled,

L. GARR

1
2 waiver, for the moment.
3        Ms. Garr, the question is did
4 he say in words or substance what you read
5 in the last sentence of that third
6 paragraph. That's all he is asking.
7        THE WITNESS: Yeah, for the
8 first part -- I don't recall, no. I'm
9 sorry, there is two pieces to the last
10 sentence. I recall that he said he did
11 not know under Ecuadorian law and was
12 looking into under Ecuadorian law if it
13 was permissible or not, and that's going
14 to seek the court orders and things of
15 that nature.
16        And under the U.S. ethical
17 rules, I did have -- I do recall having a
18 conversation with him regarding just
19 generally participating in the case
20 regarding U.S. ethical rules.
21        THE SPECIAL MASTER: What did
22 he say is what he is asking? Did he say
23 in words or substance what is said there
24 in the second clause?
25        THE WITNESS: He said that he

L. GARR

1
2 was seeking advice as to the impact under
3 U.S. ethical rules and advised us to do
4 the same.
5   Q.    Did Mr. Donziger tell you that
6 he did not know that Mr. Beltman and
7 Stratus were functionally drafting the
8 report for Mr. Cabrera?
9        MR. GOMEZ: Objection.
10        THE SPECIAL MASTER: Overruled.
11   A.    I don't recall a conversation
12 of that specific nature.
13   Q.    Did Mr. Donziger say to you
14 that it was news to him, that he was
15 learning it also for the first time that
16 Mr. Beltman and Stratus was functionally
17 writing the report for Mr. Cabrera?
18        MR. GOMEZ: Objection.
19   Q.    In those words or words to that
20 effect, substance.
21        THE SPECIAL MASTER: Overruled.
22   A.    Not that specific, but he did
23 state that he wanted to speak to local
24 counsel about what had happened, but he
25 didn't -- I did get a sense or he did say

43 (Pages 166 - 169)

Page 170

1          L. GARR
2 in words or substance. I don't know
3 exactly what took place and I need to find
4 out what happened.
5     Q.    Did you understand him to mean
6 that he didn't know that Stratus had
7 functionally written the report for
8 Mr. Cabrera?
9          MR. GOMEZ: Objection.
10         THE SPECIAL MASTER: Overruled.
11    A.    I guess I think I took it to
12 mean he didn't know the level of
13 coordination or the document -- how things
14 took place or the level of cooperation.
15    Q.    And on the next page, you see
16 on the second page Mr. Woods had advised
17 that he was concerned -- "I was concerned
18 that the issue might present questions of
19 personal liability." Do you see that?
20    A.    Yes.
21    Q.    Did you talk to Mr. Woods about
22 his concerns regarding personal liability?
23         MR. GOMEZ: Objection.
24         THE SPECIAL MASTER: Overruled.
25    A.    Not that I recall, no.

Page 171

1          L. GARR
2     Q.    Did you have concerns at the
3 time regarding personal liability?
4          MR. GOMEZ: Objection.
5          THE SPECIAL MASTER: Overruled.
6     A.    No.
7     Q.    And then it says that "We had a
8 duty to inform all parties with an
9 interest in the case of the full elements
10 of this information and that we should
11 cease using the Cabrera report estimates
12 as an 'independent expert' opinion
13 immediately until we determine the issues
14 at hand."
15         Do you see that?
16    A.    I do.
17    Q.    Did Mr. Donziger say in words
18 or substance that you should no longer --
19 you and the Lago Agrio plaintiffs' team
20 should no longer use the Cabrera -- refer
21 to the Cabrera report estimates as an
22 independent expert opinion?
23         MR. GOMEZ: Objection.
24         THE SPECIAL MASTER: Overruled.
25    A.    I don't recall.

Page 172

1          L. GARR
2          (Plaintiff's Exhibit 2710
3 marked for identification.)
4     Q.    2710 is a two-page document.
5 At the top it is an e-mail exchange
6 between Laura Garr and ampage@gmail.com
7 dated 3-18-2010, Re: Documents.
8          Do you recall being in Ecuador
9 at the time of this e-mail exchange,
10 Ms. Garr?
11    A.    I don't. But I see on the
12 date, and the travel itinerary, that I was
13 in Ecuador at the time.
14    Q.    The Bates number, just for the
15 record, is PLAMP 6226.
16         Let me direct your attention to
17 the bottom of the e-mail. Directing your
18 attention to the 1:34 p.m. e-mail where
19 you say you are scanning the following
20 documents --
21         THE SPECIAL MASTER: Hold on
22 one second. Let me try to read it in
23 order. Do I start at the bottom here?
24         MR. BRODSKY: Yes, start at the
25 bottom where it says --

Page 173

1          L. GARR
2          THE SPECIAL MASTER: Okay, just
3 a second.
4          (Witness perusing document.)
5          MR. BRODSKY: Why don't I hand
6 out 2710B, which is a cleaner, easier
7 version to read, Mr. Gitter.
8          (Plaintiff's Exhibit 2710B
9 marked for identification.)
10         MR. BRODSKY: For the record,
11 2710B is the metadata version of 2710.
12         (Witness perusing document.)
13    A.    Okay.
14    Q.    Do you recall scanning
15 documents, as you say in this e-mail, "I
16 am scanning the following documents
17 referenced in the earlier e-mail," and
18 then you list a series of documents?
19    A.    I mean, from reading this, yes,
20 but I don't independently recall it.
21    Q.    Down at the end, it says "There
22 are numerous other times when Chevron
23 challenges the scope of Cabrera's work,
24 timing, and so on. That is the list
25 prepared by Julio and there are still

44 (Pages 170 - 173)

Page 174

1        L. GARR
2 others."
3        By Julio, you mean who?
4    A.    I assume Julio Prieto.
5    Q.    The response, do you see where
6 it says "Are the meetings with EC law
7 professors suspended?" Do you see where
8 Mr. Page says that?
9    A.    Yes.
10   Q.    "If not, please make sure they
11 are regardless of what Steven is saying."
12   A.    Yes.
13   Q.    And you respond "Okay. We
14 cancelled the one from today. Oyarte got
15 back to us, but we are playing phone tag
16 (intentionally) and will only say 'moving
17 forward we might need assistance on points
18 of Ecuadorian law.'"
19        What's your understanding of
20 why -- what's your understanding of the
21 purpose for Mr. Page's instructions to
22 cancel any meetings with the Ecuadorian
23 law professors?
24        MR. GOMEZ: Objection.
25        THE SPECIAL MASTER: Overruled.

Page 175

1        L. GARR
2    A.    I don't recall specifically,
3 but I have a vague recollection of there
4 being an attempt to set up multiple
5 meetings with various experts to use for
6 affidavits and filings that I believe were
7 either no longer required or somebody else
8 already -- they had somebody else lined
9 up, and so we would need them in the
10 future for various things but there wasn't
11 the urgent rush in the same way to obtain
12 them, from what I recall.
13        (Plaintiff's Exhibit 4220
14 marked for identification.)
15   Q.    I'm showing you 4220, which is
16 an e-mail from Aaron Marr Page dated March
17 18, 2010 to Laura Garr, subject, Re:
18 Moving Forward, and this is subject to the
19 502(d) stipulation, Bates numbered
20 GARR65707.
21        Have you had a chance to review
22 this before coming here today?
23   A.    No, I have not. I'm sorry, I
24 might have. This appears to be one of the
25 documents I reviewed, but if I could just

Page 176

1        L. GARR
2 review it again quickly.
3        (Witness perusing document.)
4    Q.    Directing your attention to --
5    A.    I'm sorry, I'm on the last
6 sentence, sorry, paragraph, I mean.
7        (Witness perusing document.)
8    A.    Okay.
9    Q.    Directing your attention to
10 your e-mail, the part where it says on 5,
11 "We have pulled all documents where
12 Cabrera has addressed the court."
13        Who is the "we" there?
14   A.    I don't recall. I would be
15 guessing again.
16   Q.    The first point is "Pablo is
17 back in the office." Is that a reference
18 to Pablo Fajardo?
19   A.    Yes, I would believe so, yes.
20   Q.    Were you pulling documents with
21 Pablo Fajardo?
22   A.    I don't know if he was involved
23 in the process of pulling documents.
24        (Plaintiff's Exhibit 4276
25 marked for identification.)

Page 177

1        L. GARR
2    Q.    This is an e-mail exchange with
3 Mr. Page on the next day, March 19th,
4 2010, with Laura Garr, subject, Re:
5 Seeking An Update, and it is GARR64098.
6        Is this one of the documents
7 you reviewed before coming here today?
8    A.    I believe so, yes. Yes.
9    Q.    Directing your attention to the
10 bottom of your e-mail where it says "I
11 realize that my original purpose for being
12 down here has changed, but I have not been
13 updated on what I'm supposed to be doing
14 now or how to proceed while here."
15        Does this refresh any
16 recollection as to what the original
17 purpose was?
18        MS. PARADISE: You can take a
19 minute to read the document, Laura.
20        (Witness perusing document.)
21   A.    No, it doesn't.
22   Q.    Do you see where it says, in
23 the paragraph above that, the second to
24 last sentence of that paragraph, "Juampa"?
25 Who does Juampa refer to?

45 (Pages 174 - 177)

Page 178

```
 1          L. GARR
 2   A.    Juan Pablo.
 3   Q.    Juan Pablo Saenz?
 4   A.    Yes.
 5   Q.    It says "Juan Pablo Saenz" --
 6 is that "Julio Prieto"?
 7   A.    Yes.
 8   Q.    -- "have been assisting
 9 throughout the entire time.  The girls
10 have been great about pulling all
11 documents we request.  We have mountains
12 of paper now, but I'm not sure what it is
13 that you need."
14         Was this the pulling of records
15 from the court file, from the copies of
16 the court file?
17   A.    I assume so, yes.
18   Q.    Were there other documents?
19   A.    No, I would assume it is the
20 court file.
21   Q.    Let's turn to 4222.
22         (Plaintiff's Exhibit 4222
23 marked for identification.)
24   Q.    This is a six-page document to
25 Rick Kornfeld from Laura Garr dated March
```

Page 179

```
 1          L. GARR
 2 25th, 2010 "Re: Cabrera Report."
 3   A.    Yes, I see.
 4   Q.    Did you write this memo to
 5 Mr. Kornfeld?
 6   A.    I believe so, yes.
 7         THE SPECIAL MASTER:  Hold on.
 8 Let me read it, please.
 9         MR. BRODSKY:  I'm sorry, your
10 Honor.
11         (Witness perusing document.)
12   Q.    Was Rick Kornfeld representing
13 the Lago Agrio plaintiffs in the District
14 Court of Colorado 1782 proceeding after
15 the withdrawal of the Brownstein firm?
16   A.    I'm so sorry, can you please
17 repeat the question?
18   Q.    Was Rick Kornfeld representing
19 the Lago Agrio plaintiffs in the District
20 of Colorado in the 1782 proceeding after
21 the withdrawal of the Brownstein firm?
22   A.    I believe so, yes.
23   Q.    Who, if anyone, asked you to
24 prepare this memo to Mr. Kornfeld?
25   A.    I would guess it would be
```

Page 180

```
 1          L. GARR
 2 Steven Donziger.
 3   Q.    Do you have a recollection of
 4 whether it was Mr. Donziger?
 5   A.    I don't have a specific
 6 recollection of him requesting it, but
 7 that would be the only person that would
 8 really direct this.
 9   Q.    Was it the practice at the time
10 that the only person who directed you to
11 prepare memos for U.S. lawyers was
12 Mr. Donziger?
13   A.    I believe so, yes.
14   Q.    Looking at this document, what
15 were the source or sources of information
16 contained within this document, putting
17 aside the Lago Agrio court filings?  Were
18 there any sources for the information
19 contained herein other than the Lago Agrio
20 court filings?
21   A.    I didn't finish reading it all.
22 Can I have one more minute?
23   Q.    Sure.
24         THE SPECIAL MASTER:  You can
25 have as much as you want.
```

Page 181

```
 1          L. GARR
 2         THE WITNESS:  Okay, thank you.
 3         (Witness perusing document.)
 4   A.    Okay.
 5   Q.    Putting aside the Lago Agrio
 6 court filings that are listed in exhibits
 7 what, if any, other sources of information
 8 did you have for preparing this memo?
 9   A.    It would be I guess whatever
10 was filed in the -- as exhibits in the
11 1782 action by Chevron and communications
12 with Steven and local counsel.
13   Q.    By Steven --
14   A.    Steven Donziger, I'm sorry.
15         THE SPECIAL MASTER:  By local
16 counsel, Ecuadorian --
17         THE WITNESS:  Ecuadorian
18 counsel, I'm sorry, yes.
19   Q.    Which Ecuadorian local counsel?
20   A.    Julio Prieto, Juan Pablo Saenz,
21 and I assume Pablo Fajardo as well.
22   Q.    There is the statement at the
23 opening to Mr. Kornfeld saying "Richard
24 Cabrera Vega is the independent special
25 master who was appointed by the Ecuadorian
```

46 (Pages 178 - 181)

Page 182

L. GARR

2 court.
3        Do you recall prior to this
4 time having any conversations with
5 Mr. Donziger that raised questions
6 regarding whether or not Mr. Cabrera was
7 independent?
8    A.    Not that I recall.
9    Q.    And then directing your
10 attention to the pending questions on the
11 third page, it says "Subsequent to the
12 formal submission of materials to Cabrera
13 in response to the court order, local
14 counsel for the plaintiffs had extensive
15 ex parte communication with Cabrera and
16 provided him with documents for possible
17 adoption in his report."
18        Do you see that?
19    A.    I do.
20    Q.    Do you recall the basis for
21 that statement?
22    A.    I believe from Steven Donziger
23 and local counsel, and Ecuadorian counsel.
24    Q.    It says "U.S.-based counsel was
25 aware of these contacts, but generally not

Page 183

L. GARR

2 present."
3        Do you see that?
4    A.    Yes.
5    Q.    Who did you mean by U.S.-based
6 counsel?
7    A.    I would assume Steven Donziger.
8    Q.    Did Mr. Donziger tell you that
9 prior to the formal submission of
10 materials to Cabrera in response to the
11 court order, local counsel had extensive
12 ex parte communication with Mr. Cabrera?
13    A.    I'm sorry?
14    Q.    Did Mr. Donziger tell you that
15 prior to -- your paragraph starts with
16 "Subsequent to."
17        Did Mr. Donziger tell you that
18 prior to the formal submission of
19 materials to Cabrera that there was ex
20 parte communication between local counsel
21 and Cabrera?
22        MR. GOMEZ: Objection.
23        THE SPECIAL MASTER: Overruled.
24 Answer.
25    A.    Not that I recall.

Page 184

L. GARR

2    Q.    And did he tell you that
3 Mr. Donziger, he himself, had communicated
4 with Stratus in connection with preparing
5 a report to be given to Mr. Cabrera to
6 sign?
7        MR. GOMEZ: Objection.
8        THE SPECIAL MASTER: Overruled.
9    A.    Not that I recall, no.
10        THE SPECIAL MASTER: Now I add
11 a crime-fraud to both of those rulings,
12 not just waiver.
13    Q.    And page 6 at the very end --
14 do you see on the last two pages, on page
15 5 and 6, there are a series of exhibits?
16    A.    Yes.
17    Q.    The earliest exhibit of these
18 13, let me direct your attention to number
19 8, which is an August 17th, 2007 Cabrera
20 request for information. Do you see that?
21    A.    Yes.
22    Q.    Is this a complete list of all
23 the Ecuadorian filings relating to
24 Cabrera's responsibilities and role?
25    A.    I don't believe so. Not that I

Page 185

L. GARR

2 know. I don't know.
3    Q.    Did you decide which of these
4 you were going to provide to the Kornfeld
5 firm -- which of the Cabrera related
6 filings to provide to the Kornfeld firm or
7 did somebody direct you, select them for
8 you?
9        MR. GOMEZ: Objection.
10        THE SPECIAL MASTER: Overruled.
11    A.    No, I don't believe I -- I
12 don't believe I was responsible for
13 choosing the exhibits.
14    Q.    Who was responsible for that?
15        MR. GOMEZ: Objection.
16        THE SPECIAL MASTER: Overruled.
17    A.    Well, I believe this was
18 prepared, I recall, with Steven, but also
19 these were just exhibits that were the
20 ones that were provided to me in response
21 to my request in Ecuador for relevant
22 court orders about the documents.
23    Q.    Who did you make that request
24 to?
25    A.    Julio Prieto, Juan Pablo Saenz,

47 (Pages 182 - 185)

Page 186

1          L. GARR
2 and the girls that were handling the
3 documents that could assist as well.
4     Q.    Let me show you Exhibit 4886.
5          (Plaintiff's Exhibit 4886
6 marked for identification.)
7     Q.    Which is a document dated July
8 12, 2007 to the President of the Superior
9 Court of Justice of Nueva Loja directly
10 delivered, and it starts with "I, Richard
11 Cabrera Vega."
12          Let me direct your attention to
13 paragraph 1 where it says --
14     A.    Do I need to read this
15 document?
16     Q.    No, I'm going to direct your
17 attention to exactly what we are going to
18 talk about.
19     A.    Okay.
20     Q.    The paragraph 1 says "As your
21 Honor can see in my work plan, there are
22 several sites that I have selected for the
23 work of taking samples of both the soil
24 and the groundwater with the aim of
25 ensuring the complete and absolute

Page 187

1          L. GARR
2 impartiality with which I must act in
3 carrying out the expert evaluation."
4          Do you see that?
5     A.    I do.
6     Q.    Was this a document that was --
7 this document wasn't pulled for you in
8 connection with while you were down in
9 Ecuador relating to Cabrera's work?
10     A.    Not that I recall, no.
11          (Plaintiff's Exhibit 107 marked
12 for identification.)
13     Q.    I show you Exhibit 107, which
14 is a three-page document, on the front
15 says Nueva Loja, July 23rd, 2007, Chief
16 Justice of the Superior Court of Justice
17 of Nueva Loja, hand-delivered, "I, Richard
18 Cabrera Vega."
19          Let me direct your attention to
20 the third full paragraph where it says "I
21 should clarify that I do not have any
22 relation or agreements with the plaintiff,
23 and it seems to me to be an insult against
24 me that I should be linked with the
25 attorneys of the plaintiffs."

Page 188

1          L. GARR
2          Do you see that?
3     A.    I do.
4     Q.    Were you provided with this
5 document when you were in Ecuador before
6 preparing this memorandum on March 25th,
7 2010?
8          THE SPECIAL MASTER:  This
9 memorandum we are talking about is 4222?
10          MR. BRODSKY:  Yes.
11          THE SPECIAL MASTER:  Think
12 transcript, Counsel.
13     Q.    Were you provided with Exhibit
14 107 prior to preparing and while preparing
15 Exhibit 4222?
16     A.    Not that I recall.
17     Q.    Do you remember being told or
18 shown this document reflecting
19 Mr. Cabrera's statement that he --
20          THE SPECIAL MASTER:  By "this
21 document," you mean Exhibit 107?
22          MR. BRODSKY:  107.
23          THE SPECIAL MASTER:  Think
24 transcript, Counsel.
25     Q.    -- stating that "I should

Page 189

1          L. GARR
2 clarify that I do not have any relation or
3 agreements with the plaintiff"?
4     A.    I do not recall, no.
5     Q.    And did you -- do you recall
6 coming across this document at any time
7 while you were working with Mr. Donziger?
8     A.    I don't recall.  Not that I
9 recall.
10     Q.    You learned information,
11 correct, that this statement -- you
12 learned information in 2010 that the
13 statement here -- that shows that the
14 statement here is inaccurate, correct?
15          THE SPECIAL MASTER:  "The
16 statement here" is the middle paragraph of
17 Exhibit 107, which reads -- would you read
18 it, Counsel, please.
19          MR. BRODSKY:  Yes, your Honor.
20          THE SPECIAL MASTER:  Just
21 remember that the person who is reading
22 this transcript has no idea what you are
23 talking about when you use the word
24 "this."
25          MR. BRODSKY:  Understood.

48 (Pages 186 - 189)

Page 190

```
1            L. GARR
2  Withdrawn.
3     Q.    Ms. Garr, you learned
4  information, correct, in 2010 that the
5  statement by Richard Cabrera Vega on July
6  23rd, 2007 that "I should clarify that I
7  do not have any relation or agreements
8  with the plaintiff" is inaccurate,
9  correct?
10          MR. GOMEZ: Objection.
11          THE SPECIAL MASTER: Overruled.
12    A.    Yes.
13    Q.    In any of the meetings that you
14  had with Mr. Donziger and the Patton Boggs
15  attorneys and the Emery Celli lawyers, did
16  anyone raise this statement by Mr. Cabrera
17  on July 23rd, 2007 that "I do not have any
18  relation or agreements with the
19  plaintiff"?
20          MR. GOMEZ: Objection.
21          THE SPECIAL MASTER: Overruled.
22    A.    Not that I recall.
23    Q.    Let me show you Exhibit 108.
24          (Plaintiff's Exhibit 108 marked
25  for identification.)
```

Page 191

```
1            L. GARR
2     Q.    Exhibit 108 is a document that
3  states at the top of the second page
4  "Quito, October 11, 2007, Acting Chief
5  Judge of the Superior Court of Nueva Loja.
6  I, Engineer Richard Cabrera Vega."
7          (Witness perusing document.)
8     A.    Yes.
9     Q.    Were you provided this
10  document, Exhibit 108, prior to or during
11  your preparation of Exhibit 4222, your
12  memo on March 25th, 2010 to Mr. Kornfeld?
13    A.    Not that I recall.
14    Q.    Directing your attention to the
15  part 1, clarification of various
16  questions, subparagraph 2, do you see
17  where it says "I have performed my work
18  with absolute impartiality, honesty,
19  transparency and professionalism"?
20          Do you see that?
21    A.    Yes.
22    Q.    Did any of the Lago Agrio
23  plaintiffs' representatives provide or
24  show you this document with Mr. Cabrera's
25  statement on October 11th, 2007 in Exhibit
```

Page 192

```
1            L. GARR
2  108?
3          MR. GOMEZ: Objection, asked
4  and answered.
5          THE SPECIAL MASTER: Overruled.
6     A.    Not that I recall.
7     Q.    Down at the bottom on paragraph
8  6, second sentence, it says "It is clear I
9  could not perform a job of this magnitude
10  alone and therefore have employed several
11  technical officers and experts to perform
12  these tasks under my coordination and
13  responsibility."
14          Do you see that?
15    A.    Yes.
16    Q.    Did you come to learn --
17          MS. PARADISE: Slight
18  correction to your reading.
19          MR. BRODSKY: I'm sorry.
20  Withdrawn.
21    Q.    Directing your attention to the
22  page where it says "It is clear that I
23  could not perform a job of this magnitude
24  alone and have therefore employed several
25  technicians and experts to perform these
```

Page 193

```
1            L. GARR
2  tasks under my coordination and
3  responsibility," do you see that?
4     A.    Yes.
5     Q.    That sentence that I just read
6  in Exhibit 108, did you come to learn that
7  Mr. Cabrera did not select those technical
8  officers and experts who provided -- who
9  were the basis of his report?
10          MR. GOMEZ: Objection.
11          THE SPECIAL MASTER: Overruled.
12    A.    That he did not select his
13  technical experts?  No.
14    Q.    Let me show you Exhibit 1915.
15          (Plaintiff's Exhibit 1915
16  marked for identification.)
17    Q.    This is a three-page document,
18  DONZ-HDD0167393 with the top e-mail
19  message from
20  annmaest@statusconsulting.com sent April
21  1st, 2008 to Steven Donziger, copied to
22  Doug Beltman, "Re: For translation,
23  please respond ASAP."
24    A.    Okay.
25    Q.    Ms. Garr, have you ever seen
```

49 (Pages 190 - 193)

Page 194

```
1           L. GARR
2  this e-mail exchange -- did you see this
3  e-mail exchange in 2010 or prior to 2010?
4     A.    No, but I haven't read it yet.
5  But looking at it, no.
6     Q.    Please take a moment to read
7  it.
8           THE SPECIAL MASTER:  Take a
9  moment to read it.
10          (Witness perusing document.)
11    A.    Okay.
12    Q.    Directing your attention to the
13 second page, do you see the e-mail from
14 Cristina Cadena to
15 gringograndote@gmail.com?
16    A.    Yes.
17    Q.    And then the e-mail from Gringo
18 Grande to sdonziger@gmail.com, it is the
19 one right above that message on page 2 of
20 Exhibit 1915?
21    A.    Yes.
22    Q.    Does this refresh any
23 recollection that Mr. Donziger used the
24 e-mail address of
25 gringograndote@gmail.com?
```

Page 195

```
1           L. GARR
2     A.    No, not that I recall.
3     Q.    Did Mr. Donziger ever tell you
4  that he was using the
5  gringograndote@gmail.com?
6     A.    Not that I recall.
7     Q.    Do you see where it says Ann
8  Maest?  You know who Ann Maest is,
9  correct?
10    A.    Yes.
11    Q.    Who is Ann Maest?
12    A.    I have never met her, but my
13 understanding is she was a technical
14 expert that worked for Stratus Consulting.
15    Q.    Do you see Ann Maest's message
16 at the top of page 2, "This is a 60-page
17 document - very unlikely it can get
18 translated today, unless it's already in
19 process (Doug?).  Let me know if there's a
20 summary of the summary.  Or maybe the
21 Findings document, which is much more to
22 the point for the press?"
23          Do you see that?
24    A.    I do.
25    Q.    You see the date is April 1st,
```

Page 196

```
1           L. GARR
2  2008?
3     A.    Yes.
4     Q.    Are you aware that Cabrera's
5  report was filed on April 1st, 2008?
6     A.    No, I was not working for the
7  litigation at this time, and no, I was not
8  aware of that.
9           THE SPECIAL MASTER:  Take a
10 look at Exhibit 723, which should be in
11 front of you.
12    Q.    Do you recognize 723 as
13 Mr. Cabrera's report?
14    A.    Yes, I believe it is, yes.
15    Q.    And the date of that report?
16    A.    April 1st, 2008 -- or March --
17          THE SPECIAL MASTER:  Filed?
18          THE WITNESS:  Filed, I guess
19 April 1st, 2008.
20    Q.    Let me show you 1916 and 1916A,
21 which is the e-mail exchange between
22 Cristina Cadena to Gringo Grandote, and
23 then Gringo Grandote's e-mail to S.
24 Donziger.
25          (Plaintiff's Exhibit 1916
```

Page 197

```
1           L. GARR
2  marked for identification.)
3          (Plaintiff's Exhibit 1916A
4  marked for identification.)
5     Q.    Let me ask you to look at
6  1916A, where it says Informe Sumario Del
7  Examen Pericial.  Compare that first page
8  to the third page of 724.  Do you have 724
9  in front of you?
10    A.    I do.
11    Q.    Without doing a detailed word
12 by word line, fair to say that it appears
13 to be a verbatim copy with the
14 exception -- verbatim, 1916A appears to be
15 a verbatim copy of the third page --
16 starting at the third page of 724 with the
17 exception of the handwriting in the upper
18 right-hand corner and the stamp in the
19 lower right-hand corner?
20          MR. GOMEZ:  Objection.
21 Documents speak for themselves.
22          THE SPECIAL MASTER:  If it is a
23 prelude to a follow-up question, then you
24 ought to begin with "Do you notice that."
25 Okay?
```

50 (Pages 194 - 197)

L. GARR

1
2   Q.   Do you notice that?
3        MR. GOMEZ: Same objection.
4        THE SPECIAL MASTER: Overruled.
5   A.   Yeah, I'm looking just at this
6   first and third page, but yes, I notice it
7   looks identical except for the changes you
8   noted.
9   Q.   Did Mr. Donziger ever tell you
10  when you were in Ecuador that he had sent
11  1916A on April 1st, 2008 to Doug Beltman
12  and Ann Maest of Stratus?
13  A.   I assume you mean when I was in
14  Ecuador in March of 2010?
15  Q.   Yes.
16  A.   No.
17  Q.   Did he ever tell you that on
18  the day the Cabrera report was filed,
19  Mr. Donziger was personally communicating
20  and providing Stratus information --
21  withdrawn.
22       Did Mr. Donziger ever tell you
23  that he was providing a document that was
24  drafted under the name of Richard Cabrera
25  on April 1st, 2008 to be given to

L. GARR

1
2   Mr. Cabrera?
3   A.   No, not that I recall, no.
4   Q.   And when Mr. Donziger spoke to
5   you about the communications between the
6   Lago Agrio plaintiffs' representatives and
7   Mr. Cabrera, did he ever mention that he
8   himself was involved personally in helping
9   to communicate information to Mr. Cabrera?
10  A.   Not that I recall, no.
11  Q.   In fact, based on your
12  conversations with Mr. Donziger, is it
13  fair to say that he gave you the opposite
14  impression from talking to him in 2010?
15       MR. GOMEZ: Objection,
16  foundation.
17       THE SPECIAL MASTER: No, no,
18  no. Objection overruled. Go on. The
19  question is proper. Go ahead and answer
20  it.
21  A.   I'm sorry, can you repeat the
22  question?
23  Q.   In fact, based on your
24  conversations with Mr. Donziger, is it
25  fair to say that he gave you the opposite

L. GARR

1
2   impression from talking to him in 2010?
3   A.   Yes, although -- well, I got
4   the impression that he did not recall and
5   was speaking with counsel, the Ecuadorian
6   counsel, to find out the exchange of
7   information with the exception of in 2010
8   there was an outtake of a meeting that
9   occurred subsequent to all of this where
10  it appeared he was present at a meeting.
11  Q.   And at the time that --
12       THE SPECIAL MASTER: I think
13  his question was directed to what was
14  going on in the transmission of an English
15  version of the Cabrera report being
16  translated with Mr. Donziger's own e-mail,
17  cover e-mail. That's what he was talking
18  about.
19       THE WITNESS: Yeah, I have
20  no -- I was never told about that, no.
21  Q.   And is it fair to say he gave
22  you the opposite impression from your
23  conversations with him in 2010 that he did
24  not have a personal role in preparing a
25  draft or the actual Cabrera report to be

L. GARR

1
2   provided to Cabrera?
3        MR. GOMEZ: Objection,
4   privileged and form.
5        THE SPECIAL MASTER: Privileged,
6   overruled, both on waiver and crime-fraud
7   grounds. Form is fine.
8   A.   I'm so sorry, can you repeat
9   it? I'm sorry.
10  Q.   Is it fair to say Mr. Donziger
11  gave you the opposite impression from your
12  conversations with him in 2010 that he did
13  not have a personal role in preparing a
14  draft or the actual Cabrera report to be
15  provided to Cabrera?
16  A.   I don't think he said anything
17  that specific, but I did get the
18  impression that that was -- that he did
19  not participate in that.
20  Q.   You got that impression that he
21  didn't participate in preparing any draft
22  with Mr. Cabrera's name on it for
23  Mr. Cabrera to sign because he told you
24  that he was trying to learn the facts
25  about what actually happened in connection

51 (Pages 198 - 201)

Page 202

```
1            L. GARR
2  with Stratus' relationship with
3  Mr. Cabrera?
4     A.    Correct.
5     Q.    Did there come a time when you
6  spoke with Mr. Pablo Fajardo regarding any
7  concerns they had about going to jail if
8  there was disclosure about the
9  interactions between the Lago Agrio
10 plaintiffs' representatives and
11 Mr. Cabrera?
12         MR. GOMEZ:  Objection.
13         THE SPECIAL MASTER:  Overruled.
14    A.    I recall a conversation in
15 Ecuador where they expressed concern
16 about -- Pablo Fajardo and with the
17 Ecuadorian team expressed concern about
18 the formalistic nature of Ecuadorian law
19 and how it would be viewed under the
20 formal laws of Ecuador, that it could be
21 viewed as improper.
22    Q.    What could be viewed as
23 improper you understood from what
24 Mr. Fajardo said were the ex parte
25 communications between the representatives
```

Page 203

```
1            L. GARR
2  of the Lago Agrio plaintiffs and
3  Mr. Cabrera?
4     A.    I don't recall if it was Pablo
5  Fajardo, but I do recall a conversation
6  with the Ecuadorian team, Julio and Juan
7  Pablo and Pablo Fajardo, of, yes, about
8  the --
9          THE SPECIAL MASTER:  To that
10 effect?
11         THE WITNESS:  Yes, to that
12 effect, thank you.  Thank you.
13    Q.    Did Mr. Donziger ever inform
14 you -- did you have a conversation with
15 Mr. Donziger about concerns raised by
16 Julio Prieto regarding whether they could
17 go to jail if disclosures came out
18 regarding the relationship between the
19 Lago Agrio plaintiffs' representatives and
20 Mr. Cabrera?
21         MR. GOMEZ:  Objection.
22         THE SPECIAL MASTER:  Overruled.
23    A.    I don't know if the word "jail"
24 was ever used, but Steven Donziger was
25 present for the conversation that I just
```

Page 204

```
1            L. GARR
2  referenced in the last question.
3     Q.    In Ecuador?
4     A.    In Ecuador.
5     Q.    And what, if anything, did
6  Mr. Donziger say in response?
7          MR. GOMEZ:  Objection.
8          THE SPECIAL MASTER:  Overruled.
9     A.    I don't recall specifically,
10 but I recall a conversation discussing
11 that and saying that there needed to be --
12 instead of guessing about the Ecuadorian
13 rules, there needed to be more, you know,
14 outreach to Ecuadorian counsel regarding
15 the permissibility of the law, and I
16 recall there being a conversation, again,
17 it was about a formalistic nature of the
18 Ecuadorian law and a conversation of what
19 happened in practice and him saying I
20 don't understand if this was done by the
21 parties and this was done by Chevron as
22 well, why this is -- why this is so
23 impermissible or you are worried it would
24 be viewed as impermissible, and just a
25 conversation of that nature, of wanting to
```

Page 205

```
1            L. GARR
2  reach out to get further advice from
3  Ecuadorian counsel and -- yeah.
4     Q.    Did anybody -- the participants
5  in that conversation were you,
6  Mr. Donziger, Julio Prieto, Juan Pablo
7  Saenz and Pablo Fajardo?
8     A.    I believe Aaron Page was there
9  as well.
10    Q.    Mr. Woods was not there?
11    A.    No, not that I recall.
12    Q.    Did anybody bring up -- how
13 long was this conversation?
14    A.    On that particular topic?
15    Q.    On that particular topic.
16    A.    I don't recall.
17    Q.    Did anybody bring up --
18         THE SPECIAL MASTER:  When was
19 that conversation?  You never asked.  When
20 are we talking about?  March of 2010?
21         THE WITNESS:  March or April, I
22 would assume.  It was after the 1782
23 filing in Colorado.
24    Q.    Did anybody raise in that
25 conversation or bring up that the Lago
```

L. GARR

1
2 Agrio plaintiffs' representatives had,
3 through Stratus, functionally written the
4 report for Mr. Cabrera?
5        MR. GOMEZ: Objection.
6        THE SPECIAL MASTER: Overruled.
7    A.    Not that I recall, no.
8        (Plaintiff's Exhibit 1625A
9 marked for identification.)
10   Q.    Let me show you Exhibit 1625A,
11 which is a one-page e-mail at the top
12 which is a translation in English of the
13 e-mail on the third page, the e-mail being
14 from Julio Prieto to Steven Donziger,
15 juanpasaenz@hotmail.com, Luis Yanza, Pablo
16 Fajardo Mendoza, subject, Accion de
17 Proteccion, date is March 30, 2010.
18        If you would take a moment to
19 read that and let me know when you are
20 finished.
21        (Witness perusing document.)
22   A.    Okay.
23   Q.    Does this refresh any
24 recollection of a conversation with Julio
25 Prieto regarding concerns about --

L. GARR

1
2        THE SPECIAL MASTER: Wait a
3 minute. First order of business, let me
4 deal with my smallish concerns about dates
5 and times.
6        Does this refresh your
7 recollection, looking at this e-mail and
8 the date of the e-mail, does this help to
9 refresh your recollection as to whether
10 the conversation you described earlier
11 among a larger group in Ecuador that you
12 were present was in March or April?
13        THE WITNESS: It doesn't, just
14 because I don't -- I guess it would be
15 around the same time period, but I don't
16 know exactly when that conversation was.
17        THE SPECIAL MASTER: Okay. Go
18 ahead, Counsel.
19   Q.    Does this refresh any
20 recollection of a conversation with Julio
21 Prieto where Julio Prieto expressed
22 concern regarding potential disclosures of
23 the relationship between the Lago Agrio
24 plaintiff representatives and Cabrera?
25        MR. GOMEZ: Objection.

L. GARR

1
2        THE SPECIAL MASTER: That's
3 what I just asked. But I was looking for
4 the date.
5    A.    I mean, I didn't receive this
6 e-mail. I have seen it because I believe
7 it was in -- it has been referenced in
8 filings, but I never received this e-mail,
9 so, I mean, other than what I recall and
10 have recounted, I don't -- it doesn't
11 refresh anything further from this.
12   Q.    Prior to that, did you read
13 newspaper articles referencing this
14 e-mail?
15   A.    I believe so.
16   Q.    Did you ever have any
17 conversations with Julio Prieto where he
18 expressed concern that the disclosures
19 could result in them going to jail?
20        MR. GOMEZ: Objection.
21   Q.    Besides the conversation you
22 discussed already.
23        MR. GOMEZ: Objection.
24        THE SPECIAL MASTER: Overruled.
25   A.    Besides the conversation I

L. GARR

1
2 discussed, which did not -- I don't recall
3 him ever using the term "jail" during
4 that, but besides that conversation, no.
5    Q.    Did the concerns about the
6 legal consequences of the relationship
7 between the Lago Agrio plaintiff
8 representatives and Cabrera come up during
9 the meeting in New York at Patton Boggs
10 where Mr. Fajardo was present?
11        MR. GOMEZ: Objection.
12        THE SPECIAL MASTER: Overruled.
13   A.    I don't recall.
14        THE SPECIAL MASTER: Once
15 again, let's just do it, you know, the
16 old-fashioned way.
17        You mentioned a meeting at
18 Patton Boggs, right?
19        THE WITNESS: Uh-huh.
20        THE SPECIAL MASTER: And
21 approximately when did that occur?
22        MR. BRODSKY: We were going to
23 get to that.
24        THE SPECIAL MASTER: Well, why
25 don't we do it in the orderly way so that

53 (Pages 206 - 209)

Page 210

L. GARR

1  L. GARR
2 the reader of the transcript knows.
3      Approximately when did it
4 occur?
5      THE WITNESS: I don't recall
6 specifically. I know it was subsequent to
7 the 1782 filing in Colorado. I don't
8 recall how long after.
9      THE SPECIAL MASTER: And where
10 in Patton Boggs' offices did it take
11 place?
12      THE WITNESS: It was in a
13 conference room.
14      THE SPECIAL MASTER: As best
15 you can recall, who was present? First
16 start with the Patton Boggs people, then
17 go on to the next set of people, etc.
18      THE WITNESS: I don't recall.
19 I remember I was present, Steven Donziger
20 was present, Pablo Fajardo and Luis were
21 present for --
22      THE SPECIAL MASTER: Luis
23 Yanza?
24      THE WITNESS: Luis Yanza and
25 Pablo Fajardo were present for a portion,

Page 211

1      L. GARR
2 a portion of the meeting, and I don't
3 recall who else was present at that time.
4 I know there were --
5      THE SPECIAL MASTER: Were Emery
6 Celli lawyers present?
7      THE WITNESS: I don't recall.
8      THE SPECIAL MASTER: Did this
9 meeting occur over one day or two days?
10      THE WITNESS: I don't recall.
11      THE SPECIAL MASTER: Go ahead,
12 Counsel.
13 BY MR. BRODSKY:
14  Q.   Let's show you Exhibit 4279,
15 which is a six-page document Bates stamped
16 DONZ31150 to 31151. It is an e-mail from
17 Steven Donziger dated April 6, 2010 to
18 Laura Garr, Aaron and Andrew Woods,
19 subject, Agenda, April 7 and April 8
20 Invictus Meetings, and it attaches a
21 multipage agenda for Invictus 2-8-2010
22 meetings.
23      (Plaintiff's Exhibit 4279
24 marked for identification.)
25      (Witness perusing document.)

Page 212

1      L. GARR
2  A.   Would you like me to review all
3 of it or is there a particular section?
4  Q.   Well, just looking at the first
5 page now which is the e-mail exchange, is
6 this the April 7 --
7      THE SPECIAL MASTER: Is this
8 the meeting you were talking about at the
9 Patton Boggs office?
10      THE WITNESS: If this is
11 where -- if Pablo Fajardo and Luis Yanza
12 were there, that's the only meeting that I
13 ever recall them being at in Patton Boggs'
14 offices. So if they were at this meeting
15 on April 7th and 8th, it would have been
16 that meeting.
17  Q.   Do you remember -- does this
18 refresh your recollection about having a
19 two-day meeting at Patton Boggs' offices?
20  A.   Other than reading it, no.
21  Q.   At this meeting that you
22 remember where Pablo Fajardo --
23      THE SPECIAL MASTER: Why don't
24 you ask her to look it over. Looking at
25 the agenda may help you answer even these

Page 213

1      L. GARR
2 basic questions.
3      THE WITNESS: Okay.
4      (Witness perusing document.)
5      MR. GOMEZ: Excuse me, can we
6 take a short break while she does that?
7      THE SPECIAL MASTER: Yeah, of
8 course.
9      THE VIDEOGRAPHER: We are going
10 to go off the record --
11      THE SPECIAL MASTER: No,
12 actually. She is reading the document in
13 the course of giving testimony and she is
14 in the room. It is only he that is going
15 to be out of the room.
16      (Mr. Gomez departs the room.)
17      (Witness perusing document.)
18      MS. PARADISE: One other member
19 of your firm joined. Could you just
20 clarify that for the record?
21      MR. BRODSKY: Yes, for the
22 record, Randy Mastro of Gibson Dunn has
23 joined us on behalf of Chevron.
24      (Witness perusing document.)
25  A.   Okay.

54 (Pages 210 - 213)

Page 214

1              L. GARR
2    Q.    Do you recall whether this is
3  the meeting, now having looked at the
4  agenda, that Pablo Fajardo was present in?
5    A.    I'm not sure.
6         MR. GOMEZ: For the record, I'm
7  back in the room.
8         MR. BRODSKY: By "I," you mean
9  Julio Gomez?
10        MR. GOMEZ: Yes.
11        THE SPECIAL MASTER: Put your
12  microphone on, then. You weren't on the
13  record. You were not back on the record.
14    Q.    Let me direct your attention to
15  certain parts of the agenda.
16        Do you see the second page of
17  the agenda where it discusses Current
18  Section 1782 Actions, Denver Action?
19    A.    Yes.
20    Q.    Do you see where it says Role
21  of Stratus Consulting?
22    A.    Yes.
23    Q.    "A. Identification of
24  potentially harmful Stratus documents," do
25  you see that?

Page 215

1              L. GARR
2    A.    Yes.
3    Q.    There was a discussion of
4  potentially harmful Stratus documents at
5  this meeting at Patton Boggs' offices?
6         MR. GOMEZ: Objection.
7         THE SPECIAL MASTER: I'm sorry,
8  Counsel, I think the first order of
9  business is to use the document to help
10  identify things like who was present at
11  the meeting, and the e-mail may help
12  her -- the e-mail addressees may help her
13  identify it and then you can go on to
14  substance.
15        MR. BRODSKY: Understood.
16    Q.    Directing your attention to the
17  first page, the e-mail from Eric
18  Westenberger to a number of people, was
19  Eric Westenberger present at the meeting?
20        MR. GOMEZ: Objection.
21        THE SPECIAL MASTER: Overruled.
22    A.    I don't recall. I don't
23  recall.
24    Q.    Would you go through each of
25  those names and tell us which individuals

Page 216

1              L. GARR
2  who received Mr. Westenberger's e-mail on
3  April 6, 2010 were present.
4         MR. GOMEZ: Objection.
5         MR. HILLE: Can I say a
6  clarification, Mr. Gitter?
7         THE SPECIAL MASTER: Sure.
8         MR. HILLE: The witness
9  testified about a meeting she attended and
10  then there have been questions about a
11  meeting that is reflected in this
12  document, and I just wanted to understand
13  if the questions are directed to the
14  meeting that the witness attended or the
15  meeting reflected in the document, because
16  I don't think we have been able to connect
17  the two. Is that okay?
18        THE SPECIAL MASTER: That's
19  fine.
20        MR. BRODSKY: Let me do this,
21  let's go to 4227.
22        (Plaintiff's Exhibit 4227
23  marked for identification.)
24    Q.    4227 is a three-page document.
25  It is an e-mail from juliabrickell@H5.com

Page 217

1              L. GARR
2  on April 29, 2010 to Laura Garr at
3  Donziger & Associates, with the subject
4  line Your Invictus Notes, and it contains
5  an attachment of two pages of notes.
6    A.    Yes.
7    Q.    These are your notes, Ms. Garr,
8  from an Invictus meeting?
9    A.    They appear to be, yes.
10    Q.    You recognize the handwriting?
11    A.    This is my handwriting, yes.
12    Q.    At the top of the -- and this
13  is Exhibit 4227. At the top of the second
14  page of Exhibit 4227, it says April 7th,
15  2010, Invictus Meeting?
16    A.    Yes.
17    Q.    Take a moment, if you would,
18  this is one of those documents stamped
19  GARR39654.
20        Prior to coming here today to
21  the deposition, you had read this?
22    A.    Yes.
23    Q.    Having read it prior to coming
24  here today, does this -- you attended the
25  April 7 meeting at Patton Boggs, correct?

55 (Pages 214 - 217)

1          L. GARR
2    A.    Yes, it appears so, yes.
3    Q.    From looking at these
4 handwritten notes, does it help you
5 remember who else attended the meeting?
6 Start with Patton Boggs.
7    A.    I do recall -- I'm sorry, I do
8 recall a presentation by Doug Beltman that
9 was given. I believe Eric Westenberger
10 was present. Julia Brickell was present,
11 I believe. I believe there were
12 representatives of Emery Celli. I don't
13 know if it was Ilann Maazel, Jonathan
14 Abady or both.
15         I don't recall if somebody from
16 Motley Rice was present, but I have no
17 reason not to believe, I just don't
18 recall. Again, Steven Donziger, yes. And
19 I don't know still, though, if this was
20 the same meeting where Pablo Fajardo and
21 Luis Yanza attended.
22         THE SPECIAL MASTER: You
23 skipped two names on the e-mail list,
24 James Tyrrell and Jason Rockwell.
25         THE WITNESS: Oh, right. I

1          L. GARR
2 don't know who Jason -- I don't remember
3 who Jason Rockwell is. I don't know if he
4 was present or not.
5         And I believe James Tyrrell was
6 present for the -- I'm just recalling it
7 from the Doug Beltman presentation, I
8 believe he was present, but, again, I'm
9 not sure.
10   Q.    Do you have a recollection one
11 way or the other whether Mr. Tyrrell was
12 present for the other portion of the
13 meeting as well that was not Mr. Beltman's
14 presentation?
15   A.    I just don't -- I don't recall.
16 I'm sorry.
17   Q.    Let me direct your attention to
18 the agenda item. And keeping your notes
19 next to it, do you see where it says -- we
20 were talking about where it says
21 "identification of potentially harmful
22 Stratus documents"?
23   A.    I saw that before. I think
24 I've lost that. Is that -- I'm sorry,
25 what page is that again?

1          L. GARR
2    Q.    That is on page 2 of the
3 attachment to Exhibit 4279.
4    A.    Yes.
5         MS. PARADISE: It is
6 actually --
7         MR. BRODSKY: Page 4 of the
8 document, page 2 of the attachment.
9    A.    (e)(i)(2)?
10   Q.    Yes, (e)(i)(2)?
11   A.    (a).
12   Q.    (a).
13   A.    Yes.
14   Q.    What do you remember about the
15 discussion of identifying potentially
16 harmful Stratus documents at this meeting
17 at Patton Boggs?
18   A.    I don't recall.
19   Q.    You don't recall one way or the
20 other what was discussed?
21   A.    No.
22   Q.    In the next part of the
23 document, it says "Identification of risks
24 associated with Stratus connection with
25 Ecuador Special Master Richard Cabrera

1          L. GARR
2 Vega." Do you see that?
3    A.    I do.
4    Q.    You remember that the risks,
5 the topic of the risks associated with
6 Stratus' connection with Mr. Cabrera was
7 discussed during the Patton Boggs meeting?
8    A.    I do.
9    Q.    Who was present for that
10 conversation?
11   A.    Other than what I -- I don't
12 recall.
13   Q.    How long was that conversation;
14 do you remember?
15   A.    I don't.
16   Q.    Who led that part of the
17 conversation?
18   A.    I don't recall.
19   Q.    During the discussion, did it
20 come up that there was substantial or
21 extensive ex parte communications between
22 Stratus and Mr. Cabrera?
23         MR. GOMEZ: Objection,
24 privilege and form.
25         THE SPECIAL MASTER: Overruled.

56 (Pages 218 - 221)

Page 222

1        L. GARR
2    A.    I recall there being discussion
3 about the documents being given from
4 Stratus to Richard Cabrera for his use in
5 the report -- for his use in his damages
6 report.
7    Q.    Who was discussing that?
8    A.    It was around a conference
9 table. It was just generally discussed.
10 I don't have a specific recollection of
11 people speaking.
12   Q.    In that context, did people
13 talk about specific Stratus documents that
14 were potentially harmful?
15        MR. GOMEZ: Objection,
16 privilege and form.
17        THE SPECIAL MASTER: Let me
18 look at the question. Overruled.
19   A.    I don't recall that, no.
20   Q.    Did people give -- were there
21 handouts during this meeting containing
22 Stratus documents?
23        MR. GOMEZ: Objection, form.
24        THE SPECIAL MASTER: Overruled.
25   A.    I don't recall.

Page 223

1        L. GARR
2    Q.    You don't remember one way or
3 the other whether specific documents were
4 distributed reflecting communication
5 between Stratus and Mr. Cabrera?
6    A.    Not that I recall any, but I
7 just don't recall, but I don't recall any,
8 no.
9    Q.    Do you recall there was a
10 strategy put in place to prevent the
11 disclosure of potentially harmful Stratus
12 documents?
13        MR. GOMEZ: Objection.
14        THE SPECIAL MASTER: Overruled,
15 first, waiver, and let me hear the answer
16 and then I will decide about the
17 crime-fraud.
18   A.    I don't recall a strategy to
19 not disclose, but I do recall a strategy
20 of questions such as privilege and finding
21 out, again, you know, finding out relevant
22 information under Ecuadorian law and U.S.
23 law and under the 1782, again, whether it
24 would be permissible if the evidentiary
25 period were open, things of that nature.

Page 224

1        L. GARR
2    Q.    Did anyone raise during the
3 meeting that one of the risks of full
4 disclosure of the Stratus documents was
5 the concern by the representatives of the
6 Lago Agrio plaintiffs that they might go
7 to jail if there is full disclosure of the
8 relationship between the representatives
9 of Lago Agrio and the plaintiffs and
10 Stratus -- and Mr. Cabrera?
11        MR. GOMEZ: Objection,
12 privileged and form.
13        THE SPECIAL MASTER: The form
14 is bad. The privilege objection is
15 overruled. It is almost compound and it
16 is very long. Break it up.
17        MR. BRODSKY: I'll withdraw it.
18   Q.    Did anyone raise during the
19 meeting the concern Mr. Prieto raised in
20 his e-mail to Mr. Donziger about going to
21 jail if there was disclosure of the
22 relationship between representatives of
23 the Lago Agrio plaintiffs and Mr. Cabrera?
24        MR. GOMEZ: Objection,
25 privilege.

Page 225

1        L. GARR
2        THE SPECIAL MASTER: Overruled.
3    A.    I don't recall if jail was
4 discussed. I don't recall that. But I do
5 recall there being a discussion about the
6 concerns of the permissibility of such
7 contact under Ecuadorian law, and that
8 Ecuadorian counsel was concerned about
9 that.
10   Q.    Who raised it; do you remember?
11   A.    I believe Steven raised it, but
12 I don't recall.
13   Q.    At that meeting, did Patton
14 Boggs, anybody from Patton Boggs discuss
15 the Stratus documents that had been
16 reviewed?
17        MR. GOMEZ: Objection to form.
18        MR. BRODSKY: Withdrawn.
19   Q.    During that meeting, did you
20 understand during the meeting that Patton
21 Boggs had reviewed Stratus documents prior
22 to that meeting relating to communications
23 between Stratus and Mr. Cabrera?
24        MR. GOMEZ: Objection,
25 privileged.

57 (Pages 222 - 225)

Page 226

1        L. GARR
2      MR. HILLE: And to form.
3      THE SPECIAL MASTER: The form
4  is slightly objectionable, but not in a
5  way that the witness can't understand it.
6  The privilege objection is overruled for
7  the reasons stated before.
8    A.    I don't -- I don't fully
9  understand what Stratus documents means or
10 what was discussed. I don't remember -- I
11 just don't remember there being particular
12 Stratus documents. I don't know what the
13 question is referring to or what this is
14 referring to. I don't remember Stratus
15 documents of any kind.
16   Q.    Did you take away from the
17 meeting that lawyers from Patton Boggs had
18 reviewed documents relating to
19 communications between representatives of
20 the Lago Agrio plaintiffs and Mr. Cabrera?
21     MR. GOMEZ: Objection,
22 privileged.
23     THE SPECIAL MASTER: Overruled.
24   A.    I don't recall that, no. I
25 don't recall.

Page 227

1        L. GARR
2    Q.    Do you recall a risk associated
3  with full disclosure was the -- withdrawn.
4    Do you recall one of the topics
5  of a risk from full disclosure of the
6  Stratus documents -- well, withdrawn.
7    Do you recall one of the risks
8  discussed at this meeting of disclosing
9  documents sought by Chevron in the 1782
10 action in the District of Colorado was
11 proof of fraud?
12     MR. GOMEZ: Objection,
13 privileged, form.
14     THE SPECIAL MASTER: No, it
15 started out as bad form, but it got fixed.
16 Privilege is overruled. You were too
17 quick, Mr. Gomez.
18   A.    No, I don't recall that, no.
19   Q.    Do you see where it talks about
20 Texas and other actions on the agenda,
21 going down?
22   A.    Yes.
23   Q.    Item number 2, "role of 3TM
24 International." Do you see that?
25   A.    Yes.

Page 228

1        L. GARR
2    Q.    Do you recognize what 3TM is?
3  Are you familiar with 3TM?
4    A.    It sounds familiar, but I can't
5  recall exactly. I think it was scientific
6  experts. I'm not sure.
7    Q.    Let me ask you to turn to the
8  last page of the agenda where it says
9  Immediate Next Steps. Under number 2 is
10 "Strategy for 1782 proceedings." Do you
11 see that?
12     So on the second to last page,
13 I apologize, second to last page.
14   A.    Okay.
15   Q.    Do you see where it says
16 "Strategy, Immediate Next Steps, strategy
17 for 1782 proceedings" under item number 2?
18   A.    Yes.
19   Q.    Do you remember Mr. Tyrrell
20 discussing the strategy for 1782
21 proceedings at this meeting?
22   A.    I recall discussions about 1782
23 proceedings.
24   Q.    Do you remember a discussion of
25 strategy in responding to Chevron's 1782

Page 229

1        L. GARR
2  proceedings?
3    A.    Yes.
4    Q.    Do you remember a part of that
5  discussion the strategy was to delay those
6  proceedings as long as possible?
7    A.    No.
8      MR. GOMEZ: Objection.
9    A.    No.
10   Q.    When you say no, you don't
11 remember one way or the other, or you
12 remember it wasn't discussed?
13   A.    I don't recall that being
14 discussed.
15   Q.    Do you see where it says
16 "potential meeting with plaintiffs
17 abroad"?
18   A.    No.
19   Q.    Number 5 under Immediate Next
20 Steps.
21   A.    Yes.
22   Q.    Are you aware of a meeting --
23 what's your understanding of what that
24 means; do you know?
25   A.    I believe it was a desire for

58 (Pages 226 - 229)

Page 230

```
 1        L. GARR
 2 other U.S. counsel that was present at the
 3 meeting to speak with the Ecuadorian --
 4 oh, plaintiffs abroad, I recall there
 5 being a desire to speak with Ecuadorian
 6 counsel directly, and I don't know if it
 7 was potentially to actually meet with the
 8 plaintiffs as well.  I don't know.
 9    Q.    Does that refresh your
10 recollection that at this meeting at
11 Patton Boggs, given that there was a
12 discussion about the desire to meet with
13 Ecuadorian counsel, that Pablo Fajardo was
14 not present, this is not the conversation
15 that you are recalling where Pablo Fajardo
16 was present in New York where there was a
17 discussion of concerns relating to the
18 disclosures in the 1782 proceeding in
19 Denver?
20    MR. GOMEZ:  Objection.
21    THE SPECIAL MASTER:  Well, if
22 the objection is as to form, I agree,
23 because the word that -- I don't know what
24 the reference is -- what the word "that"
25 refers to in that question.  And it is
```

Page 231

```
 1        L. GARR
 2 compound.  Just fix it, please.
 3    Q.    You recall a discussion at this
 4 meeting at Patton Boggs that there was a
 5 desire to speak with Ecuadorian counsel
 6 directly, correct?
 7    THE SPECIAL MASTER:  That's
 8 what she just said.
 9    A.    Yeah, I do recall that.
10    Q.    Ecuadorian counsel includes
11 Pablo Fajardo, correct?
12    A.    Yes.
13    Q.    Does that refresh any memory
14 that Pablo Fajardo was not present when
15 there was that express desire by lawyers
16 in the United States to meet with the
17 Ecuadorian representatives?
18    A.    That would make sense, although
19 I don't know if this means meeting
20 directly with the plaintiffs, as in the
21 indigenous communities, then it might --
22 it might mean something different.
23    Q.    Let me ask you to turn to your
24 handwritten notes on the first page on
25 4227 where it says, in the middle of it,
```

Page 232

```
 1        L. GARR
 2 "goal" --
 3    A.    On the first page?
 4    Q.    On the first page of your
 5 notes.  Do you see where it says Roman
 6 numeral I, Background, and then below it,
 7 there are two asterisks and then there is
 8 a fourth dash with the word "goal"?
 9    A.    Yes.
10    Q.    And it says "cleanest judgment
11 and quickest enforcement"?
12    A.    Yes, I see that.
13    Q.    What did you mean by that,
14 "cleanest judgment"?
15    MR. GOMEZ:  Objection.
16    THE SPECIAL MASTER:  Privilege,
17 form, what?
18    MR. GOMEZ:  Privilege.
19    THE SPECIAL MASTER:  Overruled.
20    A.    I don't recall now.  This looks
21 like a list of things that were being
22 discussed at the meeting, so I assume I
23 was capturing that as something that was
24 being stated.
25    Q.    Do you see where it says, a few
```

Page 233

```
 1        L. GARR
 2 lines below, three lines below, "fully
 3 disclose to judge in Ecuador to cleanse
 4 record"; do you see that?
 5    A.    Yes.
 6    Q.    Were you writing down what
 7 somebody else was saying?
 8    A.    I believe so, yes.
 9    Q.    Do you know who said that?
10    A.    I don't know specifically, no.
11    Q.    And do you have an
12 understanding of what you meant by "fully
13 disclose to the judge in Ecuador"?
14    MR. GOMEZ:  Objection.
15    THE SPECIAL MASTER:  Overruled.
16 By the way, apart from the other reasons I
17 have articulated for overruling privilege
18 objections is this, when this document was
19 introduced and first questioned about,
20 there was not an objection to it on the
21 grounds of privilege.  Any privilege that
22 might have attached to this document, and
23 I don't think it does, was waived again by
24 that failure to object to it.
25    Therefore, it is perfectly
```

59 (Pages 230 - 233)

VERITEXT REPORTING COMPANY
212-267-6868     www.veritext.com     516-608-2400

Page 234

```
1           L. GARR
2  appropriate to be asking the witness about
3  the portions of the document which are not
4  necessarily comprehensible because they
5  are handwritten notes, and the first thing
6  you can ask always about handwritten notes
7  is what did you mean by such and such.
8      Go on.
9      A.    I'm sorry, can you repeat your
10 question?
11     Q.    What did you mean by the words
12 "fully disclose to judge in Ecuador"?
13     A.    I believe this was, again,
14 capturing discussions of the desire to
15 make sure the record in Ecuador had a
16 full -- contained a full description of
17 the contact between the plaintiffs'
18 attorneys and Richard Cabrera.
19     Q.    And was there a discussion of
20 those contacts at this meeting?
21         MR. GOMEZ: Objection.
22         THE SPECIAL MASTER: That's
23 overruled for the previous reasons. By
24 the way, my point before about asking a
25 witness about what does this mean applies
```

Page 235

```
1           L. GARR
2  also to not only your own handwritten
3  notes, but the notes of somebody whose
4  handwriting you know, or what's your
5  understanding of it.
6          MS. PARADISE: Do you need the
7  question repeated?
8          THE WITNESS: I do, I'm sorry.
9      Q.    Was there a discussion of the
10 contact between the plaintiffs' attorneys
11 and Richard Cabrera?
12     A.    I believe so, yes.
13     Q.    What do you remember about that
14 discussion?
15         MR. GOMEZ: Objection.
16         THE SPECIAL MASTER: Overruled,
17 waiver so far. We will hear the answer
18 and there may be crime-fraud as well.
19     A.    Again, I'm actually -- I know
20 there was a discussion regarding
21 submitting documents that were drafted by
22 Stratus to be adopted by Cabrera. I don't
23 recall if this was the meeting or not
24 where Pablo and Luis attended, so I'm not
25 sure.
```

Page 236

```
1           L. GARR
2      Q.    Do you see the part where it
3  says "to cleanse record"? What did you
4  mean by "to cleanse record"?
5          MR. GOMEZ: Same objection, to
6  preserve.
7          THE SPECIAL MASTER: Overruled.
8      A.    I believe I was capturing other
9  people's phrasing, but what I understand
10 it to mean was to ensure that the record
11 had -- that there was, again, full
12 disclosure in the record about any
13 submission of materials or contacts so
14 that the record contained a full
15 description of any communications or any
16 collaboration with Richard Cabrera.
17     Q.    Was there an acknowledgment at
18 this meeting that there hadn't been full
19 disclosure to the Ecuadorian court
20 regarding the contacts between the
21 representatives of the Ecuadorian Lago
22 Agrio plaintiffs and Cabrera?
23         MR. GOMEZ: Objection.
24         THE SPECIAL MASTER: Overruled.
25     A.    I don't recall that. I know --
```

Page 237

```
1           L. GARR
2  I recall it being more of a discussion of
3  if the record does not fully reflect it,
4  it should fully reflect it and make sure
5  that everything is fully disclosed.
6      Q.    It says at the top "reconsider
7  Cabrera report," do you see that, with an
8  asterisk?
9      A.    I do.
10     Q.    What did you mean by
11 "reconsider Cabrera report" in your notes?
12         MR. GOMEZ: Objection, to
13 preserve.
14         THE SPECIAL MASTER: Overruled.
15     A.    Again, I probably was just
16 writing the phrasing as it was being
17 stated by others, but I think there was --
18 I do recall discussion of one of the
19 concerns was the weight, if any, that
20 would be given to the Cabrera report and a
21 discussion of -- and I think what came out
22 of one of the things from the meeting was
23 as part of the risks was that the damages
24 report might not be given as much weight
25 or might not be accepted, in which case
```

60 (Pages 234 - 237)

Page 238

```
1          L. GARR
2  how to -- how to proceed with a different
3  damage report.
4      Q.     Was there a plan as a result of
5  that meeting to proceed with a different
6  damages report?
7          MR. GOMEZ: Objection,
8  privilege.
9          THE SPECIAL MASTER: Overruled.
10     A.     There was at some point. I
11 don't know if it came from this meeting
12 specifically.
13     Q.     At the bottom of your notes you
14 have "get copies of CD to all people,"
15 with brackets, "AW." What did you mean by
16 "get copies of CD to all people"?
17     A.     I don't know.
18     Q.     You don't know what copies you
19 are talking about?
20     A.     No.
21     Q.     And AW, do you know if that is
22 a reference to Andrew Woods?
23     A.     I would assume, but I don't
24 know.
25         MR. BRODSKY: This would be a
```

Page 239

```
1          L. GARR
2  good time for a break, Mr. Gitter, to
3  change the tape.
4          THE SPECIAL MASTER: That's
5  fine.
6          THE VIDEOGRAPHER: Then we will
7  go off the video record. The time is
8  p.m.
9          (Recess taken.)
10         THE VIDEOGRAPHER: We are back
11 on the record. The time is 3:13 p.m.
12 This is the beginning of disk four.
13 BY MR. BRODSKY:
14     Q.     Ms. Garr, let me show you 4267
15 once again which reflect your migration
16 records and entry into Ecuador.
17         Directing your attention to
18 April 12th to April 15th, 2010, do you see
19 that there?
20     A.     I do.
21     Q.     Do you recall after this
22 meeting at Patton Boggs on April 7th and
23 April 8th, 2010 going to Ecuador within a
24 week?
25     A.     I don't.
```

Page 240

```
1          L. GARR
2      Q.     Do you recall generally after
3  the Patton Boggs meeting on April 7th and
4  April 8th, 2010 going to Ecuador?
5      A.     No.
6      Q.     Let me show you Exhibit 4284.
7          (Plaintiff's Exhibit 4284
8  marked for identification.)
9      Q.     4284, the first four pages are
10 Bates numbered DONZ-HDD-4621 to 4624, and
11 at the top it says Dear Fellow Counsel.
12 The metadata appears on page 5 and it
13 continues for the rest of the document.
14 The metadata reflects the document was
15 created on April 17th, 2010 and that the
16 author was Steven R. Donziger.
17     A.     Okay.
18     Q.     Did you ever see this document
19 before?
20     A.     Can I have a chance to look at
21 it?
22     Q.     Sure.
23         (Witness perusing document.)
24     Q.     My questions will be on page 1
25 and page 2, Ms. Garr, so when you finish
```

Page 241

```
1          L. GARR
2  the first two pages --
3      A.     Okay, I finished the first two
4  pages. I haven't reviewed at all the
5  remaining pages, though. So if I don't
6  need to, I won't.
7      Q.     Just based on the first two
8  pages, have you seen this document before?
9      A.     I don't know if I've seen this
10 document. I don't recall.
11     Q.     From looking at the first two
12 pages, did you draft any part of it?
13     A.     No, not that I recall, no.
14     Q.     Did you observe Mr. Donziger
15 drafting any part of it?
16     A.     No, not that I recall.
17     Q.     The metadata shows -- reflects
18 that it was on April 17th, 2012, and
19 directing your attention to your migration
20 records which show you in Quito from April
21 12th to April 15th, and let me ask you to
22 look at the second sentence of this, which
23 says --
24     A.     Of the first page?
25     Q.     Which is Exhibit 4284, the
```

61 (Pages 238 - 241)

Page 242

```
1            L. GARR
2  first page, "I was accompanied by Laura
3  Garr and Aaron Page." Do you see that?
4     A.    I do.
5     Q.    Does this refresh any
6  recollection that you, Mr. Page and
7  Mr. Donziger were in Ecuador within a week
8  of the meeting at Patton Boggs on April
9  7th and April 8th?
10       MR. GOMEZ: Objection, form.
11       THE SPECIAL MASTER: Overruled.
12 Go ahead, answer the question.
13    A.    By the dates, again, I don't
14 have an independent recollection, but it
15 seems that that is correct that there was
16 a meeting and that I did go to Ecuador.
17    Q.    In this document, it says in
18 the first paragraph "As you know, I was in
19 Ecuador last week where I spent several
20 hours meeting with local counsel and
21 conducting due diligence on Ecuador law
22 issues and the trial record as they relate
23 to the Aguinda case."
24       Were you in Ecuador in April
25 2010 with Mr. Donziger spending time
```

Page 243

```
1            L. GARR
2  meeting with local counsel and conducting
3  due diligence on Ecuador law issues?
4     MS. PARADISE: Objection to
5  form. It is compound.
6       THE SPECIAL MASTER: It is
7  slightly compound, but it is all right.
8     A.    I'm sorry, the date you said
9  would be April 10th. Was I in Ecuador on
10 April 10th?
11    Q.    Your migration records, which
12 is Exhibit --
13    A.    Indicate that I was there from
14 the 12th to the 15th.
15    Q.    -- show you were there from the
16 12th to the 15th.
17    A.    I don't have an independent
18 recollection, but I would believe that
19 these would be correct, which would mean
20 no, I was not in Ecuador on April 10th.
21    Q.    The question is, Ms. Garr,
22 during your trip to Ecuador from April
23 12th to April 15th, did you spend time
24 with local counsel conducting due
25 diligence on Ecuador law issues?
```

Page 244

```
1            L. GARR
2     A.    I don't recall.
3     Q.    Do you remember doing that in
4  March or April 2010 in Ecuador?
5     A.    Yes.
6     Q.    Do you remember, putting aside
7  the date, in some trip to Ecuador in March
8  or April 2010 analyzing the status of the
9  Aguinda case?
10    A.    I'm not quite sure what that
11 means, analyzing the status of the Aguinda
12 case.
13    Q.    Did you discuss with
14 Mr. Donziger and local counsel in March or
15 April 2010 the Aguinda case while in
16 Ecuador?
17    A.    Presumably. I don't know.
18 Yes.
19    Q.    Did you, during that same
20 period of time in Ecuador analyze how
21 information obtained by Chevron through
22 the 1782 proceedings could impact -- or
23 could impose risks for the case itself?
24       MR. GOMEZ: Objection.
25       THE SPECIAL MASTER: What is
```

Page 245

```
1            L. GARR
2  the nature of the objection?
3       MR. GOMEZ: Privilege and form.
4       THE SPECIAL MASTER: The form
5  is not good. Rephrase it. The privilege
6  objection I will deal with when the form
7  is better.
8     Q.    So my questions, the next few
9  questions, will relate to the period of
10 March and April of 2010 during a trip that
11 you took to Ecuador with Mr. Page and
12 Mr. Donziger.
13       During that period of time in
14 Ecuador, did you have a conversation
15 with -- participate in a discussion
16 regarding the impact of disclosures to
17 Chevron in the 1782 proceedings on the
18 Lago Agrio case in Ecuador?
19       MR. GOMEZ: Objection.
20       THE SPECIAL MASTER: Is that a
21 privilege objection?
22       MR. GOMEZ: Both form and
23 privilege.
24       THE SPECIAL MASTER: The form
25 is slightly better, maybe enough better so
```

62 (Pages 242 - 245)

1          L. GARR
2 that I can let it go and see if she can
3 answer it.
4          And on the privilege objection,
5 it is overruled on the waiver ground. We
6 will hear what the answer is and then
7 decide whether or not crime-fraud is
8 implicated also.
9          THE WITNESS: Okay, I'm so
10 sorry to do this, is there a way to just
11 read it back.
12          (The record was read.)
13 A.     Yes.
14 Q.     What did you discuss?
15          MR. GOMEZ: Objection.
16          THE SPECIAL MASTER: I'm sorry,
17 what was the question?
18          MR. BRODSKY: What did you
19 discuss. Describe the discussion. She
20 said yes.
21          THE SPECIAL MASTER: Did we
22 identify with whom?
23          MR. BRODSKY: Withdrawn.
24 Q.     Who was present for the
25 conversation?

1          L. GARR
2          THE SPECIAL MASTER: There you
3 go.
4 A.     I believe this was the
5 conversation I was discussing before
6 between local Ecuadorian counsel, where
7 Aaron Page was present, Steven Donziger,
8 discussing where Julio Prieto raised the
9 concerns about -- and Julio Prieto and
10 Juan Pablo Saenz and Pablo Fajardo were
11 discussing their concerns under Ecuadorian
12 law of the document submission to Cabrera
13 or the disclosure of that under 1782.
14 Q.     You said that, page 199 of the
15 transcript, line 20, through page 200,
16 line 3, you said that "Pablo Fajardo and
17 with the Ecuadorian team expressed concern
18 about the formalistic nature of Ecuadorian
19 law and how it would be viewed under the
20 formal laws of Ecuador, that it could be
21 viewed as improper."
22          Do you remember that?
23 A.     Yes.
24 Q.     What did you mean by "the
25 formalistic nature of Ecuadorian law"?

1          L. GARR
2 A.     It was stated, it came up in
3 the context of a distinction between what
4 happened in practice versus the written
5 law, and just in the question, again, I
6 was referencing earlier where Steven asked
7 how if this is what the practice was
8 between both parties that it would be
9 something that would be deemed improper,
10 and the response from Ecuadorian counsel
11 was Ecuadorian law was not like the U.S.
12 law, it was much more formalistic and it
13 doesn't matter in practice so much as if
14 the law says something specific that there
15 could be an issue raised.
16 Q.     Is it fair to say that during
17 this conversation there was an agreement
18 that Cabrera had violated his duties to
19 the court?
20          MR. GOMEZ: Objection.
21          THE SPECIAL MASTER: Overruled.
22          MR. HILLE: Could we just hear
23 it again, please.
24          (The record was read.)
25          MR. HILLE: I object to the

1          L. GARR
2 form.
3          THE SPECIAL MASTER: That is
4 overruled.
5 A.     I don't know that there was an
6 agreement that there had been a violation.
7 There was a concern raised that because
8 of, again, the formalistic nature, and I'm
9 a little, again, hazy on the details, but
10 the mechanism by which this case was
11 brought kind of exceeded the
12 traditional -- pardon my inarticulate
13 answer here, but my understanding at the
14 time was that it was discussed that the
15 formalistic nature of the laws with the
16 parties and what was happening in practice
17 on both sides, if a challenge was raised,
18 a court could stick to the formalistic
19 nature despite the practice of the
20 parties.
21          I mean, it wasn't an agreement
22 that they said it definitely would go this
23 way, but it was raised that there was a
24 potential that it could be viewed that way
25 if brought under Ecuadorian law.

63 (Pages 246 - 249)

Page 250

```
1           L. GARR
2        THE SPECIAL MASTER: I'm sorry,
3  I think the question was this: The
4  question was related to whether there was
5  an agreement or not related to the fact
6  that Cabrera had certain duties to the
7  court, some of which he spelled out and
8  said he had performed, and the fact or the
9  possibility that he violated those duties.
10        So are you saying -- you've
11  used the word "formalistic nature"
12  repeatedly. So is it formalistic? Put it
13  this way: Was there a discussion that
14  violating a duty to the court when you
15  have said something to the court is
16  nothing but a formalistic issue?
17        MR. GOMEZ: Objection to form.
18        THE SPECIAL MASTER: Yeah, you
19  are right. You are right. I withdraw it.
20        THE WITNESS: That particular
21  issue didn't -- I'm sorry.
22        MS. PARADISE: There is not a
23  question.
24        THE SPECIAL MASTER: Put it
25  this way: The question really was about
```

Page 251

```
1           L. GARR
2  did he violate the duties to the court,
3  was that discussed? And if you can leave
4  out the word "formalistic" in your answer.
5        MR. GOMEZ: And privilege, to
6  preserve.
7        THE SPECIAL MASTER: I'm sorry?
8        MR. GOMEZ: Objection,
9  privilege, to preserve the record. I'm
10  objecting.
11        THE SPECIAL MASTER: And for
12  the record, you are overruled again.
13        THE WITNESS: There was --
14  there was a discussion about how it could
15  be viewed under Ecuadorian law and that it
16  could be deemed improper. There wasn't a
17  specific discussion about -- that I was a
18  part of or recall about the specific roles
19  of Cabrera or his role with the court. It
20  was the production.
21    Q.    Did anyone say during this
22  conversation that because Cabrera had said
23  to the court he was independent, impartial
24  and there was no disclosure of his
25  relationship with the Lago Agrio plaintiff
```

Page 252

```
1           L. GARR
2  representatives, that that could
3  violate -- that did violate his duties as
4  a court-appointed expert to the court?
5        MS. PARADISE: Objection to
6  form.
7        MR. GOMEZ: Objection,
8  privileged.
9        THE SPECIAL MASTER: Overruled,
10  both. Go ahead, answer the question.
11    A.    I don't recall any discussions
12  about Stratus -- about Cabrera's assertion
13  to the court. I recall just discussions
14  about the submission of documents and any
15  contact with him, whether or not that
16  would be deemed proper.
17        I don't recall any
18  conversations related to Cabrera's
19  statements before the court.
20    Q.    And did anybody say, as
21  Mr. Donziger says in this April 17th, 2010
22  letter to Dear Fellow Counsel, last
23  sentence, first page, "By working so
24  closely with our local counsel and
25  Stratus, Cabrera violated his duties to
```

Page 253

```
1           L. GARR
2  the court"?
3        MR. GOMEZ: Objection.
4        THE SPECIAL MASTER: Overruled.
5    A.    I don't recall specifically
6  someone saying that exact sentence.
7    Q.    Putting aside the exact words,
8  do you remember in substance somebody
9  saying during that conversation in Ecuador
10  that Cabrera, in substance, violated the
11  duties to the court as a result of his
12  relationship with the Lago Agrio plaintiff
13  representatives?
14        MR. GOMEZ: Objection.
15        THE SPECIAL MASTER: Overruled.
16    A.    I don't recall.
17    Q.    You don't recall one way or the
18  other?
19    A.    I don't recall one way or the
20  other, I don't.
21    Q.    But by formalistic, when you
22  were referring before to Mr. Fajardo
23  expressing concern about the formalistic
24  nature of Ecuadorian law, what you meant
25  by that was whether or not there was
```

Page 254

```
 1            L. GARR
 2 compliance with the letter of the law?
 3    A.    Yes.
 4    Q.    Did anybody express an
 5 understanding that somehow it would be
 6 different in the United States, that you
 7 didn't have to comply with the letter of
 8 the law in the United States?
 9         MR. GOMEZ: Objection.
10         THE SPECIAL MASTER: Overruled.
11    A.    No.
12    Q.    Do you see where Mr. Donziger
13 says, in the paragraph, The Cabrera Report
14 and the Role of Stratus: Ecuador Law, do
15 you see that on the first page -- it is on
16 the first page of Dear Fellow Counsel.
17    A.    Oh, I'm sorry.
18    Q.    It is under the bold, The
19 Cabrera Report and the Role of Stratus:
20 Ecuador Law.
21         MR. HILLE: It is the heading.
22    A.    Yes.
23    Q.    The second sentence says "As
24 previously indicated, if Chevron succeeds
25 in obtaining discovery from Stratus and
```

Page 255

```
 1            L. GARR
 2 deposing the Stratus principals"; do you
 3 see that?
 4    A.    Yes.
 5    Q.    Do you recall discussion in
 6 Ecuador about trying to stop Chevron from
 7 succeeding in obtaining discovery from
 8 Stratus and deposing the Stratus
 9 principals?
10         MR. GOMEZ: Objection.
11         THE SPECIAL MASTER: Overruled
12 on waiver. We are waiting to hear the
13 answer on the crime-fraud exception.
14    A.    I recall there being
15 discussions about that it would happen and
16 the difference between U.S. law, kind of
17 explaining why discovery would be
18 permissible in the U.S., which was not
19 understood or clear to Ecuadorian counsel.
20    Q.    And was there a discussion of
21 trying to stop Chevron from getting that
22 information? That information being
23 discovery from Stratus and Stratus'
24 relationship with Cabrera.
25         MR. GOMEZ: Objection, form and
```

Page 256

```
 1            L. GARR
 2 privilege.
 3         THE SPECIAL MASTER: The form
 4 is okay. Privilege is overruled.
 5    A.    I recall Ecuadorian counsel
 6 asking if that could -- if production
 7 could -- if discovery could not take
 8 place, if there was a mechanism to not
 9 have it take place.
10         THE SPECIAL MASTER: Now the
11 crime-fraud is back in on that one.
12    Q.    And who said that; do you
13 remember?
14         THE SPECIAL MASTER: In
15 furtherance. Mr. Gomez, you are
16 squinting.
17         MR. GOMEZ: Could we excuse the
18 witness for a minute?
19         THE SPECIAL MASTER: Sure.
20         THE WITNESS: I'm sorry, can I
21 clarify one thing on that?
22         THE SPECIAL MASTER: Yes. No,
23 no, you want her to be excused?
24         MR. GOMEZ: I want her to be
25 excused, but then she said she wanted to
```

Page 257

```
 1            L. GARR
 2 clarify something. How should we do it?
 3         MS. PARADISE: Why doesn't she
 4 clarify after she is excused?
 5         THE SPECIAL MASTER: Fine.
 6         (Witness departs the room.)
 7         MR. GOMEZ: The reason for my
 8 doubt on the ruling --
 9         THE SPECIAL MASTER: Squinting?
10         MR. GOMEZ: My squinting, is as
11 I understood the answer is Ecuadorian
12 counsel inquired whether discovery --
13 whether there was some way for discovery
14 not to take place.
15         Now, to me that response sounds
16 like a foreign attorney simply asking to
17 know how procedures work in the United
18 States, and I don't see how that inquiry
19 or that question, which is the response
20 she gave, furthers any kind of
21 crime-fraud.
22         THE SPECIAL MASTER: Well, it
23 has already been found that the plaintiffs
24 in connection with the Colorado proceeding
25 committed a fraud on the Colorado court.
```

65 (Pages 254 - 257)

Page 258

1        L. GARR
2        MR. GOMEZ: Well, it has been
3 found that there is probable cause.
4        THE SPECIAL MASTER: That's
5 what I mean, the first branch. The first
6 branch is done.
7        That being so, the inquiry is
8 part of an effort to further that. And if
9 you look at the history of what was done,
10 that's how you get there.
11        MR. GOMEZ: Well, I
12 respectfully disagree.
13        THE SPECIAL MASTER: You know
14 what, I take it back. I will let this one
15 go.
16        MR. GOMEZ: We can call the
17 witness back.
18        THE SPECIAL MASTER: And
19 particularly since she is going to clarify
20 it anyway.
21        MR. GOMEZ: That's right.
22        THE SPECIAL MASTER: And I'm
23 reasonably confident that the
24 clarification will moot our discussion.
25        MR. GOMEZ: We shall see.

Page 259

1        L. GARR
2        (Witness returns to the room.)
3 BY MR. BRODSKY:
4    Q.    Ms. Garr, you wanted to clarify
5 something?
6    A.    Yes. I just wanted to clarify
7 that the Ecuadorian counsel wasn't saying
8 they didn't want to produce the materials,
9 they were saying -- it was more of a
10 question of how could such materials,
11 attorney e-mails and documents that were
12 produced that the Ecuadorian court ruled
13 were not part of the record, how could
14 that be made -- how could that be
15 disclosed and discoverable under U.S. law,
16 and it was explained by, what I recall,
17 Steven and Aaron Page that under U.S. law
18 such material is discoverable and that it
19 would be -- it would be -- you know, it
20 would be provided in this action.
21        So that was -- it was more a
22 question of not understanding how
23 something like that is permissible under
24 U.S. law.
25        THE SPECIAL MASTER: Mr. Gomez,

Page 260

1        L. GARR
2 as I predicted, our discussion is mooted
3 by her clarification.
4        MR. GOMEZ: Yes.
5    Q.    At the same time there was
6 discussion how, by local Ecuadorian
7 counsel, of how it could be uncovered or
8 discovered in the United States the
9 documents reflecting the relationship
10 between Stratus and Cabrera, at the same
11 time local Ecuadorian counsel was
12 concerned that those disclosures would
13 personally expose them to liability?
14        MR. GOMEZ: Objection.
15        MR. HILLE: There was a lot in
16 that question. I'm sorry, could we just
17 hear it back.
18        THE SPECIAL MASTER: Actually,
19 the problem with the question is
20 argumentative. Rephrase it.
21    Q.    During this conversation, the
22 same conversation down in Ecuador, was
23 there a discussion that local Ecuadorian
24 counsel were concerned about personal
25 exposure of liability if the disclosures

Page 261

1        L. GARR
2 came out in the United States --
3        MR. GOMEZ: Objection.
4    Q.    -- in the 1782 proceeding?
5        THE SPECIAL MASTER: Overruled.
6    A.    It was during that same
7 conversation that the issue was raised,
8 again, that it could be used, and I'm
9 forgetting now the mechanism, I think it
10 was referenced in here, though, but that
11 it could be used to challenge -- that it
12 could be used in a filing against the
13 Ecuadorian counsel.
14    Q.    Was there a discussion with
15 local counsel stating that they were
16 concerned that these disclosures would
17 result in legal consequences to them
18 personally?
19        MR. GOMEZ: Objection,
20 privileged and form.
21        THE SPECIAL MASTER: Overruled.
22    A.    I recall there being discussion
23 about that it could potentially lead to
24 legal consequences.
25    Q.    Criminal consequences?

66 (Pages 258 - 261)

Page 262

```
1           L. GARR
2   A.    I don't recall that.
3   Q.    Do you remember during this
4  conversation in Ecuador that Mr. Donziger
5  stated he had approved and supervised the
6  communications between Stratus and
7  Cabrera?
8        MR. GOMEZ: Objection.
9        THE SPECIAL MASTER: Overruled.
10  A.    I don't recall that.
11  Q.    Let's move to --
12        THE SPECIAL MASTER: Mr. Gomez,
13 you understand when I say overruled only
14 to your privilege objection, it means the
15 waiver ground only and not the
16 crime-fraud?
17        MR. GOMEZ: I do, thank you.
18        THE SPECIAL MASTER: Unless I
19 specifically mention the crime-fraud.
20        (Plaintiff's Exhibit 4289
21 marked for identification.)
22  Q.    I show you an exhibit marked
23 4289, WOODS-HDD-144964.  It is an
24 e-mail --
25        THE SPECIAL MASTER: I believe
```

Page 263

```
1           L. GARR
2  the ground is the one I articulated, not
3  when it comes to communications, not at
4  all, the Judge Francis/Judge Kaplan waiver
5  point.
6        MR. GOMEZ: Yes, I understand
7  that.
8   Q.    It is an e-mail from
9  edaleo@pattonboggs.com to Julia Brickell,
10 Ilann Maazel, Steven Donziger, Laura Garr,
11 Jonathan Abady, Andrew Wilson,
12 neconomou@h5.com, imoll@motleyrice.com,
13 awoods@donzigerandassociates.com,
14 bnarwold@motleyrice.com, with copies to
15 James Tyrrell, Eric Westenberger and
16 Edward Yennock, Agenda for Today's 1 p.m.
17 Invictus Meeting.
18        Did you participate --
19        THE SPECIAL MASTER: Hold on.
20 Let me read it.  That probably will give
21 the witness a chance to read it, too.
22        THE WITNESS: I appreciate
23 that, thank you.
24        (Witness perusing document.)
25  Q.    Ms. Garr, have you had a chance
```

Page 264

```
1           L. GARR
2  to look at the two-page outline of an
3  agenda for the Invictus meeting on April
4  30, 2010?
5   A.    Yes.
6   Q.    Do you recall participating in
7  an Invictus meeting at Patton Boggs' New
8  York office on April 30th in person?
9   A.    I don't recall.
10  Q.    Do you recall participating by
11 phone?
12  A.    I don't recall.
13  Q.    Directing your attention to
14 where it says in Roman numeral II Cabrera
15 Facts and Strategy, do you see (2)(D)
16 where it says "Cabrera story, documents in
17 support of Texas and Colorado filings"?
18  A.    I do.
19  Q.    Do you have an understanding of
20 what "Cabrera story" means?
21  A.    I don't.
22  Q.    And turning to Section (E),
23 "Strategy Consideration: How Do We
24 Characterize Cabrera Going Forward."
25  A.    Yes.
```

Page 265

```
1           L. GARR
2   Q.    What, if anything, do you
3  remember regarding a discussion with
4  Patton Boggs on or about April 30, 2010
5  relating to how to characterize Cabrera
6  going forward?
7        MR. GOMEZ: Objection,
8  foundation.
9        THE SPECIAL MASTER: He saved
10 it by the words "if any."
11  A.    I don't recall.
12        THE SPECIAL MASTER: In other
13 words, you are overruled.
14  Q.    You don't recall?
15  A.    I don't recall, I'm sorry.
16  Q.    Do you recall any conversations
17 with Patton Boggs lawyers regarding
18 strategy of how to characterize Cabrera
19 going forward in 2010?
20  A.    About how to characterize
21 Cabrera, no, I don't.
22  Q.    Do you remember any
23 conversations with Patton Boggs in 2010
24 regarding how to deal with Cabrera and his
25 report after the Section 1782 proceeding
```

67 (Pages 262 - 265)

Page 266

1        L. GARR
2 was filed in Denver?
3        MR. GOMEZ: Objection,
4 privilege.
5        THE SPECIAL MASTER: Overruled.
6   A.   Yes.
7   Q.   What do you remember?
8   A.   I recall discussions about the
9 potential impact that the allegations
10 raised and the discussions about obtaining
11 other scientific experts.
12   Q.   And who was speaking on behalf
13 of Patton Boggs during this conversation?
14        THE SPECIAL MASTER: She
15 recalls discussions, not one.
16        MR. BRODSKY: Fair.
17        THE SPECIAL MASTER: Why don't
18 you just go through them one by one.
19   Q.   Can you go through the
20 discussions with Patton Boggs?
21        THE SPECIAL MASTER: First
22 identifying who the other party to the
23 discussion was, or parties.
24   A.   I don't recall specific
25 conversations. I just recall that there

Page 267

1        L. GARR
2 were general discussions about obtaining
3 additional experts, and, again, general
4 discussions about the possibilities of --
5 the different possibilities of whether the
6 Cabrera report would be sustained under
7 Ecuadorian law or how it would be relied
8 upon, if at all.
9   Q.   Who from Patton Boggs was
10 participating in these discussions?
11   A.   I believe it was discussed in
12 that April 8th meeting, so if Eric
13 Westenberger was present, I believe, and I
14 don't recall who else might have been
15 present.
16        (Plaintiff's Exhibit 4294
17 marked for identification.)
18   Q.   Let me show you 4294, which is
19 a one-page document from Ilann Maazel at
20 ecbalaw.com on May 4th, 2010 to Ingrid
21 Moll, Eric Westenberger, Julia Brickell,
22 Jonathan Abady, Andrew Woods, Steven
23 Donziger, Laura Garr, Bill Narwold, James
24 Tyrrell, Andrew Wilson, Eric Daleo, and
25 Eric Yennock, subject, Global Strategy,

Page 268

1        L. GARR
2 WOODS-HDD-0245699.
3   A.   Can I have a minute to review
4 it?
5        (Witness perusing document.)
6   A.   Okay.
7   Q.   In the e-mail, Mr. Maazel says,
8 in the first paragraph, "As I understand
9 from last Friday's meetings and
10 conversations with Steve, our options are
11 as follows."
12        Does this document refresh your
13 recollection that during an Invictus
14 meeting on April 30th there was a
15 discussion of these options?
16   A.   I'm not sure, I'm sorry.
17   Q.   Does it refresh any
18 recollection that you participated in
19 conversations with Patton Boggs --
20 withdrawn.
21        Did you participate in
22 conversations with Patton Boggs laying out
23 the options described in Mr. Maazel's May
24 4th e-mail in 4294?
25   A.   I recall the substance of this

Page 269

1        L. GARR
2 e-mail. I'm not sure if it was at that
3 meeting or if it was because of this
4 e-mail and subsequent conversations, but I
5 do recall the substance of kind of the
6 getting an expert report and having --
7 informing the Ecuadorian court of -- I
8 mean, I understand the substance of this.
9 I don't know if it was from that April
10 meeting or not.
11   Q.   Understanding the substance of
12 this and what's laid out here, what's your
13 understanding of which option, if any, was
14 chosen in dealing with the "Cabrera
15 business"?
16        MR. GOMEZ: Objection.
17        THE SPECIAL MASTER: Overruled.
18   A.   My understanding was that
19 option number 3 was the option that --
20   Q.   Option number 3 says "mea culpa
21 is part of the strategy," correct?
22   A.   Yes.
23   Q.   Mea culpa laid out in Roman
24 numeral number I says "lay out for the
25 Ecuadorian court what happened with

Page 270

1          L. GARR
2 Cabrera and advise the court to take it
3 into account in whatever way it deems
4 appropriate." Do you see that?
5    A.    I do.
6    Q.    Is it your understanding that
7 the Lago Agrio plaintiff representatives
8 laid out for the Ecuadorian court what
9 happened with Cabrera?
10    A.    Yes, I believe so, yes.
11    Q.    You base that on conversations
12 with others?
13    A.    Yes.
14    Q.    Do you base it on any review of
15 the actual filings in Ecuador regarding
16 what was said in connection with the
17 relationship between Cabrera and Stratus?
18          MR. GOMEZ: Objection.
19          THE SPECIAL MASTER: Overruled.
20    A.    I don't recall reviewing any
21 actual filings.
22          THE SPECIAL MASTER: Wait one
23 second.
24          Go ahead.
25    Q.    Who told you that what happened

Page 271

1          L. GARR
2 with Cabrera was laid out for the
3 Ecuadorian court?
4    A.    It was my understanding that --
5          THE SPECIAL MASTER: No, no.
6 The question is who told you, who.
7          THE WITNESS: I don't recall.
8 I believe Steven.
9    Q.    Mr. Donziger?
10    A.    Mr. Donziger.
11    Q.    Do you recall when Mr. Donziger
12 told you that?
13    A.    I don't.
14    Q.    Did you talk to anyone else
15 about whether what happened with Cabrera
16 was laid out to the Ecuadorian court as
17 part of a mea culpa strategy?
18    A.    I can't recall specific
19 conversations with people, but I recall
20 discussions about filings that were made
21 in Ecuador regarding Cabrera and filings
22 made by Chevron regarding Cabrera, and I
23 think the documentation from the 1782
24 being filed in Ecuador.
25    Q.    Did anybody from Patton Boggs

Page 272

1          L. GARR
2 tell you that what happened with Cabrera
3 was laid out with the Ecuadorian court?
4    A.    I don't recall.
5          THE SPECIAL MASTER: Wait one
6 second.
7          Go ahead.
8    Q.    At some point the Lago Agrio
9 plaintiffs in Ecuador proposed to the
10 court that each side submit supplemental
11 expert reports?
12    A.    I believe so. I don't know the
13 exact language of the filing, but I
14 believe there was a request for additional
15 damage reports.
16    Q.    We talked about earlier
17 cleansing reports. Are those one in the
18 same?
19          MR. GOMEZ: Objection.
20          MS. PARADISE: Objection to
21 form.
22          MR. HILLE: Objection, I think
23 that misstates --
24          THE SPECIAL MASTER: I'm sorry?
25          MR. HILLE: I think that

Page 273

1          L. GARR
2 misstated the prior testimony.
3          MR. BRODSKY: I'll withdraw it.
4    Q.    Were these supplemental expert
5 reports known as cleansing reports?
6          MR. GOMEZ: Objection, form.
7    A.    I've seen that used. I don't
8 know if I have seen it in press, you know,
9 news articles or if it was from e-mails.
10 I've seen the word "cleansing" in here as
11 well.
12          So I don't independently recall
13 them -- me ever using that term or hearing
14 that term, but I'm seeing it in here,
15 so...
16    Q.    Do you remember anybody from
17 Patton Boggs ever using the term
18 "cleansing reports"?
19    A.    I don't recall.
20    Q.    Or any Ecuadorian plaintiff
21 representatives using that term?
22    A.    No, I don't recall that.
23    Q.    What role, if any, did you play
24 in connection with the supplemental expert
25 reports?

69 (Pages 270 - 273)

Page 274

L. GARR

1
2    A.    I went down to Ecuador with,
3  I'm sorry, I'm forgetting his name, Ted
4  Dunkelberger, I believe, and another
5  colleague of his as part of the -- I
6  believe his group was responsible for the
7  scientific experts and assisted in
8  obtaining documentation that they
9  requested for use by the experts to
10 perform their reports.
11   Q.    Before we get to that trip
12 with -- how long were you there with
13 Mr. Dunkelberger in connection with these
14 reports?
15   A.    I don't recall.  A few days, I
16 believe.
17   Q.    If you look at your migration
18 records, do you see -- does it refresh
19 your recollection that you were in Quito
20 from August 29th, 2010 through September
21 2nd, 2010, and September 13th, 2010
22 through September 17th, 2010 in Exhibit
23 4267?
24   A.    I see that, yes.  I don't know
25 which of these I was there with them.

Page 275

L. GARR

1
2    Q.    Before we get to -- before we
3  get to that, I want to direct your
4  attention to a few e-mail exchanges --
5        THE SPECIAL MASTER:  Before we
6  get to that, did we exhaust the witness on
7  the question of what she was told was done
8  by way of laying out for the Ecuadorian
9  court what happened with Cabrera?
10       THE WITNESS:  I'm sorry?
11       MR. HILLE:  Do you want the
12 witness to respond to that?
13       THE SPECIAL MASTER:  Yes,
14 please.  Have you told us everything there
15 is that you remember about what was laid
16 out, what you were told was laid out for
17 the court?
18       THE WITNESS:  No, there is
19 additional information.  My understanding
20 was that there was consistent and regular
21 submissions that were filed by Chevron of
22 documents that they obtained in the 1782s
23 or by the plaintiffs, I don't recall now
24 who, but that all of the documentation was
25 submitted, as well as any outtake footage

Page 276

L. GARR

1
2  was being regularly submitted on an
3  ongoing basis or in one package to the
4  Ecuadorian court, and that there were
5  filings, I understood, on both sides
6  related to the -- and my understanding
7  were there were also filings, motions to
8  strike made by Chevron and responses to
9  that and additional filings, again, I
10 thought by both sides, describing the full
11 contact with Cabrera.
12       THE SPECIAL MASTER:  Do you
13 know whether everything you have seen
14 today in front of you by way of exhibits
15 was submitted to the court in -- by way of
16 laying it out for the court in Ecuador?
17       THE WITNESS:  I don't know.
18       THE SPECIAL MASTER:  And there
19 are exhibits that you have seen today that
20 you had never seen before, correct?
21       THE WITNESS:  Yes.
22       THE SPECIAL MASTER:  And there
23 are facts that you saw today that you
24 never heard of before, correct?
25       THE WITNESS:  Yes.

Page 277

L. GARR

1
2        THE SPECIAL MASTER:  Thank you.
3    Q.    And in Exhibit 4294,
4  Mr. Maazel's e-mail where he says "lay out
5  for the Ecuadorian court what happened
6  with Cabrera," is it your understanding
7  that that meant any disclosures by Chevron
8  would be included in laying out for the
9  court what happened with Cabrera?
10       MR. GOMEZ:  Objection.
11       MS. PARADISE:  Can you direct,
12 I'm sorry, the witness to the exact line
13 that you are referring to?
14   Q.    If you look at 4294, I will ask
15 the question again in a different form.
16       Exhibit 4294, number 1, it says
17 "for the mea culpa strategy, lay out for
18 the Ecuadorian court what happened with
19 Cabrera."
20       Is it your understanding that
21 Chevron's submissions to the Ecuadorian
22 court are part of Patton Boggs' or Emery
23 Celli's strategy for laying out for the
24 Ecuadorian court what happened with
25 Cabrera?

70 (Pages 274 - 277)

Page 278

L. GARR

1
2  MR. GOMEZ: Objection,
3  privileged and form.
4        THE SPECIAL MASTER: Overruled.
5  A.   I'm not sure I understand your
6  question completely, but I took it to mean
7  the coordination just between the
8  plaintiffs and Cabrera, not Chevron's
9  coordination with Cabrera.
10       THE SPECIAL MASTER: No, no,
11  no. What he is asking -- shall I rephrase
12  it so we can move on? Go ahead.
13  Q.   By laying out for the
14  Ecuadorian court what happened with
15  Cabrera, it was your understanding that it
16  was the Lago Agrio plaintiffs'
17  representatives who would be laying out
18  for the court what happened with Cabrera?
19       MR. GOMEZ: Objection,
20  privileged.
21       THE SPECIAL MASTER: Overruled.
22  A.   I did have an understanding
23  that it would be the plaintiffs that would
24  be submitting something.
25  Q.   Now, let's take a look at 4291.

Page 279

L. GARR

1
2       (Plaintiff's Exhibit 4291
3  marked for identification.)
4  Q.   This is a multipage e-mail,
5  Ms. Garr. I'm going to be focusing on the
6  e-mail at the top of the first page from
7  Ilann Maazel on May 3rd, 2010 to Eric
8  Westenberger, Andrew Wilson, Edward
9  Yennock,
10  sdonziger@donzigerandassociates.com,
11  lgarr@donzigerandassociates.com,
12  jabady@ecbalaw.com, copied to Eric Daleo,
13  Jason Rockwell and Jonathan Abady,
14  subject, Draft Affidavit, Donziger 39377.
15       In the interests of just trying
16  to save time, if I could direct your
17  attention to that first e-mail at the top.
18       MS. PARADISE: Laura, if you
19  feel the need to read the whole document,
20  you should.
21       THE WITNESS: Okay.
22       (Witness perusing document.)
23       MR. GOMEZ: While the witness
24  is reading, can we have a reading of the
25  time?

Page 280

L. GARR

1
2       THE VIDEOGRAPHER: Five hours
3  and 26 minutes, minus the short breaks.
4       THE SPECIAL MASTER: Minus two
5  minutes.
6       THE VIDEOGRAPHER: Four
7  minutes. There were two two-minute
8  breaks.
9       THE SPECIAL MASTER: I see,
10  okay.
11       (Witness perusing document.)
12  Q.   Have you finished reviewing it?
13  A.   Yes, I have.
14  Q.   Thank you. You reviewed the
15  whole document?
16  A.   Yes.
17  Q.   Okay, great. We might as well
18  talk about the whole document, then.
19  A.   Okay.
20  Q.   On the last -- the third page,
21  Edward Yennock's e-mail of May 3rd, 2010
22  at 6:43 p.m.; do you see that?
23  A.   Yes.
24  Q.   You are a recipient of that
25  e-mail, correct?

Page 281

L. GARR

1
2  A.   Yes, I appear to be, yes.
3  Q.   It says "All, attached is a
4  draft of Pablo Fajardo Mendoza's
5  declaration in support of our motion to be
6  filed in Denver." Do you see that?
7  A.   Yes.
8  Q.   It says, in the next paragraph,
9  "Laura and/or Steve, please read the
10  declaration to Pablo ASAP."
11       Do you see that?
12  A.   I do.
13  Q.   Did you read the declaration to
14  Mr. Fajardo?
15  A.   Not that I recall, no.
16  Q.   Was Mr. Fajardo, to your
17  recollection in New York at the time?
18  A.   Not that I recall, no.
19  Q.   Did you participate in
20  reviewing any part of that declaration?
21  A.   Not that I recall, but is that
22  the declaration we looked at?
23  Q.   We will get to that.
24  A.   Okay, I'm sorry. So then not
25  that I recall.

71 (Pages 278 - 281)

Page 282

1        L. GARR
2     Q.    Let me direct your attention to
3 Mr. Maazel's e-mail on the first page.
4        Mr. Maazel says "Maybe it is
5 because I missed something at the end of
6 the meeting last Friday" -- do you see
7 that?
8     A.    Yes.
9     Q.    -- "but I don't quite get the
10 purpose of this affidavit. Pablo mentions
11 one document submission but not the other.
12 If he is submitting an affidavit about
13 what happened, why omit the most important
14 part? It seems misleading at best."
15        Do you recall discussions about
16 whether or not drafts of Mr. Pablo
17 Fajardo's affidavit were misleading?
18        MR. GOMEZ:  Objection.
19        THE SPECIAL MASTER:  Overruled.
20     A.    I don't.
21     Q.    Let me show you 857, which is
22 the declaration of Pablo Fajardo Mendoza
23 dated May 5th, 2010 filed in the District
24 Court of Colorado.
25        (Plaintiff's Exhibit 857 marked

Page 283

1        L. GARR
2 for identification.)
3        (Witness perusing document.)
4     Q.    As you are reading the
5 document, would you see whether there is
6 any reference to Mr. Cabrera being
7 independent anywhere in the document.
8        MR. HILLE:  I just object on
9 the basis the document speaks for itself.
10        MR. BRODSKY:  The document
11 speaks for itself. Why don't we move on.
12        THE SPECIAL MASTER:  Wait one
13 second. Let me just read this.
14        (Witness perusing document.)
15        MS. PARADISE:  I apologize, but
16 my contact lens is falling out. Do you
17 mind if I go to wash my hands to take out
18 my contact?
19        THE SPECIAL MASTER:  No, of
20 course not.
21        MS. PARADISE:  While Laura is
22 reading the document.
23        (Ms. Paradise departs the
24 room.)
25        MR. BRODSKY:  Any chance,

Page 284

1        L. GARR
2 Mr. Gitter, you can give me a few extra
3 minutes for the reading of this document
4 so it doesn't count against me?
5        THE SPECIAL MASTER:  No.
6        MR. BRODSKY:  It doesn't hurt
7 to ask.
8        THE SPECIAL MASTER:  It is a
9 part of the normal questioning. If we
10 tried to keep track of that in addition to
11 all the other things we try to keep track
12 of, we would never make it.
13        (Witness perusing document.)
14        (Ms. Paradise returns to the
15 room.)
16     A.    Okay.
17     Q.    Does it refresh your
18 recollection having reviewed the Pablo
19 Fajardo declaration, Exhibit 857, that you
20 participated in editing and/or drafting
21 it?
22     A.    I have no recollection of
23 editing or drafting this document.
24     Q.    Let me show you 861.
25        (Plaintiff's Exhibit 861 marked

Page 285

1        L. GARR
2 for identification.)
3     Q.    861 is a two-page document
4 dated May 3rd, 2010 from Laura Garr to
5 Steven Donziger, Re: Draft Affidavit,
6 DONZ39373.
7        Ms. Garr, directing your
8 attention to your e-mail on May 3rd, where
9 it says "My edits or questions are
10 highlighted in track. It is obviously
11 very important you verify the information
12 with Pablo."
13        Do you see that?
14     A.    I do.
15     Q.    Does this refresh any
16 recollection that you reviewed a draft
17 affidavit of Pablo Fajardo Mendoza before
18 it was filed with the District Court of
19 Colorado?
20     A.    It appears I did. I don't
21 recall --
22     Q.    It doesn't refresh any memory?
23     A.    I don't have any independent
24 recollection.
25     Q.    Looking back at Exhibit 4291,

72 (Pages 282 - 285)

Page 286

L. GARR

1
2 which is the Ilann Maazel May 3rd, 2010
3 e-mail, do you see the third paragraph
4 where Mr. Maazel says "I wouldn't
5 emphasize too much that Cabrera was
6 independent and court-appointed."
7       Do you see that?
8    A.    Yes.
9    Q.    Do you recall discussion about
10 how the strategy in the United States in
11 connection with 1782 proceedings was to
12 not emphasize Mr. Cabrera was independent?
13       MR. GOMEZ: Objection.
14       THE SPECIAL MASTER: Overruled.
15    A.    I don't recall a strategy on
16 that, no.
17    Q.    Do you recall any strategy of
18 trying to provide information to the court
19 relating to Cabrera without fully
20 disclosing the nature of the relationship
21 between Cabrera and the Lago Agrio
22 plaintiff representatives?
23       MR. GOMEZ: Objection.
24       THE SPECIAL MASTER: Overruled.
25 That's overruled.

Page 287

L. GARR

1
2    A.    No, I don't recall that.
3    Q.    Having read the Pablo Fajardo
4 Mendoza declaration of May 5th, 2010,
5 Exhibit 857, did you see in that
6 declaration the laying out to the District
7 Court of Colorado the nature of the
8 relationship between Cabrera and the
9 representatives of the Lago Agrio
10 plaintiffs?
11       MR. GOMEZ: Objection, the
12 document speaks for itself.
13       MR. HILLE: I join that.
14       THE SPECIAL MASTER: No, you
15 are both wrong. She is an editor of this
16 document, according to this e-mail, and
17 her understanding -- she testified that
18 she understood there was going to be a mea
19 culpa and a laying out of -- a mea culpa
20 and a laying out of facts and her
21 understanding, whether she saw in this
22 document or now sees in this document that
23 laying out or mea culpa is relevant.
24       Please answer the question.
25    A.    I don't see a full -- all I see

Page 288

L. GARR

1
2 is a description of documents that were
3 presented to Cabrera.
4       THE SPECIAL MASTER: You don't
5 see a full what?
6       THE WITNESS: The lay out --
7 the mea culpa -- reading this document was
8 for the Ecuadorian court. I don't know
9 that that was ever discussed in here.
10       But as far as the declaration,
11 I don't see that it goes into great detail
12 about, other than that documents were
13 presented to Cabrera.
14    Q.    Was there an understanding that
15 there wouldn't be a disclosure, a full
16 disclosure to the District Court of
17 Colorado like there would be to the
18 Ecuadorian court regarding the nature of
19 the relationship between Cabrera and the
20 Lago Agrio plaintiff representatives?
21       MR. GOMEZ: Objection.
22       THE SPECIAL MASTER: Overruled.
23    A.    Not that I recall.
24       THE SPECIAL MASTER: Can I ask
25 whether we have the edits that the witness

Page 289

L. GARR

1
2 made?
3       MR. BRODSKY: We do, but in the
4 interests of time I didn't want to take up
5 the time to go through those edits.
6       THE SPECIAL MASTER: Can I see
7 them anyway, please?
8       MR. BRODSKY: Yes. In the
9 interests of just trying to --
10       THE SPECIAL MASTER: I'm not
11 going to count this. This is something I
12 want to see in my role as somebody who has
13 to review all her documents for
14 crime-fraud privilege.
15       MR. BRODSKY: You are not going
16 to count this time against us?
17       THE SPECIAL MASTER: Correct,
18 my looking at this edit.
19       MS. MALONEY: I will find them.
20       THE SPECIAL MASTER: Why don't
21 we go on, and once they are found, I will
22 look at them.
23       MS. PARADISE: The witness
24 wants a clarification on the record.
25       THE WITNESS: I would just note

73 (Pages 286 - 289)

Page 290

```
1            L. GARR
2  that I sent edits to Steven at 7:21, and
3  the discussion subsequent all took place,
4  all of the discussions except for the
5  initial e-mail took place after my edits.
6      Q.    Were your edits made prior to
7  May 5th, 2010 when the Pablo Fajardo
8  declaration was --
9      A.    It appears they were here, yes.
10     Q.    Do you recall meeting in 2010
11 when Mr. Fajardo and Mr. Yanza came to New
12 York and you translated the meeting for
13 other people in attendance?
14     A.    I recall attempting poorly
15 to -- I don't know that I recalled that I
16 translated what they were saying to people
17 in attendance, but I believe I tried to
18 say the themes that were being discussed
19 in English to them, if I recall.
20     Q.    To them --
21     A.    Pablo Fajardo and Luis Yanza,
22 and I recall it not going very well.
23     Q.    Approximately when was this
24 meeting?
25     A.    That's the meeting we were
```

Page 291

```
1            L. GARR
2  discussing earlier. I don't recall.
3      Q.    We were discussing a number of
4  meetings earlier. Which one is this one?
5      A.    I'm sorry, the only one where
6  Luis Yanza and Pablo Fajardo came to
7  Patton Boggs' offices that I'm aware of.
8      Q.    During this meeting was
9  Mr. Tyrrell present?
10     A.    I don't recall.
11     Q.    Were lawyers from Patton Boggs
12 present, regardless of whether you can
13 recall any particular lawyer?
14     A.    Yeah, I believe so. I believe
15 so.
16     Q.    Were lawyers from other firms
17 there?
18     A.    I believe Emery Celli was
19 present, but -- I believe so, yes.
20     Q.    Was Mr. Fajardo during this
21 meeting questioned regarding -- withdrawn.
22         Did Mr. Fajardo describe during
23 this meeting interactions the Lago Agrio
24 plaintiffs' representatives had with
25 Cabrera?
```

Page 292

```
1            L. GARR
2      A.    Yes.
3      Q.    What did, in substance, did
4  Mr. Fajardo say?
5          MR. GOMEZ: Objection.
6          THE SPECIAL MASTER: Overruled.
7      A.    I don't remember exactly, but I
8  recall it being very brief, that documents
9  were submitted to Cabrera on behalf of the
10 Lago Agrio plaintiffs.
11         THE SPECIAL MASTER: The
12 conversation, excuse me, the statements by
13 Mr. Fajardo are within the crime-fraud
14 exception, in furtherance of the fraud,
15 the cover-up.
16     Q.    Was Mr. Donziger present for
17 this conversation?
18     A.    I believe so, yes.
19     Q.    Did Mr. Donziger elaborate on
20 what Mr. Fajardo said?
21     A.    I believe so, yes.
22     Q.    What did Mr. Donziger say?
23     A.    I recall Mr. Fajardo not being
24 comfortable speaking, or not fully
25 speaking at the moment -- I'm not stating
```

Page 293

```
1            L. GARR
2  that properly.
3          I recall Pablo Fajardo giving
4  like a one-sentence description and Steven
5  Donziger then elaborating that there had
6  been -- kind of elaborating on the extent
7  of the document production.
8      Q.    What did Mr. Donziger say in
9  his elaboration?
10     A.    I don't recall.
11     Q.    You said Mr. Donziger
12 elaborated on the extent of the document
13 production. What did you mean by that?
14     A.    I don't recall specifically
15 what Pablo Fajardo said, but I recall it
16 being a very brief statement and Steven
17 describing more extensively that it was --
18 I don't know if it was -- I don't recall
19 if it was a larger number of documents
20 than he implied or just clarifying that it
21 was large sections of the Cabrera report
22 where it was not fully clear from Pablo
23 Fajardo's statement.
24     Q.    You saw earlier the Dear Fellow
25 Counsel letter with the metadata of
```

Page 294

1        L. GARR
2 Mr. Donziger of April 17th, 2010, Exhibit
3 4284; do you remember reading that?
4    A.    Yes.
5    Q.    Did Mr. Donziger convey in
6 substance the information in that Dear
7 Fellow Counsel letter relating to the
8 relationship between -- withdrawn.
9        Did Mr. Donziger convey in
10 substance that Stratus had wrote the bulk
11 of the report by Cabrera and submitted it
12 to the court?
13        MR. GOMEZ: Objection.
14        THE SPECIAL MASTER: Overruled.
15        MS. PARADISE: Do you need him
16 to repeat the question, Laura?
17        THE WITNESS: No.
18    A.    I don't recall if it was at
19 that meeting. I do recall Steven
20 stating -- Steven Donziger stating that
21 large sections of the Cabrera report were
22 drafted by Stratus and given to Cabrera
23 for use in his report.
24    Q.    Did Mr. Fajardo during that
25 meeting refuse to answer questions?

Page 295

1        L. GARR
2    A.    Not that I recall.
3        THE SPECIAL MASTER: Excuse me,
4 you don't recall when Donziger said that.
5 Did he say it before you edited Fajardo's
6 affidavit?
7        THE WITNESS: I don't recall.
8    Q.    Did anybody on behalf of Patton
9 Boggs respond to the statements made by
10 Mr. Donziger relating to -- that you just
11 accounted for?
12        MR. GOMEZ: Objection.
13        THE SPECIAL MASTER: Overruled.
14    A.    I recall a meeting where that
15 was said and then a discussion of going to
16 Ecuador to find out under the laws what
17 the court orders were about the impact
18 that would have under -- about obtaining
19 Ecuadorian experts and about -- and then
20 subsequent discussions about what impact
21 that would have on the report itself and
22 therefore needing more scientific --
23 potentially additional damage report,
24 those discussions, stemming from his
25 disclosure.

Page 296

1        L. GARR
2    Q.    Did anybody -- any of the
3 lawyers in the room raise whether or not
4 they needed to correct statements made to
5 federal district courts in the United
6 States as a result of what Mr. Donziger
7 was saying regarding the relationship
8 between Mr. Cabrera and the Lago Agrio
9 plaintiff representatives?
10    A.    I don't --
11        MR. GOMEZ: Objection.
12        THE SPECIAL MASTER: I think
13 she was going to say I don't know or I
14 don't recall, so the objection is
15 pointless.
16    Q.    You don't recall one way or the
17 other?
18    A.    I don't.
19    Q.    Did anybody say that they were
20 surprised by this information?
21        MR. GOMEZ: Objection.
22        THE SPECIAL MASTER: Overruled.
23    A.    I don't know if anyone said
24 that specifically, but I think -- I don't
25 know.

Page 297

1        L. GARR
2    Q.    Did you get the impression
3 people were surprised based on your
4 observations?
5        MR. GOMEZ: Objection.
6        THE SPECIAL MASTER: Overruled.
7    A.    I don't know about surprised.
8 I think there was a concern to find out
9 what the implication was under the law as
10 a result of such contact, more kind of
11 confusion.
12    Q.    There was confusion about
13 Ecuadorian law; is that what you are
14 saying?
15        THE SPECIAL MASTER: Wait one
16 second. I'm trying to understand now,
17 when was this now?
18        THE WITNESS: Based on my
19 recollection of the follow-up items that
20 came out of that, it seemed it would be
21 March, prior to then going and getting the
22 court orders from the -- this was related
23 to document production, but I don't
24 recall.
25        THE SPECIAL MASTER: Wait a

75 (Pages 294 - 297)

1        L. GARR
2 second. Just a minute, please. I'm
3 confused.
4        I want to try to understand
5 something. Is it your best recollection
6 that Mr. Donziger said that Stratus wrote
7 large sections of the Cabrera report at a
8 meeting at Patton Boggs?
9        THE WITNESS: I believe so,
10 yes.
11       THE SPECIAL MASTER: And that
12 would have been no earlier than April 7 or
13 so, correct?
14       THE WITNESS: It was subsequent
15 to the 1782 filing, but I don't recall the
16 date.
17       THE SPECIAL MASTER: The first
18 time you went down to Ecuador was on March
19 the 4th or so, right, or early March? It
20 was March the 3rd?
21       THE WITNESS: Yes.
22       THE SPECIAL MASTER: And at
23 that time, to the best of your
24 recollection, had the 1782 been filed in
25 Colorado?

1        L. GARR
2        THE WITNESS: I believe so,
3 yes.
4        THE SPECIAL MASTER: Can you
5 describe what was the state of your
6 knowledge at that time of the role of the
7 plaintiffs' counsel and Stratus vis-à-vis
8 Cabrera?
9        THE WITNESS: I was not aware
10 at that time that large portions of the
11 report were drafted by Stratus and sent to
12 Cabrera.
13       THE SPECIAL MASTER: And you
14 learned that when?
15       THE WITNESS: I don't recall.
16 I would say it was subsequent to that.
17 I'm confident it was subsequent to that.
18 I am confident, I believe, again, the
19 second visit. I'm not sure -- I don't
20 know. I don't know when I learned it. I
21 do know that first trip when I was
22 reviewing the court records I did not
23 know.
24       THE SPECIAL MASTER: Okay,
25 thank you.

1        L. GARR
2    Q.   Let's go to the post-Cabrera
3 reports.
4        THE SPECIAL MASTER: The
5 post-Cabrera reports?
6        MR. BRODSKY: These cleansing
7 reports.
8        THE WITNESS: I'm sorry, can I
9 just clarify that last one? I don't want
10 to misstate anything. I was under the
11 impression that when I saw the record,
12 there were 3,000, I think, something pages
13 that were submitted, and I was aware that
14 the plaintiffs submitted that.
15       I was not aware -- when I say I
16 was not aware that it was Stratus
17 drafting, I was not clear what those
18 materials were, but there was a court
19 record that showed submissions.
20       THE SPECIAL MASTER: Is it ever
21 your understanding that the Cabrera --
22 that the drafts that Stratus had written
23 were submitted to the court?
24       THE WITNESS: No. But at that
25 time I did not know of that.

1        L. GARR
2        THE SPECIAL MASTER: And what
3 do those 3,000 pages that you saw have to
4 do with the 58-page Cabrera report?
5        THE WITNESS: I don't know.
6    Q.   Were you involved in -- before
7 we get to the cleansing reports, were you
8 involved in -- in connection with the
9 cleansing reports, were you involved in
10 drafting a submission by Pablo Fajardo to
11 the Ecuadorian Lago Agrio court?
12   A.   No.
13   Q.   Did there come a time when the
14 Second Circuit Court of Appeals ordered
15 the filmmaker, Berlinger, to produce the
16 Crude outtakes?
17   A.   Yes.
18   Q.   Did you have a conversation or
19 conversations with Mr. Donziger regarding
20 what was in those Crude outtakes?
21       MR. GOMEZ: Objection.
22       THE SPECIAL MASTER: Overruled.
23 The subject of the Crude outtakes were
24 also a subject of very substantial
25 testimony without privilege objection by

76 (Pages 298 - 301)

Page 302

```
1            L. GARR
2 Mr. Donziger.  And if you want citation,
3 you will get them afterward from
4 Mr. Ormand.
5    Q.    You may answer, Ms. Garr.
6    A.    Yes.
7    Q.    What, if anything, did
8 Mr. Donziger say regarding whether any of
9 those outtakes would show a relationship
10 or meetings between the representatives of
11 the Lago Agrio plaintiffs and Mr. Cabrera?
12   A.    At the time of the ruling?
13   Q.    Before the ruling.
14   A.    Nothing.
15   Q.    And after the ruling?
16   A.    After the ruling, I don't
17 recall any conversation until --
18       MS. PARADISE:  I don't think
19 the witness finished her answer.
20   Q.    I'm sorry.
21   A.    I don't recall any conversation
22 until there was an outtake showing a
23 meeting.
24   Q.    And then what conversation took
25 place after there was an outtake showing a
```

Page 303

```
1            L. GARR
2 meeting?
3    A.    I don't -- I don't recall any
4 specific conversations.
5    Q.    Let me show you 4233.
6       (Plaintiff's Exhibit 4233
7 marked for identification.)
8    Q.    Which is a one-page e-mail
9 exchange from Laura Garr to Andrew Woods,
10 "Re: Second Circuit Order," dated July
11 15th, 2010.
12       Do you recall this e-mail
13 exchange?
14   A.    Yes.
15   Q.    Do you see where it says --
16 Mr. Maazel says "the footage I believe
17 contains a meeting with Steve, Pablo,
18 Stratus and Cabrera"?
19   A.    I see that, yes.
20   Q.    "And it also contains a meeting
21 with Steve and Stratus in Colorado"?
22   A.    I see that, yes.
23   Q.    Your response was forwarding it
24 to -- or sending it to Andrew Woods,
25 responding to Andrew Woods and saying
```

Page 304

```
1            L. GARR
2 "Nothing of concern Steven?  nice..."
3       What did you mean by that?
4       MR. GOMEZ:  Objection.
5       THE SPECIAL MASTER:  Overruled.
6    A.    When the Second Circuit -- or
7 when the outtake footage was the subject
8 of the 1782, Steven had stated that he
9 wasn't concerned if the outtakes were in
10 fact produced, because, if anything, it
11 showed that there was nothing concerning
12 on the footage, if anything, it was
13 negative for Chevron.
14   Q.    And your response means?
15   A.    That this seemed like something
16 that was news to me and was a concern.
17   Q.    What was of concern to you?
18 Was it news to you that there were --
19 there was a relationship between Cabrera
20 and the Lago Agrio plaintiff
21 representatives?
22   A.    Yes, that there was a meeting
23 with them, yes, that Steven participated
24 in a meeting with Cabrera, yes.
25   Q.    Was it that Steven Donziger
```

Page 305

```
1            L. GARR
2 participated in a meeting with Cabrera or
3 was it that there were meetings between
4 Cabrera and the Lago Agrio plaintiff
5 representatives?
6       MR. GOMEZ:  Objection.
7       THE SPECIAL MASTER:  Overruled.
8    A.    I don't recall at this time.  I
9 know I was not aware that there was a
10 meeting with Stratus, that I then saw on
11 the outtakes, that I recall being very
12 surprised by that.
13       At this point there was
14 obviously discussion of the fact that
15 there was collaboration, but I don't
16 know -- I don't know at this date what I
17 knew or not.
18   Q.    Did you know by July -- well,
19 withdrawn.
20       Didn't you know by July 15th,
21 2010 that Mr. Pablo Fajardo had
22 communicated with Cabrera?
23   A.    I believe so.  I believe so.
24   Q.    In that case what was
25 surprising about this was Mr. Donziger's
```

77 (Pages 302 - 305)

1          L. GARR
2 involvement in those meetings with
3 Cabrera?
4          MR. GOMEZ: Objection,
5 mischaracterizes.
6          THE SPECIAL MASTER: She'll
7 clarify.
8    A.    My understanding was there
9 was -- that Stratus Consulting was
10 drafting materials, that they were
11 produced directly to Cabrera. Meetings of
12 this nature ahead of -- I was not -- it
13 was surprising, I think, a meeting --
14          THE SPECIAL MASTER: A planning
15 meeting at which Cabrera attended and
16 Donziger attended and the plaintiffs'
17 counsel attended, is that what was
18 surprising to you?
19          THE WITNESS: Yes.
20          THE SPECIAL MASTER: Thank you.
21    Q.    And following that discovery,
22 what, if anything, did you say to Donziger
23 and what, if anything, did he say to you?
24          MR. GOMEZ: Objection.
25          THE SPECIAL MASTER: Overruled.

1          L. GARR
2    A.    I'm trying to recall when I
3 first saw the footage. I don't remember a
4 specific conversation.
5    Q.    Were you upset?
6          MR. GOMEZ: Objection.
7          THE SPECIAL MASTER: Overruled.
8    A.    I recall being confused and
9 concerned.
10          THE SPECIAL MASTER: Excuse me,
11 confused is different from concerned.
12 Were you concerned?
13          MR. GOMEZ: Objection, your
14 Honor.
15          THE SPECIAL MASTER: Overruled.
16 The question was were you upset, I think,
17 right?
18          THE WITNESS: I don't recall at
19 this time if it was -- I know there was a
20 discussion, subsequent explaining, you
21 know, ex parte contact.
22          So I don't know at this point
23 if I was no longer -- I was aware that ex
24 parte contact took place, but I -- I don't
25 recall exactly what I thought on this day,

1          L. GARR
2 I'm sorry, except that --
3    Q.    Were you upset on or about that
4 day, whether it was that day or shortly
5 after that day, after you saw that Crude
6 outtake of Mr. Donziger meeting with
7 Mr. Cabrera, that Mr. Donziger had misled
8 you?
9          MR. GOMEZ: Objection.
10          THE SPECIAL MASTER: Overruled.
11    A.    I'm sorry, I am trying to place
12 myself at that time because I'm not
13 remembering any specific conversations.
14 If I was more aware by the time I saw the
15 outtakes -- I'm sorry, I don't --
16    Q.    Putting aside exactly when you
17 learned the fact, when you learned the
18 fact that Mr. Donziger had met with
19 Cabrera, did you feel that Mr. Donziger
20 had misled you up to that point?
21          MR. GOMEZ: Objection.
22          THE SPECIAL MASTER: Overruled.
23    A.    I felt that he might have
24 known, been aware of more than I had
25 previously assumed, in terms of the

1          L. GARR
2 collaboration with Cabrera.
3    Q.    Mr. Donziger had been
4 maintaining, had he not, telling you for
5 months that you had to go to Ecuador to
6 uncover and discover what relationship
7 there was between Cabrera and the Lago
8 Agrio plaintiff representatives; is that
9 fair?
10    A.    Yes.
11    Q.    And here is a tape showing that
12 Mr. Donziger himself is meeting with
13 Cabrera, correct?
14    A.    Yes.
15    Q.    Didn't you feel that
16 Mr. Donziger had misled you into believing
17 you had to go to Ecuador with him to
18 uncover what the relationship was with
19 Mr. Cabrera given that he himself had met
20 with Cabrera?
21          MR. GOMEZ: Objection.
22          THE SPECIAL MASTER: Overruled.
23    A.    My only hesitation -- my
24 hesitation is just the timing of things as
25 they played out.

78 (Pages 306 - 309)

Page 310

L. GARR

1
2     THE SPECIAL MASTER: Can you
3  answer his question?
4     A.    I'm sorry, can you ask the
5  question again? Did I feel misled, was
6  that the question?
7     Q.    Yes.
8     THE SPECIAL MASTER: Yes.
9     A.    At various points I did feel
10  misled.
11     Q.    And you felt misled by
12  Mr. Donziger at various points?
13     MR. GOMEZ: Objection.
14     THE SPECIAL MASTER: Overruled.
15     A.    Yes.
16     Q.    One of those points was you
17  learning that Mr. Cabrera had met with
18  Mr. Donziger, correct?
19     A.    Yes.
20     Q.    There were other points,
21  though, in which you felt misled by
22  Mr. Donziger?
23     A.    Yes.
24     Q.    What were those other points?
25     A.    I think there was a delay of

Page 311

L. GARR

1
2  information that was relayed to me
3  throughout the time, and so the delay with
4  which information was shared, there were
5  instances where I was doing work that in
6  hindsight did not seem -- the documents,
7  it seemed like they were aware of how the
8  documents were submitted for the court
9  record, there were moments when the
10  explanation came subsequent -- it was
11  delayed from when the initial allegation
12  was made or the initial issue was raised.
13     Q.    I'm not sure I quite
14  understand.
15     A.    Fair enough.
16     Q.    There were points in which
17  looking back after you learned information
18  from Mr. Donziger in hindsight you felt
19  misled that you were asked to do certain
20  things that were known to Mr. Donziger?
21     MR. GOMEZ: Objection.
22     THE SPECIAL MASTER: Overruled.
23     A.    Yes, although there always
24  seemed to be an explanation of some sort
25  that was provided.

Page 312

L. GARR

1
2     Q.    Put aside Mr. Donziger's
3  explanations, which we will get to in a
4  minute, but there were various points in
5  which Mr. Donziger -- which you performed
6  certain tasks and later learned
7  information that called into question why
8  Mr. Donziger had asked you to do things
9  that he already knew about?
10     A.    Yes.
11     MR. GOMEZ: Objection.
12     THE SPECIAL MASTER: She said
13  yes. The objection is overruled and it is
14  too late in any event.
15     Q.    One of those things is sending
16  you down to Ecuador to uncover information
17  relating to the relationship between
18  Cabrera and Stratus Consulting, correct?
19     MR. GOMEZ: Objection.
20     THE SPECIAL MASTER: Overruled.
21     A.    I'm not sure that was why I was
22  sent. It was to obtain orders from the
23  court. But trying to find out the process
24  by which documents were submitted to the
25  court seems that that was known prior and

Page 313

L. GARR

1
2  was not necessary for me to be looking
3  into that.
4     Q.    What are some of the other
5  things -- withdrawn.
6     What are the other points at
7  which you felt Mr. Donziger misled you
8  because he had asked you to do certain
9  things that you later realized he already
10  knew?
11     A.    It would be the document
12  production, in addition to the actual
13  meeting.
14     Q.    Did you feel Mr. Donziger --
15     A.    And, I'm sorry, and the outtake
16  footage again not being of any concern to
17  then there being several outtake clips
18  that were used that --
19     Q.    Did Mr. Woods respond --
20     THE SPECIAL MASTER: Excuse me,
21  she didn't finish her answer. Several
22  outtakes of what, that were of concern?
23     THE WITNESS: Well, that -- I
24  think a lot of the outtakes were also not,
25  but there were things that I think there

79 (Pages 310 - 313)

Page 314

L. GARR

1
2 was a lot more film footage of what would
3 otherwise have been privileged meetings
4 and things of that nature that I was
5 surprised by.
6    Q.    One of those footage outtakes
7 were you surprised by was the footage
8 outtake when there was Pablo Fajardo
9 saying they would write the Cabrera
10 report, in substance; do you remember that
11 outtake and do you remember Ann Maest
12 during that outtake laughing, but not
13 Chevron?
14        MS. PARADISE: Objection to
15 form, compound.
16        THE SPECIAL MASTER: Objection
17 to form, what?
18        MS. PARADISE: Compound.
19        THE SPECIAL MASTER: Well, the
20 clip was compound.
21    A.    I'm not sure the meeting I took
22 to be that they were drafting his report
23 for him, but the fact that there was a
24 meeting of -- I mean, the quote you just
25 said was not the thing that, you know, I

Page 315

L. GARR

1
2 don't know that I would characterize it
3 that way.
4        But the meeting was -- the
5 meeting itself was one instance where I
6 was surprised.
7        THE VIDEOGRAPHER: We need to
8 take a break to change tapes. Can we do
9 it right now?
10        THE SPECIAL MASTER: Yes.
11        THE VIDEOGRAPHER: The time is
12 4:50 p.m. We are off the record.
13        (Recess taken.)
14        THE VIDEOGRAPHER: We are back
15 on the record. The time is 4:58 p.m.
16 This is the beginning of disk five.
17 BY MR. BRODSKY:
18    Q.    Ms. Garr, do you recall seeing
19 in 2010 at some point the Crude outtake
20 where Mr. Donziger expresses whether part
21 of his for doing this case was to make money?
22    A.    I don't recall.
23    Q.    Your motive when you were
24 assisting Mr. Donziger was not to make
25 money, was it?

Page 316

L. GARR

1
2    A.    No.
3    Q.    You didn't have a percentage
4 interest in the outcome of litigation in
5 Ecuador, correct?
6    A.    No, I do not -- did not -- do
7 not.
8    Q.    Before we get to
9 Mr. Donziger's -- well, we might as well
10 do it now.
11        You said at various points
12 Mr. Donziger, in substance -- withdrawn.
13        At times did Mr. Donziger
14 provide explanations at the points at
15 which you felt you were misled?
16    A.    Yes.
17    Q.    Do you recall the first
18 explanation Mr. Donziger gave?
19        MS. PARADISE: Objection to
20 form, vague.
21    Q.    You recall the moments in which
22 you raised issues with Mr. Donziger with
23 respect to which you felt misled, correct?
24    A.    I don't know that I had
25 conversations with him saying I felt

Page 317

L. GARR

1
2 misled.
3    Q.    There were points at which you
4 felt --
5        THE SPECIAL MASTER: You don't
6 have to go over the old ground. Asked and
7 answered, if you are going to ask her
8 there were points at which you were
9 misled. The answer is that was asked and
10 answered several times.
11    Q.    Mr. Donziger gave explanations
12 to you at times in 2010, correct, for
13 questions you had regarding his conduct?
14    A.    I just want to be able to
15 answer, questions that came up,
16 allegations that were raised, say, it
17 wasn't always his conduct, but questions
18 regarding document production, say, to
19 Stratus -- by Stratus to --
20    Q.    What do you remember about
21 Mr. Donziger's explanations, for example,
22 regarding, take Stratus' relationship --
23 Cabrera's relationship with the Lago Agrio
24 plaintiff representatives?
25        THE SPECIAL MASTER: It is a

1          L. GARR
2 question of which moment in time.  What
3 was his first explanation, is that what
4 you are after?
5          MR. BRODSKY:  Sure, I'll take
6 the first, second and third.
7          THE SPECIAL MASTER:  What was
8 the first explanation when you first went
9 down there as to the relationship of the
10 Lago Agrio plaintiffs and Mr. Cabrera?
11          THE WITNESS:  I believe -- I
12 believe he stated that he needed to speak
13 with counsel to find out the nature of
14 what took place.  And the first trip I
15 took in March?
16          THE SPECIAL MASTER:  Yes.
17          THE WITNESS:  It was just to go
18 speak with local counsel and what, if
19 anything, was in the court record that
20 permitted documents being provided to
21 Cabrera.
22          THE SPECIAL MASTER:  Was that
23 the first time he offered any explanation
24 for the relationship of anybody with
25 Cabrera?  You had been there since 2007 or

1          L. GARR
2 thereabouts.
3          THE WITNESS:  I was there just
4 the summer after my first year of law
5 school in 2007 and then again in 2009.
6          THE SPECIAL MASTER:  All right.
7     Q.     And did you ever speak with
8 Andrew Woods regarding your beliefs at the
9 time that you were misled?
10          MR. GOMEZ:  Objection.
11          THE SPECIAL MASTER:  Overruled.
12    A.     I don't know that I -- I don't
13 recall any conversations about being
14 misled.
15    Q.     Do you recall speaking with
16 Mr. Woods after sending him that e-mail
17 regarding the Crude outtakes saying
18 "Nothing of concern?  nice..."?
19    A.     I don't recall any specific
20 conversation.  I don't know if we spoke
21 after this e-mail.
22    Q.     Do you remember Mr. Woods
23 expressing to you his view that he had
24 been misled by Mr. Donziger on occasion in
25 2010?

1          L. GARR
2          MR. GOMEZ:  Objection.
3          THE SPECIAL MASTER:  Overruled.
4     A.     If he felt he ever or in
5 relation to this e-mail?
6     Q.     If Mr. Woods ever said to you
7 he felt that he had been misled by
8 Mr. Donziger.
9     A.     I don't recall.
10    Q.     You don't recall one way or the
11 other?
12    A.     Yeah, I don't recall.
13    Q.     At what point -- you were
14 describing how you went down to Ecuador
15 with Mr. Dunkelberger, correct?
16    A.     Yes.
17    Q.     How did that -- who, if anyone,
18 told you to go down with Mr. Dunkelberger?
19    A.     I believe I was asked to go
20 down by Steven.
21    Q.     What did Mr. Donziger say?
22    A.     I don't recall entirely what he
23 specifically said.  I believe we were both
24 to be going down, and I recall we were
25 both supposed to go down, and then I

1          L. GARR
2 recall I think he did not -- he did not
3 end up coming.
4     Q.     And you went down with
5 Mr. Dunkelberger by yourself?
6     A.     I'm sorry, I did not go down
7 with him, but I did -- there is a better
8 way to say that -- but I was down in
9 Ecuador when he was down there.
10          THE SPECIAL MASTER:  While I'm
11 thinking of it, apart from your counsel
12 and apart from what you said today here,
13 had you ever shared your feeling that you
14 had been misled by Mr. Donziger with any
15 other person?
16          THE WITNESS:  Again, I don't
17 know about misled, but I did have a
18 concern at one point when the allegations
19 were raised that I did seek the advice of
20 independent counsel at one point.
21          THE SPECIAL MASTER:  Thank you.
22    Q.     That's Professor Bruce Green
23 from Fordham University?
24    A.     Yes.
25    Q.     When you spoke to Mr. Green,

L. GARR

1        L. GARR
2 I'm not asking you about your conversation
3 with Mr. Green or what Mr. Green said, put
4 that aside, but when you spoke to
5 Mr. Green, the information you provided to
6 Mr. Green was based on representations
7 that Mr. Donziger gave to you, correct?
8        MR. HILLE:  Can I just hear the
9 question again?
10        THE SPECIAL MASTER:  No way.
11 I'm not going to let -- no way.
12    Q.    What did you understand -- did
13 Mr. Donziger explain to you the purpose of
14 what you were doing in Ecuador with
15 Mr. Dunkelberger?
16        MR. GOMEZ:  Objection.
17        THE SPECIAL MASTER:  Overruled.
18    A.    I don't recall a specific
19 conversation, but I had an understanding
20 of the purpose of the visit.
21    Q.    What is your understanding of
22 the purpose of the visit?
23        MR. GOMEZ:  Objection.
24        THE SPECIAL MASTER:  Before I
25 respond to that objection, I'm going to

1        L. GARR
2 ask you a question for voir dire.  How did
3 you get the understanding?
4        THE WITNESS:  At meetings that
5 were held with all counsel in the matter.
6        THE SPECIAL MASTER:  Oh, you
7 mean Patton Boggs and Donziger and so
8 forth?
9        THE WITNESS:  Yeah, and -- yes.
10        THE SPECIAL MASTER:  Your
11 objection is overruled.
12    A.    I'm sorry, I don't recall the
13 question.
14    Q.    What was your understanding of
15 the purpose of the visit?
16    A.    I believe it was an
17 introduction of Ted Dunkelberger and his
18 colleague to the Ecuadorian local counsel
19 for purposes of subsequent expert reports
20 that would be submitted in the Lago Agrio
21 trial.
22    Q.    And how much time did you spend
23 with Mr. Dunkelberger in Ecuador?
24    A.    Again, I'm sorry, I'm not sure
25 which date it was.  It was a few days I

1        L. GARR
2 believe that we were there.
3    Q.    What was Mr. Dunkelberger
4 doing?
5    A.    I recall a meeting with --
6 between him and -- between
7 Mr. Dunkelberger and his colleague whose
8 name I'm spacing, and I believe Juan Pablo
9 Saenz, Julio Prieto and Pablo Fajardo, I
10 believe he was there, kind of discussing
11 the background of the case and then just
12 general information that he would need to
13 perform any scientific reports.
14    Q.    Was Mr. Dunkelberger given
15 Mr. Cabrera's report, including the
16 summary and the annexes?
17    A.    I don't recall fully, but I
18 believe that was part of the documentation
19 that was provided.
20    Q.    And Mr. Dunkelberger was basing
21 in part his work on the Cabrera report,
22 correct?
23        MR. GOMEZ:  Objection.
24        THE SPECIAL MASTER:  Overruled.
25    A.    I don't know what -- I don't

1        L. GARR
2 know what the experts used in -- I know
3 they were provided the information, but I
4 don't know.
5    Q.    Were you present when anybody,
6 including yourself, told
7 Mr. Dunkelberger -- well, withdrawn.
8        Did you ever tell
9 Mr. Dunkelberger the nature of the
10 relationship between Cabrera and the Lago
11 Agrio plaintiff representatives prior to
12 or during your trip in Ecuador?
13        MR. GOMEZ:  Objection.
14        MR. BRODSKY:  What's the
15 objection?
16        MR. GOMEZ:  Privileged,
17 attorney work product.
18        THE SPECIAL MASTER:  Overruled.
19    A.    Not that I recall.
20    Q.    Did anybody ask you ever not to
21 talk to Mr. Dunkelberger about
22 Mr. Cabrera's relationship with the Lago
23 Agrio plaintiff representatives?
24    A.    No.
25    Q.    Did anybody in your presence

82 (Pages 322 - 325)

Page 326

1        L. GARR
2 ever tell Mr. Dunkelberger that, or
3 describe -- withdrawn.
4        Did anybody in your presence
5 tell Mr. Dunkelberger information about
6 the relationship between Cabrera and the
7 Lago Agrio plaintiff representatives?
8        MR. GOMEZ: Objection, vague.
9        THE SPECIAL MASTER: If you
10 understand the question, answer it.
11   A.    I don't recall a specific
12 conversation, but I do believe he was
13 aware of the allegations surrounding the
14 Cabrera report and the -- I believe he was
15 made aware that it was -- the purpose of
16 subsequent damage reports were to be
17 independent of the Cabrera report, I
18 believe, although I don't recall who or
19 what conversation took place.
20   Q.    You don't recall who said that?
21   A.    No.
22   Q.    You have a general recollection
23 that somebody told that to
24 Mr. Dunkelberger?
25   A.    I believe so.

Page 327

1        L. GARR
2   Q.    Do you have any memory of
3 anybody telling Mr. Dunkelberger that the
4 Cabrera report was functionally written by
5 the Lago Agrio plaintiff representatives?
6   A.    I don't recall, but I do
7 recall -- I vaguely recall there being
8 discussions of it was Stratus work as part
9 of that underlying the report, I believe.
10        So I don't recall -- which
11 makes me think there was a conversation
12 about that at some point, but I don't
13 recall.
14   Q.    Did anybody tell
15 Mr. Dunkelberger that Stratus in fact had
16 written the Cabrera report?
17   A.    I don't recall. I don't
18 recall. I vaguely recall there being
19 discussions, again, that the work was
20 Stratus' work and that's where the
21 reference -- I mean, that's -- that
22 Stratus -- I'm sorry, I don't recall.
23   Q.    Did anybody in your presence
24 discuss Chevron's allegations relating to
25 the Cabrera report with Mr. Dunkelberger?

Page 328

1        L. GARR
2   A.    I don't recall.
3   Q.    Were you involved at all with
4 any of the other experts in connection
5 with these cleansing reports, other than
6 Mr. Dunkelberger?
7   A.    There was a colleague with
8 Mr. Dunkelberger at that time who I was
9 with during those days. I'm sorry, can
10 you repeat the question?
11   Q.    Putting aside Mr. Dunkelberger
12 and anyone working with Mr. Dunkelberger,
13 did you speak with or interact with any
14 other cleansing expert?
15   A.    I don't recall who the contact
16 was. If there was somebody else I might
17 have communicated to provide documentation
18 that was requested. It might have been
19 someone other than those two people, but I
20 don't recall.
21   Q.    Did you have any interaction
22 with The Weinberg Group?
23   A.    I believe that was Ted
24 Dunkelberger's.
25   Q.    Anybody else at The Weinberg

Page 329

1        L. GARR
2 Group other than Ted Dunkelberger?
3   A.    Again, I'm not sure if there
4 was somebody, another contact that I sent
5 documents to at some point.
6   Q.    Did Mr. Donziger talk about
7 what The Weinberg Group was going to do?
8   A.    Yes.
9   Q.    And what did Mr. Donziger say?
10   A.    Again, I'm not recalling a
11 specific conversation, but generally that
12 The Weinberg Group was -- I believe there
13 were several experts from various fields
14 that were doing expert reports on various
15 categories of damages and that it would be
16 to be submitted in the Lago Agrio trial.
17   Q.    And did you understand what
18 Weinberg Group's role was in connection
19 with each of those experts?
20   A.    I don't know if those experts
21 worked for The Weinberg Group or if The
22 Weinberg Group coordinated obtaining the
23 experts.
24        THE SPECIAL MASTER: I'm sorry,
25 did you say that you were delivering

83 (Pages 326 - 329)

Page 330

1        L. GARR
2  documents to The Weinberg -- to
3  Mr. Dunkelberger?
4        THE WITNESS:  I did assist
5  sending documents from Ecuador, that were
6  requested, documents that were requested
7  for review as part of the expert report.
8        THE SPECIAL MASTER:  Did you
9  send them the work of Stratus or anything
10 like that?
11       THE WITNESS:  I recall it being
12 a very large quantity of documents.  I
13 don't know exactly what was sent over.
14 But it was enumerated list of items that
15 were requested and sent over.
16       THE SPECIAL MASTER:  Are you
17 aware that there were, how should I put
18 it, professional criticisms of the Cabrera
19 report that were made when the report
20 first came out?
21       THE WITNESS:  I'm sorry, of the
22 Cabrera report when it first came out?
23       THE SPECIAL MASTER:  Of the
24 Cabrera report.
25       THE WITNESS:  Yes.

Page 331

1        L. GARR
2        THE SPECIAL MASTER:  Did you
3  become aware at some point that --
4        THE WITNESS:  I'm sorry, I'm
5  not aware when it first came out that
6  there were criticisms, but I'm aware that
7  criticisms were made of the Cabrera
8  report.
9        THE SPECIAL MASTER:  Did you
10 become aware of the fact that it was
11 Stratus who made the criticisms of their
12 own work?
13       THE WITNESS:  I don't know
14 about that.  I do know that there was a
15 subsequent reply that was also drafted by
16 Stratus.  I did become aware of that.  I
17 don't remember if it was criticisms or
18 not, but there was something else that was
19 submitted.
20       THE SPECIAL MASTER:  My then
21 question was, did you send that to
22 Dunkelberger?
23       THE WITNESS:  I don't recall.
24 I don't know.
25    Q.    Did you learn anything in

Page 332

1        L. GARR
2  connection with your work on these
3  cleansing reports where you felt
4  Mr. Donziger misled you?
5    A.    No.
6    Q.    Did Mr. Fajardo provide you
7  with any information to give to The
8  Weinberg Group?
9    A.    Not that I recall.
10   Q.    Were you present when Mr. --
11 when The Weinberg Group, any
12 representative, Mr. Dunkelberger, obtained
13 any information from Mr. Fajardo?
14       MR. GOMEZ:  Objection, assumes
15 facts.
16       THE SPECIAL MASTER:  He is
17 right.  The objection is sustained.
18   Q.    Did you observe
19 Mr. Dunkelberger interacting with Pablo
20 Fajardo?
21   A.    I believe Pablo was at the
22 meeting that I referenced earlier where
23 there was a discussion.
24   Q.    At any point did Mr. Fajardo
25 provide documents to Mr. Weinberg -- I

Page 333

1        L. GARR
2  mean Mr. Dunkelberger?
3    A.    Not that I recall.
4    Q.    Anybody, any of the Lago Agrio
5  plaintiff representatives in your presence
6  provide documents to Mr. Dunkelberger?
7    A.    He had requested documents that
8  were provided by the -- that were -- all
9  of the documents that were provided to The
10 Weinberg Group that I'm aware of came from
11 the Lago Agrio representatives, from that
12 office.
13   Q.    Do you know who was giving him
14 the documents?
15   A.    I know -- I believe in that
16 first visit there were some that were
17 provided, that were available offhand, I
18 think.  Otherwise a list was just created
19 and some were sent and pulled at their
20 request and at the request of the experts
21 thereafter.
22   Q.    What documents?
23   A.    There was -- there was a very
24 long list of different things that were
25 filed in the -- that had been filed,

84 (Pages 330 - 333)

Page 334

1        L. GARR
2 different reports that had been filed in
3 the Lago Agrio trial from various experts,
4 various chemical samplings, I recall
5 various maps and geographic materials, I
6 believe census data was requested and
7 supplied.
8        I don't know that that was from
9 the record. I think that was maybe
10 Ecuadorian census data, or maybe it was
11 from the court record, I don't know. It
12 was a whole host of various requests for
13 information.
14    Q.    Did you have an understanding
15 that The Weinberg Group was writing or
16 drafting -- withdrawn.
17        Did you have any understanding
18 that The Weinberg Group was drafting the
19 reports or any report by any of the
20 cleansing experts?
21        MR. GOMEZ: Objection.
22    A.    I'm sorry, I don't understand.
23 I don't know.
24    Q.    Do you know one way or the
25 other whether The Weinberg Group was

Page 335

1        L. GARR
2 actually writing any of the reports of the
3 cleansing experts?
4        MR. GOMEZ: Objection.
5        THE SPECIAL MASTER: Overruled.
6    A.    I don't understand the
7 question, I'm sorry. The Weinberg -- oh,
8 you mean like the -- no, I don't know. I
9 don't know.
10    Q.    Just to make my question clear,
11 do you have any understanding that The
12 Weinberg Group was doing what Stratus was
13 doing for Cabrera, The Weinberg Group was
14 drafting reports for cleansing experts in
15 the way Stratus drafted the report for
16 Cabrera?
17        MR. GOMEZ: Objection.
18        THE SPECIAL MASTER: Overruled.
19    A.    No, I don't know who worked
20 under the umbrella of The Weinberg Group,
21 if some of the experts themselves worked
22 for The Weinberg Group, in which case it
23 is what they were hired to do. I don't
24 know the relationship.
25        THE SPECIAL MASTER: Excuse me

Page 336

1        L. GARR
2 one second, I have to explain something.
3 Mr. Gomez, the subject of The Weinberg
4 Group, the cleansing experts, was also the
5 subject of a substantial amount of
6 testimony by Mr. Donziger without any
7 objection by any of the three lawyers for
8 your clients and also no objection by
9 counsel for Mr. Donziger.
10        Furthermore, the cleansing
11 reports are indeed a subject of waiver
12 specifically in the January 19, 2011
13 letter from counsel for Mr. Donziger,
14 Bruce Kaplan.
15        While I'm on that subject, let
16 me mark this as -- I think you have a
17 copy, Mr. Gomez, I think we sent you a
18 copy -- I'm going to mark as Special
19 Master Exhibit 2 a copy of the January 19,
20 2011 letter to me as then Special Master
21 in the 1782 proceeding in this court by
22 Bruce Kaplan, counsel for Mr. Donziger in
23 which, among other things, he specifically
24 states that they will not assert any
25 privilege with respect to the matters --

Page 337

1        L. GARR
2 of the following matters, the Cabrera
3 report, the submission to the Lago Agrio
4 court of the request to file new reports
5 or the preparation of the supplemental
6 damage reports, which we understood to
7 mean the cleansing of the Cabrera report,
8 and then he goes on to say what other
9 things he will not assert privilege about,
10 one of which is basically irrelevant here,
11 and then he goes on to talk about a couple
12 of things that they will assert work
13 product privilege about.
14        (Special Master Exhibit 2
15 marked for identification.)
16    Q.    Let me show you, Ms. Garr,
17 Exhibit 4240, which is a multipage
18 document. It is an e-mail from Adlai
19 Small, asmall@pattonboggs.com, to Laura
20 Garr, subject, Additional Information
21 Requests, dated August 31st, 2010, and it
22 contains an attachment of Supplemental
23 Information Request No. 4 from D. Allen to
24 C. Arthur, T. Dunkelberger, The Weinberg
25 Group, and it contains another attachment,

85 (Pages 334 - 337)

Page 338

1        L. GARR
2  two-page attachment of D. Allen dated
3  August 27, 2010 to C. Arthur, T.
4  Dunkelberger, The Weinberg Group. It is a
5  GARR9236 Bates number to 40 produced
6  pursuant to the 502 agreement.
7        (Plaintiff's Exhibit 4240
8  marked for identification.)
9        (Witness perusing document.)
10   A.   Yes, I reviewed this document.
11   Q.   And this is, at the bottom, an
12  e-mail from Chris Arthur of The Weinberg
13  Group. Do you recognize Chris Arthur, do
14  you know who that is?
15   A.   I don't. I don't recognize
16  him.
17   Q.   Do you know who D. Allen is, or
18  Doug Allen?
19   A.   No, I don't recall.
20   Q.   Do you have an understanding of
21  why -- of what the purpose of D. Allen
22  making requests to the Dunkelberger -- The
23  Weinberg Group for information?
24   A.   I would assume it is one of the
25  experts, but I don't recall.

Page 339

1        L. GARR
2   Q.   It has an e-mail exchange here
3  where you are being forwarded the
4  information from Adlai Small of Patton
5  Boggs. Do you see that?
6   A.   Yes.
7   Q.   What role did Patton Boggs play
8  in connection with The Weinberg Group?
9        MR. GOMEZ: Objection.
10        THE SPECIAL MASTER: Who said
11  that?
12        MR. GOMEZ: I did.
13        THE SPECIAL MASTER: Overruled.
14   A.   I believe Adlai Small was the
15  contact with The Weinberg Group -- at
16  least was the person I dealt with in terms
17  of information requests from The Weinberg
18  Group, or from the experts for the
19  reports.
20   Q.   Did you speak with Mr. Small
21  about requests coming from The Weinberg
22  Group?
23   A.   Yes.
24   Q.   What did Mr. Small say to you
25  and what did you say to him?

Page 340

1        L. GARR
2        MR. GOMEZ: Objection, form and
3  privilege.
4        THE SPECIAL MASTER: What
5  privilege is this?
6        MR. GOMEZ: Attorney work
7  product.
8        THE SPECIAL MASTER: Waived.
9   A.   We discussed various
10  information requests that came in, and I
11  believe there was -- I believe someone
12  that worked with him that created kind of
13  a chart or a tally of the documents that
14  were requested and being provided, and so
15  he was -- we communicated where I was
16  sending information that was requested by
17  the experts.
18   Q.   Did you have any understanding
19  of whether any of the cleansing experts
20  were doing any work themselves in Ecuador,
21  putting aside Mr. Dunkelberger and The
22  Weinberg Group, did you have any
23  understanding as to whether any cleansing
24  experts were doing any work themselves in
25  Ecuador?

Page 341

1        L. GARR
2        MR. GOMEZ: Objection, vague.
3        THE SPECIAL MASTER: Objection
4  what?
5        MR. GOMEZ: Vague.
6        THE SPECIAL MASTER: I know.
7  What is it?
8        MR. GOMEZ: Form.
9        THE SPECIAL MASTER: It is
10  pretty bad. Why don't you revise it.
11   Q.   Were any of the cleansing
12  experts, to your knowledge, doing any
13  sampling in Ecuador?
14   A.   I don't recall. Not that I
15  recall.
16   Q.   Did you know how much time
17  these experts drafted -- how much time it
18  took the experts to draft these reports?
19   A.   I don't recall, but I do recall
20  there being -- time was a concern, what
21  could be done in the short amount of time
22  to have it completed.
23   Q.   Who told you time was a
24  concern?
25   A.   I recall discussions about the

86 (Pages 338 - 341)

Page 342

```
1              L. GARR
2  nature of the work, I guess, of what could
3  be completed, or what type of report could
4  be produced, what information could be
5  gathered or done at the time.
6      Q.    And was there -- did anybody
7  express to you that there was time
8  pressure because the Lago Agrio
9  plaintiffs' representatives wanted to have
10 these cleansing reports done before all
11 the disclosures came out in the United
12 States relating to the Cabrera report?
13          MR. GOMEZ: Objection.
14          THE SPECIAL MASTER: No, that
15 is okay. If it is a privilege objection,
16 it is overruled.
17     A.    No.
18     Q.    Are you familiar with the use
19 by Mr. Donziger of the word "puppeteer"?
20     A.    No.
21     Q.    Were you aware that
22 Mr. Donziger was using code words for
23 people?
24          MR. GOMEZ: Objection, assumes
25 facts.
```

Page 343

```
1              L. GARR
2          THE SPECIAL MASTER: No, I
3  think the record is sufficiently developed
4  on this and has plenty of foundation.
5      A.    No.
6      Q.    Had you ever heard Mr. Donziger
7  refer to Mr. Cabrera as Wao, spelled
8  W-a-o?
9      A.    No.
10     Q.    Or Waiter?
11     A.    Waiter? No.
12     Q.    Had you ever heard Mr. Donziger
13 refer to Pablo Fajardo in writing or in
14 person as Bebe, B-e-b-e?
15     A.    Yes.
16     Q.    And BB, the word BB, in
17 writing?
18     A.    I think his nickname was Bebe,
19 like B-e-b-e.
20     Q.    Had you ever heard
21 Mr. Donziger --
22     A.    I'm sorry, I think Pablo
23 Fajardo referred to himself that way, I
24 recall. I don't know that Steven ever
25 did.
```

Page 344

```
1              L. GARR
2      Q.    Had you ever heard Mr. Donziger
3  refer to the Lago Agrio court as
4  Restaurant?
5      A.    No.
6      Q.    In writing or otherwise?
7      A.    No.
8      Q.    And had you ever heard of
9  Mr. Donziger referring to anyone as
10 Waiter?
11     A.    Besides --
12     A.    Besides an actual waiter.
13     A.    No.
14     Q.    Or a judge as Cook?
15     A.    No.
16          THE SPECIAL MASTER: See what I
17 mean about the record being well-developed
18 in this area?
19     Q.    There came a point -- did there
20 come a point, Ms. Garr, when the
21 withdrawals of Constantine Cannon, the
22 Brownstein firm, and any other firm caused
23 you concern?
24          MR. GOMEZ: Objection.
25          THE SPECIAL MASTER: Overruled.
```

Page 345

```
1              L. GARR
2      A.    As I had mentioned earlier,
3  there was one point in relation to the
4  Cabrera -- the allegations raised in the
5  1782 in Colorado where I was concerned at
6  that time, and I believe there was a
7  withdrawal of a firm around that at that
8  time.
9          So at that point I had
10 concerns, although I don't know if it was
11 specific to the firm withdrawal or if it
12 was just generally all the events that
13 were taking place at that time.
14     Q.    Did you ever speak to Mr. Page
15 regarding the withdrawals of any counsel
16 in representing the Lago Agrio plaintiff
17 representatives in the District of
18 Colorado?
19     A.    I don't recall.
20     Q.    Were you aware of any payments
21 made by or at the direction of
22 Mr. Donziger to Judge Zambrano?
23     A.    No.
24     Q.    Were you aware of any payments
25 made by or at the direction of Alberto --
```

87 (Pages 342 - 345)

Page 346

1          L. GARR
2 at Mr. Donziger's direction or by him to
3 Alberto Guerra?
4    A.    No.
5    Q.    Were you aware of any payments
6 made by representatives of the Lago Agrio
7 plaintiffs to Judge Zambrano?
8    A.    No. Is that different than the
9 first question you asked me?
10   Q.    Yes.
11   A.    I'm sorry, I didn't --
12   Q.    Were you aware of whether any
13 of the Lago Agrio plaintiff
14 representatives made any payments to
15 Mr. Zambrano?
16   A.    Oh, I'm sorry, I was listening
17 to the name, I'm sorry. No, I'm not
18 aware, no.
19   Q.    Or Alberto Guerra?
20   A.    No.
21   Q.    Are you aware of whether
22 Mr. Donziger paid a bonus to any of the
23 Ecuadorian plaintiffs' representatives for
24 any reason --
25        MR. GOMEZ: Objection.

Page 347

1          L. GARR
2    Q.    -- a bonus of money?
3        MR. GOMEZ: Objection.
4    A.    To the plaintiffs, as in the
5 Ecuadorian counsel?
6    Q.    Yes.
7    A.    I don't know about a bonus, but
8 I do recall -- I believe I recall a
9 conversation about increasing salary or --
10 I think maybe it was just actually getting
11 paid back salary at one point.
12   Q.    To whom?
13   A.    I'm sorry, to the Ecuadorian
14 counsel, Julio Prieto and Juan Pablo
15 Saenz.
16   Q.    How did you learn this?
17   A.    It is a vague recollection, but
18 I recall there being -- I think being in
19 Ecuador with discussions of the fact that
20 they had -- I think they had not been paid
21 in a while, and I recall -- yeah, I recall
22 that they had not been paid in a while.
23   Q.    And you recall Mr. Prieto and
24 Mr. Saenz saying this to whom?
25   A.    To Steven, I believe.

Page 348

1          L. GARR
2    Q.    In your presence?
3    A.    I think so. I believe so.
4    Q.    Was there anyone else present
5 for the conversation?
6    A.    I don't recall. I don't
7 recall.
8    Q.    Approximately when did it
9 occur?
10   A.    It would be during the 2009 to
11 2010 year.
12   Q.    What did Mr. Donziger say, if
13 anything, in response?
14   A.    I think he said something along
15 the lines of I'm sorry, you will get paid,
16 something like that.
17   Q.    Do you know how Mr. Donziger
18 made any payments to the representatives
19 of the Lago Agrio plaintiffs?
20   A.    I'm not certain.
21   Q.    Did you observe Mr. Donziger
22 giving money to, in any form, to the Lago
23 Agrio plaintiff representatives?
24   A.    No.
25   Q.    There came a point, Ms. Garr,

Page 349

1          L. GARR
2 when you left Mr. Donziger's employment,
3 correct?
4    A.    Yes.
5        (Plaintiff's Exhibit 4244
6 marked for identification.)
7    Q.    Let me show you Exhibit 4244,
8 which is a one-page document, GARR24365,
9 from Laura Garr dated October 1st, 2010 to
10 Steven Donziger, "Re: Update."
11   A.    I see it, yes.
12   Q.    Is this on or about the day
13 that you were leaving Mr. Donziger's
14 employment?
15   A.    I don't recall the exact day.
16 I don't recall the exact day I left, but
17 it was around October, the beginning of
18 October.
19   Q.    Mr. Donziger says in his e-mail
20 at 11:05 a.m., "I want to hear your
21 concerns and try to chart a way forward."
22        Do you see that in the third
23 sentence?
24   A.    Yes.
25   Q.    Do you understand what he meant

88 (Pages 346 - 349)

Page 350

1        L. GARR
2 by "your concerns"?
3    A.    I don't recall.  I don't.
4    Q.    You don't remember at the time
5 shortly before you left Mr. Donziger's
6 employment expressing concerns directly to
7 him?
8    A.    I recall us having a
9 conversation about working conditions and
10 arrangements that this may be referring
11 to.
12    Q.    What working conditions and
13 arrangements?
14    A.    I believe we had gotten into --
15 toward the end we were disagreeing about
16 the way -- I was not being treated well
17 toward the end.
18    Q.    What do you mean by that?
19    A.    I recall there being
20 discussions where a friend of his came to
21 work on the case that I didn't enjoy
22 working with, and also I think we were
23 just -- he was not being very pleasant to
24 work with.
25    Q.    And what do you mean by he was

Page 351

1        L. GARR
2 not being very pleasant to work with?  I
3 know it is an uncomfortable question,
4 Ms. Garr, given your past relationship
5 with him, but what do you mean by that?
6    A.    There were moments where he
7 could be very rude.
8    Q.    Who was the person who was
9 Mr. Donziger's friend coming to work for
10 him?
11    A.    Eric Moe was his name.
12    Q.    And he was working in
13 Mr. Donziger's apartment?
14    A.    No, at this time we were
15 working out of H5's conference room.
16    Q.    Why were you working out of
17 H5's conference room?
18    A.    Because they offered office
19 space and it was better than working out
20 of his apartment.
21    Q.    And who worked at H5?
22    A.    Julia Brickell, Nicholas -- oh,
23 I'm sorry, you mean --
24    Q.    My question was unclear.  Who
25 with Donziger & Associates was working at

Page 352

1        L. GARR
2 H5 office space?
3    A.    Andrew Woods, I was, Eric Moe
4 came and was working there.  There was a
5 point when there was a contract attorney
6 that also worked there.
7        THE SPECIAL MASTER:  Who was
8 the contract attorney?
9        THE WITNESS:  I forget his
10 name, but he was referenced in one of the
11 documents that I reviewed.  So I saw it
12 recently.  I would remember it if I saw it
13 again.  But I don't remember his name now.
14    Q.    Who hired him, H5 or Steven
15 Donziger?
16    A.    I don't know.
17    Q.    At the time you left his
18 employment was part of your concerns that
19 Mr. Donziger did not react appropriately
20 when you raised your own concerns
21 regarding what was taking place in the
22 litigation?
23        MS. PARADISE:  Objection,
24 vague.
25        THE SPECIAL MASTER:  No, I

Page 353

1        L. GARR
2 don't think that is vague.
3    A.    I was going to ask you to
4 repeat it though.
5    Q.    At the time you left
6 Mr. Donziger's employment, was part of
7 your concerns that Mr. Donziger did not
8 react appropriately when you raised your
9 own concerns regarding what was taking
10 place in connection with the litigation,
11 the Lago Agrio litigation?
12        MR. GOMEZ:  Objection,
13 mischaracterizes.
14    A.    I don't know what concerns you
15 are talking about that I raised to him,
16 but -- yeah, I'm sorry, so I don't know --
17 there were instances where I don't think
18 he reacted well to certain circumstances,
19 but I don't know that that was --
20    Q.    What circumstances?
21    A.    Well, I mean --
22        MS. PARADISE:  Objection, asked
23 and answered.
24        THE SPECIAL MASTER:  No, I
25 don't think so.

89 (Pages 350 - 353)

Page 354

L. GARR

2 A. That was very broad. There
3 were times when he could be very kind of,
4 you know, difficult to work with. He was
5 an emotional person, so there were times
6 that that was difficult to work with.
7       So I don't know -- I'm
8 trying -- I don't know if you are speaking
9 about here or at the time I was leaving
10 his employment.
11 Q. Are you trying to say that at
12 times Mr. Donziger did not take criticism,
13 questions, from you well?
14       MR. GOMEZ: Objection,
15 mischaracterizes.
16       THE SPECIAL MASTER: No, no, he
17 is asking a question. He is entitled to
18 do that.
19 A. I'm sorry, can you repeat the
20 question again?
21 Q. Are you trying to say that
22 Mr. Donziger did not react well when you
23 raised questions or criticisms?
24 A. That's not what I was trying to
25 say, but in answer to that question, I

Page 355

L. GARR

2 think there were times when he did not
3 react well.
4       THE SPECIAL MASTER: You have
5 about a minute left.
6 Q. Can you give us an example of a
7 time when Mr. Donziger did not react well
8 to criticism from you?
9 A. Yes.
10       MR. GOMEZ: Objection,
11 relevance, to him not reacting well to
12 criticisms.
13       THE SPECIAL MASTER: Criticism
14 about the matter.
15 Q. What's the subject matter of
16 the criticism?
17 A. Any example? There was a time
18 I stated that I didn't want to get iced
19 tea for him and he yelled at me.
20 Q. Were there any criticisms that
21 you raised with him related to the subject
22 matter of the litigation? Did you ever
23 criticize the way he was conducting
24 himself in connection with the Lago Agrio
25 litigation?

Page 356

L. GARR

2 A. I think I raised at some point
3 after the fact with the footage of
4 privilege issues of having camera crews in
5 various meetings.
6 Q. And how did Mr. Donziger react?
7 A. I think he -- I recall he
8 stated something to the effect of that it
9 was important to him that there was public
10 awareness brought to this case and that he
11 didn't regret having the camera crews
12 there.
13       THE SPECIAL MASTER: That's it.
14 Thank you very much, Ms. Garr. We got you
15 out before 6.
16       MR. BRODSKY: Thank you,
17 Ms. Garr, thank you for your time today.
18       (Continued on the next page.)
19
20
21
22
23
24
25

Page 357

L. GARR

2       THE VIDEOGRAPHER: We are going
3 off the record. The time is 5:47 p.m.
4
5       [TIME NOTED: 5:47 p.m.]
6
7 _____
8 LAURA GARR
9
10 Subscribed and sworn to before me
11 this _____ day of _____, 2013.
12
13 _____
14       Notary Public
15
16
17
18
19
20
21
22
23
24
25

Page 358

```
1
2        I N D E X
3   WITNESS    EXAMINATION BY    PAGE
4   GARR    BRODSKY         5
5
6
7        E X H I B I T S
    PLAINTIFFS' DESCRIPTION      PAGE
8   Exhibit 107 Document entitled    187
        Nueva Loja Jule 23,
9       2007
    Exhibit 108 Document entitled    190
10      Quito, October 11,
        2007
11  Exhibit 723 Document entitled    45
        Nueva Loja, 1 April
12      2008
    Exhibit 724 Spanish version of   45
13      Exhibit 723
    Exhibit 857 Declaration of       282
14      Fajardo
    Exhibit 861 DONZ00039373 Page 1  284
15      of 2 and 2 of 2
    Exhibit 879 Affidavit of Andrew  59
16      Woods
    Exhibit 1625A DONZ00055225       206
17  Exhibit 1730 WOODS-HDD-0210541-  159
        0210542
18  Exhibit 1915 DONZ-HDD-0167393-   193
        0167395
19  Exhibit 1916 DONZ00045505        196
    Exhibit 1916A DONZ00045506 Page 1 197
20      of 61 to 61 of 61
    Exhibit 2710 PLAMP00006226-      172
21      0006227
    Exhibit 2710B E-mail from Garr to 173
22      Page dated 3/18/10
    Exhibit 4020A DONZ00054731       122
23  Exhibit 4020B DONZ00054732 Page 1 122
        of 3 through 3 of 3
24  Exhibit 4207 GARR00064446        57
25
```

Page 359

```
1
2        E X H I B I T S
3   PLAINTIFFS' DESCRIPTION      PAGE
    Exhibit 4209 DONZ00054540-00054541 93
4   Exhibit 4210 WOODS-HDD-0158292-  94
        0158293
5   Exhibit 4211 GARR00010902-       99
        00010906
6   Exhibit 4212 DONZ00054640 Page 1 105
        of 5 through 5 of 5
7   Exhibit 4214 DONZ00054812 and    128
        0054813 Page 1 of
8       4 through 4 of 4
        and 0054814
9   Exhibit 4217 DONZ00040882        130
    Exhibit 4219 GARR00069213        136
10  Exhibit 4220 GARR00065707        175
    Exhibit 4222 DONZ00037626-       178
11      00037631
    Exhibit 4227 GARR00039654-       216
12      00039656
    Exhibit 4229 H5000018261-000018262 85
13  Exhibit 4233 WOODS-HDD-0155202   303
    Exhibit 4240 GARR00009236-       338
14      00009240
    Exhibit 4244 GARR00024365        339
15  Exhibit 4267 Certificate of Border 60
        Crossing Activity
16  Exhibit 4276 GARR00064098        176
    Exhibit 4279 DONZ00031150 Page 1 211
17      of 2 and 2 of 2,
        DONZ00031151, Page 1
18      of 6 through 6 of 6
    Exhibit 4284 DONZ-HDD-0004621-   240
19      0004624
    Exhibit 4289 WOODS-HDD-0144964-  262
20      0144966
    Exhibit 4291 DONZ00039377 Page 1 279
21      of 4 through 4 of 4
    Exhibit 4294 WOODS-HDD-0245699   267
22  Exhibit 4886 Document entitled   186
        Nueva Loja, July 12,
23      2007
24
25
```

Page 360

```
1
2        E X H I B I T S
3
    SPECIAL MASTER  DESCRIPTION    PAGE
4   Exhibit 2 Letter from Kaplan to   337
        Gitter dated 1/19/11
5
6
    DIRECTIONS NOT TO ANSWER
7
        Page    Line
8       (NONE)
9
10
    REQUESTS
11
        Page    Line
12      (NONE)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 361

```
1
2        CERTIFICATION
3
4      I, TODD DeSIMONE, a Notary Public for
5   and within the State of New York, do
6   hereby certify:
7      That the witness whose testimony as
8   herein set forth, was duly sworn by me;
9   and that the within transcript is a true
10  record of the testimony given by said
11  witness.
12     I further certify that I am not related
13  to any of the parties to this action by
14  blood or marriage, and that I am in no way
15  interested in the outcome of this matter.
16     IN WITNESS WHEREOF, I have hereunto set
17  my hand this 5th day of June, 2013.
18
19

20         _____
           TODD DESIMONE
21
22
23
24
25
```

91 (Pages 358 - 361)

Page 362

```
1
2        ERRATA SHEET
         VERITEXT REPORTING COMPANY
3
   CASE NAME: CHEVRON v DONZIGER
4 DATE OF DEPOSITION  6/5/13
   WITNESS' NAME· LAURA GARR
5
   PAGE/LINE(S)/  CHANGE      REASON
6    ___/___/_____/_____
7    ___/___/_____/_____
8    ___/___/_____/_____
9    ___/___/_____/_____
10·  ___/___/_____/_____
11   ___/___/_____/_____
12   ___/___/_____/_____
13   ___/___/_____/_____
14   ___/___/_____/_____
15   ___/___/_____/_____
16   ___/___/_____/_____
17   ___/___/_____/_____
18   ___/___/_____/_____
19   ___/___/_____/_____
20
21        LAURA GARR
22
   SUBSCRIBED AND SWORN TO BEFORE ME
23 THIS _____ DAY OF _____, 2013
24
25 (NOTARY PUBLIC)  MY COMMISSION EXPIRES
```

92 (Page 362)

[& - 2009]                                                                 Page 1

| & | | | |
|---|---|---|---|

**&**  1:18 2:3,15 4:9,12
4:22,25 12:19 19:2
20:21 21:5 24:12
25:5,14 29:5 217:3
351:25

**0**

00009240   359:14
00010906   359:5
00037631   359:11
00039656   359:12
0004621   359:18
0004624   359:19
0006227   358:21
0054813   359:7
0054814   359:8
0144964   359:19
0144966   359:20
0155202   359:13
0158292   94:10
359:4
0158293   359:4
0167393   358:18
0167395   358:18
0210541   358:17
0210542   358:17
0245699   268:2
359:21
0691   1:4 3:22
07090   2:11

**1**

**1**   102:20,24 186:13
186:20 191:15
240:24 263:16
277:16 358:11,14
358:19,23 359:6,7
359:16,17,20
1/19/11   360:4
**10**   72:2
**10036**   2:16
**10166**   2:4
**104th**   19:14

**105**   359:6
**107**   187:11,13
188:14,21,22
189:17 358:8
**108**   190:23,24 191:2
191:10 192:2 193:6
358:9
**10:34**   80:16
**10:55**   80:19
**10th**   243:9,10,20
**11**   1:4 3:21 6:15
191:4 358:10
**111**   2:10
**1155**   2:15
**11:05**   349:20
**11th**   191:25
**12**   186:8 359:22
**122**   358:22,23
**128**   359:7
**12:31**   160:24,25
**12th**   62:12 128:16
239:18 241:21
243:14,16,23
**13**   184:18
**130**   359:9
**136**   359:9
**13th**   85:11 274:21
**144964**   262:23
**14:27**   112:8
**150**   6:13,18 57:20
**159**   358:17
**15th**   62:13 131:3
239:18 241:21
243:14,16,23
303:11 305:20
**1625a**   206:8,10
358:16
**17**   137:5 142:16
**172**   358:20
**173**   358:21
**1730**   159:16 161:11
162:25 358:17
**175**   359:10
**176**   359:16

**178**   359:10
**1782**   15:7,15 35:13
41:12 44:16 46:10
46:15 49:2,4 54:19
63:16 74:15 93:10
93:14,20 94:18
96:25 99:10 101:22
101:23 105:17
113:23 119:10
120:9 131:5 132:5
133:6 143:9,12
154:7,9 157:25
179:14,20 181:11
205:22 210:7
214:18 223:23
227:9 228:10,17,20
228:22,25 230:18
244:22 245:17
247:13 261:4
265:25 271:23
286:11 298:15,24
304:8 336:21 345:5
**1782s**   98:16 149:14
154:20 275:22
**17th**   61:21 136:20
147:2 184:19
240:15 241:18
252:21 274:22
294:2
**18**   175:17
**186**   359:22
**187**   358:8
**18th**   161:17
**19**   336:12,19
**190**   358:9
**1915**   193:14,15
194:20 358:18
**1916**   196:20,25
358:19
**1916a**   196:20 197:3
197:6,14 198:11
358:19
**193**   358:18
**196**   358:19

**197**   358:19
**199**   247:14
**19th**   177:3
**1:21**   161:3,6
**1:34**   172:18
**1st**   193:21 195:25
196:5,16,19 198:11
198:25 349:9

**2**

**2**   124:15 125:9
129:24 191:16
194:19 195:16
220:2,8,9,10 227:23
228:9,17 240:25
264:15 336:19
337:14 358:15,15
358:15 359:17,17
359:17 360:4
**2-8-2010**   211:21
**20**   247:15
**200**   1:18 2:3 3:16
135:7 247:15
**200,000**   73:8 74:17
**2007**   15:19,20 16:13
43:3,11 75:25 79:3
79:6 130:18 184:19
186:8 187:15 190:6
190:17 191:4,25
318:25 319:5 358:9
358:10 359:23
**2008**   51:13 121:15
127:8 193:21 196:2
196:5,16,19 198:11
198:25 358:12
**2009**   16:8,13,20,24
17:8,19,25 18:5,8
19:3,8 21:10,13,15
21:16 22:3 23:9,17
28:15 29:14,18
31:14 32:16 33:23
34:24 35:9 36:25
38:3 39:12 40:4,10
40:16 42:14 44:4,7
44:14 319:5 348:10

[2010 - 54732]                                                                                    Page 2

| | | | |
|---|---|---|---|
| **2010** 10:5 11:17 | **2011** 7:14 8:2,5,9,12 | **30th** 264:8 268:14 | **4222** 178:21,22 |
| 12:4,5,6,11,12,18 | 8:17 9:13,16 12:24 | **31151** 211:16 | 188:9,15 191:11 |
| 19:4,9 22:4 23:9,18 | 336:12,20 | **31st** 337:21 | 359:10 |
| 25:8,18 28:15 29:19 | **2012** 13:6 241:18 | **337** 360:4 | **4227** 216:21,22,24 |
| 31:15 32:16 33:24 | **2013** 1:12 3:13 | **338** 359:13 | 217:13,14 231:25 |
| 34:25 35:9 36:25 | 60:20 357:11 | **339** 359:14 | 359:11 |
| 38:4 39:12 40:5,10 | 361:17 362:23 | **360** 10:10,14 | **4229** 85:5,6 359:12 |
| 40:16 42:14 44:5 | **206** 358:16 | **39377** 279:14 | **4233** 303:5,6 359:13 |
| 46:20 48:3 52:6,14 | **211** 359:16 | **3:13** 239:11 | **4240** 337:17 338:7 |
| 53:24 54:17,24 | **216** 359:11 | **3rd** 57:16 60:23 | 359:13 |
| 56:11 57:16 60:23 | **23** 358:8 | 61:4 279:7 280:21 | **4244** 349:5,7 359:14 |
| 60:24 61:21,22,25 | **23rd** 61:22 187:15 | 285:4,8 286:2 | **4267** 60:5,6 239:14 |
| 62:6,12,13,17 64:4 | 190:6,17 | 298:20 | 274:23 359:15 |
| 64:5 74:22 85:11 | **240** 359:18 | **3tm** 227:23 228:2,3 | **4276** 176:24 359:16 |
| 86:21 87:19 88:2,18 | **245** 19:13 | **4** | **4279** 211:14,23 |
| 90:2 93:7 94:8 | **25th** 179:2 188:6 | | 220:3 359:16 |
| 100:21 106:2,11 | 191:12 | **4** 108:9,12,18 | **4284** 240:6,7,9 |
| 109:11 112:9 | **26** 280:3 | 129:23 220:7 | 241:25 294:3 |
| 122:15 123:23 | **262** 359:19 | 337:23 359:8,8,8,21 | 359:18 |
| 128:16 131:3 | **267** 359:21 | 359:21,21 | **4289** 262:20,23 |
| 136:20 137:5 | **27** 338:3 | **40** 338:5 | 359:19 |
| 142:16 147:2 | **2710** 172:2,4 173:11 | **4020a** 119:14 122:9 | **4291** 278:25 279:2 |
| 153:13 163:15 | 358:20 | 122:13,13 123:20 | 285:25 359:20 |
| 164:15 175:17 | **2710b** 173:6,8,11 | 124:3 358:22 | **4294** 267:16,18 |
| 177:4 179:2 188:7 | 358:21 | **4020b** 122:11,13,18 | 268:24 277:3,14,16 |
| 189:12 190:4 | **279** 359:20 | 123:25 124:2 | 359:21 |
| 191:12 194:3,3 | **28** 63:16 | 358:23 | **45** 358:11,12 |
| 198:14 199:14 | **282** 358:13 | **4207** 57:12,15 | **4621** 240:10 |
| 200:2,7,23 201:12 | **284** 358:14 | 358:24 | **4624** 240:10 |
| 205:20 206:17 | **29** 60:20 217:2 | **4209** 93:3,4 359:3 | **4886** 186:4,5 359:22 |
| 211:17 216:3 217:2 | **29th** 274:20 | **4210** 94:4,5 99:23 | **4:50** 315:12 |
| 217:15 239:18,23 | **2nd** 274:21 | 359:4 | **4:58** 315:15 |
| 240:4,15 242:25 | **3** | **4211** 99:18,20 | **4th** 93:7 94:8 267:20 |
| 244:4,8,15 245:10 | | 100:17 359:5 | 268:24 298:19 |
| 252:21 264:4 265:4 | **3** 104:15 129:23 | **4212** 105:20,21 | **5** |
| 265:19,23 267:20 | 247:16 269:19,20 | 112:8 359:6 | |
| 274:20,21,21,22 | 358:23,23,23 | **4214** 128:12,13 | **5** 1:12 108:18 |
| 279:7 280:21 | **3,000** 127:7 300:12 | 132:19 359:7 | 176:10 184:15 |
| 282:23 285:4 286:2 | 301:3 | **4217** 130:21,22 | 229:19 240:12 |
| 287:4 290:7,10 | **3-18-2010** 172:7 | 359:9 | 358:4 359:6,6,6 |
| 294:2 303:11 | **3/18/10** 358:22 | **4219** 133:12 136:15 | **502** 6:23 100:20 |
| 305:21 315:19 | **30** 206:17 264:4 | 136:18 359:9 | 136:21 175:19 |
| 317:12 319:25 | 265:4 | **4220** 175:13,15 | 338:6 |
| 337:21 338:3 | **303** 359:13 | 359:10 | **54732** 122:19 |
| 348:11 349:9 | | | |

[57 - agrio]

**57** 358:24
**58** 301:4
**59** 358:15
**5:47** 357:3,5
**5th** 3:13 100:21
  282:23 287:4 290:7
  361:17

**6**

**6** 106:11 184:13,15
  192:8 211:17 216:3
  356:15 359:18,18
  359:18
**6,000** 80:3
**6/5/13** 362:4
**60** 195:16 359:15
**61** 358:20,20,20
**6226** 172:15
**6:43** 280:22
**6th** 112:9

**7**

**7** 106:2 211:19
  212:6 217:25
  298:12
**723** 45:8,8,11,16
  52:15 196:10,12
  358:11,13
**724** 45:9,13,18 46:2
  52:16 197:8,8,16
  358:12
**7:21** 290:2
**7th** 212:15 217:14
  239:22 240:3 242:9

**8**

**8** 2:11 184:19
  211:19
**85** 359:12
**857** 282:21,25
  284:19 287:5
  358:13
**861** 284:24,25 285:3
  358:14
**879** 59:13,14 60:9
  63:7 358:15

**8th** 212:15 239:23
  240:4 242:9 267:12

**9**

**9** 60:24 71:10
  122:15
**93** 359:3
**94** 359:4
**99** 359:5
**9:06** 1:13 3:14
**9th** 61:4 123:23
  125:2

**a**

**a.m.** 1:13 3:14 80:16
  80:19 349:20
**aaron** 8:11 57:16
  87:12,21,22 93:8
  122:14 123:22
  124:8 128:17
  129:18 136:19
  137:8 175:16 205:8
  211:18 242:3 247:7
  259:17
**abady** 218:14
  263:11 267:22
  279:13
**ability** 5:23 88:19
**able** 34:7,18 35:5,5
  216:16 317:14
**abroad** 229:17
  230:4
**absolute** 186:25
  191:18
**accepted** 237:25
**access** 11:7 12:8,25
  23:7,14 81:14
  112:15,21 113:14
  113:15 114:14
**accessed** 13:10 29:9
  29:12
**accessing** 90:23 91:4
**accion** 206:16
**accompanied** 242:2
**account** 29:6,10
  270:3

**accounted** 295:11
**accuracy** 70:2
**accurate** 71:8
**acknowledgment**
  236:17
**act** 187:2
**acted** 97:13
**acting** 191:4
**action** 49:5,8,9
  54:19 181:11
  214:18 227:10
  259:20 361:13
**actions** 36:19 154:7
  214:18 227:20
**active** 37:7
**actively** 37:11,23
**activities** 29:23 30:7
**activity** 60:19
  359:15
**actual** 30:14 35:23
  36:8 45:20 110:2
  121:22 200:25
  201:14 270:15,21
  313:12 344:12
**add** 118:13 155:24
  184:10
**addition** 10:14
  55:21 107:11
  284:10 313:12
**additional** 6:15 81:5
  139:11 148:14,18
  149:9 150:15
  152:22 153:4,24
  267:3 272:14
  275:19 276:9
  295:23 337:20
**address** 28:18,19,22
  29:5 194:24
**addressed** 176:12
**addressees** 215:12
**addresses** 29:3,11
  29:15
**addressing** 79:20,21
**adlai** 151:20 152:12
  153:8 337:18 339:4

  339:14
**administrative**
  56:20 85:22
**admire** 23:22 24:2
**adopted** 109:18,23
  110:19,23 165:6,23
  235:22
**adoption** 182:17
**advice** 169:2 205:2
  321:19
**advise** 270:2
**advised** 169:3
  170:16
**affidavit** 63:13,22
  64:7,9,12,14,18
  67:6,14,24 68:2,11
  68:14,16 69:19,19
  70:3,8 71:10 72:2
  129:8,16,19,21
  279:14 282:10,12
  282:17 285:5,17
  295:6 358:15
**affidavits** 73:7 74:3
  74:7,10,11,14 175:6
**afternoon** 141:14
**afterward** 302:3
**agenda** 211:19,21
  212:25 214:4,15,17
  219:18 227:20
  228:8 263:16 264:3
**agree** 3:10 230:22
**agreement** 6:24
  100:20 136:22
  248:17 249:6,21
  250:5 338:6
**agreements** 187:22
  189:3 190:7,18
**agrio** 8:16 10:3 11:9
  13:3,11 22:13 23:2
  29:20 31:13,25 32:9
  36:18 40:3,9 41:3
  42:10 46:5 47:5,8
  47:11,17 65:8,15
  75:25 76:21 77:4,19
  78:7 96:15 108:2

109:3 123:3 135:20
158:16 166:4 167:9
171:19 179:13,19
180:17,19 181:5
191:22 199:6 202:9
203:2,19 206:2
207:23 209:7 224:6
224:9,23 226:20
236:22 245:18
251:25 253:12
270:7 272:8 278:16
286:21 287:9
288:20 291:23
292:10 296:8
301:11 302:11
304:20 305:4 309:8
317:23 318:10
323:20 325:11,23
326:7 327:5 329:16
333:4,11 334:3
337:3 342:8 344:3
345:16 346:6,13
348:19,23 353:11
355:24
**aguinda** 42:6 242:23
244:9,11,15
**ahead** 28:6 123:9,16
139:17 146:6
199:19 207:18
211:11 242:12
252:10 270:24
272:7 278:12
306:12
**aim** 186:24
**al** 1:9 3:19
**alberto** 345:25
346:3,19
**alert** 11:11,18,20
**alerted** 11:14
**alerts** 13:2
**allegation** 70:9,18
83:4 311:11
**allegations** 54:19
119:11 158:2,4,6,14
266:9 317:16

321:18 326:13
327:24 345:4
**allege** 100:13
**alleged** 104:10,21
158:8
**alleges** 104:5
**allen** 337:23 338:2
338:17,18,21
**alternative** 104:4,9
106:3 132:2,9 133:2
**amazon** 24:19
**amended** 14:12
**american** 84:2
**americas** 2:15
**amount** 336:5
341:21
**amp** 129:15,17
**ampage** 172:6
**analysis** 107:6
**analyze** 244:20
**analyzing** 244:8,11
**andrea** 2:7 84:23
**andrew** 8:7 20:9,16
38:5,6 53:15 63:14
63:23 64:6 68:14
70:12 94:8 161:20
211:18 238:22
263:11 267:22,24
279:8 303:9,24,25
319:8 352:3 358:15
**aneuman** 2:7
**ann** 195:7,8,11,15
198:12 314:11
**annexes** 324:16
**annmaest** 193:20
**answer** 32:5 50:19
51:24 66:24 69:9,11
88:25,25 97:4 98:25
110:16 111:23,25
113:4 120:19
123:10,14 134:12
137:21 139:14
144:10 145:12,22
146:7,10 147:17,20
147:22 148:23

157:2,22 163:21
164:25 166:12
183:24 199:19
212:25 223:15
235:17 242:12
246:3,6 249:13
251:4 252:10
255:13 257:11
287:24 294:25
302:5,19 310:3
313:21 317:9,15
326:10 354:25
360:6
**answered** 192:4
317:7,10 353:23
**anybody** 76:9 83:23
90:22 91:8 123:17
143:23 148:9 205:4
205:12,17,24
225:14 252:20
254:4 271:25
273:16 295:8 296:2
296:19 318:24
325:5,20,25 326:4
327:3,14,23 328:25
333:4 342:6
**anymore** 146:17
**anyway** 258:20
289:7
**apart** 83:16 233:16
321:11,12
**apartment** 20:4,5
21:17,21 22:2,9
27:12,15 69:22
351:13,20
**apologize** 12:16
49:21 228:13
283:15
**apparently** 138:12
**appeals** 301:14
**appear** 95:7 137:16
217:9 281:2
**appeared** 52:22
109:6 200:10

**appears** 95:15 96:20
100:6,7 106:13
107:4 175:24
197:12,14 218:2
240:12 285:20
290:9
**applied** 114:7
**applies** 97:8 127:20
165:14 234:25
**apply** 69:7 114:25
**appointed** 54:6
71:18 107:16
181:25 252:4 286:6
**appointment** 80:24
**appreciate** 157:8
263:22
**appropriate** 234:2
270:4
**appropriately**
352:19 353:8
**approved** 262:5
**approx** 127:7
**approximate** 17:17
**approximately** 3:14
6:9,11 21:12 22:4
61:8 62:6 209:21
210:3 290:23 348:8
**april** 51:12 60:20
62:12,13,17 74:22
85:11 87:18,23
88:18 90:2 193:20
195:25 196:5,16,19
198:11,25 205:21
207:12 211:17,19
211:19 212:6,15
216:3 217:2,14,25
239:18,18,22,23
240:3,4,15 241:18
241:20,21 242:8,9
242:24 243:9,10,20
244:15 245:10
252:21 264:3,8
265:4 267:12
268:14 269:9 294:2

298:12 358:11
**area** 167:12 344:18
**areas** 77:23
**argument** 105:10
114:22
**argumentative**
260:20
**arguments** 114:24
**arrangements**
350:10,13
**arrival** 60:22 61:21
62:12
**arthur** 337:24 338:3
338:12,13
**article** 11:13,19,22
13:10,11 14:4
**articles** 10:9,11,13
10:17,18 12:8,25
13:21,23 14:20,24
15:11 203:13 273:9
**articulated** 233:17
263:2
**asap** 193:23 281:10
**aside** 7:21 14:24
15:12 147:6 180:17
181:5 244:6 253:7
308:16 312:2 322:4
328:11 340:21
**asked** 72:17 102:6
116:16,22 179:23
192:3 205:19 208:3
248:6 311:19 312:8
313:8 317:6,9
320:19 346:9
353:22
**asking** 117:3,17,19
117:22 127:9 164:8
164:10 168:6,22
234:2,24 256:6
257:16 278:11
322:2 354:17
**asmall** 337:19
**aspect** 37:5
**aspects** 160:9
161:13,16,19

162:11
**assert** 96:15 336:24
337:9,12
**asserted** 65:12
**assertion** 97:20
252:12
**assessment** 42:22
44:2 47:14
**assist** 92:8 127:11
186:3 330:4
**assistance** 174:17
**assistant** 2:22 4:17
**assisted** 38:8 86:4
274:7
**assisting** 54:18
93:17,18 178:8
315:24
**associate** 29:5
**associated** 220:24
221:5 227:2
**associates** 12:19
20:22 21:5 25:6
87:11 217:3 351:25
**assume** 95:23 96:2
129:17,17 174:4
178:17,19 181:21
183:7 198:13
205:22 232:22
238:23 338:24
**assumed** 308:25
**assumes** 332:14
342:24
**assuming** 139:9
153:17
**assumption** 37:18
38:18
**asterisk** 237:8
**asterisks** 232:7
**attached** 133:6
233:22 281:3
**attaches** 211:20
**attachment** 93:9
100:23 122:18,22
123:20 124:3 217:5
220:3,8 337:22,25

338:2
**attacks** 140:12,17
**attempt** 134:11
175:4
**attempting** 290:14
**attend** 30:5 37:13,16
38:14,21,24 39:2
**attendance** 290:13
290:17
**attended** 162:16
216:9,14 217:24
218:5,21 235:24
306:15,16,17
**attention** 42:6,18
58:12 60:21 62:12
71:9 86:16 96:4
104:16 105:19
106:7 126:19
128:22 129:22
162:25 172:16,18
176:4,9 177:9
182:10 184:18
186:12,17 187:19
191:14 192:21
194:12 214:14
215:16 219:17
239:17 241:19
264:13 275:4
279:17 282:2 285:8
**attorney** 64:21,22
65:17 72:4 131:15
145:2 154:14
257:16 259:11
325:17 340:6 352:5
352:8
**attorneys** 2:4,12,16
3:24 7:22 73:5
76:13 105:7 161:22
161:23 187:25
190:15 234:18
235:10
**audio** 3:8
**august** 21:14,15
22:3 23:9,17 25:8
28:15 29:14,18

31:14 32:16 33:23
34:24 35:9 36:25
38:3 39:12 40:4,10
40:16 42:13 44:14
48:2 184:19 274:20
337:21 338:3
**author** 240:16
**auto** 29:17
**available** 78:24
333:17
**avenue** 1:18 2:3,15
3:16 86:9
**avoid** 134:24
**aw** 238:15,21
**aware** 8:21,25 9:5,9
26:17 33:12 36:3
37:12 43:15 50:22
51:2 74:6 83:21
145:4 182:25 196:4
196:8 229:22 291:7
299:9 300:13,15,16
305:9 307:23
308:14,24 311:7
326:13,15 330:17
331:3,5,6,10,16
333:10 342:21
345:20,24 346:5,12
346:18,21
**awareness** 30:7
144:20 154:17,25
356:10
**awesome** 138:13
**awoods** 85:12
263:13

**b**

**b** 105:5 343:14,14
343:19,19 358:6
359:2 360:2
**back** 80:18 82:10,16
82:19 84:15,16,20
87:3,3 130:18
132:14 144:15
145:5 160:18 161:5
174:15 176:17

[back - brodsky]

214:7,13 239:10
246:11 256:11
258:14,17 260:17
285:25 311:17
315:14 347:11
**background** 232:6
324:11
**bad** 224:14 227:15
341:10
**bar** 25:17
**base** 270:11,14
**based** 35:11 36:10
36:24 38:2 42:25
106:20 153:6
182:24 183:5
199:11,23 241:7
297:3,18 322:6
**basic** 24:8 213:2
**basically** 59:17 99:7
337:10
**basing** 139:25
324:20
**basis** 17:21 20:7
31:9 37:9 38:10
139:15 182:20
193:9 276:3 283:9
**bates** 6:19 57:23
93:10 94:10 100:18
106:4 172:14
175:19 211:15
240:10 338:5
**bb** 343:16,16
**bebe** 343:14,18
**becoming** 50:22
144:25 150:19
**bedroom** 20:4
**began** 143:13 145:9
154:21
**beginning** 80:20
161:7 239:12
315:16 349:17
**behalf** 4:8,11,19
76:20 77:3 84:25
118:17 131:21
213:23 266:12

292:9 295:8
**beliefs** 319:8
**believe** 6:16,21 8:6
14:19 21:14 26:4
27:14 28:16 35:2
36:14,21,23 37:7,13
37:22 40:19 42:12
43:24 46:4 54:9,23
55:3 61:6 62:18,19
66:6 68:13 69:16,23
69:24 70:7 71:5
74:9,11,13 76:3
78:8 81:20 82:22
88:3,7 89:6,17 90:9
94:2,21 97:24 101:7
101:21 103:23
110:25 111:3 112:4
118:9 124:7 125:23
130:19 131:15,18
143:3,14,21 145:22
147:21 148:24,25
155:13,16 157:17
157:25 159:11
161:18,21 162:21
175:6 176:19 177:8
179:6,22 180:13
182:22 184:25
185:11,12,17
196:14 205:8 208:6
208:15 218:9,11,11
218:17 219:5,8
225:11 229:25
233:8 234:13
235:12 236:8
243:18 247:4
262:25 267:11,13
270:10 271:8
272:12,14 274:4,6
274:16 290:17
291:14,14,18,19
292:18,21 298:9
299:2,18 303:16
305:23,23 318:11
318:12 320:19,23
323:16 324:2,8,10

324:18 326:12,14
326:18,25 327:9
328:23 329:12
332:21 333:15
334:6 339:14
340:11,11 345:6
347:8,25 348:3
350:14
**believing** 309:16
**beltman** 156:19
157:13 163:6
167:11 169:6,16
193:22 198:11
218:8 219:7
**beltman's** 219:13
**berlinger** 301:15
**best** 13:24 17:12
19:20 61:7 144:3
151:17 152:2,14,18
153:6 166:19 167:3
210:14 282:14
298:5,23
**beth** 2:6 4:10
**better** 5:20 42:2
160:14 245:7,25,25
321:7 351:19
**beyond** 37:21
**big** 119:24
**bill** 267:23
**bit** 135:4
**blackberries** 20:20
**block** 112:15,21
113:14,15 114:14
**blog** 10:24
**blogs** 10:21
**blood** 361:14
**bloomberg** 10:17
**bnarwold** 263:14
**boggs** 97:24 149:25
151:14,18 161:22
162:9,20 190:14
209:9,18 210:10,16
212:9,13,19 215:5
217:25 218:6
220:17 221:7

225:14,14,21
226:17 230:11
231:4 239:22 240:3
242:8 264:7 265:4
265:17,23 266:13
266:20 267:9
268:19,22 271:25
273:17 277:22
291:7,11 295:9
298:8 323:7 339:5,7
**bold** 254:18
**bonus** 346:22 347:2
347:7
**booking** 58:14
**border** 60:19 359:15
**bottom** 6:20 58:13
96:5,10 106:9 137:3
172:17,23,25
177:10 192:7
238:13 338:11
**brackets** 238:15
**brains** 140:20 141:5
**branch** 24:22 66:4
66:10 258:5,6
**break** 79:15,17
80:14 84:24 160:21
161:10 213:6
224:16 239:2 315:8
**breaks** 280:3,8
**brent** 2:23 3:11
**brickell** 218:10
263:9 267:21
351:22
**brief** 63:15 105:5
131:23 292:8
293:16
**briefs** 105:15
**bring** 82:10 87:3
90:6 135:16 205:12
205:17,25
**broad** 354:2
**brodsky** 2:5 4:6,7
5:8,21 28:7 41:11
41:21 42:4 57:21
60:11 79:14 84:22

[brodsky - celli]                                                      Page 7

| | | | |
|---|---|---|---|
| 85:2 95:18 101:6 | cabrera 42:19,20 | 236:22 237:7,11,20 | call 34:16,16 94:9 |
| 124:2 125:3,15 | 43:11,19 44:4,9,13 | 247:12 248:18 | 94:15,22,24 95:4,6 |
| 128:5,8 133:18 | 44:24 45:5,20,24 | 250:6 251:19,22 | 95:8,16,22 96:3 |
| 136:17 144:14 | 46:9,12,22,25 47:4 | 252:25 253:10 | 98:18 128:18 |
| 160:2,16,22 161:9 | 47:9,13,18 48:9,15 | 254:13,19 255:24 | 141:14 258:16 |
| 172:24 173:5,10 | 49:23,24 50:8,9,15 | 260:10 262:7 | called 5:5 129:8 |
| 179:9 188:10,22 | 50:24,25 51:19 52:7 | 264:14,16,20,24 | 312:7 |
| 189:19,25 192:19 | 52:15,24 53:10,11 | 265:5,18,21,24 | camacho 2:13 4:19 |
| 209:22 211:13 | 53:24 54:11,15 | 267:6 269:14 270:2 | camera 356:4,11 |
| 213:21 214:8 | 55:20 57:8,9 65:5 | 270:9,17 271:2,15 | cancel 174:22 |
| 215:15 216:20 | 65:23 66:17,20 | 271:21,22 272:2 | cancelled 174:14 |
| 220:7 224:17 | 71:19 76:11,23 77:3 | 275:9 276:11 277:6 | cannon 131:17 |
| 225:18 238:25 | 77:5,7,9,13 88:6,11 | 277:9,19,25 278:8,9 | 155:4,12 156:12 |
| 239:13 246:18,23 | 92:2 102:22 103:6 | 278:15,18 283:6 | 344:21 |
| 259:3 266:16 273:3 | 103:12,22 104:6,11 | 286:5,12,19,21 | cannon's 159:9 |
| 283:10,25 284:6 | 104:17,22 106:3 | 287:8 288:3,13,19 | caption 3:17 |
| 289:3,8,15 300:6 | 107:5,15,20 108:4 | 291:25 292:9 | capturing 232:23 |
| 315:17 318:5 | 108:16,22 109:5,12 | 293:21 294:11,21 | 234:14 236:8 |
| 325:14 356:16 | 109:13,18 110:9,12 | 294:22 296:8 298:7 | care 58:20 |
| 358:4 | 110:19,23 112:3 | 299:8,12 300:2,5,21 | careful 146:22 |
| brought 46:16,20 | 120:15 121:8,11,25 | 301:4 302:11 | carrying 127:11 |
| 78:12 82:15 148:14 | 123:4 127:11,22 | 303:18 304:19,24 | 187:3 |
| 148:18 249:11,25 | 129:25 130:16 | 305:2,4,22 306:3,11 | case 2:15 3:18,19,21 |
| 356:10 | 132:3 140:23 156:3 | 306:15 308:7,19 | 4:22,25 8:22 9:2,6 |
| brownstein 95:13 | 158:18 159:4 | 309:2,7,13,19,20 | 9:10 11:13,14 12:2 |
| 101:19 102:10 | 162:17 163:7,10 | 310:17 312:18 | 19:2 24:12 25:14 |
| 105:8 126:23 | 165:7,19,22 166:7,8 | 314:9 318:10,21,25 | 42:7,10 66:13 86:2 |
| 128:18 179:15,21 | 167:11,13 169:8,17 | 324:21 325:10 | 87:24 155:23 |
| 344:22 | 170:8 171:11,20,21 | 326:6,14,17 327:4 | 159:10 168:19 |
| brownsteincheckli... | 176:12 179:2 | 327:16,25 330:18 | 171:9 237:25 |
| 100:24 | 181:24 182:6,12,15 | 330:22,24 331:7 | 242:23 244:9,12,15 |
| bruce 321:22 336:14 | 183:10,12,19,21 | 335:13,16 337:2,7 | 244:23 245:18 |
| 336:22 | 184:5,19 185:5 | 342:12 343:7 345:4 | 249:10 305:24 |
| building 77:21 | 186:11 187:18 | cabrera's 44:25 | 315:21 324:11 |
| bulk 72:4 294:10 | 190:5,16 191:6 | 46:2 48:8 75:24 | 335:22 350:21 |
| bullet 102:19 104:3 | 193:7 198:18,24 | 109:6 110:11 | 356:10 362:3 |
| 104:15 124:15 | 199:2,7,9 200:15,25 | 140:11,16 163:9,16 | categories 329:15 |
| 125:9,20,23 126:3 | 201:2,14,15,23 | 164:16 173:23 | cause 66:8 258:3 |
| 129:23 | 202:3,11 203:3,20 | 184:24 187:9 | caused 344:22 |
| business 22:13 | 206:4 207:24 209:8 | 188:19 191:24 | cd 238:14,16 |
| 207:3 215:9 269:15 | 220:25 221:6,22 | 196:4,13 201:22 | cease 171:11 |
| | 222:4 223:5 224:10 | 252:12,18 317:23 | cell 3:6 21:3,4 28:10 |
| c | 224:23 225:23 | 324:15 325:22 | 28:12,13,16 |
| c 2:2,13 129:24 | 226:20 234:18 | cadena 194:14 | celli 97:22,23 98:2,7 |
| 337:24 338:3 | 235:11,22 236:16 | 196:22 | 98:9,12 149:25 |

161:23 190:15
211:6 218:12
291:18
**celli's** 277:23
**census** 334:6,10
**certain** 12:22 106:7
109:22 142:18,23
145:21 147:20
214:15 250:6
311:19 312:6 313:8
348:20 353:18
**certificate** 60:19
359:15
**certification** 361:2
**certified** 60:14
**certify** 361:6,12
**chain** 105:24 112:10
145:9
**challenge** 249:17
261:11
**challenges** 173:23
**chance** 101:2,13
131:7 175:21
240:20 263:21,25
283:25
**change** 137:11,17
239:3 315:8 362:5
**changed** 177:12
**changes** 198:7
**changing** 147:17,21
**characterization**
119:21
**characterize** 264:24
265:5,18,20 315:2
**charge** 30:18 35:10
35:15
**charged** 133:24
**chart** 340:13 349:21
**check** 137:9
**chemical** 334:4
**chevron** 1:5 2:24
3:18 4:8,11,14 11:5
14:10 42:6 63:11
68:10 71:12,15
84:25 96:25 98:21

104:5,10,17,22
106:2 112:20,21
115:6,15 116:20
117:14 120:10
129:25 130:15
133:7 143:9 154:8
154:23 158:15
173:22 181:11
204:21 213:23
227:9 244:21
245:17 254:24
255:6,21 271:22
275:21 276:8 277:7
304:13 314:13
362:3
**chevron's** 13:15
14:5,17 15:3 54:19
63:16 72:3 93:14,19
104:18,22 105:17
129:25 132:4
228:25 277:21
278:8 327:24
**chief** 187:15 191:4
**choosing** 185:13
**chopped** 18:21
**chosen** 269:14
**chris** 338:12,13
**circuit** 66:13 301:14
303:10 304:6
**circumstances**
353:18,20
**citation** 302:2
**civ** 1:4 3:21
**claims** 132:4
**clarification** 191:15
216:6 258:24 260:3
289:24
**clarify** 49:16 119:15
187:21 189:2 190:6
213:20 256:21
257:2,4 258:19
259:4,6 300:9 306:7
**clarifying** 80:23
293:20

**clause** 168:24
**cleaner** 173:6
**cleanest** 232:10,14
**cleanse** 233:3 236:3
236:4
**cleansing** 148:19
149:3 272:17 273:5
273:10,18 300:6
301:7,9 328:5,14
332:3 334:20 335:3
335:14 336:4,10
337:7 340:19,23
341:11 342:10
**clear** 85:24 192:8,22
255:19 293:22
300:17 335:10
**clearly** 113:2 127:22
**client** 64:22 65:17
145:2
**clients** 336:8
**clip** 314:20
**clips** 313:17
**close** 102:14
**closely** 19:9 28:3,14
252:24
**closest** 20:16
**coalition** 24:19
**code** 342:22
**collaborated** 30:19
**collaboration**
236:16 305:15
309:2
**colleague** 274:5
323:18 324:7 328:7
**collect** 88:13 91:25
**collecting** 88:5
103:5,10,13 104:21
130:10
**collection** 102:9
**colorado** 44:17 49:6
54:20 63:11 65:4,25
66:16 101:22
120:11 137:10
144:9 156:3 179:14
179:20 205:23

210:7 227:10
257:24,25 264:17
282:24 285:19
287:7 288:17
298:25 303:21
345:5,18
**column** 60:22
**come** 10:10 27:23
77:8 107:19,25
109:2,10,15,16
121:2,21,23 122:25
140:22 155:3
156:14 157:9
160:18 192:16
193:6 202:5 209:8
221:20 301:13
344:20
**comes** 10:12 263:3
**comfortable** 292:24
**coming** 136:24
175:22 177:7 189:6
217:20,23 321:3
339:21 351:9
**commission** 362:25
**committed** 66:9
257:25
**common** 77:23
**communicate** 20:21
92:17,20 199:9
**communicated** 8:4
9:18 32:8 103:21
184:3 305:22
328:17 340:15
**communicating**
58:6 121:24 198:19
**communication**
16:25 18:11 40:8,15
46:14 64:15,22
66:12,15 143:14
182:15 183:12,20
223:4
**communications**
40:2 65:17 92:8
111:24 112:2
181:11 199:5

[communications - conversation] Page 9

202:25 221:21
225:22 226:19
236:15 262:6 263:3
communities 231:21
company 86:13
362:2
compare 197:7
compared 133:8
comparing 107:8
complaint 14:9,12
complete 78:10,19
80:2 184:22 186:25
completed 341:22
342:3
completely 45:22
150:22 278:6
compliance 254:2
complicated 155:23
comply 254:7
compound 88:23
224:15 231:2 243:5
243:7 314:15,18,20
comprehensible
234:4
comprehensive
60:16
computer 11:12
23:8,11 26:23
computers 20:11
92:13
concern 67:25 68:15
69:13,18 70:2,13
71:21 116:5,24
117:8 118:4 119:18
119:19,20,20,22,24
120:7 133:14 134:4
134:7,19 135:5,20
158:3 202:15,17
207:22 208:18
224:5,19 247:17
249:7 253:23 297:8
304:2,16,17 313:16
313:22 319:18
321:18 341:20,24
344:23

concerned 68:4,20
70:20 170:17,17
225:8 260:12,24
261:16 304:9 307:9
307:11,12 345:5
concerning 304:11
concerns 68:7 115:5
115:14,20 116:18
116:23 117:4,12,18
117:19 118:14
119:8 156:16
157:11 158:5
170:22 171:2 202:7
203:15 206:25
207:4 209:5 225:6
230:17 237:19
247:9,11 345:10
349:21 350:2,6
352:18,20 353:7,9
353:14
conclude 66:7
conditions 350:9,12
conduct 73:6,15,20
317:13,17
conducted 22:12
conducting 242:21
243:2,24 355:23
conference 210:13
222:8 351:15,17
confident 258:23
299:17,18
confidential 131:5
confused 298:3
307:8,11
confusion 297:11,12
connect 216:16
connection 7:17
14:17 29:20 38:21
46:10 48:8 54:17
65:23,25 88:5
130:10 184:4 187:8
201:25 220:24
221:6 257:24
270:16 273:24
274:13 286:11

301:8 328:4 329:18
332:2 339:8 353:10
355:24
consequences 209:6
261:17,24,25
consider 23:16
146:2
consideration
264:23
considered 154:5
consistent 275:20
constantine 131:16
131:17 155:4,12
156:11 159:9
344:21
constituting 80:7
consulting 47:23,24
48:4,12 50:13 53:9
96:24 101:24
134:15 195:14
214:21 306:9
312:18
consulting's 48:7
52:22
contact 16:16,17
18:25 104:6,11,17
104:21 129:24
225:7 234:17
235:10 252:15
276:11 283:16,18
297:10 307:21,24
328:15 329:4
339:15
contacts 182:25
234:20 236:13,20
contained 106:19
107:2 110:10
180:16,19 234:16
236:14
containing 130:25
222:21
contains 127:21
217:4 303:17,20
337:22,25

content 118:13
148:6
context 100:5
139:25 141:10
152:11 153:7
222:12 248:3
continue 3:9 68:22
80:22
continued 161:8
356:18
continues 240:13
continuously 167:12
contract 41:11
352:5,8
contributed 52:9,18
conversation 32:23
33:8,10,18,22 34:4
34:8,9,19 67:10,12
68:9 69:15 72:9,18
72:25 95:10,12,25
96:21 118:10,25
119:8,9 143:17
144:18 155:25
157:16,19 158:12
159:2,8 161:25
162:4 165:15
168:18 169:11
202:14 203:5,14,25
204:10,16,18,25
205:5,13,19,25
206:24 207:10,16
207:20 208:21,25
209:4 221:10,13,17
230:14 245:14
246:25 247:5
248:17 251:22
253:9 260:21,22
261:7 262:4 266:13
292:12,17 301:18
302:17,21,24 307:4
319:20 322:2,19
326:12,19 327:11
329:11 347:9 348:5
350:9

| | | | |
|---|---|---|---|
| **conversations** 3:5 8:20 14:25 15:13 22:20 32:21,24 33:4 33:4 53:7,15 67:8 67:16,18,21,22 96:22 97:17 98:6 99:15,17 102:8 115:18 116:21 119:3,5 150:11 157:15 158:24 160:8 161:12,18,21 162:2,3,10 182:4 199:12,24 200:23 201:12 208:17 252:18 265:16,23 266:25 268:10,19 268:22 269:4 270:11 271:19 301:19 303:4 308:13 316:25 319:13 **convey** 294:5,9 **cook** 344:14 **cooperation** 159:4 163:6 165:19 170:14 **coordinated** 29:24 30:8 329:22 **coordination** 170:13 192:12 193:2 278:7 278:9 **copied** 78:12 112:10 122:16 131:3 193:21 279:12 **copies** 45:10 75:7,11 75:16,17,18,20 78:24 82:15 102:21 126:6,11 178:15 238:14,16,18 263:14 **copy** 46:3 78:6,25 79:5 89:3 99:21 197:13,15 336:17 336:18,19 | **corner** 6:20 197:18 197:19 **corporation** 1:5 2:25 3:18 4:8,11,14 **correct** 6:21 7:2 16:9 18:2 24:17 43:23 84:17 121:8 124:2 127:17 136:25 138:15 153:13,24 189:11 189:14 190:4,9 195:9 202:4 217:25 231:6,11 242:15 243:19 269:21 276:20,24 280:25 289:17 296:4 298:13 309:13 310:18 312:18 316:5,23 317:12 320:15 322:7 324:22 349:3 **correction** 192:18 **correctly** 70:11 153:18 **correspondence** 40:21,22 144:21,22 145:7 148:15 149:8 149:15,17 150:14 151:6 152:21 153:23 154:12 **counsel** 6:10 14:25 15:13 29:24,30 30:6 65:7,9,15 68:18 70:14,22 75:4 82:19 95:16,25 100:8 111:10 112:13 116:6 117:9,21,23 117:24 118:2,4,18 118:19,21 126:21 126:24 127:8 135:20 155:5 163:8 169:24 181:12,16 181:18,19 182:14 182:23,23,24 183:6 183:11,20 188:12 | 188:24 189:18 200:5,6 204:14 205:3 207:18 211:12 215:8 225:8 230:2,6,13 231:5,10 240:11 242:20 243:2,24 244:14 247:6 248:10 252:22,24 254:16 255:19 256:5 257:12 259:7 260:7 260:11,24 261:13 261:15 293:25 294:7 299:7 306:17 318:13,18 321:11 321:20 323:5,18 336:9,13,22 345:15 347:5,14 **count** 284:4 289:11 289:16 **counter** 132:4 **counting** 133:21 **country** 15:8 **couple** 337:11 **course** 213:8,13 283:20 **court** 1:2 3:20 4:3 7:3 10:17 30:15 54:6 55:17,22 56:19 57:10 59:22 61:14 63:2,10 65:24 66:3 66:16,21 71:18 73:10,23,24 74:25 75:25 76:4 77:4,6 77:14 78:6,14,21 80:23 81:9 82:2 84:3,19 89:7,18,18 102:23 107:16 121:22 125:25 126:8 127:8,9,25 133:11 168:14 176:12 178:15,16 178:20 179:14 180:17,20 181:6 182:2,13 183:11 | 185:22 186:9 187:16 191:5 236:19 248:19 249:18 250:7,14,15 251:2,19,23 252:4,4 252:13,19 253:2,11 257:25 259:12 269:7,25 270:2,8 271:3,16 272:3,10 275:9,17 276:4,15 276:16 277:5,9,18 277:22,24 278:14 278:18 282:24 285:18 286:6,18 287:7 288:8,16,18 294:12 295:17 297:22 299:22 300:18,23 301:11 301:14 311:8 312:23,25 318:19 334:11 336:21 337:4 344:3 **courthouse** 89:12 **courts** 83:9,19 84:17 296:5 **cover** 200:17 292:15 **covered** 13:20 **create** 167:18 **created** 89:13,16 240:15 333:18 340:12 **credibility** 71:17 **crews** 356:4,11 **crime** 66:5,9 97:12 99:13 113:7 127:20 137:23 139:15 155:25 156:2 157:24 163:21 165:14 166:12 184:11 201:6 223:17 235:18 246:7 255:13 256:11 257:21 262:16,19 289:14 292:13 |

[criminal - devices]                                                    Page 11

criminal 261:25
cristina 194:14
  196:22
criticism 354:12
  355:8,13,16
criticisms 330:18
  331:6,7,11,17
  354:23 355:12,20
criticize 355:23
crossing 60:19
  359:15
crude 7:8 301:16,20
  301:23 308:5
  315:19 319:17
crutcher 1:18 2:3
  4:9,12
culpa 269:20,23
  271:17 277:17
  287:19,19,23 288:7
current 214:17
cut 151:8,9

**d**

d 6:23 100:20
  136:21 175:19
  264:15 337:23
  338:2,17,21 358:2
daily 19:10 20:7
  27:6
daleo 267:24 279:12
damage 44:19,22
  238:3 272:15
  295:23 326:16
  337:6
damages 47:13
  222:5 237:23 238:6
  329:15
dash 232:8
data 334:6,10
date 3:12 12:21
  48:25 60:20,22
  121:22 122:7
  172:12 195:25
  196:15 206:17
  207:8 208:4 243:8

244:7 298:16
  305:16 323:25
  362:4
dated 100:21 105:25
  106:10 122:14
  123:23 131:2
  136:19 172:7
  175:16 178:25
  186:7 211:17
  282:23 285:4
  303:10 337:21
  338:2 349:9 358:22
  360:4
dates 75:10 207:4
  242:13
dave 6:6
david 2:18 4:21
day 12:10 22:9,11
  30:24,24 36:8,8
  49:24 50:9 127:17
  162:22 177:3
  198:18 211:9
  212:19 307:25
  308:4,4,5 349:12,15
  349:16 357:11
  361:17 362:23
days 11:25 21:19
  22:5 61:9 211:9
  274:15 323:25
  328:9
de 100:22 206:16
deal 207:4 245:6
  265:24
dealing 80:7 269:14
dealt 339:16
dear 126:20 240:11
  252:22 254:16
  293:24 294:6
debated 114:9
december 12:6,11
decide 185:3 223:16
  246:7
deciding 157:23
decision 36:16 159:9

decisions 14:16,22
declaration 63:22
  281:5,10,13,20,22
  282:22 284:19
  287:4,6 288:10
  290:8 358:13
deemed 248:9
  251:16 252:16
deems 270:3
defendants 1:10
  2:12
defense 24:19
deferral 19:2 24:24
deferred 24:12
  25:13
definitely 249:22
del 197:6
delay 78:10 83:18
  229:5 310:25 311:3
delayed 311:11
delays 82:25 83:6,7
deliberate 83:18
delivered 47:21
  186:10 187:17
delivering 83:9
  329:25
delivery 49:23
delta 58:22
denver 93:9 94:9
  95:13,16 99:25
  100:8,13,15 105:16
  131:5 143:10
  214:18 230:19
  266:2 281:6
departs 133:17
  213:16 257:6
  283:23
departure 60:23
  61:22 62:13
depending 137:21
  139:13 157:2
  163:20
depends 12:2
deposing 255:2,8

deposition 1:15 3:8
  3:15 6:3 7:5,10,12
  24:9 65:3,14 79:23
  101:9 217:21 362:4
depositions 63:12
describe 15:18 16:5
  16:11,20 18:3,13
  19:5,20 29:19 39:25
  40:7,14 46:11,21
  48:6 246:19 291:22
  299:5 326:3
described 25:20
  26:7 79:4 81:6
  96:19 207:10
  268:23
describes 99:24
describing 97:15
  99:16 100:9 149:6
  276:10 293:17
  320:14
description 234:16
  236:15 288:2 293:4
  358:7 359:3 360:3
desimone 1:19 4:4
  361:4,20
desire 229:25 230:5
  230:12 231:5,15
  234:14
desk 81:20 90:11
desks 90:24 92:14
desktop 26:19
despite 249:19
detail 52:4 53:16,21
  288:11
detailed 197:11
details 249:9
determine 171:13
determined 127:6
developed 343:3
  344:17
developments 10:3
  10:8,21 15:2,7,14
device 21:2
devices 20:20,22,23
  20:25 21:7

| | | | |
|---|---|---|---|
| devoted 81:8 | directions 360:6 | 225:4 226:10 227:8 | 327:8,19 341:25 |
| dhille 2:18 | directly 29:6 40:23 | 229:12,14 232:22 | 347:19 350:20 |
| difference 146:4 | 107:9 116:4 117:7 | 249:14 251:3 | disk 80:20 161:7 |
| 255:16 | 165:24 166:7 | 267:11 288:9 | 239:12 315:16 |
| different 59:21 65:8 | 167:11 186:9 230:6 | 290:18 340:9 | display 27:2 |
| 101:11 132:16 | 231:6,20 306:11 | discusses 214:17 | distinct 32:22 |
| 154:21 231:22 | 350:6 | discussing 14:21 | distinction 248:3 |
| 238:2,5 254:6 267:5 | disagree 258:12 | 18:25 44:12 97:25 | distinctions 108:14 |
| 277:15 307:11 | disagreeing 350:15 | 116:10 160:8,12 | 108:20 |
| 333:24 334:2 346:8 | disclose 96:23 | 161:12,15 162:15 | distribute 45:9 |
| difficult 118:11 | 223:19 233:3,13 | 162:16 204:10 | distributed 223:4 |
| 354:4,6 | 234:12 | 222:7 228:20 247:5 | district 1:2,3 3:20 |
| digital 88:20 | disclosed 115:5,15 | 247:8,11 291:2,3 | 3:21 13:17 49:6 |
| diligence 242:21 | 116:20 117:13 | 324:10 | 54:20 63:10,10 |
| 243:3,25 | 237:5 259:15 | discussion 43:14 | 120:10 179:13,19 |
| dining 19:18,23,24 | disclosing 118:5 | 44:20 53:4 84:6 | 227:10 282:23 |
| dint 79:24 | 227:8 286:20 | 96:13 98:19 115:2,3 | 285:18 287:6 |
| dire 323:2 | disclosure 116:6 | 115:4,13 116:18 | 288:16 296:5 |
| direct 30:21 42:5,18 | 202:8 223:11 224:4 | 117:11 149:13 | 345:17 |
| 58:12 71:9 105:19 | 224:7,21 227:3,5 | 215:3 220:15 | document 23:12 |
| 108:10 126:18 | 236:12,19 247:13 | 221:19 222:2 225:5 | 46:7 50:7 57:11,15 |
| 128:21 129:22 | 251:24 288:15,16 | 228:24 229:5 | 57:19 58:2 60:14,16 |
| 154:2 172:16 180:8 | 295:25 | 230:12,17 231:3 | 63:9,19,22 85:9,14 |
| 184:18 185:7 | disclosures 203:17 | 234:19 235:9,14,20 | 86:18 94:7,11,13 |
| 186:12,16 187:19 | 207:22 208:18 | 237:2,18,21 245:15 | 99:23 100:18 101:8 |
| 214:14 219:17 | 230:18 245:16 | 246:19 250:13 | 101:17 102:2,2 |
| 275:3 277:11 | 260:12,25 261:16 | 251:14,17 255:5,20 | 103:2,24 105:23 |
| 279:16 282:2 | 277:7 342:11 | 258:24 260:2,6,23 | 106:5 107:14 |
| directed 30:25 31:7 | discover 309:6 | 261:14,22 265:3 | 108:10 121:20 |
| 39:18,22 69:16 76:9 | discoverable 84:8 | 266:23 268:15 | 122:23,24 123:19 |
| 127:23 129:10 | 84:10 144:23 | 286:9 290:3 295:15 | 124:6,14,18,22 |
| 180:10 200:13 | 259:15,18 | 305:14 307:20 | 127:19,21 128:6,9 |
| 216:13 | discovered 260:8 | 332:23 | 128:15,23 130:25 |
| directing 60:21 | discovery 71:13 | discussions 36:7 | 131:11 132:15,22 |
| 62:11 86:16 96:4 | 254:25 255:7,17,23 | 46:23,24 53:17,18 | 159:18,20,23 160:3 |
| 104:16 106:6 | 256:7 257:12,13 | 84:13 97:6,21 98:3 | 170:13 172:4 173:4 |
| 172:17 176:4,9 | 306:21 | 98:5,10 99:3 104:9 | 173:12 176:3,7 |
| 177:9 182:9 191:14 | discrete 16:24 17:7 | 113:20,25 114:4,19 | 177:19,20 178:24 |
| 192:21 194:12 | 27:19 | 115:23 116:3 | 179:11 180:14,16 |
| 215:16 239:17 | discuss 18:20 31:5 | 143:12 228:22 | 181:3 186:7,15 |
| 241:19 264:13 | 225:14 244:13 | 234:14 252:11,13 | 187:6,7,14 188:5,18 |
| 285:7 | 246:14,19 327:24 | 255:15 266:8,10,15 | 188:21 189:6 191:2 |
| direction 345:21,25 | discussed 111:21 | 266:20 267:2,4,10 | 191:7,10,24 193:17 |
| 346:2 | 158:3 208:22 209:2 | 271:20 282:15 | 194:10 195:17,21 |
| | 220:20 221:7 222:9 | 290:4 295:20,24 | 198:23 206:21 |

| | | | |
|---|---|---|---|
| 211:15,25 213:4,12 | 173:18 175:25 | **donz00045506** | 87:18 88:2 89:10 |
| 213:17,24 215:9 | 176:11,20,23 177:6 | 358:19 | 90:3,6,10,23 91:3 |
| 216:12,15,24 220:8 | 178:11,18 182:16 | **donz00054540** | 93:8 94:17 95:11,21 |
| 220:23 233:18,22 | 185:22 186:3 | 93:11 | 97:22 102:3,8 105:7 |
| 234:3 240:13,14,18 | 197:21 214:24 | **donz00054540-00...** | 105:11,14,25 |
| 240:23 241:8,10 | 215:4 217:18 | 359:3 | 106:10 111:4,5 |
| 242:17 247:12 | 219:22 220:16 | **donz00054640** | 112:10 118:16,17 |
| 263:24 267:19 | 222:3,13,22 223:3 | 359:6 | 120:11,13 121:3,4 |
| 268:5,12 279:19,22 | 223:12 224:4 | **donz00054731** | 122:16,25 123:23 |
| 280:11,15,18 | 225:15,21 226:9,12 | 358:22 | 128:17 130:5 |
| 282:11 283:3,5,7,9 | 226:15,18 227:6,9 | **donz00054732** | 142:15,22 143:15 |
| 283:10,14,22 284:3 | 235:21 252:14 | 358:23 | 143:16 144:2 |
| 284:13,23 285:3 | 259:11 260:9 | **donz00054812** | 145:19 147:5,6,12 |
| 287:12,16,22,22 | 264:16 275:22 | 359:7 | 147:15,18 155:11 |
| 288:7 293:7,12 | 288:2,12 289:13 | **donz00055225** | 155:17 156:7,17 |
| 297:23 313:11 | 292:8 293:19 311:6 | 358:16 | 157:12 159:2,8 |
| 317:18 337:18 | 311:8 312:24 | **donz31150**   211:16 | 162:5,6 163:14 |
| 338:9,10 349:8 | 318:20 329:5 330:2 | **donz39373**   285:6 | 164:8,14 165:10,13 |
| 358:8,9,11 359:22 | 330:5,6,12 332:25 | **donz54640**   106:4 | 166:3,15 167:8,21 |
| **documentary**  7:8 | 333:6,7,9,14,22 | **donz54731**   122:19 | 169:5,13 171:17 |
| **documentation** | 340:13 352:11 | **donz54812**   128:19 | 180:2,4,12 181:14 |
| 55:18 271:23 274:8 | **doing**   16:24 35:6 | **donziger**   1:9 3:19 | 182:5,22 183:7,8,14 |
| 275:24 324:18 | 43:16,18 60:9 64:14 | 7:25 12:19 13:16 | 183:17 184:3 189:7 |
| 328:17 | 74:21 94:3 132:8 | 14:5,10,18 15:3,19 | 190:14 193:21 |
| **documents**  6:8,12 | 177:13 197:11 | 16:9,12,14,21 17:7 | 194:23 195:3 |
| 6:13,15,18,19,22 | 244:3 311:5 315:21 | 17:12,19,24 18:4 | 196:24 198:9,19,22 |
| 41:17 43:2 44:20 | 322:14 324:4 | 19:5,8,22 20:8,21 | 199:4,12,24 201:10 |
| 46:24 47:10,12,18 | 329:14 335:12,13 | 21:5,25 22:12,20,23 | 203:13,15,24 204:6 |
| 51:7 53:19,22 55:19 | 340:20,24 341:12 | 23:16 24:16 25:2,5 | 205:6 206:14 |
| 57:8,20 63:13 75:10 | **donz**   193:18 240:10 | 25:24 26:19 27:12 | 210:19 211:17 |
| 76:4 77:2,7 78:11 | 358:18 359:18 | 28:8,12 29:3,4,13 | 217:3 218:18 |
| 81:19,23 82:2,5,10 | **donz00031150** | 29:22 31:12,23 32:8 | 224:20 240:16 |
| 82:13 83:2,7,12,24 | 359:16 | 32:14,17 33:6,15,18 | 241:14 242:7,25 |
| 84:8,15,16,20 85:13 | **donz00031151** | 33:25 34:9,13,23 | 244:14 245:12 |
| 88:13 90:24 91:4,10 | 359:17 | 35:4,9 36:11,15 | 247:7 252:21 |
| 91:18,21,23 92:12 | **donz00037626** | 37:2 38:2,12,20 | 254:12 262:4 |
| 96:16,24 98:21 99:4 | 359:10 | 39:3,9 40:25 43:10 | 263:10 267:23 |
| 99:7,9 102:21 103:5 | **donz00039373** | 44:3,8,12 46:9,11 | 271:9,10,11 279:14 |
| 103:10,13,18,20,21 | 358:14 | 46:21 47:7,16,22 | 285:5 292:16,19,22 |
| 104:3 113:21 114:2 | **donz00039377** | 48:6,11,16,23 49:22 | 293:5,8,11 294:2,5 |
| 124:9,13 125:19,24 | 359:20 | 50:3,5,12,21 54:10 | 294:9,20 295:4,10 |
| 126:3,6 127:5 | **donz00040882** | 54:18 55:12 59:2,8 | 296:6 298:6 301:19 |
| 133:10 136:23 | 359:9 | 65:6,9 67:13,18 | 302:2,8 304:25 |
| 154:18 162:17 | **donz00045505** | 70:3,24 73:2,14 | 306:16,22 308:6,7 |
| 172:7,20 173:15,16 | 358:19 | 74:2,7 80:4 86:21 | 308:18,19 309:3,12 |

309:16 310:12,18
310:22 311:18,20
312:5,8 313:7,14
315:20,24 316:12
316:13,18,22
317:11 319:24
320:8,21 321:14
322:7,13 323:7
329:6,9 332:4 336:6
336:9,13,22 342:19
342:22 343:6,12,21
344:2,9 345:22
346:22 348:12,17
348:21 349:10,19
351:25 352:15,19
353:7 354:12,22
355:7 356:6 362:3
**donziger's**  10:4
11:16 12:4 21:17
29:19 31:10 37:2
69:22 79:25 200:16
305:25 312:2 316:9
317:21 346:2 349:2
349:13 350:5 351:9
351:13 353:6
**donzigerandassoci...**
85:12 263:13
279:10,11
**doubt**  257:8
**doug**  193:22 195:19
198:11 218:8 219:7
338:18
**downstairs**  90:14
**draft**  30:14 35:24,25
105:4 106:11
200:25 201:14,21
241:12 279:14
281:4 285:5,16
341:18
**drafted**  48:13
110:18 123:4 124:7
125:9,17 165:3
198:24 235:21
294:22 299:11
331:15 335:15

341:17
**drafting**  64:9 93:16
93:19,21 105:15
124:6 125:5 129:7
169:7 241:15
284:20,23 300:17
301:10 306:10
314:22 334:16,18
335:14
**drafts**  282:16
300:22
**drawers**  81:21
90:25
**due**  242:21 243:3,24
**duly**  5:6 361:8
**dunkelberger**
148:25 274:4,13
320:15,18 321:5
322:15 323:17,23
324:3,7,14,20 325:7
325:9,21 326:2,5,24
327:3,15,25 328:6,8
328:11,12 329:2
330:3 331:22
332:12,19 333:2,6
337:24 338:4,22
340:21
**dunkelberger's**
328:24
**dunn**  1:17 2:3 3:16
4:9,12 6:14 84:24
99:24 213:22
**dunn's**  100:9
**duplicate**  78:5,14
**duties**  248:18 250:6
250:9 251:2 252:3
252:25 253:11
**duty**  171:8 250:14
**dvd**  87:4
**dvds**  88:19

**e**

**e**  2:2,2,7 28:18,18,21
29:3,11,14 40:21,22
58:13 85:10 93:13

105:24 112:8,9
122:14,21 128:25
129:5 130:25
131:13 136:19
137:4,15,18 138:11
140:11,12,15 142:2
142:6,12,18 143:13
144:21,24 145:7,11
145:24 146:2,10,17
146:23,25 147:3
148:15 149:4,8,16
150:14,19 151:4,5,7
151:9 152:21 153:3
153:23 161:2,2
172:5,9,17,18
173:15,17 175:16
176:10 177:2,10
193:18 194:2,3,13
194:17,24 196:21
196:23 200:16,17
206:11,13,13 207:7
207:8 208:6,8,14
211:16 212:5
215:11,12,17 216:2
216:25 218:23
220:9,10 224:20
259:11 262:24
263:8 264:22 268:7
268:24 269:2,4
273:9 275:4 277:4
279:4,6,17 280:21
280:25 282:3 285:8
286:3 287:16 290:5
303:8,12 319:16,21
320:5 337:18
338:12 339:2
343:14,14,19,19
349:19 358:2,6,21
359:2 360:2
**earlier**  138:25
139:22 173:17
207:10 248:6
272:16 291:2,4
293:24 298:12
332:22 345:2

**earliest**  44:11 48:22
119:7 137:4 184:17
**early**  16:8,13,20
17:8,19 18:5 44:7
127:8 298:19
**easier**  173:6
**ec**  174:6
**ecbalaw.com**  267:20
279:12
**ecuador**  10:4 13:12
15:23,24 29:21
30:23 31:25 32:10
34:25 35:4 37:4
40:4,9,18 42:11,23
45:5 51:12 54:17
56:11 57:3 58:7
59:3,10 60:18 61:4
61:25 62:5,7,16,17
71:13,18 72:5,6
73:6,15,20 74:8,13
74:21 83:25 84:10
86:20 87:10,17
88:21 89:8 90:2
91:10,21 94:16
102:4 108:3 111:13
121:7 124:5 130:5
143:20 172:8,13
185:21 187:9 188:5
198:10,14 202:15
202:20 204:3,4
207:11 220:25
233:3,13 234:12,15
239:16,23 240:4
242:7,16,19,21,24
243:3,9,20,22,25
244:4,7,16,20
245:11,14,18
247:20 253:9
254:14,20 255:6
260:22 262:4
270:15 271:21,24
272:9 274:2 276:16
295:16 298:18
309:5,17 312:16
316:5 320:14 321:9

322:14 323:23
325:12 330:5
340:20,25 341:13
347:19
**ecuadorian** 8:15
24:21 31:12 36:18
55:18 56:7 68:13,18
68:18 70:10,11,14
70:15,19,22,23 71:7
73:9 75:14,25 76:10
76:12,13,21 84:7
89:18 96:14 97:7
102:23 114:5 116:3
116:5 117:9,21,22
117:23 118:2,4,18
118:19,20 120:4
123:3 126:8 158:17
166:4 167:18
168:11,12 174:18
174:22 181:16,17
181:19,25 182:23
184:23 200:5
202:17,18 203:6
204:12,14,18 205:3
223:22 225:7,8
230:3,5,13 231:5,10
231:17 236:19,21
247:6,11,17,18,25
248:10,11 249:25
251:15 253:24
255:19 256:5
257:11 259:7,12
260:6,11,23 261:13
267:7 269:7,25
270:8 271:3,16
272:3 273:20 275:8
276:4 277:5,18,21
277:24 278:14
288:8,18 295:19
297:13 301:11
323:18 334:10
346:23 347:5,13
**edaleo** 263:9
**edit** 23:12 289:18

**edited** 295:5
**editing** 129:16
284:20,23
**editor** 287:15
**edits** 285:9 288:25
289:5 290:2,5,6
**edward** 263:16
279:8 280:21
**effect** 125:18 164:2
164:18 169:20
203:10,12 356:8
**effort** 71:6 258:8
**either** 9:18 11:5
32:25 37:14 38:17
55:25 111:9 126:15
175:7
**elaborate** 292:19
**elaborated** 293:12
**elaborating** 293:5,6
**elaboration** 293:9
**electronically** 80:3
**elements** 171:9
**emery** 97:22,23 98:2
98:7,9,12 149:25
161:23 190:15
211:5 218:12
277:22 291:18
**emotional** 354:5
**emphasize** 286:5,12
**employ** 12:19
**employed** 192:10,24
**employee** 25:5 26:3
**employment** 10:5
11:16 12:5 21:4
349:2,14 350:6
352:18 353:6
354:10
**encourage** 141:17
**encouraging** 141:21
**ended** 84:19
**enforcement** 232:11
**engineer** 191:6
**englert** 122:15
123:21 124:17
126:22

**english** 46:3 92:18
92:21 200:14
206:12 290:19
**enjoy** 350:21
**ensure** 236:10
**ensuring** 186:25
**entire** 25:21 33:3,7
33:17,21 34:8,9,19
59:18 109:21 123:4
178:9
**entirely** 38:16,19
69:24 85:24 320:22
**entitled** 96:9 114:2
354:17 358:8,9,11
359:22
**entries** 78:21
**entry** 239:16
**enumerated** 330:14
**equipment** 20:13
**eric** 215:17,19 218:9
263:15 267:12,21
267:24,25 279:7,12
351:11 352:3
**erica** 123:21
**errata** 362:2
**esq** 2:5,6,7,8,13,17
2:18,21,22,24
**estimate** 17:18
**estimates** 171:11,21
**et** 1:9 3:19
**ethical** 167:18,20
168:16,20 169:3
**evaluation** 187:3
**event** 312:14
**events** 345:12
**everybody** 45:10
140:20 141:4
**evidentiary** 74:11
102:14 223:24
**ex** 182:15 183:12,19
202:24 221:21
307:21,23
**exact** 12:21 48:25
62:3 78:5,14 86:4
113:23 253:6,7

272:13 277:12
349:15,16
**exactly** 12:18 27:7
37:17 38:8 44:15
49:3,13 51:25 82:8
89:3 110:20 131:23
145:14 150:2
162:13 170:3
186:17 207:16
228:5 292:7 307:25
308:16 330:13
**examen** 197:7
**examination** 5:8
161:8 358:3
**examined** 5:6
127:25
**example** 41:16
83:10 90:12 317:21
355:6,17
**exceeded** 249:11
**exception** 66:5
113:7 127:20
137:23 139:15
163:22 165:14
197:14,17 200:7
255:13 292:14
**exchange** 137:15
172:5,9 177:2 194:2
194:3 196:21 200:6
212:5 303:9,13
339:2
**exchanges** 275:4
**exchanging** 58:5
**excuse** 12:15 41:10
51:11 57:18 59:16
68:21 89:11 95:9
101:3 109:24
133:15 145:8
166:17 213:5
256:17 292:12
295:3 307:10
313:20 335:25
**excused** 256:23,25
257:4

[exhaust - farber]

exhaust 275:6
exhibit 45:7,8,9,11
  45:13,16,18 46:2
  52:15 57:12,15
  59:13,14 60:5,6
  63:7 85:5,6 92:11
  93:3,4 94:4,5 99:18
  101:4,4 105:21
  112:8 122:9,11
  128:13 129:11
  130:22 132:18
  136:15,18 159:16
  161:11 172:2 173:8
  175:13 176:24
  178:22 184:17
  186:4,5 187:11,13
  188:13,15,21
  189:17 190:23,24
  191:2,10,11,25
  193:6,14,15 194:20
  196:10,25 197:3
  206:8,10 211:14,23
  216:22 217:13,14
  220:3 240:6,7
  241:25 243:12
  262:20,22 267:16
  274:22 277:3,16
  279:2 282:25
  284:19,25 285:25
  287:5 294:2 303:6
  336:19 337:14,17
  338:7 349:5,7 358:8
  358:9,11,12,13,13
  358:14,15,16,17,18
  358:19,19,20,21,22
  358:23,24 359:3,4,5
  359:6,7,9,9,10,10,11
  359:12,13,13,14,15
  359:16,16,18,19,20
  359:21,22 360:4
exhibits 133:6 181:6
  181:10 184:15
  185:13,19 276:14
  276:19

expectation 165:23
experience 82:25
  83:6
expert 42:22 43:22
  44:2 53:25 54:4,6
  71:18 76:2 77:10
  107:21 163:10
  171:12,22 187:3
  195:14 252:4 269:6
  272:11 273:4,24
  323:19 328:14
  329:14 330:7
experts 52:9,17 97:9
  104:18,23 120:22
  129:25 139:3 140:4
  148:14,18,19
  149:10 150:15
  152:22 153:4,24
  154:10,22 175:5
  192:11,25 193:8,13
  228:6 266:11 267:3
  274:7,9 295:19
  325:2 328:4 329:13
  329:19,20,23
  333:20 334:3,20
  335:3,14,21 336:4
  338:25 339:18
  340:17,19,24
  341:12,17,18
expires 362:25
explain 70:15
  322:13 336:2
explained 259:16
explaining 255:17
  307:20
explanation 311:10
  311:24 316:18
  318:3,8,23
explanations 312:3
  316:14 317:11,21
explanatory 112:12
expose 260:13
exposure 260:25
express 231:15
  254:4 342:7

expressed 67:25
  69:13 115:20
  116:22 117:4,8
  118:6,14 119:9
  158:5 202:15,17
  207:21 208:18
  247:17
expresses 315:20
expressing 68:15
  69:25 70:13 117:18
  158:14 253:23
  319:23 350:6
extensive 182:14
  183:11 221:21
extensively 293:17
extent 165:9 293:6
  293:12
externed 24:23
externship 16:24
  17:15 18:6 44:8
extra 284:2

## f

f 161:2
fa 100:22
face 95:19
fact 26:7 53:8 71:7
  154:17 199:11,23
  250:5,8 304:10
  305:14 308:17,18
  314:23 327:15
  331:10 347:19
  356:3
facts 105:6 201:24
  264:15 276:23
  287:20 332:15
  342:25
failure 233:24
fair 30:17 31:22
  32:7 35:8 66:15
  80:10,11 135:11
  146:24 152:17
  164:23 197:12
  199:13,25 200:21
  201:10 248:16

266:16 309:9
  311:15
faith 134:8
fajardo 8:21 9:13
  32:18,25 33:7 40:15
  40:19,23 56:13
  75:15 77:25 79:12
  91:13,17,22 92:15
  92:18 111:16,23,25
  118:22 129:21
  162:15 176:18,21
  181:21 202:6,16,24
  203:5,7 205:7
  206:16 209:10
  210:20,25 212:11
  212:22 214:4
  218:20 230:13,15
  231:11,14 247:10
  247:16 253:22
  281:4,14,16 282:22
  284:19 285:17
  287:3 290:7,11,21
  291:6,20,22 292:4
  292:13,20,23 293:3
  293:15 294:24
  301:10 305:21
  314:8 324:9 332:6
  332:13,20,24
  343:13,23 358:14
fajardo's 77:20
  282:17 293:23
  295:5
fall 17:24 18:8 19:3
  21:10,13
falling 283:16
falls 66:11
false 127:21
familiar 29:2 47:24
  48:3 56:24 63:21
  228:3,4 342:18
family 7:22
far 138:18 235:17
  288:10
farber 101:20

**fashion** 125:22
**fashioned** 209:16
**favor** 135:8
**february** 64:4
**federal** 296:5
**feel** 116:14 279:19
   308:19 309:15
   310:5,9 313:14
**feeling** 321:13
**fellow** 240:11
   252:22 254:16
   293:24 294:7
**felt** 163:5 308:23
   310:11,21 311:18
   313:7 316:15,23,25
   317:4 320:4,7 332:3
**field** 43:3,9,17,18
**fields** 329:13
**file** 63:15 159:7
   161:17 162:12
   178:15,16,20 337:4
**filed** 3:19 13:17
   14:10 30:25 31:5,6
   43:2 45:25 49:5,9
   49:10,25 50:8,9
   52:6,14,23 54:20
   64:6 67:24 68:10,11
   68:15 69:19 105:16
   109:13 119:11
   120:10 143:9 158:2
   181:10 196:5,17,18
   198:18 266:2
   271:24 275:21
   281:6 282:23
   285:18 298:24
   333:25,25 334:2
**files** 76:16 81:10,14
   91:9 101:23
**filing** 44:16 49:2,5
   64:17 67:5,13,25
   68:5 70:8 89:8
   121:11 205:23
   210:7 261:12
   272:13 298:15

**filings** 7:4 51:9
   121:8 175:6 180:17
   180:20 181:6
   184:23 185:6 208:8
   264:17 270:15,21
   271:20,21 276:5,7,9
**film** 314:2
**filmmaker** 301:15
**final** 45:3,4
**financial** 41:2
**find** 55:17 73:23
   75:6,9 98:20 132:8
   170:3 200:6 289:19
   295:16 297:8
   312:23 318:13
**finding** 96:6 104:9
   223:20,21
**findings** 195:21
**fine** 79:17 128:9
   136:3 201:7 216:19
   239:5 257:5
**finish** 129:2,4
   159:25 180:21
   240:25 313:21
**finished** 18:6 128:21
   206:20 241:3
   280:12 302:19
**finishing** 131:9
**firm** 36:17 37:20
   95:13 97:23,24
   99:25 100:13,15
   101:22 102:11
   179:15,21 185:5,6
   213:19 344:22,22
   345:7,11
**firms** 36:12,13
   37:14,24 38:17
   291:16
**first** 5:5 12:21 15:21
   15:21 16:2 24:9,20
   45:17 46:9,14,16,20
   54:22 56:11 60:10
   61:18 62:7 63:4
   66:4 71:11 79:23
   96:11 97:4 106:8

108:19 114:22
   127:3,19 128:24
   129:5,10 142:10,14
   145:16 168:8
   169:15 176:16
   197:7 198:6 207:3
   210:15 212:4 215:8
   215:17 223:15
   231:24 232:3,4
   233:19 234:5 240:9
   241:2,3,7,11,24
   242:2,18 252:23
   254:15,16 258:5,5
   266:21 268:8 279:6
   279:17 282:3
   298:17 299:21
   307:3 316:17 318:3
   318:6,8,8,14,23
   319:4 330:20,22
   331:5 333:16 346:9
**five** 21:19 105:23
   280:2 315:16
**fix** 231:2
**fixed** 227:15
**flight** 58:22
**flying** 124:25
**focusing** 162:25
   279:5
**folks** 87:4
**follow** 197:23
   297:19
**followed** 10:2,7,20
   13:15 15:6
**following** 85:4
   172:19 173:16
   306:21 337:2
**follows** 5:7 268:11
**footage** 275:25
   303:16 304:7,12
   307:3 313:16 314:2
   314:6,7 356:3
**footnotes** 106:12
   108:12
**fordham** 321:23

**foreign** 257:16
**forget** 138:25
   139:21 352:9
**forgetting** 92:6
   261:9 274:3
**form** 32:3 49:16
   50:17 51:20,22
   53:13 102:18,23
   110:14 112:25
   120:17 122:4 123:8
   125:13 148:21
   201:4,7 221:24
   222:16,23 224:12
   224:13 225:17
   226:2,3 227:13,15
   230:22 232:17
   242:10 243:5 245:3
   245:4,6,22,24 249:2
   250:17 252:6
   255:25 256:3
   261:20 272:21
   273:6 277:15 278:3
   314:15,17 316:20
   340:2 341:8 348:22
**formal** 182:12 183:9
   183:18 202:20
   247:20
**formalistic** 202:18
   204:17 247:18,25
   248:12 249:8,15,18
   250:11,12,16 251:4
   253:21,23
**forth** 145:5 323:8
   361:8
**forward** 69:11 87:9
   174:17 175:18
   264:24 265:6,19
   349:21
**forwarded** 29:6
   339:3
**forwarding** 303:23
**found** 125:24
   257:23 258:3
   289:21

| | | | |
|---|---|---|---|
| **foundation** 113:18 | 276:10 287:25 | 48:1 49:1 50:1 51:1 | 177:4 178:1,25 |
| 125:11 153:15 | 288:5,15 | 52:1 53:1 54:1 55:1 | 179:1 180:1 181:1 |
| 199:16 265:8 343:4 | **fully** 45:21 78:10 | 56:1 57:1,25 58:1 | 182:1 183:1 184:1 |
| **four** 63:8,9 100:18 | 111:21 113:8 | 59:1,17 60:1,13 | 185:1 186:1 187:1 |
| 128:15 140:11,16 | 144:11 155:21 | 61:1 62:1 63:1 64:1 | 188:1 189:1 190:1,3 |
| 239:12 240:9 280:6 | 226:8 233:2,12 | 65:1 66:1 67:1 68:1 | 191:1 192:1 193:1 |
| **fourth** 232:8 | 234:12 237:3,4,5 | 69:1 70:1 71:1 72:1 | 193:25 194:1 195:1 |
| **framework** 119:23 | 286:19 292:24 | 73:1 74:1 75:1 76:1 | 196:1 197:1 198:1 |
| **francis** 139:13 263:4 | 293:22 324:17 | 77:1 78:1 79:1 80:1 | 199:1 200:1 201:1 |
| **fraud** 65:21,23,24 | **functionally** 163:8 | 81:1,4 82:1 83:1 | 202:1 203:1 204:1 |
| 66:5,8,14,20,20 | 163:16 164:16 | 84:1 85:1,3 86:1 | 205:1 206:1 207:1 |
| 97:12,14,18 99:13 | 169:7,16 170:7 | 87:1 88:1 89:1 90:1 | 208:1 209:1 210:1 |
| 99:15 113:7 127:20 | 206:3 327:4 | 91:1 92:1 93:1,6 | 211:1,18 212:1 |
| 127:23 137:23 | **funding** 155:22 | 94:1,8 95:1 96:1 | 213:1 214:1 215:1 |
| 139:15 144:8 | **fundraising** 37:8,11 | 97:1 98:1 99:1 | 216:1 217:1,2,7 |
| 155:25 156:2,9 | 37:15,23 | 100:1,21 101:1 | 218:1 219:1 220:1 |
| 157:4,24 163:21 | **funds** 37:3,24 38:2 | 102:1 103:1 104:1 | 221:1 222:1 223:1 |
| 165:14 166:12 | 38:12,22 39:3 | 105:1,25 106:1,6,10 | 224:1 225:1 226:1 |
| 184:11 201:6 | **further** 117:22 | 107:1 108:1 109:1 | 227:1 228:1 229:1 |
| 223:17 227:11 | 128:4 205:2 208:11 | 110:1 111:1 112:1 | 230:1 231:1 232:1 |
| 235:18 246:7 | 258:8 361:12 | 113:1 114:1 115:1 | 233:1 234:1 235:1 |
| 255:13 256:11 | **furtherance** 66:14 | 116:1 117:1 118:1 | 236:1 237:1 238:1 |
| 257:21,25 262:16 | 66:18 97:13,18 | 119:1 120:1 121:1 | 239:1,14 240:1,25 |
| 262:19 289:14 | 99:15 127:23 144:8 | 122:1,16,20 123:1 | 241:1 242:1,3 243:1 |
| 292:13,14 | 156:2,8 157:3 | 124:1 125:1 126:1 | 243:21 244:1 245:1 |
| **frauds** 66:18 | 256:15 292:14 | 127:1 128:1,16,22 | 246:1 247:1 248:1 |
| **frequency** 31:21 | **furthermore** 336:10 | 128:25 129:1,9 | 249:1 250:1 251:1 |
| 40:2,7,14 | **furthers** 257:20 | 130:1 131:1,3 132:1 | 252:1 253:1 254:1 |
| **frequently** 22:17 | **future** 175:10 | 133:1 134:1 135:1 | 255:1 256:1 257:1 |
| 31:16,18 | **g** | 135:18 136:1,20 | 258:1 259:1,4 260:1 |
| **friday** 282:6 | | 137:1,5 138:1 139:1 | 261:1 262:1 263:1 |
| **friday's** 268:9 | **g** 2:18 5:4 161:4 | 140:1 141:1 142:1 | 263:10,25 264:1 |
| **friend** 350:20 351:9 | **garr** 1:16 3:23 4:7 | 143:1 144:1 145:1 | 265:1 266:1 267:1 |
| **friendly** 16:7 17:3 | 4:23 5:2,9,23 6:1,19 | 146:1 147:1 148:1 | 267:23 268:1 269:1 |
| 18:14,17 19:12 | 7:1 8:1 9:1 10:1 | 149:1 150:1 151:1 | 270:1 271:1 272:1 |
| **front** 19:25 23:4 | 11:1 12:1,24 13:1 | 152:1 153:1 154:1 | 273:1 274:1 275:1 |
| 187:14 196:11 | 14:1 15:1 16:1 17:1 | 155:1 156:1 157:1 | 276:1 277:1 278:1 |
| 197:9 276:14 | 18:1 19:1 20:1 21:1 | 158:1 159:1,19 | 279:1,5 280:1 281:1 |
| **full** 26:23 107:4 | 22:1 23:1 24:1 25:1 | 160:1 161:1,10 | 282:1 283:1 284:1 |
| 110:22 116:6 127:4 | 26:1 27:1 28:1 29:1 | 162:1 163:1 164:1 | 285:1,4,7 286:1 |
| 163:3 165:4,17 | 30:1 31:1 32:1 33:1 | 165:1 166:1 167:1 | 287:1 288:1 289:1 |
| 167:15 171:9 | 34:1 35:1 36:1 37:1 | 168:1,3 169:1 170:1 | 290:1 291:1 292:1 |
| 187:20 224:3,7 | 38:1 39:1 40:1 41:1 | 171:1 172:1,6,10 | 293:1 294:1 295:1 |
| 227:3,5 234:16,16 | 42:1,5 43:1 44:1 | 173:1 174:1 175:1 | 296:1 297:1 298:1 |
| 236:11,14,18 | 45:1,15 46:1 47:1 | 175:17 176:1 177:1 | 299:1 300:1 301:1 |

302:1,5 303:1,9
304:1 305:1 306:1
307:1 308:1 309:1
310:1 311:1 312:1
313:1 314:1 315:1
315:18 316:1 317:1
318:1 319:1 320:1
321:1 322:1 323:1
324:1 325:1 326:1
327:1 328:1 329:1
330:1 331:1 332:1
333:1 334:1 335:1
336:1 337:1,16,20
338:1 339:1 340:1
341:1 342:1 343:1
344:1,20 345:1
346:1 347:1 348:1
348:25 349:1,9
350:1 351:1,4 352:1
353:1 354:1 355:1
356:1,14,17 357:1,8
358:4,21 362:4,21
**garr00009236**
359:13
**garr00010902** 359:5
**garr00024365**
359:14
**garr00039654**
359:11
**garr00064098**
359:16
**garr00064446** 57:24
358:24
**garr00065707**
359:10
**garr00069213** 359:9
**garr10902** 100:19
**garr24365** 349:8
**garr39654** 217:19
**garr64098** 177:5
**garr65707** 175:20
**garr69213** 136:22
**garr9236** 338:5
**gather** 87:12

**gathered** 88:21
342:5
**general** 41:6 67:9,17
94:23 98:4 143:11
147:13 148:5
149:13 152:24
154:3,11 157:16,19
267:2,3 324:12
326:22
**generalities** 41:14
41:19,25
**generally** 11:14 12:7
18:13,22 19:10 20:9
20:15 23:13 25:14
30:13,23 33:10
35:19 55:16 62:8
81:16 95:4 98:7,14
126:15 143:7,8
158:13 168:19
182:25 222:9 240:2
329:11 345:12
**geographic** 334:5
**gerardo** 2:12
**getting** 58:22 82:25
83:7 88:12 150:13
153:25 255:21
269:6 297:21
347:10
**gibson** 1:17 2:3 3:16
4:8,11 6:14 84:24
99:24 100:9 213:22
**gibsondunn.com**
2:5,6,7,8
**girl** 92:7
**girls** 178:9 186:2
**gitter** 2:21 4:16
79:14 84:23 133:13
133:18 173:7 216:6
239:2 284:2 360:4
**gitter's** 85:4
**give** 83:24 142:22
143:4 145:20
147:19 148:9
155:11 222:20
263:20 284:2 332:7

355:6
**given** 21:4,8 46:25
50:7,8 54:14 69:9
69:11 82:6 152:20
153:2,12 184:5
198:25 218:9 222:3
230:11 237:20,24
294:22 309:19
324:14 351:4
361:10
**giving** 84:2 213:13
293:3 333:13
348:22
**global** 42:22 43:22
44:2 47:14 267:25
**gmail** 28:24 29:6,9
29:12
**gmail.com** 57:17
93:7 131:4 172:6
194:15,18,25 195:5
**go** 3:10 23:11 28:6
40:17 41:17 42:2
54:25 55:16 56:6
62:25 75:5 79:18
123:9,16 127:24
128:12 133:12
139:17 145:5 146:6
199:18,19 203:17
207:17 210:17
211:11 213:10
215:13,24 216:21
224:6 234:8 239:7
242:12,16 246:2
247:3 249:22
252:10 258:15
266:18,19 270:24
272:7 278:12
283:17 289:5,21
300:2 309:5,17
317:6 318:17
320:18,19,25 321:6
**goal** 232:2,8
**goes** 138:11 141:12
288:11 337:8,11

**going** 27:2 31:4,8
37:13,19 45:7 55:23
56:5 57:6 59:22
69:11 73:15 75:22
80:15 82:20 83:18
83:24 87:9 105:16
113:6 116:14 128:3
133:19,25 137:12
152:10 154:23
160:23 168:13
185:4 186:16,17
200:14 202:7
208:19 209:22
213:9,14 224:20
227:21 239:23
240:4 258:19
264:24 265:6,19
279:5 287:18
289:11,15 290:22
295:15 296:13
297:21 317:7
320:24 322:11,25
329:7 336:18 353:3
357:2
**gomez** 2:10,13 4:18
4:18,19 24:4 32:3
51:20 61:5 64:19
68:21 69:2,5,10
70:5 71:2,22 72:11
72:15,20 76:24 80:2
80:10,11 88:22
96:17 97:2 98:23
112:23 113:17
115:7,16,21 117:15
122:2 125:10,14
127:17 132:10
133:13,20 134:4
135:14 137:19
138:4 139:7 140:5
141:7 142:7,19,25
144:4 145:13,23
146:3 147:9 150:16
151:21 153:14
155:18 156:18,20
156:23 157:20

158:9,20 163:18
164:3,19 165:11
166:9 167:24 169:9
169:18 170:9,23
171:4,23 174:24
183:22 184:7 185:9
185:15 190:10,20
192:3 193:10
197:20 198:3
199:15 201:3
202:12 203:21
204:7 206:5 207:25
208:20,23 209:11
213:5,16 214:6,9,10
215:6,20 216:4
221:23 222:15,23
223:13 224:11,24
225:17,24 226:21
227:12,17 229:8
230:20 232:15,18
233:14 234:21
235:15 236:5,23
237:12 238:7
242:10 244:24
245:3,19,22 246:15
248:20 250:17
251:5,8 252:7 253:3
253:14 254:9
255:10,25 256:15
256:17,24 257:7,10
258:2,11,16,21,25
259:25 260:4,14
261:3,19 262:8,12
262:17 263:6 265:7
266:3 269:16
270:18 272:19
273:6 277:10 278:2
278:19 279:23
282:18 286:13,23
287:11 288:21
292:5 294:13
295:12 296:11,21
297:5 301:21 304:4
305:6 306:4,24
307:6,13 308:9,21

309:21 310:13
311:21 312:11,19
319:10 320:2
322:16,23 324:23
325:13,16 326:8
332:14 334:21
335:4,17 336:3,17
339:9,12 340:2,6
341:2,5,8 342:13,24
344:24 346:25
347:3 353:12
354:14 355:10
**gomez's** 79:20
**good** 4:6 5:9,10
79:15 134:8 135:15
239:2 245:5
**google** 11:11 13:2
**gotten** 11:18,20
350:14
**grande** 194:18
**grandote** 196:22
**grandote's** 196:23
**great** 64:24 87:5
141:18 178:10
280:17 288:11
**green** 321:22,25
322:3,5,6
**gringo** 194:17
196:22,23
**gringograndote**
194:15,25 195:5
**ground** 113:3,5
156:25 163:20
166:11,12 246:5
262:15 263:2 317:6
**grounds** 97:12
99:13 115:9 139:12
140:7 144:6 157:22
201:7 233:21
**groundwater**
186:24
**group** 148:25
149:25 207:11
274:6 328:22 329:2
329:7,12,21,22

332:8,11 333:10
334:15,18,25
335:12,13,20,22
336:4 337:25 338:4
338:13,23 339:8,15
339:18,22 340:22
**group's** 329:18
**guadalupe** 100:22
**guerra** 346:3,19
**guess** 23:20 29:11
37:18 39:13,16,19
107:6,7 126:23
130:12 133:9
134:13 136:12
145:3 149:24 152:2
153:20 161:22
164:21 170:11
179:25 181:9
196:18 207:14
342:2
**guessing** 13:7 95:2
151:19,25 152:6,8
176:15 204:12

| h |
| --- |

**h** 358:6 359:2 360:2
**h5** 38:6 85:17,22,25
86:13,13 149:25
351:21 352:2,14
**h5's** 85:23 351:15
351:17
**h5.com** 216:25
263:12
**h5000018261-000...**
359:12
**half** 127:17
**hand** 6:20 171:14
173:5 187:17
197:18,19 361:17
**handful** 13:5
**handle** 85:21
**handling** 186:2
**handouts** 222:21
**hands** 283:17

**handwriting** 197:17
217:10,11 235:4
**handwritten** 218:4
231:24 234:5,6
235:2
**happen** 150:4,7,8
255:15
**happened** 11:15
169:24 170:4
201:25 204:19
248:4 269:25 270:9
270:25 271:15
272:2 275:9 277:5,9
277:18,24 278:14
278:18 282:13
**happening** 249:16
**hard** 75:17,18,20
82:15 135:9
**harmful** 214:24
215:4 219:21
220:16 222:14
223:11
**hazy** 113:22 249:9
**hdd** 94:10 240:10
262:23 268:2
358:17,18 359:4,13
359:18,19,21
**hdd0167393** 193:18
**heading** 254:21
**hear** 5:18 24:11 84:3
97:4 98:25 113:4
123:13,14 124:11
134:5 137:12 144:9
151:23 157:22
166:11 223:15
235:17 246:6
248:22 255:12
260:17 322:8
349:20
**heard** 84:6 135:21
165:13 276:24
343:6,12,20 344:2,8
**hearing** 130:15
134:10 151:23
273:13

**held** 1:17 3:15
  163:10 323:5
**help** 23:12 27:5
  56:18,20 89:20 92:9
  149:21 207:8
  212:25 215:9,11,12
  218:4
**helped** 91:24
**helpful** 18:10
**helping** 38:11 199:8
**helps** 120:6
**heredia** 56:23,23
  100:22
**hereunto** 361:16
**hesitation** 309:23,24
**hey** 137:8
**hi** 131:25
**highlighted** 285:10
**hille** 2:18 4:21,21
  6:6 80:24 81:3
  123:24 129:9 216:5
  216:8 226:2 248:22
  248:25 254:21
  260:15 272:22,25
  275:11 283:8
  287:13 322:8
**hindsight** 311:6,18
**hire** 37:3
**hired** 335:23 352:14
**hiring** 36:12,21
**history** 258:9
**hoke** 122:16 123:22
  124:17 126:22
**hold** 123:12 172:21
  179:7 263:19
**holding** 86:18,22
**home** 19:10,13,17
**honesty** 191:18
**honor** 68:22 145:14
  179:10 186:21
  189:19 307:14
**horse's** 41:12
**host** 334:12
**hotel** 58:14

**hotmail.com** 206:15
**hour** 17:21 160:15
**hours** 6:11 17:15,18
  41:23 65:10 242:20
  280:2
**house** 77:22
**housing** 81:8
**huge** 75:8
**hugo** 2:12 4:19
**huh** 58:18 62:15
  209:19
**hundreds** 80:6
**hurt** 284:6
**hyatt** 101:19

**i**

**iced** 18:21 355:18
**idea** 189:22
**identical** 198:7
**identification** 45:12
  45:14 57:13 59:15
  60:7 85:7 93:5 94:6
  99:19 105:22
  122:10,12 128:14
  130:23 136:16
  159:17 172:3 173:9
  175:14 176:25
  178:23 186:6
  187:12 190:25
  193:16 197:2,4
  206:9 211:24
  214:23 216:23
  219:21 220:23
  240:8 262:21
  267:17 279:3 283:2
  285:2 303:7 337:15
  338:8 349:6
**identified** 80:6
**identify** 3:25 57:23
  215:10,13 246:22
**identifying** 97:15
  220:15 266:22
**ignorance** 27:2
**ii** 264:14

**ilann** 218:13 263:10
  267:19 279:7 286:2
**immediate** 228:9,16
  229:19
**immediately** 49:13
  154:9 171:13
**imoll** 263:12
**impact** 167:19 169:2
  244:22 245:16
  266:9 295:17,20
**impartial** 54:4,8
  251:23
**impartiality** 187:2
  191:18
**impeach** 71:17
**impermissible** 204:23,24
**implicated** 246:8
**implication** 297:9
**implied** 293:20
**important** 138:22
  282:13 285:11
  356:9
**impose** 244:23
**impression** 165:20
  199:14 200:2,4,22
  201:11,18,20 297:2
  300:11
**improper** 70:19
  104:5,11 202:21,23
  247:21 248:9
  251:16
**inaccurate** 68:12,16
  68:19 69:20 70:17
  189:14 190:8
**inarticulate** 249:12
**include** 52:8 75:24
  146:14
**included** 50:23 76:7
  124:9 277:8
**includes** 231:10
**including** 72:6
  324:15 325:6
**increased** 153:2

**increasing** 347:9
**independent** 23:14
  53:25 54:6 77:10
  107:15,21 108:4
  163:10 171:12,22
  181:24 182:7
  242:14 243:17
  251:23 283:7
  285:23 286:6,12
  321:20 326:17
**independently**
  27:21 62:24 66:3
  94:20 106:15 138:6
  173:20 273:12
**index** 89:4,7,12,13
  89:15,18,21
**indicate** 166:15
  167:8 243:13
**indicated** 163:4
  167:17 254:24
**indigenous** 231:21
**individuals** 215:25
**inefficiency** 83:17
**inefficient** 83:14
**inform** 171:8 203:13
**information** 60:17
  68:17 69:20 71:8,16
  72:5 76:22 77:5
  87:3,10 88:5,20
  92:2 102:10 106:18
  106:20,25 108:24
  109:5,12 112:15,22
  113:16 114:14,20
  115:5,14 116:19
  117:13 120:5
  121:12 124:14
  132:3,9 133:3,8
  142:12,18 156:16
  157:11 171:10
  180:15,18 181:7
  184:20 189:10,12
  190:4 198:20 199:9
  200:7 223:22
  244:21 255:22,22
  275:19 285:11

286:18 294:6
296:20 311:2,4,17
312:7,16 322:5
324:12 325:3 326:5
332:7,13 334:13
337:20,23 338:23
339:4,17 340:10,16
342:4
**informe** 197:6
**informing** 269:7
**ingrid** 267:20
**initial** 76:6 112:16
114:15 138:2 290:5
311:11,12
**inquired** 165:18
257:12
**inquiry** 257:18
258:7
**inspections** 43:3,17
43:19
**instance** 114:23
140:22 315:5
**instances** 39:16,17
39:22 311:5 353:17
**instruct** 64:20
145:10 147:7
**instruction** 134:20
147:14 148:4,10
149:7,12 150:8,12
150:13 151:3
152:20,25 153:9,12
153:18 154:19
155:2
**instructions** 142:23
143:5 145:20
147:19 153:7
174:21
**insult** 187:23
**intended** 127:24
**intentionally** 174:16
**interact** 31:12,16
328:13
**interacted** 31:24
**interacting** 31:19
332:19

**interaction** 328:21
**interactions** 46:21
47:4,8 202:9 291:23
**interest** 41:3 171:9
316:4
**interested** 361:15
**interests** 279:15
289:4,9
**interfere** 3:8
**interfering** 5:15,22
**international**
227:24
**interning** 15:25
**interns** 27:10,14
**internship** 15:22
**interrupt** 5:18 28:6
**interrupted** 152:9
**interviewing** 15:22
**introduced** 43:8
101:8 233:19
**introduction** 323:17
**investigation** 73:6
73:16,21
**invictus** 211:20,21
217:4,8,15 263:17
264:3,7 268:13
**invite** 38:20 39:5
**invited** 38:25
**involved** 27:8 35:18
35:20 36:8,12,20
37:15,20,24 38:7
55:11 64:25 149:21
176:22 199:8 301:6
301:8,9 328:3
**involvement** 38:11
306:2
**irrelevant** 337:10
**issue** 63:11 111:20
112:14 114:13
116:11 170:18
248:15 250:16,21
261:7 311:12
**issues** 171:13 242:22
243:3,25 316:22
356:4

**item** 219:18 227:23
228:17
**items** 297:19 330:14
**itinerary** 172:12

**j**

**jabady** 279:12
**jail** 202:7 203:17,23
208:19 209:3 224:7
224:21 225:3
**james** 218:24 219:5
263:15 267:23
**january** 121:15
336:12,19
**jason** 218:24 219:2
219:3 279:13
**javier** 2:12 4:20
**jeff** 131:25
**jeffrey** 131:2
**jennifer** 2:17 4:24
6:7
**jersey** 2:11
**job** 75:22 192:9,23
**john** 123:21
**join** 27:3 287:13
**joined** 84:24 213:19
213:23
**jokes** 145:4 146:20
147:3,6,24 148:7
**joking** 146:11
**jonathan** 218:13
263:11 267:22
279:13
**jose** 2:24 4:13
**journal** 10:19
**jparadise** 2:17
**juampa** 177:24,25
**juan** 9:9,24 34:12
56:12 57:5 75:15
77:24 79:12 92:4
118:23 126:16
178:2,3,5 181:20
185:25 203:6 205:6
247:10 324:8
347:14

**juanpasaenz** 206:15
**judge** 14:15,21
65:22 66:19 81:2
139:12,13 191:5
233:3,13 234:12
263:4,4 344:14
345:22 346:7
**judge's** 41:17
**judgment** 232:10,14
**jule** 358:8
**julia** 218:10 263:9
267:21 351:22
**juliabrickell** 216:25
**julio** 2:13 4:18 8:25
9:15 56:12 57:5
75:15 77:24 79:11
92:4 118:22 126:15
141:18,21 173:25
174:3,4 178:6
181:20 185:25
203:6,16 205:6
206:14,24 207:20
207:21 208:17
214:9 247:8,9 324:9
347:14
**july** 186:7 187:15
190:5,17 303:10
305:18,20 359:22
**june** 1:12 3:13
361:17
**justice** 186:9 187:16
187:16
**justin** 2:22 4:17

**k**

**kaplan** 65:22 66:19
139:12 263:4
336:14,22 360:4
**kaplan's** 14:16,21
**keep** 284:10,11
**keeping** 219:18
**kind** 21:8 27:5 31:5
36:6 56:2,18,19
76:16 77:21,22,25
89:4 119:4 120:7

| | | **l** | 158:1 159:1 160:1 |
|---|---|---|---|

125:23 150:21
154:11,20,23 160:8
161:12 226:15
249:11 255:16
257:20 269:5 293:6
297:10 324:10
340:12 354:3
**kitchen** 19:18,23,25
20:2,16 21:20
**knew** 47:21 121:19
305:17 312:9
313:10
**know** 5:12 12:14,20
13:4 16:15 17:4,14
27:7,23 28:17 29:13
30:15 31:20 34:21
34:22 36:11,22
37:17,21 38:9,13
41:19 42:9 49:3,11
50:20 51:9 52:21,25
53:2,17,20 55:9,24
56:25 61:15,17
62:25 65:21 70:17
74:12 81:19,22 82:7
85:16,20,25 86:3,15
86:21 89:3,23 98:7
98:16,17,18 99:2
100:4,14,25 102:17
103:15,25 107:22
108:5,23 109:19
110:20 111:8,18
113:19 114:8
115:24,25 116:4
119:12 120:6,8
125:21 128:20
129:18 130:20
131:20,23 134:15
140:2 141:11,15
142:13 146:21
149:24 150:20
152:3 154:19
160:10 161:14
165:4 168:11 169:6
170:2,6,12 176:22
185:2,2 195:8,19

203:23 204:13
206:19 207:16
209:15 210:6 211:4
218:13,19 219:2,3
223:21 226:12
229:24 230:6,8,23
231:19 233:9,10
235:4,19 236:25
238:11,17,18,21,24
241:9 242:18
244:17 249:5
257:17 258:13
259:19 269:9
272:12 273:8,8
274:24 276:13,17
288:8 290:15
293:18 296:13,23
296:25 297:7
299:20,20,21,23
300:25 301:5 305:9
305:16,16,18,20
307:19,21,22
314:25 315:2
316:24 319:12,20
321:17 324:25
325:2,2,4 329:20
330:13 331:13,14
331:24 333:13,15
334:8,11,23,24
335:8,9,19,24
338:14,17 341:6,16
343:24 345:10
347:7 348:17 351:3
352:16 353:14,16
353:19 354:4,7,8
**knowledge** 8:10
31:9 76:14 106:20
299:6 341:12
**known** 273:5 308:24
311:20 312:25
**knows** 163:5 210:2
**kornfeld** 178:25
179:5,12,18,24
181:23 185:4,6
191:12

**l** 5:4 6:1 7:1 8:1 9:1
10:1 11:1 12:1 13:1
14:1 15:1 16:1 17:1
18:1 19:1 20:1 21:1
22:1 23:1 24:1 25:1
26:1 27:1 28:1 29:1
30:1 31:1 32:1 33:1
34:1 35:1 36:1 37:1
38:1 39:1 40:1 41:1
42:1 43:1 44:1 45:1
46:1 47:1 48:1 49:1
50:1 51:1 52:1 53:1
54:1 55:1 56:1 57:1
58:1 59:1 60:1 61:1
62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1
74:1 75:1 76:1 77:1
78:1 79:1 80:1 81:1
82:1 83:1 84:1 85:1
86:1 87:1 88:1 89:1
90:1 91:1 92:1 93:1
94:1 95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1

158:1 159:1 160:1
161:1,4 162:1 163:1
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1
185:1 186:1 187:1
188:1 189:1 190:1
191:1 192:1 193:1
194:1 195:1 196:1
197:1 198:1 199:1
200:1 201:1 202:1
203:1 204:1 205:1
206:1 207:1 208:1
209:1 210:1 211:1
212:1 213:1 214:1
215:1 216:1 217:1
218:1 219:1 220:1
221:1 222:1 223:1
224:1 225:1 226:1
227:1 228:1 229:1
230:1 231:1 232:1
233:1 234:1 235:1
236:1 237:1 238:1
239:1 240:1 241:1
242:1 243:1 244:1
245:1 246:1 247:1
248:1 249:1 250:1
251:1 252:1 253:1
254:1 255:1 256:1
257:1 258:1 259:1
260:1 261:1 262:1
263:1 264:1 265:1
266:1 267:1 268:1
269:1 270:1 271:1
272:1 273:1 274:1
275:1 276:1 277:1
278:1 279:1 280:1
281:1 282:1 283:1
284:1 285:1 286:1
287:1 288:1 289:1
290:1 291:1 292:1

| | | | |
|---|---|---|---|
| 293:1 294:1 295:1 | 292:10 296:8 | **lauragarr** 57:17 | **learn** 11:7 15:13 |
| 296:1 297:1 298:1 | 301:11 302:11 | 93:7 | 109:16 110:9 |
| 299:1 300:1 301:1 | 304:20 305:4 309:7 | **law** 10:10,14 15:21 | 121:23 155:7,10 |
| 302:1 303:1 304:1 | 317:23 318:10 | 16:2,23 17:8 24:20 | 192:16 193:6 |
| 305:1 306:1 307:1 | 323:20 325:10,22 | 36:13,17 37:14 | 201:24 331:25 |
| 308:1 309:1 310:1 | 326:7 327:5 329:16 | 38:17 66:13 68:13 | 347:16 |
| 311:1 312:1 313:1 | 333:4,11 334:3 | 68:19 70:10,11,15 | **learned** 15:2 51:17 |
| 314:1 315:1 316:1 | 337:3 342:8 344:3 | 70:19,23 71:7 83:25 | 52:2 109:11 138:2 |
| 317:1 318:1 319:1 | 345:16 346:6,13 | 84:7 97:23,23 | 155:4 156:17 |
| 320:1 321:1 322:1 | 348:19,22 353:11 | 101:21 114:5,5 | 157:12 189:10,12 |
| 323:1 324:1 325:1 | 355:24 | 119:25 120:4 | 190:3 299:14,20 |
| 326:1 327:1 328:1 | **laid** 269:12,23 270:8 | 167:19 168:11,12 | 308:17,17 311:17 |
| 329:1 330:1 331:1 | 271:2,16 272:3 | 174:6,18,23 202:18 | 312:6 |
| 332:1 333:1 334:1 | 275:15,16 | 204:15,18 223:22 | **learning** 51:6 159:3 |
| 335:1 336:1 337:1 | **lak** 1:4 3:22 | 223:23 225:7 | 169:15 310:17 |
| 338:1 339:1 340:1 | **landline** 28:11 | 242:21 243:3,25 | **leave** 12:19 63:15 |
| 341:1 342:1 343:1 | **language** 73:17 | 247:12,19,25 248:5 | 135:12,13 251:3 |
| 344:1 345:1 346:1 | 272:13 | 248:11,12,14 | **leaving** 12:4 22:24 |
| 347:1 348:1 349:1 | **laptop** 21:2 26:7,15 | 249:25 251:15 | 349:13 354:9 |
| 350:1 351:1 352:1 | 26:19,22 89:7 90:6 | 253:24 254:2,8,14 | **led** 221:16 |
| 353:1 354:1 355:1 | **laptops** 20:12,24 | 254:20 255:16 | **left** 10:4 11:16 349:2 |
| 356:1 357:1 | 92:16 | 259:15,17,24 267:7 | 349:16 350:5 |
| **labeled** 63:9 | **large** 82:14 165:5 | 297:9,13 319:4 | 352:17 353:5 355:5 |
| **lag** 83:12 | 293:21 294:21 | **laws** 202:20 247:20 | **legal** 35:23 56:7 |
| **lago** 8:15 10:3 11:9 | 298:7 299:10 | 249:15 295:16 | 105:10 209:6 |
| 13:2,11 22:13 23:2 | 330:12 | **lawsuit** 13:16 14:5 | 261:17,24 |
| 29:20 31:13,25 32:9 | **larger** 207:11 | 14:17 15:3 | **length** 62:4,6 79:21 |
| 36:18 40:3,9 41:3 | 293:19 | **lawyer** 151:14 | 79:22 |
| 42:10 46:5 47:5,8 | **late** 49:19 312:14 | 291:13 | **lengthy** 83:14 |
| 47:11,16 65:8,14 | **latest** 137:10 | **lawyers** 8:20,25 9:5 | **lens** 283:16 |
| 75:25 76:21 77:4,18 | **laughing** 314:12 | 9:9 37:3 75:14 | **letter** 252:22 254:2 |
| 78:6 96:14 108:2 | **laura** 1:15 3:23 4:22 | 77:19 83:8 180:11 | 254:7 293:25 294:7 |
| 109:3 123:3 135:20 | 5:2 58:13 87:12 | 190:15 211:6 | 336:13,20 360:4 |
| 158:16 166:4 167:9 | 94:8 100:21 105:25 | 226:17 231:15 | **level** 159:3 163:6 |
| 171:19 179:13,19 | 106:10 122:16 | 265:17 291:11,16 | 165:19 170:12,14 |
| 180:17,19 181:5 | 128:16 131:3 | 296:3 336:7 | **levels** 165:21 166:6 |
| 191:22 199:6 202:9 | 136:20 137:5 172:6 | **lay** 269:24 277:4,17 | **lgarr** 279:11 |
| 203:2,19 205:25 | 175:17 177:4,19 | 288:6 | **liability** 170:19,22 |
| 207:23 209:7 224:6 | 178:25 211:18 | **laying** 268:22 275:8 | 171:3 260:13,25 |
| 224:9,23 226:20 | 217:2 242:2 263:10 | 276:16 277:8,23 | **light** 144:6 149:14 |
| 236:21 245:18 | 267:23 279:18 | 278:13,17 287:6,19 | 154:6 |
| 251:25 253:12 | 281:9 283:21 285:4 | 287:20,23 | **likewise** 71:14 |
| 270:7 272:8 278:16 | 294:16 303:9 | **layout** 79:11 81:6 | **line** 57:17 95:14 |
| 286:21 287:9 | 337:19 349:9 357:8 | **lead** 261:23 | 108:11 128:19 |
| 288:20 291:23 | 362:4,21 | | 145:17 197:12 |

217:4 247:15,16
277:12 360:7,11
362:5
**lined** 175:8
**lines** 233:2,2 348:15
**linked** 187:24
**list** 52:16 102:20
125:24 173:18,24
184:22 218:23
232:21 330:14
333:18,24
**listed** 125:20 181:6
**listen** 33:2,3,7,17
34:7,18 41:14
**listened** 33:21
**listening** 33:11
346:16
**litigation** 10:3 13:3
13:12 19:7 22:13
23:2 25:15 29:20
30:2,4,6,11 35:10
37:4 41:3 42:23
81:11 86:5 196:7
316:4 352:22
353:10,11 355:22
355:25
**little** 49:19 135:4,19
135:21 154:17
249:9
**living** 20:3
**llc** 2:10 4:19
**llp** 1:18 2:3,15
**local** 29:24 55:16
56:7 75:4 82:19
111:9 127:7 163:7
169:23 181:12,15
181:19 182:13,23
183:11,20 242:20
243:2,24 244:14
247:6 252:24 260:6
260:11,23 261:15
318:18 323:18
**located** 3:16 19:13
**location** 79:2 86:7

**locked** 81:22
**loja** 186:9 187:15,17
191:5 358:8,11
359:22
**long** 6:9 19:24 55:5
205:13 210:8
221:13 224:16
229:6 274:12
333:24
**longer** 25:10 39:15
145:6 171:18,20
175:7 307:23
**look** 71:25 73:22
76:10 91:9,24 95:14
95:19 101:2 106:8
107:13 108:9
122:21 130:24
132:14 196:10
197:5 212:24
222:18 240:20
241:22 258:9 264:2
274:17 277:14
278:25 289:22
**looked** 133:10 214:3
281:22
**looking** 55:21 57:10
62:18 74:24 75:6,23
76:3,18 91:6 104:25
114:17 133:7
146:25 159:19
168:12 180:14
194:5 198:5 207:7
208:3 212:4,24
218:3 241:11
285:25 289:18
311:17 313:2
**looks** 93:25 198:7
232:20
**lost** 219:24
**lot** 40:23 84:7
150:19 151:8 152:6
154:4 260:15
313:24 314:2
**love** 137:12

**lower** 197:19
**luis** 2:24 9:5,21
33:25 34:5 90:14,15
90:19,20 111:10
162:15 206:15
210:20,22,24
212:11 218:21
235:24 290:21
291:6
**lunch** 160:14,20
**luncheon** 160:25

## m

**m** 2:8 122:15
**maazel** 218:13
263:10 267:19
268:7 279:7 282:4
286:2,4 303:16
**maazel's** 268:23
277:4 282:3
**madison** 86:9
**maest** 195:8,8,11
198:12 314:11
**maest's** 195:15
**magnitude** 192:9,23
**mail** 28:18,18,21
29:3,11,14 40:21,22
58:13 85:10 93:13
105:24 112:8,9
122:14,21 128:25
129:5 131:13
136:19 137:4,15,18
138:11 140:11,12
140:15 142:2,6,12
142:18 143:13
144:21 145:7,11,24
146:10,17,25 147:3
148:15 149:4,8,16
150:14,19 151:4,5,7
151:9 152:21
153:23 172:5,9,17
172:18 173:15,17
175:16 176:10
177:2,10 193:18
194:2,3,13,17,24

196:21,23 200:16
200:17 206:11,13
206:13 207:7,8
208:6,8,14 211:16
212:5 215:11,12,17
216:2,25 218:23
224:20 262:24
263:8 268:7,24
269:2,4 275:4 277:4
279:4,6,17 280:21
280:25 282:3 285:8
286:3 287:16 290:5
303:8,12 319:16,21
320:5 337:18
338:12 339:2
349:19 358:21
**mailing** 144:24
**mails** 130:25 146:2
146:23 153:3
259:11 273:9
**mainstream** 10:22
**maintaining** 309:4
**major** 13:19 15:10
31:4 35:20
**making** 36:16 152:2
338:22
**maloney** 2:6 4:10,10
289:19
**mandate** 106:3
127:12
**manhattan** 86:11,12
**maps** 334:5
**march** 54:24 57:16
59:18 60:2,23,24
61:4,4,21,22,25
62:5 64:4 74:22
88:18 90:2 93:7
94:8 100:21 106:2
106:11 112:9
122:15 123:23
125:2 128:16 131:2
136:19 137:5
142:16 146:25
161:17 175:16
177:3 178:25 188:6

[march - mcdermott]                                                      Page 26

| | | | |
|---|---|---|---|
| 191:12 196:16 | 88:24 89:11,19 95:9 | 209:12,14,20,24 | 308:10,22 309:22 |
| 198:14 205:20,21 | 95:17 96:18 97:3,10 | 210:9,14,22 211:5,8 | 310:2,8,14 311:22 |
| 206:17 207:12 | 98:24 99:6,11 101:3 | 211:11 212:7,23 | 312:12,20 313:20 |
| 244:4,7,14 245:10 | 101:7 107:16 | 213:7,11 214:11 | 314:16,19 315:10 |
| 297:21 298:18,19 | 109:24 110:4,7,15 | 215:7,21 216:7,18 | 317:5,25 318:7,16 |
| 298:20 318:15 | 113:2 115:8,17,22 | 218:22 220:25 | 318:22 319:6,11 |
| **mark** 336:16,18 | 117:2,16 118:7,12 | 221:25 222:17,24 | 320:3 321:10,21 |
| **marked** 45:11,13 | 120:18 122:5 123:9 | 223:14 224:13 | 322:10,17,24 323:6 |
| 57:13,14 59:14 60:7 | 123:12,16 124:10 | 225:2 226:3,23 | 323:10 324:24 |
| 85:7 93:5 94:6 | 124:24 125:16 | 227:14 230:21 | 325:18 326:9 |
| 99:19 101:8 105:22 | 127:14 128:7,10 | 231:7 232:16,19 | 329:24 330:8,16,23 |
| 122:10,12 128:14 | 132:11 133:16,23 | 233:15 234:22 | 331:2,9,20 332:16 |
| 130:23 136:16 | 134:3,23 135:15,18 | 235:16 236:7,24 | 335:5,18,25 336:19 |
| 159:17 172:3 173:9 | 136:11 137:20 | 237:14 238:9 239:4 | 336:20 337:14 |
| 175:14 176:25 | 138:5 139:8,10 | 242:11 243:6 | 339:10,13 340:4,8 |
| 178:23 186:6 | 140:6 141:8 142:8 | 244:25 245:4,20,24 | 341:3,6,9 342:14 |
| 187:11 190:24 | 142:20 143:2 144:5 | 246:16,21 247:2 | 343:2 344:16,25 |
| 193:16 197:2,4 | 145:8,16,25 146:5,9 | 248:21 249:3 250:2 | 352:7,25 353:24 |
| 206:9 211:24 | 147:10,16,25 | 250:18,24 251:7,11 | 354:16 355:4,13 |
| 216:23 240:8 | 148:22 149:2,20 | 252:9 253:4,15 | 356:13 360:3 |
| 262:21,22 267:17 | 150:17 151:22 | 254:10 255:11 | **mastro** 2:8 213:22 |
| 279:3 282:25 | 152:7 153:16 | 256:3,10,14,19,22 | **material** 24:8 97:16 |
| 284:25 303:7 | 155:19,24 156:5,21 | 257:5,9,22 258:4,13 | 127:6,21 259:18 |
| 337:15 338:8 349:6 | 156:24 157:21 | 258:18,22 259:25 | **materials** 48:14 |
| **marr** 8:11 57:16 | 158:10,21 160:13 | 260:18 261:5,21 | 54:14 104:5,10 |
| 122:14 129:18 | 160:17 163:19 | 262:9,12,18,25 | 108:15,21 109:17 |
| 136:19 175:16 | 164:4,7,20,24 | 263:19 265:9,12 | 109:25 110:5 116:7 |
| **marriage** 361:14 | 165:12 166:10,17 | 266:5,14,17,21 | 116:8 119:23 |
| **martin** 2:24 4:13,13 | 166:23 167:2,25 | 269:17 270:19,22 | 127:10 154:4 |
| **mary** 2:6 4:10 | 168:21 169:10,21 | 271:5 272:5,24 | 165:22 166:6 |
| **master** 2:21,22 4:15 | 170:10,24 171:5,24 | 275:5,13 276:12,18 | 182:12 183:10,19 |
| 4:16 5:17 12:15,23 | 172:21 173:2 | 276:22 277:2 278:4 | 236:13 259:8,10 |
| 24:6,15 25:4,16,19 | 174:25 179:7 | 278:10,21 280:4,9 | 300:18 306:10 |
| 25:23 26:2,6,10,13 | 180:24 181:15,25 | 282:19 283:12,19 | 334:5 |
| 26:18,25 27:9,16,22 | 183:23 184:8,10 | 284:5,8 286:14,24 | **matter** 80:8 157:2 |
| 28:5 32:4 41:10,22 | 185:10,16 188:8,11 | 287:14 288:4,22,24 | 248:13 323:5 |
| 43:21 49:18 50:18 | 188:20,23 189:15 | 289:6,10,17,20 | 355:14,15,22 |
| 51:11,23 57:18,22 | 189:20 190:11,21 | 292:6,11 294:14 | 361:15 |
| 59:16,24 60:8,12 | 192:5 193:11 194:8 | 295:3,13 296:12,22 | **matters** 85:22 |
| 64:23 67:3 68:24 | 196:9,17 197:22 | 297:6,15,25 298:11 | 336:25 337:2 |
| 69:4,8 70:6 71:3,23 | 198:4 199:17 | 298:17,22 299:4,13 | **max** 2:21 4:15 |
| 72:13,16,22 76:25 | 200:12 201:5 | 299:24 300:4,20 | **mcdermott** 65:3,13 |
| 79:16 80:13,21 81:4 | 202:13 203:9,22 | 301:2,22 304:5 | 79:23 101:9 122:15 |
| 81:13,25 82:9,17,24 | 204:8 205:18 206:6 | 305:7 306:6,14,20 | 123:21 124:17 |
| 83:16,22 84:9,14,21 | 207:2,17 208:2,24 | 306:25 307:7,10,15 | 126:22 127:16 |

| | | | |
|---|---|---|---|
| **mea** 269:20,23 | **meet** 6:10 30:6 42:9 | 314:3 323:4 356:5 | **minimal** 16:16 |
| 271:17 277:17 | 42:14 43:5 56:10 | **member** 25:17 | 17:20 18:24 40:21 |
| 287:18,19,23 288:7 | 230:7,12 231:16 | 213:18 | **minimize** 148:15 |
| **mean** 11:2 17:20 | **meeting** 18:20 37:19 | **members** 126:16 | 149:8,16 150:13,21 |
| 18:10 19:17 20:24 | 38:21 39:2 56:5 | **memo** 104:14 159:6 | 151:5 152:20 |
| 29:10 30:3,10 32:12 | 111:6,7,11,13,13,19 | 161:17 162:12 | 153:23 |
| 32:22 33:9 43:19 | 111:21,22 117:11 | 179:4,24 181:8 | **minus** 280:3,4 |
| 44:23 49:5,16 50:24 | 162:14,14,16,18,22 | 191:12 | **minute** 160:18 |
| 52:19 54:12 74:23 | 200:8,10 209:9,17 | **memorandum** | 177:19 180:22 |
| 75:12 77:16 93:25 | 211:2,9 212:8,12,14 | 188:6,9 | 207:3 256:18 268:3 |
| 93:25 100:6 141:9 | 212:16,19,21 214:3 | **memory** 124:20 | 280:7 298:2 312:4 |
| 164:9 165:7 166:19 | 215:5,11,19 216:9 | 138:9 231:13 | 355:5 |
| 170:5,12 173:19 | 216:11,14,15 217:8 | 285:22 327:2 | **minutes** 280:3,5,7 |
| 174:3 176:6 183:5 | 217:15,25 218:5,20 | **memos** 180:11 | 284:3 |
| 188:21 198:13 | 219:13 220:16 | **mendoza** 206:16 | **mischaracterizes** |
| 208:5,9 214:8 | 221:7 222:21 224:3 | 282:22 285:17 | 125:14 306:5 |
| 231:22 232:13 | 224:19 225:13,19 | 287:4 | 353:13 354:15 |
| 234:7,11,25 236:4 | 225:20,22 226:17 | **mendoza's** 281:4 | **misconstrued** 145:4 |
| 236:10 237:10 | 227:8 228:21 | **mention** 79:22 | 146:13,22 |
| 238:15 243:19 | 229:16,22 230:3,10 | 152:9 199:7 262:19 | **misleading** 282:14 |
| 247:24 249:21 | 231:4,19 232:22 | **mentioned** 10:25 | 282:17 |
| 258:5 269:8 278:6 | 234:20 235:23 | 46:9 90:19 127:5 | **misled** 99:25 100:13 |
| 293:13 304:3 | 236:18 237:22 | 161:16 162:11 | 308:7,20 309:16 |
| 314:24 323:7 | 238:5,11 239:22 | 209:17 345:2 | 310:5,10,11,21 |
| 327:21 333:2 335:8 | 240:3 242:8,16,20 | **mentions** 282:10 | 311:19 313:7 |
| 337:7 344:17 | 243:2 263:17 264:3 | **mentor** 23:17 | 316:15,23 317:2,9 |
| 350:18,25 351:5,23 | 264:7 267:12 | **message** 193:19 | 319:9,14,24 320:7 |
| 353:21 | 268:14 269:3,10 | 194:19 195:15 | 321:14,17 332:4 |
| **means** 13:18 98:20 | 282:6 290:10,12,24 | **met** 6:6 15:21 27:25 | **misrepresented** |
| 100:14 114:13 | 290:25 291:8,21,23 | 66:5 195:12 308:18 | 70:12 |
| 226:9 229:24 | 294:19,25 295:14 | 309:19 310:17 | **missed** 282:5 |
| 231:19 244:11 | 298:8 302:23 303:2 | **metadata** 173:11 | **misstate** 300:10 |
| 262:14 264:20 | 303:17,20 304:22 | 240:12,14 241:17 | **misstated** 273:2 |
| 304:14 | 304:24 305:2,10 | 293:25 | **misstatement** 106:2 |
| **meant** 79:19 86:23 | 306:13,15 308:6 | **michael** 123:22 | **misstates** 272:23 |
| 129:15 139:6,21 | 309:12 313:13 | **microphone** 214:12 | **mix** 155:22 |
| 141:3 233:12 | 314:21,24 315:4,5 | **microphones** 3:4,7 | **mmaloney** 2:6 |
| 253:24 277:7 | 324:5 332:22 | **middle** 108:13,19 | **moe** 351:11 352:3 |
| 349:25 | **meetings** 30:5,12 | 189:16 231:25 | **moll** 267:21 |
| **mechanism** 249:10 | 35:18,20 37:13,17 | **migration** 60:18 | **moment** 85:8 122:20 |
| 256:8 261:9 | 38:15 39:6 116:10 | 239:15 241:19 | 168:2 194:6,9 |
| **media** 10:22 87:13 | 174:6,22 175:5 | 243:11 274:17 | 206:18 217:17 |
| 88:14,19 | 190:13 211:20,22 | **mind** 65:12 283:17 | 292:25 318:2 |
| **mediation** 108:15 | 268:9 291:4 302:10 | **mindful** 64:20 | **moments** 311:9 |
| 108:21 | 305:3 306:2,11 | | 316:21 351:6 |

[money - objection]                                                    Page 28

**money** 39:6 315:21
315:25 347:2
348:22
**month** 59:18,25
**months** 11:24 12:13
25:8 49:9 119:13
309:5
**moot** 258:24
**mooted** 260:2
**morning** 4:6 5:9,10
79:15,16
**motion** 31:6 63:14
107:8 132:5 158:2
281:5
**motions** 30:14,15,22
30:25 31:4 35:24
36:2,9 276:7
**motive** 315:20,23
**motley** 218:16
**motleyrice.com**
263:12,14
**mountains** 178:11
**mouth** 41:13
**move** 72:23 128:6,8
128:10 262:11
278:12 283:11
**moving** 174:16
175:18
**multipage** 211:21
279:4 337:17
**multiple** 144:18
161:25 162:3 175:4

**n**

**n** 2:2 161:2,2,2
358:2
**name** 3:11,22 4:7
44:18 45:4 46:2
50:14,23,25 51:19
52:7,15,22,24 53:10
53:20 56:15,21,23
70:21 110:11 117:4
117:24 118:8 152:9
198:24 201:22
274:3 324:8 346:17

351:11 352:10,13
362:3,4
**names** 52:8,17 92:6
215:25 218:23
**naranjo** 2:13
**narrative** 110:2,10
120:15
**narwold** 267:23
**national** 60:17,18
**nature** 10:11 15:18
155:23 157:18
158:12 168:15
169:12 202:18
204:17,25 223:25
245:2 247:18,25
249:8,15,19 250:11
253:24 286:20
287:7 288:18
306:12 314:4
318:13 325:9 342:2
**necessarily** 81:15
234:4
**necessary** 313:2
**neconomou** 263:12
**need** 41:13 87:4
129:3 139:3 140:4
150:21 151:8 157:5
159:22 170:3
174:17 175:9
178:13 186:14
235:6 241:6 279:19
294:15 315:7
324:12
**needed** 83:8 154:12
154:16 204:11,13
296:4 318:12
**needing** 295:22
**needs** 134:19 151:9
**negative** 304:13
**neglected** 79:22
**neuman** 2:7 84:23
**never** 27:15 35:21
54:12 65:12 81:18
81:25 91:13 146:16
159:12 165:5

195:12 200:20
205:19 208:8
276:20,24 284:12
**new** 1:3,18,19,21
2:4,4,11,16,16 3:12
3:17,17,21 13:17
22:8 86:14 101:4
155:14 162:18,19
209:9 230:16 264:7
281:17 290:11
337:4 361:5
**news** 10:12,17 11:5
13:19 15:10 169:14
273:9 304:16,18
**newspaper** 10:9
208:13
**newspapers** 13:23
**ngos** 30:8
**nice** 304:2 319:18
**nicholas** 351:22
**nickname** 343:18
**non** 10:22
**normal** 284:9
**notary** 1:21 357:14
361:4 362:25
**note** 3:3 112:12
289:25
**noted** 198:8 357:5
**notes** 94:9 95:3,7,10
95:12,16 217:4,5,7
218:4 219:18
231:24 232:5 234:5
234:6 235:3,3
237:11 238:13
**notice** 1:17 197:24
198:2,6
**notion** 76:19
**november** 12:6,9,11
**nueva** 186:9 187:15
187:17 191:5 358:8
358:11 359:22
**number** 3:21 57:24
93:11 101:4,5 121:7
153:3 172:14
184:18 215:18

227:23 228:9,17
229:19 269:19,20
269:24 277:16
291:3 293:19 338:5
**numbered** 94:10
100:18 106:4
175:19 240:10
**numeral** 232:6
264:14 269:24
**numerous** 71:12
173:22

**o**

**o** 161:2,2,2 343:8
**object** 68:22,25
233:24 248:25
283:8
**objecting** 69:9
251:10
**objection** 24:4 32:3
49:15,20 50:16
51:20,21 53:12 61:5
64:19 65:11,18
66:22 69:3 70:5
71:2,22 72:11,14,21
76:24 79:20 88:22
96:17 97:2,11 98:23
99:12 110:13
112:23,24 113:17
115:7,16,21 117:15
120:16 122:2,3
123:7 125:10,12
132:10 137:19
138:4 139:7 140:5
141:7 142:7,19,25
144:4 145:13 147:9
148:20 150:16
151:21 153:14
155:18 156:18,20
156:22 157:20
158:9,20 163:18
164:3,19 165:11
166:9 167:24 169:9
169:18 170:9,23
171:4,23 174:24

183:22 184:7 185:9
185:15 190:10,20
192:3 193:10
197:20 198:3
199:15,18 201:3
202:12 203:21
204:7 206:5 207:25
208:20,23 209:11
215:6,20 216:4
221:23 222:15,23
223:13 224:11,14
224:24 225:17,24
226:6,21 227:12
229:8 230:20,22
232:15 233:14,20
234:21 235:15
236:5,23 237:12
238:7 242:10 243:4
244:24 245:2,6,19
245:21 246:4,15
248:20 250:17
251:8 252:5,7 253:3
253:14 254:9
255:10,25 260:14
261:3,19 262:8,14
265:7 266:3 269:16
270:18 272:19,20
272:22 273:6
277:10 278:2,19
282:18 286:13,23
287:11 288:21
292:5 294:13
295:12 296:11,14
296:21 297:5
301:21,25 304:4
305:6 306:4,24
307:6,13 308:9,21
309:21 310:13
311:21 312:11,13
312:19 314:14,16
316:19 319:10
320:2 322:16,23,25
323:11 324:23
325:13,15 326:8
332:14,17 334:21

335:4,17 336:7,8
339:9 340:2 341:2,3
342:13,15,24
344:24 346:25
347:3 352:23
353:12,22 354:14
355:10
**objectionable** 226:4
**objections** 233:18
**objective** 96:23
112:16 114:15
**obligation** 41:16
**observation** 90:24
**observations** 35:12
36:10,24 38:3 59:8
106:21,22 297:4
**observe** 31:11,18
35:6 89:9 90:3,10
105:14 241:14
332:18 348:21
**observed** 35:21 36:9
43:3,8
**obtain** 72:4 73:6
74:3 82:5 89:3
126:2 175:11
312:22
**obtained** 74:7,10,12
74:14 83:13 108:23
244:21 275:22
332:12
**obtaining** 75:24
254:25 255:7
266:10 267:2 274:8
275:18 329:22
**obviously** 23:19
285:10 305:14
**occasion** 27:6 40:17
81:16 150:8,9
319:24
**occasions** 6:8 15:23
16:3 31:23 33:16
39:13 59:20,25
**occur** 209:21 210:4
211:9 348:9

**occurred** 141:15
200:9
**occurring** 36:4
**october** 10:5 11:17
12:5,18,22 19:4
21:11,16 22:4 23:9
23:18 28:15 29:18
31:14 32:16 33:24
34:24 35:9 36:25
38:4 39:12 40:5,10
40:16 42:14 46:20
191:4,25 349:9,17
349:18 358:10
**offered** 318:23
351:18
**offhand** 333:17
**office** 19:21 56:17
60:18 75:16 77:18
77:19,20 78:13 86:8
86:14 90:14 92:3
126:10,11,12
140:20 141:4
176:17 212:9 264:8
333:12 351:18
352:2
**officers** 192:11
193:8
**offices** 1:17 79:3,6,8
81:7 86:3,7 89:10
89:14 90:3,11
162:20 210:10
212:14,19 215:5
291:7
**official** 85:20
**oh** 12:13 92:11
129:12 140:21
141:5 147:25
218:25 230:4
254:17 323:6 335:7
346:16 351:22
**okay** 60:12 69:5
85:15 94:14 99:11
101:18 104:7 128:5
131:12 132:21
136:8,10 148:2

160:16 164:11
173:2,13 174:13
176:8 181:2,4
186:19 193:24
194:11 197:25
206:22 207:17
213:3,25 216:17
228:14 240:17
241:3 246:9 256:4
268:6 279:21
280:10,17,19
281:24 284:16
299:24 342:15
**old** 209:16 317:6
**omit** 282:13
**once** 11:23,24 76:17
154:20 209:14
239:15 289:21
**ones** 58:3 65:8 76:7
76:13,15 82:18
185:20
**ongoing** 276:3
**open** 120:13 223:25
**opening** 181:23
**opinion** 171:12,22
**opportunities** 71:12
71:15
**oppose** 72:3
**opposed** 69:2 110:4
**opposite** 199:13,25
200:22 201:11
**opposition** 63:15
73:11 105:5
**option** 269:13,19,19
269:20
**options** 268:10,15
268:23
**order** 6:14 41:18
72:3 73:9 77:6
80:24 121:16,17,22
125:25 127:9
172:23 182:13
183:11 207:3 215:8
303:10

| | | | |
|---|---|---|---|
| **ordered** 301:14 | 163:19 164:20 | **oyarte** 174:14 | 104:2,14 105:23 |
| **orderly** 209:25 | 165:12 166:10 | | 106:8,9 107:14 |
| **orders** 55:17 57:10 | 167:25 169:10,21 | **p** | 108:9,12,17,18 |
| 73:24 74:25 168:14 | 170:10,24 171:5,24 | **p** 2:2,2 | 112:11 122:14,14 |
| 185:22 295:17 | 174:25 183:23 | **p.m.** 112:9 160:24 | 122:21 123:22 |
| 297:22 312:22 | 184:8 185:10,16 | 160:25 161:3,6 | 124:15 125:9 127:3 |
| **organization** 24:25 | 190:11,21 192:5 | 172:18 239:8,11 | 128:15,25 129:5,10 |
| **original** 177:11,16 | 193:11 198:4 | 263:16 280:22 | 129:18,23 130:24 |
| **ormand** 2:22 4:17 | 199:18 201:6 | 315:12,15 357:3,5 | 136:19 138:14 |
| 302:4 | 202:13 203:22 | **pablo** 8:21 9:9,24 | 139:6,21 140:9,19 |
| **ought** 197:24 | 204:8 206:6 208:24 | 34:12 40:15,19 | 141:3,12,20,24 |
| **outcome** 316:4 | 209:12 215:21 | 56:12,13 57:5 75:15 | 142:5,11,16 147:2 |
| 361:15 | 221:25 222:18,24 | 75:15 77:20,24,25 | 151:4 170:15,16 . |
| **outline** 93:9,10,13 | 223:14 224:15 | 79:12,12 92:4 | 172:4 174:8 175:16 |
| 93:24 264:2 | 225:2 226:6,23 | 111:10 118:22,23 | 177:3 178:24 |
| **outreach** 204:14 | 227:16 232:19 | 126:16 129:8,16,19 | 182:11 184:13,14 |
| **outside** 19:25 44:21 | 233:15 234:23 | 129:21 162:15 | 187:14 191:3 |
| **outtake** 200:8 | 235:16 236:7,24 | 176:16,18,21 178:2 | 192:22 193:17 |
| 275:25 302:22,25 | 237:14 238:9 | 178:3,5 181:20,21 | 194:13,19 195:16 |
| 304:7 308:6 313:15 | 242:11 246:5 | 185:25 202:6,16 | 195:16 197:7,8,15 |
| 313:17 314:8,11,12 | 248:21 249:4 | 203:4,7,7 205:6,7 | 197:16 198:6 205:8 |
| 315:19 | 251:12 252:9 253:4 | 206:15 210:20,25 | 206:11,13 211:15 |
| **outtakes** 7:8 301:16 | 253:15 254:10 | 212:11,22 214:4 | 212:5 214:16 |
| 301:20,23 302:9 | 255:11 256:4 261:5 | 218:20 230:13,15 | 215:17 216:24 |
| 304:9 305:11 | 261:21 262:9,13 | 231:11,14 235:24 | 217:14 219:25 |
| 308:15 313:22,24 | 265:13 266:5 | 247:10,10,16 281:4 | 220:2,7,8 228:8,12 |
| 314:6 319:17 | 269:17 270:19 | 281:10 282:10,16 | 228:13 231:24 |
| **overall** 36:6 | 278:4,21 282:19 | 282:22 284:18 | 232:3,4 240:12,24 |
| **overhear** 32:14,17 | 286:14,24,25 | 285:12,17 287:3 | 240:25 241:24 |
| **overheard** 33:6 | 288:22 292:6 | 290:7,21 291:6 | 242:2,3,6 245:11 |
| **overlap** 120:4 | 294:14 295:13 | 293:3,15,22 301:10 | 247:7,14,15 252:23 |
| **overrule** 97:10 | 296:22 297:6 | 303:17 305:21 | 254:15,16 259:17 |
| **overruled** 51:24 | 301:22 304:5 305:7 | 314:8 324:8,9 | 264:2 267:19 279:6 |
| 64:23 65:19 66:22 | 306:25 307:7,15 | 332:19,21 343:13 | 280:20 282:3 285:3 |
| 70:6 71:3,23 72:13 | 308:10,22 309:22 | 343:22 347:14 | 301:4 303:8 338:2 |
| 76:25 96:18 99:12 | 310:14 311:22 | **package** 127:6 | 345:14 349:8 |
| 113:3 115:8,17,22 | 312:13,20 319:11 | 276:3 | 356:18 358:3,7,14 |
| 117:16 122:5 | 320:3 322:17 | **page** 8:12 27:3 | 358:19,22,23 359:3 |
| 132:11 137:20 | 323:11 324:24 | 39:21,22 57:15,16 | 359:6,7,16,17,20 |
| 138:5 139:8 140:6 | 325:18 335:5,18 | 58:6 60:14,15 63:9 | 360:3,7,11 362:5 |
| 141:8 142:8,20 | 339:13 342:16 | 71:25 73:8 74:17 | **page's** 58:12,21 |
| 143:2 144:5 147:10 | 344:25 | 85:9 87:18 88:2 | 146:25 174:21 |
| 150:17 153:16 | **overruling** 233:17 | 94:7,17 95:11,21 | **pages** 80:3,6,7 110:2 |
| 155:19 156:24 | **oversaw** 29:25 30:3 | 96:5,11 99:23 | 110:10 122:22 |
| 157:21 158:10,21 | 30:9,10 | 100:18 102:25 | 127:7 135:7 184:14 |

217:5 240:9 241:2,4
241:5,8,12 300:12
301:3
**paid** 25:10 346:22
347:11,20,22
348:15
**paper** 178:12
**paradise** 2:17 4:24
4:25 6:7 49:15,21
50:16 51:21 53:12
110:13 112:24
120:16 122:3 123:7
125:12 148:20
157:5 159:22
177:18 192:17
213:18 220:5 235:6
243:4 250:22 252:5
257:3 272:20
277:11 279:18
283:15,21,23
284:14 289:23
294:15 302:18
314:14,18 316:19
352:23 353:22
**paragraph** 71:10
72:2 73:4 108:11,14
108:19 127:2,4
140:9 141:13 163:2
165:17 167:16
168:6 176:6 177:23
177:24 183:15
186:13,20 187:20
189:16 192:7
242:18 254:13
268:8 281:8 286:3
**paragraphs** 106:12
138:14
**pardon** 249:12
**parentheses** 105:12
**park** 1:18 2:3 3:16
**part** 20:21 21:4
23:20 36:6 38:18
48:10 75:22 86:3
98:3 104:15 105:5
105:15 112:5

145:12 158:7 168:8
176:10 191:15
220:22 221:16
229:4 236:2 237:23
241:12,15 251:18
258:8 259:13
269:21 271:17
274:5 277:22
281:20 282:14
284:9 324:18,21
327:8 330:7 352:18
353:6
**parte** 182:15 183:12
183:20 202:24
221:21 307:21,24
**participant** 158:19
**participants** 205:4
**participate** 94:15
102:7 103:4,9 104:8
104:20 115:3,13
116:17 124:6 129:7
159:10 201:19,21
245:15 263:18
268:21 281:19
**participated** 98:9
117:12 268:18
284:20 304:23
305:2
**participating** 95:5
95:22 168:19 264:6
264:10 267:10
**participation** 32:2
32:11 122:8
**particular** 66:12
108:11 161:25
205:14,15 212:3
226:11 250:20
291:13
**particularly** 258:19
**parties** 3:9 4:2
121:12 127:10
171:8 204:21 248:8
249:16,20 266:23
361:13

**parts** 106:7 126:19
214:15
**party** 130:6 266:22
**patton** 97:24 149:24
151:14,18 161:22
162:9,20 190:14
209:9,18 210:10,16
212:9,13,19 215:5
217:25 218:6
220:17 221:7
225:13,14,20
226:17 230:11
231:4 239:22 240:3
242:8 264:7 265:4
265:17,23 266:13
266:20 267:9
268:19,22 271:25
273:17 277:22
291:7,11 295:8
298:8 323:7 339:4,7
**pattonboggs.com**
263:9 337:19
**payaguaje** 2:12
**payments** 345:20,24
346:5,14 348:18
**pen** 86:18,22
**pending** 182:10
**people** 20:6 22:6,25
28:2 51:16 52:3,9
55:2,10 81:21 82:5
82:7 90:16 92:7,9
99:16 117:3,17,20
118:8 150:12
210:16,17 215:18
222:11,12,20
238:14,16 271:19
290:13,16 297:3
328:19 342:23
**people's** 236:9
**percentage** 316:3
**perfectly** 136:8
233:25
**perform** 192:9,11
192:23,25 274:10
324:13

**performed** 191:17
250:8 312:5
**performing** 43:25
**pericial** 197:7
**period** 16:22 19:9
21:19,23 22:3 23:17
28:19,22 32:15
34:24 42:13 46:8
57:8 61:16 74:11
77:15 88:10 102:14
119:6,12 143:8
153:20 207:15
223:25 244:20
245:9,13
**permissibility**
204:15 225:6
**permissible** 168:13
223:24 255:18
259:23
**permits** 80:24
**permitted** 76:22
318:20
**person** 15:16 21:6
32:25 42:15 43:6,9
51:7 66:7 97:14
150:4,23 180:7,10
189:21 264:8
321:15 339:16
343:14 351:8 354:5
**personal** 20:22,23
20:24 21:2,6 47:4
106:19 170:19,22
171:3 200:24
201:13 260:24
**personally** 47:19,20
198:19 199:8
260:13 261:18
**perspective** 137:13
**perusing** 85:14
94:13 101:17 106:5
122:23 128:23
131:11 132:22
159:18 160:3 173:4
173:12 176:3,7
177:20 179:11

| | | | |
|---|---|---|---|
| 181:3 191:7 194:10 | 326:7 327:5 333:5 | 318:10 342:9 346:7 | **pointless** 296:15 |
| 206:21 211:25 | 345:16 346:13 | 346:23 347:4 | **points** 102:16 |
| 213:4,17,24 240:23 | 348:23 | 348:19 | 124:15 125:9,20 |
| 263:24 268:5 | **plaintiff's** 45:11,13 | **plamp** 172:15 | 126:4 174:17 310:9 |
| 279:22 280:11 | 57:12 59:14 60:6 | **plamp00006226** | 310:12,16,20,24 |
| 283:3,14 284:13 | 85:6 93:4 94:5 | 358:20 | 311:16 312:4 313:6 |
| 338:9 | 99:18 105:21 122:9 | **plan** 186:21 238:4 | 316:11,14 317:3,8 |
| **petition** 63:16 72:3 | 122:11 128:13 | **planning** 306:14 | **police** 60:17 |
| **petitioner** 63:11 | 130:22 136:15 | **play** 273:23 339:7 | **poorly** 290:14 |
| **phone** 21:6 22:16,21 | 159:16 172:2 173:8 | **played** 309:25 | **populate** 29:17 |
| 28:8,9,10,13,13,16 | 175:13 176:24 | **playing** 174:15 | **por** 100:22 |
| 32:25 33:10,12,15 | 178:22 186:5 | **pleasant** 100:11 | **portable** 87:13 |
| 33:20 34:6,16,16 | 187:11 190:24 | 350:23 351:2 | 88:14,18 |
| 174:15 264:11 | 193:15 196:25 | **please** 3:3,6 5:12 | **portion** 210:25 |
| **phones** 3:6 21:3,4 | 197:3 206:8 211:23 | 41:22 94:12 117:24 | 211:2 219:12 |
| **photocopies** 78:16 | 216:22 240:7 | 118:7 123:13 | **portions** 48:18,20 |
| 78:20 | 262:20 267:16 | 144:10,11 146:6 | 51:18 53:9 73:8 |
| **photos** 105:2 130:13 | 279:2 282:25 | 174:10 179:8,16 | 74:17 75:6 234:3 |
| 130:14,15 | 284:25 303:6 338:7 | 189:18 193:23 | 299:10 |
| **phrase** 116:2 | 349:5 358:7 359:3 | 194:6 231:2 248:23 | **possibilities** 267:4,5 |
| **phrasing** 236:9 | **plaintiffs** 8:16 11:6 | 275:14 281:9 | **possibility** 250:9 |
| 237:16 | 11:10,10 31:14,25 | 287:24 289:7 298:2 | **possible** 32:12,13 |
| **physically** 78:12,23 | 32:10 36:18 40:4,9 | **plenty** 343:4 | 52:2 59:11 72:6 |
| **piaguaje** 2:12 4:20 | 40:12 42:10 46:5 | **plus** 21:19 | 148:16 149:9,17 |
| **pick** 3:4 | 47:12,17 65:9,15 | **podolny** 85:10,16 | 182:16 229:6 |
| **piece** 134:18 | 72:4 73:5 76:21 | **point** 22:8,8,10 28:2 | **post** 300:2,5 |
| **pieces** 168:9 | 77:4 89:13,16 96:15 | 38:7 46:19 68:4 | **posted** 11:5,8 46:4 |
| **place** 3:6 44:17 | 108:2 109:4 123:3 | 71:7 74:22 78:15,19 | **potential** 37:15 |
| 138:3 170:3,14 | 131:21 135:21 | 79:24 89:2 102:20 | 207:22 229:16 |
| 210:11 223:10 | 158:17 163:3,7,8,15 | 104:3,15 121:19 | 249:24 266:9 |
| 256:8,9 257:14 | 164:15 166:5 167:9 | 125:23 129:23 | **potentially** 118:18 |
| 290:3,5 302:25 | 171:19 179:13,19 | 144:23 146:22 | 214:24 215:4 |
| 307:24 308:11 | 182:14 187:25 | 150:18 163:15 | 219:21 220:15 |
| 318:14 326:19 | 191:23 199:6 | 164:15 176:16 | 222:14 223:11 |
| 345:13 352:21 | 202:10 203:2,19 | 195:22 234:24 | 230:7 261:23 |
| 353:10 | 206:2 224:6,9,23 | 238:10 263:5 272:8 | 295:23 |
| **plaintiff** 1:6,16 2:4 | 226:20 229:16 | 305:13 307:22 | **practice** 22:24 |
| 77:19 187:22 189:3 | 230:4,8 231:20 | 308:20 315:19 | 124:21 144:24 |
| 190:8,19 207:24 | 234:17 235:10 | 320:13 321:18,20 | 180:9 204:19 248:4 |
| 209:7 251:25 | 236:22 257:23 | 327:12 329:5 331:3 | 248:7,13 249:16,19 |
| 253:12 270:7 | 272:9 275:23 278:8 | 332:24 344:19,20 | **predicted** 260:2 |
| 273:20 286:22 | 278:16,23 287:10 | 345:3,9 347:11 | **preliminary** 124:9 |
| 288:20 296:9 | 291:24 292:10 | 348:25 352:5 356:2 | 124:13 |
| 304:20 305:4 309:8 | 299:7 300:14 | **pointed** 125:8 | **prelude** 197:23 |
| 317:24 325:11,23 | 302:11 306:16 | | |

| | | | |
|---|---|---|---|
| preparation 7:4,18 | press 10:10 11:2,3,4 | 114:22,25 116:11 | 245:17 286:11 |
| 58:4 63:25 64:3 | 11:8 29:23 30:7 | 145:2 148:6 156:22 | process 36:21 83:14 |
| 191:11 337:5 | 108:6 195:22 273:8 | 221:24 222:16 | 103:10 132:2 |
| prepare 6:2,5 30:22 | pressure 342:8 | 223:20 224:14,25 | 176:23 195:19 |
| 89:20 179:24 | presumably 244:17 | 226:6 227:16 | 312:23 |
| 180:11 | presumed 149:14 | 232:16,18 233:17 | produce 98:21 |
| prepared 48:13 53:9 | pretty 341:10 | 233:21,21 238:8 | 259:8 301:15 |
| 54:14 135:12 | prevent 83:18 | 245:3,5,21,23 246:4 | produced 6:23 |
| 173:25 185:18 | 223:10 | 251:5,9 256:2,4 | 57:19 100:19 |
| preparing 93:23 | prevents 83:25 | 262:14 266:4 | 102:21 103:5,11 |
| 120:14 181:8 184:4 | previous 12:16 | 289:14 301:25 | 259:12 304:10 |
| 188:6,14,14 200:24 | 234:23 | 336:25 337:9,13 | 306:11 338:5 342:4 |
| 201:13,21 | previously 96:19 | 340:3,5 342:15 | product 50:23 64:21 |
| presence 22:14 70:4 | 154:4,16 254:24 | 356:4 | 65:16 114:6 154:14 |
| 325:25 326:4 | 308:25 | privileged 96:8,10 | 325:17 337:13 |
| 327:23 333:5 348:2 | prieto 8:25 9:15 | 99:4 114:6,21,21 | 340:7 |
| present 2:20 3:25 | 33:14,15,19 56:12 | 131:4 154:5,14 | production 63:13 |
| 12:10 22:2,19 33:5 | 77:24 79:11 92:4,14 | 201:4,5 224:12 | 251:20 256:6 293:7 |
| 33:14,24 34:4,13,15 | 92:21 118:22 | 225:25 226:22 | 293:13 297:23 |
| 34:20 51:16 52:3 | 141:22 174:4 178:6 | 227:13 252:8 | 313:12 317:18 |
| 65:7 69:17 73:10 | 181:20 185:25 | 261:20 278:3,20 | professional 1:20 |
| 111:17,19 115:4,12 | 203:16 205:6 | 314:3 325:16 | 18:16,18 19:11 |
| 115:18 116:11,17 | 206:14,25 207:21 | probable 66:8 258:3 | 100:10 330:18 |
| 116:21 143:23 | 207:21 208:17 | probably 12:17 | professionalism |
| 150:2 170:18 183:2 | 224:19 247:8,9 | 18:25 24:8 39:20 | 191:19 |
| 200:10 203:25 | 324:9 347:14,23 | 40:22 139:2 140:4 | professor 321:22 |
| 207:12 209:10 | principals 255:2,9 | 141:13 237:15 | professors 174:7,23 |
| 210:15,19,20,21,25 | printed 102:3,6 | 263:20 | prohibit 90:22 |
| 211:3,6 214:4 | printing 101:25 | problem 167:18 | project 25:3 |
| 215:10,19 216:3 | prior 7:11 25:12 | 260:19 | projects 16:25 17:6 |
| 218:10,10,16 219:4 | 29:14 64:2 120:9,23 | procedures 257:17 | 17:7,11 27:19 |
| 219:6,8,12 221:9 | 121:10,25 136:24 | proceed 4:5 177:14 | proof 104:16,21 |
| 230:2,14,16 231:14 | 142:15 182:3 183:9 | 238:2,5 | 129:24 130:10 |
| 246:24 247:7 | 183:15,18 188:14 | proceeding 65:4,25 | 227:11 |
| 267:13,15 291:9,12 | 191:10 194:3 | 93:14,20 94:18 | proper 199:19 |
| 291:19 292:16 | 208:12 217:20,23 | 96:25 120:9 143:9 | 252:16 |
| 325:5 332:10 348:4 | 225:21 273:2 290:6 | 144:9 179:14,20 | properly 293:2 |
| presentation 218:8 | 297:21 312:25 | 230:18 257:24 | proposed 272:9 |
| 219:7,14 | 325:11 | 261:4 265:25 | proteccion 206:17 |
| presented 288:3,13 | private 3:5 | 336:21 | protective 6:14 |
| preserve 68:23 69:7 | privilege 65:11,18 | proceedings 15:8,15 | proved 77:6 |
| 236:6 237:13 251:6 | 72:14 83:5 96:15 | 35:13 46:11 82:20 | provide 68:18 76:22 |
| 251:9 | 97:6,7,8,20,25 | 105:17 143:12 | 91:17,20 185:4,6 |
| president 186:8 | 98:15 99:4 112:14 | 228:10,17,21,23 | 191:23 286:18 |
| | 113:14 114:3,7,13 | 229:2,6 244:22 | 316:14 328:17 |

332:6,25 333:6
**provided** 47:17
55:19 77:3 91:23
102:22 103:6,12,22
109:5,12,17 110:8,9
124:14 126:13,15
162:17 182:16
185:20 188:4,13
191:9 193:8 201:2
201:15 259:20
311:25 318:20
322:5 324:19 325:3
333:8,9,17 340:14
**providing** 198:20,23
**public** 1:21 30:7
356:9 357:14 361:4
362:25
**published** 14:16,21
**pull** 56:18
**pulled** 76:17 176:11
187:7 333:19
**pulling** 76:16
176:20,23 178:10
178:14
**puppeteer** 342:19
**purported** 52:8,16
**purpose** 55:13 62:22
64:17 67:5 88:8
112:20 113:13,15
127:15 174:21
177:11,17 282:10
322:13,20,22
323:15 326:15
338:21
**purposes** 74:14
112:13 323:19
**pursuant** 1:16 6:23
100:20 338:6
**pursue** 37:4
**put** 142:23 145:20
146:9 147:7,19
148:8 151:3,4,11
214:11 223:10
250:12,24 312:2
322:3 330:17

**putting** 7:21 14:24
15:12 145:2 146:14
146:23 147:5
154:13 180:16
181:5 244:6 253:7
308:16 328:11
340:21

**q**

**quantity** 330:12
**question** 9:21 33:13
52:12 66:11,24 67:2
67:4 83:3 92:12
103:8 109:9 113:4,9
115:11 116:14
120:3 123:10,13
132:24 133:22
139:19 144:10,13
145:10,15,17,19
146:7,13 147:18
157:6 164:12 168:3
179:17 197:23
199:19,22 200:13
204:2 222:18
226:13 230:25
234:10 235:7
242:12 243:21
246:17 248:5 250:3
250:4,23,25 252:10
257:19 259:10,22
260:16,19 271:6
275:7 277:15 278:6
287:24 294:16
307:16 310:3,5,6
312:7 318:2 322:9
323:2,13 326:10
328:10 331:21
335:7,10 346:9
351:3,24 354:17,20
354:25
**questioned** 233:19
291:21
**questioning** 65:6
127:16 145:9 284:9

**questions** 5:12,19
80:23,25 81:5 85:4
102:13 111:23
112:2 134:12
170:18 182:5,10
191:16 213:2
216:10,13 223:20
240:24 245:8,9
285:9 294:25
317:13,15,17
354:13,23
**quick** 227:17
**quickest** 232:11
**quickly** 176:2
**quimby** 2:10
**quite** 13:8 244:10
282:9 311:13
**quito** 58:14 60:23
61:3,22 62:13 75:16
77:18 81:7 90:4
92:3 126:10,11,12
137:14 138:12,18
138:22 191:4
241:20 274:19
358:10
**quote** 314:24

**r**

**r** 2:2 5:4,4,4 161:2,4
161:4,4 240:16
**rack** 140:20 141:4
**raise** 38:12 39:6
133:14 190:16
205:24 224:2,18
296:3
**raised** 79:23 115:14
116:18,25 119:11
158:4 182:5 203:15
224:19 225:10,11
247:8 248:15 249:7
249:17,23 261:7
266:10 311:12
316:22 317:16
321:19 345:4
352:20 353:8,15

354:23 355:21
356:2
**raising** 37:3 38:2,22
39:3 134:5
**randy** 2:8 213:22
**rbrodsky** 2:5
**reach** 205:2
**react** 352:19 353:8
354:22 355:3,7
356:6
**reacted** 353:18
**reacting** 355:11
**read** 10:15 11:19
12:8,16 13:10 14:4
14:9,13,15,20 24:10
95:20 107:3,10
123:15 131:7 135:6
144:14,16 168:4
172:22 173:7
177:19 179:8
186:14 189:17
193:5 194:4,6,9
206:19 208:12
217:21,23 246:11
246:12 248:24
263:20,21 279:19
281:9,13 283:13
287:3
**reader** 210:2
**reading** 11:21 67:19
102:12 107:7 129:2
129:4 131:10
141:10 159:25
173:19 180:21
189:21 192:18
212:20 213:12
279:24,24 283:4,22
284:3 288:7 294:3
**reads** 134:25 189:17
**realize** 177:11
**realized** 313:9
**really** 36:8 37:21
39:19 44:21 59:11
67:11 92:9 106:17
127:15 135:10

| | | | |
|---|---|---|---|
| 136:4 151:25 152:6 | 106:25 108:8 | 212:13 214:2 | 324:5,17 325:19 |
| 153:10,11 180:8 | 110:21 111:6,11 | 215:22,23 218:7,8 | 326:11,18,20 327:6 |
| 250:25 | 113:24 114:18,19 | 218:15,18 219:15 | 327:7,7,10,13,17,18 |
| **reason** 65:19 66:6 | 115:23 116:9 118:2 | 220:18,19 221:12 | 327:18,22 328:2,15 |
| 66:23 83:3 155:10 | 118:10 121:10,14 | 221:18 222:2,19,25 | 328:20 330:11 |
| 155:11 156:6 | 121:18 122:6,7 | 223:6,7,7,9,18,19 | 331:23 332:9 333:3 |
| 157:24 218:17 | 124:19 125:5 | 225:3,4,5,12 226:24 | 334:4 338:19,25 |
| 257:7 346:24 362:5 | 126:14 129:13,20 | 226:25 227:2,4,7,18 | 341:14,15,19,19,25 |
| **reasonable** 66:7 | 130:14 131:20,22 | 228:5,22 229:13 | 343:24 345:19 |
| **reasonably** 258:23 | 133:4,5,9 134:6,25 | 230:4 231:3,9 | 347:8,8,18,21,21,23 |
| **reasons** 46:6 226:7 | 134:25 135:2,2,3,7 | 232:20 235:23 | 348:6,7 349:15,16 |
| 233:16 234:23 | 135:7,8,9,10,23,24 | 236:25 237:2,18 | 350:3,8,19 356:7 |
| **recall** 10:23,24 12:7 | 135:25,25 136:2,5 | 239:21 240:2 | **recalled** 290:15 |
| 13:14 14:2,8 16:17 | 137:24,25 138:6 | 241:10,13,16 244:2 | **recalling** 70:11 |
| 17:14,16 20:25 | 139:24 140:8 141:9 | 251:18 252:11,13 | 108:6 119:2,4 |
| 26:22,24 28:20,21 | 141:21,23 142:21 | 252:17 253:5,16,17 | 130:13 153:18 |
| 28:25 29:8,17 32:20 | 143:6,7,11,18,21,25 | 253:19 255:5,14 | 219:6 230:15 |
| 32:23 34:3 36:3 | 144:17 146:19 | 256:5 259:16 | 329:10 |
| 38:23 39:4,19,24 | 147:11,13 148:3,13 | 261:22 262:2,10 | **recalls** 134:21,21 |
| 41:4,6 42:16 43:13 | 149:11,19 150:2,6 | 264:6,9,10,12 | 266:15 |
| 44:10,15 47:2,19,20 | 150:10,18,22 | 265:11,14,15,16 | **receive** 27:25 208:5 |
| 48:25 49:12,13 | 153:11 155:21 | 266:8,24,25 267:14 | **received** 12:25 |
| 50:10,22 51:4,5,6,8 | 156:13 157:14 | 268:25 269:5 | 208:8 216:2 |
| 51:10,25 52:20 53:3 | 158:11,13,23 159:5 | 270:20 271:7,11,18 | **recess** 80:17 160:25 |
| 53:4,14,16,18 55:6 | 159:14,15 160:7,12 | 271:19 272:4 | 239:9 315:13 |
| 55:7,14 56:3,13,15 | 161:12,15 162:8,13 | 273:12,19,22 | **recipient** 280:24 |
| 56:21 57:4 58:5,8 | 162:14,23 163:23 | 274:15 275:23 | **recognize** 45:22 |
| 59:4,6,7 60:4 61:12 | 163:25 165:16 | 281:15,18,21,25 | 57:25 123:20 |
| 61:24 62:3,4,8,19 | 166:14,18,21 167:6 | 282:15 285:21 | 196:12 217:10 |
| 62:21 64:6,10,13 | 167:14 168:8,10,17 | 286:9,15,17 287:2 | 228:2 338:13,15 |
| 67:7,9,12,15,17,20 | 169:11 170:25 | 288:23 290:10,14 | **recollection** 13:25 |
| 67:22 68:3,3,8,9 | 171:25 172:8 | 290:19,22 291:2,10 | 17:13 44:12 48:23 |
| 69:14 71:4,20,24 | 173:14,20 175:2,12 | 291:13 292:8,23 | 58:11 59:2 61:3,8 |
| 72:12,24 73:3,17 | 176:14 182:3,8,20 | 293:3,10,14,15,18 | 94:23 98:5 106:16 |
| 74:5,9,15 76:5 | 183:25 184:9 | 294:18,19 295:2,4,7 | 119:7 136:2,6,8 |
| 77:11,12,12,15 | 185:18 187:10 | 295:14 296:14,16 | 144:3 151:17 152:3 |
| 84:12 87:17,20,21 | 188:16 189:4,5,8,9 | 297:24 298:15 | 152:14,15,18,19,25 |
| 87:25 88:4,8,12,16 | 190:22 191:13 | 299:15 302:17,21 | 153:6 159:20 160:5 |
| 90:8 91:7,22 93:15 | 192:6 195:2,6 199:3 | 303:3,12 305:8,11 | 166:19 167:3 175:3 |
| 93:22 94:3,20 95:2 | 199:10 200:4 | 307:2,8,18,25 | 177:16 180:3,6 |
| 95:3,23,24,24 96:3 | 202:14 203:4,5 | 315:18,22 316:17 | 194:23 206:24 |
| 97:5,21 102:12,16 | 204:9,10,16 205:11 | 316:21 319:13,15 | 207:7,9,20 212:18 |
| 102:16 103:14 | 205:16 206:7 208:9 | 319:19 320:9,10,12 | 219:10 222:10 |
| 104:13,24,25,25 | 209:2,13 210:5,8,15 | 320:22,24 321:2 | 230:10 242:6,14 |
| 105:2,3,18 106:13 | 210:18 211:3,7,10 | 322:18 323:12 | 243:18 268:13,18 |

274:19 281:17
284:18,22 285:16
285:24 297:19
298:5,24 326:22
347:17
**reconsider** 237:6,11
**record** 3:3,10 55:18
55:22 57:7 59:23
61:14 63:2 68:23
69:7 73:8,23 74:18
74:24 75:5,7,8,12
75:17,19,21,23
76:10,14 77:17 78:3
78:6,15,17,19,21
79:4,5,18 80:16,19
81:9 82:3 84:23
89:5 91:6,25 123:15
126:9,12 133:19,21
140:21,23 141:5
144:16 160:24
161:6 172:15
173:10 213:10,20
213:22 214:6,13,13
233:4 234:15 236:3
236:4,10,12,14
237:3 239:7,11
242:22 246:12
248:24 251:9,12
259:13 289:24
300:11,19 311:9
315:12,15 318:19
334:9,11 343:3
344:17 357:3
361:10
**recording** 3:9
**records** 56:19 92:10
178:14 239:16
241:20 243:11
274:18 299:22
**recounted** 208:10
**reed** 2:5 4:7
**refer** 107:20,23
148:17 171:20
177:25 343:7,13
344:3

**reference** 49:4
176:17 230:24
238:22 283:6
327:21
**referenced** 15:10
125:25 126:3
132:15 140:12
173:17 204:2 208:7
261:10 332:22
352:10
**references** 44:19
**referencing** 107:5
208:13 248:6
**referred** 10:13,25
137:18 343:23
**referring** 108:3
123:24 129:19
132:18 147:2
148:19 226:13,14
253:22 277:13
344:9 350:10
**refers** 107:14
230:25
**reflect** 237:3,4
239:15
**reflected** 216:11,15
**reflecting** 188:18
223:4 260:9
**reflects** 240:14
241:17
**refresh** 58:10,25
61:2 124:20 138:8
159:20 160:4
177:15 194:22
206:23 207:6,9,19
208:11 212:18
230:9 231:13 242:5
268:12,17 274:18
284:17 285:15,22
**refuse** 294:25
**refused** 8:21 9:2,6
9:10
**regarding** 30:6
47:16 64:12,17 67:5
67:25 68:7 70:2

72:10 76:2 77:14
87:10 89:5 97:20
102:9,13 111:19,23
112:2 115:4 140:16
154:9 156:11,15
157:10 158:15
159:3,9 165:18
168:18,20 170:22
171:3 182:6 202:6
203:16,18 204:14
206:25 207:22
235:20 236:20
245:16 265:3,17,24
270:15 271:21,22
288:18 291:21
296:7 301:19 302:8
317:13,18,22 319:8
319:17 345:15
352:21 353:9
**regardless** 38:24
121:21 174:11
291:12
**registered** 1:20
**regret** 356:11
**regular** 275:20
**regularly** 276:2
**relate** 242:22 245:9
**related** 29:23 46:15
55:19 57:7 74:10
76:8 88:11 98:15
121:8 185:5 250:4,5
252:18 276:6
297:22 355:21·
361:12
**relating** 13:2,11,24
14:4,16 15:2,14
22:13,25 35:11,12
66:17 76:11 77:9
81:10 88:6 92:2
93:13 94:17 144:8
149:9 150:14
152:21 153:3,23
156:2,19 157:12
159:7 184:23 187:9
225:22 226:18

230:17 265:5
286:19 294:7
295:10 312:17
327:24 342:12
**relation** 98:18
187:22 189:2 190:7
190:18 320:5 345:3
**relationship** 15:19
16:5,12,18,21 18:4
18:11,16,18 19:5,12
19:12 46:12 158:16
202:2 203:18
207:23 209:6 224:8
224:22 251:25
253:12 255:24
260:9 270:17
286:20 287:8
288:19 294:8 296:7
302:9 304:19 309:6
309:18 312:17
317:22,23 318:9,24
325:10,22 326:6
335:24 351:4
**relayed** 118:3 311:2
**relaying** 117:12
**release** 108:7
**releases** 10:10 11:2
11:3,4,8
**relevance** 24:5
355:11
**relevant** 41:15
57:10 73:23 75:6,9
82:13 185:21
223:21 287:23
**relied** 35:22 267:7
**rely** 106:24
**relying** 68:17 70:14
70:21
**remain** 138:22
**remaining** 241:5
**remember** 14:3
29:16 47:6 52:4
59:12 63:4 64:3
69:15,18,21 87:22
93:12,23 95:5 96:22

98:8,12 101:10,25
111:12,16 112:19
114:4 116:2 134:9
138:21 140:15
150:5,23 153:22,25
188:17 189:21
210:19 212:17,22
218:5 219:2 220:14
221:4,14 223:2
225:10 226:10,11
226:14 228:19,24
229:4,11,12 235:13
244:3,6 247:22
253:8 256:13 262:3
265:3,22 266:7
273:16 275:15
292:7 294:3 307:3
314:10,11 317:20
319:22 331:17
350:4 352:12,13
**remembering**
134:17 161:24
308:13
**repeat** 50:2 52:11
66:25 103:7 109:8
113:10 115:10
116:13 132:23
139:18 144:12
164:12 179:17
199:21 201:8 234:9
294:16 328:10
353:4 354:19
**repeated** 235:7
**repeatedly** 250:12
**rephrase** 5:13 245:5
260:20 278:11
**reply** 120:8 331:15
**replying** 120:5
**report** 39:11 44:19
44:22,25 45:3,4,21
45:25,25 47:13,14
48:8,9,17,19,21
49:17,24,25 50:7,9
50:14,15 51:18,18
52:6,10,14,18,23

53:10 54:11,15
60:20 65:5,23 107:5
107:9 108:16,22
109:7,14,22 110:19
123:4 132:4 163:9
163:16 164:16
165:5,8 169:8,17
170:7 171:11,21
179:2 182:17 184:5
193:9 196:5,13,15
198:18 200:15,25
201:14 206:4 222:5
222:6 237:7,11,20
237:24 238:3,6
254:13,19 265:25
267:6 269:6 293:21
294:11,21,23
295:21,23 298:7
299:11 301:4
314:10,22 324:15
324:21 326:14,17
327:4,9,16,25 330:7
330:19,19,22,24
331:8 334:19
335:15 337:3,7
342:3,12
**reporter** 1:20 4:3
10:18
**reporting** 362:2
**reports** 153:20
272:11,15,17 273:5
273:5,18,25 274:10
274:14 300:3,5,7
301:7,9 323:19
324:13 326:16
328:5 329:14 332:3
334:2,19 335:2,14
336:11 337:4,6
339:19 341:18
342:10
**represent** 4:2 36:17
**representations**
322:6
**representative**
332:12

**representatives** 8:15
11:9 31:13,24 32:9
40:3,8,12 108:2
123:2 130:16
158:17 166:5
167:10 191:23
199:6 202:10,25
203:19 206:2
207:24 209:8
218:12 224:5,8,22
226:19 231:17
236:21 252:2
253:13 270:7
273:21 278:17
286:22 287:9
288:20 291:24
296:9 302:10
304:21 305:5 309:8
317:24 325:11,23
326:7 327:5 333:5
333:11 342:9
345:17 346:6,14,23
348:18,23
**representing** 3:12
4:4,25 109:3 179:12
179:18 345:16
**request** 76:4 87:9
88:12 178:11
184:20 185:21,23
272:14 333:20,20
337:4,23
**requested** 83:13
102:10 121:11
274:9 328:18 330:6
330:6,15 333:7
334:6 340:14,16
**requesting** 112:22
180:6
**requests** 113:23
334:12 337:21
338:22 339:17,21
340:10 360:10
**required** 175:7
**requirement** 17:15

**research** 122:17
**researching** 132:2
132:25 133:2
**respect** 33:13 65:15
65:16 66:2 101:23
127:2,4 316:23
336:25
**respectfully** 258:12
**respects** 23:23,24
**respond** 119:22
174:13 193:23
275:12 295:9
313:19 322:25
**responding** 54:18
101:22 112:20
228:25 303:25
**responds** 138:14
**response** 58:19,21
70:25 87:8 93:14,19
105:16 114:24
127:9 174:5 182:13
183:10 185:20
204:6 248:10
257:15,19 303:23
304:14 348:13
**response.doc.** 93:10
**responses** 140:11,17
276:8
**responsibilities**
184:24
**responsibility**
103:16 130:9
192:13 193:3
**responsible** 130:6,6
185:12,14 274:6
**rest** 240:13
**restaurant** 344:4
**result** 208:19 238:4
253:11 261:17
296:6 297:10
**resumed** 161:4
**resumés** 27:25
**return** 87:14 88:16
**returns** 135:17
259:2 284:14

reveal 64:21
review 6:12 7:3,7,11
  7:16 30:14 85:9
  94:11 101:13
  124:18,21 159:23
  175:21 176:2 212:2
  268:3 270:14
  289:13 330:7
reviewed 6:8 58:4
  76:17 121:7 125:6
  126:5,5 136:24
  175:25 177:7
  225:16,21 226:18
  241:4 280:14
  284:18 285:16
  338:10 352:11
reviewing 128:21
  270:20 280:12
  281:20 299:22
revise 341:10
revisit 71:6
rice 218:16
richard 42:19 45:5
  46:25 50:14,23,25
  51:19 52:7,15,24
  53:10 71:18 107:15
  181:23 186:10
  187:17 190:5 191:6
  198:24 220:25
  222:4 234:18
  235:11 236:16
rick 178:25 179:12
  179:18
right 6:20 19:25
  20:17 24:13 26:8
  61:10 136:13 139:2
  152:22 160:2,22
  194:19 197:18,19
  209:18 218:25
  243:7 250:19,19
  258:21 298:19
  307:17 315:9 319:6
  332:17
risk 227:2,5

risks 220:23 221:4,5
  224:3 227:7 237:23
  244:23
rmastro 2:8
rockwell 218:24
  219:3 279:13
role 29:19 37:3
  43:15 48:7 64:8
  74:2 76:2,6 77:9,14
  85:23 86:4 101:20
  120:14,21,23
  131:19 184:24
  200:24 201:13
  214:20 227:23
  251:19 254:14,19
  273:23 289:12
  299:6 329:18 339:7
roles 132:16 251:18
roman 232:5 264:14
  269:23
room 3:25 19:19,23
  19:24 20:3,3 22:24
  23:3 58:15,19 75:8
  81:8 86:9 133:17
  135:17 210:13
  213:14,15,16 214:7
  257:6 259:2 283:24
  284:15 296:3
  351:15,17
rooms 77:23 81:10
  90:17
roughly 21:10 41:20
rude 351:7
rule 66:11 113:6
ruled 65:2,12,13,22
  66:4 127:19 139:13
  259:12
rules 73:9 167:20
  168:17,20 169:3
  204:13
ruling 69:6 99:14
  137:22 139:16
  164:5 257:8 302:12
  302:13,15,16

rulings 77:4 83:5
  184:11
rush 175:11

**s**

s 2:2 105:6,25 161:2
  161:2,2 196:23
  358:6 359:2 360:2
  362:5
saenz 9:10,24 34:12
  34:14 56:13 77:25
  79:12 92:4,14,23
  118:23 178:3,5
  181:20 185:25
  205:7 247:10 324:9
  347:15,24
salad 18:22
salary 347:9,11
samples 186:23
sampling 80:5
  130:17 341:13
samplings 334:4
sat 20:15,16,17
save 160:14 279:16
saved 265:9
saw 15:23 31:7 43:9
  63:24 121:19
  219:23 276:23
  287:21 293:24
  300:11 301:3
  305:10 307:3 308:5
  308:14 352:11,12
saying 47:3,7 68:10
  68:11 69:19 70:20
  97:12 100:10 134:5
  134:6 135:10 136:4
  136:4 140:23 148:7
  149:21 150:20
  151:8,24,25 166:22
  167:6 174:11
  181:23 204:11,19
  233:7 250:10 253:6
  253:9 259:7,9
  290:16 296:7
  297:14 303:25

314:9 316:25
  319:17 347:24
says 58:13 60:16,22
  61:20 72:2 73:4
  74:16 86:17 87:2,8
  93:9 96:6 99:24
  100:23 102:20
  104:3,15 105:4
  106:9 108:12
  112:12 126:20,25
  129:24 130:4 137:4
  138:18,24 140:3,19
  141:17,24 163:2
  165:18 167:16
  171:7 172:25
  173:21 174:6,8
  176:10 177:10,22
  178:5 182:11,24
  186:13,20 187:15
  187:20 191:17
  192:8,22 195:7
  197:6 214:20
  217:14 219:19,20
  220:23 228:8,15
  229:15 231:25
  232:5,10,25 236:3
  237:6 240:11
  241:23 242:17
  248:14 252:21
  254:13,23 264:14
  264:16 268:7
  269:20,24 277:4,16
  281:3,8 282:4 285:9
  286:4 303:15,16
  349:19
scan 82:14
scanned 82:13,18
scanning 172:19
  173:14,16
school 15:21 16:2,23
  17:9 24:21 319:5
schreck's 101:20
scientific 228:5
  266:11 274:7
  295:22 324:13

scope 173:23
sdonziger 131:4
  194:18 279:10
seat 20:15
second 61:24 62:5
  63:5 66:10,13 99:23
  102:19,25 104:2,15
  107:13 112:9 127:2
  140:9 145:18
  147:17 163:2
  168:24 170:16
  172:22 173:3
  177:23 191:3 192:8
  194:13 214:16
  217:13 228:12,13
  241:22 254:23
  270:23 272:6
  283:13 297:16
  298:2 299:19
  301:14 303:10
  304:6 318:6 336:2
section 15:7,14
  35:12 63:16 96:25
  105:6,10,17 125:8
  212:3 214:18
  264:22 265:25
sections 109:22
  110:18,20,22 125:8
  128:22 165:6
  293:21 294:21
  298:7
see 13:24 37:20
  44:18 45:15,18,24
  58:9,17,20,23 60:24
  61:11,20 62:14
  63:17,19 71:7 72:7
  73:12,13 74:16
  86:25 87:5,6,15,16
  96:5,10 100:2 102:5
  102:19 104:2,18
  105:8,13 107:17
  112:17 126:20,25
  127:12 130:2,7
  132:6 137:6,9
  138:17,24 139:4

140:13,24 142:2
147:25 159:6
163:12 167:16
170:15,19 171:15
172:11 174:5,7
177:22 179:3
182:18 183:3
184:14,20 186:21
187:4 188:2 191:16
191:20 192:14
193:3 194:2,13
195:7,15,23,25
214:16,20,25
219:19 221:2
227:19,24 228:11
228:15 229:15
232:5,12,25 233:4
236:2 237:7 239:18
240:18 242:3 246:2
254:12,15 255:3
257:18 258:25
264:15 270:4
274:18,24 280:9,22
281:6,11 282:6
283:5 285:13 286:3
286:7 287:5,25,25
288:5,11 289:6,12
303:15,19,22 339:5
344:16 349:11,22
seeing 51:7 64:2,3
  77:12,13 101:10
  102:17 129:20
  159:21 273:14
  315:18
seek 37:14 71:13,16
  81:23 154:9,24
  168:14 321:19
seeking 37:7,11,23
  77:5 96:7 98:22
  169:2 177:5
seeks 71:14
seen 10:24 13:19,21
  46:6 135:5 160:5,6
  193:25 208:6 241:8
  241:9 273:7,8,10

276:13,19,20
sees 287:22
select 36:16 185:7
  193:7,12
selected 186:22
selva 24:21 79:8
  89:14 130:4
semblance 136:7
send 84:19 330:9
  331:21
sending 93:12
  303:24 312:15
  319:16 330:5
  340:16
senior 23:19
sense 88:10 154:3,7
  154:8,12,23 169:25
  231:18
sensitive 3:4
sent 6:13,16 84:15
  84:16 85:11 93:7
  94:2,8 124:16
  128:16 140:13,16
  193:20 198:10
  290:2 299:11
  312:22 329:4
  330:13,15 333:19
  336:17
sentence 71:11
  86:25 87:8 112:11
  163:4 168:5,10
  176:6 177:24 192:8
  193:5 241:22
  252:23 253:6
  254:23 293:4
  349:23
separate 6:7
separately 162:6
september 7:13 8:2
  8:5,8,12,17 9:13,16
  274:20,21,22
series 106:11 119:2
  119:4 173:18
  184:15

served 120:21
set 19:21 20:13
  117:21 175:4
  210:17 361:8,16
seven 41:23
share 141:25 142:5
  142:12,17
shared 159:12 311:4
  321:13
sharing 147:3
she'll 306:6
sheet 362:2
shelley 85:10,16
  86:17
shinder 128:18
  131:2,14,14 163:4
short 131:22 213:6
  280:3 341:21
shortly 49:8 308:4
  350:5
show 45:7,8 57:14
  59:13 60:5 63:7
  85:3 92:11 94:4
  100:17 104:5
  124:25 136:18
  186:4 187:13
  190:23 191:24
  193:14 196:20
  206:10 211:14
  239:14 240:6
  241:20 243:15
  262:22 267:18
  282:21 284:24
  302:9 303:5 337:16
  349:7
showed 104:11
  300:19 304:11
showing 60:13 93:3
  175:15 302:22,25
  309:11
shown 161:11
  188:18
shows 189:13
  241:17

| | | | |
|---|---|---|---|
| **side**  272:10 | 95:2 96:12 101:16 | **source**  97:15 104:4 | 79:16 80:13,21 81:4 |
| **sidebar**  135:19 | 102:24 103:7,17,24 | 104:10 180:15 | 81:13,25 82:9,17,24 |
| **sides**  249:17 276:5 | 105:3 107:3 108:17 | **sources**  10:14 13:20 | 83:16,22 84:9,14,21 |
| 276:10 | 108:25 109:8 113:8 | 14:2 106:4 132:3,9 | 88:24 89:11,19 95:9 |
| **sign**  184:6 201:23 | 113:22 115:10,11 | 133:3 180:15,18 | 95:17 96:18 97:3,10 |
| **signature**  123:6 | 116:13 118:11,15 | 181:7 | 98:24 99:6,11 101:3 |
| **similar**  29:4 167:22 | 119:16 124:10 | **southern**  1:3 3:20 | 101:7 107:16 |
| **simply**  257:16 | 127:14 128:7 | 13:17 | 109:24 110:4,7,15 |
| **single**  65:11 | 129:12 131:9 | **space**  20:2,7 78:2 | 113:2 115:8,17,22 |
| **sit**  41:13 | 132:14,23 139:18 | 86:8 351:19 352:2 | 117:2,16 118:7,12 |
| **sites**  186:22 | 141:25 144:12 | **spacing**  324:8 | 120:18 122:5 123:9 |
| **sitting**  4:16 62:21 | 146:8 151:2 152:5 | **spanish**  45:17 46:4 | 123:12,16 124:10 |
| 63:3 | 159:24 164:7 | 52:16 92:18,21 93:2 | 124:24 125:16 |
| **situation**  29:7 | 166:25 168:9 | 358:12 | 127:14 128:7,10 |
| **six**  6:11 61:9 178:24 | 175:23 176:5,6 | **speak**  5:19 7:20 | 132:11 133:16,23 |
| 211:15 | 179:9,16 181:14,18 | 23:3 40:19 51:15 | 134:3,23 135:15,18 |
| **skipped**  218:23 | 183:13 192:19 | 55:16 64:11,16 67:4 | 136:11 137:20 |
| **skype**  94:21,24 95:5 | 199:21 201:8,9 | 112:4 156:4,10 | 138:5 139:8,10 |
| **slight**  192:17 | 215:7 218:7 219:16 | 169:23 197:21 | 140:6 141:8 142:8 |
| **slightly**  101:11 | 219:24 234:9 235:8 | 230:3,5 231:5 | 142:20 143:2 144:5 |
| 226:4 243:7 245:25 | 243:8 246:10,16 | 318:12,18 319:7 | 145:8,16,25 146:5,9 |
| **small**  80:5 151:20 | 250:2,21 251:7 | 328:13 339:20 | 147:10,16,25 |
| 152:13 153:8 | 254:17 256:20 | 345:14 | 148:22 149:2,20 |
| 337:19 339:4,14,20 | 260:16 265:15 | **speaking**  22:25 | 150:17 151:22 |
| 339:24 | 268:16 272:24 | 32:15,17 33:6,19 | 152:7 153:16 |
| **smallish**  207:4 | 274:3 275:10 | 49:19 53:21 98:14 | 155:19,24 156:5,21 |
| **socialize**  18:19 | 277:12 281:24 | 100:7 117:10 149:6 | 156:24 157:21 |
| **socializing**  18:15 | 291:5 300:8 302:20 | 152:11 200:5 | 158:10,21 160:13 |
| **soil**  186:23 | 308:2,11,15 310:4 | 222:11 266:12 | 160:17 163:19 |
| **somebody**  57:6 | 313:15 321:6 | 292:24,25 319:15 | 164:4,7,20,24 |
| 78:16,23 95:12 | 323:12,24 327:22 | 354:8 | 165:12 166:10,17 |
| 151:2 175:7,8 185:7 | 328:9 329:24 | **speaks**  128:2 283:9 | 166:23 167:2,25 |
| 218:15 233:7 235:3 | 330:21 331:4 | 283:11 287:12 | 168:21 169:10,21 |
| 253:8 289:12 | 334:22 335:7 | **special**  2:21,22 4:15 | 170:10,24 171:5,24 |
| 326:23 328:16 | 343:22 346:11,16 | 4:16 5:17 12:15,23 | 172:21 173:2 |
| 329:4 | 346:17 347:13 | 24:6,15 25:4,16,19 | 174:25 179:7 |
| **soon**  87:4 | 348:15 351:23 | 25:23 26:2,6,10,13 | 180:24 181:15,24 |
| **sorry**  5:18 12:9 | 353:16 354:19 | 26:18,25 27:9,16,22 | 183:23 184:8,10 |
| 13:14 14:7 17:4 | **sort**  134:20 311:24 | 28:5 32:4 41:10,22 | 185:10,16 188:8,11 |
| 24:9 28:5,25 39:7 | **sought**  82:2,18 | 43:21 49:18 50:18 | 188:20,23 189:15 |
| 40:6,13 43:20 44:17 | 113:22 227:9 | 51:11,23 57:18,22 | 189:20 190:11,21 |
| 50:2 52:11 56:22,25 | **sound**  56:24 | 59:16,24 60:8,12 | 192:5 193:11 194:8 |
| 59:12 61:12 63:6,8 | **sounds**  61:10 228:4 | 64:23 67:3 68:24 | 196:9,17 197:22 |
| 63:18,20 66:25 | 257:15 | 69:4,8 70:6 71:3,23 | 198:4 199:17 |
| 67:11,20 86:12 92:5 | | 72:13,16,22 76:25 | 200:12 201:5 |

202:13 203:9,22
204:8 205:18 206:6
207:2,17 208:2,24
209:12,14,20,24
210:9,14,22 211:5,8
211:11 212:7,23
213:7,11 214:11
215:7,21 216:7,18
218:22 220:25
221:25 222:17,24
223:14 224:13
225:2 226:3,23
227:14 230:21
231:7 232:16,19
233:15 234:22
235:16 236:7,24
237:14 238:9 239:4
242:11 243:6
244:25 245:4,20,24
246:16,21 247:2
248:21 249:3 250:2
250:18,24 251:7,11
252:9 253:4,15
254:10 255:11
256:3,10,14,19,22
257:5,9,22 258:4,13
258:18,22 259:25
260:18 261:5,21
262:9,12,18,25
263:19 265:9,12
266:5,14,17,21
269:17 270:19,22
271:5 272:5,24
275:5,13 276:12,18
276:22 277:2 278:4
278:10,21 280:4,9
282:19 283:12,19
284:5,8 286:14,24
287:14 288:4,22,24
289:6,10,17,20
292:6,11 294:14
295:3,13 296:12,22
297:6,15,25 298:11
298:17,22 299:4,13
299:24 300:4,20

301:2,22 304:5
305:7 306:6,14,20
306:25 307:7,10,15
308:10,22 309:22
310:2,8,14 311:22
312:12,20 313:20
314:16,19 315:10
317:5,25 318:7,16
318:22 319:6,11
320:3 321:10,21
322:10,17,24 323:6
323:10 324:24
325:18 326:9
329:24 330:8,16,23
331:2,9,20 332:16
335:5,18,25 336:18
336:20 337:14
339:10,13 340:4,8
341:3,6,9 342:14
343:2 344:16,25
352:7,25 353:24
354:16 355:4,13
356:13 360:3
**specific** 34:3 41:4
50:11 52:4 53:14,16
55:25 67:8,15 68:9
76:19 90:17 98:6
102:13 118:10
144:17 147:11
148:4,6 149:12
152:15 157:14
158:11,24 169:12
169:22 180:5
201:17 222:10,13
223:3 248:14
251:17,18 266:24
271:18 303:4 307:4
308:13 319:19
322:18 326:11
329:11 345:11
**specifically** 43:14
47:20 55:14 57:5
62:20 71:5 76:5,15
87:20 88:8 90:8
98:16,17 107:23

143:6 162:8 163:24
175:2 204:9 210:6
233:10 238:12
253:5 262:19
293:14 296:24
320:23 336:12,23
**specifications** 65:21
**specifics** 41:18
69:14
**specified** 66:19
**speculate** 134:20
136:12
**speculating** 134:9
134:14,18 142:9
**speculation** 136:6
**spelled** 250:7 343:7
**spend** 41:23,24
243:23 323:22
**spending** 242:25
**spent** 24:16 242:19
**spoke** 33:15,25 34:5
34:10,13,17 69:12
111:8 156:15
157:10 199:4 202:6
319:20 321:25
322:4
**spoken** 7:24 8:7,11
8:14 9:12,15 111:9
**spot** 90:18
**squinting** 256:16
257:9,10
**srd** 122:17
**staff** 126:17
**stalin** 42:19 45:5
71:19
**stamp** 6:19 57:24
197:18
**stamped** 122:19
211:15 217:18
**stamps** 154:14
**standing** 69:3
**stands** 32:23
**start** 21:13 45:16
136:3 172:23,24
210:16 218:6

**started** 18:7 44:13
227:15
**starting** 17:24 137:3
197:16
**starts** 183:15 186:10
**state** 1:21 169:23
299:5 361:5
**stated** 55:15 70:9
107:9 156:6,6 226:7
232:24 237:17
248:2 262:5 304:8
318:12 355:18
356:8
**statement** 37:10
72:10 80:10,12
141:25 142:16
146:17 154:2
181:22 182:21
188:19 189:11,13
189:14,16 190:5,16
191:25 293:16,23
**statements** 41:2,5,7
75:24 77:8,12,13
107:8 252:19
292:12 295:9 296:4
**states** 1:2 3:20 60:20
63:10 71:14 82:11
82:21 83:9 84:11,17
88:17 111:14,15
140:10 143:19,22
191:3 231:16 254:6
254:8 257:18 260:8
261:2 286:10 296:6
336:24 342:12
**stating** 163:23
188:25 261:15
292:25 294:20,20
**status** 244:8,11
**statutes** 73:9
**stay** 25:10 133:20
**stayed** 25:9
**stemming** 295:24
**steps** 228:9,16
229:20

steve  268:10 281:9
303:17,21
steven  1:9 3:18 7:24
19:8 20:17,21 21:5
21:8 25:2,5 36:21
38:15 51:5 55:9,11
58:15,22 69:17 87:2
87:11,22 93:8 96:2
· 97:22 106:10 111:3
111:4,5,8 116:11
118:3,6,9,16,17
121:3 123:22
128:17 146:19
155:9 161:19 163:4
165:3,18 167:17
174:11 180:2
181:12,13,14
182:22 183:7
185:18 193:21
203:24 206:14
210:19 211:17
218:18 225:11
240:16 247:7 248:6
259:17 263:10
267:22 271:8 285:5
290:2 293:4,16
294:19,20 304:2,8
304:23,25 320:20
343:24 347:25
349:10 352:14
stick  249:18
stipulation  175:19
stop  146:21 152:8
255:6,21
stopped  108:3
storage  87:13 88:14
88:19
story  264:16,20
strategy  30:12,18,20
35:10,18,20 36:7
98:20 99:2 137:11
137:17 138:2,3
141:14 223:10,18
223:19 228:10,16
228:16,20,25 229:5

264:15,23 265:18
267:25 269:21
271:17 277:17,23
286:10,15,17
stratus  47:23,24
48:3,7,12,17 50:4
50:13,22 51:17
52:22 53:8 54:11,13
76:20 96:24 99:7
101:23 102:22
103:5,11,20,21
104:6,12 108:15,20
109:4,11,17,23
111:24 115:15
116:19 117:13
120:14,20 121:23
127:5 159:4 165:3,7
166:4 169:7,16
170:6 184:4 195:14
198:12,20 202:2
206:3 214:21,24
215:4 219:22
220:16,24 221:6,22
222:4,13,22 223:5
223:11 224:4,10
225:15,21,23 226:9
226:12,14 227:6
235:22 252:12,25
254:14,19,25 255:2
255:8,8,23,23
260:10 262:6
270:17 294:10,22
298:6 299:7,11
300:16,22 303:18
303:21 305:10
306:9 312:18
317:19,19,22 327:8
327:15,20,22 330:9
331:11,16 335:12
335:15
stratusconsulting....
193:20
street  2:10 10:18
19:14

strike  276:8
subject  57:17 65:4,5
65:11,20 72:18 80:8
85:12 93:8 94:9 ·
99:10 100:22 113:6
122:17 128:18
131:4 135:19
136:20,21 137:23
156:25 175:17,18
177:4 206:16
211:19 217:3
267:25 279:14
301:23,24 304:7
336:3,5,11,15
337:20 355:15,21
subjects  66:2
submission  57:11
77:6 182:12 183:9
183:18 236:13
247:12 252:14
282:11 301:10
337:3
submissions  30:16
275:21 277:21
300:19
submit  47:12 119:23
272:10
submitted  45:4
47:11 48:14 53:19
53:22 57:9 66:16
103:18 127:7
133:11 275:25
276:2,15 292:9
294:11 300:13,14
300:23 311:8
312:24 323:20
329:16 331:19
submitting  235:21
278:24 282:12
subparagraph
191:16
subpoenas  63:12
subscribed  357:10
362:22

subsequent  182:11
183:16 200:9 210:6
269:4 290:3 295:20
298:14 299:16,17
307:20 311:10
323:19 326:16
331:15
substance  164:23
165:10 168:4,23
169:20 170:2
171:18 215:14
253:8,10 268:25
269:5,8,11 292:3
294:6,10 314:10
316:12
substantial  65:6
66:6 71:16 221:20
301:24 336:5
succeeding  255:7
succeeds  254:24
sufficiently  343:3
suite  2:11
sum  164:22
sumario  197:6
summarized  124:8
124:13 125:19,22
summarizing  100:8
summary  195:20,20
324:16
summer  15:20,25
16:4,6,13 24:20,20
319:4
superior  186:8
187:16 191:5
supervised  262:5
supervisor  25:3,15
supplemental
272:10 273:4,24
337:5,22
supplied  334:7
support  63:14 76:19
264:17 281:5
supposed  53:25 54:3
83:5 177:13 320:25

[sure - think]                                                                                          Page 43

**sure** 5:21 13:4,8
  28:25 33:16 34:4,15
  38:8,16,19 41:8
  64:15 69:6,24 84:18
  94:25 98:6 99:9
  103:23,24 111:7,18
  111:20 117:7
  119:17 130:19
  132:21 133:16
  145:14 160:6
  174:10 178:12
  180:23 214:5 216:7
  219:9 228:6 234:15
  235:25 237:4
  240:22 244:10
  256:19 268:16
  269:2 278:5 299:19
  311:13 312:21
  314:21 318:5
  323:24 329:3
**surprised** 87:24
  296:20 297:3,7
  305:12 314:5,7
  315:6
**surprising** 305:25
  306:13,18
**surrounding** 326:13
**suspended** 174:7
**sustain** 24:7
**sustained** 267:6
  332:17
**sv** 130:4
**swear** 4:5
**sworn** 5:6 357:10
  361:8 362:22
**system** 60:17

**t**

**t** 161:2 337:24 338:3
  358:6 359:2 360:2
**table** 19:19,24 20:18
  90:13,16 222:9
**tag** 174:15
**take** 12:3 34:25
  54:16 55:8 62:16

85:8 95:13 122:20
  122:21 130:24
  160:11,20 177:18
  194:6,8 196:9
  206:18 210:10
  213:6 217:17
  226:16 256:7,9
  257:14 258:14
  270:2 278:25
  283:17 289:4 315:8
  317:22 318:5
  354:12
**taken** 1:16 58:20
  80:17 95:8 108:7
  239:9 315:13
**talk** 43:10 44:3,8
  158:25 170:21
  186:18 222:13
  271:14 280:18
  325:21 329:6
  337:11
**talked** 13:21 138:25
  139:22 272:16
**talking** 61:13 97:16
  97:19 99:7 109:25
  132:12 188:9
  189:23 199:14
  200:2,17 205:20
  212:8 219:20
  238:19 353:15
**talks** 227:19
**tally** 340:13
**tape** 239:3 309:11
**tapes** 315:8
**tasks** 192:12 193:2
  312:6
**tea** 18:21 355:19
**team** 47:5,8,17
  55:17 56:7 122:17
  130:5 171:19
  202:17 203:6
  247:17
**technical** 97:7,8,9
  120:21 192:11
  193:7,13 195:13

**technicians** 192:25
**ted** 274:3 323:17
  328:23 329:2
**telephone** 33:25
  34:14 150:5
**tell** 41:20 47:22
  48:11,16 49:22 50:3
  50:5,6,12 54:10
  55:12,22 56:4 68:6
  73:14 91:8 113:5
  117:20 118:13
  123:17 142:17
  155:17 163:14
  164:14 166:3 169:5
  183:8,14,17 184:2
  195:3 198:9,17,22
  215:25 272:2 325:8
  326:2,5 327:14
**telling** 309:4 327:3
**ten** 15:25
**term** 209:3 273:13
  273:14,17,21
**terms** 308:25 339:16
**testified** 5:6 156:7
  216:9 287:17
**testify** 5:24 8:22 9:2
  9:6,10
**testimony** 7:17,21
  7:25 8:8 12:17
  24:11 41:12 65:10
  79:25 144:7 213:13
  273:2 301:25 336:6
  361:7,10
**texas** 227:20 264:17
**thank** 12:23 80:13
  84:21 89:19 110:7
  135:16 181:2
  203:12,12 262:17
  263:23 277:2
  280:14 299:25
  306:20 321:21
  356:14,16,17
**themes** 290:18
**thereabouts** 319:2

**therewith** 65:24
**thing** 96:8 107:4
  119:15 124:25
  129:3 167:23 234:5
  256:21 314:25
**things** 10:11 39:18
  39:23 41:15 76:6
  102:14 121:24
  134:18 142:23
  145:21 147:7,20
  154:15,21 166:24
  168:14 170:13
  175:10 215:10
  223:25 232:21
  237:22 284:11
  309:24 311:20
  312:8,15 313:5,9,25
  314:4 333:24
  336:23 337:9,12
**think** 10:16 12:21
  13:13 26:21 27:18
  27:25 28:2,24 29:7
  30:24 31:3,7 35:15
  35:15,17,19,21,22
  36:2,5,5,22 38:5,16
  39:20 41:25 43:7
  47:2 48:18 49:11
  55:15,25 59:19 60:3
  60:4 66:14 76:6
  78:8 81:19 99:9
  104:25 108:5
  109:20 111:6,9
  114:9,10,16,17
  116:24 117:2,6,8
  124:8,12 127:18
  132:15 133:5 134:7
  134:8,9,11,23
  135:11 144:18,20
  144:25 147:23
  149:5 150:18,22,25
  151:7,11,13,16,20
  151:25 152:12
  154:2,25 155:6,9,21
  160:13 161:20
  170:11 188:11,23

200:12 201:16
215:8 216:16
219:23 228:5
233:23 237:17,21
250:3 261:9 271:23
272:22,25 296:12
296:24 297:8
300:12 302:18
306:13 307:16
310:25 313:24,25
321:2 327:11
333:18 334:9
336:16,17 343:3,18
343:22 347:10,18
347:20 348:3,14
350:22 353:2,17,25
355:2 356:2,7
**thinking**  59:22
321:11
**third**  62:17 63:5
104:14 167:15
168:5 182:11
187:20 197:8,15,16
198:6 206:13
280:20 286:3 318:6
349:22
**thorough**  73:10
**thought**  72:23 95:18
127:11 276:10
307:25
**thoughts**  122:17
**three**  65:7 122:22
138:14 161:7
187:14 193:17
216:24 233:2 336:7
**time**  3:13,24 13:9
14:4 16:19 17:2
19:7,9,14 21:19,23
22:3 25:12,21 27:10
27:15 28:14,19,23
32:15 33:3 34:5,17
35:3 36:4 42:3,17
43:4,16,17 46:16,19
48:2 52:6 53:2
55:15 56:14 57:7

59:3,9 61:15 64:7
64:12 67:23 71:16
77:15 78:16,22
79:15 80:16,19
83:12 88:10 101:20
107:19,25 109:2,10
109:16 110:21
113:24 114:19
119:6,12 122:25
124:21 125:4
131:22,24 133:9,19
133:22,23 137:4,14
142:10,14 148:13
150:3 152:12
153:19 154:6 155:3
155:15 156:14
157:9,25 159:23
160:9,10,19,24
161:6,13,14 169:15
171:3 172:9,13
178:9 180:9 182:4
189:6 196:7 200:11
202:5 207:15 211:3
239:2,7,11 242:25
243:23 244:20
245:13 249:14
260:5,11 279:16,25
281:17 289:4,5,16
298:18,23 299:6,10
300:25 301:13
302:12 305:8
307:19 308:12,14
311:3 315:11,15
318:2,23 319:9
323:22 328:8
341:16,17,20,21,23
342:5,7 345:6,8,13
350:4 351:14
352:17 353:5 354:9
355:7,17 356:17
357:3,5
**timeline**  122:7
**times**  13:5 27:11
38:14 144:19
173:22 207:5

316:13 317:10,12
354:3,5,12 355:2
**timing**  173:24
309:24
**title**  85:21
**today**  3:13 5:23 7:18
7:21 62:22 63:3
136:24 174:14
175:22 177:7
195:18 217:20,24
276:14,19,23
321:12 356:17
**today's**  6:2 7:4
263:16
**todd**  1:19 4:3 361:4
361:20
**told**  37:19 48:23
50:21 55:8 65:2
70:22 107:20,23
109:4 111:2 112:19
113:11,13,20 116:4
123:2 153:22 165:2
188:17 200:20
201:23 270:25
271:6,12 275:7,14
275:16 320:18
325:6 326:23
341:23
**tom**  58:20
**tomorrow**  140:10
141:14
**top**  60:16 85:10
105:24 107:14
130:25 138:17
172:5 191:3 193:18
195:16 206:11
217:12,13 237:6
240:11 279:6,17
**topic**  205:14,15
221:5
**topics**  227:4
**totaling**  80:3
**totally**  136:7,12
**track**  116:14 284:10
284:11 285:10

**traditional**  249:12
**traffic**  150:20 151:9
**transcript**  7:12 80:2
80:4 134:24 135:6
188:12,24 189:22
210:2 247:15 361:9
**transcripts**  7:10
**transferred**  89:6
**translated**  195:18
200:16 290:12,16
**translation**  60:15
193:22 206:12
**transmission**  200:14
**transparency**
191:19
**travel**  72:6 172:12
**traveling**  22:7
**travels**  82:3
**treated**  350:16
**trial**  73:8 74:17,24
75:5,8,12,17,18,20
75:23 76:14 77:17
78:3,6 79:4,5 89:5
91:6,25 126:9,12
242:22 323:21
329:16 334:3
**tried**  284:10 290:17
**tries**  135:9
**trip**  54:22 55:2,5,8
55:13 56:11 58:7
59:9,21 61:13,18,25
62:5,7,16,17 63:4,5
63:5 77:11 87:21,25
88:9 243:22 244:7
245:10 274:11
299:21 318:14
325:12
**trips**  34:25 54:16
62:23,25 88:18 89:9
89:25
**true**  61:6 70:13
158:6,15 361:9
**trust**  100:12
**truthfully**  5:24

**try** 134:12 172:22
284:11 298:4
349:21
**trying** 75:9 86:17
98:20 119:25 120:3
134:8,17,24 136:2,5
201:24 255:6,21
279:15 286:18
289:9 297:16 307:2
308:11 312:23
354:8,11,21,24
**turn** 3:6 112:7
119:14 125:7
127:10 130:21
178:21 228:7
231:23
**turned** 149:15 154:6
165:21 166:5
**turning** 116:7
123:19 264:22
**two** 6:7 10:24 12:12
12:13 17:21 20:4
25:8 28:2 29:10
80:20 85:9 87:10
94:7 105:7 130:25
160:18 162:22
166:24 168:9 172:4
184:14 211:9
212:19 216:17
217:5 218:23 232:7
241:2,3,7,11 264:2
280:4,7,7 285:3
328:19 338:2
**type** 10:18 342:3
**tyrrell** 218:24 219:5
219:11 228:19
263:15 267:24
291:9

**u**

**u** 5:4 161:4
**u.s.** 25:2 29:23,25
31:3 36:17,19 55:4
86:13 87:14 114:5
167:20 168:16,20

169:3 180:11
182:24 183:5
223:22 230:2
248:11 255:16,18
259:15,17,24
**u.s.c.** 63:16
**ubs** 89:6
**uh** 58:18 62:15
209:19
**umbrella** 335:20
**unclear** 351:24
**uncomfortable**
351:3
**uncover** 309:6,18
312:16
**uncovered** 260:7
**underlying** 103:18
113:21 114:2,24
119:25 327:9
**understand** 5:11,13
69:5 73:25 74:20
113:9 119:25 120:3
126:21 127:15
137:10 170:5
204:20 216:12
225:20 226:5,9
236:9 262:13 263:6
268:8 269:8 278:5
297:16 298:4
311:14 322:12
326:10 329:17
334:22 335:6
349:25
**understanding** 6:25
42:21,24 48:19 52:5
52:5,13,20 53:23 54:5
54:8 73:19 78:5,9
78:18 86:19,23
89:17 91:18 109:21
110:17 112:14
114:12 118:24
120:20,23 121:2
129:14 139:5,20
141:2,19 142:4
164:6,9 165:25

174:19,20 195:13
229:23 233:12
235:5 249:13 254:5
259:22 264:19
269:11,13,18 270:6
271:4 275:19 276:6
277:6,20 278:15,22
287:17,21 288:14
300:21 306:8
322:19,21 323:3,14
334:14,17 335:11
338:20 340:18,23
**understood** 41:21
42:4 73:22 74:23
81:3 165:2,5 189:25
202:23 215:15
255:19 257:11
276:5 287:18 337:6
**united** 1:2 3:20 63:9
71:14 82:11,21 83:9
84:11,17 88:17
111:14,15 143:19
143:22 231:16
254:6,8 257:17
260:8 261:2 286:10
296:5 342:11
**university** 27:20
321:23
**unnecessarily**
138:13
**unnecessary** 138:19
**unobjected** 79:25
**unsure** 167:19
**update** 136:21 177:5
349:10
**updated** 177:13
**upper** 197:17
**upset** 307:5,16
308:3
**urgent** 175:11
**use** 22:16 47:13
54:15 82:19 84:16
90:11 135:22 144:3
145:11 146:17
165:7 171:20 175:5

189:23 215:9 222:4
222:5 274:9 294:23
342:18
**usually** 18:19 22:7
27:24 56:16 82:12

**v**

**v** 362:3
**vague** 120:7 175:3
316:20 326:8 341:2
341:5 347:17
352:24 353:2
**vaguely** 62:2 327:7
327:18
**varied** 31:20 90:13
**varies** 11:23
**various** 27:11 29:25
30:4,10 36:19 44:19
46:6 82:20 126:2
128:22 160:8
161:13,16,19
162:10 175:5,10
191:15 310:9,12
312:4 316:11
329:13,14 334:3,4,5
334:12 340:9 356:5
**vega** 42:19 45:5
50:15 51:19 52:7,15
52:24 53:11 71:19
107:15 181:24
186:11 187:18
190:5 191:6 221:2
**verbatim** 109:6,13
110:24,25 197:13
197:14,15
**verify** 285:11
**veritext** 3:12 4:4
362:2
**version** 46:4 101:12
173:7,11 200:15
358:12
**versus** 3:18 42:6
99:5 107:8 248:4
**video** 133:19 134:2
239:7

videographer 2:23
3:2 80:15,18 133:25
160:23 161:5 213:9
239:6,10 280:2,6
315:7,11,14 357:2
videotaped 1:15
videotapes 7:7
view 37:9 91:15
134:14 319:23
viewed 114:21
154:18 202:19,21
202:22 204:24
247:19,21 249:24
251:15
viewing 102:17
vigilance 154:13
vigilant 143:13
144:25 145:6
146:11,11,14 148:5
violate 251:2 252:3
252:3
violated 248:18
250:9 252:25
253:10
violating 250:14
violation 249:6
vis 299:7,7
visit 77:16 299:19
322:20,22 323:15
333:16
viva 24:21 79:9
89:14 130:4
voicing 69:18
voir 323:2
voluminous 165:21
166:6

**w**

w 343:8
wade 73:7 74:16
wait 147:16 207:2
270:22 272:5
283:12 297:15,25
waiter 343:10,11
344:10,12

waiting 255:12
waived 113:3
233:23 340:8
waiver 65:14 66:3
79:24 80:9 96:19,19
97:11 99:13 132:12
132:12 137:21
139:12 144:6
155:20 157:2
158:22 163:20
166:11 168:2
184:12 201:6
223:15 235:17
246:5 255:12
262:15 263:4
336:11
waivers 64:24
walk 23:5
wall 10:18
want 24:7 41:24,24
68:25 97:3 123:14
157:22 158:7,18
180:25 256:23,24
259:8 275:3,11
289:4,12 298:4
300:9 302:2 317:14
349:20 355:18
wanted 83:8 137:8
169:23 216:12
256:25 259:4,6
342:9
wanting 204:25
wants 289:24
wao 343:7
warning 160:19
wash 283:17
way 5:13 8:5 9:19
58:11 87:2 103:9
107:10 115:25
119:18,20 139:11
163:7 175:11
209:16,25 219:11
220:19 223:2 226:5
229:11 233:16
234:24 246:10

249:23,24 250:13
250:25 253:17,19
257:13 270:3 275:8
276:14,15 296:16
315:3 320:10 321:8
322:10,11 334:24
335:15 343:23
349:21 350:16
355:23 361:14
ways 15:4 23:21
website 46:5
week 12:21 17:19
21:20 55:6 62:9
139:2,23 239:24
242:7,19
weekly 17:20
weeks 11:25 15:25
119:13
weight 237:19,24
weinberg 148:25
328:22,25 329:7,12
329:18,21,22 330:2
332:8,11,25 333:10
334:15,18,25 335:7
335:12,13,20,22
336:3 337:24 338:4
338:12,23 339:8,15
339:17,21 340:22
wells 2:23 3:11
went 17:23 55:4
56:9 59:9,20,24
61:14 70:20 77:17
78:23 81:16 124:22
274:2 298:18 318:8
320:14 321:4
west 19:14
westenberger
215:18,19 218:9
263:15 267:13,21
279:8
westenberger's
216:2
westfield 2:11
whatsoever 16:18

whereof 361:16
whispering 3:5
white 2:15 4:22,25
19:2 24:12 25:13
whiteandcase.com
2:17,18
wholesale 109:18
wholly 165:6
wild 152:2
wilson 263:11
267:24 279:8
withdraw 72:20
125:15 224:17
250:19 273:3
withdrawal 156:11
179:15,21 345:7,11
withdrawals 344:21
345:15
withdrawing 155:4
155:12
withdrawn 21:11
31:10 50:4 51:15
91:19 93:17 111:24
113:12 120:12
141:20 152:18
166:2 190:2 192:20
198:21 225:18
227:3,6 246:23
268:20 291:21
294:8 305:19 313:5
316:12 325:7 326:3
334:16
witness 2:16 3:22
4:5,22 5:2,5 12:20
24:14,18 25:7,18,22
25:25 26:4,9,12,16
26:21 27:4,13,18,24
31:2 37:6 43:24
51:14 59:19 60:3
64:20 67:7 80:25
81:12,18 82:4,12,22
83:11,20 84:5,12,18
85:14 89:15 91:2,3
94:13 95:15 97:13
99:8,14 101:17

| | | | |
|---|---|---|---|
| 106:5 110:3,6 117:6 | 319:3 321:16 323:4 | **work** 17:23 18:20 | **writing** 50:13 |
| 117:25 118:9,15 | 323:9 330:4,11,21 | 23:20 27:6,17 28:3 | 121:24 142:24 |
| 122:23 124:12 | 330:25 331:4,13,23 | 35:23 40:23 43:15 | 145:21,23 146:2,15 |
| 128:23 129:12 | 338:9 352:9 358:3 | 43:25 56:8,10 64:21 | 147:8,20 148:8 |
| 131:11 132:22 | 361:7,11,16 362:4 | 65:16 86:2 93:16,18 | 151:12 169:17 |
| 133:15,17 134:5 | **witnesses** 73:7 74:3 | 100:11 114:6 | 233:6 237:16 |
| 135:9,16,17 136:10 | 74:8 | 154:14 173:23 | 334:15 335:2 |
| 136:14 144:7 146:8 | **wodds** 359:21 | 186:21,23 187:9 | 343:13,17 344:6 |
| 146:16 147:23 | **woman** 92:6 | 191:17 257:17 | **written** 48:17 50:23 |
| 148:3 149:5,23 | **women** 56:17 | 311:5 324:21 | 50:24 51:17 54:11 |
| 152:5,10 156:7 | **woods** 8:7 20:9 | 325:17 327:8,19,20 | 110:11 123:5 |
| 157:7 159:18,24 | 21:22 25:20 26:14 | 330:9 331:12 332:2 | 144:22 163:9,16 |
| 160:3 164:11 | 38:6,11 39:5,11,18 | 337:12 340:6,20,24 | 164:16 170:7 206:3 |
| 166:21,25 167:5 | 53:8 63:14,23 64:11 | 342:2 350:21,24 | 248:4 300:22 327:4 |
| 168:7,25 173:4,12 | 64:16 66:17 67:4,23 | 351:2,9 354:4,6 | 327:16 |
| 176:3,7 177:20 | 67:24 68:6,14 69:12 | **worked** 16:8,14,22 | **wrong** 95:20 101:10 |
| 179:11 181:2,3,17 | 69:25 71:10,21 | 17:18 19:4,6,9,16 | 101:12 127:18 |
| 191:7 194:10 | 72:10 87:7 88:13 | 19:18 20:6 24:18,22 | 287:15 |
| 196:18 200:19 | 94:9,10 102:9 105:6 | 27:5 28:14 37:6,25 | **wrote** 129:15 131:13 |
| 203:11 205:21 | 105:11 112:11 | 39:8,14 43:11 57:4 | 137:5 159:7 294:10 |
| 206:21 207:13 | 156:4,10,15 157:10 | 75:4 79:3,6 81:21 | 298:6 |
| 209:19 210:5,12,18 | 158:5,25 159:3,7,12 | 82:7 86:2,6,10 98:7 | |
| 210:24 211:7,10,25 | 161:17,20 162:5,7 | 126:17 131:24 | **x** |
| 212:10 213:3,4,17 | 162:12 170:16,21 | 165:24 166:7 | **x** 1:5,11 358:2,6 |
| 213:24 216:8,14 | 205:10 211:18 | 167:10,12 195:14 | 359:2 360:2 |
| 218:25 226:5 234:2 | 238:22 262:23 | 329:21 335:19,21 | **y** |
| 234:25 235:8 | 267:22 268:2 303:9 | 340:12 351:21 | **yanza** 9:5,22 34:2,5 |
| 240:23 246:9 | 303:24,25 313:19 | 352:6 | 34:10 90:20 92:15 |
| 250:20 251:13 | 319:8,16,22 320:6 | **working** 11:12 18:7 | 92:25 162:16 |
| 256:18,20 257:6 | 352:3 358:16,17 | 19:7 21:17 23:8,10 | 206:15 210:23,24 |
| 258:17 259:2 | 359:4,13,19 | 24:16 25:9,14,23 | 212:11 218:21 |
| 263:21,22,24 268:5 | **word** 30:9 134:13 | 27:11 33:11 39:15 | 290:11,21 291:6 |
| 271:7 275:6,10,12 | 149:2,3 189:23 | 44:13 56:17 85:25 | **yeah** 18:17 61:19 |
| 275:18 276:17,21 | 197:11,12 203:23 | 86:20 90:4 131:21 | 68:3 94:25 125:21 |
| 276:25 277:12 | 230:23,24 232:8 | 189:7 196:6 252:23 | 157:7 159:24 168:7 |
| 279:21,22,23 | 250:11 251:4 | 328:12 350:9,12,22 | 198:5 200:19 205:3 |
| 280:11 283:3,14 | 273:10 342:19 | 351:12,15,16,19,25 | 213:7 231:9 250:18 |
| 284:13 288:6,25 | 343:16 | 352:4 | 291:14 320:12 |
| 289:23,25 294:17 | **words** 135:22 144:2 | **world** 128:3 163:11 | 323:9 347:21 |
| 295:7 297:18 298:9 | 163:25 164:17,17 | **worried** 204:23 | 353:16 |
| 298:14,21 299:2,9 | 167:3,22,22 168:4 | **worth** 134:15 | **year** 15:21 16:2 19:2 |
| 299:15 300:8,24 | 168:23 169:19,19 | 140:22 141:6 | 21:9,19 24:12,16,20 |
| 301:5 302:19 | 170:2 171:17 | **write** 131:25 179:4 | 24:25 25:11 40:20 |
| 306:19 307:18 | 234:11 253:7 | 314:9 | 319:4 348:11 |
| 313:23 318:11,17 | 265:10,13 342:22 | | |

**yelled**  355:19
**yennock**  263:16
  267:25 279:9
**yennock's**  280:21
**yesterday**  6:16
  135:6
**york**  1:3,18,19,21
  2:4,4,16,16 3:12,17
  3:17,21 13:17 22:8
  86:15 155:14
  162:18,19 209:9
  230:16 264:8
  281:17 290:12
  361:5
**younger**  92:7

**z**

**zambrano**  345:22
  346:7,15

**à**

**à**  299:7