# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CHEVRON CORPORATION,

     Plaintiff,

  v.

STEVEN DONZIGER, *et al.*,

     Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

:
:
:
:
:
:
:  11 Civ. 0691 (LAK)
:
:
:
:
:
:

**PLAINTIFF CHEVRON CORPORATION'S MEMORANDUM OF LAW IN OPPOSITION TO JAVIER PIAGUAJE PAYAGUAJE'S, HUGO GERARDO CAMACHO NARANJO'S, AND NON-PARTY PATTON BOGGS'S MOTION TO STRIKE THE DECLARATION OF CHRISTOPHER BOGART FROM THE DOCKET, FOR AN ORDER GRANTING CAMACHO AND PIAGUAJE LEAVE TO SERVE A LIMITED DOCUMENT SUBPOENA ON BURFORD CAPITAL LLC AND ITS AFFILIATES, FOR AN ORDER STRIKING CONFIDENTIALITY DESIGNATIONS, AND FOR SANCTIONS AGAINST CHEVRON AND BURFORD**

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035
*Attorneys for Plaintiff Chevron Corporation*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................... ii

TABLE OF ABBREVIATIONS AND DEFINED TERMS ....................................... v

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ............................................................................................................. 5

A.   There Is No Basis To Strike The Bogart declaration. ...................................... 5

    1.   The Bogart Declaration Does Not Prejudice Any Party ......................... 6

    2.   The Bogart Declaration is Relevant to Chevron's Claims and to
        Anticipated Defenses ............................................................................. 8

        a.   The Bogart Declaration is Relevant to Chevron's Fraud Claim ............... 8

        b.   The Bogart Declaration is Relevant to Chevron's RICO Claim and
            Defendants' Affirmative Defenses .......................................................... 18

    3.   *Weber, Doolittle,* and *Sellers* do not apply to the Bogart declaration. .................. 19

B.   Movants Spin a False Narrative Regarding Bogart's Declaration That Is
    Unsupported and Contradicted by the Record. ............................................... 21

    1.   Bogart's Allegations That Patton Boggs Knowingly Furthered the LAPs'
        Fraud Are Supported by the Contemporaneous Record. ..................... 22

    2.   The Claim That Burford Abandoned the LAPs Because of Chevron's
        Pressure Is False and Unsupported by the Cited Documents. .............. 25

C.   There Is No Basis to Reopen Discovery. ........................................................ 29

D.   There Is No Basis for Sanctions ..................................................................... 32

CONCLUSION ......................................................................................................... 35

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Bakalar v. Vavra*,
    851 F. Supp. 2d 489 (S.D.N.Y. 2011) ....................................................................... 29, 30

*Chevron Corp. v. Naranjo*,
    667 F.3d 232 (2d Cir. 2012) ......................................................................................... 7

*Chevron Corp. v. Naranjo*,
    No. 11-1150, 2011 WL 4375022 (2d Cir. Sep. 19, 2011) .................................................. 7

*Cnty. Vanlines Inc. v. Experian Info. Solutions, Inc.*,
    205 F.R.D. 148 (S.D.N.Y. 2002) .................................................................................... 7

*Colletti v. Fagin*,
    1999 U.S. Dist. LEXIS 2635, No. 90 Civ. 4591, 1999 WL 126461
    (S.D.N.Y. Mar. 10, 1999) ........................................................................................... 32

*Dail v. City of Goldsboro*,
    5:10-CV-00451-BO, 2011 WL 2293904 (E.D.N.C. June 9, 2011) .................................... 6

*Doolittle v. Structured Inves. Co., LLC*,
    No. CV 07-356-S-EJL-CWD, 2008 WL 5121591 (D. Idaho Dec. 4, 2008) .................... 19

*Gotlin v. Lederman*,
    2009 U.S. Dist. LEXIS 78818 (E.D.N.Y. Sept. 1, 2009) ............................................... 30

*Gray v. Town of Darien*,
    927 F.2d 69 (2d Cir. 1991) ........................................................................................ 29

*Gucci Am. v. Guess?, Inc.*,
    790 F. Supp. 2d 136 (S.D.N.Y. 2011) ......................................................................... 30

*In re Health Mgmt., Inc.*,
    No. 96 Civ. 0889 (ADS), 1999 U.S. Dist. LEXIS 22729, 1999 WL
    33594132 (E.D.N.Y. Sept. 25, 1999) .......................................................................... 30

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
    164 F.R.D. 346 (S.D.N.Y. 1996) .................................................................................. 5

# TABLE OF AUTHORITIES
(continued)

Page(s)

*In re Ullico Inc. Litig.*,
  237 F.R.D. 314 (D.D.C. 2006)..................................................................... 34

*Litvinov v. Hodson*,
  74 A.D.3d 1884, 905 N.Y.S.2d 400 (2010) ................................................. 9

*Loubier v. Allstate Ins. Co.*,
  No. 3:09CV261, 2010 WL 1279082 (D. Conn. Mar. 30, 2010) ..................... 6

*Mendez v. City of New York Human Res. Admin.*,
  04CIV0559RWS, 2005 WL 1109451 (S.D.N.Y. May 10, 2005) .................... 6

*My First Shades v. Baby Blanket Suncare*,
  No. 08-CV-4599 MKB, 2012 WL 6675118 (E.D.N.Y. Dec. 21, 2012) ........... 9

*Oppel v. Empire Mut. Ins. Co.*,
  92 F.R.D. 494 (S.D.N.Y. 1981) .................................................................... 6

*Prestige Builder & Mgmt. LLC v. Safeco Ins. Co. of Am.*,
  896 F. Supp. 2d 198 (E.D.N.Y. Oct. 10, 2012)............................................ 9

*Pretty v. Prudential Ins. Co. of Am.*,
  696 F. Supp. 2d 170 (D. Conn. 2010)........................................................ 30

*Sample v. Gotham Football Club, Inc.*,
  59 F.R.D. 160 (S.D.N.Y. 1973) .................................................................... 6

*Sellers v. M.C. Floor Crafters, Inc.*,
  842 F.2d 639 (2d Cir. 1988)....................................................................... 20

*Sunshine Cellular v. Vanguard Cellular Sys.*,
  810 F. Supp. 486 (S.D.N.Y. 1992)............................................................... 5

*Trebor Sportswear Co., Inc. v. The Limited Stores, Inc.*,
  865 F.2d 506 (2d Cir. 1989)....................................................................... 29

*Weber v. AVX Pension Plan for Bargaining Unit & Hourly Employees*,
  07-CV-615S, 2009 WL 3165627 (W.D.N.Y. Sept. 27, 2009)....................... 19

## Statutes

18 U.S.C. § 1343 ............................................................................................ 18

# TABLE OF AUTHORITIES
(continued)

Page(s)

18 U.S.C. § 1956..................................................................................................................... 18

## TABLE OF ABBREVIATIONS AND DEFINED TERMS

The following abbreviations and defined terms will be used in this Memorandum of Law:

| | |
|---|---|
| Bogart | The April 16, 2013 declaration of Christopher Bogart.  The declaration appears twice in the record of this action, first at Dkt. 1039-2, and again at Dkt. 1141-1. |
| Cabrera Report | The expert report submitted in the Lago Agrio Litigation under the name of the court-appointed expert, Richard Stalin Cabrera Vega |
| Defendants | All Defendants to this action generally |
| Donziger | Defendants Steven Donziger, The Law Offices of Steven R. Donziger, and Donziger & Associates PLLC |
| Fajardo | Defendant Pablo Fajardo Mendoza |
| Gomez Ex. __ | Exhibit to the Declaration of Julio Gomez, Dkt. 1257 |
| Lago Agrio litigation | Maria Aguinda et al. v. Chevron-Texaco, the litigation brought by the LAPs in Lago Agrio, Ecuador |
| LAP team | The lawyers and other representatives of the LAPs and their agents and employees, including but not limited to Donziger, Fajardo, Yanza, Stratus, Julio Prieto, Juan Pablo Saenz, Selva Viva, and the Amazon Defense Front |
| LAPs | The plaintiffs in the Lago Agrio Litigation, including appearing Defendants Hugo Gerardo Camacho Naranjo and Javier Piaguaje Payaguaje |
| Mot. | Javier Piaguaje Payaguaje's, Hugo Gerardo Camacho Naranjo's, And Non-Party Patton Boggs's Motion To Strike The Declaration Of Christopher Bogart From The Docket, etc., Dkt. 1256 |
| Movants | Defendants Hugo Gerardo Camacho Naranjo and Javier Piaguaje Payaguaje, and non-party Patton Boggs LLP |
| Stavers Ex. __ | Exhibit to the Declaration of Jason B. Stavers, filed concurrently herewith |

## PRELIMINARY STATEMENT

Burford Capital's Christopher Bogart struck a nerve.  Exposing the truth often does.  In his April declaration, filed with the Court at that time, he described how Defendant Steven Donziger and Patton Boggs obtained $4 million in funding for the Lago Agrio litigation from his investment firm on the basis of material false statements and omissions—primarily by knowingly providing deceptive accounts of the corrupt relationship between the Lago Agrio Plaintiffs' team and the supposedly independent Ecuadorian court expert, Richard Cabrera.  Documents Burford produced in response to a subpoena from Chevron confirm Bogart's sworn account.  This includes a September 2011 letter to Donziger and other LAP agents that makes essentially the same allegations, but that Defendants failed to produce to Chevron in violation of their own discovery obligations.  Dkt. 714-1.  Bogart's testimony is yet another in a growing mound of evidence, including depositions, sworn statements, and documents from a dozen of Defendants' former allies confirming the truth of Chevron's allegations and the absence of any plausible defense by Donziger and the LAPs.[1]  Now, more than two months later, in a 35-page motion loaded with baseless accusations and accompanied by a public relations campaign repeating them, the LAPs and nonparty Patton Boggs—which heretofore has gone to great lengths to avoid appearing before this Court—lash out at Bogart, Burford, and Chevron, and demand sanctions.  But their fury finds no support in the documents they cite, or in the declaration itself, and merits only rebuke, not relief.

