Attachment 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
CHEVRON CORPORATION,                                                 :
:
Plaintiff,                          :
:
v.                                      :    11 Civ. 0691 (LAK)
:
STEVEN DONZIGER, et al.,                                             :
:
Defendants.                          :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**CHEVRON CORPORATION'S MOTION FOR RECONSIDERATION OF THE
COURT'S MARCH 15, 2013 RULING ON THE CLEANSING EXPERTS BASED ON
NEWLY DISCOVERED EVIDENCE STEVEN DONZIGER AND PATTON BOGGS
MADE AFFIRMATIVE MISREPRESENTATIONS TO THE WEINBERG GROUP**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION ................................................................................................... 1

BACKGROUND ...................................................................................................... 3

    I.    Chevron's Subpoena on PB for Materials Evidencing the Fraudulent
        "Cleansing" of the Cabrera Report .................................................................3

    II.   The Court's March 15 Order Relating to the Cleansing Experts.....................4

    III.  The Weinberg Group's Role .............................................................................5

ARGUMENT ........................................................................................................... 8

    I.    Chevron Recently Obtained New Evidence ....................................................8

    II.   New Evidence Establishes Probable Cause that Donziger and PB Made
        Affirmative Misrepresentations to Weinberg and the Cleansing Experts ......10

        A.    PB and Donziger Made Affirmative Material Misrepresentations to
             Weinberg.............................................................................................10

        B.    Donziger and PB Misled the Cleansing Experts by Omitting Material
             Information About Cabrera...................................................................14

        C.    Donziger and PB Misled the Cleansing Experts About the Source of Data
             in the Cabrera Report...........................................................................16

        D.    Had PB and Donziger told Dunkelberger the Truth About the Cabrera
             Fraud, the Cabrera Report Would not Have Been Used as a Roadmap and
             Would Have Posed a Serious Risk that the Cleansing Reports Would not
             Have Been Obtained..............................................................................17

        E.    Donziger's and PB's Misrepresentations and Omissions Were in
             Furtherance of a Fraudulent Scheme ...................................................19

    CONCLUSION.................................................................................................. 20

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Chevron Corp. v. Donziger*,
   886 F. Supp. 2d 235 (S.D.N.Y. 2012) ...................................................................... 11

*Chevron Corp. v. Donziger*,
   No. 11 Civ. 0691, 2013 WL 1087236 (S.D.N.Y. March 15, 2013) ................................ passim

*Chevron Corp. v. Donziger*,
   88871 F. Supp. 2d 229 (S.D.N.Y. 2012) .................................................................... 3

*Chevron Corp. v. Naranjo*,
   667 F.3d 232 (2d Cir. 2012) ...................................................................................... 9

*Chevron Corp. v. Salazar*,
   275 F.R.D. 437 (S.D.N.Y. 2011) .............................................................................. 7

*Chevron Corp. v. The Weinberg Group*,
   286 F.R.D. 95 (D.D.C. 2012) .................................................................................... 9

*Chevron Corp. v. The Weinberg Group*,
   No. 1:11-mc-409, 2011 WL 10593727 (D.D.C. Sept. 8, 2011) ................................ 9

*Chevron Corp. v. Weinberg Group*,
   682 F.3d 96 (D.C. Cir. 2012) .................................................................................... 9

*L'Amoureux v. Vandenburgh*,
   4 N.Y. Ch. Ann. 171 (N.Y. Ch. 1838) ...................................................................... 7

*Neder v. United States*,
   527 U.S. 1 (1999) ...................................................................................................... 7

*RST v. Research in Motion Ltd.*,
   597 F. Supp. 2d 362 (S.D.N.Y. 2009) ...................................................................... 7

*United States v. Jacobs*,
   117 F.3d 82 (2d Cir. 1997) ........................................................................................ 7

*United States v. Merritt*,
   No. 90-cr-767, 1991 WL 79235 (S.D.N.Y. May 7, 1991) ........................................ 7

*Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bld.*,
   956 F.2d 1245 (2d Cir. 1992) ................................................................................ 7, 8

**INTRODUCTION**

Chevron moves for reconsideration of the Court's crime-fraud ruling on the cleansing experts in its March 15, 2013 order, *Chevron Corp. v. Donziger*, 11 Civ. 0691, 2013 WL 1087236 (S.D.N.Y. March 15, 2013), because Patton Boggs ("PB") and Steven Donziger cannot and should not be permitted to use the attorney-client and work product privileges to shield communications made in furtherance of an attempt to commit or conceal a fraud.  Newly obtained evidence from the June 26, 2013 deposition of Ted Dunkelberger of The Weinberg Group ("Weinberg") demonstrates that Donziger and PB made affirmative misrepresentations to, and concealed material information from, Weinberg about the Cabrera Report.  In turn, as Donziger and PB intended, Dunkelberger passed on these misrepresentations to the cleansing experts.  Donziger's and PB's lies to Weinberg and the cleansing experts were made in furtherance of continuing to present Cabrera as an independent expert, inducing the cleansing experts to rely on the Cabrera Report, bolstering the false pretense that Cabrera had actually written the report, and covering up the Cabrera fraud by preventing disclosure in the cleansing reports that Stratus Consulting ("Stratus"), Donziger, and the LAPs' team had ghostwritten the report.  In short, in an attempt to "cleanse" the Cabrera fraud, Donziger and PB advanced the fraud.  Based upon this new evidence, the Court should reconsider that portion of its March 15 order as it relates to internal PB communications about the cleansing of the Cabrera Report, including the retention of Weinberg and the cleansing experts and what was communicated to them, as well as communications between PB and the Lago Agrio Plaintiffs' ("LAPs") team on the one hand, and Weinberg and the cleansing experts, on the other.

