UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CHEVRON CORPORATION,

                Plaintiff,

      v.

STEVEN DONZIGER et al.,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CASE NO. 11-CV-0691 (LAK)

---

**JAVIER PIAGUAJE PAYAGUAJE'S, HUGO GERARDO CAMACHO NARANJO'S, AND NON-PARTY PATTON BOGGS' JOINT MEMORANDUM OF LAW IN SUPPORT OF MOTION TO STRIKE THE DECLARATION OF CHRISTOPHER BOGART FROM THE DOCKET, FOR AN ORDER GRANTING CAMACHO AND PIAGUAJE LEAVE TO SERVE A LIMITED DOCUMENT SUBPOENA ON BURFORD CAPITAL LLC AND ITS AFFILIATES, FOR AN ORDER STRIKING CONFIDENTIALITY DESIGNATIONS, AND FOR SANCTIONS AGAINST CHEVRON AND BURFORD**

---

<u>**TABLE OF CONTENTS**</u>

TABLE OF AUTHORITIES ............................................................................... iii

INTRODUCTION .............................................................................................. 1

BACKGROUND ................................................................................................ 4

     A.    Apparently trusting that Burford's documents will never be public, Chevron made the Bogart Declaration the centerpiece of a PR coup .................................................................................. 4

     B.    The central thesis of Bogart's Declaration—that Patton Boggs defrauded Burford—cannot be reconciled with Burford's prior statements and actions. ............................................................... 6

          1.    Bogart's story does not make sense: Burford "had spent hundreds of hours" on the Ecuador matter before Patton Boggs was retained ................................................... 6

          2.    Burford's internal communications: Patton Boggs "has handled itself entirely responsibly." ................................ 7

          3.    Two years after the RICO action, Burford continued to seek out opportunities to work with Patton Boggs. .................... 8

     C.    Bogart's assertion that Burford would not have invested in the Ecuador matter had it been given more information is belied by Burford's documents. ............................................................ 10

          1.    Bogart's real-time reaction to the RICO complaint. ................ 10

          2.    Burford's understanding of the Cabrera issue. ........................ 11

          3.    Bogart's understanding of the Joseph Kohn situation. ............. 12

          4.    Bogart's supposed ignorance regarding the Crude film outtakes. ...................................................................... 13

          5.    Burford was ready to "ride the waves" of the RICO case, until Chevron pressured it both from within and without ...................................................................... 14

     D.    Reason #1 why Burford spurned the Lago Agrio Plaintiffs: Chevron leveraged its relationship with Burford's incoming Managing Director to co-opt Burford more than two years ago, even before Chevron filed its RICO case. ................................ 16

      **E.**    **Reason #2 why Burford spurned the Lago Agrio Plaintiffs: Uncomfortable with investing in plaintiffs'-side, human-rights litigation from the outset, Burford feared being blackballed by its target market following the unanticipated public disclosure of Burford's support of mass-tort plaintiffs. .........................................19**

**ARGUMENT** ......................................................................................................**23**

    **I.**    **THE COURT SHOULD STRIKE THE BOGART DECLARATION FROM THE DOCKET ON THE GROUNDS THAT CHEVRON SUBMITTED IT IN BAD FAITH FOR AN IMPROPER PURPOSE** ...........**23**

    **II.**    **ALTERNATIVELY, THE COURT SHOULD GRANT CAMACHO AND PIAGUAJE LEAVE TO SERVE A DOCUMENT SUBPOENA ON BURFORD** ..................................................................................**25**

    **III.**    **THE COURT SHOULD STIRKE Burford's abusive and unfair designations of confidentiality, AND SHOULD SANCTION BURFORD AND CHEVRON** .....................................................**28**

**CONCLUSION** ..................................................................................................**33**

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Am. Tel. & Tel. Co* v. *Grady*,
   594 F.2d 594 (7th Cir. 1979) ................................................................................................29

*Bakalar v. Vavra*,
   851 F. Supp. 2d 489 (S.D.N.Y. 2011).............................................................................26, 28

*Bernal v. All Am. Inv. Realty, Inc.*,
   479 F. Supp. 2d 1291 (S.D. Fla. 2006) ................................................................24, 32, 33, 35

*Brown & Williamson Tobacco Corp. v. FTC*,
   710 F.2d 1165 (6th Cir. 1983) ..............................................................................................31

*Callaway Golf Co. v. Corporate Trade Inc.*,
   10 Civ. 1676, 2011 U.S. Dist. LEXIS 44756 (S.D.N.Y. Apr. 26, 2011)................................26

*Culinary Foods, Inc. v. Raychem Corp.*,
   151 F.R.D. 297 (N.D. Ill. 1993)............................................................................................31

*Dep't of Economic Development v. Arthur Anderson & Co.*,
   924 F. Supp. 449 (S.D.N.Y. 1996)........................................................................................31

*Doolittle v. Structured Invs. Co., LLC*,
   CV 07-356-S-EJL-CWD, 2008 U.S. Dist. LEXIS 98693 (D. Idaho Dec. 4, 2008) ...............24

*Fears v. Wilhelmina Model Agency, Inc.*,
   02 Civ. 4911, 2003 U.S. Dist. LEXIS 12850 (S.D.N.Y. July 22, 2003) ................................32

*Gavenda v. Orleans Cnty.*,
   No. 95-CV-0251E (SC), 1996 WL 377091 (W.D.N.Y. June 19, 1996)..................................27

*Glenmede Trust Co. v. Thompson*,
   56 F.3d 476 (3d Cir. 1995)....................................................................................................31

*In re Agent Orange Prod. Liab. Litig.*,
   821 F.2d 139 (2nd Cir. 1987)................................................................................................28

*In re Parmalat Securities Litigation*,
   258 F.R.D. 236 (S.D.N.Y. 2009) ...............................................................................29, 30, 31

*In re Ullico*,
   237 F.R.D. 314 (D.D.C. 2006)..........................................................................................32, 33

*Mader v. Motorola Inc.*,
   No. 92 C 8089, 1994 U.S. Dist. LEXIS 13937 (N.D. Ill. Sept. 28, 1994).............................29

*Nicklash v. JLG Industries Inc.*,
    193 F.R.D. 570 (S.D. Ind. 1999)........................................................................31

*Pettrey v. Enterprise Title Agency, et al.*,
    470 F.Supp.2d 790 (N.D. Ohio 2006)................................................................32

*Public Citizen* v. *Liggett Group. Inc.*,
    858 F.2d 775 (1st Cir. 1988).............................................................................28

*Sellers v. M.C. Floor Crafters, Inc.*,
    842 F.2d 639 (2d Cir. 1988).............................................................................24

*Spencer v. Int'l Shoppes, Inc.*,
    CV 06-2637, 2011 U.S. Dist. LEXIS 91281 (E.D.N.Y. Aug. 16, 2011)................26

*THK Am., Inc. v. NSK Co.*,
    157 F.R.D. 637 (N.D. Ill. 1993)........................................................................32

*Wade v. North Am. Asset Servs., LLC*,
    12-CV-1111, 2013 U.S. Dist. LEXIS 20232 (E.D.N.Y. Feb. 14, 2013)...............26

*Weber v. AVX Pension Plan*,
    07-CV-615S, 2009 U.S. Dist. LEXIS 88847 (W.D.N.Y. Sept. 27, 2009)............24

## RULES

Fed. R. Civ. P. 11 ...........................................................................................18, 33

Fed. R. Civ. P. 26 .................................................................................28, 29, 30, 31

Fed. R. Civ. P. 56 ...................................................................................................24

## STATUTES

28 U.S.C. § 1782............................................................................................. passim

**INTRODUCTION**

The Declaration of Christopher Bogart ("Bogart"), CEO of Burford Capital LLC ("Burford"[1]), filed with the Court on April 17, 2013 (the "Bogart Declaration"), suggests that Burford terminated its agreement to finance the Lago Agrio Plaintiffs' litigation against Chevron because, upon Chevron's filing of its RICO case, Burford learned that Patton Boggs had misled it regarding the nature of alleged fraud committed by certain of the Lago Agrio Plaintiffs' other representatives. (*See generally* Dkt. 1039-2.)   We have since examined the documents that Burford produced in this action.   They tell a very different, and remarkable, story—one that thoroughly discredits the Bogart Declaration.

Burford's internal communications reveal that it believes Patton Boggs has done nothing wrong.   In fact, up until *March 2013*, Bogart and Burford continued to seek out opportunities to collaborate with Patton Boggs, and recommended James Tyrrell, the firm's lead partner on the Ecuador matter, to others.   Burford's documents also reveal that Burford was not nearly as under-informed as Bogart suggests.   Contrary to his Declaration, Bogart and others reviewed and commented on the "worst" outtakes from the film *Crude* before Burford's investment closed. Similarly, Bogart now claims that he was horrified to learn of "fraud" accusations leveled by Joseph Kohn, one-time financier of the Lago Agrio Plaintiffs.   But when Kohn's allegations went public, Bogart expressed interest in buying out the disgruntled Kohn's stake at a discount.

Why, then, did Burford spurn the Lago Agrio Plaintiffs?   And why, almost two years after terminating its relationship with the Lago Agrio Plaintiffs, has Burford now agreed to help Chevron attack Patton Boggs?   The answer originates in two personnel changes that occurred at Burford in January 2011.   At that time, Burford's then-Chairman, Selvyn Seidel, left the firm.

---

[1] For ease of reference, "Burford" shall herein be deemed to refer to Burford Capital LLC, Burford Capital Limited, and any of their direct and indirect parents, subsidiaries or affiliates.

Seidel, who took an interest in human rights litigation, championed Burford's investment in the Ecuador matter.  Burford's other principals, particularly Bogart, were uncomfortable with a plaintiff-side human rights investment, fearing that if the investment became public, it would undermine the firm's effort to position itself as a financier strictly of business litigation.  Even more impactful than Seidel's departure, however, was the fact that at roughly the same time, Burford welcomed a new Managing Director, Ernest Getto—who happened to be one of Chevron's outside counsel.

Before Chevron had even filed its RICO case, Burford established a direct line to Chevron through Getto, all the while pretending to support the Lago Agrio Plaintiffs publicly. While Burford's capitulation was motivated at least in part by Chevron's efforts to "blackball" Latham & Watkins, the firm from which Getto was arriving, Bogart's inherent distaste for the Ecuador investment made it easy for Chevron to co-opt Burford.  In preparing Getto for a dinner meeting with Chevron's General Counsel, R. Hewitt Pate, on January 27, 2011, Bogart expressed frustration that Burford did not have, in his view, good cause to back away from its investment because Chevron had not yet alleged any misconduct on the part of Patton Boggs.  Days later, after Chevron filed its RICO case labeling Patton Boggs a "non-party co-conspirator," Bogart emailed congratulations to Randy Mastro of Gibson Dunn.

