UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                :

CHEVRON CORPORATION,         :

           Plaintiff,     :

                          :   CASE NO. 11-CV-0691 (LAK)

      v.                   :

STEVEN DONZIGER et al.,      :

           Defendants.   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

---

**JAVIER PIAGUAJE PAYAGUAJE'S, HUGO GERARDO CAMACHO NARANJO'S, AND NON-PARTY PATTON BOGGS LLP'S JOINT REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION TO STRIKE THE DECLARATION OF CHRISTOPHER BOGART FROM THE DOCKET, FOR AN ORDER GRANTING CAMACHO AND PIAGUAJE LEAVE TO SERVE A LIMITED DOCUMENT SUBPOENA ON BURFORD CAPITAL LLC AND ITS AFFILIATES, FOR AN ORDER STRIKING CONFIDENTIALITY DESIGNATIONS, AND FOR SANCTIONS AGAINST CHEVRON AND BURFORD**

---

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT .................................................................................1

ARGUMENT.............................................................................................................1

    I.    THE COURT SHOULD STRIKE THE BOGART DECLARATION.............1

    II.    CHEVRON'S OPPOSITION PAPERS UNDERSCORE THE
           IMPORTANCE OF ALLOWING LIMITED, ADDITIONAL
           DISCOVERY..........................................................................................3

CONCLUSION .......................................................................................................10

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

Cases

*Eaton, Cole & Burnham Co. v. Avery*,
    83 N.Y. 31 (1880) ................................................................................................2

*Griffin v. Mashariki*,
    96-cv-6400 (DC), 1997 U.S. Dist. LEXIS 19325 (S.D.N.Y. Dec. 8, 1997)............7

*Litvinov v. Hudson*,
    74 A.D.3d 1884 (N.Y. App. Div. 4th Dep't 2010) ................................................2

*My First Shades v. Baby Blanket Suncare*,
    No. 08-CV-4599 (MKB), 2012 U.S. Dist. LEXIS 181168 (S.D.N.Y. Dec. 21, 2012).............2

*Prestige Builder & Management LLC v. Safeco Insur. Co. of America*,
    896 F. Supp. 2d 198 (E.D.N.Y. 2012) ..................................................................2

*Rice v. Manley*,
    66 N.Y. 82 (1876) ................................................................................................2

*SEC v. Thrasher*,
    No. 92-cv-6987 (JFK), 1996 U.S. Dist. LEXIS 2141 (S.D.N.Y. Feb. 27, 1996) ....................7

## PRELIMINARY STATEMENT

Patton Boggs LLP ("PB") and the Lago Agrio Plaintiffs (collectively, "Movants") submit this reply brief in further support of their joint motion to strike the Declaration of Christopher Bogart, Dkt. 1039-2 (the "Bogart Declaration"), and in further support of the Lago Agrio Plaintiffs' request for permission to serve a limited subpoena *duces decum* on Burford.[1] Chevron has failed to explain the relevance of the Bogart Declaration, or demonstrate that its filing was anything other than a libel-proof public relations stunt.  Furthermore, Chevron's protestations to the contrary merely underscore the Lago Agrio Plaintiffs' need for additional discovery from Burford should the Declaration remain on the docket.  Chevron's arguments against permitting limited discovery are hollow; the proceedings will not be delayed, and Chevron will suffer no prejudice.[2]

## ARGUMENT

## I.      THE COURT SHOULD STRIKE THE BOGART DECLARATION

Chevron's contention that the Bogart Declaration was not just a public relations stunt rests upon its bogus claim of "funder fraud."  Chevron insists that it may premise a "third-party fraud" claim on the notion that the Lago Agrio Plaintiffs' alleged "lies to Burford . . . nett[ed] them $4 million to further their campaign."  (Dkt. 1297 at 15.)  Although Chevron stops short of articulating as much—probably because it sounds frivolous—the remainder of Chevron's theory must be that Burford's infusion of capital "damaged" Chevron by providing Chevron's foes with the means to continue litigating, whereas, without that capital, Chevron's foes would have given up, or would have at least been more readily dispatched.  Assuming *arguendo* that "third-party

---

[1] Movants stipulated to withdrawing as moot their request to lift Burford's improper confidentiality designations and their request that Burford reimburse their fees and costs associated with bringing this Motion.  (*See* Dkt. 1306.)

