UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :
CHEVRON CORPORATION,                                :
                                                    :
                          Plaintiff,                :
                                                    :
            -against-                               :          Case No. 11 Civ. 0691 (LAK)
                                                    :
STEVEN R. DONZIGER, et al.,                         :
                                                    :
                          Defendants.               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**CHEVRON CORPORATION'S  LOCAL RULE 56.1
STATEMENT OF MATERIAL FACTS IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT ON ITS RICO CLAIM,
SUMMARY JUDGMENT ON CERTAIN AFFIRMATIVE DEFENSES,
AND AN ORDER ESTABLISHING FINDINGS OF FACT
PURSUANT TO FED. R. CIV. P. 56(g)**

Pursuant to Local Civil Rule 56.1, Plaintiff Chevron Corporation ("Chevron") hereby

submits this statement of material facts as to which there is no genuine issue of fact to be tried.

//

//

//

//

//

//

TABLE OF CONTENTS

Page

I.      The Cabrera Report ........................................................................................ 1

II.     The Ecuadorian Judgment ........................................................................... 22

III.    Wire Fraud ................................................................................................... 39

TABLE OF ABBREVIATIONS AND DEFINED TERMS

| | |
|---|---|
| D. Def. __; LAP Def. __ | Affirmative Defenses, by number, asserted by Donziger and the LAPs, respectively. The defense are asserted in Defendants' operative answers: Dkt. 307 (Donziger) and Dkt. 259 (LAPs). |
| Beltman | Douglas Beltman |
| Cabrera Report | The expert report submitted in the Ecuadorian litigation under the name of the court-appointed expert, Richard Stalin Cabrera Vega |
| Defendants | All Defendants to this action generally |
| Donziger | Defendants Steven Donziger, The Law Offices of Steven R. Donziger, and Donziger & Associates PLLC |
| Ecuadorian Court Record | The official court record in the Ecuadorian litigation consisting of the hand-numbered pages 1 to 216338 maintained by the Provincial Court of Sucumbios in Lago Agrio, Ecuado |
| Fajardo | Defendant Pablo Estenio Fajardo Mendoza |
| Ecuadorian Litigation | *Maria Aguinda et al. v. Chevron-Texaco*, the litigation brought by the LAPs in Lago Agrio, Ecuador |
| LAP Team or Ecuadorian Plaintiffs' Team | The lawyers and other representatives of the Ecuadorian plaintiffs and their agents and employees, including but not limited to Donziger, Fajardo, Yanza, Stratus, Julio Prieto, Juan Pablo Saenz, Selva Viva, and the Amazon Defense Front |
| LAPs or Ecuadorian Plaintiffs | The plaintiffs in the Ecuadorian Litigation, including appearing Defendants Camacho and Piaguaje |
| Maest | Ann Maest |
| ROE | The Republic of Ecuador |
| Stavers Decl. | The Declaration of Jason B. Stavers, filed concurrently herewith |
| Stratus | Stratus Consulting, Inc. and, where the context indicates, Douglas Beltman, and Ann Maest |
| Yanza | Defendant Luis Francisco Yanza Angamarca |

## I.      The Cabrera Report

1.      **In 2006, Donziger and the Ecuadorian plaintiffs' team held private meetings with Judge Yánez, who was then presiding over the Ecuadorian litigation.**

- *Chevron Corp. v. Donziger*, 886 F. Supp. 2d 235, 256–57, 288–89 (S.D.N.Y. 2012) ("Fajardo had *ex parte* meetings with the judge . . .").

- Dkt. 28-9 at ECF 20 (DONZ00036235) (2006.03.11 Donziger personal journal entry recounting at least two March 2006 meetings between the LAPs' lawyers and Judge Germán Yánez Ricardo Ruiz without Chevron representatives present, stating: "Lunch meeting with judge. This was second meeting with judge – had lunch with him the previous Friday in the Cangrejo Rojo. I love it – this lobbying. I am good at it.").

- *Id*. at ECF 18 (DONZ00036233) ("lunch after with judge, he hits on Atossa and two Scandanavian [sic] woman [sic].").

- Dkt. 32-4 at 1 (DONZ00023182) (2006.7.26 Donziger emails Kohn: "Pablo met with the Judge today. The judge, who is on his heels from the charges of trading jobs for sex in the court, said he is going to accept our request to with-draw the rest of the inspections . . . . The judge also I believe wants to forestall the filing of a complaint against him by us, which we have prepared but not yet filed.").

- Dkt. 28-8 at ECF 11 (DONZ00027256 at 36) (2006.11.20 Donziger journal entry noting: "Meeting with Judge: on Sat night at Lupe's house.").

- Dkt. 28-8 at ECF 13 (DONZ00027256 at 38) (2006.11.16 Donziger journal entry noting: "Meeting with Judge in hotel: On Tuesday night in Hotel Auca.").

- Dkt. 402-13 at ECF 10 (Ex. 2313) (DONZ00042039) (2006.11.28 email in which Sáenz writes, "At the meeting we had with the judge yesterday regarding the global assessment, three things were clear.").

- Dkt. 402-13 at ECF 18 (Ex. 2314) (DONZ00042194) (2006.12.21 email in which Fajardo writes that he "met with the Judge today, and I can say that he will definitely not issue the order [authorizing global inspections] before the recess; he will issue it immediately afterward").

- Dkt. 28-8 at ECF 1 (DONZ00027256 at 26) (2007.01.19 Donziger journal entry recording: "Met with judge last night in house. Humble house, furniture. Made tea. I really like the guy. Remember last August I wanted

to ride the wave and get him off case?  This was an example of Pablo's total intelligence. We saved him, and now we are reaping the benefits.").

- Dkt. 28-7 at ECF 14 (DONZ00027256 at 10) (2007.03.01 Donziger journal entry stating: "On Friday night, Pablo and Luis met with the judge near the airport in his barrio in a restaurant."); *id.* (2007.03.01 Donziger journal entry stating: "Pablo returned to Lago and met with the judge. . . . The bottom line is that the judge asked us for help to protect him, like we did last August."); *id.* at ECF 5 (DONZ00027256 at 1) (2007.05.25 Donziger journal entry stating: "Two very disturbing meetings with Judge in Lago on May 21. First with Trudie and Luis – Yanza full of his charm and bullshit, starts blaming Texaco for filing too many papers. And then that night, I saw another side of Pablo. He called to ask if I would call the judge so we could go see him at his house. . . . I called the judge and he asked that we bring over some whiskey or some wine. We didn't. When we got there, he was clearly drunk and had a young woman.").

2.      **In these meetings, through means including showing him an ethics complaint against him which they threatened to file, Donziger and the Ecuadorian plaintiffs' team coerced Judge Yánez into terminating the judicial inspections then proceeding in the Ecuadorian litigation and instituting a single global inspection.**

- 886 F. Supp. 2d at 288–89 ("[T]he decisions to terminate judicial inspections, to pursue the global assessment, and to select Cabrera as the global expert were tainted by the duress and coercion applied to [the court] by Fajardo, Donziger, and perhaps others in *ex parte* meetings.").

- Dkt. 28-9 at ECF 2 (DONZ00027256 at 56) (2006.07.25 Donziger journal entry stating that if the judicial inspections are not cancelled "then we are in all-out war with the judge to get him removed").

- Dkt. 32-4 at 1 (DONZ00023182) (2006.7.26 Donziger emails Kohn: "Pablo met with the Judge today. The judge, who is on his heels from the charges of trading jobs for sex in the court, said he is going to accept our request to withdraw the rest of the inspections . . . . The judge also I believe wants to forestall the filing of a complaint against him by us, which we have prepared but not yet filed.").

- Dkt. 28-8 at ECF 29 (DONZ00027256 at 54) (2006.09.13 Donziger journal entry: "We wrote up a complaint against Yanez, but never filed it, while letting him know we might file it if he does not adhere to the law and what we need.").

2

- Dkt. 402-13 at ECF 18 (Ex. 2314) (DONZ00042194) (2006.12.21 email in which Fajardo writes that he "met with the Judge today, and I can say that he will definitely not issue the order [authorizing global inspections] before the recess; he will issue it immediately afterward").

3.    **Donziger and the Ecuadorian plaintiffs' team subsequently coerced Judge Yánez into appointing Richard Stalin Cabrera Vega ("Cabrera") as the global independent expert.**

- 886 F. Supp. 2d at 289 ("Judge Yánez appointed Cabrera as the LAP team had urged him to do").

- Dkt. 6-2 at CRS-361-11-CLIP-01, Dkt. 8-5 (Ex. 2 (certified transcript)) at 431, 434 (Donziger: "We have to keep pushing on all fronts at all times. . . . [A]ll this bullshit about the law and facts . . . but in the end of the day it is about brute force . . . . [Cabrera's appointment] took five months . . . five months of delay . . . and [the judge] never would have done[it] had we not really pushed him.").

- Dkt. 658-18 (Reyes Declaration) ¶ 30 (Reyes recommended Cabrera to the LAP team for the global expert role because, in Reyes's words, "for Mr. Cabrera, issues such as independence and professional standards were not that important, and therefore he would have no problem doing what the plaintiffs were proposing.").

- Dkt. 28-7 at ECF 22 (DONZ00027256 at 18) (2007.02.12 Donziger journal entry stating that he interviewed Cabrera and that he "may be the perfect foil for Chevron").

- Dkt. 28-7 at ECF 15-16 (DONZ00027256 at 11-12) (2007.02.27 Donziger journal entry, referring to Cabrera's appointment as the Global Expert: "I asked Pablo if he was 100% sure the judge would [appoint] Richard and not Echeverria, and he said yes, but given that this is the most important decision of the case thus far, there is simply no margin for error.").

- Dkt. 356-9 at ECF 152 (DONZ-HDD-0113389) (2007.06.13 Donziger email: When Cabrera was sworn in as the Global Expert, Donziger called it a "HUGE VICTORY", and went on to state, "Congratulations…. that visit to the judge last week was a huge help.").

4.      **On March 3, 2007, Steven Donziger, Pablo Fajardo, Luis Yanza, Ann Maest, and other members of the Ecuadorian plaintiffs' team met with Cabrera, without any attorney or representative of Chevron present, to plan the global assessment.**

- Dkt. 6-2 (Exhibit 1) (video of March 3, 2007 meeting in Ecuador attended by the LAPs' attorneys, the LAPs' technical experts, and Cabrera) at CRS-187-01-02 , 188-00-CLIP-02, 188-01-CLIP-01, 189-00-CLIP-02 ("and Richard, of course you really have to be comfortable with all that"), 189-00-CLIP-03 (Cabrera visible), 189-00-CLIP-05, 191-00-CLIP-02 (Cabrera introduces himself), CRS-191-00-CLIP-03 ("Chevron's main problem right now is that it doesn't know what the hell is going to happen in the global expert examination . . . . I hope none of you tell them please . . . . it's Chevron's problem. . . . the work isn't going to be the expert's. All of us bear the burden. . . . But all of us, all together, have to contribute to that report."), 192-00-CLIP-01 (Cabrera visible), 193-00-CLIP-01; Dkts. 7-2, 7-3, 7-4, 7-5 (Exhibit 2 (certified transcript)) at 169-235, 241-53.

- Dkt. 8-9 (Ex. 6) (Donziger Dep. Tr.) at 1120:23-1121:5 (Donziger testifying that "the primary purpose of the [March 3, 2007,] meeting" with Cabrera was to "lay out the entire case and legal theory for Mr. Cabrera and the other participants in the meeting").

- Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 2147:7-11 (Donziger admitting that during the March 3, 2007, meeting with Cabrera, he assumed Cabrera would be appointed as the court's global expert).

- Dkt. 1007-1 (Ex. 3653) (Maest Witness St.), ¶ 6 ("During this trip, on March 3, 2007, at the LAPs' representatives offices in Quito, Ecuador (also known as the 'Selva Viva' offices), I participated in a lengthy strategy meeting of the LAPs' team about preparation of the upcoming global expert report."); *id*. ¶ 8 ("Among those attending the March 3, 2007 planning meeting in Quito were Donziger, Pablo Fajardo, Luis Yanza, Fernando Reyes, and other consultants and lawyers for the LAPs. Also attending the meeting was Richard Cabrera, whom Pablo Fajardo referred to as a 'perito,' or expert. Donziger told me prior to the meeting that Cabrera would be there, and he was hoping Cabrera would be appointed as the Ecuadorian Court's expert tasked with performing the global damage assessment requested by the LAPs").

