## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| CHEVRON CORPORATION,<br><br>                    Plaintiff,<br><br>          v.<br><br>STEVEN DONZIGER *et al.*,<br><br>                    Defendants. | 11-CV-0691<br><br>The Honorable Lewis A. Kaplan, U.S.D.J.<br>The Honorable James C. Francis, U.S.M.J. |

## DEFENDANTS' MOTION TO IMPOSE TERMINATION SANCTIONS BASED ON PLAINTIFF CHEVRON CORPORATION'S REPEATED EFFORTS TO CORRUPT WITNESS TESTIMONY IN THIS PROCEEDING

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

I.   PRELIMINARY STATEMENT ................................................................................... 1

II.  BACKGROUND ........................................................................................................ 3

     A.  Chevron's payments to Guerra ............................................................................. 4

     B.  Payments to Diego Borja ..................................................................................... 7

     C.  Stratus Settlement Agreement ............................................................................. 9

     D.  Bogart and Burford's "Flip" .............................................................................. 11

III. LEGAL STANDARD ............................................................................................... 13

IV. ARGUMENT ............................................................................................................ 15

     A.  Chevron's misconduct compels terminating sanctions because Chevron has made it impossible to know the truth in this case ............................................................... 15

     B.  Chevron's conduct violates Federal Law and Ethical Rules .................................... 17

        1.  Chevron's payments for evidence and information are improper for a testifying fact witness .................................................................................................. 20

        2.  Chevron's ongoing payments under the contract for testimony are impermissibly contingent on future cooperation and testimony ....................... 23

        3.  Chevron's payments are manifestly unreasonable ......................................... 25

           a.  Chevron's monthly payments are unreasonably high and disproportionate to his time spent in the litigation and amount to a witness salary .............................................................................................. 25

           b.  The payments to live in the United States cannot be justified on the basis of Guerra's safety ......................................................................... 27

     C.  Chevron has acted in bad faith .......................................................................... 29

     D.  Chevron's conduct has, and will continue to prejudice the defendants if allowed to continue ............................................................................................................ 33

i

V.  REQUEST FOR RELIEF ............................................................................................... 34

# <u>TABLE OF AUTHORITIES</u>

## FEDERAL CASES

*ABF Freight Sys. v. NLRB*,
    510 U.S. 317, 323, 114 S. Ct. 835 (1994) ....................................................................... 30

*American Stock Exch., LLC v. Mopex, Inc.*,
    215 F.R.D. 87 (S.D.N.Y.2002) ........................................................................ 35 & n.13

*Arista Records LLC v. USENET.com*,
    633 F. Supp. 2d 124 (S.D.N.Y. 2009) ..................................................................... 14, 15

*Caldwell v Cablevision Sys. Corp.*,
    86 A.D.3d 46 (N.Y. App. Div. 2d Dep't 2011) ....................................................... 19, 27

*Centennial Mgmt. Servs. v. Axa Re Vie*,
    193 F.R.D. 671 (D. Kan. 2000) ........................................................................ 19, 25, 26

*Chambers v. Nasco, Inc.*,
    501 U.S. 32 (1991) ....................................................................................... 14, 14 & n.7

*Chevron Corp. v. Bonifaz*,
    No. 4:09-05371, Dkt. 71 (N.D. Cal. Oct. 8, 2010) ........................................... 31 & n. 13

*Chevron Corp. v. Camacho Naranjo*
    667 F.3d 232 (2d Cir. 2012) ................................................................................. 3 & n. 2

*Chevron Corp. v. Donziger*,
    No. 3:13-mc-80038-CRB, Dkt. 59 at 6, 11 (N.D. Cal. April 5, 2013) ............................ 31

*Chevron Corp. v. Salazar*,
    No. 11-0691-LAK (D. Or. Nov. 30, 2011) ...................................................... 31 & n. 13

*Chevron Corp. v. Stratus*,
    No. 10-cv-00047-MSK-MEH, D.E. 293 (D. Colo. Nov. 15, 2010) .................. 31 & n. 13

*Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*,
    482 F.3d 1091 (9th Cir. 2007) ......................................................................... 1, 15, 17

*Daval Steel Prods. v. M/V Fakredine*,
    951 F.2d 1357, 1366 (2d Cir.1991) ................................................................. 35 & n.14

*DLC Mgmt. Corp. v. Town of Hyde Park*,
    163 F.3d 124  (2d Cir. 1998)................................................................................... 13, 14


*Hamilton v. General Motors Corp.*,
    490 F.2d 223, 229 (7th Cir. 1973) ........................................................................ 19, 20

*Golden Door Jewelry Creations v. Lloyds Underwriters Non-Marine Ass'n*,
    865 F. Supp. 1516 (S.D. Fla. 1994) ...................................................................... 20, 35

*Gutman v. Klein*,
    No. 03CV1570, 2008 WL 4682208 (E.D.N.Y. Oct. 15, 2008) report and recommendation
    adopted, No. 03 CIV. 1570, 2008 WL 5084182 (E.D.N.Y. Dec. 2, 2008)..................... 30

*In re Hugo Gerardo Camacho Naranjo and Javier Piaguaje Payaguaje*,
    No. 13-772, Dkt. 58-1 (2d Cir. Filed April 3 2013)........................................................ 17

*In re Robinson*,
    151 A.D. 589, 136 N.Y.S. 548 (1912) ........................................................................... 24

*In re Telcar Group, Inc.*,
    363 B.R. 345 (Bankr. E.D.N.Y. 2007).............................................................. 18, 19, 22

*Jones v. Niagara Frontier Transp. Auth.*,
    836 F.2d 731, 735 (2d Cir. 1987)................................................................................... 15

*Jones v. NFTA*,
    836 F.2d 731, 734 (2d Cir. 1987)................................................................................... 15

*Konstantopoulos v. Westvaco Corp.*,
    112 F.3d 710 (3d Cir.1997) cert. denied, 522 U.S. 1128 (1998) ........................ 35 & n.14

*Kravtsov v. Town of Greenburgh*,
    No. 10-CV-3142 CS, 2012 WL 2719663 (S.D.N.Y. July 9, 2012) .............. 14, 35 & n.16

*McMunn v. Memorial Sloan–Kettering Cancer Ctr.*,
    191 F.Supp.2d 440 (S.D.N.Y. 2002)....................................................................... 30, 33

*Nat'l Hockey League v. Metro. Hockey Club, Inc.*,
    427 U.S. 639 (1976)....................................................................................................... 15

*New York v. Solvent Chemical Co.*,
    166 F.R.D. 284 (W.D.N.Y. 1996)........................................................................... 18, 24

*Passlogix, Inc. v. 2FA Tech., LLC*,
    708 F. Supp. 2d 378, 2010 U.S. Dist. LEXIS 44182 (S.D.N.Y. 2010).............. 35 & n.15

*Rocheux Int'l of N.J. v. United States Merchs. Fin. Group, Inc.*,
    No. 06-6147, 2008 WL 3246837 (D.N.J. Oct. 5, 2009) ..................................... 19, 20, 35

*State Farm Mut. Auto. Ins. Co. v. Grafman*,
    274 F.R.D. 442, 2011 U.S. Dist. LEXIS 53382 (E.D.N.Y. 2011) ................................. 15

*United States v. Blaszak*,
    349 F.3d 881 (6th Cir. 2003) ................................................................................. 18, 24

*United States v. Cinergy Corp.*,
    No. 99 CV 1693, 2008 WL7679914, at *12 (S.D. Ind. Dec. 18, 2008) ........................ 26

*United States v. Norris*,
    300 U.S. 564, 574, 81 L. Ed. 808, 57 S. Ct. 535 (1937) ................................................ 30

*West v. Goodyear Tire & Rubber Co.*,
    167 F.3d 776 (2d Cir. 1999) ................................................................................. 14, 15

 *Wright v. Somers*,
    125 Ill. App. 256, 257-58 (1906) ................................................................................. 20

## FEDERAL STATUTES

18 U.S.C. § 201 ................................................................................................. 18, 19, 20, 23

## FOREIGN CASES

Order, Sole Chamber of the Provincial Court of Justice of Sucumbíos, Nueva Loja, Ecuador,
*Maria Aguinda v. Chevron Corp.,* Case No. 2011-0106 (Jan. 3, 2012) ..................................... 31

## OTHER AUTHORTITIES

ABA Comm. on Ethics and Prof. Resp., Formal Op 96-402 (1996). ............................. 18, 19, 26

ABA Model Rules of Professional Conduct, Rule 3.4(b) ........................................................... 18

*About Miami-Dade County:* History, Miami-Dade County,
*http://www.miamidade.gov/info/about_miami_dade_statistics.asp*
(last updated Feb. 24, 2012) ........................................................................................28-29 & n.11

"Chevron Paid $2.2 Million to Man Who Threatened To Expose Company's Corruption in
Ecuador," U.S. Chamber of Commerce Foundation, *available at* http://bclc.uschamber.com/csr-
news/chevron-paid-22-million-man-who-threatened-expose-companys-corruption-ecuador.

(last accessed September 5, 2013) ...................................................................... 8 & n.3

Disciplinary Rule 7-109(C) of NY Code of Professional Conduct ............................................ 21

Dr. Robert D. Cruz & Mr. Robert Hesler,
*Miami-Dade County Economic & Demographic Profile 2013*,
MIAMI-DADE COUNTY DEPT. OF REGULATORY & ECONOMIC RESOURCES, 2013 ............ 28 & n.11

*Fact Sheet: Witness Security, 2013*, U.S. Marshals Service ........................................................ 28

New York State Rules of Professional Conduct (Rule 3.4) .................................................. 18, 19

N.Y. Comm. on Prof'l Ethics, Op. 668 (16-94) June 3, 1994 ............................................... 18, 24

Restatement (Third) of Law Governing Lawyers § 117(1-2) (2000) ......................................... 22

*Salaries of Elected County Constitutional Officers and School District Officials for
Fiscal Year 2012-13*,
THE FLORIDA LEGISLATURE'S OFFICE OF ECONOMIC AND DEMOGRAPHIC RESEARCH ..... 29 & n.12

## I. PRELIMINARY STATEMENT

Defendants present this joint motion for terminating sanctions and other relief to put an end to Chevron and its counsel Gibson Dunn & Crutcher's intentional and unrelenting pattern of misconduct to corrupt this proceeding with illegal and unethical payments and other inducements to key witnesses to secure favorable testimony. As this memorandum will show, these tactics have so damaged the integrity of the discovery process in this case that there can be no "assurance of proceeding on the true facts." *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1096–97 (9th Cir. 2007) (citation and internal quotation marks omitted). Such actions also violate federal law and ethical rules and warrant sanctions not only against Chevron, but also against those of its counsel complicit in this misconduct.

