**EXHIBIT 1**

Page 1

```
1
2    UNITED STATES DISTRICT COURT
3    SOUTHERN DISTRICT OF NEW YORK
4    11 CIV 0691(LAK)
5    -----------------------------------x
     CHEVRON CORPORATION,
6
              Plaintiff,
7
8        - against -
9
     STEVEN DONZIGER, et al.,
10
              Defendants.
11
     -----------------------------------x
12                May 2, 2013
                  9:07 a.m.
13
14
15        Videotaped Deposition of ALBERTO
16   GUERRA BASTIDAS, taken by Defendants,
17   pursuant to Notice, held at the offices of
18   Gibson Dunn & Crutcher LLP, 200 Park
19   Avenue, New York, New York, before Todd
20   DeSimone, a Registered Professional
21   Reporter and Notary Public of the State of
22   New York.
23
24
25
```

Page 2

```
 1
 2    A P P E A R A N C E S :
 3
      GIBSON DUNN & CRUTCHER LLP
 4    200 Park Avenue
      New York, New York 10166
 5         Attorneys for Plaintiff
      BY:    RANDY M. MASTRO, ESQ.
 6           rmastro@gibsondunn.com
             AVI WEITZMAN, ESQ.
 7           aweitzman@gibsondunn.com
 8        - and -
 9    GIBSON DUNN & CRUTCHER LLP
      3161 Michelson Drive
10    Irvine, California 92612-4412
      BY:   VIRGINIA FITT, ESQ.
11          vfitt@gibsondunn.com
12
13
14
      SMYSER KAPLAN & VESELKA, LLP
15    Bank of America Center
      700 Louisiana, Suite 2300
16    Houston, Texas 77002
             Attorneys for Defendants Javier
17           Piaguaje Payaguaje and Hugo Gerardo
             Camacho Naranjo
18    BY:    LARRY R. VESELKA, ESQ.
             lveselka@srv.com
19           JAROD STEWART, ESQ.
             jstewart@skv.com
20
21
22
23
24
25
```

Page 3

```
 1
 2   A P P E A R A N C E S: (Continued)
 3   GOMEZ LLC
     111 Quimby Street
 4   Suite 8
     Westfield, New Jersey 07090
 5          Attorneys for Defendants Javier
            Piaguaje Payaguaje and Hugo Gerardo
 6          Camacho Naranjo
     BY:    JULIO C. GOMEZ, ESQ.
 7
 8
     KING & SPALDING LLP
 9   1185 Avenue of the Americas
     New York, New York 10036-4003
10          Attorneys for Chevron Corporation in
            other litigation
11   BY:    CALINE MOUAWAD, ESQ.
              cmouawad@kslaw.com
12          EDWARD KEHOE, ESQ.
              ekehoe@kslaw.com
13
14
     CLAYMAN & ROSENBERG LLP
15   305 Madison Avenue
     Suite 1301
16   New York, New York 10165
            Attorneys for The Witness
17   BY:    CHARLES E. CLAYMAN, ESQ.
              clayman@clayro.com
18          SAMANTHA KANTOR, ESQ.
              kantor@clayro.com
19
20   ALSO PRESENT:
21      MAX GITTER, ESQ., Special Master
22      JUSTIN ORMAND, ESQ., Assistant to the
        Special Master
23
        JESUS RIVERA, Spanish Interpreter
24
        JAMES ROBERTS, Videographer
25
```

Page 4

1

2              THE SPECIAL MASTER:  Two

3    things.  I just did the first of the

4    three.  Two things.  First, I want to be

5    sure everybody knows about the rule that

6    if you use a writing or a video or an

7    audio in some language other than English,

8    that you have to have a translation, side

9    by side translation in front of me as well

10   as in front of the witness.  That is item

11   one.

12              Item two, it is my rule there

13   are no speaking objections of any kind and

14   no colloquy of any kind while the witness

15   is present in the room.  Therefore, every

16   objection has to be followed by a single

17   word or catch phrase, privileged, form,

18   relevance, whatever it is, and no more, in

19   front of the witness.

20              I am told that this witness has

21   no English to speak of and if that is true

22   and if counsel are satisfied, all counsel

23   are satisfied to that effect, we can relax

24   that portion of the rule a very small

25   amount.  You can elaborate a sentence

Page 5

```
 1
 2   worth.  But I would much rather that any
 3   colloquy or argument about a privilege
 4   objection be done at a break, that they
 5   can be collected, people can be asked to
 6   move on, there are various ways to do it.
 7   But it is much better to do it at a break,
 8   among other reasons, since argument
 9   doesn't count, argument over objections
10   and things of that sort don't count unless
11   I say so against the seven hours, it is
12   much easier for the reporter, or whoever
13   is doing the counting, to keep track of
14   where we stand in the seven hours.
15            There was another point and I
16   just lost it for a moment.  When I think
17   of it, I will come back to it.
18            MR. VESELKA:  One of the issues
19   that we would have with regard to trying
20   to have some discussions briefly with him
21   present, Mr. Rivera is going to
22   reflexively translate.
23            THE SPECIAL MASTER:  You know
24   what, you are right.  Let's stick with the
25   rule in its strictest form, no colloquy of
```

Page 6

1

2   any kind while the witness is in the room.

3                    MR. VESELKA:   If I may,

4   Mr. Gitter, I have two points I would like

5   to bring up very briefly.

6                    One is that I believe you

7   recall we had originally requested that

8   this be a more than seven-hour deposition

9   because of the translation, and as I

10  understood the way the court has ruled is

11  that is sort of within your purview today,

12  we will wait and see and be as efficient

13  as we can and see what we can get done.

14  But I wanted to preserve that we may be

15  asking you at the end for some additional

16  time.  I don't know.  Though we have

17  already agreed with them at least for this

18  setting that they said they only had this

19  one day available.  So when we are

20  rescheduling it --

21                    MR. MASTRO:   That's correct, we

22  only have this one day for today.

23                    THE SPECIAL MASTER:   I

24  understand we issued an order yesterday

25  that Zambrano, if he comes, is going to be

1
2   more than just the three and a half hours.
3   If you ask for more time, I'm a little
4   worried about the amount of time just
5   exploding on us.
6             MR. MASTRO:  And we object to
7   the more than seven hours in this case
8   because they are getting seven hours to
9   depose him.  We are not taking any of the
10  time.
11            THE SPECIAL MASTER:  That much
12  I understood.  I don't need to decide that
13  now and I'm not going to decide it.
14            MR. VESELKA:  As to the order
15  vis-à-vis Mr. Zambrano, we could talk on a
16  break later, I don't want to take up the
17  time now, because there is a clarification
18  I wanted to ask about because I didn't
19  understand, if you granted more time after
20  the three and a half for us and the three
21  and a half for them and you granted them
22  more time, I assume if there is more time
23  granted it would be split evenly too?
24            THE SPECIAL MASTER:  No.
25            MR. VESELKA:  I thought Judge

Page 8

```
 1
 2   Kaplan said whatever time on any witness
 3   would be split evenly.
 4              THE SPECIAL MASTER:  That's not
 5   the way Mr. Katz and I talked about this.
 6   That's not the way we understood that.  We
 7   will figure it out.  We will clarify it.
 8              MR. VESELKA:  The final thing
 9   is last evening we received an additional
10   production with regard to this witness, or
11   matters that regard this witness that we
12   just received, which is the same thing
13   that happened with Mr. Rivero's deposition
14   last week.
15              THE SPECIAL MASTER:  You mean
16   you received it from Chevron?
17              MR. VESELKA:  Yes, things that
18   we believe should have been produced way
19   in advance of now.  The issue to be taken
20   up is even though it is marked
21   confidential and there are still
22   redactions in it, but we will do -- I want
23   to get done, if I can, today.  But I just
24   want to preserve all issues to come
25   forward.
```

Page 9

```
 1
 2              THE SPECIAL MASTER:  Got it.
 3              MR. MASTRO:  Your Honor, to be
 4   clear, it was 11 pages of more personal
 5   information recently with redactions about
 6   location and things like that for a
 7   witness who has security concerns.
 8              THE SPECIAL MASTER:  Folks, let
 9   me just say, I'm not saying this to boast,
10   but I got all of the alleged privileged
11   documents from the counsel for the witness
12   yesterday, Beyer, I got them late at night
13   on computer, which was very difficult to
14   open.  I managed somehow to get them open
15   with the help of Mr. Ormand.  I read those
16   very carefully, very late into the night.
17   I got up at 4:30 in the morning and
18   finished the reading and figured out what
19   I was going to do as a result.
20              I know you folks work exactly
21   the same way.  We all have been working
22   that way since we started the practice of
23   law, some of us 45 years ago.  So
24   understand how much sympathy you get from
25   me on productions the night before,
```

1

2   particularly if they are only 11 pages,

3   having just seen one literally 200 pages

4   that I had to first try to open.  But you

5   may get sympathy.

6              MR. MASTRO:  Your Honor, I just

7   want to make one very brief point, which

8   is that I will be the person --

9   Mr. Clayman is the witness' lawyer.  I

10  will also be defending in terms of the --

11  from Chevron's perspective, but

12  Mr. Weitzman who is here, he is closer to

13  some of the document issues and otherwise

14  there may be times where I have to step

15  out or have to turn to him to speak on

16  certain questions.  I just wanted to let

17  you know.

18              THE SPECIAL MASTER:  I assume

19  counsel will have no objection.  Everybody

20  understands this is a game of singles, not

21  doubles, so there is only one person

22  making objections.  There is only one;

23  there can be small exceptions.

24              Now I have been reminded by

25  Mr. Clayman's name that I wanted to say

Page 11

1
2   something on the record and make a
3   disclosure.  The disclosure is this.  Like
4   virtually every lawyer in the City of New
5   York of a certain age, I have known
6   Mr. Clayman for a very long time and we
7   have gotten along well.  I do not frankly
8   remember whether I actually had a case
9   with him.  I think I did, but I can't
10  remember what it was.  In any event, I'm
11  quite confident that his presence here
12  will not affect my ability to move fairly.
13  If I can get consent from counsel about
14  that, that would be appreciated.
15              MR. VESELKA:  I don't have any
16  problem with your being here because of
17  Mr. Clayman's presence.
18              THE SPECIAL MASTER:  Very good.
19              *   *   *
20              THE VIDEOGRAPHER:  Good
21  morning.  We are now on the record.
22  Please note the microphones are sensitive
23  and may pick up whispering and private
24  conversations.  Please turn off all cell
25  phones or place them away from the

Page 12

1
2  microphones as they can interfere with the
3  deposition audio.  Recording will continue
4  until all parties agree to go off the
5  record.
6            My name is Jim Roberts
7  representing Veritext with offices in New
8  York City, New York.  Today's date is May
9  2nd, 2013.  The time is approximately
10  a.m.  This deposition is being held at
11  Gibson Dunn located at 200 Park Avenue,
12  New York City, New York, and is being
13  taken by counsel for the defendant.  The
14  caption of the case is Chevron Corporation
15  versus Steven Donziger, et al.  The case
16  is filed in the U.S. District Court,
17  Southern District of New York, case number
18  11 CIV 0691(LAK).  The name of the witness
19  is Alberto Guerra Bastidas.
20            Our court reporter, Todd
21  DeSimone, also of Veritext, has noted
22  counsel's appearances and will now swear
23  in the interpreter and the witness.
24       *    *    *
25  J E S U S    R I V E R A,

Page 13

```
 1              A. GUERRA BASTIDAS
 2   called as an interpreter, was duly sworn
 3   to translate the testimony from English to
 4   Spanish and Spanish to English as follows:
 5        *    *    *
 6   A L B E R T O   G U E R R A
 7   B A S T I D A S,
 8   called as a witness, having been first
 9   duly sworn, was examined and testified
10   as follows:
11              THE SPECIAL MASTER:  One small
12   mechanical matter.  Can I be informed of
13   who it is that is keeping the time?
14              THE VIDEOGRAPHER:  I would be
15   happy to.
16              THE SPECIAL MASTER:  You know
17   it runs only while the witness is in the
18   room.
19   EXAMINATION BY MR. VESELKA:
20       Q.      Good morning, Mr. Guerra.  Can
21   you give us your full name, please, sir.
22       A.      I go by the name of Alberto
23   Guerra Bastidas.
24       Q.      And you have signed I believe
25   it is two declarations for Chevron to use
```

1                   A. GUERRA BASTIDAS

2    in this case; is that correct?

3                   MR. MASTRO:  Objection to form.

4       A.        I have signed three sworn

5    statements.

6       Q.        What are the dates of those

7    three?

8       A.        November 2012, January 2013 and

9    April 2013.

10      Q.        And the one for April 2013, do

11   you know what proceeding it was going to

12   be used in?

13      A.        That statement makes -- strike

14   that.  That declaration makes reference to

15   one document that I found among the main

16   documents and that I provided to Chevron.

17      Q.        Which document is that?

18      A.        A document that I identify as a

19   memory aid.

20      Q.        My question was do you know

21   whether that declaration -- do you know in

22   what proceeding, rather, the proceeding

23   between Chevron and the Republic of

24   Ecuador in the BIT arbitration or this

25   case that declaration was going to be

```
 1                A. GUERRA BASTIDAS

 2    used?

 3         A.       I'm not aware as to in what

 4    proceedings it may be used.

 5         Q.       How long is the April

 6    declaration?

 7         A.       It is short, quite short.

 8         Q.       One or two pages?

 9         A.       From what I can recall, one

10    page.

11         Q.       What do you remember saying in

12    that declaration?

13         A.       That because my attorney,

14    Counsel Clayman, told me about the need to

15    provide documents that were requested by

16    the other party, I had to review such

17    documents among personal documents brought

18    over from Ecuador and because of that,

19    among the many documents that I have that

20    were brought over from Ecuador, I found

21    that document attached to other similar

22    documents that referred to personal

23    administrative matters which are also

24    entitled memory aid.

25         Q.       Are you saying that you have
```

Page 16

```
 1              A. GUERRA BASTIDAS
 2   recently brought up from Ecuador personal
 3   documents that you did not have available
 4   to review when you were preparing your
 5   earlier declarations?
 6              MR. MASTRO:  Objection to form,
 7   mischaracterizes prior testimony.
 8              THE SPECIAL MASTER:  The
 9   witness may answer if he understands the
10   question.
11      A.      I kindly request that you
12   repeat the question, please.
13      Q.      Surely.  I will step back and
14   try to break it down into a series of
15   questions.
16              In working with Chevron to
17   prepare the declarations you signed in
18   November of 2012 and in January of 2013
19   you had reviewed certain sets of documents
20   and provided some of those documents to
21   Chevron, correct?
22      A.      Yes.
23      Q.      The additional documents that
24   you found that were also referred to as
25   ayuda de memoria, or memory aid, in this,
```

```
 1              A. GUERRA BASTIDAS
 2    that's the subject of your April 2013
 3    declaration, it came from a review of some
 4    different set of documents that you just
 5    recently brought up from Ecuador; is that
 6    what you are saying?
 7         A.      That's not what I'm saying.
 8         Q.      You made a reference in your
 9    answer earlier about the April
10    declaration, that you had gone through
11    some documents that you had recently
12    brought up from Ecuador; is that correct?
13         A.      I came from Ecuador in January
14    2013 and I brought with me a large amount
15    of documents, some of them personal in
16    nature, some professional in nature, some
17    family related.
18         Q.      How voluminous was it?  I mean,
19    would you say it is five boxes, six boxes,
20    two boxes, how many?
21         A.      I could quantify the volume of
22    documents as 100 pounds in documents.
23         Q.      And I guess my question
24    presumed, and I guess your answer
25    presumed, these are actually hard copy,
```

```
 1              A. GUERRA BASTIDAS
 2   these are paper documents; is that
 3   correct?
 4        A.     Yes, the documents I'm
 5   referring to are physical documents,
 6   paper.
 7        Q.     Had you reviewed that set of
 8   documents in the time frame between April
 9   of 2012 and November 12th of 2012 --
10   excuse me, let me back up and start over.
11              Had you reviewed that set of
12   papers and documents before you signed
13   your declaration of November 17, 2012?
14              MR. MASTRO:  Objection to form.
15              THE WITNESS:  So should I
16   answer notwithstanding the objection?
17              THE SPECIAL MASTER:  Yes, if
18   you understand it.
19        A.     Could you please repeat the
20   question.
21        Q.     Had you reviewed that 100
22   pounds of documents that you just referred
23   to that you brought up in January of 2013
24   before you executed the declaration for
25   Chevron on November 17th, 2013 -- '12,
```

Page 19

```
 1              A. GUERRA BASTIDAS
 2    2012?
 3              MR. MASTRO:  Same objection.
 4      A.       Well, those documents, before
 5    they were attached, before they were made
 6    part of the luggage and brought from
 7    Ecuador, I reviewed them -- I reviewed
 8    them very lightly without noticing
 9    specifically in detail the contents of
10    each one because there were very many.
11      Q.       Did you make available to
12    Chevron any of those particular documents
13    before you executed the declaration on
14    November 17th, 2012?
15      A.       Regarding those documents
16    specifically, no.
17      Q.       When did those documents --
18    when in January did those documents get to
19    you in the United States?
20      A.       They arrived a few days after
21    my physical arrival.
22      Q.       When did you arrive in the
23    United States in January of 2013?
24      A.       I arrived precisely on January
25    12th, 2013.
```

Page 20

                    A. GUERRA BASTIDAS

 1

 2        Q.      ████ ████ ████ ███ █████ █████ ███ ████

 3   ██████

 4              MR. CLAYMAN:  Objection, your

 5   Honor.  I would like to be heard.

 6              THE SPECIAL MASTER:  Let's have

 7   the witness out of the room.

 8              THE VIDEOGRAPHER:  Off the

 9   record, 9:35 a.m.

10              (Witness departs the room.)

11              MR. CLAYMAN:  Your Honor, there

12   are serious security concerns with regard

13   to my client.  I don't think it is

14   necessary, proper or appropriate for him

15   to be forced to say where he arrived.  We

16   have given the date and the location is

17   not known and we don't want it to be

18   known.

19              MR. VESELKA:  They have given

20   us numerous documents that show him flying

21   ███ ████ █████ ██████ ██ █████████ ████████

22   ████ ████ ████ ██████ ███ ████████ ███ ██

23   already have a number of those dates.

24   Also, there is no reason for any

25   confidentiality of where he lives or where

Page 21

```
 1              A. GUERRA BASTIDAS

 2   he is in the U.S.  The only issues that

 3   the court has addressed has been issues of

 4   concern of security in Ecuador, of course

 5   with which we disagree, but there has not

 6   been any issue with regard to any security

 7   risk in the United States.

 8              So we don't see any basis, we

 9   think it is inappropriate.  It is

10   inappropriate for the redactions in that

11   same regard after they have already waived

12   it with disclosing documents with respect

13   to his flight schedules between the

14   various cities.

15              THE SPECIAL MASTER:  Mr.

16   Clayman?

17              MR. CLAYMAN:  Your Honor, it

18   isn't the environment in Ecuador that we

19   are concerned about, it is individuals in

20   Ecuador who would want to do this

21   individual harm, my client, who easily

22   could come to this country.  He has shown

23   absolutely no showing as to why he needs

24   to know that information.

25              MR. MASTRO:  And, your Honor, I
```

Page 22

1          A. GUERRA BASTIDAS

2    just wanted to say from Chevron's

3    perspective, we have designated documents

4    as confidential that we thought revealed

5    his location.  We have redacted the

6    ███████  ██████  ████▪ ████████  ██████████  ██

7    the documents that were produced last

8    night.  I don't think Mr. Veselka has

9    accurately characterized the --

10            THE SPECIAL MASTER:  I don't

11   see there is a pressing need to know

12   ███████  ████  ████  ████  ██████  ██████  ████

13  ██  ██████  ████  █████  █████  ██████  ██████  █████

14   anywhere else in the United States.

15            MR. CLAYMAN:  Thank you, your

16   Honor.

17            MR. VESELKA:  We are going to

18   need talk with him about who he is meeting

19   with, when he has given declarations, what

20   he has reviewed.

21            THE SPECIAL MASTER:  That you

22   can do.

23            MR. VESELKA:  So I can't ask

24   him where he was when he signed a

25   declaration, when he has put a location on

Page 23

```
 1            A. GUERRA BASTIDAS
 2   it?
 3              THE SPECIAL MASTER:  Just a
 4   second.  If he has put the location on
 5   it -- and can somebody tell me what
 6   location was put on it?
 7              MR. VESELKA:  One is New York,
 8   one is in Chicago.  I don't know the April
 9   one.  They have never produced the April
10   one to us.  That is the first we have ever
11   learned about it today.  So I don't know
12   where that one was signed.
13              MR. MASTRO:  The April
14   declaration obviously, your Honor, was
15   filed in connection with the lawsuit.
16   They obviously received that.  It was
17   e-filed.  But leaving that aside, we do
18   not state on the face -- it is not stated
19   on the face of declarations that
20   Mr. Guerra signed, other than perhaps the
21   one for April that was submitted, and I'm
22   not sure, we are checking that right now.
23              THE SPECIAL MASTER:  Can you
24   show me what you are talking about, Mr.
25   Veselka?
```

```
 1              A. GUERRA BASTIDAS
 2                  MR. VESELKA:  I can read from
 3    the last line of the November 17th one,
 4    "executed in the city of Chicago, Illinois
 5    on November 17, 2012."
 6                  THE SPECIAL MASTER:  It does
 7    not give you an address, right?
 8                  MR. VESELKA:  No, it does not
 9    give an address.  If the issue is address
10    versus cities, that's a different thing.
11                  THE SPECIAL MASTER:  Just a
12    second.  Let's be very careful.  You can
13    ask him only what appears on the document
14    about the city, that is to say that no
15    further inquiry about his locations apart
16    from what is shown in the document.
17                  MR. VESELKA:  This is a
18    witness, a major witness that we may want
19    to subpoena for trial.  I believe we are
20    entitled to know -- I think they are
21    obligated to let us know the location of
22    witnesses.
23                  THE SPECIAL MASTER:  At the
24    point when you do that, when you want to
25    do that, you can make an application for
```

```
 1              A. GUERRA BASTIDAS
 2   that.  But right now you have no need to
 3   know anything about his addresses beyond
 4   what is on the face of the documents that
 5   you have been given so far as I can tell.
 6              And I do understand the
 7   security concern that is being expressed
 8   by Mr. Clayman.  I have heard it before,
 9   not with respect to this witness.  I have
10   heard it before.  I have heard another
11   lawyer in a related proceeding express a
12   security concern about a person residing
13   in the United States with respect to
14   possible harm to come to him from someone
15   in Ecuador.  So I cannot say off the top
16   of my head that it is a frivolous position
17   that is being taken.
18              MR. VESELKA:  I understand
19   that.  And --
20              THE SPECIAL MASTER:  I'm sorry,
21   look, I'm not trying to prevent you from
22   learning anything you are entitled to
23   learn.  I'm just weighing the need, the
24   nature of the need that you have against
25   the severity of the concern that is being
```

```
 1              A. GUERRA BASTIDAS
 2    expressed by a member in good standing of
 3    the Bar of the City of New York.
 4              MR. VESELKA:  And I will be
 5    ready to move on.  May I ask of counsel,
 6    because I'm unaware, I somehow missed if
 7    they have filed this third declaration, as
 8    to when that was filed, with what
 9    pleading?
10              THE SPECIAL MASTER:  You
11    certainly may.
12              MR. WEITZMAN:  My
13    understanding, I'm going to get the filed
14    copy sent over to me and printed, that it
15    was filed with the reply motion on the
16    summary judgment, on the summary judgment
17    motion in April.
18              THE SPECIAL MASTER:  In fact,
19    Mr. Weitzman is actually refreshing my
20    recollection, I think I saw that.
21              MR. WEITZMAN:  There were two
22    declarations filed, one by Mr. Guerra and
23    one by Mr. Clayman with the reply papers.
24    I will obtain a copy.
25              MR. VESELKA:  Do you remember
```

1                A. GUERRA BASTIDAS

2      when that was filed?

3                MR. WEITZMAN:  I don't know the

4      exact date, but I will obtain copies and

5      provide a copy to you of the filed copy.

6                MR. VESELKA:  Thank you.

7                THE SPECIAL MASTER:  I

8      guarantee you that Mr. Ormand can get it

9      for you in just a few minutes by going to

10     the docket.

11               MR. VESELKA:  But I need to ask

12     one other clarification, Mr. Gitter.  To

13     the extent they have produced documents to

14     us, Mr. Guerra, through Mr. Clayman, has

15     produced documents to us which reflect his

16     flight schedules which list cities, can I

17     use those?

18               THE SPECIAL MASTER:  If they

19     have been marked confidential, then we are

20     going to have to seal that portion of the

21     transcript.

22               MR. VESELKA:  These are not

23     marked confidential.

24               THE SPECIAL MASTER:  Then yes,

25     you may.

Page 28

```
 1              A. GUERRA BASTIDAS
 2              MR. VESELKA:  That's where the
 3  questions were coming from.
 4              THE SPECIAL MASTER:  If it
 5  appears right on the face of it, fine.
 6              MR. MASTRO:  He can come back
 7  in, right?
 8              MR. VESELKA:  Yeah.
 9              THE SPECIAL MASTER:  Let's move
10  on.  You have my ruling.  To the extent
11  and only to the extent it has been exposed
12  in a nonconfidential form may you refer to
13  his whereabouts in the United States.
14              (Witness returns to the room.)
15              THE VIDEOGRAPHER:  Back on the
16  video record, 9:45 a.m.
17              (Guerra Exhibit 7 marked for
18  identification.)
19  BY MR. VESELKA:
20      Q.      Mr. Guerra, you have been
21  handed what is marked as Exhibit No. 7.
22  Can you identify this as some travel
23  itineraries for you and your family in
24  January and I think February, let's see if
25  it goes back, and -- from November of 2012
```

Page 29

```
 1              A. GUERRA BASTIDAS
 2    through January and February of 2013?
 3                 MR. MASTRO:  Objection to form.
 4                 THE SPECIAL MASTER:  Answer it
 5    if you can understand it.
 6        A.       Yes, I understood.
 7                 Yes, these reflect tickets --
 8    air tickets for flights for my wife and
 9    myself.
10        Q.       And were these tickets all paid
11    for by Chevron?
12        A.       Yes.
13        Q.       And if we turn to page 101,
14    that shows you and your wife flying from
15    ████ ███ ███ ████ ███ ████ ██ ██████
16    ████ ███████
17        A.       Yes, sir, yes.
18        Q.       And that's the trip you were
19    referring to a while ago when you came to
20    the United States?
21        A.       Yes.
22        Q.       And that's when the personal
23    effects, including the 100 pounds of
24    documents, were shipped up sometime in or
25    around the date of that trip?
```

Page 30

1              A. GUERRA BASTIDAS

2      A.      Well, no, those documents, that

3  shipment, that was sent later.

4      Q.      So you did not have those

5  ████████  █████  ████  █████  █████  █████  ████  █████

6  █████  ██████  █████  ███████  ██████  ███

7  other Chevron officials on January 13th of

8  2013, did you?

9              MR. MASTRO:  Objection to form.

10     A.      On the date that you mentioned,

11  the date in your question, I didn't have

12  that documentation, the documents I'm

13  referring to.

14     Q.      Now, while we have got Exhibit

15  7 out here, on that page 101 it reflects a

16  ████████  ████  █████  ██████  █████  █████  █████  █████

17  ███  █████  ████  █████  █████

18      ██  ██████  ██████  ████  █████  █████

19  █████  ██████  █████  ██████

20  ██████  █████  ███████  █████████

21  █████  █████  █████  ███  ██  █████  ██

22  █████  █████  ███████  █████████  █████

23  █████  ████  ████  █████  █████  ████  ██

24  █████  █████  ████  ██████  █████  ██  ██

25  █████  █████  █████  ██████  █████

1           A. GUERRA BASTIDAS

2       Q.      So you did not fly back to

3   Quito on February 2nd of 2013?

4       A.      No, I have not done that.

5       Q.      And I think you just said you

6   haven't been back since, correct?

7       A.      I have not returned to Ecuador

8   since February.

9       Q.      Do you have any plans to return

10   to Ecuador?

11       A.      I consider that I will return

12   to Ecuador once I consider that there is

13   no risk to my personal safety and my

14   family's.

15       Q.      When the ticket was first

16   booked that's reflected in the itinerary

17   on that page, were you planning at that

18   time when you came up to the United States

19   to return to Ecuador?

20       A.      I have not planned to return to

21   Ecuador since January 12th when I arrived

22   in the United States.

