Redacted Version
Publicly Filed

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                      :
CHEVRON CORPORATION,                                                  :
                                                                      :
                              Plaintiff,                              :
                                                                      :
              -against-                                               :
                                                                      :   Case No.  11 Civ.  0691 (LAK)
                                                                      :
STEVEN R. DONZIGER, et al.,                                           :
                                                                      :
                              Defendants.                             :
                                                                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO IMPOSE TERMINATION SANCTIONS**


GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

*Attorneys for Plaintiff Chevron Corporation*

Redacted Version
Publicly Filed

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 4

I.     All of the Challenged Witness Testimony Is Corroborated by Extensive Documentary Evidence .......................................................................................... 4

II.    Defendants and Their Allies in the Ecuadorian Government Seek to Suppress These Disclosures .................................................................................................. 7

III.   A Procession of Witnesses Come Forward to Confirm What the Evidence Shows—Many at Great Personal Risk ................................................................... 11

    A.    Albert Guerra, Now Living In Exile, Confirms Judgment Fraud ......................... 11

    B.    Other Witnesses Required Protection or Anonymity ............................................. 16

    C.    Vilification of Other U.S. Witnesses ..................................................................... 17

ARGUMENT ................................................................................................................... 18

I.     Applicable Law Permits Payments to Fact Witnesses ....................................... 18

    A.    Parties May Make "Reasonable" Payments to Fact Witnesses For Expenses Incurred in Connection With Litigation, Including Those Incurred as a Result of Security Risks ....................................................................... 18

    B.    Parties May Pay Witnesses for Physical Evidence ............................................... 20

    C.    Witness Payments Create, at Most, an Issue for the Trier of Fact, Not a Basis to Circumvent It ............................................................................................ 22

II.    Chevron's Ethical Compensation to Guerra Was Reasonable Under the Circumstances and Has Not Induced False Testimony .......................................... 23

    A.    Chevron's Payments to and Relocation of Guerra Are Reasonable Payments Are Not Contingent Upon Testimony ................................................... 23

    B.    There are Ample Reasons to Credit Guerra's Testimony ...................................... 26

    C.    Chevron Acted in Good Faith by Hiring Experts in Relevant Legal and Economic Fields and Affirmatively Disclosing Payments ..................................... 28

III.   Chevron's Conduct with Regard to Bogart, Stratus and Other Witnesses to Defendants' Fraud Was Proper ............................................................................... 30

IV.   Defendants' Argument for Terminating Sanctions Does Not Apply to Chevron's Conduct—But Fits Their Own Obstructive Behavior ....................................... 33

V.    There is No Basis to Exclude the Challenged Witnesses ................................. 34

CONCLUSION ................................................................................................................ 35

Redacted Version
Publicly Filed

# TABLE OF AUTHORITIES

<u>Page(s)</u>

## Cases

*Arista Records LLC v. Usenet.com, Inc.*,
    633 F. Supp. 2d 124 (S.D.N.Y. 2009) ................................................................. 33

*Caldwell v. Cablevision Systems Corp.*,
    20 N.Y.3d 365 (2013)................................................................. 19, 22, 35

*Caldwell v. Cablevision Systems Corp.*,
    925 N.Y.S.2d 103 (App. Div. 2011) ................................................................. 22

*Ceats, Inc. v. Cont'l Airlines, Inc.*,
    No. 2012-1614, 2013 WL 1776814 (Fed. Cir. Apr. 26, 2013)........................................ 21

*Centennial Mgmt. Servs., Inc. v. Axa Re Vie*,
    193 F.R.D. 671 (D. Kan. 2000) ................................................................. 20, 22, 30

*Chevron Corp. v. Champ*,
    Nos. 1:10-mc-27, 2010 WL 3418394 (W.D.N.C. Aug. 30, 2010)...................................... 4

*Chevron Corp. v. Donziger*,
    886 F. Supp. 2d 235 (S.D.N.Y. 2012) ................................................................. 5

*Chevron Corp. v. Page*,
    No. RWT-11-1942, Oral Arg. Tr. at 10:17-21 (D. Md. Aug. 31, 2011) ............................... 4

*Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*,
    482 F.3d 1091 (9th Cir. 2007) ................................................................. 1, 33, 34

*Fisher v. United States*,
    425 U.S. 391 (1976) ................................................................. 20

*Fund of Funds, Ltd. v. Arthur Andersen & Co.*,
    545 F. Supp. 1314 (S.D.N.Y. 1982) ................................................................. 35

*Golden Door Jewelry Creations v. Lloyds Underwriters Non-Marine Ass'n*,
    865 F. Supp. 1516 (S.D. Fla. 1994)................................................................. 20, 25

*In re Beef Indus. Antitrust Litig.*,
    607 F.2d 167 (5th Cir. 1979)................................................................. 30

*In re Chevron Corp.*,
    *No. 1:10-mc-00002-LAK, Dkt. 151 (S.D.N.Y. Jan. 11, 2011)* ...................................... 34

*In re Chevron Corp.*,
    633 F.3d 153, 166 (3d Cir. Feb. 3, 2011)................................................................. 4

*In re Chevron Corp.*,
    No. 10-cv-1146-IEG (WMC), 2010 WL 3584520 (S.D. Cal. Sept. 10, 2010) ................... 4

Redacted Version
Publicly Filed

*In re Chevron Corp.*,
   No. 11-24599-CV, slip op. at 4 (S.D. Fla. June 12, 2012) .................................................. 4

*In re Chevron Corp.*,
   No. cv-10-2675 (SRC) (D.N.J. June 11, 2010) .................................................................... 4

*In re Chevron Corp.*,
   Nos. 1:10-mc-00021-22 (JH/LFG), slip op. at 3-4 (D.N.M. Sept. 2, 2010) ......................... 4

*In re Del-Val Fin. Corp. Sec. Litig.*,
   868 F. Supp. 547 (S.D.N.Y. 1994) ..................................................................................... 30

*In re Initial Pub. Offering Sec. Litig.*,
   226 F.R.D. 186 (S.D.N.Y. 2005) ........................................................................................ 30

*Jamaica Time Petroleum, Inc. v. Fed. Ins. Co.*,
   366 F.2d 156 (10th Cir. 1966) ........................................................................................... 35

*Mejia v. Dole Food Co. & Rivera v. Dole Food Co.*, Case Nos. BC340049, BC379820,
   Cal. Super. Ct., Cnty. of L.A., Terminating Sanctions Order ¶¶ 120-123 (June 17,
   2009) .................................................................................................................................. 35

*Metso Minerals, Inc. v. Powerscreen Int'l Dist. Ltd.*,
   833 F. Supp. 2d 282 (E.D.N.Y. 2011) ............................................................................... 22

*Minpeco S.A. v. Hunt*,
   127 F.R.D. 460 (S.D.N.Y. 1989) ........................................................................................ 31

*New York v. Solvent Chemical Co.*,
   166 F.R.D. 284 (W.D.N.Y. 1996) ................................................................................ 18, 20

*NLRB v. Thermon Heat Tracing Svcs., Inc.*,
   143 F.3d 181 (5th Cir.1998) .............................................................................................. 20

*Osorio v. Dole Food Co.*,
   665 F. Supp. 2d 1307 (S.D. Fla. 2009) .............................................................................. 35

*Osorio v. Dow Chemical Co.*,
   635 F.3d 1277 (11th Cir. 2011) ......................................................................................... 35

*Prasad v. MML Investors Servs., Inc.*,
   No. 04 Civ. 380 (RWS), 2004 WL 1151735 (S.D.N.Y. May 24, 2004) ..................... 18, 20

*Rizzo v. Soc. Sec. Admin.*,
   25 F. App'x 978 (Fed. Cir. 2001) ....................................................................................... 33

*Rocheux Int'l of N.J. v. United States Merchs. Fin. Group, Inc.*,
   No. 06-6147, 2009 WL 3246837 (D.N.J. Oct. 5, 2009) .............................................. 25, 26

*Roemmich v. Eagle Eye Dev., LLC*,
   No. 1:04-cv-079, 2006 WL 3833433 (D.N.D. Dec. 29, 2006) ........................................... 20

*Smith v. Pfizer Inc.*,
   714 F. Supp. 2d 845 (M.D. Tenn. 2010) ............................................................................ 20

*Tatreau v. City of Los Angeles*,
   310 F. App'x 995 (9th Cir. 2009) ....................................................................................... 33

Redacted Version
Publicly Filed

*Tellez v. Dole Food Co.*,
    Case No. BC312852, Cal. Super. Ct., Cnty. of L.A., Statement of Decision ¶¶ 4
    (March 11, 2011) ...................................................................................................... 35

*U.S. v. Innamorati*,
    996 F. 2d 456 (1st Cir. 1993) .................................................................................. 23

*United States v. Birnbaum*,
    373 F.2d 250 (2d Cir. 1967) .................................................................................... 35

*United States v. Cresta*,
    825 F.2d 538 (1st Cir. 1987) ............................................................................... 3, 35

*United States v. Johnson*,
    688 F.3d 494 (8th Cir. N.D. 2012) .......................................................................... 21

*United States v. Medina*,
    41 F. Supp. 2d 38 (D. Mass. 1999) .......................................................................... 21

*Varnelo v. Eastwind Transp., Ltd.*,
    No. 02 Civ. 2084 (KMW) (AJP), 2003 WL 230741 (S.D.N.Y. Feb. 3, 2003) ................. 31

*West v. Goodyear Tire & Rubber Co.*,
    167 F.3d 776 (2d Cir. 1999) .................................................................................... 33

**Statutes**

18 U.S.C. § 201(c)(2) .......................................................................................................... 20

18 U.S.C. § 201(d) .............................................................................................................. 20

**Other Authorities**

American Bar Association Standing Committee on Ethics and Professional
    Responsibility, Formal Opinion 96-402 (August 2, 1996) ...................................... 19, 20

Ronald D. Rotunda & John S. Dzienkowski, Legal Ethics – The Lawyer's Deskbook on
    Professional Responsibility § 3.4-3 (2013-2014 ed.) .................................................. 21

**Rules**

Fed. R. Civ. P. 11 ............................................................................................................... 35

NY R. Prof'l Conduct 3.4(b) ............................................................................................... 19

**Statutes**

18 U.S.C. § 201(c)(2) .......................................................................................................... 20

18 U.S.C. § 201(d) .............................................................................................................. 20

Redacted Version
Publicly Filed

## PRELIMINARY STATEMENT

Mere weeks before their racketeering trial, Defendants ask this Court to silence the witnesses they could not suppress.  Despite a campaign of obstruction and intimidation by Defendants and their allies in the Ecuadorian government, Defendants have been unable to keep the true facts of this case from coming to light.  Former Ecuadorian judge Alberto Guerra has revealed how Defendants' confidential materials appear in the $18 billion judgment against Chevron.  U.S. scientists from Stratus have confirmed that they ghostwrote a court expert's purportedly "independent" report and then concealed their authorship.  Christopher Bogart, CEO of Burford Capital, has disclosed how Defendants defrauded his firm out of millions of dollars in order to fund their enterprise against Chevron.  And this extraordinary testimony is corroborated in virtually every material respect by documents, video footage, and physical evidence.  For their willingness to come forward, these witnesses have been vilified, slandered, sued, condemned as "enemies of the state," and in Guerra's case, driven into exile and now threatened with criminal prosecution in Ecuador.  Other witnesses still in Ecuador are cowed into silence, or have sought to remain anonymous with this Court's protection.

