UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHEVRON CORPORATION,<br><br>                Plaintiff,<br><br>    v.<br><br>STEVEN DONZIGER *et al.*,<br><br>                Defendants. | 11-CV-0691<br><br>The Honorable Lewis A. Kaplan, U.S.D.J.<br>The Honorable James C. Francis, U.S.M.J. |

**DEFENDANTS' MEMORANDUM OF LAW IN RESPONSE TO THE
COURT'S ORAL ORDER TO SHOW CAUSE ON WHY DEFENDANTS
SHOULD NOT BE DEPRIVED OF A JURY DESPITE CHEVRON'S
WITHDRAWAL OF ITS MONEY DAMAGES CLAIMS**

## PRELIMINARY STATEMENT

Defendant Steven R. Donziger, on behalf of Defendants Donziger & Associates, PLLC, the Law Offices of Steven R. Donziger, Hugo Gerardo Camacho, and Javier Piaguaje Payaguaje, (collectively, "Defendants") respectfully submit this motion to demand a jury trial on Chevron's RICO and fraud allegations as a matter of fundamental fairness required by the U.S. Constitution. The reasons are as follows:

**Fundamental fairness requires a jury trial**. Chevron demanded a jury when it filed the instant matter more than two years ago. It then used the explosive "thermonuclear" impact of the allegations – the "terrorizing" effect of civil RICO as another court has described it -- to launch a global smear campaign designed to destroy my reputation, chill my free speech rights, and drive me away from representing the Ecuadorian communities who are my clients. This campaign was promoted, encouraged, and amplified by the very court that Chevron now seeks to preside over a bench trial. Fundamental fairness requires a jury for these reasons alone, but there are others.

**Chevron has accused me of being a criminal**. This United States of America does not allow criminal prosecutions – even those brought via the mechanism of a "civil" statute like RICO – to happen without a jury. Chevron's counsel has repeatedly called me a "criminal" in open court; Chevron executives, including the company CEO, have called me "criminal" in public fora including on earnings calls with analysts and shareholders. It would amount to a travesty of justice to deny me and my clients a jury trial in what is essentially a private prosecution funded by corporate largesse.

**Chevron has not really dropped its damages claims, thus requiring a jury under the Seventh Amendment.** The Seventh Amendment requires a jury in this case because Chevron's stipulation that it will drop damages has is baseless—and a subterfuge. As set forth below, Chevron is simply masquerading damages as equity.

1

**BACKGROUND**

From the moment it filed the instant matter more than two years ago in February 2011, Chevron claimed before this Court and the public that it wanted a jury trial. Just days before that trial is set to commence where its proof finally could be put to the test before an impartial fact finder, Chevron retreated to the safe offices of a court that publicly announced in a related proceeding that Defendants were running "a giant game" to be "the next big thing in fixing the balance of payments deficit." *In re Chevron Corp.*, 10-MC-00002-LAK (S.D.N.Y.), September 23, 2010 Hearing Transcript at 78:11-13. Without as much as an evidentiary hearing, the Court freely characterized me as a "field general" and public relations flak, "orchestrating a campaign to intimidate the Ecuadorian judiciary" and going "far beyond the rendition of professional legal services." DI 181 at 35. The Court went so far as to suggesting I had "criminal" exposure without as much as considering responsive pleadings that it deemed waived after denying me time to get counsel. The current maneuver, seeking to have Your Honor (with all his documented biases readily obvious) try this case without the protection afforded by a jury, no doubt plotted a long time ago by Chevron lawyers without notifying the court or adversary counsel, offends the basic notions of fair play and due process that undergird our judicial system. It also means whatever outcome there is for the Defendants – and surely that outcome is entirely predictable if there is a bench trial before Your Honor given the conclusions already drawn – will lack legitimacy and credibility in courts throughout the world.

Shockingly, despite the importance of the question at hand, Defendants are still left scrounging in footnotes to figure out Chevron's (and the Court's) position on why it thinks it is so entitled to upend this case in this fashion now. After Defendants put the issue of our right to a jury squarely on the table Sept. 11 in an application for an Order to Show Cause, DI 1415,

Chevron responded with an opposition that failed to address this critical issue save for a single footnote.  DI 1433.  The Court followed suit, relying in a footnote on Chevron's single footnote.  DI 1436.  Defendants responded by moving for reconsideration to insist that the issue be addressed squarely.  DI 1442.  The Court responded a few business hours later, denying the motion and essentially just re-quoting its own footnote.  DI 1443.

