**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                  :

CHEVRON CORPORATION,          :

             Plaintiff,       :

                    :

       v.                :   11 Civ. 0691 (LAK)

                    :

STEVEN DONZIGER, *et al.*,     :

             Defendants.   :

                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


### CHEVRON CORPORATION'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS RENEWED MOTION FOR REINSTATEMENT OF ITS UNJUST ENRICHMENT CLAIM (COUNT 6)


**\*\*FILED UNDER SEAL PURSUANT TO THE PROTECTIVE ORDER\*\***
**\*\*REDACTED PUBLIC VERSION\*\***


GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

*Attorneys for Plaintiff Chevron Corporation*

## I.      PRELIMINARY STATEMENT

Chevron Intellectual Property LLC ("Chevron IP") no longer has the right to control the use, sale, or licensing of its trademarks in Ecuador, or to receive income based on them.  Supplemental Declaration of Adolfo Callejas ("Callejas Supp. Decl.") at ¶ 14.  Chevron IP has been effectively stripped of its rights of ownership, and in fact, as of last week, Ecuador's official intellectual property registry now lists Chevron IP as "owner (prior to the attachment)," including for trademarks such as the following:



MINISTRY OF INDUSTRIES AND COMMERCE.
ENTRY AND REGISTRATION OF THE TRADEMARK CALLED:
"CHEVRON DESIGN IN BLUE WHITE AND RED"
NATIONALITY: AMERICAN
ORDER NUMBER: FOUR HUNDRED NINETEEN (419)
DECREE ORDAINING THE ENTRY AND REGISTRATION OF THE TRADEMARK #
1126

*See* Callejas Supp. Decl. at ¶ 9, Ex. 4604 at 3; ¶ 7, Ex. 4602.  Chevron's unjust enrichment claim is, therefore, without question now ripe, and the Court should reinstate it.

The LAPs already told the Ecuadorian court that, once attached in their favor, Chevron IP's trademarks could be sold at auction for hundreds of millions of dollars and the revenue streams on existing licenses could be collected.  Dkt. 785-11 at 21–30.  And having executed on the Ecuadorian court's October 15, 2012 and September 9, 2013 orders through annotating the registrations with proof of these attachment orders, the IEPI is now the "legal custodian" of the attached trademarks and the attachment is complete:



ECUADORIAN INSTITUTE OF INTELLECTUAL PROPERTY. *General Secretary.* Quito, on September 27, 2013. CERTIFIED: The asset freeze placed on the product trademark registered under No. 419-70, is annotated in the electronic document pursuant to the decree issued by the Presidency of the Provincial Court of Sucumbíos, within the Summary Verbal Proceeding # 0002-2003-P-CPJS, contained in the court orders of October 15, 2012 and September 09, 2013, notice having been giving to the IEPI [Ecuadorian Institute of Intellectual Property] by way of the Official Letters No. 196-P-CPJS-2012, and No. 0144 –P-CPJS-2013, respectively, to which I hereby certify

Dkt. 1472-2; Callejas Supp. Decl. ¶¶ 6, 9, Ex. 4601.  As a result, the LAPs presently have constructive possession of Chevron IP's trademarks, which the LAPs contend are part of "Chevron's

intellectual property" assets (Dkt. 785-11 at 21) in Ecuador, and, by operation of the Ecuadorian court's orders, enjoy beneficial ownership "over all royalties and any type of income" generated by these trademarks, now or in the future.  Dkt. 785-2 at 5; Dkt. 1472, ¶ 8.  Chevron IP is now stripped of its right to use these trademarks within Ecuador's borders.  Callejas Supp. Decl. ¶ 6, Ex. 4601.[1]  And while the LAPs enjoy beneficial ownership of the trademarks today, their interest in these marks is now being monetized through an auction sale or collection on the licenses associated with 13 of the trademarks, which will now necessarily occur by operation of law.  *See* Dkt. 785-11 at 21.  Chevron's unjust enrichment claim should be reinstated to establish a constructive trust in Chevron's favor and disgorgement of any revenues or royalties collected now, or in the future, as a result of the taking of these marks.

Nothing in the LAPs' opposition even attempts to refute these dispositive facts.  Chevron's motion should be granted.

