UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CHEVRON CORPORATION,

                    Plaintiff,

                -against-                              11 Civ. 0691 (LAK)

STEVEN DONZIGER, et al.,

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## OPINION ON MOTIONS TO
## COMPEL AND FOR SANCTIONS

Appearances:

                        Randy M. Mastro
                        Andrea E. Neuman
                        Scott A. Edelman
                        William E. Thompson
                        GIBSON, DUNN & CRUTCHER, LLP
                        *Attorneys for Plaintiff*

                        Julio C. Gomez
                        GOMEZ LLC

                        Tyler G. Doyle
                        Craig Smyser
                        Larry R. Veselka
                        SMYSER KAPLAN & VESELKA, L.L.P.

                        *Attorneys for Defendants Hugo Gerardo Camacho Naranjo and*
                        *Javier Piaguaje Payaguaje*

                        Stephen R. Donziger
                        DONZIGER & ASSOCIATES

                        John W. Keker
                        Elliot R. Peters
                        Christopher J. Young
                        Jan Nielsen Little
                        Matthew M. Werdeger
                        KEKER & VAN NEST, LLP

                        *Attorneys for Donziger Defendants*

# TABLE OF CONTENTS

Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    I.    The Defendants' Ecuadorian Associates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    II.   The Alleged Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    III.  The Evidence of Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        A.    Alleged Bribery of the Judge . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        B.    Additional Evidence that the LAPs – Not the Judge – Wrote the Judgment
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
        C.    Evidence of Fraud With Respect to the Judicial Inspection Process . . . . 12
            1.    Dr. Calmbacher . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
            2.    The Termination of Judicial Inspections, Cabrera's Appointment,
                and the Cabrera Report  . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
            3.    Other Evidence of Fraud in Respect of the Cabrera Report  . . . . 14
            4.    The "Cleansing Reports"  . . . . . . . . . . . . . . . . . . . . . . . . . 16
    IV.  Chevron's Unsuccessful Attempts to Obtain Discovery from Defendants . . . . 20
        A.    The Motion to Compel Production of Ecuadorian Documents in the Count
            9 Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
        B.    Chevron's Document Requests in this Action . . . . . . . . . . . . . . . . 22
        C.    The Motion to Compel in this Action  . . . . . . . . . . . . . . . . . . . . 24
            1.    The Córdova Lawsuit . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
            2.    The Ruling on the Motion to Compel . . . . . . . . . . . . . . . . . 26
        D.    The Motion for Sanctions  . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Discussion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
    I.    The February 11 Order Compelling Production  . . . . . . . . . . . . . . . . . . . . 29
        A.    Mr. Donziger Has Had the Practical Ability to Obtain the Ecuadorian
            Documents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
        B.    The Ecuadorian Lawyers and Their Associates Are Agents of or Under the
            Practical Control of the LAP Representatives . . . . . . . . . . . . . . . . 42
        C.    Ecuadorian Law and Principles of International Comity . . . . . . . . . . . 45
            1.    Personal Jurisdiction  . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
            2.    The Alleged Illegality of Production Under Ecuadorian Law Did
                 Not Preclude the Court's Order to Produce . . . . . . . . . . . . . . . 52
                i.    Whether There is a True Conflict of Law  . . . . . . . . . . 53
                ii.   Comity Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . 59
                    a.    The Importance of the Documents to the Litigation
                       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
                    b.    Specificity of the Requests  . . . . . . . . . . . . . . . . 62
                    c.    The Availability of Alternative Means of Obtaining
                       the Information . . . . . . . . . . . . . . . . . . . . . . . . . 62
                    d.    Whether the Information Originated in Ecuador  . 63
                    e.    Balance of National Interests . . . . . . . . . . . . . . . 64
                    f.    Hardship of Compliance  . . . . . . . . . . . . . . . . . 66
    II.   The Motion for Sanctions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67
        A.    The Parties' Positions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68
        B.    The LAP Representatives' Jurisdictional Argument Fails  . . . . . . . . . 69
        C.    The February 11 Order Bound the Donziger Defendants . . . . . . . . . . 71
        D.    Mr. Donziger Had and Has the Practical Ability to Obtain Documents
            From the Ecuadorian Attorneys and Agents . . . . . . . . . . . . . . . . . 72
        E.    Ecuadorian Law Does Not Prevent the Imposition of Sanctions . . . . . . 78

F.    Defendants Have Acted Willfully and In Bad Faith . . . . . . . . . . . . . . 80
      1.    Defendants Refuse to Produce Documents . . . . . . . . . . . . . . . . 80
      2.    The LAP Representatives' U.S. Counsel Suggests that Fajardo File
            Suit in Ecuador and Keeps the Suit's Existence Secret . . . . . . . 82
      3.    The Córdova Suit Was Collusive . . . . . . . . . . . . . . . . . . . . . . . . 84
      4.    Further Evidence That Defendants Have Not Acted in Good Faith
            With Respect to the Ecuadorian Documents . . . . . . . . . . . . . . . 87
      5.    Defendants' Further Efforts to Block Discovery . . . . . . . . . . . 92
G.    Which Sanctions Are Appropriate . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94
      1.    The LAP Representatives' Personal Jurisdiction Defense . . . . . 95
      2.    All Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98
            i.    Adverse Inference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99
            ii.   Introduction at Trial of Responsive Documents . . . . . . 103

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

LEWIS A. KAPLAN, *District Judge.*

New York attorney Steven Donziger and his Ecuadorian clients have obtained an $18.2 billion judgment against Chevron Corporation ("Chevron") from an Ecuadorian court (the "Judgment").  Chevron sues here for equitable relief,[1] claiming that the Judgment was obtained by fraud – including but not limited to bribery of the Ecuadorian judge – as part of a scheme to extort money from it.  The defendants include Mr. Donziger's Ecuadorian clients, their lead Ecuadorian counsel, and several other individuals and organizations allegedly complicit in the scheme.  Other than Mr. Donziger and his law firms (the "Donziger Defendants"), all of the defendants save two individual Ecuadorians (the "LAP Representatives") have defaulted.

Chevron has sought discovery – especially document production – from the Donziger Defendants and the LAP Representatives in an effort to substantiate its claims.  Its efforts have largely been stonewalled.  These defendants have not produced the requested documents or provided other requested information that is in the hands of their own Ecuadorian lawyers and associates.  Chevron moved to compel production.  While that motion was pending, the Ecuadorian lawyers – at the suggestion of U.S. counsel for the LAP Representatives – caused a collusive lawsuit to be brought in Ecuador, without notice to Chevron, that ultimately resulted in an injunction barring the Ecuadorian lawyers and other associates from turning documents over in this case.  This has not stopped these defendants, however, from submitting documents in this case that they obtained from their Ecuadorian lawyers when it suited their purposes – in one case just days after denying that they had control over the documents submitted and claiming they could not produce them to Chevron.

The Court first ordered that the requested documents be produced.  Defendants

---

[1]   Chevron has waived its damage claims against the defendants who have answered the amended complaint. DI 1404, DI 1469.

declined to comply.  Chevron then moved for sanctions, including contempt and default judgments.
The matter has been fully briefed, and the Court has had the benefit of an evidentiary hearing.  The
Court now concludes that (1) these defendants have the practical ability to produce the documents,
(2) the collusive Ecuadorian injunction is no obstacle to the imposition of sanctions, and (3) these
defendants have acted in bad faith in their failure to produce documents in the hands of their
Ecuadorian attorneys and agents.  While it declines to grant the more onerous sanctions sought by
Chevron, sanctions narrowly tailored to their actions are appropriate.


*Facts*

        The history of the Ecuadorian litigation and the background of this case have been
set out in detail in at least three prior opinions.[2]  In order to understand fully the context of the
present motion, it nevertheless is necessary to revisit subjects previously covered, especially to bring
the account up to date in light of subsequent events.


I.      *The Defendants' Ecuadorian Associates*

        The documents Chevron seeks are in the physical possession, custody, or control, of
(1) the Lago Agrio Plaintiffs' ("LAPs")[3] Ecuadorian lawyers – including Pablo Fajardo, Juan Pablo

---

[2]
        *See Chevron Corp. v. Donziger*, 768 F. Supp. 2d 581, 597-626 *vacated sub nom. Chevron
        Corp. v. Naranjo*, 11-1150-CV L, 2011 WL 4375022 (2d Cir. Sept. 19, 2011) *and rev'd and
        remanded sub nom. Chevron Corp. v. Naranjo*, 667 F.3d 232 (2d Cir. 2012) *cert. denied*,
        133 S. Ct. 423, 184 L. Ed. 2d 288 (U.S. 2012); *Chevron Corp. v. Donziger*,  886 F. Supp.
        2d 235, 241-48 (S.D.N.Y. 2012); *Chevron Corp. v. Donziger*, 11 Civ. 0691 (LAK), 2013
        WL 1087236, *3-6 (S.D.N.Y. Mar. 15, 2013).

[3]
        The LAPs are a group of 47 indigenous Ecuadorians who filed suit against Chevron in
        Ecuador.  They all are defendants in this action, although only two of them – the LAP
        Representatives – have answered the complaint and are defending the action.

Sáenz, and Julio Prieto[4] – and (2) three non-lawyers – Luis Yanza, the Amazon Defense Front ("ADF"), and Selva Viva – who also are based in Ecuador.  The relationships between and among Mr. Donziger, the LAPs, and these lawyers and other allies naturally are significant, as they bear on whether Mr. Donziger and the LAP Representatives have the ability, practical or legal, to obtain the documents in question.  The evidence concerning those relationships therefore is discussed in detail in those sections of this opinion that deal with the control issue.  But it is important to understand several essential points at the outset.

   *First*, Mr. Donziger has had practical control over the LAPs' Ecuadorian and U.S. litigation efforts for years.  He has raised money to finance it, controlled or at least influenced the way in which that money was spent, and has paid or approved payment of the Ecuadorian lawyers and others.  Fajardo was picked by Mr. Donziger to take over the lead role in court in the Ecuadorian litigation as, in Mr. Donziger's words, the LAPs' "local counsel."[5]

   *Second*, at least one of the agreements between the LAPs and an outside investor who provided financing for the litigation gave Donziger extensive legal rights to access documents and information in the hands of the LAPs' Ecuadorian counsel.[6]

---

[4]    Sáenz and Prieto are alleged co-conspirators in this case.

[5]    Gomez Decl. [DI 287] Ex. 15 (Donziger Dep.), at 3440:5-10.

   Messrs. Sáenz and Prieto, also Ecuadorian lawyers, work under Fajardo's supervision.

[6]    *See, e.g.*, 11 Civ. 03718, DI 44, Ex. 46 (Treca Funding Agreement), § 5.1 ("the Claimants shall, as requested by the Nominated Lawyers or [Donziger] . . . submit to examination by the Active Lawyers [including Donziger] for the preparation of written statements, subscribe to the same under oath if required, consult with the Active Lawyers [including Donziger] for purposes of pursuing the Claim or settling the Award and appear at any proceedings or hearing (including hearings located abroad) reasonably required in connection with such statements or the Claim generally").

4

*Third*, Luis Yanza, the principal non-lawyer Ecuadorian individual at issue here, is Mr. Donziger's "closest friend" in Ecuador.  He heads the ADF – which purports to represent the LAPs, albeit not in a professional legal capacity – and controls the responsive ADF documents.  In addition, he is the general manager of Selva Viva, which is an entity created by the ADF to administer litigation funds and which also doubtless has responsive documents.[7]  Indeed, the relationship among Messrs. Yanza, Donziger, and Fajardo is so close that all three work out of the Selva Viva office in Quito, Mr. Donziger when he is in Ecuador rather than in New York, where he resides and maintains his law office.

Fajardo, the ADF, Yanza, and Selva Viva all are defendants in this case.   All have been duly served and have defaulted.[8]  Nevertheless, they continue to assist in the defense.  Among other things, Fajardo and Sáenz have submitted declarations in support of the LAP Representatives in this case.[9]

## II.    *The Alleged Fraud*

Chevron asserts that the Ecuadorian Judgment is the product of fraud and RICO violations.  These claims rest on allegations, among others, that Mr. Donziger and others based in

---

[7]
 Champion Decl [DI 400] Ex. 2023 (Aug. 14, 2007 Email from Donziger to Kohn and others) ("The ADF created Selva Viva as a pass thru mechanism to administer the funds for the litigation; the Frente [*i.e.*, ADF] controls Selva Viva.").

[8]
 DI 469.

[9]
 DI 128 (Fajardo); DI 152 (Sáenz).

the United States here conceived, substantially executed, largely funded, and significantly directed[10] a scheme to extort and defraud Chevron, a U.S. company, by, among other things, (1) bringing the lawsuit in Ecuador;[11] (2) fabricating (principally in the United States) evidence for use in that lawsuit in order to obtain a judgment there;[12] (3) corrupting and pressuring Ecuadorian judges to obtain the Judgment; (4) exerting pressure on Chevron to coerce it to pay money not only by means of the Ecuadorian litigation and Judgment, but also by subjecting Chevron to public attacks in the United States and elsewhere based on false and misleading statements;[13] (5) inducing U.S. public officials to investigate Chevron;[14] and (6) making false statements to U.S. courts and intimidating and tampering with witnesses in related U.S. court proceedings to cover up their improper activities.[15]

---

[10]

Amended complaint ("Cpt.") ¶ 1 (alleging that defendants "sought to extort, defraud, and otherwise tortiously injure plaintiff Chevron by means of a plan they conceived and substantially executed in the United States."); *id.* ¶ 2 ("The enterprise's ultimate aim is to create enough pressure on Chevron in the United States to extort it into paying to stop the campaign against it.").

[11]

*Id.* ¶ 3.

[12]

*E.g., id.* ¶ 145 ("Back in the United States, preparations were well underway for drafting Cabrera's report [the report of a supposedly independent, court-appointed expert]."); *id.* ¶ 151 ("While Stratus [LAP environmental consultant] was the primary coordinator of the . . . Cabrera Report, other members of the [LAP's] U.S.-based team of experts . . . also contributed to the report without attribution in the report or disclosure to Chevron."); *id.* ¶¶ 353–56.

[13]

*Id.* ¶ 214.

[14]

*Id.* ("And they have taken this pressure campaign to U.S. state and federal agencies, seeking their falsely induced assistance in this racketeering scheme."); *id.* ¶ 216.

[15]

*Id.* ¶¶ 273–77, 291–300, 311–16.

Chevron has presented evidence supporting these allegations on various motions throughout this litigation. The Court summarizes that evidence below.[16]

### III.    The Evidence of Fraud

#### A.    Alleged Bribery of the Judge

Chevron has submitted a declaration of Alberto Guerra Bastidas, a former judge of the Provincial Court of Sucumbios, Ecuador,[17] the court that rendered the Judgment, and at one time the judge assigned to the case against Chevron.   In summary, Guerra states that the LAPs' counsel – Fajardo and Donziger – bribed the judge who signed the Ecuadorian Judgment, Nicolás Zambrano, to decide the Lago Agrio case in favor of the LAPs and to permit the LAPs to write the decision that the judge signed.  Mr. Guerra was deposed in this action and reiterated his assertions.  Although former judge Zambrano[18] has submitted a declaration denying the central allegations, he declined

---

[16]

The text and footnotes in Section III are taken largely from the Court's opinion in *Chevron Corp. v. Donziger,* 11 Civ. 0691 (LAK), 2013 WL 1087236.

[17]

Mastro Decl. [DI 746] Ex. C (Guerra Decl.).  Mr. Guerra was dismissed as a judge in 2008, ostensibly for private statements to the effect that the case against Chevron should be dismissed.  He avers, however, that the real reason for his dismissal was his confrontation with two judges who later served on the Chevron case "regarding several dubious and illegal rulings that had issued in the proceedings, and regarding their practice of asking the settling experts for 25 percent of their fees in consideration for having them appointed as such." Guerra Decl. ¶ 6.

[18]

Judge Zambrano reportedly was removed from the bench after rendering the decision against Chevron "for releasing a suspected drug trafficker in an act of 'obvious negligence or an inexcusable mistake.'"  Eduardo Garcia & Alexandria Valencia, *Chevron Hopes to Benefit from Ecuador's Judge Dismissal*, REUTERS (Mar. 9, 2012) (available at http://www.reuters.com/article/2012/03/09/ecuador-chevron-idUSL2E8E9ETI20120309) (last visited Sept. 10, 2013).

to appear for deposition.[19]

The details of the alleged bribery and of some evidence corroborating Guerra's testimony are described extensively in *Chevron Corp. v. Donziger*,[20] where the Court, for purposes of dealing with claims of attorney-client privilege and work product, held that there was probable cause to suspect fraud in the procurement of the Judgment.  For present purposes it suffices to quote this summary:

> "Guerra . . . claims that there were corrupt bargains between the LAPs and former Judge Zambrano in each of the two separate periods during which Zambrano presided over the Chevron case, which were October 2009 until March 12, 2010 and October 2010 through the entry of the judgment on February 14, 2011.  During the first period, Guerra asserts principally that (a) Zambrano told Guerra that he had reached an agreement with the LAPs to quickly move the case in the plaintiffs' favor, (b) Guerra then met with Fajardo, the LAPs' lawyer, in Quito where the two agreed that Guerra would write Zambrano's decisions and favor Chevron, and (c) Guerra later met in Quito with Fajardo, Donziger, and Yanza on which occasion Donziger thanked him for ghostwriting Zambrano's decisions and for 'helping steer the case in favor of the Plaintiffs'.'  During the second period, after former Judge Zambrano began presiding over the case for the second time, (a) Zambrano suggested that Guerra meet with the LAPs' representatives to work out a deal to fix the case, (b) Guerra then made such a proposal to Fajardo, subsequent to which (c) Guerra met with Fajardo, Yanza, and Donziger at a restaurant in Quito where they discussed the proposal, (d) Zambrano later told Guerra that he had spoken to Fajardo, who had agreed to the deal, and (e) Guerra had subsequent meetings with Zambrano both in Lago Agrio and in Quito in furtherance of the arrangement."[21]

The Guerra declaration, if it ultimately is credited, establishes that the Judgment was

---

[19]

The LAP Representatives recently filed notice that Mr. Zambrano has agreed to testify in Court and will submit to deposition before he does so.  DI 1385.

[20]

11 Civ. 0691 (LAK), 2013 WL 1087236, at *6-7 (S.D.N.Y. Mar. 15, 2013), *on reconsideration*, 2013 WL 1975439 (S.D.N.Y. May 14, 2013).

[21]

*Chevron Corp. v. Donziger,* 11 Civ. 0691 (LAK), 2013 WL 3294820, at *2 (S.D.N.Y. June 28, 2013) (on LAP Representatives' motion to compel production of documents) (footnotes omitted).

8

fraudulently obtained.  Even before the Guerra affidavit was filed, however, Chevron had presented other evidence of fraud in the procurement of the Judgment.  More recently, it has submitted still more.

B.      *Additional Evidence that the LAPs – Not the Judge – Wrote the Judgment*

On July 31, 2012, the Court granted in part and denied in part Chevron's motion for partial summary judgment seeking dismissal of the defenses of collateral estoppel and *res judicata*.[22] In that opinion, the Court held that there was no genuine issue of material fact that fraud tainted various aspects of the Lago Agrio litigation.  Chevron subsequently submitted additional evidence in support of its contention that the Judgment was obtained by fraud.

In its motion for partial summary judgment, Chevron's "ghostwriting" allegations – its contention that the Judgment was written in whole or in part by the LAPs, not the judge – were based significantly on three LAP documents that were not part of the court record but parts of which wound up in the Judgment:

- A document entitled *The Merger of Chevron Inc. and Texaco Inc.* (the "Unfiled Fusion Memo") that was written by one or more members of the LAP team and that addresses, among other things, successor liability.[23]

- The Index Summaries – spreadsheets prepared by the LAP team that list and summarize documents filed in the Lago Agrio court.

- The Selva Viva Data Compilation, which "consists of spreadsheets containing environmental sampling data."[24]

---

[22]

*Chevron Corp. v. Donziger*, 886 F. Supp. 2d 292.

[23]

*Id.* at 253.

[24]

*Id.*

Chevron submitted analyses by experts that established that portions of each of these documents appeared verbatim in the Judgment.[25]  Thus, Chevron contended that (1) relevant portions of the Judgment either were written by the LAPs, who had generated the documents, and passed to the judge *ex parte*, or (2) these documents themselves were provided *ex parte* to the Lago Agrio court, which copied at least parts of them word-for-word  into the Judgment.

There was and remains no evidence disputing the fact that parts of the Judgment were virtually identical to the Unfiled Fusion Memo.  This Court therefore held that this virtual identity "demonstrate[d] as a matter of law that whoever wrote the Judgment had access to and copied portions of the [Unfiled Fusion] Memo."[26]  The Court, however, concluded that "[t]he identity of language between parts of the Unfiled Fusion Memo and parts of the Judgment – troublesome as it is – d[id] not alone warrant the conclusion that Chevron has established that there is no genuine issue of material fact" that the Judgment had been written by someone other than the judge who signed it.[27]  With respect to the Index Summaries and Selva Viva Data Compilation, the Court held that "[w]hile the similarities between those documents and aspects of the Judgment supports the premise that the author or authors of the Judgment had access to and copied them, the nature of their contents makes it more difficult to conclude that any *ex parte* submission of them materially impacted Chevron's ability to present its defense."[28]

---

[25]

        *Id.* at 253-54.

[26]

        *Id.* at 286.

[27]

        *Id.* at 288.

[28]

        *Id.* at 287 n.319.

Subsequent to that opinion, Chevron submitted additional evidence in support of another motion, which sought a determination that certain documents sought from Patton Boggs as to which the LAPs claimed privilege were producible under the crime-fraud exception to the attorney-client privilege.  It claimed that this added material showed that at least three other portions of the Judgment are identical to other internal LAP documents that were not in the Ecuadorian court record:

> • A memorandum by a Donziger intern (the "Moodie Memorandum"), which analyzed causation under a doctrine applied in California asbestos litigation.
>
> • An analysis entitled *La Explotacion De Petroleo En La Zona Conesionada A Texaco Y Sus Impactos En La Salud De Las Personas*, which was written by LAP consultant Richard Clapp (the "Clapp Report").
>
> • An email regarding trusts sent by Fajardo to alleged co-conspirators on June 18, 2009 (the "Fajardo Trust Email").

Chevron supported its contention with respect to each document by analyses that concluded that (1) the language or analysis in the relevant LAP internal document and the Judgment is nearly identical, and (2) the analysis or language is not in the court record.[29]  In each case, Chevron's evidence was sufficient to warrant the conclusion that the items in question further supported the existence of probable cause to suspect that the LAPs, not the judge, wrote the relevant part of the Judgment.[30]

---

[29]

    *See, e.g.*, Mastro Decl. [DI 658], Ex. 3003 (Green Decl.), at 2, ¶ 12 ("it is highly unlikely, perhaps even more so than highly, that the passages in the [judgment regarding causation] were prepared independently of the Moodie memorandum.").

[30]

    *Chevron Corp. v. Donziger*, 2013 WL 1087236, at *9 n.78.

