UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
CHEVRON CORPORATION,                                    :
:
                          Plaintiff,                   :
:
            -against-                                   :
:        Case No.  11 Civ.  0691 (LAK)
:
STEVEN R. DONZIGER, et al.,                             :
:
                          Defendants.                  :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**PLAINTIFF CHEVRON CORPORATION'S
MEMORANDUM OF LAW IN RESPONSE TO COURT ORDER
REGARDING CERTAIN DOCUMENTS**


GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

*Attorneys for Plaintiff Chevron Corporation*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ....................................................................................... 1

BACKGROUND ............................................................................................................... 3

ARGUMENT ................................................................................................................... 10

I.      Any Claim of Privilege Is Waived....................................................................... 10

II.     The Index on Its Face Establishes That the Documents Are Not Privileged.................... 10

III.    The ROE and Defendants Have Colluded to Violate the Confidentiality of
        Documents, Intimidate Witnesses, and Otherwise Interfere With the RICO
        Trial in This Court, Raising an Inference of Bad Faith and Crime-Fraud ....................... 13

        A.      The Record in This Action Reveals Ongoing Criminal and Fraudulent
                Behavior by the ROE and Others................................................................. 14

        B.      The Emails on the Index Appear to Have Been Sent in Furtherance of
                This Unlawful Conduct ............................................................................... 16

                1.      The Documents Are In Furtherance of Crimes and Frauds This
                        Court Has Already Identified ............................................................. 16

                2.      The Documents Are in Furtherance of Crimes and Fraud
                        Established by the Record and the Prior Rulings of this Court.................. 17

CONCLUSION................................................................................................................. 19

## PRELIMINARY STATEMENT

The Republic of Ecuador (the "ROE") faces a heavy burden to bar Chevron's counsel in this action from receiving and relying on documents that have been provided to Chevron in the United States by an independent third party.  While Chevron does not know the contents of these documents,[1] the Index made available by the Court's order indicates that they are relevant to this action, and that any privilege which might have applied has been waived by their disclosure and potentially vitiated by the crime-fraud exception.  Third-party Margaret Petito brought these documents to Chevron's attention in the first place because she thought "they might be relevant to claims that certain parties were conspiring against Chevron in connection with the Lago Agrio litigation."  Dkt. 1505-2 at 2.  The Index appears to confirm this.  Moreover, this is not a discovery dispute, in which Chevron is asking the Court to give it access to documents held by the ROE.  It is the ROE that seeks relief here, and extraordinary relief at that.  "[E]xceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth."  *United States v. Nixon*, 418 U.S. 683, 710 (1974).  If the ROE is to suppress disclosure of these documents, it must identify an applicable U.S. legal authority and then fully satisfy that authority—presumably by demonstrating a valid privilege applies.  For a host of reasons, it is unlikely to be able to do so, especially since the documents show that the ROE itself possesses confidential Chevron documents in violation of this Court's orders, but has taken no steps to notify Chevron or return them, but rather has actively exploited them.  *See Smithfield Foods, Inc. v. United Food and Com. Workers Intern. Union*, 593 F. Supp.

---

[1]  In an abundance of caution, when the documents were made available to Chevron, it retained counsel distinct from its trial counsel in this action, and instructed this attorney to take possession of the documents, evaluate them, and, upon a determination of their relevance to this lawsuit, provide them to the Court.  *See* Dkt. 1503.

2d 840, 847 (E.D. Va. 2008) ("The well-recognized doctrine of unclean hands prevents a plaintiff from obtaining equitable relief if the plaintiff has been 'guilty of any inequitable or wrongful conduct with respect to the transaction or subject matter sued on.'") (quoting *WorldCom, Inc. v. Boyne*, 68 F. App'x 447, 451 (4th Cir. 2003).

At a minimum, the ROE should not be permitted to assert privilege based on the Index as it stands. That document, which was prepared by an attorney not affiliated with the ROE understandably could not provide the level of detail and identification required under the Federal Rules for the assertion of privilege. But the ROE is in a position to provide that detail and identification, and would have to do so even to attempt to assert privilege here. Indeed, the very first email listed was initiated by an unidentified sender with the email account "noticias1@presdencia.gob.ec." While the email address of that party—#"1" in the "presidencia" or the president's office—suggests the identity of its holder, the ROE undoubtedly knows whose email address that is. It therefore cannot assert a privilege without providing evidence of the identity of the holder of that email account, as well as confirming the names and roles of every other party to these communications, and it must provide complete descriptions of the communications themselves sufficient to permit Chevron and the Court to "assess the claim," or else it cannot possibly sustain its burden. Fed. R. Civ. P. 26(b)(5)(ii); L.R. 26.2(a)(2)(A). That is the ROE's burden, not the burden of the attorney who developed the initial document Index. "[A]s with all privileges, the person claiming the attorney-client privilege has the burden of establishing all essential elements." *In re Horowitz*, 482 F.2d 72, 82 (2d Cir. 1973).

