# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CHEVRON CORPORATION,

                Plaintiff,

    -against-

                                   Case No. 11 Civ. 0691 (LAK)

STEVEN R. DONZIGER, et al.,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF DAVID L. RUSSELL

I, DAVID L. RUSSELL, declare under penalty of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746:

1.    I am an environmental engineer and the president and the principal of Global Environmental Operations, Inc., or "GEO," an environmental consulting firm, located in Lilburn, Georgia. I have been a civil and environmental engineer for the past 40 years.

2.    Before I started GEO in 1986, I was an environmental engineer for a number of waste management and environmental remediation companies. My work as an environmental engineer included remediation of and strategic planning related to oil operations both in the United States and in Latin America. For example, from approximately 1996 to 2002, I worked on a series of projects for Venezuela's government-owned oil company relating to spill clean-up and response assessment, and the evaluation of oil and gas operations at refineries.



PLAINTIFF'S
EXHIBIT
**3200**
11 Civ. 0691 (LAK)

### Introduction to Steven Donziger and My First Trip to Ecuador

3.      I first met Steven Donziger ("Donziger") in 2003 through the Technical Advisory Service for Attorneys, an expert search firm. I went to New York, and Donziger interviewed me to provide technical support for him in Ecuador in the Ecuadorian litigation. During the meeting, Donziger identified himself as the lead U.S. attorney in the Ecuadorian litigation. This meeting lasted three to four hours, and Manuel Pallares was present for part of the meeting. Before meeting with Donziger, I was not aware of the Ecuadorian litigation. At or shortly after this initial meeting, Donziger offered to hire me, and I agreed to investigate the contamination in Ecuador. I negotiated my fees with Donziger.

4.      I ultimately worked for Donziger from the Fall of 2003 to early 2005. At first, my role was to do an initial cost estimate for remediation based on a brief trip to Ecuador. Later, I became the lead environmental scientist for Donziger and the Ecuadorian plaintiffs' team in the Ecuadorian litigation.

5.      In the Fall of 2003, at Donziger's direction, I spent a number of days in the Oriente region of Ecuador. Donziger wanted me to provide him with a cost estimate to clean up or remediate any oil contamination. Donziger was the guiding hand during my trip, and told me to go with a group of individuals to a number of oil operation sites in the Oriente region over several days. At some sites we stopped and walked around, but at other sites we drove by in our van. I did not analyze any soil or water samples, and I was not provided with any environmental data.

6.      Among the places Donziger and others showed me were sites and stations operated by Petroecuador. At some point, Donziger told me to assume that Chevron was responsible for environmental harm caused by those sites and stations because Texaco gave Petroecuador the technology to operate them before Texaco left Ecuador. Based on the

2

Plaintiff's Exhibit 3200   p. 2 of 44

assumptions Donziger told me to use, including that Chevron bore responsibility for all of these sites and stations, I included these sites and stations in my cost estimate. I accepted what Donziger said and did not question Donziger's explanation that Chevron was responsible.

7.      During this trip, I also met with members of the Ecuadorian plaintiffs' legal and public relations team, including Manuel Pallares, Alberto Wray, Monica Pareja, Cristobal Bonifaz, John Bonifaz, Lou Dematteis, and members of Amazon Watch. I do not recall meeting the Ecuadorian plaintiffs during this trip to Ecuador or at any other time. Both Alberto Wray and Monica Pareja, who were lawyers working for Donziger, prepared me to testify to the Ecuadorian court as an expert during the trial. However, they never called me as a witness. I do not speak Spanish, and I relied on Donziger and others on the Ecuadorian plaintiffs' team for information during the trip.

### My Cost Estimate

*Donziger's Statements to Me Prior to Determining a Rough Cost Estimate*

8.      On this same trip to Ecuador in the Fall of 2003, at Donziger's request, I spent a few days in the Hotel Lago in an unoccupied dance hall working on a cost estimate for remediation.

9.      While I was working on the estimate in the Hotel Lago, Donziger told me that he wanted a "really big number," and he needed a "really big number" for purposes of "putting pressure" on Chevron to settle the litigation. In response, I told him that I would try to come up with the biggest possible cost estimate I could. Donziger told me that he wanted everything that I could come up with in terms of possible costs and gave me the general categories of those costs. When I questioned whether there was enough information to estimate costs in certain categories, like groundwater or drinking water contamination, Donziger told me that everything was from Chevron and that I should just assume that there was contamination.

3

10.     I provided Donziger with a $6.114 billion cost estimate based largely on the assumptions Donziger told me to use, the descriptions of the environmental damage in the area given to me by Donziger and members of the Ecuadorian plaintiffs' team, and my observations during my trip. Exhibit PX2414 is a true and correct copy of the cost estimate I developed. When I wrote in that cost estimate "[t]he areas you asked me to address were the following . . . ," [PX2414 at 1], I meant that I was estimating the cost of remediation based on the categories of damages that Donziger identified.

