# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ x

CHEVRON CORPORATION,

           Plaintiff,

  -against-

                                   Case No. 11 Civ. 0691 (LAK)

STEVEN R. DONZIGER, et al.,

           Defendants.

------------------------------------ x

## DIRECT TESTIMONY OF ADOLFO CALLEJAS RIBADENEIRA

I, ADOLFO CALLEJAS RIBADENEIRA, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the following is true and correct:

1.      My name is Adolfo Callejas Ribadeneira and I reside in Quito, Ecuador. I am currently the managing partner of *Callejas y Asociados*, a seven-lawyer law firm based in Quito that provides general counsel and representation on corporate, tax, labor, civil litigation and family legal matters, among others. I also am counsel of record representing Chevron Corporation ("Chevron") in the civil litigation initiated against it in the Provincial Court of Justice of Sucumbíos in Lago Agrio, Ecuador (Case No. 002-2003-P-CSJNL) (the "Lago Agrio Litigation"). As lead counsel of record in that case, I have been responsible for managing the day-to-day activity locally in Chevron's defense of that case since its inception. I have personal and firsthand knowledge of the facts set forth below.

2.      My native language is Spanish. I started using English when I began working for Texaco Petroleum Company ("TexPet") in 1978 and consider myself to have a working



PLAINTIFF'S
EXHIBIT
**4300**
11 Civ. 0691 (LAK)

knowledge of the English language, though I am more comfortable reading English than I am writing or speaking it.

## Personal Background

3.      I was born in Ecuador in 1947 and raised in the city of Ambato, approximately 130 kilometers south of Ecuador's capital, Quito. My father's family settled in Ambato in the beginning of the 19th century. Although my mother's family is from Quito, my mother was born near Ambato (in Riobamba). My father owned a leather tannery business and, from 1958 to 1967, served as a member of the Ecuadorian National Congress representing the provinces of Tunguragua and Pastaza. Pastaza is located in the Amazon region. My father was also the regional president of the International Red Cross for those same provinces. I remember traveling with my father to visit and participate in political and other events benefiting those communities. My heritage and my father's public service instilled in me a great sense of national pride and faith in Ecuador.

4.      I attended the Catholic University of Ecuador where I studied law and graduated with a Doctor of Jurisprudence in 1973. I have been licensed to practice law in the Republic of Ecuador since 1973. I began my legal career as an attorney with the National Planning Board (*Junta Nacional de Planificación*), working for the National Institute of Statistics and Census (*Instituto Nacional de Estadística y Censos*) for five years.

5.      In 1978, I joined the legal department of the Petroecuador-TexPet Consortium (the "Consortium"), a joint venture between TexPet and Petroecuador, the state-owned oil company of Ecuador.[1] My initial title at the Consortium was Attorney, Level A (*Abogado A*).

---

[1]      At the time, the state-owned oil company was known as the *Corporación Estatal Petrolera Ecuatoriana*, or CEPE. The name was changed to Petroecuador in the late 1980s, but for ease of reference Petroecuador is used at all times in this declaration.

Plaintiff's Exhibit 4300   p. 2 of 42

6.     In 1980, I became Chief Legal Counsel at the Consortium.  In that capacity, I managed a wide range of legal issues relating to the Consortium and reported directly to the Consortium Operator.  I also had to and did become familiar with the history, ownership, and operation of the Consortium, as well as all related governing agreements and practices.

7.     In October 1989, I began working directly for TexPet as the Head of the Legal Department.  I remained with TexPet until June 6, 1992, when the Concession contract expired and any and all interests that TexPet had in the Consortium were terminated.  At that time, I opened my own law firm and continued to represent or serve as outside counsel for TexPet in a number of local matters.  For the most part, those cases included labor lawsuits brought against TexPet by former employees terminated when the Concession contract expired, various civil and tax matters, and lawsuits brought against TexPet by several municipalities in the former Concession area on behalf of the "communit[ies] at large" to protect "the health of all citizens, animals, species, flora, fauna, rivers, water sources and soil."

## The Consortium

8.     One of the most important topics in Ecuadorian history is the colonization and development of the Ecuadorian Amazon region, also known in Ecuador as "the Oriente."  The Oriente is an area in the eastern half of Ecuador near the Colombian and Peruvian borders in the Amazon rainforest.  After the war between the Republic of Ecuador and Peru in the 1940s, the Republic of Ecuador lost much of the Amazonian territory it had once claimed as its own.  By the early 1960s, the Republic of Ecuador wanted to settle the Oriente to assert its right to the land that it was assigned by treaty and to prevent further loss of land.

9.     To do so, in 1963, the Republic of Ecuador passed the law on colonization, which decreed that the lands in the Oriente that had no registered titleholders were the property of the state.  The law required the Republic of Ecuador to issue land grants to Ecuadorian citizens who

- 3 -

Plaintiff's Exhibit 4300   p. 3 of 42

would earn title to that land in exchange for developing it for agricultural and farming purposes. Further, in 1964, the Republic of Ecuador passed a law that allowed oil exploration via "concessions" on the same lands that had been opened for settling in 1963.

10.   Also in 1964, the Republic of Ecuador granted a concession to TexPet and Ecuadorian Gulf Oil Company ("Gulf") to develop oil in a portion of the Oriente (the "Concession"). Their joint venture came to be known as the "TexPet-Gulf Consortium" or, more commonly, simply "the Consortium." Although each had a 50% interest in the Consortium, TexPet and Gulf decided that TexPet would be the sole "operator" of their joint venture.

11.   On August 6, 1973, six years after the first significant discovery of oil in Lago Agrio, the Republic of Ecuador, TexPet and Gulf signed a new Concession contract that gave the Republic of Ecuador more control, more profits and the possibility of an ownership interest in the Consortium's operations. Specifically, the revised contract: (1) reduced the size of the Concession area by nearly two-thirds, from more than 1.4 million hectares to less than 500,000 hectares; (2) shortened the term of the Concession by establishing a new termination date of June 6, 1992; (3) significantly increased royalties and more than tripled taxes payable to the Republic of Ecuador; and (4) granted the state-owned oil company an option to acquire a 25% ownership interest in the Consortium's ongoing operations.

12.   In 1974, Petroecuador exercised its option and became a 25% stakeholder in the Consortium, reducing TexPet's and Gulf's ownership interest to 37.5% each. Two years later, in 1976, Petroecuador acquired Gulf's remaining 37.5% interest in the Consortium, giving the state-owned oil company a majority 62.5% interest in the Consortium.

13.   As majority owner, Petroecuador contributed 62.5% of the Consortium's investments and operating costs, and both parties approved all annual work programs and

- 4 -

budgets. Petroecuador retained oversight of TexPet's activities beyond the annual budgeting cycles by approving projects as they were implemented and answering monthly "cash calls" with the funds necessary for each month's operating expenses.

14. TexPet continued in the role of operator until July 1, 1990, when Petroamazonas, an affiliate of Petroecuador, took over operations. During its time as operator, TexPet maintained two offices in Quito: one for the Consortium Operator, with its TexPet employees as well as Petroecuador employees who were "seconded" to the Consortium; and a "Proprietary Office" where TexPet management oversaw the company's minority ownership interest in the Consortium and its relationship with Petroecuador and the Republic of Ecuador.

15. In 1992, the Concession contract terminated. TexPet had sought a 10-year extension, but the Republic of Ecuador refused. Upon termination of the Concession contract, Petroecuador took over 100% ownership of the oilfields and facilities in the former Concession area, and the Consortium ceased to exist. TexPet has not operated any oilfields in Ecuador since 1990 and has had no ownership interest in any oilfield operation in Ecuador since 1992.

16. During the nearly three decades of the Consortium's operations, it generated over USD $20 billion in profits for the Republic of Ecuador. The Republic of Ecuador not only received 62.5% of the oil revenue generated by the Consortium, per Petroecuador's ownership share; it also received additional revenue from TexPet's share in the form of an 87.35% income tax, 18.5% of gross production as royalties, and a requirement that TexPet contribute to domestic oil needs at below-market prices. As a result, the Republic of Ecuador retained the vast majority of the Consortium's revenues, while TexPet's profits were less than USD $500 million.

## The Lago Agrio Litigation

17. On May 7, 2003, a group of 48 Ecuadorians (the "Lago Agrio Plaintiffs"), all claiming to be residents of the former Concession area, filed suit against Chevron Corporation in

Plaintiff's Exhibit 4300   p. 5 of 42

the Superior Court of Nueva Loja (the "Lago Agrio Court" or the "Court").  *See* Plaintiff's Exhibit ("PX") 316 (Lawsuit for Alleged Damages filed before the President of the Superior Court of Nueva Loja, in Lago Agrio, Province of Sucumbíos, on May 7, 2003 ("Lago Agrio Complaint")).  I recognize PX 316 is a true and correct copy of the Lago Agrio Complaint.

