# EXHIBIT A
# Part 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CHEVRON CORPORATION,

                Plaintiff,

      v.

STEVEN DONZIGER, et al.,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Case No. 11 Civ. 0691 (LAK)

## WITNESS STATEMENT OF ALBERTO GUERRA BASTIDAS

I, ALBERTO GUERRA BASTIDAS, hereby declare under penalty of perjury pursuant to 28

U.S.C. § 1746, that the following is true and correct:

    1.     My name is Alberto Guerra Bastidas.

    2.     I am a citizen of Ecuador, born in the city of San Gabriel, province of Carchi,

Ecuador, on May 30, 1954.  My national identity number is 170359028-9.

    3.     I received a law degree from the Central University of Ecuador and graduated in

1982. I worked in private practice as a lawyer in Ecuador from 1982 until 1995. In 1995, I was

appointed as a civil trial judge in the Province of Pichincha, subordinate to the Superior Court of

Justice in Quito.  In 1998, I was appointed Judge of the Provincial Court of Sucumbíos.

    4.     In January of 2002, I was elected Presiding Judge of the Provincial Court of

Sucumbíos and I finished my two-year term as Presiding Judge in January of 2004. During this

time, between May 13, 2003 and January 7, 2004, I was the first Judge to preside over the oral

summary trial No. 002-2003 brought against Chevron Corporation ("Chevron").  At the

beginning of the case, I doubted the validity of the Ecuadorian Plaintiffs' claims given the

1



PLAINTIFF'S
EXHIBIT
**4800**
11 Civ. 0691 (LAK)

settlement and release between the Republic of Ecuador and TexPet, but due to public pressure brought to bear by the representatives of the Ecuadorian Plaintiffs during the first hearing in the case, I allowed the case to continue.  More specifically, a massive protest was assembled outside the courthouse and I feared that, were I to issue a court order against the Ecuadorian Plaintiffs, the protesters would take over the courthouse and endanger my well-being as well as the safety of others.

5.     My first interaction with the representatives and attorneys for the Plaintiffs in the case against Chevron, as well as with the attorneys for this company, the law firm of Callejas & Asociados, including Adolfo Callejas and Alberto Racines, was in my capacity as Judge of the case.

6.     Fair and accurate photographs of certain of the representatives of the Ecuadorian Plaintiffs Messrs. Steven Donziger, Luis Yanza, and Pablo Fajardo are marked as PX 93 and PX 1680 (Donziger), PX 94 and PX 1679 (Yanza), and PX 95 and PX 1678 (Fajardo).

7.     In May of 2008, I was dismissed as Judge of the Sucumbíos Court.  According to the Judiciary Council, the reason for my dismissal was that I made statements that the Chevron case should be declared null, at a time when I no longer presided over the Chevron case.  In reality, I believe I was dismissed because I confronted Judges Novillo and Yánez, who succeeded me as judges in this case, regarding several dubious and illegal rulings they had issued in the proceedings, and regarding their practice of asking the experts for 25 percent of their fees in consideration for having appointed them as such. The reason why I believed that the Chevron case should have been declared null was that the settling experts were being appointed in violation of Ecuadorian law. I must clarify that the appointment of Mr. Richard Cabrera, to perform the "global assessment," also contravened Ecuadorian civil procedural law.

2

8.      After leaving the Lago Agrio Court in May of 2008, I continued having contact with several people from the Lago Agrio legal community.  Among them was attorney Nicolás Zambrano, who, in August of 2008, was appointed Judge of the Provincial Court of Sucumbíos, the same post I had previously held.  A fair and accurate photograph of Mr. Nicolás Zambrano is marked as PX 129.  My relationship with Mr. Zambrano began in 1998, when he was a prosecutor in the city of Lago Agrio and I was Magistrate Judge of the Provincial Court of Sucumbíos. At that time, Mr. Zambrano would occasionally ask me, as a favor, to issue rulings dismissing certain cases. I was careful to issue these rulings with some legal grounds, but I understood that the party benefitting from my decision was paying Mr. Zambrano bribes for arranging to have the case ruled in that party's favor, and Mr. Zambrano, from time to time, shared with me a portion of those bribes.

9.      Mr. Zambrano was not the only attorney or litigant to pay me bribes in exchange for favorable rulings.   While I was a judge, the payment of bribes to judges in exchange for a desired result was commonplace.  As a practicing attorney, I on occasion bribed judges, including judges on the nation's highest courts, to rule in my clients' favor or assist me in obtaining favorable rulings.  And as a judge, I occasionally accepted bribes from litigants in exchange for issuing favorable rulings.  Nor am I the only judge to have accepted such bribes. Attorneys that I knew while I was a judge acknowledged to me that they had bribed other judges, and judges who I knew similarly told me that they were receiving bribes from attorneys.  Based on my own personal knowledge, I know that Mr. Zambrano and most other judges who served on the Provincial Court of Sucumbíos accepted bribes from litigants and attorneys.  I know this because several judges offered to split the bribes with me so that I too would rule in favor of the

3

bribing party, in particular when I was on a three-judge appellate panel in which one of the judges was paid a bribe.

