# EXHIBIT A
# Part 2

as a judge at the end of February of 2012. I have no knowledge as to how the Chevron judgment at the appellate level, as signed by the appellate justices, or any subsequent court rulings in the case against Chevron were reached.

55.     I have had no other contact with the attorneys for the Ecuadorian Plaintiffs since then, except for a meeting arranged by Mr. Fajardo in his Quito office, located in a house at José de Abascal E12A-143 and Portete. I do not recall the exact date of the meeting, but I estimate it was around May or June of 2011. Also present at the meeting was an individual who was identified to me as one of the American attorneys representing the Ecuadorian Plaintiffs in the United States. It was explained to me at that meeting that Chevron was challenging the Ecuadorian legal system in the United States and the Ecuadorian plaintiffs needed people to testify about the suitability of the Ecuadorian legal system. The American attorney then proposed that I go to the United States to testify to that effect and thus discredit Chevron's attorneys. Mr. Fajardo offered to pay my airfare and hotel expenses and to give me USD $5,000 for giving that testimony. Mr. Fajardo told me I would have to travel in November of 2011 and I told him I would consider his offer. I did not disclose to the American attorney the payments I received from the Ecuadorian plaintiffs, my ghostwriting of orders and rulings for Mr. Zambrano, the $500,000 bribe from the Ecuadorian plaintiffs to Mr. Zambrano, or the general level of corruption in the Ecuadorian judicial system because I understood from Mr. Fajardo in advance what they needed me to say and I did not know or trust this American attorney anyway. Mr. Fajardo never again reaffirmed the proposal nor did I seek him out to follow up on the subject.

*Other Judge Zambrano Cases*

56.     In addition to the work I did on the Chevron orders and judgment, I also performed similar work on other judgments for other cases assigned to Judge Zambrano. On one particular

Plaintiff's Exhibit 4800   p. 22 of 61

occasion, the representatives of the Compañía Oleoducto de Crudos Pesados, known as OCP, paid Mr. Zambrano and me to issue an appellate judgment that they had written.  OCP operates pipelines in Ecuador for the transport of crude oil, and a judgment had been issued against OCP for environmental damages by the then-President of the Superior Court of Justice of Sucumbíos. An OCP representative gave me the draft of the appellate judgment on a flash drive, which was loaded onto Judge Zambrano's computer with the help of a computer technician. Judge Zambrano subsequently issued that judgment drafted by OCP as if he had written it himself. The OCP representative paid me $20,000 as Mr. Zambrano's intermediary, and paid Mr. Zambrano an additional $50,000 (through me) for having the draft appellate judgment signed by the appellate panel.  A true and accurate copy of the draft OCP judgment provided to me by OCP representatives and issued by Mr. Zambrano, which was contained on the computer that I provided to Chevron on July 13, 2012, is marked as PX 1468.  I recall that I flew to Lago Agrio via TAME a week or two before Mr. Zambrano issued the OCP judgment to deliver to him the flash drive containing the draft OCP judgment, and then flew back to Quito that same day.  This is confirmed by my TAME flight records, a true and correct copy of which are marked PX 1722, which reflect that I flew from Quito to Lago Agrio on July 15, 2009 and flew back to Quito on that same date.

57.    I have also reviewed the documents marked PX 1773 through PX 1875, PX 1468, and PX375.  Based on the writing style and structure of each document, as well as my specific recollections regarding the substance of these documents, I recognize each of these documents to be true and correct copies of orders and rulings I drafted as Mr. Zambrano's ghostwriter.

*My Decision to Come Forward and Reveal the Truth*

Plaintiff's Exhibit 4800   p. 23 of 61

58.     In April of 2012, Mr. Zambrano, who had recently been dismissed from his post as Judge of the Sucumbíos Court, authorized me to begin talks with Chevron's representatives to reveal the truth regarding the drafting of the judgment in the Chevron case.  In my initial discussions with Chevron's representatives, whom I never before met and did not trust, I attempted to negotiate a large payment for myself, as I believed that, with the substantial $18 billion judgment issued by Mr. Zambrano, Chevron would be willing to pay me a substantial amount for evidence and testimony that the judgment was illegal and obtained by fraud.  I believed that my greatest value to Chevron would be getting Mr. Zambrano to come forward, reveal the truth, and provide his evidence to Chevron, and that I would be rewarded handsomely for this.  That is why I took it upon myself to suggest to Mr. Zambrano that he attempt to negotiate a substantial million-dollar payment from Chevron on his own behalf, even though Chevron never suggested any such thing.

59.     I was mistaken in my belief that Chevron would pay for testimony.  The Chevron representatives I contacted told me repeatedly that Chevron absolutely would not pay me or Mr. Zambrano for testimony.  This is confirmed in the recordings that Chevron's representatives made of my conversations with them in the summer of 2012.  I did not know at the time that Chevron was making these recordings.

60.     Mr. Zambrano ultimately had a change of heart and told me that he was not willing to provide information to Chevron or to reveal the truth, for reasons he did not explain to me.  I decided, however, to continue cooperating because I believed at the time that the true facts regarding my and Mr. Zambrano's agreement and activities with the Ecuadorian Plaintiffs' representatives would inevitably be discovered, and that, as a result, the judgment would never be enforced.

24

Plaintiff's Exhibit 4800   p. 24 of 61

61.    Because I believed that discovery of the Mr. Zambrano's fraud was inevitable, I wanted to receive some payment, however modest, for the evidence I would provide. As detailed in my written agreements with Chevron, true and correct copies of which are attached as PX 1671 and PX 1672, Chevron paid me a combined total of $48,000—paid in increments at different points in time after I collected and turned over additional hard evidence—for the physical evidence I had in my possession or undertook efforts to obtain, and for the time and effort I expended in collecting this evidence. This evidence included my personal computer, which I had used to write many of the judgments and court rulings for Judge Zambrano (PX 1736), numerous flash drives (marked as PX 1737), two cellular telephones (marked as PX 1738), as well as my daily planners (PX 1733 and PX 1734), TAME shipping records (PX 1682), my cellular telephone records (PX 1727 and PX 1728), bank records relating to my Banco Pichincha bank account, and credit card statements.[2]  I also provided the investigators access to my email accounts "albertoguerrab@hotmail.com" and "albertoguerra54@hotmail.com."[3]  In addition, as described above, I later found and provided the "memory aid" that I received from Mr. Fajardo (PX 1703).

