# EXHIBIT A
# Part 3

propuesta. El Sr. Fajardo dijo que necesitaba informar al Sr. Donziger sobre el contenido de la propuesta.

42.    Días después, el Sr. Fajardo me citó para una reunión que se llevó a cabo en el restaurante Honey & Honey en Quito. El Sr. Fajardo me dijo que había informado al Sr. Donziger acerca de nuestra conversación y la propuesta del Sr. Zambrano, y que el Sr. Donziger quería escucharla directamente de mí. Los Sres. Fajardo, Yanza y Donziger estuvieron presentes en esa reunión, en la que recapitulé la propuesta en detalle, explicando que a cambio de un pago de 500.000 dólares al menos, el Sr. Zambrano dejaría que el equipo de los demandantes ecuatorianos redactase la sentencia en favor de ellos mismos, y que el Sr. Zambrano firmaría ese borrador de sentencia. El Sr. Donziger luego hizo varias preguntas sobre la propuesta, referentes a cómo podía el equipo de los demandantes ecuatorianos estar seguro de que el Sr. Zambrano no iba a tomar el dinero y luego no cumplir su palabra, sobre cómo asegurar la reserva del acuerdo y cómo asegurar que el Sr. Zambrano no modificaría el proyecto de sentencia. En respuesta a ello les informé que el Sr. Donziger podía confiar en que el Sr. Zambrano no se desviaría del acuerdo y que guardaría el secreto. Si bien parecía que el Sr. Donziger estaba interesado en la propuesta, afirmó que en ese momento ellos no tenían esa cantidad para pagarnos.

43.    Posteriormente, el Sr. Zambrano me dijo que estaba en contacto directo con el Sr. Fajardo y que los representantes de los demandantes habían accedido a pagarle 500.000 dólares del dinero que ellos recolectasen en el futuro con la sentencia, a cambio de permitirles a ellos escribir la sentencia a favor de los demandantes. El Sr. Zambrano me dijo que me iba a compartir parte de ese dinero una vez que le hubiesen pagado a él.

44.    De ahí en adelante cambió nuestro modus operandi con respecto a mi función como escritor fantasma del caso Chevron. El Sr. Zambrano me señaló que había que ser más

Plaintiff's Exhibit 4800   p. 47 of 61

cuidadosos puesto que los abogados de Chevron estaban muy pendientes de encontrar

irregularidades; de ahí que unas veces yo viajaba a Lago Agrio, donde trabajaba en las

providencias del caso Chevron. Regularmente yo viajaba a Lago Agrio en autobús, y menos

frecuentemente por avión vía TAME. Se adjuntan como PX 1722 hasta PX 1726 copias fieles y

verdaderas, certificadas por TAME, de los registros de TAME en que constan mis viajes entre

Quito y Lago Agrio del 2009 hasta fines del 2010. Por ejemplo, esos registros constatan que

viajé en TAME de Quito a Lago Agrio el 4 de agosto de 2010, con regreso a Quito el 6 de agosto

de 2010; y que nuevamente viajé de Quito a Lago Agrio el 11 de agosto de 2010, con regreso a

Quito el 12 de agosto de 2010. Los registros de vuelos de TAME también constatan un viaje de

ida de Lago Agrio a Quito el 15 de diciembre de 2011. En esa ocasión yo viajé a Lago Agrio en

autobús, y en varias ocasiones más viajé en autobús de ida y vuelta a Lago Agrio para escribir en

secreto para el Sr. Zambrano en el caso Chevron.

45.     Cuando trabajaba en Lago Agrio, a menudo pernoctaba en el departamento del Sr.

Albán o en la casa del Sr. Giuseppe Barna, y laboraba haciendo las providencias judiciales para

el Sr. Zambrano en el departamento del propio Sr. Zambrano en esa ciudad. En esa época los

Sres. Zambrano y Albán vivían en el mismo edificio de departamentos ubicado en la calle

Francisco de Orellana en la ciudad de Lago Agrio.

