# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CHEVRON CORPORATION,

                Plaintiff,

     -against-

              Case No.  11 Civ. 0691 (LAK)

STEVEN R.  DONZIGER, et al.,

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## <u>DIRECT TESTIMONY OF TROY A. DAHLBERG</u>

       I, TROY DAHLBERG, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

       1.     I am a Partner in the Forensic Practice of KPMG LLP.  I have more than 30 years of experience providing accounting, auditing, and consulting services to companies in many industries.  Through my experience as a forensic accountant, I have performed investigations in which I have analyzed documents to determine whether accounting transactions were proper in the normal course of business, as well as to identify financial and accounting irregularities based on the facts and circumstances of various situations.

       2.     I have been retained by Gibson, Dunn & Crutcher LLP ("Gibson Dunn") on behalf of Chevron Corporation ("Chevron") in this case to review materials available through discovery in *Chevron Corp. v. Steven Donziger et al.*, 11-CIV-0691 (LAK) (S.D.N.Y) (the "Donziger Case") and associated proceedings to:  (1) summarize financial activity between and among various individuals and entities in connection with the Lago Agrio Litigation (the

1



PLAINTIFF'S
EXHIBIT
**4900R**
11 Civ. 0691 (LAK)

"Litigation"); and (2) opine on whether the available documents reflect financial recordkeeping in accordance with standards for transparency and accountability.

3.     I have prepared this declaration containing my direct testimony for this matter. This summarizes my opinions detailed in expert reports previously submitted to the parties, the bases and reasoning for my opinions, and information I considered in forming my opinions.

## I.     Summary of Expert Opinion

4.     Based on my experience and expertise, and my review and analysis of available documents, I have come, within a reasonable degree of certainty, to the following conclusions:

5.     The available documents show that individual investors, law firms, and litigation investment firms contributed approximately $16 million to finance the activities and operations surrounding the Litigation.  (*See infra* Part IV.A; PX 2143 (Funding for the Enterprise)).

6.     Steven Donziger ("Donziger") had primary control of financing and related fund disbursements to individuals and entities in connection with the Litigation from approximately 2004 and continuing through at least July of 2012.  (*See infra* Part IV.A-B).

7.     Disbursements were made to various individuals and entities in several categories, including:

> - *Steven Donziger and the Law Offices of Steven R. Donziger*.  The available documents show Evidence of Payments[1] of approximately $1,300,000 to Donziger and the Law Offices of Steven R. Donziger.  (*See infra* Part IV.B.i; PX 2137; PX 2147).[2]

---

[1]   Where I was not able to confirm that a particular payment or transfer actually occurred, but I had some evidence of a payment, I have designated those as "Evidence of a Payment" or "Evidence of Payments."  *See infra* ¶ 32.

[2]   The total payments include Evidence of Payments from wire transfers, cancelled checks, and bank statements, and also include non-traditional accounting source records, such as fund transfers and requests, agreements and contracts, emails, memoranda, invoices, and other documents.  The transactions and transfers that I was able to reconcile to documents from financial institutions (e.g., a wire transfer record, cancelled check, or bank statement) are described as "Confirmed Payments."  *See infra* ¶ 32.  Confirmed Payments to Steven Donziger and the Law Offices of Steven R. Donziger total approximately $958,000.

2

- *U.S. Counsel*. The available documents show Evidence of Payments of approximately $7,600,000, to individuals or entities primarily working at Donziger's direction to provide legal services. (*See infra* Part IV.B.ii; PX 2137; PX 2147; Attachment H).[3] Specifically, several different firms throughout the United States were engaged through various arrangements to oppose the 28 U.S.C. § 1782 proceedings ("Section 1782 proceedings"). Draft agreements I reviewed also appear to show that certain individuals or entities were to be paid a contingency fee based on the outcome of the Litigation, as opposed to predetermined hourly or flat rate fees.

- *Ecuadorian Counsel*. The available documents show Evidence of Payments of approximately $684,000, to individuals or entities primarily working at Donziger's direction to provide legal services for the Lago Agrio Plaintiffs in Ecuador. (*See infra* Part IV.B.iii; PX 2137; PX 2147; Attachment E).[4]

- *Selva Viva SELVIVA CIA, Ltda ("Selva Viva")*. The available documents show Evidence of Payments of approximately $3,700,000, to Selva Viva, the primary organization managing Litigation finances in Ecuador. (*See infra* Part IV.B.iv; PX 2137; PX 2142; PX 2147).[5]

- *Experts and Consultants*. The available documents show Evidence of Payments of approximately $4,900,000, to individuals or entities working at Donziger's direction to provide scientific or technical services in the Litigation. (*See infra* Part IV.B.v; PX 2137; PX 2138; PX 2147).[6]

- *Public Relations Services*. The available documents show Evidence of Payments of approximately $601,000, to individuals or entities working at

---

[3]  The transactions and transfers that I was able to reconcile to documents from financial institutions involving U.S. Counsel total approximately $959,000. The remaining Evidence of Payments are from source records, such as fund transfers and requests, agreements and contracts, emails, memoranda, invoices, and other documents.

[4]  The transactions and transfers that I was able to reconcile to documents from financial institutions involving Ecuadorian counsel total approximately $141,000. The remaining Evidence of Payments are from source records, such as fund transfers and requests, agreements and contracts, emails, memoranda, invoices, and other documents.

[5]  The transactions and transfers that I was able to reconcile to documents from financial institutions involving Selva Viva total approximately $3,500,000. The remaining Evidence of Payments are from source records, such as fund transfers and requests, agreements and contracts, emails, memoranda, invoices, and other documents.

[6]  The transactions and transfers that I was able to reconcile to documents from financial institutions involving Experts and Consultants total approximately $1,000,000. The remaining Evidence of Payments are from source records, such as fund transfers and requests, agreements and contracts, emails, memoranda, invoices, and other documents.

3

Plaintiff's Exhibit 4900R   p. 3 of 144

Donziger's direction to provide public relations services for the Litigation. (*See infra* Part IV.B.vi; PX 2137; PX 2147; Attachment F).[7]

- *Crude*.  The available documents show Evidence of Payments relating to the funding of *Crude* of approximately $2,500,000, and the documents show that Donziger lined up several sources of funding for the production of the film.  (*See infra* Part IV.B.vii; PX 2137; PX 2147; Attachment H).[8]

- *Non-Governmental Organizations ("NGOs")*.  The available documents show Evidence of Payments of approximately $765,000, to NGOs, including Amazon Watch, which was primarily working at Donziger's direction to publicize the Litigation generally and advocate Donziger's positions before government officials.  (*See infra* Part IV.B.viii; PX 2137; PX 2147; Attachment I).[9,10]

8.     The extremely poor organization and incomplete nature of the financial and accounting records that Donziger produced and appeared to maintain would not have allowed him to provide accountability to either his investors or to the Lago Agrio Plaintiffs (the "LAPs") as to the totality of the funds that were raised or the totality of disbursements made in relation to the Litigation.  (*See infra* ¶¶ 54-56).  In my experience, financial and accounting decisions primarily controlled by one individual (as Donziger controlled these decisions throughout the Litigation), and inadequate documentation to support transactions, incomplete and/or unclear

---

[7]   The transactions and transfers that I was able to reconcile to documents from financial institutions involving Public Relations Services total approximately $208,000.  The remaining Evidence of Payments are from source records, such as fund transfers and requests, agreements and contracts, emails, memoranda, invoices, and other documents.

[8]   The transactions and transfers that I was able to reconcile to documents from financial institutions involving *Crude* total approximately $38,000.  The remaining Evidence of Payments are from source records, such as fund transfers and requests, agreements and contracts, emails, memoranda, invoices, and other documents.

[9]   The transactions and transfers that I was able to reconcile to documents from financial institutions involving NGOs total approximately $260,000.  The remaining Evidence of Payments are from source records, such as fund transfers and requests, agreements and contracts, emails, memoranda, invoices, and other documents.

[10]   I also saw evidence of draft advisory agreements between the LAPs and their Attorneys and Representatives and various individuals related to lobbying activities in connection with the Litigation including Christopher Lehane of CSL Strategies LLC and Mark Fabiani of Mark Fabiani LLC; Downey McGrath Group, Inc., and the Ben Barnes Group.  Based on the documents reviewed, there is no evidence of compensation paid to Lehane, Fabiani, Downey McGrath or Barnes; it appears that the lobbyists would be paid according to contingency agreements.  (*See infra* IV.B.ix; PX 560 (WOODS00045036); PX 562 (WOODS00045051); PX 555 (WOODS00045023)).

4

accounting records, excessive number of bank accounts, commingling of trust and personal funds, and frequent fund transfers from account to account, are all potential indicators of fraud.

     **A.**     **Analysis of Payments Made to Richard Cabrera, Stratus Consulting, Fernando Reyes, and Cristobal Villao**

     9.     The LAPs' Attorneys and Representatives[11] appear to have expended approximately $392,000 on payments to Richard Cabrera ("Cabrera") and approximately $1.7 million on payments to Stratus Consulting ("Stratus") in connection with the April 1, 2008 expert report that Cabrera filed in the Litigation (the "Cabrera Report").  (*See infra* Part IV.C; PX 2138 (Experts and Consultants); PX 2139 (Payments to Richard Cabrera); PX 2147 (Evidence of Payments)).  I have reviewed documents which show Evidence of Payments totaling approximately $392,000 to Cabrera, approximately $272,000 of which appear to represent payments that the Ecuadorian court authorized and required in connection with Cabrera's appointment as the independent expert in the Litigation, and $120,000 of which appear to represent payments from Frente de Defensa de la Amazonia (the "Amazon Defense Front," "FDA," or "Frente") to Cabrera from a "Secret Account."  (*See infra* ¶¶ 114-118; PX 2139 (Cabrera Payments Timeline)).  I also saw evidence of payments to Fernando Reyes ("Reyes") and Cristobal Villao ("Villao") for services in connection with the Cabrera Report, which were apparently not disclosed to the Ecuadorian Court.  (*See infra* ¶¶ 121-122; PX 2138 (Experts and Consultants)).

---

[11] The LAPs' Attorneys means any of the various attorneys or law firms that have or continue to represent the LAPs, including, Steven Donziger, Pablo Fajardo, Kohn, Swift & Graf, Cristobal Bonifaz, Patton Boggs LLP, Motley Rice LLC, Emery Celli Brinckerhoff & Abady LLP, et al.  The LAPs' Representatives means any of the various entities and individuals that have or continue to represent the LAPs in a non-legal capacity, including, Asamblea De Afectados Por Texaco, Frente de Defensa de la Amazonia, Luis Yanza, Selva Viva, Karen Hinton, et al.

Plaintiff's Exhibit 4900R   p. 5 of 144

**B.      Analysis of Payments Made to Alberto Guerra**

10.     The documents I reviewed show payments to Alberto Guerra from an employee of Selva Viva in 2009 and 2010.  (*See infra* Part IV.D).

**C.      Lago Agrio Plaintiffs' 2012 Motion for Costs and Fees**

11.     The LAPs' Attorneys submitted a request to the Ecuadorian Court seeking reimbursement of various court costs—including attorneys' fees, experts' services, laboratory fees, transportation expenses, hotel and lodging expenses, and other expenses—from Chevron in the amount of $1,611,657.64.  Of the requested amount, $1,594,690.92 was supported by invoices or receipts and attached to the motion for costs and fees.  (*See* Attachment M).  Based on documents reviewed, Selva Viva appears to have received approximately $2.7 million of funds from various sources between 2005 and December 31, 2011, including Kohn, Swift & Graf ("KSG") and Donziger.  Due to the limitations on the documentation available for my review, I was unable to determine the purpose or destination of the excess amount of approximately $1,000,000.  (*See infra* Part IV.E.; PX 2142 (Selva Viva Funding)).

**D.      Distribution of the Judgment from the Lago Agrio Litigation**

12.     Various individuals and entities entered agreements with the LAPs and the LAPs' Attorneys and Representatives to provide services and/or financial contributions to further the activities and operations surrounding the Litigation.  I reviewed both executed and unexecuted draft agreements, and various versions of the agreements, as well as emails and memoranda discussing terms of distribution of the Final Judgment[12] in exchange for services and/or financial contributions provided by these individuals or entities.  The executed October 31, 2010,

---

[12]   "Final Judgment" is the determination and/or reward – potential or actual – emanating from the Lago Agrio Litigation.

6

Intercreditor Agreement establishes a nine-level waterfall distribution arrangement in the event that the LAPs prevail in the Litigation. After payment of legal fees and various amounts due to investors, the ninth and final distribution of funds, if any, would go to established trusts. (*See infra* Part IV.F; PX 552 at p. 56-57 of 79 (DONZS00015670 at p. 52-53 of 75)).

13.     The proportion of the Final Judgment distributed to the LAPs' Attorneys and Representatives under these agreements depends on the amount of funds, if any, actually recovered from the Final Judgment. If the full $19,041,414,529 Final Judgment were recovered, the LAPs' Attorneys who are pursuing the Litigation on behalf of the LAPs, ("Active Attorneys" or "Active Lawyers")[13], would receive approximately $4.122 billion, with approximately $1.2 billion distributed to Donziger. (*See infra* Part IV.F; PX 2151 (Potential Recovery of Certain Groups from Ecuadorian Judgment); PX 2152 (Potential Recovery of Select Recipients from Ecuadorian Judgment)). Funders, such as Torvia Limited and Orin Kramer would receive approximately $2.3 billion of the Final Judgment. (*See* PX 2151 (Potential Recovery of Certain Groups from Ecuadorian Judgment)). The proportion of the Final Judgment distributed to the LAPs' Attorneys and Representatives would be even greater if, hypothetically, a smaller sum is collected. If only $100,000,000 of the Final Judgment was recovered, the Active Attorneys would receive approximately $22,000,000, with approximately $6,300,000 distributed to Donziger. (*See* PX 2151 (Potential Recovery of Certain Groups from Ecuadorian Judgment)) The Funders would receive approximately $69,000,000 of a $100,000,000 award. (*See* PX 2151 (Potential Recovery of Certain Groups from Ecuadorian Judgment)).

---

[13]   Schedule 3 of the Burford Funding Agreement defines "Active Lawyers" as "the lawyers conducting the Claim on behalf of the Claimants. (*See* PX 552) The Intercreditor Agreement names Patton Boggs, LLP, Emery, Celli, Brinkerhoff, & Abady, Steven Donziger, and Pablo Fajardo as Active Lawyers (PX 552 at p. 48 of 79 (DONZS00015670 at p. 44 of 75)).

14.     Based on the documents I reviewed, it appears that Amazonia Recovery Limited—an entity created to collect and disburse the Lago Agrio Judgment—has been created in Gibraltar, apparently consistent with the statements in the Invictus memorandum regarding collecting and distributing proceeds from the Judgment outside of Ecuador.  (*See infra* Part IV.F.vi; PX 657 at p. 11 of 38; PX 1527R at 30-31 of 32).

## II.     Background and Qualifications

15.     I am a Partner in the Forensic Practice of KPMG LLP.

16.     I hold a Bachelor of Arts in History from the University of California, Berkeley and a Juris Doctor from the Southwestern School of Law.

17.     I am licensed to practice law in the State of California and am a member of the American Bar Association.

18.     I am a Certified Public Accountant and am licensed in California and New York.

19.     I am a member of the Institute of Certified Public Accountants (AICPA) and am Accredited in Business Valuation and Certified in Financial Forensics by the AICPA.

20.     I have more than 30 years of experience providing accounting, auditing, and consulting services to companies in many industries.  Through my experience as a forensic accountant, I have performed investigations where I have analyzed documents to determine whether accounting transactions were proper in the normal course of business, as well as identified financial and accounting irregularities based on the facts and circumstances of various situations.  I have provided these services for publicly traded companies, private companies, municipalities and government entities, partnerships, trusts, and individuals, all of which required similar skill sets when analyzing available documents.

8

21.     I have been designated as an expert witness on multiple occasions.  I have served as a neutral accountant, arbitrator, and court-appointed expert.

22.     I have testified in state and federal courts, as well as in various complex arbitrations.

## III.     <u>Methodology</u>

23.     I was asked to provide an analysis of funds contributed and disbursed in connection with the Litigation and related activities and to summarize the transactions.  In order to conduct that analysis, I requested Chevron's Counsel provide me with all available records relating to money flows to and from the LAPs' Attorneys and Representatives and various other entities, individuals, and banks.

24.     I was provided with documents including fund transfers and requests, agreements, emails, invoices, excerpts of general ledgers, documents discussing flows of funds, film outtakes, various memoranda requesting authorization of payments, fund disbursement schedules, bank and credit card statements, fund disbursement schedules, and wire transfer documents reflecting payments made or received in connection with the Litigation by various individuals and entities. I was also provided with court filings and transcripts of depositions, as well as the exhibits used during those depositions.

25.     In forming the opinions expressed herein, I, or KPMG professionals working under my direction, have reviewed approximately 20,000 files encompassing at least 100,000 pages.  The documents that I and other KPMG professionals have reviewed are documents produced in this action, *Chevron Corp. v. Steven Donziger, et al.*, 11 Civ. 0691 (LAK) (S.D.N.Y.), as well as documents produced by respondents in various Section 1782 and other proceedings, including, among others, *Chevron Corp. v. Salazar*, 11-CV-03718 (S.D.N.Y. 2011),

9

and *Chevron Corp v. Steven Donziger et al.*, 11-CV-24599 (S.D. Fla. 2011).  I also gathered

additional documents and information through independent research.

26.     The information sources and data that form the factual basis for my findings,

conclusions, and opinions include, among other things, analysis of these voluminous documents

and my education, training, and over 30 years of professional experience.

27.     The documents provided did not include complete financial statements, complete

general ledgers and/or summary cash flow statements showing clearly the inflows and

disbursements of funds.  I understand all of these documents were requested, but not produced,

in the Donziger Case and Section 1782 proceedings.  Specifically, there were not complete sets

of any of the following:

- Records of deposits in and withdrawals out from specified case funds, including specified dates, sources and descriptions of each item deposited, and the date, payee and purpose of each withdrawal or disbursement.

- Records of trust or escrow accounts, showing the source of all funds deposited in such accounts, the names of the persons for whom the funds are or were held, the amount of such funds, the description and amounts, and the names of all persons to whom funds were disbursed.

- Copies of executed retainer and executed compensation agreements.

- Copies of statements to clients or other persons showing the disbursement of funds to them or on their behalf.

- Copies of bills rendered.

- Copies of records showing payments to lawyers, consultants, experts or other persons, for services rendered or performed.

- Checkbooks, check stubs, bank statements, pre-numbered canceled checks and duplicate deposit slips with respect to case accounts, and other accounting records.

- Accurate accounting entries of financial transactions, including receipts and disbursements, general ledger books or similar records, and/or any other books of account kept in the regular course of practice.

10

28.     I, or KPMG professionals working under my supervision, reviewed thousands of financial records and created schedules and summaries from the available records to make visible the flow of funds among the involved individuals and entities.  This reconstruction is incomplete due to the gaps in records previously described.  Typically, a forensic accounting investigation is initiated when an entity, often via a whistleblower, discovers that a transaction or action surrounding a certain issue was improper.  The investigation usually includes examining the books and records related to the allegation and scrutinizing the subject transactions.  If it appears that certain individuals are involved in the subject transactions, I would typically examine the totality of similar types of transactions in which the individual(s) were involved, in order to determine transactions that occurred outside the normal activities of the business or enterprise.  In order to perform investigative services, I would analyze records such as general ledgers, checkbooks, charts of accounts, disbursement journals, trial balances, etc.  I would typically attempt to trace the specific transactions identified in the aforementioned records back to bank statements and supporting documentation in order to determine when money was spent, where money was spent, and to what the spending was related.  When investigating an individual's or entity's finances, I am typically able to trace funds utilizing records and documents such as checkbooks, bank statements, and receipts.

29.     In the case of Steven Donziger, there were not full sets of documents such as bank statements, checkbooks, or disbursement journals that were supported by other documents such as invoices or receipts in order to show where, when, and on what the investments in the Litigation were utilized.[14]

---

[14]   I understand that these records were requested in various discovery proceedings.

11

30.     After reviewing the available documents, I have identified at least eleven bank accounts held by or in the name of, or controlled by Steven R. Donziger, but have received documentation for only ~~seven~~ *ten* (AND) accounts.[15]

31.     It was impossible to fully reconcile the bank statement information that was provided to other records for several reasons, including the lack of account balances, and the level and inconsistency of redactions.  For example, in the September 11, 2008 through October 09, 2008 bank statement for Donziger's Personal Checking Account ending in 5365, the line item detail for check number 460 is listed as paid on 10/03 in the amount of $1,455.58.  (*See* PX 584 at p. 244 of 328 (DONZ00133373)).  However, the image for check number 460 is redacted with the date, amount, and payee of the check concealed.  Without the full detail of this payment, it is not possible to definitively reconcile the transfer of funds.  (*See* PX 617 at p. 120 of 126 (DONZ00133815)).  For this reason, it is my opinion (a) that Donziger is unable to provide accountability to the LAPs or investors and (b) that Donziger did not take measures to fulfill his responsibility to maintain books and records in the manner as required by various agreements and which an individual or entity would be expected to fulfill when managing a client's assets and acting on a client's behalf.  (*See infra* Part IV.)

---

[15]   1.   "Law Firm Account" – 0218 (PX 586, PX 616, name and usage derived from PX 1482 pg. 4)
   2.   "Ecuador Case Account" – 2758 (PX 586, 616 name and usage derived from PX 1482 pg. 4)
   3.   Personal Checking Account – 5365 (PX 584, PX 617, PX 2519, PX 2520, usage derived from PX 1482 pg. 4)
   4.   Personal Savings Account – 5678 (PX 584, PX 617, PX 2519, PX 2520, usage derived from PX 1482 pg. 5)
   5.   Closed Personal Account – 52-65 (PX 581, PX 615, usage derived from PX 1482 pg. 5)
   6.   Closed Personal Account – 61-65 (PX 581, PX 615, usage derived from PX 1482 pg. 5)
   7.   Closed Personal Account – 01-65 (PX 580 usage derived from PX 1482 pg. 5)
   8.   R. DeLeon IOLA Account – 9822 (PX 588)
   9.   R. DeLeon IOLA Account – 0989 (PX 609)
   10.  "Chase Investment Services Corp." – 6569 (PX 584 (referenced only)), 4179 (PX 2519 (referenced only))
   11.  Unidentified Chase Account – 9890 (PX 614)

12

32.     As a result of the deficiencies in record keeping, I was required to review and analyze a large amount of records, and to capture financial data from non-traditional accounting source records, such as fund transfers and requests, agreements and contracts, emails, memoranda, invoices, and other documents in order to get a fuller picture of the transactions and fund flows in connection with the Litigation.  Where I was not able to confirm that a particular payment or transfer actually occurred, but I had some evidence of a payment, I have designated those as "Evidence of a Payment" or "Evidence of Payments."  The transactions and transfers that I was able to reconcile to documents from financial institutions (e.g., a wire transfer record, cancelled check, or bank statement) were captured as "Confirmed Payments."  In instances where a Confirmed Payment represented the only evidence of a transaction, I also captured this amount as Evidence of a Payment; as such, the total Evidence of Payments is an approximate representation of all transactions, whether confirmed or unconfirmed.

33.     Also, for some transactions, the documents produced may have contained multiple instances of documentation relating to the same transaction.  Accordingly, to determine the approximate dollar value of financial transactions and/or flow of funds as accurately as possible, I eliminated from my analyses documents and/or transactions that appeared duplicative and were otherwise captured within another transaction.  For example, a reference to an invoice in subsequent correspondence was not captured within my analysis if this invoice was previously captured as a separate transaction.  Additionally, to the extent that I identified transactions where an entity or individual used the proceeds from a previously recorded transaction to fund a subsequent transaction with a separate entity or individual, only the initial transaction was recorded.  Similarly, I did not capture various expenses, such as airfare, hotel and lodging, phone bills, and wire transfer fees as the funds associated with such transactions were not ultimately

13

retained by the recipient of the reimbursement, but rather by the company that provided such

aforementioned services.  I analyzed the financial data and grouped my analysis into two

categories as follows:

- **Analysis of Transactions Relating to Investment Funds:**  In this section, I summarize the available records of funds contributed to pay for the Litigation and related matters, including funds that appear to be contributed through various funding and investment arrangements.  Where expenses were paid shortly after the receipt of contributed funds, I have inferred that these expenses reflect the use of funds received and have included this in the analysis.  (*See infra* Part IV.A; PX 2143 (Funding for the Enterprise)).

- **Fund Disbursements for the Operations in Support of the Lago Agrio Litigation:**  In this category, I summarize the amount of funds expended in connection with the Litigation and related matters.  In the documents I reviewed, I saw evidence that Donziger directed or facilitated various expenditures to numerous individuals and entities.  I prepared transaction summaries for each of these individuals and entities.  From my analysis of the qualitative information in the documents I reviewed, I classified the individuals and entities into nine broad categories as follows:  Steven Donziger and the Law Offices of Steven R. Donziger, P.C., U.S. Counsel, Ecuadorian Counsel, Selva Viva, Experts and Consultants, Public Relations, *Crude*, NGOs, and Lobbyists.  I then consolidated the individual transaction summaries into the broader group in which the individual or entity belongs.  Payment summaries were not created for every entity or individual referenced within the documents made available to me, or in the Litigation overall, but rather were generated based upon the significance of the payments noted and the relationship of the entity or individual to the Litigation.  (*See infra* Part IV.B; PX 2137; PX 2147; Attachments D-F, H, & I).

## IV.   Analysis

### A.   Analysis of Transactions Relating to Investment Funds

34.   I have reviewed financial and accounting documents that show that the activities

and operations surrounding the Litigation were funded by a number of investors during varying

distinct periods of time throughout the course of the Litigation.  Based on the documents I

analyzed, it appears that the various individual investors, law firms, and litigation investment

firms agreed to provide approximately $32 million in funds to finance the activities and

14

operations surrounding the Litigation; the largest funders being KSG, DeLeon, and Torvia

Limited ("Torvia"), and Treca Financial Solutions ("Treca"), an indirect subsidiary of Burford

Capital LLC (formerly known as Burford Group LLC) ("Burford").  (*See* PX 2143).  However,

the available financial records showed Confirmed Payments accounting for only approximately

$16 million in investments contributed.

15

# Funding for the Enterprise

| Investor | Investments Contributed | Commitment Amounts[1] |
|---|---|---|
| Kohn Swift & Graf, P.C. | $ 6,360,647 | $ 6,360,647 |
| Russell DeLeon | $ 1,500,000 | $ 2,000,000 |
| Orin Kramer | $ 150,000 | $ 150,000 |
| Torvia Limited | $ 3,413,367 | $ 7,250,000 |
| Burford | $ 4,000,000 | $ 15,000,000 |
| 88 Capital | | $ 250,000 |
| Equitable Outcomes | | $ 150,000 |
| Jonaks Limited | | $ 200,000 |
| Satee GMBH | | $ 300,000 |
| David Sherman III | | $ 250,000 |
| Glenn Krevlin | | $ 250,000 |
| Michael Donziger | | $ 150,000 |
| Russell O. Wiese | | $ 50,000 |
| TC Payment Services International | $ 424,948 | |
| Amazonia Recovery Limited | $ 149,000 | |
| **TOTAL** | **$ 15,997,963** | **$ 32,360,647** |

*PX 2143*      *Confidential*

[1] Commitment amounts are amounts to be funded as defined in each individual or entity's respective funding agreement as "Commitment Amount" or "Capital Commitment." KSG's commitment amount is based upon Kohn's representation of investments contributed in his deposition testimony, as well as general ledger and bank records.

PLAINTIFF'S
EXHIBIT
2143
11 Civ. 0691 (LAK)

### i.   Kohn Swift & Graf P.C. Financing Era

35.   During the period 1993 through 2009, it appears that KSG contributed

approximately $6.4 million in connection with the Litigation and related matters.[16]   (*See* PX

2143).   I reviewed and analyzed documents such as emails, invoices, excerpts of general ledgers,

documents discussing flows of funds, fund transfers and requests, various memoranda requesting

authorization of payments, and fund disbursement schedules tracking payments, that evidence

that KSG provided financing for the Litigation.   The documents I reviewed show that from the

origination of the Litigation, Donziger managed the Litigation and related activities, and KSG

financed them.   However, the first agreement[17] describing Donziger's involvement in the

Litigation is a January 2006 agreement between Donziger, KSG and Law Offices of Cristobal

Bonifaz ("Bonifaz") and the Frente, indicating that the Frente retained the above attorneys to

---

[16]   KSG and Bonifaz filed the initial case *Aguinda v. Texaco, Inc.,* No. 93 Civ. 7527 (S.D.N.Y. 1993) (the "*Aguinda* Case" or "*Aguinda*"), which was dismissed in 2001. I reviewed an August 12, 1993, agreement where KSG and Bonifaz agreed to "work as co-lead counsel on the litigation." (*See* PX 2350 at p. 5-6 (WOODS-HDD-0218978-79). The agreement stipulated that KSG and Bonifaz "would apply to the court for attorneys' fees and reimbursement of costs from any amount obtained from the defendant by way of settlement or judgment" and that "the allocation of those fees between [the] firms…will be allocated based on the "lodestar" of the respective firms, i.e., the total number of hours worked multiplied by the hourly rate." (*See id.*). Bonifaz and KSG entered into a subsequent agreement on December 21, 1994, which superseded the August 12, 1993 agreement. (*See* PX 2350 at p. 1-3 (WOODS-HDD-0218974-76). The December 21, 1994 agreement stipulates that "[KSG] will be allocated a fee based on the "lodestar" method…or a fee equal to one third of the total fees awarded to all law firms and attorneys represented individually in the litigation, whichever is greater. (*See id.*). Further, the agreement provided that Bonifaz, "will be allocated the remaining portion of the fee to be shared, if necessary with any or all other law firms and attorneys represented individually in the litigation other than [KSG and Bonifaz]." (*See id.*). *See infra* ¶¶ 180-182. Documents I reviewed evidence that during the period 1993 through 2002 KSG provided financing of approximately $700,000. (*See* PX 641 (KSG00135246 (contains near duplicate of DONZ00083678))). Donziger states in his deposition testimony, that he was involved in *Aguinda* as plaintiff's counsel working "under the auspices of Mr. Bonifaz's firm." (*See* Donziger Dep., Dec. 23, 2010, at p. 1779:19-1780:6).

