UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x
:
:
:
CHEVRON CORPORATION,                               :
:
                 Plaintiff,                :
:  Docket No. 11 CV 0691 (LAK)
      v.                                           :
:
STEVEN DONZIGER, et al.,                           :
:
               Defendants.               :
:
---------------------------------------------------------x


**PLAINTIFF CHEVRON CORPORATION'S RESPONSE TO
DONZIGER'S LETTER RE TRIAL PROCEDURES [DKT. 1593]**


                                                        GIBSON, DUNN & CRUTCHER LLP
                                                        200 Park Avenue
                                                        New York, NY  10166-0193
                                                        Telephone:   212.351.4000
                                                        Facsimile:    212.351.4035

                                                        *Attorneys for Plaintiff Chevron Corporation*

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT .................................................................................................................................. 1

    A.    Donziger's Complaints About the Written Direct Testimony Requirement Lack Merit ........................................................................................................... 1

        1.    Donziger Should Not Be Exempt From Providing Direct Testimony in Writing ................................................................................. 2

        2.    Chevron's Submission of Witness Statements Has Not Prejudiced Defendants ................................................................................ 4

    B.    Donziger's Arguments About the Supposed Scientific Evidence in the Lago Agrio Record Are Beside the Point ............................................................... 5

    C.    The Court Should Not Reconsider Its Rulings on Chevron's Pre-Inspection Videos, Which Are Irrelevant and Are Protected Work Product ......... 7

    D.    This Court's Additional Protections for "Doe" Witnesses Remain Justified ........ 9

    E.    Donziger's Concerns About the Logistics of Courtroom Accommodations for the Parties' Trial Teams Are Being Addressed ............................................... 12

CONCLUSION ............................................................................................................................ 13

PRELIMINARY STATEMENT

Donziger's complaints about "certain procedures being used" at trial are not well taken. Dkt. 1593 at 1.  The Court has already rejected most of Donziger's arguments, and for good reason.  The requirement of putting on direct testimony during a bench trial via written statements, for instance, is widely used in this District (and others), and has been endorsed by the Second Circuit (and others).  In the end, it affords Defendants greater strategic and logistical advantages than proceeding by way of live direct testimony.  Moreover, Donziger has not articulated any plausible theory of relevance for such things as the purported "extensive scientific evidence" of contamination in Ecuador, or the use of "pre-inspection" videos to "corroborat[e] [Donziger's] state of mind." *Id.* at 1–2.  And the Court has addressed numerous times the "Doe" witness procedures, the ample justifications for granting additional protections to the Doe witnesses, and the fact that such protections are commonplace in circumstances like these.

In short, Donziger's complaints are unfounded.  They have little or nothing to do with "fairness."  And they have no basis in reality.  None of Donziger's proposals, if adopted, would make the trial any more "just, speedy, [or] inexpensive." Fed. R. Civ. P. 1.  In fact, in most instances, the opposite would be true.  The Court should deny Donziger's requests.

ARGUMENT

**A.     Donziger's Complaints About the Written Direct Testimony Requirement Lack Merit**

Donziger objects to this Court's Individual Practices to the extent they require parties to submit witnesses' direct testimony in writing for bench trials, with live cross-examination and redirect.  Donziger seeks a blanket exemption for himself, so that he can put on his direct testimony orally in open court, and he complains about the manner in which Chevron has submitted

1

its witnesses' written direct testimony thus far. *See* Dkt. 1593 at 3. Donziger's objections are misplaced.

### 1. Donziger Should Not Be Exempt From Providing Direct Testimony in Writing

The Second Circuit has "approve[d] the procedure [of] allowing the parties to produce direct evidence from their witnesses in writing while permitting subsequent oral cross-examination." *Ball v. Interoceanica Corp.*, 71 F.3d 73, 77 (2d Cir. 1995). This procedure "'is an accepted and encouraged technique for shortening bench trials.'" *Id.* (quoting *Phonetele Inc. v. Am. Tel. & Tel. Co.*, 889 F.2d 224, 232 (9th Cir. 1989)); *see also In re Adair*, 965 F.2d 777, 780 (9th Cir. 1992) (rejecting due process challenge to the compelled use of written direct testimony at a bench trial). As the District of D.C. has explained, "[r]equiring the parties to submit their direct testimony in writing in lieu of the usual question-and-answer form is sanctioned under the inherent powers of the Court, the Federal Rules of Civil Procedure and the Federal Rules of Evidence." *Saverson v. Levitt*, 162 F.R.D. 407, 410 (D.D.C. 1995); *see also* Dkt. 1501 at 1 ("a substantial proportion of other judges of this Court" require submission of written direct testimony in bench trials). And as this Court has noted, the use of written statements here has given Defendants a "vast advantage," as they "have been provided in advance of the trial with the written direct testimony of most of the plaintiff's witnesses," even though Defendants have yet to provide a single written statement of their own. Trial Tr. at 67; *see also* Dkt. 1501 at 4 (modifying standard bench trial procedures to give Defendants additional time to prepare witness statements). The benefit to Donziger is especially great because it provides his new lawyers with ready access to Chevron's affirmative case, in advance, enabling them to get up to speed more quickly.

