UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHEVRON CORPORATION,<br><br>                Plaintiff,<br><br>    v.<br><br>STEVEN DONZIGER *et al.*,<br><br>                Defendants. | 11-CV-0691<br><br>The Honorable Lewis A. Kaplan, U.S.D.J.<br>The Honorable James C. Francis, U.S.M.J. |

**DEFENDANTS' MOTION TO STRIKE THE TESTIMONY
OF ALBERTO GUERRA BASTIDES**

**INTRODUCTION**

The payments and benefits that Chevron has conferred on its star witness, Alberto Guerra Bastides, ("Guerra"), violate federal law and legal ethical rules, and require that Guerra's testimony be stricken in its entirety. Defendants have already drawn the Court's attention to the outrageous nature and extent of Chevron's payments in a motion filed last month, in which Defendants requested that the entire action be dismissed with prejudice on account of abusive conduct by Chevron and its counsel. *See* DI 1485-1 (Redacted Motion for Terminating Sanctions) ("Sanctions Mot."); DI 1423 (declaration with exhibits in support). Even if the Court ultimately is not inclined to terminate the case on the basis of these facts, at a minimum, the Court must strike Guerra's testimony. That Chevron and its counsel have crossed the line here cannot seriously be debated. No less an authority than Dean and Distinguished Professor of Law Erwin Chemerinsky has executed a declaration opining that "if a party or its counsel were permitted to pay a testifying witness for physical evidence, beyond the reasonable value of that evidence, and to pay the witness a salary in exchange for an agreement to testify, there would be little left of the rule against compensating fact witnesses." DI 1423-2 at ¶ 13. That is precisely what has occurred here.

Even if Guerra were an upstanding citizen, his testimony would be so tainted by Chevron's payments and benefits that it would need to be thrown out. But Guerra is no upstanding citizen; he is an admitted liar, criminal and con man. For two days last week, the federal courthouse was blighted as Chevron used it as a stage for this man's objectively corrupt testimony, in which he admitted to offering and accepting between 20 and 40 bribes throughout his career as a lawyer and judge—once accepting as little as $200 to "fix" a case. Now, Guerra wants this Court to believe that the hundreds of

1

thousands of dollars Chevron has paid or promised to pay him are something other than yet another bribe. The Court should not allow this farcical witness to further taint these proceedings. Defendants expect that Chevron will advocate "punting" this issue by suggesting that the Court may simply assign Guerra's testimony little or no weight in the end. That would be an insufficient remedy under these circumstances. Litigants must understand that our legal system cannot be debased in this manner, and that supremely wealthy parties cannot get away with buying testimony by labeling their payments otherwise. The Court should now decide and grant the relief requested in Defendants' Motion for Terminating Sanctions, or, in the alternative, strike Guerra's testimony from the record in its entirety.

## ARGUMENT

### I. Chevron's Payments To Guerra Violate The Federal Anti-Gratuity Statute And The Rules Of Professional Conduct

When, after a long career of paying and accepting bribes, Guerra apparently decided that he would place himself in the service of Chevron, the former judge was earning $500 per month and had no savings. In contrast, Chevron has committed to paying Guerra, for a period of at least two years, a "salary" of $10,000 per month—20 times more than he was earning in Ecuador. It is unclear what need Guerra has for such a generous salary, in light of the fact that Chevron also: (i) provides Guerra with a monthly $2,000 "housing allowance"; (ii) bought Guerra a car and is paying for his auto insurance; (iii) is paying for health insurance to cover Guerra, his wife, his son, his son's wife, and his grandchildren; (iv) paid Guerra roughly $12,000 to purchase household items upon his move to the U.S.; (v) paid Guerra's moving expenses, including five airline tickets, transportation of personal items, and a temporary hotel stay upon arriving

in the U.S.; (vi) paid Guerra roughly $50,000 in exchange for "evidence," including $10,000 for belatedly finding a single document that supposedly eluded Guerra upon prior searches because it was "stuck" to something else; and (vii) pays the legal fees of Guerra's various attorneys, including the fees of the lawyers handling immigration issues for his various family members.[1]  Guerra's relocation on Chevron's dime also reunited him with his daughter and a second son, who live in the U.S. and who Guerra had not seen in several years.[2]

