# EXHIBIT A

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

CHEVRON CORPORATION,                    :
                                         :
                  Plaintiff,             :
                                         :
       v.                                :        11 Civ. 0691 (LAK)
                                         :
STEVEN DONZIGER, et al.,                 :
                                         :
                  Defendants.            :
                                         :

## DIRECT TESTIMONY OF JOSEPH C. KOHN

I, JOSEPH C. KOHN, under penalty of perjury under the laws of the United States of
America pursuant to 28 U.S.C. § 1746, declare:

1.      The law firm, Kohn, Swift and Graf PC ("KSG"), with which I have been a
member since 1982, was retained by the Frente de Defensa de la Amazonia ("Frente") to act as
one of the U.S. counsel for the plaintiffs in the case *Maria Aguinda y otros v. Chevron* (the
"Ecuadoran litigation"). KSG was one of the U.S. counsel representing the plaintiffs in *Aguinda
v. Texaco*, filed in the Southern District of New York in 1993. On November 19, 2009, I sent a
letter to the Frente stating that KSG was withdrawing as counsel for the reasons set forth in the
letter.

2.      I received a bachelor's degree from the University of Pennsylvania *cum
laude* in 1979. I graduated *cum laude* from Villanova University School of Law in 1982. I was
admitted to the Pennsylvania bar in 1982 and am currently admitted to the bars of Pennsylvania,
the Eastern District of Pennsylvania, the Third Circuit, and the Eastern District of Michigan.
Although my firm's name has changed over time, I have worked as an attorney at KSG since
1982. I have been a shareholder in the firm since 1988. My practice includes business and



PLAINTIFF'S
EXHIBIT
**5600**
11 Civ. 0691 (LAK)

commercial litigation and class actions involving antitrust, securities, and consumer related litigation, environmental and mass tort litigation, and international human rights cases.

3.        When the Ecuadoran litigation was filed in 2003, I, along with The Law Offices of Cristóbal Bonifaz and Steven Donziger, served as U.S. counsel for the Ecuadoran plaintiffs. Alberto Wray, an Ecuadoran lawyer from the firm of Cabezas and Wray, served as lead Ecuadoran counsel at that time. Luis Yanza, as the representative of the Frente was also involved in the case from the outset. Dr. Wray and Mr. Bonifaz were primarily responsible for the determination and development of the legal theories upon which the action was filed.

4.        It is my understanding of Ecuadoran law, as explained to me by Dr. Wray and Mr. Bonifaz, that the Ecuadoran litigation sought recovery for collective rights. It did not include either individual personal injury or individual property damage claims. The Frente, as a representative organization was designated as the beneficiary of any judgment in the complaint.

5.        During prior New York litigation against Texaco involving some of the same individual plaintiffs as the Ecuadoran litigation, the legal team then representing a group of Ecuadoran plaintiffs agreed on behalf of those plaintiffs not to sue or seek recovery against the Republic of Ecuador or Petroecuador. PX 684 is a true and correct copy this agreement, dated November 20, 1996 among Mr. Bonifaz and me.

6.        I do not have any agreements with Chevron regarding this or any other litigation or the content of my testimony here. I am informed that this Court permits direct witness testimony to be submitted in a written statement for party witnesses, and I have requested permission to proceed in this manner even though I am a non-party witness and have been subpoenaed to testify by Chevron.

Plaintiff's Exhibit 5600   p. 2 of 29

7.          KSG's role in the Ecuadoran litigation had several aspects.  Throughout the period of our involvement, we contributed funding for the litigation expenses, which required the services of lawyers, scientists, and other consultants over many years.  We were involved in discussing strategy in the Ecuadoran litigation and in U.S.-based related cases, meeting with government representatives, settlement strategy, and mediations in 2007 and 2008.

8.          In November 2010, KSG filed a complaint in the Eastern District of Pennsylvania against the Frente, Mr. Donziger, and others, setting forth the firm's position regarding the production of the firm's documents in connection with the claims being made by Chevron against various participants in the Ecuadoran litigation.  Our firm in that case, and in matters pending in the Southern District of New York, took the position akin to an interpleader. We stated that we had no objection to producing documents relevant to the dispute, and simply requested that a court rule on whether any requested documents were privileged.  After KSG filed the complaint in the Eastern District of Pennsylvania, Chevron initiated a Section 1782 action against KSG there, and issued a subpoena in the Southern District of New York in this case.  KSG's interpleader position remained the same in all courts.

9.          From May 2003 until November 2009, KSG was the primary funder of the litigation and related U.S. public relations and other activities.  During those nearly seven years, the firm paid over $6 million in litigation expenses.  This included the $1.1 million that we provided to Mr. Donziger for legal services and expenses, $1.1 million that we paid to U.S. consultants, and $2.2 million that we transferred by wire from bank accounts in the United States to bank accounts in Ecuador.  PX 641 is a true and correct copy of an accurate summary of the expenses that KSG incurred in funding the Ecuadoran litigation from 2003 to May 2009.  This summary was prepared by my staff at my request and is a document kept during the regular

3

course of my business.  (PX 641).  Of that amount, over $1.1 million was paid directly to Steven Donziger in fees and case-related expenses as a 1099 contractor.  In other words, as part of its support of the Ecuadoran litigation, KSG advanced legal fees to Mr. Donziger of approximately $150,000 per year in personal compensation, and we covered all of his expenses in connection with the case, such as his travel and lodging expenses.  The expenditures in PX 641 do not include the value of KSG attorney time spent on the matter.

10.     At the outset of the case in Ecuador, both Mr. Bonifaz and Mr. Donziger kept me apprised of developments.  For example, in October 2005, I received an email from Mr. Donziger in which he attaches a strategy memorandum for our public media efforts.  (PX 734).  Exhibit 734 is a true and correct copy of this email from Mr. Donziger to me with the subject line "Lehane's first press plan" attaching a Word document containing a strategy memorandum of one of our public media efforts.  Mr. Bonifaz was born in Ecuador and is fluent in Spanish.  Mr. Donziger also speaks Spanish.  I do not speak Spanish.

11.     In the time period since the Ecuadoran litigation was filed in 2003, I visited Ecuador on one occasion, in about September or October of 2007, to meet with some of the Ecuadoran plaintiffs' representatives, and to tour some of the region involved in the case.

