UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
: 
CHEVRON CORPORATION, :
:
                    Plaintiff, :
:
         -against- :
:           Case No.  11 Civ. 0691 (LAK)
:
STEVEN R. DONZIGER, et al., :
:
                    Defendants. :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**CHEVRON CORPORATION'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTION FOR RECONSIDERATION
OF THIS COURT'S OCTOBER 10, 2013 OPINION ON
MOTIONS TO COMPEL AND FOR SANCTIONS**


GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

*Attorneys for Plaintiff Chevron Corporation*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ....................................................................................................1

PROCEDURAL HISTORY..........................................................................................................2

ARGUMENT ...............................................................................................................................3

I.      Defendants Control the Ecuadorian Documents..................................................................4

        A.      Donziger Has Possession, Custody, or Control of the Ecuadorian
                Documents ...............................................................................................................4

        B.      The LAPs Have Possession, Custody, or Control of the Ecuadorian
                Documents ...............................................................................................................6

II.     Defendants Refused in Bad Faith to Produce the Documents Ordered .............................9

III.    Chevron Suffered Prejudice from Defendants' Willful Misconduct ................................12

IV.     The Court Imposed Reasonable Sanctions Merited by Defendants' Misconduct ............15

        A.      The Court Properly Struck the LAPs' Personal Jurisdiction Defense ..................16

        B.      The Court's Preclusion and Adverse Inference Sanctions Are Limited and
                Appropriate ...........................................................................................................19

V.      The Court Properly Considered International Comity.......................................................19

        CONCLUSION....................................................................................................................21

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Auscape Int'l v. Nat'l Geographic Soc'y*,
   No. 02 Civ. 6441(LAK), 2003 WL 134989 (S.D.N.Y. Jan. 17, 2003)....................................19

*Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.*,
   602 F.2d 1062 (2d Cir. 1979) .......................................................................................18

*Davidson v. Dean*,
   204 F.R.D. 251 (S.D.N.Y. 2001) ...................................................................................10

*Ferguson v. Lion Holding, Inc.*,
   No. 02 CIV. 4258 (PKL), 2004 WL 1276846 (S.D.N.Y. June 8, 2004) ...................................3

*Frummer v. Hilton Hotels Int'l*,
   19 N.Y.2d 533 (N.Y. 1967)............................................................................................18

*Gucci Am., Inc. v. Curveal Fashion*,
   No. 09 Civ. 8458 (RJS)(THK), 2010 WL 808639 (S.D.N.Y. Mar. 8, 2010) ............................9

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
   No. 06-MD-1775, 2010 WL 2976220 (E.D.N.Y. July 23, 2010)............................................21

*In re Auction Houses Antitrust Litig.*,
   196 F.R.D. 444 (S.D.N.Y. 2000)....................................................................................10

*Ings v. Ferguson*,
   282 F.2d 149 (2d Cir. 1960) ..........................................................................................15

*Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*,
   456 U.S. 694 (1982) .........................................................................................16, 17, 19

*Jackson v. Goord*,
   664 F. Supp. 2d 307 (S.D.N.Y. 2009) ................................................................................5

*Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co.*,
   841 F. Supp. 2d 769 (S.D.N.Y. 2012) ..............................................................................14

*Linde v. Arab Bank, PLC*,
   269 F.R.D. 186 (E.D.N.Y. 2010)....................................................................................10

*McAnaney v. Astoria Fin. Corp.*,
   233 F.R.D. 285 (E.D.N.Y. 2005)...................................................................................2, 4

*McGee v. Dunn*,
   No. 09 Civ. 6098 (FPS), 2013 WL 1628604 (S.D.N.Y. Apr. 16, 2013) ..................................3

*Metro. Opera Ass'n, Inc. v. Local 100, Hotel Emps. & Rest. Emps. Int'l Union*,
   No. 00 Civ. 3613 (LAP), 2004 WL 1943099 (S.D.N.Y. Aug. 27, 2004)................................18

*Minpeco, S.A. v. Conticommodity Servs., Inc.*,
   116 F.R.D. 517 (S.D.N.Y. 1987)................................................................................15, 21

*Morales v. Quintiles Transnational Corp.*,
   25 F. Supp. 2d 369 (S.D.N.Y. 1998) ................................................................ 3

*Penthouse Int'l, Ltd. v. Playboy Enters., Inc.*,
   663 F.2d 371 (2d Cir. 1981) ............................................................................ 9

*Remington Prods., Inc. v. N. Am. Philips Corp.*,
   107 F.R.D. 642 (D. Conn. 1985) .................................................................... 10

*Shrader v. CSX Transp., Inc.*,
   70 F.3d 255 (2d Cir. 1995) ............................................................................. 3

*Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist. of Iowa*,
   482 U.S. 522 (1987) ...................................................................................... 20

*Titra Cal., Inc. v. Titra Film*,
   No. 98 CIV. 0234 (KMW) (FM), 2001 WL 1382587 (S.D.N.Y. Nov. 6, 2001) .................... 10

*Travel Sentry, Inc. v. Tropp*,
   669 F. Supp. 2d 279 (E.D.N.Y. 2009) ............................................................. 12

*Valarezo v. Ecuadorian Line, Inc*.,
   No. 00 CIV. 6387(SAS), 2001 WL 740773 (S.D.N.Y. June 29, 2001) ................... 14, 15

## Rules

Fed. R. Civ. P. 11 .......................................................................................... 11

## PRELIMINARY STATEMENT

There is no basis in fact or law to reconsider this Court's 104-page opinion.  The Court's

finding "that defendants have the ability to obtain documents in the possession of their attorneys

and agents in Ecuador and that their failure to do so under court order evidences bad faith" was

amply supported by the full written record.  Dkt. 1529 at 104.  And the Court held a three-day

evidentiary hearing to give Defendants a further opportunity to present any case they had to

make, but Defendants did not call a single witness or introduce a single exhibit.  The Court di-

rected its remedy to the precise injury proven, "declin[ing] to grant the more onerous sanctions

sought by Chevron" but granting "sanctions narrowly tailored to [Defendants'] actions."  Dkt.

