Exhibit A

Exhibit A

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHEVRON CORPORATION,<br><br>               Plaintiff,<br><br>     v.<br><br>STEVEN DONZIGER *et al.*,<br><br>               Defendants. | 11-CV-0691<br><br><br>The Honorable Lewis A. Kaplan, U.S.D.J.<br>The Honorable James C. Francis, U.S.M.J. |

## FINAL DIRECT TESTIMONY OF STEVEN DONZIGER

I, STEVEN DONZIGER, under penalty of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, declare:

## I.      NO FURTHER WAIVER

I challenge at the most fundamental level the legitimacy of this proceeding and the appropriateness of the Court's decision to take this case to trial despite the profound foundational problems we have identified in briefing.  This Court's bias against me and my Ecuadorian clients has been meticulously documented in various filings before Your Honor and before the Second Circuit Court of Appeals.  Nonetheless, I have done my best to prepare a statement that addresses what I see as the key allegations against me.  I have tried to ignore the avalanche of gratuitous allegations from Chevron clearly not tied to any claim for relief.  The information in this statement, as well as any information not included in this statement, should not be interpreted as a waiver of any argument or position that the Donziger Defendants have with respect to Chevron's allegations either in this case or in any related litigation in any jurisdiction at any

time.  Additionally, I am cognizant that I am testifying in the context of a series of rulings on the waiver of attorney-client privilege and attorney work product with respect to my confidential communications with and advice to my clients and my core mental impressions and strategies as an attorney.  Because Chevron's case is largely founded on documents subject to waiver of these privileges, over my objections, at this point I can only substantively address its allegations by addressing material that I would ordinarily consider privileged and confidential.  By responding to the way Chevron has used this material, I do not in any way intend to waive my objections based on attorney client and work product privileges.

## II.      PERSONAL BACKGROUND

1.      My name is Steven R. Donziger.  I am a member of the bars of the State of New York, the District of Columbia, the Southern District of New York, and the Second Circuit Court of Appeals.  I graduated from Harvard Law School in 1991.   I am aware of no ethics complaint filed against me since I became a lawyer.

2.      Before attending law school, I worked as a journalist for United Press International in Washington, D.C. (1983 to 1984) and in Nicaragua, where I lived from 1984 to 1987.  During my time in Nicaragua, I wrote numerous articles as a free lance journalist that were published in newspapers such as The Atlanta Constitution, The Toronto Star, and The Christian Science Monitor.  During that time, I also covered news events in several Latin American countries, including in El Salvador, Costa Rica, and Mexico.  I became fluent in Spanish and familiar with some of the many cultures in Latin America.

3.      Upon graduation from law school, my legal and policy work focused primarily on assisting persons who lack means and power to achieve accountability for wrongs done to them.

From 1991 to 1993, I served as a lawyer in the office of the District of Columbia Public Defender Service. I mostly represented juvenile defendants and handled approximately 40 cases.

4. From 1993 to 1995, I worked as the executive director of the National Criminal Justice Commission, a non-profit project of the National Center On Institutions and Alternatives based in Alexandria, VA. As part of this work, I edited a book published in 1996 by HarperPerennial, *The Real War On Crime*. The book analyzed U.S. criminal justice policy and practice and recommended reforms. Members of the Commission included Edward Levi, former Attorney General of the United States; Professor James Vorenberg, former Dean of the Harvard Law School; Elaine Jones, Director of the NAACP Legal Defense Fund.; Professor Norval Morris, a former Dean of the University of Chicago Law School; and Professor Charles Ogletree, now the Jesse Climenko Professor of Law at Harvard Law School.

5. From 1995 to 1997, I worked as an associate at the law firm of Kostelanetz & Fink in New York City. From 1997 to 1999, I worked as an associate at the law offices of Gerald B. Lefcourt in New York City. Since 1999, I have worked as a solo practitioner with a primary focus on providing advice to the indigenous and farmer communities in Ecuador's rainforest, and their representatives. I have worked on a small number of cases other than the Ecuador matter since 1999.

6. This affidavit is neither comprehensive nor exhaustive. It covers highlights of events that took place over a two-decade litigation that have generated millions of legal documents; many thousands of personal emails; and engaged some 2,000 lawyers and legal personnel for the defendant, Chevron Corp., and its predecessor company, Texaco. Due to resource limitations, I have not personally reviewed all of these documents and emails for purposes of either this declaration or the RICO litigation. I have not personally reviewed the

transcripts from all 19 days of my deposition testimony related to this matter. Nor have I had time to review the entire universe of Chevron's exhibits for the RICO trial. I do not remember everything I did or what happened over the course of my involvement in the *Aguinda* matter. The events herein are based on my recollection as it exists today, occasionally refreshed by my review of a limited number of documents.

### III.    THE AGUINDA CASE

7.      It is my belief that the judgment in the *Aguinda* case is valid and represents a profound historical accomplishment of indigenous and farmer communities in securing justice for wrongs inflicted upon them by one of the most powerful corporations on the planet. As explained herein, it always has been my belief, based on valid scientific evidence, that Chevron (operating through Texaco) deliberately discharged billions of gallons of toxic waste into Ecuador's rainforest as a cost-saving measure; that the dumping violated laws in place at the time in Ecuador as well as Texaco's operating agreement with Ecuador's government; that it violated oil industry norms and customs extant at the time; and, that the dumping resulted in grave harm and even death to thousands of innocent people, poisoned sections of the rainforest ecosystem, and contributed greatly to the devastation of the cultures of indigenous groups.

8.      It is my belief that this RICO case also presents profound and potentially historic implications, albeit of a very different and disturbing sort. The Gibson Dunn law firm was retained by Chevron in the fall of 2009, shortly after the firm had "turned the tables" on U.S. lawyers for foreign plaintiffs in a case in state court in California by accusing the lawyers (and their clients) of a "massive scheme" of "fraud." That case involved many of the hallmarks we have seen here: armies of private investigators, use of secret John Doe witnesses, personal attacks on the lawyers for the plaintiffs, abuse of the discovery process, and other features of

what I fear is fast becoming a new "playbook" for corporate America about how to deal with human rights claims—and human rights lawyers—regardless of the merits of the dispute. I believe this case is an exercise in retaliation for my having assisted in the winning of a verdict against Chevron—in the forum Chevron chose. Especially if Gibson Dunn proves that civil RICO can be used as a tool in this "turning tables" strategy, I worry that a whole generation of legitimate human rights advocacy like the *Aguinda* case in Ecuador will be confronted with this brand of attack.

9.     This matter has been fueled in significant part by this Court's decision to order a film director to turn over his outtakes and to give Chevron unfettered access to my confidential and attorney-client privileged documents and communications. Chevron's subsequent use of some of this material has been intentionally deceptive and misleading, as outlined in my counterclaims and other filings. For example, Chevron has constantly quoted one of my statements from the outtakes that "this is not a legal case, this is a political battle that's being played out through a legal case," leaving out the immediately following words: ". . . ***and all the evidence is in***. I mean the judge can easily find that we can win this case based on what's in right now, what Texaco's admitted to." Such misleading, incomplete, and out-of-context use of the outtakes and my documents is replete throughout Chevron's briefing in this and other 1782 cases—and throughout the trial record. Even worse, Chevron's response to this challenge to its use of the material has been to heighten the level of deception. For example, in my counterclaims I objected to the Chevron's use of an outtake to argue that I "boasted" that, unlike in the United States, "the 'game' is 'dirty' and there are 'almost no rules' in Ecuador." By quoting the fuller transcript, I showed that I was specifically talking about the "dirty" manner in which Chevron was trying to play the game and that my remarks were motivated by our sincere

5

belief at the time that Chevron had corrupted a judge. As we have demonstrated to the Court, Chevron responded by professionally video-editing the outtakes to remove, in a way that is barely noticeable to the viewer, my references to our fears of Chevron's corruption, and submitting these edited outtakes to the Court as true and correct copies. This is tampering with evidence, pure and simple. Because our side has such limited resources, we are to this day still uncertain of how many other instances of tampering exist.

10.     The lead lawyer in the Ecuador case from 2005 until the present has been Pablo Fajardo. Mr. Fajardo is the sole representative of the named plaintiffs before the Ecuador court. I served on the case at the pleasure of the plaintiffs and their representative. I work for them; they do not work for me. While I did play a significant role in Ecuador on the *Aguinda* case as an advisor to the Ecuadorian legal team, I never appeared in court in Ecuador, am not certified to practice law in Ecuador, and never signed a pleading in Ecuador. I never reviewed the vast majority of pleadings that the plaintiffs submitted to the Ecuador court. I believe generally that my clients listen to my advice, but they often do not take my advice.

11.     I believe the Ecuador communities hired me because of a broader set of skills related to advocacy for the disadvantaged. I believe they also hired me, in part, because of my ability to motivate people to work under extraordinarily difficult circumstances, even when the odds seem stacked against us. I also believe I was hired for, or have brought to the case, a strategic approach with respect to issues of public perception and power dynamics that are undeniably key aspects of a high-profile litigation on behalf of disadvantaged groups such as indigenous nationalities in Ecuador. At the end of the day, it may be that the core value I have brought to the Ecuador case has been my commitment to constantly push back even as we face

from Chevron what I believe could be the most well-funded corporate retaliation campaign in history.

12. The broad-based advocacy approach used by the plaintiffs in the Aguinda case is grounded in fundamental political rights guaranteed by the Ecuadorian Constitution and international human rights treaties. To the extent that vindication of such rights requires activity beyond the customary practices of the legal profession, such as public demonstrations and other direct public advocacy, this is a reality that has always faced groups seeking social change or justice that runs against the interests of entrenched power structures. This is no longer a controversial proposition in the U.S. legal community, nor in legal academic literature. It is certainly what I learned studying law and human rights advocacy at Harvard, and my understanding is that it is essentially embedded in the human rights legal education in many of our nation's top law schools and law school clinics.[1]

13. When representing persons who historically have been denied access to justice, as the indigenous groups in Ecuador's Amazon have been for centuries, I believe it is critical that advocates consider multi-dimensional approaches to ensure fair treatment for their clients. This includes working not only in court, but through the media, through popular protest, through direct advocacy with influential members of society, and by educating elected representatives to ensure that the right to a fair trial as guaranteed by law is respected. The goal in the *Aguinda* case was never to politically influence the legal process, but to safeguard that process from corrupt activities on behalf of Chevron such that the right to a fair trial for our clients would be protected. The irony is that my state of mind throughout the Ecuador phase of the *Aguinda* litigation was affected greatly by my observations of Chevron engaging in the exact same types

---

[1] *See* DX 1704-1705.

of out-of-court advocacy efforts, including meetings with government officials in Ecuador and the U.S., the use of paid advertisements to attack Ecuador's court process and the plaintiffs, and the use of numerous public relations firms to propagandize on behalf of the company.   In my mind, and in contrast to our approach, Chevron tried to leverage these advocacy efforts to quash the ability of the affected communities in Ecuador to access the justice system and be accorded fair treatment, and were thus improper.   But watching Chevron's deployment of these tactics reinforced in my own mind that our similar efforts were both legitimate and critical to the advocacy on our side of the case.[2]

14.     During part of the time the case was being litigated in Ecuador, I made notes reflecting my thoughts and impressions in a series of electronic files that were turned over to Chevron under court order.   Chevron has sought to characterize these notes as my "diary."   I don't consider these notes to be a "diary," but in any event, I wish to clarify.   In these notes, I recognized that the litigation in Ecuador was unprecedented and could someday make for an interesting and educational book or memoir that would share lessons for other human rights advocates.   I never saw these personal notes as a complete or accurate re-telling of the facts as they were happening in Ecuador.   I typically wrote the notes on airplane trips to and from Ecuador.  The notes were designed to help remind me of details later, if I were to write a book.[3]

15.     I believe my notes reflect that I always believed in the bona fides of the underlying evidence.   Generally, they show an American lawyer in a foreign jurisdiction struggling in good faith under difficult, complicated, and entirely unprecedented circumstances to advance the interests of his clients based on competent evidence.   I did make errors along the way but they were not unusual for any lawyer involved in a two-decade litigation.  More

---

[2] *See* DX 773-789; DX 790-795; DX 798-810; DX 813-815; DX 817; DX 820-827.
[3] *See* DX 1306.

importantly, any errors I made were inconsequential relative to the strength of our case on the merits and were addressed fully by the courts in Ecuador.