Their response to Bogart's statements reveals two things: first, that they have no substantive answer to his statements, and second, that they know how damaging those statements are to

---

[1] In addition to Bogart, these "whistleblower" witnesses include the LAPs' former Ecuadorian collaborators Alberto Guerra and Fernando Reyes, the LAPs' former counsel Joseph Kohn (also a funder), John McDermott and Jeffrey Shinder, the LAPs' former expert consultants Charles Calmbacher, David Russell, and Doug Beltman and Anne Maest of Stratus, and former Donziger intern Laura Garr.

their defense.  If the LAPs and Patton Boggs believed that Bogart was not telling the truth, that "Bogart's story does not make sense" (Mot. at 6), and that his assertions are "belied by Burford's documents" (*id*. at 10), they would have deposed Bogart and confronted him with these supposed inconsistencies.  They did not do so because their purported rebuttal is a fiction, spun of improbable inferences and outright falsehoods, generated for public relations purposes.  To take just one example, the motion asserts that Chevron's outside counsel pulled the strings at Burford for two years, deceiving this Court all the while.  But Movants' claimed support for this charge is that Chevron's counsel called Burford's counsel on two occasions, one of which the cited document describes as "a cordial conversation without any real content."  Mot. at 19 (citing Gomez Ex. 65).  And if Defendants believed that Bogart's declaration is "apropos of nothing" (*id*. at 24), they would have ignored it, not prepared a 35-page motion attacking it, even as they maintain before this Court that they are unable to afford legal counsel to address relevant issues in the case.

Contrary to the LAPs' and Patton Boggs's pose, the declaration is relevant to Chevron's third-party fraud claim, describing how Defendants fraudulently induced Burford to fund their efforts at a critical juncture so that their campaign could continue against Chevron, thereby harming it; and it is relevant to Chevron's RICO claim, describing numerous acts of wire fraud and money laundering.  It also supports this Court's personal jurisdiction over the LAPs, and provides evidence that Donziger and Patton Boggs acted, in New York and elsewhere, as the LAPs' agents.

Movants largely ignore Bogart's central charge—that Burford was duped into investing in the Lago Agrio litigation—but, instead, focus on the sub-issue of whether or not non-party Patton Boggs was a knowing participant in that fraud.  But regardless of whether Patton Boggs

has done anything wrong here, it would be no defense to the charges against the Defendants in this action—Donziger and the LAPs.  And it is their fraudulent procurement of funds from Burford to pursue their campaign against Chevron that is at issue.  Nonetheless, to defend non-party Patton Boggs, Movants must distort the declaration and "respond" to "straw man" claims of their own creation.

In particular, Movants must twist the timeline underlying Bogart's declaration.  The declaration presents Bogart's view of the facts as he saw them on April 16, 2013, when he signed the declaration.  Among the facts that Bogart knew on April 16, 2013, was that Patton Boggs had known much more about the LAPs' fraud with Cabrera than it disclosed to Burford in 2010, and that in fact it had been actively concealing what it knew from Burford.  Bogart does *not* say that he knew this in 2010, or in 2011, or even at any point in time substantially earlier than April 2013, and the contemporaneous record that Movants draw out at length confirms this, and only this:  while Bogart learned over the course of 2011 that Donziger had lied to him, he believed at the time that Patton Boggs had been deceived as well, based on Patton Boggs's oral representations to him.  This is hardly a "smoking gun" redounding to the credit of Patton Boggs or the LAPs—that, until recently, Bogart believed that Patton Boggs had been honest with him, but now knows otherwise.

And Movants' account of the timing of this change of heart—shortly after March 13, 2013 (Mot. at 1, 8, 10) explains it.  Contrary to their twisted narrative, there was no nefarious plot against Patton Boggs carried out by, among others, Tyrrell's own former law partner, Ernie Getto.  Rather, on March 15, 2013, this Court issued its 72-page opinion analyzing the role Patton Boggs played in concealing the truth about Cabrera from Chevron and various courts, citing an extensive evidentiary record.  Dkt. 905.  As the record here demonstrates, cordial relations

between Burford and Patton Boggs ceased from that point forward, and a month later, Bogart signed his declaration explaining that not only had Donziger misled him, but that he now understood Patton Boggs had known and facilitated the deception. Whether or not some of the evidence upon which the Court relied had been publicly available before that time, Bogart's failure to appreciate the truth revealed by that evidence until that point does not belie Bogart's statements; it bears them out.

Moreover, the LAPs' "shadow counsel," Patton Boggs, which is neither a party nor counsel of record here, has no standing to move to "strike" the Declaration, much less to seek "sanctions." And the LAPs cannot be heard to complain about being required to seek the Court's intervention to lift confidentiality designations, since they agreed to this procedure, which is expressly contained in the Protective Order—which both the LAPs and Patton Boggs lead partner James Tyrrell signed. Nor can they re-open discovery to seek material related to facts and allegations that they have known about—but concealed from Chevron—for a year and a half and that they took months to request after Bogart's declaration was first publicly filed.

As for their request that the Court lift certain confidentiality designations from documents produced by Burford, these designations were made by producing party Burford, and Chevron takes no position on the merits of that request, except to note that it did not require a 35-page broadside against Bogart, Burford, Chevron, and its lawyers. But then, lifting the confidentiality designations is not really Movants' objective here. In fact, as Chevron was preparing to file this brief, Movants withdrew their request that the Court order confidentiality designations removed and their request for sanctions against Burford, pursuant to a negotiated resolution to which Chevron was not a party. Yet they continue to press for sanctions from Chevron. But the relief they obtained by agreement with Burford not only moots any request for sanctions from Chev-

ron, it confirms that there was never any basis for the request, because the relief Movants sought was available from Burford, and not from Chevron.

At bottom, this motion is a distraction, intended for public relations purposes. Patton Boggs is not a party here, and the LAPs had every opportunity to challenge Bogart in a deposition, or to depose Getto or any of the other Buford personnel they cast in their fictional melodrama. Bogart's declaration is not relevant to any currently pending motion. Should Chevron rely on it in future motion practice, Defendants are free to try to rebut it in response. Should Bogart testify at trial, Defendants are free to cross examine him. If the LAPs want to disclose to the public the documents they cite in their motion, they could simply have made an application to do so, but they had no grounds for launching a "seedy narrative" against Chevron, Burford, Bogart, and the rest of their targets. Accordingly, Movants' requests to strike the Bogart declaration, to re-open discovery, and for sanctions are all meritless and should be denied.

## ARGUMENT

### A.    There Is No Basis To Strike The Bogart declaration.

There is no basis for striking the Bogart declaration, which is relevant to Chevron's claims and to anticipated defenses and works no prejudice against any party. "Motions to strike are not favored and will be denied unless the allegations have no possible relation to the controversy . . . . If there is any doubt whether the challenged matter may raise an issue of fact or law, the motion to strike should be denied." *Sunshine Cellular v. Vanguard Cellular Sys.,* 810 F. Supp. 486, 499–500 (S.D.N.Y. 1992) (citations omitted). To prevail on a motion to strike, Movants must show that "it is clear that the [challenged matter] has no bearing on the subject matter of the litigation and that its inclusion will prejudice the [movants]." *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 164 F.R.D. 346, 350 (S.D.N.Y. 1996) (citations and internal quotation marks omitted). Movants fail to meet either requirement.

### 1.    The Bogart Declaration Does Not Prejudice Any Party

Movants make almost no effort to explain how the presence of the Bogart declaration on the docket prejudices any party.  Failure to demonstrate prejudice is fatal to the motion.  *See Sample v. Gotham Football Club, Inc.*, 59 F.R.D. 160, 169 (S.D.N.Y. 1973) (requiring "a showing of prejudice to the moving party before a Rule 12(f) motion may be granted"); *Oppel v. Empire Mut. Ins. Co.*, 92 F.R.D. 494, 498 (S.D.N.Y. 1981) (denying the motion to strike because, "even though redundant, there is no prejudicial harm to plaintiff"); *Loubier v. Allstate Ins. Co.*, No. 3:09CV261, 2010 WL 1279082, at *7 (D. Conn. Mar. 30, 2010) ("Having failed to argue or show that prejudice would result from inclusion of the paragraphs it seeks to strike, Allstate's motion will be denied.").

To be sure, Movants complain that it "defame[s] Patton Boggs" (Mot. at 24), but even if this were true (and it is not), this is not a basis to strike the declaration.  Patton Boggs is not a party, nor even counsel of record in this action for any party.  Accordingly, alleged prejudice to Patton Boggs is irrelevant—nor can Patton Boggs appear as a moving party here.  *See Dail v. City of Goldsboro*, 5:10-CV-00451-BO, 2011 WL 2293904, at *1 (E.D.N.C. June 9, 2011) (denying motion to strike filed by a non-party that "has not sought to intervene in this action and has no grounds for doing so. As a mere non-party, Neal has no standing to file pleadings or motions in this lawsuit."); *Mendez v. City of New York Human Res. Admin.*, 04CIV0559RWS, 2005 WL 1109451, at *2 (S.D.N.Y. May 10, 2005) ("Eggleston is not a party to this action. Therefore, her motion is denied in its entirety.").