Dunkelberger served as the principal intermediary between, on the one side, Donziger and PB, and, on the other side, the cleansing experts.  With PB attorneys representing him at the deposition, Dunkelberger testified that PB attorney Eric Westenberger on multiple occasions and

Donziger on at least one occasion told Dunkelberger in August 2010 that Cabrera was an "independent expert." Ex. A at 71:21-72:16 (Transcript of Deposition of Ted Dunkelberger (June 26, 2013) ("Dunkelberger Tr.")). Dunkelberger also testified that PB had told him that Cabrera had actually written the Cabrera Report, and that PB and Donziger gave him Stratus's endorsement of the Cabrera Report as the work of a "neutral" "Technical Special Master," as if Stratus had nothing to do with writing the report. *Id.* at 60:19-21, 61:2-3, 71:6-12, 73:15-74:21, 174:21-175:9. PB and Donziger knew these statements about the Cabrera Report were false when they said them, and intended Dunkelberger to convey this false information in turn to the cleansing experts. PB and Donziger also failed to provide the cleansing experts with Chevron's rebuttal expert reports—even though at least one cleansing expert requested them—to prevent the cleansing experts from inquiring about Chevron's allegations, learning the truth, and disclosing the truth in their reports.

Dunkelberger's testimony fills in a key missing piece of evidence of the scheme to present Cabrera as an independent expert, induce the cleansing experts to file reports based on the ghostwritten Cabrera Report and cite to Cabrera as if he had written the report, and conceal from the cleansing experts (and in turn the Lago Agrio court) that Stratus, Donziger, and the LAPs' team had ghostwritten the report. Further, Dunkelberger's testimony shows that, had PB and Donziger disclosed the truth about the Cabrera Report to Weinberg and, thus in turn, the cleansing experts, Dunkelberger would not have directed the cleansing experts to use the Cabrera Report as a "roadmap" for assessing damages. Some of those cleansing reports likely would not have been submitted as written and some of the authors would not have relied on the Cabrera Report, much less participated in the "cleansing" process.

2

Moreover, regardless of their effect on the cleansing reports, Donziger's and PB's misrepresentations and material omissions were in furtherance of a scheme to continue to use Cabrera and hide the fraud while attempting to defraud Chevron.[1]  It is not necessary for the reports themselves to have been fraudulent in order to find that there were communications to Weinberg and the cleansing experts in furtherance of a fraud and that this conduct vitiated the protection of the attorney-client and work product privileges.  *See Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 249 (S.D.N.Y. 2012).

Accordingly, the Court should reconsider the portion of the March 15 Order denying a crime-fraud finding as it relates to PB's internal and external communications about the process by which Donziger and PB jointly presented Cabrera as an independent expert who had written the report in their attempt to "cleanse" the fraud.  This includes communications about what to disclose and what to conceal from Weinberg and the cleansing experts regarding Cabrera.  In the alternative, the Court should find that Chevron has a substantial need for these materials and that it cannot obtain them without undue hardship.  Accordingly, PB should produce "fact" work product, and "opinion" work product should be listed on a privilege log.

## BACKGROUND

I.    **Chevron's Subpoena on PB for Materials Evidencing the Fraudulent "Cleansing" of the Cabrera Report**

On June 15, 2012, Chevron served PB with a subpoena seeking, among other things, materials evidencing the fraudulent "cleansing" of the Cabrera Report.  Dkt. 493-1 at Request No.

---

[1]  The new evidence goes well beyond prior evidence this Court found to be insufficient, namely "that the new experts developed no new substantive analysis, were instructed to rely on the Cabrera report, and were not told the truth that the Cabrera report had been written, at least in major part, by the LAPs and Stratus."  *Donziger*, 2013 WL 1087236, at *28.

23.[2]  PB moved to quash that subpoena on July 20, 2012 (Dkts. 522-529, 532) and on August 24,

2012, the Court denied PB's motion, without prejudice to PB's privilege and burden claims.

Dkt. 571.  On September 7, 2012, PB submitted additional objections (Dkt. 579), which the

Court addressed at hearings on September 25 and 27, 2012.  Dkt. 714-2, -3.  Although the Court

substantially narrowed the scope of Chevron's subpoena (Dkt. 621), PB sought "to avoid entirely

any obligation to comply prior, or, at least, to minimize the scope of any disclosure."  *Donziger*, 2013

WL 1087236, at *1.

## II.    The Court's March 15 Order Relating to the Cleansing Experts

On March 15, 2013, the Court ruled on PB's objections, holding, among other things, that

PB likely "is an important and, in many respects, unique source of evidence of the alleged fraud

that is available nowhere else" and that "Chevron has shown that it needs discovery from PB."

*Id.*, at *13, *32.  The Court further held that Chevron had satisfied the first prong of the crime-

fraud exception by demonstrating probable cause to believe Defendants had engaged in a crime

or fraud with respect to five areas:  (1) "[t]he alleged bribery of the Ecuadorian judge and the

writing of the Judgment and other judicial documents in the Lago Agrio case"; (2) "[t]he claim

that the LAPs wrote the reports submitted over Calmbacher's signature and affixed signature

pages, knowing that the reports did not reflect his views"; (3) "[t]he circumstances in which the

Lago Agrio court terminated the judicial inspection process"; (4) "[t]he selection and

appointment of Cabrera, the preparation and submission of his report to the Lago Agrio court,

and its presentation as his independent work"; and (5) "[t]he submission of deceptive accounts of

---

[2]  "Cleanse" is the self-incriminating term that PB and Donziger used to describe the process of replacing the Cabre-ra Report with new ones prior to the issuance of the judgment.  *See* Dkt. 9-8 (Westenberger's May 20, 2010 email describing the "effort to 'cleanse' any perceived impropriety related to the Cabrera Report"); Dkt. 53-11 (Donziger's June 14, 2010 email to Tyrrell, Westenberger, and Daleo referring to "the 'cleansing' process").