Despite its private alliance with Chevron, however, the publicity of Burford's historic investment in the Chevron/Ecuador matter continued to undercut the firm's mission, as would-be clients questioned how the case could be viewed as "business litigation."  Burford also feared that its high-profile Ecuador investment might lead to legislation spurred by the U.S. Chamber of Commerce, which could impair the viability of litigation financing in key states.  Apparently to

get the firm back into the good graces of its target market, Burford has now transitioned from supporting Chevron privately to actively undermining the Lago Agrio Plaintiffs.

The Bogart Declaration is the centerpiece of a public-relations stunt. Before Chevron filed the Bogart Declaration on this Court's docket, it already had shared with journalists and bloggers a press release announcing Burford's "flip." The primary objective of this stunt is to pressure Patton Boggs into denouncing its clients, the Lago Agrio Plaintiffs—just like Burford did, and just like Stratus Consulting did weeks before it. The Declaration could not have been intended to accomplish anything legitimate vis à vis this litigation. Chevron had to know that the Bogart Declaration's charge that Patton Boggs led Burford up the garden path would, like its other claims, be proven false by reference to Burford's own documents.

Although the Bogart Declaration can be discredited in court, Chevron undoubtedly believes that its PR coup cannot so easily be undone. To that end, Burford has designated virtually all of its documents "confidential," requiring them to be filed under seal and shielding them from public scrutiny. These designations do not guard trade secret or any similarly worthy business interest. Rather, they seem designed to (a) impair the Lago Agrio Plaintiffs' capacity to publicly rebut the Bogart Declaration's accusations, and (b) protect Burford from the embarrassing revelation that it was secretly egging on its clients' litigation adversary with the hope of finding an excuse to terminate an ostensibly disadvantageous funding relationship.

This Court should strike the Bogart Declaration from the docket because it is irrelevant, submitted in bad faith for an improper purpose, and inadmissible on summary judgment. Should the Court decline to do so, the Court should alternatively grant Messrs. Camacho and Piaguaje leave to serve a limited subpoena *duces tecum* on Burford, capturing communications between Chevron's and Burford's respective counsel (communications that Chevron strategically agreed

to exclude from its subpoena to Burford (*see* Dkt. 685 at 3)), documents related to the Chevron/Burford Settlement Agreement, and other documents concerning the relationship between Chevron and Burford.  Either way, the Court should reject Burford's confidentiality designations, and should permit Messrs. Camacho and Piaguaje and Patton Boggs[2] to substitute an unredacted version of this motion on the docket.  Finally, the Court should sanction Chevron and Burford for refusing to remedy improper confidentiality designations in order to avoid exposure of the Bogart Declaration as a sham.

## BACKGROUND

**A.    Apparently trusting that Burford's documents will never be public, Chevron made the Bogart Declaration the centerpiece of a PR coup.**

The Bogart Declaration is a PR ploy.  The primary *raison d'être* of the Declaration is to damage the reputation of Patton Boggs.  To wit: Patton Boggs first learned of Burford's "flip" by way of press inquiries; reporters already were seeking the firm's comment on the Chevron/Burford settlement *more than two hours before* Chevron filed the Settlement Agreement and Bogart Declaration on this Court's docket. (*Compare* Declaration of Julio C. Gomez, dated June 20, 2013,[3] Ex. 1 (inquiry from Roger Parloff with Fortune Magazine at 7:05 a.m. EDT) *with* Ex. 2 (ECF notice indicating 9:36 a.m. EDT filing).)  By mid-day on April 17, 2013, the public domain was inundated with coverage touting Chevron's latest co-opting of a one-time ally of the Lago Agrio Plaintiffs, delivering Chevron juicy headlines such as "*Patton Boggs Lied To Fund $19B Chevron Suit, Investor Says,*" "*Litigation finance firm in Chevron*

---

[2] Non-party Patton Boggs joins this Motion insofar as briefing on Chevron's subpoena to the firm was the vehicle Chevron chose as pretext for filing the Bogart Declaration, and insofar as the Bogart Declaration is plainly designed to smear Patton Boggs with the end-game of driving it away from its representation of the Lago Agrio Plaintiffs.

[3] Unless otherwise noted, all exhibits cited herein refer to documents appended to the Gomez Declaration.

*case says it was duped by Patton Boggs*," and "*Burford Inks Deal with Chevron, Says Patton Boggs Hid Truth About Ecuadorian Plaintiffs.*"[4] (Exs. 4, 5, & 6.)

Upon Chevron's unveiling of the Bogart Declaration, we set about reviewing the roughly 7,000 documents that Burford had produced to Chevron, and which Chevron in turn produced to Defendants on February 22, March 8, and April 25, 2013. (Exs. 8, 9, & 10.)  We have now reviewed several thousand documents, and have yet to come across a single document that is *not* marked "confidential" pursuant to this Court's Protective Order. (Dkt. 723.)  The confidentiality designations are as abusive as it gets—Burford has even designated as "confidential" emails the substance of which is limited to some variation on "read this attached online news article."  (*See, e.g.*, Ex. 11 at BUR0003453.)  On May 2, 2013, Defendants transmitted a letter to Chevron's counsel, requesting that Chevron exercise its authority under the Chevron/Burford Settlement Agreement to have removed the confidentiality designations as to roughly 130 enumerated documents.[5]   (Ex. 12.)   Chevron claimed, however, that it is not obligated to do anything because it is not, in this instance, the "producing party"—although, vis à vis the Defendants, it is. (Ex. 13.)  Instead of wasting time dickering with Chevron's counsel over its responsibilities, we immediately propounded the same request on Burford's counsel.  (Ex. 14.)  Burford did not offer the courtesy of a response.

---

[4] Chevron's "RICO Media Plan" sheds light on how the company uses this litigation as a PR-generator; Chevron's ability to mobilize dozens of journalists to deliver its message may be unparalleled.  Chevron's media blitz in conjunction with the filing of this action included "an editorial board meeting at Forbes magazine, hosted by Steve Forbes, and attended by Hew [Pate] and Randy [Mastro]."  (Ex. 7 at CVX-RICO-4730819.)

[5] At Chevron's request, Burford *must* de-designate documents improperly labeled "confidential":

> Chevron may request that the Burford Parties remove confidentiality designations on particular documents they have already produced, and the Burford Parties shall comply with any such request unless the document contains confidential business information pertaining to any of the Burford Parties. Chevron may also request that the Burford Parties agree to redact any confidential business information from a document and agree to removal of the confidentiality designation from the document in its redacted form and the Burford Parties shall not unreasonably withhold such consent.  (Dkt. 1039-01 at 4.)

The impetus behind Chevron's and Burford's refusal to relinquish abusive confidentiality designations without a fight, even at risk of sanctions, is apparent upon examination of Burford's documents. The documents belie every key assertion in the Bogart Declaration.

**B.    The central thesis of Bogart's Declaration—that Patton Boggs defrauded Burford—cannot be reconciled with Burford's prior statements and actions.**

Bogart accuses Patton Boggs of exploiting a relationship of trust, inducing Burford to invest in the Chevron/Ecuador matter under false pretenses. The documents, however, demonstrate that Burford does not actually believe this. Rather, this accusation apparently is what Chevron most needs from Burford at this moment.

**1.    *Bogart's story does not make sense: Burford "had spent hundreds of hours" on the Ecuador matter before Patton Boggs was retained***

At bottom, Bogart's story is illogical. Per Burford's own funding pitch to the Amazon communities: (a) "Burford began working with the *Aguinda* team in *October 2009*" (several months before Patton Boggs came into the picture); (b) before Patton Boggs arrived, "Burford ha[d] made countless introductions to respected professionals in the US and internationally, and ha[d] been *active in case strategy*"; (c) also before Patton Boggs arrived, "Burford ha[d] spent *hundreds of hours* already working on the matter"; and (d) "Burford . . . introduced [Patton Boggs], and Jim Tyrrell, to the case."[6] (Ex. 15 at 7 (emphases added).)

How, then, would it have made sense for Burford to rely on Patton Boggs—newest on the block by a wide margin—as an authoritative source for *historical* knowledge about the case, when Burford had already spent "hundreds of hours" working with principals who had been with

---

[6] Burford's management appears to have obscured this last, key fact in its attempts to convey to its board and constituents that management should not be blamed for the company's involvement in the Ecuador matter. An "interim report" prepared in August 2011 by Bogart for Burford's board misleadingly suggests that Burford became involved with the Ecuador matter *after* Patton Boggs did, and only because Patton Boggs solicited financing from it. (*See* Ex. 16 at BUR0046324 ("Burford's involvement in this matter occurred as a result of a major US law firm seeking financing to enter the matter as new counsel.").)

the case for years?  Indeed, a glance at the pre-funding project checklist prepared and maintained by Burford confirms that Burford generally looked to Patton Boggs to tackle going-forward issues, not investigation of historical facts.[7]  (*See* Ex. 17.)  As set forth below, Burford's internal emails confirm what is logical under these circumstances: Burford does not view Patton Boggs as responsible for misleading it.

### 2.    *Burford's internal communications: Patton Boggs "has handled itself entirely responsibly."*

On January 27, 2012, Jon Molot, Burford's Chief Investment Officer, drafted a primer on Burford's view of the case, to be conveyed to Burford's new Managing Director, Ernest Getto. (Ex. 18 at BUR0056893.)  In Molot's view: "*We were misled – and I believe Patton Boggs was misled* – about the true extent of what went on with Cabrera, which now has come out in the SDNY [Donziger 28 U.S.C. § 1782] proceedings.  We are furious about this and furious with Donziger. . . . *We are not, however, furious with Patton Boggs, which we think has handled itself entirely responsibly here*. . . ." (*Id.* (emphasis added).)  Molot added that although "Chevron is right to suspect that we were misled," and although "[w]e don't want to be in the middle of this kind of a scandal[,] . . . . we have backed a reputable law firm litigating what we believe – and what Patton Boggs believes – to be a meritorious case." (*Id.*)

In August 2011—several months after the events that the Bogart Declaration cites as disclosing Patton Boggs' supposed deception—Bogart drafted a section on the Ecuador investment for inclusion in Burford's "interim report" to its board.  (*See* Ex. 16 at BUR0046323.)