[2] Burford, the entity that would bear the burden of the limited discovery requested, has not submitted any opposition to this request, despite its knowledge that the Lago Agrio Plaintiffs would continue pursuing it.  (*See* Dkt. 1306.)

fraud" can, as a general matter, be a valid theory of recovery under New York law,[3] Chevron's "funder fraud" theory is certainly a bridge too far.  It does not resemble the purported "third-party fraud" cases identified by Chevron and the Court in earlier filings, which involve *plaintiffs* relying on defendants' misrepresentations delivered through an intermediary;[4] or defendants' misrepresentations to third parties that cause "direct harm" to the plaintiff.[5]  All that Burford is alleged to have done is provide money to litigants so that they could continue to pursue their claims and defend against Chevron's claims.  Burford's conduct did not and could not have "produce[d] [Chevron's] injury."[6]  And whatever one thinks about the merits of the Lago Agrio Plaintiffs' claims and defenses, it is more than a stretch for Chevron to suggest that the very act of continuing to litigate rather than rolling over is culpable conduct.  The Court implicitly seems to have recognized this when it compared the receipt of funding to the receipt of data processing equipment—both merely provide the means to litigate.  (*See* Dkt. 1329 at 28-29.)

Further, although Chevron maintains that the Bogart Declaration was not just a public relations stunt designed to injure PB's reputation, Chevron offers no explanation as to why it began launching its PR campaign before it filed the Bogart Declaration with this Court.  (*See*

---

[3] The Lago Agrio Plaintiffs' position that Chevron's third-party fraud theories are all invalid as a matter of law, and the Court's disagreement with that position, are matters of record that will not be rehashed here.

[4] *See, e.g.*, *Litvinov v. Hudson*, 74 A.D.3d 1884 (N.Y. App. Div. 4th Dep't 2010) (permitting fraud claim where court found that third party was "acting as an intermediary" between plaintiff and defendant, and defendant knew that plaintiff would ultimately rely on false statement); *Eaton, Cole & Burnham Co. v. Avery*, 83 N.Y. 31 (1880) (court held that fraud claim could be based on statements defendant made to third parties with the intent that they would ultimately be "communicated to the plaintiff and relied upon by it").

[5] *My First Shades v. Baby Blanket Suncare*, No. 08-CV-4599 (MKB), 2012 U.S. Dist. LEXIS 181168 (S.D.N.Y. Dec. 21, 2012) (where manufacturer sued competitor on theory that defendant used a false patent number on its product and in its marketing materials to confuse customers, who relied on the misrepresentation when buying defendant's product and not plaintiff's, court observed that "here the statements were made not to the general public but to Plaintiffs' customers and Plaintiffs were directly harmed by the loss of business."); *see also Prestige Builder & Management LLC v. Safeco Insur. Co. of America*, 896 F. Supp. 2d 198 (E.D.N.Y. 2012) (court permitted fraud claim to proceed where subcontractor sued employees of general contractor for falsely certifying to parks department that all subcontractors were paid, which caused parks department to withhold payment from plaintiff).

[6] *Rice v. Manley,* 66 N.Y. 82, 87 (1876) ("[I]t matters not whether the false representations be made to the party injured or to a third party, whose conduct is thus influenced to produce the injury.").