- Dkt. 658-18 (Reyes Declaration), ¶¶ 34-35.

5.      **At this meeting, Pablo Fajardo gave a presentation outlining the intended substance of the report Cabrera would file, and indicated that the Ecuadorian plaintiffs'**

team had already predetermined the outcome of the global assessment—that they themselves would write a report that would support their claim for billions of dollars against Chevron and would put Cabrera's name on it.

- Dkt. 6-2 (Exhibit 1) at CRS191-00-CLIP-03 (video of Fajardo stating that "[T]he work isn't going to be the expert's. All of us bear the burden."); Dkt. 7-5 (Exhibit 2) at 245 (certified transcript).

- Dkt. 6-2 (Exhibit 1) at 188-00-CLIP-02, 188-01- CLIP-01, 189-00-CLIP-02, 189-00-CLIP-03, 189-00-CLIP-05, 191-00-CLIP-02, 191-00-CLIP-03, 192-00-CLIP-01, 193-00-CLIP-01 (video of the March 3, 2007 meeting with Cabrera and subsequent discussions); Dkts. 7-2-7-5 (Exhibit 2 (certified transcript)) at 169-235, 241-53.

- Dkt. 1007-1, Ex. 3653 (Maest Witness St.), ¶¶ 6-9 ("It was clear from the presentations and from my discussions with people at the meeting that the LAPs planned to conduct the global damages assessment. In particular, I understood Fajardo's statements captured in the outtake from Crude: '[a]nd here is where we do want the support of our entire technical team . . . of experts, scientists, attorneys, political scientists, so that all of us will contribute to that report—in other words—you see . . . the work isn't going to be the expert's. All of us bear the burden,' to mean that the LAPs' lawyers and consultants would contribute to Cabrera's work and report.").

- Dkt. 658-18 (Reyes Declaration), ¶¶ 34-35.

**6.     On March 19, 2007, the Ecuadorian court announced the appointment of Cabrera as the global expert.**

- Dkt. 32-5 (2007.03.19 court order) at ECF 2 ("Mr. Richard Cabrera is appointed as the expert for the expert evaluation requested by plaintiffs . . . ").
- Dkt. 923 ¶ 48 (Donziger admission of this fact).

**7.     The Ecuadorian court ordered Cabrera to be "impartial" and "independent" and to ensure that his work was "transparent" and "independent from the two parties."**

- Dkt. 32-9 at ECF 3 (page no. "130,169 reverse") (Cabrera sworn to perform his duties "faithfully and in accordance with science, technology

and the law and with complete impartiality and independence vis-à-vis the parties").

- Dkt. 32-6 at ECF 2 (page no. "132,846 reverse") (2007.10.03 court order regarding Cabrera's duties: "The Expert [Cabrera] is hereby reminded that he is an auxiliary to the Court for purposes of providing to the process and to the Court scientific elements for determining the truth."); *id.* at ECF 6 (page no. "132,848 reverse") (ordering Cabrera to "perform his work in an impartial manner and independently with respect to the parties"); *id.* ("In reference to the persons acting as assistants to [Cabrera] in the sampling and other work being performed by the expert, these must be independent from the two parties."); *id.* at ECF 10 (page no. "132,850 reverse") ("the role of the expert is one of complete impartiality and transparency with respect to the parties and their attorneys").

8. **The Ecuadorian plaintiffs repeatedly asserted, to the Ecuadorian court, and to other audiences, that Cabrera was a "neutral" and "independent" court-appointed expert or "Special Master," and they denied any improper relationship with Cabrera.**

- Dkt. 400-2 (Ex. 2017) at ECF 90-91 (page nos. "129,696 reverse"– 129,697) (2007.05.10 LAP court filing asserting that: "The logic behind appointing a single expert who has not been nominated by the parties to perform the expert examination has been made clear on a number of occasions. This is primarily due to the issue of impartiality and procedural economy. Impartiality because, having not been named by either of the parties, he will be even more objective in his analysis and conclusions. . . .").

- Dkt. 402-12 (Ex. 2308) at ECF 78-79 (page no. "134,001 reverse," 134,004) (2008.01.11 LAP court filing asserting that: "Cabrera was not proposed by the plaintiffs" and "was not appointed at the suggestion of the plaintiffs," but was nominated by the court).

- Dkt. 36-5 at ECF 3 (page no. "140,167 reverse") (2008.04.04 LAP filing stating that the notion that Cabrera "works for us" is "simply ridiculous").

- Dkt. 400-2 (Ex. 2019) at ECF 122-23 (page no. "140,184 reverse"– 140,185) (2008.04.18 LAP filing stating: "I remind you, Mr. President, that expert Cabrera was given the task because of his professional and personal suitability, and as such, his work should be free of external pressures from the parties, especially when these pressures can compromise the systematic integrity of his work in an attempt to turn this professional designated by the court into a mere executor of their plans and strategies.").

- Dkt. 36-6 at ECF 2 (page no. "140,266 reverse") (2008.04.25 LAP filing asserting that the allegation that the LAPs have a "close relationship with the Independent Expert Richard Cabrera" is "[a]nother infamy").

- Dkt. 30-5 at ¶ 29 (2010.01.14  LAP complaint to stay arbitration asserting that: "The best and most recent independent estimate available of the human health impact of this contamination is provided by the neutral Special Master appointed by the court to provide advice on damages.").

- Dkt. 47-57 at 27 (2010.07.09 LAP filing in Stratus 1782 asserting that: "Cabrera is not even an expert for one party, but a Court-appointed neutral.").

- Dkt. 47-30 at 7 (Donziger testimony before the Lantos Commission that: "The best and most recent independent estimate available of the human health impact of this contamination is provided by the expert appointed by the court, Richard Cabrera.").

- Dkt. 47-28 (Ex. 267) (2008.03.18 letter from Amazon Watch to the SEC seeking investigation and sanction of Chevron for alleged failure to comply with securities regulations, emphasizing the independence of the forthcoming Cabrera Report).

- Stavers Decl. Ex. 4108 (Shinder Dep. Tr.) at 68:5-69:22 (Donziger and others hid the Stratus-Cabrera relationship from Constantine Cannon); Stavers Decl. Ex. 4101 (ChevPriv-00000844).

- Stavers Decl. Ex. 4106 (McDermott Dep. Tr.) at 56:10 to 57:20 (Weinberg group was told by Donziger and others that Cabrera was independent; No one told Weinberg about LAPs meetings or ghostwriting of the Cabrera Report).

- Dkt. 1039-2 (Declaration of Christopher Bogart) at ¶ 4 (". . . plaintiffs assured Burford in writing that Cabrera was an "independent," "court-appointed" expert akin to a US Special Master supervising "14 independent scientists" in preparing a "court-ordered damages report" and that Chevron's allegations regarding Cabrera's relationship with the LAP team were "false" and "twisting the truth."); id. at ¶ 10-12 (Patton Boggs assured Burford of the propriety of contacts with Cabrera).

- Stavers Decl. Ex. 4104 at 2 (DONZ00030787). (2008.12.01 e-mail exchange between Mr. Donziger and *Latin Lawyer* reporter Felicity Harrison in which Donziger writes: "Our side had nothing to do with the Cabrera report; it was done independently of the parties . . . the plaintiffs never paid Cabrera; the court did.").

- Dkt. 47-31 (Ex. 270) at 1 (2009.01.31 email in which Stratus sent the Cabrera Report to Congressman Jim McGovern and represented it as the work of a "court expert").

**9.     On at least 11 occasions after the appointment of Cabrera, Cabrera submitted filings to the Ecuadorian court denying any relationship with the plaintiffs or bias favoring the plaintiffs.**

- Dkt. 400-3 (Ex. 2029) at ECF 52 (page no. "131,338 reverse") (2007.07.12 Cabrera letter referencing "the complete and absolute impartiality with which I must act in carrying out the expert evaluation").

- Dkt. 35-9 at ECF 1 (page no. "131,972 reverse") (2007.07.23 Cabrera letter) (Cabrera letter stating, "I do not have any relation or agreements with the plaintiff, and it seems to me to be an insult against me that I should be linked with the attorneys of the plaintiffs.").

- Dkt. 400-3 (Ex. 2030) at ECF 59 (page no. "132,263 reverse") (2007.08.23 Cabrera letter reporting that, "In order to demonstrate the transparency, and impartiality and objectivity with which I am performing the field work . . . I chose to draft a sample registry sheet").

- Dkt. 401-7 (Ex. 2178) at ECF 3 (page no. "133,180 reverse") (2007.10.11 Cabrera letter stating, "The defendant's attorneys allege that the plaintiff is in 'close contact' with me, and that the plaintiff has provided me with technical information and support staff to assist with the expert examination. This is untrue. If I need any technical information in connection with this case, all I have to do is request it from this Court; the idea that the plaintiffs would be helping me with that is unthinkable.").

- Dkt. 400-3 (Ex. 2031) at ECF 64 (133,254 (reverse)) (2007.10.16 Cabrera letter stating that Cabrera's "duty as expert is to comply with the law").

- Dkt.400-3 (Ex. 2032) 3 at ECF 69 (page no. "133,465 reverse") (2007.10.31 Cabrera letter stating, "I can only confirm my commitment to continue my work with absolute impartiality, honesty and transparency.").

- Dkt. 400-3 (Ex. 2033) at ECF 73 (page no. "133,582 reverse") (2007.11.08 Cabrera letter asking the court to order public and private institutions to provide him with essential information so he can "conduct a thorough, impartial and objective investigation in strict observance of the law").

- Dkt. 400-3 (Ex. 2034) at ECF 78 ("133,907 reverse") (2007.12.10 Cabrera letter stating, "I hope and I am certain that my report, which is completely impartial, will help bring to light the truth of the matters in dispute.").

- Dkt. 35-10 at 7 (2008.10.07 Cabrera letter stating that "I am an honest man with nothing to hide, and my conduct as an expert in this case has been as professional, impartial and objective as possible, as can be seen from my expert report. The fact that neither of the two parties is fully satisfied with my report is clear evidence of my impartiality.").

- Dkt. 36-4 at ECF 2 (page no. "154,480 reverse") (2009.03.04 Cabrera response to questions regarding Cabrera's independence: "Once more I make it a matter of record that I have done my work, with my technical team, in adherence to my principles of integrity and, without a desire to negatively affect or benefit either party . . . .").

- Dkt. 400-3 (Ex. 2035) at ECF 83 (2010.03.22 Cabrera letter stating, "Chevron accuses me of having a conflict of interest . . . . Your Honor, this is another serious and false accusation.").

**10.   On or about July 1, 2007, the Ecuadorian plaintiffs' team entered into a contract with Cabrera and purchased life insurance for him.**

- Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 3800:9-3808:16, 4842:22-4843:18 (Donziger testifying that the LAPs' counsel had entered into a contract with Cabrera and purchased life insurance for him).

- Dkt. 400-3 (Ex. 2027) at ECF 37-38 (DONZ00062501) (2007.07.01 email from Fajardo mentioning a conversation with Cabrera "about a little mistake in the contract," suggesting that the LAPs' representatives "help [Cabrera] get an office" and arrange for Prieto's girlfriend to be his assistant, and asserting that the LAPs have a "duty to help [Cabrera] get insurance").

- Dkt. 400-3 (Ex. 2028) at ECF 45 (2007.07.11 email discussing life insurance quotes for Cabrera).

**11.   On July 23, 2007, Cabrera submitted a filing to the Ecuadorian court in which he stated "I should clarify that I do not have any relation or agreements with the plaintiff, and it seems to me to be an insult against me that I should be linked with the attorneys of the plaintiffs."**

9

- Dkt. 35-9 at ECF 1 (page no. "131,972 reverse") (2007.07.23 Cabrera letter) (Cabrera letter stating, "I do not have any relation or agreements with the plaintiff, and it seems to me to be an insult against me that I should be linked with the attorneys of the plaintiffs.").

### 12. The Ecuadorian plaintiffs' team secretly prepared Cabrera's work plan for him and worked closely with him in carrying it out.

- 886 F. Supp. 2d at 289 ("There is no genuine issue with respect to the facts that the LAP team secretly prepared [Cabrera's] work plan [and] worked closely with him in carrying it out[.]").