First, Chevron has paid and will continue to pay former Ecuadorian judge Alberto Guerra Bastidas ("Guerra"), arguably its most important witness, at least $326,000 through 2015 as compensation for his favorable testimony and cooperation. This amount – negotiated directly with Guerra in the U.S. by Gibson Dunn & Crutcher ("GDC") lead counsel Randy Mastro – is exorbitant and is at least ten times Guerra's annual salary when he was employed as a judge; the amount simply cannot be justified as legal or ethical under any reasonable interpretation of the case law or ethical rules, as ethics expert Erwin Chemerinsky explains in the attached affidavit. *See* Declaration of Steven R. Donziger dated September 12, 2013 ("Donziger Decl."), Ex. 2 ("Chemerinsky Decl."). Second, and far worse, Chevron tried to use Guerra as a conduit to offer a $1 million bribe to the sentencing judge in the underlying Ecuador case, Nicolas Zambrano, in exchange for his own false testimony that Chevron planned to use to undermine his own judgment finding the company liable for intentionally discharging billions of gallons of toxic waste water in Ecuador's Amazon region. Third, Chevron has threatened to destroy the careers

of reputable scientists at Colorado-based Stratus Consulting – and drive Stratus Consulting into bankruptcy – to coerce them into offering testimony that contradicts earlier sworn statements concluding that Chevron was clearly responsible for causing long-term, extensive and harmful toxic pollution in Ecuador that has decimated the local population. Last, Chevron knowingly submitted a false and misleading affidavit from Christopher Bogart, the CEO of an entity that formerly funded the LAPs. Bogart claims in the affidavit he was misled by the defendants, when Bogart's own emails demonstrate exactly the opposite.

This pattern of illegality and misconduct is so egregious it warrants the termination of Chevron's entire RICO and fraud case as an appropriate sanction. It is simply impossible in light of Chevron's and its counsel's record[1] of misconduct to conduct a proper trial such that the fact finder has a reasonable chance of ascertaining the truth about the events relating to these key witnesses. This case should be decided on the merits, but Chevron's misconduct has made this

---

[1]    This is not the first case in which this same team from Gibson Dunn & Crutcher has unethically and illegally attempted to pay exorbitant witness fees in exchange for false testimony. Recent filings in California and Florida related to claims brought against Dole by banana plantation workers in Nicaragua (attached hereto) show that GDC lawyers relied on sworn testimony from numerous witnesses who recounted being offered cash and other benefits (such as help immigrating to the U.S.) by investigators in exchange for false testimony. *See* Donziger Decl., Ex. 3 at 1-2, 6-10; Exs. 4-14. For example, one former banana plantation worker testified that an investigator for the Dole-GDC team "came to my house and asked me if I was willing to go to the United States to declare that the people in the [] lawsuit had never actually worked at the banana plantations," and specifically "that [my] job would be to investigate the people in the lawsuit who had not worked ***and [to] state that the people [I] had led [as a supervisor] had not worked at the banana plantations***." Donziger Decl., Ex. 9 (emphasis added).  The allegations are particularly shocking given that GDC lawyers repeatedly told judges in the Florida and California cases that the firm was ***not*** paying the witnesses it put forward in support of its "fraud" theory even though it was. *See* Donziger Decl., Ex. 3 at 7-8.  Only after more evidence came to light about the payments did GDC publicly reverse course and admit to the courts that it was paying the witnesses. The firm first explained that the payments were disbursed from an "administrative" account that it had not been aware of; it also tried to argue that the payments were mere stipends to cover expenses and were not significant. *Id.*; Donziger Decl., Ex. 14, at 150-151. These explanations were false. In fact, some of the witnesses were being paid a regular wage more than ten times the average annual salary for a Nicaraguan worker. *Id.* The "fraud" theory used by GDC in the Dole cases is eerily similar to the theory the firm has concocted on behalf of Chevron in the instant case; the unethical tactics are adopted from the same template; and some of the lead GDC partners from the Dole cases -- including Andrea Neumann, Scott Edelman, William Thomson and Theodore Boutrous -- have also played key roles on behalf of Chevron in the instant case, including in the solicitation of false testimony as described in this motion.

impossible. If permitted to continue unabated, Chevron and its counsel will make a mockery of the rule of law, cause substantial prejudice to Defendants, and be rewarded for engaging in the worst sort of abusive litigation practices. Defendants request that the Court rectify this wrong and restore order and dignity to the judicial process by issuing case terminating sanctions, or, at the very least, issuing witness preclusion sanctions to exclude any and all testimony and evidence obtained through Guerra, Stratus scientists (Beltman and Maest), or Bogart.

## II. BACKGROUND

This case arises out of a two-decade struggle for clean water, health services, and environmental remediation brought by residents of the Ecuadorian Amazon against Chevron Corporation ("Chevron") and its predecessor, Texaco, for three decades of oil contamination. Since 2011, Chevron has sought to avoid payment of a judgment rendered against it by an Ecuadorian court in favor of those Amazon residents. To do so, Chevron contends that the Ecuadorian Defendants' attorneys procured the judgment by fraud.[2] Since going on the offensive by filing the instant action, Chevron has engaged in a shameless pattern of inducing witnesses and potential witnesses to testify in its favor with promises of money or threats of career and personal destruction. These abusive tactics reached a crescendo earlier this year with Chevron's introduction of a declaration by disgraced former Ecuadorian Judge Guerra. Dkt. 746-3. According to Chevron, Guerra's declaration shows he was "paid" by the LAPs to "ghostwrite" the Lago Agrio judgment for then presiding Judge Nicolas Zambrano. Dkt. 745. But Chevron obtained Guerra's declaration and continuous cooperation by employing illegal and unethical tactics that this court should not tolerate.

---

[2]     Chevron raised these allegations on appeal in Ecuador, but the appellate court squarely rejected Chevron's claim that the judgment was the product of fraud. *See Chevron Corp. v. Camacho Naranjo,* 667 F.3d 232, 237 (2d Cir. 2012).

### A.  Chevron's payments to Guerra

In the summer of 2012, Chevron sent two of its agents - Andres Rivero (a U.S.-based lawyer for Chevron) and a secret agent ("INV #5") - to meet with disgraced former Judge Guerra, who had previously reached out to Chevron on at least two prior occasions seeking a bribe. Dkt. 916, 1078; Donziger Decl., Ex. 1 (Redacted Transcript of Deposition of Alberto Guerra Bastidas ("Guerra Depo.")) at 55, 68.  In July 2012, Chevron was ready to cut a deal. Chevron paid Guerra two large lump sums of money totaling $38,000, purportedly for physical evidence of clearly inconsequential value. *See* Dkt. 755-14 ¶¶ I.A.5, 6. Thereafter, Chevron continued to purchase Guerra's testimony at a handsome price: at least $326,000 in cash, in addition to the numerous non-cash benefits, guaranteed through at least 2015.

When Chevron made its first payment to Guerra in July 2012 – with its lawyer Rivero delivering $18,000 in cash taken from a suitcase – Guerra was unemployed. Guerra Depo. at 150; *id.* at 151. Guerra also had no savings. Dkt. 1078-1 at 17. By the time Chevron negotiated a written payment-for-testimony deal with Guerra in November of 2012, he had been unemployed for nearly five months. In November 2012, Chevron flew Guerra to Chicago to "negotiate" the terms of Guerra's contract with Chevron's counsel, a group that included Gibson Dunn partner Randy Mastro and the ubiquitous Rivero. Guerra Depo. at 191. While in Chicago with Chevron representatives -- in the middle of negotiations over how much he would receive from Chevron -- Guerra drafted and signed his Declaration on or about November 17, 2012. *Id.* at 191-93; *id* at 205-8 (stating that the agreement as to the $12,000 monthly payments "came about one day before I traveled to Quito, November 18th, 2012"); *Id.* at 205-9.

Chevron's payments to Guerra (including promises of future payments) exceed anything that possibly could be interpreted as reasonable in light of federal law or the ethical rules. They include, at least:

- $18,000 in cash, delivered to Guerra in a suitcase. Dkt. 755-14 ¶ I.A.5; Dkt 1078-1 at 84. This payment was apparently for "evidence" of minimal value (consisting of 1 hard drive, thumb drives, day planners, copies of bank, phone, email, and credit card records, 2 cell phones, 1 floppy disc, CDs, and some paper shipping records). Dkt. 746-3. *See also* Dkt 1078-1 at 40-42; Guerra Depo. at 181-2.
- A state of the art new computer to replace the one Guerra provided to Chevron, dkt. 755-14 ¶ I.A.5, although the above-mentioned $18,000 supposedly contemplated payment for the computer as well. *See* Dkt. 1078-1 at 45-7; 50.
- $20,000 in exchange for additional physical items including cell phones, electronic media, telephone records and bank account records. Dkt. 755-14 ¶ I.A.6.
- A new cell phone. *Id.*
- All travel and moving expenses for Guerra and his whole family, including his son and family, from Ecuador to the United States. *Id.* ¶ II.B.1.g; Guerra Depo. at 208-9.
- $12,000/month stipend for "cooperating", Guerra Depo. at 214-6; 220; 247, including $10,000 for "living expenses" and $2,000 housing allowance. Dkt. 755-14 ¶ II.B.1.a & b. These payments are guaranteed for 24 months, and potentially longer depending on the outcome of a reassessment by an "independent" evaluator. *Id.* ¶II.B.5.
- A new car comparable to that which he had in Ecuador. *Id.* ¶ II.B.1.d; Guerra Depo. at 206-9; Dkt. 977-3 at 4 (the car lease is estimated to cost $300/month).
- Health Insurance for Guerra, his spouse, his son, his son's spouse and grandson. Dkt. 755-14 ¶ II.B.1.c; Guerra Depo. at 206-9.
- Payment for a lawyer to represent Guerra in dealings with any federal or state government investigative authorities and any civil matters. Dkt. 755-14 ¶ II.B.1.e; Guerra Depo. at 204-7.
- Payment for an immigration lawyer for Guerra, his wife, his son and his son's wife and his grandson, "to address the[ir] USA resident status" Dkt. 755-14 ¶ II.B.1.f; Guerra Depo. at 214-16. And the promise of future immigration assistance for Guerra's other son, already living in the US. Guerra Depo. at 214-16; 220; 247.
- "*In addition to the compensation set forth in* [the Contract]" Chevron will also "pay or reimburse Guerra for such reasonable travel or other expenses he may incur in connection with preparing to testify or testifying or responding to questions and inquiries from any federal or state government investigating authorities" for at least two years. Dkt. 755-14 ¶ II.B.2.
- Guerra also testified that he has been offered or promised at least two additional sums of money outside the terms of the contract totaling $15,000. *See* Guerra Depo. at 142 (stating Chevron agents offered $5,000, in addition to travel expenses, to meet with Chevron executives in Bogota); *Id.* at 212-13 (asked in his April 2013 Deposition whether he had been offered an additional $10,000, Guerra stated "coincidentally, yesterday, my attorney … told me that Chevron had agreed, was going to compensate me or pay me for additional evidence").

In exchange, Chevron's contract with Guerra obligates Guerra to "make himself available to testify … in any aspect (pre-trial, trial or post-trial) of the Chevron SDNY Case[,]" Dkt. 755-14 ¶ II.A.2, and to "meet with, be interviewed by, and make himself available to Chevron representatives and to testify under oath at the request of Chevron" in any other proceeding "related to or concerning the Lago Agrio litigation." *Id*. ¶ II.A.3. The purported purpose of the payments is "so that Guerra will be able to prepare to testify, to testify, and to respond to investigators." *Id*. ¶ II.B.3. Chevron may terminate the agreement if Guerra breaches any part. *Id.* at C.2. By the time the trial is scheduled to start in October 2013, Chevron will have paid Guerra *at least* $158,000 in cash payments alone under the terms of the contract, simply for sitting for a deposition, signing declarations, turning over some evidence and promising to testify. By January 2015, Guerra is guaranteed to have received *at least* $326,000 in cash, in addition to numerous non-cash benefits. Chevron's own agents have admitted these payments were not for time spent or for evidence furnished, but rather to incentivize Guerra to provide favorable testimony for Chevron and to act as a "bridge" to bribe Judge Zambrano. *See* Dkt. 1329 at 39 & n.45. Rivero, who was representing Chevron in paying off Guerra, was forced to admit the money Chevron paid Guerra was the product of a negotiation that had nothing to do with time spent or physical value of evidence; rather, Chevron paid Guerra based on how "good" his evidence is, incentivizing Guerra to fabricate evidence to extract further payments. *Id.*

Certainly the most egregious element of Chevron's illegal bribery campaign is Chevron's attempt to use Guerra as a "bridge" to bribe Judge Zambrano to undermine his own judgment. That this was Chevron's intent was made clear in the July 2012 meeting, where, just prior to handing Guerra the suitcase full of cash, one of Chevron's agents told Guerra, "all of us can benefit in this situation[:]"

You because you get some money for you, for you to use, lets [sic] say, however you may want, uh, and Zambrano because finally we will be able to take that next, necessary step to be able to sit down with him, and talk about what it is he has, under conditions that, lets [sic] say, would generate trust for us and him, too This is not about him feeling mistrustful, Or, two, *if we don't achieve this,* well all of us will be affected because we won't achieve this, they will not authorize us, they will not authorize the meeting with Zambrano, *and you, too will be left with nothing.*

Dkt. 1078-1 at 45-46 (emphasis added). Chevron's agent, Rivero, clarified Guerra was expected to be the "bridge" to Nicolas Zambrano: "you get yours when a deal is reached with Zambrano, a part of it. And that is not negotiable with Zambrano…The idea is that you get a, some part of the value of that, because we didn't get to Nicolas Zambrano except through you." *Id.* at 66-7.

Guerra later confirmed that Chevron's representatives had induced him to reach out to Judge Zambrano so they could offer him a bribe. Guerra Depo. at 170 (Chevron "led me to understand, or that's the way I understood it, that once they negotiated with Mr. Zambrano, they would compensate me with some amount of money."); *id.* at 165 ("I believe that I would benefit better once Mr. Zambrano were to take part in the conversations and the negotiations."); *id.* at 169 (They "led me to understand that I was the bridge with Mr. Zambrano"). Lured by large financial inducements, Guerra attempted to pressure Judge Zambrano into working with Chevron. Dkt. 974-1 ¶ 19. *See e,g,* Guerra Depo. at 163-4 (after the first large payment, "[i]mmediately after that date I insisted quite a lot with Mr. Zambrano."); *See also* Dkt. 974-1 ¶¶ 18-19 (Zambrano notes how Guerra sought to persuade Zambrano to tell Chevron what they wanted to hear). Judge Zambrano refused.

### B.  Payments to Diego Borja

Chevron's unethical and illegal arrangement with Guerra is not unique but part of a pattern. (One might even call the pattern a racketeering conspiracy.) At the time of Chevron's inducement of Guerra and attempt to bribe Zambrano, Chevron had already furnished a similar

over-the-top package of exorbitant benefits and hush money to Diego Borja. Borja was a longtime Chevron contractor who posed as a fake environmental remediation consultant in Ecuador to procure, under false pretenses, a meeting with the then judge presiding over the Lago Agrio litigation, Juan Nuñez. With Chevron's knowledge and under its direction, Borja secretly videotaped and tried to entrap then-presiding Judge Juan Nuñez discussing a "bribe" when it was Chevron's agent (Borja) who offered the bribe (which Nunez did not accept or even indicate he would consider). *See* Dkt. 532-2 at 93-94. Borja handed over three recordings at a meeting in San Francisco with Chevron officials, then returned to Ecuador to make a fourth. *Id.*

Although the entrapment scheme backfired, Dkt. 154 ¶35, Chevron has paid Borja at least $2.2 million in hush money and benefits since 2009.[3] This is no surprise given that Borja has been caught on tape making comments that he has evidence about Chevron's criminal conduct in Ecuador during the Lago Agrio litigation that could devastate the company's entire case were it to come to light. Dkt. 154 ¶39. Borja was recorded stating that if Chevron tricked him and

> if something bad happened to me…and they don't give my wife what they have to…what it supposedly should be…There's a document for that, where I…immediately go to the other side…I have correspondence that talks about things you can't even imagine, dude…. I can't talk about them here, dude, because I'm afraid, but they're things that can make the Amazons win this just like that (snapping his fingers).

*Id.*

Even before engaging Borja in this shady scheme, Chevron used Borja to set up four front companies – some posing as independent scientific labs – to "cook" scientific samples. Dkt. 154 at ¶37, 40. According to Borja, these labs "cooked" the evidence and, "if the U.S. judge who sent the case to Ecuador in the first place ever knew what [Borja] knows, he would 'close

---

[3]     *See* "Chevron Paid $2.2 Million to Man Who Threatened To Expose Company's Corruption in Ecuador," U.S. Chamber of Commerce Foundation, (last accessed September 5, 2013) *available at* http://bclc.uschamber.com/csr-news/chevron-paid-22-million-man-who-threatened-expose-companys-corruption-ecuador.

[Chevron] down.'" *Id.* at ¶40. To keep this information and other supposedly explosive information under control, Chevron has paid Borja lavishly for his loyalty.

Chevron's payments to Borja include at least, payments for Borja and his family to travel to the U.S.; "attorneys' fees" (including nationally renowned criminal defense, immigration, and tax attorneys); monthly cash payments purportedly starting around $10,000 a month, and a house in California on a golf course. *Id.*; Dkt. 366-25.  According to Chevron, these payments and his relocation to the United States are necessary for his safety. Dkt. 366-25 at 10. And yet, just after negotiating the terms of the payment agreement with Borja - to protect his safety - Chevron apparently deemed it safe enough to send Borja back to Ecuador to attempt to make a fourth recording. *Id.* at 8-9.

Borja himself has been caught on tape discussing Chevron's abusive litigation tactics. *See* Dkt. 1329 at 30 & n.18; Dkt. 532-2 at 93-94 ("[T]hese guys, once the trial is over, they'll go after everyone who was saying things about it. . . . [T]he lawsuits will start against everyone who said things, you get it?").

## C.  Stratus Settlement Agreement

Chevron and its counsel have also used coercion and threat of financial ruin to pressure Stratus Consulting, the environmental consulting firm that had assisted in data analysis for the Lago Agrio litigation, to testify favorably for Chevron.

Chevron named Stratus and Stratus employees Ann Maest and Douglas Beltman, as RICO defendants and waged a large-scale public relations and improper pressure campaign to destroy Stratus financially and irreparably damage its reputation by using defamatory statements. Chevron even directly pressured the company's clients to fire Stratus and falsely claimed Stratus had been found guilty in court. *See e.g.* Dkt. 768 at 101-108; Dkt. 768-2; Dkt. 768-3; Dkt. 768-5.

Of course, Stratus for years had vigorously defended the scientific evidence proving Chevron's contamination in Ecuador. Prior to its capitulation to Chevron's blackmail, Stratus had stated in court filings in this very case:

> Chevron knows that based on scientific data collected during the Lago Agrio litigation, including data collected by Chevron, Stratus actually found that contamination was present at every single well site and station that was sampled, and that the areas contaminated by oilfield operations requiring cleanup included over 900 oilfield pits, 356 well sites, 22 oil processing stations, and additional areas of spilled oil – a huge amount of environmental damage costing immense sums to remediate.