23       Q.      And that's because during that

24   time frame of January 12th through

25   February 2nd you knew Chevron was going to

Page 32

                    A. GUERRA BASTIDAS

1   file in this case your declarations,

2   correct?

3                MR. MASTRO:  Objection to form.

4                THE SPECIAL MASTER:  Hold on a

5   second.  Let me look at this objection.

6                You may answer it if you

7   understand it.

8       A.       I knew that I could not return

9   to Ecuador once it became known, once it

10  was made public in Ecuador regarding my

11  disposition to cooperate with Chevron in

12  this issue.

13      Q.       As part of your cooperation

14  with Chevron, you provided the first two

15  declarations we described earlier of

16  November 17th, 2012 and January 13th of

17  2013, correct?

18      A.       I signed those declarations,

19  yes.

20      Q.       And in those declarations you

21  admitted to violating Ecuadorian law,

22  correct?

23      A.       Yes.

24      Q.       So you knew you would be at

Page 33

```
 1              A. GUERRA BASTIDAS
 2    risk for criminal prosecution in Ecuador
 3    if you returned, correct?
 4         A.      I feared physical attacks and
 5    attacks to the physical integrity and
 6    personal integrity of myself and my
 7    family.
 8              MR. VESELKA:  Objection,
 9    nonresponsive.  Move to strike.
10              THE SPECIAL MASTER:  Stricken.
11         Q.      My question was you knew that
12    your admissions in your declarations of
13    the violation of Ecuadorian law meant you
14    could be prosecuted in Ecuador for those
15    violations, correct?
16         A.      They could do so and in fact
17    they will do so.
18         Q.      You stated in your declarations
19    that you knew that these were violations
20    of law because you admit today, do you
21    not, that you violated Ecuadorian law?
22              THE SPECIAL MASTER:  I object
23    to that question.
24              MR. MASTRO:  Objection to form.
25              THE SPECIAL MASTER:  I'm sorry,
```

Page 34

1              A. GUERRA BASTIDAS

2    I don't understand that objection.

3                 MR. VESELKA:  You don't

4    understand the question?

5                 THE SPECIAL MASTER:  Yeah.

6                 MR. VESELKA:  I will rephrase

7    the question.

8                 THE SPECIAL MASTER:  You are

9    mixing up two time frames.  I'm sorry.

10                MR. VESELKA:  Purposely, but I

11   can straighten it out.

12                MR. MASTRO:  Your Honor, I

13   don't want to interrupt the line of

14   questioning but I would like to be heard

15   when the witness is out of the room on the

16   question of this striking.  I didn't want

17   to interrupt at that moment or have a

18   speaking objection, but I would like to be

19   heard later on.

20                THE SPECIAL MASTER:  Fine.

21                MR. MASTRO:  Thank you.

22      Q.      Do you admit today, as you

23   admitted in your declaration, that you

24   violated Ecuadorian law?

25      A.      I admit having done some bad

1              A. GUERRA BASTIDAS

2   things in my life but in this case I admit

3   to having violated Ecuadorian laws along

4   also with other people.

5       Q.      And the violations you admit

6   include writing judgments or orders for

7   other judges when you were not a judge?

8       A.      Yes.

9       Q.      And that could constitute

10  tampering with a public document?

11      A.      I'm not fully aware as to how

12  that would be qualified as a crime in

13  Ecuador.  Perhaps --

14              THE INTERPRETER:  And the

15  interpreter needs to look up the term

16  "falsedad ideologica."  Excuse me, real

17  quick.

18              THE SPECIAL MASTER:  While he

19  is doing that, can we please have printing

20  out of the question and answer that I had

21  stricken, please, since we are going to be

22  discussing it later at a break?  Somebody

23  please arrange that.

24      A.      Misrepresentation of a

25  document.

Page 36

```
 1              A. GUERRA BASTIDAS
 2      Q.       You also admit to having
 3  solicited bribes with regard to your
 4  involvement of trying to help Chevron in
 5  the Lago Agrio litigation?
 6      A.       Could you please repeat and
 7  clarify your question, please?
 8      Q.       Sure.
 9              You admit that you directly
10  and/or through others approached
11  representatives of Chevron to solicit
12  bribes for your trying to help them in the
13  Lago Agrio litigation?
14              MR. MASTRO:  Objection to form.
15              THE SPECIAL MASTER:  You may
16  answer it if you understand it.
17      A.       I did understand, yes.
18              I admit having approached
19  Chevron on two occasions through the
20  suggestion and authorization of
21  Mr. Zambrano with the second time, the
22  second occasion that I approached Chevron
23  when I stated Mr. Zambrano's intentions to
24  help with the judgment in exchange for
25  money.  Obviously I was kind of a
```

```
 1              A. GUERRA BASTIDAS
 2   go-between.  Yes, I was, too, hoping that
 3   I would get some amount for me.
 4        Q.       You expected to get paid as
 5   part of that transaction, if it was done?
 6                 MR. MASTRO:  Objection to form.
 7        A.       Yes.
 8        Q.       And you expected that --
 9                 MR. MASTRO:  The witness,
10   please give me a chance to state my
11   objection first before we proceed.
12                 THE WITNESS:  Yes.
13        Q.       And you expected the source of
14   that payment to you to be Chevron?
15                 MR. MASTRO:  And I object to
16   the form again, foundation, and assumes
17   facts not in evidence.
18                 THE SPECIAL MASTER:  I think if
19   you rephrase it, "if the source of that
20   payment were to be made."
21        Q.       I'm going to rephrase the
22   question.
23                 If the payment that you were
24   soliciting had been made, you expected to
25   be paid a portion of that from the money
```

Page 38

```
 1              A. GUERRA BASTIDAS
 2   that would have been paid by Chevron?
 3              MR. MASTRO:  I'm going to
 4   object to form again.
 5              THE SPECIAL MASTER:  You may
 6   answer.
 7      A.       I considered that if Chevron
 8   agreed -- acceded to paying Mr. Zambrano,
 9   Mr. Zambrano would share with me an amount
10   or a percentage from that amount.
11      Q.       And that was your motivation
12   for approaching Chevron, correct?
13      A.       That was the motivation
14   Mr. Zambrano had when requesting that I
15   approach Chevron.
16              MR. VESELKA:  Objection,
17   nonresponsive.
18              THE SPECIAL MASTER:  I'm sorry,
19   that is in part responsive.  I'm not
20   striking that.  You may follow it up.
21      Q.       My question goes to your
22   motivation.  Your motivation in
23   approaching Chevron was to get paid
24   whatever portion you would get if a
25   transaction were paid by Chevron, correct?
```

Page 39

```
 1              A. GUERRA BASTIDAS
 2              MR. MASTRO:  Objection to form.
 3    Asked and answered.
 4              THE SPECIAL MASTER:  No, it
 5    hasn't.  Go ahead.
 6       A.       Regarding this, in me, there
 7    were two motivations, to collaborate, to
 8    contribute with my friend, Mr. Zambrano,
 9    and be the recipient of some amount of
10    money.
11       Q.       Let's go back to the topic we
12    were discussing earlier with regard to the
13    documents that were brought up as part of
14    your baggage to the United States sometime
15    after January 12th of 2013.
16              MR. CLAYMAN:  Is that a
17    question?  I'm sorry.
18              MR. VESELKA:  No.
19              THE SPECIAL MASTER:  In fact,
20    I'm going to strike that because I'm
21    worried about something that may be
22    unclear on the record to you.  It is not
23    unclear on the record to me because I'm
24    following it very closely on the computer
25    screen.
```

Page 40

1              A. GUERRA BASTIDAS

2              I'm striking your preamble.

3   Ask a question.  Your preamble has a

4   different characterization of documents

5   from what he had stated pursuant to your

6   question about documents before and which

7   documents were shipped up at that time.

8              MR. CLAYMAN:  Thank you, your

9   Honor.

10      Q.        Have you made all of those

11  documents that arrived whenever you

12  testified they arrived that you say you've

13  looked through now available to your

14  counsel, Mr. Clayman, to review for

15  responsiveness to the subpoena?

16              MR. CLAYMAN:  I would object to

17  that, your Honor.

18              THE SPECIAL MASTER:  Let's have

19  the witness out of the room.

20              THE VIDEOGRAPHER:  Off the

21  video record, 10:14 a.m.

22              (Witness departs the room.)

23              THE SPECIAL MASTER:  What's the

24  nature of your objection, Mr. Clayman?

25              MR. CLAYMAN:  Your Honor, I

Page 41

1              A. GUERRA BASTIDAS

2   believe that what my client and I have

3   spoken to, what documents I have shown him

4   and what documents he has shown me is part

5   of our work product, part of our

6   preparation involves privileged

7   conversations, and the result of it is

8   work product and is not subject to

9   inquiry.

10            THE SPECIAL MASTER:  I thought

11  you were going to raise a different issue.

12            MR. CLAYMAN:  I will raise that

13  one too.

14            MR. VESELKA:  I can determine

15  whether this witness --

16            THE SPECIAL MASTER:  Let me

17  tell you my problem.  I was paying very

18  close attention on the screen to the exact

19  words you were using because I was afraid

20  that a confusion had arisen over what

21  documents came right after January 12.

22            Your question on that issue

23  included the word "personal effects" and

24  "documents" that I thought the witness was

25  talking about personal effects and

Page 42

1              A. GUERRA BASTIDAS
2    documents having arrived then and he
3    distinguished those from professional
4    documents.  Because this all began with
5    the basis for your questioning about this
6    last affidavit.  I want to be clear what
7    my problem has been and why I was saying
8    anything at all.
9              I want to think about your
10   objection, Mr. Clayman, because I think
11   the record means that he shipped personal
12   documents around January 12 and so I'm not
13   sure that your objection even applies.
14   But I want to think about that.  But I
15   also wanted to be sure that everybody in
16   the room heard what I see on the screen,
17   and what I heard, about what documents
18   were being sent then.
19              MR. VESELKA:  But my
20   understanding from his previous testimony
21   was that at some point after the 12th and
22   13th, that as part of coming up he had 100
23   pounds of documents, that some were
24   personal, some were professional, and some
25   were, I forgot what the third --

Page 43

```
 1              A. GUERRA BASTIDAS
 2              THE SPECIAL MASTER:  You are
 3  now identifying the problem that I think
 4  you have created on the record.  I had
 5  understood, you having begun with what are
 6  the documents that you are talking about
 7  with respect to this last affidavit, and
 8  he made clear that he had reviewed a set
 9  of personal documents which he hadn't
10  previously reviewed and came up with a new
11  document called a memory aid that he had
12  just filed.
13              As I understood the testimony
14  at least, and I think you had made clear
15  in one last question about the
16  documents -- about what was shipped up on
17  January 12 or thereabouts you used the
18  phrase "your personal effects and
19  documents."  I thought he was talking
20  about and you were talking about the
21  personal documents.  If you want to
22  clarify it, you can do that.
23              MR. VESELKA:  We can come back
24  to this later.  All I'm trying to find out
25  is if there are material that he got and
```

Page 44

1          A. GUERRA BASTIDAS

2  reviewed after the material that had been

3  prepared and produced, whether it ever got

4  looked at for responsiveness either to the

5  request from Chevron or to the subpoena.

6  Because I'm going to ask where did you

7  look to produce them, did you provide

8  them.

9          THE SPECIAL MASTER:  Why don't

10  you do that.  By the way, with that word

11  "subpoena" you have just mooted

12  Mr. Clayman's objection.

13          MR. MASTRO:  Your Honor, should

14  we wait for a different break or can I be

15  heard on the striking question?

16          THE SPECIAL MASTER:  I guess

17  since he is out, we are on a break.  Go

18  ahead.  The question was "So you knew you

19  would be at risk for criminal prosecution

20  in Ecuador if you returned, correct?"

21          No, let's go back.

22          "Question:  As part of your

23  cooperation with Chevron, you provided the

24  first two declarations we described,

25  November 17th and January 13th, correct?

Page 45

```
 1                 A.  GUERRA BASTIDAS
 2                 "I signed those declarations,
 3    yes.
 4                 "And in those declarations you
 5    admitted to violating Ecuadorian law?
 6                 "Answer:  Yes.
 7                 "Question:  So you knew you
 8    would be at risk for criminal prosecution
 9    in Ecuador if you returned, correct?
10                 "Answer:  I feared physical
11    attacks and attacks to the physical
12    integrity and personal integrity of myself
13    and my family.
14                 "Mr. Veselka:  Objection,
15    nonresponsive, move to strike.
16                 "The Special Master:
17    Stricken."
18                 Now, sir, make your argument.
19                 MR. MASTRO:  Your Honor, the
20    reason why Mr. Guerra's answer I believe
21    was partially responsive to the question
22    is that the suggestion of Mr. Veselka's
23    question and the line of questioning is
24    that this witness left Ecuador or wouldn't
25    return to Ecuador because he feared
```

Page 46

```
 1              A. GUERRA BASTIDAS
 2   criminal prosecution alone.  In fact, the
 3   witness answers it and says actually, I
 4   wouldn't go back because I fear my
 5   physical safety.  It is not because of
 6   that.
 7              THE SPECIAL MASTER:  No, no,
 8   I'm sorry, I overrule -- you are wrong.
 9   The striking stands.  You can say what you
10   would like.
11              My problem, let me just tell
12   you, Mr. Veselka, the problem you are
13   creating, if this is taken out of context
14   in any publicity, there is a problem.
15              MR. MASTRO:  This is the
16   problem, your Honor.  He is trying to
17   create a false impression.  The witness is
18   saying --
19              THE SPECIAL MASTER:  Mr.
20   Mastro, take it up with Judge Kaplan if
21   you disagree with my ruling.  You have two
22   days to appeal.  My ruling is this was
23   unresponsive to the specific question he
24   asked.  The specific question he asked
25   was, so you knew you would be at risk of
```

Page 47

1              A. GUERRA BASTIDAS

2    prosecution in Ecuador, correct?  Answer:

3    I feared physical attack for a different

4    reason.

5              He didn't ask him about fears.

6    He didn't ask him about fears of any kind.

7    He didn't ask him about fears of being

8    prosecuted.  He asked him about fears of

9    going back for fear of prosecution.  He

10   asked him the simple question, you knew

11   you would be at risk for prosecution,

12   period.  He is entitled to that.  He is

13   cross-examining the witness.

14             The witness made clear that, A,

15   he admitted that he violated the law; B,

16   he also made clear as a bell throughout

17   that he feared physical attack.  I mean,

18   please, Mr. Mastro, you need no more

19   argument.  I'm ruling against you.  Take

20   it up with Judge Kaplan if you disagree.

21             MR. MASTRO:  I'm going to take

22   it up, your Honor.  But the suggestion

23   that he wouldn't go back to Ecuador

24   because he feared criminal prosecution,

25   and that is not what the witness was

Page 48

```
 1              A. GUERRA BASTIDAS
 2   responding.  The witness said I won't go
 3   back to Ecuador because I fear for my
 4   safety.
 5              THE SPECIAL MASTER:  Mr.
 6   Mastro, as you well know from prior
 7   experience, I believe that when a question
 8   calls for a yes or no answer, as this one
 9   is, and is very simple and is declarative
10   and has nothing in it other than one
11   simple declarative statement of content,
12   he could have answered it yes or no.  He
13   should have answered it yes or no.  The
14   volunteered portion was unresponsive and
15   stricken.
16              MR. VESELKA:  Since we have
17   taken this break, do we want to go ahead
18   and take a real break so we don't have to
19   do another one in 20 minutes?
20              THE SPECIAL MASTER:  Correct,
21   let's do that.
22              (Recess taken.)
23              THE VIDEOGRAPHER:  We are going
24   back on the record at 10:38 a.m.  This is
25   the beginning of disk two in the
```

Page 49

```
 1              A. GUERRA BASTIDAS
 2   deposition of Alberto Guerra Bastidas.
 3   BY MR. VESELKA:
 4       Q.        In January of 2012 how were you
 5   employed?
 6       A.        At that time I was an attorney
 7   for an insurance company.
 8       Q.        In Quito?
 9       A.        In Quito.
10       Q.        And how long did you have --
11   from when until when did you have that
12   job?
13       A.        From what I can recall, I had
14   this job from June of 2008 to December of
15   2012, with two short periods during that
16   time.
17       Q.        You mean two short periods
18   where you were not working for that
19   insurance company?
20       A.        Yes.
21       Q.        And what was the reason for
22   those two intervals not working for that
23   company?
24       A.        Because during the intervals
25   that I'm referring to, I worked for the
```

Page 50

```
 1              A. GUERRA BASTIDAS
 2   State.
 3        Q.       And what was that position?
 4        A.        On the first one, I was an
 5   advisor of a National Assembly member,
 6   meaning of the National Assembly.  And the
 7   second intervals, I was the attorney for a
 8   municipality, for a local government,
 9   sectional local government of La Joya de
10   los Sachas.  That's the name.
11        Q.       How long were you the lawyer
12   for that municipality, from when to when?
13        A.        From what I recall, I was the
14   attorney for the municipality between May
15   and June of 2012.
16        Q.       What were you paid when you
17   were on the Provincial Court of Sucumbios?
18        A.        At first, from what I recall, I
19   was receiving a monthly salary of $1,500
20   approximately, but by the end of my
21   position, of my employment, I was earning
22   around $5,000 per month.
23        Q.       And what did you earn working
24   for the insurance company?
25        A.        In the insurance company, the
```

Page 51

```
 1              A. GUERRA BASTIDAS
 2   beginning, I was earning $1,500 and toward
 3   the end I was earning $500.
 4        Q.      What did you earn as the lawyer
 5   for the municipality La Joya de los
 6   Sachas?
 7        A.      I remember having received
 8   around $1,012 per month.
 9        Q.      In 2012 you were trying to do
10   some renovations or repairs to your home;
11   is that correct?
12        A.      I was trying to finish the
13   construction of my home in the best way.
14        Q.      So the house was not yet
15   completed?
16        A.      Correct.
17        Q.      Were you living in the house or
18   was this going to be a new house you were
19   going to move into?
20        A.      In 2012 the house had not been
21   completely finished according to what had
22   been planned, but my family and I had been
23   living in that house since January.
24        Q.      Now, you told Chevron's lawyers
25   when you were meeting with them that you
```

1               A. GUERRA BASTIDAS

2   were making $80,000 a year as of January

3   2013; is that right?

4               MR. MASTRO:  Objection to form.

5               MR. CLAYMAN:  There is an

6   objection.

7               THE SPECIAL MASTER:  Objection

8   overruled.

9       A.      In my intent to improve my

10  situation and Zambrano's situation in

11  negotiations with Chevron, I mentioned to

12  Chevron some things like what you were

13  quoting.

14      Q.      So as part of your negotiating

15  with Chevron, you overstated your income;

16  is that what you are saying?

17              MR. MASTRO:  Objection to form.

18  Misstates his prior testimony.

19              THE SPECIAL MASTER:  Just a

20  second.  He is asking him, is that what he

21  is saying.  It is all right.  The question

22  is fine.

23      A.      I'm stating that in the face of

24  a possible future negotiation I overstated

25  regarding the income or the money that I

1          A. GUERRA BASTIDAS

2   was receiving at that time.

3      Q.      Did you also overstate the

4   income of your son in those same

5   discussions?

6      A.      I don't specifically recall

7   having touched upon the issue of my son's

8   income.

9      Q.      Do you remember telling anyone

10  for Chevron or anybody in those

11  negotiations that your son in Ecuador was

12  making $40,800 a year?

13     A.      It is possible that I might

14  have talked about that detail because we

15  were talking generally about many

16  subjects.

17     Q.      What did you earn in 2012?

18     A.      In 2012, at the end of 2012, I

19  made a report for the purposes of my tax

20  statement, and if I remember correctly in

21  that report I said that I earned $42,000

22  approximately.

23     Q.      In the negotiations with

24  Chevron that led up to your entering into

25  the agreement with them, which we will

Page 54

```
 1              A. GUERRA BASTIDAS
 2   discuss more later, did Chevron ever ask
 3   you to show the documents with regard to
 4   what you had reported to the SRI about
 5   your income in 2012?
 6       A.      What I do recall specifically
 7   is that I gave to one of Chevron's
 8   representatives a copy of the original
 9   document which stated my income and the
10   payment of taxes to my government in the
11   amount of approximately $3,000.
12       Q.      In April of 2012 you entered
13   into -- you made some approaches --
14              THE SPECIAL MASTER:  Now you
15   are changing your year.  Are you meaning
16   to?
17              MR. VESELKA:  Yes, sir.
18              THE SPECIAL MASTER:  Go ahead,
19   sorry.
20       Q.      Going back to April of 2012 you
21   made some approaches to Chevron to see if
22   they would want to make payments to
23   influence the final -- excuse me, let me
24   start over.
25              In April of 2012 you made
```

1              A. GUERRA BASTIDAS

2      approaches to Chevron about the potential

3      of helping them get Mr. Zambrano to meet

4      with them; is that correct?

5                   MR. MASTRO:  Objection to form.

6                   THE SPECIAL MASTER:  Go ahead

7      and answer, if you can.

8          A.        In April of 2012 and with

9      Mr. Zambrano's authorization I tried to

10     seek contact with Chevron in order to talk

11     specifically about Mr. Zambrano's

12     predisposition to tell the truth regarding

13     the judgment.

14         Q.        What was the last -- when had

15     been the last time you had made any

16     approaches to Chevron with regard to the

17     Lago Agrio litigation, the Aguinda

18     litigation, before April of 2012?

19         A.        The last and previously

20     immediate approach that I had with Chevron

21     regarding the Aguinda versus Chevron case,

22     and before April of 2012, was

23     approximately between August and November

24     of 2010.

25         Q.        So since the sentencia or

Page 56

```
 1                A. GUERRA BASTIDAS
 2   judgment was issued in February of 2011
 3   you had not been approached by anyone on
 4   behalf of Chevron before April of 2012; is
 5   that correct?  The judgement is in
 6   February of 2012.
 7                THE SPECIAL MASTER:  I know
 8   exactly when the judgment was.
 9                MR. MASTRO:  Objection to form.
10                THE SPECIAL MASTER:  It is your
11   question that is troublesome to me.
12                You have an assumption in your
13   question.  First of all, the previous
14   question had to do with his approaches to
15   Chevron on behalf of Mr. Zambrano.  Now
16   your question seems to turn everything
17   around and says -- is talking about
18   Chevron's approach to him.
19                MR. VESELKA:  I will make it
20   clear, but that's right.
21                THE SPECIAL MASTER:  Then make
22   it clear.  Because in this sequence it is
23   very unclear.
24      Q.       Had anyone on behalf of Chevron
25   made any approach to you with regard to
```

```
 1              A. GUERRA BASTIDAS
 2   anything having to do with the Aguinda
 3   litigation or this case after the
 4   sentencia was issued in February 2011 and
 5   before April of 2012?
 6       A.       No, at no time did people from
 7   Chevron seek me.  I made contact with
 8   people from Chevron starting on April
 9   2012.
10       Q.       I want to go through and ask
11   you about all the different people you met
12   with or talked with at different times.
13              MR. VESELKA:  But I need to,
14   for purposes of this case, be careful.
15   There are certain people that are referred
16   to not by name, and I need to confirm that
17   Mr. Guerra knows to refer to them by the
18   code name.  So I'm going to try to ask if
19   he knows --
20              THE SPECIAL MASTER:  Wait one
21   second.  Isn't the way to deal with this
22   just to seal that portion of the
23   transcript?  I assume he is allowed to use
24   the real names of John Doe or Jane Doe or
25   whatever.  Why don't we just seal the
```

Page 58

1               A. GUERRA BASTIDAS
2    portion, to make it easier, why don't we
3    just seal that portion of the transcript
4    and limit it to counsel.
5               MR. MASTRO:  The names have
6    been limited to U.S. counsel.  You know
7    the names.
8               MR. VESELKA:  It is very
9    specific people, only very specific
10   people.  If we have to do that on some
11   portion, I'm going to try to do it where
12   we have a portion on that.  I'm trying to
13   ask if I can keep portions that wouldn't
14   have to be sealed like that by using the
15   name Doe 1 and Doe 2 and all I'm trying to
16   establish now is if he knows who I would
17   mean by Doe 1 or Doe 2.
18               MR. CLAYMAN:  He does not know.
19               MR. MASTRO:  About those
20   denominations, Doe 1 and 2.  I believe we
21   should confirm that everyone in this room
22   as lawyers are entitled to know the names.
23               THE SPECIAL MASTER:  Well, I
24   don't know what the names are and I don't
25   know who they are, but I don't need to, I

```
 1             A. GUERRA BASTIDAS
 2   assume, for purposes of my mission.
 3             MR. MASTRO:  The suggestion
 4   that the portion of the record be sealed
 5   and limited only to those individuals who
 6   are allowed to know that information,
 7   that's U.S. lawyers on the other side.
 8             THE SPECIAL MASTER:  Whatever
 9   you guys want.  However you folks want to
10   handle it is fine with me.
11             MR. VESELKA:  I want to have as
12   small a portion of the record having to be
13   sealed as possible.  So I want to wait and
14   see what portion comes up where we need to
15   do that.  So I don't want to agree in
16   advance everything.  If and when he gets
17   to somebody on that, then we will be able
18   to know.
19             THE SPECIAL MASTER:  But I
20   don't understand, how are you going to
21   find out whether he knows the underlying
22   name of John Doe without uttering the
23   underlying name John Doe?
24             MR. MASTRO:  Another way to
25   possibly deal with this is to take a short
```

Page 60

```
 1              A. GUERRA BASTIDAS

 2    break and let him know who Doe 1 and Doe 2

 3    are so that he can answer the questions as

 4    Doe 1 and 2.  But he didn't know about the

 5    applications for them to be Doe 1 and Doe

 6    2.

 7              THE SPECIAL MASTER:  I see.

 8              MR. GOMEZ:  Excuse me, are we

 9    off the clock?

10              THE SPECIAL MASTER:  This

11    should be counting against examining

12    counsel's time.  And the witness is in the

13    chair, you will notice.

14              MR. GOMEZ:  I know.  We really

15    should excuse him.

16              THE SPECIAL MASTER:  I don't

17    think so.

18              MR. VESELKA:  I would like, in

19    order to have as little as possible

20    sealed, if he could know how to say Doe 1

21    and Doe 2.

22              THE SPECIAL MASTER:  Why don't

23    you go through all the other names first

24    and then tell us that you are about to do

25    those two and we will begin the sealing.
```

```
                                          Page 61
 1               A.  GUERRA BASTIDAS
 2   Then to the extent -- then we can unseal
 3   anything that is oversealed.  How is that?
 4               MR. MASTRO:  Your Honor, I was
 5   also suggesting another way to do this is
 6   to break, I haven't spoken to the witness
 7   on breaks before, but just for this
 8   limited purpose tell him who Doe 1 and Doe
 9   2 are so that he can use Doe 1 and 2
10   answering the questions.
11               THE SPECIAL MASTER:  It is up
12   to you.
13               MR. VESELKA:  That would be
14   fine with me, if he is capable of doing
15   that.  So that way when we --
16               THE SPECIAL MASTER:  Fine.
17               MR. MASTRO:  Why don't we do
18   that.
19               THE SPECIAL MASTER:  Do you
20   want to break now?
21               MR. VESELKA:  Just for a short
22   one on that.  Because I'm worried if I
23   start going through who did you meet with
24   next and it comes out.
25               THE SPECIAL MASTER:  I see.
```

Page 62

```
 1            A. GUERRA BASTIDAS
 2            THE VIDEOGRAPHER:  Off the
 3   record, 11:08 a.m.
 4            (Recess taken.)
 5            THE VIDEOGRAPHER:  We are going
 6   back on the record at 11:17 a.m.
 7   BY MR. VESELKA:
 8       Q.    Mr. Guerra, you have now been
 9   informed of how to refer to certain people
10   by the --
11            THE SPECIAL MASTER:  The
12   designation.
13       Q.    -- designation Doe 1 or Doe 2?
14       A.    Yes.
15       Q.    Thank you.
16            Going back to your approach to
17   Chevron in April of 2012, who did you
18   approach first?
19       A.    I remember having previously
20   talked with one of Chevron's attorneys
21   very lightly and the same day, the same
22   day with Doe 2, and with Doe 2 I did go
23   into details as to the intent of
24   communicating with people from Chevron and
25   I was authorized -- I was authorized to do
```

Page 63

1              A. GUERRA BASTIDAS

2      so by Mr. Zambrano.

3                  MR. MASTRO:  Just for purposes

4      of the record, the translator, in any

5      reference to Doe 1 or Doe 2, is going to

6      use the male reference.  Nothing is to be

7      drawn from that one way or the other, just

8      the translations and references to gender

9      will all be to male.