At the same time, Defendants have gone to extraordinary lengths to shield their Ecuadorian allies' documents, which they continue to withhold in defiance of this Court's orders.  And they now file this motion on the eve of trial as a smear tactic, knowing they are repeating the same stale, discredited allegations they raised before concerning these same insider witnesses who surfaced many months ago to expose this fraud scheme.

Defendants' "rationale" is as noxious as their request.  Defendants request that these witnesses be precluded, or even that this entire case be terminated, because conduct they falsely ascribe to Chevron supposedly has "so damaged the integrity of the discovery process in this case that there can be no 'assurance of proceeding on the true facts.'"  Dkt. 1422 at 1 (quoting *Conn.*

Redacted Version
Publicly Filed

*Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1096–97 (9th Cir. 2007)).

Yet, as this Court has already found, these are the same Defendants who,

> have resisted discovery to an astonishing degree by tactics including by refusing to pro-
> duce responsive documents located in Ecuador, bringing a secret and collusive Ecuadori-
> an lawsuit to obtain a court order barring their Ecuadorian agents from complying with
> document discovery requests, refusing to appear for depositions, and invoking frivolous
> privilege objections to block and delay discovery.

Dkt. 809 at 1–2.  And as this Court has already found, these are the same Defendants who,

> have openly threatened Guerra and [Fernando] Reyes with civil litigation and criminal
> prosecution for providing evidence in this case. They previously prevailed upon the Ec-
> uadorian government to prosecute two of Chevron's Ecuadorian counsel criminally. The
> LAPs' determination to intimidate Ecuadorian judges to get their way is evident from
> statements made by their lawyers in *Crude* and the video outtakes.

Dkt. 843 at 28.  The assertion that *Chevron* has obscured the true facts here goes beyond "chutz-

pah." *See* Dkt. 574 at 1.  It is rank hypocrisy from criminals and tortious wrongdoers.

In reality, Chevron and its counsel have at all times acted ethically, legally, and forth-

rightly.  Chevron has not paid anyone for testimony, nor has it coerced anyone to testify.  Chev-

ron fully and promptly disclosed all relevant information about its dealings with the witnesses

whom Defendants now challenge.  Indeed, Defendants' motion rests on documents Chevron pro-

vided, or that were produced by the witnesses themselves, months ago.  And those same docu-

ments rebut the inferences Defendants would draw from them.  Guerra was not paid for his tes-

timony, as his agreements, his testimony, and the contemporaneous record of his communica-

tions with Chevron make clear.

Chevron is compensating Guerra for the expense he continues to incur in order to testi-

fy—the expense of a forced relocation from his homeland where he and his family are no longer

safe, because he has told the truth.  Defendants concede that Chevron may compensate Guerra

for his time lost and expenses incurred as a result of testimony, including payments necessary to

protect him from security risks in Ecuador, and they do not dispute that those risks are real.  Nor

Redacted Version
Publicly Filed

could they, as their ally, President Correa, continues his barrage of attacks on Chevron and all those who speak out against the LAPs with fiery speeches and broad threats.  Having successfully driven Guerra from his homeland, Defendants should not be heard to complain that the expense of his exile is unreasonable.

Moreover, Burford and Stratus were not "coerced," and they provided truthful testimony about Defendants' crimes—testimony that is consistent in every respect with the contemporaneous record.  And these witnesses confirm what the documents, the video footage, and Defendants' own admissions have already established:  Defendants are pursuing a longstanding campaign of bribery, extortion, and fraud against Chevron.

Indeed, this Court has largely rejected the arguments made here already.  Defendants have pressed them in various forms over the past year, without success.  *See*, *e.g.*, Dkt. 1256 (Bogart); 960 (Beltman and Maest); 916 (Guerra).  Just nine days before Defendants filed this motion, the Court denied "in all respects" the 35-page motion the LAPs and Patton Boggs directed solely at Christopher Bogart's declaration.  Dkt. 1381.  The instant motion, presumably drafted by Patton Boggs or other clandestine counsel (at the same time that Defendants speciously claim to be "struggling to find the time and resources," Dkt. 1442 at 4), was filed for press purposes and just before the hearing on Defendants' now-rejected mandamus petition.

If Defendants had any real answer to the testimony these witnesses are expected to offer at trial, they would challenge that testimony on cross-examination.  That is where this manufactured dispute should be resolved.  *See United States v. Cresta*, 825 F.2d 538, 546 (1st Cir. 1987) ("[C]ourts have chosen to rely upon cross-examination to ferret out any false testimony.").  Chevron has filed detailed declarations from each of these witnesses, disclosed all material facts about its relationship with them, and all of these witnesses have been available for deposition.

Redacted Version
Publicly Filed

But Defendants have chosen, instead, to pursue this misguided attempt to try to get this Court to

preclude these witnesses entirely, thus seeking by judicial decree to achieve that which they have

failed to achieve by intimidation and know they cannot accomplish by cross-examination.  This

Court should have none of it.  And Defendants' motion should be denied.

## STATEMENT OF FACTS

I.    **All of the Challenged Witness Testimony Is Corroborated by Extensive Documentary Evidence**

Defendants' own documents, deposition testimony, and video footage provide over-

whelming evidence supporting Chevron's claims, and corroborate the testimony Defendants now

challenge.  Even before Alberto Guerra, Christopher Bogart or the Stratus Defendants had said

one public word about Defendants' fraud, seven different federal courts outside this District

found that the evidence Chevron had amassed at that time established probable cause that De-

fendants had engaged in criminal or fraudulent conduct.[1]  In August 2010, for example—months

before Judge Zambrano had even begun his second term as presiding judge, and before the major

events to which Guerra has since testified had even taken place—the United States District Court

for the Western District of North Carolina said about Defendants' conduct: "While this court is

unfamiliar with the practices of the Ecuadorian judicial system, the court must believe that the

concept of fraud is universal, and that what has blatantly occurred in this matter would in fact be

considered fraud by any court."  *Chevron Corp. v. Champ*, Nos. 1:10-mc-27, 1:10-mc-28, 2010

---

[1]  *In re Chevron Corp.*, No. 11-24599-CV, slip op. at 4, 26 (S.D. Fla. June 12, 2012) ("Chevron has obtained mounds of evidence, in multiple § 1782 proceedings, that suggests that the judgment itself was also ghostwritten."); *Chevron Corp. v. Page*, No. RWT-11-1942, Oral Arg. Tr. at 10:17-21, 11:13-23 (D. Md. Aug. 31, 2011) (finding crime-fraud); *In re Chevron Corp.*, 633 F.3d 153, 166 (3d Cir. Feb. 3, 2011) (affirming crime-fraud finding); *In re Chevron Corp.*, No. 10-cv-1146-IEG (WMC), 2010 WL 3584520, at *6 (S.D. Cal. Sept. 10, 2010) (finding crime-fraud); *In re Chevron Corp.*, Nos. 1:10-mc-00021-22 (JH/LFG), slip op. at 3-4 (D.N.M. Sept. 2, 2010) ("The release of many hours of the [*Crude*] outtakes has sent shockwaves through the nation's legal communities, primarily be-cause the footage shows, with unflattering frankness, inappropriate, unethical and perhaps illegal conduct."); *Chevron Corp. v. Champ*, Nos. 1:10-mc-27, 1:10-mc-28, 2010 WL 3418394, at *6 (W.D.N.C. Aug. 30, 2010); Hr'g Tr. at 43:13-44:16;  *In re Chevron Corp.*, No. cv-10-2675 (SRC) (D.N.J. June 11, 2010) (finding crime-fraud).

Redacted Version
Publicly Filed

WL 3418394, at *6 (W.D.N.C. Aug. 30, 2010); Hr'g Tr. at 43:13-44:16.  In February 2011, five days after commencing this RICO action, Chevron provided evidentiary support for every single factual allegation in its 397-paragraph complaint, Dkt. 6–55, and subsequently provided support for every additional allegation in its 433-paragraph amended complaint, Dkt. 355–56.  In July 2012, nearly a year before the witness testimony that is the subject of this motion was disclosed, this Court made extensive findings that there was no genuine dispute of fact as to major aspects of Chevron's allegations, including that Defendants ghostwrote the Cabrera Report, and concluded that "there are serious questions concerning the preparation of the Judgment itself."  *Chevron Corp. v. Donziger*, 886 F. Supp. 2d 235, 292 (S.D.N.Y. 2012).

This massive evidentiary record, consisting of thousands of exhibits, corroborates the testimony Defendants challenge here.  Footage from Defendants' propaganda film project confirms Defendants' *ex parte* meetings with Cabrera and Donziger's knowing intent to corrupt the Ecuadorian court process—just as Douglas Beltman and Ann Maest now testify.[2]  Beltman and Maest's own email communications further confirm their role in first ghostwriting, then falsely promoting, the supposed Cabrera Report.[3]  And Donziger himself has admitted that Cabrera adopted what Stratus wrote "pretty much verbatim."  Dkt. 8-9 (Ex. 6) at 2433:8–14.  Other con-

---

[2]  Dkt. 6-2 (Ex. 1) (CRS-191-00-CLIP-03) (2007.03.03 *Crude* outtake video clip of meeting among P. Fajardo, S. Donziger, A. Maest, R. Cabrera, and others); Dkt. 1007-1 (Ex. 3653) (Maest Decl.) at ¶ 8 ("Also attending [the March 3, 2007 meeting] was Richard Cabrera, whom Pablo Fajardo referred to as a 'perito,' or expert.  Donziger told me prior to the meeting that Cabrera would be there, and he was hoping Cabrera would be appointed as the Ecuadorian Court's expert tasked with performing the global damage assessment requested by the LAPs."); Dkt. 1007-1 (Ex. 3652) (Beltman Decl.) at ¶ 6 ("Based upon conversations and review of a video clip, I understand that Richard Cabrera also attended the [March 3, 2007] meeting.").

[3]  Dkt. 33-2 (Ex. 168) (2008.02.22 email from D. Beltman to D. Chapman and others describing their work on "the single most important technical document for the case."); Dkt. 33-10 (Ex. 176) (2008.03.12 email from D. Beltman to info@translatingspanish.com attaching draft report with introduction stating "This report was written by Richard Cabrera, ING to provide expert technical assistance to the Court."); Dkt. 34-29 (Ex. 204) (2008.07.29 email from D. Beltman to S. Donziger regarding "peer review" of Cabrera Report) ("some of the underlying work in the Cabrera report has weaknesses that an academic would probably have a hard time defending . . . We're having better success with consultants being willing to sign endorsements than academics (something I am not proud of)."); Dkt. 34-14 (Ex. 189) (2008.07.28 email from D. Beltman to D. Mills musing on the complexity of concealing their role in the Cabrera Fraud, "Oh, what a tangled web …").

Redacted Version
Publicly Filed

temporaneous correspondence offers further confirmation that Defendants knew they were en-

gaged in criminal conduct in this regard, and tried to keep it secret, as Beltman and Maest testify.