Despite Chevron's and the Court's attempt to bury this issue in footnotes, it is, in Defendants view, "far and away the most important legal issue in this case."  DI 1415 at 1.  Chevron's devout wish is that by simply calling the relief it now demands "equitable" rather than legal money damages, it can make its worst nightmare—a jury of ordinary Americans sitting in judgment of its trumped-up claims in this case—disappear.  But Chevron's self-interested characterization is of no weight:

> [T]he conventional label that attaches to a given cause of action or remedy may not by itself tell us whether the claim is legal or equitable. 'Issues are not inherently legal or equitable. They are like chameleons which take their color from surrounding circumstances.' Thus, the determination of a claim's legal or equitable nature is highly contextual and is not governed by bright-line rules.

*Design Strategies, Inc. v. Davis*, 367 F. Supp. 2d 630, 637 (S.D.N.Y. 2005) (quoting 9 C. Wright & A. Miller, § 2302 (quoting Fleming James, *Right to a Jury Trial in Civil Actions*, 72 Yale L.J. 655, 692 (1963)).  As shown below, Chevron's claims, even after its historic reversal on money damages, are still founded on legal claims and factual issues that require jury consideration and determination.  And allowing Chevron to escape a jury now, after two and half years of intentional stigmatization of Defendants as criminals, would clearly violate Defendants' Seventh Amendment rights and raise serious due process concerns.

3

**ARGUMENT**

A.   **The Nature of Chevron's Claims, Rather Than The Relief It Seeks, Should Be Dispositive In The Unique Circumstances Here**

The role of the jury "as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care." *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 565, 110 S. Ct. 1339, 1344-45 (1990). The Seventh Amendment guarantees the right to a jury in civil cases for "suits at common law," and further guarantees the jury trial right for new and statutory causes of actions that are "similar to cases that were tried in courts of law." *Tull v. United States*, 481 U.S. 412, 417-18, 107 S. Ct. 1831, 1835 (1987). In determining whether the Seventh Amendment extends to these new causes of action, courts consider "***both*** the nature of the action and the remedy sought." *Id.* As Judge McMahon of this Court has explained:

> A two-step inquiry is required to determine when the jury right attaches: first, the court must consider whether the action would have been deemed legal or equitable in 18th-century England before the merger of courts of law and equity; second, the court must 'examine the remedy sought and determine whether it is legal or equitable in nature.'

*Maersk, Inc. v. Neewra, Inc.*, 697 F. Supp. 2d 300, 338 (S.D.N.Y. 2009) *aff'd sub nom. Maersk, Inc. v. Sahni*, 450 F. App'x 3 (2d Cir. 2011) (quoting *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989)). Judge McMahon's analysis highlights two points: first, even though the second (remedy) part of the two-part inquiry "is more important than the first," ***it is still a two-part inquiry***; second, the inquiry hinges not on the characterization of the relief by the plaintiff but on the "nature" of the relief upon examination by the court. *See also Stonewall Ins. Co. v. Nat'l Gypsum Co.*, 86 CIV. 9671 (JSM), 1992 WL 281401 (S.D.N.Y. Sept. 25, 1992) (withdrawal of damages did not dispose of jury trial right where claim was "essentially legal in nature");

4

*Windsurfing Intern., Inc. v. Ostermann*, 534 F. Supp. 581, 584-86 (S.D.N.Y. 1982) (finding that a preemptive effort to obtain declaratory relief of a legal issue, patent infringement, "cannot serve to extinguish any jury right to which Ostermann would be entitled if it proceeded to supply the sailboards . . . and Windsurfing sued it for infringement").

Here, the first part of the inquiry, however important it may be relative to the second part, is at least clear. With respect to RICO, "there can be no dispute that the [civil RICO] Defendants have a Seventh Amendment right to a jury trial." *Maersk*, 697 F. Supp. 2d at 340-341 (analyzing *NSC Int'l Corp. v. Ryan*, 531 F. Supp. 362 (N.D. Ill. 1981) (finding, after an analysis of comparable torts that would have been recognized as legal in 18th-century England, that a jury trial right attaches) and *Molloy v. Primus Auto. Fin. Servs.*, 247 B.R. 804 (C.D. Cal. 2000) ("It is undisputed that [defendant] has the right to a trial by jury on plaintiffs RICO . . . claims")). Similarly, "[it] goes without saying that the Seventh Amendment right to a jury trial attaches to common-law fraud claims." *Maersk*, 697 F. Supp. 2d at 341.