## II.   ARGUMENT

### A.   The IEPI's Actions Transfer Control of Chevron IP's Assets in Ecuador to the LAPs

Notwithstanding the LAPs' latest claim that Chevron's intellectual property remains outside their "control," the LAPs previously conceded that, once these assets are attached, the LAPs will have successfully enforced the fraudulent Lago Agrio judgment.  In their September 26, 2012 filing seeking to enforce the fraudulent $19 billion judgment, the LAPs characterized the "Intellectual Property of Chevron" as "property in Ecuador that the plaintiffs seek to attach here, so it can later be auctioned."  Dkt. 785-11 at 21.  The LAPs sought (and were granted) the at-

---

[1]  Chevron appreciates the Court's willingness to hear this argument, once again, and the prompt scheduling of this motion by Order to Show Cause and its related briefing.  With trial set to begin in less than one week, it would be especially helpful to know as soon as possible whether this claim will be part of Chevron's case-in-chief.  Accordingly, Chevron has filed this reply in support of reinstatement of its unjust enrichment claim more than 24 hours in advance of when it is due.

tachment of Chevron's intellectual property to ensure that "[e]ven if Chevron abandoned many of its activities in the country," Chevron's "residual property, tangible and intangible, in Ecuador," would be "protected and executed, in order to satisfy . . . the plaintiffs' rights." *Id.*

Dissatisfied that one year after Embargo Orders were entered in their favor, attachment orders entered against Chevron IP were still not forthcoming from IEPI, Pablo Fajardo, as counsel for the LAPs, once again asked the Ecuadorian Court to intervene.  Specifically, on September 5, 2013, the LAPs sought a court order directing IEPI to complete the "attachment ordered on Chevron, Texaco, Havoline, and Ursa brands, among others, together with all of their distinctive/associated signs," and "be advised that it is being legally established as custodian of the attached property."  Dkt. 1472-1 at 2.  Just four days later on September 9, 2013, the court (1) ordered IEPI to "immediately make a margin note for each of the titles of the brands and distinctive signs so they reflect the ordered attachment" of Chevron IP's assets in Ecuador and (2) advised IEPI that "it is hereby established as the legal custodian of the attached property." Dkt. 1472-2 at 3.

IEPI, in a letter dated October 3, 2013, has now confirmed that it has completed the attachment of Chevron IP's assets in Ecuador and taken custody of its trademarks.  Callejas Decl. Ex. 4604.[2]  The letter identifies Chevron IP as "owner (prior to the attachment)," but now through completion of the attachment and transfer of custody to IEPI, the LAPs enjoy constructive possession of these trademarks.  The LAPs suggest to this Court that their successful at-

---

[2]  The letter explains that of the 50 trademarks held in Chevron IP's name and identified by the Court in its September 9, 2013 order, eight have expired for failure to renew their registrations and 13 are subject to a licensing agreement with Swissoil for which the Court issued prior orders permitting Swissoil to continue to use the marks under its license agreement with Chevron IP, notwithstanding any subsequent attachment, auction and sale of the trademarks to a third party when the license will then be transferred to that party.

tachment of these trademarks has not "enriched" them—that something more must happen.[3]
This is a distinction of form, not substance.  While the LAPs have not yet monetized the trade-
marks through auction or by tapping a licensing revenue stream that is already in place—both of
which were contemplated in their enforcement motion (Dkt. 785-11 at 21)—the LAPs' "*control*"
over trademarks that were previously in Chevron IP's control and for which Chevron IP was the
identified "owner," "prior to the attachment," suffices to re-instate Chevron's claim.  Ex. 4604;
Dkts. 1471 at 5, 1472 ¶¶ 8, 9, 11.  The LAPs now may do with these trademarks what they
please.  Therefore, without reinstatement of Count 6, Chevron will have no recourse through
which to obtain equitable relief.

**B.    New York Law Governs Chevron's Unjust Enrichment Claim**

Defendants litigated the viability of Chevron's unjust enrichment claim under New York
law for two years before making an about-face in March 2013 and asserting that Ecuadorian law
applied.  As Chevron argued in response to that change of position, "The LAPs should not be
permitted to assert an argument they have long since forfeited."  Dkt. 885 at 8-9; *see also* Dkt.
601 at 25–26; Dkt. 634; Dkt. 420 at 11–14; Dkt. 444 at 11–14; Dkts. 468, 889 (applying U.S. law
to Chevron's unjust enrichment claim); *Tehran-Berkeley Civil & Envtl. Engineers v. Tippetts-*