    *Moodie Memorandum.*  Chevron's expert explains that both the Moodie Memorandum and the Judgment analyze "causation law of the United States and Australia, not Ecuador. . . . Absent some explanation, [he] would consider it highly unlikely that an Ecuadorian court would independently choose United States and Australian causation law, rather than Ecuadorian causation law."  Mastro Decl. [DI 658], Ex. 3003 (Green Decl.), at 4, ¶ 13.  Moreover, the expert opines that the causation analysis in both the Judgment and the

memorandum was incorrect under U.S. law and, in any case, inapplicable to the Lago Agrio case. While the LAPs argue that the expert's work was not thorough and would not be admissible in its present form at trial, it afforded a sufficient factual basis to support a finding of probable cause for purposes of the crime-fraud exception to the attorney-client privilege.

*Clapp Report.* Chevron has submitted evidence showing that portions of the Clapp Report were included in an annex to the Cabrera Report. Mastro Decl. [DI 658], Ex. 3005 (Leonard Report) at 9-10, 13. Emails between Donziger and a Stratus employee make clear that they sought to keep the Clapp Report's true authorship secret, presumably to create the appearance that Cabrera had written it. *See* Hendricks Decl. [DI 34], Ex. 188 (Email from Doug Beltman at Stratus to Donziger stating "We have to talk to Clapp about that 5-pager, and how we have to limit its distribution. It CANNOT go into the Congressional Record as being authored by him."). The annex to the Cabrera report, however, "did not contain the entirety of the Clapp Report . . . , and portions that were *not* included appear in the judgment." DI 657, at 7; Mastro Decl. [DI 658], Ex. 3005 (Leonard Report) at 33-34. Chevron's expert notes that this includes a 34-word string which appears both in the Clapp Report and the Judgment, as well as two additional 16-word overlaps. Ex. 3006 (Juola Report) at ¶¶ 23, 24. The portions of the Clapp Report that appear in the Judgment appear nowhere else in the Lago Agrio court record. *Id.* at ¶ 29.

The LAPs do not dispute that sections of the Clapp Report appear verbatim in the Judgment and are nowhere else in the Lago Agrio court record. They argue only that "Chevron has not proved that the materials [including the Clapp Report] were not provided to the Judge in some informal manner such that the materials did not get signed and numbered as part of the record." DI 712, at 5. But the LAPs point to no evidence that the Clapp Report ever was submitted to the judge in a manner that did not result in its being part of the court record much less that any such submission would not have been improper. Given the identity of language in parts of the Clapp Report and the Judgment and the absence of that language anywhere in the court record, this too supported the conclusion that there is probable cause to suspect fraud for purposes of the crime-fraud exception to the attorney-client privilege.

*Fajardo Trust Email.* The same can be said for the Fajardo Trust email. On June 18, 2009, Fajardo sent an email to Donziger and others concerning Ecuadorian trust law and the *Andrade v. Conolec* case. DI 401, Ex. 2174. Portions of that email – including a misquotation of the *Andrade* case – appear in the Judgment. The Court noted in its opinion on Chevron's motion for partial summary judgment that "Chevron has submitted no expert reports documenting alleged plagiarism in the Judgment from the Fajardo email, or indicating whether or not the Fajardo email was or was not a part of the Lago Agrio court record." *Chevron v. Donziger*, 886 F. Supp. 2d at 254 n.116. It recounted the LAPs' contention that any language that was common to the Fajardo Trust Email and the Judgment was merely "stock language" that could have been found independently in the court record. *Id.* The Court therefore declined to find that there was no genuine issue of material fact that the Fajardo Trust Email had been submitted fraudulently to the court.

Chevron's new evidence overcomes these deficiencies, at least for present purposes. Chevron's expert now concludes that "parts of the [Judgment] must likely have had their

C.    *Evidence of Fraud With Respect to the Judicial Inspection Process*

1.    *Dr. Calmbacher*

Dr. Charles Calmbacher was the LAPs' expert for some of the early judicial inspections.  Indeed, two reports were filed with the Lago Agrio court under his name and with his signature.  Those two reports, however, contained conclusions and findings that he later testified he did not reach.[31]  The Court held on summary judgment that "the evidence is uncontradicted" that "[w]hile his signatures on the reports were genuine, the text associated with them was not."[32]  The Court therefore concluded that "[i]t . . . is at least arguable that Chevron has established from Dr. Calmbacher's uncontradicted testimony . . . that the LAP lawyers wrote the reports submitted over Dr. Calmbacher's signatures and that Calmbacher did not in fact hold the views there stated."[33]  The Court declined to decide on summary judgment whether the submission of the purported Calmbacher report was fraudulent as there was sufficient evidence of bad feeling between Calmbacher and Donziger assessment by the trier of fact.  The evidence, however, was sufficient

---

origin in the unfiled Fajardo Trust email."  Mastro Decl. [DI 658] Ex. 3005(Leonard Decl.), at 33.  This includes identical word strings which are found nowhere else in the court record, *id.* at 30, and improper reliance on *Andrade*, which both the Fajardo Trust email and the Judgment incorrectly cite as dealing with "the legal basis of the trust," although the case itself says nothing about trusts.  *Id.* at 31.  Furthermore, following a complete review of the Lago Agrio court record, Chevron's expert now has concluded that the Fajardo Trust Email is found nowhere within it.  Hernandez Aff. [DI 548] ¶ 26. The LAPs do not attempt to explain how the language from the Fajardo Trust email ended up in the Judgment despite the fact that it was never part of the Lago Agrio court record.  Thus, the Fajordo Trust Email further supports the probable cause finding.

[31]

*Chevron Corp. v. Donziger*, 886 F. Supp. 2d at 288.

[32]

*Id.*

[33]

*Id.*

13

to warrant the Court's conclusion, for purposes of Chevron's crime-fraud argument with respect to certain privilege claims, that there was probable cause to suspect that the Calmbacher report was tainted by fraud.[34]

> ### 2.   The Termination of Judicial Inspections, Cabrera's Appointment, and the Cabrera Report

In 2006, the LAPs applied to the Lago Agrio court to terminate at least some of the judicial inspections that it had ordered.  While that application was pending, Mr. Donziger drafted a misconduct complaint against the judge to whom the case then was assigned, who, according to Mr. Donziger, was "on his heels from . . .  from trading jobs for sex in the court."[35]  Pablo Fajardo, the LAPs' principal Ecuadorian lawyer, then had *ex parte* meetings with the judge[36] during which he (1) attempted to persuade the judge to appoint Cabrera as the global expert, which ultimately occurred on March 19, 2007, and (2) "let [the judge] know [the LAPs] might file it [*i.e.*, the misconduct complaint] if he does not adhere to the law and what we need."[37]

The Court held in its summary judgment opinion that there was no genuine issue of material fact that "the decisions to terminate judicial inspections, to pursue the global assessment, and to select Cabrera as the global expert were tainted by the duress and coercion applied to [the

---

[34]

> *Chevron Corp. v. Donziger*, 2013 WL 1087236, at *9.

[35]

> *Chevron Corp. v. Donziger*, 886 F. Supp. 2d at 288.

[36]

> *Id.* at 256.

[37]

> *Id.* (internal quotation marks omitted).

judge] by Donziger, Fajardo, and perhaps other."[38]  The Court held also that there was no genuine

issue of fact that Cabrera's

> "report was not entirely or even predominantly his own work or that of any assistants
> or consultants working only for him.  There is no genuine issue with respect to the
> facts that the LAP team secretly prepared his [*i.e.*, Cabrera's] work plan, worked
> closely with him in carrying it out, and drafted most of the report and its annexes.
> Nor is there any genuine issue regarding the fact that the LAP team then publicly
> objected to the very report that they, in large part, secretly had drafted . . . .  The
> answers filed by Cabrera in response to the LAPs' (and Chevron's) objections – like
> the report itself – were drafted at least in substantial part by the LAP team and
> written to read as if Cabrera had written them."[39]

It concluded as well that, while the Lago Agrio court "disclaimed reliance" on the Cabrera report,

Chevron had presented evidence from which it could be concluded that the Lago Agrio court in fact

had relied on the Cabrera report at least for certain determinations.[40]

### 3.    Other Evidence of Fraud in Respect of the Cabrera Report

Subsequent to the first partial summary judgment decision, Chevron submitted a

declaration of Ramiro Fernando Reyes Cisneros ("Reyes"),[41] an Ecuadorian petroleum and

environmental engineer,[42] that supported Chevron's contention that the object of terminating the

original judicial inspections and appointing a single global expert was to obtain the appointment of

---

[38]

    *Id.* at 289.

[39]

    *Id.*

[40]

    *Id.* at 289-90.

[41]

    *See* Mastro Decl. [DI 658] Ex. 3014 (Reyes Decl.).

[42]

    *Id.* ¶ 3.

someone chosen by the LAPs who would "play ball" with them.

Reyes' declaration states that he was asked by the LAPs' attorneys, before the termination of the judicial inspections and the appointment of Cabrera as the global expert, to serve as an independent expert to "monitor" the settling experts in the Lago Agrio case.[43]  Mr. Donziger explained to Reyes at the time that he was unhappy with the reports plaintiffs' then-experts had submitted and wanted Reyes to submit to the Lago Agrio court another report that established "that the findings of the settling experts' report . . . were wrong."[44]  Reyes makes clear that Donziger and the other attorneys aimed to keep their relationship with Reyes secret so that his report would appear to be "independent."[45]  He claims that, despite Donziger's wishes, he believed that "the evidence did not support Mr. Donziger's position and [he] could not twist [his] professional assessments to make them fit the plaintiffs' interests."[46]  Accordingly, in a report Reyes prepared and showed to Donziger, he concluded that, while "the settling experts had failed to strictly follow their judicial mandate . . . their report contained enough information for the Court to make its own ruling."[47]  Donziger was dissatisfied with Reyes' report and did not ask him to submit it to the court.[48]

---

[43]

The "settling experts" were meant to review and then provide opinions on the final reports submitted by the original court-appointed experts before the judicial inspection process was terminated.  *See Chevron Corp. v. Donziger*, 886 F. Supp. 2d at 244.

[44]

*Id.* ¶ 20.

[45]

*Id.* ¶ 15.

[46]

*Id.* ¶ 20.

[47]

*Id.*

[48]

*Id.*

In 2006, after the Lago Agrio court halted the judicial inspections, Donziger and the other LAP lawyers, according to Reyes, informed Reyes that they wanted him to serve as the global "court-appointed" expert[49] and that he would "need . . . to state that Chevron was the only party responsible for environmental damages and the harm to the local community."[50]  When Donziger later told Reyes that the "judge . . . was putting up hurdles to [Reyes'] appointment as expert," Reyes and Donziger discussed appointing Cabrera instead.[51]  At a later meeting with Cabrera and certain LAP attorneys which Reyes attended, "Mr. Fajardo, Mr. Yanza and Mr. Donziger dropped any pretense that Mr. Cabrera would act independently in writing an expert report that would be technically sound and executed according to professional standards.  On the contrary, it was obvious [to Reyes] that the plaintiffs had already predetermined the findings of the global assessment, that they themselves would write a report that would support their claim . . . and would simply put Mr. Cabrera's name on it."[52]

### 4.    The "Cleansing Reports"

As the evidence of infirmities in and affecting the Cabrera fraud was coming to light, the LAP team privately began to "acknowledge[] problems associated with Cabrera's lack of

---

[49]  *Id.* ¶ 22.

[50]  *Id.* ¶ 25.

[51]  *Id.* ¶¶ 29-30.

[52]  *Id.* ¶ 35.

17

independence."[53] The LAPs' lawyers' planned to hire a new expert to address Cabrera's findings and "submit an additional expert report to the Lago Agrio court that would appear to be independent of but that, in fact, would rely on the data and conclusions reached in the Cabrera report."[54] One of the LAPs' lawyers explained that the new expert's report was intended to "'cleanse' any perceived impropriety related to the Cabrera Report."[55]  Another wrote that, with the new expert's report,

> "[t]he path for an Ecuadorian decision will be simple.  We would hope the judge would say/rule: There has been much controversy surrounding the Cabrera report, and objections to it. [Perhaps: The court did not anticipate that there was the degree of collaboration between plaintiffs' counsel and Cabrera, that there may have been. Given these issues, the court is not relying on Cabrera for its ruling.]  However, the Court now has additional submissions from the parties . . . The court finds the new report (demonstrating damages of $ — billion) to be persuasive, reliable and accurate and therefore rules . . . ."[56]

Ultimately, the LAPs petitioned the Lago Agrio court to allow the parties to submit "supplementary information to aid th[e] Court in the process of assessing the global damages."[57] The court granted the LAPs' request and the LAPs submitted seven new reports to the Lago Agrio court from newly hired experts.[58]  The LAPs' attorneys had instructed the new experts to rely on the Cabrera report but had not told them that Cabrera's report had been written by Stratus Consulting and

---

[53]
     *Chevron Corp. v. Donziger*, 886 F. Supp. 2d at 261.

[54]
     *Id.*

[55]
     Hendricks Decl [DI 9] Ex. 13 (May 20, 2010 email from PB partner Eric Westernberger to others).

[56]
     Champion Decl. [DI 400] Ex. 2060 (June 14, 2010 email).

[57]
     Stavers Decl. [DI 549] Ex. 2420 (Fajardo declaration submitted to Lago Agrio court (the "Fajardo Lago Agrio Decl.")), at 2.

[58]
     *Chevron Corp. v. Donziger*, 886 F. Supp. 2d at 261.

18

the LAP team rather than Cabrera.[59] This occurred despite the fact that, in Mr. Donziger's words, the "general idea" had been that "Stratus would draft the report in a form that could be submitted directly to the Ecuadorian court by Mr. Cabrera."[60]    "[T]he . . . [new] experts that submitted reports later admitted that they never had traveled to Ecuador for the purpose of gathering data to support their reports.  At least four relied on the data and conclusions in the Cabrera report."[61]  For example, one of the purportedly independent cleansing experts later admitted that he had "relied on parts of the Cabrera report" and "made no efforts to independently verify underlying data."[62]  Another expert said he relied on "data series and cost figures" from the Cabrera report without "know[ing] one way or the other whether they're correct or not."[63]

In the Judgment, which allegedly was written by the LAPs and signed by the judge in exchange for the promised bribe, the Lago Agrio court purported to disclaim reliance on the Cabrera report.  The Judgment, however, contains at least some evidence that it relied upon the Cabrera report in that it relied on cleansing reports, which in turn rested on Cabrera.  For example, in assessing damages, the Judgment cited a cleansing report that "contain[ed] no damage assessment

---

[59]
       *See e.g.*, Stavers Decl. [DI 549] Ex. 2417 (Shefftz deposition transcript), at 68:14-24 (cleansing expert was told "that the Cabrera report was prepared by an independent [and neutral] expert").

[60]
       Hendricks Decl. [DI 8] Ex. 6 (Donziger deposition transcript), at 2253:5-11.

[61]
       *Chevron Corp. v. Donziger*, 886 F. Supp. 2d at 261.

[62]
       Champion Decl. [DI 400] Ex. 2073 (Allen deposition transcript), at 171:18-172:3.

[63]
       Champion Decl. [DI 400] Ex. 2074 (Shefftz deposition transcript), at 63:3-21.

independent of that in the Cabrera report."[64]   Thus, this Court concluded on the partial summary

judgment motion  that "[t]he uncontradicted evidence . . . shows that the Cabrera report was tainted

and that the Lago Agrio court relied to some extent on that report, both directly and via its reliance

on the [cleansing] report."[65]

\*       \*       \*

Based on the foregoing, the Court concluded that there is

"probable cause to suspect, taking the matters essentially in chronological order, that (1) the LAPs wrote the Calmbacher reports that were filed with the Lago Agrio court and attached Calmbacher's signatures to them, knowing that the reports did not reflect his views, (2) the judicial inspection process was terminated, the global expert proposal adopted, and Cabrera selected as the global expert as a result of the LAPs' threat that they would file a misconduct complaint against the judge if he did not accede to their wishes that he take these actions, (3) the LAPs secretly planned and wrote all or at least the great majority of Cabrera's report, were complicit in its presentation to the Lago Agrio court as Cabrera's independent work, and took other steps to bolster the false pretense that the report had been independent, (5) the LAPs entered into an improper relationship with Judge Zambrano during his first tenure as the presiding judge pursuant to which Judge Zambrano agreed 'to quickly move the case along in their favor,' (6) and the LAPs then entered into a supplementary and equally improper relationship with Guerra pursuant to which Guerra agreed to move the case quickly and limit Chevron's procedural options 'by not granting their motions on alleged essential errors in rulings [Guerra] was to write, in exchange for payment by the LAPs' representatives of approximately USD $1,000 per month for writing the court rulings Mr. Zambrano was supposed to write.' In addition, there is probable cause also to suspect that LAP lawyers and other representatives later bribed Judge Zambrano to obtain the result they wanted and, pursuant to the arrangement they struck with him, actually wrote the decision to which he signed his named after some cosmetic and inconsequential editing by Guerra."[66]

The Court therefore held that Chevron had satisfied the first prong of the crime-fraud exception to

---

[64]

    *Chevron Corp. v. Donziger*, 886 F. Supp. 2d at 290.

[65]

    *Id.*

[66]

    *Chevron Corp. v. Donziger*, 2013 WL 1087326, at \*12.

the attorney-client privilege – that there was probable cause to suspect a crime or fraud had been committed – with respect to five topics: the Calmbacher report, the decision to terminate the judicial inspection process, the selection and appointment of Cabrera and the preparation and submission of his report, the authorship of the Judgment, and the submission of declarations signed by Fajardo to the Lago Agrio court and U.S. courts, which concealed and misrepresented material facts regarding the Cabrera report.[67]

## IV.   *Chevron's Unsuccessful Attempts to Obtain Discovery from Defendants*

Some important events described above occurred in Ecuador and involved Mr. Donziger and/or the Ecuadorian lawyers and associates.  Nonetheless, in both this action and the Count 9 Action,[68] defendants have refused to produce any documents in the possession, custody, or control of their attorneys and agents in Ecuador.   While their refusal has remained consistent, the basis they have provided for it has changed dramatically throughout the history of this case.

---

[67]

Subsequent to the Court's crime-fraud ruling, Chevron settled with the Stratus defendants. DI 1002.  Two of the Stratus defendants – Douglas Beltman and Ann Maest – submitted declarations in which they attested in substance that, at the direction of Donziger, they had written the Cabrera report and several of its annexes, and that the report's damage calculations and scientific conclusions were based at least in part on faulty assumptions and improper and unreliable calculations and scientific techniques.  *See* Stavers Decl. [DI 1007] Exs. 3652, 3653.  These declarations were filed subsequent to the Court's order compelling production of documents from Ecuador.  The Court did not rely on them in concluding that production was appropriate.

[68]

The "Count 9 Action" refers to 11 Civ. 3718 (LAK), which came into existence by the severance of Count 9 of Chevron's amended complaint in this action.  The Count 9 Action, which sought a declaratory judgment, has been dismissed.

A.      *The Motion to Compel Production of Ecuadorian Documents in the Count 9 Action*

The first point to bear in mind is that the defendants' contention that production of documents in the hands of their Ecuadorian lawyers and associates would violate Ecuadorian law is a belated afterthought.  Documents in the hands of those individuals and entities were sought in the Count 9 Action, but defendants made no such argument there despite extensive litigation concerning the production of those documents.

Chevron first moved in the Count 9 Action to compel the LAP Representatives to produce documents in the possession, custody, or control of their attorneys in Ecuador.[69]  The LAP Representatives opposed the motion, contending, *inter alia*, that they could not produce those documents because the Ecuadorian attorneys were not their agents and therefore were not subject to their control.[70]  They did not contend that production would be unlawful under Ecuadorian law.  This Court ordered production, holding that (1) Federal Rule of Civil Procedure 34 requires that a party served with a request for documents produce requested items "in the responding party's possession, custody, or control," (2) lawyers are agents of their clients and, therefore, (3) the LAP Representatives were obliged to produce all responsive documents in the possession, custody, or control of their Ecuadorian attorneys and agents.[71]

Notwithstanding the Court's order, the LAP Representatives refused to produce any

---

[69]      11 Civ. 3718, DI 77.

[70]      11 Civ. 3718, DI 96.

[71]      11 Civ. 3718, DI 101 (citing Fed. R. Civ. P. 34(a)(1)).

documents from their Ecuadorian attorneys.  Chevron moved for sanctions[72] in response to which the LAPs offered a new basis for their nonproduction – they argued, *inter alia*, that collecting, reviewing, and producing documents from their "approximately 87 lawyers . . . who have represented the Ecuadorian claimants" would be too burdensome.[73]

Magistrate Judge James C. Francis IV rejected the LAP Representatives' position, again ordered production, and deferred determination of Chevron's motion for a contempt ruling pending defendants' compliance with the order.[74]  Ultimately, the dismissal of the Count 9 Action intervened before the sanctions issued was decided.  But the key point for present purposes is that the defendants at no point argued in the Count 9 Action that production of the Ecuadorian documents was foreclosed by Ecuadorian law.

B.    *Chevron's Document Requests in this Action*

Chevron served its first set of requests for the production of documents in this action on the Donziger Defendants and the LAP Representatives on June 7, 2012.[75]  The defendants served

---

[72]

*See* 11 Civ. 3718, DI 178.

[73]

11 Civ. 3718, DI 215, at 7-8.

[74]

11 Civ. 3718, DI 240.

[75]

Champion Decl. [DI 895] Exs. 3504, 3505, 3506, 3507.

The document requests stated that they required production of responsive documents "in the possession, custody, or control of DEFENDANT's agents, attorneys or representatives (including but not limited to attorneys in this action, attorneys in the LAGO AGRIO LITIGATION, Pablo Fajardo Mendoza, Luis Yanza, Julio Prieto Méndez, Juan Pablo Sáenz)." *E.g.*, DI 3504, at 1.

their responses and objections on July 9, 2012.[76]  They did not object to the requests on the ground that any specific provision of Ecuadorian law prevented their attorneys and agents from producing the requested documents to them.[77]  Nor did they object to producing responsive documents in the physical possession of their Ecuadorian attorneys and allies on the ground that they lacked control over or practical ability to procure the documents from them.[78]  And the LAP Representatives did not contend that they could not be compelled to produce documents because they were objecting to the exercise of personal jurisdiction over them.  Nonetheless, defendants failed to produce – or to claim privilege as required by Rule 26(b)(5)(A) and S.D.N.Y. Rule 26.2 with respect to – any responsive documents in the possession, custody, or control over their agents and attorneys in Ecuador.[79]

---

[76]

*See* Donziger Defs.' Responses and Objections to Chevron Corp.'s First Set of Requests for the Production of Documents [DI 1508]; LAP Reps.' Joint Amended Objections and Responses to Chevron's First Set of Requests for Production of Documents [DI 616], Ex. 2**.**

[77]

*See* DI 616, Ex. 2.  The LAP Representatives did lodge boilerplate objections to Chevron's document requests, contending that the requests "call for . . . documents . . . that are protected from disclosure by the attorney-client privilege, the work product doctrine, the common-interest privilege, and/or any other privilege, immunity, confidentiality, or limitation on discovery pursuant to the constitutions, laws, or judicial orders of any tribunal of either the United States or the Republic of Ecuador." *Id.* at 15.  Insofar as they purported to invoke Ecuadorian law, on an "and/or" basis, they failed to identify any particular Ecuadorian law or decisions said to preclude disclosure.

[78]

*Id.*

[79]

While defendants did object to production on alleged privilege grounds, they did so only in conclusory terms.  Their failure to file the privilege logs required by the rules cited in the text waived any privilege objections that otherwise might have existed.  *See infra* n. 235 and accompanying text.