The limited information available in the Index as it stands, however, provides strong reasons to believe that many or all of these documents cannot be privileged, regardless of the parties involved, because they are in furtherance of criminal or fraudulent activity. Document DC 006,

2

for example, which attaches an internal Chevron memo marked "CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER," without question demonstrates that this Court's protective order— in this action—has been violated.  *See* Dkt. 723 (Protective Order).  Other documents on their face pertain to non-legal activities, such as the first document on the list, DC 001-002, concerning "Press Release re: penal action;" the fifth document on the list, DC 017-023, concerning "Press releases in Argentina; BP oil spill in Gulf;" and the last document on the list, DC 043-047, concerning "Tour of Wellsite."  Moreover, other documents—such as the second document on the list, DC 003-005, concerning "Most recent request from Ecuador to Tribunal in Chevron case;" and the second to last document on the list, DC 024-042, concerning "Transmittal of Jones Day letter to Dr. Galo Alfredo Chiriboga Zambrano"—appear likely to relate to the ROE's recent campaign to interfere with this action in this Court, in the related Bilateral Investment Treaty arbitration, and in proceedings in Ecuador by threatening Chevron's percipient and expert witnesses and Chevron lawyers.

Under these circumstances, the ROE cannot meet its burden to show that Chevron must be denied access to the content of documents obtained by an independent third party.  Thus, any claim of privilege by the ROE fails.  In any event, no claim may even be advanced unless it is supported at the time it is made by full description as required by Local Rule 26.2(a)(2)(A).  Should the ROE provide such a basis, Chevron respectfully requests permission to respond, if the Court has any doubts whether Chevron should enjoy unrestricted use of these documents.

## BACKGROUND

The evidence shows that the Ecuadorian judgment against Chevron is not the product of a judiciary independent from influence by Defendants in this case and their allies in the Ecuadorian government.  Defendants here have intensified their collusion with other branches of the Ecuadorian government, including President Correa and the state-controlled Ecuadorian media, to

further thwart this Court's authority and disrupt Chevron's ability to prosecute its case at trial. Just as Defendants colluded with the Ecuadorian court in rendering the judgment and in the *Cordova* action to intentionally interfere with discovery proceedings in this case (*see* Dkt. 1529 at 1 & *passim*), the highest levels of the Ecuadorian government are now conducting an open campaign to interfere with other aspects of this and related proceedings.

President Correa and the state-run media are engaging in a campaign to intimidate Chevron's witnesses and to create a climate of fear in Ecuador against aiding Chevron in this (and other) litigation. They call Chevron, and anyone who would aid it in exposing this fraud, "traitors," "criminals" and "enem[ies] of the country" who are "conspir[ing] against the Government," "giving ammunition to [Ecuador's] international enemies," and waging a "criminal campaign" against Ecuador (Dkt. 1451-8 (Ex. 4207); Dkt. 1484-1 (Ex. 4401); Dkt. 1451-7 (Ex. 4206)). There is now a website dedicated to attacking those who have "cooperated" with Chevron as a "long list of traitors" who "have filled their pockets in exchange for harming their own people." Dkt. 1484-2 (Ex. 4402) (Los vende patria, http://www.losvendepatria.com/ (last visited Sept. 27, 2013)).

While this is a new level of activity, these tactics are consistent with President Correa's practice for "attacking judges who rule in ways he finds unfavorable, while ordering judges to rule in specific ways in cases in which he is interested. These constant attacks and [executive] meddling have created an environment of significant intimidation, self censorship and judicial pliancy in which dissent is penalized and criminalized and the president routinely gets his way through bullying, threats and reprisals." Dkt. 1475-11 (Ex. 4310) at 17 (Expert Report of Douglas Farah).

In addition, there is no question this Court's protective order has been violated. On Sep-

tember 16, state-owned newspaper *El Telégrafo* published an article entitled, "Chevron intentó

cercar a Correa negociando con la Casa Blanca" ("Chevron tried to approach Correa, negotiating

with the White House").  Dkt. 1484-3 (Ex. 4403); *see also* Dkt. 1484-4 (Ex. 4404) (*Freedom of

the Press 2013*, Freedom House, http://www.freedomhouse.org/report/freedom-

press/2013/ecuador (last visited Sept. 22, 2013) (noting state ownership of *El Telégrafo*)).  The

article quotes at length from a confidential memo Chevron produced in this action and designat-

ed "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER."  *See* Dkt. 1484-3 (Ex. 4403)

("A 2010 confidential document from the petroleum company reveals . . .");  Dkt. 1484-5 (Ex.

4405) (CVX-RICO-4888873 through CVX-RICO-4888876).  On September 28, *El Telégrafo*

published a second article regarding the confidential document, in which it stated that Correa

"confirmed the revelation" and quoted the President as accusing Chevron of misconduct: "This is

very serious because it shows that they are the ones who wanted to interfere in the lawsuit, and

not us. They were the ones who went to the US government to pressure them to unlawfully inter-

vene in the Lago Agrio lawsuit."  Dkt. 1484-16 (Ex. 4416) (*El Telégrafo, The President Claims

the Oil Company's Meetings Reveal Its Intention to Intervene in the Lawsuit* (Sept. 28, 2013)).