11.     Within a year of working for Donziger, I came to learn that my cost estimate was wildly inaccurate and had no scientific data to back it up. I explained that to Donziger, Cristobal Bonifaz (another lawyer working on the case), and others. I remember telling them that my cost estimate was a guess based on a short period of looking at sites without actual scientific data. And Mr. Bonifaz recognized that the cost assessment had no scientific data underlying it and should not be considered an accurate evaluation of cost. Mr. Bonifaz acknowledged that the estimate of billions of dollars in costs was for PR purposes because no one had an accurate estimate of the total costs. Mr. Bonifaz's statement that, in effect, my six-billion-dollar cost estimate was just for PR purposes is consistent with what Donziger told me.

*Donziger Misused My Cost Estimate*

12.     Given that the cost estimate was a wild guess and not based on any testing, actual science, or personal knowledge, I was unhappy with what Donziger and Amazon Watch were doing with it. Donziger, Amazon Watch, and others supporting the Ecuadorian plaintiffs repeatedly cited the cost estimate on television, radio, in press releases, and to news reporters as an accurate, scientifically supported cost estimate, and occasionally used my name or the name of my company in describing the estimate. Donziger was using the estimate as a club and trying to batter Chevron with it in public, and I was uncomfortable with that because the estimate was

4

Plaintiff's Exhibit 3200   p. 4 of 44

being presented as gospel and that's not what it was. I was increasingly concerned that being publicly connected with this cost estimate would hurt my professional reputation, because the estimate was so clearly and significantly exaggerated.

*My "Cease and Desist" Letter to Donziger and Amazon Watch*

13.     I stopped working for Donziger in early 2005. I no longer trusted Donziger and became convinced that he did not really care about the scientific or technical evidence in the case. When he hired me, he led me to believe that the cost estimate I did was the first step in a serious effort to evaluate the conditions of the oil operations in Ecuador. I came to realize that all he really wanted from me was that first cost estimate, and once he had it, he didn't care about the conditions of the oil operations. He was refusing to pay me for the work I had done, which is something I had seen him do before when someone refused to do or say what he wanted. Donziger controlled who got paid and how much, and used that power to keep people in line.

14.     When I realized that Donziger didn't care about evaluating actual conditions in Ecuador and determining a scientifically-based cost estimate, I told Donziger on several occasions from late 2004 through early 2005 that my initial cost estimate was wildly inaccurate and that it should not be used.

15.     After I stopped working for Donziger in early 2005, I, in fact, discovered that Donziger and Amazon Watch continued using my cost estimate in their PR campaign, and that they even cited my estimate in a complaint letter to the Securities and Exchange Commission ("SEC") in early 2006. [PX0754]. In fact, in that letter to the SEC, they falsely stated that my cost estimate was for a "basic clean-up" when it was wildly exaggerated based on Donziger's misrepresentations to me. They also actually claimed to the SEC that a "comprehensive ecological remediation could cost twice" my estimate, which was completely false. I got upset. I had told Donziger and others on his team that this cost estimate was wildly inaccurate and I did

5

not want my name linked with Donziger's lawsuit. And here they were misusing my cost estimate in Donziger's public campaign against Chevron and in making false statements to a U.S. federal agency. I was outraged. I felt it was hurting my professional reputation and compromising my integrity.

16.     So, in early 2006, I wrote Donziger and Amazon Watch to tell them to "cease and desist" using the estimate. [PX0763]. I initially sent Leila Salazar-Lopez of Amazon Watch an email on February 13, 2006, informing her that the cost estimate "is no longer valid and cannot be used to defend Steve [Donziger]'s lawsuit. You may not reproduce it nor use it in any method or publish it." [PX0766]. That same day, I received an email from Donziger. In his email, Donziger wrote: "AW [which I understood to be referring to Amazon Watch] indicated that you don't stand by your clean-up assessment anymore. Please give me a call so we can discuss, as this implicates your credibility and our strategy." [PX0763]. I understood from Donziger's email that he was upset that I no longer supported the 2003 cost estimate because it was the only dollar figure Donziger's team had to use in their strategy to pressure Chevron. I did not call Donziger, as he requested in his email. I no longer trusted Donziger. I did not want to speak with him. I wanted nothing to do with him anymore. Instead, I replied to his email and stated: "See the attached. It says what I want to say." [PX0763]. My attachment was a letter, dated February 14, 2006, requesting that he "cease and desist" using my cost estimate.

17.     In my "cease and desist" letter to Donziger, I told him to stop using the cost estimate. I told him that it was invalid for a number of reasons, from the lack of supporting scientific data to the fact that it was "heavily influenced by [Donziger] in the writing." [PX0763]. I also explained to Donziger that I was concerned that his misuse of my cost estimate was damaging my reputation and the reputation of my company. I wrote: "It is no longer any of

6

my concern, except to see that the name of my company and my reputation are not abused by continued association with the Aguinda vs. Texaco lawsuit." [PX0763]. I also told him: "If subpoenaed, I will tell the truth about what I know about the existing costs, how the cost estimate was prepared, and what the differences in unit costs might be to cleanup [sic] contamination in Ecuador." [PX0763]. I felt it was important to tell Donziger that I was not afraid to set the record straight about the inaccuracy of the cost estimate if he continued to use it. The close of my letter stated that the "2003 cost estimate is a ticking time bomb which will come back to bite you, and very badly if anyone attempts due diligence on it." [PX0763]. By that, I meant that if anyone drilled into the cost estimate they would quickly find out that it was a gross exaggeration.