18.  ~~The Lago Agrio Plaintiffs claimed that their case was the continuation of the *Aguinda* lawsuit, which, after almost 10 years of litigation before the U.S. courts in New York, was dismissed in 2002 on *forum non conveniens* grounds.  Although I was not personally involved in defending the *Aguinda* lawsuit, I was part of the legal team that supported the U.S. attorneys who represented Texaco.~~

19.  ~~Although a number of the 48 named Lago Agrio Plaintiffs also appeared as *Aguinda* plaintiffs, the Lago Agrio Plaintiffs were not the identical group that sued in the *Aguinda* case in New York.  Nor was their lawsuit a continuation of the *Aguinda* case.  The New York plaintiffs had vindicated individual rights and sought damages for alleged personal injuries and property damage against Texaco, Inc., but the Lago Agrio Complaint named only ChevronTexaco Corporation as a defendant and sought relief for diffuse rights, alleging collective harm to the environment in the former Concession area under the recently promulgated Environmental Management Act ("EMA").~~

### The Judges Overseeing the Lago Agrio Litigation

20.  A total of six judges presided over the trial phase (first instance) of the Lago Agrio Litigation.  ~~When a judge acts for the first time, he begins his order by stating that he is taking over the case ("*avoco conocimiento de la presente causa*") or otherwise exercising his official role, but there were some occasions when there was a delay between the judge's appointment and his first action in the case.~~  The timeline I set forth below generally indicates

- 6 -

when the various judges first acted in the case as reflected in the record; this may not, however,

be the precise date of appointment:

- **Judge Alberto Guerra Bastidas (May 2003–January 2004):** as President of the Lago Agrio Court, accepted the Lago Agrio Plaintiffs' Complaint under summary verbal proceedings;

- **Judge Efrain Novillo Guzmán (February  2004–January 2006):** took over the case when elected President of the Lago Agrio Court on January 7, 2004;

- **Judge German Yánez Ruíz (February 2006–August 2007):** took over the case when elected President of the Lago Agrio Court on January 18, 2006;

- **Judge Efraín Novillo Guzmán (August 2007–August 2008)**: took over the case when Chevron filed a motion to recuse Judge Yánez; Judge Novillo also presided over the recusal case but never ruled, merely letting Judge Yánez's term as President expire;

- **Judge Juan Evangelista Núñez Sanabria (August 2008–September 2009):** took over the case when elected President of the Lago Agrio Court (there is no reference in the order to the date of his designation as President);

- **Judge Nicolás Augusto Zambrano Lozada (September 2009–February 2010):** took over the case in the first days of September 2009 when Judge Núñez excused himself based on the alleged bribery solicitation scheme;

- **Judge Leonardo Ordóñez Piña (February 2010–August 2010):** took over the case when elected President of the Lago Agrio Court on February 18, 2010;

- **Judge Nicolás Augusto Zambrano Lozada (August 2010–March 2011):** took over the case when Chevron filed a motion to recuse Judge Ordóñez, although Judge Ordóñez continued to act—issuing several additional rulings—following that motion.

### The Lago Agrio Record

21.   ~~Based on my 40 years of practice in Ecuadorian courts, I know that Ecuadorian law is specific and explicit about the importance of the official court record.  Under Ecuadorian law, every document added to the court record is required to be formally incorporated into the record by a court order.~~  Filings are received by the Clerk of the Court ("*Secretaria*") or other court personnel, stamped, each page hand-numbered sequentially, and then bound into sequentially numbered volumes called "*cuerpos legales*"—each of which generally is comprised

- 7 -

of 100 numbered pages or "*fojas*." The judge hearing the case then must rule on the case based only on the material found in these "*cuerpos legales*," which constitute the official court record. As I learned in my first year in law school, "that which is not in the court record does not exist in the universe" for the judge. This process ensures that the public have access to the complete record of the case as required by law.

22. I am not aware of any legal provision allowing a party to have a document included in the official record without the judge ordering its inclusion. And at no time did I or any member of my team provide documents or evidence to a judge presiding over the Lago Agrio Litigation outside the procedure set forth by law. My team certainly never left documents related to the case at the door of any judge of the Lago Agrio Court.

23. Each of the documents referenced in this witness statement that comes from the official record of the Lago Agrio Litigation will have two distinct characteristics: (1) the Court's seal stamped on every page; and (2) a hand-written "*foja*" number on every page. I certify that *Callejas y Asociados* has maintained a complete certified copy of the official record in the Lago Agrio Litigation. *See* PX 2521 (Demonstrative of Lago Agrio Court Record as of September 17, 2013). I recognize that PX 2521 is a true and correct set of photographs of the storage where the certified copy of the Lago Agrio record is maintained by *Callejas y Asociados* as of September 17, 2013.

### The Lago Agrio Litigation Commences

24. On May 13, 2003, Judge Alberto Guerra Bastidas, who was then the President of the Lago Agrio Court and the first presiding judge of the case, accepted the Lago Agrio Complaint and admitted it for processing under a special procedure known as summary verbal proceedings, as provided by the EMA.

- 8 -

25.     In accordance with the rules on summary verbal proceedings, the Lago Agrio Court held a Conciliation Hearing on October 21, 2003.  Mr. Ricardo Reis Veiga, an in-house attorney for Chevron, and I appeared before the Court on that date to contest the Court's jurisdiction, answer the Lago Agrio Plaintiffs' Complaint, present Chevron's affirmative defenses, and move for the Lago Agrio Complaint to be dismissed.

26.     At the end of the Conciliation Hearing, and upon a determination that the lawsuit could not be resolved based on the hearing, Judge Guerra ordered the opening of the evidentiary phase of the trial.

27.     I recall that the Lago Agrio Plaintiffs' representatives organized a hostile group of protesters outside the courthouse on the day of the Conciliation Hearing, which I found very unsettling at the time.  I later realized this was only the beginning of a long campaign, which continues to this day, of pressure, threats, and intimidation launched by the Lago Agrio Plaintiffs' representatives and directed at Chevron, its lawyers, and the courts.

### The Evidentiary Phase

28.     Under Ecuadorian civil procedure, the parties must submit all of their evidentiary requests in a defined period; in the case of summary verbal proceedings, that period is six days. While all of the evidence does not have to be provided within that time frame, all requests for then-existent documents, witness testimony, expert assessments, judicial inspections of a place or thing, and other proof must be requested by both parties by the statutory deadline.

29.     My legal team and I submitted a number of evidentiary requests on Chevron's behalf during the initial six-day evidentiary period, as did the lawyers for the Lago Agrio Plaintiffs.  Although there were numerous requests for documents and for witness testimony from both sides, the bulk of the requests were for judicial inspections of a total of 122 sites,

Plaintiff's Exhibit 4300   p. 9 of 42

including well sites and production stations, in the former Concession area and nearby oilfields. (I describe the judicial-inspection process further, below.)

30.     The Court accepted both the Lago Agrio Plaintiffs' and Chevron's evidentiary requests in a written order dated October 29, 2003, and I recognize that PX 317 is a true and correct copy of that order. *See* PX 317 (10.29.2003 Court Order). Neither Chevron nor the Lago Agrio Plaintiffs objected to the Court's order, which then became binding law of the case for both the parties and the Court, pursuant to Articles 281 and 289 of the Code of Civil Procedure.

31.     To prepare for the judicial inspections, both parties identified technical experts to negotiate the necessary procedures that would govern the judicial-inspection process. Chevron's Senior Environmental Scientist, Sara McMillen, assumed this role for the company, and David Russell, a consulting environmental engineer, took the lead on behalf of the Lago Agrio Plaintiffs. On August 18, 2004, just before the first judicial inspection, the parties submitted jointly to the Court "Terms of Reference for the Participation of Experts," a Sampling Plan, and an Analysis Plan. As the joint motion indicates, these rules were meant to govern the work not only of the parties, but of all experts and technical personnel. The Court approved and adopted these protocols and ordered the parties to proceed pursuant to the terms of these stipulated procedures.

### The Judicial Inspections

32.     The judicial inspections began on August 18, 2004.

33.     Each inspection began with the Court hearing any procedural matters and then swearing in the parties' nominated (suggested) experts and the potential "settling experts" of the Court's choosing. The court appointed the settling experts to serve as a type of technical arbiter in case the parties' experts produced divergent, conflicting technical reports. Chevron and the Lago Agrio Plaintiffs were expected to share the settling experts' expenses, each submitting their

Plaintiff's Exhibit 4300   p. 10 of 42

half to the Court, which then processed all payments to the experts. The Court then would give the party who had requested the inspection an opportunity to present its arguments, followed by a similar opportunity for the other party. Both parties also had the right to propose relevant documentation or other evidence that they wanted the Court to include in the record. Following each side's oral presentation, the Court, in the presence of all parties, would proceed to inspect the site, registering comments and observations and allowing the parties and the experts to identify the areas where they intended to take samples. At the end of the inspection, a written transcript of the proceedings, or *acta*, would be finalized and signed jointly by the parties, the experts, and the Court. The *acta* also included a list of all documents presented at the inspection and that the Court, thereby, incorporated into the official record.

34.     Upon the conclusion of each judicial inspection, the parties' experts submitted detailed reports, setting forth their findings and conclusions. Each party then had the right to comment on the reports and ask for any necessary explanations or clarifications. In practice, this meant a cycle of reporting that began with the experts' reports, followed by the parties' rebuttals, the corresponding replies, additional rebuttals, and a final reply from the experts. On average it took several months to complete each judicial-inspection cycle, although multiple judicial-inspection cycles could be underway simultaneously.

35.     During the judicial inspections, I observed that the experts suggested by the Lago Agrio Plaintiffs generally used methods that did not meet the requirements of the Terms of Reference, the Sampling Plan, or the Analysis Plan. For example, many of the Lago Agrio Plaintiffs' experts used a laboratory called HAVOC to analyze their samples but did not include the laboratory's accreditation with their reports, as required by the Sampling Plan and as reiterated by the Court at each judicial inspection. My team and I suspected that the HAVOC

Plaintiff's Exhibit 4300   p. 11 of 42

laboratory had neither the analytical capability nor the facilities to run the tests required by the Analysis Plan or that were reported in the Lago Agrio Plaintiffs' experts' reports. Thus, we initiated a separate judicial proceeding in Quito, where the HAVOC laboratory was located, to conduct a judicial inspection of the laboratory's facilities. On eight separate occasions, however, the Lago Agrio Plaintiffs' representatives intervened and blocked the judicial inspection of the laboratory even though the proceeding involved only Chevron and HAVOC.