10.    Indeed, in February 2012, the Judicial Council dismissed Mr. Zambrano (along with Mr. Ordóñez) as a judge on the Provincial Court of Sucumbíos as a result of the Judicial Council's findings that Mr. Zambrano acted improperly and without legal basis in a significant narco-trafficking case. More specifically, from my review of the Judicial Council's findings against Mr. Zambrano (PX 411), I have learned that Mr. Zambrano improperly reversed the pretrial detention order issued against one criminal defendant charged with transporting 557 kilograms of cocaine and weapons possession, resulting in the defendant's subsequent flight and trial evasion, and then Mr. Zambrano improperly and without legal justification reduced on appeal the sentences of two convicted drug trafficking accomplices in that same case. While the Judicial Council's findings did not address whether Mr. Zambrano received a bribe in exchange for his improper conduct in the narco-trafficking case, it was widely suspected in the legal community that Mr. Zambrano had received such bribes.

### My Agreement with Judge Nicolás Zambrano

11.    As a former prosecutor, Mr. Zambrano had ample knowledge of criminal law and procedure, but very limited knowledge of civil law rules, substantively and especially procedurally. Therefore, after he was appointed Judge of the Sucumbíos Court, Mr. Zambrano and I reached a financial agreement in which I would help him by writing writs and rulings which Mr. Zambrano had to issue as judge in civil cases assigned to him randomly, in exchange for compensation or payment of USD $1,000 per month, approximately, for this work. At that time I was dealing with financial hardships after having been dismissed, unjustifiably, from the Sucumbíos Court of Justice, and for this reason I agreed to this arrangement. I was Mr.

4

Zambrano's "ghostwriter," and I wrote many of the rulings issued in civil cases assigned to Mr. Zambrano, including the Chevron case. My role as Mr. Zambrano's ghostwriter continued until February of 2012, when Mr. Zambrano was removed from the Provincial Court of Sucumbíos.

12.     I had a close, personal friendship with Mr. Zambrano, which, since I frequently visited his chambers, provided me insight into his personal work habits. Mr. Zambrano typically worked in his office behind a locked glass door. When I arrived, I would knock on his door, and once he confirmed it was me, if he was alone, Mr. Zambrano would let me into his office and lock the door behind us so that we could talk confidentially. While Mr. Zambrano had an interest in criminal law, he had limited knowledge of, and showed little enthusiasm for, civil law. That is one of the reasons that he asked me to serve as his ghostwriter in civil cases. From my conversations with Mr. Zambrano, I knew that he had only a basic knowledge of the Chevron case, not the detailed knowledge it would have taken to write the judgment that was ultimately issued in this case in February 2011. Mr. Zambrano was particularly close to Judge Núñez, and also had a romantic relationship with Liliana Suárez, the court clerk, starting approximately in 2009.

13.     When I first began working as Mr. Zambrano's ghostwriter, I would generally work on the weekends, at my home in Quito, writing the rulings and judgments that Mr. Zambrano had to issue the following week. Mr. Zambrano and I would meet regularly in the Quito airport during layovers on his flights to his home in Manta or his occasional flights to Guayaquil; he would give me the court files so that I would work on the rulings and judgments related to each case. Depending on Mr. Zambrano's itinerary, we would meet again at the Quito airport on his way back from Manta or from Guayaquil when he was returning to the city of Lago Agrio, and I would deliver to him the court files and some flash drives containing the files

5

with the corresponding rulings. The same procedure was applied to the Chevron case. Mr. Zambrano would give me the documents and, later, I would work on the rulings that I delivered to him so that he would sign them as the judge of the case. We did not use e-mail for this for two reasons. First, because Mr. Zambrano and I were not very skilled with technology, so sending files via e-mail was difficult for us; second, because Mr. Zambrano is very careful and distrustful, he would tell me we had to be careful and not leave any evidence that I was assisting him with the drafting of his rulings, which was contrary to Ecuadorian law.