62.    On November 17, 2012, while in Chicago, I signed a declaration setting forth certain facts regarding my relationship and activities with Mr. Zambrano and the Ecuadorian Plaintiffs' representatives. Before that date, Chevron's representatives had informed me that they would protect me and my family from any retaliation resulting from public disclosure of my statements about corruption regarding the judgment, but I had not had any firm discussions with

---

[2] On October 2, 2013, I was provided and reviewed the contents of an image copy of the hard drive from the computer I had provided to Chevron's investigators in July 2012. Based on my review of the hard drive's contents, I confirm that the image was a true and accurate copy of the hard drive I provided to investigators, and that since turning over my computer to Chevron's investigators, my computer's contents have not been altered.

[3] After I gave my email accounts and passwords to the Chevron investigators, I saw that they attempted but were unable to access my accounts, presuambly due to the length of time that had elapsed since I had last accessed those e-mail accounts.

Plaintiff's Exhibit 4800   p. 25 of 61

Chevron concerning financial commitments or steps Chevron would take to protect me and my family.  Indeed, when I signed the declaration in November 2012, my family had not come to an internal agreement about whether to leave Ecuador for security reasons as a result of public disclosure of my statements regarding corruption, or who from my family might have to leave.  It was not until December 2012 that my wife, as well as my son and his family, decided that it would be too dangerous to remain in Ecuador once my statements became public.  It was only at that point that my U.S. lawyer, who I engaged in approximately mid-December, first began to negotiate with Chevron the terms of my agreement with Chevron, which was signed on January 27, 2013 (PX 1671), more than two months after I signed my initial declaration.  Throughout these negotiations (and even prior), Chevron's representatives made clear that my hopes for a large payment would not become a reality.  Chevron's representatives told me that they could only pay an amount necessary to maintain my quality of life in the United States and to ensure my and my family's safety.  I understood then, as I understand now, that Chevron did not and would not at any time pay me in exchange for my testimony.  I understand that Chevron's security payments to me and my family are in no way contingent upon the content of my statements or testimony, and that these security arrangements are not conditional on the outcome of any matter in which I testify.  Rather, I understand that, under my agreement with Chevron, I am obligated to tell the truth, as required by oath or any other legal obligation, and to make myself available to provide testimony or information.

63.    I know that, by coming forward and testifying in this case, I am confronting the Ecuadorian Plaintiffs, their lawyers and representatives, and the Government of President Rafael Correa. This decision has put my safety and security, as well as that of my family, at risk. My family and I fear that if we return to Ecuador, we will be persecuted, tortured, and/or

26

assassinated by the Government of Ecuador or other groups or people that the Government will not or cannot control.  Indeed, the Ecuadorian Plaintiffs' lawyers and their allies in the Correa administration have publicly attacked me in Ecuador and in the U.S., branded me a traitor, and threatened me with criminal prosecution.  ~~The Republic of Ecuador has retaliated against family members of mine that have remained in Ecuador, including a relative who lost his employment with the Ecuadorian government as a result of my testimony in this case.~~  The Ecuadorian Plaintiffs' lawyers have followed through on their threats, filing a fabricated criminal complaint against me in Ecuador.  The Government of Rafael Correa has supported the Ecuadorian Plaintiffs in this regard and is now actively pursuing an investigation of me for the crime of incitement of separatism.

64.     In January 2013, my family and I (including my wife, my son and his wife, and my son's young child) left Ecuador for the United States, due to my and my family's well-founded fears of persecution, torture, and/or assassination, as a result of my statements becoming public in this case.  Before my cooperation in this case, my wife and I lived very comfortably in a large 500 square meter (nearly 5,400 square foot) home, with a guest house for our maid, in an affluent, gated community in Quito, surrounded by friends, family, and community.  While I had been dismissed as a judge, I continued to consult as a lawyer from time-to-time and hoped one day to get my job as a judge back.  Since leaving Ecuador, a false and malicious criminal complaint has been filed against me by the Ecuadorian Plaintiffs' attorneys.  I have been branded a traitor by Ecuador, and I am living in a state of fear and insecurity in exile in a country whose language I do not speak.  My residence is a small two bedroom rental apartment.  I can no longer practice my profession or support my family.  My son and his wife, both of whom had stable employment in Ecuador, cannot work here or support themselves and their children.  The

27

monthly payments I receive from Chevron, as detailed in PX 1671, are for my and my family's subsistence and protection in the United States. This includes myself, my wife, my son, his two children, and his wife. I am not living nearly as comfortably as I was in Ecuador, and I am concerned for my and my family's future.

65.    Despite the Republic of Ecuador's and the Ecuadorian Plaintiffs' efforts to silence and intimidate me, I feel duty bound to state the truth in this case.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on _____, 2013.

_____
Alberto Guerra Bastidas

Plaintiff's Exhibit 4800   p. 28 of 61

## RIVERA INTERPRETING, INC.

*Tel. 310-621-7683 ◆ jrivera@riverainterpreting.com ◆ Fax 818-341-8958*

Oct. 9, 2013

Re: "WITNESS STATEMENT OF ALBERTO GUERRA BASTIDAS"

To Whom It May Concern:

I, Jesús Rivera, affirm that I am a certified judicial interpreter and translator of the Spanish and English languages. I am certified by:

- The Judicial Council of the State of California, since 2000,
- The Administrative Office of the U.S. Courts, since 2006,
- The American Translators Association (English←→Spanish) since 2008.