46.     Cuando yo viajaba a Lago Agrio para trabajar en las providencias del caso

Chevron para el Sr. Zambrano, hacía ese trabajo en un computador portátil que el Sr. Fajardo

previamente me había entregado en persona en la planta baja del edificio Moncada, ubicado en

Lago Agrio. No recuerdo con exactitud la fecha en que el Sr. Fajardo me entregó ese

computador, pero creo que fue durante el primer período del Sr. Zambrano como juez del caso

Chevron. Aun cuando sí trabajé con ese computador portátil en Lago Agrio, no llegué a tenerlo

Plaintiff's Exhibit 4800   p. 48 of 61

por mucho tiempo y se lo regresé al Sr. Fajardo semanas después. Se me entregó el mismo computador portátil en el segundo período en que el Sr. Zambrano conoció la causa de Chevron. Hice el trabajo de redactar las providencias del caso Chevron principalmente en el departamento del Sr. Zambrano, en el computador portátil del Sr. Fajardo. Luego de terminar de redactar alguna providencia del caso Chevron, yo dejaba el computador en el departamento del Sr. Zambrano, para que él obtuviese el borrador. De lo que yo observé y converse personalmente con el Sr. Zambrano, supe que él típicamente se llevaba el computador portátil para hacer imprimir las providencias en otro sitio, debido a que el Sr. Zambrano no tenía un impresor en su departamento.  Una vez impresa la providencia que yo había escrito, el Sr. Zambrano le encargaba a una hija de un amigo suyo, un abogado llamado Arturo Calva, que transcribiese las providencias en su propio computador en su oficina. El Sr. Zambrano me dijo que lo hacía de esta manera porque no quería cargar los borradores de las providencias en su computador de trabajo con una memoria extraíble, porque tenía entendido que un técnico en computación podría detectar si eso había ocurrido, y que no quería que se supiese que las providencias no habían sido redactadas en su computador del trabajo.

47.    A fines de enero o principios de febrero de 2011, aproximadamente dos semanas antes de que fuese emitido el fallo de primera instancia del caso Chevron , el Sr. Zambrano me entregó un borrador de sentencia para que yo lo revisara. Fue a través del Sr. Zambrano que yo me enteré que los abogados de los demandantes habían escrito esa sentencia y se la habían entregado a él. El Sr. Zambrano me pidió que trabajase en ese documento para afinarlo y pulirlo, dándole una mayor estructura jurídica. Al recordar estos hechos, en un principio supuse que había recibido el documento en una memoria extraíble que me había entregado el Sr. Zambrano en el aeropuerto de Quito, dado que el Sr. Zambrano a menudo me entregaba memorias

20

extraíbles junto con los expedientes de la corte. Pero, más tarde recordé con exactitud que trabajé en ese documento en el domicilio del Sr. Zambrano en Lago Agrio, usando el computador del Sr. Fajardo. Cuando llegué a Lago Agrio para trabajar el borrador de la sentencia, el Sr. Zambrano, el Sr. Fajardo y yo nos encontramos brevemente en el domicilio del Sr. Zambrano. El borrador de sentencia escrito por los demandantes ya estaba en el computador portátil (el mismo que me había entregado el Sr. Fajardo) en el departamento del Sr. Zambrano, y les dije a los Sres. Fajardo y Zambrano que lo revisaría y corregiría. Antes de irse, el Sr. Fajardo me dijo que lo llamase en caso de requerir alguna ayuda adicional.

48.     No recuerdo exactamente en qué fecha ocurrió esto, pero trabajé en el borrador de la sentencia por el transcurso de varias horas durante dos días. El Sr. Zambrano me pidió explícitamente que no hiciera copias ni que dejara rastro de este documento ni de los cambios que le hacía, fuera del archivo que trabajé en el computador del Sr. Fajardo.