[17]   Agreement to Dispute a Case Against Chevron Texaco, Now Chevron, in Ecuador, ("Agreement to Dispute a Case Against Chevron") the FDA, on its own behalf and representing all of its member organizations, as well as the farmers residing in the Amazonian region impacted by the practices of Texaco; the Organization of Zionist Aboriginal Citizens of Ecuador (ONISE), representing the Zionist citizens; the Sequoia Aboriginal Organization of Ecuador (OISE), representing the Sequoia citizens; the Aboriginal Federation of Cofan Citizens of Ecuador (FEINCE), representing the people of Cofan entered into an agreement with the law firm of Kohn, Swift & Graft, the law office of Steven R. Donziger, and the law offices of Cristobal Bonifaz on January 2, 2006 to take on the litigation of the case *Aguinda vs. Texaco.* (*See* PX 248 (DONZ00115108)).

17

"handle"[18] the Litigation[19] case in Ecuador and/or in the United States and finance the costs of

Ecuadorian attorneys' fees and litigation expenses.[20]  (*See* PX 248 (DONZ00115108)).  In return,

Donziger, KSG, and Bonifaz were to receive a percentage of what was won in the case, in

addition to recovery of any costs they incurred during the course of the Litigation.  My review of

the documents revealed that Bonifaz was discharged as counsel soon after the "Agreement to

Dispute a Case Against Chevron" was drafted and I have not seen evidence that he executed the

"Agreement to Dispute a Case Against Chevron."  (*See* PX 248 (DONZ00115108); PX 2355

(DONZ00127157); WOODS-HDD-0218967-87).  Only KSG and Donziger executed the

"Agreement to Dispute a Case Against Chevron."  Donziger executed the "Agreement to Dispute

a Case Against Chevron" on April 27, 2006.  (*See* PX 248 (DONZ00115108); PX 2355

(DONZ00127157)).  I reviewed a separate agreement between KSG and Donziger dated as of

August 7, 2008, whereby they mutually agreed to an equal split of entitled fees after

reimbursement of costs, out-of-pocket disbursements, and amounts due to other attorneys were

paid.  (*See* PX 2352 at p. 1 of 2 (DONZ00115107)).

> 36.    Although the above agreements generally state that Donziger and KSG were
responsible for conducting the litigation and financing it, my analysis of the documents reveals
that they divided responsibilities.  During the period 2003 through 2009, KSG provided
financing for the matter and Donziger was primarily responsible for the oversight of the

---

[18]  The term "handle" is the specific wording in the Agreement; however my understanding is that this term was
utilized to mean "manage" the case.  (PX 248 at ¶ 2).

[19]  The "Agreement to Dispute a Case Against Chevron" references "*Aguinda v. Texaco*," however, based on my
reading of the documents, it is my understanding that this is a reference to the Litigation.  Maria Aguinda
remained the lead plaintiff in the filing of the *Maria Aguinda et al. v. Chevron-Texaco*, and it appears that the
LAPs' Attorneys and Representatives refer to the cases interchangeably.

[20]  Based on the language in the agreement, paragraph 1, it appears that this agreement superseded all previous
existing agreements between the parties. (PX 248 at ¶ 1).

18

Litigation, including the overall promotion of the case, raising capital to fund the case, management of the overall operations of the case, case strategy, advocacy and public relations efforts and case management.  For example, in an email dated July 15, 2009, Donziger writes to KSG "the obligation of your firm is to finance this litigation; that has been our understanding for years since the earliest days of the case."  (*See* PX 2447 (WOODS-HDD-0090032).

Additionally, in a February 4, 2010 letter, Donziger writes to Luis Yanza ("Yanza"), "my law firm and the Kohn law firm signed a separate agreement where we agreed that our firms would split equally any recovery of attorney fees . . .  this agreement was based on the understandings, consistent with years of practice as well as the agreement between the clients and the U.S. attorneys, that the Kohn firm would be responsible for covering the basic out-of-pocket expenses of the case while my firm would be primarily responsible for the overall management of the case in Ecuador and related advocacy efforts, such as media and outreach to environmental groups and shareholders."  (*See* PX 1222 (DONZ00129820)).

      37.     The financial information I have reviewed shows that KSG provided approximately $6.4 million dollars in the Litigation.  (*See e.g.*, PX 2143; PX 581, PX 584, PX 586; PX 641).  The documents also show that Donziger maintained control over KSG's investment through the facilitation and authorization of operational expenses paid directly by KSG.  During the KSG Financing Era, the documents evidenced various transactions, flows of funds, payments, and wire transfers from KSG to numerous individuals and entities including, but not limited to, Donziger, the Frente, Selva Viva, Stratus, Amazon Watch, and various other public relations advocates and consultants.  The roles of KSG and Donziger are clearly set forth in numerous documents between Donziger and KSG.  For example, whereby KSG provides Donziger a detailed disbursement schedule so that Donziger can perform his function of

19

overseeing the disbursements and raising additional funds.  Donziger asks Joseph Kohn

("Kohn"), "Can [you please] send me the disbursements document from the Chevron fund…I

need to show it to our funder."  (*See* PX 2427 at p. 1 of 4 (DONZ00025328)).

38.     I have reviewed a letter written by KSG dated November 19, 2009 to Yanza and

Pablo Fajardo ("Fajardo") which shows that KSG withdrew from representation and would not

be providing any additional financing after November 2009.  (*See* PX 1406 at p. 19 of 22

(DONZ00026949)).

### ii.     DeLeon Financing Era

39.     Donziger appears to have obtained additional investment funds for the Litigation

from Russell DeLeon.  In a letter on Donziger's letterhead dated March 28, 2007, Donziger

confirms the receipt of a $1 million dollar investment from DeLeon and sets forth the terms of

the investment.  (*See* PX 846 at p. 3 of 4 (DONZ00117411)).  This investment is evidenced in a

bank statement where I identified a transaction from DeLeon to Donziger's Law Firm Account

ending in 0218[21] on March 23, 2007, in the amount of $1,750,000.  (*See* PX 586 at p. 3 of 368

(DONZ00132978); PX 1482).  Subsequently, on March 28, 2007, Donziger transferred

$1,000,000 to KSG.[22]  (*See* PX 586 at p. 3 of 368 (DONZ00132978)).

40.     On March 9, 2010, DeLeon entered into a subsequent agreement with the LAPs to

fund an additional $500,000.  (*See* PX 2357 at p. 27 of 45 (WOODS-HDD-0231857-881)).  The

agreement explicitly stated that the "Case Fund shall be administered by the Litigators in

---

[21]   *See supra* n. 15

[22]   I was not able to determine the ultimate disposition of the additional $750,000 transfer, however, it appears that
it was utilized to fund activities related to a separate legal matter which Donziger was assisting DeLeon with in
connection with his online poker business.  This is evidenced in a March 29, 2007 memorandum from Donziger
to DeLeon, in which Donziger separately summarizes "various activities relating to Ecuador" and "activities
related to Party Gaming," noting that, "the funds you sent for legal fees are in a separate escrow account in
Chase Manhattan bank."  (*See* PX 846 at p. 1 of 4 (DONZ00117410 (duplicate of DONZ00081714)).

Plaintiff's Exhibit 4900R   p. 20 of 144

accordance with their professional responsibilities and obligations" and that the LAPs will ensure that "the Litigators at all times maintain accurate and complete accounting and other financial records in respect to the Case Fund." (PX 2357 at p. 7 of 45 (WOODS-HDD-0231863), p. 27 of 45 (WOODS-HDD-0231883)). "Litigators" is defined in the agreement as "Steven R. Donziger." (PX 2357 at p. 4 of 45 (WOODS-HDD-0231860)). It appears that the term "Case Fund" is first mentioned in an investment agreement dated June 30, 2009 between Donziger, KSG, and DeLeon for $500,000 and again in an executed agreement dated as of March 9, 2010. (*See* PX 543 (DONZ00039161-62); PX 2357). The draft agreement states that Case Fund "means an escrow account established for the purposes of banking the JRD Future Funding and any other monies for use in respect of the Case." (*See* PX 543 at p. 5 of 26 (DONZ00039162); PX 2357 at p. 4 of 45 (WOODS-HDD-0231860)). It does not appear that Donziger established a separate "Case Fund" account, and, instead, commingled DeLeon's investment funds with funds from other sources into the Law Firm Account. This is shown by bank statements that demonstrate that the Law Firm Account, which was where DeLeon's contributions were deposited, was established at least as early as March 8, 2007. (*See* PX 586 at p. 3 of 368 (DONZ00132978)). Additional evidence of commingling is the appearance in the Law Firm Account of funds from sources other than DeLeon or Torvia, such as a $400,000 deposit from Patton Boggs on December 31, 2010. (*See* PX 586 at p. 229 of 368 (DONZ00132906)). Unlike DeLeon's initial investment which was disbursed to Donziger and then transferred to KSG, funds from the subsequent investments stayed in Donziger-controlled bank accounts and Donziger appears to have had primary day-to-day control over the disbursement of the funds.

41.    On March 10, 2010, DeLeon transferred $500,000 in connection with the March 9, 2010 investment agreement to the Law Firm Account. (*See* PX 586 at p. 149 of 368

21

(DONZ00132930).  It appears that a supplemental Investment Agreement was entered into by
DeLeon and Donziger on March 11, 2010, with the March 9, 2010 Agreement as an annex.  (*See*
PX 2357 at p. 2, 20 of 45 (WOODS-HDD-0231857, WOODS-HDD-0231876); *see also* PX 1245
(WOODS-HDD-0231902-23)).  This Agreement specifies that, "[Donziger] shall ensure that the
Litigators at all times maintain accurate and complete accounting and other financial records in
respect of the Case Fund."  (*See* PX 2357 at p. 7 of 45 (WOODS-HDD-0231863)).  "Litigators"
is defined by the Agreement to mean "[Donziger] and/or other counsel as the Asamblea so
designates."  (PX 2357 at p. 4 of 45 (WOODS-HDD-0231860)).

      42.      Donziger's primary control over the investment funds is evidenced by his March
12, 2010 transfer of $500,000 from the Law Firm Account to the Ecuador Case Account ending
in 2758.  (*See* PX 586 at p. 151 of 368 (DONZ00132932); PX 1482)).  Subsequently, on March
23, 2010, Donziger issued a check to himself from the Ecuador Case Account in the amount of
$306,166.79, which on March 25, 2010 he deposited in his Personal Savings Account ending in
5678.  (*See* PX 586 at p. 151 of 368 (DONZ00132932) (check 999996); PX 617 at p. 113 of 126
(DONZ00134258)).  According to my review of a memorandum, as well as banking records, it
appears that this $306,166.79 was for the reimbursement of case related expenses that Donziger
claimed to pay out of his personal funds.  (*See* PX 617 at p. 113 of 126 (DONZ00134259); PX
647 at p. 4 of 4 (WOODS-HDD-0022012) (listing expenditures purportedly associated with
check 999996)).

      43.      Based upon Donziger's poor record keeping, as well as apparent incomplete
financial records, it is not possible to reconcile the expenses that he claims he has paid to the
expense reimbursement check of $306,166.79 that he wrote to himself.

Plaintiff's Exhibit 4900R   p. 22 of 144

44.     Based on my analysis of the financial information, it appears that fund transfers between accounts were common.  It appears that Donziger had multiple bank accounts (trust and personal),[23] and I was not able to locate any documentation to support the transfers between these accounts.  Per review of the documents, it appears that on August 17, 2010, per a funding agreement with Torvia Limited, Magister Law (DeLeon's attorneys in Gibraltar) wire transferred $1,250,000 to the Law Firm Account.  (*See* PX 586 at p. 185 of 368 (DONZ00132898)).  The Agreement was not executed until October 31, 2010; however, it had an effective date of August 17, 2010.  (*See* PX 547 at p. 2, 4, 20 of 21 (DONZS00013699-700 (contains duplicate of DONZS00013727)).  On August 18, 2010, Donziger completed an online transfer in the amount of $1,250,000 from the Law Firm Account to the Ecuador Case Account.  (*See* PX 586 at p. 185 of 368 (DONZ00132898)).  Subsequently, there are numerous wire transfers and check payments made by Donziger from the Ecuador Case Account to various entities including, but not limited to, Selva Viva in the amount of $30,000, Andrew Woods ("Woods") in the amount of $25,000, Julio Prieto Mendez ("Prieto") and Pablo Fajardo Mendoza, each for $10,000, Stratus in the amount of $108,567.38, The Weinberg Group ("Weinberg") in the amount of $50,000, Emery Celli Brinkerhoff & Abady, LLP ("ECBA") in the amount of $98,534.52, Jay Horowitz of Horowitz & Forbes LLP in the amount of $65,812.62, John Boyd in the amount of $5,000, and Coffield Law Group in the amount of $19,410.19.  (*See* 586 at p. 187 of 368 (DONZ00132900)).  Evidence demonstrates that Donziger commingled funds when, on August 30, 2010, he transferred $464,736.50 from the Ecuador Case Account to his Personal Savings Account ending in 5678.  (*See id.*).  Based upon the documentation reviewed and the redacted account information, I was not able to determine the ultimate disposition of the $464,736.50.  See PX

---

[23]  *See supra* n. 15.

Plaintiff's Exhibit 4900R   p. 23 of 144

2145 for an illustration on the flow of funds following the August 17, 2010 transfer of

$1,250,000.

Plaintiff's Exhibit 4900R   p. 24 of 144



PX 586 at p. 185-187 (DONZ00132898-900)

PX 2145     Confidential

PLAINTIFF'S EXHIBIT
2145
11 Civ. 0691 (LAK)

Plaintiff's Exhibit 2145   p. 1 of 1

Plaintiff's Exhibit 4900R   p. 25 of 144

45.     Subsequent financial statements evidence seven wire transfers from █████████ ██████████████████████████████████████████ to the Law Firm Account ██████████████████████████████████████████.  (*See* PX 586 at p. 295, 301, 305, 309, 321, 339, 356 of 368 (DNZDEF0009210, DNZDEF0009216, DNZDEF0009220, DNZDEF0009224, DNZDEF0009236, DNZDEF0009254, DNZDEF0009271)).  There is evidence of an additional twelve wire transfers to the Selva Viva Account 5004 between May 20, 2011 and April 4, 2013 from DeLeon, or his related Gibraltar entities, including Magister Law, TC Payment Services International, Torvia Limited, as well as Amazonia Recovery Limited.[24] (*See* PX 583 at p. 68, 70, 72, 75, 77, 78, 81, 83, 85, 87, 89 of 181 (BPNA02928, BPNA02930, BPNA02932, BPNA02935, BPNA02937, BPNA02938, BPNA02941, BPNA02943, BPNA02945, BPNA02947, BPNA02949)).  Altogether, the additional wire transfers total $1,082,829.  (*See id.*).  It appears that these amounts satisfy portions of the aforementioned Deleon and Torvia investment agreements.  Due to the lack of detailed accounting records, I am unable to confirm the disposition of these funds.

46.     During the DeLeon Financing Era, the documents I reviewed and analyzed show various transactions, flows of funds, payments, and wire transfers to numerous individuals and entities including, but not limited to, Donziger, Fajardo, Prieto, Woods, ECBA, Weinberg, Selva Viva, Stratus, and various other public relations advocates and consultants.  It appears that the funds were primarily controlled by Donziger, who authorized, facilitated, or paid various

---

[24]  TC Payment Services is assumed to be a DeLeon-related entity, as it is established in Gibraltar, and his wife, Ruth Parasol DeLeon, and his law firm, Magister law, are named in the company profile and particulars.  (*See* PX 2462; 2011 12 21 Particulars of Directors & Secretaries of TC Payment Services (International)).  Amazonia Recovery Limited is also connected to DeLeon, as it is established in Gibraltar and Torvia Limited is a significant shareholder.  (*See* PX 2463 at p. 2 of 3; PX 656 at p. 4,13,15,17,19 of 19).

26

individuals and entities.  However, based on the lack of detailed accounting records produced I was not able to determine the ultimate disposition of all funds contributed or disbursed.

### iii.  Burford Financing Era

47.     Evidence I have reviewed shows that on October 31, 2010, Burford agreed to provide potential financing of up to $15 million to further advance the Litigation.  (*See* PX 552 at p. 8, 36 of 79 (DONZS00015669-70).  Burford's investment was substantiated in the Treca Financial Solutions Agreement ("Treca Agreement" or "Burford Funding Agreement"), which provided for financing in three tranches — the first tranche totaled $4 million, and the second and third tranche were each for $5.5 million.[25]  (*See* PX 552 at p. 8, 36 of 79 (DONZS00015670 Pages 4, 32 of 75)).  Based on the documents I reviewed, it appears that Treca was to disburse the initial funding tranche to the Trust Account, which was maintained by the Nominated Lawyers, Patton Boggs, to be used solely to hold funds requested by the LAPs to pay for the operational expenses in connection with the Litigation.  (*See id.* at p. 36, 45-46 of 79).  Unlike the previous financing arrangements, the Burford Funding Agreement required expenses to be jointly approved by Donziger and another law firm — Patton Boggs, named in the Burford Funding Agreement as the Nominated Lawyers.  (*See id.* at p. 35-36 of 79).

48.     I have reviewed evidence which shows that the initial tranche of the "Capital Commitment" in the Burford Funding Agreement was funded (*See* PX 552 at p. 8 of 79 (DONZS00015669-70)).  However, I understand that specific evidence (e.g., bank statements, wire transfers, etc.) to confirm that the initial funding occurred has not been produced.  In an email dated November 2, 2010, transmitted to Donziger, Nicolas Economou of H5, William

---

[25]   *See supra ¶* 34 (noting relationship between Treca Financial Solutions and Burford Group LLC).

27

Carmody of Purrington Moody Weil LLP, and James Tyrrell of Patton Boggs, amongst others, Christopher Bogart writes, "I confirm that we have funded Patton Boggs' London account."  (*See* PX 552 at p. 3 of 79 (DONZS00015669-70)).  Additionally, Burford has publicly acknowledged that they provided the initial $4 million of funding on October 31, 2010.  (*See e.g.*, Parloff, Roger, "Investment Fund: We were defrauded in suit against Chevron," CNN Money, January 10, 2013, *available at* http://finance.fortune.cnn.com/2013/01/10/burford-capital-chevron-ecuador/).

49.     Although Donziger was not the "Nominated Lawyer" in the Burford Funding Agreement, it appears that he remained involved in the facilitation and authorization of fund disbursements.  (*See* PX 552 at p. 35-36 of 79)).  A draft retainer agreement for Patton Boggs referenced the Burford Funding Agreement and contemplated that the firm provide Donziger, the "Plaintiffs' U.S. Representative"[26] with "a monthly statement setting forth all deposits and withdrawals from the Trust Account."  (PX 553 at p. 5 of 14 (Section 3(f)); *see supra* ¶ 47 (discussing Burford Funding Agreement "Trust Account").  The draft Patton Boggs retainer agreement also contemplated that Patton Boggs would submit its invoices to Donziger (*see id.* at p. 5 of 14 (Section 3(e)) and that Patton Boggs would only be able to release funds from the Trust Account for payment of such invoices upon Donziger's review and approval in writing.  (*See* PX 553 at p. 5–6 of 14 (Section 3(g))).

50.     The documents I reviewed demonstrate that on December 31, 2010, Patton Boggs wire transferred $400,000 to the Law Firm Account.  (*See* PX 586 at p. 223 of 368 (DONZ00132906)).  Notably, on January 3, 2011, Donziger transferred $50,000 from the Law

---

[26]   The draft Patton Boggs Retainer Agreement defines Donziger as the ""Plaintiffs' U.S. Representative." (PX 553 at p. 3 of 14)

Plaintiff's Exhibit 4900R   p. 28 of 144

Firm Account to his Personal Checking Account ending in 5365.  (*See* PX 586 at p. 235 of 368

(DONZ00133915)).  Subsequently, Donziger also transferred $35,000 to Selva Viva and $30,000

to Karen Hinton ("Hinton").  (*See id.*; *see also infra* ¶ 87 (discussing Donziger's approval of a

payment to Weinberg subsequent to funding from Burford).

      51.      Further illustrating the complexities in tracing the flow of funds and the

commingling between accounts on March 15, 2011, Donziger transferred $40,000 from the Law

Firm Account to his Personal Checking Account ending in 5365.  (*See* PX 586 at p. 259 of 368

(DONZ00133921)).  On March 17, 2011, Donziger transferred $30,000 from his Personal

Checking Account ending in 5365 to the Ecuador Case Account.  (*See id*. at p. 260 of 368

(DONZ00133922)).  On the same day, Donziger proceeded to transfer $30,000 from the Ecuador

Case Account to the Selva Viva Account ending 5004 in Banco Pichincha.  (*See id*. at p. 261

(DONZ00133923)).  See PX 2146 for an illustration of the flow of funds.

29



# FUNDING PROVIDED TO SELVA VIVA SELVIVA CIA, LTDA. THROUGH STEVEN DONZIGER

Steven Donziger

The Law Firm Account (0218)

Personal Checking Account (5365)

Ecuador Case Account (2758)

**(1)**

**(2)**

(1) – 3/15/2011 Donziger transfers $40,000 from the Law Firm Account to Personal Checking Account (5365)

(2) – 3/17/2011 Donziger transfers $30,000 from Personal Checking Account (5365) to the Ecuador Case Account (2758)

(3) – 3/17/2011 Donziger transfers $30,000 from the Ecuador Case Account (2758) to Selva Viva in Ecuador

**(3)**

Selva Viva

PX 2146    Confidential                    PX 586 at p. 257-63 (DONZ00133919-24)

**PLAINTIFF'S EXHIBIT**
**2146**
11 Civ. 0691 (LAK)

Plaintiff's Exhibit 2146   p. 1 of 1

Plaintiff's Exhibit 4900R   p. 30 of 144

52.     It appears that Donziger was subsequently reimbursed by Patton Boggs on March 18, 2011, where Patton Boggs transferred $30,000 into the Law Firm Account.  (*See* PX 586 at p. 259 (DONZ00133921)).

53.     Through my review of the documents, I have not found any evidence indicating that the two additional tranches in the Burford Funding Agreement were funded by Burford. Additionally, I have reviewed evidence which supports the conclusion that Burford, neither through Treca nor through another entity, provided further funding after the first tranche.  (*See* PX 1490 (BUR0000845-47); PX 1476 at p. 2-4 of 4 (BUR0041741-44 (contains duplicate of WOODS00039812-14); Christopher Bogart Decl., Apr. 16, 2013, at ¶¶ 4, 28, 32, Dkt. 1039-2 at p. 4 of 21).

### iv.     Conclusion

54.     In my opinion, it appears Donziger had primary control of the financing and related fund disbursements.  Particularly with respect to the KSG and DeLeon investments, the majority of the funds were deposited into accounts controlled solely by Donziger, allowing him the opportunity to distribute funds as he determined.  Although KSG often requested that Donziger provide invoices and receipts to KSG with his requests for funds, I was unable to trace a majority of the funds provided by KSG.  DeLeon rarely required any sort of back up or accountability from Donziger.  Burford entrusted the distribution of its contribution to the Litigation to Patton Boggs and Donziger.  I have seen records indicating that $400,000 of Burford's $4 million investment was transferred directly to Donziger.  I have seen no documents detailing the disbursement of the remaining Burford investment, and as such, the final disposition of the $4 million initial tranche from the Burford Funding Agreement is unclear. Based upon my understanding of COSO Internal Control – Integrated Framework and my

31

professional experience in reviewing accounting, financial, and business records, I have found

that financial and accounting decisions primarily controlled by one individual (i.e., Donziger),

inadequate documentation to support transactions, incomplete and/or unclear accounting records,

excessive number of bank accounts, commingling of trust and personal funds, and frequent fund

transfers from account to account are all potential indicators of fraud.[27]

      55.    In my opinion, the extremely poor organization and incomplete nature of the

financial and accounting records that Donziger produced and appeared to maintain would not

have allowed him to provide accountability to either his investors or to the LAPs as to the totality

of the funds that were raised or the expenses incurred in relation to the Litigation.  For example,

there are numerous documents prepared by Woods, including one dated June 9, 2011, that appear

to be an attempt to create an overview of reimbursable disbursements made by Donziger related

to the Litigation.  (*See* PX 1483 (WOODS00044485-86 (near duplicate of March 12, 2011

memorandum from Woods to Donziger, WOODS00044495-96)).  However, Woods notes that,

"the amounts herein reflect my best accounting of the expense categories based on the American

Express account I have access to and your verbal representations to me.  I have indicated where I

still need backup documentation for the expense categories with an asterisk."  (PX 1483 at p. 1

of 2 (WOODS00044485-86)).  It appears that Donziger was reimbursed $400,000 via a wire

transfer from Patton Boggs on December 31, 2011.  (*Compare* PX 1483 (WOODS00044485-86),

*with* PX 586 at p. 223 of 368 (DONZ00132906)).  However, the majority of expenses listed on

Woods' memorandum to Donziger have no backup and appear to be based entirely on

Donziger's "verbal representations."  (PX 1483 (WOODS00044485-86)).  Therefore these

---

[27]  The Committee of Sponsoring Organizations of the Treadway Commission (COSO) is a joint initiative of five
private sector organizations and is dedicated to providing thought leadership through the development of
frameworks and guidance on enterprise risk management, internal control and fraud deterrence.

32

memoranda are not sufficient to determine the status of Donziger's disbursements and expenses related to the Litigation. Although I was able to construct a summary of approximate fund disbursements, it required an exhaustive analysis of thousands of documents, such as emails, memoranda, court documents, executed and unexecuted agreements, invoices, excerpts of general ledgers, and expense documents. The incomplete financial records that were produced and apparently maintained by Donziger render it virtually impossible to determine the ultimate source and uses of funds transferred to or from various entities in connection with the Litigation. Under the agreements he signed, including his retainer agreements establishing his role as attorney and U.S. Representative for the LAPs (*see* PX 558 at p. 4-5 of 13), Donziger had a responsibility to safeguard and segregate the investments raised for the Litigation from his personal and other business assets, to not commingle various assets between accounts, and to maintain accurate and complete accounting and financial records; however, Donziger failed to meet these responsibilities.

56.     I have determined that as of July 2012, Donziger had a balance of approximately ▮▮▮▮▮▮▮ in his personal Chase Bank accounts ending in ▮▮▮▮▮▮▮▮▮▮▮▮ (*See* PX 2519 at p. 317 of 322 (DNZDEF0009418)). Donziger also had a balance of approximately ▮▮▮▮▮▮ in his Chase Bank business accounts ending in 2758 (the "Ecuador Case Account") and 0218 (the "Law Firm Account"). (*See* PX 586 p. 365 of 368 (DNZDEF0009280)). Additionally, as of April 2013, the Selva Viva account ending in 5004 at Banco Pichincha had a balance of approximately $122,000, and the Frente account ending in 0404 at Banco Pichincha had a balance of approximately $125,000.[28]  (*See* PX 583 at p. 90 of 181 (BPNA02950); PX 575 at p.

---

[28]   The Frente account ending in 9800 at Banco Pichincha appears to have been closed, as the final activity for this account was March 2012, with an ending balance of only $104.81.  (*See* PX 578 at p. 9 of 19 (BPNA00439)).

33

39 of 79 (BPNA01367)).  Due to the lack of subsequent bank records, I am unable to determine the final disposition of the aforementioned funds.

**B.      Fund Disbursements for the Operations in Support of the Lago Agrio Litigation**

57.      The financial and accounting documents I have reviewed show the investments obtained in connection with the Litigation were utilized for direct costs of litigation such as Ecuadorian and U.S. attorneys' fees and expert and consultant fees, as well as for other expenses, including the overall promotion of the case, case strategy, and advocacy and public relations efforts.  Based on my review of the documents, it appears that disbursements were made to various individuals and entities, which I have classified into nine categories as follows:  Steven Donziger and the Law Offices of Steven R. Donziger, P.C., U.S. Counsel, Ecuadorian Counsel, Selva Viva, Experts and Consultants, Public Relations, Crude, Lobbyists, and NGOs.

58.      In my review of the available documents, I saw Evidence of Payments of approximately $22 million during the period 1993 to 2011.  I was able to identify Confirmed Payments totaling approximately $7 million.  (*See* PX 2137 (Summary of Enterprise Spending); PX 2147 (Evidence of Payments)).

# Summary of Enterprise Spending

| Payment To | Confirmed Payments[1] | Evidence of Payments[1] |
|---|---|---|
| Public Relations | $ 207,820 | $ 601,443 |
| Experts and Consultants | $ 999,934 | $ 4,931,540 |
| U.S. Counsel | $ 958,594 | $ 7,564,639 |
| Ecuadorian Counsel | $ 140,820 | $ 684,319 |
| Steven R. Donziger [2] *and the Law Offices of Steven R. Donziger* | $ 958,168 | $ 1,348,068 |
| Crude | $ 37,608 | $ 2,474,139 |
| NGOs | $ 260,361 | $ 765,282 |
| Selva Viva Selviva CIA, Ltda. | $ 3,477,617 | $ 3,657,615 |
| **TOTAL** | **$ 7,040,923** | **$ 22,027,045** |

[1] The transactions and transfers that could be reconciled to documents from financial institutions (e.g., a wire transfer record, cancelled check, or bank statement) were classified as "Confirmed Payments." Where a particular payment could not be confirmed, but there was some evidence of a payment, it is designated as "Evidence of a Payment." In instances where a Confirmed Payment represented the only evidence of a transaction, I also captured this amount as Evidence of a Payment; as such, the Evidence of Payments is an approximate representation of all transactions, whether confirmed or unconfirmed.
[2] The amount to Steven Donziger includes only those payments that could be confirmed as salary based on available documentation and does not include either reimbursements for expenses or lump sums Donziger transferred between his business and personal accounts, including a $464,736.50 transfer from the Law Firm Account (0218) to his personal account (5678) on August 18, 2010. (*See* PX 586 at p. 185-187 (DONZ00132898-900)).