Notwithstanding the binding authority endorsing this Court's well-established procedure in bench trials, Donziger now seeks an exemption for himself, which would enable him to testify live on direct. Dkt. 1593 at 3.[1] Donziger suggests that this special treatment is necessary to protect his "right to a public trial." *Id.* But requiring Donziger to submit his direct testimony in written form, rather than oral, has no effect on the right to a "public" trial.[2]

If anything, Donziger's written testimony—which will be filed immediately on the public docket and which can be distributed instantly through the internet or otherwise to the press—will result in a far more "public" trial than Donziger ever could have received by testifying live on the witness stand. This is particularly true given the time delay and additional expense of obtaining trial transcripts from the court reporter, which would be the only way for the public at large to "hear" Donziger's "live" direct testimony.[3] While Donziger may want to use his in-court testimony as a soapbox to further his public relations goals, that is not a legitimate reason to deviate from this Court's normal practices. *Cf.* Dkt. 1569-1 (PX 3300) ¶ 17 (S. McMillen witness statement: "Whenever Mr. Donziger attended a judicial inspection, it devolved into a media circus. There would be significant media coverage, [and] a much more combative atmosphere that seemed to be directed more at the media than at the Ecuadorian Court . . . .").

---

[1] Specifically, Donziger seeks to "be allowed to testify in public in *addition* to submitting a declaration." *Id.* (emphasis added). Although Donziger does not specify what content would be included in his written declaration, presumably there would be at least some overlap with his proposed oral direct testimony. Proceeding in such a duplicative fashion is unnecessary and inefficient.

[2] *See, e.g.*, *Gannett Co. v. DePasquale*, 443 U.S. 368, 380 (1979) (explaining that the Sixth Amendment "public" trial right ensures that a criminal trial is subject to contemporaneous review in the forum of public opinion).

[3] Because of the use of written direct testimony, members of the public interested in this trial have had rapid access to the proceedings, and have been able to comment on the direct testimony of Chevron's witnesses. *See, e.g.*, Ted Folkman, *Lago Agrio: Day 1*, Letters Blogatory (Oct. 16, 2013), http://lettersblogatory.com/2013/10/16/lago-agrio-day-1/ ("[W]hile we don't have a transcript of testimony to report on today, we do have the first witness statement, the statement of Ricardo Reis Veiga, a senior Chevron in-house lawyer.").

Donziger is free to include whatever relevant, admissible testimony he so desires in his written statement, and he will have the same opportunity to "rebut" Chevron's allegations regardless of the form of his testimony. He does not suggest any plausible reason why his testimony on the stand would differ from what he puts in a written statement. He also ignores that, if, after reviewing the written direct testimony, Chevron chooses to cross-examine Donziger, then he would still have an opportunity to testify live on both cross and redirect. *See In re Adair*, 965 F.2d at 779 (noting that "permit[ting] oral cross-examination and redirect examination in open court . . . preserves an opportunity for the judge to evaluate the declarant's demeanor and credibility"). Thus, Donziger will suffer no prejudice by having to comply with the Court's long-standing and well-established procedures.

### 2. Chevron's Submission of Witness Statements Has Not Prejudiced Defendants

Donziger also claims that because some of Chevron's initial witness statements contained arguable hearsay and testimony not based on personal knowledge, he and his co-counsel needed to "waste valuable time preparing cross-examination for the entirety of the declaration." Dkt. 1593 at 3. Regardless, the process of submitting witness statements a week or more in advance of the witness's live testimony is far more efficient and advantageous for the cross-examiner. When a witness testifies live on direct, the cross-examiner is forced to predict and prepare in advance for all possible testimony that witness might offer on any relevant subject in the case—this necessarily results in wasted time and effort because, at the end of the day, the witness's actual direct testimony limits the scope and subjects for cross-examination. And with a live witness, the cross-examiner must think on his or her feet and make objections in real time; the written statement process gives Defendants far more time to reflect and make any objections.