Chevron's arrangement with Guerra violates federal law and ethical rules.  As outlined in greater detail in the pending Sanctions Motion, the Federal Anti-Gratuity statute prohibits payments or the offering of "anything of value" to witnesses "for or because of" their testimony—that is, "with intent to influence [the witness's] testimony under oath."  18 U.S.C. §§ 201(b)-(c); Sanctions Mot. at 18-19.  Even without corrupt intent, anyone who "directly or indirectly, gives, offers, or promises anything of value to

---

[1]  In fact, Chevron is not only taking care of immigration issues for the family members who Chevron plucked from Ecuador contemporaneously with Guerra, as contemplated in the contract between Chevron and Guerra. DI 755-14.  Rather, Chevron also has outfitted Guerra's *other* son—who has been in the U.S. illegally for several years and was facing deportation—with an immigration lawyer.  This benefit was not disclosed in the contract produced by Chevron, notwithstanding the "entire agreement" provision of that contract.  *Id*. at 6.

[2]  Guerra's live testimony elicited just how important the immigration portion of the cash and benefits package he received from Chevron was and is to him, only adding to layers to the fact that Chevron has so overcompensated Guerra that the payments cannot be realistically linked to reasonable compensation for time and expenses and can only be seen as compensation in exchange for the testimony itself.  Guerra testified that even more valuable to him than all the money he received from Chevron was the chance for his entire extended family to become legal permanent residents of the United States and live together in the same country for the first time in decades.  Chevron was uniquely positioned to offer this to Guerra because not only could it fund the hiring of an immigration attorney for the whole Guerra clan, but it has essentially laid the groundwork for Guerra's asylum claims by seeking to establish, through this Court, the notion that persons who cooperate with Chevron in Ecuador face serious threats of persecution (despite the absence of any allegations that any one of the hundreds of persons who have worked for Chevron in Ecuador on the Lago Agrio case have ever been physically harmed).  Only Chevron had the ability to provide Mr. Guerra not only immigration counsel but the "facts" he needs for a successful asylum application to achieve legal permanent residence—the most important item on Mr. Guerra's wish list.

any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness . . ." can be fined, imprisoned, or both. *Id.*; *see also United States v. Blaszak*, 349 F.3d 881, 885-87 (6th Cir. 2003). Furthermore, payments to witnesses "contingent on the content of their testimony are expressly forbidden" under the Rules of Professional Conduct of New York and other rules. *In re Telcar Group, Inc.*, 363 B.R. 345, 355 (Bankr. E.D.N.Y. 2007); NY Rules of Prof'l Conduct, Rule 3.4 (a lawyer shall not "offer an inducement to a witness that is prohibited by law or pay, offer to pay or acquiesce in the payment of compensation to a witness contingent upon the content of the witness's testimony or the outcome of the matter."); N.Y. Comm. on Prof'l Ethics, Op. 668 (16-94) June 3, 1994; ABA Model Rules of Prof'l Conduct, Rule 3.4(b).

Under the Anti-Gratuity Statute and the New York Rules, witnesses may only be paid "reasonable" compensation for expenses associated with traveling to and time spent testifying. 18 USC § 201(d) (witness may only be paid "reasonable cost of travel and subsistence incurred" and "reasonable value of time lost in attendance at any … proceeding"); NY Rule 3.4 (lawyer may only pay "reasonable compensation" for "loss of time in attending, testifying, preparing to testify or otherwise assisting counsel, and reasonable related expenses"); s*ee also In re Telcar Group, Inc.*, 363 B.R. at 353 ("fact witness can only be compensated for time spent preparing, consulting, and giving testimony at a deposition or trial," and "reimbursed for reasonable costs of travel and subsistence."). Any payments beyond those limits "are impressible and violate public policy." *Id.*; *see also N.Y. v. Solvent Chemical Co., Inc.*, 166 F.R.D. 284, 289-91 (W.D.N.Y. 1996) (while payment for reimbursement of loss time was fine, inducements that led to "sympathetic" testimony "went too far"); *Golden Door Jewelry,* 865 F. Supp.

at 1524-27 (finding that even payments for *truthful* testimony contingent on the testimony being helpful to a party violates the integrity of the justice system); *Hamilton v. General Motors Corp.*, 490 F.2d 223 (7th Cir. 1973) (compensation of fact witnesses beyond lost time and reasonable expenses are unenforceable and against public policy).