12.     In 2005, Mr. Bonifaz's role in the case diminished and he was terminated as counsel by the plaintiff-client groups in 2005 or 2006.  From that point forward, Mr. Donziger became our sole source for information about the Ecuadoran litigation (other than public accounts).  And from 2005 onwards, Mr. Donziger was the person primarily responsible for making day-to-day decisions in the management of the case, including hiring Ecuadoran personnel for the case, scientists and other consultants, public relations personnel, lobbyists, and Ecuadoran counsel.

4

13.         By 2006, Dr. Wray no longer had a day-to-day role in the case.  With the departure of Mr. Bonifaz and the reduced role of Dr. Wray, Mr. Donziger became the principal American lawyer on the case and the sole link to the plaintiff-client groups and the sole source of information to me concerning the Ecuadoran litigation.

14.         In 2006, Mr. Donziger informed me that Pablo Fajardo was taking a prominent role in the Ecuadoran litigation.  Mr. Donziger described Mr. Fajardo to me as a dedicated, bright, humble, and honest young lawyer whose family lived in the Oriente and who had been working hard on the case.  Mr. Fajardo quickly became the public face of the litigation team in Ecuador—for example, within a year, he was in an article in Vanity Fair magazine about the case.

15.         During the time I was involved in the Ecuadoran litigation, Mr. Donziger and the plaintiffs also retained Alejandro Ponce Villacís and Juan Pablo Sáenz as members of the Ecuadoran legal team.

16.         Mr. Donziger recommended salary amounts to me for each of the Ecuadoran lawyers.  I have no personal knowledge as to how Mr. Donziger arrived at his recommendations, but they appeared reasonable to me.  Periodically, on behalf of Selva Viva— which was the name of a corporation formed to facilitate payments to the various vendors involved in the litigation in Ecuador—Mr. Donziger presented me with proposed budgets for financing the litigation.  Lump sum payments were made to Selva Viva pursuant to the budgets and I understood those payments were then disbursed among the employees, vendors, and others as set forth in the budgets.

17.         Luis Yanza, in his capacity as head of the Frente, also served as an accountant for the case.  I understood based on my conversations with Mr. Donziger that Mr.

Plaintiff's Exhibit 5600   p. 5 of 29

Yanza had an accounting background and that he served as the bookkeeper for Selva Viva. KSG received accountings from Mr. Donziger and Selva Viva. These were supposed to be provided on a monthly basis, and initially with some delays, they were. As time wore on, there were greater and greater delays in our receipt of the back-up documentation. Overall, KSG received accountings covering July 2005 to September 2009, with the exception of the time period covering October and November 2007.

18.      The attorneys and representatives of the Ecuadoran plaintiffs came to visit the United States on a number of occasions. In 2006, Mr. Donziger, Mr. Fajardo, Mr. Yanza, and Mr. Ponce met me in my offices to discuss the case. PX 13 is a true and correct copy of a clip in which Mr. Donziger, Mr. Fajardo, Mr. Yanza, and Mr. Ponce are in my offices meeting with me to discuss recent developments in the Ecuadoran litigation. This was the first time I had met Mr. Ponce, who was traveling to New York to attend Mr. Donziger's wedding. Mr. Fajardo, Mr. Yanza, and Mr. Sáenz and other representatives of the plaintiffs attended a mediation in Washington, D.C. in November 2007. Mr. Yanza, Mr. Fajardo, and Humberto Piaguaje, a representative of the Ecuadoran plaintiffs, visited me in my office in April of 2010 as well.

19.      In or about the Fall of 2007, I agreed with Mr. Donziger to his request to enter into a written agreement regarding the allocation of any attorneys' fees recovered in the case. Mr. Donziger proposed, and I agreed, that (i) we would mutually agree on the amount of fees to be paid to any other lawyers working on the case, and (ii) split the remaining fee recovery in the Ecuadoran litigation 50/50 between KSG and Mr. Donziger. I drafted a simple letter agreement to that effect. Mr. Donziger signed the letter approximately one year later in August 2008. (PX 2352). PX 2352 is a true and correct copy of a letter agreeing to do so, dated August 7, 2008, from me to Mr. Donziger.

6

20.          In late 2008 and 2009, KSG attempted to take a more active role in day-to-day decision-making and efforts in the litigation, and in the related publicity and other activities in the United States.  Despite statements by Mr. Donziger that a decision in the Ecuador case would occur in late 2007 or 2008, that had not happened, and the case seemed to be dragging on indefinitely.  There was also the related U.S. litigation.  I believed it was important that KSG lawyers become more closely involved in the final submissions to the Ecuadoran court in order to obtain a judgment that would be enforceable in the United States and elsewhere.  At the same time, Chevron was making allegations that representatives of the Ecuadoran plaintiffs had improperly influenced the independent court expert's global damages report, and had otherwise engaged in misconduct in the litigation.  Through various actions, Mr. Donziger rebuffed these efforts by our firm to take a more active role.

21.          In September 2009, Chevron made charges concerning Judge Nunez and an alleged bribery scheme.  I believed it was important that these allegations be investigated so that if any improprieties existed they could be resolved and not endanger the entire case and the enforceability of any judgment.  Accordingly, I requested that these contentions be investigated by an American lawyer and investigator retained by KSG and Mr. Donziger.