1529 at 2.  The Court even accorded the LAPs additional time to comply with the Court's prior

orders.  But rather than attempt to comply, or even to stop using the Ecuadorian state as both a

sword and a shield, Defendants seek "reconsideration" of the Court's detailed opinion by repeat-

ing the same arguments this Court has already considered and rejected.  Worse yet, Defendants

echo the language of their Ecuadorian co-counsel in continuing to treat this Court with disre-

spect.[1]

---

[1]   *See* Dkt. 1631 at 2 ("Now that Chevron's claims will not be heard by an impartial jury, Chevron has shown no
evidence of prejudice."); 6-7 ("The Court has applied its oft-used waiver tactic in an unequal fashion, applying
it to Donziger and now to Camacho and Piaguaje, while graciously finding reasons why Chevron is not subject
to waiver."); 11 n.2 ("Apparently, the Court decided to compel production, without consulting the relevant law,
and then wrote an opinion after the fact."); 19 ("Finding that Defendants and their counsel were required to tell
the Court about a suggestion to Ecuadorian co-counsel smacks of a double standard."); 20 n.4 ("The Court, in
its rush to judgment, has pushed this case to a trial in approximately 18 months."); 21 ("Now that Chevron and
the Court have, over Defendants' objections, dispensed with the possibility for an impartial jury to hear this
matter, the suggestion that Chevron's ability to try its case is somehow handicapped or impaired because Mr.
Fajardo and his Ecuadorian colleagues will not provide Chevron with their privileged litigation files is ridicu-
lous."); 24 ("The Court should reconsider its sanctions order and decide the facts and law in this case based on
all relevant evidence, not just on the conclusions or inferences the Court wants to draw and the evidence the
Court wants to see or hear."); ("Merely assuming its applicability to Messrs. Camacho and Piaguaje, the Court
entered sanctions striking a valid personal jurisdiction defense and imposing in addition the twin penalties of
'the Court gets to decide whatever facts it wants to decide against Defendants' based on adverse inferences at
trial and 'the Court gets to exclude the defense evidence it wants to exclude' at trial."); 11 ("That windfall of
privileged information (not surprisingly obtained as a result of a ruling by this court of 'waiver' of Donziger's
objections) encompassed hundreds of thousands of records."); 16 ("The suggestion that Camacho and Piaguaje
should fire their Ecuadorian lawyers . . . in order to produce documents to Chevron in a jurisdiction where they

In short, Defendants' present motion is yet another effort to dodge their responsibility for their own acts and those of their agents and representatives. But reconsideration cannot be premised "solely on a party's disagreement with the Court's ruling." *McAnaney v. Astoria Fin. Corp.*, 233 F.R.D. 285, 287 (E.D.N.Y. 2005) (quoting *Colodney v. Continuum Health Partners, Inc.*, No. 03 Civ. 7276 (DLC), 2004 WL 1857568, at *3 (S.D.N.Y. Aug. 8, 2004)) (internal quotation marks omitted). And Defendants' rhetoric gets them nowhere. Because there is nothing new here and nothing the Court overlooked, Defendants' motion should be denied.

## PROCEDURAL HISTORY

Chevron has been seeking the Ecuadorian documents from Defendants since May 2011, when Chevron first served discovery requests in the Count 9 proceedings. Dkt. 77 (11 Civ. 3718). Despite two separate orders from this Court requiring production, Defendants produced none of the Ecuadorian documents in the control of their agents or representatives in the Count 9 action. Dkts. 101, 240 (11 Civ. 3718). Defendants first claimed that they had no control over the documents in question, but when that excuse was rebuffed, they claimed that production would be too burdensome. Dkts. 96, 215 (11 Civ. 3718).

In June 2012, Chevron again sought the Ecuadorian documents from Defendants (Dkt. 895 Exs. 3504, 3505, 3506, 3507), including documents in the possession, custody, or control of Defendants' Ecuadorian agents and representatives. *See, e.g.*, Ex. 3504 at 1. Defendants failed again to produce the Ecuadorian documents, and Chevron moved to compel production on August 13, 2012. Dkt. 562. Defendants responded on August 15, 2012. *See* Dkt. 1529 at 24; Dkt.

---

have been sued despite their utter lack of contacts with New York is absurd, condescending, and improper. It is equally absurd for a Court in the United States to opine on how matters *in Ecuador* should be run."); 20 ("This Court apparently doubts that statement, but it cannot sit as a super appellate judge over proceedings in a sovereign nation, nor does it have the right to adjudicate the truthfulness or credibility of statements or testimony made in a foreign proceeding."); 22 ("Waiver and sanctions are the smooth path unmeritorious cases travel on their way to victory.").

563; Dkt. 564.  On February 13, 2013, the Court granted Chevron's motion to compel production

of the Ecuadorian documents and ordered the Defendants to state whether they would comply.

Dkt. 787.  Defendants stated that they would not produce the required materials.  *See* Dkts. 836,

841.

On March 12, 2013, Chevron moved for sanctions and to hold Defendants in contempt

for their failure to produce the Ecuadorian documents in accordance with the Court's order.

Dkt. 894.  Defendants opposed on March 26, 2013, raising essentially the same arguments they

raise in this motion for reconsideration.  *See* Dkts. 947, 950.  Chevron replied on April 2, 2013.

Dkt. 965.  The Court held a three-day hearing on April 16-18, 2013.  On October 10, 2013, the

Court granted Chevron's motion but imposed only limited sanctions.  Dkt. 1529.

## ARGUMENT

A motion for "reconsideration will generally be denied unless a moving party can point to

matters that might reasonably be expected to alter the conclusion reached by the court."  *McGee*

*v. Dunn*, No. 09 Civ. 6098 (FPS), 2013 WL 1628604, at *4 (S.D.N.Y. Apr. 16, 2013) (citations

omitted).  A motion for reconsideration "is not a substitute for appeal and may be granted only

where the Court has overlooked matters or controlling decisions which might have materially

influenced the earlier decision."  *Morales v. Quintiles Transnational Corp.*, 25 F. Supp. 2d 369,

372 (S.D.N.Y. 1998) (citations omitted).  The party seeking reconsideration "may not . . . ad-

vance new facts, issues or arguments not previously presented to the Court, nor may it . . . reliti-

gat[e] issues already decided by the Court."  *Ferguson v. Lion Holding, Inc.*, No. 02 CIV. 4258

(PKL), 2004 WL 1276846, at *1 (S.D.N.Y. June 8, 2004) (citing *Shrader v. CSX Transp., Inc.*,

70 F.3d 255, 257 (2d Cir. 1995)).  In short, "[a] motion for reconsideration cannot be granted . . .

solely on a party's disagreement with the Court's ruling." *McAnaney*, 233 F.R.D. at 287 (quoting *Colodney*, 2004 WL 1857568, at *3) (internal quotation marks omitted).

Defendants' principal "argument" is that they do not wish to be sanctioned.  The Court made a well-reasoned decision that (i) Defendants control the Ecuadorian documents; (ii) Defendants acted in bad faith in disobeying the Court's order and refusing to produce the Ecuadorian documents; (iii) Chevron suffered prejudice from Defendants' refusal; and (iv) limited sanctions are deserved, (v) even taking into account concerns of international comity.  Defendants purport to take issue with each of these findings, but they cannot cite any overlooked legal authority or facts that call the Court's decision into question, let alone mandate a different result. The Court should, therefore, deny Defendants' motion.