16.     Other than the *Aguinda* case, I have nothing other than passing familiarity with any other litigation in Ecuador.   I have never been the "procurador comun" (or the lead lawyer) on the Aguinda case in Ecuador.  Many of the emails or outtakes used by Chevron do not reflect the nuanced reality of my role in the case.  As I wrote in my personal notes, "as close as I feel to Luis [Yanza] and as much as I feel he appreciates me as a friend and colleague, I know his first loyalty is to his people and that they could dump me … at anytime."  This has always been the fundamental truth of my participation in the case.

17.     My overriding concern throughout the Ecuador trial was that Chevron was trying to corrupt and delay the proceedings because it was obvious from the beginning that the evidence was such that we could easily meet our burden of proof.   The litigation strategy of the plaintiffs in Ecuador was predicated to a great degree on dealing with what we regarded as Chevron's improper strategy.  This required us to take lawful steps that we felt were necessary to ensure that our clients would receive a fair trial based on competent evidence.   I believed that if the Ecuadorian communities received a fair trial, there was no doubt they would win the case, based on the facts and the law as I understood both to be.  My fear that Chevron was trying to corrupt the trial shaped my strategic outlook, and helps explain many of my comments and actions.   I had a good faith basis for this belief, as explained below.

18.     The belief that I and my colleagues were fighting to neutralize Chevron's corruption, to ensure the fundamental right to a fair trial for our clients, is corroborated by numerous contemporaneous statements on the Crude outtakes and in my personal notes, such as:[4]

---

[4] *See* DX 1306; DX 679-699.

- "[A]ll Texaco has to do, if you think about it, all they have to do is get the court to do nothing. That's easy. We have to get the court to act in a way no court has ever acted before in Ecuador. That's hard. They work the back scenes. . . . [S]uddenly there's, like, a paralysis in the court. You know, and we're stuck."

- "[W]e believe that the judge is trying to stall the case until the end of the year, until the new guy comes in . . . . [B]ut it goes way beyond the problem of any individual judge, [be]cause it's possible the next person could come in . . . and not want to deal with it and do the same."

- "There are just too many obstacles . . . the obvious friendly ties of the judge and his staff to the Texaco lawyers"

- "We are winning on the proof, but we are losing the larger war because of time . . . . You are fighting constantly to not let that fire burn out."

- "I have that depressing, sinking feeling again that the awesome power we are up against keeps growing more daunting . . . . [Chevron] always has the power to just crush us with time."

- "Our phone and electricity will be cut off this week.  We have received no money since November.  LY [Luis Yanza] feels the brunt of the pressure from creditors, the brunt of the pressure from base communities, and the brunt of the pressure from staff who have not gotten paid."

- "They want to drag it out…T[exaco] prefers delay. Run numbers. Make at least 300m[illion] per year, pay lawyers 10m[illion] a year – with this rate of return they want to keep it going forever."

19.    I also believe that Chevron's management does not believe the case is a fraud based on various settlement discussions that have taken place between the parties. There have been several attempts by Chevron to settle or mediate the *Aguinda* litigation.  Chevron initiated the first settlement discussions of any significance in March 2007, which culminated in a two-day mediation in November of that year overseen by an outside mediator.   The contacts continued for a number of weeks.   This mediation took place after most of the judicial inspections had been completed in Ecuador and the vast majority of scientific evidence had been presented to the court.  A second attempt at settlement occurred in February 2009 at the offices

of Jones Day in San Francisco.  A third attempt occurred in 2012 when Chevron's General

Counsel, R. Hewitt Pate, initiated contact with our side via an intermediary.

### A.      My Introduction To The Case

20.      I first became involved in the Ecuador litigation in the Spring of 1993.  In April of

that year, I took a trip that lasted several days to the area of Ecuador where Texaco had operated,

called the Napo Concession ("Napo" derives from the Napo River, which flows through the

Concession and is a major tributary to the Amazon River.)  The group included lawyers,

scientists, and public health specialists.    Among them was Chris Jochnick, a law school

classmate and a founder of a human rights organization called The Center for Social and

Economic Rights; three scientists then associated with the Harvard School of Public Health --

Dr. Sarah Zaidi; Dr. Steven Kales; and Anthony LaMontagne; and Cristobal Bonifaz, a solo

practitioner from Massachusetts, a native of Ecuador, and the father of a close friend from law

school, John Bonifaz.

21.      That trip was organized and led by Dr. Bonifaz.  At the time, I was working as a

staff attorney at the District of Columbia Public Defender Service.  Mr. Bonifaz invited me on

the Ecuador trip with the idea that I might help him initiate a lawsuit, should one be viable after

appropriate investigation.  I understood that Mr. Bonifaz had already been to the area once on his

own.

22.      On that first trip to Ecuador, I traveled with Mr. Bonifaz and others on dirt roads

throughout the Napo Concession. We covered hundreds of miles through the forest to visit oil

wells and separation stations that had been built and operated by Texaco.  We also talked to

dozens of local residents, sometimes through translators who could communicate in the native

indigenous languages.  That trip took place less than a year after Texaco's interest in the oil

fields in the Napo Concession had expired and the company had ceased operating in the country.

23.     During that trip, I observed extensive oil contamination in the rainforest around

the well sites and separation stations where Texaco had operated.  I also observed tankers with

industrial-sized hoses squirting oil sludge from the waste pits along the roads; men, women, and

children walking barefoot through the oil waste; oil waste pits on fire, producing enormous

plumes of black smoke; uncontrolled gas flaring near each well site; open-air toxic waste pits

sitting on the jungle floor, many with pipes used to discharge their contents into streams and

rivers; and what looked like lakes of oil from spills.

24.     As I understood it at the time from various independent sources and my own

observations, the contamination appeared to have been the responsibility of Texaco.  I knew this

because it was a well-known fact, undisputed by Chevron, that Texaco was the sole and

exclusive operator of all exploration and production in the Napo Concession from 1964 to 1990.

It was also confirmed at the time by Judith Kimerling in her book, *Amazon Crude*, published in

1989 by the Natural Resources Defense Council.    According to Ms. Kimerling, Texaco

designed, engineered, built, and exclusively operated this system of oil extraction until

Petroecuador assumed control of the operation in 1990.[5]

25.     Also on that first trip to Ecuador, I spoke in Spanish to many local residents who

recounted to me firsthand the grave impacts on their communities, health, way of life, and well-

being from the oil contamination.  Among those I met on that first trip were Maria Aguinda, a

Quichua mother who became the lead plaintiff in the underlying lawsuit filed in 1993 in U.S.

---

[5] *See* DX 901.

federal court; and Elias Piaguaje, a Secoya leader who told his gripping personal story in an affidavit filed in U.S. federal court in 1994.

26.     Piaguaje had a powerful impact on me.  In his affidavit, he described horrific living conditions because of the oil industry's contamination and brutal oppression from Ecuador's military when indigenous groups tried to seek redress.  He testified that "because of the contamination caused by Texaco in the river, we can no longer fish, use water from the river to cook or drink, wash our clothes in the river or bathe peacefully in the river."  He also described the history of Texaco working closely with Ecuador's army.  He also described an incident where Ecuador's army opened fire on indigenous protestors, resulting in one person being killed.

27.     Upon returning to the U.S., I began working with Mr. Bonifaz and his son on a lawsuit against Texaco that would seek funds to clean up the environmental damage and compensate people for their personal injuries.  That lawsuit against Texaco, titled *Aguinda v. Texaco*, was filed as a putative class action in the Southern District of New York on Nov. 3, 1993, and assigned to the late Judge Vincent Broderick.  Mr. Bonifaz wrote the complaint. While my name was on the original complaint under the auspices of the law firm of Mr. Bonifaz, the lead lawyers were Mr. Bonifaz and Joseph Kohn from the law firm Kohn Swift & Graf.

28.     From 1993 to 2002, the Aguinda litigation centered on the desire of the Ecuadorian plaintiffs to have a trial in New York federal court.  Texaco argued the trial should be held in Ecuador and urged removal on grounds of *forum non conveniens*.  During this nine-year period, often at the request of Dr. Bonifaz, I took a handful of trips to Ecuador to meet with clients in the Amazon rainforest, to attend meetings of local community groups including the Frente de la Defensa de la Amazonia, and to take care of lawsuit-related issues.

**B.     The Documentary Evidence of Texaco's Operational Practices That I Learned During the 1990s And In The Ecuador Trial**

29.     During the litigation in New York in the 1990s, we were able to make significant headway on the factual development of the case, including receiving discovery from Texaco's files that revealed in the most stunning terms just how duplicitous the oil company's conduct in Ecuador was.  This discovery powerfully affected my state of mind as the case against Chevron in Ecuador began.  I came to learn of undisputed evidence demonstrating that the company had implemented practices in Ecuador designed to pollute, notwithstanding Texaco's—and more broadly, the petroleum industry's—expressed awareness of the dangers of these practices and of safer alternatives.

30.     From documents I reviewed in handling the case, I understood that Texaco was aware before it commenced operations in Ecuador that production water from oil extraction is harmful to the environment and to humans, and that it is unsafe to dump it into rivers, streams, or surface ponds.  For example, Texaco engineer K.C. Ten Brink authored the chapter of a 1962 industry text entitled Primer of Oil & Gas Production, which stated: "Extreme care must be exercised in handling and disposition of produced water not only because of possible damage to agriculture, but also because of the possibility of polluting lakes and rivers which provide water for drinking as well as for irrigating purposes."[6]

31.     I learned that in 1972, Texaco applied for a patent for an improved production water "re-injection" technology (granted to it in 1974), in which the company stated that the discharge of production water "in or close to the ground surface may cause considerable contamination problems," and that its invention offered a "solution" by "inject[ing] these fluids

---

[6] See DX 1490.

14

inside the underground formations whose geologic characteristics prevent the possibility of contact with the surface or fresh water formations."[7]

32.     As the plaintiffs' investigation of Texaco's conduct continued, I came to learn that notwithstanding its apparent knowledge of the risk posed to people and the environment by careless disposal of "production water" and other drilling by-products, Texaco discharged billions of gallons of production water directly into the surface waters of the Amazon basin. During the early years of the litigation, I came to learn that after separating the production water from the oil in large pits, Texaco channeled the untreated production water through a system of pipes the company constructed, and emptied it directly into the waterways of the Amazon River basin.  I learned that Texaco's (and later, Chevron's) Ecuadorian lawyer, Rodrigo Perez Pallares, publicly admitted that "15.834 billion gallons [of production water] were spilled in Ecuador during the operations of the Texaco Consortium between 1972 and 1990, i.e., an average of 880 million gallons per year."[8]

33.     Early in the litigation, I learned that Texaco had carved shallow, unlined oil waste pits into the jungle floor.  It then used those pits as a permanent repository for toxic "drilling muds" and oil-production waste – apparently in contravention of prevailing industry knowledge. For example, the aforementioned 1962 industry text states that the use of unlined pits for long-term waste storage "may be harmful due to possible leaking to nearby sources of fresh water, pastures and agricultural lands."[9]

---

[7] *See* DX 945.

[8] *See* DX 1514.

[9] *See* DX 1490; DX 1505; DX 1091-1092.

34.     From my research on the case, I came to believe that Texaco chose substandard methods to maximize profit.  For example, in a 1976 letter, TexPet's manager located in Quito, Ecuador informed the Chairman of the company's Board of Directors that the Ecuadorian government's Hydrocarbon Chairman had requested that Texaco drain and cover its pits in light of a recent "contamination problem" caused by breaks in Texaco's pits due to due "excessive rains and, in some cases, as a result of improper drainage of the pits."  Texaco did not adopt this proposal, noting that it "[would] be significantly more expensive."  A few years later, in a 1980 letter responding to the Ecuadorian government's request that Texaco conduct a study concerning possible elimination of the unlined pits, Texaco's District Superintendent explained to a Texaco engineer: "First, the current pits are necessary for an efficient and economic operation. . . .  The alternative for using our current pits is to use steel pits at a prohibitive cost. . . . A second alternative is to fill the old pits, dig new pits, and line the new pits. . . . The total cost of eliminating the old pits and lining new pits would be $4,197,968. . . .  Therefore, it is recommended that the pits neither be fenced, lined, nor filled."[10]

35.     Environmental auditors hired by Texaco in the 1990s also concluded that Texaco failed to put spill prevention methods, waste reduction plans, or pollution prevention plans in place at any time during the company's operations in Ecuador.[11]

36.     Despite the existence of a 1976 law requiring environmental impact studies for industrial projects that could impact the ecosystem or air quality, Texaco's auditors found that the company did not prepare a single impact study for any of the exploratory drilling they conducted in Ecuador.

---

[10] *See* DX 1058; DX 1064. *See also* DX 1051-1063.
[11] *See* DX 1491-1492.