If Movants have a theory of prejudice to a party, it is that by allegedly "defam[ing]" Patton Boggs, Chevron will "compel Patton Boggs to abandon its clients."  Mot. at 24.  But Patton Boggs has been making this unsupported claim for several years now—in its several suits against Chevron (and its outside counsel)—and it has not abandoned the LAPs.  Movants offer no evi-

dence suggesting any risk Patton Boggs will "abandon" its clients because Bogart accused it of fraud. "[M]ere assertions by the moving party that he is prejudiced are insufficient" to support a motion to strike. *County Vanlines Inc. v. Experian Info. Solutions, Inc.*, 205 F.R.D. 148, 153 (S.D.N.Y. 2002). In fact, just two weeks ago, Tyrrell himself sat for deposition, and while he discussed the Bogart declaration at some length, he gave no indication that he was considering quitting the matter because of it. Stavers Ex. 3801 at 336:20-407:20.[2]

        This is not to say that the facts upon which the Bogart declaration is based—the underlying fraud perpetrated by the LAPs team in the United States and Ecuador—*should not* give Patton Boggs, or any firm, pause. While the LAPs are entitled to an ethical defense of their interests in this action, they are not entitled to, and no ethical firm would engage in, a campaign of delay and obstruction predicated on concealed evidence, and intentionally misleading representations to courts. But that is exactly what Donziger has sought from his U.S. lawyers, and what Patton Boggs has provided, as Bogart eventually came to realize. Other firms have refused to participate in this fraudulent endeavor. For example, the Constantine Cannon firm of New York disassociated itself from Donziger and the LAPs after a single meeting with Stratus, and the Brownstein Hyatt firm of Denver concluded that to continue that to represent the LAPs as Donziger

---

[2] The argument is also duplicitous—by Movant's theory, their own motion should be stricken because, without any evidence, it accuses Chevron's counsel of deceiving the Court. See Mot. at 19, 27. Indeed, Patton Boggs has tried, unsuccessfully, to sue Chevron's outside counsel, and Movants and Defendants Donziger have between them tried six times to "compel" this Court to abandon the case, including a currently pending petition that accuses the Court of engaging in a "calculated effort to evade" the Second Circuit's prior ruling. Patton Boggs v. Chevron and GDC, No. 1:11-cv-00799 (D.D.C. 2011; Appeal No. 13-772, Dkt. 1-1 (2d Cir. 2013) at 31-39; Dkt. 160; Dkt. 285; Dkt. 391; )*Chevron Corp. v. Naranjo*, 667 F.3d 232, 239 n.11 (2d Cir. 2012; . *Chevron Corp. v. Naranjo*, No. 11-1150, 2011 WL 4375022, at *1 (2d Cir. Sep. 19, 2011)And Movants' complaint that Chevron informed the press about the Bogart declaration is cut from the same cloth. See Mot. at 4, 5 n.4, 31–32. The LAPs' long history of litigating in the press is well known to the Court. Indeed, they claim to be unable to pay their lawyers but they maintain a press agent. And just a week after Movants filed this motion, the Washington Post ran an extensive interview with Tyrrell about this case, complete with a photo shoot of Tyrrell apparently in his New Jersey office. Stavers Ex. 3802.

wished them to do would risk "compromising this firm's reputation and ethical stature[.]"[3]   Dkt. 48-7 (Ex. 310), 48-9 (Ex. 312).  Tyrrell, on the other hand, who calls himself the "Master of Disaster," appears to be impervious to the ethical implications of his engagement.

Finally, neither form of prejudice, if it existed, would be cured by striking the declaration. Whatever reputational harm Patton Boggs has suffered would be unaddressed.  Indeed, if Movants were concerned about the substance of the Bogart declaration, their best recourse would have been to have noticed Bogart's deposition and cross-examined him on that substance.  Having failed to challenge their accuser when given the opportunity, they should not be permitted to wipe his testimony from the record now.

## 2.   The Bogart Declaration is Relevant to Chevron's Claims and to Anticipated Defenses

Contrary to the Movants' two paragraph discussion of relevance (Mot. at 23–24) the Bogart declaration is relevant to disputed issues in this case.  It constitutes direct, eye-witness testimony as to statements made to Burford by agents of the LAPs, including Donziger himself, and direct, eye-witness testimony as to Burford's reliance on those statements in making its decision to provide funds to the LAP team.  It is also relevant to Chevron's RICO claim, providing insight into the nature of Defendants' enterprise and evidence supporting the wire fraud and money laundering predicate acts, and it provides evidence that rebuts various defenses raised against those claims by both Donziger and the LAPs.

### a.   The Bogart Declaration is Relevant to Chevron's Fraud Claim

Chevron's fraud claim in this action proceeds on a third-party fraud theory—"where a

---

[3]

8

false representation is made to a third party, resulting in injury to the plaintiff." *Litvinov v. Hodson*, 74 A.D.3d 1884, 1885, 905 N.Y.S.2d 400, 401 (2010); Dkt. 468 at 40–43.[4]  Defendants have made false statements to numerous third parties in their campaign to pressure Chevron, and their lies to Burford were among the more effective, netting them $4 million to further their campaign.  The Bogart declaration details just how Defendants misled Burford, and how Burford relied on Defendants' misleading statements in its decision to fund Defendants' activities.

In response, Movants assert that Chevron's theory of fraud with respect to Burford is a "frolic" that Chevron "invented . . . to justify its filing of the Bogart Declaration."  Mot. at 23.  They do not articulate any basis as to why these facts do not fit third-party fraud, however, relying solely on brief comments made by this Court about that fraud in the September 25, 2012 hearing on Chevron's subpoena to Patton Boggs.  *Id.*  But the quoted exchange rebuts Movants' theory—Chevron obviously did not "invent" the third-party fraud involving Burford to justify filing the Bogart Declaration because it was relying on that argument seven months earlier in an effort to obtain discovery from Patton Boggs.[5]  Nor does the Court's statement preclude Chevron's reliance on the Burford fraud now.  It was expressly preliminary ("you haven't persuaded me *yet*") and the Court made clear that it was not making general relevance determinations at that hearing.  Stavers Ex. 3803 at 33:6, 6:18-23.  Indeed, the Court encouraged Chevron to obtain the sought-after information directly from Burford, if Chevron was in need of that information.  *Id.* at 35:16-18 ("Nobody is stopping you from taking Burford's deposition and let's see where that goes, if you decide to do it.").

---

[4] *See also My First Shades v. Baby Blanket Suncare*, No. 08-CV-4599 MKB, 2012 WL 6675118, at *11 (E.D.N.Y. Dec. 21, 2012) ("New York allows plaintiffs to bring claims based on a theory of third party reliance."); *Prestige Builder & Mgmt. LLC v. Safeco Ins. Co. of Am.*, 896 F. Supp. 2d 198, 205 (E.D.N.Y. Oct. 10, 2012) ("[T]he third-party reliance doctrine is good law in New York . . . .").

[5] *See also* Dkt. 657 at 22 (December 12, 2012 brief by Chevron, stating, "the funding agreements may reveal that Defendants and their co-conspirators misled third-party funders as to the risks of the litigation and the fraud used to obtain the judgment, and may also lead to evidence of money laundering").

The Bogart declaration is evidence that Defendants and their agents made both affirmative statements and omissions to Burford to induce Burford to fund the Lago Agrio litigation and enforcement efforts. Bogart states that "Patton Boggs and Donziger also specifically assured us that the contacts that had occurred between the LAPs and Cabrera were both limited and permissible." Bogart, ¶ 12. And he states that the LAPs' agents withheld the material fact that "portions of the Cabrera report had been written by the LAPs," despite Burford's specific inquiries, and despite the fact that it was "utterly unfathomable" to Bogart how "any New York lawyer could believe" that this was not "'reasonably likely to be material' to Burford's assessment." *Id.* ¶ 17. Contemporaneous documents confirm that the intent of these statements and omissions was, as Bogart believed, to induce investment. *See id.* ¶ 13 (quoting June 2010 correspondence between Donziger and Patton Boggs in which Donziger observes that disclosure of the truth could result in "negative fallout" with respect to the LAPs' fund raising).[6] Indeed, Movants do not deny that they made these statements and omissions to Bogart, but rather challenge Bogart's testimony that Burford relied on them in its funding decision.