the LAPs' and Stratus's relationship with Cabrera in the District Court of Colorado and elsewhere in Section 1782 proceedings." *Id.*, at *30. The Court limited the subpoena to these subjects. *Id.*

The Court also found that based on the then-"present record" there was "insufficient factual basis to suspect that the cleansing reports themselves were fraudulent" (*id.*, at *29), and struck Chevron's request for those materials from the subpoena, while recognizing that (1) the cleansing experts "developed no new substantive analysis, were instructed to rely on the Cabrera report, and were not told that the Cabrera report had been written, at least in major part, by the LAPs and Stratus," (2) the cleansing experts "never had traveled to Ecuador for the purpose of gathering data to support their reports," (3) "[a]t least four relied on the data and conclusions in the Cabrera report," and (4) although the Lago Agrio court disclaimed reliance on the Cabrera Report, "[t]he Judgment, however, appears to reveal that the court in fact relied upon it by its reliance on the cleansing reports." *Id.*, at *11, *28. At that time, Chevron did not have testimony from any Weinberg employee.

## III.    The Weinberg Group's Role

In late August 2010, Donziger and PB hired Weinberg to serve as the conduit between them and the cleansing experts. *See* Ex. B (August 23, 2010 engagement letter, Dunkelberger Dep. Ex. 4605, Bates No. TWG00002769).[3] PB provided Dunkelberger with the documents upon which the cleansing experts should rely to prepare their reports, including the Cabrera Report and Stratus's December 1, 2008 endorsement of that report. *Id.* ("To the extent that time permits, [Weinberg] will use information provided in the Cabrera report and available

---

[3] PB did not produce the signed engagement letter until the afternoon before Dunkelberger's deposition.

supplementary data as a basis for preparing a document outlining our own assessment of the environmental and human health damages."); Ex. C (PB's August 17, 2010 email to Dunkelberger, Dunkelberger Dep. Ex. 4601, Bates No. TWG00002426). PB and Donziger agreed to pay consulting fees to Weinberg "not to exceed a total of $325,000 (of which a retainer of $50,000 has already been paid)." Ex. B (Dunkelberger Dep. Ex. 4605). "All professional fees and expenses [were] the responsibility of the Law Offices of Steven R. Donziger, P.C." *Id.*

Dunkelberger managed the project. He recruited the cleansing experts, supervised their work, and communicated with Donziger and PB. Ex. A at 91:16-24 (Dunkelberger Tr.). Weinberg was under "time duress" to complete the work; in fact, the six cleansing experts were recruited and their reports completed within approximately twenty-three days. *Id.* at 274:9-10, 274:25-275:5. Although Weinberg was never mentioned in the cleansing reports, Dunkelberger admitted that Weinberg "essentially wrote" two of them. Ex. D (TWG0000347) ("Kerry [Roche] and Marla [Scarola] essentially wrote Carlos Picone's section on Health Care System costs, and Tom [Golojuch] wrote the piece on Potable Water which will be used extensively by the section author."). After the reports were filed in Lago Agrio on September 16, 2010, Dunkelberger raised with PB and Donziger the possibility of doing additional work to "further clarify what was submitted under time duress" as there were "so many issues and so much there that it was unclear as to what would require clarifying analysis and/or supplemental data." Ex. A at 274:9-17 (Dunkelberger Tr.). Neither PB nor Donziger took him up on this offer. *Id.* at 272:25-273:13.

## LEGAL STANDARD

### 1.      Motion for Reconsideration

Local Rule 6.3 governs reconsideration of any pre-judgment order.  Reconsideration may

be justified due to "the availability of new evidence."  *RST v. Research in Motion Ltd.*, 597 F.

Supp. 2d 362, 365 (S.D.N.Y. 2009) (internal quotation marks omitted) (quoting *Virgin Atl.*

*Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992)).

### 2.      The Crime-Fraud Exception

Otherwise privileged communications or materials must be produced where a factual ba-

sis exists to show:  (1) "probable cause to believe that a fraud or crime has been committed," and

(2) "the communications in question were in furtherance of the fraud or crime."  *United States v.*

*Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997); *see Chevron Corp. v. Salazar*, 275 F.R.D. 437, 451

(S.D.N.Y. 2011).  "Probable cause exists where 'a prudent person ha[s] a reasonable basis to

suspect the perpetration or attempted perpetration of a crime or fraud, and that the communica-

tions were in furtherance thereof.'"  *Donziger*, 2013 WL 1087236, at *25.

The crime-fraud exception extends not only to misrepresentations of material facts, but

also to concealment of such facts.  *See Neder v. United States,* 527 U.S. 1, 22 (1999); *see also*

*L'Amoureux v. Vandenburgh*, 4 N.Y. Ch. Ann. 171 (N.Y. Ch. 1838) ("It is a fraud to conceal a

fraud.") (citing to Justice Story in 1 Story's Eq. 379, § 390); *United States v. Merritt*, No. 90-cr-

767, 1991 WL 79235, at *2 (S.D.N.Y. May 7, 1991) ("[T]he indictment clearly alleges a scheme

to defraud that contemplated not only the submission of the false claim but also the concealing of

the fraudulent nature of the transaction . . . . [Attempts to conceal the fraud] were clearly

necessary steps in executing this scheme to defraud.").