---

[7] In fact, Burford commissioned and characterized the "Invictus" memorandum as a "settlement plan and program." (Ex. 17 at CVX-RICO-1480569.)  And save for a few paragraphs summarizing the current posture of the litigation at the outset of the memo—paragraphs which the Bogart Declaration inflates into a purported, in-depth historical analysis—that is precisely what the Invictus memo was (its byline was "Path Forward").  (*See* Dkt. 49-5 at 1.)  Even if the Invictus memo was what Bogart now makes it out to be, the following relevant language appeared on the front cover not in fine print, but in enormous font: "Any statements concerning the merits of the parties' respective positions are opinions based on the facts as known by way of Plaintiffs' litigation team. . . . and do not constitute a guarantee of any outcome." (*Id.*)

Bogart wrote: "It has later come to light that prior counsel in the case had not been candid with new counsel [Patton Boggs], and both new counsel and Burford had been misled about the prior activities of prior counsel in the case. . . . Nevertheless, Burford's business lies in financing complex litigation for major law firms, and the risk of later discovery of unknown facts is one of the risks inherent in that business." (*Id.* at BUR0046324.)

And in September 2011, Bogart and others prepared a "Q&A" to share with Burford's board, which stated that "*neither Patton Boggs nor Burford could have discovered through reasonable diligence*" the alleged "earlier conduct" of the Lago Agrio Plaintiffs' lawyers giving rise to Chevron's RICO claims. (Ex. 19 at BUR0021513-14 (emphasis added).)

Later still, in October 2011, Bogart reiterated his belief that Patton Boggs had done nothing wrong. At that time, a reporter had informed Burford that Tyrrell of Patton Boggs provided a comment "expressing the belief that Chevron succeeded . . . in causing friction between Burford" and the Lago Agrio Plaintiffs. (Ex. 20 at BUR0017498.) Even then, Bogart had nothing negative to say about the firm: "The macro point . . . is that clients aren't always candid with their lawyers. This is not a new issue in law and [has] nothing to do with funding. . . . [T]he facts provided to Patton Boggs turned out not to be true." (*Id.*)

### 3.    *Two years after the RICO action, Burford continued to seek out opportunities to work with Patton Boggs.*

It is inconceivable that a company would continue to engage in extensive business dealings with a law firm that had falsely induced it to underwrite a fraud. But that is precisely what Burford did between October 2012 and March 2013, including: proposing that the two companies continue doing business together; recommending to former colleagues the very lawyer who allegedly made the misrepresentations; and looking to engage the law firm for lobbying services. The only way to square this conduct with the Bogart Declaration is to

conclude that libeling Patton Boggs was the price that Chevron demanded to spare Burford from Chevron's legal and extra-judicial retaliation.

Bogart and Tyrrell met for breakfast on October 9, 2012—almost two years after Chevron filed its RICO action[8]—to discuss future business relationships.[9] (Exs. 21 & 22.) Following the meeting, on October 19, Bogart wrote to Tyrrell as follows:

> Again, it was nice to see you, and I'm looking forward to the next steps we discussed on various matters.
>
> You're going to get a letter from Mark Hansen reminding you and others of your obligations in the Ecuador matter. While that is obviously important to us, as we discussed,[10] I think we can set all things Ecuador over to one side and not have them interfere with an ongoing relationship. I just wanted to give you a head's up so that there aren't any mixed messages.

(Ex. 23.)

One month later, on November 14, 2012, Bogart recommended Tyrrell to his former colleagues at Time Warner to represent it in connection with a new matter. Bogart wrote:

> I'm writing to introduce you to Jim Tyrrell, now of Patton Boggs and head of their NY/NJ practice and formerly a Latham litigation partner who has a long and successful record. Jim is well known to us.
>
> Jim has successfully opposed the lawyer bringing these actions, he tells me, and thus I am putting all of you together.

---

[8] By October 2012, Chevron already had plastered "non-party co-conspirator" Patton Boggs' email communications throughout filings around the country; subpoenaed Patton Boggs in this action; used favored reporters to plant negative articles about the firm (*see, e.g.*, Ex. 25); and had quite obviously elevated "tainting" Patton Boggs to the top of its list of objectives. Further, as discussed *infra*, Chevron and Burford had by this time been secretly coordinating for almost two years. In sum, it would be ridiculous for Burford to suggest that it has a materially different view of Patton Boggs today than it did eight months ago.

[9] Tyrrell and Bogart also discussed the fact that they were to speak on the same panel for the ICC Institute of World Business in Paris on November 26, 2012. (*See* Ex. 21 at 3.) When Tyrrell ultimately had to cancel that engagement, Bogart responded: "We'll miss you!" (Ex. 26.)

[10] Bogart used this occasion to ask Tyrrell to protect Burford's investment stake in the Ecuador litigation—almost two years after Burford claims that it realized the case was a fraud. And there was, of course, no suggestion of misrepresentation by Patton Boggs.

(Ex. 24.)  When Patton Boggs quickly learned that other counsel had already been retained, Tyrrell received an apology email from Ms. Will, one of Burford's Managing Directors, who added that "we're always happy to put in a good word wherever we can help."  (Ex. 27.)

In fact, Burford continued its efforts to work with Patton Boggs well into 2013.  After Bogart expressed interest in engaging Patton Boggs' public policy specialists in December of 2012, Tyrrell made arrangements for Molot and Burford's COO, Andrew Langhoff, to meet Patton Boggs' Chairman, Thomas H. Boggs, on December 19, 2012.  (Ex. 29.)  Although the lobbying relationship never consummated, over the next three months, Burford executives exchanged dozens of e-mails with members of Patton Boggs' public policy group, who, among other courtesies, put Burford in touch with appropriate state-level specialists around the country. (*See, e.g.*, Exs. 31, & 32.)  These communications continued until March 13, 2013.  Burford then fell silent.  This is apparently the point, just a month before executing his Declaration, at which Bogart determined that it was in Burford's financial interest (*see infra* at 19-23) to throw Patton Boggs under the proverbial bus.

      **C.**    **Bogart's assertion that Burford would not have invested in the Ecuador matter had it been given more information is belied by Burford's documents.**

          **1.**    ***Bogart's real-time reaction to the RICO complaint.***

The Bogart Declaration characterizes Chevron's RICO filing on February 1, 2011, as the watershed, eye-opening moment for Burford—the moment when Burford "[l]earn[ed] of the [f]raud." (Dkt. 1039-2 at 15.)  This is a fiction.  On February 5, 2011, Seidel wrote to Bogart asking whether Chevron had indeed "filed a RICO case in the SDNY . . . naming Burford and Patton Boggs as unamed [*sic*] co-conspirators." (Ex. 33 at BUR0016588.)  In stark contrast to the reaction one would expect from Bogart if his Declaration is to be trusted, Bogart responded:

- 10 -

"Indeed it has.  *But it does not contain any new allegations.*  It's attached if you're curious." (*Id*. (emphasis added).

### 2.   *Burford's understanding of the Cabrera issue.*

Although the Bogart Declaration suggests that, prior to its investment in November 2011, Burford believed the issue with Cabrera was limited to "*ex parte* contacts," as opposed to "ghostwriting," Burford's documents again indicate otherwise.  For example, in August 2010— three months before Burford invested in the case—Burford's then-CFO commented that the Cabrera Report's "unjust enrichment" section (Annex T) "was done by a firm expert in such analysis, *probably Stratus*."[11] (Ex. 34 (emphasis added).)

But even assuming that Burford did not *fully* understand prior to its investment the extent of the Lago Agrio Plaintiffs' involvement with Cabrera, that revelation did not faze Burford.  Bogart today claims that if Burford had known prior to its investment about "Donziger's admissions in his [§ 1782] deposition . . . that the LAPs' team had ghostwritten the entire Cabrera Report and then engaged in an extensive cover up of that fact. . . . Burford would not have agreed to enter into the Funding Agreement. . . ."  (Dkt. 1039-2 at 18.)  Burford's documents do not support that claim.   Burford's documents show that it received, in real time or close to it, transcripts from Donziger's 16-day § 1782 deposition.  (*See, e.g*., Ex. 39 at

---

[11] To the extent that Patton Boggs and other newly-retained counsel were focused during their initial involvement in the litigation on the issue of "*ex parte* contacts" with Cabrera, it was because that is what Chevron at the time, in its § 1782 proceedings, was claiming to be misconduct.  (*See, e.g*., Ex. 35 (Chevron alleging in the S.D.N.Y that "Donziger and U.S.-based consultants he hired had improper *ex parte* contacts with both Cabrera and multiple members of his team."); Exs. 36 & 37 (in the Eastern District of Pennsylvania and the District of New Mexico, Chevron alleging that "Cabrera's claims of independence were false.  Outtakes from *Crude* obtained by Chevron in another Section 1782 proceeding show Plaintiffs' representatives and consultants meeting *with Cabrera* to plan his expert report on March 3, 2007 . . . .) (emphasis in original).)  Chevron backed off of its "*ex parte* contacts" narrative once the Lago Agrio Plaintiffs were finally able to prove that Chevron also had met privately with court-appointed experts in Ecuador.  (*See, e.g*., Dkt. 154 at 26; Dkt. 154-07.)  Chevron, on the other hand, might say that it changed its narrative because it *later* found out about the "ghostwriting" of the Cabrera Report through its § 1782 discovery actions.  That would be misleading.  For example, in March 2009—long before Chevron launched the first of its § 1782 proceedings—Chevron's personnel discussed internally how Cabrera ████████████████████████████████████████████████████████████████████████████ " (Ex. 38 at CVX-RIC0-4885720.)

BUR0065823 (rough draft of transcript sent on December 3, 2010); Ex. 40 at BUR0065253 (rough draft of transcript sent on January 9, 2011); Ex. 41 at BUR0063365 (rough draft of transcript sent on January 19, 2011); Ex. 42 at BUR0064072 (rough draft of transcript sent on January 19, 2011).)  There is no evidence of outrage in this set of documents.  Rather, ████, in which Donziger admitted that the Lago Agrio Plaintiffs' team drafted the Cabrera Report (both the "executive summary" and the annexes) (*see* Ex. 43 at 2758:6-10), Burford's counsel ██████████ ██████████████████████████████████████ ██████████████████" (Ex. 44 at BUR0064018.)