Dkt. 1329 at 9-10.)  Still, Chevron argues that a court may only consider the improper purpose of an affidavit in its analysis of whether to strike the affidavit if it is a *party* that is targeted.  (*See* Dkt. 1297 at 12.)  Chevron cites no authority supporting such a limitation.  Indeed, it would seem that defaming a non-party—who ordinarily cannot defend himself—should be more disfavored than defaming a party.  In any event, whether one characterizes it as libelous, a PR-grab, or both, the Bogart Declaration is an improper sideshow and should be treated accordingly.

## II.   CHEVRON'S OPPOSITION PAPERS UNDERSCORE THE IMPORTANCE OF ALLOWING LIMITED, ADDITIONAL DISCOVERY

The evidence cited in Movants' opening papers undercut the Bogart Declaration in two primary ways.  The documents show that neither Bogart nor any of his colleagues truly believes that PB duped Burford into funding the Lago Agrio Plaintiffs' case against Chevron.  (*See* Dkt. 1329 at 11-15.)  The documents also expose the falsity of Bogart's claim that Burford turned against the Lago Agrio Plaintiffs out of righteous indignation. (*See id*. at 15-20.)  The documents show that Burford's choice results instead from a combination of Chevron's extra-judicial pressure and maneuvering and Burford's perception that it alienated its corporate client-base by aligning itself with the plaintiffs' side of an environmental and human rights dispute. (*See id*. at 21-28.)  Chevron's efforts to salvage both aspects of the Bogart Declaration—together with the company's dogged assertion of meritless third-party "funder-fraud" claims—underscore that the Lago Agrio Plaintiffs are entitled to the limited, additional discovery requested.

***Bogart's condemnation of PB.***   Chevron has identified a convenient *post hoc* rationalization for the fact that Burford continued to seek opportunities to work with PB, and recommended PB to others, over two years after Chevron commenced this action naming PB as a "non-party co-conspirator."  Chevron's theory is that Burford's relationship with the Lago Agrio Plaintiffs' team can be divided into "three phases," the third phase commencing with "this

Court's order on the [PB] subpoena," whereupon Burford "realize[d] that [PB] had not been a dupe, but a willing participant in the LAP team's fraud . . . ."  (Dkt. 1297 at 29.)

The most obvious problem with Chevron's theory is the Bogart Declaration itself. Despite purporting to tell the comprehensive story of Burford's discovery that it had been hoodwinked, the Declaration says *nothing* about the March 15, 2013 Opinion.  If that Opinion really was an enlightening event for Bogart—one that supposedly motivated him to publicly excoriate PB—it seems that Bogart would have at least mentioned it, just as he portrayed as revelatory the Court's March 7, 2011 Opinion granting Chevron's preliminary injunction.  (*See* Dkt. 1039-2 at ¶ 30.)  Instead, Chevron, with literally *no* evidence (even though it has access to all of Burford's documents), speculates that the March 15, 2013 Opinion marked for Bogart and Burford the beginning of a new "phase."  If Bogart "forgot" this critical detail, Chevron should have at least obtained a supplemental declaration attesting to the supposed significance of the March 15, 2013 Opinion.  Instead, Chevron attempts to put words in Bogart's mouth.

***Chevron's manipulation of Burford.***  Chevron casts Movants' accusations regarding Chevron's manipulation of Burford as a flight of fancy.  To do so, Chevron misrepresents Movants' filing.  According to Chevron: "the motion asserts that Chevron's outside counsel pulled the strings at Burford for two years, deceiving this Court all the while.  But Movants' claimed support for this charge is that *Chevron's counsel called Burford's counsel on two occasions . . . .*"  (Dkt. 1297 at 8 (emphasis added).)  To the contrary, the following timeline of events leads Movants to conclude that Chevron "pull[ed] Burford's strings"—to such an extent that Burford's CEO apparently felt compelled to execute a false and misleading Declaration:

- **January 25, 2011:** Burford announces that one of Chevron's outside counsel, Ernest Getto of Latham & Watkins, has joined Burford as a Managing Director.  (Dkt. 1329 at 21.)  Prior to this official announcement, Getto, while still at Latham, apparently was receiving

Ecuador-related materials directly from Chevron, and forwarding them to his new colleagues at Burford. (*Id.*)

- **January 27, 2011:** Burford's Jon Molot notes that "Chevron has raised concerns with [Getto] about [his] joining Burford given that we have funded [PB's] role in the Ecuador litigation." (Dkt. 1329 at 21.)