- Dkt 6-2 (Ex. 1) at CRS-189-00-CLIP-02; Dkt. 7-4 (Ex. 2 (certified transcripts)) at 223-27 (Donziger proposed forming a "work committee" to draft Cabrera's "work plan" with the goal of having "more or less eighty percent-ninety percent on the way to a plan" in a few days).

- Dkt. 8-9 (Donziger Dep. Tr.) at 2203:4-17 (the LAPs' counsel and consultants ghostwrote Cabrera's work plan, were involved in Cabrera's site selection, and suggested Cabrera's sampling protocols); *id.* at 2177:8-2178:15 (The Ecuadorian Plaintiffs' Team controlled the composition of Cabrera's work team); *id.* at 2406:7-11) (The "work plan that Mr. Cabrera submitted was the one provided to him by the plaintiffs.").

- Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 2165:2-6 ("Q. Did the plaintiffs' team draft the Cabrera work plan? A. I believe the plaintiffs' team drafted a work plan that was given to him for his adoption."), *id.* at 2184:3-2186:4 (Donziger testimony regarding plaintiffs' team involvement with Cabrera's site selection); Dkt. 400-4 (Ex. 2044) (Cabrera's work plan filed with the Lago Agrio court).

- Dkt. 32-12 (Ex.156) (DONZ00062680) (Donziger wrote, "My tendency is to stop Richard [Cabrera] from working much more in the field ... or, if he continues doing it, he should continue under the most strict control with an extremely limited number of samples. And we'll change the focus of the data at our offices.").

- Dkt. 1007-1, Ex. 3652 (Beltman Witness St.), ¶ 16 ("At no time did I ever see any indication of an independent Cabrera 'team' nor did I ever meet anyone I understood to be a member of Cabrera's 'independent team.' To the contrary, individuals that I am aware of who assisted in preparing the Cabrera Report were affiliated with or working at the direction of Donziger and the LAPs' representatives.").

13. **Cabrera filed the report bearing his name with the Ecuadorian court on April 1, 2008.**

- Dkt. 33-12 (Filed-stamped excerpt of the Cabrera Report).

- Dkt. 8-6 (Ex. 3) at 10 (annotated Crude tape log showing that clips CRS447 to CRS450, capturing "Turning in of Peritage Global," were filmed on April 1, 2008).

- Dkt. 34- 19 (Ex. 194) (2008.04.02 Amazon Defense Front press release announcing the filing of the Cabrera report on "Tuesday") (N.B. April 1, 2008 fell on a Tuesday).

14. **The report stated that it had been "prepared by the Expert Richard Stalin Cabrera Vega" with the help of "my technical team, which consists of impartial professionals."**

- Dkts. 33-12 (Cabrera Report) at 1-2.

15. **The main body of the report and most of its appendices were written by Stratus or other Ecuadorian plaintiffs' consultants working at Stratus's direction.**

- 886 F. Supp. 2d at 289 (The Cabrera Report "was not entirely or even predominantly [Cabrera's] own work or that of any assistants or consultants working only for him. There is no genuine issue with respect to the facts that the LAP team secretly prepared his work plan, worked closely with him in carrying it out, and drafted most of the report and its annexes.").

- Dkt. 400-4 (Ex. 2046) at 1-2 (DONZ00083815) (LAP team internal memo: "The Cabrera Report is a series of 17 annexes; in all, 11 of them were prepared by Stratus and adopted by Cabrera.").

- Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 2377:21-2378:9 (Donziger testifying that Stratus drafted "an actual report with annexes in Cabrera's name"); *id.* at 3400:3-9 (Donziger testifying that, as of March 2010, he knew that "Stratus had drafted a substantial number of annexes that were adopted by [Cabrera] verbatim that were included in his report").

- Dkt. 8-9 (Donziger Dep. Tr.) at 2433:8-14 (Donziger: the Cabrera Report as filed was "pretty much verbatim" as written by the LAPs' counsel and consultants).

11

- Dkt. 400-4 (Ex. 2047) at 1-2 (DONZ-HDD-0004621) (Donziger admitting that if Chevron's attorneys obtained discovery, "they will find that Stratus wrote the bulk of the report adopted by Cabrera and submitted to the court.").

- Dkt. 32-16 (STRATUS-NATIVE043270-043278) (Stratus contracted with Kohn, Swift & Graf to write Cabrera Report); Dkt. 32-17 (STRATUS-NATIVE066482-84) (same); Dkt. 32-18 (DONZ00026949) (same).

- Stavers Decl. Ex. 4108 (Shinder Dep. Tr.) at 62:9-25 (Beltman told Shinder, with Donziger present, that Stratus "wrote the [Cabrera] report.").

- Dkt. 32-13 at 1 (DONZ00061973) (2007.03.28 to 2007.04.03 email exchange in which David Chapman (Stratus) states: "I think the way this would work best is that if Stratus did much of the work, putting the pieces together and writing the report.").

- Dkt. 6-2 (Exhibit 1) at CRS-269-01-04, 269-01-08; Dkt. 7-10 (Exhibit 2 (certified transcript)) at 355-62 (Donziger and Stratus discuss damages categories to include in Cabrera Report).

- Dkt. 1007-1 (Ex. 3652) (Beltman Witness St.), ¶ 17 ("At no point during Stratus's time working on the Ecuador Project, including at the January 2008 meeting, did I have an understanding that Cabrera was preparing his own report. It was clear from statements Donziger and others made that the LAPs' team expected the Lago Agrio court to rely upon the Cabrera Report in rendering its judgment. "); *id.*., ¶¶ 20-31 (describing how—at Donziger's direction—Beltman prepared drafts of the "Summary Report of Expert Examination" of the Cabrera Report and the coordinated authorship of annexes to the Cabrera Report); Dkt. 1007-1, Ex. 3653 (Maest Witness St.), ¶¶ 30 (same).

- Dkt. 32-19 (Ex. 163) (2008.02.08 email from Beltman to Donziger attaching draft copy of "Outline for PG Report").

- Dkt. 33-2 (Ex. 168) (STRATUS-NATIVE043232) (2008.02.22 Beltman email to Stratus employees telling his team that they will draft the Cabrera Report: "The project is at a key point right now. We have to write, over the next 2 to 3 weeks, probably the single most important technical document for the case. . . . We (the case attorneys, the case team in Quito, and Stratus) have put together a very ambitious outline for this report. The people in the Quito office are working on some parts, and we're working on others.").

- Dkt. 32-20 (STRATUS-NATIVE043849) (2008.02.26 email from D. Beltman to A. Maest and others at Stratus with subject line "Ecuador annex schedule" and attachment entitled "DRAFT – Outline for PG Report," outlining plan for attributing authorship of the annexes Stratus was drafting to Cabrera and others); *id.* at 1 (Beltman: "The summary

12

Peritaje Global report (~50 pages). This is what I will be working on mostly, and it will take most of my time over the next two weeks.").

- Dkt. 33-4 at 1 (2008.02.27 Email from Beltman to Donziger: "Attached is my rough start of the Peritaje Global report. . . . Would you let me know if you think I'm on track in terms of tone, language level, and content?").

- Dkt. 34-7 at 1 (STRATUS-NATIVE063676) (Beltman emailing Donziger regarding the fact that Powers' name needed to be taken off his report before it was filed as an annex to the Cabrera Report).

- Dkt. 33-5 (Powers Dep. Tr.) at 95:14-22, 109:2-7, 251:4-253:1, 255:5-256:13 (LAP expert Bill Powers testifying that a "similar" version of a report he prepared and emailed to Stratus was filed as Annex S of the Cabrera Report and that calculations he prepared were incorporated into Annex T of the Cabrera Report).

- Dkt. 33-7 (Ex. 173) at 2 (STRATUS-NATIVE069116-7) (2007.03.06 Beltman Email: "Here is the Uhl report, cleaned and sanitized.").

- Dkt. 32-21 (STRATUS-NATIVE040664) (2008.03.10 email from Beltman to Maest  with subject "Annex translation update").

- Dkt. 33-3 at 1 (STRATUS-NATIVE053742) (Beltman "My goal is to have the entire report drafted by COB Tuesday. Based on how things are going, our current translators will take more than a week to turn it around . . . And [sic] that's not much time before it has to go to the court on Monday.").

- Dkt. 33-10 at 1 (STRATUS-NATIVE058388–419) (email from Beltman to translators attaching a draft of the Cabrera Summary Report in English and requesting that it be translated into Spanish for the upcoming submission to the Ecuadorian court).

- Dkt. 53-6 (STRATUS-NATIVE063142) (Beltman emailing Cabrera Report revisions to Ecuadorian counsel and Donziger less than one week before it was filed).

- Dkt. 104-2 at 1-2 (STRATUSNATIVE069123-24) (Donziger asking Beltman for feedback regarding the damages tables for the Cabrera Report on March 30, 2008, less than 36 hours before the Cabrera Report was filed).

- Dkt. 53-8 (2008.04.01 email from Ann Maest to Beltman attaching Cabrera's "Declaration Of Findings").

- Dkt. 355-42 at 1 (DONZ00045505) (2008.04.01 email from "gringograndote@ gmail.com" to Donziger attaching a Word version of the Cabrera Report identical to filed version and last saved hours before the Cabrera Report was filed in Ecuador); Dkt. 355-43 (DONZ00045506) at 1-62 (Word version of the Cabrera Report identical to filed version and last saved hours before the Cabrera Report was filed in Ecuador).

- Dkt. 402-4 (Ex. 2250) ¶ 24 (Declaration of Michael F. McGowan concluding that the "text of the 'INFORME SUMARIO VERSION FINAL(Steve).doc' document attached to the Gringograndote Email and the Forwarding Email is identical to text of the report filed by Richard Cabrera on April 1, 2008."); *id.* ¶ 27 (providing last saved and print times).

- Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 5014:22-5016:7 (Donziger testifying that he had a Word version of the Cabrera Report in his possession before it was filed in Ecuador); *id.* at 2490:12-18.

- Dkt. 47-55 at 1, 3 (DONZ00031368) (email exchange between the LAPs' counsel, noting "we do better by explaining that we authored the report," discussing a need "to acknowledge that we authored portions of the report," and emphasizing that they would not benefit from "denying what is already apparent (that we authored portions of the report)").

- Dkt. 400-16 (Ex. 2105) (2011.06.30 McMenamin Declaration) ¶¶ 3, 9(a).

**16.     Donziger personally oversaw the writing of the report submitted by Cabrera.**

- Dkt. 33-4 (Ex. 170) at 1 (Beltman email to Donziger stating "[a]ttached is my rough start of the Peritaje Global report," and asking whether it is "on track in terms of tone, language level, and content?" Donziger responds, "I think it's working.  Keep going.").

- Dkt. 1007-1, Ex. 3653 (Maest Witness St.), ¶ 21 ("I had previously taken direction for my work on the project from Donziger, and, from that point forward, Stratus took its direction for its work on the Ecuador Project from Donziger. . . . Donziger indicated what tasks he wanted Stratus to perform, edited and approved drafts of statements or reports Stratus would issue, and assigned, approved, and directed all of Stratus' work on the Ecuador Project.  It is my understanding that from Stratus's retention in August 2007 until its work on the matter ceased, Donziger was Stratus's principal point of contact for its work on the Ecuador Project."), *id.* at ¶ 23 ("Donziger exercised near complete control over major decisions of strategy for the Ecuador Project, particularly as related to our work."); Dkt. 1007-1, Ex. 3652 (Beltman Witness St.), ¶¶ 2-4 (same)

- Dkt. 1007-1, Ex. 3652 (Beltman Witness St.), ¶ 9 (regarding Stratus's contract: "Stratus 'shall coordinate with and receive technical direction regarding the scope of work from Clients' Project Manager.' I understood that Donziger was the Clients' Project Manager.").

- Stavers Decl. Ex. 4109 (Beier Dep. Tr.) at 103:1-104:14 (Beltman told Beier that Donziger and Fajardo had instructed him to draft the Cabrera Report and comments).

- Dkt. 1007-1, Ex. 3652 (Beltman Witness St.), ¶ 27 ("Donziger and Fajardo told me to whom authorship of the Cabrera Report Annexes

should be attributed . . . to make it more difficult to uncover that Stratus had written the Annexes.").

- Dkt. 104-2 at 1-2 (STRATUSNATIVE069123-24) (Donziger discussing changes to the damages awards in the Cabrera Report with Beltman on March 30, 2008, less than 36 hours before the Cabrera Report was filed).