Dkt. 768 at 99; *See also* Dkt. 1329 at n. 44 (citing other examples of Stratus defending the science). Ann Maest and Douglas Beltman have also defended their work and their findings that Chevron caused massive pollution in Ecuador in sworn deposition testimony. *See, e.g.*, Donziger Decl., Ex. 15.

Chevron then unleashed a coercive pressure campaign threatening Stratus with financial ruin if it stood behind its scientific findings. As Stratus described it in a defamation filing against Chevron before this court:

> Not willing to wait for trial, Chevron has concocted and is executing a tortious scheme, eerily similar to the scheme alleged in its Amended Complaint, to destroy Stratus financially pre-trial through a malicious and escalating extra judicial campaign of defamation, spinning unfounded and unproven allegations into the public consciousness and explicitly urging Stratus' clients to terminate Stratus by claiming these allegations against Stratus have already been proven in court. Chevron's goal is to bring Stratus to its knees and render it financially incapable of defending against Chevron's lurid allegations, sealing Stratus' fate pretrial.

Dkt. 768 at 99.

When the pressure simply became too great to bear, Stratus capitulated. Chevron agreed to settle its claims against Stratus and abandon entirely its efforts to destroy the firm in exchange for Stratus's cooperation and agreement not to defend its own scientific findings. Chevron had turned Stratus from a litigation opponent to a cooperating, testifying witness. The settlement

agreement requires Stratus to, among other things, make "Ann Maest and Douglas Beltman, and other Stratus employees as necessary, available to testify in person, by deposition or by written statement, under oath, in any stage of the RICO Action and BIT Arbitration, or the Related Actions, at the request of Chevron[.]" Dkt. 1002 ¶ 1(a). Although "each understand that they are obligated to tell the truth," *id.*, the agreement simultaneously places a gag order on Stratus, dictating that it "will not in any remarks, statements, or opinions, assert the factual or scientific validity or accuracy of all or any part of the Cabrera Report." *Id.* ¶ 2(b).

After settling, Stratus began to toe the Chevron line. Stratus asserted the science contained in the Cabrera Report is "unreliable"—despite the fact Stratus had repeatedly said the opposite under oath—months after Stratus complained that Chevron's extra-judicial campaign to destroy its client relationships might "bring Stratus to its knees," destroying its reputation and its business, and render it incapable of defending itself. Dkt. 768 at 99.

### D.  Bogart and Burford's "Flip"

Recent filings by Patton Boggs and the LAPs lay out a comprehensive and troubling portrait of yet another example of Chevron and its counsels' witness tampering in "flipping" Burford Capital – a former funder of the litigation - into switching sides and defaming Patton Boggs by threatening Burford with the prospect of being "blackballed." *See* Dkt. 1329 at 33. Here too, Chevron used coercion to obtain a favorable declaration from a named litigation foe. But the declaration Chevron procured – that of Christopher Bogart of Burford – is filled with contradiction and betrays the offensiveness of Chevron's tactics. *See id.*; Dkt. 1330.

Bogart's declaration was the product of a "secret collaboration" between Chevron and friendly insiders at Burford, *id.* at 16-19, going back to at least January 2011. *Id.* at 27; *and see* Dkt. 1330 at 4-6 (providing detailed timeline demonstrating Chevron "pull[ed] Burford's

11

strings"). Although Bogart's declaration states that Burford ceased funding the litigation because it was deceived by Patton Boggs and the LAPs, dkt. 1039-2, internal documents produced during this litigation make quite clear that Bogart and Burford were well aware of the fraud allegations – and the "worst" *Crude* outtakes – for months, even years, before Burford "flipped." *See generally* Dkt. 1329.

   To be sure, Burford's "flip" was a calculated business decision, driven by the pressure Chevron exercised through its "insider" and by Burford's fear of being "blackballed." Burford never expected its involvement in this case (nor its involvement in any ongoing cases) to become public knowledge, *see id.* at 20, and once it did, it "created some painful fallout" among certain law firms on the other side of the case, *id.* at 21 (quoting Ex. 71 at BUR0012138). "Ultimately, Burford made a business decision, calculating that abandoning the Lago Agrio Plaintiffs and assisting Chevron would be necessary to restore its relationships with key firms and to secure the future of the industry in which it operates." *Id.* at 23.

   Chevron insists that the Bogart declaration constitutes "new evidence" that warrants expanding Chevron's allowed discovery from Patton Boggs. *See, e.g.,* Dkt. 1032 at 18. But such arguments are disingenuous at best; "Chevron kept this 'new' information secret for months, waiting to unveil it at an opportune moment." *Id.* at n. 25.

*   *   *

   These are just the latest examples in what has been a comprehensive campaign of witness tampering and other litigation misconduct by Chevron and its counsel. Evidence shows that Chevron has a long history in Ecuador of corrupting the judicial process by offering payments to witnesses, trying to intimidate judges, seeking to corrupt the trial and fabricating scientific evidence. This conduct has included 1) paying off witnesses to ensure that they don't divulge

12

information damaging to Chevron, dkt. 154 ¶39; 2) using its ties to the military to thwart the collection of scientific evidence via the site inspection process implemented by the Lago Agrio Court, dkt. 154 ¶17[4]; 3) delay and intimidation tactics vis à vis court-appointed experts, *id.* at ¶31; 4) engaging two operatives—one a convicted drug trafficker—to videotape the presiding Lago Agrio judge and entrap him into revealing his thoughts on the case prematurely. *id.* at ¶¶32 – 40[5]; 5) assisting Chevron operatives in setting up numerous "front companies" in order to make their scientific work look independent from Chevron, *id.* at ¶37.[6] In addition to these extra-legal tactics, Chevron's in court litigation tactics were so abusive that, after dozens of warnings, the Lago Agrio Court had no choice but to sanction Chevron's counsel for their misconduct. *Id.* at ¶47.  It should come as no surprise, that after engaging in such tactics in Ecuador, the company was hit with a $9.6 billion punitive damages penalty for trying to undermine the administration of justice in Ecuador.

### III. LEGAL STANDARD

Federal courts have a "well-acknowledged inherent power to levy sanctions in response to abusive litigation practices." *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 135 (2d Cir. 1998).  This inherent power derives from the "sage acknowledgment that courts are 'vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and

---

[4]    *Id.* at ¶27 ("Chevron pressured and corrupted a military official into writing and presenting a fraudulent intelligence report to the Court in an effort to stop the inspection of a separation station that would have exposed Chevron's toxic contamination to the world. To compound its malfeasance, Chevron lied about its involvement with the cancellation.").

[5]    Later, one of the operatives was taped admitting to a friend that "there was no bribe" and Chevron has engaged in unlawful conduct that, if brought to light, would not only result in a verdict against Chevron, but would in fact cause the downfall of the company. *Id.* at ¶¶32 – 40

[6]    *See also id.* at ¶40 (according to one operative, "Chevron always stayed, supposedly, independent, and sent the analysis to have them analyzed….But I know that's not true….I have proof that [the labs] were more than connected, they belonged to them [Chevron].").

submission to their lawful mandates.'" *Id.* at 136 (quoting *Chambers v. Nasco, Inc.*, 501 U.S. 32, 43 (1991)). [7] Courts in the Second Circuit exercise their inherent power to assess sanctions "when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* (internal quotation marks omitted). The Court's inherent authority casts a wide net by "reach[ing] both conduct before the court and that beyond the court's confines[ .]" *Chambers,* 501 U.S. at 44. In this sense, this motion must be considered in the larger context of Chevron's repeated abusive litigation tactics both in Ecuador, *see* II.D., *supra,* and in other courts around the United States.

When deciding on the proper sanction to issue, a court generally must consider the offending party's willfulness or bad faith, the offending party's history of misconduct including noncompliance with court orders and requests from the opposing party, the effectiveness of lesser sanctions, whether the offending party has been informed about the possibility of sanctions, and possible prejudice to the moving party. *Arista Records LLC v. USENET.com*, 633 F. Supp. 2d 124, 138 (S.D.N.Y. 2009) (citing *DLC Mgmt. Corp.,* 163 F.3d at 136). The sanctions should also deter parties from engaging in misconduct and remedy the damage to the non-offending party. *Kravtsov v. Town of Greenburgh*, No. 10-CV-3142 CS, 2012 WL 2719663 at *7 (S.D.N.Y. July 9, 2012).

When the offending party has engaged in truly willful or bad faith egregious litigation practices, the Supreme Court has affirmed that "outright dismissal of a lawsuit . . . is within the court's discretion." *Chambers*, 501 U.S. at 45. In the Second Circuit, terminating sanctions may be granted if there is "a showing of willfulness, bad faith, or fault on the part of the sanctioned

---

[7]   Notably, the existence of a rule or statute describing a mechanism by which a court may impose sanctions for a specific type of abuse does not limit the courts' inherent power to fashion sanctions. *Chambers v. NASCO, Inc.,* 501 U.S. 32, 45-46 (1991).

party." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999); *See also Jones v. NFTA*, 836 F.2d 731, 734 (2d Cir. 1987). Terminating sanctions are appropriate "[w]here a party so damages the integrity of the discovery process that there can never be assurance of proceeding on the true facts." *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1096–97 (9th Cir.2007) (citation and internal quotation marks omitted).

Although terminating sanctions are reserved for extreme circumstances, "in this day of burgeoning, costly and protected litigation courts should not shrink from imposing harsh sanctions where they are clearly warranted." *Arista Records LLC*, 633 F. Supp. 2d at 138 (quoting *Jones v. Niagara Frontier Transp. Auth.*, 836 F.2d 731, 735 (2d Cir. 1987)). Terminating sanctions are particularly suitable when lesser sanctions would not be an effective deterrent or remedy for the party's severe misconduct. *State Farm Mut. Auto. Ins. Co. v. Grafman,* 274 F.R.D. 442, (E.D.N.Y. 2011). Terminating sanctions are intended not just as a penalty, but rather to deter those who might be tempted to such conduct in the absence of such a deterrent. *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976). Chevron and its counsel's conduct warrant terminating sanctions here.