10                 THE SPECIAL MASTER:  Or female,

11     but they in fact may refer to females?

12                 MR. MASTRO:  Correct.  But he

13     will use male throughout for both Doe 1

14     and Doe 2.

15       Q.       You answered that you first

16     talked with one of Chevron's lawyers

17     briefly.  Who was that?

18                 THE SPECIAL MASTER:  Actually,

19     he said "lightly."

20                 MR. VESELKA:  "Lightly."

21       A.       I greeted and I spoke to

22     lightly with Mr. Enrique Carvajal who I

23     ran into in the court offices.

24       Q.       The court offices in Sucumbios?

25       A.       Yes.

Page 64

1           A. GUERRA BASTIDAS

2      Q.        Why were you in the court

3  offices in Sucumbios?

4      A.        In that location, aside from

5  the Sucumbios court offices being there,

6  there are also the courtrooms that make up

7  the Sucumbios court, the various

8  courtrooms, and I visited regarding some

9  issue from a client.

10     Q.        And what did you say to

11  Dr. Carvajal?

12     A.        I told Dr. Carvajal lightly

13  that I had a story to tell Chevron

14  regarding the drafting of the judgment at

15  the trial court level.

16     Q.        What did Dr. Carvajal say to

17  you?

18     A.        He nodded.  It surprised him.

19  And he stated that he would send me some

20  message through Doe 2.

21     Q.        Do you know of Dr. Carvajal

22  being involved or aware of any of the

23  contacts you had made to Chevron back in

24  2009 or 2010 before the judgment was

25  issued?

Page 65

```
 1              A. GUERRA BASTIDAS
 2      A.         I don't know about that.  I
 3  don't know.  I never asked.
 4      Q.         So Dr. Carvajal referred you to
 5  go talk to Doe 2?
 6      A.         No.
 7                 THE SPECIAL MASTER:  Counsel,
 8  he said it just the other way around.
 9      Q.         So with whom did you have
10  contact next?
11      A.         With Doe 2.
12      Q.         How did that come about?  Did
13  Doe 2 call you or did Doe 2 come by and
14  see you?  Tell us how that contact
15  occurred.
16      A.         The city of Lago Agrio, it is
17  small.  It is not very big.  Almost all
18  know each other.  I personally went to
19  visit Doe 2's office and among other
20  comments I told them that I had ran into
21  Dr. Carvajal and I told Doe 2 the contents
22  of my conversation with Dr. Carvajal, and
23  I additionally told Doe 2 regarding the
24  motivation or the aim to talk to Chevron
25  in order to tell the truth regarding the
```

Page 66

```
 1                 A. GUERRA BASTIDAS
 2    judgment and that I was doing so
 3    specifically authorized by Mr. Zambrano.
 4         Q.        And what did Doe 2 say to you?
 5         A.        From what I can recall, Doe 2
 6    said that he would somehow get in touch
 7    with Chevron's representatives in order to
 8    make it known in the future about the
 9    possibility of meetings in case there were
10    any interest in doing so.
11         Q.        Anything else you can remember
12    about that conversation with Doe 2?
13         A.        Not specifically in that
14    conversation, but I must say that Doe 2
15    knew about my involvement before the
16    judgment and following the judgment.
17         Q.        And was that because of
18    previous conversations you had had with
19    Doe 2?
20         A.        Yes, I had -- I have talked
21    with them regarding this many times.
22         Q.        What do you remember your
23    telling Doe 2 about your involvement
24    before this conversation in April of 2012?
25         A.        I recall having told him
```

Page 67

```
 1              A. GUERRA BASTIDAS
 2   regarding all of my involvement.
 3       Q.      What involvement was that that
 4   you told him?
 5       A.       Specifically having been
 6   involved or having written the court
 7   orders in the Chevron case during the time
 8   that Mr. Zambrano was the judge, and also
 9   I told him in a timely manner that I was
10   involved in observing in reviewing and
11   doing some sort of light touch-up work on
12   the judgment before it was issued and
13   published.
14       Q.      Going back to your meeting in
15   the offices of Doe 2 in April of 2012, can
16   you tell us any more about the
17   conversation about which either of you
18   said?
19       A.       Doe 2 and I had contact -- had
20   known each other for many years and
21   because of that, in that city and under
22   those circumstances we talked about
23   several issues, but specifically regarding
24   what has been stated here I don't recall
25   having informed him of any substantive
```

Page 68

```
 1              A. GUERRA BASTIDAS
 2   issue.
 3       Q.      Did you raise the issue of your
 4   hope to being financially rewarded for
 5   this participation?
 6       A.      I don't recall specifically,
 7   but I considered that because it was
 8   obvious that I also expected some sort of
 9   economic benefit.
10       Q.      How was that conversation left?
11   Who was going to do what next?
12       A.      Doe 2 was going to talk with
13   Chevron's representatives in order to tell
14   them specifically that Mr. Zambrano,
15   through me, was willing to say that he had
16   not written the judgment, that it was
17   written by the plaintiffs, and obviously
18   to talk about and to negotiate regarding
19   that possibility.
20       Q.      So with whom did you have
21   contact next with regard to this matter?
22       A.      Doe 2 sometime later, days or
23   weeks later, Doe 2 put me in touch with
24   Mr. Rivero and Mr. Akerman whom identified
25   as Chevron's representatives because
```

Page 69

```
 1              A. GUERRA BASTIDAS
 2    that's how they -- that's what they said.
 3        Q.      When you say Doe 2 put you in
 4    touch with these representatives, how did
 5    Doe 2 do that?  Was it a meeting?  Was it
 6    a phone call?  Was it an e-mail?
 7        A.        In order to have the first
 8    meeting between myself and Mr. Rivero and
 9    Mr. Akerman, Doe 2 spoke with me over the
10    phone, and set up the meeting which took
11    place -- the physical meeting which took
12    place in a hotel in Quito where
13    Mr. Akerman and Mr. Rivero were staying,
14    and in the meeting it included
15    Mr. Akerman, Mr. Rivero, Doe 2 and myself.
16        Q.      That meeting occurred on June
17    3rd or 4th of 2012; is that correct?
18        A.      Yes, around those dates, from
19    what I can recall.
20        Q.      Do you remember which date
21    specifically?
22        A.      Specifically June 3rd.
23        Q.      Thank you.
24                So you had one or more than one
25    conversations with Doe 2 about setting up
```

Page 70

```
 1              A. GUERRA BASTIDAS
 2   the meeting on June 3rd?
 3        A.     I had some phone conversations
 4   with Doe 2, not with the aim of setting up
 5   the conversation or the first meeting with
 6   Chevron's representatives, but for the
 7   purpose of coordinating or to look into
 8   the possibility of, during that
 9   conversation, having Mr. Zambrano
10   intervene fundamentally.
11        Q.     Do you remember any discussions
12   with Doe 2 about the possibility of
13   providing information to the Attorney
14   General's Office?
15              MR. MASTRO:  Objection to form.
16              THE SPECIAL MASTER:  Overruled.
17        A.     From what I can recall, it was
18   a conversation in which Doe 2 referred to
19   the fact that Chevron possibly would bring
20   or file some action or motion against the
21   State through the Office of the Attorney
22   General and definitely given, because of
23   that circumstance and in the future,
24   definitely the truth of the facts of the
25   case would be known.
```

Page 71

```
 1              A. GUERRA BASTIDAS
 2      Q.        Now, your wife had suggested to
 3  you that it would be better to talk to
 4  Chevron because that way you might be able
 5  to achieve some benefits for you and your
 6  family, correct?
 7              MR. MASTRO:  Objection to form.
 8              THE SPECIAL MASTER:  Why don't
 9  you rephrase the question.
10      Q.        Did your wife suggest to you
11  that you should be talking to Chevron in
12  order to try to achieve some benefits for
13  your family?
14              MR. MASTRO:  Objection to form.
15              THE SPECIAL MASTER:  Overruled.
16      A.        My wife has never been aware
17  through me nor has she ever made any
18  suggestions to her husband regarding
19  issues that are not exclusively those
20  pertaining to the family and the home.
21      Q.        Do you remember discussing with
22  Doe 2 in one of the phone calls before the
23  June 3rd meeting that what this was about
24  was about getting some benefit for you?
25      A.        With Doe 2 we spoke before June
```

Page 72

1              A. GUERRA BASTIDAS

2      3rd on several occasions, and yes,

3      obviously we spoke about some financial

4      benefit.

5          Q.      In one of your conversations

6      with Doe 2 you told Doe 2 that you had

7      seen or touched up a draft of the

8      judgment -- that you had received a draft

9      of the judgment on a flash drive, correct?

10              MR. MASTRO:  Objection to form,

11     and best evidence is whatever transcript

12     he has to put before the witness.

13              THE SPECIAL MASTER:  Overruled.

14         A.      I told the detail to Doe 2

15     because that's how I remembered it.

16     That's how I remembered it.

17         Q.      But you were never able to find

18     that flash drive with that draft of the

19     judgment on it, were you?

20         A.      I remembered having received

21     the draft judgment in a flash drive in the

22     city of Quito.

23              MR. VESELKA:  I'll object,

24     nonresponsive.

25              THE SPECIAL MASTER:  I think it

```
 1            A. GUERRA BASTIDAS
 2   is the beginning of a real answer.  Go
 3   ahead.  So you are allowed to follow up.
 4       Q.        But you have been unable to
 5   find any flash drive that has the draft of
 6   the judgment on it, correct?
 7       A.        Later on at the time when it
 8   came to provide the first sworn
 9   declaration that I have given, as I
10   remembered things regarding all the issues
11   that happened, I understood that the
12   memory of the -- what is it called -- the
13   memory flash -- of the flash drive was not
14   correct, that the judgment or the draft
15   judgment, I noticed it or I saw it on a
16   laptop that was provided to me in Lago
17   Agrio and which I saw inside
18   Mr. Zambrano's residence, and that that
19   computer belonged to Mr. Fajardo.
20       Q.        The memory that you are
21   describing now that came to you later when
22   you were working on the first declaration,
23   you say you saw a draft of the judgment on
24   a laptop that you saw in Mr. Zambrano's
25   home; is that what you said?
```

Page 74

1              A. GUERRA BASTIDAS

2      A.       That's what I said, yes.

3      Q.       And you are referring to a home

4   in Lago Agrio?

5      A.       At the residence of

6   Mr. Zambrano in Lago Agrio, in the city of

7   Lago Agrio.

8      Q.       But didn't you say before you

9   had seen the draft judgment on a flash

10  drive that you got in Quito?  That's

11  inconsistent, correct?

12               MR. MASTRO:  Objection to form.

13               THE SPECIAL MASTER:  If you can

14  understand it, you can answer.

15     A.       I did understand.  I can

16  answer.

17               Initially I said that I

18  remember seeing the draft judgment in a

19  memory -- in a flash drive that

20  Mr. Zambrano had given me in Quito, but I

21  amend -- I amend this issue in the sense

22  that actually the draft judgment was in a

23  computer that was provided to me and that

24  I used in Nueva Loja, Lago Agrio.

25     Q.       How long did you work on your

1              A. GUERRA BASTIDAS

2    touch-up of the judgment on that laptop?

3         A.      I worked a few hours over two

4    days only.

5         Q.      And were you in Lago Agrio that

6    entire time?

7         A.      Yes.

8         Q.      Where were you -- where were

9    you staying in Lago Agrio?

10               THE SPECIAL MASTER:  Excuse me,

11   you mean where were you staying in Lago

12   Agrio or where did you do the work?

13        Q.      Let's ask about where you were

14   staying in Lago Agrio first.

15        A.      At that time, around those

16   dates, in Lago Agrio, I would spend -- if

17   I was going to be only a very short time

18   in Lago Agrio I would spend the night in

19   the home of Dr. Fernando Alban, a judge

20   who is a friend of mine; but if my stay in

21   Lago Agrio would be longer, two, three or

22   four nights, I would stay at the residence

23   of Mr. Giuseppe Barna located five

24   kilometers from the center of town.

25        Q.      In which place were you staying

1                A. GUERRA BASTIDAS

2    at the time you say you were touching up

3    the draft judgment?

4         A.        In Dr. Alban's apartment.

5         Q.        And is that where you actually

6    did the work you say you did on touching

7    up the draft judgment?

8         A.        No, I did that in the apartment

9    or residence of Mr. Zambrano.  He wouldn't

10   allow me to take the computer elsewhere.

11        Q.        And how long did it take you to

12   do the work of this touch-up you say you

13   did?

14                THE SPECIAL MASTER:  Asked and

15   answered.  Do you want me to read it to

16   you?

17                MR. VESELKA:  He said some

18   hours and I was trying to get a little

19   more specific.

20                THE SPECIAL MASTER:  That you

21   can do.  Actually, he said some hours over

22   two days.

23        Q.        How many hours each day?

24        A.        From what I can recall, I spent

25   on that first day four or five hours on

Page 77

```
 1            A. GUERRA BASTIDAS
 2   the draft judgment.  It was a full but
 3   quick reading of the totality of the
 4   document.  And then on the second day I
 5   did some -- I made some small changes
 6   regarding some terms regarding more to
 7   legal terms and terms related to the
 8   environment, to environmental law, and
 9   that was it.
10       Q.     Do you know what days those
11   were that you were working on that?
12       A.     I don't have in mind, I don't
13   remember exactly these dates, but my
14   presence in Lago Agrio, I was there
15   approximately between two and three weeks
16   before the date the judgment was issued.
17       Q.     You said that on the second day
18   you made some changes regarding terms.
19   How long did you spend working on making
20   those changes on the second day?
21       A.     From what I can recall, no more
22   than three or four hours maximum.
23       Q.     Was anybody else there with you
24   while you did this?
25       A.     No.
```

Page 78

1              A. GUERRA BASTIDAS

2      Q.        Either day?

3      A.        While I reviewed that first day

4  or the second day when I was working

5  there, there was nobody else present

6  there, but I had maintained phone contact

7  with Mr. Zambrano.  I did so -- also had

8  contact with Dr. Alban and with

9  Mr. Fajardo.

10     Q.        All of those are phone contacts

11 you are describing with Dr. Alban and

12 Mr. Fajardo?

13     A.        Yes.

14     Q.        Tell us what was said in any of

15 your phone conversations with Dr. Alban.

16     A.        With Dr. Alban I talked about

17 if I was going to go out for lunch.

18 "Albertito, is this taking long?  Is this

19 going to take you a while?  Any worries?

20 Any concerns?"

21              With Mr. Fajardo, "Alberto, is

22 everything all right?  Do you need

23 something?"  "Yes, I need a memory aid

24 because this issue of the essential errors

25 is complicated, it is obscure for me, and

```
 1            A. GUERRA BASTIDAS
 2   then solving this, well, there's no time
 3   for that.  I would have to review the
 4   trial, possibly dozens or hundreds of
 5   court files.  You must have a compilation
 6   or compressed information.  If you have
 7   that, give it to me because this is
 8   confusing.  This is a Tower of Babel."
 9   "Yes, Alberto, we are going to do that.
10   We will do everything possible.  You can
11   count on all the help that I can provide."
12            That was the style of the
13   conversations.
14       Q.       And did you receive the memory
15   aid while you were there those two days
16   working on the draft judgment?
17       A.       From what I can recall, I
18   received the memory aid in the late
19   afternoon or night of the first day.
20       Q.       How did you receive it?
21       A.       I have stated, because that's
22   how I remembered it, having received it
23   via e-mail, because that's how I remember
24   it.
25       Q.       On what device could you get
```

Page 80

```
 1              A. GUERRA BASTIDAS
 2   your e-mail while you were in Lago Agrio
 3   on those two days?
 4        A.        At that time in Lago Agrio
 5   there were places with computers that they
 6   had the e-mail service, Internet service.
 7        Q.        Internet cafe?
 8        A.        A kind of, yes.  In Ecuador
 9   they are called net cafes.
10        Q.        And on what e-mail address did
11   you receive it?
12        A.        At the e-mail that I had at the
13   time, AlbertoGuerraBastidas@hotmail,
14   GuerraAlberto@hotmail, possibly
15   AlbertoGuerra54@hotmail.  I have not had
16   other accounts.
17        Q.        But you don't remember on which
18   account you received that?
19        A.        No.
20        Q.        How did you travel to Lago
21   Agrio on the days where you say you were
22   working on the draft judgment?
23        A.        Starting on the date when I was
24   dismissed of my position as judge, most of
25   my trips to Lago Agrio were over land.
```

Page 81

1                   A. GUERRA BASTIDAS

2      And on the dates that you are referring

3      to, those dates, that was no exception, it

4      was also over land.

5              Q.         So you drove yourself?

6              A.         Generally I never went in my

7      car from Quito to Lago Agrio, I got around

8      in the so-called -- well, in the vehicles

9      of the public transportation.

10             Q.         Which public transportation

11     would you use to get to Lago Agrio in

12     those days?

13             A.         There were several companies

14     that provide public transportation from

15     Quito to Lago Agrio, but the main ones or

16     the ones that have the most trips is the

17     transportation cooperative, Banos, the

18     Loja transportation cooperative, and the

19     Putumayo transportation cooperative.

20                  For my travels, I would use a

21     vehicle from the cooperative, whatever

22     vehicle was the first one available.

23             Q.         And that's how you came back

24     from Lago Agrio after doing the work you

25     say you did on the draft judgment as well?

Page 82

```
 1              A. GUERRA BASTIDAS
 2      A.        Yes, from what I can recall,
 3  yes, I returned over land.
 4      Q.        How long were you in Lago Agrio
 5  in total, including the time when you
 6  spent these two days you say you worked on
 7  the draft judgment?
 8              MR. MASTRO:  Objection to form.
 9              THE SPECIAL MASTER:  Overruled.
10      A.        I don't recall specifically how
11  many days I was in Lago Agrio, for the
12  purpose, having traveled, that detail.
13      Q.        Did you do any other work while
14  you were in Lago Agrio on that trip?
15      A.        No.
16      Q.        Did you meet with anyone in
17  person on that trip?
18      A.        Yes.
19      Q.        Who?
20      A.        With Mr. Zambrano, with
21  Mr. Fajardo, with Mr. Alban, with Doe 2,
22  and possibly one or two attorneys,
23  acquaintances of mine.
24      Q.        In the meetings with Dr. Alban,
25  was anybody else present?
```

```
 1              A. GUERRA BASTIDAS
 2      A.      No.
 3      Q.      Did you tell Dr. Alban what you
 4  were doing?
 5      A.      Yes, he knew.
 6      Q.      What did he say to you about
 7  that?
 8              THE SPECIAL MASTER:  If
 9  anything.
10      Q.      If anything.
11      A.      Dr. Alban was a kind of
12  disciple of mine.  He was a younger
13  attorney than I was by some years, and he
14  rather didn't give me advice but he was
15  asking me how are things, how did I see
16  things.
17      Q.      And what did you tell him?
18      A.      I would tell him about the
19  subject, how things were and what I had
20  seen, what I had done, the way the
21  document was drafted, issues relating to
22  the judges profession.
23      Q.      Did you tell him that it was
24  improper for you to be working on that
25  judgment?
```

Page 84

```
 1            A. GUERRA BASTIDAS
 2      A.      I told him I had been invited
 3  by Mr. Zambrano to look at the document
 4  and to try to, in that document, to do
 5  something that would allow to not leave
 6  any doubts that it had been written in the
 7  court.
 8      Q.      And did Dr. Alban say anything
 9  to you about whether you should or
10  shouldn't be doing that or anything about
11  whether he agreed with it or in any way
12  questioned your activities?
13            MR. MASTRO:  Objection to form.
14            MR. VESELKA:  Do you think I
15  could make it a little more compound?
16            MR. MASTRO:  Maybe a little
17  more compound, but not much more.  It has
18  kind of been asked and answered.  You
19  asked him what Alban said.  So it is both
20  asked and answered and compound.
21            THE SPECIAL MASTER:  He is
22  going to rephrase the question.
23      Q.      Did Dr. Alban in any way
24  suggest that you should not be doing that
25  work or that you should report anything to
```

```
 1              A. GUERRA BASTIDAS

 2   the authorities?

 3              THE SPECIAL MASTER:  Same

 4   problem.

 5              MR. MASTRO:  Yeah, same

 6   objection.

 7              MR. CLAYMAN:  One at a time.

 8       Q.       Did Dr. Alban report what

 9   Mr. Zambrano was asking you to do to any

10   of the authorities?

11       A.       Excuse me, could you please

12   repeat the question?  Or maybe I didn't

13   understand the interpretation.

14       Q.       Did Dr. Alban suggest to you

15   that you should report what Mr. Zambrano

16   was asking you to do to any authorities?

17       A.       No, at no time.

18       Q.       Did he in any way suggest that

19   you should not be doing that work?

20              MR. MASTRO:  Objection to form.

21   Asked and answered.

22              THE SPECIAL MASTER:  I will let

23   it go.  It is improper, but I will let it

24   go.

25              THE WITNESS:  Do I answer?
```

Page 86

1              A. GUERRA BASTIDAS

2                  THE SPECIAL MASTER:  Yes.

3                  MR. MASTRO:  Do you want to

4     repeat the question?

5                  THE WITNESS:  Please.

6                  MR. MASTRO:  The court reporter

7     will read it.

8                  (The record was read.)

9                  THE WITNESS:  Do I answer?

10                 THE SPECIAL MASTER:  Yes.

11        A.       No, Dr. Alban never suggested

12     what I'm being asked.

13                 MR. VESELKA:  I think we have

14     to change the tape.

15                 THE VIDEOGRAPHER:  We are going

16     off the record, 12:24 p.m.  This is the

17     end of disk two in the deposition of

18     Alberto Guerra Bastidas.

19                 (Luncheon recess:  12:24 p.m.)

20

21

22

23

24

25

Page 87

1              A. GUERRA BASTIDAS

2          A F T E R N O O N    S E S S I O N

3                  1:22 p.m.

4  A L B E R T O    G U E R R A

5  B A S T I D A S, resumed.

6              THE VIDEOGRAPHER:  We are going

7  back on the record at 1:22 p.m.  This is

8  the beginning of disk three in the

9  deposition of Alberto Guerra Bastidas.

10 CONTINUED EXAMINATION

11 BY MR. VESELKA:

12    Q.        Good afternoon, Mr. Guerra.  We

13 were discussing before the lunch break

14 meetings that you had while you were in

15 Lago Agrio some weeks before the judgment

16 issued in February of 2011, and you talked

17 about your conversations with Dr. Alban.

18              Is there anything more you

19 remember about your conversations with Dr.

20 Alban during that period relating to the

21 work you were doing -- you say you were

22 doing on the touching up the draft

23 judgment?

24              MR. MASTRO:  Objection to form,

25 asked and answered.

1          A. GUERRA BASTIDAS

2              THE SPECIAL MASTER:  If he

3    remembers anything more than he had

4    already testified to before the lunch

5    break, he can answer, but otherwise he can

6    just say no.

7        A.      With Dr. Alban we permanently

8    and constantly were talking on the phone

9    either personally -- either on the phone

10   or personally.  He is a judge and

11   occasionally he would require my guidance,

12   my orientation, but I don't recall

13   specifically having talked with Dr. Alban

14   specifically about the Chevron case aside

15   from what I have already stated.

16       Q.      Let's turn now to your

17   conversations or meetings on that trip

18   with Pablo Fajardo.  How many meetings did

19   you have with him?

20       A.      From what I can recall, I had

21   only one meeting.

22       Q.      When in the period of days

23   while you were there did that meeting

24   occur?

25       A.      That meeting took place when I

Page 89

```
 1              A. GUERRA BASTIDAS
 2    first arrived for the purpose of providing
 3    me the computer in the house, inside the
 4    house of Mr. Zambrano or in the terrace
 5    level of the residence of Mr. Zambrano.
 6         Q.      How long was your meeting with
 7    Mr. Fajardo?
 8         A.      A few minutes.
 9         Q.      Was anybody else present?
10         A.      Mr. Zambrano.
11         Q.      What did you say to
12    Mr. Fajardo?
13         A.      I greeted Mr. Fajardo and I
14    received from him the laptop and I stated
15    I would review the document as calmly as
16    possible and as thoroughly as possible.
17    That was practically the full
18    conversation.
19         Q.      What did Mr. Fajardo say to
20    you?
21         A.      For me to do it, he replied to
22    my greeting, he gave me the device and he
23    said that if I needed any help or support,
24    to call him on the phone.
25         Q.      What did Mr. Zambrano say at
```

Page 90

```
 1              A. GUERRA BASTIDAS
 2   that meeting?
 3       A.      Mr. Zambrano limited himself to
 4   opening the door into his residence.  He
 5   set up a chair for me.  He said for me to
 6   feel comfortable and to continue working,
 7   I have to go to the office.  See you
 8   around noon for lunch, which indeed
 9   happened.  And then in the afternoon we
10   will see each other -- in the evening so
11   we can have dinner, and that's what
12   happened.
13       Q.      Can you remember anything else
14   that was said before you started your
15   work?
16       A.      I don't recall anything else
17   specifically.
18       Q.      Had you talked with Mr. Fajardo
19   about this project before your meeting
20   upon your arrival?
21       A.      We had talked previously
22   regarding the possibility of having the
23   plaintiffs draft the judgment.
24       Q.      When was that conversation?
25       A.      That conversation takes place
```

Page 91

```
 1              A. GUERRA BASTIDAS
 2   between August to October, approximately,
 3   in 2010.
 4        Q.      Where?
 5        A.      The city of Quito.
 6        Q.      Was this a phone call or a face
 7   to face meeting?
 8        A.      Chevron, through Doe 2, had
 9   rejected the possibility of an encounter
10   between Zambrano and Chevron, and because
11   of this Zambrano had authorized me to talk
12   to the plaintiffs regarding the
13   possibility of having them draft the
14   judgment in exchange for giving
15   Mr. Zambrano at least $500,000.
16              And given these circumstances I
17   spoke over the phone with Mr. Zambrano.
18   We set up a meeting in Quito, personal
19   meeting.  This meeting takes place on
20   December 6th and Ria Coca in Quito, and
21   that's when I tell him, making the full
22   comments, the entire offer that I
23   mentioned seconds ago.
24              MR. VESELKA:  I object,
25   nonresponsive.
```

Page 92

```
 1            A. GUERRA BASTIDAS
 2            THE SPECIAL MASTER:  He did in
 3    the course of this give you two
 4    conversations, one is a phone
 5    conversation, another one is a meeting.
 6    So if I strike this and you ask it again
 7    and if you want to know whether he had a
 8    phone conversation or a meeting, it is
 9    going to be objected to as asked and
10    answered.
11            Wait, if we are going to have a
12    lengthy colloquy, the witness probably
13    ought to leave the room.
14            MR. MASTRO:  He should leave
15    for this.
16            THE SPECIAL MASTER:  Let's ask
17    the witness to leave.
18            THE VIDEOGRAPHER:  Off the
19    video record, 1:34 p.m.
20            (Witness departs the room.)
21            THE SPECIAL MASTER:  Okay,
22    Mr. Mastro, what is it you want to say?
23            MR. MASTRO:  Your Honor, in
24    reading the answer, it is obvious he is
25    answering the question referring to
```

Page 93

1              A. GUERRA BASTIDAS

2    speaking on the phone to Mr. Fajardo and

3    then meeting with him in person, but the

4    name Zambrano appears, I'm not sure

5    whether that is the name he said or

6    whether he just misspoke.  That's why I

7    asked him to leave the room.

8              But it is obvious he is

9    answering the question and referring to

10   Mr. Fajardo in terms of the phone call and

11   the meeting.  So perhaps the record needs

12   to be clarified that way.  But he did

13   answer the question.

14              MR. VESELKA:  He answered the

15   question about dealings with -- he had

16   conversations with Mr. Zambrano and the

17   question had been about a conversation

18   with Mr. Fajardo.

19              THE SPECIAL MASTER:  I think if

20   you keep reading the answer you will see

21   he is talking about, on this one,

22   Mr. Mastro is right, he is obviously

23   talking about Fajardo.