Dkt. 1007-1 (Ex. 3652) ¶ 27; 58-60 (Ex. 3653) ¶¶ 12, 25, 44, 50.  In 2010, one co-conspirator

wrote to Donziger that disclosure of documents held by Stratus would mean that "all of us, your

attorneys, might go to jail."  Dkt. 9-6.  A year earlier, Fajardo had told the *Crude* filmmakers that

if evidence of Defendants' relationship with one of Cabrera's supposed team members was not

cut from the film, the result would be "so serious that we could lose everything[.]"  Dkt. 47-6.

Chevron began identifying the dozens of examples of Defendants' confidential, unfiled

work product in the $18 billion judgment nearly two years before Alberto Guerra came forward

to explain how they got there—and his testimony remains the only serious explanation put for-

ward by any party for this evidence.[4]  Documents provided by Guerra himself prove that he was

Zambrano's ghostwriter for years, and his bank records and Defendants' contemporaneous

emails show that he was in the pay of the LAPs as well.[5]  Indeed, Donziger has admitted that

---

[4]  Dkt. 746-3 at ¶ 23 ("Plaintiffs' representatives had agreed to pay [Zambrano] USD $500,000 from whatever mon-
ey they were to collect from the judgment, in exchange for allowing them to write the judgment in the Plaintiffs'
favor."); Dkt. 658-7 – 658-8 (Ex. 3005) (2012.12.10 Expert Report of Dr. Robert Leonard) (LAPs' internal unfiled
work product found in the Judgment); Dkt. 755-13 (Ex. 3267) (Declaration of Patrick Juola, Ph.D.) (LAPs' internal
unfiled work product not found in the Lago Agrio record); Dkts. 548, 658-5 - 658-6 (Ex. 3004) (affidavits of Samuel
Hernandez, Jr.) (LAPs' internal unfiled work product not found in the Lago Agrio record).
[5]  *See* ████████████████████████████████████████████ Dkt. 746 (Ex. C) (Attachment I) (handwritten entries in Guerra day planner in-
dicating payment from Zambrano); Dkt. 755-16 (Ex. 3278) (Expert Report of Michael Younger finding documents
on Guerra's computer are the same or similar to court documents filed by Zambrano); Dkt. 431-5 (Ex. 1285) (court
order dismissing Zambrano for corruption); Dkt. 746-3 (Ex. C) (Attachment F) (TAME shipping records); Dkt. 746-
11 (Ex. F) (Declaration of Alberto Racines discussing contact with Guerra); Dkt. 746-10 (Ex. E) (Declaration of
Adolfo Callejas discussing contact with Guerra); Dkt. 746-3 (Ex. C) (Attachments K, L, M, & N) (PACER 80-103),
Dkt. 763-7 (Ex. 3290) (bank deposit slips signed by LAPs' employee Ximena Centeno); Dkt. 755-7 (Ex. 3221)
(2010.09.05 email from Guerra to Donziger); Dkt. 746-12 (Exhibit G) (Declaration of Patricio Efrain Campuzano
discussing contact with Guerra); Dkt. 754-50 (Ex. 3163) (2009.11.27 email from Yanza discussing higher budget
"since we are paying the puppeteer" and additional expenses including "another computer (because we had to give
one to the man)."); Dkt. 658-7 (Ex. 3005) (Expert Report of Robert A. Leonard finding overlap between the Judg-
ment and the LAPs' internal unfiled work product); Dkt. 754-27 (Ex. 3140) (09.15.2009 email from Fajardo, "The
puppeteer is pulling the string and the puppet is returning the package…"); Dkt. 754-41 (Ex. 3154) ("The puppeteer
won't move his puppet until the audience doesn't pay him something."); Dkt. 754-50 (Ex. 3163) ("[I]t is important
to clarify on this that the budget is higher in relation to the previous months, since we are paying the puppeteer.");
[Footnote continued on next page]

Redacted Version
Publicly Filed

Guerra offered him Zambrano's bribery terms, and offered only a carefully hedged, partial denial of Guerra's testimony that Defendants ultimately took the deal.[6]

Christopher Bogart's testimony too is confirmed by documents, including Bogart's own contemporaneous notes of a critical January 27, 2011 conversation with Tyrrell.  Dkt. 1039-2, Attachment A.  And in a September 2011 letter from Burford to Donziger (which Bogart approved and participated in drafting) Burford informed Donziger that Burford believed Donziger and his co-conspirators "engaged in a multi-month scheme to deceive and defraud in order to secure desperately needed funding[.]"  Dkt. 714-1 at 1-2.  Notably, Defendants did not produce this document to Chevron, which obtained it only from Burford through a subpoena—a subpoena Defendants sought to block.  Dkt. 698.  That is indicative of Defendants' approach throughout this litigation—to suppress evidence of their fraud by whatever means necessary.

## II.   Defendants and Their Allies in the Ecuadorian Government Seek to Suppress These Disclosures

Rather than meet Chevron's claims on the merits—and implicitly acknowledging the fact that their own materials establish Chevron's case—Defendants have spent the last several years obstructing Chevron's discovery efforts at every turn.  This motion, like their previous baseless attempts to strike Guerra and Bogart's declarations, follows "the strategy as outlined by Jim [Tyrrell]" to prevent, hinder, and delay disclosure of materials from Defendants and everyone associated with them.  *See* Dkt. 496-5 (Ex. 5).  One of Defendants' lawyers was "sickened" by Donziger's lies to him in the face of "point-blank" questions about the truth of the Cabrera fraud. Stavers Ex. 4301 at 35:12-36:16; 69:5-22.  Defendants' lead U.S. firm in this effort, Patton

---

[Footnote continued from previous page]
Dkt. 400-2 (Ex. 2012); Dkt. 400-1 (Ex. 2010) at 3822:12-3824:8.

[6] Dkt. 922 ¶ 5 ("I do recall being at a restaurant in Quito with Guerra, when Guerra asked for a bribe of $500,000. . . . I have never sought to pay any money in exchange for a favorable verdict in the Lago Agrio litigation, nor have I encouraged or solicited anyone else to discuss or pursue paying money for a favorable verdict.")

Redacted Version
Publicly Filed

Boggs, "challeng[ed] everyone around them to take positions that are implausible at best, and very possibly spurious" in order to obstruct discovery, including a "demand that [co-counsel] make [itself] unavailable in order to keep the depositions [of Stratus employees] from proceeding." Dkt. 1240-4 (Ex. 4). *See also* Stavers Ex. 4302 at 136:13-22 (Patton Boggs suggested that he "make a client unavailable for a deposition under a pretense."). When Defendants were unable to prevent one deposition from occurring, they celebrated the fact that the deponent "did an excellent job of not remembering anything," even while admitting that "Chevron will be able to do side-by-side comparisons of Stratus work product and [Cabrera's] report to a judge that will smell bad." Dkt. 47-58 (Ex. 296). Donziger himself has refused to comply with court orders commanding him to produce materials, going so far as to withhold for months tens of thousands of responsive documents stored on his hard drives, including key documents related to secret payments to Cabrera, and acknowledgments of wrongdoing.[7]

Defendants have not relied solely on obstruction to prevent the truth from coming out. Particularly in Ecuador, where they enjoy the active support of the oppressive Correa regime, Defendants have gone on the offensive. The Correa Administration's public support for the LAPs has been emphatic—Correa himself has offered the LAPs "the National Government's full support" including "assistance in gathering evidence" against Chevron.[8] The darker side of this support has been the public and private intimidation of witnesses to Defendants' crimes. As this Court has already found, the LAP team and the ROE have long colluded to persecute those affil-

---

[7]  Stavers Ex. 4315 at 3; Dkt. 356-9 (Ex. S) (Yanza asking Donziger "for you to send us money to the secret account to give it to the Wuao and if not, the work stops"); Dkt. 179-15 (Ex. 15) (04.17.2010 letter addressed to "fellow counsel" from Donziger discussing Cabrera fraud and noting that Ecuadorian counsel are "concerned about how the information would land in Ecuador and what impact it would have on the case, and to them personally").

[8]  Dkt. 402-5 (Ex. 2253) (Press Release, *The Government Supports The Actions of the Assembly of Parties Affected by Texaco Oil Company, Government of Ecuador Secretary General of Communications*, Mar. 20, 2007).

Redacted Version
Publicly Filed

iated with Chevron.  Dkt. 843 at 20–25 (finding an "alliance" between the LAPs and the ROE).[9]

Accordingly, as witnesses to Defendants' fraud have come forward, Defendants have made sure that the witnesses feel not only the fury of the LAPs' media machine, but the chilling hand of Correa's authoritarian regime.  And the last year alone has seen the LAPs and the ROE threaten retribution against a number of witnesses who dared to testify to the truth regarding Defendants' fraud.  In early 2013, for example, after both Guerra and Reyes had come forward with declarations detailing Defendants' fraudulent conduct, Defendants retaliated by threatening slander suits and criminal prosecutions against both of them.  *See* Dkt. 843, at 14; Dkt. 796 (Ex. 11), at 6; Dkt. 796-12 (Ex. 12).  When Fajardo filed a criminal complaint against Guerra, the ROE immediately began an investigation, with continued prompting and support from Fajardo. Stavers Ex. 4303.  *See also* Dkt. 854-4 (Ex. 4).  And for his part, President Correa repeated the LAPs' talking points and publicly rebuked Guerra and any other witnesses who dare to reveal the corruption and misconduct within the Ecuadorian judiciary, and even said that people should not "place much belief in accidents in the coming months."  Dkt. 1096-3 (Ex. 3).  *See also* Dkts. 746-1 (Ex. A) (Amazon Defense Coalition press release discussing defamation lawsuit against Reyes), 746-2 (Ex. B) (ChevronToxico.com press release stating "Reyes must answer for perjury."), 759-1 (Ex. 1) (press release warning the Ecuadorian public "not to be caught off guard" by "Ecuadorians who are betraying the country and selling themselves to the highest bidder for a few dollars" by providing evidence in this case); 759-3 (Ex. 3) at 4-5 (interview with Fajardo in

---

[9]  *See also* Dkt. 30-22 at 1 (Juan Pablo Sáenz to Donziger:  "Our sources at the government tell us that they're actively looking for them, to cut their heads off.  We should focus on Borja and Hansen, since they're the Chevron stooges.  Correa and his cronies will take care of the rest."); Dkt. 843 at 20-24 (describing the success of the Defendants' team in pressing the Correa regime to reopen a meritless criminal case against Chevron lawyers); Dkt. 30-2 (Ex. 91) (*Crude* Transcript) at 43 (Donziger:  "Correa just said that anyone in the Ecuador government who approved the so called remediation is now going to be subject to litigation in Ecuador.  Those guys are shitting in their pants right now.").  And as this Court is aware, the Ecuadorian government has also assisted Defendants with their obstruction of document discovery in this case through the collusive *Cordova* lawsuit.  *See* Dkt. 1151 at 10–13; Dkt. 894 at 6–7.

Redacted Version
Publicly Filed

which he stated that the LAPs already "found out due to . . . several . . . people, too, obviously, we asked for the information—the migration movements" of additional people in Sucumbios that are helping Chevron, and asserted that "Chevron corrupt[ed]" Guerra.