By contrast, the relief part of inquiry in this case, again however important it may be, has become so tangled and ravaged it is no longer comprehensible. Despite its piecemeal approach and tactical tardiness, Chevron has now dropped all its money damages against all Defendants. But what is left? On the RICO side, the issue of the availability of equitable relief to private litigants—another issue of fundamental importance which Chevron and the Court appear to be studiously ignoring despite Defendants' multiple pleas—is settled. There is no availability. DI 1468 at 18-21 (citing numerous circuit courts opinions holding that injunctive relief is not available to private litigants, as well as numerous decisions in this circuit analyzing the small, short-lived strain of contrary authority and concluding that it has been surpassed and that the unavailability of injunctive relief under § 1964(c) is clear).

5

The situation with respect to Chevron's claim to injunctive relief from its fraud claim is also infirm.  First, equitable relief must come from a showing of "irreparable harm and inadequacy of legal remedies," *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506-07 (1959); *Granfinanciera*, 492 U.S. at 48 (the "long-settled rule [is] that suits in equity will not be sustained where a complete remedy exists at law")—a showing Chevron has not established at this stage and cannot establish. Second, a prayer for equitable relief pendant on a legal claim cannot extinguish core jury trial rights that may attach to the claim at law.  *See Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 479 (1962) ("We conclude therefore that the district judge erred in refusing to grant petitioner's demand for a trial by jury on the factual issues related to the question of whether there has been a breach of contract. Since these issues are common with those upon which respondents' claim to equitable relief is based, the legal claims involved in the action must be determined prior to any final court determination of respondents' equitable claims.).  Third, the equitable injunctive relief that Chevron would draw from its fraud claim is highly problematic.  Once again, the Court has a duty to examine the "nature" of the equitable relief claimed.  *See Maersk*, 697 F. Supp. 2d at 338; Wood, 369 U.S. at 477 ("the constitutional right to trial by jury cannot be made  to depend upon the choice of words used in the pleadings"). Here, Chevron, in its pretrial submission, openly asserts entitlement to relief flatly enjoining the "filing or prosecuting [of] any action for recognition or enforcement of the [Ecuadorian] Judgment" as far as might allowed by the Court's jurisdiction, and "[s]eeking or receiving any payment, compensation, or other benefit from the enforcement of the [Ecuadorian] Judgment" on a presumably global basis.  This relief, while it may not be identical, is obviously and perilously close to the relief the Court entered and the Second Circuit vacated in the Count 9 action. *Chevron v. Naranjo*, 667 F.3d 232, 242 (2d Cir. 2012) (vacating Count 9 injunction because "it

is, in reality, an anti-enforcement injunction"). While not as flatly unprecedented and unfounded as the relief entered in that action, the "new" injunctive relief under fraud is also highly disfavored. *See, e.g.*, *Fairchild, Arabatzis & Smith, Inc. v. Prometco*, 470 F. Supp. 610 (1979) (barring injunction to prevent enforcement of British judgment); *Humphreys v. Leggett*, 50 U.S. 297, 309-11 (1850) ("[t]his court has gone far to systematize the rules which should limit the interference of equity to restrain parties from using and enforcing judgments at law"); *Truly v. Wanzer*, 46 U.S. 141 (1847). It also directly and negatively impacts the international comity concerns discussed at length by *Naranjo*, namely that United States courts are not "transnational arbiter(s) to dictate to the entire world which judgments are entitled to respect and which countries' courts are to be treated as international pariahs." *Naranjo*, 667 F.3d at 242.

> A decision by a court in one jurisdiction, pursuant to a legislative enactment in that jurisdiction, to decline to enforce a judgment rendered in a foreign jurisdiction necessarily touches on international comity concerns. . . . That inquiry may be necessary, however, when a party seeks to invoke the authority of our courts to enforce a foreign judgment. But when a court in one country attempts to preclude the courts of every other nation from ever considering the effect of that foreign judgment, the comity concerns become far graver. In such an instance, the court risks disrespecting the legal system not only of the country in which the judgment was issued, but also those of other countries, who are inherently assumed insufficiently trustworthy to recognize what is asserted to be the extreme incapacity of the legal system from which the judgment emanates. The court presuming to issue such an injunction sets itself up as the definitive international arbiter of the fairness and integrity of the world's legal systems.