---

[3]  The LAPs' suggestion that the pendency of an appeal of the fraudulent Lago Agrio judgment has any
relevance is misplaced.  The LAPs have touted that the judgment is enforceable within Ecuador now.
The LAPs have pursued and obtained enforcement orders in Ecuador and Argentina, *e.g.*, Dkt. 785-11
(Ex. K); Dkt. 784-3 (Ex. 3295), and the LAPs enforcement efforts in Brazil and Canada are still pend-
ing.  *See* Dkt. 549-4 (Ex. 2424); Dkt. 1141-2 (Ex. 3707).  Using the appellate process in Ecuador to
their strategic advantage, the LAPs would require Chevron to wait for the courts of Ecuador to re-
solve all appeals while they continue enforcing the fraudulent judgment in Ecuador and around the
world. The LAPs' suggestion that the pendency of an appeal of the fraudulent Lago Agrio judgment
has any relevance is misplaced.  The LAPs have touted that the judgment is enforceable within Ecua-
dor now.  The LAPs have pursued and obtained enforcement orders in Ecuador and Argentina, e.g.,
Dkt. 785-11 (Ex. K); Dkt. 784-3 (Ex. 3295), and the LAPs' enforcement efforts in Brazil and Canada
are still pending.  See Dkt. 549-4 (Ex. 2424); Dkt. 1141-2 (Ex. 3707).  Using the appellate process in
Ecuador to their strategic advantage, the LAPs would require Chevron to wait for the courts of Ecua-
dor to resolve all appeals while they continue enforcing the fraudulent judgment in Ecuador and
around the world.  This makes no sense, and does not preclude this court from according equitable re-
lief if Chevron prevails at trial.

*Abbett-McCarthy-Stratton*, 888 F.2d 239, 242 (2d Cir. 1989) ("The parties' briefs . . . rely on

New York law.  Under the principle that implied consent to use a forum's law is sufficient to es-

tablish choice of law, we will apply New York law to this case.") (citations omitted)).  Indeed,

Defendants also have changed position on the predicate question of whether Ecuadorian law rec-

ognizes an unjust enrichment claim, having included an $8.3 billion unjust enrichment claim

against Chevron in their ghostwritten Cabrera Report.  *See* Dkts. 9-2 at 27–29; Dkt. 104-2 (Belt-

man and Donziger discussing unjust enrichment recommendation in Cabrera Report less than

two days before it is filed).  Irrespective of the LAPs' waiver, because Chevron's unjust enrich-

ment claim sounds in tort, choice of law is determined by the situs of the tort.  *See Hughes v.*

*LaSalle Bank*, 419 F. Supp. 2d 605, 617 (S.D.N.Y. 2006).  Chevron Corporation is a U.S. com-

pany that was harmed in the U.S.  Further, Defendants orchestrated their fraud from New York.

Thus Ecuadorian law cannot, and does not, apply.[4]  Indeed, in *Prime Mover Capital Partners*

*L.P. v. Elixir Gaming Technologies, Inc.*, this Court applied the tort-based interest analysis to de-

cide that New York law applied to various claims, including unjust enrichment, because "many

of the acts charged, . . . including the preparation and dissemination of materially false and mis-

leading information, occurred in substantial part in [New York] and that a substantial part of the

events or omissions giving rise to the claims . . . occurred in [New York.]"  2012 WL 4714799,

at *13 (S.D.N.Y. Sept. 27, 2012) (Kaplan, J.).  As Chevron explained to the Court in March

2013, Ecuador cannot be said to have the "greatest interest in regulating the tortious conduct al-

leged in this action."  *Prime Mover Capital Partners L.P. v. Elixir Gaming Technologies, Inc.*,

2012 WL 4714799, at *13 (S.D.N.Y. Sept. 27, 2012) (Kaplan, J.). New York's interest in enforc-

---

[4]  Both Chevron Corporation and Chevron Intellectual Property LLC are corporations registered in the
United States.  While these are separate and distinct legal entities, Defendants successfully argued to
the Ecuadorian court that the assets of Chevron subsidiaries were legally equivalent to the assets of
Chevron Corporation.  *See* Dkt. 785-2 at 1-3.  Defendants are therefore estopped from contradicting
that falsehood to this Court.  *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 141 (2d Cir. 2000).

ing its fraud and unjust enrichment laws against actions taken there is significant, while Ecuador

has little interest in enforcing its laws against fraud committed in the United States.  Application

of New York law to all enrichment the LAPs receive would ensure predictability and uniformity

of result and prevent the LAPs from forum shopping to enforce their fraudulent judgment in ju-

risdictions that do not recognize unjust enrichment claims, which the LAPs as much as admit to

here.[5]

## C.   "Evidence of Contamination" Has No Relevance to This Action

Chevron has been arguing the same underlying factual predicates related to the LAPs' at-

tachment of Chevron IP's assets for months now.  It even submitted an expert report ███████

█████████████████████████████████████████████████████  and it intends to call the report's

author, Weston Anson, in the upcoming trial.  Dkt. 1492-1; *see also* Supplemental Declaration of

Randy Mastro, Ex. 4608 (May 28, 2013, Supplemental Report of Weston Anson███████████

███████████████████████████████████████████████████████████).  The

only new facts, and indeed, the ones most relevant at this time, are that the LAPs have perfected

the embargo of the trademarks, obtained a beneficial interest in the marks and any proceeds,

thereby relegating Chevron IP to the official status of "prior"  holder of control of the assets and