C.    *The Motion to Compel in this Action*

Chevron first moved on August 12, 2012 to compel the LAP Representatives and the Donziger Defendants to produce responsive documents in the hands of their Ecuadorian lawyers and other associates.[80]  This time the LAP Representatives conceded that Fajardo was their agent.[81]  They nevertheless resisted the motion, arguing, *inter alia*, that the motion was premature and that Chevron had failed to establish that the ADF, Yanza, and Selva Viva were their agents or subject to their control.[82]  The Donziger Defendants argued that Chevron had not shown that Mr. Donziger had the practical ability to obtain documents from his Ecuadorian co-counsel and the others.[83]  Now, however – for the first time in over a year of litigation concerning Chevron's efforts to obtain production of responsive documents from the LAPs' Ecuadorian attorneys and allies – both the Donziger Defendants and the LAP Representatives claimed that Ecuadorian law prohibited the attorneys from turning them over.

The LAP Representatives submitted a declaration by an Ecuadorian lawyer who contended that a "quasi-contractual community" among a group of clients represented by a single lawyer is created by Ecuadorian law and that anything belonging to any of the member of the community belongs to the community as a whole.[84]  This includes documents and "client secrets."

---

80
    DI 562.

81
    DI 563, at 2.

82
    *Id.*

83
    DI 564, at 1-2.

84
    DI 563, Ex. 1.

The attorney, he argued, cannot provide to any individual client his or her own documents (or any documents belonging to the community) without the express permission of every member of the community.  Production of responsive documents in the hands of the Ecuadorian lawyers, he asserted, therefore would be forbidden absent the express permission of all of the clients – the LAPs.

Chevron disputed these conclusions with a declaration of another Ecuadorian lawyer, who contended that the LAP Representatives' argument was erroneous.[85]  In the end, however, it became unnecessary to resolve this dispute, which was overtaken by events.

### 1.    *The Córdova Lawsuit*

While Chevron's motion was pending, and unbeknownst to Chevron or the Court, Attorney Smyser, formerly an attorney in this case for the LAP Representatives, "suggest[ed]" – as he put it – "to the Ecuadorian legal team that someone should consider seeking an Ecuadorian court ruling on the issue of document production."[86]  Although Smyser claimed that "Mr. Fajardo did not indicate whether he would act on the suggestion,"[87] a lawsuit was filed in Ecuador on October 18, 2012, in the name of one of the non-defending LAPs, Octavio Ismael Córdova Huanca, against Córdova's attorneys – Fajardo, Sáenz, and Prieto, as well as Yanza – to bar them from turning over

---

[85]

Ltr., Randy Mastro, Sept. 5, 2012.

[86]

DI 899 (Ltr., Craig Smyser and Larry R. Veselka, Mar. 8, 2013), at 2; *see also* Smyser Decl. [DI 952], at ¶ 2 ("On October 4, 2012, I participated in a phone call with Pablo Fajardo and Jarod Stewart and discussed, among other things, Chevron's motion to compel . . . . I suggested that given the parties' competing expert declarations on an issue of Ecuadorian law, the best way to resolve the issue would be to ask an Ecuadorian court for a ruling on the rights and obligations of the lawyers and the clients in this relationship governed by Ecuadorian law.").

[87]

Smyser Decl. [DI 952], at ¶ 2.

any information in discovery in this case (the "*Córdova* Lawsuit").[88]

Three months later, the LAP Representatives for the first time informed Chevron and this Court of the *Córdova* lawsuit[89] when they submitted a copy of a ruling from an Ecuadorian trial court which stated that:

> "PABLO FAJARDO MENDOZA, LUIS FRANCISCO YANZA ANGAMARCA, JULIO MARCELO PRIETO MENDEZ, and JUAN PABLO SANEZ MENA, ARE ORDERED NOT TO DELIVER TO Judge Lewis Kaplan of second district of the State of New York, or to anyone, any information that they have [or various categories of documents] that has been generated by, or is known to, the DEFENDANTS by their representation and that is available to them regarding the lawsuit against Chevron."[90]

This ruling, the defendants contended, "control[led] the issue of obtaining discovery in Ecuador."[91]

### 2.   *The Ruling on the Motion to Compel*

The Court granted Chevron's motion to compel documents from the LAP Representatives' Ecuadorian attorneys and agents by order dated February 11, 2013, with the promise of a fuller opinion to follow.[92]   The order provided in relevant part:

> "The Court now grants Chevron's motion (Dkt. 562) in all respects.   The LAP Representatives and Donziger, in responding to the Chevron RFP, shall produce all responsive documents that are in the possession, custody or control of their Ecuadorian attorneys and agents.   Any such responsive documents as to which no

---

[88]   DI 734, Ex. A (*Córdova* Ruling).

[89]   *See* DI 734.

[90]   DI 734, Ex. A (*Córdova* Ruling), at 4-5.

[91]   DI 734.

[92]   DI 787.

work product or attorney-client privilege is claimed shall be produced on or before March 6, 2013, which is 21 days after the date of this order and is consistent with the schedule to which the parties stipulated in Dkt. 703.  In the event work product, attorney-client privilege, or other privilege is claimed with respect to any such responsive documents, the LAP Representatives and Donziger shall provide a privilege log on or before February 22, 2013, the date agreed upon in the parties' Third Discovery Stipulation, dated February 11, 2013."[93]

The order further directed defendants to advise the Court whether they would comply with the order compelling production.  The defendants responded that they would not.[94]

### D.    The Motion for Sanctions

Chevron then moved, on March 12, 2013, to sanction and hold the Donziger Defendants and the LAP Representatives in contempt and to grant other relief for their failure to comply with the Court's order compelling production of the Ecuadorian documents.[95]  Chevron argued that defendants' failure to comply with the order, as well as various other discovery abuses, justified imposition of a wide array of sanctions, including holding defendants in contempt, entry of default judgments, striking defendants' affirmative defenses, prohibiting defendants from opposing Chevron's RICO and fraud claims, entering adverse findings of fact, and directing the jury to draw adverse inferences as to the Ecuadorian documents.[96]

Defendants argued that sanctions would be inappropriate because, among other

---

[93]     *Id.*

[94]     Then-counsel for the defendants stated that they had informed Fajardo of the order and asked him whether he would provide the responsive documents, but that Fajardo declined. DI 836, DI 841.

[95]     DI 893.

[96]     *Id.* at 19-23.

reasons, compliance with the Court's order was impossible under Ecuadorian law.  The LAP

Representatives argued also – for the first time in this matter – that the Court's order compelling

production did not apply to them because the Court lacks personal jurisdiction over them.  The

Donziger Defendants reiterated their argument, first made in opposition to Chevron's motion to

compel, that they could not obtain documents from the Ecuadorian attorneys and associates because

they were not Mr. Donziger's agents and he did not control them.

On April 16 through 18, 2013, the Court held an evidentiary hearing limited to the

issues:

> "1.    Whether and to what extent Donziger, the LAP Representatives, and their respective U.S. counsel acted in good faith to produce documents that are response to Chevron's First Set of Requests for Production of Documents and that are located in Ecuador.
>
> 2.    Whether and to what extent Donziger, the LAP Representatives, and their respective U.S. counsel have acted in good faith to comply with this Court's order of February 13, 2013 [granting Chevron's motion to compel the production of documents in the possession of defendants' attorneys and agents in Ecuador].
>
> 3.    Whether and to what extent Donziger, the LAP Representatives, and their respective U.S. counsel acted improperly or in bad faith with respect to the commencement, prosecution, and disclosure or lack thereof of proceedings in Ecuador that culminated in [the *Córdova* ruling] and in relation to the delay of proceedings in this Court during the pendency of that Ecuadorian proceeding.
>
> 4.    Whether and to what extent Donziger, individually and through his U.S. counsel, has and has had the practical ability to obtain documents and information from the LAPs' Ecuadorian counsel, Luis Yanza, Selva Viva, and the Amazon Defense Front.
>
> 5.    Whether and to what extent the LAP Representatives, individually and through Donziger, Donziger's U.S. counsel, and their own U.S. counsel, have and have had the practical ability to obtain documents and information from the LAPs' Ecuadorian counsel, Luis Yanza, Selva Viva, and the Amazon

29

Defense Front."[97]

*Discussion*

Part I below elucidates the bases for the order granting Chevron's motion to compel – to that extent, this is the opinion promised by the February 11, 2013 order compelling production (the "February 11 Order").  Part II deals with the motion for sanctions.

In setting forth the basis for the February 11 Order, the Court refers only to evidence before it at the time that order was issued.  Additional pertinent evidence – including the record of the April 2013 evidentiary hearing on the motion for sanctions – was placed before it later and is considered in Part II.

I.      *The February 11 Order Compelling Production*

Rule 26 of the Federal Rules of Civil Procedure provides that a party "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense."[98] Rule 34 in turn provides that a party served with a document request must produce requested items "in the responding party's possession, custody or control."[99]  A party is deemed to "control" documents that it has the legal right or the practical ability to obtain – even where those documents are in the physical possession of non-parties.[100]  "Documents in the possession of a party's attorney may be

---

[97]      DI 997.

[98]      Fed. R. Civ. P. 26(b)(1).

[99]      Fed. R. Civ. P. 34(a)(1).

[100]     7 Moore's Federal Practice § 34.14[2], at 34-73 to 34-77, 34-79, 34-81-82 (3d ed. 2013); 8B C. Wright & A. Miller, Federal Practice and Procedure: Civil § 2210, at

considered to be within the control of the party."[101]

Defendants refused to produce any documents – or even enumerate documents as to which they claimed privilege or work product protection – in the possession of their lawyers and agents in Ecuador.  They made essentially three arguments in opposition to the  motion to compel: (1) the LAP Representatives contended that Chevron failed to show that Yanza, the ADF, and Selva Viva were agents of the LAPs and therefore subject to their control; (2) the Donziger Defendants argued that Chevron did not establish that they had the practical ability to obtain documents in the possession of the Ecuadorian attorneys; and (3) both the Donziger Defendants and the LAP Representatives claimed that their Ecuadorian attorneys were prevented by Ecuadorian law from producing documents they obtained from the LAPs or created in the course of representing them. As these arguments are somewhat entwined with one another, a brief description of the Court's discussion of them is in order.

*First,* as noted, Rule 34 requires a party to produce documents over which it has practical control. Thus, Parts A and B explain the basis for the Court's conclusions that Mr. Donziger and the LAP Representatives have practical control over the Ecuadorian attorneys and associates.

*Second*, as will be seen, a Court may compel production of documents even where foreign law prohibits it, but only if (1) it has personal jurisdiction over the parties from whom production is sought, and (2) ordering production is in accord with principles of international comity. In Part C(1), the Court explains its conclusion that it has personal jurisdiction over the LAP

---

149-153 (2010).

[101]

7 Moore's Federal Practice § 34.14 [2][c], at 34-80.

31

Representatives, at least for purposes of the motion to compel.[102]  Having concluded that defendants have at least practical control over the Ecuadorian documents and that the Court has personal jurisdiction over the LAP Representatives for this purpose, the Court concludes in Part C(2)(a) that Ecuadorian law at least nominally prohibits production of the documents from Ecuador. Nevertheless, in Part C(2)(b) it explains that the Ecuadorian prohibition was not conclusive and that the factors pertinent to the comity analysis warranted the conclusion that the February 11 Order, which compelled production of responsive documents in the possession of the Ecuadorian attorneys and agents, was appropriate.

A.     *Mr. Donziger Has Had the Practical Ability to Obtain the Ecuadorian Documents*

In determining who controls and directs the Lago Agrio litigation and the lawyers and associates working for the LAPs, we must begin with the person who claims – in his words –  to "know more about the details of this story than anybody,"[103] Mr. Donziger.   Donziger – again in his own words – is "the person primarily responsible for putting [the Lago Agrio team] together and supervising it."[104]  He is – yet again, in his words – "at the epicenter of the legal, political, and media activity surrounding the case both in Ecuador and the U.S. [and has] close ties with almost all of the important characters in the [cases], including Amazon indigenous leaders, high-ranking Ecuadorian government officials, the world's leading scientists who deal with oil remediation, environmental

---

102

It is not disputed that the Court has personal jurisdiction over Donziger.

103

Hendricks Decl. [DI 9] Ex. 14 (Donziger book proposal), at 2.

104

*Id.*

activists, and many of Chevron's key players."[105]

Mr. Donziger has been "working on the . . . case . . . almost since the day [he] graduated from Harvard Law School in . . . 1991."[106]  He was invited by an Ecuadorian lawyer working in the United States – Cristobal Bonifaz – to travel to Ecuador and speak with the residents of the Ecuadorian rainforest about whether to bring a lawsuit against the Texaco Petroleum Company ("TexPet"), then a fourth-tier subsidiary of Texaco.[107]  Donziger and the other lawyers eventually filed suit in this Court against TexPet and others on behalf of a class of Ecuadorian plaintiffs who claimed TexPet had caused harm to their health and environment.[108]  The case – *Aguinda v. Texaco* – eventually was dismissed on the ground of *forum non conveniens*.[109]

While *Aguinda* was pending in New York, however, Texaco signed a settlement agreement with the Republic of Ecuador ("ROE") and Petroecuador, Ecuador's state-owned oil company, under which TexPet agreed to perform environmental remediation work in exchange for the ROE and Petroecuador releasing it from all liability and claims.[110]  But the settlement and release ultimately failed to end all litigation against TexPet relating to its work in Ecuador.  In 1999, while

---

[105]

    *Id.* at 4.

[106]

    *Id.*

[107]

    *Id.* at 9.  Chevron acquired all of the shares of Texaco in 2001.  *Chevron v. Donziger*, 886 F. Supp. 2d at 241.

[108]

    *Chevron v. Donziger*, 886 F. Supp. 2d at 241-42.

[109]

    *Aguinda v. Texaco*, 303 F.3d 470 (2d Cir. 2002).

[110]

    *Chevron Corp. v. Donziger*, 768 F. Supp. 2d at 598; *Republic of Ecuador,* 376 F. Supp. 2d at 342; 11 Civ. 3718, Hendricks Decl. II Ex. 46.

the *Aguinda* plaintiffs were litigating Texaco's motion to dismiss, Ecuador enacted the Environmental Management Act of 1999 (the "EMA"), which *inter alia* created a new private right of action for damages for the cost of remediation of environmental harms generally.[111]  The EMA became the basis upon which the Lago Agrio case was brought.  And it eventually became clear that Bonifaz and his team – which included Mr. Donziger – had "worked with Ecuadorian lawyers to draft [the EMA] similar to the U.S. superfund law" in preparation "for a possible move [of the case] from U.S. courts."[112]

In 2003, following the dismissal of *Aguinda*, the LAPs, represented by Ecuadorian counsel acting with Mr. Donziger, filed suit against Chevron – which by then had acquired all of Texaco's common stock in a reverse triangular merger – in Lago Agrio, Ecuador.[113]  Because Donziger was not licensed to practice law in Ecuador, however, a local lawyer was needed to appear in court.  Alberto Wray initially was the lead Ecuadorian lawyer.[114]  Donziger later promoted Fajardo to lead the Ecuadorian team,[115] and he has worked intimately with Fajardo ever since.

Mr. Donziger's dominant role with respect to Fajardo and the more junior Ecuadorian lawyers is clear from his own writings.  Donziger refers to them as his "local counsel."[116]  Fajardo

---

[111]  *Chevron v. Donziger*, 886 F. Supp. 2d at 242 (citing Act 99-37, Registro Oficial No. 245, July 30, 1999).

[112]  *See* 11 Civ. 3718, Hendricks Decl. II, at 2.

[113]  *Chevron v. Donziger*, 886 F. Supp. 2d at 243.

[114]  Hendricks Decl. [DI 9] Ex. 14 (Donziger book proposal), at 22.

[115]  *See id.* at 21, 25-26.

[116]  Gomez Decl. [DI 287], Ex. 15 (Donziger Dep.), at 3440:5-10.

refers to Donziger as "as the 'cabeza' [i.e., the head or chief] of the lawsuit."[117]  Donziger once wrote

that Fajardo "at times . . .  seems very immature and unsophisticated - but the only thin[g] holding

him back is lack of experience."[118]  In particular, Donziger felt that Fajardo and the other Ecuadorian

lawyers did not fully comprehend the necessity of making sure the Ecuadorian judges "fear[ed]"

them.  He wrote of a conversation he once had with Fajardo and Yanza:

> "I launched into my familiar lecture about how the only way the court will respect us
> is if they fear us - and that the only way they will fear us is if they think we have . .
> . control over their careers, their jobs, their reputations - that is to say, their ability to
> earn a livelihood. Goes back to what Mateo said months ago, to my Peru analogy
> about that petty thief being burned at the stake.  I have never felt Pablo understood
> this fundamental issue, even though he is a committed leftist - it's like he really
> believes in the law as a vehicle for social change.   But it also has to do with
> something he can't control, but I suspect that he realizes privately - his lowly social
> status in a country where privilege is ingrained and totally tied to power. When Pablo
> walks into the court, he is one of them, no different from the secretaries and clerks -
> a punk kid from the Amazon, with nothing to back him up, nothing to fear, no strings
> to pull. When [Texaco's lawyer] walks into the court, he has 500 years of history
> behind him - plus the awesome power of an international company, unlimited
> resources, full-page ads, a villa on a military base, and utter arrogance that comes
> from knowing you are the it man. So when Pablo says he talks to Guerra, or any of
> the other judges, I just don't know what happens behind those doors. I know he does
> his best, and what he says is likely excellent. But they don't fear him, and without
> fear, we are going to lose no matter how strong the evidence. In fact, because there
> is so little fear of us, Texaco is in the game in a big way despite the fact they are
> losing overwhelmingly."[119]

Donziger expressed also his concern that Texaco's lawyers "just out-argue us and my biggest concern

is that I don't think Pablo [Fajardo] and Julio [Prieto] can do much better than they are doing, given

their capacities and lack of understanding of Ecuadorian and international law. . . . They don't have

---

[117]      Hendricks Decl. [DI 28] Ex. 76 (Donziger journal), at 23 of 109.

[118]      *Id.* at 28 of 109.

[119]      *Id.* at 55 of 109.

the capacity."[120]

In light of the foregoing, it is not surprising that Mr. Donziger "play[s] [what he has called] an integral role i[n] designing the [Lago Agrio] trial strategy and working closely with" Fajardo, Yanza – whom he has described as his "closest friend in Ecuador and the coordinator of the case for the affected communities" – and the rest of the Ecuadorian team.[121] His "supervis[ion]"[122] of the Lago Agrio litigation and the LAPs' Ecuadorian lawyers has been extensive. He has visited his "local counsel" in Quito at least monthly. He has reviewed the Ecuadorian lawyers' work product, provided them with memoranda and documents to be filed with the Lago Agrio court (at least one of which in substance ended up in the Judgment despite the fact that it is not in the Lago Agrio record),[123] coordinated filings both in Ecuador and in the various U.S. litigations,[124] met with several of the Ecuadorian judges presiding over the Lago Agrio case,[125] and managed the LAPs'

---

[120]

Id. at DONZ00036231-32.

[121]

Hendricks Decl. [DI 9] Ex. 14 (Donziger book proposal), at 21.

[122]

Id. at 2.

[123]

See Chevron Corp. v. Donziger, 2013 WL 1087236, at *9 & n.78 (discussing memo written by Donziger intern whose analysis on Australian causation law ended up in the Judgment).

[124]

See e.g., Hendricks Decl [DI 28] Ex. 76 (Donziger journal) at 44 of 109 ("Feel overwhelmed. I need another lawyer. I have the annexes [to the Cabrera report], the intervention in Sand and SF, the Bar complaint, Miles and the FCPA complaint, the Fraud memo – we have to get this stuff in.").

[125]

See, e.g., id. at 4 of 109 ("Met with judge in Lago on April 10. . . Met in empty warehouse near his house, across from the TAME office in Lago Agrio. He seemed very agitated. Said we were not helping him."); 26 of 109 ("Guerra will be the judge to decide the case. We have to start lobbying him, working with him."); id. at 36 of 109 ("Meeting with Judge: on Sat night at Lupe's house."); id. at 38 of 109 ("Meeting with Judge in hotel: On Tuesday night in Hotel Auca"); id. at 26 (Jan. 19, 2007 journal entry noting: "Met with judge last

experts. Donziger hired and worked directly with Stratus, which wrote Cabrera's report.[126] Indeed, he was present at meetings in which members of the LAP team met *ex parte* with Cabrera and a representative of Stratus to discuss the extent to which Stratus would be involved in drafting the report.[127]

      Mr. Donziger's own words are not the only proof of his extensive involvement in and control over the Lago Agrio litigation. Indeed, the retention agreement into which he entered with the LAPs and Fajardo very clearly enumerates his responsibilities and makes clear his role as chief of the Lago Agrio team. That agreement, entered into in January 2011, provides:

---

night in house. Humble house, furniture. Made tea. I really like the guy. Remember last August I wanted to ride the wave and get him off case? This was an example of Pablo's total intelligence. We saved him, and now we are reaping the benefits."); *id.*, at 1 of 109 ("Two very disturbing meetings with Judge in Lago on May 21. First with Trudie and Luis Yanza full of his charm and bullshit, starts blaming Texaco for filing too many papers. And then that night, I saw another side of Pablo. He called to ask if I would call the judge so we could go see him at his house. . . . I called the judge and he asked that we bring over some whiskey or some wine. We didn't. When we got there, he was clearly drunk and had a young woman."); *id.* at DONZ0036233 ("lunch after with judge, he hits on Atossa and two Scandanavian [sic] women");  *id.* at DONZ0036235 ("Lunch meeting with judge. This was second meeting with judge - had lunch with him the previous day in Cangrejo Rojo. I love it – this lobbying. I am good at it.").

[126]

*See Chevron Corp. v. Donziger*, 886 F. Supp. 2d at 258-59 (describing meeting Donziger, a Stratus representative, and others had with Cabrera to "lay out the entire case and legal theory for Mr. Cabrera.") The Reyes declaration states that Donziger asked Reyes to serve as an independent expert to "monitor" the settling experts in the Lago Agrio case. *Chevron Corp. v. Donziger*, 2013 WL 1087236, at *10 (citing Mastro Decl. [DI 658] Ex. 3014 (Reyes Decl.)). According to Reyes, Donziger asked Reyes to write a report establishing that the settling experts were wrong. *Id.* Later, Donziger and the other LAP lawyers informed Reyes that they wanted him to serve as the global "court-appointed" expert. *Id.* at *11. When the Lago Agrio court "put up hurdles" to his appointment, Donziger and Reyes discussed appointing Cabrera instead. *Id.* Reyes' account is corroborated – at least to some degree – by Donziger's own journal. *See* Hendricks Decl [DI 28], Ex. 76, at 18 of 109, 20 of 109, DONZ0036276.

[127]

*Chevron Corp. v. Donziger*, 886 F. Supp. 2d at 258; *In re Application of Chevron Corp.,* No. M–19–111, Berlinger Decl. ¶ 18; Hendricks Decl. [DI 8], Ex. 6 (Donziger Dep. Transcript), at 1120-1121.