Defendants or their Ecuadorian allies almost certainly provided this confidential docu-

ment to *El Telégrafo* in violation of the Protective Order.  The article admits that it is quoting

from a "confidential document," which means that the copy used was the version stamped

"CONFIDENTIAL" and produced to Defendants in this litigation.  Other than the stamp, the

document nowhere else indicates that it is "confidential."  Moreover, upon learning of the article,

Chevron requested that Defendants' current and former counsel explain how the newspaper re-

ceived the confidential document.  Dkt. 1484-6 (Ex. 4406).  Defendants refused to respond.

Now that the case in this Court is approaching trial, the ROE's attempts to intimidate

Chevron's witnesses are unmistakable.  Dr. Vladimiro Xavier Álvarez Grau is a prominent Ecuadorian law professor and former public official, who was disclosed to Defendants as a potential trial witness on August 30, 2013, in Chevron's proposed Pretrial Order.  Dr. Alvarez has taken a firm stance against Ecuadorian judicial corruption.  On September 16, 2013, an unidentified individual purporting to be a reporter with state-owned and -controlled Ecuadorian newspaper *El Telégrafo* contacted Dr. Alvarez regarding one of his reports.  Dkt. 1484-8 (Ex. 4408) (*El Telégrafo*, *Three US Law Firms Have Contacted Him to Issue Reports* (Sept. 18, 2013).  The individual pushed Dr. Alvarez to acknowledge that he was a collaborator with Chevron, and that Dr. Alvarez was acting against the interests of his country for pay.  *Id.*  Indeed, the caller pressed Dr. Alvarez on any payments he received for providing his expert opinion, asking about compensation no fewer than five times, as Dr. Alvarez refused to offer the information: "Have you been paid anything by the three separate law firms that approached you from the United States? . . . But is there a price or not? . . . And can we know how much you have received as payment for those professional opinions? . . . But if everything is so up front, so transparent, can't you say how much you charged? . . .  But a journalist is not a judge to issue you with a summons, so I ask again, how much income did you declare to the relevant authority, the Internal Revenue Service?"  *Id.*  The "interview" was published the next day and lists no author, under the byline of the "Investigative Unit."  *Id.*  In a recent interview, President Correa tore up a copy of a newspaper as a threat to media that do not conform to his vision for press coverage, such as the papers *Hoy*, *El Comercio*, and *La Hora*.  He claims that they have not sufficiently supported his *Mano Sucia de Chevron* ("dirty hand of Chevron") campaign and warned that they "could face sanctions under the country's Communications Law, under which they are required to 'publish public interest articles.'"  Dkt. 1484-7 (Ex. 4407) (Silvia Higuera, *Correa warns 3 newspapers about*

*possible sanctions for insufficient coverage of Chevron lawsuit*, Knight Center for Journalism (Sept. 26, 2013)).

This was not the first "use . . . of [Ecuadorian] state power to intimidate persons assisting Chevron." Dkt. 843 at 25.  Nor is Dr. Alvarez alone.  On September 17, *El Telégrafo* published a graphic based on Chevron's Count 9 privilege log appendix.  The article highlights certain Chevron lawyers and experts on the list and asserts they are "collaborators" with whom Chevron intended to "suffocate Ecuador."  Dkt. 1451-9 at 1-2 (Ex. 4208).  It lists nine categories of "collaborators," and names specific individuals, including Dr. Alvarez and Chevron's former expert Walter Spurrier.  *Id.* at 5.  The article cites Fajardo repeatedly, quoting his attacks on Dr. Alvarez's report and Chevron's efforts to counter Defendants' fraud.  *Id.* at 4–5.  Fajardo may be personally involved in the efforts to intimidate Dr. Alvarez given Fajardo's involvement in the article and his past threats against Chevron's potential witnesses, including Guerra and Reyes.  Dkt. 843 at 28.

In addition, a special website has been created to brand—by name—those Ecuadorians who have worked with Chevron as doing "harm [to] their Amazon brothers and their country."  The site is called "Los vende patria," which translates roughly to "The Sellers of the Fatherland" or "The Traitors."  Dkt. 1484-2 (Ex. 4402).  The website shows pictures of individuals accused of assisting Chevron, along with their titles, places of work, and Ecuadorian identification numbers.  *Id*.  The website also describes how each of the "traitors" has betrayed the country and how they "have filled their pockets in exchange for harming their own people," noting their respective roles.  *Id.*  The individuals include attorneys who have assisted Chevron as well as journalists who have written articles perceived as favorable to the company.  *Id.*  While Chevron has managed to provide for the security of certain witnesses, including Alberto Guerra, who has relocated

to the United States with his family, others remain in Ecuador.  These witnesses are at risk of the threat of retribution that Judge Kaplan identified in his earlier opinion granting protection to Does 1 and 2.  Dkt. 843.