18.     On February 16, 2006, Ms. Salazar-Lopez responded to my "cease and desist" letter. She said that Amazon Watch had "decided to take [my] report off of [their] website." [PX0766]. That meant that my cost estimate would no longer appear on a website that Donziger and Amazon Watch used as part of their PR campaign against Chevron. Ms. Salazar-Lopez also requested that I "inform [them] of the viability of cheaper and cleaner cleanup methods, as well as [my] new cost estimate." [PX0766]. I declined. I told her in my response by email that "I do not ever, under any circumstances, plan, nor will I ever publish a revised cost estimate on the Ecuador Project! I am no longer affiliated with it." [PX0766].

19.     On the same day that Ms. Salazar-Lopez responded to my "cease and desist" letter, Donziger also sent me a letter. Although the overall tone of the letter was threatening and it contained a number of misleading and false statements about the cost estimate, I recall being satisfied that Donziger said that he personally no longer planned on citing me as a source for a damage assessment.

7

20.     However, I quickly learned that, despite making that promise, Donziger and his team continued to publicly cite my cost estimate in their PR campaign against Chevron. I remember seeing press releases and articles after I sent the "cease and desist" letter where my cost estimate was cited, including ones where my company was mentioned by name. In preparation for my testimony, I reviewed several press releases issued by or at the direction of Donziger, Amazon Watch, and the Frente from about March 2006 through July 2007 that continued to misuse my cost estimate over and over and over again despite my "cease and desist" demand. [*See* PX2221; PX0466-67; PX0472-83; PX0485-86; PX0491-94; PX0497; PX0499]. I remember having seen at least a few of these press releases or articles around the time they were published.

21.     I wrote to Donziger again, on August 15, 2006, and demanded that he stop using my cost estimate. [PX0788]. In my email to Donziger, I said: "A while back I told the ADF [referring to the Amazon Defense Front] and you, to stop using my name and cost estimate and leave me out of the case. . . . I washed my hands of the entire business, hoping not to see or hear about the case again. Nor did I really want to hear from you again because your last letter was threatening." [PX0788]. I also said: "I see that today, the ADF decided to post the cost estimate and post my telephone number on the Spanish web site. . . . the cost estimate should not be used again, ever!" [PX0788]. I sent my email demanding that they stop to Donziger—not the ADF— because I knew that Donziger was in control of their PR campaign. As I explained in my email: "I know that you paid the ADF for some of their publicity and help direct some of their operations and [sic] against Chevron/ Texaco, because you had me write checks to them." [PX0788]. Donziger responded by email and said: "Dave: No problem, I will contact the Frente to have that removed." [PX0788].

8

22.     But, once again, despite my demand that Donziger and his team stop using my wildly inaccurate cost estimate, and despite Donziger's promise to do so, Donziger and his team ignored me. They continued to issue press releases relying on that estimate. [PX2221; PX0476-83; PX0485-86; PX0491-94; PX0497; PX0499].  I was frustrated because I had now warned Donziger in writing twice to stop using my cost estimate, and Donziger promised to stop; but then went ahead and continued to use it anyway.

23.     I have reviewed a *Crude* outtake, dated December 6, 2006, in which Donziger is speaking in a room with a woman whom I do not recognize. [PX0018; PX0018A].  Donziger stated:  "You know, Dave has personal reasons for wanting to back off of that number, but they're not based on professional reasons relating to the cleanup." [PX0018; PX0018A]. Donziger's statement—that my reasons for backing off the number are personal and not based on professional reasons related to the cleanup—is false.  Donziger's additional statement that my cost estimate of $6 billion dollars "is a valid number," [PX0018; PX0018A], is also false, as I had told Donziger on several occasions in late 2004 through early 2005, in my February 2006 "cease and desist" letter, and in my August 2006 email.  In that same outtake, Donziger also goes on to say: "The reality is—based on what this guy is telling me—it would cost less than that. Significantly less than that.  You know, because of a whole host of reasons." [PX0018].  I am not sure who Donziger was referring to when he said "this guy" was telling him that the cleanup would cost "significantly less" than my initial cost estimate.  But when I saw this outtake, it confirmed my understanding from Donziger of what he was up to—that Donziger gave me inaccurate assumptions for my initial cost estimate despite knowing that they were grossly exaggerated, all because he was trying to pressure Chevron by putting a big "price tag" on the remediation.

9

### My Role as Chief Environmental Scientist for Donziger

24.     From the Summer of 2004 through the end of 2004, I became the chief environmental scientist in charge of the Ecuadorian plaintiffs' sampling and environmental investigations.  Donziger asked me to set up a team to conduct judicial inspections, which were inspections of the oil well sites conducted by the parties' experts and the judge.  I created budgets for the scientific investigation, purchased equipment, hired, trained, managed, and paid members of the Ecuadorian plaintiffs' field team, and hired and interfaced with the plaintiffs' outside laboratories.  I did my work from both the United States and Ecuador, and communicated the activities of the scientific team primarily by email with Donziger when he was in New York City and also when he was in Ecuador.  During the period I worked with the Ecuadorian plaintiffs, I spent almost half of my time in Ecuador.  All of my work was performed at Donziger's direction.