36. I recall one such occasion captured in outtake footage from the "documentary" *Crude*. That outtake shows Mr. Donziger speaking about his premeditated desire to humiliate and intimidate the judge responsible for the HAVOC judicial inspection. PX 4–PX 5 (03.30.2006 *Crude* Outtakes). I recognize that PX 4 and PX 5 are true and correct copies of *Crude* outtakes filmed on March 30, 2006. In these videos, I recognize Mr. Donziger and I am aware that the videos were filmed on March 30, 2006. I recall that date because it was the date set by Judge Germán González del Pozo, the judge presiding over the HAVOC judicial inspection proceeding, for his inspection of the lab and was the very same morning that the Lago Agrio Plaintiffs' representatives appeared at his office to intervene in the inspection.

37. In the first video, Mr. Donziger appears in a vehicle of some kind, en route to the judge's chambers, and is filmed explaining that approaching a judge, as he was preparing to do, "is something that you would never do in the United States. . . . But Ecuador, you know, there's almost no rules here, and this is how the game is played. It's dirty." PX 4A (03.30.2006 *Crude* Outtake). I recognize that PX 4A is a true and correct copy of the transcript of a *Crude* outtake from March 30, 2006. Mr. Donziger continued: "the only language that I believe this judge is gonna understand is one of pressure, intimidation and humiliation. And that's what we're doing today. We're gonna let him know what time it is. I hate doing it. I hate doing this stuff. I don't

- 12 -

feel comfortable doing it. As a lawyer I never do this. You don't have to do it in the United States. It's, it's dirty. I hate it. Hate it. But it's necessary." PX 5A (03.30.2006 *Crude* Outtake). I recognize that PX 5A is a true and correct copy of the transcript of a *Crude* outtake from March 30, 2006. This shows me that Mr. Donziger knew what he was about to do and that he had made a conscious decision to use "dirty" tactics to prevent the HAVOC inspection and thereby hide the fact the laboratory lacked facilities and equipment to perform the necessary analysis as well as proper accreditation as required by the Court.

38.   The *Crude* outtakes also captured the Lago Agrio Plaintiffs' representatives' improper appearance in Judge González del Pozo's chambers, during which the Lago Agrio Plaintiffs' team barged in with camera crews and then angrily confronted Dr. Diego Larrea, one of the lawyers at *Callejas y Asociados* and a member of the legal team representing Chevron, upon his arrival—all while the judge sat behind his desk. *See* PX 6 (03.30.2006 *Crude* Outtake of complete *Crude* scene). I recognize that PX 6 is a true and correct copy of a *Crude* outtake filmed on March 30, 2006. Specifically, I recognize Mr. Donziger, Alejandro Ponce, and Luis Yanza. Mr. Donziger repeatedly called Dr. Larrea "*un abogado corrupto de Texaco*" or "Texaco's corrupt lawyer" in front of an Ecuadorian judicial officer. PX 6A (03.30.2006 *Crude* Outtake). I recognize that PX 6A is a true and correct copy of the transcript of a *Crude* outtake from March 30, 2006. (I discuss the impact of these defamatory allegations in more detail, below.) I also learned that Judge González del Pozo was hospitalized with high blood pressure that same day.

### The Lago Agrio Plaintiffs' Relinquishment of Their Judicial Inspections

39.   As I mentioned above, at the beginning of the judicial inspections, the Court appointed one or more "settling experts" to resolve any conflicting reports from the parties' respective experts. The decision to request a settling report was solely in the Court's discretion.

- 13 -

In the Lago Agrio Litigation, prior to the premature termination of the judicial-inspection process, only one such report was formally ordered by the Court—for the Sacha-53 well site.

40.    But just days before the report for Sacha-53 was issued, on January 27, 2006, the Lago Agrio Plaintiffs filed a request to "withdraw" from 26 of their judicial inspections, arguing that it was "no longer essential to continue carrying out inspections unnecessarily, particularly with respect to the evidentiary interests of the plaintiffs." PX 328 (07.21.2006 Lago Agrio Plaintiffs' Motion quoting their January 27, 2006 motion). I recognize PX 328 is a true and correct copy of the Lago Agrio Plaintiffs' July 21, 2006 Motion.

41.    When the Court did not accept the Lago Agrio Plaintiffs' January 27, 2006 motion and instead ordered another round of judicial inspections, the Lago Agrio Plaintiffs filed several motions challenging the Court's decision, repeating their request to withdraw from certain judicial inspections. I recall that they also organized several demonstrations outside the courthouse and subjected the presiding judge at the time, Judge Germán Yánez, to a press campaign that questioned his handling of the case and accused him of bias in favor of Chevron.

42.    With this backdrop of public pressure, the Lago Agrio Plaintiffs filed a new request, this time to "relinquish" a total of 64 inspections—all of their requested inspections that had not been scheduled yet by the Court. The Court accepted this relinquishment request in an order issued on August 22, 2006. *See* PX 329 (09.07.2006 Court Order). I recognize PX 329 is a true and correct copy of the Court's September 7, 2006 Order ratifying the Court's order of August 22, 2006. The Court then ruled that the Lago Agrio Plaintiffs' relinquishment request was valid, even though the Lago Agrio Plaintiffs' representatives could not obtain ratification from all of the named plaintiffs as previously ordered by the Court. *See* PX 335 (03.19.2007 Court Order). I recognize PX 335 is a true and correct copy of the Court's March 19, 2007

Plaintiff's Exhibit 4300   p. 14 of 42

Order.  Although several of the named Lago Agrio Plaintiffs never ratified this decision by Mr. Fajardo and the Lago Agrio Plaintiffs' representatives, I recall that both Hugo Gerardo Camacho Naranjo and Javier Piaguaje Payaguaje ratified Mr. Fajarado's request.

### The Appointment of a Single Global Expert

43.    Around the same time, the Lago Agrio Plaintiffs' representatives began to petition the Court to appoint a single expert to carry out the "global assessment" they previously had requested.  PX 330 (12.04.2006 Lago Agrio Plaintiffs' Motion).  I recognize PX 330 is a true and correct copy of the Lago Agrio Plaintiffs' December 4, 2006 Motion.

44.    On March 19, 2007, the Court accepted the Lago Agrio Plaintiffs' request and ordered that the global assessment be put in the hands of a single expert.  PX 335 (03.19.2007 Court Order).  The Court's order directly contravened the Lago Agrio Plaintiffs' original evidentiary request on that topic, as well as the Court's previous order accepting that request.  To my surprise, the Court then designated Richard Stalin Cabrera Vega to carry out the global expert assessment.  Not only was Mr. Cabrera not qualified, but his appointment was replete with procedural irregularities.

45.    The Lago Agrio Plaintiffs defended the decision to appoint Mr. Cabrera as the sole global assessment expert by stressing his "impartiality":

> The logic behind appointing a single expert who has not been nominated by the parties to perform the expert examination has been made clear on a number of occasions.  This is primarily due to the issue of impartiality and procedural economy.  ***Impartiality because, having not been named by either of the parties, he will be even more objective in his analysis and conclusions***, and procedural economy because having a single expert obviates an excessively lengthy and mechanistic process of questions, clarifications, challenges, etc., as has been the case in the reports of other court-ordered inspections that have been carried out.

Plaintiff's Exhibit 4300   p. 15 of 42

PX 338 (05.10.2007 Lago Agrio Plaintiffs' Motion; emphasis added).  I recognize PX 338 is a true and correct copy of the Lago Agrio Plaintiffs' May 10, 2007 Motion.

46.     ~~The explanation for the procedural irregularities in Mr. Cabrera's appointment only became apparent to me later, after reviewing the *Crude* outtakes.  In one particular outtake, filmed on June 4, 2007, Mr. Fajardo and Mr. Donziger discuss their plan to pressure the Court to swear in Mr. Cabrera as the "independent" global assessment expert:~~

> ~~I think we have to be more and more aggressive . . . .  I think we actually have to put an army together.  We have to have demonstrations, have protests. I think that has to be done right now . . . .  And also, immediately after the expert is sworn in, I think it's indeed necessary for us to organize pressure demonstrations at the court and vigilance . . . .  A good demonstration in the beginning, but slightly demanding, I mean, a little bit aggressive . . . .  So, that has to be done . . . Because the idea is to teach a lesson to this judge and to the next one . . . .  I mean, teach the court a lesson.  A message to the court.~~

~~PX 63B (06.04.2007 *Crude* Outtake).  I recognize PX 63B is a true and correct certified translation of a *Crude* outtake filmed on June 4, 2007, and in this video I recognize Mr. Farjardo and Mr. Donziger.~~

47.     During this time, the Court ignored our requests for relief and instead approved many of the procedural irregularities in Mr. Cabrera's appointment.  The Court did, however, give Mr. Cabrera explicit instructions about his role as the global expert and set clear boundaries on his appointment.  ~~First, the Court instructed Mr. Cabrera that he was to be an "auxiliary to the Court for purposes of providing to the process and to the Court scientific elements for determining the truth."~~  ~~Second,~~ the Court ordered Mr. Cabrera to maintain "***complete impartiality and transparency*** with respect to the parties and their attorneys."  PX 348 (10.03.2007 Court Order; emphasis added).  These duties were ~~further~~ defined when Mr. Cabrera officially was sworn in by the Court on June 13, 2007, and he promised "to perform his duties

- 16 -

faithfully and in accordance with science, technology, and the law, *with complete impartiality and independence vis-à-vis the parties*." PX 342 (06.13.2007 Court Order; emphasis added). I recognize PX 342 is a true and correct copy of the Court's June 13, 2007 Order.