14.    Another mechanism we sometimes used was that Mr. Zambrano would send me the documents in freight packages on TAME airline, the state-owned and largest airline of Ecuador, and I would return them in the same manner, by shipment via TAME. PX 1682 is a true and accurate certified copy of business records of packages shipped to or from me, which I obtained directly from TAME and provided to Chevron.[1]

15.    When I shipped documents to Mr. Zambrano on TAME, I provided general descriptions of the shipments' contents, such as "box with documents" or "package with documents." My general descriptions of the shipments' contents are contemporaneously reflected in the "contents" column of the TAME records. When I shipped draft rulings to Mr. Zambrano, I generally shipped them on flash drives included within the package or box of documents. Indeed, this is confirmed by the entry on PX 1682 for my shipment to Mr. Zambrano on October 3, 2011, which reflects that I shipped an "envelope with flash memory drive" to Mr. Zambrano on that date. The reason that date reflects a shipment of a flash memory but the other dates do not is because the flash memory drive was the only item I shipped to Mr. Zambrano on that date.

---

[1] PX 1721 is a true and accurate copy of the letter from TAME accompanying these records.

Plaintiff's Exhibit 4800   p. 6 of 61

16.     Occasionally, at Mr. Zambrano's direction, I shipped documents and draft rulings I prepared for Mr. Zambrano addressed to other individuals in Lago Agrio to deliver to Mr. Zambrano.  For example, on two occasions in November 2009, I shipped to Narcisa León, an employee at the Provincial Court of Sucumbíos, draft orders that I had prepared, for delivery to Mr. Zambrano. On other occasions, I shipped documents and draft rulings I had prepared for Mr. Zambrano to a mutual friend and Ecuadorian judge, Fernando Albán, who then delivered them to Mr. Zambrano.

17.     Regarding the payments I received from Mr. Zambrano for working as his ghostwriter, I must state that, generally, he would give me money in cash during our quick meetings in the Quito airport. At other times, Mr. Zambrano would deposit money directly into my bank account at Banco Pichincha. True and accurate copies of monthly Account Statements that I obtained from Banco Pichincha for my Banco Pichincha bank account with account number 621310861 are marked as PX 1704 – PX 1708 and PX 1710. True and accurate copies of records from my bank account, which I requested and received from Banco Pichincha, and which are certified by Banco Pichincha, are marked as PX 1711 – PX 1717.

18.     In particular, on or about June 24, 2011, Mr. Zambrano deposited $300 into my Banco Pichincha bank account.  Specifically, PX 1713 (CVX-RICO-5913098) and PX 1684 include a June 24, 2011 deposit slip, certified by Banco Pichincha, that reflects a $300 deposit made by Mr. Zambrano into my account.  The deposit slip bears Mr. Zambrano's signature, which I recognize from the numerous times I have seen Mr. Zambrano's distinctive signature, including on orders I prepared for him in the Chevron case and other civil cases. The deposit slip also bears, beneath the Mr. Zambrano's signature, a national identity number of 0906018262. In Ecuador, every Ecuadorian citizen is assigned a unique national identity number. National

7

identity numbers are publicly published online by the Ecuadorian Internal Revenue Service. PX 1743 is a true and accurate copy of information publicly-available on the Ecuadorian Internal Revenue Service's website showing that Mr. Zambrano's national identity number is 0906018262, the same number listed on the June 24, 2011 deposit slip (PX 1713).  PX 1704 and PX 1683 are true and accurate copies of the June 2011 Account Statement from by Banco Pichincha bank account and reflect that the $300 deposit Zambrano made into my account cleared on June 27, 2011.  I affirm once again that the $300 deposit made by Mr. Zambrano was payment for my services as Mr. Zambrano's ghostwriter.

19.    Furthermore, it was my custom to write down in my daily planner the receipt of payments from Mr. Zambrano. True and accurate copies of my daily planner entries from approximately July 2011 through July 2012, containing my handwritten notes, are marked as PX 1733 and PX 1734.  It was my practice to regularly record the events in my daily planner contemporaneously with their occurrence and based on my own personal observations.  I provided these daily planners to Chevron, but unfortunately, I could not locate my daily planners prior to July 2011.  Nevertheless, the entries I could locate confirm that Mr. Zambrano provided me cash in return for my work as his ghostwriter.

20.    For example, the entry in my daily planner for July 15, 2011—a true and accurate copy of which is marked as PX 1735 (CVX-RICO-5912802)—states that on that date I "Received 500 from Nicolas - I gave 100 to Mom paid 27 for gasoline." The entry for October 14, 2011 on that same exhibit (CVX-RICO-5912845) states "Received 500.00 from Nicolas Zambrano." Both of these entries reflect $500 payments from Mr. Zambrano for my services as his ghostwriter.  Similarly, the entry in my daily planner for February 24, 2012—a true and accurate copy of which is marked PX 1685—states that "Nicolás transfers me 2,000," which

8

reflects a $2,000 payment from Mr. Zambrano to me. This $2,000 payment from Mr. Zambrano is also reflected in the February 2012 Account Statement from my Banco Pichincha bank account, a true and accurate copy of which is marked as PX 1705.  The notes regarding Mr. Zambrano in my daily planner, reflected in PX 1735 and PX 1685, were recorded contemporaneously at the time that Mr. Zambrano made payments to me and based on my own personal observations.