I affirm that "WITNESS STATEMENT OF ALBERTO GUERRA BASTIDAS" is a true and accurate translation of "DECLARACIÓN DE TESTIGO DE ALBERTO GUERRA BASTIDAS."

Sincerely,

Jesús Rivera

*Certified by the U.S. and California Courts and the ATA*

**CORTE DISTRITAL DE LOS ESTADOS UNIDOS
DISTRITO SUR DE NUEVA YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CHEVRON CORPORATION,

              Demandante,

     v.

STEVEN DONZIGER, et al.,

              Demandados.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Caso Núm. 11 Civ. 0691 (LAK)

## <u>DECLARACIÓN DE TESTIGO DE ALBERTO GUERRA BASTIDAS</u>

Yo, ALBERTO GUERRA BASTIDAS, por la presente declaro bajo pena de perjurio de conformidad con el Título 28, Art. 1746 del Código de los Estados Unidos, que lo expuesto a continuación es verdadero y correcto:

1.      Me llamo Alberto Guerra Bastidas.

2.      Soy ciudadano ecuatoriano, nacido en la ciudad de San Gabriel, provincia del Carchi, Ecuador, el 30 de mayo de 1954. El número de mi cédula de identidad nacional es el 170359028-9.

3.      Soy abogado titulado en la Universidad Central del Ecuador, graduado en 1982. Ejercí la profesión de abogado en el Ecuador de 1982 hasta 1995. En 1995 fui nombrado juez civil de primera instancia en la provincia de Pichincha, subordinado a la Corte Superior de Justicia de Quito. En 1998 fui nombrado juez de la Corte Provincial de Sucumbíos.

4.      En enero de 2002 fui designado Presidente de la Corte Provincial de Justicia de Sucumbíos y concluí mi período de dos años como Presidente en enero de 2004. Durante este período, desde mayo 13 de 2003 hasta el 7 de enero de 2004, fui el primer juez del juicio verbal

1

sumario Núm. 002-2003, radicado en contra de Chevron Corporation ("Chevron"). Al inicio del caso dudé sobre la validez de las pretensiones de los demandantes ecuatorianos, debido al acuerdo de finiquito y liberación celebrado entre la República del Ecuador y TexPet, pero, debido a la presión pública ~~impuesta por los representantes de los demandantes ecuatorianos~~ durante la primera audiencia del caso, permití que el caso continuara. Más concretamente, una manifestación masiva se había congregado frente al edificio de la corte y yo temí que si emitía una resolución en contra de los demandantes ecuatorianos, los manifestantes ocuparían la sede de la corte y pondrían en peligro mi seguridad personal y la de otras personas.

5.     Mi primera interacción con los representantes y abogados de los demandantes del caso en contra de Chevron, así como con los abogados de esta empresa, la firma Callejas & Asociados, incluyendo a Adolfo Callejas y Alberto Racines, fue en ejercicio de mi papel como juez de la causa.

6.     Se adjuntan fotografías fieles y exactas de algunos de los representantes de los demandantes ecuatorianos, los señores Steven Donziger, Luis Yanza y Pablo Fajardo, como pruebas PX 93 y PX 1680 (Donziger), PX 94 y PX 1679 (Yanza), y PX 95 y PX 1678 (Fajardo).

7.     En mayo de 2008, fui destituido como juez de la Corte de Sucumbíos. De acuerdo al Consejo de la Judicatura, la razón por la cual fui destituido fue haber hecho declaraciones en privado afirmando que el caso de Chevron debía ser declarado nulo; para esa época yo ya no conocía el caso Chevron. En realidad creo que fui destituido porque me enfrenté a los jueces Novillo y Yánez, que me sucedieron como jueces en este caso, con respecto a varias decisiones dudosas e ilegales que ellos habían tomado en el proceso, y sobre su práctica de pedir a los peritos el 25 por ciento de sus honorarios como contraprestación por su nombramiento como tales. La razón por la que creía que el caso Chevron debía ser declarado nulo era porque el

2

nombramiento de los peritos dirimentes estaba realizándose en contra de lo que establece la ley.

Debo aclarar que el nombramiento del Sr. Richard Cabrera, para realizar el "peritaje global", también fue en contra de lo que establece la ley procesal civil.

8.      Después de salir de la Corte de Justicia de Lago Agrio en mayo de 2008, yo continué manteniendo contacto con varias personas de la comunidad legal de Lago Agrio. Entre ellos se encontraba el señor Nicolás Zambrano, que en agosto de 2008 fue nombrado juez de la Corte Provincial de Sucumbíos, en el mismo puesto que yo había ocupado anteriormente. Se adjunta una fotografía fiel y exacta del Sr. Nicolás Zambrano, como prueba PX 129. Mi relación con el Sr. Zambrano se inició en 1998, tiempo en que él se desempeñaba como fiscal de la ciudad de Lago Agrio y yo como ministro juez de la Corte Provincial de Sucumbíos. Por aquel entonces, ocasionalmente, el Sr. Zambrano me pedía de favor que dictara providencias desestimando ciertos casos. Yo me cuidaba de emitir estas providencias con algún fundamento legal, pero tengo entendido que la parte beneficiadas por mis pronunciamientos le pagaban sobornos al Sr. Zambrano para arreglar que los casos fuesen fallados en su favor, y de cuando en cuando el Sr. Zambrano, compartía conmigo parte de esos sobornos.

9.      El Sr. Zambrano no fue el único abogado o litigante que me pagó sobornos a cambio de fallos favorables. Mientras fui juez, fue común que se pagasen sobornos a jueces a cambio de resultados favorables. Como abogado en libre ejercicio de mi profesión, en ocasiones yo pagué sobornos a jueces, incluso a jueces en las cortes principales de la nación, para que fallasen en favor de mis clientes o me ayudasen a obtener fallos favorables. También como juez, ocasionalmente yo acepté sobornos de litigantes a cambio de que expidiese fallos favorables. No soy el único juez que ha aceptado tales sobornos. Cuando fui juez, conocí a abogados que admitieron ante mí haber sobornado a otros jueces y de igual manera conocí a jueces que me

3

dijeron haber recibido sobornos de parte de abogados. Basándome en mis conocimientos personales, sé que el Sr. Zambrano y la mayoría de los jueces que laboraban en la Corte Provincial de Sucumbíos aceptaron sobornos de litigantes y abogados. Sé esto porque varios jueces ofrecieron compartir esos sobornos conmigo a cambio de que yo también fallase en favor de la parte que daba el soborno, particularmente cuando yo integraba la sala de apelaciones de tres jueces y a uno de esos jueces se le pagaba un soborno.