49.     Apenas recibí el documento, empecé a trabajar en el mismo; leí su parte expositiva, ligeramente la considerativa y la resolutiva; luego me puse a trabajar en varias secciones que necesitaban más estructura y base, sobre todo en la terminología relacionada con la ley ambiental. Recuerdo que llamé al Sr. Fajardo a su celular para preguntarle sobre unas partes del documento que me generaron confusión. El Sr. Fajardo me dijo que no me preocupara y que me iba a entregar algo que él llamó "ayuda memoria" para clarificarme mis inquietudes. Más tarde ese mismo día el Sr. Fajardo me proporcionó un documento con cierta información del caso. En realidad, la "ayuda memoria" no me ayudó mucho con mis incógnitas, entonces concluí ese día en temas de puntuación y ortografía. El día siguiente me dediqué a hacer cambios para darle al documento más estructura a fin resultara similar a una sentencia proveniente de la Presidencia de la Corte de Sucumbíos. En general, le hice muy pocos cambios al borrador de la

21

sentencia, mayormente cambios de palabras por una cuestión de preferencia personal, y mi versión del borrador de la sentencia no era muy diferente del documento que los abogados de los demandantes le habían entregado al Sr. Zambrano. Luego regresé el computador portátil, que jamás vi de nuevo.

50.    Cuando expliqué estos acontecimientos por vez primera en una declaración jurada en noviembre de 2012, afirmé que recordaba haber recibido la "ayuda memoria" del Sr. Fajardo mientras yo trabajaba en corregir el borrador de la sentencia, pero no pude localizar el documento mismo. Hacia finales de marzo o principios de abril de 2013, localicé una copia de esa "ayuda memoria" que el Sr. Fajardo me había proporcionado, mientras revisaba mis archivos para determinar si tenía yo documentos relacionados con un emplazamiento girado por el equipo legal de los demandantes ecuatorianos en los Estados Unidos. PX 1703 es una copia fiel y verdadera de la "ayuda memoria" que localicé en esa ocasión. Entre los registros que revisé para atender el emplazamiento de los demandantes ecuatorianos se incluyen registros que ellos requirieron relacionados con mi destitución de la Corte Provincial de Sucumbíos. En mis archivos hallé un documento relacionado con mi destitución de la Corte Provincial de Sucumbíos, detrás del cual hallé la "ayuda memoria" del caso Chevron que recibí de Pablo Fajardo. Como dije anteriormente, recibí esta "ayuda memoria" de Pablo Fajardo mientras yo trabajaba en la sentencia para el Sr. Zambrano, a fines de enero o principios de febrero de 2011. Por el contenido y tono de la "ayuda memoria", se advierte que fue escrita por abogados de los demandantes ecuatorianos. El último párrafo del documento, por ejemplo, se refiere a los abogados de Chevron como "los abogados de mi contraparte", lo que claramente refleja que la "ayuda memoria" efectivamente fue redactada por el Sr. Fajardo u otros abogados de los demandantes ecuatorianos.

22

Plaintiff's Exhibit 4800   p. 51 of 61

51.     Basándome en lo que el Sr. Zambrano me dijo, tengo entendido que los abogados de los demandantes ecuatorianos le hicieron cambios a la sentencia hasta el último minuto antes de que ésta fuese firmada y publicada por el Sr. Zambrano.  He repasado la sentencia definitiva, marcada como PX 399. Luego de esa revisión, percibo que la estructura, los términos y el contenido de la sentencia definitiva en gran parte reflejan el borrador de la sentencia que yo modifiqué aproximadamente dos semanas antes de que fuese expedida la sentencia definitiva. Efectivamente, a mí me parece que la sentencia definitiva es una versión posterior y casi idéntica al borrador de la sentencia que yo trabajé.

52.     Después de que el Sr. Zambrano publicó la sentencia, le ayudé por vía telefónica a preparar la providencia de ampliación y aclaración de la sentencia.