*PX 2137     Confidential*

PLAINTIFF'S
EXHIBIT
2137
11 Civ. 0691 (LAK)



**Evidence of Payments Based on Available Documentation**

Steven R. Donziger and the Law Offices of Steven R. Donziger
6.1%
$1,348,068

Selva Viva CIA, LTDA.
16.6%
$3,657,615

Public Relations
2.7%
$601,443

NGOs
3.5%
$765,282

Experts and Consultants
22.4%
$4,931,540

- Richard Cabrera, Stratus Consulting, UBR, & Weinberg
  11.7%
  $2,586,024

- All Other Experts and Consultants
  10.7%
  $2,345,517

U.S. Counsel
34.3%
$7,564,639

Crude
11.2%
$2,474,139

Ecuadorian Counsel
3.1%
$684,319

PX 2147    Confidential

PLAINTIFF'S EXHIBIT
2147
'11 Civ. 0691 (LAK)

Plaintiff's Exhibit 2147   p. 1 of 1

Plaintiff's Exhibit 4900R   p. 36 of 144

### i.    Steven R. Donziger and the Law Offices of Steven R. Donziger

59.    The documents I reviewed show Evidence of Payments in various forms, including, but not limited to, request for payments, discussions of the status of such payments, and Confirmed Payments to Donziger and employees of the Law Offices of Steven R. Donziger, P.C.,[29] for legal services rendered on behalf of the LAPs in connection with the Litigation.  The documents I analyzed included invoices from Donziger, issued through the Law Offices of Steven R. Donziger, P.C., for monthly fees as well as various emails discussing the status of his requests, all of which were directed to various staff members of KSG.  Based on the amounts requested for payment in the documents made available for review, it appears that Donziger requested approximately $1.3 million for salary for himself and his employees, associates, and interns, separate from requests by other U.S. Attorneys.  (*See* PX 2137).

60.    From available documents, it appears that from the period beginning February 2004 through November of 2009, Donziger made repeated requests for monthly salary-type payments through issuing invoices for payment of his fees to KSG.  The monthly amounts requested by Donziger varied within the range of $10,000 to $17,500, and these amounts were sometimes grouped together in larger requests representing multiple months of fees.  (*See* PX 634 (DONZ00082640-708)).  From the financial records available, I identified Confirmed Payments for approximately 70% of the requests made by Donziger, which represents approximately $958,000.  (*See* PX 2137).

61.    Based on documents I reviewed, it appears that the "Chevron Fund" maintained by KSG was the source of funding for a significant portion of the payments requested by

---

[29]  Employees of the Law Offices of Steven R. Donziger, P.C. are individuals who worked in roles such as associates, assistants, and interns.  These individuals include Andrew Woods, Benjamin Goldstein, Cara Parks, Daniel M. Firger, Daria Fisher, Farihah Zaman, Gabriela Espinoza, Jeremy C. Low, Laura Garr, and Lauren Schrero.

37

Donziger; funds were transferred from the Chevron Fund to the KSG Attorney Account for disbursement to Donziger.[30]  (*See* PX 2427 at p. 3–4 of 4 (DONZ00025329)).

62.     It appears that a significant portion of the payments made to Donziger for his salary requests between February 2004 and November of 2009 came from the "Chevron Fund" managed by KSG; however, in May of 2007, Donziger also sought funds for his salary-type payments from another source, an investment made by DeLeon.  On March 28, 2007, Donziger drafted a letter to DeLeon stating that, "we have received from you the sum of $1 million (U.S.) (the "funds") to support this litigation, subject to the following terms . . . funds will not be used to retire debts relating to the *Aguinda* litigation at the time the funds were received . . . ."  (PX 846 at p. 3 of 4 (DONZ00117411)).  The terms outlined in the confirmation letter provided that these funds were not to be used to settle past-due litigation debts.  However, on May 1, 2007, Donziger requested that Kohn provide approximately $118,000 out of this investment fund to cover several months of Donziger's current and past due salaries and expenses.  (*See* PX 854 at p. 1 of 2 (DONZ-HDD-0107288)).  In his request to KSG, Donziger stated that "Russ[ell DeLeon] is cool with it."  (*See id.*).  Based upon my review of schedules prepared by KSG, it appears that through November 30, 2007, $136,997.96 was disbursed to Donziger from the supposedly restricted investment made by DeLeon.  (*See* PX 641 (KSG00135246 (contains near duplicate of DONZ00083678))).  ███████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

---

[30]  Per a letter from Joseph C. Kohn, the account ending in 0412 is the account corresponding to the Kohn, Swift & Graf Attorney Account while the account ending 4900 is the Kohn, Swift & Graf/Chevron Litigation Account. (*See* DONZ00038743; *see also* PX 641 at p. 6 of 13 (KSG00135251)).

████████████████████████████████████████████████

████████████████████        Due to the limited banking records provided, I was unable to confirm if all

of the payments from the KSG case funds were definitively made to Donziger, however, this

appears to be a clear example of the poor condition of the financial records Donziger maintained

related to transactions made in connection with the Litigation.  These conditions would have

made it almost impossible for Donziger to provide full accountability for the financial

transactions with which he was involved.

      63.     Donziger also requested payments from DeLeon separate and above those

requested from KSG, in several instances these requests related to the same period of service.

For example, in a December 17, 2007 email to DeLeon, Donziger submitted an expense

summary, invoices, and a request for reimbursement.  (*See* DONZ-HDD-0147576-79).  Donziger

issued an invoice to DeLeon, dated November 24, 2007, in the amount of $64,200, as well as an

invoice dated December 3, 2007 in the amount of $49,200.  (*See id.*).  These invoices appear to

be the last in a series of invoices issued to DeLeon representing fees from March through

November of 2007 totaling approximately $405,900.  (*See id.*).  It appears that these requested

payments were paid out of the DeLeon IOLA Account ending 9822[31] at Chase Bank; however,

due to the limited and redacted nature of Donziger's personal bank statements, I have been

unable to confirm receipt of all of these payments.[32]  I reviewed a statement regarding the activity

in the DeLeon IOLA Account ending in 9822 through August 14, 2008, which notes that

---

[31]  *See supra* n.15.

[32]  I can confirm check withdrawals from the DeLeon IOLA Account ending 9822 for the amounts Donziger
requested in his December 17, 2007 email to DeLeon.  (*Compare* DONZ-HDD-0147576-79, *with* PX 588 at p.
37 of 231 (DNZDEF00011064) (showing images for checks 1183, 1184, and 1185 to Steven Donziger from
account ending 9822)).  Due to the redactions in the account statements for Donziger's Personal Chase Bank
Accounts, I cannot confirm whether Donziger deposited these checks in any of the accounts for which I have
records.

39

Donziger was in receipt of fees totaling $800,612.50 for the period March 2007 through April 2008. (*See* PX 606 (DONZ00036216-17)).  During the deposition of Donziger, his attorney noted that this amount was related to another matter[33] and Donziger himself states that these fees were unrelated to the Litigation; however, the recipients of the other payments on the sheet, such as the Weiser Group[34] and Fajardo,[35] clearly link a portion of these funds to the Litigation. (*See id.*; Donziger Dep., Dec. 8, 2010, at p 937:7-13).  As such, it is difficult to assess the accuracy of the purported fee payments Donziger received from the DeLeon IOLA Account ending 9822 and whether they were related to the Litigation or separate ongoing matters for DeLeon.

64.     The documents I reviewed show Evidence of Payments from July 15, 2002 through April 20, 2010 totaling approximately $971,000 related to Donziger's monthly salary-type payments (excluding the DeLeon requests).  I identified Confirmed Payments for approximately $787,000.  Subsequent to April 1, 2009 according to Donziger, he was paid, "15 to $20,000 a month when compensated." (*See* Donziger Dep., Dec. 8, 2010, at p. 924:15-925:9).  Based on Donziger's assertion regarding the amount he received monthly, from April 2010 through February 2013 he would have received an additional $555,000 to $740,000 in salary.  The documents evidence payments totaling approximately $1.3 million related to Donziger's salary and that of his employees, with Confirmed Payments for approximately $958,000. (*See* PX 2137; PX 2147).

---

[33]   "…everything on this piece of paper, Exhibit 455 for identification [DONZ00036216], other than the $1 million fee figure shown to Kohn Swift & Graf re Ecuador case, has to do with other legal work that Mr. Donziger did for Mr. DeLeon and is not part of -- it is not responsive to this case.  It was obviously produced by mistake. And the only part of it that he should be allowed to be questioned on is the Kohn Swift & Graf fee payment. The other is totally unrelated…" (*See* Donziger Dep., Dec. 8, 2010, at p. 927:21-928:9).

[34]   Donziger states that the Weiser Group performed public relations work associated with the Litigation. (*See* Donziger Dep., Dec. 8, 2010, at p. 937:20-23).

[35]   A $10,000 donation to Fajardo is noted in PX 606 (DONZ00036216).

Plaintiff's Exhibit 4900R   p. 40 of 144

### ii.   U.S. Counsel

65.     The documents I analyzed include transactions with individuals or entities that provided legal services in connection with the Litigation in the United States and/or operated primarily or exclusively in the United States, including Aaron Marr Page and Forum Nobis; Aguirre, Morris & Severson LLC; Brownstein Hyatt Farber Schrek, LLP; Coffield Law Group; Constantine Cannon; Dow Golub Remels & Beverly, LLP; Emery Celli Brinckerhoff & Abady LLP; Freedman & Boyd; Friedman Kaplan Seiler & Adelman LLP; Gerald Lefcourt; Graham Erion; Hoff Curtis; Horowitz & Forbes LLP; Motley Rice LLC; Patton Boggs; Purrington Moody; Recht & Kornfeld P.C.; Roberts & Stevens; Slater, Tenaglia, Fritz & Hunt, P.A.; and Stein, Sperling, Bennett, De Jong, Driscoll & Greenfeig, P.C. [36]  (*See* Attachment D).  Based on the documents reviewed it appears that the above mentioned firms and individuals requested payments totaling approximately $7.5 million.  (*See* Attachment D).

66.     Several different firms throughout the United States were engaged by the LAPs' Attorneys and Representatives through various arrangements to respond to Section 1782 discovery proceedings throughout the United States; for example, Patton Boggs; Slater, Tenaglia, Fritz & Hunt, P.A. ("Slater"); Aguirre , Morris & Severson LLC ("Aguirre"); and Brownstein Hyatt Farber Schrek, LLP.

67.     The documents I reviewed revealed that the entities and individuals rendering legal services were engaged and compensated through several different individuals and entities working on behalf of the LAPs.

---

[36]   Other individuals and entities, such as Robert Morvillo of Morvillo, Abramowitz, Grand, Iason & Silberberg, P.C., were considered; however, I did not review evidence of executed retainer agreements or other evidence which show that the individuals or firms were retained in the Litigation.

41

68.     For example, it appears that Patton Boggs had a draft agreement to be jointly

engaged by Fajardo, acting on behalf of the LAPs; Ermel Chavez Parra, acting on behalf of the

Frente; and Yanza, acting on behalf of the Asamblea De Afectados Por Texaco to provide

assistance in connection with the Litigation in relation to the Section 1782 proceedings filed by

Chevron throughout the United States.  (*See* PX 553 (DONZS00016115)).  It appears that Patton

Boggs initially expressed interest in becoming involved in the Litigation due to a request for

information from Donziger, to which Patton Boggs responded on February 5, 2010.  (*See*

DONZ00102519-20).  In exchange for these services, it appears that Patton Boggs was to receive

12% of the Total Contingency Fee Payment from a Final Judgment[37] as well as an "Hourly Fee

Payment . . .  [of] 75% of the standard hourly rates normally charged by" Patton Boggs.[38]  (*See*

PX 553 at p. 4 of 14 (Sections 3(a)-(b)) (DONZS00016115)).

69.     Additionally, consistent with the Burford Funding Agreement, the Patton Boggs

draft retainer agreement states that Patton Boggs would receive invoices for other attorneys

retained by the LAPs in the Litigation and pay said invoices upon approval by Tyrrell, the lead

attorney for Patton Boggs and Donziger.[39]  (*See* PX 553 at p. 6 of 14 (Section 3(h)); *see supra*

---

[37]  Section 3(a) of the unsigned draft retainer agreement states that "[a]s compensation for its services hereunder, the Firm shall be entitled to twelve percent (12%) of the Total Contingency Fee Payment.  The "Total Contingency Fee Payment" means an amount equal to twenty percent (20%) of all Plaintiff Collection Monies." (*See* PX 553 at p. 4 of 14 (DONZS00016115)).

[38]  Section 3(b) of the unsigned draft retainer agreement states that "[a]s further compensation for its services hereunder, the Firm shall, subject to paragraphs (d), (e) (f) and (g) below, be entitled to payment for time spent by the Firm's attorneys and paralegals on the Litigation at seventy five percent (75%) of the standard hourly rates normally charged by the Firm."  (*See* PX 553 at p. 4 of 14 (DONZS00016115)).

[39]  Section 3(h) of the unsigned draft retainer agreement states that, "The Firm acknowledges that other law firms, advisors and service providers retained by the Plaintiffs in connection with the Litigation and related activities have been instructed to submit their respective monthly invoices to (x) James E. Tyrrell, Jr. in his capacity as chairman of the management committee under the Master Agreement and (y) Plaintiffs' U.S. Representative. The Firm shall not make any payment in respect of any such invoice unless and until it has received the written authorization to pay such invoice from (i) James E. Tyrrell, Jr., in his capacity as chairman of the management committee under the Master Agreement, and (ii) the Plaintiffs' U.S. Representative.  The Firm shall pay each

*(Cont'd on next page)*

42

¶ 49 (discussing requirement of Donziger approval for payment of Patton Boggs' invoices from investment funds from Burford Funding Agreement)).  It appears Patton Boggs did pay the invoices of other attorneys.  For example, Adlai Small ("Small") of Patton Boggs, requested Donziger review and approve the payment of invoices for Slater for $3,750 related to Section 1782 proceedings in New Jersey and Aguirre for $10,656.73 related to Section 1782 proceedings in California.  (*See* DONZS00015047).  Donziger subsequently indicated his approval for Patton Boggs to issue payment for these amounts to the firms.  (*See id.*).  Based on the limited documentation available, I was unable to verify these payments to Slater and Aguirre as Confirmed Payments.  (*See* Attachment D).

70.     Documents I have reviewed show that in November of 2010 ECBA sent an invoice for various legal services to Tyrrell at Patton Boggs stating, "See the attached as per Steve's [Donziger] request."  (*See* DONZS00015694-95).  The request was an invoice totaling $366,141.93 and included descriptions of legal services for: calls and discussions regarding the Section 1782 motions, as well as various aspects of the case in New York, Colorado, and Texas.  (*See id.*).  In total, for the period of May 4, 2010 through November 11, 2010, ECBA appears to have requested approximately $937,000 in payment from various sources.  From the available documents, I was only able to identify Confirmed Payments relating to ECBA for approximately $396,000.  (*See* Attachment D).

71.     ECBA originally signed an engagement letter with Donziger, as well as Yanza and Fajardo, in December 2009.  (*See* PX 544 (DONZ-HDD00215173); PX 2448 (DONZ00067188 (near duplicate of DONZ00053422-423))).  Based on my review of the

---

*(Cont'd from previous page)*

    invoice as to which the foregoing written authorizations have been given no later than 10 days following its receipt of all necessary approvals."

Plaintiff's Exhibit 4900R   p. 43 of 144

documents, it appears that during the period of May 2010 through September 2010, Donziger

remitted payment to ECBA directly out of both his Personal Savings Account ending in 5678

and the Law Firm Account.  For example, on May 11, 2010 and September 28, 2010 Donziger

wire transferred $90,000 and $95,200.88, respectively, from his Personal Savings Account

ending in 5678 to ECBA's TD Bank account ending in 3673.  (*See* PX 2519 at p. 90, 127 of 322

(DONZ00134274, DONZ00133524 ).  On July 1, 2010, July 6, 2010 and August 23, 2010,

Donziger wire transferred $25,000, $87,237.49, and $98,534.52, respectively, from the Law Firm

Account to ECBA's TD Bank account ending in 3673.  (*See* PX 586 at p. 179, 187 of 368

(DONZ00132918, DONZ00132900).

   72.  Motley Rice was engaged to provide services for the LAPs or any related third

party in connection with Section 1782 proceedings throughout the United States.  In exchange

for these services, it appears that Motley Rice was to receive 16.5% of the Total Contingency

Fee Payment.[40]  (*See* PX 557 at p. 2 of 11 (Section 3(a)) (WOODS00045380)).  This

arrangement also provided Motley Rice with reimbursement of Ordinary Expenses[41] and

"Extraordinary Expenses" upon approval of Donziger, and an unnamed "Chairman."[42]  Although

the retainer agreement shows that Donziger was not directly named as an engaging party, his

involvement is clearly evident through his emails discussing the potential engagement (s*ee*

---

[40] Section 3(a) of the agreement states that "[a]s compensation for its services hereunder, the Firm shall be entitled
to an Active Lawyer Percentage (its "Active Lawyer Percentage") of sixteen and one-half percent (16.5%) of
the Total Contingency Fee Payment."  (*See* PX 557 at p. 2 of 11 (Section 3(a)) (WOODS00045380)).

[41] Section 3(b) of the agreement states that "[a]s soon as practicable (but in no event more than 10 days) following
the end of a calendar month, the Firm shall notify the Plaintiffs, in writing, of all Ordinary Expenses (defined
below) that the Firm incurred during such immediately preceding month . . .  'Ordinary Expenses' means
reasonable third party costs and expenses that are actually incurred by the Firm . . . including . . . deposition
costs such as court reporter and videographer costs . . . "  (*See* PX 557 at p. 3 of 11 (Section 3(b))
(WOODS00045381)).

[42] Section 3(b) of the agreement states that "'Extraordinary Expenses' means any and all costs and expenses
incurred by the Firm other than Ordinary Expenses that are directly connected with the Litigation."  (*See* PX
557 at p. 3 of 11 (Section 3(c)) (WOODS00045381)).

Plaintiff's Exhibit 4900R    p. 44 of 144

DONZ00105869), as well as the reference made to Donziger within the agreement.[43]  Motley Rice requested multiple payments from Donziger totaling approximately $22,000 in the period between September 13, 2010 and October 26, 2010.  (*See* Attachment D; DONZ00116191-92). Due to the limited nature of documentation made available for my review regarding Motley Rice, I was unable to confirm receipt or payment of any of the approximate $22,000 requested by Motley Rice.[44]

73.    Based on the documents reviewed, I saw Evidence of Payments to United States attorneys for approximately $7.6 million.  (*See* Attachment D).

### iii.    Ecuadorian Counsel

74.    The documents I reviewed show Evidence of Payments in various forms, including, but not limited to, requests for payments and evidence of such payments through wire transfers and checks from the United States LAPs' Attorneys and Representatives to various individuals or entities that provided legal services within Ecuador in connection with the Litigation.  (*See* Attachment E).  The documents I analyzed included transactions with the following individuals or entities that provided legal services in connection with the Litigation: Alberto Wray, Alejandro Ponce Villacis, Juan Pablo Saenz, Julio Prieto Mendez, Monica Pareja, Neidl & Associates, Pablo Fajardo Mendoza, and Paola Delgado.  Other Ecuadorian attorneys, such as Cristobal Bonifaz and Ermel Chavez, are known to have been part of the LAPs' legal team however, due to the lack of Ecuadorian financial records, I saw no evidence of payments to

---

[43]  The preamble to the agreement states that, "WHEREAS, the Plaintiffs are currently represented by Pablo Fajardo Mendoza, Esq., Steven R. Donziger, Esq.  ("Plaintiffs U.S. Representative") (the foregoing, collectively with any successors thereto, the "Plaintiffs' Representatives"), the firm and other lawyers and law firms . . . " (See PX 557 at p. 1 of 11 (WOODS00045379)).

[44]  Transactions related to Motley Rice relate to reimbursement of costs incurred, such as the costs of court reporters.

45

them.  The U.S. based attorneys working on behalf of the LAPs appear to have paid these individuals and firms in connection with their legal services provided within Ecuador in the Litigation.  Based on the documents reviewed, it appears that Ecuadorian Counsel requested payment for services totaling approximately $684,000.  (*See* Attachment E).

75.     The documents I reviewed revealed that the Ecuadorian Counsel were engaged, directed, and compensated through several different manners and mechanisms by individuals or entities acting on behalf of the LAPs.  For example, there is evidence that Fajardo, the lead attorney in Ecuador, received payments of approximately $93,000, from varying sources including Donziger, Selva Viva, and Yanza.  I was able to identify Confirmed Payments of approximately $83,000.  Based on the documentation made available to me, the source for the entire population of Confirmed Payments to Fajardo was Donziger; these payments came from the Law Firm Account, the Ecuador Case Account and Donziger's Personal Checking Account ending in 5365. ((DONZ00133409, DONZ00133448, DONZ00132900, DONZ00132947, DNZDEF0009342, DNZDEF0009248) (*See* Attachment E).

76.     Julio Prieto is also another attorney engaged by the LAPs' Attorneys and Representatives to assist in Ecuador.  Based on documentation reviewed, Prieto requested payments from Donziger and Selva Viva totaling approximately $30,000, all of which was requested directly from Donziger.  For example, on May 23, 2008, at Donziger's request, Prieto sent an invoice for $2,000 for "Legal work relating to Ecuador case."  (*See* DONZ-HDD-0222587-88).  Based on the documentation made available for my review, I identified Confirmed Payments for approximately $24,000.  ((DONZ00133311, DONZ00133380, DONZ00133409, DONZ00133421, DONZ00133448, DONZ00133484, DONZ00132900, DONZ00133901) (*See* Attachment E)).

46

### iv.    Selva Viva Selviva CIA Ltda.

77.    The documents reviewed show Evidence of Payments in various forms, including, but not limited to, requests for payments and evidence of such payments through wire transfers and checks from the LAPs' Attorneys and Representatives to Selva Viva.  It is my understanding that Selva Viva was created by the Frente "simply as a pass-through mechanism to administer funds for the litigation" and was the organization primarily responsible for managing funds in Ecuador.  (*See* PX 897 at p. 2 of 5 (DONZ00024903)).  It appears that this entity was established in the latter half of 2004 following Russell's July 24, 2004 email to Wray and Donziger requesting a "legal presence" in Ecuador.  (*See* DONZ-HDD-0071103).  For at least some period of time, Donziger was the President of Selva Viva, Fajardo headed the legal team, and "Yanza actually ran the organization."  (*See* Donziger Dep., Jan. 18, 2011, at p. 3093:14-19, DONZ000380620-68 at p. 3 of 38, and Donziger Dep., Dec. 23, 2010, at p. 1824:15-25).

78.    The documents I have reviewed show that KSG transferred approximately $1.9 million to Selva Viva (*see e.g.*, PX 583; PX 621 at p. 8–20), and that Donziger was primarily responsible for the facilitation of these payments.  (*See* DONZ00038074; DONZ00129821).  For example, on July 20, 2007, Donziger sent an email to KSG with the subject line, "100,000 to Selva Viva," asking, "Can we make sure this gets out today?"  (*See* DONZ00020858).  Later that day, KSG sent Donziger and email asking him to sign an acknowledgement of the transfer of $100,000 payment to Selva Viva.  (*See* DONZ-HDD-0118160-61).  Subsequent to the KSG Financing Era, it appears that Donziger paid Selva Viva directly out of both the Law Firm Account and the Ecuador Case Account, as well as his Personal Checking and Savings Accounts

47

ending in 5365, 5678, and 9890[45] in the amount of approximately $505,000.  (*See* PX 586 at p.

127, 145, 152, 159, 179, 185, 187, 235, 249, and 261 of 368; PX2519 at p. 55, 92, 123, 141, 157,

and 201 (DONZ00133476, DONZ00133494, DONZ00133520, DONZ00133514,

DONZ00133474, DONZ00133534); and PX583 at p. 82 of 181 (BPNA02942)).  I also identified

additional payments of approximately $3,000 made to Selva Viva in 2012 from Luis Yanza, and

approximately $25,000 in 2013 from the Amazon Defense Front.  (*See* PX 583 (BPNA02936);

and PX 579 (BPNA02135)).

79.     For further discussion on payments made to Selva Viva, *see infra* Part IV.E.

### v.     Experts and Consultants

80.     I have reviewed documents that evidence requests for payments, wire transfers,

and checks indicating the LAPs' Attorneys and Representatives transferred funds to various

consultants and experts in connection with the Litigation.  The documents I analyzed include

transactions between the LAPs' Attorneys and the following consultants and experts: 3TM

International, Inc.; Ann Maest ("Maest"); Buka Environmental; Cabrera; CESAQ – PUCE;

Charles Calmbacher; Dick Kamp ("Kamp"); Dr. Charles Champ; Doug Beltman ("Beltman");

Edison Camino Castro ("Camino");[46] E-Tech International ("E-Tech"); Fernando Reyes

("Reyes"); Fine and Associates; Global Environmental Operations ("GEO") and David Russell

---

[45]   Based upon a lack of documentation, it is unclear whether this account is Donziger's personal account or was created for the purposes of funding the Litigation.  (*See* PX 614 (BPSUPP02376)).

[46]   Edison Camino worked as a "perito" for the LAPs during the Litigation, and later filed suit against the LAPs, Kohn and Donziger in both Ecuadorian and the United States' Courts.  (*See* DONZ00038695).  Camino's attorney claims, "Camino-Castro was hired by [Donziger] in mid-August of 2004.  He was to be paid at a rate of $6,000/month. (US dollars).  He worked until May of 2005 when Donziger fired him.  He was not paid for the last 2 months for his services and thus claims $12,000.  Additionally, he served as Perito on five judicial inspections.  Assuming $30,000 for each additional inspection for which he was not paid at all, and the two months of pay that he did not receive, he is owed $162,000 plus interest for the 17 months for a total demand of $185,290."  (*See* DONZ00038713).  Based upon the documents I have reviewed, I cannot determine how, or if, this matter was resolved.

48

("Russell");[47] Globally Green Consulting ("Globally Green"); H5; HAVOC; Hydrosphere; John Rodgers; Jorge Jurado; Juan Cristobal Villao Yepez; Julie Claire; Laura Belanger; Leo Zurita; Manuel Pallares; Maria Valentina Ramia; Miguel San Sebastian; Monserrathe Bejarano; Oscar Davila; Partners In Health; Powers Engineering and Bill Powers ("Powers"); Rachel Ross; Reforesta, Inc.; SEA Group, Inc.; Stratus Consulting; Weinberg;[48] Uhl, Baron, Rana and Associates ("UBR"); Xavier Grandes; and Yolanda Leon Trujillo.  Based on the documents reviewed, there is Evidence of Payments to experts and consultants for approximately $4.9 million.  (*See* PX 2137, PX 2147, PX 2138).

---

[47]  Based on my review of various documents, it appears that due to nonpayment, GEO filed a Complaint against KSG, as well as Donziger and Kohn individually, in the State Court of Gwinnett County, Georgia as Civil Action File Number 05-C09383.  This matter was later settled sometime on or around September 2005, for a payment of $88,309.88 from KSG to GEO.  (*See* DONZ00102954).

[48]  Included in Weinberg invoices are the charges for the services of specialized experts from Douglas C. Allen Associates hired on the LAPs behalf, including Carlos Picone M.D., Daniel Rourke Ph.D., Paolo Scardina Ph.D, and Jonathan S. Shefftz.  (*See* DONZS00003449)

49

## EXPERTS & CONSULTANTS

| Payment To | Confirmed Payments | Evidence of Payments | Payment To | Confirmed Payments | Evidence of Payments |
|---|---|---|---|---|---|
| 3TM International, Inc. | $ - | $ 48,974 | Manuel Pallares | $ 154,576 | $ 159,126 |
| CESAQ - PUCE | $ 62,148 | $ 87,148 | Maria Valentina Ramia | $ 469 | $ 1,069 |
| Dr. Charles Champ | $ - | $ 157,500 | Miguel San Sebastian | $ - | $ 12,327 |
| Edison Camino Castro | $ - | $ 400,000 | Monserrathe Bejarano | $ - | $ 5,141 |
| E-Tech International | $ - | $ 220,643 | Oscar Davila | $ - | $ 5,000 |
| Fernando Reyes | $ - | $ 4,000 | Partners In Health | $ - | $ 38,737 |
| Fine and Associates | $ 60,000 | $ 115,800 | Powers Engineering | $ - | $ 9,925 |
| Global Environmental Operations | $ 210,000 | $ 708,310 | Rachel Ross | $ - | $ 2,346 |
| Globally Green Consulting | $ - | $ 13,133 | Richard Cabrera Vega | $ 304,814 | $ 391,814 |
| H5 | $ - | $ 303,783 | Stratus Consulting | $ 108,567 | $ 1,713,442 |
| Hydrosphere | $ - | $ 22,717 | The Weinberg Group | $ 50,000 | $ 431,408 |
| John Rodgers | $ - | $ 3,823 | Uhl, Baron, Rana and Associates | $ 49,360 | $ 49,360 |
| Jorge Jurado | $ - | $ 21,350 | Yolanda Leon Trujillo | $ - | $ 2,260 |
| Leo Zurita | $ - | $ 2,405 | | | |
| | | | **TOTAL** | **$ 999,934** | **$ 4,931,540** |

PX 2138    *Confidential*

1  Where an individual or entity appeared to be paid through a subcontractor agreement with an entity on this list, the payments were assumed to be included in the Evidence of Payments captured for the entities and individuals listed here.  These include Charles Calmbacher, David Russell, Dick Kamp, HAVOC, SEA Group, Inc. Xavier Grandes, Reforesta, Inc., Julie Claire, and Buka Environmental.