4

In addition, Donziger complains that in one instance, he did not receive a revised witness statement from Chevron until the night before the witness was to testify. Dkt. 1593 at 3 (referring to the revised witness statement of Dr. Callejas). But Donziger and his co-Defendants received Dr. Callejas's original witness statement a week *before* the trial. The revised statement deleted certain material, but did not add anything new of substance. As a result, Chevron's submission of Dr. Callejas's unredacted and then redacted statement gave Defendants advanced notice of his testimony when, by contrast, no such notice would have been provided if Dr. Callejas's direct testimony were given "live."[4]

### B.   Donziger's Arguments About the Supposed Scientific Evidence in the Lago Agrio Record Are Beside the Point

Donziger relies on a false premise to advance his argument on the supposed relevance of scientific evidence—namely, he claims it would be a valid defense to Chevron's RICO and fraud claims to show that the Lago Agrio judgment had scientific support. Chevron has responded to similar "relevance" arguments concerning the criminal charges that Defendants promoted against Chevron lawyers, and Chevron explained in some detail why the supposed "merits" of those charges—and in particular the claimed relevance of the supposed facts regarding the environmental remediation—were neither a defense nor relevant to the claims at issue. *See* Dkt. 1598. Chevron will not repeat those arguments, which are equally applicable here.

In addition, where a judgment is secured through bribery or fraud, case law shows that it is no defense to claim that the judgment was actually "correct." In *United States v. Manton*, 107

---

[4]  Chevron appreciates that new counsel for Donziger during the trial have conducted "meet and confers" in response to Chevron's standing invitation to engage in them to conserve resources and avoid unnecessary arguments. The "meet and confer" with the LAPs' counsel, for example, during a break in the court proceedings during Dr. Callejas's testimony, conserved significant time and resulted in an agreement on redactions to certain parts of his statement. Chevron welcomes the opportunity to have additional "meet and confers" whenever defense counsel would like regarding any of its witness statements, the exhibits to those statements, the other exhibits on its list, and its August 30 proposed list of stipulated facts (which would conserve significant amounts of time, avoid unnecessary motion practice, and further reduce the need to call certain witnesses or elicit evidence from certain witnesses).

F.2d 834 (2d Cir. 1938), the defendant, a former Second Circuit judge who had been convicted of conspiracy to obstruct justice for taking bribes from litigants, argued that the jury should have been permitted to consider whether his decisions were correct. *Id*. at 846. This former judge claimed that he committed no crime unless his decisions were "wrong" because other circuit judges, who had not been bribed, necessarily had to agree with him in order to render a decision in the briber's favor. Justice Sutherland, writing for a specially constituted panel that also included Justice Stone, held that "[t]here is nothing in the point." *Id*. The court explained:

> The conspiracy here contemplated the payment of money to induce a judge to exercise his judicial power in favor of the bribe-givers, without regard to the merits. *If the decisions finally rendered in pursuance of the conspiracy be legally sound the fact is immaterial*. . . .
>
> And for aught that now appears we may assume for present purposes that all of the cases in which Manton's action is alleged to have been corruptly secured were in fact rightly decided. But the unlawfulness of the conspiracy here in question is in no degree dependent upon the indefensibility of the decisions which were rendered in consummating it. Judicial action, whether just or unjust, right or wrong, is not for sale; and *if the rule shall ever be accepted that the correctness of judicial action taken for a price removes the stain of corruption and exonerates the judge, the event will mark the first step toward the abandonment of that imperative requisite of even-handed justice* . . . .

*Id*. (emphasis added).

Likewise, where a party commits fraud upon a court, it is irrelevant whether the fraud is material, whether the fraud succeeds, or even whether the fraud is later supposedly "cured." In *Hazel-Atlas Glass Co. v. Hartford-Empire*, 322 U.S. 238 (1944), plaintiffs submitted a ghostwritten article to the court as purportedly independent evidence, and then sought to defend the eventual judgment in their favor on the grounds that the article was not "basic" to the judgment. *Id*. at 246–47. The Supreme Court dismissed this argument, as the attorneys committing the fraud "thought the article material . . . and went to considerable trouble and expense to get it published." *Id*. Thus, the Court concluded, "[t]hey are in no position now to dispute its effective-

6

ness," and there was no need to "appraise the influence that the article exerted on the judges." *Id.* at 247. Even where attempted fraud on the court fails, and real evidence replaces fabricated evidence, there can be no materiality defense. *See Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1120 (1st Cir. 1989) ("The failure of a party's corrupt plan does not immunize the defrauder from the consequences of his misconduct.").