Chevron has offered two distinct excuses for its patronage of Guerra. First, Chevron defends the roughly $50,000 it has paid to Guerra in exchange for documents and other physical evidence by arguing that witnesses may be compensated for the "reasonable value" of the evidence they provide. But, as already outlined for the Court, Chevron's argument is misguided—a blatant end-run around the rule against paying fact witnesses. *See* Sanctions Mot. at 20-22. As explained by Professor Chemerinsky, while a lawyer "may pay [a witness's] reasonable costs to gather documents and physical evidence from various sources[,]" allowing lawyers to pay fact witnesses based on the "value [of the evidence] ***to the lawyer or part****y* obtaining" it "would [leave] virtually no limitation on payments that lawyers could make to fact witnesses under the guise of obtaining evidence." DI 1423-2 at ¶¶ 9, 11 (emphasis added). Chevron and Gibson Dunn have paid a witness $18,000 for a laptop (which Chevron also replaced), some USB drives, and day planners; $20,000 for a few discs, a couple of mobile phones, and some paper records; and $10,000 for later stumbling on a single document. To suggest that such thinly-veiled inducement of favorable testimony is magically rendered harmless by a clause in the Chevron/Guerra contract stating that "[n]o payment is contingent on the content of Guerra's statements or testimony" makes a mockery of our justice system. As Professor Chemerinsky observes, if parties were permitted to pay for evidence based on how helpful that evidence might be to their case," they could easily "circumvent the

prohibition of paying non-expert witnesses for their testimony by saying it was to pay for documents or other physical evidence." *Id*. at ¶ 13.

Second, Chevron defends the remainder of its payments and benefits promised to Guerra—his $10,000/month salary, his housing allowance, health insurance, etc.—as necessary for the avoidance of persecution in Ecuador. As Professor Chemerinsky points out, "if a witness faces a bona fide personal safety or security risk due to his or her testimony" attorneys may be justified in paying "expenses reasonably necessary to keep the witness in a safe location." DI 1423-2 at ¶ 7. But that is not what has happened here. There is no basis upon which to credit Guerra's claimed fear that he and his family would be in any sort of physical danger in Ecuador. Generalized Ecuadorian crime statistics cannot possibly satisfy this burden—if they did, no fact witness should be sent back to Detroit, either—nor can rhetoric, however fiery, from certain quarters labeling Guerra a scoundrel.[3] Rather, what Guerra quite obviously fears is lawful prosecution for the many serious crimes he has admittedly perpetrated in Ecuador in addition to what he claims to have done in connection with the Lago Agrio Litigation—namely, the offering and acceptance of up to 40 bribes throughout his career as a lawyer and a judge. Yet, as justification for paying exorbitant sums to keep him permanently in the United States, Chevron cites to the Ecuadorian government's apparent belief, and the Lago Agrio Plaintiffs' lawyers' concurrence, that Guerra should answer for his crimes in the nation in which they were committed. DI 1474 at 14. We are entering a disturbing new era in transnational litigation if U.S. courts are going to encourage the wealthiest private actors to antagonize foreign sovereigns by scooping up admitted criminals and harboring them in the U.S.

---

[3]   Despite the rhetoric, Chevron has never alleged that any one of the scores of Ecuadorian lawyers and consultants who have worked for it in connection with the Lago Agrio Litigation has ever been physically harmed.

because they are willing to offer favorable testimony in return. If this Court were to condone Chevron's handling of Guerra, it would be signaling that a private litigant's desire to secure favorable testimony in a civil case warrants the obstruction of justice as to a serious criminal matter abroad.