22.          In September 2009, KSG proposed that KSG and Mr. Donziger engage Kenneth Trujillo, Esquire—a Spanish-speaking former Assistant United States Attorney, former City Solicitor of Philadelphia, and an experienced commercial litigator with contacts in South America—to investigate Chevron's allegations of misconduct by the Ecuadoran plaintiffs' team.  PX 1155 is a true and correct copy of a draft agreement prepared at my instruction by my staff between KSG and Mr. Trujillo in which KSG sets out the terms of Mr. Trujillo's investigation of Chevron's allegations of misconduct by the Ecuadoran plaintiffs' team.  Our

7

intent to investigate the allegations regarding Richard Cabrera was specified in the draft retainer agreement our firm prepared with Mr. Trujillo: "[W]e [KSG] request that your Firm make inquiries into what knowledge members of the legal team prosecuting the . . . litigation may have … of improper contacts between members of [the] legal team and various . . . court-appointed experts." (PX 1155). When I first reached out to Mr. Donziger to introduce Mr. Trujillo, Mr. Donziger agreed that an investigation was a good idea. I recall at least one conference call between Mr. Donziger, Mr. Trujillo, and me. Mr. Donziger called and emailed me a few days later, however, to say he did not think going forward with an investigation was a good idea and he didn't think it would sit well with the Ecuadoran team. (PX 1156). PX 1156 is a true and correct copy of an email, sent on September 4, 2009 from Mr. Donziger to me with the subject line "idea to retain a lawyer." Mr. Donziger followed up on this conversation with another call in which he made a point of saying he was giving me his "personal assurance" that nothing improper had occurred in the case. Ultimately, Mr. Donziger flatly refused to participate or go forward with the hiring of Mr. Trujillo, and told us that the legal team in Ecuador would refuse to cooperate in any such investigation. He also said if we insisted on the investigation, we should withdraw from the case. I did not go forward with retaining Mr. Trujillo because I believed that without Mr. Donziger's agreement and cooperation it would have been impossible to effectively investigate the various allegations being made by Chevron, including those regarding Richard Cabrera.

23.          Later that year, in November 2009, KSG discontinued funding of the Ecuadoran litigation, including paying Mr. Donziger. This occurred prior to any of the Section 1782 litigation initiated by Chevron.

8

24.     On August 9, 2010, I sent a letter to Messrs. Fajardo, Yanza, Ermel Chavez, Humberto Piaguaje, Hugo Payaguaje, and Emergildo Criollo in which I catalogued some of Mr. Donziger and his team's fraudulent activities of which I had recently become aware. PX 1406 is a true and correct copy of this letter.

25.     After evidence emerged of the fraudulent activities of Mr. Donziger and others representing the Ecuadoran plaintiffs (PX 1406), KSG disavowed any financial interest in the Ecuadoran judgment, including that documented in PX 2352. Accordingly, neither I nor my firm has retained any financial interest in the February 14, 2011 Ecuadoran judgment. As against Mr. Donziger and U.S.-based consultant Stratus Consulting, Inc., I have preserved through tolling agreements my firm's right to pursue litigation to recover amounts paid them in connection with the Ecuadoran litigation.

26.     At the outset of the litigation, it was my understanding that there would be two phases to the evidence-gathering process in Ecuador. In the first phase, the parties would conduct a series of judicial inspections of various sites in the former concession area for the purpose of testing for contamination. Both sides' reports would then be submitted to a panel of "settling experts" for reconciliation. During the second phase, experts would be appointed to conduct a "global damages assessment," based on a review of all of the data and evidence gathered in the first phase and any further analysis needed.

27.     In the Spring of 2006, Mr. Donziger and I discussed the status of the inspection process. Mr. Donziger believed, and I agreed, that it would be best to limit or end the judicial inspections and move onto the second evidence-gathering phase of the litigation: the global damages expert report and final submissions. The reasons for this approach would be to reduce costs and bring the litigation to conclusion more quickly.

9

28.     On July 26, 2006, Mr. Donziger emailed me reporting that the judge was going to accept our request to largely withdraw the rest of the inspections and begin the global damages expert process. (PX 785). PX 785 is a true and correct copy of this email with the subject line "Potentially huge." Mr. Donziger later informed me in 2007 that the Court was appointing a sole global damages expert whose name was Richard Cabrera.

29.     On behalf of the Ecuadoran plaintiffs, Mr. Donziger and I retained Stratus in the Spring of 2007 to provide us with materials for submission to the court and also to prepare materials to assist us in efforts to mediate the Ecuadoran litigation. In accordance with the contract with Stratus, it was my understanding that materials prepared by Stratus on behalf of the Ecuadoran plaintiffs would be "for submittal to the court," on the record, and that the global damages expert would then review and consider whether to accept, or reject, or rely upon in some way any or all of Stratus's findings in his own report. (PX 633). The contract attached as pages DONZ00067482 (pages 1 through 9) to PX 633 is a true and correct copy of the August 20, 2007 contract between KSG and Stratus.

30.     At the time the Cabrera Report was filed in April 2008, Mr. Donziger sent me multiple press releases, some in draft form, all referring to Mr. Cabrera as an "independent" expert. (PX 1023, PX 1032). PX 1023 and PX 1032 are emails from Mr. Donziger to me dated April 1, 2008 and April 4, 2008 respectively in which Mr. Cabrera is referred to as independent. The facts as phrased in these press releases were consistent with Mr. Donziger's representations to me at that time, including the statement in an April 3, 2008 press release (PX 1032), that "Chevron's claim that Professor Cabrera is cooperating with the plaintiffs is completely false[.]" And the statements that Mr. Cabrera was being "paid directly by the court for the current phase

Plaintiff's Exhibit 5600   p. 10 of 29

of his work, as is customary and required in Ecuador[,]" and "[h]is report . . . reflects the work of

no fewer than 14 prominent Ecuadorean scientists and technical experts[.]"  (PX 1032).

31.        Between 2007 and 2009, KSG paid more than $1 million to Stratus based

on Mr. Donziger's approval of their work.  I did not review drafts of Stratus's work being

submitted in Ecuador.  I do not recall reviewing any draft documents beginning with "I, Richard

Cabrera."  I was not involved in any discussions about Stratus's work being attributed to Mr.

Cabrera or otherwise being used in a non-transparent manner.  It was my understanding that, at

all times, the Ecuadoran plaintiffs' consultants' materials were being submitted publicly to the

Ecuadoran court through a proper, legal process consistent with Ecuadoran law.

32.        I was told that the Ecuadoran court process allowed for comments to the

Cabrera Report to be filed.  I was aware that, with Stratus's help, our team was preparing

comments to the Cabrera Report.  In June 2008, after the Cabrera Report had been filed, Mr.

Beltman sent me a cost estimate for upcoming tasks for the preparation of the comments to the

Cabrera Report.  (PX 1047).  PX 1047 is a true and correct copy of this email exchange dated

June 29 to July 7, 2008, between Mr. Beltman, Mr. Donziger, Ms. Dawn Williams, Mr. Joe

Harvey, and me with the subject line "approval for upcoming work."  Among these tasks, Mr.