I.     **Defendants Control the Ecuadorian Documents**

   A.     **Donziger Has Possession, Custody, or Control of the Ecuadorian Documents**

The Court correctly held that Donziger has the practical ability to obtain the Ecuadorian documents based on his role as "cabeza" of the Ecuadorian legal team.  *See* Dkt. 1529 at 31-42. Donziger oversaw the enterprise's funding and the Ecuadorians' salaries and bonuses, stands to make the most of any lawyer if the judgment is enforced, edited the Ecuadorian lawyers' work and gave them materials to file, hired and consulted with experts, and has a retainer agreement vesting him with broad power to control and coordinate legal strategy around the world.  Dkt. 1529 at 31-42, 72-78.  And Donziger repeatedly received documents from Ecuador at his request.  *E.g.*, Dkt. 966-1 (Exs. 3603-04); Dkt. 966-7 (Exs. 3630-31).

Donziger does not dispute the evidence of his control of the Ecuadorian documents before 2012 and 2013.  Nor could he.  Instead, Donziger claims that the evidence presented by Chevron is "stale" and unreliable because it supposedly does not demonstrate his control over the past year or so.  Dkt. 1631 at 10.  Donziger's argument is misguided for multiple reasons.  As an

initial matter, this very same argument was already raised by Donziger (*see, e.g.*, Dkt. 564 at 2; Dkt. 895-1 (Ex. 3501) at 30:6-25), and rejected by the Court (Dkt. 1529 at 72-78).  There is nothing new or overlooked that would require reconsideration.

Indeed, in arguing a lack of current control, Donziger principally relies upon the claim that he was supposedly stripped of his position as the head of the Ecuadorian litigation by virtue of a vote of the Union of Afectados in January 2013.  *See* Dkt. 1631 at 10-11.  But Donziger made this argument at the sanctions hearing, citing the same document.  Ex. 1 (4/16/13 Hr'g Tr.) at 112.  There is no reason for the Court to reconsider evidence it has already seen and rejected. *Jackson v. Goord*, 664 F. Supp. 2d 307, 313 (S.D.N.Y. 2009) ("Reconsideration of a previous order by the court is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources [which] may [not] be used as a vehicle for relitigating issues already decided by the Court.") (citations omitted).  In addition, the supposed "removal" of Donziger's powers is doubtful.  Donziger's retainer agreement requires modifications to be made jointly in writing (Dkt. 355-37 (Ex. 1122) at 10), and this was not done (Ex. 1 (4/16/13 Hr'g Tr.) at 121:17-19 ("Q. Do you know whether your retention agreement has been modified by a writing? A. I don't believe it has.")).  Moreover, the Asamblea's purported vote appears to be little more than an attempt to shield the Ecuadorian documents from production.  *See* Dkt. 734-1 Ex. A (*Cordova* January 15, 2013 ruling); Dkt. 1631 at 10 (noting that the Union of Afectados voted after meetings on January 14 and 15).  As the Court noted, the purported transfer "appears to be an attempt to create a facade to hide reality and to buttress Mr. Donziger's argument that he no longer is in control rather than to portray reality."  Dkt. 1529 at 77.

In fact, there is ample evidence that Donziger remains in control to this day.  As recently as October 15, 2013, Humberto Piaguaje said that "Steven Donziger is our lawyer to the pre-

sent." Ex. 2 (10/15/2013 Ecuadorinmediato Radio interview).  Donziger also admitted at the

sanctions hearing in April 2013 that he still travels to Ecuador monthly[2] and works "close to full

time" on this case.  Ex. 1 (4/16/13 Hr'g Tr.) at 58.  He also testified that he still has the same fi-

nancial interest in the judgment—$1 billion—which is the most of any lawyer working on the

matter.  Ex. 1 (4/16/13 Hr'g Tr.) at 128.  There is also evidence that Donziger may still be re-

cruiting new funders, such as the London-based Woodsford Litigation Funding.  *See* Dkt. 1182-3

(Ex. 8) (Donziger gave an "Executive Breakfast" at The Arts Club in London, England on May

20, 2013); Ex. 3 (5/23/13 Mot. for Procedural Safeguards Hr'g Tr.) at 15 ("To the implication

that I'm somehow in London for reasons that are troublesome, again, I resent, sir.  And I'm here

to raise money so I can support my own defense in this case."); Ex. 4 (Woodsford, a London-

based investment firm, is now a litigation financer in this action).  Donziger's supposed account-

ant has additionally produced documents showing that Donziger made hundreds of thousands of

dollars in transfers to and from Selva Viva in 2012.  Ex. 5.  Just last week, Donziger also attend-

ed an appellate argument related to the LAPs' Canadian enforcement action.  Dkt. 1646.  And if

there were any shortcoming in proof of current control by Donziger—and there is not—it would

be only because discovery for this case was generally cut off in or before July 2012 (Dkt. 721)

and Donziger now sees it convenient to paint a false narrative that he has been "separated and

severed" from the Ecuadorians (Dkt. 895-1 (Ex. 3501) at 30:6-25).

**B.     The LAPs Have Possession, Custody, or Control of the Ecuadorian Docu-
ments**

This Court has repeatedly held, with ample support, that the LAPs have control of the

Ecuadorian documents in the hands of their attorneys and agents.  Dkt. 787; Dkt. 101 in 11-cv-

---

[2]  Ex. 1 (4/16/2013 Hr'g Tr.) at 53 ("Q. Am I correct that since February 1, 2011 when this RICO case was filed, you've made 22 trips to Ecuador? A. Sir, I don't know how many trips I've made. As I previously testified, I travel roughly once a month to Ecuador. Q. You continue to do that since the filing of the RICO action? A. Roughly, yes, maybe a little less frequently as I just testified.").

3718; *see also* Dkt. 84 (11 Civ. 3718), at 9 ("Lawyers are agents for their clients.  Fajardo, Saenz and Prieto therefore are agents of the LAPs on that basis alone."); *id.* at 8 (finding that an "agent-principal relationship[]" between non-lawyer Yanza and the appearing LAPs has been "conclusively established.").  In its sanctions opinion, the Court found so again, rejecting Defendants' arguments to the contrary.  *See, e.g.*, Dkt. 1529 at 43.

First, the LAPs now claim the Court overlooked their objections in their discovery responses to production of documents in control of their attorneys and agents (Dkt. 1631 at 7-8).  This is incorrect.  The LAPs objected to the production of "documents in the possession, custody, or control of *other* Ecuadorian inhabitants of the Napo Concession area," or, in other words, documents in the possession of *other LAPs*.  Dkt. 616-2, Ex. 2 at 2 (emphasis added).  The LAPs did not object to production of documents in the possession of their attorneys and agents on the grounds of lack of control.  Instead, the LAPs asserted *privilege* over documents in the possession of "their legal agents or representatives . . . working on behalf of the Lago Agrio Plaintiffs in Ecuador."  Dkt. 616-2, Ex. 2 at 7; *id.* at 7-9.  This indicates control, not its absence.[3]

Second, the LAPs claim that the Court erroneously applied U.S. law in determining that the Ecuadorians are the LAPs' agents and in finding that the LAPs conceded this point.  Dkt. 1631 at 8.  But contrary to the LAPs' current claims, the LAPs' brief repeatedly acknowledged that the Ecuadorians at issue are their "lawyers and agents."  *See, e.g.*, Dkt. 950 at 1, 11.  And the LAPs previously raised their meritless objection to the application of U.S. agency law with the Court (*id.* at 6), so this is no basis for reconsideration.  The LAPs argue that Ecuadorian law prohibited the Ecuadorian lawyers from sharing a client's files with that client.  Dkt. 1631 at 7-9.