16

37.     Texaco's environmental auditors observed that the company had no environmental management personnel stationed anywhere in the Concession.  The auditors further concluded that the company did not design its facilities in a manner that would contain or prevent spills, and that Texaco built berms around crude oil tanks that were too small to contain oil spilled from the tanks, and observed that several of the tank berms did not have appropriate drains.

38.     I found particularly tragic the fact that we will never know the extent of Texaco's pollution or its internal knowledge because in the early 1970s the company adopted an express policy of not reporting environmental incidents and destroying existing spill records, thereby concealing the true magnitude of the damage inflicted by Texaco.  On July 17, 1972, Texaco executive Robert M. Bischoff circulated, on behalf of Robert C. Shields, Chairman of the Board of Directors of Texaco Petroleum, a confidential memorandum to Texaco Petroleum's acting manager in Ecuador entitled "Reporting of Environmental Incidents: New Instructions" (the "Shields Memorandum") which directed Texaco employees to take steps to conceal the company's misconduct.  The Shields Memorandum instructed the company's employees in Ecuador only to record spills and other environmental incidents if the media or the government became independently aware of the incident: "Only major events . . . are to be reported . . . . A major event is further defined as one which attracts the attention of the press and/or regulatory authorities or in your judgment merits reporting."  The Shields Memorandum also instructed Texaco personnel to destroy records:  "No reports are to be kept on a routine basis and all previous reports are to be removed from Field and Division Offices and destroyed."  Personally,

I took this as a sign that Texaco (and later Chevron), was willing to engage in what I considered unethical conduct as necessary to suit its interests.[12]

39.     In March 1994, a report was issued by the Center On Economic and Social Rights called *Rights Violations in the Ecuadorian Amazon: The Human Consequences of Oil Development*.  This report was based on water and soil samples taken by Harvard scientists during the first trip to Ecuador organized by Dr. Bonifaz.  It reinforced my good faith belief that legal action against Chevron was legitimate.  According to the report: "The CESR team collected samples from drinking, bathing, and fishing waters used by local communities and from waste waters released by oil facilities.  The team also conducted limited medical examinations of people from the affected communities."[13]

40.     The CESR report concluded that "waste water samples at the point of emission into the environment contained extremely high levels of toxic compounds"; that drinking water samples contained levels of polycyclic aromatic hydrocarbons 10 to 1,000 times higher than guidelines from the U.S. Environmental Protection Agency; that "fingerprinting analysis" matched contaminant patterns in drinking, bathing, and fishing waters to waste water sources at nearby oil facilities that I knew had been built by Texaco; and that medical examinations of local communities found cases of dermatitis "apparently related to oil contamination."  These sampling results were available to Dr. Bonifaz, myself, and the other members of the legal team before the original *Aguinda* complaint was filed on Nov. 3, 1993.  They formed part of the basis

---

[12] *See* DX 1052.

[13] *See* DX 1.

for the allegations contained therein.  They also formed the basis for many of the decisions made by myself and other members of the plaintiffs' team later in the case.[14]

41.     The CESR report, in reference to environmental conditions in the Napo Concession area, concluded: "The presence of high levels of toxic compounds and oil-related injuries indicate that the exposed population faces an increased risk of serious and non-reversible health effects such as cancers and neurological and reproductive problems."[15]

42.     Subsequent to the publication of the CESR report, I became aware of other environmental and health studies that also found evidence of harmful contamination in the area of Ecuador where Texaco had operated.  These studies all came to my attention during the 1990s, before the *Aguinda* case was moved to Ecuador.  These included two studies conducted by Texaco even before the *Aguinda* lawsuit was first filed in U.S. courts that found what I considered to be devastating evidence of the company's wrongdoing in Ecuador.   These two studies are as follows:

- One study, by the HBT-AGRA firm and commissioned by Texpet and Petroecuador in 1992, had an enormous impact on me when I read it in the mid-1990s because it confirmed what I had seen on my first trip.  More importantly, it was Texpet's own study and it was consistent with the CESR study in terms of describing conditions that clearly show that Chevron used substandard operational practices. The HBT Agra report found widespread contamination "of soil and water at locations throughout the concession."  It found "contamination of soil and water … at well sites, production stations along road ways, flow lines and secondary pipelines."  It also found numerous violations of Ecuador law.   At production stations, it found that produced water was "disposed of through a waste stream into the surrounding area."  It also found produced water in the earthen waste pits next to wells was "discharged into a local creek or river or in some instances directly into the jungle."  It also concluded that no groundwater monitoring was in place prior to 1990 "at any of the stations" and that Texpet had not implemented a spill prevention plan.  The audit found evidence of oil spills at

---

[14] *See* DX 1

[15] *See* DX 1

97% (158 of 163) sites assessed. This report also recommended that Texaco conduct a comprehensive environmental investigation and risk assessment to determine the full scope of the company's liability – something the company never did. Finally, the report listed the many Ecuadorian laws prohibiting pollution that it concluded Texaco had violated.[16]

- Another study commissioned by Texaco, the Fugro McClelland study, came to the same conclusions about the company's responsibility for contamination, as follows: "The audit identified hydrocarbon contamination requiring remediation at all production facilities and a majority of the drill sites …. Various degrees of crude oil contamination existed on many of the well sites audited." The report also observed that all "produced water from the production facilities [was] eventually discharged to creeks and streams" and that none of the discharged were reported to the Ecuadorian authorities. It also found that because discharges were kept secret, Ecuadorian governmental authorities "did not establish sampling points and water quality standards to determine regulatory compliance."[17]

43.     I was astounded when I read these two internal Texaco audits and matched them up with my experience traveling in the affected area throughout the 1990s. It was obvious to me as I had traveled through the region that Texaco had not installed any environmental controls whatsoever during its long tenure as Operator of the Napo Concession. Now, the company's own internal audit reports confirmed my observations. In fact, it was always clear to me that Texaco had dumped billions of gallons of produced water, oil, and chemicals into the jungle and streams and rivers over the course of its period as operator of the Concession, and had done so in violation of Ecuadorian law. Again, that was now being confirmed by Texaco's own auditor. And it was also clear that Texaco had rejected the advice of its own auditor and failed to conduct a full investigation to determine the scope of its liability upon leaving Ecuador.[18]

44.     Another key report that impacted my understanding of the case was the report issued by the Ecuadorian office of the comptroller (or *controlaria*) (roughly equivalent to the

---

[16] *See* DX 1491; *see also* DX 946.

[17] *See* DX 1492.

[18] *See* DX 1491-1492.

General Accounting Office in the U.S.).  In 2002, the *controloria* published the results of its investigation of the Remediation Action Plan (RAP), the document describing the scope of Texaco's clean-up obligations in Ecuador.  The report examined whether Texaco had fulfilled its obligations under the RAP.  The investigation lasted six years and involved sampling of numerous Texaco-built well sites in the concession area, including many from sites supposedly remediated by Texaco.  The investigation found that: the contract contained numerous omissions and technical deficiencies that negatively affected Ecuador's interests; that Texaco didn't fulfill its contractual obligations to remediate oil pits; that some pits that were supposed to be remediated under the contract had not been; and, that some pits that were supposedly remediated were found to contain surface crude oil.  Only 158 of the 225 pits scheduled for remediation under the RAP were actually remediated, according to the study.  Over 84% of those "remediated" pits had chemical soil levels exceeding permissible standards under Ecuadorian norms.[19]

### C.    Evidence of Contamination From The Judicial Inspections

45.    The series of court-ordered judicial inspections of oil sites in the *Aguinda* case began in August 2004.  Chemical sampling results from the first sites inspected, from both Chevron and the plaintiffs, showed extensive levels of soil contamination that exceeded both Ecuadorian norms and the very lax clean-up standard that Texaco had negotiated in its remediation agreement with Ecuador's government.  Simply put, there was irrefutable evidence of illegal levels of contamination at the initial well sites and production stations inspected, and extensive evidence suggesting Chevron committed a fraud in the remediation.  This reinforced my previous belief, based on the CESR report and Texaco's two internal audit reports as well as

---

[19] *See, e.g.,* DX 1086..

my own conversations with local residents, that the contamination left by the defendant was extensive and harmful and that the company had lied to Ecuador's government about adequately remediating the waste pits in exchange for a limited release.[20]

46.    I also remember being pleasantly surprised to see how Chevron's own technicians were producing sampling data that demonstrated contamination and in effect were proving the claims on our side.  This is reflected in Chevron's technical report from Sacha 94, the fourth well site examined during the inspection process.  I read this report shortly after Chevron submitted it to the court.  Texaco had closed this well site before it ceased being operator of the consortium, so Petroecuador never had operated in this location.  Chevron's own court-appointed technical expert, Ernesto Baca, reported Total Petroleum Hydrocarbon levels—commonly abbreviated TPH—at the site of 8,700 mg/kg, or more than eight times the permissible Ecuadorian norm governing soil contamination.  Yet in the mid-1990s Chevron had certified the site as "completely remediated" in its effort to secure a final release from Ecuador's government.[21]

47.    The experience was repeated elsewhere.  A well constructed by Texaco called Sacha 57 was the site of the eleventh judicial inspection.  Chevron's court-nominated expert, Gino Bianchi, reported to the court six separate soil samples from this well site that exceeded Ecuadorian norms for TPH.  One of these samples, taken at Pit 2 of the site, revealed TPH levels of 8,144 mg/kg, or more than eight times over the Ecuador threshold.  Like Sacha 94, Texaco had claimed to Ecuador's government that the site had been "completely remediated" when it

---

[20] *See, e.g.*, DX 1082; DX 1091-1092; DX 1723.

[21] *See* DX 605X(i); DX 605AD; DX 605AF; DX 605AH; DX 605AI; DX 605AK ; DX 605AL; DX 605AM; DX 605AN; DX 605AP; DX 605AQ; DX 605AR; DX 605AS; DX 605AU; DX 605AW; DX 605AY; DX 605BA; DX 605BB; DX 605BC; DX 605BD; DX 605BE; DX 605BF; DX 605BG; DX 605BH; DX 605BI; DX 605BK; DX 605BM; DX 605BN; DX 605BP; DX 605BR; DX 605BT; DX 605BV; DX 605BX; DX 605BZ; DX 605CB; DX 605CD; DX 605CF; DX 605CH; DX 605CI; DX 605CK; DX 605CM; DX 605CN; DX 605CP; DX 605FB.  *See also* DX 1117; 1517.

attempted to secure its release.  In my mind, the evidence that Texaco had lied to Ecuador's government was accumulating.[22]

48.     Chevron cannot blame its findings from these two inspections on the plaintiffs nor they can they blame Petroecuador, which never operated at these sites.  It was clear to me this was the tip of the iceberg in that Chevron's own data was proving the claims of the plaintiffs. Indeed, as much as Chevron used deceptive sampling and analysis techniques through much of the judicial inspections process to minimize its own contamination, the company found exceedances for TPH over the 1,000 ppm Ecuadorian threshold at either 79% of the well sites inspected, per our analysis of the data at the time, or 91% of the well sites, per a subsequent analysis conducted by the reputable environmental consulting firm The Louis Berger Group.  I found the statistic extraordinary given the deceptive manner in which Chevron's experts were taking samples far away from the "hot spots" that were the primary sources of contamination. And I believed at that time, based on the mounting evidence pointing to Chevron's liability, that Chevron's only chance to avoid losing the trial (absent a technical defense such as the release) was to paralyze the court or to corrupt the process.[23]

49.     I remember that after a year of judicial inspections, our team organized a press conference in Quito in August of 2005.  At the press conference, the Ecuadorian lawyers announced that Chevron's own sampling results were proving the claims of the affected communities.  After this press conference, Chevron clearly changed its sampling protocol in an apparent attempt to further hide the extent of the contamination at its former well and production sites.  In fact, an internal analysis we conducted of Chevron's results from the remainder of the

---

[22] See DX 428; DX 1482; DX 1091-1092; DX 1510-1511.

[23] See DX 1117.

judicial inspections demonstrates that the company's reported TPH exceedances were cut roughly in half after we held the press conference in August 2005.