Bogart is unequivocal about his firm's reliance on what he later realized were material falsehoods and omission—which is relevant to Chevron's fraud claim. *See, e.g.*, Bogart, ¶¶ 3, 8, 13 ("There is absolutely no question that Burford would not have invested in the Litigation . . . had we known the whole truth about Cabrera."). Movants argue otherwise, however, asserting that "Bogart's assertion that Burford would not have invested in the Ecuador matter had it been given more information is belied by Burford's documents." Mot. at 10. Movants' argument is

---

[6] Contemporaneous documents also confirm Bogart's testimony regarding what he and others at Burford were told by Defendants and their agents. For example, Donziger assured Burford that Cabrera was an "independent expert" and that he had supervised a team of "14 independent scientists" to prepare a "court-ordered damages report." Stavers Ex. 3804 at BUR0012912; *see also* Stavers Ex. 3911 (DONZ00058121) (Cabrera "conduct[ed] his own sampling program throughout the area and review[ed] the evidence submitted by the parties"). In the "Invictus" memo, Patton Boggs told Burford that Chevron was distorting reality in its statements about Cabrera, and that these allegations were "especially frivolous." Dkt. 49-5 at 3.

self-defeating.  Movants' challenge to Bogart's veracity does nothing to carry Movant's burden

to show that the declaration is not relevant.  Movants' decision to spend six pages arguing the

truth of Bogart's statements, while devoting only a conclusory two paragraphs as to their rele-

vance, is an implicit admission that not only is Bogart's testimony relevant, but that they recog-

nize its substantive significance.  *Compare* Mot. at 10–15 (arguing that Bogart's statements are

not true) *with id.* at 23–24 (asserting that Bogart's statements are not relevant).  Moreover, Mo-

vants' attempts to isolate and attack Burford's reliance on Patton Boggs, versus its reliance on

Donziger and other LAPs agents, is a red herring.[7]  Chevron's claims in this action are against

the LAPs and Donziger—it has no burden to show that Patton Boggs was an active participant in

each and every false statement by Defendants.

Not only is Movants' attack on Bogart's statements immaterial to the relief they purport

to seek, it is false and unsupported by the evidence they cite.  Movants' opening salvo is the

claim that "Burford's own funding pitch to the Amazon communities" shows that "before Patton

Boggs arrived, 'Burford ha[d] spent *hundreds of hours* already working on the matter.'"  Mot. at

6 (alterations and emphasis in original).  But the cited document says only that Burford had spent

hundreds of hours on the matter—it does not say that this time was incurred "before Patton

Boggs arrived"—and the context refutes Movants' material addition.  The document was provid-

ed on June 23, 2011, four months after Patton Boggs was formally retained, and the cover email

shows that Patton Boggs was even involved in preparation of the document itself.  *See* Stavers

Ex. 3805 (Gomez Ex. 15) at *3 ("Patton Boggs is kindly translating it and the Spanish version

will be forthcoming shortly").

---

[7] For example, Movants claim that because a "pre-funding project checklist"—actually a list of documents Bur-
ford was expecting—identifies Patton Boggs only for "going-forward issues," Burford must not have been rely-
ing on Patton Boggs for "investigation of historical facts."  Mot. at 7.  Even if this were true, and it is not, the
non-Patton Boggs person for almost all other issues is Donziger, rendering this a distinction without a differ-
ence in the context of this case.  *See* Gomez Ex. 17.

Nor is there any inconsistency shown by this document's indication that Burford had the initial contact with the LAPs, and then introduced Patton Boggs, and Burford's reliance on Patton Boggs. Bogart is clear that Burford was initially skeptical about the litigation, and only became seriously interested after Patton Boggs become involved—interested because it believed that it could rely on Patton Boggs's expertise. *See*, *e.g.*, Bogart, ¶¶ 6 ("Tyrrell's and Patton Boggs' assumption of a leadership role in the Lago Agrio Litigation transformed it as an investment possibility"), 8 ("it was agreed that Patton Boggs would provide its analysis"), 16 ("Patton Boggs represented to us that it had a plan to address concerns regarding the Cabrera Report raised by Chevron"). Contemporaneous documents showing that Burford sought information and analysis from Patton Boggs, and indeed grew frustrated when it was slow in coming, support Bogart's testimony. *See* Stavers Ex. 3871 (BUR0032554) (Tyrrell to Seidel, June 27, 2010: "On case issues, much of that can now come from Patton Boggs"); Stavers Ex. 3857 (BUR0015390) (Bogart to Seidel et al., August 19, 2010: "the delay here is not of our making but is rather a delay in getting the long-promised work done by Patton Boggs . . . [attaching a timeline indicating that on January 15, 2010] Sel and Chris meet with Donziger and Tyrrell (who has not yet been selected as counsel); pose a number of basic questions . . . answers not immediately forthcoming . . . [in early April] we [were] having internal discussions at Burford about some alternative approach that just has us funding Patton Boggs somehow . . . [in late April] we decide not to react to [new proposal from LAPs] until Sel can spend more time with Jim Tyrrell on the case . . . [in May] Sel will engage with Jim Tyrrell on case progress "); Stavers Ex. 3830 (BUR0001235) (Seidel to Bogart, August 23, 2010: "Jim thinks this is a wonderful case, and feels that emphatically, despite issues he talked to Jon about"; Bogart to Seidel in response, August 24, 2010: "The process really needs to be [Donziger, Tyrrell and Nicholas Economou (LAPs advisor)] providing

due diligence material and analysis to us . . . I need the Patton Boggs analysis to go from its current 'good start' level to a product with which you are happy[.] "). And the "cleansing strategy" developed by Patton Boggs was a significant factor in Burford's decision to invest. *See* Stavers Ex. 3814 (BUR0000324-25) (Molot to Bogart, June 23, 2010: "I feel pretty good about the ability to enforce this judgment following Jim's cleansing strategy."); Stavers Ex. 3824 (BUR0000977) (Bogart to S. Wilson (Burford Vice-Chairman), August 4, 2010: "Jim Tyrrell has had some success in Ecuador in starting to fix one of the areas in the case we have found problematic (the damages expert). However, the focus on those efforts have delayed the overall diligence process and thus we are not going to be presenting the case to the board next week.").

Most significantly, when Burford put the funding proposal before its investment committee for approval on September 5, 2010, it not only provided the committee with a copy of the Invictus memorandum—the only third party material provided—but relied heavily on Patton Boggs's analysis in its discussion of the Lago Agrio merits and fraud allegations. Stavers Ex. 3862 (BUR0021593) (Burford Investment Committee Memorandum, September 5, 2010: "As reflected in the attached Patton Boggs memo, the evidence of environmental degradations and shoddy practices is overwhelming. . . . Chevron is likely to focus on communications between plaintiffs and the neutral, court-appointed expert that Cabrera that, in Chevron's view, render Cabrera's report tainted and undermine the soundness of any court judgment. Chevron has also accused the expert of being corrupt. As described in the Patton Boggs memo, Chevron is working hard to establish that Cabrera and the court did not exercise independent judgment, but instead were unduly influenced by the plaintiffs in this case. . . . When we first examined this case many months ago on a preliminary basis, the allegations regarding the court-appointed expert Cabrera gave us some pause. . . . Since then, however, Patton Boggs has developed and begun to

execute a 'cleansing strategy' that would protect an Ecuadorian judgment from attack."). Indeed, Burford prefaced its entire risk analysis discussion with a blanket statement of reliance on Tyrrell and Patton Boggs: "we are influenced not only by the risk/return balance here . . . but also by the fact that we have substantial confidence in Jim Tyrrell, the lead partner at Patton Boggs . . . not only to navigate the enumerated risks but to do so with our interests as well as his and the plaintiffs' clearly in mind. As you know, we have a special relationship with and respect for Jim and Patton Boggs[.]" *Id.*

And even after the January 27 phone call, when Tyrrell informed Bogart that Donziger had lied about the extent of the relationship with Cabrera, Bogart and his colleagues at Burford recognized the importance of their continued faith in Patton Boggs. In an email later that evening to incoming Burford director Ernie Getto, Bogart wrote about how important Patton Boggs was, and continued to be, in Burford's assessment. Movants make much of this email, because it indicates that Getto was to have dinner with Chevron's general counsel (*see* Mot. at 2, 17–18) and Movants claim that it shows that Burford wanted to convey the message to Chevron that it was "repentant," and backing away from their LAPs investment. Mot. at 17–18. But *of course* Burford was concerned about its investment—just hours earlier, the lawyer that had orchestrated that relationship, Tyrrell, had told Bogart that he'd been lied to by Donziger, the lead LAPs attorney, that "Donziger was a fool," and that Patton Boggs was "discussing their ethical obligations," but that the firm was under "enormous financial pressure." Bogart, Attachment A. Burford was in for $4 million, with $11 million more committed, to a man they now knew was a "fool" and a liar. Yet, even then, with these revelations, Burford's took faith in its "special relationship" with Tyrrell, telling Getto that "Burford's role here is to fund Patton Boggs" and that "Neither Chevron nor any court has taken any action against Patton Boggs—there are no sanc-

tions, there is no Rule 11 order—indeed there are no allegations from Chevron of any wrongdo-ing on Patton Boggs' part." Stavers Ex. 3892 (Gomez Ex. 62 at 3). Movants' claim that Burford did not rely, and rely heavily, on Patton Boggs in making its investment decision is flatly contra-dicted not just by Bogart's sworn statement, but by the contemporaneous documents.

Movants further argue that, whatever Burford was told by Tyrrell, Donziger, and others, it had access to the relevant evidence, and that the truth "did not faze Burford." Mot. at 11. But this is the point of relying on trusted advisors, advisors who have purportedly looked in the fac-tual record at length, as Bogart states in his declaration. Bogart, ¶ 8 ("In the Lago Agrio Litiga-tion, it was not feasible for Burford to, for example, review the massive record amassed in the Ecuadorean proceeding, or to travel to Ecuador to conduct its own on-site diligence. Because Patton Boggs needed to do that work in connection with its own entry into the case in any event, it was agreed that Patton Boggs would provide its analysis on those issues . . . and that Burford would not try independently to perform that work . . . .").[8] That Burford did not instantly identi-fy the damaging admissions and documents in hundreds of pages of deposition testimony as it came in on a near-daily basis—after the investment deal was signed—is no reason to doubt Bo-gart's sworn testimony. *See* Mot. at 11–12. Especially when just weeks later, it did suspend its funding, citing the concerning allegations of fraud. Bogart, ¶ 33.