## ARGUMENT

### I.     Chevron Recently Obtained New Evidence

Reconsideration of this Court's finding on the cleansing experts is warranted based on newly discovered evidence. *Virgin Atl. Airways, Ltd.*, 956 F.2d at 1255. It was only on June 26, 2013 that Chevron was able to depose a Weinberg employee. Because none of the cleansing reports mentions Weinberg or its involvement in drafting the cleansing reports (*see, e.g.*, Dkt. 400-10 (Report of Douglas Allen) and Dkt. 400-11 (Report of Jonathan Shefftz)), Weinberg's involvement only came to light after Chevron began to obtain discovery directly from the cleansing experts in December 2010. After discovery from the cleansing experts revealed Weinberg's role, Chevron filed an action pursuant to 28 U.S.C. § 1782 ("Section 1782") seeking discovery from Weinberg. *See In re Chevron Corp.*, No. 1:11-mc-00030 (CKK) (D.D.C.). When four months elapsed with no progress in the Section 1782 proceeding,[4] on May 20, 2011, Chevron also sought discovery from Weinberg in the instant case, serving a subpoena with a return date of June 3, 2011. *Chevron Corp. v. The Weinberg Group*, 1:11-mc-409, Dkt. 18-21 (D.D.C.).

Represented by LAPs' counsel at the time,[5] Weinberg engaged in gamesmanship to avoid producing responsive documents, objecting to Chevron's subpoena but failing to explain why it could not comply. *Id.* at Dkt. 1-24. Instead, LAPs' counsel stated—without Chevron's consent or any court's approval—that Weinberg would not produce documents until three weeks later

---

[4]  Chevron filed the Section 1782 action in the D.C. District Court in late January 2011. Chevron subsequently informed the court about new developments in Ecuador and the instant case, but the court did not take any action by the time Chevron moved to compel compliance in the RICO case.

[5]  Julio Gomez, who also represents the LAPs, represented Weinberg for part of the proceedings in the D.C. District Court. PB subsequently took over that representation and continues to represent Weinberg to this day.

and then only on a "rolling basis" for an indefinite period.  *Id.* at Dkt. 18-22.  LAPs' counsel also

stated—again unilaterally and without court approval—that Weinberg did not have to comply

with Rule 45 and provide a privilege log until after its production was complete.  *Id.*

Accordingly, on July 15, 2011, Chevron filed a motion to compel production with the D.C.

District Court.[6]

On September 26, 2012, the D.C. District Court ordered discovery, holding that the

attorney-client privilege did not apply to Weinberg's documents and that Chevron had a

substantial need for them, vitiating fact work product protection.  *Chevron Corp. v. The*

*Weinberg Group*, 286 F.R.D. 95, 99-100 (D.D.C. 2012).  The D.C. District Court also ordered

Weinberg to produce documents on its privilege log that could not possibly be privileged.[7]  *Id.* at

100.  Subsequently, at the suggestion of the Court, the parties entered into a Rule 502(d)

agreement, and Weinberg completed its production of documents in late October 2012.[8]

Following the production of documents, Chevron notified the parties and this Court of its

intent to depose Dunkelberger.  That deposition finally took place on June 26, 2013.

---

[6]  When Weinberg began producing documents three weeks later, its production was deficient and Chevron's efforts
to obtain cooperation failed.  *Chevron Corp. v. The Weinberg Group*, 1:11-mc-409, Dkt. 1-21, -22 (D.D.C.).  On
July 15, 2011, Chevron moved to compel Weinberg to comply with the subpoena.  *See Chevron Corp. v. The
Weinberg Group*, No. 1:11-mc-409 (D.D.C.).  On September 8, 2011, the D.C. District Court ordered production,
overruling Weinberg's work product objections on the basis of the crime-fraud exception.  *Chevron Corp. v. The
Weinberg Group*, No. 1:11-mc-409, 2011 WL 10593727 (D.D.C. Sept. 8, 2011).  After Count 9 in the S.D.N.Y.
was stayed and later dismissed (*see Chevron Corp. v. Naranjo*, 667 F.3d 232 (2d Cir. 2012)), the D.C. Circuit va-
cated the September 8, 2011 order and remanded the case for further proceedings.  *Chevron Corp. v. Weinberg
Group*, 682 F.3d 96 (D.C. Cir. 2012).

[7]  The court also ordered *in camera* review of maps, articles, and diagrams on the privilege log.  Shortly thereafter,
Weinberg produced them.

[8]  At the suggestion of the D.C. District Court, on October 15, 2012, the parties entered into a stipulated voluntary
dismissal of the Section 1782 action, based on Weinberg's agreement that all documents and testimony in the
RICO action could be used in foreign tribunals.  *In re Chevron Corp.*, 1:11-mc-00030, Dkt. 46 (D.D.C. Oct. 15,
2012).

## II.     New Evidence Establishes Probable Cause that Donziger and PB Made Affirmative Misrepresentations to Weinberg and the Cleansing Experts

The new evidence demonstrates that Donziger and PB jointly made affirmative misrepresentations to and concealed material information from Weinberg, and in turn the cleansing experts, by falsely presenting the Cabrera Report as the product of a neutral, independent, court-appointed expert when, in fact, the report had been the work of Donziger, the LAPs' team and Stratus.[9]

### A.     PB and Donziger Made Affirmative Material Misrepresentations to Weinberg

#### 1.     PB and Donziger Misrepresented that Cabrera was an Independent Expert

Dunkelberger's testimony demonstrates that Donziger, Ilann Maazel at Emery Celli Brinckerhoff & Abady, LLP, and PB's Westenberger all misrepresented to Dunkelberger that Cabrera was an "independent expert" appointed by the Lago Agrio court.  Ex. A at 60:19-61:11 (Dunkelberger Tr.) (testifying that Westenberger told him that Cabrera was "an independent expert and the allegations were that there was involvement by other parties in the development of the independent expert report, therefore, you know, the credibility of the report suffered, and as a result of that they required another analysis or an attempt to conduct an analysis in a short period of time"); *see also id.* at 71:6-12 (testifying that Westenberger, Maazel, and Donziger told him that Cabrera was an independent expert); *id.* at 74:22-75:17 ("I don't recall any discussions of

---

[9] Unlike the motion for reconsideration filed by the LAPs on July 12, 2013 (Dkt. 1294), which neither presented new evidence nor showed that the Court overlooked controlling decisions or factual matters before it, Chevron's instant motion is based on new evidence that could not have been obtained previously through due diligence.