### 3.    *Bogart's understanding of the Joseph Kohn situation.*

The Bogart Declaration also claims that Burford was outraged to learn that attorney Joseph Kohn, who previously provided funding to the Lago Agrio Plaintiffs, believed that Donziger had engaged in fraudulent conduct that damaged the case.  (*See* Dkt. 1039-2 at 13-14.)  Bogart now states that if Burford knew before it funded in November 2010 that the "status of that relationship" between Kohn and Donziger deteriorated because of Donziger's alleged misconduct, Burford "would not have entered into the Funding Agreement." (*Id.* at 14.)  Again, Burford's documents expose the falsity of this claim.  On December 18, 2010, Bogart circulated an article discussing how Kohn had "become increasingly uncomfortable with Donziger's handling of the case" and had "left the case before Chevron's fraud accusations became public." (Ex. 45 at BUR0070087.)  On December 23, 2010, Seidel forwarded to Bogart an email noting that "Kohn and the Lago Agrio plaintiffs parted ways earlier this year, following revelations about possible misconduct in the Ecuador proceedings . . ." (Ex. 46 at BUR0035751.)  Seidel's email included a link to a December 17, 2010 article on the Forbes website titled "*Chevron Ecuador Case A Shambles, Former Backer Says*," wherein the author describes Kohn's August

2010 letter "excoriat[ing] plaintiff attorney Steven Donziger and say[ing] even if he wins the judgment will be unenforceable in the U.S. or anywhere else."[12]  (*Id.*; *see also* Ex. 47.)

What was Bogart's reaction to all of this?  Not anger, but opportunism.  Bogart perceived that Kohn's desire to distance himself from the case might allow Burford to buy out Kohn's interest in the judgment at a discount. (Ex. 48.)  Several days after the mainstream press picked up on Kohn's August 2010 letter and its accusations of fraud, Bogart informed Patton Boggs' Tyrrell that Burford was "interested in understanding more about the Kohn interest and a potential deal.  How shall we do that?" (*Id.*)

### 4.      *Bogart's supposed ignorance regarding the Crude film outtakes.*

The Bogart Declaration further suggests that Bogart and others at Burford did not have an opportunity to consider unflattering outtakes from the 2009 documentary film, *Crude*, before Burford funded the Lago Agrio Plaintiffs. (*See* Dkt. 1039-2 at 12-13 ("Especially given the difficulty of viewing the outtakes ourselves, Burford relied on Patton Boggs' representations regarding the *Crude* outtakes footage. . . . I did not see any of the outtakes until after our due diligence had been completed.").)  The truth is that Bogart and Burford viewed the "worst" of the *Crude* outtakes before Burford extended funding on November 2, 2010 (Dkt. 1039-2 at 15).

On October 29, 2010, Aviva Will (one of Burford's Managing Directors) forwarded to Bogart, Molot and others an article from the American Lawyer website entitled "*Chevron in Ecuador – the Tapes the Plaintiffs Don't Want You to See*."  (Ex 50 at BUR0000001.)  The article linked to and described six outtakes from *Crude*.  Bogart indeed viewed these linked

---

[12] Moreover, on January 19, 2011, Burford's counsel sent to Bogart and others a copy of Volume XII of the transcript from Donziger's § 1782 deposition, wherein Chevron questioned Donziger extensively about Kohn's August 2010 letter. (*See, e.g.* Ex. 42 at BUR0064072; Ex. 49 at BUR0064530 – 32 (Q: "[Y]ou are aware that Mr. Kohn has written in August 2010 that the systematic extensive contacts orchestrated by Donziger and with the participation and agreement of local Ecuadorian counsel have threatened the entire case,  you are aware that Mr. Kohn has stated that, correct, sir?" A: "Yes.").)

*Crude* outtakes, *and commented on them*. (*See* Ex. 51 at BUR0017933.)  The author of the article noted that "Chevron sees the first two selections [outtakes] as their *clearest evidence that plaintiffs secretly ghostwrote the independent expert's damages report*. . . . The remaining outtakes contain astonishingly frank musings by Steven Donziger on politics and litigation in Ecuador. Chevron regards them as expressions of unethical and unlawful efforts to pressure the court." (Ex. 50 at BUR0000001 (emphasis added).)  Nevertheless, Burford's reaction to the piece was neither shock nor outrage at the allegations of fraud, but rather, a comment on Chevron's hypocrisy: "Funny thing is that what Chevron is doing now seems pretty similar to Donziger's strategy in Ecuador." (*Id*.)  Molot added that the outtakes highlighted the need to support Patton Boggs' effort to ensure that its clients would not unjustly bear the consequences of any past mistakes their prior attorneys may have made.  (*See* Ex. 51 at BUR0017933.)

### 5.     *Burford was ready to "ride the waves" of the RICO case, until Chevron pressured it both from within and without*

Burford remained bullish on the case despite everything that had come to light in the Donziger and *Crude* § 1782 proceedings because it believed that Chevron's strategy of using "all the litigation over the lawyers' conduct" to "obscure" the merits of the case would ultimately fail.  (Ex. 18 at BUR0056893.)  Although Molot claims to have been "personally dismayed" that Burford had not received prior to investing a more detailed account of what occurred in Ecuador, Molot expressed that revelations about Cabrera and other alleged lawyer misconduct "should by no means lead [Burford] to abandon a reputable law firm pursuing a meritorious case – particularly when that firm is committed to cleaning up the prior errors so that the case is decided on the merits, rather than based on the prior lawyer's misdeeds" (*Id*.)

In fact, Bogart chastised a fellow investor in the case for having buyer's remorse after the RICO action was filed.  On June 2, 2011 (well after both the filing of Chevron's RICO case *and*

the Court's issuance of its preliminary injunction opinion, both cited in the Bogart Declaration as supposed turning points), Bogart reprimanded Herbert Lichtmann, who had expressed regret about his investment in light of the controversy surrounding the litigation, because the core allegations were admittedly clear as of December 2010, when Mr. Lichtmann invested: "You bought into this deal in December 2010.  You knew then about the allegations relating to Donziger; they were public. . . . [w]e offered you the opportunity to reverse your investment in early 2011 . . . . Then the enormous judgment came down and you decided to stay in." (Ex. 52 at BUR0057547.)  Bogart added that Lichtmann, "as with any investor," should have simply "ridden the waves together" with Burford instead of panicking.  (*Id.*)

In fact, even after this Court issued its preliminary injunction opinion in March 2011, Bogart's notes reflect that Burford was contemplating "rid[ing] out" the appeal from the injunction, and would "seriously consider further funding" if the Second Circuit lifted the injunction.  (Ex. 53 at BUR0004496.)  If, as the Bogart Declaration states, Burford "[l]earn[ed] of the [f]raud" when Chevron filed its RICO action and obtained an injunction (Dkt. 1039-2 at 15), Burford did not seem to mind the idea of profiting from that supposed fraud.

The Bogart Declaration is a revisionist history.  While a few of Burford's documents—particularly those wherein its executives are formulating positions to share with the outside world—suggest that perhaps some at the firm *may*, as Mr. Molot phrased it, have been "pissed" that Burford did not know more historic detail at an earlier time (Ex. 18 at BUR0056893), Burford's real motivation for noisily abandoning the Lago Agrio Plaintiffs was not the alleged belated discovery of relevant historical facts.

**D.     Reason #1 why Burford spurned the Lago Agrio Plaintiffs: Chevron leveraged its relationship with Burford's incoming Managing Director to co-opt Burford more than two years ago, even before Chevron filed its RICO case.**

On January 25, 2011, Burford issued a press release announcing that Ernest Getto, recently retired from partnership at Latham & Watkins, had joined Burford as a Managing Director.  (Ex. 54.)    While at Latham, Getto was one of Chevron's most visible outside counsel.[13]  Notwithstanding the fact that Burford did not announce Getto's arrival until late January 2011, during the latter part of 2010 and in early January, Burford's documents indicate that Getto was straddling his new and old positions. (*See, e.g*., Ex. 56 at BUR005198-99; Ex. 57 at BUR0053872; Ex. 58 at BUR0057437; & Ex. 59 at BUR0072383.)   During that period, apparently to maintain the appearance of a "wall," Getto would send Chevron-related documents—documents, such as undocketed letters from Chevron to this Court, which Getto likely acquired from Chevron—from his Latham email account to his Burford email account, and would from there forward them to his new colleagues at Burford.  (*See id*.)

In Molot's words, "Chevron ha[d] raised concerns with [Getto] about [his] joining Burford given that [Burford] ha[d] funded Patton Boggs' role in the Ecuador litigation." (Ex. 18 at BUR0056893.)   But it appears that Chevron did far more than "raise concerns" with Getto. Rather, Chevron used its relationship with Getto's former firm, Latham & Watkins, as a pressure point to cause Burford's capitulation.  According to Getto, his former colleagues at Latham "had gotten an earful" about "how the Burford relationship was hurting the firm." (Ex. 60 at BUR0005157.)   Getto recounted for his Burford associates a meeting he had with a former Latham colleague who "really didn't know the Chevron story as it involved me."  (*Id*.)  In that

---

[13] Although Getto's profile on the Burford website is silent about his work for Chevron, his "Retired Partner" biography on the firm's website still notes that "representing Chevron, [Getto] . . .  led a Latham team that won all 12 motions for summary judgment in the highly publicized Beverly Hills High School toxic tort litigation."  (Ex. 55.)

meeting, Getto was informed that Chevron "was being punitive with [Latham]." (*Id.*)  Indeed, it was "cited as fact" that Chevron had caused Latham to be "'blackballed' due to Burford." (*Id.*)  Getto indicated that he expected to gain more insight in a forthcoming meeting with the Managing Partner of Latham's San Francisco office, who asked to speak with Getto after meeting with Chevron's General Counsel, R. Hewitt Pate.  (*Id.*)

The party line of Burford's management—conveyed to its board in the aforementioned "Q&A" prepared by Bogart and others (*see supra* at 8)—was that "Ernie [Getto] has no connection to this [Ecuador] matter whatsoever." (Ex. 61 at BUR0021517.)   But communications exchanged within Burford's management team tell us otherwise.  According to Getto himself, his undermining of the relationship between the Lago Agrio Plaintiffs and Burford was such that "Chevron ought to be thanking [Latham] and me for my going to Burford . . . . ." (Ex. 60 at BUR0005157.)  In another communication, Bogart cited "the shenanigans with Ernie" among the factors that led Burford to sour on the Ecuador investment.  (Ex. 52 at BUR0057547.)