- **January 27, 2011:** Bogart and others prepare Getto for a dinner meeting with Chevron's General Counsel, R. Hewitt Pate, to occur that evening. (Dkt. 1329 at 22.) Bogart expresses to Getto that Burford wants to extricate itself from its engagement with the Lago Agrio Plaintiffs, an engagement that is "far afield from [Burford's] core business of financing corporate litigation" and came about only because Burford's former Chairman took an interest in human rights litigation not shared by Bogart and his colleagues. (*Id.* at 23.) But Burford feels that it cannot abandon the matter without hurting its business reputation, unless and until Chevron levels allegations of misconduct specifically at PB. (*Id.*)

- **February 11, 2011:** After Chevron secures a TRO blocking the Lago Agrio Plaintiffs from enforcing any Ecuadorian judgment—a negative development for Burford's shareholders— Bogart emails Randy Mastro of Gibson Dunn: "Randy – Congratulations on a superbly executed campaign! Chris". (Dkt. 1329 at 23.)

- **March 3, 2011:** Chevron contacts Getto seeking a "substantive proposal" from Burford; Getto refers Chevron to the dialogue "channel" between Mastro and Burford's counsel. (Dkt.1329 at 24.)

- **June 2, 2011:** Bogart scolds a fellow investor for getting cold feet regarding the Ecuador matter, observing that the investor had been contemporaneously informed about "the shenanigans with Ernie," among other factors that led to the souring of Burford's relationship with the Lago Agrio Plaintiffs. (Dkt. 1329 at 22.)

- **June 28, 2011:** Fortune Magazine's Roger Parloff publishes an article entitled "*Have You Got a Piece of This Lawsuit?*", a story which appears to have been spoon-fed to Parloff, at least in substantial part, by Chevron's PR team. (*See* Dkt. 1329 at 26.) Parloff posits that Burford victimized thousands of unknowing individuals—many of whom are likely "British mums and dads"—by investing their capital in a "malodorous case" even after "U.S. courts had already issued rulings that found evidence of fraud by the plaintiffs' lawyers." (Dkt. 1260-17.) The embarrassing article capitalizes on Burford's "anxiety about [its] public perception," and places further pressure on Burford to renounce its support of the Lago Agrio Plaintiffs. (*See* Dkt. 1329 at 22.)

- **July 9, 2011:** Getto recounts a recent discussion with a former colleague at Latham who "really didn't know the Chevron story as it involved me." (Dkt. 1329 at 21.) Getto describes that Latham "had gotten an earful" from Chevron about "how the Burford relationship was hurting the firm," and that, in fact, Chevron had caused Latham to be "blackballed" owing to its ties to Burford. (*Id.* at 21-22.) Getto indicates that he is scheduled to meet with the Managing Partner of Latham's San Francisco office, who asked to speak with Getto after meeting with Chevron's Pate. (*Id.*)

- **Aug 3, 2011:**  Mastro reaches out to Burford; the contents of the conversation are presently unknown.  (Dkt. 1329 at 24.)

- **September 18, 2011:** Bogart and others draft a "Q&A" for Burford's board/ shareholders, which falsely assured Burford's constituents that "Ernie [Getto] has no connection to this [Ecuador] matter whatsoever." (Dkt. 1329 at 22.)

- **September 29, 2011:**  Burford transmits a scathing letter to Donziger and others, announcing that it will provide no more funding to the Lago Agrio Plaintiffs in light of alleged fraud. (Dkt. 714-1.)