- Stavers Decl. Ex. 4108 (Shinder Dep. Tr.) at 136:8-137:10 (Donziger told Shinder that he was the "lead lawyer . . . crusading on behalf of the [LAPs]."  Shinder believes Donziger was involved in and supervising the day-to-day direction of the Lago Agrio litigation in Ecuador.).

- Stavers Decl. Ex. 4107 (Silver Dep. Tr.) at 111:16 to 113:15 (Beltman told Silver that the report-drafting process was "odd."  Donziger apparently assured Beltman that the procedures being undertaken by Stratus "at Donziger's direction" were "how it was done in Ecuador.").

17.    **Donziger and the Ecuadorian plaintiffs' team continued to revise the**

**Cabrera report until just before Cabrera filed it.**

- Dkt. 1007-1, Ex. 3652  (Beltman Witness St.), ¶ 24 ("I continued to provide comments on and material for the Summary Report and annexes to Donziger and the LAPs' team members in Quito up to the night of March 30, 2008, when I provided comments to Donziger on a draft damages table for the Summary Report that I had received from him.").

- Dkt. 104-2 at 1-2 (STRATUSNATIVE069123-24) (Donziger asking Beltman for feedback regarding the damages tables for the Cabrera Report on March 30, 2008, less than 36 hours before the Cabrera Report was filed)

- Dkt 33-12 (Cabrera Report submitted April 1, 2008 including damages table discussed by Donziger and Beltman on page 6).

- Dkt. 53-6 (STRATUS-NATIVE063142) (Beltman emailing Ecuadorian counsel and Donziger revisions to the Cabrera Report less than one week before it was filed).

- Dkt. 355-42(DONZ0045505) and Dkt. 355-43 (DONZ00045506) (email from "gringograndote@ gmail.com" to Donziger attaching a Word version of the Cabrera Report that according to the metadata was last saved mere hours before the Cabrera Report was filed in Ecuador and that is identical to the filed version of the Report).

- Dkt. 402-4 (Ex. 2250) ¶ 24 ((Declaration of Michael F. McGowan concluding that the "text of the 'INFORME SUMARIO VERSION FINAL(Steve).doc' document attached to the Gringograndote Email and

15

the Forwarding Email is identical to text of the report filed by Richard
Cabrera on April 1, 2008."); *id.* ¶ 27 (providing last saved and print
times).

- Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 5014:22-5016:7 (Donziger
  testifying that he had a Word version of the Cabrera Report in his
  possession before it was filed in Ecuador).

**18.    Donziger does not know if Cabrera ever read the report submitted in his**

**name.**

- Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 2249:3-12, 2590:20-
  2591:22 (Donziger testifying that he does not know whether Cabrera
  drafted any portion of his report or whether he even reviewed it before it
  was filed).

**19.    On November 17, 2008, Cabrera filed a supplemental report responding to**

**objections to his report by the parties.**

- Dkt. 400-4 (Ex. 2048) (Cabrera Supplemental Report entitled "Answers
  by the Expert Richard Cabrera, with the Support of His Technical Team,
  to the Questions and Comments Made by the Plaintiff").

**20.    The answers filed by Cabrera in response to the Ecuadorian plaintiffs' (and**

**Chevron's) objections—like the report itself—were drafted at least in substantial part by**

**the Ecuadorian plaintiffs' team and written to read as if Cabrera had written them.**

- 886 F. Supp. 2d at 289 ("The answers filed by Cabrera in response to the
  LAPs' (and Chevron's) objections—like the report itself—were drafted at
  least in substantial part by the LAP team and written to read as if Cabrera
  had written them.").

- Dkt. 1007-1, Ex. 3652 (Beltman Witness St.), ¶ 45 ("I understood that
  Cabrera filed the "Cabrera Response" based at least in part on text written
  by the LAPs' representatives and consultants, including Stratus, on
  November 17, 2008. The Cabrera Response incorporated work,
  calculations, and text written by Stratus, among others, and increased the
  damages assessed in the Cabrera Report from $16 billion to $27 billion.");
  Dkt. 1007-1, Ex. 3653 (Maest Witness St.), ¶ 43 (same).

- Dkt. 9-4 at 2 (STRATUS-NATIVE051389) (Stratus team members
  discussed the preparation of the Supplemental Cabrera Report and the

16

need to "clean up the language" of a portion of the supplemental report "so it sounds more like the Perito [Cabrera] and less like a comment.").

- Dkt. 34-21 (STRATUS-NATIVE053480) at 1; Dkt. 400-1 (Ex. 2010) (Donziger Dep.) at 2962:9- 2963:23 (Donziger testifies: "I believe Stratus prepared the [November report] materials in the hope that [Cabrera] would adopt them, sort of how they did with the annexes and executive summary.").

21. **Donziger instructed Stratus to keep its role in writing the Cabrera report a**

**secret.**

- Dkt. 1007-1, Ex. 3653 (Maest Witness St.), ¶ 12 ("In discussions around the time of the March 2007 meetings, Donziger made it clear to me that it was vital that the coordination between the LAPs and Cabrera be kept secret."); *id*. at ¶¶ 17, 25; Dkt. 1007-1, Ex. 3652 (Beltman Witness St.), ¶ 10 (same).

- Dkt. 1007-1, (Ex. 3652) (Beltman Witness St.), ¶ 11 ("At Donziger's direction, Stratus also represented the Cabrera Report as having been prepared by Cabrera, including confirming the understanding of prospective endorser Lou Blanck that the 'report is by an expert appointed by the judge . . . '").

- *Id*. at ¶ 62 ("Under Donziger's direction and oversight, I drafted and made presentations to funders and potential funders of the litigation . . . . At Donziger's insistence, I did not reveal Stratus's or the LAPs' representatives' involvement in drafting the Cabrera Report or the Cabrera Response, or Cabrera's connection to the LAPs during any of these presentations.").

- *Id*. at ¶ 65 ("On May 3, 2009, *60 Minutes* aired a segment called Amazon Crude. I was present in Ecuador during the *60 Minutes* filming. Per Donziger's instructions, I did not reveal Stratus's or the LAPs' involvement in drafting the Cabrera Report, or Cabrera's connection to the LAPs' team.").

- Dkt. 7-6 (Exhibit 2 (certified transcript)) at 266 (Donziger: "Our goal is that they [Chevron] don't know shit.").

- Dkt. 400-4 (Ex. 2043) at ECF 15 (LAP team plan, with instruction "Everyone silent" next to the planned date for submission of the Cabrera report).

22.     **Donziger and the Ecuadorian plaintiffs' team's undisclosed role in drafting the Cabrera report and controlling its contents was contrary to the orders of the Ecuadorian court and contrary to Ecuadorian law.**

- Dkt. 32-6 (Ex. 151) at ECF 2 (page no. "132,846 reverse") (2007.10.03 court order stating that: "The Expert [Cabrera] is hereby reminded that he is an auxiliary to the Court for purposes of providing to the process and to the Court scientific elements for determining the truth."); *id*. at ECF 6 (ordering Cabrera to "perform his work in an impartial manner and independently with respect to the parties"); *id*. ("In reference to the persons acting as assistants to [Cabrera] in the sampling and other work being performed by the expert, these must be independent from the two parties."); *id*. at ECF 10 (ordering Cabrera to maintain "complete impartiality and transparency with respect to the parties and their attorneys").

- Dkt. 32-9 (Ex. 154) at ECF 3 (page no. "130,169 reverse") (Cabrera sworn to perform his duties "faithfully and in accordance with science, technology and the law and with complete impartiality and independence vis-à-vis the parties").

- Dkt. 400-4 (Ex. 2047) (DONZ-HDD-0004621-22) (Donziger: "The traditional Ecuadorian law perspective (which will be asserted by Chevron) would hold that the level of collaboration between one party and the expert is problematic and improper in that all court appointed experts in Ecuador should be independent. By working so closely with our local counsel and Stratus, Cabrera violated his duties to the court.").

- Dkt. 1240-6 (Simon Dep. Tr.) at 86:13-87:5 (LAP expert Simon admitting under oath that a court-appointed expert must be independent of the parties and impartial and that an expert is incompetent if he fails to maintain his independence.); *id*. at 92:14-93:3, 101:17-102:2 (because an expert is an "aid to the court" or its "auxiliary," "[i]t is understood" that an expert "must be someone of recognized honesty and propriety" and "always maintain a certain distance with respect to the parties."); *see also id*. at 117:17-118:8 ("it would obviously be improper" for one party to meet with a court-appointed expert before that expert was appointed to get his commitment in advance to "slam" the other side with a $10 billion judgment); *see id*. at 144:24-145:7, 166:24-167:7. (it would be improper and illegal under Ecuadorian law for an expert to submit to the court work secretly drafted by one of the parties.); *id*. at 182:22-183:9 (payments to a court-appointed expert outside of the court-mandated process would be improper and illegal.).

- Dkt. 1240-1 (Albán Dep. Tr.) at 31:25-32:2 (LAP expert Albán testifying that bribing a court-appointed expert is a crime under Ecuadorian law); *id*. at 53:23-54:23 (ghostwriting a court expert's report and secretly paying a court-appoint expert outside of the court-approved process is contrary to Ecuadorian law); *id*. at 77:11-18 (court experts are obligated to follow the terms of the orders of the court that appointed them); *id*. at 96:23-97:2 ("a meeting between a potential expert and one of the parties in order to agree on a future modification of the expert's report would not be appropriate."); *id*. at 113:10-21 (the LAPs' authoring of Cabrera's work plan, without attribution to the LAPs, would be "inappropriate" under Ecuadorian law); *id*.at 129:3-23 (it is a criminal offense to draft a report in Cabrera's voice and submit it to the court as Cabrera's own work product).

- Dkt. 754-10 (Ex. 3123) (Romero Expert Report), ¶ 11 (Defendants "have flagrantly violated Ecuadorian law, including articles 251 and 256 of the Code of Civil Procedure (hereinafter, the "CCP"), and the orders of the Lago Agrio Court dated June 13, 2007 and October 3, 2007, since the expert would have failed to perform his tasks in a trustworthy and lawful manner and would have failed to comply with the abovementioned Court orders."; *id*. ¶ 13 "The fact that there is no written provision in Ecuador that expressly prohibit the parties from meeting with a court-appointed judicial expert does not mean that any kind of interaction between them is permitted.").

- Stavers Decl. Ex. 4102 (BHFS0000056) (2010.03.19 handwritten notes of Brownstein attorney E. Englert regarding meeting with Jeffrey Shinder, corroborating Shinder's statement that what he learned about Stratus made him "physically ill" and was a "fraud on foreign court," and describing their new legal strategy as "like [a] criminal defense lawyer with guilty client making procedural objections.").

- Stavers Decl. Ex. 4103 (ChevPriv-00001598).

- Dkt. 9-6 (Ex. 11) (DONZ00055225) (2010.03.30 Email from Prieto warning Donziger, Fajardo, and Yanza that disclosure of their relationship with Cabrera could have "devastating" effects: "apart from destroying the proceeding, all of us, your attorneys, might go to jail").

23.    **Donziger and the Ecuadorian plaintiffs' team's denials of their relationship with Cabrera and their promotion of his report as "independent" were false.**

- Sts. 1–22.

- Dkt. 905 at 35 (the Fajardo declaration was a "seriously misleading account of what had happened."); *id*. at 32 ("The Fajardo Declaration that

ultimately was filed gave a bland description of the process by which the judicial inspections had been terminated, the global expert proposal adopted, and Cabrera in particular selected. But it failed to mention that Fajardo and Donziger had threatened the judge with a misconduct complaint unless the judge agreed to their demands and appointed Cabrera. And while it acknowledged that the LAPs had 'delivered materials to Mr. Cabrera,' it did not mention the March 3, 2007 meeting at which the LAPs laid out the plan for Cabrera's report and indicated that the work would be done by them. Nor did it reveal that Stratus and the LAPs' counsel in fact had written all or most of Cabrera's report. In other words, it omitted what the Emery Celli lawyer said was 'the most important part' – that Fajardo 'sent documents that originated from Stratus.' The declaration similarly neglected to report that the LAPS "chang[ed] the focus of [Cabrera's] data at [their] offices.") (citations omitted); Dkt. 48-13 (Ex. 316) (Declaration of Pablo Fajardo), ¶ 11.

- Dkt. 28-8 (Ex. 76) at ECF 5 (DONZ00027256 at 30) (Dec. 16 Donziger journal entry describing the global expert's role as "ha[ving] to totally play ball with us and let us take the lead while projecting the image that he is working for the court.").