## IV. ARGUMENT

### A. Chevron's misconduct compels terminating sanctions because Chevron has made it impossible to know the truth in this case

Over the course of this litigation, Chevron and its counsel have engaged in a shocking pattern of using money, influence, dishonesty, harassment and threats to achieve their litigation goals. Chevron's payments to Guerra for his testimony and cooperation, in addition to the improper pressure that it has used to "flip" other key witnesses such as Stratus and Burford, have made it impossible to know the truth in this case. Chevron's tactics have already produced inconsistent statements on the part of these key witnesses, and they will only produce further

future unreliable and misleading statements and testimony. Cross-examination will not suffice to rectify such contamination of past and future testimony and evidence.

Nothing in the record provides support for the notion that Guerra's declaration or deposition testimony should be accepted as true. Guerra himself claims to have solicited bribes on multiple occasions from both sides to this litigation – including multiple solicitations of Chevron. *See e.g.* Guerra Depo. at 36-37, 55. Chevron itself has had serious reason to question Guerra's integrity and veracity.

Judge Zambrano has already submitted a sworn declaration that refutes each of Guerra's suspect assertions. Dkt. 974-1 (Zambrano Decl.) ¶14. Judge Zambrano has also confirmed that Guerra, enticed by Chevron's willingness to shell out money, sought to bribe Judge Zambrano to tell Chevron what they wanted to hear, so as to garner more money. Guerra called Zambrano "several times to tell me that Chevron was interested in talking to me", *id.* ¶ 18, and "that *Chevron* was offering me a minimum of one million dollars to start, or for me to name the amount, whatever I wanted" *id.* ¶ 19 (emphasis added). Judge Zambrano "absolutely rejected" Guerra's proposal. *Id.*

Guerra's motivation to sell himself to the highest bidder and Chevron's eagerness to purchase witness cooperation – including inducing Guerra to bribe the Ecuadorian judge – has irreparably compromised the integrity of the judicial process and renders it impossible to know the truth about what happened during the Lago Agrio litigation. Guerra has already admitted to lying to Chevron repeatedly and exaggerating information about the Defendants in order to enhance his bargaining position. *See e.g.* Guerra Depo. at 168 ("I told Chevron several things.  Some of them were true, others were exaggerations."); *Id.* at 149-50 (regarding his claim to Chevron that the LAPS offered him $300,000, Guerra stated "My intent was to improve

my position, the face of a good future negotiation for Mr. Zambrano and myself, so that to that end I said some things or I exaggerated some things."). When asked about his claim to Chevron that the LAPs had offered him $300,000, Guerra admits that this claim was "an exaggeration made to Chevron's representatives." *Id.; see also id.* at 155-7 ("I told the men who represented Chevron that because of my involvement previous to the issuance of the judgment and because of the judgment, that plaintiffs had offered to pay me $300,000, but I said it to improve my negotiating position. That's the truth."). Despite this vivid illustration of Guerra's ease at lying when convenient to his self-interest, Chevron continues to disingenuously trumpet Guerra's testimony as ground-breaking "evidence" in the case. *See, e.g.*, Brief of Respondent Chevron Corporation in Opposition to Petitioners Motion to Expedite Mandamus Proceedings at 7-8, *In re Hugo Gerardo Camacho Naranjo and Javier Piaguaje Payaguaje*, No. 13-772, Dkt. 58-1 (2d Cir. Filed April 3 2013) at 7-8. This Court should not be misled and should not allow a trial based on procured testimony of such questionable credibility.

Chevron's payment for Guerra's testimony would be objectionable standing alone, but when considered in the wider context of Chevron's litigation practices in this case – including the financial and reputational pressure that Chevron has used to "flip" other key witnesses like Stratus and Burford, the court cannot turn a blind eye. These tactics have so damaged the integrity of the discovery process in this case that there can be no "assurance of proceeding on the true facts." *Conn. Gen. Life Ins. Co.*, 482 F.3d at 1096–97 (citation and internal quotation marks omitted).

**B.  Chevron's conduct violates Federal Law and Ethical Rules**

Payments to fact witnesses for testimony -- even true testimony -- are expressly prohibited under both Federal Law and New York's Ethical Rules. *See New York v. Solvent Chemical Co.*, 166 F.R.D. 284, 289 (W.D.N.Y. 1996).

The Federal Anti-Gratuity Statute criminalizes payments to non-expert witnesses for testimony. 18 U.S.C. § 201. Anyone who

> directly or indirectly, corruptly gives, offers, or promises anything of value to any person, or offers or promises such person to give anything of value to any other person or entity, with intent to influence the testimony under oath or affirmation of such first-mentioned person as a witness,

can be fined, imprisoned, or both as well as "disqualified from holding office." 18 USC § 201(b)(3). Further, even without corrupt intent, anyone who "directly or indirectly, gives, offers, or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness . . ." can be fined, imprisoned, or both. 18 USC § 201(c). *See also United States v. Blaszak*, 349 F.3d 881, 885-87 (6th Cir. 2003).

The New York Rules of Professional Conduct likewise provide that a lawyer shall not "offer an inducement to a witness that is prohibited by law or pay, offer to pay or acquiesce in the payment of compensation to a witness contingent upon the content of the witness's testimony or the outcome of the matter." NY RPC 3.4; N.Y. Comm. on Prof'l Ethics, Op. 668 (16-94) June 3, 1994. *See also* ABA Model Rules of Prof'l Conduct, Rule 3.4(b); *In re Telcar Group, Inc.*, 363 B.R. 345, 355 (Bankr. E.D.N.Y. 2007) (["P]ayments to witnesses contingent on the content of testimony or the outcome of litigation are expressly forbidden" under New York ethical standards).

Under the Anti-Gratuity Statute and the New York Rules, witnesses may only be paid "reasonable" compensation for expenses associated with traveling to and time spent testifying. 18 USC § 201(d) (witness may only be paid "reasonable cost of travel and subsistence incurred"

18

and "reasonable value of time lost in attendance at any … proceeding"); NY Rule 3.4 (lawyer may only pay "reasonable compensation" for "loss of time in attending, testifying, preparing to testify or otherwise assisting counsel, and reasonable related expenses"). *See also In re Telcar Group, Inc.,* 363 B.R.at 353 ("fact witness can only be compensated for time spent preparing, consulting, and giving testimony at a deposition or trial," and "reimbursed for reasonable costs of travel and subsistence."). Any payments beyond those limits "are impressible and violate public policy." *Id.*

Compensation "must be reasonable, so as to avoid affecting, even unintentionally, the content of a witness's testimony." ABA Comm. on Ethics and Prof. Resp., Formal Op 96-402 (1996). *See Telcar Group Inc.,* 363 B.R. at 255 (noting potential violation of Disciplinary Rule 7-109(C) of NY Code of Professional Conduct where a witness would receive more than "reasonable compensation for lost time and reimbursement" and payments "have no relation to the amount of time expended" or "reasonable cost in attending or testifying at any proceeding"); *Caldwell v Cablevision Sys. Corp.,* 86 A.D.3d 46, 52 (N.Y. App. Div. 2d Dep't 2011) *aff'd* 20 N.Y.3d 365 (N.Y. 2013) ("Payment to a fact witness which bears no relation to the witness's reasonable losses… is nothing more than a fee for testifying"); *Rocheux Int'l of N.J. v. United States Merchs. Fin. Group, Inc.*, No. 06-6147, 2008 WL 3246837, at *4 (D.N.J. Oct. 5, 2009) (payments to fact witness improper where fees "did not compensate for his costs of attending trial or lost time during trial"); *Centennial Mgmt. Servs. v. Axa Re Vie,* 193 F.R.D. 671, 679-80, (D. Kan. 2000) (if payments seem "unreasonably high or disproportionate" to time spent on litigation matters, "then an inference could be drawn that the payments, in reality, were made for the substance or efficacy of [the witness's] testimony"). Unreasonably high payments disproportionate to the value of the time actually spent testifying "lean toward the procurement

of perjury," "the perversion of justice," and "corruption in our courts." *Hamilton v. General Motors Corp.,* 490 F.2d 223, 228 (7th Cir. 1973) (quoting *Wright v. Somers*, 125 Ill. App. 256, 257-58 (1906)).

Even if the court determines that there was no violation under Section 201 of the Anti-Gratuity Statute, this court can and should apply sanctions for violations of New York Ethical standards. The decision to pay a witness for factual testimony "cast[s] a cloud over the legitimacy of that testimony, and the Court must prevent this suspect evidence from contaminating future proceedings." *Rocheux Int'l of N.J.,* 2009 U.S. Dist. LEXIS 93082, at *11 ) (excluding witness testimony where "such a sanction [was] necessary to protect the integrity of [the] proceedings"); *see also Golden Door Jewelry Creations, Inc.*, 865 F. Supp. at 1521, 1526 (sanctions appropriate under Florida ethics standards because attorneys "knew about, acquiesced and even negotiated the amount of money the defendant paid to witnesses, informants, and intermediaries and actively participated and assisted in the transfer of the funds.").

1. **Chevron's payments for evidence and information are improper for a testifying fact witness**

When Chevron first paid Guerra for "evidence," even Chevron's own expert, professor Cohen, noted that payments could run afoul of the Anti-Gratuity statute if the witness might "potentially testify" despite the fact that Chevron claimed at the time to have "no present intention to call the witness to testify" Dkt. 977-4. 1 ¶ 14. But once Chevron knew Guerra likely would be a testifying witness, *see* DKt. 977-5 ¶5 (noting before second payment, Chevron had decided it would call Guerra to testify), these payments became clearly improper. *See* Declaration of Dean and Distinguished Professor of Law Erwin Chemerinsky, dated July 26, 2013, at ¶12 ("Chemerinsky Decl.") ("A lawyer who pays a testifying fact witness for physical evidence, beyond the reasonable value of such evidence, violates the rule against compensating

20

witnesses."). In any event, the payments Chevron made are rendered improper due simply to the outlandishly disproportionate rate paid.