24              MR. VESELKA:  I don't believe

25   so.  He is saying he went back through a

Page 94

```
 1                  A. GUERRA BASTIDAS
 2   whole history with Mr. Zambrano --
 3                  THE SPECIAL MASTER:  Wait a
 4   second.  Let me go back to it.  Let me go
 5   back to the whole answer.
 6                  I think we need clarity.  We
 7   need clarity from the witness about this.
 8   Let's get him back in.
 9                  MR. MASTRO:  If he has read his
10   answer, I think he will realize --
11                  THE SPECIAL MASTER:  Let's have
12   it read and let's see what he says.
13                  MR. VESELKA:  Can I just ask
14   him, did he mean this or that?  Won't that
15   be quicker?
16                  THE SPECIAL MASTER:  He is
17   going to have to have the answer read
18   back, did you mean Zambrano, phone call
19   with Zambrano or a phone call with
20   Fajardo, my question was about Fajardo,
21   that's what you can say and that's what
22   you ought to do.
23                  Let's get him.
24                  (Witness returns to the room.)
25                  THE VIDEOGRAPHER:  Back on the
```

Page 95

1               A. GUERRA BASTIDAS
2     record, 1:37 p.m.
3     BY MR. VESELKA:
4         Q.       The translator is going to read
5     your answer back to you and then I'm going
6     to ask a follow-up question.
7                   THE SPECIAL MASTER:  Why don't
8     you have the translator read the question
9     and the answer and then you can have a
10    follow-up.  I think that is clearer.  I
11    think he is going to have to back up
12    and -- you know, the easier way to do it,
13    read the question and then Mr. Veselka is
14    going to say everybody agrees that the
15    question related to the content of a phone
16    conversation or a meeting with
17    Mr. Fajardo, and here is your answer, and
18    did you mean in this answer Fajardo or
19    Zambrano.  Let's do it that way.
20                  MR. MASTRO:  It starts at
21    87-14, your Honor, that's the first
22    reference to the name in the question.
23                  THE SPECIAL MASTER:  I
24    understand.  But the translator can tell
25    the witness that everybody agrees that the

Page 96

```
 1              A. GUERRA BASTIDAS
 2   question was about Fajardo.  So the
 3   question to you now is, in your answer
 4   about a phone call, did you mean Zambrano
 5   or Fajardo.
 6              (Answer reread to the witness
 7   by interpreter.)
 8      Q.      Did you mean to say the phone
 9   conversation was with Mr. Zambrano or with
10   Mr. Fajardo?
11      A.      With Mr. Fajardo.  I'm mistaken
12   there.  I'm referring to Mr. Fajardo.
13              THE SPECIAL MASTER:  Just to
14   follow up, and as to the meeting, are you
15   referring to Mr. Fajardo or Mr. Zambrano?
16              THE WITNESS:  I held a meeting
17   with Mr. Fajardo.
18      Q.      And you say that meeting
19   occurred on December 6th, 2010?  Oh,
20   that's right, I'm sorry.  I'll withdraw
21   that question.
22              MR. MASTRO:  It is a street.
23   December 6th is a street.
24      Q.      The 6th of December is the name
25   of a street in Quito, correct?
```

1              A. GUERRA BASTIDAS

2      A.      Yes.

3      Q.      When you used it in your

4  answer, were you referring to meeting on

5  that street?

6      A.      The meeting takes place at the

7  intersection of December 6th and Rio Coca,

8  at the intersection of those two streets.

9      Q.      And did this meeting occur --

10  when do you think this meeting occurred,

11  between August and October of 2010?

12      A.      There is no possibility of me

13  stating it specifically, but I consider it

14  happened in October or November.

15      Q.      Was it before the judge had

16  entered the Autos Para Sentencia?

17              MR. MASTRO:  If he recalls.

18      A.      From what I can remember, yes,

19  sometime before.

20      Q.      At the meeting with Mr. Fajardo

21  at the intersection, were you outside or

22  were you in some office?

23      A.      We were outside.

24      Q.      Anyone else present in your

25  conversation?

Page 98

```
1              A. GUERRA BASTIDAS
2       A.        No, only he and I.
3       Q.        Did Mr. Fajardo give you
4   anything at this meeting?
5       A.        He thanked me profusely for
6   being the link with Mr. Zambrano.
7       Q.        Did he give you anything else?
8       A.        No, physically, no.
9       Q.        What did he say to you?
10      A.        In that specific meeting,
11  first, that he was happy with my
12  involvement in this issue.  He was excited
13  and grateful for the proposal that I was
14  bringing forth for Mr. Zambrano, and aside
15  from talking about other considerations,
16  about making other considerations
17  regarding this proposal, specifically
18  Mr. Fajardo told me that this decision,
19  that he had informed Mr. Donziger about
20  this decision, that he should know the
21  details regarding this issue and that he
22  should make the decision regarding this,
23  and that later on when Mr. Donziger were
24  in the country he would inform me or
25  together we would all have a conversation,
```

1              A. GUERRA BASTIDAS

2   all of us.

3        Q.      What did you say to Mr. Fajardo

4   in the meeting on the intersection of Rio

5   Coca and the 6th of December?

6        A.      I conveyed to Mr. Fajardo

7   regarding the proposal by Mr. Zambrano,

8   essentially and specifically that they

9   draft the judgment in exchange for giving

10  at least $500,000 to Mr. Zambrano, which

11  is what I mentioned to them, that

12  Mr. Zambrano authorized me to negotiate an

13  amount independently of the amount for

14  him.

15       Q.      Did you make a proposal of an

16  amount for you in this conversation?

17       A.      No.

18       Q.      So Mr. Fajardo was not able to

19  give a final decision at that because he

20  had to get it signed off by others?

21              THE SPECIAL MASTER:  You are

22  going to have to rephrase that.  He has no

23  knowledge as to whether Mr. Fajardo was

24  able to make a final decision.

25       Q.      Mr. Fajardo told you that the

```
1                  A. GUERRA BASTIDAS
2    final decision would have to be made by
3    others, that he could not do it at that
4    meeting, correct?
5         A.        Yes, that's how it happened.
6         Q.        And you had referred earlier to
7    a phone call to set up this in-person
8    meeting.  Do you remember that?
9         A.        I remember, yes, but my phone
10   call was to Mr. Fajardo so we could meet
11   and talk.
12        Q.        That's what I wanted to get
13   straight.  You called Mr. Fajardo to ask
14   if ya'all could meet and talk?
15        A.        Yes.
16        Q.        Did you have any contact with
17   Mr. Fajardo after the meeting you just
18   described and before seeing him in Lago
19   Agrio on the trip where you say you worked
20   on the draft --
21                  THE SPECIAL MASTER:  I'm going
22   to object to that question.
23                  MR. MASTRO:  Objection to form.
24                  THE SPECIAL MASTER:  You have
25   used the phrase "you say."  You don't have
```

```
 1               A. GUERRA BASTIDAS
 2   a jury here.  Every witness whose
 3   testimony you take is of course saying.
 4   It is offensive to witnesses to say that.
 5               MR. VESELKA:  I don't mean to
 6   be offensive, but I mean to be precise,
 7   because he is saying this, and I don't
 8   want to describe much of this in front of
 9   the witness --
10               THE SPECIAL MASTER:  Let's not
11   have colloquy.  I will leave it to others
12   to make an objection.  You don't have a
13   jury here is my point.
14               MR. VESELKA:  This testimony
15   might be read to the jury.
16               THE SPECIAL MASTER:  I
17   understand that.  That's the point, if it
18   is read to the jury, then you can say --
19   it is a form of argumentativeness is my
20   point.
21               MR. CLAYMAN:  The term "You
22   have testified this morning" may help you
23   do that this afternoon.  Could you do
24   that, rather than "you say"?
25               THE SPECIAL MASTER:  Huh?
```

1           A. GUERRA BASTIDAS

2               MR. CLAYMAN:  He has testified.

3       Q.      Did you have any meetings with

4   Mr. Fajardo between the conversation in

5   Quito that you just described and the time

6   you arrived at Mr. Zambrano's residence in

7   Lago Agrio as you testified earlier?

8       A.      After the conversation that I

9   had with Mr. Fajardo on December 6th at

10  Rio Coca, which was not the first one,

11  previously we had talked several times in

12  person or over the phone, after that I met

13  with him a few days after this meeting.

14  He called me on the phone and he wanted to

15  meet me at Honey Honey, a restaurant on

16  Portugal and Eloy Alfaro streets in Quito

17  at which meeting Mr. Fajardo was there,

18  Mr. Yanza and Mr. Donziger and myself.

19              After this meeting with

20  Mr. Fajardo we met or we saw each other a

21  few more times for the purpose of

22  delivering the $1,000 they were giving me,

23  and finally the meeting in Lago Agrio when

24  I received the computer, and then at the

25  end of this whole time, a meeting that I

```
 1              A. GUERRA BASTIDAS
 2   had with him to May and July more or less
 3   of 2011 after the judgment had been
 4   issued.
 5              After that meeting in 2011 in
 6   which I had to talk with American
 7   attorneys, friends of Mr. Fajardo, and
 8   finally we talked because he called me on
 9   the phone, perhaps possibly at the end of
10   the month of May -- strike that -- June or
11   July of 2011.  After that we haven't
12   spoken anymore.
13       Q.     At the meeting with the
14   American lawyers to which you just
15   referred, you were being interviewed about
16   potentially serving as an expert witness
17   for the defendants, Camacho and Piaguaje,
18   in this case in New York, correct?
19       A.      I wasn't told about being an
20   expert witness for the benefit of a
21   specific person.  What I was told
22   specifically was that there was a trial
23   starting maybe soon in New York, a trial
24   in which it would be attempted to
25   establish, to determine that the justice
```

1           A. GUERRA BASTIDAS

2     system in Ecuador is horrible, it is bad,

3     it is corrupt, as well as its

4     administrators.

5         Q.        And in that interview you told

6     the North American lawyers that Judge

7     Zambrano had no outside influence on him

8     with regard to the issuance of the

9     judgment, correct?

10                  MR. MASTRO:  Objection to form.

11                  THE SPECIAL MASTER:  You may

12     answer.

13        A.        From what I can recall, I

14     painted a very pleasant picture regarding

15     the straightforwardness of the Ecuadorian

16     legal system and its administrators, and I

17     focused on providing an account of my

18     involvement as the first judge in the

19     Chevron case, regarding some other aspect

20     of my involvement in legal issues or

21     trials, but I don't recall specifically

22     having talked about Mr. Zambrano and his

23     involvement in the case.

24        Q.        Do you remember telling the

25     North American lawyers with whom you met

```
1              A. GUERRA BASTIDAS
2    that you had been pressured by the
3    Attorney General Borja to dismiss the case
4    at the first meeting of the case in 2003?
5        A.        Yes, I told them.
6        Q.        And that's true?
7                  MR. MASTRO:  Objection to form.
8    What's true?
9        Q.        To be clear, I will rephrase
10   the question.
11                 And it is true that the
12   Attorney General Borja had called you when
13   you were the presiding judge in 2003 and
14   asked you to dismiss the case?
15       A.        The Attorney General for the
16   State, Borja, called me the day before the
17   first hearing, so that's October 20th of
18   2003, and he specifically told me on the
19   phone that it was the State, the party
20   that should be sued, and not Chevron, and
21   things of a legal nature that I understood
22   and that he was concretely asking me that
23   at the end of the first hearing I should
24   not order that the case move on to the
25   evidentiary period, but that I should, at
```

```
 1              A. GUERRA BASTIDAS
 2   that moment move the case for the issuance
 3   of the judgment.  These are legal
 4   procedures that at some point I would like
 5   to inform you about in my country.
 6       Q.        And you told the North American
 7   lawyers that you refused to do what
 8   Mr. Borja asked you to do was an example
 9   of the independence and impartiality of
10   the Ecuadorian judiciary, correct?
11              MR. MASTRO:  Objection to form.
12              THE SPECIAL MASTER:  You may
13   answer, if you understand it.
14       A.        I don't recall specifically and
15   concretely that I may have told him that,
16   but I told them about the call from the
17   Attorney General.
18       Q.        And did you also tell the North
19   American lawyers that you had received a
20   call from a friend of yours who was a
21   minister in the government, Mr. Colon?
22       A.        I told them about that detail,
23   a phone call that took place later, later,
24   after the first hearing.
25       Q.        And you told the North American
```

```
 1              A. GUERRA BASTIDAS
 2   lawyers that you understood that that
 3   minister was calling on behalf of Chevron,
 4   correct?
 5              MR. MASTRO:  Objection to form.
 6              THE SPECIAL MASTER:  Overruled.
 7   You may answer.
 8       A.      At the time I had my
 9   conversation with the North American
10   lawyers that person was not a minister of
11   anything.  He had been a minister years
12   before.  He was a minister for energy and
13   mines.  And I told the North American
14   lawyers that this individual, this former
15   minister, followed the same line of
16   thinking as the Attorney General of the
17   State.
18       Q.      My question was did you tell
19   the North American lawyers that you
20   understood at the time you got the call
21   from the ex-minister that he was acting on
22   behalf of Chevron?
23              MR. MASTRO:  Objection to form,
24   asked and answered.
25              THE SPECIAL MASTER:  You may
```

```
 1                A. GUERRA BASTIDAS
 2   answer.
 3       A.       I told the American attorneys
 4   that the former minister could share the
 5   same line of thinking as the Attorney
 6   General, Jose Maria Borja.
 7                MR. VESELKA:  I object,
 8   nonresponsive.
 9                THE SPECIAL MASTER:  No, now
10   you have gotten the same answer twice, you
11   don't like it, but you have gotten it.
12                MR. VESELKA:  He hasn't
13   answered the question.
14                THE SPECIAL MASTER:  He said
15   this is what he told the American lawyers.
16       Q.       Do you deny telling the North
17   American lawyers, in addition to what you
18   just said, that you understood the
19   ex-minister when he called you was calling
20   on behalf of Chevron?
21                MR. MASTRO:  Objection to form.
22   Asked and answered.
23                THE SPECIAL MASTER:  You may
24   answer it.
25       A.       I don't deny it.  From what I
```

```
 1              A. GUERRA BASTIDAS
 2   can recall, I don't deny it, but neither
 3   do I confirm it.
 4              THE INTERPRETER:  If the
 5   Special Master allows it, a minute.
 6              MR. CLAYMAN:  May I have a
 7   minute to speak to my client?
 8              THE SPECIAL MASTER: Absolutely.
 9              THE VIDEOGRAPHER:  Off the
10   record, 2:11 p.m.
11              (Discussion off the record.)
12              THE VIDEOGRAPHER:  Back on the
13   record, 2:14 p.m.
14   BY MR. VESELKA:
15      Q.      Mr. Guerra, do you deny telling
16   the North American lawyers that Judge
17   Zambrano was not pressured or influenced
18   by anyone with regard to his judgment in
19   the Lago Agrio case?
20              MR. MASTRO:  Objection to form.
21              THE SPECIAL MASTER:  You may
22   answer.
23      A.      Not specifically, I don't
24   recall having said it like that.  I don't
25   recall having stated it like that, if I
```

1            A. GUERRA BASTIDAS

2    did.  I didn't record the conversation.

3        Q.      Do you deny that you told the

4    North American lawyers that Judge

5    Zambrano's actions were clean and

6    appropriate?

7                MR. MASTRO:  Objection to form,

8    and asked and answered.

9                THE SPECIAL MASTER:  You may

10   answer.

11       A.      I don't deny -- well, excuse

12   me, I don't recall several of the issues

13   that were talked about with the American

14   attorneys.

15       Q.      You do remember that you did

16   not tell the North American lawyers about

17   your having any improper role with

18   Mr. Zambrano, correct?

19       A.      Mr. Zambrano invited me to that

20   meeting so that I would inform the

21   American attorneys on the transparency and

22   straightforwardness of the Ecuadorian

23   legal system.  I told them what I knew

24   they wanted to hear.  I didn't tell them

25   or I didn't confirm anything that would go

```
 1              A. GUERRA BASTIDAS
 2   against those good intentions of theirs.
 3        Q.      So you were not open and
 4   truthful with the North American lawyers,
 5   were you?
 6        A.      I was not open, true.  I was
 7   not open.  I told them what they wanted to
 8   hear.
 9        Q.      After that meeting you had a
10   conversation with Mr. Fajardo where you
11   asked to be paid $500,000, correct?
12        A.      No.  Excuse me, for me, no.
13        Q.      Okay.  So you asked for 500,000
14   in the conversation with Mr. Fajardo
15   afterwards, but that was for Mr. Zambrano
16   and you?
17              MR. MASTRO:  Objection to form.
18              THE SPECIAL MASTER:  You may
19   answer.
20        A.      The conversation with the
21   American attorneys was held a long time
22   after the judgment was issued, perhaps May
23   or July of 2011.  There was nothing else
24   to be asked for.  The issue of the
25   $500,000 was a year prior, in 2010.
```

```
 1              A. GUERRA BASTIDAS
 2      Q.       Well, I'm getting confused I
 3  guess.
 4              Did you or did you not ask
 5  Mr. Fajardo in the conversation with him
 6  after your meeting with the North American
 7  lawyers to be paid $500,000?
 8              MR. MASTRO:  Objection, asked
 9  and answered.
10              THE SPECIAL MASTER:  You can
11  answer.
12      A.       I didn't ask Fajardo for even a
13  greeting.  He offered me $5,000 for me to
14  make the trip, for the airfare and for my
15  lodging.
16      Q.       $5,000, is that what you just
17  said?
18      A.       He offered me $5,000 for me to
19  come here.
20      Q.       To come to that meeting with
21  the North American lawyers?
22      A.       For me to come to New York to
23  give testimony regarding the suitability
24  of the Ecuadorian legal system.
25              MR. MASTRO:  When you are done
```

1              A. GUERRA BASTIDAS

2    with this topic, I wanted to raise one

3    thing with the Special Master.  I would

4    ask the witness to briefly step out.  Just

5    whenever you are done with this line.

6              MR. VESELKA:  I was moving on.

7              MR. MASTRO:  So if we could

8    just very briefly, it will just be uno

9    momento.

10             THE VIDEOGRAPHER:  Off the

11   record 2:22 p.m.

12             (Witness departs the room.)

13             MR. MASTRO:  This is page 106,

14   line 13.  Again, I think that the

15   transcript says he said Zambrano.  I think

16   it is quite clear he meant that Fajardo

17   invited him to the meeting with the

18   American lawyers.  So either it is a

19   transcription problem or the witness

20   probably once again says the prior

21   question referred to Zambrano.  He may

22   have just used the name but I think it is

23   clear he meant Fajardo invited me to that

24   meeting.  So we might want to clarify

25   that.  Unless you want to tell us that

1                A. GUERRA BASTIDAS

2    Zambrano was the one who arranged that

3    meeting, which would be --

4                THE SPECIAL MASTER:  And that

5    he came here.

6                MR. MASTRO:  So I will take the

7    testimony if you want me to and use it to

8    good effect, but I think it was not

9    accurate.

10                MR. VESELKA:  All of this was

11    in Ecuador.  I understood him to be saying

12    that Zambrano told him to respond to it,

13    which I didn't know.  But I think it is

14    worth clearing up, I agree.  I agree, we

15    will clear that up.

16                MR. MASTRO:  Again, I didn't

17    want to say it in front of the witness,

18    but I think he was referring to

19    Mr. Fajardo setting up the meeting.  We

20    had earlier testimony about setting up the

21    meeting.

22                MR. GOMEZ:  I need to speak to

23    my co-counsel.

24                THE SPECIAL MASTER:  You may.

25                (Discussion off the record.)

Page 115

1              A. GUERRA BASTIDAS

2              THE VIDEOGRAPHER:  Back on the

3    record, 2:27 p.m.

4    BY MR. VESELKA:

5        Q.        A moment ago, Mr. Guerra, you

6    testified that Mr. Zambrano was the person

7    that invited you to come meet with the

8    North American lawyers to talk about

9    transparency and straightforwardness of

10   the legal system.

11              Did you mean to say

12   Mr. Zambrano or did you mean to say

13   Mr. Fajardo?

14       A.        I wanted to say expressly that

15   to that meeting with the American

16   attorneys, I was expressly invited by

17   Mr. Fajardo.

18              THE INTERPRETER:  Excuse me,

19   counsel, your Honor, there is just one

20   slight correction I would like to make to

21   the record as far as the translation.  It

22   is 106-24, just to fine-tune it, instead

23   of "open" -- he says "I was not open,

24   true."  It was "I was not sincere."

25              MR. MASTRO:  Just so the record

1              A. GUERRA BASTIDAS

2   is complete, the answer about the

3   invitation was line 106 -- is page 106,

4   line 13.

5        Q.      When did you meet with

6   Mr. Fajardo for him to pay you $1,000?

7                MR. MASTRO:  Objection to form.

8                THE SPECIAL MASTER:  You may

9   answer.

10       A.      Mr. Fajardo and I reached an

11  agreement regarding my involvement in

12  drafting the court orders in the Chevron

13  case.  This agreement, which included the

14  payments to me of $1,000, was approved by

15  Mr. Donziger in my presence after this

16  first meeting that I held with Mr. Fajardo

17  regarding that, and I was being paid the

18  $1,000 every month, any day toward the end

19  of every month by Mr. Fajardo, money in

20  cash.

21       Q.      When did you meet with

22  Mr. Fajardo when he gave you cash of

23  $1,000?

24       A.      At the end of the month,

25  usually at the end of the month --

```
 1              A. GUERRA BASTIDAS
 2      Q.      Ocho?
 3              THE SPECIAL MASTER:  Let him
 4   answer.
 5              MR. VESELKA:  I'm sorry, I
 6   apologize.
 7      A.      October, November, January.
 8   October/November of 2009, January/February
 9   of 2010, November/December of 2011,
10   January of 2011, approximately.
11      Q.      How many of those times did you
12   meet -- are you saying in --
13              THE SPECIAL MASTER:  Excuse me,
14   can we just double-check to see whether he
15   meant, before January '11, I think he said
16   November/December 2010, and it sounded to
17   me like a misspeak as opposed to -- let's
18   just clear it up.
19              THE WITNESS:  Am I to say
20   something?
21              THE SPECIAL MASTER:  Yes.
22      Q.      Which month?
23              THE SPECIAL MASTER:  No, which
24   year.
25              MR. VESELKA:  The months of
```

Page 118

1                   A. GUERRA BASTIDAS
2    which year, right.
3                   THE SPECIAL MASTER:  After
4    2009, the November/December, what year was
5    that?
6                   THE WITNESS:  After 2009, oh,
7    it was the year 2010.
8                   THE SPECIAL MASTER:  I was
9    right, okay.
10       Q.       Where did you meet Mr. Fajardo
11   for those payments?
12       A.       At 6th of December and Rio
13   Coca.
14       Q.       Did you get a payment then?
15       A.       Yes.
16                  MR. MASTRO:  Objection.
17       Q.       I asked you earlier if you
18   received anything from him and you said
19   only thanks.
20                  THE SPECIAL MASTER:  Excuse me,
21   I'm sustaining that objection.  You know,
22   first of all, that is argumentative and I
23   think contrary to the testimony.
24                  MR. MASTRO:  Correct.
25                  MR. VESELKA:  It is not.  He

```
 1              A. GUERRA BASTIDAS
 2    said I got thanks and I got nothing
 3    physically.
 4              MR. MASTRO:  As to one meeting
 5    that you asked him about specifically.
 6              MR. VESELKA:  That's what he
 7    just talked about.
 8              MR. MASTRO:  That is not what
 9    he is talking about.  You have an
10    open-ended question about payments all the
11    time, at the end of every month.
12              MR. VESELKA:  Okay, then I'm
13    misunderstanding his answer.
14       Q.       Are you saying you met
15    Mr. Fajardo outside at the same
16    intersection on multiple occasions?
17       A.       Yes.
18       Q.       And how would he deliver the
19    cash to you?
20       A.       In bills.
21       Q.       What size bills?
22       A.       20s, 50s.
23       Q.       Did he have it wrapped in
24    anything?  Did he just have it unwrapped?
25       A.       In an envelope.
```

```
 1              A. GUERRA BASTIDAS
 2       Q.       What was on the envelope?
 3       A.       Well, the bills.
 4       Q.       No, on the outside of the
 5   envelope.
 6       A.       It is a white envelope, yes.
 7       Q.       So you would then go deposit
 8   that in your account?
 9       A.       The deliveries of monies were
10   generally done at nighttime and I would
11   usually use that money for expenses
12   related to purchases for the construction
13   of a house I was building.
14       Q.       So you did not deposit it into
15   your account?
16              MR. MASTRO:  Objection to form,
17   asked and answered, and mischaracterizes
18   his prior testimony where he said
19   generally and usually.
20              MR. VESELKA:  This is more than
21   an objection to form, your Honor, I mean
22   Mr. Gitter.
23              THE SPECIAL MASTER:  Yeah, you
24   are right.  You are right, okay.  But I
25   think he is right this time.  You are
```

1              A. GUERRA BASTIDAS

2   right and he is right.

3              MR. VESELKA:  I'm concerned

4   about having time consumed on things that

5   I don't think have --

6              THE SPECIAL MASTER:  Ten

7   minutes is being added to your time.

8              MR. VESELKA:  All right,

9   thanks.

10     Q.     I think it is a new question.

11  I don't think there was a question

12  pending.

13     A.     So I need to answer?

14             THE SPECIAL MASTER:  No, no.

15  He is going to ask a question that is not

16  objectionable.

17     Q.     Do you have any documents

18  reflecting deposits into your accounts of

19  any payments you say you received from

20  Mr. Fajardo that reflect Mr. Fajardo's

21  name on them?

22             MR. MASTRO:  Objection to form.

23             THE SPECIAL MASTER:  Break it

24  up.  I think there were actually two

25  questions there.

1              A. GUERRA BASTIDAS

2      Q.        You do not have any records of

3  those receipts that have Mr. Fajardo's

4  name on them, correct?

5              MR. MASTRO:  Objection to form.

6              THE SPECIAL MASTER:  You may

7  answer that.

8      A.        There are two public

9  instruments that evidence the payment on

10  two occasions of $1,000 by the plaintiffs,

11  and of course -- no, that's enough.

12      Q.        But those documents don't have

13  Mr. Fajardo's name on them, do they?

14      A.        They don't have Mr. Fajardo's

15  name.

16      Q.        What name do they have?

17      A.        Those documents have been

18  signed by Ximena Centeno, an employee of

19  the group of Mr. Fajardo's.

20      Q.        Do you know Ximena Centeno?

21      A.        No.

22      Q.        Have you ever met her?

23      A.        No.

24      Q.        So you don't -- were you there

25  watching her make those payments?

```
 1              A. GUERRA BASTIDAS
 2      A.      No.
 3              THE SPECIAL MASTER:  Did you
 4   ask payments or deposits?
 5              MR. VESELKA:  Deposits.
 6              THE SPECIAL MASTER:  You mean
 7   to his account?
 8              MR. VESELKA:  Right.
 9              THE SPECIAL MASTER:  You mean
10   Mr. Guerra's account.
11      Q.      So you do not personally know
12   if Ximena Centeno signed and made those
13   deposits or not, correct?
14              MR. MASTRO:  Objection to form.
15              THE SPECIAL MASTER:  You may
16   answer.
17      A.      I have seen documents that show
18   that Ximena Centeno signed a paid -- made
19   deposits of payments, at least two
20   payments, into my bank account that I have
21   in Quito.
22      Q.      But you did not see her sign
23   it, so you don't know if she or somebody
24   else signed it?
25              MR. MASTRO:  Objection.
```

1          A. GUERRA BASTIDAS

2               THE SPECIAL MASTER:  That

3    question is absolutely objectionable.  No,

4    you can know something without seeing it.

5    You may not know it with the same

6    certainty, but you can know something

7    without seeing it.  That's the problem

8    with your question.

9        Q.     Have you ever, at the time of

10   those deposits, had you ever seen Ximena

11   Centeno's signature on anything else?

12       A.     I don't recall, but I consider

13   I didn't.

14       Q.     So you are basing your

15   testimony here just on reading the name of

16   that signature?

17               MR. MASTRO:  Objection to form.

18               THE SPECIAL MASTER: .  I'm not

19   allowing that question.  Which testimony?

20               MR. VESELKA:  His testimony

21   that she is the one who made those

22   deposits.

23               THE SPECIAL MASTER:  Then make

24   that clear.

25       Q.     So you are basing your

                        A. GUERRA BASTIDAS

 1
 2    testimony earlier that Ximena Centeno made
 3    those deposits in your account on behalf
 4    of Mr. Fajardo or his group simply based
 5    on reading her name on the deposit slips?
 6                    MR. MASTRO:  Objection to form.
 7                    THE SPECIAL MASTER:  I object
 8    to the form too.  I'm going to allow that
 9    objection.  It is argumentative.  The word
10    "simply" makes it argumentative, because
11    the witness has given other testimony that
12    might lead somewhat to some of that
13    conclusion.
14        Q.        Do you have any basis for your
15    testimony that those deposits were made on
16    behalf of Mr. Fajardo other than what's
17    written on the deposit?
18                    THE SPECIAL MASTER:  You may
19    answer that question.
20        A.        At the time that -- immediately
21    after those deposits were being made by
22    the person who was making them,
23    Mr. Fajardo would call me to tell me, to
24    inform me that the deposit had been
25    already made into my account.  I would go

1              A. GUERRA BASTIDAS

2    to the bank, to the ATM, and I would

3    confirm that indeed the deposit of $1,000

4    had been made, the deposit that

5    Mr. Fajardo had referred to over the

6    phone.  After that I had to worry as to

7    what to spend them on, and obviously not

8    if they were made by check or in cash or

9    who had done it.  I knew they were from

10   Mr. Fajardo because he would tell me on

11   the phone.