Recent efforts to silence critics of what Correa calls "the most important judgment in the history of the country," Dkt. 402-11, have grown increasingly troubling.  Correa has launched a near daily campaign of attacks on Chevron and those affiliated with Chevron, calling it an "enemy of [the] country," Dkt. 1451-7 (Ex. 4206); Dkt. 1451-8 (Ex. 4207), and threatening to publicize the name of every Ecuadorian attorney working for Chevron.  Stavers Ex. 4321.  *See also* Stavers Ex. 4318 at 1 (Correa:  "[T]hese immoral people, these criminals …").  Meanwhile, a professional looking website has recently appeared, titled "Los Vende Patria" (which translates to "The Sellers of the Fatherland" or "The Traitors") which is dedicated to naming Ecuadorians who have worked with Chevron "to harm their Amazon brothers and their country."  Stavers Ex. 4316.  Correa has also pushed the media to further his intimidation campaign—in one recent televised address, Correa literally ripped apart copies of Ecuadorian newspapers, accusing their publishers of failing to print sufficiently lengthy articles on the government's "Dirty Hand of Chevron" campaign,[10] and threatening them with sanctions under the country's new "Communications Law."[11]  Stavers Ex. 4317.

---

[10]  This campaign includes Correa's highly publicized trip to the Lago Agrio region, where he dipped his hand in a pit of crude, showing it for the cameras.  The pit chosen for this photo op, however, was one that Petroecuador, not TexPet, was obligated to remediate.  Stavers Exs. 4320, 4318.

[11]  Harsh condemnation and misuse of the judiciary to punish those who oppose him is a Correa hallmark.  In the *El Universo* case, for example, Correa responded to a newspaper column that had been critical of his administration by launching criminal defamation proceedings against the editorialist and three newspaper editors, resulting in a $40 million fine and three-year prison sentences for the defendants.  Several of the defendants had to flee the country, Dkt. 796-5, 796-8, and an Ecuadorian judge involved in the case chose to flee to Colombia and seek the protection of the Inter-American Human Rights Commission after she revealed that lawyers for President Correa had promised her $3,000 a month if she would rule against the newspaper.  *See* Dkt. 398, ¶ 50.  After evidence emerged that Correa's lawyer secretly ghostwrote the judgment, the defendants eventually received full pardons following international pressure.  *See generally* Dkt. 398, ¶¶ 46-54.

Redacted Version
Publicly Filed

### III.    A Procession of Witnesses Come Forward to Confirm What the Evidence Shows—Many at Great Personal Risk

### A.    Albert Guerra, Now Living In Exile, Confirms Judgment Fraud

Before he agreed to testify and was forced to move with his family to the United States, Alberto Guerra lived with his wife in a 5,380 square foot house in an affluent, gated and secure neighborhood in Quito, Ecuador.  Dkt. 977-3 (Ex. 3634) at 1.  Guerra's home—on which he was putting the finishing touches of a 2012 renovation—had four bedrooms, four and a half bath-rooms, as well as maids' quarters and a detached 645 square foot guest house.  *Id.*; Stavers Ex. 4304 at 51:9-23.  Guerra's son lived with his wife and young child in Quito in a 1,560 square foot, three bedroom and two bathroom condominium.  Dkt. 977-3 (Ex. 3634) at 1.  Both families owned a car, and three of the four adults enjoyed income from employment and investments.  Dkt. 977-3 (Ex. 3634) at 1.  As Ecuadorian citizens, they enjoyed the benefits of an extensive public health system, *id.* at 3, and at the time he initiated discussions with Chevron, Guerra was working as an attorney for an insurance company in Quito.  Stavers Ex. 4304 at 49:4-16.

Then Zambrano asked Guerra to contact Chevron.  Indeed, the "bridge" to Zambrano that Defendants call "the most egregious element of Chevron's illegal bribery campaign," Dkt. 1422 at 6, was in fact the basis upon which Guerra contacted Chevron in April 2012.  Zambrano in-structed him to contact Chevron about the possibility that Zambrano could testify about his knowledge of the judgment fraud on Chevron's behalf.  Dkt. 746-3, ¶ 33; Stavers Ex. 4304 at 55:8-13.  In their meetings with Guerra, ███████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

Redacted Version
Publicly Filed

████████   After these initial talks between Chevron and Guerra, however, Zambrano—who at

that time had been recently dismissed from his post as Judge of the Sucumbíos Court, *see gener-*

*ally* Dkt. 1448 at 7–8—changed course without explanation and stated that he was not willing to

testify. Dkt. 746-3, ¶ 33. Guerra was never able to serve as a "bridge" to Zambrano, and no

agreement was ever reached with him—at least not by Chevron.

Chevron continued to discuss the matter with Guerra, however, when Guerra revealed

that he also had personal knowledge of the judgment writing process, as well as other relevant

information and corroborating physical evidence. *See* Dkt. 746-3, ¶¶ 23-28. Ultimately, Chev-

ron agreed to purchase the physical evidence from Guerra, and compensate Guerra for the time

and expense incurred in collecting them, paying him $38,000. Dkt. 755-14 at 1–2. Included in

the physical evidence Guerra provided are items that corroborate aspects of his testimony, such

as: (i) Guerra's computer and electronic media containing over 100 court orders he ghostwrote

for Zambrano (including some for the Chevron case); (ii) copies of his bank records (revealing

two deposits by a LAPs employee); (iii) certified shipping records for the delivery of packages

between Zambrano in Lago Agrio and Guerra in Quito (corroborating his claim that he shipped

packages to Zambrano); (iv) copies of his credit card statements; (v) cell phones, and; (vi) cell

phone records for the months of May, June and July of 2012. *Id.*; Dkt. 746-3, ¶ 33; Stavers Ex.

4304 at 212:20-213:10.

Later, in response to a subpoena from Defendants, Guerra located additional corroborat-

ing evidence, including evidence of the ghostwriting of the judgment itself. Guerra had previ-

ously testified that in early 2011, after he began working on the draft judgment provided to him

on Fajardo's computer, he called Fajardo with questions about the draft. In response, Guerra tes-

tified, "Mr. Fajardo e-mailed me a document of around 10 to 12 pages titled 'Memory Aid,' with

Redacted Version
Publicly Filed

some information about the case." Dkt. 746-3, ¶ 26.  When he had initially collected the evi-

dence he provided to Chevron, Guerra had not located this Memory Aid, and believed he no

longer had it.  Dkt. 1007-6 (Ex. 3676) (2013.04.12 Guerra Decl.) at ¶ 3.  In subsequent searches

he made in response to Defendants' request, however, Guerra located it in a different file.  Dkt.

1007-6 (Ex. 3676) at ¶¶ 4-6, (Ex. 3675) (Clayman Decl.) at ¶¶ 3-4.  Thereafter, he located addi-

tional banking and travel records, and for his time and expenses in collecting this information,

Chevron paid Guerra $10,000.  Stavers Ex. 4307 (Supplemental Guerra Agreement), at ¶¶ 5-7.

Forensic analysis of the memory aid confirms that it was printed no later than April 2011.

Stavers Ex. 4308 (Lyter Decl.) ¶¶ 24-25.

From the beginning, Guerra's conversations with Chevron were shadowed by concerns

about his security.  Guerra knew of course that his participation in the LAPs' scheme was illegal,

and that the Ecuadorian authorities could prosecute him.  Stavers Ex. 4304 at 33:11-17 ("They

could do so and in fact they will do so.").  But Guerra also knew that his testimony could put his

family at risk if they remained in Ecuador.  *See* Stavers Ex. 4304 at 246:19-247:16.

Guerra's fears were well founded.  Guerra's declaration did not become public until Jan-

uary 28, 2013, when Chevron filed its summary judgment motion, but the LAPs had already be-

gun laying the groundwork for their retaliation against him as early as January 9, 2013, when

they issued a press release warning the Ecuadorian public "not to be caught off guard" by "Ecua-

dorians who are betraying the country and selling themselves to the highest bidder for a few dol-

lars" by providing declarations exposing the LAPs' fraud.  Dkt. 759-1 (Ex. 1).  They issued an-

other press release on January 21, 2013, stating that "Chevron recently moved [Judge] Guerra to

the U.S., where the company is planning to produce a media event where he will make false and

misleading allegations against the plaintiffs."  Dkt. 759-1 (Ex. 2).  The release quoted Fajardo's

Redacted Version
Publicly Filed

preemptive attack on Guerra:  "It always was obvious that Guerra wished to sell himself to the

highest bidder."  *Id*.  In an interview the next week, Fajardo ominously stated that the LAPs al-

ready "found out due to . . . several . . . people, too, obviously we asked for the information—the

migration movements" of additional people in Sucumbios that are helping Chevron, and asserted

that "Chevron corrupt[ed]" Judge Guerra.  Dkt. 759-1 (Ex. 3) at 4-5.

Following the release of Guerra's declaration, the LAPs' threats became more concrete.

On February 18, 2013, Fajardo and another LAP agent filed a criminal complaint against Guerra,

accusing him of various crimes including perjury, defamation, and bribery, among others.  Dkt.

854-4 (Ex. 4).  Fajardo has made the criminal action against Guerra a priority, making numerous

filings submitting and requesting evidence.  *See* Stavers Ex. 4309, Dkt. 854-4 (Ex. 4).

Two separate expert analyses of the security situation in Ecuador have confirm that Guer-

ra and his family faced a serious, sustained threat as a result of his testimony.  Douglas Farah, an

expert in Latin American affairs at the Center for Strategic and International Studies recently

concluded "Ecuador under Correa has become a highly criminalized state where the government

has consistently and repeatedly meddled in judicial affairs and attacked those it views as enemies

or dissidents."  Stavers Ex. 4310 at 12.  Farah cites the longstanding relationship of convenience

between the Republic of Ecuador and the FARC, which maintains its "diplomatic headquarters"

in Quito, *id.* at 8, and has ties to senior members of the Correa administration, *id.* at 19–23.  In

addition to the FARC's inherent antagonistic posture towards U.S. corporations, the FARC is

aligned with indigenous and non-governmental organizations in the Lago Agrio region, where

the Colombian government believes the FARC maintains 1,800 troops.  *Id.* at 28–30.  And ██████

██████ a leading security risk management consultancy, concluded ███████████████████

████████████████████████████████████████████████████████████

14

Redacted Version
Publicly Filed

████████████████████████████████████████████████████

██████████████████████████████    Dkt. 884-2 (Ex. 2) at 2–3.

As a result of Guerra's testimony about the LAPs corruption, Guerra has been effectively exiled from his homeland.  Accordingly, Chevron has paid for his relocation, as among the costs Guerra has incurred in order to testify.  Because he and his family are unable to work under his current immigration status,[12] Chevron provides Guerra with a monthly payment of $10,000 so that he can pay for his living expenses—as well as the living expenses of his wife, his son, his son's wife, and his young grandchild—and a stipend of $2,000 per month for his rent, but an economist retained by Chevron concluded that amount "is significantly less than that which would be required to maintain in the United States the standard of living enjoyed by [Guerra and his family] in Ecuador."  Dkt. 977-3 (Ex. 3634) at 4.[13] ████████████████████

████████████████████████████████████████

████████████████████████████████████████    Dkt. 977-3 (Ex. 3634) at 3-4.  Indeed, even if Guerra's expected future income in Ecuador were substantially less than he claimed, it would still represent a higher standard of living in Ecuador than he is enjoying now.  Chevron also purchased a used car for Guerra to use for the duration of the agreement, a 2011 Honda CRV, the exact same make, model, and year of the car that Guerra

---

[12] The agreement obligates Guerra and his family to make a good-faith attempt to find work if their immigration status changes, and provides for a reduction in monthly payments should he or his familiar members find employment.  Dkt. 755-14 at 5.