*Id.* at 243-244. Out of the hat of a highly controversial third-party state law fraud claim, Chevron wants this Court to magically pull out a global injunction that would not only have the same practical effect as the vacated Count 9 injunction, but in so doing would raise exactly the same comity concerns identified by *Naranjo*. Chevron may go even further and ask this Court to pull an entire RICO trial—unsupported by any form of possible RICO relief—out of the same magic hat. After *Naranjo*, the Court should be weary of entertaining Chevron's demands for

7

judicial wizardry of this sort.

In sum, even taking the two-part inquiry on the jury trial right that Chevron cannot avoid and may even agree with, the first prong of the inquiry on the fundamental nature of the claims should govern here because it is strong and clear while the second part of the inquiry on the nature of relief leaves nothing to stand on upon due examination.

**B.       Eviscerating Defendants' Right To Jury Vindication In Light Of The Manner In Which Chevron Has Chosen To Prosecute Its Claims Would Violate Defendants' Seventh Amendment Rights And Work A Manifest Injustice**

It would also, in the context of this case, be abusive and run against the core principles underlying the constitutional guarantee to a civil jury.[1] Courts have recognized that these

---

[1] Although our modern discussion tends to draw sharp lines between the jury trial right in criminal and civil matters, the historical and constitutional understanding significantly intertwined the two. *See Parsons v. Bedford, Breedlove & Robeson*, 28 U.S. 433, 446, 7 L. Ed. 732 (1830) (observing that the right to trial by a civil jury in particular "has always been an object of deep interest and solicitude, and every encroachment upon it has been watched with great jealousy . . . . One of the strongest objections originally taken against the constitution of the United States was the want of an express provision securing the right of trial by jury in civil cases . . . as fundamental guarantee of the rights and liberties of the people."). The function of a jury of ordinary individuals as a "vital check against the wrongful exercise of power," *Powers v. Ohio*, 499 U.S. 400, 411-12 (1991), applies not only in the context of a government prosecution but in those rare civil cases like this one where a civilian entity is given latitude by official authority to effect a private prosecution, employing not only equal but in fact far greater resources to the task than would any government prosecutor. *See* 4 THE COMPLETE ANTI-FEDERALIST 149 (H. Storing ed. 1981) (Letters of Centinel) (the jury trial "preserves in the hands of the people that share which they ought to have in the administration of justice, and prevents the encroachments of the more powerful and wealthy citizens.") (citing 3 BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 379-80). The jury also plays a key role in maintaining the legitimacy of the courts as fact-finding institution by connecting the fact-finding function to an institution—the jury—that draw from a deep well of public trust. *See Delavantura v. Columbia Acorn Trust*, 417 F. Supp. 2d 147, 155 (D. Mass. 2006) ("a judicial system cannot long continue to command the respect and moral authority of the people it serves unless the judicial edicts are actually based on facts -- facts found by American juries wherever the Constitution so demands"); *Balzac v. Porto Rico*, 258 U.S. 298, 310 (1922) ("One of [the jury system's] greatest benefits is in the security it gives people that they, as jurors actual or possible, being part of the judicial system of the country can prevent its arbitrary use or abuse."); 4 THE COMPLETE ANTI-FEDERALIST at 149 ("[I]f the power of judging were entirely trusted with the magistrates, or any select

fundamental principles are especially implicated when a civil plaintiff seeks to invoke criminal law or concepts, or even just the stigmatizing language of criminal law, in prosecuting its case. *See, e.g.*, *Cunningham v. State*, 835 N.E.2d 1075, 1079 (Ind. Ct. App. 2005) (civil fines were quasi-criminal and "jury trial must be honored"); *Boyd v. United States*, 116 U.S. 616, 634-35 (1886) (finding criminal procedure protections available to litigant in civil action where the "substance and effect [of the action was] a criminal one"). This concern, of course, is at its highest in the context, which one court has described as "the litigation equivalent of a thermonuclear device" that carries "an almost inevitable stigmatizing effect on those named as defendants." *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996).

> The terrorizing aspect of a RICO charge conjures dreadful images of the defendant's involvement in the racketeering schemes of the prototypical colorful mobsters and violent thugs who ordinarily fill the plots of organized crime. For plaintiffs seeking to score a tactical edge or to deal the heaviest possible vengeful blow to the defendant's personal reputation, shocking RICO accusations may serve to strengthen their hand or induce sooner capitulation in any settlement discussions. The extraordinary costs associated with defending complex charges may also inflict added pain and provide defendants greater incentive to curtail RICO litigation.