---

[5]   Chevron responded to Defendants' identical choice of law argument previously and herby incorpo-
rates those arguments by reference.  *See* Dkt. 885 at 8-10.  The single case Defendants cited in sup-
port of their March 2013 argument that the laws of Ecuador should apply here, and which they recy-
cled yesterday, is *In re Rezulin Prods. Liab. Litig.*, 392 F. Supp. 2d 597, 619 (S.D.N.Y. 2005)
(Kaplan, J.).  This Court expressly noted in *In re Rezulin Products Liability Litigation*, that the unjust
enrichment claim there "d[id] not clearly resemble a contract or a tort."  392 F. Supp. 2d 597, 618
n.117 (S.D.N.Y. 2005).  Even if this Court were to apply the *Rezulin* Restatement analysis, however,
Ecuadorian law would still not apply.  *Rezulin*'s restitution analysis is a balancing test, and while "the
place where the benefit or enrichment was received 'will *usually* be [the contact] of greatest im-
portance with respect to most issues,'" it is not a bright line test.  *Rezulin*, 392 F. Supp. 2d at 618
(emphasis added).  Here, the LAPs' agents are pursuing an extensive fraud directed, implemented,
and funded from the United States, indeed, largely from New York and directed at a U.S.-based com-
pany.  That aspects of this particular enrichment took place in Ecuador is incidental to the broader
scheme giving rise to the enrichment, which has been conducted from New York.  Thus, even under
the Restatement's restitution analysis the "act conferring the benefit" is the dominant factor, *see id.*,
and here that is the LAPs' team's fraudulent scheme (and not IEPI's ministerial attachment orders).

triggered an imminent auction for the LAPs" benefit.  *See* Callejas Supp. Decl. at ¶ 7, Ex. 4602,

¶ 14.  The LAPs know all this, and have far greater access to the relevant evidence than does

Chevron.  Accordingly, there is no discovery needed to assess these facts, which are, moreover,

demonstrated on the face of the registrations of the trademarks the LAPs sought and obtained.

Ex. 4601.  The embargo process is one the LAPs themselves instigated, and when it was not

competed to their satisfaction, they pursued, and obtained, additional relief from the Ecuadorian

court.

Hoping to reopen discovery into areas that the Court ruled on months ago and delay final

adjudication of Chevron's equitable claims, the LAPs claim that unjust enrichment cannot be

evaluated without re-litigating the merits of environmental audits and inspections on which the

fraudulent judgment was purportedly based.  This contention is absurd.  This Court found many

months ago that purported evidence about contamination is irrelevant to the scheme of wrongdo-

ing that has formed the basis for Chevron's complaint.[6]  And while certain types of judgments

may, under certain circumstances, be immune from an unjust enrichment, "a conclusion that one

party has obtained benefits from another by fraud is also one of the most recognizable sources of

unjust enrichment"—and whether the Ecuadorian judgment is entitled to recognition is at issue

in this case.  Restatement (Third) of Restitution and Unjust Enrichment § 13.  Given that the

LAPs have already begun collecting on their fraudulent judgment through attachment of Chevron

IP's assets in Ecuador, a just outcome will require the equitable remedies available from a claim

against the LAPs for unjust enrichment.

---

[6] Chevron has represented that it "intends to prove that the Lago Agrio litigation was pursued in a cor-
rupt and fraudulent manner," Dkt. 705 at 3-4, and on that basis the Court confirmed that Chevron's
"sham litigation" allegations "shall not be construed as making any assertions with respect to the en-
vironmental conditions existing in the Oriente in the 1960s to the 1990s …." Dkt. 720 at 2.  Accord-
ingly, at that time it denied Defendants' "so-called 'science and environmental discovery requests'"
as exceeding "even the broad scope of relevant discovery" because "the Ecuador pollution case is not
to be retried here." Dkt. 901 at 1-2.

### III.   CONCLUSION

For the foregoing reasons, Chevron requests that the Court reinstate Chevron's claim for

Unjust Enrichment against the LAPs.

Dated: October 9, 2013                               Respectfully submitted,

New York, New York                                  GIBSON, DUNN & CRUTCHER LLP

                                                    /s/ Randy M. Mastro
                                                    _____

                                                    Randy M. Mastro
                                                    Andrea E. Neuman
                                                    200 Park Avenue
                                                    New York, New York 10166
                                                    Telephone: 212.351.4000
                                                    Facsimile: 212.351.4035

                                                    William E. Thomson
                                                    333 South Grand Avenue
                                                    Los Angeles, California 90071
                                                    Telephone: 213.229.7000
                                                    Facsimile: 213.229.7520

                                                    Attorneys for Chevron Corporation