"(2)   Devotion of Resources

(a)   [Mr. Donziger's] Firm agrees that it shall zealously represent the [LAPS] in connection with the [Lago Agrio] Litigation and shall commit substantial resources to the Litigation as may be required in order to zealously prosecute and defend the Litigation whether foreseen or unforeseen. . . .

(b)   In addition, the [LAPs] hereby appoint Steven R. Donziger, Esq. To act as their United States Representatives ("Plaintiffs' U.S. Representatives") *to exercise overall responsibility for the strategic direction of the [Lago Agrio] Litigation and the day-to-day management of the [Lago Agrio] Litigation*.  Without limiting the generality of the foregoing, the Plaintiffs' U.S. Representative shall have primary responsibility for the following:

(i)   coordinating the overall legal strategy of the Plaintiffs to pursue and defend all aspects of the [Lago Agrio] Litigation, as applicable, in such a manner as to advance and further the interests of the [LAPs] in the [Lago Agrio] Litigation to maximum extent (*including, without limitation, coordinating the United States legal strategy with the Ecuadorian legal strategy*);

(ii)   assembling and organizing the various United States lawyers and law firms who or which from time to time will represent the [LAPs] in connection with the [Lago Agrio] Litigation (including, without limitation, preparing and negotiating engagement agreements with such lawyers and law firms on behalf of the Plaintiffs; and coordinating the efforts and undertakings of such lawyers and law firms);

(iii)   coordinating the efforts to procure funding or financing for the [Lago Agrio] Litigation from on or more third parties . . . .

(iv)   assembling and organizing the various non-legal advisors, experts, service provides and others who or which from time to time will assist the Plaintiffs in pursuing and/or defending various aspects of the [Lago Agrio] Litigation and coordinating the efforts and undertakings of such advisors, experts, service providers and others; and

(v)   coordinating the media, public affairs and public relations activities on behalf of the [LAPs] . . . ."

"The Plaintiffs' U.S. Representative hereby acknowledges that, in carrying out the foregoing responsibilities, he will be required to provide his efforts in the United States, Ecuador and elsewhere."[128]

And, as his retention agreement makes clear, Mr. Donziger's involvement has not been limited to Ecuador. The Court previously has noted that "[Donziger's] firm has been the functional equivalent of the LAPs' New York office."[129] He has performed a variety of roles on behalf of the LAPs, including in New York – "public relations, hiring and consulting with experts, political activity, fund raising and so on."[130] He persuaded Berlinger to film and produce *Crude*.[131] He reached out to financial and political bodies to support and publicize the litigation and to exert pressure on Chevron to settle.[132] And he contacted New York's then Attorney General,[133] who sent Chevron a letter requesting follow up about the veracity of Chevron's public disclosures respecting liability in Ecuador.[134]

Moreover, as the coordinator and supervisor of the LAPs' team, Mr. Donziger largely has controlled its funding. Donziger took the lead in soliciting funds from investors and was

---

[128]
    Hendricks Decl. [DI 355] Ex. 1122 (Donziger retention agreement), at 2-3 (emphasis added).

[129]
    *Chevron Corp. v. Donziger*, 768 F. Supp. 2d at 641.

[130]
    *Id.*

[131]
    *Chevron Corp v. Donziger*, 886 F. Supp. 2d at 244-45.

[132]
    *See, e.g.*, 10 MC 00002, Hendricks Decl. II Ex. 277.

[133]
    *Id.*, Ex. 6, at 719:2-720:12.

[134]
    *Id.*, Ex. 271.

primarily responsible for engaging the investment firms.[135]   And once the funding was secured, he

controlled or had veto power over the manner in which the funds provided to the Lago Agrio team

were spent.[136]   Mr. Donziger served also as the intermediary between the Ecuadorian lawyers and

associates and the Kohn law firm, which acted as the primary funder for the Ecuadorian litigation for

several years.[137]   Indeed, there is  evidence that when the Ecuadorian lawyers and agents needed

money, they contacted Mr. Donziger, who transferred it to the team's bank accounts in Ecuador.[138]

Mr. Donziger on occasion has even paid the salaries of his local counsel out of his personal

accounts[139] and determined whether and to what extent they would receive bonuses for their work on

---

[135]

> *See, e.g.*, DI 814,  Ex. 3 (Steven Donziger's Responses and Objections to Chevron Corporation's First Set of Requests for Admission), at 156-57 ("REQUEST FOR ADMISSION NO. 530: Admit that under the 2010 Torvia Agreement, Torvia made an additional contribution in the amount of $1.25 million on August 17, 2010 into a bank account held in YOUR name or controlled by YOU.  RESPONSE TO REQUEST FOR ADMISSION NO. 530: . . . Donziger admits that he received $1.25 million from Torvia Limited on or about March 10, 2010.").

[136]

> *See, e.g.*, 11 Civ. 03718, DI 44, Ex. 46 (Treca Funding Agreement), at Sched. 1, p. 2.

[137]

> 11 Civ. 3718, Champion Decl. [DI 37], Exs. 13-14 (Jan. 2007 emails between Donziger and Joseph Kohn discussing Kohn's transfers of money "to Quito" used to fund the litigation and "pay off some debts"), Exs. 15-18, 24-29  (documents reflecting payments made by Kohn to LAPs' scientific consultants).

[138]

> *See, e.g.*, Champion Decl. [DI 400], Ex. 2021 (June 2007 emails between Donziger and Yanza discussing transfers of money from Donziger to Yanza's accounts), Ex. 2022 (Sept. 2007 email from Yanza to Donziger stating, "[w]e need 50 thousand more next Monday at the latest."); Ex 2026 (Sept. 2007 email from Yanza to Donziger relaying the ADF's account information and saying "I hope you make a deposit right away").

[139]

> *See e.g.*, DI 562, Ex. 1, 2, (Donziger Dep. Tr.), at 4912:19-22 ("I think [Yanza's] salary was set by mutual consent between Mr. Kohn and myself on the one hand, and Mr. Yanza on the other, when Mr. Kohn was involved in the case).  *See also* DI 814, Ex. 2 ( Steven Donziger's Responses and Objections to Chevron Corporation's First Set of Requests for Admission), at 23 ("REQUEST FOR ADMISSION NO. 7:  Admit that YOU were involved in setting Luis Yanza's monthly salary for his work concerning the LAGO AGRIO

the Lago Agrio team.[140]

      The fact that Mr. Donziger has played the leading role in the litigation against Chevron for many years is borne out by his position in the team's compensation structure.  Mr. Donziger stands to receive more money from the Lago Agrio litigation than any other lawyer – or law firm – working on the case for the LAPs.  The LAPs have agreed to a contingent fee for all of their lawyers of 20 percent of any recovery.[141]  Donziger's retention agreement with them entitles him to 31.5 percent of the total contingency fee.[142]  Thus, he would stand to receive over $1 billion if the Judgment were collected in its entirety.   This is more than three times the amount Fajardo would be entitled to receive.[143]   In addition, Mr. Donziger's retention agreement provides also that Mr. Donziger is entitled to a monthly retainer – paid by the LAPs – for his services on the Lago Agrio

---

LITIGATION.  RESPONSE TO REQUEST FOR ADMISSION NO. 7: . . .  Donziger admits that he was aware of, and at times participated in, discussion concerning Luis Yanza's compensation."); *id.* at 24-25 (same for Juan Pablo Sáenz); *id.* at 26 (same for Julio Prieto).

[140]

DI 562, at 3; Ex. 2 (Donziger Dep. Tr.), at 4913: (Q: Who determined whether Mr. Yanza would receive a bonus?  A: I think, again, it was done by mutual consent between Mr. Yanza and myself after Mr. Kohn had withdrawn from the case.").  *See also* DI 814, Ex. 2 ( Steven Donziger's Responses and Objections to Chevron Corporation's First Set of Requests for Admission), at 23-24 ("REQUEST FOR ADMISSION NO. 9:  Admit that YOU were involved in setting Luis Yanza's bonuses for work concerning the LAGO AGRIO LITIGATION.  RESPONSE TO REQUEST FOR ADMISSION NO. 9: . . . Donziger admits that he was aware of, and at times participated in, discussion concerning Luis Yanza's compensation."); *id.* at 25-27 (same for Juan Pablo Sáenz.); *id.* at 26 (same for Julio Prieto).

[141]

Hendricks Decl. [DI 355] Ex. 1122 (Donziger retention agreement), at 3.

[142]

*Id.*

[143]

Hendricks Decl. [DI 355] Ex. 1106 (Fajardo retention agreement), at 2.

team.[144]

   Nonetheless, despite the overwhelming evidence that Donziger has controlled the Lago Agrio litigation team – as well as evidence that, when the American legal team (led by Donziger and Patton Boggs) needed documents,[145] declarations,[146] or assistance from the Ecuadorian attorneys, they got it – Donziger contended in his opposition to the motion to compel that he was unable to obtain documents from the Ecuadorians. But he presented no evidence on the motion to compel to support his assertion that he lacked control over the Ecuadorian attorneys and agents. He pointed to no instance in which he had asked the Ecuadorians for documents and they had refused to provide them,[147] this despite Chevron's presentation of evidence of many instances in which Fajardo and others complied with Donziger's various requests.[148]

   The evidence Chevron presented, as well as Mr. Donziger's failure meaningfully to

---

[144]

  Hendricks Decl. [DI 355] Ex. 1122 (Donziger retention agreement), at 4.

[145]

  *See, e.g.*, Champion Decl. [DI 400] Ex. 2036 (Dec. 17, 2007 email from Fajardo to Donziger) ("Commander, this is the document submitted by the expert that you requested").

[146]

  *Chevron Corp. v. Donziger*, 2013 WL 1087236, at *13-14 (describing how Donziger and PB orchestrated the filing of a declaration signed by Fajardo – written by PB – to the District of Colorado in the Stratus 1782 proceeding); *id.* (email from PB partner that said, "[t]his is why we struggled with who should sign the declaration. If Steve [Donziger] signs, he will most certainly be deposed. Same for any other counsel in the U.S. We figured that with [Fajardo], they likely would not slow down the process by deposing him.") (citing Stavers Decl [DI 549] Ex. 2407).

[147]

  Later, in response to Chevron's motion to impose sanctions based on non-compliance with the order compelling production, Donziger did submit evidence in an effort to establish that he no longer had the practical ability to obtain the requested documents from Ecuador. We discuss that evidence, which was not before the Court on the motion to compel production, in connection with the application for sanctions.

[148]

  *See supra* nn. 140, 141.

confront any of it, led the Court to find that Mr. Donziger – who initiated the Lago Agrio litigation, put together the legal teams in Ecuador and the United States, controlled the funding and managed the litigation strategy, and controlled at least to some degree the salaries of the Ecuadorian lawyers – had and has the ability to obtain documents from his Ecuadorian team.

  **B.**  *The Ecuadorian Lawyers and Their Associates Are Agents of or Under the Practical Control of the LAP Representatives*

   The LAP Representatives conceded on the motion to compel that Fajardo and the other Ecuadorian attorneys are their agents for purposes of Rule 34.[149] They argued, however, that Chevron had failed to establish that the non-lawyers – Luis Yanza, the ADF, and Selva Viva – were their agents and or otherwise subject to their control for purposes of Rule 34.[150] This argument was belied by the record as well as defendants' own statements and actions throughout the history of this case.

   As previously described, Donziger – in addition to being the LAPs' so-called U.S. Representative[151] – is the "cabeza" or head of the Ecuadorian legal team.  According to Donziger, Yanza is not only Donziger's "closest friend in Ecuador," but "a central part of the [Ecuadorian] litigation team, even though he is not a lawyer.  He purports to represent the plaintiffs.  He is

---

[149]
   In the Count 9 Action, the Court ruled that the Ecuadorian lawyers were the LAP Representatives' agents and ordered production, stating "that the attorneys were agents of their clients, and that '[a]n agent is subject to a duty to provide his principal with information relevant to the affairs entrusted to him or her provided only that doing so would not violate a superior duty owed to another.'" 11 Civ. 3718, DI 101, at 3 (citing *Evvtex Co. v. Hartley Cooper Assocs., Ltd.*, 102 F.3d 1327, 1332 (2d Cir. 1996); RESTATEMENT (THIRD) OF AGENCY § 8.11 (2006).  This is not disputed in this action.

[150]
   DI 563, at 2.

[151]
   Hendricks Decl. [DI 355] Ex. 1122 (Donziger retention agreement), at 1-2.

involved in strategy discussions.  And throughout the many years of his involvement in the case, he always has played that role."[152]  At the direction of Donziger and Fajardo, Yanza consistently has been a key player in the LAPs' legal battle in Ecuador.  He has "work[ed] full time in his role as case coordinator for the" LAPs.[153]  He has lobbied the president of Ecuador on the LAPs' behalf.[154]  According to Guerra, Yanza was involved in setting up and carrying out the scheme to pay Guerra and Zambrano to render the Judgment in the LAPs' favor.  He has raised funds to support and run the Lago Agrio litigation team and even signed the LAPs' funding agreements with various litigation funders  on the LAPs' behalf pursuant to a power of attorney.[155]  So too did he sign Donziger's retainer agreement  on the LAPs' behalf with U.S. counsel pursuant to a special power of attorney.[156]  The suggestion that he is not the LAPs' agent and, in addition, subject to their practical control through Donziger, strains credulity.

So does the argument concerning the ADF and Selva Viva, both of which are run by Yanza.  The ADF and Selva Viva were created by Yanza and others to handle the Lago Agrio team's funding and expenses and ultimately to deal with the proceeds from the Judgment.  Yanza co-founded

---

[152]

       Hendricks Decl. [DI 400] Ex. 2010 (Donziger Dep. Tr.), at 107:18-24.

[153]

       DI 562, Ex. 2 (Donziger deposition transcript), at 4920:11-17.

[154]

       *In re Chevron Corp.*, 749 F. Supp. 2d at 155.

[155]

       *See* 11 Civ. 3718, DI 44, Ex. 46 (Treca Funding Agreement), at S-3; DI 370-9 (Michael Donziger Funding Agreement), at S-2; DI 355-36 (Sherman Funding Agreement), at S-2; DI 355-32 (Torvia Limited Funding Agreement), at S-2; DI 355-36 (Wiese Funding Agreement), at S-2.

[156]

       Hendricks Decl. [DI 355] Ex. 1122 (Donziger retention agreement), at 12.

44

the ADF – a non-profit organization purporting to represent the LAPs in the Lago Agrio Litigation.[157]
And Yanza is "paid by the Lago Agrio Plaintiffs' team for his services in running Selva Viva,"[158] –
an entity created by the ADF to administer litigation funds[159] – of which Mr. Donziger was and may
still be president.[160]

      In entering the February 11 Order, the Court concluded that the Ecuadorian lawyers,
Yanza, the ADF, and Selva Viva are agents of the LAPs and, in any case, directly or indirectly
subject to their practical control.

*   *   *

      Having determined that Donziger had the practical ability to obtain documents from
the LAPs' Ecuadorian lawyers and associates and that the non-lawyer associates were agents of and
subject to the practical control of the LAP Representatives, the Court then turned to defendants' final
argument: that production of the LAPs' documents was illegal under Ecuadorian law.  As will be
seen, the Court determined that ordering production of the documents was appropriate whether or not
Ecuadorian law prevented it.  In so holding – although the LAP Representatives did not contend on

---

[157]
    *Chevron Corp. v. Donziger,* 886 F. Supp. 2d at 249 n.85; DI 168 (Lago Agrio Judgment),
at 186.

[158]
    DI 562, Ex. 2 (Donziger deposition transcript), at 4911:19-22; *id.* at 4920:11-17 (Donziger
testifies that Yanza "was working full time in his role as case coordinator for the affected
communities.  So as part of that role he ran the Selva Viva entity."); *see also* Champion
Decl. [DI 400] Ex. 2023 ("Luis Yanza [is] the coordinator of the [Lago Agrio] case, and the
guy who runs the Selva Viva account.  He is the same guy we have always worked with.").

[159]
    Champion Decl [DI 400] Ex. 2023 (Aug. 14, 2007 Email from Donziger to Kohn and
others) ("The [ADF] created Selva Viva as a pass thru mechanism to administer the funds
for the litigation; the Frente controls Selva Viva.").

[160]
    *In re Chevron Corp.*, 10 MC 0002 (LAK), DI 14-5 (Oct. 8, 2004 Ltr.).

the motion to compel that their unresolved objection to the Court's personal jurisdiction over them precluded an order compelling production – the Court nevertheless considered that possibility and concluded that it did not.

C.   *Ecuadorian Law and Principles of International Comity*

Defendants argued that this Court could not properly conclude that they had control over the Ecuadorian documents and therefore could not order them to produce the documents.  The argument was this:  "[T]he attorney-client relationship at issue in Chevron's motion is between Ecuadorian clients and lawyers and is thus governed by Ecuadorian law."[161]  Fajardo was precluded by Ecuadorian law from producing the documents.  *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*,[162] defendants contended, held that a federal district court could not compel production of documents, the production of which would violate foreign law.  Accordingly, in their view, this Court could not grant Chevron's motion to compel.  But the argument was unpersuasive because defendants misread *Shcherbakovskiy*.

*Shcherbakovskiy* in relevant part involved an appeal from a default judgment entered as a sanction for plaintiff's failure to comply with an order to produce documents, the production of which the plaintiff claimed would have violated Russian law.  In granting that default judgment, the district court "took the view that Russian law was irrelevant to discovery matters in United States courts" and, in addition, rejected plaintiff's factual claim on credibility grounds.[163]  The Court of

---

[161]   DI 563, at 2.

[162]   490 F.3d 130 (2d Cir. 2007).

[163]   *Id.* at 138.

46

Appeals reversed, holding that "Russian law is relevant to the issues,"[164] and remanded for further proceedings.  On remand, the district court considered Russian law, but nevertheless reimposed sanctions for non-production, which the Court of Appeals then affirmed.[165]

Defendants here sought great comfort in the Second Circuit's statement that "[i]f Russian law prohibits appellant from obtaining and producing the documents even with the agreement of [the board of the company of which the plaintiff was the board chair] . . . then the matter is at an end."[166]  They interpret that as meaning that a U.S. court may not compel production of documents, the furnishing of which would violate the law of another nation.  But they are mistaken for two reasons.

*First*, they ignore the fact that the "at an end" statement, whatever precisely it was intended to convey, was *dictum.*  The relevant holding of the case was simply that Russian law was pertinent.  Absent a determination that Russian law prohibited production, there was no occasion to consider the implications of any such conclusion.

*Second*, they ignore the fact that the Supreme Court has made clear that "it is well settled that [foreign] statutes do not deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate that statute."[167]  A district court may "impose discovery under the Federal Rules of Civil Procedure when it has

---

[164]

*Id.* at 139.

[165]

*Shcherbakovskiy v. Seitz,* 03 Civ. 1220 (RPP), 2010 WL 3155169, at *14 (S.D.N.Y. July 30, 2010), *aff'd,* 450 Fed. App'x. 87 (2d Cir. 2011).

[166]

*Id.* at 139.

[167]

*Société Nationale Industrielle Aérospatiale v. U.S. Dist. Court for S. Dist. of Iowa*, 482 U.S. 522,  544 n.29 (1987) (hereinafter *Aérospatiale*).

personal jurisdiction over the foreign party" notwithstanding provisions of foreign law that would prohibit production.[168]  In such circumstances, the court should undertake a "particularized analysis of the respective interests of the foreign nation and the requesting nation" before doing so.[169]  This comity analysis requires a court to balance the interests of the United States in fully and fairly adjudicating disputes before its courts, the party requesting the information in obtaining information it contends is necessary for prosecution of its suit, and the foreign nation whose laws prohibit the information from being disclosed.[170]  Accordingly, the Court turned to the personal jurisdiction prerequisite and then to the comity analysis.

### 1.     Personal Jurisdiction

The LAP Representatives asserted in their answer to Chevron's complaint that the Court lacks personal jurisdiction over them.  They did not, however, object to Chevron's document requests on this ground.  Nor did they raise it in their opposition to Chevron's motion to compel.  Indeed, never during the three days of hearings the Court held in an effort to resolve the parties'

---

[168]     *Aérospatiale*, 482 U.S. at 553 n.4.  Moreover, prohibitions of foreign law do not necessarily bar the conclusion that a party has "control" over documents for purposes of Rule 34. *Société Internationale pour Participations Industrielles et Commerciales, S. A. v. Rogers*, 357 U.S. 197, 204 (1958); *see also Tiffany (NJ) LLC v. Qi Andrew,* 276 F.R.D. 143, 150 (S.D.N.Y. 2011) (defendant bank had custody and control over requested documents even though production prohibited by Chinese law); *Minpeco, S.A. v. Conticommodity Servs., Inc.*, 116 F.R.D. 517, 520 (S.D.N.Y. 1987) (finding control even where Swiss bank secrecy law prohibited production of documents).

[169]     *Aérospatiale*, 482 U.S. at 543.

[170]     *E.g.*, *In re Grand Jury Subpoena dated August 9, 2000*, 218 F. Supp. 2d 544, 554 (S.D.N.Y. 2002) ("When the laws of two jurisdictions conflict, the court must balance the interests, including the respective interests of the states involved and the hardship that would be imposed upon the person or entity subject to compliance.").

disputes over their respective document requests was such an argument made.

The LAP Representatives' failure to raise personal jurisdiction waived that argument for purposes of the motion to compel.[171]  But even if they properly and timely had argued that the Court lacked the power to compel them to produce documents because it did not have personal jurisdiction over them,  the Court would have rejected that argument.

In *Insurance Corporation of Ireland v. Compagnie des Bauxites de Guinee*,[172] the petitioner argued that the district court's imposition of sanctions for the petitioner's failure to produce jurisdictional discovery was improper because the court lacked personal jurisdiction to order such production in the first place.  Petitioner contended that "a party need not obey the orders of a court until it is established that the court has personal jurisdiction over that party.  If there is no obligation to obey a judicial order, a sanction cannot be applied for the failure to comply."[173]

The Supreme Court rejected that argument.  It held in essence that a court has jurisdiction to determine whether it has jurisdiction: "By submitting to the jurisdiction of the court

---

171

  *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1473 (9th Cir. 1992) (defendant waived argument that Chinese secrecy laws prevented production of documents where defendant failed to object on that ground or to make argument in its opposition to plaintiff's motion to compel); *Marx v. Kelly, Hart & Hallman, P.C.*, 929 F.2d 8, 12 (1st Cir. 1991) ("If the responding party fails to make a timely objection [to a request for discovery under Rule 34], or fails to state the reason for an objection, he may be held to have waived any or all of his objections"); *Eldaghar v. City of New York Dep't of Citywide Admin. Servs.*, 02 Civ. 9151(KMW)(HBP), 2003 WL 22455224, at *1 (S.D.N.Y. Oct. 28, 2003) ("The law is well settled that a failure to assert objections to a discovery request in a timely manner operates as a waiver."); *Cohalan v. Genie Indus., Inc.*, 276 F.R.D. 161, 163 (S.D.N.Y. 2011) (same); 7 MOORE'S FEDERAL PRACTICE § 34.13[2][b] at 34-58 (3d ed. 2013) ("If a party responding to a Rule 34 request objects to a particular item or category of the request, the reason for the objection must be stated . . . . Failure to comply . . . may be held to be a waiver of any objections not adequately stated.").