President Correa has also increased his public attacks on Chevron, which makes clear to Chevron's witnesses who reside in Ecuador that they are effectively considered enemies of the state.  The following are only a few recent examples:

- In a recent interview, Correa focused on the "traitors" aiding Chevron:  "How much did the traitors collaborate in this, how much did the media collaborate, who conspired against the Government, right?  They're giving ammunition to those international enemies our country has."  Dkt. 1451-8 (Ex. 4207).  And Correa has left no doubt that he counts Chevron among those enemies, terming the company an "enemy of the country" and accusing Chevron of waging a "criminal campaign" against Ecuador.  Dkt. 1451-7 (Ex. 4206).

- In another recent interview, Correa referred to Chevron's employees and agents as "these immoral people, these criminals . . . They can buy the Arbitration Tribunals, they can buy the corrupt press that sells out in exchange for some lentil soup here in Ecuador, but they can't cover up the truth. . . . If they don't have a court-ordered sanction for their millions, they'll have a moral sanction and hopefully an economic sanction by the conscientious citizens around the globe. No buying products from these Chevron criminals, from these delinquents who devastated our Amazonia . . . we must react against such impunity, against such abuse, against such exploitation."  Dkt. 1484-1 (Ex. 4401).

- In his weekly national address, Correa threatened Chevron's Ecuadorian attorneys: "We will not let this go unpunished.  We will not let this be forgotten. We will show the country, the Ecuadorian lawyers, that they are lawyers for Chevron against their own Country, against their own countrymen."  Dkt. 1484-15 (Ex. 4415) at 1 (*Cadena Presidencial Rafael Correa* (Sept. 28, 2013)).  Correa further threatened those involved in the 1998 Release with criminal prosecution: "how sad it is that 'Chevron's Dirty Hand' is extended to Ecuador itself.  There are accomplices of Chevron here, people who help that oil company out.  They are the ones who signed in '98 that everything had been remediated.  I hope they can be brought to justice."  *Id.* at 1.  Correa specifically named Benjamín Ortiz, a former minister involved in the 1998 Release who has consulted for Texaco, accusing him at length of "scandalous" conduct and "corruptly lying" regarding the remediation, and asserting that, as a shareholder and director of the newspaper *Hoy*, he was responsible for alleged media bias from "the [newspaper] that has defended Chevron the most."  *Id.* at 1-3.  Correa presented the case as a national struggle urging the Ecuadorian people to fight Chevron and its accomplices within Ecuador: "this conflict that is of interest to the entire Country.  The right, left, poor, rich, against a multinational company that wants to crush us with its hundreds of millions of dollars.  But we must not only fight abroad, we must also fight against "Chevron's Dirty Hand" inside the country. . . . You must understand those who we have been confronting and their plots . . ."  *Id.* at 3.

- State-owned newspaper *El Telégrafo* reported on the privilege log Chevron filed in the RICO action, focusing on Vladimiro Álvarez Grau's appearance therein. The article claims that data provided by the United States and independent NGOs show that the Ecuadorian judiciary ranks among the top third of Latin American countries and is "better" than 55% of court systems worldwide, whereas Álvarez maintains, in filings made in U.S. legal proceedings, that Ecuador in fact has a corrupt and politicized judiciary. The article also lambasts Álvarez for having held a position in the Mahuad administration when the agreement releasing Texaco from liability was signed. Dkt. 1484-9 (Ex. 4409) (*El Telégrafo, The objective: to undermine the country* (Sept. 18, 2013)).

- In an interview, President Correa's adviser, Alexis Mera, announced that the three government employees who signed the settlement and release with Texaco would be prosecuted for embezzlement in relation to that agreement. Dkt. 1484-10 (Ex. 4410) (*Ecuadorinmediato, Alexis Mera: Three former public officials under Mahuad will be charged with Embezzlement of public funds after favoring Chevron* (Sept. 24, 2013)).

- State-owned online newspaper *El Ciudadano* accused other publications, including *El Comercio* and *Expreso*, of publishing "false information that Chevron gave them," which related to the partial judgment of the BIT tribunal. *El Ciudadano* further wrote that Correa "criticized the lack of ethics and objectivity" by the media outlets publishing this information. Dkt. 1484-11 (Ex. 4411) (*El Ciudadano, Commercialized press repeats false information that Chevron delivered about The Hague interim award* (Sept. 21, 2013)).

- Correa recently urged Chevron shareholders to divest: "The shareholders, there are people of good will, good faith, who are Chevron shareholders. They don't even know about these things, aren't aware they are indirect accomplices in the greatest or one of the greatest environmental disasters in the history of humanity." Dkt. 1484-12 (Ex. 4412) at 3-4 (*Cadena Nacional* (Ecuador TV (Sept. 17, 2013)).