25.     Donziger repeatedly made exaggerated claims publicly to try to generate publicity adverse to Chevron and put pressure on Chevron to settle the case.  I recommended that the Ecuadorian plaintiffs conduct a thorough environmental investigation as part of the judicial inspections in order to determine whether their claims were accurate.  [PX0688].  On April 12, 2004, I sent an email to Cristobal Bonifaz, copying Donziger and Joe Kohn, stating:

> We will need data, and reasonably good data when we begin
> looking at the settlement.  We also will need to provide
> information on the extent of the contamination in order to give
> substance to the cost estimate.  This argues for some sampling -- as
> I have said, a reasonable amount of representative sampling to
> sharpen our cost estimate, which as both of you know is based on
> very few numbers.  The largest single element in the costs is the
> groundwater contamination, and when I made that estimate, I did

10

Plaintiff's Exhibit 3200   p. 10 of 44

> not have a good estimate of how much contaminated groundwater
> is present, nor have I seen any data which would allow me to
> improve upon that estimate.

[PX0688]. Subsequently, I designed an investigation of the soil, groundwater, and drinking water that I thought was needed to determine whether or not there was any exposure to residents. Donziger refused to approve the investigation that I had recommended, claiming that it would be too costly. Based on my communications with and observations of Donziger, I came to understand from Donziger that he didn't want an investigation done so he could continue to make exaggerated claims publicly to pressure Chevron into a settlement.

### Dr. Calmbacher

26.     The first of the Ecuadorian plaintiffs' judicial inspection experts was Dr. Charles Calmbacher, a Certified Industrial Hygienist, whom I have worked with for many years. I brought Dr. Calmbacher onto the team around June 2004 to assist with various expert reports, and he was tasked with inspecting and writing the reports for the sites known as Sacha-6, Sacha-21, Sacha-94, and Shushufindi-48. Shortly after he inspected those sites, and we had received the analysis of the samples, Dr. Calmbacher told me via phone, and I informed Donziger via phone, that we did not see anything at the sites Dr. Calmbacher inspected that appeared to present a risk to health or to the environment. Donziger told me he was not satisfied with the conclusions reached by Dr. Calmbacher during his inspections.

27.     In late 2004, Dr. Calmbacher became very ill with dengue fever and returned to the United States. In early 2005, Donziger solicited my help to obtain reports and signature pages from Dr. Calmbacher. So I contacted Dr. Calmbacher. After working on some of his reports in the United States, Dr. Calmbacher gave one of the reports to me in hard copy and I sent it to Donziger in Ecuador. The report Dr. Calmbacher submitted to me contained a cover letter that was signed by him, and his initials appeared on each page. Once I received his report,

11

I affixed my seal to the signature page and signed the report as well. This report concluded that there was little evidence of contamination. On February 1, 2005, I sent Donziger an email notifying him that one such report prepared by Dr. Calmbacher was in the mail, and I stated: "I gave the document shipment to DHL a few minutes ago. . . . The documents should be down there on Thursday." [DX0730]. In my email, I also asked: "What about the next site Chuck has to sign off?" [DX0730]. Donziger responded that "it is not due until the first week of march. i can probably take down whatever we need taken down. i believe the SA-94 should be on the x-drive for chuck to look at." [DX0730]. The X drive was a shared drive used by the team so members could share and revise documents. After speaking with Dr. Calmbacher, I replied to Donziger: "[G]ot a call from Chuck. He has made revisions from X drive and it is ready to go." [DX0730].

28.    On March 1, 2005, I sent Donziger an email after I had contacted Dr. Calmbacher. In that email, I stated: "I communicated your threat to Calmbacher before I left for Chicago." [PX0721]. What Donziger had threatened at the time was that he wouldn't pay Dr. Calmbacher for his work and might even sue him for breach of contract if Dr. Calmbacher did not sign the documents. At the same time, Dr. Calmbacher was incurring substantial medical bills and needed the money. As a result, Donziger's threat of nonpayment was real and effective. In that same email to Donziger, I said that "I also advised him [referring to Dr. Calmbacher] that it was in his interest to comply by signing the documents and sending them to you." [PX0721]. And I stated: "Perhaps you better give him a call." [PX0721]. Donziger replied: "thanks, will take care of it." [PX0721]. On March 3, 2005, Donziger sent an email to Dr. Calmbacher in which he asked: "Chuck -- can you please fedex to me overnight for friday delivery a repeat of the papers you sent last time" and "i am leaving saturday for ecuador and will take it down with

12

me." [PX0723]. In my reply to Donziger, I wrote: "I just spoke to chuck. He said that he would send the papers today. . . ." [PX0723].

29. In connection with sending Donziger the signed reports, I remember Donziger told me that he wanted Dr. Calmbacher to send blank signature pages with Dr. Calmbacher's signature on them. Based on what Donziger told me, I understood that the blank signature pages were necessary in case Donziger and his team had to make minor modifications, such as correcting typographical or formatting errors, and then reprint the reports. These reports by Dr. Calmbacher were supposed to be expert reports for the benefit of the Court and thus he and I considered it our obligation to be honest, accurate, and forthright with the Court.