48.     Once Mr. Cabrera was sworn in, we filed a number of objections to his fieldwork and sampling methodology. The Lago Agrio Court ignored these petitions *during* Mr. Cabrera's fieldwork and only acknowledged them *after* Mr. Cabrera already had conducted his fieldwork, rendering our requests moot.

### The Relationship Between the Lago Agrio Plaintiffs' Representatives and Mr. Cabrera

49.     I had suspected for some time that Mr. Cabrera had an improper relationship with the Lago Agrio Plaintiffs' representatives. For example, unlike the Lago Agrio Plaintiffs' representatives, Chevron lawyers and our technical team members were often blocked from observing up close Mr. Cabrera's inspections.

50.     I also recall that in February 2007, Mr. Cabrera filed a letter with the Court asking that Chevron be ordered to pay the fees due to him for his prior role as a settling expert and noting that he had made an arrangement with the Lago Agrio Plaintiffs, who already had paid him their share directly. Mr. Cabrera then hand-delivered a copy of this filing to one of the attorneys on my team and repeated his request for payment. That attorney told Mr. Cabrera that the payment described in the filing was illegal and improper because any such payment was to have been made through the Court, not by the Lago Agrio Plaintiffs directly. Upon hearing this, Mr. Cabrera returned to the courthouse and, with the assistance of then-presiding Judge Yánez, snatched Mr. Cabrera's request from the case file before it had been hand-numbered and made part of the record, thereby erasing all evidence of the mentioned payment arrangement from the court records.

Plaintiff's Exhibit 4300   p. 17 of 42

51.     This payment to Mr. Cabrera by the Lago Agrio Plaintiffs' representatives, purportedly for his settling expert work, was particularly suspicious for several reasons.  First, instead of following the established protocol of paying the Court, which subsequently would make the payment to Mr. Cabrera, the Lago Agrio Plaintiffs' representatives paid Mr. Cabrera directly via the "*Frente de la Defensa Amazonia*" or Amazon Defense Front ("FDA"), which was the Lago Agrio Plaintiffs' primary support base and the designated beneficiary of any award in the case in their favor.  Second, the payment purported to cover fees for Mr. Cabrera's role as a settling expert, even though the Lago Agrio Plaintiffs had long before that time rejected the settling-expert process and refused to pay their share of any such fees.  Third, Mr. Cabrera received this payment one month before he was appointed as global assessment expert.  Evidence uncovered later by Chevron in U.S. discovery proceedings revealed that the Lago Agrio Plaintiffs' representatives had hand-picked Mr. Cabrera to be the global expert and had met with him extensively prior to his appointment.  *See* PX 33–PX 40 (*Crude* Outtakes from March 3, 2007 Meeting).  I recognize that PX 33 through PX 40 are true and correct copies of *Crude* outtakes filmed on March 3, 2007.  In these videos I recognize Mr. Donziger and other members of the Lago Agrio Plaintiffs' legal and technical team as well as Mr. Cabrera and Fernando Reyes.

52.     Throughout Mr. Cabrera's proposed appointment, swearing in, field work and the ultimate submission of his reports, Chevron repeatedly petitioned the Court to address its concerns over Mr. Cabrera's lack of impartiality and independence and his suspected collusion with the Lago Agrio Plaintiffs' representatives.  Although the Court never intervened, I recall multiple occasions where the Court issued orders reminding Mr. Cabrera of his duties and obligations:

- 18 -

- "The Expert is hereby reminded that he is an auxiliary to the Court for purposes of providing to the process and to the Court scientific elements for determining the truth." PX 348 (10.03.2007 Court Order). I recognize PX 348 is a true and correct copy of the Court's October 3, 2007 Order.

- "The transparency of the expert's work will be ensured, and the parties shall have access to that work" and "[t]he Expert is responsible for the opinions, for the conclusions made by the professionals making up his team and assisting with the preparation of the report." PX 348 (10.03.2007 Court Order).

- "The Expert, Richard Cabrera, is informed that he must personally prepare and work on the expert report, taking into account the scientific, technical, and legal standards of both a universal nature and those in effect here." PX 352 (10.22.2007 Court Order). I recognize PX 352 is a true and correct copy of the Court's October 22, 2007 Order.

- "[I]n his report the Expert is required to cite all of the scientific sources, and analytical and legal documents that he uses to perform his work." PX 357 (11.29.2007 Court Order). I recognize PX 357 is a true and correct copy of the Court's November 29, 2007 Order.

53. In response to Chevron's objections and the Court's instructions, Mr. Cabrera repeatedly affirmed his integrity and denied any relationship with the Lago Agrio Plaintiffs or their allies. These are some of Mr. Cabrera's denials submitted to the Court and with which I am familiar:

- "I should clarify that I do not have any relation or agreements with the plaintiff, and it seems to me to be an insult against me that I should be linked with the

Plaintiff's Exhibit 4300   p. 19 of 42

attorneys of the plaintiffs." PX 281 (07.23.2007 Cabrera Letter).  I recognize PX 281 is a true and correct copy of Mr. Cabrera's July 23, 2007 Letter.

- "[B]eing the professional that I am and in compliance with the orders issued by [the Court] regarding my designation, confirmation and acceptance of my appointment as Expert, *I have performed my work with absolute impartiality, honesty, transparency and professionalism*.  I reject the descriptions or attacks that have been leveled against me alleging that I am biased toward one of the parties, and I also reject the unfounded accusations that I am performing my work surreptitiously.  That is completely untrue." PX 283 (10.11.2007 Cabrera Letter; emphasis added).  I recognize PX 283 is a true and correct copy of Mr. Cabrera's October 11, 2007 Letter.

- "I have fully and faithfully complied with the instructions you gave in each order and at the meetings that were held during the sample collection process." PX 286 (10.30.2007 Cabrera Letter).  I recognize PX 286 is a true and correct copy of Mr. Cabrera's October 30, 2007 Letter.

- "I can only confirm my commitment to continue my work with absolute impartiality, honesty and transparency.  I cannot conclude this brief without first rejecting the insulting, offensive and bad-faith descriptions set forth in several of the briefs I received . . . ." PX 287 (10.31.2007 Cabrera Letter).  I recognize PX 287 is a true and correct copy of Mr. Cabrera's October 31, 2007 Letter.

54.    For their part, the Lago Agrio Plaintiffs' representatives denied Chevron's allegations of an improper relationship with Mr. Cabrera, stating that Chevron's claims "reflect[ed] a delirium of persecution more than reality" and were nothing more than a "judicial

Plaintiff's Exhibit 4300   p. 20 of 42

lynching." PX 354 (10.29.2007 Lago Agrio Plaintiffs' Motion). I recognize PX 354 is a true and correct copy of the Lago Agrio Plaintiffs' October 29, 2007 Motion. The Lago Agrio Plaintiffs' representatives further claimed that Chevron's requests to the Court were "based completely on the *baseless concept of a "conspiracy," of which there is no evidence*; for this reason the request is completely unfounded and must be rejected as well as sanctioned given that it was lodged for the sole purpose of damaging the Lago Agrio Plaintiffs' case and tarnishing the good name of the distinguished Superior Court of Nueva Loja . . . ." PX 354 (10.29.2007 Lago Agrio Plaintiffs' Motion; emphasis added). In multiple outtakes from *Crude*, I recognize Mr. Fajardo and other members of the Lago Agrio Plaintiffs' legal and technical team meeting with Mr. Cabrera and Fernando Reyes, on March 3, 2007, about two weeks before Mr. Cabrera was appointed by the Court.

### The Cabrera Reports

~~55.    On March 24, 2008, Mr. Cabrera wrote to the Court, advising that the global damages report was nearly complete. PX 309 (03.24.2008 Cabrera Letter). I recognize PX 309 as a true and correct copy of Mr. Cabrera's March 24, 2008 Letter. He represented to the Court that, "*My report* is organized in sixty (60) pages plus twenty-one (21) exhibits and various appendices." PX 309 (03.24.2008 Cabrera Letter; emphasis added).~~

56.    On April 1, 2008, Mr. Cabrera walked into the Lago Agrio courthouse to file the report (the "Cabrera Report"). Mr. Cabrera was accompanied by the Lago Agrio Plaintiffs, their supporters, and members of the press (all of whom were apparently advised beforehand of the filing). Unlike the Lago Agrio Plaintiffs' representatives and the media, Chevron received no prior notice that the Cabrera Report would be filed that day. I have viewed a video of this filing created by the Lago Agrio Plaintiffs' representatives. PX 83 (*Crude* Outtake documenting submission). I recognize that PX 83 is a true and correct copy of a *Crude* outtake filmed on

Plaintiff's Exhibit 4300    p. 21 of 42

April 1, 2008. In the video I recognize Mr. Cabrera and, notably, Aaron Marr Page, who seemed to be overseeing the filing of the Cabrera Report.

57.     In September 2008, Chevron challenged the findings of the Cabrera Report and filed a rebuttal brief, asking the Lago Agrio Court to strike the report in its entirety and to open a hearing on the numerous "essential errors" it contained.   Chevron also asked the Court to summon Mr. Cabrera to appear and answer questions about the health survey that he used as one of the bases for his damage assessment.   Likewise, the Lago Agrio Plaintiffs also submitted comments to the Cabrera Report, requesting clarifications and additional damage assessments.