### Mr. Zambrano's First Term Presiding Over the Chevron Case

21.    In August of 2009, ~~Mr. Juan Núñez, who at that time was the judge of the Chevron case, became entangled in a video scandal. Because of that scandal,~~ Judge Núñez had to recuse himself from the Chevron case proceedings. ~~In keeping with the law,~~ it then fell on Judge Zambrano to preside over the Chevron case starting in October of 2009.

*Mr. Zambrano and My Efforts to Obtain Payment from the Litigants*

22.    Once it became clear that Mr. Núñez would have to withdraw from the Chevron case, Mr. Zambrano asked me to attempt, through friends of mine, to get in touch with the attorneys for Chevron in order to negotiate an agreement by which the company would pay Mr. Zambrano and me for issuing the final judgment in Chevron's favor. Mr. Zambrano told me that Chevron would have much more money than the Plaintiffs for this agreement, and therefore we could get a better deal and greater benefits for ourselves.  I do not recall the exact date, but during the period from August through October of 2009, I approached attorney Alberto Racines of Mr. Adolfo Callejas' law firm to tell him I could establish a direct connection with Judge Zambrano so they could discuss and negotiate important and decisive issues in the case, including the judgment. For several weeks I pressed Mr. Racines to do the deal, but he rejected my proposal, and a relationship with Chevron was never achieved. ~~It was publicly known that I~~

9

Plaintiff's Exhibit 4800   p. 9 of 61

was close to Mr. Zambrano, and some attorneys in the city of Lago Agrio, including an attorney

close to Chevron's local attorneys, knew that I was writing rulings on his behalf. Now, it must be

clearly stated that I have no personal knowledge that Chevron's attorneys ever knew about my

agreement with Mr. Zambrano, and Chevron's representatives never paid me for any work I did

on behalf of Judge Zambrano.

23.    I updated Mr. Zambrano on Chevron's rejection, which he was disappointed to

have received.  Mr. Zambrano subsequently told me that I should meet with Mr. Pablo Fajardo,

that he had reached an agreement with the Plaintiffs' representatives to quickly move the case

along in their favor (although he did not tell me the details of that agreement) and that I should

work out a financial arrangement directly with Mr. Fajardo for payment of my ghostwriting

services.  Mr. Fajardo and I subsequently met in Quito, at the corner of Río Coca and 6 de

Diciembre avenues, and we discussed my role as ghostwriter for Mr. Zambrano. We agreed on 3

things: (1) I would make the case move quickly; (2) Chevron's procedural options would be

limited by not granting their motions on alleged essential errors in rulings I was to write, so the

case would not be delayed; and (3) the Plaintiffs' representatives would pay me  USD $1,000 per

month for writing the court rulings Mr. Zambrano was supposed to write. My understanding was

that I had to follow these guidelines during the remainder of the case.

24.    Mr. Fajardo told me that we needed to meet with Mr. Donziger to go over this

arrangement.  Mr. Fajardo had previously explained to me that Mr. Donziger was the lead among

the Plaintiffs' team and thus he needed to inform Mr. Donziger of everything that was happening

in the case.  Indeed, Mr. Fajardo told me in confidence some details of the inner workings of the

Plaintiffs' legal team, including, for example, that Mr. Donziger travels to Europe on occasion

because there were investors funding the litigation who lived in Europe.

Plaintiff's Exhibit 4800   p. 10 of 61

25.     As Mr. Fajardo had requested, several days after my meeting with him at the corner of Río Coca and 6 de Diciembre streets, I met with Messrs. Fajardo, Donziger and Luis Yanza at the Honey & Honey Restaurant located on Eloy Alfaro avenue and Portugal street in the city of Quito.  I understood that Mr. Yanza was a close and trusted confidante of Mr. Fajardo's, but since he rarely spoke at the meetings I attended with Mr. Donziger and Mr. Fajardo, I do not have much knowledge of his role on the Ecuadorian Plaintiff's team.

26.     Photographs of the "Honey & Honey" restaurant where I met with Mr. Fajardo, Mr. Donziger, and Mr. Yanza are marked as PX 1686.

27.     During this meeting at the Honey & Honey Restaurant, Mr. Fajardo summarized the three parts of our agreement, explaining to Mr. Donziger that I would ghostwrite Judge Zambrano's orders so that the case would not be delayed, in exchange for payment of $1,000 per month from the Ecuadorian Plaintiffs' team.  Mr. Donziger then asked me whether Mr. Fajardo's summary was correct, and I told Mr. Donziger directly that those were indeed the terms of the agreement and that Mr. Zambrano authorized me to enter into this agreement.  Mr. Donziger then thanked me for my work as Mr. Zambrano's ghostwriter in this case and for helping steer the case in favor of the Plaintiffs.