10.     De hecho, en febrero 2012 el Consejo de la Judicatura destituyó al Sr. Zambrano (junto con el Sr. Ordóñez) como juez de la Corte Provincial de Sucumbíos como consecuencia de que el Consejo determinó que el Sr. Zambrano había actuado impropiamente y sin fundamentos legales en un caso importante de narcotráfico. Más específicamente, al repasar los pronunciamientos del Consejo de la Judicatura en contra del Sr. Zambrano (PX 411), me enteré que el Sr. Zambrano impropiamente sustituyó una orden de prisión preventiva expedida en contra de un individuo acusado de los delitos de transportar 557 kilogramos de cocaína y de tenencia de armas, lo que ocasionó que aquél se fugase y evadiese el juicio. Además, el Sr. Zambrano, en un fallo de segunda instancia, impropiamente y sin justificativos legales redujo las condenas de dos cómplices convictos por el mismo caso de narcotráfico.. Si bien el pronunciamiento del Consejo de la Judicatura no determina si el Sr. Zambrano recibió un soborno a cambio de ese comportamiento impropio en el caso de narcotráfico, en la comunidad legal se sospechó ampliamente que el Sr. Zambrano había recibido tales sobornos.

### Mi acuerdo con el juez Nicolás Zambrano

11.     Como antiguo fiscal, el Sr. Zambrano tenía amplios conocimientos del derecho penal y su procedimiento, pero poseía conocimientos bastante limitados de la normativa civil en lo sustantivo y sobre todo en lo procedimental. Por lo tanto, después de ser nombrado juez de la

4

Corte de Sucumbíos, el Sr. Zambrano y yo llegamos a un acuerdo económico mediante el cual yo

le ayudaría a redactar las providencias y sentencias que el Sr. Zambrano tenía que expedir como

juez en los casos civiles que le eran asignados por sorteo, a cambio de la retribución o pago de

1.000 dólares mensuales aproximadamente, por ese trabajo. A esa época yo estaba afrontando

una situación financiera difícil por haber sido despedido, injustificadamente, de la Corte de

Justicia de Sucumbíos, por lo cual accedí a este arreglo. Yo era el "escritor fantasma" del Sr.

Zambrano y escribí la gran mayoría de las providencias dictadas en los casos civiles que al Sr.

Zambrano correspondió, incluyendo el caso Chevron, lo cual perduró hasta febrero de 2012,

cuando el Sr. Zambrano fue separado de la Corte Provincial de Sucumbíos.

   12.    Yo mantuve una amistad personal con el Sr. Zambrano y dado que yo lo visitaba

frecuentemente en su despacho de juez, pude observar sus hábitos de trabajo personales. El Sr.

Zambrano típicamente trabajaba en su oficina, con la puerta de vidrio cerrada con llave. Cuando

yo llegaba, yo tocaba la puerta y luego que confirmaba que era yo, y si estaba solo, el Sr.

Zambrano me dejaba entrar en su oficina y luego cerraba la puerta con llave para que

pudiésemos hablar en privado. Si bien al Sr. Zambrano le interesaba más el derecho penal,

manifestaba escaso interés y tenía conocimientos limitados en el derecho civil. Esta es una de las

razones por la que me pidió que fuese su escritor fantasma en su casos civiles. Por mis

conversaciones con el Sr. Zambrano yo sabía que él tenía sólo conocimientos básicos del caso

Chevron, y no los conocimientos detallados que se hubiesen requerido para redactar la sentencia

que eventualmente fue expedida en este caso en febrero de 2011. El Sr. Zambrano era

particularmente allegado al juez Núñez. Yo también supe que a partir de aproximadamente 2009

el Sr. Zambrano tuvo una relación sentimental con Liliana Suárez, la secretaria relatora de la

Corte.

Plaintiff's Exhibit 4800   p. 34 of 61

13.    Cuando empecé a trabajar como el escritor fantasma del Sr. Zambrano, yo solía trabajar generalmente los fines de semana en mi residencia en Quito, redactando las providencias y sentencias que el Sr. Zambrano tenía que emitir la semana siguiente. El Sr. Zambrano y yo nos reuníamos de manera recurrente en el aeropuerto de Quito cuando él hacía escala para volar a su casa en Manta y ocasionalmente a Guayaquil, y en ese momento me entregaba los expedientes de los procesos, para que yo trabajara en las providencias y sentencias correspondientes a cada caso. Dependiendo del itinerario del Sr. Zambrano, nos encontrábamos de nuevo en el aeropuerto de Quito cuando él venía de Manta o de Guayaquil e iba en retorno a la ciudad de Lago Agrio, y yo le entregaba los expedientes de los casos y unas memorias extraíbles con los archivos de las providencias respectivas. El mismo procedimiento se aplicaba para el caso Chevron. El Sr. Zambrano me entregaba los documentos y posteriormente yo trabajaba en las providencias que le entregaba para que él las firmara como el Juez de la causa. No utilizábamos el correo electrónico para esto por dos razones. La primera, porque el Sr. Zambrano y yo no éramos muy hábiles con la tecnología, entonces se nos dificultaba mandar los archivos por correo electrónico, y la segunda, porque el Sr. Zambrano es muy cuidadoso y desconfiado, por lo que me decía que teníamos que ser cuidadosos y no dejar evidencia alguna de que yo le estaba ayudando a redactar sus providencias, hecho que violaba las leyes ecuatorianas.