53.     Yo sabía en ese momento, y lo sé hoy, que ese acuerdo del cual yo era partícipe, por el cual los representantes de los demandantes redactaban la sentencia del caso de Chevron y el juez Zambrano, con mi ayuda, la expedía, violaba las leyes. Según la legislación ecuatoriana, el juez es el único autorizado para redactar los autos y sentencias. Por las mismas razones sabía en ese momento, y lo sé hoy, que el arreglo en el que participé, en el que yo redactaba providencias para el Sr. Zambrano manejando el caso a favor de los demandantes, y recibía pagos de los representantes de los demandantes por ese trabajo, era una violación de las leyes. Y sabia en ese momento, y lo sé hoy, que el acuerdo que el Sr. Zambrano me dijo que había logrado con los abogados de los demandantes, para dejarles redactar la sentencia a favor de los demandantes y en contra de Chevron, a cambio de que él recibiera 500.000 dólares una vez que recolectaran el dinero de la sentencia, era una violación de las leyes.

54.     Después de que el Sr. Zambrano publicó la sentencia del caso Chevron, me concentré en ayudar al Sr. Zambrano con otros casos civiles y laborales que requerían autos y

23

Plaintiff's Exhibit 4800   p. 52 of 61

sentencias expedidos por él, y es por eso que continué trabajando como escritor secreto del juez Zambrano hasta que fue destituido a fines de febrero de 2012. No tengo conocimientos sobre cómo se hizo la sentencia de segunda instancia firmada por los jueces de segundo nivel, ni sobre cualesquiera resoluciones posteriores en el caso contra Chevron.

55.     No he tenido ningún otro contacto con los abogados de los demandantes ecuatorianos desde entonces, excepto una reunión a la que me citó el Sr. Fajardo en su oficina en Quito, que estaba localizada en una casa en José de Abascal E12A-143 y Portete. No recuerdo la fecha exacta de esa reunión, pero estimo se dio en mayo o junio de 2011. También estuvo presente en esa reunión una persona a quien me la presentaron como uno de los abogados norteamericanos que representaban a los demandantes ecuatorianos en los Estados Unidos. En esa reunión se me explicó que Chevron estaba impugnando en los Estados Unidos el ordenamiento judicial ecuatoriano, y que los demandantes ecuatorianos necesitaban personas que fuesen a testificar sobre la idoneidad del sistema judicial. El abogado norteamericano luego propuso que yo fuese a los Estados Unidos a aportar ese testimonio, y así desacreditar a los abogados de Chevron. El Sr. Fajardo ofreció pagarme el pasaje aéreo y gastos de hospedaje y dijo que me daría 5.000 dólares por aportar ese testimonio. El Sr. Fajardo me dijo que yo tendría que viajar en noviembre de 2011 y yo le manifesté que iba a considerar la propuesta. No le revelé al abogado norteamericano los pagos que yo había recibido de los demandantes ecuatorianos, que había redactado en secreto las providencias y sentencias del Sr. Zambrano, el soborno de 500.000 dólares por parte de los demandantes ecuatorianos para el Sr. Zambrano, ni el nivel general de corrupción en el sistema judicial ecuatoriano, porque entendía de antemano por parte del Sr. Fajardo lo que ellos requerían que yo dijese, y porque de todos modos yo no conocía ni confiaba de este abogado norteamericano.

24

El Sr. Fajardo nunca más se ratificó en la propuesta y yo tampoco lo busqué para darle seguimiento al tema.