PLAINTIFF'S
EXHIBIT
2138
11 Civ. 0691 (LAK)

81.     In late January 2006, the LAP's Attorneys engaged E-Tech to assist in the Litigation and "a contract, budget, and scope of work was drawn up with Donziger and agreed upon [on] February 14[, 2006]."  (*See* KAMP-NATIVE000138 at p. 1 of 4).  Under this contract, it appears that E-Tech was "writing, and assisting in the writing of judicial annexes, as well as finding and working with expert witnesses, participating in meetings with Chevron shareholders, doing extensive research on all data gathered to date as well as analyzing laboratory requirements and capacity within the context of the lawsuit, providing technical support to Amazon Watch in the maintenance of the ChevronToxico website and assisting Mr. Donziger, in general in responding to Chevron legal and public information actions."  (*See id.* at p. 2 of 4).  This "mutually agreed upon contractual letter" also specified the payment amounts and schedule of such payments from Donziger to E-Tech.  (*See* PX 791 at p. 2 of 4 (DONZ00023464)).  It appears that as of the end of 2006, KSG paid $112,683 of the total amount and wired the remaining $35,000[49] on March 30, 2007.  (*See* DONZ00024117-18; DONZ00036910 at p. 3 of 3).  Based on the documents reviewed, it appears that Donziger was actively involved in directing such payments from KSG to E-Tech.  For example, on March 21, 2006, Donziger forwarded an email from Kamp with E-Tech's bank account information to Carol Kusner of KSG indicating that he "talked to Joe and [they] need to get money out asap to the account below, via wire.  The amt that needs to be wired is 20,000."  (*See* DONZ00028370).  As E-Tech's internal ledger for its Century Bank account evidences receipt of a $20,000 payment on the following day, it is apparent that KSG adhered to Donziger's instruction to pay E-Tech.  (*See* KAMP-NATIVE000069-73 at p. 1 of 5).

---

[49]   *See supra* n.30.

51

82.      I have also reviewed documents that reveal that the amounts payable to E-Tech correspond to services rendered by various individuals and entities. E-Tech subcontracted with Hydrosphere, Globally Green, SEA Group, Inc., HAVOC, Buka, Powers Engineering, Quarles, Rodgers, Belanger, Maest, Powers, and various other entities and individuals to assist with the services it provided on behalf of the LAPs. (*See* KAMP-NATIVE000069-73). There are numerous instances where the aforementioned entities and individuals transmitted emails and invoices in relation to payment for their time and expenses incurred with regards to the Litigation. In many cases, it appears that E-Tech paid these parties utilizing funds previously received from KSG. (*See* KAMP-NATIVE000314; KAMP-NATIVE000129). E-Tech transmitted approximately 75 payments totaling approximately $150,000 between March 2006 and October 2007 to various entities, including subcontractors. (*See* KAMP-NATIVE000069-73).

83.      As of the middle of 2007, E-Tech transitioned out of its role of managing the environmental work related to the Litigation. On June 12, 2007, Kamp sent a letter to Donziger on behalf of E-Tech stating that E-Tech would no longer be managing work performed and payments to entities and individuals, but rather Donziger would assume this role. (*See* DONZ00043403-408 at p. 3-4 of 11; DONZ00109095).

84.      Documents I have reviewed show that after June 2007, Stratus submitted various emails, invoices, memoranda, and expense documents to the LAPs' Attorneys requesting payments totaling approximately $1.7 million. (*See* STRATUS-NATIVE053616, STRATUS-NATIVE053618, STRATUS-NATIVE053620, DONZ-HDD-0155008, DONZ00040121, DONZ00040123, DONZ00040117, DONZ-HDD-0175145, DONZ00026487, DONZ-HDD-0187 4967, WOODS-HDD-0144890, STRATUS-NATIVE006989, DONZ00048202,

52

DONZ00081455, WOODS-HDD-0144898, DONZ00049803, DONZ00050072, STRATUS-NATIVE062811, DONZ00051595, DONZ00029297, STRATUS-NATIVE050017, DONZ00023147, STRATUS-NATIVE050019, STRATUS-NATIVE056779, STRATUS-NATIVE06777, STRATUS-NATIVE056774, STRATUS-NATIVE056784, DONZ00068290, PX 586 at p. 187 (DONZ00132900), DONZS00003214, DONZS00004472, and WOODS00040383.)  Based on the documents I have reviewed, Stratus invoiced $1,155,285 to KSG between September 26, 2007 and December 1, 2009 for services performed through November 23, 2009 and invoiced Donziger in the total amount of $558,156.51 in relation to services performed between December 18, 2009 and March 31, 2011 (*See* STRATUS-NATIVE050017-20 at p. 3 of 4; PX 2142 (WOODS-HDD-0144877-922 at p. 40 of 46); and WOODS00040383).  Although the Stratus invoices were not addressed to Donziger between September 26, 2007 and December 1, 2009, it is apparent that Donziger was still involved in Stratus' payment during this time period.  (*See* DONZ00127591-92 at p. 1 of 9; DONZ00039709-10; DONZ00063994).  As of December 18, 2009, Stratus began to directly bill Donziger for services performed.  (*See* PX2142 (WOODS-HDD-0144877-922 at p. 40 of 46)).  By April 29, 2011 Stratus had invoiced Donziger $558,156.51 for services performed between December 18, 2009 and March 31, 2011.  (*See* PX2142 WOODS-HDD-0144877-922 at p. 40 of 46 and WOODS00040383).  *See infra* Part IV.C.

85.     During the same timeframe in which the documents reviewed show that Donziger was paying Stratus, he also retained and remitted payment to Weinberg, a firm that specializes in reviewing scientific developments and proposals.  Documents I have reviewed show that Weinberg was engaged by the LAPs' Attorneys to "conduct a comprehensive review" of various aspects of the Cabrera Report.  (*See* PX 1415 at p. 3 of 7 (DONZ00058722)).  Based on the

53

documents reviewed, it appears that Weinberg began rendering services in relation to the

Litigation on August 17, 2010.  (*See* DONZ00014335-37).  On August 23, 2010, a retainer

agreement was executed between Weinberg and the LAPs' Attorneys, which resulted in a

Confirmed Payment in the amount of $50,000 from the Ecuador Case Account to Weinberg on

the same date.  (*See id.* and PX 586 at 187 (DONZ00132900)).

86.     Additional documents reviewed show that Weinberg invoiced Donziger up until

January 11, 2011 for services performed through December 31, 2010.  (*See* DONZS00007331).

During this period of time, it appears that in addition to the $50,000 retainer payment, Weinberg

invoiced Donziger in the amount of approximately $381,000.  (*See* PX 2138).

87.     Documents that I have reviewed show Donziger approved and facilitated

payments to Weinberg through Patton Boggs.  In an email from Adlai Small (Patton Boggs) to

Donziger on November 10, 2010, Small requests permission for a $300,000 payment to

Weinberg for work in connection with the September 16 expert submission.  (*See* PX 1460

(DONZS00015696)).  In this same email, Small also states that "This [$300,000] payment

includes monies that will be sent by Weinberg to the six experts as well as monies payable to the

Weinberg Group for the services it provided in connection with the September 16 submission."

(*See id.*).  Based on this document and others, it appears that Weinberg retained outside experts

to assist in its review.  These outside experts submitted invoices and expenses directly to

Weinberg.  For example, on August 27, 2010 and September 17, 2010 Daniel Rourke sent

memoranda to Ted Dunkelberger (Senior Director at Weinberg) detailing the time he incurred in

relation to the Litigation and requesting payment for such services.  (*See* Rourke-Native-009574

and Rourke-Native-009578).  Rourke's August 27, 2010 and September 17, 2010 memoranda

show that he spent 47.4 hours and 171.2 hours, respectively, which total to 218.6 hours working

54

on matters related to the Litigation.  (*See id.*).  As these 218.6 hours were included on Weinberg's October 1, 2010 invoice addressed to Donziger, it is apparent that Weinberg in turn requested payment from Donziger related to the consultant's time and expenses incurred.  (*See* DONZ00014335-37).

88.    In addition to showing Donziger's facilitation and control of payments to experts, the documents I reviewed also reveal that that the LAPs' Attorneys transferred $120,000 to an account that the LAPs' Attorneys referred to as the "Secret Account."  It is my understanding that the "Secret Account" was utilized to make payments to Richard Cabrera, the Ecuadorian court-appointed independent, impartial, and neutral Special Master. (*See* PX 2139).  *See infra* Part IV.C

### vi.    Public Relations

89.    The documents I reviewed show Evidence of Payments in various forms, including, but not limited to, requests for payments and evidence of such payments through wire transfers and checks from the LAPs' Attorneys and Representatives to various individuals or entities that provided public relations services in connection with the Litigation.  The documents I analyzed included transactions with the following individuals or entities that provided public relations services in connection with the Litigation: Arcos Communication, Business Wire Inc, Celia Alario, Courtney Taylor Eckel, Joan Kruckewitt, Jose Fajardo, Joseph Mutti, Karen Hinton, Ken Sunshine, Kerry Kennedy ("Kennedy"), Liza Sabater, Lou Dematteis ("Dematteis"), Maria Eugenia Yepez, Michaela D'Amico, Paul Orzulak and Thomas Cavanagh. The LAPs' Attorneys and Representatives appeared to have paid these individuals and firms in connection with their services provided on behalf of the LAPs.  Based on the documents

55

reviewed, I saw Evidence of Payments of approximately $601,000 for these firms and individuals. (*See* Attachment F).

90.    These aforesaid individuals and entities provided services to and at the direction of the LAPs' Attorneys and Representatives. Transactional documents I reviewed evidenced public relations activities including, but not limited to, oversight of public relations activities, strategic communications consulting, advertising for the *Crude* film, production of the "Crude Reflections" book, and fundraising consulting services.

91.    The documents I reviewed revealed that the entities and individuals providing these services were engaged, directed, and compensated through several different manners and mechanisms by various of the LAPs' Attorneys and Representatives and, in some cases, other individuals or entities that were engaged to provide public relation services. For example, Hinton was retained through her entity, Hinton Communications, to provide media and press service for the Frente and Amazon Watch - an entity that was also retained to provide public relations services on behalf of the LAPs. Based on the documents I reviewed related to Hinton, there is evidence of approximately $293,000 in payments from a combination of Donziger and KSG for her services rendered on behalf of the LAPs. Based on the evidence I reviewed, it appears that Donziger either remitted payment to Hinton directly or authorized and facilitated payment to her. For example, on May 22, 2008, Donziger forwarded an invoice from Hinton to Joseph Kohn for payment, requesting that he "take care of this as soon as you can…" and noting that "this woman is amazing and it is important we keep her humming." (*See* DONZ-HDD-0175885-86). Based on my analysis, Hinton received the largest percentage of payments related to public relations services.

56

92.     Other entities and individuals retained by Donziger were compensated through varying arrangements.  For example, Dematteis was retained by Donziger to produce, design, and ship the "Crude Reflections" book.  (*See* DONZ-HDD-0168452 and DONZ00090613). Evidence I reviewed demonstrates that Donziger remitted payment directly to Dematteis as well as instructing and/or authorizing others to pay Dematteis.  (*See* DONZ00079181; DONZ00109096-97).

93.     Additionally, documents I have reviewed show that Donziger, acting on behalf of the LAPs, paid Kennedy to provide public relations services for the LAPs relating to the Litigation.  (*See* WOODS-HDD-0187449-50).  Kennedy appears to have visited Ecuador to discuss the case with Donziger and later appears to have begun billing Donziger $10,000 per month for the months of October through December 2009.  (*See* WOODS-HDD-0310129; WOODS-HDD-0353330-31).  There is evidence that Kennedy was paid a total of approximately $120,000.  (*See* Attachment F).  I was able to confirm the transfer of $50,000 based upon review of a bank statement, credit card statements, cancelled check, or other such definitive financial record.  The largest transaction relating to Kennedy is a $50,000 payment directly from the Ecuador Case Account.  (*See* DONZ00132914 at p. 142).  Donziger's American Express credit card statement for account ending in 58001 shows that Donziger purchased an airline ticket for Kennedy in connection with her trip to Ecuador in the amount of $2,141.  (*See* DONZ00131820 at p. 771).  Kennedy appears to have requested the payment of an additional $40,000 through Donziger; however, due to the limited documentation available, I was unable to confirm payment of this amount.  (*See* WOODS-HDD-0285920).

94.     In total, based on the documents reviewed, I have seen Evidence of Payments to individuals or entities providing public relation services in the amount of approximately

57

$601,000, of which I was able to identify Confirmed Payments totaling approximately $208,000. (*See* Attachment F).  These transactions appear to relate to individuals or entities working on behalf of the LAPs at the direction of the LAPs' Attorneys and Representatives in an effort to publicize the Litigation to garner increased public support for the Litigation.  Based on the documents provided for my review, it appears that Donziger directed the engagement of the individuals and entities providing the public relation services, as well as coordinated or facilitated the payment of these service providers or paid them directly from bank accounts under his control.

### vii.    *Crude*

95.    I have reviewed documents relating to the background of the film *Crude*, as well as financial and operational details associated with the production of *Crude*, including the sources of production funding.  (*See* Attachment H).  The documentary film was produced and directed by Joseph A. Berlinger through his affiliation with several entities, including Crude Productions, LLC,[50] which was created for the purpose of managing the funding and production of *Crude*. [51] [52]

---

[50]    Berlinger explains in his deposition testimony that, "Crude Productions, LLC hired Radical Media to be the production services company to provide production services.  And Radical Media hired Third Eye Motion Picture Company to provide the directing and producing services of me to make the film."  (*See* Berlinger Dep., Oct. 28, 2010, at p. 55:8-14).  Notably, Third Eye Motion Picture Company is Berlinger's film production company.  (*See* Berlinger Dep., Oct. 28, 2010, at p. 11:23-25).

[51]    Berlinger states in his deposition testimony, "We created an LLC and a subscription agreement in which we attracted investors."  (*See* Berlinger Dep., Oct. 28, 2010, at p. 47:17-20).  Additionally, when asked if he had multiple LLCs that funded the film or just one, Berlinger replied, "No, one LLC that funded the film," and named "Crude Productions, LLC."  Berlinger goes on to state, "The film *Crude* was produced through the LLC."  (*See id.* at p. 47:21-49:18).  Additionally I reviewed evidence stating, "The purposes for which Company is organized and operated are: to engage in the production and exploitation of all rights in all media throughout the world in, ancillary to and derived from a documentary film currently entitled "Crude" currently intended for initial theatrical release…"  (*See* JB-STIP00180574 at p. 6).

[52]    Additional entities and individuals included in the making of *Crude* include Motion Picture Enterprises, Outpost Digital, PJ Johnston Communications, Richard Stratton and Elisabeth Holm, and Marcela Reyes.  (*See* DONZ00012443, WOODS00043742,  DONZ00132883 and JB-NonWaiver00143939-942).

58

96.     Documents reviewed show that in 2006 Donziger partially financed Berlinger's initial expenses incurred for trips to Ecuador.  (*See* Berlinger Dep., Oct. 28, 2010, at p. 48:7-50:24). Subsequently, when Berlinger committed to filming the documentary, an entity named Crude Productions, LLC was established in order to manage the funding associated with the film.[53]

97.     Based on my review of the documents, it appears that multiple individuals and entities provided funding to Crude Productions, LLC for the *Crude* project.  The initial investors and entities associated with Crude Productions LLC included Red Envelope Entertainment, an entity associated with Netflix, with an initial capital investment of $300,000; Dr. Stuart Zweibel, with an initial capital investment of $50,000; Dr. Dan Luciano with an initial capital investment of $100,000; Crude Investments, Inc., with an initial capital investment of $752,177; and Joe Berlinger, with an initial capital investment of $2,609.  (*See* JB-STIP00180574 at p. 25).  There is also evidence that Donziger contributed additional amounts of at least $7,500[54] and $25,000.[55]

98.     In exchange for providing funding for *Crude*, it appears that Donziger had the opportunity to provide comments and suggest edits to the film.  For example, according to Berlinger's deposition, Donziger was afforded the right to instruct the film crew when to turn the cameras off and request Berlinger to edit out time periods just before the cameras were requested to be turned off, as well as the right to preview certain portions of the film and provide feedback

---

[53]  When asked, "How were you able to fund the film?" Berlinger responds, "Ultimately we created an LLC... in which we attracted investors," and names "Crude Productions LLC."  Berlinger also states, "The film *Crude* was produced through the LLC."  (*See* Berlinger Dep., Oct. 28, 2010, at p. 47:15-48:24).

[54]  September 15, 2009 Invoice from Third Eye Motion Picture Company to Steven Donziger for "Shared Promotional Expenses for Crude."  (*See* WOODS-HDD-0226735-37).  Steven Donziger expense document: Joe Berlinger – Crude Contribution $7,500.  (*See* WOODS-HDD-0017983-86).

[55]  In an email dated 4/24/2009 from Berlinger to DeLeon, Donziger is listed as a current P&A investor of $25,000.  (*See* JB-NonWaiver00144197).

Plaintiff's Exhibit 4900R   p. 59 of 144

to Berlinger.  (*See* Berlinger Dep., Oct. 28, 2010, at p. 65:10-70:7).  The largest investor in

*Crude* was Crude Investments, Inc., which ultimately provided significant funds for the film,

contributing approximately 70-75% of total funding over time, or roughly $900,000.  (*See*

Berlinger Dep., Oct. 28, 2010, at p. 80:16-18; JB-NonWaiver00143913-14).

99.     Crude Investments, Inc., is solely owned by DeLeon, who was introduced to

Berlinger through Donziger.  DeLeon's investment in the film was in the name of Crude

Investments, Inc.  DeLeon eventually received credit as a producer on the film and was also

afforded the ability to view final cuts of the film and make editorial suggestions, similar to

Donziger.  (*See* Berlinger Dep., Nov. 11, 2010, at p. 196:2-17; Berlinger Dep., Mar. 11, 2011, at

p. 921:5-7).  DeLeon also appears to have contributed to Berlinger's legal defense relative to the

Section 1782 proceeding regarding the *Crude* outtakes.  (*See* JB-NonWaiver00144708;

DONZ00126311).

100.    Individuals associated with the Litigation received compensation for their

involvement with the film.  (*See* Bonfiglio Dep., Nov. 23, 2010, at p. 50:5-16; DONZ00047978-

79).

### viii.    NGOs

101.    Documents I reviewed such as emails, memoranda, invoices, and financial

records, show that the LAPs, as well as their Attorneys and Representatives, interacted with

several Non-Governmental Organizations[56] ("NGOs"), such as Accion Ecologica, Action

---

[56]   According to the United Nations, "a non-governmental organization (NGO) is any non-profit, voluntary
citizens' group which is organized on a local, national or international level."  ("Non-governmental
Organizations," United Nations, Department of Public Information and Non-Governmental Organizations,
available at http://outreach.un.org/ngorelations/about-us/; see also "nongovernmental organization (NGO),"
Merriam Webster, available at http://www.merriam-webster.com/concise/nongovernmental+organization ("The
purposes of NGOs cover the entire range of human interests and may be domestic or international in scope.
Many NGOs are key sources of information for governments on issues such as human rights abuses and

*(Cont'd on next page)*

Plaintiff's Exhibit 4900R    p. 60 of 144

Solidarite Tiers Monde ("ASTM"), the Frente, Amazon Watch, Ayuda Popular Noruega (Norwegian People's Aid), Earthrights International ("Earthrights"), Environmental Law Alliance Worldwide ("ELAW"), Esperanza International, Asamblea de Afectados por Texaco, The Moriah Fund, Oil Watch, Oxfam America ("Oxfam"), Fundacion Pachamama (Pachamama Alliance) ("Pachamama"), Public Welfare Foundation, Rainforest Action Network ("RAN"), Rainforest Foundation, and the Sigrid Rausing Trust. The NGOs performed various roles in connection with the Litigation, such as providing and facilitating funding, providing aid to the communities in Ecuador and promoting the Litigation. It appears that the Frente, Amazon Watch, RAN, and The Rainforest Foundation (with Trudie Styler) had significant communication with the LAPs, and their Attorneys and Representatives. The involvement of the other NGOs in the Litigation was facilitated by Amazon Watch. (*See* Attachment I).

102.    Based upon my review of documents, the NGO that acquired most funding throughout the Litigation was the Frente.[57]  The Frente appears to be an Ecuadorian private non-profit organization. The Frente "coordinates the [Litigation] and executes the decisions made by [Asamblea De Afectados Por Texaco], which groups all of the plaintiffs in the case. The [Frente] also administers the funds for the case and is the designated "beneficiary" and "trustee" of a trust ordered by the Judgment in the Litigation and intends to administer the proceeds from the Judgment entered against Chevron.[58]  I have reviewed bank account information which

---

*(Cont'd from previous page)*

   environmental degradation.  Some NGOs fulfill quasi-governmental functions for ethnic groups that lack a state
   of their own.  NGOs may be financed by private donations, international organizations, governments, or a
   combination of these.")).

[57]   For purposes of this analysis, the Frente is understood to mean the entity itself, as well as any members working
   on its behalf, including Yanza, Ermel Chavez, Juan Aulestia, Maria Eugenia Yepez, Manuel Pallares, and
   Rodolfo Munoz.

61

shows wire transfers of approximately $735,000 from various NGOs to the Frente's Banco

Pichincha Account ending in 5004.  (*See* PX 583).  Due to a lack of documentation, the

designated purpose of NGO funds is unclear.

103.     Along with Donziger, Yanza helped to facilitate the majority of the payments that

came into the Frente, the majority of which was paid by KSG.  Based upon my analysis of the

documents, it appears that the Frente was directly paid approximately $450,000 over the course

of the Litigation.  (*See* Attachment I).  It also appears that they were paid additional funds

through Selva Viva.  Additionally, there is a lack of complete records relating to the Frente, as

there are at least 7 bank accounts in the Frente's name for which no bank statements were

provided.[59]

104.     Amazon Watch[60] is a nonprofit organization based in San Francisco.  Based on

documents I have reviewed, it appears that Amazon Watch has been involved with the LAPs and

their Attorneys and Representatives since the inception of the Litigation, beginning in September

2002.  Throughout the Litigation, Amazon Watch has performed various roles in the United

---

*(Cont'd from previous page)*

[58]   Clause 8 of the Treca Financial Solutions Funding Agreement executed on October 31, 2010 mandates the
establishment of a trust to administer the Litigation and the proceeds from the judgment entered against
Chevron, and sets out the rights of the LAPs in accordance with the trust.  "The Claimants hereby agree to
establish . . . a trust under Ecuadoran law . . . [to] hold as the corpus of the Trust all of the litigious rights as well
as any and all interest in the Claim, the Award, any proceedings of the enforcement enforce the Award. . . .
[T]he Trustee is the sole and only Person entitled to, among other things, pursue the Claim and enforce and
collect the Award, and [] have the authority and obligation to apply and distribute any proceeds of the Award . .
. in compliance with the provisions of this Agreement and the Intercreditor Agreement. . . .  The [LAPs']
Representatives, or a board of managers constituted under the Trust Deed, shall have the right to direct and
control the Trustee with respect to the pursuit of the Claim."  (*See* PX 552 (DONZS00015670 at p. 11)).

[59]   Banco Pichincha accounts ending in 1765, 1593, 3133, 0815, 5304, 3804, and 5704.  (*See* BPNA00452-53,
BPNA01412-BPNA01410, BPNA01422-23, BPNA02146, BPNA02147, BPNA03045, BPNA06633,
BPSUPP00524, BPSUPP00525, BPSUPP02131, and BPSUPP02376).

[60]   For purposes of this analysis, "Amazon Watch" encompasses the entity itself as well as employees acting on its
behalf, including, but not limited to: Atossa Soltani, Paul Paz y Mino, Elisa Bravo, Jennifer Delury Ciplet,
Kevin Koenig, Leila Soraya Salazar-Lopez, Michaela D'Amico, Mitch Anderson, Han Shan, and Thomas
Cavanagh.

States and Ecuador, such as strategizing with the LAPs' Attorneys and Representatives,

promoting the Litigation through public relations and press initiatives, and funding and working

with other NGOs.

105.    Based on my analysis, it appears that Amazon Watch received funding from KSG

of approximately $216,000.  (*See* DONZ00035865, DONZ00024257, DONZ00038742,

WOODS-HDD-0148188, WOODS-HDD-0148192, DONZ00113688, WOODS-HDD-0148195,

DONZ00035592-95, and WOODS-HDD-0007998).  It appears that several other NGOs had

ongoing relationships with Amazon Watch, such as Accion Ecologica, Oxfam America, APDH

and Pachamama Foundation.[61]  Additional NGOs that Amazon Watch had a relationship with

relating to the Litigation were The Moriah Fund,[62] The Sigrid Rausing Trust,[63] Earthrights,[64] and

ELAW.[65]

106.    It appears that RAN collaborated with, and contributed $100,000 to, Amazon

Watch through at least 2009, started the "We Can Change Chevron" campaign, and also received

at least $200,000 in funding from DeLeon.  (*See* PX 1135 ((DONZ00040754) near duplicate of

DONZ00040753) and WOODS-HDD-0019140-157).  Further, it appears that they continued

---

[61]  According to Amazon Watch tax documents, it appears that Pachamama received $20,900 in grant money from them in 2005, $11,250 in 2006 and $12,200 in 2007.  (*See* Amazon Watch Form 990 for 2002, 2004-2007).

[62]  Based on my review of several documents, it appears that the Moriah Fund financially supported Amazon Watch and the Frente, as Lael Parish writes to Fajardo, "The Moriah Foundation is a philanthropic organization that supports Amazon Watch..."  Parish also states, that "The Moriah Foundation has also supported the Amazon Defense Front for many years."  (*See* DONZ00047929 at p. 2).

[63]  Based upon documents I have reviewed, it is my understanding that the Sigrid Rausing Trust financially supported Amazon Watch's "Clean Up Ecuador Campaign" with donations of $100,000 in 2005 and an additional £135,000 from 2006-2009.  (*See* DONZ00084668, Exhibit 22, and DONZ00020198).

[64]  According to a July 19, 2010 memorandum, it appears that EarthRights was "presently moving toward making an amicus submission on behalf of ERI and other NGOS in the UNCITRAL arbitration between Chevron Corporation and the Republic of Ecuador."  (*See* DONZ00058242).

[65]  ELAW sought a Wayne Morse Center Project Grant of $9,880 to help fund [the] 10-week fellowship for Pablo Fajardo.  (*See* ELAW 01055). It also appears that ELAW provided $22,030 to Pablo in order to fund his fellowship.  (*See* ELAW 01055).

63

their involvement with the LAPs throughout 2010, as Michael Brune emails Styler, Zac Goldsmith, and Donziger on January 6, 2010 summarizing their current strategy for a Chevron Campaign. (*See* DONZ00049605).

### ix. Lobbyists

107. The documents reviewed provide evidence of draft advisory agreements between the LAPs and their Attorneys and Representatives and various individuals related to lobbying activities in connection with the Litigation.  Additionally, I have reviewed expense reimbursement payments from the LAPs' Attorneys and Representatives to various individuals or entities in connection with lobbying activities.  The documents I analyzed identified relationships with the following individuals or entities that appear to have served as lobbyists: Christopher Lehane of CSL Strategies LLC ("Lehane") and Mark Fabiani of Mark Fabiani LLC ("Fabiani"); Downey McGrath Group, Inc. ("Downey McGrath"), and the Ben Barnes Group ("Barnes").

108. The documents I reviewed revealed that the aforementioned lobbyists were retained by the LAPs' Attorneys and Representatives, and primarily directed by Donziger in their efforts, which centered on generating publicity and support for the Litigation.  Based on my review of the draft advisory agreements, it appears that the lobbyists were all to be compensated through contingent payments related to the Judgment in the Litigation.  Additionally, per their agreements, Downey McGrath and Barnes were permitted to incur reimbursable expenses, and based upon the documents reviewed, it appears that they submitted invoices for expenses to Donziger for reimbursement.  (*See* WOODS00041115).  Additionally, it appears that Donziger paid Downey McGrath and Barnes, and then subsequently invoiced KSG to be reimbursed for those expenses.  (*See* WOODS-HDD-0310068 and DONZ00082823).

64

109.    According to an October 6, 2005 retainer agreement for Lehane and Fabiani, in return for providing consultation and organizational support to the Litigation, including "providing public affairs advice," they were to be compensated "two percent (2%) of the total attorneys' fees awarded to all attorneys and law firms in the Cases" and were responsible to pay their own expenses.  (*See* DONZS00013512-13).  It appears that this agreement was later amended in 2010 to one and one-quarter percent (1.25%) of the Total Contingency Fee Payment.[66]  (*See* DONZS00003508-10).  It is unclear which agreement currently stands, as the documents reviewed consist of various versions of unexecuted drafts of agreements.

110.    Similarly, I have reviewed documents which evidence that Downey McGrath was retained to provide "lobbying, public affairs and other services" on behalf of the LAPs, and as compensation for its services would receive one percent (1%) of the Total Contingency Fee Payment, as well as reimbursement for permitted expenses.  (*See* WOODS00045051).

111.    Barnes was also retained to perform "lobbying, public affairs and other services" in respect of the Litigation.  (*See* DONZS00013501).  Barnes's original agreement dated October 25, 2010 states that they are to be paid five percent (5%) of the Total Contingency Payment, while an amended draft of the agreement dated November 10, 2010 notes that Barnes is entitled to a fee in the amount of three and one-half percent (3.5%) of the Total Contingency Fee Payment, as well as reimbursement for permitted expenses.  (*See* DONZS00013501 and DONZS00003583 at p. 12).

---

[66]  The term "Total Contingency Fee Payment" means an amount equal to twenty percent (20%) of all Plaintiff Collection Monies.  The term "Plaintiff Collection Monies" means any amounts paid, whether from defendant Chevron Corporation (a/k/a Texaco; ChevronTexaco; Chevron), any other party listed as a defendant in respect of the Litigation (including, without limitation, his or her respective affiliates and successors in interest), or any other party added or joined to the Litigation from time to time as a defendant or indemnitor or against whom proceedings are asserted or threatened.  (*See* DONZS0003508-10).