Here, Chevron seeks to prove (and is proving) that Defendants' corrupt scheme included submitting fraudulent reports to the Lago Agrio court under the name of an expert who did not agree with the findings of those reports, bribing a purportedly independent court expert to allow them to ghostwrite his global damages assessment while at the same time touting his "independence," and then bribing the presiding Ecuadorian judge to allow them to ghostwrite the judgment itself. Whether the Ecuadorian judgment is supported by some scientific evidence is irrelevant to whether Defendants are to be found liable for these actions. Accordingly, Donziger's claim that there are "a total of 103 technical and evidentiary reports (apart from those challenged by Chevron and disregarded by the Ecuador court) submitted by court-appointed experts" is beside the point. Dkt. 1593 at 2.

**C.   The Court Should Not Reconsider Its Rulings on Chevron's Pre-Inspection Videos, Which Are Irrelevant and Are Protected Work Product**

Donziger urges this Court once again to revisit the settled issue of the pre-inspection videos. While Donziger admits he is asking "the Court to reconsider its ruling" (Dkt. 1593 at 2), he makes no effort to comply with the stringent standards for reconsideration, and he points to no intervening change in the law or the discovery of new evidence. *See, e.g., Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) ("The major grounds justifying reconsideration are 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" (citation omitted)); *Davidson*

7

*v. Scully*, 172 F. Supp. 2d 458, 461 (S.D.N.Y. 2001) ("A motion for reconsideration may not . . . be used as a vehicle for relitigating issues already decided by the Court."). Donziger's request for reconsideration is therefore procedurally improper and should be denied on that basis alone.

Even if the Court were to reach the merits, there is no reason to revisit the prior rulings on this issue. Before trial, the Court denied Defendants' motion to compel responses to discovery requests relating to the pre-inspection videos after concluding that "these videos are not relevant" because "the Ecuador pollution case is not to be retried here." Dkt. 901 at 2–3. When Defendants sought to question Sara McMillen regarding the pre-inspection videos during her deposition, the Special Master ruled that "the videos clearly fall within the work product privilege [because] they were made at the direction of an attorney for purposes of pre litigation investigation." Dkt. 1397-1 (S. McMillen Dep.) at 196:1–2. This Court then reaffirmed its ruling last week, both because Defendants waived the issue by not appealing the Special Master's privilege ruling, and also because the videos were in fact protected work product. *See* Trial Tr. at 497 ("[Y]ou had your chance with the special master. You argued the issue. You lost. You had the right to appeal. You didn't. It's over on that basis. . . . [E]ven if you hadn't lost on that basis . . . and I were to consider the matter de novo, my view would be that it's obviously work product and you don't get it anyway.").[5]

Donziger offers no valid reason to question this Court's prior conclusion that the pre-inspection videos are both irrelevant and protected work product. He asserts that the videos

---

[5] Donziger's criticism of the Court's waiver ruling—a supposedly "technical reason" (Dkt. 1593 at 2)—is irrelevant in light of the alternative ruling on the merits. Nonetheless, a party's waiver of an argument by failing to raise it on appeal has consequences, and cannot be cast aside as a mere "technicality." *See, e.g.*, *Simpson v. Lear Astronics Corp.*, 77 F.3d 1170, 1174 (9th Cir. 1996) ("[A] party who fails to file timely objections to a magistrate judge's nondispositive order . . . forfeits the right to appellate review."). *Cf. United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

8

"show Chevron technicians openly discussing ways to hide evidence of the company's pollution from the court." Dkt. 1593 at 2. But Donziger is recycling Defendants' erroneous contention that Chevron sought to find "clean" soil samples for some improper purpose. This Court has already explained the fallacy of this argument.[6] Donziger also claims that the videos cannot be attorney work product because there are "Ecuadorian citizens from the affected area interviewed by the cameraman." *Id.* But witness interviews are protected work product, even when conducted by non-attorney staff members (such as cameramen). *See, e.g.*, *United States v. Nobles*, 422 U.S. 225, 238–39 (1975) ("It is . . . necessary that the [work-product] doctrine protect material prepared by agents for the attorney as well as those prepared by the attorney himself."); *S.E.C. v. Strauss*, No. 09 CIV. 4150 (RMB) (HBP), 2009 WL 3459204 (S.D.N.Y. Oct. 28, 2009) ("[T]he non-attorneys who prepared notes of interviews were supervised by and acting at the direction of an attorney . . . . This evidence is sufficient to bring the work of the non-attorney staff members within the protection of the work-product doctrine.").