Finally, even if Guerra faced a legitimate and reasonably concrete threat to his physical safety in Ecuador, a private litigant's payment of a salary to a fact witness—particularly, as in this case, a formidable salary for a minimum of two years—cannot be accepted as a reasonable measure to deal with the alleged security threat. There simply must be a line. Otherwise, the possibilities for abuse are limitless. As discussed in Defendants' Motion for Terminating Sanctions, Guerra is not the first admitted wrongdoer plucked from Ecuador by Chevron under the auspices of an amorphous security threat and paid hundreds of thousands (and potentially, millions) of dollars for testimony and/or silence. Sanctions Mot. at 7-9. Chevron is essentially operating a private witness protection program in service of a civil case.[4]

In sum, the payments and benefits that Chevron has promised and delivered to Guerra amount to bribery by any reasonable interpretation of the facts, and as such "violate the very heart of the integrity of the justice system." *Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Assoc.*, 865 F. Supp 1516, 1524-27

---

[4] Chevron for years has orchestrated a public relations and lobbying campaign designed to imbue the public consciousness with fear and suspicion regarding Ecuador. *See, e.g.*, DI 1241-2 at 5-8. By casting Ecuador—universally regarded as one of the world's top retirement havens (*see* International Living, *The World's Top Retirement Havens in 2013*, available at http://internationalliving.com/2012/12/the-worlds-top-retirement-havens-in-2013/# (last visited October 28, 2013)—as a lawless and dangerous cesspool of a country from which witnesses must be secreted at extraordinary expense, Chevron now attempts to reap the fruits of the antipathy it has so deliberately sown. Indeed, emerging evidence suggests that Chevron may have influenced the content of the U.S. State Department Reports on which it now relies as an independent condemnation of Ecuador. *See generally* http://lettersblogatory.com/foia/. In short, Chevron's trashing of a sovereign nation with impunity in these proceedings is the culmination of several years of cynical groundwork-laying.

(S.D. Fla. 1994).  The remedy is clear.  "[T]he proper sanction for the wrongful payment of fact witnesses is the exclusion of the tainted witnesses." *Rocheaux Int'l of N.J. v. U.S. Merchants Fin. Grp., Inc.*, Civ. 06-6147, WL 3246837 (D.N.J. Oct 5, 2009).  That is what must occur here.

## II. Even Assuming That The Existence of Corroborating Evidence Redeems a Witness Tainted By Unlawful Payments, Guerra's Testimony Lacks Corroboration

In opposing Defendants' pending Motion for Terminating Sanctions, Chevron suggested that even if witnesses like Guerra would otherwise be tainted as a result of the benefits conferred on them, the testimony of such witnesses is redeemed by virtue of corroborating evidence.  *See* DI 1474 at 17, 31-32.  But even assuming that the existence of corroborating evidence permits the Court to overlook unlawful witness payments—and it does not—Chevron has adduced no evidence to corroborate the core aspects of Guerra's testimony.  The essence of Guerra's testimony is that the Lago Agrio Plaintiffs' representatives bribed Judge Nicolas Zambrano Lozada ("Judge Zambrano") in exchange for the opportunity to ghostwrite a judgment in their clients' favor.  Chevron offers no other witness, nor does it offer any physical evidence, to corroborate the notion that there was any bribe.  In fact, Chevron's evidence does not corroborate the notion that the Lago Agrio Plaintiffs "ghostwrote" the Ecuadorian Judgment.[5]

Chevron's "corroboration" of Guerra is smoke and mirrors.  Chevron has larded up Guerra's testimony with marginal assertions that he *can* corroborate (albeit with incompetent or dubious evidence) in the apparent hope that this will cause the Court to

---

[5] Chevron would surely respond that the appearance of the Lago Agrio Plaintiffs' so-called "unfiled work product" in the Judgment is evidence of that.  But as this Court has once before observed, any similarities between "unfiled" documents and select passages from the Judgment are equally amenable to the explanation that Judge Zambrano came to possess these documents at some point and resolved to use them as he wrote the Judgment.