Beltman listed "[t]ranslate Cabrera report annexes from Spanish into English" for "~$50,000."

At the time, I was not struck by the strangeness of this request, but now, knowing that Stratus

wrote the Cabrera Report in English and translated it into Spanish, I find it misleading that Mr.

Beltman requested reimbursement for translating the same report back into English.  While Mr.

Donziger sent me Stratus's draft comments on the Cabrera Report with his edits, I was not

consulted or asked to edit the proposed comments.  (PX 1037).  PX 1037 is a true and correct

11

copy of this email from Mr. Donziger to me with the subject line "i sent this to doug with edits" attaching a redline of Mr. Beltman's draft of Stratus's comments.

33.     I am aware that Mr. Cabrera filed a subsequent supplemental report that increased the damages estimate to $27 billion in November 2008. To the extent that Stratus, Mr. Donziger, or other Ecuadoran plaintiffs' representatives were involved in drafting Mr. Cabrera's Supplemental Report, I had no knowledge of that.  Mr. Donziger told me that Stratus's role was to draft our team's initial report for submission "to the court" and then to help with the technical aspects of the case during the motion practice that followed.  Stratus was also assisting the Ecuadoran plaintiffs' team with a mediation of the case.  Finally, Stratus assisted Mr. Donziger and the Ecuadoran attorneys in drafting our team's final submission to the court.  I now know Mr. Donziger lied to me about the nature of Stratus's work on the Cabrera Report.

34.     KSG paid for various other consultants in connection with the Ecuadoran litigation.  Our records reflect that Fernando Reyes was paid $3,000 in connection with the Ecuador litigation.  (PX 641).  I have never met Mr. Reyes, although I believe he is an engineer. I do not recall the purpose of that payment or what services Mr. Reyes provided.  Money that KSG paid Mr. Donziger as legal fees or reimbursement of expenses was paid by check and at times transferred by wire into his bank accounts.

35.     KSG generally paid the U.S. consultants, including Stratus, directly by check or wire transfer.

36.     As previously noted, for the management of litigation funding in Ecuador, Mr. Donziger and Mr. Yanza set up a corporation called Selva Viva.  In 2005, Selva Viva opened bank accounts at Banco Pichincha, an Ecuadoran bank with a branch in the United

Plaintiff's Exhibit 5600   p. 12 of 29

States, through which Mr. Donziger, Mr. Yanza, and others paid bills for a wide range of services needed to pursue the litigation in Ecuador.

37.    At Mr. Donziger's direction, between June 2005 and November 2009, KSG made approximately 51 separate wire transfers from our U.S. bank account to a Banco Pichincha account with an account number ending in 5004 in amounts ranging from $10,000 to $100,000.

38.    In 2007, Mr. Donziger made several references in emails to my assistants at KSG and me regarding a second bank account at Banco Pichincha.  (PX 897, 916, 965, 968, 984).  PX 897, 916, 965, 968, and 984 are true and correct copies of emails from Mr. Donziger to my assistants and me requesting transfers to this second bank account.  This account had an account number ending in 9800.   On three occasions, Mr. Donziger instructed KSG to wire funds to this account.  In accordance with these instructions from Mr. Donziger, KSG wire transferred $120,000 total from its U.S. bank account to this second account in Ecuador on August 15, 2007 ($50,000), September 17, 2007 ($50,000), and February 12, 2008 ($20,000).

39.    In response to an email from my assistant asking why the transfer should be made to this second account, Mr. Donziger stated that the reason for making these payments into a different account was because these payments involved "separate case-related piece[s] of work that [are] being run by the Frente.  The Frente created Selva Viva simply as a pass thru mechanism to administer funds for the litigation; the Frente controls Selva Viva.  This separate account will be used for [the] same purpose under the same control of the Frente and Yanza, and will be accounted for the same way with receipts."  (PX 897).  PX 897 is a true and correct copy of an email exchange between Mr. Donziger, Ms. Karen Wilson, Ms. Kathy Kenny, and me dated August 14, 2007 with the subject line "Critical money transfer."  I understood that the

13

second account was simply an administrative or ministerial matter, no different from any business or firm having more than one bank account.

40.        My firm invested a substantial sum in public relations during the course of the Ecuadoran litigation. (PX 641). Mr. Donziger, however, supervised public relations and lobbying activities in the United States on behalf of the Ecuadoran plaintiffs. Mr. Donziger selected and hired public relations and political consultants in the United States, including Karen Hinton. Mr. Donziger supervised Ms. Hinton's work and was intimately involved in all press releases issued by Hinton Communications on behalf of the Ecuadoran plaintiffs. In fact, Mr. Donziger authored many of the press releases that were issued by Hinton Communications. While public relations and lobbying can play a legitimate role as part of a legal strategy, I would never endorse or knowingly engage in the use of falsehoods as part of a media, government relations, or legal strategy.

41.        In June 2009, I was contacted by counsel for Karen Hinton seeking "success bonus compensation" for her participation on the media team. I forwarded this request to Mr. Donziger, who ultimately handled this request. Ms. Hinton sought at least 5% of any "fees earned on [any] settlement or [damages] award." (PX 1144). PX 1144 is a true and correct copy of an email exchange between Mr. Donziger and me on June 26, 2009 with the subject line "Success Bonus Compensation," forwarding an email exchange between Ms. Grace Fremlin and me on June 25-26, 2009.

42.        Amazon Watch, an independent environmental organization that supported the Ecuadoran plaintiffs' cause, organized a series of protests, marches, activity around the Chevron annual shareholder meeting for the purpose of drawing attention to the Ecuadoran litigation. KSG contributed to their programs and campaigns. In 2007, KSG contributed more

14

than $180,000 to Amazon Watch.  While I don't recall KSG having reviewed materials Amazon Watch published before they did so, I do recall that Mr. Donziger worked with them to organize their activities, as well as their press releases.