---

[3]  That the LAPs later claim that this should "not be construed as an admission of possession, custody, or control" of these legal materials (Dkt. 616-2, Ex. 2 at 9) is not an affirmative objection to control and conflicts with the claim of privilege.  Similarly, the LAPs' boilerplate objections to producing documents not in their possession, custody or control (*see, e.g.*, Dkt. 616-2, Ex. 2 at ¶ 22) cannot be stretched to read as specific objections to production of documents in the control of their Ecuadorian attorneys and representatives.

That incorrect position was also raised before the Court and rejected.  Dkt. 1529 at 45-47, 52-67.
The legal relationship between Fajardo, Donziger, and the LAPs is governed by their retainer
agreements.  Dkt. 965 at 9-10.  As Chevron's Ecuadorian legal expert made clear, those retainer
agreements are "the law between the contracting parties" and obligate Fajardo to provide docu-
ments at the LAPs' and Donziger's requests.  Dkt. 965 at 10.  Defendants' Ecuadorian legal ex-
perts did not address the retainer agreements, and thus Defendants have no basis to challenge the
law governing the attorney-client relationship here.[4]

       Third, Defendants complain that the Court makes too much of the selective provision of
documents by Fajardo and the other Ecuadorians to aid in Defendants' case, while refusing to
produce documents in response to Chevron's requests and this Court's orders.  Dkt. 1631 at 9.
Defendants claim the Court overlooked the distinction supposedly being drawn by Fajardo *et al*.
in producing non-privileged documents, but withholding documents subject to confidentiality or
privilege.  *Id*.  But this is incorrect.  The Court considered and properly rejected it.  Dkt. 1529 at
91-92.  The fact that Fajardo supplied Donziger with draft pleadings and other privileged work
product at Donziger's request when not subject to the Court's production order proves the point.
*See, e.g.*, Dkt. 966-1 Ex. 3603; Dkt. 966-7 Ex. 3630.  Moreover, this pattern is clear gamesman-
ship:  Defendants claim a lack of possession or control when it suits them, such as in the case of
the Zambrano recordings sought by Chevron (Dkt. 870), but then are able to obtain those same
documents when they seem useful—again as in the case of the Zambrano recordings (Dkt. 974).
And, just recently, Defendants produced a declaration from Milton Efrain Jaque Tarco concern-

---

[4]  The LAPs argue elsewhere that they should not be sanctioned for the supposedly independent actions of Fajardo
in refusing to produce the Ecuadorian documents under Ecuadorian law.  This ignores the LAPs' control over
Fajardo as their attorney and their independent right of access to the documents under the retainer agreement,
which the Court has already addressed.  Dkt. 1529 at 89 & n. 297 (citing Dkt. 355-32 (Ex. 1106) (Fajardo Re-
tainer Agreement) at 5 ("The Plaintiffs' files shall be and remain the property of the Plaintiffs.")).  Indeed, this
argument appears to be little more than a thinly veiled attack on the Court's impartiality:  Defendants argue that
the "Court cannot satisfy its displeasure with Mr. Fajardo . . . by meting out punishment against Camacho and
Piaguaje."  Dkt. 1631 at 20-21.

ing Judge Zambrano's computer (Dkt. 1601) after refusing to turn over any of Judge Zambrano's materials in anticipation of Judge Zambrano's deposition (Dkt. 1458).[5]

## II.    Defendants Refused in Bad Faith to Produce the Documents Ordered

This Court correctly held that Defendants willfully refused to comply with the Court's order to produce the Ecuadorian documents.  Dkt. 1529 at 80, 94.  Defendants did nothing of significance to secure the Ecuadorian documents other than send Fajardo letters that did not even request production of the documents.  Dkt. 1529 at 91.[6]  Indeed, rather than comply with their discovery obligations, Defendants and their counsel secretly initiated the collusive *Cordova* suit to frustrate this Court's authority.  Dkt. 1529 at 82-87.  That is bad faith.  Dkt. 1529 at 88 n.292 (citing cases).  Moreover, Defendants' actions are part of a broader pattern of discovery misconduct, *see, e.g.*, Dkt. 905 at 50, and "[s]anctions must be weighed in light of the full record in the case."  *Penthouse Int'l, Ltd. v. Playboy Enters., Inc.*, 663 F.2d 371, 388 (2d Cir. 1981).  Defendants do not point to any issue of fact or controlling law that the Court overlooked.  Defendants quibble only with the Court's findings about Defendants' misconduct.

Defendants misstate their obligation when they purport to defend their conduct by asserting that they did not "do nothing" or "tell the Court" they would do nothing to comply.  Dkt. 1631 at 15.  Defendants were required to do more than engage in a judicial charade.  Defendants

---

[5]  The LAPs also assert that their attorneys and agents face imprisonment if they disclose confidential or privileged material.  Dkt. 1631 at 9.  But, as the Court noted, Defendants did not present any evidence that their Ecuadorian attorneys could actually face prosecution.  Dkt. 1529 at 66; *see also Gucci Am., Inc. v. Curveal Fashion*, No. 09 Civ. 8458 (RJS)(THK), 2010 WL 808639, at *7 (S.D.N.Y. Mar. 8, 2010) ("[T]he Court cannot conclude that the prospect of significant hardship is anything more than mere speculation.").  And extensive evidence reflects that the Ecuadorian state is allied with the LAPs in defending this action, making prosecution unlikely even if merited.  *See* Dkt. 1483 at 8-13.