50.     From this point forward, whenever I would attend a judicial inspection, I observed with even greater clarity how Chevron's field technicians would employ forms of trickery. Much of this is documented in a report we commissioned from three American experts (Dr. Ann Maest, William Powers, and Mark Quarles) that was submitted as evidence to the Ecuador court. This report, *How Chevron's Sampling and Analysis Methods Minimize Evidence of Contamination*, found that during the inspections process Chevron was engaging in flagrant violations of sampling protocol normally used to assess oil field contamination.  Among the problematic techniques, according to these experts: Chevron selected sampling locations far away from contaminant pathways; Chevron was artificially lowering its sampling results by mixing dirty samples with cleaner samples from another part of the inspected site, in violation of EPA protocols for oil field sampling; and Chevron was applying wholly inflated clean-up standards with no basis in the law.    In its own analyses, Chevron was using a 10,000 ppm standard for TPH, when the Ecuador norm for sensitive ecosystems was 1,000 ppm and the norm in many U.S. states was 100 ppm, or 100 times lower than Chevron's invented standard.   If a TPH sample came in higher than 1,000 ppm but lower than 10,000 ppm, Chevron's experts would conclude that the particular sample proved the site did not violate Ecuadorian norms.  As I observed or was informed of these techniques by Chevron, I became more convinced of Chevron's willingness to use unethical means to win the case.[24]

51.     Another example of Chevron's legal trickery occurred when it did find levels of contamination in the soil.  Chevron would often cite a set of standards from Louisiana that were

---

[24] S*ee* DX 13; DX 1504..

50 or 100 times higher than Ecuador's own standards.   I later learned through research that the Louisiana standard cited by Chevron was only intended to be applied in very narrow circumstances where the polluter was first able to prove that there was no possible threat of groundwater or spillover surface water contamination—the exact opposite of the conditions in the rainforest, where pits overflowed constantly and the groundwater aquifer was shallow and was used by the local population as a source of drinking water.[25]

52.     I believed at the time that Chevron had deliberately planned a sampling protocol to hide contamination.  This has since been confirmed by Chevron videos I saw that were given to me by Amazon Watch as well as evidence produced by the Republic of Ecuador from a 1782 deposition of a Chevron expert, Bjorn Bjorkman.  These videos and the deposition testimony demonstrated that Chevron field technicians were secretly pre-inspecting certain well sites and production stations prior to the judicial inspections to determine where to find "clean" samples. When the Chevron technicians would return in the presence of the judge during the actual judicial inspections, they would know where to lift "clean" samples that were then submitted to the Ecuador court as if they were a "random" sample illustrative of overall conditions at the site. Some of the Chevron pre-inspection videos showed Chevron technicians finding contamination during the pre-inspections and laughing about it.  I also became aware of a playbook prepared by Chevron that was given to its field technicians to follow during the judicial inspections.   The playbooks contained a game plan for "finding" non-contaminated samples based on the site intelligence gathered during the pre-inspections process.  By following the playbook, Chevron

---

[25] *See, e.g.,* DX 1503.

and its experts turned the search for the truth during the judicial inspections into a game of hide and seek.[26]

53.     I was told by our experts at Stratus Consulting that Chevron also went out of its way to avoid sampling for groundwater contamination.   The company failed to install groundwater wells to monitor groundwater migration away from the pits.  It also refused to take soil samples deep enough beneath the pits to find groundwater, even though numerous such samples from the plaintiffs were finding exceedances in groundwater through such sampling. Finally, Chevron avoided taking samples down gradient from the waste pits, where oil leeching from the pits would be expected to flow.  Observing this and relying on this from our experts shaped my belief that Chevron was cutting corners, committing a fraud on the court, and cheating in fundamental ways during the judicial inspections.[27]

54.     Of particular concern to me were the sampling results from Chromium VI, a known human carcinogen according to the U.S. government's Agency for Toxic Substances and Disease Registry (ATSDR).  Chromium VI was an accurate marker of Texaco's responsibility for contamination given that it is a chemical that was consistently used by the company when perforating its wells.  Given that Texaco built most of its wells in the 1970s, the presence of this chemical meant contamination had existed in the environment for decades.    I was shocked and angered that Chevron continually refused to test its soil and water samples for Chromium VI, given how much harm it could cause to persons and animals exposed.  I recall that nine out of 46 sites inspected by Dr. Cabrera had exceedances for this carcinogen.  Numerous other judicial

---

[26] *See* DX 591-594.

[27] *See* DX 1082-1083; DX 1085.

inspection sites also indicated the presence of chromium VI in samples submitted to the court by the plaintiffs.[28]

55.     All the above information came to me in a variety of forms during the years of the judicial inspections and after.   In addition to the site inspection reports from our nominated experts and Chevron's nominated experts, in 2007 we hired Stratus Consulting to review, analyze, and summarize all the data and methodology issues that until that point had been dispersed and less usable.   The documents they provided me starting in 2007 profoundly impacted my state of mind and remain compelling and largely un-rebutted treatments of the core technical issues in the case.[29]

56.     The Stratus memos included one titled "Summary of Environmental Data On Oil Contamination in the Napo Concession" which aggregated the chemical sampling results for TPH collected during the trial. Beltman concluded in this memo that 91% of all well sites investigated had TPH higher than 5,000 parts per million, or five times greater than the Ecuadorian norm and over the contractual standard Texaco.   He also found that 97% of the sites had TPH above the Ecuador standard of 1,000 ppm.   The majority of sites showed TPG greater than 10,000 ppm and "many sites" had TPH in excess of 100,000 ppm, or 100 times higher than the Ecuadorian norm.   Beltman also found that 91% of the sites samples by Chevron showed TPH over U.S. standards.   Beltman wrote in the memo: "Table 3 shows that all or nearly all of the sites are contaminated with petroleum above standards."   He also wrote that the data show Texpet's remediation in the 1990s "was completely ineffective".   He wrote:   "All of the investigations demonstrate the same fact: contamination in the Concession is widespread and extensive."

---

[28] *See* DX 1083-1086; DX 939.

[29] *See* DX 1080-1086.

57.     Beltman also prepared memos on Texaco's so-called "remediation" that in my mind had a powerful impact on my state of mind and buttressed my good faith belief that Messrs. Reis Veiga and Perez Pallares had committed fraud.  I actively called for the prosecution of these two individuals based on my understanding of this and other data.  One memo, called "Texaco's Phony Cleanup," documented in meticulous detail at least 54 of Texaco's former waste pits that produced TPH results during the trial higher than the oil company's contractually required clean-up standard.  Several of these results were produced by Chevron's own sampling.  He also documented other pits that Texaco had said required no clean-up that were contaminated.  He also pointed out that Texaco's clean-up team tested its results with a test (called TCLP) that guaranteed the company would find "clean" results even if the site was heavily contaminated.  In all, this memo from Beltman relied on data in evidence to demonstrate clearly that the remediation supervised by Reis Veiga and Perez Pallares was an absolute fraud.  I could prove this definitively if the court would allow evidence to be submitted.

58.     Beltman did several other memos, but one that stuck out in my mind was a presentation he created I believe in 2009 that summarized all the key scientific data before the Ecuador court.  In this presentation, which was confirmed almost slide by slide in Beltman's sworn deposition testimony, Beltman writes: "Data from Texaco's time show that the produced water was toxic to aquatic life and contained high levels of petroleum hydrocarbons."  He explained that since the 1920s in the U.S., the same produced water that Texaco discharged in Ecuador was typically re-injected back into the ground.  The presentation also explains that the *Aguinda* case only concerned sites built by Texaco, not any built by Petroecuador.  The main conclusion of the memo is the same as Texaco's own internal audits from HBT-Agra and Fugro-McClelland: "There is overwhelming scientific evidence that Texaco operated the oilfield with

few or no environmental controls, and that their operations caused massive environmental contamination that persists today."

59.     Another source of confirmation regarding the technical issues came from Marcelo Munoz, who as explained below was a court-appointed expert assigned to produce a report requested exclusively by Chevron.  At a number of sites, Munoz found exceedances for certain chemicals, including TPH, barium, vanadium, and chromium.  As explained to me by Stratus, Dr. Munoz's sampling as well as several other sets of data from investigative sampling programs that all confirm the existence of contamination linked to Texaco's operations.  Finally, and most recently, the Republic of Ecuador, in connection with collateral proceedings initiated against it by Chevron, retained a number of reputable experts to analyze the same site inspection data and other data we relied on during the trial.  Their conclusions are reviewed in detail at pages 40-52 of the Republic's "Track 2" Counter Memorial.  The existence and deadly consequences of Chevron's contamination of the Ecuadorian rainforest is simply indisputable in my mind.  It was a key motivating factor as I sought justice for the affected communities in the *Aguinda* case.[30]

### D.     Evidence of Negative Health Impacts

60.     My state of mind with regard to the negative health impacts of Chevron's operational practices in Ecuador also was heavily influenced by a series of peer-reviewed studies conducted largely by Dr. Miguel San Sebastian, a Spanish scientist who in the 1990s lived in the affected area. Dr. San Sebastian and his colleagues published several peer-reviewed studies in prestigious academic journals that reinforced my good faith belief that the people living in the region were suffering severe ongoing health impacts, including cancers, as a result of exposures to oil contamination.  I also received a slew of anecdotal stories of cancer and other health

---

[30] *See* DX 902; DX 1100-1120; DX 1086.

impacts consistent with Dr. San Sebastian's conclusions from Rosa Moreno, the nurse in the town of San Carlos who had become a trusted friend.   The health studies that I read that reinforced my belief are as follows:[31]

- M. San Sebastián, B. Armstrong, J.A. Córdoba and C. Stephens, *Exposures and cancer incidence near oil fields in the Amazon basin of Ecuador*, Occup. Environ. Med 58:517-522 (2001).   I read this study, which focused on the town of San Carlos where Rosa Moreno worked, shortly after it was published.   I had visited San Carlos on many occasions to talk to local residents and visit with Ms. Moreno, who worked out of a small community health clinic in the middle of town that seemed permanently understocked in terms of medicines and overloaded in terms of patient demand.   I knew San Carlos was in the geographic epicenter of Texaco's operations in the Sacha field, one of six main oil fields in the Napo Concession.   There were numerous oil wells built in and around the town of San Carlos in addition to one enormous separation station, Sacha Norte, where I knew from local residents and Ms. Kimerling's book that Texaco had discharged millions of gallons of untreated produced water into streams and rivers.   The town also was located downstream from another enormous separation station, Sacha Sur, where I understood that millions of gallons of additional produced water were discharged into a river, the Yanayacu, that passed through the town of San Carlos.   This particular study of San Carlos by Dr. San Sebastian found significantly elevated rates of cancers and cancer deaths among males, including cancers of the stomach, liver, pancreas, throat, skin, and blood.   The authors noted that San Carlos was surrounded by over 30 oil wells, most of them "just a few meters from the houses" and all of which "dispose of waste, without treatment, in the small rivers that cross the village." While the authors noted that the small population size made it "difficult to reject the possibility of chance," they ultimately concluded that their risk estimate was conservative because of the likelihood of "cancer cases in San Carlos that were not diagnosed" due to a lack of medical attention and diagnostic equipment.[32]

- A.K. Hurtig, M. San Sebastian, *Geographical differences in cancer incidence in the Amazon basin of Ecuador in relation to residence near oil fields*, Int'l J. of Epidemiology (2002) This study found statistically significant higher rates of cancer in people living in oil-producing areas compared to people living in similar regions of the Ecuadorian Amazon unaffected by oil operations.   The study found higher rates of cancers of the stomach, rectum (over 10 times higher), skin melanoma (over 10 times higher), soft tissue (over 15 times higher) and kidney in men, and for cancers of the cervix and lymph nodes in women, and higher rates of leukemia for male and female children under 10 years of age.   The authors

---

[31] *See* DX 708-715.

[32] *See* DX 715.

concluded that actual cancer rates likely were higher because the limited available date at the National Cancer Registry in Ecuador.[33]

- A.K. Hurtig, M. San Sebastian, *Incidence of Childhood Leukemia and Oil Exploitation in the Amazon Basin of Ecuador*, Int'l J. of Occupational and Env'l Health (July/Sept 2004). This study examined differences in cancer rates between Amazonian populations living in close proximity to oil fields, and those living in areas without oil operations. The study, which encompassed data from the years 1985-2000, found statistically significant elevated rates of leukemia in children under 14.[34]

- M. San Sebastián, B. Armstrong, J.A. Córdoba and C. Stephens, *Outcomes of Pregnancy among Women Living in the Proximity of Oil Fields in the Amazon Basin of Ecuador*, Int'l J. of Occupational & Environmental Health (Oct-Dec. 2002) This study found a highly statistically significant (less than 1% possibility of results obtained by chance) elevated risk of miscarriage or spontaneous abortion (2.5 times higher) for women exposed to the contaminated streams in the area where Texaco operated. The study focused on pregnancy outcomes and was carried out by interviewing 650 women in 23 different communities, nine of which were located on streams that, lab tests showed, were severely contaminated with petroleum (up to 300 times over international norms). The study controlled for smoking, alcohol, medication use, and other potentially confounding factors such as socioeconomic conditions and occupation streams. The study found a link between women's exposure to contaminated streams and elevated risks of miscarriage and spontaneous abortion.[35]

### E.    Evidence of Chevron's Corruption

61.    A powerful influence on my state of mind throughout the case was what I perceived to be Chevron's aggressive, disingenuous, and outright duplicitous conduct related to the litigation. This conduct impressed upon me that I was confronting an opponent who would press every advantage it had without regard for due process or fair play, much less the larger interests of justice for the indigenous people of the Ecuadorian Amazon. To fully catalog my experiences with respect to Chevron's conduct in this litigation would take a lot more time than I have been able to spare in the process of drafting this witness statement while simultaneously litigating this trial, but the following points stand out.