In a footnote, Movants attempt to minimize the importance of the Invictus Memorandum, asserting that it was only a "settlement plan and program," although they admit it was "commis-

---

[8] In his recent deposition, Tyrrell offered another argument against Bogart's claim of reliance, arguing that Bur-ford had numerous other sources of information, stating that "Burford engaged the Torys law firm of Great Britain to represent it. It engaged I understand other counsel in Ecuador to give it answers to questions on Ecua-dorian law and other things." Stavers Ex. 3801 (Tyrrell Depo. Tr. at 342:22-343:6). But as Bogart explains in his declaration, these alternate lines of inquiry did not concern the factual material for which Burford relied on Patton Boggs: "Burford and its outside counsel conducted its own diligence on other aspects of the potential in-vestment . . . such as the enforceability of a potential funding contract under Ecuadorian law, the documentation required to bind the LAPs, and how to ensure Burford's investment was appropriately secured." Bogart, ¶ 8.

sioned" by Burford.  Mot. at 7 n.7.  But the fact that the report downplayed the Cabrera fraud, devoting only "a few paragraphs" to it, is the point—contemporaneous documents show that Burford expressly wanted Patton Boggs's assurances that Chevron's allegations would not derail enforcement, and subsequently relied on Patton Boggs's dismissal of the Cabrera allegations as a "distortion" until the overwhelming evidence categorized in this Court's preliminary injunction order showed it otherwise.  For example, after reviewing a draft of the Invictus memorandum, Burford sent Patton Boggs a list of 8 issues it wanted to see addressed in more detail.  Stavers Ex. 3806 (BUR0002406).  The second issue on the list is titled "Grounds for non-enforcement" and states:  "The memo referred to the expert irregularities and the efforts by Chevron to under-mine the propriety of the process, but we'd like to go through the grounds for non-enforcement under NY law and the law of other relevant jurisdictions and how we'd rebut Chevron's argu-ments on each."  *Id*. at 2.  In his response, Tyrrell changed the subject, describing how Patton Boggs intended not to "rebut" Chevron's allegations, but to sidestep them, reporting that "we continue to look for favorable enforcement jurisdictions in the United States."  Regarding Chev-ron's allegations, Tyrrell evaded Burford's inquiry by responding only to general attacks on the Ecuadorian the judiciary, and ignoring the "expert irregularities" Burford asked about entirely.  *Id*.  Moreover, Invictus was not the only factual representation Patton Boggs made to Burford.  It also sent Burford the Fajardo Declaration and the cleansing expert petition filed with the Ecuado-rian court, asserting, "The May 2010 Declaration of Pablo Fajardo more thoroughly explains the process used to select Mr. Cabrera."  Stavers Ex. 3874 (BUR00034071).  As this Court has held, that declaration did no such thing, and was in fact "deceptive."  Dkt. 905 at 5, 38–39.

Movants' supposed smoking gun document regarding the *Crude* outtakes is no more compelling.  Movants cite an October 29, 2011, email exchange between Bogart and others at

Burford, discussing certain *Crude* outtakes, as supposed evidence rebutting Bogart's claim that he did not see the *Crude* outtakes "until after our due diligence had been completed."  In fact, this correspondence confirms Bogart's statement.  The correspondence suggests that this is first time Bogart and the others have seen the *Crude* outtakes—late in the evening of October 29, 2010.  Burford, through its funding subsidiary, Treca, signed the agreement with the LAPs just two days later, on October 31 (Dkt. 252-1–252-2)—it is credible, indeed likely, that due diligence had been completed more than 48 hours before the final deal documents were signed. While Movants' comment on the absence of "shock or outrage" in the emails, the nature of Burford's reaction to the clips is not apparent from the brief statements made on those late night emails.  But at least one statement that Movant's neglect to quote in their motion is of significance—Molot's observation that "[i]t's really important that we're backing Patton Boggs here." Stavers Ex. 3860 (Gomez Ex. 51).

Finally, Movants' attempt to rebut Bogart's statements about the withdrawal of Kohn from the litigation are baseless on their face.  In response to Bogart's statement that Burford would not have entered into the funding agreement (signed October 31, 2010) had it known about the nature of Kohn's concerns, Movants cite to evidence that Burford knew about Kohn… in December, *after* it entered into the funding agreement.  Mot. at 12 (citing documents from December 2010).  Defendants were free to depose Bogart and challenge his statements with this evidence, they chose not to.  Should Bogart testify at trial, they are free to challenge his testimony then.  But they cannot have his declaration stricken from the record on the basis of documents that do not contradict, and frequently support, that declaration.[9]

---

[9] Movants do not challenge the third aspect of fraud, that Burford's reliance on Defendants, in the form of the $4 million funding, harmed Chevron.  It is established by the record in any event.   With that money, the LAPs were able to continue to pursue their fraudulent scheme to force Chevron into a settlement.

**b.      The Bogart Declaration is Relevant to Chevron's RICO Claim and Defendants' Affirmative Defenses**

The Bogart declaration is also relevant to Chevron's RICO claim, providing insight into the nature of Defendants' enterprise and facts relevant to the predicate acts of wire fraud and money laundering.  Bogart provides evidence of the roles played in Defendants' enterprise by Donziger and Patton Boggs, in particular that Donziger "described himself as the lead U.S. lawyer for the LAPs and also the overall strategist behind the Litigation" (Bogart, ¶ 5) and that "By early 2010, Patton Boggs had secured a leading role in the Litigation, with Jim Tyrrell as the lead partner." *Id*. at 6.  Bogart provides evidence that the Invictus memorandum—sent to Burford by email on multiple occasions (*see* Stavers Ex. 3857 (BUR0015390) at 5) was part of a "scheme or artifice to defraud" (18 U.S.C. § 1343), along with various other email communications (*e.g.* Stavers Ex. 3874 (BUR00034071) (Patton Boggs forwards Fajardo Declaration to Burford)) and he provides evidence that Defendants caused funds to be transferred into the United States (from Cayman Islands-based Treca Financial Solutions) in furtherance of unlawful activity (18 U.S.C. § 1956).

The Bogart declaration also supports this Court's exercise of personal jurisdiction over the LAPs.  Bogart's testimony is in its entirety a description of Donziger and Patton Boggs holding themselves out as the LAPs agents and seeking funding from a New York business on the LAPs' behalf (*see*, *e.g.*, Bogart, ¶ 7 ("Donziger made it clear that he had broad authority from the LAPs to negotiate financing arrangements"), and Bogart describes meeting "Ecuadorian counsel for the LAPs, Pablo Fajardo, and their Ecuadorian representative, Luis Yanza, in New York, at the offices of Patton Boggs" in furtherance of the LAPs' efforts to obtain funding from New York-based Burford (*id*.).  The extensive U.S. activity described in the Bogart declaration also goes to Donziger's argument that Chevron is seeking an impermissible extraterritorial applica-

18

tion of RICO in this action. Dkt. 307 at 71 (Donziger's answer to amended complaint, raising

extraterritoriality as an affirmative defense).

    Finally, the declaration is relevant to Donziger's intent. Bogart attests that Donziger

knew Burford would not invest if it knew the truth about Defendants' fraud and that Donziger

intentionally concealed the details of Defendants' relationship with Cabrera to obtain funding

from Burford: "Indeed, Donziger knew as much: when debating how much to conceal, he wrote

his colleagues (including Patton Boggs) in June 2010, during a period of active negotiations with

Burford, that they 'need to probe' what admitting the truth would mean 'at a time we are trying

to raise money' because there would be 'negative fallout' and it might be better to be general'.

Of course, we were unaware of this behind the scenes debate about their deception until after we

invested." Bogart, ¶ 13.

### 3.  *Weber, Doolittle,* and *Sellers* do not apply to the Bogart declaration.

    Movants rely on *Weber, Doolittle,* and *Sellers* in arguing that a motion to strike is war-

ranted. *See* Mot. at 24. *Weber* stands for the unremarkable proposition that a court may strike

irrelevant material. *Weber v. AVX Pension Plan for Bargaining Unit & Hourly Employees*, 07-

CV-615S, 2009 WL 3165627, *3 (W.D.N.Y. Sept. 27, 2009) ("paragraphs 1–4, 6–15, and 17

contain irrelevant evidence, and are inadmissible pursuant to Rule 402 of the Federal Rules of

Evidence. Thus, Defendants' Motion to Strike is granted as to these paragraphs."). The Bogart

declaration is relevant, as discussed, so *Weber* provides Movants with no support.

    Nor does *Doolittle v. Structured Inves. Co., LLC*, No. CV 07-356-S-EJL-CWD, 2008 WL

5121591 (D. Idaho Dec. 4, 2008) offer Movants the support they claim. *See* Mot. at 24 n.16. In

*Doolittle*, the defendant submitted "over two hundred pages" of material related to a separate

bankruptcy proceeding in support of its argument that the claims in *Doolittle* were the property

of the bankruptcy trustee. *Id* at *4–6. But, independent of these materials, the court rejected the

contention that the claims before it were not the property of the trustee, because the claims had arisen after the bankruptcy petition was filed. *Id*. at *5. Moreover, the court noted that the "over two hundred pages" of material was not necessary, even if the existence of a bankruptcy proceeding was relevant. *Id*. at *6. The court did not, as Movants suggest, strike the material because it cast plaintiff Doolittle "in an unfavorable light"—it struck it because it was "irrelevant." Plaintiffs elevate a single sentence of dicta, which notes only that it would not itself view Doolittle unfavorably "considering the outcome of his bankruptcy case." *Id*. Furthermore, the alleged prejudice in *Doolitle* was to a party, not to a nonparty law firm that has not appeared in the action.