Richard Cabrera, who he was, other than he was an independent expert, much like a court-appointed expert.").[10]

PB and Donziger's misrepresentations were deliberate. They did not tell Dunkelberger that Cabrera was an independent expert once, but on multiple occasions. Ex. A at 71:21-72:16 (Dunkelberger Tr.). And Donziger and PB knew that Cabrera was not an "independent expert." *See Chevron Corp. v. Donziger*, 886 F. Supp. 2d 235, 259-60 (S.D.N.Y. 2012).[11] That explains why Maazel stated in an email to Westenberger, among others, as early as May 3, 2010, that "I wouldn't emphasize too much that Cabrera was independent and court-appointed. Once [Fajardo] says that in an American court, we'll never be able to back off from it." Dkt. 549-3 at 91-96. But Westenberger, Maazel and Donziger did the exact opposite when describing Cabrera months later—emphasizing that Cabrera was independent and court-appointed to Weinberg and, in turn, the cleansing experts. Ex. A at 71:21-72:16 (Dunkelberger Tr.). Indeed, the final Weinberg engagement letter, which PB did not produce to Chevron until the day before Dunkelberger's deposition, deleted the phrase "independent expert" when referencing Cabrera.

---

[10] Weinberg produced a draft engagement letter and internal email that described Cabrera as "an independent expert for the court" but did not reveal, as Dunkelberger did, that Donziger and PB were the sources of that description. *See* Ex. E (August 18, 2010 draft engagement letter sent to PB, Dunkelberger Dep. Ex. 4610, Bates No. TWG00000123-24); Ex. F (Weinberg August 23, 2010 email, Bates No. WGPL00006283).

[11] Donziger testified that he conveyed to PB "all of the important, relevant facts concerning the plaintiffs' team's role in the preparation of the Cabrera Report." Ex. M at 3387:22-3388:4 (Transcript of Deposition of Steven Donziger (Jan. 19, 2011) (asked "did you share with the Patton Boggs lawyers in or about April 24, 2010 your local Ecuadorian counsel's concern that all of them might end up in jail if there were full disclosure of the plaintiffs' team role in Cabrera's work," Donziger testified: "That was shared, yes."). When deposed, the recollections of lead PB attorney James Tyrrell about Donziger's disclosures relating to the Cabrera fraud were limited. Tyrrell did not recall learning that Ecuadorian counsel was concerned about ending up in jail. He recalled: (1) At some point in the Spring 2010, Donziger "identified certain specific contacts that occurred between representatives of the Lago Agrio plaintiffs back in that time period, 2007-2008, and Mr. Cabrera," (Ex. G at 137-38 (Transcript of Deposition of James Tyrrell (June 13, 2013))); (2) "[s]ubsequent to the early conversation, we received information or confirmation from Mr. Donziger that Stratus had been involved in preparing drafts of either annexes to or attachments to or sections of the Cabrera report and that those drafts were provided I believe to representatives of the Ecuadorian plaintiffs," (*id.* at 167:17-25); and (3) He learned "somewhere between April and July 2010" that "there was personal participation between Mr. Donziger and Mr. Cabrera" (*id.* at 169:2-12). Beyond that, Tyrrell did not recall. *Id.* at 168:15-25, 140:19-23, 143:18-21, 144:9-12.

Ex. B.  That deletion reflects a conscious decision on the part of Donziger and PB not to leave a written trail that they represented Cabrera was an independent expert.

## 2.   Donziger and PB Misrepresented that Cabrera Wrote the Report

Dunkelberger's testimony demonstrates that Donziger and PB misrepresented that Cabrera himself had written the Cabrera Report, when in fact by August 2010 both Donziger and PB knew that the LAPs' team and Stratus (along with Donziger himself) had written it.  Asked '[w]hat did Eric Westenberger say regarding the allegations made by Chevron during this meeting or call" in August 2010, Dunkelberger testified, in part, "[t]he expert that wrote the report was an independent expert."  Ex. A at 60:19-21, 61:2-3 (Dunkelberger Tr.).  Asked later "[w]ho said that the expert that wrote the report was an independent expert," Dunkelberger responded, "Eric Westenberger, Ilann [Maazel], and Steven Donziger."  *Id.* at 71:6-12; *see also id.* at 73:15-74:21 ("there was a discussion of Cabrera being involved in the drafting of his report").[12]

## 3.   PB and Donziger Deceived Weinberg and the Cleansing Experts by Providing Them With Stratus's False Submission to the Lago Agrio Court Endorsing the Cabrera Report

In providing Dunkelberger and the cleansing experts with Stratus's December 1, 2008 "Comments on the Report of the Court-Appointed Expert Richard Cabrera Vega in the Case of Maria Aguinda y Otros v. Chevron Corp" without informing them of the most salient fact—that Stratus (and others) actually wrote the report—Donziger and PB deceived Weinberg and the

---

[12] The impact of this misrepresentation cannot be underestimated.  Jeffrey Shinder, whom Donziger retained to represent the LAPs in the Section 1782 proceeding in Colorado, testified recently about his reaction upon learning from Doug Beltman that Stratus was involved in writing the Cabrera Report: ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████  Ex. H at 82–83 (Transcript of Deposition of Jeffrey Shinder (June 28, 2013)).

cleansing experts about Stratus's endorsement of the Cabrera Report and the content of Stratus's submission.