These "shenanigans" apparently were well underway as early as January 27, 2011, when Molot and Bogart drafted separate summaries of Burford's "view of the case and its history" for Getto, in preparation for his "dinner with Hew Pate," to take place that evening.  (Ex. 18 at BUR0056893; Ex. 62 at BUR0056012.)  Molot's "Draft to Ernie" vigorously defended Burford's continued involvement in the case and praised Patton Boggs for remaining steadfast, but it is not clear that Molot's draft summary—which was sent only to Bogart for review—actually ever made it to Getto.  (Ex. 18 at BUR0056893.)  Bogart's preparatory email, on the other hand, *did* go to Getto.  (Ex. 62 at BUR0056012.)  But Bogart did not, as Molot had proposed, convey to Getto (and, in turn, to Chevron's Pate) that Burford was resolute in its support of the case and of Patton Boggs.  Quite the opposite.  Bogart struck a repentant tone, wishing Chevron to

understand that the "Chevron/Ecuador matter is not a typical matter for Burford," which "generally invest[s] in commercial disputes between two companies" and works with firms like "a Latham [& Watkins], a Hunton & Williams, or a Gibson Dunn." (*Id*.)  Bogart also conveyed that Burford would not necessarily be displeased to see Chevron attack Patton Boggs.  Admitting that "Burford would, frankly, be happier not to be in the middle of this mess, especially given that it is relatively far afield from our core business of financing corporate litigation," Bogart nonetheless felt that Burford was stuck because "Burford's role here is to fund Patton Boggs" and "[n]either Chevron nor any court has taken any action against Patton Boggs – there are no sanctions, there is no Rule 11 order – indeed, there are no allegations from Chevron of any wrongdoing on Patton Boggs' part[.]"   (*Id*. at BUR0056014.)  Making himself even clearer, Bogart added that "Burford's business will also suffer if we strand a major law firm – with substantial unpaid fees – in the middle of a case when there is no suggestion that the firm has acted improperly."  (*Id*.)

Getto evidently took Bogart's words under advisement.  Five days after Getto's dinner meeting with Pate, Chevron filed its RICO case, branding Patton Boggs as a "non-party co-conspirator" and accusing the firm, *inter alia*, of devising a strategy to "extort a payment" from Chevron (*i.e.*, articulating a strategy to enforce a judgment in jurisdictions where Chevron holds assets) and of "managing" the Lago Agrio Plaintiffs' "obstruction efforts" (*i.e.*, stoutly defending its clients privilege against Chevron's tidal wave of coordinated § 1782 discovery actions).  (*See, e.g.*, Dkt. 283 at 112, 138.)  Six days later—after Chevron secured a TRO preventing judgment enforcement, which was obviously a serious blow to Burford's prospects for recovery on its investment—Bogart emailed Randy Mastro: "Randy – Congratulations on a superbly executed campaign! Chris".  (Ex. 63 at BUR0071161.)  With friends like these . . . .

Burford's secret collaboration with Chevron continued from there (*see, e.g.*, Ex. 64 at BUR0049986; Ex. 65 at BUR0047966), presumably through the present.  We are reminded that at a hearing before this Court on September 25, 2012, Mr. Mastro "speculated," in articulating why he needed discovery as to funding-related documents, that perhaps—"*I can't say whether that is going to be the case for Burford, but we think we have a good faith basis*"—Burford was "induced to fund, to keep this thing going, the scheme going, and later came to realize they had been hoodwinked.  That's third-party fraud.  That's extremely relevant to the RICO." (Sept. 25, 2012 Hr'g Tr. at 31:7-12 (emphasis added).)  Those remarks seemed to us remarkably prescient in light of the fact that Burford's scathing September 29, 2011 letter accusing the Lago Agrio Plaintiffs' counsel of fraud (Dkt. 714-1) had yet to be produced in the litigation.  In hindsight, not only is it clear that Mr. Mastro already had seen the letter by virtue of his clandestine relationship with Burford; it also seems likely that Chevron or its counsel were involved in engineering the letter—as part of the "substantive proposal" that Chevron first solicited from Burford on March 3, 2011. (Ex. 65 at BUR0047966; *see also* Ex. 66 at BUR0049969 (indicating that Mr. Mastro phoned Burford in August of 2011, one month before Burford transmitted its "fraud" letter to the Lago Agrio Plaintiffs' counsel).)

       **E.**     **Reason #2 why Burford spurned the Lago Agrio Plaintiffs: Uncomfortable with investing in plaintiffs'-side, human-rights litigation from the outset, Burford feared being blackballed by its target market following the unanticipated public disclosure of Burford's support of mass-tort plaintiffs.**

As noted previously, Burford's "fundamental business is in financing large commercial litigation matters – disputes between corporations . . . ."  (Ex. 62 at BUR0056012.)  Why then, did Burford invest in the Ecuador matter in the first place?  According to Bogart—or at least what Bogart wanted *Chevron* to hear—the impetus behind Burford's atypical investment in the Ecuador matter was "Selvyn Seidel, then Burford Group's Chairman and the former head of

Latham's New York litigation practice, [who] was particularly interested in it given his deep personal interest in international human rights litigation." (*Id*. at BUR0056013.) Bogart explained to the incoming Getto (and, in turn, to Chevron's Pate) that "Selvyn has since left Burford and was frankly his own man while he was here."[14] (*Id*.) Indeed, Burford offered to sell its interest in the Ecuador matter to Seidel's new company, Fulbrook Advisors LLC, on January 28, 2011—the day after Getto's dinner meeting with Pate, and a few days before the RICO suit was filed. (Ex. 67 at BUR0000336.) Bogart's reasoning had nothing to do with the alleged fraud uncovered in the § 1782 proceedings: "We don't particularly like the Ecuador case, as you know. It was your enthusiasm that carried us into it. Jon and I aren't comfortable with it. . . . It is not so much that we doubt the entry of a judgment in Ecuador or Jim's and Patton Boggs' abilities, but rather that it is not our kind of case . . . ." (*Id*.)

Although Burford's other principals, particularly Bogart, did not share Seidel's enthusiasm for human rights matters, it seems that Burford was satisfied that its investment in the Ecuador matter would not injure its reputation as a "business litigation" financier because its investments are generally kept quiet. According to Getto, "no one believed that Burford's [Ecuador] investment, or its terms, would become public knowledge." (Ex. 69 at BUR0011487.) Burford's attitude toward the case changed, however, once that expectation proved erroneous and Burford's investment could no longer be kept quiet, particularly when journalists began to take unwelcomed interest in Burford's involvement. In February 2011, Roger Parloff of Fortune informed Burford that he was interested in writing about Burford's investment in the Chevron/Ecuador matter "because the Chevron case is one of the few specific investments of

---

[14] Seidel advocated conveying to the Amazon communities, in Burford's financing pitch to them, that "one aspect we have brought to this dispute is our commitment to support claims based on human rights. It is a special feature we believe in and take pride in our commitment to such claims." (Ex. 68 at BUR0055373.)

Burford or, in fact, any ALF [alternative litigation financing] company, that has become public."
(Ex. 70 at BUR0000081.)

Parloff's interest in the Ecuador investment spooked some at Burford, given Parloff's proclivity to write "opinion masquerading as news story" in aid of Chevron's litigation position. (Ex. 71 at BUR0012138; *see also id.* (Burford referring to Parloff's writing as "superficial and biased" and observing that, "[c]onsidering the source, we couldn't have expected anything different.").)  Whether or not Burford knew it at the time, its assessment of the Chevron/Parloff relationship was spot-on: Chevron's documents indicate that it was the driving force behind the content of Parloff's litigation financing exposé.  A few months before Parloff published his June 2011 article entitled "*Have you got a piece of this lawsuit?*" (opining that the Chevron/Ecuador matter "opens a window on a troubling new business: speculating in court cases") (Ex. 72), the Chevron PR team was feeding Parloff the Lago Agrio Plaintiffs' funding documents and "reviewing . . . transcripts to extract the relevant funding sections for [Parloff's] review."  (*See, e.g.*, Ex. 73 at CVX-RICO-4769225.)  To the extent that Chevron's goal was to gin up press scrutiny as another means of pressuring Burford to publicly denounce the Lago Agrio Plaintiffs, Chevron's plan worked.

Once it unexpectedly became fodder for mainstream publications, "Burford's decision to invest" in the Ecuador matter "created some painful fallout – particularly among certain law firms on the opposite side of the case."  (Ex. 71 at BUR0012138.)  But the fallout—or at least the perceived fallout—apparently extended beyond that distinct group of firms, large and influential as that group might be.  Burford believed that public awareness of its Ecuador investment would more broadly cause "very serious problems with major firms."  (Ex. 71 at BUR0012138.)  Getto relayed to Bogart and others that a chief litigator from one major firm told him that "she had

partners who were interested in Burford, but the firm was being pressured by their insurance clients to stay away" because of the Ecuador matter. (*Id*.)  Getto complained that the "Ecuador investment cuts against" Burford's message that it "holds itself out as different from most funders in that it funds business disputes," a representation that was "front and center" in Getto's presentations to potential clients.  (*Id*.; *see also* Ex. 69 at BUR0011487 (Bogart lamenting that due to Ecuador publicity, "the general sense in the ether [is] that Burford is somewhat more like a contingency fee firm and somewhat less like a Goldman to the Am Law 100.").)  Burford's management struggled to formulate a coherent answer to the oft-posed question, "[h]ow can you argue this is core to your strategy [of investing in U.S.-based, commercial litigation] when, at heart, it's a class action in Ecuador?" (Ex. 61 at BUR0021516 (answering that question by noting that the Lago Agrio Litigation was originally brought in New York and that the judgment will be enforced elsewhere, thus the case is not really "Ecuadorian").)  In that vein, Getto complained on one occasion that "[t]he first question of me at the Chief Litigation Counsel meeting was about Ecuador and how that was a 'business dispute.'" (Ex. 71 at BUR0012138.)

Presented with Burford's panic about the "outing" of its investment in the Ecuador matter, Burford's outside PR specialist lectured Bogart and others that "Burford clearly knew that it would be criticized publicly because of its investment in Ecuador, due to the highly controversial and protracted nature of the case. . . . [M]edia criticism should *not* be the reason to reconsider the [investment] decision once made . . . ." (*Id.* (emphasis in original).)  Nevertheless, in light of all the unwanted attention, Burford became desperate to dissociate from the case.  In an email to co-investor Herbert Lichtmann, Bogart recounted that Burford in early 2011 "offered to sell you our entire interest in light of" Burford's "anxiety about Burford's public perception." (Ex. 52 at BUR0057547.)