On this record—particularly as laid out with greater context in the moving papers—there is substantial reason to believe that Burford noisily abandoned the Lago Agrio Plaintiffs because Chevron got its hooks into Burford, directly and indirectly.[7]  Chevron offers no alternative explanation for the most damning documents.  Chevron blithely calls Getto's statements about Chevron's "blackballing" of Latham—obviously intended to cause the capitulation of Burford, which has several close ties to Latham—"innocuous," with no explanation of how such pressure tactics could possibly be characterized as such.  (Dkt. 1297 at 33.)  Chevron does not, however, deny that this "blackballing" occurred.  Similarly, Chevron does not endeavor to explain Bogart's statement about "shenanigans with Ernie"; Chevron ignores that problem altogether. Perhaps most notably, Chevron does not deny that Mr. Mastro knew about Burford's September 29, 2011 letter before it was produced, but pretended that he did not as he advocated the supposed need for access to PB's funding-related documents. (*See* Dkt. 1329 at 24.)  Nor does Chevron deny that its lawyers played a role in the creation of a letter that Chevron now holds up as independent evidence of "fraud."  (*See id.*)  If these charges were untrue, one would expect to see evidence rather than rhetoric, or at least a sworn declaration from Mr. Mastro.  Instead,

---

[7] Burford also was motivated by feedback suggesting that Burford had alienated its client pool by stepping in on the plaintiffs' side of a dispute with a major corporation. (*See* Dkt. 1329 at 7, 27.)  Burford, like Latham & Watkins, seems to have been "blackballed," at least to a degree that caused consternation. This motivating factor may be distinct from the pressures that Chevron placed more directly on Burford, but discovery may show that the push-back Burford received from prospective clients was engineered by Chevron; using its influence to threaten its target's business is precisely how Chevron induced Stratus Consulting's capitulation.  (*See* Dkt. 768 at 92-112.)

Chevron offers only a hollow critique of Movants' supposed want of evidentiary support for the charges.  (*See* Dkt. 1297 at 34.)

\* \* \* \* \*

There is the rub.  Chevron cannot on one hand criticize Movants because documents produced thus far do not—at least according to Chevron—prove definitively that the Bogart Declaration is the end-product of Chevron's extra-judicial "shenanigans," yet, on the other hand, take the position that the Lago Agrio Plaintiffs should be denied discovery that may flesh out this story.   In a similar vein, notwithstanding the implausibility of Chevron's contention that evidence of good relations between Burford and PB well into 2013 is meaningless because Burford did not "discover" PB's supposed misdeeds until mid-March 2013, the Lago Agrio Plaintiffs have a right to test Chevron's *post hoc* theory.   That test can be accomplished by reference to the documents and communications leading to the Chevron/Burford settlement and the attendant Bogart Declaration.  It was not Chevron's mercy, or happenstance, which caused Chevron to stipulate that it would give up the pursuit of three categories of Burford's documents: (1) documents concerning PB's *Invictus* memorandum; (2) documents concerning compensation or benefits that Burford might receive arising from its involvement in this matter; and (3) communications between Chevron's and Burford's respective counsel.[8]    (*See* Dkt. 685.) Chevron and Burford did not want the Lago Agrio Plaintiffs to see these documents, which undoubtedly speak to Bogart's credibility, and likely to Chevron's powers of persuasion.[9] Indeed, the Bogart Declaration describes the *Invictus* memo as the principle mechanism by

---

[8] The December 20, 2012 Stipulation between Chevron and Burford indicates that Chevron withdrew from its subpoenas Request Nos. 1 and 7, which relate to the *Invictus* memo and to Burford's expected compensation, respectively.  (*See* Dkt. 685 at 2; Declaration of Julio C. Gomez, dated Aug. 1, 2013 ("Gomez Decl."), Ex. 1 at 2.)