- Dkt. 400-4 (Ex. 2047) (DONZ-HDD-0004621–22) ("By working so closely with our local counsel and Stratus, Cabrera violated his duties to the court.").

- Dkt. 1007 (Ex. 3652) (Beltman Witness St.), ¶ 60 ("The December 1, 2008 Stratus Comments do not disclose that Stratus drafted substantial portions of the Cabrera Report, but instead state that the report was prepared by Cabrera. The decision to issue the Stratus Comments and their content was influenced greatly by Donziger. I and Stratus deeply regret stating in the Stratus Comments that Cabrera was equivalent to a United States 'Special Master.' Moreover, the Stratus Comments were intended to be an endorsement of the Cabrera Report and Cabrera responses."); *see also* Dkt. 1007-1 (Ex. 3653) (Maest Witness St.), ¶ 44 (same).

- Dkt. 9-7 (Ex. 12) at 1 (DONZ00056679) (2010.05.16 email from Ecuadorian plaintiffs' lawyer James Horowitz admitting that Stratus was involved in "ghosting" the Cabrera Report and expressing concerns regarding Stratus's "endorsement" of the report because it was "written in a manner to give the impression that Cabrera was entirely independent and conducted his own research and came up with his own findings."  Horowitz concluded "[I]t appears not only that Cabrera and [the Lago Agrio] plaintiffs can be charged with a 'fraud' respecting [Cabrera's] report, but that Stratus was an active conspirator.").

- Dkt. 1039-2 (Ex. 3687) (Declaration of Christopher Bogart), ¶¶ 13-15 (referring to statements made to Burford about Cabrera's independence,

Bogart states "As we later learned, the representations that Patton Boggs made to us in Invictus and otherwise during our diligence process were false and misleading in several respects.").

- Dkt. 32-7 at 1 (DONZ00108564) (2007.05.10 email from Donziger to Fajardo and Yanza: "we need the following . . . to think of anything Richard [Cabrera] could do AGAINST us to prove his independence . . . to try find ways to Keep Texaco from finding out much about his plan and his work").

24. **Donziger intended to use the ghostwritten Cabrera report and false claims about its independence to obtain property from Chevron.**

- Dkt. 6-2 (Exhibit 1) at CRS-269-01-04 (video of meeting between Donziger, Beltman, and other members of the LAPs' team to discuss—in Donziger's words—how they were going to "jack this thing up to thirty billion").

- Dkt. 28-7 (Ex. 76) at ECF 9 (DONZ00027256 at 5) (2007.04.12 Donziger journal entry: "I sit back and dream . . . . Billions of dollars on the table. A movie, a possible book.").

- Dkt. 355-26 (Ex. 1068) (DONZ00128420) (Email from A. Page to S. Donziger re "DOJ ltr."  Page discusses increasing the damages estimate: "Just curious, I really don't understand why you're shying away from going up on the remediate estimate.  Like I wrote earlier, while 20b can be attacked it can't be destroyed in a way that will embarrass us . . . And I really think upping it will make media/court/CVX itself start thinking in terms of billions, albeit lower . . .").

- Dkt. 1007-1 (Ex. 3653) (Maest Witness St.), ¶ 16 ("It was my impression that Donziger was not interested in the results of scientific evaluations of the area unless he could use them to attack Chevron.  Donziger seemed interested in increasing the damage claims as high as possible.").

- Dkt. 47-30 (Statement by Donziger to the Tom Lantos Human Rights Commission) at 5 (Donziger told the U.S. Congress that "an independent court expert working with a team of 14 scientists, found that Chevron is liable for up to $27 billion in damages . . . . If the court accepts the damages assessment, then the case could produce the largest judgment ever for an environmental lawsuit.").

## II.     The Ecuadorian Judgment

25.     At the time the judgment issued, the official court record in the Ecuadorian litigation consisted of the hand-numbered pages 1 to 216,338 maintained by the Provincial Court of Sucumbios in Lago Agrio, Ecuador.

- Dkt. 402-6 (Ex. 2257) at 1 (page 1 of the Ecuadorian court record).

- Dkt. 402-17 (Ex. 2354) (first page of judgment, with Ecuadorian court record page number (216,338) in the upper right corner).

- Dkt. 402-15 (Ex. 2326) (certification found on Ecuadorian court record page number 216,437 ("back"), confirming that pages "216,388 to page 216,437 are copies of the original[]" court judgment).

26.     Sections 3, 6, 7, 9, 10, and 15 of the Ecuadorian judgment contain text, data, or other information found in the Ecuadorian plaintiffs' team's unfiled work product but not found in the Ecuadorian court record.

- 886 F. Supp. 2d at 253–54; Dkt 905 at 19–22.

- Dkt. 763-5 (Ex. 3276) (certified translation of the judgment, highlighted to show overlap with the LAPs' unfiled work product (yellow) and reliance on the Cabrera Report (red)).

- Dkt. 658-7, 658-8 (Leonard Report) Ex. 5 (judgment highlighted to show overlap with unfiled Ecuadorian plaintiffs' team work product).

- Dkt. 355-27 (Ex. 1076) (email from Katia Gomez to Donziger attaching memo titled "Justificaciones alegato final.pdf." ("Katia Memo")); Dkt. 168 at 65 (Lago Agrio Judgment); Dkt. 763-5 at 65 (showing overlap between Lago Agrio Judgment and Katia Memo).

- Dkt. 755-26 (Ex. 3280) at 3-4 ("[I]t is highly unlikely that the passages in the Aguinda judgment identified above were prepared independently of the Moodie memorandum"); Dkt. 763-5 at 89-90) (showing text from Moodie memorandum found in Section 7 of the judgment).

- Dkt. 658-7 (Leonard Report) at 20; *id*. at Ex. 5 at ECF  89-90 (judgment highlighted to show text from the unfiled Index Summaries in section 9); Dkt. 763-5 at 100) (same).

- Dkt. 401-08 (Ex. 2182) at Ex. A (2011.06.10 Younger Report ) at 9-17 (Section 9 contains data from the Selva Viva Data Compilation); Dkt. 763-5 at 101-02, 104-05, 108-112 (same).

- Dkt. 658-7 (Leonard Report) at 33-34 (Section 9 contains text from the Clapp Report); Dkt. 658-8 at ECF 1-2 (same); Dkt. 763-5 at 109-110 (same).

- Dkt. 763-5 at 169-171 (showing text from the Moodie Memo found in Section 10 of the judgment).

- Dkt. 658-7 (Leonard Report) at 30-33 (Section 15 contains text from the Fajardo Trust Email); Dkt. 658-8 at ECF 13 (same); Dkt. 763-5 at 186 (same).

27.    **Sections 13 and 14 of the judgment contain text, data, or other information found in the Cabrera report but nowhere else in the Ecuadorian court record.**

- 886 F. Supp. 2d at 290 ("The uncontradicted evidence therefore shows that the Cabrera report was tainted and that the Lago Agrio court relied to some extent on that report, both directly and via its reliance on the Barnthouse report.").

- Dkt. 763-5 (Ex. 3276) (certified translation of the judgment, highlighted to show overlap with the LAPs' unfiled work product (yellow) and reliance on the Cabrera Report (red)).

- *Id*. at 125, 180, 182-83 (Section 13 of the judgment assesses soil remediation damages based on 880 pits in the former Concession, awards $150 million in damages for a potable water system, and awards $200 million to recover native flora and fauna—figures derived from the Cabrera Report.).

- Dkt. 755-16 (Ex. 3278) (2013.01.24 Younger Report) at 14-16, 24-25; *see also* Dkt. 401-08 (Ex. 2182) at ECF 35-36 (2011.06.10 Younger Report at 17-18) (the 880 pit count was derived from Annex H-1 to the Cabrera Report.).

- *Compare* Dkt. 33-12 at 6 *and* 33-14 at 43 (Cabrera Report recommending a $428 million award to provide "potable water to the people living in the Concession area and within its area of influence"); *with* Dkt. 168 (Judgment) at 182-83 (citing the Barros report and arriving at a $150 million award for regional potable water systems by multiplying Cabrera's $428 million figure by 35 percent to cover the 35 percent of the population not serviced by public water systems); Dkt. 400- 20 (Ex. 2128) at ECF 172-74 (page nos.167,403-167,405) (2010.02.11 Barros Report criticizing

23

Cabrera's regional aqueduct system as unnecessary and finding that "the
alleged cost of $430 million potable water figure is enormously
exaggerated" and "fraudulent").

- Dkt. 400-10 (Ex. 2064) (Barnthouse Report) at 2-9 (citing Cabrera Report
  for $200 million flora and fauna award); Dkt. 400-11 at ECF 74, 78, 81-82
  (Ex. 2071) (Barnthouse Dep. Tr.) at 52:2-10, 80:13-19, 123:3-124:17 (Dr.
  Barnthouse concedes that he did not perform a "natural resource damage
  assessment" and that his analysis "couldn't be completely independent"
  because many of the sources on which he relied "were only available from
  the Cabrera Report."; *id.* at 79:1-79:8 at ECF 77 (Barnthouse states, that in
  his opinion, the damage figures in the Cabrera Report are "uncertain.");
  Dkt. 400-14 at ECF 2-3 (Ex. 2078) (DONZ00031590) (the LAPs' U.S.
  legal team discussing whether or not to file the Barnthouse Report because
  of its "strict reliance on Cabrera.").

- *Compare* Dkt. 763-5 at 184–86 (Judgment) *with* Dkt. 9-2 (Supp. Cabrera
  Report) at 29 (Section 14 of the judgment follows the Cabrera Report's
  unjust enrichment award, $8.42B (Cabrera) vs. $8.64B (Judgment));
  *compare* Dkt. 33-15 at 50 *with* Dkt. 763-5 at 185 (the Cabrera Report
  contemplated that unjust enrichment would be awarded under the guise of
  "punitive" damages while the judgment justifies its punitive damages
  award by invoking "the benefits obtained through the wrong" and
  "economic benefit obtained").

- Dkt. 1312-2 (Dunkelberger Dep. Tr.) at 77: 22 to 79:7 (Weinberg was
  instructed to use the Cabrera Report as a "roadmap" in its damages
  estimate).

28. **Of the judgment's 188 pages, 51 contain text, data, or other information
found in the Ecuadorian plaintiffs' team's unfiled work product but not found in the
Ecuadorian court record; 9 pages contain text, data, or other information found in the
Cabrera Report and nowhere else in the Ecuadorian court record.**

- Sts. 26, 27.

- Dkt. 763-5 (Ex. 3276) (certified translation of the judgment, highlighted to
  show overlap with the LAPs' unfiled work product (yellow) and reliance
  on the Cabrera Report (red)).

29. **The judgment awards compensatory damages in the same categories as the
Cabrera Report, but those categories are supported by nothing else in the Ecuadorian**

24

**court record except the Cabrera Report and the Ecuadorian plaintiffs' final alegato, which**

**itself cites throughout to the Cabrera Report.**

- Dkt. 168 at 1, 176–84 (February 24, 2011 Chevron letter to Judge Kaplan laying out damages assessed by Lago Agrio Judgment and attaching text of Judgment which awards damages in eight categories).

- Dkt. 1007-1, Ex. 3652 (Beltman Witness St.) ¶¶ 47-56 (enumerating damages categories in the Cabrera Report as prepared by Stratus).

- Dkt. 400-22 (Ex. 2140) at 89 (2011.01.17 LAP trial brief stating that "the various categories of damage and injury . . . will be fully addressed at Part Two of Plaintiffs' Alegato Final, forthcoming");

- Dkt. 400-12–13 (Ex. 2077) at 4-12 (2011.02.01 LAP final trial brief discussion of "remediation of soil and groundwater," which cites only cleansing expert "Douglas Allen" (who offered no causation opinion) and "the Cabrera Report").

- Dkt. 400-12–13 (Ex. 2077) at 18-20 (2011.02.01 LAP final trial brief discussion of "ecosystem" damages, which cites only cleansing expert "Dr. Barnthouse" (who offered no causation opinion) and "the Cabrera Report").

- Dkt, 400-12–13 (Ex. 2077) at 20-27 (2011.02.01 LAP final trial brief discussion of "adverse impacts to indigenous cultures," which cites only the Cabrera Report for support).