To justify such large payments, Chevron has claimed this was not just for physical evidence but also for "information reflected in Guerra's documents and records," Dkt. 976 at 3, and "time and effort to collect this information" *Id.* at 1. While a lawyer "may pay reasonable costs to gather documents and physical evidence from various sources[,]" if a lawyer "pays a testifying witness for physical evidence, such payments must be based on the *reasonable value* of the evidence, and *a reasonable fee* for the witness's time spent gathering the evidence." Chemerinsky Decl. ¶ 9 (emphasis added). Chevron has repeatedly crossed that line. In obtaining Guerra's computer, Guerra was given $18,000 *in addition* to a new, state of the art replacement computer. In doing so, Chevron violated the rule against compensating witnesses. *See id.* ¶12*; and id.*¶10 (a lawyer "should not pay the witness more than the replacement cost" and "any costs incidental to copying the necessary data."). *Id.* ¶ 10.

Although Chevron contends the money was based in part on "time and effort to collect information," the record shows otherwise. The recorded conversation between Rivero, Ackerman and Guerra proves that the money was the product of a negotiation that had nothing whatsoever to do with time spent or the actual value of the evidence obtained. *See especially* Dkt. 1078-1 at 64-67.[8] There was no "collecting" of information involved – Guerra simply handed over his entire computer and his cell phone, allowed Chevron to photocopy his day planner, and gave Chevron access to his email accounts. Almost nothing was required of Guerra. *See id.* at 49 (INV

---

[8]    Guerra says "I have some attachment" to what he is turning over and Rivero respond "You will become more attached to what you can buy with the money we pay you." Dkt. 1078-1 at 64. Guerra says "but its [sic] so little"; Rivero responds, "This is what we have in cash. Between now and afternoon's end we'll have managed to have a little more." *Id.* Guerra says "make it fifty thousand" and Rivero says "Oh, you're asking more than twice" and  "Help us Buddy, a little, uh, you know. Help me a little." *Id.* at 65.

#5 says next step is "I go with this computer to, *to a lab* … where *they* could go through it and look for the information you explained to us is in there.") (emphasis added); *Id.* at 60 (Guerra tells them he is not good with computers, and tells Rivero and INV #5 "So then, *you,* would have to, would have to, calmly and with a technician, to peel away everything that is in there.") (emphasis added). The only time Guerra put into "collecting" this information was the time spent negotiating for the highest payment he could.

Equally problematic, in that same exchange, where the suitcase of cash changed hands, Chevron's agents made it clear that future payments would be contingent on future cooperation - namely, bringing Judge Zambrano on board. Rivero told Guerra he was expected to be the "bridge to Nicolas Zambrano" and "you get yours when a deal is reached with Zambrano, a part of it. And that is not negotiable with Zambrano…. The idea is that you get a, some part of the value of that, because we didn't get to Nicolas Zambrano except through you." Dkt. 1078-1 at 66-7. Promises of payments like this, contingent on testimony or favorable outcomes, are a clear violation of the rules. *See* NY RPC 3.4; *In re Telcar Group, Inc*., 363 B.R. at 355 (contingent payments "expressly forbidden under the ethical standards of the State of New York").

In a last ditch effort to explain away its massive payments, Chevron, with the help of Professor Cohen, attempts to create a new *post hoc* rule to justify its misconduct. Chevron argues it is "reasonable" to pay Guerra so much because the "evidence" "was expected to be of significant value in demonstrating Defendants' illegal scheme" Dkt. 976 at 4; *and id.* at 5 (quoting Cohen as saying one factor is "its expected value in demonstrating the illegal scheme"). But there is no basis in law for such a rule, and in fact the law is to the contrary. *See e.g.* Restatement (Third) of Law Governing Lawyers § 117(1) (2000) (lawyer may not offer to pay a witness any consideration "in excess of the reasonable expenses of the witness incurred and the

reasonable value of the witness's time spent in providing evidence."). Indeed, "[i]f that were the rule, there would be virtually no limitation on payments that lawyers could make to fact witnesses under the guise of obtaining evidence." Chemerinsky Decl. ¶ 11; *Id.* ¶ 13 (if allowed, "lawyers always could circumvent the prohibition of paying non-expert witnesses for their testimony by saying it was to pay for documents or other physical evidence.").

Chevron's ethics expert, Professor Cohen, submitted three different declarations over the span of six months. *See* Dkt. 977-4; Dkt. 977-5; Dkt. 977-6. Together, they demonstrate a remarkable evolution of opinion to fit the client's need to justify the expanding scope of its illegal and unethical conduct. Professor Chemerinsky's Declaration makes clear that Cohen's "opinion" is not representative of the Ethics Professionals community as a whole.[9] Chemerinsky Decl. ¶ 11. (The "reasonable value" of physical evidence "should *not* be based on its value to the lawyer or party obtaining the evidence.") (emphasis added).

### 2. Chevron's ongoing payments under the contract for testimony are impermissibly contingent on future cooperation and testimony

By its terms, the contract expressly obligates Guerra to testify in this case, and "at the request of Chevron" in any other related proceedings. *See* Dkt. 755-14 ¶ II.A.2 & 3; Section II.A., *supra.* Indeed, a main purpose of the payments and other non-cash benefits described in the contract is "so that Guerra will be able to prepare to testify, to testify, and to respond to investigators." *Id.* ¶ II.B.3. At the same time, the contract empowers Chevron to cut off money to Guerra if he chooses not to testify. *See id.* ¶ ¶ II.B.5, II.C.2. Although the contract states that the testimony must be truthful and that Chevron has no control over the content, *id.* ¶ II.B.3, it is well established that "[t]he payment of a sum of money to a witness to tell the truth is as clearly

---

[9]    Notably, Professor Chemerinsky's ethics opinion was provided without compensation. Chevron has not disclosed whether or not it has offered Professor Cohen compensation.

subversive of the proper administration of justice as to pay him to testify to what is not true." *Solvent Chemical Co.*, 166 F.R.D. at 289 (internal quotation marks and citations omitted); *see also In re Robinson*, 151 A.D. 589, 600, 136 N.Y.S. 548, 445 (1912) ("there certainly can be no greater incentive to perjury than to allow a party to make payments to its opponent's witnesses under any guise or on any excuse."); *United States v. Blaszak*, 349 F.3d at 885-87 ("Section 201(c)(3) criminalizes compensation for or because of testimony, regardless of its content."). Nor can the regular payments be justified as regular expenses associated with testifying, since the contract expressly states that: "[*i*]*n addition to* the compensation set forth*"* in the contract, "Chevron shall pay or reimburse Guerra for such reasonable travel or other expenses as he may incur in connection with preparing to testify or testifying[.]" *Id.* ¶ II.B.2 (emphasis added).

Chevron's payments to Guerra have also been and continue to be contingent on future cooperation, evidence, and favorable testimony, and on his ability to bribe the Ecuadorian judge in violation of the NY Ethics Rules and Federal Law. *See e.g.* N.Y. Comm. on Prof'l Ethics, Op. 668 (16-94) June 3, 1994; Restatement (3d) Law Governing Lawyers § 117(2) ("lawyer may not offer to pay a witness any consideration … contingent on the outcome of the witness's testimony or the outcome of the litigation"). The contract, by its terms, promises future compensation continuing during and even after trial - including monthly payments of $12,000 for at least two years, health insurance, and a future favorable change of immigration status - all of which are contingent on Guerra's performance under the terms of the contract, *See* Section II.A. *supra.* Moreover, at the end of two years is a "reassessment" to determine whether payments will continue, at which point Chevron could decide not to keep paying Guerra based on the content of the testimony provided at trial. *See* Dkt. 755-14 ¶ II.B.5. The possibility of future payments, which Chevron has not committed to make yet, renders the payments contingent. Guerra, like

24

any other witness in his circumstances, would be influenced by the certainty that any further payments would be entirely contingent on his continued "cooperation" with Chevron."

### 3. Chevron's payments are manifestly unreasonable

The astronomical amounts Chevron paid to Guerra are further evidence that the payments were unreasonable and for an improper purpose. These payments are manifestly unreasonable in amount, duration and scope, and thus violate federal law and New York Rules of Professional Conduct.

### a. Chevron's monthly payments are unreasonably high and disproportionate to his time spent in the litigation and amount to a witness salary

Although witnesses may be reimbursed for reasonable expenses incurred in testifying and preparing to testify, Chevron's payments to Guerra dramatically exceed these limited exceptions in quantity and purpose.

The only cases Defendants have found supporting large payments to witnesses are those where a witness worked extensively as a consultant on the case and was paid at a reasonable hourly rate based on their expertise and time spent on the litigation. *See e.g. Centennial Management Services, Inc.* 193 F.R.D. 675 (payments to witness permissible where based on hourly rate paid for work as consultant; contract laid out tiered rates for assistance as a consultant and witness in litigation; litigation was complex and witness had years of firsthand experience and because of his services, large payments were reasonable). These cases are inapposite here where Guerra is clearly not a consultant, and is not working on this litigation in any way beyond providing his own testimony.

Where, as here, the witness is retired or does not work, payments should not be "unreasonably high or disproportionate to the time spent on litigation." *See id. at* 679-80 (the witness in that case was a former employee of the defendant and was unemployed at the time his

services were offered in the case). According to the ABA, in situations "where a witness is retired or unemployed" and "has not sustained any direct loss of income in connection with giving or preparing to give testimony" a lawyer must determine "the reasonable value of the witness's time based on all relevant circumstances." ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 96-402 (1996)) (emphasis added); *Centennial Mgmt. Serv., Inc*., 193 F.R.D. at 680 (same); *See also e.g., United States v. Cinergy Corp.,* No. 99 CV 1693, 2008 WL7679914, at *12 (S.D. Ind. Dec. 18, 2008) (payment of $200 an hour to witness was beyond "the reasonable value of time lost" for a person who was retired and had made $88 per hour for his services at the time of his retirement three years earlier.). Chevron cannot justify the payments as compensating for any "loss" associated with income either.