12        Q.      You've produced -- you have

13   made available to Chevron your phone

14   records, correct?

15        A.      Yes, I made available to them

16   phone records and other documents, one of

17   two daily planners and other documents

18   related to the case.

19        Q.      None of your phone records

20   reflect any calls from Pablo Fajardo,

21   correct?

22              MR. MASTRO:  Objection to form.

23              THE SPECIAL MASTER:  You may

24   answer.

25        A.      I'm not an expert technician.

1              A. GUERRA BASTIDAS

2     I don't know anything about that.

3              MR. GOMEZ:  Excuse me,

4     Mr. Gitter, can we have the time?  Can we

5     have a counting of the time?

6              THE SPECIAL MASTER:  Sure.

7              MR. GOMEZ:  Thank you.

8              THE SPECIAL MASTER:  I have

9     given ten more minutes, so add in ten or

10    subtract ten.

11             MR. MASTRO:  When we take a

12    break, I would like to address that.

13    Thank you, your Honor.

14             THE VIDEOGRAPHER:  About 3

15    hours 40 minutes we have been on the

16    record, 3:40.

17       Q.      Now I want to turn back to the

18    meeting on June 3rd that was set up by

19    your phone calls with Doe 2.  Do you

20    remember that subject?

21             MR. MASTRO:  Mr. Veselka,

22    should we fix the record now so we don't

23    keep using the wrong --

24             MR. VESELKA:  Let's do it at

25    the end.  I don't want him to mentally --

Page 128

```
 1              A. GUERRA BASTIDAS
 2              THE SPECIAL MASTER:  I agree
 3  with Mr. Veselka on this one.
 4              MR. MASTRO:  That's fine.
 5     Q.      Where did the meeting on June
 6  3rd -- you said it was at a hotel.  The
 7  meeting on June 3rd was at a hotel with
 8  Mr. Rivero and Akerman?
 9     A.      Yes, I recall it was at a hotel
10  in the city of Quito.
11     Q.      Do you remember which hotel?
12     A.      Possibly the Marriott.
13              THE SPECIAL MASTER:  I think
14  the record ought to be clear, now we are
15  talking about June 3rd, 2012, right,
16  Mr. Veselka?
17              MR. VESELKA:  Yes, sir.
18              THE SPECIAL MASTER:  We had
19  just been on 2010/2011.  Now we are on
20  June 3rd, 2012.
21     Q.      Do you now or have you ever had
22  an account at Banco Instituto del
23  Ecuatoriano de Seguridad Social?
24     A.      I have been affiliated to the
25  Ecuadorian Institute of Social Security
```

```
 1              A. GUERRA BASTIDAS
 2   for many years, but I don't have a bank
 3   account in the bank that's affiliated with
 4   the Ecuadorian Institute of Social
 5   Security.
 6        Q.      How are you affiliated with the
 7   institute?
 8        A.      Well, in Ecuador people who
 9   work for the state or people who work in
10   the private sector are affiliated to
11   Social Security, so if an employee falls
12   ill, he is treated by Social Security.
13   The money doesn't come from the employer.
14        Q.      Did you have a meeting at the
15   location of the Banco Instituto
16   Ecuatoriano de Seguridad Social with any
17   Chevron representatives?
18        A.      I don't recall specifically.  I
19   don't recall.
20        Q.      Had there been meetings that
21   had been tentatively scheduled but that
22   did not happen with the Chevron
23   representatives before the meeting of June
24   3rd of 2012?
25        A.      I don't recall, but I don't
```

```
 1              A. GUERRA BASTIDAS
 2   think there were meetings scheduled before
 3   that date.
 4        Q.     "That date" being June 3rd,
 5   2012?
 6        A.     I'm referring to June 3rd of
 7   2012.
 8        Q.     How long did that meeting last?
 9        A.     The meeting of June 3rd, 2012,
10   as I recall, lasted from three to four
11   hours.
12        Q.     And was Doe 2 there at the
13   start of the meeting to introduce you to
14   the Chevron representatives?
15        A.     Yes.
16        Q.     And did Doe 2 stay for the full
17   three or four hours?
18        A.     It's, from what I can recall,
19   I'm under the impression that he did stay
20   until the end, yes.
21        Q.     Did you bring any documents or
22   electronic devices with you to the meeting
23   on June 3rd?
24        A.     No, only my cell phone so that
25   I could be in touch with my family, with
```

1               A. GUERRA BASTIDAS

2    my wife basically.

3        Q.       Was this your first time to

4    meet Mr. Rivero and Mr. Akerman?

5        A.       In person, yes.

6        Q.       Which of them had you talked --

7    had you talked on the phone with one or

8    more of them before?

9        A.       That's my impression that yes,

10   I had already talked on the phone with

11   them.

12       Q.       And when was that?

13       A.       I'm not sure.  That's the

14   impression that I have.  But definitely on

15   June 3rd that's when the meeting took

16   place in person physically.

17       Q.       So is there anything you can

18   remember about any of the phone

19   conversations that may have occurred

20   before June 3rd more substantive than just

21   setting up the meeting of June 3rd?

22       A.       I had not talked with

23   Mr. Akerman or Mr. Rivero before June 3rd.

24   I can almost tell you that's how I recall.

25   But I talked about them with Doe 2 before

```
 1              A. GUERRA BASTIDAS
 2   June 3rd.
 3        Q.      At the meeting on June 3rd did
 4   Mr. Rivero or Mr. Akerman have any money
 5   with them to pay you for visiting with
 6   them?
 7                 MR. MASTRO:  Objection to form.
 8                 THE SPECIAL MASTER:  How would
 9   he know that unless it was given or
10   displayed?
11                 MR. VESELKA:  I'll rephrase it.
12        Q.      Did Mr. Rivero or Mr. Akerman
13   tell you that they had money there
14   available to pay you for meeting with them
15   or for other purposes?
16                 MR. MASTRO:  Objection to form.
17                 THE SPECIAL MASTER:  Answer it
18   if you can understand it.
19        A.      Understood.
20                 The date mentioned in --
21   referred to in the question, from what I
22   understand, is June 3rd of 2012, which was
23   my first meeting with Mr. Akerman and
24   Mr. Rivero, and at that meeting, at that
25   encounter, Doe 2 was present who
```

1                   A. GUERRA BASTIDAS

2    introduces us.  In that meeting, from what

3    I can recall, at no time was there talk of

4    money or the financial.  We talked

5    generalities, a little bit of everything.

6         Q.       What do you remember the

7    Chevron representatives saying about the

8    potential for you to be compensated for

9    meeting with them and providing

10   information to them?

11                 THE SPECIAL MASTER:  I'm sorry,

12   in light of the prior answer, that

13   question is objectionable.  He said in his

14   immediately prior answer "In that meeting,

15   from what I can recall, at no time was

16   there talk of money or the financial."

17                 MR. VESELKA:  And I'm trying to

18   delve into that to make sure that he is

19   not talking about a specific transaction.

20                 THE SPECIAL MASTER:  Why don't

21   you ask that.  Why don't you ask that

22   then.

23        Q.       Was there discussion about when

24   or under what circumstances the Chevron

25   representatives would be willing to talk

1                A. GUERRA BASTIDAS

2     with you about any financial compensation?

3                    MR. MASTRO:  Objection.

4                    THE SPECIAL MASTER:  I will let

5     it go on, just to move things along.  But

6     that is an objectionable answer and I may

7     strike it yet -- question, and I may

8     strike it.

9                    MR. MASTRO:  That is asked and

10    answered as well.

11        A.       From what I can recall at that

12    first meeting, aside from identifying

13    ourselves, I made a statement so that

14    Chevron's representatives, Akerman and

15    Rivero, would know about the legal -- the

16    Ecuadorian legal system, the way that

17    judges operate, regarding my involvement

18    in this case as judge at the early stage,

19    and also about my involvement after I

20    stopped being a judicial employee.

21        Q.       You had a number of meetings

22    with those Chevron representatives after

23    the meeting on June 3rd, correct?

24        A.       Yes.

25        Q.       And one of those was a meeting

```
 1              A. GUERRA BASTIDAS
 2   on July 13, 2012?
 3       A.      I cannot state the date with
 4   certainty.  I actually believe it was July
 5   12th -- July 12th of 2012.
 6       Q.      You are aware that that
 7   conversation was tape-recorded by Chevron?
 8              MR. MASTRO:  Objection to form.
 9       A.      At that time I did not know
10   that Chevron was recording the
11   conversations.
12       Q.      But you know it now, that some
13   of the conversations were recorded?
14       A.      Yes.
15       Q.      Is it legal in Ecuador for you
16   to be tape-recorded without your
17   knowledge?
18              MR. MASTRO:  Objection, calls
19   for a legal conclusion.
20              THE SPECIAL MASTER:  You may
21   answer.
22       A.      Currently, if I remember
23   correctly, in Ecuador it is required that
24   the person who is going to be recorded
25   agree to it so that if the recording is
```

1              A. GUERRA BASTIDAS

2  made without the other person's knowledge,

3  and later on that conversation is filed

4  before a court and the person does not

5  reject that, that evidence is not valid.

6  And that's as far as it goes, not about if

7  the person doing the recording is

8  committing a crime.

9      Q.      But since you learned about the

10  existence of the recordings of some of the

11  conversations, you've had a chance to look

12  over those, correct?

13     A.      Here in the United States, once

14  I got here.

15             MR. VESELKA:  We need to switch

16  the tape.

17             THE VIDEOGRAPHER:  We are going

18  off the record, 3:09 p.m.  This is the end

19  of disk three in the deposition of Alberto

20  Guerra Bastidas.

21             (Recess taken.)

22             (Guerra Exhibit 8 marked for

23  identification.)

24             THE VIDEOGRAPHER:  We are going

25  back on the record at 3:16 p.m.  This is

```
 1              A. GUERRA BASTIDAS
 2   the beginning of disk four in the
 3   deposition of Alberto Guerra Bastidas.
 4   BY MR. VESELKA:
 5        Q.       You have been handed what has
 6   been marked as Exhibit 8.  Have you seen
 7   before this transcript and translation of
 8   the meeting of July 13th, 2012?
 9        A.       Yes, I have seen it.
10        Q.       Turn to page 44.  You see in
11   the second entry there for Mr. Rivero he
12   has a statement he makes that concludes
13   with "So then they say 'fine.'  Finally
14   they said 'that's fine, here's the
15   price.'"
16              THE SPECIAL MASTER:  What page
17   are we at, I'm sorry?
18              MR. VESELKA:  Page 44, sir.
19        A.       Yes, I'm seeing it.
20        Q.       And then there are two entries
21   below that for what are marked as
22   Investigator Number 5 in this transcript
23   and you see where their Investigator
24   Number 5 says that you and the first --
25   "in the first meetings you told us, well,
```

```
 1              A. GUERRA BASTIDAS
 2   but how much money, etc., etc."
 3              So does that refresh your
 4   recollection that at the first meeting on
 5   June 3rd there had been some discussion
 6   about money or how much you could be paid
 7   for the assistance?
 8       A.      Not specifically, no, I don't
 9   recall that money was talked about during
10   the June 3rd meeting.
11       Q.      So notwithstanding what the
12   Chevron investigator is saying here, you
13   don't remember --
14              THE SPECIAL MASTER:  I'm sorry,
15   argumentative.  The last question -- the
16   full and complete answer to the last
17   question is -- the question was does it
18   refresh your recollection.  His answer is
19   no, it does not.  That's it.  You can't
20   then ask a question so, in other words,
21   you know, etc.
22              MR. VESELKA:  I will move on,
23   but respectfully disagree that
24   cross-examination would allow.
25              THE SPECIAL MASTER:  I don't
```

Page 139

```
1              A. GUERRA BASTIDAS
2     think so.
3        Q.       So is your memory that the
4     discussion of money first came up at the
5     meeting on June 25th?
6                 MR. MASTRO:  Objection.
7        A.       The issue of the money
8     regarding certain evidence, from what I
9     can recall, came up during the
10    conversation on this date, July 13th of
11    2012, and I don't believe that, prior to
12    that, there were any conversations
13    regarding money.
14       Q.       So what else do you remember
15    being discussed on June 3rd that you
16    haven't told us yet?
17       A.       Specifically, aside from what
18    has been stated, I recall having said
19    clearly that I was attending that meeting
20    authorized -- having been authorized by
21    Mr. Zambrano and with the goal of getting
22    to know each other and, finally, with the
23    aim of negotiating or to have Mr. Zambrano
24    negotiate himself, or that I would
25    represent Mr. Zambrano in the negotiation
```

```
 1              A. GUERRA BASTIDAS
 2   in future conversations.
 3       Q.      Did the subject of getting U.S.
 4   resident visas for any of your children
 5   come up on June 3rd?
 6       A.      No, hardly.  That was not
 7   talked about.
 8       Q.      Have you seen any transcript of
 9   the meeting on June 3rd?
10       A.      If it exists, I have seen it.
11       Q.      Well, do you know if one
12   exists?
13       A.      There exists.
14       Q.      Did you tape-record any of your
15   meetings with Chevron representatives?
16       A.      No.
17       Q.      Did you tape-record any phone
18   calls with any representatives of Chevron
19   or intermediaries, including Doe 2?
20       A.      No.
21       Q.      Did you record any meetings or
22   telephone calls with Mr. Zambrano?
23       A.      No.
24       Q.      Did you tape-record any
25   meetings or telephone calls with
```

```
 1              A. GUERRA BASTIDAS
 2   Mr. Fajardo or anybody working with him?
 3        A.      No.
 4        Q.      At the conclusion of the
 5   meeting in the Marriott Hotel on June 3rd,
 6   you stated you wanted to get specific
 7   directions or authorization from
 8   Mr. Zambrano; is that correct?
 9              MR. MASTRO:  Objection to form.
10              THE SPECIAL MASTER:  No, that's
11   all right.  You may answer.
12        A.      Could you please repeat the
13   question?
14              MR. VESELKA:  Could you just
15   read it, please.
16              (The record was read.)
17        A.      I understand that I must have
18   said it because I was acting -- my aim was
19   to negotiate for Zambrano.
20        Q.      Do you recall a follow-up
21   telephone call with Doe 2 on the day after
22   your meeting?
23        A.      I don't remember it
24   specifically, but Doe 2 would call me all
25   the time.
```

```
 1              A. GUERRA BASTIDAS
 2      Q.        Did Doe 2 tell you that that
 3   call was recorded on June 4th?
 4      A.        No.
 5      Q.        Do you remember Doe 2 telling
 6   you that the Chevron executives were very
 7   pleased with your story?
 8      A.        Yes.
 9      Q.        And do you remember Doe 2
10   telling you that you could receive a bonus
11   of $5,000 if you would go meet with
12   Chevron executives in Bogotá?
13              MR. MASTRO:  Objection to form.
14   Best evidence is the transcript.
15              THE SPECIAL MASTER:  You may
16   answer.
17      A.        The offer came from -- or the
18   words, the terms, came from Doe 2 or
19   possibly from either Mr. Akerman or
20   Mr. Rivero.  I'm not sure, but I was told
21   that aside from the travel expenses I
22   would have -- $5,000 would be made
23   available for me for expenses, personal
24   expenses.
25      Q.        Do you remember a telephone
```

1           A. GUERRA BASTIDAS

2    conversation with the Chevron

3    representatives on June 5th following up

4    after the meeting of June 3rd and your

5    conversation with Doe 2?

6        A.        Not specifically.

7        Q.        Do you know if you had talked

8    with Mr. Zambrano by then after your

9    meeting on June 3rd?

10               MR. MASTRO:  Objection to form.

11               THE SPECIAL MASTER:  You may

12   answer it.

13       A.        The meeting, the first meeting

14   that I had with Mr. Akerman and

15   Mr. Rivero, I attended -- I went there

16   authorized by Mr. Zambrano.  I would

17   inform Mr. Zambrano as to the essence, the

18   core of my conversations with the

19   representatives from Chevron.  He was

20   informed as to what I was talking about.

21       Q.        So would you keep him informed

22   on a daily basis?

23       A.        I kept him updated according to

24   how the conversations were being held.

25       Q.        You don't have any phone

```
 1                A. GUERRA BASTIDAS
 2    records that reflect those calls, do you?
 3                MR. MASTRO:  Objection to form.
 4                THE SPECIAL MASTER:  I think
 5    the witness testified he really doesn't
 6    know anything about telephone records, he
 7    is not technically adept or something like
 8    that.
 9                MR. MASTRO:  Correct.
10                MR. VESELKA:  They have
11    produced phone records.
12                THE SPECIAL MASTER:  Go ahead.
13    Go ahead.  I mean, let's go ahead.
14        Q.      You don't know of any phone
15    records that you have that reflect those
16    calls with Mr. Zambrano, correct?
17                MR. MASTRO:  Same objection.
18        A.      No.
19        Q.      Now, you have three children?
20                THE SPECIAL MASTER:  Excuse me
21    a second, I'm troubled about leaving the
22    record.  Do you know one way or the other
23    what your phone records reflect?  I think
24    that's the first question.  Can you please
25    ask the witness that question?
```

Page 145

```
1              A. GUERRA BASTIDAS
2                   THE WITNESS:  No, I don't
3      recall.
4                   THE SPECIAL MASTER:  You know,
5      that's the problem with that question.  I
6      mean, the problem is -- the problem with
7      that question is that if the answer is no,
8      it could mean I just don't know anything
9      about it.  If you ask me whether my phone
10     records reflect conversations, I haven't
11     the faintest clue.
12                  MR. VESELKA:  They will be able
13     to cross-examine him when they put him on
14     -- get that on direct at trial.
15                  THE SPECIAL MASTER:  Yeah,
16     between now and then you can make whatever
17     publicity you want to make about it.
18     That's the problem.
19                  MR. VESELKA:  Between now and
20     then I have got something that I can show
21     at trial.  I'm here working trying to get
22     a witness -- I don't want to take time.
23                  THE SPECIAL MASTER:  Go, go.
24         Q.       Do you have three children; is
25     that right?
```

```
 1              A. GUERRA BASTIDAS
 2     A.      Yes.
 3     Q.      One daughter who has resident
 4  status in the U.S., correct?
 5     A.      Yes.
 6     Q.      And who is married?
 7     A.      Yes.
 8     Q.      One son that was living in
 9  Ecuador back in 2012, correct?
10     A.      Yes, correct.
11     Q.      And he is married also,
12  correct?
13     A.      Married and with one child.
14     Q.      Congratulate him for me.
15     A.      Thank you.  I will do so.
16     Q.      And then you have a son who
17  lives in the United States and works in
18  the United States but has some issues with
19  regard to his residency status; is that
20  correct?
21     A.      Yes.
22     Q.      And he is married also?
23     A.      Yes, he is married.
24     Q.      Do you remember raising and
25  asking the Chevron representatives about
```

```
 1              A. GUERRA BASTIDAS
 2   whether they would be able to help you
 3   with resident visas in the U.S. for your
 4   two sons in the phone call of June 5th,
 5   2012?
 6        A.      Regarding the date, I cannot
 7   tell you exactly; but as far as the
 8   content, yes.
 9        Q.      So in one of the meetings or
10   phone calls in June of 2012 you brought
11   that up; is that fair?
12        A.      Yes.
13        Q.      Do you remember raising in the
14   phone call on June 5th of 2012 with the
15   Chevron representatives about your wanting
16   to get Mr. Zambrano's approval and, quote,
17   "in some way share with him, even if
18   indirectly, any fruits or results"?
19              MR. MASTRO:  Objection to form,
20   best evidence, transcript.
21              THE SPECIAL MASTER:  Answer the
22   question.
23        A.      I said so.  I said so.  What I
24   cannot say with certainty is if I said it
25   on the date that you stated.
```

1              A. GUERRA BASTIDAS

2      Q.      Do you remember any meetings or

3  conversations with any of the Chevron

4  representatives or Doe 2 after the phone

5  call of June 5th and before the meeting of

6  June 25th, 2012?

7      A.      Not specifically.

8      Q.      Who attended the meeting on

9  June 25th?

10      A.      If the meeting that you are

11  referring to is related to the meeting

12  that I had with Chevron's representatives,

13  then at that meeting the people present

14  were Mr. Rivero, Mr. Akerman and myself.

15      Q.      Where was that meeting?

16      A.      Given that we would meet in the

17  room, the hotel room, where I would stay,

18  in my residence one time, or twice

19  perhaps, and other places where we would

20  agree to meet, public places, I cannot

21  tell you with certainty as to the place,

22  the location where we met, regarding the

23  meeting that you are talking about.

24      Q.      Well, there's a meeting in July

25  where you go to your house to show the

1                A. GUERRA BASTIDAS

2    Chevron representatives some of your

3    electric devices, correct?

4        A.        Yes, that happened.

5        Q.        And was that the first time you

6    went to your house for one of the meetings

7    with Chevron?

8        A.        That's the first time they went

9    to my house.

10        Q.        So you would not have gone to

11    your house on the meeting on June 25th?

12        A.        The most likely thing is no.

13        Q.        In the conversation with the

14    Chevron representatives on June 25th,

15    2012, you understood you were in

16    negotiations over the financial terms or

17    other fruits and benefits that you might

18    get out of cooperating with Chevron,

19    correct?

20                MR. MASTRO:  Objection to form.

21                THE SPECIAL MASTER:  You can

22    answer the question if you understand it.

23        A.        Yes, understood.

24                My aim was to negotiate

25    specifically for Mr. Zambrano and

1          A. GUERRA BASTIDAS

2  obviously for myself as well.  There

3  should be some personal benefit.

4      Q.      And as part of those

5  negotiations in that conversation on June

6  25th you represented to the Chevron

7  representatives that you had been offered

8  $300,000 by the plaintiffs in the Lago

9  Agrio litigation, correct?

10     A.      My intent was to improve my

11 position, the face of a good future

12 negotiation for Mr. Zambrano and myself,

13 so that to that end I said some things or

14 I exaggerated some things.

15     Q.      And one of the things you

16 exaggerated was that you had been offered

17 $300,000 by the Lago Agrio plaintiffs,

18 that was an exaggeration, correct?

19     A.      There was an exaggeration made

20 to Chevron's representatives.

21     Q.      And at the time of these

22 negotiations were you employed, in June

23 and July of 2012?

24     A.      By July of 2012 I no longer had

25 employment.

1          A. GUERRA BASTIDAS

2     Q.          Your municipal position was May

3   and June of 2012, correct?

4     A.          Yes, May and June, when I

5   worked in the municipal position, but I

6   recall that the mayor ordered that I be

7   paid for the month of July without me

8   having worked it.

9     Q.          Did he do that just to help you

10  out because you had no savings at the

11  time?

12              MR. MASTRO:  Objection to form.

13  Mischaracterizes his testimony.

14              THE SPECIAL MASTER:  I have a

15  different objection.  But if you can

16  understand it, let him answer.

17    A.          The mayor had invited me to

18  work at that municipality with a

19  commitment that I would be compensated at

20  least $3,000 per month.  Because the

21  compensation was $1,000 I believe that he

22  tried to compensate me by paying me the

23  additional month and of course for which

24  I'm grateful.

25    Q.          In your negotiating with

```
 1              A. GUERRA BASTIDAS
 2   Chevron over financial terms did you
 3   represent to them that you did not have
 4   any savings?
 5       A.      If you can please clarify the
 6   time you are referring to, if it's before
 7   the judgment or later on in 2012.
 8       Q.      Certainly.  Anytime you need
 9   clarification, let me know.
10               I'm talking particularly in the
11   July 2012 time frame.
12       A.      I told them, Chevron's
13   representatives, that I had no savings.
14       Q.      And was that true at the time?
15       A.      What is most likely is that I
16   had no savings.
17       Q.      Did the Chevron representatives
18   ever tell you that they questioned your
19   credibility?
20       A.      They didn't say so expressly
21   but I understood that they were doing
22   that, because on several occasions, on
23   several meetings daily, conversations,
24   they would summarize and they would repeat
25   their questions.
```

1          A. GUERRA BASTIDAS

2     Q.       At the meeting of July 13th,

3  the meeting started off in the morning in

4  a hotel; is that correct?

5     A.       I think it is this one

6  (indicating).  Yes, it is the hotel where

7  Chevron's representatives were staying.

8     Q.       Which hotel was that?

9     A.       I honestly don't recall.  I

10  cannot tell you specifically.

11     Q.       And at this meeting in the

12  morning at the hotel the Chevron

13  representatives had $20,000 in cash

14  available to pay you, correct?

15     A.       I didn't count it.  I didn't

16  count the money.  But they let me know

17  orally that they had money, possibly

18  $20,000, ready to be paid.

19     Q.       And do you remember responding,

20  asking them to add a couple of zeros to

21  that?

22     A.       Yes.

23     Q.       And that was just part of your

24  negotiations?

25     A.       It was part of a joke, a joke.

```
 1              A. GUERRA BASTIDAS
 2   Latinos, we're like that.
 3       Q.      People call me humorless all
 4   the time.
 5              THE SPECIAL MASTER:  I could
 6   make a joke about that.
 7              MR. VESELKA:  Right.
 8              THE SPECIAL MASTER:  But I will
 9   suppress it.
10       Q.      You had already suggested to
11   them that you had been offered 300,000 by
12   the Lago Agrio plaintiffs in order to --
13              THE SPECIAL MASTER:
14   Argumentative already.
15              MR. MASTRO:  And asked and
16   answered.
17              THE SPECIAL MASTER:
18   Argumentative already.  Change it.
19              MR. VESELKA:  Asking him about
20   his testimony?
21              THE SPECIAL MASTER:  Didn't you
22   begin with the word -- I'm sorry, I
23   thought I heard the word "but."  Sorry.
24       Q.      You previously had testified
25   that you referenced -- you had claimed
```

1                A. GUERRA BASTIDAS

2     that you had been offered 300,000 by the

3     Lago Agrio plaintiffs in order to try to

4     set a higher number as part of your

5     bargaining, correct?

6                    MR. MASTRO:  Objection to form.

7     Mischaracterizes the prior testimony.

8                    THE SPECIAL MASTER:  You may

9     answer if you understand it.

10        A.        I told the men who represented

11    Chevron that because of my involvement

12    previous to the issuance of the judgment

13    and because of the judgment, the

14    plaintiffs had offered to pay me $300,000,

15    but I said it to improve my negotiating

16    position.  That's the truth.

17        Q.        And asking for 200,000 in the

18    meeting on July 13th would have been part

19    of that same negotiating?

20                    MR. MASTRO:  Objection to form,

21    mischaracterizes prior testimony.

22                    THE SPECIAL MASTER:  No, he

23    said it was a joke.

24                    MR. VESELKA:  And I'm trying to

25    examine him on that whether that was

```
 1              A. GUERRA BASTIDAS
 2   consistent with his bargaining position
 3   where he started off at 300,000 and now he
 4   is at 200,000, it is trying to
 5   cross-examine --
 6              THE SPECIAL MASTER:  Okay, go
 7   ahead, answer the question if you can.
 8       A.      On this date, the date you are
 9   mentioning, I was told they had 20,000.  I
10   didn't verify it.  There was no reason why
11   I should have done so.  At the moment of
12   truth, sometime later, I said let's make
13   it 50 and, finally, in exchange for
14   certain evidence that I turned over I
15   received from them $18,000.
16       Q.      When you had come down, as you
17   said, I'm not trying to recharacterize
18   your testimony --
19              THE SPECIAL MASTER:  But you
20   are.
21              MR. MASTRO:  You are.
22              THE SPECIAL MASTER:  But you
23   are.  Go ahead.  You already did.
24       Q.      When you arrived at your demand
25   for 50,000 Chevron representatives went
```

```
 1              A. GUERRA BASTIDAS
 2   and picked up an extra 30,000 in cash to
 3   have the 50,000 in cash when you went to
 4   your home that afternoon, correct?
 5              MR. MASTRO:  Objection,
 6   mischaracterizes prior testimony, assumes
 7   facts not in evidence, lack of foundation,
 8   and argumentative.
 9              THE SPECIAL MASTER:  You can
10   answer the question if you understand it.
11       A.     I reaffirm what I said in the
12   sense that I negotiated only for the
13   18,000 in exchange for the evidence.
14   That's what I received in cash, and I
15   don't know for a fact that they may have
16   gone to some banking institution or some
17   other place to get the money that you were
18   referring to.
19       Q.     So the Chevron representatives
20   didn't tell you that they had, on the way
21   between the meeting at the hotel and going
22   to look at the equipment at your house,
23   that they had picked up the extra 30,000
24   in cash?
25              MR. MASTRO:  Same objection.
```

```
 1              A. GUERRA BASTIDAS
 2                  THE SPECIAL MASTER:  You may
 3    answer.
 4        A.         From the meeting at the hotel,
 5    I went to a notary public's office and
 6    after I finished my procedures at that
 7    location, I met with them.  They were
 8    waiting for me at a nearby place.  And
 9    from there we went to my residence.
10        Q.         And do you remember that after
11    you had negotiated with them, Mr. Rivero
12    said he would be willing to pay 42,000
13    that day if when they reviewed the
14    material that you had at the house it
15    included a copy of the draft sentencia and
16    the memoria ayuda?
17                  MR. MASTRO:  I object to form.
18        A.         I don't recall.
19                  MR. CLAYMAN: Excuse me, he has
20    been sitting for about three hours.  Is it
21    going to be possible for us to take a
22    break soon?
23                  THE SPECIAL MASTER:  Very soon.
24    Ask him if he wants to take a break.
25                  MR. CLAYMAN:  Yes, your Honor.
```

1              A. GUERRA BASTIDAS

2                 THE SPECIAL MASTER:  Let's take

3      our afternoon break.