[13] Jerry Nickelsburg, Ph.D., is Adjunct Professor of Economics at the Anderson School of Management at UCLA.  He has a Masters in Economics with a specialization in statistical methods from the University of Colorado (1973) and a Ph.D. in economics with a specialization in Monetary Economics and Statistical Methods from the University of Minnesota (1980).  He has published over 100 articles and two books on international economics, labor economics, industrial organization, statistical methods, monetary economics, economic forecasting and public policy analysis.  He teaches statistical methods and forecasting and comparative economic analysis.  He has previously taught econometrics, international economics, international business, and macroeconomics at the undergraduate, professional and graduate levels.  See Dkt. 977-3 (Ex. 3634) at 4-5.

Redacted Version
Publicly Filed

owned in Ecuador.  Stavers Ex. 4307 (Supplemental Guerra Agreement) at § II(B)(1).

Guerra testified that he wants to return to Ecuador, but would consider returning only if he determined there was no longer any risk to his family's personal safety.  Dkt. 746-3, ¶ 34; Stavers Ex. 4304 at 31:9-14.  Accordingly, the agreement with Guerra requires Chevron to commission an "independent third-party assessment" of the security risk.  "If that independent assessment finds substantial evidence of a risk to Guerra's personal safety and security, Chevron and Guerra will act in good faith to reach an agreement on new terms[.]"  Dkt. 755-14 (Ex. 3268) at 4.  The agreement states: "Chevron shall base any agreement in this regard on that independent assessment.  Any further agreement will not be contingent on the content of Guerra's statements or testimony or the outcome of any matter in which Guerra testifies, or on the outcome of any investigation in which he provides statements or testimony."  *Id.*

## B.      Other Witnesses Required Protection or Anonymity

The attacks on Guerra are part of a pattern.  Years ago, Borja participated in a series of meetings with the judge then presiding over the Lago Agrio litigation and operatives from President Correa's political party.  The judge's participation in those meetings—no matter how Defendants publicly spin it, was unlawful, as even Donziger and other LAP attorneys privately admitted at the time.  Dkt. 370-6 (Ex. 1184) (Donziger:  "Those videos are BAD for us guys, no matter how u slice it.  The judge should not have been in the meetings, period …"); Dkt. 370-6 (Ex. 1186) ("What is bad is that he commits criminal malfeasance when he talks about the judgment."); Dkt. 1208-6 ("Chevron is calling for the judge to be removed because he never should have been in that room having these particular conversations with those particular people in the first place.").  When Borja, who was not acting at Chevron's direction when he attended and recorded the meetings, exposed what he had witnessed, the LAPs responded with threats and harassment.  Ermel Chavez, Pablo Fajardo, and Julio Prieto, for example, struck back at Borja by

Redacted Version
Publicly Filed

filing suit in Sucumbios, alleging that Borja's recordings are "a fabrication conceived by the Ec-

uadorian attorneys representing Chevron."  Stavers Ex. 4311.  ██████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████

Further, Defendants' claim that Borja set up front companies and admitted to fabricating

evidence does not bear scrutiny.  Indeed, most of Defendants' claims concerning Borja are sup-

ported only by the declaration of co-conspirator Saenz, not by any independent evidence.  ██████

██████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████

In fear of these attacks, if witnesses to the LAPs corruption wish to remain in Ecuador,

they must avoid identifying themselves in public.  *See* Dkt. 843 at 28 ("The Does plainly would

be potential targets of intimidation, retribution, and conceivably worse if their identities became

known. … [T]here is little reason to suppose that any of [Defendants or their allies in Ecuador]

could be constrained by any order this Court might issue to restrict their behavior if the identity

of the Does became known to them.").  This can only help suppress evidence of the LAPs fraud.

## C.    Vilification of Other U.S. Witnesses

Witnesses who have come forward to testify about Defendants' misconduct not involving

the ROE directly are also subject to smear campaign and pressure tactics.  When Fernando Reyes

Redacted Version
Publicly Filed

voluntarily came forward, for example, to reveal that the LAPs' lawyers hired him to pretend to be an "independent" monitor to try to influence the judicial inspection process while on the LAPs' payroll, the LAPs' agents, through press releases and Fajardo's public statements, immediately attacked Reyes, called upon Ecuadorian authorities to prosecute him for perjury, and threatened to sue him for defamation.  Dkt. 746 (Ex. A), (Ex. B); Dkt. 796 (Ex. 11) at 8.

Numerous other witnesses who have chosen to reveal the truth about Defendants' fraud have faced a barrage of public threats and attacks:  in the last year alone, Christopher Bogart and representatives of Stratus Consulting have each been the subjects of Defendants' abuse, who have asserted in press releases that "Chevron also engaged in witness tampering by coercing Christopher Bogart … Bogart already has been discredited as a liar …" and that "[i]f Beltman and Maest testify consistent with the recently extorted affidavits, they will look like liars."[14] This baseless motion and similar motions the Court has already rejected are more of the same.

## ARGUMENT

### I.    Applicable Law Permits Payments to Fact Witnesses

#### A.    Parties May Make "Reasonable" Payments to Fact Witnesses For Expenses Incurred in Connection With Litigation, Including Those Incurred as a Result of Security Risks

Defendants concede that a party may pay a fact witness's expenses and reimburse the witness for time lost in connection with the litigation.  Dkt. 1422 at 18–19.  *See New York v. Solvent Chemical Co.,* 166 F.R.D. 284, 289 (W.D.N.Y. 1996); *Prasad v. MML Investors Servs., Inc.*, No. 04 Civ. 380 (RWS), 2004 WL 1151735, at *5-7 (S.D.N.Y. May 24, 2004).  Defendants concede that "if a witness faces a bona fide personal safety or security risk . . . it is permissible

---

[14]  *Chevron Tried to Bribe Ecuador Judge with $1 Million Payment on Eve of RICO Trial*, ChevronToxico.com (Sept. 13, 2013), available at:  http://chevrontoxico.com/news-and-multimedia/2013/0913-chevron-tried-to-bribe-ecuador-judge-with-1-million-payment; *The Truth Behind The Stratus Affidavits*, TheChevronPit.com (Apr. 17, 2013), available at:  http://thechevronpit.blogspot.com/2013/04/the-truth-behind-stratus-affidavits.html.

Redacted Version
Publicly Filed

for attorneys to pay expenses reasonably necessary to keep the witness in a safe location."  Dkt.
1423-2, ¶ 7; Dkt. 1422 at 27.  And the New York Court of Appeals recently held that where the
opposing party challenges witness compensation, even where the witness payment in question
constitutes "a substantial payment to a fact witness in exchange for minimal testimony . . . such
testimony is generally admissible, but that the trial court should, in a proper case, charge the jury
as to the witness's potential bias, in light of the perceived excessiveness of the fee."  *Caldwell v.*
*Cablevision Systems Corp.*, 20 N.Y.3d 365, 371 (2013).

These propositions are unexceptional and universally accepted.  For example, while the
New York Rules of Professional Conduct prohibit offering witnesses inducement or compensa-
tion, "contingent upon the content of the witness's testimony or the outcome of the matter," that
same rule allows a lawyer to "advance, guarantee or acquiesce in the payment of . . . reasonable
compensation to a witness for the loss of time in attending, testifying, preparing to testify or oth-
erwise assisting counsel, and reasonable related expenses."  NY R. Prof'l Conduct 3.4(b); *see*
*also* NY Comm. of Prof'l Ethics, Op. 668 (1994) (concluding the same under prior law);  NY
Comm. of Prof'l Ethics, Op. 962 (2013) (reimbursement of travel expenses is reasonable).

The ABA similarly agrees that "a lawyer, acting on her client's behalf, may compensate a
non-expert witness for time spent in attending a deposition or trial or in meeting with the lawyer
preparatory to such testimony, provided that the payment is not conditioned on the content of the
testimony . . . ."  American Bar Association Standing Committee on Ethics and Professional Re-
sponsibility, Formal Opinion 96-402 (August 2, 1996).  No distinction is drawn between com-
pensation for "time spent in actually attending a deposition or trial," "time spent in pretrial inter-
views," and "time spent in reviewing and researching records that are germane to his or her tes-
timony."  *Id.*  The Committee goes on to explain that the amount of compensation must be "rea-

Redacted Version
Publicly Filed

sonable," and that for a witness who is retired or unemployed, "reasonable" compensation is determined by the "value of the witness's time based on all relevant circumstances." *Id.*

Federal law allows witnesses to receive payment related to expenses and lost time.  While the Federal Anti-Gratuity Statute prohibits payments "for or because of the testimony under oath . . . ," 18 U.S.C. § 201(c)(2), it expressly exempts "payment, by the party upon whose behalf a witness is called and receipt by a witness, of the reasonable cost of travel and subsistence incurred and the reasonable value of time lost in attendance at any such trial, hearing, or proceeding . . . ." 18 U.S.C. § 201(d).  And federal courts, including the Southern District, "are generally in agreement that a witness may properly receive payment related to the witness' expenses and reimbursement for time lost associated with the litigation." *Prasad*, 2004 WL 1151735, at *5.[15]

In sum, it is well accepted that, while a witness may not be given compensation contingent upon the content of the witness's testimony or the outcome of the litigation, a witness may be paid reasonable compensation for expenses incurred and time lost related to the litigation.

## B.    Parties May Pay Witnesses for Physical Evidence

Authenticated physical evidence is qualitatively different from testimony in that it is not generally subject to alteration under the influence of compensation.  "There is a presumption of

---

[15]  *See New York v. Solvent Chemical Co.*, 166 F.R.D. 284, 289 (W.D.N.Y.1996) ("[T]he court finds nothing improper in the reimbursement of expenses incurred by [the witness] in travelling to New York to provide [a party] factual information, or in the payment of a reasonable hourly fee for [his] time."); *Centennial Mgmt. Servs., Inc. v. Axa Re Vie*, 193 F.R.D. 671, 682 (D. Kan. 2000) ("[O]ccurrence witnesses may be reasonably compensated for time spend in attending a deposition or trial; for time spent in pretrial interviews with the lawyer in preparation for testifying; and for time spent in reviewing and researching records that are germane to his or her testimony."); *Roemmich v. Eagle Eye Dev., LLC*, No. 1:04-cv-079, 2006 WL 3833433 (D.N.D. Dec. 29, 2006) (approving fees paid to a former federal official who had supervised the development projects at issue in the litigation); *Smith v. Pfizer Inc.*, 714 F. Supp. 2d 845, 853 (M.D. Tenn. 2010) (it is "not necessarily improper for a party to pay a fact witness if the money compensates the witness . . . for lost time."); *Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non–Marine, Ass'n*, 865 F. Supp.1516, 1526 n. 11 (S.D.Fla.1994) (finding that payments to a fact witness were improper, but acknowledging that "[p]ayments made to fact witnesses as actual expenses as permitted by law will not be disturbed or set aside"). *See generally NLRB v. Thermon Heat Tracing Svcs., Inc.*, 143 F.3d 181, 190–91 & n. 4 (5th Cir.1998) (Garza, C.J., dissenting) (providing an overview of statutory and common law views on witness compensation and noting that improper compensation to fact witnesses is typically defined to exclude the payment of reasonable expenses and compensation for lost time; *see also Prasad*, 2004 WL 1151735, at *5 (observing that there is "a great difference between questionable payments to witnesses and subornation of perjury").