*Gross v. Waywell*, 2009 U.S. Dist. LEXIS 52599 (S.D.N.Y. June 16, 2009). Chevron's attempts to capitalize on the quasi-criminal underpinnings of civil RICO and implement its "stigmatizing" and "terrorizing" effect on Defendant Steven Donziger in particular are legion and entirely obvious. *See, e.g.*, DI 1474 at 2 (calling Defendants "criminals"); DI 45-1 (Defendants have "committed numerous criminal acts").[2] Aside from being defamatory and unethical, these

---

body of men, named by the executive authority, their decisions, in spite of their own natural integrity, would have a biass [sic] towards those of their own rank and dignity; for it is not to expected, that the few should be attentive to the rights of the many.").

[2] Council on Foreign Relations, *The Case for U.S. Multinationals*, Nov. 29, 2012 (on-the-record forum with Chairman and CEO of Chevron, John Watson), *at* http://www.cfr.org/business-and-foreign-policy/case-us-multinationals/p29593 ("I'm not going to pay criminal[s]"); Deposition of John Watson, June 27, 2013, at 201-204

particularly malicious and manipulative attempts by Chevron to publicly indict Defendants should block the company from cutting off Defendants' fundamental right to seek vindication in front of a jury of their peers.

Courts have recognized similar concerns where the plaintiff seeks punitive relief—both as to damages and as to any equitable relief sounding in a need to punish alleged inequitable conduct. *See, e.g.*, *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 54, 111 S. Ct. 1032, 1062 (1991) (because "punitive damages are quasi-criminal punishment" there is a need for "strong procedural safeguards"); *Austin v. United States*, 509 U.S. 602, 621-22, 113 S. Ct. 2801, 2812 (1993) (finding that where a civil forfeiture remedy is punishment it is subject to the limitations of the Eight Amendment's Excessive Fines Clause); *cf. U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*, 44 F.3d 1082 (2d Cir. 1995) (Heaney, J., dissenting) (civil RICO actions where "remedies go beyond rough compensation must be considered quasi-criminal" and therefore inappropriate to decide on summary judgment). The relief requested by Chevron in this case—indeed this entire case, from start to finish—is fundamentally punitive and even retaliatory in nature.

**C.    Were the Court To Allow Chevron To Reinstate Its Unjust Enrichment Claims, A Jury Trial Would Be Necessary To Decide Underlying Factual Questions And Damages**

Chevron's attempt to reinsert its unjust enrichment claim back into this proceeding, if granted by the Court (which would be unwarranted, since Chevron's latest attempt provides even less evidence of actual, substantial enrichment by Defendants as the Court has plainly required, see DIs 889, 467 at 47-48), constitutes another ground on which the Court should refuse to shift tactics and deny Defendants a jury at this stage. Were Chevron able to transform this trial into a

---

(clarifying that when Mr. Watson publicly refers to "people that have committed crimes against us" he means Mr. Donziger and the Defendants).

bench trial and later succeed on reinstating its unjust enrichment claim, significant parts of the case if not the whole case would have to be re-tried in front of a jury in order to allow a jury to make the necessary factual findings on which the Court could then base any finding of equitable relief under unjust enrichment.  *See* N.Y. Pattern Jury Instr.--Civil 4:2 (3d ed. 2013) (while the question of "whether equitable considerations warrant a finding of unjust enrichment" may be for the court, "it is for the jury to determine whether the facts are as claimed").  It is also for the jury to determine "whether there was actually a net benefit conferred on defendant." *Id.*

Similar to the analysis above, while an unjust enrichment claim may be equitable in nature, the remedy sought must still be examined to determine whether the jury right attaches. *See The Daisy Group, Ltd. v. Newport News, Inc.*, 999 F. Supp. 548, 552 (S.D.N.Y.1998) ("If Daisy's claim for profits is legal in nature, a jury right exists despite plaintiff's requests for other relief that is equitable.").  This Court has highlighted the difference between unjust enrichment claims that go to genuine restitution or disgorgement and those that serve as "a rough proxy measure of plaintiff's damages." *Daisy Group*, 999 F. Supp. at 552 (quoting *George Basch Co., Inc. v. Blue Coral, Inc.*, 968 F.2d 1532, 1538 (2d Cir. 1992)); *Empresa Cubana Del Tabaco v. Culbro Corp.*, 123 F. Supp. 2d 203 (S.D.N.Y. 2000) (explaining that while pure disgorgement may be wholly equitable, "the issue becomes clouded when a claim for an accounting is substituted for a damage claim") (citing *Basch* and *Alcan Int'l Ltd. v. The S.A. Day Manufacturing Co., Inc.*, 179 F.R.D. 398, 402 (W.D.N.Y.1998)).