172

  456 U.S. 694, 706 (1982).

173

  *Id.* at 706.

for the limited purpose of challenging jurisdiction, the defendant agrees to abide by the court's determination on the issue of jurisdiction."[174] A defendant cannot challenge the court's jurisdiction over it and then refuse to comply with the court's order compelling production of discovery pertinent to deciding the jurisdictional objection. Indeed, it is axiomatic that plaintiffs must "be given an opportunity to conduct discovery on . . . jurisdictional facts, at least where the facts, for which discovery is sought, are peculiarly within the knowledge of the opposing party."[175]

As noted, the LAP Representatives challenge this Court's jurisdiction over them,[176] and the Court has not yet resolved the jurisdictional challenge. This did not, however, justify the LAP Representatives' refusal to produce documents to Chevron.

The LAP Representatives moved to dismiss this case for lack of personal jurisdiction. They contended that their retention of Mr. Donziger and their participation in litigation in New York – both of which the Court previously held were grounds on which Chevron was likely to prevail on

---

[174]

      *Id.*

[175]

      *Gualandi v. Adams*, 385 F.3d 236, 244 (2d Cir. 2004) (citing *Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986)). Indeed, courts have held that a party may not assert foreign law as a defense to jurisdictional discovery. *See, e.g.*, *Rich v. KIS Calif., Inc.*, 121 F.R.D. 254, 259 (M.D.N.C. 1988) (rejecting defendants' attempt to evoke Hague Convention to resist jurisdictional discovery).

[176]

      The Court first addressed the jurisdiction question in its opinion on Chevron's motion for a preliminary injunction barring enforcement in the Count 9 Action. The Court held that "Chevron [was] likely to prevail on its contention that the LAP Representatives [we]re doing business in New York" and were subject to specific jurisdiction for purposes of N.Y. CPLR §§ 301 and 302 "by virtue of their repeated litigation in this Court and Donziger's activities on their behalf." *Chevron Corp. v. Donziger*, 768 F. Supp. 2d at 642.

yhe jurisdictional issue[177] – were insufficient to satisfy N.Y. CPLR §§ 301 and 302.[178]

The Court noted that the LAP Representatives' motion involved arguments and facts that went beyond the allegations in Chevron's complaint and in substance was "one for summary judgment" on the issue of personal jurisdiction.[179]  The Court determined that deferral of the motion therefore would be "appropriate and preferable here because discovery [was] just beginning in this action, and the factual issues pertinent to th[e] motion [we]re intertwined with the merits."[180]  In other words, discovery was necessary to resolve the LAPs' jurisdictional challenge.  It therefore denied the LAP Representative's motion without prejudice to renewal following the close of discovery.[181]

Because the Court determined that the issue of personal jurisdiction is intertwined with the merits of Chevron's claims, and because material evidence bearing on many of Chevron's allegations likely resides in Ecuador, Chevron is entitled to discovery from the Ecuadorian attorneys and agents in order to prove that the Court has jurisdiction over the LAP Representatives.  Moreover, the Court noted in its order denying without prejudice the LAP Representatives' motion to dismiss that N.Y. CPLR § 301 "extends general jurisdiction to a non-domiciliary based on sufficient presence

---

[177]

*Id.*

[178]

*See* DI 517.

[179]

*Id.* at 1-2.

[180]

DI 572. at 2.

[181]

DI 572.

The LAP Representatives have not renewed the motion in the months since discovery closed.  Nor did their proposed special verdict form request submission of the issue to the jury.

in New York of its agent even where the non-domiciliary did not exercise 'direct control over its

putative agent.'"[182]   Thus, the extent to which the LAP Representatives authorized or ratified Mr.

Donziger's New York-based activities – either directly or through their attorney-in-fact, Pablo

Fajardo, or their other attorneys and agents – necessarily is informed by communications among the

LAP Representatives, their Ecuadorian representatives, and Mr. Donziger, as well as the activities

of Mr. Donziger.  Discovery of those communications and activities is necessary to resolve the LAPs'

jurisdictional challenge.  Indeed, many of Chevron's document requests seek information directly

related to these issues.[183]

---

[182]

DI 572, at 2 n.8 (citing *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 95 (2d Cir. 2000)).

[183]

*E.g.*, DI 616-2 (LAP Reps.' Responses and Objections to Chevron's Doc. Requests), 3 ("ALL DOCUMENTS RELATED TO any travel by any LAGO AGRIO PLAINTIFF to the New York RELATED TO CHEVRON or the CHEVRON LITIGATIONS"); 5 ("ALL DOCUMENTS RELATED TO any travel by any of the non-U.S. resident RICO DEFENDANTS or non-U.S. CO-CONSPIRATORS to New York RELATED TO CHEVRON or the CHEVRON LITIGATIONS"); 13 ("ALL DOCUMENTS RELATED TO the hiring or retention of counsel for the LAGO AGIO LITIGATION"); 14 ("ALL DOCUMENTS RELATED TO the authority of Steven Donziger to act on behalf of the LAGO AGRIO PLAINTIFFS in the United States or Ecuador"); 26 ("ALL COMMUNICATIONS between any LAGO AGRIO PLAINTIFF and Steven Donziger"); 27 ("ALL AGREEMENTS RELATED TO the funding of the LAGO AGRIO LITIGATION or the CRIMINAL CASES"); 28 ("ALL DOCUMENTS RELATED TO any PERSON, excluding counsel of record, who financially supported or invested in … The LAGO AGRIO LITIGATION"); DI 616-3 (LAP Reps.' Responses and Objections to Chevron's Doc. Requests, Part II) 35 ("ALL DOCUMENTS RELATED TO funding by KOHN SWIFT & GRAF . . . of the CHEVRON LITIGATIONS"); 36 ("ALL DOCUMENTS that set forth an accounting of the expenditures for the CHEVRON LITIGATIONS including but no limited to any accountings prepared by SELVA VIVA"); 37 ("ALL DOCUMENTS RELATED TO the CHEVRON LITIGATIONS associated with savings, checking, money market, brokerage or any other credit or debit accounts belonging to Steven Donziger"); DI 616-5 (LAP Reps.' Responses and Objections to Chevron's Doc. Requests, Part IV) 87 ("ALL DOCUMENTS RELATED TO E-TECH"); 93 ("ALL DOCUMENTS RELATED TO the work of SELVA VIVA RELATED TO THE CHEVRON LITIGATIONS"); 94 ("ALL DOCUMENTS RELATED TO the identification or recruitment by any LAGO AGRIO PLAINTIFF RELATED PARTY of any person other than CABRERA to potentially serve as the global expert and any COMMUNICATIONS with such person"); DI 616-6 (LAP Reps.' Responses and Objections to Chevron's Doc. Requests, Part V) ("ALL DOCUMENTS RELATED TO

The LAP Representatives' attempt to prevent discovery from Ecuador therefore prevented jurisdictional among other discovery.  This was impermissible.  Defendants could not successfully have premised their refusal to provide such discovery on an argument that the Court lacks jurisdiction over them – and they in fact made no such argument in opposition to the motion to compel.  Thus, the Court determined that it has jurisdiction over the LAP Representatives at least for purposes of the motion to compel[184] and therefore had the power to order production of the documents notwithstanding Ecuadorian law.  It next turned to the question whether such an order was appropriate given the principles of international comity.

      2.     *The Alleged Illegality of Production Under Ecuadorian Law Did Not Preclude the Court's Order to Produce*

A district court has the power to order production of documents located abroad even

---

Steven Donziger's allocation or distribution of any of the proceeds RELATED TO the LAGO AGRIO JUDGMENT including all COMMUNICATIONS RELATED TO the same"); 120 ("ALL DOCUMENTS RELATED TO the release, disposal, sale, transfer or gift whether through contract or otherwise of any interest in any of the proceeds from the LAGO AGRIO JUDGMENT to any individual or entity by any of the LAGO AGRIO PLAINTIFFS, any of the RICO DEFENDANTS or any of the CO-CONSPIRATORS"); 135 ("ALL DOCUMENTS RELATED TO Joseph Berlinger, Michael Bonfiglio, @Radical Media or any PERSONS employed by them or working at their direction, CONCERNING the CHEVRON LITIGATIONS or the film *Crude; The Real Price of Oil*"); 137 ("ALL DOCUMENTS RELATED TO any COMMUNICATIONS by any of the LAGO AGRIO PLAINTIFF RELATED PARTIES with any State Attorney General's Office or its employees REGARDING CHEVRON"); 139 ("ALL DOCUMENTS RELATED TO any COMMUNICATION by any of the LAGO AGRIO PLAINTIFF RELATED PARTIES with any State's Office of the Comptroller or its employees including the Office of the New York State Comptroller").

[184]    *See* RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 442, Reporter's Note No. 11 (1987) ("Challenges to [personal] jurisdiction may depend on questions of fact. . . . In such circumstances, some United States courts have sustained discovery requests related to these questions before a determination of jurisdiction, provided the plaintiff has made an initial showing giving reason to believe that the bases for jurisdiction are present.").

where disclosure of those documents is prohibited by foreign law.[185]  As noted, defendants contended in their opposition to the motion to compel that Ecuadorian law – specifically, the alleged obligations of a lawyer to a group of clients represented as a collective – prohibits their Ecuadorian attorneys and associates from producing responsive documents to them or to Chevron.  The indispensable first step in the comity analysis, however, was to determine whether there was a true conflict between the *Córdova* injunction and U.S. law.[186]

i.      *Whether There is a True Conflict of Law*

Among the relevant principles is whether there is a true conflict of law between Ecuador and the United States with respect to the Court's authority to compel production of responsive documents.

a.      *Ecuadorian Law*

The *Córdova* injunction barred Fajardo, other lawyers, and Yanza from producing documents because allowing production would violate "Subsections a), b), c) and 1) of Section 7 of Art. 76 of the [Ecuadorian] Constitution[, which] provide that: "No one may be denied the right to defend his interests in any phase or stage of the proceeding; To have the time and means adequate

---

[185]

        *Aerospatiale*, 482 U.S. at  544 n.29 (1987) ("It is well settled that [foreign blocking] statutes do not deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate that statute.") (citing *Rogers*, 357 U.S. at 202).

[186]

        *See, e.g.*, *Hartford Fire Ins. Co. v. California,* 509 U.S. 764, 798 (1993) ("The only substantial question in this litigation is whether 'there is in fact a true conflict between domestic and foreign law.'") (quoting *Aérospatiale,* 482 U.S. at 555 (concurring in part and dissenting in part)); *In re Maxwell Commc'n Corp. plc by Homan*, 93 F.3d 1036, 1049 (2d Cir. 1996) ("International comity comes into play only when there is a true conflict between American law and that of a foreign jurisdiction."); *Linde v. Arab Bank, PLC*, 706 F.3d 92, 111 (2d Cir. 2013).

54

for the preparation of his defense; To be heard at the appropriate time and on equal terms."[187]

  As will be seen below, there are troubling aspects as to the manner in which the *Córdova* ruling was sought and procured, matters that go to the good faith of the LAPs and their attorneys. But this Court perhaps may not, and in any case did not here, disregard that ruling insofar as it purports to state the law of Ecuador. Accordingly, the Court assumed, at least for purposes of this motion, that the *Córdova* injunction is binding in Ecuador on those persons to whom it is directed.   The next step in the analysis was to consider how U.S. law would have treated a comparable situation, this in order to assess the existence and extent of any conflict between U.S. and Ecuadorian principles, the latter as embodied in the *Córdova* ruling.

### b.  *U.S. Law*

  Under U.S. law, confidential attorney-client communications for the purpose of obtaining or communicating legal advice are protected from disclosure by the attorney-client privilege. Certain other materials are protected by the work product doctrine. But it certainly cannot be said that there never may be any discovery of anything at all from attorneys. Among other considerations, the privilege and work product protection are waivable including, for example, by selective dissemination. Attorneys often come into possession of relevant documents that are neither attorney-client communications nor work product and which therefore are discoverable. Privilege and work product protection may be vitiated by the crime-fraud exception. All of these possibilities are dealt with by the requirement that the party asserting privilege or work product protection against disclosure bears the burden of establishing that the prerequisites to protection are satisfied. In the

---

[187]  DI 734, Ex. A, at 3.

case of document discovery, this requires at a minimum the preparation of a so-called privilege log setting forth basic information to permit the existence of protection to be contested in a meaningful way.[188]  In short, U.S. law permits discovery of relevant documents from attorneys unless a privilege or other protection from disclosure is duly claimed, the relevant particulars of the claim of privilege or other protection from disclosure are set forth as to each allegedly protected document, and the claim of protection sustained.

The *Córdova* injunction reflects the very different view that there may be no disclosure of documents possessed by attorneys – period.  That is very much at odds with U.S. law.

The *Córdova* injunction is at odds with U.S. law in a second respect – it enjoins any disclosure by Yanza, who is not an attorney.  While there are circumstances under U.S. law in which some materials possessed or generated by lay persons working with attorneys come within protections normally afforded to attorneys,[189] the circumstances warranting the extension of protections to such persons – typically, that the materials in question were integral to the lay person assisting the attorney in performing his legal function – must be established by the party claiming them.[190]  There is nothing in the record or in the *Córdova* ruling that suggests that all responsive documents in the possession, custody, or control of Yanza were integral to any assistance he provided to the attorneys in performing the attorneys' function of representing their clients in the Ecuadorian

---

[188]

> *See, e.g.*, Fed. R. Civ. P. 26(b)(5); S.D.N.Y. Civ. R. 26.2.

[189]

> *E.g.*, *United States v. Kovel,* 296 F.2d 918 (2d Cir.1961) (client's communications with accountant employed by his attorney privileged where made to enable attorney to understand the client's situation in order to provide legal advice).

[190]

> *See, e.g.,* *In re Grand Jury Subpoenas Dated March 24, 2003 Directed to (A) Grand Jury Witness & (B) Grand Jury Witness,* 265 F. Supp. 2d 321 (S.D.N.Y. 2003).

courts.  Indeed, given the abundance of evidence of Yanza's activity in lobbying the Ecuadorian government, it seems altogether likely that he possesses or controls documents that do not even remotely come within any such description.

Accordingly, the *Córdova* ruling conflicts with U.S. law at least in the foregoing respects.  Moreover, it must be noted that defendants did not argue in their opposition to the motion to compel that U.S. law prohibited an order compelling production of documents from their Ecuadorian attorneys and associates.  Nor did they contend sufficiently that any of the responsive documents in Fajardo's and the other Ecuadorians' possession were privileged or protected by the work product doctrine under U.S. law.  Because it is the burden of the party asserting a privilege to establish its existence,[191] and because defendants failed so to establish, they have waived any contention that any responsive documents in the possession, custody, or control of the Ecuadorian attorneys and associates would have been protected from disclosure under U.S. law by the attorney-client privilege or work product doctrine.

Finally, the *Córdova* decision did not adopt the controverted argument that the LAP Representatives made here in opposition to the motion to compel – that an Ecuadorian lawyer representing a group of clients is prohibited by Ecuadorian law from disclosing the documents and "secrets" of any without the express permission of all.  Indeed, neither the decision itself nor so much of the record as the parties submitted to this Court on this motion suggested that the argument was made by the plaintiff in *Córdova*.  But the result here would have been the same even if Ecuadorian

---

[191]   *Spectrum Sys. Int'l Corp. v. Chem. Bank*, 78 N.Y.2d 371, 377 (1991) ("the burden of establishing any right to protection is on the party asserting it; the protection claimed must be narrowly construed; and its application must be consistent with the purposes underlying the immunity"); *see also United States v. Schwimmer*, 892 F.2d 237, 244 (2d Cir. 1989) (same).

law were to that effect.

The relevant U.S. analogy is to situations in which two or more clients share a single lawyer or there is a joint representation of multiple clients by multiple lawyers – in other words, the so-called joint defense privilege or "common interest rule."[192]  That rule "serves to protect the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel."[193]  The common interest rule "has been described as 'an extension of the attorney-client privilege.'"[194] A party asserting it first must establish that the documents purportedly subject to the rule are in fact attorney-client communications subject to the attorney-client privilege.[195]  Thus, "[a]s in all claims of privilege arising out of the attorney-client relationship, a claim resting on the common interest rule requires a showing that the communication in question was given in confidence and that the client reasonably understood it to be so given."[196]  And once the party claiming common interest privilege has established that the documents in question are subject to the attorney-client privilege, it must further show that (1) it shares a common legal interest with the party with whom the documents or information were shared, and (2) the statements for which

---

[192]
    *Schwimmer*, 892 F.2d at 243.

[193]
    *Id.*

[194]
    *Id.* (citing *Waller v. Financial Corp. of Am.,* 828 F.2d 579, 583 n. 7 (9th Cir.1987)).

[195]
    *Schwimmer*, 892 F.2d at 243 (quoting *Waller v. Fin. Corp. Of Am.*, 828 F.2d 579, 583 n.7 (9th Cir. 1987)).

[196]
    *Id.* at 244.

58

protection is sought were designed to further that interest.[197]

The common interest rule, like all privileges, is narrowly construed and subject to many exceptions.[198] The burden of establishing that it applies, "in all its elements, always rests upon the person asserting it."[199] This showing must be made on a document-by-document basis, and based on "competent evidence, usually through the admission of affidavits, deposition testimony or other admissible evidence."[200]

Defendants did not show that the common interest privilege would have protected each and every responsive document at issue here, assuming *arguendo* that U.S. law controlled any protection they might have enjoyed. They presented no evidence – either to this Court nor, so far as the record reveals, to the court in the *Córdova* action – showing that each document satisfies the requisite criteria. They submitted no privilege log or description of the documents. They have not established, as would be required under U.S. law, that *each responsive document* (1) reflects attorney-client communications, and (2) is subject to the common interest rule. They simply contended that *no document* in the possession of any of the Ecuadorian attorneys and agents may be produced.

Assuming *arguendo* that Ecuadorian law is what the defendants say it is – that an Ecuadorian lawyer representing a group of clients is prohibited by Ecuadorian law from disclosing the documents and "secrets" of any without the express permission of all – it goes far beyond the

---

[197]

        *E.g.*, *Gulf Islands Leasing v. Bombardier Capital*, 215 F.R.D. 466, 471 (S.D.N.Y 2003).

[198]

        *United States v. Weissman*, 195 F.3d 96, 100 (2d Cir. 1999) ("Privileges should be narrowly construed and expansions cautiously extended.")

[199]

        *Schwimmer*, 892 F.2d at 244.

[200]

        *Bombardier Capital*, 215 F.R.D. at 472 (citing *von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 147 (2d Cir. 1987)).

protections from discovery afforded by U.S. law.  There is a true conflict on this assumption as well.

*   *   *

Having determined that (1) defendants have at least practical control over the documents in the possession of their Ecuadorian attorneys and agents for Rule 34 purposes, (2) the Court has jurisdiction over defendants, in the case of the LAP Representatives for the purpose of compelling at least jurisdictional discovery, (3) Ecuadorian law prohibits or, in the case of the "group privilege" argument, is assumed to prohibit production of the requested documents, and (4) there is a true conflict between Ecuadorian and U.S. law, the Court then determined whether an order compelling defendants to produce the documents would be in accord with principles of international comity.

<em>ii.    Comity Analysis</em>

A district court has wide discretion to determine whether and to what extent it should compel discovery by a party over which it has jurisdiction where that party contends that foreign law prohibits production.  In such cases, the Supreme Court has held, a court faced with the determination should undertake a "particularized analysis of the respective interests of the foreign nation and the requesting nation."[201]  That analysis involves consideration of the factors set forth in what is now Section 442 of the Restatement (Third) of Foreign Relations Law of the United States,[202]  which are:

> "(1) the importance to the . . . litigation of the documents or other information requested; (2) the degree of specificity of the request; (3) whether the information originated in the United States; (4) the availability of alternative means of securing

---

[201] *Aérospatiale*, 482 U.S. at 543-44.

[202] *Id.* at 544 n.28 (quoting RESTATEMENT OF FOREIGN RELATIONS LAW OF THE UNITED STATES (REVISED) § 471(1)(c) (Tent. Draft No. 7, 1986 (approved May 14, 1986)); *see also Linde v. Arab Bank, PLC*, 706 F.3d 92, 109-110 (2d Cir. 2013).

the information; and (5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located."[203]

Courts in the Second Circuit consider also the "hardship of compliance on the party or witness from whom discovery is sought [and] the good faith of the party resisting discovery."[204]

None of the parties addressed these factors on Chevron's motion to compel. The LAP Representatives and the Donziger Defendants argued simply that Ecuadorian law prohibits production of the documents and production therefore could not be compelled.[205] Chevron took an equally simple position, first failing to consider Ecuadorian law at all, and then contending that defendants were wrong as to its substance. After first considering the analysis set forth above, however, the Court undertook a comity analysis.

### a.    The Importance of the Documents to the Litigation

The first factor the Court analyzed was the importance of the documents to this litigation. A court need consider only the relevance of the requested documents to the case; it need not find that the documents are "vital to a proper defense of this action."[206] Moreover, "production is favored when the evidence sought from the producing party is directly probative to the issues of

---

203

 *Aérospatiale*, 482 U.S. at 544 n.28 (quoting RESTATEMENT OF FOREIGN RELATIONS LAW OF THE UNITED STATES (Revised) § 471(1)(c) (Tent. Draft No. 7, 1986 (approved May 14, 1986)).

204

 *Tiffany (NJ) LLC*, 276 F.R.D. at 151 (quoting *Gucci Am., Inc. V. Corveal Fashion*, 09 Civ. 8459 (RJS) (THK), 2010 WL 808639, at *2 (S.D.N.Y. Mar. 8, 2010)).

205

 DI 563, 564.

206

 *Reino de España v. Am. Bureau of Shipping,* 03Civ. 3573 (LTS), 2005 WL 1813017, at *7 (S.D.N.Y. Aug. 1, 2005) (internal citations and quotation marks omitted).

the case."[207]

Chevron's complaint centers on allegations that Mr. Donziger – based in New York – acted in concert with the LAPs' attorneys and agents – based in Ecuador – and others to conceive, substantially execute, largely fund, and significantly direct a scheme to extort and defraud Chevron by, among other things bringing a lawsuit in Ecuador.

*First*, as discussed above, many of the documents Chevron seeks would go directly to the nature and extent of the activities of Donziger and others in New York on behalf of the LAPs, which would be highly pertinent to the existence of personal jurisdiction over the LAP Representatives.

*Second*, many of Chevron's document requests seek information relating to the alleged activities the LAPs' attorneys and agents undertook to carry out the alleged scheme, as well as their communications with Donziger and others in New York and elsewhere in the United States who allegedly directed or participated in it. The requests seek documents relating, among other things, to: the LAPs' agents communications with members of the Ecuadorian government and judiciary, their *ex parte* contacts with Cabrera and other court-appointed experts, payments they allegedly made to Ecuadorian judges, documents they allegedly provided to the Lago Agrio judge that were not in the Lago Agrio court record, and the manner in which the Lago Agrio litigation was financed and run. Although defendants did not provide the Court with any description of the documents in their Ecuadorian attorneys' possession, there is no doubt – and neither the LAP Representatives nor Donziger have attempted to dispute – that the documents at issue are relevant, perhaps vital, to Chevron's prosecution of this case.

---

[207]    *Reino de España*, 2005 WL 1813017, at *7.

The importance of the documents, both to this litigation generally and to the personal jurisdiction issue in particular, counseled strongly in favor of production.