- Correa has recently embarked on a new campaign against Chevron called "La mano sucia de Chevron" ("Chevron's dirty hand"). Dkt. 1484-13 (Ex. 4413) (*El Telégrafo, This is Chevron's dirty campaign* (Sept. 18, 2013)). Visiting the former concession area, Correa had himself photographed putting his hand in oil, declaring that this was "Chevron's dirty hand," and calling for a boycott of Chevron. *Id.* Shortly after the event, *The Economist* reported that the "pit into which Mr. Correa dipped his hand earlier this month is the responsibility of Petroecuador." Dkt. 1484-14 (Ex. 4414) (*The Economist, Oil in Ecuador: It's hard to be green* (Sept. 28, 2013)). In response, Correa attacked the respected publication, accusing it of corruption: "Chevron surely pays them for ads or something. But how they lie, how those people can lie." Dkt. 1484-15 (Ex. 4415) at 1 (*Cadena Presidencial Rafael Correa* (Sept. 28, 2013)). Consistent with Correa's view that the state bears no responsibility, the Government has launched a webpage for the "dirty hand" campaign, detailing Chevron's purported crimes. *See* La Mano Sucia, http://lamanosucia.com/ (last visited Sept. 30, 2013).

The Ecuadorian judiciary has also assisted Defendants here in suppressing documents ordered by the Court to be disclosed to Chevron. In a 104-page opinion on Chevron's motions to

compel and requesting sanctions, Judge Kaplan just this week found that Defendants "caused a collusive lawsuit to be brought in Ecuador, without notice to Chevron, that ultimately resulted in an injunction barring the Ecuadorian lawyers and other associates from turning documents over in this case." Dkt. 1529 at 1. The ROE's attempt to protect these documents is more of the same—collusion "in derogation of the search for truth." *Nixon*, 418 U.S. at 710.

## ARGUMENT

### I.   Any Claim of Privilege Is Waived

In the circumstances here, any claim of privilege is presumptively waived. The Petito documents surfaced because Margaret Petito, who is not affiliated with Defendants or the ROE (or Chevron), came to possess them. "Although the attorney-client privilege is of ancient lineage and continuing importance, the confidentiality of communications covered by the privilege must be jealously guarded by the holder of the privilege lest it be waived." *In re Sealed Case*, 877 F. 2d 976, 980 (D.C. Cir. 1989). In *In re Sealed Case*, the Court of Appeals for the District of Columbia found that an employee of a corporation had disclosed a document to the government— apparently without permission and contrary to the corporation's intent to protect the document— and that under the circumstance the privilege was waived. *Id.* at 977–78. Thus, even assuming the ROE could establish that the documents were privileged in the first instance, it must also establish with factual evidence—not speculation—why the fact that Petito came into possession of the documents does not mean that any privilege claims here are waived.

### II.   The Index on Its Face Establishes That the Documents Are Not Privileged

"[A]s with all privileges, the person claiming the attorney-client privilege has the burden of establishing all essential elements." *In re Horowitz*, 482 F.2d at 82. "To invoke the attorney-client privilege, a party must demonstrate that there was (1) a communication between client and counsel, which (2) was intended to be and was in fact kept confidential, and (3) made for the

purpose of obtaining or providing legal advice." *John Doe Co. v. United States*, 79 F. App'x
476, 477 (2d Cir. 2003).  The information available to Chevron does not establish anything about
these communications that satisfies these requirements—to the contrary, it suggests that the doc-
uments do *not* satisfy them.

The document labeled DC-001-002 concerns "Press release re: penal action" and DC
017-023 concerns "Press releases in Argentina; BP oil spill in Gulf."  *See* Index.[2]  Press releases
are not ordinarily privileged, and communications about public relations, "although they may
assist counsel in formulating legal advice, are not generally protected by the attorney-client privi-
lege."  *Chevron v. Salazar*, No. 11-cv-03718, Dkt. 227 (S.D.N.Y. Aug. 16, 2011) at 3.  Nor are
public relations events like a "Tour of Wellsite," the subject of DC 043-047.  *See* Index; *Salazar*,
Dkt. 227 at 3–4, citing *Haugh v. Schroder Investment Mgmt. N. Am. Inc.*, No. 02 Civ. 7955, 2003
WL 21998674, at *3 (S.D.N.Y. Aug. 25, 2003) ("A media campaign is not a litigation strate-
gy.").

Another document, an email that begins with a transmittal of a letter from the ROE to the
international arbitral tribunal presiding over Chevron's claims against Ecuador under the Bilat-
eral Investment Treaty between the United States and Ecuador, also likely concerns press releas-
es or other press activity.  Chevron has been able to identify the email, on which its arbitration
counsel at King & Spalding LLP were cc'd, that begins DC 003-005.  The rest of the document
appears to be a series of emails between the unidentified "noticias1," Alexis Mera, a senior advi-

---

[2]  As the Court is aware, the attorney Chevron retained to receive the documents from Ms. Petito
created an index of the documents for the Court (the "Index").  The Court is already in posses-
sion of the Index, and on October 11, 2013, the Republic of Ecuador authorized Chevron's attor-
ney to disclose the Index to Chevron.  Because it was prepared by an attorney not affiliated with
the Republic of Ecuador, it necessarily lacks information about the identity of parties to commu-
nications, the purpose of communications and other information required of a proper privilege
log.  *See* L.R. 26.2.