30. Years after I had stopped working for the Ecuadorian plaintiffs' team, in or about March 2010, Donziger called me and asked for Dr. Calmbacher's contact information. I recall generally that it occurred shortly before Dr. Calmbacher was scheduled to be deposed by Chevron. I told Donziger that I would try to get in touch with Dr. Calmbacher, and I did. Dr. Calmbacher then authorized me to give his phone number to Donziger, and I did.

### Donziger's Role in the Case

31. Throughout the period I worked on the Ecuadorian litigation, based on my communications with and observations of Donziger, Donziger was always in control of the case, dictating case strategy, overseeing the activities of the legal and technical teams, and was involved in directing the payments to and from the GEO Ecuador Account (which I had set up for technical work on the case). [PX0699]. Based on my communications with Donziger, I know that Donziger frequently oversaw the case and took these actions while he was working in Manhattan.

32. Although I frequently communicated with other members of the Ecuadorian plaintiffs' legal and technical teams, I reported to and took direction from only Donziger. I also

13

saw Donziger directing the work of the other members of the plaintiffs' team, including Pablo

Fajardo, Luis Yanza, and Edison Camino Castro. Donziger ordered them around, yelled at them,

and berated them if they did not comply with his orders quickly enough. He also said to me on

more than one occasion that he had to manipulate the Ecuadorians in order to get them to do

what he wanted. At times, Donziger worked on this case in Ecuador, but he also directed the

team's activities from Manhattan by phone and email.

33.     When Donziger said he wanted something done, the Ecuadorian plaintiffs' team

did it. For example, on September 16, 2004, Donziger sent an email to Manuel Pallares, and

Edison Camino Castro, and copied Alberto Wray and me, setting forth a new budgetary policy

regarding experts. [PX0699]. At the close of the email, Donziger stated: "Please let me know if

you have any problems with this. If I do not hear from you quickly, this is the policy."

[PX0699]. That statement is similar to many other statements I heard Donziger make about how

he was the decision-maker as to what the policy or strategy was and we should abide by that

policy or implement that strategy going forward.

34.     At some point in 2003, I learned that Joe Kohn, a partner in a law firm in

Philadelphia, Pennsylvania, provided the financial support for the Ecuadorian litigation.

Donziger controlled communications between the Ecuadorian plaintiffs' team and Mr. Kohn.

Donziger sought to downplay the amount of money the judicial inspections were costing.

Several times he upbraided me for providing Mr. Kohn with accurate budget estimates.

Donziger instructed me not to email Mr. Kohn without copying him and insisted that I provide

him with proposed emails to Mr. Kohn so that he could first approve them. On July 29, 2004, I

sent an email to Mr. Kohn. In response, Donziger sent me an email stating: "dave -- pls do NOT

send this type of thing to joe without sending it to me first." [PX0693]. Donziger also stated:

14

"pls do not communicate with him directly unless i know about it in advance. he is going to fall off his chair when he sees this." [PX0693]. When Donziger directed me "not to communicate with [Mr. Kohn] directly unless [Donziger knew] about it in advance," I understood that Donziger wanted to control the information provided to Mr. Kohn and that I should not communicate with Mr. Kohn directly. In response to Donziger's email, I wrote: "apologies. Let's talk." [PX0693]. I apologized because I understood that Donziger was in charge and that I should not take any actions, including sending an email to Mr. Kohn, without Donziger's prior approval. After this email exchange, I did not communicate directly with Mr. Kohn again. This was typical of the way Donziger controlled the distribution of information in the case.

35. Similarly, Donziger controlled the team's communications with the press. In early 2004, Donziger instructed me that neither I nor anyone else on the team could communicate with the press. Donziger told me that he did not want members of the team communicating directly with the press because he wanted to be in control of the press narrative.

36. Donziger instructed me how to distribute the money from the GEO Ecuador account. He instructed me to direct payments to Amazon Watch, Luis Yanza of the Frente, and public relations firms assisting the Ecuadorian plaintiffs' team. [PX0696; PX0698; PX0701; PX0704]. For example, on August 26, 2004, Donziger wrote in an email to me: "Please let me know if you can send out the following in terms of money immediately: . . . 2556.20 to AmazonWatch [sic]." [PX0696]. On October 10, 2004, Donziger sent me an email in which he stated: "We have the following expenses that we must pay out and we must build this into the budget: . . . 1,400 wired to Luis Yanza. This includes three months of his cellphone at 300/month, plus 500 for some other expenses related to the case that I will [sic] explain to you." [PX0704]. Donziger did not always explain why he wanted me to send money to various

15

individuals or entities.  Although I do not recall every payment Donziger told me to make, it was

my practice to follow Donziger's instructions as to who should receive money and how much

should be sent.

37.     On multiple occasions, Donziger made it very clear to me that I needed to keep

his payments to others, including Yanza, a secret and that I should not discuss these payments

with anyone but him.  For example, on September 16, 2004, Donziger sent me an email and

stated: "[A]lso, when you give luis or his people anything out of your budget keep it totally

confidential where only you and perhaps other person should know.  this is completely sensitive

for many reasons you are not aware.  please reassure me.  information control is critical."