58.     In response to Chevron's essential errors petition, Mr. Cabrera again affirmed his supposed impartiality and integrity:

> Mr. President, *I am an honest man with nothing to hide, and my conduct as an expert in this case has been as professional, impartial and objective as possible*, as can be seen from my expert report.  The fact that neither of the two parties is fully satisfied with my report is clear evidence of my impartiality. . . .  I do not take orders from either of the parties to the lawsuit. . . .   This means, Mr. President, that *I am not, nor will I be, subject to the views or whims of either of the parties; I act in accordance with rulings by the judge, with the law and with my principles*.  Not being subject to orders from either of the parties leads me to believe that I have or should have some guarantee of protection from the Court.  I cannot be subject or overly vulnerable to the pressures that have been exerted on me by both parties, and with particular forcefulness by the defendant.   Mr. President, *I once again confirm my utmost willingness to cooperate as an absolutely impartial adjunct to the judge* to ensure that the judge has sufficient, clear technical information.

PX 299 (10.08.2008 Cabrera Letter; emphasis added).  I recognize PX 299 is a true and correct copy of Mr. Cabrera's October 8, 2008 Letter.

59.     In November 2008, Mr. Cabrera submitted a supplemental report, allegedly authored by him, responding to comments submitted by the Lago Agrio Plaintiffs' representatives.  The supplemental report added another USD $11 billion to the initial damages

Plaintiff's Exhibit 4300   p. 22 of 42

assessment in the Cabrera Report without providing any additional evidence. *See* PX 313 (11.17.2008 Supplemental Cabrera Report). I recognize PX 313 is a true and correct copy of the November 17, 2008 Supplemental Cabrera Report.

60.     Thereafter, through discovery proceedings in the United States, Chevron found compelling evidence demonstrating that Mr. Cabrera did not act either "independently" or "impartially" as the global assessment expert. Chevron also uncovered evidence of an improper relationship between Mr. Cabrera and the Lago Agrio Plaintiffs' legal and technical teams. Chevron repeatedly petitioned the Court for relief based on these facts, but the Court ignored or rejected all of our petitions without legal reasoning or explanation.

61.     On June 6, 2010, the Lago Agrio Plaintiffs asked the Court to order the submission of reports—that we now know they privately called the "cleansing expert reports"— to try and "cleanse" the record of the taint of the Cabrera fraud. *See* PX 1367R (06.04.2010 Lago Agrio Plaintiffs' Team email (stating that "curative additional [expert] reports" would be their "'cleanser'" rather than "full disclosure" of the Cabrera fraud)). I recognize that PX 1367R is a true and correct certified translation of an email dated June 4, 2010. The Court granted the Lago Agrio Plaintiffs' request and made clear it would not accept any other briefing, which we understood to mean it would not consider any evidence of the Cabrera fraud itself.

62.     When Chevron filed a motion challenging that illegal ruling, Judge Leonardo Ordóñez, who was the presiding judge at the time, deferred ruling on the motion beyond the time permitted by law. On August 26, 2010, Chevron moved to recuse Judge Ordóñez for, among other reasons, failure to issue a timely decision on that motion and dozens of others that Chevron had filed in prior months. That recusal motion was then granted by Judge Zambrano, who immediately took over as presiding judge for the final judgment phase. Judge Zambrano then

Plaintiff's Exhibit 4300   p. 23 of 42

promptly denied Chevron's motion to nullify Judge Ordóñez's order that had allowed for the filing of "cleansing" expert reports and also denied or deferred until judgment virtually all of Chevron's many other motions, with almost no explanation whatsoever.

### Contacts by Former Judge Guerra and Others

63.     Chevron, as a matter of corporate policy and practice, and my firm, *Callejas y Asociados*, absolutely and strictly prohibit the bribery of any government official.  In all cases handled by *Callejas y Asociados*, each lawyer is informed that he is obligated to report to me, in the first instance, any improper or illicit contact or solicitation of a bribe from any government or judicial official.

64.     In 2009, I learned that Dr. Iván Alberto Racines Enríquez, one of the lawyers on my firm's legal team representing Chevron in the Lago Agrio Litigation, had recently encountered Dr. Alberto Guerra Bastidas, the first judge who had presided over the Lago Agrio Litigation, in Quito.  During that encounter, Dr. Guerra had wanted to discuss with Dr. Racines the anticipated resolution of the Lago Agrio Litigation—which Dr. Racines understood to be an improper overture by Dr. Guerra to influence the outcome of the Lago Agrio Litigation for a price.  Dr. Racines told me that he had no intention of following up with Dr. Guerra on the matter, and I agreed.

65.     But Dr. Guerra contacted Dr. Racines again by telephone in October 2009.  Dr. Guerra told Dr. Racines that he, Dr. Guerra, could: (1) serve as an intermediary for communicating with then-presiding Judge Zambrano, (2) "fix" the entire case, and (3) influence the trial court judgment in Chevron's favor.  When I learned of this, I told Dr. Racines to be very careful and that these types of contacts should be avoided, as such contacts were not permitted by Chevron or my firm and were prohibited under Ecuadorian law.  I knew that Chevron and my firm would never be part of any such scheme.  Days later, Dr. Racines told me he received a

Plaintiff's Exhibit 4300   p. 24 of 42

follow-up call from Dr. Guerra asking whether Chevron's lawyers were willing to speak with Judge Zambrano. Dr. Racines refused.

66.     Dr. Guerra continued to try to contact Dr. Racines by telephone, and I suggested that Dr. Racines change his telephone number, as it appeared that Dr. Guerra was insistent in his efforts to involve my firm and Chevron in a bribery scheme to "fix" the case in Chevron's favor. Dr. Racines agreed and changed his telephone number. Dr. Racines advised me further that he encountered Dr. Guerra one or two months later, and Dr. Guerra repeated his previous improper overtures and added that he knew who would draft the judgment in the Lago Agrio Litigation. I then advised Dr. Racines again that he should avoid further contact.

67.     On October 8, 2009, I received a telephone call from Mrs. Liliana Suarez, the former clerk of the Provincial Court of Justice of Sucumbíos. In that call, Mrs. Suarez told me that Judge Zambrano, who was then the judge presiding over the Lago Agrio Litigation, wished to hear directly from Chevron's lawyers alone regarding our concerns about the management of the proceedings by previous judges. Mrs. Suarez said that the October 9 holiday would be a good opportunity for her to introduce me to the judge and asked if I would travel to the city of Manta for the meeting. I believed such a meeting with Judge Zambrano would be highly improper and I absolutely would not participate. Therefore, I refused her invitation. I never spoke with Mrs. Suarez, much less Judge Zambrano, about this topic again. I recounted this contact in a contemporaneous affidavit, a true and correct copy of which is PX 1167. PX 1167 (10.16.2009 Affidavit of Adolfo Callejas Ribadeneira).

68.     I memorialized these events in an affidavit and discussed with Dr. Racines that he do the same. I also felt that going public to report these contacts, within the context of ongoing events in Ecuador, might endanger my legal team, my family, and me. For example, during that

- 25 -

same time period, Chevron had made several filings demonstrating the Lago Agrio Plaintiffs' representatives' fraud and collusion, including filings to the Lago Agrio Court, the Judicial Council and the Prosecutor General's Office, and all of our petitions fell on deaf ears. Moreover, at that very time my close friends, Dr. Rodrigo Pérez Pallares and Mr. Ricardo Reis Veiga were being unfairly subjected to criminal prosecution in Ecuador (discussed more fully, below). I, too, was the target of attacks by the Lago Agrio Plaintiffs' representatives, who I knew had attempted to get the Republic of Ecuador to open investigations of me.

69.    In approximately the last quarter of 2010, I learned from another one of the lawyers on my legal team in the Lago Agrio Litigation, Dr. Patricio Efrain Campuzano Merino, that one of his friends (whom I shall call Doe 1) contacted him saying she had something important to discuss with him regarding the Lago Agrio Litigation. Doe 1 said that, according to Dr. Guerra, Judge Zambrano wanted to know whether Chevron would be interested in drafting the final judgment of the trial court in favor of Chevron. I understood this to mean that Chevron could pay an amount of money to Judge Zambrano to obtain and ghostwrite a judgment in its favor in the Lago Agrio Litigation. I replied to Dr. Campuzano that our answer was a firm, "No." I was furious because I understood this to be another attempt to contact Chevron lawyers improperly. And I did not appreciate these ongoing efforts to reach out to Chevron and my firm to engage in illegal activities—something that we never invited, indicated any willingness to consider, or would ever entertain.

70.    Based on my involvement in the legal community in Ecuador, particularly because of my experience in Lago Agrio, I am aware that Judge Zambrano had long been accused of corruption. I have reviewed several bar complaints and ethics complaints that have been lodged against Judge Zambrano—dating back to 1996 when he was a prosecutor. One of

Plaintiff's Exhibit 4300   p. 26 of 42

the significant incidents that I recall occurred in November 2009, when a complaint was filed against Judges Zambrano and Ordóñez by the National Police of Ecuador for releasing an accused drug trafficker in the *Caso Aniversario*. The complaint alleged that Judges Zambrano and Ordóñez acted "with malice, manifest negligence or inexcusable error" in releasing the suspect before trial. In February 2012, Judges Zambrano and Ordóñez were dismissed from the court for judicial misconduct related to the *Caso Aniversario*.