28.     I also recall that at either this meeting or at the second meeting I had with Mr. Donziger at the Honey & Honey restaurant, which is described in detail below, Mr. Donziger emphasized that we needed to avoid granting Chevron's essential errors motion at all costs because it was his and Mr. Fajardo's aim to have the judgment issued soon.  Mr. Donziger also mentioned at one of those two meetings at the Honey & Honey restaurant, in response to my inquiry whether he could assist my son with immigration issues in the United States, that Mr. Donziger was friendly from his university days with the United States President, Barack Obama.

11

29.     During the time that Mr. Zambrano was the judge overseeing the Chevron case, I was handling the proceedings behind the scenes. Mr. Zambrano and I agreed that I would write the court rulings in favor of the Plaintiffs. As Mr. Fajardo and I had discussed and planned, sometimes I drafted court decisions that ruled, in part, in favor of Chevron to avoid suspicion. Mr. Zambrano rarely gave me guidelines on how to specifically write court rulings, trusting that I would handle the process in keeping with the Plaintiffs' interests. Because Messrs. Zambrano and Fajardo knew that I would follow the procedural guidelines aligned with the Plaintiffs' interests, and given the primary purpose of not slowing down the process, I did not have to consult with them regarding the substance of the court rulings I drafted.  However, on several occasions, I don't recall the exact dates, Mr. Fajardo and I did discuss specific procedural issues in the case against Chevron. Sometimes these conversations were over the phone and other times we discussed these issues when Mr. Fajardo would give me money in person.

30.     To my understanding, Chevron's legal representatives did not know that the Plaintiffs' representatives were paying me money, nor did they know that I was acting as Mr. Zambrano's ghostwriter steering the case in favor of the Plaintiffs.

*Draft Orders in the Chevron Case on My Personal Computer*

31.     During Mr. Zambrano's time as judge of the Chevron case, I was able to write many court rulings for the Chevron case, as well as other civil cases, on the computer at my home in Quito.  I typically drafted the court ruling by copying a prior ruling and adapting it to the issue at hand.  Once I finished drafting the court ruling, I would either give the draft ruling to Mr. Zambrano at the Quito airport or ship it to him (directly or through an intermediary) via TAME airline. True and accurate copies of draft orders that I wrote for Mr. Zambrano in the Chevron case, which were located in my personal computer that I provided to Chevron on July

12

13, 2012 (which is marked as PX 1736), have been marked as PX 1172, PX 1173, PX 1186, PX 1190 through PX 1193, PX 1197, PX 1209, PX 1220 and PX 1243.

*Payments from the Ecuadorian Plaintiffs' Legal Team*

32.    The payments from the Plaintiffs' representatives were given to me by Mr. Fajardo in cash, or were deposited into my savings account at Banco Pichincha. On the occasions the Mr. Fajardo paid me in cash, he would typically give me an envelope with cash when we would meet at our usual meeting place on the corner of Rio Coca and 6 de Diciembre streets.

33.    True and accurate copies of deposit slips into my Banco Pichincha bank account of deposits of USD $1,000 made on December 23, 2009, and February 5, 2010, are marked as PX 1713 at CVX-RICO-5913096 and CVX-RICO-5913097, respectively. (True, correct, and clearer copies of the December 23, 2009 deposit and February 5, 2010 are marked PX 1719 and 1718, respectively). I know that these deposits were made by Ms. Ximena Centeno on behalf of the Ecuadorian Plaintiffs' team because, whenever any such payments were made, Mr. Fajardo would call me to let me know that the money had just been deposited. These deposits are also reflected in my Banco Pichincha account statements, true and accurate copies of which are marked as PX 1708 (December 2009) and PX 1689 (February 2010). The February 5, 2010 deposit slip (PX 1713 at CVX-RICO-5913097) bears the national identity number of 1716841547. From my review of PX 1742, which is a true and accurate copy of information publicly available on the Ecuadorian Internal Revenue Service's website, I know that this national identity number (1716841547) belongs to Ms. Ximena Maribel Centeno Viteri.

34.    Deposits of USD $1,000 were also made into my bank account on October 29, 2009, and November 27, 2009. True and accurate copies, certified by Banco Pichincha, of the October 29, 2009 and November 27, 2009 deposits are marked as PX 1713 at CVX-RICO-

13

5913099 and CVX-RICO-5913100.  These deposits are also reflected in my Account Statements, true and accurate copies of which are marked as PX 1706 and PX 1707.  I know of no reason other than my agreement with the Ecuadorian Plaintiffs' legal team for those deposits to have been made into my bank account.