14.    Otro mecanismo que utilizábamos, menos frecuente, es que el Sr. Zambrano me enviaba los documentos en paquetes por carga en la aerolínea TAME, la aerolínea estatal y la más grande del Ecuador, y yo se los regresaba de la misma manera, por envío vía TAME. La

Plaintiff's Exhibit 4800   p. 35 of 61

prueba PX 1682 es copia fiel, verdadera y certificada de los registros de paquetes enviados a mí

o por mi persona, y que yo obtuve directamente de TAME y luego le proporcioné a Chevron[1].

15.    Cuando yo le enviaba documentos al Sr. Zambrano mediante TAME, yo aportaba

una descripción general del contenido de los envíos, tal como "caja con documentos" o "paquete

con documentos". Las descripciones generales mías del contenido de los envíos se reflejan

contemporáneamente en la columna de "contenido" de los registros de TAME. Cuando yo le

enviaba los borradores de las providencias al Sr. Zambrano, generalmente se las enviaba en

memorias extraíbles incluidas en los paquetes o cajas de documentos. De hecho, esto se confirma

en PX 1682 en el asiento de mi envío hecho al Sr. Zambrano el 3 de octubre, 2011, que constata

que en esa fecha envié al Sr. Zambrano un "sobre con una memoria extraíble". La razón por la

cual esa fecha refleja el envío de una memoria extraíble, pero las otras fechas no, es porque el

único artículo que le envié al Sr. Zambrano en esa fecha fue la memoria extraíble.

16.    En algunas ocasiones, según instrucciones del Sr. Zambrano, yo envié documentos

y borradores de providencias a nombre de otras personas de Lago Agrio para que ellos se los

entregasen al Sr. Zambrano. Por ejemplo, en dos ocasiones en noviembre de 2009 le envié a

Narcisa León, empleada de la Corte Provincial de Sucumbíos, borradores de providencias que yo

había preparado, para que se las entregase al Sr. Zambrano. En otras ocasiones, envié

documentos y borradores de providencias que yo había preparado a un juez y amigo mutuo,

Fernando Albán, quien luego de recibirlos los entregó al Sr. Zambrano.

17.    En cuanto a los pagos que recibí del Sr. Zambrano para llevar a cabo este trabajo

de escritor fantasma, debo indicar que, por lo general, él me entregaba dinero en efectivo durante

nuestras rápidas reuniones en el aeropuerto de Quito. En otras ocasiones, el Sr. Zambrano me

---

[1]        PX 1721 es una copia fiel y exacta de la carta de TAME que se incluye en estos registros.

Plaintiff's Exhibit 4800   p. 36 of 61

depositaba dinero directamente en mi cuenta bancaria en el Banco Pichincha. Se anexan las pruebas PX 1704 hasta PX 1708 y PX 1710, que son copias fieles y verdaderas de los estados de cuenta mensuales que obtuve del Banco Pichincha correspondientes a mi cuenta número 621310861 del Banco Pichincha. Se anexan las pruebas PX 1711 hasta PX 1717, que son copias fieles y verdaderas de comprobantes de mi cuenta bancaria, que yo solicité y recibí del Banco Pichincha, y que fueron certificados por el Banco Pichincha.

   18.   Específicamente, el 24 de junio de 2011 el Sr. Zambrano depositó 300 dólares en mi cuenta del Banco Pichincha. En particular, PX 1713 (CVX-RICO-5913098) y PX 1684 incluyen una papeleta de depósitos del 24 de junio, 2011, certificada por el Banco Pichincha, que constata un depósito de 300 dólares hecho por el Sr. Zambrano en mi cuenta. Esa papeleta de depósitos incluye la firma del Sr. Zambrano, la cual reconozco dadas las numerosas veces que he visto su firma característica, incluso en las providencias que yo le preparé en el caso Chevron y otros casos civiles. Debajo de la firma del Sr. Zambrano, la papeleta de depósitos también incluye un número de la cédula nacional de identidad, el 0906018262. En el Ecuador se le asigna a todo ciudadano un número de cédula nacional exclusivo. Los números de cédulas aparecen publicados en internet por el Servicio de Rentas Internas del Ecuador. PX 1743 es una copia fiel y verdadera de datos disponibles al público en el sitio de internet del Servicio de Rentas Internas del Ecuador, y muestra que el número de cédula nacional del Sr. Zambrano es el 0906018262, el mismo número escrito en la papeleta de depósitos del 24 de junio, 2011 (PX 1713).  PX 1704 y PX 1683 son copias fieles y verdaderas del estado de cuenta de junio, 2011, de mi cuenta en el Banco Pichincha, y constata un depósito de 300 dólares que el Sr. Zambrano hizo en mi cuenta y que quedó asentado el 27 de junio, 2011. Afirmo una vez más que el depósito de 300 dólares que hizo el Sr. Zambrano fue un pago por mis servicios como su escritor fantasma.

Plaintiff's Exhibit 4800   p. 37 of 61

19.     Además, yo acostumbraba anotar en mis agendas el recibo de pagos de parte del Sr. Zambrano. Se anexan las pruebas PX 1733 y PX 1734, que son copias fieles y verdaderas de mis apuntes en mi puño y letra que constan en mis agendas de julio 2011 a julio 2012, aproximadamente. Era mi costumbre regular anotar en mis agendas acontecimientos diarios cuando ocurrían, y basándome en lo que yo observaba personalmente. Le entregué a Chevron estas agendas, pero, desgraciadamente no pude hallar mis agendas previas a julio de 2011. No obstante, los registros que sí hallé confirman que el Sr. Zambrano me aportó dinero en efectivo por mi trabajo como su escritor fantasma.