*Otros casos del juez Zambrano*

56.     Además del trabajo que hice con las providencias y la sentencia del caso Chevron, desempeñé trabajos parecidos con otras sentencias de otros casos asignados al juez Zambrano. En un caso específico, representantes de la compañía Oleoducto de Crudos Pesados, conocida como OCP, nos pagaron al Sr. Zambrano y a mí para que expidiésemos una sentencia de segunda instancia que ellos habían redactado. OCP maneja oleoductos para el traslado de petróleo crudo ecuatoriano, y el entonces Presidente de la Corte de Justicia de Sucumbíos había expedido una sentencia en contra de OCP, por daños ambientales. Un representante de OCP me dio el borrador de la sentencia de segunda instancia en una memoria extraíble, y de ahí fue cargada en el computador del juez Zambrano con la ayuda de un técnico en computación. El juez Zambrano posteriormente expidió esa sentencia redactada por la OCP como si él mismo la hubiese escrito. Un representante de OCP me pagó 20.000 dólares por ser el enlace con el Sr. Zambrano, y al Sr. Zambrano le pagó 50.000 dólares (a través de mi persona) por haber logrado que los jueces de la sala de segundo nivel ratificaran el borrador de la sentencia en segunda instancia. Se marca como PX 1468 una copia fiel y verdadera del borrador de la sentencia de OCP, que me fue entregada por representantes de OCP y que fue expedida por el Sr. Zambrano. Esa sentencia estaba en el computador particular mío que yo le entregué a Chevron el 13 de julio de 2012. Recuerdo que viajé a Lago Agrio vía TAME una o dos semanas antes de que el Sr. Zambrano emitiese la sentencia de OCP, para entregarle la memoria extraíble que contenía esa sentencia; viajé de regreso a Quito ese mismo día. Esto lo confirman mis registros de vuelos de TAME, cuya copia

Plaintiff's Exhibit 4800   p. 54 of 61

fiel y verdadera queda marcada como PX 1722; constatan que viajé de Quito a Lago Agrio el 15 de julio de 2009 y que regresé en avión a Quito ese mismo día.

57.     También he repasado los documentos que se anexan como PX 1773 hasta PX 1875, PX 1468 y PX375.  Por el estilo de la redacción y la estructura de cada documento, así como por mi recuerdo específico sobre la sustancia de estos documentos, veo que todos son copias fieles y verdaderas de los autos y sentencias que yo redacté para el Sr. Zambrano siendo su escritor fantasma.

*Mi decisión de dar la cara y decir la verdad*

58.     En abril de 2012, el Sr. Zambrano, que para entonces había sido destituido recientemente de su puesto de juez de la Corte de Sucumbíos, me autorizó para que iniciase conversaciones con representantes de Chevron para revelar la verdad acerca de la redacción de la sentencia del caso Chevron. En mis conversaciones iniciales con los representantes de Chevron, a quienes yo no conocía y en quienes no confiaba, intenté negociar un pago importante para mí, pues yo creía que dada la considerable sentencia expedida por el Sr. Zambrano, por 18.000 millones de dólares, Chevron estaría dispuesta a pagarme una cifra importante por aportar pruebas y testificar que la sentencia fue ilícita y se obtuvo mediante un fraude. Creí que lo más valioso de mi parte para Chevron sería lograr que el Sr. Zambrano diese la cara, revelase la verdad y aportase a Chevron sus propias pruebas, y que por esto a mí se me remuneraría generosamente. Es por esto que opté por sugerirle al Sr. Zambrano que intentase negociar un abultado pago millonario de Chevron para él mismo, aun cuando Chevron jamás sugirió tal cosa.

59.     Yo estaba equivocado al creer que Chevron pagaría por testimonios. Los representantes de Chevron con quienes me comuniqué me dijeron reiteradamente que Chevron absolutamente no me pagaría ni a mí ni al Sr. Zambrano por nuestro testimonio. Esto está

Plaintiff's Exhibit 4800   p. 55 of 61

confirmado por las grabaciones de mis conversaciones con los representantes de Chevron,
hechas por ellos, a mediados de 2012. En esa época yo no sabía que Chevron estaba grabando
esas conversaciones.

60.     El Sr. Zambrano cambió de parecer y me dijo que no estaba dispuesto aportarle
información a Chevron ni a revelar la verdad, por motivos que no me explicó. Sin embargo, yo
decidí que continuaría cooperando porque creía que, inevitablemente, se descubrirían los hechos
verdaderos sobre el acuerdo entre el Sr. Zambrano y mi persona y nuestras actividades con los
representantes de los demandantes ecuatorianos, y que como resultado de esto jamás se
ejecutaría la sentencia.