Plaintiff's Exhibit 4900R    p. 65 of 144

112.     Based on the documents reviewed, there is no evidence of compensation paid to Lehane, Fabiani, Downey McGrath or Barnes; as discussed above, it appears that the majority of the lobbyists were to be compensated on a contingent basis.  However, there is confirmed evidence that Barnes was reimbursed for related expenses, as there are two checks payable to Barnes from Donziger's Personal Checking Account ending in 5365, one in the amount of $5,349.80 for "DC expenses" and one in the amount of $1,515.64 for "reimbursement."  (*See* DONZ00133177).

### x.     Conclusion

113.     In my opinion, the extremely poor condition of the financial and accounting records that Donziger produced and appeared to maintain would not have allowed him to provide accountability to either his investors or to the LAPs as to the totality of the funds that were disbursed in connection with both the direct costs of litigation (e.g., Ecuadorian and U.S. attorney's fees, and expert and consultant fees) and for other expenses incurred for the overall promotion of the case, case strategy, and advocacy of public relations efforts.  The incomplete financial records that were produced and apparently maintained by Donziger render it virtually impossible to determine the ultimate source and use of related funds transferred to or from related entities.  Under the agreements he signed and his role as a LAPs' Attorney and Representative, Donziger had a responsibility to maintain accurate and complete accounting and financial records, however he failed to do so.

### C.     Analysis of Payments Made to Richard Cabrera Vega, Stratus Consulting, Fernando Reyes and Juan Cristobal Villao

114.     It is my understanding that on March 19, 2007 the Ecuadorian court appointed Cabrera as an Expert "so that he may conduct an Expert Investigation, for purposes of verifying

Plaintiff's Exhibit 4900R   p. 66 of 144

the environmental effects of activities related to the production of hydrocarbons in all of the

fields produced by Texaco (later acquired by Chevron)…"  (*See* PX 335 (CVX-RICO-1141931 -

CVX-RICO-1141933)).  I reviewed documents evidencing that Cabrera was sworn in as the

court-appointed expert on June 13, 2007 and according to the Ecuadorian court filing on this

date, Cabrera took an oath stating, "that he is not under any legal impediment whatsoever and

swears to perform his duties faithfully and in accordance with science, technology and the law,

with complete impartiality and independence vis-à-vis the parties."  (*See* PX 335 (CVX-RICO-

1141931 - CVX-RICO-1141933)).  Review of the documents revealed that, on April 1, 2008,

Cabrera submitted the Cabrera Report to the Ecuadorian court.  (*See* 2008.04.01 Cabrera

Original Expert Report - ENG cert).  In the introduction to his report, Cabrera states, "This

Expert Report required a lot of work in order to deal with all of the requirements made by the

Court.  As stipulated in the Court order mentioned initially, my work is based on the assistance

provided by other experts in making some of the technical analyses.  These experts have

therefore been part of my technical team, which consists of impartial professionals with

impeccable credentials, as can be observed in Exhibit V to this report."  (*See id*; 2008.04.01

Cabrera Report Anexo V (ENG cert)).

      115.    Based on my review of Ecuadorian Court orders and filings, the Ecuadorian Court

established a process for providing payment to Cabrera for his services as the Court's neutral

expert.  Based on my review of submissions to the Ecuadorian Court, such as requests for

payments by Cabrera, Court orders authorizing such payments, and filed copies of checks

evidencing such payments, it appears that the Ecuadorian Court authorized $271,814 in

payments for Cabrera, all of which appear to be paid through the Selva Viva account ending in

Plaintiff's Exhibit 4900R   p. 67 of 144

5004.  (*See* PX 2139)).  The court authorized process for Cabrera payments followed a specific

pattern as follows:

- Richard Cabrera would submit a request to the court.  For example, on July 27, 2007, Cabrera wrote, "In order to continue with the work in which I am engaged and meet the deadline you established, I hereby move that you order that the party that requested the Expert exam deposit the sum of $47,118 at your office.  This money shall be used to pay technical personnel, laboratories, and other services."  (PX 347).

- Then, the judge would authorize the payment and add such authorization to the court record.  For example, the court record from October 3, 2007, reflects the authorization of the $47,118 payment, stating, "Add to the court record the brief filed by Mr. Richard Cabrera at 8:07 a.m. on 27 July 2007.  With regard to its contents, the plaintiff is hereby ordered to deposit the fees of said expert within the next 5 days."  (PX 348).

- Subsequent to the court order, the LAPs would issue payment.  For example, on October 9, 2007, the LAPs issued check number 001753, in the amount of $47,000, made payable to Richard Cabrera.  This payment was filed with the court on October 10, 2007.  (*See* PX 349).

116.    Based on my analysis of documents such as emails, memoranda, and bank

statements, I identified additional Evidence of Payments totaling $120,000[67] that appear to be

payments made to Cabrera from ~~Selva Viva~~ *The Frente (TAD)* out of a different bank account, Banco Pichincha

account ending in 9800.  Based upon the analysis of documents relating to this account, it

appears that funds are transferred to this account from KSG and that it was referred to in emails

between Donziger and Yanza as the "Secret Account."[68]  (*See* PX 870 (DONZ00043423); PX

912 (DONZ-HDD-0124585)).  I have not seen any documentation of court orders authorizing

---

[67]   This amount is comprised of three separate transfers in the amounts of $50,000, $50,000, and $20,000 made on August 15, 2007, September 14, 2007, and February 8, 2008, respectively.  (*See* PX 2139 (Payments to Richard Cabrera)).

[68]   The documents I have reviewed evidence that the "Secret Account" was established around June 12, 2007 at Banco Pichincha, Lago Agrio Branch in Nueva Loja, Ecuador.  (*See* PX 870 (DONZ00043423)).  The bank account is in the name of the Frente, the bank account number ending in 9800, and the swift code to deposit funds in the United States is PICHECEQ.  (*See* PX 912 (DONZ-HDD-0124585); PX 871 (DONZ-HDD-0113361)).

68

these payments.  However, I did identify email communication discussing ~~Selva Viva's~~ payment

to the "Wao."[69]  It appears that the "Secret Account" was established for the purpose of paying

Cabrera.[70]  The process through which Cabrera was paid through the Secret Account was not

consistent and varies greatly from the court authorized process.  An example of how Cabrera was

paid through the Secret Account is:

- First, on July 26, 2007, Yanza wrote Donziger an email stating, "Tonight I have to coordinate the new request for money with the huao [Cabrera] in order to continue the work. [...] I estimate that we have to give the expert no less than 50 thousand now."  (PX **888** at p. 1 of 5 (DONZ-HDD-0118357).

- Subsequently, on August 14, 2007, Yanza emailed Donziger bank account information for the Secret Account, and said, "Please be sure to send the money today."  (PX **897** (DONZ00024903)).  Donziger then forwarded this email to KSG with the subject line "critical money transfer," stating, "Pls [sic] transfer, 50,000 to the following account in Ecuador."

- Based on KSG's general ledger, as well as a Banco Pichincha statement, it appears that KSG wire transferred $50,000 to the Secret Account on August 15, 2007.  (*See* DONZ00025329, PX **578** at p. 6 of 19 (BPNA00436); PX **618** at p. 4 of 13 (BPNA00592)).

- Finally, on August 17, 2007, $33,000 was wired directly to Cabrera from the Secret Account.  (*See* PX **578** at p. 6 of 19 (BPNA00436); BPSUPP02137; PX **590** at p. 1 of 3 (BPSUPP02154); PX **591** at p. 1 of 3 (BPSUPP02155); PX **593** at p. 1 of 3 (BPSUPP02157)).  I have not seen any documentation of court orders authorizing this $33,000 payment.  (*See* PX **2139** (Payments to Richard Cabrera)).

---

[69]  Based on my review of the Memorandum of Law in Support of Motion for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery from Banco Pichincha for Use in Foreign Proceedings and Donziger Dep., Mar. 23, 2011, at p.4412:9-4416:2, PX 335 (CVX-RICO-1141931 - CVX-RICO-1141933), it is my understanding that "Wao" was the alias for Cabrera.

[70]  For example, in an email dated September 12, 2007, Donziger and Yanza discuss making a transfer "...using the same mechanism from weeks ago, that is, he [Kohn] sends us money to our secret account, to give to [Wao], to not stop the work." This email references "to give to Wuao," a misspelling of Cabrera's code name "Wao." (*See* Donziger Dep., Mar. 23, 2011, p. 4412:9-4416:2).

69

Plaintiff's Exhibit 4900R   p. 69 of 144



# PAYMENTS TO RICHARD CABRERA

**Cabrera Requests**

06/25/2007 **$59,349** [PX 277R]
07/27/2007 **$47,118** [PX 347]
10/15/2007 **$97,000** [PX 350]
04/28/2008 **$25,550** [PX 294]
12/15/2008 **$42,915** [PX 302]

**Court Authorizations**

06/26/2007 **$59,349** [PX 344]
10/03/2007 **$47,118** [PX 348]
10/22/2007 **$97,000** [PX 352]
05/30/2008 **$25,550** [PX 368]
04/17/2009 **$42,915** [PX 373]

**Payments from Selva Viva**

06/23/2007 **$59,349** [PX 344]
10/09/2007 **$47,000** [PX 349]

11/22/2007: $30,000 [PX 356]
01/24/2008: $25,000 [PX 361]
03/19/2008: $9,000 [PX 362]
05/10/2008: $33,000 [PX 367]
Total= **$97,000**

09/02/2008: $12,000 [PX 369]
12/05/2008: $13,550 [PX 370]
Total= **$25,550**

07/02/2009: $10,000 [PX 376]
09/11/2009: $25,000 [PX 378]
06/09/2010: $7,915 [PX 388]
Total= **$42,915**

| 2007 | 2008 | 2009 | 2010 |

**Secret Account Transfers**

06/12/2007: **First known reference to "Secret Account."** [PX 871]

06/13/2007 **Cabrera sworn in as court expert** [PX 342]

8/14/2007: **"Critical money transfer"** of $50,000 [PX 897]

8/15/2007: **$50,000 transfer from KSG** [DONZ00025329; PX 578; PX 618]

8/17/2007: **$33,000 transfer to Cabrera from "Secret Account" (FDA Account 9800)** [PX 578, PX 590, PX 591, PX 593 ]

9/12/2007: **Yanza asks Donziger to have KSG send $30,000 to "Secret Account" and $20,000 to Selva Viva or $50,000 to "Secret Account" "to give to Wuao"** [PX 913]

9/17/2007: **$50,000 transfer from KSG** [DONZ00025329; PX 578; PX 618]

1/28/2008: **Yanza $25,000 transfer request** email [PX 963]

2/8/2008: **Yanza $25,000 transfer request** email [PX 967]

2/8/2008: **Donziger $20,000 transfer request** email [PX 968]

2/12/2008: **$20,000 transfer from KSG** [PX 578; PX 618]

*PX 2139*

**PLAINTIFF'S EXHIBIT 2139**
11 Civ. 0691 (LAK)

117.    I have also seen bank statements confirming that KSG transferred $50,000 into the Secret Account on September 17, 2007 and $20,000 on February 12, 2008[71]  (*See* PX 578 at p. 6–7 of 19 (BPNA00436-37)) and PX 618 (BPNA00601)).  Per my review of the documents available to me, there is no evidence of payments from Cabrera to the LAPs, their Attorneys, or Representatives, such as reimbursements for any advance payment Cabrera received out of the $120,000 apparently transferred to the "Secret Account."  In my review of the April 2012 and June 2012 motions for attorneys' fees and costs filed by Fajardo with the Ecuadorian Court, I saw no reference to the August 17, 2007 transfer of $33,000 to Cabrera or any other sum.  As such, it appears that ~~Selva Viva~~ THE FRENTE (TAD) paid Cabrera in excess of the amount authorized by the Ecuadorian court.  Additionally, I have seen no evidence of payments, court authorized or otherwise, payable from Chevron to Cabrera.

118.    THE ~~Selva Viva~~'s (TAD) transfers of funds to Cabrera appear to be in excess of the amount authorized by the Ecuadorian court and payments were made through the use of an intermediary "Secret Account."  The payments made to Cabrera through the Secret Account appear to be inconsistent with my understanding of how Cabrera was to be compensated for court authorized work, and appear to be for work performed solely on behalf of the LAPs.  As Cabrera was supposed to be working independently as the neutral expert in the Litigation, these additional

---

[71]  Subsequent to the incoming wire transfers from KSG to the Secret Account, there were several large cash withdrawals made from the Secret Account by Lucia Eugenia Chungo Garces and employees of the Frente, including Jose Fajardo, Marisol Guadalupe Asimbaya Jarrin, and Angelica Leonela Encarnacion Quenama. (See DONZ00025167 and FDA_Current_Employees[1]_).  Subsequent to the August 15, 2007 transfer, in addition to the $33,000 transfer to Cabrera, there were cash withdrawals totaling $120,616 made between August 17, 2007 and February 26, 2008.  (*See* PX 578 at p. 6–7 of 19 (BPNA00436-37)).  Based upon the documentation reviewed, I was not able to determine the ultimate disposition of the cash withdrawals, however, around the dates of each of the wire transfers, there was significant email communication among Donziger, Yanza, and Kohn regarding transferring money to the Secret Account to pay the Wao (Cabrera). (*See* PX 347 (CVX-RICO-1148013-14), PX 913 (DONZ-HDD-0125080), DONZ0006379, and DONZ00062893).

71

Secret Account payments appear to be improper.  In my opinion, these facts concerning the payments made by ~~Selva Viva~~ *THE FRENTE (FDA)* to Cabrera are indicative of fraudulent activity.

119.    Based on information I have reviewed, it appears that employees of Stratus played a major role as the support team in the drafting of the expert report, as they outlined and drafted substantial portions of the Cabrera report and many of its annexes and supervised its translation to Spanish.  (*See* PX 2433 (STRATUS-NATIVE070483-487); PX 979 (DONZ00025833); PX 2436 (STRATUS-NATIVE055867 (near duplicate of STRATUS-NATIVE053742)); PX 1050 (STRATUS-NATIVE044716)).

120.    In addition to the correspondence showing the LAPs' Attorneys' involvement in Cabrera's report, I have also reviewed documents, including invoices, letters, and emails, evidencing transfers of funds from the LAPs' Attorneys to Stratus.  Such documents evidence that the LAPs' Attorneys were paying Stratus between the date that the Ecuadorian court appointed Cabrera (June 13, 2007) and the date that Cabrera submitted the expert report to the Ecuadorian court (around April 1, 2008).  More specifically, my review of financial documents and accounting records show that Stratus billed KSG[72] approximately $533,000 for the services they performed during this timeframe.  (*See* PX 2412 (WOODS-HDD-0144903, WOODS-HDD-0144881).  Based on the timing of these services, it appears that this amount corresponds to the preparation of Cabrera's expert report.  As discussed above, payments to Stratus related to such invoices were facilitated by Donziger.[73]  Notably, none of the documents related to the

---

[72]   The documents reviewed demonstrate that Donziger utilized KSG in the facilitation of payments.  Invoices were addressed to either Donziger or KSG; however, Donziger received the requests for payment, while KSG made the actual payments.  (*See* PX 2412 (WOODS-HDD-0144877-922)).

[73]   Refer to Experts and Consultants section above for discussion of the LAPs' Attorneys payments to Stratus.

72

Ecuadorian Court's authorized payments to Richard Cabrera include any indication of Stratus'
involvement with Cabrera's report.

121.    Based on my review of the documents, it is my understanding that in addition to
apparently paying Stratus, the LAPs' Attorneys also incorporated other consultants' work in
Cabrera's report as well.  According to the outtakes from the film *Crude,* Fernando Reyes was
also present at the March 3, 2007 meeting with the LAPs' Attorneys and Representatives and
Cabrera.  Based on the declaration of Reyes, Donziger paid him two monthly payments of
$1,500 in exchange for "reviewing everything Cabrera did on the technical part of the project."
(*See* Fernando Reyes Decl., Dec. 6, 2012, at ¶ 32, Dkt. 658-18; PX 887 (DONZ00024588)).
Additionally, he was hired by the LAPs' Attorneys and paid approximately $10,000 to perform
technical analyses during the summer of 2007.[74]  (*See* Fernando Reyes Decl., Dec. 6, 2012, at
¶ 38, Dkt. 658-18).  According to Reyes' deposition, unbeknownst to him at the time, the
technical analyses were submitted as Annex S of Cabrera's report.  (*See id.*).  I have not seen
evidence that the payments to Reyes were made through a court authorized process.

122.    Based upon the documents I have reviewed, it appears that Juan Cristobal Villao
Yepez was also paid outside of the court authorized process.  Villao is included in Annex V of
Cabrera's report indicating that he is a part of Cabrera's independent technical team.  Cabrera's
independent technical team was to be paid from the payments made to Cabrera through the court
authorized process.  However, during the period that he would have been a participant in
Cabrera's purportedly independent team, Villao was also noted as an employee of UBR.  UBR
sent their invoices to, and were directly paid by, KSG.  Villao's name was included on several

---

[74]  Reyes' involvement is corroborated by various email communications with Donziger discussing documents and
payment, as well as Donziger requesting KSG to pay Reyes.  (*See* DONZ00090541, DONZ-HDD-0152268, and
PX 887 (DONZ00024588)).

Plaintiff's Exhibit 4900R   p. 73 of 144

invoices from UBR to KSG for his time in Quito, indicating that his work was to review and make revisions to a UBR report, which ultimately ended up as an annex to the Cabrera Report. (*See* PX 639 (VU00000215-217); PX 596 (VU00000190-207)).  This final UBR report is attached to an email that Villao sends to Fajardo, Yanza, and Donziger on behalf of UBR; in the introduction to the report, Villao states that, "UBR was retained by Eng. Richard Cabrera in July 2007…"  (PX 0949 (VU00000126 (duplicate of DONZ00045334-337))).  Subsequently, there are appearances of materials with UBR's logo in the Cabrera Report.  Based upon financial records, it is confirmed that KSG paid UBR approximately $49,360 for invoices dated July 2007 through 2008.  (*See* PX 2430 (VU00000188-89); PX 596 (VU00000190-207); PX 635 (VU00000208-10); PX 637 (VU00000211-14); PX 639 (VU00000215-17); PX 640 (VU00000218-21)).  According to the UBR invoices, of the $49,360 charged by the firm, approximately $19,000 related to Villao.  (*See* PX 596 (VU00000190-207); PX 635 (VU00000208-10); PX 637 (VU00000211-14); PX 639 (VU00000215-17); PX 640 (VU00000218-21)).  There is no evidence that these payments were through a court authorized process, and they appear to be in addition to any compensation Villao may have received from his role as part of Cabrera's independent technical team.

### D.     Analysis of Payments Made to Alberto Guerra

123.     In my review of various documents, I have reviewed evidence in which it appears that the LAPs' Attorneys and Representatives paid Alberto Guerra, a former Judge of the Provincial Court of Sucumbíos from 1998 until his dismissal in 2008.  (PX 1756)  Former Judge Guerra presided over the Litigation between May 13, 2003 and January 7, 2004.  (*See* Alberto Guerra Decl., Nov. 17, 2012, at ¶¶ 4, 7, Dkt. 746-3).

74

Plaintiff's Exhibit 4900R   p. 74 of 144

124.    Documents I have reviewed show that on December 23, 2009 and again on February 5, 2010, Ximena Centeno, an employee of Selva Viva, deposited $1,000 in Guerra's account at Banco Pichincha.  (*See* PX 1687; PX 1688; PX 1689; PX 1718).  The signature on the February 5, 2010 deposit slip includes Ximena Centeno's "Numero do Cedula," Citizen ID Number, 1716841547, which I understand is unique to each Ecuador citizen.  (*See id.*; Alberto Guerra Decl., Nov. 17, 2012, at ¶ 14; Dkt. 763-7 Stavers Dec Exhibit 3290).

### E.    Lago Agrio Plaintiffs' 2012 Motion for Costs and Fees

125.    It is my understanding that on April 23, 201,2 the LAPs' Attorneys, specifically Fajardo, filed a request with the Ecuadorian Court for an order for settlement of various items, including court costs and attorneys' fees.  Fajardo identified such court costs in the amount of $1,611,657.64 for which he was seeking the Ecuadorian court to order Chevron to reimburse the LAPs.  (*See* Attachment M).  I reviewed the documents Fajardo submitted to the Ecuadorian court, which included all of the receipts and invoices to substantiate the total amount of court costs, and it appears that the total amount expended was $1,594,690.92.  (*See* Attachment M).  Based on my review of these documents, these expenditures were paid out of the Selva Viva account ending 5004 at Banco Pichincha.

126.    Based on my review of the documents, Donziger and funders, including Torvia, transferred approximately $2.7 million to Selva Viva between 2005 and 2011.  (*See* PX 2142; PX 583).  Based on this evidence, it appears that the amount of approximately $2.7 million that the LAPs' Attorneys transferred to the Selva Viva account is in excess of the $1.6 million for which Fajardo sought reimbursement through the court.  Based on my review of the limited documents available to me, I am not able to determine the purpose or destination of the excess

75

amount of approximately $1,100,000 or why the LAPs did not seek reimbursement from the Court for that additional amount.

Plaintiff's Exhibit 4900R   p. 76 of 144

## Selva Viva Funding in Excess of the 2012 Motion for Fees & Costs

| Year | Cuerpo Summary Motion for Costs | Confirmed Payments to Selva Viva | Funds Unaccounted For |
|---|---|---|---|
| 2004 | $ - | $ - | $ - |
| 2005 | $ 378,581.58 | $ 334,984.00 | $ (43,597.58) |
| 2006 | $ 288,659.06 | $ 175,000.00 | $ (113,659.06) |
| 2007 | $ 353,764.62 | $ 617,000.00 | $ 263,235.38 |
| 2008 | $ 208,289.14 | $ 431,000.00 | $ 222,710.86 |
| 2009 | $ 142,895.84 | $ 329,000.00 | $ 186,104.16 |
| 2010 | $ 130,257.65 | $ 320,000.00 | $ 189,742.35 |
| 2011 | $ 109,209.75 | $ 469,922.00 | $ 360,712.25 |
| 2012 | $ - | $ - | $ - |
| **TOTAL** | **$ 1,611,657.64** | **$ 2,676,906.00** | **$ 1,065,248.36** |

PX 2142

PLAINTIFF'S
EXHIBIT
2142
'11 Civ. 0691 (LAK)

Plaintiff's Exhibit 2142   p. 1 of 1

Plaintiff's Exhibit 4900R   p. 77 of 144

**F.    Potential Distribution of Final Judgment Distribution Amount In *Aguinda y Otros v. Chevron Corporation***

**i.    Introduction**

127.    I have reviewed the February 14, 2011 Lago Agrio Judgment and ancillary court rulings (hereinafter "Lago Agrio Judgment") (PX 400), the Commercial Trust for the Administration of ADAT Monies agreement (hereinafter "LAPs Trust Agreement") (PX 2459), and the financial and accounting documents and agreements among the LAPs and their Attorneys and Representatives.  My review included both executed and unexecuted draft agreements, as well as various emails and memoranda discussing terms of distribution of the Lago Agrio Judgment award.  After reviewing the Lago Agrio Judgment and documents produced in discovery, I find it is virtually impossible to determine precisely how any funds received would be divided.  However, the plan for distribution of funds may be illustrated using hypothetical amounts.

128.    First, the portion of a hypothetical recovery that would be available to the LAPs' Attorneys and Representatives for distribution (hereinafter "Final Judgment Distribution Amount")[75] cannot be determined from the terms of the Lago Agrio Judgment.  Neither the Lago Agrio Judgment nor the LAPs Trust Agreement provides a complete direction for the disbursement of the $19,041,414,529 award.[76]  The amount assumed to be available for distribution affects the analysis because different sharing rules are invoked depending on the base sum.

---

[75]    The term "Final Judgment Distribution Amount" refers to the ultimate pool available for distribution under each agreement.  The Final Judgment Distribution Amount is a highly reasonable approximation of the award actually disbursed under an agreement.  For example, certain disbursements may be reduced by "Jurisdiction Exit Tax" or "expenses up to $2,500,000."

[76]    The total judgment awarded to the LAPs and their Attorneys and Representatives as of August 3, 2012 is $19,041,414,529.  (*See* PX 414).

78

129.    Second, the documents include numerous overlapping funding and service agreements entered into among the LAPs' Attorneys and other Representatives to further the operations of the Litigation.  These documents reflect agreements to provide services and/or financial contributions in exchange for a distribution of some share of the Final Judgment Distribution Amount.  The complex interplay among these agreements cannot be fully ascertained due to a lack of complete financial records and executed agreements produced during discovery.

### ii.    Lago Agrio Judgment

130.    The Lago Agrio Court returned a judgment totaling $19,041,414,529 in favor of the LAPs in the matter of *Aguinda y Otros v. Chevron Corporation* (No. 2003-0002) Sucumbíos Provincial Court of Justice, Lago Agrio, Ecuador.  (*See* PX 400; PX 414; PX 430; PX 431; PX 2460).  The Lago Agrio Court divided the Judgment into four (4) components: 1) Environmental Remediation Damages, 2) Punitive Damages, 3) An additional 10% Award paid to Frente under the Ecuador Environmental Management Act, and 4) 0.1% professional fee for the LAPs' legal counsel.  The Judgment does not provide complete directions for the disbursement of the award. It only expressly directs how the Environmental Remediation Damages are to be disbursed.

131.    The February 14, 2011 Lago Agrio Judgment directed Chevron to pay environmental damages totaling $8,646,160,000 to a trust established for the benefit of the LAPs for the purpose of executing the environmental remediation.  (*See* PX 400 (2011.02.14 Lago Agrio Judgment_CRT at p. 179-184)).[77]  The Judgment apportioned the damages for

---

[77]  "Within a period of sixty days of the date of service of this judgment, the plaintiffs shall establish a commercial trust, to be administered by one of the fund and trust administrator companies located in Ecuador. . . .  The autonomous endowment shall be comprised by the total value of the compensation that the defendant has been ordered to pay per part Thirteenth of the Findings [which are the Environmental Remediation Damages]. . . . The beneficiary of the trust shall be the Amazon Defense Front [Frente] or the person or persons that it

*(Cont'd on next page)*

79

environmental remediation as follows into several categories.  (*See id.*).  The Lago Agrio Judgment provided for a Trustee under the direction of a Board of Directors consisting of appointees from the Frente, to administer the environmental remediation.  (*See id.* at p. 186-187 of 189).  Under this trust agreement, the Trustee is responsible for administering the remediation funds and the Lago Agrio Court will oversee the effectiveness of the remediation.  (*See id.*).

132.    The Lago Agrio Judgment also awarded 100% punitive damages and an additional 10% Award in the name of the Frente.  (*See id.* at p. 185 of 189).  The 10% Award totals $1,729,232,000, and was calculated by the Lago Agrio Court based on the remediation damages and the punitive damages.  (*See* PX 2460).  The Lago Agrio Court also ordered an additional 0.1% in attorneys' fees in its January 3, 2012 order (*see* PX 430 at p. 4 of 11) and granted the LAPs' motion for additional costs adding another $19,862,529.  (*See* 2012.07.25 Correction of Assessment Report by Gloria Pinos Galeas_CRT).  The final revised amount of the total award is $19,041,414,529, including court costs.  (*See* PX 414 (2012.08.03 Order_CRT)). The Judgment does not contain any direction for the distribution of these funds.  (*See id.*).[78]  The LAPs' Attorneys and Representatives specifically excluded these additional funds from the Commercial Trust for the Administration of ADAT Monies in the LAPs Trust Agreement.  (*See* PX 2459; *see infra* Part IV.F.iii (Commercial Trust for the Administration of ADAT Monies

---

*(Cont'd from previous page)*

    designates, considering that 'those affected' by the environmental harm, are undetermined, but determinable, persons united by a collective right, with the measures of reparation being."  (*See* PX 400 (2011.02.14 Lago Agrio Judgment_CRT at p. 186)).

[78]  The Lago Agrio Judgment specifically mandates the establishment of a trust for "part Thirteenth of the Findings," which is the Environmental Remediation Damages, but does not specify disbursements for Parts Fourteenth (punitive damages) and Fifteenth (Civil Damages).  (*See* PX 400 (2011.02.14 Lago Agrio Judgment_CRT at p. 176, 186).

80

Plaintiff's Exhibit 4900R   p. 80 of 144

section)).  Therefore, the treatment of the award of punitive damages, the 10% Award to the Amazon Defense Front, and attorneys' fees and costs are not specified.

133.    Furthermore, the Lago Agrio Judgment does not provide instructions for a scenario in which the LAPs and their Attorneys and Representatives cannot enforce the full $19,041,414,529 judgment.  The Judgment does not provide any direction in the case that proceeds received are less than the full award.  For example, it is unclear whether monies received must be applied first to fulfilling the requirements of the Environmental Remediation Damages, pro rata across the various categories of the Lago Agrio Judgment, or in some other manner.  The Intercreditor Agreement executed on October 31, 2010 establishes a structure under which the LAPs' Attorneys and Representatives are paid prior to the LAPs, but the Lago Agrio Judgment does not consider that agreement.  (*Compare* PX 552, *with* PX 400).

### iii.    Commercial Trust for the Administration of ADAT Monies

134.    The LAPs and their Attorneys and Representatives executed the Commercial Trust for the Administration of ADAT Monies to disburse the Environmental Remediation Damages totaling $8,646,160,000.  (*See* PX 2459 at p. 8 of 393).[79]  The Commercial Trust for the Administration of ADAT Monies was established for the benefit of the LAPs and the Frente.  (*See id.* at p. 5 of 393).  Under the trust agreement, the trust's Board of Directors primarily consists of Frente appointees.  (*See id.* at 17 of 393).  The LAPs' Trust Agreement specifically excludes authority over the punitive damages and the 10% Award to the Frente.  (*See id.* at p. 8 of 393).  Furthermore, the trust agreement states these funds will not be contributed toward the

---

[79]  The Directors are tasked with establishing an environmental remediation plan, and hiring contractors to execute this plan.  (*See* 2012.03.01 Judgment Trust Document at p. 20-21).  The Trustee is tasked with releasing funds and providing oversight of the remediation effort.  (*See id.*).

81

environmental remediation under any condition, including, for example, inadequate funds to complete the remediation.  (*See id.* at p. 9-10 of 393).