Thus, the pre-inspection videos are irrelevant and are protected work product.

**D.    This Court's Additional Protections for "Doe" Witnesses Remain Justified**

Donziger is also wide of the mark with his repeated attacks on this Court's protections for the "Doe" witnesses. Donziger claims that he "know[s] of no allegation against [him] personally

---

[6] *See* Trial Tr. at 497–98 ("Now, you focused on line number 3 on the first page of the table, and you completely ignored the very first thing that is stated there. That the point here was to draw a clean line around the site to show no widespread impacts. And this part you did emphasize. 'Locations for perimeter sampling should be chosen to emphasize clean points around the pits when possible.' And then adjacent to that, under sampling activities, it says, To collect soil samples at four or more locations around the sites using locations that the preliminary inspection team has shown to be clean. Now, to me it's crystal clear that the point made in that line is *perfectly analogous to what happens when a surgeon operates on a malignant or suspected malignant tumor.* There is a tumor. You want to know if it is malignant, and if it is malignant, you want to know how far out, from what is observable with the naked eye and then confirmable pathologically, the tumor extends. And so the surgeon causes the pathologist to test not only the heart of the tumor, which is of course essential to identify the pathology, but what appeared to be clean areas around it to ensure that when the surgeon cuts -- the analogy here being remediates -- you get the whole cancer. The presupposition is here we are testing pits that are, to one degree or another, in colloquial terms, dirty, cancerous using my metaphor. And what this line is talking about is, don't assume that it spreads outward from the pit infinitely. What are the limits?" (emphasis added)).

9

that could possibly justify" these protections. Dkt. 1593 at 3–4. Yet this Court has explained in detail its reasons for limiting access to the Doe testimony, including the extensive factual legal bases for such limitations—none of which Donziger addresses. *See* Dkt. 843 at 29 ("[T]he Court finds that the disclosure of the Does' identities in any manner that could lead to their identities being learned by the LAPs, their counsel and allies in Ecuador, including the Ecuadorian government, is substantially likely to result in reprisals against them as well as efforts to intimidate them and thus to cause them to alter their testimony. There is good cause for preventing any such disclosure for as long as possible."). And these sorts of limitations are not out of the ordinary. *See generally Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 27 (1984) (affirming trial court's discretion to issue a protective order covering all identifying information obtained through discovery of certain witnesses who requested confidential treatment of testimony because they were "threatened [with] physical harm . . . involving attacks, threats, and assaults").[7]

With respect to Donziger himself, this Court has already found that "Donziger's actions give little comfort that he would comply with confidentiality obligations imposed upon him, at least on those occasions where he is in Ecuador." Dkt. 843 at 34. By his own words, Donziger has plotted to "'intimidate,' 'pressure,' and 'humiliate'" anyone who would oppose him. *Id.* at 17 (quoting *Crude* outtake); *see also id.* at 16–20 (describing Donziger's threats to judiciary and pressure tactics, including his plan to cause the judge to fear he will be "killed" for opposing the LAPs). Further, Donziger has boasted about his connections with the Republic of Ecuador ("ROE"), stating that the ROE and the LAPs had "been really helping each other" and that the Defendants "are now friends with the President [of Ecuador]" (*id.* at 20, 22), and Donziger has demonstrated a willingness to use those connections to go after whomever he sees as his oppo-

---

[7] *See* Pretrial Conf. Tr. (10/9/13) at 31 ("In civil cases believe me you know that it is plain vanilla common, for example, that executives of a business don't get access to trade secrets produced by their competitors in the course of litigation about the trade secrets. I can go on with other examples for some time.").

10

nent. *Id.* at 20–24 (outlining Donziger's attempts to have criminal charges brought against counsel in Ecuador).