8

excuse the total lack of corroboration for the assertions that matter most. Long is the leap from Guerra's assertion that Judge Zambrano delegated certain tasks on a number of cases to a former judge—*i.e.*, the assertion to which almost all of Guerra's "corroboration" is geared—to the core assertion that Judge Zambrano delegated the drafting of the final Judgment to the victorious litigant. Consider some of Guerra's supposed corroboration:

- *Mobile phone records*: Chevron confiscated Guerra's mobile phones and computers, and has accessed Donziger's electronic devices and phone records. Yet Chevron has produced no evidence of any contact between Guerra and any member of the Lago Agrio Plaintiffs' legal team supportive of the accusations in the Guerra Declaration. As for Judge Zambrano, Guerra's phone records show a few phone calls between Guerra and a phone number identified as belonging to Zambrano in June 2012—long after entry of the Judgment and after Guerra claims to have begun cooperating with Chevron.

- *Email accounts*: Guerra gave Chevron access to his email accounts, and Chevron has adduced not a single email to Guerra from any member of the Lago Agrio Plaintiffs' team. Nor has Chevron adduced a single, pertinent email communication between Guerra and Zambrano.

- *The daily planner*. Guerra testified that it was his "custom to write down important events or important circumstances that were important for [him]" in his daily planners. Of course, Guerra testified that he "lost" all of the planners that purportedly would have logged events relating to the Lago Agrio Plaintiffs' alleged ghostwriting of the Judgment. Thus, Guerra only has produced planner entries for a one-year period beginning in July 2011—five months the Judgment was rendered.

- *Orders purportedly drafted by Guerra for Judge Zambrano*: Guerra's testimony and evidence concerning his claim that he served as Judge Zambrano's part-time "ghostwriter" of orders in the Lago Agrio Litigation and other cases are not probative of the real issue in this case. This testimony is instead offered for an improper and cynical purpose. As noted above, Chevron apparently hopes that the "corroboration" of various irrelevant aspects of Guerra's narrative will lead the Court to accept the relevant portion of Guerra's story (*i.e.*, the bribe and the Lago Agrio Plaintiffs' alleged drafting of the Judgment) without any corroboration at all. This testimony

9

and evidence should be stricken regardless of what this Court resolves to do with the rest of Guerra's testimony.[6]

But even assuming Guerra's claims about assisting Zambrano with various orders in the Lago Agrio Litigation are somehow germane, their "corroboration" is a mirage. Guerra's computer hard drive purportedly contained nine draft orders related to Judge Zambrano's cases. According to Chevron's expert, Spencer Lynch, all of these files were copied from an external drive onto Guerra's computer on the same day in July 2010.[7] And, again, the external drive from which these orders were copied is apparently lost.

- *Copies of bank deposit slips and TAME shipping log*: The bank records and shipping records that supposedly corroborate Guerra's claimed status as Judge Zambrano's ghostwriter—again, they do not support the notion that Judge

---

[6] Pursuant to Rule 404 of the Federal Rules of Evidence, for evidence of a crime, wrong, or other act to be admissible, it (1) must be relevant to an issue other than character of the defendant's propensity to commit the charged offense; and (2) must satisfy the balancing test imposed by Rule 403, which requires that the evidence have probative value that is not substantially outweighed by the unfair prejudice that might result from its admission. Weinstein's Fed. Evid., § 404.21[1][b] (2d ed. 2012). Although the manner in which Chevron has drafted Guerra's witness statement attempts to blend the issues, Guerra alleges two distinct "schemes": (1) the alleged arrangement whereby Guerra would help Zambrano draft orders in several cases, including the Lago Agrio case; and (2) the alleged arrangement whereby the Lago Agrio Plaintiffs' representatives allegedly offered Zambrano and Guerra a bribe in exchange for the opportunity to draft the final Judgment themselves. The latter allegation is what is at issue in this case; Chevron offers evidence of #1 to suggest that if Judge Zambrano was willing to enter into such an arrangement, it is more likely that he was willing to enter into arrangement #2. But that does not, and under the Federal Rules of Evidence, *cannot* follow.