43.      The Ecuadoran plaintiffs' team planned and executed a significant media campaign around the filing of the Cabrera Report.  My firm covered the costs of that campaign. That campaign prominently featured the idea that Mr. Cabrera was an "independent," court-appointed expert, who found Chevron liable for billions of dollars in damages in Ecuador.  I gave one interview, which appeared on television news, in which I repeated that Mr. Cabrera was "the judge's independent expert."  PX 1036 is a true and correct copy of the transcript of this interview given to Fox News with Nicole Petallides on May 31, 2008.  I did so based on Mr. Donziger's many statements to me and others that Mr. Cabrera was an independent expert acting at the direction of the Ecuadoran court.

44.      A lobbyist named Ben Barnes provided some assistance on behalf of the Ecuadoran plaintiffs with respect to communications with the Office of the U.S. Trade Representative and others in government, and he also offered assistance in facilitating a possible settlement of the case.  Mr. Barnes proposed to Mr. Donziger and me an agreement by which Mr. Barnes was to receive a percentage of the amount of legal fees received from the Ecuadoran judgment, and a letter agreement was prepared setting forth his proposal, but I am not aware whether that agreement was ever signed.

45.      Mr. Barnes had personal contacts that he claimed could be helpful in facilitating a possible settlement with Chevron.  In 2009, Charles James, Chevron's General Counsel, called me to say that Mr. Barnes and others at his direction had been speaking to Chevron board members about the Ecuador litigation.  Mr. James expressed his concern to me

15

about this because Chevron was a represented party in the Ecuador litigation.  At my direction,

an attorney at my firm analyzed the question of whether a non-lawyer could be subject to the

ethical restrictions placed upon lawyers with respect to contacting represented parties (and

whether lawyers who are aware of such contacts have ethical restrictions) and determined that

non-lawyers and lawyers who might direct or be aware of such contacts could be subject to such

rules under certain circumstances.  I shared this information with Mr. Donziger, and advised that

Mr. Barnes should not make further contacts, but Mr. Donziger was unconcerned and dismissed

the issue, saying he was fine letting Chevron complain about it.

      46.      Later, Mr. Donziger informed me that another individual, the Honorable

Willie Brown, Jr.—former San Francisco mayor and former Speaker of the California House of

Representatives—who was, in fact, a lawyer, was going to engage in similar direct contacts with

Chevron.  I once again raised the ethical prohibition about direct contacts with a represented

party.  Mr. Donziger's response was that we should just let Chevron complain about it (i.e., file a

complaint of some kind against Mr. Brown and our firms), and then said "we will just blow it up

into a bigger press thing."  I responded that our firm did not want to be the subject of any such

complaint, and that I assumed Mr. Brown, who had built a reputation over his lifetime, would not

either.

      47.      Mr. Donziger arranged for the *Crude* film crew to come to my offices on

two occasions in 2006 and 2007.  As a result, I appear in *Crude* and in *Crude* outtakes.

      48.      In one *Crude* outtake, Mr. Donziger is shown explaining to me that the

Attorney General of Ecuador had taken some action.  In fact all that happened was a report had

been given to the Attorney General in Ecuador that he had sent to the Attorney General of the

United States.  Mr. Donziger put the document in front of me, without warning, after the cameras

16

were rolling.  Mr. Donziger stated that "for a couple of [years] we've been trying to get the

Attorney General to do something about [Chevron]."  (PX 32).  From looking at the document

for the first time, I could see it was not a report of the Attorney General nor did it describe a

criminal charge of any kind.  Rather, it was a report on behalf of some group of plaintiffs.  I did

not believe any criminal charge had been brought by any governmental entity at that time.  At

that time, we had a scheduled meeting with Chevron's counsel in several weeks for the purpose

of discussing a possible settlement negotiation.  I wanted to know if this report was something

our group of plaintiffs had done and had control over, or whether it was done by some third-party

group.  That is why I asked Mr. Donziger, "So, again, that may [be] something that we could

facilitate going away at the right time."  Mr. Donziger responded, "Exactly."  (PX 32).  It was

the report I was asking about, and not any criminal charge brought.

49.          I never heard about this report again from Mr. Donziger.  I have reviewed

PX 32, a video clip I understand was produced by Mr. Mike Bonfiglio in a related Section 1782

action, and the scene is consistent with my knowledge and recollection of my conversation with

Mr. Donziger on that day.  At no time did I raise, discuss, or threaten Chevron's counsel that a

criminal charge could be brought against Chevron or its employees.

50.          Even before the Cabrera Report was filed in 2008, Chevron representatives

began suggesting that Mr. Cabrera was not an independent expert.  I raised these allegations with

Mr. Donziger on several occasions.  Mr. Donziger consistently denied there was anything

improper in connection with Mr. Cabrera, or that there was any basis for Chevron's allegations

that Mr. Cabrera was not independent.

51.          In November 2007, I participated in a mediation in Washington, D.C. with

Chevron on behalf of the Ecuadoran plaintiffs.  Mr. Donziger, Mr. Fajardo, Mr. Sáenz, and Mr.

17

Yanza were also present.  During the course of the mediation, Chevron's counsel, Thomas

Cullen, Esquire of the Jones Day firm, stated to me, Mr. Donziger, Mr. Fajardo, Mr. Sáenz, Mr.

Yanza, and other representatives of the plaintiffs attending the mediation that Chevron suspected

improper contacts and collusion with Mr. Cabrera by the Ecuadoran plaintiffs' team.  On a break,

I asked Mr. Donziger and Mr. Fajardo about Mr. Cullen's statement, and Mr. Donziger told me

that Chevron was exaggerating things, such as the fact that one or more of the plaintiffs were

seen near Mr. Cabrera during an inspection of a well site.  Mr. Donziger's position was that there

was no merit to these charges.  I responded that if there were any other contacts, or improper

conduct, it would come out eventually.  Mr. Donziger assured me that there was no truth to

Chevron's allegations.

52.        In February 2009, I met Chevron attorneys Mr. Cullen and Mr. James in

San Francisco.  I was accompanied by Mr. Ben Barnes.  During this meeting, Mr. James again

asserted that the Ecuadoran plaintiffs' team had improper contacts with Mr. Cabrera.  After the

meeting, I again asked Mr. Donziger in Mr. Barnes's presence whether there was any truth to

Chevron's claims.  Mr. Donziger again assured me that there were no improper contacts between

Mr. Cabrera and the Ecuadoran plaintiffs' team and that Chevron's allegations were overblown,

without merit, and "b.s."