[6]  Defendants argue that they have requested documents from Fajardo on multiple occasions, Dkt. 1631 at 15-16, but even if this is so, it does not excuse Defendants' failure to comply with this Court's orders.  As the Court correctly found, "[t]here are myriad other ways defendants could have attempted to obtain the Ecuadorian documents" besides making doomed requests to Fajardo."  Dkt. 1529 at 89.  The LAPs could have intervened in the *Cordova* action (if they had notice of it), or "threaten[ed] to sue or fire Fajardo for his refusal to provide them with the documents so they could comply with this Court's order," given "that his refusal constituted a breach of his retainer agreement."  *Id.* at 89 and n.297 (citing Dkt. 355-32 (Ex. 1106) (Fajardo Retainer Agreement) at 5 ("The Plaintiffs' files shall be and remain the property of the Plaintiffs.")).

had an obligation to, in good faith, exhaust all options for compliance in an effort to fulfill the

Court's order. *See Titra Cal., Inc. v. Titra Film*, No. 98 CIV. 0234 (KMW) (FM), 2001 WL

1382587, at *5 (S.D.N.Y. Nov. 6, 2001). Doing anything less is bad faith. *Remington Prods.,*

*Inc. v. N. Am. Philips Corp.*, 107 F.R.D. 642, 653 (D. Conn. 1985) (behavior falling "far short of

the spirit of . . . [the] order" supports bad faith); *Davidson v. Dean*, 204 F.R.D. 251, 255

(S.D.N.Y. 2001). Despite Defendants' contention that "they did everything they could to com-

ply" with the Court's order (Dkt. 1631 at 16), that is not the case, as the Court found (Dkt. 1529

at 88-92). Donziger's sole act was to send Fajardo a letter that was "calculated to fail." *See*

*Linde v. Arab Bank, PLC*, 269 F.R.D. 186, 199 (E.D.N.Y. 2010); *In re Auction Houses Antitrust*

*Litig.*, 196 F.R.D. 444, 445-46 (S.D.N.Y. 2000) (holding that a party "certainly has not exhausted

the means at its disposal to procure a response" to a discovery request from a former employee

because the party merely asked for the information without doing anything more such as ceasing

payments to the employee or announcing that it would consider its indemnification obligation

unenforceable). As the Court recognized, the LAPs similarly failed to take meaningful steps to

comply, as they did nothing more than request the documents from Fajardo, despite having addi-

tional options including (i) intervening in the *Cordova* action to prevent entry of the injunction,

or (ii) threatening to sue or fire Fajardo for his failure to provide access to the documents as he

was contractually required. Dkt. 1529 at 89 & n. 297 (citing Dkt. 355-32 (Ex. 1106) (Fajardo

Retainer Agreement) at 5 ("The Plaintiffs' files shall be and remain the property of the Plain-

tiffs.")).

      The Court was also correct to find that Defendants acted in bad faith. Defendants argue

that the *Cordova* lawsuit was not collusive, but that is wrong. Defendants cannot dispute that (i)

the LAPs' counsel suggested to Fajardo to get an order from an Ecuadorian court "that says that

you . . . are barred from providing the documents without the permission of all your clients"
(Dkt. 1529 at 82); (ii) the *Cordova* suit began after one of Fajardo's own clients sued him, pre-
sumably at Fajardo's suggestion (*see* Dkt. 1529 at 82-83); (iii) Fajardo actually argued against
production of documents at the final *Cordova* hearing stating that it "it is obvious that constitu-
tional rights of the plaintiff and the other plaintiffs in the principal case [would be] violated" if
production were to occur (Dkt. 1529 at 84) (alterations in original); and (iv) Fajardo and Cordova
appealed the suit until they received the desired result, an order barring production, and then
stopped (Dkt. 894 at 17).  That is a collusive lawsuit under any definition.  *See, e.g.*, Black's Law
Dictionary (9th ed. 2009) (defining "collusive action" as "[a]n action between two parties who
have no actual controversy, being merely for the purpose of determining a legal question or re-
ceiving a precedent that might prove favorable in related litigation.").  Defendants again argue
that the *Cordova* suit was adversarial because Fajardo stated on the record that he had "decided
to hand over the information that Chevron is demanding" (Dkt. 950 at 14), but that argument was
already raised by Defendants and rejected by the Court (Dkt. 947 at 16-17; Dkt. 950 at 8-9; Dkt.
1529 at 85-87).  It does not take a "super appellate judge" to determine that Fajardo's statement
is inherently untrustworthy as it was contrary not only to Fajardo's other statements at the hear-
ing but to Fajardo's "long-held conviction" not to produce the Ecuadorian documents.  Dkt. 1631
at 16, 20.  There is no good faith basis for Defendants to claim that the *Cordova* action was any-
thing but collusive.  *See* Fed. R. Civ. P. 11.

In addition, Defendants' unsupported attempts to draw parallels between the secret, col-
lusive *Cordova* suit and Chevron's public and disclosed 1782 proceedings—*of which the LAPs
received notice and in which they participated*—are frivolous,[7] as are Defendants' irrelevant at-

---

[7]  *See, e.g.*, *Chevron Corp. v. Stratus Consulting, Inc.*, No. 1:10-cv-00047-MSK-MEH, Dkt. 30 (D. Colo. Mar. 29,
2010) (entry of appearance on behalf of the LAPs in the Stratus 1782 action).  Defendants also had notice of the

tempts to raise "surveillance" and "secret" actions by Chevron.  Dkt. 1631 at 19.  Defendants'

claims of inequitable treatment by the Court merit even less attention given the Court's efforts to

accommodate Defendants with extensions of time and other relief after the Court's deadlines

have passed.  *See, e.g.*, Dkt. 1384 at 1 (granting Defendants' extension requests even though

"there has been no serious showing that the requested extension is necessary"); Dkt. 1462 (grant-

ing Defendants an extension of time to file deposition designations); Dkt. 1486 at 7 (granting De-

fendants' motion for leave to add Judge Zambrano as a trial witness); Dkt. 1539 (allowing

Donziger to amend his witness list by adding 28 witnesses four days before the start of trial).[8]

## III.   Chevron Suffered Prejudice from Defendants' Willful Misconduct

The Court properly found that the documents Chevron seeks from Ecuador are "relevant,

perhaps vital, to Chevron's prosecution of this case" and unavailable through any other means.

Dkt. 1529 at 61-63.  Defendants' self-imposed blackout of discovery from Ecuador has denied

Chevron the opportunity to provide further direct proof of the fraud committed against it.  De-

fendants argue that Chevron does not need more evidence because it gained access to discovery

through the 1782 proceedings and because there is no longer an "impartial jury to hear this mat-

ter," only a Court that has provided "the smooth path unmeritorious cases travel on their way to

victory."  Dkt. 1631 at 21-22.  These disrespectful assertions are without merit.

First, Defendants argue that the Court erred by concluding that the information in the Ec-

uadorian documents could not be obtained by other means.  Dkt. 1631 at 11.  According to De-

fendants, Chevron has "every shred of paper and every kilobyte of data Donziger possessed" and

---

Calmbacher 1782 action, as Donziger attempted to prevent Dr. Calmbacher from testifying.  Dkt. 31-21 (Ex. 136) (Calmbacher Dep.) at 144:24-145:10.  *See also* 10/31/2013 Trial Tr. at 1268, 1270 (noting that Donziger retained Jeffrey Shinder to handle the Calmbacher 1782 proceeding).

[8]  Defendants also tacitly admit that they hid the *Cordova* action from the Court and Chevron until a decision had been reached, but attempt to excuse that failure by claiming disclosure would somehow have "obliterate[d] the attorney-client and common-interest privileges."  Dkt. 1631 at 18.  Defendants ignore their duty of candor to this Court.  *See Travel Sentry, Inc. v. Tropp*, 669 F. Supp. 2d 279, 286 (E.D.N.Y. 2009) ("As officers of the court, all attorneys conducting discovery owe the court a heightened duty of candor.").