---

[33] *See* DX 710.
[34] *See* DX 708- 709.
[35] *See* DX 713. *See also* DX 711; DX 714.

62.     While we were fighting to keep the litigation in New York, we were simultaneously hearing reports of Texaco working back channels in Ecuador that would allow it to use its influence to kill off the case if it were transferred to Ecuador.  When I spent significant time in Ecuador later, I was able to confirm these accounts.  I also found confirmation in documentary evidence produced in discovery, such as a memo from the lobbying firm Holwill & Co. which laid out in detail Texaco's activities at the time to meet with high-level government officials and "opinion leaders in Ecuador to explain the implications of the lawsuit for investments in Ecuador."  I recall the description from the memo of one meeting between Texaco officials and Ecuador's Minister of Energy where the Minister explained that he had to appear critical of Texaco in public but "[h]e winked and added that he had been tough on the company but that this was 'just politics'."[36]

63.     While we were fighting to keep the litigation in New York, I followed the negotiations between Texaco and the ROE regarding a partial release of claims and felt at the time like I was watching a slow-motion video of a car crash, where you know the gruesome ending.  Texaco initiated serious negotiations to "remediate" only after we brought our lawsuit. The company negotiated in private, with all the benefits of influence it then enjoyed; it never brought representatives for the affected communities into the process. The first time such communities had a chance to comment was when a draft of the release of claims that Texaco wanted—a complete release of "all" claims—was circulated to the environmental community. As fully documented in related litigation, many civil society organizations reacted negatively to this proposal and it was tabled in favor of a release that expressly carved out third-party private claims of the type we were pursuing in the Aguinda case. The release agreement in May 2005

---

[36] *See* DX 379; DX 381.

expressly stated that it applied to "claims by the Government of the Republic of Ecuador, Petroecuador and its Affiliates," not to any third-party claims.  Nonetheless, we on the *Aguinda* team knew the purpose of this entire process and were not surprised when Texaco promptly introduced the release agreement to argue that our case should be dismissed.  While the tactic failed, Chevron has again and again brought up the release as a defense. When Chevron argued its position before U.S. Judge Leonard B. Sand in 2005, the company was rebuffed.  Judge Sand cast severe doubt on the claim, noting that "it is highly unlikely that a settlement entered into while Aguinda was pending would have neglected to mention the third-party claims being contemporaneously made in Aguinda if it had been intended to release those claims or to create an obligation to indemnify against them."  *Republic of Ecuador v. ChevronTexaco Corp.*, 376 F. Supp. 2d 334, 374 (S.D.N.Y. 2005).  Chevron responded by simply withdrawing its claim over the release so it could press it later in other fora (including in this court) without an adverse decision by Judge Sand.[37]

64.     While we were fighting to keep the *Aguinda* litigation alive in New York, Chevron submitted dozens of affidavits from highly-qualified Ecuadorian scholars as well as its own attorneys.  All argued in one way or another for the case to be adjudicated in Ecuador because of the fundamental fairness of Ecuadorian courts towards foreign corporations.  I will admit that during this time period, part of me started to believe Texaco's experts that maybe a fair trial was possible in Ecuador.  My disillusionment came in two parts.  First, almost as soon as we started litigating in Ecuador, Chevron filed an international arbitration demand against the government of Ecuador arguing that several of the key issues in the case—such as the effect of the release agreement described above—should be decided by an international arbitration panel,

---

[37] *See* DX 419; DX 421; DX 1721.

putting the lie to all its prior assertions about the case needing to be heard in Ecuador. Second, as soon as the evidence from the judicial inspections started to turn against Chevron, the company began attacking the fairness of Ecuador's courts, again putting the lie to all its prior statements. This series of events reinforced my belief that our opponent was willing to say or do anything in the litigation process, if it thought it could get away with it.[38]

65. Another maneuver by Chevron that influenced my view of the case and our opponent came from Chevron's shifting positions on the legal effect of its 2001 merger with Texaco. Initially, Chevron saw advantage to arguing that it had accomplished a "merger" with Texaco. Later, to in an apparent attempt to gain an advantage in the litigation, the company claimed to have effected a "reverse triangular merger" in which it could claim that a non-existent shell company had merely "purchased" Texaco. Before the Second Circuit, Chevron taunted us that "In their brief, plaintiffs argue that these lawsuits should proceed in New York because it is 'the home of Texaco Inc.' That is no longer true. . . . Texaco merged with Chevron Inc. on October 9, 2001, five months after the District Court's decision. The resulting corporation, ChevronTexaco, Inc., is headquartered in San Francisco. ChevronTexaco is in the process of closing down what remains of Texaco's former offices in White Plains, New York." Not surprisingly, when we started up our case in Ecuador, we brought suit against the merged entity "ChevronTexaco," as it was called at that time, not the "remains of Texaco." "ChevronTexaco"—as signed on its briefs in this jurisdiction, represented by the same legal team that had always represented Texaco—promised this Court and the Second Circuit to submit to jurisdiction in Ecuador. But in Ecuador, Chevron immediately moved to dismiss the case on the basis that "ChevronTexaco" had never done business in Ecuador, whereas "Texaco" still

---

[38] *See* DX 361-369; DX 1706-1716.

technically existed as a shell entity with no assets registered at ChevronTexaco's California headquarters and should have been sued instead.  While we considered the argument frivolous at the time and since (and the Second Circuit has similarly characterized the argument as frivolous, dismissing Chevron's position most recently in a footnote), Chevron still continues to press it not just in Ecuador and the United States but in enforcement proceedings around the world.[39]

66.     When the trial started in Ecuador, the deceptive and aggressive conduct I started to witness from Chevron moved from the legal realm to much broader areas.  For example, as I describe elsewhere in this statement, Chevron developed, through the use of its connections and financial resources, a close connection with the military base in the region of the trial such that it started carting around truckloads of soldiers with its legal team to site inspections and retained high-level retired military officials to pressure standing officers to issue documents and take other steps to assist the company in its pressure campaign against the plaintiffs and the court.

67.     I was also shocked to see how aggressive Chevron's technical team was.  I expected on a technical level the parties would engage in something of a nuanced debate about the extent of the risk of the contamination and to what degree Chevron was responsible for it.  Instead, Chevron hired some of the world's top paid "experts" to come in with a no-holds-barred position that there was no risk from the hundreds of open-air oil waste pits, and that Chevron was not liable to any degree for any existing contamination in the region even with respect to pits that remained untouched from Chevron's time as operator or that were "remediated" in the 1990s but still showed massive contamination.

68.     When we got into the details of the site inspection process, I recall being shocked from a lay perspective that Chevron's experts seemed to be taking samples far away from the

---

[39] *See* DX 605EE; DX 1088-1089.

actual contamination, and drawing numerous apparently clean soil and water samples while our experts were drawing samples that literally stank of petroleum.  We went to great lengths, despite budget constraints, to retain an initial team of sophisticated environmental remediation experts who were able to examine Chevron's reports and confirm for me that Chevron's experts were indeed focusing on samples taken from the "cap layer" of cover soil to ignore the contamination underneath, that they were sampling "upstream" from expected contamination sources, and other technical tactics later confirmed in the report from the American experts Maest, Powers, and Quarles.  I later learned that Chevron's deception with the site inspections ran much deeper, and that in fact during official site inspections its experts were instructed in no uncertain terms to "only" take samples at "locations the PI team has shown to be clean"—i.e., where a pre-inspection team had already taken a sample and confirmed that Chevron wouldn't get an unexpected negative result.[40]

69.    Another constant concern of mine was surveillance and harassment by admittedly unknown persons, but persons acting consistently in the interests of Chevron.  I have since learned that just one of Chevron's many investigative firms on the case, Kroll, has deployed over 100 individuals on the matter; that Kroll has generated "20 to 30" reports on me alone; that Kroll at one point was involved in recruiting journalists to pose as themselves in order to spy on the plaintiffs' team, and many other rather shocking and disturbing facts.  I reached the point where I hired a former FBI agent to conduct a brief counter-surveillance operation just to confirm that I wasn't crazy.  It turns out I'm not: after only one day of work, he filed a report detailing how a

---

[40] *See* DX 13; DX 592; DX 1071; DX 695-697; DX 699.

series of cars followed me and my wife and child traveled around Manhattan on the first day he conducted his operation.[41]

70.     Another incident that convinced me and other members of our team that we were dealing with an opponent that would stop at nothing was the "sting operation" incident regarding Diego Borja and Wayne Hansen that was coordinated by Chevron in meetings throughout the summer of 2009 and "released" on Chevron's YouTube channel in September 2009.  I was not surprised to learn that Chevron's initial characterization of the videos as evidence of corruption was false—because even basic investigation revealed that the tapes involving the judge in the *Aguinda* case bore no suggestion of corruption, and that the other tapes of discussions with a "party official" involving a bribe were in fact with a well-known huckster with no political connections whatsoever.  (This matter is discussed at length in my counterclaims, which I hereby affirm to be true and accurate based on my knowledge.)  I was, however, surprised that once the falsity of the scheme had been exposed, Chevron continued to rely on it for various assertions in its international arbitration cases and in public relations materials.[42]

## IV.     **THE LAGO AGRIO JUDGMENT**

71.     I did not write the judgment in the *Aguinda* case in Ecuador. I have no knowledge that anybody on the legal team of the plaintiffs wrote the judgment in this case, or wrote any part of the judgment.

72.     I have never met Judge Nicolas Zambrano, nor have I ever communicated with him.  Other than his live testimony during this trial, I have never seen Judge Nicolas Zambrano.

---

[41] *See* DX 702; DX 586; DX 686; DX 407.

[42] *See* DX 31-59; DX 913; DX 1047-1050; DX 1722.

## V.     GUERRA'S ALLEGATIONS

73.     I did not bribe Judge Zambrano.  The allegations by former Judge Alberto Guerra that I was involved in a meeting where I "approved" a plan arranged by Pablo Fajardo to pay Zambrano $500,000 is false.   Chevron has no evidence that I had any involvement in bribing any judge apart from Guerra's thoroughly false and corrupt testimony.

74.     I have no knowledge of anybody on the plaintiffs' team paying or seeking to pay Judge Zambrano.

75.     I already have denied under oath all of ex-Judge Alberto Guerra's allegations against me in my declaration dated March 15, 2013.  I affirm that testimony.  I never "thanked" Judge Guerra "for his work as a ghostwriter," I did not "send word through Mr. Fajardo" that I would help Mr. Guerra on an immigration matter, and I did not agree to or express any support for a plan to pay any amount of money so that the plaintiffs would be able to draft the final judgment.

76.     I vaguely recall seeing the cryptic emails from Alberto Guerra on March 1, March 5, 2008 and on September 5, 2010, that Chevron has put into evidence.  I was as confused about those emails then as I am now.  I assumed they were either spam, or part of some scheme by Guerra.  I simply ignored them at the time.  I don't recall any further or related discussion regarding them.

77.     I was openly associated with the *Aguinda* case during the short time in 2003 when Mr. Guerra was the presiding judge.  We occasionally chatted about non-substantive matters during that time period.  I understood at the time, from Mr. Fajardo and others, that Mr. Guerra was frustrated by having been replaced as the presiding judge and that he was seeking ways to reassert a role for himself in the case.  My impression at the time was that he continued to frequent the courthouse, visit with judges and lawyers active in the local legal community, and

made it known that he was "in the know" about what was happening in that community.  Once or twice, after Mr. Guerra left the bench, I met with him in hopes of learning the local rumors about Chevron's activities and attempts to influence judges or the legal process.