Finally, Movants contend that the Bogart Declaration is "inadmissible on summary judgment or otherwise" because Bogart attests that "the following is true and correct or based on reasonable information and belief." Mot. at 24 (citing Bogart at 1). Movants rely on *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639 (2d Cir. 1988), but in *Sellers*, the court did not strike anything—rather, the Second Circuit declined to consider, on summary judgment, a declaration with similar attestation language, notwithstanding the fact that the objecting party had failed to move to strike it in the proceedings below. *Id*. at 643. And the court declined to consider the declaration because it found "no way to ascertain which portions of [the] affidavit were based on personal knowledge[.]" *Id*. That is not the case with the Bogart declaration, the bulk of which describes events personally witnessed or participated in by Bogart. *See*, *e.g.*, Bogart, ¶ 7 ("I personally attended several meetings with Donziger at Patton Boggs' offices, and my colleagues attended yet more. Donziger made it clear that he had broad authority from the LAPs to negotiate financing arrangements and to be the primary interface with Burford"), ¶ 12 ("Patton Boggs and Donziger also specifically assured us that the contacts that had occurred between the LAPs

and Cabrera were both limited and permissible."), ¶ 21 ("I did not see any of the outtakes until after our due diligence had been completed and our investment committee had already approved the investment."), ¶ 39 ("On January 27, 2011, Tyrrell called me to discuss the status of the Litigation. Tyrrell told me that Donziger had not told Patton Boggs the truth about the extent of his prior contacts with Cabrera.").  And Bogart's position as CEO of Burford Capital establishes that his factual statements about what Burford Capital did, knew, and did not know are all based on personal knowledge.

### B. Movants Spin a False Narrative Regarding Bogart's Declaration That Is Unsupported and Contradicted by the Record.

Finally, although it is not relevant to anything properly before the Court, because Movants go on at some length about a purported conspiracy theory between Burford and Chevron, Chevron necessarily must take the time to debunk it.  The essence of Christopher Bogart's declaration is that his firm, Burford, invested in the Lago Agrio litigation in reliance on statements made to it by the LAP's various agents and that certain of those statements, notably about the independence of the Ecuadorian court expert, Richard Cabrera, were later revealed to be false. Bogart, ¶4.  Unable to defend their corrupt relationship with Cabrera, as they have been throughout this and related litigations, Movants distort both the Bogart declaration and the contemporaneous documents Burford produced to create a straw man narrative to attack.

Their reckless treatment of the record is manifest in numerous falsehoods—for example the bizarre claim that Chevron has "backed off" its core allegation regarding the LAP team's relationship with Cabrera (Mot. at 11)—but their straw man stands on two thatched legs.  First, they rearrange the timeline of events, misconstruing Bogart to allege a complete exposure of the truth in January 2011, against which they present the subsequent two years of friendly relations between Burford and Patton Boggs as "evidence" that Bogart is not truthful in his declaration.

But this is not so—Bogart became aware of the falsity of many of the representations in January 2011, but believed at the time that Patton Boggs had been fooled as well, in substantial part because Patton Boggs partner Jim Tyrrell told him so.  Second, Movants purport to rebut Bogart's core allegation, that Burford invested based on false assurances by the LAPs' U.S. lawyers, with the counter-allegation that Burford knew about the fraud all along, and only abandoned the LAPs when pressured to do so by Chevron.  Movants' conspiracy theory bears no resemblance to the truth, and is unsupported by the documents Movants cite.  Indeed, while Movants allege that Chevron sought to profit from the confidentiality of the Burford production, it is *Movants* who have capitalized on their sealed filing, spinning a yarn for the public that looks authoritative only because it contains citations and mysteriously blacked out quotes that cannot be checked publicly, but is exposed as fiction when the "supporting" documents are revealed.

### 1.   Bogart's Allegations That Patton Boggs Knowingly Furthered the LAPs' Fraud Are Supported by the Contemporaneous Record.

The central conceit of Movants' brief is that because the Bogart declaration "suggests that . . . upon Chevron's filing of its RICO case, Burford learned that Patton Boggs had misled it," any evidence of continued cordiality between Burford and Patton Boggs after that filing "thoroughly discredits the Bogart Declaration."  Mot at 1.  To that end, Movants submit a string of documents showing that, indeed, Burford and Patton Boggs continued to enjoy a professional, even friendly relationship, "up until *March 2013*[.]"  *Id.*  The italicized date is presumably intended to signal Movants' dismay that Bogart would try and deny *two years* of continued good relations, and Movants return to the date in dramatic fashion ten pages later, after their catalog of good relations, with the dramatic assertion:  "These communications continued until March 13, 2013.  Burford then fell silent."  *Id.* at 10.  Movants offer an elaborate conspiracy theory to explain Burford's change of heart (*id.* at 19–23) but the truth is much simpler.  Two days after

March 13, this Court issued its 72-page order on Chevron's subpoena to Patton Boggs, reviewing in detail the evidence Patton Boggs's active role in the LAP teams' fraud and obstructive behavior in U.S. courts and in Ecuador.  Dkt. 905.  And while the Court did not reach the question of "whether there is probable cause to suspect that [Patton Boggs] or any of its personnel was a culpable or knowing participant in any alleged fraud or crime," the evidence arrayed in that order, and the factual findings that were made are more than enough to explain Burford's new perspective on its former business partners at Patton Boggs.

The relationship between Burford and the LAP team can be divided into three phases.  In the first phase, which lasted until late January 2011, Burford evaluated and ultimately invested in the Lago Agrio Litigation, working primarily with Tyrrell at Patton Boggs and Defendant Steven Donziger.  The second phase begins on January 27, 2011, when Tyrrell called Bogart and disclosed to him that "Donziger had not told Patton Boggs the truth about the extent of his prior contacts with Cabrera."  Bogart, ¶ 39.  A series of revelations would follow, ultimately leading Burford to terminate the funding agreement with the LAPs in September 2011.  *Id.*, ¶ 35–38. But, as the record shows and Bogart does not deny, throughout this period, Burford believed Patton Boggs to have acted in good faith.  But this phase ends with the issuance of this Court's March 15, 2013 order on the Patton Boggs subpoena, and Bogart's realization that Patton Boggs had not been a dupe, but a willing participant in the LAP team's fraud, as reflected in the Bogart declaration.

Manipulating this timeline, Movants quote at length from correspondence and documents from the January 2011 through March 2013 period, in which Burford representatives assure various audiences that "Patton Boggs had done nothing wrong," as Movants put it, as purported rebuttal to Bogart's *current* understanding of Patton Boggs's misconduct.  Mot. at 8.  Similarly,

Movants catalog discussions of business relationships between the firms during this time, assert-ing, "It is inconceivable that a company would continue to engage in extensive business dealings with a law firm that had falsely induced it to underwrite a fraud." *Id*.

But what Movant's own cited documents show is that Burford remained in cordial con-tact with Patton Boggs during that period because it believed that Patton Boggs had been misled as well. *See, e.g.*, *id*. at 7 (quoting Burford's Chief Investment Officer, Jonathon Molot, "We were misled – and I believe Patton Boggs was misled"). Bogart and others at Burford believed this because that is what Tyrrell told Bogart in the January 27, 2011 call. Bogart, ¶ 39. As Bo-gart's contemporaneous notes from that call record, Tyrrell told him, "'Donziger not told the truth to new counsel of extent of his prior contacts with Cabrera'" and that "Donziger never dis-closed vast majority of contacts despite being asked specifically about them." Bogart, Attach-ment A. The deception was so significant, Tyrrell told Bogart, that the firms involved were "dis-cussing their ethical obligation," and "evaluating what to do." *Id*. Movants now accuse Bogart of perjuring himself because Bogart believed what Tyrrell told him that day.

Attempting to support their mischaracterization of Bogart's declaration, Movants distort its text. "The Bogart Declaration," Movants claim, "characterizes Chevron's RICO filing on February 1, 2011, as the watershed, eye-opening moment for Burford—the moment when Bur-ford '[l]earn[ed] of the [f]raud.' This is fiction." Mot. at 10. Indeed it is, but it is Movants' fic-tion, not Bogart's, because his declaration does no such thing. The declaration devotes one mat-ter-of-fact sentence to the filing of the RICO action: "On February 1, 2011, Chevron filed the captioned action." Bogart, ¶ 29. It is a contemporaneous Burford document, a February 21, 2011 letter from its financing subsidiary, Treca, to the LAPs, which contains the observation that Chevron's allegations "appear to contravene directly the representations made to the Funder"

24

(Stavers Ex. 3913 at 2; Bogart, ¶ 33)—but since this does not fit Movants' theory, they disregard it.