Donziger and PB misled Weinberg and the cleansing experts to believe four significant falsehoods when they provided Stratus's court submission for them to rely on.  First, Donziger and PB misrepresented that Stratus's "endorsement" was meaningful when, in fact, they knew that Stratus's role was being concealed from the Lago Agrio court.[13]  Had Donziger and PB disclosed that Stratus, Donziger, and the LAPs' team had actually written the Cabrera Report, which Donziger and PB knew, there was a serious risk that Weinberg and the cleansing experts would have realized that Stratus—along with Donziger and the LAPs' team—had deceived and defrauded the court with the Cabrera Report.[14]  Second, Donziger and PB once again misrepresented that Cabrera was independent, "neutral," and the equivalent of a "Technical Special Master," giving additional false comfort to Weinberg and the cleansing experts about the accuracy, reliability, and soundness of the Cabrera Report.  Dkt. 34-26 at 1.  Third, PB and Donziger deceived Weinberg and the cleansing experts into believing that a third-party scientific consulting firm, and "approximately 20 prominent scientists" including "toxicologists, economists, ecologists, geochemists, hydrologists, environmental chemists, environmental scientists, and engineers" and "experts from academia and from the environmental industry," had concluded that "the overall approach used by Mr. Cabrera is sound, reasonable, and consistent with approaches used in other environmental damage cases around the world."  *Id.*  Finally, after

---

[13] Douglas Beltman and Ann Maest, both of whom signed the December 1, 2008 submission, have disavowed their statements in that submission, all their work, and their testimony about that work in the Lago Agrio case.  Dkt. 1007-1 at 50, ¶ 76 (Declaration of Douglas Beltman); *id.* at 44, ¶ 59 (Declaration of Ann Maest).

[14] Testifying recently about his reaction to learning that Stratus had submitted the December 1, 2008 comments on a report it had ghostwritten with Donziger and the LAPs' team, Shinder said: ███████████ Ex. H at 69:18-22 (Shinder Tr.).

informing Weinberg generally of Chevron's allegations about the Cabrera Report,[15] Donziger

and PB misled them to believe that Stratus and prominent scientists had concluded that Chevron

was "twisting the truth" to discredit the Cabrera Report.  *Id.* at 11.

> **B.      Donziger and PB Misled the Cleansing Experts by Omitting Material Information About Cabrera**

Dunkelberger's testimony also demonstrates that Donziger and PB purposefully con-

cealed material information from Weinberg and the cleansing experts about the Cabrera Report.

No one told Dunkelberger that Donziger and the LAPs' team had participated in writing

the Cabrera Report, that Donziger and the LAPs' team had met with Cabrera, that Stratus

ghostwrote the Cabrera Report as if it was written by Cabrera in the first person, or that Cabrera

fraudulently concealed the truth about the report from the Lago Agrio court.  *See* Ex. A at 80:25-

81:7 (Dunkelberger Tr.) (Q: "Did anybody from Patton Boggs tell you between August 2010 and

September 16, 2010 that Mr. Cabrera had met with representatives of the Lago Agrio plaintiffs

without the Lago Agrio court's knowledge?"; A: "No."); *id.* at 81:24-82:7 (Q: "Did anybody tell

you between August 2010 and September 16, 2010 that Stratus Consulting worked with the Lago

Agrio plaintiff representatives and Mr. Donziger to write the report using Mr. Cabrera's name?";

A: "No."); *id.* at 250:7-24 (Q: "During any of these conversations with Mr. Fajardo in Ecuador,

did Mr. Fajardo inform you about his role in connection with drafting the report filed under the

---

[15] In the context of explaining the purpose of finding new experts to issue reports on damages in the Lago Agrio court, Donziger and PB told Dunkelberger that there were allegations surrounding the Cabrera Report, but neither said that the allegations of ghostwriting were true.  Ex. A at 53:8-16 (Dunkelberger Tr.) ("As best as I can recall, there was no qualifying remarks as to if the allegations [concerning the veracity of the Cabrera Report] were false or true."); *see also id.* at 63:2-9 (Q: "What if anything did Mr. Westenberger say regarding the truth or falsity of the allegations by the defense regarding the veracity of the report?"; A: "Nothing that I recall."); *id.* at 66:6-8 ("There was no detailed discussion about those allegations, if they were true or false."); *id.* at 87:17-88:2 ("There was a consistent theme in these discussions, and it didn't go beyond the allegations that there was involvement by a U.S.-based consulting firm in the drafting of an independent expert report.  So details of the allegations and the interaction and that story, as I best recall, did not go beyond the nature of the allegations by the defense on the veracity of the report.").

name Richard Cabrera on or about April 1st, 2008, in Lago Agrio Ecuador?"; A: "No."; Q: "Did

any of the other Lago Agrio plaintiff representatives describe to you any role they had in

connection with the report of the so-called independent expert, Richard Cabrera?"; A: "No.").[16]

Just as this Court found that the Fajardo Declaration was "a seriously misleading account

of what had happened"—because it "failed to mention that Fajardo and Donziger had threatened

the judge with a misconduct complaint unless the judge agreed to their demands and appointed

Cabrera," "did not mention the March 3, 2007 meeting at which the LAPs laid out the plan for

Cabrera's report and indicated that the work would be done by them," did not "reveal that Stratus

and the LAPs' counsel in fact had written all or most of Cabrera's report," and "neglected to

report that the LAPs 'chang[ed] the focus of [Cabrera's] data at [their] offices,'" (*Donziger*, 2013

WL 1087236, at *14 (footnotes omitted))—this Court should also find that Donziger's and PB's

representations to Dunkelberger and the cleansing experts were similarly misleading.

Furthermore, based on Dunkelberger's testimony, there is compelling evidence that

Dunkelberger was directed not to provide Chevron's rebuttal reports to the cleansing experts, and

that the LAPs' team was directly involved in this deception.  Dunkelberger had traveled to

Ecuador in late August to meet with Fajardo and other members of the LAPs' team to obtain

documents requested by the cleansing experts.[17]  Ex. A at 194:5-8 (Dunkelberger Tr.); Ex. I at

323:14-21 (Transcript of Deposition of Laura Garr (June 5, 2013)); Ex. J (TWG0001315-21).