In fact, Burford feared that its now high-profile role in the Ecuador matter would not hurt just Burford, but might harpoon the entire, fledgling alternative litigation financing industry: "[I]t won't take much to push a number of established law firms and GC's away from ALF, which seems to me the bigger risk . . . ." (Ex. 71 at BUR0012138.)  Getto added that Burford's investment in the case might galvanize an already potent opposition and result in unfavorable legislation: "With Big Oil, the insurance industry and the Chamber of Commerce allied in trying to shut ALF down, I would expect to see some bills in at least a few states."  (*Id*.)

Ultimately, Burford made a business decision, calculating that abandoning the Lago Agrio Plaintiffs and assisting Chevron would be necessary to restore its relationships with key firms and to secure the future of the industry in which it operates.

## ARGUMENT

### I.  THE COURT SHOULD STRIKE THE BOGART DECLARATION FROM THE DOCKET ON THE GROUNDS THAT CHEVRON SUBMITTED IT IN BAD FAITH FOR AN IMPROPER PURPOSE

Chevron has invented the pretext of a so-called "funder fraud" theory to justify its filing of the Bogart Declaration.  But the extent of the facts known to Burford at any given time before or after it provided litigation financing to the Lago Agrio Plaintiffs has no bearing on Chevron's claim that it is the victim of fraud and extortion.  Nor does Bogart's purported opinion of the case today.  This Court already has indicated that Chevron's "funder-fraud" theory is a frolic:

| | |
|---|---|
| THE COURT: | [Y]ou haven't persuaded me yet that evidence that third-party investors were snookered, if indeed that's the case, is particularly probative of anything in this case. |
| MR. MASTRO: | But, your Honor, it is critically important, because without that money . . . Patton Boggs never would have gotten involved in this case . . . . |
| THE COURT: | Without the word processor, they couldn't have gotten involved either and we are not examining IBM. |

(Sept. 25, 2012 Hr'g Tr. at 33:6-17.)

The Bogart Declaration is apropos of nothing, other than spinning a seedy narrative. Chevron filed the Bogart Declaration in bad faith for an improper purpose unrelated to achieving any legitimate, merits-based legal outcome: to defame Patton Boggs while attempting to manage its risk of a libel suit—owing to litigation immunity—and ultimately to compel Patton Boggs to abandon its clients. The irrelevance of the allegations contained in the Bogart Declaration is reason enough to strike it.[15] That the Declaration so blatantly is intended to defame a party's counsel for purposes of driving them from the case renders that relief all the more appropriate.[16] We also note that Bogart does not swear that *any* portion of his declaration is based on personal knowledge, nor is he able to attest that *all* of it is true. Rather, Bogart cagily "declare[s] that the following is true and correct *or* based on reasonable information and belief . . . ." (Dkt. 1039-2 at 2 (emphasis added).) The fact that the Declaration is thus inadmissible on summary judgment or otherwise further supports striking it.[17] It is useless for any purpose other than PR.

Over four years ago, Chevron decided that its best "████████████████████ ████████ (Ex. 74 at CVX-RICO-4875276.) To that end, Chevron even once contemplated starting a "Wikipedia" page for Donziger, which it would dedicate to disgracing

---

[15] *See, e.g., Weber v. AVX Pension Plan*, 07-CV-615S, 2009 U.S. Dist. LEXIS 88847, *8-9 (W.D.N.Y. Sept. 27, 2009) (striking on grounds of irrelevance 15 of 18 paragraphs of fact-witness declaration submitted in connection with opposition to summary judgment motion).

[16] *See, e.g., Doolittle v. Structured Invs. Co., LLC*, CV 07-356-S-EJL-CWD, 2008 U.S. Dist. LEXIS 98693, *11–20 (D. Idaho Dec. 4, 2008) (where declaration submitted by defendants set forth irrelevant facts designed to "cast [plaintiff] in an unfavorable light" in the eyes of the court, the court "decline[d] to entertain any such suggestion," accepted plaintiff's argument that the declaration contained "prejudicial evidence submitted for the sole purpose of annoying and harassing" plaintiff, and granted plaintiff's motion to strike offending portions of the declaration and accompanying exhibits).

[17] *See, e.g., Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir. 1988) (reversing grant of summary judgment where district court erroneously relied on affidavit which stated that it was based on "personal knowledge *or* upon information and belief as to matters conveyed to [him]," holding that because there was "no way to ascertain which portions of [the] affidavit were based on personal knowledge, as opposed to information and belief, the affidavit is insufficient under Rule 56 to support the motion for summary judgment.") (emphasis added).

him.  (Ex. 75 at CVX-RIC0-4746092 ("Why should we let them write history when we can write it ourselves?").)  Chevron took a similar approach to the Republic of Ecuador itself.  In 2008, it devised a strategy to generate public fear and suspicion regarding the country, adopting "Ecuador: the next major threat to America?" as one of its "message themes," whereby the American public would be led to "wonder if Ecuador is the next Cuban missile crisis in the making."[18]  (*Id*. at CVX-RIC0-4746091.)

Chevron is now using these proceedings as a pulpit from which to "▆▆▆▆▆▆" Patton Boggs, which has inconvenienced Chevron and its counsel by winning crucial appellate victories on behalf of the Lago Agrio Plaintiffs in three different circuit courts of appeal.  If Burford is willing to be Chevron's tool to cast public aspersions at Patton Boggs about "funder fraud," Chevron and Burford should act at their own peril—this proceeding should not give them cover to defame without consequence.  The Court should strike the Bogart Declaration.

## II.   ALTERNATIVELY, THE COURT SHOULD GRANT CAMACHO AND PIAGUAJE LEAVE TO SERVE A DOCUMENT SUBPOENA ON BURFORD

Should the Court decline to strike the Bogart Declaration from the docket, the Court should permit Messrs. Camacho and Piaguaje to serve on Burford the proposed subpoena *duces tecum* submitted in connection with this Motion.  (Ex. A.)  The proposed subpoena is limited, with requests seeking information about the Chevron/Burford settlement, communications between Burford and Chevron, and other topics aimed at understanding the manner in which Chevron brought about Burford's capitulation.  (*See id.*)

---

[18] If Camacho and Piaguaje had the resources to pursue Chevron's documents half as aggressively as Chevron has had the luxury of pursuing everyone else's, we would surely find similar game-plans for defaming Stratus, Burford, and others who have buckled under the weight of Chevron's revenge tour.  Chevron is plainly executing the retaliation plan warned of several years ago by Chevron contractor Diego Borja, who attempted to entrap an Ecuadorian judge in a bribery scheme using a pen camera and was later himself caught on tape revealing that Chevron had engaged in all manner of misconduct in connection with the Lago Agrio Litigation: "[T]hese guys, once the trial is over, they'll go after everyone who was saying things about it. . . . [T]he lawsuits will start against everyone who said things, you get it?" (*See* Dkt. 532-2 at 93-94.)

There is "good cause" to reopen document discovery in the limited manner requested.[19]

"[A] finding of good cause depends on the diligence of the moving party."[20]   In turn, the moving party's diligence is a function of the "information the 'party knew, or should have known,' in advance of the deadline sought to be extended."[21]   Where, as here, the non-movant adduces new evidence or allegations after the close of the discovery deadline, courts routinely find that the "good cause" standard has been met.[22]

Defendants had no reason to seek discovery from Burford before the unveiling of the Bogart Declaration and the Chevron/Burford Settlement Agreement.  Up to this point, the Court scoffed at Chevron's "funder fraud" theory—a theory which did not even begin to crystalize until after the document discovery period closed, in any event.  It never before appeared that what Burford says, and its motive for saying it, would be probative of any claim or defense. Defendants did not *begin* receiving documents revealing Burford's relationship with Chevron until February 22, 2013.  Even then, absent the Bogart Declaration, there was no apparent litigation purpose to demand discovery related to the Chevron/Burford relationship.

Other factors sometimes considered by courts as part of the "good cause" analysis also weigh in favor of allowing limited discovery here.  The "bad faith . . . of the party opposing such

---

[19] *See Bakalar v. Vavra*, 851 F. Supp. 2d 489, 493 (S.D.N.Y. 2011) (*citing Gray v. Town of Darien*, 927 F.2d 69 (2d Cir. 1991).

[20] *Wade v. North Am. Asset Servs., LLC*, 12-CV-1111, 2013 U.S. Dist. LEXIS 20232, *7 (E.D.N.Y. Feb. 14, 2013) (quoting *Grochowski v. Phoenix Constr.*, 318 F.3d 80, 86 (2d Cir. 2003); *see also Bakalar*, 851 F. Supp. 2d at 494.

[21] *Wade*, 2013 U.S. Dist. LEXIS 20232 at *7-8 (quoting *Sokol Holdings, Inc. v. BMB Munai, Inc*., No. 05 Civ. 3749 (KMW)(DF), 2009 U.S. Dist. LEXIS 72659, 2009 WL 2524611, at *8 (S.D.N.Y. Aug. 14, 2009)).

[22] *See, e.g*., *Wade*, 2013 U.S. Dist. LEXIS 20232 (granting defendants request to reopen discovery to serve a single subpoena on non-party bank where bank records could shed light on veracity of statement made by plaintiff for the first time after the close of discovery); *Spencer v. Int'l Shoppes, Inc.*, CV 06-2637, 2011 U.S. Dist. LEXIS 91281 (E.D.N.Y. Aug. 16, 2011) (granting defendant's request to reopen discovery on a limited basis for purpose of inquiries into plaintiff's medical condition that arose after discovery deadline); *Callaway Golf Co. v. Corporate Trade Inc*., 10 Civ. 1676, 2011 U.S. Dist. LEXIS 44756 (S.D.N.Y. Apr. 26, 2011) (permitting deposition after expiry of discovery deadline in light of new allegations of forgery).

extension," or in this case, reopening, of discovery is apparent.[23]  Our need to reopen discovery is the product of Chevron's strategic decision to lay in wait to spring its "funder fraud" narrative at this late hour in the case—a moment when Chevron has shifted its focus to sidelining Patton Boggs.[24]  Burford's documents indicate that it has been coordinating with Chevron and Gibson Dunn since roughly January 2011.  It appears virtually certain that Mr. Mastro stood before the Court and feigned ignorance concerning the circumstances of Burford's abandonment of the Lago Agrio Plaintiffs.[25]  (*See supra* at 19.)  There also is every reason to believe that Chevron was responsible in some way for the September 29, 2010 letter in which Burford leveled pointed accusations against the Lago Agrio Plaintiffs' lawyers (but not Patton Boggs)—a letter that Chevron now holds out as independent evidence of fraud.  (*See, e.g.*, Dkt. 713 at 6.)  Chevron further concealed the extent of its coordination with Burford by stipulating, in December 2012, that Burford need not produce or log communications between Chevron's counsel and Burford's counsel.  What may once have seemed an innocuous concession now takes on a different hue.