[9] Indeed, Documents relating to a settlement agreement—which the Lago Agrio Plaintiffs request by way of their proposed subpoena—are routinely ordered produced for the very reasons they are sought here.  *See, e.g.*, *Griffin v. Mashariki*, 96-cv-6400 (DC), 1997 U.S. Dist. LEXIS 19325 (S.D.N.Y. Dec. 8, 1997):  *SEC v. Thrasher*, No. 92-cv-6987 (JFK), 1996 U.S. Dist. LEXIS 2141 (S.D.N.Y. Feb. 27, 1996).

which Burford was misled.  (*See, e.g.*, Dkt. 1039-2 at 8-9.)  We can see no rational explanation as to why Chevron would allow Burford to exclude documents concerning the memo from its production, other than the fact that these documents undermine Chevron's narrative.  Chevron's agreement to exclude documents concerning Burford's expected compensation and/or benefits is at first similarly puzzling, until one realizes that Chevron's excluded document request was broad enough to cover benefits promised to Burford *by Chevron*.  (*See* Gomez Decl., Ex. 1 at 2.)

Chevron's arguments against allowing the Lago Agrio Plaintiffs to serve their narrow proposed subpoena (*see* Dkt. 1257-1) on Burford are that the Lago Agrio Plaintiffs: (1) "had every opportunity to challenge Bogart in a deposition" and elected not to; (2) "knew of Burford's fraud allegations, and Chevron's contacts with Burford, long before the filing of this Motion," and (3) are attempting to "obstruct and delay" the proceedings by requesting additional discovery at this late hour.  (*See* Dkt. 1297 at 11, 37.)  We address these arguments *seriatim*.

*First,* never in this proceeding or any related proceeding has the Court denied Chevron document discovery on the basis that Chevron could just as easily sit down with the witness and ask him questions.  Now would be an especially unsuitable time to institute such a rule.  Just as Chevron would undoubtedly contend that it cannot be forced to rely solely on the word of the Lago Agrio Plaintiffs' representatives, so too is the case with Bogart.  This is a witness who claims, in a sworn Declaration, that he would have been scared off from the Ecuador investment had he known of former funder Joseph Kohn's allegations of fraud against Donziger, when, in fact, Bogart's real-time response to Kohn's allegations was a desire to *increase* his firm's stake in the case by buying out Kohn's stake on the cheap.  (*See* Dkt. 1329 at 17-18.)  This is a witness who claims that he was deprived of the opportunity to appreciate the seriousness of the *Crude* outtakes before it was too late, when the documents show that he viewed and commented on the

"worst" of those outtakes before Burford gave a penny to the Lago Agrio Plaintiffs.  (*See id*. at 18.)  Under these circumstances, there is no substitute for document discovery.

*Second*, Chevron's contention that the Lago Agrio Plaintiffs "knew of Burford's fraud allegations, and Chevron's contacts with Burford, long before the filing of this Motion" (Dkt. 1297 at 37), is a red herring.  Even if the Lago Agrio Plaintiffs "knew" of these facts before Chevron's filing of the Bogart Declaration, they would not have had good reason to expend time and money pursuing discovery from Burford.  With limitless resources, Chevron has made this case about everything and the kitchen sink.[10]  Until the Bogart Declaration, supposed "funder fraud" was far down on the list (if on the list at all) of issues—something that Mr. Mastro mentioned once or twice at a discovery hearing to no avail.  (*See* Dkt. 1329 at 28-29.)  Before Bogart became a Chevron witness in this proceeding on April 17, 2013, there would have been no point in pursuing discovery concerning the relationship between Chevron and Burford— whether or not the Lago Agrio Plaintiffs suspected that a relationship existed.