- Dkt. 400-12–13 (Ex. 2077) at 39-48 (2011.02.01 LAP final trial brief discussion of "devastating effects caused on public health," which cites only cleansing expert "Picone" (who offered no causation opinion) and "the Cabrera Report").

- Dkt. 400-12–13 (Ex. 2077) at 48-59 (2011.02.01 LAP final trial brief discussion of "drinking water," which cites only cleansing expert "Scardina" (who offered no causation opinion) and "the Cabrera Report.").

- Dkt. 400-12–13 (Ex. 2077) at 59-65 (2011.02.01 LAP final trial brief discussion of "excess cancer," which cites only cleansing expert "Rourke" (who offered no causation opinion) and "Cabrera").

- *Compare* Dkt. 33-12 at 4-5 (Cabrera Report recommending a $1.7 billion award for soil remediation), and Dkt. 9-2 at 18, 53 (Supplemental Cabrera Report estimating that the "total cost for remediating the soil to 100 ppm TPH should be $2,743,000,000"), *with* Dkt. 168 at 181 (Judgment

awarding $5,396,160,000.00 to "recover the natural conditions of the soil impacted by Texpet's activities").

• *Compare* Dkt. 33-12 at 5 (Cabrera Report recommending a $428 million award to provide "potable water to the people living in the Concession area and within its area of influence"), and Dkt. 9-2 at 53 (same), *with* Dkt. 168 at 182-83 (Judgment awarding $150 million for regional potable water systems which will transport water "from other parts of the region through aqueducts . . .").

• *Compare* Dkt. 33-12 at 5, (Cabrera Report recommending a $480 million award to provide "healthcare systems for the region's population . . ."), and Dkt. 9-2 at 53 (same), *with* Dkt. 168 at 183 (Judgment awarding $1.4 billion for a "health system, to cover the health needs created by the public health problem occasioned by the acts of the defendant . . .").

• *Compare* Dkt. 33-12 at 5 (Cabrera Report recommending a $430 million award to "implement a plan for recovering the territory, food supply and culture for the ancestral indigenous groups that have been affected by Texaco's operations"), and Dkt. 9-2 at 53 (same), *with* Dkt. 168 at 183 (Judgment awarding $100 million for a "community reconstruction and ethnic reaffirmation program" to redress "cultural harm").

• *Compare* Dkt. 33-12 at 7, 9 & 33-15 at 48-49 (Cabrera Report claiming that the people in the region suffer increased rates of cancer and recommending a $2,910,400,000 award as "appropriate compensation for the excessive number of deaths from cancer suffered by the people living in the Concession area"), *and* Dkt. 9-2 at 35-38 (Supplemental Cabrera Report estimating "the total monetary value of excessive deaths due to cancer" at $9.527 billion), *with* Dkt. 168 at 184 (Judgment claiming "sufficient indications to demonstrate the existence of an excessive number of deaths from cancer").

• *Compare* Dkt. at 168 at 131-34 (Judgment citing two studies published by Dr. Miguel San Sebastian: the Yana Curi Report and Cancer in Ecuadorian Amazon), *with* Dkt. 400- 22 (Ex. 2143) (Annex P of the Cabrera Report) at 9, 10, 13 (same), *and* Dkt. 402-3 (Ex. 2237) at 9-18 (Dr. Michael A. Kelsh, Ph.D., Rebuttal to Mr. Cabrera's Excess Cancer Death and other Health Effects Claims, and his Proposal for a New Health Infrastructure).

• Dkt. 168 at 139-45 (Judgment relying on lay witness testimony regarding the cause of cancer and self-reported surveys); Dkt. 400-22 (Ex. 2142) (Annex Q of the Cabrera Report) at 1-5 (citing self-reported cancer surveys).

• *Compare* Dkt. 33-12 at 6 (Cabrera Report recommending between $875 million and $1.697 billion in damages to "restore" tropical rainforest and

compensate "for the loss of the rain forest ecosystem"), *and* Dkt. 9-2 (Supplemental Cabrera Report) at 53 (same), *with* Dkt. 168 at 182 (Judgment awarding $200 million "to recover the native flora, fauna, and the aquatic life of the zone . . .").

- *Compare* Dkt. 9-2 at 12-14, 53 (Supplemental Cabrera Report recommending an award of $3,236,350,000 to remediate groundwater), *with* Dkt. 168 at 179 (Judgment awarding $600 million for "the cleanup of groundwater").

30.     **Section 14 of the judgment imposes punitive damages that are illegal under Ecuadorian law, and follows the Cabrera Report's unjust enrichment award in justification and size.**

- Dkt. 400-21 (Ex. 2137) (DONZ00038323) (Donziger writing: "Punitive: no basis in Ecuadorian law, but we could push it and seek it anyway.").

- Dkt. 400-21 (Ex. 2136) (Expert Report of Dr. Gustavo Romero Ponce), ¶ 6 ("Punitive damages are not recognized by Ecuadorian law.").

- Dkt. 402-16 (Ex. 2349) (Expert Report of Dr. César Coronel Jones), ¶ 26 ("[I]mposing punitive damages is not permitted in Ecuador. . . . The Decision acknowledged that there is no Ecuadorian legal source that allows imposition of punitive damages.").

- *Compare* Dkt. 763-5 at 184-86 (Judgment) *with* Dkt. 9-2 at 29 (Supp. Cabrera Report) (Section 14 of the judgment follows the Cabrera Report's unjust enrichment award ($8.42B (Cabrera); $8.64B (Judgment)); *compare* Dkt. 33-15 at 50 *with* Dkt. 763-5 at 185 (Cabrera Report contemplates that unjust enrichment would be awarded under the guise of "punitive" damages while the judgment justifies its punitive damages award by invoking "the benefits obtained through the wrong" and the "economic benefit obtained").

31.     **The document bearing Bates numbers DONZ-HDD-0142504-25, a memorandum that begins "La fusión entre Chevron Inc. Y Texaco Inc.," regarding the corporate relationship between Texaco and Chevron (the "Fusion Memo"), was written by the Ecuadorian plaintiffs' team and consists of the Ecuadorian plaintiffs' team's unfiled work product that does not appear in the Ecuadorian court record.**

- Dkt. 400-17 (DONZ-HDD-0142504-25) at 1; Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 4687:10-13 ("Q. Are you aware of an occasion on which Exhibit 1806A, the Fusion memo, was provided to the court in Lago Agrio? A. No.").

- Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 4687:14-20 ("Q. Are you aware of any occasion on which anyone affiliated with the Lago Agrio plaintiffs provided any portion of the text of the Fusion memo in any form to anyone affiliated with the Lago Agrio court? A. I just don't know.").

- Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 4701:11-25, 4703:4–4704:20 (Donziger testifying that the LAPs' team was uncertain as to why the LAP-authored Fusion Memo is not in the Lago Agrio court record).

- Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 4702:22-4703:8 ("Q. Have you specifically had discussions with Mr. Fajardo as to whether or not he ever submitted Exhibit 1806A [the Fusion memo] or some version of it to the Ecuadorian court on the record? A. Yes. Q. Was he able to confirm to you whether or not he had submitted Exhibit 1806A [the Fusion memo] or some version of it to the Ecuadorian court on the record? A. No, he was unable to.").

- Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 4704:13-20 ("Q. You are referring to when the [Fusion] [M]emo was being drafted? A. Yes. Well, when the research was being done and the intention was to put a document together. It might have been this memo, or, I don't know, I wasn't involved on a day to day basis, but to put into evidence to deal with this issue.").

- Dkt. 401-05 (Ex. 2163) (DONZ00110731) at 1 (Donziger demanding from Sáenz "a list of EVERY document you are submitting—every court case, everything, even if it is 50 things"); Dkt. 400-22 (Ex. 2141) (DONZ00093025) (Sáenz's list of "EVERY document" to be filed does not include the Fusion Memo.).

32.    **Identical or nearly identical word strings and strings of symbols in the Unfiled Fusion Memo appear in the judgment and parts of the judgment, including a multi-page section dealing with the relationship among Texpet, Texaco, and the Consortium, are virtually identical—character-for-character—with the Unfiled Fusion Memo.**

- 886 F. Supp. 2d at 253–54; Dkt. 905 at 19–20.

28

- Dkt. 658-7 (Ex. 3005) (Leonard Report) at 15 ("There are multiple instances of verbatim copying of word strings from the Fusion Memo to the [Judgment] that do not appear to be set phrases nor explainable by chance.").

- Dkt. 658-7 (Ex. 3005) (Leonard Report) at 15, 18, 14 (providing examples of "co-occurring identical or nearly identical word string[s]," "identical idiosyncratic numerical ordering," and highlighting exhibits showing "strings of text and symbols which were plagiaristically copied from the [LAPs'] unfiled Fusion Memo").

- Dkt. 400-19 (Ex. 2119) (Expert Report of Dr. Teresa Turell) at 8, 23-39, 44 (concluding that a portion of the Judgment is "an almost verbatim reproduction" of the Fusion Memo, which "is a clear indication that the latter was plagiarized by the former").

- Dkt. 755-13 (Ex. 3267) (Expert Report of Dr. Patrick Juola), ¶ 78 ("[T]he overall similarity between [the Judgment] and the other documents cited, including Fusion, could not have derived from secondary sources with the court record.").

33.    **The document bearing the Bates number DONZ00025296, an analysis entitled, La Explotacion De Petroleo En La Zona Concesionada A Texaco Y Sus Impactos En La Salud De Las Personas (the "Clapp Report"), was written by Richard Clapp in his capacity as a consultant to the Ecuadorian plaintiffs, and consists of Ecuadorian plaintiffs' team work product.**

- Dkt. 658-7–8 (Leonard Report) at 9-10 & Ex. 9.

- Dkt. 34-23 (STRATUS NATIVE 065062) (stating of Clapp: "[a] long while back, he wrote up a summary of the toxic effects of the chemicals in crude oil and drilling fluids, and it was incorporated into the expert report as an annex pretty much as is").

34.    **A 34-word string appears verbatim in the Clapp Report and in the judgment. The English translation of the verbatim passage is: "Soil and water samples taken during the judicial inspections have indicated excessive lead levels that could pose health risks for local populations.  Lead levels in the ground. . . ."**

29

- Dkt. 905 at 21 n.78.

- Dkt. 658-7–8 (Leonard Report) at 9-10 & Ex. 9.

35.    While a portion of the Clapp Report appears, unattributed, in the Cabrera

report as Annex K, the 34-word string that appears verbatim in the judgment is not Annex

K, or anywhere else in the Ecuadorian court record.

- Dkt. 34-14 (2008.07.28 email from Beltman to D. Mills noting that
  Clapp's report "ended up as an Appendix to the Cabrera report"); *see also*
  Dkt. 34-23 (Ex. 198) (2008.11.06 email from Beltman to Donziger noting
  that Clapp's report "was incorporated into the expert report as an annex
  pretty much as is").

- Dkt. 658-7 (Leonard Report) at 33-34 (The portion of the Clapp Report
  that does not appear in the Cabrera Report also does not appear anywhere
  else in the Lago Agrio Record); Dkt. 755-13 (Ex. 3267) (Juola Report), ¶¶
  56–61 (same).

36.    The documents bearing Bates numbers DA00000040, DA00000041, and

DA00000042, which were produced by the Ecuadorian plaintiffs' counsel to Chevron on or

around December 1, 2010, are Microsoft Excel spreadsheets containing environmental

sampling data created by the Ecuadorian plaintiffs' team known as the "Selva Viva Data

Compilation."

- Dkt. 402-12 (Ex. 2303) (DA00000040); Dkt. 402-12 (Ex. 2304)
  (DA00000041); Dkt. 402-12 (Ex. 2305) (DA00000042).

- Dkt. 400-1 (Ex. 2010) (Donziger Depo. Tr.) at 2607:10-2608:19; 2853:8-
  2861:18, 4834:1-4842:3.

- Dkt. 402-11 (Ex. 2298) (Belanger Dep. Tr.) at 129:25-134:2.

37.    The Selva Viva Data Compilation is not in the Ecuadorian court record.

- Dkt. 548, ¶ 29 (Affidavit of S. Hernandez, Morningside Translations)
  (concluding that the Selva Viva Data Compilation was not located in the
  court record).

38.     More than 100 features of the Selva Viva Data Compilation, including the use of "_sv" and "_tx" in sample names, enclosing measurements of meters or centimeters within parentheses, misstating sample counts, misreporting milligrams per kilogram as micrograms per kilogram, and other errors appear in the judgment, but not in the sampling results in the Ecuadorian court record.