Given that Guerra was unemployed prior to deciding to testify for Chevron, his lack of income is not a result of that testimony. *See e.g.* Guerra Depo. at 150. Guerra's last job, as a lawyer for a municipality, ended in June 2012 and he was paid one last monthly amount of $1,000 to cover July. *Id.* at 151. When the actual contract was negotiated in November 2012, Guerra had been unemployed for months. Dkt 977-6 (Cohen Decl. #3) ¶4 (Guerra "does not now have a salaried position"). Chevron glosses over this significant detail in the contract, noting only that "upon entry to the USA, Guerra will not have employment" without mentioning this is no change from his circumstance in Ecuador. *See* Dkt. 755-14 at I.B.12

Even when Guerra was last employed, his salary never amounted *to even half* of what he is presently paid by Chevron. *See* Dkt. 1078-1 at 18-20 (stating salary at court was $4,800/month); Guerra Depo. at 50-51 ($1500/month at the court at first and eventually about $5,000; $500 to $1,500/month when working for insurance company; $1,012/month as lawyer for municipality).

Tellingly, Chevron opted not to disclose the amount it would pay Guerra to its own "expert."  Professor Cohen expressly notes that "I have no basis to assess whether the amounts proposed by Chevron are reasonable, but I have been informed by Chevron's counsel that Chevron is prepared to demonstrate the reasonableness of the amounts in New York court." Dkt. 977-6 ¶33. Yet even Cohen noted that such payments must be "*reasonable* approximations of *actual* out-of-pocket expenses and losses." *Id.* (emphasis added). Chevron's payments go exponentially farther. Ultimately, Chevron's payments amount to an extravagant witness salary, and the "payment of a salary to a witness, in exchange for the witness's agreement to testify or to be available to testify, is a clear violation of the rule." Chemerinsky Decl. ¶8. If allowed, "there would be little left of the rule against compensating fact witnesses." *Id.* ¶13.

       **b.**     **The payments to live in the US cannot be justified on the basis of Guerra's Safety**

The sole basis Chevron provides to justify these extravagant cash and non-cash benefits are the "risks to the personal safety and security to Guerra and his family." Dkt. 755-14 ¶ II.B.III; *See also* Dkt. 976 at 4.  But this excuse fails. While there may be some justification for allowing parties to provide for the safety of a witness, like any permissible payment to a witness, it must be *reasonable. See* Chemerinsky Decl ¶7 (if bona fide personal safety or security risk exists due to testimony, "it is permissible for attorneys to pay expenses *reasonably necessary* to keep the witness in a safe location") (emphasis added); *See also Caldwell v Cablevision Sys. Corp., 2*0 N.Y.3d 365, 371 (2013) (unreasonable compensation can "hinder the truth seeking process because it tends to influence witnesses to remember things in a way favorable to the side paying them") (quotations and citations omitted). Chevron has set Guerra up with an unnecessarily extravagant lifestyle that goes much too far.

Chevron previously submitted an analysis purporting to justify these payments on the grounds that they would be insufficient to maintain the standard of living Guerra previously enjoyed. Dkt. 977-3 (Ex. 3634); Dkt. 976 at 5.[10] However, it is unreasonable to compare Chevron's payments with the affluent standard of living Guerra and his family maintained in Ecuador before Guerra became unemployed. Maintaining a comparable affluent standard of living is simply unnecessary to ensure Guerra's safety and availability. The "severely circumscribed" nature of allowable payments cannot be indefinitely expanded to encompass providing a lavish lifestyle to someone in the U.S., simply because that is the lifestyle he enjoyed in his home country. If that were the case, it would be legitimate to pay a rich person unbounded amounts for his testimony, simply because he is rich. Indeed, participants in the Federal Witness Security Program are merely provided with "financial assistance for housing, subsistence for basic living expenses and medical care." *Fact Sheet: Witness Security, 2013*, U.S. MARSHALS SERVICE, http://www.usmarshals.gov/duties/factsheets/witsec-2013.pdf.

Payments to a witness for security expenses "should, however, be carefully scrutinized to ensure that the security threat is real, and that the expenses paid are reasonable and do not amount to an inducement to testify or compensation for testifying." Chemerinsky Decl ¶7. Even if Chevron's alleged security threat were real – there is no reason why Guerra's safety need be secured by affluence. Chevron's monthly payments alone add up to $144,000 per year -- three times the average annual salary and median household income of the average resident in Miami-Dade County, where Guerra was relocated.[11]  It is also more than the annual salary of a county

---

[10]     The opinion indicates that the analysis was based on Guerra's last stated income – however, this analysis is misleading because Guerra was not employed at the time. This might explain why Chevron redacted the income amounts stated in the opinion. Dkt. 977-3 (Ex. 3634) at 2.

[11]     The median household income of the average resident in Miami-Dade County is $40,552 and the average annual salary is $45,230.  Dr. Robert D. Cruz & Mr. Robert Hesler, *Miami-Dade County*

judge, and a Florida state circuit court judge;[12] and enough to support two families of five in Miami-Dade County. These payments alone place Guerra near the top 20 percent of households in Miami-Dade County.

Even if these extravagant living expenses and housing expenses could be justified prior to and during trial, which they cannot, there is no basis for such payments continuing after trial - which they undoubtedly will in this case if the trial proceeds as scheduled this year.

The additional non-cash benefits Chevron provides are further improper inducements. Even if such benefits could be justified for Guerra, they are extended under the contract to not only Guerra and his wife, but to his adult son and his adult son's family. Dkt. 755-14 ¶ II.B.1. Chevron has also said it will help Guerra's other son, who is already living in the United States, with his immigration status. *See* Guerra Depo. at 220. There can be no justification for providing such benefits to Guerra's adult son who never had to relocate from Ecuador in the first place.

In sum, Guerra's monthly allowance alone is unreasonably extravagant to ensure his safety without also impermissibly influencing his testimony.

### C. Chevron has acted in bad faith

Chevron procured and submitted paid-for testimony to this Court—not to fulfill the truth-seeking function of the civil discovery process—but to subvert it. By submitting paid-for testimony that has already been directly contradicted and deemed false, dkt. 974-1, ¶14, Chevron

---

*Economic & Demographic Profile 2013*, MIAMI-DADE COUNTY DEPT. OF REGULATORY & ECONOMIC RESOURCES, 2013, at 6 *available at* http://www.miamidade.gov/oedit/library/miami-dade-profile-2013.pdf; *About Miami-Dade County: History*, MIAMI-DADE COUNTY, http://www.miamidade.gov/info/about_miami_dade_statistics.asp (last updated Feb. 24, 2012).

[12]    For 2012-2013, a Miami Dade County judge's annual salary is $134,280, and a state circuit court judge, who earns about $142,178. *Salaries of Elected County Constitutional Officers and School District Officials for Fiscal Year 2012-13*, THE FLORIDA LEGISLATURE'S OFFICE OF ECONOMIC AND DEMOGRAPHIC RESEARCH. *available at* http://edr.state.fl.us/content/local-government/reports/finsal12.pdf.

would "put the factfinder and parties 'to the disadvantage, hindrance, and delay of ultimately extracting the truth by cross examination, by extraneous investigation or other collateral means.'" *ABF Freight Sys. v. NLRB*, 510 U.S. 317, 323 (1994) (quoting *United States v. Norris*, 300 U.S. 564, 574 (1937)). Not only is there reason for the Court and the parties to question the veracity and integrity of Guerra's declaration, *see* Section II.B., *supra*, there is also good reason to believe that it is false and was obtained by Chevron to further its litigation goals.

Shortly after Chevron submitted Guerra's suspect declaration to the court, dkt.746-3, key elements of Guerra's declaration were directly contradicted with a sworn statement from Judge Nicolás Zambrano, the target of Guerra's accusations regarding judicial corruption and ghostwriting. Dkt. 974-1, ¶ 14. Significantly, Zambrano's sworn statement also shed light on *Chevron's* own attempts to use Guerra to offer Zambrano a (minimum) $1 million bribe "in exchange for a statement in favor of Chevron." Dkt. 974-1, ¶ 19.

Chevron's unethical and illegal efforts to secure favorable testimony from Guerra and to attempt to use Guerra to bribe Judge Zambrano betray Chevron's bad faith and disregard for the integrity of the truth-seeking function of the discovery process. The procurement and introduction of favorable paid-for testimony causes the same defects in the trial process as the manipulation or destruction of evidence and should therefore be subject to the same sanctions. Tampering with the truth-seeking process is nothing less than an act of bad faith. *See e.g., Gutman v. Klein*, No. 03CV1570, 2008 WL 4682208 (E.D.N.Y. Oct. 15, 2008) report and recommendation adopted, No. 03 CIV. 1570, 2008 WL 5084182 (E.D.N.Y. Dec. 2, 2008) (manipulating or destroying evidence amounts to bad faith); *McMunn v. Memorial Sloan–Kettering Cancer Ctr.*, 191 F.Supp.2d 440, 446–62 (S.D.N.Y. 2002) (misrepresentation of facts in testimony is bad faith). As if this weren't enough, Chevron's unethical tactics have also

tarnished any testimony that could come from other key witnesses such as Maest, Beltman, and Bogart, whose testimony will be the result of shameless pressure tactics unleashed against them by Chevron and its counsel.

Indeed, an Ecuadorian Appellate Court—to which Chevron presented many of the "fraud" allegations that are the subject matter of this case—has already admonished Chevron for, among other things, its "evident attempt[s] to abuse the legal process and with the clear intent to obstruct the administration of justice[,]" Order, Sole Chamber of the Provincial Court of Justice of Sucumbíos, Nueva Loja, Ecuador, *Maria Aguinda et al. v. Chevron Corp.,* Case No. 2011-0106, at 3-5 (Jan. 3, 2012) at 2,14-15, and for its "manifest ... bad faith[.]" *Id.* at 16.

Several other U.S. district courts have already sanctioned or admonished Chevron or its counsel for its harassing tactics during the course of its "until hell freezes over" strategy, [13] many of which include targeting and harassing non-profit organizations critical of Chevron. *See* Order, *Chevron Corp. v. Donziger*, No. 3:13-mc-80038-CRB, Dkt. 59 at 6, 11 (N.D. Cal. April 5, 2013) (threatening to impose sanctions and quashing two overbroad subpoenas issued by Chevron to non-profit advocacy organization, Amazon Watch, because subpoenas targeted core First Amendment expressive activity; and finding that despite Chevron's allegations that it took part in a "conspiracy against Chevron" through its campaign, "all that Chevron has shown this Court is that Amazon Watch has been very critical of Chevron's operations in Ecuador.").