4                 THE VIDEOGRAPHER:  We are going

5      off the record at 4:05 p.m.  This is the

6      end of disk four in the deposition of

7      Alberto Guerra Bastidas.

8                 (Recess taken.)

9                 THE VIDEOGRAPHER:  We are going

10     back on the record at 4:29 p.m.  This is

11     the beginning of disk five in the

12     deposition of Alberto Guerra Bastidas.

13                MR. MASTRO:  Mr. Veselka, are

14     you going to tell us about the other

15     issue?

16                MR. VESELKA:  There is an

17     e-mail coming.

18     BY MR. VESELKA:

19         Q.       At your home you provided to

20     the Chevron representatives certain

21     electronic equipment?  And for reference

22     I'm going to hand you what has been

23     previously marked as Exhibit 4.  This is a

24     copy of your January 27th, 2013 agreement

25     with Chevron, correct?

```
 1              A. GUERRA BASTIDAS
 2      A.        Yes, that's correct.
 3      Q.        If you look at page 8 or
 4  Attachment A --
 5      A.        Page 8, yes.
 6      Q.        -- that lists the equipment and
 7  papers that you provided to the Chevron
 8  representatives at your house on July 13,
 9  2012, correct?
10      A.        Yes.
11      Q.        Did you give them anything
12  other than that that day?
13      A.        I gave them the computer, the
14  CPU to the computer.  I don't know if it
15  is written here because it is in English.
16      Q.        The Maxtor hard drive?
17      A.        Oh, Maxtor, yes.  I turned this
18  over to them.
19      Q.        And did the representatives
20  look through and go through and try to
21  find the draft sentencia?
22      A.        I don't recall specifically
23  that they had looked for the document.
24      Q.        Do you remember that they did
25  examine and look through some of the flash
```

```
 1              A. GUERRA BASTIDAS
 2   drives and the hard drives in order to see
 3   what was or wasn't on there before they
 4   agreed to pay you the $18,000?
 5              MR. MASTRO:  Objection to form,
 6   foundation.
 7              THE SPECIAL MASTER:  Answer the
 8   question if you can.
 9      A.       Upon arriving at my residence,
10   after meeting my wife and greeting her, I
11   showed them the hard drive, and I
12   understand a good deal of the items
13   referred to in page 8, and one of them,
14   and I think it was Mr. Akerman, entered
15   into the system, and under those
16   circumstances Mr. Rivero gave me the
17   $18,000.
18              I don't know if it was -- the
19   operation didn't take too long, an hour,
20   hour and a half at most.  I'm not learned
21   about these things.  I don't know if they
22   looked, you know, with another device,
23   etc., etc., these items, etc.  But they
24   definitely received them and they took
25   them.
```

1              A. GUERRA BASTIDAS

2        Q.       What were they carrying the

3   cash in?

4        A.       As far as I can recall, I saw

5   the cash in the hotel, in a safe in the

6   hotel, but it was my understanding that

7   Mr. Akerman was carrying the cash in a

8   backpack hanging from his shoulder, a

9   backpack, a backpack.

10       Q.       So at the end of the day, of

11   that day, when they decided they were

12   going to pay you the $18,000, he gave you

13   the cash out of the backpack?

14       A.       He pulled it out of the

15   backpack.  That's my clearest

16   recollection.

17       Q.       How big a stack was it?

18       A.       It was nine stacks of $20

19   bills.

20       Q.       Each stack was about an inch or

21   two; is that what you are saying?

22       A.       Each stack was approximately

23   two or three centimeters.

24       Q.       So the total stack would be 25

25   to 30 centimeters?

```
 1              A. GUERRA BASTIDAS
 2              MR. MASTRO:  Do we really have
 3   to do the math?
 4       A.       Nine times two, 18.
 5       Q.       And where did you put it?
 6       A.       Nine times this (indicating),
 7   if we piled them up, possibly 20
 8   centimeters.
 9       Q.       And where did you put it?
10       A.       In a drawer, in a desk in my
11   living room.
12       Q.       Did Chevron ask for a receipt?
13       A.       No.
14       Q.       You understood at the end of
15   that day that they were willing to pay
16   more if you had more information for them,
17   including the flash drive with the draft
18   judgment, right?
19              MR. MASTRO:  Objection to form.
20              MR. VESELKA:  Mr. Gitter, we
21   have an objection to form.  I'm sorry.
22              THE SPECIAL MASTER:  I'm
23   embroiled in trying to open your e-mail.
24              Overruled.
25       A.       I was hoping that in the future
```

```
 1              A. GUERRA BASTIDAS
 2    I could obtain a larger benefit or
 3    earning.
 4        Q.      So one of the things you did
 5    was go get more information -- more
 6    documents and information and computer
 7    information to provide to them at a later
 8    meeting, correct?
 9        A.      Immediately after that date I
10    insisted quite a lot with Mr. Zambrano,
11    but what I definitely did later on was to
12    obtain bank records, certificates from an
13    airline, and those kinds of documents.
14        Q.      If you look in Exhibit 4 to
15    Attachment B on page 10, the top part of
16    that lists information that you turned
17    over to the Chevron representatives on
18    July 31st, 2012, correct?
19        A.      Yes, that's what it states,
20    correct.
21        Q.      And when you gave them that,
22    were you hoping that they would pay you
23    more money?
24        A.      No, because I would have told
25    them specifically that I was -- that I was
```

Page 165

1              A. GUERRA BASTIDAS

2    requesting more money, and I didn't do

3    that.  I gave it to them.

4        Q.      But you knew that if you could

5    find the draft judgment, they were willing

6    to give you more money, right?

7        A.      I believe that I would benefit

8    better once Mr. Zambrano were to take part

9    in the conversations and the negotiations.

10       Q.      And those benefits that you are

11   talking about would be additional money

12   and/or help on visas for you or your

13   family in the U.S.?

14       A.      I must tell you that I didn't

15   think about coming to the United States

16   with my wife nor with my son from Ecuador.

17       Q.      Up until the July 31st meeting

18   where you turned over these materials, you

19   had always remembered that your draft

20   judgment that you had worked on, that you

21   had touched up, you had on a flash drive,

22   correct?

23              MR. MASTRO:  Objection to form,

24   mischaracterizes the testimony.  Go ahead.

25       A.      I had that memory.

```
 1              A. GUERRA BASTIDAS
 2       Q.       And then as of July 31st, since
 3   they weren't paying you any more for the
 4   material you were providing, that's when
 5   you first remembered that the work on the
 6   draft judgment was done on this other
 7   computer that you've told us about,
 8   correct?
 9               MR. MASTRO:  Objection to form.
10               THE SPECIAL MASTER:  Sustained.
11       Q.       The flash drives that you
12   thought included your work on the draft
13   judgment were flash drives you had at your
14   house in Quito, correct?
15       A.       The flash drives were in my
16   house in Quito.
17       Q.       But the Chevron representatives
18   did not find any copy of the draft
19   judgment on those flash drives, correct?
20               THE SPECIAL MASTER:  Asked and
21   answered.
22       Q.       Only after they did not find
23   that draft judgment on your flash drives
24   did you then for the first time suggest
25   that the work had been done on a separate
```

Page 167

```
 1            A. GUERRA BASTIDAS
 2   computer, correct?
 3            MR. MASTRO:  Objection to form,
 4   lack of foundation, asked and answered.
 5            THE SPECIAL MASTER:  Overruled.
 6   You may answer.
 7       A.      At first I believe that the
 8   judgment could be in the computer or on
 9   one of these flash drives that I had in my
10   residence, and I had not worried about
11   that previously, there was no reason for
12   me to do so.
13            But later on, it is my
14   understanding, I was told by Chevron's
15   representatives that they were not finding
16   the draft judgment.  That's when I began
17   an effort to remember until I determined
18   that actually the draft judgment, the
19   project, I worked on it in Lago Agrio,
20   among other documents that I have
21   generated over there.
22       Q.      And you had not told Chevron
23   that you had worked on any part of the
24   project on a computer in Lago Agrio -- on
25   a separate computer in Lago Agrio before
```

Page 168

```
 1              A. GUERRA BASTIDAS
 2   that time, correct?
 3              MR. MASTRO:  Objection to form.
 4              THE SPECIAL MASTER:  Overruled.
 5      A.       Could you please repeat the
 6   question.
 7      Q.       You had not told Chevron that
 8   you had worked on any part of the project
 9   on a separate computer in Lago Agrio
10   before July 31st, correct?
11      A.       I told Chevron several things.
12   Some of them were true, others were
13   exaggerations.  Sometimes some things were
14   said firmly, others were said lightly,
15   because Mr. Akerman and Mr. Rivero were at
16   all times making questions regarding
17   everything and I was actually worried
18   about definitely in negotiating for
19   Mr. Zambrano.
20      Q.       In the conversation on July
21   31st -- or 13th -- the representatives of
22   Chevron had told you that you were going
23   to be their bridge to Mr. Zambrano,
24   correct?
25              MR. MASTRO:  Objection to form.
```

1           A. GUERRA BASTIDAS

2                THE SPECIAL MASTER:  Overruled.

3      A.       During some conversation they

4   told me or had me -- led me to understand

5   that I was the bridge with Mr. Zambrano,

6   and I myself, from the very beginning, had

7   also believed that.

8      Q.       So after the meetings in July

9   and after you had provided certain

10  material and been paid a certain amount of

11  money, you understood that the Chevron

12  representatives wanted you to approach

13  Mr. Zambrano to see if he would meet with

14  them?

15     A.       During the meeting that you are

16  referring to, Chevron's representatives,

17  they didn't give me a certain amount of

18  money.  They gave me $18,000 in exchange

19  for the physical evidence that I turned

20  over at that time, specifically the CPU,

21  the computer.

22               And following that I continued

23  thinking that the objective was not I, but

24  Mr. Zambrano.

25     Q.       And you understood as the

1              A. GUERRA BASTIDAS

2      bridge to Mr. Zambrano that you -- Chevron

3      representatives said they would pay you a

4      finder's fee if Mr. Zambrano agreed to

5      meet with them?

6                  MR. MASTRO:  Objection to form,

7      argumentative.

8                  THE SPECIAL MASTER:  You may

9      answer.

10        A.        Chevron's representatives whom

11     I was meeting, Mr. Akerman and Mr. Rivero,

12     during some conversation of the many that

13     we had led me to understand, or that's the

14     way I understood it, that once they

15     negotiated with Mr. Zambrano, they would

16     compensate me with some amount of money.

17        Q.        And Mr. Rivero gave you a stack

18     of documents that he wanted you to give to

19     Mr. Zambrano to show that he was the

20     person involved and would be the

21     representative, that he had the authority

22     for Chevron, correct?

23        A.        Because I was insisting with

24     Mr. Zambrano so that he would meet with

25     the men from Chevron, Mr. Zambrano

```
 1              A. GUERRA BASTIDAS
 2  demanded that he meet with a man named
 3  James Craig whom he acknowledged is the
 4  only person identified with Chevron
 5  because he was the spokesperson for Latin
 6  America, and he didn't want and he
 7  wouldn't agree to meet with the people
 8  with whom I was meeting, so that once
 9  Mr. Rivero and Mr. Akerman were informed
10  of this concern of Mr. Zambrano's,
11  Mr. Rivero gave me part of his CV -- part
12  of his identification, something from some
13  magazines, from El Commercio, from the
14  press, and I gave that information to
15  Mr. Zambrano so that he could see that he
16  was going to meet with people from Chevron
17  and not a con man or ripoff artists.
18       Q.       So you did give the stack of
19  materials that Mr. Rivero gave you --
20            THE SPECIAL MASTER:  Excuse me,
21  Counsel.  Are you asking him whether what
22  you are holding in your hand and flipping
23  is the stack of materials?  Why are you
24  doing that while asking him a different
25  question?
```

```
 1              A. GUERRA BASTIDAS
 2                   MR. VESELKA:  Well, I was going
 3    to show it to him.
 4                   THE SPECIAL MASTER:  And that's
 5    okay.  I expressed sotto voce to your
 6    colleague when the witness is trying to
 7    answer the question, it is distracting to
 8    have packets of paper being moved around
 9    here.  It is distracting to me.
10                   MR. VESELKA:  It is distracting
11    to me.  But with a time limitation on a
12    witness that we really think because of
13    the translation needs more, we have to try
14    to --
15                   THE SPECIAL MASTER:  Please,
16    just continue.  And now we both have to go
17    look at the transcript again.
18         Q.      You gave to Mr. Zambrano the
19    materials Mr. Rivero asked you to give
20    him, correct?
21         A.      Yes.  Yes, I personally gave
22    Mr. Zambrano that documentation around
23    August of 2012.
24         Q.      On August 14th, to be exact,
25    correct?
```

```
1              A. GUERRA BASTIDAS
2       A.        It was possibly that date, but
3   it was August of 2012.
4       Q.        Where did you see Mr. Zambrano
5   when you gave it to him?
6       A.        In the City of Quito, across
7   from the Mariscal Sucre Airport, the old
8   airport.
9       Q.        And how did you know
10  Mr. Zambrano was going to be there?
11      A.        Mr. Zambrano was constantly
12  getting in touch with me over the phone,
13  and we had agreed over the phone that he
14  would wait for me at that location.
15      Q.        Did you know where he had been
16  earlier that day?
17      A.        No, but he told me he was
18  coming in from a trip.  He didn't tell me
19  if he was coming in from Oriente or from
20  the coast.
21      Q.        At the time that you took that
22  material at Chevron's request to give to
23  Mr. Zambrano, did you know that
24  Mr. Zambrano had been videotaped by
25  Chevron or its agents meeting with Pablo
```

Page 174

1              A. GUERRA BASTIDAS

2    Fajardo and some North American lawyers?

3       A.        No, at that time, I was not

4    aware of that detail.

5       Q.        When did you first become aware

6    of that detail?

7                 MR. MASTRO:  Objection,

8    foundation.

9                 THE SPECIAL MASTER:  Go ahead.

10   Overruled.

11      A.        Regarding that detail that you

12   are mentioning, I found out later,

13   possibly around the months of August,

14   September, October 2012.

15      Q.        From whom?

16      A.        One of the Mr. Akerman or

17   Mr. Rivero.  Mr. Akerman or Mr. Rivero

18   showed me a photograph where one can see

19   Mr. Zambrano speaking with individuals as

20   handsome as you are, American; well,

21   American.  In the lower part of the

22   photograph, it says August 14th, 2012.

23      Q.        Have you ever seen or heard --

24   have you ever heard any audio recordings

25   of that conversation?

Page 175

1           A. GUERRA BASTIDAS

2              THE SPECIAL MASTER:  Which

3    conversation, I'm sorry?

4              MR. VESELKA:  The conversation

5    between the less handsome North American

6    lawyers and Mr. Zambrano and Mr. Fajardo.

7       A.      I have not heard -- I have not

8    seen video, nor, what do you call that,

9    audio containing conversations between

10   Zambrano and Fajardo.

11      Q.      Either on that day with those

12   North American lawyers or of any other

13   conversation between Mr. Fajardo and

14   Mr. Zambrano?

15      A.      Fajardo and Zambrano, I don't

16   recall having heard that.

17      Q.      While you have Exhibit 4 out in

18   front of you, if you would turn to page 6.

19              That's your signature, correct?

20      A.      Yes.

21      Q.      And when did you sign that?  It

22   is dated on the first page, January 27th,

23   if I remember correctly.

24      A.      Yeah, this is the agreement

25   signed by myself and Chevron on the date

1          A. GUERRA BASTIDAS

2   stated.

3        Q.        Where was it negotiated?

4        A.        This, regarding some issues

5   related to this, it was talked about in

6   the City of Chicago in November of last

7   year, but eventually it was finalized and

8   executed in the City of New York and in

9   the presence of my attorney.

10       Q.        If you go back to Exhibit 7,

11  your itinerary, and turn to page 99, that

12  reflects you and your wife flying to

13  Chicago on the 14th of November, 2012,

14  correct?

15       A.        That's correct.

16       Q.        And it shows you all leaving

17  Chicago on the 19th of November?

18       A.        Yes, that's correct.

19       Q.        So is that when you were

20  starting the negotiations over what ended

21  up being the agreement that is Exhibit 4?

22       A.        It is in Chicago that we speak

23  specifically about the subject of Exhibit

24  4 specifically.

25       Q.        Had you seen a draft before you

```
 1              A. GUERRA BASTIDAS
 2   got to Chicago?
 3              MR. CLAYMAN:  Objection.
 4              MR. MASTRO:  Objection to form.
 5   Draft of what?
 6              THE SPECIAL MASTER:  You mean a
 7   draft of the agreement there that is being
 8   shown?
 9              MR. VESELKA:  Yes, sir.
10              THE SPECIAL MASTER:  You may
11   answer the question.
12       A.      I had not seen any draft.
13       Q.      And with whom did you negotiate
14   the agreement during the meetings in
15   Chicago in November?
16              MR. MASTRO:  Objection to form.
17              THE SPECIAL MASTER:  You may
18   answer the question.
19       A.      In November in Chicago there
20   were approaches toward a negotiation, in
21   those conversations regarding the issues
22   of the travel for the whole family, of
23   moving, of transportation, of a vehicle,
24   and others.  From what I can recall
25   Chevron was represented in those
```

1              A. GUERRA BASTIDAS

2    conversations by a man named Jose.

3         Q.      Jose Martin?

4         A.      Possibly, yes.  Possibly, yes.

5    Mexican, 45 to 50 years of age?

6         Q.      A young man.

7         A.      Possibly general accountant.

8    Mr. Randy Mastro was there, Mr. Akerman,

9    Mr. Rivero, and some other people whom I

10   don't remember -- whose last names I don't

11   remember.

12        Q.      Had you engaged counsel to

13   advise you yet?

14        A.      No, I had not hired an

15   attorney, but, however, Chevron

16   suggested -- asked if I wanted an

17   attorney, but the truth is at that time,

18   at that place, I still considered myself

19   good enough to represent myself.

20        Q.      During those negotiations, were

21   there at least draft term sheets?  I don't

22   know if that phrase is familiar to you or

23   not.

24              MR. MASTRO:  Objection to form.

25   Mischaracterizes his prior testimony.

Page 179

1              A. GUERRA BASTIDAS

2                   THE SPECIAL MASTER:  No, no,

3      no, it doesn't do anything of the sort,

4      Mr. Mastro.  Overruled.

5                   MR. MASTRO:  On page 173, line

6      16.

7                   THE SPECIAL MASTER:  Look,

8      forget it, the question is fine.  Please

9      answer the question.  I don't care

10     whatever it says.

11                  MR. MASTRO:  Can you reread the

12     question.

13        Q.      Were there at least draft term

14     sheets that you were looking at or

15     exchanging during the meetings in

16     November?

17                  MR. MASTRO:  Objection to form.

18        A.      There were sheets that I used

19     in Spanish where I wrote down the essence

20     of the proposal and of what was being

21     discussed.

22        Q.      How much were you asking for?

23        A.      I don't recall, but initially I

24     assumed I could negotiate for strong

25     amounts of money.

1              A. GUERRA BASTIDAS

2     Q.      Does that mean you were asking

3  for amounts much larger than what ended up

4  being in the agreement?

5              THE SPECIAL MASTER:  Excuse me.

6  He just answered the question.  Your

7  question was "How much were you asking

8  for?"  "Answer:  I don't recall, but

9  initially I assumed," etc.

10              Your next question is "Does

11  that mean you were asking for."  He just

12  told you he doesn't recall what he was

13  asking for.  The question is

14  objectionable.  Move on.

15              MR. VESELKA:  The one before

16  was asking specific amounts.  This is

17  asking just whether the amounts were

18  larger than what it ended up being.

19              THE SPECIAL MASTER:  It says,

20  "How much were you asking for?"  "I don't

21  recall."  I'm sorry, the question you have

22  just put is incomprehensible in light of

23  the last answer.  It is incomprehensible

24  to me, and if it is incomprehensible to

25  me, it is objectionable and you've got to

```
 1              A. GUERRA BASTIDAS
 2   rephrase it.
 3              Incomprehensible questions have
 4   a tendency to mislead, not that it is
 5   intended, but they have that tendency.
 6      Q.      Are the amounts in the final
 7   agreement as signed substantially less
 8   than what you were asking for?
 9              MR. MASTRO:  Objection.
10      Q.      If you remember.
11              MR. MASTRO:  And I objected.  I
12   object to the form.
13              THE SPECIAL MASTER:  If you
14   remember.
15      A.      I was not aware of the American
16   system.  I don't know American laws
17   regarding this issue, so when I was in
18   Ecuador, I told Chevron's representatives
19   that I could negotiate for, according to
20   me, well, definitely a certain capital.
21              Later on I found out that here
22   they are more direct, more serious, that
23   payments could be made for evidence, but
24   payments are not allowed for testimony or
25   sworn statements, that's against the law.
```

Page 182

1          A. GUERRA BASTIDAS

2              So, in other words, the rules

3   here are clear and I agreed to subject

4   myself to those rules.

5      Q.     Is it correct that Chevron's

6   representatives and negotiators told you

7   they could not pay you the amounts you

8   were asking because of those rules?

9              MR. MASTRO:  Objection to form.

10             THE SPECIAL MASTER:  You may

11   answer.

12     A.     In the face of the explanation,

13   because of the explanation that I received

14   regarding this and from Counsel Rivero, I

15   accepted and I agreed to and it was

16   eventually made concrete, my cooperation

17   with Chevron, only and exclusively that

18   which is stated in the agreement that we

19   have looked at this afternoon.

20     Q.     While you were in Chicago in

21   November negotiating those terms, were you

22   also negotiating the language of your

23   first declaration?

24             MR. MASTRO:  Objection to form.

25             THE SPECIAL MASTER:  Yes, I

1          A. GUERRA BASTIDAS

2     will sustain that.

3          Q.     Your declaration, your first

4     declaration I believe is dated November

5     17th, 2012, correct?

6          A.     Yes.

7          Q.     And it states that you signed

8     it in Chicago; is that true?

9          A.     That's true.

10          Q.     So the declaration -- you were

11     working with the lawyers for Chevron on

12     the language of the declaration during the

13     meetings you had in Chicago, correct?

14               MR. MASTRO:  Objection.

15               THE SPECIAL MASTER:  Wait one

16     second.

17               That question is okay.  The

18     problem before was the assumption of a

19     negotiation of the declaration.  This time

20     you are talking about working on the

21     declaration.

22               MR. MASTRO:  Your Honor, I have

23     an objection.  I need to be heard.  If the

24     witness could step out for a minute.

25               THE SPECIAL MASTER:  Okay.

Page 184

```
 1              A. GUERRA BASTIDAS
 2              THE VIDEOGRAPHER:  We are going
 3   off the record, 5:31 p.m.
 4              (Witness departs the room.)
 5              THE SPECIAL MASTER:  Your
 6   objection is to more than form?
 7              MR. MASTRO:  Yes, it is.
 8              THE SPECIAL MASTER:  My ruling
 9   on the form stands.  Okay, Mr. Mastro,
10   what's your problem?
11              MR. MASTRO:  He is conflating
12   two things, your Honor.  The reason for my
13   objection on the form basis is because he
14   is trying to conflate and make it sound
15   like the two things were going on
16   simultaneously, when declaration is one
17   thing, and what the witness said were, his
18   words, that there were also some
19   discussions of approaches toward a
20   negotiation.
21              He is trying to conflate it all
22   as if this happening overlapping and
23   simultaneously, and that really creates a
24   very misleading record of what happened
25   there.  I haven't said this in front of
```

```
 1                A. GUERRA BASTIDAS
 2   the witness, but the fact of the matter is
 3   that the witness testified the only
 4   discussions in Chicago had to do with
 5   approaches towards a negotiation and
 6   whatever happened, a declaration happened,
 7   and then --
 8                THE SPECIAL MASTER: Mr. Mastro,
 9   what the witness testified about the
10   approaches were in response to his
11   question as to term sheets.  I can't do
12   this, unlike my associate, but I think the
13   witness had acknowledged that there were
14   negotiations going on.
15                In response to the question as
16   to whether or not term sheets were
17   created, I think the witness raised the
18   point about approaches.
19                MR. MASTRO:  No, your Honor,
20   with all due respect --
21                THE SPECIAL MASTER:  Then show
22   me the transcript.  I asked for a printer
23   to print out questions precisely because I
24   cannot do this scrolling.
25                MR. MASTRO:  Your Honor, before
```

Page 186

```
 1              A. GUERRA BASTIDAS
 2   he used the word "term sheets," which I
 3   objected to because I thought it was very
 4   misleading to a witness who doesn't know
 5   what term sheets means.
 6              THE SPECIAL MASTER:  Look, I
 7   let it go because he should have asked, do
 8   you know what a term sheet is, etc.  I
 9   don't want to be here half the night.
10              MR. MASTRO:  I don't either,
11   your Honor, but this is an important
12   point.
13              THE SPECIAL MASTER:  Let me
14   see -- let me see where the term
15   "negotiations" first came up.
16              MR. MASTRO:  It is 173, line 15
17   on.  The question is he has shown him the
18   agreement and he has asked him who he
19   negotiated the agreement with during
20   meetings in Chicago, and he responds "In
21   November in Chicago there were approaches
22   towards a negotiation."
23              THE SPECIAL MASTER:  Let me see
24   it.  He is trying to help me find it.
25              MR. MASTRO:  Certainly, your
```

Page 187

```
 1            A. GUERRA BASTIDAS
 2   Honor.
 3            THE SPECIAL MASTER:  I've got
 4   it.  I'm there now.  Hold on.  Let me read
 5   this.
 6            I'm sorry, in this case
 7   Mr. Mastro is right.  He never adopted
 8   your term "negotiations" which you
 9   repeated several times even after he said
10   there were approaches to a negotiation.
11   The witness never adopted that word.
12            Now I should have just
13   sustained the objection as to form on the
14   last question, the previous question, on
15   two grounds, not simply that you would
16   assume there was a negotiation about --
17   don't raise your hand to me yet,
18   Mr. Veselka.  I would like to finish.
19            The witness not having adopted
20   your term, but instead said what
21   Mr. Mastro says he said, I think it may
22   well be overstating to call it a
23   negotiation and it may therefore be
24   conflating things.
25            Wait, wait.  A, if you suggest
```

```
 1              A. GUERRA BASTIDAS
 2    that they were negotiating a declaration,
 3    I'm not going to let you ask that question
 4    again unless, you know, you ask the
 5    question did you negotiate a
 6    declaration --
 7              MR. MASTRO:  You mean
 8    negotiation of an agreement.
 9              THE SPECIAL MASTER:  No, no.
10              MR. VESELKA:  The question now
11    is the declaration, that's right.
12              THE SPECIAL MASTER:  I
13    understand that.  Well, you know what, why
14    don't we do this, this is not that hard.
15              "Question:  Did you discuss --
16    did you work on a declaration when you
17    were in Chicago in November?"  Period,
18    stop, end.  Go.
19              MR. VESELKA:  Which I thought
20    was all I was asking.
21              THE SPECIAL MASTER:  That I
22    will allow.
23              MR. VESELKA:  For the purposes
24    of the record of the discussion we just
25    had, though, I would like to point out
```

```
 1              A. GUERRA BASTIDAS
 2   that the witnesses answers, "There were
 3   sheets that I used in Spanish where I
 4   wrote down the essence of the proposal and
 5   of what was being discussed.  I don't
 6   recall, but initially I assumed I could
 7   negotiate for strong amounts of money."
 8              So he is talking about
 9   negotiations.  He is talking about sheets.
10   But then I switched over separately --
11              MR. MASTRO:  Actually, it is
12   why I objected to the form.  He is talking
13   about a sheet of paper like this where he
14   took some notes, not a term sheet.  This
15   is so misleading, and they use this, your
16   Honor, to say the nastiest, vilest things
17   about our firm.
18              THE SPECIAL MASTER:  A, he is
19   not going to say any more nasty things
20   about your firm, not in my presence.
21              MR. GOMEZ:  Mr. Gitter, I don't
22   think anyone said anything about
23   Mr. Mastro's firm.
24              THE SPECIAL MASTER:  Stop,
25   stop.  I'm going to impose the rule I had
```

Page 190

```
 1              A. GUERRA BASTIDAS
 2  imposed once before.  If any of you wants
 3  to say something nasty or critical about
 4  your opposing counsel, you may not say it
 5  to his or their face, you have to say it
 6  to me privately, and I will convey it in
 7  my own words.
 8              Is that rule understood by
 9  everyone?
10              MR. GOMEZ:  Yes.
11              THE SPECIAL MASTER:  Good.
12              Now bring the witness back,
13  and, if necessary, I will ask the
14  questions to make sure they are
15  appropriate and there will not be anything
16  misleading.  Agreed?
17              MR. VESELKA:  Absolutely.
18              (Witness returns to the room.)
19              THE VIDEOGRAPHER:  Back on the
20  record, 5:38 p.m.
21              THE SPECIAL MASTER:  I'm going
22  to do it, that way we will avoid
23  objections, I hope, and just move things
24  faster.  And if I have omitted what you
25  are getting at --
```

Page 191

1              A. GUERRA BASTIDAS

2                  MR. VESELKA:  That will be

3      fine.  That will be fine.