Redacted Version
Publicly Filed

integrity of physical evidence absent a showing of bad faith, ill will, or tampering with the evidence. *United States v. Johnson*, 688 F.3d 494, 505 (8th Cir. N.D. 2012); *see also Ceats, Inc. v. Cont'l Airlines, Inc.*, No. 2012-1614, 2013 WL 1776814, at *4 (Fed. Cir. Apr. 26, 2013) (holding that physical evidence eliminates "the risk of litigation inspired fabrication or exaggeration."). Commentators have noted the relevance of the distinction in the payment context, finding that payments for information do not raise the same concerns as payments connected to testimony because the purpose of such payments "is not to change the content of the testimony but simply to get information that, realistically, would not otherwise normally be given." Ronald D. Rotunda & John S. Dzienkowski, Legal Ethics – The Lawyer's Deskbook on Professional Responsibility § 3.4-3 (2013-2014 ed.). *See also United States v. Medina*, 41 F. Supp. 2d 38, 51 (D. Mass. 1999) (denying defendant's motion to exclude testimony of witness based on $70,000 payment for information because the "distinction between information and testimony is an important one").

Defendants concede that parties may pay witnesses for physical evidence, but assert that such payments must be limited to the "replacement cost," of the physical items themselves. Dkt. 1422 at 21. They cite no authority for this except the undeveloped opinion of one lawyer to whom they appear to have revealed none of the operative facts. *Id.* (citing to Declaration of Erwin Chemerinsky). Defendants' position is inconsistent with the law permitting payments for information because if payments of physical evidence are limited to the replacement cost of the medium containing the evidence, than in fact, no payments at all are permitted for the evidence itself—i.e. the information contained in the physical item.

Ultimately, a payment for physical evidence raises the same question as a payment for time or expenses—does the payment undermine the payee's credibility as a fact witness? De-

Redacted Version
Publicly Filed

fendants admit, because they must, that courts can assess the reasonableness of payments for time or expenses, Dkt. 1422 at 27, but claim that if payments for physical evidence were permitted, there "would be virtually no limitation on payments that lawyers could make to fact witnesses under the guise of obtaining evidence." *Id*. at 23 (quoting Chemerinsky Decl.). In fact, the "limitation" remains the same—payments that are contingent upon the substance of the witness's ultimate testimony are not permitted, whereas reasonable payments are allowed. Determinations about whether a payment is "reasonable" or whether a witness is credible are the bread and butter of trial courts and fact finders. *See, e.g.*, *Caldwell*, 20 N.Y.3d at 371 ("A line must therefore be drawn 'between compensation that enhances the truth seeking process by easing the burden of testifying witnesses, and compensation that serves to hinder the truth seeking process because it tends to "influence" witnesses to "remember" things in a way favorable to the side paying them'") (quoting N.Y. St. Bar. Assn. Comm. on Prof. Ethics Op. 668).

### C.   Witness Payments Create, at Most, an Issue for the Trier of Fact, Not a Basis to Circumvent It

Where payments have been fully disclosed, the witness's veracity is handled in the same manner as any impeachment challenge—by examination before the trier of fact. *Centennial Mgmt. Servs., Inc. v. Axa Re Vie*, 193 F.R.D. 671, 682 (D. Kan. 2000); *Metso Minerals, Inc. v. Powerscreen Int'l Dist. Ltd.*, 833 F. Supp. 2d 282, 319 (E.D.N.Y. 2011) ("[m]any courts, including courts in this Circuit, have found that a compensated fact witness is competent to testify as long as the fact that payments were made to that witness is disclosed to the trier of fact); *Caldwell v. Cablevision Systems Corp.*, 925 N.Y.S.2d 103, 110 (App. Div. 2011) ( "the appropriate remedy in a case such as this one, where one might reasonably infer that a fact witness has been paid a fee for testifying, is to permit opposing counsel to fully explore the matter of compensation on cross-examination and summation"), *aff'd Caldwell*, 20 N.Y.3d 365.

Redacted Version
Publicly Filed

Upon proper disclosure, courts have permitted testimony even in cases where substantial cash payments were made to witnesses just before trial.  In *U.S. v. Innamorati*, 996 F. 2d 456 (1st Cir. 1993), for example, the court affirmed convictions based in part on the testimony of a "key witness" who had received $250,000 in payments, immunity from prosecution, and enrollment in the witness protection program.  It did so on the following grounds, which largely comport with the facts of this case:

> The terms of the agreement were not concealed; to the contrary, defendants' counsel questioned Scott closely about his arrangements with the government, and argued at length in closing that Scott should be disbelieved as a result of them. There was evidence to corroborate virtually every aspect of Scott's testimony. And the court instructed the jury to consider carefully any inducements or advantages that any witnesses had received. Finally, the $250,000 payment to Scott was completed several days prior to trial, and the payment was thus not directly dependent upon the result of Scott's testimony in court.

*Id.* at 482.

## II.   Chevron's Ethical Compensation to Guerra Was Reasonable Under the Circumstances and Has Not Induced False Testimony

### A.   Chevron's Payments to and Relocation of Guerra Are Reasonable Payments Are Not Contingent Upon Testimony

Chevron's payments to Guerra were reasonable, and complied with federal law and ethical obligations.  Chevron made payments to Guerra based upon: (1) Guerra's expenses incurred and time lost in connection with providing evidence for this litigation; (2) the value of the information contained on Guerra's computer and other sources; and (3) the costs of relocating Guerra and his family to the United States.  Dkt. 755-14 (Ex. 3268).  Chevron voluntarily disclosed all such payments to Defendants and this Court.  *Id.*  No payment from Chevron to Guerra has been made, or will be made, dependent on the content of Guerra's testimony or the outcome of this or any other litigation.  *Id* at 4.

In exchange for the corroborating physical evidence Guerra provided and for Guerra's time and efforts to collect it, Chevron compensated Guerra with a fixed sum of $38,000.  Dkt.

Redacted Version
Publicly Filed

755-14 (Ex. 3268) at 1–2.  This payment contemplated both the physical value of the evidence as well as the value of the information itself.  *See* Dkt. 977-2 (Ex. 3633).  Chevron's payments for this material obviously did not change the evidence itself—the bank deposit slips showing the LAPs paying Guerra $1,000 on two occasions would be the same whether Chevron compensated Guerra $38,000 or $38.  *See Johnson*, 688 F.3d at 505.  And this evidence will have substantial weight at trial.  Defendants insinuate that the evidence was nonetheless "fabricat[ed] to extract further payments," Dkt. 1422 at 6, but offer no support.  The evidence was disclosed eight months ago, and Defendants offer nothing here to question its authenticity.  They cannot rebut it now with vague suggestions that Guerra was "incentivized" to "fabricate" it.  *Id.*

Chevron's payments to Guerra for living expenses and relocation to the United States are also appropriate.  As this Court has recognized, there is a "substantial risk that Fajardo, Yanza, and their associates would attempt to coerce, intimidate, and initiate reprisals against" those individuals who have come forward in Ecuador to expose the truth about the ghostwriting of the judgment.  *See* Dkt. 843 at 15-16.  Witnesses have needed protection "against vilification and reprisals at the hands of the LAPs, their allies, and even the government of Ecuador, as well as the risk of violence . . . ."  Dkt. 941 at 3.  And as Guerra has explained, he is fearful that he and his family would be retaliated against were they to remain in Ecuador after Guerra revealed the truth about the ghostwriting of the judgment.  Dkt. 1423-1.  Security experts have confirmed that Ecuador under Correa is not a safe environment for those who speak out against the regime and its allies.  Stavers Ex. 4310; Dkt. 884-2 (Ex. 2).  Relocation of Guerra and his family was necessary to ensure that he did not suffer reprisals—by Defendants and their allies—for speaking out.

Chevron disclosed its agreement with Guerra for this support, which states: "It is expressly acknowledged that Chevron has no control over, and places no limits on the content of, Guer-

Redacted Version
Publicly Filed

ra's testimony." Dkt. 755-14, Ex. 3268 at 4. And if an independent assessment performed after two years determines that the security threat to Guerra and his family in Ecuador remains, the agreement requires Chevron to negotiate an extension of the terms that "will not be contingent on the content of Guerra's statements or testimony or the outcome of any matter in which Guerra testifies, or on the outcome of any investigation in which he provides statements or testimony." *Id.* Defendants concede that payments for a "bona fide personal security risk" is permitted, Dkt. 1422 at 27, so they cannot be heard to complain about Chevron taking steps to ensure that the security risk remains "bona fide."

Far from excessive or permitting Guerra to live the life of luxury implied by Defendants, the living expenses paid by Chevron are "significantly less" than those required to maintain Guerra's Ecuadorian standard of living in the United States. Dkt. 977-3 (Ex. 3634) at 1, 4. Defendants offer no facts or opinion to rebut this testimony, except generic data about average household income. Dkt. 1422 at 28–29.

The authorities Defendants cite to support their contention that Chevron's payments are made to influence Guerra's testimony are inapposite because they turn on express deals made to influence the content of testimony. Defendants rely on *Golden Door Jewelry Creations v. Lloyds Underwriters Non-Marine Ass'n*, 865 F. Supp. 1516 (S.D. Fla. 1994) and *Rocheux Int'l of N.J. v. United States Merchs. Fin. Group, Inc.*, No. 06-6147, 2009 WL 3246837 (D.N.J. Oct. 5, 2009) for their contention that this Court should "apply sanctions" based on Chevron's payments to Guerra. Dkt. 1422 at 20. But in *Golden Door*, the court found that sanctions were warranted because the party had explicitly made the payment to the witness "contingent upon" how "helpful" the witness's testimony was during the litigation. *Golden Door*, 865 F. Supp. at 1524-25. And in *Rocheux*, the party "arranged for payment of more than $4,000 to [the witness] *for his*

Redacted Version
Publicly Filed

*testimony*." *Rocheux*, 2009 WL 3246837, at *1 (emphasis added).

       **B.**     **There are Ample Reasons to Credit Guerra's Testimony**

      If Chevron's payments to Guerra altered his testimony, then Defendants should be able to

identify what is false about his current testimony. After all, he testifies in substantial part about

Defendants' conduct. But they do not point to contrary evidence raising serious concerns in this

regard. They simply assert that because he was being paid, he must be lying. But nearly all of

Guerra's testimony is corroborated by documents.