Chevron's demand for unjust enrichment is clearly "a rough proxy measure" of alleged damages.  To the degree the harm for which Chevron seeks "restitution" is the mere entry of judgment against it, restitution is foreclosed by *Naranjo*.  To the degree it is the harm of lost property and profits, these are damages—exactly as they are listed in Chevron's pretrial

submission, intertwined with other damages such as efforts to resist enforcement. Tellingly, Chevron cannot point to any discrete figure that must be restored or disgorged, but rather intends to prove up its harm at trial through a complex damages analysis. *See* Expert Report of Weston Anson (Confidential) (offering a tripartite conclusion is that the enterprise value of a company using Chevron's IP in Ecuador is approximately $232 million, while the value of the IP itself ranges from $23-28 million depending on the method used); Expert Report of David Stowell (assessing alleged damages caused by the Argentine embargo as ranging from $705,239-$1,599,180). Determination of whether these damages actually occurred, their true quantum, and whether Defendants as a factual matter were "enriched" by them are all factual matters that cannot be abrogated from the jury by Chevron's *ipse dixit* characterization of them as unjust enrichment of Defendants. *See Barry v. Edmunds*, 116 U.S. 550, 565 (1886) ("where no precise rule of law fixes the recoverable damages, it is the peculiar function of the jury to determine by their verdict"); *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935) (recognizing Seventh Amendment right "to have a jury properly determine the question of liability and the extent of the injury by an assessment of damages").

## CONCLUSION

For the foregoing reasons, the Court should affirm Defendants' right to a jury in this case.

Dated: October 4, 2013　　　　　　　　　Respectfully submitted,
　　　　　New York, New York

　　　　　　　　　　　　　　　　　　　　   *s/ Steven R. Donziger*
　　　　　　　　　　　　　　　　　　　Steven R. Donziger
　　　　　　　　　　　　　　　　　　　245 W. 104th Street, #7D
　　　　　　　　　　　　　　　　　　　New York, NY 10025
　　　　　　　　　　　　　　　　　　　Tel: (917) 678-3943
　　　　　　　　　　　　　　　　　　　Fax: (212) 409-8628
　　　　　　　　　　　　　　　　　　　Email: StevenRDonziger@gmail.com

　　　　　　　　　　　　　　　　　　　*Pro Se*

　　　　　　　　　　　　　　　　　　　   *s/ Steven R. Donziger*
　　　　　　　　　　　　　　　　　　　Steven R. Donziger
　　　　　　　　　　　　　　　　　　　245 W. 104th Street, #7D
　　　　　　　　　　　　　　　　　　　New York, NY 10025
　　　　　　　　　　　　　　　　　　　Tel: (212) 570-4499
　　　　　　　　　　　　　　　　　　　Fax: (212) 409-8628
　　　　　　　　　　　　　　　　　　　Email: StevenRDonziger@gmail.com

　　　　　　　　　　　　　　　　　　　*Attorney for Defendants Law Offices of Steven R. Donziger and Donziger & Associates, PLLC*

　　　　　　　　　　　　　　　　　　　*s/ Julio C. Gomez*
　　　　　　　　　　　　　　　　　　　Julio C. Gomez
　　　　　　　　　　　　　　　　　　　GOMEZ LLC
　　　　　　　　　　　　　　　　　　　The Sturcke Building
　　　　　　　　　　　　　　　　　　　111 Quimby Street, Suite 8
　　　　　　　　　　　　　　　　　　　Westfield, NJ 07090
　　　　　　　　　　　　　　　　　　　Telephone:  908.789.1080
　　　　　　　　　　　　　　　　　　　Facsimile:  908.789.1080
　　　　　　　　　　　　　　　　　　　Email:  jgomez@gomezllc.com

　　　　　　　　　　　　　　　　　　　*Counsel for Defendants Hugo Gerardo Camacho Naranjo and Javier Piaguaje Payaguaje*