### b.    Specificity of the Requests

"Generalized searches for information, the disclosure of which is prohibited under foreign law, are discouraged."[208]  Where document requests are overbroad and not tailored to the allegations in the complaint, this factor will counsel against production.

In the time since Chevron first served its documents requests, the parties have engaged in meet-and-confers to address defendants' objections to the requests.  The requests were narrowed substantially, partly by agreement and then in consequence of rulings made during oral argument on December 20, 2012.[209]  By the time the Court issued the February 11 order compelling discovery, Chevron's document requests had been narrowed significantly.  There was no significant issue as to the level of specificity.

### c.    The Availability of Alternative Means of Obtaining the Information

The bulk of the information sought in Chevron's document requests could not be obtained by other means.  Many of the events that led up to the Judgment took place in Ecuador, albeit probably with supervision, planning, and assistance from the United States.  Many of these events – e.g., the judicial inspection process, Cabrera's appointment and the filing of his report, and

---

[208]

    *Richmark Corp.*, 959 F.2d at 1475.

[209]

    DI 721, ¶ 3 & Schs. 5 (pp. xxiii-xlvi) -6 (pp. xlvii-lxxii).

the alleged ghostwriting of all or part of the Judgment – allegedly were orchestrated and committed in large part by Mr. Donziger and the LAPs' Ecuadorian attorneys and agents, the very people from whom Chevron sought documents.  Chevron could not reasonably have obtained equivalent information from other sources.[210]  Defendants did not contend otherwise, at least persuasively.[211]

*d.*      *Whether the Information Originated in Ecuador*

The documents at issue on the motion to compel are located – and many likely originated – in Ecuador.  However, where "the information cannot be *easily obtained* through alternative means, the origin of the information can be counterbalanced with the inability to obtain the information through an alternative means, thus favoring disclosure."[212]  As explained above, Chevron could not readily obtain the information it seeks from other sources, if at all.  This factor thus counseled in favor of production.

---

[210]

It is true that the Court ordered limited production from Patton Boggs in part because Chevron was unable to get discovery from the LAPs' Ecuadorian attorneys and agents. *Chevron Corp. v. Donziger*, 2013 WL 1087236, at *21-22.  There is no basis to conclude, however, that PB – an American law firm, albeit one heavily involved since 2010 in most aspects of the Ecuadorian and U.S. litigation efforts – can provide discovery that is substantially equivalent to that which could be provided by the Ecuadorian attorneys and agents who were personally involved in the events Chevron alleges were tainted by fraud.

[211]

Chevron contends that "these documents are not otherwise available to Chevron, because the custodians at issue are not directly subject to compulsory process of the Court." DI 562, at 2.

[212]

*Lantheus Med.*, 841 F. Supp. 2d at 793 (citing *Gucci Am.*, 2010 WL 808639, at *3 (emphasis in original)).

64

e.      *Balance of National Interests*

The fifth factor is the balance of the interests of Ecuador in enforcing its laws against the interests of the United States in requiring production of the documents.  Courts consider this the most important factor in the comity analysis.

Certainly the *Córdova* ruling reflects a determination by an Ecuadorian governmental body.  Ecuador presumably has an interest in seeing that it is complied with.

On the other hand, "the United States has 'a substantial interest in fully and fairly adjudicating matters before its courts,' [and] [a]chieving that goal is only possible with complete discovery."[213]  At issue in this litigation are, among other things, the actions taken by the defendants in the Ecuadorian proceedings.  The absence of the Ecuadorian attorneys' and agents' documents threatens the Court's ability to ensure that the truth underlying these matters is revealed and that the case is fairly and properly adjudicated.

The United States has an interest also in ensuring that its laws are enforced.  And, "[a]lthough the interest of the United States in criminal and civil enforcement suits is normally stronger than its interest in private disputes," this distinction is less significant where, as here, claims are brought under RICO, which has the effect "intended by Congress . . . of enforcing the law by means of 'private attorney generals.'"[214]  The Supreme Court has recognized that RICO "bring[s] to bear the pressure of 'private attorneys general' on a serious national problem for which public

---

[213]

       *Gucci Am., Inc.*, 2010 WL 808639, at *5 (quoting *Minpeco, S.A. v. Conticommodity Servs., Inc.*, 116 F.R.D. 517, 524 (S.D.N.Y. 1987)).

[214]

       *Minpeco. S.A.*, 116 F.R.D. at 523.

prosecutorial resources are deemed inadequate."[215]  The important interest of combating the "serious

national problem[s]" of racketeering and corruption would be undermined absent production of these

documents.

Finally, "when foreign governments . . . have considered their vital national interests

threatened, they have not hesitated to make known their objections to the enforcement of a subpoena

to the issuing court."[216]  The fact that the Ecuadorian government – which has not hesitated to make

clear its support for the LAP team[217] – neither sought to intervene in this discovery dispute nor

expressed a view on this issue cuts against a finding that Ecuador's interests outweigh those of the

United States on this issue.

---

[215]

*Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 151 (1987); *see also Linde*, 706 F.3d at 112 (finding U.S. had interest in compelling disclosure of foreign documents in suit brought under Alien-Terrorism Act because the "legislative history reflects that Congress conceived of the ATA, at least in part, as a mechanism for protecting the public's interests through private enforcement").

[216]

*United States v. First Nat. City Bank*, 396 F.2d 897, 904 (2d Cir. 1968); *see also United States v. Davis*, 767 F.2d 1025, 1035 (2d Cir. 1985) ("The absence of any objection by the Cayman government to the subpoena and subsequent order . . . is significant.").

[217]

*See, e.g.*, *In re Application of Chevron Corp.*, 709 F. Supp. 2d 283, 289 (S.D.N.Y. 2010) *aff'd sub nom. Chevron Corp. v. Berlinger*, 629 F.3d 297 (2d Cir. 2011) (describing scene from *Crude* in which "a representative of the plaintiffs informs Donziger that he had left the office of President Correa 'after coordinating everything.' Donziger declares, 'Congratulations. We've achieved something very important in this case . . . .  Now we are friends with the President.' The film then offers a glimpse of a meeting between President Correa and plaintiffs' counsel that takes place on a helicopter. Later on, President Correa embraces Donziger and says, 'Wonderful, keep it up!'"). *See also Ecuador President Rafael Correa: Chevron is 'Enemy of Our Country'*, AGENCE FRANCE PRESSE, Aug. 17, 2013, *a v a i l a b l e a t* http://www.huffingtonpost.com/2013/08/17/ecuador-president-rafael-correa_n_3773558.html.

### f.     Hardship of Compliance

Finally, in determining whether to compel discovery from a party that claims production is prohibited by foreign law, courts should consider the effect the discovery order is likely to have on the party facing conflicting legal obligations.  If a party is likely to face criminal prosecution for complying with an order, a court should be more reluctant to order production than where there is no such risk.[218]

While no one has indicated that criminal prosecution would be a theoretical consequence of violating the *Córdova* injunction, the Court so assumes.  It notes also that the provision of the Ecuadorian penal code cited by the LAPs in their opposition to the motion to compel provides that "any . . . professional entrusted with a secret by reason of the profession they exercise and who disclose the secret, even in a court of law, will be punished with a prison term of one to six months and a fine of eight to sixteen United States dollars."[219]  Nevertheless, neither the LAP Representatives nor the Donziger Defendants asserted that anyone likely would be prosecuted criminally, or even sued civilly, if they and their Ecuadorian attorneys and associates complied fully with an order compelling production.  Defendants did "not submit[] any authority regarding the likelihood of prosecution, conviction, or imposition of . . . a sentence or fine" if their lawyers and associates were to turn over their documents.[220]  Moreover, the record reveals that Fajardo has

---

[218]

    *Societe Internationale*, 357 U.S. at 211.

[219]

    DI 563, Ex. A, at 1.  The provision states also that "[e]xceptions will be granted if the law obligates the party in question to disclose the secret."

[220]

    *Gucci Am., Inc.* 2010 WL 808639, at *6.  Moreover, "the mere threat of criminal prosecution abroad does not strip our courts of the authority to order production of relevant materials in private civil litigation."  *Linde*, 706 F.3d at 114.

provided Donziger and the LAPs' U.S. attorneys with documents and materials throughout the history of this case when such materials were thought helpful to their position.[221]  Not once has he been prosecuted or subjected to any penalty.  The absence of any such evidence weighs against a finding that a party faces hardship if it complies with a discovery request.[222]  This factor counseled in favor of ordering production.

*   *   *

In sum, the Court was persuaded that principles of comity weighed in favor of ordering the production of the documents Chevron requested from the LAP Representatives' attorneys and agents in Ecuador.  Chevron's motion to compel production of documents from the LAPs' Ecuadorian attorneys and agents therefore was granted.

## II.     *The Motion for Sanctions*

As noted, defendants informed the Court that they would not comply with the order compelling production of documents from Ecuador.  Chevron then moved to sanction and hold the Donziger Defendants and the LAP Representatives in contempt of court for their failure to comply with the Court's order compelling production of the Ecuadorian documents.  Having reviewed the parties' briefs and concluded the evidentiary hearing, the Court now resolves Chevron's sanctions motion.

---

[221]      *See, e.g.*, DI 1316 ("the LAP Representatives former counsel admitted that he received the Zambrano declaration and the tape recordings from Pablo Fajardo") (citing Mastro Decl. [DI 1075] Ex. 5 (Apr. 8, 2013 Ltr. From Craig Smyser to Randy Mastro)); DI 974 Ex. 1 (Zambrano Decl.); DI 66-2 & 138-13 (Fajardo Decl.); DI 154 (Sáenz Decl.); *Chevron Corp. v. Stratus Consulting, Inc.*, No. 10 Civ. 00047 (D. Colo.), DI 99 (Fajardo Decl.).

[222]      *Tiffany (NJ) LLC*, 276 F.R.D. at 158.

A.      *The Parties' Positions*

Federal Rule of Civil Procedure 37(b)(2) permits a court to impose sanctions for a party's failure to obey a discovery order. "Where, as here, the nature of the alleged breach of a discovery obligation is the non-production of evidence," Rule 37(b) affords a court "broad discretion in fashioning an appropriate sanction."[223]  The Rule instructs that the sanction be "just,"[224] which means that "the severity of the sanction must be commensurate with the non-compliance."[225] Sanctions for failure to comply with discovery orders should "insofar as possible, . . . restor[e] the prejudiced party to the same position [it] would have been in absent the wrongful [withholding] of evidence by the opposing party."[226]

Chevron contends that (1) defendants failed to exercise reasonable diligence in seeking documents in the possession of their Ecuadorian agents, and (2) defendants' justifications for their failure to produce the documents as ordered by the Court – including that they were prohibited from doing so by Ecuadorian law – are "baseless."[227]  In addition, Chevron argues that defendants should be sanctioned for their failure "to comply with their discovery obligations apart

---

223

 *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002).

224

 Fed. R. Civ. P. 37(b)(2)(A).

225

 *Shcherbakovskiy* 490 F.3d at 140.

226

 *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998).  Although *Kronisch* concerned the destruction of evidence rather than its non-production, the Second Circuit has made clear that evidence need not be destroyed for an adverse inference instruction to apply. *See, e.g.*, *Reilly v. Natwest Mkts. Grp., Inc.*, 181 F.3d 253, 267 (2d Cir. 1999) (affirming an adverse inference instruction where party failed to produce documents until the eve of trial due to gross negligence).

227

 DI 894, at 15.

from the Ecuadorian documents."[228]  According to Chevron, these discovery abuses – combined with defendants' refusal to produce the Ecuadorian documents – justify a broad range of sanctions.

The LAP Representatives argue that (1) the Court's order compelling production of the Ecuadorian documents "does not apply to" them because the Court lacks personal jurisdiction over them,[229] (2) the LAP Representatives have no ability to produce documents in the possession of their Ecuadorian lawyers and agents because Ecuadorian law prohibits disclosure of such documents,[230] and therefore (3) none of the requested sanctions is appropriate.

The Donziger Defendants contend that (1) they "do[] not have any Ecuadorian attorneys and agents" from which they could have requested documents and therefore did not violate the Court's order compelling discovery,[231] (2) they do not possess, or have the ability to obtain, documents in the possession of the attorneys and agents in Ecuador, and (3) Chevron's "other gripes concerning Donziger's document production and supplemental interrogatory responses are premature and without merit."[232]

B.      The LAP Representatives' Jurisdictional Argument Fails

The LAP Representatives contend that the February 11 Order compelling production

---

[228]

      *Id.* at 8.

[229]

      DI 950, at 10.

[230]

      *Id.* at 11.

[231]

      DI 947, at 10.

[232]

      *Id.* at 19.

of responsive documents from Ecuador did not apply to them because the Court lacks personal jurisdiction over them. The order, however, was directed squarely at them in unmistakable terms – it obviously "applied" to them. Thus, their argument in substance is that the February 11 Order, insofar as it applied to them, was erroneous and that they therefore cannot be sanctioned for refusing to comply with it. They are mistaken.

*First,* the LAP Representatives did not object to Chevron's document requests on jurisdictional grounds or attempt to limit Chevron's document requests to those relating to jurisdictional issues. Nor did they make any such argument in their opposition to Chevron's motion to compel. They thereby waived any contention that they should not have been ordered to comply with the document requests on the theory that the Court lacked personal jurisdiction over them.[233]

*Second,* "all orders and judgments of courts must be complied with promptly. If a person to whom a court directs an order believes that order is incorrect the remedy is to appeal, but, absent a stay, he must comply promptly with the order pending appeal. Persons who make private determinations of the law and refuse to obey an order generally risk criminal contempt even if the order is ultimately ruled incorrect."[234] So too here. A party ordered to furnish discovery must comply with that order subject to any appellate recourse that may be open to it. Refusal to comply risks the imposition of sanctions.

*Third*, the Supreme Court clearly has held that sanctions may be imposed on a party

---

[233]

E.g., *Eldaghar*, 2003 WL 22455224, at *1; *Cohalan*, 276 F.R.D. at 163; *Hall v. Sullivan*, 231 F.R.D. at 473; 7 MOORE'S FEDERAL PRACTICE § 34.13[2][b]. at 34-58 (3d ed. 2013) ("If a party responding to a Rule 34 request objects to a particular item or category of the request, the reason for the objection must be stated . . . Failure to comply . . . may be held to be a waiver of any objections not adequately stated.").

[234]

*Maness v. Meyers,* 419 U.S. 449, 458 (1975).

that protests a court's exercise of personal jurisdiction over it where that party refuses to provide discovery relevant to resolve the jurisdictional issue.[235]  That is exactly the situation here, as much of the discovery sought from the LAP Representatives goes to the issue whether the Court has personal jurisdiction over them.  Put differently, the Court has personal jurisdiction over the LAP Representatives for purposes of the motions to compel and for sanctions.

C.      *The February 11 Order Bound the Donziger Defendants*

Mr. Donziger argues that the February 11 Order did not require the Donziger Defendants to produce documents that physically were in the hands of the Ecuadorians because he has no Ecuadorian attorneys or agents.  This contention is untenable.

Chevron's motion sought an order compelling production by both the LAP Representatives and the Donziger Defendants of all responsive documents in the hands of the Ecuadorian attorneys and associates, including Fajardo, Sáenz, Prieto, Yanza, the ADF, and Selva Viva.[236]  It contended that Mr. Donziger controlled the Ecuadorian litigation for the LAPs and that he had practical control over the Ecuadorian attorneys and associates, as he supervised their activities, decided on their salaries and bonuses, controlled the flow of money to them from the United States, and "acted in some respects like the Ecuadorian lawyers' virtual employer."[237]  In opposing the motion, the Donziger Defendants argued only that Chevron had failed to establish Mr. Donziger's practical control over the Ecuadorian attorneys and associates and that production by them of the

---

[235]        *Ins. Corp. of Ireland*, 456 U.S. at 706.

[236]        DI 562.

[237]        *Id.* at 3.

documents would contravene Ecuadorian law.[238]   There was no contention that the Donziger Defendants should not be compelled to produce those documents because the Ecuadorians were not Mr. Donziger's attorneys or agents except, perhaps, to whatever extent such a contention was implied by his denial of practical control over them.

The February 11 Order unambiguously granted Chevron's motion "in all respects."[239] The Donziger Defendants thus were obliged to produce all responsive documents in the possession, custody or control of Fajardo, Sáenz, Prieto, Yanza, the ADF and Selva Viva, among others, regardless of whether they were Mr. Donziger's personal attorneys or agents.  That in fact was the sole focus of the motion insofar as it concerned the Donziger Defendants.  There was no doubt on that score whatever.

D.    *Mr. Donziger Had and Has the Practical Ability to Obtain Documents From the Ecuadorian Attorneys and Agents*

As discussed above, Chevron presented considerable evidence on its motion to compel establishing that Mr. Donziger is able to and indeed does obtain documents from the Ecuadorian attorneys and associates.  It has submitted further evidence on its motion for sanctions establishing that his ability to obtain these documents has not diminished.

Nonetheless, Mr. Donziger argues that he asked Fajardo to produce the documents Chevron sought and the Court ordered produced, but that Fajardo refused.[240]  Chevron, he contends,

---

[238]

DI 564, at 2.

[239]

DI 787.

[240]

DI 841, Ex. B, at 1 (Email from Fajardo to Donziger's former counsel informing him that Fajardo would not produce the documents and asserting that "Judge Lewis Kaplan, induced

has failed to show that he has the practical ability to compel Fajardo to do otherwise.  He contends

that Fajardo and the other Ecuadorian attorneys are not his agents.  He works for them, not the other

way around.[241]  He argues that he does not now control the Ecuadorian legal team, whatever may

have been the case in the past, as a result of his having been directed by this Court in a prior action

to turn over his case file.[242]  He relies for this proposition particularly on a February 11, 2013 Fajardo

email, which stated to members of the Ecuadorian team that "[i]n recent years, Steven [Donziger] has

been carrying out the functions of legal team coordination, communication and coordination in lobby

efforts, support and work with shareholders seeking financial resources to fund the case."[243]  From

that point on, however, "[f]or the coordination of the legal team in the United States, the plaintiffs

have designated Juan Pablo Sáenz as the main attorney to replace Steven."[244]

But the Court held in its decision on Chevron's motion to compel and finds again on

this motion that Mr. Donziger has the practical ability to obtain documents from the Ecuadorian

attorneys and agents.

The question whether Fajardo and the others are Mr. Donziger's agents in a strict legal

sense is a red herring.  The issue is whether Mr. Donziger has practical control over them, regardless

---

[241]      by Chevron Corporation, is very much mistaken in falsely asserting that we (attorneys in Ecuador) are attorneys and agents of Mr. Steven Donziger.").

DI 947, at 12-16.

[242]      "[W]ith the decisions by this Court for me to turn over my entire case file, as well as the filing of the RICO case, my advice to the [LAPs's Ecuadorian counsel] I believe has had a significantly diminished degree of influence as a result of the position that I'm put in."  Apr. 16, 2013 Tr. at 98:12-24.

[243]      Apr. 17, 2013 Hearing Ex. A.

[244]      *Id.*

74

of the precise legal structure.  The Court held in issuing the February 11 Order that he has such control as the practical head of the Ecuadorian legal team and the LAPs' U.S. representative.  And the record now contains even more evidence that supports that finding.  For example, there is additional evidence that Fajardo sent documents to Mr. Donziger in response to various requests.[245]  There is additional evidence also of Mr. Donziger's involvement in filings in the Lago Agrio litigation, evidence that demonstrates his supervisory and commanding role and his ability to demand and obtain documents from his "local counsel."  In one instance, Donziger on July 19, 2010, emailed Fajardo and Sáenz and asked  "[w]hen is the draft of the motion mentioned below going to be ready?  We'd like to read it asap."[246]  And in another, Donziger emailed Fajardo, Prieto, Sáenz, and Yanza with a list of tasks they needed to accomplish, explaining that

> "[t]oday is Sunday but it's urgent that we resolve the following by Monday: (1) The local motion with the court – we need a draft right away with the translation *so we can review it here before submitting it in Lago Agrio*.  The sooner it can be submitted the better; rush if possible friends.  2) Translators to translate several legal documents quickly for the Yankee attorneys.  We need two for next week, full time if possible.  3) I'm thinking that Pablo should come to the U.S. for the hearing.  Let's talk later.  Please friends, we are in a difficult situation; I'm asking you to work today."[247]

Fajardo responded with an update on each task.  Prieto replied that he could "start on the motion.

---

[245]

    *See, e.g.*, Champion Decl. [DI 966] Ex. 3604 (March 16, 2010 Email from Fajardo to Donziger associate including "a good summary to share with Shinder/Denver folks re: Cabrera's appointment."); Apr. 16 2013 Tr. Ex. 4 (July 22, 2010 email from Donziger to Fajardo) (Donziger asks "Can you send me the summary that I recently asked for?" and Fajardo complies).

[246]

    Champion Decl. [DI 966] Ex. 3610.

[247]

    *Id.* Ex. 3609 (Mar. 7, 2010 email from Donziger to Yanza, Prieto, Sáenz, Fajardo, Garr, and Page) (emphasis added).

Which motion exactly?" and then later sent a draft.[248]

In another instance, Mr. Donziger on  June 6, 2008, instructed Fajardo, Sáenz, and Prieto to "[g]et this done on time and don't fuck up please."[249]  One does not tell one's boss to get something done on time and "don't fuck up."  When such language is used, it is by bosses to subordinates.  The logical conclusion here, based not only on this piece of evidence but the entire record, and the one the Court adopts, is that Mr. Donziger for years has been the "boss" of the Ecuadorian team.  He has given it orders and demanded compliance.  The only remaining question is whether circumstances have changed as Mr. Donziger claimed at the hearing.

Mr. Donziger attributes the proposed change in his role to dissatisfaction by the Ecuadorians with the fact that he was ordered by this Court in November 2010 (and the Second Circuit, a fact he does not mention) to "turn over [his] entire case file" in the Section 1782 proceeding.  And he seeks corroboration of the alleged change in Fajardo's February 11, 2013 email, which purported to replace Donziger as the coordinator of the U.S. litigation with Juan Pablo Sáenz, one of Fajardo's Ecuadorian subordinates.  But neither the timeline nor the inherent logic of this argument hangs together.

As an initial matter, this Court's  ruling in the Section 1782 proceeding was issued on November 10, 2010.[250]  Almost immediately thereafter – in January 2011– the LAPs entered into a

---

248

    *Id.*

249

    *Id.* 3618; *see also id.*  Ex. 3603 (Nov. 9, 2007 email from Donziger to Fajardo) ("Hey you little bastard, where is the document?"); *id.* Ex. 3617 (Sept. 20, 2010 Email from Donziger to Sáenz, Fajardo, Prieto, Yanza and others)  ("Friends, Let's talk tonight.  Let's not do anything rash please.  Let's analyze it first as a group.").