sor to President Correa, Diego Garcia Carrion, the Attorney-General of Ecuador, and others.  The

subject description of the Index describes the topic of the email chain as "Most recent request

from Ecuador to Tribunal in Chevron case," but the ROE's letter to the Tribunal complains about

a supposed "new development in Chevron's media offensive," and attaches an article by a Jones

Day lawyer in an arbitration journal.  Ex. B.  The ROE's letter purports to protest "inflammatory

remarks" in the Jones Day article such as:

- "Ecuador's judges are 'judges in the dock'";

- "A decree issued by President Correa 'seemed to imply that judges must support government policies or risk dismissal'";

- "'As regard Correa's own actions, the president has repeatedly attacked court decisions he deems unfavourable to his administration and expressed his approval or disapproval of specific judges";

- "President Correa 'has also been accused of using his personal authority to pressure judges'";

- "'The cumulative effect of a series of judicial reforms and arguably heavy-handed interference from the executive has been an upheaval of the Ecuadorian judiciary.'"

The ROE's letter then promises that the ROE "respectfully reserve[s] its right to respond in

kind."  To the extent the responsive email chain thus relates to Ecuador's efforts to respond to

this supposed media campaign—and especially if it indicates plans to respond with falsehoods

and pressure on Chevron's witnesses and counsel, as seems likely in view of recent ROE activi-

ties described below—it is unlikely to be privileged.  At a minimum, without more, this docu-

ment appears to concern unprivileged press activity.  *See Salazar*, Dkt. 227 at 3–5.

Two other documents transmit or refer to materials created by or involving Chevron or its

counsel.  *See* Index (DC 006-012: "Memo 10/22/10 Irwin to Watson CVX-RICO 4888873-76;

transcription Rivera-Zambrano"; DC 024-042: "Transmittal of Jones Day letter to Dr. Galo Al-

fredo Chiriboga Zambrano").  Besides evidencing the ROE's possession of a confidential Chev-

ron document, addressed further below, these entries on the Index give no indication of how the

"[t]ransmittal" of Chevron materials among officials of the ROE could be privileged.  "[T]here is general agreement that the protection of the privilege applies only if the primary or predominate purpose of the attorney-client consultation is to seek legal advice or assistance."  *In re County of Erie*, 473 F.3d 413, 420 n.7 (2d Cir. 2007) (quotation omitted).

Finally, numerous parties to the communications do not appear to be lawyers, or acting in a legal capacity.  While Chevron does not know who many of these people are, the email addresses themselves indicate that parties listed on the Index include Daniel Leon (Daniel.leon@secom.gob.ec) a government public relations officer, Maria Fernanda Espinosa (mfespinosa@midena.gob.ec), the Minister of National Defense, and Pedro Merizalde Pavon (pedrokmerizaldep@yahoo.es) the Minister of Non-Renewable Natural Resources.  Mr. Merizalde is notable for another connection to this case, however—on information and belief he is the Chairman of the Board of Refineria del Pacifico, former Ecuadorian judge Nicholas Zambrano's new employer.  *See* Dkt. 1448.

III.   **The ROE and Defendants Have Colluded to Violate the Confidentiality of Documents, Intimidate Witnesses, and Otherwise Interfere With the RICO Trial in This Court, Raising an Inference of Bad Faith and Crime-Fraud**

Even if any of the documents on the Index had been subject to a valid claim of privilege, any privilege is likely vitiated by the crime-fraud exception.  Under that exception, no privilege protects communications or work product materials where there is probable cause to believe that: (1) a crime or fraud has been attempted or committed, and (2) the communications or materials in question were in furtherance of the fraud or crime.  *United States v. Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997).  If "a prudent person" would conclude there is a "'reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud, and that the communications were in furtherance thereof" then the materials fall under the crime-fraud exception and no privilege protects them.  *Jacobs*, 117 F.3d at 87 (quoting *In re John Doe, Inc.*, 13 F.3d 633, 637 (2d Cir.

1994) (internal quotation marks omitted)).  The attorneys involved in the communication in

question need not be aware of the crime or fraud for the exception to apply.  *See In re Grand*

*Jury Subpoena Duces Tecum*, 731 F.2d 1032, 1038 (2d Cir. 1984); *United States v. Kerik*, 531 F.

Supp. 2d 610, 617 (S.D.N.Y. 2008).

> A.   **The Record in This Action Reveals Ongoing Criminal and Fraudulent Be-
> havior by the ROE and Others**

In this action, the first prong of the crime-fraud exception has already been found as to a

number of issues, including incidents in which Defendants corrupted the Ecuadorian judiciary.

Dkt. 905 at 65–66.  Moreover, the Court has found that there is an "alliance between the LAPs

and the Ecuadorian government" and that the president of Ecuador himself "played a role in se-

curing the now abandoned criminal prosecution of two of Chevron's attorneys"—yet another ex-

ample of the corruption and lack of independence of the Ecuadorian judiciary.  Dkt. 843 at 28.