[PX0698].  On October 1, 2004, Donziger told me by email that "it is critical that nobody,

including chuck [Calmbacher], know about the 300 paid to luis [Yanza] each month for his

phone.  btw, has this been paid to him?  how?  i am thinking maybe the best way is for you to

give me the cash, and i will give it to him so nobody knows."  [PX0701].  I understood that

Donziger did not want anyone to know that Donziger had been paying $300 each month for

Yanza's phone.  In his October 10, 2004 email to me, Donziger reminded me:  "All payments to

Luis must be kept in confidence."  [PX0704].  I understood from Donziger's statements that "it is

critical that nobody . . . know," "this is completely sensitive" and "[a]ll payments to Luis must be

kept in confidence" that Donziger wanted me to keep the information a secret from the rest of the

team.

**My Withdrawal from Donziger's Team**

38.     As of February 1, 2005, the Ecuadorian plaintiffs owed $113,545.55 to my

company, GEO, for my work on the case and GEO's payments to subcontractors and suppliers,

including Dr. Calmbacher.  I informed Donziger that I would no longer work for the Ecuadorian

plaintiffs until I was paid my fees and for the expenses I had incurred for subcontractors and

16

suppliers. I made numerous requests for payment, but Donziger and the plaintiffs failed to pay me. Therefore, in July 2005, I brought a lawsuit against Donziger and Mr. Kohn, which eventually resulted in a settlement. As a result of the settlement, I was able to see to it that the subcontractors and suppliers were paid a certain amount of money, and I received the balance of the remaining money.

39.     From time to time after I stopped working for Donziger on the case, I communicated with Sara McMillen, a Chevron employee. I first met Ms. McMillen in 2004 while working for Donziger in Quito, Ecuador. On Donziger's behalf, I negotiated the sampling and analysis protocols with Ms. McMillen and others. Even though we were adversaries while I worked on the Ecuadorian litigation, I had come to respect her professionalism, and I believed that she was approaching the investigation of the oil operations sites as an objective scientist should. On several occasions, either by email or phone, I shared my personal opinions about the Ecuadorian litigation with her. I conveyed that my initial cost estimate was wildly exaggerated, and I offered to evaluate and revise it, based on the subsequent research I had done. I had hoped to be paid for that work. Ms. McMillen never responded to my offers to provide a revised estimate so I dropped the subject and I never prepared one. In April 2008, I corresponded with Ms. McMillen about the Cabrera report. Given the information I knew from when I worked on the case, there was absolutely no basis for the damages figure in the Cabrera report. On May 6, 2008, I emailed Ms. McMillen, stating: "I agree with you about the Cabrerra [sic] report. To put it mildly, it is pure unadulterated fabrications. I would have said BS but that's got political implications and would be insulting to a bull to produce a product of so low quality-- but it does have the same aroma." [DX0741].

17

40.     In 2011, Chevron representatives sought documents from my firm, and I voluntarily provided them.  Then, in 2013, Chevron representatives asked me to provide a sworn statement concerning my communications, interactions, and experiences with Donziger.  I then voluntarily provided a sworn declaration.  I have received no compensation from Chevron, other than reimbursement for travel expenses to meet with Chevron representatives.

## Conclusion

41.     Donziger lied to me repeatedly.  He misled me repeatedly.  He asked me to prepare a remediation cost estimate, using assumptions he gave me, and told me to make it a "really big number."  And based largely on his lies and misrepresentations, I gave him what he wanted in the Fall of 2003—a rough, preliminary cost estimate that I realized within months of working on the case in 2004 was grossly exaggerated and wildly inaccurate.  I came to understand from my communications with Donziger that he was using that wildly inaccurate remediation cost estimate as a club to batter Chevron publicly to try to force the company to settle the case.  So I told Donziger to stop using it.  And then when he didn't listen, I sent him and Amazon Watch "cease and desist" letters and emails demanding that they stop using it.  But Donziger didn't listen.  As he said to me, Donziger felt he had to put a "really big number" out there to get Chevron's attention.

18

Plaintiff's Exhibit 3200   p. 18 of 44

42.    I came to understand from my communications with Donziger that he paid lip service to the notion that he was about the people of Ecuador when, in reality, Donziger's primary goal was to get as much money as he could from Chevron to enrich himself and his legal team.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 3rd day of October 2013.