### The Judgment

71.   As I previously testified, Chevron moved in August 2010 to recuse Judge Ordóñez who was then replaced by Judge Zambrano. Judge Zambrano immediately denied virtually every one of Chevron's multiple pending motions. Then, on December 17, 2010, Judge Zambrano closed the evidentiary record, indicating that the case was ready for review and resolution. PX 397 (12.17.2010 Court Order). I recognize PX 397 is a true and correct copy of the Court's December 17, 2010 Order. By that order, Judge Zambrano requested that the record in its entirety be sent to him so he could review it and issue a judgment in the case. At that time, the record consisted of 212,119 *"fojas"* (approximately 231,000 pages, counting the reverse side of certain *fojas* that contained additional information), collected in 2,022 *"cuerpos legales"* or volumes. With final briefing from the parties, these numbers grew to 216,337 *"fojas"* (approximately 236,000 pages) in 2,065 *"cuerpos legales,"* all of which Judge Zambrano would have had to read and consider prior to issuing judgment. The stack of 2,065 *"cuerpos legales"* Judge Zambrano was required to review would have extended over 1,700 feet or one-third of a mile.

72.   Surprisingly, on February 14, 2011, only 59 days after he closed the evidentiary record consisting at the time of more than 230,000 pages, Judge Zambrano somehow issued the

Plaintiff's Exhibit 4300   p. 27 of 42

188-page, single-spaced Lago Agrio Judgment. PX 400 (02.14.2011 Lago Agrio Judgment). I recognize PX 400 is a true and correct copy of the Lago Agrio Judgment.

**The Appeal and Cassation**

73. ~~Because Chevron believed that the judgment was unsubstantiated, unwarranted and corrupted by fraud,~~ Chevron ~~immediately~~ appealed the judgment ~~on February 17, 2011. The Lago Agrio Plaintiffs also filed an appeal~~ on March 9, 2011.

74. The process of determining which judges would hear the appeal was subject to numerous irregularities, and the manner in which the appellate judges were selected and appointed raised serious questions about their neutrality. A three-judge panel was originally selected soon after the parties' appeals were filed, but the initial composition of the panel was soon disturbed. In the ensuing months, at least five substitute judges were alternated on and off the panel. Another judge who briefly sat on the panel had filed, shortly before his appointment, a complaint against Chevron on behalf of an individual client.

75. Some of these changes in panel composition came by decree of Ecuador's politicized Judicial Council, which has been accused of interfering with judicial proceedings and has been criticized lately for being under the control of the executive branch. Two other changes in the panel composition were effected by lottery, as ordered and overseen by Judge Zambrano. Those lotteries were held in secret, without notifying Chevron, even though we had the right to be present. Judge Zambrano's involvement is apparent from his signature on certain *actas* confirming the results of the official lotteries or on the official personnel actions reflecting the selection of those appellate judges.

76. Every indication was that these appellate judges were hand-picked behind closed doors to swiftly affirm the indefensible Lago Agrio Judgment issued by Judge Zambrano. For example, shortly after Judge Zambrano issued the Lago Agrio Judgment, he appeared on national

- 28 -

Plaintiff's Exhibit 4300   p. 28 of 42

television with the President of the Judicial Council who proudly called him a "star" of the Ecuadorian judiciary. In fact, while the appellate panel was constantly changing, it was Judge Zambrano who served not only as President of the Lago Agrio Court, but also as provincial delegate of the Judicial Council. And it was Judge Zambrano who appeared at the press conference with the newly constituted appellate panel to introduce them to the public and announce that they would be reviewing his own decision. The entire sequence of events was almost unbelievable.

77. On January 3, 2012, less than five weeks after it finally had been constituted, the appellate panel issued a decision affirming, virtually in its entirety, the USD $18.2 billion Judgment against Chevron. PX 430 (01.03.2012 Appellate Court Judgment). I recognize PX 430 is a true and correct copy of the January 3, 2012 appellate court judgment. I have read the appellate court judgment and noted several additional irregularities.

78. ~~The Ecuadorian appellate court judgment does not purport to explain or even mention the majority of the evidence in the Lago Agrio record demonstrating that the Lago Agrio Plaintiffs' representatives ghostwrote the trial court judgment. The appellate court also refused to consider Chevron's evidence regarding the Lago Agrio Plaintiffs' representatives' purported fraud. In fact, the appellate court conceded that the trial court judgment contained errors — which corresponded exactly to errors found in the Lago Agrio Plaintiffs' internal files — but did not identify any record source for those errors. Instead, the appellate court merely noted that in Chevron's appeal "[m]ention is also made of fraud and corruption of plaintiffs, counsel and representatives, a matter to which this Chamber should not refer at all, except to let it be emphasized that the same accusations are pending resolution before authorities of the United States of America due to a complaint that has been filed by the very defendant here, Chevron,~~

- 29 -

~~under what is known as the RICO act.~~"   ~~PX 430 (01.03.2012 Appellate Court Judgment; emphasis added).~~

79.    The Lago Agrio Plaintiffs then filed a motion for amplification and clarification of the appellate court judgment.  Among other things, the motion asked the appellate court to state that, in fact, it had reviewed the evidence submitted by Chevron regarding fraud.  Chevron filed an opposition to the motion contending, among other things, that the Lago Agrio Plaintiffs' motion illegally sought to alter or amend the appellate court judgment.  Ignoring that pleading, the appellate court issued a decision the very next day, on January 13, 2012, largely granting the Lago Agrio Plaintiffs' motion.  Although the appellate court claimed to find no basis for Chevron's fraud allegations, it deferred the fraud issue, stating that the appellate court would "stay[] out of these accusations, preserving the parties' rights to present formal complaint[s] to the Ecuadorian criminal authorities or to continue the course of the actions that have been filed in the United States of America."  The court also noted that the 15-day period for Chevron to issue a public apology, or face the doubling of the USD $8.6 billion compensatory award for punitive damages, had begun to run as of the January 13 decision.

80.    On January 20, 2012, Chevron filed a Petition for Cassation with the National Court of Justice.  In the Petition for Cassation, Chevron argued that the appellate court judgment, affirming the trial court judgment, should be nullified in its entirety due to, among other things, rampant fraud and corruption committed by the Lago Agrio Plaintiffs' representatives against Chevron throughout the trial and in the judgment itself, all of which the lower courts had ignored.  In addition, Chevron argued that the Lago Agrio Court had no legal authority to award punitive damages, much less for Chevron's failure to "apologize."

- 30 -

81. In the same Petition for Cassation, Chevron also requested that any enforcement of the judgment be suspended while Chevron's cassation appeal remained pending. This request was based upon an order issued by an arbitral panel convened under the Bilateral Investment Treaty between the United States and Ecuador ("BIT Tribunal"), that required the Republic of Ecuador "to take all measures at its disposal to suspend or cause to be suspended the enforcement or recognition within and without Ecuador of any judgment" in the Lago Agrio Litigation. PX 444 (02.09.2011 BIT Tribunal Order). I recognize PX 444 is a true and correct copy of the BIT Tribunal's Interim Measures Order dated February 9, 2011.

82. In February 2012, Chevron's Petition for Cassation was accepted and transmitted to the National Court of Justice for further consideration. At the same time, however, the appellate court denied Chevron's request to suspend enforcement of the Lago Agrio Judgment, notwithstanding the BIT Tribunal's initial order and subsequent interim awards. Chevron filed multiple objections to the appellate court's decision regarding enforcement, all of which were denied, opening the way for the Lago Agrio Plaintiffs' enforcement efforts in Ecuador and elsewhere.

83. In November 2012, Chevron's Petition for Cassation was admitted for consideration by the National Court of Justice. The cassation appeal was assigned to a panel of three judges, recently appointed to the National Court through a new selection process initiated by the current administration. The presiding judge for the panel, Dr. Wilson Andino, is the brother of a member of the National Assembly from the governing political party.

**The Lago Agrio Plaintiffs' Attempted Execution of the Lago Agrio Judgment in Ecuador**

84. On September 17, 2012, Judge Wilfrido Erazo assumed control of a newly initiated enforcement proceeding in Lago Agrio, running concurrently with Chevron's cassation appeal. In October 2012, Judge Erazo issued orders that purported to embargo the assets of

Plaintiff's Exhibit 4300   p. 31 of 42

Chevron Corporation and many of its direct and indirect subsidiaries around the world. *See* PX 432 (10.15.2012 Embargo Order); PX 418 (10.25.2012 Supplemental Embargo Order). I recognize PX 432 and PX 418 are true and correct copies of the October 15, 2012 Embargo Order and the October 25, 2012 Supplemental Embargo Order (the "Embargo Orders"). Each of Chevron's objections to the Embargo Orders was promptly denied.

85.    On September 9, 2013, Judge Erazo issued a further embargo order, directing that the Ecuador Institute of Intellectual Property (*Instituto Ecuatoriano de Propriedad Intelectual* or "IEPI") serve as depository for the various trademarks held by a Chevron subsidiary, Chevron Intellectual Property LLC ("Chevron IP"), and subject to the Embargo Orders. Judge Erazo further instructed IEPE to annotate the registrations for those trademarks with the terms of the Embargo Orders. I understand that IEPI did as directed, completing its annotation of the trademark registrations with this latest embargo order on October 1, 2013.

86.    Now that IEPI has annotated the Chevron IP trademark registrations to indicate they are subject to the Embargo Orders, I understand that Chevron IP no longer controls these trademarks and that they are now under IEPI's custody for the benefit of the Lago Agrio Plaintiffs. I understand that the Lago Agrio Court is now responsible for the valuation and auction of the Chevron IP trademarks, at which point the proceeds of the auction will be turned over to the Lago Agrio Plaintiffs. In sum, the Chevron IP trademarks are now officially under IEPI's custody for the benefit of the Lago Agrio Plaintiffs.