35.    The monthly payments I received from the Plaintiffs' representatives and attorneys stopped after Mr. Zambrano was replaced as judge in the Chevron case by Mr. Leonardo Ordóñez, who had been appointed Chief Judge of the Provincial Court of Sucumbíos in February 2010. After Mr. Zambrano no longer presided over the Chevron case, I continued writing the court rulings for Mr. Zambrano in other civil cases, and he continued paying me for this work as his ghostwriter.

## Zambrano's Second Term Presiding Over the Chevron Case

36.    Around August of 2010, Chevron filed a motion for the recusal of Mr. Ordóñez as judge of the case, on which Mr. Zambrano had to rule. Mr. Zambrano saw this as an opportunity to once again take control of the Chevron case, and asked me to help him write the court ruling sustaining Judge Ordóñez's disqualification from the case. At that time, and due to those circumstances, I resumed my role as Mr. Zambrano's ghostwriter on the Chevron case. Mr. Zambrano also saw this as an opportunity to once again approach Chevron's attorneys to see if they were willing to pay to have the case decided in their favor. Just as before, Mr. Zambrano and I believed that Chevron could pay more money than the Ecuadorian Plaintiffs and could pay immediately, instead of paying only after the case was resolved.

37.    Although Mr. Zambrano and I had decided to approach Chevron first, my relationship remained close with the Ecuadorian Plaintiffs.  So much so that I wrote Mr. Donziger an e-mail on September 5, 2010, asking him to advise me on an immigration issue

14

related to my daughter who lived in Chicago.  In that email, I offered to "support the matter of

Pablo Fajardo"—a code term that I used to refer to the Chevron case—"so it comes out soon and

well."  A true and accurate copy of the email I sent Mr. Donziger on September 5, 2010, is

marked as PX 1745.  Mr. Donziger did not answer my e-mail directly, but Mr. Fajardo

subsequently told me that Mr. Donziger had received that e-mail and that he would look into my

request.

　　　38.　　This was not the first time I emailed Mr. Donziger.  I also emailed Mr. Donziger

twice in early March 2008 asking him for U.S. legal advice on behalf of a friend.  True and

correct copies of those emails are marked PX 2469, PX 1749, and PX 986.

*Mr. Zambrano and my Continued Efforts to Obtain Payment from the Litigants*

　　　39.　　Mr. Zambrano again asked me to get in touch with my contacts to try to negotiate a

financial agreement with Chevron.  Given that my previous attempts to approach Chevron

through Mr. Racines had been unsuccessful, on this occasion I asked an intermediary to propose

to Chevron's attorneys that Chevron write the final judgment in the case in exchange for a

payment to Mr. Zambrano and me.  The intermediary told me that s/he reached out to one of

Chevron's attorneys at Mr. Callejas's law firm, but that Chevron had no interest in striking any

such deal.  The end result of all this was that Chevron rejected any approach or negotiation with

Judge Zambrano and me, and we understood that there was no chance to negotiate an agreement

with Chevron.

　　　40.　　The individual who was my intermediary to contact Chevron was Doe 1, whom I

knew to be a close friend of one of the attorneys at Mr. Callejas's law firm.  I specifically told

Doe 1 to inform Doe 1's friend at Mr. Callejas's law firm that Mr. Zambrano would be willing to

let Chevron draft the judgment and that Mr. Zambrano would then sign Chevron's draft

15

judgment in exchange for a payment from Chevron to be later determined by mutual agreement. Doe 1 informed me that, as I had requested, Doe 1 conveyed this message to one of the attorneys at Mr. Callejas's law firm, but the offer was rejected. While I do not recall the specific date, I believe that this occurred sometime in September or October 2010.

41.     After learning of Chevron's refusal, I informed Mr. Zambrano, and he suggested and authorized me to seek an agreement with the Ecuadorian Plaintiffs' representatives so that they could obtain a verdict in their favor, in exchange for a payment of at least USD $500,000 to Mr. Zambrano; and for whatever amount I could negotiate or agree to for myself. The proposal entailed the Ecuadorian Plaintiffs' writing a draft of the judgment and Judge Zambrano signing it and issuing it as his own. I approached Mr. Fajardo and informed him of this offer. Mr. Fajardo reacted to the proposal enthusiastically. Mr. Fajardo stated that he needed to inform Mr. Donziger of the details of the proposal.