20.     Por ejemplo, el asiento en mi agenda para el 15 de julio de 2011 [del cual se incluye una copia fiel y verdadera como prueba PX 1735 (CVX-RICO-5912802)], dice que en esa fecha yo "Recibo 500 de Nicolas – doy 100 a Mamá pago 27 en gasolina". El asiento para el 14 de octubre de 2011 de esa misma prueba (CVX-RICO-5912845) dice "Recibo de Nicolas Zambrano 500,00". Estas dos anotaciones reflejan pagos de 500 dólares de parte del Sr. Zambrano por mis servicios como su escritor fantasma. Asimismo, el asiento en mi agenda del 24 de febrero de 2012 (cuya copia fiel y verdadera se anexa como prueba PX 1685) dice que "Nicolás me remite 2.000", lo que refleja un pago de 2.000 dólares que me hizo el Sr. Zambrano. Este pago de 2.000 dólares del Sr. Zambrano también consta en mi estado de cuenta de febrero de 2012 de mi cuenta en el Banco Pichincha, del cual se anexa una copia fiel y verdadera como PX 1705.  Los apuntes acerca del Sr. Zambrano que aparecen en mi agenda y que constan en PX 1735 y PX 1685, fueron hechos contemporáneamente en la época en que el Sr. Zambrano me hizo esos pagos, y se fundamentan en lo que yo observé personalmente.

9

Plaintiff's Exhibit 4800   p. 38 of 61

## El primer período del Sr. Zambrano como juez del caso Chevron

21.      En agosto de 2009, el Sr. Juan Núñez, que en ese momento era el juez del caso Chevron, se vio envuelto en el escándalo de los vídeos. Por ese escándalo el juez Núñez tuvo que excusarse de la tramitación del caso Chevron. Por mandato legal, le correspondió al juez Zambrano presidir el caso Chevron a partir de octubre de 2009.

*Las gestiones del Sr. Zambrano y mías para obtener pagos de los litigantes*

22.      En el momento en que quedó claro que el Sr. Núñez tendría que salir del caso Chevron, el Sr. Zambrano me pidió que intentase, a través de mis amistades, ponerme en contacto con los abogados de la compañía Chevron para negociar un acuerdo por el cual la compañía nos pagaría al Sr. Zambrano y a mí por emitir la sentencia definitiva a favor de Chevron. El Sr. Zambrano me dijo que Chevron tendría mucho más dinero que los demandantes para este acuerdo y que por lo tanto podríamos conseguir un mejor arreglo y mayores beneficios para nosotros. No recuerdo la fecha exacta, pero aproximadamente entre agosto y octubre de 2009 yo me comuniqué con el abogado Alberto Racines, de la firma del Sr. Adolfo Callejas, para decirle que yo podía crear una conexión directa con el juez Zambrano para que pudiesen hablar y negociar temas importantes y decisivos del caso, incluyendo la sentencia. Le insistí al Sr. Racines durante varias semanas para este acuerdo, pero él rechazó mi propuesta y nunca se logró conseguir un acercamiento con Chevron. Se conocía públicamente que yo era allegado al Sr. Zambrano, y algunos abogados de la ciudad de Lago Agrio, incluso un abogado allegado a los abogados locales de Chevron, sabían que yo le redactaba las decisiones a su nombre. Ahora bien, es importante aclarar que no tengo conocimiento personal de que los abogados de Chevron supieran de mi acuerdo con el Sr. Zambrano y los representantes de Chevron jamás me pagaron por ningún trabajo que yo realicé a nombre del juez Zambrano.

10

23.     Puse al Sr. Zambrano al tanto del rechazo por parte de Chevron, y él se sintió decepcionado por ello. Después de esto el Sr. Zambrano me dijo que yo debería reunirme con el Sr. Pablo Fajardo porque ya había llegado a un acuerdo con los representantes de los demandantes para mover el proceso de manera rápida a favor de ellos. No me contó los detalles de ese acuerdo, pero me dijo que yo debería hacer un arreglo económico directamente con el Sr. Fajardo para que me pagasen por mis servicios como escritor fantasma. Más adelante el Sr. Fajardo y yo nos reunimos en Quito en una esquina de las avenidas Río Coca y 6 de Diciembre, y hablamos de mi rol como escritor fantasma del Sr. Zambrano. Ambos acordamos tres cosas: (1) yo haría que el caso procediera con rapidez, (2) se le limitaría el espacio procesal a Chevron no concediéndole sus peticiones respecto a los errores esenciales en los autos que yo escribiese, para no retardar el proceso, y (3) los representantes de los demandantes me pagarían 1.000 dólares mensuales por escribir las providencias que le correspondía hacer al Sr. Zambrano. Yo tenía entendido que tenía que seguir estas directrices durante el resto del caso.

24.     El Sr. Fajardo me dijo que teníamos que reunirnos con el Sr. Donziger para repasar este acuerdo. El Sr. Fajardo me había explicado anteriormente que el Sr. Donziger era el principal en el equipo de los demandantes, por lo que debía informarle sobre todo lo que estaba ocurriendo en el caso.  De hecho, el Sr. Fajardo me dijo en confianza algunos de los detalles del trabajo interno del equipo legal de los demandantes, incluso, por ejemplo, que el Sr. Donziger viajaba a Europa ocasionalmente porque en Europa vivían inversionistas que financiaban el litigio.

25.     Tal como lo había solicitado el Sr. Fajardo, varios días después de mi encuentro con él en la esquina de Río Coca y 6 de Diciembre, me reuní con los señores Fajardo, Donziger y Luis Yanza en el restaurante Honey & Honey, ubicado en la avenida Eloy Alfaro y calle

11

Portugal, de la ciudad de Quito. Yo tenía entendido que el Sr. Yanza era hombre de confianza del Sr. Fajardo, pero debido a que rara vez habló en las reuniones a las que asistí con los Sres. Donziger y Fajardo, es poco lo que sé acerca de su participación en el equipo de los demandantes ecuatorianos.

26.     Se anexan en la prueba PX 1686 fotografías del restaurante Honey & Honey, lugar en el que me reuní con los Sres. Fajardo, Donziger y Yanza.