61.     Debido a que yo creía que era inevitable que se descubriría el fraude del Sr.
Zambrano, yo quería recibir algún pago, por modesto que fuese, por las pruebas que yo aportaría.
Según se puntualiza en mis acuerdos escritos con Chevron, cuyas copias fieles y verdaderas
están marcadas como PX 1671 y PX 1672, Chevron me pagó la suma combinada de 48.000
dólares (pagados en incrementos en varias instancias después de que yo recolectaba y entregaba
pruebas firmes adicionales) por las pruebas físicas que estaban en mi poder o que me dediqué a
obtener, y por el tiempo y esfuerzo dedicados a recopilar esas evidencias. Entre estas evidencias
están mi computador personal, el cual usé para redactar muchas de las providencias y sentencias
para el juez Zambrano (PX 1736), numerosas memorias extraíbles (PX 1737), dos teléfonos
celulares (PX 1738), así como mis agendas (PX 1733 y PX 1734), registros de envíos vía TAME
(PX 1682), los registros de mis teléfonos celulares (PX 1727 y PX 1728), registros bancarios
relacionados con mi cuenta del Banco Pichincha y estados de cuenta de tarjetas de crédito.[2]

---

[2]     El 2 de octubre de 2013, se me proporcionó, y revisé, una copia imagen del disco duro del computador que
les entregué a los investigadores de Chevron en julio de 2012.  Después de revisar el contenido del disco duro,
confirmo que esa imagen es copia fiel y exacta del disco duro que yo les entregué a los investigadores, y que el
contenido de mi computador no ha sido alterado desde que yo se los entregué a los investigadores de Chevron.

27

Además, di a los investigadores acceso a mis cuentas de correo electrónico

"albertoguerrab@hotmail.com" y "albertoguerra54@hotmail.com".[3] Asimismo, como ya

describí más arriba, posteriormente hallé y les proporcioné la "ayuda memoria" que recibí del Sr.

Fajardo (PX 1703).

    62.    El 17 de noviembre de 2012, estando yo en Chicago, firmé una declaración que

expone ciertos hechos acerca de mi relación y actividades con el Sr. Zambrano y los

representantes de los demandantes ecuatorianos. Antes de esa fecha, los representantes de

Chevron me habían informado que me protegerían a mí y a mi familia de cualesquiera

represalias luego que fuesen reveladas públicamente mis declaraciones sobre hechos de

corrupción con respecto de la sentencia, pero no había tenido ninguna conversación firme con

Chevron acerca de compromisos económicos ni sobre qué medidas podría tomar Chevron para

protegerme a mí y a mi familia. De hecho, cuando firmé la declaración en noviembre de 2012,

mi familia no había acordado internamente si saldríamos del Ecuador por motivos de seguridad

como consecuencia de hacerse públicas mis declaraciones sobre la corrupción, ni qué familiares

tendrían que salir. No fue sino hasta diciembre de 2012 que mi señora, así como mi hijo y su

familia, decidieron que permanecer en el Ecuador sería demasiado peligroso luego de que se

conocieran públicamente mis declaraciones. No fue sino hasta ese momento que mi abogado

estadounidense, a quien yo contraté a mediados de diciembre aproximadamente, empezó a

negociar con Chevron los términos de mi acuerdo con Chevron, que fue firmado el 27 de enero

de 2013 (PX 1671), más de dos meses después de que yo firmé mi declaración inicial. Durante el

curso de estas negociaciones (e incluso antes), los representantes de Chevron me dijeron

---

[3]    Luego que di mis cuentas de correo electrónico y mis contraseñas a los investigadores de Chevron, vi que intentaron ingresar en esas cuentas sin lograrlo, presumiblemente debido al tiempo que había transcurrido desde la última vez que yo había ingresado en esas cuentas de correos.