135.    Under the LAPs' Trust Agreement, the LAPs purported to irrevocably transfer ownership of their "assets," which amount to "all of the monies the [LAPs] receive[] in the future as a result of the part of the enforceable judgment corresponding to [Environmental Remediation Damages]," to the trust.  (PX 2459 at p. 9 of 393).  This clause of the LAPs' Trust Agreement is consistent with Clause 8 of the Treca Financial Solutions Funding Agreement, which bound the Frente to "cause each Claimant to assign all of its or his Litigation Rights to the Trust, in exchange for . . . an equivalent beneficial interest in the trust."  (*See* PX 552 at p. 17 of 79 (DONZS00015670 at p. 13)).

136.    The LAPs and their Attorneys and Representatives have not produced any evidence of an additional trust or fund established to disburse the punitive damages, 10% Award to the Frente, or the award of legal fees and additional costs.  The January 3, 2012 Lago Agrio Court Order requires that, "Concerning punitive damages … another trust must be created for the administration thereof."  (PX 430 at p. 16 of 33).  However, I have seen no documentation reflecting its creation.  Clause 8 of the Treca Financial Solutions Funding Agreement also provided that the Trustee could establish a "Second Trust" for the purpose of disbursing the Final Judgment Distribution Amount[80] according to the terms of that agreement.  (*See* PX 552 at p. 15

---

[80]   The Final Judgment Distribution Amount, as referred to in the Treca Financial Solutions Funding Agreement and Intercreditor Agreement, is "Net Recoveries."  "Net Recoveries means the difference between: (a) the total proceeds of the Award; and (b) the total of (i) up to $2,500,000 in reimbursements of amounts advanced to fund costs incurred by the Claimants since the inception of the Claim . . . , (ii) any Jurisdiction Specific Exit Tax payable on the Award and (iii) if the Funder has not actually funded the entire $15,000,000 Capital Commitment, all other Taxes and other withholdings imposed upon or against all or any portion of the Award (including, for the avoidance of doubt, any amounts not paid to the Claimants by virtue of the application of the Act in respect of which the Claimants would have been required to make a payment to the Funder if it had funded the entire $15,000,000 Capital Commitment)."  (PX 552 at p. 44-45 of 79 (DONZS00015670 at p. 40-41)).

Plaintiff's Exhibit 4900R   p. 82 of 144

of 79 (DONZS00015670 at p. 11)).  This trust would not necessarily be administered under the supervision of the Lago Agrio Court.

### iv.    NewCo Structure

137.    A document produced by the LAPs' Attorneys and Representatives provides further insight into a plan for collecting and distributing the Lago Agrio Judgment.  (*See* PX 1520 (DNZDEF0002205)).  The LAPs' Attorneys and Representatives appear to have planned to create an entity to collect and disburse the Lago Agrio Judgment, as well as collect investments and pay case expenses.  (*See id.*).  The document only refers to this entity as "NewCo" and does not specify its legal structure or jurisdiction of establishment.  (*See id.*).  NewCo would be managed by a Board of Directors and advised by a Steering Committee.  (*See id.*).  The entity would distribute the Judgment to new and existing funders, attorneys and advisors, and to the LAPs, via the Remediation Trust and a separate Punitive Damages Trust.  (*See id.*).  The document also provides for the following distribution of the Lago Agrio Judgment: 10.5% to the funders, 17% to the attorneys and advisors, 70% to the claimants, and 2.5% to cases expenses and other potential claims.  (*See id.*).[81]  These figures are mostly consistent with potential distributions under the Intercreditor Agreement executed on October 31, 2010.  (*See* DONZS00015670).  I have reviewed information which shows that "NewCo" was eventually established as Amazonia Recovery Limited, a Gibraltar registered company.  Amazonia Recovery Limited's Articles of Association discuss a Punitive Damages Trust[82] and a

---

[81]  The NewCo distribution percentages to funders, lawyers and advisors, LAPs, and expenses are approximations.  (*See* PX 1520 (DNZDEF0002205)).

[82]  The trust established under the laws of Gibraltar, which will receive the portion of the Award specifically for punitive damages in accordance with the Judgment.

83

Remediation Trust.[83]  (*See* PX 657).  Although the Remediation Trust has been established as the

Commercial Trust for the Administration of ADAT Monies, I have not seen evidence that the

Punitive Damages Trust has been established.  (*See* Donziger Dep., June 25, 2013, p. 633:22-

634:2).  The Articles of Association of Amazonia Recovery Limited also outline a shareholder

class hierarchy that can be seen as akin to the priority for distribution of the Final Judgment

Distribution Amount per the Intercreditor Agreement and outlined below ~~in Figure 8~~.  (*See* PX

657).  Additionally, the Articles of Association state that there will be a Board of Directors

advised by a Steering Committee, which is the same structure proposed for NewCo (*see id.*).  As

such, it would be reasonable to conclude that NewCo was established as Amazonia Recovery

Limited.

### v.   Distribution Waterfall

138.   Based on my review of the documents, the priority for the potential distribution of

the Final Judgment Distribution Amount is established in the "Distribution Waterfall," Clause

3.2 of the Intercreditor Agreement, dated October 31, 2010.  (*See* PX 552 at p. 56 of 79

(DONZS00015670 at p. 52)).  The Intercreditor Agreement was executed in conjunction with the

Treca Financial Solutions Funding Agreement—which provides the terms for Burford's

investment in the Litigation.[84]  (*See id.*).  Based on my review of documents, it appears that the

LAPs and their Attorneys and Representatives were in the process of formalizing all current and

previous funding and service agreements in conjunction with the execution of the Intercreditor

---

[83]   The trust established under the laws of Ecuador, as required by Section Fifteen of the Judgment, to administer the costs needed to carry out the remediation measures contemplated in Section Thirteen of the Judgment.

[84]   For further information regarding the Burford investment see Analysis of Transactions Related to Investments section above.

84

Agreement; however, they did not complete this process as of discovery. [85] The Intercreditor Agreement clarifies that all prior and future funding and service agreements are subject to the Distribution Waterfall set out in Section 3.2.[86] (*See* PX 552 at p. 57-58 of 79 (DONZS00015670 at p. 53-54)).

139.   Based on my review of the financial and accounting documents and agreements produced during discovery, the Inactive Lawyers[87] had not assented to the Intercreditor Agreement at the time of discovery.  (*See* DONZS00014031-32).  Previously, KSG's distribution priority, in particular, was unclear.  KSG's return on investment appeared to be severely diluted under the Intercreditor Agreement.  Unless KSG agreed to a separate settlement, it was possible that KSG would not accept the limitations that would affect it under the Intercreditor Agreement. Based on our analysis of the available financial and accounting records, KSG provided funding of approximately $7,000,000 in connection with the Litigation and prior to the firm's disavowal of economic interest did not appear to have finalized an agreement as to how it would be compensated or reimbursed for its funding.[88] (*See* PX 641 (KSG00135246 (contains near

---

[85]   Lee Hamilton's (Purrington Moody) To-Do List noted various items to be completed, including but not limited to, "final agreement needs to be translated into Spanish for review by clients", "awaiting final agreement in concept as to terms", and "agreement needs to be sent to the co-investors for review and approval."  (*See* DONZS00014031-32).

[86]   "The claims described in Clause 3.2 will be paid in the priority described in Clause 3.2 regardless of the security or other interests held by, or any other rights and remedies available to, the Parties by contract, applicable law or otherwise."  (*See* PX 552 at p. 57-58 of 79 (DONZS00015670 at p. 53-54).  Based on my review it does not appear that KSG or Bonifaz assented to the Intercreditor Agreement.  (*See* DONZS00014031-32).

[87]   Inactive Lawyers are "any lawyers or law firms who or which previously represented the Plaintiffs in the Litigation but who or which are no longer active in the Litigation."  (*See* PX 1464 at p. 6 of 30 (DONZS00014130 at p. 4)).  Inactive Lawyers include KSG, Cristobal Bonifaz, and Beldock, Levine & Hoffman.  (*See* PX 1464 at p. 26 of 30).

[88]   KSG's internal accounting records as of May 31, 2009 show it had incurred unreimbursed expenses totaling $6,536,624.32.  KSG's unreimbursed expenses from 1993 to 5/31/2009 were $6,204,672, and additional expenses included $184,268.74 contributed to Amazon Watch and $147,683 contributed to E-Tech.  (*See* PX 641 at p. 2 of 13 (KSG00135246 (contains near duplicate of DONZ00083678))).  KSG does not classify its

*(Cont'd on next page)*

85

duplicate of DONZ00083678))).  KSG began representing the LAPs in 1993, in the predecessor

lawsuit *Aguinda et al. v. Texaco Inc.* (S.D.N.Y.), which was dismissed in 2002.  (*See* PX 316

(CVX-RICO-1006382 - CVX-RICO-1006389)).  The LAPs' Attorneys and Representatives

terminated KSG's representation on July 26, 2010 and the firm acknowledged termination on

July 29, 2010.  (*See* PX 1406 (DONZ00126441 at p. 2)).  The Distribution Waterfall would be

affected if KSG were to assert a claim to distribution as a Litigation Major or Minority Funder,

and also KSG could also assert a claim to 7th Priority distribution contingency fees based on its

2008 agreement with Donziger, which provided for a 50/50 split of any contingency fee award

between the firm and Donziger.  (*See* PX 2352 (DONZ00115107)).  While KSG did not see the

Litigation to the end, it did provide legal representation to the LAPs for about 17 years.

However, it appears that KSG has relinquished its right to a distribution.  In a June 6, 2013

deposition, Joseph Kohn disavowed any economic interest in the Lago Agrio judgment, stating,

"In the fall or winter of 2010, [KSG] made it clear that we had no interest in any potential

attorneys' fee that might ever be obtained or awarded in the matter.  [KSG] also had out-of-

pocket costs, expenses, related to the matter, and the end of last year the firm determined that …

we would formally disavow and waive any such claim for any cost reimbursement."  (*See* Kohn

Dep., June 6, 2013, p. 18:2-19:6).  KSG wrote off any potential award/reimbursement from the

Lago Agrio judgment, and subsequently sent a follow up letter to the plaintiffs confirming such.

It is unclear how this would affect the Distribution Waterfall. [89]

---

*(Cont'd from previous page)*

    unreimbursed expenses as "investments" or "funding," but KSG's payments were the only source of litigation
    funding from 1993 until DeLeon first invested in the Litigation in March 2007.

[89]  *See infra* Part IV.F.v.e.

Plaintiff's Exhibit 4900R   p. 86 of 144

140.    Clause 3.2 of the Intercreditor Agreement sets forth nine (9) priorities for the

distribution of the Final Judgment Distribution Amount[90]:

- First, such proceeds shall be applied by the Nominated Lawyers in satisfaction of any taxes or similar government claims ranking in priority to the claims of the Parties hereto;

- Second, any remaining proceeds, in payment of the reasonable expenses of the Nominated Lawyers, Trustee No. 1 and Trustee No. 2 in carrying out their obligations under this Agreement, excluding any expenses relating to the payment of contingent fees or other similar fees of any Person;

- Third, any remaining proceeds up to an aggregate amount equal to US$2,360,000 shall be paid to Torvia, and US$140,000 shall be paid to Torvia or other Minority Funders[91] (as directed by the Claimants) pursuant to the terms of the Minority Funder Funding Agreements;

- Fourth, any remaining proceeds shall be paid to the Major Funder[92] in satisfaction of the amounts that are due to the Major Funder pursuant to the terms of the Major Funder Funding Agreement;

- Fifth, any remaining proceeds shall be paid to the Minority Funders in satisfaction of the amounts that are due to the Minority Funders pursuant to the terms of the Minority Funders Funding Agreements;

- Sixth, any remaining proceeds shall be paid to the Active Lawyers and Advisors in satisfaction of the unreimbursed fees and expenses (not including any contingency-based fees) of the Active Lawyers and Advisors earned or incurred pursuant to their respective Engagement Agreements and unpaid at the time of the payments hereunder;

- Seventh, any remaining proceeds shall be paid to the Active Lawyers and the Advisors (pari passu, and pro rata based upon the amount to which such Active Lawyers and the Advisor is entitled) in satisfaction of the amounts that are due to the Active Lawyers and the Advisors pursuant to the terms of their respective Engagement Agreements and any other agreements among themselves governing the distribution of such proceeds;

---

[90]   *See* PX 552 at p. 56 of 79 (DONZS00015670 at p. 52-53)).

[91]   "Minority Funders" is defined in the Intercreditor Agreement to mean, "Torvia and any other Person who or which from time to time funds Expenses or other expenses related to the Claim other than the Major Funder, and 'Minority Funder' means any one of them."  (*See id.* at p. 53 of 79).

[92]   "Major Funder" is defined in the Intercreditor Agreement to mean, "Treca Financial Solutions."  (*See id.* at p. 48 of 79).

87

- Eighth, any remaining proceeds shall be paid to any successor(s) of an Active Lawyer and any additional lawyers and/or law firms engaged by the Claimants but who or which has not executed this Agreement, to the extent the Claimants' Representative, the Nominated Lawyers Representative and the Trustee No.2, if existing, have received sufficient details about those claims and no applicable law or court order requires those claims to be paid equally with the claims of the Parties described in Clause 3.2.7; and

- Last, the balance (if any) shall be paid to the Claimants or as otherwise required by applicable law.

141.    My calculations based on the Distribution Waterfall and various documents

provide for the following potential distributions:

88

## POTENTIAL RECOVERY OF CERTAIN GROUPS FROM ECUADORIAN JUDGMENT[1]

| | RECOVERY LEVELS | | |
|---|---|---|---|
| | $19,041,414,529 | $1,000,000,000 [2] | $100,000,000 [2] |
| **Funders[3]** *Based on certain funding agreements* | $ 2.308 billion | $ 123 million | $ 69 million |
| **Attorneys & Advisors[3]** *Attorneys and Advisors* | $ 4.122 billion | $ 217 million | $ 22 million |
| **Administrative Fees & Expenses[5]** | $ 8 million | $ 8 million | $ 8 million |
| **Amounts Held in Trust[4]** *Remediation & Punitive Damages Trust* | $ 12.603 billion | $ 652 million | $ 1.5 million |
| **Individual LAPs** | $ 0 | $ 0 | $ 0 |

1) These figures are approximations based on the Intercreditor Agreement, other agreements among the LAPs and their Attorneys and Representatives, and reasonable assumptions. All of these figures are subject to taxes.
2) Calculations from full Recovery Level amount as available to the LAPs' Attorneys and Representatives.
3) In the Intercreditor Agreement's Distribution Waterfall, Priorities 3,4, and 5 address funders, Priorities 6 and 7 address Active Lawyers and Advisors, and Priority 9 addresses the individual Claimants. (See PX 552).
4) Per various Ecuadorian Court orders. (See PX. 399, PX 414)
5) For purposes of these calculations, the Nominated Lawyers reimbursable expenses in Priority 2 are $1 million and the fees and expenses for Joseph Kohn at priority 8 are $7 million. KSG did not execute the Intercreditor Agreement, but available documents show that the firm contributed approximately $7 million to the Enterprise.

*PX 2151*          *Confidential*

PLAINTIFF'S EXHIBIT **2151** 11 Civ. 0691 (LAK)

> a.   **Priority 1 – Such proceeds shall be applied by the Nominated Lawyers in satisfaction of any taxes or similar government claims ranking in priority to the claims of the Parties.**

142.    The first distribution priority for the Final Judgment Distribution Amount will be any taxes or government claims arising from the Judgment.  (*See* PX 552 at p. 56 of 79 (DONZS00015670 at p. 52)).  The tax distribution will be coordinated by the "Nominated Lawyers," Patton Boggs.  (*See* PX 552 at p. 48 of 79).  Taxes and government claims are anticipated in Ecuador, the United States, and any jurisdiction where the Judgment is enforced. Taxes cannot be estimated at this time due to the uncertainty of which jurisdictions will enforce the Lago Agrio Judgment.

143.    According to Clause 20.2 of the Treca Funding Agreement, the Major Funder's disbursement will be calculated based on the pre-tax Final Judgment Distribution Amount.[93]  The various Minority Funder Funding Agreements either are silent on taxes, or specify that the Final Judgment Distribution Amount under the agreements will be reduced by only the Jurisdiction Specific Exit Tax.  (*See* PX 547 (DONZS00013700) (silent on taxes); WOODS00045133 at p. 22 (WOODS00045154 (discussing "Jurisdiction Specific Exit Tax")); PX 554 at p. 28 of 34 (DONZS00014869 at p. 28 of 34 (same))).  On the other hand, the draft Master Agreement dated December 1, 2010 (hereinafter Active Attorney Master Agreement) among Active Lawyers explains that attorney contingency fees will be reduced by taxes assessed on the Final Judgment Distribution Amount.  (*See* PX 1464 at p 7 of 30 (DONZS00014130 at p. 5 of 29)).  Thus, the

---

[93]   Clause 20.2 of the Treca Financial Solutions Funding Agreement provides that "[e]xcept for Jurisdiction Specific Exit Taxes, the [LAPs] shall make all payments under or in connection with this [Funding] Agreement without any deduction or withholding for or on account of any Tax, save only as may be required by applicable law."  (*See* PX 552 at p. 29–30 of 79 (DONZS00015670 at p. 26)).  Clauses 20.1 and 20.3 of this Funding Agreement would have provided Burford with remedies against the LAPs to enforce Clause 20.2 had Burford invested its full $15,000,000 capital commitment.  (*See id.*).

90

burden of any taxes is avoided by the highest priority distributions and is borne by the lower levels.

> **b.**     **Priority 2 – Any remaining proceeds, in payment of the reasonable expenses of the Nominated Lawyers, Trustee No. 1 and Trustee No. 2 in carrying out their obligations under this Agreement, excluding any expenses relating to the payment of contingent fees or other similar fees of any Person.**

144.    The second distribution priority for the Final Judgment Distribution Amount will be reasonable expenses incurred by Patton Boggs as Nominated Lawyers, Trustee No. 1, and Trustee No. 2 in distributing the Final Judgment Distribution Amount. Trustee No. 1 will be a reputable trust company established under the laws of Ecuador for the purpose of distributing the Final Judgment Distribution Amount to the LAPs. (*See* PX 552 at 48–49 of 79 (DONZS00015670 at p. 44–45 of 75)). Trustee No. 2 will be a recognized registered trust company in a common law jurisdiction (excluding the United States) selected by the LAPs with the approval of the Major Funder and Torvia for the purpose of distributing the Final Judgment Distribution Amount in accordance with the terms of the Intercreditor Agreement. (*See* PX 552 at p. 43 of 79). For purposes of my calculations, I have used $1 million as the hypothetical amount for Patton Boggs expenses under Priority 2.

> **c.**     **Priority 3 – Any remaining proceeds up to an aggregate amount equal to US$2,360,000 shall be paid to Torvia, and US $140,000 shall be paid to Torvia or other Minority Funders (as directed by the Claimants) pursuant to the terms of the Minority Funder Funding Agreements.**

145.    The third distribution priority for the Final Judgment Distribution Amount is a guaranteed payment of $2,360,000 to Torvia Limited, a company incorporated in Gibraltar at the direction of funder DeLeon. (*See* PX 552 at p. 56 of 79 (DONZS00015670 at p. 52 of 75)).

91

146.    Prior to the execution of the Intercreditor Agreement, DeLeon made two investments in the Litigation totaling $1,500,000, including $1,000,000 on March 23, 2007 and $500,000 on March 10, 2010.[94] (*See* PX 586 at p. 3, 149 of 368 (DONZ00132976 and DONZ00132930; *supra* Part IV.A.ii).  DeLeon also appears to have incurred additional expenses totaling $360,000 in connection with the Litigation.[95]

147.    The terms of these investments and expenses appear to be assumed as "Reimbursable Funding" in Section 5.7 of the August 17, 2010 Investment Agreement between the LAPs and Torvia, executed via the Intercreditor Agreement on October 31, 2010 (hereinafter "August 17, 2010 Torvia Investment Agreement").[96] (*See* PX 547 at p. 6 of 21 (DONZS00013700 at p. 5)).  The August 17, 2010 Torvia Investment Agreement provides that Torvia recover Reimbursable Funding totaling $2,360,000.  (*See* p. 547 at p. 10 of 21).  The Distribution Waterfall guarantees Torvia/DeLeon this $2,360,000 as a priority disbursement senior to the claims of the Major Funder, other Minority Funders, and other parties to the Intercreditor Agreement.  (*See* PX 552 at p. 56 of 79 (DONZS00015670 at p. 52)).  It appears that the terms of DeLeon's prior investments in the Litigation are incorporated in the August 17, 2010 Torvia Investment Agreement, and DeLeon will not receive additional disbursements from the LAPs beyond the Distribution Waterfall.  Further return on the DeLeon/Torvia investments is determined according to Priority 5.

---

[94]  The terms of the March 9, 2010 Investment Agreement between DeLeon and the LAPs provided for a return of the lesser of: a) 1.75% of the Final Judgment Distribution Amount and b) 7% multiplied by the Gross Attorney fees plus 1.75% of the Final Judgment Distribution Amount less Reimbursable Funding ($2,360,000).  (*See* PX 2357 at p. 25 of 45 (WOODS-HDD-0231881)).

[95]  The additional expenses include $160,000 for a VIP tour of the contamination site and a $200,000 contribution to the Rainforest Action Network.  (*See* PX 2357 at p. 27  of 45(WOODS-HDD-0231883)).

[96]  "Reimbursable Funding" "means all monies contributed to fund the expenses of the [Litigation] and all deferred liabilities in respect of the expenses of the [Litigation]."  (*See* PX 547 at p. 6 of 21 (DONZS00013700 at p.5).

Plaintiff's Exhibit 4900R    p. 92 of 144

148.    The Intercreditor Agreement also provides for an additional $140,000 to be
disbursed to Minority Funders at the discretion of the LAPs.  (*See* PX 552 at p. 56 of 79
(DONZS00015670 at p. 52)).

> **d.    Priority 4 – Any remaining proceeds shall be paid to the Major
> Funder in satisfaction of the amounts that are due to the Major
> Funder pursuant to the terms of the Major Funder Funding
> Agreement.**

149.    The fourth distribution priority for proceeds remaining from the Final Judgment
Distribution Amount is due to the "Major Funder," Treca, in accordance with the terms of the
Major Funder Funding Agreement.  (*See* PX 552 at p. 56 of 79 (DONZS00015670 at p. 52)).[97]
Treca is a Cayman Islands company established by Burford as a vehicle to invest in the
Litigation.  (*See id.* at p. 7 of 79).[98]  Per the Major Funder Agreement, Treca committed to invest
up to $15,000,000—an initial tranche of $4,000,000, with the option to invest second and third
tranches of $5,500,000, in response to requests by the LAPs or their Attorneys and
Representatives.  (*See* PX 552 at p. 8 of 79 (DONZS00015670 at p. 4)).  On February 15, 2011
the LAPs' Attorneys and Representatives issued a Funding Notice requesting Treca to fund the
second tranche, however, evidence shows that only the initial $4,000,000 tranche was funded to
the Litigation.  (*See* PX 2366 (WOODS00039808)).

150.    According to Christopher Bogart (CEO of Burford), on February 21, 2011, Treca
informed the LAPs that the Funding Notice issued by the LAPs was invalid due to a temporary
restraining order ("TRO") issued by the court on February 9, 2011.  The TRO was sought by

---

[97]   Burford initially negotiated the Treca Financial Solutions Funding Agreement via the company Nugent
Investments Limited, but ultimately executed the agreement as Treca.  (*See* DONZ00127998).

[98]   After the payment of the first tranche in Treca Financial Solutions Funding Agreement, Burford sold 4/15ths of
Treca to Ecuadorian Ventures LLC, thus Ecuadorian Ventures LLC is potentially entitled to 4/15ths of the
amount collected by Treca, pursuant to the Intercreditor Agreement.  (See BUR0004803, BUR0004826, and
BUR0041440).

93

Chevron to prevent the LAPs from any attempts to enforce the Lago Agrio judgment and prevented any person or entity "from funding, commencing prosecuting, advancing in any way, or receiving benefit from, directly or indirectly, any action or proceeding for recognition or enforcement of any judgment" in the Litigation.  (*See* Christopher Bogart Decl., Apr. 16, 2013, at ¶¶ 32, Dkt. 1039-2).  Subsequent to the TRO, Burford/Treca decided to terminate the Funding Agreement, stating that they were "deeply concerned about the mounting evidence of fraud and misconduct that appears to have permeated the Lago Agrio Litigation."  (*See id.* at ¶¶ 3, 35). Burford informed the LAPs of its decision to terminate in a letter dated September 23, 2011, stating, "It is clear from the evidence that has come to light subsequent to our discussions with you and Treca's entry into the Funding Agreement that Claimants, the [Frente], their affiliates and their attorneys have engaged in conduct and activity that gives rise to numerous material breaches of the Funding Agreement.  In addition to breaching the Funding Agreement – through misrepresentations and other material failures – the conduct discovered amounts to fraud."  (*See id. at ¶* 35).

151.    On April 15, 2013, the Burford Parties[99] entered into a Settlement Agreement with Chevron Corporation stating that, "The Burford Parties . . .  hereby renounce all claims arising under the Funding Agreement and the Intercreditor Agreement, including all claims regarding, and the right to payment of, the Burford Interest . . .  and any right of Treca . . .  to claim damages under Section 11 of the Funding Agreement."  (*See* 4/15/2013 Settlement Agreement).  Additionally, Treca is to be dissolved by December 31, 2013.  This Settlement Agreement was fully executed on April 15, 2013, and was announced to the public April 17,

---

[99]    The Burford Parties include Burford Capital Limited, Burford Capital LLC, Litigation Risk Solutions, Treca Financial Solutions, Nugent Investments Solutions and Glenavy.  Ecuadorian Ventures LLC is also a party to this settlement agreement and relinquished its interest in the Judgment.   (See 4/15/13 Settlement Agreement).

Plaintiff's Exhibit 4900R   p. 94 of 144

2013 via a joint press release.  Therefore, as of April 15, 2013, the Burford Parties have

relinquished all economic interests to the Judgment.  It is unclear as to how this would affect the

Distribution Waterfall.  For purposes of my calculations, I continue to include the provisions of

the Major Funding Agreement and recognize Burford as the Major Funder for Priority 4.

   152.    Pursuant to the Major Funder Funding Agreement, for any Final Judgment

Distribution Amount greater than $1,000,000,000, Treca's return on investment is 5.545%.  (*See*

PX 552 at p. 36, 39 of 79 (DONZS00015670 at p. 32, 35)).  However, Treca's return could be

reduced by the fraction of capital invested ($4,000,000) over capital committed ($15,000,000) if

its refusal to fund the second tranche was a breach of this agreement.  (*id.*).  Since it is unclear

how Burford's relinquishment affects the Distribution, my analysis continues to include the

provisions of the Major Funding Agreement and assumes Treca's return on investment is

5.545%.[100]  According to a memorandum drafted by Donziger regarding Burford's investment,

under this formula Treca is estimated to receive seven times its investment if a $2,000,000,000

Final Judgment Distribution Amount is awarded.  (*See* DONZ00031534 at p. 1 of 4).[101]

   153.    Pursuant to the Major Funder Funding Agreement, for any Final Judgment

Distribution Amount less than $1,000,000,000, Treca's return is (1) 0% of the initial $2,500,000

---

[100]   My analysis assumes Treca will be awarded the full 5.545% Funding Compensation Percentage and not 1.487% of the Final Judgment, although Treca only funded $4,000,000 of its $15,000,000 Commitment Amount.  The percentage of the Final Judgment available to Treca has been disputed by Treca and the LAPs' Attorneys and Representatives. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████  Treca has rejected the LAPs' Attorneys and Representatives' position.  (*See* BUR0013596-97).  The parties have not expressly debated whether Treca's return would be reduced by the fraction of capital invested ($4,000,000) over capital committed ($15,000,000).  (*See* PX 552 at p. 36 of 79 (DONZS00015670 at p. 32)).  However, it is reasonable to assume the LAPs' Attorneys and Representatives would seek to enforce this reduction if Treca pursued a claim to the Final Judgment Distribution Amount.

[101]   It appears that this estimate is based on a $15,000,000 investment by Burford.  (*See* DONZ00031534 at p. 1 of 4).  However, as noted above, evidence shows Burford only invested $4,000,000.  (*See* PX 2366 (WOODS00039808)).

95

awarded; (2) 98.25% of each dollar of awarded above $2,500,000 until Treca recoups its investment; and (3) 78.25% of each additional dollar awarded until Treca receives $55,450,000, its anticipated return on a $1,000,000,000 judgment.  (*See* PX 552 at p. 36-37, 39 of 79 (DONZS00015670 at p. 32-33, 35)).[102]

> **e.**   **Priority 5 – Any remaining proceeds shall be paid to the Minority Funders in satisfaction of the amounts that are due to the Minority Funders pursuant to the terms of the Minority Funders Funding Agreements.**

154.    The fifth distribution priority for proceeds remaining from the Final Judgment Distribution Amount is due to the various Minority Funders according to the terms of each individual Minority Funder's Funding Agreement.  (*See* PX 552 at 56 of 79 (DONZS00015670 at p. 52)).  Based on my review of the documents, I identified numerous draft unexecuted funding agreements negotiated by the LAPs' Attorneys and Representatives with potential Minority Funders.  However, based on the lack of complete records available I was not able to determine whether the draft funding agreements were ever executed.  For purposes of this analysis, I assumed that any agreement only produced in draft form was executed, and the proposed funding was invested in the Litigation.

155.    Per the Intercreditor Agreement, the Minority Funding Funder Agreements fully vest if a $1,000,000,000 Final Judgment Distribution Amount is awarded.  (*See* PX 552 at p. 57 of 79 (DONZS00015670 at p. 53)).  If the Final Judgment Distribution Amount awarded is under $1,000,000,000, the Major Funder and Torvia have preference over the other Minority Funders—the Major Funder receives 98.25% of the proceeds and Torvia receives 1.75% of the proceeds, until the Major Funder recoups its full investment ($4,000,000).  (*See id.*).  Thereafter,

---

[102]   5.545% of a $1,000,000,000 judgment is $55,450,000.