Donziger and his "friends" in the Ecuadorian government have time and again shared Chevron's confidential information in violation of binding protective orders, including the orders of this Court. *See* Dkt. 1562-1; Dkt. 1562-2 (admission by ROE's counsel in BIT proceeding to wrongfully sharing information subject to protective order with LAPs and Donziger); Dkt. 1562-3 (internal ROE document disclosed to Chevron by order of Magistrate Judge Francis, consisting of email correspondence between senior Ecuadorian officials, copying President Correa ("noticias1"), agreeing to "talk in person," and attaching a confidential internal Chevron document produced subject to the Protective Order, Dkt. 723, with the subject line "you all have to read this!!!!!"); Dkt. 1544 at 2–5 (describing evidence that Defendants have wrongfully circulated protected Chevron materials to the ROE and other third parties). Donziger cannot provide adequate assurances that he would comply with the protective order for the Doe witnesses if he were allowed access to their declarations or identifying information. Rather, if Donziger's past behavior is any guide, there is a significant likelihood that Donziger would share the Does' information with his "friends" in the ROE and that he or others would go after the DOEs as they have with other witnesses in Ecuador.[8]

On the other side of the scale, Donziger fails to identify any particular deficiency in his counsel's ability to cross-examine the Doe witnesses beyond his desire to share with his co-counsel his "familiarity with Ecuador." Dkt. 1593 at 3–4. Donziger is of course free to share his

---

[8] There is now a website dedicated to attacking—by name—those who have "cooperated" with Chevron as a "long list of traitors" who "have filled their pockets in exchange for harming their own people." Dkt. 1484-2 (Ex. 4402). It calls out by name and photograph, among others, Chevron's lead attorney in Ecuador, Adolfo Callejas. *See Los vende patria*, http://www.losvendepatria.com/ (last visited Oct. 23, 2013); *see also* Dkt. 1475-11 (Ex. 4310) at 17 (Expert Report of Douglas Farah regarding security risks for those opposing the Correa regime in Ecuador).

general knowledge of Ecuador and specific facts relating to each and every allegation in Chevron's amended complaint and public filings; his counsel can ask him questions and obtain information from him so long as they do not reveal the identity of the Doe witnesses. And his counsel could obtain relevant information from other sources if they thought it necessary. Moreover, Donziger does not dispute that he and the LAPs have a common interest with respect to the Doe witnesses, such that counsel for the LAPs could adequately address any of Donziger's possible concerns about these witnesses. *See* Dkt. 1358 at 6–7; Dkt. 1454 at 1.

Donziger's counsel's access to the Doe declarations serves, "to a very important extent and perhaps fully," Donziger's own "interest in properly preparing this action for trial" and "in preparing to meet the testimony of the Doe" witnesses. Dkt. 843 at 32. As for Donziger's request that this Court "make a determination as to whether the basis for its [decision] to grant Chevron's request [for protection] still stands" (Dkt. 1593 at 3), Chevron has addressed the continued need to protect Doe 3 in its Response to Defendants' Motion to Lift Protective Order as to Doe III, or in the Alternative, to Allow Investigation (Dkt. 1592). *See* Dkt. 1599.

### E.  Donziger's Concerns About the Logistics of Courtroom Accommodations for the Parties' Trial Teams Are Being Addressed

Finally, Donziger takes issue with Chevron's trial team's use of the jury deliberation room during trial. Dkt. 1593 at 4. Although the defense team has been using two different, smaller witness rooms adjacent to the courtroom during the trial, Donziger now claims that these rooms are insufficient given the number of lawyers on the defense team. *Id*. Chevron is willing to work in good faith with the Court, its staff, and Defendants to ensure that both sides are able

to present their evidence and witnesses. In fact, Chevron understands that the Court is making an effort to find additional space for defense counsel to use, which should resolve the issue.[9]

## CONCLUSION

For these reasons, there is no basis to suggest that Donziger is receiving anything less than a fair trial. The Court should deny Donziger's various requests.

Dated: October 24, 2013  
New York, New York

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: /s/ Randy M. Mastro  
Randy M. Mastro  
Andrea E. Neuman  
200 Park Avenue  
New York, New York 10166  
Telephone: 212.351.4000  
Facsimile: 212.351.4035  

William E. Thomson  
333 South Grand Avenue  
Los Angeles, California 90071  
Telephone: 213.229.7000  
Facsimile: 213.229.7520  

*Attorneys for Plaintiff Chevron Corporation*

---

[9] As a practical matter, Chevron has already expended considerable time and effort to set up its preparation room—including setting up a court-approved computer connection. It would be challenging and disruptive, and would require a non-trivial amount of attorney and non-attorney resources, to redo this set-up in the middle of trial.