[7] Judge Leonardo Ordoñez was presiding over the case at this time. Perhaps the foremost reason why Guerra's story is implausible is that the case would have been decided by Judge Ordoñez, who had issued an *autos para sentencia* (indicating that judgment was imminent), had Chevron not obtained his recusal by bombarding him with motions and complaining that the judge was not ruling on them. Indeed, the Lago Agrio Plaintiffs' contemporaneous emails indicate that it was Chevron who desired to replace Judge Ordoñez with Judge Zambrano. *See* DX 875 Email from Pablo Fajardo dated Sept. 26, 2010 ("As we know, the [Ordoñez] recusal should be decided I think during the course of the week; that means that possibly by Friday, we may know which judge will stay with the case . . . *Apparently, Chevron has a preference for Judge Zambrano and is doing everything possible for Judge Zambrano to be the one who stays with the case . . . .*") (emphasis added). Chevron's apparent desire to usher out a judge against whom no allegations of corruption have been made, and to usher in Judge Zambrano, is more than curious. After all, Guerra and Chevron now claim that, years earlier, during Judge Zambrano's first stint as presiding judge, Guerra approached Chevron's lawyers claiming that, in exchange for a bribe, he could get Judge Zambrano to rule in Chevron's favor. One would think that Chevron, if its story is to be believed, would have vigorously opposed Judge Zambrano's resumption of control over the case, not invited it.

10

> Zambrano allowed the Lago Agrio Plaintiffs' representatives to draft their own judgment—lack authentication and are inadmissible hearsay.
>
> As for authentication, Chevron asks this Court to rely solely on the word of Guerra, who admittedly will do anything even for small amounts of money and who, after receiving $18,000 for the meager evidence he initially provided Chevron, anticipated being similarly compensated (and was so) for providing more. Defendants find it highly suspect that Chevron and its counsel (i) apparently left it to Guerra to acquire this additional evidence on his own from third parties; and (ii) apparently failed to obtain verification of that evidence from the claimed source. Chevron and its counsel ordinarily dot every "i" and cross every "t." Leaving authentication to chance, rather than flying representatives of TAME and Banco Pichincha to New York to authenticate these allegedly key documents, is not at all their style. Chevron's unusual course of conduct brings to mind the phrase "plausible deniability."
>
> With respect to hearsay, the deposit slip itself is purportedly an assertion by the bank, offered by Chevron for the truth of the matters asserted therein. Similarly, the supposed compendium of Guerra's shipping records are an assertion by TAME offered for the truth of the matters asserted therein. Chevron has made no effort to lay a proper foundation to bring the documents within the "business records" exception to the rule prohibiting hearsay. Nor could Chevron lay such a foundation through Guerra. To wit, this evidence is offered to bolster the credibility of a witness whose credibility would otherwise be zero—it would be entirely circular, and would defeat the purpose of the exercise, to allow Guerra's testimony to prove up this supposedly corroborating evidence. Moreover, the TAME shipping log is *on its face* the antithesis of a business record. Far from having been created in the ordinary course, the compendium was purportedly created by the TAME legal department at the request of the witness, specifically for use in litigation.

What Chevron deems corroboration is, in reality, a series of remarkably convenient excuses for the absence of evidence that should exist if Guerra is telling the truth, supplemented by evidence that is (a) incompetent; (b) "found" or produced by Guerra only after the reward became clear to him; (c) lacking any connection to the core allegations in this case; or (d) suffering from some combination of those three defects.

* * *

The bottom line is that Guerra is and apparently always has been desperate for money, and will stoop to extraordinary lows to get it—including fabricating a story for

11

Chevron, weaving big lies with small truths in an effort to create the illusion of a verified account.  Guerra's recent testimony only serves to drive his unreliability home.