53.        In 2008, the relationship between KSG and Mr. Donziger began to

deteriorate.  Over the course of the next year or more, my colleagues at KSG and I made

repeated efforts to play a more active role in the case and in related activities.  My desire to take

a more active role was driven by a number of considerations.  First, the projected timelines for

the completion of the case were not being met.  Second, the allegations that Chevron was

making, and other indications of questionable conduct in the proceedings, had me concerned

18

about the conduct of the litigation and the enforceability of any judgment that ultimately might come out of the action. Third, even without these issues, I wanted the experienced lawyers in our firm to participate in the strategy and legal work going forward, including the important final briefs for two primary reasons: (i) so that we would make the strongest arguments and have the best chance of prevailing in Ecuador; and (ii) so that any favorable judgment we received would stand the best chance of being recognized and enforced against Chevron in the United States.

54.        Initially, Mr. Donziger claimed that our increased participation was welcome, but in reality, he made a concerted effort to prevent our meaningful involvement. He refused to provide us with copies of his files, including all the court filings we had requested; he cancelled or postponed meetings at the last minute; and generally he refused to substantively engage with KSG. A critical example of this behavior was his repeated efforts to prevent us from meeting with members of the Ecuadoran legal team by first delaying or rescheduling meetings, and then ultimately stating we were not allowed to speak directly with the Ecuadoran legal team. Mr. Donziger also refused to provide us with more information about how funds were being spent in the case. (PX 1153). PX 1153 is a true and correct copy of an email exchange between Mr. Donziger and me dated August 20-24, 2009 with the subject line "Issues V2." Meanwhile, Mr. Donziger became increasingly strident in his demands that we pay case expenses and professional fees to him and others at his sole direction.

55.        Mr. Donziger blocked the scheduling of a meeting between my firm and the Ecuadoran counsel and plaintiffs' representatives, to discuss the status of the litigation, including the final brief. We suggested such a meeting in early 2009, but Mr. Donziger kept putting it off and even became irate when a lawyer in our firm, Neil Glazer, Esquire, communicated with Mr. Sáenz directly. Mr. Sáenz appeared to acquiesce to this control, telling

19

us: "Steven is our point of contact, so please coordinate with him about the best way to proceed." (PX 1185). PX 1185 is a true and correct copy of an email from Mr. Neil Glazer to Mr. Craig Hillwig, of KSG, replying to a forward dated November 13, 2009 from Mr. Sáenz to Mr. Yanza, Mr. Fajardo, and me, copying Mr. Jared Solomon, Mr. Glazer, and Mr. Hillwig.

56.     At a meeting in April 2009, Mr. Donziger agreed to let other attorneys at my firm copy his entire case files, but then a few days later, he changed his mind, stating that it wasn't "necessary" or a good idea because the case was complicated.

57.     On November 9, 2009, I wrote to Mr. Donziger by email requesting that he reduce his monthly fees and expenses on the case. I reminded Mr. Donziger that I would be willing to discuss proposals for finding other sources of funding and management, but it was Mr. Donziger who never engaged with any of the law firms I identified. I perceived that Mr. Donziger's unwillingness to engage with firms at my suggestion was because he doubted they would "simply take orders from [him]," which is what he wanted. (PX 1181). Mr. Donziger informed me, in response, that my "firm's primary obligation [was] to finance the case," while his was to "run the case." He asserted that he had done the overwhelming amount of the work and essentially refused to engage on these issues. I told Mr. Donziger that his position left us no choice but to discontinue funding the case and paying his monthly invoices past the following week. PX 1181 is a true and correct copy of an email exchange between Mr. Donziger and me dated November 9, 2009 with the subject line "update/trip to ecuador."

58.     Mr. Donziger demanded I appear in Quito for a meeting that same week to meet with Mr. Fajardo and Mr. Yanza. (PX 1181). I informed him I was not available to travel that week, but suggested we meet in Washington, D.C. the following week. (PX 1182). PX

Plaintiff's Exhibit 5600   p. 20 of 29

1182 is a true and correct copy of an email exchange between Mr. Donziger and me dated November 10, 2009 with the subject line "followup."

59.          On November 10, 2009, I sent a letter to Mr. Yanza and Mr. Fajardo regarding the possibility of further settlement negotiations with Chevron.  (PX 1184).  I pointed out among other things that a settlement of $700 million or more would "provide for virtually 100% clean-up," as well as funds for many other projects.  (PX 1184).  PX 1184 is a true and correct copy of this letter from me to Messrs. Yanza and Fajardo dated November 10, 2009 with the subject line "Ecuador-Texaco Case."

60.          On November 13, 2009, I received a letter from Mr. Fajardo and Mr. Yanza advising me they did not agree we should engage in further settlement negotiations and that they believed all budget and strategy decisions must be made by Mr. Donziger.  (PX 1187).  PX 1187 is a true and correct copy of a letter from me to Messrs. Yanza and Fajardo dated November 19, 2009 in which I describe and discuss this November 13, 2009 letter.

61.          On November 19, 2009, I responded to Mr. Yanza's and Mr. Fajardo's letter in which they parroted many positions I had heard from Mr. Donziger.  I told them that, "The working relationship between me and . . . Steven ha[d] steadily deteriorated over the past years."  And that we had "paid all necessary litigation expenses, as well as many wasteful and unnecessary expenses incurred due to Steven's extravagance and decisions."  I also told them that "[b]y far, the largest single component of the 'budget' is Steven's demand for fees and expenses, and there, in my opinion, lies the root of the current problem, and the reason why this current crisis arises. . . . At the same time as we have spent enormous sums of money on the case, Steven has denied us access to documents, information and the legal team, despite our repeated requests.  He has made it impossible for us to effectively discharge our duty as

21

attorneys and has interfered with the attorney-client relationship." I concluded by stating: "unless or until such agreements are reached, this firm considers that due to Steven's influence and interference, there is no longer an attorney-client relationship with our firm and we will withdraw from any further representation related to the case and notify the vendors and other appropriate entities of that fact." (PX 1187).