Donziger, as the "head" of the litigation, "would have been involved in everything that happened in Ecuador and there would be no relevant documents Chevron has not already received."  Dkt. 1631 at 11-12.  But Donziger did not come close to producing all of the documents and material he possessed during the relevant time period.  For example, Donziger failed to disclose at least 8 email addresses and to produce more than 65 external storage devices that were connected to his computers, the content of which could not be found.  Ex. 6 (4/26/11 letter in Donziger 1782); Dkt. 356-11 (Ex. BA) at ¶ 23.[9]  Moreover, Donziger's documents do not reflect the complete picture of the fraud.  In criminal organizations, there are "buffers" between the individuals actually on the ground, for example, paying bribes (like Ximena Centeno, a low-level Selva Viva employee) and the managers who decide those bribes are to be paid (like Donziger).  Dkts. 746-3–746-6 (Ex. C) (Guerra Decl.), ¶ 14 & Attachments K, L, M, & N; Dkt. 763-7 (Ex. 3290) (Ecuadorian records for Ximena Centeno matching her to the cedula number that appears on the deposit slip in Attachment N to the Guerra Declaration).  Documents from individuals in Ecuador would reveal the action on the ground that Donziger directed from the United States.  Donziger also took pains to avoid using written communication and to use code names in discussing sensitive subjects.[10]  The Ecuadorian documents would shed further light on Donziger's secretive communications by providing additional context from other individuals, even if Donziger were

---

[9]   Donziger has admitted under oath that he has no idea what happened to external storage devices that likely contain material responsive to Chevron's discovery requests.  *See, e.g.*, Ex. 7 at 3700:15-23 ("Q. And is it your testimony as you sit here today that you have no specific recollection of what you did with that flash drive after you used it a few weeks ago? … A. That's correct.")

[10]  *See, e.g.*, Dkt. 755-1 (Ex. 3206) (On February 5, 2010, the same day Selva Viva employee Ximena Centeno deposits $1,000 into Alberto Guerra's bank account, Donziger writes Fajardo "Are you available?"  Fajardo replies, "Call me at the number 089543018."); Dkt. 31-11 (Ex. 126) (Fajardo explained that it was "urgent" that the RICO Defendants "coordinate" with Petroecuador "so they will desist [remediating] until we've had a chance to extract the evidence we need."  In response, Donziger cautioned Fajardo to "[b]e careful with written letters—informal and oral meetings are better[.] [W]e don't want Texaco to use some letter to say we are obstructing remediation."); Dkt. 400-1 (Ex. 2010) (Donziger Dep. Tr.) at 3822:12-3824:8 (Donziger testifying that Fajardo's code words "the cook," "the waiter," and "the other restaurant" referred to the judge, Cabrera, and Chevron, respectively); Dkt. 402-13 (Ex. 2315) (DONZ00043514) (email from Fajardo instructing Donziger to use the code name "Lagarto 3" in communications regarding the global damages assessment).

not directly involved in precursor or follow-up activity.

New evidence further supports the conclusion that the Ecuadorian documents would have helped Chevron's case at trial.  For example, Spencer Lynch testified that having access to Saenz's computer and the documents on it would have helped him track down the location of drafts of the Cabrera report and also drafts of the judgment.  10/21/13 Trial Tr. at 638.  Additionally, Dr. Robert Leonard testified that having access to the Ecuadorian documents would have assisted him in analyzing whether the judgment contained further copying of Defendants' internal work product.  10/21/13 Trial Tr. at 667.

Second, Defendants argue that "the Court overlooked that Chevron can obtain the information it seeks directly from Mr. Fajardo and his colleagues in Ecuador through letters rogatory."  Dkt. 1631 at 12.  But to receive discovery under letters rogatory, Chevron would have to receive the voluntary cooperation of the Ecuadorian state.  *Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co.*, 841 F. Supp. 2d 769, 777 (S.D.N.Y. 2012) (citations and internal quotation marks omitted) ("[T]he . . . enforcement of letters rogatory by U.S. and foreign courts rest[s] entirely upon the comity of courts toward each other.").  There is no reasonable prospect of that occurring.  As an initial matter, "there is no assurance that letters rogatory would produce the required [discovery] as Ecuador is not a signatory to the Hague Convention on the Taking of Evidence Abroad."  *Valarezo v. Ecuadorian Line, Inc.*, No. 00 CIV. 6387(SAS), 2001 WL 740773, at *4 (S.D.N.Y. June 29, 2001).  Moreover, as the Court found in February, "the Republic of Ecuador is an avowed supporter of the LAPs."  Dkt. 843 at 25.  Chevron has presented extensive evidence that Defendants and the Ecuadorian government have only strengthened their ties and their campaign against Chevron in recent months.  Dkt. 1483.[11]  For example, on October 15,

---

[11]  The case of *Ings v. Ferguson*, 282 F.2d 149 (2d Cir. 1960), cited by Defendants, is no longer representative of the Second Circuit's view on compelling production of materials in a foreign country.  *See, e.g., Minpeco, S.A.*

2013, Ecuador passed a resolution effectively naming Chevron an enemy of the state.  Ex. 8 (National Assembly resolution "establish[ing] an Ad Hoc Specialized Commission . . . to audit and monitor the actions of the multinational company Chevron-Texaco in Ecuador" and "urg[ing] citizens, private companies and the media to act in accordance with the highest interests of the Ecuadorian State" against Chevron).[12]

Finally, Defendants argue that Chevron cannot suffer prejudice from their lack of production because this Court is biased in Chevron's favor.  *See, e.g.*, Dkt. 1631 at 21 ("Now that Chevron and the Court have, over Defendants' objections, dispensed with the possibility for an impartial jury to hear this matter, the suggestion that Chevron's ability to try its case is somehow handicapped or impaired because Mr. Fajardo and his Ecuadorian colleagues will not provide Chevron with their privileged litigation files is ridiculous.").[13]  Defendants' familiar and disrespectful refrain is unworthy of officers of the court.

## IV.  The Court Imposed Reasonable Sanctions Merited by Defendants' Misconduct

This Court exercised restraint in imposing sanctions, "declin[ing] to impose the harshest of [the sanctions Chevron requested] notwithstanding defendants' obdurate and quite possibly contemptuous refusal to comply with their discovery obligations."  Dkt. 1529 at 95.  The Court decided only (i) to strike the LAPs' personal jurisdiction defense if they did not produce relevant

---

*v. Conticommodity Servs., Inc.*, 116 F.R.D. 517, 521 (S.D.N.Y. 1987).  *Ings* is also distinguishable because the foreign nation had a procedure in place to effectuate compliance with letters rogatory, 282 F.2d at 151-52, unlike Ecuador, *see Valarezo*, 2001 WL 740773, at *4.