78.     The one meeting with Guerra that stands apart vividly in my memory was in Quito.  I referred to it in my declaration.  I met with Mr. Guerra with the idea that I would pick up useful tidbits of "courthouse gossip" related to Chevron's latest efforts to stymie the proceedings by paralyzing the court with frivolous motions and personal attacks.  This is the meeting where Mr. Guerra openly asked for a bribe.  I immediately and unequivocally refused. The experience saddened me.  It also concerned me because it reflected a potential corruptibility of the process in Ecuador that was my greatest fear.

## VI.   EX PARTE CONTACTS

79.     I observed the first six days of the trial in October 2003 (called the "proof period"), and numerous judicial inspections after that, where lawyers for the parties would easily interact with the presiding judge on an *ex parte* basis without it being part of the official court record.  At first I found the *ex parte* contacts startling based on my experience as an American lawyer, but I tried to withhold judgment given that I was observing a different legal culture with its own rules and customs. In the District of Columbia Superior Court (where I practiced as a public defender), I understood there to be an ironclad rule that there could be no contact by either party with the judge without a court reporter present. In Ecuador, I repeatedly observed lawyers for Chevron engaging in *ex parte* contacts with judges, court-appointed independent experts, and court personnel.    I repeatedly was told by our Ecuadorian legal team of such contacts by Chevron with judges and court personnel.  I also observed it during judicial inspections and on other occasions.  If those were the rules, it was clear to our local counsel that our side would

have to do the same, or we would risk putting our clients at an extreme disadvantage throughout the trial.

80.     I recall reading trial testimony by one of Chevron's court-appointed independent experts for the *Aguinda* trial, the American John Connor, stating that he worked as an "independent" expert for Texaco and Chevron over many years in the *Aguinda* and other litigations, billing millions of dollars for his services.  Yet he never found, either in the *Aguinda* litigation or in the many other litigations where he served as a technical expert for Texaco and Chevron, that his clients were responsible for even one penny of environmental or other damages.  Connor's testimony also shaped my view of how the word "independent" was used by Chevron when applied to court experts used by one party.  In Ecuador, Connor – like all party-nominated court experts – was considered "independent" under the law.[43]

81.     Also reinforcing the notion in my mind that Chevron was using *ex parte* contacts to improperly influence the court was the fact that it had used its relationships and money to co-opt the most powerful institution in the Amazon region – Ecuador's military. As I understood it, Chevron's relationship with the military was built on the long-standing ties between Texaco and the military, which Chevron's litigation team (including Adolfo Callejas and Rodrigo Perez Pallares) had personally been involved in.  Chevron used cash to hire top-ranking former military officials, such as former Captain Manuel Bravo, to advise it and lobby the military.  I was aware through conversations with Chevron personnel and other sources that Chevron arranged with the military base near Lago Agrio, called Rayo 24, to construct at its own expense a luxury villa where its litigation team could stay during the judicial inspections.  I later confirmed that

---

[43] *See* DX 1720.

Chevron was paying a monthly fee to stay at the villa, which would be handed over to the military base as a gift at the end of the trial.

82.     On at least one occasion that we were able to document, Chevron used its relationships with army personnel in Ecuador and its *ex parte* contacts at the court to devastating effect.  Guanta was a critically important judicial inspection that was to take place on the ancestral lands of the Cofan, an indigenous group that had been virtually wiped out in recent decades because of Chevron's contamination and the settlement by farmers of rainforest lands. We had invested significant resources in preparing for the inspection.  Most of the surviving members of the Cofan who lived in a small town called Dureno had pooled their limited resources to travel by bus to observe the inspection in their traditional dress.  I had learned that wearing traditional dress was a critically important affirmation of indigenous culture that would have added meaning at the site inspection, which was visibly contaminated with waste pits. Many Cofan came hoping to testify about how their traditional culture had been impacted by Texaco's pollution.[44]

83.     The Guanta site inspection was canceled by the judge the day before it was to be conducted and just minutes before the court's closing time, without notice to our side.  Until a government investigative report came out several weeks later, Chevron unequivocally denied having interfered "or in any way manipulated the evidence or reports by the Ecuadorian military" in the scheme to cancel the inspection, going so far as to threaten that allegations to the contrary were "are false, irresponsible and defamatory."  I soon learned that Chevron's press release was false and misleading and that the company had lied. As later stated in the government investigative report, Captain Bravo and other Chevron "functionaries" pressured a junior military

---

[44] *See* DX 958-962.

officer to produce a fake "military intelligence report" based solely on information provided by Chevron, and pressured the court *ex parte* a few minutes before its 6 p.m. closing time to cancel the Guanta site inspection. I later learned from one of the government of Ecuador's submissions in an international arbitration that Chevron had secretly sent its technicians to the Guanta site one month before the scheduled inspection and found high levels of cancer-causing chemicals such as Policyclic Aromatic Hydrocarbons (PAHs), which they never reported to the court.[45]

84.     The fact that this inspection was canceled had a devastating impact on our ability to advance the *Aguinda* case and caused a roughly six-month delay in the inspections process. When the Guanta inspection did occur the following year, very few Cofan came. The experience was demoralizing to the Cofan, who had to suffer the added indignity of being falsely accused of posing a security threat to the very oil company that had perpetrated the crimes against them that were prepared to testify about.

85.     This entire episode impacted my perspective on the litigation. It reinforced my suspicion that Chevron's legal team in Ecuador would do anything to undermine the progress of the trial, even if meant engaging in unethical or illegal behavior. I had noticed that teams of army soldiers regularly accompanied Chevron's legal team to site inspections and often served as "mules" by carrying their equipment. On one occasion—during the rescheduled Guanta inspection— Ricardo Reis Veiga and the other Chevron lawyers arrived, accompanied by an armored vehicle akin to a small tank. Several armed soldiers sat on top, wearing dark sunglasses and toting machine guns. To me, this appeared to be Chevron's way of sending the court and the indigenous groups a clear signal about its still-potent influence with the military. The few Cofan who came to the rescheduled inspection told our local counsel that they felt intimidated by the

---

[45] *See* DX 1475-1476; DX 958;DX 605EB..

presence of the armored vehicle and the armed soldiers.  At the judicial inspections, I could see the influence that Chevron's phalanx of military security guards was having on the judge (just as clearly as I could see the guards scowling at my clients and effectively keeping them away from the trial process).  I knew we would never have the connections or resources to compete with Chevron with respect to influence on the military, but I believed that the communities needed to leverage those few areas of power they did have—such as the right to protest—to full effect if they were to have any chance of litigating *Aguinda* on a level playing field.

86.     In another instance, Chevron was able to obtain an entirely improper court order to inspect the HAVOC laboratory based on a series of *ex parte* contacts between the company's lawyers and a court in Quito.  Chevron's *ex parte* contacts in this instance produced a court order that I understood to be illegal (as explained to me by Alejandro Ponce Villacis, one of the Ecuadorian lawyers on our team and a law professor), but also threatened to cripple our ability to litigate the *Aguinda* case.  As I understood it, HAVOC was possibly the last accredited independent laboratory in Ecuador that was willing to work with our team to analyze soil and water samples lifted at the judicial inspections.  The results of the testing of these samples was the heart of the evidence proving Chevron's contamination.  If we lost our relationship with HAVOC, we would have been unable to meet our burden of proof and the valid claims of the communities might have been lost altogether.

87.     Ecuador is a small country and there were a limited number of laboratories available to process soil and water samples.  Budget limitations prevented us from sending the samples to laboratories in the U.S.  All of the Ecuadorian laboratories were heavily dependent on oil companies for their revenues.  As a result, very few were open to working with the indigenous and farmer communities out of fear they would offend their traditional client base.

43

88.     This dynamic was explained to me repeatedly by some of our technical advisors in Ecuador, including Fausto Penafiel and Luis Villacreces.   Both Penafiel and Villacreces were technicians with many years of experience working in Ecuador's oil industry.   We already had lost our relationships with two previous laboratories in Quito that had been processing our samples from the judicial inspections.   Our relationship with the HAVOC lab was therefore of the most critical importance. And I believed Chevron realized this as well.   This is why I assumed at the time that the company targeted the HAVOC lab with an improper judicial inspection based on an *ex parte* court contact.   I believed, based on Chevron's history of corruption in the Ecuador proceedings as documented in part herein, that the primary purpose of the "inspection" was to intimidate the HAVOC lab into not working with our team.   Mr. Fausto Moreno, one of the owners of the lab, told me he had the same impression.   He also told me that Chevron came to the HAVOC lab to perform its inspection with video cameras and members of the media in tow, which further inflamed the situation and caused the lab great embarrassment.[46]

89.     Also affecting my state of mind was that the director of the HAVOC lab told me during this time that Chevron representatives were pressuring his other clients to sever ties with HAVOC.   He saw this as a way to strong arm the lab to drop us as a client.   I knew this to be a classic Chevron tactic that later was employed against other of our allies, including entities such as Amazon Watch and Stratus Consulting.   Mr. Moreno told me he was worried that the publicity related to Chevron's attempted inspection could drive the lab out of business.   That is why we took steps to arrange counsel for HAVOC to oppose the judicial inspection.   It also explains the scene in the movie Crude where, without prior announcement, I enter the office of the judge who issued the inspection order after Chevron's *ex parte* contact.   The fact that a Chevron lawyer,

---

[46] *See* DX 753; DX 605EO; DX 605EP; DX 605EQ; DX605FE; DX605FF; DX605FH.

Diego Larrea, showed up within minutes of my arrival to contest what I was saying simply reinforced the notion in my mind that Chevron had been working its private contacts with the court, and might have corrupted the judge.

90.     I also participated in meetings with potential court-nominated independent experts such as Dr. Richard Cabrera and Fernando Reyes.  As reflected in my personal notes, the purpose of these meetings was to test their desire and capability to do the global damages assessment in light of Chevron's pressure campaign.  As with Chevron's strategy related to the HAVOC lab, I knew that any individual of the few who were eligible to be appointed could expect to be harassed, defamed, and even threatened with bodily harm if they agreed to take on the appointment.  As it turned out, I was prescient.  Almost immediately upon Dr. Cabrera's appointment, Chevron took out numerous paid advertisements in leading Ecuadorian newspapers attacking his qualifications and appointment.  It seemed to me Chevron was trying to drive him off the case.  I later found out from local counsel and from a court filing that Dr. Cabrera's office was robbed of case-related materials.  I also heard reports that Chevron's lawyers and operatives were hostile toward Dr. Cabrera when he was doing his field work.[47]

## VII.   THE CABRERA ISSUE

91.     I have always had a good faith belief that the science and conclusions in the executive summary of the Cabrera report are valid and based on appropriate scientific analysis. Although I often have been confused about the issues involved, I now believe the process used to create the executive summary of the Cabrera report was fundamentally consistent with Ecuador law, custom and practice as it was occurring in the *Aguinda* case.  Certainly, I never understood that any actions I took or of which I was aware at the time were impermissible in Ecuador.    At

---

[47] *See* DX 1306; DX 412-414. DX 1127; DX 1485-1486.

no time did I act with fraudulent or criminal intent.  The court's striking of the Cabrera report was considered by us to be a draconian sanction that hurt our side, not Chevron's.[48]

92.     There were numerous reasons why I believed counsel for the plaintiffs treated Dr. Cabrera in a manner consistent with Ecuador law.  They included: a) both parties had close *ex parte* contact with independent court-appointed experts during the judicial inspections process, which was and remains a common practice in Ecuador; b) both parties had *ex parte* contact with court-appointed experts who were preparing reports independent of the inspections, if the party asked for that report unilaterally, as the plaintiffs did with the global damages assessment; and c) Ecuador law experts have confirmed that parties can have *ex parte* contact with court-appointed experts under any circumstances.  In short, I understood that court experts in Ecuador not uncommonly worked closely with the party that asked for the report the expert was preparing.  We did the same with regard to Dr. Cabrera.