Although the section of the declaration mentioning Chevron's complaint is titled "Burford Learns of the Fraud"—the source of Movants' altered quotation—the bulk of this section and the following section is about this Court's issuance of the temporary restraining order and preliminary injunction, which Burford interpreted as barring further funding.  *See* Bogart, ¶ 29–32.  If there is a "watershed" moment described in that section—although that is Movants' language, not Bogart's—it is this Court's March 7, 2011 preliminary injunction order, which Bogart describes as including "extensive factual findings based on documents and information that had never been disclosed to Burford during the due diligence process, before it agreed to fund, and that would have been material to Burford's decision to enter in the Funding Agreement."  *Id.*, ¶ 30.  It appears that factual findings from this Court concerned Burford far more than allegations in Chevron's complaint.  But the 126-page March 7 order mentions Patton Boggs only in passing.  *See* Dkt. 181 at 32, 58–59, 123 n.430.  Whatever "eye-opening" impact that order had for Bogart and others at Burford, it went to the LAP team's fraud in Ecuador, not Patton Boggs's active and knowing role in furthering that fraud in the United States.  As discussed above, that fuller understanding would come with another order, two years later, directly discussing Patton Boggs.

### 2.      The Claim That Burford Abandoned the LAPs Because of Chevron's Pressure Is False and Unsupported by the Cited Documents.

Movants claim that Burford invested in the fraud with full knowledge of the relevant facts, but then, just two months later, decided that supporting the LAPs would undermine the rest of its business, walked away from the $4 million it had already invested, and entered into a secret deal with Chevron to repudiate Patton Boggs and the LAPs at a moment of Chevron's choosing.

But this elaborate theory finds no support in the documents Movants cite, ignores the directly contradictory evidence, and indeed, has no support, because it is false.

As explained above, Movants' underlying arguments regarding Burford's reliance on Patton Boggs's diligence related to the Lago Agrio case are nonsensical.  In an attempt to hide the obvious, Movants invent an even more fantastical narrative about an alleged scheme between Burford and Chevron.  But the evidence presented by the Movants does not support their allegations of a "secret collaboration" between Burford and Chevron.

Movants claim that, before it was announced that Getto had joined Burford in late January 2011, Getto was "straddling his new and old positions" during late 2010 and early January 2011.  Mot. at 16.  To prove this assertion, Movants rely on three emails that Getto forwarded from his Latham and Watkins email address to his Burford email address, during a two hour period on the evening of January 31, 2011, and in email from July 2011 in which he discusses conversations with former colleagues at Latham and Watkins.  *Id*. (citing Gomez Ex. 56–59).  Contrary to Movants' assertion, this does not prove that Getto was "straddling" his new and old jobs "during the latter part of 2010 and early January."

Movants contend that Getto was "undermining" the relationship between the LAPs and Burford, citing an email where Getto says that "Chevron ought to be thanking [Latham] and me for my going to Burford . . . ."  Mot. at 17; Stavers Ex. 3840 (Gomez Ex. 59) at BUR0005157.  But the LAPs omit the remainder of this email, in which Getto explains that Chevron should be "thanking" him for going to Burford because he "had been helpful in looking into the alleged fraud by Donziger."  Stavers Ex. 3840 at BUR0005157.  This does not evidence a conspiracy between Getto and Chevron to undermine Burford's relationship with the LAPs.

In addition, Movants allege that, while Burford's management was representing to the board that Getto was not involved in the Ecuador matter, Getto was actively working on the case. Mot. at 17. But Burford's documents show that Burford's management "purposely walled [Getto] off from" the Lago Agrio matter and that Getto and other members of Burford's management "ha[d] not spoken at all about the Chevron matter." Stavers Ex. 3893 (Gomez Ex. 18) at BUR0056893.

Movants further claim that Burford's "secret collaboration with Chevron" continued from January 2011 "presumably through the present." Mot. at 18–19. But the documents the LAPs rely on do not come close to establishing a "secret collaboration." The LAPs cite BUR0049986, which is an initial contact email from Burford's counsel to Randy Mastro. The email, in relevant part, simply states "I wanted to let you know that I represent Burford Group, and that if you or any of your colleagues in the Chevron matter want to communicate with Burford please contact me." Stavers Ex. 3890 (Gomez Ex. 64) at BUR0049986. The LAPs also rely on BUR0047966 (Stavers Ex. 3886(Gomez Ex. 65)), which is an email from Bogart to Steve Wilson stating "Hansen talked to Mastro some time ago, a cordial conversation without any real content. Chevron called Ernie again yesterday wanting direct dialog and a 'substantive proposal' from us; Ernie referred them back to the Hansen-Mastro channel." These two documents hardly evidence a "secret collaboration" between Chevron and Burford.

Nor do these documents, or anything else, support Movants' unexplained allegation that Chevron and Burford hatched a "secret collaboration." Mot. at 14. Based on a single innocuous email, Movants allege "Burford's capitulation was motivated at least in part by Chevron's efforts to 'blackball' Latham & Watkins"—an allegation that makes no sense. As discussed, Movants make much of Getto's role at Burford, but never explain how Getto—currently one of 14 indi-

viduals identified as members of Burford's "Senior Team" on its web site—could have exerted such control over Burford to cause them to abandon a $4 million investment.  Of course, Chevron has made well known its intention to hold accountable those who have aided and abetted the LAPs, including funders and lawyers involved; and it named Burford as a non-party co-conspirator in its complaint (Dkt 1, ¶ 17(n)), so Burford was well aware of potential claims it might face as a result of its involvement here.  But it was not the risk of suit from Chevron that swayed Burford—the firm refused to disavow Patton Boggs or publicly criticize the LAPs for over two years after Chevron filed its complaint in this action.  It was the truth being revealed over the course of this case that caused Burford to come forward now.

Nonetheless, Movants contend that Mr. Mastro and Chevron were involved in "engineer-ing" the letter that Burford sent to the LAPs' representatives on September 29, 2011, in which Burford terminated the funding agreement.  Mot. at 19.  They also claim that Mr. Mastro had a "clandestine relationship with Burford."  *Id.*  The LAPs base this contention on the fact that Mr. Mastro mentioned the possibility of third-party fraud involving Burford in a September 25, 2012 hearing and that Mr. Mastro had called Burford one month before Burford sent its letter to the LAPs' counsel.  *Id.*  But the only relevant part of Ex. 66, which the LAPs cite as evidence of Mr. Mastro's phone call to Burford, is that the email has the subject line "Randy Mastro called." Stavers Ex. 3807 (Gomez Ex. 66) at BUR0049969.  Ex. 65 just says that Chevron asked for a "substantive proposal" and Burford referred them to the dialog between Burford's counsel and Gibson Dunn.  Stavers Ex. 3886 at BUR0047966.

Movants' conspiracy theory is unfounded, and serves only to explain their distorted revi-sion of Bogart's declaration.  The record tells a simpler story.  Defendants and Patton Boggs lied to Bogart.  Bogart believed Patton Boggs, but soon learned that Defendants had lied.  Two years

later, this Court issued an extensive order analyzing the record, and Bogart came to realize the Patton Boggs had lied to him as well.  But what matters, what is of exceptional significance in this lawsuit, is that Burford was induced to provide $4 million in funding to the LAPs by false statements and omissions.  Movants' motion has little to say about that, for all of its harsh language and colorful allegations.

### C.   There Is No Basis to Reopen Discovery.

Movants argue, in the alternative, that the Court should permit the LAPs to re-open discovery to serve a subpoena on The Burford Group.  Mot. at 25–28.  But they fail to meet the standard for re-opening discovery and doing so would serve no purpose beyond furthering Defendants' campaign of obstruction and delay.

First, Movants misrepresent the standard for re-opening discovery, omitting relevant factors enumerated in an opinion they cite.  "In deciding whether to reopen discovery, courts consider whether good cause exists." *Bakalar v. Vavra*, 851 F. Supp. 2d 489, 493 (S.D.N.Y. 2011) (citing *Gray v. Town of Darien*, 927 F.2d 69, 74 (2d Cir. 1991)).  "A significant consideration is whether there has already been adequate opportunity for discovery." *Id.* (citing *Trebor Sportswear Co., Inc. v. The Limited Stores, Inc.*, 865 F.2d 506, 511 (2d Cir. 1989)).  "Courts also consider (1) whether trial is imminent, (2) whether the request is opposed, (3) whether the non-moving party would be prejudiced, (4) whether the moving party was diligent in obtaining discovery within the guidelines established by the court, (5) the foreseeability of the need for additional discovery in light of the time allowed for discovery by the district court, and (6) the likelihood that the discovery will lead to relevant evidence." *Id.* (citing cases).  Of these factors, Movants purport to address only good cause, the imminence of trial, and the prejudice to the opposing party.  *See* Mot. at 25-28.  Even these factors weigh against reopening discovery here and, unsurprisingly, those factors Movants omit weigh heavily against such action.

Moreover, the standard for re-opening discovery is considerably higher than Movants portray. District courts within the Second Circuit routinely deny such requests—especially where the moving party could have previously obtained the discovery it sought. *See*, *e.g.*, *Bakalar* 851 F. Supp. 2d at 493–94 (denying motion to re-open discovery based on lack of diligence); *Gucci Am. v. Guess?, Inc.*, 790 F. Supp. 2d 136, 140–142 (S.D.N.Y. 2011) (same); *Gotlin v. Lederman*, No. 04-CV-3736 (ILG), 2009 WL 2843380, at *7 (E.D.N.Y. Sept. 1, 2009) (same). This Court should do the same here, where Movants do not come close to satisfying the standard.