Cleansing expert Doug Allen, for example, had asked Dunkelberger to provide a number of

---

[16] Dunkelberger also testified that when he met with Pablo Fajardo and other Ecuadorian counsel in Ecuador during
a trip whose sole purpose was to collect information for use in the cleansing expert reports, neither Fajardo nor
any member of the LAPs' team disclosed their role in connection with the Cabrera Report to Dunkelberger.  *See*
Ex. A at 250:7-24.

[17] Chevron has a substantial need to obtain all PB communications reflecting conversations with Fajardo and other
members of the LAPs' team regarding Dunkelberger's visit to Ecuador and what information to provide and not to
provide Dunkelberger and the cleansing experts.

documents, including copies of all work product "prepared by Chevron's technical consultants up through the present."  Ex. K (Dunkelberger Dep. Ex. 4603, Bates No. TWGP00000113). Dunkelberger testified that the handwriting directly under that request from Allen was his and stated:  "large record – Spanish – how important, have one sample."  Ex. A at 187:22-23 (Dunkelberger Tr.); Ex. K.  Although Dunkelberger claimed not to understand what his notes meant, the most likely meaning is that Dunkelberger was told that the record of Chevron's rebuttal experts was "large," in "Spanish," and not important enough to provide more than "one sample."  Indeed, Allen testified that he "asked for any reports other than what had been identified by Cabrera that were prepared by Chevron's consultants," and he never received them. Dkt. 111-16 at 106:23-107:15 (Transcript of Deposition of Douglas Allen (Dec. 16, 2010)).[18] The evidence shows, therefore, that Dunkelberger was directed—most likely by the LAPs' team—not to provide Chevron's rebuttal expert reports to Allen and the other cleansing experts. By not providing these rebuttal expert reports, Donziger, PB, and the LAPs' team deliberately kept them in the dark about the strength of the allegations of the Cabrera fraud.

### C.   Donziger and PB Misled the Cleansing Experts About the Source of Data in the Cabrera Report

Donziger and PB misled the cleansing experts to rely on fraudulent data in the Cabrera Report.  Regardless of the merits of that data, Donziger and PB kept the truth from them to induce the cleansing experts to rely on the information.  For example, Stratus understood that the inventory of the number of waste pits in the Cabrera Report was "created by the LAPs' representatives or their associates.  Stratus was never requested to, and did not do, a verification that the 916 or 917 pits shown on the inventory in fact existed.  Donziger nonetheless instructed

---

[18] Similarly, cleansing expert Paolo Scardina testified that Weinberg never told him about Chevron's rebuttal expert reports.  Ex. L at 215:19-216:1 (Transcript of Deposition of Paolo Scardina (Dec. 22, 2010)).

Stratus to use the pit inventory as the basis for a remediation cost assessment assuming that its 'pit count' was accurate" and Stratus did.  Dkt. 1007-1 at 13-14 ¶ 37 (Declaration of Douglas Beltman).  However, neither Donziger nor PB disclosed to Dunkelberger that the pit count in the Cabrera Report was based on Donziger and the LAPs' team.  In fact, they lied to Allen by telling him that the number used by Cabrera represented "the most recent information available."  Dkt. 400-10 at 98 of 218 (Report of Douglas Allen).  ("However, it is DCA's understanding *from counsel* that the inventory of well sites/pits, and production stations/pits that was *conducted by Cabrera represents the most recent information available*.  Accordingly, DCA based its valuation of environmental damages on the number of well sites/pits and production stations/pits reported in Cabrera's inventory to support the estimation of a potential low cost and a potential high cost range . . . ") (emphasis added, citation omitted).  Asked "[i]f the author of the Cabrera report who wrote that there were 916 waste pits swore a declaration that stated in substance the only source for that information came from Steven Donziger and there was no scientific basis for that number, would you have allowed the subcontractors to rely on that number," Dunkelberger testified:  "If the number was false and we knew it was false, we would not ask them to rely on that number."  Ex. A at 165:13-15 (Dunkelberger Tr.).  By misleading Dunkelberger about fraudulent "data" in the Cabrera Report, Donziger and PB induced the cleansing experts to rely on that "data" in their reports.

> **D.     Had PB and Donziger told Dunkelberger the Truth About the Cabrera Fraud, the Cabrera Report Would not Have Been Used as a Roadmap and Would Have Posed a Serious Risk that the Cleansing Reports Would not Have Been Obtained**

But for PB's and Donziger's misrepresentations and omissions about the Cabrera fraud, it is highly unlikely that they would have been able to secure the cooperation of Weinberg and all six of the cleansing experts to rely on any aspect of the Cabrera Report.  Asked

17

"if you [Dunkelberger] knew the author of a report wasn't truthful, [Dunkelberger] wouldn't rely on that report, correct," Dunkelberger testified "correct."  Ex. A at 144:2-6 (Dunkelberger Tr.). Asked "and a court should not rely on a report if the author wasn't truthful," Dunkelberger testified "correct."  *Id.* at 144:14-16.  And asked to confirm that "[a] court should not rely on an independent court-appointed expert's report if that was submitted concealing that someone else wrote it," Dunkelberger said "yes."  *Id.* at 145:3-10.  Indeed, Dunkelberger made clear that no court should rely on an expert report where there was "some misleading."  *Id.* at 146:15-20. Dunkelberger himself posed the question:  "The question is, should the court rely on an expert report where there is some misleading?"  *Id*.  And Dunkelberger answered it unequivocally: "The court should not rely on that."  *Id.*[19]