---

[23] *Gavenda v. Orleans Cnty.*, No. 95-CV-0251E (SC), 1996 WL 377091, at *1 (W.D.N.Y. June 19, 1996).

[24] Apparently dissatisfied that burying the firm under the weight of a massive and costly document subpoena and using this litigation as a platform from which to defame the firm has not caused Patton Boggs to back away from its representation of the Lago Agrio Plaintiffs, Chevron has now upped the ante by seeking permission to file "fraud" and other claims directly against Patton Boggs in a separate action.  We do not believe it to be a coincidence that Chevron embarked on this course just as the Defendants' lawyers' in this action were forced to seek withdrawal because they could not afford to remain in.  Apparently, Chevron believes that sidelining Patton Boggs is the key to crushing the Lago Agrio Plaintiffs once and for all.

[25] Chevron has asked for sanctions on the basis that Defendants' counsel knew about proceedings in Ecuador that might affect discovery in this action, but failed to inform the Court about them. (*See* Dkt. 894 at 13, 20.)  Mr. Mastro's failure to disclose that Chevron and Burford had been cooperating for a year-and-a-half, as of the September 25, 2012 hearing—apparently pretending to be in the dark in order to justify burdening Patton Boggs with "funder-fraud" discovery—is not materially different.  The same goes for Chevron's insistence that the Bogart Declaration constitutes "new evidence" that warrants expanding Chevron's entitlement to take discovery from Patton Boggs.  (*See, e.g.*, Dkt. 1032 at 18.)  Chevron kept this "new" information secret for months, waiting to unveil it at an opportune moment.

Finally, to the extent courts may consider "whether trial is imminent" and "whether the non-moving party would be prejudiced" by discovery,[26] we do not ask the Court to postpone any deadlines.  With the Court's approval, the subpoena will be served *post haste*.  We do not anticipate much of a privilege dispute, given that our core interest is communication between Chevron and Burford, or between their respective counsel.

## III.   THE COURT SHOULD STIRKE BURFORD'S ABUSIVE AND UNFAIR DESIGNATIONS OF CONFIDENTIALITY, AND SHOULD SANCTION BURFORD AND CHEVRON

The Protective Order entered in this case allows for the designation as "confidential" of material that the producing party "in good faith believes reflects . . . a. sensitive personal information, including, for example, private details such as social security numbers . . . ; b. confidential business information . . . or other information that the Producing Party believes in good faith to be entitled to protection under Federal Rule of Civil Procedure 26(c)(l)(G); or c. information the Producing Party is contractually or legally obligated to keep confidential." (Dkt. 723 at 2.)   Burford's confidentiality designations are not protecting "sensitive personal information," nor does it appear that Burford is under any contractual obligation to designate all of its documents "confidential."   Rather, Burford seems to suggest that all of its documents constitute "confidential business information" within the ambit of Rule 26(c)(l)(G).   Burford's documents—at the very least, those cited herein—merit no such protection.[27]

"[T]he public has a presumptive right of access to discovery materials. . . ."[28]   That right of access may nonetheless be trumped where the producing party can show that its documents

---

[26] *Bakalar*, 851 F. Supp. 2d at 493.

[27]   Pursuant to the Court's Protective Order, Burford, as "[t]he Producing Party[,] bears the burden of persuading the Court that the Information is in fact Confidential . . . ." (Dkt. 723 at 6.)

[28] *In re Agent Orange Prod. Liab. Litig.,* 821 F.2d 139, 145-46 (2nd Cir. 1987); *see also Public Citizen* v. *Liggett Group. Inc.,* 858 F.2d 775 (1st Cir. 1988) ("It is implicit in Rule 26(c)'s 'good cause' requirement that ordinarily (in

are "sources of business information that might harm a litigant's competitive standing."[29] This Court has observed that "[a]lthough a business's information need not be a 'true' trade secret in order to warrant protection from disclosure under Rule 26(c) . . . , trade secret law is instructive in gauging whether information constitutes sensitive business information that courts should shield from public scrutiny."[30]

In *Parmalat*, a case before this Court, defendants had collectively designated as "confidential" documents containing several categories of information, including: "operations and policy information," "strategic information," "financial information," "meeting minutes of governing boards," the "process for conducting credit review and analysis," "information regarding methods used to structure and market transactions to clients," "information detailing confidential communications with potential or actual investors," "pricing strategy and fee arrangements" and "transaction documents."[31]   Defendants attempted to justify their designations by submitting testimony from employees "asserting that the information in their documents . . . would cause significant economic harm to defendants if the documents were disclosed to competitors."[32]   The court rejected defendants' designations and ordered the unsealing of all documents at issue, observing, *inter alia*, that because "strategic decisionmaking is necessarily fact-specific," defendants had not shown how any aspect of their decisionmaking as to a particular matter "would be helpful to anyone attempting to understand [defendants']

the absence of good cause) a party receiving discovery materials might make them public."); *Am. Tel. & Tel. Co* v. *Grady*, 594 F.2d 594, 596 (7th Cir. 1979) ("As a general proposition, pretrial discovery must take place in the public unless compelling reasons exist for denying the public access to the proceedings."); *Mader v. Motorola Inc.*, No. 92 C 8089, 1994 U.S. Dist. LEXIS 13937, *15 (N.D. Ill. Sept. 28, 1994) (court "cautioned defendants against indiscriminately designating materials as confidential. . . . [T]he court bears in mind that litigation and trials are intended to be public.").

[29] *In re Parmalat Securities Litig.*, 258 F.R.D. 236, 244 (S.D.N.Y. 2009).

[30] *Id*. (internal citations omitted).

[31] *Id*. at 249-252.

[32] *Id*. at 248.

current marketing strategy, or any of [defendants'] other strategic decisionmaking, for that matter."[33]   Notwithstanding the fact that most of the documents contained information that "would not generally disclosed to the public," the Court concluded that defendants had "failed to show that the disclosure of any of the particular documents in issue would reveal business information that is sufficiently valuable and secret that it could cause competitive harm . . . ."[34]

Like the documents at issue in *Parmalat*, the Burford documents cited in these papers (representative of the remainder of its production), are not "confidential documents sufficiently valuable and secret to afford an actual or potential economic advantage over others."[35] Burford's decision-making processes regarding its Ecuador investment are not "valuable" information akin to a trade secret—*especially* not when Burford admits that the Ecuador investment was a one-off far outside its bailiwick.  In any event, the vast majority of Burford's documents reveal little to nothing about Burford's analysis of any potential investment.  Rather, most of the documents, particularly those cited herein, involve Burford's reaction and response to publicity and scrutiny arising from an investment it already made.

Moreover, we must ask how Burford can claim with a straight face that the information cited herein is confidential when Bogart's Declaration selectively divulges much of the same type of information, and even quotes from documents that Burford has labeled "confidential.[36] Categorically speaking, the Bogart Declaration purports to explain:  (1) how Burford first came to be involved with the Ecuador matter; (2) Burford's knowledge (or supposed lack thereof) and

---

[33] *Id.* at 250-57.

[34] *Id.* at 253, 257.

[35] *Id.* at 245 (internal citations and quotations omitted).

[36] For instance, the Bogart Declaration quotes extensively from a "confidential" memorandum from Burford's management to its board, whereby management presented the potential risks and rewards of the Ecuador investment. (*Compare* Dkt. 1039-2 at 9-10 *with* Ex. 76 at BUR0063264 - 271.)

analysis of the risks attendant to the Ecuador investment before it financed the case (*see, e.g.* Dkt. 1039-2 at 6-8); (3) Burford's rationale for investing in the case as an initial matter (*see id.* at 6-14); (4) the facts and circumstances of Burford's claimed reliance on Patton Boggs for diligence purposes (*see id.* at 6-8); and (5) Burford's reasoning for refusing to fund the second tranche and terminating the funding agreement (*see id.* at 9-18).  On one hand, then, Burford has divulged—in exceedingly public fashion—details regarding the company's purported thought processes vis à vis its analysis of and disassociation from the Ecuador investment.  Yet, on the other hand, Burford claims that any documents speaking to the same issues are confidential.

Burford evidently is concerned that public disclosure of its documents could result in the tarnishment of Burford's reputation for several reasons, not the least of which is the discrediting of Bogart's sworn testimony.  To be sure, it is possible that disclosure could have such an effect. But the fact that "disclosure [of documents] might result in adverse publicity," and thus, potential injury to the producing party's business, does not mean that these documents contain "confidential business information" such that they would be amenable to a protective order.[37] "Simply showing that the information would harm the company's reputation is not sufficient to overcome the strong common law presumption in favor of public access to court proceedings and records."[38]  The axiom that the prospect of reputational harm or incrimination does not justify

---

[37] *In re Parmalat*, 258 F.R.D. at 244; *see also Dep't of Economic Development v. Arthur Anderson & Co.*, 924 F. Supp. 449, 487 (S.D.N.Y. 1996) ("'Good cause' [to file documents under seal] is not established merely by the prospect of negative publicity."); *Glenmede Trust Co. v. Thompson*, 56 F.3d 476, 484 (3d Cir. 1995) ("General allegations of injury to reputation and client relationships or embarrassment. . . [are] insufficient to justify" confidentiality designations); *Nicklash v. JLG Industries Inc.*, 193 F.R.D. 570 (S.D. Ind. 1999) (manufacturer of a lift involved in an accident was not entitled to a protective order limiting production of incident reports of prior lift failures, despite its fear of possible embarrassment and groundless litigation as a result of public's misinterpretation of the reports); *Culinary Foods, Inc. v. Raychem Corp.*, 151 F.R.D. 297 (N.D. Ill. 1993) (holding that protective order was unsupported by claim that public disclosure of information regarding hazards of product and defendant's knowledge thereof might be embarrassing or incriminating).

[38] *Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165, 1179-80 (6th Cir. 1983) (court recognizing that producing party's natural desire to shield prejudicial information from the public "cannot be accommodated by the

sealing documents is particularly compelling here.  Bogart did not need to execute a Declaration attacking the Lago Agrio Plaintiffs and Patton Boggs—particularly not one full of falsehoods and half-truths, which, if exposed, would reflect poorly on Burford.  Nor did Burford need to issue a press release and otherwise take part in Chevron's media push.  Burford invited the spotlight.  Reputational harm is the risk inherent in Burford's Faustian bargain.