*Third*, Chevron's claim that requesting to probe the Declaration is an "obstruct and delay tactic" is just not true.[11]  Chevron will not be prejudiced one whit because there will be no "delay."  The Lago Agrio Plaintiffs already stated that they would not seek to push back any deadline on the basis of additional Burford discovery.[12]  (Dkt. 1329 at 33.)  Chevron's warning that "there is no guarantee" that the Lago Agrio Plaintiffs will not change their position is

---

[10] Months after convincing the Court to take the "environmental conditions in Ecuador" off the table (Dkt. 720), Chevron submitted a declaration by scientist David Russell, the ultimate conclusion of which is that "*[b]ased on all of the scientific information I have seen*, I am certain that Donziger and the Plaintiffs are lying about the *environmental conditions in Ecuador*."  (Dkt. 1141-2, Ex. 3708 at ¶ 33 (emphasis added).)  The Lago Agrio Plaintiffs are no closer today to understanding what a trial of this case is actually going to be about than we were when Chevron filed its blunderbuss Complaint over two years ago.

[11] The fact that it took substantial time to review thousands of Burford's documents, piece together what really happened, and draft a significant brief is no reason to deny discovery here.  Given that it is has the benefit of being on the offensive, it is not possible to know how long Chevron spends putting together the more fact-laden of its filings, with scores of exhibits, but we expect that Chevron has on occasion taken months to do so.

[12] If the Court finds it necessary, the Lago Agrio Plaintiffs will stipulate as such.

nonsensical.  (Dkt. 1297 at 38.)  Even if that were to happen—and it will not— the Court would not be required to oblige.  And the Court can easily ensure that Burford discovery matters conclude expediently and without effect on any other aspect of the proceedings by, for instance, delegating these matters to Magistrate Francis.  Moreover, the documents that the Lago Agrio Plaintiffs are *most* interested in—communications between Chevron and Burford (and their respective counsel)—are a finite, non-privileged universe; there is no reason why obtaining them should be time-consuming.  Finally, it is not as if this limited discovery would be a true outlier. Chevron, as recently as two days ago, continues to produce new documents obtained through § 1782 discovery, documents "recently produced to Chevron by third-parties in this action," and "documents recently gathered by Chevron."  (Gomez Decl., Ex. 2.)  Less than two weeks ago, Chevron sought reconsideration of a four-month old decision in an effort to obtain still more documents from non-party PB.  (Dkt. 1312.)  And on July 30, the Court referred to Magistrate Francis two other outstanding motions to compel discovery.  (Dkt. 1326.)  In sum, permitting the Lago Agrio Plaintiffs to serve their proposed subpoena on Burford will not delay any aspect of this case.  The Lago Agrio Plaintiffs should receive the requested discovery in the event that the Court declines to strike the Bogart Declaration.

<u>CONCLUSION</u>

For the foregoing reasons, as well as those stated in the moving brief, Movants respectfully request that the Court strike the Bogart Declaration from the docket.  Further, the Lago Agrio Plaintiffs alternatively request leave to serve their proposed, limited subpoena *duces tecum* on Burford.  Finally, for the reasons stated in the moving brief, Movants request that Chevron be ordered to reimburse some or all of the fees and costs associated with bringing this motion.

Dated:      August 1, 2013                    Respectfully submitted,
            New York, New York


                                              s/ Julio C. Gomez
                                              Julio C. Gomez
                                              GOMEZ LLC
                                              The Trump Building
                                              400 Wall Street, 28th Floor
                                              New York, New York  10005
                                              Telephone:  212.400.7150
                                              Facsimile:  212.400.7151
                                              Email:  jgomez@gomezllc.com

                                              *Counsel for Defendants Hugo Gerardo Camacho*
                                              *Naranjo and Javier Piaguaje Payaguaje*

                                              s/ James K. Leader
                                              James K. Leader, Esq.
                                              S. Alyssa Young, Esq.
                                              LEADER & BERKON LLP
                                              630 Third Avenue
                                              New York, New York 10017
                                              Telephone:  (212) 486-2400
                                              Facsimile:  (212) 486-3099

                                              *Attorneys for Non-Party Patton Boggs LLP*