- 886 F. Supp. 2d at 253–54; Dkt. 905 at 19–20.

- Dkt. 356-12 (Ex. BC) (2011.03.01 Younger Expert Report), ¶ 17 (concluding that "numerous data points cited" in the Judgment, "in excess of 100 specific repeated irregularities," were "copied, cut-and-pasted, or otherwise taken directly from the [Unfiled] Selva Viva Data Compilation").

- *Id.* at ¶ 14 (explaining that many "sampling results set forth in the [Judgment] on pages 104-112 ended with the suffix '_sv' or '_tx'" but that Mr. Younger's review of the judicial inspection reports and lab results "failed to show a single sample result referenced in this manner."); *see also* Dkt. 402-10 (Ex. 2271).

- Dkt. 356-12 (Ex. BC) ¶ 16.c (explaining that both the Judgment and the Selva Viva Data Compilation show "John Connor as the examiner responsible" for certain test data while "the Judicial Inspection Report filed with the court showed that Professor Fernando Morales was the one who carried out the inspection"); Dkt. 168 at 108 (Judgment stating that "Chevron's expert, John Connor, submitted results showing quantities of 9.9 and 2.3 mg/kg. (see samples JL-LACPIT1- SD2-SU1.R (1.30-1.90)M and JI-LAC-PIT1- SD1-SUI-R (1.6-2.4)M) in the judicial inspection in Lago Agrio Central").

- Dkt. 356-12 (Ex. BC) ¶ 16.a (As Michael Younger concluded, "the Court likely relied on and subsequently misinterpreted the Unfiled Selva Viva Compilation, rather than relying on the Filed Lab Results submitted with the Judicial Inspection Reports.").

- Dkt. 356-12 (Ex. BC) ¶ 16.b (explaining that the Judgment and [Unfiled] Selva Viva Data Compilation listed "concentrations of substances at specific sites" as milligrams per kilogram (mg/Kg) whereas the filed lab results "indicated that concentrations for those same substances and sites should be listed as micrograms per kilogram (μg/Kg) – a thousand times less concentrated than the levels reported in the [Judgment]"); Dkt. 168 at 108-09 (Judgment reporting PAH results for various sites in mg/Kg instead of μg/Kg).

- Dkt. 356-12 (Ex. BD), ¶ 12  (2011.04.15 Supplemental Younger Report) (concluding that the Judgment's reference to 1,984 TPH results brought by Chevron's experts "was inaccurate and based on the Selva Viva Data Compilation, not documents filed with the court");  Dkt. 168 at 102 (Judgment stating, "it is noted among these TPH results, 80.4% have been brought by the LAPs' experts (1,984 results)").

- Dkt. 356-12 (Ex. BD), ¶ 15 (concluding that Judgment's claim that experts for the LAPs submitted 420 TPH results "was overstated" and "based on its apparent reliance on the [Unfiled] Selva Viva Data Compilation"); Dkt. 168 at 102 (Judgment stating that the LAPs' "experts have submitted 420 results").

- Dkt. 356-12 (Ex. BD), ¶ 14 (concluding that the "erroneous TPH counts in the [Judgment] had the additional effect of distorting the sample percentages listed in the decision").

- Dkt. 401-08 (Ex. 2182), Ex. A at 17 (2011.07.14 Younger Expert Report) ("I conclude that the Unfiled Selva Viva Data Compilation and the Stratus Compilation were sources of numerous data points cited in the [Judgment]. It is highly unlikely that the Filed Lab Results from the Judicial Inspection Reports were the source of these data points based on the numerous irregularities found in the [Judgment] that did not match the Filed Lab Results but that did match data within the Unfiled Selva Viva Data Compilation.").

- Dkt. 755-16  (Ex. 3278) at 19-22 (2013.01.24 Expert Report of Michael L. Younger); *id.* at 2, 14 ("Analysis of the [Judgment] filed in the Lago Agrio litigation shows that it repeats errors found in unfiled court documents. This indicates that the [Judgment] was derived from material not filed with the court in the Lago Agrio litigation.").

- Dkt. 168 at 101-02, 109 (Judgment stating that "alarming levels of mercury have been found in the Sacha, Shushufindi, and Lago Agrio fields, where we found several samples reaching 7 mg/kg"); Dkt. 400-22 (Ex. 2144) (2012.01.03 appellate decision) at 11-12 (indicating that mercury had been found above detection limits); Dkt. 356-12 (Ex. BC), ¶16.a (concluding that the author of the Judgment "likely relied on and subsequently misinterpreted the [Unfiled] Selva Viva Data Compilation, rather than relying on the Lab Results filed with the Judicial Inspection Reports" and in so doing, "eliminated any non-detect results and made mercury levels appear higher and more certain than the actual filed results"); *see also* Dkt. 402-9 (Ex. 2268) (Annex E of the Cabrera Report) at 7, 9, 69 (reporting mercury concentrations of 7mg/Kg instead of nondetect results).

39.     The document bearing the Bates number WOODS-HDD-0012793, a memorandum purporting to analyze causation (the "Moodie Memorandum"), was primarily written by the Ecuadorian plaintiffs' Australian legal intern Nicholas Moodie in his capacity as Ecuadorian plaintiffs' legal intern.

- Dkt. 918-49 (Ex. 39) (Moodie Memorandum with heading "FROM: Nicholas Moodie" and re line "The standard of proof in US common-law toxic tort negligence claims.").

- Dkt. 1007-5 (Ex.3670) (DONZ00065435) (2008.12.01 Donziger email: "Nick Moodie, who is from Australia, will be joining us as an intern on Jan 4 for about two months.").

40.     The Moodie Memorandum is not in the Ecuadorian court record.

- Dkt. 658-5 at 5 (12.12.12 Affidavit of Samuel Hernandez, Part 1) ¶ 22; *see also* Dkt. 658-6 (12.12.12 Affidavit of Samuel Hernandez, Part 2).

41.     Both the Moodie Memo and the judgment adopt the "substantial factor" test from *Rutherford v. Owens-Illinois, Inc.*, 941 P.2d 1203 (Cal. 1997).

- Dkt. 755-26 (Ex. 3280) (Green Decl.), ¶¶ 2-3 (Michael Green determines that the Moodie Memo and the judgment adopt the "substantial factor" test from *Rutherford v. Owens-Illinois, Inc.*, 941 P.2d 1203 (Cal. 1997) and compares the overlap between the two documents).

- Dkt. 168 at 170 (Lago Agrio Judgment citing "substantial factor theory").

42.     The substantial factor test employed by the court in *Rutherford* was to address a particular problem in asbestos litigation and is not generally applicable in tort contexts that do not present the difficult and specific proof problems present in that case.

- Dkt. 755-26 (Ex. 3280) (Green Decl.), ¶¶ 2-3 (The Moodie Memo and the judgment adopt the "substantial factor" test from *Rutherford v. Owens-Illinois, Inc.*, 941 P.2d 1203 (Cal. 1997), but that test was employed in Rutherford "to address a particular problem in asbestos litigation and is not generally applicable in tort contexts that do not present the difficult and specific proof problems present in that case. . . . Rutherford does not reflect a general approach to causation in toxic substances cases, but rather

33

a response to scientific uncertainty when multiple defendants each
contribute to the risk of disease but proof of which defendant's
contribution was the but for cause is scientifically impossible. Subsequent
cases in California, including toxic torts, have confined Rutherford to that
specific circumstance.").

43.    **Both the Moodie Memo and the judgment use the same verbatim phrase to
ascribe to Australian law the principle that causation can be established provided the
defendants' contribution to an injury is "more than a minimal, trivial or an insignificant
factor."**

- Dkt. 168 at 90 (Lago Agrio Judgment).

- Dkt. 918-49 (Ex. 39) at ECF 4 (WOODS_HDD-0012795) (Moodie
  Memo: "Australia: 'Contributions' means D's conduct was more than a
  minimal, trivial or insignificant factor").

44.    **The phrase "minimal, trivial or an insignificant factor" has never been
adopted by any Australian court or tribunal and does not appear in Austlii, the most
comprehensive full text database of Australian case law.**

- Dkt. 755-27 (Ex. 3283) at ¶¶ 12-15 (Spiegelman Declaration) (the phrase
  "more than a minimal, trivial or insignificant factor" does not occur in
  Australian law.).

45.    **Both the Moodie Memo and the judgment cite to Australian case law for the
proposition that "causation can be established by a process of inference" from multiple
pieces of evidence, even where no single piece of evidence is sufficient to establish causation.
The Moodie Memo cites the Australian case *Seltsam v McGuiness* (2000) 49 NSWLR 262
for this proposition.**

- Dkt. 168 at 90 (Lago Agrio Judgment) ("Australian case law tells us that
  causation can be established by a process of inference which combines
  concrete facts even if the actual causation cannot be attributed to any one
  of them by itself . . .").

34

- Dkt. 918-49 (Ex. 39) at ECF 4 (WOODS_HDD-0012795) (Moodie Memo: "Australia: Causation can be established by a process of inference that combines primary facts, even if each piece of evidence alone does not rise above the level of possibility").

46.     **This proposition, sometimes known as the "strands in a cable" approach, is a well-established proposition throughout the common law world, and the author of the *Seltsam* opinion, James Spigelman AC QC, has stated under oath that to ascribe it to Australian law is "inaccurate."**

- Dkt. 755-27 (Ex. 3283) (Spigelman Declaration) ¶¶ 24-26  (Spiegleman describing as "so strange as to constitute an inaccuracy" that both the Moodie Memorandum and the judgment describe a well-established common law principle as a feature of Australian law, and cite an opinion he authored.  Spigelman states that to "attribute this principle to Australian law… is inaccurate.").
- Dkt. 905 at 21 n.78.

47.     **On June 18, 2009, Pablo Fajardo sent the Ecuadorian plaintiffs' team, including Julio Prieto, Juan Pablo Sáenz, and Steven Donziger, an email discussing and quoting from the case *Andrade v. Conelec* (the "Fajardo Trust Email").**

- Dkt. 401-07 (Ex. 2174) (DONZ00051504).

48.     **The Fajardo trust email is not in the Ecuadorian court record.**

- Dkt. 548 (Affidavit of S. Hernandez, Morningside Translations) ¶¶ 17, 26 ("The Trust Email was not located in the Reviewed Record.").

49.     **The judgment contains text found in the Fajardo Trust Email, including language identically misquoting the *Conelec* case.**

- Dkt. 905 at 21–22 n.78.
- Dkt. 168 at 186-87 (Lago Agrio Judgment requiring proceeds of judgment be placed in a trust whose beneficiary is the Amazon Defense Front).
- *Compare* Dkt. 168 (Judgment) at 186 *and*  Dkt. 401-7 (Ex. 2174) (DONZ00051504) (2009.06.18 Fajardo Trust Email with highlighting

showing overlap with the Judgment) *with* Dkt. 401-11 (Ex. 2199) (Highlighted version of the *Andrade v. Conelec* from the *Registro Oficial* demonstrating the judgment and Fajardo Trust Email similarly misquote *Andrade*).

- Dkt. 658-7 (Ex. 3005 Part 1) at 30 (Dr. Leonard reported "nearly identical strings of more than 40 words, identical citation errors, and identical mistranscriptions" between the judgment and the Fajardo Trust Email.).

- Dkt. 658-8 (Ex. 3005 Part 2)*.* at Ex. 5 & 8 at ECF 13, 47 (highlighted portions of the judgment and Fajardo Trust Email showing overlap between the two documents).

**50.     The Microsoft Excel spreadsheets bearing Bates numbers DONZ00048820 (filename "pruebas pedidas en etapa de prueba.xls") and GARR-HDD-0003243-3446 (filename "cuadro_de_pruebas09-05(1).xls") (the "Index Summaries"), which summarize and list certain filings made during the Ecuadorian litigation, were prepared by the Ecuadorian plaintiffs' team and consist of the Ecuadorian plaintiffs' team's unfiled work product.**

- Dkt. 400-17 (Ex. 2117) (Leonard Report) at 8; 24-26 & Ex. 4 at 8-18.

- Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 4822:24-4824:13 (Donziger's attorney, Robert Kaplan, explaining that the document bearing the Bates numbers GARR-HDD-0003243-46, was produced in June 2011); *id.* at 4815:14–4827:14 (describing creation of index summaries); *id.* at 4820:14-17 ("Q. Exhibit 1869A [DONZ00048820] is an internal plaintiff document for the litigation, correct? A. Yes."); *id.* at 4821:6-16 ("Q. Do you know who created Exhibit 1869A? A. I don't know specifically. People in our office, and I think it might have been Mr. Prieto and/or Mr. Saenz. Q. Do you know who had the responsibility, if anyone, for maintaining the index that's been marked as Exhibit 1869A? A. I think it was considered the responsibility of the local legal team."); *id.* at 4826:4-8 ("Q. Exhibit 1870 [GARR-HDD-0003243-3446], like Exhibit 1869A, is an internal plaintiff document, correct? A. Yes.").

**51.     The Index Summaries are not in the Ecuadorian court record.**

- Dkt. 400-16 (Ex. 2102) at ECF 84 (Dr. Patrick Juola analyzed the court record for text from the index summaries and was "unable to find

significant matches between the overlap identified" between the judgment and index summaries and "lower court record in the Lago Agrio case.").

- Dkt. 548 at 9, ¶ 24 (the analysis of Sam Hernandez, whose team reviewed the Lago Agrio record for excerpts of text that appear in both the judgment and index summary, and found "No complete Record Index Excerpt" in the Lago Agrio court record.

52. **Identical or nearly identical word strings and strings of symbols, including identical citation errors, punctuation errors, and orthographic errors in the Index Summaries appear in the judgment.**

- 886 F. Supp. 2d at 253–54; Dkt. 905 at 19–20.

- Dkt. 400-17 (Ex. 2117) (Leonard Report) at 11 (concluding that "portions of [the Judgment] and the Lago Agrio Plaintiffs' unfiled work product contain matching or similar word strings and strings of symbols whose presence is not explainable either as set phrases or by chance, and that those portions of the [Judgment] are therefore plagiarized from [the LAPs'] unfiled work product"); *id.* at 20-26 & Ex. 4 at 8-18 (providing examples of "co-occurring identical or nearly identical word string[s]," "identical orthographic errors" and "repeating citations errors" in the Index Summaries and the Judgment); *id.* at 26 (noting that the Judgment "replicates the same citation error" as the LAPs' Index Summaries by incorrectly claiming that the Judicial Inspection Acta "ends at 75013 instead of 75003").

- Dkt. 400-18 (Ex. 2118 (Supp. Leonard Report) at 1 & Ex. A, (highlighted exhibits showing "strings of text and symbols which were plagiaristically copied" from the LAPs' Index Summaries).

- Dkt. 400-19 (Ex. 2119) at 44 (Dr. Teresa Turrell concluded, "the differences and linguistic strategies observed in [the Index Summary], diverging from the Source texts indexed in the [Index Summary], were reproduced in [the Judgment], something which would allow us to conclude that whoever the author of [the Judgment] is, the writer of such text had access to the [Index Summary] or another containing its contents.").

53. **The document bearing Bates number DONZS00002439, a Microsoft Word document titled "Borrador_Alegato_Final_Parcial_Envio_EEUU_[11_nov_2010].docx" (the "Draft Alegato"), which is a draft of the Ecuadorian plaintiffs' "Final Alegato" in the Ecuadorian litigation, was produced to Chevron in or around January 2011 (the "Draft**

**Alegato"). It is a document written by the Ecuadorian plaintiffs' team and contains the**

**Ecuadorian plaintiffs' team's unfiled work product.**

- Dkt. 400-19 (Ex. 2123) (DONZS00002438) (2010.11.11 email from Saenz to Donziger and Fajardo attaching Draft Alegato); Dkt. 400-20 (Ex. 2124) (DONZS00002439) (Draft Alegato).

- Dkt. 400-1 (Ex. 2010) (Donziger Depo. Tr.) at 4736:20-4745:25 (Donziger intended to "take the lead in" writing the alegato in 2007 and 2008.); *id*. at 4792:7-4814:21 (Donziger coordinated efforts on the final alegato in 2010, including work related to the fusion memo, the work of legal interns Katia Fach Gomez and Brian Parker, and the re-drafting of the alegato by U.S. attorneys.).

54. **The Draft Alegato does not appear in the Ecuadorian court record.**

- Dkt. 658-5 (Ex. 3004) (Affidavit of Samuel Hernandez) at 5, 7 (concluding that "[t]he Draft Alegato was not located in the Lago Agrio Record" based on close review of all portions of the Lago Agrio record that could have contained the draft alegato).

- Dkt. 755-13 (Ex. 3267) (2013 Juola Expert Report), ¶¶ 68-74; Dkt. 400-16 (Ex. 2102) (2011.12.20 Juola Report) at 5 ("[T]he overall similarity between [the Judgment] and the LAPs' Work Product Documents cited . . . could not have derived from legitimate copies from secondary sources in the Lago Agrio court record.").

55. **The judgment contains examples of strings of words and symbols identical or**

**nearly identical to the unfiled Draft Alegato.**

- Dkt. 658-7 (Ex. 3005) (Leonard Expert Report) at 20-22 (the Judgment "contains examples of strings of words and symbols identical or nearly identical to . . . the unfiled Draft Alegato"); *id*., Ex. 5 at 23-24, Ex. 7 at 61 (documenting multiple instances of verbatim or nearly verbatim overlap between the Draft Alegato and pages 23 and 24 of the Lago Agrio Judgment); *see also id.* Ex. 4 at 9.

- Dkt. 400-17 (Ex. 2117) (Leonard Expert Report) at 17-20 (concluding that the "Fusion Memo was intended to be attached to the Draft Alegato," that "the Fusion Memo was not attached" to the filed Final Alegato, that the "Draft Alegato contains several verbatim word strings from the Fusion Memo," and that the Judgment "was plagiarized from the unfiled Fusion Memo and the unfiled Draft Alegato, as opposed to relying on the filed Final Alegato.").

- Dkt. 400-18 (Ex. 2118) (Supp. Leonard Expert Report), Exs. A, C (highlighted exhibits showing "strings of text and symbols which were plagiaristically copied" from the Draft Alegato).

## III.  Wire Fraud

56.    **On June 14, 2006, Donziger violated 18 U.S.C. § 1343 through the wire transmission of an email to Alejandro Ponce Villacis with the subject "Need plan."**

- St. 1–24.

- Dkt. 30-7 (Ex. 96) (DONZ00086533) (2006.06.14 Email from Donziger to A. Villacis with the subject "Need plan" and instructions to "prepare a detailed plan with the necessary steps to attack the judge through legal, institutional channels and through any other channel you can think of.").

57.    **On July 26, 2006, Donziger violated 18 U.S.C. § 1343 through the wire transmission of an email to Joseph Kohn with the subject "Potentially huge."**

- St. 1–24.

- Dkt. 32-4 at 1 (DONZ00023182) (2006.7.26 Donziger email to Kohn with subject "Potentially huge": "Pablo met with the Judge today. The judge, who is on his heels from the charges of trading jobs for sex in the court, said he is going to accept our request to withdraw the rest of the inspections . . . . The judge also I believe wants to forestall the filing of a complaint against him by us, which we have prepared but not yet filed.").

58.    **On April 3, 2007, Donziger violated 18 U.S.C. § 1343 through the wire transmission of an email to David Chapman with the subject "Re: Approach for assessment."**

- St. 1–24.

- Dkt. 32-13 (Ex. 157) at 1 (DONZ00061973) (2007.04.03 email from Chapman to Donziger with subject "Re: Approach for assessment": "I think the way this would work best is that if Stratus did much of the work, putting the pieces together and writing the report.").

59.     **On May 7, 2007, Donziger violated 18 U.S.C. § 1343 through the wire transmission of an email to Luis Yanza with the subject "Re: JK."**

- St. 1–24.

- Dkt. 34-6 (Ex. 181) at 1 (DONZ00108534) (2007.05.07 email from Donziger to Yanza with subject "Re: JK": "What are the chances of us renting another site to write the PG . . . I don't know, but we need an isolated site.").

60.     **On May 10, 2007, Donziger violated 18 U.S.C. § 1343 through the wire transmission of an email to Pablo Fajardo and Luis Yanza with the subject "Re: CONCERN CONFIDENTIAL."**

- St. 1–24.

- Dkt. 32-7 (Ex. 152) at 1 (DONZ0018564) (2007.05.10 email from Donziger to Fajardo with subject "Re: CONCERN CONFIDENTIAL" stating that they should have Cabrera act "AGAINST us to prove his independence" and "find ways to keep Texaco from finding out much about his plan and his work.").

61.     **On July 17, 2007, Donziger violated 18 U.S.C. § 1343 through the wire transmission of an email to Pablo Fajardo and Luis Yanza with the subject "Ideas for the meeting with Richard."**

- St. 1–24.

- Dkt. 32-12 (Ex.156) at 1 (DONZ00062680) (2007.07.17 Donziger email to Yanza and Fajardo with subject "Ideas for meeting with Richard": "My tendency is to stop Richard [Cabrera] from working much more in the field ... or, if he continues doing it, he should continue under the most strict control with an extremely limited number of samples. And we'll change the focus of the data at our offices.").

62.     **On November 17, 2007, Donziger violated 18 U.S.C. § 1343 through the wire transmission of an email to Doug Beltman with the subject "Re: Unjust Enrichment."**

- St. 1–24.

40

- Dkt. 32-22 (Ex. 166) at 1 (DONZ00025512) (2007.11.17 email exchange with subject "Re: Unjust Enrichment" in which Beltman emails Donziger an unjust enrichment estimate of $530 million and Donziger replies "make sure you don't say or even suggest anything that backs away from the figures. [R]emember, we said in the submission that the unjust enrichment would be on the order of billions of dollars.").

63.    **On February 27, 2008, Donziger violated 18 U.S.C. § 1343 through the wire transmission of an email to Doug Beltman with the subject "Re: Start on report text; human tox annex."**

- St. 1–24.

- Dkt. 33-4 (Ex. 170) at 1 (DONZ00025833) (2008.02.27 email exchange between Beltman and Donziger with subject "Re: Start on report text; human tox annex." in which Beltman writes "[a]ttached is my rough start of the Peritaje Global report . . . Would you let me know if you think I'm on track in terms of tone, language level, and content?" and Donziger responds: "I think it's working.  Keep going.").

64.    **On March 6, 2008, Donziger violated 18 U.S.C. § 1343 through the wire transmission of an email to Doug Beltman with the subject "Re: we have spanish translation of Uhl report already."**

- St. 1–24.

- Dkt. 33-7 (Ex. 173) at 2 (STRATUS-NATIVE069117) (2008.03.06 email exchange between Beltman and Donziger with subject "Re: we have spanish translation of Uhl report already" in which Beltman writes "Here is the Uhl report, cleaned and sanitized." and they discuss "scrubbing" the report and other changes).

65.    **On March 30, 2008, Donziger violated 18 U.S.C. § 1343 through the wire transmission of an email to Douglas Beltman with the subject "what do u think of this?"**

- St. 1–24.

- Dkt. 53-7 (Ex. 407) (STRATUS-NATIVE069123) (2008.03.30 email exchange between Beltman and Donziger with subject "what do u think of this?" discussing damages chart sent by Donziger that later appears on page 6 of Cabrera report).

**66.     On December 1, 2008, Donziger violated 18 U.S.C. § 1343 through the wire transmission of an email to Felicity Harrison with the subject "Re: Request for comment on Chevron press release re dispute in Ecuador."**

- St. 1–24.

- Stavers Decl., Ex. 4104 at 2 (DONZ00030787) (2008.12.01 email from Donziger to *Latin Lawyer* reporter F. Harrison with the subject "Re: Request for comment on Chevron press release re dispute in Ecuador." in which Donziger states, "Our side had nothing to do with the Cabrera report; it was done independently of the parties . . . . The plaintiffs never paid Cabrera; the court did.").

Dated: August 16, 2013                  Respectfully submitted,
New York, New York

                                    /s/ Randy M. Mastro
                            _____
                            Randy M. Mastro
                            Andrea E. Neuman
                            GIBSON, DUNN & CRUTCHER LLP
                            200 Park Avenue
                            New York, New York 10166
                            Telephone: 212.351.4000
                            Facsimile:  212.351.4035

                            William E. Thomson
                            333 South Grand Avenue
                            Los Angeles, California 90071
                            Telephone: 213.229.7000
                            Facsimile:  213.229.7520

                            *Attorneys for Chevron Corporation*