---

[13]     *See, e.g.,* Order, *Chevron Corp. v. Stratus,* No. 10-cv-00047-MSK-MEH, D.E. 293 (D. Colo. Nov. 15, 2010) (ordering counsel to stop asking the Ecuadorian Plaintiffs' environmental consultants harassing questions during depositions); *Chevron Corp. v. Salazar, et al.,* No. 11-0691-LAK, at 9 (D. Or. Nov. 30, 2011) (ordering Chevron to pay $32,945.20 to E-LAW, a non-profit environmental organization that filed an amicus brief in the Lago Agrio Litigation, because Chevron's subpoena "was, at least in part, meant to harass"); *Chevron Corp. v. Bonifaz*, No. 4:09-05371, Dkt. 71 (N.D. Cal. Oct. 8, 2010) (dismissing for lack of credible evidence Chevron's SLAPP (strategic lawsuit against public participation) suit alleging that one of the Ecuadorian plaintiffs' counsel engaged in malicious prosecution).

Chevron's history and pattern of related misconduct in this case further demonstrates bad faith. Improper payments to Guerra are simply one example of a much wider pattern of litigation misconduct purchasing loyalty and cooperation from potentially hostile witnesses in an effort to subvert the truth and serve its litigation goals. Chevron has paid a similar package - purportedly amounting to at least $2.2 million since 2009 - to Diego Borja, a former Chevron contractor, who worked to entrap Ecuadorian judges on Chevron's behalf and who has claimed to have evidence that could "devastate" Chevron. In addition to paying the effective equivalent of "hush money," Chevron has also shielded Borja and his family from judicial scrutiny in Ecuador by moving them to the United States. Section, II.A, *supra.* There is clearly a pattern here.

Even when Chevron has not been able to pay witnesses to cooperate, it has coerced them to do so by threatening reputation and financial ruin. Chevron coerced Burford into defaming Patton Boggs by threatening Burford with the prospect of being "blackballed." *See* Dkt. 1329 at 33.  Meanwhile, Chevron named Stratus Consulting as a defendant in the RICO suit and waged a relentless campaign to tarnish Stratus's reputation and convince Stratus's clients to stop working with the company. *Supra*, II.C., *supra*. After years of legal threats, tarring of reputation and near financial ruin under pressure from Chevron, Stratus dramatically changed its story. Stratus settled Chevron's claims against it by signing an unlawful commitment to testify. The unlawful settlement agreement also imposes an impermissible gag on Stratus – requiring that Stratus agree *not* to stand behind positions it has taken in the past. *See* II.C, *supra*.

Courts have expressly found that "orchestrating [a] settlement" of claims against a witness and "undertaking not to sue" a witness are "the equivalent of making cash payments" as a means of making a witness "sympathetic and securing his testimony." *Id*. at 289-90 (finding settlement and agreement not to sue "were designed to overcome the hostility" of witness and

32

thus witness's cooperation had been "purchased") (internal quotations omitted). Thus where a party has threatened suit and then dropped the threat "as a means of obtaining [the witness's] cooperation[,]" that party "went too far." *Id.* Chevron has gone too far here.

Finally, courts are more willing to grant terminating sanctions where the offending party has been warned that their actions may result in dismissal of the case. *See e.g. McMunn*, 191 F. Supp. 2d at 444-45 (dismissing complaint after party received "adequate notice of the possibility that the Court would dismiss her suit for misconduct"). Chevron has been put on notice by this Court, when, during argument, this Court stated, "everybody ought to be extremely sensitive to the witness tampering issue, if you get my drift." Dkt. 759-5 at 84.

### D. Chevron's conduct has, and will continue to prejudice the defendants if allowed to continue

Chevron's submission of paid-for testimony not only threatens the integrity of the judicial process, it has also caused substantial prejudice to the parties by misleading the court and the general public. Since the submission of Guerra's suspect declaration, this Court has repeatedly relied on the truth of the contents of the declaration in considering or deciding motions by both parties. *See e.g.* Dkt. 1321 (relying on Guerra's declaration when dismissing counter-claims against Chevron); *see also* Dkt. 905 at 62. In turn, Defendants have taken pains to correct the record, *see e.g.* dkt. 916, dkt. 974, but the Court continues to consider Chevron's evidence without considering the manner in which Chevron obtained it.

The degree to which Guerra's evidence has misled this Court was made apparent in a recent order in which this Court discussed the Guerra declaration, stating: "Chevron submitted the declaration of a former Ecuadorian judge in the Lago Agrio case who attested to having worked out an arrangement with the other LAP lawyers in which the *LAPs' lawyers would pay $1 million to ghostwrite the judgment under the judge's name.*" Dkt. 1321 at 19 (emphasis

33

added). This is, of course, a rather confusing statement—a close review of Guerra's declaration, to which the court cites, never mentions a sum of $1 million. Remarkably, the only evidence in the record concerning a $1 million bribe is the bribe that *Chevron* unsuccessfully offered Judge Zambrano. *See* Dkt 974-1 at ¶19.

The entirety of the testimony that Chevron submitted from Guerra - as well as the other key witnesses Chevron has coerced into compliance - is riddled with such internal inconsistencies that there is no way for this Court, nor the parties, nor the trier of fact, to know the truth. Chevron's litigation goals might be served by generating ambiguity with statements from a man who admits to misrepresenting the facts to gain a financial advantage, but this Court and Defendants are surely harmed by it.

## V. REQUEST FOR RELIEF

Chevron's misconduct warrants case terminating sanctions. It should be clear that despite past threats of sanctions, and the exercise of sanctions by other courts in this country and in Ecuador, neither Chevron nor its counsel are deterred by monetary fines or other forms of sanctions. As one of the richest companies in the world, Chevron is simply immune to monetary sanctions and sees them as a cost of doing business. Moreover, Chevron has made a mockery of this judicial process – obscuring and subverting the truth through pay-offs, intimidation and coercion. Chevron is simply incapable of submitting itself to the truth seeking process.

Should the court decline to order case terminating sanctions at this time, it should, in the alternative preclude Chevron from introducing the testimony of the witnesses it has procured through the unethical tactics outlined in this memorandum, namely, that of Alberto Guerra Bastidas, Ann Maest, Douglas Beltman, and Christopher Bogart any other witnesses from Stratus or Burford who might testify on this subject. This Court should also preclude Chevron from

relaying on Guerra's declaration and testimony to advance arguments from this point forward, including through trial. Guerra has contradicted his own testimony too many times to count. Cross-examination cannot ensure the truth is uncovered.

Courts have recognized that "the proper sanction for the wrongful payment of fact witnesses is the exclusion of the tainted witness." *Rocheux Int'l of N.J., Inc.,* 2009 U.S. Dist. LEXIS 93082 at *11-12 (citing *Golden Door Jewlery Creations Inc. v. Lloyds Underwriters Non-Marine Ass'n,* 865 F. Supp. 1516, 1526-27 (S.D.Fla. 1994)). Unless and until this Court sends the message that egregious misconduct will not be tolerated, Chevron will continue to subvert the truth-seeking function of discovery, use money and coercion to obtain favorable testimony, and mock the integrity of the judicial process.

In addition to excluding evidence, a court may also restrict an offending party from presenting certain arguments.[14]  These sanctions are appropriate where a party's misconduct results in prejudice to the non-offending party – as has already happened and will continue here.[15]  Preclusion is appropriate if these sanctions shift the risks to the offending party and deter them from future misconduct.[16]  The Court should thus also preclude Chevron from presenting arguments based on testimony from all four witnesses that Chevron has tainted – namely, Guerra, Maest, Beltman and Bogart. Finally, this Court should issue appropriate sanctions against any counsel involved in the aggressive and abusive litigation tactics described herein.

---

[14]    *See e.g.*, *Daval Steel Prods. v. M/V Fakredine*, 951 F.2d 1357, 1366 (2d Cir.1991) (barring party from presenting evidence opposing claim); *see also Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719-21 (3d Cir.1997) (preventing spoliator's expert witness from testifying about spoliated evidence), cert. denied, 522 U.S. 1128 (1998); *American Stock Exch., LLC v. Mopex, Inc.*, 215 F.R.D. 87 (S.D.N.Y.2002) (adopting recommendation that Chevron's motion to preclude affirmative defense be granted due to discovery violations).

[15]    *Passlogix, Inc. v. 2FA Tech., LLC,* 708 F. Supp. 2d 378, 421 (S.D.N.Y. 2010).

[16]    *Kravtsov v. Town of Greenburgh,* 10-CV-3142 CS, 2012 WL at *5.

Dated: September 12, 2013

GOMEZ LLC
Attorney at Law

By:     *s/ Julio C. Gomez*
        Julio C. Gomez

        The Sturcke Building
        111 Quimby Street, Suite 8
        Westfield, NJ
        T: 908-789-1080
        F: 908-789-1081
        E-mail: jgomez@gomezllc.com

        *Attorney for Defendants*
        *Hugo Gerardo Camacho Naranjo and*
        *Javier Piaguaje Payaguaje*

Dated: September 12, 2013     By:     */s/ Steven R. Donziger*
        Steven R. Donziger
        245 W. 104th Street, #7D
        New York, NY 10025
        Telephone: (917) 678-3943
        Facsimile: (212) 409-8628
        Email: StevenRDonziger@gmail.com

        *Pro Se*

        LAW OFFICES OF STEVEN R.
        DONZIGER, P.C.

Dated: September 12, 2013

By:     */s/ Steven R. Donziger*
        Steven R. Donziger
        245 W. 104th Street, #7D
        New York, NY 10025
        Telephone: (212) 570-4499
        Facsimile: (212) 409-8628
        Email: StevenRDonziger@gmail.com

        *Attorney for Defendants Law Offices of*
        *Steven R. Donziger LLC and Donziger &*
        *Associates, PLLC*