4                  THE SPECIAL MASTER:  Good.

5                  Does somebody have the date of

6      the November declaration?

7                  MR. VESELKA:  November 17,

8      2012.

9                  THE SPECIAL MASTER:  Is it

10     correct that you were in Chicago with

11     Chevron people between November 15 and

12     November 19, 2012?

13                 THE WITNESS:  That's true.

14                 THE SPECIAL MASTER:  And in the

15     middle of that period, on November 17, you

16     signed a declaration, correct?

17                 THE WITNESS:  Yes.

18                 THE SPECIAL MASTER:  Before you

19     signed that declaration on November 17th,

20     while in Chicago, did you work on that

21     declaration?

22                 THE WITNESS:  I worked on the

23     declaration, yes.

24                 THE SPECIAL MASTER:  Okay,

25     done.  End of story.  Move on to another

Page 192

```
 1              A. GUERRA BASTIDAS
 2    subject, Mr. Veselka.
 3              MR. VESELKA:  The one follow-up
 4    I would want to ask, if I may, and you
 5    could tell me, is:
 6        Q.      Who drafted the various
 7    versions of the declaration?
 8              THE SPECIAL MASTER:  I will let
 9    you ask that question.
10              THE WITNESS:  May I answer?
11              THE SPECIAL MASTER:  Yes.
12              THE INTERPRETER:  I need to
13    inquire.  I'm asking the word "elements,"
14    if it means individuals or machines.
15        A.      Chevron had several
16    instruments, meaning recordings of the
17    conversations with me which they had been
18    recorded, and initially in Chicago I
19    summarized the subject matter in a more
20    formal way starting with my first name and
21    my surname, my whole life, my involvement
22    in the case, the whole thing, and based on
23    all this information a legal team from
24    Chevron in another place in a different
25    office from where we were meeting
```

Page 193

```
 1              A. GUERRA BASTIDAS
 2  initially, they were working on the draft
 3  of each one of the subjects.
 4              They would bring them to me.
 5  We would discuss the terms.  I would
 6  request that changes be made, and finally
 7  I was in agreement because I saw that it
 8  was a good job, complete, and I finally --
 9  I'm sorry, concrete, not complete -- and I
10  finally signed.
11              THE SPECIAL MASTER:  You have
12  your answer.
13      Q.      With regard to the elements
14  that ultimately got included in the
15  agreement in January --
16              THE SPECIAL MASTER:  Wait a
17  second.  Are you switching now?
18              MR. VESELKA:  I'm switching.
19              THE SPECIAL MASTER:  He used
20  the word "elements" in connection with the
21  declaration.  I'm not going to let you
22  mislead -- I don't mean deliberately, of
23  course -- I'm not going to let you ask
24  questions that may have the effect of
25  misleading the witness, okay?  We have a
```

Page 194

1              A. GUERRA BASTIDAS

2    foreign witness.

3         Q.     At the conclusion of the

4    meetings with the Chevron lawyers,

5    Mr. Jose and Mr. Mastro, with regard to

6    the terms of what was ultimately turned

7    into the agreement, were the compensation

8    portions essentially agreed to by the end

9    of those meetings?

10              MR. MASTRO:  Objection to form.

11   Asked and answered.  Mischaracterizes his

12   prior testimony.

13              THE SPECIAL MASTER:  Wait a

14   second.  Are you talking about the January

15   27th agreement?

16              MR. VESELKA:  Yes, sir.

17              THE SPECIAL MASTER:  Do I have

18   to really go back all the way to the

19   discussions of that agreement and the

20   terms -- and the various terms?

21              Will somebody please show me,

22   work the machine, please, and show me what

23   there is about the negotiation of that

24   agreement, and particularly the

25   compensation terms.

1              A. GUERRA BASTIDAS

2                   MR. MASTRO:  Page 173, line 15.

3                   THE SPECIAL MASTER:  I think

4    you are taking me to the November

5    approaches to negotiation.

6                   MR. MASTRO:  And he is trying

7    to conflate --

8                   THE SPECIAL MASTER:  I

9    understand.

10                   MR. VESELKA:  I'm not trying --

11                   THE SPECIAL MASTER:  Stop.  Let

12   me just read and then we will get to the

13   question that is pending.

14                   MR. VESELKA:  I would rather

15   withdraw it and try to go on and do it a

16   more specific way.

17                   THE SPECIAL MASTER:  Go ahead.

18       Q.       Under your agreement with

19   Chevron, Chevron is paying you $10,000 a

20   month, correct, among other things?

21       A.       Chevron is giving me $12,000

22   per month for cooperating, according to

23   the agreement.

24       Q.       Had you arrived at that number

25   as an approach that you would be paid

Page 196

1              A. GUERRA BASTIDAS

2   monthly payments that would add up to

3   $12,000 by the end of your discussions in

4   Chicago in November?

5              MR. MASTRO:  Objection to form.

6              THE SPECIAL MASTER:  You may

7   answer.

8       A.        After the conversations we

9   agreed to that amount, they agreed to that

10  amount, I accepted it, and it was agreed

11  that it would be the final amount.

12      Q.        The January agreement also

13  provides for Chevron to pay for an

14  independent attorney to represent you.

15              Had that already been agreed

16  upon, had you arrived to that as an

17  approach in the discussions in November?

18              MR. MASTRO:  Objection to form,

19  your Honor, and I need to speak to you,

20  please.

21              THE SPECIAL MASTER:  All right,

22  send the witness out again.

23              THE VIDEOGRAPHER:  Off the

24  record, 5:48 p.m.

25              (Witness departs the room.)

1               A. GUERRA BASTIDAS

2                    MR. MASTRO:  I think the

3    question, that is why I objected to it,

4    was confusing for him because he said we

5    discussed approaches.  There was no

6    agreement on an amount agreed to of

7    $12,000 in Chicago.  The witness has never

8    testified to that.

9                    And I think, you know, he has

10   been confused by the line of questioning.

11   He said approaches were discussed in

12   Chicago at the end of the Chicago period

13   and then negotiations continued

14   thereafter.  He is now trying to create a

15   record as if there was agreement in

16   Chicago when the witness previously

17   testified all they discussed were

18   approaches to negotiation.  Even the

19   answer he gave, "after the conversations,

20   we agreed to that amount, they agreed to

21   that amount, and I accepted it."

22                    It was conversations over a

23   period of weeks.  It was not in Chicago.

24   It was not in November in Chicago.  And

25   the witness, if asked the question, would

```
1                    A. GUERRA BASTIDAS
2    say that.
3                    THE SPECIAL MASTER:  Let me
4    just see what the witness just answered
5    about the $12,000.
6                    He is right.  His answer was --
7    your question was "Had you arrived at that
8    number as an approach that you would be
9    paid monthly payments by the end of your
10   discussions in Chicago?"  "Answer:  After
11   the conversations, we agreed to that
12   amount, they agreed to that amount."
13                   MR. MASTRO:  As long as the
14   record is crystal clear.  Because I don't
15   want anyone quoting this back and saying
16   that that was agreed upon in Chicago in
17   November, because it wasn't, I know it,
18   his own counsel knows it, and I want to
19   make sure the record is crystal clear.
20                   MR. VESELKA:  Do I get to
21   address the issue?
22                   THE SPECIAL MASTER:  Of course
23   you do.  I'm just learning how to read
24   this, and I just read it, and what it says
25   is:
```

```
 1              A. GUERRA BASTIDAS
 2              "Question:  Had you arrived at
 3   that number as an approach that you would
 4   be paid monthly payments that would add up
 5   to $12,000 by the end of your discussions
 6   in Chicago in November?
 7              "Objection as to form.
 8              "Special Master.  You may
 9   answer.
10              "Answer:  After the
11   conversations, we agreed to that amount,
12   they agreed to that amount, I accepted it,
13   and it was agreed that it would be the
14   final amount."
15              MR. VESELKA:  That does not
16   mean it is not in November.  The
17   discussions are there, after those
18   discussions in November he can be saying
19   that.  I asked him.  He gave an answer.
20   If they think it is wrong, they can
21   testify themselves --
22              THE SPECIAL MASTER:  I don't
23   understand what you are saying.  Are you
24   interpreting his words "after the
25   conversations" as meaning they had agreed
```

Page 200

```
 1              A. GUERRA BASTIDAS

 2   in November?  If you are --

 3              MR. VESELKA:  That's the way I

 4   understood him to say it.  I was listening

 5   to him and I heard him, and he said we

 6   discussed it and we arrived at that.  I

 7   know it is not put until the final version

 8   until the contract is signed.  But that's

 9   what I understand him to say.

10              THE SPECIAL MASTER:  If that's

11   what your understanding is, that's not

12   what the witness said.

13              MR. GOMEZ:  Mr. Gitter, may I

14   make a suggestion?

15              THE SPECIAL MASTER:  Yes.

16              MR. GOMEZ:  Could we just go

17   through the agreement and just ask the

18   witness, did you agree to this term in

19   Chicago?

20              THE SPECIAL MASTER:  Why don't

21   we do it just for absolute clarity, what

22   I'm going to do is I'm going to ask the

23   questions and I'm going to say let's go

24   through this.

25              How many terms do you want to
```

```
 1              A. GUERRA BASTIDAS
 2   go through?
 3              MR. GOMEZ:  All of them.
 4              THE SPECIAL MASTER:  When, to
 5   the best of your recollection, was this
 6   agreed to, is the question.
 7              MR. GOMEZ:  I think we can be
 8   precise.  Was it at the meeting.
 9              THE SPECIAL MASTER:  Why don't
10   we begin with --
11              MR. VESELKA:  All I was trying
12   to go through, they essentially have four
13   compensation provisions here, and I was
14   just trying to determine if they were
15   agreed to in principle in November.  I
16   thought that's what he said.
17              THE SPECIAL MASTER:  That's not
18   what he said.  He said "after the
19   conversation."
20              MR. STEWART:  And your question
21   was "after the conversations in November."
22              THE SPECIAL MASTER:  No, it
23   isn't.  His question was had you arrived
24   at that number as an approach that you
25   would be paid monthly payments by the end
```

```
 1              A. GUERRA BASTIDAS
 2   of your discussions in Chicago in
 3   November.  And he said after the
 4   conversations.
 5              By the way, Mr. Translator,
 6   when you translate "discussions," does
 7   that translate in Spanish into something
 8   closer to "conversation"?
 9              THE INTERPRETER:  Yes.
10              THE SPECIAL MASTER:  It is the
11   same?
12              THE INTERPRETER:  Yes.
13              THE SPECIAL MASTER:  Then
14   Mr. Mastro is right.  Mr. Mastro is right.
15   The witness testified that he had the
16   agreement on the $12,000 after the
17   discussions.  You said the discussions in
18   November.  He said after the discussions.
19              And if you have a different
20   understanding, then that threatens that
21   other people may have the same
22   understanding.  Because my understanding
23   from reading the document, that is the
24   transcript, and from what the translator
25   just told me, it is after the discussions.
```

```
 1              A. GUERRA BASTIDAS
 2              MR. VESELKA:  If you and I talk
 3   and negotiate for two hours and at the end
 4   of those two hours we say okay, we are
 5   going to agree to this, that's after those
 6   discussions, but that's still in the same
 7   time frame.
 8              THE SPECIAL MASTER:  Not
 9   necessarily.
10              MR. GOMEZ:  Then let's ask the
11   witness, Mr. Gitter.
12              THE SPECIAL MASTER:  That's
13   fine.  Let me ask it.  Do you want to do
14   it?
15              MR. GOMEZ:  Was that term
16   decided in Chicago?  Was that term decided
17   in Chicago?
18              THE SPECIAL MASTER:  Mr. Gomez,
19   this is a game of singles, not doubles.  I
20   told you that before.  And we have had
21   that problem before.  The person speaking
22   on your behalf is not you, the person
23   speaking on your behalf is your co-counsel
24   who is asking the questions.
25              MR. MASTRO:  May I just go very
```

Page 204

1                    A. GUERRA BASTIDAS
2    quickly to --
3                    THE SPECIAL MASTER:  I tell you
4    what we are going to do.  We are going to
5    take a very short break so people cool
6    down.
7                    Before we do that, I want to
8    think about how to do this fairly to you
9    and the other side.
10                   MR. VESELKA:  One, I want to
11   make sure our e-mail got here about
12   Zambrano.
13                   MR. MASTRO:  It did.  We will
14   be communicating with you about that.
15                   MR. VESELKA:  Secondly, I don't
16   want to spend 15 minutes on this.  I have
17   only got an hour left.  I have other
18   things I have to hit quickly on.  That's
19   why I thought we were just going to hit
20   the few concepts, whether those were there
21   or not.
22                   THE SPECIAL MASTER:  Okay.
23                   (Recess taken.)
24                   THE VIDEOGRAPHER:  We are going
25   back on the record at 6:03 p.m.  This is

Page 205

1              A. GUERRA BASTIDAS

2    the beginning of disk six in the

3    deposition of Alberto Guerra Bastidas.

4              THE SPECIAL MASTER:  Mr.

5    translator, what is the Spanish word for

6    "discussions" and what is the Spanish word

7    for "conversations," if they are two

8    different words?  Are they two different

9    words?

10             What do you use when you tell

11   him -- if Veselka asks about discussions,

12   what do you say to the witness, what

13   Spanish word do you use to the witness and

14   what word does he use in response?

15             THE INTERPRETER:  I would say

16   the equivalent of conversation, because

17   "discutir" is to argue and it has that

18   connotation.  So it is a conversation.

19             THE SPECIAL MASTER:  Okay.  Let

20   me go.  Let the record show that

21   Mr. Veselka is shaking his head.

22             Mr. Guerra, I'm going to go

23   through four compensation terms in your

24   agreement dated January 27.  Would you

25   take that agreement, put that agreement

1            A. GUERRA BASTIDAS

2    before the witness.

3            THE WITNESS:  Gladly.

4            THE SPECIAL MASTER:  This was

5    signed on January 27th, correct, January

6    27 of this year?

7            THE WITNESS:  Yes.

8            THE SPECIAL MASTER:  With the

9    help of your attorney, Mr. Clayman?

10            THE WITNESS:  Mr. Clayman was

11    advising me regarding this issue, yes.

12            THE SPECIAL MASTER:  Now, would

13    you please turn to page 3 of this

14    agreement.  I want you to look at (a) and

15    (b) together, that is $12,000, at the

16    bottom.  That's $12,000 a month?

17            THE WITNESS:  Yes.

18            THE SPECIAL MASTER:  In your

19    answer to the question of when did you

20    reach a basic agreement about that figure,

21    $12,000 a month, you answered "after the

22    conversations in Chicago in November."  Do

23    you remember that testimony?

24            THE WITNESS:  I remember it,

25    yes, that's correct.

1          A. GUERRA BASTIDAS

2              THE SPECIAL MASTER:  When you

3   said "after the conversations," did you

4   mean at the end of the conversations or

5   after all those conversations in a time

6   between the conversations and January 27th

7   of this year?

8              THE WITNESS:  I mean to say

9   that this agreement, the conversations,

10  this came about one day before I traveled

11  to Quito, November 18th, 2012.

12             THE SPECIAL MASTER:  Okay, the

13  end of the conversation.

14             Now, paying for the lawyer,

15  when did that come about?  The agreement

16  to pay a lawyer, page 4, it is (c) on the

17  top of page 4.  When was that agreed?

18             THE WITNESS:  This issue was

19  agreed to in April of 2013, very shortly

20  before I signed the agreement.

21             THE SPECIAL MASTER:  You mean

22  in January of 2013?

23             THE WITNESS:  Correct, January

24  2013.

25             THE SPECIAL MASTER:  Go down on

Page 208

1               A. GUERRA BASTIDAS

2    page 4, (f), payment for an immigration

3    attorney, when was that agreed to?

4               THE WITNESS:  This was agreed

5    to in Chicago in November.

6               THE SPECIAL MASTER:  Then the

7    provisions on page 3 at the bottom, (c)

8    and (d), health insurance and a leased

9    automobile comparable to the one he was

10   abandoning in Ecuador, when did that

11   agreement come about, or reached, when was

12   that agreement reached?

13              THE WITNESS:  At the end of

14   November -- at the end of the conversation

15   that I had in November.

16              MR. VESELKA:  Can you ask about

17   (g) as well?  Page 4.

18              THE SPECIAL MASTER:  (g), the

19   cost of moving from Ecuador to the United

20   States.

21              THE WITNESS:  Only myself or

22   also my sons?

23              THE SPECIAL MASTER:  Were the

24   agreements at different times?

25              THE WITNESS:  No, for the two

 1                 A. GUERRA BASTIDAS

 2     families, that was agreed to in November.

 3                   THE SPECIAL MASTER:   Okay,

 4     done.  Move on, Mr. Veselka.

 5     BY MR. VESELKA:

 6         Q.        The declaration that you

 7     signed, the first declaration you signed

 8     November 17, 2012 in Chicago, that was

 9     never notarized, was it?

10         A.        I had not had previous

11     experience regarding this and I cannot say

12     if it was notarized, if there was a notary

13     or not.  But I didn't go to a notary's

14     office, a place where they had a sign that

15     said notary public, as it is done in my

16     country.

17         Q.        You've reviewed your November

18     17th, 2012 declaration to prepare for

19     testifying today?

20                   MR. CLAYMAN:  Could you just

21     repeat that question?  I missed it.

22                   MR. VESELKA:  I asked if he

23     reviewed the November 17th, 2012

24     declaration in preparation for his

25     deposition.

```
 1              A. GUERRA BASTIDAS
 2              MR. CLAYMAN:  Thank you.
 3      A.      Yes.
 4      Q.      Did you see anything there that
 5  you would want to change that you no
 6  longer believe is true?
 7      A.      Could you please repeat the
 8  question?  Could you clarify it?
 9      Q.      When you reviewed it, did you
10  see anything that you said there that you
11  would want to change because you no longer
12  believe it to be true?
13      A.      No.
14      Q.      The same question with regard
15  to your January declaration.
16      A.      If I may see the January
17  declaration, please.
18      Q.      We will get it.  I will move on
19  while they are digging for that.
20              (Guerra Exhibit 9 marked for
21  identification.)
22              THE SPECIAL MASTER:  I'm sorry,
23  what's going on?
24              MR. VESELKA:  We have to find
25  the Spanish part that's in there for him
```

```
 1                A. GUERRA BASTIDAS
 2   to be able to confirm.  Page 4.
 3        A.        Yes, I have it in mind.
 4        Q.        Is there anything there that
 5   you believe you need to change because it
 6   is no longer true?
 7        A.        From what I understand, what's
 8   included here is the issue regarding the
 9   -- to this date I have read the totality
10   of the judgment issued in Lago Agrio on
11   February 14th of 2011, a detail which in
12   my initial declaration I had not included
13   or I had not stated that I had done so,
14   that I read the document.
15        Q.        And so you still believe
16   everything you say there is true?
17        A.        Yes.
18                  THE SPECIAL MASTER:  So that
19   the record is clear, by the "there" you
20   were pointing to the January --
21                  MR. VESELKA:  I'm sorry,
22   Exhibit 9.
23                  THE SPECIAL MASTER:  Exhibit 9,
24   the January 28 declaration?
25                  MR. VESELKA:  Declaration, yes,
```

Page 212

```
1                A. GUERRA BASTIDAS

2    sir.

3         Q.      We are finished with that for

4    now.

5                 In addition to the compensation

6    terms included in the agreement that is

7    Exhibit 4, if I remember correctly, you

8    have recently received an additional

9    payment of $10,000 from Chevron, correct?

10                MR. MASTRO:  Objection to form.

11                THE SPECIAL MASTER:  You may

12   answer.

13        A.      I don't recall an additional

14   payment of $10,000 that you are referring

15   to.  I don't have it in mind.

16        Q.      You have also signed a third

17   declaration on April 11, 2013 that you

18   told us about earlier, correct?

19        A.      Yes.

20        Q.      Is it true that in April you

21   were provided an additional $10,000, in

22   addition to what is due under the

23   agreement, in exchange for additional bank

24   records and the ayuda memoria, the memory

25   aid, excuse me?
```

1              A. GUERRA BASTIDAS

2                  MR. MASTRO:  Objection to form.

3      Q.        I want to rephrase it.

4                  Have you recently provided to

5    Chevron additional bank records and the

6    memory aid that they asked you to look for

7    and provide to them?

8      A.        I did provide, not too long

9    ago, without being able to specify the

10   date, the document entitled memory aid.

11     Q.        And do you understand that

12   because of your effort to do that, Chevron

13   has agreed to pay you an additional

14   $10,000?

15                 MR. MASTRO:  Objection to form.

16                 THE SPECIAL MASTER:  You may

17   answer.

18     A.        Regarding -- I have not

19   received the $10,000 you are referring to.

20   I'm being very frank, I have not asked to

21   be given those $10,000, and

22   coincidentally, yesterday, my attorney,

23   Mr. Clayman, he is the one who told me

24   that Chevron had agreed, was going to

25   compensate me or pay me for additional

```
 1              A. GUERRA BASTIDAS
 2    evidence, including the memory aid.
 3        Q.      When you came to the United
 4    States in January, you intended to move to
 5    the United States and no longer live in
 6    Ecuador, correct?
 7                THE SPECIAL MASTER:  Asked and
 8    answered.  It happened very early this
 9    morning.
10        Q.      You entered the United States
11    under a tourist visa?  What type of visa
12    do you have?  Let me just make it easier.
13    What type of visa do you have?
14        A.      It is a V1/V2 visa, which my
15    understanding is granted to tourists.
16        Q.      Is that the same for you and
17    your wife?
18        A.      That's the case for my wife,
19    for my son, his wife, and his son, my
20    grandchild, all of us.
21        Q.      And you understand that under a
22    tourist visa you can't stay in the United
23    States indefinitely, correct?
24        A.      Yes.
25        Q.      Have you applied for any other
```

1                A. GUERRA BASTIDAS

2    type of status in the United States?

3         A.        That procedure has not been

4    done yet, but it will be done.

5         Q.        What kind are you going to

6    apply for?

7         A.        It will be requested that for

8    myself and my family, we may be

9    acknowledged as asylum seekers.

10        Q.        Other than paying for your

11   immigration lawyer, Mr. Kurzban, is

12   Chevron doing anything to assist you and

13   your family in any changes in your

14   immigration status?

15        A.        I'm sorry, can you please

16   repeat the question, making it specific?

17        Q.        You are represented with regard

18   to immigration matters by Mr. Ira Kurzban,

19   correct?

20        A.        Yes.

21        Q.        Does he represent both you and

22   your wife and your son and his wife and

23   your grandson?

24        A.        Yes.

25        Q.        And Chevron pays his bills?

1                A. GUERRA BASTIDAS

2      A.        It is my understanding that

3   Chevron is paying those bills.  I am not

4   doing it.

5      Q.        And other than Chevron paying

6   those bills, is there anything else

7   Chevron is doing to help you or your

8   family with regard to your immigration

9   status in the United States?

10      A.        The asylum application has not

11   yet been filed before the U.S. government,

12   but I understand that the attorney who is

13   going to do that needs documents,

14   information and documents, and I

15   understand that it will be Chevron who is

16   going to help him obtain part of them to

17   get them.

18      Q.        Do you understand that Chevron

19   will be doing any kind of sponsoring for

20   you or any other part of your family?

21      A.        Excuse me, can you please

22   clarify your question?

23      Q.        Sure.

24                Do you understand that as part

25   of any of your applications with regard to

```
 1              A. GUERRA BASTIDAS
 2    asylum or immigration status that Chevron
 3    is going to sponsor you or your family?
 4              MR. MASTRO:  Objection to form.
 5              THE SPECIAL MASTER:  Do you
 6    understand his question?
 7              THE WITNESS:  If you allow me,
 8    forgive me, it is somewhat ambiguous.
 9              THE SPECIAL MASTER:  Yes, it
10    is.  I find it somewhat ambiguous, that's
11    why I asked you the question.  For
12    somebody who doesn't speak English, it is
13    probably triply ambiguous.
14       Q.       Do you understand that as part
15    of an asylum application whether you need
16    a sponsor that agrees to help provide
17    assistance for you?
18              MR. MASTRO:  Objection to form.
19              THE SPECIAL MASTER:  I'm sorry,
20    my colleague here actually knows a little
21    bit about immigration law because a lot of
22    our people do.
23              MR. VESELKA:  That would be
24    really helpful.
25              THE SPECIAL MASTER:  It would
```

```
 1              A. GUERRA BASTIDAS
 2   be.  Therefore I don't think you ought to
 3   be asking this witness questions of that
 4   kind.  He has an immigration lawyer.  He
 5   doesn't know, I'm sure, because you don't,
 6   and I don't know what the elements are of
 7   a political asylum application.
 8              MR. VESELKA:  The question was
 9   did he understand one way or the other.
10              THE SPECIAL MASTER:  No, no,
11   you asked him about sponsorship.
12              MR. VESELKA:  I asked him
13   whether he understood whether he needed a
14   sponsor.
15              THE SPECIAL MASTER:  Do you
16   understand what a sponsor is?  And I will
17   bet you $100 that this witness doesn't
18   understand what a sponsor is because it is
19   a term of art.  Maybe my associate does.
20   I don't.
21              Next question, do you know if a
22   sponsor is needed in connection with an
23   asylum application.
24              MR. VESELKA:  That's what I was
25   asking, I thought.
```

```
 1              A. GUERRA BASTIDAS
 2                  THE SPECIAL MASTER:  No, that's
 3      not what you asked.
 4                  MR. VESELKA:  I will ask it.
 5      BY MR. VESELKA:
 6         Q.      Do you understand whether there
 7      is a sponsor needed with regard to an
 8      asylum application?
 9                  THE SPECIAL MASTER:  No.  Do
10      you know what a sponsor is in terms of
11      asylum law?
12                  THE WITNESS:  No.
13                  THE SPECIAL MASTER:  Move on.
14         Q.      How long do you understand you
15      can stay in the United States before you
16      must get some other status?
17                  MR. MASTRO:  Objection,
18      foundation.
19                  THE SPECIAL MASTER:  No, he can
20      answer.
21         A.      A total of 180 days, starting
22      from the date when I came to the United
23      States.
24         Q.      Is Mr. Kurzban or anybody else
25      also trying to do anything to help resolve
```

```
 1              A. GUERRA BASTIDAS
 2    the status of your son who has been living
 3    in the United States?
 4        A.       Not yet.  There is a
 5    predisposition to do that, but for the
 6    time being they are concentrated and
 7    focused on the documentation for those of
 8    us who are right from Ecuador.
 9        Q.       First things first.
10                 In your meetings with the
11    Chevron representatives, you told them
12    that you became ill after drinking
13    contaminated water in Sacha, correct?
14                 MR. MASTRO:  Objection to form,
15    and it is irrelevant.  And I would like to
16    be heard on this.
17                 THE SPECIAL MASTER:  You may
18    not need to be heard because I know this
19    lawsuit is not about the underlying issues
20    in Ecuador.
21                 Mr. Veselka, I really don't
22    want to take another break and send the
23    witness out of the room and add to
24    everybody's time here.  It is 20 to 7.
25    Witnesses tend to get tired actually at 5
```

```
 1              A. GUERRA BASTIDAS
 2   o'clock and 6 o'clock.  I think the
 3   relevance of the question you are asking
 4   is at best marginal.  I don't think it is
 5   needed.  If you will be kind enough to
 6   move on without my forcing you to do so, I
 7   would appreciate it.  Because otherwise we
 8   are going to have to --
 9              MR. VESELKA:  I don't want to
10   take a break.  Let's mark this, please.
11              (Guerra Exhibit 10 marked for
12   identification.)
13      Q.     You have been handed what has
14   been marked as Exhibit 10.  If you turn,
15   the first part is a translation into
16   English, but if you go past the portion of
17   the translator's statement, you will get
18   to the part in Spanish.
19              MR. MASTRO:  Is this going to
20   be identified for the record?  It has
21   never been produced to us.
22              THE SPECIAL MASTER:  The first
23   thing I would like to know is, what is it?
24              MR. VESELKA:  That of course is
25   what I was going to ask him.  For him, he
```

1                A. GUERRA BASTIDAS

2   was going to want to see the Spanish part.