      Guerra's account of the ghostwriting scheme is corroborated by the evidence he produced

to Chevron, including draft orders in the Lago Agrio litigation that Guerra ghostwrote for Zam-

brano, shipping records, calendars, and proof of the LAP team's payment of Guerra's monthly

fee directly into his bank account. *See, e.g.*, Dkt. 764 ¶¶ 197-203, 205-06. This evidence fully

corroborates Guerra's account of the ghostwriting of the Lago Agrio judgment that he explains in

his declaration. And Guerra's declaration and deposition testimony has also been corroborated

by the Doe witnesses, as this Court has observed: "One of the [Doe] declarations contains infor-

mation that, if credited, would substantially corroborate Guerra. The other offers more modest

corroboration but contains important information regarding the risk of reprisals against these and

other witnesses." Dkt. 843 at 12. Defendants' assertion that "[n]othing in the record provides

support for the notion that Guerra's declaration or deposition testimony should be accepted as

true" is itself unsupported by the record. Dkt. 1422 at 16.

      Defendants' only "rebuttal" evidence regarding Guerra's testimony is the suspect and in-

complete Zambrano declaration. Dkt. 1422 at 16 ("Judge Zambrano has already submitted a

sworn declaration that refutes each of Guerra's suspect assertions. . . . Judge Zambrano has also

confirmed that Guerra . . . sought to bribe Judge Zambrano . . . ."). In Defendants' view, every-

thing Zambrano says is unalterable fact, definitively rebutting Guerra's testimony. This position

Redacted Version
Publicly Filed

smacks of a bid for media coverage, not serious consideration in a court of law.

Defendants' reliance on Zambrano to "rebut" Guerra is preposterous.  First of all, it is Zambrano, not Guerra, who failed to appear for his deposition.  And even Zambrano's non-notarized "declaration," made under express refusal to submit to this Court's jurisdiction, fails to address, much less refute, Chevron's evidence of judgment fraud and does not, for example, deny or explain why Guerra's hard drive contained draft judgments issued by Zambrano in this and other cases (Dkt. 755-16 (Ex. 3278) at 10-11, 38), why TAME shipping records show numerous shipments between Zambrano and Guerra (Dkt. 763-6 (Ex. 3289)), or why Guerra's planner and bank records indicate that he received payments from Zambrano (Dkts. 746-3 at ¶ 10).  Nor does Zambrano offer any serious explanation as to how the LAPs unfiled work product made it into the judgment he issued.  He offers only the dubious statement that "documents related to the case . . . were left at the door to my office at the Court."  Dkt. 974-1 ¶ 16.  He does not say what documents these were, who left them, why he believed he could rely on them in direct contravention of Ecuadorian law, Dkt. 1411, at 6-7, and any sense of due process.  Nor have Defendants ever even asserted, let alone provided evidence, that they left the work product at issue outside Zambrano's door. Moreover, there is evidence—Guerra's sworn testimony and the numerous markers of the LAP team's role in drafting the judgment—that Defendant have paid Zambrano, and paid him in a manner that is beyond dispute illegal and unethical.

Meanwhile, Guerra's statements are corroborated by extensive documents, and Chevron has disclosed its payments to him, going so far as to record conversations between Chevron's representatives and Guerra.  Guerra has sat for a full day of deposition, where Defendants had the opportunity to challenge his credibility, but chose only to ask a few cursory questions, despite Chevron's prior disclosure of its payments to Guerra.  They seek here to achieve by motion

Redacted Version
Publicly Filed

what they could not achieve on cross examination or with rebuttal evidence.

### C.   Chevron Acted in Good Faith by Hiring Experts in Relevant Legal and Economic Fields and Affirmatively Disclosing Payments

Before Chevron made any payments to Guerra, Chevron retained Professor George M. Cohen, the Brokaw Professor of Corporate Law at the University of Virginia School of Law, and the author of numerous books and articles on legal ethics, to advise Chevron on its relevant legal and ethical obligations.[16]   *See* Dkt. 976 (Exs. 3635–3637).  Regarding Chevron's payments to Guerra for information, Professor Cohen stated that

> Chevron's counsel may pay the witness solely for the information in his possession, so long as that payment is a fixed sum not in any way contingent on his testimony or the outcome of any litigation; the payment is reasonable relative to the prior payment, the effort to be expended to acquire it, and its expected value in demonstrating the illegal scheme; the witness makes no promise to testify in exchange for the payment; and no future payment will be made to the witness for his testimony other than legally and ethically permitted payment for expenses incurred in connection with testifying."

Dkt. 976 (Ex. 3636), ¶6.  Chevron strictly followed these requirements:  (1) Chevron paid Guerra a fixed sum of $38,000 that was expressly not contingent on Guerra's testimony or the outcome of the RICO action or any related litigation; (2) the payment was reasonable in relation to the value of the evidence to Chevron, as the information provided strong evidence of the LAPs' involvement in ghostwriting the Lago Agrio judgment; and (3) Chevron will not make any future payments to Guerra for his testimony other than those consistent with these limits.

With respect to Chevron's payment of Guerra's relocation and living expenses, Professor Cohen advised Chevron that "Chevron's counsel may compensate the witness for expenses, so

---

[16]  Defendants submit with their motion the declaration of Erwin Chemerinsky—the date of which, July 26, 2013, makes clear that this motion has been in development for some time.  It is not clear what purpose this submission is meant to serve, except to create the impression that the law governing witness compensation is a "battle of experts." It is not, it is a legal question well within the purview of this Court's own assessment.  Chevron retained Professor Cohen to advise *Chevron*—not to buttress its position before the Court.  Dean Chemerinsky's opinion is just that, his opinion.  It cites no authority other than ABA Model Rule 3.4(b), consists of 9 short paragraphs of declaratory statements, and it does not consider a single relevant fact from this case.  Were it offered as an expert opinion, it would not meet the requirements of Fed. R. Evid. 702.  It should be given no weight.

Redacted Version
Publicly Filed

long as that payment is a fixed sum not in any way contingent on the content of his testimony or the outcome of any litigation and the payment is reasonable." Dkt. 976 (Ex. 3637), ¶ 6. Such payment for expenses may include "any expenses incurred by a witness in preparing to testify, in connection with testifying, or as a consequence of testifying, including expenses for housing and subsistence that extend beyond the time of his testifying, so long as sufficient evidence is presented to support the basis for these incurred expenses – in this case, legitimate concerns for the safety and security of the witness and his family." *Id.* Chevron acted in good faith reliance upon Professor Cohen's advice regarding the types of payments that would comply with federal law and ethical obligations. *See* Dkt. 977-6 (Ex. 3637), ¶ 4.[17]

With regard to the actual amounts paid to Guerra, Defendants state, "Tellingly, Chevron opted not to disclose the amount it would pay Guerra to its own 'expert.'" Dkt. 1422 at 27. Defendants are referring to Professor Cohen, but Professor Cohen is a lawyer, not an economist, and Chevron did not retain him to advise it on the reasonableness of monetary compensation. It did, however, retain Professor Jerry Nickelsburg, Adjunct Professor of Economics at the Anderson School of Management, University of California Los Angeles, who is without question an expert and to whom Chevron did "disclose the amount it would pay Guerra[.]" *Id.* Professor Nickelsburg's expert opinion, the only one that has been offered on the question, is that Chevron's payments to Guerra are "significantly less than that which would be required to maintain in the United States the standard of living enjoyed by [Guerra and his family] in Ecuador." Dkt. 977-3 (Ex. 3634) at 4. ██████████████████████████

---

[17] Defendants' unsupported jibes at Professor Cohen's integrity, Dkt. 1422 at 23, are unworthy of lawyers admitted to practice before this Court. The implication Defendants draw from the fact that Professor Cohen provided three reports to Chevron—that Professor Cohen changed his opinion to suit Chevron's needs—is belied by the reports themselves, which address new factual developments, and not changes to Professor Cohen's carefully considered analysis. *See* Dkt. 977-4 (Ex 3635), 977-5 (Ex. 3636), 977-6 (Ex. 3637).

Redacted Version
Publicly Filed

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

Defendants ignore these expert opinions, which Chevron provided to them months ago, Stavers Ex. 4319, and offer no expert analysis to support their argument that Chevron's payments to Guerra were unreasonable. They do not dispute the security risk Guerra faces in Ecuador, and set forth only a few superficial statements regarding the cost of living in one U.S. county as their "evidence" that these payments were "extravagant." Dkt. 1422 at 27-28.

In addition to soliciting expert opinions as to the propriety and reasonableness of payments to Guerra and the threat Guerra faces in Ecuador, Chevron acted in good faith by disclosing the payments to the Court and to Defendants. Chevron filed its agreement with Guerra just one day after it was signed. Dkt. 745, Dkt. 755-14 (Ex. 3268). And Chevron has fully and repeatedly explained its basis for believing that its payments to Guerra were proper. *See* Dkt. 976; Dkt. 977-2 (Ex. 3633). Disclosure is a factor courts consider in determining that payments to a fact witness are reasonable. *Centennial Mgmt. Servs.*, 193 F.R.D. at 680.

### III.   Chevron's Conduct with Regard to Bogart, Stratus and Other Witnesses to Defendants' Fraud Was Proper

Requiring the cooperation of a settling party in exchange for the release of claims is both reasonable and proper to achieve settlement of the parties' disputes. *See In re Initial Pub. Offering Sec. Litig.*, 226 F.R.D. 186, 193-94 (S.D.N.Y. 2005) (approving proposed settlement requiring "reasonable cooperation" in providing "further information concerning the claims in the Complaints"); *In re Del-Val Fin. Corp. Sec. Litig.*, 868 F. Supp. 547, 550 & n.5 (S.D.N.Y. 1994) (settlement agreement providing for, among other things, the "promise to cooperate with Plaintiffs' counsel in various ways in any continuing litigation," including "maintain[ing] relevant documents" and agreeing to submit to interviews and appear at trial); *In re Beef Indus. Antitrust*

Redacted Version
Publicly Filed

*Litig.*, 607 F.2d 167, 170 (5th Cir. 1979) (settlement agreement providing for, *inter alia,* "access

to [defendant's] records and employees for discovery purposes").  In addition, the settling party's

agreement to make itself available to testify is a reasonable condition of settlement.  *Minpeco*

*S.A. v. Hunt*, 127 F.R.D. 460, 462 (S.D.N.Y. 1989); *Varnelo v. Eastwind Transp., Ltd.*, No. 02

Civ. 2084 (KMW) (AJP), 2003 WL 230741, at *23 (S.D.N.Y. Feb. 3, 2003).

Defendants allege that Chevron has "used coercion and threat of financial ruin to pressure

Stratus . . . to testify favorably for Chevron." Dkt. 1422 at 9.  But Defendants base this assertion

on the bare fact that Chevron named Stratus as a defendant in this litigation, and that Stratus de-

cided to settle instead of proceed to trial.  *Id.* at 9-10.  Chevron did not improperly pressure Stra-

tus to settle.  Indeed, Stratus has acknowledged that "[w]hile discovery was ongoing, counsel for

the Stratus Defendants approached counsel for Chevron and expressed a desire to resolve these

parties' disputes and to cooperate with Chevron going forward."  Dkt. 933 at 2.

Under the settlement agreement between Chevron and Stratus, Stratus undertook "no ob-

ligations with respect to the substance of their testimony."  Dkt. 933 at 2; Dkt. 934-1 (Ex. 1) at 2.

As explained in Chevron and Stratus's joint motion to stay all deadlines as to Stratus, requiring

the "cooperation of a settling party in exchange for the release of claims is both reasonable and

proper to achieve settlement of the parties' disputes."  Dkt. 933 at 4.  Additionally, the settling

party's agreement to make itself available to testify is a proper and reasonable condition of set-

tlement.  *Id.*  Stratus "entered this agreement freely, at arms-length, with the advice of counsel,"

*id.* at 6, and did not "capitulate" to Chevron's "pressure," Dkt. 1422 at 10.

Defendants also allege that Chevron improperly pressured Burford to "flip" and to

"defam[e] Patton Boggs by threatening Burford with the prospect of being 'blackballed.'"  Dkt.

1422 at 11.  Defendants' effort to echo Chevron's own pressure campaign allegations does not

Redacted Version
Publicly Filed

withstand scrutiny.  Unlike Chevron, which has supported its claims with reams of documentary and testimonial evidence, Defendants' theory lacks any credible support, and indeed, often contradicts the evidence it claims as support.  Defendants rehash the same arguments they advanced in their motion to strike the Bogart Declaration and to which Chevron has already responded. *See generally* Dkt. 1297.  In particular, Defendants' claim that Chevron threatened Burford with the prospect of being "blackballed," which caused Burford to "flip," is incorrect and unsupported by the record.  Defendants rely on a single email that refers to alleged difficulties between Chevron and the law firm Latham & Watkins, not Burford.  Dkt. 1329 at 16-17.  Furthermore, Defendants' claims of "coercion" are belied by the fact that Burford agreed to finance and partially financed the litigation against Chevron knowing all about Chevron, the size of the company, and its purported influence in markets.  Burford is not an unsophisticated novice but a publicly-traded firm run by highly accomplished and well-funded individuals, including former senior executives and counsels of Fortune 500 companies, litigators at top international law firms, and former government officials.  Bogart himself is a former Executive Vice President and General Counsel of Time Warner, a former trial lawyer from Cravath, Swaine & Moore, and a former CEO of a publicly traded investment vehicle.  Stavers Ex. 4313.  To the extent the Lago Agrio investment was causing problems for Burford, it came not in the form of potential threats from Chevron, but from becoming embroiled in the LAPs' fraudulent scheme and Burford losing its vital reputation for integrity and truthfulness.  *See* Dkt. 1039-2 (Ex. 3687) (Bogart Decl.) at ¶¶ 2-3.  In the very email Defendants cite discussing "painful fallout" among certain law firms, Getto relates that the reason firms are shying away was not due to Burford's opposing Chevron but because Burford was viewed as "funding a fraud."  Dkt. 1324-10 (Ex. 71).[18]

---

[18]    Defendants also rehash their claims that the Bogart declaration is the product of "secret collaboration" between
[Footnote continued on next page]

Redacted Version
Publicly Filed

Finally, Defendants listed all four witnesses they now seek to exclude on their own witness list.  This waives any objection to Chevron calling these witnesses.  *See Rizzo v. Soc. Sec. Admin.*, 25 F. App'x 978, 983 (Fed. Cir. 2001) (unpublished) (party waived objections to a witness included on her witness list, "thus she clearly had no objection to his testifying").

## IV.   Defendants' Argument for Terminating Sanctions Does Not Apply to Chevron's Conduct—But Fits Their Own Obstructive Behavior

The relief requested by Defendants—terminating sanctions—is wholly inappropriate here.  The imposition of terminating sanctions is a "drastic remedy" that "should be imposed only in extreme circumstances, usually after consideration of alternative, less drastic sanctions." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999); *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 138 (S.D.N.Y. 2009).  Determining whether or not to impose terminating sanctions is within the discretion of the district court.  *Tatreau v. City of Los Angeles*, 310 F. App'x 995, 996 (9th Cir. 2009).

Defendants assert that Chevron's payments to Guerra have "so damaged the integrity of the discovery process in this case that there can be no 'assurance of proceeding on the true facts.'"  Dkt. 1422 at 1 (citing *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1096-97 (9th Cir. 2007)).  They demand terminating sanctions to put an end to "Chevron's intentional and unrelenting pattern of misconduct."  *Id.*

This is nonsense.  It is Defendants who have sought at every turn to avoid "proceeding on the true facts."  As this Court has found, "The LAP Representative[s], the Donziger Defendants, and their Ecuadorian allies have been remarkably obstructive in this case.  They have utterly refused to comply with court orders directing them to provide discovery of documents and infor-

---

[Footnote continued from previous page]
Chevron and Burford insiders, allegations which Chevron has already addressed.  Dkt. 1297 at 21-29.

Redacted Version
Publicly Filed

mation . . . The likelihood of further attempts to preclude or disrupt discovery is palpable." Dkt.

865. *See also* Dkt. 181 at 32 & n.115; *In re Chevron Corp.*, No. 1:10-mc-00002-LAK, Dkt. 151

(S.D.N.Y. Jan. 11, 2011). As Professor Nancy Moore has noted, "the efforts by Donziger . . . , in

various U.S. district court proceedings, to hide the truth concerning the ghostwriting of the

Cabrera Report violated [his] professional responsibilities under the rules of conduct applicable

to [] lawyers." Dkt. 958-21 (Ex. 21) at 4.

Defendants purport to rely on the *New Images* opinion for the proposition that Chevron's

conduct has prevented the "true facts" from coming to light. Dkt. 1442 at 1, 15, 24. But it is

*Defendants'* conduct in this litigation that parallels that at issue in *New Images*—not Chevron's.

For instance, the defendants in *New Images* "hid the identities and locations of former employ-

ees" in order to "frustrate effective discovery that would expose fraudulent" practices. *Id.* at

1095. Additionally, when the defendants "finally responded to the order compelling discovery,

their response approached contumaciousness." *Id.* Their responses "appear[ed] calculated to

prevent plaintiffs from learning and proving the truth." *Id.* Based upon the "contumacious"

conduct of the defendants in *New Images*, the court ordered terminating sanctions. *Id.* at 1097.

This case offers Defendants no support, to say the least.

## V.      There is No Basis to Exclude the Challenged Witnesses

Defendants request, in the alternative, that the Court "exclude any and all testimony and

evidence obtained through Guerra, Stratus scientists . . . , or Bogart." Dkt. 1422 at 3. This relief,

too, is inappropriate. Even if the Court were to find that Chevron payments were unreasonable,

the "appropriate remedy" is to "permit opposing counsel to fully explore the matter of compensa-

tion on cross-examination and summation, and to leave it for a properly instructed jury to con-

sider whether the payment made to the witness was, in fact, disproportionate to the reasonable

value of the witness's lost time and, if so, what effect, if any, that payment had on the witness's

Redacted Version
Publicly Filed

credibility." *Caldwell v. Cablevision Sys. Corp.*, 86 A.D.3d 46, 55 (2011). *See also United States v. Cresta*, 825 F.2d 538, 546 (1st Cir. 1987) ("courts have chosen to rely upon cross-examination to ferret out any false testimony"); *United States v. Birnbaum*, 373 F.2d 250, 256 (2d Cir. 1967) ("The established safeguards of the Anglo-American legal system leave the veracity of the witness to be tested by cross-examination."); *Jamaica Time Petroleum, Inc. v. Fed. Ins. Co.*, 366 F.2d 156, 158 (10th Cir. 1966) (payment of a witness "affects the credibility of the witness and the weight to be given his testimony"); *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 545 F. Supp. 1314, 1369-70 (S.D.N.Y. 1982) (holding that the remedy for challenges to witness payments is "to bring any such payments to the attention of the jury and for counsel to comment upon the possible effect of large payments upon a witness' credibility").

## CONCLUSION

For the foregoing reasons, Chevron requests that the Court deny Defendants' Motion to Impose Termination Sanction.[19]

Dated:  September 30, 2013                           Respectfully submitted,

---

[19] Defendants include in their motion an extensive footnote making a series of false allegations against Chevron's outside counsel.  The allegations arise out of unrelated litigation for an unrelated client, in which Gibson, Dunn represented Dole Food Company, Inc. in connection with claims against Dole arising out of banana farm operations in Nicaragua, including the attempted enforcement of a Nicaraguan judgment against the company.  California state courts conclusively rejected these claims, and the Southern District of Florida, and the Eleventh Circuit Court of Appeals rejected the Nicaraguan judgment as irremediably tainted.  When Dole unmasked the plaintiffs' extensive fraud—including having "coached their clients to lie about working on banana farms, forged work certificates to create the appearance that their clients had worked on Dole-contracted farms, . . . faked lab results to create the impression that their clients were sterile," and "tampered with witnesses"—plaintiffs attempted to fight back with baseless allegations that Dole had bribed witnesses. *Tellez v. Dole Food Co.*, Case No. BC312852, Cal. Super. Ct., Cnty. of L.A., Redacted Statement of Decision, ¶ 5–6, 94 (March 11, 2011).  Defendants here quote from Nicaraguan plaintiffs' court filings, but omit the rejection of these fabricated claims by the courts.  A California court found that these "allegations of bribery lack any credibility whatsoever" *Mejia v. Dole Food Co. & Rivera v. Dole Food Co.*, Case Nos. BC340049, BC379820, Cal. Super. Ct., Cnty. of L.A., Redacted Terminating Sanctions Order ¶¶ 120-123 (June 17, 2009), and that "Dole did not bribe witnesses and the purported evidence in support of plaintiffs' claims lacks credibility." *Tellez*, Redacted Statement of Decision ¶ 94.  And the United States District Court for the Southern District of Florida declined to even address the bribery allegations when it found conclusively for Dole. *Osorio v. Dole Food Co.*, 665 F. Supp. 2d 1307, 1312 fn.3, 1321, 1351 (S.D. Fla. 2009) *aff'd. Osorio v. Dow Chemical Co.*, 635 F.3d 1277 (11th Cir. 2011).  Defendants cannot plausibly claim to have been unaware of these facts, or believe these discredited allegations would carry any weight with the Court. *See* Dkt. 1141-4, Ex. 3722 at 1–2 (criticizing practice of making filings for the "purpose of permitting a libel-proof press release to be issued"); Fed. R. Civ. P. 11.

Redacted Version
Publicly Filed

New York, New York

　　　　　　　　　　　　　　　　　　　　　　　　　　　/s/ Randy M. Mastro
　　　　　　　　　　　　　　　　　　　　　　　　　Randy M.  Mastro
　　　　　　　　　　　　　　　　　　　　　　　　　Andrea E.  Neuman
　　　　　　　　　　　　　　　　　　　　　　　　　GIBSON, DUNN & CRUTCHER LLP
　　　　　　　　　　　　　　　　　　　　　　　　　200 Park Avenue
　　　　　　　　　　　　　　　　　　　　　　　　　New York, New York 10166
　　　　　　　　　　　　　　　　　　　　　　　　　Telephone: 212.351.4000
　　　　　　　　　　　　　　　　　　　　　　　　　Facsimile:  212.351.4035

　　　　　　　　　　　　　　　　　　　　　　　　　William E.  Thomson
　　　　　　　　　　　　　　　　　　　　　　　　　333 South Grand Avenue
　　　　　　　　　　　　　　　　　　　　　　　　　Los Angeles, California 90071
　　　　　　　　　　　　　　　　　　　　　　　　　Telephone: 213.229.7000
　　　　　　　　　　　　　　　　　　　　　　　　　Facsimile:  213.229.7520

　　　　　　　　　　　　　　　　　　　　　　　　　*Attorneys for Chevron Corporation*