250

    *In re Chevron Corp.*, 749 F. Supp. 2d 141 (S.D.N.Y. 2010) *aff'd sub nom. Lago Agrio Plaintiffs v. Chevron Corp.*, 409 F. App'x 393 (2d Cir. 2010).

new retainer agreement with Donziger – an agreement that would make him a billionaire if the Judgment were collected in full.[251]  Moreover, that agreement gives him the prospect of far greater compensation than any other individual lawyer on the LAP team, including Fajardo.  Its execution and richness – and its continuation right to the present[252] – both are in very serious tension with the suggestion that Donziger's role changed in the wake of the discovery orders in the 1782 proceeding. And this is borne out by the fact that Donziger has made payments from his accounts to Fajardo and others in Ecuador even after the Court's November 2010 ruling,[253] that he is still traveling at least monthly to Quito,[254] and that he still communicates with his Ecuadorian colleagues multiple times a day.[255]  Nor has he come forward with evidence showing that he no longer pays or approves payments to the Ecuadorian attorneys, that his trips and communication with the Ecuadorian legal team are any less frequent, or that his involvement in determining strategy is any less pronounced today than what it was when he was – in his own words – the person "primarily responsible" for

---

[251]

Hendricks Decl. [DI 355] Ex. 1122 (Donziger retention agreement), at 1.

[252]

Donziger testified during the sanctions hearing that his "compensation remains the same today as it was under the retainer agreement dated January 5, 2011."  Apr. 16, 2013 Hearing Tr. at 128:13-15.

[253]

*See, e.g.*, Champion Decl. [DI 966] Exs. 3622, 3623, 3625 (showing transfers made from Donziger's bank accounts to LAPs' lawyers in Ecuador in 2010-2011). Although Chevron has not submitted more recent evidence of payments made through Donziger's accounts, that is presumably because the Court set the discovery cutoff for all documents related to payments made by Donziger in connection with the Chevron litigation to July 10, 2012. *See* DI 721, at 54-55.

[254]

Champion Decl. [DI 966] Ex. 3601 (Donziger's migration records from 2005-2013).

[255]

Champion Dec. [DI 895] Ex. 3519 (Donziger privilege log).

"putting . . . together" and "supervising" the Lago Agrio team.[256]

That leaves Fajardo's February 11, 2013 email, which purported to appoint Mr. Sáenz to take over certain of Mr. Donziger's responsibilities.[257]  Even taken in its own terms, it appears to be an attempt to create a facade to hide reality and to buttress Mr. Donziger's argument that he no longer is in control rather than to portray reality. Mr. Sáenz is an Ecuadorian lawyer who has practiced for less than five years.[258]  The likelihood that such a person would be selected to take over the particular responsibilities at issue, which are described in the sealed exhibit, seems limited. Moreover, the timing of that email is revealing.

The ostensible cause of the alleged change in Mr. Donziger's position of command is this Court's November 2010 ruling.  Yet there is no evidence at all of any such change until after Chevron moved in August 2012 to compel production of documents from Ecuador.  The LAP Representatives' first response was to contend that the motion was premature.  As a decision on that issue became imminent, however, the LAPs – at the suggestion of one of their U.S. counsel – on October 18, 2012 commenced the *Córdova* action in Ecuador in an effort to obtain any injunction barring production of Ecuadorian documents in this case.  On January 1, 2013, one of the LAP Representatives' U.S. lawyers informed Fajardo that he anticipated that this Court would soon "issue a court order ruling on the issue of Messrs. Camacho and Piaguaje have the capacity to obtain the documents from you . . . , documents that belong to all the plaintiffs [and that they] anticipate[d] that the [Court would] say that they do have that capacity and that the [Court would] order them to obtain

---

[256]      Hendricks Decl. [DI 9] Ex. 14 (Donziger book proposal), at 2.

[257]      Apr. 17, 2013 Hearing Ex. A.

[258]      Sáenz Decl. [DI 152] ¶ 2.

the documents to be provided to Chevron."[259]  The *Córdova* injunction then issued on January 15, 2013, and this Court was so informed a week later.[260]  The Fajardo email purportedly appointing Sáenz was created on February 11, 2013, coincidentally the very day on which the February 11 Order compelling production was issued.

This evidence suggests that the LAPs anticipated that the motion to compel would be decided against them.  They appear to have sought to create a defense in depth against that possibility as well as against the risk of sanctions in the event they failed to comply.  Those defenses certainly included the *Córdova* action and appear to have included the Fajardo February 11 email.  In any case, however, the argument that the February 11, 2013 email was a consequence of the November 10, 2010 decision in the Section 1782 proceeding is not persuasive.  Nor is the contention that it reflected or effected any material change in Mr. Donziger's position as the commander of the entire Lago Agrio legal effort.  In all the circumstances, it is more likely than not that Fajardo's email – an email by a long time subordinate purporting to displace his long time supervisor and "cabeza" – reflected an effort to create a false impression in order to avoid the entry of or defeat the purpose of the February 11 Order*, as was the *Córdova* lawsuit.

The Court therefore finds that Mr. Donziger had and has the practical ability to obtain documents from the Ecuadorian attorneys and associates.

E.     *Ecuadorian Law Does Not Prevent the Imposition of Sanctions*

Finally, defendants contend that sanctions are inappropriate because compliance with

---

[259]     Apr. 17, 2013 Hearing Ex. B (Jan 1, 2013 Email from Jarod Stewart to Fajardo).

[260]     DI 734.

79

the Court's order is legally impossible:  Fajardo, they say, is prohibited by Ecuadorian law from producing the documents, and will not do so.  Thus defendants actually are making two distinct, albeit somewhat related, arguments, viz. that the Court should not impose sanctions because (1) Ecuadorian law prohibits the disclosure and, in any case, (2) these parties should not be punished for Fajardo's refusal, justified by Ecuadorian law or not, to turn over the discovery.

We begin with the proposition that sanctions should not be imposed because the discovery is prohibited by Ecuadorian law.  As discussed above, when a party invokes foreign law to justify its noncompliance with a court's discovery order, courts must consider whether principles of international comity permit an order compelling discovery and subsequent imposition of sanctions. In doing so, courts should weigh the factors contained in Section 442 of the Restatement (Third) of Foreign Relations Law.[261]  In addition, "[c]ases from our Circuit counsel that, when deciding whether to impose sanctions, a district court should also examine . . . whether that party has demonstrated good faith in addressing its discovery obligations."[262]  A court may impose the harshest sanctions – including contempt, dismissal, or default – where it finds that a party has deliberately concealed information or failed to make a good faith effort to comply with a discovery order.[263]  However, a court may impose less severe sanctions  even if it does not find that a party has acted in bad faith or willfully.[264]

---

[261]

*Linde*, 706 F.3d at 111 ("In general, the careful application of Restatement § 442 will faithfully adhere to the principles of international comity.").

[262]

*Id.* at 110.

[263]

Restatement § 442(2)(b).

[264]

*Id.* § 442(2)(c).

The Court already has considered the factors set out in Section 442 of the Restatement, as well as the question whether defendants or, for that matter, Fajardo might face any hardship if they complied with the Court's order.[265]   It is "not required to consider [them] anew in reviewing a requests for sanctions based on noncompliance."[266]   Having determined that ordering production of the documents from Ecuador was warranted notwithstanding Ecuadorian law, the Court proceeds to consider the final factor:  whether defendants have acted in good faith in their attempts to produce the requested documents to Chevron and to comply with the Court's order.

## F.     Defendants Have Acted Willfully and In Bad Faith

The Donziger Defendants and the LAP Representatives contend that they have acted in good faith in their attempts to comply with the Court's order.  They say they asked Fajardo for the documents and he refused to provide them.  Fajardo's refusal to produce the documents, they claim, is not their fault and certainly does not amount to bad faith on their part. But defendants' argument fails to take account of all the relevant facts.  It leaves out a variety of events that occurred before this Court, in Ecuadorian courts, and behind the scenes, the sum total of which amounted to bad faith. A brief summary of those events is in order.

### 1.     Defendants Refuse to Produce Documents

Chevron served its first set of requests for the production of documents on the

---

[265]

      *See supra* § 1.3.

[266]

      *Linde*, 269 F.R.D. at 196 (citing *Weiss v. Nat'l Westminster Bank, PLC*, 242 F.R.D. 33, 35 (E.D.N.Y. 2007).

Donziger Defendants and the LAP Representatives on June 7, 2012.[267]  The Donziger Defendants did not object to producing any documents on the ground that he lacked control over the Ecuadorian attorneys or the practical ability to obtain documents from them.[268]  Nor did they claim that alleged Ecuadorian "group secrecy" law prevented them from producing any documents.  The LAP Representatives did not object to producing any documents on the ground that the Court lacked personal jurisdiction over them.  Nor did they object on the basis that any specific provision of Ecuadorian law prevented their attorneys and agents from producing the requested documents to them.  Nonetheless, all of these defendants declined to produce any documents in the possession, custody, or control over their agents and attorneys in Ecuador.

Chevron moved to compel production of documents in the possession, custody, or control of the Ecuadorian attorneys and agents on August 13, 2012.[269]  The LAP Representatives opposed Chevron's motion on the ground that alleged Ecuadorian "group secrecy" law prevented Fajardo from turning over the LAPs' documents without the express permission of all his clients.[270]  As detailed previously, this was the first time that argument was made to Chevron or to the Court.  Donziger opposed the motion claiming, *inter alia*, that Fajardo and the other Ecuadorian attorneys were not his agents and that he therefore lacked the ability to obtain documents from them.

---

[267]

Champion Decl. [DI 895] Exs. 3504-7.

[268]

Despite the fact that the document requests made clear that they applied to all documents "in the possession, custody, or control of DEFENDANT's agents, attorneys or representatives (including but not limited to attorneys in this action, attorneys in the LAGO AGRIO LITIGATION, Pablo Fajardo Mendoza, Luis Yanza, Julio Prieto Méndez, Juan Pablo Sáenz)."

[269]

DI 562.

[270]

DI 563.

2.      *The LAP Representatives' U.S. Counsel Suggests that Fajardo File Suit in Ecuador and Keeps the Suit's Existence Secret*

On October 4, 2012, one of the LAP Representatives' former counsel, Craig Smyser, as he put it, suggested that Fajardo "ask an Ecuadorian court for a ruling on the rights and obligations of the lawyers and the clients in this relationship governed by Ecuadorian law."[271]  According to Smyser, Fajardo "did not indicate then whether he would act on the suggestion."[272]  On October 9, 2012, an associate at Smyser's firm, Jarod Stewart, emailed Fajardo.  He stated:

> "Until now, Judge Kaplan has not issued an order [on Chevron's motion to compel]. If you [pl.] can file in Ecuador an action requesting a declaratory judgment that says that you [sing.] are barred from providing the documents without the permission of all your clients, we could file this complaint before Judge Kaplan to inform him this issue will be decided by a judge in Ecuador and that Judge Kaplan has to wait before issuing his decision until the court in Ecuador has issued its ruling."[273]

Fajardo responded, "I will keep you informed."[274]

One week later, the *Córdova* Lawsuit was filed in the Provincial Court of Sucumbíos in Ecuador.[275]  That same day, Smyser stated at a status conference before this Court:  "I have asked [Ecuadorian counsel] in person for the documents, and the lawyer has said, I can't give them to you."[276]  He did not inform the Court or Chevron that he had suggested that Fajardo seek a

---

[271]     Smyser Decl. [DI 952] ¶ 2.

[272]     *Id.*

[273]     Apr. 17, 2013 Hearing, Ex. B (Oct. 9 2012 Email from Jarod Stewart to Fajardo).

[274]     *Id.*

[275]     Champion Decl. [DI 895], Ex. 3508.

[276]     Oct. 18, 2012 Tr. at 19:16-18.

declaratory judgment in Ecuador.  A few days later, however, Stewart emailed Fajardo and Sáenz, stating: "We want to know the current situation regarding the complaint for a declaratory judgment in Ecuador regarding providing documents to Messrs. Camacho and Piaguaje."[277]  On October 22, 2012, Fajardo informed Stewart "that a lawsuit had been filed in Ecuador to seek a declaration from an Ecuadorian court as to the rights and obligations of the *Aguinda* plaintiffs and their lawyers."[278]

On January 1, 2013, Fajardo informed Stewart that there would be a hearing on the lawsuit in Ecuador.[279]  "After the hearing Mr. Fajardo informed [Stewart] that he did not know what could happen because it would be the judge's decision."[280]  Two weeks later, Fajardo sent Stewart a copy of the Ecuadorian court's order granting Córdova's request for an injunction.[281]  On January 23, 2013, defendants submitted the ruling to this Court, stating that it "resolves the legal question whether Ecuadorian law legally prohibits counsel for Defendants from obtaining and producing to Chevron the documents covered by Chevron's motion to compel."[282]

At a minimum, this time line reflects the fact that the LAP Representatives' U.S. counsel – while continuously telling this Court that they had asked Fajardo for the LAPs' documents – at the same time secretly suggested to him that he initiate a lawsuit in Ecuador in an effort to

---

[277]       Apr. 17, 2013 Hearing, Ex. 12 (Oct. 22, 2012 Email from Jarod Stewart to Fajardo).

[278]       Stewart Decl. [DI 951] ¶ 10.

[279]       *Id.* ¶ 11.

[280]       *Id.*

[281]       *Id.* ¶ 12.

[282]       DI 734, at 1.

foreclose that very possibility.  And it reveals also that the U.S. lawyers were aware of the suit long before they made its existence known to the Court.  In fact, they did not inform Chevron or the Court about the lawsuit until they were told Fajardo had received his desired result and the injunction had been granted.

This gamesmanship in and of itself undermines the LAPs' counsels' contention that that they acted in good faith in fulfilling their obligations to their clients and to this Court.  But the details of the *Córdova* case reveal an even more troubling state of affairs.

### 3.       The Córdova Suit Was Collusive

Although the Court will not pass judgment on the merits or outcome of the ruling in the *Córdova* case as a matter of Ecuadorian law, a brief discussion of how it came to be and how the dispute was presented to the Ecuadorian court is in order.  It is important also to note that defendants informed the Court of none of the following details.

*First*, the *Córdova* suit was collusive in the sense that there was no real dispute between the parties.  Both Córdova, the plaintiff, and Fajardo, the defendant, sought a declaration by the court that Fajardo was prohibited from producing the LAPs' documents.  Indeed, Fajardo – who ostensibly was the target of the requested injunction – argued in support of Córdova's case.  He told the trial court that, if he were to turn over the documents, "it is obvious that constitutional rights of the plaintiff and the other plaintiffs in the principal case [would be] violated."[283]  The Ecuadorian court in the final instance did what all of the parties before it – the plaintiff and the defendants – asked it to do:  it entered an order barring disclosure to this Court of any information possessed by

---

[283]       DI 734, Ex. A at 2-3.

or known to the defendants in that case concerning the Chevron litigation.[284]

      *Second,* it is abundantly clear that the point of the *Córdova* suit was to frustrate Chevron's efforts to obtain discovery in this Court to which it was entitled.  The LAPs concealed the existence of the *Córdova* suit from Chevron until it was over and they had obtained their desired result.  Even assuming that Ecuadorian law did not require notice to or joinder of Chevron on an indispensable party or other basis, the LAPs' concealment of the action, especially given the ongoing litigation in this Court concerning the production of the Ecuadorian documents, was done in bad faith.

      *Third*, in an effort to convince the Ecuadorian court that an injunction was necessary, Fajardo made representations that directly contradicted those that the LAP Representatives' former U.S. counsel made to this Court.  Fajardo told the Ecuadorian court that, "faced with the strong

---

[284]

      *Id.* at 4-5.  In addition, Fajardo holds a broad power of attorney on behalf of all of the LAPs.  Hendricks [DI 106] Ex. 481.  He thus was in a position to facilitate all of the U.S. discovery on behalf of all of them, not to mention himself, had he wished to do so.  He likewise was in a position to have resisted the *Córdova* suit, both individually and on behalf of the other LAPs, had he so desired.

      Moreover, the language of the ruling itself is troublesome.  Section FIVE of the Ecuadorian court's decision, which contains its reasoning, begins as follows:

      "The plaintiff, in bringing a suit for the protection of constitutional rights, must prove that rights referred to that might be violated will cause <u>him</u> serious harm, which has been proven in this case.   Therefore, it is appropriate to apply Section 21 of Art. 66, and Arts. 75 and 76 of the Constitution of the Republic of Ecuador referred to by the plaintiff.  On pages 51 et seq. of the record and in the public hearing, the plaintiff submitted documentation with a translation into Spanish by [name omitted], in which it appears that the Judge of the United States of American Lewis A. Kaplan of the second district of the State of New York demands <u>our</u> confidential information in favor of his jurisdiction, this has been requested from <u>our</u> attorneys . . ." DI 787, at 4 (emphasis added).

      Note that the writer of the decision on line 2 spoke of the plaintiff in the third person — as "him."  Two sentences later, however, in lines 8 and 9, the writer referred to the confidential information and the LAPs' attorneys as "our" information and "our" attorneys instead of the plaintiff's information and the plaintiff's attorneys.

pressure to which we, the attorneys and social leaders, have been subjected in this lawsuit, and in view of an increasing threats, even to punish our attorneys in the United States, we have discussed this matter and *decided to turn over the information Chevron is demanding*."[285] This, of course, flew in the face of what Fajardo allegedly told the LAPs' former U.S. counsel, who in turn consistently told this Court from the beginning of this discovery dispute that Fajardo refused to turn over the LAPs' documents because he was prevented by Ecuadorian law from doing so.

*Fourth*, the argument Córdova made to the Ecuadorian courts as to why the injunction was necessary, which ultimately appears to have been accepted, was different from that which the LAP Representatives made to this Court. For example, Córdova argued to the Ecuadorian court that, "if the plaintiffs provide Chevron with even a small part of the information, our chance of success both at the National Court and the judgment enforcement stge would be seriously and irremediably harmed. The oil company would learn intimate details regarding the internal operations of the plaintiffs' team . . . . That would irreparably harm my . . . right of access to Justice and to the effective, impartial and expeditious protection of rights . . . protected by Article 75 of the Constitution. . . ."[286] And he contended to the trial judge that ultimately granted the injunction that "our struggle against [the] petroleum giant would be destroyed and the company would not carry out the court-ordered environmental remediation action" if Fajardo and the other lawyers were to turn over the requested documents.[287]

This was not the argument the LAP Representatives made to this Court when they

---

[285]

DI 734, Ex. A, at 3 (emphasis added).

[286]

Champion Decl. [DI 895], Ex. 3513, at 2-3.

[287]

Champion Decl. [DI 895], Ex. 3516, at 2-3 (brackets in original).

informed it that Ecuadorian law prohibited production of the documents.  Instead, the LAP Representatives told this Court that Ecuadorian law prohibited a lawyer representing a group of clients from disclosing the clients' "secrets" to a third party unless all of the clients agreed to the disclosure.  The argument Córdova made to the Ecuadorian courts – that production of a party's documents is forbidden by the Ecuadorian Constitution because the parties must be "on equal terms" – was never made to this one, at least as far as can be discerned from the papers the parties have submitted.

Thus, the *Córdova* suit – whatever its merits – reveals a collusive and clandestine attempt by the LAPs' Ecuadorian and U.S. attorneys to keep the documents in Ecuador from being produced and to do so without permitting Chevron from even attempting to contest the case before it was decided.

### 4.    *Further Evidence That Defendants Have Not Acted in Good Faith With Respect to the Ecuadorian Documents*

When assessing the good faith factor of the comity analysis, a court will consider whether and to what extent a party has attempted to obtain the discovery in question.  Where foreign law prevents production of documents, good faith may be demonstrated where a party seeks a waiver of the foreign law,[288] attempts to obtain the documents from other sources,[289] or produces the documents in question to the extent they are not protected by foreign law.[290]

---

[288]    *See Linde*, 706 F.3d at 113; *Richmark Corp.*, 959 F.2d at 1479.

[289]    *See Linde*, 706 F.3d at 110.

[290]    *Rogers*, 357 U.S. at 203.

Defendants did none of these things.[291]  They did not attempt meaningfully to comply with Chevron's document requests or the Court's order compelling production.  Instead, they sought a court order preventing the production.[292]  Moreover, the record indicates that at least some of the LAPs – including one of the LAP Representatives – never were even asked for their permission to allow Fajardo to produce their documents, which would have sufficed at least until entry of the *Córdova* injunction.  Moreover, although Fajardo stated in a letter to the LAP Representatives that he was "expressly prohibited by [his] clients and the law from" producing the documents,[293] the record indicates that his statement was based on a personal assumption, not on any actual prohibition by the plaintiffs' themselves.  For example, when defendant Camacho was asked at his deposition whether "Mr. Fajardo . . . ever asked [Camacho] if [Fajardo] c[ould] make copies of [the plaintiffs'] documents and give them to Mr. Donziger," Mr. Camacho responded, "No."[294]  And, to the extent that Fajardo did "ask" some of his clients for their permission to produce their files to the LAP Representatives, he informed them also that permitting him to do so, in his opinion, would violate Ecuadorian law.  Defendant Piaguaje testified at the sanctions hearing as follows:

---

[291]

"The district court is free to consider the full record in the case in order to select the appropriate sanction."  *S. New England Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 144 (2d Cir. 2010) (internal citation and quotation marks omitted).

[292]

This in and of itself is evidence of bad faith. "Evidence that parties or targets have actively sought a prohibition against disclosure . . . may be regarded as evidence of bad faith and justification for sanctions in accordance with Subsection 2(b)."  RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 442 cmt. h (1987); *see also In re Grand Jury Subpoena Dated August 9, 2000*, 218 F. Supp. 2d 544, 563 (S.D.N.Y. 2002) (a party that "'courted legal impediments' . . . does not appear to have genuinely attempted to comply") (citing *Minpeco*, 116 F.R.D. at 528).

[293]

DI 563, Ex. 2 (Aug. 14, 2012 Ltr. from Fajardo to Camacho and Piaguaje).

[294]

DI 1180, Ex. 1 (Camacho Dep. Tr.), at 181:17-22

> Q:      When you were present [at a meeting with the plaintiffs' representatives], did anything happen with respect to producing documents or not in this case in the United States?   A:      When I was in a meeting – well, not all the – it was only the representatives and not all the plaintiffs were there.
>
> Q:      When you were in a meeting with the representatives of the various private groups, was any action taken with respect to producing documents in this case?  *  *  *   A:      We talked about the issue, but then if Attorney Fajardo later says that it cannot be done because there are laws in Ecuador, laws that say[] it couldn't be done, then also the other [plaintiffs] are also in agreement."[295]

Thus, despite the fact that, according to defendants, Ecuadorian law permits disclosure of the documents in Fajardo's possession if all of the plaintiffs agreed to such disclosure, Fajardo apparently informed the plaintiffs that any disclosure at all would violate Ecuadorian law.

But defendants' lack of good faith did not end there.  There are myriad other ways defendants could have attempted to obtain the Ecuadorian documents.  The LAP Representatives, at least in theory, could have intervened in the *Córdova* suit to resist the injunction in order to permit them to produce the documents here.  But they were prevented from doing so because their lawyers never made them aware that such a suit was filed.[296]  Nor did the LAP Representatives threaten to sue or fire Fajardo for his refusal to provide them with the documents so they could comply with this Court's order, despite that his refusal constituted a breach of his retainer agreement.[297]

Mr. Donziger also has failed to pursue any of the other options available to him to

---

[295]

    Apr. 17, 2013 Tr. at 245:15-246:2.

[296]

    DI 1180, Ex. 1 (Camacho Dep.) at 181:23-182:6; 182:15-19 ("Q:  Did anyone ever tell you that there was going to be a court hearing on the issue of whether Mr. Córdova could prevent Mr. Yanza and Mr. Fajardo from providing you documents for your defense?  A:  No.").

[297]

    Hendricks Decl. [DI 355] Ex. 1106 (Fajardo Retainer Agreement), at 5 ("The Plaintiffs' files shall be and remain the property of the Plaintiffs.").

comply with the Court's order.  He did not attempt to enforce his contractual rights to access the documents.[298]  He did not initiate legal action against Fajardo.  He did not discharge or stop paying Fajardo or the other Ecuadorian attorneys for their failure to provide him with the documents.[299]  Instead, he continued to fund their operation, supervise or assist in their work, and communicate with and visit them as frequently as he ever did.

Nor has Mr. Donziger made any legitimate effort to comply with Chevron's document requests or the Court's order compelling production.  He testified that he had "one or two conversations" with Fajardo after Chevron moved to compel to discuss whether Fajardo would produce the LAPs' documents.[300]  Fajardo allegedly refused.  But neither Donziger nor his former counsel ever indicated to Fajardo that they had actually wanted the documents from Fajardo or instructed him to produce them.  Instead, Donziger testified that he merely "discuss[ed] with [Fajardo] whether [Donziger was] going to produce documents from [Fajardo's] files."[301]  Never did Donziger demand that Fajardo provide them.

Then, "[i]mmediately after" the Court ordered defendants to advise the Court whether

---

[298]

        *Id.* at 5 (Fajardo "will provide the Other Plaintiffs' Representatives [including Mr. Donziger] with access to the Plaintiffs' files at such reasonable times as may be requested by the Other Plaintiffs' Representatives").

[299]

        *See, e.g.*, *In re Auction Houses Antitrust Litig.*, 196 F.R.D. 444, 445-46 (S.D.N.Y. 2000) (finding party's effort to obtain information from former employee pursuant to discovery request insufficient where party "requested [former employee] to furnish the information and that [former employee] declined to do so . . . . But [party] does not say that it has done anything more than request [former employee] to provide the information necessary . . . [and] has not threatened to cease payments to him and his counsel or to consider its indemnification obligation as unenforceable in light of [former employee's] position")

[300]

        Apr. 16, 2013 Hearing Tr. at 24:14-22.

[301]

        *Id.* at 25:4-8.

they would comply with the order, former "counsel for Donziger sent a letter to Fajardo, enclosing Chevron's requests for production to Donziger"[302] and asking him whether he intended to produce the documents.  But the letter that so stated was not a serious attempt to obtain production of the requested documents.  It contained no demand.  It threatened no consequences if the documents were turned over.  And it went out of its way to state that "Mr. Donziger does not consider you [Fajardo] to be his attorney nor his agent."[303]  Indeed, the letter was "calculated to fail."[304]  Unsurprisingly, Fajardo replied that he would not produce the documents because, *inter alia*, "Judge Lewis Kaplan, induced by Chevron Corporation, is very much mistaken in falsely asserting that we (attorneys in Ecuador) are attorneys and agents of Mr. Steven Donziger."[305]

Finally, mere weeks ago, defendants produced 29 Ecuadorian documents that had not previously been produced to Chevron.[306]  Defendants included these documents – minutes from meetings of the "Asamblea" – on their list of exhibits they plan to introduce at trial.[307]  These documents clearly were responsive to Chevron's document requests, which explicitly called for all

---

[302]

    DI 947, at 7.

[303]

    DI 841, Ex. 1.  Moreover, so far as the record discloses – and neither Donziger nor his former counsel have indicated to the contrary – this was the first time Chevron's document requests to Donziger were provided to Fajardo.

[304]

    *Linde*, 706 F.3d at 113 (citing *Linde v. Arab Bank, PLC*, 269 F.R.D. 186, (E.D.N.Y. 2010)).

[305]

    DI 841, Ex. 2, at 1.

[306]

    Chevron's request for production 149 requested "ALL DOCUMENTS RELATED To the ASSEMBLY OF THE AFFECTED."  Champion Decl [DI 895] (Ex. 3504), ¶ 9.

[307]

    DI 1377 (Defendants' Joint Preliminary Trial Report), Ex 1, at 16-19 (Defs.' Exs 218-246).

documents related to the Asamblea.[308]  Moreover, these documents – the property of the LAPs – likely would fall within the definition of materials the production of which was barred by *Córdova*. That these documents were not disclosed until the eve of trial underscores the gamesmanship and bad faith of defendants and their Ecuadorian counsel when it comes to production of key documents from Ecuador and reveals that their strategy has always been to produce materials when it suits their purposes and is most helpful to their case, notwithstanding Court orders for full production or prejudice to the plaintiff.

### 5. *Defendants' Further Efforts to Block Discovery*

Defendants' recalcitrance in the discovery process is not limited to the dispute over the Ecuadorian documents.  Chevron has fared no better in getting the LAPs' agents to submit to deposition[309] or the LAP Representatives to provide adequate responses to its interrogatories and requests for admission ("RFAs").  In both the Count 9 Action and this one, the LAP Representatives have made many baseless objections and arguments in efforts to justify their refusal to respond adequately to Chevron's RFAs.[310]  In the Count 9 Action, the LAP Representatives claimed not to have knowledge of or recollect the information necessary to answer many of Chevron's

---

[308]

The "Asamblea de Afectados por Texaco" is said to be a group of Ecuadorian indigenous organizations affiliated with the plaintiffs who claim to have been affected by Texaco's operations in the region. DI 355-37 (Ex. 1122), Ex A.

[309]

None of the LAPs' Ecuadorian attorneys or agents submitted to deposition in this or the Count 9 Action.

[310]

For example, in the Count 9 action, the LAPs refused to respond to any of Chevron's RFAs because they claimed the term "drafted" was ambiguous.  *See* 11 Civ. 3718, DI 71, Ex. 3.

interrogatories.[311]  In this action, the LAP Representatives and the Donziger Defendants initially refused to respond to a single interrogatory propounded by Chevron based on an unfounded numerosity objection.[312]  And both the Donziger Defendants and the LAP Representatives have refused to respond to many of Chevron's requests for admissions on the ground that they could not be asked to admit facts relating to the acts of their Ecuadorian attorneys and agents and/or could not admit or deny the truth of any event they did not personally witness.[313]

Finally, it must be noted that defendants' agents and attorneys – most notably Fajardo – have produced documents when it has been helpful to the LAP Representatives and Donziger Defendants in this Court and refused when it has not.  Indeed, as discussed previously, Fajardo and Yanza have provided to Donziger documents, including memoranda, expert summaries, and court filings, throughout this litigation.  So too has Fajardo provided the LAP Representatives' former U.S. counsel with documents they recently have filed in this case – including an affidavit of a former Ecuadorian judge[314] and alleged tape recordings of conversations that the judge claims to have had with a private Chevron lawyer.[315]  So far as this Court is aware, Fajardo never was sued or prosecuted

---

[311]

     *See* 11 Civ. 3718, DI 72, Ex. 3, 4.

[312]

     DI 781 Exs. 4, 5; DI 809 (Order Granting Chevron's Motion to Compel).

[313]

     *See* DI 815, Ex. 3; DI 814, Exs. 2,3.

[314]

     Apr. 17, 2013 Tr. at 255:5-16.

[315]

     *Id.* 259:1-6.  When Chevron moved to compel production of these recordings, the LAP Representatives informed the Court that they "d[id] not have the recordings that are the subject of Chevron's motion to compel."  DI 870.  The Court eventually denied Chevron's motion to compel on that basis.  DI 937.  Two weeks later, the LAP Representatives submitted the recordings to the Court.  DI 974 Exs. 2, 3.  Smyser testified that he did not have the recordings when he responded to Chevron's motion to compel, but that he did not bother to ask Fajardo or the other Ecuadorian lawyers whether they had a copy of the tape

for producing these documents. It is clear that the defendants have "decided when [they] will be cooperative, and when [they] will not be cooperative, which [they] ha[ve] no right to do."[316] This "selective compliance with foreign . . . secrecy laws . . . highlights the limits of [their] supposed good faith and casts doubt on [their] claims of hardship."[317]

*   *   *

The Court finds that defendants have practical control over the responsive documents ordered produced by the February 11 Order and that they have not produced them as required. Indeed, they have not made a good faith effort to comply. Instead, they have sought to evade their discovery obligations and the Court's order. Neither the *Córdova* injunction nor any other Ecuadorian law excuses their non-compliance. Sanctions are warranted.

### G.    *Which Sanctions Are Appropriate*

"Rule 37(b)(2) contains two standards – one general and one specific – that limit a district court's discretion [in determining which sanctions are appropriate]. First, any sanction must be 'just'; second, the sanction must be specifically related to the particular 'claim' which was at issue in the order to provide discovery."[318] Thus, the Court must select sanctions that are "commensurate

---

[316]    recording before doing so. Apr. 17, 2013 Tr. at 259:17-20.

[317]    *Linde*, 269 F.R.D. at 200 (citing *Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1065 (2d Cir. 1979).

      *Id.*

[318]    *Ins. Corp. of Ir.*, 456 U.S. at 707.

with the non-compliance"[319] such that they restore the prejudiced party, as nearly as possible, to the position it would have occupied had the discovery been produced and the evidence disclosed.

Chevron contends that a broad range of sanctions – including contempt, entry of default judgments, striking defendants' answers or affirmative defense, adverse findings of fact, and directing that adverse inferences be drawn as to the Ecuadorian documents[320] – are appropriate. The Court declines to impose the harshest of these sanctions, notwithstanding defendants' obdurate and quite possibly contemptuous refusal to comply with their discovery obligations. Instead, the Court carefully has selected sanctions that address defendants' misbehavior and seek to place Chevron in a position as near as possible to that which it would occupy had the documents from Ecuador been produced.

1.      *The LAP Representatives' Personal Jurisdiction Defense*

As noted, the LAP Representatives waived their personal jurisdiction objection to producing the Ecuadorian documents and to sanctions for failing to comply with the order to produce them by failing properly to assert it in their responses to Chevron's document requests and in opposition to Chevron's motion to compel. But even if they had not waived it, a sanction striking their personal jurisdiction defense would be appropriate for their failure to comply with the order to produce insofar as it required production of documents bearing on their personal jurisdiction defense in this action.

---

[319]

*Shcherbakovskiy*, 490 F.3d at 140.

[320]

DI 894, at 19-23.

The Supreme Court held in *Insurance Corporation of Ireland*[321] that a court may order a party that contests the exercise of personal jurisdiction over it to provide discovery relevant to deciding the jurisdiction issue.  But it dealt also with the consequences of a failure by such a party to comply with an order compelling it to provide such jurisdictional discovery.

The district court in *Insurance Corporation of Ireland* ordered discovery for the purposes of determining jurisdiction.  After the petitioner refused to produce the required documents, the district court struck its personal jurisdiction defense.  The district court made clear, however, that "even if there was not compliance with the discovery order, this sanction would not be applied if petitioners were to 'produce statistics and other information' that would indicate an absence of personal jurisdiction."[322]

The Supreme Court affirmed the sanctions order, finding that "[i]n effect, the District Court simply placed the burden of proof upon petitioners on the issue of personal jurisdiction.  Petitioners failed to comply with the discovery order; they also failed to make any attempt to meet this burden of proof.  This course of behavior, coupled with the ample warnings, demonstrates the 'justice' of the trial court's order."[323]

The Court held also that the sanction was commensurate with the petitioner's non-compliance.  Respondent

"was seeking through discovery to respond to petitioners' contention that the District Court did not have personal jurisdiction. Having put the issue in question, petitioners did not have the option of blocking the reasonable attempt of [respondent] to meet its

---

[321]

456 U.S. 694.

[322]

*Id.* at 708 (citation omitted).

[323]

*Id.*

> burden of proof . . . . Because of petitioners' failure to comply with the discovery orders, respondent was unable to establish the full extent of the contacts between petitioners and Pennsylvania, the critical issue in proving personal jurisdiction."[324]

Thus, the Supreme Court held that the district court properly treated petitioner's refusal to provide jurisdictional discovery as an "admission of the want of merit in the asserted defense."[325]

The Supreme Court's holding in *Insurance Corporation of Ireland* applies squarely to this case.  As noted above, the documents Chevron seeks from the Ecuadorian attorneys and associates include material that goes to the question of this Court's personal jurisdiction over the LAP Representatives.  As in *Insurance Corporation of Ireland*, Chevron's "allegation that the court [has] personal jurisdiction over [the LAPs is] not a frivolous claim, and its attempt to use discovery to substantiate this claim [is] not, therefore, itself a misuse of judicial process."[326]  Indeed, this Court previously determined that, based on the facts then available to it, Chevron is likely to prevail in its contention that the Court has personal jurisdiction over the LAP Representatives.[327]

Accordingly, the LAP Representatives' personal jurisdiction defense is stricken unless, on or before October 24, 2013, they comply with the February 11 Order to the extent it requires production of documents responsive to the requests enumerated in footnote 183 that are in the possession, custody or control of their agents, attorneys or representatives in Ecuador including but not limited to their attorneys in this action, their attorneys in the Lago Agrio Litigation (including

---

[324]

    *Id.* at 708-9.

[325]

    *Id.* (quoting *Hammond Packing Co. v. State of Ark.*, 212 U.S. 322, 3501 (1909).

[326]

    *Id.* at 708.

[327]

    *Chevron Corp. v. Donziger*, 768 F. Supp. 2d at 642.

98

but not limited to Fajardo, Prieto, and Sáenz), and Yanza, the ADF, and Selva Viva.

Striking the LAP Representatives' personal jurisdiction defense is an entirely appropriate sanction given the noncompliance with the February 11 Order and the Supreme Court's holding in *Insurance Corporation of Ireland.* Nonetheless, the Court recognizes that a reviewing court may disagree with this resolution of the personal jurisdiction issue. Accordingly, in order to afford a reviewing court a full record on the issue, the Court will take evidence and making findings at trial on the question whether it has personal jurisdiction over the LAP Representatives independent of this sanctions order.


2.    *All Defendants*

The Donziger Defendants have not contested the Court's personal jurisdiction over them and thus never could have objected to production of the requested documents on jurisdictional grounds. As noted, the LAP Representatives might have done so, but did not. Accordingly, the Court turns to the consideration of sanctions for failure to comply with all aspects of the February 11 Order as against all defendants as distinguished from the failure to comply to the extent the order compelled production of documents relevant to personal jurisdiction over the LAP Representatives.

Chevron contends that the Court should prohibit defendants from offering evidence in opposition to Chevron's RICO, RICO conspiracy, civil conspiracy, and fraud claims.[328] The effect of such a sanction essentially would be to enter default judgments against the defendants. Although defendants willfully and knowingly have disobeyed the February 11 order, the Court determines that such a harsh course of action is inappropriate in this case and that more narrowly tailored sanctions

---

[328]    DI 894, at 22.

are available.[329]

### i.    Adverse Inference

An adverse inference serves the remedial purpose "of restoring the prejudiced party to the same position he would have been in absent the wrongful destruction of [or willful refusal to produce] evidence by the opposing party."[330]  Where "an adverse inference . . . is sought on the basis that the evidence was not produced in time for use at trial, the party seeking the instruction must show (1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had 'a culpable state of mind'; and (3) that the missing evidence is 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense."[331]  Chevron has satisfied all three of these requirements as to these defendants.

*First*, the February 11 Order required the Donziger Defendants and the LAP Representatives to produce the responsive documents to the extent they were in the possession, custody, or control of the Ecuadorian attorneys and associates identified in the document requests. That order unequivocally rejected the Donziger Defendants' contention that the Court's order does

---

[329]

> *In re WRT Energy Sec. Litig.*, 246 F.R.D. 185, 200 (S.D.N.Y. 2007) (precluding a party from introducing certain evidence was "an appropriate sanction here, particularly because it can be tailored to mitigate the specific prejudice that the Underwriter Defendants would otherwise suffer.  However, in the process of leveling the playing field, care must be taken not to tilt it too far in favor of the party seeking sanctions.").

[330]

> *Residential Funding Corp.*, 306 F.3d at 108 (citing *Kronish*, 150 F.3d at 126).

[331]

> *Id.* at 107.

not apply to him because he "has [no] Ecuadorian attorneys or agents"[332] as well as the LAP Representatives' argument that they "are legally unable to obtain control over the requested documents."[333]

Second, as shown above, defendants repeatedly and willfully have refused to comply with the Court's discovery order.[334]  Although "the law in this Circuit regarding the level of fault necessary to justify an adverse inference instruction is unsettled," the decision whether to impose this sanction should be made on a "case-by-case" basis.[335]  The district court should determine where a party's culpability falls "'along a continuum of fault – ranging from innocence through the degrees of negligence to intentionality.'"[336]  Where, as here, a party actively seeks legal impediments to justify its non-production, selectively determines when it will produce documents and when it will not, and continues to assert objections to discovery that long have been rejected, that party has willfully and culpably failed to produce evidence and an adverse inference instruction is warranted.[337]

---

[332]
     DI 947, at 23.

[333]
     DI 950, at 21.

[334]
     *Residential Funding Corp.*, 306 F.3d at 113 ("District courts should not countenance 'purposeful sluggishness' in discovery on the part of parties or attorneys and should be prepared to impose sanctions when they encounter it.").

[335]
     *Reilly*, 181 F.3d at 267.

[336]
     *Id.* at 267 (quoting *Welsh v. United States*, 844 F.2d 1239, 1246 (6th Cir. 1988)).

[337]
     *See Residential Funding Corp.*, 306 F.3d at 10; *Linde*, 269 F.R.D. at 199-200.  Moreover, it is clear that adverse inference instructions may be appropriate even in the absence of bad faith.  *See, e.g.*, *Residential Funding Corp.*, 306 F.3d at 107 ("The sanction of an adverse inference may be appropriate in some cases involving the negligent destruction of [or failure to produce] evidence because each party should bear the risk of its own negligence."); *Cine-Forty Second St.*, 602 F.2d at 1068; *Reilly*, 181 F.3d at 267.

*Third*, Chevron has shown that the evidence it seeks in the documents requested from the Ecuadorian attorneys and agents is relevant to its claims.  This factor requires a party "seeking an adverse inference [to] adduce sufficient evidence from which a reasonable trier of fact could infer that 'the destroyed [or unavailable] evidence would have been of the nature alleged by the party affected by its destruction [or unavailability].'"[338]

As an initial matter, "[w]here a party destroys [or fails to produce] evidence in bad faith [or through gross negligence], that bad faith alone is sufficient circumstantial evidence from which a reasonable fact finder could conclude that the missing evidence was unfavorable to that party."[339] "Accordingly, where a party seeking an adverse inference adduces evidence that its opponent destroyed potential evidence (or otherwise rendered it unavailable) in bad faith or through gross negligence (satisfying the "culpable state of mind" factor), that same evidence of the opponent's state of mind will frequently also be sufficient to permit a jury to conclude that the missing evidence is favorable to the party (satisfying the "relevance" factor)."[340] As defendants have acted willfully in failing to produce the evidence from Ecuador, Chevron need not show that the evidence it seeks is likely relevant to its claims.  But it has certainly made that showing.

As detailed above and in several prior opinions,[341] Chevron has adduced considerable

---

[338]

*Residential Funding Corp.*, 306 F.3d at 109 (quoting *Kronisch*, 150 F.3d at 127).

[339]

*Id.*; *see also Kronisch*, 150 F.3d at 126 ("It is a well-established and long-standing principle of law that a party's intentional destruction of evidence relevant to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction.").

[340]

*Id.*

[341]

*See, e.g.*, *Chevron Corp. v. Donziger*, 2013 WL 1087236; *Chevron v. Donziger*, 866 F. Supp. 2d 235.

evidence that suggests that several aspects of the Lago Agrio litigation were tainted by fraud.  It has shown also that there is probable cause to believe that the Ecuadorian judge was bribed and that the Judgment itself was written not by the judge who signed it but by the LAP Representatives lawyers and agents.  Many of the allegedly fraudulent acts – including the termination of the judicial inspection process, the submission of Cabrera's report, the bribing of the Ecuadorian judges, and the ultimate rendition of the Judgment – were committed by or involved the Ecuadorian attorneys and agents – the very people who possess the evidence Chevron seeks.  Although the failure to produce the documents or provide any description of them renders it impossible to determine precisely what evidence the documents contain, Chevron has produced significant "evidence suggesting that a document or documents relevant to substantiating [its] claim would have been included among the [Ecuadorian] files."[342]

Many of Chevron's document requests seek information relating to the events the Court has found (1) were tainted by fraud, or (2) as to which there is probable cause to suspect fraud.[343]  Defendants have failed to produce the documents from their attorneys and agents in Ecuador that would shed light on these events.  Their failure to produce may very seriously prejudice Chevron's ability to prove various of its allegations.  Thus, the Court in its discretion may infer from defendants' failure to produce documents in the possession of their attorneys and agents that the evidence defendants refused to provide from their Ecuadorian attorneys and agents would have been

---

[342]

      *Kronisch*, 150 F.3d at 128.

[343]

      Champion Decl. [DI 895] Ex. A ("Facts the Court Should Deem Admitted for Defendants' Failure to Produce the Ecuadorian Documents").

unfavorable to them.[344]

> ii.      Introduction at Trial of Responsive Documents

Finally, Rule 37 provides that the Court may prohibit a party that violates a discovery order from "supporting or opposing designated claims or defenses, or from introducing designated matters in evidence."[345]  Such a sanction generally is available only  where "the failure to comply with a court order is due to willfulness or bad faith, or is otherwise culpable."[346]

It would be entirely appropriate given the circumstances to prevent defendants from introducing at trial documents that were held by defendants' attorneys and agents in Ecuador and responsive to Chevron's requests  but that were not produced pursuant to the February 11 Order.[347]  For more than three years – in both the Count 9 Action and this one – defendants have refused to produce these documents notwithstanding Chevron's requests and the Court's orders compelling them to do so.  They have not hesitated to provide them to their co-counsel in the United States, however, when it has suited the purposes of the defendants in this action.  Such selective disclosure of evidence favorable to their case most certainly has prejudiced Chevron and has provided defendants with a tactical advantage.  And Chevron likely would be prejudiced at trial should defendants be permitted to introduce documents defendants were ordered but failed to produce.

---

[344]      4-75 Sand, Modern Federal Jury Instructions - Civil, P 75-7.

[345]      Fed. R. Civ. P. 37(b)(2)(A)(ii).

[346]      *Daval Steel Prods.*, 951 F.2d at 1367.

[347]      *See, e.g.*,  *Chanel, Inc. v. Veronique Idea Corp.*, 795 F. Supp. 2d 262, 270 (S.D.N.Y. 2011).

104

Nonetheless, the Court at this time declines to preclude defendants from introducing documents they may or may not seek to introduce at trial. Instead, it will rule on the admissibility of any such materials on a document-by-document basis if, as, and when defendants attempt to introduce them. In doing so, it may exclude all or some such documents as a sanction irrespective of whether they otherwise would have been admissible.

\*   \*   \*

The Court has found that defendants have the ability to obtain documents in the possession of their attorneys and agents in Ecuador and that their failure to do so under court order evidences bad faith on their part. It therefore has determined that these sanctions are both just and commensurate with the defendants' bad faith and non-compliance with the Court's order. Chevron's request for more onerous sanctions is denied.

## Conclusion

For the foregoing reasons, Chevron's motion to sanction and hold the Donziger Defendants and the LAP Representatives in contempt of court [DI 893] is granted in part and denied in part as set forth above.

SO ORDERED.

Dated:        October 10, 2013

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)