In recent months—the time period covered by the documents at issue—the longstanding

collusion between the ROE and Defendants has escalated.[3]  As more former insiders of the LAP

Team have come forward to reveal the fraud through which the Ecuadorian judgment was ob-

tained, the ROE has sought to intimidate witnesses and lawyers associated with Chevron or per-

sons who are otherwise unsympathetic to the government's public position regarding the Lago

Agrio litigation.  For example, as described above, an Ecuadorian newspaper associated with the

---

[3] Judge Kaplan has already sealed the testimony of several Doe witnesses based on justified concerns for their safety should their identities become known.  *See* Dkt. 843.  But they are not alone.  When Chevron filed the declaration of former Ecuadorian Judge Alberto Guerra earlier this year, including extensive documentary corroboration—that the $18 billion judgment against Chevron was the product of a $500,000 bribe, Pablo Fajardo, the LAPs' Ecuadorian lawyer, filed a criminal denouncement of Guerra.  Dkts. 1475-3 (Ex. 4303), 854-4 (Ex. 4).  The ROE then launched a criminal investigation of Guerra for supposedly having falsely accused himself of committing a crime—but not former Judge Zambrano, despite the extensive and unrefuted evidence that he permitted the LAPs to draft the judgment.  *Id.*  Fajardo has also threatened to file a criminal complaint against Fernando Reyes, another former insider of the LAP Team who came forward to explain how Donziger tried to use Reyes to corrupt the judicial inspections and global expert process in the Lago Agrio litigation.  *See* Dkts. 746-1 (Ex. A), 746-2 (Ex. B), 796-11 (Ex. 11); *see also* Dkt. 843 at 28 (finding that Defendants have "openly threatened . . . Reyes with civil litigation and criminal prosecution for providing evidence in this case").

Correa administration, El Telegrafo, recently published a list of lawyers and expert witnesses who have worked for Chevron, Dkt. 1451-9 (Ex. 4208), in a cover story asserting that Chevron intended to "suffocate Ecuador."  It singled out for criticism Chevron expert Vladimiro Alvarez Grau, who has opined in this action that Ecuador's judiciary has become subject to corruption and executive interference and thus lacks independence or due process.  Dkt. 56-1.  President Correa has also launched an aggressive media campaign against Chevron in Ecuador, "*mano sucia de Chevron*" (the "dirty hand of Chevron").  Alexis Mera, the Correa advisor who is identified as a sender or recipient of many of the emails in the Index, has publicly called on prosecutors to reopen the criminal investigation into the government officials who approved the TexPet remediation on behalf of the government in the 1990s—the same tactics that once subjected two Chevron lawyers to years of ROE harassment but that was ultimately dismissed for lack of evidence after it no longer seemed useful.  *See* Dkt. 843 at 20–25; Dkt. 1483 at 12.

Finally, during the same time period covered by the emails at issue here, the ROE has officially closed the investigation of the Judge Nunez bribery solicitation scandal.  The report that closes the investigation falsely accuses Chevron's U.S. counsel at Jones Day of having acted "malicious[ly]" in bringing the evidence of that scandal—including videotapes—to the Ecuadorian prosecutors' attention, in part because he has alleged that "that the government of Ecuador, through the executive branch, is interfering in the judicial branch, and even conspiring against Chevron."  Ex. A at 2, 12.  This accusation of "malice" appears intended to prepare the way for civil or criminal charges against Chevron and/or its counsel.  The ROE official at issue, Galo Chiriboga Zambrano, appears in the Index as a correspondent with Mera, along with Nathalie Cely (the Ecuadorian ambassador to the United States) and the unidentified "noticias1."  Index at DC 024.

**B.    The Emails on the Index Appear to Have Been Sent in Furtherance of This Unlawful Conduct**

The time period of these emails—during an intensification of the ROE's campaign against Chevron—and the limited information provided about them links them to both crime-fraud findings already made by this Court, and other findings supported by the record.

**1.    The Documents Are In Furtherance of Crimes and Frauds This Court Has Already Identified**

The documents on the Index implicate Defendants' ongoing collusion with the ROE and the associated corruption of the Ecuadorian judiciary that Judge Kaplan has already found in connection with sealing records and protecting the anonymity of witnesses, Dkts. 843, 1227, holding depositions outside of Ecuador, Dkts. 882, 1327, and specifically for purpose of the first prong of the crime-fraud exception, Dkt. 905.  The prior categories of crimes or frauds Judge Kaplan has found related in large part to corruption of the Ecuadorian judiciary by the LAP Team.  *See* Dkt. 905 at 65–66.  Judge Kaplan's related findings regarding the ongoing intimidation of witnesses and other misconduct by the ROE also establish the first prong of the crime-fraud exception.  *See Chevron Corp. v. Salazar*,  No. 11-cv-03718, Dkt. 180 at *8–9 (S.D.N.Y. August 3, 2011) (finding first prong of crime-fraud exception based on previous factual findings by Judge Kaplan); Dkt. 905 at 62 (finding the record "establishes probable cause to suspect that the LAPs committed wire fraud and obstructed justice" by attempting to disrupt discovery and obstruct disclosure of the truth about the Cabrera Report).  The documents at issue here suggest that Defendants' collusion with the ROE continues.  Document DC 024 includes correspondence between members of the Correa administration and the prosecutor who just closed the Nunez investigation with his threatening accusations against Chevron's outside counsel, and DC 001 concerns "Press Release re: penal action," an apparent effort to publicize the consequences of supporting Chevron in Ecuador.

### 2.  The Documents Are in Furtherance of Crimes and Fraud Established by the Record and the Prior Rulings of this Court

First, the ROE has participated in the violation of the protective order this Court has entered in this case.  Chevron has apprised the Court before of Defendants' repeated disregard of the protective order by providing confidential Chevron documents to third parties, including the ROE.  *See* Dkts. 1222, 1484-3 (Ex. 3), 1484-5 (Ex. 5), 1484-16 (Ex. 16).  Such violations of confidentiality have flowed in multiple directions.  Donziger "somehow" obtained—and then filed on the public record in this case—ROE submissions to the Treaty arbitration tribunal that are not publicly available but that rather are subject to confidentiality provisions.  *See* Dkt. 1432.  The ROE has claimed this was inadvertent, but Donziger has still not corrected the improper filing.  At least one document on the Index is part of this misconduct.  DC 006-012 appears to be part of that bad faith conduct.  The attachment to DC 006-012 is CVX-RICO 4888873-76, a document that Chevron designated "CONFIDENTIAL" pursuant to the protective order.  The attachment was apparently emailed to various officials of the Ecuadorian government, including Alexis Mera, which emphasizes the reach of both the collusion between the ROE and Defendants here and how far the violations of this Court's orders go.  *Cf.* Dkt. 843.

Second, Ms. Petito brought these documents to Chevron in the first place because she thought "they might be relevant to claims that certain parties were conspiring against Chevron in connection with the Lago Agrio litigation."  Dkt. 1505-2 at 2.  Given that high officials of the ROE are on most of the emails listed in the Index, Ms. Petito's sworn statement, along with the ROE's track record senior level collusion and attacks on Chevron, provides probable cause that those "conspiring" against Chevron include members of the Correa government, if not Correa himself.  And the ROE's recent efforts to intimidate witnesses set to testify in the RICO action and at least acquiescence in the violation of the protective order provides probable cause to be-

lieve that part of the conspiracy is the ROE's interference in the imminent RICO trial. Part of that interference, as explained above, involves an aggressive media campaign to intimidate Chevron witnesses from testifying and anyone in Ecuador from disagreeing with the government's position. Several of the documents on the Index appear to reflect the ROE's harassing media campaign. *See* Index (DC-001-002: "Press Release re: penal action"; DC 003-005: discussing arbitration filing regarding supposed Chevron "media offensive"; DC 017-023: "Press releases in Argentina; BP oil spill in Gulf"; DC 043-047: "Tour of Wellsite").

Third, the evidence these documents appear to be of the ROE "conspiring against Chevron" implicates the ROE in false representations to U.S. courts. For example, during the appeal from Judge Kaplan's order of a preliminary injunction in the Count 9 action, the ROE filed an amicus brief touting the independence of its judiciary and its lack of any interest in the outcome of the Lago Agrio litigation. *See Chevron Corp. v. Naranjo*, 2d Cir. 11-1150, Dkt. 231 at 1 ("While the Republic has no interest in either the RICO claims or the underlying Lago Agrio Litigation . . . ."); *id.* at 7 ("Ecuador has adopted a *system* of jurisprudence in which all litigants are afforded due process; judicial reforms have enhanced the fairness and independence of the court processes; and empirical evidence establishes that courts act independently of public opinion and the wishes of the Republic's officeholders."). These statements by the ROE are false in light of the documents on the Index, which may confirm that collusion between the ROE and Defendants in his action has been ongoing for years. *See In re Sealed Case*, 754 F.2d 395, 401 (D.C. Cir. 1985) (finding that the crime-fraud exception applies where "the judicial process itself was a central target and tool of the alleged criminal and fraudulent activity at issue in this case").

In short, what all the documents on the Index have in common is that they appear to reflect an ongoing collusive campaign between the ROE and Defendants, which has long existed

but that has now intensified as trial in this action has drawn near, to prevent Chevron from presenting its case before this Court, to control and manipulate the Ecuadorian judiciary, and to conceal this collusion from U.S. courts.  There is no basis for privilege claims in such documents.

## CONCLUSION

For the foregoing reasons, the Court should authorize disclosure of the documents to Chevron.

Dated:  October 12, 2013                    Respectfully submitted,
New York, New York

                                            _____/s/ Randy M. Mastro_____
                                            Randy M.  Mastro
                                            Andrea E.  Neuman
                                            GIBSON, DUNN & CRUTCHER LLP
                                            200 Park Avenue
                                            New York, New York 10166
                                            Telephone: 212.351.4000
                                            Facsimile:  212.351.4035

                                            William E.  Thomson
                                            333 South Grand Avenue
                                            Los Angeles, California 90071
                                            Telephone: 213.229.7000
                                            Facsimile:  213.229.7520

                                            *Attorneys for Chevron Corporation*