David L. Russell

Signed before me this 3rd day
of october 2013

**Q. BADWAN**
**Notary Public, Gwinnett County, Georgia**
**My Commission Expires October 7, 2015**

19



# DONZIGER AND/OR CO-CONSPIRATORS' USE OF $6 BILLION CLAIM

**February 14, 2006**
Russell's "Cease and Desist" Letter
[PX 764]

**August 9, 2006**
ChevronToxico Article
[PX 475]

**August 7, 2006**
ChevronToxico Article
[PX 474]

**July 24, 2006**
LAPs Interview with Radio La Luna
[PX 473]

**March 17, 2006**
ChevronToxico Article
[PX 466]

**March 22, 2006**
ChevronToxico Article
[PX 467]

**April 26, 2006**
ChevronToxico Article
[PX 472]

**August 15, 2006**
Russell's "I Asked You Once" Email
[PX 788]

**August 25, 2006**
ChevronToxico Article
[PX 476]

**September 13, 2006**
Amazon Watch Press Release
[PX 477]

**September 29, 2006**
ChevronToxico Article
[PX 478]

**October 9, 2006**
ChevronToxico Article
[PX 479]

**October 30, 2006**
ChevronToxico Article
[PX 480]

**November 8, 2006**
ChevronToxico Article
[PX 481]

**November 15, 2006**
ChevronToxico Article
[PX 482]

**March 6, 2007**
ChevronToxico Article
[PX 483]

**March 20, 2007**
ChevronToxico Article
[PX 485]

**April 24, 2007**
ChevronToxico Article
[PX 486]

**July 3, 2007**
ChevronToxico Article
[PX 491]

**July 4, 2007**
ChevronToxico Article
[PX 492]

**July 9, 2007**
Amazon Watch Press
Release [PX 493]

**August 30, 2007**
ChevronToxico Article
[PX 494]

**April 2, 2008**
ChevronToxico
Article
[PX 499]

**March 18, 2008**
Amazon Watch
Letter to SEC
[PX 497]

**2006**        **2007**        **2008**

DONZIGER AND/OR CO-CONSPIRATORS'
USE OF $6 BILLION CLAIM

## Letter from David Russell to Steven Donziger

**February 14, 2006**

"Subject: **Cease and Desist**"

"The 2003 cost estimate **is too high by a substantial margin, perhaps by a factor of ten, or more.**"

"**estimate is no longer valid**"



Source:
PX 764



## DONZIGER AND/OR CO-CONSPIRATORS' USE OF $6 BILLION CLAIM

# ChevronToxico Article
**March 17, 2006**

"The 'remediation' cost less than one percent of the
$6 billion which one independent expert told the court
would be the likely minimum cost for a genuine clean-up."

Source: PX 466

2006                    2007                    2008

**DONZIGER AND/OR CO-CONSPIRATORS' USE OF $6 BILLION CLAIM**

## ChevronToxico Article

**March 22, 2006**

"Chevron is resorting to increasingly desperate measures to cover its tracks in the landmark environmental trial in Ecuador in which the oil giant faces a $6 billion clean-up tab."

Source: PX 467

| 2006 | 2007 | 2008 |



## ChevronToxico Article

### April 26, 2006

"Cleaning up the mess has been estimated to cost at least $6 billion, not including personal damages to thousands of victims."

"Two rainforest leaders sparked a dramatic showdown with Chevron CEO David O'Reilly today over the oil major's devastating $6 billion toxic contamination of their ancestral lands in Ecuador's Amazon region."

Source: PX 472

2006                    2007        2008





# DONZIGER AND/OR CO-CONSPIRATORS' USE OF $6 BILLION CLAIM

## LAPs Interview with Radio La Luna
### July 24, 2006

"[I]t is estimated by independent experts that a true cleanup will take, uh, will cost at least six billion dollars."

Source: PX 473

2006 — 2007 — 2008

## DONZIGER AND/OR CO-CONSPIRATORS' USE OF $6 BILLION CLAIM

# ChevronToxico Article

**August 7, 2006**

"If Ecuador prevails, Chevron could face a $6 billion clean-up tab—the estimated cost of a comprehensive remediation."

Source: PX 474

| 2006 | 2007 | 2008 |



**DONZIGER AND/OR CO-CONSPIRATORS'
USE OF $6 BILLION CLAIM**

## ChevronToxico Article
**August 9, 2006**

"If Ecuador prevails, Chevron could face a $6 billion
clean-up tab—the estimated cost of a comprehensive
remediation . . ."

Source: PX 475

| 2006 | 2007 | 2008 |



**DONZIGER AND/OR CO-CONSPIRATORS'**

# Email from David Russell to Steven Donziger

**August 15, 2006**

"Subject: Re: **I asked you once . . .** "

"**[T]he cost estimate should not be used again, ever!**"



Source:
PX 788



**DONZIGER AND/OR CO-CONSPIRATORS'
USE OF $6 BILLION CLAIM**

## ChevronToxico Article

### August 25, 2006

"Decision Should Move $6 Billion Case Toward Faster Conclusion, Say Indigenous Groups and Lawyers"

"In a major blow to Chevron in its $6 billion class-action pollution trial in Ecuador, a judge this week canceled almost all of the remaining judicial inspections sought by the parties in a move to speed the case toward a final decision."

Source: PX 476

| 2006 | 2007 | 2008 |



**DONZIGER AND/OR CO-CONSPIRATORS' USE OF $6 BILLION CLAIM**

## Amazon Watch Press Release

### September 13, 2006



"As the historic $6 billion pollution trial against Chevron in Ecuador nears its final phase . . ."

"At least $6 billion to remediate"

"An independent expert has estimated a clean-up would cost $6.1 billion . . ."

Source: PX 477

2006            2007            2008





**DONZIGER AND/OR CO-CONSPIRATORS'**
**USE OF $6 BILLION CLAIM**

February 14, 2006                    August 15, 2006

## ChevronToxico Article

**September 29, 2006**

"Chevron is currently a defendant in a landmark $6 billion environmental trial in Ecuador."

Source: PX 478

April 26, 2006
ChevronToxico Article

November 15, 2006
ChevronToxico Article

August 30, 2007
ChevronToxico Article

2006                    2007                    2008

**DONZIGER AND/OR CO-CONSPIRATORS'
USE OF $6 BILLION CLAIM**

## ChevronToxico Article
**October 9, 2006**

"The landmark $6 billion class-action lawsuit against the oil major"

"an environmental remediation that has been provisionally estimated at $6.1 billion."

Source: PX 479

| 2006 | 2007 | 2008 |

## DONZIGER AND/OR CO-CONSPIRATORS' USE OF $6 BILLION CLAIM

# ChevronToxico Article
**October 30, 2006**

"A landmark $6 billion pollution trial in Ecuador's rainforest"

"Would cost at least $6 billion to remediate."

Source: PX 480

2006          2007          2008





**DONZIGER AND/OR CO-CONSPIRATORS'
USE OF $6 BILLION CLAIM**

## ChevronToxico Article

**November 8, 2006**

"its Ecuador liability - estimated at
$6 billion."

Source: PX 481



DONZIGER AND/OR CO-CONSPIRATORS'
USE OF $6 BILLION CLAIM

## ChevronToxico Article

**March 6, 2007**

"ongoing $6 billion-class action environmental trial against
the oil giant"

"independent damage assessment, by the U.S. firm Global
Environmental Operations, estimates clean-up to cost at least
$6.14 billion."

Source: PX 483

| 2006 | 2007 | 2008 |
|------|------|------|



## DONZIGER AND/OR CO-CONSPIRATORS' USE OF $6 BILLION CLAIM

**ChevronToxico Article**

March 20, 2007

"The Ecuador judge hearing a $6 billion class-action environmental lawsuit against Chevron."

Source: PX 485

2006 2007 2008

**DONZIGER AND/OR CO-CONSPIRATORS'**
**USE OF $6 BILLION CLAIM**

## ChevronToxico Article
### April 24, 2007

"Amazon Watch Executive Director Atossa Soltani said:
'Chevron shareholders need to know that Chevron is
now on the brink of being ordered to pay for an
environmental remediation that has been provisionally
costed at $6 billion.'"

Source: PX 486

2006        2007        2008





## DONZIGER AND/OR CO-CONSPIRATORS' USE OF $6 BILLION CLAIM

**ChevronToxico Article**

**July 3, 2007**

"Chevron Increasingly Desperate in $6 Billion Environmental Lawsuit in Amazon Rainforest."

Source: PX 491

2006          2007          2008

## DONZIGER AND/OR CO-CONSPIRATORS' USE OF $6 BILLION CLAIM

# ChevronToxico Article
## July 4, 2007

"Chevron's suggestion this week that it might withdraw from a landmark $6 billion rainforest pollution trial in Ecuador on the eve of a final judgment represents a 'desperate move' that could backfire against the oil giant, representatives for the plaintiffs said today."

Source: PX 492

2006            2007            2008





## DONZIGER AND/OR CO-CONSPIRATORS' USE OF $6 BILLION CLAIM

## ChevronToxico Article
**August 30, 2007**

"Global Environmental Services, an Atlanta-based company that assessed the damage, called the area the 'Rainforest Chernobyl' and estimated clean-up would cost at least $6 billion."

Source: PX 494

| 2006 | 2007 | 2008 |



## DONZIGER AND/OR CO-CONSPIRATORS' USE OF $6 BILLION CLAIM

### Amazon Watch Letter to the Securities and Exchange Commission

**March 18, 2008**



AMAZON WATCH

" . . . quoting plaintiff's attorney Steven Donziger that damages 'likely will be significantly higher' than earlier $6 billion estimate."

Source: PX 497

| 2006 | 2007 | 2008 |
| --- | --- | --- |



**DONZIGER AND/OR CO-CONSPIRATORS'**
**USE OF $6 BILLION CLAIM**

## ChevronToxico Article
**April 2, 2008**

"For years, plaintiffs have estimated environmental damages to be roughly $6 billion (later adjusted to $10 billion) while Chevron claimed they were negligible."

Source: PX 499

2006          2007

**Russell Exhibits**

PX 0018

PX 0018A

PX 466#

PX 467#

PX 472#

PX 473#

PX 474#

PX 475#

PX 476#

PX 477#

PX 478#

PX 479#

PX 480#

PX 481#

PX 482#

PX 483#

PX 485#

PX 486#

PX 491#

PX 492#

PX 493#

PX 494#

PX 497#

PX 499#



PLAINTIFF'S
EXHIBIT
**3200A**
11 Civ. 0691 (LAK)

PX 688

PX 693

PX 696

PX 698

PX 699

PX 701

PX 704

PX 721

PX 723

PX 754

PX 763

PX 766

PX 788

PX 2221

PX 2414

DX 730 (as identified by the Defendants on August 31, 2013)

DX 741 (as identified by the Defendants on August 31, 2013)