### Petroecuador Decides to Remediate and the Lago Agrio Plaintiffs Intervene

87.    In 2006, the Republic of Ecuador initiated the Project for the Elimination of Pits in the Amazon District ("PEPDA") to remediate Petroecuador's oilfields. I am familiar with this PEPDA program because I reviewed information about it obtained from the Ministry of the Environment. I understood that PEPDA's objective was to remediate pits in Petroecuador's area

- 32 -

Plaintiff's Exhibit 4300   p. 32 of 42

of operations, which included all pits and spills not in the former Concession area, as well as those related to the former Consortium that remained Petroecuador's responsibility after the settlement among the Republic of Ecuador, Petroecuador and TexPet.

88.   In July 2007, Mr. Cabrera moved the Lago Agrio Court to order Petroecuador to suspend the PEPDA remediation program at all sites that were the subject of the Lago Agrio Litigation and that were within his work plan until after he completed his sampling.   PX 278 (07.12.2007 Cabrera Motion).   I recognize PX 278 is a true and correct copy of Mr. Cabrera's July 12, 2007 Motion.   I recall that, at approximately the same time, the Lago Agrio Plaintiffs' representatives were complaining in the press that the PEPDA remediation would destroy evidence in the trial.   I remember this specific media campaign very well, because it was so ironic to me that the Lago Agrio Plaintiffs—who purported to want an improvement of the Oriente environment—would try to stop Petroecuador's remediation efforts as a litigation tactic. Not surprisingly, on October 3, 2007, the Court ordered Petroecuador to suspend remediation of all areas that were the subject of the Lago Agrio Litigation until after the global expert assessment was finished.   *See* PX 348 (10.03.2007 Court Order).

89.   I understand also that later in 2009, after PEPDA remediation had again resumed, the Lago Agrio Plaintiffs' representatives met with the Ministry of the Environment and urged the Republic of Ecuador to suspend the remediation again.   I have since seen an email in which Mr. Fajardo discusses a newspaper article titled, "STATE ASSUMES ENVIRONMENTAL CLEAN UP," and notes that the Republic of Ecuador intended to spend USD $96 million on remediation.   PX 1142 (06.09.2009 Lago Agrio Plaintiffs' Email).   I recognize that PX 1142 is a true and correct certified translation of an email dated June 9, 2009.   Mr. Fajardo expresses concern that the financial cost is "extremely low" and that the article "is perfect for Texaco to

- 33 -

~~say that the State finally assumed its duty and is going to clean up what it ought to." PX 1142~~ ~~(06.09.2009 Lago Agrio Plaintiffs' Email). In that email, Mr. Donziger commanded his~~ ~~Ecuadorian co-counsel to "go to Correa to put an end to this shit once and for all." PX 1142~~ ~~(06.09.2009 Lago Agrio Plaintiffs' Email). In fact the Republic of Ecuador and PEPDA later~~ ~~stopped the remediation, which, to my knowledge, has not resumed.~~

### The Sham Criminal Charges

90.    Almost immediately after the Lago Agrio Litigation was filed, the Lago Agrio Plaintiffs' representatives began a campaign to undermine the settlement and release agreement between TexPet, the Republic of Ecuador, and Petroecuador. As part of that campaign, the Lago Agrio Plaintiffs' representatives—including Mr. Donziger—began pressuring the Republic of Ecuador to bring sham criminal charges against Mr. Veiga, Dr. Pérez, and various former ministers and officials of the Republic of Ecuador and Petroecuador for purported falsification of documents regarding the remediation and settlement, as well as for purported environmental crimes. Despite the fact that four separate prosecutors had not found any basis for criminal charges, the Lago Agrio Plaintiffs' representatives succeeded in pressuring the Republic of Ecuador to bring sham criminal charges in 2010.

91.    I observed that the constant threat of prosecution between 2003 and 2011 took a heavy personal toll on Mr. Veiga, Dr. Pérez, and their families.

92.    After the sham criminal charges were lodged formally against him, and as a direct result of the publicity campaign waged by the Lago Agrio Plaintiffs' representatives, Dr. Pérez was forced to relocate to the United States. During that time, we spoke regularly about how unhappy he was in Florida and how unfair the unrelenting persecution was in Ecuador. ~~Like any true patriot, however, he wanted only to return home.~~

- 34 -

93.    Dr. Pérez finally returned home, only a few days after the Republic of Ecuador dropped the sham criminal charges against him (and I imagine not coincidentally, a few months after Chevron filed this RICO action in New York and the criminal charges became an issue for the Republic of Ecuador in the BIT Tribunal). But tragically, as if waiting until he could do so in his homeland, Dr. Pérez passed away three weeks later—never fully able to clear his name of the accusations leveled against him.  To this day, his name is referred to in the press and official statements as a traitor and a "country seller," with no respect for his death or his family's loss.  I know from conversations with members of the Pérez family that they are devastated each time his memory is reviled by the leaders of the country he loved so much.  They cannot see a day when they will be free to mourn their loss in peace and with the respect and reverence any death deserves.

94.    Throughout the entire process of combating these sham criminal charges, and even after they were dismissed, my family, my colleagues, and I feared the prospect of the same thing happening to us.  If the Lago Agrio Plaintiffs' representatives could manufacture charges against Mr. Veiga and Dr. Pérez—two lawyers I greatly respected—then they could likely manufacture sham allegations against me or any member of my team.

### The Lago Agrio Plaintiffs' Ongoing Media Campaign

95.    I observed many ways in which Mr. Donziger and the Lago Agrio Plaintiffs' representatives made this lawsuit more about prosecuting Chevron in the national and international press than about presenting evidence and legal arguments to the Lago Agrio Court. I recall an outtake from *Crude* where Mr. Donziger describes it candidly:

> You push, you push, you push.  You talk to the court, you talk to other judges, you talk to journalists.  You know, you talk to influential people who talk to the judge.  You know, it is the most ridiculous legal culture.  I mean, I have to say, it's just utterly ridiculous, the time you have to spend on non-legal stuff to get a

- 35 -

~~legal decision made . . . . But, you know, you're still dealing with hundreds of years of encrusted judicial weakness and corruption. And that . . . that stuff doesn't disappear overnight, you know. That's the culture here.~~

~~PX 33 (03.30.2007 *Crude* Outtake).~~ Through an enormous media and public pressure campaign to which I personally have been subjected and which I endured for the past decade, the Lago Agrio Plaintiffs' representatives have characterized anyone associated with TexPet or Chevron as an enemy of the Republic of Ecuador.

96.    I also observed the Lago Agrio Plaintiffs' representatives pressure the Ecuadorian judiciary, ~~which Mr. Donziger described as "utterly weak." PX 8A (03.30.2006 *Crude* Outtake). I recognize that PX 8A is a true and correct copy of the transcript of a *Crude* outtake filmed on March 30, 2006. As Mr. Donziger put it, he and the other Lago Agrio Plaintiffs' representatives would "go in and confront the judge with media around, and fight and yell and scream and make a scene, and, you know, that would never happen in the United States. That would never happen in any judicial system that had integrity. And it's that very weakness that, you know, lets people do that. That is also—lets people corrupt the process." PX 8A (03.30.2006 *Crude* Outtake). Mr. Donziger's plan was to "just walk in [the judge's] office with all the media, and it's obvious what we're doing, and he . . . he doesn't have the power to say, 'Get the fuck out of my office.' Like, at least to the press. I mean, I've never seen such utter weakness. It's the same kind of weakness that leads to corruption." PX 7A (03.30.2006 *Crude* Outtake). I recognize that PX 7A is a true and correct copy of the transcript of a *Crude* outtake filmed on March 30, 2006. In these videos, I recognize Mr. Donziger, and I am aware that they were filmed on March 30, 2006, the day the Lago Agrio Plaintiffs' representatives confronted Judge González del Pozo in an attempt, which was ultimately successful, to obstruct the judicial inspection of the HAVOC laboratory.~~

Plaintiff's Exhibit 4300   p. 36 of 42

97. I recall another particular outtake from *Crude* in which Mr. Donziger explained to the U.S. experts, who would help the Lago Agrio Plaintiffs' representatives draft the Cabrera Report, how to win a case in Ecuador:

> Hold on a second, you know, this is Ecuador okay? . . . You can say whatever you want but at the end of the day there's thousand people around the courthouse, you're going to get what you want. Sorry, but it's true . . . . And if we had no more money to do more work we would do that. You know what I am saying? . . . And it wouldn't really matter that much . . . Because at the end of the day, this is all for the Court just a bunch of smoke and mirrors and bullshit. It really is. We have enough, to get money . . . to win.

PX 43A (03.04.2007 *Crude* Outtake). I recognize that PX 43A is a true and correct copy of the transcript of a *Crude* outtake filmed on March 4, 2007. In this video I recognize Mr. Donziger, Anne Maest, and Charles Champ, who were all in Ecuador at a meeting with Mr. Cabrera. Although the Lago Agrio Plaintiffs' case may have been "smoke and mirrors and bullshit," their efforts to influence and intimidate the Lago Agrio Court were very real and very effective.

98. The attacks on Chevron's executives and legal team by the Lago Agrio Plaintiffs' representatives have been profoundly personal for each of us representing Chevron in Ecuador. One shocking example I recall was a parade and demonstration staged by the Lago Agrio Plaintiffs and their representatives in Lago Agrio on October 5, 2009. PX 90 (Screenshot of "*Marcha Demandantes*"); PX 91 (Video of "*Marcha Demandantes*"). I recognize that PX 90 is a true and correct copy of still shots of the Lago Argrio Plaintiffs' October 5, 2009 protest. I recognize that PX 91 is a true and correct copy of the video of the Lago Agrio Plaintiffs' October 5, 2009 protest. I learned of this march days before it occurred and watched it on video a few days after it happened. As the video reveals, Luis Yanza, among others, led a protest through the streets of Lago Agrio while protestors held effigies of me and other Chevron executives,

Plaintiff's Exhibit 4300    p. 37 of 42

including Chevron's then-CEO David J. O'Reilly, Mr. Veiga, Mr. Pérez, and Chevron spokesperson James Craig.  The life-sized effigies contained our photographs and depicted us dressed as prisoners.  The protestors shouted, among other things, "Let death bury him!  Bury that one face down so the one below likes it!"  In Ecuadorian popular culture, burying a person face down signifies that the person's soul is to be delivered to hell.  There was then a mock funeral procession during which the protestors placed our effigies in coffins, marched them outside the city of Lago Agrio, and buried them.  Our supposed "widows" then threw flowers on the shallow graves.  I realized for the first time as I watched this video that these and other threats could become real acts of violence, and I feared and still fear for our safety.

99.  ~~I learned that the Lago Agrio Plaintiffs' representatives also pressured our Catholic Church leaders to censure Chevron's legal team in Ecuador for our involvement in the case.~~  I am aware that the Lago Agrio Plaintiffs' representatives requested and obtained a letter of support from an Ecuadorian Catholic Bishop.  ~~The offensiveness of Mr. Donziger's efforts in this regard cannot be overstated.~~  In Ecuador, the Catholic Church is the institution that enjoys the highest trust and credibility.  I am a man of the Catholic faith, and it would be devastating to be censured by the Catholic Church.  Yet, it appears that Mr. Donziger and his allies tried to achieve just that.

100.  Likewise, my colleague Dr. Diego Larrea, who is a very religious man, recounted to me that members of his church and his minister confronted him and questioned his involvement in the Lago Agrio Litigation as counsel for Chevron.  The church members had seen television coverage of the events in Judge González del Pozo's office, including when Mr. Donziger repeatedly shouted at Dr. Larrea, calling him "*un abogado corrupto*."  PX 6B (03.30.2006 *Crude* Outtake).  Ultimately, Dr. Larrea's minister informed him that Dr. Larrea's

Plaintiff's Exhibit 4300   p. 38 of 42

volunteer participation at church services was no longer welcome. Dr. Larrea was and remains devastated by this turn of events.

101. The effects of these public relations and media attacks have been quite personal. During 2006, for example, my wife and I traveled with some friends to a tourist destination in the Amazon region outside the former Concession area. When we stopped at a local restaurant, the waiter approached me and said, "What are you doing here? You should not be here!" I was very concerned because the waiter seemingly recognized me from my involvement in the Lago Agrio Litigation, and I felt like I could be the victim of threats and violence—even when doing things in my private life with friends and family. Since that experience, I never have returned for tourist visits to the Amazon region, which is regrettable because this is something I enjoyed doing very much with my family and friends ever since I traveled there with my father as a child. On another occasion in Quito, during an athletic event I attended, someone at the event shouted to others, "It's him, it's him. Look at him." I turned and realized that they were talking about me. Nothing happened at the time, but I again realized how recognizable—and at risk—I had become.

102. Often the aggressive publicity campaign engaged in by the Lago Agrio Plaintiffs' representatives took on a nationalistic tone that painted TexPet and Chevron as enemies of the country. Even the current administration has taken to referring to me and my legal team as "traitors" and sell-outs. PX 490R (04.28.2007 Press Release). I recognize that PX 490R is a true and correct copy of an April 28, 2007 press release. For example, in a government broadcast, the following statement was made: "Chevron-Texaco has those 'homeland-selling' lawyers defending it, who for a few dollars are capable of selling souls, homeland, family, etc." PX 853 (04.28.2007 Government Broadcast). I recognize that PX 853 is a true and correct copy of the

- 39 -

Plaintiff's Exhibit 4300   p. 39 of 42

transcript of an April 28, 2007 government broadcast. These transcripts accurately reflect remarks made by the current administration about me and my colleagues.

103. Since filing Chevron's Petition for Cassation, the Lago Agrio Plaintiffs' representatives have staged protests on the last Thursday of every month on the steps of the National Court of Justice. During these rallies, protestors have chanted: "Never forget those who sold the fatherland. Never forget those who sold our resources and assets. Never forget . . . Adolfo Callejas. Never forget . . . Alberto Racines."

### Prior Declarations and the Ecuadorian Judiciary

104. During the course of the *Aguinda* litigation in federal court in New York, I submitted several declarations addressing, among other things, the availability of certain remedies to the *Aguinda* plaintiffs before Ecuador's courts. In those declarations, dated August 22, 1994, January 2, 1995, December 1, 1995, December 28, 1998, January 22, 1999, February 4, 2000, and March 8, 2000, I also stated my opinion about the impartiality and independence of the Ecuadorian judiciary at that time. Since filing those declarations more than a decade ago, my opinion about the Ecuadorian judiciary has changed radically, particularly for those cases that involve high-profile parties or the interests of the Republic of Ecuador or its officials.

105. During the past ten years, the increasing political power of the Executive Branch has impeded the impartiality and independence of the Ecuadorian judiciary and threatened the Rule of Law.

106. I am a proud patriot and Ecuadorian, but I am ashamed of the way the Provincial Court of Justice of Sucumbíos and other judicial bodies have handled the Lago Agrio Litigation and related matters. Several of the judges presiding over the case succumbed to pressure from the Lago Agrio Plaintiffs' representatives to make irregular and improper decisions and rulings in the case, including ignoring many of Chevron's pleadings. Many of the same judges also have

- 40 -

been subjected to a politically charged environment that has made it all but impossible for Chevron to receive just and impartial treatment.

107.   I also am concerned that key public officials of the Republic of Ecuador have continued to take a very personal and direct interest in the case, publicly siding with the Lago Agrio Plaintiffs and initiating an aggressive media campaign against Chevron, even while Chevron's cassation appeal remains pending before the National Court of Justice.

108.   The Lago Agrio Plaintiffs' representatives and the current administration continue their campaign of attacks on Chevron and those affiliated with Chevron, calling them "immoral" and "criminals."   Indeed, a website has recently appeared on the internet, titled *"Los Vendepatria"* (which translates to "The Sellers of the Fatherland" or "The Traitors") and dedicated to singling out Ecuadorians who have worked with Chevron "to harm their Amazon brothers and their country."  Much to my dismay, my name and the names of lawyers in my law firm, among others, are listed alongside our photographs.  The website accuses us of betraying our beloved country.

109.   The public smear campaign against Chevron continues to this day and shows no signs of stopping, fueling a growing atmosphere of fear and intimidation.  I even have been advised by other Ecuadorians not to make public remarks regarding the Lago Agrio Litigation.  I remain concerned not just for the safety of myself, but also for that of my family and my co-workers.  I have had to live with that fear every day.

110.   Over the course of the Lago Agrio Litigation, Chevron has sought vigorously to protect its rights to defend itself against the Lago Agrio Plaintiffs' claims.  These efforts have included: the pursuit of evidence to support Chevron's jurisdictional, procedural and substantive defenses; motions objecting to serious and numerous irregularities; initiation of related judicial

Plaintiff's Exhibit 4300   p. 41 of 42

proceedings, such as requests for inspections, judicial confessions, and recusals, to prove up those irregularities; motions challenging court orders that did not comport with the requirements of Ecuadorian law; appeals from the denials of such motions; challenges to the fraudulent judgment itself; and further appeals and other recourse against that judgment and the parallel enforcement proceeding.  The vast majority of Chevron's motions and other challenges to these procedural irregularities—many of which Chevron has claimed constitute fraud by the Lago Agrio Plaintiffs' representatives and collusion with the Lago Agrio Court and which it has supported with mountains of evidence—were ignored or simply denied without citing any substantial factual or legal basis.  As frustrating and demoralizing as these efforts have been, my legal team and I have continued to assert the rights of our client at every stage, consistent with our professional obligations.

111.    The obvious lack of impartiality and lack of independence and the outright abuse of the Rule of Law in connection with the Lago Agrio Litigation sadden me as a lawyer and as a citizen of the Republic of Ecuador.

Executed on the 9 th day of October, 2013 in New York, New York.

Adolfo Callejas Ribadeneira

- 42 -

*Chevron Corp. v. Donziger*,
No. 11 Civ. 0691 (LAK)


**Exhibits Cited in Adolfo Callejas Ribaneira Witness Statement (PX 4300)**


Offered for the Truth:

- PX 0006
- PX 0006A
- PX 0006B
- PX 0033
- PX 0033A
- PX 0034
- PX 0034A
- PX 0035
- PX 0035A
- PX 0035B
- PX 0036
- PX 0036A
- PX 0036B
- PX 0037
- PX 0037A
- PX 0037B
- PX 0038
- PX 0038A
- PX 0038B
- PX 0039
- PX 0039A
- PX 0039B
- PX 0040
- PX 0040A
- PX 0040B
- PX 0083
- PX 0083A
- PX 1167


Not Offered for the Truth

- PX 0090
- PX 0091
- PX 0278
- PX 0281
- PX 0283



PLAINTIFF'S
EXHIBIT
**4300A**
11 Civ. 0691 (LAK)

*Chevron Corp. v. Donziger*,
No. 11 Civ. 0691 (LAK)

- PX 0286
- PX 0287
- PX 0299
- PX 0313
- PX 0316
- PX 0317
- PX 0328
- PX 0329
- PX 0330
- PX 0335
- PX 0338
- PX 0342
- PX 0348
- PX 0352
- PX 0354
- PX 0357
- PX 0397
- PX 0400
- PX 0418
- PX 0430
- PX 0432
- PX 444
- PX 0490#
- PX 0490R
- PX 0853

Plaintiff's Exhibit 4300A   p. 2 of 2