42.     Days later, I was called by Mr. Fajardo to a meeting that took place at the Honey & Honey restaurant in Quito. Mr. Fajardo stated that he informed Mr. Donziger of our conversation and Mr. Zambrano's proposal, and that Mr. Donziger wanted to hear it directly from me. Messrs. Fajardo, Yanza and Donziger were present at the meeting, in which I summarized the proposal in detail, explaining that, in exchange for a payment of at least $500,000, Mr. Zambrano would let the Ecuadorian Plaintiffs' team draft the judgment in their own favor, and that Mr. Zambrano would then sign this draft judgment. Mr. Donziger then asked several questions about the proposal regarding: how the Ecuadorian Plaintiffs' team could be sure that, if a payment were to be made to Mr. Zambrano, he would keep his word; how they could ensure that the agreement would remain secret; and how they could be sure that Mr. Zambrano would not alter the draft judgment. I informed them, in response, that Mr. Donziger

16

can trust that Mr. Zambrano would not deviate from the agreement and that he would keep it secret. Although Mr. Donziger appeared to be interested in the proposal, he stated that they did not have that sum of money to pay us at the moment.

43.   Mr. Zambrano later told me that he was in direct contact with Mr. Fajardo and that the Plaintiffs' representatives had agreed to pay him USD $500,000 from whatever money they were to collect from the judgment, in exchange for allowing them to write the judgment in the Plaintiffs' favor. Mr. Zambrano told me he would share with me part of that money once it was paid to him.

44.   From that point forward, our modus operandi regarding my role as ghostwriter in the Chevron case changed. Mr. Zambrano advised me that we had to be more careful because the attorneys for Chevron would be very attentive to any irregularities. Because of that, there were times when I traveled to Lago Agrio to work on the court rulings for the Chevron case. I would regularly travel to Lago Agrio by bus, and less frequently by plane on TAME. True and accurate copies, certified by TAME, of TAME's records reflecting my travel between Quito and Lago Agrio from 2009 through 2010 are marked as PX 1722 through PX 1726. Those records reflect, for example, that I traveled via TAME from Quito to Lago Agrio on August 4, 2010, returning to Quito on August 6, 2010; and that I again traveled from Quito to Lago Agrio on August 11, 2010, returning to Quito on August 12, 2010. The TAME flight records also reflect a one-way trip from Lago Agrio to Quito on December 15, 2010. I traveled to Lago Agrio by bus on that trip, and there were several other occasions that I traveled by bus to and from Lago Agrio to ghostwrite in the Chevron case for Mr. Zambrano.

45.   When I worked in Lago Agrio, I would often stay at Mr. Albán's apartment or Giuseppe Barna's home, and work on the court rulings for Mr. Zambrano at Mr. Zambrano's

Plaintiff's Exhibit 4800   p. 17 of 61

apartment in that city.  At the time, Mr. Zambrano and Mr. Albán both resided in the same

apartment building located at Francisco de Orellana street, in the city of Lago Agrio.

46.     When I traveled to Lago Agrio to work on the Chevron rulings for Mr. Zambrano,

I would work on a laptop, which Mr. Fajardo had previously provided to me personally on the

ground floor of the "Moncada" building in Lago Agrio.  I don't recall the precise date that Mr.

Fajardo provided me the laptop, but I believe that it was sometime during Mr. Zambrano's first

time presiding over the Chevron case.  Although I did work on the laptop while in Lago Agrio, I

did not keep it for very long and, weeks later, I returned it to Mr. Fajardo.  I was provided the

same laptop during Mr. Zambrano's second time presiding over the Chevron case.  I principally

worked on drafting the Chevron orders and rulings on Mr. Fajardo's computer in Mr.

Zambrano's apartment.  After I finished drafting a particular Chevron order, I would leave the

computer in Mr. Zambrano's apartment for Mr. Zambrano to obtain the draft.  From my own

personal observations and my conversations with Mr. Zambrano, I knew that Mr. Zambrano

typically would take the laptop with him to have the order printed out elsewhere, since Mr.

Zambrano did not have a printer in his apartment.  Once the order I drafted was printed, Mr.

Zambrano would have the order's contents re-typed onto his personal work computer by the

daughter of one of his friends, an attorney named Arturo Calva.  Mr. Zambrano told me that he

did this because he did not want to upload the draft order onto his work computer from a flash

drive, as he understood that computer technicians could detect when that happens and he did not

want it to become known that the orders had not been drafted on his work computer.

47.     In late January or early February of 2011, approximately two weeks before the trial

court in the Chevron case issued the judgment, Mr. Zambrano gave me a draft of the judgment so

that I could revise it.  It was through him that I found out that the attorneys for the Plaintiffs had

Plaintiff's Exhibit 4800   p. 18 of 61

written that judgment and had delivered it to him. Mr. Zambrano asked me to work on the document to fine-tune and polish it so it would have a more legal framework. In trying to recall these events initially, I assumed I had received the document on a flash drive given to me by Mr. Zambrano in the Quito airport, as Mr. Zambrano often provided me flash drives along with the court files. But later on, I specifically recalled that I worked on that document in Mr. Zambrano's residence in Lago Agrio using Mr. Fajardo's computer. When I arrived in Lago Agrio to work on the draft judgment, Mr. Zambrano, Mr. Fajardo and I met briefly in Mr. Zambrano's home. The draft judgment written by the Ecuadorian Plaintiffs' team was already on the laptop in Mr. Zambrano's apartment (the same one that Mr. Fajardo had previously provided me), and I told Mr. Fajardo and Mr. Zambrano that I would review and revise it. Before leaving, Mr. Fajardo told me to call him if I needed any further assistance.

48.   I do not recall the exact date this happened, but I worked on the draft judgment for several hours during two days. Mr. Zambrano explicitly asked me not to make copies and not to leave traces of the document or the changes I was making, outside of the file on which I worked on Mr. Fajardo's computer.

49.   I began working on the draft judgment as soon as I received it; I read its findings of fact, skimmed the legal conclusions and the operative part, and then I began to work on several sections that needed more structure and basis, especially with terminology related to environmental law. I remember that I called Mr. Fajardo on his cell phone to ask him about some sections of the document that confused me. Mr. Fajardo told me not to worry and that he would provide me what he called a "memory aid" to clarify my concerns. Mr. Fajardo did so later that day, providing me a document with some information about the case. In reality, the "memory aid" from Mr. Fajardo did not help me much with my doubts, so I ended that day working on

19

Plaintiff's Exhibit 4800   p. 19 of 61

punctuation and spelling.  I spent the following day making some changes to improve its structure and make it seem more like a judgment issued by the President of the Court of Sucumbíos.  Overall, I made very few changes to the draft judgment—mostly word changes due to personal preference—and my version of the draft judgment was not too different from the one that the Plaintiffs' lawyers had given to Mr. Zambrano.  I then returned the laptop and have never since seen the laptop again.

50.     When I first summarized these events in a sworn declaration in November 2012, I stated that I recalled receiving this "memory aid" from Mr. Fajardo while I was working on edits to the draft judgment, but I could not locate the document itself.  In or about late March or early April 2013, I located a copy of the "memory aid" that Mr. Fajardo had provided me as I was reviewing my files to determine whether I had any documents responsive to a subpoena served by the Ecuadorian Plaintiffs' legal team in the United States.  PX 1703 is a true and correct copy of the "memory aid" that I located at the time.  Among the records I reviewed in response to the Ecuadorian Plaintiffs' subpoena were records they demanded relating to my dismissal from the Provincial Court of Sucumbíos.  In my files, I found a document relating to my dismissal from the Provincial Court of Sucumbíos, behind which I found the "memory aid" about the Chevron case that I had received from Pablo Fajardo.  As stated above, I received this "memory aid" from Pablo Fajardo when I was working on the judgment for Mr. Zambrano, in late January or early February 2011. From the content and tone of the "memory aid," it is apparent that it was written by counsel for the Ecuadorian Plaintiffs.  The last paragraph of the document, for example, refers to Chevron's counsel as "the attorneys of my opposing party," which clearly reflects that the "memory aid" had indeed been drafted by Mr. Fajardo or other attorneys for the Ecuadorian Plaintiffs.

20

51.   Based on what Mr. Zambrano told me, it is my understanding that the Ecuadorian Plaintiffs' attorneys made changes to the judgment up to the very last minute before it was signed and issued by Mr. Zambrano.  I have reviewed the final judgment, marked as PX 399. Based on my review, I recognize that the final judgment's structure, wording and content largely mirror the draft judgment as I revised it approximately two weeks before the final judgment was issued.  Indeed, the final judgment appears to me to be a later, essentially identical version of the draft judgment on which I worked.

52.   After Mr. Zambrano issued the judgment, I assisted him over the phone as he prepared the supplemental and clarification order for the judgment.

53.   I knew at that time, and I know now, that the agreement in which I participated, and by which the Plaintiffs' representatives drafted the judgment in the Chevron case that Judge Zambrano issued, with my help, was a violation of Ecuadorian law.  According to Ecuadorian law, only a judge is authorized to write rulings and judgments. For these same reasons I knew at the time, as I know now, that the arrangement in which I participated, whereby I drafted court rulings for Mr. Zambrano steering the case in favor of the Plaintiffs, and was paid by the Plaintiffs' representatives for that work, was a violation of Ecuadorian law. And I knew at that time, as I know now, that the agreement that Mr. Zambrano told me he had reached with the Plaintiffs' attorneys, to let them draft the judgment in favor of the Plaintiffs and against Chevron, in exchange for him receiving USD $500,000 once they collected the money from the judgment, was a violation of Ecuadorian law.

54.   After Mr. Zambrano issued the judgment in the Chevron case, I focused on helping Mr. Zambrano with other civil and labor cases that required court rulings and judgments from him, and that is why I continued working as a ghostwriter for Judge Zambrano until his dismissal

21