27.     En esta reunión en el restaurante Honey & Honey, el Sr. Fajardo recapituló nuestro acuerdo de tres puntos, explicándole al Sr. Donziger que yo redactaría en secreto las providencias del juez Zambrano para no retardar el caso, a cambio del pago de 1.000 dólares mensuales por parte del equipo de los demandantes ecuatorianos. El Sr. Donziger luego me preguntó si el resumen hecho por el Sr. Fajardo era correcto, y le dije directamente al Sr. Donziger que efectivamente, esos eran los términos de nuestro acuerdo y que el Sr. Zambrano me había autorizado para hacer este acuerdo. El Sr. Donziger luego me agradeció por mi trabajo como escritor secreto del Sr. Zambrano en este caso y por ayudar a direccionar el caso a favor de los demandantes.

28.     También recuerdo que, o bien en esta reunión o en una segunda reunión que tuve con el Sr. Donziger en el restaurante Honey & Honey, que describo en detalle más abajo, el Sr. Donziger recalcó la necesidad de evitar conceder las peticiones de Chevron sobre errores esenciales a toda costa, porque el objetivo suyo y del Sr. Fajardo era lograr que se expidiese pronto la sentencia. En una de estas dos reuniones que tuvimos en el restaurante Honey & Honey, el Sr. Donziger también mencionó (después de que yo le pregunté si podría ayudar a mi hijo con asuntos de inmigración en los Estados Unidos) que tenía trato amistoso con el

12

presidente de los Estados Unidos, Barack Obama, desde que ambos eran estudiantes universitarios.

29.     Durante el tiempo que el Sr. Zambrano fue el juez que conocía el caso Chevron, yo manejaba los trámites tras bastidores. El Sr. Zambrano y yo acordamos que yo redactaría las providencias en favor de los demandantes. Tal como el Sr. Fajardo y yo lo habíamos hablado y planificado, ocasionalmente yo redactaba providencias que en parte resolvían a favor de Chevron para evitar despertar sospechas. El Sr. Zambrano rara vez me daba directrices sobre cómo redactar las providencias en específico, confiando en que yo manejaría el proceso acorde a los intereses de los demandantes. Debido a que los Sres. Zambrano y Fajardo sabían que yo mantendría la directriz procesal afín a los intereses de los demandantes, y dado el objetivo primordial de no desacelerar el curso del proceso, yo no tenía que consultar con ellos sobre las providencias. Sin embargo, en varias ocasiones, no recuerdo con exactitud las fechas, el Sr. Fajardo y yo conversamos temas específicos del procedimiento del caso contra Chevron. A veces estas conversaciones eran por teléfono y otras veces hablamos de estos temas cuando el Sr. Fajardo me entregaba dinero en persona.

30.     A mi entender, los representantes legales de Chevron no conocían que los representantes legales de los demandantes me estaban pagando dineros, ni sabían que yo actuaba como escritor fantasma del Sr. Zambrano direccionando el caso en favor de los demandantes.

*Los borradores de providencias del caso Chevron en mi computador particular*

31.     Durante el período del Sr. Zambrano como juez del caso Chevron, yo alcancé a escribir muchas providencias del caso Chevron y de otros procesos civiles en mi computador de mi casa en Quito. Usualmente yo preparaba una providencia copiando otra providencia anterior y luego adaptándola al asunto presente. Una vez que terminaba de redactar la providencia, o bien

13

le entregaba ese borrador al Sr. Zambrano en el aeropuerto de Quito, o se lo enviaba a él (directamente o mediante intermediarios) por la aerolínea TAME. Se anexan como pruebas PX 1172, PX 1173, PX 1186, PX 1190 hasta PX 1193, PX 1197, PX 1209, PX 1220 y PX 1243 copias fieles y verdaderas de borradores de providencias que yo escribí para el Sr. Zambrano en el caso Chevron, y que fueron localizadas en mi computador personal que le aporté a Chevron el 13 julio de 2011 (e identificado como PX 1736).

*Pagos de parte del equipo legal de los demandantes ecuatorianos*

32.     Los pagos por parte de los representantes de los demandantes me los entregaba el Sr. Fajardo en efectivo, o fueron depositados en mi cuenta de ahorros en el Banco Pichincha. En las ocasiones en que el Sr. Fajardo me pagó en efectivo, típicamente me entregaba un sobre con efectivo cuando nos reuníamos en nuestro sitio usual de la esquina de las avenidas Río Coca y 6 de Diciembre.

33.     Se anexan copias fieles y verdaderas de papeletas de depósitos del Banco Pichincha por depósitos de 1.000 dólares hechos en mi cuenta bancaria el 23 de diciembre de 2009, y 5 de febrero de 2010, como prueba PX 1713 en CVX-RICO-5913096 y CVX-RICO-5913097,  respectivamente. (Se anexan como pruebas PX 1719 y 1718 copias fieles, verdaderas y más claras de los depósitos del 23 de diciembre de 2009 y del 5 de febrero de 2010, respectivamente). Sé que estos depósitos fueron hechos por la Sra. Ximena Centeno a nombre del equipo de los demandantes ecuatorianos, porque cada vez que se me hacían pagos por esta razón, el Sr. Fajardo me llamaba telefónicamente para avisarme que se me había depositado el dinero. Estos depósitos también aparecen en mis estados de cuenta del Banco Pichincha, cuyas copias fieles y verdaderas se anexan como PX 1708 (diciembre de 2009) y PX 1689 (febrero de 2010). La papeleta de depósitos del 5 de febrero de 2010 (PX 1713 en CVX-RICO-5913097)

14

incluye el número de cédula de identidad 1716841547. Luego de revisar el PX 1742, que es

copia fiel y verdadera de información disponible públicamente en el sitio de internet del Servicio

de Rentas Internas del Ecuador, sé que este número de cédula (1716841547) le corresponde a la

Sra. Ximena Maribel Centeno Viteri.

34.     También se hicieron depósitos de 1.000 dólares en mi cuenta bancaria el 29 de

octubre de 2009 y el 27 de noviembre de 2009. Se adjuntan como PX 1713 en CVX-RICO-

5913099 y CVX-RICO-5913100 copias fieles y verdaderas certificadas por el Banco Pichincha,

de los depósitos del 29 de octubre de 2009 y del 27 de noviembre de 2009. Estos depósitos

también constan en mis estados de cuenta, cuyas copias fieles y verdaderas se anexan como PX

1706 y PX 1707. No sé de ningún otro motivo que justifique esos depósitos en mi cuenta

bancaria, aparte de mi acuerdo con el equipo legal de los demandantes ecuatorianos.

35.     Los pagos mensuales que recibí de los representantes y abogados de los

demandantes cesaron después de que el Sr. Zambrano fue sustituido como juez del caso Chevron

por el Sr. Leonardo Ordóñez, quien fue elegido Presidente de la Corte Provincial de Sucumbíos

en febrero de 2010.  Después de que el Sr. Zambrano dejó de conocer el caso Chevron, continué

redactando las providencias del Sr. Zambrano en otros casos civiles, y él continuo pagándome

por este trabajo que hacía como su escritor fantasma.

### El segundo período de Zambrano como juez del caso Chevron

36.     Aproximadamente en agosto de 2010, Chevron radicó una petición de recusación

del Sr. Ordóñez como juez del caso, asunto que debió decidir el Sr. Zambrano. El Sr. Zambrano

vio en esto una oportunidad para retomar el control del caso Chevron y me pidió que le ayudase

a redactar la providencia en que se aceptaba la recusación del juez Ordóñez. A ese momento y

por tal circunstancia, reanudé mi papel de escritor fantasma del Sr. Zambrano en el caso

15

Plaintiff's Exhibit 4800   p. 44 of 61

Chevron. El Sr. Zambrano también vio en esto otra oportunidad para ponerse en contacto una vez más con los abogados de Chevron, para ver si estaban dispuestos a pagar para que el caso se decidiese en su favor. Al igual que antes, el Sr. Zambrano y yo creíamos que Chevron podría pagar más dinero que los demandantes ecuatorianos y que podría pagar inmediatamente, en lugar de pagar sólo después de que el caso se hubiese resuelto.

37.    Si bien el Sr. Zambrano y yo decidimos abordar primero a Chevron, mi relación con los demandantes ecuatorianos continuaba siendo estrecha. Tan es así que le escribí un correo electrónico al Sr. Donziger, el 5 de septiembre de 2010, pidiéndole que me orientase en un asunto de inmigración de una hija mía que vive en Chicago. En ese correo ofrecí mi "apoyo para que el tema relacionado con Pablo Fajardo salga pronto y bien". El "tema" fue mi término en clave para el caso Chevron. Se anexa como PX 1745 una copia fiel y verdadera del correo electrónico que le envié al Sr. Donziger el 5 de septiembre de 2010. El Sr. Donziger no respondió directamente mi correo, pero el Sr. Fajardo me dijo posteriormente que el Sr. Donziger había recibido ese correo y que averiguaría respecto de mi pedido.

38.    Esa no fue la primera vez que yo le enviaba un correo al Sr. Donziger. A principios de marzo de 2008 le envié dos correos solicitándole asesoramiento sobre las leyes de EE.UU., a nombre de una amistad. Se anexan como pruebas PX 2469, PX 1749 y PX 986 copias fieles y verdaderas de esos correos.

*Los continuos intentos del Sr. Zambrano y de mi parte para obtener un pago de los litigantes*

39.    El Sr. Zambrano nuevamente me pidió que me comunicase con mis contactos para intentar negociar un acuerdo económico con Chevron. Dado a que mis intentos anteriores de abordar a Chevron a través del Sr. Racines habían sido infructuosos, en esta ocasión le pedí a otro individuo que fuese mi enlace para proponerles a los abogados de Chevron que Chevron

16

escribiese la sentencia definitiva del caso a cambio de hacer un pago para el Sr. Zambrano y para mí. El individuo me dijo que se había comunicado con uno de los abogados de Chevron de la firma legal del Sr. Callejas, pero que Chevron no tenía interés en hacer ese tipo de acuerdos. El resultado de todo esto fue que Chevron rechazó todo contacto o negociación con el juez Zambrano y conmigo, y ambos entendimos que no había posibilidad alguna de negociar un arreglo con Chevron.

40.     El individuo que fue mi enlace para comunicarme con Chevron es Fulano 1, a quien yo conocía como amigo allegado de uno de los abogados de la firma del Sr. Callejas. Le dije a Fulano 1 específicamente que informase a su amistad del estudio del Sr. Callejas que el Sr. Zambrano estaría dispuesto a dejar que Chevron redactase el borrador de la sentencia definitiva, y que el Sr. Zambrano firmaría ese borrador de sentencia de Chevron a cambio de que Chevron le pagase una suma de dinero a determinarse de común acuerdo. Fulano 1 me informó que, tal como yo le había solicitado, transmitió ese recado a uno de los abogados de la firma del Sr. Callejas, pero que se rechazó la oferta. Si bien no recuerdo la fecha específica, creo que esto ocurrió en septiembre u octubre de 2010, aproximadamente.

41.     Una vez que conocí la respuesta negativa de Chevron, informé de ello al Sr. Zambrano y él me sugirió y autorizó intentar llegar a un acuerdo con los representantes de los demandantes ecuatorianos, con el fin de que estos obtuviesen un veredicto a su favor, a cambio de un pago de al menos 500.000 dólares para el Sr. Zambrano, y en mi beneficio, de la suma que pudiese concertar o acordar. La propuesta implicaba que los demandantes ecuatorianos redactarían el borrador de la sentencia y que el juez Zambrano la firmaría y la publicaría como propia. Ese acercamiento lo hice con el Sr. Fajardo, que reaccionó con entusiasmo ante la

Plaintiff's Exhibit 4800   p. 46 of 61