Plaintiff's Exhibit 4800   p. 57 of 61

claramente que no se concretarían mis esperanzas de obtener un gran pago. Los representantes de Chevron me dijeron que sólo podrían pagar una cantidad necesaria para mantener mi estándar de vida en los Estados Unidos y para garantizar la seguridad de mi familia y mi persona. Entendía entonces, tal como lo entiendo ahora, que Chevron no me pagó y en ningún momento me habría pagado por mi testimonio. Entiendo que los pagos de Chevron por mi seguridad y la de mi familia de ninguna manera están supeditados al contenido de mis declaraciones o mi testimonio, y que estos arreglos de seguridad no están condicionados al resultado de ningún asunto en que yo testifique. Mejor dicho, tengo entendido que según mi acuerdo con Chevron, estoy obligado a decir la verdad, según se requiera mediante juramentos o cualesquiera otras obligaciones jurídicas, y a estar disponible para testificar o aportar información.

63.    Sé que por haber dado la cara y testificado en este caso, me encuentro enfrentado a los demandantes ecuatorianos, a sus representantes y abogados, así como al gobierno del presidente Rafael Correa. Esta decisión ha puesto en riesgo mi seguridad así como la de mi familia. Mi familia y yo tememos que si regresamos al Ecuador seremos perseguidos, torturados y/o asesinados por el Gobierno del Ecuador u otros grupos o personas que el Gobierno no quiera o no pueda controlar. De hecho, los abogados de los demandantes ecuatorianos y sus aliados dentro del gobierno de Correa me han atacado públicamente en el Ecuador y en los Estados Unidos, me han tildado de traidor y han amenazado someterme a procesos penales. La República del Ecuador incluso ha tomado represalias en contra de familiares míos que permanecen en el Ecuador, entre ellos un pariente que perdió su empleo con el gobierno ecuatoriano como consecuencia del testimonio que aporté en este caso. Los abogados de los demandantes ecuatorianos ya cumplieron una de sus amenazas: radicaron una denuncia penal inventada en mi contra en el Ecuador. El Gobierno de Rafael Correa ha respaldado a los demandantes

29

ecuatorianos en este aspecto y ahora promueve enérgicamente una investigación de mi persona por el delito de incitación al separatismo.

64.    En enero de 2013, mi familia y yo (incluyendo a mi señora, un hijo y su esposa y el niño pequeño de mi hijo) salimos del Ecuador rumbo a los Estados Unidos debido a los justificados temores de mi parte y de mi familia sobre persecución, tortura y/o asesinato, como consecuencia de que mis declaraciones hubiesen salido a la luz pública. Antes de que yo cooperase en este caso, mi esposa y yo vivíamos muy cómodamente en una residencia grande de 500 metros cuadrados (casi 5.400 pies cuadrados), con casa aparte para nuestra empleada doméstica, en una urbanización cercada en un barrio acomodado de Quito, Ecuador, rodeados por familiares, amistades y nuestra comunidad. Si bien fui destituido como juez, ocasionalmente continuaba haciendo trabajos de consultor como abogado y esperaba que algún día me fuese restituido mi puesto de juez. Desde que salí del Ecuador, los abogados de los demandantes ecuatorianos radicaron una falsa y dolosa denuncia penal en mi contra. Se me ha tildado de traidor en Ecuador, y ahora vivo exiliado, en un estado de temor e inseguridad, en un país cuyo idioma no hablo. Mi residencia es un pequeño departamento alquilado de dos dormitorios. Ya no puedo ejercer mi profesión ni mantener a mi familia. Mi hijo y su esposa, que tenían empleo estable en el Ecuador, no pueden trabajar aquí ni mantenerse a sí mismos y a sus hijos. Los pagos mensuales que recibo de Chevron, tal como se detalla en PX 1671, son para el sustento de mi persona y de mi familia y nuestra protección en los Estados Unidos. Esto incluye a mi persona, mi esposa, mi hijo, sus dos hijos y su esposa. Para nada vivo tan cómodamente como vivía en el Ecuador, y me preocupa mi futuro y el de mi familia.

Plaintiff's Exhibit 4800   p. 59 of 61

65.     Pese a los esfuerzos de la República del Ecuador y de los demandantes ecuatorianos por silenciarme e intimidarme, siento la obligación de decir la verdad sobre este caso.

Declaro bajo la gravedad de juramento según las leyes de los Estados Unidos de América que lo anterior es cierto y correcto. Ejecutado el _____9 de Octubre_____ de 2013.

Alberto Guerra Bastidas

31

Plaintiff's Exhibit 4800   p. 60 of 61

*Chevron Corp. v. Donziger*,
No. 11 Civ. 0691 (LAK)

## Exhibits Cited in Guerra Witness Statement (PX 4800)

Offered for the Truth:

- PX 1682
- PX 1683
- PX 1684
- PX 1685
- PX 1689
- PX 1704
- PX 1705
- PX 1706
- PX 1707
- PX 1708
- PX 1710
- PX 1711
- PX 1712
- PX 1713
- PX 1714
- PX 1715
- PX 1716
- PX 1717
- PX 1718
- PX 1719
- PX 1721
- PX 1722
- PX 1723
- PX 1724
- PX 1725
- PX 1726
- PX 1727
- PX 1728
- PX 1733 (in part)
- PX 1734 (in part)
- PX 1735 (in part)
- PX 1742
- PX 1743

Not Offered for the Truth

- PX 0093



*Chevron Corp. v. Donziger*,
No. 11 Civ. 0691 (LAK)

- PX 0094
- PX 0095
- PX 0129
- PX 0375
- PX 0399
- PX 0411
- PX 0986
- PX 1172
- PX 1173
- PX 1186
- PX 1190
- PX 1191
- PX 1192
- PX 1193
- PX 1197
- PX 1209
- PX 1220
- PX 1243
- PX 1468
- PX 1671
- PX 1672
- PX 1678
- PX 1679
- PX 1680
- PX 1686
- PX 1703
- PX 1745
- PX 1749
- PX 1773
- PX 1774
- PX 1775
- PX 1776
- PX 1777
- PX 1778
- PX 1779
- PX 1780
- PX 1781
- PX 1782
- PX 1783
- PX 1784
- PX 1785
- PX 1786
- PX 1787
- PX 1788

Plaintiff's Exhibit 4800A   p. 2 of 4

*Chevron Corp. v. Donziger*,
No. 11 Civ. 0691 (LAK)

- PX 1789
- PX 1790
- PX 1791
- PX 1792
- PX 1793
- PX 1794
- PX 1795
- PX 1796
- PX 1797
- PX 1798
- PX 1799
- PX 1800
- PX 1801
- PX 1802
- PX 1803
- PX 1804
- PX 1805
- PX 1806
- PX 1807
- PX 1808
- PX 1809
- PX 1810
- PX 1811
- PX 1812
- PX 1813
- PX 1814
- PX 1815
- PX 1816
- PX 1817
- PX 1818
- PX 1819
- PX 1820
- PX 1821
- PX 1822
- PX 1823
- PX 1824
- PX 1825
- PX 1826
- PX 1827
- PX 1828
- PX 1829
- PX 1830
- PX 1831
- PX 1832

3

*Chevron Corp. v. Donziger*,
No. 11 Civ. 0691 (LAK)

- PX 1833
- PX 1834
- PX 1835
- PX 1836
- PX 1837
- PX 1838
- PX 1839
- PX 1840
- PX 1841
- PX 1842
- PX 1843
- PX 1844
- PX 1845
- PX 1846
- PX 1847
- PX 1848
- PX 1849
- PX 1850
- PX 1851
- PX 1852
- PX 1853
- PX 1854
- PX 1855
- PX 1856
- PX 1857
- PX 1858
- PX 1859
- PX 1860
- PX 1861
- PX 1862
- PX 1863
- PX 1864
- PX 1865
- PX 1866
- PX 1867
- PX 1868
- PX 1869
- PX 1870
- PX 1871
- PX 1872
- PX 1873
- PX 1874
- PX 1875
- PX 2469

4