96

the Major Funder receives 78.25% of the proceeds and the Minority Funders receive 21.75% of

the proceeds until the Major Funder receives approximately $55,450,000, its anticipated return

on a $1,000,000,000 judgment.  (*See id.*).  If a $1,000,000,000 Final Judgment Distribution

Amount is awarded, investment returns for the Minority Funders fully vest according to the

terms of each Minority Funder's Funding Agreement.

### (1)    Torvia Limited/DeLeon

156.    Donziger negotiated numerous investment agreements, both on behalf of the

LAPs and individually, with DeLeon and Torvia.[103]

157.    Torvia executed one (1) funding agreement with the LAPs.  Torvia invested

$1,250,000 in the Litigation through the August 17, 2010 Torvia Investment Agreement.  (*See*

PX 547 at p. 1, 8 of 21 (DONZS00013700 at p. 7)).  The terms of this investment provide for a

3.0% share of the Final Judgment Distribution Amount.  (*See id.*).[104]

158.    Additionally, the LAPs and their Attorneys and Representatives negotiated further

investments with Torvia and DeLeon.  However, I have not reviewed evidence that these

agreements were executed.  Torvia committed to invest $2,000,000 in the Litigation through the

draft April 7, 2011 Torvia Limited Funding Agreement, which appears to be executed on May

16, 2011.  (*See* WOODS00045133-57 at p. 20 of 25; PX 1480 (WOODS00042562); and PX 568

---

[103]  Previous investment agreements between DeLeon and the LAPs executed prior to the August 17, 2010 Torvia
Limited Investment Agreement are incorporated into and superseded by this agreement.  (*See* PX 547 at p. 13,
20 of 21 (DONZS00013700 at p. 12, 19).  See also analysis in Priority 3.

[104]  The Frente has agreed that the Torvia Apportionment shall be 3.0% of Net Plaintiff Recovery, provided that:  If
a Major Funding is completed, the Torvia Apportionment shall be an amount equal to the sum of the following:
(a) an amount equal to 1.75% of Net Plaintiff Recovery; plus (b) an amount equal to 0.25% of Net Plaintiff
Recovery above $20,000,000 (for example: if Net Plaintiff Recovery is equal to $100,000,000, an amount equal
to: 0.25% x $80,000,000); plus (c) an amount equal to 120% of the Major Funding Percentage of Net Plaintiff
Recovery above $20,000,000, (For example: if a $1,000,000 investment in the Major Funding entitles the
investor to a Major Funding Percentage of 1%, Torvia shall receive 1.2% of Net Plaintiff Recovery above
$20,000,000.  If Net Plaintiff Recovery is equal to $100,000,000, Torvia would receive an amount equal to
1.2% x $80,000,000)."  (See *id.* at p. 8).

97

(WOODS00042568)).  The terms of this investment provide for a return of 1.00% of any Final

Judgment Distribution Amount above $20,000,000 for each of the $2,000,000 funded.  (*See*

WOODS00045133-57 at p. 17 of 25).  Also, on May 16, 2011, the LAPs' Attorneys sent a side

letter to Torvia authorizing an additional $4,000,000 investment in the Litigation pursuant to the

same terms as the May 16, 2011 Torvia Limited Funding Agreement.  (*See* WOODS00042564-

567 at p. 1 of 4).

      159.    Torvia also made further investments in the Litigation totaling ███████

████████████████████████████; these funds were transferred directly to Donziger's

Chase bank accounts.  (*See* PX 586 at p. 295, 301, 305, 309, 321, 339, 356 of 368

(DNZDEF0009210, DNZDEF0009216, DNZDEF0009220, DNZDEF0009224,

DNZDEF0009236, DNZDEF0009254, and DNZDEF0009271).  Additionally, I have reviewed

documents showing that Torvia made further wire transfers totaling $1,082,829 between May 2,

2011 and April 4, 2013 into the Selva Viva Account ending in 5004.  (*See* PX 583 at p. 68, 70,

72, 75, 77, 78, 81, 83, 85, 87, and 89 (BPNA02928, BPNA02930, BPNA02932, BPNA02935,

BPNA02937, BPNA02938, BPNA02941, BPNA02943, BPNA02945, BPNA02947, and

BPNA02949)).  I have not reviewed any documents that discuss terms for these additional

investments.  Therefore, these investments are not included in my analysis of the Potential

Distribution of the Final Judgment Distribution Amount.

### (2)    Satee GmBH, 88 Capital LLC, Jonaks Limited, Equitable Outcomes, and Orin Kramer

      160.    88 Capital LLC negotiated with the LAPs and their Attorneys and Representatives

a draft Funding Agreement as of November 24, 2010, on behalf of itself and as an agent for

Satee GmBH, Jonaks Limited, Equitable Outcomes, and Orin Kramer, committing to invest in

98

the Litigation.[105]  (*See* PX 554 at p. 3 of 34 (DONZS00014869)).  This draft Funding Agreement

provided a $300,000 commitment from Satee GmBH, a $250,000 commitment from 88 Capital

LLC, a $200,000 commitment from Jonaks Limited, a $150,000 commitment from Equitable

Outcomes, and a $150,000 commitment from Kramer.[106]  (*See id.* at p. 20).  My analysis of bank

statements for the Law Firm Account confirms that Kramer invested $150,000 in the Litigation.

(*See* PX 586 at p. 143 of 368 (DONZ00132912)).

### (3)   Glen Krevlin

161.    Glen Krevlin negotiated a draft Funding Agreement with the LAPs and their

Attorneys and Representatives, as well as a draft Convertible Promissory Note with Donziger

individually.  It is unclear if these investments were intended to be cumulative or mutually

exclusive.  Krevlin committed to invest $250,000 in the Litigation through a draft Funding

Agreement, as of February 16, 2011, with the LAPs.[107]  (*See* PX 564 at p. 21 of 26

(WOODS00045203)).  Krevlin also committed to loaning $250,000 to Donziger through a draft

---

[105]   The November 27, 2010 draft Funding Agreement between the LAPs and Satee GmBH, Jonaks Limited, Equitable Outcomes, and Oran Kramer appears to supersede the November 19, 2010 draft Funding agreement between the LAPs and Satee GmBH, 88 Capital LLC, and Orin Kramer, which was negotiated under the same terms.  (See PX 554 at p. 3 of 34 (DONZS00014869)).

[106]   The terms of the draft Funding Agreement as of November 27, 2010 provide: If the Net Recoveries are greater than or equal to $1,000,000,000, then each Funder shall receive its Pro Rata Share of 1.00% of the Net Recoveries for each $2,459,016 of the aggregate amount actually funded by all of the Funders.  If Net Recoveries are less than $1,000,000,000, each funder will receive its pro rata share of Net Recoveries as follows: (a) 0.000% of the amount less than $2,360,000; plus (b) 5.210% of any amount greater than $2,360,000 and less than or equal to $5,000,000; plus (c) 0.000% of an amount greater than $5,000,000 and less than or equal to $17,676,000; plus (d) 20.000% of an amount greater than $17,676,000 and less than or equal to $20,000,000; plus (e) For any amount greater than $20,000,000, for each additional $5,000,000 of Net Recoveries (or portion thereof), a percentage determined by a formula provided in the Funding Agreement. (*See* PX 554 at p. 22-23 of 34 (DONZS00014869 at p. 22-23)).

[107]   The terms of the draft Funding Agreement as of February 16, 2011 provide: If Net Recoveries are greater than or equal to $1,000,000,000, then 1% of the Net Recoveries for each $5,410,279.53 actually funded.  If Net Recoveries are less than $1,000,000,000, then $65,208.33 for each $5,000,000 of Net Recoveries over $20,000,000 up to $462,083.33.  (*See* PX 564 at 17 of 26 (WOODS00045200)).

99

Convertible Promissory Note as of February 17, 2011, with a return on this investment payable from Donziger's attorney fees according to Priority 7.[108]  (*See* PX 2368 (WOODS00034373)).

### (4)   Michael Donziger

162.   Michael Donziger negotiated a draft Funding Agreement with the LAPs and their Attorneys and Representatives, as of February 16, 2011, committing Michael Donziger to invest $150,000 in the Litigation.[109]  (*See* PX 565 (WOODS000452209-233)).

### (5)   Russell O. Wiese

163.   Russell O. Wiese negotiated a draft Funding Agreement with the LAPs and their Attorneys and Representatives, as well as a draft Convertible Promissory Note with Donziger individually.  It is unclear if these investments were intended to be cumulative or mutually exclusive.  Wiese committed to invest $50,000 in the Litigation through a draft Funding Agreement as of March 11, 2011 with the LAPs.[110]  (*See* PX 567 at 20 (WOODS00045177)).  Wiese also committed to loaning $50,000 to Donziger individually through a draft Convertible Promissory Note as of March 1, 2011, with a return on this investment payable from Donziger's attorney fees according to Priority 7.[111]  (*See* PX 2371 (WOODS00041526)).

---

[108]   *See infra* Part I.A.i.g

[109]   The terms of the draft Funding Agreement as of February 16, 2011 provide: If Net Recoveries are greater than or equal to $1,000,000,000, then 1% of the Net Recoveries for each $5,410,279.53 actually funded.  If Net Recoveries are less than $1,000,000,000, then $39,125 for each $5,000,000 of Net Recoveries over $20,000,000 up to $277,250.  (*See* PX 565 at 17 of 25 (WOODS00045225).

[110]   The terms of the draft Funding Agreement as of March 11, 2011 provide: If Net Recoveries are less than $1,000,000, then (a) $6,250 for each $5,000,000above $20,000,000 but less than $90,000,000; and (b) $97,348 for each $5,000,000 between $90,000,000 and $95,000,000.  If Net Recoveries are greater than or equal to $1,000,000,000 but less than $2,000,000,000, then a payment of $12,379 for each $100,000,000 above $1,000,000,000.  If Net Recoveries are greater than or equal to $2,000,000,000, then the return is 0.01543% of the Net Recoveries.  (*See* PX 563 (WOODS0004514)).

[111]   *See infra* Part I.A.i.g

100

### (6)   David Sherman III

164.    David Sherman III negotiated a draft Funding Agreement with the LAPs and their Attorneys and Representatives, as well as a draft Convertible Promissory Note with Donziger individually.  It is unclear if these investments were intended to be cumulative or mutually exclusive.  Sherman committed to invest $250,000 in the Litigation through a draft Funding Agreement as of February 16, 2011 with the LAPs.[112]  (*See* PX 563 (WOODS00045127)). Sherman also committed to loaning $250,000 to Donziger individually through a draft Convertible Promissory Note as of February 17, 2011, with a return on this investment payable from Donziger's attorney fees according to Priority 7.[113]  (*See* PX 2367 (WOODS00034371)).

### (7)   KSG

165.    As previously discussed, Priorities 4 and 5 of the Distribution Waterfall could be affected if KSG were to assert a claim to distribution as a litigation funder.  KSG's unreimbursed expenses totaling approximately $7,000,000 were the primary source of Litigation funding from 1993 to 2007.[114]  (*See* PX 641 (KSG00135246 (contains near duplicate of DONZ00083678))). KSG could seek a distribution from the Major and Minority Funder's share of the Final Judgment Distribution Amount based on its "investment" in the Litigation.  It is unclear how

---

[112]   The terms of the draft Funding Agreement as of February 16, 2011 provide: If Net Recoveries are greater than or equal to $1,000,000,000, then 1% of the Net Recoveries for each $5,410,279.53 actually funded.  If Net Recoveries are less than $1,000,000,000, then for each $5,000,000 of Net Recoveries over $20,000,000, a payment of $65,208.33 until the aggregate amount paid to the funder equals $462,083.33.  (*See* PX 563 (WOODS00045124)).

[113]   *See infra* Part IV.F.v.g.

[114]   KSG's internal accounting records as of May 31, 2009 show it had incurred unreimbursed expenses totaling $6,536,624.32.  KSG's unreimbursed expenses from 1993 to 5/31/2009 were $6,204,672, and additional expenses included $184,268.74 contributed to Amazon Watch and $147,683 contributed to E-Tech.  (*See* PX 641 at p. 2 of 13 (KSG00135246 (contains near duplicate of DONZ00083678))).  KSG does not classify its unreimbursed expenses as "investments" or "funding," but KSG's payments were the only source of litigation funding from 1993 until DeLeon first invested in the Litigation in March 2007.  (*See* DONZ00310902).

101

KSG's relinquishment of economic interest in the Judgment would affect the Distribution Waterfall.

> **f.      Priority 6 – Any remaining proceeds shall be paid to the Active Lawyers and Advisors in satisfaction of the unreimbursed fees and expenses (not including any contingency-based fees) of the Active Lawyers and Advisors earned or incurred pursuant to their respective Engagement Agreements and unpaid at the time of the payments.**

166.    The sixth distribution priority for proceeds remaining from the Final Judgment Distribution Amount is unreimbursed fees and expenses, not including any contingency-based fees, incurred by the Active Lawyers and Advisors.  (*See* PX 552 at p. 56 of 79 (DONZS00015670 at p. 52)).

167.    The documents analyzed provide an incomplete accounting of expenses incurred to prior to the discovery; however, it is reasonable to assume unreimbursed fees and expenses are minimal and that certain attorneys and advisors have received ongoing compensation for fees and expenses.  The Active Attorneys negotiated monthly retainers and compensation into their retainer agreements, along with attorney contingency fees.

168.    Donziger's Retainer Agreement provided for a "Monthly Retainer" and reimbursement of reasonable expenses.  (*See* PX 558 at p. 4 of 13 (WOODS00045390 at p. 4 of 13)).  My review of the documents shows that KSG paid Donziger a monthly salary of approximately $10,000 to $17,500.  Donziger also continued to pay himself a salary from the Case Fund after KSG's termination.  (*See* Donziger Dep., Nov. 29, 2010, at p. 207:5-23).

169.    Patton Boggs' Retainer Agreement provided for an "Hourly Fee Payment" of 75% of the firm's standard hourly rates and reasonable expenses, subject to a $225,000 monthly budget, as well as 12% of attorney contingency fees.  (*See* WOODS00045366 at p. 3-4).  As of October 30, 2010, Patton Boggs had incurred fees and expenses totaling $1,622,839, and the

102

LAPs' Attorneys and Representatives discussed paying Patton Boggs from the first tranche of Burford Funding.  (*See* DONZS00013639 at p. 1 of 2).  There is no evidence confirming this payment was actually made.[115]

170.    Additional Active Attorneys and Advisors negotiated similar provisions, either for ongoing fees, or expenses, or both.  My review of the documents evidences that these parties submitted invoices throughout the Litigation and the LAPs' Attorneys and Representatives subsequently paid them.  (*See* DONZS00015695, DONZ00106172, and WOODS-HDD-0042338).  Any attorney contingency fees paid to these reimbursed Active Attorneys and Advisors under Priority 7 would be in the nature of an additional "success fee" on top of the previously made payments.

171.    Any actual unreimbursed fees and expenses would be disbursed according to Priority 6.  (*See* PX 552 at p. 56 of 79 (DONZS00015670 at 52 of 75)).  Based on the Intercreditor Agreement, the Active Lawyers are (i) Patton Boggs, (ii) ECBA, (iii) Donziger & Associates, PLLC, and (iv) Fajardo.  (*See* PX 552 at p. 56 of 79 (DONZS00015670 at 45 of 75)).  Additionally, the LAPs retained Motley Rice and F. Gerald Maples, P.A[116] as attorneys on a

---

[115]   The parties had an understanding that outstanding fees and expenses totaling $1,622,839 owed to Patton Boggs would be paid from the Burford funding--$1,500,000 from the first tranche and the remaining from the second trance.  (*See* DONZS00013639).  Based on my review of the documents, it appeared Burford did not invest the second tranche in the Litigation.  (*See* PX 2366 (WOODS00039808)).

[116]   On February 14, 2013, F. Gerald Maples, of F. Gerald Maples, PA, filed a Motion to With Withdraw as Counsel of Record from Case Number 11-CV-3718 (LAK) (*Chevron Corp. v. Salazar,* Case No. 11-CV-3718 (S.D.N.Y. 2011), Dkt. 799, due to the fact that Maples sued Steven Donziger and William Carmody for breach of contract to recover attorney fees and costs incurred as a result of representation by Maples of the Ecuadorian Plaintiffs in the original suit entitled *Maria Aguinda v. Chevron Corporation*, number 002-2003, Provincial Court of Justice of Sucumbíos, Ecuador and for representation of Donziger in the instant litigation."  *See* F. *Gerald Maples, P.A., v. Donziger*, Case No. 2:13-cv-00223-JTM-SS (E.D. La. Feb. 6, 2013).

Plaintiff's Exhibit 4900R   p. 103 of 144

contingency basis.[117]  (*See* PX 557 (WOODS00045379-389), PX 2365 (WOODS00045019-022) and PX 561 (WOODS00045403)).

172.    Priority 6 will also disburse unreimbursed fees and expenses to the LAPs' current Advisors[118]: Erik T. Moe, H5, Barnes, The Honorable Willie Lewis Brown, Lehane and Fabiani, and Downey McGrath.  (*See* PX 2362 (DONZS00004099 at p.4), PX 566 (WOODS00045076-085), PX 555 (WOODS00045023-035), PX 2363 (WOODS00045063-075), PX 560 (WOODS00045036-50), and PX 562 (WOODS00045051-62).  My review of the documents evidences that Donziger paid H5 fees and expenses in November 2010 and H5 submitted an additional invoice in January 2011.  (*See* WOODS00024887 and DONZS00015995).  Documents reviewed also evidence that Donziger reimbursed Barnes for expenses in February and March 2009.  (*See* PX 584 (DONZ00133177)).  Additionally, Hinton served as a communications advisor to the LAPs throughout the Litigation, and she had proposed a $20,000 monthly-fee contract to the LAPs' Attorneys and Representatives.[119]  (*See* PX 2361 (DONZS00003759)).  My review of the documents shows Karen Hinton consistently submitted invoices for salary-type payments.  (*See* DONZ00021997, DONZ00022066, DONZ00093608, DONZ00017432, DONZ00029005, DONZ00029066, DONZ00029216, DONZ00029217, DONZ00035648, WOODS-HDD-0314490, WOODS-HDD-0314449, WOODS-HDD-0356414, DONZ-HDD-0201626, DONZS00000184, DONZS00016335, DONZS00001115).

---

[117]  Motley Rice's retainer agreement provided for reimbursement of reasonable out-of-pocket expenses and Maples' retainer agreement did not provide for any reimbursement of expenses.  (*Compare* PX 557 at p. 3 of 11 (WOODS00045381),*with* PX 561 at p. 3-4 of 12 (WOODS00045405-06)).

[118]  The actual unreimbursed fees and expenses reimbursed to each Advisor under Priority 6 are determined by the terms of each Advisor's agreement with the LAPs and their Attorneys and Representatives.

[119]  Hinton's proposed contract does not provide her with any distribution from the Final Judgment.  (*See* PX 2361 (DONZS00003759)).  Lee Hamilton's (Purrington Moody) To-Do List, noted Hinton's retainer agreement was still under negotiation at the time of this discovery.  (*See* DONZS00014031-32)).

104

> **g.**    **Priority 7 – Any remaining proceeds shall be paid to the Active Lawyers and the Advisors (pari passu, and pro rata based upon the amount to which such Active Lawyers and the Advisor is entitled) in satisfaction of the amounts that are due to the Active Lawyers and the Advisors pursuant to the terms of their respective Engagement Agreements and any other agreements among themselves governing the distribution of such proceeds.**

173.    The seventh distribution priority for proceeds remaining from the Final Judgment Distribution Amount is based on attorney contingency fees awarded to the LAPs' Attorneys and Representatives.  (*See* PX 552 at p. 56 of 79 (DONZS00015670 at p. 52)).  The Active Attorney Master Agreement explains attorney contingency fees will be reduced by taxes assessed on the Final Judgment Distribution Amount.  (*See* PX 1464 at p. 7 of 30 (DONZS00014130 at p. 5)).  Additionally, while the LAPs' Attorneys and Representatives appear to have apportioned attorney fees beyond 100%, the Active Attorney Master Agreement provides that each party's award percentage will be reduced pro rata.  (*See id.* at p.7).

174.    Priority 7 provides the Active Attorneys and Advisors with the following approximate distributions:

105

## POTENTIAL RECOVERY OF SELECT RECIPIENTS FROM ECUADORIAN JUDGMENT[1]

| | RECOVERY LEVELS | | |
|---|---|---|---|
| | $19,041,414,529 | $1,000,000,000 [2] | $100,000,000 [2] |
| **Steven Donziger – Attorney** *31.5% of Total Contingency* [3] | **$ 1.200 billion** | **$ 63 million** | **$ 6.3 million** |
| **Torvia Limited / DeLeon – Funder:** *Invested $9,110,000* | $ 1.145 billion | $ 62 million | $ 8 million |
| **Patton Boggs – Attorney:** *12% of Total Contingency* [3] | $ 457 million | $ 24 million | $ 2.4 million |
| **Pablo Fajardo Mendoza – Attorney:** *10% of Total Contingency* [3] | $ 381 million | $ 20 million | $ 2 million |
| **H5 – Lit. Support/Advisor:** *1.75% of Plaintiff Collection Monies* [4] | $ 333 million | $ 18 million | $ 1.75 million |
| **Lehane/Fabiani – PR/Lobbyist:** *1.25% of Total Contingency* [3] | $ 48 million | $ 2.5 million | $ .25 million |
| **Orin Kramer – Funder:** *Invested $150,000* | $ 12 million | $ .6 million | $ .6 million |

1) These figures are approximations based on the Intercreditor Agreement, other agreements among the LAPs and their Attorneys and Representatives, and reasonable assumptions.  All of these figures are subject to taxes.
2) Calculations from full recovery amount as available to the LAPs' Attorneys and Representatives.
3) The "Total Contingency Fee Payment" means an amount equal to twenty percent (20%) of all Plaintiff Collection Monies."
4) The term "Plaintiff Collection Monies" means any amounts paid, whether from defendant Chevron Corporation (a/k/a Texaco; ChevronTexaco; Chevron), any other party listed as a defendant in respect of the Litigation (including, without limitation, his or her respective affiliates and successors in interest), or any other party added or joined to the Litigation from time to time as a defendant or indemnitor or against whom proceedings are asserted or threatened.  (*See* DONZS0003508 10)

*PX 2152*      *Confidential*

PLAINTIFF'S EXHIBIT
**2152**
11 Civ. 0691 (LAK)

### (1)     Attorneys

175.    The Active Attorney Master Agreement and individual retainer agreements with each of the LAPs' attorneys and representatives set the share of contingency fees for each party. (*See id. at p. 6*).  The Active Attorney Master Agreement apportions attorney fees as follows: 31.5% to Donziger; 16.5% to Motley Rice; 12% to Patton Boggs; 10% to ECBA; and 10% to Fajardo.  (*See id.* at p. 23).  Additionally, the draft retainer agreement as of February, 2011 for Maples apportions 10% of the "Total Contingency Fee Payment" to this law firm.  (*See* PX 561 at p. 3 of 12 (WOODS00045404-405)).  PX 2152 above displays multiple hypothetical situations demonstrating possible outcomes if the Full Judgment was recoverable and enforceable, and the amounts that each of the attorneys and advisors could potentially collect.  The "Total Potential Distribution to Priority 7" is calculated by taking 20%, the "Total Contingency Fee Payment" per the Active Attorney Master Agreement, of the hypothetical "Final Judgment Amount," (*See id.* at p. 6), then, allocating the attorneys' fees as apportioned in the Active Attorney Master Agreement.  Using Donziger's 31.5% contingent fee as an example of how a specific attorneys' potential distribution could be calculated, the hypothetical amounts range from $6.3 million to $1.2 billion, depending on which of the components of the Final Judgment are considered.

### (i)     Donziger Personal Loans

176.    Donziger also negotiated personal loans in 2010 and 2011 with Krevlin, Wiese, and Sherman, with returns payable from his share of the attorney fees.  Donziger negotiated draft Convertible Promissory Notes with Krevlin ($250,000),[120] Wiese ($50,000), [121] and Sherman

---

[120]  The terms of the draft Convertible Promissory Note as of February 17, 2011 provide: Six percent (6.00%) interest on the loan by the due date, and after the due date the return is equal to (Unpaid Amount/$250,000) x 0.000642 x Net Recoveries.  (*See* PX 2368 (WOODS00034373)).

107

($250,000).[122]  (*See* PX 2368 at p.1 of 2 (WOODS00034373), PX 2371 at p. 2 of 11

(WOODS00041527), and PX 2367 (WOODS00034371)).  These investors also negotiated

Funding Agreements with the LAPs' Attorneys and Representatives, and it is unclear if the

investments were intended to be cumulative or mutually exclusive.[123]  Donziger negotiated an

additional draft Convertible Promissory Note as of February 17, 2011 for a $100,000 loan with

the Leon S. Donziger Trust.[124]  (*See* PX 2369 (WOODS00044740)).

177.    Additionally, in January 2010 Donziger contemplated selling DeLeon a

percentage from his attorney fees award for an additional investment.  (*See* DONZ00082968).

Donziger considered selling 4.00% of his attorney fees for $2,000,000 and 25% of his attorney

fees for $10,000,000.  (*See id.*).  In June 2010, Donziger negotiated an additional draft personal

loan agreement with DeLeon for $250,000.[125]  (*See* DONZ00130830-31).  Returns from this

personal loan would be payable from Donziger's share of the attorney contingency fees.  (*See*

*id.*)

(ii)    KSG

---

*(Cont'd from previous page)*

[121]  The terms of the draft Convertible Promissory Note as of March    , 2011 provide: Six percent (6.00%) interest on the loan by the due date, and after the due date the return is equal to (Unpaid Amount/$50,000) x 0.0001545 x Net Recoveries.  (*See* PX 2371 (WOODS00041527)).

[122]  The terms of the draft Convertible Promissory Note as of February 17, 2011 provide: Six percent (6.00%) interest on the loan by the due date, and after the due date the return is equal to (Unpaid Amount/$250,000) x 0.000642 x Net Recoveries.  (*See* PX 2367 (WOODS00034371)).

[123]  *See supra* Part. *See infra* Part IV.F.v.e.

[124]  The terms of the draft Convertible Promissory Note as of February 17, 2011 provide: Six percent (6.00%) interest on the loan by the due date, and after the due date the return is equal to (Unpaid Amount/$250,000 [sic]) x 0.000917 x Net Recoveries.  (*See* PX 2369 (WOODS00044740)).  The Leon S. Donziger Trust Convertible Promissory Note as of February 17, 2011 for a $100,000 loan appears to supersede a Michael Donziger Convertible Promissory Note as of the same date for $250,000.  (*See* PX 2370 (WOODS00044745)).

[125]  The terms of the draft Personal Loan Agreement as of June    , 2010 provide DeLeon a return of 5% per annum until the loan becomes payable, and then 10% per annum after this date, to be paid from Donziger's Attorney Contingency Fee.  (*See* DONZ00130831).

Plaintiff's Exhibit 4900R   p. 108 of 144

178.    As previously discussed, it is possible that KSG will not accept the limitations that would affect it under the Intercreditor Agreement.  KSG could assert an additional claim to 7th Priority distribution contingency fees based on its 2008 agreement with Donziger, which provided for a 50/50 split of any contingency fee award between the firm and Donziger.  (*See* PX 2353 (DONZ00115107)).  While KSG did not see the Litigation to the end, it did provide legal representation to the LAPs for about 17 years.  It is unclear how this would affect the Distribution Waterfall.

**(2)      Advisors**

179.    Priority 7 will also award attorney fees to the LAPs' Advisors based on the terms of each individual advisory agreement.  The advisory agreements apportion the attorney fees as follows: 3.25% to Moe; a 1.25% service fee and a discretionary bonus of up to 0.5% to H5[126]; 3.5% to Barnes; 0.5% to The Honorable Willie Lewis Brown)[127]; 1.25% to Lehane and Fabiani[128]; and 1% to Downey McGrath.  (*See* PX 2362 (DONZS00004099); PX 566 (WOODS00045077-078 at p. 2, 3 of 10); PX 555 (WOODS00045035); PX 2363 (WOODS00045075); PX 560 (WOODS00045050); and PX 562 at p. 12 of 12 (WOODS00045062)).

**h.       Priority 8 – Any remaining proceeds shall be paid to any successor(s) of an Active Lawyer and any additional lawyers and/or law firms engaged by the Claimants but who or which**

---

[126]   H5's advisory agreement awards the firm a 1.25% service fee and 0.5% bonus based on "Plaintiff Collection Monies," defined as "monetary amount paid" to the LAPs.  (*See* PX 566 (WOODS00045077-78)).

[127]   KSG's initial retainer agreement with The Honorable Willie Lewis Brown dated February 2, 2009 provided Brown 2% of the total attorney's fees.  (*See* PX 2353 (DONZ00097121)).

[128]   Donziger and KSG's initial retainer agreement with Lehane and Fabiani dated October 6, 2005 provided a 2% share of the total attorney's fees awarded in the Litigation.  (*See* PX 2351 (DONZ00115109 at p. 2 of 4)).  Lehane appears to agree to a dilution of his contingency fee award in an email dated November 6, 2010.  (*See* DONZS00014038; PX 2359 (DONZS00014039)).

109

**has not executed this Agreement, to the extent the Claimants'
Representative, the Nominated Lawyers Representative and
the Trustee No.2, if existing, have received sufficient details
about those claims and no applicable law or court order
requires those claims to be paid equally with the claims of the
Parties.**

180.    The eighth distribution priority for proceeds remaining from the Final Judgment

Distribution Amount is unreimbursed expenses and legal fees owed to successor attorneys to the

Litigation.  (*See* PX 552 at p. 57 of 79 (DONZS00015670 at p. 53)).  The successor attorneys,

referred to as Inactive Lawyers in the Active Attorney Master Agreement,[129] include Bonifaz,

KSG, and Beldock, Levine & Hoffman.  (*See* PX 1464 (DONZS00014130 at p. 24)).[130]  As

previously discussed, the Inactive Lawyers' share of the Final Distribution Amount, particularly

KSG, is significantly diluted due to their placement in the Distribution Waterfall.  It appears that

The Inactive Lawyers have not assented to the Intercreditor Agreement; therefore their ultimate

distribution priority is uncertain.[131]  (*See* DONZS00014031-32).

181.    For purposes of my calculations, I have assumed that KSG would have a claim of

$7 million based on the funding they provided for the Litigation as of August 2010.  (*See* PX 641

(KSG00135246 (contains near duplicate of DONZ00083678))).[132]  However, as discussed above,

KSG could assert a claim to distribution as a litigation funder under Priorities 4 and 5, and an

---

[129]   Inactive Lawyers are "any lawyers or law firms who or which previously represented the Plaintiffs in the
Litigation but who or which are no longer active in the Litigation."  (*See* PX 1464 at p. 6 of 30
(DONZS00014130 at p. 4 of 59)).

[130]   There is no further reference to Beldock, Levine & Hoffman beyond the Active Attorney Master Agreement in
the documents I reviewed.

[131]   Lee Hamilton's (Purrington Moody) To-Do List.  (*See* DONZS00014031-32).

[132]   KSG's internal accounting records as of May 31, 2009 show it had incurred unreimbursed expenses totaling
$6,536,624.32.  KSG's unreimbursed expenses from 1993 to 5/31/2009 were $6,204,672, and additional
expenses included $184,268.74 contributed to Amazon Watch and $147,683 contributed to E-Tech.  (*See* PX
641at p. 2 of 13 (KSG00135246 (contains near duplicate of DONZ00083678))).  KSG does not classify its
unreimbursed expenses as "investments" or "funding," but KSG's payments were the only source of litigation
funding from 1993 until DeLeon first invested in the Litigation in March 2007.

110

additional claim to attorney contingency fees under Priority 7.   However, as discussed above,

the LAPs' Attorneys and Representatives terminated KSG's representation on July 26, 2010 and

the firm acknowledged termination on July 29, 2010.  (*See* PX 1406 (DONZ00026949)).  It is

unclear how Joseph Kohn's relinquishment of KSG's interest in the Judgment would affect the

Distribution Waterfall.

      182.     Unreimbursed expenses and fees owed to Bonifaz and his priority are unclear.

Bonifaz and Kohn Nast & Graf P.C. (now KSG) executed an internal fee sharing agreement on

December 21, 1994 providing attorney fees to be split approximately two-thirds to Kohn Nast &

Graf P.C. and one-third to Bonifaz.  (*See* PX 2350 (WOODS-HDD-0218974-76)).[133]  Kohn

intended on honoring this agreement with Bonifaz in a letter dated June 7, 2006, after Bonifaz

was terminated by the LAPs' Attorneys and Representatives.  (*See* WOODS-HDD-0218986-

987).  On the other hand, an email from Donziger on June 3, 2009 stated the agreement between

Bonifaz and Kohn had "little affect [sic] today."  (*See* PX 2355 (DONZ00127157)).[134]  Any

additional unreimbursed expenses incurred by Bonifaz during the *Aguinda* litigation were not

documented in discovery.[135]

---

[133]   Under the internal fee sharing agreement dated December 21, 1994 with Kohn Nast & Graf P.C., Bonifaz was to receive a "a fee based on the 'lodestar' method -- i. e. the total number of hours worked multiplied by the hourly rate -- or a fee equal to one third of the total fees awarded to all law firms and attorneys represented individually in the litigation, whichever is greater," with the remainder, about two-thirds, awarded to Kohn Nast & Graf P.C.  (*See* PX 2350 at p. 2 of 10 (WOODS-HDD-0218975)).

[134]   According to an email from Donziger, the Bonifaz-Kohn fee sharing agreement would not be honored, because Bonifaz was not retained by the LAPs in the Litigation, Bonifaz exited the case before the "majority of the value was created," and Bonifaz "tried to sabotage the case . . . mean[ing] he forfeited his rights."  (PX 2355 (DONZ00127157)).

[135]  *See supra* n.16.

111

        i.        **Priority 9 – The balance (if any) shall be paid to the Claimants or as otherwise required by applicable law.**

183.    The ninth distribution priority returns any balance from the total Judgment not disbursed through the first eight (8) distribution priorities to the trusts. (*See* PX 552 at p. 57 of 79 (DONZS00015670 at p. 53 of 75)).

        vi.     **Distribution Outside of Ecuador**

184.    The various emails and memoranda I reviewed suggest that the LAPs' Attorneys and Representatives in the United States wanted to distribute potential proceeds received from the Judgment outside of Ecuador. For example, a memorandum entitled "Invictus: Path Forward: Securing and Enforcing Judgment and Reaching Settlement," discusses "arranging for receipt of any funds recovered against the judgment through payment agents in the United States and thereafter dividing those funds outside the Republic of Ecuador" which would "have the practical effect of keeping the funds outside the immediate reach of Ecuadorian law upon recovery and would permit any adjudication of fee splitting to take place in a carefully considered forum." (PX 1527R at p. 30-31 of 32). The creation of Amazonia Recovery Limited in Gibraltar appears to be consistent with the statements in the Invictus memorandum regarding collecting and distributing proceeds from the Judgment outside of Ecuador.

I declare under penalty of perjury that foregoing is true and correct. Executed on October 8th, 2013.

                                              Troy A. Dahlberg

112

Plaintiff's Exhibit 4900R  p. 112 of 144

# ATTACHMENT A

# Funding for the Enterprise

| Investor | Investments Contributed | Commitment Amounts[1] |
|---|---|---|
| Kohn Swift & Graf, P.C. | $ 6,360,647 | $ 6,360,647 |
| Russell DeLeon | $ 1,500,000 | $ 2,000,000 |
| Orin Kramer | $ 150,000 | $ 150,000 |
| Torvia Limited | $ 3,413,367 | $ 7,250,000 |
| Burford | $ 4,000,000 | $ 15,000,000 |
| 88 Capital | | $ 250,000 |
| Equitable Outcomes | | $ 150,000 |
| Jonaks Limited | | $ 200,000 |
| Satee GMBH | | $ 300,000 |
| David Sherman III | | $ 250,000 |
| Glenn Krevlin | | $ 250,000 |
| Michael Donziger | | $ 150,000 |
| Russell O. Wiese | | $ 50,000 |
| TC Payment Services International | $ 424,948 | |
| Amazonia Recovery Limited | $ 149,000 | |
| TOTAL | $ 15,997,963 | $ 32,360,647 |

PX 2143        *Confidential*

[1] Commitment amounts are amounts to be funded as defined in each individual or entity's respective funding agreement as "Commitment Amount" or "Capital Commitment." KSG's commitment amount is based upon Kohn's representation of investments contributed in his deposition testimony, as well as general ledger and bank records.

PLAINTIFF'S
EXHIBIT
2143
11 Civ. 0691 (LAK)

# ATTACHMENT B



**Evidence of Payments Based on Available Documentation**

Selva Viva CIA, LTDA.
16.6%
$3,657,615

Steven R. Donziger and the Law Offices of Steven R. Donziger
6.1%
$1,348,068

Public Relations
2.7%
$601,443

NGOs
3.5%
$765,282

Experts and Consultants
22.4%
$4,931,540
- Richard Cabrera, Stratus Consulting, UBR, & Weinberg
  11.7%
  $2,586,024
- All Other Experts and Consultants
  10.7%
  $2,345,517

U.S. Counsel
34.3%
$7,564,639

Crude
11.2%
$2,474,139

Ecuadorian Counsel
3.1%
$684,319

PX 2147       Confidential

PLAINTIFF'S EXHIBIT
2147
'11 Civ. 0691 (LAK)

Plaintiff's Exhibit 2147   p. 1 of 1

Plaintiff's Exhibit 4900R   p. 116 of 144

# ATTACHMENT C

# Summary of Enterprise Spending

| Payment To | Confirmed Payments[1] | Evidence of Payments[1] |
|---|---|---|
| Public Relations | $ 207,820 | $ 601,443 |
| Experts and Consultants | $ 999,934 | $ 4,931,540 |
| U.S. Counsel | $ 958,594 | $ 7,564,639 |
| Ecuadorian Counsel | $ 140,820 | $ 684,319 |
| Steven R. Donziger [2] *and the Law Offices of Steven R. Donziger* | $ 958,168 | $ 1,348,068 |
| Crude | $ 37,608 | $ 2,474,139 |
| NGOs | $ 260,361 | $ 765,282 |
| Selva Viva Selviva CIA, Ltda. | $ 3,477,617 | $ 3,657,615 |
| **TOTAL** | **$ 7,040,923** | **$ 22,027,045** |

[1] The transactions and transfers that could be reconciled to documents from financial institutions (e.g., a wire transfer record, cancelled check, or bank statement) were classified as "Confirmed Payments." Where a particular payment could not be confirmed, but there was some evidence of a payment, it is designated as "Evidence of a Payment." In instances where a Confirmed Payment represented the only evidence of a transaction, I also captured this amount as Evidence of a Payment; as such, the Evidence of Payments is an approximate representation of all transactions, whether confirmed or unconfirmed.
[2] The amount to Steven Donziger includes only those payments that could be confirmed as salary based on available documentation and does not include either reimbursements for expenses or lump sums Donziger transferred between his business and personal accounts, including a $464,736.50 transfer from the Law Firm Account (0218) to his personal account (5678) on August 18, 2010. (*See* PX 586 at p. 185-187 (DONZ00132898-900)).

*PX 2137*       *Confidential*

PLAINTIFF'S EXHIBIT
2137
11 Civ. 0691 (LAK)

# ATTACHMENT D

# U.S. COUNSEL

| Payment To | Confirmed Payments | Evidence of Payments |
|---|---|---|
| Aaron Marr Page and Forum Nobis, PLLC | $ 25,442 | $ 83,718 |
| Aguirre, Morris & Severson LLP | $ - | $ 41,422 |
| Brownstein Hyatt Farber Schrek, LLP | $ 25,000 | $ 36,740 |
| Coffield Law Group, LLP | $ 19,410 | $ 93,351 |
| Constantine Cannon LLP | $ 25,000 | $ 44,161 |
| Dow, Golub, Remels, & Beverly, LLP | $ - | $ 33,781 |
| Emery, Celli, Brinckerhoff & Abady LLP | $ 395,973 | $ 937,004 |
| Freedman, Boyd, Hollander, Goldberg, Urias, & Ward, P.A. | $ 5,000 | $ 48,046 |
| Friedman Kaplan Seiler & Adelman LLP | $ 296,526 | $ 371,526 |
| Gerald B. Lefcourt, P.C. | $ 75,000 | $ 150,000 |
| Graham Erion | $ 5,431 | $ 5,431 |
| Hoff Curtis, P.C. | $ - | $ 875 |
| Horowitz & Forbes LLP | $ 65,813 | $ 72,932 |
| Motley Rice LLC | $ - | $ 21,739 |
| Patton Boggs LLP | $ - | $ 4,832,698 |
| Purrington Moody Weil LLP | $ - | $ - |
| Recht & Kornfeld P.C. | $ 20,000 | $ 20,196 |
| Roberts & Stevens, P.A. | $ - | $ 8,352 |
| Slater, Tenaglia, Fritz & Hunt, P.A. | $ - | $ - |
| Stein, Sperling, Bennett, De Jong, Driscoll & Greenfeig, P.C. | $ - | $ 12,667 |
| Keker & Van Nest LLP | $ - | $ 750,000 |
| **TOTAL** | **$ 958,594** | **$ 7,564,639** |

# ATTACHMENT E

# ECUADORIAN COUNSEL

| Payment To | Confirmed Payments | Evidence of Payments |
|---|---|---|
| Alberto Wray | $ - | $ 335,096 |
| Alejandro Ponce Villacis | $ - | $ 42,403 |
| Juan Pablo Saenz | $ 33,910 | $ 53,760 |
| Julio Prieto Mendez | $ 23,955 | $ 30,000 |
| Monica Pareja | $ - | $ 33,600 |
| Neidl & Associates | $ - | $ 82,060 |
| Pablo Fajardo Mendoza | $ 82,955 | $ 93,000 |
| Paola Delgado | $ - | $ 14,400 |
| TOTAL | $ 140,820 | $ 684,319 |

# ATTACHMENT F

# PUBLIC RELATIONS

| Payment To | Confirmed Payments | Evidence of Payments |
|---|---|---|
| Arcos Communication | $ - | $ - |
| Business Wire Inc. | $ 21,100 | $ 22,605 |
| Celia Alario | $ - | $ 3,500 |
| Courtney Taylor Eckel | $ - | $ 5,000 |
| Joan Kruckewitt | $ - | $ 3,919 |
| Jose Fajardo | $ 1,666 | $ 2,673 |
| Joseph Mutti | $ 1,882 | $ 32,672 |
| Karen Hinton | $ 118,283 | $ 293,241 |
| Ken Sunshine | $ - | $ 52,506 |
| Kerry Kennedy | $ 50,000 | $ 120,000 |
| Liza Sabater | $ 800 | $ 2,400 |
| Lou Dematteis | $ 13,828 | $ 36,360 |
| Maria Eugenia Yepez | $ - | $ 2,206 |
| Michaela D'Amico | $ - | $ 1,600 |
| Paul Orzulak | $ - | $ 22,500 |
| Thomas Cavanagh | $ 262 | $ 262 |
| TOTAL | $ 207,820 | $ 601,443 |

# ATTACHMENT G

# EXPERTS & CONSULTANTS

| Payment To | Confirmed Payments | Evidence of Payments | Payment To | Confirmed Payments | Evidence of Payments |
|---|---|---|---|---|---|
| 3TM International, Inc. | $ - | $ 48,974 | Manuel Pallares | $ 154,576 | $ 159,126 |
| CESAQ - PUCE | $ 62,148 | $ 87,148 | Maria Valentina Ramia | $ 469 | $ 1,069 |
| Dr. Charles Champ | $ - | $ 157,500 | Miguel San Sebastian | $ - | $ 12,327 |
| Edison Camino Castro | $ - | $ 400,000 | Monserrathe Bejarano | $ - | $ 5,141 |
| E-Tech International | $ - | $ 220,643 | Oscar Davila | $ - | $ 5,000 |
| Fernando Reyes | $ - | $ 4,000 | Partners In Health | $ - | $ 38,737 |
| Fine and Associates | $ 60,000 | $ 115,800 | Powers Engineering | $ - | $ 9,925 |
| Global Environmental Operations | $ 210,000 | $ 708,310 | Rachel Ross | $ - | $ 2,346 |
| Globally Green Consulting | $ - | $ 13,133 | Richard Cabrera Vega | $ 304,814 | $ 391,814 |
| H5 | $ - | $ 303,783 | Stratus Consulting | $ 108,567 | $ 1,713,442 |
| Hydrosphere | $ - | $ 22,717 | The Weinberg Group | $ 50,000 | $ 431,408 |
| John Rodgers | $ - | $ 3,823 | Uhl, Baron, Rana and Associates | $ 49,360 | $ 49,360 |
| Jorge Jurado | $ - | $ 21,350 | Yolanda Leon Trujillo | $ - | $ 2,260 |
| Leo Zurita | $ - | $ 2,405 | | | |
| | | | **TOTAL** | **$ 999,934** | **$ 4,931,540** |

[1]  Where an individual or entity appeared to be paid through a subcontractor agreement with an entity on this list, the payments were assumed to be included in the Evidence of Payments captured for the entities and individuals listed here.  These include Charles Calmbacher, David Russell, Dick Kamp, HAVOC, SEA Group, Inc. Xavier Grandes, Reforesta, Inc., Julie Claire, and Buka Environmental.

PLAINTIFF'S EXHIBIT
2138
11 Civ. 0691 (LAK)

Plaintiff's Exhibit 2138   p. 1 of 1

Plaintiff's Exhibit 4900R   p. 126 of 144

# ATTACHMENT H

# CRUDE

| Payment To | Confirmed Payments | Evidence of Payments |
|---|---|---|
| Crude Productions LLC | $ - | $ 2,019,677 |
| Elisabeth Holm | $ - | $ 7,500 |
| Joseph A. Berlinger | $ - | $ 380,500 |
| Marcela Reyes | $ - | $ 877 |
| Motion Picture Enterprises | $ 4,608 | $ 4,608 |
| Outpost Digital | $ 15,000 | $ 17,977 |
| PJ Johnston Communications | $ 500 | $ 500 |
| Richard Stratton | $ 17,500 | $ 42,500 |
| TOTAL | $ 37,608 | $ 2,474,139 |

# ATTACHMENT I

# NGOs

| Payment To | Confirmed Payments | Evidence of Payments |
|---|---|---|
| Amazon Watch & Amazon Watch Employees | $ 11,181 | $ 243,173 |
| The Amazon Defense Front | $ 187,416 | $ 449,416 |
| Juan Aulestia | $ 165 | $ 165 |
| Luis Yanza | $ 61,600 | $ 72,528 |
| TOTAL | $ 260,361 | $ 765,282 |

# ATTACHMENT J



**FUNDING THROUGH STEVEN DONZIGER IOLA ACCOUNTS**

Steven Donziger

The Law Firm Account (0218)

8/18/2010
Donziger transfers $1,250,000 from the Law Firm Account to the Ecuador Case Account (2758)

Ecuador Case Account (2758)

8/17/2010
Magister Law, DeLeon's attorney in Gibraltar, transfers $1,250,000 to the Law Firm Account (0218)

Subsequent to 8/18/2010
Donziger makes multiple wire transfers and check payments to several entities, including his personal savings account

Torvia Ltd. via Magister Law (PX 547)

(31%)
Unidentifiable transactions
$ 382,938.79

(9%)
Stratus Consulting
$108,567.38

(8%)
Emery Celli Brinkerhoff & Abady
$98,534.52

(37%)
Donziger Personal Savings Account (5678)
$ 464,736.50

(4%)
Weinberg Group
$50,000.00

(1%)
Coffield Law Group
$19,410.19

(1%)
Maria Cadena
$10,000.00

(0%)
John Boyd
$5,000.00

(5%)
Jay Horowitz of Horowitz/Forbes LLP
$65,812.62

(2%)
Andrew Woods
$25,000.00

(1%)
Julio Prieto
$10,000.00

(1%)
Pablo Fajardo
$10,000.00

**Personal Savings Account (5678)**

PX 2145     *Confidential*

*PX 586 at p. 185-187 (DONZ00132898-900)*

PLAINTIFF'S EXHIBIT
**2145**
11 Civ. 0691 (LAK)

Plaintiff's Exhibit 2145   p. 1 of 1

Plaintiff's Exhibit 4900R   p. 132 of 144

# ATTACHMENT K



# FUNDING PROVIDED TO SELVA VIVA SELVIVA CIA, LTDA. THROUGH STEVEN DONZIGER

Steven Donziger

The Law Firm Account (0218)

Personal Checking Account (5365)

Ecuador Case Account (2758)

**(1)**

**(2)**

(1) – 3/15/2011 Donziger transfers $40,000 from the Law Firm Account to Personal Checking Account (5365)

(2) – 3/17/2011 Donziger transfers $30,000 from Personal Checking Account (5365) to the Ecuador Case Account (2758)

(3) – 3/17/2011 Donziger transfers $30,000 from the Ecuador Case Account (2758) to Selva Viva in Ecuador

**(3)**

Selva Viva

PX 2146    *Confidential*                    PX 586 at p. 257-63 (DONZ00133919-24)

PLAINTIFF'S EXHIBIT
**2146**
11 Civ. 0691 (LAK)

# ATTACHMENT L



PX 2139

PLAINTIFF'S
EXHIBIT
2139
11 Civ. 0691 (LAK)

# ATTACHMENT M

## 2012 MOTION FOR FEES & COSTS:
## DIFFERENCE BETWEEN INVOICES SUBMITTED AND
## SUMMARY OF EXPENSES INCURRED

| Year | Summary of Invoices[1] | Summary of Expenses Incurred[2] | Difference |
|------|------------------------|----------------------------------|------------|
| 2004 | $ 507.44 | $ - | $ (507.44) |
| 2005 | $ 414,838.18 | $ 378,581.58 | $ (36,256.60) |
| 2006 | $ 270,248.80 | $ 288,659.06 | $ 18,410.26 |
| 2007 | $ 339,116.84 | $ 353,764.62 | $ 14,647.78 |
| 2008 | $ 207,356.91 | $ 208,289.14 | $ 932.23 |
| 2009 | $ 109,517.08 | $ 142,895.84 | $ 33,378.76 |
| 2010 | $ 104,658.99 | $ 130,257.65 | $ 25,598.66 |
| 2011 | $ 86,933.07 | $ 109,209.75 | $ 22,276.68 |
| 2012 | $ 37.13 | $ - | $ (37.13) |
| Illegible[3] | $ 61,476.48 | $ - | $ (61,476.48) |
| TOTAL | $ 1,594,690.92 | $ 1,611,657.64 | $ 16,966.72 |

1) The Summary of Invoices was prepared by examining each invoice submitted with the April 23, 2012 motion for costs and fees filed by Pablo Fajardo before the Ecuadorian Court.
2) The information in Summary of Expenses Incurred is from the chart provided by Pablo Fajardo in the April 2012 motion for fees and costs. The invoices provided did not support the requested amounts.
3) The category is used where a transaction date is indecipherable.

# ATTACHMENT N

## Selva Viva Funding in Excess of the 2012 Motion for Fees & Costs

| Year | Cuerpo Summary Motion for Costs | Confirmed Payments to Selva Viva | Funds Unaccounted For |
|------|------|------|------|
| 2004 | $ - | $ - | $ - |
| 2005 | $ 378,581.58 | $ 334,984.00 | $ (43,597.58) |
| 2006 | $ 288,659.06 | $ 175,000.00 | $ (113,659.06) |
| 2007 | $ 353,764.62 | $ 617,000.00 | $ 263,235.38 |
| 2008 | $ 208,289.14 | $ 431,000.00 | $ 222,710.86 |
| 2009 | $ 142,895.84 | $ 329,000.00 | $ 186,104.16 |
| 2010 | $ 130,257.65 | $ 320,000.00 | $ 189,742.35 |
| 2011 | $ 109,209.75 | $ 469,922.00 | $ 360,712.25 |
| 2012 | $ - | $ - | $ - |
| **TOTAL** | **$ 1,611,657.64** | **$ 2,676,906.00** | **$ 1,065,248.36** |

PX 2142

PLAINTIFF'S
EXHIBIT
2142
'11 Civ. 0691 (LAK)

Plaintiff's Exhibit 2142   p. 1 of 1

Plaintiff's Exhibit 4900R   p. 140 of 144

# ATTACHMENT O

## POTENTIAL RECOVERY OF CERTAIN GROUPS FROM ECUADORIAN JUDGMENT[1]

| | RECOVERY LEVELS | | |
|---|---|---|---|
| | $19,041,414,529 | $1,000,000,000 [2] | $100,000,000 [2] |
| **Funders**[3] *Based on certain funding agreements* | $ 2.308 billion | $ 123 million | $ 69 million |
| **Attorneys & Advisors**[3] *Attorneys and Advisors* | $ 4.122 billion | $ 217 million | $ 22 million |
| **Administrative Fees & Expenses**[5] | $ 8 million | $ 8 million | $ 8 million |
| **Amounts Held in Trust**[4] *Remediation & Punitive Damages Trust* | $ 12.603 billion | $ 652 million | $ 1.5 million |
| **Individual LAPs** | $ 0 | $ 0 | $ 0 |

1) These figures are approximations based on the Intercreditor Agreement, other agreements among the LAPs and their Attorneys and Representatives, and reasonable assumptions. All of these figures are subject to taxes.
2) Calculations from full Recovery Level amount as available to the LAPs' Attorneys and Representatives.
3) In the Intercreditor Agreement's Distribution Waterfall, Priorities 3,4, and 5 address funders, Priorities 6 and 7 address Active Lawyers and Advisors, and Priority 9 addresses the individual Claimants. (See PX 552).
4) Per various Ecuadorian Court orders. (See PX 399, PX 414)
5) For purposes of these calculations, the Nominated Lawyers reimbursable expenses in Priority 2 are $1 million and the fees and expenses for Joseph Kohn at priority 8 are $7 million. KSG did not execute the Intercreditor Agreement, but available documents show that the firm contributed approximately $7 million to the Enterprise.

*PX 2151        Confidential*

PLAINTIFF'S EXHIBIT 2151 11 Civ. 0691 (LAK)

# ATTACHMENT P

## POTENTIAL RECOVERY OF SELECT RECIPIENTS FROM ECUADORIAN JUDGMENT[1]

| | RECOVERY LEVELS | | |
|---|---|---|---|
| | $19,041,414,529 | $1,000,000,000 [2] | $100,000,000 [2] |
| **Steven Donziger – Attorney**<br>*31.5% of Total Contingency* [3] | **$ 1.200 billion** | **$ 63 million** | **$ 6.3 million** |
| **Torvia Limited / DeLeon – Funder:**<br>*Invested $9,110,000* | $ 1.145 billion | $ 62 million | $ 8 million |
| **Patton Boggs – Attorney:**<br>*12% of Total Contingency* [3] | $ 457 million | $ 24 million | $ 2.4 million |
| **Pablo Fajardo Mendoza – Attorney:**<br>*10% of Total Contingency* [3] | $ 381 million | $ 20 million | $ 2 million |
| **H5 – Lit. Support/Advisor:**<br>*1.75% of Plaintiff Collection Monies* [4] | $ 333 million | $ 18 million | $ 1.75 million |
| **Lehane/Fabiani – PR/Lobbyist:**<br>*1.25% of Total Contingency* [3] | $ 48 million | $ 2.5 million | $ .25 million |
| **Orin Kramer – Funder:**<br>*Invested $150,000* | $ 12 million | $ .6 million | $ .6 million |

1) These figures are approximations based on the Intercreditor Agreement, other agreements among the LAPs and their Attorneys and Representatives, and reasonable assumptions.  All of these figures are subject to taxes.
2) Calculations from full recovery amount as available to the LAPs' Attorneys and Representatives.
3) The "Total Contingency Fee Payment" means an amount equal to twenty percent (20%) of all Plaintiff Collection Monies."
4) The term "Plaintiff Collection Monies" means any amounts paid, whether from defendant Chevron Corporation (a/k/a Texaco; ChevronTexaco; Chevron), any other party listed as a defendant in respect of the Litigation (including, without limitation, his or her respective affiliates and successors in interest), or any other party added or joined to the Litigation from time to time as a defendant or indemnitor or against whom proceedings are asserted or threatened.  (*See* DONZS0003508 10)

*PX 2152        Confidential*

**PLAINTIFF'S EXHIBIT**
**2152**
11 Civ. 0691 (LAK)

*Chevron Corp. v. Donziger*,
No. 11-CV-0691 (LAK)

## **Exhibits Cited in Direct Testimony of Troy Dahlberg (PX 4900)**

Offered Under Federal Rule of Evidence 1006

- PX 2137
- PX 2138
- PX 2139
- PX 2142
- PX 2143
- PX 2145
- PX 2146
- PX 2147
- PX 2151
- PX 2152

Offered for the Truth

- PX 0335
- PX 0348
- PX 0352
- PX 0368
- PX 0373
- PX 0414
- PX 0430
- PX 0431
- PX 0543
- PX 0544
- PX 0547
- PX 0553
- PX 0554
- PX 0555
- PX 0557
- PX 0558
- PX 0560
- PX 0561
- PX 0562
- PX 0563
- PX 0564
- PX 0565
- PX 0566
- PX 0567
- PX 0568
- PX 0575
- PX 0578



PLAINTIFF'S
EXHIBIT
**4900A**
11 Civ. 0691 (LAK)

*Chevron Corp. v. Donziger*,
No. 11-CV-0691 (LAK)

- PX 0579
- PX 0580
- PX 0581
- PX 0582
- PX 0583
- PX 0584
- PX 0586
- PX 0588
- PX 0590
- PX 0591
- PX 0593
- PX 0596
- PX 0606
- PX 0609
- PX 0614
- PX 0615
- PX 0616
- PX 0617
- PX 0618
- PX 0621
- PX 0634
- PX 0635
- PX 0637
- PX 0639
- PX 0640
- PX 0641
- PX 0647
- PX 0686
- PX 0791
- PX 0846
- PX 0854
- PX 0870
- PX 0871
- PX 0887
- PX 0888
- PX 0897
- PX 0912
- PX 0913
- PX 0949
- PX 0963
- PX 0967
- PX 0968
- PX 0979
- PX 1050

2

*Chevron Corp. v. Donziger*,
No. 11-CV-0691 (LAK)

- PX 1135
- PX 1222
- PX 1406
- PX 1415
- PX 1460
- PX 1464
- PX 1480
- PX 1482
- PX 1483
- PX 1520
- PX 1687
- PX 1688
- PX 1689
- PX 1718
- PX 1739
- PX 1756
- PX 2350
- PX 2351
- PX 2352
- PX 2353
- PX 2355
- PX 2357
- PX 2359
- PX 2361
- PX 2362
- PX 2363
- PX 2365
- PX 2366
- PX 2367
- PX 2368
- PX 2369
- PX 2370
- PX 2371
- PX 2412
- PX 2427
- PX 2430
- PX 2433
- PX 2436
- PX 2447
- PX 2448
- PX 2460
- PX 2462
- PX 2463
- PX 2519

Plaintiff's Exhibit 4900A   p. 3 of 4

*Chevron Corp. v. Donziger*,
No. 11-CV-0691 (LAK)

- PX 2520

<u>Not Offered for the Truth</u>

- PX 0248
- PX 0277R
- PX 0294
- PX 0302
- PX 0316
- PX 0342
- PX 0344
- PX 0347
- PX 0349
- PX 0350
- PX 0356
- PX 0361
- PX 0362
- PX 0367
- PX 0369
- PX 0370
- PX 0376
- PX 0378
- PX 0388
- PX 0400
- PX 0656
- PX 0657
- PX 1245
- PX 1490
- PX 1527# (For Identification Only)
- PX 1527R
- PX 2459

4