The record is now clear that as a practicing attorney and as a judge, Guerra routinely paid and solicited dozens of bribes, and as a judge was happy to "fix" a case in favor of a party for a bribe that could run as low as $200.  Given this history, Guerra was surely ecstatic at the bribe-money possibilities when he was assigned to be the first judge in the massive Lago Agrio case in 2003—and disappointed  and frustrated when his first term as judge on the case came and went in seven months without any meaningful progress in the case.  *See* Witness Statement of Alberto Guerra Bastidas at ¶ 4.  As his direct testimony suggests, Guerra was desperate to maintain some sort of a foothold in the case (and on Chevron's side of the case).  For example, he "confronted Judges Novillo and Yanez" for certain rulings they made in favor of the plaintiffs and openly declared that he would declare the case null in favor of Chevron if (or when) he was reassigned to it under the rotating two-year term system of the court.  *Id*. at ¶ 7.

By his own admission, Guerra was fired as a judge on account of this behavior.  Shortly thereafter, he began approaching Chevron attorneys in the case—according to his own testimony and Chevron's attorneys' sworn declarations—offering to "'fix' the judgment in favor of Chevron."  PX 1674 at ¶6; see also PX 1673, 1675, 1676.  Indeed, one of Chevron's attorneys stated he went so far as to "change my cellular telephone number . . . because of the persistent calls from the telephone number used by Dr. Guerra."  *Id*.  Guerra further understood from multiple conversations and lunch meetings with Chevron attorneys—where, as Guerra's testimony revealed, they always fully heard out his offers and consulted with their principals before allegedly saying "no"—that as an

out-of-work former judge with no role in the case, he simply didn't have the "goods" Chevron wanted.  Guerra had every incentive to manufacture those goods so that he could bargain hard with Chevron about the price of his testimony.  And bargain he did, lying repeatedly to Chevron—*i.e.*, that he was in possession of emails that would confirm Chevron's ghostwriting allegations; that he possessed drafts of the Judgment; that the Lago Agrio Plaintiffs had recently offered him $300,000 to cooperate—in order to improve his bargaining position.

The payments and benefits promised to Guerra alone require that his testimony be discarded; Guerra's proven willingness to lie to secure greater benefits emphasizes the need of that relief.  Under the circumstances, Guerra's testimony does not serve, but instead hinders, the truth-seeking function of this court.

## CONCLUSION

For all of the foregoing reasons, as well as those stated in pertinent portions of Defendants' Motion for Terminating Sanctions, this Court should, at a minimum, strike the testimony of Alberto Guerra Bastides.

Dated: October 30, 2013                                    Respectfully submitted,

New York, New York

| | |
|---|---|
| *s/ Richard H. Friedman* | *s/ Steven R. Donziger* |
| Richard H. Friedman | Steven R. Donziger |
| Friedman \| Rubin | 245 W. 104th Street, #7D |
| 1126 Highland Ave. | New York, NY 10025 |
| Bremerton, WA  98337 | Tel: (917) 678-3943 |
| Tel: (360) 782-4300 | Fax: (212) 409-8628 |
| Fax: (360) 782-4358 | Email: StevenRDonziger@gmail.com |
| Email: rfriedman@friedmanrubin.com | |
| | *Pro Se* |
| *s/ Zoe Littlepage* | |
| Zoe Littlepage |  *s/ Julio C. Gomez* |
| Littlepage Booth | Julio C. Gomez |
| 2043A West Main | GOMEZ LLC |
| Houston, TX  77098 | The Sturcke Building |
| Tel: (713) 529-8000 | 111 Quimby Street, Suite 8 |
| Fax: (713) 529-8044 | Westfield, NJ 07090 |
| Email: zoe@littlepagebooth.com | Telephone:  908.789.1080 |
| | Facsimile:  908.789.1080 |
| *s/ Steven R. Donziger* | Email:  jgomez@gomezllc.com |
| Steven R. Donziger | |
| 245 W. 104th Street, #7D | *Counsel for Defendants Hugo Gerardo Camacho Naranjo and Javier Piaguaje Payaguaje* |
| New York, NY 10025 | |
| Tel: (212) 570-4499 | |
| Fax: (212) 409-8628 | |
| Email: StevenRDonziger@gmail.com | |
| | |
| *Attorneys for Defendants Steven R. Donziger, Law Offices of Steven R. Donziger and Donziger & Associates, PLLC* | |

14