62.       On November 24, 2009, Mr. Donziger informed me by email that he was unilaterally retaining Emery Celli to represent the Ecuadoran plaintiffs in connection with litigation in the U.S. District Court for the Southern District of New York related to an arbitration between Chevron and the Republic of Ecuador. Mr. Donziger demanded to know whether my firm "[was] working on this, plans to continue working on it, and wants to participate in this process." (PX 1752). He also stated that he was talking to other firms about joining the case, and blamed this on purported "shortfalls in funding," which was offensive, given that he refused our requests for additional disclosure and documentation about what was being funded. (PX 1752). Mr. Donziger never asked our permission to engage additional law firms to represent our clients with respect to the same matter in which we had represented them. PX 1752 is a true and correct copy of this email exchange between Mr. Donziger and me dated November 24, 2009 with the subject line "update."

63.       In approximately March or April of 2010, I had a telephone conversation with Jeffrey Shinder, Esquire, of Constantine Cannon who told me he had withdrawn from representing the Ecuadoran plaintiffs in the 1782 proceeding against Stratus because he had learned about a level of collaboration between Stratus and Cabrera that he found to be very troubling and he did not want his firm associated with it.

Plaintiff's Exhibit 5600   p. 22 of 29

64.        Soon thereafter, I met with Mr. Donziger at his request at the New York offices of my attorney, Stephen Susman, Esquire, of the Susman Godfrey firm.  Mr. Donziger asked me if I was interested in joining a committee of lawyers representing the Ecuadoran plaintiffs, and I told him that I had spoken with a lawyer at the Constantine firm about the Ecuadoran plaintiffs' team's contacts with Mr. Cabrera and I would not discuss anything with him unless he—and any one of the Ecuadoran team that had contact with Mr. Cabrera—"came clean" about what happened with Mr. Cabrera.  Mr. Donziger did not respond directly to that.  Instead, he looked down at his shoes and said someone on the Ecuadoran team "may" have provided "some" documentation to Mr. Cabrera, and if it came out, it could be embarrassing for the Ecuadoran plaintiffs' team.  I stated at that meeting that I thought his leadership of the case had severely damaged the opportunity for the plaintiffs to recover, and that he should withdraw from the case in a clear and public way, and there should be a transition to new counsel.

65.        On April 13, 2010, I wrote to Mr. Fajardo and Mr. Sáenz and informed them that I had just found out from Mr. Donziger that the Stratus 1782 would reveal "highly embarrassing" information about the Ecuadoran plaintiffs' interactions with Mr. Cabrera.  I urged them to investigate the nature of their team's relationship with Mr. Cabrera and to obtain new counsel who were not part of any improper conduct.  (PX 1290).  PX 1290 is a true and correct copy of this letter from me to Messrs. Fajardo, Sáenz, and Yanza dated April 13, 2010 with the subject line "Chevron."

66.        Later the same month, my colleagues and I met with Mr. Fajardo, Mr. Yanza, and Mr. Humberto Piaguaje at their request at our offices in Philadelphia.  (PX 1309).  I asked them about their interactions with Mr. Cabrera.  Mr. Fajardo said that they provided Mr. Cabrera with documents in accordance with a court order and there was nothing to Chevron's

23

charges. I asked him why, if it was that clear, they had not simply filed that order with the court presiding over the Stratus 1782 proceeding in Colorado and put an end to the issue. Mr. Fajardo responded that perhaps they should, but I never saw any such order.

67.       A few days later, on May 1, 2010, I received an unsolicited email from Mr. Fajardo in which he states that he "neglected to tell me" at the recent meeting additional information. He then disclosed to me for the first time that, "[b]ased on the same order of the judge, by which we submitted information to Expert Cabrera, we proceeded to submit a packet of information, mainly the input of Stratus, around the middle of March 2008." (PX 1312). Again, Mr. Fajardo assured me that "there is no illegality in the process of delivering information." PX 1312 is a true and correct copy of this email from Mr. Fajardo which was translated by my paralegal, Ms. Sofia Lopez, dated May 1, 2010 with the subject line "ACLARACION." Looking back at this email now, I realize that this unsolicited email from Mr. Fajardo was another example of Mr. Donziger and the Ecuadoran plaintiffs' team lying to me and KSG about the Ecuadoran plaintiffs' team's contacts with Mr. Cabrera.

68.       On July 29, 2010, I received a letter, dated July 26, 2010, from representatives of the Ecuadoran plaintiffs purporting to terminate our attorney-client relationship. On August 9, 2010, I responded to the July 26, 2010 letter, informing the attorneys and representatives of the Ecuadoran plaintiffs that I was "personally saddened and professionally disappointed." (PX 1406). I informed them that I was "shocked by recent disclosures concerning potentially improper and unethical, if not illegal, contacts with court-appointed expert, Mr. Cabrera." (PX 1406). In addition, I told them that I believed that Mr. Donziger's influence over them had ultimately damaged our relationship. I also told them KSG had concluded that Mr. Donziger intentionally misled us in order to get us to continue to fund the

24

Ecuadoran litigation.  I notified them that Mr. Donziger had misled us about contacts with Mr.

Cabrera, lied to us about the status of the case and the Ecuadoran plaintiffs' team's actions, and

withheld material information from us.  I wrote that it was clear to us, in hindsight, that Mr.

Donziger made statements that were "blatant lies, intended to induce our firm into paying more

money for litigation expenses."  (PX 1406).

69.        Since KSG ceased representing the Ecuadoran plaintiffs, I have come to

learn from various public filings, emails, declarations, depositions, videos, and reports that Mr.

Donziger lied to me about a number of aspects of the Ecuadoran litigation.  In addition to

falsehoods about Mr. Cabrera, the Ecuadoran plaintiffs' team's contacts with him and the role

that Stratus and the Ecuadoran plaintiffs' team played in writing Mr. Cabrera's report, Mr.

Donziger misrepresented facts to me, omitted material facts in his communications with me, and

was generally dishonest with me about the manner in which he was managing the Ecuadoran

litigation.

70.        I believe that Mr. Donziger made these material false statements and

material omissions to me to defraud me and KSG because he knew that if he were to tell me the

truth about Mr. Cabrera and other misconduct, I would have sought to remove him from the case,

or, failing that, KSG would have stopped funding the litigation.  On that, Mr. Donziger was

entirely correct.  He obtained millions of dollars in litigation funding from KSG on the basis of

material misrepresentations and material omissions about the Ecuadoran litigation.

71.        Dr. Charles Calmbacher was an expert who did work for the Ecuadoran

plaintiffs during the judicial inspections.  As far as I know, Dr. Calmbacher was retained by

David Russell or by Mr. Donziger.  I never met Dr. Calmbacher, and was not very familiar with

his work.  Until Chevron took his deposition in discovery proceedings in the United States in

25

early 2010, I was not aware that reports had been submitted to the Ecuadoran court under Dr.

Calmbacher's name that did not represent his conclusions and were not his work product.  In

addition, Mr. Donziger was never able to explain to me how the deposition proceeded without

any attorney being there on behalf of the clients, the Ecuadoran plaintiffs.

72.        At the time Dr. Calmbacher consulted with the Ecuadoran plaintiffs' team,

and thereafter I was in regular contact with Mr. Donziger and expected him to keep me apprised

of significant developments in the case.  He did not tell me about what transpired with the

submission of Dr. Calmbacher's reports, and that is a material omission on his part I consider to

have been used to defraud KSG and obtain continued funding the Ecuadoran litigation.  Had I

known at the time that Mr. Donziger was engaging in the conduct ascribed to him by Dr.

Calmbacher, I would have instructed Mr. Donziger not to go forward with it, and I would not

have permitted KSG funds to be used to facilitate it.

73.        Mr. Donziger never informed me that he and his Ecuadoran co-counsel

vetted candidates to be the global damage expert prior to the court ordering the end of judicial

inspections and the beginning of the court expert phase of trial.  I was not aware that Fernando

Reyes was one of the candidates Mr. Donziger and his Ecuadoran co-counsel vetted.  I was not

aware that Fernando Reyes suggested to Mr. Donziger that he choose Mr. Cabrera to be the court

expert.  These were omissions on Mr. Donziger's part that I consider to have been material to

whether KSG would have continued funding the Ecuadoran litigation.

74.        I am aware from *Crude* outtakes that a meeting occurred on March 3, 2007

in Quito, Ecuador in which the Ecuadoran plaintiffs' counsel and consultants and Mr. Cabrera

himself participated.  Mr. Donziger never informed me that he and the Ecuadoran plaintiffs'

Ecuadoran lawyers and technical team, including U.S.-based consultant Stratus, met with Mr.

26

Cabrera on March 3, prior to Mr. Cabrera's appointment as global expert. I was not otherwise aware at the time that this meeting occurred. I consider this also to have been a material omission by Mr. Donziger.

75.        I had no knowledge that Stratus, including Douglas Beltman and Ann Maest, met with Mr. Cabrera at any point to work on the Cabrera Report. I had no knowledge that Stratus was writing the Cabrera Report, which Mr. Cabrera filed under Mr. Cabrera's name. I was not consulted when Mr. Donziger and his consultants and co-counsel drafted Mr. Cabrera's work plan and I was not consulted when Mr. Donziger and his consultants and co-counsel assigned sections and subject matters that would become the Cabrera Report. I was aware of a plan that split up the report Stratus was drafting—in my belief in its own name—among the consultants in the Ecuadoran plaintiffs' employ. However, based on public filings, I have come to learn that there was a work plan that was circulated among Mr. Donziger and the Ecuadoran plaintiffs' consultants, but not to me or others at KSG, that attributes each section of the report Stratus was drafting to Mr. Cabrera. (PX 990). I reviewed PX 990, which I understand was produced by Stratus in a related Section 1782 action. I consider all of these also to have been material omissions by both Mr. Donziger and Stratus.

76.        I was not aware that Donziger instructed Stratus to keep their work on the Cabrera Report "confidential."

77.        If I had known that the Ecuadoran plaintiffs' team and Stratus had written Mr. Cabrera's report and provided it to him the day before he filed it, I never would have given an interview on Fox News in which I repeated the misstatements that Mr. Cabrera was an independent expert appointed by the judge who analyzed all of the evidence from all of the

27

parties from both sides. (PX 1036). And my firm never would have approved expenses for the other public relations efforts in connection with the Cabrera Report.

78.         Mr. Donziger never informed me that $33,000 of the $50,000 KSG wire transferred to the second account in Ecuador was being used to pay Mr. Cabrera outside the court process. Mr. Donziger never informed me that he was making payments to Mr. Cabrera outside the court process and that those payments were never disclosed to the Ecuadoran court or to Chevron. I consider these also to have been material omissions by Mr. Donziger.

79.         I was not told that materials were submitted to Mr. Cabrera outside of the court process and without Chevron's knowledge. I was not told that materials prepared by Stratus and others crossed the line from being submissions for his consideration to actually being the complete writing of his report. I was not aware that the Cabrera Report was being misrepresented to the Court, to Chevron, and to the world at large, as Mr. Cabrera's independent assessment. I was not told that the Ecuadoran plaintiffs' team made secret payments to Mr. Cabrera outside of the court process, or that KSG funds were used to provide him with other material support, such as providing him with an office, purchasing him insurance, or providing him with an assistant. I was not told that I was transferring money into a "secret account" for the purposes of paying Mr. Cabrera outside the court process. Indeed, I was repeatedly assured that nothing untoward was going on. These are all omissions by Mr. Donziger that I consider material, and had I been aware of them, KSG would not have continued to be involved in or fund these efforts.

80.         Had I been told the truth about Mr. Cabrera, KSG would not have participated in or funded the Ecuadoran plaintiffs' efforts in preparing the Cabrera Report and bribing Mr. Cabrera.

28

81.     I relied on Mr. Donziger to tell me the truth about what was going on in the Ecuadoran litigation—about Mr. Cabrera, about Dr. Calmbacher, and about other things—and I now know that Mr. Donziger did not tell me the truth.  It is now clear to me that Mr. Donziger deceived and defrauded me, and that, as a result, we continued to pay millions of dollars to that litigation that we never would have paid had we known the truth.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this /  th day of October 2013.

Joseph C. Kohn

29

Plaintiff's Exhibit 5600   p. 29 of 29