[12]  In addition, President Correa and his collaborators call Chevron, and anyone who would aid it in exposing the fraud, "traitors," "criminals" and "enem[ies] of our country" who are "conspir[ing] against the Government," "giving ammunition to [Ecuador's] international enemies," and waging a "criminal campaign" against Ecuador (Dkt. 1451-8 (Ex. 4207); Dkt. 1484-1 (Ex. 4401); Dkt. 1451-7 (Ex. 4206)).  These efforts target Chevron's witnesses in this action in an attempt to intimidate them into not testifying.  *See* Dkt. 1483 at 9-10 (discussing intimidation of Dr. Alvarez).  In furtherance of this pressure campaign, Defendants share materials with the Ecuadorian government, including confidential documents Chevron produced in this action subject to the protective order.  Dkt. 1483 at 6-8; Dkt. 1503 at 3.

[13]  Indeed, Donziger recently repeated the accusations of bias in a radio interview on October 26, 2013, declaring that Defendants' efforts are "ultimately, I think, a losing proposition, because the judge, I think, has already made up his mind."  Ex. 9.

documents by October 24, 2013, while still allowing them to adduce evidence on this point at

trial; and (ii) to hold open the possibility of imposing adverse inferences and precluding the in-

troduction of limited Ecuadorian documentary evidence in appropriate circumstances.  *Id.* at 95-

104.  Defendants offer a litany of arguments against the limited sanctions.  Dkt. 1631 at 1, 23,

24.  But these sanctions at most put Chevron in the position that it would have occupied had it

received the Ecuadorian discovery.  Defendants present no new legal arguments or facts suffi-

cient to justify reconsideration of the Court's measured decision.

### A.    The Court Properly Struck the LAPs' Personal Jurisdiction Defense

The LAPs object to the treatment of their personal jurisdiction objections and defense on

two related levels.  First, the LAPs claim that the Court "erred in its facts" in finding that the

LAPs waived their personal jurisdiction objection to discovery.  But that finding was immaterial,

as the Court made clear:  "[E]ven if [the LAPs] properly and timely had argued that the Court

lacked the power to compel them to produce documents because it did not have personal juris-

diction over them, the Court would have rejected that argument."  Dkt. 1529 at 48.  As the Su-

preme Court held in *Insurance Corporation of Ireland v. Compagnie des Bauxites de Guinee*, a

party before the court cannot refuse to obey an order to permit jurisdictional discovery on the

grounds of lack of jurisdiction.  *Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S.

694 (1982).  There, the defendants argued that imposition of jurisdictional sanctions under Rule

37 would violate due process and "that until a court has jurisdiction over a party, that party need

not comply with orders of the court; failure to comply, therefore, cannot provide the ground for a

sanction."  *Id.* at 695-96.  The Supreme Court rejected these arguments, finding that defendants

were attempting to complicate what was a "straightforward matter."  *Id.* at 696.  Analogizing the

imposition of jurisdictional sanctions to the striking of a personal jurisdiction defense under Rule

12 for failure to timely raise the objection, the Court held: "The failure to follow [procedural]

rules may well result in a curtailment of [the right to assert a personal jurisdiction defense]." *Id.*
at 705.  Accordingly, as the Court here found, even if the LAPs had maintained their objection,
that would not "justify the [LAPs'] refusal to produce documents to Chevron."  Dkt. 1529 at 49.
The law is clear that sanctions can be imposed against the LAPs for obstructing discovery into
whether personal jurisdiction exists over them regardless of whether such personal jurisdiction
has been established.  Dkt. 1529 at 70-71 (citing *Ins. Corp. of Ir.*, 456 U.S. at 706).  Whether the
LAPs preserved their personal jurisdiction objection is immaterial to their being sanctioned
here.[14]

In any event, the LAPs are incorrect in claiming that they did not waive their jurisdiction-
al defense to the discovery at issue here.  Regardless of whether the LAPs may have raised their
objections in other settings, the Court correctly found that the LAPs did not raise the objection in
their opposition to Chevron's motion to compel, or during the three day sanctions hearing.[15]  Dkt.
1529 at 47-48.

Second, the LAPs claim that the Court "struck Camacho and Piaguaje's valid personal ju-
risdiction defense" as "an improper and unwarranted sanction that overlooks the facts and con-
trolling law presented in Defendants' motion to dismiss for lack of personal jurisdiction."  Dkt.
1631 at 22.  As an initial matter, the "facts and controlling law" that are important to the current
motion are Defendants' misconduct in withholding the Ecuadorian documents and the Supreme

---

[14]  Defendants attempt to distinguish the cases the Court cited in finding the LAPs waived their personal jurisdic-
tion objection as to the discovery requests.  Dkt. 1631 at 5-6.  But even if those cases were distinguishable (and
presumably the Court found they were not), the issue is moot.  As discussed, the Court held that even if the
LAPs had maintained their objection, that would not "justify the [LAPs'] refusal to produce documents to
Chevron."  Dkt. 1529 at 48-49 (citing *Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694
(1982)).
[15]  While the LAPs may have made a boilerplate personal jurisdiction argument in other pleadings, at the sanctions
hearing they were given an opportunity to present evidence in support of it and failed to do so.  Their silence on
what they now paint as a critical issue speaks volumes, particularly because Javier Piaguaje himself testified at
the hearing and could have articulated exactly why the Court allegedly does not have jurisdiction over him.
Ex. 10 (4/17/2013 Hr'g Tr.) at 216.

Court's decision in *Insurance Corporation of Ireland*, not the law and facts in Defendants' motion to dismiss.  In any event, the sanctions here are also proper and warranted, and Defendants raise no real issue of fact or law to the contrary.  The LAPs and their counsel—whom the LAPs chose and still choose to represent them—engaged in bad faith conduct, and a sanction for that misconduct is just.  The LAPs cannot walk away from the actions taken in their name by their attorneys.  *Metro. Opera Ass'n, Inc. v. Local 100, Hotel Emps. & Rest. Emps. Int'l Union*, No. 00 Civ. 3613 (LAP), 2004 WL 1943099, at *25 (S.D.N.Y. Aug. 27, 2004) ("litigant chooses counsel at his peril, and . . . counsel's disregard of his professional responsibilities can lead to extinction of his client's claim"); *Frummer v. Hilton Hotels Int'l*, 19 N.Y.2d 533, 538 (N.Y. 1967) (holding that where a party "receive[d] considerable benefits from" its agents' activities, it "may not be heard to complain about the burdens").[16]

Moreover, the sanction here is also closely tied to the LAPs' misconduct.  In *Insurance Corporation of Ireland*, the Supreme Court affirmed the district court's striking of a personal jurisdiction defense for the failure to provide required jurisdictional discovery.  The Court found that jurisdictional sanctions were specifically related to the misconduct at issue because "[h]aving put the issue [of personal jurisdiction] in question, [defendants] did not have the option of blocking the reasonable attempt of [plaintiff] to meet its burden of proof."  *Ins. Corp. of Ir.*, 456 U.S. at 709.  Applying this reasoning, this Court found that a sanction striking Defendants' personal jurisdiction defense was warranted because, in part, "the documents Chevron seeks

---

[16]   Moreover, the personal jurisdiction sanction here is not "severe" as Defendants claim.  The LAPs were given the opportunity to produce documents by October 24 to avoid having their defense struck, and the Court is still permitting the LAPs to introduce any evidence of their personal jurisdiction claim at trial.  Dkt. 1529 at 98. Given the misconduct at issue here, much stronger sanctions were justified.  *See Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1064 (2d Cir. 1979) (plaintiff's grossly negligent failure to produce discovery justified preclusion of all evidence related to damages even though sanction was "tantamount to a dismissal" of plaintiff's claim).

from the Ecuadorian attorneys and associates include material that goes to the question of this Court's personal jurisdiction over the LAP Representatives." Dkt. 1529 at 97.

### B.    The Court's Preclusion and Adverse Inference Sanctions Are Limited and Appropriate

Defendants argue that preclusion and adverse inference sanctions are unwarranted because Defendants did not act in "bad faith" or with a "culpable state of mind." Dkt. 1631 at 23. Bad faith is not required. *Auscape Int'l v. Nat'l Geographic Soc'y*, No. 02 Civ. 6441(LAK), 2003 WL 134989, at *6 (S.D.N.Y. Jan. 17, 2003). And, in any event, Defendants' bad faith is clear. *See* Section II *supra*. In addressing this same argument by Defendants, the Court properly found that "[w]here, as here, a party actively seeks legal impediments to justify its non-production, selectively determines when it will produce documents and when it will not, and continues to assert objections to discovery that long have been rejected, that party has willfully and culpably failed to produce evidence and an adverse inference instruction is warranted." Dkt. 1529 at 100 (citations omitted). Defendants raise no serious basis to reconsider that finding.

Moreover, after finding that "[i]t would be entirely appropriate given the circumstances to prevent defendants from introducing at trial" the Ecuadorian documents, the Court "decline[d] to preclude defendants from introducing documents they may or may not seek to introduce at trial." Dkt. 1529 at 103-04. Instead, the Court is proceeding on a document-by-document basis as Defendants may attempt to introduce Ecuadorian documents (*id*. at 104), which grants Defendants the opportunity to pursue admission despite their willful misconduct. There is no presumption of exclusion for any document, merely the possibility of a targeted future sanction that may or may not come to pass.

## V.    The Court Properly Considered International Comity

The Court properly found that, even assuming *arguendo* that Ecuadorian law and the

*Cordova* decision barred Defendants' Ecuadorian attorneys and agents from providing the Ecuadorian documents, the Court still could impose sanctions on Defendants for violation of the Court's orders. Dkt. 1529 at 45-67. In addressing comity, the Court conducted the "particularized analysis of the respective interests of the foreign nation and the requesting nation" required by *Societe Nationale Industrielle Aerospatiale v. United States District Court for the Southern District of Iowa*, 482 U.S. 522 (1987). The Court found that the comity analysis favored the application of U.S. law in light of the importance of the Ecuadorian documents to this litigation, the specificity of Chevron's requests, the fact the documents could not easily be obtained from other sources, the U.S. national interest in the case (which outweighs that of Ecuador), and the lack of hardship of compliance. Dkt. 1529 at 47-67. As above, Defendants present no new legal arguments or evidence sufficient to justify reconsideration of the Court's careful and thorough analysis.

Defendants primarily argue that the Court erred in its comity analysis because the information in the Ecuadorian documents could be gained through other sources. That argument is baseless as set forth in Section III *supra*. Defendants' other argument is likewise without merit: the Court did not err in finding that U.S. interests outweigh those of Ecuador as Defendants contend. Dkt. 1631 at 13. Putting aside Defendants' claim that they are being denied "full[] and fair[]" adjudication due to the Court's prior rulings on the scope of discovery, Defendants' only claim is that there is a "lack of any U.S. interest in applying the civil RICO statute to overseas conduct." Dkt. 1631 at 13. However, the principal conduct here is not overseas. Indeed, the Court emphasized the extent to which the scheme here is the work of a New York lawyer, who described himself as being at the "epicenter" of the case. Dkt. 1529 at 31-42 (Donziger "initiated the Lago Agrio litigation, put together the legal teams in Ecuador and the United States, con-

20

trolled the funding and managed the litigation strategy, and controlled at least to some degree the salaries of the Ecuadorian lawyers").

Moreover, the Court properly found that the U.S. has a strong national interest in enforcing RICO and other laws against a U.S.-based attempt by a U.S.-based lawyer to extort a U.S. company.  Dkt. 468 at 14 ("[I]t is very unlikely that Congress had 'no concern' with the conduct of the affairs of foreign enterprises through patterns of racketeering activity, at least if the prohibited activities injured Americans in this country and occurred here, either entirely or in significant part.").[17]  *Minpeco, S.A. v. Conticommodity Servs., Inc.*, 116 F.R.D. 517, 523-24 (S.D.N.Y. 1987) ("[I]t is difficult to imagine a private commercial lawsuit which could be more infused with the public interest" than one which alleges RICO violations).  Defendants do not put forth any meaningful countervailing interest of Ecuador in denying Chevron the opportunity to fully investigate the fraud being committed here.[18]

## CONCLUSION

For the forgoing reasons, Chevron respectfully requests that the Court deny Defendants' motion for reconsideration.

Dated:  November 4, 2013                    Respectfully submitted,
New York, New York

                                            */s/ Randy Mastro*
                                            Randy M. Mastro
                                            Andrea E. Neuman

---

[17]  Defendants' citations to cases about attempts to apply RICO extraterritorially are inapposite here, as this Court already held in ruling on Donziger's motion to dismiss.  Dkt. 468 at 11-12.  As this Court correctly held, this is a case about a New York lawyer who directed an enterprise from the United States to harm an American plaintiff.  *See, e.g.*, *id.*; Dkt. 905 at 12-13.

[18]  Any purported interest Ecuador may have in protecting its citizens from foreign discovery would be insufficient.  *See, e.g.*, *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1775, 2010 WL 2976220, at *2 (E.D.N.Y. July 23, 2010) ("The South African interest in enforcing the blocking statute at issue here, on the other hand, is entitled to less deference since it is not a substantive rule of law at variance with the law of the United States, but rather one whose primary purpose is to protect its citizens from discovery obligations in foreign courts.").

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Telephone: 212.351.4000
Facsimile:  212.351.4035

William E. Thomson
333 South Grand Avenue
Los Angeles, California 90071
Telephone: 213.229.7000
Facsimile:  213.229.7520

*Attorneys for Plaintiff Chevron Corporation*