93.     Based on what I observed in Ecuador, my meetings with Dr. Cabrera before his appointment were consistent with what I understood was the practice in the *Aguinda* case and with the rules as I understood them to be.  Both parties consistently lobbied the court for the appointment of independent experts for the evidentiary reports they requested.  According to our local counsel, Dr. Callejas and Chevron's own lawyers were lobbying the judge in *ex parte* meetings to appoint various Chevron experts—including its long-time American expert John Connor—as the single global damages expert, even though the plaintiffs and not Chevron had been the party to request the report.  In other words, Chevron was so aggressive about lobbying for its preferred experts that it wanted Mr. Conner to deliver a court report on behalf of the rainforest communities, a prospect I found utterly absurd.  When the court denied Chevron's

---

[48] *See* DX 1718; DX 416.

request, Chevron accused the court of being biased against it and violating its due process rights, despite the fact that Connor was not capable of being appointed for this expert post under the court's rules, whereas Dr. Cabrera was so qualified.  When the court finally did name Dr. Cabrera as the damages expert, I was aware that Chevron attacked Dr. Cabrera publicly in newspaper advertisements, its lawyers tried to disrupt his work by filing recusal motions against the judge who appointed him, and its technical workers and lawyers treated him rudely when he was doing his field work.[49]

94.      Chevron has questioned why I characterized Dr. Cabrera as "independent" given the role played by Stratus in the drafting of parts of his report.  The reason is simple – Dr. Cabrera, in my mind, was "independent" given that the word is a term of art in Ecuador applied to all court-appointed experts.  This is true whether they are recommended by one party or both, or whether their work involved judicial inspections or thematic evidentiary reports requested by one party.  I understood that Dr. Cabrera, like all court-nominated experts, was expected to work closely with the party that asked for the report.  I understood that at the end of the day, he was to exercise his independent judgment over any draft by signing it if he wished to adopt it, rejecting it if he did not wish to adopt it, or by making any modifications he wished.  It is my belief that all experts appointed by the Court in Ecuador were considered "independent" in that they were obligated to exercise their independent judgment before submitting their reports, even if they worked closely and at the direction of one of the parties and even if one of the parties drafted their report.   I have no knowledge that Dr. Cabrera, who did extensive fieldwork at 49 former Texaco oil production sites, did not exercise his independent judgment when signing his report.

---

[49] *See* DX 412-414; DX 605DV; DX 995; DX 1561; DX 1127; DX 1485-1486.

95.     Also shaping my view was that Chevron would characterize its own paid experts as "independent" when talking about them both publicly and in court filings.   This further reinforced my good faith belief that calling Dr. Cabrera "independent" was appropriate.   For example, on June 25, 2007, Chevron lawyer Larrea filed a pleading with the Ecuador court attaching what he called an "independent" report authored by three Chevron-paid American experts – Dr. Pedro Alvarez, Dr. Douglas Mackay, and Dr. Robert Hinchee.   Another Chevron expert from the U.S., Ralph Marquez, was also touted by the company as "independent".   The company hired Marquez, a former lobbyist for the chemical industry in Texas, to provide what it called in a corporate press release an "independent" assessment of Dr. Cabrera's field work. Chevron met with these experts ex parte, paid 100% of their fees, and the plaintiffs never had contact with them.[50]

96.     Chevron's treatment of Dr. Marcelo Munoz is another example.   Dr. Munoz was a court-appointed independent "thematic" expert requested unilaterally by Chevron during the initial six-day "proof period" in 2003. The court appointed him at Chevron's request, yet under Ecuadorian practice, I understood he was technically an independent court expert.   The plaintiffs had no counterpart for the issue he was studying because they never requested a report on the same topic—just as Chevron never requested the global damages report assigned to Dr. Cabrera. Dr. Munoz described in a court filing an agreement he had with Chevron, reached in an *ex parte* meeting with Chevron engineer Alfredo Guerrero, over a work plan and budget. This is similar to how the plaintiffs treated Dr. Cabrera.[51]

---

[50] *See* DX 610; DX 870-872. *See also* DX 1720.

[51] *See* DX 1067.

97.     When Dr. Cabrera was working, our team tried to keep contacts with him confidential.  There were many valid reasons for this.  Our local counsel was concerned that Chevron would mischaracterize the contacts or file numerous motions to further delay the trial.  Our team also did not want to divulge its litigation strategy to Chevron just as Chevron did not divulge its litigation strategy to the plaintiffs.  Our local counsel advised me that the role Stratus played was the most effective way to ensure that the voluminous scientific evidence was organized properly for presentation to the court in the damages assessment, given the limited time available to do the work.  It was also clear that given the enormous volume of sampling data that had been generated in the trial, Dr. Cabrera (like other experts asked to take on an assessment involving a large amount of data) needed some level of assistance.  The idea was always to do our best to present the valid scientific evidence to the court, assuming of course that Dr. Cabrera based on his own independent assessment would approve of any final product submitted to the court.

98.     Chevron is correct in stating that the plaintiffs paid Dr. Cabrera for work performed.  This was proper as I understood it.  Under Ecuador law, all experts requested unilaterally by a party are paid by that party, and before September 2009, could be paid either through court processes or directly by the party, pursuant to the preference of the expert.

99.     Dr. Cabrera was paid by our team directly on occasion pursuant to his preference and also because at certain times it was impossible to access court processes because the court had been frozen by frivolous Chevron disqualification motions.  Because Dr. Cabrera had to bear significant fixed costs to cover the salaries and expenses of his technical team, I was told that any failure to pay him in a timely manner would cause a severe disruption, such that the trial could be further delayed by months and possibly years.  Worse, our team feared he might refuse to

continue to work with us. I understood that the amounts paid to Dr. Cabrera were entirely reasonable based on work performed.

100. My understanding is that consistent with Ecuadorian procedural rules, all experts were paid for work performed solely by the party that requested the work. My understanding from observations, reading documents, and conversations with Chevron personnel, is that Chevron used the same or similar practices for its court-nominated independent experts from which it sought thematic evidence. Such experts included Marcelo Munoz, Gerardo Barros, and Jose Bermeo. Chevron paid or was obligated to pay these independent court-appointed experts just as the plaintiffs paid or were obligated to pay Dr. Cabrera. By all appearances, Chevron also met with these experts *ex parte*, without the presence of lawyers for the plaintiffs, and helped plan and prepare their reports. Chevron also kept its *ex parte* contacts with court-nominated experts secret from adversary counsel, just as the plaintiffs did. I understood that it was common practice during the *Aguinda* trial for court-nominated experts to be paid directly by the parties and not through the court and to keep their contacts with the parties confidential and undisclosed. Thus, not disclosing every aspect of our team's contacts with Dr. Cabrera seemed consistent with the customary way in which experts were treated during the *Aguinda* trial.

101. In the course of this case I have seen emails of our team discussing a "second account" or "secret account" that was used to hold funds used to pay Cabrera. I don't have any independent recollection of these discussions, and don't recall that they were of any significance. We were so short of money that we could not fully pay staff salaries, vendors, or even basic utilities. (I recall that even the electricity to our building was shut off around that time.) I suspect that the account was "secret" only so as to avoid the negative effect on morale that would

have come if staff learned that significant funds were coming in to pay an expert even while we were telling them there was nothing we could do about paying their salaries.

102.   When the judgment in Ecuador was issued, it became clear the Court had disregarded the Cabrera report in its entirety and rejected Chevron's request that the Court find that the Cabrera report was tainted with fraud or that the selection of Dr. Cabrera was improper. I had mixed feelings about the exclusion of the Cabrera report.  What I did know was that for all the fury generated by Chevron over this issue, the company never has cited a single provision of Ecuador law prohibiting interaction between a party and a court-appointed independent expert in Ecuador.  I have also never seen anything that seriously questions the science or conclusions of the Cabrera report, which are consistent with Chevron's own evidence and internal audit reports as explained herein.[52]

103.   Excluding the Cabrera report was a draconian sanction for the rainforest communities.  As a practical matter, it reduced the amount of damages the court could award and took away our global report on science.  While we were permitted by the court to submit new expert reports, these new reports did not have the same level of breadth and depth as the Cabrera report because of the limited time available to submit them.  This was a blow to our case.  To this day, I believe the executive summary of the Cabrera report represents an accurate, comprehensive, and clear assessment of the scientific evidence documenting Chevron's wrongdoing in Ecuador.  The decision to disregard the Cabrera report was affirmed on two levels of appeal in Ecuador.   In my mind, the so-called "fraud" surrounding the Cabrera report is designed by Chevron to distract attention from its own wrongdoing in Ecuador.  In any event, after the judgment, the Cabrera issue was simply no longer relevant to the Ecuador litigation. I

---

[52] *See* DX 395.

also believe it is not relevant to the RICO litigation in that any errors made, if indeed they were made, had no impact on the final finding of liability and really are questions of Ecuadorian law best decided by the courts of that country.

104.    When Chevron began to allege in U.S. courts that our actions with respect to the Cabrera report were "fraudulent" I became concerned.  For several months I worked with local counsel and U.S.-based counsel to try to reconstruct and analyze what had happened and to talk to Ecuador lawyers to determine if Chevron's allegations that the conduct was wrongful had a basis, or were just the latest chapter in the company's pressure campaign.  As part of this process, I invited Jeffrey Shinder to come with me to Colorado to interview the Stratus principals who were involved in the project.   Shinder was given full and unfettered access to those at Stratus who worked on the Ecuador project and I deliberately stayed out of his meeting with Douglas Beltman that he describes in his testimony, so as not to influence Shinder's due diligence.  Shinder is mistaken when he testified I was present in his meeting with Beltman. I was present in the law office where the meeting took place, and Shinder and I spoke briefly immediately after he exited that meeting.[53]

105.    During this time, I asked my then associate, Laura Garr, to travel to Ecuador to interview local counsel and find documents in the court record that might shed more light on what exactly happened with Dr. Cabrera given Chevron's allegations.  I traveled myself to Ecuador for the same reason in 2010, as did my colleague, Aaron Page.  The email I wrote in April 2010 (PX 1291) is an accurate reflection of my thinking at the time, which generally concluded that there were two main schools of thought regarding how the Ecuador court might

---

[53] *See* DX 1478.

treat Chevron's complaints about the issue.  Even at the time I wrote that email, the issue seemed open to differing interpretations.

106.    After writing PX 1291, I spoke or wrote to numerous people about the Cabrera report.  I did not want to mislead anyone, but I also did not want to create the impression that what we had done was wrong, because I did not believe it was.  For months after writing PX 1291 and continuing up to and through my 1782 depositions, I was trying to avoid being on the defensive about the Cabrera issue so that our side had the opportunity to reconstruct the facts, investigate the law in Ecuador, and map out a thoughtful strategy for the various U.S. litigations relating to the issue.

## VIII.  CALMBACHER

107.    Mr. Calmbacher was a technical expert hired to assist with judicial inspections. In November of 2004, Mr. Calmbacher provided his data for the judicial inspection of a well site called Sacha Norte 4.  The sampling data clearly showed elevated levels of barium, lead and chromium in violation of Ecuadorian norms. In November of 2004, Mr. Calmbacher provided a number of signed cover pages for reports directly to individuals in the Quito office. They were not given to me.

108.    Sometime in the beginning of 2005, Mr. Calmbacher told me that he had fallen ill from his stay in Ecuador. Because of his illness, I was worried that he would not complete his reports on time and we would miss the court-ordered deadline for submission of two of his reports. If that happened, all of the money we had spent on the judicial inspections would be lost and I felt we would lose credibility with the court at the very outset of the judicial inspections process.  I expressed my frustration to Mr. Calmbacher and explained that if he did not provide his report by the deadline, we would not be able to pay his outstanding bill, since Mr.

53

Calmbacher would have breached our agreement.  I spoke to David Russell about my concerns.  Mr. Russell also conveyed my concerns to Mr. Calmbacher on March 1, 2005 and explained to Mr. Calmbacher that "it was in his [Mr. Calmbacher's] interest" to sign the documents and send them to me.  Mr. Russell was as agitated as I was and noted "I don't know what is happening."  On March 3, 2005, I wrote to Mr. Calmbacher again and reminded him that "the report is due next week."  Mr. Calmbacher had previously given us permission to have Monica "(or someone else) sign with power of attorney or [his] authorization, if that is acceptable."  Mr. Calmbacher also had agreed in the past to sign "several" pre-designed forms to be used for the various reports.  In June of 2005, Mr. Russell confirmed that Mr. Calmbacher had "reviewed and signed off on the reports, and even edited them, although others prepared them."  Specific emails show that Dr. Calmbacher reviewed, edited, and approved final drafts of the reports only days before they were submitted to the Court.  From here, Chevron appears to allege, without any specific details, that the reports were changed.  I deny that I changed or participated in any plan to change the reports after Dr. Calmbacher approved them, and am aware of no such conduct by our team.[54]

109.    I never changed any of Dr. Calmbacher's reports or writings without his knowledge.  To my knowledge, no one on our team did either.  I do recall that Dr. Calmbacher was very difficult to work with, particularly after he got sick.  We worked hard and in good faith to find ways for him to complete his technical obligations to the Court, even though he refused to return to Ecuador.  (I recall being told by Ecuadorian counsel that there was no way to replace him as an expert once he had been nominated and appointed by the Court.)  I am aware that Dr. Calmbacher has testified he finished all work and communications with our team in late 2004,

---

[54] *See* DX725-DX735; DX 1381; PX 721, DX723, PX 3203.

but I have numerous work-related emails from him well into 2005.  This is consistent with my recollection that Dr. Calmbacher often displayed poor memory and incoherent thinking.

110.    Ultimately, Dr. Calmbacher was terminated for missing the deadlines on his first two reports and other unprofessional conduct.  For these reasons, we only agreed to pay part of his fee while he demanded all of it.  The dispute quickly became bitter, and in a series of emails and phone calls he attacked me personally and threatened me if I did not pay him.  In one email, he demanded that I "pay up" in order to not "start a war," because "[w]ars have no rules and people can suffer irreparable professional, psychological and physical damage as a result. You don't want that."  I never "paid up" pursuant to such demand.[55]

IX.    **DAVID RUSSELL**

111.    In October 2003, Mr. Russell went to Ecuador for almost two weeks as a technical consultant to the plaintiffs.  During that time he toured the concession area, visually inspected dozens of pits, and was provided with and reviewed a considerable amount of data, including historical records and maps.  I asked Mr. Russell to prepare a rough cost estimate for remediation.  Given the theories of the case, and the early stage of the proceedings, I appropriately instructed him to assume: (a) that the claim was for remediation and compensation to particular landowners for the value of specific property damage; (b) that Texaco was potentially liable for all the contamination in that specific region, since the only other operator was Petroecuador and we had various theories of joint and several liability in the case; and (c) the claim was for a complete and full remediation to restore the environment as much as possible to its original state, just as would be done with respect to contamination in any populated site in

---

[55] *See* DX 1382.

the United States. I told him that I believed that the clean-up for the affected communities should be as comprehensive as it would be for an American in a wealthy suburb in California, for example. I asked Mr. Russell to keep that goal in mind when creating his estimate.

112. After traveling through the Napo Concession and reviewing various sites, Mr. Russell spent several days in Lago Agrio working on his calculations before providing me with a signed report. I did not interfere with his calculations or conclusions, and Mr. Russell's report made sure to note the limitations and assumptions underlying his estimate. Mr. Russell also agreed to testify at the trial phase of the case the following year.[56]

113. In late 2004, we had a strategy meeting in New York. At that meeting, Mr. Russell explained that analyzing samples for BTEX and GRO petroleum components was not likely to be useful because even if the samples drew from Texaco's contamination, those components were likely to have volatized or dispersed in the intervening time period. Moreover, we suspected that Chevron would use any of our findings of BTEX or GRO as evidence for its theory that we were finding Petroecuador contamination rather than Texaco contamination. (That said, I recall being told that it was possible to find BTEX and GRO in older Texaco contamination if the contamination was sufficiently sealed off from the environment, as some of it was; moreover, we were asserting various legal theories such as joint and several liability that could make sample results from more recent Petroecuador contamination of legal significance.) In any event, I recall that the conclusion of the conversation was that if we were looking for a sample analysis that would more precisely evidence the scope of Texaco's contamination, testing for total TPH was the more appropriate test to use. It was also more useful because it was the same measurement regulated by Ecuadorian laws and most comparative international laws.

---

[56] *See* PX 2414.

Accordingly, we adopted a focus on sampling for TPH more than BTEX or GRO, although we still kept a balanced portfolio of chemical analyses.

114.    By 2005, we had a budget shortfall (as would happen repeatedly over the course of the case) and were having trouble continuing to fund the case.  We could not pay Mr. Russell's outstanding bills and he was furious enough that we had several heated arguments. Mr. Russell soon filed a lawsuit against Joe Kohn and me. The lawsuit was ultimately settled but my relationship with Mr. Russell was destroyed.

115.    On February 14, 2006, I received a cease and desist letter from Mr. Russell.  In his letter, Mr. Russell wrote that he believed that the affected area could be remediated for a lower cost than he had previously estimated.  He asked that we stop associating his name or his company with the *Aguinda* lawsuit.  The next day, I sent a lengthy email fully informing the entire Quito office of Mr. Russell's letter and requesting that our technical team in Ecuador "prepare a preliminary report with costs in the coming days" so that "we would have something written and official" to use as a basis for our estimate for the remediation cost.  I believed that this new cost estimate would be more accurate since it would be based on "evidence that came [comes] out of the trial that Russell does not know." I confirmed that "the major issue in the case is: which is the amount and costs of reparation. The least important issue is whether or not there is contamination: that has been proven." As I stated to our entire team and our allies "Our principle is simple – a total restoration of the environment, in an effective way, with cheapest costs possible consistent with that principle. We have no interest in increasing the figure unnecessarily."[57]

---

[57] *See* PX 763, PX 741; DX 738.

116.    The next day, February 16, 2006, I prepared a detailed response to Russell, which I shared with our entire team, including our U.S. technical experts and our friends at Amazon Watch.  I sent the response in hard copy to Mr. Russell.  I and others on the team wondered if Mr. Russell had somehow been "bought" by Chevron.  I noted the response of our lead U.S. technical expert, Dr. Ann Maest, which was that it was "odd" that Mr. Russell "staked his name and credibility on his cost estimate, yet he has not revised it with a new estimate based on different assumptions."  As mentioned below, our concerns about Mr. Russell being potentially compromised by Chevron were not unfounded.  In any event, because Mr. Russell's withdrawal of his estimate seemed only thinly if at all based on any new facts, our impression was that the withdrawal was primarily motivated by Chevron pressure and that the appropriate response from our side was to ensure that our estimates were roughly accurate using alternative sources.  By February 21, 2006, we had received a new cost estimate from our Ecuadorian technical team. That same day, I sent the new report to American expert Bill Powers, asking him to "read Fausto [Penafiel]'s report and tell me if the numbers add up. This is urgent."  I also sent it to Ann Maest and Mark Quarles stating, "PLEASE READ the attached. It is a new cost assessment by [F]austo to replace the one by Russell in case we bump into problems with journalists."  Bill Powers provided me with edits from the technical team and stated that "Mark (referring to Mark Quarles) has signed-on as one of the authors which is outstanding."[58]

117.    On February 22, 2006 Simeon Tegel of Amazon Watch confirmed to me that Amazon Watch had "now taken down the Russell report from chevtox [the website ChevronToxico]."  Mr. Tegel confirmed our position that we were getting a new cost report that

---

[58] *See* DX 741-747.

was "likely to give higher figures than Russell (we therefore prefer both their scope and anticipated results)" based on the most recent data adduced as evidence.[59]

118.    On April 15, 2006, we received a more detailed cost assessment from our Ecuadorian technical team led by Fausto Penafiel.  This report estimated the remediation cost at over \$15 billion.  This estimate was described to me as a "reasonable" and "fair" number based upon a careful analysis of the existing data.  On April 16, 2006, in response to some further inquiries I had about this report, a junior attorney who had worked extensively on technical issues re-analyzed the data and told me that "based on our current numbers, the remediation proposal will come in at about \$20 billion."  The junior lawyer provided me with a lengthy document and Excel spreadsheet setting forth the basis for this analysis.  I was told that the team had "made every effort to be reasonable, while creating a remediation that eliminates as much contamination as possible" and the number provided was not "propaganda."  I told the team on April 16, that the report "sounds like some pretty sophisticated, evolved analyses. I am most impressed."  The team decided at that time to not release this new cost estimate to the public but rather to use it internally to support our remediation estimates.[60]

119.    On August 15, 2006, Mr. Russell wrote me again and complained that the ADF had posted his cost estimate again. I responded immediately and said "No problem. I will contact the Frente to have that removed" and I did.[61]

120.    After receiving Mr. Russell's cease and desist letter, we took steps to not cite Mr. Russell on the ChevronToxico website "as a source for a damage assessment," which was my

---

[59] *See* DX 749.

[60] *See* DX 730; DX 731; DX 753; DX 1484.

[61] *See* DX 788; DX 1484; DX 753.

understanding of his demand on us.  So, while we continued to reference the lawsuit as a $6 billion case, we tried to not cite Mr. Russell.

121.    I never gave Mr. Russell permission to discuss this case with Chevron, or to provide samples from the concession area to laboratories.  Although Mr. Russell told me in February 2006 that he "would never discuss [our] internal strategies and deliberations under any circumstances," I later learned in discovery that he had in fact been doing just that for some time with Chevron representatives, and was even pitching Chevron to hire him to "prepare a study to revise the cost estimate down."[62]

## X.    JUDGE YANEZ

122.    Chevron accuses me and the client representatives of improperly pressuring Judge German Yanez by threatening to file a complaint against him at a time when he was "reeling from charges of trading jobs for sex in the court."  In fact, the documents Chevron draws from to make this allegation demonstrate that our team had nothing to do with a sexual harassment complaint against Judge Yanez.  We were aware of the sexual harassment complaint, and certainly discussed it, but we had no role in initiating it.  We had a different problem with Judge Yanez:  he was not acting on pending motions, and the case was not moving due to his inability to discharge his duties effectively in the face of Chevron's pressure to paralyze the court.  Our complaint was based entirely on procedural law issues with respect to Judge Yanez's handling of the case and was unquestionably legitimate.  Chevron itself filed complaints and recusal motions almost constantly.  In my memoir notes—the only piece of evidence Chevron cites for the notion that the Afectados Representatives' actions were improper—I described the situation with dramatic flair.  In fact, while I know we were aware of the sexual harassment complaint against

---

[62] *See* DX 745; DX 729.

Yanez, and I believe he was aware of our intention to file a complaint (which we said on the record, and which was preceded by numerous on the record complaints in the action itself), I have no recollection of myself or anybody on our team actually linking the two before Judge Yanez and have no reason to believe that he saw them as linked.  I believe the description in my memoir notes was a dramatic spin on what were otherwise much less intriguing facts in the process.  I never threatened Judge Yanez or any other judge that we would file a complaint against that judge if he did not rule in our favor.[63]

## XI.   **MISCELLANEOUS**

123.    With respect to the testimony of Troy Dahlberg, the "Commitment Amounts" portions of Mr. Dahlberg's declaration bear no relation to reality.  There were many discussions about funding that never materialized, and it looks as though Mr. Dahlberg took any reference to a discussion of funding as evidence of a "commitment," which is not true.  Similarly, the "Evidence of Payments" portions of Dahlberg's declaration bear no relation to reality.  Again, it looks as though Mr. Dahlberg took any evidence of a discussion of payment and added it into the "Evidence of Payment" column, regardless of whether payment was actually made.  The figures in these sections are simply not accurate.  I also never funded the movie Crude as Mr. Dahlberg asserted.

124.    I disagree with Mr. Dahlberg's characterization of my finances and his suggestion that being disorganized is an indicia of fraud.  This is a tautology.  Being organized could also be seen as an indicia of fraud.  In any event, each of my bank accounts served a legitimate purpose.

125.    With respect to the testimony of Jeffrey Shinder, as noted above I did not participate in the meeting between him and Douglas Beltman.  Mr. Shinder also mentioned the

---

[63] *See* DX 882-888; DX 1028.

hotel he and I were staying at in Colorado.  That hotel was across the street from the Stratus office and his bill was $227.05 per night.[64]

~~126.   At stated at the outset, this statement is neither comprehensive nor exhaustive.  In the limited time available to me, especially in light of my obligations as counsel of record and co-counsel on a legal team consisting almost entirely of lawyers with no more than a few months' experience on the mass of underlying facts and law, I have not been able dedicate sufficient time and resources to fully respond to all the issues that I might.  I respectfully reserve the right to address any issues I may have missed in a supplemental filing of this statement or an additional statement and to address any such issues in direct testimony before the esteemed Mr. Mastro's highly anticipated cross-examination.~~

127.   As stated, it is impossible for this statement to be fully comprehensive.  Many other documents and facts are relevant to the issues discussed here.  Nonetheless, I believe that the facts stated herein establish the fundamental truth of my testimony: I did not bribe any judge; I did not commit extortion, nor employ wrongful means for a wrongful purpose to pressure Chevron; I did not commit fraud nor did I ever have any fraudulent or corrupt intent in any of my actions with respect to the *Aguinda* case.  All of my efforts on the *Aguinda* case have been made in good faith to achieve a just result for my clients, while working through the challenges of operating in a foreign jurisdiction and legal culture, on a case that was unprecedented in that jurisdiction,  while operating under constant pressure of lack of resources, and faced with the aggressive and corrupt litigation and out-of-court pressure tactics of Chevron.  I am proud of what the rainforest communities have accomplished in Ecuador and I object to this Court's attempt to intervene in the rulings of the Ecuadorian judicial system.

---

[64] *See* DX 1478.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 17, 2013.

Steven Donziger