Second, Movants acknowledge the importance of diligence to the good cause inquiry, but gloss over their delay in seeking discovery. As Movants acknowledge, "the moving party's diligence is a function of the 'information the party knew, or should have known,' in advance of the deadline sought to be extended." Mot. at 26 (citations omitted). "Where a party is aware of the existence of documents or other information before the close of discovery and propounds requests after the deadline has passed, those requests should be denied." *Gucci Am*, 790 F. Supp. 2d at 140; *see also Pretty v. Prudential Ins. Co. of Am.*, 696 F. Supp. 2d 170, 178–179 (D. Conn. 2010); *In re Health Mgmt., Inc.*, No. 96 Civ. 0889 (ADS), 1999 WL 33594132, at *5 (E.D.N.Y. Sept. 25, 1999).

Movants claim that "Defendants had no reason to seek discovery from Burford before the unveiling of the Bogart Declaration and the Chevron/Burford Settlement Agreement." Mot. at 26. But as Movants admit, Chevron was making this argument, in furtherance of discovery from one of the Movants, Patton Boggs, as early as September 25, 2012—over two months before the December 1 deadline for document discovery. Mot. at 19, 23–24. Indeed, at that time, Defendants had better reason to know of the relevance of Burford's documents to Chevron's claims, be-

cause they were in possession of the September 2011 letter from Burford expressly accusing the LAPs and their agents of defrauding Burford in order to obtain the $4 million financing.  But rather than seek discovery from Burford, they improperly withheld that critical piece of evidence (Dkt. 894 at 14–15) and sought to obstruct Chevron's discovery of these facts from Patton Boggs and from Burford.  Dkt. 698 (LAPs motion for protective order striking Chevron's third-party subpoenas).  Nor can Movants justify their request to re-open discovery on the basis of alleged contacts between Chevron and Burford.  In December 2011, a year and a half before filing the present Motion and a year before the close of written discovery, Tyrrell raised the same allegations Movants offer here, claiming that Burford decided to distance itself from the case after Chevron "made it clear that there would be repercussions if [Burford] continued funding" and that "Chevron dealt with them directly."  Stavers Ex. 3808 (2011.12.11 Frankel article).  Tyrrell further asserted that "Burford's decision not to up its investment doesn't mean the litigation funder has developed doubts about the plaintiffs' case, but rather is a sign that Chevron has intimidated funders."  *Id.*  And on March 14, 2011, Donziger and Fajardo accused Burford of "incorporat[ing] a conflict of interest into its investment portfolio" by appointing Getto as a Managing Director.  Stavers Ex. 3914 (WOODS00041392).  Defendants thus knew of Burford's fraud allegations, and Chevron's contacts with Burford, long before filing this Motion.  Only now when their attempt to conceal their fraud has failed have they discovered a sudden need to pursue additional discovery.

But even if the Court were to accept the implausible contention that the LAPs had no basis to seek discovery until Chevron filed the Bogart declaration, the application for additional discovery itself is still untimely.  Chevron filed the declaration on April 17, 2013, but Movants waited more than two months to seek additional discovery, and offer no excuse for their delay.

This is reason alone to deny the request. *See Colletti v. Fagin*, No. 90 Civ. 4591, 1999 WL 126461, at *3 (S.D.N.Y. Mar. 10, 1999) (denying request to "reopen discovery on the eve of trial" where party had prior opportunity to conduct the same discovery and "chose not to do so").

Third, trial is set to begin on October 15, 2013, just three months from now. Dkt. 1268 at 3. And though Movants "do not ask the Court to postpone any deadlines" (Mot. at 28) at this time, they offer no assurance that they won't do so in the future, or that co-defendant Donziger will not do so. Indeed, capitalizing on additional discovery disputes to create delay would be in keeping with Defendants' long standing strategy, "as outlined by Jim [Tyrrell] to "fight hard on all fronts all the time and concede nothing, buy as much time as possible." Dkt. 496-5.

Finally, Movants argue that Chevron would not be prejudiced by re-opening discovery. Mot. at 28. But this position rests solely on Movants unsupported claim that they are not asking now to extend any deadlines. *Id.* As discussed, there is no guarantee that Movants will not seek to use the re-opening of discovery as a basis for delaying trial. And delay here, and indeed in any action touching on their fraud, has always been the LAPs objective, so that they can pursue pre-judgment attachments and other remedies abroad on the back of their fraudulent judgment, without examination by any court of the means by which they obtained it.

**D.    There Is No Basis for Sanctions.**

Movants argue that "Chevron and Burford should be sanctioned for their refusal to remedy Burford's bad-faith confidentiality designations without application to the Court." Mot. at 33. "The two should be ordered to cover the fees and costs required to bring this motion." *Id.* But the Protective Order—which both Movants have signed—puts the burden on the party challenging confidentiality designations to bring an appropriate motion. Dkt. 723 ¶ 14. Movants thus seek sanctions for allegedly being forced to do what the Protective Order requires them to do. Even if there were a basis for sanctions—and there is not—Chevron would be an improper tar-

32

get.  Chevron cannot be sanctioned for refusing to do something it had no power to do.  The Protective Order authorizes Burford, as the producing party, to designate documents as confidential and does not empower anyone but Burford or the Court to lift those designations.  Dkt. 723, ¶ 8. And indeed, just before this brief was filed, Movants and Burford informed the Court that they had reached an agreement whereby Burford removed the confidentiality designation from certain documents, and Movants dropped their request for sanctions, but only with respect to Burford, not Chevron.  Dkt. 1255.  This confirms what Chevron told Defendants over two months ago, that "any concerns that the Donziger Defendants and the LAPs may have with respect to Burford's confidentiality designations and Burford's redaction of its documents are properly addressed to Burford[.]"  Gomez Ex. 77.  Movants' continued pursuit of sanctions against Chevron now that they have obtained the relief they sought—and from the only party that could have provided that relief—is groundless harassment.

Movants' argument that Chevron is the "producing party . . . vis a vis the Defendants" is wrong.  Mot. at 5.  The Protective Order defines the "producing party" as the party designating the documents.  Dkt. 723.  It makes no sense, and is contrary to the language of the order, to claim that when Chevron sent a copy of the Burford production to LAPs, it somehow became the "producing party" per the Protective Order.[10]  Indeed, under this theory, Chevron also became the "producing party," authorized to lift confidentiality designations, for the documents produced to it in this action by Donziger associates Laura Garr and Andrew Woods—who designated virtually their entire productions confidential—when Chevron produced those documents, at Defendants' insistence, to Defendants in this action.  *See* Stavers Ex. 3809 (May 31 Production Let-

---

[10]  Although the designating party is assumed to be the party initially producing the documents (*see also* Dkt. 723, ¶ 3), the language of the order suggests it could be anyone who thinks something is confidential.  Dkt. 723, ¶ 2. In any event, it is the designation of confidentiality, not the production of documents, that is the essential criteria for qualifying as a "producing party" under the protective order.

ter), ¶ 5; Ex. 3810 (June 11 Production Letter).  Movants also mischaracterize the term in the Burford agreement requiring Burford to comply with Chevron's request to lift improper designations.  Dkt. 1039-1 (Ex. 3686) at 4-5.  Even if it gives Chevron any authority beyond that already provided by the Protective Order, it does not obligate Chevron to make such a request on anyone else's behalf, nor does it preclude anyone else from obtaining the relief provided for by the Protective Order.  *Id.*

Movants confine their request for sanctions to a single paragraph, fail to cite the Protective Order, and offer but one readily distinguishable case.  Mot. at 33.  The Protective Order provides: "If the parties cannot resolve their disagreement, the objecting party may seek appropriate relief pursuant to the Court's Individual Practices for Discovery Disputes."  Dkt. 723, ¶ 14.  But the sole case Movants cite in support of their sanctions request concerned a protective order that was materially different because it required the *designating* party to bring a motion to uphold the designation, but allowed it 60 days to do so.  *In re Ullico Inc. Litig.*, 237 F.R.D. 314, 317 (D.D.C. 2006).  Thus, the court found that bad faith conduct by the designating party would give that party a "strategic advantage in the form of an unwarranted and unfair designation of 'confidential' for months."  *Id.*  Here, in contrast, the Protective Order does not favor the designating party or prejudice the challenging party by imposing a lengthy delay in the event of a challenge.  Rather, the Protective Order merely requires the challenging party to meet-and-confer with the designating party and, should that not resolve the concern, permits the challenging party to seek relief from the Court.  Dkt. 723, ¶ 14.  Challenges may thus be resolved as quickly as this Court's schedule permits—provided the challenging party itself moves promptly, something Movants here did not do.  They cannot complain about their own delay.

Finally, there is no basis for imposing sanctions here, where Movants have suffered no prejudice.  The Protective Order permits the use of documents in this action and for other purposes (Dkt. 723, ¶ 6), and movants have done that here. And they have obtained the relevant relief, pursuant to an agreement with Burford, as they should have done before making their unfounded and false accusations against Chevron in this improper motion.

## CONCLUSION

For the foregoing reasons, Chevron respectfully requests that the Court deny Movants' requests to strike the Bogart declaration, to permit additional discovery and to sanction Chevron.


Dated: July 15, 2013                          Respectfully submitted,
New York, New York

                                              /s/ Randy M. Mastro
                                              Randy M. Mastro
                                              Andrea E. Neuman
                                              GIBSON, DUNN & CRUTCHER LLP
                                              200 Park Avenue
                                              New York, New York 10166
                                              Telephone: 212.351.4000
                                              Facsimile:  212.351.4035

                                              William E. Thomson
                                              333 South Grand Avenue
                                              Los Angeles, California 90071
                                              Telephone: 213.229.7000
                                              Facsimile:  213.229.7520

                                              *Attorneys for Chevron Corporation*