Therefore, had PB and Donziger told Dunkelberger that Cabrera claimed to be an "independent expert" but was actually partial to Donziger and the LAPs' team, that the Cabrera Report was actually ghostwritten by Stratus, Donziger, and the LAPs' team, or that Stratus had falsely endorsed the Cabrera Report, Dunkelberger would not have relied on the Cabrera Report. *See* Ex. A at 144:14-16 (Dunkelberger Tr.).  Moreover, given that Dunkelberger believed that no court should rely on an expert report that "conceal[ed] someone else wrote it" and where there was "some misleading" (*id.* at 145:3-10, 146:15-20), Dunkelberger would not have offered the Cabrera Report to the cleansing experts as a "roadmap" and would not have permitted them to rely on it in their reports.  At a minimum, given Dunkelberger's testimony, had Donziger and PB told the truth about the Cabrera Report to Weinberg, there is probable cause to believe that some

---

[19] Dunkelberger also testified that it was important that the data relied on by the cleansing experts was reliable; that the data was based on truthful information; that the data was supported by valid scientific bases. Ex. A at 106:3-108:18 (Dunkelberger Tr.).

of those cleansing reports would not have been submitted as written and some of the cleansing

authors would not have relied on the Cabrera Report, or participated in the "cleansing" process.[20]

## E.   Donziger's and PB's Misrepresentations and Omissions Were in Furtherance of a Fraudulent Scheme

Regardless of whether the cleansing reports would have been issued or not had the truth

regarding Cabrera been disclosed to Weinberg and the cleansing experts, Donziger's and PB's

affirmative misrepresentations and material omissions were in furtherance of falsely presenting

Cabrera as an independent expert who actually wrote "his" report and in furtherance of

Donziger's and PB's attempt to cover up the Cabrera fraud.  The newly obtained evidence from

Dunkelberger demonstrates that, just as the LAPs' team "took a number of steps to create or re-

inforce the entirely inaccurate contention that the Cabrera report was the unbiased work of an

independent expert when, in fact, it had been the work of the LAPs' representatives themselves

and was not independent in the slightest respect," (*Donziger*, 2013 WL 1087236, at *2),

Donziger and PB took those very same steps in their misrepresentations and omissions to Wein-

berg and the cleansing experts.  By lying to Weinberg and the cleansing experts, Donziger and

PB induced the cleansing experts to rely on Cabrera.  And once the cleansing experts cited to

Cabrera and used "his" report in reaching their conclusions, Donziger and PB bolstered the false

pretense that Cabrera had actually written the report.

---

[20] Dunkelberger contradicted himself when he testified about whether the cleansing experts relied on the Cabrera Report.  On the one hand, Dunkelberger testified that "[w]e did not rely on the [R]eport" and he told the cleansing experts not to rely on the Cabrera Report.  Ex. A at 160:8-10, 161:11-16 (Dunkelberger Tr.).  On the other hand, Dunkelberger testified that "our default resource was the Cabrera [R]eport. . . . We were relying on the numbers cited in the Cabrera [R]eport as the number to work from."  *Id.* at 181:22-182:12.  Several of the cleansing experts, of course, testified that they had relied on the Cabrera Report.  *See* Dkt. 34-24 at 140:21-141:11 (Allen Tr.); Dkt. 36-10 at 52:2-10 (Barnthouse Tr.); Dkt. 36-14 at 224:20-225:20 (Scardina Tr.); Dkt. 36-12 at 59:20-60:2 (Shefftz Tr.).  And, this Court has already found evidence that at least four of the cleansing experts relied on the Cabrera Report and cited Cabrera in reaching their conclusions. And, this Court has already found evidence that at least four of the cleansing experts relied on the Cabrera Report and cited Cabrera in reaching their conclusions. *Donziger*, 2013 WL 1087236, at *29.

19

Further, just as the LAPs' team "committed fraud in at least one Section 1782 proceeding in the United States by submitting to a court in Colorado a deceptive account of the LAPs' relationship with Cabrera" and committed fraud in the Lago Agrio court by submitting the "deceptive" declaration of Pablo Fajardo on June 21, 2010 (*id.*, at *2, *29) for purposes of avoiding any disclosure or admission that Stratus, Donziger and the LAPs' team had ghostwritten the Cabrera Report, Donziger and PB misled Weinberg and the cleansing experts regarding Cabrera to prevent them from inquiring further about Chevron's allegations, learning the truth, and disclosing the truth in any of their reports. As the LAPs' own Ecuadorian law experts recently admitted, the submission of a ghostwritten report is "obviously . . . illegal and improper." *See* Ex. N at 166:18-167:7 (Transcript of Deposition of Farith Ricardo Simon Campana (June 8, 2013)); *see also* Ex. O at 107:9-16 (Transcript of Deposition of Juan Pablo Albán Alencastro (May 24, 2013)) (testifying that "when the expert passes off someone else's work as his own without attributing it to the person who submitted it" would "constitute false testimony"). Accordingly, Donziger and PB not only lied to Weinberg and the cleansing experts about the authorship of the Cabrera Report to obtain their cooperation, but they lied to them to ensure that the Lago Agrio court record continued to reflect the LAPs' false assertion that the Cabrera Report was the work of Cabrera.

## CONCLUSION

For the foregoing reasons, the Court should reconsider that portion of its March 15 order relating to the cleansing experts and order PB to produce all internal and external PB communications relating to the process by which Donziger and PB presented Cabrera as an independent expert who had written the report in their attempt to "cleanse" the fraud, including communications about what to disclose to and conceal from Weinberg and the cleansing experts about Cabrera.

Date:  July 19, 2013                    Respectfully submitted,

                                        GIBSON, DUNN & CRUTCHER LLP

                                        */s/ Randy M. Mastro*
                                        Randy M. Mastro
                                        Andrea E. Neuman
                                        200 Park Avenue
                                        New York, New York 10166
                                        Telephone: 212.351.4000
                                        Facsimile: 212.351.4035

                                        William E. Thomson
                                        333 South Grand Avenue
                                        Los Angeles, California 90071
                                        Telephone: 213.229.7000
                                        Facsimile: 213.229.7520
                                        *Attorneys for Chevron Corporation*