In light of the foregoing, at a minimum, the Court should strike the confidentiality designations as to the Burford documents appended to the Gomez Declaration and cited herein. But the Court should not stop there.   Owing to Burford's bad-faith decision to label "confidential" what appears to be all of the roughly 7,000 documents it produced, the Court should order Burford to make a particularized showing why any *other* specific document that it designated "confidential" should remain so, or else give up *all* of its confidentiality designations.[39]  This is the fair way to proceed when there has been a "gross abuse" of a blanket protective order.[40]   "The improper designation of thousands of documents as 'confidential' would create unnecessary logistical restraints on . . . Defendants' filing these documents with the court, including their inability to use the ECF system and having to file all of these documents

---

courts without seriously undermining the tradition of an open judicial system. Indeed, common sense tells us that the greater the motivation a corporation has to shield its operations, the greater the public's need to know.")

[39] *See, e.g., In re Ullico*, 237 F.R.D. 314, 318 (D.D.C. 2006) (where party labeled as "confidential" 99 percent of roughly 60,000 documents produced, court ordered producing party to remove the confidential designation from *all* documents and to re-review in good faith within 20 days, observing that "Counterclaim Defendants should not be prejudiced as a result of what can be viewed as Ullico's bad faith participation in discovery.  Ullico bears the burden of designating the documents appropriately . . . and because of the sheer quantity of documents involved, it is especially important for this burden to remain with Ullico."); *Fears v. Wilhelmina Model Agency, Inc.*, 02 Civ. 4911, 2003 U.S. Dist. LEXIS 12850, *6-7 (S.D.N.Y. July 22, 2003) (observing that "[i]t is difficult, if not impossible, to imagine that every piece of paper being produced by [defendant] is so sensitive that a blanket designation of 'confidential—attorneys' eyes only' is appropriate," court ordered offending party to prove the merit of confidentiality designation as to each and every document); *Pettrey v. Enterprise Title Agency, et al.*, 470 F.Supp.2d 790, 792-96 (N.D. Ohio 2006) (striking confidentiality designations as to 152 boxes of documents, rejecting producing party's excuse that "reviewing documents prior to production was 'an enormously expensive and time-consuming burden'"); *THK Am., Inc. v. NSK Co.*, 157 F.R.D. 637, 645–47 (N.D. Ill. 1993) (where party had designated an "absurdly high" number of documents as "attorneys' eyes only," court ruled that producing party "ha[d] lost the right to use the category.").

[40] *In re Ullico*, 237 F.R.D. at 317.

under seal. The large quantity of documents that have been labeled 'confidential' multiplies the obstacle for the . . . Defendants, who are forced to adhere to these restraints for the majority of documents produced by [Burford]."[41]

Finally, Chevron and Burford should be sanctioned for their refusal to remedy Burford's bad-faith confidentiality designations without application to the Court.[42] As noted previously, Chevron, by virtue of the Chevron/Burford Settlement Agreement, holds the absolute power to demand that Burford waive its confidentiality designations. (*See supra* at 5.) But instead of acting in good faith and curing an obvious problem, Chevron played the obstructionist, deflecting our inquiry to Burford. (Ex. 77.) Burford, in turn, ignored our request. The two should be ordered to cover the fees and costs required to bring this motion.[43]

## CONCLUSION

We plead with the Court to focus objectively on the manner in which Chevron is building its case here. Chevron coerced Burford into defaming Patton Boggs by threatening Burford, and a law firm with which Burford shares close ties, with the prospect of being "blackballed." Under the circumstances, Burford's claims are roughly as believable as Stratus's assertion that the science contained in the Cabrera Report is "unreliable"—despite repeatedly saying the opposite

---

[41] *In re Ullico*, 237 F.R.D. at 318.

[42] In the event that the Court does not strike the Bogart Declaration, Messrs. Camacho and Piaguaje intend also to seek Rule 11 sanctions against Chevron for submitting a false declaration to injure the reputation of opposing counsel. *See, e.g., Bernal v. All Am. Inv. Realty, Inc.*, 479 F. Supp. 2d 1291, 1330 (S.D. Fla. 2006) (observing that "[a]n officer of the court is expected to know that such accusations must not be casually made," court sanctioned counsel who submitted a false affidavit accusing the plaintiff of "bribery, witness tampering, obstruction of justice and subornation of perjury: serious criminal conduct under any circumstance, but extraordinary charges in the context of otherwise ordinary civil litigation," charges that could "ruin one's reputation [and] livelihood . . . .").

[43] *See, e.g., In re Ullico*, 237 F.R.D. at 318-19 (court ordering party which had "grossly abused" blanket protective order by designating ninety-nine percent of its documents "confidential" to pay moving party's fees and costs associated with motion challenging designations).

under oath[44]—months after Stratus complained that Chevron's extra-judicial campaign to destroy its client relationships might "bring Stratus to its knees and render it financially incapable of defending against Chevron's lurid allegations, sealing Stratus' fate pretrial." (Dkt. 768 at 99.)  In the case of Chevron's star witness, former-judge Alberto Guerra, it was not a threat, but rather, literally a suitcase full of cash—the fullness of which would be dependent upon the juiciness of the evidence Guerra could scrape together—which induced the evidentiary bombshell.[45]

This Court once remarked that the case in Ecuador appeared to be "mud-wrestling, not bona fide litigation." (Ex. 30 at 13:25-14:1.)  If Chevron is permitted to continue "flipping"

---

[44] *See, e.g.*, Ex. 78 at 274:21-24 ("[T]hat's certainly part of why *Mr. Cabrera's report is valid and can be relied upon*, is that he used a wide range of technical disciplines to address a wide range of technical needs.") (emphasis added); 265:4-9 ("The purpose [of this document] is to describe the content of Mr. Cabrera's report and why *the content of that report is valid and reasonable and can be relied on*.") (emphasis added); *see also* Dkt. 768 at 99 (Stratus representing in February 2013 that "based on scientific data collected during the Lago Agrio litigation, including data collected by Chevron, Stratus actually found that contamination was present at every single well site and station that was sampled . . . – a huge amount of environmental damage costing immense sums to remediate.").

[45] Guerra's Declaration gives the impression that Chevron "compensated" him for the value of the items taken from him (computers, phones, etc.) and for his "time and expenses" spent rounding up evidence. (Dkt. 746-3 at 8-9).  But that is not the case.  Chevron has produced an audio recording (and a transcript thereof) of a meeting between Guerra, attorney Andres Rivero, and an unidentified private investigator, during which the three discuss Guerra's prospects for compensation. (*See* Dkt. 1078-1.)  As Rivero was forced to admit, the money Chevron paid Guerra was the product of a negotiation that had nothing to do with time spent or the physical value of the evidence; rather, Chevron has paid Guerra based on how "good" his evidence is, incentivizing Guerra to fabricate evidence to extract further payments. (Ex. 79 at 161:9-17.)  To wit, Guerra explained to Chevron's representatives his dire financial situation—he had no salary at the time, and only enough saved two cover two months of ordinary expenses. (Dkt. 1078-1 at 19.)  Chevron's representatives initially told Guerra that they had brought with them to the meeting "twenty thousand in hand" that could be his, depending upon what he has to offer. (*Id*. at 51.)  Guerra responded that the $20,000 had "left [him] intrigued.  But there is very little here." (*Id*. at 61.)  At that price, Guerra stated that "[e]ven though one may be—be willing, but sometimes it can't be done, right?" (*Id*.)  Rivero informed Guerra that a "memory aid" that Pablo Fajardo supposedly emailed to Guerra, and other purported emails between Fajardo and Guerra, were the most crucial aspect of "what we want to buy from you," indicating that these items would result in greater payment. (*Id*. at 50.)  When Guerra stated that he may have "some attachment" to some of the items that Chevron wanted to take from him, Chevron's investigator responded: "You can become more attached to what you can buy with the money we pay you." (*Id*. at 66.)  Still, Guerra was reluctant to cooperate: "It helps, but it's so little." (*Id*. at 66.)  Chevron's representatives, however, assured Guerra that the *real* money would come if he could deliver Judge Zambrano: "[Y]ou get yours when a deal is reached with Zambrano. . . ." (*Id*. at 68.)  But Chevron also warned Guerra that if he failed to deliver Zambrano, he "will be left with nothing." (*Id*. at 48.)  Although Chevron eventually "bought" Guerra's computer, neither the supposed "memory aid" email, nor any other Fajardo/Guerra emails, nor the draft Judgment, materialized. (Ex. 79 at 173:5-174:15.)  But given the understanding that more evidence equals more cash, we are not surprised that, months later, a paper copy of the purported "memory aid" turned up in Guerra's files—albeit with no indicia that Fajardo prepared it or sent it to Guerra. (Ex. 28.)  Sure enough, Chevron paid Guerra an extra $10,000 for his fortuitous find. (*Id*.)

witnesses through thinly-veiled bribery, intimidation, and using its influence to threaten them with financial ruin, the record playing out before this Court may invite a similar characterization. We respectfully request that this Court help to bring these proceedings under control by striking the Bogart Declaration and ordering the Clerk to remove it from the public docket.  In lieu of striking the Declaration, Messrs. Camacho and Piaguaje request leave to serve a limited subpoena *duces tecum* on Burford.  Whether the Court strikes the Declaration, allows limited discovery, or grants neither of those requests, we also request that the Court: (1) strike Burford's confidentiality designations as to all documents attached to the Gomez Declaration submitted in support of this motion; (2) order the Clerk to substitute the unredacted version of this Memorandum of Law and related documents, including exhibits, on the docket in place of the redacted versions; and (3) order Burford that it must within 14 days make a particularized showing to the Court why any *other* specific document that it designated "confidential" should remain so, or else give up *all* of its confidentiality designations.  Finally, we request that the Court order Chevron and Burford to reimburse all fees and costs we incurred in bringing this motion (with a 50/50 split), and award any other sanction the Court sees fit.

| | |
|---|---|
| Dated:    June 20, 2013<br>              New York, New York | Respectfully submitted, |

*s/ Julio C. Gomez*
Julio C. Gomez
GOMEZ LLC
The Trump Building
400 Wall Street, 28th Floor
New York, New York  10005
Telephone:  212.400.7150
Facsimile:  212.400.7151
Email:  jgomez@gomezllc.com

*Counsel for Defendants Hugo Gerardo Camacho*
*Naranjo and Javier Piaguaje Payaguaje*

_s/ James K. Leader_
James K. Leader, Esq.
S. Alyssa Young, Esq.
LEADER & BERKON LLP
630 Third Avenue
New York, New York 10017
Telephone:  (212) 486-2400
Facsimile:  (212) 486-3099

_Attorneys for Non-Party Patton Boggs LLP_