3   I'm trying to get him to see there.  Has

4   he found it, the Spanish part?

5                MR. CLAYMAN:  What's the

6   question?

7        Q.      Is he ready?

8        A.      Yes, I have it.  I have seen

9   it.

10        Q.      Can you identify this is a

11   paper that you wrote entitled Sobre El

12   Medio Ambiente Amazonico Del Ecuador?

13                MR. MASTRO:  And I object to

14   any questioning on this line for the same

15   reasons.  Regardless of who the author of

16   it is, it is irrelevant to the case and he

17   shouldn't be questioned on it.

18                MR. VESELKA:  It ties into

19   other issues.

20                THE SPECIAL MASTER:  To what

21   other issues?

22                MR. MASTRO:  They also never

23   produced it to us in the case.

24                THE SPECIAL MASTER:  If it is

25   relevant, just a second, if it is

```
 1                A. GUERRA BASTIDAS
 2   relevant --
 3                MR. VESELKA:  I don't want to
 4   talk about it in front of him.
 5                THE SPECIAL MASTER:  If it is
 6   relevant, why wasn't it produced?  I'm
 7   asking you.
 8                MR. VESELKA:  They haven't
 9   asked us to produce Guerra documents.
10                MR. MASTRO:  Yes, we have.
11                MR. STEWART:  It was produced
12   to us by them on his hard drive.
13                MR. VESELKA:  It came from his
14   hard drive when they produced it to us.
15                THE SPECIAL MASTER:  We are
16   going to have to take a break, I'm sorry.
17   I want to know what the relevance of this
18   is.
19                MR. VESELKA:  Okay.
20                THE VIDEOGRAPHER:  Off the
21   record, 6:40 p.m.
22                (Witness departs the room.)
23                THE SPECIAL MASTER:  I may
24   charge this time to you; do you
25   understand?
```

1              A. GUERRA BASTIDAS
2                 MR. VESELKA:  Why?
3                 THE SPECIAL MASTER:  Because on
4     the face of it, it doesn't look relevant
5     to me, and I will see what you say.
6                 MR. VESELKA:  When he was
7     working on various things, it ties into
8     when and why he may have requested
9     particular information from Mr. Fajardo
10    that he is now trying to claim is
11    something different.  I really don't want
12    to have to disclose to opposing counsel.
13                MR. MASTRO:  It is all entirely
14    about --
15                THE SPECIAL MASTER:  Just a
16    second.  Just a second.  Information about
17    what?
18                MR. VESELKA:  About the case,
19    the Lago Agrio case.
20                THE SPECIAL MASTER:  Can you
21    tell me when this was created?  Do you
22    know when it was created?
23                MR. VESELKA:  We know from
24    pulling it from the things, and I'm trying
25    to remember.

```
 1              A. GUERRA BASTIDAS
 2              MR. GOMEZ:  The metadata, we
 3   have from the metadata.
 4              MR. MASTRO:  What's the date?
 5              MR. VESELKA:  Off the top of my
 6   head, I'm not remembering.  My memory was
 7   I thought it was '09.
 8              MR. MASTRO:  During the period
 9   when he was still part of the conspiracy?
10   It appeared he was being paid 1,000 bucks
11   a month from Fajardo and company.  This is
12   all about the underlying merit of the Lago
13   case and the science, exactly what Judge
14   Kaplan said was out during the period he
15   was being paid by them.
16              THE SPECIAL MASTER:  From what
17   you just said, it can't mean -- it can't
18   be relevant to what you are saying it is
19   relevant to.  Fajardo is a lawyer.  He is
20   not a scientist.  He is far from a
21   scientist, just as you and I are far from
22   scientists.
23              MR. VESELKA:  My point is they
24   are trying to create --
25              THE SPECIAL MASTER:  I tell you
```

1                   A. GUERRA BASTIDAS

2    what, I want to hear an offer of proof in

3    camera.  I want an offer of proof in

4    camera as to what is going to happen as a

5    result of this examination with this

6    document.  You can leave the room.  It

7    will be in camera and it will be sealed.

8                   MR. MASTRO:  I simply want to

9    reiterate --

10                   THE SPECIAL MASTER:  Come on, I

11    don't need to hear from you right now.

12    And I want a demonstration as to when this

13    was created.  This will be sealed and

14    separately printed.

15                   (The following portion was

16    sealed and is bound in separate

17    transcript.)

18                   THE SPECIAL MASTER: Mr. Mastro,

19    you will be able to object in the course

20    of it.  I'm going to allow very limited

21    questioning for a very specific purpose

22    which could be relevant independent of the

23    underlying merits of the Ecuador

24    litigation.  I may have to take over the

25    questioning to make certain he doesn't go

1                A. GUERRA BASTIDAS

2    out of bounds.

3                MR. MASTRO:  Your Honor, might

4    I suggest that we think any questioning on

5    this document would be wholly

6    inappropriate and it is irrelevant.  I

7    think your Honor would benefit from us

8    being able to brief the question, and if

9    your Honor decided there was some limited

10   questioning that was necessary at that

11   point, we would have to bring him back for

12   that purpose.

13               THE SPECIAL MASTER:  That is

14   fair.  That is fair.  This could get out

15   of hand here.  The witness will be called

16   back for 20 minutes at some point on some

17   other day when everybody is in New York

18   and here.  Nobody is going to have to

19   spend any additional time traveling.

20               MR. VESELKA:  Can we have him

21   go ahead and just identify that it is his

22   document or not?

23               THE SPECIAL MASTER:  Yes, you

24   can do that.

25               MR. VESELKA:  And that's it?

1           A. GUERRA BASTIDAS

2                THE SPECIAL MASTER:  That's all

3     you can do.

4                MR. STEWART:  And the date.

5                THE SPECIAL MASTER:  I'm sorry,

6     you just demonstrated to me how difficult

7     it is to determine when it is created.

8     There is not any way I'm going to allow

9     you to do a memory test on this witness.

10                MR. VESELKA:  I'm not going to

11     ask about the others.

12                THE SPECIAL MASTER:  I am.  If

13     we are going to get briefing on it, then

14     we are going to get it identified so I can

15     get briefing that is intelligible on the

16     subject.  I want the object here to be

17     plain enough so that there can be

18     intelligent briefing.  The briefing is not

19     going to be in camera, you understand.  I

20     have your offer of proof.

21                I will allow -- in fact, let me

22     do this.

23                THE VIDEOGRAPHER:  Stand by.

24     We are going back on the record at

25     p.m.

```
 1              A. GUERRA BASTIDAS
 2                  THE SPECIAL MASTER:  Show him
 3      an Exhibit 10 that doesn't have a date on
 4      it at the top or anywhere else.
 5                  THE INTERPRETER:  Just to make
 6      sure, it starts here (indicating)?
 7                  THE SPECIAL MASTER:  The
 8      Spanish starts at wherever it starts.
 9                  THE INTERPRETER:  Paragraph 1,
10      under a heading.
11                  THE SPECIAL MASTER:  The
12      witness has been handed Exhibit 10.
13      Mr. Guerra, could you just take a few
14      minutes to look over this document.  And
15      my question is going to be very simple:
16      Do you recognize it?
17                  (Witness perusing document.)
18                  THE WITNESS:  I recognize it.
19                  THE SPECIAL MASTER:  What is
20      it?
21                  THE WITNESS:  It is an outline,
22      if you want to call it that, the outline
23      of a chat for students.  It was the
24      outline for a complaint, it is an
25      attachment to the judiciary council,
```

```
 1              A.  GUERRA  BASTIDAS
 2   before  judicial  officers  in  my  country,
 3   more  or  less.
 4              THE  SPECIAL  MASTER:   Did  you
 5   prepare  this?
 6              THE  WITNESS:   A  good  part  of  it
 7   I  prepared.
 8              THE  SPECIAL  MASTER:   Who  else
 9   prepared  it?
10              THE  WITNESS:   Mr.  Fernando
11   Alban  contributed  with  some  elements.
12              THE  SPECIAL  MASTER:   Do  you
13   know  approximately  when  it  was  prepared,
14   approximately?
15              THE  WITNESS:   This  document  was
16   prepared  in  2012,  the  reason  being  that  I
17   was  in  Sacha,  but  its  first  part  was
18   prepared  years  before  or  some  time  before,
19   and  for  the  purpose  was  a  speech  --
20              MR.  MASTRO:   Your  Honor  --
21              THE  SPECIAL  MASTER:   Shhhh.
22              THE  WITNESS:   --  regarding  the
23   death  of  my  father.
24              THE  SPECIAL  MASTER:   When  did
25   your  father  die?
```

1          A. GUERRA BASTIDAS

2              THE WITNESS:  My father died in

3    1985.

4              THE SPECIAL MASTER:  This

5    document is absolutely irrelevant.  I

6    don't need briefing.

7              MR. MASTRO:  Thank you, your

8    Honor.

9              THE SPECIAL MASTER:  It is

10   absolutely irrelevant for the purpose

11   which you just described in camera.  The

12   dates have nothing whatsoever to do with

13   the purpose for which you want to

14   introduce it.

15             MR. MASTRO:  Your Honor, I

16   would move to strike the entire part of

17   that deposition and it should be stricken

18   from the record.

19             THE SPECIAL MASTER:  It is

20   stricken.

21             MR. MASTRO:  The documents

22   should be stricken.

23             THE SPECIAL MASTER:  The

24   documents will be stricken.

25             MR. VESELKA:  My objection is

```
1                A. GUERRA BASTIDAS
2   noted.
3                THE SPECIAL MASTER:  Fine.  You
4   could submit a brief or do whatever you
5   like.  I'm glad -- excuse me.
6                MR. MASTRO:  I'm sorry.
7                THE SPECIAL MASTER:  I'm glad I
8   asked for your offer of proof and I'm glad
9   I asked the witness about this, because it
10  simply has no bearing whatsoever on your
11  theory.
12               MR. MASTRO:  Your Honor,
13  further, this should come out of their
14  time, so they should only have ten minutes
15  left.
16               THE SPECIAL MASTER:  I'm taking
17  back the ten minutes.  This was a -- no,
18  I'm going to split the baby on the ten
19  minutes.
20               MR. MASTRO:  So he has five
21  minutes left.
22               THE SPECIAL MASTER:  I am not
23  taking out this -- I'm the one that called
24  for the offer of proof.  He has 25 minutes
25  left.
```

Page 233

```
 1              A. GUERRA BASTIDAS
 2              MR. MASTRO:  Less than 25.
 3              THE SPECIAL MASTER:  He has
 4   less than 25 minutes left.
 5              MR. MASTRO:  He only has about
 6   15 minutes left.
 7              THE VIDEOGRAPHER:  Right.
 8              THE SPECIAL MASTER:  Oh, I see,
 9   we have just used up a bunch of minutes.
10   All right, this is stricken.
11              (Guerra Exhibit 11 marked for
12   identification.)
13   BY MR. VESELKA:
14     Q.      Let me hand you what has been
15   marked as Exhibit 11.
16              Mr. Guerra, this is a copy of
17   the notice and subpoena for your
18   deposition and for you to produce
19   documents.
20              Have you reviewed all of your
21   documents to see what you might have that
22   would be responsive to this subpoena
23   requesting documents?
24              THE SPECIAL MASTER:  Excuse me,
25   did you serve him with a Spanish version
```

Page 234

1              A. GUERRA BASTIDAS

2    of this?

3              MR. VESELKA:  I don't believe

4    we did.

5              THE SPECIAL MASTER:  Is the

6    version he has in front of him a Spanish

7    version?

8              MR. VESELKA:  No.

9              THE SPECIAL MASTER:  So how can

10   you ask him a question about this

11   document?  He doesn't speak English, he

12   doesn't read English, and he has got a

13   lawyer here.

14              (Guerra Exhibit 12 marked for

15   identification.)

16      Q.      Exhibit 12 is the documents we

17   received from your counsel in response to

18   the subpoena.

19              THE SPECIAL MASTER:  Well,

20   that's not correct.  It has to be a prior

21   version of the subpoena.  This subpoena is

22   dated April the 26th and the cover letter

23   for the documents on Exhibit 12 is April

24   5.

25              So obviously you are talking

1              A. GUERRA BASTIDAS

2    about a prior version of the subpoena and

3    you are representing that the document

4    portion is identical on this --

5              MR. VESELKA:  If you look at

6    the notice, your Honor, page 2 of the

7    notice, the last paragraph, Mr. Clayman

8    agreed, once we sent this, that it would

9    apply to the others.

10             THE SPECIAL MASTER:  That is

11   fine.  I wasn't questioning that.  I just

12   like to be sure the record accurately

13   reflects what is being marked.

14             MR. VESELKA:  Because of the

15   language issue, and I'm not trying to go

16   through and invade privilege, all I want

17   to know, ask a straightforward question,

18   does he know of any documents in his

19   possession that haven't been reviewed or

20   made available to his lawyers to review

21   for production.

22             THE SPECIAL MASTER:  That's a

23   perfectly straightforward and normal

24   question.  You may ask it.

25        Q.     You can answer.  There is no

Page 236

```
 1              A. GUERRA BASTIDAS
 2   objection.
 3              MR. MASTRO:  So the question is
 4   have you reviewed all of your documents to
 5   see what you might have that would be
 6   responsive to the subpoena requesting
 7   documents, is that the pending question?
 8              MR. VESELKA:  The question is
 9   what it was, which the Master has already
10   said was a perfectly appropriate question.
11              THE SPECIAL MASTER:  I now see
12   the phrasing is a little confusing.  Go
13   ahead and have him answer the question as
14   best he can.
15              THE WITNESS:  Knowing that
16   countless documents have been requested,
17   they were specified in some document, to
18   which I had access through my attorney,
19   Chuck Clayman, I requested to have sent
20   over from where I am living with my family
21   to have a good -- all the existing
22   documents, personal and family documents.
23              The only thing that didn't make
24   it here are the family pictures, and it
25   has been my attorney and Chevron's
```

1          A. GUERRA BASTIDAS

2    representatives who have reviewed the

3    documentation, and they may have

4    discounted that among that there should be

5    any that should be submitted in this case.

6         Q.      Do you still have your notes

7    from the meetings in Chicago in November?

8         A.      No, they were thrown -- they

9    were thrown away.

10        Q.      Did you make notes of any of

11   your meetings or phone calls with Chevron

12   representatives like Mr. Rivero or

13   Mr. Akerman from June of 2012 up until you

14   went to Chicago in November of 2012?

15        A.      I wrote down in my personal

16   daily planners certain of those meetings

17   or encounters of that nature, not all of

18   them, but...

19        Q.      You say the notes from November

20   were tossed.  When were they tossed?

21        A.      They were loose sheets,

22   information that I had written down, and

23   after informing regarding the tentative

24   agreements, because that's what they

25   contained, specifically to my wife, I

```
 1              A. GUERRA BASTIDAS
 2   tossed them.
 3       Q.      When did you toss them?
 4              MR. MASTRO:  If he recalls.
 5       A.       I don't recall specifically,
 6   but the day before returning to Quito.
 7       Q.       While Zambrano was still
 8   presiding judge, he issued 21 orders and
 9   rulings in the Chevron case between
10   October 2010 and February 2011.  Did you
11   work on those?
12              MR. VESELKA:  I'll rephrase it
13   if you want.
14              THE SPECIAL MASTER:  No, you
15   are going to withdraw it, is what you are
16   going to do, because you are testifying
17   here.  How do you know that that's how
18   many orders he issued?
19              MR. VESELKA:  That's the
20   record.  But I will reword it a different
21   way.
22       Q.       Did you work, perform any work
23   on any orders or rulings of Mr. Zambrano
24   in the Chevron case between October 2010
25   and February 2011?
```

1          A. GUERRA BASTIDAS

2               THE SPECIAL MASTER:  You mean

3    other than what he has already testified

4    to?  In addition to what you have

5    testified to before, otherwise it is an

6    asked and answered question.

7       Q.       Other than anything that you

8    have testified to before with regard to

9    the judgment.

10               THE SPECIAL MASTER:  Go ahead.

11               MR. VESELKA:  I'm trying to.

12   We are being distracted here.

13               THE SPECIAL MASTER:  Go ahead.

14      Q.       Other than what you have

15   testified about work on the draft

16   judgment, did you work on any orders or

17   rulings that Mr. Zambrano issued in the

18   case between October 2010 and February

19   2011?

20               MR. MASTRO:  Objection to form

21   still.

22               THE SPECIAL MASTER:  No, go

23   ahead.

24      A.       At that time I would draft the

25   court orders that Judge Zambrano was

1             A. GUERRA BASTIDAS

2    asking me to do.  The majority of them I

3    issued, I worked on them in Lago Agrio,

4    and on some occasions if I didn't work on

5    them personally and directly, then over

6    the phone I guided Mr. Zambrano to do so.

7             So therefore somehow I'm also

8    responsible for the clarification court

9    order which is issued after February 14th

10   of 2011.

11       Q.     On what computer did you do

12   that work when you were in Lago Agrio?

13             THE SPECIAL MASTER:  That's

14   your last question.

15       A.     The last document that I'm

16   referring to post-judgment was done by

17   Mr. Zambrano, but under my directions over

18   the phone.

19             MR. VESELKA:  Objection,

20   nonresponsive.  The question went to the

21   ones he did while he was in Lago Agrio, so

22   it wouldn't be over the phone.  I just

23   would like to follow up to --

24             THE SPECIAL MASTER:  No, you

25   are out of time.  In fact, you have used

```
 1              A. GUERRA BASTIDAS
 2  up more time than you were allotted.
 3              MR. VESELKA:  We would request
 4  that this is insufficient time because of
 5  the translation and the number of
 6  objections and that we need more time with
 7  this witness, not to say it has to be
 8  today, but we believe that there should be
 9  more time allotted because of the problems
10  with translation and because of the
11  crucial nature of this witness.
12              THE SPECIAL MASTER:  I will
13  take a written submission on that as to
14  what you think you need and how much time
15  it is, and I will make a decision based on
16  that.
17              MR. VESELKA:  We will provide
18  that.
19              MR. MASTRO:  Your Honor, I just
20  have a few quick questions for the
21  witness.
22              THE SPECIAL MASTER:  No, no.
23              MR. MASTRO:  Your Honor --
24              THE SPECIAL MASTER:  No.  I
25  will tell you what I would do -- wait a
```

Page 242

```
 1              A. GUERRA BASTIDAS
 2   second.
 3              MR. MASTRO:  Your Honor, I will
 4   be very brief.
 5              THE SPECIAL MASTER:  Not only
 6   would you be very brief, I want to hear --
 7   we are just going to have an offer of
 8   proof as to why you need the seven or
 9   eight minutes that you think you need, and
10   I will tell you in advance, unless it is
11   something that is out and out misleading
12   that resulted from a question from
13   Mr. Veselka, you ain't getting any time.
14              MR. MASTRO:  I understand, and
15   I think I will be able to explain that to
16   your satisfaction.  And I probably
17   wouldn't even need five minutes.
18              THE VIDEOGRAPHER:  Off the
19   record, 7:18 p.m.
20              (The following portion was
21   sealed and is bound in separate
22   transcript.)
23              THE VIDEOGRAPHER:  We are going
24   back on the record at 7:26 p.m.
25              MR. MASTRO:  Mr. Veselka and I
```

```
 1              A. GUERRA BASTIDAS
 2  have talked about the references to Doe 1,
 3  and we both agree that that was really a
 4  reference to Doe 2.  So all of the
 5  questions about Doe 1 and answers about
 6  Doe 1 were really in reference to Doe 2
 7  based on the submissions that were made to
 8  the court.
 9              MR. VESELKA:  Right.  We agree
10  and stipulate.  Do we want to have him
11  change it in the transcript so it won't be
12  confusing to people later?
13              THE SPECIAL MASTER:  I think
14  the parties ought to agree on a revision
15  of the transcript and submit it to me,
16  too.
17              MR. MASTRO:  That's fine by us.
18              THE SPECIAL MASTER:  Okay.
19  Tell him it is not his issue and not his
20  problem.
21              Okay, I'm going to allow
22  Mr. Clayman, counsel for the witness, to
23  clarify two or three points in a very
24  short period of time.
25  EXAMINATION BY MR. CLAYMAN:
```

```
 1            A. GUERRA BASTIDAS
 2       Q.       Firstly, you testified your
 3  income tax for Ecuador, the last one
 4  filed, showed about $42,000 in income.
 5       A.       For the year 2012, yes, that
 6  amount, approximately.
 7       Q.       And was there money that you
 8  received during that year that was not
 9  included on your income tax return?
10       A.       Yes.
11       Q.       And did that come from private
12  sources?
13       A.       Yes.
14       Q.       Secondly, at the end of the
15  questioning today, it was my perception,
16  and I have spent a lot of time with you,
17  that you were feeling a little tired, and
18  I want to go through an issue with regard
19  to the meeting in Chicago in November very
20  quickly.
21            The first thing that was
22  discussed in Chicago was your declaration;
23  is that correct?
24            MR. VESELKA:  Objection, form.
25       A.       Yes.
```

```
 1            A. GUERRA BASTIDAS
 2      Q.        And only after that was the
 3  agreement begun to be discussed; is that
 4  correct?
 5                MR. VESELKA:  Objection, form,
 6  leading.
 7                THE SPECIAL MASTER:  It is like
 8  redirect.  It can be done to move things
 9  along, absolutely.
10      Q.        You can answer that.
11      A.        Indeed, that's what happened.
12  There were only conversations regarding an
13  agreement, nothing was made concrete on
14  that issue.
15      Q.        And when you left Chicago,
16  there was no written agreement, you
17  weren't shown any agreement; is that
18  correct?
19      A.        Correct, yes, that's correct.
20      Q.        And in fact you didn't retain
21  me until sometime in the middle or end of
22  December; is that correct?
23      A.        True, yes.
24      Q.        And at that time we discussed
25  terms of this agreement, some of which had
```

1               A. GUERRA BASTIDAS

2   actually never even been brought up

3   before; isn't that correct?

4               MR. VESELKA:  Objection, form.

5       A.      Yes, as Mr. Clayman states,

6   that's how things happened.

7       Q.      And only after I finished

8   negotiation with Chevron's lawyers did we

9   finally in January get this agreement that

10  you signed with those terms set forth; is

11  that correct?

12              MR. VESELKA:  Objection,

13  leading.

14              THE SPECIAL MASTER:  Objection

15  overruled for the same reasons.  I don't

16  want to be here another half hour.

17      A.      That's correct, as the person

18  asking the question states.

19      Q.      And, finally, one of the new

20  parts of that agreement were issues

21  regarding bringing your son and daughter

22  with you from Ecuador into this country

23  because of their safety concerns and

24  readjusting the amount of money that was

25  needed; is that correct?

Page 247

1              A. GUERRA BASTIDAS

2              MR. VESELKA:  Same objection.

3    Objection to form, leading.

4              THE SPECIAL MASTER:  Overruled.

5              MR. VESELKA:  And

6    mischaracterizes his previous testimony.

7              THE SPECIAL MASTER:  Overruled.

8      A.       It is precisely around the time

9    referred to in the question that my son

10   decided to leave Ecuador.  He fears for

11   his safety, and I conveyed this detail to

12   Chevron through Mr. Clayman, and somehow

13   through a bit of pressure from me I am

14   able to have my son come over, and based

15   on that, it's the written agreement that I

16   have signed with the terms it contains.

17              MR. CLAYMAN:  Thank you.  I

18   have no further questions, your Honor.

19              THE SPECIAL MASTER:  No one

20   else has any further questions today.

21              MR. VESELKA:  We would want to

22   follow up on those, but I understand we

23   are not going to.

24              THE SPECIAL MASTER:  Not today,

25   we are not.

Page 248

1          A. GUERRA BASTIDAS

2              THE VIDEOGRAPHER:  We are going

3  off the record 7:33 p.m.  This is the end

4  of disk six and concludes today's

5  deposition of Alberto Guerra Bastidas.

6              THE SPECIAL MASTER:  Mr.

7  Veselka, you are going to make a

8  submission to me about additional time.

9  You better make it by Monday afternoon, by

10  close of business on Monday, okay?

11              MR. VESELKA:  Right.

12              THE SPECIAL MASTER:  Thank you.

13              MR. MASTRO:  And we will have

14  the opportunity to object?

15              THE SPECIAL MASTER:  You will

16  have 24 hours to object.

17              MR. MASTRO:  Because we will

18  object.

19              (Continued on the next page.)

20

21

22

23

24

25

Page 249

1              A. GUERRA BASTIDAS

2                THE SPECIAL MASTER:  I'm not

3    surprised.

4                (Time noted:  7:34 p.m.)

5

6

7        _____

              ALBERTO GUERRA BASTIDAS

8

9

10   Subscribed and sworn to before me

11   this ____ day of _____, 2013.

12

13   _____

14              NOTARY PUBLIC

15

16

17

18

19

20

21

22

23

24

25

Page 250

```
 1
 2              I N D E X
 3
    WITNESS          EXAMINATION BY        PAGE
 4
    BASTIDAS      VESELKA                     13
 5               CLAYMAN                     243
 6
             E X H I B I T S
 7
    GUERRA     DESCRIPTION               PAGE
 8  Exhibit 7  AGB0091-0102                28
    Exhibit 8  CVX-RICO-5916723-          136
 9             5916815
    Exhibit 9  1/28/13 declaration of    210
10             Guerra with attachments
    Exhibit 10 Paper entitled Sobre El   221
11             Medio Ambiente Amazonico
               Del Ecuador
12  Exhibit 11 Notice of Deposition      233
    Exhibit 12 Documents received in     234
13             response to subpoena
14
15
    DIRECTIONS NOT TO ANSWER
16
    Page      Line
17       (NONE)
18
19
    REQUESTS
20
    Page      Line
21       (NONE)
22
23
24
25
```

Page 251

## CERTIFICATION

I, TODD DeSIMONE, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose testimony as herein set forth, was duly sworn by me; and that the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 3rd day of May, 2013.


_____
TODD DESIMONE

Page 252

1                           ERRATA SHEET

                    VERITEXT REPORTING COMPANY

2                          1250 BROADWAY

                     NEW YORK, NEW YORK 10001

3                          212-279-9424

4      NAME OF CASE: CHEVRON vS. DONZIGER

       DATE OF DEPOSITION: MAY 2, 2013

5      NAME OF DEPONENT: ALBERTO GUERRA BASTIDAS

6      PAGE    LINE(S)        CHANGE              REASON

7      ____|_____|_____|_____

8      ____|_____|_____|_____

9      ____|_____|_____|_____

10     ____|_____|_____|_____

11     ____|_____|_____|_____

12     ____|_____|_____|_____

13     ____|_____|_____|_____

14     ____|_____|_____|_____

15     ____|_____|_____|_____

16     ____|_____|_____|_____

17     ____|_____|_____|_____

18     ____|_____|_____|_____

19     ____|_____|_____|_____

20     ____|_____|_____|_____

21                          _____

                            ALBERTO GUERRA BASTIDAS

22

       SUBSCRIBED AND SWORN TO BEFORE ME

23     THIS___DAY OF _____, 20__.

24

       _____     _____

25     (NOTARY PUBLIC)              MY COMMISSION EXPIRES: